# EXHIBIT 2

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA HAND DELIVERY**

August 26, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

In accordance with this Court's July 26, 2011 Order (MDL Docket No. 2450), Plaintiffs submit this letter brief in support of their request for sanctions pursuant to Fed. R. Civ. P. 37(b) against defendants, Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"), for their refusal to obey this Court's April 12, 2011, April 26, 2011, and June 23, 2011 discovery Orders. Given the defendants' complete disregard for this Court's explicit directives, and their pattern of obstructionist conduct throughout the discovery process, Plaintiffs respectfully request that the Court enter default judgments against the MWL and IIRO, as a lesser sanction will not remedy the defendants' misconduct.

## 1.     PROCEDURAL HISTORY

Consolidated merits discovery commenced as to the MWL and IIRO in 2005. Since that time, Plaintiffs' efforts to obtain meaningful discovery from those defendants have been frustrated by a range of improper tactics employed by the MWL and IIRO to avoid their discovery obligations under the Federal Rules. These tactics have been discussed at length in prior filings and include: (1) significant delays in responding to discovery requests; (2) disregarding Judge Daniels' December 21, 2007 Order directing the defendants to respond to Plaintiffs' discovery requests in accordance with his determination that "the appropriate temporal scope of discovery should reasonably begin in 1992;" (3) failing to substantiate undue burden

The Honorable Frank Maas
August 26, 2011
Page 2

and expense objections; (4) misleading this Court and the Plaintiffs about their abilities to electronically search for and retrieve responsive documents; (5) failing to honor agreements reached after lengthy meet and confers; (6) unfulfilled promises to promptly produce significant amounts of responsive materials; (7) repeatedly recycling previously produced documents and representing them as new productions; and (8) reasserting in the context of recent discovery disputes arguments and objections that had previously been overruled by the Court. These evasive and abusive practices have required the Plaintiffs to expend significant amounts of time and resources in an attempt to obtain the most basic discovery, and have further forced the Plaintiffs to seek this Court's assistance on several occasions to resolve these discovery disputes.

This pattern of misconduct prompted Plaintiffs to file two targeted discovery motions between March and April of this year, seeking to compel production of several specific categories of documents of particular importance and relevance to this litigation. In doing so, Plaintiffs sought to ensure that the defendants' resources were dedicated at this stage to retrieving materials of greatest significance to Plaintiffs' claims, and to provide a focused setting for evaluating the defendants' fidelity to their discovery obligations. Following extensive briefing and argument, the Court broadly granted Plaintiffs' motions to compel via Orders issued on April 12, 2011 and April 26, 2011. At a subsequent hearing on June 23, 2011, Plaintiffs presented evidence that the MWL and IIRO had failed to comply with those Orders, and the Court then issued a supplemental Order directing the MWL and IIRO to fully comply with the Court's earlier Orders by July 8, 2011. In issuing that supplemental Order, the Court expressly warned the MWL and IIRO of the potential that a failure to fully comply with the Court's Orders by July 8, 2011 could lead to case dispositive sanctions.

As demonstrated below, the MWL and IIRO have manifestly failed to comply with the Orders issued on April 12, 2011, April 26, 2011, and June 23, 2011. Indeed, the defendants' own internal documents reveal that both organizations have failed to produce wholesale categories of documents plainly within the scope of the Court's Orders, despite the Court's explicit admonition that continuing non-compliance would lead to sanctions. Further, statements by the defendants' own designated representative, Sameer al Radhi, reveal that no effort has been undertaken by the MWL and IIRO to search locations where responsive materials are certain to exist. The breadth of these omissions reveal a conscious disregard for the Federal discovery rules and this Court's authority, and warrant entry of judgments by default against the MWL and IIRO.

A.     **The Defendants Have Failed to Obey This Court's April 12, 2011 Order Entered Pursuant to Federal Rule of Civil Procedure 37(a)**

On March 16, 2011, Plaintiffs submitted a motion seeking an order from this Court compelling defendants MWL and IIRO to abide by agreements reached during a lengthy meet and confer held earlier in the litigation, and immediately produce all responsive materials relating to eight (8) categories of documents requested by the Plaintiffs. In the interests of

The Honorable Frank Maas
August 26, 2011
Page 3

---

brevity, Plaintiffs incorporate by reference their letter submissions of March 16, 2011 and April 7, 2011 in support of that motion, attached hereto as Exhibits 1 and 2.[1]

The categories of documents sought by the Plaintiffs through that motion, (which the defendants had originally agreed to produce on an expedited basis in October 2007), were:

1.  Annual, semi-annual, and other periodic financial reports of the MWL and IIRO (including the branch offices), such as annual reports, balance sheets, financial statements, bank account summaries, audits, etc;

2.  Lists of recipients of aid from the MWL or IIRO offices, to include lists which can be generated through any computer or electronic data storage systems of those organizations;

3.  All documents related to the annual Constituent Council ("Council") of the MWL, including without limitation, reports submitted by internal and external offices of the MWL and IIRO, studies and research papers considered during the annual Council meetings, records relating to the activities of Special Committees of the MWL and/or IIRO, transcripts or records of speeches and discussions during the Council meetings, resolutions and recommendations of the Council, agendas, etc.;

4.  Annual or periodic reports concerning the objectives and activities of the MWL and/or IIRO;

5.  Reports authored by delegations or groups sent by the MWL and/or IIRO to assess conditions and needs in regions outside of Saudi Arabia;

6.  Reports submitted by the field offices of the MWL and/or IIRO concerning their operations and finances;

7.  Summaries of disbursements by the MWL and IIRO; and

8.  Documents describing the organizational structure of the MWL and IIRO, including documents relating to the relationship between the various offices of those organizations and the relationship between the MWL and IIRO more generally.

*See* Exhibit 1.[2]

---

[1] Plaintiffs' Exhibits Nos. 1-58 are attached to the Affirmation of J. Scott Tarbutton, Esq. Attaching Exhibits in Support of Plaintiffs' August 26, 2011 Letter Application Requesting Rule 37(b) Sanctions Against Defendants Muslim World League and International Islamic Relief Organization.

[2] On April 5, 2011, subsequent to the filing of the motion to compel but prior to the hearing concerning same, the defendants produced approximately 2600 documents, in an apparent attempt to give the appearance of some good faith inn the discovery process. That production consisted of 2,412 pages of documents and three brochures relating to the opening of an Islamic Cultural Center in Madrid, totaling another 212 pages. Plaintiffs expended significant time and resources to translate and analyze the production of mostly Arabic documents. Ultimately, the lengthy

The Honorable Frank Maas
August 26, 2011
Page 4

On April 12, 2011, this Court granted Plaintiffs' motion to compel and ordered the defendants to produce, within thirty (30) days, all responsive documents relative to the eight categories of information. *See* Affirmation of J. Scott Tarbutton, Esq., Exhibit "A" – April 12, 2011 Discovery Hearing Transcript, pp. 41-42 (hereinafter referred to as "Tarbutton Affirmation").[3]

Notwithstanding the Court's direct Order, that deadline passed without any production by the MWL or IIRO, and without any communication from Mr. McMahon's office concerning the required production. Belatedly, the defendants eventually produced 846 pages of documents on May 20, 2011, a mere fraction of the responsive materials in the possession, custody, and control of the MWL and IIRO. Indeed, the production included absolutely no documents responsive to several of the eight categories of documents the Court directed the defendants to produce, and a number of the documents that were produced had been artificially generated by copying text from the MWL's website. *See* Plaintiffs' June 16, 2011 letter to Mr. McMahon (identifying the numerous problems with the defendants' May 20 production), attached hereto as Exhibit 3.

## B.     The IIRO Refuses to Obey this Court's April 27, 2011 Order Entered Pursuant to Federal Rule of Civil Procedure 37(a)

On March 24, 2011, Plaintiffs filed an additional motion to compel, seeking several additional targeted categories of documents directly relevant to the activities and relationships that prompted the U.S. government and United Nations to designate several branches of the IIRO as terror support organizations pursuant to Executive Order 13224. Specifically, the motion sought to compel production of any and all documents concerning:

1.     the IIRO's relationship with, and employment of, al Qaeda co-founder Wa'el Hamza Jelaidan, including all transfers of money between the IIRO and Jelaidan;

2.     the IIRO's relationship with, and employment of, al Qaeda member Mohammed Jamal Khalifa, including Khalifa's role in heading the IIRO's office in the Philippines;

3.     the U.S. Department of the Treasury's Executive Order 13224 designations of the IIRO's branch offices in the Philippines and Indonesia "for facilitating fundraising for al Qaida and affiliated terrorist groups;"

4.     all operations of the Philippines and Indonesia branch offices, including but not limited to, bank account records, investment records, identification of employees, and contributions received and disbursements made by the offices;

---

evaluation of these documents revealed that 1,781 of the 2,412 pages had previously been produced by the IIRO. Thus, 74% of the documents produced on April 5 were recycled documents produced earlier in the litigation.

[3] Plaintiffs' letter Exhibits A-D are attached to the Affirmation of J. Scott Tarbutton, Esq. Transmitting Documents in Support of Plaintiffs' August 26, 2011 Letter Application Requesting Rule 37(b) Sanctions Against Defendants Muslim World League and International Islamic Relief Organization.

The Honorable Frank Maas
August 26, 2011
Page 5

_____

5.  the U.S. Department of the Treasury's Executive Order 13224 designation of Abd al Hamid Sulaiman al Mujil, the IIRO's Executive Director of the Eastern Province branch, for using "his position to bankroll the al Qaida network in Southeast Asia," including all documents relating to al Mujil's tenure with the IIRO and the transfer of IIRO funds authorized by him and/or the Eastern Province Branch;

6.  statements for all bank accounts held by the IIRO within the Kingdom of Saudi Arabia and abroad; and

7.  the expulsion of IIRO personnel from Pakistan following the September 11, 2001 attacks for their links to al Qaeda.

*See* Plaintiffs March 24, 2011 and April 21, 2011 letter submissions, attached hereto as <u>Exhibits 4</u> and <u>5</u>. Plaintiffs similarly incorporate by reference the underlying procedural history leading to this dispute, which can be found in the aforementioned exhibits.

Oral argument on the Plaintiffs' motion was held on April 26, 2011, during which the Court sent a clear message to defense counsel that he must take a greater role in connection with his clients' discovery responsibilities. The Court stated:

> I do think this is the type of stage of the case where you or somebody on your behalf needs to sit down with the folks who are responding to these requests and hold their hand to a certain extent and describe in greater detail what needs to be searched for. It's somewhat inconsistent to say, we have developed this massive index and, yet, not produce documents that relate to the employment of some of these individuals, directives they may have given or received and the like.

> And I recognize that, as Mr. Carter pointed out, there is a significant disconnect between that which was requested and that which has been received. And I'm not so naïve to think that perhaps it won't persist. I hope it doesn't. But if it does, I suppose that will lead to additional motion practice. And if the IIRO or any other defendant has failed to produce documents that manifestly are within its possession, custody, or control, that may lead to consequences that that particular defendant doesn't care for.

*See* Tarbutton Affirmation, Exhibit "B" – April 26, 2011 Discovery Hearing Transcript, p. 20.

The Honorable Frank Maas
August 26, 2011
Page 6

_____

The Court subsequently issued an Order granting the Plaintiffs' March 24, 2011 Motion to Compel, subject to two limited exceptions,[4] and directed the IIRO to produce all responsive documents by June 13, 2011. *See* April 26, 2011 Order (MDL Docket No. 2424), attached hereto as <u>Exhibit 6</u>. No documents were produced by the IIRO on or before the June 13 deadline, nor has there been any production since that due date.

### C.   <u>The Defendants Have Failed to Obey This Court's June 23, 2011 Order</u>

In light of the defendants' utter failure to comply with this Court's Orders of April 12 and April 26, Plaintiffs were compelled to again seek once again the Court's intervention at a discovery conference held on June 23, 2011. After hearing lengthy presentations from both sides concerning the matter, the Court expressly warned counsel for the MWL and IIRO of the possibility of sanctions for their continued refusal to abide by the Court's prior orders:

> What inevitably may happen in this case is that if responsive documents are not produced, and Mr. Carter and his colleagues are able to show that the documents exist and should be produced [. . .] If they make a sufficiently persuasive showing, your clients may be faced with the prospect that I issue case-dispositive sanctions.
>
> So, I will let you finish talking but I just wanted you to understand my concerns and where we collectively may all be headed.

*See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, pp. 9-10.

The Court explicitly mentioned the possibility of the entry of default judgments:

> I think I have made my position clear which is that if a persuasive showing can be made that MWL and IIRO have not fully complied with the ruling that I made on April 12 and April 26, those organizations may be facing a more formal motion that I would entertain which if my recommendation were to be accepted by Judge Daniels might lead to the entry of default judgments against those organizations.

*Id.* at pp. 17-18.

Counsel for the MWL and IIRO conceded on the record during the June 23 hearing that he was fully aware of the possibility of sanctions and that he had specifically advised his clients of the Court's warnings. *Id.* at p. 11.

_____

[4] The Court declined to compel production of all documents concerning the Afghan jihad, but invited Plaintiffs to reformulate that request. In addition, as to the banking records sought through Plaintiffs' March 26 motion, the Court limited the scope of production to those banking records it previously directed the defendants to produce via its April 12 Order. The Court otherwise granted the application in its entirety.

The Honorable Frank Maas
August 26, 2011
Page 7

Before adjourning the conference, the Court instructed the defendants that they must produce all documents by July 8, 2011 to bring themselves into complete compliance. *Id.* at p. 20. *See* June 23, 2011 Order (MDL Docket No. 2442), attached hereto as <u>Exhibit 7</u>.

Although Plaintiffs subsequently received two disks from defense counsel on July 8, even those belatedly produced documents fell far short of satisfying the defendants' obligations. The first disk contained MWL documents totaling approximately 1,274 pages. That limited production represented but a fraction of the documents that should have been produced in accordance with the Court's Orders, and broadly omitted entire classes of documents, including but not limited to: bank account records (including account records for MWL and IIRO branch offices in the Kingdom and abroad); financial, budgetary, and activity reports submitted to the Constituent Council from the MWL and IIRO departments and branch offices; special committee reports submitted to the Constituent Council; monthly and annual financial reports prepared by each defendant's finance department; delegation reports; and underlying financial and account documentation relied upon by auditors employed by the MWL and IIRO. In sum, nothing about the defendant's July 8 production can be characterized as a good faith attempt to comply with this Court's Orders.

The second disk produced on July 8 on behalf of the IIRO fairs no better. Totaling 769 pages, the materials included in that disk were simply a reproduction of documents that had been previously produced on May 20, 2011, but now included updated bates numbers.[5] *See* <u>Exhibit 8</u> (July 7, 2011 email from Mr. McMahon asking Plaintiffs to treat them as a replacement set). In other words, the IIRO did not supplement its production at all following the June 23 conference.

At a discovery conference on July 13, 2011, Plaintiffs again raised the failure of the MWL and IIRO to satisfy the Court's directives, and the Court invited Plaintiffs to move for sanctions. *See* July 26, 2011 Order (MDL Docket No. 2450), attached hereto as <u>Exhibit 9</u>.

## II.   APPLICABLE LAW

Fed. R. Civ. P. 37(b)(2)(A)(vi) states:

> If a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>
> *          *          *
>
> (vi) rendering a default judgment against the disobedient party.

---

[5] Documents produced on May 20, 2011 were stamped with bates numbers that were duplicative of bates numbers tagged to documents produced early in the litigation. The July 8 production was merely a correction of that mistake.

The Honorable Frank Maas
August 26, 2011
Page 8

The "imposition of litigation-ending sanctions under Rule 37 is a matter of judicial discretion." *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 640 (1976); *Microsoft Corp. v. Computer Care Ctr.*, No. 06-1429, 2008 U.S. Dist. LEXIS 112080, *10 (E.D.N.Y. April 8, 2008); *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (J. Maas) (stating "Under Rule 37, the Court has 'broad authority to impose sanctions' for such discovery misconduct."). The Court of Appeals for the Second Circuit has repeatedly recognized "the importance of appropriate sanctions as a necessary means of dealing with a recusant party." *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). The availability of severe sanctions, such as dismissal of an action or entry of a default judgment, is "necessary to achieve the purpose of Rule 37 as a credible deterrent rather than a 'paper tiger.'" *Id.* Such sanctions are routinely imposed and are justified for discovery abuse because "discovery orders are meant to be followed." *Bambu Sales, Inc. v. Osak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995). As this Court stated in *MCI Worldcom Comm., Inc. v. Gamma Comm. Group, Inc.*, 204 F.R.D. 259, 262 (S.D.N.Y. 2001), courts "do not look favorably upon parties that fail to respond to court orders or remain silent in the face of repeated discovery requests."

When considering a motion for a default judgment pursuant to Fed. R. Civ. P. 37(b) for failure to obey a discovery order, a district court is guided by the following factors: "(a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Am. Cash Card Corp. v. Amcash New York W. Corp.*, 184 F.R.D. 521 (S.D.N.Y. 1999); *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009).

## III.   THE LIMITED NUMBER OF DOCUMENTS PRODUCED BY THE MWL AND IIRO IN THESE PROCEEDINGS DO NOT MATCH THE BREADTH AND SOPHISTICATION WITH WHICH THESE GLOBAL ORGANIZATIONS OPERATE

Full appreciation of the depth of the defendants' conscious disregard for this Court's Orders requires an understanding of the defendants' organizational structures, internal financial and operational protocols, and record-keeping and reporting procedures. Contrary to the proposed excuses the defendants have offered for their non-compliance with discovery obligations – e.g., that the MWL and IIRO are unsophisticated and poorly organized entities – their own internal documents make absolutely clear that both organizations are highly centralized and sophisticated global enterprises, with internal controls and record-keeping protocols that rival those of a well run multi-national corporation. It is thus evident from the very nature of these organizations that they have made no meaningful effort to comply with their discovery obligations and this Court's specific Orders.

### A.   Establishment of the MWL and IIRO

The MWL (a/k/a Rabita Al-Islam Al-Islami) was established by the Kingdom of Saudi Arabia on May 18, 1962. Centrally located in Makkah (a/k/a "Mecca"), Saudi Arabia, the MWL has several thousand employees and maintains offices in more than forty-four (44) countries

The Honorable Frank Maas
August 26, 2011
Page 9

throughout the world – including branches in Bangladesh, Indonesia, Kenya, Nigeria, Pakistan, the Philippines, Russia, Sudan, Somalia, and Tanzania, among others. Although the MWL has sought in the context of this litigation to characterize itself as a simple "charity" engaged in "humanitarian" and "relief" activities, its own web profile reveals that it is primarily dedicated to the propagation of Wahhabi Islam. According to the MWL's own description, the focus of its activities include: (i) propagating the religion of Islam; (ii) persuading individuals, communities, and state entities to abide by the rules of Sharia (Islamic law); (iii) establishing Islamic bureaus, information centers, schools, and mosques to further Islamic purposes; (iv) supporting efforts to promote and raise the standard of the Arabic language; (v) coordinating the activities of Islamic activists throughout the world; and (vi) providing emergency relief to individuals affected by war and natural disasters.[6]

To fulfill the MWL's objectives to promote Wahhabi Islam around the world, the IIRO (a/k/a Hay'at Al-Igatha Al-Islamiyya Al-Alamiyah) was founded following a decision adopted at the 20th session of the MWL Constituent Council in 1978, pursuant to Royal Approval No. 4834, primarily to serve as an operational arm of the MWL (although the MWL carries out operations on its own as well).[7] The IIRO's headquarters are located in Jeddah, Saudi Arabia, and it maintains more than 100 offices in the Kingdom and abroad. *See* Declaration of Saleh Abdullah al Saykhan, Manager of the Financial Administration of the IIRO, at Exhibit 10. Through this network of offices, the IIRO has carried out operations in more than 120 countries, operating in numerous conflict regions such as Afghanistan, Albania, Bangladesh, Bosnia, Chechnya, Ethiopia, Indonesia, Kenya, Kosovo, Lebanon, Nigeria, Pakistan, Sudan, Tanzania, Uganda, and Yemen. *Id.*; *see also* IIRO Annual Report for 2000-2001 at Exhibit 11, pp. 89-109. These activities reportedly include providing assistance to victims of war and natural disasters, sponsoring health, education, and social projects, and providing financial and technical support to a number of economic development efforts. *Id.*

**B.    Funding**

Both the MWL and IIRO rely extensively on the Kingdom of Saudi Arabia to fund their operations. In a November 2000 interview with the Saudi newspaper Okaz, MWL Secretary General Abdullah al Turki confirmed that the Kingdom holds "an important and fundamental role in supporting the League, providing over 90% of its budget."[8] Indeed, documentation produced by the MWL in these proceedings shows that the organization received 100 million Saudi Riyals from the Saudi government for fiscal year 1994, and 80 million Saudi Riyals in 1997 (more than 90% of its budget for each of those years).[9] The IIRO similarly depends on the Kingdom for much of its operational funding. *See* "Reasons for Order," The Minister of Citizenship and Immigration and Mahmoud Jaballah, Docket DES-6-99, Federal Court of

---

[6] http://www.themwl.org/Profile/default.aspx?l=EN.

[7] According to Dr. Ahmed Mohammed Ali, a former Secretary General of the MWL, the MWL provides "humanitarian assistance" through the arms of the IIRO. *See* Ahmed, Iftikhar, "*Counter Anti-Islam Propaganda, Says MWL Sec-General*," Moneyclips (May 6, 1995).

[8] Okaz, November 2, 2000.

[9] MWL005346 and MWL005350-5351.

The Honorable Frank Maas
August 26, 2011
Page 10

Canada, November 2, 1999,  p. 13 (stating that the IIRO receives 70% of its funding directly
from the Saudi government.).

## C.    Organizational Structure

Given the complex nature of these organizations and the magnitude of their global
activities, it is not surprising to learn that the MWL and IIRO are highly centralized
organizations with well-defined financial, operational, reporting and administrative structures in
place to oversee their world-wide operations.  Indeed, each of the defendants has created a
sophisticated hierarchical structure of departments to efficiently manage the various aspects of
running a large and multifaceted international organization, and maintain control over their
offices throughout the world.

As set forth in the attached hierarchical chart at Exhibit 12 ("Plaintiffs' Investigative
Document"),[10] the MWL's Constituent Council is considered to be the highest authority in the
MWL and is directly responsible for establishing the organization's policies. *See also*
Declaration of Ali Muhammad al Kamal, Manager for the Financial Affairs Division of the
MWL, attached hereto as Exhibit 13.  Chaired by the Grand Mufti of Saudi Arabia, the
Constituent Council "is to conduct and supervise the affairs of the League, and it is the Council's
right to delineate the League's policy, and determine its course in such directions as would lead
to the realization of its objectives in the best interest of Islam and Muslims." *See* MWL
Constitution at Exhibit 14 ("Plaintiffs' Investigative Document").  The MWL's daily operations
are conducted and supervised by its General Secretariat, which is headed by a Secretary General
appointed by the Constituent Council based on a nomination by the government of Saudi Arabia.
*See* Exhibit 13.

To carry out the various policies and objectives defined by the Constituent Council, the
MWL has created a number of departments within the organization, including but not limited to
the following:  (i) a finance department (which includes accounting and auditing); (ii) a property
and assets department; (iii) a media department; (iv) a public relations department; (v) a
publications department; (vi) a study and research department; (vii) an employee affairs
department; (viii) an international conventions and organizations department; (ix) a mosques and
Islamic collaboration department; and (x) a da'awa[11] and teaching department. *See* Exhibit 12
("Plaintiffs' Investigative Document").

The IIRO has similarly constructed a well defined hierarchy of departments and offices to
assist its Secretary General carry out the necessary policies and goals of the organization.  Those
offices include: (i) finance, budget, investment, and auditing departments; (ii) a media and
information department; (iii) a public relations department; (iv) local and external offices
departments; (v) social welfare, healthcare, and education departments; (vi) a research and

---

[10] The term "Plaintiffs' Investigative Document" shall mean a document that has been obtained by the Plaintiffs
through their independent investigation, and not produced by the defendants.
[11] Da'awa is an Arabic term used to refer to efforts to propagate or proselytize Islam.

studies department; (vii) a donations department, and several other departments crucial to the organization. *See* IIRO Administrative Structure Chart at Exhibit 15.

### D.   Organizational Control

To ensure that the defendants' goals and objectives are consistently met, the MWL and IIRO have designed and implemented a number of elaborate control systems that impact just about every aspect of their operations, including: employee conduct (both in the Kingdom and abroad), banking and financial activities, assets and resources, communications (internally and externally), public relations and messaging, fundraising and donations, collaboration with international aid associations, distribution of charitable aid (monetary and non-monetary), publication and dissemination of magazines, books, newsletters, and other materials, and relationship building with international bodies and foreign states. These organizational control mechanisms, viewed by the MWL and IIRO as fundamentally important to their overall success, provide leadership with constant oversight over the organizations' activities, both in the Kingdom and in the branch offices abroad.

### 1.   Required rules and regulations.

To achieve the level of organizational control demanded by their leadership, the MWL and IIRO have enacted a number of rigid and systematic rules and regulations that set forth the required behavior and responsibilities of their employees and offices at all levels. The following examples are illustrative:

- The MWL Secretary General shall appoint the employees for League's offices. *See* MWL005132.

- At the beginning of every fiscal year, the Secretary General shall publish a resolution detailing the allocations to all of the MWL overseas offices and Islamic centers it is running. *See* MWL005139.

- The MWL General Secretariat shall prepare a detailed report on the MWL's activities over the past fiscal year, and shall have records of all of its activities (bank accounts, income, expenses, donations, and scholarships). *See* MWL005143.

- Every MWL office shall have organized documentation for every employee, including his photograph, I.D. or passport, employment records, and other documents relating to his appointment. *See* MWL005313.

- MWL office managers may not make a decision regarding a financial undertaking not already identified in the annual budget without written consent from the authorized entity within the MWL General Secretariat. Moreover, any available funds that are beyond the scope determined in the annual budget may not be spent

The Honorable Frank Maas
August 26, 2011
Page 12

_____

without written consent from the authorized entity within the MWL General Secretariat. *See* MWL005320.

- Every MWL office is required to maintain ledgers, including but not limited to, a bank account ledger, a fund ledger, a daily items ledger, a registry for properties (fixed assets), and a ledger for the office purchases officer. *See* MWL005324.

- IIRO overseas offices are required to meticulously keep historical, academic, and media documentation relating to the offices' activities, projects, and plans. *See* IIRO001219.

- Delegations shall not be received in the IIRO overseas offices nor acknowledged without receiving prior written consent from the IIRO Secretary General. *See* IIRO001219.

- Islamic appearance and morals must be kept, in speech and in action, and all employees must be encouraged to keep them. *See* IIRO001219.

- The IIRO Secretary General must be notified of all donations received by each overseas IIRO office, which must be deposited into the office's bank account. *See* IIRO001219.

- In the event that an employee tenders his resignation, it will be given to the IIRO Secretary General along with documents providing details on the employee, his work, and the office's position as to whether or not to accept the resignation. *See* IIRO001219.

- An IIRO employee may not attend any convention, course, or activity without receiving prior written permission from the IIRO Secretary General. The employee must undertake to submit a written report when receiving permission to attend the activity. *See* IIRO001220.

- No bank account may be opened without prior consent of the Secretary General. *See* IIRO001220.

These rules and regulations are regularly reviewed, debated, and updated by MWL and IIRO leaders to maintain the desired level of control and oversight.

## 2. Departmental and branch office reporting requirements.

One of the primary methods by which the MWL and IIRO maintain close supervision over their operations is through robust and regular reporting from all levels of their organizations. For instance, the MWL Constituent Council relies upon detailed reporting in order to supervise the affairs of the MWL, as well as to consider, debate, and establish the organization's policies. It is well-documented that during each annual conference hosted by the Council, it will receive and review numerous reports, including: reports regarding the activities

The Honorable Frank Maas
August 26, 2011
Page 13

of all of the MWL offices (both in the Kingdom and abroad); MWL financial reports, including reports on MWL bank accounts; reports regarding MWL delegations to foreign countries, including trips by the MWL Secretary General; reports submitted by special committees of the Council; and reports relative to the IIRO's achievements and activities. *See* Exhibit 16 ("Plaintiffs' Investigative Document"); *see also* MWL005130 (the MWL Constituent Council will examine reports submitted to it by the Secretary General, review the MWL's annual budget, and approve the League's annual bills).

Reporting from the MWL and IIRO branch offices similarly provide their headquarters with the ability to closely monitor the financial, administrative, and operational activities of those offices. Per the directives of officials in the Kingdom, the branch offices *must* regularly transmit reports back to the office of the Secretary General regarding their employees, revenues and expenses, loan activities, donations, and various projects undertaken in the name of the charities. The following examples are noteworthy:

- MWL overseas offices must submit a report on their activities every three (3) months to the MWL Secretary General. *See* MWL005132.

- MWL office managers must present the MWL General Secretariat with annual performance assessment reports for each employee or officer. *See* MWL005308.

- MWL overseas offices must submit a monthly report detailing its expenditures as set forth in the annual budget. *See* MWL005323.

- IIRO overseas offices are required to submit monthly reports on the office's performance, plans, projects, and employees. *See* IIRO001219.

- IIRO overseas offices are required to send technical and financial reports to the headquarters regarding on-going projects. The reports must detail the type of project, the estimated financial cost, the estimated timeframe for accomplishing the project, and payments and expenses already issued and/or accumulated. *See* IIRO000687-688.

- Local IIRO offices within the Kingdom are required to report on all donations arriving in their offices. *See* IIRO000222-223.

- Local and overseas IIRO offices have been asked to report on all loan activities to the IIRO financial department on a regular basis. *See* IIRO000383-385.

- IIRO overseas offices are required to submit annual reports to the IIRO Secretary General regarding their employees' performance. Annual reports signed by the branch office's employees, attesting that they have received their salaries, must also be prepared and sent to the IIRO Secretary General. *See* IIRO001221.

- In the event an overseas IIRO office is closed down, the IIRO Secretary General must be updated on the instructions from the host government relative to the

The Honorable Frank Maas
August 26, 2011
Page 14

---

closing, the nearest Saudi embassy should be notified, and reports regarding the balance of cash in the bank and in the office's funds must be prepared. *See* IIRO001222.

Required reporting relative to all bank accounts opened in the name of the MWL and IIRO is strictly enforced to ensure perpetual oversight over the entities' funds, as seen in the following examples:

- A report must be submitted every three (3) months to the MWL Secretary General regarding the MWL's accounts. *See* MWL005150.

- A special independent bank account will be opened for sums transferred to the overseas offices that are not allocated within the office's budget. The documentation from this account will be separated from any other expenditure documents when sent to the MWL General Secretariat in order to avoid overlap in the accounts. The General Secretariat should receive copies of the bank statements every month. *See* MWL005322.

- At the end of every fiscal year, the MWL General Secretariat shall receive a bank statement detailing the balance of the account on the last day of the year. *See* MWL005323.

- IIRO offices are required to send a report to the IIRO chairman for every account opened abroad under the name of the IIRO or a name intended to protect the organization's money. *See* IIRO000209-213.

- IIRO offices are required to send bank statements on a monthly basis to IIRO headquarters. Moreover, no IIRO bank account is opened without approval from the IIRO headquarters. *See* IIRO000983.

- When opening a separate bank account for revenue, the IIRO offices are required to report the account to the IIRO Secretary General. *See* IIRO001532.

In addition to the required reporting from the organizations' local and overseas offices, the MWL's and IIRO's various departments are required to prepare and submit their own reports detailing their activities:

- The MWL's Financial Affairs Department is responsible for preparing the MWL's monthly and final financial reports. *See* MWL005431.

- The MWL's Financial Affairs Department is responsible for submitting a bi-annual financial report to the MWL Secretary General regarding the MWL's financial state. *See* MWL005492.

The Honorable Frank Maas
August 26, 2011
Page 15

- The MWL's General Department for International Relations and Conventions is responsible for preparing reports on the working conditions of the MWL overseas offices. *See* MWL005446.

- The MWL's Islamic Cultural Department must submit an annual report on its activity to the MWL Constituent Council. *See* MWL005487.

- The MWL's Islamic Minorities Department is responsible for preparing an annual report on the department's activities. *See* MWL005494.

- The MWL's Student Affairs Department is responsible for preparing an annual report on the department's activities. *See* MWL005497.

- The MWL's Islamic Organizations Department is responsible for preparing an annual report on the department's activities. *See* MWL005499.

- The IIRO's Finance Department is responsible for submitting accounts reports, as well as submitting periodic reports relative to the financial performance of the IIRO. *See* IIRO000163.

As the foregoing clearly demonstrates, robust and meticulous reporting concerning banking, financial and operational activities is a primary mechanism through which the MWL and IIRO leadership maintain tight control and supervision over every aspect of their global operations.

### 3.    MWL and IIRO delegations.

Another prominent method by which the defendants maintain close oversight of their operations and activities around the world is by organizing and sending groups of MWL and IIRO representatives to foreign countries and overseas offices where the organizations purport to carry out, or intend to carry out, humanitarian or other activities.  During the relevant time period, MWL and IIRO delegations have been sent to Abkhazia, Argentina, Austria, Azerbaijan, Burma, Bosnia-Herzegovina, Cameroon, Chad, Egypt, Ghana, Indonesia, Kashmir, Kazakhstan, Lebanon, Libya, Malaysia, Montenegro, Niger, the Philippines, Russia, Serbia, Somalia, Sudan, Switzerland, Tajikistan, Uzbekistan, Venezuela, and many other countries around the globe.  *See* MWL005530-5819; *see also* <u>Exhibit 17</u> (MWL Constituent Council urging more delegations to sections of the world where Muslim minorities live) (MWL005663); <u>Exhibit 18</u>, IIRO 1996 Annual Report, p. 17 (the IIRO's Department of External Offices arranges periodic "field visits to overseas offices to inspect humanitarian activities.").

Importantly, these delegations are responsible for preparing reports regarding their trips outside of the Kingdom and submitting them to leadership, consistent with the reporting requirements mentioned above.  *See* MWL005587, MWL005633, MWL005750; *see also* <u>Exhibit 16</u> ("Plaintiffs' Investigative Document") (The MWL Constituent Council reviewed files and

The Honorable Frank Maas
August 26, 2011
Page 16

_____

reports regarding the MWL Secretary General's trips to Bosnia, Ethiopia, Sudan, and other countries.)

### 4. Accounting and auditing requirements.

Accounting and auditing have also been critical tools employed by the MWL and IIRO to provide them with reliable and accurate information regarding their finances. For example, one of the main priorities of the IIRO's Department of Finance is to supervise the accounts of the IIRO and audit them accordingly. *See* Exhibit 18, IIRO 1996 Annual Report, p. 19. After "meticulously auditing" the accounts, the auditors are further responsible for preparing and presenting quarterly and periodic reports to the IIRO's Board of Directors and Secretary General. *See* IIRO000560 at Exhibit 19.

### E. Document and Information Archiving And Computer Usage

The level of sophistication with which these defendants conduct their operations is further demonstrated by the methodical control, maintenance, and care over any and all documentation and information in their possession. For example, the cataloguing, archiving, storage, and retrieval of files, publications, and reporting are an essential aspect of the MWL's operations:

- The MWL's Press and Publications Department, which is responsible for overseeing the publication of the organization's Arabic and English magazines and other periodicals, includes an archive section which stores the various publications. *See* MWL005375-5377.

- The MWL's Administrative Tracking Department, which is responsible for organizing visits to the MWL offices, preparing reports on these visits, and then submitting them to the Secretary General, is also tasked with organizing the files so that information can be easily retrieved. *See* MWL005414.

- The MWL Secretary General's office includes a document tracking unit which is responsible for filing materials pertaining to the Secretary General's instructions, decisions, and transactions. *See* MWL005476.

- The MWL's General Office is responsible for keeping copies of transactions in special files which are organized and cataloged. *See* MWL005498.

The use of computer information systems to record, organize, and store valuable operations information has been a vital tool used by the MWL and IIRO for many years. Contrary to the defendants' assertion to this Court that they "did not begin using computers in their home and field offices until after 1996,"[12] there is compelling evidence that computer systems were being used by the MWL and IIRO as far back as the 1980's. For instance, the

_____

[12] *See* Martin McMahon's November 7, 2007 letter submission to the Honorable George B. Daniels at p. 6, attached hereto as Exhibit 20, p. 6.

The Honorable Frank Maas
August 26, 2011
Page 17

_____

MWL has proudly boasted the successes of its decision to implement a plan in October 1983 to construct an expansive information system using computers, microfilm, microfiche, and printers to gather and preserve documents and information relating to the activities of the organization. *See* relevant sections from the MWL's 25-year anniversary book titled, "The Islamic World League In 25 Years, May 1962-1987:  Achievements And A Look To The Future," at pp. 104-105, attached hereto as Exhibit 21 ("Plaintiffs' Investigative Document").  According to the MWL:

> One of the goals on which the Muslim World League was established, as it strived to improve its performance so that it would be commensurate to its growing role and ever multiplying responsibilities, is serving organizations and providing them with all kinds of assistance possible.  It was from this perspective that the League saw the importance of establishing the information system (computer) and (Micro-fiche).  This step was taken at the beginning of the year 1404H (1983G), with the aim of filing the gathered and renewable information to use it in serving the Islamic faith throughout the world.

Various references in the limited documentation produced by the MWL during discovery further corroborate the organization's reliance on computer technology (prior to 1996) to aid its operations, including information sharing with the IIRO and World Assembly of Muslim Youth ("WAMY"):

- The MWL's Information Center, in collaboration with the IIRO, WAMY, and Islamic Development Bank, formed a committee to coordinate the organizations' efforts in the field of data gathering, including the development of a management database system to share information.  *See* MWL005374.

- Pursuant to an April 4, 1989 memorandum from the MWL Secretary General, urgent aid should be given to the Computer Center for improvements to its operations.  *See* MWL005466.

- Pursuant to an April 4, 1989 memorandum from the MWL Secretary General, the Computer Center fulfills a significant role in organizing materials, as well as keeping them in a manner that facilitates the retrieval and reproduction of materials.  *See* MWL005469.

- Pursuant to an April 4, 1989 memorandum from the MWL Secretary General, there is an urgent need to formulate a plan for the expansion of the Computer Center and its services.  *See* MWL00547366.

- A December 29, 1992 resolution signed by the MWL Secretary General, stating that Computer Department is subordinate to the Information Center.  *See* MWL005401-5402.

The Honorable Frank Maas
August 26, 2011
Page 18

---

- A November 28, 1995 resolution signed by the MWL Secretary General, stating that the Manager of the Computer Department will now be referred to as the Manager of the Information and Library Department.[13]  *See* MWL005398-5400.

The IIRO similarly began using computer systems to record and store information sometime in the 1980's.  During an October 19, 1989 meeting of the IIRO Council, the Chairman of the IIRO's Committee for Computerization and Information Development, Dr. Faysal Iskandarani, advised the Council of the Committee's recent achievements, including the purchase and installation of an integrative computer network in the various IIRO departments. Dr. Riyadh Arafa, the Director of the IIRO's Computer and Information Center, also attended the meeting.  *See* Exhibit 22 and Exhibit 23 (October 12, 1988 internal IIRO memorandum to the Supervisor of Social Welfare requesting the replacement of older computers and the need for more memory (RAM) for other computers).

Buried within the largely unresponsive documents produced by the IIRO during the early stages of discovery are additional references indicating that the computer systems implemented by the IIRO allow it to search easily and quickly for information and documentation when necessary, contrary to the representations the IIRO has made in this litigation.  For example, Dr. Ahmad Mohammad Ali, the Secretary General of the MWL, sent a letter to the IIRO on January 30, 1995, requesting that the IIRO investigate whether it had ever received aid from the University al-Jihad.  On February 10, 1995, just ten days after receiving that inquiry, the Secretary General of the IIRO, Dr. Farid Yassin Qurashi, wrote to Dr. Ali, and represented as follows:

> I hereby wish to inform you that *after checking our archives and computer*, no aid whatsoever was found to have been given in the past by the above-mentioned university.  (emphasis added).

*See* IIRO00690; *see also* IIRO00668 (letter dated February 9, 1995 from Dr. Samir Bin Yahya al Mu'abir (Director of IIRO's Educational Program) to the IIRO general comptroller, stating that the archive listings and the IIRO's computers did not have evidence of the aid the organization provided to the University al-Jihad).

Moreover, the IIRO has been very candid regarding its use of computer systems as a necessary and important aspect of its daily activities, particularly as it relates to employee training and shipping.  *See* IIRO's 1996 Annual Report at Exhibit 18, p. 18 (the IIRO's Department of Warehousing and Shipping uses "computer programmes to record bills of lading, and to produce freight reports"), and p. 21 (the IIRO's Training and Development Centre offers computer courses in Excel, Windows, and Microsoft, as well as computer management and administration).

---

[13]  It should also be noted that an analysis of six (6) MWL computers previously seized by the FBI and provided to the Plaintiffs for inspection during an October 2007 meet and confer in Washington D.C. revealed that one of the computers (an Apple McIntosh) contained files dating back to 1987, while another contained files dating back to June and September 1995.

The Honorable Frank Maas
August 26, 2011
Page 19

_____

The careful recording and organization of data and information is a critical aspect of the MWL's and IIRO's operations, particularly given the defendants' practice of self-promotion via their books, magazines, journals, newsletters, and annual reports which are routinely published and disseminated in the Middle East and around the world. The meticulous collection and storage of such information, including the ability to search for, obtain, and use the data quickly when needed, has allowed the organizations to provide detailed reporting of their accomplishments at all levels. *See generally* IIRO Annual Reports for 2000-2001 (IIRO000331-441) and 2002-2003 (IIRO000553-650) at Exhibit 11 and Exhibit 24 respectively (using detailed charts, graphs, and pie charts to account for monetary fundraising, spending, projects, and humanitarian activities in countries all over the world). *See* IIRO000342-347 and IIRO000563 (identifying the exact amount of Saudi Riyals raised by each IIRO office in the Kingdom); IIRO000420-435 and IIRO000633-649 (identifying the exact amount of Saudi Riyals spent by each overseas office on specifically identified projects (i.e., running hospitals; subsidizing orphanages; constructing Islamic cultural center; digging wells). *See also* December 1999 MWL Journal at Exhibit 25 ("Plaintiffs' Investigative Document"), pp. 40-42 (detailed reporting on the humanitarian achievements of its subsidiary organization, the IIRO, with the precise number of houses built in Bangladesh, the precise number of Muslims who benefited from meals supplied by the IIRO, the exact amount of Saudi Riyals spent on distributed meals, and the precise number of wells that were dug).

**F.     The Number of Documents Produced by the MWL and IIRO After Almost Six Years of Discovery is a Mere Fraction of the Responsive Documentation and Information Currently in Their Possession, Custody, and Control**

As the foregoing demonstrates, the MWL and IIRO are large, complex, and sophisticated organizations that rely on well-defined and elaborate control systems, to include systematic and regular reporting protocols, to maintain strict oversight and supervision over thousands of employees in hundreds of offices, countless projects and activities in foreign countries around the globe, and numerous banking and financial accounts in the Kingdom and abroad.[14]

By definition, the scope of documentation that should have been produced by the defendants in response to this Court's Orders must bear some logical relationship to the scale of their global operations, and requirements of their own internal protocols concerning financial, banking, and operational reporting. That is manifestly not the case.

Shockingly, since merits discovery was initiated in late 2005, the MWL and IIRO have produced only 6,395 and 4,839 pages of bates-numbered documents respectively, and

_____

[14] Interestingly, early in these proceedings, counsel for the MWL and IIRO often sought to stress to the Plaintiffs that these elaborate controls established by the defendants were too substantial to allow even a few dollars to mysteriously disappear into the hands of Osama bin Laden, al Qaeda, and/or affiliated terror organizations. Counsel's characterizations in fact led the Plaintiffs to request the relevant eight (8) categories of documents specified in their July 21, 2008 letter to Mr. McMahon, pursuant to the understanding that they would be readily retrievable based on the descriptions of the reporting requirements by counsel. *See* Exhibit 1.

The Honorable Frank Maas
August 26, 2011
Page 20

_____

approximately 2,700 pages of loose documents.[15] Just as egregious, almost 2,000 pages of this production from the defendants were merely recycled, duplicative copies of documents produced early in these proceedings. *See* Footnote no. 2 supra. Given the financial, banking and reporting protocols of the MWL and IIRO, and the scope of their global operations, it is self evident that the productions made by those defendants represent a mere fraction of the responsive documentation in their possession, custody and control.

The severity of the defendants' non-compliance with this Court's Orders is further evidenced by the following specific examples of documents within the relevant categories that should have been, but were not, produced in response to those Orders. These examples are drawn from evidence within the defendants' own documents as well as Plaintiffs' independent investigative efforts, and are by no means exhaustive.

IV.   **DEFENDANTS' POSITION THAT THEY HAVE COMPLIED WITH THIS COURT'S DISCOVERY ORDERS AND PRODUCED ALL MATERIALS RESPONSIVE TO CATEGORIES 1-8 IS DIRECTLY CONTRADICTED BY THEIR OWN RECORDS**

Faced with the reality of case terminating sanctions, the MWL and IIRO have represented to this Court that all documents responsive to the 8 categories they were directed to produce on April 12, 2011 have in fact been produced, and challenged Plaintiffs to produce evidence to the contrary (effectively challenging Plaintiffs to prove a negative). *See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, pp. 10-11 ("It's our position that we have produced everything now."); and p. 13 ("To reiterate, we believe we have produced everything that is responsive to 1 to 8 for MWL and IIROSA.").[16] Unfortunately for the defendants, their own discovery documents belie those hollow and misleading statements and provide persuasive evidence in support of Plaintiffs' contention that the MWL and IIRO continue to withhold massive numbers of responsive documents in their possession, custody and control, in blatant violation of this Court's discovery orders.

A.   **A Significant Amount of the Defendants' Financial Reporting Remains Unproduced**

By Order dated April 12, 2011, this Court directed defendants MWL and IIRO to produce, within thirty (30) days, all documentation and information responsive to Plaintiffs' Category No. 1 request – *annual, semi-annual, and other periodic financial reports of the MWL and IIRO (including the branch offices), such as annual reports, balance sheets, financial statements, bank account summaries, audits, etc.* Although both of the defendants have

_____

[15] Counsel also made available for inspection several boxes of materials that had been seized by the FBI during a raid of the MWL's New York office and later returned. Those materials were not produced in response to the Orders at issue herein, but rather years before. What is notable about those materials is that they confirm that the external offices do store and maintain significant records.

[16] It is worth noting that after making those representations at the June 23, 2011 hearing, the MWL produced an additional 1,274 pages documents purportedly responsive to the 8 categories, thereby acknowledging that the representation made at the June 23 hearing was inaccurate.

The Honorable Frank Maas
August 26, 2011
Page 21

produced a handful of generic, end of the year financial statements, there remain significant omissions in those productions. Indeed, the defendants' own documents make it very clear that the MWL and IIRO rely upon, and are therefore in possession of, a variety of financial reporting that are directly responsive to the Plaintiffs' document request and remain unproduced.

**1.  Financial reporting originating from the defendants' finance departments.**

The MWL and IIRO Finance Departments, entrusted with overseeing all financial aspects of the organizations and their branch offices, are directly responsible for preparing and submitting periodic financial reporting to their leadership. For example, a 1997 document produced by the MWL, bearing bates number MWL005431, confirms that the MWL's Financial Affairs Department is responsible for preparing the organization's *monthly* and final financial reports. *See* Exhibit 26; *see also* Exhibit 27 (May 2, 1995 letter from the MWL's Finance Department Manager to the IIRO General Supervisor enclosing a donation for the Chechen mujahideen and requesting an update on the IIRO's plans to provide the Chechen mujahideen with financial aid). Similarly, the IIRO's 1996 Annual Report states that the IIRO Finance Department performs the "preparation and analysis of accounts records and its related reports," and further submits periodic reports on the IIRO's financial performance. *See* Exhibit 18, p. 19. Again, although the defendants produced a handful of generic year end financial statements and annual reports, their productions did not contain the systematic financial reporting of their respective Finance Departments (such as the monthly financial reports prepared by the MWL Finance Department), as described in their own documents.

**2.  Financial reporting submitted to the MWL Constituent Council.**

It is well documented that during each annual conference hosted by the MWL Constituent Council, the Council will be presented with a number of reports detailing the financial activities of the MWL and IIRO. *See* Exhibit 16 ("Plaintiffs' Investigative Document") (Executive Summary of the 37th Conference of the MWL Constituent Council, held on April 10-11, 2002, identifying that the Council was presented with the MWL's financial reports and a summary of its accounts for the years 1998-1999 and 1999-2000); Exhibit 28 (same) (MWL005594); *see also* MWL005130 (the MWL Constituent Council will examine reports submitted to it by the Secretary General, review the MWL's annual budget, and approve the League's annual bills). To date, the defendants have failed to produce the financial packages submitted to the MWL Constituent Council (although directly responsive to multiple categories within the scope of the Court's April 12 Order).

**3.  Financial reporting relating to the defendants' auditing practices.**

The MWL and IIRO place a heavy emphasis on auditing as an important accounting tool to provide the defendants with close oversight of their financial activities. Indeed, documents produced by the defendants in these proceedings show that the MWL and IIRO regularly audit their offices, both in the Kingdom and abroad. Underwhelming at best, the limited documentation fails to include any of the underlying financial data and other reporting which the

The Honorable Frank Maas
August 26, 2011
Page 22

auditors consistently rely upon to conduct their analyses – information the Plaintiffs have repeatedly made clear they want.

For instance, the MWL has produced a mere twenty-seven (27) pages of documents regarding their accounting and auditing practices for 1992-1997. *See* MWL005344-5370. In addition to various charts summarizing the MWL's expenses, income, and assets, the production includes correspondence from the auditors confirming that they reviewed financial reporting and account information to conduct their analysis. *See* Exhibit 29 (June 18, 1995 letter from Issa El Ayouty & Co. Accountants & Auditors to the MWL, stating that their auditing personnel reviewed income and expenditure account information prepared by the MWL's financial center, as well as the financial statements and records). *See also* Exhibit 30 (June 24, 1999 letter from the Kingdom's General Comptroller to the MWL Secretary General advising that an audit revealed that some institutions did not report donations in their records, and requesting that detailed reports of the donations be sent). Of course, missing from the MWL's production is the actual financial and account reporting presented to the auditors.

Documents from the IIRO similarly confirm that financial documentation reviewed by the IIRO's auditors has not been produced. As but one example, a report concerning an audit of the IIRO's Indonesia branch for the period May 2006 to July 2006 confirms that the auditor reviewed books, records, accounts and annual financial statements. *See* Exhibit 31. None of these underlying financial documents have been produced. More significantly, it should be noted that the IIRO's internal guidelines require that every office outside the Kingdom retain an outside auditor to conduct an annual audit of the branches' financial activities. *See* Exhibit 34 (Articles 126-128 set forth the duties and responsibilities of the branch office auditors, including financial reporting requirements). Thus, it follows that there are audits and related financial documents for each of the IIRO's many branch offices, all of which are within the possession, custody and control of the IIRO. However, for many of the branches, Plaintiffs have never received a single audit or financial statement.

In addition to the independent auditing of the individual branches, the IIRO's auditing department routinely authors and submits auditing reports to organizational leaders. *See* relevant sections of the IIRO's Constitution specifically stating that the duties of the Internal Auditor include submitting reports to the IIRO President and Secretary General, attached hereto as Exhibit 32. *See also* Exhibit 19 (IIRO's 2002-2003 Annual Report at p. 8, detailing the IIRO's Internal Audit Post-Payment office ("IAP") and the Chartered Auditor which are responsible for "meticulously auditing the accounting documents" and submitting periodic reports to the IIRO Board of Directors).[17] The IIRO's production also fails to contain anything resembling the full reporting generated by the Internal Auditor, IAP and Chartered Auditor.[18]

---

[17] *See also* IIRO001371-1385 (1998-1999 correspondence between the IIRO Deputy Financial Auditor and the IIRO Secretary General regarding the financial auditor's report); IIRO001561 (July 1998 correspondence from the IIRO Internal Auditor, Awad Alamah, to the IIRO Secretary General regarding disposal of receipts), IIRO001576-1577 (September 1997 document from the IIRO Overseas Offices Committees discussing changes to regulations regarding the dispatch of auditors); IIRO001616-1619 (1989 correspondence from the Director of the IIRO's Audit Department discussing auditing of accounts); IIRO001645 (the IIRO's internal accountant speaking of the importance of internal auditing of IIRO's accounts); IIRO001810 (minutes of the 5th Convention of the IIRO

The Honorable Frank Maas
August 26, 2011
Page 23

Because generic year end summaries and final audit reports do not contain meaningful details on their own, Plaintiffs have made clear throughout discovery that it is this underlying financial documentation that the Plaintiffs are most interested in receiving from the defendants. Acutely aware of the Plaintiffs' frustrations, the Court made this very point to defense counsel of its own initiative:

> The Court: But they didn't want the auditor's report, they want the underlying documents.
>
> Mr. McMahon: Oh no, I know, Your Honor.

*See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, p. 30.

Notwithstanding the Court's instructions, the MWL and IIRO have not produced the underlying financial documents reviewed by the auditors.

### 4.  Financial reporting relating to the branch offices' bank accounts and other financial activities.

Plaintiffs have additionally not received the requisite financial reporting demanded of the defendants' branch offices regarding their bank accounts and other financial activities. For example, documents produced by the MWL confirm that the branch offices are required to transmit copies of bank statements to League headquarters every month, as well as reporting on the MWL's accounts every three (3) months. *See* MWL005322 and MWL005150 at Exhibits 33 and 34 respectively. The offices are further required to send detailed reporting regarding their monthly purchases, receipts, and payments, in addition to a monthly report detailing the office's expenditures as set forth in the annual budget. *See* MWL005325 and MWL005323 at Exhibits 35 and 36.

The office of the IIRO Secretary General has similarly instructed all of the overseas office managers to submit periodic reporting regarding the office's banking activities, including

---

Executive Committee discussing the examination of the auditor's report); and IIRO001816 (January 1, 2002 letter from IIRO Secretary General Basha to the MWL Secretary General al Turki advising that the Executive Committee decided to postpone the discussion on the candidates for the auditors of the external offices, preferring to pass the matter on the auditor's office of Nadhir Banqa, who are the auditors of the General Secretariat). *See also* IIRO001818-1838 (October 1999 correspondence from the IIRO Secretary General to various accounting firms requesting proposed estimates to conduct audits of IIRO branch offices in Egypt, Jordan, Sudan, Mauritania, Thailand, Bangladesh, Ethiopia and Nigeria).

While the IIRO seems content to produce multiple pieces of correspondence discussing its auditing practices, the Plaintiffs have yet to receive any of the important financial records connected to the audits of the branch offices identified above, much less any documentation relating to any audit of the IIRO General Secretariat conducted by the office of Nadhir Banqa.

[18] Sameer al Radhi confirmed for the Plaintiffs that the MWL and IIRO auditors would be required to review financial records in order to develop their reports. *See* Transcript of June 23, 2011 Hearing, p. 30.

The Honorable Frank Maas
August 26, 2011
Page 24

required reporting for every account opened abroad under the name of the IIRO or a name intended to protect the organization's money. *See* IIRO001219-1223 at <u>Exhibit 37</u>; (IIRO001532) (when opening a separate bank account for revenue, the IIRO offices are required to report the account to the IIRO Secretary General). *See also* IIRO000209-213.

As the foregoing demonstrates, the defendants' assertion that it has produced all responsive financial reporting is clearly contradicted by their own documents which show the existence of extensive and multi-faceted reporting in their possession. Because the defendants' refusal to produce the requested information after almost six years of discovery and several Orders issued by this Court may be characterized only as volitional, it warrants severe sanctions.

### B.  <u>Defendants Have Failed to Comply With the Court's Orders Directing Them to Provide Responsive Bank Account Records</u>

Per its April 12, 2011 Order, the Court directed the MWL and IIRO to produce all bank statements relating to accounts maintained by those organizations for the period 1992-2004. Earlier in the litigation, the MWL had produced limited and select documentation concerning bank accounts maintained by its London office at National Commercial Bank, Saudi American Bank, NatWest, and Midland Bank for approximately years 1996-2000. On June 21, 2011, counsel for the MWL and IIRO advised that he had received original dot matrix printouts relating to the accounts of the MWL and IIRO at National Commercial Bank and al Rajhi Bank for the years 1995-2000.[19] Again, those records represent a small portion of the responsive materials which should have been produced in accordance with the Court's Order.

As detailed above, the branch offices of the MWL and IIRO maintain local bank accounts as a necessary condition of carrying out operations outside of the Kingdom. Each branch office is required to submit detailed reporting to the Saudi headquarters concerning every such account. *See* <u>Exhibit 34</u> (a report must be submitted every three (3) months to the MWL Secretary General regarding the MWL's accounts) (MWL005150); <u>Exhibit 33</u> (documentation from the special independent bank account will be separated from any other expenditure documents when sent to the MWL General Secretariat) (MWL005322); and <u>Exhibit 38</u> (every MWL office is required to maintain a bank account ledger and a fund ledger) (MWL005324). *See also* <u>Exhibit 31</u> (no IIRO bank account is opened without approval from the IIRO headquarters) (IIRO000983); IIRO000209-213 (IIRO offices are required to send a report to the IIRO chairman for every account opened abroad under the name of the IIRO or a name intended to protect the organization's money; <u>Exhibit 37</u> (no bank account may be opened without prior consent of the Secretary General) (IIRO001220); and IIRO001532 (when opening a separate

---

[19] When asked if the records could be reprinted so that Plaintiffs could properly review them, counsel for the defendants explained that they could not. But when the Plaintiffs' spoke with the defendants' representative about this issue, Sameer al Radhi, he explained that no one had ever inquired as to whether the banks could re-print the 1995-2000 records, much less whether the banks would be willing to print out bank account records for 1992-1994 and 2001-2004. Mr. Radhi further told Plaintiffs that NCB and Al Rajhi Bank provided the banking records to the MWL and IIRO at an early stage of this litigation and the defendants have had them ever since, raising a significant question as to why they had not been produced years earlier.

The Honorable Frank Maas
August 26, 2011
Page 25

-----

bank account for revenue, the IIRO offices are required to report the account to the IIRO Secretary General).

Moreover, the MWL and IIRO headquarters regularly receive bank statements for every account opened under their names, or on their behalves. *See* Exhibit 36 (at the end of every fiscal year, the MWL General Secretariat shall receive a bank statement detailing the balance of the account on the last day of the year) (MWL005323); Exhibit 31 (IIRO offices are required to send bank statements on a monthly basis to IIRO headquarters) (IIRO000983). All of these banking records are readily available to the defendants and can be easily retrieved by their finance departments. *See* Exhibit 18, p. 19 (IIRO's Department of Finance supervises the bank accounts of the IIRO and the monthly statements.).

For the vast majority of the branch offices of the IIRO and MWL, Plaintiffs have never received a single bank statement, although the existence of relevant accounts is indisputable.[20] For instance, Plaintiffs have discovered through their independent investigative efforts that the IIRO's Philippine office maintained three accounts at the Bank of Philippine Islands – Account Nos. 02001001000001145671, 0200200100000012000472, and 0011-1652-06. *See* Exhibits 39 and 40. These accounts were frozen in conjunction with the U.S. Department of the Treasury's designation of the IIRO Philippines branch office. No documents pertaining to these accounts have been produced, despite the Court's directive that the IIRO produce all bank statements and all records relating to the operations of the designated Philippine branch.

The IIRO has also not produced banking records for accounts connected to the designated Indonesia branch office. As specifically identified in the auditor's report at Exhibit 31, the auditor notes that four (4) bank accounts were held by the branch office for the period of July 2002 to June 2006. Two of those accounts were held at Mandiri Bank, and the other two at IFI Bank. But again, no documents regarding any account for the Indonesia branch office have been produced.

The Plaintiffs have also not received any relevant account information for the IIRO's Sanabil al Khair Trust. As described in IIRO's 1996 Annual Report, the Trust was created by the IIRO to generate 1 billion Saudi Riyals through yearly fundraisers in the major cities of the Kingdom. *See* Exhibit 18, p. 16. While a certain percentage of the money raised goes to humanitarian projects, the funds are primarily invested to create wealth for the organization. According to the Annual Report, the Trust has worked with Faisal Islamic Bank in Bahrain and Al Rajhi Bank in Saudi Arabia relative to their investment needs. *Id.* Consequently, there must be significant banking and financial materials and information in the possession of the IIRO relating to the Trust, including documents relating to any and all bank accounts established to manage all monies collected during Trust fundraisers, as well as documents relating to the Trust's investment accounts held at various banks.

-----

[20] The defendants' representative, Sameer al Radhi, confirmed during the July 11, 2011 telephone conference that all branch offices outside of the Kingdom have their own bank accounts.

The Honorable Frank Maas
August 26, 2011
Page 26

Plaintiffs have additionally uncovered the existence of an IIRO account at Dubai Islamic Bank which was used to support Chechen fighters through the "Special Chechen Refugees Assistance Fund" – Account No. 01520483656101. The IIRO is further known to have a relationship with Stanbic Bank Tanzania, Ltd, Tanzania.

Moreover, according to the August 1995 edition of the IIRO's Journal ("*Igatha*"), the IIRO was accepting donations deposited into joint accounts with the MWL at all branches of Al Rajhi Bank, Islamic Investment Company of the Gulf, Faisal Islamic Bank, Al Barakah General Fund, and Al Barakah Bank Group. *See* Exhibit 41 ("Plaintiffs' Investigative Document") (identifying Account Nos. 77704 and 77700). *See also* Exhibit 42 ("Plaintiffs' Investigative Document") (excerpts from the MWL Journals advertising Account No. 77704). Plaintiffs have not received records relating to accounts at Islamic Investment Company of the Gulf, Faisal Islamic Bank, Al Barakah General Fund, and Al Barakah Bank Group.

Finally, the MWL was accepting donations through two different accounts in Pakistan. *See* Exhibit 43 ("Plaintiffs' Investigative Document") (the MWL accepts donations, through Rabita Trust, at Habib Bank Secretariat Block "A," Islamabad at Account No. 9536-3, and at Habib Bank Civic Center Branch, Islamabad, Account No. 97073-1).

As the foregoing certainly demonstrates, the MWL and IIRO remain committed to withholding the production of bank statements on a wholesale basis, as well as related account reporting, and other responsive banking records. In almost six years of discovery, the best they can muster are some bank statements for the MWL London branch and a set of dot-matrix printouts provided to the defendants several years ago by a third party in a marginally legible format and made available to Plaintiffs' only recently. Defendants' continued refusal to produce relevant banking documents strongly favors case terminating sanctions.

## C.   Defendants Are Withholding the Production of Significant Amounts of Responsive Documentation Relating to the MWL Constituent Council

The Court additionally directed the defendants on April 12 to produce all documents responsive to Plaintiffs' Category No. 3 request – *all documents relating to the annual Constituent Council of the MWL, including without limitation, reports submitted by internal and external offices of the MWL and IIRO, studies and research papers considered during the annual Council meetings, records relating to the activities of Special Committees of the MWL and/or IIRO, transcripts or records of speeches and discussions during the Council meetings, resolutions and recommendations of the Council, agendas, etc.* Although the defendants have produced a limited number of documents relating to the Council, those productions are severely deficient and the evidence confirms that the defendants have failed to engage in any good faith effort to collect and produce all responsive materials.

As briefly mentioned in Section III(D)(2) above, the Council holds annual conferences at the MWL's headquarters in Mecca, Saudi Arabia. Attendees include officials of the MWL, members of the Council who represent Muslim communities around the globe, and prominent members in the field of Islamic dawa. Speakers have generally included the Saudi kings, the

The Honorable Frank Maas
August 26, 2011
Page 27

MWL's Secretary Generals, and leading Saudi clerics. As set forth in the MWL's Constitution, the Constituent Council reviews studies and research papers that are submitted by its members during the conference. *See* Exhibit 14 ("Plaintiffs' Investigative Document"). The Council further reviews reports regarding the activities and projects of the MWL undertaken on its own, or in cooperation with other international organizations and groups. At each annual conference, the MWL Secretary General will submit an annual report concerning the activities of the MWL in the preceding year. *Id.* Moreover, the Council will also set up special committees which hold their own sessions to meet and discuss a variety of issues. Following deliberation, these special committees will submit their own reports and recommendations. At the conclusion of each conference, the Council will issue resolutions and recommendations relating to a number of issues addressed by the Council's members.

The defendants' response to Plaintiffs' Category No. 3 has been particularly egregious. For example, the defendants' first production consisted of a handful of summaries and alleged "meeting minutes" for certain of the Council's annual conferences. *See* IIRO000771-846. After careful analysis and investigation, Plaintiffs concluded that these were not copies of original MWL documents but rather documents that had been quickly created by copying and pasting selected text from separate documents found on the MWL website. Much of the Arabic text in the documents is scrambled as a result, thereby making a majority of the documents unreadable. *See* IIRO000782-834. Despite defense counsel's acknowledgement that the documents were in fact copied as determined by the Plaintiffs, the defendants have not even made an effort to cure the defect and/or produce the original documents from the MWL webpage (of course, merely producing several pages from the internet would still not satisfy the defendants' obligations). *See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, p. 12.

The defendants also produced 291 pages of documents relating to the "decisions and recommendations" typically issued by the Council at the close of each conference. *See* MWL005530-5820. While these basic "summaries" may be nominally responsive to the Plaintiffs' discovery request, this limited production represents a mere fraction of the responsive, Council-related documents in the possession of the defendants.

For instance, through their own independent investigation, Plaintiffs were able to obtain the Executive Summary of the 37th Conference of the MWL Constituent Council, held on April 10-11, 2002, attached hereto as Exhibit 16 ("Plaintiffs' Investigative Document"). In addition to identifying the conference attendees, the special committees, and the issues to be discussed during the conference, the document identifies several types of reporting that are submitted to the Council for consideration and debate, including but not limited to: (1) reports of the League offices and its overseas branches; (2) reports of the IIRO's achievements for the previous year; (3) reports concerning delegations led by the MWL Secretary General to various foreign countries; and (4) financial reports, including reports on MWL bank accounts. *Id.*

Furthermore, several of the documents recently produced by the defendants offer additional evidence of the required financial and operations reporting reviewed by the Council. *See* Exhibit 44 (the Council reviewed financial reports from the previous year, as well as reporting from the General Secretariat discussing the activities of the MWL branch offices)

The Honorable Frank Maas
August 26, 2011
Page 28

_____

(MWL005559); Exhibit 45 (the Council reviewed the report regarding IIRO activities) (MWL005560); Exhibit 28 (the Council reviewed the final financial report and final statement of the League for the years 1998-1999 and 1999-2000) (MWL005594); and Exhibit 46 (the Council reviewed the report regarding the activities of al Haramain al Masjed al Aqsa)[21] (MWL005561). Despite confirmation of their existence, Plaintiffs have not received any such reporting presented to the Council during any conference held between 1992 and 2004.

When comparing the defendants' limited production with the foregoing evidence, it is clear that the defendants have made no meaningful effort to comply with this Court's diective to produce complete records concerning the Constituent Council meetings. Setting aside the extensive reporting identified above, the defendants have failed to produce even the most basic materials relating to these conferences such as copies of invitations, guest lists, proposed and finalized agendas, press releases, and prepared statements and speeches. In fact, the MWL has not even produced copies of articles discussing the Conferences from their own Arabic and English journals (which Plaintiffs uncovered through independent investigative efforts). *See* Exhibits 47, 48, and 49 (all "Plaintiffs' Investigative Documents"). The defendants cannot credibly maintain their position that they have produced all documents relating to the MWL Constituent Council. This further supports a finding that the MWL and IIRO are willfully disregarding this Court's Orders and severe sanctions are therefore necessary.

### D. Defendants Are Similarly Withholding the Production of Large Amounts of Responsive Branch Office Reporting

The Court's April 12 Order also directed the MWL and IIRO to produce all documents responsive to Plaintiffs' Category No. 6 request – *reports submitted by the field offices of the MWL and IIRO concerning their operations and finances.* With respect to this category as well, the defendants have made no credible effort to comply with this Court's Order.

As described in Section III(D)(2) above, the MWL and IIRO rely on robust reporting to maintain tight supervision over the financial, administrative, and operational activities of their branch offices within the Kingdom and around the world.

The MWL itself has enacted a number of specific rules and regulations that set forth the specific types of reporting required by its branch offices. *See* Exhibit 50 (MWL overseas offices must submit a report on their activities every three (3) months to the MWL Secretary General) (MWL005132); Exhibit 35 (MWL offices are required to send detailed reporting regarding monthly purchases, receipts, and payments) (MWL005325); Exhibit 51 (when a MWL employee or manager finishes his job, a report must be sent regarding the number of bank accounts, a statement of financial registries, inventories of check books, inventories of office contents, etc.) (MWL005329); Exhibit 34 (a report must be submitted every three (3) months to the MWL

_____

[21] Al Haramain al Masjed al Aqsa ("AHAMAA"), a purported charitable organization operating under the supervision of the MWL, was designated as a Specially Designated Global Terrorist Entity by the U.S. Department of the Treasury on May 6, 2004 pursuant to Executive Order 12334. According to Treasury, the Bosnian branch of the AHAMAA "has significant financial ties to al Qaida financier Wa'el Hamza Julaidan who was designated by the Treasury Department on September 6, 2002."

The Honorable Frank Maas
August 26, 2011
Page 29

_____

Secretary General regarding the MWL's accounts) (MWL005150); Exhibit 52 (at the end of every year, an annual evaluation report on every employee will be filed) (MWL005207); Exhibit 53 (MWL office managers must present the MWL General Secretariat with annual performance assessment reports for each employee or officer) (MWL005308); and Exhibit 36 (MWL overseas offices must submit a monthly report detailing its expenditures as set forth in the annual budget) (MWL005323). *See also* Exhibit 16 ("Plaintiffs' Investigative Document") (MWL Constituent Council "reviewed the reports of the League offices and its overseas branches."); Exhibit 54 (regarding the merging of the IIRO and MWL offices in Islamabad, Pakistan, the MWL Secretary General instructed the office representatives to provide reports on the monies deposited into the banks, a report on contracts, and a report on projects carried out on behalf of the organizations).

The IIRO similarly requires all of its offices outside of the Kingdom to submit detailed reports to the headquarters in Jeddah concerning their finances and other activities. *See* Exhibit 37 (March 16, 1999 memorandum from the IIRO Secretary General's office to all overseas office managers setting forth fifty (50) instructions and rules they are required to follow, including the submission of regular reporting regarding employee performance, the office's plans and projects, loan activities, and banking activities). *See also* Exhibit 2, pp. 2-6 (identifying IIRO documents which verify the various types of reports required of the IIRO branch offices).

The IIRO has simply failed to produce any branch office reporting, while its parent organization produced 287 pages of documents on July 8 under the heading of "MWL Offices Reports." Upon closer inspection, however, these documents are nothing more than short, generic summaries of the activities of certain MWL branch offices and Islamic centers (likely compiled by the headquarter office), and not the actual detailed operations and financial reports generated by the field offices themselves as identified in the defendants' own documents. Additionally, there are a number of gaps in the production (missing years 1992-1993, 1994-1995, 1995-1996, and 1996-1997). A few examples of the summaries have been provided at Exhibit 55.

The defendants' own documents make it very clear that the MWL and IIRO are in possession of significant reporting from their branch offices around the world, yet there has been no effort on their part to make any good faith production, even when ordered by this Court. Accordingly, case dispositive sanctions should be ordered.

E.    **Defendants Have Failed to Provide Sufficient Documentation Relating to Their Delegations**

Per its April 12, 2011 Order, the Court directed the defendants to promptly produce all documents responsive to Plaintiffs' Category No. 5 request – *reports authored by delegations or groups sent by the MWL and/or IIRO to assess conditions and needs in regions outside of Saudi Arabia.*

As set forth above in Section III(D)(3) above, delegations are an important method by which the MWL and IIRO maintain close supervision over their operations and activities around

The Honorable Frank Maas
August 26, 2011
Page 30

the world.  Part of that oversight includes requiring each delegation to submit reports to the
MWL and IIRO head offices regarding their observations and achievements following each trip.
*See* Exhibit 16 ("Plaintiffs' Investigative Document") (MWL Constituent Council discusses the
reports of the Secretary General's visits to various foreign countries); Exhibit 56 (MWL
Constituent Council reviewed a report delivered by the delegation that visited Caucasus and
Central Asia) (MWL005750); Exhibit 16 (MWL Constituent Council reviewed the MWL
Secretary General's and Deputy Secretary General's trips to various countries; Exhibit 57 (1997
document discussing delegations to MWL offices and preparing reports on the visits
(MWL005587); Exhibit 54 (April 2, 1998 IIRO memorandum discussing the delegation that
arrived at the MWL and IIRO offices in Pakistan to merge the two offices per the orders from the
Secretary General, and their responsibility to provide reports on the banking activities,
possessions of the office, and projects).  *See also* IIRO 1996 Annual Report, Exhibit 18, at p. 17
(the IIRO's Department of External Offices arranges periodic "field visits to overseas offices to
inspect humanitarian activities.").

Once again, the IIRO has failed to produce any documentation closely resembling a
delegation report per the April 12 Order.  Moreover, the MWL produced just eighteen (18) pages
of documents under a heading of "MWL Meetings and Delegations."  A mere 18 pages of
documents clearly does not represent the totality of documents in the possession of the MWL,
particularly in light of the above mentioned documents.  Nor does it represent in any way a good
faith attempt to comply with this Court's discovery orders.  Accordingly, case dispositive
sanctions are warranted.

**F.      Defendants Have Failed to Produce Requested Annual or Periodic Reports**

Defendants have further failed to produce all responsive documents relating to Plaintiffs'
Category No. 4 request – *annual or periodic reports concerning the objectives and activities of
the MWL or IIRO*.  While the IIRO has provided Plaintiffs with the organization's English
annual reports for a number of years, there are still several gaps that remain in that production
(missing English reports for 1992-1995, and 1997).  Furthermore, the IIRO has failed to produce
any of the organization's Arabic annual reports it routinely publishes and disseminates.  *See*
Exhibit 58 ("Plaintiffs' Investigative Document") (Arabic version of the IIRO's Annual Report
for 2007-2008, discovered as a result of Plaintiffs' investigation).  The MWL's production fares
no better.  The MWL has not produced any English or Arabic annual reports generated by the
MWL.

The Honorable Frank Maas
August 26, 2011
Page 31

---

## V.   THE IIRO HAS BLATANTLY IGNORED THIS COURT'S APRIL 26, 2011 AND JUNE 23, 2011 DISCOVERY ORDERS

### A.   The IIRO Has Failed to Produce Any Documents Relating to IIRO Executive Director and Al Qaeda's "Million Dollar Man," Abd Al Hamid Sulaiman Al Mujil, and the Philippines and Indonesia Branch Offices

Abd al Hamid Sulaiman al Mujil, the Executive Director of the IIRO's Eastern Province branch office in Saudi Arabia for a number of years, was designated on August 3, 2006 by the U.S. Department of the Treasury, pursuant to Executive Order 13224, for using "his position to bankroll the al Qaida network in Southeast Asia" and maintaining "a cell of regular financial donors in the Middle East who support extremist causes." The IIRO Philippines and Indonesia branch offices were similarly designated that same day "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Exhibit 4, pp. 10-13 and attached exhibits.

By Order dated April 26, 2011 (MDL Docket No. 2424), this Court directed the IIRO to produce: (1) all documents pertaining to al Mujil's activities with the IIRO; and (2) all documents relating to the Philippines and Indonesia branch offices. That thirty (30) day deadline passed without any production by the IIRO, and the defendant similarly failed to comply with the Court's June 23, 2011 Order to produce all documents by July 8, 2011. To date, Plaintiffs have yet to receive a single document relating to al Mujil or the branch offices in compliance with this Court's recent discovery Orders.[22]

As a top official with the IIRO for eighteen (18) plus years, fifteen (15) of which were spent as the Executive Director of the Eastern Province branch, al Mujil held the authority for directing and supervising the activities of various active IIRO offices, including the designated Philippines and Indonesia branch offices. In that capacity, al Mujil authorized money transfers to those offices, oversaw the receipt and analysis of financial, banking, administrative, and project reports prepared by the branch offices as required by IIRO reporting protocols, organized delegations of IIRO and/or MWL representatives visiting those offices, directed fundraising efforts, maintained close supervision over all collected donations, and prepared and submitted financial reports to IIRO headquarters in relation to the activities of the Eastern Province branch offices, as well as a host of other responsibilities. As Mr. Radhi conceded during counsel's conference him, al Mujil would have surely authored countless documents during his career with

---

[22] It is noteworthy to mention that within the defendant's October 28, 2008 production, the IIRO produced seven (7) pieces of correspondence al Mujil sent or received in his capacity as the Director of the Eastern Province branch relating to the disposition of certain donations for wells in Ethiopia and Nigeria. *See* IIRO001962, 1963, 1965, 1969, 1970, 1972, and 1973 (these documents were produced as a part of the IIRO's supplemental responses to Plaintiffs' First Set of Requests for Production of Documents; not in response to Plaintiffs' supplemental discovery requests relating specifically to al Mujil and the Philippine and Indonesia branch offices). Also included within that production was a self-serving affidavit in which al Mujil denies all terror-related charges. That affidavit was reportedly filed with the IIRO's application to the U.S. Department of the Treasury to have the August 2006 designations withdrawn. Nevertheless, the IIRO has not produced any documents relating to al Mujil in response to Plaintiffs' targeted requests and this Court's Orders of April 26 and June 23.

The Honorable Frank Maas
August 26, 2011
Page 32

the IIRO that are responsive to Plaintiffs' discovery requests; yet those documents continue to be withheld by the defendant.

The IIRO is also certain to have an extensive collection of responsive documents in its possession, custody, or control for the designated offices. Founded sometime in the late 1980's or early 1990's by al Qaeda member Mohammed Jamal Khalifa, the Philippines branch remained in operation until its 2006 designation by the U.S. and U.N. The Indonesia office, founded in 1992, remains open to this day despite its well documented support for al Qaeda and the Jemaah Islamiyah terrorist organization. With approximately thirty (30) or more years in service collectively for the IIRO, the Philippines and Indonesia branches undeniably generated innumerable documents and materials that are responsive to Plaintiffs' discovery requests, including meeting minutes, financial and banking reporting, records detailing transfers of funds to and/or from IIRO headquarters and the Eastern Province branch, employee and administrative reports, delegation reports, budget records, correspondence between the offices and IIRO headquarters and the Eastern Province branch, income and expense reports, asset lists, loan activity records, donation records, lists of recipients of aid, and technical and financial reporting regarding on-going projects. With the exception of a few isolated documents relating to the construction of mosques and wells, as well as self-serving statements from Philippine and Indonesian government officials that the IIRO offices operate in accordance with the local laws, the IIRO has not produced these operational documents.

Moreover, significant documentation and reporting exists in relation to the closing of the Philippines office in 2006. IIRO regulations require that in the event an overseas office is closed, the IIRO Secretary General must be immediately notified of the instructions from the host government relative to the closing, the nearest Saudi embassy should be notified, inventory reports of the assets and the balance of cash in the bank should be prepared, as well as other reporting. *See* Exhibit 37 (Directive No. 49). Again, this has not been produced.

The IIRO's obvious non-compliance with this Court's discovery orders is only exacerbated by the recent statements of IIRO representative, Sameer al Radhi. During the July telephone conference, Plaintiffs learned: (1) Mr. Radhi is in agreement with Plaintiffs' counsel that al Mujil would have generated documents during his long tenure with the IIRO, particularly in the course of his activities as Executive Director; (2) not a single employee or representative of the IIRO has been directed and/or taken the initiative to travel to the IIRO's Eastern Province branch to search for responsive materials; and (3) the Indonesian branch office remains open, and Mr. Radhi is certain that there are documents relating to its operations located within that office which have not been produced.

The IIRO's failure to invest any resources in the search for responsive records relating to al Mujil or the branch offices is staggering. Accordingly, case terminating sanctions against the defendants are warranted.

The Honorable Frank Maas
August 26, 2011
Page 33

---

**B.**     **The IIRO Has Failed to Produce Any Documents Relating to Wa'el Hamza Jelaidan**

The IIRO has also failed to comply with this Court's April 26 and June 23 Orders to produce all responsive documents relating to Executive Order 13224 Specially Designated Global Terrorist and founding member of al Qaeda, Wa'el Hamza Jelaidan. Four months have passed since the Court's initial Order and the defendant has failed to produce a single piece of paper regarding Osama bin Laden's close associate.

Although the defendant has denied any relationship with Jelaidan,[23] Plaintiffs have submitted several pieces of evidence originating from the U.S. government which support their contention that Jelaidan used his leadership position with the IIRO in Pakistan to direct financial and logistical support to al Qaeda, including facilitating the purchase of weapons for members of the terror organization. *See* Exhibit 4, pp. 3-4. Indeed, counsel for the IIRO made a point to tell this Court that Jelaidan was a prominent figure in the Afghan resistance and forged a strong relationship with Osama bin Laden at that time. *See* Tarbutton Affirmation, Exhibit "A" – April 12, 2011 Discovery Hearing Transcript, pp. 40-41.

Notwithstanding the compelling evidence submitted by the Plaintiffs, the IIRO continues to take the position that it does not have any documents for Jelaidan. *Id.* at p. 21. Unfortunately for the defendant, that position is refuted by virtue of its own indexes which were produced to the Plaintiffs just prior to the April 12, 2011 hearing. Index No. 1 specifically identifies Jelaidan's name at Entry Nos. 22163, 23607, and 23243. At the very least, those documents should have been produced by the July 8 deadline imposed by this Court.

The IIRO's failure to comply with the Court's April 26 and June 23 discovery orders relating to Jelaidan is only further evidence of the defendant's deliberate disregard for this Court and this important litigation.

**C.**     **The IIRO Has Failed to Produce Responsive Documentation Relating to Mohammed Jamal Khalifa**

Mohammed Jamal Khalifa, a former senior member of al Qaeda and brother-in-law to Osama bin Laden, was the Regional Director of the IIRO in South-East Asia for a number of years and specifically used his leadership position within the IIRO's office in the Philippines to maintain close connections with al Qaeda, provide support to the Abu Sayyaf terrorist organization, and become an important financier for radical Islamic organizations. *See* Exhibit 4, pp. 5-7. Despite two separate orders from this Court directing the IIRO to turn over responsive documentation relating to Khalifa and his tenure with the defendant, the IIRO continues to withhold the production of meaningful discovery materials.

---

[23] *See* Tarbutton Affirmation, Exhibit "A" – April 12, 2011 Discovery Hearing Transcript, pp. 40-41 (asserting that "IIROSA has nothing to do with Jelaidan").

The Honorable Frank Maas
August 26, 2011
Page 34

As previously discussed herein, the MWL and IIRO served the Plaintiffs with approximately 2,624 pages of documents on April 5, 2011, just days before the scheduled April 12 oral argument on the Plaintiffs' March 24 motion to compel. That production contained forty-four (44) pages of documents referencing Khalifa. However, after careful inspection, Plaintiffs discovered that forty-one (41) of the 44 pages were reproduced from a prior production several years earlier, many of which are merely self-serving selections of newspaper articles and letters in which Khalifa and/or IIRO officials claim his innocence from terror-related charges.

Despite producing yet another set of recycled, unresponsive documents, the IIRO continued to take the position at three subsequent hearings before this Court that the defendant has produced all of the Khalifa files. *See* Tarbutton Affirmation, Exhibit "A" – April 12, 2011 Discovery Hearing Transcript, p. 40; Exhibit "B" at pp. 16-17; and Exhibit "C" at p. 21. Recognizing the inherent conflict with that position, the Court stated:

> And I base that simply on the fact that if ... Khalifa spent a period of time working with the IIRO in the Philippines, there must be more documentation that relates to what [he] did while [he was] there, which is the sort of documentation that the plaintiffs seek[.]

*Id.*, Exhibit "B" – April 26, 2011 Discovery Hearing Transcript, p. 22.

Consistent with the Court's reasoning, there should be a substantial collection of operations files and other materials in the possession of the IIRO detailing Khalifa's oversight of the Philippines branch and its employees, including but not limited to: (1) documents relating to Khalifa's management and control over the IIRO's monies, bank accounts, and assets; (2) financial, administrative, and project reports prepared by the office and submitted to IIRO headquarters while under Khalifa's leadership; (3) documents relating to Khalifa's oversight of transfers of funds between IIRO-Saudi Arabia and IIRO-Philippines; and (4) documents relating to Khalifa's authority to determine and/or make recommendations as to which charitable designees should receive financial and/or non-monetary support from the IIRO.

Moreover, the IIRO has failed to produce any documents regarding Khalifa's relationship with Abd al Hamid Sulaiman al Mujil, the IIRO Executive Director in Saudi Arabia who was directly responsible for authorizing money transfers to the IIRO-Philippines branch while Khalifa oversaw that office. The existence of correspondence and other reporting between the two men is more than plausible.

Equally frustrating, the indexes produced to the Plaintiffs prior to the April 12 hearing identify at least three separate files relating to Khalifa which should have been produced. Entry No. 1630, dated March 12, 1993, mentions a letter regarding continuation of expenses to Khalifa, the supervisor of the IIRO office in the Philippines. Entry No. 2130, dated September 3, 1992, refers to a letter issued by the IIRO regarding the employment of Khalifa as a supervisor for the IIRO office in the Philippines. Finally, Entry No. 15707 cites a March 26, 2001 letter from the IIRO to an unknown recipient regarding information about Khalifa. To the best of Plaintiffs' knowledge, these files have also not been produced.

The Honorable Frank Maas
August 26, 2011
Page 35

### D.  The IIRO Has Failed to Produce Any Documents Relating to the Expulsion of IIRO Personnel From Pakistan

The IIRO was additionally directed to produce all documents and materials in its possession relating to the expulsion of IIRO personnel from the Islamic Republic of Pakistan following the September 11, 2011 attacks.  It was widely reported in the global media that eighty-nine (89) Arab workers, including IIRO employees, were thrown out of that country for their links to al Qaeda.  *See* Exhibits T and U from Plaintiffs' March 24, 2011 Motion to Compel, attached hereto as Exhibit 4.  Once again, in direct violation of this Court's April 26 and June 23 discovery Orders, the IIRO has failed to turn over any documentation regarding this issue.

## VI.  A REPRESENTATIVE OF THE MWL AND IIRO CONFIRMS THERE HAS BEEN NO GOOD FAITH EFFORT ON THE PART OF THE DEFENDANTS TO SEARCH FOR AND PRODUCE RESPONSIVE MATERIALS

A hearing was held on July 13, 2011 to update the Court on several discovery issues, including the defendants' non-compliance with the Court's Order of June 23, 2011.  Plaintiffs advised the Court that, at defense counsel's urging and the Court's resulting direction, Plaintiffs conducted a telephone conference on July 11, 2011 with Mr. Sameer al Radhi, the appointed representative of the MWL and IIRO to assist Mr. McMahon with discovery.[24]  Mr. McMahon also participated in the call.

The telephone conference with Mr. Radhi confirmed for the Plaintiffs that there has been very little effort invested by the defendants to search for and gather responsive materials. Specifically, in addition to confirming that the defendants have invested little time or effort toward satisfying their discovery obligations (allowing the responsibility to fall to a volunteer with little authority and little resources to collect from a vast worldwide database), Plaintiffs also learned:  (1) no one has gone to the IIRO's Eastern Province branch to search for records in response to Plaintiffs' discovery requests seeking documents regarding Abd al Hamid Sulaiman al Mujil, the Executive Order 13224 designee and former Executive Director of the branch; (2) although the office remains open, no effort has been made in response to the Court's April Orders to collect materials from the IIRO's branch office in Indonesia; (3) any and all searches for responsive materials were strictly limited to a review of the defendants' warehouse by Mr. Radhi, and no directives were issued to the organizations' individual departments to conduct similar searches of their own records; and (4) no one has contacted Al Rajhi Bank or National Commercial Bank to determine if the banks can generate digital printouts of the defendants' banking records for years 1992-1995.  Moreover, Mr. Radhi corroborated two very important points that the Plaintiffs have asserted in their discovery motions regarding MWL and IIRO branch offices:  (1) all individual branch offices outside of the Kingdom have their own bank accounts; and (2) documents in the IIRO branch offices are within the custody and control of the

---

[24] Mr. Radhi is a sixty-five (65) year old retiree who worked at the MWL for nineteen (19) years, and another nine (9) years for the IIRO.  Mr. Radhi is no longer an employee of either organization and has been working on their behalf with Mr. McMahon on a purely volunteer basis.

The Honorable Frank Maas
August 26, 2011
Page 36

---

IIRO in Saudi Arabia by virtue of the fact that the branch offices cannot undertake any activity without first seeking approval from headquarters and submitting the required paperwork. *See* Tarbutton Affirmation, Exhibit "D" – July 13, 2011 Discovery Hearing Transcript, pp. 20-24.

The deliberate refusal on the part of the MWL and IIRO to engage in any good faith effort to collect and produce responsive materials, even after three successive orders issued by this Court, is stunning. Accordingly, case terminating sanctions should be ordered.

## VII.   THE IMPOSITION OF SANCTIONS, INCLUDING ENTRY OF DEFAULT JUDGMENTS AGAINST THE MWL AND IIRO, IS WARRANTED GIVEN THE DEFENDANTS' CONTINUED REFUSAL TO OBEY THIS COURT'S DISCOVERY ORDERS

### A.   Defendants Have Willfully and in Bad Faith Refused to Produce Documents to the Plaintiffs

From the outset of discovery in this litigation, the MWL and IIRO have refused to meaningfully respond to Plaintiffs' discovery. Significant delays in responding to document requests, unfulfilled promises to promptly produce significant amounts of responsive materials, productions that include thousands of pages of duplicate or recycled Arabic documents under the guise of new productions, and at least one identified instance of manufacturing a set of documents for production as originals are just a few of the egregious tactics employed by the defendants to frustrate these proceedings and delay discovery. Such tactics have often forced the Plaintiffs to incur significant costs to translate and analyze these sporadic and haphazard productions only to discover that much of what the defendants have produced is worthless. Any suggestion from the defendants that these productions represent a good faith effort is blatantly disingenuous.

The courts have reasoned that such on-going behavior is grounds for the entry of a default judgment. In *Montblanc-Simplo GMBH v. Colibri Corp.*, 692 F. Supp. 2d 245 (E.D.N.Y. 2010), the court granted the motion of the plaintiffs, Montblanc-Simplo and Montblanc NA, for a default judgment as a sanction under Rule 37(b). The plaintiffs initially brought suit against the defendants for trademark, trade dress, and copyright infringement arising out of the defendants' sale of pens, watches, and other accessories that bore the plaintiffs' trade dress and copyrighted designs without authorization. The case was initially referred to mediation but prior to the mediation date, the parties informed the court that the defendants had closed down, released their employees, and had been placed in receivership. The receiver for the defendants then failed to respond to the plaintiffs' discovery demands. In response, the court ordered the defendants to either respond to the discovery or notify the court that he would not defend the case or had settled the case. No response was filed and plaintiffs moved for entry of a default judgment as a sanction. The receiver finally confirmed that he was not authorized to participate in the litigation.

In granting the motion for a default judgment, the Court cautioned that "culpability or intent is a primary concern under Rule 37, which does not authorize a sanction terminating the

The Honorable Frank Maas
August 26, 2011
Page 37

---

case where the 'failure to comply has been due to inability, and not to willfulness, bad faith, or any fault' on the part of the party against whom sanctions are sought." *Id.* at 251. However, "dispositive relief" is necessary in the face of a "continuing sage of dilatory conduct." *Id.* The court reasoned that defendants willfully refused to participate in the litigation and advised their receivor to inform the court that they would not pursue a defense. Further, the receivor advised the court that he was not authorized to participate in the litigation. Given this willful disregard of its obligations, the Court granted the motion for a default judgment.

A similar result was reached in *State Farm Mut. Auto. Ins. Co. v. Semion Grafman*, No. 04-2609, 2011 U.S. Dist. LEXIS 53382 (E.D.N.Y. April 4, 2011), in which the court entered a default judgment against two defendants, Jacob Kagen and Mirka United, Inc., under Fed. R. Civ. P. 37 for discovery abuses. In that case, State Farm brought suit against a host of defendants alleging a widespread scheme to obtain improper reimbursements from State Farm for medical supplies and services. Kagen owned several supplier retailers and secretly owned and operated medical clinics. The complaint alleges that Kagen through his wholly-owned retailer, Mirka United, submitted false paperwork and invoices to State Farm for reimbursement. Kagen and Mirka United engaged in obstructionist discovery practices throughout the course of nearly five years of discovery including missing court-ordered deadlines for discovery, failing to produce documents, and failing to make timely disclosures. *Id.* at *9.

The court granted the plaintiffs' motion for case terminating sanctions against the defendants due to their discovery abuses. The court reasoned that the defendant willfully disregarded his discovery obligations and there was "nothing in the record that would demonstrate that Kagan's conduct was merely an oversight or was the product of a good faith attempt at compliance." *Id.* at 30.

In *Am. Cash Card Corp. v. Amcash New York West Corp.*, 184 F.R.D. 521 (S.D.N.Y. 1999), the court reasoned that the defendant's "disobedience was willful, as demonstrated by: its repeated failure to comply with the Court's orders" and "its failure to produce such basic documents as checking statements, financial records, and tax returns[.]"

In the present case, there is not a shred of evidence in the record to suggest that the defendants' conduct has been anything other than a deliberate, orchestrated plan to delay these proceedings and withhold the production of responsive (and likely damaging) documentation. The Plaintiffs' discovery requests have been outstanding for almost six years and the defendants have been given multiple chances to cure their deficiencies and produce responsive materials. Plaintiffs underscore the fact that the productions underlying this motion were the product of a long series of meet and confer sessions where Plaintiffs agreed to prioritize discovery items that were intended to prioritize the universe of discovery sought from the defendants – in short, these items we supposed to be the ones that were *easy* to produce. The MWL and IIRO have refused to produce the most basic documents, and like the defendant in *Amcash*, have failed to comply with this Court's Orders of April 12, 2011, April 26, 2011, and June 23, 2011. By all accounts, the defendants have willfully and in bad faith refused to meaningfully respond to Plaintiffs' discovery requests and case terminating sanctions are therefore appropriate.

The Honorable Frank Maas
August 26, 2011
Page 38

---

**B.      Defendants' Have a Long History of Non-Compliance**

Plaintiffs served the MWL and IIRO with their initial set of discovery requests in October 2005 and December 2005 respectively.  From the commencement of discovery to the present, Plaintiffs have attempted to work in good faith with the defendants on many occasions via numerous meet and confers and telephone conference to address any and all perceived areas of dispute, and where possible, narrow and/or prioritize the requested information so that defendants could manage their obligations and promptly produce the relevant, responsive documents.  When it became clear that the defendants' repeated assurances (that significant document productions were on the way) were nothing more than hollow promises and stall tactics, Plaintiffs filed two motions to compel the production of documents in March of this year.  Five months later, defendants have still not responded to the discovery requests in any meaningful way, and Plaintiffs were forced to file this motion for sanctions.  Thus, the history of noncompliance by the defendants is both long and tortured – but not without numerous opportunities for the defendants to redeem themselves.

**C.      A Lesser Sanction Will Not Deter the Defendants' Evasive and Abusive Conduct**

The Second Circuit has explained that one of the purposes of discovery sanctions under Fed. R. Civ. P. 37 is to deter discovery abuse by the recalcitrant party and serve as a "general deterrent." *Update Art, Inc. v. Modiin Publishing, Ltd., et al.*, 843 F.2d 67, 71 (2d Cir. 1988).  The Supreme Court has explained that "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc., et al.*, 427 U.S. 639, 643 (1976).  Furthermore, when "'less harsh sanctions, including orders compelling defendants to [comply] have already proven fruitless,' the default sanction is the only appropriate remedy." 2011 U.S. Dist. LEXIS 53382 at *34 (citing *Microsoft Corp. v. Computer Care Ctr.*, 2008 U.S. Dis. LEXIS 112080, at *14) (E.D.N.Y. Apr. 8, 2008)).

Here, lesser sanctions will no doubt prove fruitless.  Despite ordering the defendants on three separate occasions to produce the responsive documents and materials in their possession, defendants have still not complied.  In fact, this Court addressed this exact point during the June 23, 2011 hearing.  It stated:

> [T]here is not much point in my simply saying you really have to comply with orders that I last time and the time before said you really have to comply with.

*See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, pp. 41-42.

The Honorable Frank Maas
August 26, 2011
Page 39

Given the defendants' history of noncompliance with this Court's Orders, and the egregious tactics used by them over the course of discovery in these proceedings, it is clear that any lesser sanction will not deter the defendants' conduct.

### D. **Defendants Were Explicitly Warned During the June 23, 2011 Conference That Sanctions Would be Imposed in the Face of Their Continued Non-Compliance**

As set forth in Section I(C) above, the Court warned the MWL and IIRO that case-dispositive sanctions were a likely reality if responsive documents were not produced. *See* Tarbutton Affirmation, Exhibit "C" – June 23, 2011 Discovery Hearing Transcript, pp. 9-10 and 17-18. Counsel for the defendants acknowledged that he had explicitly warned his clients of the possibility of such sanctions. *Id.* at p. 11. On July 26, 2011, the Court entered an Order directing Plaintiffs to file their motion for sanctions against the defendants.

### E. **Defendants' Complicity**

The MWL and IIRO have been complicit in their discovery abuses since discovery was initiated in 2005. Plaintiffs are not aware of any evidence to suggest that the defendants' counsel is the strategist and/or cause behind any of the defendants' discovery abuses.

### F. **Plaintiffs Have Been Extremely Prejudiced by the Defendants' Refusal to Obey This Court's Discovery Timetables and Produce Responsive Information in Their Care, Custody and Control**

The MWL and IIRO have engaged in a pattern of deliberate and unacceptable discovery abuses that have prejudiced the Plaintiffs' ability to obtain responsive and meaningful documentation critical to their claims against the defendants. Despite promising to produce the eight (8) categories of information on an expedited basis in October 2007, the defendants withheld the production of any documents for over three years until ordered by this Court to turn them over. Even when productions have been forthcoming, Plaintiffs have incurred significant expenses to analyze thousands of pages of unresponsive, duplicative, recycled Arabic documents. Moreover, the IIRO has yet to produce a single document in response to the Court's directive to produce documents relative to categories identified in the March 24, 2011 motion to compel. Such abuses have significantly delayed this litigation and prejudiced the Plaintiffs.

The Honorable Frank Maas
August 26, 2011
Page 40

_____

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for sanctions, strike the defendants' Answers, and enter default judgments against the MWL and IIRO pursuant to Fed. R. Civ. P. 37(b).

Respectfully submitted,

THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

cc:   The Honorable George B. Daniels
      Sean P. Carter, Esq.
      J. Scott Tarbutton, Esq.
      Robert T. Haefele, Esq.
      Jodi Westbrook Flowers, Esq.
      James P. Kreindler, Esq.
      Andrew J. Maloney, Esq.
      Jerry S. Goldman, Esq.
      Martin F. McMahon, Esq.
      Alan Kabat, Esq.

PHILADELPHIA\6164972\1  117430.000