# EXHIBIT 3

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

October 14, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

> Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

Plaintiffs respectfully submit this letter brief in reply to the Muslim World League's and International Islamic Relief Organization's Memorandum in Opposition to Plaintiffs' Motion for Sanctions. As the Court is aware, Plaintiffs' Motion for Sanctions seeks entry of default judgments as to the Muslim World League and International Islamic Relief Organization based on their failure to comply with this Court's April 12, 2011, April 26, 2011, and June 23, 2011 discovery Orders. For the reasons discussed below, that Motion should be granted.

## I.   INTRODUCTION

Plaintiffs' initial letter brief in support of its Motion for Sanctions, filed with the Court on August 26, 2011, includes a lengthy overview of the procedural history of the series of discovery disputes that culminated in the Plaintiffs' request for entry of default judgments as to the MWL and IIRO. In the interests of brevity, the Plaintiffs will not recite that background again in this letter. For purposes of this reply, the Plaintiffs would merely note that the Court's April 12, 2011 Order directed the defendants to produce all documents within eight (8) specified categories. The Court's April 26, 2011 directed the defendants to provide any and all documents within an additional seven (7) categories. Through its Order of June 23, 2011, the Court set an absolute deadline of July 8, 2011 for the defendants to fully comply with the Court's two prior discovery orders.

The Honorable Frank Maas
October 14, 2011
Page 2

Significantly, the documents that the Court ordered the defendants to produce through its April 12, April 26 and June 23, 2011 Orders represented a mere starting point for discovery as to the MWL and IIRO. Unfortunately, and as discussed in detail below, the defendants have fundamentally failed to comply with the Court's directives that they produce those basic discovery documents. Taken as a whole, the procedural record relating to the Plaintiffs' efforts to obtain discovery from these defendants, including the admissions and arguments made in the defendants' own Opposition brief, reveal a continuing pattern of discovery abuses by the defendants, and a fundamental lack of candor in the defendants' dealing with the Plaintiffs and the Court in relation to the discovery process. This misconduct has required the Plaintiffs to invest massive time and expense in chasing the defendants for basic discovery documents, which even in the face of this Court's specific orders still have not been provided, and needlessly wasted the time and resources of this Court. Under the circumstances, the entry of default judgments is the only appropriate sanction.

## II.   DEFENDANTS HAVE SHOWN, AND CONTINUE TO SHOW, A COMPLETE LACK OF REGARD FOR THIS COURT'S DISCOVERY ORDERS AND THEIR DISCOVERY OBLIGATIONS UNDER THE FEDERAL RULES

In determining whether the imposition of case dispositive sanctions as to the MWL and IIRO is appropriate, this Court need look no further than the defendants' own opposition papers, through which the defendants acknowledge their wholesale failure to comply with this Court's Orders, and admit that in many cases efforts were not even undertaken to collect documents within the scope of the Court's Orders until after the Court invited the Plaintiffs to move for case dispositive sanctions. In fact, in several instances, the defendants make clear that they still have not made any effort to locate and produce categories of documents specifically called for in the Court's Orders, and have no intention of doing so. These acknowledgements directly contradict the defendants' prior representations to the Court, and thus reflect a fundamental lack of candor throughout the discovery process.

### A.   Defendants Acknowledge They Have Not Complied With This Court's Discovery Orders

During the June 23, 2011 discovery hearing, this Court set an absolute deadline of July 8, 2011 for the defendants to bring themselves into full compliance with the Court's discovery Orders of April 12 and April 26. During that same conference, counsel for the defendants affirmatively represented to this Court that the MWL and IIRO had produced all documents responsive to the initial 8 categories that were the subject of the Court's April 12, 2011 Order:

- "What my point is that we have produced everything that was called for in terms of the 8 categories for both MWL and IIRO-SA and we have that format.... That is our position that we have complied." *See* June 23, 2011 Discovery Hearing Transcript, p. 10.

- "Its our position that we produced everything now, albeit late." *Id.*, p. 11.

The Honorable Frank Maas
October 14, 2011
Page 3

_____

- "Yes, your Honor.  To reiterate, we believe we have produced everything we have that is responsive to 1 to 8 for MWL and IIRO-SA, but there are other documents out there that they have been requesting like banking records." *Id.*, p. 13.

Just a day before the July 8 deadline, the defendants reaffirmed those representations, again stating that they had produced all documents within the initial eight categories, and that they had now produced all responsive materials within the scope of the Court's April 26, 2011 Order as well:

1.  Catgories 1-8 have been provided for both the Muslim World League ("MWL") and the International Islamic Relief Organization ("IIRO").

2.  The second set of categories 1-6 has been provided.  With respect to the second set of categories, counsel for MWL and IIRO understands that Plaintiffs will object to this production and request more documentation for Wael Jelaidan, Jamal Khalifa, and Al-Mujil.  However, MWL and IIRO do not have any further documents, and they [are] not obligated to produce something they do not have.

*See* July, 7, 2011 joint letter from the Plaintiffs' Executive Committees and the Defendants' Executive Committee submitting proposals concerning the agenda for the July 13, 2011 discovery conference, attached hereto as <u>Exhibit 1</u>.[1]

Subsequent developments and acknowledgments, triggered only by Plaintiffs' painstaking and costly efforts to demonstrate the defendants' non-compliance, confirm that these representations were patently false.   For instance, on July 8, 2011, just one day after representing to the Court that they had already produced all documents within the initial 8 categories, the defendants produced approximately 1,274 pages of new documents relating to those categories. *See* Plaintiffs' Motion for Sanctions, p. 7.  Thereafter, on August 26, 2011, the very day the defendants knew the Plaintiffs would be filing their Motion for Sanctions, counsel for the defendants wrote to the Plaintiffs to advise that he had received nine (9) boxes of IIRO and MWL documents totaling approximately **12,000** pages, consisting of field office reports, delegation reports, and MWL Constituent Council records.[2]  The shear magnitude of this collection of responsive documents and timing of its delivery to the defendants' counsel makes clear that no meaningful effort was invested in searching for these records until after the Court invited the Plaintiffs to move for sanctions.

_____

[1] Plaintiffs' exhibits may be found with the attached Affirmation of J. Scott Tarbutton, Esq., Attaching Exhibits in Support of Plaintiffs' October 14, 2011 Reply Letter Brief Requesting Rule 37(b) Sanctions Against Defendants Muslim World League and International Islamic Relief Organization.

[2] It should be noted that the Plaintiffs invested considerable time, energy and expense during the period between July 8, 2011 and August 26, 2011 developing a record to establish that the defendants had not produced all responsive materials within the 8 categories, including field office reports, delegations reports and Constituent Council records.  Their failure to provide any indication of the existence of these records between July 8 and August 26 needlessly wasted the Plaintiffs' time and resources, and is itself further evidence of their bad faith.

The Honorable Frank Maas
October 14, 2011
Page 4

Indeed, the defendants' Opposition brief and supporting papers concede that, in many cases, efforts to identify and collect documents within the scope of the Court's Orders were not initiated until recently, and that wholesale classes of responsive documents have not been produced. For instance, on p. 6 of their Opposition, the defendants state that, in addition to the 12,000 pages of documents at Mr. McMahon's office, "the Defendants are in the process of sending the Defense counsel more responsive documents in the next few weeks." *See* Opposition, p. 6. These materials apparently include resolutions and recommendations from the annual meetings of the MWL Constituent Council, as well as Council meeting minutes. *Id.*, p, 11. In a similar vein, Mr. Radhi indicates in his affidavit that he is "in the process of acquiring the 2001-2004 bank statements, the MWL annual reports and the MWL Constituent Counsel [sic] minutes and will produce within the next few weeks." *See* Exhibit 2 to Defendants' Opposition, at ¶ 23.

Additionally, Mr. Radhi indicates in his affidavit that he only recently contacted the defendants' banks to determine whether it is possible to obtain electronic bank statements for years 1992-1995. *See* Opposition, p. 13. The banks have reportedly responded that it could take at least six (6) months to obtain the statements. In addition, the defendants have produced a letter from Dr. Adnan Khalil Basha to Al Rajhi Bank requesting bank account records. *See* Exhibit 11 to Defendants' Opposition. The letter is important in two respects. First, the letter is dated August 13, 2011 (just as the Plaintiffs were preparing to file their Motion for Sanctions), clearly demonstrating that the defendants did not even attempt to collect responsive documentation until months after this Court entered Orders directing them to produce all banking records. Second, rather than request responsive records for all accounts associated with the charities, the letter from Dr. Basha selectively requests documents for only a few accounts – this time, accounts at the Al Rajhi Bank-Palestine branch (including accounts for orphans).

Further, although the Court specifically directed the MWL and IIRO to provide bank records for their branch offices, the defendants' have never done so, and their Opposition papers suggest that they believe their obligation to comply with that aspect of the Court's Order is somehow limited by their own perception of what is reasonable. In this regard, Mr. Radhi asserts in his affidavit that "Securing banking records from 60-66 offices, as the Court would understand, would be unduly burdensome and quite expensive."

Contrary to Mr. Radhi's assertion, the Court did not conclude that production of these records would be unduly burdensome, but in fact specifically rejected that argument in directing their production.[3] For obvious reasons, those records are of particular importance in this litigation, given that the claims against these defendants rest, in part, on their role in channeling finances to al Qaeda. The defendants' continuing refusal to produce those records, even in the face of an explicit Court directive, is clear evidence of their bad faith.

---

[3] Aside from this isolated statement in the Radhi affidavit, the MWL and IIRO do not address the branch office bank account records at all, despite the fact that the Plaintiffs' Motion for Sanctions discussed their non-production at length. The effort to evade any direct discussion of these records is emblematic of the defendants' lack of candor.

The Honorable Frank Maas
October 14, 2011
Page 5

### B.   Defendants Continue To Evade Producing Responsive Documents Relating To The IIRO Designees

As this Court is well aware, Plaintiffs have been seeking (for the last 5 years) the production of targeted categories of documents directly relevant to the activities and relationships that prompted the United States and United Nations to designate the Philippines and Indonesia branch offices of the IIRO, as well as the Executive Director of the IIRO Eastern Province branch, Abd al Hamid Sulaiman al Mujil. *See* Plaintiffs' Motion for Sanctions, pp. 4-6. Those categories include, but are not limited to: (1) all documents relating to the operations of the Philippine and Indonesia branch offices (including bank account records, investment records, identification of employees, and documents concerning contributions, disbursements and projects); and (2) all documents concerning al Mujil's designation, his activities with the IIRO, and the transfer of IIRO funds authorized by him and/or the Eastern Province branch. *Id.* Despite this Court's April 26, 2011 and June 23, 2011 Orders compelling production of those documents, the defendants failed to produce any of the requested documents by the July 8 deadline. Instead, the defendants have transparently mischaracterized the scope of the Court's Orders, in an effort to minimize the gravity of their non-compliance. These attempts to recast the Court's plain Orders are inherently deceptive, and further support the imposition of case dispositive sanctions.

### 1.   Defendants continue to withhold responsive documents relating to Abd al Hamid Sulaiman al Mujil.

In one of the more bizarre explanations provided by the defendants in response to the question of why no documents have been produced relating to al Mujil, defense counsel states that Mr. Radhi conducted several searches of the Indonesia office for responsive information but found no documents regarding al Mujil because he "never had anything to do with the Indonesian office." *See* Opposition, p. 14; *see also* Exhibit 12 to Defendant's Opposition, Affidavit of Dr. Abdul Hamid al-Mojil ("I have had no contact of any kind with the MWL/IIRO Indonesian office."). On that basis, the defendants imply that they have complied with the Court's directives concerning al Mujil. This line of argument again reveals the defendants' fundamental lack of regard for this Court's authority.

Once again, this Court directed the IIRO to produce *all* documents relating to al Mujil's activities with the IIRO, where he served for fifteen (15) years as the Executive Director of the IIRO Eastern Province branch *in Saudi Arabia*. At no time did the Court limit the scope of the search concerning al Mujil to documents presently located in the Indonesian branch which mention him by name. Nonetheless, the IIRO has artificially (or strategically) limited its search concerning al Mujil to the IIRO-Indonesia office only, and steadfastly refused to search for documents relating to al Mujil in the Philippines or at the Eastern Province branch in Saudi Arabia where al Mujil worked.

Significantly, during the July 11, 2011 conference call with Plaintiffs' counsel, Mr. Radhi agreed that al Mujil would have generated documents during his long tenure with the IIRO, particularly in the course of his activities as the Executive Director of the Eastern Province

The Honorable Frank Maas
October 14, 2011
Page 6

branch. Nonetheless, Mr. Radhi acknowledged that no employee or representative of the IIRO had been directed and/or taken the initiative to travel to the IIRO's Eastern Province branch to search for responsive materials. Given these statements, the Plaintiffs specifically raised the defendants' failure to conduct a search of the Eastern Province branch for records concerning al Mujil during the hearing on July 13, 2011, and again in their Motion for Sanctions. Despite that fact, the defendants continue to evade the issue entirely.

Further, the assertion by al Mujil and the defendants that he never had any contact of any kind with the IIRO-Indonesia office is simply false, contradicted not only by U.S. intelligence but by al Mujil's own words. In conjunction with the August 2006 designations, the United States government unambiguously states that al Mujil authorized transfers of money to the IIRO branch offices via his position at the Eastern Province branch, including transfers to the Indonesian branch:

> The Indonesian and Philippines branches of IIRO have received support from IIRO-EP [Eastern Province], which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

*See* Exhibit 4 to Plaintiffs' Motion for Sanctions, pp. 10-13. These assertions are corroborated by the IIRO's own Annual Reports, which confirm for all relevant periods that the Eastern Province Branch implemented the IIRO's projects in Indonesia. *See* Exhibits 11, 18, and 24 to Plaintiffs' Motion for Sanctions. Moreover, in his own affidavit submitted in support of the IIRO's Application to the U.S. Department of the Treasury's Office of Foreign Assets Control, al Mujil affirms that he "traveled to Indonesia almost 10 years ago to visit the IIROSA office there." *See* Exhibit 2.

While the IIRO is unwilling to conduct a meaningful search for any records concerning al Mujil (a/k/a the "Million Dollar Man")[4], they were curiously able to invest the time and resources to secure a self-serving affidavit from him to support their disingenuous arguments concerning the scope of his responsibilities with the IIRO. In proffering that affidavit, the IIRO no doubt found it convenient that no IIRO documents have been produced that would allow the Plaintiffs to test the accuracy of his statements, and that al Mujil is not himself a party to the litigation and no longer an employee of the IIRO.

As the foregoing discussion makes abundantly clear, the defendants are consciously playing games with regard to the al Mujil discovery, in defiance of this Court's explicit directives, and their efforts to conceal their non-compliance by implicitly misrepresenting the scope of the Court's directives concerning al Mujil are inherently deceptive. Under these circumstances, the imposition of case dispositive sanctions is more than warranted.

---

[4] Plaintiffs respectfully remind this Court that al Mujil not only had relationships with Osama bin Laden and Abdullah Azzam (the co-founders of al Qaeda), but has been directly linked to the senior al Qaeda operational planner responsible for the September 11 attacks, Khalid Sheikh Mohammed.

The Honorable Frank Maas
October 14, 2011
Page 7

2. **Defendants have no intention of producing documents regarding the IIRO-Indonesia branch office.**

The defendants' brazen disregard for the Court's prior discovery rulings is further evidenced by their continuing refusal to produce any documents from the IIRO-Indonesia office. As was the case with respect to documents concerning al Mujil, the Court issued a broad Order directing the defendants to produce all documents concerning the activities of the IIRO Indonesian branch. However, and as discussed in the prior section, the defendants unilaterally redefined the scope of discovery to limit searches of that office to al Mujil-related documents only. The Director of MWL/IIRO Indonesia office, Fahd Mohammad Sanad al Harbi, acknowledges this fact in his Affidavit, submitted as Exhibit 21 to Defendants' Opposition, explicitly stating at ¶ 4 that the defendants' searches were confined only to "documents either authorized by Dr. al-Mujil or documents concerning Dr. al-Mujil."

Here again, the scope of the defendants' search falls far short of anything approximating a good faith effort to comply with this Court's discovery Orders, and reflects a fundamental unwillingness to produce documents directly relevant to the claims at issue in this litigation, even in the face of case dispositive sanctions.

Compounding their complete failure to produce records relating to the Indonesian office, the defendants flaunt their belief that they can unilaterally re-define the nature and rules of the discovery process in this context, indicating in their Opposition that in lieu of producing the required records they have retained an auditor to prepare "an auditing report about the office for 1992-2000," for purposes of validating that "funds provided are used in accordance to the purpose of the donors and according to the policies and procedures provided by the management." Rahdi Affidavit at ¶¶ 10.1, 11. Given that the Court has already expressly told the defendants that the Plaintiffs are not interested in post-litigation audits generated to serve the defendants' own defenses, but rather in the underlying documents themselves[5], the defendants' continuing efforts to avoid discovery by commissioning yet another pointless audit reflect a fundamental refusal to abide by the rules of discovery.

3. **Defendants are blatantly misleading this Court regarding the IIRO-Philippines branch office.**

In an effort to explain to this Court why they have not produced any meaningful documents relating to the operations of the IIRO-Philippines branch, the defendants now claim that "there was no official IIRO Philippines office until 2011." *See* Opposition, p. 14.; *see also* defendants' Exhibit 13 (IIRO-Philippines' Articles of Incorporation, dated June 11, 2011, and other documentation filed with the Securities and Exchange Commission of the Republic of the Philippines). The defendants' new position is nothing more than a deliberate effort to mislead this Court regarding the existence of an IIRO branch office that is widely accepted to have

---

[5] Of course, the fact that an audit is possible for the years 1992-2000 necessarily means that relevant documents from that period exist.

The Honorable Frank Maas
October 14, 2011
Page 8

supported Osama bin Laden, al Qaeda, and affiliated terrorist organizations such as the Abu Sayyaf Group.

Contrary to the defendants' most recent story concerning the IIRO's activities in the Philippines, Plaintiffs have obtained documents through their independent investigations that confirm that the IIRO opened its own, independent office in the Philippines in 1991. Attached as Exhibit 3 are: (1) the Republic of the Philippines Securities and Exchange Commission (SEC) registration document for the IIRO, dated September 20, 1991; (2) the IIRO Articles of Incorporation filed with the Philippines SEC, identifying Mohammed Jamal Khalifa as an officer, and notarized on September 19, 1991; and (3) the IIRO By-Laws adopted September 2, 1991, also identifying Khalifa as an officer. These documents conclusively establish that the IIRO formally registered a branch office in the Philippines in 1991, under the direction of Mohammed Jamal Khalifa. These documents also confirm that the Philippine branch established in 1991 was required by its own Articles of Incorporation and By-Laws to generate and maintain detailed records concerning its operations. (It is worth noting that the "SECOND" paragraphs of the 1991 and 2011 Articles of Incorporation, concerning the "purpose or purposes" for which the IIRO is incorporated, are identical word-for-word, leaving little doubt that the 1991 document was used as a template for the 2011 incorporation).

Remarkably, the defendants' present effort to disclaim the existence of an "official" IIRO Philippines office prior to 2011 is directly contradicted by Exhibit 14 to the defendants' own Opposition – "Report by International Islamic Relief Organization (IIRO) on Operating Status of the Philippines and Indonesia Offices and Ongoing Efforts to Combat Terrorism," dated July 28, 2009[6]. Specifically, the discussion at pages 2-3 of the report clearly states that the IIRO opened its office in the Philippines in 1991, opened a bank account, and hired employees. The report is also notable in that it additionally confirms Plaintiffs' argument that strict oversight and controls implemented by the IIRO headquarters in Saudi Arabia required the branch offices in the Philippines and Indonesia to generate regular reporting regarding finances and budgets, donations, audits, delegations, and projects. *See* pp. 4-7. According to the defendants, these documents do not exist. The report, it should be mentioned, was authored by Mr. Radhi.

Moreover, even if the IIRO's representation that it did not open an "official" office in the Philippines until 2011 were not false, it would not excuse the defendants' complete failure to produce documents concerning the IIRO's activities in the Philippines. In this regard, it is important to note that the IIRO does not go so far as to deny that it carried out activities in the Philippines prior to 2011, but rather merely denies the existence of an "official" office. The IIRO then indicates that the IIRO's work in the Philippines prior to 2011 was carried out under the MWL's registration. However, as the Court plainly directed the IIRO to produce all documents concerning its activities in the Philippines, the semantic distinction it now offers in an effort to avoid its discovery obligations is simply meaningless.

---

[6] Rather than responding to the Plaintiffs' discovery, the defendants have invested their time and effort in generating and collecting documents that they believe will support their defenses, as evidenced by this report (*see* pp. 8-9, stating that the IIRO publicly condemns terrorism) and the other examples in the discussion which follows at Section III(D).

The Honorable Frank Maas
October 14, 2011
Page 9

### C. Defendant IIRO Continues To Evade This Court's Order Directing It To Produce Documents Relating To The Detention and Expulsion Of IIRO Employees From Pakistan Following The September 11, 2001 Attacks

As part of the Court's April 24, 2011 Order, defendant IIRO was directed to produce all "documents relating to any investigations conducted by the Islamic Republic of Pakistan and its subsequent determination to expel IIRO personnel after September 11, 2001." *See* Plaintiffs' Motion for Sanctions, Exhibit 4 (March 24, 2011 Motion to Compel, pp. 9-10). The IIRO has never produced documents within the scope of that Order, and continues to refuse to squarely address the subject matter of the request. In particular, in support of its assertion that responsive documents do not exist, the defendant again relies exclusively on the same dubious document it produced early in discovery,[7] in which an IIRO-Pakistan official asserts that no "employee has so far been arrested having a link with al-Qaida." *See* Exhibit 15 to Defendants' Opposition. The obvious defects in this document were identified in detail in the Plaintiffs' March 24 Motion to Compel at pp. 9-10, and during the related oral argument. In particular, the Plaintiffs pointed out that the assertion that "no employee so far has been arrested having a link to Al-Qaida" failed entirely to exclude the possibility that IIRO employees were detained or expelled without being formally arrested, or the possibility that IIRO employees were in fact investigated or arrested for some offense without any specific assertion that they were linked to al Qaeda.

In issuing its Order compelling discovery on this subject after full consideration of each side's arguments, the Court plainly intended to require the IIRO to meet the substance of the Plaintiffs' request head on, and to ensure that the technical distinctions drawn in the letter from the Director of the IIRO-Pakistan office did not serve to obstruct meaningful discovery. That the defendants continue to rely on that same letter at this point in time certainly does not demonstrate good faith on their part.

### D. Defendants Admit They Have Destroyed Relevant Evidence

Beyond confirming the defendants' conscious failure to comply with this Court's discovery Orders, the defendants' Opposition also establishes that they have engaged in the pervasive destruction of relevant evidence during the course of these proceedings, conduct that independently supports the imposition of case dispositive sanctions. On this point, Plaintiffs respectfully direct the Court's attention to Section B, p. 11, of the defendants' Opposition brief, wherein they explain that they each have a ten (10) year document retention policy. The defendants go on to state that they did not suspend their document destruction programs until *after* receiving Plaintiffs' first set of document requests in late 2005, and that as a result of the destruction of documents pursuant to their document retention policies prior to that point in time "they have only 5% of the documents from years before 1996." In other words, between the time this litigation was initiated in 2002 and the service of the Plaintiffs' initial discovery requests in late 2005, the defendants destroyed 95% of their records for the years 1992, 1993, 1994, and 1995. As the Court has already specifically determined that those years are relevant

---

[7] *See* Exhibit 15 to Defendants' Opposition (IIRO001139).

The Honorable Frank Maas
October 14, 2011
Page 10

and within the temporal scope of discovery, the MWL and IIRO have by their own admission knowingly destroyed valuable evidence.

Significantly, courts within the Second Circuit have consistently held that the obligation to preserve evidence arises "when the party has notice that the evidence is relevant to the litigation or when a party should have known that the evidence may be relevant to future litigation." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see also Barsoum v. N.Y.C. Housing Auth.*, 202 F.R.D. at 400, 396 (holding a party is under an obligation to retain documents and other evidence that it knows may be relevant to pending or future litigation).

The duty to preserve relevant evidence not only applies during litigation, but also applies to the period before litigation when a party knows or reasonably should know that the evidence may be relevant to anticipated litigation. *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998). "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.Supp.2d 456, 466 (S.D.N.Y. 2010) (internal citations omitted) (holding duty to preserve was triggered by filing of complaint). The obligation to preserve evidence exists whether or not the documents have been specifically requested in a demand or whether there has been a specific discovery order issued. *Kronisch*, 150 F.3d at 126-27. *See also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) (holding that the duty to preserve is an ongoing obligation and the party and counsel must monitor the party's compliance with the litigation hold to ensure proper implementation).

The imposition of sanctions for the destruction of evidence is appropriate where the spoliating party: (1) had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) acted with a culpable state of mind upon destroying or losing the evidence; and (3) the missing evidence is relevant to the moving party's claim or defense. *Pension*, 685 F.Supp.2d at 467. With regard to the second prong, the courts have reasoned that a culpable state of mind is satisfied by mere negligence. *Toussie v. Cty. of Suffolk*, No. 01-6716, 2007 U.S. Dist. LEXIS 93988 (E.D.N.Y. Dec. 21, 2007). Moreover, courts within the Second Circuit hold that once the duty to preserve evidence has been triggered, the failure to preserve evidence constitutes gross negligence. *Green v. McClendon*, 262 F.R.D. 284 (S.D.N.Y. 2009) (explaining failure to implement litigation hold amounts to gross negligence); *Chan v. Triple 8 Palace*, No. 03 Civ. 6048, 2005 U.S. Dist. LEXIS 16520 (S.D.N.Y. Aug. 11, 2005).

In the instant case, the duty on the part of the MWL and IIRO to preserve evidence arose no later than August 2002, when the *Burnett* Plaintiffs filed the first September 11 related lawsuit.[8] However, the defendants concede that they did not properly address and change their

---

[8] *Thomas Burnett, Sr., et al. v. Al Baraka Investment and Development Corporation, et al.*, Case No. 1:02-CV-01616, filed on August 15, 2002 in the United States District Court for the District of Columbia (naming the MWL and IIRO as defendants). The *Ashton* Plaintiffs filed their complaint against the defendants just a few weeks later on

The Honorable Frank Maas
October 14, 2011
Page 11

document retention policies until approximately 2006. As such, the first and second prongs of
the spoliation test are satisfied, as the MWL and IIRO failed to implement a litigation hold for
several years after their duty to preserve was triggered. Further, the Court already has
determined that the defendants' records for the years 1992, 1993, 1994 and 1995 are relevant.

In evaluating the degree of the defendants' culpability with regard to the destruction of
those documents, it is important to note that the Plaintiffs' early pleadings include detailed
allegations concerning the sponsorship of al Qaeda by the defendants between the formation of
that terrorist organization in 1988 and Osama bin Laden's departure from Sudan in 1996. The
allegations concerning Mohammed Jamal Khalifa's activities in the Philippines in the early
1990s are a prime (but by no means the only) example. Given the allegations targeting the terror
sponsorship activities of the MWL and IIRO during the early 1990s, the defendants had a
significant incentive to destroy their documents from that period. For that reason, and given
their utter lack of candor throughout the discovery process, their failure to set a litigation hold in
place and protect materials from that timeframe must be regarded as a calculated decision to use
their document retention policies as cover for the destruction of relevant evidence. Accordingly,
the entry of default judgments against the MWL and IIRO is more than appropriate.

### E.   The Defendants Have Consistently Denied The Existence Of Documents Until The Plaintiffs Prove Otherwise

Since the commencement of motion practice seven (7) months ago to compel the
production of discovery from the MWL and IIRO, Plaintiffs have confronted a disturbing
practice on the part of the defendants of denying the existence of documents, until and unless the
Plaintiffs submit evidence disproving those denials. At that point, the defendants invariably seek
to qualify their earlier statements, and advance explanations as to why the documents cannot be
produced. These tactics are hallmarks of bad faith, and especially problematic in a case
involving the covert sponsorship of terrorism.

### 1.   Defendants denied the existence of branch office reporting to the headquarters in Saudi Arabia.

One of the more compelling examples of the defendants' willful misconduct is their
response to Plaintiffs' Category No. 6 request seeking "reports submitted by the field offices of
the MWL and IIRO concerning their operations and finances," which was the subject of
Plaintiffs' March 16, 2011 Motion to Compel.

Responding to the Plaintiffs' motion, the defendants clearly denied the existence of any
such branch office reporting. *See* Defendants' April 1, 2011 letter brief attached hereto as
Exhibit 4 (stating that "it would have been virtually impossible for undersigned counsel to
promise a forthcoming production of documents that do not exist; e.g. reports from field offices

September 4, 2002 in the Southern District of New York – *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No.
1:02-CV-06977.

The Honorable Frank Maas
October 14, 2011
Page 12

back to IIRO headquarters in Jeddah"). Plaintiffs' subsequent reply letter brief, dated April 7, 2011, identified twelve (12) separate IIRO documents produced during discovery which undeniably show that the IIRO branch offices are required to regularly transmit reports back to the IIRO headquarters regarding their bank accounts, revenues and expenses, loan activities, donations, projects, and other activities. *See also* Plaintiffs' Motion for Sanctions, pp. 11-15 (identifying a number of the defendants' own documents which show the extensive reporting required of the MWL and IIRO branch offices).

> **2.**   **Defendants' internal documents support Plaintiffs' assertion that "bank statements" are sent from the branch offices to the headquarters in Saudi Arabia.**

In addition to the various reporting required of the branch offices, the MWL and IIRO offices are required to send copies of their bank statements every month to their respective headquarters. Indeed, Plaintiffs have identified several of the defendants' own documents which specifically state that "bank statements" are to be regularly transmitted back to Saudi Arabia. *See* Plaintiffs' Motion for Sanctions, p. 14 (discovery documents MWL005322 and IIRO000983). In their Opposition, the defendants take the position that the Plaintiffs are incorrect in their reading of these documents, and that the documents the branch offices are required to submit are not the actual bank statements, but rather "informal reconciliation reports" generated by the branch offices themselves. *See* Opposition, p. 12.

In point of fact, the plain language used by the defendants in their documents makes it very clear that actual "bank statements" are transmitted to the MWL and IIRO headquarters on a regular basis. For example, IIRO000982-983, which was submitted as Exhibit 31 to Plaintiffs' Motion for Sanctions, details the controls imposed upon the branch office by the IIRO head office in Jeddah, and explicitly states that "Monthly bank reconciliation *together with bank statements* are sent on a monthly basis to the Head Office." (emphasis supplied). Defendants produce the same document as Exhibit 20 to their own Opposition (*see* p. 9, discussing the bank statements). Also, MWL005322, produced as Exhibit 33 to Plaintiffs' Motion, states that the General Secretariat must receive "a copy of the bank statements." In view of these protocols, the defendants' suggestion that the branch offices do not submit their bank statements to the headquarters is unbelievable.

Ultimately, the distinction the defendants seek to draw between bank statements and reconciliation reports is unhelpful to them in any case. As a primary matter, by emphasizing the existence of the reconciliation reports the defendants have merely identified another group of responsive documents they have failed to produce in response to the Court's Orders, as the defendants have produced neither the branch office bank statements nor the reconciliation reports. Further, the Court's Oder directing the defendants to produce their bank statements was not limited to bank statements that were sent to the headquarters.

The Honorable Frank Maas
October 14, 2011
Page 13

3.       **Defendants intentionally misled this Court regarding its computer systems.**

As Your Honor will recall, the MWL and IIRO were adamant in their representations to this Court that they "did not begin using computers in their home and field offices until after 1996." *See* Exhibit 20 to Plaintiffs' Motion for Sanctions (Martin McMahon's November 7, 2007 letter submission to the Honorable George B. Daniels at p. 6.). However, after careful analysis of several of the defendants' internal documents, it became abundantly clear that use of computers, microfiche, and microfilm were an important part of the defendants' daily operations as far back as the 1980's. Indeed, Plaintiffs cited to a number of the defendants' documents in the Motion for Sanctions at pp. 16-19.

Having exposed the defendants' blatant misrepresentation to this Court, the MWL and IIRO now desperately seek to minimize the extent of their dishonesty by claiming that: (1) any attempt by the defendants to implement an electronic database system in the 1980's failed; (2) the computer system was only limited to word processing; and (3) an effective database never really materialized until after 2004. *See* Opposition, p. 10.[9] Interestingly, the defendants do not produce any documents to support these new claims and Plaintiffs can only speculate as to their accuracy. Nevertheless, the defendants' actions are a prime example of the bad faith that continues in these discovery proceedings.

In sum, the defendants' own Opposition confirms their pervasive failure to comply with this Court's Orders, and their continuing refusal to produce documents plainly within the scope of those Orders. In addition, the Opposition acknowledges that the defendants have engaged in the wholesale destruction of relevant evidence during the course of these proceedings, and as a result documents from the critical period between 1992-1995 are no longer available. The fundamental lack of candor reflected by the defendants actions, coupled with the severity of their misconduct and continuing refusal to abide by this Court's Orders even in the face of the present Motion for Sanctions, leaves no doubt that the imposition of default judgments is necessary to protect the integrity of the discovery process and represents the only appropriate sanction.

**III.     THE ARGUMENTS AND EXCUSES OFFERED BY THE DEFENDANTS FOR THEIR FAILURE TO COMPLY WITH THE COURT'S ORDERS ARE DISINGENUOUS AND ONLY SERVE TO UNDERSCORE THEIR BAD FAITH**

Recognizing that they can no longer credibly argue that they have complied with the Court's discovery Orders given the compelling evidence offered by the Plaintiffs to the contrary, the defendants instead offer various excuses for their non-compliance, and on the basis of those excuses suggest that a sanction lesser than entry of default judgments should be considered by the Court. In fact, the excuses offered by the defendants only serve to underscore their defiance of this Court's directives and fundamental lack of credibility throughout the discovery process.

---

[9] In his affidavit filed in support of the defendants' Opposition, Mr. Radhi notes that one of the documents relied upon by the Plaintiffs' relative to the defendants' use of computers was incorrectly cited as 1988, when the correct conversion date from Arabic to English is 1998. Plaintiffs apologize for the translation mistake but note that all of the other internal defendant documents cited in their brief clearly show that the MWL and IIRO were using computer systems early in the 1980s.

The Honorable Frank Maas
October 14, 2011
Page 14

### A.     Defendants Continue To Assert Burden and Expense Arguments That Have Previously Been Rejected By This Court

Since the inception of discovery, the MWL and IIRO have consistently sought to hide behind unsupported assertions of undue burden and expense in the hopes of avoiding meaningful discovery, repeatedly arguing that rather than having them search for and produce responsive documents, the Court should instead direct the Plaintiffs' counsel to travel to several random branch offices of the defendants' choosing, or pay to copy the entire contents of the defendants' warehouses. These arguments featured prominently in every submission the defendants offered relative to the underlying discovery disputes, and in every oral argument made to the Court by their counsel during the related hearings. Despite the fact that the Court directly rejected those arguments and proposals in issuing the underlying Orders compelling discovery, the defendants insist on reasserting them in their Opposition to the Motion for Sanctions, inaccurately suggesting that the Court merely deferred ruling on those arguments. The defendants' compulsive effort to interject arguments that have already been rejected is yet another example of their refusal to respect the discovery process.

Initially, Judge Daniels considered, rejected, and struck the defendants' burden objections in December 2007, when he held that the appropriate temporal scope of discovery should reasonably begin in 1992. *See* Order at MDL Docket Entry No. 2059. More recently, this Court rejected the defendants' very same burden arguments when Your Honor ordered the MWL and IIRO to produce within 30 days the 8 categories of documents indentified in the Plaintiffs' March 16, 2011 Motion to Compel. *See* April 12, 2011 Discovery Hearing Transcript, pp. 41-42. Soon thereafter, this Court again rejected the defendants' claims that producing the additional categories of documents that were the subject of Plaintiffs' March 24, 2011 Motion to Compel "would prove unduly burdensome and oppressive." *See* April 26, 2011 Discovery Order granting Plaintiffs' Motion to Compel (MDL Docket Entry No. 2424).

Notwithstanding the Court's unequivocal rejection of those objections, the MWL and IIRO continue to argue in their Opposition that producing responsive documentation is "unduly burdensome." For instance, the defendants assert that producing MWL Constituent Council meeting minutes and resolutions and recommendations "is a frivolous endeavor designed to unduly enhance the burden on the Defendants." *See* Opposition, p. 11. Defendants similarly argue that producing bank statements for the IIRO branch offices is "an unduly burdensome task" that "would require an overwhelming effort, including substantial costs and time." *Id.*, p. 12; *see also* Affidavit of Sameer al-Radhi at Exhibit 2 to Defendants' Opposition (stating that securing banking records "would be unduly burdensome and quite expensive"). Moreover, defense counsel claims in his affidavit that the defendants' inability to respond to Plaintiffs' discovery in a timely manner has been due to the "unduly burdensome" requests themselves. *See* Affidavit of Martin F. McMahon at Exhibit 3 to Defendants' Opposition, p. 10.[10]

---

[10] Defense counsel further states in his affidavit that one of the reasons for the defendants' untimely discovery responses is "because this Court in the last year changed the relevant discovery timeline." Although this Court clarified that relevant discovery should extend until 2004 (not 2001 as Mr. McMahon had proposed) during the April 12, 2011 discovery conference, Plaintiffs are unaware of any other rulings by this Court which significantly

The Honorable Frank Maas
October 14, 2011
Page 15

The defendants' insistence on again advancing burden and expense arguments that have been squarely rejected by the Court on several occasions further reflects the defendants' refusal to acknowledge and abide by this Court's rulings, and these rejected arguments can in no way serve to excuse their misconduct at this point.

### B. Defendants' Bare Assertions That They Lacked Knowledge Of The U.S. Judicial System And Their Discovery Obligations Are Unconvincing

The defendants also unconvincingly cite their alleged unfamiliarity with the American judicial system in support of their efforts to minimize their culpability for their acknowledged failure to comply with the Court's Orders. *See* Defendants' Exhibit No. 3, Affidavit of Martin F. McMahon, ¶ 22 (stating that "[a]lthough the production was late, it was due to the Defendants' lack of knowledge of the judicial system."). This argument, made for the first time more than nine (9) years into this litigation and in response to a pending Motion for Sanctions, is in fact belied by the defendants' own statements.

According to an affidavit filed by Mr. McMahon, he has visited Saudi Arabia 5-6 times and has held numerous meetings with the IIRO's Secretary General, Dr. Adnan Basha, and the defendants' discovery liaison, Sameer al Radhi (roughly one trip per year since the commencement of merits discovery). *Id.* at ¶ 1. Mr. McMahon states that during those meetings he explained the discovery process to his clients, including the reasons for objecting to Plaintiffs' initial discovery requests. *Id.* at ¶ 2. According to Mr. McMahon's affidavit, Dr. Basha and Mr. Radhi were very concerned that the MWL and IIRO were complying with the Federal discovery rules, so much so that they had Mr. Radhi hire assistants to help him deal with the Plaintiffs' discovery.[11]

Mr. McMahon also states that he made a number of trips to the United Kingdom to meet with Ahmad Thomson (a London-based attorney hired by the defendants for the September 11th case) to discuss on-going discovery issues in the litigation. *Id.* at ¶ 8-10. Additionally, Mr. McMahon states that he has traveled to several branch offices of the MWL and IIRO "to help prepare and notify the offices of the Plaintiffs' outstanding discovery requests." *Id.* at ¶ 11; *see also* Opposition at p. 8. Counsel has further represented to this Court that he regularly discusses discovery issues with Mr. Radhi via Skype, an internet-based audio-video communication application. *See* April 12, 2011 Discovery Hearing Transcript, p. 36; June 23, 2011 Discovery Hearing Transcript, p. 8.

---

altered the timeline for discovery in these proceedings, other than Judge Daniels' December 2007 Order mentioned above, which the defendants have been aware of for almost four (4) years. To suggest that the reason for the defendants' untimely productions is due in part to this Court's ruling, particularly when the MWL and IIRO repeatedly claimed they had complied with the Court's discovery Orders, is utterly disingenuous and shows a complete lack of respect for the discovery process.

[11] According to Mr. Radhi's Affidavits, attached hereto as <u>Exhibit 5</u>, he was permitted to hire assistant to help him deal with Plaintiffs' discovery. He and his assistants logged approximately 28,008 hours responding to the Plaintiffs' discovery requests (7,200 hours on behalf of the MWL and 20,808 hours on behalf of the IIRO).

The Honorable Frank Maas
October 14, 2011
Page 16

After almost nine (9) years since the first lawsuit was filed against the MWL and IIRO, six (6) years of merits discovery, numerous trips by defense counsel to Saudi Arabia and other countries to meet with the defendants' representatives to discuss the discovery process, and the creation of a discovery team to assist Mr. Radhi respond to Plaintiffs' discovery, it is more than difficult to credit the defendants' claim that they did not have an understanding of their discovery obligations in this litigation. What is more plausible is that the defendants were made aware of their obligations under the Federal rules, but willfully elected to disregard those obligations and enlist a number of obstructionist tactics to frustrate these discovery proceedings and withhold the production of responsive documentation and information.

C.     **Underlying Financial Records Relating To The Defendants' Audits Continue To Be Withheld Despite The Defendants' Legal Right To Request And Obtain Them From Their Accountants**

Equally troubling are the defendants' efforts to blame their failure to produce the financial and accounting records underlying various audits on their non-party auditing firms.[12] In this regard, the defendants argue in the Opposition that they have contacted their auditors at KPMG and Ernst & Young regarding the underlying records, but that, "because of customary practice, they have refused to provide that information unless the audit is challenged and found to be deficient." *See* Opposition, pp. 11-12. On that basis, and despite the Court's very explicit directive that the defendants produce the underlying financial documents during the hearing on July 13, 2011,[13] the defendants refuse to produce the records and argue that "[b]efore this Court orders the production of documents which form the bases of various IIRO audits...the Court should require the Plaintiffs to produce expert auditor testimony to the effect that the audits that have been produced are inaccurate, flawed, disingenuous, or incomplete in some manner." *See* Opposition, p. 12, at fn. 3. This line of argument is nothing short of remarkable in several respects.

To begin with, in support of the contention in their brief that the defendants' auditors have refused to provide the defendants with copies of the defendants' own documents, the defendants cite to the declarations set forth in ¶¶ 20-21 of the Affidavit of their counsel, Mr. McMahon. However, Mr. McMahon's Affidavit includes absolutely no affirmative representation that the auditors have refused to provide the defendants with copies of their own documents. To the contrary, Mr. McMahon's Affidavit merely indicates that the auditors told him that it "would be a very expensive proposition to go back and pull the documents that served as the basis for any audit.' *See* McMahon Affidavit at ¶ 21. Further, neither the defendants'

---

[12] Rather bizarrely, the defendants also attempt to blame the Plaintiffs for the defendants' failure to have produced relevant documents by this point in the litigation. With regard to this argument, the Plaintiffs would simply note that the defendants should have produced all of the documents at issue voluntarily in response to the discovery requests the Plaintiffs served in 2005. That the defendants refused to comply with their discovery obligations and forced the Plaintiffs to file a series of motions in an effort to secure the most basic discovery materials can hardly be offered as an excuse. In any case, it is the conduct of the defendants in failing to comply with the Court's explicit directives that is at issue here.

[13] *See* July 13, 2011 hearing transcript at pp. 30-31.

The Honorable Frank Maas
October 14, 2011
Page 17

brief nor Mr. McMahon's Affidavit make any attempt to explain why the defendants are unable to collect the underlying financial records from their own files.

Moreover, while Mr. McMahon's affidavit does not in any way support the argument the defendants raise in their brief, it does confirm both that the efforts to secure responsive documentation from the IIRO's auditors were not initiated until September 2011, and that relevant documents in the possession of the auditors have been destroyed during the course of this litigation. *See* McMahon Affidavit at ¶¶ 19-20 (stating that Mr. McMahon approached the IIRO's auditors about the records during interviews conducted in September 2011, and that relying on the Kingdom's regulations concerning the retention by auditors of financial documents, the auditors no longer have records relating to period prior to 2002).

In addition, in making their disingenuous argument that they are unable to obtain their own documents from their auditors, the defendants make no attempt to reconcile their position with the well established case law holding that a party has control over financial documents in the possession of his or her accountant. *See The Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 154 (S.D.N.Y. 1997) (citing *Winston v. Alhadeff*, 1986 U.S. Dist. Lexis 27167 (N.D. Ill. April 7, 1986) ("Documents of a client given to an accountant are within the custody and control of the client since he has a right to demand their return.")); *De Vos v. Lee*, 2008 U.S. Dist. Lexis 58817, *3 (E.D.N.Y. 2008) (holding that documents in the possession of party's accountant are deemed within that party's control for purposes of Rule 34 discovery); *Calzaturficio S.C.A.R.P.A. S.P.A. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 39 (D. Mass. 2001) (corporate defendant's tax-related documents in possession of its accountant found to be within defendant's control because it had "the legal right and practical ability to obtain the documents from the accountant"); *MPG Ingredients, Inc. v. Mars, Inc.*, 2007 U.S. Dist. Lexis 83594 (D. Kan. 2007) ("A party is also deemed to have control over financial records of the party that are in the possession of the party's accountant."). As a corollary, the defendants make no attempt to explain why the underlying financial records cannot be collected from the defendants' own files.

The defendants also seek to mislead the Court through omission in arguing that they are unable to secure any financial documents from their auditors. In particular, the defendants focus exclusively on their alleged attempts to obtain documents from two of their Kingdom based auditors, KPMG and Ernst & Young. However, the defendants have acknowledged that the branch offices outside of the Kingdom are separately audited by local accounting firms, and the Plaintiffs have specifically demanded the production of the financial records relating to those audits in compliance with this Court's orders. The defendants' papers make absolutely no reference to the records in the possession of those additional auditors, or any attempt by the defendants to secure records from them.

Finally and most importantly, by arguing that the Court should compel the Plaintiffs to proffer "expert auditor testimony" before requiring the defendants to produce documents which form the bases of audits, the defendants are directly defying this Court's prior orders. Stated simply, the Court has already directed the defendants to produce the financial documents underlying the audits in explicit terms. The defendants' continuing resistance to the Court's authority on this point is stunning.

The Honorable Frank Maas
October 14, 2011
Page 18

---

**D.     The Defendants' Resources Have Been Invested Primarily In Generating And
Collecting Self-Serving Documents That Were Not Requested By The Plaintiffs**

In further support of their effort to excuse their non-compliance with the Court's orders,
the MWL and IIRO seek unpersuasively to convince the Court that they have invested significant
resources and monies in a good faith effort to comply with Plaintiffs' document demands.  As
purported evidence of their good faith the defendants' cite:  (1) Mr. McMahon's multiple and
expensive trips to Saudi Arabia, London, Gilbralter, Madrid, and other destinations to discuss
discovery issues with the defendants; (2) the thousands of hours allegedly expended by Mr.
Radhi and his team in relation to discovery; (3) Mr. Radhi's multiple trips to the Indonesia
office, including a visit lasting 37 days; and (4) the investment of considerable sums of money
on attorneys and other employees, such as Mr. Abdelgader Hashim, to assist with discovery.

Plaintiffs submit that a closer examination of the defendants' expenditures of time and
money reveals that they were not properly focused on searching for and producing documents
within the scope of the Court's orders, but instead dedicated primarily to the creation, collection
and production of self-serving documents and information that validate their theories and
defenses in this case.  Having primarily invested their resources in the production of thousands of
pages of unresponsive documents, the defendants cannot in good conscience claim they have
acted in good faith.

**1.     Defendants have spent thousands of dollars on attorneys to collect and
produce unresponsive documents.**

As briefly addressed above, the MWL and IIRO contend that their purportedly good faith
discovery efforts include the hiring of multiple attorneys and employees to actively work on
document production.  One of those attorneys is Abdelgader Hashim, a local attorney based in
Jeddah.  According to the defendants, the charities paid Mr. Hashim over $100,000 in legal fees
to prepare "the examples of how IIRO employees are specifically instructed to avoid any
political involvement in the various host countries where IIRO is working." *See* Opposition, p.
7; *see also* McMahon Affidavit at ¶ 4.  Without question, the search Mr. Hashim was retained to
conduct was designed to collect documents to support the IIRO's defenses, and there is no
credible basis to cite it as a good faith effort to respond to the Plaintiffs' discovery requests or
comply with this Court's orders .

To learn that the MWL and IIRO have invested a significant sum of money having a
single person to collect unresponsive documents, though both disappointing and shockingly
improper, it is sadly not surprising at this stage of the proceedings, as it merely represents the
latest disclosed example of the defendants' history of concentrating their efforts to produce
thousands of pages of self-serving documents – namely, for example, documents which strongly
emphasize the humanitarian and charitable works of the organizations around the world, while
simultaneously rejecting claims that the defendants and their employees provided material,
financial, logistical, and other forms of support to al Qaeda and associated terrorist organizations
for a period of many years.

The Honorable Frank Maas
October 14, 2011
Page 19

For instance, in response to the Plaintiffs' discovery requests seeking documentation relating to Mohammed Jamal Khalifa's tenure with the IIRO, including all documents relating to his role in heading the IIRO's branch office in the Philippines, the IIRO initially produced a handful of documents in an apparent attempt to distance itself from Khalifa's terror activities. These materials included: (i) self-serving statements by IIRO officials denying that the IIRO-Philippines office ever gave funds to the al Qaeda-linked terror organization, Abu Sayyaf Group; and (ii) statements by IIRO officials that the organization was never aware of any terror activities carried out by Khalifa. Moreover, the defendant produced documentation emphasizing the humanitarian achievements of the IIRO branch office in the Philippines, including; (i) the establishment of a scholarship program benefiting hundreds of students in the Philippines; (ii) the construction and management of elementary and high schools; (iii) the sponsorship of vocational training programs; (iv) the construction of several orphanages; (v) the management of several health clinics in various cities which provide free check-ups and medicine; and (vi) relief assistance provided to crisis victims in the Philippines. *See* Exhibit 4 to Plaintiffs' Motion for Sanctions. Plaintiffs have never received the requested information as detailed in Plaintiffs' March 24 Motion to Compel, yet the defendants continue to take the position that they have produced all documents relating to Khalifa. *See* Plaintiffs' Motion for Sanctions, Exhibit 4, March 24, 2011 Motion to Compel, p. 5 (identifying Khalifa's links to terror activities).

The defendants' insistence on producing documents that fit their defenses in this litigation is further exhibited by the recycled production of numerous pieces of correspondence from various foreign governments (Afghanistan, Bosnia-Herzegovina, Indonesia, Jordan, Kenya, Pakistan, Tanzania, Uganda, and others), thanking the defendants' for their humanitarian aid and assistance in those countries. These self-serving, unresponsive documents were produced earlier in discovery, and yet again in support of the defendants' Opposition brief. *See* Opposition, Exhibits 24 and 25 (producing a United Nations Peace Messenger Award and "IIRO Recommendation Letters" from foreign states commending the IIRO's humanitarian activities). Notably, the majority of these letters are dated in 2007, supporting Plaintiffs' argument that the defendants were not expending their resources on efforts to search for and produce documents responsive to Plaintiffs' requests. Instead, the MWL and IIRO were spending their time contacting foreign governments where they have branch offices and requesting that government officials draft letters praising the relief efforts of the charities. To claim that they have expended valuable resources and time on discovery is completely disingenuous.

### 2.    Auditing of the IIRO-Indonesia branch office.

The MWL and IIRO also cite multiple expensive trips taken by Mr. Radhi to the IIRO-Indonesia branch office to obtain responsive documentation as further evidence of the defendants' good faith efforts in these discovery proceedings. *See* Opposition, p. 7. During one such visit, Mr. Radhi reportedly stayed thirty-seven (37) days to secure "a bid from an auditing firm to go over every expense item for the Indonesian office." *Id.* Plaintiffs never requested that the IIRO perform and/or produce such an audit. Instead, as this Court is well aware, Plaintiffs requested that the defendants produce any and all documents concerning:    (1) the U.S. Department of the Treasury's Executive Order 13224 designation of the Indonesia branch office "for facilitating fundraising for al Qaeda and affiliated terrorist groups; (2) all operations of the

The Honorable Frank Maas
October 14, 2011
Page 20

Indonesia branch office, including but not limited to, bank account records, investment records, identification of employees, and contributions received and disbursements made by the offices; and (3) the transfer of IIRO funds to the Indonesia branch authorized by the Executive Director of the IIRO Eastern Province branch, Abd al Hamid Sulaiman al Mujil. *See* Plaintiffs' Motion for Sanctions, pp. 4-6. Indeed, this Court's Orders of April 26 and June 23 directed the IIRO to immediately produce those documents.

Plaintiffs submit that the time expended by Mr. Radhi to obtain the proposed audit is yet another example of the defendants' efforts to redefine the subject of discovery and produce only documents that serve to support their defenses in this case. In fact, this is not the first time the defendants have engaged an auditing firm to examine the IIRO-Indonesia branch office's financial records for this very purpose. *See* Exhibit 20 to Defendants' Opposition (audit performed by M. Said & Co. for the period of May 2005 to July 2006 concluded that "we found no evidence to support the accusation that IIRO Indonesia supported extremist organizations or International Terrorism."). Based on the foregoing, the defendants' contention of good faith is without merit.

### 3. Defendants continue to urge the production of thousands of pages of orphan documents not requested by the Plaintiffs.

As this Court will recall, the defendants have on more than a few occasions expressed an interest to respond to Plaintiffs' discovery requests by producing voluminous orphan records which were being stored in the IIRO's office in Jeddah. Indeed, defense counsel represented that his clients were spending countless hours of their time gathering these records. Plaintiffs' counsel made it abundantly clear to this Court and the defendants that Plaintiffs were not interested in any documents relating to orphans:

> The Court: One of the problems is, its seems to me – and that's why I picked on item 8, the org charts first – if I take something at the other end of your list, list of recipients of aid, Mr. McMahon said in his letter that there is 18,000 orphans who got aid. And I assume you are less interested in orphans than projects.

> Mr. Carter: Your Honor, I think that's accurate.

*See* April 12, 2011 Discovery Hearing Transcript, p. 31. Despite Plaintiffs' unambiguous position, the defendants during the ensuing two months continued to focus on the production of orphan records and Plaintiffs were forced to spend additional time addressing the unwanted documents:

> Mr. McMahon: No, your Honor, we have been producing and we just got in some more documents, we have had an ongoing production, Mr. Carter is not satisfied with it, but there has been an ongoing production, for example, on orphan records, the 52,000 orphans.

> The Court: Their letter said they don't want orphan records, so why are we
> talking about producing even 12 orphan records. They have made it clear they
> could care less which orphans got $2 a month in exchange for their fingerprints.
>
> Mr. McMahon: I thought they wanted the list of the orphans and we can't just
> push a button in the computer and that spits itself out; we have to go in and do the
> hard copies.
>
> The Court: Let's clear that up. Mr. Carter, whoever wants to chime in, do you
> want the list of orphans?
>
> Mr. Carter: Your Honor, we don't. We discussed this very issue at the April 12
> hearing. We had a colloquy with the court during which you said, I take it you
> don't want the orphan records, and we said, correct, your Honor. We followed up
> with emails subsequently making clear that we don't want the orphan records. So
> the fact that we are continuing to have this same discussion is a source of
> frustration.

*See* June 23, 2011 Discovery Hearing Transcript, pp. 6-7.

To this day, the defendants continue to push the production of approximately 100,000
pages of self-serving orphan records that Plaintiffs have consistently stated they do not want.
*See* Opposition, pp. 5, 19. The MWL and IIRO cannot credibly claim that are acting in good
faith with these actions.

## 4. Defendants spent countless hours on a warehouse index the Plaintiffs did not request.

The defendants additionally cite the considerable amount of time spent on the preparation
of the IIRO warehouse index as further evidence of their good faith. However, like the
categories of documents cited above, the index is merely another example of an on-going pattern
to redefine the nature of discovery, evade their obligations to actively search for and segregate
responsive materials, and produce documentation neither requested by the Plaintiffs nor the least
bit helpful.

As the Court will recall, the index (containing 100,000 Arabic entries) was produced in
response to Plaintiffs' March 16 and March 24 Motions to Compel, and just days prior to the
April 12 hearing to address the first motion. Those motions were predicated upon the
defendants' failure to produce specific categories of documents requested by the Plaintiffs years
earlier. Instead of trying to locate and produce the underlying documents, the defendants
assumed that the production of the index would excuse their on-going deficiencies. The Court
disagreed and issued its first Order directing the defendants to produce all documents requested
by the Plaintiffs. That the defendants are continuing to try to redirect focus from the actual
documents responsive to the discovery requests to an essentially useless, uninformative "index,"
is even more evidence of the defendants' lack of good faith.

## 5. Defendants continue to seek and produce cost estimates to copy the entire IIRO warehouse.

Soon after the commencement of merits discovery with the MWL and IIRO, rather than even considering performing the obligated good faith search for responsive documents, the defendants provided the Plaintiffs with a cost estimate they had obtained to copy and/or scan all of the documents (responsive or not) located in the IIRO warehouse.[14] Despite advising the defendants that Plaintiffs were not interested in copying the entirety of the IIRO warehouse, the MWL and IIRO continued to seek and produce various copying estimates during the course of discovery.[15] Plaintiffs have made it clear to the defendants on several occasions that they have never been interested in copying *all* documents from the IIRO warehouse, yet the defendants persist in spending their time and resources to obtain these estimates. *See* Opposition, p. 9 (stating that the defendants have secured costly bids from certain vendors to scan and copy the entire IIRO warehouse and approximately 1 million pages of MWL documents). Plaintiffs submit that the defendants' time would have been better served searching for and producing responsive discovery materials as ordered by this Court.

## E. Contrary to The Defendants' Assertions, the Relevant Decisional Law Within The Second Circuit Supports The Entry Of Default Judgments Against The MWL And IIRO As The Only Appropriate Sanction

Courts within the Second Circuit hold that the imposition of case terminating sanctions pursuant to Rule 37 is appropriate where the party has willfully refused to comply with the court's discovery orders. *See Southern New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 147-149 (2d Cir. 2010) (affirming the district court's decision to enter default judgments against the defendants where the record fully supported the court's determination that: (i) the defendants acted willfully and in bad faith; (ii) the defendants' conduct was not isolated but formed a pattern of "prolonged and vexatious obstruction of discovery with respect to . . . highly relevant records;" and (iii) the defendants were clearly warned that failure to produce documents would likely result in the imposition of a default judgment); *Dayco Corp. v. Foreign Transactions Corp.*, 1984 U.S. Dist. LEXIS 15031, *7 (S.D.N.Y. July 11, 1984) (concluding that the defendant's failure to comply with discovery orders was willful, the court affirmed the Special Master's recommendations to strike the defendant's answer and enter default judgment); *Hochberg v. Howlett*, 1994 U.S. Dist. LEXIS 5617, *9-12 (S.D.N.Y. May 3, 1994) (holding that case dispositive sanctions were appropriate given the party's willful refusal to comply with the court's clear discovery orders); *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 303 (2d Cir. 2009) (affirming lower court's case terminating sanctions where the party's noncompliance

---

[14] In a June 9, 2006 letter from Mr. McMahon to Plaintiffs' counsel, defense counsel states that he received a verbal quote for scanning document in the IIRO warehouse in Jeddah for $500,000.

[15] In a subsequent letter dated June 22, 2006, Mr. McMahon states that he received a preliminary estimate of $1 million to copy all IIRO documents. On September 6, 2006, Mr. McMahon provided the Plaintiffs with a $3 million estimate to scan all IIRO documents in both of its warehouses and at the Saudi headquarters in Jeddah. Finally, in his April 2, 2011 letter submission to the Court, defense counsel states that "both entities secured estimates (total $2.1 million) to copy and scan the IIRO warehouse and some 6,000 folders from the MWL office in Mekkah."

The Honorable Frank Maas
October 14, 2011
Page 23

with several discovery orders amounted to "sustained and willful intransigence in the face of repeated and explicit warnings from the court that the refusal to comply with court orders ... would result in the dismissal of [the] action.")

　　　*See also State Farm Mut. Auto. Inc. Co. v. Grafman*, 274 F.R.D. 442, 450 (E.D.N.Y. 2011) (noting that the innocent party had to "devote extensive time and resources to trying to obtain the most basic discovery," the court held that the entry of default judgment was warranted based on the intentional spoliation of evidence, the willful disregard of court orders, and at least gross negligence in failing to preserve critical evidence); *Microsoft Corp. v. Computer Care Ctr., Inc.*, 2008 U.S. Dist. LEXIS 112080 (E.D.N.Y. Apr. 8, 2008) (holding that the sanction of default was warranted where the defendant continued to disregard the court's discovery orders).

　　　As the case law makes clear, the entry of default judgment is more than warranted in the instant case where the MWL and IIRO have willfully and in bad faith refused to comply with three (3) discovery orders issued by this Court, admittedly destroyed relevant evidence, denied the existence of responsive documentation until Plaintiffs have submitted documentary evidence proving otherwise, intentionally misled this Court regarding several important discovery issues, and otherwise engaged in a pattern of prolonged obstructionist behavior throughout the entire discovery process. The imposition of lesser sanctions against the MWL and IIRO will most certainly prove fruitless and case terminating sanctions are therefore appropriate.

## IV.    CONCLUSION

　　　For the foregoing reasons, Plaintiffs again respectfully request that this Court grant Plaintiffs' motion for sanctions, strike the defendants' Answers, and enter default judgments against the MWL and IIRO pursuant to Fed. R. Civ. P. 37(b).

　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　MDC 1570 plnt    Ex. Conll

　　　　　　　　　　　　　THE MDL 1570 PLAINTIFFS' EXECUTIVE
　　　　　　　　　　　　　COMMITTEES

　　　　　　　　　　　　　By Jerry S Goldman

The Honorable Frank Maas
October 14, 2011
Page 24

---

cc:     The Honorable George B. Daniels
        Sean P. Carter, Esq.
        J. Scott Tarbutton, Esq.
        Robert T. Haefele, Esq.
        Jodi Westbrook Flowers, Esq.
        James P. Kreindler, Esq.
        Andrew J. Maloney, Esq.
        Jerry S. Goldman, Esq.
        Martin F. McMahon, Esq.
        Alan Kabat, Esq.

PHILADELPHIA\6219010\1 117430.000