# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

### AFFIRMATION OF J. SCOTT TARBUTTON, ESQ. ATTACHING EXHIBITS IN SUPPORT OF PLAINTIFFS' OCTOBER 14, 2011 REPLY LETTER BRIEF REQUESTING RULE 37(b) SANCTIONS AGAINST DEFENDANTS MUSLIM WORLD LEAGUE AND INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

J. Scott Tarbutton, Esq., affirms as follows:

1.     I am an attorney admitted to practice *pro hac vice* in the above-captioned matter, and a member of the law firm Cozen O'Connor.  I submit this Affirmation to transmit to the Court the following exhibits submitted in support of Plaintiffs' October 14, 2011 reply letter brief requesting sanctions pursuant to Fed. R. Civ. P. 37(b) against defendants, Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"), for their refusal to obey this Court's April 12, 2011, April 26, 2011, and June 23, 2011 discovery Orders.

2.     Exhibit 1 to this Affirmation is a true and accurate copy of the July, 7, 2011 joint letter submission from the Plaintiffs' Executive Committees and the Defendants' Executive Committee to the Honorable Frank Maas submitting proposals concerning the agenda for the July 13, 2011 discovery conference.

3.     Exhibit 2 to this Affirmation is a true and accurate copy of the Affidavit of Dr. Abdul Hamid al Mojil submitted to the U.S. Department of the Treasury's Office of Foreign Assets Control.

4.     Exhibit 3 to this Affirmation is a true and accurate copy of:  (i) the Republic of the Philippines Securities and Exchange Commission ("SEC") registration document for the

IIRO, dated September 20, 1991; (ii) the IIRO Articles of Incorporation filed with the Philippines SEC and notarized on September 19, 1991; and (iii) the IIRO By-Laws adopted September 2, 1991.

5.     Exhibit 4 to this Affirmation is a true and accurate copy of the April 1, 2011 letter from Martin F. McMahon to the Honorable Frank Maas.

6.     Exhibit 5 to this Affirmation is a true and accurate copy of the Sameer al Radhi Affidavits submitted on behalf of the MWL and IIRO.

7.     Affirmed in Philadelphia, Pennsylvania on October 14, 2011.

_____/S/_____

J. Scott Tarbutton, Esquire

PHILADELPHIA\6219643\1  117430.000

# **EXHIBIT 1**

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA FACSIMILE**

July 7, 2011

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

> **Re:** *In Re: September 11, 2001 World Trade Center Attack*, 03 MDL 1570 (GBD)

Dear Judge Maas:

The Plaintiffs' Executive Committees and the Defendants' Executive Committee, on behalf of the Defendants who are currently subject to discovery, respectfully submit their proposals concerning the agenda for the July 13, 2011 discovery conference.

Before addressing the agenda, however, the plaintiffs request that the Court grant the parties permission to bring laptops, iPads, and/or similar computer devices into the courthouse for the July 13, 2011 hearing. See Transcript of October 28, 2010 hearing, at 15-16. Defendants do not oppose the request for an endorsement to permit attorneys of record to bring electronic devices into the courtroom for the hearing.

### *Agenda Item 1 - Discovery Schedule Issue:*

*Plaintiffs' Proposal:*

Plaintiffs request the opportunity to address to Your Honor's attention the continuing concerns about the discovery schedule and the impossibility that discovery will be completed by the current August 2011 deadline. In plaintiffs' view, among the factors complicating that deadline are the length of time necessitated to fully brief discovery disputes (no less than three weeks), the fact that most of the defendants have still produced an inconsequential volume of

The Honorable Frank Maas, U.S.M.J.
July 7, 2011
Page 2

_____

documents, either in quantity or quality, and the number of outstanding defense objections and discovery disputes that remain among the parties.

In response to an inquiry from the defendants' inquiry as to what extension plaintiffs suggest, plaintiffs advised that plaintiffs would agree to a three month extension of the August 2011 deadline with a correlating three month extension of the October deadline, but with the understanding that these deadlines may once again need to be revisited.

### Defendants' Response:

Defendants do not oppose the request for a three month extension of the August 29, 2011 deadline for the production of documents, and will discuss the remaining deadlines at the hearing.

### Agenda Item 2 - Perouz Sedaghaty Discovery:

### Plaintiffs' and Defendants' Joint Proposal:

Plaintiffs and defendants request that the Court address the issue of the plaintiffs' letter application to compel discovery from defendant Perouz Sedaghaty (a/k/a Pete Seda), which was completely briefed as of July 6, 2011, pursuant to the Court's directions for briefing discovery disputes.

### Agenda Item 3 - MWL and IIRO Discovery:

### Plaintiffs' Proposal:

In accordance with the Court's directions during the June 23, 2011 discovery conference, plaintiffs request that the Court address the matter raised during the June 23, 2011 conference – namely, the burden of defendants IIRO and MWL to establish that they have fully complied with this Courts prior orders as to production of certain discrete groups of documents identified from the plaintiffs' full set of requests served on IIRO and the MWL.[1]  To avoid ambiguity, one set of eight categories of documents were identified in plaintiffs' letter dated March 16, 2011 and discussed during the April 12, 2011 and June 23, 2011 discovery conferences – they include:

1.  Annual, semi-annual and other periodic financial reports of the MWL and IIRO (including the branch offices), such as annual reports, balance sheets, financial statements, bank account summaries, audits etc.;

2.  Lists of recipients of aid from the MWL or IIRO offices, to include lists which can be generated through any computer or electronic data storage systems of those organizations;

_____

[1] Plaintiffs remind the Court that these categories of documents were selected, based on meet and confer sessions with defendants' counsel over the course of several years, to represent sets of documents that would begin the discovery process because they were identified as discrete groups that were more readily available for production.  They do not represent the totality of discovery already formally requested from these defendants.

The Honorable Frank Maas, U.S.M.J.
July 7, 2011
Page 3

3. All documents relating to the annual Constituent Council of the MWL, including without limitation reports submitted by internal and external offices of the MWL and IIRO; studies and research papers considered during the annual Council meetings; records relating to the activities of Special Committees of the MWL or IIRO; transcripts or recordings of speeches and discussions during the Council meetings; Resolutions and recommendations of the Council, agendas, etc.;

4. Annual or periodic reports concerning the objectives and activities of the MWL or IIRO;

5. Reports authored by delegations or groups sent by the MWL or IIRO to assess conditions and needs in regions outside of Saudi Arabia;

6. Reports submitted by the field offices of the MWL and IIRO concerning their operations and finances;

7. Summaries of disbursements by the MWL and IIRO; and

8. Documents describing the organizational structures of the MWL and IIRO, to include documents relating to the relationship between the various offices of those organizations, and the relationship between the MWL and IIRO more generally.

In addition, a second set of six additional categories were identified in plaintiffs' letter dated March 21, 2011, discussed during the April 26, 2011 and June 23, 2011 discovery conferences, and referenced in the Court's April 27, 2011 order – they include:

1. IIRO's banking and financial documents;

2. Documents detailing IIRO's organizational structure and its relationship to the Muslim World League;

3. Documents relating to IIRO's relationship with Mohammed Jamal Khalifa (senior member of al Qaeda and the IIRO's Regional Director in South East Asia);

4. Documents relating to the IIRO's relationship with E.O. 13224 SDGT Wa'el Hamza Jelaidan;

5. IIRO's role in supporting al Qaeda training camps in and around Afghanistan, and

6. Documentation relating to IIRO employees linked to the sponsorship of radical, extremist, or terrorist activities or organizations.

As previously indicated during the June 23 conference, although plaintiffs will certainly endeavor to address the defendants anticipated claim that they have fully complied with their discovery obligations, the very short interval between the Friday, July 8 cutoff for the defendants to produce additional information and the Monday, July 11 date for the parties' submissions to

The Honorable Frank Maas, U.S.M.J.
July 7, 2011
Page 4

_____

the Court for the July 13 conference may necessitate additional time for review of any additional documents before a more complete demonstration of the defendants' failures.

In addition, based on the Court's direction during the June 23, 2011 conference, plaintiffs anticipate the court addressing the following related issues:

1.   The correction of the bates stamp problems identified during the June 23, 2011 conference ("[I]f your clients have produced un-Bates-stamped documents or documents which bear numbers that have previously been used, they are going to have to reproduce those documents with a new set of Bates numbers that don't use the same Bates numbers for two discrete documents. And I will expect that that also will have been accomplished ... before July 12 or 13, not around or a day or two after whenever we hold the conference." Transcript of June 23, 2011 Conference, page 19, lines 13-21.)

2.   Reporting to the Court regarding the anticipated informal meet and confer telephone conference between plaintiffs' counsel and defense counsel and Mr. al Rahdi (and an Arabic translator if needed)

3.   Clarification of IIRO's and MWL's position as to whether either defendant is excluding from review and/or production any class of documents, for example, because of a claim that such documents are non-discoverable due to some claim of sovereign immunity or concern (as Mr. McMahon characterized during the June 23, 2011 conference) "sensitive attorney-client issues," due to some alleged relationship between the defendants and the Kingdom of Saudi Arabia, notwithstanding the fact that the Kingdom has previously disclaimed that either the MWL or IIRO has been an agency, instrumentality, or organ of the Kingdom.

_Defendants MWL's and IIRO's Response:_

Counsel for defendants MWL and IIRO respectfully submits the following in response to plaintiffs' statements in this letter regarding the document production, and in response to this Court's Order (Doc. No. 2442).

1.   Categories 1-8 have been provided for both the Muslim World League ("MWL") and the International Islamic Relief Organization ("IIRO").

2.   The second set of categories 1-6 has been provided. With respect to the second set of categories, counsel for MWL and IIRO understands that Plaintiffs will object to this production and request more documentation for Wael Jelaidan, Jamal Khalifa, and Al-Mujil. However, MWL and IIRO do not have any further documents, and they not obligated to produce something they do not have.

The Honorable Frank Maas, U.S.M.J.
July 7, 2011
Page 5

---

3.  MWL and IIRO, pursuant to this Court's Order, at ¶ 2 (Doc. No. 2442), will re-produce all documents previously produced that either lacked a Bates number of were not stamped with unique numbers.

4.  The alleged invocation of Kingdom of Saudi Arabia privileges – When counsel for MWL and IIRO provided the Plaintiffs with 21 binders in 2008 (MWL 00001-MWL 05121), therein were contained the documents plaintiffs have demanded. MWL and IIRO are not now invoking any sort of governmental privilege.

5.  There are anywhere from 12-21 boxes returned from the FBI and Homeland Security which counsel for MWL and IIRO have made available, but which the Plaintiffs inexplicably do not want to examine. These are the documents, based on the search warrant, that the FBI thought were the documents that would establish that the charities support terrorism, but did not result in any prosecution of MWL and IIRO. These were seized from the Virginia and New York offices for the MWL and IIRO. They were also reviewed by the Senate Finance Committee to determine if the 501(c)(3) status of either MWL or IIRO should be revoked. The Committee found no basis for such a revocation.

6.  Index to the IIRO warehouse – The Court suggested that an index be prepared for the IIRO warehouse, and it was. The Plaintiffs now have a problem with the indexes and claim that they are worthless. Hopefully this issue can be refined at the meet and confer that will be held on July 11, 2011, pursuant to this Court's Order, at ¶ 3 (Doc. No. 2442). Mr. Carter has assured counsel for MWL and IIRO that an agenda will be provided beforehand so that Mr. al-Radhi can focus on the discovery issues Plaintiffs are claiming still exist.

7.  Defense counsel for MWL and IIRO apologizes to the Court, but he does not believe he can attend the hearing on July 13, 2011 in person, and will have to participate by telephone. There are no funds available for such travel.

8.  Offer to visit MWL/IIRO offices – As the Court is aware, the offer to visit MWL/IIRO offices in New York has been extended to the international offices including Madrid, Gibraltar, London, and Tanzania. Plaintiffs have not accepted this offer.

9.  Composition of Plaintiffs' reviewing committee – At the prior hearing it came up that there are a number of translators involved in terms of determining the adequacy of production. MWL and IIRO are concerned that some of these translators may actually be independent "researchers" and "experts" who have repeatedly published negative reports about Islamic charities and could misuse the review of MWL and IIRO documents to their own benefit, or to provide misleading information as to the alleged adequacy of the document production. Therefore, MWL and IIRO request that the plaintiffs be required to provide a list of all persons who will be translating or reviewing the documents.

The Honorable Frank Maas, U.S.M.J.
July 7, 2011
Page 6

10.  Another issue that the Court has not addressed is the recommendation of counsel for MWL and IIRO that the Plaintiffs come to Jeddah and verify what has been produced and what allegedly has been hidden.  MWL and IIRO should not have to bear the burden of copying their entire archived files and transporting those to this country.

11. Another issue is the existence of a bona fide offer from a major discovery vendor UnitedLex concerning the MWL's 6,000 folders. The Court has not yet acted upon this.

12. IIRO banking records for 1995-2002 have been made available in the office of counsel for MWL and IIRO for inspection by Plaintiffs.  Counsel for MWL and IIRO is in the process of coordinating with Mr. Carter a date for inspection of these records.

13. Another issue that the Plaintiffs have raised is production of documents concerning the Afghan war.  If this is Plaintiffs' new theory, then MWL and IIRO should be allowed to file a third party complaint against those who funded the Afghan war in the 1980s.  And the report that the Plaintiffs rely upon to assert there is a role IIRO played in Al Qaeda training camps is undated, unsigned, and is based on "clandestine reports."  The Court should not be concerned about this document at all, which is akin to the "Golden Chain" document that has been rejected by at least five judges, including Judge Casey.

Finally, counsel for MWL and IIRO wants to remind the Court that the Plaintiffs' theory is that those Defendants acted as the epicenter of terrorism financing, and their offices are the channels for this financing.  This is why counsel for MWL and IIRO cannot comprehend Plaintiffs' refusal to inspect the offices mentioned above.

Respectfully submitted,

Robert T. Haefele
THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

Alan R. Kabat
DEFENDANTS' EXECUTIVE COMMITTEE

cc:    Hon. George B. Daniels (By Federal Express)
       MDL-1570 counsel (By electronic mail)

# **EXHIBIT 2**

## AFFIDAVIT

Under pain of perjury I Dr. Abdulhamid Al Mojil hereby give this affidavit in support of the application of the International Islamic Relief Organization's (hereafter IIROSA) to have the Indonesian office , the Philippines Office and Abdulhamid Al Mojil be undesignated by the United States Treasury Department.

1.  I, of course was designated along with the above offices on Friday  August 4, 2006. There is absolutely no basis for this designation.

2.  I have worked with IIROSA for 18 years. I have served in the following capacities:

    2.1. Executive Director for 15 years. The Title of Executive Director was fundamentally a nominal one, and not functional in respect of powers of execution and decision making. The real nature of my position functionally was one of an administrative officer.

    This evidenced by the following facts:

    2.1.1.  I did not have the power to hire and fire employees or to assign any employee to particular task.

    2.1.2.  I did not have the authority to authorize use of funds of IIROSA for any purpose other than when specifically instructed to do so by the Regional General Supervisor  which is equivalent to a chef executive officer (CEO) for the eastern region .

    2.1.3.  Payments or outlay of funds were made in accordance with the authorized budget for the particular project through the relevant countrywide committee in respect of each country for which the humanitarian aid is allocated.

    2.1.4.  Payments in respect of projects for which there is an authorized budget were authorized by the Regional General Supervisor (CEO) to the relevant country committee and then the actual payment was effected through the joint signatures of two persons, at least, among a number of persons who held joint signatory capacity for effecting authorized payments.

    2.1.5.  I did not have the power to authorize any payment; however small the amount may be, in connection with any of the IIROSA's activities outside the Kingdom of Saudi Arabia, unless the particular payment is authorized by the Regional General Supervisor (CEO)., and even then the actual payment was effected through a joint signature of the authorized signatures as explained above.

    Such payment can be authorized and effected only if  there was an authorized budget in respect of such payment, and that such payment related to an authorized project that falls within IIROSA's humanitarian activities, such as maintaining orphanages and helping orphans and the destitute generally, or digging wells to provide potable water. It is worth noting that the average price per well was about US$ 500 and the average price for building a mosque was US$15000 Dollars per mosque.

IIRO 04054

2.1.6.  In respect of administrative and operational matters my responsibilities basically involved execution of the instructions and decisions of senior management as were directed to me from time to time by the Eastern Region General Supervisor (equivalent to CEO). Specifically, I did not have any level of authority in respect of effecting payments or receiving payments whether locally or internationally and I did not have the authority for independent decision making of whatever nature as relates to receiving or effecting payments.

In my capacity as Executive Director during the period between 1989 and 2005 my responsibilities were to undertake the following tasks:

2.1.6.1.   Follow up of the decision of the Regional Director of the Organization who is in charge of all department in head office Eastern province and the other branches in the region.

2.1.6.2.   Follow up the decisions of regional council of the organization.

2.2. I also worked for two years since 2005, as a Eastern Region General Supervisor, but this title did not entitle me with the authority of a CEO because the authority for executive matters was retained by the Head Office in Jeddah during my term in this capacity. I held this position until my designation by OFAC on August 4, 2006, whereupon I was instructed to stop any involvements with the IIROSA office in the Eastern Region which was then closed.

3.  I have never personally or on behalf of IIROSA contribute any funds or provide any form of assistance to Al Qaida even when the support of the mujihadeen in their resistance against the soviet communist occupation of Afghanistan was internationally approved with direct support from the US.

4.  I have never received donations on my own behalf or on behalf of the IIROSA from any source outside the Kingdom at any time. I have never met with Osama Bin Laden or Dr. Abdullah Azzam or a Abu Sayaf in the Philippines, or Khalid Al Shaikh, or with the Jamaa Islamia of Indonesian whether within or outside the Kingdom of Saudi Arabia, even at the time when the resistance of the mujahideen against the communist soviet occupation was internationally acceptable.

5.  I have never lived in Afghanistan whether during, before, or after the 1990. I did however stay in Pakistan for three weeks on a short business visit to the Office of IIROSA in Peshawar in 1990. The reason I stayed for three weeks, is that I was requested by the College of Architecture which was newly set up in Peshawar to give lectures in construction engineering and planning pending the arrival of the assigned lecturer.

6.  My travels were mainly limited to the Gulf states for visiting relatives or shopping. However, after the year 1995 I did travel to some Arab country such as Lebanon, Syria, and Jordan for tourism. During the same year I also traveled to Yemen on two occasions attending conferences about orphans under the auspices of the President of Yemen.

IIRO 04055

7. The IIROSA activities in Indonesia are carried under the supervision of the Eastern Region office of IIROSA and not under my supervision. I traveled to Indonesia almost 10 years ago to visit the IIROSA office there.

8. The Eastern Region office does not have much activity in the Philippines which is carried out directly by the Philippines office of IIROSA. However I traveled to the Philippines about three to four times to visit the IIROSA office and the IIROSA activities there. The last such trip that I made was about seven years ago.

9. The senior officer of IIROSA in the Eastern Region is the General Supervisor which is equivalent to a Chief Executive OFFICER (CEO) for the Eastern Region. All matters concerning the Eastern Region or which are under the auspices of the Eastern Region are referred to the General Supervisor (CEO). These included offices and activities in: a) Indonesia through the Dammam office, b)Thailand through the AlKhobar office, c) the Philippines through the Hafr Al Beatin office, c)the office in India through the Al hassa office and d) the Sudan through the Jubail office.

10. My own direct  area of activity is the follow up of the Islamic University of Jala in southern part of Thailand.  However, after the resignation of the General Supervisor in 1424 (2004), I was assigned as General Supervisor of the Eastern Region, however as mentioned above, the follow up function of the IIROSA activities in the above countries was, as of my assignment to this position, transferred to the Head Office in Jeddah.

11. I was never called for questioning by any authority regarding Afghanistan regarding any involvement with the Afghanistan struggle because I had no connection of whatever nature with any of those suspected of having extremist or terrorist views or connections which in any case I do not have.

12. I have never ever invited Philippines to Saudi Arabia and I did not go to Hajj at 2004.

13. I strongly object to the designation as unfounded and deny each and all allegations and statements directed against me as supporting Al Qaida and terrorism of any type.

Abdulhamid Al Mojil



IIRO 04056

# EXHIBIT 3



**SEC EXPRESS LANE**

Republic of the Philippines

# Securities and Exchange Commission

EDSA, Greenhills, Mandaluyong
Metro-Manila

S.E.C. Reg. No. _____ 195916

TO ALL TO WHOM THESE PRESENTS MAY COME, GREETINGS:

and By-Laws
WHEREAS, Articles of Incorporation duly signed and acknowledged for the organization of the

ILRO — INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, INC.

under and in accordance with the provisions of the Corporation Code of the Philippines, Batas Pambansa Blg. 68, approved on May 1, 1980, were presented for filing in this Commission on September 20, 1991 _____, and a copy of said Articles is hereto attached;

NOW, THEREFORE, by virtue of the powers and duties vested in me by law, I do hereby certify that the said Articles of Incorporation were, after due examination to determine whether they are in accordance with law, duly registered in this Commission on the 20th day of September _____ Anno Domini, Nineteen Hundred and Ninety-one.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the seal of this Commission to be affixed at Mandaluyong, Metro Manila, Philippines, this 20th day of September _____ in the year of our Lord nineteen hundred and ninety-one.

RECEIVED ORIGINAL
BY: _____
DATE: 9-25-91

JL/ape

SONIA M. ZALDO
Director
Corporate and Legal Department

SEC EXPRESS LANE
FORM NO. I-NS (Ordinary Non-Stock)



# ARTICLES OF INCORPORATION

## OF

IIRO-International Islamic Relief Organization, Inc,.
Name of Corporation

**KNOW ALL MEN BY THESE PRESENTS:**

The undersigned incorporators, all of legal age and a majority of whom are residents of the Philippines, have this day voluntarily agreed to form a non-stock corporation under the laws of the Republic of the Philippines.

### AND WE HEREBY CERTIFY:

**FIRST:** That the name of the said association shall be:

IIRO – International Islamic Relief Organization, Inc,.

**SECOND:** That the purpose or purposes for which such corporation is incorporated are:

1. To provide humanitarian services which will develop and elevate the Educational, Social, and Health aspects in the Philippines community;

2. To assist in the different natural and Man-made calamities in the Philippines by giving financial assistance and Relief Goods, Clothings, etc.;

3. To own, acquire, purchase, lease, sell, convey, transfer, and establish, Orphanage Centers,       , Mosques, Machanery Equipments,       , and other to/be used in facilitating the aforesaid of the level of the Pilipines;

4. To accept Donations and Contributions from National and Foreign Sources; and

5. Other incidental purposes not mentioned above.

Note: Submit mode of operation or how to carry out the purposes of the Corporation.
(All information indicated for in this form should be typewritten)

2

030474

THIRD: That the principal office of the association is located in the City/Municipality of Makati, Metro Manila, Philippines.

FOURTH: That the term for which the said association is to exist is _Fifty Years_ ( 50 ) years from and after the date of incorporation.

FIFTH: That the names, nationalities and residences of the incorporators of the association are as follows:

| Name | Nationality | Residence |
|---|---|---|
| Mohammad J. Khalifah | SAUDIA | 202-IMC Bldg. 900 U.N. Ave. Malate, Mla. |
| Zakaria M. Shikh | JORDANIAN | Valero Tower Bldg. Valero St. Salcedo Village, Makati, Metro Manila |
| Gemma C. Cruz | Filipina | Lot. 7 Blk.17 Makariisa Vill. Tagig, M.M. |
| Abubakar S. Sarifadden | Filipino | #940 Sn. Andres St. Malate, Manila. |
| Alice A. Yabo | Filipina | 202-IMC Bldg.900 U.N. Ave., Malate, Mla. |

SIXTH: That the number of trustees of the association shall be _Five_ ( 5 ) and the names, nationalities and residences of the first trustees of the association are as follows:

| Name | Nationality | Residence |
|---|---|---|
| Mohammad J. Khalifah | SAUDIA | 202-IMC Bldg. 900 U.N. Ave. Malate, Mla. |
| Zakaria M. Shikh | JORDANIAN | Valero Tower Bldg. Valero St. Salcedo Village, Makati, Metro Manila |
| Gemma C. Cruz | Filipina | Lot.7 Blk.17 Makariisa Village, Tagig,M.M |
| Alice A. Yabo | Filipina | 202-IMC Bldg. 900 U.N. Ave. Malate, Manila |
| Abubakar S. Sarifadeh | Filipino | #940 Sn. Andres St. Malate, Manila |

030474

SEVENTH: That the present members of the association with their contributions are the following:

*(List of additional members, should be submitted to the Securities & Exchange Commission.)*

| Name | Constitution |
|------|--------------|
| Mohamad J. Bashish | P 7,000.00 |
| Zakaria M. Smith | P 5,000.00 |
| Gasm-O-Casm | P 7,000.00 |
| Allee A. Yabo | P 5,000.00 |
| Ababakar S. Bashish | P 7,000.00 |

EIGHTH: That _____ Gasm-O-Casm _____ has been elected by the members as Treasurer of the association to act as such until his/her successor is duly elected and qualified in accordance with the by-laws, and that as such Treasurer, he/she has been authorized to receive for and in the name and for the benefit of the association, all contributions or donations paid or given by the members.

IN WITNESS WHEREOF, we have hereunto signed this Article of Incorporation, this ____ day of September, 19 ____, Province of ____, in the City/Municipality of Makati ____, Republic of the Philippines.



5

030474

## ACKNOWLEDGMENT

REPUBLIC OF THE PHILIPPINES) s.s.
　　QUEZON CITY　　)

BEFORE ME, a Notary Public, for and in QUEZON CITY
Philippines, this _18th_ day of _September_ 19 _91_,
personally appeared the following persons with their corresponding
Residence Certificate Nos.:

| Name | Res. Cert. No. | Date/Place Issued |
|------|----------------|-------------------|
| Mohammad J. Khalifah | 5466780 L | 11/03 / 91 — Manila |
| Zakaria M. Shaikh | 5467846 L | 11/03/91 — Manila |
| Gemma C. Cruz | 5467840 L | 11/03/91 — Manila |
| Alice A. Yabo | 5466790 L | 11/03/91 — Manila |
| Abubakar A. Sarifudah | 5483717 L | 27/2 /91 — Manila |

known to me and to me known to be the same persons who executed
the foregoing Articles of Incorporation constituting of five (5)
pages, including this page where the acknowledgment is written, and they
acknowledged to me that the same is their free act and voluntary deed.

WITNESS MY HAND AND SEAL on the day first above-written.



Doc. No. _179_;
Page No. _98_;
Book No. _XXIV_;
Series of 19 _91_

SEC EXPRESS LANE
BY-LAWS (Non-Stock)

030474



EXPRESS LANE UNIT
O. K. FOR PAYMENT
9 20 3

BY - LAWS

OF

IIRO - International Islamic Relief Organization, Inc,.
_____
Name of Corporation

## ARTICLE I
### Meetings

Section 1. Annual Meetings — The annual meetings of the members shall be held at the principal office of the association on 2 January _____ of each year.
( Date of meeting )

Section 2. Monthly/Special Meetings — Monthly/Special meetings of the members shall be called every end of the month by the President of the association. During such meetings, the President shall render his monthly report to the members regarding the activities of the association.

Special meetings may be called as the need thereof arises, by the Board of Trustees or the President or upon petition of 1/3 of the general membership.

Section 3. Notices — Notices of the date, time and place of annual, monthly and special meetings of the members shall be given either personally or by special delivery mail, at least one week before the date set for such meeting. In urgent cases, the notice may be communicated at least two days before the meeting personally or by telephone, or by telegram, if contact is not possible. The notice of every special meeting shall state briefly the purpose or purposes of the meeting. No other business shall be considered at such meeting, except with the consent of all the members present thereat.

Section 4. Waiver of Notice — Notice of meeting may be waived verbally by any member attending it.

Section 5. Quorum — A quorum for any meeting of the members shall consist of a majority of the members and a majority of such quorum may decide any question at the meeting, except those matters where the Corporation Code requires the affirmative vote of a greater proportion.



030474

2

**Section 6. Order of Business** — The order of business at the annual meeting of the members shall be as follows:

a. Proof of service of the required notice of the meeting, except when such notice is waived by the members constituting a quorum.

b. Proof of the presence of a quorum.

c. Reading and approval of the minutes of the previous annual meeting, except when said meeting is dispensed with by a majority vote of those present.

d. Unfinished business.

e. Report of the Trustees.

f. Election of the Trustees for the ensuing year.

g. Other matters.

The order of business at any meeting may be changed by a vote of a majority of the members present.

**Section 7. Voting Proxy** — Members shall be entitled to one vote and they may vote either in person or by proxy, which shall be in writing and filed with the Secretary of the Association before the scheduled meeting.

## ARTICLE II
### Trustees

**Section 1. Board of Trustees** — The corporate powers of this corporation shall be exercised, its business conducted and its property controlled by the Board of Trustees.

**Section 2. Qualification** — No person shall be eligible for election to the Board of Trustees unless he is qualified for membership.

1. [illegible]
2. [illegible]
3. [illegible]
4. [illegible]

3

030474

Section 3. Disqualification of Directors, Trustees or Officers — No member convicted by final judgment of an offense punishable by imprisonment for a period exceeding six (6) years, or a violation of this code, committed within five (5) years prior to the date of his election or appointment, shall qualify as a trustee or officer.

## ARTICLE III

### Officers

Section 1. Officers — The officers of the association shall be a President, a Vice-President, a Secretary, a Treasurer and an Auditor. They shall be elected by the Board of Trustees from among themselves. The Board may combine compatible offices in a single person.

Section 2. Term of Office of Officers — All officers of the association shall hold office for one year and until their successors are duly elected and qualified.

## ARTICLE IV

### Functions & Powers of Officers

Section 1. President — The President shall be the Chief Executive Officer of the association. In addition to duties as such. He shall preside in all meetings of the Board of Trustees and those of the members of the association.

He shall execute all resolutions and/or decisions of the Board of Trustees. He shall be charged with directing and overseeing the activities of the association. He shall appoint and have control over all employees of the association, review and approve expense vouchers. Together with the Secretary of the association, he shall present to the Board of Trustees and the members an annual budget and, from time to time as may be necessary, supplemental budgets. He shall submit to the Board as soon as possible after the close of each fiscal year, and to the members of each annual meeting, a complete report of the activities and operations of the association for the fiscal year under his term.

Section 2. Vice-President — The Vice President if qualified, shall exercise all powers and perform all duties of the President during the absence or incapacity of the later and shall perform duties that maybe assigned by the board of directors.

Section 3. Secretary — The Secretary shall give all the notices required by these by-laws and keep the minutes of all meetings of the members and of the Board of Trustees and of all meetings of all committees, in a book kept for the purpose. He shall keep the seal of the

4                          030474

association and affix such seal to any paper or instrument requiring the same. He shall have custody of the correspondence files and all other papers that are to be kept by the Treasurer. He shall maintain the members' register, have charge of the bulletin board at the principal office of the association. He shall also perform all such other duties and work as the Board of Trustees may from time to time assign to him.

Section 4. Treasurer — The Treasurer shall have charge of the funds, receipts and disbursements of the association. He shall keep all moneys and other valuables of the association in such bank or banks as the Board of Trustees may designate. He shall keep and have charge of the books of accounts which shall be open to inspection by any member of the Board of Trustees, whenever required, an account of financial condition of the association and of all transactions made by him as Treasurer. He shall also perform such other duties and functions as may be assigned to him from time to time by the Board of Trustees. He shall post a bond in such amount as may be fixed by the Board of Trustees.

Section 5. Auditor — He shall examine financial records and audit money. He shall also perform other functions as may be provided for by the Board of Trustees.

## ARTICLE V

### Members

Section 1. Qualifications for Membership — The board shall determine the qualifications of an applicant for membership.

Section 2. Rights of Members — A member shall have the following rights:

a.   To exercise the rights to vote on all matters relating to the affairs of the association;

b.   To be eligible to any elective or appointive office of the association;

c.   To participate in all deliberations/meetings of the association;

d.   To avail of all the facilities of the association;

e.   To examine all the records or books of the association during business hours.

030474

• 6

Section 4. Fiscal Year — The fiscal year of the association shall be from January 1st to December 31st of each year.

## ARTICLE VIII

### Corporate Seal

Section 1. Form — The corporate seal of the association shall be in such form and design as may be determined by the Board.

## ARTICLE IX

### Amendments of the By-Laws

Section 1. Amendments — These by-laws, or any provision thereof, may be amended or repealed by a majority vote of the members and by a majority vote of the Trustees at any regular or special meeting duly held for the purpose.

Adopted this ___2nd___ day of ___September___ , 19 _91_ in __Makati__, __Metro-Manila_____ by the affirmative vote of the undersigned members representing a majority of the members of the association in a special meeting duly held for the purpose.

*(Note: 1. If filed with Articles of Incorporation, should be signed by all incorporators;*
*2. If filed after incorporation, should be signed by majority of the members and should submit director's certificate for the adoption of the by-laws)*

ABUBAKAR A. SARIPADA

MOHAMMAD J. KALIPAH

(Each signature must have the name or names provided for signature on the last page of the articles)

# **EXHIBIT 4**

# MARTIN F. MCMAHON & ASSOCIATES

1150 CONNECTICUT AVENUE, N.W.
SUITE 900
WASHINGTON, D.C. 20036

Established 1978

TELEPHONE (202) 862-4343
FACSIMILE (202) 828-4130

www.martinmcmahonlaw.com

MARTIN F. MCMAHON
Managing Partner
Admitted in District of Columbia, New York
and U.S. District Court of Maryland

CHRISTINE M. HILGEMAN
Associate
Admitted in Virginia and
District of Columbia

JAMES M. LUDWIG
Of Counsel
Admitted in District of Columbia

CHRISTOPHER R. SMITH
Of Counsel
Admitted in District of Columbia and
Maryland

TODD E. GALLINGER
Of Counsel
Admitted in California and
New York

ROBERT MANCE
Of Counsel
Admitted in District of Columbia and
Maryland

April 1, 2011

<u>VIA FEDERAL EXPRESS</u>

Hon. Frank Maas
United States Magistrate Judge
Southern District of New York
Daniel P. Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

**Re:   Opposition to Plaintiffs' Letter Application Dated March 16, 2011**

Dear Judge Maas:

This is the Defendants', International Islamic Relief Organization (hereinafter "IIRO") and Muslim World League (hereinafter "MWL"), response to the first motion to compel filed by the Plaintiffs via their letter application on March 16, 2011.

**<u>Introduction</u>:**
This Court will eventually be hearing two motions to compel concerning IIRO and MWL's alleged refusal to produce certain documentation. This opposition is in response to Plaintiffs' first motion to compel, i.e. letter application dated March 16th. The application focuses on a meet-and-confer session that occurred in 2007. While the Plaintiffs want to characterize that meeting as an agreement among counsel about future document production, as explained *infra*, it would have been virtually impossible for undersigned counsel to promise a forthcoming production of documents that do not exist, e.g. reports from field offices back to IIRO headquarters in Jeddah.

1. **<u>What is IIRO?</u>**
   IIRO is a worldwide affiliate of the Muslim World League, and its obligation is to build wells, provide for orphans, and overall help the underprivileged classes of the world. IIRO takes care of 18,000 orphans in Africa and has observer status at the United

1

Nations. It has over 90[1] field operations in the world where it houses orphans or builds wells in remote parts of Africa. Its Secretary General, Dr. Adnan Basha, not only has been dismissed from this lawsuit but has repeatedly and earnestly denounced global terrorism of any kind. IIRO is an important presence in various Muslim countries throughout the world, and is akin in its operations to the International Red Cross. Plaintiffs have been provided with numerous letters of commendation from many countries praising IIRO's efforts in helping the poor populations of the world.

## 2. The 9/11 case is inherently frivolous

To put the instant application in perspective, it is important to first understand the inherent weaknesses in this case and what is driving this outrageous discovery request. It is basically a flawed lawsuit premised on press clippings and the views of an alleged expert, Mr. Brisard. He is a totally disgraced author who has even had to apologize to a Defendant herein, Mr. Bin Mahfouz, for his reckless claims regarding an international conspiracy to fund terrorism. Indeed, the exact charge leveled by the Plaintiffs against IIRO.

The case against IIRO hinges on the Treasury Department, Office of Foreign Assets Control's designation of IIRO's former Philippines office, largely stemming from the fact that one of Osama bin Laden's brothers in law (Mr. Jamal Khalifa) oversaw that operation in the Philippines. But the Plaintiffs herein fail to recognize and/or admit that after being tried *in absentia* in Jordan and found guilty of terrorism charges, the Jordanian Court of Cassation completely exonerated Mr. Kahlifa regarding charges of funding international terrorism because of fraudulent affidavits. Thus, the centerpiece of this lawsuit against IIRO is lacking. *See Exhibit A.*

The second crucial piece of evidence that the Plaintiffs rely on herein is an alleged CIA intelligence report, which links IIRO to training camps in Afghanistan. It is another version of the "golden chain" document. For the court's edification, the "golden chain," Mr. Brisard's creation, has been rejected by at least four different judges, U.S. and U.K. based, including deceased Judge Casey.

The "CIA" document, just like the golden chain document has no author, is unsigned, and was produced by a "clandestine" source. This document is the alleged "smoking gun" that the Plaintiffs rely on when they claim that IIRO funds international terrorism. It is difficult to appreciate that if IIRO funds international terrorism on such a grand scale, why have only two of its 90 overseas offices been designated (which amounts to 2.2 percent)? Surely if IIRO, as the Plaintiffs have alleged, has engaged in a global campaign to fund terrorism, the Treasury Department would have found ample evidence of such a campaign. It is like condemning the Red Cross for financial record keeping issues because of a few individuals in its organization, or condemning the Catholic Church as a whole for its priests that have been convicted of abusing young Catholic men.

## 3. Categories of Documents[2]

---

[1] According to Plaintiffs' alleged CIA report discussed *infra*.
[2] All the documents referenced herein will be mailed on a CD to plaintiffs' counsel.

It is important to advise the Court that defense counsel never agreed to have this application heard on April 12th. It was, and is, his understanding that his clients' application concerning initial disclosures and World Assembly of Muslim Youth's (WAMY) motion to compel would be heard on that day. Counsel believes that two hours have been set aside for these items and did not understand that the Plaintiffs were insisting on hearing their first motion to compel during the same hearing. So it is on the record, Defendants oppose hearing the first motion to compel on April 12th and would recommend it being set at the earliest convenient time and have the companion motion to compel heard at the same time. Otherwise, it would be a genuine waste of judicial resources.

Category 1: Undersigned counsel had agreed to produce annual financial reports (which he believes have already been produced to the Ashton-Burnett Plaintiffs). So to put this issue aside, IIRO and MWL would be producing in Washington, DC annual financial reports or simply mail them to counsel for the relevant timeframe and make a representation that they do not have any other periodic reports. To counsel's knowledge, there are no specific financial reports from the branch offices because everything comes out of Jeddah concerning branch offices. Jeddah controls the purse strings of overseas offices and keeps an account of expenses, but there are no financial reports that come back from an overseas office to Jeddah regarding field operations. London and Madrid may be the exceptions.

Each organization has annual audits performed in connection with preparation of an accounting report, so those documents will be produced in Washington, D.C. as well for the relevant time frame.

With respect to the other items in Category 1, including bank account summaries, counsel would reiterate its invitation to the plaintiffs' lawyers to visit the MWL office in London to see first-hand how an active MWL/IIRO office operates. For the court's edification, there are a number of offices and field operations overseas where the MWL and IIRO share facilities for cost-saving purposes.

This invitation was extended to the Plaintiffs' attorneys and also an invitation to depose the document production manager for each entity, Mr. Sameer al-Radhi. Defense counsel suggested London as a meeting place, midway between New York and Jeddah. Plaintiffs' attorneys have refused those invitations, without explaining in writing why they decline such invitations. Those invitations were extended with a view toward narrowing the differences between the parties as to what can and will be produced by IIRO and MWL. Defendants' counsel figured that the more the Plaintiffs' lawyers learned about MWL and IIRO operations, the easier this discovery process could proceed. The Court should know that Plaintiffs' attorneys were also invited to other offices, e.g. Gibraltar, Madrid, and even offices in Africa, where the 1998 Embassy bombings occurred. Again, the invitation was extended so that we could jointly streamline the discovery process. The Plaintiffs could get the documents they need, and Defendants' operations worldwide would not come to a screeching halt.

In an effort to further assist the Plaintiffs' lawyers, both entities secured estimates (total $2.1 million) to copy and scan the IIRO warehouse and some 6,000 folders from the MWL office in Mekkah. The Court should have both estimates in its possession. These are staggering sums to consider, but given the fact that the Plaintiffs' lawyers propounded almost 300 separate document requests (considering the sub-parts), this is not an outrageous amount. It should also give the Court some pause in terms of allowing discovery to go unchecked in this case.

As the Court may not know, the Defendants have invited the Plaintiffs' lawyers to come to Jeddah and physically examine categories of documents so they would know what they want to have produced. Undersigned counsel has made arrangements to have documents moved from Mekkah to Jeddah so that non-Muslim attorneys would be able to look at documents from the MWL headquarters and offices in Mekkah.
In the interest of economy, it is estimated by undersigned counsel that having three attorneys fly to Jeddah would total approximately $128.000 (see exhibit 2). Weighing this number against the estimates for scanning and copying IIRO and MWL databases, it is appropriate that the Plaintiffs' lawyers seriously consider this option. The Court should further understand that undersigned counsel has on numerous occasions invited the 9/11 lawyers to visit the Kingdom and meet with IIRO and MWL representatives and see these people that they are accusing of serious criminal charges. That invitation has not been embraced.

Category 2: To illustrate the burden that such a requirement would have on IIRO, the Court would have to understand that IIRO sponsors 18,000 orphans in Africa alone, and as noted in the CIA report, IIRO has over 90 field offices worldwide. Based upon undersigned counsel's inspection of the orphan records in Jeddah, a list of the orphans and their mothers may simply be a matter of computer generation. The IIRO and MWL offices are in the process of communicating with undersigned counsel, who has personally inspected the voluminous orphans' records in IIRO's office in Jeddah. Also, 6,000 MWL folders in Mekkah have been identified as responsive to Plaintiffs' Rule 34 requests, and we are waiting for a response from Mekkah regarding specific identities of the various worldwide recipients of aid from IIRO or MWL.

Again, the Plaintiffs' lawyers would be able to ascertain records pertaining to relief recipients if they would first inspect MWL's London office to see how it operates. All documents (excluding attorney-client privileged documents) would be available for review. They could also meet with MWL's counsel in London who would identify the various documents contained in the London office database. He is now procuring an estimate from a discovery vendor concerning the London office documents. Counsel believes that would help the plaintiffs' lawyers understand the scope of the production they are seeking.

Category 3: Any and all documents relating to MWL Constituent Council meetings will be made available to plaintiffs either in Washington, D.C. or in Mekkah (such documents will be copied and transported to Jeddah for inspection). Annual reports reference the Council and its activities and will be provided to counsel.

Category 4: Such annual reports are available concerning MWL and IIRO's objectives ad activities and will be made available in Washington, D.C. or Jeddah.

Category 5: Given the number of field offices (over 90, as referenced in the alleged CIA memo), this would be a substantial burden on Defendants. It is suggested again that the plaintiffs' lawyers consider visiting the various offices that counsel has identified as a fair sample of MWL activities worldwide – London, where terrorist attacks have occurred; Madrid, where terrorist attacks have also occurred; and the Gibraltar office, which because of its proximate location to northern Africa, the CIA has identified it as a hotbed location of future terrorism. If there was any activity that IIRO or MWL was engaged in in northern Africa that could support international terrorism, it would probably show up in the area around the Gibraltar offices. Also the offices in Kenya and Tanzania (where the 1998 Embassy bombings occurred) would be a logical place for the Plaintiffs' lawyers to start reviewing documents that allegedly show evidence of support for international terrorism. Once the lawyers complete this sample of offices, they would have a better picture of how the offices function, leading to a more realistic assessment of how to satisfy their discovery needs.

Category 6: Defendants repeat the observations made in response to Category 5, i.e. visiting a sample of MWL offices worldwide, which would furnish them with better knowledge of the inner workings of the overseas offices. See the attached annual reports.

Category 7: Summaries of disbursements will be produced in Washington, D.C. or Jeddah, depending upon the timeframe. See the attached annual reports.

Category 8: Such documents will be produced in Washington, D.C. or Jeddah and/or Mekkah.

Finally, given consideration to many factors, including undersigned counsel's potential trip to Saudi Arabia, with the exception of Category 1 producing other categories of documents may not be feasible within 20 days.

Respectfully Submitted,
MARTIN F. MCMAHON & ASSOCIATES

Martin F. McMahon
*Counsel for Muslim World League, International Islamic Relief Organization, and Wael Jelaidan*

5

# EXHIBIT 5

بسم الله الرحمن الرحيم

مكة المكرمة - المملكة العربية السعودية     رابطة العالم الإسلامي

Makkah Al-Mukarramah - Saudi Arabia     **MUSLIM WORLD LEAGUE**



No. ........................... الرقـــم

Date ........................... التاريـــخ

Encl. ........................... المرفقات

مكتب الأمين العـام
**Office of the
Secretary - General**

### Affidavit of Sameer al-Radhi, MWL

1. MWL is an international Islamic Organization based in Mecca, Saudi Arabia providing guidance to Islamic teaching. It provides people affected by war and natural disasters with emergency relief and encourages inter-cultural dialogue

2. MWL strongly denounces and condemns all sort of terrorism whether it is physical terrorism, moral or intellectual. This is evident in all their policies and instructions, directives and regulations, and keen to assert that in every occasion.

3. During my work in MWL for nineteen years, and I did not find any evidence that MWL in any period of duration supported terrorism. On the contrary they distance themselves from it in any way. MWL always and on every occasion denounces and condemns any and all terrorist attacks.

4. With respect to September 11th tragedy, the incident is condemned with the strongest words. Nothing justifies this criminal act. It is a shameful exploitation of Islam in this despicable crime. It is equally unfair to accuse any Muslim organization simply because they are Muslim.

5. I am Sameer J. A. al-Radhi and I give this affidavit in support of the Muslim World League's (MWL) memorandum in opposition to the Plaintiffs' motion to compel.

6. I have worked at MWL for 19 years, and one of my major responsibilities was to work with Mr. McMahon on various issues that arose in the 9/11 case.

7. By my estimate I have spent, at least, a total of 600 hours on the 9/11 case for the MWL, and I had 5 assistants helping me in terms of responding to the Plaintiffs' document production requests. I believe my assistants logged 6,600 hours in the 9/11 case.

8. As a result of those efforts, we produced 20 binders which addressed the voluminous document production requests, and I understand Mr. McMahon shared those binders with the Plaintiffs' lawyers.

9. In the course of trying to satisfy that document request, I and my assistants performed a number of tasks, including but not limited to:
   a. Identification.

1

      b.  Categorization and classification.
      c.  Indexing and Filing.
      d.  Email Correspondence and Communication.
         P.S. This does not include the travel made to various countries to provide documents for discovery, or/ and meetings.

10. I understand that in addition to those 20 binders, Mr. McMahon had the Plaintiffs' lawyers visit his office to examine the 20 binders referenced herein, as well as numerous boxes of documents returned from the FBI and Homeland Security as well as the tax division of the IRS.

11. In addition to those documents, I myself was able to produce 6,000 MWL folders of documents that are in my view, responsive to the Plaintiffs' document requests. Because of the voluminous nature of the 6,000 folders (approximately 3,000,000 pages), we hired a discovery vendor called UnitedLex, and they came up with a bid to scan the 6,000 folders, and I understand Mr. McMahon has provided that bid to the Plaintiffs' lawyers.

12. We have compiled indexes for those 6,000 folders, and those indexes total ten pages. With those indexes, the Plaintiffs' lawyers can tell us which folders they wish to examine, especially financial documents.

13. All MWL documents are in hard copy format and are organized in files.

14. Almost 99% of the documents are in Arabic.

15. There is no electronic financial database for the period of 1992 – 2002, except the general ledger for each year.

16. In addition to that production, the MWL has set up a website, which contains documents going back to 1962, the founding date of the MWL. To the best of my knowledge there are approximately 150,000 pages of official documents, along with hundreds of thousands of pages of MWL publications that can be downloaded from the website. It displays 50 years of work from the MWL.

17. In order to access that website, it would be necessary to have an Arabic-speaking translator, but other than that, the documents are easy to download from there.

18. The contents of the website include:
      a.  The origins, objectives, goals and organizational structure of the MWL
      b.  Database of departments and offices of the MWL, including contact information
      c.  Advocacy issues
      d.  Education – MWL institute, scholarship and courses
      e.  Profile of MWL institutes
      f.  Courses offered by the Department of Islamic Dawa Affairs and the Department of Education
      g.  MWL's positions and views on various issues
      h.  A comprehensive archive of all official statements by the MWL

2



    i.  Major MWL publications (The Truthful Call, MWL Magazine, Magazine Fiqh and other publications)
    j.  MWL newspaper
    k.  A description of MWL projects and how to contribute
    l.  Complete archive of conferences and symposia
    m.  News
    n.  Complete information of all MWL bodies and conferences
    o.  Subsidy forms
    p.  Links
    q.  Membership

19. We came up with approximately 10 pages of indexes for the MWL database, and those indexes should afford the Plaintiffs' lawyers an opportunity to understand what is in the MWL database.

20. The reason the indexes are so voluminous is that:
    a.  The files are classified by country.
    b.  There are files for more than 60 countries, including Saudi Arabia.

21. Because Mr. McMahon told me the lawyers were afraid to visit the Kingdom, he requested that I secure a bid to scan the MWL database. I secured that bid, which was approximately $1,000,000, and provided it to him, which I assume he provided to the Plaintiffs' lawyers.

22. Because of the sheer volume of documents involved, Mr. McMahon asked me to be deposed by the Plaintiffs' lawyers, in terms of what documentation there was in the headquarters in Makkah and what documentation there was in different MWL offices around the world.

23. I agreed that I would sit for a deposition and try to explain to the 9/11 lawyers the complexity of the matter, and hopefully would be able to reduce the amount of documentation that they required.

24. I understand that Mr. McMahon made this proposal, but the 9/11 lawyers did not embrace it. I remain available to attend such a deposition preferably in Jeddah, but to accommodate the 9/11 lawyers, we could also do it in London.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.



Sameer al-Radhi                          Date

3

MUSLIM WORLD LEAGUE
INT'L. ISLAMIC RELIEF ORG.
THE KINGDOM OF SAUDI ARABIA
Member of the Economic & Social Council of the UN
(ECOSOC)



رابطة العالم الإسلامي
هيئة الإغاثة الإسلامية العالمية
بالمملكة العربية السعودية
عضو المجلس الاقتصادي والاجتماعي التابع للأمم المتحدة

Sub : ............................ : الموضــــوع

No : ............................ : الرقــــم
Date : ............................ : التاريخ

### Affidavit of Sameer al-Radhi, IIRO

1. IIRO is a non-governmental charitable organization, seeking to help the poor and needy widows, orphans and victims of natural disasters, without any distinction or discrimination. Article 2 of IIRO's constitution specifically states that it is established to "help in alleviating the suffering of distressed and needy people world-wide." It mainly relies on voluntary financing projects.

2. IIRO is a body of humanist principles completely incompatible with any kind of terrorism whether it is physical terrorism, moral or intellectual. This is evident in all their policies and instructions, directives and regulations, and keen to assert that in every occasion.

3. During my work in IIRO for nine years and knowing its inception, I did not find any evidence that IIRO in any period of duration supported terrorism. On the contrary they distance themselves from it in any way. IIRO always and on every occasion denounces and condemns any and all terrorist attacks.

4. With respect to September 11th tragedy, the incident is condemned with the strongest words. Nothing justifies this criminal act. It is a shameful exploitation of Islam in this despicable crime. It is equally unfair to accuse any Muslim organization simply because they are Muslim. But it is most unjust if the aim of these accusations is to disable humanitarian charitable organizations and deprive millions of beneficiaries of the programs offered by these organizations in health, education and welfare of orphans and digging wells.

5. I am Sameer J. A. al-Radhi and I give this affidavit in support of the International Islamic Relief Organization's (IIRO) memorandum in opposition to the Plaintiffs' motion to compel.

6. I had worked at IIRO for 9 years, and one of my major responsibilities was to work with Mr. McMahon on various issues that arose in the 9/11 case.

7. By my estimate I have spent, at least, a total of 7,740 hours on the 9/11 case, and I had three assistants helping me in terms of responding to the Plaintiffs' document production requests. I believe my assistants logged 13,068 hours in the 9/11 case.

1

Please qoute our Ref. No. and date in all correspondence!   Pour repondre, priere de citer la date et le numero de cette lettre!   الرجاء عند الرد الإشارة إلى رقم وتاريخ هذه الرسالة

العنوان : ص.ب ١٤٨٤٣ - جدة ٢١٤٣٤ - تليفون : ٦٥١٥٤١١-٦٥١٢٣٣٣ ٢ ٩٦٦+ فاكس : ٦٥١٨٤٩١ - ٦٥١٢٩٩٧ - ٢ ٩٦٦+
Address: P.O.Box:14843 Jeddah 21434 - Tel.: +966 2 6512333 - 6515411 Fax: +966 2 6518491 - 6512997
E- mail: relief@iirosa.org   البريد الالكتروني

8. I estimate that we have produced more than 6,500 pages that contained various government official letters, recommendations, thank you letter, annual reports, warehouse photos, IIRO's correspondence letters etc.

9. In the course of trying to satisfy that document request, I and my assistants performed a number of tasks, including but not limited to:
   a. Identification.
   b. Categorization and classification.
   c. Indexing and Filing.
   d. Email Correspondence and Communication.
      PS This does not include the travel made to various countries to provide documents for discovery, or/ and meetings.

10. All IIRO documents are in papers in the form of files except those that are frequently required and are archived in the IIRO archiving system.

11. Almost 99% of the documents are in Arabic.

12. There is no electronic financial database of the period of 1992-2002, except the general ledger for each year.

13. For the period of 1992 -1995 we have only a 5% sample entry for each year, according to IIRO's filing system.

14. For the period of 1996 – 2002, we have all the documents.

15. Some of the documents that are usable (required from time to time) are archived in the IIRO archiving system.

16. These printed documents are classified into two groups:
   a. Public documents
   b. Privileged documents which are protected by Saudi Arabia's privileges pursuant to the immunity defense.

17. We came up with approximately 4,000 pages of indexes for the financial files and official documents stored in the warehouse, and those indexes should afford the Plaintiffs' lawyers an opportunity to understand what is in the IIRO database.

18. The reason the indexes are so voluminous due the nature of classification is that:
   a. Each file is a separate entry.
   b. Each year there are between 1,190 – 3,000 entries.
   c. Each entry consists of 300 - 500 pages, in some certain cases the entry may contain more than 1,000 pages.
   d. There are also other documents stored in IIRO's warehouse in a total of 125 boxes consisting of 1,449 files.



e. Each file may contain an average around 300 – 500 pages which are correspondence materials.

19. A major problem is that when you total the subparts of the Plaintiffs' document request, it equals approximately 900 requests. We did our best to match the requests with the IIRO database, and again we hope that the indexes will afford the Plaintiffs' a better handle on IIRO's document database.

20. I spent a considerable amount of time at the IIRO warehouse located at the suburb of Jeddah. I took pictures of the warehouse (see attached) to help educate the Plaintiffs' lawyers about what they are dealing with.

21. Because Mr. McMahon told me the lawyers were afraid to visit the Kingdom, he requested that I secure a bid to scan the IIRO warehouse. I secured that bid, which was approximately $1 million provided it to him, which I assume he provided to the Plaintiffs' lawyers.

22. Because of the sheer volume of documents involved, Mr. McMahon asked me to be deposed by the Plaintiffs' lawyers, in terms of what documentation there was in the headquarters in Jeddah and what documentation there was in the warehouse and what documentation there was in different IIRO offices around the world.

23. I agreed that I would sit for a deposition and try to explain to the 9/11 lawyers the complexity of the matter, and hopefully would be able to reduce the amount of documentation that they required.

24. I understand that Mr. McMahon made this proposal, but the 9/11 lawyers did not embrace it. I remain available to attend such a deposition preferably in Jeddah, but to accommodate the 9/11 lawyers, we could also do it in London.

25. I think it would be very helpful to the Plaintiffs' lawyers to schedule such a deposition in the near future to accommodate their discovery needs and at the same time hold down the massive discovery expenses attendant to their document request.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____          _____
Sameer al-Radhi                                    Date

3