# EXHIBIT 8

```
                                                                  1
        14QMTERC
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 2
 3      IN RE:  TERRORIST ATTACKS ON
 3      SEPTEMBER 11, 2001                   03 MDL 1570 (GBD)(FM)
 4
 4      ------------------------------x
 5
 5                                           April 26, 2011
 6                                           11:25 a.m.
 6
 7      Before:
 7
 8                          HON. FRANK MAAS,
 8
 9                                        Magistrate Judge
 9
10                          APPEARANCES
10
11      ANDERSON KILL & OLICK PC
11           Attorneys for O'Neill Plaintiffs and PEC
12      BY:  JERRY S. GOLDMAN
12
13      KRIENDLER & KREINDLER LLP
13           Attorneys for Plaintiff Ashton
14      BY:  JAMES P. KREINDLER
14
15      COZEN O'CONNOR
15           Attorneys for Federal Insurance Plaintiffs
16      BY:  SEAN P. CARTER
16           J. SCOTT TARBUTTON
17
17      MOTLEY RICE
18           Attorneys for Burnett Plaintiffs
18      BY:  BRIAN FRUTIG (by telephone)
19
19      FERBER CHAN ESSNER & COLLER
20           Attorneys for Continental Casualty Plaintiffs
20      BY:  ROBERT M. KAPLAN (by telephone)
21
21      BERNABEI & WACHTEL
22           Attorneys for Al Haramain USA and the Defendants'
22           Executive Committee
23      BY:  ALAN R. KABAT
23
24      CLIFFORD CHANCE
24           Attorneys for Defendant Dubai Islamic Bank
25      BY:  STEVEN T. COTTREAU
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                              2
      14QMTERC
 1                            APPEARANCES (cont'd)
 2    McMAHON & ASSOCIATES
 2         Attorneys for Defendants IIRO, MWL and Wael Jelaidan
 3    BY:  MARTIN McMAHON (by telephone)
 3
 4    LAW FIRM OF OMAR T. MOHAMMEDI LLC
 4         Attorneys for Defendants WAMY and WAMY International
 5    BY:  OMAR T. MOHAMMEDI
 5         -and-
 6    GOETZ & ECKLAND
 6         FREDERICK GOETZ (via telephone)
 7
 7    STEVEN BARENTZEN (by telephone)
 8         Attorney for Defendant Jamal Barzinji
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

3

14QMTERC

```
 1                (Case called)
 2                THE COURT:  Before I turn to what was suggested as the
 3     agenda items, tell you, if you haven't already seen it, that I
 4     did enter a Rule 502 order yesterday.  And it's sufficiently
 5     short that I'll skip the whereases and just read the operative
 6     language.  It is hereby ordered that pursuant to Federal Rule
 7     of Evidence 502(d), the parties' production of any documents in
 8     this proceeding shall not, for purposes of this proceeding or
 9     any other proceeding in any other court, constitute a waiver of
10     any attorney-client privilege or attorney work product
11     protection applicable to those documents.
12                There was also a letter indicating that there were
13     going to be some dismissals of, I guess, Ms. Luque's clients
14     and maybe some of Mr. Barentzen.
15                MR. KREINDLER:  Yes, your Honor.  When we were before
16     you last time I had reported that we had an agreement in
17     concept.  I have got the agreement with me now that is in
18     final, and we are all signing, exchanging signatures.
19                The essence of it is that group of defendants will
20     cooperate with us, let us look at the documents they have,
21     speak to us in interviews.  And then when we are done we will
22     do some short depositions.  We are paring down the defendants
23     in the case and hopefully getting some useful information.
24                THE COURT:  There was the request to extend the
25     deadline for the rolling production of documents to August 29
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

14QMTERC

1   which I also signed.
2            I guess that brings us to the suggested agenda, which
3   will take me a minute to find.  It's not jumping out at me, but
4   I know there is the motion to compel.  There was also an
5   indication that at a subsequent date you folks wanted to
6   propose or least some folks wanted to propose an extension of
7   the fact discovery deadline, but that was tabled for a later
8   conference, correct?
9            MR. KREINDLER:  Yes, your Honor.
10           THE COURT:  Is there anything on the agenda for today
11   other than the motion to compel IIRO and MWL and Wael Jelaidan?
12           MR. McMAHON:   Your Honor, are you saying that the
13   second motion to compel is for oral argument today?
14           THE COURT:  When you say the second motion to compel,
15   tell me which motion you are talking about.
16           MR. McMAHON:  Well, I don't know the exact date when
17   the plaintiffs made application, your Honor.
18           THE COURT:  There is a March 24 letter which says, we
19   want eight categories of documents.
20           MR. McMAHON:  Yes, your Honor.  I refer to that as
21   motion to compel number one.  We had oral argument on that the
22   last time I was in New York before your Honor.
23           THE COURT:  Right.  But then I got an April 21 reply
24   letter which I read, and I wasn't sure whether that was an
25   effort to continue the discussion of the rulings I made last

5

14QMTERC
```
 1   time or what we were about.
 2            MR. CARTER:  Your Honor, if I can take a step back, I
 3   think there were a few agenda items outside of the motion to
 4   compel.  Your Honor had mentioned that there had been a request
 5   to extend the overall deadline for liability fact discovery.  I
 6   am not sure that it had been tabled.  The parties were about a
 7   month apart on where they propose that that be set.  The
 8   defendants had suggested to us that it would make sense to set
 9   it at the end of January, and we had suggested the end of
10   February.  Prior to the conference this morning I had suggested
11   to Mr. Kabat that we may be split the difference, that two-week
12   period, and try to live with that.  He had not spoken to all of
13   the folks on his side.  That's where we stand on that.
14            The other agenda item --
15            THE COURT:  I did find the letter as you were talking,
16   but go on.
17            MR. CARTER:  There is a slight disagreement as to the
18   use of interrogatories going forward in the litigation.  We had
19   suggested that the parties simply adhere to the local rules.
20   And in the event that any party wanted to go beyond, they would
21   make application to the Court if they couldn't work it out.
22   The defendants have suggested that contention interrogatories
23   should be permitted at some point.  It's our understanding that
24   contention interrogatories are contemplated under the local
25   rules just at the end, at the conclusion of normal fact
```

6

14QMTERC
```
 1    discovery.
 2              THE COURT:  I may have said it last time, but if I
 3    didn't, let me reveal my bias, which is that I view
 4    interrogatories as a colossal waste of time, except for the
 5    sorts of very basic inquiries that the local rule contemplates.
 6    So I'm not in favor of and it doesn't sound like anybody is
 7    proposing allowing interrogatories as the case moves forward
 8    but for contention interrogatories as a possibility.  And what
 9    I'd like to do is simply table the discussion of contention
10    interrogatories, see how everything else plays out, and at a
11    stage closer to the end of either discovery or fact discovery,
12    probably fact discovery, take up whether contention
13    interrogatories really will move the ball forward.
14              MR. CARTER:  That works from our perspective, your
15    Honor.
16              THE COURT:  And from the defendant's perspective?
17              MR. KABAT:  Your Honor, the concern we have, it was so
18    voluminous that none of the defendants could figure out who to
19    depose.  We understand that you issued an order requiring them
20    to narrow the witness list, and I would expect that witness
21    list to be particularized as to each defendant because even if
22    they go through 1500 to 200, that's still a lot for each
23    defendant to figure out who I depose.  So it would be very
24    helpful if the witness list could be narrowed down as to each
25    defendant.  And then perhaps we may not need contention
```

7

14QMTERC

1 interrogatories, but I think if the plaintiff could be directed
2 to particularize their witness list, that may avoid some of the
3 reason why we would otherwise need contention interrogatories.
4 THE COURT: I said it had to be more than detailed and
5 tailored. I am not sure I said by defendant. I don't think I
6 said that. Let me ask what the plaintiffs are contemplating in
7 their revised disclosures.
8 MR. CARTER: Your Honor, what I would expect is that
9 there will be certain witnesses identified with general
10 information concerning the history of Al-Qaeda, those kinds of
11 general background pieces of information, and that there will
12 be segregated witnesses identified for each of the defendants,
13 which is actually something that we did in the earlier
14 disclosures, and we would carry forward.
15 THE COURT: With that in mind, we will table
16 discussion of contention interrogatories.
17 Privilege logs you folks had suggested tabling, and
18 that's fine.
19 When is our May conference?
20 MR. KABAT: May 12, I believe.
21 THE COURT: You are still discussing it, but the
22 Solomonic solution to the extension of fact discovery sounds
23 appropriate and is probably what I would do if you don't reach
24 a resolution, since you're only one month apart.
25 I guess this is what threw me off. The last item on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

14QMTERC

1    the joint letter says:  The parties are currently completing
2    briefing on a motion to compel served on IIRO on March 24 which
3    Mr. McMahon tells me he characterizes as motion to compel 1.
4              MR. CARTER:  Your Honor, I think there is some
5    confusion with regard to the dates.  Motion to compel number 1
6    was the eight categories relative to which your Honor heard
7    argument and issued a ruling.
8              THE COURT:  Which was the subject of the March 24 and
9    subsequent letters, at least in part.
10             MR. CARTER:  The initial letter, I think, was filed on
11   March 16.  Our initial letter was served.  We also served
12   Mr. McMahon with a second motion on March 24.  Subsequent to
13   that March 24 date, we had a meet and confer which then
14   triggered the remaining briefing schedule.  Mr. McMahon filed
15   his opposition to that motion which included those affidavits,
16   the Al Radhi affidavits, and then we submitted our reply brief
17   on April 21.  That motion is specific to the IIRO and targets
18   IIRO's relationship with three individuals, as well as a few
19   other areas, the records relating to the Philippine and
20   Indonesian branches of the IIRO which had been designated, as
21   well as the expulsion of some folks from Pakistan shortly after
22   September 11 who were alleged to be associated with the IIRO,
23   and the IIRO's relationship to some training camps and camps in
24   Afghanistan.
25             THE COURT:  I guess I find it confusing in part

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

·14QMTERC

```
 1    because the reply says:  I write in reply to the April 11
 2    letter brief of IIRO, et cetera.  The April 11 letter from
 3    Mr. McMahon says it's submitted as IIRO and Muslim War of
 4    Leagues opposition to the second motion.  I guess you are on
 5    the same page that it's the second motion.
 6            And then I have the March 24 letter which focuses on
 7    the IIRO.  And in reading that, it talked about broad
 8    categories and then specific requests.  I didn't count the
 9    number.
10            Tell me how this differs from the first application.
11            MR. CARTER:  Your Honor, the first application focused
12    on those eight categories which are organizational documents,
13    some general financial documents, documents relating to
14    recipients of aid.
15            This request focuses on some very specific people who
16    we allege to have been within the inner circle of Al-Qaeda and
17    also associated with the IIRO.  And we came to the view that
18    these individuals were prominent figures within Al-Qaeda and
19    affiliated with the IIRO, not based on some sort of vague
20    reference to their names in media reporting, but, rather, as a
21    result of persistent reporting by the United States Government
22    and formal designations of several of these folks.
23            And this, broadly speaking, is sort of the second
24    phase of an effort on the plaintiff's part to focus the
25    discovery process relative to the IIRO and to some degree the
```

14QMTERC

1    Muslim World League on the issues that are the greatest
2    priority that we ensure a rolling production, and we have time
3    to do follow-up discovery as to the issues that are of greatest
4    importance to us and speak most directly to the claims.  And we
5    have submitted as part of the application a fair amount of
6    documentation to sort of give the Court a sense of why we have
7    come to the view that these relationships are so important, and
8    I think those documents speak for themselves and we won't spend
9    a tremendous amount of time on them.
10            Our concern, really, at this point, your Honor, is
11   that there seems to be a disconnect between our requests, the
12   rules, and the kind of search that's being carried out by
13   certain of these defendants.  If you take, for example, our
14   request for documents relating to Mohammed Jamal Khalifa.
15   Mohammed Jamal Khalifa started this office in the Philippines.
16   He's alleged to have been a founding member of Al-Qaeda.  The
17   government has featured him prominently in a number of
18   settings.
19            Recently, Mr. McMahon told us that we would be
20   receiving the entire Khalifa file and there was a statement to
21   that effect during the last court proceeding.
22            When we look at the actual documents, what we have
23   really are a small sampling of documents which Khalifa and some
24   other IIRO official deny that the office he headed was a front
25   for supporting terrorism, and media reports in which he or

14QMTERC

```
 1    another IIRO official has denied.  We don't see a complete
 2    production of responsive documents.  This is an individual who
 3    was the head of this office for a period of many years.  We are
 4    not seeing any of the documents relating to the reporting he
 5    would have sent back to Saudi Arabia as a matter of course.  We
 6    are not seeing the documents as to his disbursements, none of
 7    the really operational documents for that office.
 8              With Wael Jelaidan, we were told during the meet and
 9    confer that it's Mr. McMahon's understanding that he's not an
10    employee of the IIRO and never was.  As we discussed at the
11    last conference, he was an employee of the Muslim World League.
12    We understand that he headed a joint office of the Muslim World
13    League and the IIRO and that in his capacity as a Muslim World
14    League director he had authority to issue papers on behalf of
15    the IIRO.
16              Whether or not he's an employee of the IIRO doesn't
17    speak meaningfully to the question of whether the IIRO has
18    documents concerning or relating to Wael Jelaidan, and we are
19    not seeing any of those documents produced, even though the
20    government is telling us in various settings that they exist.
21              The last individual at issue is Abd Al Hamid Suleiman
22    Al Mujil.  Al Mujil was designated by the U.S. Government at
23    the same time the U.S. Government designated the Philippine and
24    Indonesian offices of the IIRO, your Honor, and he was
25    described as the million dollar man within the IIRO for
```

12

14QMTERC

```
 1   supporting terrorism.  Close personal relationship, according
 2   to the U.S. Government, with Khalid Sheikh Mohammed, the
 3   mastermind of the September 11 attacks, the relationship as the
 4   supervisor of the offices in the Philippines and Indonesia.  He
 5   was within Saudi Arabia in the eastern province.  Those three
 6   figures really are central to trying to take meaningful
 7   discovery of the IIRO's relationship to Al-Qaeda.  And we
 8   really need a broad and thorough search for records relating to
 9   those people, as well as the Philippine and Indonesian
10   branches.
11           The last couple of things raised in this motion are a
12   request for some bank records.  Frankly, your Honor, I think
13   that was addressed via the Court's last ruling on the eight
14   categories.
15           THE COURT:  The last ruling dealt with bank
16   statements.  My sense was, although I didn't go and
17   specifically look, request No. 6 is statements, not anything
18   beyond statements, so I guess you are right.
19           MR. CARTER:  What I would say, your Honor, is that the
20   eight categories were the focus of our initial motion so we can
21   try to get a read of what we needed to explore more
22   particularly with regard to financials.  I don't think we need
23   to cross the bridge to other bank records at this point until
24   we see those documents.
25           There is also a request for documents relating to the
```

13

14QMTERC

```
 1    expulsion of some workers from Pakistan in the wake of the
 2    September 11 attacks.  There was pretty pervasive reporting
 3    that some alleged relief workers were expelled from Pakistan on
 4    the theory that they were affiliated with Al-Qaeda.  We
 5    understand that several of those folks were from the IIRO.
 6               Again, in terms of the integrity of the process, the
 7    difficulty is, what we are hearing back from Mr. McMahon is
 8    that someone who took over the office several years later is
 9    unaware of an IIRO employee being arrested for being a part of
10    Al-Qaeda.  Again, that's different from the question of whether
11    or not they are aware of any IIRO employees who were expelled
12    or disciplined on some other basis, and so we are trying to get
13    to the heart of that matter.
14               THE COURT:  One thing I didn't understand in relation
15    to this case is request No. 57, which relates to the struggle
16    against the Soviet occupation of Afghanistan.
17               MR. CARTER:  Your Honor, as the 9/11 commission itself
18    framed this issue, Al-Qaeda is an outgrowth of the Muji Hadin
19    resistance to the Soviet occupation of Afghanistan, and the
20    relationships were forged in that setting.
21               And, among others, the relationships that were forged
22    were the relationships between and among Mohammed Jamal
23    Khalifa, Wael Jelaidan, and Osama Bin Laden.  In fact, at the
24    last hearing you'll remember that Mr. McMahon mentioned that
25    Jelaidan was a very prominent figure in the Afghan resistance
```

14QMTERC

1   and that he forged a relationship during that time with Osama
2   Bin Laden.
3           Judge Daniels previously addressed how far back we
4   should be permitted to go in discovery.  And he set 1992 as the
5   presumptive date and suggested that in particular
6   circumstances, upon an adequate showing, a earlier inquiry may
7   be warranted.  Judge Daniel's rulings was predicated on the
8   logic that Bin Laden began opening declaring to third parties
9   his intention to strike America in 1992.
10          From our perspective, the departure to an earlier
11  period becomes appropriate where you are dealing with
12  individuals and organizations that were operating within the
13  inner Al-Qaeda circle from those earlier dates.  And that is
14  particularly prevalent with regard to Jelaidan and Khalifa, and
15  the role that they played in supporting those fighters during
16  that period and whether that relationship continued afterwards.
17  It's one of those simple --
18          THE COURT:  It's a little like saying, they all
19  belonged to the union elite club in midtown and that explains
20  how they got together.  That's along the lines of what you are
21  saying.
22          MR. CARTER:  It's along the lines.  More basically,
23  your Honor, if you were deposing a witness in a case who had
24  some personal knowledge regarding the activity of another, the
25  first question is how do you know one another and how did you

15

14QMTERC

1  first meet and what was the circumstance.
2          When we are dealing with people who partnered with one
3  another for purposes of creating a Jihad organization, it's
4  important for us to be able to at least explore how they got to
5  know one another in the first instance rather than pick it up
6  years later.
7          And so what we would propose in this particular
8  setting is simply that the date go back to late 1987.  There
9  was a document produced by the IIRO in the course of discovery
10  already that was dated November 27, 1987 which talks about the
11  Muslim World League and IIRO cooperating to get foreign
12  fighters into Afghanistan for purposes of participating in the
13  Jihad.  And so that's a benchmark at which their own internal
14  documents suggest this activity is ongoing.  The U.S.
15  Government puts the formation of Al-Qaeda just a few months
16  later in 1988.
17          With regard to these few specific categories, what we
18  ask is that we simply be allowed that inquiry back to that last
19  month of 1987 forward.  Thank you, your Honor.
20          THE COURT:  Mr. McMahon.
21          MR. McMAHON:  Yes, your Honor.  I apologize, your
22  Honor, if I was informed that there is going to be oral
23  argument on the second application today.  I just was not aware
24  of that, but I'll try to respond as best as I can under the
25  circumstances.

14QMTERC

1          With respect to Mr. Khalifa, your Honor, I was
2     informed by Mr. Al Radhi, who gave an affidavit, your Honor, in
3     support of our opposition that the Khalifa file had been
4     produced, and I believe I sent that on to Mr. Carter.
5          Here is where Mr. Khalifa fits in, your Honor.  In
6     1992 or '93, he is arrested by American authorities, I think
7     out in California, for immigration violations.  He is then
8     tried in absentia in Jordan and he is convicted.
9          However, as we pointed out in our opposition -- no one
10    ever comes up with this -- the Jordanian court of appeals, I
11    think it's called the court of cassation, totally rejected
12    those charges and accused the lower court of accepting
13    affidavits of dubious quality.
14          THE COURT:  But you're arguing the merits, and for all
15    I know you are correct that Mr. Khalifa is not a terrorist or
16    that Mujil isn't or any of the others.
17          But since the complaint has survived a motion to
18    dismiss, it seems to me I have to assume that there is a
19    good-faith basis for seeking discovery as to these individuals.
20    A lot of the thrust of your opposition seems to me to convince
21    me of the ripeness of your cause, and that strikes me as
22    premature.
23          MR. McMAHON:  Your Honor, with respect to Mr. Khalifa,
24    I believe we gave Mr. Carter the entire Khalifa file.  And
25    after we get off this phone call I will certainly reconfirm

14QMTERC

```
 1    that with Mr. Al Radhi, that that is the Khalifa file as what
 2    they have in their records at this time.
 3                With respect to Wael Jelaidan, your Honor, he is a
 4    named defendant and we have produced the discovery we had for
 5    Wael Jelaidan, and apparently the plaintiffs are not satisfied
 6    with that.
 7                But the way Wael Jelaidan fits in, your Honor, he was
 8    very active in helping the relief effort in Afghanistan.  And
 9    as Mr. Carter believes that that's the sort of stuff that is
10    liable for activity, he should have named the Central
11    Intelligence Agency, your Honor.  Because with the Saudi
12    intelligence agency, that was the most effective tandem to make
13    sure the Russians were eventually expelled from Afghanistan.
14                THE COURT:  That's why I was asking about that area.
15                MR. McMAHON:  Yes, your Honor.  The plaintiffs just
16    don't seem to accept the fact that the CIA was very much
17    involved.  And Wael Jelaidan was involved in the humanitarian
18    efforts.  He knew Osama Bin Laden very well because he was
19    involved in the humanitarian efforts.
20                With respect to Al Mujil, he is no longer employed by
21    IIROSA and IIROSA has no control over him.  To the extent there
22    are any files, for example, we will turn them over, sure, your
23    Honor.
24                Your Honor, there was a lot of ground there that
25    Mr. Carter covered.  I don't see the need to go back into 1987
```

18

14QMTERC

```
 1  with respect to the Russian occupation of Afghanistan.  This
 2  lawsuit should be more focused on the terrorist events that
 3  have occurred since 1992, the beginning of discovery.
 4           We could take this case for another ten years if we
 5  get involved in the Afghanistan stuff, and I don't know what
 6  records we have pertaining to any activities in Afghanistan
 7  because it was what, almost 20 years ago?
 8           THE COURT:  As to the documents which are the subject
 9  of the second motion to compel with respect to IIRO, with two
10  exceptions I am going to direct that the documents be produced.
11  One exception is the request for banking records to the extent
12  that it goes beyond that which I ordered as part of the first
13  motion to compel.  The second exception is, I agree with
14  Mr. McMahon that there may be extensive documentation
15  concerning the expulsion of the Soviets from Afghanistan, and
16  I'm not precluding the request.  I'm not saying that it's
17  inappropriate to go back to 1987.  I do think the request is
18  very overbroad.
19           So if a request that's more narrowly focused that
20  basically deals with, how did these folks get together and what
21  were their basic roles, as opposed to giving me every document
22  relating to the IIRO's role in supporting the Mujil Hadin
23  forces in Afghanistan in their struggle against Soviet
24  occupation, I would probably look somewhat favorably upon it.
25  But I think this is sort of a kitchen sink request that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC

1  assuming, as seems to be conceded, that the IIRO played some
2  role in that venture, could lead to a ton of documents with
3  considerable burden on the IIRO, but not shedding a great deal
4  of light necessarily.
5          Those are my rulings with respect to the so-called
6  second motion to compel.
7          Are there other matters that we should be taking up
8  today?
9          MR. CARTER:  Your Honor, I hate to win something and
10 then raise a concern, but when Mr. McMahon was speaking, you
11 probably heard him say that Mr. Al Radhi had told him that they
12 had produced "the Khalifa file" and if they had any Al Mujil
13 documents they would produce them.  There is a significant
14 concern here that there is a file called Khalifa that has
15 personal information, and then there is the file that contains
16 all the operational activities carried out under his auspices
17 and we are only getting the personal file.
18         I think I said last time, or maybe I was just thinking
19 it to myself, it seems to me -- let me go back one step.  There
20 were always difficulties when you are dealing with foreign
21 clients, particularly when their judicial systems are very
22 different than ours and the concept of discovery may be
23 somewhat alien, not to mention the language difficulties.  I do
24 think that all of these requests are reasonably focused.
25 That's part of the reason that I granted both of the motions to

14QMTERC

```
 1    compel in large measure.
 2             And I know, Mr. McMahon, you said last time that you
 3    had postponed a trip to the kingdom essentially to learn what
 4    the rulings are.  I do think this is the type of stage of the
 5    case where you or somebody on your behalf needs to sit down
 6    with the folks who are responding to these requests and hold
 7    their hand to a certain extent and describe in greater detail
 8    what needs to be searched for.  It's somewhat inconsistent to
 9    say, we have developed this massive index and, yet, not produce
10    documents that relate to the employment of some of these
11    individuals, directives that they may have given or received
12    and the like.
13             And I recognize that, as Mr. Carter pointed out, there
14    is a significant disconnect between that which was requested
15    and that which has been received.  And I'm not so naive to
16    think that perhaps it won't persist.  I hope it doesn't.  But
17    if it does, I suppose that will lead to additional motion
18    practice.  And if the IIRO or any other defendant has failed to
19    produce documents that manifestly are within its possession,
20    custody, or control, that may lead to consequences that that
21    particular defendant doesn't care for.
22             But I assume one stage, at least, between the receipt
23    of whatever additional documents are produced and a further
24    motion would be some depositions, including depositions of
25    document custodians about the type of search that was or was
```

21

14QMTERC

1    not conducted.  And mindful of the fact that that's inevitably
2    coming, Mr. McMahon, I think you really want to pursue it in
3    far greater detail and in person with the folks who were doing
4    this exhaustive indexing what it is they need to produce,
5    because I do think there is probably a lack of understanding on
6    their part.
7              MR. CARTER:  Thank you, your Honor.
8              MR. McMAHON:  Your Honor, if I can just comment.  As
9    you know, we have offered the records custodian, Mr. Al Radhi,
10   for over a year, I think, maybe even longer, to the plaintiffs
11   to avoid these kinds of problems that you're unfortunately
12   encountering in terms of motion practice.  And for the life of
13   me I don't understand why they don't take us up on that and
14   address some issues to Mr. Al Radhi, and maybe we can clear up
15   this matter a lot easier than bothering you with motion
16   practice.  Mr. Al Radhi has acted in good faith.  He has logged
17   enormous hours, your Honor, if you have read his affidavit.
18   They had to bring on two people for IRROSA alone, and he has
19   spent an enormous amounts of time for the Muslim World League
20   production as well, your Honor, and that is a bit of a problem
21   because they are located in Mecca.
22             I wish your Honor would consider deferring the rulings
23   until such time as the plaintiffs can actually depose the
24   records custodian.  Maybe there is a lot of misinformation
25   here, and they could get to the bottom of it much more directly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC

1  than through me as counsel, although I am trying to get over
2  there, your Honor.  I contemplate the necessity for a trip.
3          These court appearances -- and I apologize for today.
4  I don't know why I didn't think it was scheduled for today, the
5  oral argument -- but the court appearances have obviously
6  impeded my ability to make a quick trip over there.
7          In any case, I wish your Honor would keep that in
8  mind.  We offered Mr. Al Radhi for more than a year to avoid
9  these problems we are running into right now.  Of course, there
10  is -- I think you afforded the plaintiffs three more years,
11  your Honor, '94 -- I mean, 2004.  They are trying to get
12  together the annual reports for 2'2, 2'3 and 2'4, and other
13  categories, which is also a burden to them, because you
14  extended that time frame for three years.
15          THE COURT:  I don't view the requests that I've
16  granted as overbroad.  I think they are reasonably focused.  As
17  I said, I think there is a disconnect between that which is
18  actually required and taking what the plaintiffs say at face
19  value, that which is being produced.  And I base that simply on
20  the fact that if Jelaidan was affiliated with IIRO Pakistan or
21  Khalifa spent a period of time working with IIRO in the
22  Philippines, there must be more documentation that relates to
23  what they did while they were there, which is the sort of
24  documentation that the plaintiffs seek and, rightly or wrongly,
25  believe that they have yet to receive.

14QMTERC

1          So I don't think, and I'm not going to require the
2   plaintiffs at this stage to depose the witness you proffer
3   because I think, first, the documents ought to be produced.
4   Then certainly at some point the custodian should be deposed,
5   and we will see how all of that shakes out.
6          But one of your proposals was they should come look at
7   the warehouse in Saudi Arabia or look at how the offices
8   function.  And as to at least some of the offices, other than
9   the expense of it, I am not sure why they are not taking you up
10  on the offer.  London is not a hardship trip, and they might be
11  able to see the wedding while they were there, but I am not
12  going to second-guess how they are going about this.  I would
13  think seeing some of these offices might be informative,
14  particularly the Philippines.  But, again, I am not going to
15  second-guess the order in which they want to do this.
16  Essentially, the motion to dismiss having been denied, the
17  defendants are in this for all that goes with that in terms of
18  discovery.
19         Yes, sir.
20         MR. MOHAMMEDI:  Your Honor, I don't think this
21  argument is about merit, but I think I feel compelled to say
22  something about a letter that was sent by plaintiff on April 21
23  which I refer to page 6.
24         THE COURT:  Let me get that letter.
25         MR. MOHAMMEDI:  Your Honor, I take issue with some of

24

14QMTERC

1   the statements that were made on page 6.  First, I was not even
2   copied or served on the document that WAMY was mentioned many
3   times.
4         The second issue that they have is that they stated
5   this Court need only to look at statements by United States
6   Government and its leaders to see that the Saudi charter, such
7   as Muslim World League, IIRO, and World Assembly of Muslim
8   Youth, WAMY.  And then they said, continued to be a major focus
9   of United States counterterrorism investigation years after
10  September 11.
11        And then they go on and they stated that Secretary of
12  State Hillary Clinton, which state that Saudi Arabia remains a
13  critical financial support base for Al-Qaeda.  And they mention
14  Lashkar-e-Taiba and other terrorist groups, including Hamas,
15  and IIRO and the Muslim World League, and WAMY continued to
16  send money to fund extremist overseas.  Hillary Clinton never
17  stated anything like that.  She stated charges.
18        We believe that the plaintiff, they have a lot of
19  statements that are they are producing to this Court.  WAMY was
20  not mentioned anywhere in that Exhibit A that they mentioned.
21        At the same time, we are just asking them to produce
22  evidence to us.  They keep making merit arguments on these
23  issues without producing any meaningful document to us, and I
24  take issue with that.
25        THE COURT:  In response to what they characterized as

14QMTERC

1    Mr. McMahon's self-serving assertions on behalf of his client,
2    they essentially made their own self-serving assertions on
3    behalf of their clients.  And in terms of the merits
4    discussion, I have to say to both sides, I treat that largely
5    as punctuation.  The critical facts to me are that with respect
6    to the defendants who are now in discovery, either there was no
7    motion or the motion to dismiss was denied.  So those
8    defendants are in the case.  And the assertions that are made
9    in the complaint have to be, for the moment, taken at face
10   value.
11            So when Mr. McMahon argues that Muslim World League
12   and the IIRO are the good guys distributing funds in very
13   careful ways to 40,000 needy individuals, that's nice, but it's
14   not something that sways me one way or the other.  And,
15   similarly, when I read excerpts from what Secretary of State
16   Clinton allegedly said, that doesn't move me terribly much
17   either.
18            There is a concept of proportionality in terms of
19   discovery.  And to the extent that I have to consider whether
20   requests are proportional, I certainly have to factor in my
21   assessment of the potential strength of a case or of a
22   particular defense that's being asserted, and I will.  But
23   since the requests in the so-called first and second motions to
24   compel are fairly focused, it seems to me the burden is not
25   overwhelming in light of the seriousness of the allegations in

26

14QMTERC
1   the latest complaint and that the discovery is proper.
2           But going forward, playing tit or tat in terms of the
3   merits of the case is really not going to have much, if any,
4   effect on my discovery rulings, and probably is better saved
5   for a later stage of the case, when motions for summary
6   judgment are made.
7           Anything else?
8           MR. McMAHON:  Your Honor, thank you for your careful
9   consideration of everything.
10          I wonder if it would be appropriate if we just have a
11  recap of what your ruling is and what specific documents have
12  to be produced by which date.
13          THE COURT:  I had thought about which date and
14  intentionally didn't go there, but I guess I will.
15          My ruling is, again, that with the exception of the
16  banking records and the records relating to the IIRO's role in
17  supporting the Mujil Hadin forces in Afghanistan, item 4 in the
18  March 24 letter, the documents should be produced.
19          As to the banking records, they only need be produced
20  to the extent that I compelled them as part of the first motion
21  to compel.  As to the effort to kick the Soviets out of
22  Afghanistan, I directed plaintiffs to come up with a more
23  focused request or requests.
24          So those, in a nutshell, are my rulings.  I recognize
25  that there are more documents sought here.  And my initial
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14QMTERC

```
 1    thought, which I didn't voice, was as to the additional
 2    documents in the second motion to compel to give you an
 3    additional 30 days to produce those documents.
 4              Any thoughts, comments, Mr. McMahon?
 5              MR. McMAHON:  Your Honor, to the extent I can schedule
 6    a trip pretty quickly, I will do so, and that 30 days will
 7    certainly be on my horizon, obviously.
 8              One of the things I want to bring to your Honor's
 9    attention is that there is an entity called the Rabita Trust
10    which has been sued, and we are in jurisdictional discovery,
11    and we have basically given the plaintiffs whatever we have.
12              The Rabita Trust was headed up by Wael Jelaidan and it
13    was founded as an organization to repatriate individuals and
14    had nothing to do with this war and terrorism, whatever.  But
15    they had gotten documents concerning the Rabita Trust and that
16    is when Wael Jelaidan was running in Pakistan.  And as far as I
17    know, Rabita Trust has nothing to do with IIROSA.  It does have
18    something to do with MWL.  I just wanted you to have that as
19    some background information, your Honor, because we will be
20    addressing whether or not the Rabita Trust should be dismissed
21    because of jurisdictional issues.
22              THE COURT:  So noted.
23              See you folks in May.
24                              o0o
25
```