# EXHIBIT 16

# MARTIN F. MCMAHON & ASSOCIATES

1150 CONNECTICUT AVENUE, N.W.
SUITE 900
WASHINGTON, D.C. 20036

MARTIN F. MCMAHON
Managing Partner
Admitted in District of Columbia, New York
and U.S. District Court of Maryland

LISA D. ANGELO
Associate
Admitted in District of Columbia and
California

CHRISTINE M. HILGEMAN
Associate
Admitted in Virginia

Established 1978

TELEPHONE (202) 862-4343
FACSIMILE (202) 828-4130

www.martinmcmahonlaw.com

JASON A. DZUBOW
Of Counsel
Admitted in District of Columbia and
Maryland

CHRISTOPHER D. BROWN
Of Counsel
Admitted in District of Columbia and
Maryland

ROBERT MANCE
Of Counsel
Admitted in District of Columbia and
Maryland

November 28, 2007

**VIA OVERNIGHT DELIVERY**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
500 Pearl Street, Room 1350
New York, NY 10007-1312

    Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570

Dear Judge Daniels:

    On November 7, 2007 Defendants International Islamic Relief Organization, Muslim World League, Wael Jelaidan (collectively referred to as "Defendants") and Plaintiffs Ashton, Burnett, Federal Insurance and O'Neill (collectively referred to as "Plaintiffs") submitted respective letters to this Court seeking judicial assistance in resolving an ongoing merits discovery dispute. This letter serves as Defendants' response to the issues raised in the Plaintiffs' letter. As shown *infra*, if "boundaries" and time limits are not set in this case, discovery herein threatens to become a "shakedown" tool. *See Oppenheimer Fund v. Sanders*, 437 U.S. 340, 353 (1978).[1]

    Plaintiffs state that "the sole question presently before the court is whether [the] defendants can demonstrate that an absolute and universal prohibition of discovery of documents and information relating to periods prior to 1996,[2] regardless of the subject matter of that discovery, is appropriate in this litigation." Pls.' Disc. Ltr. p. 4 (Nov. 7, 2007) (hereinafter referred to as "Pls.' ltr"). Defendants disagree with this narrow and slanted view of the issue presented to this Court. "Only if a matter is relevant and potentially discoverable must a court

---

[1] "discovery should be denied when a party's aim is to…embarrass or harass the person from whom he seeks discovery" *Oppenheimer*, 437 U.S. at 353; *see also United States v. Howard*, 360 F.2d 373, 381 (3d Cir. 1966) (holding that the "extreme broadness" and the "lack of utility" of Plaintiff's requests served as harassment); *Balistrieri v. Holtzman*, 52 F.R.D. 23, 25 (D. Wis. 1971) (holding that certain requests would harass rather than lead to relevant evidence).

[2] Actually Plaintiffs contend 1998 should be the cut-off date. *See* Defs.' Ltr. p. 1.

then consider whether additional Rule 26 limitations on discovery apply." *During v. City Univ. of N.Y.*, 2006 U.S. Dist. LEXIS 53684 *7 (S.D.N.Y. 2006). Defs.' Disc. Ltr. p. 4 (Nov. 7, 2007) (hereinafter referred to as "Defs.' ltr"). However the Plaintiffs want to spin the issue, the real question before this Court is whether discovery limitations are appropriate in this case and if so, whether a 3-5 year "look-back" timeframe for discovery should be imposed.

Consistent with prior rulings of this Court, Defendants assert that materials predating 1998, or 1996 at the earliest, are nondiscoverable because they are not relevant to the claims presented in these consolidated cases and because Plaintiffs' requests for such materials are not calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26.

Defendants address and distill the Plaintiffs' six arguments from their letter into four parts: (1) the Federal Rules of Civil Procedure afford broad discovery rights; (2) under *Halberstam*,[3] activities and relationships of the Defendants during periods before 1996 are directly relevant to the claims asserted against them; (3) the 9/11 commission report supports broad unfettered discovery; and, (4) a U.S. Treasury press release supports Plaintiffs' need for discovery to "look" as far back as the 1980s. In response to Plaintiffs' contentions, Defendants incorporate by reference each of their arguments set forth in their initial letter.[4] Defendants further respond herein to Plaintiffs' arguments which have not already been briefed and expound for clarification purposes upon arguments from their initial letter.

## I. PLAINTIFFS' REQUESTS PRE-DATING 1998 ARE NOT RELEVANT TO THEIR CLAIMS EVEN UNDER A BROAD INTERPRETATION OF RULE 26.

In their letter, Plaintiffs cite five cases for the lone proposition that Rule 26 is to be broadly construed. Upon review of these cases however, they are all distinguishable from the instant case because the parties resisting discovery in those cases raised only conclusory objections to relevance, or in the case of *Oppenheimer Fund v. Sanders*, the rules of discovery were not even at issue. 437 U.S. 340 (1978).[5] Although Rule 26 *is* broadly construed, pre-1998 documents should be held nondiscoverable as they are (1) not relevant; and (2) the burden of production upon the Defendants is too large.

---

[3] 705 F.2d 472 (D.C. Cir. 1982).

[4] Those arguments are that merits discovery need not go beyond 1998, or at the earliest 1996 since (1) a 3-5 year "look-back" period for discovery is consistent with the requirements of Fed. R. Civ. P. 26, this Court's previous holdings, and Second Circuit case law; (2) in order to promote fairness and judicial efficiency in this vastly complex case, a limitation on discovery is appropriate; (3) a substantial amount of materials Plaintiffs seek vis-à-vis their first set of document production requests are *not* relevant, are too remote, and, even if some materials sought from the 1980s and early 1990s have some relevancy, they are so *minimally* relevant that the substantial burden on the Defendants to produce such materials outweighs the minimal benefit to the Plaintiffs; (4) there was substantial and notorious terrorist activity in the period 3-5 years before the 9/11 attacks, thus, Plaintiffs need not look back to the 1980s or 1990s for evidence, assuming it exists, to support their claims; and (5) if in the course of discovery, the Plaintiffs find specific evidence justifying an extension of the look-back period, this Court can always revisit the propriety of such a discovery limitation.

[5] The question presented in *Oppenheimer*, was whether the defendants should bear the cost of identifying class members, not whether the imposition of a timeframe limitation on discovery was needed as in the instant case. 437 U.S. at 351. Moreover, as noted throughout Defs.' Ltr and *infra* Pt. I(A-B), Defendants can point to specific and nonconclusory reasons for raising their relevance challenge.

2

### A. Plaintiffs Seek Non-Relevant And Remote Documents.

Although Plaintiffs argue that *Oppenheimer* affords them an unrestrained license to discover any materials they seek, the Supreme Court also explained, "[a]t the same time, 'discovery, like all matters of procedure, has ultimate and necessary boundaries.' Discovery of matters not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1)." *Id.* at 351-52 (internal citations omitted). Thus, when a party seeks discovery from well over twenty years ago, as in this case, Defendants' contention that "boundaries" are necessary is consistent with *Oppenheimer*. Further, as noted in Defs.' Ltr Pt. III (A): (1) because OBL did not issue his *fatwa* against the U.S. until 1996; (2) the CIA did not recognize OBL's "possible significance" prior to his issuance of the 1996 fatwa; and (3) the outlines of what would become the 9/11 plot were not even discussed until 1996 when Khalid Sheikh Mohammed met with OBL in Tora Bora, no person or entity (much less the defendants) could possibly be "on notice" of Al Qaida's intention to direct its efforts toward the United States. Consequently, discovery of materials pre-1996 are not reasonably calculated to lead to the discovery of admissible evidence. *Id.*

With respect to Plaintiffs' cases *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984) and *Daval Steel Products, Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991), like *Oppenheimer*, neither of these cases dealt with a proposed limitation on discovery. In fact, they acknowledge that discovery requests may be stricken or limited on the basis of irrelevance. *See Compagnie*, 105 F.R.D. at 42 (acknowledging that lengthy interrogatories have been stricken on the basis of irrelevance); *see also Daval*, 951 F.2d at 1367 ("[p]arties may obtain discovery regarding any matter, not privileged, which is *relevant* to the subject matter…if the information sought appears reasonably calculated to lead to the discovery of admissible evidence") (emphasis added).

Plaintiffs' reliance upon *Rivera v. Goord*, is also problematic because the party opposing discovery in that case simply objected to the relevance of discovery in general. 2007 U.S. Dist. LEXIS 24153, *3-4 (N.D.N.Y. 2007). Here, Defendants seek to impose a very specific limitation that arises from the Court's own statements about what the Plaintiffs must show in order to prove their cases. *See In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 551 (S.D.N.Y. 2005) (finding an Egyptian publication Plaintiffs sought to supplement into the record against Princes Naif and Salman as problematic because "it simply does not say that the Princes were *put on notice* regarding specific charities and that they continued to contribute to those charities with the intent that their donations would assist al Qaeda") (emphasis added). The court further added, "[I]n order to be liable for acting in concert with the primary tortfeasor under either [conspiracy or aiding and abetting] theor[ies], the defendant must know the wrongful nature of the primary actor's conduct." *id.* at 554 n. 10; *see also In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005) ("In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda."). Thus, unlike the general objections made in *Rivera*, the year OBL issued his fatwa (1996) is a precise and legally sound basis for determining that acts preceding 1996 are not relevant to the claims or defenses in this case. *See Defs.' Ltr, Pt. III (A)* (regarding Defendants inability to be "On Notice" of Al Qaeda's terrorist activities against America until 1996).

### B. Burden upon Defendants.

Even if this Court is unwilling to impose a timeframe limitation based on relevance grounds alone, this Court may still find that the evidence sought before 1996 is so tenuously and remotely relevant that a limitation may fairly and reasonably be imposed on the basis of burden to the Defendants. Additionally, if discovery remains unlimited in this case, it could easily become a tool for harassment, i.e., a "shakedown" tool. *See supra* p. 1 (quoting *Oppenheimer*, 437 U.S. 340, 353 (1978)).

As discussed throughout Defs' Ltr., the discovery sought by Plaintiffs is burdensome, not merely due to the voluminous nature of the requests, but also due to the inaccessible nature of the documents, making production either impossible or prohibitively costly.

#### 1. *Voluminous nature of the requests.*

Defendants emphatically resist pre-1988 discovery citing the voluminous nature of Plaintiffs' requests. For example, the Plaintiffs propounded 107 document requests upon Defendant IIRO (*see* Ex. C), 74 requests upon Defendant Wael Jelaidan (Ex. D), and 89 requests upon Defendant MWL. When all of the subparts to these requests are included in the count, the total number of requests rises even higher. Then the requests are compounded even further by the inclusion of Appendices attached to the back of each document request. These attachments consist of names of individuals and entities. Unbelievably, after the Defendants respond to Plaintiffs' requests on behalf of themselves, Plaintiffs ask Defendants to then answer the request again as to each of the entities and individuals noted in their Appendices. By the addition of these Appendices, the total requests for IIRO, for example, is increased by an additional 602 distinct requests.

On top of the vast amount of requests, Plaintiffs also ask the Defendants to produce documents as far back as the early 80s. Clearly boundaries in this case must be imposed. Defendants submit 1998 or 1996 at the earliest is the appropriate timeframe.

#### 2. *Inaccessibility of documents.*

Defendant IIRO has already advised the Plaintiffs (in its supplement document production responses) that there are no indexes or electronic databases that detail/describe or catalogue the documents and materials sought pursuant to Plaintiffs document requests.[6] IIRO does, however, have a master General Ledger located in Jeddah that *may* go back as far as 1996. This Ledger, however, is *not* in electronic format and contains somewhere between 2000-3000 entries for each particular year.[7] In many cases an entry in the General Ledger would relate to documents that range from 20 to over 100 or more pages in length. Therefore the General Ledger's entries for a given year would represent over two hundred thousand pages. *See* Ex. A

---

[6] *See* Def. IIRO Supp. Resp. to Consol. Pls.' Supp. Document Requests (June 22, 2006) (attached hereto as Ex.A.

[7] It is important to note that while Defendant IIRO may use computers, they do so for word processing and not for records storage. As such, IIRO treats only hard copies of documents as official records.

4

Given that most of the documents Plaintiffs seek are located worldwide, in field offices, warehouses, banks, and even within the unrecoverable files of defunct organizations, production of responsive documents may be an insurmountable task. In addition, the nature of Plaintiffs' international conspiracy claims makes discovery in this case potentially boundless. By imposing a timeframe limitation, this Court will place a temporal perimeter around the Plaintiffs' discovery requests and enable Defendants to respond. As already identified by Defs.' Ltr., the cost of copying and reviewing the IIRO warehouse in Jeddah alone would be over $3,000,000.00. *See* $3 million estimate attached to Defs.' Ltr as Ex. C.

Defendants finally seek this timeframe limitation to protect them from possible harassment. When discovery requests are extremely broad and minimally relevant, an inference of harassment may arise. *United States v. Howard*, 360 F.2d 373, 381 (3d Cir. 1966) (holding that the "extreme broadness" and the "lack of utility" of Plaintiff's requests served as harassment); *see also Oppenheimer Fund v. Sanders*, 437 U.S. 340, 353 (1978) ("discovery should be denied when a party's aim is to...embarrass or harass the person from whom he seeks discovery"); *Balistrieri v. Holtzman*, 52 F.R.D. 23, 25 (D. Wis. 1971) (holding that certain requests would harass rather than lead to relevant evidence). An inference that Plaintiffs' discovery requests were intended to harass the Defendants is supported by the fact that the Plaintiffs have consistently refused to inspect the Defendants' (IIRO and MWL) home and field offices, even though many of these offices have been offered to the Plaintiffs for inspection.[8].

Given the conclusory nature of the Plaintiffs' complaints and the fact that the Plaintiffs' discovery production has consisted almost entirely of newspaper articles, web pages and press releases, Defendants ask this Court to seriously consider the potential for abuse of discovery in this case and impose a 3-5 year "look-back" period.

## II. PLAINTIFFS' RELIANCE UPON *HALBERSTAM v. WELCH* IS MISPLACED AS TO THE INSTANT DISCOVERY DISPUTE

Plaintiffs cite to *Halberstam v. Welch*, 705 F.2d 472 (D.C Cir. 1982) on countless occasions, including their November 7th letter.[9] *Halberstam*, however, is not binding law upon this Court and from a factual standpoint, is wholly distinguishable from the instant case as it concerns the relationship between *two people* – a burglar and his girlfriend. *Id.* The fact that Judge Casey found *Halberstam* and *Boim* "instructive" when analyzing causation as to Prince Sultan and Prince Turki's motions to dismiss in *Terrorist Attacks I*, does not *ipso facto* obligate this Court to follow *Halberstam* when determining whether to impose a 3-5 year "look-back" period for discovery.

---

[8] Plaintiffs have neither accepted Def. IIRO's offer to have its records custodian be deposed

[9] *See, e.g.*, Pls.' Consol. Mem. in Opp. to Mot. to Dismiss Filed by Al Shamal Islamic Bank; Pl. Ashton's Resp. to Wael Jelaidan's First Set of Requests for Admissions; Pl. Burnett Responses to MWL's First Set of Requests for Admissions; Pl. Burnett's Response to Wael Jelaidan's First Set of Requests for Admissions; Pl. Federal Ins. Responses to Wael Jelaidan's First Set of Interrogatories; Pl. Federal Ins. Responses to Wael Jelaidan's First Set of Requests for Production of Documents; Pl. Burnett Responses to Wael Jelaidan's First Set of Interrogatories; Pls.' Ltr. (Nov. 7, 2007).

Nevertheless, Plaintiffs cite to *Halberstam* in support of their claim that discovery must look as far back as the early 1980s so that under *Halberstam's* six factor analysis, they can establish a "critical factor" – *duration of the assistance provided*. Pls.' Ltr. pp. 5-6. Plaintiffs suggest that because the D.C. Circuit took into consideration "the length of time two parties work closely together" and "the length of time an alleged aider/abetter has been involved with the tortfeasor" when it applied its six-factor analysis to the inapposite facts therein, the Plaintiffs' in *this* case are entitled to twenty-plus years of discovery.

The D.C. Circuit did not intend *Halberstam* to be the "perfect guideline" Plaintiffs' consistent references suggest it is, to wit:

> "We recognize that the elements of either theory [conspiracy and aiding and abetting] are not perfect guides in this search. We expect that they will not be accepted as immutable components but that they will be adapted as new cases test their usefulness in evaluating vicarious liability. Tort law is not, at this juncture [1982] sufficiently well developed or refined to provide immediate answers to all the serious questions of legal responsibility and corrective justice. It has to be worked over to produce answers to questions raised by cases such as this. Precedent, except in the securities area, is largely confined to isolated acts of adolescents in rural society." 705 F.2d at 489.

Interestingly enough, even if *Halberstam's* "duration of the relationship" factor was applied here, the D.C. Circuit found that **five-years** was enough time to establish that a "long term" relationship existed between the tortfeasors. *Id.* at 487-88. In other words, despite Plaintiffs' contention that they need pre-1996 discovery in order to prove a "long term relationship" between the Defendants and "the responsible terrorist organization and related parties," (so they can then prove their ATA claims), *Halberstam* clearly shows that a "long period of time," in terms of satisfying its aiding and abetting factors, can easily be established within a **five year** period.[10]

In sum, Defendants' proposed discovery limitation (3-5 years) is reasonable and will not prejudice the Plaintiffs even under *Halberstam*. Accordingly, Defendants' 3-5 year "look-back" timeframe for discovery should be imposed in this case.

### III. THE 9/11 COMMISSION REPORT ACTUALLY SERVES TO DISCREDIT PLAINTIFFS' CONTENTIONS AND HAS VARYING DEGREES OF RELIABILITY.

Plaintiffs' letter relies heavily (thirteen citations) upon the findings of the 9/11 Commission Report. Several of Plaintiffs' issues that were discussed in this Report were specifically rejected by this Court as insufficient to support Plaintiffs' factual allegations. For example, Plaintiffs submit that the 9/11 Report "embrace[s]" the Plaintiffs' allegation that "the "golden chain" is an internal al Qaida document, identifying al Qaida's most important financial

---

[10] Defendants in no way suggest that Plaintiffs can in fact satisfy *any* of *Halberstem's* aiding and abetting factors but merely identify the fact that 20+ years are not necessary to satisfy the factors.

6

benefactors, and the individuals responsible for coordinating their contributions to al Qaida." *See Pls.' Ltr.* at pp. 7-12. Plaintiffs blatantly disregard, however, the fact that Judge Casey has twice discredited the Golden Chain. *See Terrorist Attacks I*, 349 F. Supp. 2d 765, 817 (S.D.N.Y. 2005) (stating it was "a document with serious foundational flaws."); Judge Casey further described the Golden Chain as one "with no indication who wrote the list, when it was written, or for what purpose" and declined to "make the logical leap that the document is a list of al Qaeda supporters." *Id.; see also In re Terrorist Attacks III*, 464 F. Supp. 2d 335, 341 (S.D.N.Y. 2006) (affirming that "the so-called Golden Chain documents does not, on its own, provide grounds to sustain the claims in this case.)

Unlike the 9/11 Report, Judge Casey's holdings were and still are binding upon the Plaintiffs. Moreover, Judge Casey is not alone in rejecting the Golden Chain. Judge Conlon from the U.S. District Court for the Northern District of Illinois also rejected the Golden Chain as inadmissible hearsay. *See U.S. v. Arnaout*, No. 02 CR 892, 2003 WL 255226, at 1-2 (N.D. Ill. Feb. 4, 2003). Finally, Plaintiffs' so-called terrorism expert Jean-Charles Brisard, who launched the Golden Chain, has been totally discredited. *See* Witness Statement of Jean-Charles Brisard (attached hereto as Ex.B).

The fact that Plaintiffs still rely on a 2004 government report, over the law of the case in the current litigation, is quite telling indeed. When the issue of "relevance" is factored in, the 9/11 Report does not establish that a pre-1996 period is relevant to Plaintiffs' discovery needs.

### A. **Plaintiffs' 1988 Proposal Is Not Supported By the 9/11 Commission Report.**

As to Plaintiffs' claim that it is "uncontested fact[]" that al Qaeda began its specific anti-American agenda in 1988, Plaintiffs' complaints, including the *Federal Insurance* First Amended Complaint, make only generic allegations regarding the timeline of relations between defendants MWL and IIRO and al Qaeda and Osama bin Laden, claiming that defendant MWL was closely affiliated with OBL since "the 1980s" and that IIRO had established involvement with Al Qaeda "during the early 1990s." *See e.g.,* FAC ¶¶ 117-118. Now, when trying to counter Defendants' request for a 3-5 year "look-back" period for discovery, Plaintiffs pluck new dates from the pages of the 9/11 Report, notwithstanding the Report's varying degrees of reliability.

To illustrate, Plaintiffs now allege that OBL began his direct and targeted campaign of *jihad* against the *United States* as early as 1988.[11] Pls.' Ltr. at Pt. II (C). In support of this novel proposition, Plaintiffs put a significant amount of weight on the 9/11 Report's reference to the beginnings of al Qaeda in the 1980s, specifically 1988, after the Afghan triumph over Russian encroachment. *See* Pls' ltr. at pp. 6-9; *see also 9/11 Report* at pp. 55-56. This triumph was due

---

[11] This Court should know that upon review of each Plaintiffs' complaint allegations against the Defendants, the only complaints that mentioned 1988 were Plaintiff Ashton's at ¶ 373 and Plaintiff O'Neill's at ¶ 105. Even then, both complaints refer to 1988 as the year Rabita Trust (a separate defendant altogether) was founded. There is no allegation in Plaintiffs complaints' against the instant Defendants that remotely suggests that because "OBL began his direct and targeted campaign of *jihad* against the *United States* as early as 1988" that the instant Defendants were "on notice" or otherwise had "knowledge" that their alleged "assistance" to al Qeda would be used for the purpose of *jihad* against the U.S. as early as 1988.

7

in large part to the efforts of the *mujahedeen* which, of course, was funded by the United States Government. .

While the 9/11 Report cites to an 1988 Arabic article penned by Abdullah Azzam, the alleged founder of Al Qaeda al Sulbah (the "strong foundation"), as well as a series of documents named "Tareekh al Usama" and "Tareekh al Musadat" (History of Osama and History of the Services Bureau, respectively), no where does the 9/11 Commission Report declare that OBL or al Qaeda founded their organization at that time (1998) for the express purpose of *jihad* against the United States. Instead, the Report reads:

> "They established what they called a base or foundation (al Qaeda) as a *potential general headquarters for future jihad.*"

9/11 Report at 56 (emphasis added).

Even if this Court were to consider Plaintiffs' relevance argument, allegedly supported in large part by the 9/11 Report, the only thing that can be said about the year 1988 is that the idea behind al Qaeda, as a general centralizing force for unstated *future jihad*, was formulated at that time.

### B. The 1992 *Fatwa* Does Not Establish Relevance.

As to Plaintiffs claim that OBL and other al Qaeda leaders issued their first public *fatwa* against the United States in 1992" (Pls.' Ltr at 8) when the actual language of the 9/11 Report is reviewed, one finds that the Commissions findings state:

> "In early 1992, the al Qaeda leadership issued a fatwa calling for *jihad against Western 'occupation' of Islamic lands.*"

9/11 Report at 59 (emphasis added).

While the 9/11 Report reads that the 1992 fatwa "[s]pecifically singl[ed] out U.S. forces for attack," (*id.*), it is clear that the *fatwa* was still, at that time, directed internationally, at "Western" troops *abroad*. There is no reasonable or logical way to infer that this sort of language could put any charity or other person on notice that the next intended target was the United States territory *proper*. Instead, the most reasonable interpretation of this language is that it was a reaction to the 1991-1992 Persian Gulf War, where the United States and other Western and global allies set up bases in the Kingdom of Saudi Arabia for the purposes of freeing Kuwait from Iraqi hands. Therefore, the 1992 *fatwa* could have as easily been directed at British, Israeli, or other foreign troops abroad. And, while the 1992 fatwa did single U.S. forces for attack, that language is focused on *U.S. military agents abroad*, not civilians or the United States territory here at home.

Thus, Plaintiffs interpretation of the findings of the 9/11 Commission overlooks the fact that, (as previously stated by Defendants, Plaintiffs and this Court), the first *public fatwa, targeting the United States as a territory in particular* was in 1996. A true reading of the 9/11 Report actually cuts *against* Plaintiffs' arguments that a pre-1996 look-back period is required.

8

## IV. A TREASURY DEPARTMENT "PRESS RELEASE" CANNOT JUSTIFY PLAINTIFFS DEMAND FOR 20-YEARS OF DISCOVERY HEREIN.

In addition to relying upon the 9/11 Commission Report, Plaintiffs quote a Treasury Department Press Release in support of their "relevance" contentions. Pls.' Ltr. at 10. Specifically, Plaintiffs quote that "the Philippine branches of the IIRO were founded sometime in the late 1980's or early 1990's by Muhammad Jamal Khalifa, who is Usama bin Laden's brother-in-law." The press release also states, "Khalifa maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Jelaidan." Despite Plaintiffs' belief that mere memberships and associations are sufficient to establish liability in this case, they fail to note how association or even membership in al Qaida during the late 1980's or early 1990's is *relevant* (in terms of discovery) to al Qaida's *later* jihad *against the United States.*

In effect, Plaintiffs seek to proceed on a theory of guilt by association. However, guilt by association cannot be established unless that association or membership was with the knowledge that the organization was engaged in, or intended to engage in the acts on which liability is based. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 (1982) (stating that guilt by association requires "evidence that the association possessed unlawful aims"). Thus, Plaintiffs' "guilt by association" theory is only relevant if the Plaintiffs' pleadings demonstrate that during the late 1980's and early 1990's, al Qaida was engaged in a *jihad* against the United States. Their pleadings do not demonstrate this. Moreover, despite Plaintiffs' attempt to twist the language of the 9/11 Commission Report by claiming that al Qaida was formed "for waging a *global* jihad," the Commission has stated only that al Qaida was formed "as a potential general headquarters for future jihad." 9/11 Report at 56.

## V. CONCLUSION

As discussed at length above, the burden on the Defendants in this case is severe. Other defendants have been given similar time limitations in this case. *See* J. Maas Ord. (June 26, 2006) (ordering a 6 year look back period for jurisdictional discovery). Furthermore, the risk of permitting Plaintiffs to engage in a fishing expedition at Defendants' cost is reason enough for this Court to exercise its discretion by imposing the Defendants proposed timeframe limitation.

Respectfully submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.

cc: Judge Maas

9