The Plaintiffs also list several bylaws, rules, and regulations to show that the charity Defendants are required to keep detailed records. See Exhibit 7, at 8-16. Though this is true, the Plaintiffs fail to inform the Court that the Retention Policies of both organizations require them to only keep documents for a specific time period (10 years for most types of documents) and thus they have only 5% of the documents from years before 1996. See al-Radhi Aff., ¶ 27; see also Exhibit 8. It is worthy to note that the Defendants suspended the retention policy after the first production request (respecting Judge Casey's order) and thus have retained all documents dated 1996 or beyond from that court order forward. As for documents possibly missing since 1996, that will be addressed in full *infra*.

### 1.      Financial Reporting from Defendants' Finance Departments

Plaintiffs assert that Defendants' document production "did not contain the systematic financial reporting of their respective Finance Departments (such as the monthly financial reports prepared by the MWL Finance Department)." See Exhibit 7, at 21. As part of the MWL and IIRO retention policies, however, monthly financial reports are not kept after the issuance of the annual reports and the auditing reports. See Exhibit 8. In other words, after annual reports and auditing reports are prepared, interim finance reports are no longer retained.

### 2.      Financial Reporting Submitted to the MWL Constituent Council

Plaintiffs request the financial reporting and other documents concerning the MWL Constituent Council. See Exhibit 7, at 21, 26. The most recent production includes resolutions and recommendations from the annual meetings of the MWL Constituent Council. These are not the originals but do include approximately 80-90% of the information included in the Constituent Council meetings' minutes. See IIRO015484-015649. The originals are expected to arrive as early as October 1, 2011. See al-Radhi Aff., ¶ 8.

Though the resolutions and recommendations of the MWL Constituent Council have been provided in the abovementioned production, it appears that this is a frivolous endeavor designed to unduly enhance the burden on the Defendants. See Exhibit 7, at 28 (requesting such irrelevant details such as copies of invitations and not only finalized agendas, but proposed agendas as well).

### 3.      Financial Reporting Relating to the Defendants' Auditing Practices

The Plaintiffs assert that MWL and IIRO are missing from their production the "actual financial and accountant reporting presented to the auditors." See Exhibit 7, at 22. The official royal decree from the Kingdom, see Exhibit 9, states that accountants only need to retain documents used in their audits for 10 years. Consequently, the underlying data from audits performed before 2001 no longer exist. Defense counsel and Mr. al-Radhi have contacted various auditing firms, including KPMG and Ernst & Young, to ascertain whether we could obtain the underlying financial data used in the audits. But because of customary practice, they

have refused to provide that information unless the audit is challenged and found to be deficient.[3] See McMahon Aff., ¶ 21, 22.

Plaintiffs use their Exhibit 34 to assert that "IIRO's internal guidelines require that every office outside the Kingdom retain an outside auditor to conduct an annual audit of the branches' financial activities." See Exhibit 7, at 22. This is a gross mistranslation of that document. Rather than detailing IIRO's auditing guidelines for branch offices, this document refers only to MWL's auditing guidelines *within* Saudi Arabia. These guidelines require the General Audit Department to provide them notice of whether their bank accounts have sufficient funds every three months.

### 4. Financial Reporting Relating to the Branch Offices' Bank Accounts and Other Financial Activities

Plaintiffs assert MWL branch offices "are required to transmit copies of bank statements to League headquarters every month, as well as reporting on MWL's accounts every three (3) months." See Exhibit 7, at 23. To the contrary, these are not bank statements produced by the bank. These are informal reconciliation reports produced by the branch offices indicating receipts of payments from the headquarters and any change to the balance due to fluctuations in local exchange rates. Such documents are not kept beyond the issuance of annual financial and accounting reports. See Exhibit 8; see also al-Radhi Aff., ¶ 25.

Plaintiffs assert that the office of the IIRO Secretary General has "instructed all of the overseas office managers to submit periodic reporting regarding the office's banking activities, including required reporting for every account opened abroad under the name of the IIRO or a name intended to protect the organizations money." See Exhibit 7, at 24 (referring to Plaintiffs' Exhibit 37). It is true that the overseas offices are not permitted to open any bank account without prior approval by the Secretary General. Still the Plaintiffs are deliberately requesting documents which are broad, non-specific and costly to produce. To respond to their request and produce bank statements of the IIRO branch offices would be require an overwhelming effort, including substantial costs and time. As the Defendants have reiterated several times, there are more than sixty (60) offices worldwide. See al-Radhi Aff., ¶ 20. Hypothetically, if the Defendants were to produce an average of ten pages of bank statements per office per month, that would equal 1440 pages per office per year. That number multiplied by the number of years included in the discovery request and the sixty-plus offices, would yield an unduly burdensome task.

As the Defendants have already informed the Plaintiffs, they are more than willing to provide Plaintiffs with the opportunity to do a sampling of Defendants' offices in Virginia/New York (USA), London/Madrid (European Region), and Cairo/Gibraltar/Nairobi (Africa) and they can examine any and all documents held in those locations. See McMahon Aff., ¶ 5-6. But it is unduly burdensome to spend the time, money and effort to produce each and every bank statement from all sixty-plus offices. The Plaintiffs' lawyers have made no effort to educate themselves as to how the Defendants' overseas offices function and on the specific issue of bank

---

[3] Before this Court orders the production of documents which form the bases of various IIRO audits performed by KPMG and Ernst & Young, the Court should require the Plaintiffs to produce expert auditor testimony to the effect that the audits that have been produced are inaccurate, flawed, disingenuous, or incomplete in some manner.

statements. For example, they could have visited the London office early on in the litigation to familiarize themselves with how an overseas charity Defendant office operates. Accordingly, this Court should not reward the Plaintiffs' inaction.

The Plaintiffs further assert that IIRO and MWL were "accepting donations deposited into joint accounts." See Exhibit 7, at 26. However, the Plaintiffs misinterpret their Exhibits 41 and 42. Those exhibits are an MWL journal in which IIRO paid to place an advertisement for donations. These advertisements urged donors to make donations into an independent IIRO account, which was held at various banks, but with a single account number. These accounts have no affiliation with MWL. See al-Radhi Aff., ¶ 26.

Another issue presented in the Plaintiffs' letter was the production of bank statements relating to accounts maintained by MWL and IIRO for the period of 1992-2004. See Exhibit 7, at 24. MWL has produced various bank statements from National Bank and Saudi American bank for the years 1997 to 2005. Furthermore, on June 21, 2011, IIRO produced bank account printouts from National Commercial Bank and al-Rajhi Bank for the years 1995-2000. See Exhibit 10. These original printouts were offered to the Plaintiffs for examination at the Defense counsel's Washington, D.C. office; the Plaintiffs have thus far not taken up the defense counsel's offer. See McMahon Aff., ¶ 24. Mr. al-Radhi has contacted the banks in which MWL and IIRO have accounts to see if it was possible to obtain electronic bank statements for the years 1992-1995. The banks have stated that because the records are so old, they must contact headquarters in Riyadh to obtain the statements. They estimate that this process will take at least six months. See Exhibit 11; see also al-Radhi Aff., ¶ 23. As for the 2001-2004 bank statements, Mr. al-Radhi is in the process of acquiring them. See al-Radhi Aff., ¶ 23.

### 5.    Responsive Branch Office Reporting

The Plaintiffs assert that MWL and IIRO have not produced all reports submitted by the field offices concerning their operations and finances. See Exhibit 7, at 28. These documents are currently being held at the Defendants' counsel's office. We have offered to send the documents to the Plaintiffs, but they have refused to accept them. See Exhibit 1.

### 6.    Delegation Documents

Plaintiffs assert that the Defendants have not produced documents responding to a category 5 request concerning documentation relating to the MWL and IIRO delegations. See Exhibit 7, at 29-30. These documents are currently being held at the Defendants' counsel's office. We have offered to send the documents to the Plaintiffs, but they have refused to accept them. See Exhibit 1.

### 7.    Annual or Periodic Reports

Plaintiffs claim that Defendants have failed to produce requested annual and periodic reports concerning the objectives and activities of the MWL or IIRO. See Exhibit 7, at 30. The Defendants have produced the annual reports for IIRO from 1996 to 2004. See IIRO004211-004839, in July 6, 2011 Document Production. Mr. al-Radhi and his team have been unable to

locate the 1992-1995 Annual Reports. See Exhibit 8. However, the Defendants did produce the IIRO 10 year report which covers 1986-1996. See IIRO003753-003978. The MWL reports for 1992-2004 are expected to be mailed to defense counsel this week. See al-Radhi Aff., ¶ 23.

### 8.   Al-Mojil Documents

Plaintiffs assert that the Defendants have failed to produce any documents pertaining to Abd al Hamid Sulaiman al Mojil's activities with the IIRO. See Exhibit 7, at 31. Mr. Sameer al-Radhi has visited the MWL and IIRO Indonesian office three times— one being for 37 days to secure any and all documents pertaining to or authored by Dr. al-Mojil. See al-Radhi Aff., ¶ 37; see also Fahd Mohammad Sanad al-Harbi Aff., ¶ 4, Exhibit 21 (hereinafter "al-Harbi Aff."). These searches resulted in the finding of no documents regarding Dr. al-Mojil because he "never had anything to do with the Indonesian office." See al-Harbi Aff., ¶ 6; see also Dr. Abdulhamid al-Mojil Aff., Sept. 2011,  ¶ 6, Exhibit 12 ("I have had no contact of any kind with the MWL/IIRO Indonesian office.") (hereinafter "al-Mojil Aff.").

### 9.   IIRO Philippines and Indonesia Offices

The Plaintiffs claim that information regarding the alleged closing of the Philippines office in 2006 has not been produced. See Exhibit 7, at 32. However, there was no official IIRO-Philippines office until 2011. See Exhibit 13. IIRO worked under the MWL license in the Philippines from 1988 to 2004, but ceased operations on January 5, 2004.  See Exhibit 14. Therefore, contrary to the Plaintiffs' assertions, there was no closing of an IIRO office in the Philippines and thus no documents concerning that exist.

### 10.   Wa'el Jelaidan Documents

Plaintiffs also assert that Defendants have failed to produce all responsive documents relating to Wa'el Hamza Jelaidan. See Exhibit 7, at 33. The Plaintiffs point to the alleged "virtually worthless" index the Defendants provided to them to show that there are documents with Jelaidan's name. These documents are dated 1990 and 1991, and because such documents are beyond the scope of the Court's order (1992-2004), the Defendants reserve the right to object to the production. There are no additional documents referencing Mr. Jelaidan. Mr. Jelaidan was never affiliated with IIRO in any capacity; he was never an employee or an independent contractor for the organization. See al-Radhi Aff., ¶ 14 (noting that Mr. Jelaidan "has had nothing to do with IIRO … [but was the] director of MWL in Peshawar, Pakistan").

### 11.   Mohammad Khalifa Documents

Plaintiffs concede that forty-four (44) documents referencing Khalifa have been produced. See Exhibit 7, at 34. As Plaintiffs correctly note, it has been the Defendants' consistent and good faith position that all Khalifa files and documents have been produced. See Hearings on April 11, April 26, and June 23, 2011. Khalifa's affiliation with IIROSA ceased in 1994 and pursuant to the court's order, all documents from the year 1992 forward are discoverable. Documents existing for the two intervening years have been completely produced and that includes any and all documents relating to any correspondences and conversations

between Khalifa and Abd al-Hamid Sulaiman al-Mojil. In fact, an affidavit by al-Mojil himself clarifies and confirms that at the time the Eastern Office was engaged in overseeing the operations of the Philippine office, Khalifa was not the director of that office—rather Zakaria Sheikh was the director with exclusive administrative and financial authority. See al-Mojil Aff., ¶ 5.Therefore, there are no documents concerning such a connection.

Regarding the files that the Plaintiffs' reference in their letter (with the help of the indexes provided to them by the Defendants), document no. 1630 and document no. 2130 do reference Khalifa and they are attached as exhibits. See Exhibits 22 & 23. As for document no. 15707, that document cannot be located in the index.

To once again reiterate to the Plaintiffs and the Court, Khalifa's terrorism conviction in the Jordanian court were thrown out on appeal because of false affidavits. Defendants' counsel personally interviewed Khalifa on a trip to Saudi Arabia and learned, supported by documentation, that the Jordanian Court of Cassation overturned Khalifa's convictions *in absentia.*

### 12.    Alleged Expulsion of IIRO Personnel from Pakistan

Plaintiffs assert that Defendants have not produced any documents relating to the alleged "expulsion of IIRO personnel from the Islamic Republic of Pakistan." See Exhibit 7, at 35.[4] But this claim that IIRO personnel were expelled is blatantly false. See al-Radhi Aff., ¶ 17. The Director General of the IIRO Pakistan office has confirmed this by stating in a letter that "no employee has so far been arrested having a link with Al-Qaida by the Government of Pakistan or any other investigating agency in Pakistan/Afghanistan. The office is running quite smoothly and all the employees are dedicated and following the rules and regulations of I.I.R.O. and do not indulge any activities, political or otherwise." See Exhibit 15.

### IV.    PLAINTIFFS' CASE LAW DOES NOT SUPPORT ENTRY OF A DEFAULT JUDGMENT BECAUSE IT EMPHASIZES THE "LAST RESORT" NATURE OF A DEFAULT JUDGMENT AND THE NECESSITY OF A FINDING OF BAD FAITH—NEITHER OF WHICH ARE PRESENT HERE

The Plaintiffs' reliance on three pivotal cases to prove that a default judgment sanction is warranted is misplaced. As the Plaintiffs' case law demonstrates, entering a default judgment as a sanction under Rule 37 is a drastic remedy. See State Farm Mut. Auto. Ins. Co. v. Grafman, 274 F.R.D. 442 (E.D.N.Y. 2011).  In State Farm, one of three primary cases cited by the Plaintiffs, the Court imposed a default judgment as the sanction against the defendant Kagan because there was "nothing in the record that would demonstrate that Kagan's conduct was merely an oversight or was the product of a good faith attempt at compliance." Id. at 30. This

---

[4] The Plaintiffs' support their assertion that Arab charity workers were "thrown out of" Pakistan by including a news clipping, See Exhibit 4, that inherently contradicts itself. The sensational headline to the clipping reports that Pakistan is deporting eighty-nine Arab aid workers while the news article itself states that "Provincial authorities refused to implement such an order and instead established a committee to investigate those on the list." Further, the news article states that, "[t]here was no indication of any wrongdoing by any of these organizations," including IIRO.

conduct, which the State Farm court relied heavily on in rendering its decision, included: (1) the intentional destruction of computer hard drives he was required to produce in discovery; (2) the grossly negligent spoliation of wiretaps he was ordered to produce; and (3) the failure to produce, in bad faith, any information about an asset dissipation of over $500,000. Id. at 30-32.

Unlike State Farm, such destruction of evidence and intentional failures to produce documents have not occurred in this case. Since the beginning of discovery, the Defendants have worked with the Plaintiffs to produce the responsive documents. In fact, when the initial document request was sent to the Defendants, they promptly responded in a congenial attempt to reduce the document request. See McMahon Aff., ¶ 2. The Defendants have also produced an index, see Exhibit 10, which lists all the documents in the Defendants' possession. See al-Radhi Aff., ¶ 6. On countless occasions, the Defendants have invited the Plaintiffs to inspect and examine any and all documents located at the closed VA office, the open NY office and the active offices of London, Madrid, Gibraltar, and Nairobi.[5] See McMahon Aff., ¶ 5-6. There has been absolutely no attempt, on the part of the Defendants, to destroy or conceal "damning evidence" like there was in State Farm.

The Plaintiffs also rely heavily on Montblanc-Simplo GMBH v. Colibri Corp., 692 F. Supp. 2d 245, 252 (E.D.N.Y. 2010) as support for entry of default judgment. Yet, as with all of their case law, it does not square with the facts of this case. The court stated that "culpability or intent is a primary concern under rule 37" but it observed that a court would not sanction the entry of a default judgment where the "failure to comply" has been due to a party's inability, and not to willfulness. Montblanc, 692 F. Supp. 2d at 252. In Montblanc, there was no evidence that the party was unable to comply, but rather, the defendant's actions were willful. The Montblanc defendant "not only declined to participate in discovery, but, … affirmatively represented to the Court that [the Defendant] would not pursue further defense of this action. Montblanc, 692 F. Supp. 2d at 252. The court concluded that this was "a wholesale refusal to provide discovery or otherwise litigate the matter" and thus "demonstrates that defendant has willfully opted not to continue to defend this action, which warrants the sanction of default." Id. (internal quotations omitted).

The Defendants here have not exhibited "wholesale refusal" to participate in the discovery process. In fact, the Defendants have produced 23,000 pages of discovery and have made available to the Plaintiffs' attorneys an additional 12,000 pages of responsive production. The record clearly shows throughout the discovery process that the Defendants have been actively complying with the discovery requests. See al-Radhi Aff., ¶ 6 (noting the extensive hours and resources expended by the MWL and IIRO document production staff). Unlike the Montblanc defendant, MWL and IIRO have secured bids with three discovery vendors: one for the 6,000 folders in MWL Makkah, one for the London Office, and one for the IIROSA warehouse. See Exhibits 5 & 6; Thomson Aff., ¶ 16. As a result, any failure to timely produce requested documents was clearly an inability to properly respond to the Plaintiffs and not an outright refusal to conduct discovery. See McMahon Aff., ¶ 25-26.

---

[5] One would think that because the FBI raided the VA and NY offices, the material they seized pursuant to the search warrant would be material to the Plaintiffs' claims. Alas, the Plaintiffs are not interested in those documents.

The third case relied upon by the Plaintiffs is <u>American Cash Card Corp. v. AT&T Corp.</u>, 184 F.R.D. 521 (S.D.N.Y. 1999). Unlike our case, the judge imposed a default judgment as a sanction only after he initially ordered the American Cash Card Corp. (Amcash) to pay $7,500 to compensate the Defendants for costs accrued in bringing the rule 37 motions. <u>American Cash</u>, 184 F.R.D. at 522 (imposing this alternative sanction even after the Plaintiff failed to comply with two prior discovery orders). *After this monetary sanction was imposed, Amcash violated **three** more orders before the court imposed a default judgment.* <u>Id.</u> at 524 ("In the instant case, the extreme measure of a default judgment is required [because] Amcash has failed to obey not one but five orders.").

In addition, as the Plaintiffs' counsel points out in their letter, the court noted that Amcash's disobedience was willful. <u>See</u> Exhibit 7, at 37. But the Plaintiffs' letter mischaracterizes the reason why the court made such a conclusion. Beyond failing to comply with court orders and failing to produce basic documents, the court listed several additional reasons that rendered Amcash's disobedience willful, including: "[the general manager's] testimony that she was not asked … to look for responsive documents until August 16, 1996; [the general manager's] testimony that her requests to Amcash to retrieve documents from her home were ignored; Amcash's belated production of certain documents; and its misrepresentation of its ability to pay the $ 7,500 in sanctions." <u>American Cash</u>, 184 F.R.D. at 522.

In this case, the type of disobedience that the <u>American Cash</u> court deemed "willful" has not occurred. The charity Defendants have actively been engaged in the discovery process by producing not less 23,000 pages and making available another 12,000 pages of responsive documents. They have also authorized and have paid for several trips to New York, London, Gibraltar, Madrid and Jeddah for counsel to discuss discovery issues, secured bid proposals for major vendors to compile the documents requested, hired several auditors, and offered the Plaintiffs' counsel, on several occasions, to travel to and inspect the documents located at the closed VA office, the open NY office and the active offices of London, Madrid, Gibraltar, and Nairobi. <u>See</u> McMahon Aff., ¶ 5-6. Additionally, when this court suggested that an index would be helpful to show the Plaintiff lawyers the contents of the IIROSA warehouse, Mr. Al-Radhi prepared one and spent a considerable time doing so. <u>See</u> al-Radhi Aff., ¶ 6. It is clear that the charity Defendants have not engaged in willful conduct, but instead have put forth a good faith effort to comply with the Court's discovery orders.

## V.   THERE ARE STILL OUTSTANDING DISCOVERY ISSUES IN THIS CASE THAT THE COURT HAS CHOSEN NOT TO RESOLVE UP TO THIS POINT AND SUCH ISSUES SHOULD BE ADDRESSED BEFORE ANY SANCTIONS ARE IMPOSED

The Defendants have been actively and diligently responding to the discovery orders of the court. <u>See</u> <u>supra</u> Part III.A. But to completely and fully comply with such orders, a few outstanding issues need to be addressed.

As this Court knows, in the discovery conferences, the charity Defendants have invited the Plaintiffs to visit various offices located in disparate parts of the world. These offices include the New York City office, the London office, the Gibraltar office (an alleged link to a growing

17

Al Qaeda insurgency in Africa), the Madrid office, the Cairo office and the contents of the MWL's Virginia office, which had been seized by the FBI. These seized documents have been offered to the Plaintiffs several times for inspection, but they seem uninterested in them. See McMahon Aff., ¶ 11. The Court and the Plaintiffs should know that the offices listed above are samplings of the more prominent charity offices.

The Plaintiffs have yet to respond to these invitations even though the charity Defendants thought such offices were representative of its worldwide activities. It is worthy to note that even the Court has said that it does not understand why the Plaintiffs' lawyers "are not taking [the Defendants] up on the offer." Transcript of April 26, 2011 Hearing, p. 23 (Court: "...One of your proposals was they should come look at the warehouse in Saudi Arabia or look at how the offices function. And as to at least some of the offices, other than the expense of it, I am not sure why they are not taking you up on the offer.").

In addition, the IIRO and the Muslim World League has made available to the Plaintiffs for inspection any and all responsive documents located in Jeddah and Makkah, Saudi Arabia. The Plaintiffs did not embrace this opportunity to visit Saudi Arabia or have Muslim attorneys based there to act as their local counsel representatives for document production. To address the Plaintiffs' counsel's unfounded concern that their lives would be in jeopardy if they visited Saudi Arabia, the Defendant Muslim World League has sought bids from various discovery vendors, including United Lex, to determine the cost to scan and copy any and all documents in the possession of the Makkah and London MWL offices locations. See Exhibit 6. This burdensome process has been estimated to cost over one million dollars. See Exhibit 6.

## VI.    OVER THE COURSE OF THIS CASE, IT HAS BECOME APPARENT THAT THERE ARE A NUMBER OF FAIR AND REASONABLE DISCOVERY OPTIONS THAT THE PLAINTIFFS DO NOT WANT TO UTILIZE

The court should appreciate that Defense counsel has over 30 years' experience handling large cases like this one. Typically, the attorneys cooperate and figure out ways to secure discovery and avoid having the judge become embroiled in discovery disputes. Defense counsel has never experienced such an adamant refusal, as he has with the Plaintiffs' lawyers in this case, to learn about the realities of how a party (the charities), operates. Early on, Defense counsel proposed that Plaintiffs' attorneys initially visit an overseas office. They could learn how an overseas charity Defendant office operates, converse with its employees, and witness how banking statements are handled. In other words, from the start of this litigation, the Plaintiffs' lawyers could have obtained a more educated understanding of all the issues that they now have come to court with.

To give the Court another example, attached here is a comprehensive affidavit from the London-based counsel, Ahmad Thomson. A review of that affidavit reveals that he has been Defendants' counsel for some time, knows the books and records of the organizations, has done legal work for the organizations, is present in London, and has just secured the registration of IIRO with the UK Charity Commission— thus, Mr. Thomson has subjected IIRO to extreme regulatory scrutiny. If the Plaintiffs' lawyers had traveled to London and examined the material in the London office and in attorney Thomson's files, they would have learned a great deal about

how a typical overseas Defendant office operates. Alas, the Plaintiffs' lawyers could have used that experience to make discovery more manageable.

As he details in his affidavit, Mr. McMahon visited London on a number of occasions to specifically engage attorney Thomson and to request that he actively be involved in discovery issues and to prepare that office for a visit by the Plaintiffs' attorneys. Mr. McMahon's rationale was that the Plaintiffs would visit an English speaking country and any translation issues would be easily resolved by Mr. Thomson. Mr. Thomson's affidavit reveals the extensive efforts that he and Mr. McMahon made to coordinate visits to Saudi Arabia to discuss discovery issues that the Plaintiffs' lawyers argued. Mr. McMahon estimates in his affidavit that the charity Defendants have spent approximately $75,000 in airfare for him alone. MFM Aff., ¶ 5. Mr. Thomson has also visited Saudi Arabia to discuss discovery issues. Obviously, the Defendants have expended large sums of money to have attorneys in London and Washington prepare for discovery issues.

The Plaintiffs' attorneys claim that they do not want to visit the comprehensive IIRO warehouse in Jeddah because they fear for their lives.[6] Defendants have sent the Plaintiffs' lawyers pictures of the warehouse, and as Mr. Al-Radhi made clear in his affidavit, spent significant time putting together indexes so that the Plaintiffs' attorneys could select documents from a list. The Plaintiffs could have any documents they desired by simply identifying the documents in the index.

The Plaintiffs' attorneys also apparently do not want to learn how to use the IIRO index for the IIRO warehouse cited in Mr. al-Radhi's affidavit. In fact, when the index came up as an issue in a conference call with the Plaintiffs' lawyers, not one of the Plaintiffs' lawyers had the index in his possession (the conference call, in part, was meant to educate the Plaintiffs on how to effectively use the IIRO indexes). Query: why come to a conference call meeting when one of the main issues will be the IIRO index, and not bring the index? The lawyers do not want to view the orphan records, which make up approximately sixty (60) percent of IIRO's annual expense outlays. These records would be the most obvious source of information concerning dollars flowing out of charities and allegedly into hands of would-be terrorists.

The Plaintiffs' lawyers also do not want to visit IIRO headquarters in Jeddah where all of the discovery issues can be laid out and resolved. They do not want to obtain letters or meet with officers of IIRO, and do not want answers about how the IIRO dovetails its operations with overseas offices. As expressed in Mr. McMahon's affidavit, they have been unable to attend meetings in Makkah because they are not Muslim. But there have been arrangements made to have documents brought into Jeddah from Makkah. In this regard, the Plaintiffs' lawyers apparently will not even comment on the vendor's bid obtained by the MWL regarding the available 6,000 folders. The MWL secured the services of a reputable discovery vendor to address the issue, but Plaintiffs' lawyers do not want to spend any money or time to obtain these folders.

Defense counsel has had major criminal litigation experience, including various cases involving FBI warrants regarding confidential client documents. In this case, the Defendants'

---

[6] Of course, if Plaintiffs were to visit Jeddah, Mr. al-Radhi would be the quintessential host as he has been for Mr. McMahon and Mr. Thomson.

19

offices, surreptitiously and without foreknowledge, were raided by the FBI. They seized material consistent with the scope of their search warrant. One would have to assume they targeted certain records that could lead to, for example, an indictment alleging international terrorism or conspiring to avoid money laundering charges. Early on in this case, the Plaintiffs' lawyers were shown at least eleven (11) boxes that the FBI seized. Yet they now do not want to view any more boxes because there was nothing incriminating in the boxes inspected. To the point, there has never been a single indictment brought against IIRO or MWL. And these same records were inspected by the U.S. Senate Committee on Taxation with a view toward revoking their 501(c)(3) nonprofit status—no revocation has ever occurred.

For this Court's edification, Mr. al-Radhi has overseen the recent production of more than 12,000 pages of responsive documents that are largely responsive to the latest demands of the Plaintiffs. Mr. al-Radhi has expended great resources to put these 12,000 pages together. See al-Radhi Aff., ¶ 7. Mr. Carter does not want them at this time and prefers to wait until a later application can be made to this court. This is a curious approach given the sensational allegations made against the Defendants and will cause this Court to entertain a fourth application. And if this Court has to entertain another application, that will impact judicial economy.

## VII.   CONCLUSION

The Plaintiffs' assertion that the circumstances in this case mandate the entry of a default judgment is not supported by the cases they cite. All of their authorities reject entry of a default judgment. Rather, this Court should consider discovery orders: 1) mandating that the Plaintiffs accept documents produced by the Defendants; 2) mandating that the Plaintiffs visit an overseas charity office; and 3) mandating that the Plaintiffs take a position on the discovery bids obtained by the Defendants.

The Defendants have spent an immense amount of time, effort, and money (attorney/accountant fees) to satisfy their responsibilities of document production. This is certainly not the conduct of a recalcitrant, willful, and bad faith litigant who wants to frustrate the discovery process. One can question the timeliness of the production, but not the Defendants' efforts in producing 35,000 pages of responsive documents. The Defendant charities lack any sophistication with the American legal system and are being sued for $1,000,000,000,000 (one trillion). A default judgment would cripple IIRO's efforts to take care of more than 90,000 orphans worldwide, one-third of whom are in Africa. See Exhibit 16 (noting IIRO's humanitarian efforts throughout the world); Exhibit 25 (letters from host countries commending IIRO's humanitarian efforts); Exhibit 24 (United Nations Peace Messenger award).

Perhaps most importantly, the Plaintiffs cannot claim prejudice arising from the conduct of the charity Defendants. After all, they initiated appeals and filed for certiorari in pursuit of the royal family. That futile four-year effort put the case on a slow track and that was specifically the result of the Plaintiffs' own litigation strategy. Additionally, the Plaintiffs' refusal to both utilize the indexes provided to them by the Defendants and visit an overseas charity office have delayed production and frustrated the discovery efforts of the Defendants.

20

These Defendants have: offered complete access to six major overseas offices without any pre-conditions of any nature; engaged three discovery vendors in the hope that the parties can share the significant cost of this discovery effort; specifically prepared an index to assist the 9/11 lawyers in their search; and have given their best effort under exigent circumstances, i.e., they have had to take into account the activities of more than 60 non-computerized, worldwide offices with not less than ten languages involved.  This is one of the most complicated cases in America and as was remarked upon by the Supreme Court, "American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations and for any sovereign interest expressed by a foreign state." Societe Nationale Industrielle Aerospatiale v. Dist. Court for the Southern Dist. Of Iowa, 482 U.S. 522, 546 (1987).

Respectfully Submitted,

Martin F. McMahon, Esq.

21