also objects to this request to the extent it seeks documents readily accessible to the plaintiffs from the public domain.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any supplemental documents of Defendant's that are responsive to this request. Defendant however directs Plaintiffs to the following documents which rebut such accusations:

IIRO 001805 to IIRO 001808.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 97:**

Provide all documents relating to any and all information or notification you received prior to September 11, 2001, that any persons identified Exhibit A, may have been or were engaging in conduct unrelated to their ostensible charitable or humanitarian purposes, including without limitation, diverting funds or otherwise providing material support or resources to: (i) Islamic radicals, fundamentalists, extremists or persons or organizations associated with international terrorism or domestic terrorism; and/or (ii) al Qaida, other terrorist organizations and/or individuals sympathetic to al Qaida or other terrorist organizations, regardless of whether you believe such person(s) was acting within the scope of his employment in relation to any such activities.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4, 5, 6, 9, 10, 11, and 12.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any supplemental documents of Defendant's that are responsive to this request. Defendant however directs Plaintiffs to the following documents which rebut such accusations:

IIRO 001296 to IIRO 001332,          IIRO 001739 to IIRO 001758,

IIRO 001805 to IIRO 001808.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 98:**

Provide all documents relating to any and all information or notification you received prior to September 11, 2001, that al Qaida aspired to conduct terrorist attacks: (i) against the United States and its interests abroad, (ii) against the United States within its borders, and/or (iii) against New York City and the World Trade Center complex, Washington D.C. or other U.S. landmarks.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4, 5, 6, 9, 10, 11, and 12.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant asserts that it received no information or notification prior to September 11, 2001, that al Qaida aspired to conduct terrorist attacks: (i) against the United States and its interests abroad, (ii) against the United States within its borders, and/or (iii) against New York City and the World Trade Center complex, Washington D.C. or other U.S. landmarks. Accordingly, Defendant's counsel has not found or learned of any supplemental documents of Defendant's that are responsive to this request, and Defendant further asserts that no such documents exist.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 99:**

From the period beginning January 1990 through the present, please provide an electronic or paper copy of all web-pages that were ever operated by the IIRO and/or its worldwide subsidiaries, affiliates, or branch offices. Such documents shall include, but are not limited to, the e-mail server(s), webmaster(s), website designer(s), domain names, and registration of domain names.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 4, 5, 6, 8, 9, 10, and 11. Defendant

specifically objects to this Request as unduly burdensome in seeking "an electronic or paper copy of all web-pages that were ever operated by the IIRO and/or its worldwide subsidiaries, affiliates, or branch offices."

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs plaintiffs to IIRO-SA's official website, www.iirosa.org which is currently active. The IIRO has also registered www.iirosa.com and www.iirosa.net which redirect to www.iirosa.org.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 100:**

Please provide all documents relating to any "web links" that any IIRO website(s) have to other internet websites, web-pages and/or chat rooms. Such documents shall include, but are not limited to, the reason or purpose for the link, how the decision was made to add such a link to the website, whether the IIRO received any compensation for maintaining the link, and the content of the linked internet website, web page or chat room.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 4, 5, 6, 8, 9, 10, and 11. Defendant specifically objects to this Request as overbroad and unduly burdensome. Defendant also specifically objects to this Request to the extent it seeks documents readily accessible to the plaintiffs from the public domain.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs Plaintiffs to the following documents:

IIRO 001720 to IIRO 001738.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

## REQUEST 101:

Please provide any internal regulations, rules, or protocols relating to web-links, e-mail, and website uses.

## ANSWER:

Defendant restates their response to Production for Documents Request No. 100 as provided herein.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

## REQUEST 102:

Please provide all electronically-stored materials which relate to the subject matter of the documents and things described herein including: (i) data files created by a word processor, spreadsheet or other application software; (ii) databases and structural information about the databases, including network activity logs and audit trails; (iii) electronic calendars and telephone logs; whether this information exists on a network file server, main frame computer, mini-computer, stand-alone personal computer, network workstation, off-line data-storage media, including back-ups and archives, floppy diskettes, tapes and other removable electronic media.

## ANSWER:

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 4, 5, 6, 8, 9, 10, and 11.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

## REQUEST 103:

Please provide a list of all publications, newspapers, newsletters, books, reports, pamphlets, videotapes, audiotapes, and/or websites published, authored, and/or financed in whole or in part, by the IIRO.

## ANSWER:

Defendant incorporates and asserts each of the General Objections identified

above, specifically including General Objections 1, 2, 4, 5, 6, 8, 9, 10, and 11.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs Plaintiffs to the following documents:

| | |
|---|---|
| IIRO 000944 to IIRO 000968, | IIRO 003593 to IIRO 003711, |
| IIRO 001739 to IIRO 001758, | IIRO 003712 to IIRO 003752, |
| IIRO 002717 to IIRO 002726, | IIRO 003753 to IIRO 003978, |
| IIRO 002727 to IIRO 002996, | IIRO 004019 to IIRO 004043. |
| IIRO 003482 to IIRO 003592, | |

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 104:**

Please provide a copy of any and all IIRO "document retention" policies, plans, or programs.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 4, 5, 6, 9, 10, and 11.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs Plaintiffs to the following documents:

IIRO 000986 to 000987 (estimate for documents to be produced).

Defendants also produce the documents bates-stamped IIRO 003038 to IIRO 003078 consisting of pictures of the IIRO-SA warehouse where the documents are stored.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 105:**

Please provide any and all records or documents relating to the destruction of documents, including descriptions of all destroyed documents by the IIRO.

**ANSWER:**

Defendant restates their response to Production for Documents Request No. 104 as provided herein.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 106:**

Please provide copies of all reports, correspondence and records from any expert expected to testify at trial which relate to the subject matter of this case.  Such documents shall include, but are not limited to, all expert reports and all documents reviewed and relied upon by any expert expected to testify at trial.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objection 6.  Additionally, Defendant specifically objects to this Request as prematurely seeking information about expert witnesses which Defendant is under no obligation to provide at this time because discovery is ongoing.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs Plaintiffs to the following documents:

IIRO 000969 to IIRO 000985,                IIRO 004057 to IIRO 004069.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 107:**

Please provide each exhibit that you intend to rely upon at trial.

**ANSWER:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objection 6.

Further, due to the immense burden of producing all potentially responsive documents in the Southern District of New York, defendant will make its overseas offices, its warehouse in Jeddah, Saudi Arabia, and the IIRO-SA corporate headquarters available for inspection.

Subject to, and without waiving the above objections, Defendant directs Plaintiffs to the following documents:

IIRO 000001 to IIRO 004069.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


Respectfully submitted on this 28th day of October 2008,

**MARTIN F. MCMAHON & ASSOCIATES**

By:     Martin F. McMahon, Esq., # M.M. 4389
1150 Connecticut Ave., N.W.
Suite. 900
Washington, D.C. 20036
Phone: (202) 862-4343
Facsimile: (202) 862-4130
Email: mfm@martinmcmahonlaw.com
*Attorney for Defendant International Islamic
Relief Organization of Saudi Arabia (IIRO-
SA)*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of October, 2008, a copy of the foregoing Defendant International Islamic Relief Organization of Saudi Arabia's First Set of Supplemental Responses to Plaintiffs' First Set of Requests for Production of Documents sent via electronic mail and First Class mail, postage pre-paid to:

Mr. Andrew J. Maloney III, Esq.
Kreindler & Kreindler
100 Park Ave.
New York, NY 10017-5590
amoloney@kreindler.com
*Attorney for Plaintiff Ashton*

Mr. Robert L. Motley, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Rmotley@motleyrice.com
*Attorney for Plaintiff Burnett*

Mr. Sean P. Carter, Esq.
Cozen O'Connor
1900 Market St.
Philadelphia, PA 19103-3508
Scarter1@cozen.com
*Attorney for Plaintiff Federal Insurance*

Mr. Jerry S. Goldman, Esq.,
Anderson Kill & Olick, P.C.,
1251 Avenue of the Americas,
New York, New York, 10020
Tel: 212-278-1000
jgoldman@goldmanlawyers.com
*Attorney for Plaintiff O'Neill*

Martin F. McMahon, Esq.

MEMORANDUM OF UNDERSTANDING

BETWEEN

INT'L. ISLAMIC RELIEF ORG.

AND

THE UNITED NATIONS CHILDREN'S
FUND

بروتوكول إتفاق

بين

هيئة الإغاثة الإسلامية العالمية

و

منظمة الأمم المتحدة للطفولة

IIRO O04044

# MEMORANDUM OF UNDERSTANDING BETWEEN THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION AND THE UNITED NATIONS CHILDREN'S FUND

This Memorandum of Understanding (MOU) is made on Monday 9/6/2008, between the International Islamic Relief Org. (hereinafter referred to as "IIROSA") and the United Nations Children's Fund (hereinafter referred to as "UNICEF"). IIROSA and UNICEF are hereinafter collectively referred to as the "Parties".

**RECALLING,** An initiative from UNICEF to IIROSA on March 18th 2008 for a partnership to implement pending projects that are parallel with both parties' mandate (nationally and internationally) where IIROSA responded on March 20th 2008 with a primary approval of partnership (hereinafter referred to as the "Agreement"), the Parties understand that the arrangements described in this MOU supplement, but do not supersede, the arrangements provided in the Agreement;

**WHEREAS,** the Parties will launch a national joint initiative to facilitate partnership and strengthen their cooperation in matters of common concern and interest and those of their common Member Countries, for the shared purpose of advancing children development and rights in their Member States;

بروتوكول إتفاق

بين

هيئة الإغاثة الإسلامية العالمية

و

منظمة الأمم المتحدة للطفولة

تم تحرير بروتوكول الإتفاق هذا في يوم الاثنين ٢٠٠٨/٦/٩م بين كل من هيئة الإغاثة الإسلامية العالمية (المشار إليها فيما بعد باسم "الهيئة") ومنظمة الأمم المتحدة للطفولة (المشار إليها فيما بعد باسم "اليونيسيف")، ويتم الإشارة إلى كل من اليونيسيف والهيئة على نحو مشترك بـ"الطرفين".

تمهيد: أرسلت مبادرة من قبل اليونيسيف إلى الهيئة في الثامن عشر (١٨) من مسارس ٢٠٠٨ للمشاركة في تنفيذ مشاريع معلقة ومتطابقة مع تفويض الطرفين (محلياً ودولياً) واستجابت الهيئة في العشرين (٢٠) من مسارس ٢٠٠٨ بموافقة مبدئية على المشاركة (المشار إليها فيما بعد باسم "الإتفاقية")، كما يعي الطرفان أن الترتيبات التي يقوم بروتوكول الإتفاق هذا يوصفها مكملة وليست لاغية للترتيبات المنصوص عليها في الإتفاقية.

حيث سيطلق الطرفان مبادرة وطنية مشتركة لتسهيل الشراكة وتقوية تعاونهما في الشؤون ذات الاعتبارات والمصالح المشتركة والتي تخص بلديها الأعضاء وذلك للغرض المشترك المتمثل في دفع تنمية الأطفال والدفاع عن حقوقهم في تلك الدول.

2

IIRO 004045

**ACKNOWLEDGING**, the differences in the mandates of the two institutions and their vital interdependence for the achievement of global development;

**RECOGNIZING**, the benefits of genuine substantive cooperation and their wish to pursue such cooperation in a cost-effective manner, and having consulted on the priority areas and modalities of cooperation; and

**DESIRING**, to intensifying cooperation and contributing to the children's rights, health, equality and protection progress of their common member countries;

**NOW, THEREFORE**, the Parties hereto have agreed to cooperate as follows:

## ARTICLE-I
## PURPOSE

The purpose of this MOU is to facilitate collaboration and cooperation between the Parties in matters of common interest and to establish the arrangements necessary for implementing the same.

## ARTICLE-II
## AREAS OF COOPERATION

Within the context of achieving the UNICEF objectives in their common member countries, the following shall constitute areas of cooperation:

1. Focus capacity and efforts to support national and international implementation of the Millennium Development Goals (MDGs)

مع الاعتراف بالاختلافات القائمة في تفويض المؤسستين واعتمادهما المتبادل على بعضهما من أجل تحقيق التنمية العالمية؛

وإدراك فوائد التعاون الجوهري الحقيقي ورغبتها في متابعة هذا التعاون بشكل مراع للتكاليف، وقيامها بالتشاور حول أولويات وأشكال التعاون،

ورغبتهما في تقوية التعاون والمساهمة في تقدم حقوق وصحة ومساواة وحماية الأطفال في بلدانها الأعضاء المشتركة.

والآن، وعليه، وفق الطرفان بهذه الوثيقة على التعاون كما يلي:

المادة ١

الغرض

يتمثل غرض بروتوكول الاتفاق هذا في تسهيل الشراكة والتعاون بين الطرفين في الشؤون ذات المصلحة المشتركة وعمل الترتيبات الضرورية لتنفيذها.

المادة ٢

مجالات التعاون

ضمن سياق تحقيق أهداف الـ اليونيسيف في الدول الأعضاء، فإنه يجب أن تشكل النقاط التالية مجالات التعاون:

١- تركيز التدريب والجهود على تدعيم التنفيذ الوطني والدولي لأهداف تطوير الألفية.

IIRO 004046

| | |
|---|---|
| support national and international implementation of the Millennium Development Goals (MDGs) | الوطني والدولي لأهداف تطوير الألفية. |
| 2.   Ensure an effective contribution to acute poverty reduction. | ٢- ضمان مساهمة فعالة لخفض حدة الفقر. |
| 3.   Young child and maternal care at the family, community, service provider and policy levels; | ٣- رعاية الأطفال الصغار والعناية بالأمومة على مستويات العائلة والمجتمع ومقدمي الخدمة والسياسة. |
| 4.   Focus on improved developmental readiness for school including access, retention and completion, especially for girls | ٤- التركيز على الاستعداد الإنمائي المحسن على المدارس، متضمناً الدخول والدوام والإكمال، وخاصة للبنات. |
| 5.   Improve education quality | ٥- تحسين جودة التعليم. |
| 6.   Ensure education in emergency situations | ٦- ضمان التعليم في الحالات الطارئة. |
| 7.   Continue leadership of the United Nations Girls' Education Initiative | ٧- مواصلة مبادرة الأمم المتحدة لتعليم البنات. |
| 8.   Emphasis on increased care and services for children orphaned and made vulnerable by HIV/AIDS | ٨- التأكيد على زيادة الخدمات والعناية بالأطفال الأيتام وقابلي الإصابة بعدوى الإيدز. |
| 9.   Promote expanded access to treatment for children and women | ٩- تعزيز وتوسيع الحصول على علاج الأطفال والنساء. |
| 10.  Prevention of infections among children and adolescents | ١٠- الوقاية ضد العدوى بين الأطفال والمراهقين. |
| 11.  Continued strong participation in UNAIDS | ١١- المشاركة القوية المستمرة في إعانات الأمم المتحدة. |
| 12.  Strengthen country environments, capacities and responses to prevent | ١٢- تقوية بيئات الدول وطاقاتها واستجاباتها لوقاية وحماية الأطفال عن العنف والاستغلال |

IIRO 004047

and protect children from violence, exploitation, abuse, and conflict.

13. Putting children at the centre of policy, legislative and budgetary Coordinated operations in emergency and humanitarian relief assistance.

14. Collaboration in the areas of human resources development through exchange of staff, exchange of visits, and on the job training to familiarize with the modalities of operations.

15. Information exchange regarding seminars, workshops, conferences which are of interests to the Parties.

16. Other areas of cooperation may include private sector development, information and communication technology and aid coordination.

17. Communication and advocacy to be jointly implemented and coordinated between the two parties and no advertisement should be published with out the consent of both parties.

18. Fundraising plan to be agreed upon between the two parties prior to finalization of the plan.

### ARTICLE-III
### CONSULTATION AND EXCHANGE OF INFORMATION

(a) The Parties shall keep each other

وسوء المعاملة والنزاعات.

١٣- وضع الأطفال في مركز السياسة والعمليات المتسقة التشريعية والمالية المشتركة في الطوارئ ومساعدة الإغاثة الإنسانية.

١٤- التعاون في مجالات تنمية الموارد البشرية من خلال تبادل الموظفين، وتبادل الزيارات، والتدريب أثناء العمل، بأساليب العمليات.

١٥- تبادل المعلومات حول الندوات، وورش العمل، والمؤتمرات ذات الأهمية للطرفين.

١٦- يمكن أن تشمل مجالات التعاون الأخرى تنمية القطاع الخاص، وتقنية المعلومات والإتصالات، وتنسيق المساعدات.

١٧- يتم التنفيذ والتنسيق المشترك بين الطرفين فيما يخص الاتصال والدعم، ولا يجوز نشر أي إعلان دون موافقة كليهما.

١٨- يتفق الطرفان على خطة لجمع الأموال قبل وضعها في الشكل النهائي.

### المادة ٣
### التشاور وتبادل المعلومات

أ- يقوم الطرفان بإبلاغ بعضهما البعض

IIRO O04048

| English | Arabic |
|---|---|
| informed and, whenever necessary, consult each other on matters of mutual interest, which are likely to lead to greater collaboration, including on new initiatives, development cooperation policies and strategies. | وكلما كان ضرورياً يستشيران بعضهما في الشؤون ذات المصلحة المتبادلة، التي من المحتمل أن تؤدي إلى مزيد من التعاون، بما في ذلك، المبادرات الجديدة، والتطورين وسياسات واستراتيجيات التعاون. |
| (b) The Parties shall exchange relevant information and data on matters of common interest and collaborate in the collection, analysis and diffusion of such information and data, without prejudice to arrangements which may be required to safeguard the confidential and restricted character of certain information and documents. | ب- يقوم الطرفان بتبادل المعلومات ذات الصلة والبيانات المتعلقة بالشؤون ذات المصلحة المشتركة ويتعاونان في جمع وتحليل ونشر هذه المعلومات والبيانات، دون المساس بالترتيبات التي قد تكون مطلوبة للحفاظ على السمة السرية والمقيدة لمعلومات ومستندات معينة. |
| (c) In accordance with its policies and procedures and upon request from IIROSA, UNICEF agrees to provide IIROSA with products from the UNICEF specialized networks of relevance to the common interest of the Parties. | ت- وفقاً لسياستها وإجراءاتها وعند الطلب من الهيئة توافق اليونيسيف على تزويد الهيئة بالمنتجات ذات الصلة بمصلحة الطرفين المشتركة، وذلك من قبل شبكات اليونيسيف المتخصصة. |
| (d) UNICEF will keep IIROSA periodically informed, on the financial and operational status regarding project activities carried out under this MOU. | ث- تقوم اليونيسيف بإبلاغ الهيئة بشكل دوري بالوضع المالي والتشغيلي الخاص بنشاطات المشروع المنفذة بموجب بروتوكول الاتفاق هذا. |
| (e) The Parties may convene meetings at such intervals as deemed appropriate to review the progress of activities being carried out under this MOU and to plan future | ج- يقوم الطرفان بعقد اجتماعات في الفترات التي يعتبرانها مناسبة وذلك لاستعراض تقدم النشاطات المنفذة بموجب بروتوكول |

IIRO 004049

activities.

## ARTICLE-IV
## REPRESENTATION

The Parties may invite each other to send participants, speakers or observers to meetings or conferences convened by them or under their auspices, and which may be of interest to either party. Invitations will be subject to the procedures applicable to such meetings or conferences.

## ARTICLE-V
## IMPLEMENTATION MECHANISM

(a)  In order to implement specific activities in the areas of cooperation envisioned herein, the Parties will prepare, and be guided by, an Action Plan and conclude specific arrangements as may be necessary and appropriate. The activities envisaged under the MOU shall be carried out by each party in accordance with its internal regulations, rules and directives.

(b)  In case the of financial transfer between the Parties in support of particular activities under this MOU, appropriate agreements will be concluded, which shall specify the costs and expenses relating to the activities and how they are to be borne by the Parties.

(c)  Activities carried out hereunder shall be subject to mutual evaluation by both institutions or otherwise as may be agreed upon

الإتفاق هذا ولتخطيط النشاطات المستقبلية.

## الـمــــادة ٤
## الـتــمـــثـــيـــل

يقوم الطرفان بدعوة كل منهما الآخر لإرسال مشاركين أو متحدثين أو مراقبين إلى الاجتماعات أو المؤتمرات المنعقـدة مـن قبلهــا أو تحـت رعايتهما، والتي قد تكون لمصلحة أي منهمـا. وسوف تخضع الدعوات للإجراءات التي تطبـق على مثل هذه الاجتماعات أو المؤتمرات.

## الـمــــادة ٥
## آلـيـــة الـتـنـفـيـــذ

أ-  لتنفيذ نشاطات معينة في مجالات التعاون المتخطط لها في هذه الوثيقة يقوم الطرفان بإعداد وإتباع خطة عمل وإتمام ترتيبـات معينة بما قد يكون ضرورياً ومناسباً. تنفذ النشاطات المخطط لها بموجب بروتوكـول الإتفاق هذا من قِبل كل طرف وفقـاً لأنظمة وقواعد وتوجيهاته الداخلية.

ب-  وفي حالة التحويل المالي بين الطرفين لتدعيم نشاطات معينة بموجب بروتوكول الإتفاق هذا يتم إكمال الاتفاقيات المناسبة والتي يجب أن تحدد التكاليف والنفقـات المتعلقة بالنشاطات وكيفية تحملها بواسطة الطرفين.

ت-  تخضع النشاطات المنفذة بموجب هـذه الوثيقة إلى التقويم المتبادل للمؤسستين أو

by both Parties. The results and recommendations of evaluation shall be conveyed to both Parties and the respective national counterparts, which shall subsequently monitor the conduct of the appropriate actions for improvement.

(d)  The Parties shall instruct their respective central, regional and/or local offices, departments and representatives to coordinate their activities and to put into effect the objectives of this MOU, in the framework of the action agreed upon.

(e)  The Secretary General, IIROSA, and the Resident Representative, UNICEF Saudi Arabia, will be focal contacts for the purpose of the implementation of this MOU.

## ARTICLE VI
## VISIBILITY

In accordance with their respective policies and procedures the names and logos of both parties shall be present in official project-related documents, press releases, post signs, subject to the United Nations privileges and immunities provided under the 1946 Convention on the Privileges and Immunities of the United Nations and the safety and security of United Nations staff to the Convention governing the Safety and Security of UN Personnel. UNICEF shall take all appropriate measures for the documentation of IIROSA's contribution

حسبما يتفق عليه بخلاف ذلك، كما أنه من المتعين نقل نتائج وتوصيات التقويم إلى كل من الطرفين ونظرائهم القوميين، الذين يقومون في النهاية بمراقبة أداء الإجراءات المناسبة للتحسين.

ث- يجب أن يقوم الطرفان بإصدار التعليمات إلى مكاتبهم الرئيسية و/أو الإقليمية و/أو المحلية الخاصة، وإداراتهم، وممثليهم، لتنسيق نشاطاتهم وتنفيذ أهداف بروتوكول الاتفاق هذا في إطار ما اتفق عليه.

ج- يكون الأمين العام للهيئة والممثل المقيم لليونيسيف بالمملكة العربية السعودية مركزي الاتصالات لغرض تنفيذ بروتوكول الاتفاق هذا.

## المـــــادة ٦
## الوضـــوح

وفقاً لسياستيهما وإجراءاتيهما الخاصة تكون أسماء وشعارات كلا الطرفين متواجدة في المستندات والبيانات الصحفية واللوحات الرسمية المتعلقة بالمشروع، وذلك حسب امتيازات وحصانات الأمم المتحدة المدرجة بموجب ميثاق ١٩٤٦ الخاص بامتيازات وحصانات الأمم المتحدة وسلامة وأمن موظفي الأمم المتحدة بموجب الميثاق الحاكم لسلامة وأمن موظفي الأمم المتحدة، وتقوم اليونيسيف باتخاذ جميع الإجراءات المناسبة لتوثيق مساهمة ومشاركة الهيئة مع اليونيسيف في نشاط

IIRO 004051

publication system.

## ARTICLE- VII
### AMENDMENTS TO THE AGREEMENT

The Parties to this MOU may amend the provisions herein or enter into supplementary agreements by a mutual agreement between the Parties through a simple exchange of letters.

## ARTICLE-VIII
### ENTRY INTO FORCE AND TERMINATION

(a)     This MOU shall enter into force on the date of its signature by the Parties and shall remain valid for three (3) years on the understanding that either party is at liberty to terminate it at any time, provided that notice of termination is given to the other party 6 (six) months in advance.

(b)     Should the MOU be terminated by either party as indicated in (a) above steps will be taken to ensure that termination is not prejudicial to any activities or programs implemented within the framework of this MOU.

## ARTICLE-IX
### REVIEW

The MOU will be reviewed by both Parties every two (2) years as from the entry into force, to allow for modifications as deemed necessary by mutual consent.

---

المادة ٧

التعديلات على الاتفاقية

يقوم طرفي بروتوكول الاتفاق بتعديل هذا شروط هذه الوثيقة أو إبرام اتفاقيات مكملة بموجب اتفاق مشترك بينهما بواسطة تبادل بسيط للخطابات.

المادة ٨

سريان وإلغاء الاتفاق

أ– يصبح بروتوكول الاتفاق هذا نافذاً في تاريخ توقيع الطرفين عليه ويبقى سارياً لمدة ثلاثة أعوام مع الإحاطة علماً بحرية إلغائه من قبل أي من الطرفين في أي وقت شريطة منح إخطار بالإلغاء إلى الطرف الأخر قبل هذا ستة أشهر.

ب– في حالة إلغاء بروتوكول الاتفاق من قبل أي من الطرفين كما هو منصوص عليه في البند (أ) أعلاه، يتم اتخاذ خطوات لضمان عدم إضرار الإنهاء بأية نشاطات أو برامج منفذة ضمن إطار بروتوكول الاتفاق هذا.

المادة ٩

المراجعة

يقوم كل من الطرفين بمراجعة بروتوكول الاتفاق كل عامين (٢) وذلك بدءاً من سريانه للسماح بإجراء التعديلات التي يتم إعتبارها ضرورية

IIRO O04052

## ARTICLE-X
## COMMUNICATIONS

For the purpose of facilitating the implementation of this MOU, the contact of information for the Parties is:

**(a)   For the IIROSA:**
International Islamic Relief Organization

P.O. Box 14843 - JEDDAH 21434
KINGDOM OF SAUDI ARABIA
Phone: 966 2 651-2333
FAX: 966 2 651-8491

**(b)   For UNICEF:**
United Nations Children's Fund:
P.O. Box 18009 - RIYADH 11415
KINGDOM OF SAUDI ARABIA
Phone: 966 1 488-1705
FAX: 966 1 488-1736.

**IN   WITNESS   WHEREOF,** the undersigned, duly appointed representatives of the UNICEF and the IIROSA, respectively, have on behalf of the Parties signed the present MOU in two copies.

**FOR AND ON BEHALF OF THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION.**

Dr. Adnan Khalil Basha, Secretary General

**FOR AND ON BEHALF OF THE UNITED NATIONS CHILDREN'S FUND:**

Dr. Ayman Abulaban, UNICEF Gulf Area Office Representative

بالموافقة المتبادلة.

المادة ١٠

الإتصالات

لغرض تسهيل عملية تنفيذ بروتوكول الإتفاق هذا، فإن معلومات الإتصال بالطرفين هي:

أ– فيما يخص الهيئة:

هيئة الإغاثة الإسلامية الدولية

ص. ب. ١٤٨٤٣ – جدة ٢١٤٣٤
المملكة العربية السعودية
هاتف: ٢٣٣٣–٦٥١ ٢ ٩٦٦
فاكس: ٨٤٩١–٦٥١ ٢ ٩٦٦

ب– فيما يخص اليونيسيف:

منظمة الأمم المتحدة للطفولة

ص. ب. ١٨٠٠٩ – الرياض ١١٤١٥
المملكة العربية السعودية
هاتف: ١٧٠٥–٤٨٨ ١ ٩٦٦
فاكس: ١٧٣٦–٤٨٨ ١ ٩٦٦

وإثباتا لذلك فقد قام الموقعان أدناه الممثلان المفوضان لكل من اليونيسيف والهيئة، على التوالي بالبداية عن الطرفين بالتوقيع على بروتوكول الإتفاق هذا من نسختين.

عن ويرأس هيئة الإغاثة الإسلامية العالمية:

د. عدنان بن خليل باشا الأمين العام

عن ويرأس منظمة الأمم المتحدة للطفولة:

د. أيمن أبو لبن، ممثل مكتب اليونيسيف في منطقة الخليج

١٥

IIRO 004053

## AFFIDAVIT

Under pain of perjury I, Dr. Abdulhamid Al Mojil hereby give this affidavit in support of the application of the International Islamic Relief Organization's (hereafter IIROSA) to have the Indonesian office , the Philippines Office and Abdulhamid Al Mojil be undesignated by the United States Treasury Department.

1.  I, of course was designated along with the above offices on Friday, August 4, 2006. There is absolutely no basis for this designation.

2.  I have worked with IIROSA for 18 years. I have served in the following capacities:

    2.1. Executive Director for 15 years. The Title of Executive Director was fundamentally a nominal one and not functional in respect of powers of execution and decision making. The real nature of my position functionally was one of an administrative officer.

    This evidenced by the following facts:

       2.1.1. I did not have the power to hire and fire employees or to assign any employee to particular task.
       2.1.2. I did not have the authority to authorize use of funds of IIROSA for any purpose other than when specifically instructed to do so by the Regional General Supervisor, which is equivalent to a chief executive officer (CEO) for the eastern region.
       2.1.3. Payments, or outlay of funds were made in accordance with the authorized budget for the particular project through the relevant countrywide committee in respect of each country for which the humanitarian aid is allocated.
       2.1.4. Payments in respect of projects for which there is an authorized budget were authorized by the Regional General Supervisor (CEO) for the relevant country committees and then the actual payment was effected through the joint signatures of two persons, at least, among a number of persons who held joint signatory capacity for effecting authorized payments.
       2.1.5. I did not have the power to authorize any payment, however small, the amount may be, in connection with any of the IIROSA's activities outside the Kingdom of Saudi Arabia, unless the particular payment is authorized by the Regional General Supervisor (CEO), and even then the actual payment was effected through a joint signature of the authorized signatures as explained above.
       Such payment can be authorized and effected only if there was an authorized budget in respect of such payment, and that such payment related to an authorized project that falls within IIROSA's humanitarian activities, such as maintaining orphanages and helping orphans and the destitute, generally, or digging wells to provide potable water. It is worth noting that the average price per well was about US$ 500 and the average price for building a mosque was US$15000 Dollars per mosque.

IIRO 004054

2.1.6. In respect of administrative and operational matters my responsibilities basically involved execution of the instructions and decisions of senior management as were directed to me from time to time by the Eastern Region General Supervisor (equivalent to CEO). Specifically, I did not have any level of authority in respect of effecting payments or receiving payments whether locally or internationally and I did not have the authority for independent decision making of whatever nature as relates to receiving or effecting payments.

In my capacity as Executive Director during the period between 1989 and 2005 my responsibilities were to undertake the following tasks:

2.1.6.1.   Follow up of the decision of the Regional Director of the Organization who is in charge of all department in head office, Eastern province and the other branches in the region;

2.1.6.2.   Follow up the decisions of regional council of the organization.

2.2. I also worked for two years since 2005, as a Eastern Region General Supervisor, but this title did not entitle me with the authority of a CEO because the authority for executive matters was retained by the Head Office in Jeddah during my term in this capacity. I held this position until my designation by OFAC on August 4, 2006, whereupon I was instructed to stop any involvements with the IIROSA office in the Eastern Region which was then closed.

3.   I have never personally or on behalf of IIROSA contribute any funds or provide any form of assistance to Al Qaida even when the support of the mujihadeen in their resistance against the soviet communist occupation of Afghanistan was internationally approved with direct support from the US.

4.   I have never received donations on my own behalf or on behalf of the IIROSA from any source outside the Kingdom at any time. I have never met with Osama Bin Laden or Dr. Abdullah Azzam or a Abu Sayaf in the Philippines, or Khalid Al Shaikh or with the Jamaa Islamia of Indonesian whether within or outside the Kingdom of Saudi Arabia, even at the time when the resistance of the mujahideen against the communist soviet occupation was internationally acceptable.

5.   I have never lived in Afghanistan whether during, before, or after the 1990. I did however stay in Pakistan for three weeks on a short business visit to the Office of IIROSA in Peshawar in 1990. The reason I stayed for three weeks, is that I was requested by the College of Architecture which was newly set up in Peshawar to give lectures in construction engineering and planning pending the arrival of the assigned lecturer.

6.   My travels were mainly limited to the Gulf states for visiting relatives or shopping. However, after the year 1995 I did travel to some Arab country such as; Lebanon, Syria, and Jordan for tourism. During the same year I also traveled to Yemen on two occasions attending conferences about orphans under the auspices of the President of Yemen.

IIRO- INDONESIA
REVIEW REPORT
PERIOD FROM 1ST MAY 2005 TO 31ST JULY 2006.

Prepared by:

M. Said & Co.
Chartered Certified Accountants
349 c High Road
London N22 8JA
020 8888 0650

IIRO O04057

INDEX

1: INFORMATION                                        1

2: INTRODUCTION    AND DISCLAIMER                     2

3: INDONESIA BRANCH                                   3

4: BRANCH ACTIVITIES                                  4

5: BOOKS AND RECORDS                                  5

6: EMPLOYEES                                          6

7: DA-IYA                                             7

9: CONTROL AND SUPERVISION                            8&9

10: ASSETS                                            10

11: CONCLUSION                                        11

IIRO O04058

# INFORMATION

## INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

**HEAD OFFICE**
PO Box 14843
Jeddah
Saudi Arabia

**INDONESIAN OFFICE**
Jl Raya Cipinang Jaya No. 90.
Jakarta – Timur
Tel: (021) 859 11 532
Fax : (021) 859 11025

**EXTERNAL ACCOUNTANT AND AUDITORS**
MUCHARAM & AMRON
Registered Public Accountants
J l Tanah Merdeka Kav. Rambutan
Block E
No. 124-125-Ciracas-Jakarta 12830
Tel : (021) 841 1395
Fax: (021) 841 1395

**BANKERS:**
Bank Mandiri
Gedung Bumi Dayn Plaza
J l .Iman Banjol No.61
Jakarta Pusat

Bank IFI
Jedung Bapindo Plaza
J l Sudirman  Kev.54
Jakarta Selatan

**INDEPENDENT EXAMINER:**
M. Said & Co.
Chartered Certified Accountants
349 c High Road
London N22 8JA

++44 (0)20 8888 0650
++44(0) 20 8888 3535

IIRO 004059

## INTRODUCTION:

My name is Mahmud Said. I am a Fellow of the Association of Chartered Certified Accountants and a member of the Institute of Chartered Management Accountants both of which Accountancy bodies are based in the UK.

I have worked for a number of accountancy firms in London and amassed a wealth of experience in the fields of accountancy and audit over a period exceeding twenty five years and currently run my general accountancy practice as a Chartered Certified Accountant.

I understand that charges been leveled against IIRO Indonesia that it is an organization which supports and finances extremist organizations.

IIROSA have asked me to review their Indonesian Branch accounting books and records for the period from May 2005 to 31st July 2006 and to report whether there are any suspicious transactions supporting the above allegations.

This review does not include the preparation of Annual Financial Statements nor auditing them and is not as comprehensive in its scope as a normal audit.

## DISCLAIMER:

This Report was prepared for the sole use of IIROSA and should be used only in its entirely and no part should be used separately. No other party should use this report without the written permission of the author.

M. Said & Co. will not accept any responsibility whatsoever for any loss financial or otherwise incurred as a result of reliance on this report.

2

IIRO O04060

## INDONESIA BRANCH

International Islamic Relief Organization –Indonesia adopt the same objectives as the Head Office.

- IIRO Indonesia Branch was established in 1992 to extend the hand of help to Muslims but not to the exclusions of non –Muslims.
- Among its activities are the sponsorship of orphans, well digging, masjid building as well as health, education and emergency relief programs.
- In 2002 a Memorandum of Understanding between the Ministry of Religious Affairs in Indonesia and IIRO  was signed to promote cooperation in the fields of education, social and religious activities (see appendix).
- All activities in Indonesia are financed by grants from the Head –Office.
- No fund-raising is conducted by Indonesia branch.
- IIRO works closely with the Indonesian government represented by the Ministry of Religious Affairs and have regular meetings with its representatives to ensure the smooth running of the Activities of the organization.

-IIRO supports a large number of local charities in Indonesia whose objectives are similar to those of IIRO. Among these organizations are the following:

1: Dar Al Arfan
2: Al Ikwaniya.
3: Al Najah Al Aslamiyah.
4: Nour Al Hakim
5: Dar Al Rahme.
6: Rawdet Al Ouloom
7: Nisaa Al Irshad.
8: Al Irshad Al Islami.
9: Al Nour Al Islami.
10: Al Taifa Al Mansoura
11: Al Huda Al Islamiya
12: Al Dawa Al Islamiya
13: Al Safwa Al Islamiya
14: Al Wahda Al Islamiya
15: Nidaa Al Fitra

---

3

IIRO  O04061

## BRANCH ACTIVITIES

I have reviewed the Annual Financial Statements for the year ended 30th June 2006 , which have been audited in accordance with the local accounting standards by a local firm of registered public accountants Messrs Mucharam & Amron., and  have extracted the following table :

| ACTIVITY | PERCENTAGE OF TOTAL FUNDS EXPENDED |
|---|---|
| -Engineering Projects: Mosque building and well digging. | 59% |
| -Social Care : Sponsoring orphans | 9.6% |
| -Human Programs        :Ramadan Breakfast and Eid sacrifices. | 6.4% |
| -Educational Programs: Arabic and Qur'an teaching | 4.18% |
| - Emergency Relief   : Providing help for  victims of floods,  volcanoes ,earthquakes and Tsunami. | 11.20% |
| - Administration | 9.62% |
| | 100% |

The table shows the importance IIRO- Indonesia places over the provision of humanitarian assistance to the needy in Indonesia.

We have seen letters of praise and appreciation of the work of IIRO Indonesia by  both the Minister of Religious Affairs and the Head of Shura Parliament.

4

IIRO O04062

## BOOKS AND RECORDS

The following books are kept manually. Records are kept in Arabic and all writing is in ink. Currencies used are Saudi Riyal , US Dollar and Indonesian Rupiah. The books satisfy the host country's requirement for record keeping and are adequate for the purpose of preparing Annual Financials Statements:

1: Cash Book: The cash book records all bank payments and receipts. Four bank accounts were held during the period. One US$ account and one Indonesian Rupiah account were held at each the Mandiri Bank and the IFI bank i.e a total of four bank accounts.

2: Nominal ledger: where payments and deposits were posted for the purpose of preparation of the annual accounts.

There were no purchase ledger (accounts payable) nor accounts receivable .

No petty cash book was kept and we found no material petty cash payments during the period.

All invoices were filed in order of payment and were also kept in files for the different cost centres.

Our checks of transactions were designed to see if payments were:

1: Properly authorized by the Head Office and Branch Manager.
2: Supported by proper invoices.
3: Supported by signature of recipient.
4: Properly analysed in the books and posted to the correct expense centre.

Results of these tests were satisfactory.

In addition we made visits to mosques in Jakarta picked randomly. The sample was small as there were practical limitations imposed by time and geographical constraints.

Results of these tests were satisfactory.
Conclusion: all payments checked  were properly authorised and were expended on charitable activities.

We also checked deposits in all four bank accounts and had to make a visit to Jeddah in Saudi Arabia to establish the source of cash deposits and to reconcile them with payments made by the Head Office.

We checked a sample Head Office payments made to IIRO Indonesia . All payments checked were properly supported by legitimate expenses of the branch and  were all received by the branch except one payment of SR 3,703,282 ( US$ 987,541 **) which was frozen by the Saudi Hollandi bank and remains frozen up-to to-days date.

** Translated at the rate of exchange ruling on the date of the Report.

5

IIRO O04063

## EMPLOYEES

There are currently ten employees hired by IIRO in addition to the manager Mr Fahd Al Harby.

The decision to hire and fire employees is made by the Head –Office in Jeddah.
Similarly employee remuneration package is determined by the Head –Office. The manager plays an advisory role to the Head –Office, in matters relating to promotion, discipline, and determining staff salary level.

A file is maintained for each employee, which includes the following permanent information:
1: Job application form.
2: CV.
3: Employment contract.
4: Copy of ID.
5: Academic qualifications.
6: Experience certificate.
7: References.
8: Declaration by employee that he does not belong to a political party.
9: Confirmation by employee that he read IIRO rules.
10: No criminal record certificate.
All employees have Indonesian nationality except the manager and accountant who have Saudi and Egyptian nationalities respectively.


Below is a list of current employees together with their job title and salary:

| | Job Title | Salary |
|---|---|---|
| Mr Fahd A Harby | Manager | |
| Mr Yasser Mohamed Anwar Rabie | Accountant | 3000 SR |
| Mr Faiz Wardy | Secretary | 800 SR |
| Hamdoun Muhsin Ben Abdel Rahman | Secretary | 1200 SR |
| Hamdoun Sharif Hidayet | Clerk –Social care | 800 SR |
| Aidarous Rafik | Supervisor –Social care | 1200 SR |
| Kuswanto Abdul Rahman | Supervisor-Engineering | 750,000.1 Rupiah |
| Fahmi Abu Bakr Bin Sinker | Clerk –Engineering | 800 SR |
| Munawar Hayan Bin Marcos | Porter | 400 SR |
| Muhsin Ali Al Bahri | Driver | 350 SR |

Wages are paid monthly and a receipt signed by the employee is kept.
**Results:** Satisfactory.
**Conclusion:** There was an effective procedure for screening and supervising employees.

6

IIRO O04064

**DA-IYA ( PREACHERS):**
We found 117 files for Da-iya. These include files of those who worked as Da-iya since activities in Indonesia started.

**Services of all Da-iyas have been dispensed with recently, except the service of Dr Salah Eldin Al Nadawi, because of delays in getting salaries remitted from the Head Office resulting from restrictions imposed on transfers by the Head Office.**

Each Daiya file contains the following documents:
1: Job Application.
2: Passport size photograph.
3: Copy of ID.
4: Academic qualifications.
5: Experience certificates
6: References .
7: Contract of cooperation with IIRO.
8: Declaration that employee does not belong to a political party.
9: Signed declaration of adhering to terms of resolution No. 25/5 on 28-2-1425 H. Preventing dealing with terrorism.

7

IIRO O04065

## CONTROL AND SUPERVISION:

The Head Office imposes the following controls in respect of Masjid building and Well digging:
1: Requests for masjid building and well digging are checked by branch committee.
2: An initial visit is made by branch engineer to assess the viability of the request.
3: A list is prepared and sent to Head Office.
4: Head office makes further checks and invite donors to make donation.
5: Funds are sent to branch in three instalments.
6: Branch acknowledges receipt.
7: Branch makes allocation to relevant masjids after deducting administration fee.
8: Costs of masjids are already fixed in accordance with local economy thus ensuring contractor does not get more than a reasonable fee.
9: For each area normally one contractor is used.
10: Payments are made to contractors in three stages and the final payment s made only after project is complete.
11: Each receipt of funds whether by cheque or by bank transfer is acknowledged by the recipient contractor.
12: Photos showing the project at different stages and on completion are sent to the Head office.
13: At various stages of the project, the engineer make frequent visits to the project.
14: Head office informs donors of completion of project and issue a report about it for their information.

And the following controls over orphan funds:

1: All applications have orphans photo, orphan's birth certificate, father's birth and death certificates, as well as a reference from area registrar or equivalent. A copy of the file is sent to Head Office.
2: Orphan and guardian are interviewed personally by branch or institute official.
3: Branch manager scrutinizes list of orphans to ensure their details are correct and to notify any changes.
4: Remittance from Head Office is acknowledged by manager in writing.
5: At least three officials supervise the handing of donations to orphans.
6: Orphans sign or thumb print acknowledging receipt.
7: Committee in " 5 above" as well as accountant and manager sign "Handing grants report".
8: Orphans are paid within six weeks from the date of receipt of remittance.
9: Completion of orphans conditions report in within six weeks from the date of receiving the remittance.
10: Preparing a report of orphans not receiving their allowance giving total and explaining reasons for non-payment.
11: Orphans monies not handed out are not spent on any other category without written confirmation from the Head Office.
12: The process of handing grants to orphans is video-taped with date, place of handing as well as flag of the Kingdom of Saudi Arabia and the Logo of IIRO appear in the video.

8

IIRO  O04066

**Other controls imposed by the Head Office:**

1) Monthly bank reconciliation together with bank statements are sent on a monthly basis to the Head Office.
2) Monthly Trial Balance is sent to Head Office showing incoming and outgoing resources..
3) All payments are supported by invoices/payment vouchers signed by at least the accountant and the manager.
4) All payments are supported by a receipt signed by the recipient.
5) Surprise visits by officials from Head-Office.
7) No employee or da-iya service is hired without prior approval by Head – Office.
6) Contractors have to be approved by Head Office.
8) Cheques to be signed by two signatories.
9) All cheques to be photocopied and filed .
10) Where cheques are sent by post , registered post is used and a note of the date and reference number are kept.
11) Cheque books are kept in the safe.
12) No bank account is opened without Head Office approval.

**Results of tests of controls were satisfactory.**
**Conclusion: There was adequate control by the Head Office over IIRO-Indonesia.**

9

IIRO O04067

**ASSETS:**

Cash and bank balances represent 97.1% of total assets in the Balance Sheet as at 30th June 2006 audited by Messrs Mucharam & Amron. We have not sought confirmation of these balances with banks as our task was not to verify assets and liabilities,

The only fixed assets owned by the branch are two motor vehicles and offices fixtures and fittings. The net book value of these at 30th June 2006 were 2.90% of the total assets. We have not conducted any tests to verify ownership nor disclosure in the accounts.

10

IIRO O04068

REVIEW REPORT BY THE INDEPENDENT EXAMINER TO IIRO-INDONESIA
TO THE BOARD OF TRUSTEES -IIROSA

In accordance with your instructions we have reviewed the records of IIRO-Indonesia
for the period from 1st May 2005 to 31st July 2006.

Our work involved sample testing of transactions and controls as well as making
inquiries of management responsible for the financial records.

In our opinion the Head Office had adequate supervision over Indonesia branch, its
employees and its activities and that funds of IIRO Indonesia were properly applied to
Masjid building, well digging, orphan support and other charitable activities as well as
financing administration costs of running the charity.

During our examination of remittances by the Head Office to Indonesia we came across
the unusual practice of payments issued by the Head Office in the name of the manager
of IIRO Indonesia who cashed the payments in Saudi Arabia and banked them in IIRO's
Indonesian bank accounts.

One such payment of SR 3,703,282 ( US$ 987,541) did not reach the branch in Indonesia as
it was frozen by the bank in Saudi Arabia where the account of IIRO Indonesia manager
is held.

The scope of our report covers only remittances which were banked in IIRO's
Indonesian bank accounts as we are uncertain as to the completeness of all the
payments issued by the Head Office to IIRO –Indonesia.

In our opinion, subject to the above, all remittances received from the Head Office
and banked in IIRO's Indonesian bank accounts were properly applied to
charitable activities and we found no evidence to support the accusation that IIRO
Indonesia supported extremist organizations or International Terrorism.

Signed:

M. Said & Co.
Chartered Certified Accountants
349 c High Road
London N22 8JA

Date: 14.03.2008

End of Report.

11

IIRO O04069