# EXHIBIT 13

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

April 7, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

On behalf of the Plaintiffs' Executive Committees for all of the Plaintiffs, I write in reply to the April 1, 2011 letter brief of defendants Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"), which was submitted in response to the Plaintiffs' March 16, 2011 motion to compel the defendants to abide by agreements reached as a result of a lengthy meet and confer process earlier in the litigation, and promptly produce documents in accordance with those agreements. For the reasons set forth below, the defendants' objections to producing the requested information are without merit and Plaintiffs respectfully request the Court enter an Order directing those defendants to produce all responsive documents within the categories identified in their March 16th motion.

### I.      Defendants' Burden Arguments Have Previously Been Rejected By This Court

Defendants MWL and IIRO argue in their April 1st submission that it would be substantially burdensome for them to search for, locate, and produce responsive documentation relative to certain *agreed upon* categories of documents requested by the Plaintiffs.[1]

---

[1] The inclusion of these arguments is curious, given that the defendants agreed to produce those documents during the meet and confer. In fact, the entire focus of the discussion centered on identifying documents which would be

The Honorable Frank Maas
April 7, 2011
Page 2

_____

Unfortunately for the defendants, these same burden arguments have previously been considered and rejected by this Court and any attempt by the defendants to re-litigate those issues here is an abuse of the discovery process and should be soundly rejected once again.

As this Court will recall, a discovery dispute previously arose between the Plaintiffs and defendants MWL, IIRO, and Wa'el Hamza Jelaidan concerning the scope of discovery and whether discovery of the activities and relationships of the defendants before 1996 were relevant to the Plaintiffs' claims. *See* Plaintiffs' November 7, 2007 letter brief at Exhibit A; Defendants' November 7, 2007 letter brief at Exhibit B; Plaintiffs' November 29, 2007 reply letter brief at Exhibit C; and Defendants' November 28, 2007 reply letter brief at Exhibit D.

In defense of their position that discovery relating to the periods before 1996 should not be permitted, the defendants argued that searching for and locating responsive documents would be unduly burdensome, primarily due to the allegedly unmanageable state of their records. *See* Exhibits B and D. The defendants further argued that searching for and producing responsive documents would create a heavy financial burden on the defendants, again largely because of the defendants' own record-keeping methods. *Id.*

Judge Daniels considered, rejected, and struck the defendants' objections, holding that the appropriate temporal scope of discovery should reasonably begin in 1992, and further directing the defendants to respond to the Plaintiffs' discovery requests. *See* December 21, 2007 Order (MDL Docket No. 2059), attached hereto as Exhibit E. Given Judge Daniels' explicit repudiation of the defendants' burden arguments relative to discovery, the defendants cannot reintroduce those same arguments here as a basis to continue to withhold the production of documents responsive to those same discovery requests. Plaintiffs respectfully submit that the defendants' objections should once again be struck and the MWL and IIRO should again be compelled to produce the requested materials.

## II.     Defendant's Assertion That The IIRO Branch Offices Do Not Send Financial And Operations Reports To The Saudi Headquarters Is Directly Contradicted By The IIRO's Own Records

As set forth in the Plaintiffs' March 16 submission to this Court, Plaintiffs have specifically requested that the defendants produce annual, semi-annual, and other periodic reports of the MWL and IIRO branch offices, as well as reports submitted by the MWL and IIRO field offices concerning their operations and finances. *See also* Exhibit B to the March 16, 2001 letter brief (Plaintiffs' July 21, 2008 letter to Mr. McMahon requesting those same categories of documents).

In its April 1 response, defendant IIRO takes the position that the requested documentation will not be produced because the IIRO branch offices do not send financial or field operations reports to the IIRO headquarters in Jeddah. According to the defendant, any

_____

readily accessible, and it was on that basis that these particular categories were agreed upon as a logical *starting point* for discovery.

The Honorable Frank Maas
April 7, 2011
Page 3

_____

such reporting comes out of Jeddah given the headquarters' control over the branch offices. This is simply not the case and this Court need only look to several documents the defendant has previously produced to the Plaintiffs during discovery to conclude that the IIRO branch offices around the globe do in fact prepare and send reports back to the IIRO headquarters in Saudi Arabia regarding their finances and other activities in foreign countries. Indeed, per the directives of IIRO officials in Saudi Arabia, the branch offices regularly transmit reports back to IIRO headquarters regarding their revenues and expenses, bank accounts, loan activities, donations received in the branch offices, and various projects undertaken by the branches. For example:

- IIRO01219-1223 – English Translated Summary of Arabic IIRO Document – March 16, 1999 memorandum authored by IIRO Secretary General Dr. Adnan Basha and distributed to all IIRO branch office managers outside the Kingdom of Saudi Arabia. Dr. Basha advises the branch managers that he is their direct source of authority, and instructs them to follow all procedures, regulations, and rules issued by the office of the Secretary General.

  The memorandum identifies fifty (50) directives on how the IIRO employees in the branch offices are to conduct themselves relative to the office's activities. For instance, Dr. Basha advises the branch managers and their employees not to engage in certain activities without first seeking permission from IIRO headquarters, including but not limited to: (i) not giving aid to any entity before submitting such request to the Secretary General; (ii) not to withdraw any amount of money from the branch office's bank account without permission from the Secretary General; (iii) not to have ties with entities outside the host country without permission from the Secretary General; and (iv) not to sign any agreement which includes a financial or moral undertaking by the IIRO without prior written confirmation from the Secretary General.

  Importantly, Dr. Basha further instructs the IIRO branch managers on the requirements to regularly provide the Secretary General and IIRO headquarters with various types of reporting. For instance:

  - Monthly reports regarding the branch office's performance, plans, projects, and employees should be submitted.

  - Annual work programs for the branch office's plans and projects should be prepared.

  - Photocopies of employee passports must be submitted annually to the Secretary General's employee department.

  - Annual reports regarding the employees' performance should be created and sent to the Secretary General.

The Honorable Frank Maas
April 7, 2011
Page 4

---

- Annual reports signed by the branch office's employees, attesting that they have received their salaries, must be prepared and sent to the Secretary General.

- An annual budget estimate for every project should be prepared by the branch office and sent to the Secretary General.

- Field visits to programs and projects taking place outside of the branch office shall take place only after coordination with the Secretary General's Office of Administration, and after submitting a report on the matter.

- In the event of embezzlement or theft, the office manager and the employee in charge of the branch office's finances will prepare a report detailing the sum stolen or embezzled, from what allocation the sum was taken from, and the identity of the embezzler and his position, including all documents. The Secretary General should be notified and be provided with the police report, the signed report from the office manager, and all documents.

- In the event of a raid or robbery, the Secretary General and the Saudi embassy in that country must be notified, and a report on what has been destroyed or stolen should be prepared and signed by the office manager.

- In the event of a fire, the Secretary General must be notified within the first hours of the fire, a report from the fire department must be obtained, and an internal report on what has been destroyed or is missing should be prepared and signed by the office manager.

- In the event an office is closed down, the Secretary General and the Saudi embassy in that country must be notified. In addition, reports regarding the balance of cash in the bank and in the office's fund must be prepared. A report on the undertakings or activities of the employees must be prepared. Further, a list of all the payments the office has received and a list of funds belonging to the office held by other parties should be prepared. All documents should be collected and sent via fax to the Secretary General, and placed in cardboard boxes in preparation for their shipment to the Secretary General.

- IIRO00676 – English Translated Summary of Arabic IIRO Document – May 5, 2003 letter from IIRO Secretary General Dr. Adnan Basha to the director of the IIRO office in Baku, Azerbaijan stating that it is IIRO policy that the organization's offices in the various countries use the services of accountants to review the expenses and revenues of the offices and assist them with preparing and submitting financial reports to the official authorities in that country. The offices must also submit a report every 4 months to the IIRO Secretary General. Dr. Basha refers the director to the local branch of Ernst & Young which he believes can assist him.

The Honorable Frank Maas
April 7, 2011
Page 5

---

- IIRO00687-688 – English Translated Summary of Arabic IIRO Document – January 1, 1994 letter from Salih Ahmad Ba'bud, director of IIRO's offices abroad, to the directors of the IIRO offices outside the Kingdom of Saudi Arabia, requesting that the branch offices send technical and financial reports regarding projects underway. According to Ba'bud, the reports from the IIRO branch offices must detail the type of project, the estimated financial cost, the estimated timeframe for accomplishing the project, and payments and expenses already issued and/or accumulated.

- IIRO00219, IIRO00230, IIRO00241-246, IIRO00209-213 -- English Translated Summary of Arabic IIRO Documents – Protocol from the 4th meeting of the local offices committee, which took place at IIRO headquarters in June 1995. The meeting, headed by IIRO Secretary General Dr. Farid Yasin Qurashi, dealt with various issues including donations, the IIRO budget, and the relationship between the IIRO headquarters and the IIRO offices, both in Saudi Arabia and abroad, regarding projects. According to the protocol, a report must be sent to the IIRO Secretary General for every account opened abroad under the name of the IIRO or a name intended to protect the organization's money. Every account opened abroad should be reported to the IIRO chairman in person.

- IIRO00222-223 – English Translated Summary of Arabic IIRO Document – June 15, 1994 document regarding the protocol of the first meeting of the IIRO local offices committee. During the meeting, it was determined that it was necessary to amend the IIRO's financial and administrative codes and mechanisms relating to the internal and external offices. It was further decided that all donations arriving to the local IIRO offices must be reported and sent to the IIRO headquarters.

- IIRO00383 – English Translated Summary of Arabic IIRO Document – April 28, 2000 letter from IIRO Secretary General Dr. Adnan Basha to Prince Turki bin Fahd bin Jalawi and other IIRO directors addressing a 1999 memorandum regarding long term loan regulations for local and external IIRO offices. The IIRO offices are asked to send documentation regarding the loans immediately upon receipt. A copy of the letter was sent to the IIRO financial department so that it can be apprised of the directive and receive monthly reports from the IIRO offices.

- IIRO00384-385 – English Translated Summary of Arabic IIRO Documents – March 16, 1999 letters from IIRO Secretary General Dr. Adnan Basha to IIRO directors and supervisors of IIRO offices abroad addressing a 1999 memorandum regarding long term loan regulations for IIRO offices. IIRO branch office recipients of the letter are required to report loan activities and their status on a regular basis to the IIRO financial department.

- IIRO00017 – English Translated Summary of Arabic IIRO Document – May 5, 2001 letter from Dr. Yusuf bin Abdullah Basudan, Assistant to the IIRO Secretary General, to Nur Ahmad, director of the IIRO's archive, requesting that the director of the archive send the receipts received from the IIRO's office in Senegal. The receipts total several

The Honorable Frank Maas
April 7, 2011
Page 6

---

thousand Saudi riyals.  The director of the archive was asked to send the receipts within
three days.

• IIRO 00969-00985 – An audit report for the IIRO's branch office in Indonesia clearly
shows that the IIRO headquarters in Saudi Arabia receives bank statements from its
branch offices on a monthly basis.  According to the report under the heading, "Other
Controls Imposed By The Head Office:"

1) Monthly bank reconciliation together with bank statements are sent on a
monthly basis to the Head Office.

12) No bank account is opened without Head Office approval.

In light of this compelling evidence, taken directly from the IIRO's own documents, the
defendants cannot credibly argue that the IIRO branch offices do not send financial or field
operations reports to the IIRO headquarters in Saudi Arabia.  Plaintiffs respectfully request this
Court compel the defendants to produce the requested materials.

## III.     The Documents Produced In Response To The Service Of Plaintiffs' Motion Are Not Responsive To The Plaintiffs' Discovery Requests

In a desperate eleventh hour attempt to create the appearance for this Court that the
defendants are producing documentation and information responsive to the Plaintiffs' discovery
requests, defendants MWL and IIRO served the Plaintiffs with approximately 2,633 pages of
documents on April 5, 2011.  Although a majority of the documents are in Arabic, a preliminary
analysis by the Plaintiffs reveals that a number of the documents are in fact not responsive to the
8 categories of documents requested by the Plaintiffs in their July 21, 2008 letter to defense
counsel.  Moreover, the defendant has produced multiple copies of a number of non-responsive
documents, presumably in an effort to bolster the apparent volume of documents it was
producing and create the illusion of compliance with its discovery obligations.

Documents recently produced by the defendants include but are not limited to:  (i)
correspondence from foreign government officials in Sri Lanka, Uganda, Afghanistan, Nigeria,
Ethiopia, Tanzania, Jordan, Albania, Indonesia, and other countries praising the humanitarian
work of the IIRO in their countries; (ii) IIRO registries wherein visitors have expressed their
appreciation for the IIRO's humanitarian deeds around the world; (iii) letters from IIRO officials
condemning terrorist attacks such as the July 7, 2005 London bombings and the June 25, 1996
Khobar Towers bombing; and (iv) newspaper clippings regarding IIRO's charitable works in
Pakistan.  Such documents may address some self-serving agenda of the defendants, but more
importantly, they are not even remotely responsive to the materials specifically requested by the
Plaintiffs and clearly do not represent a good faith effort on the part of the defendants to produce
the requested documents.  *See* Plaintiffs' March 16, 2011 letter brief, including Exhibit B
(Plaintiffs' July 21, 2008 letter to Martin McMahon, Esq.).  Moreover, even if the documents
were arguably responsive, the defendants' practice of producing small samplings of documents

The Honorable Frank Maas
April 7, 2011
Page 7

_____

after long periods of non-production is inexcusable.  Plaintiffs are entitled to a full and complete production of responsive documents.

The defendants' non-compliance with their agreement to produce the requested materials is self evident.  Moreover, to the extent that the defendants argue that it would be substantially burdensome for them to search for, locate, and produce responsive documents, the defendants' April 5th production makes it clear that the defendants have the ability to quickly locate and produce documents to the Plaintiffs when they need to.  These on-going efforts by the defendants to intentionally obstruct the production of meaningful and responsive documentation in these proceedings (and instead, replace that production with self-aggrandizing, unresponsive documents) is unjustified and provides further compelling evidence in support of the Plaintiffs' assertion that the defendants have no intention of fulfilling their discovery obligation in this important case.

## IV.    Plaintiffs' Motion To Compel Should Be Heard During The April 12, 2011 Discovery Hearing

Finally, the defendants oppose having the Plaintiffs' March 16, 2011 Motion to Compel argued during the April 12, 2011 hearing.  Although the defendants merely assert that it would be a "genuine waste of judicial resources," the defendants fail to provide a compelling reason as to why argument on the Plaintiffs' motion should be delayed.  Pursuant to the discovery schedule endorsed by the Court on January 21, 2011, briefing as to the Plaintiffs' Motion to Compel has been completed and filed with the Court in advance of the April 12 hearing, and is therefore ripe for Your Honor's consideration.  Indeed, this motion in particular, regarding categories of documents that should have been produced pursuant to an agreement made long ago, is particularly ripe to be addressed in a timely manner.  Furthermore, Plaintiffs respectfully point out that document discovery is currently scheduled to conclude on April 29, 2011, and there should be no delay in hearing motions as that date approaches.[2]  Given that the Court has specifically set aside time to hear the Plaintiffs' Motion to Compel (as identified in the Court's March 24, 2011 Order, MDL Docket No. 2419), Plaintiffs look forward to arguing their motion at the April 12 hearing.

_____

[2] Plaintiffs recently conducted a meet and confer with counsel for defendants World Assembly of Muslim Youth ("WAMY"), MWL and IIRO.  During the course of those discussions, counsel for both WAMY and the MWL advised the Plaintiffs that they have no expectation of meeting the April 29, 2011 deadline to produce all documents requested in discovery.  In particular, counsel for WAMY stated that the defendant is currently conducting a review of its records in Saudi Arabia and creating an index that will be made available to the Plaintiffs.  WAMY estimates that review will be completed by June or July.  In light of these statements, amendments to the current discovery schedule are likely needed to accommodate the parties' on-going discovery efforts.

The Honorable Frank Maas
April 7, 2011
Page 8

_____

Respectfully submitted,

*Plaintiffs' Executive Committees*

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

cc:     Sean P. Carter, Esq.
        J. Scott Tarbutton, Esq.
        Robert T. Haefele, Esq.
        Jodi Westbrook Flowers, Esq.
        John M. Eubanks, Esq.
        James P. Kreindler, Esq.
        Andrew J. Maloney, Esq.
        Jerry S. Goldman, Esq.
        Martin F. McMahon, Esq.
        Alan Kabat, Esq.
        The Honorable George B. Daniels

PHILADELPHIA\5984672\1  117430.000

# EXHIBIT A



COZEN
O'CONNOR
ATTORNEYS

A PROFESSIONAL CORPORATION

1900 MARKET STREET   PHILADELPHIA, PA 19103-3508   215.665.2000   800.523.2900   215.665.2013 FAX   www.cozen.com

Sean P. Carter
Direct Phone   215.665.2105
Direct Fax   215.701.2105
scarter@cozen.com

November 7, 2007

**VIA FEDERAL EXPRESS**

The Honorable George B. Daniels
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 630
New York, NY 10007

     Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD)

Dear Judge Daniels:

    Plaintiffs in the *Federal Insurance, Burnett, Ashton*, and *O'Neill* cases (Plaintiffs) write to request the Court's assistance in resolving related discovery disputes between Plaintiffs and defendants Muslim World League (MWL), International Islamic Relief Organization (IIRO), and Wa'el Jelaidan. The disputes in question involve an absolute objection, commonly asserted by all three defendants in the context of ongoing merits discovery, to the discovery of any document or information relating to periods prior to 1996.[1] The objection is predicated on the theory that any discovery implicating periods prior to 1996 is *per se* irrelevant, and has been invoked irrespective of the subject matter of the underlying discovery request.

    For the reasons set forth in greater detail below, discovery of the activities and relationships of the defendants during years prior to 1996 is in fact directly relevant to Plaintiffs' claims that those defendants aided and abetted, conspired with, and materially supported al Qaida, a global terrorist organization which by all accounts was established in 1988 or earlier.

---

[1] The parties have agreed to simultaneously submit their initial letters on these discovery disputes to the Court on November 8, 2007, and any responses on November 28, 2007.

The Honorable George B. Daniels
November 7, 2007
Page 2

Accordingly, Plaintiffs respectfully request that the Court strike the defendants' global objections to the discovery of any documentation or information relating to periods pre-dating 1996.

I.      PROCEDURAL BACKGROUND

Plaintiffs have alleged that the MWL, IIRO and Jelaidan knowingly provided material support and sponsorship to al Qaida, continuously from the formation of that terrorist organization in 1988 through September 11, 2001. Among other theories, Plaintiffs' Complaints assert claims against these defendants under the Anti-Terrorism Act (ATA), Alien Tort Statute (ATS), and common law assault, battery, wrongful death and trespass.

The MWL did not to move to dismiss the claims asserted against it, choosing instead to file Answers to the relevant Complaints. Although the IIRO and Jelaidan did move to dismiss Plaintiffs' claims for lack of personal jurisdiction and failure to state a claim, the Court denied those Motions on September 21, 2005. More specifically, the Court held that Plaintiffs had made *prima facie* showings that the IIRO and Jelaidan had purposefully directed their activities at the United States, through their allegations regarding those defendants' material support and sponsorship of al Qaida during the years leading up to the September 11th Attack, and that Plaintiffs stated cognizable substantive claims against those defendants through those same allegations. By virtue of the decision denying the Motions to Dismiss of the IIRO and Jelaidan, and the filing of Answers to the Complaints by the MWL, there is no dispute that Plaintiffs are entitled to proceed with full merits discovery as to all three of those defendants.

Plaintiffs served consolidated Requests for Production of Documents upon the MWL, IIRO and Jelaidan on October 18, 2005, December 13, 2005 and June 13, 2006, respectively. Among other topics, Plaintiffs' document requests to Jelaidan sought information and documentation concerning his past ties to Osama bin Laden and al Qaida. For instance, in view of the United States Treasury Department's assertion that Jelaidan has been a close associate of Osama bin Laden since the days of the Afghan *jihad*, Plaintiffs' discovery requests to Jelaidan understandably sought details of his relationship with Osama bin Laden during periods preceding 1996, and role in the founding of al Qaida in 1988. In this regard, Plaintiffs requested that Jelaidan produce any document in his possession "relating to al Qaida's formation and organizational structure ...." In addition, Plaintiffs' consolidated discovery to Jelaidan sought information and documentation on routine discovery topics, such as his educational and employment background, which necessarily implicated periods before 1996.

Plaintiffs discovery to the MWL and IIRO similarly sought to explore their historical linkages to al Qaida in the years preceding the September 11th Attack, as well as information concerning their organizational structures. For example, Plaintiffs' discovery to the MWL and IIRO included the following request:

> From the period beginning January 1990 though the present, please provide any and all documents, statements, interviews, press releases, internal memos or other materials relating to any accusation that the [MWL/IIRO], or any employee or person associated with the [MWL/IIRO], was associated with or involved

The Honorable George B. Daniels
November 7, 2007
Page 3

_____

in the sponsorship of any radical, extremist or terrorist activities or organizations.

In response to Plaintiffs' consolidated document requests, the MWL, IIRO and Jelaidan each raised an absolute objection to the discovery of *any* documentation or information pertaining to periods before 1996, regardless of the subject matter of the underlying request, on relevancy grounds. The MWL and IIRO articulated the basis for that objection as follows:

> Based on Judge Casey's ruling that 1996 appears to be the year when an individual or entity would have sufficient knowledge concerning Osama bin Laden's evil intentions toward the U.S. and eventually the 9/11 attacks, no documents prior to 1996 will be provided. *See Terrorist Attacks II*, 2005 U.S. Dist. LEXIS 20841, at *65 (S.D.N.Y. Sept. 21, 2005).

MWL's Responses to Plaintiffs' First Set of Requests for Production of Documents, Exhibit A hereto, at pp. 3-49; IIRO's Responses to Plaintiffs' First Set of Requests for Production of Documents, Exhibit B hereto, at pp. 4-57.

In also refusing to produce any documents relating to periods prior to 1996, defendant Jelaidan presented a similar objection:

> WJ [Wa'el Jelaidan] undertakes to produce documents from 1996 - present and any request that seeks documents prior to 1996 is hereby objected to and will not be produced. WJ cites rulings from both Judge Casey and Magistrate Maas as support for this objection. Judge Casey's ruling in Terror Attacks II appears to suggest that 1996 is the year when an individual or entity would have sufficient knowledge concerning Osama bin Laden's fatwa or evil intentions toward the U.S. and eventually the 9/11 attacks. See Terror Attacks II, 2005 U.S. Dist. LEXIS 20841, at *65 (S.D.N.Y. Sept. 21, 2005). Judge Maas's recent Discovery Order also appears to suggest that a "six-year look-back" period of time for discovery in this Terrorist Attacks litigation is appropriate. J. Maas, Op. at 6 (July 28, 2006) (discussing "six-year look-back" period of time for discovery relating to National Commercial Bank).

Jelaidan's Responses to Plaintiffs' First Set of Requests for Production of Documents "Part A" Exhibit C hereto, at p. 3; Jelaidan's Responses to Plaintiffs' First Set of Requests for Production of Documents "Part B" Exhibit D hereto, at p. 2 (incorporating specific objections from Part A Responses).

As thusly presented by the defendants in their responses to Plaintiffs' consolidated discovery, their common objection to discovery of documents or information pertaining to periods prior to 1996 does not rest on the contention that *particular* documents sought by

The Honorable George B. Daniels
November 7, 2007
Page 4

_____

Plaintiffs relating to the pre-1996 period lack sufficient relevancy to be discoverable, but rather that discovery as to *any* topic is *per se* irrelevant and prohibited, to the extent it implicates points in time prior to 1996. Accordingly, the sole question presently before the Court is whether these defendants can demonstrate that an absolute and universal prohibition of discovery of documents and information relating to periods prior to 1996, regardless of the subject matter of that discovery, is appropriate in this litigation.[2]

For the reasons set forth below, the defendants' novel effort to artificially circumscribe discovery to periods after 1996 ignores the known facts regarding the origins of al Qaida and the nature of the claims advanced against those defendants, as well as the liberal discovery rights afforded by the Federal Rules. Moreover, as discussed in greater detail in Section II C, the defendants' objections grossly misconstrue the invoked decisions of Judge Casey and Judge Maas, both of which addressed completely unrelated issues pertaining to other defendants, with absolutely no bearing on the temporal scope of merits discovery as to these defendants.

## II.    LEGAL ARGUMENT

### A.    The Federal Rules of Civil Procedure Afford Broad Discovery Rights

As this Court is well aware, Rule 26(b) affords litigants broad rights to obtain discovery regarding any matter "*relevant to the claim or defense of any party.*" Fed. R. Civ. P. 26(b) (emphasis supplied). "This obviously broad rule is liberally construed." Daval Steel Products, Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991), citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, (1978) (relevance under Rule 26(b)(1) broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").

The party resisting discovery on relevancy grounds has the burden of showing, in specific terms, why the requested discovery is not relevant despite the broad and liberal construction afforded the federal discovery rules. Compagnie Francaise d'Assurance Pour Le Commerce Exterieur v. Philips Petroleum Co., 105 F.R.D. 16, 42 (S.D.N.Y. 1984). General and conclusory objections as to relevance are insufficient to carry this burden. Rivera v. Goord, 2007 U.S. Dist. LEXIS 24153, *3-4 (N.D. N.Y. 2007). Rather, the defendant must clarify and substantiate its objections by explaining, *through competent evidence submitted to the Court*, why the discovery is not relevant. Arias-Zeballos v. Tan, 2007 U.S. Dist. LEXIS 40245, *4-8 (S.D.N.Y. 2007).

Consistent with the plain language of Rule 26(b), the determination as to whether information is "relevant" within the liberal meaning of the Federal Rules must be made through reference to the nature of the "claims and defenses" at issue in the case. Thus, the pertinent inquiry in this present dispute is whether any information or documentation from points in time prior to 1996 "bears on, or ....reasonably could lead to other matters that could bear on" Plaintiffs' claims against the MWL, IIRO and Jelaidan. Oppenheimer Fund, 437 U.S. at 351.

_____

[2] There are several other unresolved disputes between Plaintiffs and these defendants. However, the parties agreed that a decision on the defendants' objection to any discovery implicating periods prior to 1996 would assist them in narrowing the remaining issues requiring Court intervention, and therefore agreed to brief this issue first.

The Honorable George B. Daniels
November 7, 2007
Page 5

Plaintiffs therefore turn next to a brief discussion of the legal theories underlying their claims against these defendants.

> B.   A Defendant's Historical Ties to The Responsible Terrorist Organization
>      and Related Parties Are Directly Relevant in an ATA Case

Plaintiffs claims against the MWL, IIRO and Jelaidan include theories of liability pursuant to the ATA. Under the ATA, a victim of a terrorist attack may sustain liability against a defendant in one of three ways: (1) by establishing that the defendant violated one of the ATA's criminal provisions, for instance by knowingly providing material support or resources to the terrorist organization responsible for his injuries; (2) by showing that the defendant aided and abetted the responsible terrorist organization; or (3) by demonstrating that the defendant conspired with the responsible terrorist organization. Boim v. Quaranic Literacy Inst., 291 F.3d 1000, 1015 (7th Cir. 2002).

Although a comprehensive discussion of ATA liability under aiding and abetting and civil conspiracy theories is beyond the scope of the present dispute, a few comments regarding the legal standards applicable to those theories are warranted.[3]  Generally speaking, the key factor in establishing civil conspiracy liability is proof of an agreement by the defendant to participate in the conspiracy which brought about plaintiff's injuries. Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983). Because conspiracies are by their very nature covert, a plaintiff need not present direct evidence of the agreement. To the contrary, it is well established that "absent a confession, an agreement between conspirators must generally be inferred from circumstantial evidence revealing a common intent." Id. at 480. Furthermore, proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement. Id. at 477

In determining whether to infer an agreement based on circumstantial evidence, the inception and duration of the relationship between the defendant and other co-conspirators is a critical factor. As the D.C. Circuit observed in Halberstam, the seminal case on concerted action liability:[4]

> The *length of time* two parties work closely together may also
> strengthen the likelihood that they are engaged in a common
> pursuit. Mutually supportive activity by parties in contact with one
> another over a long period suggests a common plan.
>
> In sum, we expect that the relationships between the actors and
> between the actions (e.g., the proximity and time and place of the
> act, and the duration of the actors' joint activity) are relevant in
> inferring an agreement in a civil conspiracy action.

---

[3] As Plaintiffs' common law causes of action are predicated, at least in part, on conspiracy and aiding and abetting theories, this discussion has equal applicability to those claims.
[4] In its January 18, 2005 decision in these consolidated proceedings, the Court found that the decisions in "*Halberstam* and *Boim* are instructive" as to Plaintiffs' ATA theories. In re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 800 (S.D.N.Y. 2005).

The Honorable George B. Daniels
November 7, 2007
Page 6

Halberstam at 481.

The historical ties between the defendant and primary tortfeasor hold equal significance in an aiding and abetting case. To prevail under an aiding and abetting theory at the time of trial, a plaintiff must present direct or circumstantial evidence that the defendant provided "substantial assistance" to the primary tortfeasor. Id. at 477. Although the determination as to whether a defendant's assistance is "substantial" enough to impose liability under aiding and abetting theories is inherently fact sensitive, six factors generally inform that analysis: the nature of the act encouraged[5]; the amount and kind of assistance given; the defendant's absence or presence at the time of the tort; *his relation to the tortious actor*; the defendant's state of mind; and *the duration of the assistance provided.* Id. at 483 – 84. Explaining the significance of the duration of the assistance provided, the Halberstam Court succinctly stated as follows:

> The length of time an alleged aider/abetter has been involved with the tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind.

Id. at 484.

Consistent with the foregoing standards, there can be no credible dispute that the origins, duration and character of a defendant's ties to the responsible terrorist organization and any related parties are directly relevant in an ATA case, and that a terror victim is therefore entitled to fully explore these historical relationships in keeping with the broad discovery rights of the Federal Rules. Application of these principles in the context of the present dispute further demonstrates that that the activities and relationships of the MWL, IIRO and Jelaidan during periods before 1996 are directly relevant to the claims asserted against them, and that their objections to pre-1996 discovery are disingenuous at best. On these points, brief discussions of the origins and development of the al Qaida movement, as well as the defendants' integral roles in advancing al Qaida's global jihad from its inception, are insightful.

C.     Al Qaida Has Its Origins in the Afghan *Jihad* and Was Formally Established No Later Than 1988

As expressly alleged in Plaintiffs' Complaints and confirmed by countless governmental and independent investigations, al Qaida was not established at the time of Osama bin Laden's 1996 *fatwa* against the United States, but in fact has its origins many years earlier in the *jihad* against the Soviet Union in Afghanistan. See the *Federal Insurance* Plaintiffs' First Amended Complaint with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order 2

---

[5] "A defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequence." Id. Thus, where the claims arise from a particularly heinous tort, such as a terrorist attack, even minor assistance to the responsible tortfeasor is properly viewed as "substantial" for purposes of aiding and abetting liability. See Boim, 291 F.3d at 1021 (noting that the ATA extends liability "to the furthest reaches of the common law").

The Honorable George B. Daniels
November 7, 2007
Page 7

---

("FAC"), ¶ 75. As the National Commission on Terrorist Attacks Upon the United States (9/11 Commission) found in its Final Report (the 9/11 Commission Report),[6] the Soviet invasion of Afghanistan served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage a *jihad*, or holy war, against the Soviet Union. See 9/11 Report, available at http://www.9-11commission.gov/report/911Report.pdf, at p. 55. Osama bin Laden himself traveled to Afghanistan in 1980 to participate in the *jihad*, and gained prominence during this period for his role in establishing the financial and logistic infrastructure that sustained the Arab Afghan fighters, commonly referred to as the *mujihadeen*. Id. at p. 55. According to the 9/11 Commission Report:

> Bin Ladin understood better than most of the volunteers the extent
> to which the continuation and eventual success of the jihad in
> Afghanistan depended on an increasingly complex, almost world-
> wide organization. This organization included a financial support
> network that came to be known as the "Golden Chain[7]," put
> together mainly by financiers in Saudi Arabia and the Persian Gulf
> states. Donations flowed through charities or other non-
> governmental organizations (NGOs). Bin Ladin and the "Afghan
> Arabs" drew largely on funds raised by this network, whose agents
> roamed world markets to buy arms and supplies for the
> Mujihadeen, or "holy warriors."

---

[6] Of course, Plaintiffs are not obligated to present external evidence or authority in order to obtain discovery in support of their claims. To the contrary, the analysis of whether requested discovery is relevant must be conducted by reference to Plaintiffs' claims against the Defendants, as alleged in the relevant pleadings, and the burden falls on the party resisting discovery to demonstrate its irrelevance. Nor do plaintiffs intend to imply that the 9/11 Report is a comprehensive authority on the al Qaida movement and support network that enabled the 9/11 Attack. However, the 9/11 Commission's general statements regarding al Qaida's roots in the Afghan *jihad* and formation in 1988 are non-controversial, and consistent with the allegations of Plaintiffs' Complaints on those points. Accordingly, the 9/11 Report represents a convenient single reference on those issues, and Plaintiffs cite it here only to alleviate the need to include numerous citations to the various Complaints.

[7] Plaintiffs allege that the "Golden Chain" is an internal al Qaida document, identifying al Qaida's most important financial benefactors, and the individuals responsible for coordinating their contributions to al Qaida. FAC ¶ 101. The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See *Final Report of the 9/11 Commission*, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and has in fact used inclusion on that list as a basis for designating individuals as terrorist sponsors and freezing their assets under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm. In addition, a collection of seized documents relating to the founding of al Qaida, which included the Golden Chain and other documents referencing the MWL and Jelaidan, was introduced and relied on in United States v. Arnaout, 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003). Perhaps most significantly, Jamal al Fadl, a former al Qaida leader who has appeared as a principal government witness in numerous al Qaida terrorist trials, has reviewed the names on the Golden Chain document and confirmed in a 302 Statement to the FBI that they are members of Osama bin Laden's "Golden Chain." Among others, al Fadl specifically identified Wa'el Jelaidan, Saleh Kamel, Youseff Jameel and Adel Batterjee as direct financiers and facilitators of al Qaida.

The Honorable George B. Daniels
November 7, 2007
Page 8

---

9/11 Report at p. 55.

At the conclusion of the Afghan *jihad*, bin Laden determined that the financial and logistic infrastructure that supported the *mujihadeen* in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global *jihad* against all of the perceived enemies of Islam, and in particular, the United States.

> April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.
>
> Bin Ladin and [Abdullah] Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad.

9/11 Report at p. 56.

The years immediately following al Qaida's founding in 1988 were critically important to the organization's growth, and to the extension of its sphere of influence. During those years, bin Laden expanded on the network of ostensible charities, banks and financial sponsors first organized in Afghanistan and now serving al Qaida, in preparation for the globalization of al Qaida's *jihad*. FAC ¶ 78; 9/11 Report at p. 57. Al Qaida used this global network to channel funds, physical assets and al Qaida terrorist fighters to regions of strategic importance to the organization's objectives, including: Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, Afghanistan, Indonesia, the Philippines Algeria, Egypt, Somalia, Palestine, Yemen, Kenya and Tanzania. See 9/11 Report at pp. 57-58. By channeling resources to jihadists and terrorist in those regions during this period, bin Laden succeeded in gaining influence over regional terrorist organizations and Islamists, and thereby established al Qaida as the vanguard of the global jihadist movement. Absent bin Laden's efforts during this period, al Qaida would not have possessed the resources needed to conduct sophisticated terrorist attacks, like the September 11th Attack. "By the time he issued his February 1998 declaration of war, Bin Laden had nurtured that organization for nearly ten years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future." 9/11 Report at p. 55.

Bin Laden made no secret of his ambition to wage *jihad* against the United States during these early years. In point of fact, bin Laden began delivering diatribes against the United States even before he left Saudi Arabia in or around 1991. In early 1992, he and the other senior al Qaida leadership issued a formal *fatwa* calling for jihad against the United States. During this period, bin Laden gave frequent lectures in which he stressed the importance of attacking the United States in order to "cut off the head of the snake." 9/11 Report at p. 59.

In sum, the uncontested facts establish that al Qaida initiated its campaign to conduct terrorist attacks against the United States no later than 1988, using as its foundation the financial

The Honorable George B. Daniels
November 7, 2007
Page 9

and logistic infrastructure established in Afghanistan. The years between 1988 and 1996 represented a critical period in al Qaida's growth and development. Indeed, the subchapters of the 9/11 Report addressing this period are tellingly titled *"The Rise of bin Laden and al Qaeda (1988-1992)"* and *"Building an Organization, Declaring War on the United States (1992-1996)."* Bin Laden made his plans to use al Qaida's resources to conduct terrorist attacks against the United States known to his collaborators and sponsors during this period. Thus, the notion that 1996 represents the earliest date on which bin Laden's terrorist ambitions were knowable to al Qaida's sponsors, as the defendants' objections incredibly suggest, is fundamentally illogical.

   D.   These Defendants Have Knowingly and Continuously Sponsored al Qaida From
        its Establishment

        While the undisputed historical facts regarding the origins and development of the al Qaida movement are themselves sufficient to demonstrate the relevance of periods prior to 1996 to Plaintiffs' ATA claims, it is worth noting that Plaintiffs have expressly alleged that these defendants have been knowing participants in that movement from the date of its inception, and that their ties to Osama bin Laden date to the Afghan *jihad*. For example, Plaintiffs allege that "the MWL's close affiliation with Osama bin Laden and other high ranking al Qaida officials dates to the 1980s," and that "from the earliest stages of al Qaida's development, the MWL has served as a front to conceal the terrorist organization's existence and true purpose." FAC ¶¶ 117-118. Plaintiffs similarly allege that the IIRO "has long operated as a fully integrated component of al Qaida's logistical and financial support infrastructure," and that Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, opened an IIRO office in the Philippines in the early 1990s to serve as a front for al Qaida's efforts in the Far East. FAC ¶¶ 113, 135-137. The Complaints further detail the IIRO's direct involvement in numerous al Qaida plots and attacks during the early 1990s. FAC ¶¶ 138-145. In addition, Plaintiffs allege that Wa'el Jelaidan "fought with bin Laden in the 1980s," and was a "founding member of al Qaida" in 1988. FAC ¶ 117.

        The reasoning of the Court's September 21, 2005 decision makes clear that these allegations do not represent superfluous historical details about the defendants, but rather factual allegations critical to the claims asserted against them under the ATA. For example, in denying Jelaidan's Motion to Dismiss, the Court noted that Plaintiffs allege that Jelaidan was "a founder and the logistical chief of al Qaida," and headed several "non-government organizations providing financial and logistical support to the al Qaida network" since its establishment. The Court similarly cited to numerous activities of the IIRO during the years prior to 1996 in denying its Motion to Dismiss. In this regard, the Court noted that the Plaintiffs' Complaints allege that "in the early 1990s, IIRO was 'rapidly becoming al Qaida's foremost charity used to transfer funds, personnel, and other means of support.'" The Court further noted that the IIRO's office in the Philippines was established in early 1990s by Mohamed Jamal Khalifa, Osama bin Laden's brother-in-law, and that the Philippine branch of the IIRO was implicated in numerous terrorist plots and attacks well before September 11, 2001, including: bombings in Jordan in 1993 and 1994; the 1993 attack on the World Trade Center; 1995 plots to assassinate President Bill Clinton and Pope John Paul II; and the 1995 plot to simultaneously bomb twelve (12) American

The Honorable George B. Daniels
November 7, 2007
Page 10

airliners in flight. Clearly, the Court would not have made specific reference to these allegations were the activities of the defendants during periods prior to 1996 irrelevant in these proceedings.

As the Court has already deemed the activities and relationships of these defendants during years prior to 1996 relevant to the claims asserted against them, Plaintiffs are unquestionably entitled to explore such activities and relationships through the discovery process. Indeed, to hold otherwise would lead to absurd results, by preventing Plaintiffs from obtaining discovery as to the relationships and activities that are most probative of these defendants' integral roles in the *jihadist* campaign that led to the September 11th Attack. On this point, Plaintiffs note that the Treasury Department has designated Jelaidan and several branches of the IIRO as Specially Designated Global Terrorists, based in part on the critical support they provided to al Qaida during the organization's incipient stages. Again, in designating Jelaidan, the Treasury Department specifically noted that Jelaidan's relationship to bin Laden dated to the 1980's, when the two fought together in the Afghan *jihad*. In support of its designation of several branch offices of the IIRO, the Treasury Department similarly cited support provided by that organization to al Qaida during periods before 1996. According to the Press Release issued by the Treasury Department in support the IIRO designations:

> The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah. While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994. In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.

Given the U.S. government's determination that the activities of the IIRO and Jelaidan during the years prior to 1996 warranted sanctioning them as al Qaida sponsors, there is no credible basis to argue that those activities are irrelevant for discovery purposes in a case involving claims predicated on their sponsorship of al Qaida. Indeed, Plaintiffs respectfully submit that the defendants are seeking to avoid discovery relating to periods prior to 1996 precisely because their activities and relationships during that era speak so meaningfully to their integral roles in al Qaida's global *jihad*.

The Honorable George B. Daniels
November 7, 2007
Page 11

---

E.      The Defendants' Interpretations of the Rulings of Judge Casey and Judge Maas
        are Frivolous

        On the most basic level, the invoked language of the decisions of Judge Casey and Judge
Maas have absolutely no bearing on the temporal scope of discovery as to these defendants, and
in no way alter the analysis presented above.

        Although the defendants do not quote the specific language of Judge Casey's decision
that forms the basis of their objection, the citation provided suggests that they are relying on the
Court's reasoning in denying the Motion to Dismiss of Tariq Hamdi, a defendant who is alleged
to have provided a satellite phone to Osama bin Laden after bin Laden's 1996 *fatwa*. In denying
Hamdi's Motion to Dismiss, the Court held as follows:

> Plaintiffs allege that Mr. Hamdi knew about bin Laden's terrorist
> activities at the time he procured a phone for him because the first
> fatwas had already been issued. They allege he provided material
> support to bin Laden in the form of a satellite phone battery. The
> ATA includes communications equipment in its definition of
> material support. "Even small donations made knowingly and
> intentionally in support of terrorism may meet the standard for
> civil liability in section 2333." These allegations are sufficient to
> notify Mr. Hamdi of the claims against him.

In re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 567 (S.D.N.Y. 2005)
(internal citations omitted).

        As near as Plaintiffs can surmise, defendants are advocating that, because Judge Casey
concluded that Tariq Hamdi could not conceivably have been ignorant of Osama bin Laden's
terrorist ambitions at the time he provided bin Laden with the satellite phone by virtue of bin
Laden's 1996 *fatwa* targeting the United States, 1996 should be viewed as the earliest date *any*
person could have been aware of Osama bin Laden's desire to attack America. Such an
interpretation of the Court's decision turns logic on its head, and misapprehends the arguments
the Court was addressing in its reasoning on Hamdi's Motion to Dismiss.

        In opposition to Hamdi's Motion to Dismiss, Plaintiffs argued that Hamdi could not
plausibly assert that he was ignorant of Osama bin Laden's terrorist aspirations when he
provided bin Laden with the satellite phone, because bin Laden had by that time issued a widely
disseminated public *fatwa* declaring war against the United States, *which had effectively placed
the entire civilized world on notice of his intent to attack America.*  In other words, Plaintiffs
argued that by 1996 even persons with absolutely no contact or relationship with Osama bin
Laden or any other al Qaida member or supporter were well aware of al Qaida's desire to kill
American citizens. The Court agreed with that simple proposition.

        Of course, the Court's finding that the entire civilized world was on notice of al Qaida's
intent to attack America by 1996 does not support the conclusion that *no* person or organization
could have known about bin Laden's terrorist plans before that date, as the defendants' objection

The Honorable George B. Daniels
November 7, 2007
Page 12

absurdly suggests. To the contrary, the uncontroverted record before this Court confirms that bin Laden had been methodically building al Qaida's global infrastructure for at least eight years before issuing his public fatwa, a fact which in and of itself establishes that certain persons and organizations were aware of al Qaida's terrorist plans no later than 1988. Moreover, the 9/11 Commission Report confirms that bin Laden began issuing *fatwas* and routinely delivering speeches declaring *jihad* against America no later than 1992.

More importantly to the present dispute, Plaintiffs have expressly alleged that these defendants have been integral members of the al Qaida movement since its inception, and that their close ties to Osama bin Laden in fact pre-date the formation of al Qaida, when they worked in concert with bin Laden to channel resources to the mujihadeen during the Afghan *jihad*. FAC ¶ 117. Given these claims, there is every reason to believe that these defendants have had specific knowledge of al Qaida's intent to attack America from the organization's inception, and there is no rational basis to find that they could not have been aware of al Qaida's antipathy towards the United States until Osama bin Laden's public *fatwa* in 1996.[8] The reasoning of the Court's decision on the Motions to Dismiss of the IIRO and Jelaidan implicitly embraces this logic, by specifically citing Plaintiffs' allegations regarding those defendants' sponsorship of al Qaida during years prior to 1996 as grounds for denying those Motions. That the defendants ignore the Court's reasoning regarding themselves entirely, and instead base their objections on language from the Court's unrelated discussion of the claims against another defendant, itself taken entirely out of context, is telling.

The defendants' reliance on the Judge Maas' decision regarding the scope of discovery to be afforded as to National Commercial Bank's systematic business contacts with the United States is equally misplaced. In the context of the dispute that resulted in the Order cited by the defendants, Judge Maas was asked to determine the appropriate look-back period for evaluating a defendant's contacts with the United States under a theory of general, as opposed to specific, jurisdiction. In that context, Judge Maas held that discovery of NCB business activities in the United States should be limited to a period going back six years prior to the filing of the Complaints.[9]

On the most basic level, the look-back period Judge Maas set for general jurisdictional discovery as to NCB has no bearing whatsoever on the present dispute. To begin with, Plaintiffs are engaged in merits discovery against these defendants as to their substantive claims under the ATA and other theories. As discussed above, the years before 1996 are of critical importance and relevance to those claims. Even if this were a jurisdictional dispute, the defendants' reliance

---

[8] Even if a particular defendant could establish through competent evidence that he was unaware of bin Laden's terrorist plans prior to 1996, such a showing would not render discovery of that defendant's ties to al Qaida during preceding years irrelevant within the meaning of the Federal Rules, given the potential that such discovery could lead to other categories of information bearing on plaintiffs' claims. Thus, the core predicate for defendants' objection itself misses the point.

[9] Plaintiffs believe that a 6 year look-back period may be artificial and prejudicial even in the context of general jurisdictional discovery in many cases. In fact, Judge Casey made specific reference to Plaintiffs' allegations that NCB maintained a branch office in the United States until 1992 in denying NCB's Motion to Dismiss for lack of personal jurisdiction. In any case, the appropriate look-back period for general jurisdictional discovery is of no moment here.

The Honorable George B. Daniels
November 7, 2007
Page 13

on Judge Maas' decision as to the scope of discovery to be afforded regarding NCB's ongoing business contacts with the United States would hold no significance, as the Court has already determined that the activities of these defendants during periods prior to 1996 are directly relevant to Plaintiffs' specific jurisdictional theories. Specifically, in concluding that Plaintiffs had made *prima facie* showings that the IIRO and Jelaidan directed their activities at the United States, the Court cited to Plaintiffs' allegations regarding those defendants' sponsorship of al Qaida during periods before 1996, the same allegations it cited in denying their Motions to Dismiss for failure to state a claim. In doing so, the Court implicitly acknowledged the identity between the substantive claims and specific jurisdictional theories in a terrorism sponsorship case. Thus, even if this were a jurisdictional discovery dispute (which it is not), Plaintiffs would be entitled to broad discovery as to the defendants' activities and relationships prior to 1996 in support of their specific jurisdiction theories.

      F.     The Defendants Have Served Discovery Relating to Periods Prior to 1996 Upon Plaintiffs and Thereby Acknowledged the Relevance of Such Periods to the Claims and Defenses in These Proceedings

Finally, through their own discovery directed to the Plaintiffs, these defendants have themselves acknowledged the relevance of periods before 1996 to the claims and defenses in this action, and waived any right to argue that information and documentation relating to periods prior to 1996 should be prohibited. In particular, although they have refused to respond to any of Plaintiffs' discovery requests relating to periods prior to 1996, all three of these Defendants have served discovery requests upon Plaintiffs which seek extensive information and documentation relating to periods prior to 1996.[10] Remarkably, many of the defendants' requests for discovery as to periods prior to 1996 seek to compel Plaintiffs to produce information and documentation regarding the precise issues and allegations which are the subject of Plaintiffs' discovery to the defendants.[11]

Because Rule 26(b)(1) affords parties the right to conduct discovery only as to topics which are "relevant" to the claims and defenses in the action, the defendants have necessarily acknowledged that information and documentation relating to periods prior to 1996 is relevant in these proceedings by serving discovery implicating such periods on Plaintiffs. Accordingly, the defendants are precluded from arguing that Plaintiffs should not be permitted to conduct discovery as to periods prior to 1996.

---

[10] For the Court's convenience, Plaintiffs have attached a chart identifying discovery requests served by these Defendants upon the *Federal Insurance* Plaintiffs which relate to periods prior to 1996 as Exhibit E hereto. These Defendants served nearly identical requests upon the Plaintiffs in the other relevant actions.
[11] The defendants' assertion of an absolute objection to Plaintiffs' pre-1996 discovery, while at the same time serving discovery upon Plaintiffs relating to the same pre-1996 issues, poses significant concerns to the integrity of the discovery process. In particular, this tactic would allow the defendants to identify the universe of information and documentation already in Plaintiffs' possession before responding to discovery, and potentially use that information to evade their discovery obligations by withholding responsive information and documentation, without any significant concern that Plaintiffs would ever discover the impropriety. For this reason alone, the defendants' objection to pre-1996 discovery should be stricken.

The Honorable George B. Daniels
November 7, 2007
Page 14

III.     CONCLUSION

      For all of the foregoing reasons, Plaintiffs respectfully request that the Court strike the global objections asserted by the MWL, IIRO and Jelaidan as to any discovery implicating periods prior to 1996.

                Respectfully,

                COZEN O'CONNOR

                BY:    SEAN P. CARTER

SPC/bdw

cc:    Magistrate Judge Frank Maas
        All Counsel of Record

PHILADELPHIA\3393623\1  117430.000

# EXHIBIT B

# MARTIN F. MCMAHON & ASSOCIATES

1150 CONNECTICUT AVENUE, N.W.
SUITE 900
WASHINGTON, D.C. 20036

MARTIN F. MCMAHON
Managing Partner
Admitted in District of Columbia, New York
and U.S. District Court of Maryland

LISA D. ANGELO
Associate
Admitted in District of Columbia and
California

CHRISTOPHER D. BROWN
Of Counsel
Admitted in District of Columbia and
Maryland

Established 1978

TELEPHONE (202) 862-4343
FACSIMILE (202) 828-4130

www.martinmcmahonlaw.com

JASON A. DZUBOW
Of Counsel
Admitted in District of Columbia and
Maryland

JACQUELYN GLUCK
Of Counsel
Admitted in District of Columbia

ROBERT MANCE
Of Counsel
Admitted in District of Columbia and
Maryland

November 7, 2007

**VIA OVERNIGHT DELIVERY**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
500 Pearl Street, Room 1350
New York, NY 10007-1312

Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570

Dear Judge Daniels:

As this Court is aware, a dispute concerning the scope of discovery has arisen between
the International Islamic Relief Organization, Muslim World League, Wael Jelaidan (collectively
referred to as "Defendants") and the Ashton, Burnett, Federal Insurance and O'Neill Plaintiffs
(collectively referred to as "Plaintiffs"). The parties seek an Order from this Court that will
resolve the issue as to whether discovery should be limited to a specific "look-back" period prior
to 9/11, and the duration of that period.

In our opinion, limiting the timeframe for discovery in this case to 1998, or at the earliest
1996, is consistent with the requirements of Fed. R. Civ. P. 26, this Court's previous holdings,
and Second Circuit caselaw. Defendants submit that in order to promote fairness and judicial
efficiency in this vastly complex case, a limitation on discovery is appropriate. A substantial
amount of materials Plaintiffs seek vis-à-vis their first set of document production requests are
*not* relevant, are too remote, and, even if some materials sought from the 1980s and early 1990s
have some relevancy, are so *minimally* relevant that the substantial burden on the Defendants to
produce such materials outweighs the minimal benefit to the Plaintiffs.

Stated simply, the Plaintiffs' claims are essentially that the Defendants are part of a
nebulous global terrorist network which financed, *inter alia*, the 9/11 tragedy. However, because
there was substantial and notorious terrorist activity in the period 3-5 years before the 9/11
attacks, Plaintiffs need not look back to the 1980s or 1990s for evidence, assuming it exists, to

support their claims. Defendants' rationale is that if they are the vital players the Plaintiffs claim them to be in financing international terrorism, surely there would be an evidentiary trail linking these Defendants to, for example, the American Embassy bombings in 1998. Besides, if in the course of discovery the Plaintiffs find specific evidence justifying an extension of the look-back period, this Court can always revisit the propriety of such a discovery limitation.

## I.   BRIEF HISTORY OF DISCOVERY DISPUTE

The Defendants seek relief as to the scope of discovery for substantially similar reasons. These reasons are best illustrated by the following events, which concern Defendant MWL.

In or about October 2005, Defendant MWL was served with Plaintiffs' first set of requests for production of documents.[1] Shortly thereafter, Defendants' counsel sent Plaintiffs' counsel a letter stating, *inter alia*:

> Your Requests contain 89 individual requests for documents, many of which contain numerous subparts. In addition, several Requests seek a variety of documents associated with the people or entities listed in Exhibit A. There are approximately 93 people and entities listed in Exhibit A. Many of the Requests seek information going back to January 1990, and some seek information from as far back as January 1980. Many of the Requests seek information that is not likely to lead to the discovery of admissible evidence, and most, if not all, of the Requests seek information that is not in English. Finally, without getting into specifics at this time, certain Requests seek confidential information and/or information that is not relevant to any of the allegations in the Complaint.[2] Given the extreme breadth of the Requests, MWL simply does not have the resources to respond, especially given the language barrier and the location of many of the documents requested. For all these reasons, the burden of the proposed discovery greatly outweighs its potential benefit.[3]

In addition and with respect to the instant dispute – the scope of discovery – Defendant proposed:

> While we believe there are ample grounds for a protective order under Rule 26, it would be more productive to work with you to refine your Requests and make them more manageable. One possibility would be to reduce the time frame of the requests and narrow their scope to documents more closely related to the

---

[1] *See* example of document production requests, attached hereto as Exhibit A. Defendants IIRO and Wael Jelaidan were served with similar requests.

[2] *See, e.g., Conlove v. Compaq Computer Corp.*, 223 F.R.D. 162, 168 (S.D.N.Y. 2004) (breadth of document request "would require an expenditure of time and resources far out of proportion to the marginal value of the materials to this litigation"); *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) ("whether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)").

[3] *See* Letter dated November 30, 2005, attached hereto as Exhibit B.

allegations. *For instance, pursuant to ¶ 42 of the Complaint, 1998 might be a more reasonable cut-off date for document production.* (emphasis added).[4]

After a series of letter exchanges between the parties, no amendment to Plaintiffs' initial request for documents was offered. Consequently, Defendant MWL was forced to provide responses to Plaintiffs' document requests which contained, *inter alia*, the following objection:

Defendant objects to this request on grounds that it is overbroad and that it is a multiple document request ostensibly portrayed as a single document request. Based upon Judge Casey's ruling that 1996 appears to be the year when an individual or entity would have sufficient knowledge concerning Osama Bin Laden's evil intentions toward the U.S. and eventually the 9/11 attacks, no documents prior to 1996 will be provided. *See Terror Attacks II*, 2005 U.S. Dist. LEXIS 20841, at *65 (S.D.N.Y. Sept. 21, 2005).[5]

Since providing Plaintiffs with initial responses to their discovery requests, the parties have met at least two times and attempted to work with each other, in good faith, on several outstanding discovery related issues. While successful in resolving (at least for now) some issues, the scope of discovery as to how far back Defendants should have to go when producing documents cannot be resolved by the parties.

## II.   SUMMARY OF ARGUMENT

The discovery date limitation, look-back period either 1998 or 1996, is *not* unfair to the Plaintiffs. However, as shown *infra*, requiring these Defendants to produce documents as far back as the early 1990s is abundantly unfair to the Defendants.

First, discovery of matters pre-dating 1998, or at the earliest 1996, are not relevant to Plaintiffs' claims because they occurred before the Defendants could have been *on notice* of the activities of Al Qaeda and Osama bin Laden, courtesy of the fatwa cited in ¶ 42 of the Federal Insurance complaint, as cited *supra* n. 4.

---

[4] Paragraph 42 of the (Federal Insurance) Complaint states in pertinent part:

In February 1998, al Qaeda issued a fatwa under the banner "the World Islamic Front for Jihad Against Jews and Crusaders," saying it was the duty of all Muslims to kill United States citizens – civilian or military – and their allies everywhere.

[5] Defendants IIRO and Wael Jelaidan also made similar objections based upon the same grounds as Defendant MWL. This Court should further know that Defendants MWL and IIRO have supplemented their discovery responses on two separate occasions and have offered Plaintiffs the opportunity to copy and inspect IIRO's largest document retention warehouse located in Jeddah, Saudi Arabia and MWL's New York, London, Gibraltar, and Madrid offices. To date, Plaintiffs have failed to make any attempt to inspect IIRO's warehouse or MWL's office (including MWL's New York office.) Also, the Defendants have provided Plaintiffs with all records received from the FBI which were seized from the MWL offices in New York and Virginia. Defendants' counsel has recently been informed that the FBI intends to produce another 30 boxes of documents. Once these boxes are received, they will be produced to the Plaintiffs. It should be noted, that no criminal prosecution against the MWL resulted from the FBI raid on MWL offices in New York or Virginia.

3

Second, discovery of matters pre-dating 1998, or at the earliest 1996, is so minimally relevant that the burden of producing these materials outweighs the potential benefit of the discovery.

Third, even if some of the documents Plaintiffs seek are relevant, this Court has the discretion to limit discovery in order to prevent undue burden to the Defendants and to promote judicial economy.

## III.   ARGUMENT

The threshold question for discovery is "Rule 26(b)(1)'s overriding relevance requirement." *During v. City Univ. of N.Y.*, 2006 U.S. Dist. LEXIS 53684 *6 (S.D.N.Y. 2006). "Only if a matter is relevant and potentially discoverable must a court then consider whether additional Rule 26 limitations on discovery apply." *Id.* at *7. Therefore, consistent with prior rulings of this Court, Defendants submit that materials predating 1998, or 1996 at the earliest, should be deemed to be nondiscoverable because they are not relevant to the claims and defenses in this case, and consequently requests for such materials are not calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26.

### A.   Defendants Could Not Be "On Notice" of Al Qaeda's Terrorist Activities Against America Until 1996.

Notice of al Qaeda's terrorist activities, vis-à-vis Osama Bin Laden's ("OBL")1996 fatwa, may be a dispositive factor in this Court's decision to limit discovery herein. As noted above, Defendants objected to most, if not all of Plaintiffs' discovery requests that sought production of documents before 1996. Defendants' rationale was that there is no factual relevance to the Defendants' activities before 1996 because the Defendants were not *on notice* of Al Qaeda's terrorist activities until that time, and hence, could not have knowingly and intentionally provided material support to al Qaeda (a prerequisite to establishing liability herein). Defendants based their position upon Judge Casey's previous holdings.

In *Terrorist Attacks II*, for example, the Court held that Tarik Hamdi's alleged delivery of a satellite phone used by OBL could have been done knowingly because the allegations against Tarik Hamdi happened after OBL declared war on Americans. *See Terrorist Attacks II*, 392 F. Supp. 2d 539, 566 (S.D.N.Y 2005). This same logic should be applied here, when this Court decides what is "relevant" in terms of Plaintiffs' document production requests. Furthermore:

> "[t]he Court has held that Defendants may be responsible for the September 11 attacks if they knowingly and intentionally provided material support to al Qaeda." (*See Terrorist Attacks II*, 392 F. Supp. 2d at 564 (citing *Terrorist Attacks I*, 349 F. Supp. 2d at 826)) *because* "In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda. *Terrorist Attacks I*, 349 F. Supp. 2d at 826 (citing *Burnett I*, 274 F. Supp. 2d at 104)."

4

In short, this Court should accept Defendants' proposed timeframe for discovery because the Plaintiffs need not delve into a timeframe that will not assist them in showing the Defendants were "on notice" of Al Qaeda's terrorist activities. Bin Laden did not declare war on America until 1996 (Peter L. Bergen , *The Osama Bin Laden I Know*, 164 (2006)), and he was not publicly acknowledged as a terrorist until he was indicted in the US in 1998. Even the Central Intelligence Agency "had no idea of [OBL's] possible significance until 'the bin Laden unit' was set up within the CIA in January 1996." *Id.* at 61. If the CIA did not recognize OBL's "possible significance" prior to his issuance of the 1996 fatwa, how could the Defendants recognize such significance, especially when the outlines of what would become the 9/11 plot were not even discussed until 1996 when Khalid Sheikh Mohammed met with OBL in Tora Bora. *Id.* at XVI; see also Substitution For The Testimony of Khalid Sheikh Mohammed, Def's Exh. 941, *U.S. v. Moussaoui*, Cr. No. 01-455-A, at 4, ¶ 6 attached hereto as Exhibit B.

## B.     The Burden Of Production to Defendants Outweighs The Likely Benefit to Plaintiffs.

As the discovery sought in this case goes back to earlier and earlier dates, the connection between alleged support to Al Qaeda and the 9/11 attacks becomes increasingly remote, to the point where the likely benefit of discovering such minimally relevant materials is outweighed by the substantial burden on Defendants in producing those materials. Although Rule 26 permits discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party," Fed. R. Civ. P. 26, "[a]ll discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003).

In particular, Rule 26(b)(2)(iii) provides that:

> "a court may limit discovery where, *inter alia*, 'the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" *Barkley v. Olympia Mortg. Co.*, 2007 U.S. Dist. LEXIS 13308 at *37 (S.D.N.Y. 2007) (quoting Fed. R. Civ. P. 26).

When the breadth of a document request "would require an expenditure of time and resources far out of proportion to the marginal value of the materials to this litigation," (*Conlove v. Compaq Computer Corp.*, 223 F.R.D. 162, 168 (S.D.N.Y. 2004)) it is appropriate to impose limits such as the timeframe sought herein. Considering the complexity of the alleged conspiracy, the number of claims filed, the number of plaintiffs' classes alleging those claims, and the sheer number of documents sought, discovery in this case threatens to spiral out of control if reasonable limits are not imposed. The party that will suffer from such a loss of control is the Defendants.

5

1.    The Burden vs. The Benefit

The Defendants face a substantial undue burden without the timeframe limitation sought herein, and can articulate the nature of that burden. *See Arias-Zeballos v. Tan*, 2007 U.S. Dist. LEXIS 40245 *4-5 (S.D.N.Y. 2007) (stating that the party resisting discovery has the burden of showing how the discovery is unduly burdensome).

First, the volume of document requests (not just the individual requests) is far beyond average, and when multiplied by the number of sub-sections, is immeasurable. This number of requests is then increased more than a hundred-fold by the attachment of "Exhibit A" to the Plaintiffs' Requests For Production of Documents.[6] Exhibit A contains 93 names of individuals and entities for whom Plaintiffs seek voluminous documentation in an attempt to discover links between the Defendants and these individuals or entities. Limiting the timeframe that Plaintiffs can seek discovery regarding these 93 individuals and entities is a rational limitation on otherwise boundless requests.

Second, discovery of documents pre-1996 is especially burdensome because it involves discovery of mostly inaccessible documents that would be extremely expensive to locate, because there is no indexing system or electronic database that allows Defendants to simply "pull a file." Based upon information and belief, Defendants did not begin using computers in their home and field offices until after 1996. Thus, documents created before 1996 are in a largely inaccessible non-electronic format. Additionally, these documents have only a rudimentary, non-electronic indexing system. Finally, most of the records Plaintiffs seek to discover are in Arabic (hence requiring translation) and many of the older records are in handwritten Arabic in ledger books and other compilations of documents which makes it essentially impossible to create "searchable" electronic images of the documents. In *Zubulake*, the court stated:

> "[W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (*a distinction that corresponds closely to the expense of production*). In the world of paper documents, for example, a document is accessible if it is readily available in a usable format and reasonably indexed. Examples of *inaccessible* paper documents could include (a) documents in storage in a difficult to reach place; (b) documents converted to microfiche and not easily readable; or (c) documents kept haphazardly, with no indexing system, in *quantities that make page-by-page searches impracticable*." *Zubulake*, 217 F.R.D. at 318 (emphasis added).

Third, while Defendants do not seek to prevent Plaintiffs' from accessing the documents they seek, the financial burden of conducting the production sought by Plaintiffs would rival the value of the claims in this case. For example, Plaintiffs want Defendants to scour through a warehouse in Jeddah, Saudi Arabia and produce all responsive documents found there from the

---

[6] *See* Ex. A.

6

early 1980's.[7]  An initial assessment of the cost of copying the contents of the warehouse alone totaled over ten million riyals, or $3,000,000.00.[8]  Although Defendants offered Plaintiffs unfettered access to the Jeddah warehouse, these offers have been declined and Defendants therefore seek to protect themselves from the undue burden of this production through the imposition of a reasonable "look-back" limitation.  Also, for the court's edification, in the specific case of Defendant IIRO, Defendants have offered a deposition of a records custodian, in London, to, in effect, educate Plaintiffs' counsel about how and where documents are kept in the IIRO headquarters and its overseas offices in an attempt to reduce the burden and costs of complying with Plaintiffs' broad discovery requests.  Plaintiffs have rejected this offer.

Therefore, due to the cost-conscious balancing of Rule 26(b)(2), inaccessibility of documents, and the severe additional burden placed on Defendants if they are required to produce discovery before 1998 or 1996, the burden clearly outweighs the benefit of discovering documents pre-1996 since they are only minimally relevant.

## 2.   Prejudice vs. Fairness

The Plaintiffs will undoubtedly argue that they will be prejudiced if Defendants' discovery timeframe limitation is imposed.  Defendants submit, however, their proposed discovery limit is fair to both parties and hardly prejudicial to the Plaintiffs.

As this Court knows, there were a series of attacks on U.S. interests, orchestrated by Al Qaeda between 1998 and the 9/11 attack in 2001, e.g., the 1998 Kenya and Tanzania embassy bombings and the 2000 USS Cole bombing.  Assuming *arguendo*, Plaintiffs' allegations that the Defendants materially supported or were members of al Qaeda are true, surely they would be able to discover links between them without looking past 1996.  If the Plaintiffs cannot discover any links between the Defendants and Al Qaeda in the 3-5 year period before the 9/11 attacks, it is certainly unlikely that they will find links relevant to their claims by looking back even further.  In fact, when one revisits the Plaintiffs' allegations in their various complaints, it is clear Plaintiffs seek broader discovery in a backdoor attempt to later allege more than what was in their original complaints.  As only one example, ¶231 of Defendant Ashton's complaint against the IIRO alleges that IIRO was implicated in the bombing of the US Embassies in Kenya and Tanzania in 1998.  Plaintiffs need not look-back to the 1980s and early 1990s in a desperate attempt to support this fantastic allegation.  Plaintiffs' discovery requests must be grounded in their original allegations.  Thus, the imposition of a "look-back" limitation will essentially force the Plaintiffs to provide to the Court documents evidencing linkage between the Defendants and post-1998 or 1996 terrorist activities.

Stated simply, the Plaintiffs do not need to discover materials predating 1998 to support their claims.  And, presuming their allegations carry any weight, they should not be prejudiced by Defendants' proposed discovery limitation.  Because this Court can always revisit the propriety of a "look-back" limitation at a later date if, in the course of discovery within the

---

[7]  *See* Ex. A (which essentially mirrors other Defendants' discovery requests)
[8]  *See* $3 million estimate attached hereto as Exhibit C.  Copying the contents of the warehouse would be necessary in order for Defense counsel to review and determine which documents are responsive to Plaintiffs requests since Plaintiffs require that all production of documents must state how each document is responsive to which requests.

suggested timeframe, the Plaintiffs find specific evidence that leads them to believe it is necessary to request an extension of the "look-back" period, the Defendants can then approach the Court for additional relief. This is a very effective approach to guard against the "fishing expedition" that these Plaintiffs are on. The Court should know that when Defendants requested documents to support the Plaintiffs' outrageous allegations, the Defendants were assaulted by news paper clippings and website articles, both of which are inadmissible hearsay.[9]

### C.    This Court Has The Discretion To Limit Relevant Discovery.

Even if this Court finds that some of the materials sought by Plaintiffs from the time period before 1998 or at the earliest, 1996 are relevant, Rule 26(c) provides that courts may limit relevant discovery to a particular timeframe to protect the defendant from overly burdensome discovery.

"[T]he discovery of relevant evidence…is subject to limitation." *Ferguson v. Lion Holding, Inc.*, 2005 U.S. Dist. LEXIS 9789, *9 (S.D.N.Y. 2005); *see also During v. City Univ. of N.Y.*, 2006 U.S. Dist. LEXIS 53684 at *15 (S.D.N.Y. 2006) ("Even if the information sought is relevant, courts have the authority to forbid or to alter discovery that is unduly burdensome."); *Barkley v. Olympia Mortg. Co.*, 2007 U.S. Dist. LEXIS 13308 at *6 (S.D.N.Y. 2007) ("the Court finds the majority of these requests to be relevant, but limits them as necessary to limit the burden placed on defendants"). Under Rule 26(c), this Court may impose the Defendants' proposed timeframe limitation to protect them from the unduly burdensome requests presented by Plaintiffs.

## IV.    CONCLUSION

As discussed at length above, the burden on the Defendants in this case is severe. Other defendants have been given similar time limitations in this case. *See* J. Maas Ord. (June 26, 2006) (ordering a 6 year look back period for jurisdictional discovery). Furthermore, the risk of permitting Plaintiffs to engage in a fishing expedition at Defendants' cost is reason enough for this Court to exercise its discretion by imposing the Defendants proposed timeframe limitation.

Respectfully submitted,

Martin F. McMahon, Esq.

cc:  All Counsel of Record via E-mail

---

[9] As only one example, in Plaintiff Burnett's responses to IIRO's Document Requests they produced 83 PDF folders each containing numerous documents. 53 of their PDF folders, however, were nothing more than Newspaper or Website Articles.

# EXHIBIT C



**COZEN**
**O'CONNOR**

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

**Sean P. Carter**
Direct Phone   215.665.2105
Direct Fax      215.701.2105
scarter@cozen.com

November 29, 2007

**VIA FEDERAL EXPRESS**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 630
New York, NY 10007

     Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD)

Dear Judge Daniels:

     Plaintiffs in the *Federal, Burnett, Ashton* and *O'Neill* cases (Plaintiffs) submit this letter in response to the November 7, 2007 submission of the Muslim World League (MWL), International Islamic Relief Organization (IIRO), and Wa'el Jelaidan, regarding the dispute between Plaintiffs and those Defendants as to the discoverability of information and documentation relating to periods prior to 1996. This letter supplements Plaintiffs' November 7, 2007 submission regarding this dispute.

I.    <u>INTRODUCTION</u>

     As set forth in greater detail in Plaintiffs' November 7th letter, all three of these Defendants have asserted an absolute objection to the discovery of any information or documentation relating to periods prior to 1996. Although there are several other unresolved discovery disputes between Plaintiffs and these defendants, the parties agreed that it would be beneficial to submit the discrete dispute regarding the defendants' common pre-1996 objections to the Court first, and to defer submission of all other discovery disputes to a later date. This approach was intended to limit the initial motion practice to a manageable scope for the Court, and to allow for a continuing dialogue among the parties regarding the other disputes.

The Honorable George B. Daniels
November 29, 2007
Page 2

_____

        As articulated by the defendants in their discovery responses, their common objection to
discovery of information or documentation relating to periods prior to 1996 rests solely on
relevancy grounds.  Indeed, although these defendants separately raise conclusory objections
relating to the alleged burden associated with Plaintiffs' discovery requests, their specific
objections to pre-1996 discovery make no mention whatsoever of any unique burden associated
with responding to discovery requests relating to such periods.[1]

        Notwithstanding the parties' agreement to limit the present submissions to the
defendants' common pre-1996 objection, the defendants' November 7th submission focuses
primarily on the defendants' separate objections regarding the alleged burdens associated with
responding to Plaintiffs' discovery requests.  While Plaintiffs strongly believe the presentation of
those arguments in the context of the present dispute deviates from the agreement the parties
reached regarding the scope of the issues to be presented to the Court at this time, Plaintiffs will
not burden the Court with argument regarding the impropriety of the defendants' inclusion of
those additional arguments.  Instead, Plaintiffs will focus on the substantive deficiencies in the
defendants' arguments, including their complete failure to substantiate any of their discovery
objections in accordance with the requirements of the Federal Rules of Civil Procedure.

II.     ARGUMENT

        In their November 7th letter, the defendants raise two primary arguments, largely
redundant of one another, in support of their effort to persuade the Court to deny Plaintiffs
discovery of highly relevant materials from periods prior to 1996.[2]  First, the defendants argue
that searching for and locating responsive documents for periods prior to 1996 would be unduly
burdensome, primarily due to the allegedly unmanageable state of their own records and
consequent need to manually search vast document archives.  Second, the defendants argue that
searching for and producing responsive documents from periods prior to 1996 would be
extremely expensive, again largely because of the defendants' own recordkeeping methods.

        For the reasons set forth in greater detail below, both of these arguments should be
rejected out of hand.  To begin with, the defendants' objections regarding the alleged burden and
expense of responding to discovery relating to periods prior to 1996 are conclusory and wholly
unsubstantiated, and therefore deficient as a matter of law.  Furthermore, it appears that several
of the conclusory and unsubstantiated representations made in the defendants' November 7th
submission are factually inaccurate.  Finally, the defendants cannot rely on the unmanageable

_____

[1] In apparent recognition that their pre-1996 objections do not raise undue burden or expense as a basis
for declining to respond to pre-1996 discovery, the defendants' November 7th submission instead cites to
a November 30, 2005 letter from counsel for the defendants to Plaintiffs, served before any of the
defendants provided discovery responses, in which counsel for the defendants proposes that discovery be
limited to the period after 1998.  Obviously, only the objections presented in a defendant's discovery
responses themselves are preserved.

[2] The defendants make only a superficial effort to persuade the Court that documents and information
relating to periods prior to 1996 are irrelevant, even though that is the sole basis raised in the objections at
issue for resisting pre-1996 discovery.  Subject to a few additional comments at the end of this letter,
Plaintiffs are content to rely on the arguments presented in their initial letter in response to the
defendants' superficial relevance arguments.

The Honorable George B. Daniels
November 29, 2007
Page 3

and disorganized state of their own recordkeeping to avoid discovery of relevant topics. To the contrary, the unwieldy state of the defendants' recordkeeping requires that they bear the burden of searching their records to identify responsive documents, and produce those documents to Plaintiffs in an organized manner.

> A.   The Defendants Bear the Burden to Explain Their Objections to Each Discovery Request in Specific Terms, and to Substantiate Those Objections Through an Affidavit or Other Competent Evidence

Although Plaintiffs provided a general statement of the defendants' burdens in relation to the present dispute in their initial letter, a few specific aspects of the governing legal standards are of particular significance to the analysis of the defendants' November 7th submission, and therefore warrant brief comment here.

The party seeking to avoid discovery has the burden of showing the court specifically how, despite the broad and liberal construction afforded the Federal discovery rules, each discovery request is not relevant or how each request is overly broad, burdensome or oppressive. Compagnie Francaise d'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 42 (S.D. N.Y. 1984). In order to satisfy that burden, the resisting party must do more than "simply intone the familiar litany that the discovery is burdensome, oppressive or overly broad." Arias-Zeballos v. Tan, 2007 U.S. Dist. LEXIS 40245, *4 (S.D. N.Y. 2007).

This prohibition against boilerplate objections lacking evidentiary support is vital to preserving the integrity and fairness of the discovery process, as well as the Court's ability to manage litigation in an efficient manner. As one district court has succinctly and insightfully explained:

> [N]on-specific objections operate to render the producing party the final arbiter of whether it has complied with its discovery obligations under Rule 26 because the requesting party lacks sufficient information to understand the scope of the objection, or to frame any argument as to why that objection is unfounded.

U.S. Commodity Futures Trading Comm'n v. Am. Derivatives Corp., 2007 U.S. Dist. LEXIS 23681, *8-9 (N.D. Ga. 2007)

In keeping with the foregoing principles and policies, the party resisting discovery bears the burden to clarify and explain, in specific and precise terms, why its objections to each discovery request are proper. Cox v. McClellan, 174 F.R.D. 32, 34 (W.D. N.Y. 1997). Moreover, the party objecting to the requested discovery on grounds of undue burden *must substantiate its objections through the submission of an affidavit or offer other evidence* revealing the nature of the burden. Because arguments of counsel within a memorandum of law do not constitute evidence, such arguments are insufficient as a matter of law to sustain the objecting party's burden, and should not be considered at all in the absence of a supporting affidavit. Arias-Zeballos, 2007 U.S. Dist. LEXIS 40245 at *7. ("Although the Memorandum of Law the defendant submitted in opposition to the plaintiffs' motion to compel attempts to explain

The Honorable George B. Daniels
November 29, 2007
Page 4

the defendant's objections to interrogatory Nos. 2 – 5, 8 and 9, a memorandum of law is not evidence. Therefore, it cannot be relied upon solely by the defendant to support the allegation she has made in objecting to answer the plaintiff's interrogatories.")

As demonstrated by the discussion which follows, application of the foregoing standards to the present dispute confirms that the defendants have failed, in the most fundamental sense, to meet the applicable burdens in relation to their discovery objections.

    B.    The Defendants' Conclusory and Unsubstantiated Assertions of Undue Burden and Expense are Complete Nullities Under the Federal Rules of Civil Procedure

        1.    The defendants have not submitted a single piece of competent evidence to substantiate any of their objections or arguments.

In accordance with the governing standards outlined above, the defendants' objections to Plaintiffs' discovery requests warrant no consideration by this Court, as the defendants have not submitted a single affidavit or other piece of competent evidence to substantiate their objections, as required under the Federal Rules. Within their respective Responses to Plaintiffs' discovery requests, the defendants present their undue burden objections in only the most boilerplate and conclusory fashion. As thusly presented, they do not represent valid objections at all. Moreover, to the extent the defendants can be viewed to have made any effort to explain and substantiate those objections in the context of the present dispute, those efforts rest entirely on representations made by counsel in the body of their November 7th letter regarding the "defendants'" recordkeeping practices and document archives, several of which are notably qualified as being made "upon information and belief."[3] As will be discussed below, the accuracy of several of those factual representations is highly questionable. But in any event, the representations and arguments of counsel do not constitute evidence. Arias-Zeballos v. Tan, 2007 U.S. Dist. LEXIS 40245 * 7. Because the defendants have not offered any affidavits or other evidence to substantiate those representations and arguments, their objections fail as a matter of law and should be overruled. Id.

        2.    The unsupported representations and arguments made by counsel are themselves general and conclusory.

In addition to lacking any evidentiary support, the representations by counsel within the body of the defendants' November 7th submission are themselves conclusory, and do not present any specific details regarding the nature of the burden Plaintiffs' individual discovery requests

---

[3] Aside from the representations made by counsel in the body of the letter, the defendants submitted two external documents: (1) an unauthenticated summary of testimony by Khalid Sheik Mohamed, the architect of the September 11th Attack; and (2) an unauthenticated quote from a vendor located somewhere in Saudi Arabia, for scanning and copying the entirety of the records located in a warehouse in Saudi Arabia. Beyond the meaninglessness of these two documents to the present dispute, neither constitutes evidence, and they therefore warrant no consideration at all. It is, however, somewhat curious that the price stated in the quote is six times higher than an estimate counsel for these defendants provided in a June 9, 2006 letter to Plaintiffs counsel. See June 9, 2006 letter from Martin F. McMahon to Sean P. Carter (June 9, 2006 letter) Exhibit A hereto, at p. 4.

The Honorable George B. Daniels
November 29, 2007
Page 5

pose to each of these defendants. In "explaining" why responding to Plaintiffs' discovery would present an undue burden, the defendants offer only the following four sentences regarding the logistics involved in locating and producing responsive documents:

> [D]iscovery of documents pre-1996 is especially burdensome
> because it involves discovery of mostly inaccessible documents
> that would be extremely expensive to locate, because there is no
> indexing system or electronic database that allows defendants to
> simply "pull a file." Based upon information and belief,
> defendants did not begin using computers in their home and field
> offices until after 1996. Thus, documents created before 1996 are
> in a largely inaccessible non-electronic format. Additionally, these
> documents have only a rudimentary, non-electronic indexing
> system.

In the most fundamental sense, the foregoing statement provides no specific factual details regarding the manner in which the defendants' records are organized or indexed, or other matters critical to the evaluation of the nature of the burden involved in responding to Plaintiffs' discovery. Indeed, the defendants' "explanation" of their burden objection amounts to no more than an *ipse dixit* assertion of burden by counsel, which attempts to arrogate to the defendants the right to decide for themselves whether Plaintiffs' discovery is objectionable.[4] Such objections warrant no consideration at all. Arias-Zeballos, 2007 U.S. Dist. LEXIS 40245 at *4 – 7.

Compounding the absence of any meaningful factual detail in their November 7th submission, the defendants do not offer any specific arguments regarding the unique burden associated with any particular discovery request, instead generically arguing that "Plaintiffs' discovery" is burdensome. However, as the authorities cited above make clear, an objecting party's burden is to articulate the nature of the burden associated with responding to each request individually. Campagnie Francaise, 105 F.R.D. at 42. This requirement is only logical, as the burdens associated with responding to distinct discovery requests for differing categories of information necessarily vary.[5] As a result, an argument which fails entirely to distinguish among

---

[4] The IIRO's "offer" to have Plaintiffs' counsel travel to London to depose a records custodian of IIRO "to, in effect, educate Plaintiffs' counsel about how and where documents are kept in the IIRO headquarters in its overseas offices" is nothing more that a transparent attempt to shift the IIRO's burden to substantiate its discovery objections to Plaintiffs, by requiring Plaintiffs to ferret out the basis for those objections through a deposition in a foreign country.

[5] As a simple example to illustrate this point, Plaintiffs submit that it would not be necessary for the MWL and IIRO to "scour" their warehouses to locate and produce their annual financial records, a category of documents Plaintiffs have specifically requested. Notably, Plaintiffs raised this precise point at a four hour meeting with counsel for these defendants on October 17, 2007. During that meeting, the parties spoke at length regarding the defendants' undue burden assertions. In the context of those discussions, Plaintiffs' counsel specifically explained that they had no interest in having the defendants copy their entire warehouses, and identified numerous categories of documents they believed the defendants could locate and produce with minimal effort. Counsel for the defendants urged Plaintiffs' counsel to be patient with his clients, and promised to make a meaningful production of documents on behalf of IIRO by mid-November.

The Honorable George B. Daniels
November 29, 2007
Page 6

the individual requests, as is the case here, simply cannot serve to sustain an objecting party's burden to explain with specificity why the discovery is objectionable.

Furthermore, the defendants' November 7th submission also fails to distinguish among the recordkeeping procedures and alleged burdens of the individual defendants. The inherent deficiency of this approach is easily evidenced through an analysis of the defendants' conclusory arguments in relation to defendant Jelaidan. Given that Jelaidan is an individual and not a corporation, it is difficult to imagine that he has a vast and complex record archive, or that he would experience any significant burden in searching his records in order to respond to Plaintiffs' discovery requests. Nonetheless, the undue burden arguments are generically advanced on his behalf. At best, the assertion of such burden arguments on behalf of defendant Jelaidan is misleading to the Court. In any case, the complete inapplicability of those arguments to Jelaidan serves to highlight why it is imperative to require <u>each</u> defendant to independently articulate and substantiate its discovery objections. The defendants' complete failure to do so here further undermines their efforts to avoid discovery as to highly probative and relevant topics.[6]

      3.      Several of the core representations made in the defendants' November 7th letter appear to be inaccurate.

Beyond the deficiencies outlined above, several of the core representations made by counsel within the body of the November 7th letter in support of the defendants' undue burden arguments appear to be factually inaccurate, a problem which underscores the importance of requiring defendants in this litigation to support their objections through "affidavits or evidence." Of particular note, Plaintiffs submit that there is good reason to question the credibility of the defendants' representation that locating responsive pre-1996 documents would require the defendants to "scour" a vast archive of documents relating to such periods, given their prior assertion that the majority of their documents from periods prior to 1996 have been destroyed pursuant to document retention policies. In this regard, counsel for the MWL and IIRO made the following representation in a June 9, 2006 letter to counsel for the *Federal* plaintiffs:

> This letter serves as a response to your letter dated May 24, 2006 and the various issues raised therein. I understand you have several discovery concerns regarding our clients Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"). As you may know, I recently traveled to both London and the Kingdom and am now in a better position to address the points enumerated in your letter.
>
> 1.    <u>Discovery of documents pre-dating 1996</u> – Based upon my recent travel to the Kingdom, it is my understanding that each entity has an independent document retention policy. For the most

---

[6] The November 7th letter submitted by counsel for all three of these defendants also makes no effort to distinguish between the recordkeeping practices of the MWL and IIRO, or to explain on an individual basis why Plaintiffs' discovery requests present a particular burden for those individual defendants.

The Honorable George B. Daniels
November 29, 2007
Page 7

_____

> part, pursuant to these policies, documents are kept for (10) ten
> years. Regarding IIRO, there may be some documents that go
> back as far as 1990 but those would only be a percentage of the
> document base.

See June 9, 2006 letter, Exhibit A hereto at p. 1.

If the foregoing statement in counsel's letter of June 9, 2006 is to be believed, it would
appear that the MWL and IIRO possess only limited documentation from periods prior to 1996.
As a result, Plaintiffs respectfully submit that there is substantial reason to doubt the accuracy of
the representation that responding to discovery relating to periods prior to 1996 would require
the MWL or IIRO to search vast catalogs of documents.

The limited discovery provided by the defendants to date[7] raises similar concerns
regarding the assertion that these defendants did not possess computer systems until 1996, as
well as the representation that the defendants cannot readily search physical records from periods
prior to 1996 for information relating to an identified third party. For example, Plaintiffs were
very recently afforded the opportunity to retrieve electronic data stored on six MWL computers,
which were previously seized by the FBI in a raid of the MWL's offices in the United States.
While the analysis of that electronic information is a complicated process which only began a
few days ago, the preliminary analysis of metadata from those computers indicates that at least
two of the computers were in use before 1996. More specifically, one of the machines is an
Apple computer which contains files dating back as far as February 1987. Another of the
computers contains files dating to June and September of 1995. Again, Plaintiffs' analysis of the
information from these computers only began a few days ago, and further investigation may
reveal files on other of the computers dating to periods prior to 1996. But, in any event, the
preliminary information available to Plaintiffs regarding these computers appears to establish
that the MWL began using computers as early as the late 1980s.

The sparse and unorganized document production by the IIRO similarly indicates that it
began using computers before 1996, and also suggests that the IIRO possesses the capacity to
efficiently search its physical records for information concerning an identified third party.
Specifically, the IIRO's limited document production contains a few documents relating to an
inquiry by the IIRO into a purported relationship with the "University al-Jihad Wa al Daa'wa" in
Peshawar, Pakistan. According to those documents, Dr. Ahmad Mohammed Ali, the Secretary
General of the MWL, sent a letter to the IIRO on January 30, 1995, requesting that the IIRO
investigate whether it had ever received aid from the University al-Jihad. On February 9, 1995,
just ten days after receiving that inquiry, the Secretary General of the IIRO wrote to Dr. Ali, and
represented as follows:

_____

[7] The profound deficiencies in the document production by these defendants to date is beyond the scope
of the present dispute. However, it is worth noting that they have made only limited and selective
productions of documents, and their efforts to suggest that they have provided meaningful discovery are
entirely disingenuous.

The Honorable George B. Daniels
November 29, 2007
Page 8

---

> I hereby wish to inform you that *after checking our archives and computer*, no aid whatsoever was found to have been given in the past by the above-mentioned university.

<u>See</u> Translation of February 9, 1995 letter from Dr. Farid Yassin Qurashi to Dr. Ahmad Mohammed Ali, <u>Exhibit B</u> hereto (emphasis supplied).

While the above-referenced series of documents is incomplete and the IIRO never indicated which document requests they are responsive to, they appear to establish that the IIRO possessed a computer system at the beginning of 1995, and had the capacity in 1995 to quickly search its physical archives for information or documentation relating to an identified third party. These documents therefore directly contradict the representations in the defendants' November 7th letter that they did not possess any computer system until after 1996, and that their physical archives are not organized in a manner which allows them to search for information relating to identified third parties.

The defendants' Responses to Plaintiffs' discovery requests also suggest that the defendants are capable of searching their documents in order to determine whether they are in possession of materials responsive to Plaintiffs' discovery requests, at least when they perceive it to be in their interests to do so. In this regard, Plaintiffs note that their discovery requests to the IIRO and MWL contain a number of discrete requests for documents relating to third-parties of particular interest, as well as events and issues of particular relevance to the claims in these proceedings. In response to many of those discrete requests, the defendants invoked the familiar litany of generic objections, and then offered some variation on the following response:

> No documents…can be produced as no documents of this kind exist.

Obviously, if the defendants' records were in fact maintained in a manner which rendered it impossible for them to identify documents referencing or relating to a third party, as their November 7th submission indicates, it would have been impossible for them to affirm in good faith that they are not in possession of a single document referencing or relating to the individuals, organizations and topics addressed in the requests at issue. That they have made numerous such affirmative representations in their discovery responses indicates that the defendants can in fact search their records for responsive materials, at least when it serves their interests to do so.[8] For the Court's convenience, a chart identifying relevant examples of requests relative to which the defendants provided such a response is attached hereto as <u>Exhibit C</u>.

---

[8] Of course, there is also the possibility that the defendants undertook no effort to search their records to verify whether they were in possession of documents responsive to these discovery requests, and denied the existence of such documents without undertaking any search at all. However, if that is the case, it only serves to further undermine the credibility of these defendants in relation to the entire discovery process.

The Honorable George B. Daniels
November 29, 2007
Page 9

There is also reason to question the factual accuracy of the defendants' representation that it would be necessary to copy and translate the entirety of their records facility simply to respond to Plaintiffs' discovery requests. In this regard, Plaintiffs note that the MWL and IIRO maintain operations throughout the world in furtherance of their efforts to spread radical Wahhabbi ideology, including extensive operations within the English speaking world. Indeed, both of those organizations publish extensive literature in English as a component of their propagation efforts.[9] In order for such global operations to be feasible, both the MWL and IIRO must possess extensive language capabilities, including personnel with intimate familiarity of the English language. Thus, there appears to be no basis in fact for the statement that it would be necessary to translate the entirety of the defendants' document archives simply to respond to Plaintiffs' discovery requests. It should also be noted that the letter counsel for these defendants sent Plaintiffs on June 9, 2006 states that the defendants also have "local counsel" in Jeddah, Saudi Arabia. See June 9, 2006 letter at footnote 1. To the extent any such "local counsel" for the defendants is proficient in both English and Arabic, the defendants' contention that responding to Plaintiffs' discovery would require them to translate every one of their documents is blatantly misleading.

In sum, the defendants have failed to offer any competent support for their objections, and the unsubstantiated arguments they have advanced in the context of the instant briefing are conclusory and of questionable accuracy. Accordingly, the defendants have not met their burdens in relation to any of the discovery objections presently before the Court.

C.   The Defendants Cannot Rely on the Unorganized State of Their Own Records as Grounds to Support Undue Burden or Expense Objections

While the defendants' undue burden and expense arguments necessarily fail for the reasons discussed above, it should also be noted that the defendants are legally barred from relying on the poorly organized state of their own records as grounds for asserting any undue burden or expense objections in relation to the discovery process.

Courts in the Southern District of New York have consistently held that a party may not rely on the unwieldy state of its own records as a means to avoid discovery, or as grounds to shift the burden and expense of locating responsive materials within a voluminous archive of poorly indexed documents to the requesting party. The decision of the Court in Standard Dyeing and Finishing Co. v. Arma Textile Printers Corp., 1987 U.S. Dist. LEXIS 868 (S.D.N.Y. 1987) is illustrative of this line of authority.

In Standard Dyeing, the district court considered whether a defendant satisfied its discovery obligations under Rule 34 by advising the plaintiff that there were a "great deal of documents and papers on the factory premises which could conceivably have among them the papers which plaintiff was seeking," and inviting the plaintiff to search those records to locate

---

[9] Notably, the MWL publishes a monthly "Journal" in English, widely disseminated in the United States, copies of which Plaintiffs have specifically requested but not been provided. Despite the fact that the MWL circulates its English Journal in the United States, the MWL apparently believes Plaintiffs' counsel should be required to travel to Saudi Arabia to obtain copies of the Journal editions.

The Honorable George B. Daniels
November 29, 2007
Page 10

any responsive materials. Standard Dyeing, 1987 U.S. Dist. LEXIS 868 at *2. The Court correctly concluded that the defendant's "invitation" to have the plaintiff search through a poorly organized "haystack" of records in order to locate responsive documents was manifestly improper under the discovery rules. In support of its decision, the Court reasoned as follows: "Where as here the state of the corporation's records would make it unreasonably burdensome for the discovering party to search for the sought-after documents, the burden falls on the discoveree to organize the documents so that the discoveror may make 'reasonable use' of them." Id. at *4.

The Court reached a similar result in Chemtex, LLC v. St. Anthony Enterprises, Inc., 2004 U.S. Dist. LEXIS 6031 (S.D.N.Y. 2004), a case involving discovery objections analogous to those advanced by the defendants in these proceedings. In Chemtex, the defendant objected to the plaintiff's document requests, arguing that the requests placed an undue burden and expense on the defendant because of the manner in which the potentially responsive documents were stored. The defendant offered to bring plaintiff's counsel to the location where the records were located and to allow counsel to search for the documents. Plaintiff rejected this proposal, and, citing to Rule 34(b), argued that the defendants' "failure to keep its documents in a fashion that would make them easily retrievable does not entitle them to avoid its discovery obligations."

The Chemtex Court concluded that the defendant's offer to allow plaintiff's counsel to visit its archive and review its documents did not satisfy the defendant's obligation to produce documents "as they are kept in the usual course of business," because the state of those records prevented the plaintiff from making "reasonable use" of the documents. Id. at *2-3. Reasoning that the alleged burden and expense of locating the responsive documents was a product of the unwieldy state of the defendant's own records, the Court overruled the defendant's undue burden and expense arguments and directed the defendant to search its archived records for documents responsive to the plaintiff's requests. Id. at *3.

In view of the foregoing authorities, the undue burden and expense objections advanced by the defendants in the present case are in fact doomed by the very arguments they proffer in support of those objections. As the predicate for their argument that the Court should deny Plaintiffs discovery as to relevant topics due to the alleged burden arising from such discovery, the defendants represent that their records are maintained in an "inaccessible" state, without any useful indexing system, and that locating documents responsive to Plaintiffs' discovery requests would consequently require the defendants to "scour" through a warehouse in Saudi Arabia.

From these arguments it necessarily follows that the alleged burden and expense associated with responding to Plaintiffs' discovery is attributable largely to the poor and unsearchable state in which the defendants maintain their own records, a circumstance which precludes them from avoiding discovery through objections of undue burden and expense. Standard Dyeing, 1987 U.S. Dist. LEXIS 868 at *4-5. As a corollary, the defendants' arguments also establish that the records in the their warehouses are not maintained in a state that would allow Plaintiffs to make "reasonable use" of them. Indeed, if the defendants are themselves unable to locate responsive materials without "scouring" the entire archives in their warehouses, there can be no dispute that Plaintiffs' counsel would face an almost incalculable burden in attempting to identify relevant documents as they are stored in the defendants' facilities. Under

The Honorable George B. Daniels
November 29, 2007
Page 11

such circumstances, the defendants "must bear the burden of searching those available records for documents responsive to plaintiffs' Rule 34(b) request," and cannot attempt to satisfy their discovery obligations by offering Plaintiffs access to their records facilities.[10] Id.

Beyond the legal deficiencies in the defendants' "undue expense" arguments, their contention that "the financial burden of conducting the production sought by Plaintiffs would "rival the value of the claims in this case" is preposterous, and deeply offensive to the victims of the September 11th Attack. As the defendants are well aware, before the Court in these consolidated MDL proceedings are claims arising from the callous murder of nearly three thousand innocent civilians, severe injuries suffered by countless other individuals, and property damage well in excess of $5 billion. Even if it were necessary for the defendants to incur $3 million in costs in order to respond to Plaintiffs' discovery requests, which for the reasons stated above almost surely is not the case, that expense would not "rival" even a fraction of the value of the claims at issue in these proceedings.

D.      The Defendants' Relevance Arguments are Superficial, Unsupported and Illogical

As mentioned previously, the defendants offer only superficial arguments in support of their novel theory that periods prior to 1996 are irrelevant to the claims advanced in these proceedings, despite the fact that all credible reporting establishes that al Qaida was formally established in 1988. For the reasons set forth in Plaintiffs' November 7th letter, these superficial arguments completely ignore the relevant legal standards, and run afoul of basic logic. Moreover, because the defendants' relevance objections are conclusory and wholly unsupported, they warrant no consideration by this Court, for the reasons set forth in sections 2A-C above. However, Plaintiffs do believe brief comment on two of the arguments presented by the defendants in their November 7th letter will further assist the Court in evaluating the overall credibility of the defendants' pre-1996 objections.

The defendants' November 7th letter asserts that "defendants could not be 'on notice' of al Qaida's terrorist activities against America until" Osama bin Laden's 1996 fatwa. While the discussion in Plaintiffs' initial letter regarding this dispute plainly reveals the illogic of such a position, it is worth noting that documents Jelaidan produced in response to Plaintiffs' discovery requests appear to specifically establish that he was intimately familiar with Osama bin Laden's plans by the early 1990s. In this regard, a September 8, 2002 *Arab News* article produced by defendant Jelaidan, which essentially outlines Jelaidan's defense to his joint designation by the U.S. and Saudi governments, is notable. In that article, a source from the MWL offers details regarding Jelaidan's acknowledged personal relationship with Osama bin Laden dating to the

---

[10] It should also be noted that the warehouses in question are located in Saudi Arabia, a country for which the State Department has issued a Travel Advisory warning American citizens to defer all non-essential travel due "to concerns about the possibility of additional terrorist activity directed against American citizens." See June 14, 2007 Travel Warning relating to Saudi Arabia, issued by the U.S. Department of State Bureau of Consular Affairs, Exhibit D hereto. The gravity of those risks prompted the U.S. government to order all non-emergency employees and all dependents of the U.S. Embassy in Riyadh and Consulates in Jeddah and Dharahm to leave Saudi Arabia in April of 2004. In addition, Plaintiffs' counsel, a number of whom are Jewish, understand that Saudi Arabia will not issue visas to persons of Jewish heritage.

The Honorable George B. Daniels
November 29, 2007
Page 12

Afghan *jihad,* but argues that Jelaidan severed ties with bin Laden in the early 1990s as a result of a "disagreement." The article goes on to explain that:

> Jelaidan had disagreed with bin Laden on the formation of al
> Qaida, as he believed that enthusiastic Arab youths would be
> uncontrollable once they returned to their native countries.
> Jelaidan together with the late Abdullah Azzam, a prominent Arab-
> Afghan leader, said that the duty of Arab fighters should be
> restricted to Afghanistan operations, which were limited to aid in
> military in tandem with Afghan Mujahedeen.
>
> Bin Laden had called for the formation of an independent front for
> the Arab fighters.

See *U.S. Urged to Give Sound Proof in Julaidan's Case,* Arab News, September 8, 2002, <u>Exhibit E</u> hereto, at p. 2.

While Plaintiffs do not at all accept the notion that Jelaidan severed ties with bin Laden over the formation of al Qaida, and indeed Jelaidan's terror designation indicates otherwise, the article is significant in that it provides credible evidence that Jelaidan was directly involved in the discussions among the senior leadership of the Afghan *jihad* regarding the formation of al Qaida. Further, Jelaidan's discovery responses confirm that he was an officer of the MWL at the time of his alleged "disagreement" with Osama bin Laden regarding the formation of al Qaida (and for many years thereafter). Jelaidan's own discovery responses thus establish that both he and the MWL were specifically aware of bin Laden's terrorist ambitions many years before 1996. See <u>New York Assets Realization Co. v. Pforzheimer</u>, 158 A.D. 700 (N.Y. App. Div. 1913) (holding that personal knowledge of an officer is imputable to the corporation).

Equally disingenuous are defendants' efforts to convince the Court that denying Plaintiffs discovery of relevant information from years prior to 1996 is appropriate "because there was substantial and notorious terrorist activity in the period 3 – 5 years before the 9/11 Attacks." First of all, for the reasons set forth in Plaintiffs' initial letter, discovery of the inception and historical links between the defendants and other members of al Qaida's global terrorist network are critical factors in relation to Plaintiffs' conspiracy, aiding and abetting and material support claims. Furthermore, given the fact that Osama bin Laden's 1996 *fatwa* placed the entire civilized world on notice of his terrorist ambitions and made al Qaida's global operations the primary focus of international counter-terrorism investigators, it is only logical to infer that al Qaida's sponsors and supporters would have undertaken heightened efforts to conceal their affiliation with bin Laden and al Qaida following that *fatwa.* That likelihood renders discovery as to the pre-1996 all the more critical, and in Plaintiffs' view raises significant questions regarding the real motivations behind the defendants' desperate efforts to avoid any discovery implicating that timeframe.

The Honorable George B. Daniels
November 29, 2007
Page 13

III.     CONCLUSION

Plaintiffs have now been endeavoring for several years to obtain meaningful discovery
from MWL, IIRO and Jelaidan.  Plaintiffs' efforts to obtain that discovery, and for that matter to
reach any reasonable compromises with these defendants concerning discovery disputes, have
been unnecessarily clouded and frustrated by the defendants' pervasive assertions of conclusory
and unsupported objections, as evidenced by the discussion set forth above.  Among other things,
this conduct has prevented Plaintiffs from obtaining any meaningful document production from
the defendants, and rendered it impossible for Plaintiffs to evaluate the veracity of the
defendants' objections or to modify any of the requests to moot the stated objections, results
which necessarily increase the burdens of the Court in managing this litigation.  The answer to
the complications resulting from the defendants' boilerplate discovery objections is not to
impose an artificial temporal limitation which would deny Plaintiffs discovery of highly relevant
topics, as the defendants propose.  Rather, the solution is simply to require the defendants to
comply with the requirements of the Federal Rules of Civil Procedure, by stating all objections
with particularity, and refraining from interposing objections that cannot by substantiated by
both governing legal standards and credible affidavit testimony or evidence.  Because the
defendants' have not met these burdens in relation to the objections presently before the Court,
Plaintiffs respectfully request that the Court overrule all of those objections at this time.

Respectfully,

COZEN O'CONNOR

BY:     SEAN P. CARTER

SPC/bdw
Enclosures

cc:     Judge Maas (Via Federal Express) (w/enc.)
        All Counsel of Record (Via email) (w/enc.)

PHILADELPHIA\3448687\1  117430.000

# EXHIBIT D

## MARTIN F. McMAHON & ASSOCIATES

1150 CONNECTICUT AVENUE, N.W.
SUITE 900
WASHINGTON, D.C. 20036

_____

Established 1978

TELEPHONE (202) 862-4343
FACSIMILE (202) 828-4130

www.martinmcmahonlaw.com

MARTIN F. McMAHON
Managing Partner
Admitted in District of Columbia, New York
and U.S. District Court of Maryland

LISA D. ANGELO
Associate
Admitted in District of Columbia and
California

CHRISTINE M. HILGEMAN
Associate
Admitted in Virginia

JASON A. DZUBOW
Of Counsel
Admitted in District of Columbia and
Maryland

CHRISTOPHER D. BROWN
Of Counsel
Admitted in District of Columbia and
Maryland

ROBERT MANCE
Of Counsel
Admitted in District of Columbia and
Maryland

November 28, 2007

**VIA OVERNIGHT DELIVERY**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
500 Pearl Street, Room 1350
New York, NY 10007-1312

  Re:  *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570

Dear Judge Daniels:

  On November 7, 2007 Defendants International Islamic Relief Organization, Muslim World League, Wael Jelaidan (collectively referred to as "Defendants") and Plaintiffs Ashton, Burnett, Federal Insurance and O'Neill (collectively referred to as "Plaintiffs") submitted respective letters to this Court seeking judicial assistance in resolving an ongoing merits discovery dispute. This letter serves as Defendants' response to the issues raised in the Plaintiffs' letter. As shown *infra*, if "boundaries" and time limits are not set in this case, discovery herein threatens to become a "shakedown" tool. *See Oppenheimer Fund v. Sanders*, 437 U.S. 340, 353 (1978).[1]

  Plaintiffs state that "the sole question presently before the court is whether [the] defendants can demonstrate that an absolute and universal prohibition of discovery of documents and information relating to periods prior to 1996,[2] regardless of the subject matter of that discovery, is appropriate in this litigation." Pls.' Disc. Ltr. p. 4 (Nov. 7, 2007) (hereinafter referred to as "Pls.' ltr"). Defendants disagree with this narrow and slanted view of the issue presented to this Court. "Only if a matter is relevant and potentially discoverable must a court

_____

[1] "discovery should be denied when a party's aim is to…embarrass or harass the person from whom he seeks discovery" *Oppenheimer*, 437 U.S. at 353; *see also United States v. Howard*, 360 F.2d 373, 381 (3d Cir. 1966) (holding that the "extreme broadness" and the "lack of utility" of Plaintiff's requests served as harassment); *Balistrieri v. Holtzman*, 52 F.R.D. 23, 25 (D. Wis. 1971) (holding that certain requests would harass rather than lead to relevant evidence).

[2] Actually Plaintiffs contend 1998 should be the cut-off date. *See* Defs.' Ltr. p. 1.

then consider whether additional Rule 26 limitations on discovery apply." *During v. City Univ. of N.Y.*, 2006 U.S. Dist. LEXIS 53684 *7 (S.D.N.Y. 2006). Defs.' Disc. Ltr. p. 4 (Nov. 7, 2007) (hereinafter referred to as "Defs.' ltr"). However the Plaintiffs want to spin the issue, the real question before this Court is whether discovery limitations are appropriate in this case and if so, whether a 3-5 year "look-back" timeframe for discovery should be imposed.

Consistent with prior rulings of this Court, Defendants assert that materials predating 1998, or 1996 at the earliest, are nondiscoverable because they are not relevant to the claims presented in these consolidated cases and because Plaintiffs' requests for such materials are not calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26.

Defendants address and distill the Plaintiffs' six arguments from their letter into four parts: (1) the Federal Rules of Civil Procedure afford broad discovery rights; (2) under *Halberstam*,[3] activities and relationships of the Defendants during periods before 1996 are directly relevant to the claims asserted against them; (3) the 9/11 commission report supports broad unfettered discovery; and, (4) a U.S. Treasury press release supports Plaintiffs' need for discovery to "look" as far back as the 1980s. In response to Plaintiffs' contentions, Defendants incorporate by reference each of their arguments set forth in their initial letter.[4] Defendants further respond herein to Plaintiffs' arguments which have not already been briefed and expound for clarification purposes upon arguments from their initial letter.

## I.   PLAINTIFFS' REQUESTS PRE-DATING 1998 ARE NOT RELEVANT TO THEIR CLAIMS EVEN UNDER A BROAD INTERPRETATION OF RULE 26.

In their letter, Plaintiffs cite five cases for the lone proposition that Rule 26 is to be broadly construed. Upon review of these cases however, they are all distinguishable from the instant case because the parties resisting discovery in those cases raised only conclusory objections to relevance, or in the case of *Oppenheimer Fund v. Sanders*, the rules of discovery were not even at issue. 437 U.S. 340 (1978).[5] Although Rule 26 *is* broadly construed, pre-1998 documents should be held nondiscoverable as they are (1) not relevant; and (2) the burden of production upon the Defendants is too large.

---

[3]  705 F.2d 472 (D.C. Cir. 1982).

[4]  Those arguments are that merits discovery need not go beyond 1998, or at the earliest 1996 since (1) a 3-5 year "look-back" period for discovery is consistent with the requirements of Fed. R. Civ. P. 26, this Court's previous holdings, and Second Circuit case law; (2) in order to promote fairness and judicial efficiency in this vastly complex case, a limitation on discovery is appropriate; (3) a substantial amount of materials Plaintiffs seek vis-à-vis their first set of document production requests are *not* relevant, are too remote, and, even if some materials sought from the 1980s and early 1990s have some relevancy, they are so *minimally* relevant that the substantial burden on the Defendants to produce such materials outweighs the minimal benefit to the Plaintiffs; (4) there was substantial and notorious terrorist activity in the period 3-5 years before the 9/11 attacks, thus, Plaintiffs need not look back to the 1980s or 1990s for evidence, assuming it exists, to support their claims; and (5) if in the course of discovery, the Plaintiffs find specific evidence justifying an extension of the look-back period, this Court can always revisit the propriety of such a discovery limitation.

[5]  The question presented in *Oppenheimer*, was whether the defendants should bear the cost of identifying class members, not whether the imposition of a timeframe limitation on discovery was needed as in the instant case. 437 U.S. at 351. Moreover, as noted throughout Defs.' Ltr and *infra* Pt. I(A-B), Defendants can point to specific and nonconclusory reasons for raising their relevance challenge.

2

### A.    Plaintiffs Seek Non-Relevant And Remote Documents.

Although Plaintiffs argue that *Oppenheimer* affords them an unrestrained license to discover any materials they seek, the Supreme Court also explained, "[a]t the same time, 'discovery, like all matters of procedure, has ultimate and necessary boundaries.' Discovery of matters not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1)." *Id.* at 351-52 (internal citations omitted). Thus, when a party seeks discovery from well over twenty years ago, as in this case, Defendants' contention that "boundaries" are necessary is consistent with *Oppenheimer*. Further, as noted in Defs.' Ltr Pt. III (A): (1) because OBL did not issue his *fatwa* against the U.S. until 1996; (2) the CIA did not recognize OBL's "possible significance" prior to his issuance of the 1996 fatwa; and (3) the outlines of what would become the 9/11 plot were not even discussed until 1996 when Khalid Sheikh Mohammed met with OBL in Tora Bora, no person or entity (much less the defendants) could possibly be "on notice" of Al Qaida's intention to direct its efforts toward the United States. Consequently, discovery of materials pre-1996 are not reasonably calculated to lead to the discovery of admissible evidence. *Id.*

With respect to Plaintiffs' cases *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984) and *Daval Steel Products, Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991), like *Oppenheimer*, neither of these cases dealt with a proposed limitation on discovery. In fact, they acknowledge that discovery requests may be stricken or limited on the basis of irrelevance. *See Compagnie*, 105 F.R.D. at 42 (acknowledging that lengthy interrogatories have been stricken on the basis of irrelevance); *see also Daval*, 951 F.2d at 1367 ("[p]arties may obtain discovery regarding any matter, not privileged, which is *relevant* to the subject matter…if the information sought appears reasonably calculated to lead to the discovery of admissible evidence") (emphasis added).

Plaintiffs' reliance upon *Rivera v. Goord*, is also problematic because the party opposing discovery in that case simply objected to the relevance of discovery in general. 2007 U.S. Dist. LEXIS 24153, *3-4 (N.D.N.Y. 2007). Here, Defendants seek to impose a very specific limitation that arises from the Court's own statements about what the Plaintiffs must show in order to prove their cases. *See In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 551 (S.D.N.Y. 2005) (finding an Egyptian publication Plaintiffs sought to supplement into the record against Princes Naif and Salman as problematic because "it simply does not say that the Princes were *put on notice* regarding specific charities and that they continued to contribute to those charities with the intent that their donations would assist al Qaeda") (emphasis added). The court further added, "[I]n order to be liable for acting in concert with the primary tortfeasor under either [conspiracy or aiding and abetting] theor[ies], the defendant must know the wrongful nature of the primary actor's conduct." *id.* at 554 n. 10; *see also In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005) ("In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda."). Thus, unlike the general objections made in *Rivera*, the year OBL issued his fatwa (1996) is a precise and legally sound basis for determining that acts preceding 1996 are not relevant to the claims or defenses in this case. *See Defs.' Ltr, Pt. III (A)* (regarding Defendants inability to be "On Notice" of Al Qaeda's terrorist activities against America until 1996).

**B.      Burden upon Defendants.**

Even if this Court is unwilling to impose a timeframe limitation based on relevance grounds alone, this Court may still find that the evidence sought before 1996 is so tenuously and remotely relevant that a limitation may fairly and reasonably be imposed on the basis of burden to the Defendants.  Additionally, if discovery remains unlimited in this case, it could easily become a tool for harassment, i.e., a "shakedown" tool.  *See supra* p. 1 (quoting *Oppenheimer*, 437 U.S. 340, 353 (1978).

As discussed throughout Defs' Ltr. , the discovery sought by Plaintiffs is burdensome, not merely due to the voluminous nature of the requests, but also due to the inaccessible nature of the documents, making production either impossible or prohibitively costly.

*1.      Voluminous nature of the requests.*

Defendants emphatically resist pre-1988 discovery citing the voluminous nature of Plaintiffs' requests.  For example, the Plaintiffs propounded 107 document requests upon Defendant IIRO (*see* Ex. C), 74 requests upon Defendant Wael Jelaidan (Ex. D), and 89 requests upon Defendant MWL.  When all of the subparts to these requests are included in the count, the total number of requests rises even higher.  Then the requests are compounded even further by the inclusion of Appendices attached to the back of each document request.  These attachments consist of names of individuals and entities.  Unbelievingly, after the Defendants respond to Plaintiffs' requests on behalf of themselves, Plaintiffs ask Defendants to then answer the request again as to each of the entities and individuals noted in their Appendices.  By the addition of these Appendices, the total requests for IIRO, for example, is increased by an additional 602 distinct requests.

On top of the vast amount of requests, Plaintiffs also ask the Defendants to produce documents as far back as the early 80s.  Clearly boundaries in this case must be imposed. Defendants submit 1998 or 1996 at the earliest is the appropriate timeframe.

*2.      Inaccessibility of documents.*

Defendant IIRO has already advised the Plaintiffs (in its supplement document production responses) that there are no indexes or electronic databases that detail/describe or catalogue the documents and materials sought pursuant to Plaintiffs document requests.[6]  IIRO does, however, have a master General Ledger located in Jeddah that *may* go back as far as 1996. This Ledger, however, is *not* in electronic format and contains somewhere between 2000-3000 entries for each particular year.[7]  In many cases an entry in the General Ledger would relate to documents that range from 20 to over 100 or more pages in length. Therefore the General Ledger's entries for a given year would represent over two hundred thousand pages.  *See* Ex. A

---

[6] *See* Def. IIRO Supp. Resp. to Consol. Pls.' Supp. Document Requests (June 22, 2006) (attached hereto as Ex.A.

[7] It is important to note that while Defendant IIRO may use computers, they do so for word processing and not for records storage.  As such, IIRO treats only hard copies of documents as official records.

4

Given that most of the documents Plaintiffs seek are located worldwide, in field offices, warehouses, banks, and even within the unrecoverable files of defunct organizations, production of responsive documents may be an insurmountable task. In addition, the nature of Plaintiffs' international conspiracy claims makes discovery in this case potentially boundless. By imposing a timeframe limitation, this Court will place a temporal perimeter around the Plaintiffs' discovery requests and enable Defendants to respond. As already identified by Defs.' Ltr. , the cost of copying and reviewing the IIRO warehouse in Jeddah alone would be over $3,000,000.00. *See* $3 million estimate attached to Defs.' Ltr as Ex. C.

Defendants finally seek this timeframe limitation to protect them from possible harassment. When discovery requests are extremely broad and minimally relevant, an inference of harassment may arise. *United States v. Howard*, 360 F.2d 373, 381 (3d Cir. 1966) (holding that the "extreme broadness" and the "lack of utility" of Plaintiff's requests served as harassment); *see also Oppenheimer Fund v. Sanders*, 437 U.S. 340, 353 (1978) ("discovery should be denied when a party's aim is to...embarrass or harass the person from whom he seeks discovery"); *Balistrieri v. Holtzman*, 52 F.R.D. 23, 25 (D. Wis. 1971) (holding that certain requests would harass rather than lead to relevant evidence). An inference that Plaintiffs' discovery requests were intended to harass the Defendants is supported by the fact that the Plaintiffs have consistently refused to inspect the Defendants' (IIRO and MWL) home and field offices, even though many of these offices have been offered to the Plaintiffs for inspection.[8]

Given the conclusory nature of the Plaintiffs' complaints and the fact that the Plaintiffs' discovery production has consisted almost entirely of newspaper articles, web pages and press releases, Defendants ask this Court to seriously consider the potential for abuse of discovery in this case and impose a 3-5 year "look-back" period.

## II.   PLAINTIFFS' RELIANCE UPON *HALBERSTAM v. WELCH* IS MISPLACED AS TO THE INSTANT DISCOVERY DISPUTE

Plaintiffs cite to *Halberstam v. Welch*, 705 F.2d 472 (D.C Cir. 1982) on countless occasions, including their November 7th letter.[9] *Halberstam*, however, is not binding law upon this Court and from a factual standpoint, is wholly distinguishable from the instant case as it concerns the relationship between *two people* – a burglar and his girlfriend. *Id.* The fact that Judge Casey found *Halberstam* and *Boim* "instructive" when analyzing causation as to Prince Sultan and Prince Turki's motions to dismiss in *Terrorist Attacks I*, does not *ipso facto* obligate this Court to follow *Halberstam* when determining whether to impose a 3-5 year "look-back" period for discovery.

---

[8] Plaintiffs have neither accepted Def. IIRO's offer to have its records custodian be deposed

[9] *See, e.g.*, Pls.' Consol. Mem. in Opp. to Mot. to Dismiss Filed by Al Shamal Islamic Bank; Pl. Ashton's Resp. to Wael Jelaidan's First Set of Requests for Admissions; Pl. Burnett Responses to MWL's First Set of Requests for Admissions; Pl. Burnett's Response to Wael Jelaidan's First Set of Requests for Admissions; Pl. Federal Ins. Responses to Wael Jelaidan's First Set of Interrogatories; Pl. Federal Ins. Responses to Wael Jelaidan's First Set of Requests for Production of Documents; Pl. Burnett Responses to Wael Jelaidan's First Set of Interrogatories; Pls.' Ltr. (Nov. 7, 2007).

Nevertheless, Plaintiffs cite to *Halberstam* in support of their claim that discovery must look as far back as the early 1980s so that under *Halberstam's* six factor analysis, they can establish a "critical factor" – *duration of the assistance provided.* Pls.' Ltr. pp. 5-6. Plaintiffs suggest that because the D.C. Circuit took into consideration "the length of time two parties work closely together" and "the length of time an alleged aider/abetter has been involved with the tortfeasor" when it applied its six-factor analysis to the inapposite facts therein, the Plaintiffs' in *this* case are entitled to twenty-plus years of discovery.

The D.C. Circuit did not intend *Halberstam* to be the "perfect guideline" Plaintiffs' consistent references suggest it is, to wit:

> "We recognize that the elements of either theory [conspiracy and aiding and abetting] are not perfect guides in this search. We expect that they will not be accepted as immutable components but that they will be adapted as new cases test their usefulness in evaluating vicarious liability. Tort law is not, at this juncture [1982] sufficiently well developed or refined to provide immediate answers to all the serious questions of legal responsibility and corrective justice. It has to be worked over to produce answers to questions raised by cases such as this. Precedent, except in the securities area, is largely confined to isolated acts of adolescents in rural society." 705 F.2d at 489.

Interestingly enough, even if *Halberstam's* "duration of the relationship" factor was applied here, the D.C. Circuit found that **five-years** was enough time to establish that a "long term" relationship existed between the tortfeasors. *Id.* at 487-88. In other words, despite Plaintiffs' contention that they need pre-1996 discovery in order to prove a "long term relationship" between the Defendants and "the responsible terrorist organization and related parties," (so they can then prove their ATA claims), *Halberstam* clearly shows that a "long period of time," in terms of satisfying its aiding and abetting factors, can easily be established within a **five year** period.[10]

In sum, Defendants' proposed discovery limitation (3-5 years) is reasonable and will not prejudice the Plaintiffs even under *Halberstam.* Accordingly, Defendants' 3-5 year "look-back" timeframe for discovery should be imposed in this case.

## III.   THE 9/11 COMMISSION REPORT ACTUALLY SERVES TO DISCREDIT PLAINTIFFS' CONTENTIONS AND HAS VARYING DEGREES OF RELIABILITY.

Plaintiffs' letter relies heavily (thirteen citations) upon the findings of the 9/11 Commission Report. Several of Plaintiffs' issues that were discussed in this Report were specifically rejected by this Court as insufficient to support Plaintiffs' factual allegations. For example, Plaintiffs submit that the 9/11 Report "embrace[s]" the Plaintiffs' allegation that "the "golden chain" is an internal al Qaida document, identifying al Qaida's most important financial

---

[10] Defendants in no way suggest that Plaintiffs can in fact satisfy *any* of *Halberstem's* aiding and abetting factors but merely identify the fact that 20+ years are not necessary to satisfy the factors.

benefactors, and the individuals responsible for coordinating their contributions to al Qaida." *See Pls.' Ltr. at* pp. 7-12. Plaintiffs blatantly disregard, however, the fact that Judge Casey has twice discredited the Golden Chain. *See Terrorist Attacks I,* 349 F. Supp. 2d 765, 817 (S.D.N.Y. 2005) (stating it was "a document with serious foundational flaws."); Judge Casey further described the Golden Chain as one "with no indication who wrote the list, when it was written, or for what purpose" and declined to "make the logical leap that the document is a list of al Qaeda supporters." *Id.; see also In re Terrorist Attacks III,* 464 F. Supp. 2d 335, 341 (S.D.N.Y. 2006) (affirming that "the so-called Golden Chain documents does not, on its own, provide grounds to sustain the claims in this case.)

Unlike the 9/11 Report, Judge Casey's holdings were and still are binding upon the Plaintiffs. Moreover, Judge Casey is not alone in rejecting the Golden Chain. Judge Conlon from the U.S. District Court for the Northern District of Illinois also rejected the Golden Chain as inadmissible hearsay. *See U.S. v. Arnaout,* No. 02 CR 892, 2003 WL 255226, at 1-2 (N.D. Ill. Feb. 4, 2003). Finally, Plaintiffs' so-called terrorism expert Jean-Charles Brisard, who launched the Golden Chain, has been totally discredited. *See* Witness Statement of Jean-Charles Brisard (attached hereto as Ex.B).

The fact that Plaintiffs still rely on a 2004 government report, over the law of the case in the current litigation, is quite telling indeed. When the issue of "relevance" is factored in, the 9/11 Report does not establish that a pre-1996 period is relevant to Plaintiffs' discovery needs.

### A.    Plaintiffs' 1988 Proposal Is Not Supported By the 9/11 Commission Report.

As to Plaintiffs' claim that it is "uncontested fact[]" that al Qaeda began its specific anti-American agenda in 1988, Plaintiffs' complaints, including the *Federal Insurance* First Amended Complaint, make only generic allegations regarding the timeline of relations between defendants MWL and IIRO and al Qaeda and Osama bin Laden, claiming that defendant MWL was closely affiliated with OBL since "the 1980s" and that IIRO had established involvement with Al Qaeda "during the early 1990s." *See e.g.,* FAC ¶¶ 117-118. Now, when trying to counter Defendants' request for a 3-5 year "look-back" period for discovery, Plaintiffs pluck new dates from the pages of the 9/11 Report, notwithstanding the Report's varying degrees of reliability.

To illustrate, Plaintiffs now allege that OBL began his direct and targeted campaign of *jihad* against the *United States* as early as 1988.[11] Pls.' Ltr. at Pt. II (C). In support of this novel proposition, Plaintiffs put a significant amount of weight on the 9/11 Report's reference to the beginnings of al Qaeda in the 1980s, specifically 1988, after the Afghan triumph over Russian encroachment. *See* Pls' ltr. at pp. 6-9; *see also 9/11 Report* at pp. 55-56. This triumph was due

---

[11]    This Court should know that upon review of each Plaintiffs' complaint allegations against the Defendants, the only complaints that mentioned 1988 were Plaintiff Ashton's at ¶ 373 and Plaintiff O'Neill's at ¶ 105. Even then, both complaints refer to 1988 as the year Rabita Trust (a separate defendant altogether) was founded. There is no allegation in Plaintiffs complaints' against the instant Defendants that remotely suggests that because "OBL began his direct and targeted campaign of *jihad* against the *United States* as early as 1988" that the instant Defendants were "on notice" or otherwise had "knowledge" that their alleged "assistance" to al Qeda would be used for the purpose of *jihad* against the U.S. as early as 1988.

in large part to the efforts of the *mujahedeen* which, of course, was funded by the United States Government. .

While the 9/11 Report cites to an 1988 Arabic article penned by Abdullah Azzam, the alleged founder of Al Qaeda al Sulbah (the "strong foundation"), as well as a series of documents named "Tareekh al Usama" and "Tareekh al Musadat" (History of Osama and History of the Services Bureau, respectively), no where does the 9/11 Commission Report declare that OBL or al Qaeda founded their organization at that time (1998) for the express purpose of *jihad* against the United States. Instead, the Report reads:

> "They established what they called a base or foundation (al Qaeda) as a *potential general headquarters for future jihad*."

9/11 Report at 56 (emphasis added).

Even if this Court were to consider Plaintiffs' relevance argument, allegedly supported in large part by the 9/11 Report, the only thing that can be said about the year 1988 is that the idea behind al Qaeda, as a general centralizing force for unstated *future jihad*, was formulated at that time.

**B.**     **The 1992 *Fatwa* Does Not Establish Relevance.**

As to Plaintiffs claim that OBL and other al Qaeda leaders issued their first public *fatwa* against the United States in 1992" (Pls.' Ltr at 8) when the actual language of the 9/11 Report is reviewed, one finds that the Commissions findings state:

> "In early 1992, the al Qaeda leadership issued a fatwa calling for *jihad against Western 'occupation' of Islamic lands*."

9/11 Report at 59 (emphasis added).

While the 9/11 Report reads that the 1992 fatwa "[s]pecifically singl[ed] out U.S. forces for attack," (*id.*), it is clear that the *fatwa* was still, at that time, directed internationally, at "Western" troops *abroad*. There is no reasonable or logical way to infer that this sort of language could put any charity or other person on notice that the next intended target was the United States territory *proper*. Instead, the most reasonable interpretation of this language is that it was a reaction to the 1991-1992 Persian Gulf War, where the United States and other Western and global allies set up bases in the Kingdom of Saudi Arabia for the purposes of freeing Kuwait from Iraqi hands. Therefore, the 1992 *fatwa* could have as easily been directed at British, Israeli, or other foreign troops abroad. And, while the 1992 fatwa did single U.S. forces for attack, that language is focused on *U.S. military agents abroad*, not civilians or the United States territory here at home.

Thus, Plaintiffs interpretation of the findings of the 9/11 Commission overlooks the fact that, (as previously stated by Defendants, Plaintiffs and this Court), the first *public fatwa, targeting the United States as a territory in particular* was in 1996. A true reading of the 9/11 Report actually cuts *against* Plaintiffs' arguments that a pre-1996 look-back period is required.

**IV.  A TREASURY DEPARTMENT "PRESS RELEASE" CANNOT JUSTIFY PLAINTIFFS DEMAND FOR 20-YEARS OF DISCOVERY HEREIN.**

In addition to relying upon the 9/11 Commission Report, Plaintiffs quote a Treasury Department Press Release in support of their "relevance" contentions.  Pls.' Ltr. at 10. Specifically, Plaintiffs quote that "the Philippine branches of the IIRO were founded sometime in the late 1980's or early 1990's by Muhammad Jamal Khalifa, who is Usama bin Laden's brother-in-law."  The press release also states, "Khalifa maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Jelaidan."  Despite Plaintiffs' belief that mere memberships and associations are sufficient to establish liability in this case, they fail to note how association or even membership in al Qaida during the late 1980's or early 1990's is *relevant* (in terms of discovery) to al Qaida's *later* jihad *against the United States.*

In effect, Plaintiffs seek to proceed on a theory of guilt by association.  However, guilt by association cannot be established unless that association or membership was with the knowledge that the organization was engaged in, or intended to engage in the acts on which liability is based.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 (1982) (stating that guilt by association requires "evidence that the association possessed unlawful aims").  Thus, Plaintiffs' "guilt by association" theory is only relevant if the Plaintiffs' pleadings demonstrate that during the late 1980's and early 1990's, al Qaida was engaged in a *jihad* against the United States. Their pleadings do not demonstrate this.  Moreover, despite Plaintiffs' attempt to twist the language of the 9/11 Commission Report by claiming that al Qaida was formed "for waging a *global* jihad," the Commission has stated only that al Qaida was formed "as a potential general headquarters for future jihad."  9/11 Report at 56.

**V.  CONCLUSION**

As discussed at length above, the burden on the Defendants in this case is severe.  Other defendants have been given similar time limitations in this case.  *See* J. Maas Ord. (June 26, 2006) (ordering a 6 year look back period for jurisdictional discovery).  Furthermore, the risk of permitting Plaintiffs to engage in a fishing expedition at Defendants' cost is reason enough for this Court to exercise its discretion by imposing the Defendants proposed timeframe limitation.

Respectfully submitted,

Martin F. McMahon, Esq.

cc: Judge Maas

9

# **<u>EXHIBIT E</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN RE: TERRORIST ATTACKS ON                                      <u>ORDER</u>
SEPTEMBER 11, 2001                                               03 MDL 1570 (GBD)

-------------------------------------------------------------x

GEORGE B. DANIELS, District Judge:

      The <u>Federal Insurance</u>, <u>Burnett</u>, <u>Ashton</u> and <u>O'Neill</u> plaintiffs seek discovery of the

activities and relationship of the defendants as far back as 1988.  They request that the Court

strike the global objections, by defendants Muslim World League, International Islamic Relief

Organization and Wa'el Jelaidan, to any discovery prior to 1996.

      Plaintiffs maintain that discovery, pertaining to years prior to 1996, is directly relevant to

their claims that those defendants aided and abetted, conspired with, and materially supported al

Qaeda after it "was established in 1988 or earlier." Defendants contend that matters pre-dating

1998, or at the earliest 1996, are irrelevant because defendants were not put on notice of al

Qaeda's terrorist activities towards the United States until Osama bin Laden's 1996 fatwah

declaring war on Americans.  Defendants further argue that the discovery sought is overly

burdensome and outweighs any minimal benefit to plaintiffs.

      Given the nature of the claims and defenses, the appropriate temporal scope of discovery

should reasonably begin in 1992.  1992 is the year prior to the 1993 attacks against the United

States, and the year when it is alleged that Osama bin Laden and other senior al Qaeda leadership

issued a formal fatwah, specifically calling for jihad against the United States and other Western

allies.  If, after receipt and review of such discovery, plaintiffs can demonstrate that further pre-

1992 discovery is warranted, such an application may be made to the Court, upon a specific

showing of relevance as to a particular issue and defendant.

The objections asserted by these defendants to all pre-1996 discovery are hereby struck, to the extent that the defendants are directed to respond to plaintiffs' requests for discovery relating back to the period beginning in 1992.

Dated: New York, New York
        December 21, 2007

SO ORDERED:

*George B. Daniel*
GEORGE B. DANIELS
United States District Judge