# EXHIBIT 14

1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2

3
----------------------------------------X
                                        :
4
IN RE:                                  : 03-MD-1570
                                        :
5
 TERRORIST ATTACKS ON SEPTEMBER 11, 2001 : 500 Pearl Street
                                        : New York, New York
6
                                        :
                                        : July 13, 2011
7
----------------------------------------X

8

9
            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
               BEFORE THE HONORABLE FRANK MAAS
                UNITED STATES MAGISTRATE JUDGE

10
APPEARANCES:

11
For Federal Insurance:    SEAN P. CARTER, ESQ.

12
For Dubai Islamic Bank:   STEVEN COTTREAU, ESQ.

13
For Havlish:              TIM FLEMING, ESQ.

14
For Plaintiffs:           JAMES KREINDLER, ESQ.
15                        ROBERT T. HAEFELE, ESQ.
                          TIM FLEMING, ESQ.
16
For Defendants:           MARTIN F. McMAHON, ESQ.
17                        ALAN KABAT, ESQ.

18

19

20

21
Court Transcriber:        MARY GRECO
                          TypeWrite Word Processing Service
22                        211 N. Milton Road
                          Saratoga Springs, NY 12866
23

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1          THE CLERK:  This is a conference in the matter of The

2    Terrorist Attacks of September 11, 2001.  Counsel, please state

3    your name for the record.

4          THE COURT:  Well, I think like Judge Daniels we won't

5       put all the appearances on the record but anybody who

6       speaks should note their appearance.

7          While we were off the record I checked with my

8    chambers.  What I propose is rather than having two conferences

9    in September that we use the September 9th date and not the

10   other date that was suggested.  Then let me give you a series

11   of dates, all of which will be at 2 p.m.; October 19th,

12   November 16th, and we'll put this in an order, December 14th,

13   January 11th, and February 15th.

14         Obviously, as in the past, if we need to cancel some

15   of the, or can cancel some of those dates and we need to adjust

16   others, we'll do that.

17         There was the issue that Judge Daniels raised of the

18   inquest hearing and so I guess the question is when is Federal

19   Insurance in a position to file its papers?

20         MR. HAEFELE:  Your Honor, before we begin, may I have

21   one clarification on the September 9th date, the --

22         THE COURT:  The time?

23         MR. HAEFELE:  -- time was at 11 o'clock and are you

24   saying it's now moved to 2?

25         THE COURT:  No, I'm not moving the time.  Whatever

3

1  time it was, it is.

2           MR. HAEFELE:  Okay.  Thank you.

3           THE COURT:  All the others will be at 2 p.m.  I'm

4  sorry if I didn't make that clear.

5           MR. CARTER:  Your Honor, we had previously I think

6  back in --

7           THE COURT:  Just tell us --

8           MR. CARTER:  Oh, I'm sorry.  Sean Carter on behalf of

9  the Federal Insurance plaintiffs.

10          THE COURT:  And I should have done the same thing to

11 Mr. Haefele when he made his comment.  Go on.

12          MR. CARTER:  We had in fact previously filed a brief

13 with supporting affidavits in support of the request for an

14 assessment of damages on behalf of the clients back in I

15 believe 2006 or so.

16          THE COURT:  Which contains the damages case?

17          MR. CARTER:  Yeah.  They contain affidavits from

18 representatives of the relevant insurers who explained the

19 basis for the calculation of damages, how their companies went

20 about calculating the loss suffered by their insureds, how they

21 came up with the particular damage figures that they're

22 claiming in the suit.  The brief also includes legal argument

23 regarding the relevant standard for evaluating damages under

24 the Anti-Terrorism Act.

25          So assuming that evidence is acceptable to Your Honor

4

1    and there's also a discussion in the brief about it being

2    competent for purposes of a default damages inquest, we can go

3    forward right now.

4         If Your Honor believes that witness testimony is

5    necessary, we can do it in short order.  It's just a matter of

6    me checking schedules.

7         THE COURT:  Well, typically I hear inquests and

8    obviously this is not a typical case, but typically I prefer to

9    do it on the papers if there's no particular reason to have an

10   evidentiary hearing.  So what I'd ask is that you send me a

11   courtesy copy of the papers and I think you can proceed unless

12   you hear otherwise on the assumption that I will consider it on

13   the papers.  I don't know what the status was of deadlines for

14   any opposition papers when those papers were filed.  So it

15   seems to me it's probably appropriate to say that any

16   opposition papers should be filed by July 29th.

17        MR. CARTER:  Your Honor, Sean Carter again.  In

18   relation to the original filing there were letter submissions

19   made by the defendants' executive committee opposing the

20   request for entry of a monetary default.  That played out again

21   in relation to the submissions for this agenda.

22        Our view is that the defendants' executive committee

23   by virtue of limitations on its own authority doesn't have the

24   capacity to raise substantive arguments and that the kind of

25   individual inquiry that would be necessary to determine whether

5

1  a defendant has standing or a valid claim of prejudice can't be

2  done based on a filing by the defendants' executive committee.

3  It has to come from a defendant.

4      THE COURT:  Well, let me interrupt you just because I

5  think that issue really is one for Judge Daniels to resolve.

6  As I interpret -- well, maybe not.  I thought the opposition

7  that was filed by the defendants was this is not the time to do

8  this for various reasons like the potential for contribution

9  and the like.  Unless the opposition related to well the number

10 you suggest is wrong or there's no evidentiary basis, I'm not

11 sure that there's an issue for me to resolve.  My role in this

12 is essentially an accounting exercise of sorts.  I'm minimizing

13 it but it's basically come up with a number which is justified

14 by the law and the facts, in my view.  Whether that judgment

15 should be entered, whether somebody has standing to object to

16 that number is really Judge Daniels' problem in my view.  I'm

17 not sure whether that responds to what you were saying fully.

18     MR. CARTER:  It does, Your Honor.  Then I think the

19 concern I raised is not properly before you and unnecessary.

20     THE COURT:  There was also, I gather, the suggestion

21 from Judge Daniels that perhaps other non-Federal Insurance

22 plaintiffs could participate on the plaintiffs' side in this

23 process.

24     MR. CARTER:  Your Honor, I think our discussion on

25 that point merged two issues.  I believe the Havlish plaintiffs

6

1    were essentially asking for an inquest on damages relative to

2    the default judgment they're pursuing against Iran.

3              THE COURT:  Okay.

4              MR. CARTER:  And with regard to that, I think what we

5    would say is that with regard to Iran there is first the

6    necessity of the entry of a default judgment as to liability

7    which under the Foreign Sovereign Immunities Act require some

8    inquiry into whether there's a prima facie case against the

9    defaulting sovereign to support the claims at issue.

10             THE COURT:  Which is the issue that is before Judge –

11   – will shortly be before Judge Daniels.

12             MR. CARTER:  It's before Judge Daniels with what was

13   referred to today as a box of documents.

14             THE COURT:  Right.

15             MR. CARTER:  And for the reason I alluded to earlier,

16   we really do think these other assets are subject to, you know,

17   very vulnerable to attack by other parties.  You know, I prefer

18   to avoid waiting on that process to play out and Havlish to do

19   this inquest with regard to Federal's essentially liquidated

20   damages as to Al Qaeda.  And I'm happy to raise that issue with

21   Havlish and see if we can reach agreement on it.  I spoke to

22   one of Mr. Fleming's co-counsel earlier this week and I think

23   we're on the same page that these really were sort of discrete

24   issues.

25             THE COURT:  Well, discrete or not, if you're correct

7

1  that a liability finding or judgment necessarily must be

2  entered first then even if it's the same issue it's on two

3  different tracks.  I've set a track for yours.  I don't know

4  how long it will take Judge Daniels to deal with the Havlish

5  motion but unless at some point there's at least the

6  opportunity for the two hearings to be on the same track,

7  there's really nothing for me to resolve in that area.

8          MR. CARTER:  Thank you, Your Honor.

9          MR. COTTREAU:  Your Honor, just one quick point.

10 Steve Cottreau for --

11         THE COURT:  Yes.

12         MR. COTTREAU:  -- Dubai Islamic Bank.  Can we just

13 get clarification as to whether the filings of the plaintiffs

14 made reference to in 2006 regarding damages was filed under

15 seal or whether that's a public filing?

16         MR. CARTER:  Your Honor, it's a public filing and in

17 fact the copies, the courtesy copies of those documents were

18 circulated to counsel in relation to the agenda submissions and

19 the briefing as to whether or not Judge Daniels should proceed

20 with the Al Qaeda default, but I'm happy to re-circulate them.

21 And obviously they'll be re-circulated at the time we submit

22 the courtesy copies.

23         THE COURT:  How extensive are the materials just out

24 of curiosity?

25         MR. CARTER:  They're not particularly extensive, Your

8

1    Honor, and the reason for that is that the Anti-Terrorism Act

2    contains language which entitles the party injured as a result

3    of a terrorist attack as a result of an injury to their

4    business or property to recover for that injury and that

5    language, that statutory language has always been interpreted

6    to mean a loss of money.  And as a result, the argument is what

7    the insurance company paid is what they're entitled to recover

8    under the Anti-Terrorism Act and it doesn't take much really to

9    authenticate that amount.

10            THE COURT:  And there are no DEF claims in there,

11    it's just property?

12            MR. CARTER:  It's property/business interruption.

13            THE COURT:  Okay.

14            MR. KREINDLER:  Your Honor, just --

15            THE COURT:  Yes.  Sure.

16            MR. KREINDLER:  -- an idea again, while we're --

17            THE COURT:  Yes, Mr. Kreindler.

18            MR. KREINDLER:  Thank you.  While we're together and

19    thinking out loud, if the nature of the defendants' objectives

20    is to the amount for fear that, you know, a huge number could

21    prejudice them at some later time, perhaps there would be a

22    solution since what we're looking at are these frozen sums that

23    are a drop in the bucket where they simply just say pick a

24    modest number and say we do not object to whatever, $50

25    million, $100 million, that could simplify the process a bit

9

1   perhaps since the frozen assets can't pay the Federal number or
2   anything close to it.
3           THE COURT:  But are the Federal Insurance plaintiffs
4   prejudiced if their claim, and I don't know what the real
5   numbers are, if their real claim is $500 million and there's a
6   stipulation that nobody objects to entry of $50 million, does
7   that affect potentially judgments against --
8           MR. KREINDLER:  Well, yeah --
9           THE COURT:  -- in the Federal Insurance case against
10  other defendants?
11          MR. CARTER:  Your Honor, if I may, you know, the way
12  that we read the law is that this particular default judgment
13  would be binding only as to Al Qaeda and we would stipulate to
14  that that it's for purposes solely of a judgment as to Al Qaeda
15  and the amount of damages properly claimed against any other
16  party would be subject to proceedings as to that party.  That
17  would be a two-way street.  You know, if we were seeking a
18  greater number under some theory then we would have an
19  opportunity but at the same time they'd have an opportunity to
20  object.  And we're willing to stipulate to that.
21          THE COURT:  And I think I would still have to make a
22  finding that the damages are at least whatever that stipulated
23  number is but certainly it would truncate the process so I
24  certainly would encourage the two sides to see whether there's
25  some resolution that can be, or accommodation that could be

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 07/21/17 Page 11 of 44

10

1   reached in that regard failing which I'll just proceed on the

2   schedule I outlined earlier.

3           MR. KREINDLER:  Great.

4           MR. CARTER:  Thank you, Your Honor.

5           THE COURT:  Anything else with respect to that issue?

6           Then I think the only discovery issue that's before

7   me, and I'm probably -- well, I'll use the anglicized name, the

8   Pete Seda application, and one of the things that perplexes me

9   is I've asked from time to time are there any discovery issues

10  hanging out there.  There was the motion for the stay that

11  apparently was filed in January and quite frankly because

12  there's a lot of paperwork that flows through the docket sheet

13  in this MDL case I was not aware was an issue potentially for

14  me to deal with until sometime in June, even though it's been

15  kicking around since January.  So let me just ask you again.

16  At the moment, other than this one issue were there other

17  things that I should be dealing with?

18          MR. HAEFELE:  Your Honor, Robert Haefele from Motley

19  Rice.

20          THE COURT:  Yes.

21          MR. HAEFELE:  The other issue that was on the agenda,

22  another discovery issue, was the issue related to Muslim World

23  League and IIRO which I think was also on the agenda and it was

24  also the subject of a hearing last time we were here.  And in

25  terms of discovery disputes that are ripe for Your Honor's

Case 1:03-md-01570-GBD-SN Document 3829-4 Filed 12/01/17 Page 12 of 44

11

1    consideration, I think that lists them all.

2            THE COURT:  Okay.  Let's deal with -- tell me how to

3    pronounce the name.  Is it Perouz Sedaghaty?  Close enough?

4    And it's your application, Mr. Kabat.  It does seem to me that

5    there's a significant difference between many of the cases

6    frankly that both sides cite and this one in that here your

7    client has been convicted.  Putting aside whether the cases

8    deal with the same subject matter either in terms of the

9    pleadings or in terms of the proof, it seems to me that that

10   makes this a somewhat tougher case for you although I gather a

11   new trial motion is pending.

12           MR. KABAT:  Yes, it is.

13           THE COURT:  And as I read the case law, it's purely a

14   matter of discretion and different judges would reach different

15   conclusions at different times based on different factual

16   scenarios.  So I have read the original motion.  I've read the

17   letters back and forth.  I only found one case when I was

18   briefly looking at the issue over the past few days where the

19   circumstance was that the defendant had been convicted and in

20   that case, which is General Dynamics v. Selb Manufacturing Co.,

21   an Eighth Circuit case, 481 F.2d 1204, the facts as recited by

22   the Eighth Circuit were that both Selb and a codefendant had

23   been convicted of conspiring to defraud the US in connection

24   with contract fraud and neither Bass nor Selb attacked the

25   sufficiency of the evidence to support the finding of guilt on

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 07/24/17 Page 13 of 14

12

1    the conspiracy count.  And then I'm skipping some of the

2    language.  And the Court continues quote, "It is true that the

3    case was being appealed and to that extent the criminal

4    proceedings were not final. But the trial court also had to

5    weigh the injustice to General Dynamics. The net worth of Selb

6    and its affiliated companies, all solely owned by the

7    codefendant,  had been declining markedly.  The litigation had

8    been pending over two years.  Many employees of the companies

9    involved had departed.  With the passage of time the testimony

10   of witnesses would be lost," et cetera, et cetera.  And then

11   says, quote, "We believe the entire matter of discovery and

12   trial could have been handled in a manner which would have

13   comported with justice for both sides.  Answers to

14   interrogatories could have been sealed except for the use of

15   the parties and their counsel in the civil litigation."

16           And I said I know that there's a new trial motion

17   pending.  Is the theory of the new trial motion that it was

18   improper to introduce all the evidence about terrorist

19   connections rather than simply trying a tax fraud case or is

20   there more to it than that?

21           MR. KABAT:  Yes, Your Honor, if I may?  Alan Kabat,

22   and if I may speak to that.  We briefed why even though the

23   Oregon case was nominally a tax and conspiracy case, the

24   Government put on lots of evidence about an alleged terrorism

25   attempt which it used as a basis for liability against Mr. Seda

Case 1:03-md-01570-GBD-SN Document 3829-14 Filed 12/01/17 Page 14 of 44

13

1   in this case.  And there's even some of the same expert

2   witnesses in both cases.  But one overarching point I would

3   like to make before we even get into the similarities between

4   the two cases --

5          THE COURT:  Well, let me just ask a question.  Is the

6   new trial motion a motion which contests the sufficiency of the

7   evidence as to the attacks charge itself or is it just you

8   hopefully prejudiced us by allowing all of this stuff in?

9          MR. KABAT:  It's a little more complex than that.

10         THE COURT:  Okay.

11         MR. KABAT:  The primary issue is that the Government

12  failed to disclose that they had made substantial incentive

13  payment to certain Government witnesses.  They did not disclose

14  that to the defense counsel before the trial.

15         THE COURT:  Okay.  So that's a Brady issue but again,

16  it doesn't go to the sufficiency of the evidence.

17         MR. KABAT:  But a post trial motion also addressed

18  that as well as the failure to disclose, as well as the

19  prejudice [unintelligible] been covered in the post trial

20  motion.

21         THE COURT:  One thing I'd ask you to do is as soon as

22  possible, and I'll ask you how long it will take, to send me a

23  copy of the new trial motion papers.

24         MR. KABAT:  From the Oregon case?

25         THE COURT:  Yes.  How long will it take to get me

14

1   that?

2           MR. KABAT:  I'll do that when I get back to DC.

3           THE COURT:  Okay.  Fine.

4           MR. KABAT:  And if I may make one other comment?

5           THE COURT:  Sure.

6           MR. KABAT:  The protective order in the Oregon case

7   specifically prohibit Mr. Seda from turning over anything he

8   received from the Government that was seized by the Government

9   back in February '04.  Even we, civil defense counsel, do not

10  have access to those materials and the Court really cannot

11  order Mr. Seda violate the protective order by turning over

12  documents to the plaintiffs in this case.  The plaintiffs in

13  their reply brief said something to the effect of well, the

14  protective order only covered discovery that was put in by the

15  Government.  It doesn't cover what was obtained during the

16  search and seizure.  However, I have confirmed with the federal

17  public defender from Oregon who represents Mr. Seda that in

18  fact the protective order does cover everything that was seized

19  back in February of '04.  Mr. Seda has no documents other than

20  what was seized back then.  I mean Mr. Seda --

21          THE COURT:  Well, that potentially could be dealt

22  with through a modification of the order in Oregon.  For

23  example, it could provide that documents can be produced by the

24  defendant in that case and in this case here subject to

25  confidentiality order and that any documents which were used in

Case 1:03-md-01570-GBD-SN Document 3829-14 Filed 12/01/17 Page 16 of 44

15

1  court filings would be under seal.  I mean it seems to me that

2  if a Fifth Amendment issue is resolved then the potential of

3  prejudice to the defendant, the issue of prejudice to the

4  Government is much more easily dealt with.

5          MR. KABAT:  Well, the plaintiff wanted to file a

6  motion to intervene in the Oregon criminal case and seek a

7  modification of it, Mr. Seda's Oregon attorney can certainly

8  respond to that.

9          THE COURT:  Well, but I am interested in having

10 discovery moved forward.  I could simply call the magistrate

11 judge in Oregon and say this may not be a development you

12 thought of or anticipated.  Is there a problem modifying the

13 order.  He can then consult with the parties and the district

14 judge there.  And if it isn't, I don't know that the defendant

15 has a dog in that fight.  He has no interest in keeping those

16 documents confidential in the criminal case.  It's the

17 Government it seems to me that would have that interest.

18         MR. KABAT:  Well, but he also doesn't have the

19 constitutional issues under Hubbell, you know, and --

20         THE COURT:  You're talking about his Fifth Amendment?

21         MR. KABAT:  Yes.

22         THE COURT:  Sure.  That it seems to me is the more

23 central question before me.  I think I understand the issues.

24 Is there anything either side wishes to add with respect to the

25 application that's before me?

16

1          MR. HAEFELE:  Your Honor, this is Robert Haefele from

2  Motley Rice.

3          THE COURT:  Yes.

4          MR. HAEFELE:  I just want to make one clarification.

5  Or I'd like Your Honor to ask for clarification.  It's my

6  understanding that the documents that were seized, which

7  included not only physical paper documents but other items

8  including things like computers and hard drives and things

9  along those lines, were all returned to the defendant.

10          THE COURT:  I'm glad you made that point because that

11 was one of the things I wanted to ask.  Is that correct?

12          MR. KABAT:  Subject to the protective order.  That's

13 my understanding from the federal public defender.  And again,

14 we are not counsel in Oregon case and I have never seen those

15 documents that were seized and returned.  But I was

16 specifically told by the federal public defender that they are

17 under the protective order.

18          MR. HAEFELE:  Your Honor, they're --

19          THE COURT:  Well, he or she may not be the last word

20 on this subject.

21          MR. HAEFELE:  Right.  And I guess that's one of the

22 questions that I also had, Your Honor, is that under the

23 circumstances it would seem that when we made the request and

24 they identified those documents as something that was

25 responsive to the request that it was incumbent upon the

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 07/21/17 Page 18 of 34

17

1   defendant to go to the prosecution and ask them whether or not

2   it was covered.  And I would imagine at that point it would

3   cause the prosecution to stand up.  And I'm kind of curious as

4   to why there is no indication from the prosecutor's office in

5   this case that they had concerns over what we get as

6   representations from the defendant who obviously has an

7   interest.  Maybe not a proper interest, but an interest in

8   preventing us from getting the documents.

9             THE COURT:  Well, if I conclude, and I said Mr. Kabat

10  has an uphill fight, if I conclude that there's no reason any

11  longer for a stay based on Fifth Amendment grounds, then the

12  only other potential stumbling block is the Oregon magistrate

13  judge order and I don't see -- I guess I'll ask both sides

14  whether they see any problem with my in the first instance if I

15  get that far, calling the magistrate judge and saying would

16  this be a problem?  It's fine that the public defender has a

17  view but it seems it's more important what the view of the

18  court that issued the order is.

19            MR. HAEFELE:  Your Honor, I can tell you that, on

20  behalf of the plaintiffs, we don't have a problem.  Again,

21  Robert Haefele.  We don't have a problem with Your Honor making

22  that call.  But I would call Your Honor's attention to the fact

23  that the order specifically covers only discovery material and

24  there was a number of items that were trial items that we used

25  and those aren't under the purview of the order and those ought

18

1    to be produced.

2            THE COURT:  Mr. Kabat?

3            MR. KABAT:  Well, we did not have that for the trial

4    and I had asked the Oregon federal public defender and he said

5    he could not turn over the trial exhibits to me.

6            THE COURT:  Okay.  But the question is whether you

7    have a problem with my consulting with the magistrate judge in

8    Oregon.

9            MR. KABAT:  Well, I think it would perhaps be helpful

10   if I could have an opportunity just to give them a heads up,

11   you know.

12           THE COURT:  Sure.  I don't have a problem with that.

13   Okay.

14           MR. KABAT:  Would you like me to send you the Oregon

15   briefs first and then you can review that before making the

16   call?  I mean in terms of the timing it might be helpful if I

17   send you the post trial briefs.

18           THE COURT:  Oh, sure.  That's fine.  Yes.  I mean

19   until I deal with the -- if I decide the Fifth Amendment issue

20   in your favor then the rest of this is academic.  If I decided

21   against you then, or your client, then I need to go to the

22   second piece of this, the effect of the Oregon order.

23           MR. HAEFELE:  Your Honor, just one last comment.  I'm

24   not sure that it plays necessarily on the legalities of it but

25   it certainly I would think play into Your Honor's

Case 1:03-md-01570-GBD-SN   Document 3824-3   Filed 07/21/17   Page 21 of 44

19

1    considerations particularly in the circumstances that you have

2    discretion here.  It does call into question the fact that when

3    we have been over the course of this litigation pressing for

4    discovery deadlines that the defense counsel has pressed for

5    particular deadlines that are completely contrary to the notion

6    that discovery shouldn't be proceeding as to the defendant that

7    he's calling for a deadline for that discovery.

8            THE COURT:  I recognize there may be some tension

9    there.  I recognize that there are arguments that could be made

10   in terms of waiver or that a motion for a stay is not the same

11   as actually receiving a stay.  I don't just parenthetically

12   disagree with that.  But I prefer to deal with this on the

13   merits and reach some resolution and then move on one way or

14   the other.

15           So with that said, let me turn to the other issue,

16   the Muslim World League and IIRO.

17           MR. CARTER:  Your Honor, thank you.  Just to go back

18   and review where we were when we last met concerning this

19   issue, the Court had issued a directive to the Muslim World

20   League and IIRO to bring themselves into complete compliance

21   with the Court's earlier orders compelling certain discovery by

22   I believe it was the 8th of July.  And Mr. McMahon, on behalf

23   of his clients, represented at that time that they would in

24   fact be in compliance.  And in subsequent letters to the Court

25   has taken the position that they have produced all responsive

20

1   materials and conducted diligent searches to find all those

2   materials.

3           Per Your Honor's instruction, we did in fact have a

4   conference call with Mr. Radhi who has been appointed as the

5   person with primary responsibility for collecting the

6   responsive documents on behalf of both the Muslim World League

7   and IIRO.  Although Mr. Radhi was at one time employed by each

8   of those organizations for various terms --

9           THE COURT:  Spell Radhi just so the transcriber has

10  it.

11          MR. CARTER:  R-A-D-H-I.  At this point, and I think

12  going back about two years now Mr. Radhi is a retiree,

13  presently 65 years old, who is working on a purely volunteer

14  basis in relation to this effort and not being paid at all.  So

15  he's not an actual employee of either organization.

16          What we think the call primarily disclosed is that

17  there hasn't been any truly diligent inquiry or search to find

18  all of the potentially responsive documents.  I think there are

19  a few examples that sort of serve to flush that out.

20          Your Honor, among other things, ordered that the IIRO

21  produce all documents pertaining to the activities of an

22  individual named Mujil, M-U-J-I-L, who had been designated in

23  2006, well after this litigation was pending, by the United

24  States Government and the UN.  Mr. Mujil was at various times

25  the director of the eastern province branch of the IIRO within

Case 1:03-md-01570-GBD-SN Document 3829-13 Filed 07/21/17 Page 23 of 34

21

1  the Kingdom of Saudi Arabia.  That branch, at least until 2002,

2  had authority for directing and supervising certain IIRO

3  projects in, among other areas, the Philippines and Indonesia

4  which of course are primary areas of interest and concern in

5  this litigation, and we've gone through that a number of times.

6          As a result of that, one of the questions we asked

7  Mr. Radhi was whether or not someone had actually gone to the

8  eastern province branch and looked for any records, and the

9  answer to that was no.  The search has been constrained to a

10  warehouse facility and no inquiry has been made within the

11  eastern province branch as to whether there are any documents.

12  Mr. Radhi acknowledged to us that of course, as one would

13  expect, Mr. Mujil must have generated documents during the

14  course of his 18-year employment with the IIRO in the course of

15  his activities as the director and that it was of course

16  reasonable to expect that certain of those documents would have

17  been in the eastern branch, yet no one has gone there to look

18  for those documents.

19          Your Honor also directed that the IIRO produce

20  documents pertaining to the Philippine and Indonesian branches.

21  Along the similar lines, we asked Mr. Radhi whether anyone had

22  checked within those offices for any documents.  The Indonesian

23  office is, as we understand it from our conversation with him,

24  still operating.  The Philippine office was in operation as we

25  understand it until 2006 after discovery had commenced against

22

1   the IIRO and only closed after it was designated.  Apparently

2   no one has gone to the Philippine or Indonesian branches of the

3   IIRO to try and find any documents they may have.

4           As an aside, we were told very specifically that the

5   IIRO is a very centralized organization and the branch offices

6   can't do anything without getting the approval and providing

7   documentation to the headquarters.  So these documents in the

8   branch offices are by admission within the custody and control

9   of the IIRO of Saudi Arabia.

10          THE COURT:  When you say we were told, you're

11  referring to part of the conversation with Mr. Radhi or --

12          MR. CARTER:  Correct, Your Honor.  And also within

13  documents that had been produced concerning the internal

14  operating procedures particularly as they've existed post 9/11.

15          THE COURT:  Right.  I know you've made submissions to

16  me in the past.  That's why I was asking.

17          MR. CARTER:  Correct, correct.  The IIRO and Muslim

18  World League also have recently provided to Mr. McMahon sets of

19  banking documents that initially we were advised were printed

20  on dot matrix printers in long sort of streaming sheets.  And

21  we were told that the print was essentially very light and that

22  they couldn't be scanned or copied so that we would have to

23  come to Mr. McMahon's office to review them.  Given the

24  impracticality of trying to do any analysis of banking records

25  in someone else's office we asked whether or not they could in

23

1   fact simply be reprinted from whatever digital file generated

2   them in the first place and we were told that that would not be

3   possible because they were originals from the archive.

4           When we discussed these records -- one more point,

5   Your Honor.  These records relate to a period from 1995 through

6   I believe 2002.  When we discuss these records with Mr. Radhi,

7   what we were told was that they were in fact provided to the

8   IIRO and Muslim World League by their banks, Al Rajhi Bank and

9   National Commercial Bank, during any early stage of this

10  litigation and they've had them since that time.  Mr. Radhi

11  does not know whether those banks could regenerate those

12  printouts so that we would have our own copies because he

13  hasn't asked.

14          And in addition, although the Court orders directed

15  that we get banking materials from 1992 forward, Mr. Radhi has

16  never gone to them to ask whether or not they can generate

17  printouts from the period of 1992 through 1995 as directed by

18  this order.  So there hasn't even been an inquiry to that

19  effect.

20          In addition, Mr. Radhi confirmed that there were in

21  addition to the Al Rajhi and NCB Bank accounts --

22          THE COURT:  Just again for the record spell Al Rajhi.

23          MR. CARTER:  A-L, R-A-J-H-I.  In addition to the Al

24  Rajhi and National Commercial Bank bank accounts Mr. Radhi

25  confirmed that individual offices outside of Saudi Arabia would

24

1    of course have their own bank accounts locally.  In other

2    words, we don't have any of those bank statements whatsoever.

3           So in sum total, we felt that the phone call we had

4    with Mr. Radhi merely served to confirm that very little

5    effort, very little true effort, has been invested in actually

6    searching and confirming that all responsive materials have

7    been aggregated and produced.  And you know there have been

8    some very specific orders and frankly we've been at this effort

9    to try and obtain these particular documents for many years

10   now.  As Your Honor can probably appreciate, we're sort of

11   reaching the point of exhaustion.

12          THE COURT:  Mr. McMahon?  Apparently he's reached the

13   point of exhaustion also.  I know I asked him to mute his

14   phone.  Maybe it's taking a second.  Why don't you call him on

15   --

16          MR. McMAHON:  Hello?

17          THE COURT:  Oh.  I take it you heard everything that

18   Mr. Carter just said.  Okay?

19          MR. McMAHON:  Yes.  I'll try to take it the way Mr.

20   Carter presented it.

21          THE COURT:  Well, let me ask you a question at the

22   beginning because I think it was last time we spoke you said

23   that you had put off a trip to Saudi Arabia because you wanted

24   to make sure that some issues had been resolved before you went

25   there.  But then I seem to recall there was a letter that said

25

 1   there were insufficient funds for you to come to New York for

 2   this conference which suggested that perhaps there were not

 3   sufficient funds for you to go to Saudi Arabia.  So I'm trying

 4   to understand the extent to which you've actually been able to

 5   sit down face to face with the folks who ought to be producing

 6   the documents, Mr. Radhi and others.

 7            MR. McMAHON:  Yes, Your Honor, good question.  Mr.

 8   Radhi wants me to come to Saudi as does the head of IIRO and

 9   the head of MWL but there are no funds currently to take care

10   of that.  And unfortunately, Your Honor, what's coming up

11   shortly is Ramadan when things really shut down in Saudi

12   Arabia.  I'm hesitant to go over there during that time unless

13   I can get out of there maybe three days after it starts.

14            But yes, Your Honor, there's still a financial issue

15   about me getting over there.  However, because some people now

16   understand the severity of the situation, there are ongoing

17   attempts to get me some travel funds.  They just haven't come

18   in yet.  Again, I told IIRO's chief executive officer this

19   morning, Dr. Basha, that I can't do anything unless the funds

20   are here.  So yes, we have an ongoing funding issue.

21            THE COURT:  Okay.  I interrupted you by asking about

22   travel.  Why don't you go on to the other points?

23            MR. McMAHON:  Well, let me get something out of the

24   way, Your Honor, so that we can see something.  There is this

25   gap for the '92, '93, '94 banking records.  Now, what Samir

26

1  [Ph.] agreed to do, because the banks over there are getting

2  tired of producing stuff, is to get the '92, '93 and '94

3  banking records which with the records we have in our office,

4  '95 up, should be a complete production.

5          Now, I hesitated to -- we went out and tried to get a

6  copy of the Al Rajhi Bank records and everybody said they

7  couldn't do it.  So I invited Mr. Carter to come down and look

8  at the records here.  Maybe we could even work out something so

9  that we ship them by Federal Express so that he has the time to

10 look at it.  I certainly did not intend that somebody come down

11 here and say your hour is up by no means.  But maybe --

12         THE COURT:  Well, I'm missing something as to that.

13 Assuming that the bank can fill in the '92 to '94 gap, why

14 can't they also produce legible copies of '95 forward?

15         MR. McMAHON:  Well, Your Honor, Samir is going to try

16 to get to the bottom of that issue.  I only learned of it when

17 I started looking at it and said to Bethany, who works with me,

18 how are we going to produce this so that somebody can read it?

19 I think you can read it.  It's in Arabic of course, different

20 Arabic numbers.  You can read it but I'm hesitant to just spend

21 a sum of money copying something and then the copy version

22 comes out a lot more unreadable.  So that's why I was thinking

23 if Mr. Carter could send somebody down and look at it, let them

24 then decide what they can do.  I don't know anything else to

25 do, Your Honor.  But I certainly did not intend that somebody

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 07/24/17 Page 28 of 44

27

1   was going to come down here for an hour review and say that

2   your time is up.  In fact, if somebody comes down here, as long

3   as they sign the appropriate documents, they can take it back

4   to Philadelphia.  Samir's concern is that's the only copy they

5   have.

6           MR. CARTER:  Your Honor --

7           MR. McMAHON:  [Inaudible].

8           MR. CARTER:  Your Honor, Mr. Carter.  Just in

9   response to that, I think the concern that I expressed is a

10  little different than the one that Mr. McMahon is addressing.

11  The concern I expressed is that we asked whether or not another

12  version of this could be generated from a digital file.  We

13  were told no, that was impossible.  And when we then spoke to

14  Mr. Radhi, he told us it may very well be possible, he just

15  never checked.  And when we asked about the gap in the '92 to

16  '95 which were subject of Your Honor's order, he simply told us

17  he didn't appreciate that he needed to look for those.  He in

18  fact at some point during the call told us he was of the

19  understanding that Judge Casey had issued an order earlier in

20  this case that restricted discovery to the period of 1996 and

21  later.  And he seemed to have no appreciation for Judge

22  Daniels' rulings setting discovery at 1992.  So there is an

23  absolutely fundamental disconnect between what the Court has

24  directed and the effort that's ongoing in Saudi Arabia and

25  elsewhere to obtain responsive materials.

28

1          MR. McMAHON:  Mr. Carter, did I tell you that there's

2     no way you could get a digital file?  When did I do that?

3          MR. CARTER:  I'm sorry, someone was whispering, I

4     didn't --

5          THE COURT:  Yes.  Mr. McMahon was inquiring as to

6     whether it was he or somebody else who represented that there

7     was no way to get a digital version of the banking records.

8          MR. McMAHON:  In that case, Your Honor --

9          MR. CARTER:  Your Honor --

10         THE COURT:  Hang on.  You asked the question.  Let's

11    get an answer.

12         MR. CARTER:  On June 28, 2011, Your Honor, I sent an

13    email to Mr. McMahon in reference to these records and it read,

14    "Martin, is it possible to simply run the print job again.

15    Thanks, Sean."  And the response was, "Sean, no, these are

16    originals from the archives."  That's it.

17         MR. McMAHON:  I'm saying where did you say, you know,

18    check on the digital file?  Who told you that there was no

19    digital file?  That's what Mr. Al Radhi is checking out

20    currently in Saudi Arabia to see --

21         THE COURT:  Well, I think the key point here, Mr.

22    McMahon, is there's a fairly comprehensive set of discovery

23    requests and in terms of production this is sort of death by a

24    thousand paper cuts.  There's an obligation on the part of any

25    party to a lawsuit to produce documents within its possession,

1   custody or control and control extends to agents and every time

2   that the plaintiffs or the Court say well a particular item is

3   inadequate then somebody attempts to find that.  And certainly

4   not the only defendant where we've had this issue.  There's not

5   a comprehensive approach.  And if, for example, there is not

6   enough money to get you to Saudi Arabia without passing the

7   collection cup, that bodes poorly for the ability to send

8   somebody, Mr. Al Radhi or somebody else, to look through the

9   records of, at a minimum, the Indonesian branch.  Or even if

10   somebody doesn't go from Saudi Arabia to Indonesia for somebody

11   in Indonesia who's his counterpart to be looking for records,

12   putting aside the fact that I gather there were numerous

13   branches of these organizations.

14        So what's needed here is not chasing after particular

15   items highlighted by Mr. Carter today or on prior occasions.

16   What's needed is recognition of the fact that there are

17   language and cultural problems and perhaps financial problems,

18   but that if MWL and IIRO don't want dispositive discovery

19   sanctions against them, they need to get their act together.

20        MR. McMAHON:  I understand, Your Honor.  Let me

21   address the Indonesian office.  I believe Mr. Carter misspoke

22   about Samir Al Radhi.  My understanding was that he did visit

23   the Indonesian office.  In fact, we provided counsel -- we sent

24   an auditor out there to go through all the records in the

25   Indonesian office and we produced that auditor's report to Mr.

30

1   Carter.

2           THE COURT:  But they didn't want the auditor's

3   report, they want the underlying documents.

4           MR. McMAHON:  Oh no, I know, Your Honor.  But I

5   thought if he looked at that report and got back to me and said

6   Martin, this is what we need that's referenced in the auditor's

7   report we could narrow down the scope of the work entailed

8   because going to Indonesia is not a walk in the park.

9           MR. CARTER:  Your Honor, if I may?  It's almost the

10  perfect example.

11          THE COURT:  Yes, Mr. Carter.

12          MR. CARTER:  It's almost the perfect example.  When

13  we spoke to Mr. Radhi he referenced the auditor's reports and

14  we essentially asked him well, wouldn't auditors have been

15  required to review some financial records in order to develop

16  these reports and he said of course.  There have been a lot of

17  financial records and of course those were subject to Your

18  Honor's order.  And what we have is auditor's report.  When we

19  brought up the subject of Mr. Mujil, the response was well you

20  have an affidavit from him in which he denies that he did any

21  of this and if you want anything else, you know, I guess I

22  could call Mr. Mujil.  And we said of course no, we want the

23  documents that are within the custody of the IIRO concerning

24  the activities he carried out as an employee.  So it's --

25          MR. McMAHON:  Part of the problem, Your Honor, is

31

1   Mujil is no longer with IIRO.  But I think what Mr. Radhi

2   agreed to do is address all these concerns that arose out of

3   our phone conversation yesterday and one of them was if he can

4   secure anything pertaining to records that exist in the

5   Indonesian office pertaining to what's his name's activities,

6   we'll produce them.

7           THE COURT:  Let me ask you, Mr. Carter, how do you

8   suggest we proceed here?

9           MR. CARTER:  Your Honor, from our perspective there

10  was a very clear directive to be in full compliance by the 8th.

11  Mr. McMahon represented that they would.  He also represented

12  in the letter that they were, that all responsive documents had

13  been identified and produced.  It seems to me that there's an

14  acknowledgment in the discourse that we're having today that

15  that is not the case.  And so, you know, I think our view is

16  that they are now in violation of three successive directives

17  of this Court and that this just simply shouldn't continue.

18  We're chasing our tails too much and it's a time to enter

19  sanctions against them.

20          THE COURT:  Okay.  Well then it seems to me what is

21  appropriate is for you to make a formal motion.  By what date

22  do you wish to make that motion?

23          MR. CARTER:  Your Honor, if I could just confer with

24  my co-counsel for a second?

25          THE COURT:  Sure.  Absolutely.

32

1        [Pause in proceedings.]

2             MR. CARTER:  Your Honor, recognizing the potential

3   that we might have to do some affidavits and things for this

4   purpose, we were thinking that 30 days would probably do it.

5             THE COURT:  Why don't I say August 19th which is

6   slightly more obviously?  And then, Mr. McMahon --

7             MR. McMAHON:  Can you give me three weeks, Your

8   Honor?

9             THE COURT:  No problem with that.  September 2nd.

10  We'll make it -- I'll give you slightly more.  We'll make it

11  Monday, September 12th.

12            MR. McMAHON:  Thank you, Your Honor.

13            THE COURT:  And I think I'll give plaintiffs an

14  opportunity to reply by the 30th.

15            MR. CARTER:  That's fine, Your Honor.

16            THE COURT:  Okay.

17            MR. McMAHON:  Your Honor, as a follow-up question, is

18  it too early to know when you'd be I guess having oral

19  arguments on this anticipated motion?

20            THE COURT:  You're assuming facts not in evidence.  I

21  typically do not have oral argument on any motions.  My usual

22  view is that oral argument is a colossal waste of time for

23  everybody.  As a practical matter, since we meet regularly, it

24  may be that I'd entertain it.  But you shouldn't assume that

25  there'll be oral argument on the motion.

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 07/22/17 Page 35 of 44

33

1          MR. McMAHON:  Fine, Your Honor.  I just wanted to

2   make sure if I had to calendar something.  That's great.

3          THE COURT:  Okay.  Are there other things we ought to

4   talk about today?  I guess since I asked the question at the

5   beginning the answer is no.  Is that correct?

6          MR. McMAHON:  Well, Your Honor, I had some issues.  I

7   don't think --

8          THE COURT:  Okay.  Hang on a second.  You can't see

9   what's occurring in the courtroom which is a huddle.

10          MR. CARTER:  I think there was a request, Your Honor,

11   for an extension of the discovery deadline which was not in

12   dispute.

13          MALE SPEAKER:  Deadlines.

14          MR. CARTER:  Discovery deadlines.

15          THE COURT:  And remind me, I know I got that request,

16   but remind me what you were asking me to do specifically.

17          MR. CARTER:  I think we had proposed moving both the

18   deadline for document discovery and the deadline for all

19   liability discovery out by three months.

20          THE COURT:  And if the parties on both sides agree, I

21   don't have a problem with that.

22          MR. CARTER:  Thank you, Your Honor.

23          MR. KABAT:  Well, we have agreed on extending the

24   document production deadline by three months.

25          MR. CARTER:  I think you submitted to me a proposed

34

1   order also; right?  Is that --

2           THE COURT:  Well, whether you did or didn't, consider

3   it done and we'll make that part of the order flowing out of

4   this session today.

5           MR. KABAT:  One issue we wanted to discuss --

6           THE COURT:  Get closer to the microphone, Mr. Kabat,

7   because I want to make sure it picks up.

8           MR. KABAT:  One issue we wanted to discuss was the

9   amount of time for deposition discovery after the completion of

10  document discovery.  And we were thinking that if document

11  discovery ended at the end of November it would be feasible to

12  have five or six months for deposition discovery given that a

13  number of witnesses for some of the defendants are overseas

14  that it may be difficult to schedule depositions.  And I have

15  not heard from plaintiffs as to whether they would be amenable

16  to five or six months for deposition discovery or if they have

17  something else in mind.

18          MR. CARTER:  I think our proposal was simply to

19  extend the existing deadlines by corresponding amounts of time.

20          THE COURT:  And assuming that's done how much time

21  was previously --

22          MR. CARTER:  That's what I don't remember, Your

23  Honor.  So maybe Mr. Kabat could tell me.

24          THE COURT:  Well, I assume it wasn't 90 days given

25  what we're --

35

```
 1              MR. CARTER:  I assume not.

 2              THE COURT:  -- talking about here.

 3              MR. COTTREAU:  I think there was an ambiguity because

 4   we had extended the document discovery.  I'm sorry, for the

 5   record --

 6              THE COURT:  Sure.

 7              MR. COTTREAU:  -- this is Steve Cottreau for Dubai

 8   Islamic Bank.  We had extended the document discovery deadline

 9   previously from April to August and we didn't have a

10   corresponding formal extension of the discovery cutoff for

11   liability.

12              THE COURT:  Well, let me put it this way.  Whatever

13   the window was for depositions when we first had an omnibus

14   schedule will be the window unless the parties want to suggest

15   something else to me.  If they do, I'll consider that.  But I

16   would imagine it had to be on the order of at least five or six

17   months in any event given what you're talking about here.

18              MR. CARTER:  That is correct, Your Honor.  I think it

19   would have been reflected in the order Your Honor initially

20   entered in October of last year.

21              THE COURT:  Okay.  We'll go back, find out what that

22   period is.  In fact, let me put the onus on you folks.  Why

23   don't you submit to me an amended scheduling order, a

24   stipulated amended scheduling order as soon as you can and I

25   will sign that.
```

36

1          Anything else from the folks in the courtroom?

2          MR. KABAT:  Yeah, we currently have a discovery

3   conference scheduled for July 28th and it's not going to be off

4   the table, but I don't think we have anything on the agenda --

5          THE COURT:  I can't imagine what we would do with

6   that so that conference is cancelled.  Anything else from folks

7   in the courtroom?  Mr. McMahon, you're up.

8          MR. McMAHON:  Thank you, Your Honor.  If you recall,

9   and it was your suggestion many months ago, that while it's

10  wonderful that we had this great [inaudible] warehouse, why

11  can't we get an index of that warehouse?  We got an index of

12  the warehouse and I purposely asked Mr. Radhi to explain that

13  index to the 9/11 lawyers.  So I wanted you to know, Your

14  Honor, that there was some positive in yesterday's session.

15         Number two, you haven't discussed and/or ruled on my

16  come to Jeddah invitation which would clarify so many of these

17  issues firsthand.

18         Number two, we have an outstanding $1.2 million

19  discovery vendor proposal from [inaudible] concerning 6,000

20  [inaudible] at the MWL.  Nothing's been said about that.  And I

21  think that's about it for me other than the fact that please

22  come to the London office and see how the office operates and

23  please visit an office overseas say in Africa where the embassy

24  bombings occurred.

25         I want Your Honor to keep in mind something which I'm

37

 1    getting really tired of with the 9/11 case.  There was a series
 2    of Al Qaeda terrorist events.  They start in 1996, Your Honor.
 3    It's not the African war which the 9/11 lawyers are now
 4    suggesting we go back to.  In 1996 the Khobar Towers were
 5    bombed in Saudi Arabia.  A lot of US Air Force lives were lost,
 6    a tragedy.  Then in '98 the embassy bombings occurred in
 7    Africa.  Then in 2000 it's the USS Cole and of course then the
 8    Wall Street 9/11 tragedy.  So think, Your Honor.  I have to
 9    give them 1992 banking records concerning the 1996 Khobar
10    Towers?  In other words, there were banking records four years
11    before that and six years before the embassy bombings and seven
12    years before the USS Cole and eight years before 9/11?  What
13    kind of financial activities anywhere would reveal anything
14    about those events which may not have occurred?  I don't think
15    you have sight, Your Honor, of the relevancy here and you gave
16    them an extra two years too.

17         Keep in mind what their theory is.  The offices of
18    these charities are the epicenters of advancing international
19    terrorism.  The Orphans Fund, different kinds of terrorism as
20    well.  They don't want to come to the offices and discover that
21    there's nothing there.  I've had my patience, Your Honor, but
22    I'm getting very frustrated with the scope of this case.  It's
23    never going to end.

24         MR. CARTER:  Well, Your Honor, with regard to the
25    1992 issue, that was a decision rendered by Judge Daniels based

38

1   on full briefing of the parties.  So I don't know that there's

2   any reason we should be revisiting that.

3          The other points that Mr. McMahon raised were in fact

4   points he raised in all of the briefs ever filed in the case

5   and in particular in the responses he offered in response to

6   the motions to compel.  You know, the Court issued very

7   specific directives relative to very specific categories of

8   information.  And you know, all we're focusing on is their

9   compliance with that and all of these other things are sort of

10  red herrings and sidetracks.  And it's difficult at this point

11  for me to understand how Mr. McMahon proposes that we would

12  travel all around the world to these offices when he can't get

13  money for a train ticket to New York.

14         MR. McMAHON:  I said London, Mr. Carter.

15         THE COURT:  No, you said, Mr. McMahon, you said come

16  to Jeddah and London and presumably for that to be a useful

17  exercise you would have to prepare the people, let's take

18  Jeddah, in Jeddah for at a minimum be there as an intermediary.

19  I don't think you'd want Mr. Carter or his Arabic speaking

20  counterpart to meet with your client ex parte without you being

21  present.  If you can't come to New York it bodes poorly for

22  what might happen if it went to Jeddah.  So in particular given

23  the circumstances of the last few weeks where it sounds like

24  funds are, to put it mildly, tight at your end, I well

25  understand Mr. Carter declining to accept the invitation to go

39

1   to Jeddah.  In terms of London or another office, I suppose

2   that, you know, there's some appeal to what you say.  If I were

3   in Mr. Carter's shoes, I might go to one of those offices but

4   I'm not them and I'm certainly not going to direct that that

5   occur.  But we have gone through that a number of times.  And

6   in terms of what you suggest is over-breadth here in terms of

7   discovery, I guess one reaction I have is given the limited

8   amount of documents that the plaintiffs have been able to

9   secure, talking about over-breadth is almost pointless because

10  even in a narrowed fashion they haven't gotten documents to

11  which they're entitled.

12          As to the 1992 period, Mr. Carter is absolutely

13  right.  Judge Daniels set that, so if you have a gripe with

14  that, direct it to Judge Daniels.  I guess that's really all I

15  want to say on the topic.

16          So the next date we have I believe is September 8th

17  and see you all then.

18          ALL:  Thank you, Your Honor.

19          MR. FLEMING:  Judge --

20          THE COURT:  I'm sorry.  Yes?

21          MR. FLEMING:  I have another issue.

22          THE COURT:  Yes.  Just identify yourself again.  You

23  probably get drowned out.

24          MR. FLEMING:  Yes.  Tim Fleming for the Havlish

25  plaintiffs.

40

1        THE COURT:  Yes.

2        MR. FLEMING:  And I return to the damages question.

3   Regardless of the answer to the question of when actual damages

4   hearings to determine damages for the Havlish plaintiffs would

5   be appropriate assuming that a judgment or a finding on

6   liability is forthcoming, regardless of when -- and I'm not

7   sure that the answer to that question as to when those hearings

8   is quite so simple, but regardless of what the answer is, the

9   Havlish attorneys would be interested in having a session with

10  you simply to understand what your viewpoint is on the proper

11  method format of making a presentation to you on the damages

12  questions [inaudible] --

13       THE COURT:  If you plug in in Westlaw Maas and

14  inquest -- actually, I was about to say you'd get a sense of

15  what I require but that's not accurate.  We have a boilerplate

16  inquest order that we use that may be more appropriate to

17  commercial disputes but essentially gives you the way I usually

18  deal with it.

19       What we will do is make that available to both

20  plaintiffs and defendants committees and we'll send you a copy

21  as well so that you see what we customarily do and then anybody

22  who wishes to can suggest modifications.  Okay?

23       MR. FLEMING:  Very well.

24       MR. COTTREAU:  Your Honor, one last point.

25       THE COURT:  Oh, sure.

Case 1:03-md-01570-GBD-SN Document 3824-3 Filed 01/24/17 Page 42 of 44

41

1       MR. COTTREAU:  Steve Cottreau again for Dubai Islamic

2  Bank.  Did I take your prior comment to mean that the August

3  hearings are cancelled as well?  I think you mentioned the next

4  -- you'll see us on September 9th.

5       THE COURT:  Yes.  When is -- what is the August date

6  that we have?

7       MR. COTTREAU:  I believe there was a date during the

8  week of the 7th.

9       THE CLERK:  August 11th and August 25.

10      THE COURT:  Well, we certainly don't need two

11  sessions in August.

12      THE CLERK:  Just for clarification, Your Honor, I

13  thought I heard that you had said September 8 [inaudible].

14      THE COURT:  Well, I was basing it upon my law clerk

15  telling me that we had moved it from September 9th to September

16  8th; is that right?  Oh, we moved it, we just didn't tell you

17  we moved it.

18      THE CLERK:  I [inaudible].

19      THE COURT:  So hopefully that date works for

20  everyone.  That is the day after Labor Day?

21      THE CLERK:  Two days after Labor Day.

22      THE COURT:  Okay.

23      THE CLERK:  That Thursday.

24      THE COURT:  So yes, September 8th.  And in terms of

25  either of the August dates, does anybody see the need for an

42

1  August session?

2          MR. CARTER:  There will likely be a dispute ripe at

3  that time, Your Honor.  You know, I think we're reluctant to

4  defer further dates because it keeps pushing the discovery

5  schedule out.

6          THE COURT:  Okay.  The August 20 -- I'm not sure how

7  we ended up with two August dates but August 25th probably is

8  not feasible for me.  What was the other date?

9          THE CLERK:  August 11th.

10          THE COURT:  Let me just double check while

11  everybody's here and make sure it is on our calendar.  What

12  time?  11?

13          THE CLERK:  11 o'clock unless the parties ask

14  [inaudible].

15          THE COURT:  All right.  Can you look at the calendar

16  on August 11th in the morning?  Is the terrorist case on the

17  calendar?  Okay.  And what's the next thing after that?  Okay.

18  Great.  Thank you.

19                  [Pause in proceedings.]

20          THE COURT:  August 11th at 11.  See you then.

21          ALL:  Thank you.

22          THE COURT:  Have a good day.

23                  * * * * * *

24

25

43

1        I certify that the foregoing is a court transcript from an

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                            Mary Greco

7    Dated:  July 19, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25