# EXHIBIT 17

**Muslim World League
Islamic Fiqh Council**

# Resolutions of Islamic Fiqh Council Makkah Mukarramah

**From 1st to 18th Sessions
During 1398-1427H (1977-2006)**

1

أبيض

# CONTENTS

**Foreword**
*Dr.  Abdullah Abdul Mohsin Al-Turki*
Secretary-General, Muslim World League,
Deputy Chairman, Islamic Fiqh Council ⋯⋯⋯⋯ 17

**Preface**
*Dr. Saleh Ibn Zabin Al-Marzooqi Al-Buqami*
Secretary-General, Islamic Fiqh Council ⋯⋯⋯⋯ 21

## Resolutions of the 1st Session

1st Resolution
   on Freemasonry and Affiliation with It ⋯⋯⋯⋯ 27

2nd Resolution
    on Communism and Affiliation with It ⋯⋯⋯⋯ 31

3rd Resolution
   on Qadiani Sect and Association with It ⋯⋯⋯⋯ 35

4th Resolution
   on Bahai Sect and Association with It ⋯⋯⋯⋯ 39

5th Resolution
   on Insurance with Its Various Kinds and Forms ⋯⋯⋯⋯ 43

   Dissent of Dr. Mustafa Al-Zarqa ⋯⋯⋯⋯ 55

## Resolutions of the 2nd Session

1st Resolution
   on Existentialism ⋯⋯⋯⋯ 61

2nd Resolution
An Appeal to Rulers of Muslim Countries for Application
of Islamic Shari'ah ................................................................ 65

Letter of the Islamic Fiqh Council to Kings, Presidents and Emirs
of Muslim Countries for Application of Islamic Shari'ah ............ 67

3rd Resolution
on Printing of Research Papers Presented to the Islamic
Fiqh Council ................................................................ 71

**Resolutions of the 3rd Session**

- Resolution
on Legal Position of Birth Control ................................ 75

**Resolutions of the 4th Session**

1st Resolution
on Practice of Proving the Crescent by Sighting,
not by Astronomical Calculation ................................ 81

2nd Resolution
on Printing of Research Paper: *'Islam and Collective War'*
Presented by Mahmood Sheith Khattab ........................ 85

3rd Resolution
on Marriage of Male Unbeliever with Female Muslim, and
on Marriage of Male Muslim with Female Unbeliever ............ 87

4th Resolution
on Research Paper: 'Spread of *Ommul Khabaeth* (Mother of Evils):
Malady and Remedy' Presented by Mahmood Sheith Khattab ......... 91

4

5th Resolution
on Research Paper: *'Hadd Al-Rajm'*
(Punishment of Stoning to Death in Islam) .................... 95

6th Resolution
on Letter of Sheikh Abdullah Ibn Zaid Al-Mahmood to
Muslim Scholars, Rulers and Jurists on Crescent-Sighting ......... 97

7th Resolution
on Unification of Crescent-Sighting .................... 107

## Resolutions of the 5th Session

1st Resolution
about Swearing by Torah/Bible before Jury .................... 113

2nd Resolution
on *Ihram* from Jeddah for Those Who Arrive
from Other Places .................... 117

3rd Resolution
on Timings of Prayer and Fasting in Countries Situated on
High Latitudes .................... 123

4th Resolution
on Artificial Insemination and Test-Tube Babies .................... 129

5th Resolution
on Friday and *Eid Khutbah* in Non-Arab Countries and
Use of Loudspeaker .................... 133

6th Resolution
on Currency Note .................... 137

7th Resolution
about Impact of Extra-ordinary Circumstances on
Contractual Rights and Obligations ......... 141

## Resolutions of the 6th Session

1st Resolution
on Election of Chairman for the Islamic Fiqh Council ......... 151

2nd Resolution
on Wrong Interpretation of *Surah Al-Ikhlas* ......... 153

3rd Resolution
on Phenomenon of Covering Truth with Falsehood
in Indonesia and Elsewhere ......... 157

4th Resolution
on Research Paper:
*'Islam of Negus and Islamic Sources'* ......... 157

5th Resolution
on Promotion of Cassettes Which Attack Islam with Title
(A Message to Sheikh Al-Sha'rawi) ......... 161

6th Resolution
on Distribution of Qur'an Copies in Hotel Rooms ......... 163

## Resolutions of the 7th Session

1st Resolution
on Stock Market ......... 167

2nd Resolution
on Changing the Script of Othmani *Mus'haf* ......... 175

3rd Resolution
   on Prohibition of Replacing the Arabic Numbers with
   Numbers Used in Europe ........................................... 179

4th Resolution
   on Spread of Dowry Custom in India ........................... 183

5th Resolution
   on Artificial Insemination and Test-Tube Babies ........... 189

## Resolutions of the 8th Session

1st Resolution
   on Organ Transplant ................................................ 199

2nd Resolution
   on Artificial Insemination and Test-Tube Babies ........... 203

3rd Resolution
   on Issue of *Ijtehad* ............................................... 213

4th Resolution
   on Collection and Distribution of *Zakah* and *Oshr*
   in Pakistan ......................................................... 219

5th Resolution
   on Muslims' Burial in Wooden Box ............................ 223

6th Resolution
   on IFC's Condemnation of Photography of Prophet
   Muhammad and Other Prophets ................................ 225

## Resolutions of the 9th Session

1st Resolution
on *Adhan* (Prayer Call) in Mosques through Audio
Cassette Recorders ..................................................... 231

2nd Resolution
on Programming of Holy Qur'an and Its Related
Information on Computer ............................................. 235

3rd Resolution
on Obligatory Establishment of Mosque in Every Locality ....... 239

4th Resolution
on Rights of Authorship for Authors ........................... 243

5th Resolution
on Benefitting from *Zakah* Money for Building Schools
and Hospitals, and Establishment of *Zakah* Fund
in European Countries ................................................ 249

6th Resolution
on Timings of Prayer and Fasting in Countries Situated
on High Latitudes ....................................................... 253

7th Resolution
on Payment of *Zakah*'s Portion of *Mujahideen* for Their
Education, Health and Media Projects ........................ 259

## Resolutions of the 10th Session

1st Resolution
on Post-Mortem Examination of Dead Bodies ............... 265

2nd Resolution
    on Death Report and Removal of Life-Support
    Instruments from Human Body ................................................ 269

3rd Resolution
    on Boxing, Free-Style Wrestling and Bull Fighting ........ 271

4th Resolution
    on Eatable Animal's Slaughter with Electric Shock ........ 257

5th Resolution
    on Research Paper of Legal Advisor, Ibrahim Abdullah
    Al-Nasser *'Stand of Islamic Shari'ah on Banks'* ................ 279

6th Resolution
    on Questions Asked by International Islamic Relief
    Committee of North America ................................................ 283

7th Resolution
    on Explanations Sought by the MWL International Islamic
    Relief Organization about Donations in Cash and Kind ........ 287

8th Resolution
    on Recording of the Qur'an on Audio Cassette .............. 293

9th Resolution
    on Difference between Various Schools of Fiqh
    and Fanatic Approach by Some of Their Followers ........ 295

10th Resolution:
    An Appeal to Governments and Peoples of
    the Muslim World ................................................................ 299

11th Resolution
    on Question Asked by Honourable / Abu Bakr Muhyuddin
    about Payment of Waqf Revenue ................................ 301

12th Resolution:
    An Appeal to Governments and Peoples of the Muslim
    World about Palestine ................................ 303

## Resolutions of the 11th Session

1st Resolution
    about *Zakah* on Rentals of Real Estate ................................ 307

2nd Resolution:
    A Statement from MWL Secretariat-General on the Novel
    Written by Salman Rushdy and Its Contents Which Include
    Offences against Islamic Principles and Personalities ............ 311

3rd Resolution
    on Blood Transfusion from Woman to Under 2-Year Child,
    and Whether Rule of *Ridhaa* Will Apply or not?, and Whether
    Compensation for This Blood Is Permissible or not? .............. 315

4th Resolution
    on Infidelity of Rashad Khaleefah ................................ 319

5th Resolution
    on Purification with Sewerage Water after Its Cleaning ....... 323

    A Viewpoint on Lawful Uses of Cleaned Sewerage Water ....... 325

6th Resolution
    on Change of Sex from Male to Female and Vice Versa ....... 329

7th Resolution on:
    1.  Cheque in Place of Possession in Cash
        Payment through Bank Transfer ............................... 333

    2.  Entry in Bank Registers for Possession to Those Who
        Want to Exchange Currency with Another Currency
        Deposited in Bank ............................... 333

8th Resolution
    on Whether Bank Can Impose Penalty on Borrower for
    Delay in Debt Payment within Fixed Period ............... 335

## Resolutions of the 12th Session

1st Resolution
    on Writing the Qur'anic Verse or Verses on a Picture of Bird
    or the Like ............................... 339

2nd Resolution
    on Husband Preventing His Wife from Taking the Medicine
    Prescribed for Her Epilepsy with Argument that She
    Is Possessed by Jinn, or Her Medicine Has
    Anesthetic Effect ............................... 341

3rd Resolution
    on Artificial Insemination between Couples ............... 343

4th Resolution
    on Abortion of Physically-Deformed Foetus ............... 345

## Resolutions of the 13th Session

1st Resolution
    on Undertaking the Deal of Currency Exchange and
    Whether Bank or Company Can Arrange Future Purchase
    Operations in Favour of a Client on His Request ........... 349

2nd Resolution
on Placenta ............................................................... 351

3rd Resolution
on Manufacturing and Marketing of Holy Ka'bah's
Replica ..................................................................... 353

## Resolutions of the 14th Session

1st Resolution
on Responsibility of Guardians and Caretakers for Their
Wards and Their Actions ........................................ 357

2nd Resolution
on Responsibility for Damages by Animal or Building
and Everything Whose Protection Requires Special
Attention ................................................................. 361

3rd Resolution
on *Mas'a* after Saudi Expansion Whether Its Previous
Status Would Remain or It Would Be Considered
within the Mosque .................................................. 365

4th Resolution
on Purchase of Company and Bank Shares if Some of Their
Dealings Are Usurious ........................................... 367

5th Resolution
on Whether Financing Partner's Profit in *Mudhaarabah*
Company Can Be Fixed with Certain Amount of Money ........... 371

6th Resolution
on Responsibility of *Mudhaarabah* Partner and Boards of
Directors for Losses ............................................... 373

7th Resolution
on Issue of Lottery ................................................................ 375

8th Resolution
on Rules of Revealing Private Parts during Treatment ........... 379

## Resolutions of the 15th Session

1st Resolution
on Muslims' Use of Genetic Engineering ............................... 385

2nd Resolution
on Use of DNA ........................................................................ 389

3rd Resolution
on Muslims' Use of Animal Bones and Skins in
Manufacturing Gelatin .......................................................... 391

4th Resolution
on Credit Sale ......................................................................... 393

5th Resolution
on *Tawarruq* Sale .................................................................. 395

6th Resolution
on Investment of Zakah Revenues ......................................... 399

## Resolutions of the 16th Session

1st Resolution
on Credit Sale ......................................................................... 403

2nd Resolution
on Validity of Divorce Concluded by Islamic Centres for
Muslim Women Who Have Divorce Ruling from an
Un-Islamic Court .................................................................. 407

3rd Resolution
on Protection of Investment Accounts in Islamic Banks ...... 409

4th Resolution
on Assets Evaluation ................................................................ 413

5th Resolution
on Muslim's Participation in Elections with
Non-Muslims ............................................................................ 419

6th Resolution
on Medicines Containing Alcohol and Drugs ..................... 423

7th Resolution
on DNA and  Its Uses .............................................................. 427

8th Resolution
on Genetic Diagnosis .............................................................. 431

## Resolutions of the 17th Session

1st Resolution
on Means of Dealing with the Perverted Thought ............... 441

2nd Resolution
on *Tawarruq* Deals by Some Banks ....................................... 447

3rd Resolution
on Stem Cells ............................................................................ 451

4th Resolution
on Use of Medicine Containing Impure Substance like
Swine and Its Substitute of Less Benefit like New
Heparin ..................................................................................... 455

14

5th Resolution
on Hereditary Blood Diseases .......................................................... 459

6th Resolution
on Recommendations of Symposium on Overcrowding in
Hajj and How to Resolve It .......................................................... 461

7th Resolution
on Book Entitled 'Hieroglyphic Language Explains
the Qur'an' .......................................................... 465

8th Resolution
on Income Tax .......................................................... 471

## Resolutions of the 18th Session

1st Resolution
on Sideline Trading .......................................................... 475

2nd Resolution
on Selling the Card that Gives Its Buyer Discounts in
Prices of Commodities and Services Provided by Other
Than Those Who Issued It .......................................................... 481

3rd Resolution
on Abrogation of Debt into Debt .......................................................... 483

4th Resolution
on Extent of Woman's Right to Terminate Marriage
Contract by *Khula* .......................................................... 487

5th Resolution
    on Modern Marriage Contracts.................................................................. 491


6th Resolution
    on Choosing the Gender of Foetus.......................................................... 495

Statement
    on Denigration of Prophet Muhammad (peace be upon him)
    in Some European Newspapers and Magazines ........................... 497

Statement
    on the Book Fraudulently Entitled *Al-Furqan Al-Haq*.............. 501

# Foreword

By
### *Dr. Abdullah Abdul Mohsin Al-Turki*
Secretary-General, Muslim World League
Deputy Chairman, Islamic Fiqh Council

*In the name of Allah, the Most Gracious, the Most Merciful*

*All praise is to Allah for His favours, which He has bestowed upon us. Blessing and peace be upon Prophet Muhammad and all those who followed his guidance.*

The glory of Islam and greatness of its Shari'ah as well as comprehensiveness of its rules to serve the cause of people in the world and in the hereafter are such realities, which cannot be denied.

Muslims have to show the obedience to Almighty Allah and they have to follow His Messenger Muhammad (peace be upon him), hence, they are bound to abide by the Qur'an and the Sunnah, because they protect them from misguidance and show them the straight path: *"Verily, this is My Straight Path, so follow it and follow not (other) paths. They will scatter you about from His (great) Path…"* (Qur'an, 6:153)

Prophet Muhammad (peace be upon him) has been reported as saying: "I have left with you two things, which if you adhere to, you will never go astray. These two things are the Book of Allah and my Sunnah."

The textual provisions of the Qur'an and the Sunnah are general while the issues and problems are unlimited. That is why we find that there are the general texts and basic rules as well as

various sources of *Ijtehad*. The Islamic Fiqh is full of rules and sources for *Ijtehad* and inference of rulings. The person who is engaged with Fiqh (understanding of the religion) has a high status in Islam. Prophet Muhammad (peace be upon him) is reported to have said: "The person, whom Allah wants to do good is blessed with Fiqh (understanding of religion).

If the textual provision clearly implies a ruling on the happening, the Fiqh scholar would adopt this ruling and apply it, and if there is no such textual provision which has a direct ruling on the happening, the Fiqh scholar would derive a ruling on the happening on the basis of inference in accordance with the established methods of inference, which is called *Ijtehad* in interpretation of the texts and their implications as well as in application of the basic rules and sources of *Ijtehad* on new developments in the life of people.

In this age when Muslims are in a large number and their countries are spread from east to west and while a number of them are living in non-Muslim countries and their issues are numerous, some of the issues being alien to the Islamic society, there is a dire need for collective *Ijtehad* of the Muslim scholars. The institutions of the Islamic Fiqh, where a number of Muslim scholars are taking part through their contributions, and specially the Muslim World League being a major Islamic organization at the level of Muslim Ummah, are closely concerned with Muslims' affairs and issues. It established an Islamic Fiqh Council in Makkah Mukarramah and selected distinguished Fiqh scholars of the contemporary age.

On this occasion, I am pleased to highlight the good efforts, which the Islamic Fiqh Council has been exerting through its activities, studies, and discussions that resulted in more than 100 decisions and resolutions. This was an outcome of 18 sessions of the Islamic Fiqh Council in a time-span of more than 25 years.

18

Had it not been the for the blessing of Almighty Allah, and the support of the Custodian of the Two Holy Mosques and his government to the Muslim World League, which is facilitating the works and programmes of the Islamic Fiqh Council, all of this would not have been possible. May Allah bless him with good rewards.

While the Islamic library is rich with religious books and studies, the contributions of the Islamic Fiqh Council through its resolutions are considered to be a collective *Ijtehad*, because it is not the outcome of one scholar's research, but it constitutes the fruitful result of the endeavour made by a group of Muslim scholars, who belong to numerous countries and various environments in different areas of the Islamic Fiqh. In brief, it represents an *Ijtehad* in issues and problems of the age, which is characterized with advancement and change that have made the issues more complicated and gave them more dimensions.

The in-depth thinking and comparison of the different views and arguments as well as taking the various needs into account, are governed by the rules and regulations stated in Islam.

The Islamic Fiqh Council had published these resolutions in various booklets, which covered one or more sessions. Then, it thought that it would be better to put all these resolutions together in one volume and arrange them according to the historical sequence of their sessions besides listing them so as to help the reader to find with ease, what he needs.

These resolutions include the economic, social, medical, stronomical and other topics needed by many scholars, researchers and students, so the resolutions are fruitful outcome presented to the reader. In order to generalize their benefits, the Islamic Fiqh Council intends to get them translated into several languages.

19

I pray to Almighty Allah that these efforts benefit the Muslims and their leaders and that they are able to implement the Islamic Shari'ah. I also pray to Him for rewarding the members and staff of the Islamic Fiqh Council.

*Dr. Abdullah Abdul Mohsin Al-Turki*
**Secretary-General, Muslim World League**

# Preface

By
**Secretary-General, Islamic Fiqh Council**
Dr. Saleh Ibn Zabin Al-Marzooqi Al-Buqami

*Praise be to Allah for His unlimited favours*
*Specially, the favour of Islam*

*Peace be on His Messenger, Prophet Muhammad and*
*all those who followed his guidance*

Islam in its essence is a comprehensive message to humanity which is suitable for all times and places. Among the distinct characteristics of this religion is moderation and middle path, because it keeps up with human progress and regulates it according to the Divine Law in the universe. The rules of Islam are in fact, mercy for human beings to serve or accomplish their interests and prevent or remove hardship away from them, as Allah says: *"He has imposed no difficulties on you in religion."* (Qur'an, 22:78)

Among the most prominent characteristics of the Islamic Shari'ah is its clarity as well as the balance of its principles, which provide no scope for any misuse. In our age when more complicated and challenging issues have emerged in the Muslim societies as a result of the scientific and cultural advancement, which the humanity never experienced in the past, Almighty Allah has blessed us with the establishment of Fiqh councils and Shari'ah boards so that they become the means of collective *Ijtehad* and our religion remains secure from any contradiction and confusion.

They have in fact become source of authority and are being consulted in the complex and pressing issues and problems,

which are related to various areas of human life, whereas Muslim scholars and researchers try their utmost to portray the happenings in their correct perspective and find out the appropriate religious ruling for them.

The Islamic Fiqh Council at Makkah Mukarramah has taken the good steps and adopted the clear methodology. It has a moderate approach in its resolutions and recommendations, which are based on evidence from the Qur'an, Sunnah, Ijma (consensus), Qiyas (analogy) and other established sources of the Islamic Shari'ah. It combines the pursuance of textual provisions and consideration of the Shari'ah objectives.

The Islamic Fiqh Council welcomes anything that is new and purposeful, and at the same time does not contradict the Islamic Shari'ah. Thanks to Almighty Allah that it did not issue any resolution in which the textual provision has been subjugated to suite the happenings. That is why the resolutions of Islamic Fiqh Council have the great impact in the Muslim world.

The Islamic Fiqh Council represents the collective *Ijtehad* in which the Muslim scholars consult each other on issues which are taken up for discussion. There is no doubt that the collective opinion is more authentic than the individual one, because one person may see an aspect of the issue, which another person may not see, and a person may remember what another person may not. The collective discussion can highlight the points which are often found missing. Similarly, collective discussion can clarify things, which were often considered ambiguous as well as it can consider things which were generally forgotten.

In order to achieve the aims of the Islamic Fiqh Concil and continue its efforts for the service of Islam and Muslims, we have the pleasure to present to the Muslim world in general and to the Muslim scholars, researchers and students in particular and to

22

those who are faced with contemporary issues in their day-to-day life and those who in every meeting with any Muslim scholar, repeat their keen desire that the Shari'ah scholars must study these new issues which have no precedent in the history of the Muslim Ummah in order to find their solutions. We are pleased to provide them with the resolutions reached by the Islamic Fiqh Council in its 18 sessions, and which are more than 100 resolutions in addition to its recommendations.

We have published them after their review and addition with various references and presented them to the reader. These resolutions are in fact a summary of many in-depth researches and detailed studies as well as thorough discussions, which resulted in this fruitful outcome. It may be mentioned here that these resolutions cover a wide-range of issues that include faith, jurisprudence, economy, medicine, astronomy, etc. In order to publish them at a larger scale, we have assigned one of the prominent publishing houses to do that. The Islamic Fiqh Council Secretariat also intends to get these resolutions translated into several languages.

We pray to Almighty Allah for blessing us with success in our works so that we will be able to achieve our good aims and objectives.

*Dr. Saleh Ibn Zabin Al-Marzooqi Al-Buqami*
Secretary-General, Islamic Fiqh Council

23

أبيض

# Resolutions of
# the Islamic Fiqh Council
# during Its First Session Held
# between 10 -17 Sha'ban 1398H

أبيض

# The First Resolution
# on Freemasonry and Affiliation with It

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1ˢᵗ session held in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H discussed the Freemasonry and those who associate with it. It also discussed the ruling of Islamic Shari'ah concerning it.

The members of the Council made a detailed study about this dangerous organization and its literature written by its own members and leading personalities as well as other old and new publications about it, and arrived at the following conclusions:

1. Freemasonry is a secret organization, concealing or revealing itself, according to the circumstances of time and place. However, its real principles are based on secrecy in all circumstances. They are not known even to its members except those who have reached its higher ranks after passing through various experiences.

2. It builds the relationship of its members in all parts of the world on superficial basis in order to dupe the simple-minded people. It pretends to establish a human fraternity among those who join it, without differentiation between various ideologies, creeds or religions.

3. It attracts the important people to its organization and lures them through the temptation of personal benefits, on the basis that each member of the organization is supposed to help the

27

other member anywhere in the world with his needs and problems and supports him to achieve his aims if he has any political ambition. This is the greatest temptation through which, they attract the influencial people in the society. It also receives financial contributions from them.

4. Affiliation to this organization is based on ceremonial entry of the new member under certain norms by which a new member is threatened in case he violates the instructions or orders issued to him through the senior ranks.

5. The simple-minded members are left free to practise their own religious rites, while the organization benefits from them to the extent of their utility, keeping them in lower ranks. On the other hand, apostates or those show readiness for apostasy are promoted gradually to the higher ranks in the light of the member's experiences and frequent tests that show their ability to serve its dangerous plans and principles.

6. It has certain political aims and has been involved overtly or covertly in some major military coups and political changes in the world.

7. In its origin and essence, this organization has Jewish roots and it is controlled secretly by a higher worldwide Jewish management. In its activities, it has a Zionist outlook.

8. In its real aims, it is against all religions. It undermines them in general and aims at tarnishing the religion of Islam in particular in the eyes of its followers.

9. It is always keen to select its members from the people who enjoy the outstanding academic, social, political, financial or any other status, so that it can effectively exploit their influence

28

in their respective societies. That is why it is so keen to attract persons such as kings, presidents, ministers and senior government officials.

10. It has many branches that take different names in order to deceive and direct the people's attention away from it. This way, it can carry out its activities under different names if it is met with resistance to the name of Freemasonry in certain environment. The branches which work under different names are most prominently known as Lions, Rotary and other outfits which harbour the sinister aims and activities that are totally against the foundations of Islam.

It has become very clear to the Islamic Fiqh Council that there is a strong relationship between Freemasonry and International Zionist Movement. That is why it was able to control the activities of many officials in the Arab and non-Arab countries, especially with regard to the issue of Palestine, obstructing their crucial roles for this great cause in the favour of Jews and International Zionist Movement.

For this and other detailed information about the sinister aims and activities of Freemasonry, the Islamic Fiqh Council decides that Freemasonry is one of the most dangerous organizations which aim at the destruction of Islam and Muslims, and that whoever associates with it, knowing its reality and objectives is an unbeliever.

However, Dr. Mustafa Al-Zarqa, member of the Council is of the opinion that we add the sentence (believing in its permissibility) between the phrase (knowing its reality and objectives) and (is an unbeliever) so that the wording is harmonious with the Shari'ah ruling to differentiate between one who commits a major sin believing that his act is permissible and

29

one who commits such a sin without believing it to be permissible, hence the former is an unbeliever (*Kafir*) and the latter is a disobedient (*Fasiq*).

**Chairman**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman**
Muhammad Ali Al-Harakan,
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Ibn Abdullah Al-Subaiel
Muhammad Rasheed Qabbani
Mustafa Al-Zarqa
Muhammad Rasheedi
Abdul Quddoos Al-Nadvi
Abu Bakr Joomi

# The Second Resolution
# on Communism and Affiliation with It

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1st session held in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H looked into the issue of communism and socialism besides many other serious issues that came up for discussion. As the Muslim world has been facing the ramifications of intellectual onslaught at the individual, social and state levels, the peoples and nations of the world are exposed to new dangers, because the impact of this dangerous onslaught has not been realized much.

The Islamic Fiqh Council is of the view that many countries in the Muslim world are suffering from the ideological and intellectual vacuum, especially when these imported ideologies and alien thoughts are tailored in a way that help them penetrate into the Muslim societies and create imbalance in the thinking and behaviour of people in these societies. They destroy the human values and destabilize all the moral bases in the society.

It is apparent that the major world countries, despite the difference of their systems and attitudes tried their utmost to tear apart the fabric of every Muslim country due to their enmity towards Islam and their fear of Muslims' awakening. Hence, these anti-Muslim countries concentrated on two main things; creeds and ethics.

In the area of creeds, they encouraged everyone who embraced communism, which in principle is called by many as

31

socialism, providing them with all means of help such as electronic and print media, propaganda machinery and hired writers. They described the communist ideology as freedom, advancement, democracy and the like. They also described any thing that is contrary to the communist ideology such as preservation of high traditional values including the Islamic teachings as reactionary, backwardness, opportunism, etc.

In the area of ethics, they called for permissive culture that allows the free mixing between males and females and described it as freedom and advancement because they knew well that whenever they were able to eliminate the religion and its ethical values, they would be successful in having their intellectual, material and political control. If this happens, they will have full control over all means of reform and change, and do whatever they want.

This naturally resulted in an intellectual, ideological and political conflict in which they helped their supporters with money, arms and propaganda machinery to strengthen them in the society to take over power. After that don't ask what would happen there. Any thing such as killing, eviction, suppression of freedom and imprisonment of religious and righteous persons may take place.

That is why when the communist onslaught raged the Muslim countries they did not consolidate themselves with their religious and ethical values in the face of this onslaught. The Islamic Fiqh Council within the framework of its religious and academic authority had to warn about the danger of this intellectual, ideological and political onslaught which was being raged through media and military means.

The Islamic Fiqh Council during its session held in Makkah Mukarramah issued the following resolution:

The Islamic Fiqh Council draws the attention of the Muslims all over the world that communism is totally against Islam, and embracing the communist ideology means the rejection of Allah's religion which He has chosen for His servants, because communism aims at destroying the Islamic ideals and ethical values while Islam which is the final of the heavenly messages was sent to bring the people out of darkness and provide them a comprehensive way of life, which covers all the social, cultural, economic and political aspects, and Islam will remain a basis to get rid of all evils that divide Muslims and destroys their unity..

That is why the religion of Islam has been the main target of the dangerous onslaught of communism and socialism in order to undermine its teachings and values. The Islamic Fiqh Council recommends to the Muslim countries and communities to be alert and prepared to encounter the menace of this ideological onslaught and resist it with all the following means:

a) To review as soon as possible all the educational curricula and programmes which are applied now, in order to get rid of all the atheist and communist ideas being spread in Muslim countries by some so-called Muslims who include teachers, authors and others.

b) To review as soon as possible all the vital government agencies especially those related to media, economy, internal and external trade as well as the local administration in order to clean and restructure them on the real Islamic foundations.

c) To urge the Muslim countries and communities to work for the establishment of specialized educational institutions that prepare the dedicated Da'wah workers who can confront this onslaught through various means. It is expected that with the abundance of such educational institutions and Da'wah

workers, this menace can be confronted in a planned and organized way.

The Islamic Fiqh Council calls upon the Muslim scholars as well as the Muslim organizations all over the world to confront these atheist ideas that aim at undermining their religion and its Shari'ah, and expose the reality of communism and socialism that pose a real threat to Islam.

**Chairman**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Ibn Abdullah Al-Subaiel
Muhammad Rasheed Qabbani
Mustafa Al-Zarqa
Muhammad Rasheedi
Abdul Quddoos Al-Nadvi
Abu Bakr Joomi

# The Third Resolution
# on Qadiani Sect and Associating with It

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1st session held in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H examined the issue of the Qadiani sect. This sect which is also called as Ahmadiyya, came into being in the 19th century C.E. in India.

The Council studied the ideology of this sect, which was founded by Mirza Ghulam Ahmad Qadiani in 1876. He claimed prophethood and that he received the divine revelation. He also claimed to be the Promised Messiah, saying that prophethood did not end with Prophet Muhammad (peace be upon him), while according to the Qur'an and the Sunnah, it is the faith of Muslims that he was the last of all the prophets.

He pretended that more than ten thousand verses were sent down and revealed to him and whoever disapproved of him is an infidel. He also pretended that Muslims must perform pilgrimage to Qadian, because it is a sacred city like Makkah and Madinah, and that it is the place which is mentioned in the Qur'an as Al-Masjid Al-Aqsa. All these things are mentioned in his books *'Braheen-e-Ahmadiyya'* and *'Tableegh Risaalat'*.

The Council also reviewed sayings and statements of Mirza Basheeruddin, who was son of Miza Ghulam Ahmad Qadiani and his successor. He said in his book *'Aeena-e-Sadaaqat'* that every Muslim, who did not perform *Bai'ah* (pledge of allegiance)

with the Promised Messiah (Mirza Ghulam Ahmad Qadiani) whether he heard his name or not, is an infidel and becomes out of the Islamic fold. (*Aeena-e-Sadaaqat*, p.35)

In the Qadiani newspaper, *Al-Fadhl,* he quoted his father as saying: "We are opposed to Muslims in everything: God, the Prophet, the Qur'an, prayer, fasting, pilgrimage, Zakah. In all of these things, we have basic differences with them." (*Al-Fadhl* Newspaper, 30 July 1931)

The same newspaper (Vol. 3) claimed that Mirza is the Prophet Muhammad as mentioned in the Qur'an and quoted Prophet Jesus as saying: *"...I am the messenger of Allah (sent) to you, confirming the law (which came) before me and giving glad tidings of a messenger to come after me, whose name shall be Ahmad..."* (Qur'an, 61:6) (from Inzaar Al-Khilafah p21)

The Council also reviewed what Muslim scholars and authors have written about this sect and made it clear that Ahmadiyya Qadiani sect is totally out of Islam, and on this basis, the provincial legislator assembly of Pakistan's North-West Frontier Province adopted a resolution unanimously in 1974, considering the Qadiani sect, a non-Muslim minority among the citizens of Pakistan. The National Assembly of Pakistan also adopted a unanimous resolution to consider the Qadiani sect a non-Muslim minority in Pakistan.

In addition to the creed of this sect, it was established by writings of Mirza Ghulam Ahmad as well as his letters, which he addressed to the colonial British government in India in order to seek its support and sympathy that he declared the prohibition of Jihad. He rejected the concept of Jihad to divert the attention of Muslims and persuade them to be faithful to the British government in India because the concept of Jihad that was rejected by some ignorant Muslims prevented them from being

36

faithful to the British.. In this regard, he said in his book *'Testimony of The Qur'an'* (7th Edition, P.17): "I believe that with the growing number of my followers, the number of those who believe in Jihad will decrease because a belief that I am Messiah or Mahdi, necessitates the rejection of Jihad."

After having deliberations on these references and many other documents that exposed the creed of Qadianis as well as their aims and objectives that undermine the Islamic faith and divert Muslims from their faith, the Islamic Fiqh Council unanimously decided that the Qadiani (Ahmadiyya) creed is totally out of Islam and its followers are infidels. Their pretension of being Muslims is merely for a deception and misguidance.

The Islamic Fiqh Council makes it clear that Muslims as government officials, scholars, Da'wah workers, intellectuals and writers must confront this misguided sect and its followers in each and every part of the world.

**Chairman**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen

Muhammad Ibn Abdullah Al-Subaiel
Muhammad Rasheed Qabbani
Mustafa Al-Zarqa
Muhammad Rasheedi
Abdul Quddoos Al-Nadvi
Abu Bakr Joomi

# The Fourth Resolution
# On Bahai Sect and Associating with It

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1st session held in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H examined the  issue of the Bahai sect, which appeared in Iran in the second half of the 19th century and has a number of followers who are scattered today in many Muslim and non-Muslim countries.

The Council studied the writings of many scholars, authors and those who are well acquainted with the reality of this sect as well as its emergence, mission, literature, life of its founder Mirza Hussein Ali Mazindrani (born on 20 Muharram 1233H / 12 November 1817) and behaviour of his followers. It also studied the life of his son and successor Abbas Afandi who was also called Abdul Baha as well as the religious formations that regulate the works and activities of this sect.

After having adequate information about many authentic sources and some books of the Bahais themselves, as well as thorough discussions on them, the Council had a clear view about the sect as the following:

Bahaism is a new artificial religion based on Babism, which is a new artificial religion invented by Ali Muhammad (born in Muharram 1235H / October 1819 in the city of Shiraz. In the beginning, he adopted a philosophical mystic approach on the pattern of Sheikhism invented by his misguided mentor Kazim

Al-Rishti, successor of Ahmad Zainuddin Al-Ahsaie, leader of Sheikhism, who pretended that his body is made of light like that of an angel. He also adopted other false superstitions.

In the beginning, Ali Muhammad followed his mentor's way, then, he left him, and after some time, he came up before the people with a new appearance, claiming that he is Ali Ibn Abi Talib about which Prophet Muhammad (peace be upon him) has been reported as saying: "I am the city of knowledge and Ali is its gate (*Bab*)." Hence, he called himself Bab (gate). Then, he claimed that he is 'Bab' of the awaited Mahdi. Later, he pretended that he himself is the Mahdi and in his last days, he claimed to have divinity and called himself 'the Supreme'.

Being a contemporary of Bab, Mirza Hussein Ali Al-Mazindarani, also called Baha followed his call. When Bab was tried and condemned to death due to his infidelity and sedition, Mirza Hussein Ali claimed that he was nominated by Bab to lead the Babis. This way, he became their head and named himself as Bahauddin.

Then, he moved further and proclaimed that all the religions came as preparatory to his appearance and that all the religions were incomplete and his religion came to accomplish them. He also proclaimed that he had characteristics of God and that he acquired God's Great Name.  He also claimed that the word 'Lord of world' is meant for him and that as Islam superseded the previous religions, Bahaism superseded Islam.

Bab and his followers interpreted the Qur'anic verses in extremely strange manner in order to make them suit their mischievous call and to imply that he has power to change the laws of the divine religions. He also presented certain rituals which are practised by his followers.

40

It became clear to the Islamic Fiqh Council through testimony of the textual proofs on the Bahais' creeds, which are contradictory to the teachings and principles of Islam that Bahaism is based on the human idolatry due to Baha's claim of divinity and of having power to change the Islamic Shari'ah, hence, the Council unanimously decided that Bahaism and Babism are out of Islam and these are considered as contrary and hostile to Islam, and their followers are openly and unequivocally Kafirs (infidels).

The Council cautioned Muslims all over the world against this infidel and misguided sect and called upon them to encounter it and remain cautious against it especially as it is proved that this sect has support of the colonial powers to undermine Islam and Muslims.

**Chairman**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf

Saleh Ibn Othaimeen

Muhammad Ibn Abdullah Al-Subaiel

Muhammad Rasheed Qabbani

41

Mustafa Al-Zarqa

Muhammad Rasheedi

Abdul Quddoos Al-Nadvi

Abu Bakr Joomi

# The Fifth Resolution
# on Insurance with Its Various
# Kinds and Forms

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1st session held in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H looked into the issue of insurance with its different kinds. It studied many Muslim scholars' writings in this regard as well as the resolution adopted by the Senior Scholars' Council in Saudi Arabia during its 10th session held in Riyadh on 4 Rabi Al-Aakhir 1398H on the prohibition of insurance with its various kinds.

After having detailed study and full deliberation on the issue, the Council decided with majority, the prohibition of insurance with all its kinds whether it be on life, business commodities or other kinds of finances.

The Council also decided unanimously its approval of the resolution adopted by the Senior Scholars Council in Saudi Arabia on permissibility of the co-operative insurance, instead of the prohibited commercial insurance, which was mentioned above.

The drafting of this resolution was assigned to a special committee.

### Report of the Committee
### Assigned to Draft the Resolution
### of the Islamic Fiqh Council on Insurance

On the basis of resolution adopted by the Islamic Fiqh Council in its session held on Wednesday 14 Sha'ban 1398H to assign each of Sheikh Abdul Aziz Ibn Baz, Sheikh Muhammad Mahmood Al-Sawwaf and Sheikh Muhammad Ibn Abdullah Al-Subaiel to draft the resolution of the Council on insurance with its various kinds and forms.

The afore-said committee held its meeting and after deliberation, it adopted the following:

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 1st session held at the headquarters of the Muslim World League in Makkah Mukarramah, Saudi Arabia between 10-17 Sha'ban 1398H looked into the issue of insurance with its various kinds, after having been acquainted with many Muslim scholars' writings in this regard and also, having been acquainted with the resolution No. 55 adopted by the Senior Scholars' Council of Saudi Arabia during its 10th session held in Riyadh on 4 Rabi Al-Aakhir 1397H about the prohibition of the commercial insurance with its various kinds.

After the detailed study and full deliberation, the Council almost unanimously and with the exception of Sheikh Mustafa Al-Zarqa, decided to prohibit the commercial insurance with its various kinds, whether it is related to life, the commercial goods or some other kinds for the following reasons:

44

**First:** The commercial insurance contract is one of the contracts which are related to the possible financial compensation and which involve the great uncertainty, because the person seeking the insurance (insurance policyholder) cannot know about the time of contract, the amount of what he gives or takes. He may pay one or two instalments, then, a disaster may take place, so he would be entitled to what the insurer (insurance company) had committed.

The disaster may not take place at all, in that case, the insurance policyholder would pay all the instalments and he may not get any amount. Likewise, the insurance company cannot fix what he gives and takes regarding every contract separately. In one Hadith, Prophet Muhammad (peace be upon him) has been reported to forbid the sale of uncertainty.

**Second:** The commercial insurance contract is a kind of gambling, because there is uncertainty in such financial compensations such as loss for nothing that causes it and profit for nothing in exchange. The insurance policyholder may pay an instalment of insurance, then the accident takes place and the insurance company is faced with a loss by paying the full amount of insurance. The accident may not take place and in this case, the insurance company gets the benefit of insurance instalments for nothing to give in exchange.

If ignorance is involved, then it would become a gambling and come under the general prohibition of gambling, as Almighty Allah says: *"O you who believe! Intoxicants, gambling, (dedication of) stones, and (divination by) arrows are an abomination of Satan's handiwork. Eschew such (abomination), that you may prosper. Satan's plan is (but) to excite enmity and hatred between you with intoxicants and gambling, and hinder*

45

*you from the remembrance of Allah and prayer. Will you not then abstain?"* (Qur'an, 5: 90)

**Third:** The commercial insurance contract includes *Riba Al-Fadhl Wa Al-Nassa'* (usury based on unequal exchange and delayed payment). Hence, if the insurance company paid to the insurance policy holder, his inheritors or beneficiaries more than the amount that he paid to the insurance company, then it is *Riba Al-Fadhl* (usury of unequal exchange) and the insurance company makes that payment to the insurance policyholder after a period, then it is *Riba Al-Nassa*, and both the transactions are prohibited in the light of the textual provisions as well as the consensus of the Muslim scholars.

**Fourth:** The commercial insurance contract is a kind of the prohibited betting, because it has ignorance, uncertainty and gambling. That is why the Islamic Shari'ah has not permitted the betting except when the purpose is to support Islam. Prophet Muhammad (peace be upon him) has confined the permission of betting with a return to three things by saying: "There is no competition except in camel race, horse race and arrow contest." Thus insurance does not come under this category and it has no similarity with it so it is prohibited.

**Fifth:** In the contemporary insurance contract, other's money is taken for nothing to give in exchange, and to take such money in the contracts of commercial deals is prohibited because it comes under the general category of prohibition mentioned in the Qur'an: *"O you who believe! Eat not up your property among yourselves in vanities; but let there be amongst you traffic and trade by mutual goodwill."* (Qur'an, 4:29)

**Sixth:** In the commercial insurance contract, there is an aspect of obligating what is not obligatory in the Islamic Shari'ah, as the insurance company does not create or cause the

accident, it merely concludes a contract with the insurance policyholder on guarantee of any accident in anticipation of its happening in exchange for an amount which the policyholder pays to it, while the insurance company does no specific work for the policyholder, so it is prohibited.

Those who allow the commercial insurance in all or some of its forms have presented certain arguments. The answer to their arguments is the following:

a) The argument of reclamation is not valid, because interests in the Islamic Shari'ah are of three kinds; I) The kind which is approved by the Islamic Shari'ah is an evidence. II) The kind which the Islamic Shari'ah is silent about it and has neither approved nor disapproved, comes under the scope of *Ijtehad*. III) The kind which the Islamic Shari'ah has disapproved due to prevalence of its bad aspect over its good aspect.

b) The argument that everything is originally permissible is not valid here, because evidences against contracts of the commercial insurance are based on the Qur'an and Sunnah.

c) The argument that necessities validate the invalid, is not correct here because what Almighty Allah has allowed through permissible means of earning are many times more than what He has not allowed, so there is no necessity approved by the Islamic Shari'ah that can force the people to the insurance which Shari'ah has prohibited.

d) The argument of general practice (*Urf*) is also not valid here, because it is not among the evidences of legislation, however, it can be a basis for application of rules and for understanding the meaning of textual phrases and people's expressions in their sayings and actions. Since evidences are clearly against

the insurance, there should be no consideration for such argument.

e) The argument that contracts of the commercial insurance are the contracts of *Mudharabah* or in its meaning, is not valid, because the capital money in *Mudharabah* does not go out of its proprietor's ownership while the insurance policyholder's payment as per insurance contract goes out of his ownership to the ownership of the insurance company. In *Mudharabah*, the capital money is inherited by heirs of its owner in case of his death while in insurance the policyholder's heirs are entitled to the insurance money as per rule even if the policyholder did not pay except one instalment. In *Mudharabah,* profit is between the two partners at a certain rate while in insurance, profit or loss of the capital money is for the insurance company, and the policyholder will get the insurance money.

f) The argument that contract of the commercial insurance is similar to clientage, is not valid, because it is a comparison with difference, and the difference here is that purpose of the insurance contract is the profit that involves uncertainty, gambling and ignorance, while the purpose of the clientage contract is the Islamic fraternity and cooperation in good and bad times. Whatever the material benefit is there, it is secondary.

g) The argument that contract of the commercial insurance is similar to the obligatory undertaking, is not valid, because it is a comparison with difference. The difference here is that undertaking of credit, loan or bearing of loss comes under a pure beneficence and its fulfilment is a duty or a moral obligation, while the insurance contract is a commercial deal whose motive is material benefit.

48

h) The argument that contract of the commercial insurance is similar to guarantee of the unknown and unnecessary is not correct, because it is too a comparison with difference. The difference here is that guarantee is a kind of donation, whose purpose is simply goodwill, while insurance contract is a contract of commercial deal whose first purpose is the material benefit, and if there is any goodwill, it is secondary.

i) The argument that contract of the commercial insurance is similar to the road-danger guarantee, is not valid, because it is a comparison with difference as well, like the previous one.

j) The argument that contract of the commercial insurance is similar to the retirement scheme, is not correct, because it is also a comparison with difference. In the retirement scheme, whatever is given as retirement pension is a right which the government has committed to its public and also it has taken into consideration the retired employee's services to his nation. The government has provided the employee with a scheme, taking into consideration his interests and needs, so the retirement scheme does not come under the financial deals between the state and its employees. Hence, there is no similarity between the retirement scheme and insurance which comes under the contracts of the commercial transactions and whose purpose is the policyholders' exploitation by the insurance companies through unlawful means, because what is given in the retirement scheme is a right which the government has committed to its public and which it pays to those who have served their nation in appreciation of their physical and mental contributions.

k) The argument that contract of the commercial insurance is similar to the system of blood-money payment (*Aaqelah*), is not correct, because it is a comparison with difference. The difference here is that killer's family members commit the

payment of blood-money due to their relationship which calls for support and cooperation without expecting anything in exchange, while contract of the commercial insurance is an exploitation based on purely financial transaction without having anything to do with sentiments of goodwill and charity.

l) The argument that contract of the commercial insurance is similar to the contract of guarding, is not correct, because it is also a comparison with difference. The difference here is that security is not a point of contracting in both cases. The point in the insurance is payment of instalments and insurance money while in guarding it is guard's work and his wage. In fact, security is an objective and outcome otherwise the guard would not deserve his wage in case the guarded object is lost.

m) The argument that insurance is similar to deposit is not correct, because it is a comparison with difference, because the fee of deposit is in exchange for keeping something in custody, while in insurance, the policyholder's payment is not for any work done by the insurance company so insurance is different from deposit.

n) The argument that insurance is similar to the deal of cloth merchants with weavers is not correct, because it is a comparison with difference. The difference here is that the cloth merchants' deal is based purely on cooperation, while the insurance is a commercial transaction, so comparison is not valid.

The Islamic Fiqh Council also decided unanimously to approve the resolution No. 51 adopted by the Senior Scholars' Council in Saudi Arabia on 4 Rabi Al-Aakhir 1397H on permissibility of the cooperative insurance instead of the prohibited commercial insurance for the following evidences:

**First:** The cooperative insurance comes under the contracts of donation with the purpose of cooperation to face the dangers and shoulder the responsibilities at the time of disasters and tragedies. Such cooperative insurance happens through contribution of individuals with cash amounts allocated to compensate those who are inflicted with damage and loss. The purpose of such cooperative insurance group is not to get any commercial profit from others' money. Their intension is only to divide the risks among themselves and cooperate on bearing the damages.

**Second:** The cooperative insurance is free from both kinds of usury (usury of unequal exchange and usury of delayed payment). The contracts of shareholders in the cooperative insurance group should not be usury-based and they would not utilize the accumulated instalments in the usury-based deals.

**Third:** Ignorance of the shareholders in the cooperative insurance group would not harm them, because they are donors so there is no question of risk, uncertainty and gambling, while the commercial insurance is a contract of the commercial and financial transaction.

**Fourth:** A group of shareholders or their representatives can invest the accumulated instalments to achieve the purpose, for which this cooperative insurance has been created. The Islamic Fiqh Council is of the opinion that the cooperative insurance should be in the form of a cooperative insurance company in view of the following:

1- Adherence to the concept of Islamic economy, which would allow individuals to carry out the various economic projects. The state's role should be only as a complementary element to

51

what individuals could be able to do and as a guide and monitor to ensure the success of these projects and their operations.

2- Adherence to the concept of cooperative insurance by which the shareholders would be independent in operation, management and execution of the entire project.

3- Training of people for the cooperative insurance through individual initiatives and personal incentives. No doubt, the participation of people in the management makes them more cautious and alert to avoid the risks which make them pay the necessary compensation, and subsequently lead to the success of cooperative insurance. If the risks were avoided successfully, the instalments would be less in future, and if the risks could not be avoided, the instalments may be more in the future.

4- The composite form of the company does not make the insurance as if it is merely a gift or grant from the state for its beneficiaries, it would also have its participation with them to support and protect them because they are the people of the real interest. It seems a more positive stand so that the shareholders may appreciate the state's role and at the same time would not abstain from their responsibility.

The Islamic Fiqh Council was of the opinion that the detailed provisions for working of the cooperative insurance should be prepared in view of the following bases:

1. The cooperative insurance company should have headquarters besides its branches in all cities. It should also have several departments according to the risks which would be covered, as well as the different categories and professions of the shareholders, for example, there should be a department for

health insurance, another for old age and other disabilities, or there should be a department for insurance of the street vendors, another for merchants, third for students, fourth for professionals such as engineers, medical practitioners, lawyers, etc.

2.  The cooperative insurance company should have greater flexibility and keep away from the complicated methods.

3.  The company should have a supreme council to decide its policies and programmes as well as to propose the necessary rules and regulations in accordance with the rulings of the Islamic Shari'ah.

4.  The members selected by the government would represent the government in the council and members selected by the shareholders would represent them in the council. This way the council would enjoy the government's consent and would be secure from malpractice and failure.

5.  If the risks exceeded the company's resources, it may require more instalments. In that case, the state and shareholders would bear this increase.

     The Islamic Fiqh Council supports the suggestion of the Senior Scholars Council in its resolution that a penal of experts should prepare the detailed provisions of this cooperative insurance company.

**Chairman**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

53

**Deputy Chairman**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Ibn Abdullah Al-Subaiel
Muhammad Rasheed Qabbani
Muhammad Rasheedi
Abdul Quddoos Al-Nadvi
Abu Bakr Joomi

54

# Dissent of Dr. Mustafa Al-Zarqa

My dear brothers, members of the Islamic Fiqh Council

I differ with you over your stand to consider the insurance which you have called as commercial insurance with its different kinds and forms as prohibited.

It is my view that insurance as an organized cooperative means to make up the damages incurred by owners of the capital money due to risks which they are exposed to, is lawful with all its three forms; insurance on commodities, insurance of liability (third party insurance) and the insurance which is mistakenly called life insurance.

My arguments are based on the Qur'an, Sunnah, the rulings of Islamic Shari'ah, its general objectives, its examples in Fiqh through proper inference. There is a notion that insurance comes under gambling or betting which are prohibited. On the other hand, there is suspicion that insurance is usury. All of this is fully explained in my book published with the title (*Insurance Contract and Stand of Islamic Shari'ah*). You are aware of it while people in the world need it to be explained to them.

I have also explained in this session that differentiation between the cooperative and commercial insurance has no basis, because every insurance is based on the concept of cooperation and its purpose is to make up the damages and distribute them among the maximum possible number; among the people who are combined by a small profession or market, and are exposed to certain risks. They contribute to form a joint fund until one of them is faced with danger and damage they compensate him from the fund in which he is also a contributor. Such kind of fund

which is termed as joint fund and which you have called as cooperative whose administration need neither full-time employees nor expenses of administration, organization, accounting, etc.

If desires for such insurance grow more and more people join it in tens, hundreds and thousands, then it takes up a large number of diversified risks and there would be a need for full-time management, organization and huge expenses such as wages, employees, other mechanized and non-mechanized resources. In that case, it would be inevitable that the full-time employees will have to live on the account of this large administration, as lives any trader, industrialist, professional or employee at the cost of his work.

Hence, it would be inevitable to differentiate between the installments collected from the insurance policyholders and between the payments of expenses and compensations for damages so that the full-time management can benefit from that difference and live on it as a trader lives on the benefit of difference in prices of purchase and sale.

To get this benefit, the insurance which you have called as commercial must be based on proper calculation to fix the installment that the policyholder would pay for various kinds of danger. This is the real difference between the two kinds. As regards the cooperative aspect, so there is no difference at all.

I would like to add also that the first session of this auspicious Council, which was attended by half of its members only while others could not attend the session due to their circumstance, should not adopt a resolution to prohibit something like insurance which is one of most important and serious issues today, because one way or other, people's interests throughout the world are involved in it. All the countries are imposing it as a

compulsory measure in cases such as third party car insurance in order to protect the life of victims in the car accidents if the car's owner or driver happens to be a poor person.

If the intension is to adopt such a  serious resolution about an issue in which Muslim scholars have major difference whether it is Halal or Haram, in my view, it is necessary that such a resolution should be adopted in a session that would be attended by all the members of the Council or majority of them, and also this issue should be referred to scholars of the Muslim world who are not the members of the Council, however, they have their academic weight, then in the light of their responses, such an important issue should be decided to facilitate things for the people instead of making things more difficult for them, particularly when Muslim scholars have different views.

Finally, I must state that if the insurance companies in their contracts with the policyholders impose certain conditions which are not approved by the Islamic Shari'ah or they fix prices of installments very high for the sake of excessive profit, then the concerned authorities must intervene to enforce the appropriate price in order to prevent exploitation. The various schools of Islamic Fiqh have asserted the necessity of pricing and fighting against monopoly for the necessary needs of the people. Its remedy is not to prohibit insurance. Therefore I would like to register my dissent as well as my respect for your views.

*Dr. Mustafa Al-Zarqa*

أبيض

# Resolutions of
# the Islamic Fiqh Council
# during Its Second Session Held
# between 26 Rabi Al-Aakhir-
# 4 Jumad Al-Oula 1399H

أبيض

# The First Resolution
# on Existentialism

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 2nd session held in Makkah Mukarramah between 26 Rabi Al-Aakhir – 4 Jumad Al-Oula 1399H studied the research paper presented by Dr. Muhammad Rasheedi on existentialism with the title *'How Can Muslim Understand Existentialism'* and its explanation of this concept as well as its three phases, in which this alien thought developed into three branches, each of them is radically distinct from the other to the extent that there are no common links or roots between one branch and the other.

It also became clear that its middle phase witnessed the development of the concept from the pure materialism, which itself is based on heresy and denial of the Creator into a leap towards believing in what is not acceptable by reason. It also became clear that the third phase witnessed the transformation of this concept into heresy, in which, under the banner of freedom, anything that is rejected by Islam and rationality is permissible.

In light of the above-mentioned description, it became clear that even in the second and middle phase of this concept whose subscribers were characterized with belief in existence of the Creator and the divine secrets, though it was said to be a reaction of materialism, technology and absolute rationality.

All that a Muslim can say about it in the light of Islam, is that this second phase of the concept or belief in the second branch of

61

existentialism as well as the opinion of its followers about religion on the basis of emotion not of reason does not agree with the Islamic principles based on divine guidance and sound reasoning to prove the existence of Almighty Allah as well as His Names and Attributes, and to prove the divine messages in light of the Qur'an and Sunnah.

On the basis of the afore-said, the Islamic Fiqh Council unanimously decided:

Existentialism in all its phases, developments and branches does not agree with Islam because it is a faith that is based on the divine guidance as well as the sound reasoning simultaneously.

Therefore, it is not permissible in any case for a Muslim to associate with this concept, thinking that it does not contradict Islam. It is also not permissible for him to call for this concept or work to spread its false ideas.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Ibn Abdullah Al-Subaiel
Saleh Ibn Othaimeen
Muhammad Salem Abdul Wadood

Hasanain Muhammad Makhloof

Abdul Mohsin Al-Abbad

Mustafa Al-Zarqa

Muhammad Rasheed Qabbani

Mahmood Sheith Khattab

Muhammad Rasheedi

Muhammad Shadhli Al-Neifer

Muhammad Mahmood Al-Sawwaf

Abdul Quddoos Hashemi Al-Nadvi

أبيض

# The Second Resolution:
# An Appeal to Rulers of Muslim Countries
# for the Application of Islamic Shari'ah

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 2nd session held in Makkah Mukarramah between 26 Rabi Al-Aakhir – 4 Jumad Al-Oula 1399H studied the painful situation of the Muslim countries and their suffering due to their disunity, lack of interest in the application of the Islamic Shari'ah, and keen desire to implement the imported laws which have no sanction of Almighty Allah.

The Council decided that it is one of its most important duties that it writes letters to kings and presidents of the Muslim countries, urging them to take appropriate initiatives to apply the Islamic Shari'ah, which would ensure them - if they adhere to it – honour in this world and success in the hereafter. It would also guarantee their victory over the enemy as well as it would ensure security and peace.

These letters would be sent according to the enclosed draft.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**

Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Hasanain Muhammad Makhloof
Mustafa Al-Zarqa
Abdul Mohsin Al-Abbad
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood
Saleh Ibn Othaimeen
Muhammad Ibn Abdullah Al-Subaiel
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Shadhli Al-Neifer

# Letter of the Islamic Fiqh Council
# to Kings, Presidents and Emirs of Muslim
# Countries for the Application of Islamic Shari'ah

*Assalaamu Alaikum Wa Ramatullahi Wa Brakaatuh*

We would like to inform you that the Islamic Fiqh Council, Makkah Mukarramah held its 2nd session on 26 Rabi Al-Awwal 1399H and one of its resolutions stipulates that a memorandum is to be addressed to the rulers of the Muslim countries to remind them that the honour in this world and success in the hereafter cannot be achieved except through the application of the comprehensive and ever-lasting Islamic Shari'ah, which guarantees the success for all those who are committed to it and are prepared to follow its way.

It is well known that Almighty Allah has sent down the Islamic Shari'ah to His Prophet Muhammad (peace be upon him) and enjoined upon all Muslims – the rulers and the ruled – to adhere to it and apply it. For this, He promised them victory in this world and success in the hereafter. He warned them against the consequences of neglecting the Islamic Shari'ah and abstaining from its application. For this, He threatened to punish them in this world and in the hereafter. Allah says in the Glorious Qur'an: *"Do they then seek after a judgement of (days of) ignorance? But who for a people whose faith is assured, can give better judgement than Allah?"* (Qur'an, 5:50)

*"But no, by the Lord, they can have no (real) faith until they make you judge in all disputes between them, and find in their souls no resistance against your decisions, but accept them with the fullest conviction."* (Qur'an, 4:65)

67

*"O you who believe If you will aid (the cause of) Allah, He will aid you, and plant your feet firmly."* (Qur'an, 47:7)

*"...Allah will certainly aid those who aid His (cause) for verily Allah is Full of Strength, Exalted in Might, (Able to enforce His Will). They are those who, if We establish them in the land, establish regular prayer and give regular charity, enjoin the right and forbid the wrong. With Allah rests the end (and decision) of (all) affairs."* (Qur'an, 22:40-41)

*"... but if as is sure, there come to you guidance from Me, whosoever follows My guidance, will not lose his way, nor fall into misery. But whosoever turns away from My Message, verily for him is a life narrowed down, and We shall raise Him up blind on the Day of Judgement. He will say: "O my Lord! Why have you raised me up blind, while I had sight (before)?" (Allah) will say: "when Our Signs came unto you, you disregard them, so this day you will be disregarded."* (Qur'an, 20: 123-126)

It is quite obvious that the difference between Shari'ah (law) of Almighty Allah and the man-made laws is like a difference between Allah the Creator and His creature. A system that was made by the human being cannot be equal to Shari'ah, which was sent down by Allah, the King of the kings and the Most Merciful to His Prophet Muhammad (peace be upon him) so that it remains as a guidance and mercy for all the worlds.

The Islamic Fiqh Council, which is holding its session in vicinity of the Holy Ka'bah, Makkah Mukarramah, is appealing to you in the name of Allah, Lord of power (and rule), who gives power to whom He pleases, and He strips off power from whom He pleases, He endures with honour whom He pleases, and He brings low whom He pleases, In His hand is all good. Verily over all things, He has power - that you take initiative for the application of Shari'ah of Allah so that you and your people

enjoy peace and security in its shadow, as this happened to the forerunners of this Ummah, whom Almighty Allah blessed to apply His Shari'ah and secured for them victory over the enemy and good reputation in this world. The reward and requital, which Allah has prepared for them, are better and more durable. No doubt, the humiliating situation, which Muslims are faced with, is the ultimate result of the non-application of the Islamic Shari'ah.

The Islamic Fiqh Council calls upon you to move ahead and take initiative for adopting the means of happiness. Your rational thinking and good reasoning make us hopeful that our call and appeal would attract your response and initiative, as Almighty Allah says: *"The answer of the Believers, when summoned to Allah and His Messenger, in order that he may judge between them, is no other than this: They say, "We hear and we obey: It is such as these that will attain felicity."* (Qur'an, 24:51)

We pray to Almighty Allah for blessing all Muslims with honour, success and victory over their enemy.

*Wassalaamu Alaikum Wa Ramatullahi Wa Barakaatuh.*

**Chairman, Islamic Fiqh Council**
***Abdullah Ibn Humaid***
President, Supreme Judicial Council
Saudi Arabia

69

أبيض

# The Third Resolution
# on Printing of Research Papers
# Presented to the Islamic Fiqh Council

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 2nd session held in Makkah Mukarramah between 26 Rabi Al-Aakhir – 4 Jumad Al-Oula 1399H listened to the summary of the research paper prepared by Sheikh Muhammad Ibn Abdullah Al-Subaiel on Theft and Its *Hadd* (punishment), and to the summary of the research paper prepared by Dr. Muhammad Rasheed Qabbani on *Hadd* (punishment) of Adultery and fornication. After distribution of these two research papers among the Council members, and expressing the gratitude of the Council, to the researchers for their interest to take up these two topics and explain the supremacy of Islamic Shari'ah over the man-made laws, the Council adopted the following resolution:

**First:** The Islamic Fiqh Council emphasized the significance of publishing these two research papers in the Journal of the Islamic Fiqh Council and other magazines concerned with the publication of such research papers on the Islamic Fiqh.

**Second:** Every research paper should be published separately and the research papers which the Council decides to print, should have a uniform size and their design would be matching the standard of these research papers.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Muhammad Ibn Abdullah Al-Subaiel
Saleh Ibn Othaimeen
Hasanain Muhammad Makhloof
Mustafa Al-Zarqa
Muhammad Rasheed Qabbani
Muhammad Rasheedi
Abdul Quddoos Hashemi
Mahmood Sheith Khattab
Abdul Mohsin Al-Abbad
Muhammad Shadhli Al-Neifer
Muhammad Salem Abdul Wadood

# Resolutions of
# the Islamic Fiqh Council
# during Its Third Session Held
# between 23-30 Rabi Al-Aakhir 1400H

أبيض

# The Resolution
# on Legal Position of Birth Control

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 3rd session held in Makkah Mukarramah between 23-30 Rabi Al-Aakhir 1400H looked into the issue of birth control or so-called 'family planning'. After having discussion and exchange of views on the issue, the Islamic Fiqh Council, unanimously, adopted the following resolution:

In view of the fact that Islamic Shari'ah calls for growth and spread of the Muslims' population and considers it a great favour that Almighty Allah has bestowed upon the human beings, and many textual provisions in the Qur'an and Sunnah point out that the concept of birth control or use of contraceptive methods is contrary to the human nature, on which Allah has created the human beings. It is also contrary to the Islamic Shari'ah, which Almighty Allah has selected for His servants.

And in view of the fact that subscribers of this concept are such a group whose aim is to plot against Muslims through decreasing their population so that they have power to control the Muslim countries and enslave their people in order to exploit their resources and riches, and since such thinking represents a kind of *Jahiliyah* (pre-Islamic period of ignorance) and bad opinion about Almighty Allah, as well as it weakens the Islamic entity which is strengthened through the growth of man power, the Islamic Fiqh Council unanimously decides that birth control is not allowed at all, and likewise, it is not allowed to use the

75

1 of 263

contraceptive methods if the intention is fear of poverty, because it is Almighty Allah who provides the livelihood and every living being gets its provision from Him, or because  such recourse was adopted due to some other reasons which are not permissible in the Islamic Shari'ah.

As regards the use of contraceptive means or methods of delaying the birth in individual cases due to certain harms such as when a woman cannot have a normal delivery and she is forced to have a surgical operation for the delivery, then there is no objection in the Islamic Shari'ah for such recourse.

Likewise, if delaying the birth is due to certain health or other justifiable reasons approved by a trusted Muslim medical scientist, even such recourse may be necessary in case, harm is certain to affect the mother and her life is surly in danger on the basis of a medical report from a trusted Muslim medical scientist.

To make a call for birth control or use of contraceptive methods in general, is not allowed in the Islamic Shari'ah for the reasons mentioned earlier. It is more serious to make it compulsory or impose it on the people at a time when huge amount of money is spent on the arms race in the world for domination and destruction, instead of spending this money in the economic development and fulfilment of the human needs.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**

Abdul Aziz Ibn Abdullah Ibn Baz

General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf

Saleh Ibn Othaimeen

Mustafa Al-Zarqa

Hasanain Muhammad Makhloof

Muhammad Salem Abdul Wadood

Muhammad Rasheed Qabbani

Mabrook Al-Awaadi

Abul Hassan Ali Al-Nadwi

Abu Bakr Joomi

Muhammad Shadhli Al-Neifer

Abdul Quddoos Hashemi

Muhammad Rasheedi

أبيض

# Resolutions of
# the Islamic Fiqh Council
# during Its Fourth Session Held
# between 7-17 Rabi Al-Aakhir 1401H

أبيض

# The First Resolution
# on Practice of Proving the Crescent
# by Sighting not by Astronomical Calculation

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H discussed the letter of the Islamic Call Society in Singapore dated 16 Shawwal 1399H / 8 August 1979 and addressed to the Saudi charge d'affaires there and which stated that there was a difference of opinion between the Islamic Call Society and the Islamic Council in Singapore about the beginning and end of Ramadhan 1399H /1979, whereas the Society viewed that beginning and end of Ramadhan are based on the sighting of crescent according to the general evidences that exist in the Islamic Shari'ah, while the Islamic Council in Singapore was of the opinion that the beginning and end of Ramadhan should be based on the astronomical calculation, arguing that in countries of the Asian region in general and Singapore in particular, the sky is mostly covered with clouds and it is difficult to sight the crescent so it should be considered an inevitable excuse that necessitates the astronomical calculation.

The Islamic Fiqh Council after having a detailed study of this issue in the light of textual provisions in the Islamic Shari'ah, decided to support the Islamic Call Society in its view, because the Shari'ah evidences in this regard are very clear.

The Council also decided that in a situation where the sighting of crescent is prevented due to the clouded sky such as Singapore and other similar regions of Asia, the Muslims should follow those Muslim countries which depend on the sighting of crescent without depending on the astronomical calculations in any way, as Allah's Prophet Muhammad (peace be upon him) has been reported as saying: "Observe the fasting on sighting the crescent and break the fasting on sighting the crescent. If it is cloudy and the sighting of crescent is prevented from you, then complete the count of 30. In another Hadith, he is reported as saying: "Do not fast unless you sight the crescent or complete the count of the month and do not break the fast unless you sight the crescent or complete the count of the month." There are more Hadiths, which have the same meaning.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi

Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

أبيض

# The Second Resolution
# on Printing of Research Paper Entitled:
# *'Islam and Collective War'*
# Presented by Mahmood Sheith Khattab

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H studied and discussed the research paper: 'Islam and Collective War'. After having listened to all the concerned views as well as having been acquainted with the preface that was written by Sheikh Abu Hasan Ali Al-Nadwi, the Council approved it, thanking Sheikh Mahmood Sheith Khattab for his research paper. It also thanked Sheikh Abu Hasan Ali Al-Nadwi for his preface.

The Islamic Fiqh Council adopted the following resolution:

1. The Council emphasizes the significance of publishing the above-mentioned research paper along with the preface in the Islamic Fiqh Council Journal and other magazines which are concerned with publication of the academic and Fiqh research works.

2. This research paper along with the preface should be printed in accordance with the previous recommendations regarding its uniform size as well as appropriate get-up.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

# The Third Resolution
# on Marriage of Male Unbeliever
# with Female Muslim, and Marriage
# of Male Muslim with Female Unbeliever

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H took note of objections by several Islamic societies in Singapore over the contents of the charter on women's rights to allow the Muslim male and female to marry with persons who do not believe in the religion of Islam and adopted unanimously the following resolution:

**First:** The marriage of a male Unbeliever with a female Muslim is absolutely prohibited and the Islamic jurisprudence scholars have full agreement on this, because the rulings of the Islamic Shari'ah in this regard are very clear, as Almighty Allah says: *"...And do not marry (your girls) to unbelievers until they become Believers..."* (Qur'an, 2:221) and as He also says: *"...If you ascertain that they are Believers, then send them not back to the Unbelievers. They are not lawful (wives) for the Unbelievers, nor are the (Unbelievers) lawful (husbands) for them. But pay the Unbelievers what they have spent (on their dower)."* (Qur'an, 60:10)

The repetition and emphasis on prohibition of relationship between the Believer female and Unbeliever male in the above-mentioned verse: *"They are not lawful (wives) for the Unbelievers, nor are the (Unbelievers) lawful (husbands) for*

*them."* (Qur'an, 60:10) as well as the order that the Unbeliever husband is paid what he has spent on his wife on her embracing the religion of Islam as mentioned in the same verse:*"But pay the Unbelievers what they have spent (on their dower)."* (Qur'an, 60:10) so that he does not suffer the double loss of the marital relationship with his wife and money that he spent on her.

If the Unbeliever wife who is married to an Unbeliever husband becomes prohibited for him on her embracing the religion of Islam and is unlawful for him, then how is it allowed that an Unbeliever man marries a Believer woman? However, Almighty Allah has allowed the marriage of such Believer woman with the Believer man after the expiry of her *Iddat* period as mentioned in the following verse: *"... And there will be no blame on you if you marry them on payment of their dower to them…"* (Qur'an, 60:10)

**Second:** It is not allowed in the same way that the Believer male marries an Unbeliever female as Almighty Allah says: *"Do not marry Unbeliever women until they become Believers…"* (Qur'an, 2:221) and He says: *"...But hold not to the guardianship of the Unbeliever women."* (Qur'an, 60:10)

Omar Ibn Al-Khattab (may Allah be pleased with him) divorced his two Unbeliever wives when this verse of the Qur'an was revealed. The Muslim scholar Ibn Qudamah Al-Hanbali stated that there is no difference on prohibition of the Unbeliever women's marriage with the Muslim man. Women from People of the Book can marry the Muslim men and there is no difference among the Muslim scholars on this issue except the Imamites who are of the view that such marriage is prohibited. However, it is better for a Muslim not to marry a woman who belongs to People of the Book, when there are the Muslim women.

Sheikh Al-Islam Ibn Taymiyah said that it is unpleasant to marry women from People of the Book if the Muslim women are available. This is also the opinion of Sheikh Al-Qadhi.

The majority of the Muslim scholars subscribe to the view of the Second Caliph, Omar Ibn Al-Khattab, (may Allah be pleased with him) who told those marrying women from People of the Book to divorce them and they did so except Hudhayfah, who declined to divorce his wife however, he divorced her later, because when a Muslim marries a woman from People of the Book, he may incline to her likings and perhaps the child born from them may follow her way.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi

Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

# The Fourth Resolution
## on Research Paper Entitled:
## 'Spread of *Ommul Khabaeth*: Malady and Remedy'
## Presented by Mahmood Sheith Khattab

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H examined the research paper 'Spread of *Ommul Khabaeth* in Arab Countries: Malady and Remedy' presented to it by the Council member, Mahmood Sheith Khattab. The Council found it a comprehensive research paper which covered the main three evils: Alcoholic drinks, drugs and Tobacco.

The frightening picture presented by this valued research work which contains the important documented information and various hygienic, social and economic statistics, cautioning about the worst scenario of the future youth generation, is in fact, a picture that is sufficient to warn the leaders of the Muslim Ummah at the various levels to shoulder their responsibilities in this regard in order to ward off the worst fate that awaits the future generation due to spread of these three evils, which the author of the research paper has called 'Mother of Evils' in the circles of the Muslim boys and girls.

Author of the research paper has found that the ways and means of these evils' spread are three as the following: i) the homes where some of these boys and girls see parents and guardians to be addicted to such evils, ii) the educational institutions where students and undergraduates influence their

91

classmates and attract them to such evils, iii) the electronic and print media, which spread these poisons through attractive images, advertisements, films and the like.

After explaining the ways and means of these evils, the author of this research paper has made it clear that the only treatment that can eliminate these evils and safeguard the Muslim Ummah and its youth from them as much as possible, is the real Islamic upbringing that is partaken sincerely and carefully so as to positively influence the Muslim youth and guide their thinking and behaviour.

The researcher has explained and proved that all the various means adopted by the Western specialists to deal with such evils under the materialistic way of life in the West and followed by West-oriented leadership in the Muslim countries have failed and led to the adverse results causing more spread of such evils, and the real treatment of such evils cannot be found except through a real Islamic upbringing.

He has cautioned against the serious dangers of smoking besides the alcoholic drinks and drugs, which make obligatory for those who are responsible for homes, educational institutions and media as well as government authorities to think seriously and shoulder their responsibilities in this regard.

The Islamic Fiqh Council thanks the researcher for this valuable research paper, which contains important information and several opinions. It also decides to print this research paper for publication and get it translated and distributed on a large scale. It also calls the attention of parents, teachers, media persons and government officials to it, appealing to them to fear Almighty Allah with respect to the generations of this Ummah and work hard to safeguard them from these evils through the real Islamic upbringing and awareness,

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

93

أبيض

# The Fifth Resolution
# on Research Paper Entitled: *'Hadd Al-Rajm'*
# (Punishment of Stoning to Death in Islam)

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H listened to the research paper 'Hadd Al-Rajm (Punishment of Stoning to Death in Islam)' presented by Dr. Muhammad Rasheed Qabbani, and viewed that this research paper is a part of a larger research work on Hadd of adultery and fornication that Dr. Muhammad Rasheed Qabbani has prepared.

The Islamic Fiqh Council in its Second Session had decided the printing of this research paper. The author has made certain observations, which were reviewed and discussed by the Council. The author also sought the addition of these observations to the relevant places in the research paper in case, it was re-printed, since this research paper was already printed hence the Islamic Fiqh Council decided the following:

**First:**
To suffice with what was already written in the research paper on *Hadd Al-Rajm*.

**Second:**
To add the enclosed observations on Dr. Muhammad Rasheed Qabbani's research paper on Hadd of adultery and put

95

them in the relevant places in the original research paper if it was re-printed due to its significance.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

# The Sixth Resolution on Letter
# of Sheikh Abdullah Ibn Zaid Al-Mahmood
# to Muslim Scholars, Rulers and Jurists
# on Crescent-Sighting

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H reviewed the letter addressed to Muslim scholars, rulers and jurists on crescent-sighting, which was written by Chief of Courts in the State of Qatar, Sheikh Abdullah Ibn Zaid Al-Mahmood and after the review, it was clear that this letter contained certain mistakes and wrong perceptions:

His statement that *Eid Al-Fitr* of this Hijrah year (1400H) happened to be wrong due to the false testimony of the crescent-sighting on the eve of Monday as nobody could sight it neither on the eve of Monday nor on the eve of Tuesday…(to end of the statement).

This statement which was made by the author of the above-mentioned letter is not true and he is wrong in his statement, because how can he judge on all people that they did not see the crescent?

It is a rule of the Islamic Shari'ah that whoever knew anything has evidence over other who did not know, and whoever proved something is evidence over one who denied it.

97

As the crescent-sighting was proved on the eve of Monday with the testimony of the trusted witnesses, whose testimony was acceptable to the jurists in the various parts of Saudi Arabia and other countries of the region. Thus it was known that the commencement of the month of Shawwal 1400H was proved in accordance with the Islamic Shari'ah on the eve of Monday.

It was based as well on the teachings of Islamic Shari'ah. As Abu Dawood reported in his *Sunan* from Abdullah Ibn Omar (may Allah be pleased with both of them) that people sighted the crescent so I informed Prophet Muhammad (peace be upon him) that I have seen it. He fasted and ordered the people for fasting. Hafiz mentioned this in *Talkhees* and Al-Daremi, Al-Darqotni, Ibn Hibban, Al-Hakim and Al-Baihaqi also reported it and Ibn Hazm regarded it a Sahih Hadith.

Ibn Abbas (may Allah be pleased with both of them) reported that a Bedouin Arab said: "O Messenger of Allah, I have sighted the crescent." Prophet Muhammad (peace be upon him) asked him: "Do you bear witness that there is no god but Allah and that I am the Messenger of Allah." He said: "Yes." He (the Prophet) said: "O Bilal, call upon the people to observe the fast tomorrow." Ibn Khuzaimah, Ibn Hibban, Al-Darqotni, Al-Hakim and Al-Baihaqi also reported it and Imam Ahmad and Al-Nassaie have also reported from Abdul Rahman Ibn Zaid Ibn Al-Khattab as saying that I have enjoyed the company of the Prophet's companions and asked them. They reported to me that Prophet Muhammad (peace be upon him) said: "Observe the fast on sighting of the crescent and stop the fast on sighting it. Your worship should be based on it. If it is cloudy and you are unable to sight the crescent, then complete thirty days of fast and if two witnesses testify for it, then you have to start and stop the fast."

Harith Ibn Hatib Al-Jamhi, Ameer of Makkah narrated: "Messenger of Allah has instructed us that we observe our

worship on sighting the crescent. If we did not sight it and two trusted witnesses testified, we observed our worship on the basis of their testimony." This was reported by Abu Dawood and Al-Darqotni.

Abu Omair Ibn Anas narrated: "We were unable to sight the crescent of the month of Shawwal, so we observed the fasting, and at the end of the day, a group of travellers came and testified before the Messenger of Allah that they have sighted the crescent yesterday, so the Prophet told the people to break their fasting of the day and celebrate their Eid next day." This was reported by Imam Ahmad, Abu Dawood, Nassaie and Ibn Majah. Al-Hafiz said in *Talkhees*: Ibn Al-Mundhir, Ibn Al-Sakan and Ibn Al-Hazm regarded it a Sahih Hadith.

Rub'ie Ibn Harrash quoted one of the Prophet's companions as saying: "The people differed over the last day of the month of Ramadhan. After that, two Bedouin Arabs came and testified before the Prophet that they sighted the crescent last evening. Prophet Muhammad (peace be upon him) ordered the people to break their fasting." This was reported by Imam Ahmad and Abu Dawood. In one report, Abu Dawood added: "and go to their Eid prayer grounds.

These Hadiths show the necessity of testimony by trusted witnesses and it is sufficient to depend on two trusted witnesses in matters of observing the fasting and breaking it. Likewise, it is sufficient to depend on one trusted witness to prove the commencement of the month of Ramadhan, as indicated by Hadith of Ibn Omar and Hadith of Ibn Abbas. These Hadiths also show that it is not necessary that all the people or a group of them should sight the crescent. These Hadiths also show that it is not necessary for the valid testimony of the two trusted witnesses or one trusted witness in respect of commencement of Ramadhan that people sight the crescent in the second night because the

places of crescent are different. Similarly, people's sights are not of the same level. Also, there may be in the horizon what might obstruct the sighting of the crescent in the second night. If sighting of the crescent in the second night was necessary for the validity of the testimony, the Prophet Muhammad (peace be upon him) would have clarified it.

Tirmidhi said: "The Muslim scholars are unanimous on accepting the testimony of the two trusted witnesses to prove the crescent sighting. Ibn Taymiyah said in *Fataawa* (Vol.25, P.186 after mentioning the varied capacity of people to sight the crescent and its reasons: " If two trusted witnesses testify for the crescent-sighting, their testimony would be taken for consideration in the Islamic Shari'ah according to the unanimous view of the Muslim scholars, although the general public did not sight it. He perhaps meant here by 'the unanimous view' when it is a cloudy season, because the different view of Imam Abu Haneefah that the commencement of the month would not be proved in a clear season unless the crescent is sighted by a number of people, is well known. All this is when there is no official ruling for that because with such a ruling, there is no scope for any difference and it is necessary to implement the ruling based on the testimony and this is the consensus view of Mulsim scholars, as Abu Zakariya Yahya Al-Nawawi has mentioned it in *Sharh Al-Muhadhdhab* (Vol.6 P.313) after mentioning the reasons of the varied capacities of the people for the crescent-sighting.

He says: "That is why if two witnesses or one witness testified for sighting the crescent and the concerned authority issued a ruling in this regard, it would not be reversed by consensus and the fasting would be compulsory and if it had been impossible, the ruling would not have been implemented and its reversal would have been compulsory.

Then, Ibn Mahmood said after the above-mentioned statement: "O Muslim scholars and jurists. We commit a great mistake every year in observing the fasting and breaking it." It is obvious that this statement contains great mistake and audacity to say against the truth because where is the mistake every year in observing the fasting and breaking it and the jurists issue their rulings according to the authentic Hadiths as well as according to what is a consensus among the Muslim scholars as mentioned earlier.

Then, Ibn Mahmood said after the previous statement: "When the crescent dawns before the sunrise in the east, it disappears before the sun so nobody sights it or the crescent rises with the sunrise, then, it disappears with sunset and nobody sights it due to the strong sunlight." This is also an obvious mistake, because it has been proved by the testimony of the trusted witnesses that the crescent may be sighted before the sun in the morning of the 29th day of the month in the east, then, it is sighted after the sunset in the west the same day because the marching course of the moon is different from the course of the sun and everyone marches on its own orbit as Almighty Allah has destined for them. As regards the Qur'anic verse: *"It is not permitted to the sun to catch up the moon, nor can the night outstrip the day. Each (just) swims along in its own orbit (according to law)."* (Qur'an, 36:40), which he has used as evidence for his statement that the crescent cannot be sighted after the sunset if it was seen in the early morning of that day before the sunrise, it is not an evidence that supports him because the experts of the Qur'anic interpretation have laid down the meaning of this verse, which implies that each of them has a role, which it plays in a systematic and orderly manner. In the interpretation of this verse, Ibn Katheer said: "According to Mujahid, each one of them has a limit, which it does not cross. When one's turn comes, the other goes." Ibn Katheer added: "According to Al-Thauri, one does not touch the light of the

101

other. And according to Ikramah, this verse means that each one of them has a function, which it performs properly."

Then, Ibn Mahmood mentioned the views of the Hanafi school of Fiqh which stipulates the sight of the crescent by a larger number of people while the sky is clear and does not suffice to one or two persons. He also said that this view is the preference of Sheikh Al-Islam Ibn Taymiyah in his writings which are related to the crescent-sighting. He added: Ibn Taymiyah does not consider the sight of crescent by one or two persons, while other people did not see it, because in such a case, the individuals may have mere imagination of sighting the crescent, and if the crescent-sighting was clear to be seen by anybody, many other people would have sighted it."

This view, which he has attributed to Sheikh Al-Islam Ibn Taymiyah, has no basis of truth. His view is well known and available in *Fataawa* Vol. 25 P. 186, where he mentioned that the unanimous view that Shari'ah ruling is based on is the testimony of two witnesses.

Then he mentioned the Hadith: "people sighted the crescent so I informed Prophet Muhammad (peace be upon him) that I have seen it. He fasted and ordered the people to fast." It was reported by Abu Dawood. Al-Hakim and Ibn Hibban regarded it a sound Hadith. He also mentioned Hadith of Ibn Abbas (may Allah be pleased with both of them) that a Bedouin Arab said: "O Messenger of Allah, I have sighted the crescent." Prophet Muhammad (peace be upon him) asked him: "Do you bear witness that there is no god but Allah and that I am the Messenger of Allah." He said: "Yes." He (the Prophet) said: "O Bilal, call upon the people to observe the fasting tomorrow." Ibn Khuzaimah and Ibn Hibban have regarded it a sound Hadith, hence these two Hadiths do not mean that sighting of the crescent is confined to these two persons because it is likely that they

were the first two persons who sighted the crescent and other persons might have sighted it later on.

It is now clear that this answer is not valid because there is no evidence in its favour, and in fact, nobody was available other than these two persons, who sighted the crescent. If there was somebody, who had sighted the crescent, there would have been report about his sighting.

This is why Muslim scholars have presented these two Hadiths to accept the testimony of one witness for the commencement of the month of Ramadhan. This is more authentic of the two views adopted by Muslim scholars as it has been mentioned earlier.

It was also mentioned earlier that when there was a ruling on it by a competent authority, then, it would be compulsory to comply with it as per the unanimous view of the Muslim scholars as it has been reported by Imam Al-Nawawi in *Sharh Al-Muhadhdhab*. Hence, we should not say anything about them without knowledge.

After that, Ibn Mahmood said at the end of his letter: "I have already said in my letter that Muslims must have one Eid every year. I have also called upon the government to appoint a judicial committee for sighting the crescent. This committee should comprise such trusted persons, who have strong sighting capability and can watch the crescent at the time of its rising especially in the month of Sha'ban and even when there is cloud or dust, they would count its 30 days. They would observe the fasting during the month of Ramadhan. After that, they would watch the crescent for the month of Dhul Hijjah to know the timing of Hajj pilgrimage. This committee should not be of less than 10 persons, who come from among the trusted and judicious people. The committee should have a chairman, whom the committee members may refer for their works".

It is obvious that this statement contains certain aspects and suggestions, which cannot be taken for consideration, because Almighty Allah has provided ease and facility and permitted the ruling based on testimony of two trusted witnesses for all months and one witness for the month of Ramadhan. Thus, nobody is allowed to create something that was not allowed by Allah and that was not brought by His Prophet Muhammad (peace be upon him) as Almighty Allah says: *"What! Have they partners (in godhead), who have established for them some religion without the permission of Allah?"* (Qur';an, 42:21)

Prophet Muhammad (peace be upon him) has been reported as saying: "Whoever innovates something unsolicited regarding our affair, it is turned down." This was reported by Bukhari and Muslim in their books from Ayeshah (may Allah be pleased with her). While Muslim has reported from her that the Prophet said: "Whoever did something that is contrary to our commandment, then it is turned down."

These are some of the numerous mistakes, which have appeared in the letter of Sheikh Abdullah Ibn Mahmood, and which we wanted to draw the attention to them. We pray to Almighty Allah for guiding all of us towards His path and making us to avoid any statements about Allah and His Prophet without adequate knowledge.


**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia


**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**

Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

أبيض

# The Seventh Resolution
## on Unification of Crescent-Sighting

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 4th session held at the general secretariat of the Muslim World League in Makkah Mukarramah between 7-17 Rabi Al-Aakhir 1401H studied the issue of difference in places of moonrise in order to sight the crescent. It viewed that Islam is considered to be a religion of facility and tolerance suitable for human nature and concern.

In the matter of crescent-sighting, it adopted the view that crescent-sighting is proved with the human eyes and not on the basis of astronomical calculations, as the Shari'ah evidences clearly stipulate. It also admitted the consideration of the difference in places of moonrise, because it provides easiness for the people.

Those who see the need of unity in the days of observing and breaking the fast, have in fact a view, which is not identical to the religious and rational perceptions.

As regards the religious perception, the scholars of Hadith have reported the Hadith of Kuraib that Umm Al-Fadhl Bint Al-Harith sent him to Mu'awiyah in Syria. He narrated: I arrived in Syria and did my job. While I was still in Syria, the month of Ramadhan commenced. I did see the crescent on the eve of Friday. Then, I came to Madinah later in the month. Abdullah Ibn Abbas (may Allah be pleased with both of them) asked me about the crescent: When did you sight the crescent? I said: We

107

sighted it on the eve of Friday. Then, he asked: did you personally sight it? I said: Yes, people sighted it as well. They observed their Ramadhan fasting and Mu'awiyah too observed his fasting. He said: But we sighted it on the eve of Saturday, so we are observing the fast till we sight it or complete the 30 days of fasting. I said: Is it not sufficient that we depend on Mu'awiyah's sighting and fasting. He said: No, this is the way our Prophet has commanded to follow. (This Hadith has been reported by Muslim)

Imam Al-Nawawi, while explaining this Hadith of Sahih Muslim, put the chapter this way: "Chapter of stating that people of each region have to see the crescent and if they sighted it in one region, their sighting would not be recognized for those who are far from them. This method of interpretation has been followed by all those who have reported this Hadith from the famous six books of Hadith. "

In the Islamic Shari'ah, observing and breaking the fast are associated with the crescent-sighting through the eye-sight as Ibn Omar (may Allah be pleased with both of them) reported Prophet Muhammad (peace be upon him) as saying: Don't observe the fast until you sight the crescent (of Ramadhan) and don't break the fast until you sight the crescent (of Shawwal) and if you have a cloudy sky, then you have to count it. (This Hadith has been reported in Sahih Bukhari and Muslim)

In this Hadith, the ruling depended on the means, which is the crescent-sighting. This may be found in a place like Makkah and Madinah and it may not be found in another place, because when the crescent is sighted in one place, there may be a day-time in another place. So how is it possible to command all people to observe or break the fast? This Hadith, in a way, explains how the crescent-sighting would be legally acceptable?

Muslim scholars in all schools of thought had the following views: The difference in places of moonrise is considered by many scholars. Ibn Abdul Barr has said that there is consensus among Muslim scholars that no unified crescent-sighting would be taken for consideration for the far-flung areas such as Khorasan, a region that is far away from Andalus (Spain) and each region would have its own ruling. The jurisprudence books in the various schools of thought are full of arguments in favour of difference in places of moonrise. These books can be consulted for more information.

As regards the rational perception, there is no disagreement among Muslim scholars on the difference in places of moonrise, because it is a thing, which anybody can see. Hence, the religion and reason agree on it. Likewise, the religion and reason agree on many rulings, which include the prayer-timings. We know that the difference in places of moonrise is very natural thing.

In light of the above-mentioned facts, the Islamic Fiqh Council adopted the following resolution:

There is no need to call for the unification of the crescent-sighting and religious feasts in the Muslim world, because such unification is not going to ensure their unity, as suggested by many of those who insist on such unification.

The Islamic Fiqh Council thinks that the issue of crescent-sighting should be left to the Ifta and judicial bodies in the Muslim countries, because it is better and more appropriate in view of the Muslims' general interest.

The Islamic Fiqh Council emphasizes that the thing, which ensures the unity and solidarity of the Muslim Ummah is in fact their agreement to comply with the Qur'an and Sunnah in all areas of the human life.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Saleh Ibn Othaimeen
Muhammad Mahmood Al-Sawwaf
Mustafa Al-Zarqa
Muhammad Shadhli Al-Neifer
Mabrook Al-Awaadi
Muhammad Abdullah Al-Subaiel
Abul Hassan Ali Al-Nadwi
Muhammad Rasheedi
Abdul Quddoos Hashemi
Muhammad Rasheed Qabbani
Hasanain Muhammad Makhloof
Abu Bakr Joomi
Muhammad Salem Abdul Wadood
Mahmood Sheith Khattab

# Resolutions of
# the Islamic Fiqh Council
# during Its Fifth Session Held
# between 8-16 Rabi Al-Aakhir 1402H
# (2-10 February 1982)

أبيض

# The First Resolution
# about Swearing by Torah/Bible
# before Jury

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) looked into the question submitted to it about putting hand on Torah, Bible or both of them while taking oath before jury in non-Muslim countries where the judicial system stipulates it on the swearing person.

The Islamic Fiqh Council studied the views of the various Fiqh schools of thought on requirements of swearing in general and judicial oath-taking before the jury in particular.

**The Council reached the following resolution:**

1. The swearing must not be by anything other than Almighty Allah, as Prophet Muhammad (peace be upon him) said: "Whoever swears, he should swear by Allah or keep quiet.

2. Putting hand on Qur'an, Torah, Bible or other is not necessary for the validity of swearing however, for avoiding lie, the government can enforce it to emphasize the oath.

3. For a Muslim, it is not lawful to put his hand on Torah or Bible while swearing, because their present editions are distorted. They are not the original books, which were sent down to Prophet Moses and Prophet Jesus (peace be upon them) and

also because Islamic Shari'ah, which was sent to Prophet Muhammad (peace be upon him) superseded all the other religious laws.

4. If the trial takes place in a non-Muslim country whose judicial system stipulates putting hand on Torah, Bible or both of them while swearing, then a Muslim must ask the court to allow him put his hand on the Qur'an. If the court did not respond positively to his request, he would be considered as if he has been forced in that case, he can put his hand on both of them or anyone of them without any intention of glorifying them.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa
Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi
Abu Bakr Muhammad Joomi

114

Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

أبيض

# The Second Resolution
# on Ihram from Jeddah for Those
# Who Arrive from Other Places

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) discussed the issue of Ihram from Jeddah, which many of those who come to Makkah Mukarramah for Hajj or Umrah pilgrimage by air or sea, are forced to do, due to their ignorance of Miqaat prescribed by Prophet Muhammad (peace be upon him), who has made it obligatory to do Ihram from Miqaat for all those who reside here or pass through it in order to perform the pilgrimage of Hajj and Umrah.

After taking into consideration, all the textual provisions available in the Islamic Shari'ah in this regard, the Islamic Fiqh Council adopted the following resolution:

**First:**
**Miqaats**, which Prophet Muhammad (peace be upon him) has prescribed and made it obligatory to do Ihram for their residents and others, who pass through them in order to perform the pilgrimage of Hajj or Umrah are:

**Dhul Hulaifah** for people of Madinah Munawwarah and those who pass through it. This place is now called Abyar Ali.

**Al-Juhfah** for people of Syria, Lebanon, Jordan, Palestine, Egypt and Morocco as well as those who pass through it. This place is now called Rabigh.

**Qarn Al-Manazil** for people of Najd and those who pass through it. This place is now called Wadi Muharram and As-Sail.

**Dhat Irq** for people of Iraq, Khorasan and those who pass through it. This place is now called Al-Dhareebah.

**Yalamlam** for people of Yemen and those who pass through it.

The Islamic Fiqh Council decided that it is obligatory for those who have intention to go for Hajj or Umrah to perform their Ihram, while approaching by air or sea, the place that is parallel to one of the above-mentioned five Miqaats, and which is the nearest to them. If they are doubtful and do not find anybody, who can guide them to the parallel of Miqaat, they must be careful and perform their Ihram before Miqaat, thinking that they have done their Ihram before reaching the line that is parallel to Miqaat, because Ihram before Miqaat is permissible.

Muslim scholars in all schools of Islamic Fiqh have the clear view on the above-mentioned issue and narrated in this regard, the authentic Hadiths of Prophet Muhammad (peace be upon him) regarding Hajj and Umrah. They have also presented as proof, what is reported from Ameer Al-Momineen Omar Ibn Al-Khattab (may Allah be pleased with him), when people of Iraq told him: Miqaat of Qarn Al-Manazil is away from our way. He told them: See its parallel on your way.

The Muslim scholars have said that Almighty Allah has commanded his servants to observe Taqwa as much as they can do. This is what can be done for those who do not pass through Miqaat. When it is known to them, then, the Hajj or Umrah pilgrims coming by air or sea must not delay their Ihram till they arrive in Jeddah, because Jeddah is not among Miqaats

118

prescribed by Prophet Muhammad (peace be upon him) for the Hajj or Umrah pilgrims.

Similarly, the person, who did not carry the Ihram garments, should not delay his Ihram till he reaches Jeddah, but it is obligatory for him to do Ihram in his trousers, in case, he did not have with him, an Izar, as Prophet Muhammad (peace be upon him) has been reported in a Sahih Hadith as saying: "Who does not find shoes, should wear socks and who does not find an Izar, should wear trousers."

However, he must keep his head uncovered, because Prophet Muhammad (peace be upon him), when asked about what a Muhrim should wear? He said: "He should not wear shirt, turban, trousers, coat and socks except when he does not find shoes." (Agreed upon)

For Muhrim, it is not permissible that he wears turban, cap or some other things used to cover the head. If he has a turban of a covering sheet, which he can use as Izar, he should use it as Izar, and in this case, he should not wear trousers. When he arrives in Jeddah, he must put off his trousers and replace it with an Izar if he can do so. If he did not have trousers and also did not have a turban which he can use as Izar, then, it is permissible for him, when he is on his way by air or sea and is in parallel to Miqaat that he should do Ihram with his (long) shirt, which he is wearing, however, he should keep his head uncovered. When he reached Jeddah, he should buy an Izar and put off his shirt and since he wore shirt, he will have to pay *Kaffarah*, that is to feed six poor persons as per the local standard, or to observe the fasting for three days, or slaughter a goat. He has the choice to do one of the three options as Prophet Muhammad (peace be upon him) had given the option to Ka'b Ibn Ajrah, when he permitted him to shave his head during his Ihram, due to the illness that he was suffering from.

119

**Second:**

The Islamic Fiqh Council assigns the MWL secretariat general to write to airline and shipping companies to inform the passengers before reaching Miqaat that they are shortly to pass Miqaat.

**Third:**

Sheikh Mustafa Ahmad Al-Zarqa, a member of the Islamic Fiqh Council differed in this regard. Sheikh Abu Bakr Muhammad Joomi, another member of the Council also differed on those who come from Sawakin to Jeddah only.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League with reservation[1]

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

---

[1] With reservation on compulsory Fidyah for wearing Shirt in this situation, since he is forced to do so for non-availability of the Ihram garments when he did Ihram, and when these garments became available put it off, as he has mentioned in Al-Furoo: If he did Ihram in Shirt and the like, would put it off and he will not have to pay any Fidyah, because Ya'la Ibn Ommayyah did Ihram in a robe, so the Prophet (peace be upon him) commanded him to put it off (agreed Upon) Abu Dawood added, so he put it off from his head and he (the Prophet) did not command him any Fidyah.

Muhammad Mahmood Al-Sawwaf

Saleh Ibn Othaimeen

Muhammad Abdullah Al-Subaiel

Mabrook Al-Awaadi

Muhammad Shadhli Al-Neifer

Mustafa Ahmad Al-Zarqa

Abdul Quddoos Hashemi

Muhammad Rasheedi

Abul Hassan Ali Al-Nadwi

Abu Bakr Muhammad Joomi

Hasanain Muhammad Makhloof

Muhammad Rasheed Qabbani

Mahmood Sheith Khattab

Muhammad Salem Abdul Wadood

أبيض

# The Third Resolution
# on Timings of Prayer and Fasting
# in Countries Situated on High Latitudes

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) reviewed the resolution of the Brussels Symposium 1400H/1980 as well as the resolution No. 61 adopted by the Senior Ulama Council in Saudi Arabia on 12th Rabi Al-Aakhir 1398H regarding the times of prayer and fasting in the countries where night is very short during certain period of year, and day is short in another period of year, or where sun continuously appears for six months and disappears for other six months.

After having studied the old and new writings on the issue by scholars of the Islamic Fiqh, the Council adopted the following resolution:

The regions which are situated on the high latitudes are divided into three categories:

1. Those regions whereas night or day continues for 24 hours or more according to variation of the year's seasons. In this situation, timings of prayer and fasting would be calculated according to the nearest region where night and day are distinguished during the 24 hours.

2. The regions where the red light after the sunset continues until Fajr (dawn) and red light of sunrise is not distinguished from

123

the red light of sunset. In these regions, timings of Isha (night prayer), Imsaak (start of fasting) and Fajr (dawn prayer) would be calculated according to time when the red light of sunset and sunrise are distinguished.

3. Those regions where night and day are distinguished during the 24 hours and where night is very long during certain period of the year and day is very long during another period of the year.

Those who reside in regions where night is distinguished from day through dawn of Fajr and sunset, and its day is very long in Summer and very short in winter, it is obligatory for them to pray five times which are well known in the Islamic Shari'ah as Almighty Allah says: *"Perform As-Salat (Iqamat As-Salat) from mid-day till the darkness of the night (i.e. Zuhr, Asr, Maghrib and Isha prayers), and recite the Qur'an in the early dawn (i.e. the morning prayer). Verily, the recitation of the Qur'an in the early dawn is ever witnessed (attended by angels in charge of mankind of the day and the night)."* (Qur'an, 17:78)  He also says: *"...Verily Al-Salat (the prayer) is enjoined on the Believers at fixed hours."* (Qur'an, 4:103)

Buraidah (may Allah be pleased with him) narrated that a man asked the Prophet (peace be upon him) about the time of prayer. Upon this he told him: pray with us these two, meaning two days. When the sun passed the meridian, he gave command to Bilal who pronounced Adhan (the call to prayer), then he commanded him so he pronounced Iqamah for Dhohr (noon) prayer. (Then at the time of afternoon prayer) he commanded him so he pronounced Iqamah for Asr (afternoon) prayer while the sun was high, white and clear. Then, he commanded him so he pronounced Iqamah for Maghrib when sun had set. Then, he commanded him so he pronounced Iqamah for Isha (night) prayer when the red light had

disappeared. Then, he commanded him so he pronounced Iqamah for Fajr (dawn) prayer when the dawn had appeared. When it was the second day, he commanded him to delay the Dhohr (noon) prayer till the extreme heat had passed and he did so. He allowed it to be delayed till the extreme heat had passed. He observed the Asr (afternoon) prayer when the sun was high, delaying it beyond the time he had previously observed it. He observed the Maghrib (evening) prayer before the red light had disappeared. He observed the Isha (night) prayer when a third of the night had passed. He observed the Fajr (dawn) prayer when there was clear morning light. He (the Prophet) then said: where is the man who inquired about the time of prayer? The man said: Messenger of Allah! Here I am. He (the Prophet) said: The time for your prayer is within the limits of what you have seen. (Muslim)

Narrated Abdullah Ibn Amr Ibn Al-Aas that the Messenger of Allah (peace be upon him) said: The time of Dhohr (noon) prayer is when the sun passes the meridian and a man's shadow is the same (length) as his height, (and it lasts) as long as the time for the Asr (afternoon) prayer has not come, the time for the Asr (afternoon) prayer is as long as the sun has not become pale, the time of the Maghrib (evening) prayer is as long as the red light has not ended, the time of the Isha (night) prayer is up to the middle of average night, and the time of the Fajr (dawn) prayer is from the appearance of dawn, as long as  the sun has not risen, but when the sun rises, refrain from prayer, for it rises between the horns of the devil. (Muslim)

There are other Hadiths which by their wording and practice determine the timings of the five prayers and do not differentiate between the day as being long or short, and likewise between night as being long or short, so long as times

of prayers are distinguished through the signs made by Prophet Muhammad (peace be upon him).

This was about their times for prayers. As regard times of their fasting during the month of Ramadhan, it is obligatory for Muslims to observe their fasting from the dawn to sunset every day as long as the day is distinguished in their country from the night and total hours of night and day are 24 hours. It is allowed for them to eat and drink as well as have the sensual relationship with their spouses in the night, even though it is short, as Almighty Allah says: *"...And eat and drink until the white thread of dawn appear to you distinct from its black thread, then complete your fasting..."* (Qur'an, 2:187)

A person who is unable to observe his fasting due to the long day or he is convinced that his fasting would cause serious illness or he is ill and his fasting would increase his illness on the basis of medical check-up, then he should not fast and make up those days in later months, as Allah says: *"...Who is present (at his home) during that month, should spend it in fasting but whoever is ill or on a journey, the prescribed period (should be made up) by days later..."* (Qur'an, 2:185) He also says: *"On no soul does Allah place a burden greater than it can bear..."* (Qur'an, 2:286)

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

126

**Members:**

Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa
Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi
Abu Bakr Muhammad Joomi
Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

أبيض

# The Fourth Resolution
# on Artificial Insemination
# and Test-Tube Babies

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) looked into the issue of artificial insemination and test-tube babies and reviewed the detailed research prepared and presented by some of the Council members on this issue in the previous session. It also reviewed the information collected by other members from the new writings on this issue. In the light of the information collected on this issue, the Council studied the issue from all aspects and dimensions.

After the thorough discussion, it reached the conclusion that this issue is very sensitive from the religious point of view and it has many dimensions. It has also serious consequences and repercussions on the life of family and its moral and social conditions, which are already seen in the foreign countries.

This issue has also certain aspects – in the religious perspective –related to the issues of legitimacy and illegitimacy, rules of need and emergency, regulations of lineage and doubtfulness, the marital bed, pregnant woman's sexual relationship with person other than the husband, rules of Iddat, purity of womb, sanctity of marriage, the rules of punishment in Islam through Hadd or Ta'zeer as there involved aspects which are not permissible in the religion such as the forms of internal insemination in woman and external insemination in the test-tube, then its plantation in womb

and other considerations which have made this issue very serious and there is a need to have more research and investigation especially after the latest writings which were published by the medical scientists who have been closely following  this issue and have opened the door of suspicion on the related happenings.

Therefore, the Islamic Fiqh Council decided to postpone its deliberation on this issue to the forthcoming session in order to have more in-depth research and investigation in its various aspects, dimensions and prospects, and so that the Shari'ah ruling is far away from any premature conclusion and close to the right path in order to know the ruling of the Islamic Shari'ah.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa
Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi

130

Abu Bakr Muhammad Joomi
Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

أبيض

# The Fifth Resolution on Friday and Eid Khutbah in Non-Arab Countries and Use of Loudspeaker

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) looked into the question which was referred to it on the prevailing difference among some Muslims in India regarding the permissibility or non-permissibility of the Friday Khutbah in the local language other than the Arabic language as there are those who see that it is not permissible, because the Friday Khutbah is in fact the replacement of the two Rak'ah obligatory prayer.

The questioner also asked whether it is permissible or impermissible to use the loudspeaker for delivering the Khutbah as some scholars announced that it is not permissible to use it. They present weak arguments.

After having studied the views of the Fiqh scholars in various schools of the Islamic Fiqh, the Council adopted the following resolution:

1. Most appropriate view which we have adopted is that the Arabic language is not a condition for validity of the Friday and Eid Khutbah in the non-Arab countries. However, it is better to recite its introductory part that contains the Qur'anic verses in Arabic so as to make non-Arabs used to the Arabic language and the Qur'an, and so that it is easy for them to learn and recite the Qur'an in its own language. After that,

Khateeb should continue his address in the local language that is understood by the audience.

2. There is no objection in the Islamic Shari'ah for the use of loudspeaker in order to deliver the Khutbahs of the Friday prayer as well as Eid Al-Fitr and Eid Al-Adha. Likewise, there is no objection for its use during the prayers. Even it is desirable to use it in the big mosques where the voice hardly reaches all corners of such mosques. It is also because the use of loudspeaker serves the objectives of Islamic Shari'ah.

Every new instrument that is in the human reach by the Grace of Almighty Allah, serves a purpose of the Islamic Shari'ah or helps in accomplishment of the Islamic duties or obligations is in fact a religious requirement.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa

134

Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi
Abu Bakr Muhammad Joomi
Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

أبيض

# The Sixth Resolution
# on Currency Note

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) looked into the research paper presented to it on the issue of the currency note and the rulings of Islamic Shari'ah on it. After having discussion and deliberation, the Council adopted the following resolution:

1. Since the origin of cash money is gold and silver, and their pricing is the main cause of usury according to one of the most authentic views in the Islamic Fiqh. This pricing is not confined to gold and silver only and since the currency note has also acquired the price value and taken the place of gold and silver in the transaction and through it, things are evaluated in the present age, because the dealing with gold and silver has disappeared. People are now content to possess and save it. The public commitments and dealings are finalized through it, despite the fact that it has no value in its own. Its value is due to some other reason and that is the existence of general trust that it enjoys as a medium of dealing and transaction. This is its price-value.

   Since the usury in gold and silver is due to the price-value that exists in the currency note, that is why the Islamic Fiqh Council decides that the currency note is self-sufficient money and its price-value is similar to that of gold and silver. Hence, Zakah is applicable in it and usury of both kinds (Fadhl and

Nassa) is also applicable in it, as they are applicable in gold and silver, where the price-value plays an important role as it plays in the currency note. This way the currency note acquires the position of money in all commitments approved by the Islamic Shari'ah.

2. The currency note is self-sufficient money, and its money value is similar to that of gold and silver. The currency note has different types, which vary as per the agencies which issue them in the different countries. In other words, the Saudi currency note is one kind and the US currency note is another kind. Likewise, every currency note is a separate kind whereas the usury with its both kinds (Fadhl and Nassa) is applicable as it is applicable in gold, silver and other kinds of money.

 All above considerations call for the following:

A: It is not lawful to sell the paper money for each other or for other kinds of cash money such as gold and silver. Hence, it is not lawful for example to sell a Saudi Riyal in exchange of any other currency in debt and with increase and decrease.

B: It is not lawful to sell one kind of the currency note between each other in increase or decrease whether it is in debt or cash sale, such as selling the notes of 10 Saudi Riyal for notes of 11 Saudi Riyal whether in cash or credit.

C: It is lawful to sell one kind of the currency note for another kind if it is in cash. For example, it is lawful to sell the Syrian or Lebanese Lira for Saudi Riyal or to sell one US Dollar for three Saudi Riyals if it is in cash, because this sale would be considered as a sale of one kind for different kind.

3. Zakah is obligatory in the currency notes when they reach the least of any *Nisab* of either gold or silver, or they make up the

*Nisab* with other wealth or goods made for commerce or trade.

4. It is lawful to make the currency notes as the capital money in Selam sales and companies.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa
Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi
Abu Bakr Muhammad Joomi
Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

139

أبيض

# The Seventh Resolution
# about Impact of Extra-ordinary Circumstances
# on Contractual Rights and Obligations

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 5th session held between 8-16 Rabi Al-Aakhir 1402H (2-10 February 1982) reviewed the problem of a sudden change caused by extra-ordinary circumstances in the undertaking contracts, which are sighed for different purposes. These extra-ordinary circumstances, which greatly affect the balance of both parties' estimates as the contract gives each party certain rights and obligations.

This problem has certain forms and situations of dealings, which require just and appropriate solutions to those forms and situations in the light of the Islamic Shari'ah. Some forms of this problem are mentioned in the following:

1. If a construction contract for a huge building, which requires a long period of construction is signed between two parties and its construction and plaster price per cubic metre is fixed at a rate of 100 Dinar, while the cost of the basic materials such as steel, cement and wood as well as cost of the labour at the time of contract is estimated 80 Dinar per cubic metre. Then, an unexpected war or a major happening takes place during the execution of the building, breaking the communication and import links and compelling a major price hike, which made the execution of the contract very difficult.

2. If a party, which has signed an undertaking contract to supply the foodstuff such as meat, milk, eggs, vegetables etc. to a hospital, university hostel or government guesthouse at a fixed price for a period of one year. Then, a natural calamity or disaster took place in the country and prices of the various commodities became manifold high making the supply commitment very difficult.

There are other forms of this problem. Then, what is the Shari'ah ruling on such cases, which often take place in the present time that is characterized with big contracts with the governments for constructions of roads, tunnels, bridges, hospital, residential complexes, university campuses and the government headquarters?

Similarly, there are contracts signed with big companies to construct the industrial complexes and the like, which did not exist in the ancient past. In this situation, whether the contractor would continue with the same conditions and prices that were before the change of the situation or the above-mentioned major happenings, whatever heavy losses, he may incur in compliance of the contract and its stipulations, or he may have some relaxation or remedy from the Islamic Shari'ah, which can adjust both the parties in a more balanced way and achieve justice between the two parties as much as possible.

The Islamic Fiqh Council looked into the similar cases in the different schools of the Fiqh and reviewed the related Shari'ah rules, which can be taken into consideration in order to find out a solution in this regard and recommend an appropriate ruling.

The Council while referring to the various schools of the Islamic jurisprudence found the following:

1.  The lease can be nullified due to the extra-ordinary circumstances such as war and other natural calamities, in which the profit becomes very difficult, even the Hanafi school of Fiqh allows the nullification of the lease due to some circumstances related to the lessee, which shows that the Hanafi school of Fiqh preferably accepts the nullification of lease in the general emergency. Ibn Rushd mentioned (*Bidayat Al-Mujtahid* Vol.2 P.192, 1st Khanji Edition, Jamaliyah Press, Egypt) under the heading: (The Emergency Rules) that the Maleki school of Fiqh views that the land, which is irrigated only by rain waters is given on lease and the drought prevents its cultivation, if the lessee cultivates this land, the drought would not hep him and the lease would be considered nullified. Similarly, when the rain is very little till the period of the cultivation expired and the lessee could not cultivate this land, the same ruling would apply in this case.

2. Ibn Qudamah Al-Maqdesi mentioned (in *Al-Mughni,* with *Al-Sharh Al-Kabeer,* Vol.6, P.30) that when a general situation of fear prevents the residence in a place, which has been leased or there is a blockade that prevents access to a land leased for cultivation, then it gives the lessee an option of nullification, because it is a situation that prevents the lessee from getting the benefit of the lease. If the fear is due to the lessee, for example, he is frightened because he has foes in that place, then he does not have an option of nullification, because this is due to his own reason and does not prevent the benefiting from the lease itself.

3. Imam Al-Nawawi has mentioned (in *Raudhat Al-Talibeen*, Vol.5, P.239) that the lease is not nullified because of the excuses like a person who hired an animal for travelling and became sick or he took a shop on rent for a profession and lost the equipments of that profession or he took on rent, a bathroom for hot water and could not manage the required

fuel. Imam Al-Nawawi adds that if the excuse is associated with the lessor as if he fell sick or became unable to go out with the animal or he rented his house and his family members, who were on tour, came back and he then needed the house. In this case, there is no nullification because there is no trouble with what has been leased.

4.  What is mentioned by the Fiqh scholars about the natural calamities that destroy the sold fruits on trees due to certain factors such as extreme cold or heat, rain, storms, whereas they decide to discount the amount equivalent to the loss caused by the natural calamity. It is a known issue of the natural calamities in the Islamic Fiqh.

5.  Sheikh Al-Islam Ibn Taymiyah said (in *Mukhtasar Al-Fatawa* P.376) that a person, who takes on lease, some amenity which is useful for general public such as bathroom, hotel or the shopping centre and its usual profit decreases due to the lesser number of customers or some other reasons such as war, change of government or fear of any kind, then the rent equivalent to the decreased profit would be discounted from the lessee.

6.  Ibn Qudamah also said (in the above-mentioned reference P.29)that if a person hired an animal for riding or loading to a certain place, then, the way to that place was cut off for fear of a mishap, or he hired an animal to Makkah for Hajj but the people did not go for Hajj that year due to some reasons, then each of the two parties can nullify the hire and if they wished to continue it till the possibility of getting the benefit, then also, it would be valid.

Sheikh Al-Kasani, one of the eminent scholars of the Hanafi school of Fiqh, said (in *Badae' Al-Sanae'* Vol.4, P.197) that the nullification is in fact, for prevention of harm, and the

denial of nullification – in case, the excuse exists – is contrary to the reason and religion, because it is like a person, who had pain in his tooth and hired a person to take out that tooth, however, pain of the tooth died down, then if he forced the hired person to take out his tooth, it would be very bad in reason and religion. What the scholars of the various schools of the Fiqh have said about the extra-ordinary circumstances in lease, they have said the same in agriculture, plantation and irrigation.

7. Prophet Muhammad (peace be upon him), his companions and many scholars of the Islamic Fiqh have given the ruling on the natural calamities, which destroy the fruits on trees that the value equivalent to the loss of the sold fruits would be discounted from the total value and if the whole quantity of the fruit is destroyed, the entire value would be discounted.

8. Prophet Muhammad (peace be upon him) is reported to have said: "No harm to self and no harm to others." The Fiqh scholars have derived from this Hadith, a jurisprudence rule and considered it one of the essential foundations of the Islamic Fiqh. They have based many rulings of the Islamic Fiqh on the basis of this rule with the aim of preventing as well as removing the harm as much as possible.

There is no doubt that the contract, which is concluded according to its legal system, is judicially binding to the concluding parties as Almighty Allah says: "*O you who believe! Fulfil (all) obligations…"* (Qur'an, 5:1) However, the binding power of the contract is not stronger than the textual ruling of the Islamic Shari'ah.

The Islamic Fiqh Council has found in the criteria of the religious commandments and the rationale of legislation in Islam that hardship, which is generally associated with the religious

commandment such as the hardship of standing in *Salah* (prayer), hardship of hunger and thirst in *Siam* (fasting) does not nullify the commandment and even does not cause any relaxation in the commandment.

However, when the hardship crossed its natural limits found in each commandment, it either nullifies the commandment or causes relaxation in it such as the hardship of the sick person in the prayer and fasting as well as the hardship of a blind or handicapped in Jihad, then the extreme hardship due to extra-ordinary circumstances, should cause the extra-ordinary dispensation that removes the extreme limit. Imam Abu Is'haq Al-Shatebi in his book, *Al-Muwafaqaat Fi Osool Al-Shari'ah* has explained in detail and presented many examples of rulings from the Islamic Shari'ah.

It is clear from this, that the usual loss in ups and downs of the business has no impact on the contract, because such loss is associated with ups and downs of the business. However, when the loss crossed its usual limits due to the above-mentioned extra-ordinary reasons, then, it causes an extra-ordinary dispensation.

Imam Ibn Al-Qayyim said in his book, *I'lam Al-Mu'qieen*: Allah has sent His Prophets and Books with balance that is key to every thing between heavens and earth. Everything that is contrary to justice has nothing to do with the Islamic Shari'ah and whenever there is justice, it means that there is Islamic Shari'ah.

The intention of the contract parties is determined by the circumstances of the contract. This intention cannot be ignored and also it is difficult to stick to the contract literally in all the circumstances. So it is obvious that the intervention in such extra-ordinary circumstances of the contract in order to find out a

146

just solution is jurisdiction of the judicial system. In the light of these guidelines and textual rulings that provide an appropriate Fiqh solution of this vital issue, the Islamic Fiqh reached the following conclusion:

1. In contracts of relaxed execution (like contracts of supply, undertaking or construction) when circumstances of the contract change in a radical way altering the prices, costs and conditions due to unexpected extra-ordinary circumstances inflicting the huge losses to the contractor in case of the contract execution, then the judge can, on request, modify the contractual rights and obligations in a way that distributes the loss on both parties. He also can nullify the contract, which was not executed yet if he found that its nullification is better through a just compensation to the contractor to cover up the major loss that may incur to him due to nullification of the contract in order to have a balance between the two parties. The judge will look into these matters in the light of the experts' opinions.

2. The judge can give the time to the contractor if he found that the extra-ordinary situation may go shortly and the contractor would not incur much loss with this extra time.

The Islamic Fiqh Council is of the view that this solution derived from principles of the Islamic Shari'ah would achieve the balance between the two parties of the contract and would prevent the heavy loss to any of the parties due to a reason, which he has nothing to do with it. The Council is also of the view that this solution is closer to the Islamic Shari'ah and its just objectives.

**Chairman, Islamic Fiqh Council**
Abdullah Ibn Muhammad Ibn Humaid
President, Supreme Judicial Council
Saudi Arabia

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harakan
Secretary-General, Muslim World League

**Members:**
Abdul Aziz Ibn Abdullah Ibn Baz
General President, Research, Ifta, Da'wah and Guidance

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Abdullah Al-Subaiel
Mabrook Al-Awaadi
Muhammad Shadhli Al-Neifer
Mustafa Ahmad Al-Zarqa
Abdul Quddoos Hashemi
Muhammad Rasheedi
Abul Hassan Ali Al-Nadwi
Abu Bakr Muhammad Joomi
Hasanain Muhammad Makhloof
Muhammad Rasheed Qabbani
Mahmood Sheith Khattab
Muhammad Salem Abdul Wadood

# Resolutions of
# the Islamic Fiqh Council
# during Its Sixth Session Held
# between 9-16 Rabi Al-Aakhir 1403H

أبيض

# The First Resolution
# on Election of Chairman
# for the Islamic Fiqh Council

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Sunday 9th Rabi Al-Aakhir 1403H looked into the issue of electing the Chairman of the Islamic Fiqh Council in succession of Sheikh Abdullah Ibn Muhammad Ibn Humaid (may Allah bless him with His mercy), and according to the 4th article of the IFC's rules and regulations, which lays down that the chairman will be elected by the Council through an absolute majority.

The Council unanimously decided that His Eminence Sheikh Abdul Aziz Ibn Abdullah Ibn Baz would be the Chairman of the Islamic Fiqh Council.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

**Members:**
Abdullah Abdul Rahman Al-Bassam
Saleh Fauzan Abdullah Al-Fauzan
Muhammad Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Al-Sawwaf
Saleh Ibn Othaimeen

Muhammad Al-Shadhli
Muhammad Rasheed Qabbani
Muhammad Salim Abdul Wadood
Abdul Quddoos Al-Hashemi
Abu Bakr Mahmood Joumi
Muhammad Rasheedi
Mahmood Sheith Khattab
Abul Hasan Ali Al-Nadwi
Hasanain Muhammad Makhloof

# The Second Resolution
# on Wrong Interpretation
# of Surah Al-Ikhlas

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Monday 10th Rabi Al-Aakhir 1403H examined the strange and objectionable article published by the Kuwaiti newspaper, *Al-Siyasah* in its Issue No. 4776 dated Thursday 17 Dhul Hijjah 1401H (15 October 1981) under a misleading headline (Meaning of Tawheed: Literal Interpretation of Surah Al-Ikhlas and Its English Translation) signed by a person called : Muhammad Ahmad Al-Shimali, who in his article had audacity to play with the meanings of the Glorious Qur'an and bring out a strange mix of ignorance, imagination and distorted notions, which do not reflect except his mental disorder, as he claims that it is an interpretation of Surah Al-Ikhlas.

This new interpreter begins his interpretation of Surah Al-Ikhlas, by saying: 'Qul' is a predicate which has been advanced to mean that there is a person before the word 'Qul'. 'Huwa' is pronoun of a subject that comes later to mean that God has made the person alone.

In this way, the misguided man goes on interpreting the remaining verses of Surah Ikhlas.

The Islamic Fiqh Council is of the view that it is not strange that among the mentally disturbed persons, there are those who consider themselves scholars and thinkers, which is a kind of

153

sickness. However, the stranger thing is that a well-know Arab newspaper in an Arab and Islamic country publishes such a senseless material under a prominent headline to point out that this is the meaning of Tawheed derived from Surah Al-Ikhlas.

It is well known that this brief but marvelous Surah which has shown the reality of Tawheed in well-defined words was and would continue to be a great challenge in the face of different false ideas and notions.

If this senseless material is a literal interpretation of the great Surah Al-Ikhlas, then what this interpreter has left for the destructive sects which play with the verses of the Qur'an as much as they want to achieve their evil aims? Such follies in fact amount to crime against the Qur'an and apostasy from Islam.

How did it happen that an Arab newspaper whose proprietor belongs to the religion of Islam and lives in a Muslim country, made its pages available for such follies? How is it possible that the newspaper and author who has audacity to ridicule the Qur'an's verses are free from the accountability enjoined by the constitutional provisions and laws of punishment as well as the rules of publication in the concerned country and all Arab countries?

For above as well as for the gravity of such irresponsible behaviour in media and publication regarding audacity against Islamic faith and values, the Council decided to draw the attention of the authorities which are responsible for protection of the Islamic teachings and values. It also referred this resolution to the General Secretariat of the Muslim World League in order to send it to the higher authorities in the State of Kuwait and other countries so that they carry out their duty towards the Qur'an and the Sunnah in order to preserve their sanctity and protect them from being tools of game in the hands of those who want to

154

misguide the thinking of people especially the youth through misusing the freedom of publication.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

**Members:**
Abdullah Abdul Rahman Al-Bassam
Saleh Fauzan Abdullah Al-Fauzan
Muhammad Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Al-Shadhli
Muhammad Rasheed Qabbani
Muhammad Salim Abdul Wadood
Abdul Quddoos Al-Hashemi
Abu Bakr Mahmood Joumi
Muhammad Rasheedi

أبيض

# The Third Resolution
# on Phenomenon of Covering Truth with False
# in Indonesia and Elsewhere

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Thursday 13th Rabi Al-Aakhir 1403H examined the phenomenon of (covering the truth with false in Indonesia and elsewhere). It reviewed the relevant reports, studies, researches and Fatwas. It also looked into the issue of attending the festivals and ceremonies of Buddhists and others.

After having discussion and exchange of views on these issues, the Council decided that Muslim's participation in such festivals and ceremonies, which are not Islamic, is prohibited and forbidden in the Islamic Shari'ah. Hence, it is not permissible for Muslim to attend such festivals, present gifts to their organizers, visit their places or follow their customs as there happen things which are contrary to the Islamic Shari'ah.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

**Members:**
Abdullah Abdul Rahman Al-Bassam
Saleh Fauzan Abdullah Al-Fauzan
Muhammad Abdullah Al-Subayil

157

Mustafa Ahmad Al-Zarqa
Muhammad Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Al-Shadhli
Muhammad Rasheed Qabbani
Muhammad Salim Abdul Wadood
Abdul Quddoos Al-Hashemi
Abu Bakr Mahmood Joumi
Muhammad Rasheedi

# The Fourth Resolution
## on Research Paper Entitled:
## (Islam of Negus and Islamic Sources)

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Sunday 16th Rabi Al-Aakhir 1403H, reviewed the research paper presented by Sheikh Mahmood Sheith Khattab, Member of the Islamic Fiqh Council on Islam of Negus, King of Abyssinia, and its authenticity at a time when some researcher has published his article in an Arabic magazine and created doubts about Islam of Negus on the basis of weak arguments subscribed by orientalists and other foreign sources.

Sheikh Khattab proved the King Negus' Islam on the basis of the essential sources of Hadith and Seerah and denounced those who take their information from the foreigners only. It is well known that their sources are motivated by suspicion and doubt and this is evident in most of their writings about Islam.

The Council is of the view that the presentation of Sheikh Mahmood Sheith Khattab is characterized with originality and good research methodology based on original and authentic sources which have made it a good academic model which should be followed by the research scholars among our new generation. It also points to the extent of mistake which has been committed due to dependence on the foreign sources only. The Council decided to recommend to the Secretariat-General of the Muslim World League to publish and distribute it, in addition to

159

its publication in the Islamic magazines for a wider benefit to the public.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

**Members:**
Abdullah Abdul Rahman Al-Bassam
Saleh Fauzan Abdullah Al-Fauzan
Muhammad Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Al-Shadhli
Muhammad Rasheed Qabbani
Muhammad Salim Abdul Wadood
Abdul Quddoos Al-Hashemi
Abu Bakr Mahmood Joumi
Muhammad Rasheedi

# The Fifth Resolution
# on Promotion of Cassettes
# Which Attack Islam with the Title
# (A Message to Sheikh Al-Sha'rawi)

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Sunday 16th Rabi Al-Aakhir, examined the issue of promoting the cassettes in Kuwait which attack Islam with the title (A Message to Sheikh Al-Sha'rawi) and contain the distortion of the Qur'an's meanings.

After having discussion and exchange of views, the Council denounced this matter and decided that it amounts to condemnation of the Islamic principles and ridicule of the religious values and it is clearly an apostasy from Islam if it has taken place at the hands of those who belong to Islam.

The Council also decided to circulate its denunciation to the concerned authorities in the Muslim countries in order to follow up this matter and take the appropriate punitive measures against those who ridicule the religion of Islam or undermine its principles and values.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

161

**Members:**

Abdullah Abdul Rahman Al-Bassam

Saleh Fauzan Abdullah Al-Fauzan

Muhammad Abdullah Al-Subayil

Mustafa Ahmad Al-Zarqa

Muhammad Al-Sawwaf

Saleh Ibn Othaimeen

Muhammad Al-Shadhli

Muhammad Rasheed Qabbani

Muhammad Salim Abdul Wadood

Abdul Quddoos Al-Hashemi

Abu Bakr Mahmood Joumi

Muhammad Rasheedi

# The Sixth Resolution
# on Distribution of the Qur'an Copies
# in Hotel Rooms

*All Praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its session held on Sunday 16th Rabi Al-Aakhir 1403H reviewed the letter of Sheikh Mahmood Sheith Khattab, Member of the Islamic Fiqh Council about the distribution of the Qur'an copies in hotel rooms, in which he did not think it appropriate to do so for fear of the Qur'an's improper treatment.

After having discussion and exchange of views on the issue, the Council decided that it is obviously in the interest of the Qur'an that its copies are placed in hotel rooms so that those who could not see or read the Qur'an, can benefit from it.

The Council also recommended to the Secretariat-General of the Muslim World League to write a letter to Sheikh Mahmood Sheith Khattab, thanking him for his religious concern over the Book of Almighty Allah and informing him about the Council's view.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Muhammad Ali Al-Harkan

163

**Members:**

Abdullah Abdul Rahman Al-Bassam

Saleh Fauzan Abdullah Al-Fauzan

Muhammad Abdullah Al-Subayil

Mustafa Ahmad Al-Zarqa

Muhammad Al-Sawwaf

Saleh Ibn Othaimeen

Muhammad Al-Shadhli

Muhammad Rasheed Qabbani

Muhammad Salim Abdul Wadood

Abdul Quddoos Al-Hashemi

Abu Bakr Mahmood Joumi

Muhammad Rasheedi

# Resolutions of
# the Islamic Fiqh Council
# during Its Seventh Session Held
# between 11-16 Rabi Al-Aakhir 1404H

أبيض

# The First Resolution
# on the Stock Market

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H looked into the issue of stock market and the contracts which are concluded there for purchase and sale of the currency-notes, company shares, government and commercial bonds as well as commodities; either in cash or credit.

The Council also discussed the positive and useful aspects of this market as well as its negative and harmful aspects in the view of economists and those who deal with the stock market.

**A) The positive and useful aspects are in the following:**

1. It represents a durable market which provides a meeting point for sellers and buyers, and offers the cash and credit deals of shares, bonds and commodities.

2. It facilitates the process of financing the industrial, commercial and government establishments through the sale of shares and bonds.

3. It facilitates the sale of shares and bonds to others in order to benefit from their value, as the companies which issue them do not set their values for their owners.

167

4. It facilitates the knowledge of standard prices of shares, bonds and commodities as well as their fluctuation in transaction through the movement of supply and demand.

**B) Its harmful and negative aspects are in the following:**

1. Most of the credit contracts, which are concluded in the stock market are not real sale and purchase, as actual possession does not take place between the two sides of contract, while the possession by both or one of the sides is compulsory in the Islamic Shari'ah.

2. The seller in the stock market in most cases sells currency-notes, shares, bonds or commodities, which he does not own, in the hope that he will buy them from the market and deliver them in time without possessing the price at the time of contract, as it is a condition in the sale of *Selam*.

3. The buyer in the stock market mostly sells what he has bought for another person before its possession, and the other person also sells it to another person before its possession and in this way sale and purchase of the same thing continue before its possession, until the deal reaches the last buyer who may want to receive the sold thing from the first seller, who might have sold what he did not own or may settle with him on the difference of price at the time of execution that is the day of settlement, whereas the role of buyers and sellers other than the first and last is confined to receiving the difference of price in case of profit or paying it in case of loss at the mentioned date, as it happens exactly between gamblers.

4. Rich businessmen monopolize the shares, bonds and commodities in the market in order to control the sellers, who sell what they do not possess, hoping to buy them before the

date of the contract execution at a lower price and deliver at once and put them in an awkward situation.

5. This risk of the financial market comes from its being a means of influence in the markets generally, because prices in these markets are not fully based on actual supply and demand for those who need to sell or buy, but the prices are also influenced by so many things; some of them are precipitated by those who dominate the market or those who monopolize the commodities or currencies in the market through spreading a false rumour or the like. So here lies the legally prohibited risk, because it leads to unnatural fluctuation in the prices which badly affects the economic life, and this is just an example.

Major financers intentionally offer a bunch of financial papers such as shares or bonds hence their price falls down due to increase in supply. The small holders of such papers hurry up to sell them at a lower price, fearing more downfall in their price and more loss to them, so once again their price falls down due to further increase in supply. The major holders turn to purchase these papers at a lower price with the aim of raising their price at the time of increase in demand. The matter ends with huge earnings for major holders and heavy losses for small holders who represent the overwhelming majority, due to their deception of the unreal offer of similar papers. The same case happens in the market of commodities as well.

This is why the stock market has created a major controversy among economists. The reason behind it is that during certain periods of the world's economic history, it has caused a heavy loss of wealth in a short period of time. On the other hand, it has also made many other people rich without any effort. In the major crises which raged throughout the world, many of these economists have called for its abolishment, for it causes within

169

no time heavy loss and sudden collapse as in earthquakes and landslides.

Therefore, the Islamic Fiqh Council after looking into the reality of stock market, as well as into the cash and credit deals on shares, bonds, commodities and currency notes, and after its discussion in the light of the Shari'ah rulings, decided the following:

**First:**

The purpose of stock market is to provide a constant and durable market where chances of supply and demand are available and dealers of sale and purchase meet each other, and this is a good and useful thing, which prevents the exploitation of simple people and those who really want to sell or buy and do not know the prices. They also do not know who wants to sell or who wants to buy?

However, apart from this obvious benefit of the stock market, there are other kinds of deals which are prohibited in the Islamic Shari'ah, or which are based on gambling as well as exploiting and eating of people's money through unlawful means. Therefore it is not possible to give a general ruling about it, but it is necessary to give a ruling on the cases and deals which take place in the stock market, each of them separately.

**Second:**

The cash deals of the actual commodities which are owned by the seller and in which possession takes place, as it is stipulated that possession should take place during the deal session are indeed lawful deals as long as the deals are not about something which is prohibited. However, if the sold thing is not in the seller's possession, then it is necessary that conditions of the *Selam* sale are fulfilled, so after that it is not permissible for buyer to sell it before he possesses it.

170

**Third:**

Cash deals of the company shares, when these shares are in the seller's possession are permissible in the Islamic Shari'ah so long as the dealings of these companies are not prohibited such as the usurious banks and companies of alcoholic drinks. In such cases it is prohibited to sell or buy their shares.

**Fourth:**

The cash and credit deals of the bonds with interest of any kind are not permissible in the Islamic Shari'ah, because these are the transactions which involve usury.

**Fifth:**

The credit deals with all their kinds that take place about shares and goods which are not in the seller's possession in the way that is common in the stock market are not permissible in the Islamic Shari'ah, because it is a sale in which a person sells what he does not possess in a hope that he would buy it later and hand it over on the fixed date. Such deal is prohibited in the Islamic Shari'ah as Prophet Muahmmad (peace be upon him) has been reported as saying: "Don't sell what you do not possess." Similarly, Zaid Ibn Thabit (may Allah be pleased with him) has reported that the Prophet (peace be upon him) prohibited the sale of goods where they are bought until the traders possess and take them to their saddlebags. (*Ahmad, Abu Dawood*).

**Sixth:**

The credit deals in the stock market are not the kind of goods sale which is lawful in the Islamic Shari'ah, since there is difference between the two on account of two reasons:

a) In the stock market, the price is not paid in the credit deals during the deal session. The payment of price is delayed to the date of settlement, while the price in the sale of *Salam* must be paid in the deal session.

171

b) In the stock market, the commodity is sold – while it is under the responsibility of the first seller – and before it is possessed by the first buyer, there are several sales, and its only purpose is to receive or pay the difference of price between the unreal sellers and buyers in a venture to get the earning and profit like gambling while in the sale of *Selam*, it is not permissible to sell the sold commodity before its possession.

On the basis of what was mentioned earlier, the Islamic Fiqh Council is of the view that it is the duty of government officials in the Muslim countries not to leave the stock markets in their countries free for all kinds of deals without any consideration of whether these deals are permissible or not. They must not leave those who play with the prices, doing whatever they want to do.

They should make it mandatory for them to follow the lawful means and methods in respect of the deals that are concluded in it. They must prohibit the deals which are not permissible in the Islamic Shari'ah and prevent the play that causes the financial disasters and destroys the public economy, inflicting the losses to so many people.

It is always good to adhere to the Islamic Shari'ah in each and every thing as Almighty Allah says: *"Verily, this is My way leading straight. Follow it and do not follow (other) paths, lest they scatter you about from His path. Thus He has commanded you so that you are righteous."* (Qur'an, 6:153)

*May Allah bless the guidance towards the straight path. Blessing and peace be on His Prophet Muhammad and on all those who followed his way of guidance.*

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

172

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Salem Abdul Wadood
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Abdul Quddoos Al-Hashimi
Muhammad Rasheedi
Mahmood Sheith Khattab
Abul Hasan Ali Al-Nadwi
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

أبيض

# The Second Resolution
# on Changing the Script of
# Othmani Mus'haf

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H took note of the letter written by Sheikh Hashim Wahbah Abdul Aal from Jeddah, in which he mentioned the issue of changing the script of Othmani Mus'haf into the script of dictation.

The Council discussed this issue and reviewed the resolution No. 71 adopted by the Senior Scholars' Council in Riyadh, Saudi Arabia on 21.10.1399H in this regard, whereas it mentioned the reasons that call for continuing the writing of the Othmani script in the Qur'an as the following:

1. It has been proved that the Qur'an was written in the Othmani script at the time of the Third Caliph Othman (may Allah be pleased with him) and he ordered calligraphers of the Qur'an to write it in a certain script. His action was approved by *Sahabah* (the prophet's companions) and later by *Tabi'een* (those who came after the era of *Sahabah*) as well as those who came after them until now. Prophet Muhammad (peace be upon him) has been reported as saying: "You must follow my Sunnah (way) and after me the way of my guided successors." Hence, writing of the Qur'an in this script was maintained on the pattern of Othman, Ali and other *Sahabah* and in implementation of their consensus.

175

2. Changing the Othmani script to the present script of dictation with the purpose of facilitating the Qur'an's recitation would lead to another change whenever the pattern of writing changes, because the script of dictation is a way of writing that may change into another pattern. This would lead to distortion of the Qur'an with the change, increase or decrease of some letters with the passage of time and difference may occur in the Qur'an. Hence, the enemies of Islam would find a chance to criticize the Qur'an, while Islam has closed the door for any such evil and prevented the causes of any dispute.

3. If the Othmani script was not maintained for writing the Qur'an, it is feared that the Book of Allah would become a play in the hands of people, and whenever an idea of writing the Qur'an would come to somebody's mind, he would propose to apply it, hence, some may suggest writing of the Qur'an in Latin script or the like. So there is a risk and it is always better to avoid it.

After having discussed all of these aspects, the Islamic Fiqh Council, unanimously decided to support the resolution of the Senior Scholars Council in Saudi Arabia that it is not permissible to change the Othmani script in the Qur'an and it is compulsory to keep the Othmani script as it is, so that it continues to be a lasting proof against any change or distortion in the Qur'anic text and also in pursuance of the pattern adopted by the Prophet's companions and those who came after them (may Allah be pleased with all of them).

As regards the need to teach the Qur'an and facilitate its recitation for new generations who are used to the prevailing script of dictation, so this need can be fulfilled through the teachers' training, because teaching of the Qur'an in any case requires a teacher who teaches the new generation how to read the words of the Othmani script in the Qur'an, which are

176

different from the usual script of dictation, especially when it is observed that the number of such words is small and they are repeated many times in the Qur'an. These words are like الصلوة (As-Salaat) and السموات (As-Samaawaat). As soon as the child is able to learn the word in the Othmani script, its reading would become easy for him, whenever he would see it in the Qur'an. We have similar examples in the words of هذا (Hadha) and ذلك (Dhalika) even in the usual script of dictation.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Salem Abdul Wadood
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Abdul Quddoos Al-Hashimi
Muhammad Rasheedi
Mahmood Sheith Khattab
Abul Hasan Ali Al-Nadwi
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

177

أبيض

# The Third Resolution
# on Prohibition of Replacing the Arabic Numbers
# with Numbers Used in Europe

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H looked into the letter received by the Secretariat-General of the Muslim World League from Dr. Kamil Al-Shareef Minister of Endowments and Islamic Affairs in Jordan and the research paper titled 'The Arabic Numbers from the Historical Perspective' presented by him to the Jordanian Council of Ministers.

The research paper states that there is a notion among some intellectuals that the Arabic numbers ( ١-٢-٣-٤ etc) are in fact the Indian numbers and the European numbers (1,2,3,4, etc) are originally Arabic numbers. This conclusion leads them to another step: a call to adopt these numbers of the European script in the Arab countries. This call is also supported by the fact that the European numbers have become the means of accounting and calculation in transactions with foreign countries and institutions, which have the wider influence in economic and social areas in the Arab countries. Also, the appearance of different varieties of calculators and computers, which only use these numbers, make the adoption of these European numbers in the Arab countries a desirable, if not an inevitable thing.

The Council also studied the contents of this research paper, which explained the historical roots of writing the Arabic and European numbers.

179

The Council also took note of the resolution adopted by the Senior Scholars' Council in Saudi Arabia in its 21st session held in Riyadh between 17-28 Rabi Al-Aakhir 1403H in this regard. This resolution stated that it is not valid to replace the Arabic numbers, which are presently used in the Arab countries with the numbers used in the Western world, due to the following reasons:

**First:**

There is no proof for what supporters of this change have said that the numbers which are used in the West are the Arabic numbers. Instead, the facts speak otherwise. The present Arabic numbers have been in use for many centuries in different conditions and circumstances, and hence they are Arabic numbers for all practical purposes.

In the Arabic language, there are words, which are not originally Arabic words, however, with the continuous use, they have become part and parcel of the Arabic language. Even some of these words are found in the Glorious Qur'an (and described as the Arabized words).

**Second:**

This notion has its negative consequences and bad effects and it is a step towards the gradual Westernization of Muslim society. It is also supported by what was mentioned in the fourth clause of the report enclosed to the case and which states: "A document has been issued by the Ministry of Information in Kuwait, stressing the need of using the European numbers for reasons based on the necessity of concentrating on factors of scientific and cultural unity at the international level."

**Third:**

This notion will prepare the ground for replacement of the Arabic script with the Latin script even on the long-term basis.

**Fourth:**

It is also one of the symbols of imitating the West and approving its styles.

**Fifth:**

The Glorious Qur'an, books of Tafseer and dictionary as well as other books use Arabic numbers in their pages and references, and which form a great heritage. If the European numbers were to be used instead of these Arabic numbers, it would make future generations unable to benefit from this heritage easily.

**Sixth:**

It is not necessary to follow some Arab countries, which have started the use of European numbers because many of these countries have neglected what is even greater and more important than this, and that is the application of Islamic Shari'ah, which is a source of honour, triumph and happiness in this world and in the hereafter. Therefore, the practice of these countries cannot be accepted as a justification.

In the light of what have been mentioned above, the Islamic Fiqh Council decided the following:

**First;** to confirm the contents of resolution issued by the Senior Scholars' Council in Saudi Arabia in this regard, stating the prohibition of replacing the Arabic numbers with the European numbers for reasons mentioned in the afore-said resolution.

**Second;** non-acceptability of the view that calls for general use of the European numbers on the basis of what has been said in this regard, because the Ummah should not abandon what it has adopted for many centuries due to certain obvious reasons and then leave it due to certain other reasons.

181

**Third;** to caution the leaders of Arab countries about the gravity of this matter and keep them away from this dangerous notion, which has serious consequences on the Arab and Islamic heritage.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**

Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Salem Abdul Wadood
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Abdul Quddoos Al-Hashimi
Muhammad Rasheedi
Mahmood Sheith Khattab
Abul Hasan Ali Al-Nadwi
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

# The Fourth Resolution
# on Spread of Dowry Custom in India

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H took note of Brother Abdul Qadir Al-Hindi's translated letter, in which he mentioned his fight against the system of dowry in the Muslim society in India. The dowry is an amount paid by the bride in the marriage and Muslims register their dower in the marriage records only without actually paying it to the wife. A lot has been written in this regard in the Muslim periodicals published in the Tamil language. Brother Abdul Qadir added saying in his letter: "Therefore, such marriage is unlawful, and also children born out of such marriage are illegitimate in accordance with the Qur'an and the Sunnah.

The Council also took note of Sheikh Abul Hasan Al-Nadwi's letter addressed to the Secretary-General of the Muslim World League on 16.3.1404H, in which he said: "The issue of dowry is widespread among the people of India, and it is basically an issue of Hindus, which has affected the Muslims due to their daughters'interaction with the Hindu girls. The Muslim leaders have been fighting against this social custom. The Indian government has also begun recently to confront this custom. In my opinion, the Islamic Fiqh Council should issue a Fatwa and adopt a resolution on this issue to prevent Muslims from an un-Islamic and unjustified custom such as dowry, which has come in their society from others. I hope, all the Muslim leaders in India make their utmost efforts to successfully remove this custom."

The Islamic Fiqh Council, after review of what he has mentioned, decided the following:

**First:**

The Council expresses its thanks to Sheikh Abul Hasan Al-Nadwi and Brother Abdul Qadir for what they have done to raise this issue, and their religious concern to fight this bad custom. It also expressed its hope that they would continue their fight against this custom and other bad customs. It prayed to Almighty Allah for them as well as for all Muslims in order to bless them with success and reward them for their endeavour.

**Second:**

The Council advises Brother Abdul Qadir and others that such a marriage though it is contrary to the marriage conducted in the light of the Islamic Shari'ah, however, it is a valid marriage according to majority of the Fiqh scholars. Nevertheless, few scholars have objected to its validity if dower is not stipulated in the marriage. The children born out of this marriage are legitimate children and they legally belong to their fathers and mothers in the light of the Islamic Shari'ah. This is the consensus of Fiqh scholars. Even those who object to the validity of such marriage, because dower is not stipulated in it, have said in their books that children out of this marriage would be attached to their fathers and mothers.

**Third:**

The Council decided that such custom is an evil and a bad practice that is contrary to the Qur'an and the Sunnah as well as to the consensus of Fiqh scholars. It is also contrary to the practice of Muslims throughout their history.

As regards the evidence from the Qur'an, so Almighty Allah says: *"And give the women (on marriage) their dower as a free*

*gift…"* (Qur'an, 4:4) *"…And there will be no blame on you if you marry them on payment of their dower to them."* (Qur'an, 60:10) *"…Seeing that you derive benefit from them, give them their dowers (at least) as prescribed…"* (Qur'an, 4:24)

As regards the evidence from the Sunnah, the legality of dower is established through the sayings of Prophet Muhammad (peace be upon him) as well as his actions and approvals.

- As regards the Prophet's saying, Jabir has reported in *Musnad Ahmad* and *Sunan Abi Dawood* that the Prophet (peace be upon him) said: "If a man gives a handful of food as the marriage dower to a woman, she will be lawful for him.

- Regarding the Prophet's action, it has been reported by Ayeshah (may Allah be pleased with him) in Sahih Muslim and other books of Sunnah that his (the Prophet's) dower for his wives was twelve and a half *Ouqiyah*.

- As regards the Prophet's approval, it has been reported in the *Sahih Bukhari* and *Sahih Muslim* and other books of Hadith that Prophet Muhammad (peace be upon him) saw the remains of flower on Abdur Rahman Ibn Auf so he asked: "What is this." He replied: "I have married a woman on gold weighing a date-pit." He said: "May Allah bless you."

On the basis of the above-mentioned argument, the Council decided that it is compulsory for the husband to pay dower to his wife, whether it is immediate or deferred, or part of it is paid immediately and the remaining is paid later, provided that it is real and its intention is to pay it whenever it is possible, because it is forbidden to contract a marriage without a dower from husband to his wife.

185

The Council recommends that it is Sunnah to have a small dower in order to facilitate the marriage by scaling down the extra-ordinary costs and expenses. It also warns against overspending and waste in the marriage.

**Fourth:**

The Islamic Fiqh Council appeals to the Muslim scholars, leaders and general public in India to fight against this bad custom of dowry and try to uproot it from their country, because it is against heavenly religions and laws. It is also against sound thinking and perfect reasoning.

**Fifth:**

This bad custom, apart from its contradiction to the Islamic Shari'ah is greatly harmful to women, because grooms in this case do not marry except the girl whose family presents them an amount of money that attracts them, hence daughters of the rich are married and daughters of the poor remain without marriage. The consequences of this situation are very obvious. Marriage then would be on the basis of financial considerations, not on the basis of choice for the best boy or the best girl. It is common scene in the Western world that the poor girl has to spend her prime youth in working and earning until she is able to collect the amount that can attract a groom to marry her.

Islam has honoured the woman as it has commanded the men willing to marry to provide her with a dower that is appropriate to her and her state of affairs. This way, Islam has opened the door for the marriage of poor girls, because a small dower is sufficient to them and it is easier for men who are not rich to marry such women.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**

Dr. Abdullah Omar Naseef

**Members:**

Abdullah Abdurrahman Al-Bassam

Saleh Ibn Fauzan Al-Fauzan

Muhammad Ibn Abdullah Al-Subayil

Mustafa Ahmad Al-Zarqa

Muhammad Mahmood Al-Sawwaf

Saleh Ibn Othaimeen

Muhammad Salem Abdul Wadood

Muhammad Rasheed Raghib Qabbani

Muhammad Shadhli Al-Neifer

Abu Bakr Mahmood Joomi

Abdul Quddoos Al-Hashimi

Muhammad Rasheedi

Mahmood Sheith Khattab

Abul Hasan Ali Al-Nadwi

Hasanain Muhammad Makhloof

Mabrook Mas'ood Al-Awaadi

187

أبيض

# The Fifth Resolution
# on Artificial Insemination
# and Test-Tube Babies

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H looked into the study prepared by the Council's Member Mustafa Ahmad Al-Zarqa on artificial insemination and test-tube babies, a matter which has occupied minds of the people and has become one of the major current issues in the world.

The Council reviewed the medical achievments that science and technology have made in the present age towards child-bearing and handling the various causes of sterility.

From the above-mentioned detailed study, it became clear for the Council that artificial insemination for seeking the birth (other than the natural way of direct sexual contact between man and woman) takes place through one of the two basic methods:

- The method of internal insemination by injecting man's sperm into the appropriate place of woman's internal part.

- The method of external insemination between man's sperm and woman's ovum in the test-tube of medical laboratories then plantation of the fertilized ovum in woman's uterus.

In both methods, the woman has to expose herself to those who perform the operation.

It also became clear to the Council from this study, as well as from the discussion and deliberation on the issue that means and methods which are used for the artifical insemination to seek birth through both internal and external ways are seven methods in various situations. For the internal insemination there are two methods and for external insemination, there are virtually five methods. The methods irrespective of their legality or illegality in the Islamic Shari'ah are as the following:

## The Internal Artificial Insemination

**First Method:**
The male sperm of a married man is taken and injected into the appropriate place in the vagina or uterus of his wife so that the sperm comes into a natural contact with the ovum discharged by the wife's ovary and fertilization takes place between them, then plantation occurs in the wall of uterus as it happens in the case of the sexual intercourse. This method is resorted to, if the husband is not able for any reason what ever it may be, to deliver his semen during intercourse to the proper place.

**Second Method:**
The sperm of man is taken and injected into the appropriate place of another man's wife so that fertilization takes place internally and, plantation occurs in the uterus as in the first method. This method is resorted to, when the husband is infertile and there is no sperm in his semen so the male sperm is taken from a man other than him.

## The External Artificial Insemination

**Third Method:**
The sperm is taken from the husband, and the ovum from the ovary of his wife and placed in the medical test-tube under certain physiological conditions until the husband's sperm comes

in contact with the ovum of his wife in the test-tube and insemination takes place, then zygote begins to divide and grow and in the appropriate time transferred from test-tube to uterus of the wife owner of the ovum in order to get implanted on its wall. Then it grows and takes the shape like any foetus, and at the end of natural prenancy period, the wife delivers a baby boy or girl. This is the test-tube baby which the scientific advancement has produced by the Grace of Almighty Allah. To this day, a number of male and female children as well as twins have been born through this method and reported by the world press and other media.

This third method is resorted to, when the wife is steril due to the closure of the tube that links her ovary to her uterus.

**Fourth Method:**
The external insemination takes place in a test-tube between sperm taken from the husband and ovum taken from the ovary of a woman other than his wife (who is called as donor), then the zygote is planted in the uterus of his wife.

This method is resorted to, when the wife's ovary is removed (by surgical operation) or inactive, however, her uterus is perfect and able to zygote's plantation in it.

**Fifth Method:**
The external insemination takes place in a test-tube between sperm of a man and ovum of a woman who is not his wife (both of them are called as donors) then the zygote is planted in the uterus of another married woman.

This method is resorted to, when the married woman – in whom zygote was planted is steril due to inaction of her ovary, however, her uterus is perfect, and her husband is also steril and both of them want a child.

191

**Sixth Method:**

The external insemination takes place in the test-container between sperm and ovum of the couple then, the zygote is planted in the uterus of a woman who volunteers to bear it.

This method is resorted to, when the wife is unable to conceive pregnancy for some reason in her uterus, however, her ovary is perfect and productive, or she is not willing to be pregnant due to her comfort in life, hence, another woman volunteers to be pregnant on her behalf.

**Seventh Method:**

It is similar to the sixth method, however, the woman who volunteers to be pregnant, is the second wife of the husband who owns the sperm and her co-wife volunteers to bear the zygote on her behalf.

This method is not prevalent in the foreign countries whose laws do not allow polygamy, but in those countries where polygamy is allowed.

These are the methods of artificial insemination, which has been achieved by modern science to treat the causes of failure in pregnancy.

The Islamic Fiqh Council has looked into the utilization of these advancements for various purposes – These are already being applied in Europe and the United States – which have been much publicized in the print and electronic media. Some of these purposes are commercial, others take place under the heading of improving the human kind; some other takes place to respond to the desire of motherhood among unmarried women or among those women who are married but cannot conceive due to some reason in them or in their husbands. Also for these purposes some human sperm banks have been established to techno-

logically preserve man's sperm for a long time. Such sperms which can be inseminated are taken from known or unknown men as donation, or in exchange for compensation, as it is said that this has become today's reality in some countries of the civilized world.

## Legal View in the light of Islamic Shari'ah

The Islamic Fiqh Council, after having looked into the documented information which has been already written and published, as well as the application of Islamic Shari'ah's rules and objectives in order to find a proper ruling on the utilization of these methods, arrived at the following detailed resolution:

### First: General Rulings

a) The exposure of a Muslim woman to other than the person with whom, sexual contact is legally permitted is not allowed in any way unless there is a legitimate purpose which the Islamic Shari'ah considers a justification for such exposure.

b) The need of woman for treatment of a disease that troubles her or treatment of an abnormal condition in her body, which irritates her, is considered a legitimate purpose that permits her to expose herself to other than her husband for this treatment, and hence this exposure would be limited to the extent of necessity.

c) Whenever the exposure of woman to other than the person with whom sexual contact is legally permitted, is allowed for a legitimate purpose, it is necessary that the person who treats her is a Muslim woman, if possible, and if not, then a non-Muslim woman, and if not, then a trusted Muslim man, and if not, then non-Muslim man, in accordance with this sequence.

Any *Khalwah* (isolated meeting) between her and the male who treats her is not permissible except in the presence of her husband or another woman.

193

## Second: Ruling on Artificial Insemination

1. The need of married woman who cannot conceive as well as the need of her husband for child is a legitimate purpose that permits her treatment through one of the permissible methods of artificial insemination.

2. The first method (in which male sperm is taken from married man then injected into the uterus of his wife through internal insemination) is a method that is permissible in the Islamic Shari'ah with the above-mentioned general conditions and after it is confirmed that the woman needs this operation in order to conceive.

3. The third method (in which sperm and ovum are taken from a married couple, and their insemination takes place externally in a test-tube, then the zygote is planted in the uterus of the wife, owner of the ovum.) is in principle acceptable in the Shari'ah view, however it is not secure at all due to doubts and complications which surround the whole operation, so this method should not be resorted to, unless there are cases of extreme necessity and after the above-mentioned general conditions are met.

4. The seventh method (in which the sperm and ovum are taken from the couple, and after their insemination in the test-container, the zygote is planted in uterus of the other wife of same husband whereas she volunteers out of her own choice for this pregnancy on behalf of her co-wife, whose uterus is surgically removed) seemed to be permissible to the Council, if it is really needed and the above-mentioned general conditions are met.

5. In the three permissible cases, the Council decides that the lineage of the born child would belong to the couple, who are the source of sperm and ovum. The inheritance and other rights

would be subject to the lineage, hence, when the lineage of the born child from a man or woman is proved, the rules of inheritance and other rights would apply accordingly between the child and those whose lineage is linked to him.

As regards the wife who volunteered to be pregnant on behalf of her co-wife (in the aforementioned seventh method), she would be considered as the child's mother of *Ridhaa*, because this child has benefitted from her body and organism more than what a child of *Ridhaa* benefits from his mother of *Ridhaa* which necessitates certain rights and rulings as the lineage necessitates certain rights and rulings.

6. Other four methods of artificial insemination in both internal and external ways as explained earlier, are prohibited in the Islamic Shari'ah, and there is no scope to allow any of them, because both sperm and ovum in these methods are not from husband and wife, or because the woman who volunteers to conceive is alien to husband and wife, who are the source of sperm and ovum.

This is due to the complications which are found in general in the artificial insemination even in the cases which are permissible in the Islamic Shari'ah. This is also due to the possibility of mixing of sperms or zygotes in the test-containers, especially when its practice is common and wide-spread.

Therefore, the Islamic Fiqh Council advises those caring for their religion, not to resort to this practice except in case of extreme necessity and with full care and caution about the mixing of sperms or zygotes.

This is what the conclusion the Council has arrived at in this issue of the hour, which has strong religious sensitivity. The Council prays to Almighty Allah for blessing it with righteousness and guidance.

195

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Salem Abdul Wadood
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Abdul Quddoos Al-Hashimi
Muhammad Rasheedi
Mahmood Sheith Khattab
Abul Hasan Ali Al-Nadwi
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

# Resolutions of
# the Islamic Fiqh Council
# during Its Eighth Session Held
# between 28 Rabi Al-Aakhir 1405H-
# 7 Jumad Al-Oula 1405H

أبيض

# The First Resolution
# on Organ Transplant

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah between 28 Rabi Al-Aakhir 1405H – 7 Jumad Al-Oula 1405H (19-28 January 1985) and on the request made by the Muslim World League Office in the United States to the Council, looked into the issue of transplanting the organ of one human being into another, who is in need of that organ to make up his idle organ in the wake of great strides made by modern medical science with the use of latest technology.

The Council reviewed the study prepared by Sheikh Abdullah Ibn Abdurrahmah Al-Bassam in this regard, and its contents that included the difference of contemporary Fiqh scholars on permissibility of transplanting the human organs and arguments of every group of scholars in favour of its views in the light of the relevant Shari'ah evidences.

After thorough discussion among its members, the Council was of the view that the arguments of those who permit transplant are stronger, therefore it adopted the following resolution:

**First:**
The transplant of an organ from the body of a living human being into the body of another human being who is in need of this organ in order to save his life or to restore the function of

that organ is a lawful act and it is not against human honour with regard to the person whose organ has been taken. In the transplant, there is also a great benefit and good support to the person who needs the organ transplant and this is a legitimate and praiseworthy work, if the following conditions are there:

1. That donation of an organ by the donor does not harm him in a way that his normal life is disturbed, because the Shari'ah rule states that any harm must not be removed by another similar or more serious harm, and in that case, the donation of organ would be a suicidal act, which is not permissible in the Islamic Shari'ah.

2. That donation of organ by the donor is voluntary and without any compulsion.

3. That the organ transplant is the only possible medical option for the treatment of the needy patient.

4. That success of the transplant operation is almost certain.

**Second:**

The following cases would be permissible in the light of Islamic Shari'ah on priority basis:

1. That the organ is taken from a dead human being in order to save another human being who is in need of it, provided that the person whose organ is taken, had given his permission for it in his lifetime.

2. That the organ is taken from an animal whose meat is lawful for eating and it is legally slaughtered or also from other animal in case of necessity for its transplant into a human being who is in need of it.

3. That a part of the human body is taken for its transplant or patching on his body itself such as taking a part of skin or bone from a human being for its transplant or patching on some other part of his body, which needs such operation.

4. That an artificial piece of metal or another material is placed in the body of a human being in order to treat a case of sickness such as joints, the heart tube, etc.

The Council is of the view that all these four cases are permissible in the Islamic Shari'ah under the above-mentioned conditions.

This session was attended by a team of medical scientists to discuss this issue and they are:

1. Dr. Sayyid Muhammad Ali Al-Baar
2. Dr. Abdullah Basalamah
3. Dr. Khalid Ameen Muhammad Hasan
4. Dr. Abdul Ma'bood Ammarah Al-Sayyid
5. Dr. Abdullah Jumu'ah
6. Dr. Ghazi Al-Hajim

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa

201

Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Mabrook Mas'ood Al-Awaadi
Muhammad Salem Abdul Wadood

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Rasheedi
Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Abul Hasan Ali Al-Nadwi

# The Second Resolution
# on Artificial Insemination
# and Test-Tube Babies

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah between 28 Rabi Al-Aakhir 1405H – 7 Jumad Al-Oula 1405H (19-28 January 1985) looked into the observations made by some of its members about the permission given by the Council in the fourth para of the second clause of the Fifth Resolution regarding the artificial insemination and test-tube babies, issued by the Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H, with the following text:

"The seventh method (in which sperm and ovum are taken from the couple, and after their insemination in the test-container, zygote is planted in uterus of the other wife of the same husband whereas she volunteers out of her own choice for this pregnancy on behalf of her co-wife, whose uterus is surgically removed) seemed to the Council that it is permissible, if it is really needed and the above-mentioned general conditions are fulfilled."

**The summary of observations on this is the following:**

The second wife in whom the fertilized ovum of the first wife was planted, may conceive second pregnancy before the closure of her uterus for pregnancy of zygote, through the husband's intercourse with her in a period that is close to plantation of zygote, then she delivers twins and it is not known who is the child born out of zygote and who is the child born out of the

203

husband's intercourse. It is also not known who is mother of the child born out of zygote and who is mother of the child born out of the husband's intercourse. One of the two pregnancies may terminate as leech or embryo and its abortion takes place with the delivery of other pregnancy, which is also not known whether this child is out of the zygote or out of the husband's intercourse. The whole situation causes the mixing of lineage from the side of real mother for each of the pregnancies. It also causes the confusion in respect of other related rulings. Therefore, the entire issue made the Council to stop its ruling on this case.

The Council also listened to the opinions expressed by the experts of gynaecology who attended the session of the Council and confirmed the possibility of the second pregnancy out of the husband's intercourse with the wife who is pregnant of zygote, and also the possibility of the lineage's mixing as mentioned in the above observations.

After having discussion and exchange of views on the issue, the Council decided to withdraw the third condition of permissibility in the seventh method which was mentioned in the Council's resolution issued in this regard during the 7th session in 1404H whereas the Council's resolution on artificial insemination and test-tube babies would now be as the following:

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 7th session held between 11-16 Rabi Al-Aakhir 1404H looked into the study prepared by the Council's Member Mustafa Ahmad Al-Zarqa on artificial insemination and test-tube babies, a matter which has occupied minds of the people and has become one of the major current issues in the world.

The Council reviewed the medical achievments that science and technology have made in the present age towards child-bearing and handling the various causes of sterility.

From the above-mentioned detailed study, it became clear for the Council that artificial insemination for seeking the birth (other than the natural way of direct sexual contact between man and woman) takes place through one of the two basic methods:

- The method of internal insemination by injecting man's sperm into the appropriate place of woman's internal part.

- The method of external insemination between man's sperm and woman's ovum in the test-tube of medical laboratories then plantation of the fertilized ovum in woman's uterus.

In both methods, the woman has to expose herself to those who perform the operation.

It also became clear to the Council from this study, as well as from the discussion and deliberation on the issue that means and methods which are used for the artifical insemination to seek birth through both internal and external ways are seven methods in various situations. For the internal insemination there are two methods and for external insemination, there are virtually five methods. The methods irrespective of their legality or illegality in the Islamic Shari'ah are as the following:

## The Internal Artificial Insemination

**First Method:**
The male sperm of a married man is taken and injected into the appropriate place in the vagina or uterus of his wife so that the sperm comes into a natural contact with the ovum discharged

205

by the wife's ovary and fertilization takes place between them, then plantation occurs in the wall of uterus as it happens in the case of the sexual intercourse. This method is resorted to, if the husband is not able for any reason what ever it may be, to deliver his semen during intercourse to the proper place.

**Second Method:**

The sperm of man is taken and injected into the appropriate place of another man's wife so that fertilization takes place internally and, plantation occurs in the uterus as in the first method. This method is resorted to, when the husband is infertile and there is no sperm in his semen so the male sperm is taken from a man other than him.

## The External Artificial Insemination

**Third Method:**

The sperm is taken from the husband, and the ovum from the ovary of his wife and placed in the medical test-tube under certain physiological conditions until the husband's sperm comes in contact with the ovum of his wife in the test-tube and insemination takes place, then zygote begins to divide and grow and in the appropriate time transferred from test-tube to uterus of the wife owner of the ovum in order to get implanted on its wall. Then it grows and takes the shape like any foetus, and at the end of natural prenancy period, the wife delivers a baby boy or girl. This is the test-tube baby which the scientific advancement has produced by the Grace of Almighty Allah. To this day, a number of male and female children as well as twins have been born through this method and reported by the world press and other media.

This third method is resorted to, when the wife is steril due to the closure of the tube that links her ovary to her uterus.

**Fourth Method:**

The external insemination takes place in a test-tube between sperm taken from the husband and ovum taken from the ovary of a woman other than his wife (who is called as donor), then the zygote is planted in the uterus of his wife.

This method is resorted to, when the wife's ovary is removed (by surgical operation) or inactive, however, her uterus is perfect and able to zygote's plantation in it.

**Fifth Method:**

The external insemination takes place in a test-tube between sperm of a man and ovum of a woman who is not his wife (both of them are called as donors) then the zygote is planted in the uterus of another married woman.

This method is resorted to, when the married woman – in whom zygote was planted is steril due to inaction of her ovary, however, her uterus is perfect, and her husband is also steril and both of them want a child.

**Sixth Method:**

The external insemination takes place in the test-container between sperm and ovum of the couple then, the zygote is planted in the uterus of a woman who volunteers to bear it.

This method is resorted to, when the wife is unable to conceive pregnancy for some reason in her uterus, however, her ovary is perfect and productive, or she is not willing to be pregnant due to her comfort in life, hence, another woman volunteers to be pregnant on her behalf.

**Seventh Method:**

It is similar to the sixth method, however, the woman who volunteers to be pregnant, is the second wife of the husband who

207

owns the sperm and her co-wife volunteers to bear the zygote on her behalf.

This method is not prevalent in the foreign countries whose laws do not allow polygamy, but in those countries where polygamy is allowed.

These are the methods of artificial insemination, which has been achieved by modern science to treat the causes of failure in pregnancy.

The Islamic Fiqh Council has looked into the utilization of these advancements for various purposes – These are already being applied in Europe and the United States – which have been much publicized in the print and electronic media. Some of these purposes are commercial, others take place under the heading of improving the human kind; some other takes place to respond to the desire of motherhood among unmarried women or among those women who are married but cannot conceive due to some reason in them or in their husbands. Also for these purposes some human sperm banks have been established to technologically preserve man's sperm for a long time. Such sperms which can be inseminated are taken from known or unknown men as donation, or in exchange for compensation, as it is said that this has become today's reality in some countries of the civilized world.

## Legal View in the light of Islamic Shari'ah

The Islamic Fiqh Council, after having looked into the documented information which has been already written and published, as well as the application of Islamic Shari'ah's rules and objectives in order to find a proper ruling on the utilization of these methods, arrived at the following detailed resolution:

**First: General Rulings**

a) The exposure of a Muslim woman to other than the person with whom, sexual contact is legally permitted is not allowed in any way unless there is a legitimate purpose which the Islamic Shari'ah considers a justification for such exposure.

b) The need of woman for treatment of a disease that troubles her or treatment of an abnormal condition in her body, which irritates her, is considered a legitimate purpose that permits her to expose herself to other than her husband for this treatment, and hence this exposure would be limited to the extent of necessity.

c) Whenever the exposure of woman to other than the person with whom sexual contact is legally permitted, is allowed for a legitimate purpose, it is necessary that the person who treats her is a Muslim woman, if possible, and if not, then a non-Muslim woman, and if not, then a trusted Muslim man, and if not, then non-Muslim man, in accordance with this sequence.

Any *Khalwah* (isolated meeting) between her and the male who treats her is not permissible except in the presence of her husband or another woman.

**Second: Ruling on Artificial Insemination**

1. The need of married woman who cannot conceive as well as the need of her husband for child is a legitimate purpose that permits her treatment through one of the permissible methods of artificial insemination.

2. The first method (in which male sperm is taken from married man then injected into the uterus of his wife through internal insemination) is a method that is permissible in the Islamic Shari'ah with the above-mentioned general conditions and after it is confirmed that the woman needs this operation in order to conceive.

3. The third method (in which sperm and ovum are taken from a married couple, and their insemination takes place externally in a test-tube, then the zygote is planted in the uterus of the wife, owner of the ovum.) is in principle acceptable in the Shari'ah view, however it is not secure at all due to doubts and complications which surround the whole operation, so this method should not be resorted to, unless there are cases of extreme necessity and after the above-mentioned general conditions are met.

4. In the two permissible cases, the Council decides that the lineage of the born child would belong to the couple, who constitute the source of sperm and ovum. The inheritance and other rights would be subject to the lineage, hence, when the lineage of the born child from man or woman is proved, the rules of inheritance and other rights would apply accordingly between the child and those whose lineage is linked to him.

5. Other methods of artificial insemination in both internal and external ways as explained earlier, are prohibited in the Islamic Shari'ah, and there is no scope to allow any of them, because both sperm and ovum in these methods are not from husband and wife, or because the woman who volunteers to conceive pregnancy is alien to the husband and the wife, who are the source of sperm and ovum.

This is due to the complications which are found in general in the artificial insemination even in the two cases which are permissible in the Islamic Shari'ah. This is also due to the possibility of mixing of sperms or zygotes in the test-containers, especially when its practice is common and wide-spread.

Therefore, the Islamic Fiqh Council advises those caring for their religion, not to resort to this practice except in case of

extreme necessity and with full care and caution about the mixing of sperms or zygotes.

This is what appeared to the Council in this issue of the hour, which has strong religious sensitivity. The Council prays to Almighty Allah for blessing it with righteousness and guidance

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Mabrook Mas'ood Al-Awaadi
Muhammad Salem Abdul Wadood

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Rasheedi
Abdul Quddoos Al-Hashimi

211

Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Abul Hasan Ali Al-Nadwi

# The Third Resolution
## on Issue of *Ijtehad*

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah between 28 Rabi Al-Aakhir 1405H – 7 Jumad Al-Oula 1405H (18-29 January 1985) looked into the issue of *Ijtehad* which is meant for striving to know any of the Shari'ah rulings through inference from the evidences of Shari'ah.

The basic structure of *Ijtehad* requires full knowledge with the necessary conditions, without which there is no scope for *Ijtehad* in order to realize the *Fardh Kifayah* (an obligation to be accomplished not necessarily by the entire society, but a section of the society), as Almighty Allah says: *"Nor should the Believers all go forth together, if a contingent from expedition remaind behind, they could devote themselves to studies in religion and admonish the people when they return to them that they (may learn) to guard themselves (against evil)."* (Qur'an, 9:122)

The Qur'anic verse expounds that studies in religion require devotion and striving, so it is necessary to make the utmost effort and full care to reach the correct understadig of religion.

Imam Al-Soyuti in his book *'Arrad Ala Man Akhlada Ilal-Ardh Wa Jahal Annal Ijtehad Fi Kulli Asri Fardh'* has fully explained the obligation of *Ijtehad*. He emphasized that *Ijtehad*

213

did not stop and its door cannot be closed by anyone. The scholars of Fiqh rules and regulations, while discussing the issue of whether any period can be without a *Mujtahid* or not, have agreed that the door of *Ijtehad* is open to all those who fullfil its conditions, which include the thorough knowledge of the Qur'an and the Sunnah, principles of the Islamic Fiqh and objects of the Islamic Shari'ah conditions and circumstances of time, rules of preference in the contradicting evidences, in addition to the fact that *Mujtahid* must be fair, trustworthy and God-fearing.

*Ijtehad* has four categories:

1. *Mujtahid Mutlaq*
2. *Mujtahid Madhab*
3. *Mujtahid Tarjeeh*
4. *Mujtahid* in any particular issue or issues, and it is permissible on the basis of the fact that Ijtehad may be in part, and it is a preferred view.

Therefore, the Council unanimously decided the following:

**First:**

The need for *Ijtehad* in any era of time is an imperative need, because there are issues which have emerged in this age and were not there in the past. Similarly new issues will emerge in the future. Prophet Muhammad (peace be upon him) approved *Ijtehad* for Mu'aaz Ibn Jabal (may Allah be pleased with him) when he said that he would do *Ijtehad* and would not hesitate, in case he did not have any textual provision in the Qur'an or the Sunnah. Hence, Islam's vitality and compatability for all times was assured as all the problems of different transactions, new systems of investments and other social problems can be solved through *Ijtehad*.

It would be better if a centre is established to put together in one place all that is issued by the Fiqh academies, seminars and conferences in order to benefit the colleges and institutions of Shari'ah and higher Islamic studies. In this way, Islam would spread more and would be able to insure a virtuous life for entire humanity.

## Second:

*Ijtehad* should be collective through a body of Islamic Fiqh which is represented by scholars of the Muslim world. The collective *Ijtehad* was the prevailing order in the era of the Guided Caliphs, as Imam Al-Shatebi in his book *Al-Mu'wafaqaat* said that Omar Ibn Al-Khattab and other senior *Sahabah* (the Prophet's companions) as they represented the best of Muslim Ummah, used to issue religious rulings on upncoming issues after having collective discussion on them. *Tabi'een* (the successors of *Sahabah*) followed this pattern and in issuing the religious ruling, they mainly benefitted from the famous Fiqh scholars as Al-Hafiz Ibn Hajar in his book *Al-Tahdheeb* stated that when an issue emerged among the people, they used to discuss it and no ruling was issued until it is raised to those scholars for a final ruling on it.

## Third:

The necessary conditions of *Ijtehad* must be found in *Mujtahid*, because *Ijtehad* is not possible without its appropriate means so that the rulings are not away from the command of Almighty Allah and that they are not faced with failure. It is certain that without these necessary conditions of *Ijtehad*, it is not possible to comprehend the objects of the Islamic Shari'ah in the light of the Qur'an and the Sunnah.

## Fourth:

For *Ijtehad* it is necessary to benefit from our predecessors' methodology so that *Ijtehad* remains in its correct path and

moves ahead in the present age with full awareness of our predecessors' methodology in every thing in order to benefit from what has been presented by them, otherwise, things would be confused, because the books of Islamic Fiqh which are derived from the Qur'an and the Sunnah provide the biggest support in the solution of problems through their precedents.

**Fifth:**

The rule *"There no Ijtehad in the presence of a textual provision"* would be followed as the textual provision is certainly definite in its meaning and implication, otherwise the foundations of the Islamic Shari'ah would collapse.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Mabrook Mas'ood Al-Awaadi
Muhammad Salem Abdul Wadood

216

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Rasheedi
Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Abul Hasan Ali Al-Nadwi

أبيض

# The Fourth Resolution
# on Collection and Distribution
# of *Zakah* and *Oshr* in Pakistan

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah between 28 Rabi Al-Aakhir 1405H – 7 Jumad Al-Oula 1405H (18-29 January 1985) and on the basis of letter No. 4 / Political 36/38 dated 27 June 1983, enclosd with a question about the issue of 'Collection and Distribution of *Zakah* and *Oshr* in Pakistan, addressed by Consulate-General of Pakistan in Jeddah to His Eminence Sheikh Abdul Aziz Ibn Abdullah Ibn Baz, Chairman of the Council who referred it with his letter No. 2601/2 dated 16 Dhul Qa'dah 1403H to the Council looked into the translation of the question which sought a ruling on whether one of the eight funds of *Zakah* mentioned in the Qur'an *Fi Sabeelillah* (in the cause of Allah) is meant only for those who fight in the cause of Allah or it has a general meaning that covers every means of good work and public interest such as construction of mosques, inns, bridges, dissemination of knowledge, dispatch of preachers, etc.

After the discussion and deliberation on the issue, it appeared that there are two views among the Muslim scholars on this issue:

**The first view** confined the meaning of *Fi Sabeelillah* in the Qur'anic verse to those who fight in the cause of Allah. This view is subscribed by the majority of Muslim scholars, who

wanted to limit the *Fi Sabeelillah* fund of *Zakah* only to those *Mujahideen* who fight in the cause of Allah.

**The second view** is that *Fi Sabeelillah* is general and it covers all means of good work and public benefit for Muslims such as construction of mosques and their maintenance, establishment of schools, inns, bridges, opening of roads, preparation of war materials, dispatch of preachers, etc., which are benefitial for Islam and Muslims. This view was subscribed by a small number of the earlier scholars, however, in the later age it became the coice of many Muslim scholars.

After having deliberation on the issue and discussion of both views and their arguments, the Islamic Fiqh Council decided the following with a majority:

1. Since the second view has been subscribed by a group of Muslim scholars and it enjoys certain insight in some Qur'an verses like the saying of Almighty Allah: *"Those who spend their substance in the cause of Allah, and follow not up their gifts with reminders of their generosity or with injury – for them their reward is with their Lord; on them shall be no fear, nor shall they grieve."* (Qur'an, 2:262)   In a Hadith, it has been reported that one man donated a camel in the cause of Allah and his wife wanted to perform the Hajj pilgrimage. Prophet Muhammad (peace be upon him) said to her: "Ride on it, because Hajj is in the cause of Allah." (*Sunan Abi Dawood*)

2. Since the purpose of armed *Jihad* is to raise the word of Almighty Allah high as this purpose is achieved through fighting in the cause of Allah, it is also achieved through the work of Da'wah to the religion of Almighty Allah, and preparation of preachers and their assistance in order to carry out their mission, so both kinds would be considered as *Jihad*. In a Hadith, Anas (may Allah be pleased with him) narrated

Prophet Muhammad (peace be upon him) as saying: "Strive hard against the Unbelievers with your money, life and tongue." (*Ahmad, Al-Nassa'i* and *Al-Hakim*)

3. Since Islam is under an ideological and intellectual onslaught by atheists, Jews, Christians and other enemies of this religion, and all of them enjoy moral and material support, therefore, it is the duty of Muslims as well to confront them with the same arms and equipments that are used against Islam.

4. Since the Muslim countries now have separate ministries for defence and there are financial allocations in the budget of every country for such purposes unlike *Jihad* with Da'wah as there are no allocations of assistance for it in most of the countries, therefore, the Council decided with an absolute majority to classify the Islamic Da'wah and anything that supports it as well as the activities related to it under the meaning of *Fi Sabeelillah* (in the cause of Allah) in the Qur'an.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer

221

Abu Bakr Mahmood Joomi

Dr. Ahmad Fahmi Abu Sinnah

Muhammad Habeeb Ibn Al-Khojah

Dr. Bakr Abdullah Abu Zaid

Mabrook Mas'ood Al-Awaadi

Muhammad Salem Abdul Wadood

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi

Muhammad Rasheedi

Abdul Quddoos Al-Hashimi

Mahmood Sheith Khattab

Hasanain Muhammad Makhloof

Abul Hasan Ali Al-Nadwi

# The Fifth Resolution
# on Muslims' Burial in Wooden Box

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council looked into the question raised by Supervisor-General of Muslim Youth and Head of the delegation from the Islamic Society, Victoria, Australia about the burial of dead Muslims in the wooden boxes as practised by Christians, stating that some Muslims like this method and follow it. This is in spite of the fact that the government of the concerned state has allowed the Muslims to bury their dead persons in accordance with the Islamic way i.e. in Kafan (burial clothing) and without box.

After having deliberation and discussion on the issue, the Council decided the following:

1. Any action or behaviour of a Muslim to look like a non-Muslim and imitate him is prohibited in the Islamic Shari'ah and it is forbidden in accordance with hadiths of Prophet Muhammad (peace be upon him).

2. To bury the dead Muslim in a box with the intention of imitating the non-Muslims is prohibited. If such practice is done without any intention, then it is undesirable, and if there is a need for this practice, then, it is not objectionable.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

223

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Mabrook Mas'ood Al-Awaadi
Muhammad Salem Abdul Wadood

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Rasheedi
Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Abul Hasan Ali Al-Nadwi

224

# The Sixth Resolution
# on IFC's Condemnation
# of Photography of Prophet Muhammad
# and Other Prophets

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah between 28 Rabi Al-Aakhir 1405H – 7 Jumad Al-Oula 1405H (18-29 January 1985) took note of the letter No. 1205/5 dated 25 Rabi Al-Awwal 1405H addressed to His Eminence Sheikh Abdul Aziz Ibn Abdullah Ibn Baz, General President of Research, Ifta, Da'wah and Guidance by the Office of his Presidency in Qatar and enclosed with a booklet that contains a sketched picture which its owner pretends that it is a picture of Prophet Muhammad (peace be upon him), and another picture which its owner pretends that it is a picture of Ali Ibn Abi Talib (may Allah be pleased with him) and which was referred by His Eminence as per his letter No. 813/2 dated 30 Rabi Al-Aakhir 1405H to the Islamic Fiqh Council in order to issue the necessary decision.

The Council after examining the above-mentioned two pictures during its 8th session held at the headquarters of the Muslim World League in Makkah Mukarramah decided the following:

The position of Prophet Muhammad (peace be upon him) is very high for Almighty Allah and for Muslims. His prominent rank and lofty status are well known in the religion. Almighty

225

Allah sent him as a mercy to all the worlds and designated him as bearer of glad tidings and warner as well as caller to His way. Almighty raised his name and elevated his rank. He blessed him and commanded the Believers to pray for his blessing. He is the leader of Adam's children and the possessor of *Maqaam Mahmood* (praised status).

It is obligatory for Muslims to respect and honour him, and glorify his position which he deserves. Any improper treatment or contempt of his person is considered as *Kufr* (infidelity) and apostasy from Islam.

To imagine his noble person through pictures whether they are moving or instant, with physique and shade or without physiques and shade, each one is *Haraam* (prohibited) and not permissible in the Islamic Shari'ah. It is not lawful at all to make such pictures and approve them for any purpose or aim whatever it may be, and if its aim is contempt, then it is blasphemy

Since it is a mischief of grave consequences, it is the duty of the concerned governments, authorities, ministries of information and media institutions to prohibit the portrayal of Prophet Muhammad (peace be upon him) in any kind of picture for stories, children's books, novels, theatres, films, televisions, cinema and other information media. It is compulsory to prevent such a practice and destroy any such thing that is found.

Similarly, it is forbidden in the case of *Sahabah* (the prophet's companions), as they had the honour of the Prophet's company and *Jihad* with him for the defence of Islam as well as for the support of Allah, His Messenger and His religion. It is they who transmitted this religion and its knowledge to us, hence, it is obligatory to honour and dignify them.

Like Allah's Messenger and Prophet Muhammad (peace be upon him), all other Messengers and Prophets (peace be upon them) have the respect and honour, so whatever is prohibited in his case, is prohibited in their case.

Therefore, the Council decided that portrayal of any one of them in any kind of picture is *Haraam* (prohibited) and is not permissible in the Islamic Shari'ah, therefore, it must be prevented.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Mahmood Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Mabrook Mas'ood Al-Awaadi
Muhammad Salem Abdul Wadood

**Note:** The following members could not attend the session:

Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Rasheedi
Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Abul Hasan Ali Al-Nadwi

# Resolutions of
# the Islamic Fiqh Council
# during Its Ninth Session Held
# between 12-19 Rajab 1406H

أبيض

# The First Resolution
# on *Adhan* (Prayer Call) in Mosques
# through Audio Cassette Recorders

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council of the Muslim World League, during its 9th session held in Makkah Mukarramah between 12-19.7.1406H looked into the question received from Minister of Endowments in Syria with No. 2412/4/1 dated 21.9.1405H regarding the broadcast of *Adhan* (prayer call) in mosques through audio cassette recorders in order to avoid the time difference between mosques in one region when *Adhan* is pronounced for the obligatory prayer.

Therefore, the Council reviewed the research papers prepared in this regard by some members of the Council and Fatwa No. 35 dated 3.1.1378H issued in this respect by former Mufti of Saudi Arabia Sheikh Muhammad Ibn Ibrahim Al-Sheikh and the resolution adopted by the Senior Scholars' Council in Saudi Arabia during its 12th session held in the month of Rabi Al-Akhir 1398H, as well as Fatwa No. 5779 dated 4.7.1403H adopted by Permanent Board of General Presidency of Research, Ifta, Da'wah and Guidance in Saudi Arabia, whereas these three Fatwas urged not to adopt this method, and mentioned that the broadcast of *Adhan* in mosques on the commencement of prayer time through audio cassette recorder and the like does not suffice the accomplishment of this worship.

After having an in-depth review of the afore-said research papers and Fatwas and a thorough discussion on them, the Islamic Fiqh Council was of the following opinion:

231

1. *Adhan* is one of Islam's rituals, which is known through the textual provisions of religion as well as the consensus of the Muslim Ummah, therefore *Adhan* is considered as one of the signs that distinguish between Muslim and non-Muslim lands. A consensus has been reported that if people of a region agree to abandon it, they would be fought for that.

2. *Adhan* since its inception in the first Hijrah year until now has been a continuous practice of Muslims for each of the daily five prayers in mosques, even though there may be several mosques in one area.

3. In one Hadith, Malik Ibn Huwairith (may Allah be pleased with him) has reported that Prophet Muhammad (peace be upon him) said: "When the time of prayer commenced, one of you should pronounce *Adhan* for all of you and the most senior person among you should lead you in prayer." (*Agreed upon*)

4. Intention is one of the conditions of *Adhan*. Hence, its pronouncement by a person such as insane, drunk and the like is not valid, because there is no intention involved in its pronouncement. The case is similar in the above-mentioned audio recording.

5. *Adhan* is a physical act of worship. Ibn Qudamah said in *Al-Mughni* (Vol.1, P.425): "A person should not base his intention on other person's *Adhan*, because it is a physical act of worship and it is not valid by two persons like in *Salah* (prayer)."

6. The unification of *Adhan* for mosques through audio recorders as mentioned above has various risks and dangers, some of them are mentioned below:

a) It is related to the legitimacy of *Adhan* that every prayer in the mosque has some practices of Sunnah, which in the case of

*Adhan* through the audio recording, would be missed besides ignoring the condition of intention for *Adhan*.

b) It opens up the door of playing with the religion and introducing a practice of *Bid'ah* among Muslims in their rituals, which subsequently would lead to the total abandonment of *Adhan* and full dependence on audio recordings.

On the basis of the above-mentioned considerations, the Islamic Fiqh Council adopts the following resolution:

To depend on broadcast of *Adhan* through audio recorder and the like in mosques on the commencement of prayer time is neither sufficient nor permissible for the accomplishment of this ritual and it would not be a valid *Adhan*. It is obligatory for Muslims to pronounce *Adhan* for every prayer in the mosque as Muslims have been doing since the time of Prophet Muhammad (peace be upon him) till now.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani

233

Muhammad Shadhli Al-Neifer

Abu Bakr Joomi

Dr. Ahmad Fahmi Abu Sinnah

Muhammad Habeeb Ibn Al-Khojah

Dr. Bakr Abdullah Abu Zaid

Dr. Yusuf Abdullah Al-Qardhawi

Muhammad Salem Abdul Wadood

Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi

Mahmood Sheith Khattab

Hasanain Muhammad Makhloof

Mabrook Mas'ood Al-Awaadi

# The Second Resolution
# on Programming of Holy Qur'an
# and Its Related Information on Computer

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its 9th session held in Makkah Mukarramah during 12-19 Rajab 1406H looked into programming the Qur'an and its related information as well as its storage on the computer in order to preserve the Qur'anic Sciences compiled by the earlier Muslim scholars in different books, which they have written specially in this field and add any information that can be added about the Glorious Qur'an and that may be needed by researchers in this age at universities and other academic institutions in the world.

The Islamic Fiqh Council was asked to express its opinion on this matter from the Shari'ah viewpoint, however a final decision on it was deferred until all the relevant information about this machine, its functions, characteristics, potentials, results, language and other related aspects is complete so as to adopt a final resolution on this scientific programming of the Qur'an. The Islamic Fiqh Council also wrote in this regard to a number of universities, academic institutions and personalities so that they provide it with all the necessary details in this regard. The Council received their reports.

Dr. Muhammad Habeeb Ibn Al-Khojah, Member of the Council also presented an additional and detailed report in the light of reports received by the Council from different sides to elaborate this issue.

It is obvious that the computer, an invention of this era, can save through programming information and documentation of huge quantity and different variety needed by researchers. It can also save additional information and classify it, then it can retrieve the required information with surprisingly fast speed, showing it on the monitor so that the computer user can see the information that he wants to retrieve.

Computer programming is now available in the Arabic language, as some scholars of Hadith and Sunnah have already applied it on some books of Hadith. It produced better results in saving the information and retrieving it easily whenever it is needed.

Therefore, after having a detailed discussion among members of the Council on the real benefits of such programming as well as its possible hazards, the Council unanimously decided that programming of the Qur'anic sciences is lawful. It also decided with majority that programming of the Qur'anic text in computer is lawful, as it renders a great service to the Qur'anic sciences and it constitutes also a great facilitation to scholars and researchers, keeping in view the following conditions:

**First:**

The specialists are consulted in the technical matters so that the computer is utilized in a proper way to avoid any error that may lead to changes due to misuse.

**Second:**

The programming is in Arabic and all the texts of the Qur'an, Sunnah and other related documents are fully governed by the rules and regulations of the language, and the Qur'anic text should be in the Othmani script.

**Third:**

The technical experts should join the Muslim scholars specialized in the Qur'anic Sciences and should together carry out the task of computer programming.

**Fourth:**

Trusted scholars and experts should review the results in order to make sure that these results are fully accurate and safe.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Salem Abdul Wadood
Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

# The Third Resolution
# on Obligatory Establishment of Mosque
# in Every Locality

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its 9th session held in Makkah Mukarramah during 12-19 Rajab 1406H looked into the matter referred by the World Supreme Council of Mosques about the obligatory establishment of mosque in every locality where Muslims live.

The Council reviewed reports and opinions presented by some of its members in this regard in the light of views subscribed by the various schools of Islamic Fiqh about the jurisprudence status of *Salat Al-Jama'ah* (congregational prayer) in mosques, because it is a ritual of Islam which must be highlighted in Muslim societies, other than the prayer of Jumu'ah, which according to the unanimous view of Muslim scholars, is obligatory for every Muslim. An individual Muslim is exempted from it only due to the excuses which are acceptable in the Islamic Shari'ah.

After discussion among its members, the Council was of the view that the congregational prayer in towns and villages in the various seasons of the year cannot be performed without the establishment of mosques where worshippers can gather at five times a day, because a suitable place is essential for any activity, and it is an established principle in the Islamic Fiqh that anything

239

which is necessarily required for an obligatory ritual is also considered to be an obligatory.

On the other hand, it is observed that the purpose of mosque in Islam since the time of Prophet Muhammad (peace be upon him) is not merely to establish the congregational prayer five times a day, but also it is a place to read the Qur'an and learn the affairs of the religion. It is also a central place for *Shoura* (consultation) of Muslims on the issues of public and social importance.

Hence, the Islamic Fiqh Council decided that it is obligatory to establish mosques according to the needs and capabilities of Muslims in their localities. In this regard, there is no difference between Muslim countries and those countries where Muslims are a minority and can organize the congregational prayers.

The Council recommends that Muslim countries and their governments cooperate with Muslim communities which need to perform this obligatory ritual.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen

Muhammad Rasheed Raghib Qabbani

Muhammad Shadhli Al-Neifer

Abu Bakr Joomi

Dr. Ahmad Fahmi Abu Sinnah

Muhammad Habeeb Ibn Al-Khojah

Dr. Bakr Abdullah Abu Zaid

Dr. Yusuf Abdullah Al-Qardhawi

Muhammad Salem Abdul Wadood

Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

أبيض

# The Fourth Resolution
# on Rights of Authorship
# for Authors

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its 9th session held in Makkah Mukarramah during 12-19 Rajab 1406H looked into rights of authorship for authors of books, researches and studies; whether these are the established rights which are possessed by their owners; whether it is lawful in the Islamic Shari'ah to compensate for them and conclude contract with their publishers; whether it is permissible for anybody other than the author to publish his books, researches and studies and sell them without his permission on the basis that these are allowed for everybody or it is not permissible?

The Islamic Fiqh Council reviewed the reports and studies prepared in this regard by some of its members and discussed the views of some contemporary research scholars that author has no legitimate financial right to the academic works which he writes or publishes, arguing that it is not lawful to prevent knowledge from the people, rather it is obligatory for them to spread knowledge, and that whoever conceals knowledge, Almighty Allah will bridle him with a rein of fire on the Day of Judgement, and it is obligatory for any one who finds a copy of a book by an author to copy or publish it, and its author has no right to prevent it.

The Council also reviewed the opposite view and its content about the rights of invention which is called 'literary ownership or industrial ownership, and means that the author of a book, resrearch or technical work, and similarly the inventor of a useful machine or tool has every right to invest in his work or invention through publication, production and sale, and he can grant it to whom he wishes with compensation or the like, and conditions which he agrees upon. Nobody has the right to publish the authored book or the research work without the permission of its owner. Any invention or original work cannot be copied or used for commercial purposes without the consent of its owner.

The Council after a thorough discussion reached the following decision:

1. Books and research works before the invention of publication means and printing press which can produce thousands of copies were published in a different way, and there was no means of publishing the book in the past except manual transcription. The transcriber used to spend years in transcribing a large book in order to produce a copy. He also used to serve the author as he produced one or more than one copies through his transcription, and if these copies were not there, the book would have remaind in the form of the author's original copy and exposed to be lost forever if the original copy was lost, hence, transcription of the book was not an offence against the author or investment by the transcriber at the expense of other's endeavour and knowledge, instead, it was a service to him as well as to his knowledge and endeavour.

2. After the advent of printing press, the issue has become totally different. The author may spend most of his life in writing a useful book and publish it in order to sell it, then another person takes a copy of this book and publishes it by copying or

printing it through modern means, and he sells this book in competition with its author, or he distributes it freely in order to get fame, hence, the author's efforts are wasted. The same thing can be said about the inventor.

This tends to demoralize the authors and inventors as they see that their endeavour would be exposed to plunder by others, when it comes to the fore, and they would find a competitor who did not make any effort in its authorship or invention, which they haved done, nevertheless, he exploits it commercially.

The conditions have changed with the change of time, and there is great difference between then and now. These conditions require new look that safeguards the right of every person who makes an endeavour.

Hence, it is necessary that author or inventor has a right to what he has authored or invented and this right is his legal ownership, and nobody is allowed to take this ownership without his permission, provided that book or research work does not call for an evil, deviation or misguidance which is afornt to the Islamic Shari'ah. In this case, it would be destroyed as it is not permissible to publish it.

Similarly, the publisher who has made an agreement with the author has no right to make any amendment in contents of the book or to change anything without the author's approval. This right of the author would be inherited, and it would be bound to comply with the international agreements as well as rules and regulations which do not contradict the Islamic Shari'ah, and regulate this right after the death of its owner, combining his private and public right, as every author or inventor benefits from the ideas and products of his predecessors even in the general

knowledge, as well as he benefits from the means and methods that existed earlier.

However, the publishing house which has employed an author to write a book for it, or the institution which has appointed an inventor to invent something for it, has the right to what he has produced for it. The right of each party would be governed by the conditions agreed upon between them in accordance with rules and regulations of the mutual contract.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Salem Abdul Wadood
Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

أبيض

# The Fifth Resolution
# on Benefitting from Zakah Money
# for Building Schools and Hospitals and
# Establishment of Zakah Fund
# in European Countries

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 9th session held in Makkah Mukarramah between 12-19 Rajab 1406H looked into the recommendation adopted by the Fiqh Research Academy of Europe, an affiliate body of the World Supreme Council of Mosques and referred to it by Deputy Chairman, Islamic Fiqh Council regarding the possibility of benefitting from the money of Zakah for the construction of schools and hospitals in the European Countries.

After listening to the speeches of its members and their discussions, the Council decided to reaffirm its resolution of the 8th session which stated that Islamic Da'wah as well as the activities which supports it, are considered under the provision of *Fi Sabeelillah* (in the Cause of Allah). It is one of eight funds clearly mentioned in the Qur'an, (9:60) on the basis of argument that Jihad in Islam is not confined to the fighting only, but it also includes striving with Da'wah, conveying the message of Islam and forbearing its difficulties. Almighty Allah says addressing His Messenger (peace be upon him) about the Qur'an: *"Therefore listen not to the Unbelievers, but strive against them with the utmost strenousness with it (Qur'an)."* (Qur'an, 25:52)

249

In a Hadith, Prophet Muhammad (peace be upon him) has been reported as saying: "Strive hard against the Unbelievers with your money, life and tongue." (Ahmad, Abu Dawood, Al-Nassai, Ibn Hibban and Al-Hakim reported this Hadith in their books.)

This meaning has become obvious in the present time more than any other time, as Muslims are being attacked in their own lands and targeted by many of the false ideologies, philosophies and factions as well as by thought and culture not by sword and cannon. They are also targeted by educational and social institutions not by military institutions. Iron is not cut except by similar iron, hence, it has become inevitable that a call to *Taghoot* (Satan) is confronted with a call to Almighty Allah; education of falsehood is countered with education of truth; un-Islamic thought is resisted by Islamic thought, as Abu Bakr Al-Siddeeq told Khalid (may Allah be pleased with both of them): "Fight them with what they fight you; sword for sword; spear for spear…"

The means and methods of Islamic Da'wah in our age have become very diverse. They are no longer confined to a word that is told, or a publication that is printed, or a book that is authored. Although each of the above-mentioned means and methods is important, however, it had become its most crucial and effective means, like the school which moulds the minds of new generation and creates their tastes and inclinations, and which inculcates in them the values and ideas. Another example is hospital which receives the sick and tries to influence him through humanitarian services.

These means and methods have been exploited by the enemies of Islam to wage an onslaught against members of the Muslim Ummah and deprive them of their Islamic personality as well as misguide them from their faith. They have established

schools, hospitals and the like for this vicious purpose, and spent hundreds of millions. Muslims and their youth are mostly exposed to this menace when they are outside their countries.

Therefore, the Council decides that educational and social institutions such as schools, hospitals and the like particularly when they are in the non-Muslim countries are considered tools of Da'wah and Jihad in the cause of Allah, hence, they also support and contribute to the activities of Da'wah. They have become necessary for safeguarding the faith and religious identity of Muslims in the face of an ideological and intellectual onslaught waged by Christian and secular schools and other institutions.

However, it is necessary that such institutions are purely Islamic and dedicated to the purpose of Da'wah and benefit to all Muslims, and not to commercial purposes which benefit some individuals or groups only.

As regards the establishment of Zakah fund to collect Zakah from its payees and spend it in its legitimate provisions, as it has been mentioned above, so it is a good and praiseworthy act in the light of Islamic Shari'ah, because it achieves certain aims and objectives of Muslims. However, such find must be run by the trusted people who are well acquainted with the rules of Islamic Shari'ah regarding the collection and distribution of Zakah.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair

Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Salem Abdul Wadood
Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

# The Sixth Resolution
# on Timings of Prayer and Fasting
# in Countries Situated
# on High Latitudes

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council in its 9th session held in Makkah Mukarramah during 12-19 Rajab 1406H looked into the timings of prayer and fasting for residents of high latitude areas. In view of the fact that the Islamic Shari'ah provides ease and relief, and on the basis of findings of the astronomical experts' committee, the Council adopted the following resolution:

## First:

In order to avoid differences and variations, arising out of many methods of astronomical calculation, each prayer time should be fixed on the basis of astronomical signs that are in line with the Islamic Shari'ah as well as with the opinions of the timing calculation experts in transformation of these astronomical signs into timing calculations related to the situation of sun over or under the horizon as follows:

### 1. *Fajr* (Early Morning):

It coincides with the appearance of the first ray of white light and its spread in the horizon (*Fajr Sadiq*) that is 18 degrees under the eastern horizon.

### 2. *Shurooq* (Sunrise):

It coincides with the appearance of sun's upper rim from the eastern horizon and that is 50 degrees under the horizon.

253

### 3. *Dhohr* (Noon):

It coincides with passage of sun's center through the meridian circle that is sun's highest daytime altitude with minimum shadow of a vertical body.

### 4. *Asr* (Afternoon):

It coincides with the situation of the sun where the shadow of a body becomes equal to its length with the addition of the meridian. The angle of this situation varies with the change of time and place.

### 5. *Maghrib* (Sunset):

It coincides with complete disappearance of sun in the western horizon and its angle is considered to be at 50 degrees under the horizon.

### 6. *Isha* (Nightfall):

It coincides with disappearance of the red light from the horizon where the situation of the sun is considered to be at an angle of 17 degrees under the western horizon.

## Second:

For the time fixation, two minutes would be added to each of the *Dhohr, Asr, Maghrib* and *Isha* times and two minutes would be deducted from each of the *Fajr* and *Shurooq* times.

## Third:

The regions of high latitude would be divided into three categories:

### 1st Region:

The region that is situated between the latitudes 45 & 48 north and south where all the clear signs of times are found during the 24 hours, whether day is long or short.

## 2nd Region:

The region that is situated between the latitudes 48 & 66 north and south where some astronomical signs of timings are not found in a number of days during the year such as the constant remaining of the red twilight till the *Fajr* time.

## 3rd Region:

The region that is situated on latitude 66 north and south up to the two poles whereas the obvious signs of times in day or night are not found during long period of the year.

## Fourth:

The ruling for the 1st region is that its residents would follow the regular timings of prayer and fasting in accordance with the religious injections regarding the times of prayer and fasting.

## Fifth:

The ruling for the 2nd region is that the time for *Isha* and *Fajr* prayers would be fixed, keeping in view the similar prayers in the nearest region where the signs of *Isha* and *Fajr* prayers are well known. The Council suggests 45 latitudes being the nearest region where the worship is easy in its distinct regular timings. For example, if time of *Isha* prayer at 45 latitudes begins after the one-third of night, the same time would be adopted for *Isha* prayer in the afore-said region. A similar method would be adopted for the time of *Fajr* prayer in this region.

## Sixth:

The ruling for the 3rd region is that the times of all prayers would be fixed, keeping in view the prayer times in 45 latitudes. In the region from the 66 latitudes to the poles, the duration of 24 hours would be divided as it is divided in the region of 45

latitudes. If the length of night in 45 latitudes is 8 hours and sun sets at 8 p.m., the time of *Isha* prayer would be at 11 p.m. The similar timing would be adopted in the afore-said region. If the time of *Fajr* prayer in 45 latitudes is at 2 a.m., the same time would be for the aforesaid region. The similar time-fixing would be adopted in this region for fasting.

This is in view of a Hadith in which a question about Dajjaal was asked: …We said, O Messenger of Allah! How long will he (Dajjaal) stay on earth? He (Messenger of Allah) said: Forty days; a day like a year, another like a month and another like a week…then we said: O Messenger of Allah, in a day that is like a year, is it enough for us to say the prayers of one day and night? He (Messenger of Allah) said: No, Make its calculation." (*Muslim* & *Abu Dawood*)

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah

Dr. Bakr Abdullah Abu Zaid
Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Salem Abdul Wadood
Abul Hasan Ali Al-Nadwi
Dr. Muhammd Al-Hawari    (from the astronomical committee)

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi

257

أبيض

# The Seventh Resolution
# on Payment of Zakah's Portion of
# Mujahideen for Their Education,
# Health and Media Projects

*All praise be to Almighty Allah.*
*Blessing and peace be on His Prophet Muhammad*
*after whom there is no prophet, and on all those*
*who followed his way of guidance.*

The Islamic Fiqh Council during its 9th session held in Makkah Mukarramah between 12-19 Rajab 1406H looked into the question raised by the chairman of Islamic Da'wah Committee in the Social Reform Society, Kuwait about the permissibility of spending the Islamic Da'wah Committee's fund collected for Afghan Mujahideen to execute their educational, health and media projects, which Chairman of the Islamic Fiqh Council asked to be presented in this session.

The Council looked into replies given by some members on this question and reviewed its previous resolutions, as well as the resolutions of the Senior Scholars' Council in Saudi Arabia. After having a thorough discussion on the question, the Council decided that spending on the projects mentioned in the question is permissible from more than one aspect:

**First:**

In view of eligibility because of need, they – Mujahideen and Muhajireen – are poor, homeless or wayfarers. Even if they had land properties and real estates in their countries, now they have become wayfarers due to their eviction from their homeland and refuge. Spending on the poor and needy from the Zakah money is not confined to the provision of their food and clothing only. It also includes everything which suffices and meets the regular

259

needs of their life, such as healthcare programmes and educational institutions, which are considered the requirements of the present-day life.

Imam Al-Nawawi quoted his Shafe'i colleagues as saying: "The standard sufficiency of basic needs includes food, clothing, residence and everything that is inevitable for needy person and those who depend upon him for their expenses. (*Al-Majmou*, Vol.6, P.190)

His saying: "everything that is inevitable" has a general flexibility that covers needs which change with the change of time, place and situation such as educational and healthcare institutions in our age, which accomplish the preservation of soul and mind. They are also considered among the five necessities.

The Islamic Fiqh scholars have regarded marriage as one of things which accomplish the sufficiency. Books of learning for the learned are also among the things that accomplish the sufficiency.

It was stated in *Al-Insaf* that it is permissible for the poor to purchase books of learning which are necessary for him for the sake of his religion and his worldly life. (Vol.3, P.165, 218)

**Second:**

On the other hand, spending on the afore-said programmes is considered under the provision of *Fi Sabeelillah* (in the Cause of Allah) even if we look at its application on Jihad in the military terms, then also, Jihad today is no more confined to Mujahideen alone, but security of the internal front and its force have become an integral part of what is called today the military strategy.

Muhajireen with all their sufferings and tragedies are a consequence of war, hence, it is necessary to take care of them and provide them with everything that is needed for their adequate living, such as education of their children and their

healthcare so that Mujahideen are assured that their families behind them are not lost and they can continue their Jihad with strength and steadfastness. No doubt, any disturbance or weakness on this front will have a damaging impact on Jihad.

This view of ours is also supported by what has been mentioned in an authentic Hadith quoting Prophet Muhammad (peace be upon him) as saying: " Whoever supported the family of a Ghazi (fighter in the Cause of Allah) in a good manner, he in deed, fought (in the Cause of Allah). Hence, the care for the family of a Mujahid fighter has been regarded as fighting in Jihad, so there should be no doubt that spending in it comes under *'Jihad Fi Sabeelillah'* ( struggle in the Cause of Allah).

On the basis of this, some Islamic Fiqh scholars have stated that spending from the provision of *Fi Sabeelillah* would be made for Ghazi's expenses as well as expenses of his family covering the costs of their departure, stay and return. (*Al-Majmou*, Vol.6, P.227)

As regards media activity, it has become one of the tools of successful war in our age, as the military experts describe it. It has now become necessary for boosting the morale of Mujahideen and mobilizing them to fight in the Cause of Allah. It is also necessary in order to create hope and trust in those civilians and supporters who are behind them. It is also necessary for causing fear in the hearts of their enemies and sometimes victory comes through this fear. It is also necessary for mobilizing the public opinion to stand for them and support their cause.

The rule of Islamic Shari'ah lays down that whatever is necessary for accomplishment of a *Wajib*(duty) is also a *Wajib*, then it is one of kinds of Jihad with tongue which comes under

the framework of the Prophet's Hadith: "Strive hard against the Unbelievers with your money, life and tongue."

On the basis of this, the Council is of the view that it is permissible to spend the Zakah money on the needs mentioned in the question.

**Chairman, Islamic Fiqh Council**
Abdul Aziz Ibn Abdullah Ibn Baz

**Deputy Chairman, Islamic Fiqh Council**
Dr. Abdullah Omar Naseef

**Members:**
Muhammad Ibn Jubair
Abdullah Abdurrahman Al-Bassam
Saleh Ibn Fauzan Al-Fauzan
Muhammad Ibn Abdullah Al-Subayil
Mustafa Ahmad Al-Zarqa
Muhammad Mahmood Al-Sawwaf
Saleh Ibn Othaimeen
Muhammad Rasheed Raghib Qabbani
Muhammad Shadhli Al-Neifer
Abu Bakr Joomi
Dr. Ahmad Fahmi Abu Sinnah
Muhammad Habeeb Ibn Al-Khojah
Dr. Bakr Abdullah Abu Zaid
Dr. Yusuf Abdullah Al-Qardhawi
Muhammad Salem Abdul Wadood
Abul Hasan Ali Al-Nadwi

**Note:** The following members could not attend the session:

Abdul Quddoos Al-Hashimi
Mahmood Sheith Khattab
Hasanain Muhammad Makhloof
Mabrook Mas'ood Al-Awaadi