# EXHIBIT 23

```
                                                              1
          14C7TER1
     1    UNITED STATES DISTRICT COURT
     1    SOUTHERN DISTRICT OF NEW YORK
     2    ------------------------------x
     2
     3    IN RE:  TERRORIST ATTACKS ON
     3    SEPTEMBER 11, 2001                 03 MDL 1570
     4
     4    ------------------------------x
     5
     5                                       April 12, 2011
     6                                       2:00 p.m.
     6
     7    Before:
     7
     8                      HON. FRANK MAAS,
     8
     9                                       Magistrate Judge
     9
    10                      APPEARANCES
    10
    11    ANDERSON KILL & OLICK PC
    11         Attorneys for O'Neill Plaintiffs and PEC
    12    BY:  JERRY S. GOLDMAN
    12
    13    KRIENDLER & KREINDLER LLP
    13         Attorneys for Plaintiff Ashton
    14    BY:  JAMES P. KREINDLER
    14
    15    COZEN O'CONNOR
    15         Attorneys for Plaintiff Federal Insurance
    16    BY:  SEAN CARTER
    16
    17    MOTLEY RICE LLC
    17         Attorneys for Plaintiffs Burnett & Eurobrokers
    18    BY:  ROBERT HAEFFELE
    18
    19    MCMAHON & ASSOCIATES
    19         Attorneys for Defendants IIRO, MWL and Wael Jelaidan
    20    BY:  MARTIN MCMAHON
    20
    21    LAW FIRM OF OMAR T. MOHAMMEDI LLC
    21         Attorneys for Defendants WAMY and WAMY International
    22    BY:  OMAR T. MOHAMMEDI
    22         FREDERICK GOETZ (via telephone)
    23
    24    ALSO PRESENT:  STEVEN COTTREAU
    24                   STEVEN BARENTZEN
    25
                         SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

14C7TER1

```
 1                  (Case called)
 2                  (In open court)
 3                  MR. GOLDMAN:  Jerry Goldman for the O'Neill plaintiffs
 4     and the Plaintiffs' Executive Committee.
 5                  THE COURT:  Good afternoon.
 6                  MR. KREINDLER:  James Kreindler, good afternoon, your
 7     Honor.
 8                  MR. CARTER:  Good afternoon, your Honor.  Sean Carter
 9     for the Federal Insurance plaintiffs.
10                  MR. HAEFELE:  Good afternoon, your Honor.  Robert
11     Haefele from Motley Rice for the Burnett plaintiffs.
12                  MR. MCMAHON:  Good afternoon, your Honor.  Martin
13     McMahon for defendants International Islamic Relief
14     Organization, the Muslim World League and Weal Jelaidan.  How
15     are you doing?
16                  THE COURT:  So far so good.
17                  MR. MOHAMMEDI:  Good afternoon, your Honor.  Omar
18     Mohammedi on behalf of WAMY and WAMY International.
19                  MR. GOETZ:  Good afternoon, your Honor.  Frederick
20     Goetz appearing by telephone as cocounsel also on behalf of
21     WAMY.
22                  THE COURT:  Good afternoon.
23                  MR. COTTREAU:  Good afternoon, your Honor. Steven
24     Cottreau for Dubai Islamic, and we are just observing today.
25                  MR. BARENTZEN:  And Steven Barenstzen.  I am also just
```

3

14C7TER1

1     here to observe, I believe.
2              THE COURT:  We will find out as we go along.
3              As I think I indicated in an order there are
4     essentially three applications that I propose to addressed
5     today:  First, the IIRO, Muslim World League and Wael Jelaidan
6     application; then the plaintiffs' March 16 letter about the
7     Muslim World League and IIRO documents; and then the WAMY
8     application. W-A-M-Y.
9              Before I get to those, one comment I had is that it is
10    hard to deal with discovery requests that you folks are all
11    knowledgeable about when the actual request is not furnished to
12    me in the exact words that were used.  And the local rule, 37.1
13    of the Civil Rules, requires a verbatim quote.  In some
14    instances I was given it, and in some instances I was able to
15    back into it, and in some instances I may have had some other
16    papers, but I believe there were times when I wasn't given
17    anything that told me precisely what the request was.
18             It may be that I was just looking in the wrong places
19    and actually had been furnished it, but in general the more
20    clear you can make it to me in the actual letter requesting or
21    opposing something, the better off we will all be.
22             So, let me turn first to the IIRO, Muslim World League
23    and Wael Jelaidan of March 3 and anything that flows from that.
24             Yes, Mr. McMahon?
25             MR. MCMAHON:  Yes, your Honor, I just want to make a

4

14C7TER1

```
 1   preliminary observation.  Whether through my inadvertence or
 2   miscommunication, I was under the impression that we were going
 3   to only argue today our application for more specificity in
 4   terms of disclosures and also WAMY's application for more
 5   specificity disclosures.
 6            I have secured some affidavits from Saudi Arabia
 7   pertaining to the efforts that my clients have undergone here
 8   in terms of discovery, and I think hearing their, I'm going to
 9   call it, first motion to compel, your Honor, I think we can
10   defer that to a hearing where we combine the first motion to
11   compel along with the more comprehensive second motion to
12   compel, you know, to save judicial resources.
13            If necessary, I guess I could argue that today.  As
14   counsel commented, I think we are getting closer on the subject
15   matters on the first motion to compel, but I want to go on
16   record, your Honor, that I really thought we were just going to
17   hit the applications, and that might take some time.  I don't
18   know.
19            MR. CARTER:  Your Honor, I think the parties addressed
20   in their letters whether or not that application should be
21   heard today, and I think we were very clear that we thought it
22   should because it was fully briefed.
23            THE COURT:  I thought I had issued an order that said
24   it was going to be discussed today.  Am I mistaken about that?
25            MR. MCMAHON:  No, I saw that, your Honor.  And Mr.
```

14C7TER1

1    Carter knew what my position was in terms of that I didn't
2    think it had been properly, say, teed up, and that it would be
3    better to move that into the more consolidated motion to
4    compel.  But if your Honor prefers, we can argue that today.
5            THE COURT:  And it may be that as to some parts of it
6    I reserve based on what you tell me.  But why don't we see what
7    happens as we go along.
8            So, why don't we first turn to your affirmative
9    application concerning plaintiffs' disclosures.
10           MR. MCMAHON:  First of all, your Honor, thank you for
11   backing us into the afternoon slot.  It avoids me getting up at
12   5:15, 5:30 in the morning.
13           We are now eight years out, your Honor, and we have
14   been hit with these allegations of this worldwide conspiracy to
15   fund international terrorism.  Plaintiffs have accused IIRO,
16   MWL and Wael Jelaidan of participating in this international
17   campaign to fund international terrorists.  Our clients have
18   been sued for a trillion dollars, your Honor.  I guess if you
19   add the triple demand, that's $3 trillion.  They have been
20   accused of heinous international criminal acts although nobody
21   has been indicted.  And I think it's about time that we held
22   the plaintiffs' feet to the fire in terms of specificity, your
23   Honor.
24           I think you know what the case law is here.  The
25   magistrate has issued an opinion, I think it was the Sheila v.

6

14C7TER1

1    New York City case.  There was also a case we gave you which
2    was the Sender v. Man case from Colorado, your Honor, involving
3    196 brokers.  If the spoken party will not even make the effort
4    to make a reasonable inquiry of witnesses, then it cannot
5    simply produce a laundry list via the party.  As such, it would
6    defeat the purpose of Rule 26(a).
7            It is our position, your Honor, that they have
8    produced a laundry list to us, and I will tell you what we have
9    been specifically given.
10           We have been given the names of 1,632 individuals.
11   That's if you include attachment A, your Honor.  We have been
12   given Guantanamo Bay detainees who apparently may tell us
13   something.  I am not sure they actually identified which one
14   would tell us what.  I'm pretty sure they don't.
15           THE COURT:  It's probably the first time Osama bin
16   Laden, former Senator Kerry and Diane Feinstein ended up on the
17   same list but...
18           MR. MCMAHON:  It gets more amusing, your Honor.  There
19   are some people on that list who are dead.  I don't know how we
20   are going to talk to them.
21           THE COURT:  Don't understand plaintiffs' counsel; they
22   are nothing if not tenuous.
23           MR. MCMAHON:  I've learned, your Honor.
24           The individual who died is Jamal Khalifa.  Just to
25   educate your Honor, this is the alleged hot button guy in the

14C7TER1
1    Philippines for IIRO.  What the plaintiffs never mentioned is
2    that although he was convicted of terrorism charges in absentia
3    in Jordan, the Jordanian Court of Cassation completely
4    exonerated him on all of those charges.
5            We have basically inaccessible evidence, foreign
6    intelligence reports.  Where do I go, to Paris and ask the
7    French intelligence agency to give me some documents?
8            They talk about F.B.I. 302s.  Your Honor, I was in a
9    big case in Washington, and I actually got all the 302s because
10   they were Brady material.  It was fascinating, and it helped
11   our case tremendously.  But I'm not aware of any mechanism
12   whereby I can get those 302s.  So, I think they are virtually
13   inaccessible.
14           THE COURT:  Well, one of the things that the
15   plaintiffs' disclosure says -- and I went back to check, and I
16   will ask plaintiffs' counsel whether it's correct as to all
17   categories of documents -- there are, as I counted it, 23
18   categories of documents in the amended initial disclosures, at
19   the end of which it says the aforementioned documents are in
20   the possession of the Plaintiffs' Executive Committees.
21           So, as to any of these intelligence reports, or 302s,
22   or whatever, the representation is that you don't have to go to
23   some foreign country or anything but, rather, you can obtain
24   them from plaintiffs' counsel.
25           Is it correct that all 23 categories of documents are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

8

14C7TER1
```
 1    in the possession of plaintiffs' counsel or plaintiffs'
 2    executive committee?
 3              MR. CARTER:  Your Honor, that is true.  And maybe some
 4    context would help.  Essentially, you know, the plaintiffs had
 5    to build this investigation post-September 11, and in doing
 6    that there are essentially a couple categories of information
 7    that we have.
 8              We have information that we as counsel collected
 9    ourselves, and that's sort of a broad array.  You have dozens
10    and dozens of congressional hearings that were held
11    post-September 11 that we filtered through.
12              You have the complete archive of the 911 Commission,
13    at least to the extent it's been released, which is the
14    National Archives in Washington, and we sent people, and we
15    read through all of that.
16              You have 302 statements which may have been released
17    in some sort of prosecution, those kinds of settings.  You have
18    the Department of Defense from Guantanamo Bay, tens and tens of
19    thousands of pages of documents that we filtered through to
20    identify what pieces of information might be relevant to claims
21    in the litigation.
22              So, as a result of those efforts we have collected all
23    of this information and we are in possession of those
24    materials.
25              Now, what the defendants really want is to know what
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1
1   is our investigation and what do you have.  That's essentially
2   the focus of all the discovery that's being conducted.  In
3   general terms if you look at the structure of the Federal
4   Rules, the advisory committee notes, they view with disapproval
5   efforts to essentially build your case on the back of the
6   efforts conducted by another party.  And it's in that vein that
7   a lot of the cases have held you can't simply obtain from
8   another party documents that they have culled from a massive
9   public record and select it as being significant.  You can't
10  necessarily get directly from them stuff that they've gone
11  through the effort to obtain via the Freedom of Information
12  Act.
13          Now, with all of that said, we recognize that
14  advancing a global objection to the discovery of that
15  information on work product grounds doesn't advance the ball
16  very much or at all.
17          THE COURT:  You did do that.
18          MR. CARTER:  Well, the objections are there, your
19  Honor, but, you know, what really needs to happen here is that
20  we have some structural problems.  We have this information.
21  To the extent it's generated by government officials or
22  government agencies, you know, we have collected it, and we are
23  prepared to disclose that kind of material in the context of
24  discovery to move the case forward, to the extent it's relevant
25  to the claims.

14C7TER1

```
 1            What we need is for this exchange of information to be
 2    somewhat simultaneous, and I think that's what the scheduling
 3    order contemplated, that we would have a rolling production by
 4    both sides, and that preserves some integrity in the process.
 5    And we are perfectly happy to do that as long as we are getting
 6    reciprocal productions from the other side; and so far we're
 7    not.
 8            Some of the objections also, your Honor, are in there
 9    because in all candor on day one of the rolling production
10    period none of us knew comprehensively everything that was in
11    our possession.  Hundreds and hundreds of thousands and
12    potentially millions of documents, and we have to assert
13    objections to the extent they may cover materials.  At the end
14    of the rolling production period I think everyone is going to
15    see that we have given them the information that we have
16    collected that they are fairly entitled to.
17            The problem is we made a significant production of
18    documents on day 1 of the rolling production period, January 2
19    I believe it was, or right around then.  We didn't receive a
20    single document on that day from any of the defendants, and we
21    have received very little since.
22            And in recent telephone conversations we have been
23    advised that certain of the defendants don't even expect to
24    complete their indexing of potentially responsive documents
25    until June or July.  And what we really need I think in place
```

14C7TER1
```
 1   at this point, your Honor, is some sort of structure that
 2   contemplates that there is going to be this reciprocal
 3   exchange, and I think we can get past a lot of these sort of
 4   isolated nitpicky fights with one another.
 5            THE COURT:  Let me hear some more from Mr. McMahon.
 6            MR. MCMAHON:  Well, your Honor, I don't know.  I saw
 7   that, and I was going to write Mr. Carter a letter to confirm
 8   all of this stuff is indeed available for the record.
 9            My concern would be, take the topic of people that are
10   incarcerated in either American or foreign prisons or
11   something, do they have interviews of these people?  Do they
12   have interviews with the Guantanamo detainees?  Or do they have
13   a list of things about Guantanamo?  That's what my problem is.
14            THE COURT:  Well, let's assume that they interviewed
15   somebody.  Unless that person is going to appear at a trial or
16   offer an affidavit or a declaration in opposition to the
17   summary judgment motion, the interview doesn't move the ball
18   forward a whole heck of a lot for them other than this
19   background information.
20            If you say there is no evidence of X, and they have an
21   interview of somebody, it seems to me that Judge Daniels is
22   unlikely to consider the hearsay interview in opposition to a
23   summary judgment motion.  So, ultimately they brought the case
24   and it's their burden to adduce admissible evidence in support
25   of their claims.
```

14C7TER1

1           MR. MCMAHON:  Well, your Honor, maybe I should just
2   make this very simple, because I am kind of a simple attorney.
3           To the extent they claim there are a series of five or
4   six terrorist incidents -- first the World Trade Center bombing
5   '93; Khobar Tower bombing in '96; Embassy bombings in '98 in
6   Eastern Africa; 2000 the attack on the Cole; and 2001 of course
7   our 9/11 tragedy -- I don't know if it's too much to ask, but I
8   would like to know who is the individual that says IIRO
9   supported the attack on the USS Cole, and what is the document
10  that says this?  Not this 19 whatever it is CIA document akin
11  to the golden chain.
12          I would like to know, for example, are you saying that
13  the Muslim World League actually attacked the 9/11 towers?  Or
14  aided in the funding of?  I'm sorry, your Honor, well, who says
15  that?  Who is the individual that says that?  And where is the
16  documents?  That's what I'd like to see, your Honor.  Because
17  the more I read about Rule 26 research, it is designed to cut
18  down on expenses of everybody and get right to it.  And these
19  are the potential witnesses that we will be calling.  And
20  sometimes that will certainly aid in potentially a settlement,
21  for example, that they have somebody who saw the car go through
22  a red light, I don't know.
23          But that's what I'm asking for, your Honor.  That's
24  the relief I seek.  And I don't want to file another motion
25  simply because -- well, let me say this:  I would like to at

14C7TER1

1    least inspect everything they have and then have the right to
2    come back and renew this application if possible.
3            THE COURT:  Well, one of the ironies is in complicated
4    commercial cases there is apparently some sentiment among
5    commercial lawyers on both sides, plaintiffs and defendants, to
6    eliminate the Rule 26(a)(2) disclosure requirement and just get
7    to discovery.  And this case may be a paradigm for why that's
8    not a bad approach, but I guess we're on the track we are on.
9            Let me tell you what I think is going to be
10   appropriate, because I do think a list of, I didn't count them,
11   a thousand names or even hundreds of names, many of which are
12   unlikely to testify at the trial -- I would think if Osama bin
13   Laden was cooperating with the plaintiffs he would have some
14   trouble getting into the courthouse to Judge Daniels' courtroom
15   for the trial.  At least I would hope that would be the case.
16           MR. MCMAHON:  Where would he go for the visa, your
17   Honor?
18           THE COURT:  That's right.  But what I think I'm going
19   to direct is that the plaintiffs produce within 30 days a list
20   of all the potential witnesses among those listed on their
21   26(a)(1) disclosures who they have the present ability to
22   depose either because the individual is cooperating with them
23   or because that person is subject to service of process, or for
24   whatever other reasons may exist, and whom they have a present
25   intention either to depose or to secure a declaration from,

14

14C7TER1
1    which isn't exactly what Rule 26(a) contemplates but should
2    eliminate dead folks, should eliminate people who are in the
3    mountains of Afghanistan and the like, and narrow it to what
4    may still be a large list but hopefully won't be a thousand
5    people.
6             MR. CARTER:  Your Honor, I think one of the reasons
7    that you see certain names of people whom you have identified
8    as individuals unlikely to show up at the courthouse is because
9    some of those people may have said things that would be
10   admissible under the rules of evidence even though they're not
11   present in the courtroom.
12            THE COURT:  But that will come in not in the form
13   of -- well, it may come in in the form of a document that
14   encapsulates that statement, and it will only come in, I
15   assume, if there is some proof that a conspiracy existed such
16   that the statement of Osama bin Laden, for example, can be used
17   against a defendant who is actually at the trial.
18            MR. CARTER:  That's correct, your Honor.  And from our
19   perspective we were doing this on the front end before any
20   discovery had occurred, and so we necessarily had to include
21   people who may show up.
22            I can give you a perfect example is Khalid Sheikh
23   Mohammed who is now going to go through this process of being
24   tried in a military tribunal, and we don't know what he may
25   say.  Based on some of his interviews, we think he may say
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14C7TER1

1   something directly relevant to remaining claims in this
2   litigation.  So, that's how the universe of witnesses was
3   defined, we think in accordance with the requirement of the
4   rule.
5           The complaint seems to be there are too many people
6   who have knowledge.  And I understand that your Honor's attempt
7   to answer that is to have us identify people with whom we're
8   presently able to secure a deposition, or some statement to
9   that effect.  And the plaintiffs don't have a problem with that
10  save for concerns about the efforts that have been ongoing to
11  identify nontestifying consultants.
12          Now, I don't think that they fall within the scope of
13  the order you --
14          THE COURT:  Well, I said somebody who you have the
15  intention to either depose or introduce a statement of.  So, if
16  for example let's assume that there is somebody who is on the
17  terrorist list not in the United States but on plaintiffs'
18  payroll as a consultant, which may be farfetched, but if that's
19  somebody who you are not presently planning to call and don't
20  intend to use directly to support your case, that person
21  wouldn't be on the list I have described.
22          MR. CARTER:  I understand, your Honor.  That's fine.
23          THE COURT:  OK.  But for each person who is on the
24  list I am going to require that you set forth topics as to
25  which you believe that person has personal knowledge of

14C7TER1
1   discoverable information so that we don't have the same list of
2   seven or eight incredibly broad topics for Senator Feinstein
3   and Osama bin Laden -- I will pick two people hopefully at
4   different extremes -- and everybody in between.
5           And what I am interested in is a description of what
6   they are knowledgeable about that's not based on conjecture but
7   based on some good faith basis for believing that they have
8   some knowledge in that particular area.
9           Just so we're clear, I'm not directing a list that
10  will supersede your prior 26(a)(1) disclosures.  This is merely
11  a supplement.  So, your list of 1,000 names and main topics
12  will continue to exist as your Rule 26 disclosure.  I guess
13  this is the CliffsNotes version of it.
14          MR. CARTER:  Your Honor, I think one thing that we
15  would like to ask is that there be some similar effort on the
16  part of the defendants to identify witnesses.
17          The difficulty arises because the current structure of
18  Rule 26(a) simply requires a defendant to identify individuals
19  they may use to support a defense.  That doesn't necessarily
20  mean that they're identifying all the witnesses within their
21  organization who have relevant knowledge concerning the claims
22  and defenses.  So, to the extent there are folks within these
23  organizations who have relevant knowledge, we would like to
24  have them identified by the defendants with a disclosure of the
25  nature of their knowledge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1

```
 1              THE COURT:  Well, let's take it a step at a time.  I
 2    think I want to limit myself for the moment to 26(a)(1)
 3    disclosures or the modification I have described of it.  And I
 4    know somebody's letter -- perhaps yours -- told me you haven't
 5    gotten a lot of 26(a) disclosures as yet.  And let's just deal
 6    with it as we go along.  Because I think also documents will
 7    inform the discussion once you get documents.
 8              At the same time I want to indicate to the plaintiffs
 9    that I do not expect the sort of nonspecific list of topics
10    that was provided last time, because I don't think you want me
11    to inform the conclusion that, as the defendants allege you are
12    doing, that this is simply a fishing expedition on the
13    plaintiffs' part.  Because if I were to conclude that, I would
14    probably -- notwithstanding the fact that both sides said this
15    is not a case in which the ten witness per side rule ought to
16    apply -- I might nevertheless severely restrict the number of
17    depositions that plaintiffs are allowed if I do conclude that
18    we're just engaged in a fishing expedition here.
19              Let me focus in on the plaintiffs for the moment.
20    After document discovery closes, and you have had an
21    opportunity to review the documents, I may -- I'm not saying I
22    will -- but I may require that the list I have just described
23    be supplemented before discovery closes with a list of
24    contemplated trial witnesses and the subjects that they may
25    testify about, so that defendants can make informed decisions
```

14C7TER1

1  about who they ought to depose rather than looking at a list of
2  200 potential witnesses, if that's what the number is.
3        I don't know what number will be provided in response
4  to my directive about a narrower list, so I'm not at all
5  certain that I will require anything like that, but that's
6  something I have been considering.
7        As to the documents where there is a representation
8  that all of those documents are in plaintiffs' collective
9  possession, I guess, I'm not going to require that there be
10  further specificity.
11        And I understand the objection that the plaintiffs
12  have made in terms of attorney work product, and I do think a
13  request that is couched in terms of "give us everything you
14  have that you have collected" would, for example, be improper.
15  And in particular something that said "give us everything that
16  counsel has collected" would be improper.
17        But my view is that if there is a document that
18  counsel have collected that responds to a specific subject
19  matter request, for example, there is a request for all
20  documents reflecting payments direct or indirect from IIRO to
21  terrorists, if there is a document that plaintiffs' counsel as
22  agents for plaintiffs have obtained from whatever source,
23  whether it's a consultant or a trial exhibit in a criminal
24  trial, or somebody flung it over the transom, I do think that
25  document has to be produced.  So, to that extent at least, I

14C7TER1
1    don't buy that documents that you have culled don't have to be
2    produced.
3            MR. CARTER:  Your Honor, I think we made clear that we
4    didn't intend to withhold stuff on that basis.
5            Again, our real problem here is that we are showing
6    everything on our side.
7            THE COURT:  Well, we will talk about timing as we go
8    forward.
9            MR. CARTER:  OK.  I mean I want to be clear, your
10   Honor, the stuff that has been produced already is significant.
11   You know, there are references to the 302s, there have been
12   reference to Treasury Department evidentiary memos, for
13   instance, concerning the IIRO and Wael Jelaidan.  Your Honor,
14   we've actually filed those of record in proceedings before you.
15           THE COURT:  Both sides have accused -- well, not both
16   sides.  Some of the defendants' letters suggest that a lot of
17   what was produced was newspaper clippings and the like.
18   Whether that's valid or not, I don't know.
19           MR. CARTER:  Well, your Honor, there were newspaper
20   clippings, but we don't believe that the newspaper clippings
21   weren't subject to production.
22           THE COURT:  No, I think that's right.
23           MR. CARTER:  And we were trying to sequence this, and
24   in trying to sequence it, for instance, with WAMY, we went
25   through and collected all the media publications.  We also went

14C7TER1

1    through and collected every congressional hearing we had
2    relative to the issue of terror sponsorship in which a witness
3    made a reference to WAMY, and we have collected proceedings
4    from other courts.  So, that stuff has all gone.
5              And we are making a diligent effort to continue this
6    rolling production, but it's very difficult when it's just not
7    coming back.
8              THE COURT:  And with that in mind, let me turn to
9    your -- I guess it's your I was going to say March 16 letter.
10             MR. MCMAHON:  Your Honor, can I just make two
11   observations on what you have just gone through?
12             THE COURT:  Sure.
13             MR. MCMAHON:  One is when they come in with these
14   responses, do I get a response that says this is all the
15   material we have on IIROSA's support for the Nigerian Embassy
16   bombing or something?  How detailed is this going to be?  I
17   don't want to come back here and make another application.  The
18   same would go of course for the other clients.
19             THE COURT:  Well, I think implicit in anybody's
20   production is a statement that this is all the material we have
21   at the moment that's responsive to a particular request.  It
22   may be that somebody flings more documents over the transom
23   that they then seasonably have to produce to you.  But am I
24   going to require either side to say this is all we have?  I
25   think that is implied in not turning over additional documents.

14C7TER1

```
 1              I would assume that at some point -- you had suggested
 2    it in terms of one of your witnesses -- that at some point
 3    there will be depositions of document custodians to see what
 4    was or wasn't searched.  Given the myriad sources that
 5    plaintiffs have utilized, that may be more difficult in terms
 6    of defendants questioning plaintiffs, but I would imagine at
 7    some point plaintiffs are going to want to know what was done
 8    by way of searching files at your end.
 9              MR. MCMAHON:  Yes, your Honor.  We prepared two
10    separate affidavits for MWL and IIROSA, and they weren't filed
11    yesterday because, as Mr. Carter reminded me, you want the
12    whole package simultaneously.  That's one of the reasons I was
13    thinking the first motion to compel should be into the second
14    motion.  And you can see for yourself, your Honor, the
15    incredible man hours that these people have expended over the
16    last six or seven years and what's coming down the road --
17    three million pages from MWL, 6,000 thousand folders, two
18    million pages from IIROSA.  Who is going to pay for the
19    scanning and copying of all of that.
20              But there are a lot of issues I think you should hear
21    at a comprehensive motion to compel and definitely read the
22    affidavits, your Honor.  Thank you.
23              MR. CARTER:  Your Honor, the affidavits were submitted
24    pursuant to the briefing schedule for a motion that's not yet
25    before the court, so they're not a part of this record.  And we
```

22

14C7TER1
1    received them yesterday, and our preliminary analysis is
2    ongoing.
3                THE COURT:  OK.  Well, then maybe there is some merit
4    to what Mr. McMahon was saying to me about putting off some of
5    this.
6                One thing I was particularly interested in this was a
7    representation made that there were going to be certain indices
8    about what files existed, and it was in the future tense, "to
9    be provided".  Have they now been provided?
10               MR. MCMAHON:  Yes, your Honor.  At that last
11   conference, if you recall, you had made a suggestion to me that
12   it's fine that there is the warehouse there, can you come up
13   with an index for that.  And we have done that.  It's long,
14   it's in Arabic, and I believe we have sent it to Mr. Carter.
15               There is now an index for the Muslim World League,
16   which is not that long, I think 10 or 12 page, albeit in
17   Arabic, your Honor.  But there is also a website for the Muslim
18   World League that goes back to 1962, your Honor.  I don't know
19   if you know --
20               THE COURT:  They had a website then?
21               MR. MCMAHON:  No.  The website was created about 18
22   months ago, but the materials content goes back to 1962.  John
23   Foster Dulles solicited the support of the Saudi Arabian
24   government to fight Communism and to set up an entity that
25   would propagate faith, religion, even if it was not Islamic.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14C7TER1
1    That's the nature of the 1962 date.
2            But, yes, your Honor it's been slow -- I apologize --
3    but I'm dealing with a different culture, and there have just
4    been enormous problems.  But I think once you see what effort
5    they've put into this production, it's quite something, based
6    upon the case law I've seen.
7            THE COURT:  Well, I am mindful of perhaps what both
8    sides have said in terms of not really getting deep into the
9    merits of these arguments until our next session, but the fact
10   that you have indexed the warehouse, if it doesn't tell them
11   who and where relevant documents would be, it may not be that
12   much of a step forward.
13           MR. MCMAHON:  Well --
14           THE COURT:  They are entitled within reason to have
15   you segregate documents responsive to reasonable and
16   particularized requests.  Maybe the index does that.
17           MR. MCMAHON:  I am hoping, your Honor, that whether
18   they visit the MWL website, or they look at these indexes, that
19   they then come back and state precisely that, Mr. McMahon, we
20   like what you've done, but it doesn't go all the way, and here
21   are the deficiencies.  And then I can deal with that with the
22   culture I'm involved with.
23           THE COURT:  One thing that struck me in everybody's
24   submissions was -- and maybe it's a function of the time period
25   we are talking about -- but I don't think I saw a single
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14C7TER1

1    reference to electronic materials.  And I would imagine that
2    for at least some of the periods there must be some electronic
3    files that are on both sides.
4            MR. CARTER:  Your Honor, if I could address that and
5    provide some context.  The way that we got to this point with
6    this motion concerning the Muslim World League and the IIRO is
7    that we served our document requests, we received numerous
8    objections to them, and a number of attorneys went down to Mr.
9    McMahon's office to confer with him on how we could get past
10   this stuff.
11           At that time the objections that were raised and the
12   problems that were raised, the predicate for the conversation,
13   are the same problems are you hearing about today:  We have a
14   lot of stuff, it's very hard to find things, I'm dealing with
15   another culture, they doesn't fully appreciate the U.S.
16   litigation process.
17           And through the course of that dialogue what we
18   attempted to do was identify categories of documents that could
19   be readily retrieved and produced to the plaintiffs in the
20   United States as a step of moving the ball forward.  That's how
21   we got to these eight categories of documents, and that's one
22   of the reasons you don't have specific document requests,
23   because this was essentially a compromise.
24           And so these documents were the very documents that
25   were identified as being readily accessible.  And we do

14C7TER1
1    reference in there that we want certain electronic, for
2    instance, lists of recipients.
3            Now, at various times we have been told that there is
4    no electronic record for these organizations.  In an earlier
5    brief we made the point that one of the documents disclosed to
6    us included a reference to a search conducted in 1995 of the
7    IIRO's computer system to determine if they gave aid to a
8    particular recipient.  So, our view is that there is a computer
9    system and it's existed at least to that time.
10           The indices that we received --
11           THE COURT:  Let me interrupt you for a second and ask.
12   They have proffered a sacrificial lamb in terms of somebody who
13   they say is knowledgeable about recordkeeping, it sounded like,
14   worldwide for one of the entities.  Why wouldn't you want to
15   talk to that person?
16           MR. CARTER:  Well, the way this involved initially,
17   your Honor, is that we actually proposed that there may be a
18   possibility at an appropriate time to do the deposition of a
19   records custodian.  Our understanding is that the individual
20   who has been most recently identified had resigned.  Now that's
21   our understanding of what we were told by Mr. McMahon at some
22   point previously.  Now he has obviously returned or maybe the
23   earlier indication was inaccurate.  Who knows.
24           THE COURT:  Or he may have resigned but still be
25   available for this purpose.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14C7TER1

```
 1              MR. CARTER:  Correct.  The difficulty from our
 2    perspective is we are not really interested in learning the
 3    universe or Muslim World League's or IIRO's documents as a
 4    general matter.  We have a pretty good handle on that, frankly,
 5    based on the limited discovery we've conducted and our own
 6    investigations.  Before we take a deposition of a record
 7    custodian --
 8              THE COURT:  Forget deposition.  I thought Mr. McMahon
 9    was saying come talk to the person, tour an office and see how
10    the records are kept.
11              MR. MCMAHON:  Your Honor, because I saw some case law
12    to this effect, I think a defendant was sort of lectured by the
13    court that it's a little late in the game to be doing this.
14              But three years ago we the started this invitation
15    process specifically because there is some overlap between the
16    MWL and IIROSA.  But there is a New York office, there was a
17    Virginia office, which the F.B.I. raided, and I'm getting back
18    all of those documents.  So, I thought, gee, the 9/11 lawyers
19    would want to go to the MWL office to start with.  But there is
20    a London office that is fairly typical of the worldwide
21    universe.  We have offered London, Gibraltar, Madrid, even one
22    of the countries where the embassy bombings occurred, Tanzania,
23    I think, with the view you can come in and talk to people here
24    and maybe get a better understanding of things and narrow
25    things down.  Because I feel it's in the best interests of
```

14C7TER1

1   getting them what they say they need -- even though I have some
2   views about this case -- and having our organizations be able
3   to function for the next two years.
4           THE COURT:  But the eight categories -- and I know
5   there is a dispute as to the extent to which there were or were
6   not agreements back in October of 2007 -- some of the eight
7   categories seem to me to be extraordinarily simple in terms of
8   locating documents.
9           I mean take number 8, I am not sure what time period
10  we are talking about, but in general give us the org chart is a
11  pretty straightforward request made in every case of any size.
12  It's something that most organizations have readily available,
13  or if it doesn't exist because of the way your clients do
14  business then the answer would be, sorry, we don't have it.
15         But giving them indices of the whole perhaps worldwide
16  warehouse doesn't necessarily tell them which file to go fish
17  in for the org charts, and it seems to me that you sitting down
18  with your clients, that that at least is something that ought
19  to be fairly easy to say here it is.
20         MR. MCMAHON:  I think so, your Honor.  I think we can
21  narrow our differences on that.  For example, that MWL website
22  I think even has that, but I'm not sure.  I just want you to
23  know, your Honor, at least I have been told -- and we were
24  shocked at this.  I have made six visits to the Kingdom, in
25  fact held up another visit because of the court hearing -- it's

28

14C7TER1
1  paper.  We were astounded on our first trip.  You just have
2  paper?  That's it?  And I think Sameer al-Radhi references that
3  in his affidavit.  It was stunning to me.
4          Now, in the IIROSA main headquarters they have a whole
5  series of computers and things, and they may be able to
6  download that information, but we take the position, your
7  Honor, that anything after 2001 is irrelevant, because we
8  litigated this with Judge Daniels I believe, and he set the
9  parameters from 1994 to 2001.
10          So, today if there is some electronic material -- and
11  I think we sent some up recently -- it's to our opinion
12  irrelevant, your Honor.  But it really was astounding to us
13  that they still do this by paper.  That was way back in 2/2 or
14  2/3 when I made my first visit.  But it is hard to believe, but
15  that's what it is.
16          And Sameer spent an enormous amount of hours coming up
17  with 6,000 folders, your Honor, that he believes, your Honor,
18  are responsive to the document request made to the MWL.
19          THE COURT:  Is that for the entirety of the document
20  request or the eight categories?
21          MR. MCMAHON:  Oh, no, your Honor.  For the entirety of
22  the request.  He's got 6,000 folders, and they are not just
23  these are all MWL documents.  Those are 6,000 folders that have
24  been culled in terms of matching up the Rule 34 requests.  They
25  had some issues, but I think he has done a good job.  So, this

14C7TER1
1    6,000 folders are sitting there, your Honor, and that's why we
2    went out and got a cost estimate.
3            THE COURT:  And these are sitting in Jeddah?
4            MR. MCMAHON:  Mecca, but they can be transported to
5    Jeddah, because I specifically said they may hire a Muslim
6    lawyer, but I want to be able to represent to the court if they
7    want to just go to Jeddah, they can certainly go through these
8    folders.  But there are folders that are responsive to the MWL
9    request, your Honor.  This isn't just the MWL universe.
10            MR. CARTER:  Your Honor, let me take a few of these
11   things in turn.  The issue as to whether or not we should be
12   traveling to Jeddah to run through these giant warehouses is
13   the subject of another soon-to-come motion.
14            We had a meet-and-confer with both counsel for Muslim
15   World League and WAMY last week, and we weren't able to resolve
16   our differences.  I am hoping when we present the arguments
17   maybe we will be able to work through it.  So, again that's not
18   on the table today.
19            What we are talking about today is these eight
20   categories.  And the frustration from our perspective is that
21   we went down, and we tried to work through all of these issues
22   and find a path that would create momentum for the discovery
23   process.  We identified these very discrete categories of
24   documents, and now we're back at a hearing years later, and
25   we're being told you should travel around the world to all of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1
```
 1            our offices to see how they work.
 2                    Well, you know, the traditional practice in discovery
 3            is that you send your requests, and the other side spends back
 4            the responsive documents.  Some of the stuff we have seen
 5            produced to us thus far gives us tremendous pause about going
 6            to any of the offices, because what we get are salutary letters
 7            thanking the IIRO and Muslim World League for digging a well.
 8            And it's specifically that kind of stuff we've said we don't
 9            want; We are not interested in that.
10                    THE COURT:  Putting aside the obvious strength of
11            views on both sides in this case, it's been my experience that
12            when you are dealing with foreign discovery in any case, even
13            it's the manufacturer of widgets, getting the very sorts of
14            information that you seek is difficult just because of cultural
15            differences.  And it sounds like Mr. McMahon has done this to
16            some extent, but usually out of frustration I have ended up
17            directing the person in Mr. McMahon's position to go and sit
18            down and sort of walk people through the files and do the types
19            of things that an associate would do in this country, dispatch
20            to somebody's warehouse in Iowa.  And we may get to that.  I
21            hear what you are saying about the eight categories.
22                    MR. CARTER:  And, again, I think we want to focus on
23            the eight categories, because everything else is not before the
24            court.  You know, when we start talking about the indices, the
25            indices have 100,000 cells, so there is 100,000 entries in
```

14C7TER1

1    effect.  We actually received four indices, and after analyzing
2    them we realized that they had given us duplicates, so that
3    there really only were two.  You know, looking at those two,
4    again you are left with 100,000 cells, and a lot of them just
5    say things like "relief" or "health".  That is not helpful.
6            Now, there are some where the categories are
7    sufficiently specific, and we are only talking about two or
8    three words that enable us to identify them as being of
9    particular interest.
10           But our view was if we could start with these eight
11   categories.  You know, the next focus frankly is on documents
12   pertaining to a gentleman named al-Mujio, who is designated by
13   the U.S. Government and directed one of the IIRO offices in
14   Saudi Arabia; the file for Mohammed Jamal Khalifa, who is
15   alleged to have been a founding member of al Qaeda.  This is
16   pretty dead-on focused stuff that we're trying to get to, and
17   to get to it we don't want to run through a bunch of warehouses
18   everywhere.
19           THE COURT:  One of the problems is, it seems to me --
20   and that's why I picked on item 8, the org charts first -- if I
21   take something at the other end of your list, list of
22   recipients of aid, Mr. McMahon said in his letter that there is
23   18,000 orphans who got aid.  And I assume you are less
24   interested in orphans than projects.
25           MR. CARTER:  Your Honor, I think that's accurate.  The

14C7TER1

1    issue though, the way we arrived at a request for recipients of
2    aid was because Mr. McMahon told us at the meeting that the
3    IIRO and the Muslim World League keep these impeccable records
4    of everyone who has ever received aid, and they can document
5    every single person.  And that led us to the simple solution,
6    well, if you can generate a list of the recipients, send it to
7    us, and at that point we can say we are interested in these
8    projects only, throw the rest of them away.
9             And so I know in a vacuum it's difficult to understand
10   how we got to that, but it was as a result of the conversation.
11            THE COURT:  What time period -- just to stick with
12   recipients of aid, for example -- were you requesting it for?
13   '94 through when?
14            MR. CARTER:  Your Honor, I should clarify that.  Judge
15   Daniels' ruling was actually that discovery would go back to
16   1992.  He did not address whether or not -- and it hasn't been
17   briefed -- as to whether or not the period of discovery should
18   extend past September 11, 2001.
19            THE COURT:  That's why I was asking you, because I
20   knew there was a start date in one of those decisions; I didn't
21   have a recollection of an end date.
22            MR. CARTER:  No, I think when we served these many,
23   many years ago, we went through the present, part of the logic
24   of that being some of the most important evidence may actually
25   be from the period post 9/11, for instance when these

14C7TER1
1    organizations were being implicated in terrorism and logically
2    would have taken steps to identify people who were problems and
3    maybe taken action against those people.  So, cutting it off at
4    September 11, 2001 doesn't make a tremendous amount of sense.
5    We are willing to deal with a reasonable period after.  It's
6    just not something that we've discussed yet.
7              THE COURT:  And notwithstanding what you said about
8    the 6,000 folders and the indices, Mr. McMahon, and subject to
9    some decision about the end date, what's so hard about
10   producing a list of recipients of aid?
11             MR. MCMAHON:  Your Honor, I'm going to stand up to
12   clarify something.  There's 40,000 kids in Africa alone who are
13   receiving aid, as Sameer -- Mr. al-Radhi has corrected me.
14             THE COURT:  Directly?
15             MR. MCMAHON:  The way they receive aid, your Honor,
16   it's maybe a remote village in northern Africa, the woman shows
17   up, has her fingerprint, the kid shows up with a fingerprint,
18   and they get two bucks a month I think for that.  That's how it
19   comes out.
20             THE COURT:  And how is that booked on the books of MWL
21   or IIRO?  Is it village A got $20,000?  Or is it Abdul got $2
22   with this person he came with?
23             MR. MCMAHON:  I appreciate your insight, your Honor,
24   trust me.  First of all, MWL is the organization up here that
25   was created in '62.

14C7TER1

1          THE COURT:  OK.
2          MR. MCMAHON:  I forget how many years later there was
3  a decision made, you know, to actually implement aid we have to
4  set up another arm which will deal with building wells, going
5  to people who have suffered in typhoons or whatever, emergency
6  health care, things like that, and that's IIRO.  So, there
7  would be IIRO records which I personally looked at in Jeddah,
8  quite comprehensive.  But I can try to get the names of 40,000
9  orphans.
10          THE COURT:  Does MWL make direct grants to anybody, or
11  is everything funneled through?
12          MR. MCMAHON:  No, I believe everything is funneled
13  through IIROSA, your Honor, in terms of the issues that they
14  are looking at.  MWL gets its money from the Kingdom, but they
15  don't do I think the orphans.
16          The theory of the plaintiffs, I believe, is that cash
17  can leak out of this system.  I have looked at the system, and
18  I used to be with the Securities Investor Protection
19  Corporation, your Honor, and I tracked money laundering all the
20  time.  And I surprised them with my request to review the
21  records.  No hesitation to do that.
22          So, it's only IIROSA, I think.  And it really is
23  financial records.  These guys want to see whether IIROSA has
24  links to -- for example, did IIROSA send money over to America
25  so that conspirator number 5 got flying lessons in Denver or

14C7TER1

1   something.  I think that's where they're going.
2           THE COURT:  Well, that's I would assume part of it.
3   They're probably not going to be able to look behind each and
4   every individual who got his, as you said, $2, but I would
5   imagine they would be interested in large payments either
6   because of where they go or when they go or whatever.
7           MR. MCMAHON:  Your Honor, I think it's going to be
8   very helpful.  I'm somewhat remiss here.  This is my fourth
9   production.  We have had Ashton, Burnett.  We had the Treasury
10  Department, OFAC, Office of Foreign Assets Control, and now we
11  have federal.  There are a lot of documents floating around the
12  office, and I just recently got a handle on them.  I gave them
13  to Mr. Carter as a result of our last communication.  But I
14  think categories 1 and 2, annual report and the financial
15  statements, do not pose an issue for us, and I have told that
16  to Mr. Carter.  8 does not pose an issue.  And some of the
17  others I think overlap.  But one of the reasons I deferred the
18  trip to Saudi was to get a better handle on things.
19          For example, on the 6,000 folders of the Muslim World
20  League, can I get some way to identify all the folders that are
21  financial, which they are looking for?  I think that's my job.
22  That's a task down the road.
23          THE COURT:  Just out of curiosity, when you deal with
24  these folks in Saudi Arabia, do they speak English or are you
25  dealing through a translator?

36

14C7TER1

1           MR. MCMAHON:  Sameer is pretty good, your Honor.  But
2   when I deal with the MWL folks from Mecca and they come into
3   Jeddah, one of them speaks English but not very well.  And I
4   have noticed in some of my e-mails with Sameer that there has
5   been a misapprehension on something, and we tried to correct
6   it.  And sometimes we even talk on Skype.  I promised him I
7   would be Skyping him tomorrow after our session today.  So, I
8   will indeed ask him about the MWL records of 6,000 folders, is
9   there a category there for financials.
10          THE COURT:  Let me go back to Mr. Carter, since there
11  seems to be a consensus that a lot of this should be the
12  subject of our next session.  Tell me what you want me to deal
13  with today, if anything.
14          MR. CARTER:  Your Honor, when I look at the response
15  that was filed, for, say, five of the eight categories there is
16  an agreement they should be produced.  So, you know, we think
17  that those documents should be produced now because we have
18  been waiting for them for a long time.
19          You know, now there is an argument in there that we
20  can't possibly give you financial reports from the field
21  offices because they are not submitted back to the
22  headquarters.
23          THE COURT:  Which is contrary to the materials you
24  gave me.
25          MR. CARTER:  Right.  And so those do exist, and we do
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1

1    want those periodic financial reports.
2            Again, this is a very, you know, confusing
3    circumstance because we went, we spent all the time to meet and
4    confer, we came up with these categories, we sent a letter back
5    in 2008.  There has never been an indication that there is an
6    inability to comply with it, and we are essentially hitting the
7    restart button again today much later.
8            So, I think all we want to addressed to is the eight
9    categories and have an order entered that those should be
10   produced.
11           THE COURT:  Well, I am looking at Mr. McMahon's letter
12   and category 7, which is summaries of disbursements, which I
13   guess is a CliffsNotes view or a macro view of what is going on
14   in these organizations.  It says will be produced Washington
15   D.C. or Jeddah, depending on the timeframe, see attached annual
16   reports.  I'm not sure I had any attached annual reports.  But
17   it would seem to me if these are summaries of disbursements,
18   Mr. McMahon, they can't be voluminous, and it ought to be
19   fairly simple to produce them if not forthwith then pretty
20   chose to forthwith rather than in Jeddah.
21           MR. MCMAHON:  No, I checked the annual reports, your
22   Honor, and it is in there in detail, the expenditures.  So
23   after reviewing those -- and I have different years.  I have to
24   get them all together -- I don't see any problem with that,
25   your Honor; it's part of the annual report.  And they are

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

14C7TER1
1    audited I think now by KPMG, but there are audited financials
2    too, which I sent I think four up.
3            THE COURT:  And you also say that you are going to
4    produce org charts.  But there is the issue where you have said
5    that there is no reporting up.  And there seem to be a host of
6    documents that suggest the contrary.
7            MR. MCMAHON:  Yes, your Honor.  I was mistaken in
8    that.  And I will you frankly, this is the most extraordinary
9    case I have ever had to defend, and I have never been in a case
10   with so many issues.  But I think that was my fault, your
11   Honor.  Again, it stems from this production.  We have had to
12   produce stuff for different plaintiffs and the Treasury
13   Department.  So I think that is part of that is for me.  And
14   Sameer is trying to -- well, as I said, I'm going to be Skyping
15   him tomorrow to get clarification on that issue.
16           THE COURT:  Well.
17           MR. CARTER:  Your Honor, if I --
18           THE COURT:  Please.
19           MR. CARTER:  You know, one of the points of confusion
20   I think here is that we're several years into this with the
21   Muslim World League and IIRO, and Mr. McMahon is presenting an
22   argument that there are no reports up from the field offices to
23   the headquarters, and then withdrawing that when we point out
24   the documents that have been produced.
25           There was an indication today that the Muslim World

14C7TER1
1    League does not engage in any direct grants of aid.  The
2    documents previously produced by the Muslim World League very
3    much indicate that it does give aid directly and engages in
4    operational activities on its own independent of the IIRO.
5            So, we are so far along in the process, and there
6    seems to be a lack of understanding of the organizations, and
7    as a consequence we have no confidence that what is coming back
8    to us is complete.
9            What we see when we raise an issue is a production of
10   a limited amount of documentation which doesn't represent the
11   complete universe but something sort of intended to appease us.
12   And what we really want is to get going, and that's it.
13           THE COURT:  And what are you suggesting I do other
14   than say produce these eight categories or copies of the
15   materials responsive to these eight categories in the United
16   States in short order?
17           MR. CARTER:  Nothing further than that, your Honor.
18   Beyond that, you know, we focused, given the timeframe that's
19   available for us to conduct discovery, and that's why we have
20   another motion that we served on Mr. McMahon which focuses very
21   much on the activities of an individual in Saudi Arabia who had
22   control over purse strings and has designated a person in the
23   Philippines who is Osama bin Laden's brother-in-law and has
24   been listed as a terror financier and supporter.
25           One other thing I should mention, there is an effort
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

40

14C7TER1

1    to categorize this as being only about financial transactions.
2    And that's not the case.  In many circumstances what you really
3    have is these organizations in our view facilitating the
4    movement of members of al Qaeda by giving them false
5    credentials so they can enter into Afghanistan, for instance,
6    and get to an al Qaeda camp.  And when you look at the
7    Department of Defense summaries for the Gitmo people, you have
8    witness who say I was at this al Farouq camp, an al Qaeda
9    training camp, I was an employee of the IIRO.
10          So, it's not just about money; it's about other
11    topics; and we are trying to focus in on all of those.  But I
12    just want to disabuse the idea that if we just get some
13    financial transactions we would be done.
14          MR. MCMAHON:  Your Honor, I think we have given you
15    all the Jamal Khalifa files, just on our last production.  We
16    gave you whatever we have.
17          You are focusing on Wael Jelaidan, but IIROSA has
18    nothing to do with Wael Jelaidan.  The problem, your Honor, is
19    sometimes these offices are overlaid and they share offices.
20          THE COURT:  I have been told by MWL and IIRO.  How
21    does Wael Jelaidan fit in with those two?
22          MR. MCMAHON:  He thinks IIROSA is the employer of Wael
23    Jelaidan, which is not the case.
24          Wael Jelaidan, your Honor, was very important in
25    Afghanistan.  He headed up the refugee mission, and he got to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1
1    know, among other things, Osama bin Laden very well, but that's
2    what his job was.  So much of this case goes back to -- and
3    it's in their papers, your Honor -- goes back to Afghanistan,
4    the occupation, when the CIA and the Saudi intelligence were
5    one-on-one and were getting stingers missiles to the Mujahideen
6    to get rid of the Russians.  That's what is another theme in
7    the disclosures, your Honor.  But Wael Jelaidan only features
8    in that he is an individual defendant and he did have, I
9    believe -- well, he had a relationship with an entity called
10   the Rabita Trust, your Honor, which is in jurisdictional
11   discovery; it's not up for anything today.  He was the
12   executive director of the Rabita Trust.
13              THE COURT:  Well, tell me why I shouldn't -- let me go
14   back a step.  You indicated that you have postponed a trip to
15   the Kingdom for purposes of this conference, and I gather you
16   will be going there soon.  Why shouldn't I say that the
17   documents responsive -- and I think we need to fix an end
18   date -- but the documents responsive to categories 1 through 8
19   have to be produced within three weeks in the United States?
20              MR. MCMAHON:  Well, I could probably use the other
21   week, your Honor.  It's not going to matter I think to them, so
22   I would ask for four weeks, your Honor.  I think that's what
23   they asked for, 30 days, or maybe that was your second motion
24   to compel.  I think you asked for production in 30 days.
25              MR. CARTER:  I think it says 20, your Honor, but...
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

42

14C7TER1

```
 1              THE COURT:  It does.  Well, 20 or 30 is not a big
 2   difference.  Suppose I say 30 days but direct that the
 3   documents responsive to those eight categories through 2004 --
 4              MR. CARTER:  That's fine.
 5              THE COURT:  -- '92 through 2004 be produced in the
 6   United States within 30 days.
 7              MR. MCMAHON:  Your Honor, could you just put on the
 8   record why we're moving off?  I'm not sure, and I don't want to
 9   misspeak, but I thought it was 2001 or December of 2001 when
10   the cut-off date was.  I haven't gone back and looked.
11              THE COURT:  OK.  I remembered there was -- maybe I
12   have it with me -- it may have been an exhibit somebody gave
13   me.  I remember Judge Daniels' order saying that the start date
14   was I thought '94.  It may be '92.  We will go back through the
15   file and whatever it is, it is.
16              If Judge Daniels set some other date, and you convince
17   me of that, I will shorten the period.  But failing that, it
18   seems to me the end of 2004 is a reasonable cut-off.  It should
19   get easier to produce it the closer we get to 2011 both in
20   terms of hopefully electronic systems and just in terms of
21   accessibility.
22              MR. MCMAHON:  I just don't think there are any
23   allegations in the complaint that bear on that, your Honor.
24   Basically they allege that you take the World Trade Center and
25   then you go back to say the 1996 Khobar Towers bombing or
```

14C7TER1

1    something.
2              THE COURT:  But it's reasonable to look at is there a
3    sudden change in the way disbursements are made such that it
4    shows either a cover-up after the fact or sheds light on
5    something that was unusual about the earlier disbursements.
6    So, I don't think a snapshot rather than sort of a continuum is
7    appropriate.  People can argue about when the period ought to
8    end.  Feel free to send me a letter that tells me that Judge
9    Daniels has already ruled on this, and if he has, I will modify
10   it.  If you want to send me a letter telling me why it should
11   end significantly before 2004, I will read it, and any response
12   I get from plaintiffs, but I'm likely not to change that
13   period.
14             MR. MCMAHON:  I understand, your Honor.  I just
15   thought that was Judge Daniels' call, that's all.
16             THE COURT:  If he has made it --
17             MR. MCMAHON:  No, any subsequent calls.  If he is
18   going to change the timeframe, I thought that's in his
19   bailiwick, not yours, but...
20             THE COURT:  No.  The only reason I'm saying if he
21   set -- and I know he did set a date -- whether it's '92 or '94,
22   I don't remember as I sit here -- I'm not going to contravene
23   that.  If he didn't set a date, trust me if he is asked, he is
24   not going to be upset with me setting a date.  And in fact I
25   assume if I were to reconsider based on new facts and say the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

44

14C7TER1

1    date should start in '89, I don't believe, unless he thinks I'm
2    clearly erroneous, he is going to change that.  I am just
3    saying if he or I decided what the start date is, I don't want
4    to keep revisiting the same issues.
5              MR. MCMAHON:  I understand, your Honor.  Thank you.
6              MR. CARTER:  Your Honor, I am actually looking at
7    Judge Daniels' order concerning the timeframe issue, and it
8    sets '92 as the early date, presumptive early date and it
9    doesn't set a terminal date.
10             THE COURT:  OK.
11             MR. CARTER:  The order was issued on December 21,
12   2004.
13             THE COURT:  Do you have you the docket entry number at
14   the top?
15             MR. CARTER:  I'm sorry, 2007.  There is no docket
16   entry.  But it is Exhibit E, your Honor, to our April 7 letter.
17             THE COURT:  Oh, right, I knew I read it somewhere.
18             MR. CARTER:  So, it's there.
19             With regard to the latter period in 2004, just as one
20   example, your Honor, the Treasury Department evidentiary memo
21   supporting the designation of the IIRO includes language
22   stating that the IIRO's sponsorship of terrorism continued at
23   least through the first half of 2006.  So, there is information
24   of record to justify this later period.
25             You mentioned also, you raised an inquiry about why
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14C7TER1
 1    Wael Jelaidan might fit into all of this, and Mr. McMahon
 2    suggested that he has nothing to do with the Muslim World
 3    League or the IIRO.  Wael Jelaidan's CV -- which is one of the
 4    only things he's produced to us -- indicates he was the
 5    director of the Muslim World League, one of its officers, for a
 6    period of many years.  So, it is our understanding that the
 7    office in question was a joint Muslim World League/IIRO office,
 8    that in the capacity as that director he had the ability to
 9    issue papers to purported relief workers; and Jamal al-Fadl had
10    testified before federal agents that Jelaidan did in fact
11    provide humanitarian papers from the IIRO for al Qaeda people.
12    So, that's sort of how he fits into this mess.
13            THE COURT:  Shall we move on to the WAMY request
14    letter?  Mr. Mohammedi, the letter of March 3, I guess, was the
15    start of that chain.
16            MR. MOHAMMEDI:  Yes, your Honor, we have eight issues
17    before this court now.  The first one we believe that
18    plaintiffs' continued argument of discovery given that it was
19    rejected --
20            THE COURT:  I'm sorry, I am having trouble hearing.
21            MR. MOHAMMEDI:  I said plaintiff is using the argument
22    of federal discovery in a way they want to extend the evidence
23    before they produce the documents.  And we are having a hard
24    time understanding the rationale.  We don't believe this is a
25    valid objection.  This is the first objection that they have
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14C7TER1
1    which is a general objection.
2              Now, the second objection that they have, in all their
3    general objections what they keep saying is all our requests,
4    including document requests, are contention interrogatories.
5    They have not been specific to the specific request that they
6    think are contention interrogatories.  And your Honor
7    specifically mentioned that you cannot make a decision based on
8    abstract.  And their objection is general objections, not
9    specific objections to specific document requests or
10   interrogatories.
11             We do believe that WAMY and WAMY International need
12   proof, and so far we believe plaintiff has produced mostly
13   newspaper clippings.  We just believe that the plaintiff, if it
14   believes that there is no document available to them, they just
15   need to say so.  However, most of their responses are very
16   vague responses and with general objections such as contention
17   discovery requests.
18             One important issue that they mentioned also is that
19   they keep making more allegations about WAMY, actually Muslim
20   World League being the parent company for WAMY, yet we have not
21   received one single document from them demonstrating that.  And
22   we made the request specifically to those, and we have not
23   received anything about that.
24             Now, the third issue that we would like to address is
25   the privilege.  They have not produced one single document
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14C7TER1
1   showing a privilege log.  Most of their argument is the fact
2   that they are claiming that there is some document that came
3   into possession and they deem them to be privilege documents.
4   So, for us to see if those are privilege documents, we would
5   like to receive a privilege log.  And they make the argument
6   that WAMY made the same objection.  But we did produce the
7   privilege document.
8           The other issue that we would like to address is the
9   protective order whereby they are stating that they would
10  withhold documents and identities of witnesses because they're
11  afraid for their safety.  We do believe that if they do have an
12  issue with safety, the proper approach is to produce or to file
13  a motion for a protective order.  And there is a protective
14  order in place as we speak, where Judge Casey had that approved
15  when we were negotiating between plaintiff and defendants.
16          Now, the other issue that I would like to address is
17  issue number 5 and objections to WAMY's interrogatories 4
18  through 12.  What they keep mentioning, they keep referring to
19  RICO statements.
20          THE COURT:  To what statements?  I'm sorry.
21          MR. MOHAMMEDI:  RICO statements.  We do believe that
22  Federal Rules of Civil Procedure, Rule 33, really a party has
23  to answer interrogatories, specifically to the specific request
24  of that interrogatory, not to mention or to refer to documents.
25  And most of those responses are referring to documents to RICO
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

48

14C7TER1
 1    statements.
 2              Now, the other issue that we would like to address is
 3    issue number 6.  And I think this one you have already made a
 4    ruling on it.  We do believe that fact witnesses, they have to
 5    produce them.  The identity of fact witnesses, I think they
 6    have to produce those witnesses if they have direct knowledge
 7    of the facts of the case.  We are not asking them to produce
 8    documents of people who they are not calling for trial, but any
 9    fact witnesses.
10              THE COURT:  When you say produce, you mean identify.
11              MR. MOHAMMEDI:  Identify, yes.  And that was in
12    response to our interrogatory number 1.
13              Now, if you go to issue number 7, would it be possible
14    with the plaintiffs' production --
15              THE COURT:  Wait.  Let me go back to interrogatory 1.
16    That's not asking who has knowledge of the facts.  That's
17    asking who did you ask for information that relates to all the
18    other interrogatory answers.
19              MR. MOHAMMEDI:  If they are related to facts, we
20    believe that they should be produced.
21              THE COURT:  OK.  I'm sorry to interrupt.  Go on to
22    number 7.
23              MR. MOHAMMEDI:  Number 7 is plaintiff produced 1,072
24    pages of documents on WAMY.  They also claim they produced
25    7,000 pages through Muslim World League which they claimed that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14C7TER1
```
 1   Muslim World League is part of the company.  We don't have the
 2   7,000 pages.  However, the problem we have, even the 1,072
 3   pages, which we state the fact that they are mostly newspaper
 4   clippings, they have not stated specifically which document
 5   corresponds to which request.
 6           Now, plaintiff I believe they make the arguments that
 7   because WAMY's requests were broad, they had to dump documents
 8   with WAMY as a response.  I will give your Honor a few
 9   examples.
10           WAMY made a request where they ask specifically how
11   WAMY uses its funds to sponsor terrorist activities.  In
12   request 75 specifically it requests that plaintiff show any
13   knowledge that WAMY had that its actions were aiding and
14   abetting al Qaeda.  And they made the argument also that
15   WAMY -- which is not before this court but I just want to
16   clarify the record -- that WAMY are doing the same thing.
17           As a matter of fact, discovery just started, and we
18   specifically had a conference with them, and we told them that
19   we have specific index that relate to specific requests for
20   them to review and then we'll produce these documents.  That's
21   issue number 7.
22           Issue number 8 relates to service.  We do believe that
23   there was no decision made by Judge Daniels on the service
24   issue related to WAMY.  And he was very specific.
25           THE COURT:  Let me cut you short on that one.  I have
```
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

14C7TER1
1    read the opposing papers, and as to documents that relate to
2    service I'm firmly convinced that one side is right, I just
3    don't know which side is right, but I'm also convinced that the
4    documents are not voluminous, so as to documents evidencing or
5    relating to service I'm going to direct that those be produced.
6    Who wants to speak to the other issues?
7              Before you do that, we are dealing with a handful of
8    the parties who are in merits discovery now, but two thoughts I
9    had as folks were talking.  The first is I don't believe there
10   is a Rule 502 order in this case relating to the production of
11   privileged documents inadvertently or advertently.  And just
12   anticipating issues down the road, if we get to voluminous
13   productions, I wonder whether it's not useful for me sua sponte
14   to simply enter a Rule 502 order.
15             MR. CARTER:  Your Honor, I think the court raised that
16   possibility in one of the earlier hearings concerning defendant
17   Barzinji, and we were receptive to the idea.
18             THE COURT:  OK.  I had forgotten I had done that, but
19   I will probably then do that in fairly short order.  And it
20   won't relate simply to inadvertent production; it will be
21   production.  Because otherwise you get into -- and I may have
22   said it the last time -- battles about was it inadvertent or
23   advertent, and I don't think those are worth worrying about.
24             The other is what Mr. Mohammedi was just talking
25   about, which is giving documents to defendant A but not

14C7TER1
1    defendant B and assuming that they will find their way to
2    everybody.  There really is no arrangement on either side, or
3    as a practical matter there probably is on the plaintiffs'
4    side, for some sort of centralized document repository here,
5    correct?
6              MR. CARTER:  There is not an arrangement for a
7    centralized document repository.  The procedure that had been
8    implemented years ago is for the plaintiffs to copy on any
9    productions Mr. Kabat who was serving in a capacity as liaison
10   counsel for the Defendants' Executive Committee, and that was
11   intended to be the vehicle for ensuring everybody received all
12   the documents.
13             THE COURT:  And that's what is continuing to happen?
14   You are giving him a disk or something?
15             MR. CARTER:  That is what is continuing to happen.
16   And, you know, I think the gap here is simply because merits
17   discovery was ongoing as to the Muslim World League and not as
18   to WAMY, and so there was probably a less interest on the part
19   of defendants in collecting discovery when their motions were
20   pending.  But it's not a problem for us to produce the stuff
21   that we have produced previously.
22             MR. MOHAMMEDI:  Your Honor, the issue is not only the
23   fact that there are 5,000 I believe you mentioned, 5,000
24   documents that were supposed to review them and they are
25   related to WAMY.  We really do believe that for a response
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14C7TER1
```
 1   document they have to be corresponding to our requests
 2   specifically.
 3             THE COURT:  OK.  Well, you had seven or eight I guess
 4   issues.  Let me hear from Mr. Carter.
 5             MR. CARTER:  Your Honor --
 6             THE COURT:  Let me just interrupt you and go off the
 7   record for a second.
 8             MR. CARTER:  Your Honor, I think potentially we can
 9   take one issue off the table right away with regard to the
10   reference made to procedures for privilege logs.
11             We had lengthy meet-and-confers two weeks ago with
12   counsel for Dubai Islamic Bank and then a general session, and
13   where we left was there was going to be a proposal submitted to
14   plaintiffs about how we were going it approach privilege log
15   issues.  So, we are waiting for that proposal, and then we will
16   see if we can work out something on a collective basis about
17   that.
18             With regard to the issues concerning identifying
19   witnesses, I think that the court has effectively dealt with
20   that through the requirement issued earlier in the context of
21   the Muslim World League's 26(a) motion.
22             Part of the issue here though is that the focus of
23   this motion was in part on identifying consultants who are not
24   expected to testify.  There is no real reason for the identity
25   of those folks to be disclosed.  And this is one of those
```

14C7TER1
1   unique cases where there are actually some reasons to have
2   concern.  Putting aside safety, you also have the issue of the
3   problem of liable tourism which has affected folks who work in
4   this area and comment about terrorism and terrorism
5   sponsorship.  So, we just don't see a basis for there having
6   any necessity to identify those folks.
7           With regard to the protective order --
8           THE COURT:  Well, and I'm not sure they fall within
9   26(a)(1), which talks about each individual likely to have
10  discoverable information which a consultant would be.  Well, I
11  guess it's arguable.  But I think you're right that my
12  modification or supplementation of what you need to produce
13  should deal with that issue.
14          Just so the record is clear, I'm not sure I've said
15  it, but non-testifying consultants to my mind need not be
16  identified.
17          MR. CARTER:  Thank you, your Honor.  You know, more
18  broadly, when we sort of look at this motion, again one of the
19  difficulties is that WAMY is essentially urging this court to
20  require plaintiffs to produce everything immediately; and we
21  haven't received a single document from WAMY Saudi Arabia.  And
22  I think a lot of these concerns, objections, all fall by the
23  wayside once we have made our complete production.  There is a
24  concern Mr. Mohammedi has expressed about the production
25  consists of newspapers.  Well, it's a rolling production.  It

54

14C7TER1
1  wasn't just newspapers; it was other things.
2          THE COURT:  I understand there is a bit of
3  gamesmanship or brinkmanship here but ultimately -- perhaps not
4  with any defendant who is here today -- you may get to the
5  juncture where defendant X has requested documents from you and
6  yet is not playing fairly in the sense that they haven't
7  produced anything.  But I don't think I can operate on the
8  principle that two wrongs make a right.
9          It may be that you are in the position of producing
10  documents as the way of being able to say either direct that
11  they produce documents that they should have produced and
12  haven't produced or strike their answer or do something
13  Draconian.
14          So, I don't think in each instance you can say until
15  they give us a commensurate number of documents we're sort of
16  slowing up what we're producing or giving them the less
17  important stuff first or anything like that.
18          MR. CARTER:  I don't think that's what I intended to
19  say, your Honor.  My point is more that we have already made an
20  initial production, and, you know, on the defendant's side they
21  are saying let's be realistic about this, it's going to take
22  some time.
23          And we have to go through that process too, and it's a
24  rolling production, and some of the concerns that are being
25  raised simply start to fall away as that production continues.

55

14C7TER1
```
 1              THE COURT:  Let me also say that -- and I think I have
 2     said it before -- generally speaking I view general objections
 3     as surplusage.  There is a decision by magistrate Judge Grimm
 4     in Maryland.  It may be the Mancia, M-a-n-c-i-a, decision; it
 5     may be one of his other decisions; but he makes the point quite
 6     forcibly that general objections rather than objections that
 7     are tailored to specific requests are not worth the paper
 8     they're written on.  And that pretty much is my view.
 9              So, to the extent there were concerns about
10     withholding of documents based on general objections, I don't
11     view a general objection as a basis for withholding documents.
12     I understand that in your letter there were some explanations
13     for why that was done, but I just thought I would make that
14     point clear.
15              MR. CARTER:  Your Honor, it is one of those things
16     that both sides have included general objections.
17              THE COURT:  Lawyers -- you know, that seems to be part
18     of what must go on in every case.  I guess there is some manual
19     that says that.  And the other is that -- and it certainly
20     happened in this case -- everybody quotes to me the number of
21     documents the other side has produced, and the fact that one
22     side has produced a thousand documents and the other a million,
23     people assume that has some significance.  But there is always
24     the possibility that one side only has 1,000 documents and the
25     other side has millions of documents.  So, the number of
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

56

14C7TER1
```
 1   documents, unless it's disproportionate to what seems ought to
 2   exist, really doesn't move me one way or the other.
 3           MR. CARTER:  Your Honor, on that point there was a
 4   suggestion that we're engaged in some attempt to manufacture a
 5   document dump.  That's not happening.  I would say in the first
 6   instance that any documents that we have necessarily relate on
 7   some level to the claims advanced in the litigation.  It's not
 8   as though we just collected every article in the world that
 9   said WAMY's name and sent it back to them.  That's not what
10   happened.
11           The concern with referenced with regard to specific
12   requests or interrogatories I think is driven by a disconnect
13   between the plaintiffs and certain of the defendants about
14   certain of the substantive standards.
15           So, for instance, when there is a request that says
16   any documents that support your claim that this organization
17   aided and abetted the September 11 attacks, the plaintiffs'
18   view, based on our reading of the law, is that general support
19   provided to al Qaeda served to facilitate the organization's
20   ability to carry out the attacks.  So, a broad discovery
21   request for any documents that you may use to support the claim
22   that this organization supported in any way the September 11
23   attacks gets all the documents.  But we did with respect to all
24   of the more narrowly tailored requests identify very
25   specifically.
```

14C7TER1

1          THE COURT:  Let's stick with the one you just
2    described.  And is your planned response to that to provide all
3    the documents that you think are responsive even though it's
4    voluminous?
5          MR. CARTER:  Yes.
6          THE COURT:  OK.  And that's what we have begun the
7    process of doing.  And of course we're not producing our
8    internal written memos, those kinds of things.  But that feeds
9    into what Mr. Mohammedi said about providing a response which
10   indicates which documents support which request.
11         MR. CARTER:  Correct, your Honor.  And there are
12   certain requests that are more specific and narrowly tailored,
13   and with regard to those we can cull from the broader universe,
14   and we have, and we have identified those limited documents
15   that speak to a particular issue.
16         THE COURT:  OK.  So, for example, if it said any
17   disbursements that WAMY made to terrorists, if you had such
18   documents you would reference a narrow group of documents.
19         MR. CARTER:  That would be a narrow group.
20         THE COURT:  OK, go on.
21         One thing I'm not clear on is generally speaking there
22   is a local rule which at the outset of discovery -- when
23   notwithstanding the age of the case, we are at the outset of
24   discovery in most instances -- limits what are permissible
25   interrogatories.  And I'm not sure whether there were other

14C7TER1
1    understandings that were reached along the way, or what the
2    circumstance is.
3           MR. CARTER:  There were not, your Honor.  Many, many
4    years ago Judge Casey during a conference indicated that he
5    didn't necessarily intend to adhere strictly to the local rules
6    particularly with regard to interrogatories.  And you know, it
7    really has sort of mushroomed from there sort of beyond what I
8    think everyone expected at the time.
9           I don't know of any order that's actually written on
10   that point.
11          THE COURT:  And have plaintiffs served interrogatories
12   to which there have been responses also?
13          MR. CARTER:  I believe we may have served
14   interrogatories on al Haramain, but that was also subject to an
15   agreement that had been reached, and it was when the case was
16   in D.C.  I do not recall having served interrogatories at all
17   since.
18          THE COURT:  Well, what I am inclined to do -- and
19   maybe since we don't have everybody at this conference, since I
20   presume they will read the transcript of this conference -- is
21   discuss at our next conference whether in fact interrogatories
22   should be limited to those which the local rule contemplates at
23   the outset of discovery.
24          I'm not a big fan of interrogatories.  Folks think
25   that as between a particular defendant and plaintiff that

14C7TER1
1   interrogatories move the ball forward.  I'm certainly not going
2   to get into the middle of that, but I would like to get the
3   show on the road, and I think interrogatories, in particular
4   contention interrogatories, or interrogatories that say what
5   interrogatories support contention 3, are not useful at this
6   point.
7           So, what I am inclined to do is say except to the
8   extent the parties otherwise agree, or there is some particular
9   circumstance that causes me to otherwise correct direct,
10  interrogatories will be limited to those very narrow topics
11  that are within the local rule.
12          So, on the defense side you should make that known
13  that that's something I plan to take up next time.
14          MR. CARTER:  I think we may have hit on everything,
15  your Honor.  I could be mistaken.
16          THE COURT:  One thing I wanted to make clear -- and I
17  think I have said in part already -- a request that says "give
18  us all the documents that you contend supports a particular
19  paragraph of the complaint" may implicate work product or
20  privilege, but if it's something more directed to subject
21  matter, such as "give us all the disbursements between A and B
22  or whatever," even if it's something that counsel obtained
23  rather than their clients, I do think it has to be produced.
24          (Continued on next page)
25          THE COURT:  I guess I did say that already.  I want to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14c0terc2
1   make sure I cover the universe here.
2           There is also, on page 5, plaintiff's
3   March 18th letter, a statement that says, in part:  Plaintiff's
4   are not evoking these privileges, namely work product and
5   attorney/client on a wholesale basis in an effort to avoid
6   production.  Plaintiffs have merely raised the objection to
7   preserve the privilege in producing documents in good faith.
8           THE COURT:  I'm not sure I have any idea what that
9   means.
10          MR. CARTER:  Your Honor, I think we addressed a little
11  bit earlier that we were venturing into this process.  And
12  without getting into too much detail about how we all
13  maintained our information and evidence, at the time of the
14  deadline for the responses, we didn't have a complete picture
15  of what we have and so, you know, we have to anticipate that
16  there might be something in there that invokes the privilege
17  but --
18          THE COURT:  Actually by the close of document
19  discovery, I will expect -- and I understand that it's subject
20  to some discussions now, but -- not say by close of discovery,
21  we're going to have to have a discussion about a date by which
22  everybody will produce a privilege log.  Except to the extent
23  that you carve out categories of documents.  Then it may be
24  useful to have a discussion about subjects as to which, or
25  chronological periods, as to which you won't actually schedule

14c0terc2
```
 1   privilege documents on a log.
 2              MR. CARTER:  I think that is precisely the discussion
 3   we intend to have, your Honor.
 4              THE COURT:  I don't know whether any of you have
 5   looked at, but Judge Facciola, who some of you from D.C.
 6   Probably know, together with another author, I forget who it
 7   is, wrote an article in the Federal Court's law review, which
 8   is the on-line journal of the Federal Magistrate Judges'
 9   Association, so it's easy to find on line, that suggested
10   a simple protocol for trying to simplify privilege logs.  And
11   you my find some useful thoughts in there in terms of ways to
12   make the process less burdensome.
13              In terms of the concerns Mr. Mohammedi alluded to
14   about documents from sources who were sensitive and the like, I
15   do agree with Mr. Mohammedi that if something -- if you're
16   proposing to withhold something on the basis that it might
17   endanger somebody, I don't think you can make that decision
18   unilaterally.  There has to be a motion for a protective order,
19   either as to specific documents and categories of documents,
20   and witness names, and the like.  And what I did look at, Judge
21   Casey's protective order.  It didn't have, if I have read it
22   correctly, an attorney's eyes only category which is, again,
23   something that you may want to discuss with the defendants
24   committee.
25              MR. CARTER:  It was, in fact, raised at one of the
```

14c0terc2

1    meet and confers.  It's another issue that is in discussion.
2            THE COURT:  Let me see whether there is anything else
3    on my notes.
4            Mr. Mohammedi mentioned an index.  Has that already
5    been turned over to you folks, or is about to be.
6            MR. MOHAMMEDI:  Working on it.  We have, really,
7    warehouses that our client, they hired about five people to go
8    through documents.  And we are working with them, trying to
9    see -- really, we will get them as soon as -- at least we get
10   some, and we can on a rolling basis, produce them to plaintiffs
11   and then, hopefully, we'll be done with them.  But
12   like plaintiff mentioned, I don't think this would be done by
13   April 26th, just humanly impossible for us to.
14           THE COURT:  I infer from the letters that both sides
15   are planning to make some proposal to me, is that --
16           MR. CARTER:  On this point, we're a bit confused
17   because, your Honor, obviously we had submitted a letter
18   previously suggesting an amendment of the scheduling deadlines.
19   The Defendant's Executive Committee opposed any amendment of
20   it.  And then, very shortly thereafter on a conference call
21   with Mr. Mohammedi and Mr. McMahon, we were told that they
22   didn't foresee any potential in the world that they could
23   comply with the April 29th deadline.  So it seems that some of
24   the defendants agree with us.  We obviously agree that it's not
25   workable.  We're not going to get done by then.

63

14c0terc2

```
 1              THE COURT:  Well, until it's changed, it is the
 2    deadline.  So anybody who thinks that it ought to be changed,
 3    needs to get me a proposal that is the result of a meet and
 4    confer in fairly short order.
 5              MR. McMAHON:  If I can be heard on that.
 6              Mr. Carter has put his finger on the nub of the issue.
 7    My colleague and I have institutional clients with huge data
 8    bases and things.  And I think we're both of the view
 9    that there needs to be some amendment there, because these
10    folks are filing these motions to compel because they are
11    coming up against serious deadlines, obviously.  And we would
12    like to comply with their needs.  So I, for one, would go on
13    the record supporting that.  But I think within the defense
14    counsel, especially Mr. Kabat, he wants everything to be
15    concluded, you know, on time.  I think I discussed this in our
16    phone conversation, and Mr. Kreindler had suggested that it has
17    to be global, so I think that's the nature of the problem.
18              THE COURT:  That clearly is right, because for me to
19    set individual deadlines for individual defendants would just
20    lead to chaos down the road.  So you need to get together with
21    the other members of the Defendant's Executive Committee.  And
22    to the extent that there can be a unified proposal which would
23    be submitted, if there were dissenters, and, on the defense side
24    if the only dissenters are you folks, you should let me know
25    that.  But something ought to be gotten to me fairly soon.
```

64

14c0terc2

1          MR. KREINDLER:  Just a suggestion, your Honor.
2  Perhaps IF the defendants took the next week to see if they
3  can adopt a unified position, then we can -- we're not chasing
4  a moving target.  Then they'll get back to us, say they have a
5  unified position or they don't, and then we know what to do.
6          THE COURT:  That seems fair.
7          MR. KREINDLER:  While I'm on my feet stretching for
8  the moment, just to share a little positive development.  We, I
9  think, have worked out an agreement with Mr. Barentzen and Ms.
10  Luque's clients, basically a deal dismissing that whole
11  category of clients in return for getting the documents
12  promptly, an opportunity to interview them and take some quick
13  depositions.  We're working on the language.  And we should
14  have that done in a couple of days.  I would have that
15  submitted to the Court.
16          THE COURT:  Well, that is good news.  Thank you.
17          When is our next regularly-scheduled meeting.
18          MR. CARTER:  Your Honor, our next meeting is April
19  26th.
20          THE COURT:  Okay.  Which is before the
21  April 29th current discovery deadline.  So, hopefully, we can,
22  during that session, talk about the document discovery
23  deadline.
24          MR. CARTER:  If I could just address that issue,
25  briefly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

14c0terc2

1          Mr. Kreindler had suggested that maybe the defendants
2    could confer over the next week.  The deadline is really
3    coming, and the --
4          THE COURT:  Why don't I say they should confer by the
5    end of week.
6          MR. CARTER:  I think that would be helpful.
7          Thank you.
8          THE COURT:  I will so direct.
9          Anything further from anyone?  Okay.  Thank you all.
10          (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25