# SUBMISSION OF YASSIN ABDULLAH KADI TO THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND, MR CLAUDE NICATI, FURTHER TO THE MEETING AT THE SWISS EMBASSY IN RIYADH ON 1 JULY 2003

## 1. INTRODUCTION

At the meeting at the Swiss Embassy in Riyadh, Saudi Arabia, on 1 July 2003, the Deputy Attorney General of Switzerland, Mr Claude Nicati ("Mr Nicati") met Mr Yassin Kadi in the presence of his legal team. Mr Nicati requested Mr Kadi and his legal team to provide a detailed explanation of the issues raised at the meeting. This memorandum sets out the evidence as requested by Mr Nicati:

1.1 **PART I** of this memorandum relates to certain transfers authorised by Mr Kadi from the account of Caravan Development Group Limited (account 10257) at Faisal Finance, Geneva, for the benefit of Wael Hamza Jeleidan (for convenience referred to as "Mr Jeleidan") between 24 February 1998 and 3 August 1998 in the total sum of US$1.25 million. Mr Kadi testified at the 1 July 2003 meeting that he authorised all these transfers for the sole purpose of giving financial support for prefabricated housing for students and ancillary buildings for the Al Eman University in Sanaa, Yemen.

1.2 **PART II** o: this memorandum contains clarification and supplemental evidence on certain issues raised by Mr Nicati during the 1 July 2003 meeting.

Following the meeting on 1 July 2003, Mr Kadi's legal team and his staff have urgently undertaken substantial investigations in various jurisdictions around the world including in Yemen, Sudan, Saudi Arabia, Jordan, Turkey and Switzerland. During these investigations a significant number of relevant documents have been obtained in various different languages, including Turkish and Arabic. Following that meeting, Mr Kadi's legal team has also met Mr Jeleidan. Mr Jeleidan has co-operated with the legal team including by authorising access to corporate documents for Maram Travel Importation and Exportation Trading Limited Company (for convenience "Maram") as well as banking documents relating both to Mr Jeleidan's personal accounts and the account of Maram. Mr Kadi's legal team has arranged for many of these documents to be translated. All the foregoing work has been undertaken as a matter of urgency as a result of the short deadline imposed at the 1 July 2003 meeting by Mr Nicati.

It must be noted at the outset that these investigations have been impeded, in part, by the very recent removal by the Turkish government authorities of crucial documents relating to Maram, a company that had a central role in the Al Eman University housing project. These documents were removed in late June or early July 2003, at around the same time as the 1 July 2003 meeting with Mr Nicati, when representatives of the Turkish Ministry of Finance visited Ms Semra Sonmez, the accountant in Istanbul who formerly represented Maram. The Turkish government authority that removed these documents is HESAP YZMANLARI KURULU, a division of MALIYE BAKANLIGE (Ministry of Finance) in Karakoy, Istanbul. Due to this, Mr Kadi's legal team has not been able to access all documents relevant to the transfers. This memorandum has, therefore, been prepared, and the evidence collated, despite, and subject to, these constraints.

A paginated file of supporting documentation is provided with this memorandum together with, wherever necessary, translations.

# PART I

## 2. BACKGROUND

### 2.1 Mr Kadi's Introduction to the Al Eman University Housing Project

Al Eman University (for convenience "the University") is located in Sanaa, in the Republic of Yemen. The University was founded in 1994 by Sheikh Abdel Majid Zindani ("Mr Zindani"). Mr Zindani has a close, and long-standing, association and friendship with Mr Kadi's uncle, Dr Mohammed Omar Zubayr ("Dr Zubayr"). Their association began when Mr Zindani was teaching as a visiting lecturer at the King Abdul Aziz University in Jeddah, Saudi Arabia, when Dr Zubayr was President, and then a consultant, for that university.

In 1997 the University was in dire need of housing units for its students. A decision was made to acquire some temporary prefabricated buildings as a short-term solution to the students' housing needs. In order to acquire these buildings, the University required funds. The University made a public appeal to raise funds and issued a fund appeal brochure, a copy of which is at Annex A. The fund appeal brochure included specifically an urgent appeal for help regarding the temporary housing for students, as well as a general appeal for funds for the University. The appeal by the University for funds was totally open and transparent. The funds raised for the student housing project would be used to acquire and provide temporary housing units for married and single students at the University as well as ancillary infrastructure such as a nursery school, clinic, grocery store and administration offices. All of these prefabricated buildings were to be located on a temporary campus at the University. For convenience this project is referred to below as the "University Housing Project".

Mr Kadi's uncle, Dr Zubayr, and Mr Zindani have, as stated above, a close and long-standing association so that when Mr Zindani founded the University in 1994, he asked Dr Zubayr, to become a member of the University's governing board. Subsequently, in 1997, when the University appealed for urgent donations for the University Housing Project, Mr Zindani requested the help of Dr Zubayr.

Dr Zubayr agreed to help and enthusiastically supported the appeal. A photograph of Dr Zubayr alongside Mr Zindani appears in the fund appeal brochure at Annex A, page 4.

It was against this background that in late 1997 Mr Kadi was approached by his uncle, Dr Zubayr, who explained the University Housing Project to him and suggested it was worthy of Mr Kadi's support.

In summary, Mr Kadi was introduced to the University Housing Project by his uncle, Dr Zubayr, who has a long-standing association with Mr Zindani, the founder of the University. The University made a public and open appeal for funds for the University Housing Project. Based on this appeal, Mr Kadi agreed to help by providing funds.

**2.2 Description and scale of the University Housing Project**

The scale, composition and layout of the proposed University Housing Project was substantial as will be seen from the drawing in the fund appeal brochure (see Annex A, page 5). The prefabricated buildings were manufactured and supplied by a company based in Istanbul, Turkey, called Vefa Engineering Industry and Trading Limited Company (for convenience "Vefa"). Drawings prepared by Vefa, and a detailed schedule of the completed buildings, are at Annex B. From these it will be seen that the University Housing Project comprised the following:

2.2.1 30 buildings for housing married students of 10 apartments each. Each apartment was of 41 sq metres and comprised 2 bedrooms, bathroom, kitchen and a small living room.

2.2.2 25 housing units for single students, each of 41 sq metres and each housing 8 students, 15 units for male students and 10 for female students.

2.2.3 A building of 114 sq metres, which was a nursery school.

2.2.4 A building, also of 114 sq metres, which was used as a clinic.

2.2.5 A building for administration offices of 340 sq metres.

2.2.6 Finally, a building, of 114 sq metres, which was used as a grocery store.

A photograph of the University Housing Project appears at Annex N (page 331). Thus, it will be seen that the University Housing Project as executed was very substantial.

**2.3 The decision to appoint Mr Jeleidan for the University Housing Project**

It is common practice in the Middle East, and especially in Saudi Arabia, that transactions are conducted on the basis of personal trust. This is unlike the West where such transactions and dealings often generate a very significant amount of documentation, as well as the conducting of due diligence investigations and the taking of references. This point applies generally to business practices throughout the Middle East, but particularly where the parties are Saudi Arabian. Mr Jeleidan is known in Saudi Arabia to come from a reputable family and also for his trustworthiness. The trust held by Mr Kadi for Mr Jeleidan underpinned all Mr Kadi's dealings concerning the University Housing Project.

Mr Kadi's uncle suggested the University Housing Project to Mr Kadi as a project deserving of support. Mr Kadi is well known for his strong commitment to helping and promoting education for both men and women in society in general, both inside and outside Saudi Arabia.

As an example of Mr Kadi's commitment to supporting education, Mr Kadi's humanitarian work has frequently included educational projects and support to schools in developing countries such as Bosnia, Pakistan and Albania. Moreover, in 1996, Mr Kadi founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia. This ultimately led to the founding of a pioneering women's college in Jeddah, named Dar Al Hekma

College in 1999. Dar Al Hekma College is now one of the first private colleges for women in the Kingdom offering university level degrees. It is also unique as it educates women in an English language setting. The college has won support from the Saudi Royal Family, business people, local and foreign dignitaries all of whom have commended its work. Mr Kadi also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn Carter during their visit to Saudi Arabia in 2000. They were very pleased with their visit to the college. Rosalyn Carter spoke of the positive impression she had gained at the college.

Consistent with Mr Kadi's commitment to supporting educational projects, he accepted his uncle's suggestion to provide financial support towards the University Housing Project.

Mr Kadi's uncle knew that Mr Kadi was extremely busy managing his international business affairs and did not have the time personally to implement the University Housing Project. Dr Zubayr suggested to Mr Kadi that he should entrust the implementation of the University Housing Project to Mr Jeleidan. Both Dr Zubayr and Mr Kadi knew and trusted Mr Jeleidan who, as stated above, was, and is, well known in Saudi Arabia for his trustworthiness and his humanitarian work helping refugees in Pakistan. In his humanitarian activities Mr Jeleidan had gained extensive experience of construction work. Among the construction projects managed by Mr Jeleidan to help refugees in Pakistan, in 1989/1990 he supervised the construction of an orphanage and in 1993 he was put in charge of a project for the construction of 1,000 housing units. Moreover, Mr Jeleidan was ideally placed to implement the University Housing Project because, with his business partner, he had recently bought Maram, a company incorporated in Turkey to carry on business in, among other areas, the construction field. (See Maram corporate documents at Annex C, pages 64, 76, 78 and 126). Mr Jeleidan could implement the University Housing Project through Maram by arranging for the purchase of the prefabricated buildings from the supplier in Turkey, and arranging for their shipment from Turkey to Yemen.

Due to the above, Mr Kadi believed that Mr Jeleidan was well qualified to implement the University Housing Project and Mr Kadi had full confidence in Mr Jeleidan's ability to do this. Mr Kadi therefore accepted his uncle, Dr Zubayr's, suggestion to entrust the implementation of the University Housing Project specifically to Mr Jeleidan.

At that time, in 1998, Mr Kadi was totally unaware of any allegation, either public or private, that Mr Jeleidan was connected with any terrorist group or individual and Mr Kadi had no evidence or reason to suspect Mr Jeleidan of any continued association with Usama bin Laden. It was at the time widely believed in Saudi Arabia that Mr Jeleidan had parted company with Usama bin Laden following the war when the Soviet forces were driven out of Afghanistan.

**2.4 Mr Jeleidan's acquisition of Maram with his business partner on 14 July 1997**

In 1997, Mr Jeleidan wished to commence a travel business in Turkey, including arranging for Muslims in Turkey to undertake pilgrimages (Hajj) and minor pilgrimages (Omrah). Maram had already been incorporated in Turkey in January 1997 for purposes which included the travel and tourism business (see Annex C, pages 64, 76, 78 and 126), but it needed 5 years of trading history before it could get a licence from the Turkish authorities to arrange pilgrimages. It was convenient for Mr Jeleidan to acquire an already existing company, which included the travel business in its corporate objectives, instead of incorporating a new company.

Therefore, Mr Jeleidan acquired the entire ownership of Maram with his business partner in Turkey, Mohammed Louy Bayazied ("Mr Bayazied").

As will be seen from Annex C, Maram was a highly regulated company. Maram was in good standing, visibly doing business and operating in Turkey until it was formally liquidated in November 2002. During the period of its existence, Maram made numerous regulatory, corporate and tax filings with the Turkish authorities.

**2.5 Mr Jeleidan executed the University Housing Project through Maram**

Mr Jeleidan executed the University Housing Project through Maram. Maram searched the market in Turkey and found a manufacturer, Vefa, which was prepared, and had the capacity, to supply the prefabricated buildings and take responsibility for the transportation of the buildings to the port in Turkey, and the installation of the buildings upon their arrival at the University in Yemen. It was accordingly Maram, which entered into a contract with Vefa. Mr Kadi refers to the contract, receipts, demands and other business documents, between Maram and Vefa at Annex E.

At Annex E (page 193-194) is a demand issued by Vefa and addressed to Maram dated 18 April 1998. It will be noted from this demand that the total value of the contract between Maram and Vefa was US$ 850,000. Of this sum Vefa had already received, by 18 April 1998, the sum of US$ 740,000. Vefa demanded from Maram payment of the balance due of US$110,000.

It will also be noted from the contract between Maram and Vefa dated 5 February 1998 (at Annex E page 185-188) that Vefa was responsible for domestic freight within Turkey. Thus, Maram was responsible, and therefore undertook liability for, transporting the buildings by ship from the port in Turkey to Yemen and then onward transportation to the University.

In addition to this, Maram was, by the terms of the contract, responsible for:

1. Equipment and labour needed for concreting of the ground.

2. Equipment and labour needed for coating of the ground.

3. Equipment and labour needed for installation of central heating

4. Equipment and labour needed for installation of appliances.



IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٢٢ ٠٤١+ – تلكس: ٣٥٤ ٤١٥ FFS-CH
تليفاكس: ٩٩ ٥٣ ٩٠٨ ٢٢ ٠٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 1

STATEMENT OF ACCOUNT

USD IFA 010409.01.00.840

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 01/01 | CARRIED FORWARD | | | | 0.00 |
| 20/10 | CASH IN FM A/C 10381 | | 200,000.00 | 22/10/97 | 200,000.00 |
| 23/10 | PPSC/C INVESTMENT | 200,000.00 | | 23/10/97 | 0.00 |
| 31/10 | MANAGEMENT FEES | 12.50 | | 31/10/97 | 12.50- |
| 03/11 | PPSC/C REIMBURSEMENT | | 200,000.00 | 05/11/97 | 199,987.50 |
| 03/11 | GROSS INCOME | | 397.22 | 05/11/97 | 200,384.72 |
| 03/11 | PROFIT PARTICIPATION | 39.72 | | 05/11/97 | 200,345.00 |
| 05/11 | PPSC/C INVESTMENT | 200,000.00 | | 05/11/97 | 345.00 |
| 10/11 | PPSC/C REIMBURSEMENT | | 200,000.00 | 12/11/97 | 200,345.00 |
| 10/11 | GROSS INCOME | | 215.06 | 12/11/97 | 200,560.06 |
| 10/11 | PROFIT PARTICIPATION | 21.50 | | 12/11/97 | 200,538.56 |
| 12/11 | PPSC/C INVESTMENT | 200,000.00 | | 12/11/97 | 538.56 |
| 24/11 | PPSC/C REIMBURSEMENT | | 200,000.00 | 26/11/97 | 200,538.56 |
| 24/11 | GROSS INCOME | | 432.64 | 26/11/97 | 200,971.20 |
| 24/11 | PROFIT PARTICIPATION | 43.26 | | 26/11/97 | 200,927.94 |
| 24/11 | TRF TO F.F.I. - TURKEY | 150,000.00 | | 26/11/97 | 50,927.94 |
| 26/11 | PPSC/C INVESTMENT | 50,000.00 | | 26/11/97 | 927.94 |
| 30/11 | MANAGEMENT FEES | 36.45 | | 30/11/97 | 891.49 |
| 01/12 | PPSC/C REIMBURSEMENT | | 50,000.00 | 03/12/97 | 50,891.49 |
| 01/12 | GROSS INCOME | | 53.76 | 03/12/97 | 50,945.25 |
| 01/12 | PROFIT PARTICIPATION | 5.37 | | 03/12/97 | 50,939.88 |
| 03/12 | PPSC/C INVESTMENT | 50,000.00 | | 03/12/97 | 939.88 |
| 08/12 | PPSC/C REIMBURSEMENT | | 50,000.00 | 10/12/97 | 50,939.88 |
| 08/12 | GROSS INCOME | | 54.35 | 10/12/97 | 50,994.23 |
| 08/12 | PROFIT PARTICIPATION | 5.43 | | 10/12/97 | 50,988.80 |
| 10/12 | PPSC/C INVESTMENT | 50,000.00 | | 10/12/97 | 988.80 |
| 15/12 | PPSC/C REIMBURSEMENT | | 50,000.00 | 17/12/97 | 50,988.80 |
| 15/12 | GROSS INCOME | | 53.47 | 17/12/97 | 51,042.27 |

195

00010681

بسم الله الرحمن الرحيم
IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1, SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

كي دي مون بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٤١٠٢٢٩٠٨٥٣٠٠+ – تلكس: FFS-CH ٤١٥٣٥٤
فاكس: ٤١٠٢٢٩٠٨٥٣٩٩+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 2

STATEMENT OF ACCOUNT

USD IFA 010409.01.00.840

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 15/12 | CARRIED FORWARD | | | | 51,042.27 |
| 15/12 | PROFIT PARTICIPATION | 5.34 | | 17/12/97 | 51,036.93 |
| 17/12 | PPSC/C INVESTMENT | 51,000.00 | | 17/12/97 | 36.93 |
| 31/12 | MANAGEMENT FEES | 10.86 | | 31/12/97 | 26.07 |
| 12/01 | PPSC/C REIMBURSEMENT | | 51,000.00 | 14/01/98 | 51,026.07 |
| 12/01 | GROSS INCOME | | 229.27 | 14/01/98 | 51,255.34 |
| 12/01 | PROFIT PARTICIPATION | 22.92 | | 14/01/98 | 51,232.42 |
| 14/01 | PPSC/C INVESTMENT | 51,000.00 | | 14/01/98 | 232.42 |
| 31/01 | MANAGEMENT FEES | 10.97 | | 31/01/98 | 221.45 |
| 09/02 | PPSC/C REIMBURSEMENT | | 51,000.00 | 11/02/98 | 51,221.45 |
| 09/02 | GROSS INCOME | | 218.17 | 11/02/98 | 51,439.62 |
| 09/02 | PROFIT PARTICIPATION | 21.81 | | 11/02/98 | 51,417.81 |
| 11/02 | PPSC/C INVESTMENT | 51,000.00 | | 11/02/98 | 417.81 |
| 20/02 | FM CARAVAN LTD., | | 350,000.00 | 24/02/98 | 350,417.81 |
| 24/02 | PPSC/C INVESTMENT | 350,000.00 | | 24/02/98 | 417.81 |
| 27/02 | PPSC/C REIMBURSEMENT | | 350,000.00 | 03/03/98 | 350,417.81 |
| 27/02 | GROSS INCOME | | 377.03 | 03/03/98 | 350,794.84 |
| 27/02 | PROFIT PARTICIPATION | 37.70 | | 03/03/98 | 350,757.14 |
| 27/02 | TRF FFI TURKEY, ISTANBUL | 150,000.00 | | 03/03/98 | 200,757.14 |
| 28/02 | MANAGEMENT FEES | 23.66 | | 28/02/98 | 200,733.48 |
| 03/03 | PPSC/C INVESTMENT | 200,000.00 | | 03/03/98 | 733.48 |
| 06/03 | PPSC/C REIMBURSEMENT | | 200,000.00 | 10/03/98 | 200,733.48 |
| 06/03 | GROSS INCOME | | 215.06 | 10/03/98 | 200,948.54 |
| 06/03 | PROFIT PARTICIPATION | 21.50 | | 10/03/98 | 200,927.04 |
| 09/03 | PPSC/C REIMBURSEMENT | | 51,000.00 | 11/03/98 | 251,927.04 |
| 09/03 | GROSS INCOME | | 218.17 | 11/03/98 | 252,145.21 |
| 09/03 | PROFIT PARTICIPATION | 21.81 | | 11/03/98 | 252,123.40 |
| 10/03 | PPSC/C INVESTMENT | 200,000.00 | | 10/03/98 | 52,123.40 |

196

بسم الله الرحمن الرحيم
IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

مؤسسة فيصل المالية (سويسرا) ش.م.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢ ٤١+ – تلكس: ٣٥٤ ٤١٥ FFS-CH
تليفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢ ٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 3

| STATEMENT OF ACCOUNT | USD | IFA | 010409.01.00.840 |
|---|---|---|---|

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 10/03 | CARRIED FORWARD | | | | 52,123.40 |
| 11/03 | PPSC/C INVESTMENT | 52,000.00 | | 11/03/98 | 123.40 |
| 16/03 | PPSC/C REIMBURSEMENT | | 200,000.00 | 18/03/98 | 200,123.40 |
| 16/03 | GROSS INCOME | | 242.22 | 18/03/98 | 200,365.62 |
| 16/03 | PROFIT PARTICIPATION | 24.22 | | 18/03/98 | 200,341.40 |
| 16/03 | PPSC/C REIMBURSEMENT | | 52,000.00 | 18/03/98 | 252,341.40 |
| 16/03 | GROSS INCOME | | 55.11 | 18/03/98 | 252,396.51 |
| 16/03 | PROFIT PARTICIPATION | 5.51 | | 18/03/98 | 252,391.00 |
| 18/03 | PPSC/C INVESTMENT | 252,000.00 | | 18/03/98 | 391.00 |
| 24/03 | PPSC/C REIMBURSEMENT | | 252,000.00 | 26/03/98 | 252,391.00 |
| 24/03 | GROSS INCOME | | 306.32 | 26/03/98 | 252,697.32 |
| 24/03 | PROFIT PARTICIPATION | 30.63 | | 26/03/98 | 252,666.69 |
| 26/03 | PPSC/C INVESTMENT | 252,000.00 | | 26/03/98 | 666.69 |
| 31/03 | MANAGEMENT FEES | 62.45 | | 31/03/98 | 604.24 |
| 02/04 | REVERSE PPSC | | 200,000.00 | 03/04/98 | 200,604.24 |
| 02/04 | TRF TO FFI TURKEY | 200,000.00 | | 03/04/98 | 604.24 |
| 07/04 | REVERSE PPSC/C REIMBURSEMENT | 200,187.50 | | 09/04/98 | 199,583.26- |
| 07/04 | BANK CHARGE | 300.00 | | 09/04/98 | 199,883.26- |
| 07/04 | PPSC/C REIMBURSEMENT | | 252,000.00 | 09/04/98 | 52,116.74 |
| 07/04 | GROSS INCOME | | 545.13 | 09/04/98 | 52,661.87 |
| 07/04 | PROFIT PARTICIPATION | 54.51 | | 09/04/98 | 52,607.36 |
| 09/04 | PPSC/C INVESTMENT | 52,000.00 | | 09/04/98 | 607.36 |
| 14/04 | FM MR. KADI | | 300,000.00 | 14/04/98 | 300,607.36 |
| 14/04 | PPSC/C REIMBURSEMENT | | 52,000.00 | 16/04/98 | 352,607.36 |
| 14/04 | GROSS INCOME | | 55.31 | 16/04/98 | 352,662.67 |
| 14/04 | PROFIT PARTICIPATION | 5.53 | | 16/04/98 | 352,657.14 |
| 15/04 | PPSC/C INVESTMENT | 300,000.00 | | 15/04/98 | 52,657.14 |
| 16/04 | PPSC/C INVESTMENT | 52,000.00 | | 16/04/98 | 657.14 |

197

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1, SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١ سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢ ٤١+ – تلكس: ٣٥٤ ٤١٥ FFS-CH تليفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢ ٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 4

**STATEMENT OF ACCOUNT**

USD IFA 010409.01.00.840

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 16/04 | CARRIED FORWARD | | | | 657.14 |
| 20/04 | PPSC/C REIMBURSEMENT | | 300,000.00 | 22/04/98 | 300,657.14 |
| 20/04 | GROSS INCOME | | 322.00 | 22/04/98 | 300,979.14 |
| 20/04 | PROFIT PARTICIPATION | 32.20 | | 22/04/98 | 300,946.94 |
| 20/04 | TRF TO FFI TURKEY - ISTAMBUL | 250,000.00 | | 22/04/98 | 50,946.94 |
| 22/04 | PPSC/C INVESTMENT | 50,000.00 | | 22/04/98 | 946.94 |
| 23/04 | RVR. MANAGEMENT FEES | | 23.66 | 28/02/98 | 970.60 |
| 23/04 | MANAGEMENT FEES | 22.06 | | 28/02/98 | 948.54 |
| 23/04 | RVR. MANAGEMENT FEES | | 62.45 | 31/03/98 | 1,010.99 |
| 23/04 | MANAGEMENT FEES | 56.26 | | 31/03/98 | 954.73 |
| 30/04 | MANAGEMENT FEES | 39.65 | | 30/04/98 | 915.08 |
| 14/05 | PPSC/C REIMBURSEMENT | | 52,000.00 | 18/05/98 | 52,915.08 |
| 14/05 | GROSS INCOME | | 256.07 | 18/05/98 | 53,171.15 |
| 14/05 | PROFIT PARTICIPATION | 25.60 | | 18/05/98 | 53,145.55 |
| 14/05 | PPSC/C REIMBURSEMENT | | 50,000.00 | 18/05/98 | 103,145.55 |
| 14/05 | GROSS INCOME | | 199.69 | 18/05/98 | 103,345.24 |
| 14/05 | PROFIT PARTICIPATION | 19.96 | | 18/05/98 | 103,325.28 |
| 18/05 | PPSC/C INVESTMENT | 103,000.00 | | 18/05/98 | 325.28 |
| 22/05 | FM 10409 | | 250,000.00 | 26/05/98 | 250,325.28 |
| 22/05 | TRF TO FFI TURKEY | 50,000.00 | | 26/05/98 | 200,325.28 |
| 25/05 | TRF TO FFI TURKEY INC. | 200,000.00 | | 26/05/98 | 325.28 |
| 31/05 | MANAGEMENT FEES | 22.05 | | 31/05/98 | 303.23 |
| 31/05 | MANAGEMENT FEES | 22.05 | | 31/05/98 | 281.18 |
| 31/05 | RVR. MANAGEMENT FEES | | 22.05 | 31/05/98 | 303.23 |
| 11/06 | PPSC/C REIMBURSEMENT | | 103,000.00 | 15/06/98 | 103,303.23 |
| 11/06 | GROSS INCOME | | 443.11 | 15/06/98 | 103,746.34 |
| 11/06 | PROFIT PARTICIPATION | 44.31 | | 15/06/98 | 103,702.03 |
| 15/06 | PPSC/C INVESTMENT | 103,000.00 | | 15/06/98 | 702.03 |

198

A MEMBER OF THE DAR AL-MAAL AL-ISLAMI GROUP

عضو مجموعة دار المال الإسلامي

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢ ٤١+ – تلكس: ٤١٥ ٣٥٤ FFS-CH
تليفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢ ٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 5

**STATEMENT OF ACCOUNT**

USD IFA 010409.01.00.840

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 15/06 | CARRIED FORWARD | | | | 702.03 |
| 18/06 | CHEQUE | | 249,986.50 | 15/06/98 | 250,688.53 |
| 18/06 | PPSC/C INVESTMENT | 250,000.00 | | 18/06/98 | 688.53 |
| 18/06 | PPSC/C REIMBURSEMENT | | 103,000.00 | 22/06/98 | 103,688.53 |
| 18/06 | GROSS INCOME | | 110.15 | 22/06/98 | 103,798.68 |
| 18/06 | PROFIT PARTICIPATION | 11.01 | | 22/06/98 | 103,787.67 |
| 19/06 | PPSC/C REIMBURSEMENT | | 250,000.00 | 22/06/98 | 353,787.67 |
| 19/06 | GROSS INCOME | | 151.04 | 22/06/98 | 353,938.71 |
| 19/06 | PROFIT PARTICIPATION | 15.10 | | 22/06/98 | 353,923.61 |
| 22/06 | PPSC/C INVESTMENT | 353,000.00 | | 22/06/98 | 923.61 |
| 25/06 | PPSC/C REIMBURSEMENT | | 353,000.00 | 29/06/98 | 353,923.61 |
| 25/06 | GROSS INCOME | | 377.51 | 29/06/98 | 354,301.12 |
| 25/06 | PROFIT PARTICIPATION | 37.75 | | 29/06/98 | 354,263.37 |
| 25/06 | WITHDRAWAL | 300,000.00 | | 29/06/98 | 54,263.37 |
| 29/06 | PPSC/C INVESTMENT | 54,000.00 | | 29/06/98 | 263.37 |
| 30/06 | MANAGEMENT FEES | 39.87 | | 30/06/98 | 223.50 |
| 03/07 | FM (CARAVAN D.G.LTD) | | 150,000.00 | 03/07/98 | 150,223.50 |
| 03/07 | PPSC/C INVESTMENT | 150,000.00 | | 03/07/98 | 223.50 |
| 03/07 | PPSC/C REIMBURSEMENT | | 54,000.00 | 07/07/98 | 54,223.50 |
| 03/07 | GROSS INCOME | | 66.75 | 07/07/98 | 54,290.25 |
| 03/07 | PROFIT PARTICIPATION | 6.67 | | 07/07/98 | 54,283.58 |
| 08/07 | PPSC/C REIMBURSEMENT | | 150,000.00 | 10/07/98 | 204,283.58 |
| 08/07 | GROSS INCOME | | 160.42 | 10/07/98 | 204,444.00 |
| 08/07 | PROFIT PARTICIPATION | 16.04 | | 10/07/98 | 204,427.96 |
| 10/07 | PPSC/C INVESTMENT | 204,000.00 | | 10/07/98 | 427.96 |
| 15/07 | PPSC/C REIMBURSEMENT | | 204,000.00 | 17/07/98 | 204,427.96 |
| 15/07 | GROSS INCOME | | 218.17 | 17/07/98 | 204,646.13 |
| 15/07 | PROFIT PARTICIPATION | 21.81 | | 17/07/98 | 204,624.32 |

199

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص.ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٢٢ ٠٤١+ – تلكس: ٤١٥٣٥٤ FFS-CH
تليفاكس: ٩٩ ٥٣ ٩٠٨ ٢٢ ٠٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 6

**STATEMENT OF ACCOUNT**

USD IFA 010409.01.00.840

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 15/07 | CARRIED FORWARD | | | | 204,624.32 |
| 17/07 | PPSC/C INVESTMENT | 204,000.00 | | 17/07/98 | 624.32 |
| 22/07 | PPSC/C REIMBURSEMENT | | 204,000.00 | 24/07/98 | 204,624.32 |
| 22/07 | GROSS INCOME | | 215.69 | 24/07/98 | 204,840.01 |
| 22/07 | PROFIT PARTICIPATION | 21.56 | | 24/07/98 | 204,818.45 |
| 24/07 | PPSC/C INVESTMENT | 204,000.00 | | 24/07/98 | 818.45 |
| 29/07 | PPSC/C REIMBURSEMENT | | 204,000.00 | 31/07/98 | 204,818.45 |
| 29/07 | GROSS INCOME | | 215.69 | 31/07/98 | 205,034.14 |
| 29/07 | PROFIT PARTICIPATION | 21.56 | | 31/07/98 | 205,012.58 |
| 30/07 | FM A/C 10257 | | 200,000.00 | 03/08/98 | 405,012.58 |
| 31/07 | PPSC/C INVESTMENT | 205,000.00 | | 31/07/98 | 200,012.58 |
| 31/07 | MANAGEMENT FEES | 40.71 | | 31/07/98 | 199,971.87 |
| 03/08 | PPSC/C REIMBURSEMENT | | 205,000.00 | 03/08/98 | 404,971.87 |
| 03/08 | GROSS INCOME | | 93.96 | 03/08/98 | 405,065.83 |
| 03/08 | PROFIT PARTICIPATION | 9.39 | | 03/08/98 | 405,056.44 |
| 04/08 | WITHDRAWAL | 300,000.00 | | 04/08/98 | 105,056.44 |
| 04/08 | PPSC/C INVESTMENT | 105,000.00 | | 04/08/98 | 56.44 |
| 31/08 | MANAGEMENT FEES | 23.26 | | 31/08/98 | 33.18 |
| 02/09 | PPSC/C REIMBURSEMENT | | 105,000.00 | 04/09/98 | 105,033.18 |
| 02/09 | GROSS INCOME | | 497.29 | 04/09/98 | 105,530.47 |
| 02/09 | PROFIT PARTICIPATION | 49.72 | | 04/09/98 | 105,480.75 |
| 04/09 | PPSC/C INVESTMENT | 105,000.00 | | 04/09/98 | 480.75 |
| 30/09 | MANAGEMENT FEES | 21.87 | | 30/09/98 | 458.88 |
| 30/09 | PPSC/C REIMBURSEMENT | | 105,000.00 | 02/10/98 | 105,458.88 |
| 30/09 | GROSS INCOME | | 444.06 | 02/10/98 | 105,902.94 |
| 30/09 | PROFIT PARTICIPATION | 44.40 | | 02/10/98 | 105,858.54 |
| 04/10 | PPSC/C INVESTMENT | 105,000.00 | | 02/10/98 | 858.54 |
| 07/10 | PPSC/C REIMBURSEMENT | | 105,000.00 | 09/10/98 | 105,858.54 |

200

A MEMBER OF THE DAR AL-MAAL AL-ISLAMI GROUP

عضو مجموعة دار المال الإسلامي

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

FAISAL FINANCE (Switzerland) S.A.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE +41 022 908 53 00 - TELEX 415 354 FFS-CH
FAX +41 022 908 53 99

مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢ ٤١+ – تلكس: ٤١٥ ٣٥٤ FFS-CH
تليفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢ ٤١+

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

Page 7

| STATEMENT OF ACCOUNT | USD | IFA | 010409.01.00.840 |
|---|---|---|---|

FROM 01/01/1997 TO 15/07/2003 *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|---|---|---|---|---|---|
| 07/10 | CARRIED FORWARD | | | | 105,858.54 |
| 07/10 | GROSS INCOME | | 111.02 | 09/10/98 | 105,969.56 |
| 07/10 | PROFIT PARTICIPATION | 11.10 | | 09/10/98 | 105,958.46 |
| 09/10 | PPSC/C INVESTMENT | 105,000.00 | | 09/10/98 | 958.46 |
| 31/10 | MANAGEMENT FEES | 22.60 | | 31/10/98 | 935.86 |
| 04/11 | PPSC/C REIMBURSEMENT | | 105,000.00 | 06/11/98 | 105,935.86 |
| 04/11 | GROSS INCOME | | 433.85 | 06/11/98 | 106,369.71 |
| 04/11 | PROFIT PARTICIPATION | 43.38 | | 06/11/98 | 106,326.33 |
| 06/11 | PPSC/C INVESTMENT | 106,000.00 | | 06/11/98 | 326.33 |
| 30/11 | MANAGEMENT FEES | 22.04 | | 30/11/98 | 304.29 |
| 03/12 | PPSC/C REIMBURSEMENT | | 106,000.00 | 07/12/98 | 106,304.29 |
| 03/12 | GROSS INCOME | | 473.50 | 07/12/98 | 106,777.79 |
| 03/12 | PROFIT PARTICIPATION | 47.35 | | 07/12/98 | 106,730.44 |
| 07/12 | PPSC/C INVESTMENT | 106,000.00 | | 07/12/98 | 730.44 |
| 30/12 | PPSC/C REIMBURSEMENT | | 106,000.00 | 05/01/99 | 106,730.44 |
| 30/12 | GROSS INCOME | | 456.83 | 05/01/99 | 107,187.27 |
| 30/12 | PROFIT PARTICIPATION | 45.68 | | 05/01/99 | 107,141.59 |
| 31/12 | MANAGEMENT FEES | 22.81 | | 31/12/98 | 107,118.78 |
| 05/01 | PPSC/C INVESTMENT | 107,000.00 | | 05/01/99 | 118.78 |
| 12/01 | PPSC/C REIMBURSEMENT | | 107,000.00 | 14/01/99 | 107,118.78 |
| 12/01 | GROSS INCOME | | 132.08 | 14/01/99 | 107,250.86 |
| 12/01 | PROFIT PARTICIPATION | 13.20 | | 14/01/99 | 107,237.66 |
| 14/01 | PPSC/C INVESTMENT | 107,000.00 | | 14/01/99 | 237.66 |
| 18/01 | PPSC/C REIMBURSEMENT | | 107,000.00 | 20/01/99 | 107,237.66 |
| 18/01 | GROSS INCOME | | 86.31 | 20/01/99 | 107,323.97 |
| 18/01 | PROFIT PARTICIPATION | 8.63 | | 20/01/99 | 107,315.34 |
| 20/01 | PPSC/C INVESTMENT | 107,000.00 | | 20/01/99 | 315.34 |
| 31/01 | MANAGEMENT FEES | 23.00 | | 31/01/99 | 292.34 |

201

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

DEBIT ADVICE

USD IFA 010409.01.00.840

KEY: 000007581 DATE : 22/05/1998

ACCORDING TO YOUR INSTRUCTIONS WE MADE THE FOLLOWING TRANSFER USD 50,000.00

TO FAISAL FINANCE INSTITUTION INC,
TURKEY - ISTAMBUL

A/C NO. 160377

WAEL HAMZAH JELAIDAN

REFERENCE : TRF TO FFI TURKEY

Form without signature

VALUE 26/05/1998 USD 50,000.00

ACNT550/SHA/FFS 25/05/98

وائل حمزة جليدان

*Wael Hamzah Jelaidan*

Date 19-5-98 التاريخ

To:

Faisal Fainance

Mr. Syed Hassan

Please, transfare the amount of ($50,000/-) fifty thousands U.S. dollars from my account at your bank to the account # (160377) at Faisal finance Istanbul, Turky.

Thanks --

Wael H. Jelaidan

Faisal Finance (Switzerland) S.A.
SIGNATURE CONFORME

جدة - شارع الاندلس - مقر شركة المدينة - ص.ب ١٤٣٦ جدة ٢١٤٣١ - هاتف ٦٦٠٨٨٧١ / ٦٦٥٤٤٣٧ ترميلة ١٥٣ - فاكس ٦٦٧١٩٦٤(٢-٩٦٦)
Jeddah - Alandalos St. - M. C. C. Bldg - P.O.Box 1436 Jeddah 21431 - Tel. 6608871 / 6654437 Ext. 153 Fax (966-2)6671964

CITIACCESS PAYMENTS SYSTEM

Transaction Input Sheet

Debit Account

Currency : USD Value Date

Amount

CITIACCESS PAYMENTS SYSTEM
Transaction Audit Trail 25 May 98 1

Tsn 544

Sent queue :

| | | | |
|---|---|---|---|
| Input by | HEDI | 25 May 98 | 13:00 |
| Verified by | LOTFI | 25 May 98 | 13:16 |
| Authorised by | JAMAL | 25 May 98 | 13:35 |
| Transmitted by | JAMAL | 25 May 98 | 13:42 |

Details of Payment

Citibank ref details NYENE XWS057 9805251235 16497

Payment Ref: AMEX NEW YORK___ TSN 544
Related Ref:

Debit Account: 36966325 NEW Y
Faisal Finance (Switzerland)
Currency: USD Value Date: 26M
Amount 50,000.00

BENEFICIARY ACCOUNT/ID 0T160377
Name WAEL HAMZAH JELAIDAN
Addr

Is Beneficiary a Bank ?: N

By order of

C:

B: FAISAL FINANCE (Switzerland) S

Cable advice YES/NO

ACCOUNT WITH BANK ID 0T177691
Name FAISAL FINANCE INSTITUTION INC,
Addr TURKEY ISTANBUL

Details of Payment
B TFR
B
B
B

INTERMEDIARY BANK ID CP0159
Name American Express Int'l Banking Corp
Addr New York

Payment method :
Cable Advice YES/NO : NO
Charges : OUR

204

00010690

DOJ AR - 002264

WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

**DEBIT ADVICE**

USD IFA 010409.01.00.840

REF: 000007849 DATE : 25/06/1998

ACCORDING TO YOUR INSTRUCTIONS WE MADE THE FOLLOWING TRANSFER USD 300,000.00

TO FAISAL FINANCE INSTITUTION INC
TURKEY

160377

WAEL HAMZAH JELAIDAN

REFERENCE : WITHDRAWAL

Form without signature

VALUE 29/06/1998 USD 300,000.00

ACNT550/SHA/FFS 25/06/98

205

PHONE NO. : 0 212 2104049 JUN. 22 1998 11:23AM P

HE. S. Hassan 22/6
PLS EXECUTE.

جلايدان Trading Services للخدمات التجارية

وائل حمزة جليدان
Wael Hamzah Jelaidan

29.6

Date 22-6-98 التاريخ

Mr. Rasheed Tymoor

Faisal Finance (Switzerland)

Please, transfare the amount of three handreds thousands U.S. dollars (U.S. $ 300,000/-) from my account no. (10409) to the account no. (160377) in Faisal Fainance, Istanbul, Turky.

Thank you --

Wael Jelaidan

Faisal Finance (Switzerland) S.A.
SIGNATURE CONFORME

جدة - شارع الاندلس - مقر شركة المدينة - ص.ب ١٤٣٦ جدة ٢١٤٣١ - هاتف ٦٦٠٨٨٧١ / ٦٦٥٤٤٣٧ ترصيلة ١٥٣ - فاكس (٠٢-٩٦٦)٦٦٧١٩٦٤
Jeddah - Alandalos St. - M. C. C. Bldg - P.O.Box 1436 Jeddah 21431 - Tel. 6608871 / 6654437 Ext. 153 Fax (966-2)6671964

CITIACCESS PAYMENTS

Page 6 - >>>>>>

CITIACCESS PAYMENTS SYSTEM

Detailed Transaction Review for range 792 - 802 26 Jun 98 14:45

BENEFICIARY ACCOUNT

HAMZAH

| | | | |
|---|---|---|---|
| Input by | LOTFI | 26 Jun 98 | 13:39 |
| Verified by | HEDI | 26 Jun 98 | 14:27 |
| Authorised by | JAMAL | 26 Jun 98 | 14:35 |
| Transmitted by | JAMAL | 26 Jun 98 | 14:40 |

Citibank ref details NYENE XWS212 9806261334 12817

AMEX NEW YORK TSN 798 Debit Account: 36966325 NEW YORK
Faisal Finance (Switzerland)
Currency: USD Value Date: 29JUN98
Amount 300,000.00

ACCOUNT/ID OT160377
HAMZAH JELAIDAN

By order of

B: FAISAL FINANCE (Switzerland) S.A.

BANK ID OT177691
AL FINANCE INSTITUTION INC.
ISTANBUL TURKEY

Details of Payment
B TFR
B
B
B

BANK ID CP0159
American Express Int'l Banking Corp
New York

Payment method
Cable Advice YES/NO : NO
Charges : OUR

207

00010693

DOJ AR 002267

F2

00010694 DOJ AR - 002268

KADI0004407

950905006 USD HESABI
1998 YILI

| TARİH | YATAN/ÇEKİLEN | BAKİYE | BIRIM_DEGER |
|---|---|---|---|
| 05.08.1998 + | 300.000,00 | 300.000,00 | 229,88 |
| 02.09.1998 - | 60.000,00 | 240.000,00 | 231,02 |
| 02.09.1998 - | 10.000,00 | 230.000,00 | 231,02 |
| 02.09.1998 - | 2.600,00 | 227.400,00 | 231,02 |
| 04.09.1998 + | 979,00 | 228.379,00 | 231,02 |
| 04.09.1998 + | 108,00 | 228.487,00 | 231,02 |
| 04.09.1998 + | 272,00 | 228.759,00 | 231,02 |
| 04.09.1998 + | 6.364,00 | 235.123,00 | 231,02 |
| 04.09.1998 - | 50.000,00 | 185.123,00 | 231,02 |
| 04.09.1998 - | 15.000,00 | 170.123,00 | 231,02 |
| 07.09.1998 - | 5.000,00 | 165.123,00 | 231,29 |
| 07.09.1998 - | 5.000,00 | 160.123,00 | 231,29 |
| 07.09.1998 - | 15,00 | 160.108,00 | 231,29 |
| 07.09.1998 - | 1.750,00 | 158.358,00 | 231,29 |
| 21.09.1998 - | 1.000,00 | 157.358,00 | 231,89 |
| 05.10.1998 + | 838,00 | 158.196,00 | 232,44 |
| 03.11.1998 + | 703,00 | 158.879,00 | 233,63 |
| 16.11.1998 - | 5.660,00 | 153.219,00 | 234,24 |
| 03.12.1998 + | 683,00 | 153.902,00 | 234,83 |
| 28.12.1998 - | 25.000,00 | 128.902,00 | 236,02 |
| 31/12/1998 tarihli durum | | 128.902,00 | 236,02 |

FAMILY FİNANS KURUMU A.Ş. Merkez Şube / İSTANBUL

208

# F3

00010696

DOJ AR - 002270

KADI0004409



5658 - MACAM SEYAHAT ITH. ACNT. IHRACAT LTD. ŞTİ.

160377001 USD HESABI

1998 YILI

| TARİH | YATAN/ÇEKİLEN | BAKİYE |
|---|---|---|
| 18.02.1998 + | 100,00 | 100,00 |
| 11.03.1998 + | 150.000,00 | 150.100,00 |
| 11.03.1998 - | 10.000,00 | 140.100,00 |
| 12.03.1998 - | 60.000,00 | 80.100,00 |
| 12.03.1998 - | 31.080,00 | 49.020,00 |
| 12.03.1998 - | 18.800,00 | 30.220,00 |
| 13.03.1998 - | 8.636,00 | 21.584,00 |
| 13.03.1998 - | 15.000,00 | 6.584,00 |
| 13.03.1998 - | 45,00 | 6.539,00 |
| 03.04.1998 + | 199.985,00 | 206.524,00 |
| 06.04.1998 - | 100.000,00 | 106.524,00 |
| 06.04.1998 - | 250,00 | 106.274,00 |
| 06.04.1998 - | 17.000,00 | 89.274,00 |
| 06.04.1998 - | 38.000,00 | 51.274,00 |
| 22.04.1998 + | 250.000,00 | 301.274,00 |
| 24.04.1998 - | 301.000,00 | 274,00 |
| 24.04.1998 + | 150.393,00 | 150.667,00 |
| 28.04.1998 - | 20.000,00 | 130.667,00 |
| 29.04.1998 - | 129.330,00 | 1.337,00 |
| 29.04.1998 + | 128.993,00 | 130.330,00 |
| 30.04.1998 - | 26.300,00 | 104.030,00 |
| 30.04.1998 + | 50.000,00 | 154.030,00 |
| 30.04.1998 - | 154.000,00 | 30,00 |
| 30.04.1998 + | 103.661,00 | 103.691,00 |
| 01.05.1998 - | 98.920,00 | 4.771,00 |
| 01.05.1998 + | 98.722,00 | 103.493,00 |
| 08.05.1998 - | 12.950,00 | 90.543,00 |
| 11.05.1998 - | 15.000,00 | 75.543,00 |
| 11.05.1998 - | 50.000,00 | 25.543,00 |
| 11.05.1998 - | 15.000,00 | 10.543,00 |
| 20.05.1998 - | 8.000,00 | 2.543,00 |
| 26.05.1998 + | 200.000,00 | 202.543,00 |
| 26.05.1998 + | 50.000,00 | 252.543,00 |
| 27.05.1998 - | 70.000,00 | 182.543,00 |
| 27.05.1998 - | 350,00 | 182.193,00 |
| 01.06.1998 - | 20.000,00 | 162.193,00 |
| 02.06.1998 - | 10.000,00 | 152.193,00 |
| 02.06.1998 - | 91.800,00 | 60.393,00 |
| 02.06.1998 + | 91.567,00 | 151.960,00 |
| 17.06.1998 + | 2.200,00 | 154.160,00 |
| 24.06.1998 - | 35.000,00 | 119.160,00 |
| 29.06.1998 - | 10.000,00 | 109.160,00 |
| 27.07.1998 - | 10.000,00 | 99.160,00 |
| 31.07.1998 - | 16.000,00 | 83.160,00 |
| 04.08.1998 - | 1.500,00 | 81.660,00 |
| 04.08.1998 - | 70.000,00 | 11.660,00 |
| 04.08.1998 - | 10.000,00 | 1.660,00 |
| 04.09.1998 + | 50.000,00 | 51.660,00 |
| 04.09.1998 - | 15.000,00 | 36.660,00 |
| 02.11.1998 - | 2.000,00 | 34.660,00 |

START ACCOUNT.

FAMILY FİNANS KURUMU A.Ş. Merkez Şube İSTANBUL

209

00010697



| | | |
|---|---|---|
| 30.11.1998 - | 2.000,00 | 32.660,00 |
| 16.12.1998 - | 5.000,00 | 27.660,00 |
| 24.12.1998 - | 20.000,00 | 7.660,00 |
| 24.12.1998 - | 20,00 | 7.640,00 |
| 28.12.1998 + | 25.000,00 | 32.640,00 |
| 28.12.1998 - | 20.000,00 | 12.640,00 |

FAMILY
FiNANS KURUMU A.Ş.
Merkez Şube İSTANBUL

210

5638-1

160377001 USD HESABI

1999 YILI

| TARİH | | YATAN/ÇEKİLEN | BAKİYE | |
|---|---|---|---|---|
| 31.12.1998 | + | 12.640,00 | 12.640,00 | DEVİR |
| 04.01.1999 | - | 2.500,00 | 10.140,00 | |
| 16.02.1999 | - | 10.000,00 | 140,00 | |
| 27.04.1999 | + | 60.000,00 | 60.140,00 | |
| 27.04.1999 | - | 15.000,00 | 45.140,00 | |
| 27.04.1999 | - | 10.000,00 | 35.140,00 | |
| 30.04.1999 | - | 4.500,00 | 30.640,00 | |
| 30.04.1999 | - | 1.850,00 | 28.790,00 | |
| 14.05.1999 | - | 5.000,00 | 23.790,00 | |
| 17.05.1999 | - | 5.000,00 | 18.790,00 | |
| 11.06.1999 | - | 2.500,00 | 16.290,00 | |
| 28.06.1999 | - | 15.000,00 | 1.290,00 | |
| 28.06.1999 | - | 1.275,00 | 15,00 | |

FAMILY FİNANS KURUMU A.Ş. Merkez Şube / İSTANBUL

211

# SOLANO LTD.

To,
Faisal Finance Switzerland,
Geneva.

Attn: Mr.Sayed Hassan.

Dear Sir,

Please transfer the sum of USD 900000.00 (Nine Hundred Thousand United States Dollars) from our A/c No. IFA- 10741 to the beneficiary as follows.

| | |
|---|---|
| Bank Name: | United European Bank. Geneve,Switzerland. |
| In Favour of: | Shamal Islamic Bank |
| Account-No: | 252606/4K |

Thanks & Regards,

Yassin Ahmed Mohammed Ali

Tel: 784160

Fax: 778396

Faisal Finance (Switzerland) S.A.
SIGNATURE CONFORME

367

SOLANO LIMITED -COMMONWEALTH
BAHAMAS
CP/P.O.BOX: 214 JEDDAH 21411
SAUDI ARABIA

DEBIT ADVICE

USD IFA 010741.01.00.840

REF: 000010256

DATE : 04/10/1999

ACCORDING TO YOUR INSTRUCTIONS WE MADE THE FOLLOWING TRANSFER

USD 900,000.00

TO UNITED EUROPEAN BANK,
GENEVA, SWITZERLAND

A/C NO. 252606/4K

SHAMAL ISLAMIC BANK

REFERENCE : TRF TO U.E.B. GVA,

Form without signature

VALUE 05/10/1999 USD 900,000.00

ACNT550/SHA/FFS 04/10/99

368



Eidg. Justiz- and Polizeidepartement

Départernent fédéral de justice et police

Dipartimento federale di giustizia e polizia

Federal Department of Justice and Police

**Bundesamt für Polizei**

**Office fédéral de la police**

**Ufficio federale di polizia**

**Federal Office of Police**

| SWISS FEDERAL PUBLIC PROSECUTOR'S OFFICE | | | | |
|---|---|---|---|---|
| E 23/…[illegible]…/2005 | | | | |
| …[illegible]… **01/2006** | | | | |
| Registered | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| Report by<br>Department | Dominique Ritter<br>Bundekriminalpolizei [Swiss Federal Bureau of Investigation], ERM-TWK |
| Date | 20/05/05 |
| File no. | 100 / 254690-705 |
| Swiss Federal Public Prosecutor's Office Case no. | BA/[redacted]/01/000[redacted] |

**Final report**

**regarding** funding and logistical support of the criminal organisation Al-Qaeda, led by Osama Bin Laden
Art. 260 *ter*, 260 *quinquies* of the Swiss Criminal Code

**for the attention of Claude Nicati, Swiss Federal Public Prosecutor's Office**

**Defendant**

| | |
|---|---|
| Surname(s) | **KADI** **m** |
| First name(s) | **Yassin Abdullah** |
| Date of birth | **23/02/1955** |
| a/k/a | **Sheikh Yassin Al Qadi and numerous variations** |
| Birthplace, region/country | **Cairo / Egypt** |
| Address, region/country | **Saudi Arabia** |
| Parents | **Abdullah Aziz Ud Din Kadi and Salha Omar Zubeir** |
| Spouse/partner | **married to Balgis**[1] |
| Occupation/employer | **Businessman** |
| Town/country | **2141 Jeddah / Saudi Arabia** |
| Address | **Wale Al-Ahad Street, Al-Farsi Center, West Tower 11th Floor, Suites 1&2**<br>**P.O. Box 214** |
| Languages | **Arabic, English** |
| Personal secretary | **Khalid Najl** |
| Availability | **Telephone: 966 2 650 2255**<br>**Fax: 966 2 650 2188** |
| UN Resolution 1267 | **included on the list of Taliban and Al-Qaeda** |

[1] Translator's note: possibly "Belgis" – source text unclear

| Regulation dated<br>Issued to | 20/05/05<br>Claude Nicati,<br>Swiss Federal Prosecutor's Department | …[signature]…<br>Federal Office of Police<br>Bureau of Investigation<br>Jacques Repond, Investigating Officer<br>BUNDESKRIMINALPOLIZEI |
|---|---|---|

the 1998 bomb attacks on the US embassies in Nairobi and Dar Es Salaam for example.

Those who served in his military organisation could then be integrated easily into the "civilian organisations" even using their real identities. These trusted allies brought in the financial resources required. Messrs. Mamdouh Mahmud SALIM (Abu Hajer al Iraqi), Mohamed Loay BAYAZID (Abu Rida al Suri) or Wa'el Hamza JULAIDAN (Abu Hasan al Madani), all mentioned below, are typical examples of this system.

Al-Qaeda had its own backers who identified with the organisation's *raison d'être*. A large number of financial backers came from rich Saudi families.
*See TAREEKHOSAMA/41/Tareekh Osama 108*
*See article "les documents originaux de la Golden Chain / La liste secrète des financiers de Ben Laden, www.investigateur.info/zines/textes/176_alqaeda.htrnl*

There were also those working for BIN LADEN who were exclusively involved in the commercial or charitable organisations and therefore provided Al-Qaeda with purely logistical and financial support. Examples include Mr. Enaam ARNAOUT (Abu Mahmoud) and his charity the Benevolence International Foundation / BIF (UN Resolution 1267). Mr. ARNAOUT is now being held in America and has been indicted for several terrorist crimes. Mr. KADI could be categorised under financial and logistical supporters thanks to his payments to suspected Al-Qaeda businesses and individuals via his own businesses, charitable organisations and private accounts.
*See brief synopsis on Osama BIN LADEN, http://de.wikipedia.org*
*See brief synopsis on Al-Qa'ida (The Base), http://ict.org*
*See USA v. Enaam Arnaout, Indictment, No. 02 CR 892*

**3. Money transferred from Y.A. KADI to Osama BIN LADEN's innermost circle**

Mr. KADI commissioned Mr. Wa'el Hamza JULAIDAN (Abu Hasan al Madani) with a building project. Mr. KADI sent Mr. Wa'el Hamza JULAIDAN a total of US$ 1'250'000.- in several payments for this purpose. These sums originated exclusively from Switzerland. Those who were involved in this operation all number amongst the trusted inner circle of Osama Bin Laden and his Al-Qaeda organisation.



The facts mentioned by Mr. KADI with regard to the transfers are summarised in the Sections below and investigated.

### 3.1 The building project for the students at Al-Eman University in the Yemen, according to Y.A. KADI

On the basis of Mr. KADI's testimony, the founder of Al-Eman University in the Yemen, Sheikh Abdel Majid ZINDANI, required financial resources to be able to offer accommodation to his numerous students. Mr. ZINDANI therefore organised a public appeal for funds in 1997. At the same time he turned to his friend, Mr. Mohammed Omar ZUBEIR, a lecturer and consultant at King Abdel Aziz University in Jeddah/Saudi Arabia and one-time President of the University. Mr. ZUBEIR then contacted his nephew, the businessman Y.A. KADI. KADI immediately announced that he was prepared to donate the money for the student accommodation at Al-Eman University, but he did not send the funds to Al-Eman University and instead took on responsibility for construction of the accommodation himself. To carry out this project, he appointed a Saudi, Wa'el Hamza JULAIDAN, as project manager, even though, from what Mr. KADI said, it appears that JULAIDAN was a poor businessman. Mr. KADI owns the company CARAVAN. Y.A. KADI transferred US$ 1'250'000.- from this company's business account at Faisal Finance in Switzerland direct to a private account held by Mr. JULAIDAN at the same Swiss bank.

Bank, Faisal Finance, in Geneva/ Switzerland

| Date | Total | Caravan KADI's business account | | JULAIDAN personal account |
|---|---|---|---|---|
| 20/02/98 | US$ 350'000.- | IFA 10257 | to | IFA 10409 |
| 14/04/98 | US$ 300'000.- | IFA 10257 | to | IFA 10409 |
| 22/05/98 | US$ 250'000.- | IFA 10257 | to | IFA 10409 |
| 03/07/98 | US$ 150'000.- | IFA 10257 | to | IFA 10409 |
| 30/07/98 | US$ 200'000.- | IFA 10257 | to | IFA 10409 |
| Total | US$ 1'250'000.- | | | |

*See Interview with Y.A. Kadi by the Swiss Federal Public Prosecutor's Office on 25/10/2001*
*See submission by Y.A.KADI to Mr. Claude Nicati of the Swiss Federal Public Prosecutor's Office on 22/08/2003*

*See BKP (Swiss Federal Bureau of Investigation) report Pierallini Paolo[8] dated 07/05/03*
*See BKP (Swiss Federal Bureau of Investigation) report Pierallini Paolo dated 17/09/03*

Mr. JULAIDAN then transferred the sums of money to two different accounts in Istanbul in Turkey. The first, business account IFA 160377 held at Faisal Finance, was in the name of a company called Maram, in which Mr. JULAIDAN holds a stake. The other Faisal Finance account, IFA 950905, belongs to Wa'el Hamza JULAIDAN in person.

Bank, Faisal Finance, in Istanbul, Turkey

| Date | Amount | JULAIDAN personal account | | Maram business account | JULAIDAN personal account |
|---|---|---|---|---|---|
| 03/03/98 | US$ 150'000.- | IFA 10409 | to | IFA 160377 | |
| 03/04/98 | US$ 200'000.- | IFA 10409 | to | IFA 160377 | |
| 22/04/98 | US$ 250'000.- | IFA 10409 | to | IFA 160377 | |
| 26/05/98 | US$ 50'000.- | IFA 10409 | to | IFA 160377 | |
| 26/05/98 | US$ 200'000.- | IFA 10409 | to | IFA 160377 | |
| 29/06/98 | US$ 300'000.- | IFA 10409 | to | IFA 160377 | |
| 04/08/98 | US$ 300'000.- | IFA 10409 | to | | IFA 950905 |
| Total | US$ 1'450'000.- | | | | |

Maram was set up by the Al-Qaeda operative, Mamdouh Mahmud SALIM (Abu Hajer al Iraqi) and his wife. He sold the company to the Al-Qaeda employees Wa'el Hamza JULAIDAN (Hasan al Madani) and Mohammed Loay BAYAZID (Abu Rida al Suri). At the time of the transfers the company was owned by Messrs. JULAIDAN and BAYAZID. Mr. Mohammed Loay BAYAZID, the Company Director, supposedly had power of attorney for business account IFA 160377 at Faisal Finance. The overall project for the construction of 59 pre-fabricated buildings for Al-Eman University in the Yemen was officially awarded to the company Maram. Maram (Julaidan/Bayazid) issued various subcontracts for this purpose to several companies.

[8] Translator's note: the name is presumably "Paolo Pierallini" but I have left it in this format because it is the name of a report

fedpol.ch

| Company | Contract | Date | Overall money transferred |
|---|---|---|---|
| Pacific Invoice[9] | Transport | 10/03/98 to 05/05/98 | US$ 110'548.- |
| Egemak | Bakery equipment | 12/03/98 | US$ 23'500.- |
| Vefa | Construction of buildings | 18/04/98 | US$ 740'000.- |
| Inoksan | Construction of kitchens | 05/05/98 | US$ 35'321.- |
| Yaman and other companies | Building contractor | 98 | US$ 125'000.- |
| Technovision | Engineering | | Amount not specified |
| Total at least | | | US$ 1'034'369.- |

*Submission of Yassin Abdullah KADI to the Deputy Attorney-General of Switzerland, further to the meeting at the Swiss Embassy in Riyadh on 1st July 2003, dated 22/08/2003, page 16*

The table details the payments performed in effect according to Mr. Kadi's report. Money withheld, such as US$ 110'000.- still claimed from Maram by the company Vefa, is not taken into account.

According to Mr. Kadi, the buildings were supposed to be shipped to the Yemen by the company "Pacific Invoice[10]". There they were to be constructed on the Al-Eman University campus. All documents relating to this transaction can be found in:
*Submission of Yassin Abdullah KADI to the Deputy Attorney-General of Switzerland, further to the meeting at the Swiss Embassy in Riyadh on 1st July 2003, dated 22/08/2003 and annexes.*

Why was a public appeal launched for the Al-Eman University building project, even though Yassin Abdullah KADI had declared that he was prepared to finance the entire project?

At the time of the money transfers Osama Bin Laden was in Afghanistan, according to press reports. His organisation, however, was active on the international stage. For instance car bombs exploded in Dar es-Salaam/Tanzania and Nairobi/Kenya outside the American Embassies on 07/08/1998, i.e. during the period when Mr. Kadi was performing his money transfers to Wa'el Hamza JULAIDAN. Hundreds of people were killed and thousands were wounded in these two attacks.
*See Kadi/Maram overview dated 13/10/03*

---

[9] Translator's note: the source text spells this "Pasifik Invoice" and later "Pacifik Invoice" but I have assumed that "Pacific Invoice" is the actual name in view of the large number of spelling mistakes

[10] Translator's note: see above



**3.2. The individuals involved in the building project and their close ties to Osama Bin Laden and the Al-Qaeda organisation.**

Several people can be linked with the funds for this project, which originated from Switzerland. It is noticeable here that all the individuals exhibit extremely close ties to Osama Bin Laden. These personal, school, business or religious relationships are presented below. A brief synopsis is also provided regarding the responsibilities of these individuals in the individual suspect companies or educational establishments.

**3.3 Abd-al-Majid Al-ZINDANI**

**3.3.1 Mr. ZINDANI's relationship with Osama BIN LADEN**

Mr. ZINDANI was placed on the Al-Qaeda and Taliban list compiled by the UN under Resolution 1267. Mr. Abd-al-Majid Al-ZINDANI, like Osama BIN LADEN's father, also comes from the Yemen. He spent a long time with Osama Bin Laden in Afghanistan, fighting against the Soviet occupying forces. According to specialist literature he had a religious, spiritual and organisational role to play for the mujahadeen. Mr. ZINDANI was reportedly one of Osama BIN LADEN's mentors but he did not take direct part in battle on the various fronts. There are clear indications, nevertheless, that Abd-al-Majid Al-ZINDANI had an important role to play for the leader of Al-Qaeda. Please refer to the BIF/Al-Qaeda document (See Section 17) Tareekhosama/49/Tareekh Osama 121.
*See Tareekhosama/48/Tareekh Osama.121*

This document relates to a meeting between ABU ABDALLAH (Osama BIN LADEN's *nom de guerre* in Afghanistan), Dr. Abdullah NASEEF and Sheikh Abd-al-Majid Al-ZINDANI on the one side and Zia-ul-Haq, the former President of Pakistan, on the other. This document shows that Abd-al-Majid Al-ZINDANI and Osama BIN LADEN attended a meeting as a team at the highest political level. This shows that both of the participants at this meeting have strong mutual interests. Mr. ZINDANI has known Mr. ZUBEIR since the



time he was guest lecturer at the King Abdul Aziz University in Jeddah, Saudi Arabia. At that time Mr. ZUBEIR was reportedly President of the University.
*See Submission of Yassin Abdullah KADI to the Deputy Attorney-General of Switzerland, further to the meeting at the Swiss Embassy in Riyadh on 1st July 2003, dated 22/08/2003, Part 1, 2 Background, 2.1*

This Jeddah-based university is considered the stronghold of radical Islam and is where Osama BIN LADEN himself studied. In Section 3.4, Mohammed Omar ZUBEIR, more details are given with regard to the university. According to expert reports it is assumed that Osama BIN LADEN has been building up his political and military infrastructure in the Yemen since 1995. He received support in achieving this from Mr. ZINDANI. A.M. ZINDANI was president of the consultative council (Majlis al Chourah) of the ISLAH Party. He was also considered the spiritual leader of the armed wing of the ISLAH party (Yemeni Union for Reform), the Yemeni Islamic Jihad. Abd-al-Majid Al-ZINDANI is reported to have set up several Al-Qaeda training camps in the Yemen. According to reports the first was created in the Sadah region in 1992, following Mr. ZINDANI's return from Afghanistan. 3500 to 4000 activists have supposedly been trained in the camps set up there.
*See Intelligence Newsletter no. 309 17/04/97, Bin Laden on Saudi Doorstep.*

It is clear that the Yemen was a preferred retreat for the former mujahadeen, the so-called Arab Afghans.
*See Yemen Times article, 500 Arab Afghans arrested, from 18/11/01*

### 3.3.2 Links between Al-Eman University in Sanaa / Yemen and Osama BIN LADEN

In parallel with the training camps, Mr. ZINDANI founded Al-Eman University in Sanaa in 1994. It must be said that actual accommodation was built at the university for students and lecturers.
*See Yemen Times article, Al-Zindani: My reservation is due to security and intelligence factors, dated 23-26/09/04*

Interestingly, a close friend of Mr. ZINDANI sits on the committee of the University, namely Mr. Mohammed Omar ZUBEIR, Yassin Al KADI's uncle.
*See Interview with Mohammed Omar Zubeir of 3/5/2004 by Claude Nicati of the Swiss Federal Public Prosecutor's Office.*



According to reports the head of the University is reportedly Mr. Abdul Wahab al-DAILAMI, a former mujahadeen, who fought against the occupying troops in Afghanistan in the 1980s.
*See News.Telegraph article, West fears Sanaa is playing double-game, from 02/03/02*

The graduate from the university who is perhaps most notorious in the west is John Walker Lindh, the American Taliban, who was arrested in Afghanistan. John Walker Lindh attended Al-Eman University and then went on to the war zone to wage his personal jihad.
*See article in The Christian Science Monitor, In Yemen Lindh's quest found its fire, from 06/02/02*

Other students and lecturers from this university have also achieved notoriety in the headlines. Former students of the university have been implicated in the murder of 3 American missionaries/doctors and Jarallah Omar, a leading member of the Yemeni Socialist Party.
*See From the Office of Public Affairs, United States Designates Bin Laden Loyalist, dated 24/02/2004, http://www.treasury.gov/press/releases/is1190.htm*
*See NRO (Nationalreviewonline) Yemeni Sheikh of Hate, by Josh Devon, 07/01/2003, http://www.nationalreview.com/comment/comment-devon010703.asp*

The man who murdered the American doctors in Jiblah, Abed AL-KAMIL, was an Al-Eman University student.
*See Yemen Times article, Jarallah's assassin faced with charges, from 27/4 – 4/5/03*

Al-Eman University lecturer Ahmad AL-DAGHSHI and Al-Eman student, Abduljabar AL MARWANI, were arrested by the Yemeni authorities in connection with the murder of the said Jarallah Omar. They were both members of the "Fundamentalist Jihad Movement", as was Jarallah Omar's murderer.
*See Yemen Times article, Arrest campaign continues, targets of terrorist activities announced, from 4/1 – 4/2/03*

Finally even Mr. ZINDANI's son-in-law, Abdulsalam AL-HARIRI, was arrested with regard to this incident.
*See Yemen Times article, Prominent sheikh's son-in-law arrested over Omar assassination, from 09/02/2003*

Mr. ZINDANI and Mr. ZUBEIR have strong mutual geopolitical and religious interests in the city of Jerusalem. Mr. ZINDANI called for a jihad in

Palestine and demanded the restoration of "Al Kuds" (Jerusalem). Mr. ZUBEIR expressed fears that the Al Aqsa Mosque in Jerusalem would be attacked by the Americans/Jews. This sort of act would be unacceptable to Muslims.
*See Interview with Mohammed Omar ZUBEIR by the Swiss Federal Public Prosecutor's Office, from 3/5/04, page 5.*
*See Yemen Times article, ZINDANI calls for Jihad in Palestine, from 14/10/2001*

Shortly after the attacks on the World Trade Center on 11/9/2001, Mr. ZINDANI closed his *Al-Eman* University for a matter of months. The university's official line was that the students had started their field-studies early.
*See Yemen Times article, Zindani calls for Jihad in Palestine, from 14/10/2001*

Mr. ZINDANI was not an uncontroversial figure in his own country either. For instance the journalist Mohammed Al-Qadhi criticised Al-Eman University as a "pain in the neck of Yemen".
*See Yemen Times, Government takes stock of religious schools / Feeding young minds, from 2003*

Abd-al-Majid Al-ZINDANI can still be connected today with individuals from the Al-Qaeda underworld. In a separate case launched by the Swiss Federal Public Prosecutor's Office, the Swiss authorities applied in 2004 to interview Al-Qaeda member Abdullah al RIMI (a/k/a OWAISS) who was imprisoned in the Yemen. The former mujahadeen and veteran from the conflict in Afghanistan explained that he had met Abdel Majid ZINDANI in the Al Masall Mosque in Taez / Yemen. Mr. ZINDANI apparently held a seminar there.
*See translation of the interview with Abdallah al R1M1 by the Yemeni authorities / Swiss Federal Public Prosecutor's Office document from 2004*

### 3.4 Mohammed Omar ZUBEIR

#### 3.4.1 Mr. ZUBEIR and Islamic extremists

Mohammed Omar ZUBEIR, born 1932, a consultant to the IDB (Islamic Development Bank), residing at Fawwaz Villa 297, Jeddah / Saudi Arabia, home telephone number 6200045, business telephone number 64661110, was interviewed on the matter in Riyadh by Mr. Claude Nicati of the Swiss Federal Public Prosecutor's Office on 03/03/2004. Mr. ZUBEIR is Yassin Abdullah KADI's uncle on his mother's side. He studied in the USA. From 1971 to 1973 he was the head of the Faculty of Economics at King Abdul

Aziz University in Jeddah/SA. Over the years from 1976 to 1979 he took over leadership of the famous university as its President. After 1979 he continued to work as a consultant to the university. In 1980 he was awarded an honorary doctorate. Mr. ZUBEIR owns a villa in Istanbul, i.e. in the same city in which Maram carried out KADI's building project. He has enjoyed a long, friendly relationship with the Al-Qaeda intermediary Wa'el Hamza JULAIDAN, whom he met in Afghanistan, during the wars against the Soviet occupiers. Significantly Mr. ZUBEIR reportedly introduced his nephew, Yassin Abdullah KADI, and Mr. Wa'el Hamza JULAIDAN. He is also reported to have proposed Wa'el JULAIDAN for the building project in the Yemen. He has also known Mr. JULAIDAN's partner at Maram for a very long time, Mr. Mohammed Loay BAYAZID, who is referred to below. Mr. ZUBEIR met Wa'el Hamza JULAIDAN's partner 5 or 6 years before work started on the building project, i.e. sometime around 1991 or 1993. Mr. BAYAZID was working for Osama BIN LADEN in the Sudan at that time. Mr. ZUBEIR must be classified as being a member of the Muslim Brotherhood. After the election victory by the FIS [Front Islamique du Salut] in Algeria was declared null and void, both the leading figures in the party, Abassi MADANI and Ali BENHADJ were arrested by the Algerian Government. Mr. ZUBEIR reportedly tried to act as a go-between between the two parties. In Algeria he reportedly met Mr. Youssef NADA from the Al Taqwa bank, who was there in relation to the same matter. For many years Mr. NADA was the person responsible for foreign policy affairs in the Muslim Brotherhood.
*See interview by the Al-Jazeera television channel, "Witness of the Age" programme hosted by Ahmed Mansour with Youssef NADA, from 08/07/2002 and other dates*

In 1992 Youssef NADA's partner, Mr. Ali Ghaleb HIMMAT, travelled to Afghanistan with the Muslim Brotherhood. The then leader (Murshid) of the Brotherhood, Mr. Mustafa MANSOUR, met there with the then Afghan President, Burhanuddin RABBANI. This meeting was held after the Soviet withdrawal from Afghanistan. The BKP (Swiss Federal Bureau of Investigation) found a videocassette of this meeting in one of the rooms belonging to Messrs. NADA and HIMMAT in Switzerland. Mr. Mohamed Omar ZUBEIR can be seen with the Muslim Brotherhood in this short recording.
*See videocassette of Ali Ghaleb HIMMAT in Afghanistan.*

The links between the KADI/ZUBEIR family and the Muslim Brotherhood can also be shown by means of the payments to the Zarka Private University detailed below.

Mr. ZUBEIR made clear in the interview his aversion to American and Israeli policy. He was not afraid of admitting to being a member of the committee of Al-Eman University in the Yemen

even though he knew that the American authorities linked this university with terrorist activities.
*See Interview with Mohammed Omar ZUBEIR from 3/5/04*

### 3.4.2 King Abdel Aziz University in Jeddah / Saudi Arabia and Osama BIN LADEN.

Mr. ZUBEIR clearly played a very central role in the intellectual development of notorious, radical figures at King Abdul Aziz University. During his time at the university, Mr. ZINDANI worked as a lecturer. Abdullah AZZAN, a Palestinian, is considered by experts as being the principal mentor of Osama BIN LADEN in Afghanistan. Mr. AZZAN was also a lecturer at Abdul Aziz University. Mr. AZZAM probably first met Osama BIN LADEN on the university campus, because the terrorist mastermind was a student there. Another notorious lecturer was Muhammad Qutb, an Egyptian. He is the brother of Sayyid QUTB, the ideological leader of the Muslim Brotherhood. After Sayyid's execution in Egypt, Muhammad QUTB published his brother's guiding works in Saudi Arabia. These writings are considered milestones of modern, radical Islam.
*See book "Jihad, the trial of political Islam", by Gilles Kepel, Table of Contents Muhammad and Sayyid QUTB (not attached)*

Wa'el Hamza JULAIDAN was also a lecturer at King Abdul Aziz University in Jeddah / Saudi Arabia from 1982 to 1983.
*See Interview with Wa'el Hamza JULAIDAN, from 3/5/04*

It is impossible to ascertain how much direct influence Mr. Mohammed Omar ZUBEIR had on the appointment of such "eminent" figures at the university. Mr. KADI could not provide an answer to this question. Mr. ZUBEIR visited Afghanistan back in 1992. He can also be seen on various photos in Pakistan/Afghanistan from around 1993, which have been provided by the FBI in New York. He is accompanied in these photographs by Wa'el Hamza JULAIDAN and Yassin Abdullah Kadi.
*See photo-dossier photograph nos. 227, 290, 226 , 294, 292*

Between 1988 and 1990 Mr. ZUBEIR visited Pakistan 3 or 4 times, in order to mediate between the rival parties in Afghanistan. He was accompanied by Yassin Abdullah KADI. According to KADI's testimony, Mr. ZUBEIR headed the delegation. He reported that his uncle also met BIN LADEN's mentor there, Abdullah AZZAM.

The Muwafaq Foundation also bought various goods though from the Binjad Establishment, P.O.Box 1301, Dubai, United Arab Emirates. For instance in 1994 Chafiq AYADI, who will be looked at in more detail below, bought at least 5 Mitsubishi Pickup L200s from the Binjad Establishment for the Muwafaq Foundation in Zagreb. A Toyota Pickup was also bought from the "Fondaciónit Bamir Muaffak". These are known to be the standard types of vehicle used by the mujahadeen around the world. Mr. KADI explained that the owner of the Binjad Establishment was Mr. Khamir Amer BALLAYTH, whom he knew personally. *See response of Yassin Abdullah KADI to the questionnaire of the Deputy Attorney-General of Switzerland, question, response nos. 152 to 155, from 12/03/04, plus attachments relating to the Mitsubishi Pickups and Toyota vehicle documentation*

## 4. The Muwafaq Foundation in the Sudan, responsible for Africa

At the invitation of the Sudanese Finance Minister, Mr. Abdel Rahim HAMDI, Mr. KADI travelled to Khartoum in 1991 with other Saudi businessmen. At this time the dominant party in the country was the National Islamic Front (NIF) led by Hassan Al TURABI, a personal acquaintance of Osama BIN LADEN. Mr. KADI went on the business trip with Ibrahim AFFENDI, Saleh KAMEL and others. Messrs. AFFENDI and KAMEL feature on the Golden Chain List (BIF/Al-Qaeda document) and are therefore considered to be sponsors of Osama BIN LADEN. After this business trip Mr. KADI set up companies and the Muwafaq Foundation in the Sudan and in other African countries.
*See response of Yassin Abdullah KADI to the questionnaire of the Deputy Attorney-General of Switzerland, response no. 51, page 11, from 12/03/04*
*See TAREEKHOSAMA/41/Tareekh Osama 108*

Mr. Siraj El Din Abdul BARI was the Regional Director of the Muwafaq Foundation in the Sudan from 1992 to 1996. From 1981 to 1992 he had been the cultural attaché at the Saudi Embassy in Washington / USA. The Muwafaq Foundation in Khartoum also reported to the Foundation in Jersey. The Muwafaq Foundation was registered in Khartoum on 16/05/1992 and then dissolved again in 1996.

To recap: Al-Qaeda and Osama Bin Laden went to the Sudan from Afghanistan from approx. 1991 to 1996, at the invitation of Hassan Al TURABI. Amongst those responsible for making preparations for this move were the aforementioned Mohamed Loay BAYAZID and Mamdouh Mahmud SALIM. The preparations involved talks being held with Hassan Al TURABI of the National Islamic Front (NIF).



According to Mr. KADI's testimony, the Muwafaq office in the Sudan was the Foundation's most important branch. The Muwafaq was financed by Khalid BIN MAHFOUZ and Yassin A. KADI's Leemount Ltd. Significant sums of money passed from KADI's Swiss bank accounts to the Sudan. These included considerable sums transferred to Khartoum from Faisal Finance account no. 10172 held by Leemount Ltd. in Geneva. The company Solano also sent money to Khartoum from account no. 10741 held at Faisal Finance in Switzerland. These transfers are described in more detail in the Section "Yassin Abdullah KADI, Osama BIN LADEN and the Shamal Islamic Bank".
*See response of Yassin Abdullah KADI to the questionnaire of the Deputy Attorney General of Switzerland Mr. Claude Nicati, questions 91ff, from 12/03/04*

The Foundation ran a large number of aid programmes in the Sudan in the areas of education, health, social welfare, agriculture, small industries and the provision of drinking water. Mr. BIN LADEN was also investing at this time in agriculture and other branches of industry. For example he set up the Damazine farm and other farms. These farms also served as training camps. Under the 1994 Al Raian project, Mr. Kadi had a total of 33 wells bored to the south of Tokar and Port Sudan, and in the areas around Assaloum and Dolabyay. Did the Muwafaq Foundation also have wells bored for the Al-Qaeda organisation? Mr. BIN LADEN definitely had the road built from Khartoum to Port Sudan.
*See YAK to OFAC, index to statement of Yassin Abdullah KADI, pages 21 - 28*

On 02/08/1996 the Board of Directors decided to close the Muwafaq Foundation in the Sudan as from the end of 1996. False statements on the Muwafaq Foundation were allegedly published in "Africa Confidential", according to which a former employee of the Muwafaq Foundation in Ethiopia had been involved in the attempted assassination of the Egyptian President, Hosni Mubarak. Allegedly it was the damage this statement did to the reputation of the Muwafaq Foundation that prompted the Board of Directors to close the Foundation.
*See YAK to OFAC, index to statement of Yassin Abdullah KADI, pages 24 - 25*
*See exhibit to the witness statement of Yassin Abdullah KADI, dated 19th December, 2002*
*See article in The Guardian, Muslim relief groups caught in crossfire*

After it was closed, all the Muwafaq's goods in the Sudan were divided amongst other relief organisations.
*See exhibit to the witness statement of Yassin Abdullah KADI, dated 19th December, 2002, pages 156 - 157*

For instance the "Cultural Centre" project in Equatoria State was bequeathed to the Al-Birr organisation. This was the forerunner of the Benevolence International Foundation (BIF) and was founded by Adel BATTERJEE. Mr. BATTERJEE is considered by experts to be a sponsor of Osama BIN LADEN and also features on the Golden Chain List (BIF/Al-Qaeda documentation).
*See Tareekhosama/41/ Tareekh Osama 108*

The Sub-Saharan International Development Organization (SIDO) took on 8 projects. It was around the same time that the Regional Director of the Muwafaq Foundation, Mr. Siraj EL DIN BARI, became General Manager of this organisation and therefore ensured the virtually seamless take-over of a large proportion of KADI's projects in the Sudan.
*See YAK to OFAC, index to statement of Yassin Abdullah KADI, pages 25 - 26*

The Dawa Organisation took on 6 projects. Unfortunately no details have been found on this charity. According to the testimony of a Sudanese national who works at the BKP (Swiss Federal Bureau of Investigation), this organisation is probably close to Hassan Al TURABI. Mr. TURABI of the National Islamic Front (NIF) had a major role to play in welcoming Osama Bin Laden to the Sudan.

### 5.1 The Muwafaq Foundation in Ethiopia

The Foundation was registered in April 1993 and its address was P.O.Box 50504, Addis Ababa. In theory it reported to the Muwafaq Foundation in Delaware/USA. The Regional Director was probably someone called Mr. Abdulmonim, tel. (work) 611747 and 189970.
*See exhibit to the witness statement of Yassin Abdullah KADI dated 19th December, 2002, page 197*

The Foundation focussed on school projects in the country. The branch was closed by the Government, along with other NGOs. The probable reason was the possible involvement in the assassination attempt on the Egyptian President, Hosni Mubarak.
*See YAK to OFAC, index to statement of Yassin Abdullah KADI, pages 59-60*

COMMONWEALTH OF THE BAHAMAS IBC 08

THE INTERNATIONAL BUSINESS COMPANIES ACT 1989

(No. 2 of 1990)

# CERTIFICATE OF GOOD STANDING (Section 11)

No. 90,550 B SOLANO LIMITED

I, CEDRIC F. MOXEY..................ASST. . Registrar General of the Commonwealth of The Bahamas DO HEREBY CERTIFY:

1. The above Company was duly (incorporated) (~~[illegible]~~ ~~under the provision of the~~ International Business Companies Act 1989(No. 2 of 1990) on the 19TH day of MAY 19 99 as a Company No 90,550B of the Register of International Business Companies.

2. The name of the Company is still on the Register of the International Business Companies and the Company has paid all fees, licence fees and penalties due and payable under the provisions of Sections 102 and 103 of the said Act.

3. The Company has not submitted to me Articles of Merger or Consolidation that have not yet been effective.

4. The Company has not submitted to me Articles of Arrangement that has not yet become effective.

5. The Company is not in the process of being wound up and dissolved.

6. No proceedings have been instituted to strike the name of the Company off the said Register.

7. In so far as is evidenced by the documents filed with me the Company is in good legal standing.

CERTIFIED A TRUE COPY

[signature]

[illegible] CORPORATE SERVICES (BAHAMAS) LTD.

[illegible]: 25th MAY 1999

Given under my hand and seal at Nassau in the Commonwealth of The Bahamas this 25TH day of MAY 19 99

[signature]

ASST. REGISTRAR GENERAL

29-MAY-1999 14:34 FROM

SOLANO LIMITED

Incorporated under the Bahamas International Business Companies Act, 1989

Certificate No. 1

Number of Shares: 12,500

Capital US$50,000.00

divided into 50,000.

shares of US$1.00 each

No transfer of the whole or any portion of the above shares can be registered without the production of this certificate.

This Certifies that YASSIN AHMED MOHAMMED ALI

of

is (are) the registered holder(s) of 12,500 shares of US$1.00 each fully paid, numbered 1 to 12,500 inclusive, of the company, subject to the memorandum and articles of association of the company

Given under the common seal of the said company on the 19th day of May, 1999

Director

Director

Secretary

COPY

# SOLANO LIMITED

Incorporated under the Bahamas International Business Companies Act, 1989

Certificate No. 2

Number of Shares: 12,500

Capital US$50,000.00

divided into 50,000

shares of US$1.00 each

No transfer of the whole or any portion of the above shares can be registered without the production of this certificate.

This Certifies that MOHAMMED AHMED OBAID BIN MAHFOOZ

of

is (are) the registered holder(s) of 12,500 shares of US$1.00 each fully paid, numbered 12,501 to 25,000 inclusive, of the company, subject to the memorandum and articles of association of the company

Given under the common seal of the said company on the 19th day of May, 1999

Director ________ Director ________

Secretary ________

KADI0012122

SOLANO LIMITED

Incorporated under the Bahamas International Business Companies Act, 1989

Certificate No. 3

Number of Shares: 12,500

Capital US$50,000.00

divided into 50,000

shares of US$1.00 each

No transfer of the whole or any portion of the above shares can be registered without the production of this certificate.

This Certifies that AHMED MOHAMMED OMER BA SUDAN

of

is (are) the registered holder(s) of 12,500 shares of US$1.00 each fully paid, numbered 25,001 to 37,500 inclusive, of the company, subject to the memorandum and articles of association of the company

Given under the common seal of the said company on the 19th day of May, 19 99

Director ________ Director ________

Secretary ________



29-MAY-1999 14:38 FROM

SOLANO LIMITED

Incorporated under the Bahamas International Business Companies Act, 1989

Certificate No. 4

Number of Shares: 12,500

Capital US$50,000.00

divided into 50,000

shares of US$1.00 each

No transfer of the whole or any portion of the above shares can be registered without the production of this certificate.

This Certifies that YASSIN ABDULLAH AZIZ UD DIN KADI

of

is (are) the registered holder(s) of 12,500 shares of US$1.00 each fully paid, numbered 37,501 to 50,000 inclusive, of the company, subject to the memorandum and articles of association of the company

Given under the common seal of the said company on the 19th day of May, 19 99

Director ______________ Director ______________

Secretary ______________

KADI0012124



SCHWEIZERISCHE BUNDESANWALTSCHAFT
MINISTERE PUBLIC DE LA CONFEDERATION
MINISTERO PUBBLICO DELLA CONFEDERAZIONE
PROCURA FEDERALA

Proceeding#: BA/EAII/1/01/0006 Riyadh, the 1st of July 2003

Start of the interrogation: 09h00

# Interrogation as an accused person

**Kadi Yassin Abdullah,** born on 23 February 1955 in Cairo, Egypt, son of Abdullah Aziz al Din Qadi and Salha Omar Zubayr, married with Balgis, resident of Jeddah, Saudi Arabia, P.O. Box 214. Profession businessman.

assisted by

Mr. Carlo Lombardini, attorney and Mr. Maurice Turrettini both attorney at law in Geneva, who may act in this procedure following the Federal Rules on Criminal Procedure (FRCP).

Mr. Carlo Lombardini and Mr. Maurice Turrettini are accompanied by:

Mr. Saad Djebbar, attorney at law,
Mr. Guy Martin, solicitor, from Peter Carter-Ruck and Partners,
Mr. Stanton D. Anderson, attorney at law, from McDermott Will & Emery,
Mr. Robin Johnson, attorney at law, from Balch & Bingham and
Mr. Saad al Berek, attorney at law in Riyadh.

appears as accused person before

- Claude Nicati, Deputy Attorney General of Switzerland
- Dominique Ritter, Federal Criminal Police
- Jean-Paul Rouiller, judicial expert

in answer of a summons

***Protocol note:***

*The interrogation is conducted in English. The translator is warned of the legal consequences of false translation pursuant to art. 307 of the*

What can you tell us about two transfers you made. The first on the 2nd of march 1992, from your account in the Faisal Finance Geneva to the al Shamal Bank in Sudan?

The first one, we won the tender for metal scrap. This payment was for the government of Sudan to pay them for the tender of metal scrap.
The second transfer went to our account in the Shamal Bank. Three million USD were used to buy a steel factory (SMT Engeneering) and one million USD was in investment funds over there (murhabaha). There is one more transaction you didn' t mention. Starting from the beginning. Shamal bank was a very well reputed bank in Sudan, with very high returns on investments (between 15 ad 17%). I also want to add that there is another transaction from our account in the Faisal. So we want to explain three transactions.
The third one, is two million were to buy an aircraft engine from General Electric for Sudan airline.
Mr Nicati knows an additional document reflecting a fourth transaction. That's the Solano Company, which has an account in the Faisal Geneva, and in the Shamal Bank, murhabaha. The bank gives the money to the Farmer Bank to give to the farmers who grow sesame.

Were you involved in rice trading ?

It might be. We did sugar definitely. About rice I am not sure.

In December 1998, 500 tons of rice sailing between Port Said and Albania were lost or stolen. What do you know about it ?

Signature

| Deputy General Attorney | Clerk | Interpreter | Accused |
| --- | --- | --- | --- |
| ............................. | ............................. | ............................. | ............................. |

IN THE MATTER OF

YASSIN ABDULLAH KADI

and

THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND
MR CLAUDE NICATI

---

# RESPONSE OF YASSIN ABDULLAH KADI TO THE QUESTIONNAIRE OF THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND MR CLAUDE NICATI

---

Peter Carter-Ruck & Partners
International Press Centre
76 Shoe Lane
London
EC4A 3JB

Tel: 0207 353 5005
Fax: 0207 353 5553
Ref: GM/MRS/7496.3

12 March 2004

registered company called **Alinted SH.P.K. ("Alinted")**. Alinted was an investment holding company formed by Dr Yamani, and some of the other leading Saudi Arabian investors who had attended the 1993 conference in Tirana sponsored by the IDB.

Through the same joint venture company, Karavan, in 2000 we began to develop the Boulevard Towers in the city center of Tirana. The present status of this development is that Karavan owns a share of the development and the remainder is owned by local Albanian shareholders and Dr Saleh. At the time of freezing of my assets in Albania the development was partly completed. The Boulevard Towers comprise two office towers built over a three-storey shopping center. I understand that construction of the towers is continuing. "

49 **According to his declarations to the US-OFAC of 19.12.2002 EUROINVEST had problems, because Mr. Chafic Ayadi sold a large quantity goods on credit to various Bosnian individuals. What type of goods were sold by Chafiq Ayadi, to whom were they sold and for what amount?**

Mr Kadi refers to the list of debtors of Euroinvest at pages 206-207 of Exhibit "YAK7". All Euroinvest debtors are local Bosnian individuals or companies. Mr Kadi has never had any grounds for suspecting that any of these individuals or companies has ever had any connection with terrorism or any criminal activity and so far as Mr Kadi is aware Euroinvest's relations with them were purely commercial. The goods sold were consumer goods including foodstuffs like sugar, oil, flour, soap, chewing gum, biscuits, detergent, marmalade, coffee, salt, chairs, and tables.

(*For more details see paragraph 158 of Mr Kadi's statement dated 19 December 2002.*)

50 **What kind of relations does Mr. Kadi maintain with Soliman Bireiri?**

Mr Kadi has had no relations whether personal or business with Soliman Biheiri since Mr Kadi withdrew his investment in BMI back in 1996. Mr Kadi was an innocent passive investor in BMI who by 1995 had become disillusioned with BMI. In 1995 Mr Kadi instructed his staff to terminate his relationship with BMI. Mr Kadi has had no contact with Mr Biheiri since 1996.

51 **What participations did Mr. Kadi have in Sudan?**

Mr Kadi repeats paragraphs 141-148 of his statement to OFAC dated 19 December 2002 where he said as follows:

"In 1990 I learned that Al Shamal Islamic Bank was achieving much greater returns on Islamic-style investments than those institutions such as Faisal Finance SA with which my funds were then placed. I had not previously had any dealings with Al Shamal Islamic Bank (although it had been founded in, and followed Islamic precepts since, 1985) but I discovered that these higher returns were generated by the adoption of a more vigorous approach to investment. In some cases, Al Shamal

Islamic Bank was able to achieve returns in excess of 15% through investment arrangements, which complied with Islamic precepts. I also discovered, that in comparison with other institutions, Al Shamal Islamic Bank operated in a more transparent fashion, providing its investors with a more detailed picture of the projects and businesses in which their funds were invested. Both of these aspects were attractive to me and thus, for solely commercial reasons, and in order to obtain a better return on my money, I decided to make investments with Al Shamal Islamic Bank.

It was my intention that all the funds I transferred to Al Shamal be invested in strict accordance with Islamic precepts. This means that generally funds would be invested according to Islamic principles and procedures. These modes have a built-in element of profit (or risk) which replaces the interest that would be payable were the parties non-Muslim. At no stage did I ever transfer funds to Al Shamal Bank for any purpose connected with terrorism or to support Osama bin Laden, Al-Qaeda or any other terrorist group.

Before committing funds for investments with Al Shamal Islamic Bank, the bank provided me with a list of correspondent banks. A copy of this list is at pages 198 to 201. It will be seen that Al Shamal's correspondent banks included such names as American Express Bank, Commerz Bank and Credit Lyonnais (Suisse) SA. The correspondent banks also included Al Barakah Bank and others. At that time, none of these institutions had, so far as I am aware, ever been the subject of any official sanction relating to money laundering or other illegal activity. Whenever I wished to invest with Al Shamal Bank, they directed me to transfer my funds to the relevant correspondent bank nominated by them. This did not cause me any concern, as it is quite usual in banking transactions to transfer monies to a bank via its correspondent bank. In this case I understood that there was no facility for the direct transfer of funds to Al Shamal Bank in Sudan. Upon the transfer being effected, Al Shamal would credit my US dollar investment account in Sudan.

The correspondent banks to which Al Shamal Bank instructed me to transfer funds were Credit Lyonnais (Suisse) S.A, and Al Barakah Bank in London. I understand this is an issue because it has been alleged in the *Burnett* civil law suit that Osama bin Laden maintained one or more accounts at Al Shamal Bank, and that Al Barakah Bank has supported Al Haramain Charity and Osama bin Laden. I have no knowledge of whether these allegations are true; in any case I confirm that I never transferred funds to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank to support Osama bin Laden, Al-Qaeda or any terrorist group or activity and I am not aware that any of these banks has ever engaged in financing or supporting any such terrorist group or activity. In all my dealings with Al Shamal Bank I never had any knowledge whatsoever of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Obviously, it follows from this that my

reasons for investing with Al Shamal Bank had nothing whatever to do with the identity of any of its other clients or investors, none of whom were known to me.

To the best of my knowledge none of the funds I transferred to Al Shamal Bank or any of its correspondents applied for one or more of the following purposes:

to enable Al Shamal Bank to issue a guarantee to the Sudanese Government in respect of a substantial scrap metal tender issued by the Sudanese Government, which I won after a contested bid in 1990 and which I considered to be a good business opportunity. The tender for this contract expressly required payment to be made to the Sudanese Government in US dollars;

to make payment in US dollars, to the Sudanese Government of monies due to it under the scrap metal contract;

concurrently with the issuing of the guarantee I refer to above, Al Shamal Bank used the funds to invest in specific Islamic investments including the purchase of wheat for sale in Sudan and other commodities;

to meet the costs involved in cutting, transporting and exporting the scrap metal I had purchased from the Sudanese Government. Under the scrap metal contract it was agreed that I was to be responsible for these costs;

to invest in the manufacture and supply of construction rods by a Sudanese company called SMT Engineering Co.;

to invest in a contract with the Sudan Petroleum Corporation for the supply of gas oil;

to invest in shares in the Saudi - Sudanese Bank;

to invest in a large quantity of sesame;

to invest in the purchase of aircraft equipment for Sudanese Airlines from General Electric Company in the USA.;

to invest in duty free shops run by the Sudanese Government.

I add that I have not made any transfers to Al Shamal Bank since 1994.

Many of these investments achieved excellent rates of return. For example in the case of the aircraft equipment purchased for Sudanese Airlines, the rate of return was in excess of 30%, which I earned over a period of 1 year.

Many of my activities in Sudan were conducted through two companies associated with me: Leemount Limited and Solano Limited. Leemount Limited was a company registered on January 15 1992 in the Isle of Man (de-registered in March 2002). I owned shares in this company. Leemount maintained US dollar and Sudanese pound accounts with Al Shamal Islamic Bank. On May 19, 1999, Solano Limited was incorporated in the Bahamas, a company in which I also had a shareholding until it was de-registered in April 2001. Solano Limited also had an account with Al Shamal Islamic bank. It engaged in the trading of commodities and agricultural products. Both these companies were registered in Sudan as foreign companies.

Finally, and for the sake of completeness, I add this: in 1991 I attended a convention of leading Saudi businessmen in Khartoum, Sudan, hosted by the Sudanese Government, which at the time was seeking to persuade foreign investors to invest in Sudan. I traveled to Khartoum with other leading Saudi businessmen, including, I recall, H.R.H. Prince Mohamed Al Faisal, Ibrahim Affendi, Saleh Kamel, representatives of Al Rahji Banking and Investment Corporation along with other Arab businessmen. We attended at the invitation of the Sudanese Minister of Finance [Abdul Rahim Hamdi] and Chairman of the Sudanese Economic Committee."

52 **With which companies and business partners did he work in Sudan?**

See answer to question 51 above. Mr Kadi also did business with Yassin Ahmed.

53 **Mr. Waleed Abu Sheika worked in the Balkans on behalf of Mr.Kadi. What can he say about this person?**

Mr. Waleed Abu Sheika was an employee who worked at the time for Mr Kadi's trading activities from Tirana, Albania, and who was employed under a profit sharing incentive package. Mr Kadi has no grounds whatever to suspect that Mr Sheika was ever involved in terrorism or any criminal activity.

54 **The company Caravan transferred money to Mr. A. Ahmed. What was this for?**

Mr Kadi does not recall this person or any money transfers to him. However, should Mr Nicati wish to pursue this matter he is asked to provide the full name of the transferee and other details of the transfer in order that Mr Kadi may investigate the matter.

55 **Did Mr. Hamza Abu Rayyan work for Luks Holi Limited Real Estate & Maintenance Company or for other companies belonging to Mr. Kadi?**

Yes, he worked for Mr Kadi mainly in the real estate business since 1994 but he may have also worked in Mr Kadi's other companies in Albania when required.



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

April 26, 2005

This Letter Head Memorandum (LHM) is written in response to an MLAT prepared by the Swiss authorities dated September 13, 2004. As a result of this request, the New York Office (NYO) of the Federal Bureau of Investigation (FBI) had to extensively interview a Cooperating Witness (CW), review a substantial amount of photographs and conduct a considerable amount of research. Since many of the individuals and organizations that were touched upon during this interview have been discussed by the CW in previous debriefing sessions, the NYO has enclosed a second LHM providing additional information from the CW relative to the topics covered. It should be noted that the information contained in the second LHM is not a full disclosure of all the information held by the FBI. The second LHM is being shared to give the Swiss authorities a better overview of the CW's knowledge regarding the subject matter.

On 11/3/2004, a CW known to the Swiss authorities, was interviewed at an undisclosed location. The interview was predicated on a request from the Swiss Federal Criminal Police who provided the FBI a list of 359 questions.

The first paragraph of the Swiss document refers to the source's testimony in the spring of 2001 in the United States of America v. Osama Bin Laden, et al. The source responded by stating that all of his previous testimony was truthful.

General questions concerning Yassin Al-Kadi

1. Upon presentations of photographs/Who is the man on the photographs number 13 and number 20?

With regards to photograph number 13, the source had previously identified this individual as Yassin Al-Kadi (refer to enclosed LHM of CW interview on 7/14/2004 whereby slide 8 is the same photograph as Swiss photograph number 13).

The source identified the individual depicted in photograph number 20 as that of Sheikh Abdul Magid Al-Zindani.

2. Where does Yassin Al-Kadi come from?

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your a

293. Two of the responsible representatives of the Al Haramain wa Al Masjed Al Aqsa Charity were Mahmood Taiba and Mohamed Ibrahim Saeed. Do you know these two individuals?

The source advised that he does not know Mahmood Taiba or Mohamed Ibrahim Saeed.

294. Did the Rahma Charitable Foundation have ties with the organization Al-Qaida?

The source advised that he does not believe so because he never heard of the Rahma Charitable Foundation.

Questions concerning business dealings in Sudan

295. In 1991, the Sudanese finance minister, Abdul Rahim Hamdi, organized a business conference in Khartoum, to which Yassin Al-Kadi and other important persons from Saudi Arabia were also invited. Was the organization Al-Qaida also present at this conference?

The source advised that he remembers such a conference and knows that Al-Qaida did attend - although he does not recall who. The source advised that the conference was sponsored by the NIF whereby the Sudanese government was trying to bring business into Sudan to help support the economy. According to the source, it was during this time frame in which the World Bank, European Banks, and even some Arab governments stopped providing financial support to Sudan. As a result of the conference, the source believes that Bin Laden and Al-Qaida purchased many shares and became a part owner of the Al-Shamal Islamic Bank, which according to the source, supported the Dafa Al-Shabi. Furthermore, Bin Laden and Al-Qaida opened numerous accounts at the bank to help Al-Qaida and the NIF obtain Letters of Credit to purchase supplies and conduct business in an effort to support themselves. The source recalls accounts being opened by Bin Laden, Abu Fadl Al-Makki, Abu Hajer, Saad Sharif and the source himself. Furthermore, the source advised that Bin Laden and NIF created their own bank, circa 1991, called Bank Al-Muzare which translates into "Farmers Bank".

Finally, the source advised that Abdul Rahim Hamdi was a member of the NIF.

296. Was the Al Hijra Company in Sudan a business of Al-Qaida?

The source advised that the Al Hijra Comapny was an Al-Qaida business.

297. Who managed the Al Hijra Company in Sudan?

The source advised that circa 1991-92, the Al Hijra Company was managed by Abu Ibrahim Al-Iraqi who the source believes is related to Abu Hajer Al-Iraqi.

298. Was the Wadi Al-Aqiq a business of the organization Al-Qaida?

The source advised that Wadi Al-Aqiq was also an Al-Qaida business and was known as the "Mother Company" since it was the holding company for other Al-Qaida businesses.

299. Who founded the Wadi Al-Aqiq Company?

The source advised that the company was founded circa 1990-91 by the following individuals: Abu Hammam Al-Saudi; Abu Unaith Al-Saudi; Ali Harun, aka Hassan Al-Sudani - who was both NIF and Al-Qaida; and Dr. Abdul Salam Suliman Saad, an NIF member who also managed an NIF Dawa Organization.

300. Where did the funds for the founding of this company come from?

The source advised that all the funds came from Bin Laden.

301. Was Mr. Yassin Al-Kadi a well-known personality in the business world in Sudan?

The source believes that Al-Kadi was a well known personality in the Sudanese business world.

302. Where did Yassin Al-Kadi invest his money in Sudan?

The source advised that he believes Al-Kadi did invest money in Sudan. Although the source is not aware of any specific details involving Al-Kadi, he did advise that in 1995, an individual associated with Al-Kadi named Salah Idriss, purchased

land in Sudan and opened a shipping business that sent livestock to Saudi Arabia. According to the source, Idriss, who is either Sudanese or a Saudi from the Dosari Tribe, was helped by Ali Harun from Bin Laden's Wadi Al-Aqiq Company to set up the shipping company. The source believes that Al-Kadi may have been involved in this business.

303. Did Yassin Al-Kadi have shares in businesses linked to the organization Al-Qaida?

The source advised that he is not aware of Al-Kadi having shares in businesses linked to Al-Qaida.

304. What kind of businesses associated with Al-Qaida was Mamdouh Mahmoud Salim managing in Sudan?

The source advised that circa 1992-93, Salim helped Abu Rida Al-Suri with the Al-Ikhlas International Company.

305. What kind of businesses associated with Al-Qaida was Mohamed Luay Bayazed managing in Sudan?

The source advised that Bayazed was the owner and manager of Bin Laden's Al-Ikhlas International Company.

306. What kind of businesses associated with Al-Qaida was Abu Hamman al-Saudi managing in Sudan?

The source advised that Abu Hammam was one of the founders of the Wadi Al-Aqiq Company which was involved in the construction of the road which linked Karmuk to Demazine. (refer to questions 298 and 299)

307. What kind of business associated with Al-Qaida was Abu Unaith Al-Saudi managing in Sudan?

The source advised that Abu Unaith was also one of the founders of the Wadi Al-Aqiq Company. Furthermore, the source advised that Abu Unaith worked with Abu Rida Al-Suri, Liwa (Sudanese military rank of Major General) Ibrahim Suliman and Dr. Omar Abd Al-Maruf, to create the Dafa Al-Shabi. According to the source, these individuals helped fund, purchase weapons and establish training camps for the Dafa Al-Shabi.

308. Did the organization Al-Qaida in Sudan have business dealings with Mr. Yassin Ahmed?

The source advised that he never heard of Yassin Ahmed.

Questions concerning businesses in the Balkans

309. In 1993, the Muslim Albanian International Investment Conference was held in Tirana: Was the organization Al-Qaida also present there?

The source does not know if Al-Qaida was present at the Muslim Albanian International Investment Conference.

310. The Caravan Development Group (Karavan) of Yassin Al-Kadi supported various charity organizations in the Balkans. Do you know this company?

The source advised that he never heard of the Caravan Development Group.

311. One of the important business partners of Yassin Al-Kadi in the Balkans was Dr. Abdul Latif Salah (Saleh). Do you know this person?

The source advised that he never heard of Dr. Abdul Latif Salah.

312. Tarek Nasser, Said O.Y. Hourani, Waleed Abu Sheika, Hamza Abu Rayyan used to work for various companies (Alinted, Cavallo, Lojall, Albanian Snacks, Euroinvest) owned by Yassin Al-Kadi in the Balkans. Do you know these persons and companies?

The source advised that he is not familiar with these individuals and/or companies.

313. Yassin Al-Kadi's company Lojall in Tirana/Albania was sold. Do you know the new owner, Medhat El-Mazalwy and his company Markata?

12 05 0111

Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Département fédéral de justice et police DFJP

**Office fédéral de la police fedpol**
Police judiciaire fédérale

Office des juges d'instruction fédéraux
Genève
R: 19 MARS 2007

Lieu de l'audition: OJIF Genève
Auditionné(e) par: Martinez Damien
N° dossier PJF: 335716
N° MPC: BA/EAII/1/01/0006

Début de l'audition: 10h17.

# Personne entendue à titre de renseignement

En présence de:

- Dominique RITTER - Enquêteur
- Damien MARTINEZ - Enquêteur

sur convocation écrite du 06.03.2007.

| | | |
|---|---|---|
| Nom(s) | **TEYMOUR** | m |
| Prénom(s) | **Rachid** | |
| Date de naissance | 28.04.1952 | |
| Lieu de naissance | Egypte, Le Caire | |
| Origine(s)/Nationalité(s) | Le Locle/ | |
| Parents | Mohamed TEYMOUR et Samya née EL MAHDI | |
| Etat civil | marié(e) à Martine née HAUSSMAN | |
| Nombre d'enfant(s) | 3 | |
| Profession(s)/employeur(s) | Conseiller financier et gestionnaire en mode libéral/ | |
| Lieu de domicile | CH- Vessy / Geneve/1234 | |
| Adresse | Route antoine martin 6 | |
| Moyen(s) communication | Tél. mobile: 0787762063<br>Tél. privé: 0227841405<br>Courriel: rachidteymour@mail.com | |
| Langue(s) | français, anglais, arabe | |
| Pièce d'identité | 005421443 | |
| Identité établie de manière certaine | Oui | |

**Information sur vos droits**

Nous vous informons qu'en votre qualité de personne entendue à titre de renseignement, vous avez le droit de refuser de répondre et que vos déclarations peuvent être utilisées comme moyen de preuve. D'autre part, nous vous rendons attentif/ive aux poursuites pénales encourues en cas de dénonciation calomnieuse, d'induire la justice en erreur et d'entrave à l'action pénale (art. 303 à 305 CP).

---

A titre de renseignement

[signature]

Concernant les documents 7.1 et 7.2. Je constate qu'il s'agit d'un virement de 100,000 dollars. Je ne connais pas ce monsieur. Il s'agit d'un transfert vers le compte à la succursale islamique de l'Arab Bank. Ce document est signé par la deuxième signature autorisée dans Caravan. La deuxième signature sur le compte de Caravan est Omar Saleh Al-Amoudi. Il s'agit d'un proche de KADI dans la société Caravan. Je ne l'ai jamais rencontré mais il s'agit d'un membre de la famille Al-Amoudi. Ici, il s'agit d'un transfert effectué par Omar Saleh Al-Amoudi pour Abdellatif Saleh. Pour vous répondre, je ne connais pas ce monsieur Abdulatif Saleh mais il est possible que j'ai entendu ce nom déjà une fois.

13. Que pouvez-vous dire sur ce document (annexe 8)?

Pour ce qui concerne les document 8.1 et 8.2 ; A l'époque, de ce que je me souviens à l'époque, KADI faisait du business de coton avec le Soudan. Vous m'informez qu'à la même époque Oussama ben Laden faisait aussi du Business de coton avec la même banque à Khartoum.

Cette opération dont vous me parlez concerne les opérations de coton avec un ressortissant soudanais qu'il a rencontré ici à Genève lors d'un autre voyage. Ensuite dans cette affaire de coton, j'ai cru comprendre que KADI avait eu des problèmes avec cette affaire de coton, et il nous avait sollicités pour résoudre cette affaire via notre affaire via notre banque. Personnellement, je ne sais pas qui est derrière Al Shamal, peut être sont-ils venus visiter les gens de DMI à l'époque.

Personnellement, je pense que ces deux millions proviennent d'une opération en relation avec une opération de coton. Peut être aussi s'agit-il d'un actionnariat de KADI dans Al Shamal. Mais je ne peux pas en être sûr.

Pour ce qui concerne les documents 8.3 et 8.4. Il s'agit de Yassin Mohamed Ali, un soudanais qui m'a été introduit par Youssef Abdu Ali à Jeddah avant l'ouverture du compte Solano, il me l'a présenté comme l'interlocuteur de Yassin KADI au Soudan. Je me souviens que dans les transactions du Soudan, je me souviens que KADI devait transférer à Solano et à Yassin Mohamed Ali, entre 2 et 3 millions pour des opérations d'investissement au Soudan gérées par Yassin Mohamed Ali. Cela devait rapporter entre 10 et 15%. Cette opération était en 1999 et en 2001, je n'ai pas reçu de contrepartie quand je suis parti de la banque. Pour vous répondre, c'est vrai qu'il s'agit de sommes très importantes investies par Yassin KADI dans Solano Ltd , environ 3 millions et que jusqu'à mon départ de la Faisal Finance en 2001, je n'ai jamais vu le retour de ces investissements. Il est vrai que je n'ai jamais revu les deux millions, puis les 900,000 dollars, parties au Soudan, et qu'il faudrait revoir si cet argent est revenu par la suite sur les comptes de KADI, si ce n'est pas le cas, c'est vrai que c'est vraiment curieux.

A titre de renseignement

INFORMATION

In presence of:    Dominique Ritter (enqueteur)
                   Daniel Martinez (enqueteur)

Written notice 3/6/2007

Name:              Rachid Teymour
DOB:               4/28/52
Place of birth:  Cairo, Egypt
Nationality:       Le Locle
Parents:            Mohamed Teymour and Samya El Mahdi
Marriage:          Martine Haussman
Children:           3
Profession/employer:  Financial advisor and administrator
Domicile:              Route Antoine Martin 6, CH Vesey, Geneva 1234
Languages:          French, English, Arabic

Information regarding your rights:
You have the right to refuse to reply and your statements can be used as proof.  On the other hand, we would like to inform you regarding lawsuits in case of false statements

Hearing of 3/14/07 of Teymour Rachid – as information

Regarding documents 7.1 and 7.2 I confirm that they regard transfer of 100,000 dollars.  I don't know this gentleman.  It regards a transfer to an account at the Islamic branch of the Arab Bank.  The document is signed by the second signature authorized by Caravan.  The second signature on the account is Omar Saleh Al-Amoudi.  It regards a relative (?) of KADI in Caravan.  I have never met him but it is a family member of Al-Amoudi.  It was a transfer made by Omar Saleh Al-Amoudi for Abdellatif Saleh.  I don't know him but it's possible that I have heard of the name.

13.  What can you tell us about this document (exhibit 8)

Re 8.1 and 8.2.  at the time I remember KADI did business in cotton with Sudan.  You told me that at the time, Oussama ben Laden also did cotton business with the same bank in Khartoum.
This operation concerns the cotton business with [someone] in Sudan that he met here in Geneva during another trip.  I understood that KADI had problems with this cotton matter and he asked us to resolve the matter through our bank.  I do not know who is behind Al Shamal, maybe they came to see the people from DMI at the time.

Personally I think that the two million relates to the cotton operation.  It could also be that it is a KADI shareholder in Al Shamal.  But I can't be sure.

Regarding documents 8.3 and 8.4.  They are about Yassin Mohamed Ali, from Sudan, who was introduced to me by Youssef Abdu Ali in Jeddah before the opening of the Solano account, he was introduced as the interlocutor of Yassin KADI in Sudan.  I remember that in the Sudan transactions, KADI was to transfer to Solano and Yassin Mohamed Ali between 2 and 3 million for the investment operations of Sudan, managed by Yassin Mohamed Ali.  This was to bring between 10 and 15%.  This operation took place in 1999 and 2001, I did not receive counterpart (?) when I left the bank.  It is true that it involved large amounts invested by Yassin KADI in Solano Ltd., about 3 million and up to my departure from Faisal Finance in 2001, I never saw a return on those investments.  It is true that I never reviewed the two million, or the 900,000 dollars, [sent?] to Sudan, and one should see whether this money was returned to the KADI accounts, and if it is not the case, it's true that it is really curious (odd)

McDermott
Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Stanton D. Anderson, P.C.
Attorney at Law
sanderson@mwe.com
202.756.8255

August 2, 2004

**Via FedEx**

His Royal Highness
Prince Bandar bin Sultan bin Abdulaziz
Ambassador
Royal Embassy of Saudi Arabia
601 New Hampshire Avenue, NW
Washington, DC 20037

Dear Mr. Ambassador:

I am counsel to Mr. Yassin Kadi, a Saudi citizen and philanthropist who was recently impugned by the Council on Foreign Relations in its Second Report of an Independent Task Force on Terrorist Financing: Update on the Global Campaign Against Terrorism Financing. As noted by the June 15 press release issued by the Embassy in response to the Council report, "The report from the Council on Foreign Relations Task Force in regard to Saudi Arabia is politically motivated, ill-informed and factually incorrect."

I am enclosing copies of two letters we have written to Senate Committees in our efforts to clarify the record and attempt to correct inaccuracies and misstatements that continue to be repeated and which are harmful to my client and his reputation.

The first letter was recently sent to Senators Collins and Lieberman of the Senate Committee on Governmental Affairs to which the report was submitted. That letter details inaccuracies made in the Task Force's report, including an apparent reliance on a now withdrawn article by discredited USA Today Reporter Jack Kelley entitled "Saudi money aiding bin Laden: Businessmen are financing front groups" that asserted that Blessed Relief was a front for Bin Laden. As the June 15 press release says, it is indeed "regrettable" that the CFR report is "motivated by politics, and not the search for the truth."

The second letter was sent to Senators Grassley and Baucus of the Senate Finance Committee concerning their reliance on a report written by Jean-Charles Brisard, that Brisard claims was commissioned by the President of the Security Council. As you can see from the attached communication from the then-President of the Security Council, Mr. Brisard's claims that his report was in any way commissioned or related to the activities of the Security Council

U.S. practice conducted through McDermott Will & Emery LLP.
600 Thirteenth Street, N.W. Washington, D.C. 20005-3096 Telephone: 202.756.8000 Facsimile: 202.756.8087 www.mwe.com

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0065045

His Royal Highness
Prince Bandar bin Sultan bin Abdulaziz
August 2, 2004
Page 2

are "deceitful and marked by the intention to mislead." Moreover, Brisard has not provided any information to substantiate his charges that we believe are inaccurate.

Your continued efforts to obtain truthful and accurate investigations into allegations of terrorist financing are greatly appreciated.

Sincerely,

Stanton D. Anderson
McDermott Will & Emery

WDC99 957580-1.064622.0011

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0065046



Direct Email : Guy.Martin@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : GM/MRS/7496.3

Date : 4 August 2004

**Carter-Ruck**

Solicitors

International Press Centre
76 Shoe Lane
London EC4A 3JB

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Barton Taylor
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

Consultant
Paul Wheeler

Partnership Secretary
Michael Croxford

Associate Firm
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**BY HAND**

**PRIVATE & CONFIDENTIAL**

His Royal Highness Prince Turki Al Faisal
Ambassador of the Kingdom of Saudi Arabia
to the United Kingdom
30 Charles Street
London
W1J 5DZ

Your Royal Highness

**Sheikh Yassin Abdullah Kadi**

I am writing to thank Your Royal Highness for receiving me, my partner Cameron Doley and Maitre Saad Djebbar last Friday 30 July when we briefed you about the case of our client, and your national, the Saudi businessman and benefactor Sheikh Yassin Abdullah Kadi. We greatly value the interest you have shown in our client's case.

I wish to reaffirm in this letter Mr Kadi's total innocence of the allegations against him. Indeed, for nearly three years, we and Mr Kadi's lawyers in other jurisdictions have spent literally thousands of hours reviewing thousands of documents and interviewing numerous witnesses covering various jurisdictions and have found no evidence that any of Mr Kadi's activities benefited Usama bin Laden, al-Qaida or any terrorist group. All the evidence supports the position Mr Kadi has maintained throughout, that in all Mr Kadi's individual, business and charitable activities he has never supported nor has he ever intended to support in any manner Usama Bin Laden or Al Qaeda.

These conclusions have been reinforced by the recent investigations of reputable international investigation organisations in the USA, which have experts with extensive experience of working for US agencies worldwide including in the Middle East.

At our meeting we explained to you some aspects of our client's case in general and elements of it relating to Switzerland and the USA in particular.

As to **Switzerland** for nearly three years Mr. Kadi has continuously provided the authorities with all the cooperation necessary to enable them to conduct their preliminary investigation. Indeed it is only as a result of the good offices of Mr Kadi that the Deputy Swiss Attorney General, Mr Claude Nicati, was able to meet with Mr Kadi in the presence of his lawyers at the Swiss Embassy in Riyadh for an entire day on 1 July 2003. Since then Mr Kadi's lawyers have provided Mr Nicati with a detailed and complete dossier of evidence explaining the transactions raised by Mr Nicati at the meeting on 1 July 2003 and evidencing their legitimacy.

Despite the full and comprehensive explanations and evidence provided to Mr Nicati, he was, regrettably, unable to conclude the investigation into Mr Kadi. Mr

**Regulated by the Law Society**

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

Nicati instead gave Mr Kadi's lawyers an opportunity to answer questions, which he said he would submit in writing. Mr Nicati then submitted in December 2003 a list of no fewer than 212 questions.

Mr Nicati's 212 questions ranged over issues far wider than the issues he raised at the meeting in Riyadh; his questions raised issues already answered comprehensively by Mr Kadi in written submissions to OFAC (of all of which Mr Nicati had previously been furnished with copies) and included one question which on any view is offensive to persons of the Muslim faith ("Why did Muwafaq [the charity associated with Mr Kadi] support by gifts the construction of several mosques and why did it pay the wages of the Imams and the employees?").

In short, after more than two years of investigation, the 212 questions Mr Nicati posed in December 2003 showed an apparent inability on his part to decide which precise allegations could be formulated as a basis for criminal proceedings against Mr Kadi.

Despite the above we submitted on behalf of Mr Kadi full and comprehensive written replies to Mr Nicati's 212 questions on 12 March 2004. In our covering memorandum to Mr Nicati of the same date we drew his attention to various developments including the recycling and repetition of false allegations in erroneous articles by commentators and groundless claims **by Mr Jean-Charles Brisard** ("Mr Brisard") in a report entitled "Terrorism Financing: Routes and Trends of Saudi Terrorism Financing" ("the Brisard Report"). We explained that according to our investigations Mr Brisard's claim that he prepared the Brisard Report for the President of the Security Council of the UN is totally untrue and this was confirmed to us by the then President of the UN Security Council, His Excellency Ambassador Valdivieso, in the enclosed statement.

In our 12 March 2004 memorandum to Mr Nicati we also asked Mr Nicati to note that Mr Brisard has a direct interest in this matter; he is the "lead investigator" for Motley Rice, a firm of US lawyers who, as you are already aware, have brought a civil law suit before the US courts on behalf of the families of the victims of the September 11 terrorist attacks against a number of Saudi defendants *(Burnett v. Al Baraka Investment and Development Corp., No. 1:02-cv-01616-JR filed D.D.C. August 15, 2002)*. Mr Brisard has also made public accusations against various Saudi defendants in the *Burnett* case. At this stage - in March 2004 - we were totally unaware that Mr Brisard had been engaged by Mr Nicati to assist in the criminal investigation against Mr Kadi or that Mr Nicati had afforded Mr Brisard complete access to the criminal file against Mr Kadi.

In light of the above we were astonished when we discovered in May 2004 that Mr Nicati had forwarded to Mr Brisard (by letter dated 7 May 2004) a copy of a letter relating to Mr Kadi sent from the General Counsel at the US Treasury Department in Washington, Mr David Aufhauser, to Mr Nicati dated 29 November 2001. This letter contained a series of untrue allegations against Mr Kadi although it had never before been provided to Mr Kadi. Moreover Mr Brisard had immediately provided a copy of the letter to Motley Rice, the firm of US lawyers acting for the plaintiffs who, as you know, have taken civil action in the USA in the *Burnett* civil lawsuit against a number of Saudi defendants.

Immediately after we discovered this, Mr Kadi's Swiss lawyers wrote to Mr Nicati to complain about his conduct. Mr Nicati replied that he had engaged Mr Brisard as an expert with a mandate to analyse the file.

Under Swiss law - as under the laws of other countries - Mr Brisard is clearly not competent to act as expert as he cannot fulfil the requirements of impartiality and objectivity in relation to the parties. Moreover it was wholly improper of him to submit a copy of the confidential letter from Mr Aufhauser to Motley Rice, the US law firm who have commenced the civil lawsuit in the USA for the plaintiffs in the *Burnett* legal action.

As a result of the foregoing Mr Kadi has been obliged to file a formal complaint to the Swiss Federal Court concerning the conduct of Mr Nicati. A copy of the complaint document is enclosed for your information.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

Mr Kadi, having acted entirely in good faith towards the responsible authorities in Switzerland, would appreciate the Saudi Government bringing this matter to the attention of the Swiss authorities, or else taking such other action as it considers appropriate in regard to the conduct of Mr Nicati.

As to the **USA** we are formulating a position regarding this and we respectfully request that we seek assistance and help from the Saudi Government at the appropriate stage. This is because we consider it essential that the timing of any intervention by the Saudi Government is to the maximum advantage of our client.

Finally we should be grateful if you would use your good offices towards the appropriate authorities in Saudi Arabia to accelerate the release of sufficient funds of Mr Kadi in Saudi Arabia so that he can pay outstanding legal costs due to the various members of his legal team.

Yours sincerely

**Guy Martin**

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

Direct Email : Guy.Martin@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : GM/MRS/7496.3

Date : 22 February 2005

Carter-Ruck

Solicitors

International Press Centre
76 Shoe Lane
London EC4A 3JB

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

Consultant
Paul Wheeler

Partnership Secretary
Michael Croxford

Associate Firm
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**VIA FAX NUMBERS: 00 966 1 407 9347/00 966 1 407 9131**

**AND BY HAND TO THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA IN LONDON**

HRH Prince Saud Al Faisal
Minister for Foreign Affairs for The Kingdom of Saudi Arabia
Riyadh
Saudi Arabia

**VERY URGENT**

Your Royal Highness

**Sheikh Yassin Abdullah Kadi**

We represent the Saudi Arabian national Yassin Abdullah Kadi. We, together with Maitre Saad Djebbar, are co-ordinating all legal and administrative proceedings relating to Mr Kadi's efforts to overturn asset-freezing orders made against him in various parts of the world.

We are writing to request your immediate and urgent intervention with the authorities in Albania to prevent them from seizing for their own use any assets of Mr Kadi in Albania.

Mr Kadi has learned through a contact in Albania that the Albanian government authorities have already stated they intend to take over for their own use property held by or on behalf of Mr Kadi in the Two Towers in Boulevard Desh Morret, Tirana, Albania, upon certification of completion of certain works at the property. We are instructed that these works are due imminently (in the next few days) to be certified as completed. Mr Kadi is thus extremely concerned that the Albanian authorities may seek to carry out their threatened action against his property in the Two Towers in the very near future.

We should make clear that Mr Kadi was included in a United Nations list (the "UN List") of persons that have been identified by the UN pursuant to UN Security Council Resolution ("UNSCR") 1333 of 2000 as being associated with Osama bin Laden and the Al-Qaida organisation.

The decision of the UN to include Mr Kadi in the UN List was at the request of the USA and based solely on unsubstantiated allegations against him. The allegations against Mr Kadi are completely untrue: he has never had any link or connection whatsoever with terrorists, nor has he ever supported or provided funds for any terrorist purpose in any way. So far as Mr Kadi is aware, he has never been charged with any crime or other offence of terrorism, terrorism financing or money laundering; moreover he has never been properly informed of the factual basis of the allegations against him. In short: Mr Kadi is the victim of a serious miscarriage of justice.

Regulated by the Law Society

We understand that the Albanian authorities have frozen the assets of Mr Kadi and companies associated with him in Albania pursuant to UNSCR 1333 (2000). We should make it clear that paragraph 8(c) of UNSCR 1333 requires (and ***only*** requires) States "*to freeze without delay funds and other financial assets of Usama Bin laden and individuals and entities associated with him as designated by the Committee".*

It is neither the purpose nor the intent of the UNSCR 1333 (2000) to authorise States to take any action against Mr Kadi's property beyond the mere freezing of his assets. UNSCR 1333 provides no mandate or authority whatsoever to States to take any further action against Mr Kadi's property beyond the mere freezing of his assets. Accordingly the Albanian government has no authority whatsoever to sequester or confiscate Mr Kadi's assets or to take over the assets for their own use. Any such action by the Albanian authorities going beyond the mere freezing of Mr Kadi's assets would constitute a grave breach of Mr Kadi's rights under international law, as well as European law and indeed, we anticipate, Albanian law.

We have previously written to the Albanian authorities to warn them of the illegality of any action going beyond the freezing of Mr Kadi's assets and we are writing to them again stressing the same position regarding any such action.

We have advised Mr Kadi that it is your right to intervene on his behalf with the Albanian authorities to prevent them from carrying out their threatened action against his property and to put them on notice of the illegality of any such action which is clearly outside both the letter and spirit of the relevant UN Security Council resolutions.

We are of course willing to assist by providing you with any further information you may require concerning our request for your urgent help on Mr Kadi's behalf.

Yours faithfully

**Carter-Ruck**

**MEMORANDUM - 10 MARCH 2005**

# MR YASSIN ABDULLAH KADI

**STRICTLY PRIVATE AND CONFIDENTIAL -
LEGAL PROFESSIONAL PRIVILEGE APPLIES**

---

## Introduction

We have been Sheikh Yassin Kadi's lawyers for ten years. Since his designation as a supposed Specially Designated Global Terrorist ("SDGT") by the US government (on 12 October 2001 - under Executive Order 13224) and the consequent freezing of his assets worldwide pursuant to UN Security Council Resolution 1333, we have coordinated the efforts to clear his name and secure the release of his frozen assets that have been made by his legal teams in the United States, the United Kingdom, Switzerland and many other jurisdictions.

During the course of this process we have engaged in dialogue with various governments in a large number of countries. We have reviewed many thousands of documents. We have interviewed witnesses in a variety of countries. We have thoroughly investigated each and every claim of which Mr Kadi or we have become aware (whether originating from official or media or other sources) that has sought to link him with the terrorism of Osama Bin Laden and Al Qaeda - and we have at no time encountered any credible evidence indicating that Mr Kadi has ever financed or supported, or intended to finance or support, any form of terrorist activity.

**US Treasury**

Acting for Mr Kadi in the High Court in London, we were, in November 2001, able to obtain an order that the UK government provide us with details of the grounds upon which the US Treasury had designated him as an SDGT. When these details were provided, in the form of an extremely short document sent to the UK government by the US Treasury, it became apparent that the latter had chosen to designate Mr Kadi on the basis of a very limited number of demonstrably inaccurate press reports, combined with references made to him in a wholly misleading affidavit (which in any event purported to relate to Hamas rather than Al Qaeda) concerning the Quranic Literary Institute in Chicago, prepared by one Robert Wright, an FBI agent who has since ceased to be employed by the FBI and whose bona fides have been entirely discredited.

Among the inaccurate press reports relied upon by the US Treasury were:

- A clearly fictitious interview with Osama Bin Laden said to have been published in *Rose Al-Yusuf* in June 1996 (upon which the UK government, at least, now accepts no reliance can properly be placed).
- A notorious article by Jack Kelly published in *USA Today* on 29 October 1999, which purported to report the findings of a Saudi government audit of the National Commercial Bank (this article is now universally recognised as having been fabricated by Mr Kelly - who was dismissed by *USA Today* in 2004 for filing invented stories - and has been removed from the newspaper's archives and website in consequence).

The US Treasury document also sought to rely upon the suggestion that Mr Kadi has a brother named Omar who was said to be the director of an entity named Mercy International. It is a matter of public record that Mr Kadi has no brother.

Upon receipt of the US Treasury document, we embarked upon a prolonged process of investigation into the allegations contained therein and of dialogue with the US Treasury's

Office of Foreign Assets Control ("OFAC"). During the course of this process, a number of documents came into our possession which suggested that Mr Kadi had been mistakenly identified as being responsible for a number of supposedly incriminating actions. For example, an undated document purporting to originate with the BFV (the German Internal Intelligence Service) - which was placed in the public domain by the attorneys acting for the 9/11 families in the civil cases currently being brought in the District Court in New York - referred to him as acting in conjunction with supposed members of his family including an Issam Quadi and, once again, Omar Al Quadi, the supposed director of Mercy International (see above). Mr Kadi has no such relatives and does not know anyone of those names. Another document that is littered with inaccuracies - an FBI record of a January 2004 interview with an anonymous "co-operating witness" - refers to Mr Kadi as "Yasin Al-Kadi" (a form of name he has never used) and identifies him as being a member of the Dosari tribe (which he is not) and a supporter of Al-Haramain in Zagreb (an organisation with which he has no connection whatsoever). Other material suggest that similar confusion has arisen on the part of OFAC as to the identity of at least one significant associate of Mr Kadi and as to the historical context in which the activities of Saudi Arabia and its nationals in Afghanistan prior to the victory of the mujahidin ought properly to be viewed.

Another factor that emerged during the course of our investigations was that the US government appeared to have designated Mr Kadi with haste in the immediate aftermath of the events of 9/11 and only thereafter sought to obtain proper evidence (as distinct from the press reports referred to above) to support its action. This was certainly the view of Thomas B. Locke, a former senior FBI agent who was retained to assist Mr Kadi's legal team and who reported that Mr Kadi had been designated without due care and that subsequent attempts to justify that designation

*"..have never found the 'smoking gun' with respect to Mr Kadi. There are rumours, innuendo, and speculation; however, not much more than the original poorly vetted intelligence that got him designated has been put forth."*

This assessment would appear to be corroborated by a document originating with OFAC itself (albeit that a copy was only provided to us by way of the Swiss Prosecutor's files - see below) - a report of a trip to Albania made by its officers in April and May 2002 (more than six months after Mr Kadi's designation) which identified the goals of the trip as including *"to...look for evidence that supports the designation of Sheik Yassin Kadi as a Specially Designated Global Terrorist under US Executive Order"*. Notwithstanding this clear objective, the best the OFAC reporters could do at the end of their trip was to conclude that, at best, only *"circumstantial/hearsay evidence"* was available to link Mr Kadi with any wrongdoing.

As the process of investigation and dialogue progressed, it became increasingly apparent that OFAC was simply not in possession of credible evidence justifying the suggestion that Mr Kadi had supported or was otherwise linked to terrorism. In a series of oral and written submissions we demonstrated to OFAC that its suspicions concerning Mr Kadi were unfounded and that the grounds upon which it sought to justify his designation were misconceived. However, at the end of the process, by way of an "evidentiary memorandum" dated 12 March 2004, OFAC formally refused Mr Kadi to remove from its list of SDGT's. The said evidentiary memorandum disregarded much of what had been submitted to OFAC on Mr Kadi's behalf and sought to maintain OFAC's position on the basis that it was impossible that any innocent explanation existed for all of those matters that were said to be of concern to the US government. Taken as a whole, the evidentiary memorandum made no more persuasive a case against Mr Kadi than that previously advanced by OFAC. Mr Whitley Bruner, a former senior CIA officer now working for Diligence LLC (the US investigation and analysis company retained to assist Mr Kadi's legal team), summarised his review of the March 2004 OFAC document in these terms:

*"the 'evidence' appears almost entirely circumstantial and the way the case is worded i.e. the absence of any language showing Kadi's intent to support terrorist actions, makes clear they are talking about guilt by association."*

**Switzerland**

Following Mr Kadi's designation by the US government, a criminal investigation was launched into his activities by the Swiss Federal Prosecutor. Mr Kadi afforded the Prosecutor his full cooperation, meeting with him, responding to all his questions and demonstrating that no basis existed to link him to the financing of terrorism. However, in time we learned that the Prosecutor had retained the services of a purported expert named Jean-Charles Brisard, who was well-known not only for his hostility to Saudi Arabia and its nationals but also as the investigator retained by the attorneys acting for the 9/11 families in the New York litigation. It also became apparent that Mr Brisard was providing those New York attorneys with confidential material that was coming into his possession by virtue of his role as the mandated expert to the Swiss investigation. Upon legal action relating to this misconduct being commenced before the Swiss Federal Court, Mr Brisard's mandate was revoked and the Swiss Prosecutor was ordered to provide disclosure of all documents relating to the investigation to Mr Kadi's legal team.

The disclosed documents filled no fewer than 70 files. They demonstrated that, over a period of more than three years, the Prosecutor had attempted to locate evidence demonstrating that Mr Kadi had been involved in the financing of Al Qaeda terrorism. Requests for cooperation and the provision of information had been made of a number of foreign governments, including those of the United States, the United Kingdom, Turkey and Albania. However, it was clear from the disclosed documents that no such evidence had been obtained from any source.

At the beginning of 2005, we learned that, rather than closing the investigation, the Prosecutor had mandated another expert to assist his investigation, an Israeli named Rita Katz, whose writings, public statements and behaviour demonstrate an even greater hostility of Saudi Arabia and its nationals than do those of Mr Brisard. Although Mr Kadi's legal advisers believe that, given the absence of any relevant evidence, the long-running

investigation should now be closed, they are concerned that the appointment of an expert as notorious as Ms Katz betrays a political and anti-Saudi agenda on the part of the Prosecutor that will make this unlikely.

**Turkey**

The Office of the Chief Public Prosecutor of the Republic of Turkey has, following an extensive investigation, concluded that neither Mr Kadi nor Mr Wa'el Julaidan (another Saudi national) were in any way linked with the terrorist activities of Osama Bin Laden and Al Qaeda and has ordered that the investigation be brought to an end and that no legal action be commenced against either Mr Kadi or Mr Julaidan.

**Saudi Arabia**

Mr Kadi has been extremely gratified to learn of the very considerable efforts that have been made by the Saudi authorities (following the issue of Royal Orders on 18 July 2003 (hijri 19/5/1424) and 15 August 2004 (hijri 29/6/1425)), to pursue his case with the US government and the United Nations, as have been set out in the document recently received from the Kingdom's Foreign Ministry.

**Conclusions**

1. Mr Kadi is the victim of a serious miscarriage of justice. Contrary to the requirements of natural justice he has been denied the basic elements of due process (a matter as to which the judgment of the European Court of Justice is presently awaited) and he has never been provided with a comprehensive statement of the precise allegations made against him or with an opportunity to argue his case before a neutral and objective tribunal.

2. Mr Kadi hopes that the Saudi government will feel able to continue to pursue his case wherever and however is necessary in order to ensure that this situation is remedied and that

he is given a proper opportunity to clear his name and to resume the life he led prior to his arbitrary designation and the unjustified freezing of his assets.

3. To this end, Mr Kadi and his legal team are prepared to afford the Saudi authorities every possible cooperation and assistance. They would respectfully suggest that senior officials within either the Ministry of the Interior or the Foreign Ministry be assigned to the case, with whom they might henceforth liaise. They would be keen have an opportunity to brief such assigned officials as to the detail of Mr Kadi's case and to provide them with any documents that might help them to understand specific issues, so as to permit them to pursue Mr Kadi's case effectively in accordance with the above Royal Orders.

4. Mr Kadi notes that, in 2004, the US Embassy in Riyadh provided the Saudi Foreign Ministry with its government's reasons for his designation as an SDGT. Mr Kadi would respectfully ask to be informed of those reasons, so as to permit him to respond to them in detail. He submits that, if the information that has been provided to the Saudi government is of the nature and quality of the allegations that have previously been made known to him, they should be subjected to the closest possible scrutiny. In particular, he is most concerned that the US government be not permitted to hide behind the pretext that the information in question is classified. This pretext has been adopted on a number of occasions previously (for example at the very outset when the erroneous press articles that formed the basis of the US government's communication to the UK government - see above - were said to be classified), but our experience shows that, wherever the information in question has subsequently been revealed, its supposedly classified nature has been seen to be wholly illusory.

5. Mr Kadi would respectfully ask that the Saudi government also uses its best endeavours to ensure that the Swiss Prosecutor's investigation into him is conducted in an objective fashion and is not permitted to continue beyond its appropriate term for political reasons. He repeats

that the Prosecutor's file reveals that no evidence exists to link him in any way to terrorism and he believes that the investigation ought to be closed without further delay.

6. Mr Kadi notes that, in 2003, the Saudi Foreign Ministry asked that the UN Security Council provide its reasons for adding him to the list of persons whose assets were to be frozen under Resolution 1333. He would wish to know what response was received to this request and to be afforded an opportunity to brief the Saudi government upon the same. He would also respectfully ask that the Saudi government presses the UN to introduce procedures that will enable listed persons in his position to have their circumstances considered by an objective and neutral tribunal, before which they might seek to argue their case with full knowledge of the allegations made against them. He would, in addition, be most grateful if the Saudi government would attempt to prevail upon the UN to arrive at a mechanism that is consistent with Security Council Resolution 1452, by which listed persons might secure the prompt release of such of their frozen assets as are necessary to meet their ongoing legal fees and other necessary expenses.

7. Mr Kadi repeats that he and his legal team would wish to give the Saudi government every possible assistance in its pursuit of each of the objectives identified at points 4. to 6. above.

**Carter-Ruck**

**Solicitors to Yassin Kadi**

**10 March 2005**

Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 29 April 2005

**Carter-Ruck**

**Solicitors**

**International Press Centre**
**76 Shoe Lane**
**London EC4A 3JB**

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Barton Taylor
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

**Consultant**
Paul Wheeler

**Partnership Secretary**
Michael Croxford

**Associate Firm**
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**BY HAND**

**PRIVATE & CONFIDENTIAL**

Jamal Khashoggi esq.
The Embassy of the Kingdom of Saudi Arabia
30 Charles Street
London
W1J 5DZ

Dear Mr Khashoggi

**Yassin Abdullah Kadi**

Maitre Saad Djebbar would be most grateful if, as previously discussed, you could pass the enclosed letter and copy documents for the personal attention of His Royal Highness the Ambassador.

Yours sincerely

**Cameron Doley**
**Managing Partner**

PCR1-227741.1

**Regulated by the Law Society**

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.



Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 29 April 2005

**Carter-Ruck**

**Solicitors**

**International Press Centre**
**76 Shoe Lane**
**London EC4A 3JB**

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Barton Taylor
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

**Consultant**
Paul Wheeler

**Partnership Secretary**
Michael Croxford

**Associate Firm**
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**BY HAND**

**PRIVATE & CONFIDENTIAL**

His Royal Highness Prince Turki Al Faisal
Ambassador of the Kingdom of Saudi Arabia
to the United Kingdom
30 Charles Street
London
W1J 5DZ

Your Royal Highness

**Yassin Abdullah Kadi**

Maitre Saad Djebbar has asked that I send you the enclosed copies of two letters and other documents that have recently been sent on behalf of your above named national to the Kingdom's Minister of Foreign Affairs.

Maitre Djebbar respectfully hopes that, given the interest you have so kindly expressed previously in Sheikh Yassin Kadi's case, you will feel able now to give your support to the proposals advanced by his legal team in the enclosed documentation.

Yours sincerely

**Cameron Doley**
**Managing Partner**

**Regulated by the Law Society**

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.



Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 25 April 2005

**Carter-Ruck**

Solicitors

International Press Centre
76 Shoe Lane
London EC4A 3JB

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

Consultant
Paul Wheeler

Partnership Secretary
Michael Croxford

Associate Firm
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

His Royal Highness Saud Al Faisal
Minister of Foreign Affairs
Kingdom of Saudi Arabia

Your Highness

**Yassin Abdullah Kadi**

We are London lawyers acting for your national Yassin Abdullah Kadi and, together with Maitre Saad Djebbar, we have coordinated the efforts to clear his name and secure the release of his frozen assets that have been made during the course of the last three and a half years by his legal teams in the United States, the United Kingdom, Switzerland and many other jurisdictions.

As Mr Kadi's coordinating lawyers, we wish to assist the government of the Kingdom of Saudi Arabia in its efforts, within the existing UN framework, to make representations as the government of a listed national to the government of the requesting state, namely the United States of America.

We believe that we could most effectively be of assistance to the Foreign Ministry in making representations on Mr Kadi's behalf were the following steps to be taken:

1. For Mr Kadi's legal team to liaise with specific appointees of the Foreign Ministry and thereafter to establish a bilateral mechanism which would enable us to provide the Ministry with sufficient detailed information to permit its officials to deal with their counterparts in the US government.

2. For us, as a first step, to brief the team appointed by the Foreign Ministry on all aspects of Mr Kadi's case and to provide them with a fullest possible picture of those developments that have occurred during the course of the past three and a half years; developments which have served to convince all members of Mr Kadi's legal team that the allegations that have been made against him are wholly unjustified.

3. For us thereafter to provide the Foreign Ministry with a comprehensive briefing document (to include an executive summary) covering all aspects of Mr Kadi's case.

4. For us to be permitted to assess any information provided to the government of the Kingdom of Saudi Arabia by the US government and to provide Mr Kadi's detailed response thereto to the Foreign Ministry.

5. For us thereafter to meet as necessary with the Foreign Ministry's appointees in order to address and deal with any further allegations that might come from the US government.

Regulated by the Law Society

6. For us (parallel to the above) to liaise with the Foreign Ministry in the preparation of proposals to be made to the UN Secretary General for the introduction of procedures that will enable listed persons in Mr Kadi's position to have their circumstances considered by an objective and neutral tribunal, before which they might seek to argue their case with full knowledge of the allegations made against them.

7. For us also to work with the Foreign Ministry with a view to making proposals to the UN Secretary General for the introduction of a mechanism that is consistent with Security Council Resolution 1452, by which listed persons such as Mr Kadi might secure the prompt release of such of their frozen assets as are necessary to meet their ongoing legal fees and other necessary expenses.

Mr Kadi naturally wishes to arrive at an effective and speedy means to bring his present situation to an end and it goes without saying that, as his coordinating lawyers, we will offer the Foreign Ministry every possible assistance to that end.

Yours faithfully

**Carter-Ruck**

Direct Email : Athalie.Matthews@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : GM/AM/7496.3
Your Ref : Yassin Kadi

Date : 23 May 2005

**Carter-Ruck**

**Solicitors**

**International Press Centre**
**76 Shoe Lane**
**London EC4A 3JB**

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

**Consultant**
Paul Wheeler

**Partnership Secretary**
Michael Croxford

**Associate Firm**
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**By Fax: 001 212 983 4895**

**STRICTLY PRIVATE AND CONFIDENTIAL**
**MOST URGENT**

His Excellency Fawzi Bin Abdul Majeed Shabashki
Permanent Representative of Saudi Arabia to the United Nations
405 Lexington Avenue
56th Floor
NY 10017
USA

Your Excellency

**Sheikh Yassin Abdullah Kadi**

This is to inform you that we are the lawyers representing the Saudi Arabian businessman and benefactor Sheikh Yassin Abdullah Kadi and would like to have the opportunity to talk to you regarding the progress of his case before the UN.

We have been informed by the Foreign Ministry of Saudi Arabia, through your Embassy in London, that His Royal Highness Prince Saud Al Faisal has authorised us to communicate and co-operate with you regarding this matter.

I would be grateful if you could ask your staff to arrange a conference call for us to speak to you or to any member of your staff as soon as possible. Alternatively please call Maitre Saad Djebbar, the international advocate who is working with us on this case, at any time on his mobile telephone number, 00 44 7802 401 862, or myself or Guy Martin at Carter-Ruck in London on 00 44 207 3535005.

We avail ourselves of this opportunity to thank you in anticipation for your co-operation in this matter.

Thank you.

Yours faithfully

**Cameron Doley**
Managing Partner

**Regulated by the Law Society**

Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 29 June 2005

**BY COURIER**

Abdul Aziz Albadi Esq
Permanent Mission of the Kingdom of Saudi Arabia to the United Nations
405 Lexington Avenue 56th Floor
New York NY 10017
USA

**Solicitors**

**International Press Centre**
**76 Shoe Lane**
**London EC4A 3JB**

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

**Consultant**
Paul Wheeler

**Partnership Secretary**
Michael Croxford

**Associate Firm**
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

Dear Sir

**Yassin Abdullah Kadi**

I write further to my letter to you dated 10 June 2005.

I understand from Maitre Saad Djebbar that the documentation enclosed with my said letter was submitted to the members of the Al Qaida and Taliban Sanctions Committee two weeks ago at 1.00 p.m. on Wednesday, 15 June 2005. I also understand that two members of the Committee then asked that matters be placed temporarily on hold so as to permit Mr Kadi's case to be considered at a full meeting of the Committee that was due to take place on Wednesday 22 June.

Maitre Djebbar tells me that he has sought to speak with you over the course of the last week in order to learn the outcome of the full meeting of the Committee. He has, however, been unable to make contact with you. I am therefore writing to request formally that you be so kind as to let us know the outcome of last week's meeting of the full Committee and how matters stand at the present moment in time. Together with Mr Kadi's legal advisers in the United States and elsewhere in the world, we wish to advise him as to the various courses of action that may now be open to him and we can clearly only do this when we know what has transpired in New York.

I therefore look forward to hearing from you.

Yours faithfully

**Cameron Doley**
**Managing Partner**

cc His Excellency Fawzi Bin Abdul Majeed Shabaski

**Regulated by the Law Society**

Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 14 July 2005

**BY COURIER**

Abdul Aziz Albadi Esq
Permanent Mission of the Kingdom of Saudi Arabia
to the United Nations
405 Lexington Avenue 56th Floor
New York NY 10017
USA

Dear Sir

**Yassin Abdullah Kadi**

I refer to my letters to you dated 10 June and 29 June 2005 and would ask, once again, that you be so kind as to let us know the outcome of the meeting of the Al-Qaida and Taliban Sanctions Committee that took place on Wednesday, 22 June and how matters stand at the present moment in time.

As previously indicated, Maitre Djebbar and I wish, together with Mr Kadi's legal representatives in the United States and elsewhere in the world, to advise him as to the various courses of action that may now be open to him and we simply cannot do this until we know what has transpired in New York.

Yours faithfully

**Cameron Doley**
**Managing Partner**

cc His Excellency Fawzi Bin Abdul Majeed Shabaski

**Solicitors**

**International Press Centre**
**76 Shoe Lane**
**London EC4A 3JB**

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

**Consultant**
Paul Wheeler

**Partnership Secretary**
Michael Croxford

**Associate Firm**
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**Regulated by the Law Society**

Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 27 July 2005

**Carter-Ruck**

Solicitors

International Press Centre
76 Shoe Lane
London EC4A 3JB

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Barton Taylor
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor

Consultant
Paul Wheeler

Partnership Secretary
Michael Croxford

Associate Firm
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

**PRIVATE & CONFIDENTIAL**

His Royal Highness Prince Turki Al Faisal
Ambassador of the Kingdom of Saudi Arabia
to the United Kingdom
30 Charles Street
London
W1J 5DZ

Your Royal Highness

**Yassin Abdullah Kadi**

Maitre Saad Djebbar and I were most pleased to hear of your appointment as the Kingdom's Ambassador to the United States of America. While, in common with your many friends and admirers in this country, we shall be most sorry to see you leave London, we are certain that your presence in Washington DC will be of the greatest possible assistance to the relationship between the Kingdom and the West. Please accept our sincere congratulations.

I would take this opportunity also to thank you for the interest you have shown in the case of our above-named client, Mr Kadi, and for the very considerable help that the Embassy in London has afforded Maitre Djebbar and my firm in pursuing Mr Kadi's circumstances with the Kingdom's Ministry of Foreign Affairs. Should you feel able to take a similar interest in Mr Kadi's situation once you have taken up your new post in Washington DC, both he and we would be extremely grateful.

Yours sincerely

**Cameron Doley**
**Managing Partner**

PCR1-233334.1

Regulated by the Law Society

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

The Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and Associated Individuals and Entities presents his compliments to the members of the Committee and has the honour to transmit herewith, for their information, a copy of a letter dated 8 January 2008 from the Permanent Representative of the United States of America to the United Nations (S/AC.37/2008/COMM.8) referring to the letter of the Chairman of the Committee dated 6 December 2007 (S/AC.37/2007/OC.112) regarding the designation of Mr. Yasin Abdullah Ezzedine Qadi (QI.Q.22.01) following a request from Saudi Arabia. The relevant communications (S/AC.37/2007/NOTE/181 and S/AC.37/2007/OC.111 and OC.112) are attached for ease of reference.

14 January 2008



Saudi Arabian Permanent Mission
To the United Nations
New York

الوفد الدائم للمملكة العربية السعودية
لدى الأمم المتحدة
نيويورك

الرقم: UN/Al-Qaida/Taliban/834
التاريخ: ١٤/١١/٢٠٠٧م

السيد/ رئيس لجنة العقوبات المفروضة على القاعدة والطالبان
المنشأة بموجب قرار مجلس الأمن رقم ١٢٦٧(١٩٩٩)

بالإشارة الى مذكرتكم رقم (S/AC.37/2007/OC.27)، وتاريخ ٢٧/٧/٢٠٠٧م بخصوص طلب وفد المملكة العربية السعودية رفع اسم المواطن ياسين بن عبدالله قاضي (رقم المرجع في القائمة الموحدة Q1.Q. 22. 01).

يرغب الوفد الدائم للمملكة العربية السعودية معرفة الأسباب الواضحة والأدلة المفصلة والثابتة التي تم الاستناد عليها في إدراج اسم المواطن ياسين بن عبدالله قاضي في القائمة الموحدة للقاعدة والطالبان.

وتقبلوا أطيب تحياتي وتقديري.

القائم بالأعمال بالنيابة
عبداللطيف سلام

.../س

KADI0068536

SECURITY COUNCIL COMMITTEE ESTABLISHED PURSUANT TO RESOLUTION 1267 (1999) CONCERNING AL-QAIDA AND THE TALIBAN AND ASSOCIATED INDIVIDUALS AND ENTITIES

S/AC.37/2007/NOTE/181
28 November 2007
ORIGINAL: ENGLISH

Note by the Chairman

The Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and Associated Individuals and Entities presents his compliments to the members of the Committee and has the honour to transmit herewith, for their consideration, two draft letters to be sent to the Permanent Missions of Saudi Arabia and of the United States to the United Nations regarding the attached letter dated 14 November 2007 from the Chargé d'affaires a.i. of the Permanent Mission of Saudi Arabia (S/AC.37/2007/COMM.176) related to the listing of Mr Yasin Abdullah Ezzedine Qadi (QI.Q.22.01.).

The Chairman wishes to advise that unless he hears to the contrary by Wednesday, 5 December 2007, 5:00 p.m., he will take it that the members of the Committee have no objection to the above-mentioned draft letters and will act accordingly.

UNITED NATIONS  NATIONS UNIES

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE ADDRESS -ADRESSE TELEGRAPHIQUE: UNATIONS NEWYORK

REFERENCE: S/AC.37/2007/**DRAFT** xx December 2007

Sir,

On behalf of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and Associated Individuals and Entities, I have the honour to refer to your communication dated 14 November 2007 (ref. UN/Al-Qaida/Taliban/834) asking the Committee to provide information on the basis for the listing of Mr. Yasin Abdullah Ezzedine Qadi (QI.Q.22.01.).

Please note that Mr. Qadi was listed on 17 October 2001 pursuant to Security Council resolution 1333 (2000), which requested the Committee *"to maintain an updated list, based on information provided by States and regional organizations, of the individuals and entities designated as being associated with Usama bin Laden, including those in the Al-Qaida organization"*.

As the information pertaining to your inquiry is confidential, the Committee is currently not in a position to release it without the express authorization of the designating State(s). The Committee has contacted the designating State(s) and invited it/them either to allow the Committee to provide you with any relevant information, or to directly share such information with your authorities. Should the designating State(s) be willing to provide pertinent information to the Committee, I will not fail to inform you accordingly.

Please accept, Sir, the assurances of my highest consideration.

Johan Verbeke
Chairman
Security Council Committee established
pursuant to resolution 1267 (1999)
concerning Al-Qaida and the Taliban
and Associated Individuals and Entities

Mr. Abdullatif H. Sallam
Chargé d'affaires, a.i.
Permanent Mission of the Kingdom of Saudi Arabia
to the United Nations
New York



UNITED NATIONS  NATIONS UNIES

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE ADDRESS -ADRESSE TELEGRAPHIQUE: UNATIONS NEWYORK

REFERENCE: S/AC.37/2007/OC.DRAFT

xx December 2007

Excellency,

On behalf of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and Associated Individuals and Entities, I have the honour to inform you that the Committee has received a letter from the Permanent Mission of Saudi Arabia to the United Nations asking for *"a clear and detailed explanation of the reasons and proven evidence on which inclusion of the name of Mr. Yasin Abdullah Ezzedine Qadi (QI.Q.22.01.) on the Committee's Consolidated List was based"*.

This name was added to the List on 17 October 2001 at the request of the United States. Whereas at that time there was no requirement of statement of case for submitting listing requests, the Security Council, in resolution 1735 adopted in December 2006, requested *"designating States, at the time of submission, to identify those part of the statement of case which may be publicly released for the purposes of the notifying the listed individual or entity, and those parts which may be released upon request to interested States"*.

I would therefore like to invite your authorities to provide the Committee with any relevant information that could be forwarded to the Saudi authorities to answer their query. If such information is shared directly with Saudi Arabia, I would appreciate it if your delegation could inform me accordingly.

On behalf of members of the Committee, I would like to thank your authorities for their consideration of this matter.

Please accept, Excellency, the assurances of my highest consideration.

Johan Verbeke
Chairman
Security Council Committee established
pursuant to resolution 1267 (1999)
concerning Al-Qaida and the Taliban
and Associated Individuals and Entities

His Excellency
Mr. Zalmay Khalilzad
Permanent Representative of the United States
to the United Nations
New York, NY

SECURITY COUNCIL COMMITTEE ESTABLISHED PURSUANT TO RESOLUTION 1267 (1999) CONCERNING AL-QAIDA AND THE TALIBAN AND ASSOCIATED INDIVIDUALS AND ENTITIES

S/AC.37/2008/COMM.8
14 January 2008
ORIGINAL: ENGLISH

Letter dated 8 January 2008 from the Permanent Representative of the United States of America to the United Nations addressed to the Chairman of the Committee

I have the honor to refer to your letter of December 6, 2007 transmitting the request of the Permanent Mission of Saudi Arabia for further information regarding the designation of Mr. Yasin Abdullah Ezzedine Qadi (QI.Q.22.01.).

Please find attached to this letter a copy of the memorandum I have provided to the Mission of Saudi Arabia, which explains the evidence supporting the request of the United States for Mr. Qadi's designation. We invite you to share this information with the other members of the Committee.

Zalmay Khalilzad

Enclosure: Statement of the Case - Qadi

**EXECUTIVE SUMMARY**
**YASIN QADI**

***Background***

Yasin QADI was initially designated a Specially Designated Global Terrorist (SDGT), pursuant to E.O. 13224 on October 12, 2001. QADI requested reconsideration of his designation and provided a number of witness statements in support of his request. Based on the admissions, explanations, and defenses of QADI and based on both unclassified and classified information available to the U.S. government, the totality of evidence demonstrates a reasonable basis to maintain the designation.

***The Muwafaq Foundation and Ties To Terrorism***

QADI's most extensive, though not sole, ties to terrorism occurred through the Muwafaq Foundation (Muwafaq). QADI was involved in the strategic decisions on how to best apply Muwafaq's funds, and QADI selected the managers responsible for the offices in various countries and then delegated his authority to them. Three former Muwafaq directors were arrested and/or deported from their countries of operation because of associations with terrorists:

1. QADI hired SDGT Chafiq Ayadi to be the director of Muwafaq's European operations in 1992, shortly after Ayadi's expulsion from Tunisia for belonging to an Islamic extremist group. In addition, evidence indicates that in the same time frame, Ayadi was operating under agreements to help Usama bin Laden. During Ayadi's tenure as director, QADI transferred substantial sums to Ayadi's account.

2. QADI hired Amir Mehdi to be the local director of Muwafaq in Pakistan in 1992. Muwafaq's offices were raided by the Pakistan security services in March 1995 and Mehdi was subsequently arrested. According to open source reporting, it was the arrest of Ramzi Yousef for the first World Trade Center bombing which triggered the raid, and Mehdi was informed that the telephone number at his residence had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.

3. In 1994, QADI and Dr. Abdul Latif Saleh set up the Muwafaq Albania office. According to information available to the U.S. government, Saleh was expelled from Albania in 1999 based on his close association with know terrorists, particularly bin Laden. Saleh's phone number had also been found in the books of individuals associated with bin Laden, who had targeted the U.S. embassy in Tirana in 1998.

Furthermore, according to information available to the U.S. government, Muwafaq operated under the SDGT Makhtab al-Khidamat umbrella until mid-2001 when a number of Arab non-governmental organizations, including Muwafaq, joined al-Qaida.

In addition, Muwafaq was involved in providing financial support for terrorist activities of the mujahidin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by bin Laden, according to information available to the U.S. government. After Muwafaq ceased operations in the Balkans in 1996, QADI continued to finance various fundamentalist organizations including, SDGTs al-Haramain and Revival of Islamic Heritage Society.

*Other Ties to Terrorism*

QADI has admitted that SDGT Wa'el Julaidan is a longstanding family friend and business associate. Julaidan is an associate of bin Laden and is also associated with al Qaida lieutenants including SDGTs Ayman al-Zawahiri, Abu Zubaida, and Mohammed Atef. QADI's involvement with Julaidan includes: giving shares of a QADI-owned company to Julaidan, involving Julaidan in the operations of QADI's Albanian companies, and providing $1.25 million to Julaidan for a university housing project in Yemen.

QADI has also acknowledged providing money directly to SDGT Muhammad Salah, who has admitted to being an operative and recruiter, specifically for the military wing of SDGT Hamas.

Direct Email : Cameron.Doley@carter-ruck.com
Direct Fax : 020 7353 5553

Our Ref : CD/ED/7496.3

Date : 10 August 2007

**Carter-Ruck**

Solicitors

International Press Centre
76 Shoe Lane
London EC4A 3JB

Tel 020 7353 5005
Fax 020 7353 5553

DX 333 Chancery Lane

Email lawyers@carter-ruck.com
Web site www.carter-ruck.com

Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Mark Thomson
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor
Hanna Basha

Partnership Secretary
Michael Croxford

Associate Firm
Bannatyne Kirkwood France & Co
Exchange House
16 Royal Exchange Square
Glasgow G1 3AG

Tel 0141 221 6020
Fax 0141 221 5120

His Royal Highness Prince Mohammed bin Nawaf
Ambassador of the Kingdom of Saudi Arabia
to the Court of St James
Royal Embassy of Saudi Arabia
30 Charles Street
London
W1J 5DZ

Your Royal Highness

**Yassin Abdullah Kadi**

My firm represents the Saudi Arabian businessman and philanthropist Yassin Abdullah Kadi. We have been instructed by him since September 2001 to conduct and coordinate all legal and administrative proceedings relating to his efforts to overturn asset-freezing orders made against him in various parts of the world and, in the meantime, to take whatever steps are necessary to protect his assets worldwide.

Mr Kadi was, on 19 October 2001, included in a United Nations list of persons identified (pursuant to Security Council Resolution 1333 (2000)) as being suspected of association with the Al Qaeda organisation. We emphasise that the UN's decision to include Mr Kadi in the said list was, and is, based solely upon the supposed existence of grounds for suspicion. No charges of a criminal nature have been brought against Mr Kadi anywhere in the world, still less has he ever been convicted of any form of criminal offence, whether relating to the activities of Al Qaeda or otherwise. The fact of the matter is that Mr Kadi has never had any link or connection whatsoever with terrorism, nor has he ever supported or provided funds for any terrorist purpose. All and any suggestions to the contrary are completely unfounded.

My firm is now instructed to take Mr Kadi's case to the Focal Point established by United Nations Security Council Resolution 1730 (2006) and to petition for the removal of his name from the above list. Both we and Mr Kadi would appreciate it greatly if, before this step is taken, Your Royal Highness could afford us the opportunity to meet with you in order to brief you as to the present status of his case and to raise certain points for your consideration.

We had the honour of meeting with your predecessor as the Kingdom's Ambassador to the Court of St James in order to discuss Mr Kadi's case, after which His Royal Highness Prince Saud Al Faisal directed that the Embassy cooperate with Mr Kadi and his advisers in their efforts to right the injustice that has been done to him. We respectfully hope to enjoy a similarly productive meeting with Your Royal Highness.

Yours sincerely

**Cameron Doley**
**Managing Partner**

**Regulated by the Law Society**

Direct Email: guy.martin@carter-ruck.com
Direct Fax: 020 7353 1062

Our Ref: GM/ALP/7496.3

25 March 2011

**By Hand**

His Royal Highness Prince Mohammed bin Nawaf
Ambassador of the Kingdom of Saudi Arabia
to the Court of St James
Royal Embassy of Saudi Arabia
30 Charles Street
London
W1J 5DZ

Carter-Ruck

**Re: Sheikh Yassin Abdullah Kadi**

**Carter-Ruck** Solicitors

6 St Andrew Street
London EC4A 3AE

T 020 7353 5005
F 020 7353 5553
DX 333 Chancery Lane
www.carter-ruck.com

Your Royal Highness,

As you know, we are the London lawyers who, with our consultant Maitre Saad Djebbar, act as the international coordinating lawyers on behalf of Sheikh Yassin Abdullah Kadi in his worldwide efforts to have his funds unfrozen.

We have recently been made aware that a report has been circulated by the Malaysian Government to various States, including Western Governments, which refers to our client's links to Malaysia and the former Deputy Prime Minister of Malaysia Anwar Ibrahim.

We would like to confirm that throughout the ten year period since Sheikh Yassin Kadi's listing in October 2001, we have been made aware of claims similar to allegations which we understand are included in the report. For example, similar claims have been raised by the Swiss Authorities who, after six years of thorough investigation into Sheikh Yassin Kadi, discontinued their criminal investigation in December 2007.

We add that, on behalf of Sheikh Yassin Abdullah Kadi, we have totally refuted any and any and all allegations of wrongdoing by him in all his commercial or charitable activities whether in Malaysia or elsewhere.

We respectfully stand ready and willing to appear before Your Royal Highness or any other representatives of the Kingdom of Saudi Arabia in order to provide any clarification or explanation which may be required concerning our client.

We add that at the hearing of Sheikh Yassin Abdullah Kadi's case before the European General Court in Luxembourg, on 17 June 2010, the lawyer representing the Government of the United Kingdom informed the Court that earlier in 2010 the Government of the Kingdom of Saudi Arabia had raised Sheikh Yassin's case with the UN Security Council's Al-Qaida and Taliban Sanctions Committee. The lawyer for the UK Government went on to say that when asked by the Committee whether it was making an application for Sheikh Yassin's delisting, the Government of the Kingdom of Saudi Arabia had confirmed that it was not applying for Sheikh Yassin's delisting.

**Partners**
Andrew Stephenson
Alasdair Pepper
Guy Martin
Nigel Tait
Ruth Collard
Cameron Doley
Claire Gill
Adam Tudor
Magnus Boyd

**Partnership Secretary**
Helen Burrluck

Regulated by the
Solicitors Regulation
Authority

SRA No. 44769

This came as a surprise to Sheikh Yassin's legal team as we had previously understood that the Kingdom of Saudi Arabia was continuing to press vigorously for his delisting at the United Nations. It would therefore be very helpful if you were able to clarify the position concerning this as soon as possible.

We believe Sheikh Yassin Kadi is the victim of a gross miscarriage of justice. So far as we are aware any and all investigations into him have been discontinued due to lack of evidence and there are no grounds to justify his continued listing or designation.

Please let us know if we can be of any further assistance.

Yours sincerely

**Guy Martin**

(CERTIFICATE No. 1) شهادة نمرة ١

النمرة ش/ ٢٠١٥

جمهورية السودان

قانون الشركات لسنة ١٩٢٥

# شهادة تأسيس

بهذا أشهد بأن

" شركة رواد التنمية والاستثمار المحدودة "

قد تأسست اليوم تحت قانون الشركات لسنة ١٩٢٥ وأن الشركة محدودة

صدرت هذه الشهادة تحت توقيعي في الخرطوم في اليوم التاسع عشر من شهر ديسمبر لسنة ألف وتسعمائة و اثنين وتسعون

| | ق | جنيه |
|---|---|---|
| رسوم التسجيل | ٠٠ | ر ١٠٠ |
| ضريبة رأس المال | ٠٠ | ر ٠٠٠ر٠٠٠ر٢ |

عبد الرحمن أحمد ابراهيم
مسجل الشركات

مطبعة التمدن

Certificate No. 1

No. *U* / 7015

[emblem]
*The Republic of Sudan*

---

The Company Law Ordinance of 1925

# CERTIFICATE OF INCORPORATION

I hereby certify that "Rowad Development and Investment Company Limited" has been incorporated today under the Company Law Ordinance of 1925 as a limited liability company.

This certificate was issued with my signature in Khartoum this day, December 19th, 1992.

| | Pounds | Piastres |
|---|---|---|
| Registration Fees: | 100 . | 00 |
| Capital Tax: | 2,500,000,000 . | 00 |

[signature]
Abdel Rahman Ahmed Ibrahim
Registrar of Companies

النمرة / ش/ ع-٤ / ١١٢٦

قانون الشركات لسنه ١٩٢٥م
المادة ١١ (٢)

بهذا اصدق بتأسيس الشركة المسماة :/

" شركة رواد التنمية والاستثمار المحدودة "

وفقا لعقد ولوائح التأسيس المقدمه بواسطة السيد / الاستاذ /

فتحى خليل محمد / المحامى

بتاريخ اليوم من شهر سنه ١٤١٣هـ
الموافق اليوم التاسع عشر من شهر ديسمبر سنه ١٩٩٢م

عبد الرحمن أحمد ابراهيم
ع/ النائب العام

"ع"

Number / *U* / P __ 4 / 9136

The Company Law Ordinance of 1925
Article 19 (2)

I hereby attest to the incorporation of the following company:

---

"Rowad Development and Investment Co. Ltd."

In accordance with the Articles of Incorporation presented by Mr.

Fathy Khalil Mohamed, Attorney at Law

| | | |
|---|---|---|
| **Date:** | **Month:** | **Year:** 1413 AH |
| **Date:** The 19th | **Month:** December | **Year:** 1992 |

[signature]
Abdel Rahman Ahmed Ibrahim
For, the Prosecutor General

"P"

| الاسم | الجنسية | محل الاقامة او السكن | اي مهنة اخري | اي ملاحظات |
|---|---|---|---|---|
| الأمين الشيخ مصطفى | سوداني | الخرطوم | | جميعهم من رجال الأعمال وذوي الخبرة المعروفة |
| التاج عبدالله البشير | // | // | | |
| حسن محمد ساتي | // | // | | |
| عبدالوهاب عثمان | // | // | | |
| يس دسوقي | // | // | | |
| عبدالرحيم محمد حموده | // | // | | |
| يس محمد علي | // | // | | |
| سراج الدين عبدالباري | // | // | | |
| حسن بابكر [illegible] | // | // | | |

التوقيع ...... [signature] ......

التاريخ ...... ١٢/١٢/١٩٩٦م ......

يتم التوقيع علي هذا الاورنيك بواسطة (مدير الشركة او السكرتير)

شركة رواد التنمية والاستثمار المحدودة

BOARD OF DIRECTOR.

| Name | Nationality | Permanent Residence | Other Professions | Notes |
|---|---|---|---|---|
| *Al-Amin Mustafa* | *Sudanese* | *Khartoum* | | *All are businessmen and people with notable professions* |
| *Al-Taj Sadiq Bashir* | *Sudanese* | *Khartoum* | | |
| *Hassan Mohamed Sati* | *Sudanese* | *Khartoum* | | |
| *Abdel Wahab Osman* | *Sudanese* | *Khartoum* | | |
| *Yassin Disuqy* | *Sudanese* | *Khartoum* | | |
| *Abdel Rahim Mohamed Hammudah* | *Sudanese* | *Khartoum* | | |
| *Yassin Ahmed Mohamed Ali* | *Sudanese* | *Khartoum* | | |
| *Seraj al-Din Abdel Bari* | *Sudanese* | *Khartoum* | | |
| *Hassan Babakr al-Haj* | *Sudanese* | *Khartoum* | | |

**Signature:** *Hassan Babakr al-Haj* [signature]
**Date:** *12/12/1996*

This form shall be signed by the Company's president or secretary.

**Rowad Development and Investment Co. Ltd.**

*Board Of Directors*

ديوان الضرائب
...
الإيصال رقم ٢٦٥١٠٩
التاريخ ٩٦/١١/٢٠

بسم الله الرحمن الرحيم

جمهورية السودان

قانون الشركات لسنة ١٩٢٥م

شركة خاصة ذات مسئولية محدودة

# عقد تأسيس

## شركة رواد التنمية والإستثمار المحدودة

- اسم الشركة : شركة رواد التنمية والإستثمار المحدودة .
- مقر الشركة : جمهورية السودان .
- الأغراض التي من أجلها تأسست الشركة :-

أ/ أن تحوز على أعمال وممتلكات الشركة المسجلة بالنمرة ٨٩٠٧ تحت اسم العمل [رواد التنمية والإستثمار] المسجلة بالنمرة ٢٤٩٧٠ كعمل جاري .

ب/ العمل على إقامة المشاريع الزراعية لزراعة مختلف أنواع المحاصيل .

ج/ العمل على إقامة المصانع لتصنيع المنتجات الزراعية كالقشارات ومصانع الزيوت وغيرها .

د/ العمل في مجال الخدمات الزراعية من حراثة وتسوية وزراعة وحصاد وتعبئة واستصلاح التربة .

و/ العمل في مجال تعبئة وتخزين وحفظ المحاصيل وانشاء وتركيب صوامع الغلال والمخازن وإنشاء ثلاجات التبريد وإقامة السلخانات .

هـ/ العمل في مجال إنتاج وإستيراد وتصدير التقاوي والشتول والأنسجة النباتية ووقاية المحاصيل وانتاج وتسويق المبيدات وخدمات الرش اليدوي والجوي .

ز/ القيام بتربية المواشي والدواجن بأنواعها المختلفة وتصنيع منتجاتها من لحوم وألبان وخلافه وتسويقها داخل وخارج السودان .

In the name of God, the Compassionate, the Merciful

The Republic of Sudan

The Company Law Ordinance, 1925

[stamp: Tax Office
[illegible]
Receipt No.:
Date:]

**Private Limited Liability Company**

# ARTICLES OF INCORPORATION

**Rowad Development and Investment Co. Ltd.**

[stamp: Tax Office
[illegible]
Receipt No.: 26519
Date: 30 November 1992
[signature]]

- **Company name**: Rowad Development and Investment Co. Ltd.
- **Company headquarters**: the Republic of Sudan.
- **Purposes for which the Corporation was founded**:
  a. To own the work and assets of registered corporation #8907 under the name Rowad Development and Investment, having been temporarily registered under number 24970.
  b. To pursue agricultural ventures, cultivating various crops.
  c. To build factories to produce agricultural products such as shelling machines, oil presses, etc.
  d. To work in the field of agricultural services, including plowing, leveling, planting, harvesting, packaging, and reclaiming soil.
  e. To work in the field of packaging, storing, and preserving crops, manufacturing and assembling grain silos and warehouses, manufacturing refrigerators, and building slaughterhouses.
  f. To work in the field of producing, importing, and exporting seeds, seedlings, plant tissue, and crop protection, as well as producing and marketing pesticides and both manual and aerial spraying services.
  g. To raise various livestock and poultry, to manufacture products from their meat, milk, etc., and to market these products in Sudan and abroad.

ح/ العمل على إستيراد مدخلات الإنتاج الزراعي وتصنيعها وإقامة مصانع السماد .

ط/ العمل على اقامة مصانع للمنتجات الحيوانية من لحوم وألبان وإقامة المدابغ وغيرها .

ى/ العمل على إنشاء وإقامة مزارع للإنتاج الحيواني والصيدليات البيطرية لإستيراد وتوزيع الأدوية البيطرية .

ك/ القيام بانشاء المناحل وانشاء الاحواض الخاصة بتربية الاسماك بالطرق العلمية الحديثة .

ل/ العمل في مجال الخدمات بكل أنواعها بما في ذلك الشحن والتفريغ والتخليص وانشاء محطات الوقود والبترول وانشاء وكالات السفر والسياحة وأعمال الفندقة والمطاعم السياحية .

م/ القيام بأعمال النقل البري والبحري والجوي بمختلف وسائل النقل للركاب والبضائع والمنتجات بكافة أنواعها في جميع انحاء السودان وخارجه .

ن/ القيام بأعمال التوكيلات العامة والتجارية وتوكيلات الشركات بأنواعها بما في ذلك شركات التأمين .

س/ العمل في مجال المقاولات المختلفة والاستثمارات الفنية والعلمية والهندسية والاقتصادية.

ع/ القيام بأي عمل أو أعمال تراها الشركة ضرورية أو ملائمة أو من شأنها تمكنها من تحقيق كل هذه الاغراض أو أي جزء منها .

ش/ القيام باعمال التجارة العمومية والاستيراد والتصدير والشراء والبيع والتعامل في البضائع والمنتجات والمواد المختلفة من كل الانواع بما فيها تجارة الماشية وكذلك القيام باستلام البضائع والسلع من المصانع وأماكن الانتاج وتوزيعها على المستهلكين في جميع انحاء السودان .

* ولتحقيق هذه الاغراض يجوز للشركة أن : -

(١) تمتلك أو تقتني أو تحوز عن طريق الشراء أو خلافه أية اراضي أو مباني أو حقوق أو اية مصلحة أخرى من عقار أو منقول أو آلات أو اموال وان تقوم باستثمارها أو تحسينها أو استعمالها لاغراض الشركة ولها أن تبيعها أو تؤجرها أو تستعملها أو تتصرف فيها بأية طريقة أخرى .

h. To import and manufacture agricultural production inputs, and to build fertilizer factories.
i. To build factories for animal meat and dairy products, tanneries, and more.
j. To build and manage livestock farms and veterinary pharmacies, and to import and distribute veterinary medicines.
k. To build apiaries and modern advanced fisheries.
l. To provide all kinds of services, including shipping, offloading, clearance, building fuel and gas stations, opening agencies for travel, tourism, hotels, and touristic restaurants.
m. To provide various means of land, sea, and air transportation for all kinds of passengers and goods across all parts of Sudan and abroad.
n. To establish all means of general, commercial, and corporate agencies, including insurance agencies.
o. To work in the field of general contracting and technical, scientific, engineering, and economic investments.
p. To pursue any ventures that the Corporation should deem necessary, appropriate, or in keeping with all or part of these purposes.
q. To practice general commerce, importation, exportation, and the buying, selling, and exchanging of all kinds of goods, products, and materials, including livestock, as well as to distribute these goods from factories and places of production to consumers across all parts of Sudan.

❊ To realize these purposes, the Corporation may:

(1) Possess, acquire, purchase, or otherwise attain land, buildings, rights, or any other real, fungible, mechanical, or financial assets, may invest, improve, or employ them for the Corporation's purposes, and may sell, rent, lend, or otherwise dispose of them in any other manner.

(٢) أن تنشيء بيوتاً للخبرة لاجراء البحوث الفنية ودراسات الجدوى للاعمال الصناعية والزراعية والتجارية وجميع المشاريع ذات الصيغة الاقتصادية وغيرها .

(٣) أن تحوز على الارض لانشاء وتشييد الجراجات وورش الصيانة لجميع العربات والآليات وجميع المعدات اللازمة لاغراض الشركة وكذلك تشييد المباني والمنازل لاغراض الشركة .

(٤) أن تؤسس وتنشيء أي شركة أو شركات داخل وخارج السودان لتقوم بكل أو بعض من أغراض هذه الشركة أو لتؤدي أعمالاً من شأنها أن تساعد لتحقيق منفعة لها ويكون لها تبعاً لذلك أن تحوز على كل أو بعض اسهم الامتيازات وعقود وضمانات الشركة اللاحقة لهذه الشركة .

(٥) أن تدخل في شركات أو تنضم الى شركة أو شركات أو تعاونيات أو اشخاص أو مؤسسات أو أي حكومة أو سلطات سواء كانت مركزية أو اقليمية أو محلية أو خلافه يبدو أن فيها ما يحقق اغراض الشركة أو أي منها .

(٦) أن تشتري وتحوز وتمتلك الاراضي والمشاريع والآلات والماكينات والمعدات الزراعية المختلفة وكل الوسائل والمواد التي تلزم في العمليات والمنتجات الزراعية بشقيها الحيواني والنباتي .

(٧) أن تقترض اي مبلغ من المال بالطرق والشروط التي تراها مناسبة وأن تسحب وتقبل وتظهر وتخصم وتنفذ وتسدد الكمبيالات والبوالص وعقود الرهن وغيرها من السندات القابلة للتحويل والتداول على الا تزاول أعمال البنوك .

(٨) أن تؤمن ممتلكات الشركة مع أي مؤسسات أو شركة اخرى أو شخص ضد كافة المخاطر والاضرار والخسائر بجميع أنواعها .

- مسئولية الاعضاء محدودة .
- رأس مال الشركة = ١,٠٠٠,٠٠٠,٠٠٠ جنيه ( واحد مليار جنيه) مقسمة إلى ١٠٠٠ سهم ( ألف سهم ) قيمة كل سهم ١,٠٠٠,٠٠٠ جنيه ( [illegible] جنيه ) .

التأسيس [illegible] كل منا [illegible] الاسهم المبينه امام أسمه : [illegible] رينا [illegible] شركة طبقاً لعقد

(2) Construct facilities for specialists to conduct technical research and feasibility studies on industrial, agricultural, commercial, and all other related economic ventures.

(3) Acquire land to construct garages and maintenance workshops for all vehicles, materials and equipment needed for the Corporation's purposes, and may construct buildings and homes for the Corporation's purposes.

(4) Found and incorporate any company or companies in Sudan or abroad to pursue all or part of the Corporation's purposes or carry out work beneficial to them, which consequently may acquire some or all of the preferred stock, contracts, and securities of these subsidiary companies.

(5) Join or partner with any central, regional, or local companies, cooperatives, individuals, institutions, governments, or authorities that appear to have the means to realize all or part of the Corporation's purposes.

(6) Purchase, acquire, and possess land, ventures, machinery, plants, various agricultural equipment, and all means of materials needed for both animal and plant agricultural operations and products.

(7) Borrow any amount of money by the methods and terms it deems appropriate, and may withdraw, accept, endorse, deduct, execute, and repay any bills, mortgages contracts, or other convertible and negotiable bonds without acting as a bank.

(8) Ensure the Corporation's property with any institution, company, or individual against all manner of risks, damages, and losses.

- ☐ Members bear limited liability.
- ☐ The Corporation's capital = 1,000,000,000 (one billion) Sudanese pounds, divided into 1,000 (one thousand) shares, each at a value of 1,000,000 (one million) Sudanese pounds.

[illegible] of the Corporation in accordance with its Articles of Incorporation [illegible] each of us and received the number of shares shown before the name:



بسم الله الرحمن الرحيم

جمهورية السودان

قانون الشركات لعام ١٩٢٥م

# عقد التأسيس
# و
# النظام الأساسي

## شركة رواد التنمية والاستثمار المحدودة

شركة خاصة ذات مسئولية محدودة

فتحي خليل محمد

المحامي وموثق العقود

الخرطوم

[illegible]

In the name of God, the Compassionate, the Merciful

The Republic of Sudan

The Company Law Ordinance of 1925

[signature]

# ARTICLES OF INCORPORATION & BYLAWS

7095

Rowad Development and Investment Co. Ltd.

Private Limited Liability Company

Fathy Khalil Mohamed
Attorney & Notary
Khartoum

[illegible] [illegible]
17 December 1992

[signature]

[illegible]
1 – Name
2 – [illegible]
3 – [illegible]
1 December 1992

| الأسم | المهنة | العنوان | عدد الأسهم | التوقيع |
|---|---|---|---|---|
| ١/ بنك الشمال الإسلامي | شركة مساهمة عامة مسجلة في السودان | ص ب/١٠٠٣٦الخرطوم | ١٠٠ | |
| ٢/الشركة العالمية الحديثة | شركة خاصة مسجلة في السودان | ص ب/١٠٠٣٦الخرطوم | ٥٠ | |
| ٣/ شركة الشيخ الزراعية | ״ ״ | ص ب/ ١٢٨٢ الخرطوم | ١٠٠ | |
| ٤/ مصانع الشيخ للزيوت | ״ ״ | ص ب/ ١٠٣٢ الخرطوم | ١٥٠ | |
| ٥/ شركة لوكس هول | ״ ״ | ص ب/ ٢١٤ الخرطوم | ١٠٠ | |
| ٦/ شركة جانديل الزراعية | ״ ״ | ص ب/١٠٠٣٦الخرطوم | ١٥٠ | |
| ٧/ شركة وادي العقيق | ״ ״ | ص ب/ ١٠٠٣٦ الخرطوم | ١٥٠ | |
| ٨/ مؤسسة موفق الخيرية | مؤسسة خيرية | ص ب/ ١٠٠٣٦ الخرطوم | ١٠٠ | |
| ٩/ ولاية دارفور | ولايـــــة | الفاشـــــر | ١٠٠ | |

تم هذا الإتفاق في هذا اليوم الربع من شهر جمادى الثانية عام ١٤١٣هـ
الموافق اليوم الثامن من شهر نوفمبر عام ١٩٩٢م.

شهد على صحة التوقيعات اعلاه

فتحي خليل محمد
المحامي وموثق العقود
الخرطوم

| | Name | Profession | Address | No. Shares | Signature |
|---|---|---|---|---|---|
| 1. | al-Shamal Islamic Bank | Public Joint Stock Company Registered in Sudan | PO Box 10036, Khartoum | 100 | {signature} |
| 2. | The Modern Global Corporation | Private Company Registered in Sudan | PO Box 10036, Khartoum | 50 | {signature} |
| 3. | The Sheikh Agricultural Corporation | Private Company Registered in Sudan | PO Box 1282, Khartoum | 100 | {signature} |
| 4. | Sheikh Oil Presses | Private Company Registered in Sudan | PO Box 1032, Khartoum | 150 | {signature} |
| 5. | The Loxhall Corporation | Private Company Registered in Sudan | PO Box 214, Khartoum | 100 | {signature} |
| 6. | The Jandil Agricultural Corporation | Private Company Registered in Sudan | PO Box 10036, Khartoum | 150 | {signature} |
| 7. | The Wadi al-Aqiq Corporation | Private Company Registered in Sudan | PO Box 10036, Khartoum | 150 | {signature} |
| 8. | The Muwafaq Charitable Organization | Charitable Organization | PO Box 10036, Khartoum | 100 | {signature} |
| 9. | The State of Darfur | State | Al-Fashir | 100 | {signature} |

This agreement was concluded on the sixth of Jumada al-Thani of 1413 AH, corresponding to the thirtieth of November of 1992.

I attest to the veracity of the above signatures
{signature}
Fathy Khalil Mohamed
Attorney & Notary
Khartoum

[fee stamps]

بسم الله الرحمن الرحيم

# شركة رواد التنمية والاستثمار المحدودة

(جنوب دارفور)

المكتب الرئيسي الخرطوم
تلفونات : ٨٤٣٥٢ – ٨٣٤١١ – ٨٣٤٠٦
ص.ب : ١٠٣٢ الخرطوم
تلكس رقم ٢٢٠٦٩ – ٢٢٠٢٨

---

التاريخ : ١٣/١/١٩٩٧م

السيد / رئيس مجلس ادارة شركة رواد التنمية والاستثمار المحدودة

السلام عليكم ورحمة الله تعالى وبركاته

**الموضوع : تقرير للموقف المالي للجنة المؤقتة للتصفية حتى الاول من يناير ١٩٩٧م**

ارجو ان ارفق لكم تقريراً للموقف المالي للجنة التصفية حتى الاول من يناير ١٩٩٧م . وحسب قرار المجلس الخاص باسناد عملية التصفية القانونية للاستاذة عائشة ابوالقاسم المحامي والموثق ارجو التكرم بالموافقة لتسليمها صورة من حسابات اللجنة حتى هذا التاريخ وتسليمها دفاتر شيكات لجنة التصفية والرصيد الموجود بالبنك لمواصلة وانهاء هذا العمل في اقصر فترة ممكنة .

وتقبلوا وافر الشكر والتقدير ،،، ،،، ،،،

موسى سعيد موسى
رئيس اللجنة المؤقتة لتصفية
شركة رواد التنمية والاستثمار المحدودة.

In the name of God, the Compassionate, the Merciful

Rowad Development and Investment Co. Ltd.

(South Darfur)

Khartoum Headquarters
Telephone: 84352 —— 83411 —— 83406

PO Box: 1032 Khartoum
Telex: 22069 —— 22028

Date: 13 January 1997
Mr. Chairman of the Board of Directors,
Rowad Development and Investment Co. Ltd.

1/13
Approved
[signature]

Peace and blessings be upon you.

RE: Financial Status Report
of the Interim Liquidation Committee
As at 1 January 1997

Please find attached the Financial Status Report of the Liquidation Committee as at 1 January 1997. Pursuant to the Board's decision to appoint Attorney and Notary Ms. Aisha Abuelgassim Haj Hamad to manage the legal liquidation process, kindly send her a copy of the Committee's accounts to date in addition to the Liquidation Committee's checkbooks and current bank balance to continue and conclude this task as quickly as possible.

With gratitude and appreciation,

[signature]
Musa Said Musa
Chairman of the Interim Liquidation Committee
Rowad Development and Investment Co. Ltd

بسم الله الرحمن الرحيم

جدول يوضح المبيعات التي قامت بها لجنة التصفية

لأصول شركة رواد التنمية والاستثمار المحدودة

| رقم مسلسل | نوع الالة المباعة وعددها | القيمة: سعر الوحدة | القيمة: القيمة الكلية | ملحوظات |
|---|---|---|---|---|
| | (أ) ولاية غرب كردفان | | | |
| ١ | *٦ جرار ماسي فيرجسون ٢٩٠ | ١٢,٠٠٠,٠٠٠×٦ | ٧٢,٠٠٠,٠٠٠ | |
| ٢ | *٦دسك قارد | ٢,٠٠٠,٠٠٠×٦ | ١٢,٠٠٠,٠٠٠ | |
| ٣ | *٢دقاقة | ٢,٥٠٠,٠٠٠×٢ | ٥,٠٠٠,٠٠٠ | |
| | (ب) شركة هرمز التجارية(على التوم خيرالله) | | | |
| ٤ | *٦جرار ماسي فيرجسون ٢٩٠ | ١٢,٠٠٠,٠٠٠×٦ | ٧٢,٠٠٠,٠٠٠ | |
| ٥ | *٦ دسك قارد | ٢,٠٠٠,٠٠٠×٦ | ١٢,٠٠٠,٠٠٠ | |
| ٦ | *٢ دقاقة | ٢,٥٠٠,٠٠٠×٢. | ٥,٠٠٠,٠٠٠ | |
| ٧ | *قاطعة سمسم | ١,٠٠٠,٠٠٠×١ | ١,٠٠٠,٠٠٠ | مؤسسة موفق الخيرية |
| ٨ | جرار ماسي فيرجسون ٢٩٠ متعطل | ٧,٠٠٠,٠٠٠×١ | ٧,٠٠٠,٠٠٠ | محمود احمد الريح |
| ٩ | *واحدة عربة لاندكروزر استيشن | ١٤,٠٠٠,٠٠٠×١ | ١٤,٠٠٠,٠٠٠ | الزبير حاج منصور |
| ١٠ | *واحدة عربة كروسيدا | ١٥,٠٠٠,٠٠٠×١ | ١٥,٠٠٠,٠٠٠ | شركة الامين الشيخ |
| ١١ | * كمبرسون /وابور لستر خردة /وابور سحاب خردة | | | (تحت الاستلام) |
| | متبقى قطع غيار الجرارات | — | ٤,٦٠٠,٠٠٠ | ولاية غرب كردفان |
| ١٢ | فرق قيمة البات فى تسوية حسن سنيو | — | ١٢,٠٠٠,٠٠٠ | |
| ١٣ | استرداد نولون السكة حديد | — | ١,٩٠٣,٤٥٠ | |
| ١٤ | مديونية ولاية جنوب دارفور لصالح الشركة | — | ١٣,٥٥٠,٠٠٠ | تحت الاستلام |
| | الجملة | | ٢٤٣,٠٥٣,٤٥٠ | |

In the name of God, the Compassionate, the Merciful

List of the Liquidation Committee's Sales
of the Assets of Rowad Development and Investment Co. Ltd.

| Serial Number | Type & Number of Machine Sold | Amount<br>Unit Price | <br>Total Amount | Notes |
|---|---|---|---|---|
| | (a) The State of West Kurdufan | | | |
| 1 | 6 Massey Ferguson 290 Tractors | 12,000,000 x 6 | 72,000,000 | |
| 2 | 6 Card Disk Ploughs | 2,000,000 x 6 | 12,000,000 | |
| 3 | 2 Grinders | 2,500,000 x 2 | 5,000,000 | |
| | (b) The Hermes Commercial Corporation (Ali Altoum Khairallah) | | | |
| 4 | 6 Massey Ferguson 290 Tractors | 12,000,000 x6 | 72,000,000 | |
| 5 | 6 Card Disk Ploughs | 2,000,000 x 6 | 12,000,000 | |
| 6 | 2 Grinders | 2,500,000 x 2 | 5,000,000 | |
| 7 | 1 Sesame Seed Sheller | 1,000,000 x 1 | 1,000,000 | The Muwafaq Charitable Organization |
| 8 | 1 Out-of-Order Massey Ferguson 290 Tractor | 7,000,000 x 1 | 7,000,000 | Mahmoud Ahmed al-Rih |
| 9 | 1 Landcruiser Station Wagon | 14,000,000 x 1 | 14,000,000 | al-Zubair Haj Mansour |
| 10 | 1 Cressida vehicle | 15,000,000 x 1 | 15,000,000 | Al-Amin Alsheikh Company |
| 11 | 1 Scrap Camperson / Weber Lester / Scrap Weber Winder<br>Remaining Tractor Spare Parts | — | 600,000 | ↑<br>*Being Received*<br>The State of West Kurdufan |
| 12 | Difference in the Machinery Value in the Hassan Sanibo Settlement | — | 12,000,000 | |
| 13 | Railroad Freight Recovery | — | 1,903,450 | |
| 14 | The Corporation's debt to the State of South Darfur | — | 13,550,000 | Being Received |
| | Total | | 243,053,450 | |

شركة رواد التنمية والاستثمار المحدودة
(جنوب دارفور)

المكتب الرئيسي الخرطوم
تلفونات : ٨٤٣٥٢ ـ ٨٣٤١١ ـ ٨٣٤٠٦

ص٠ب : ١٠٣٢ الخرطوم
تلكس رقم ٢٢٠٦٩ ـ ٢٢٠٢٨

التاريخ: ١٤/١/١٩٩٧م

الاستاذة / عائشة ابوالقاسم حاج حمد
المصفى القانونى لشركة رواد التنمية
والاستثمار المحدودة.

السلام عليكم ورحمة الله تعالى وبركاته

**الموضوع : تسليم أعمال**
**لجنة التصفية المؤقتة**

بالإشارة لخطابى بتاريخ ١٣/١/١٩٩٧م المعنون للسيد / رئيس مجلس ادارة شركة رواد التنمية والاستثمار المحدودة (صورة مرفقة لسهولة الرجوع ) والخاص بالموضوع اعلاه وموافقته على محوى الخطاب ارجو ان ارفق لكم الاتى :-

(١) كشف حساب لحساب اللجنة من تاريخ فتح (الحساب) بنك التنمية الصناعى الفرع النموذجى الخرطوم ميدان الامم المتحدة وحتى ٣/١/ ١٩٩٧م والذى يوضح الرصيد الختامى وهو مبلغ (٧٨٨٧٤٤٤٥/٧ ) ثمانية وسبعون مليون وثمانمائة اربعة وسبعون الف واربعمائة خمسة واربعون جنيهاً.

(٢) صورة لمجمل حسابات اللجنة شاملة للموارد المختلفة مثل :-

( أ) القروض الحسنة من بعض الشركاء .

(ب) مبيعات الاليات التى تحصلت عليها اللجنة .

(ج) موارد اخرى متنوعة .

والمصروفات المختلفة مثل :-

( أ) تسديد القروض الحسنة .

(ب) دفع مبلغ سبعة وتسعون مليون للشركاء من عائد مبيعات الاليات .

(ج) دفع حقوق العاملين وبعض الديون التى وافق عليها المجلس .

( د) حوافز اعضاء لجنة التصفية .

(هـ) المصروفات الاخرى الخاصة بأعمال اللجنة المختلفة .

وكل المستندات المؤيدة لهذه المصروفات موجودة لدينا ويمكن مراجعتها والرجوع اليها فى اى وقت .

In the name of God, the Compassionate, the Merciful

# Rowad Development and Investment Co. Ltd.

(South Darfur)

Khartoum Headquarters
Telephone: 84352 —— 83411 —— 83406

PO Box: 1032 Khartoum
Telex: 22069 —— 22028

Date: 14 January 1997

Ms. Aisha Abuelgassim Haj Hamad
Legal Liquidator, Rowad Development and Investment Co. Ltd.

Peace and blessings be upon you.

RE: Submission of the Work
of the Interim Liquidation Committee

In reference to my letter dated 13 January 1997 to the Chairman of the Board of Directors of Rowad Development and Investment Co. Ltd. (copy attached for reference) regarding the aforementioned topic and his agreement to that letter's contents, please find attached the following:

(1) The Committee's account statement from the date of the opening of said account at the Agricultural Development Bank, Khartoum Model Branch, UN Square until 3 January 1997, showing the final balance of 78,874,445 (seventy eight million, eight hundred seventy four thousand, four hundred forty five) pounds.

(2) A copy of all of the Committee's accounts of various resources, such as:
   a. Interest-free loans from several partners.
   b. The Committee's machinery sales.
   c. Other miscellaneous resources.

Various other expenditures, such as:
   a. The repayment of interest-free loans.
   b. The payment to partners of 97,000,000 (ninety seven million) [pounds] from the returns of machinery sales.
   c. The payment of employees' salaries and the Board-approved payment of certain debts.
   d. Liquidation Committee member bonuses.
   e. Other expenditures for various Committee employees.

All supporting documents for these expenditures are in our possession and can be reviewed and referred to at any time.

(٣) دفتر شيكات رقم ٣٩٨ ذو مائة صك مستعمل منه ثلاث وعشرين صكاً من رقم ٤٦٤٧٠١ حتى رقم ٤٦٤٧٢٣ منها ثلاثة صكوك ملغاة وهي رقم ٤٦٤٧٠٧ ، ٤٦٤٧٠٩ ، ٤٦٤٧١١ وتبقت منها سبعة وسبعون صكاً من رقم ٤٦٤٧٢٤ حتى رقم ٤٦٤٧٨٠٠ .

وتجدرالاشارة هنا الى ان/ حساب لجنة تصفية شركة رواد التنمية والاستثمار المحدودة ببنك التنمية الصناعي – الفرع النموذجي – ميدان الامم المتحدة الخرطوم هو ١٨٠١ .

(٤) ولكي يكون المصفى القانوني ملماً بأعمال اللجنة منذ البداية وحتى النهاية فاننا نرفق لكم صورة من التقرير الختامي لأعمال اللجنة – والتي يمكن منه التعرف على ماتبقى من اصول الشركة والتي يمكن السؤال عنها من السيد / المدير العام للمشروع السيد / حسن بابكر الحاج ورئيس حساباته السيد / نواي يس آدم .

(٥) في النهاية نرجو للمصفى القانوني التوفيق في أعماله وان اللجنة على استعداد للمعاونة في اجلاء اي شئ متعلق بما قامت به من أعمال حتى تسليم اعمالها للمصفى القانوني .

وشكراً ،،،، ،،،، ،،،،

موسي سعيد موسي
رئيس اللجنة المؤقتة لشركة رواد
التنمية والاستثمار المحدودة.

صورة للسيد/
رئيس مجلس ادارة شركة
رواد التنمية والاستثمار المحدودة.

Checkbook #39*8*, with 100 used checks, including 23 checks (from #464701 to 464723), of which three checks were voided (#464707, 464709, 464711), and the remaining 77 checks (from #464724 to 4647800).

(3) It should be noted here that the account *number* of the Rowad Development and Investment Co. Ltd. Liquidation Committee at the Agricultural Development Bank, Khartoum Model Branch, UN Square, is 1801.

(4) In order for the Legal Liquidator be informed of all the Committee's work from outset until conclusion, we have attached a copy of the Final Report on the Work of the Committee, from which may be learned the Corporation's remaining assets. Questions about these assets may be directed to the project's Managing Director, Mr. Hassan Babakr al-Haj, and its Chief Accountant, Naway Yassin Adam.

(5) Finally, we wish the Legal Liquidator success in her work. The Committee is prepared to assist in clearing any related tasks up until the submission of its work to the Legal Liquidator.

With gratitude,

{signature}
Musa Said Musa
Chairman of the Interim [Liquidation] Committee
Rowad Development Investment Co. Ltd.

Copy to the Chairman of the Board of Directors,
Rowad Development and Investment Co. Ltd.

شركة رواد التنمية والاستثمار المحدودة

(جنوب دارفور)

المكتب الرئيسي الخرطوم

تلفونات : ٨٤٣٥٢ ـ ٨٣٤١١ ـ ٨٣٤٠٦

ص.ب : ١٠٣٢ الخرطوم

تلكس رقم ٢٢٠٦٩ ـ ٢٢٠٢٨

---

## التقرير النهائى للجنة تصفية شركة رواد التنمية والاستثمار المحدودة

فى إجتماعه المنعقد برئاسة بنك الشمال الاسلامى بالخرطوم كون مجلس إدارة شركة رواد التنمية والاستثمار المحدودة لجنة لتقوم بحصر وتقييم ممتلكات واصول الشركة لاجراء التصفية الاختيارية لها.

وكان تكوين اللجنة على النحو التالى:ــ

(١) السيد/ موسى سعيد موسى المستشار الزراعى لشركة ليماونت رئيساً.

(٢) السيد/ عبدالجليل فضل حمد من شركة موفق للتنمية الريفية عضواً.

(٣) السيد/ عبدالرحيم محمد حمودة من شركة جانديل عضواً.

(٤) السيد/ حسن بابكر الحاج المدير العام لشركة رواد التنمية عضواً.

وانضم لاحقاً للجنة :

(٥) السيد/ صلاح ابراهيم بخيت من شركة رواد التنمية عضواً.

لقد كانت طبيعة المهام التى اوكلها مجلس الإدارة لهذه اللجنة تتمثل فى:-

(أ) التثبت من كمال مراجعة حسابات الشركة للاربعة مواسم التى باشرت الشركة فيها اعمالها وهى ٩٢/٩٣ - ٩٣/٩٤ - ٩٤/٩٥ - ٩٥/٩٦ بواسطة المحاسبون القانونيون / عدار وشركاؤه.

(ب) أعداد تقرير ختامى لاداء الشركة عن فترة عملها فى جنوب دارفور.

(ج) الأشراف على حصر منقولات الشركة وممتلكاتها والتوصية للمجلس فى الكيفية المثلى للتخلص من هذه الممتلكات .

(د) الأتصال بحكومة ولاية جنوب دارفور للمعاونة فى اعمالها.

(هـ) رفع تقرير للمجلس فى او قبل الخامس عشر من فبراير ١٩٩٦م.

ولتنسيق تنفيذ مهامها عقدت اللجنة اول اجتماع لها بتاريخ ٢٠/١٢/١٩٩٥م - حيث قررت السفر الى منطقة نشاط المشروع فى ام عجاج بجنوب ولاية دارفور.

وقد تم سفر كلٍ من:

(١) السيد/ موسي سعيد موسي رئيس اللجنة.

(٢) السيد/ عبدالجليل فضل عضو اللجنة.

(٣) السيد/ حسن بابكر الحاج عضو ومقرر اللجنة .

وانضم الى اللجنة فى مجموعة السيد/ صلاح ابراهيم بخيت عضو اللجنة.

In the name of God, the Compassionate, the Merciful

# Rowad Development and Investment Co. Ltd.

(South Darfur)

Khartoum Headquarters
Telephone: 84352 —— 83411 —— 83406

PO Box: 1032 Khartoum
Telex: 22069 —— 22028

---

## Final Report of the Liquidation Committee
## Rowad Development and Investment Co. Ltd.

At its meeting at the headquarters of the al-Shamal Islamic Bank in Khartoum, the Board of Directors of Rowad Development and Investment Co. Ltd. formed a committee to conduct an inventory and appraisal of the Corporation's property and assets in order to carry out its voluntary liquidation. The Committee was made up of:

(1) Chairman: Mr. Musa Said Musa, Agricultural Consultant at the Leemount Corporation.
(2) Member: Mr. Abdel Jalil Fadl Hamad, of the Muwafaq Rural Development Corporation.
(3) Member: Mr. Abdel Rahim Mohamed Hamudah, of the Jandil Agricultural Corporation.
(4) Member: Mr. Hassan Babakr al-Haj, Managing Director of Rowad Development and Investment Co. Ltd.

The Committee was later joined by:

(5) Member: Mr. Salah Ibrahim Bakhit of Rowad Development and Investment Co. Ltd.

The tasks assigned to this Committee by the Board of Directors included:

(a) Verifying that the Corporation's accounts had been completely reviewed for its seasons of operation, namely 92/93, 93/94, 94/95, 95/96, by legal accountants at Adar & Associates.
(b) Preparing a final report on the Corporation's performance while working in South Darfur.
(c) Supervising the inventory of the Corporation's fungible and fixed property and advising the Committee as to the ideal way to dispose of said property.
(d) Communicating with the government of the State of South Darfur to assist in its work.
(e) Submitting a report to the Board on or before 15 February 1996.

To coordinate the execution of these tasks, the Committee held its first meeting on 20 December 1995, where it decided to travel to the project region in Om Ajaj, South Darfur. The following members traveled:

(1) Mr. Musa Said Musa, Chairman of the Committee.
(2) Mr. Abdel Jalil Fadl, Member of the Committee.
(3) Mr. Hassan Babakr al-Haj, Member and secretary of the Committee.
Mr. Salah Ibrahim Bakhit, joined the Committee in Babanusa as a member.