# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

*This document relates to:*

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, 16-cv-07853
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, 16-cv-09663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, 16-cv-09937
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-00450
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-00117
*Charter Oak Fire Ins. Co., et al. v. Al Rajhi Bank, et al.*, 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-06123
*Fraser, et al. v. Al Qaeda Islamic Army, et al.*, 17-cv-07317
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-08617

## <u>CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS AL RAJHI BANK, SAUDI BINLADIN GROUP, AND NATIONAL COMMERCIAL BANK</u>

December 5, 2017

**Table of Contents**

I.     INTRODUCTION ............................................................................................... 1

II.    JASTA PROVIDES PLAINTIFFS WITH THE BROADEST POSSIBLE BASIS FOR
     RELIEF IN UNITED STATES COURTS ......................................................... 4

III.   STANDARD OF REVIEW ............................................................................... 7

IV.   LEGAL ARGUMENT ...................................................................................... 8

    A.    The Exercise of Personal Jurisdiction over Defendants is Appropriate ................. 8

        1.    Standards Governing the Personal Jurisdiction Analysis .......................... 8

        2.    Plaintiffs Allege Facts That Support the Exercise of Personal
             Jurisdiction over ARB............................................................................. 13

        3.    Plaintiffs Allege Facts That Support the Exercise of Personal
             Jurisdiction over SBG ............................................................................ 19

             a.    SBG Provided Material Support to Al Qaeda When Al Qaeda
                 Was Targeting and Attacking the United States ........................... 20

             b.    The FAC Offers New Facts and Evidence that SBG's Support
                 for Al Qaeda Continued into the Years Immediately Preceding
                 the September 11th Attacks ......................................................... 22

        4.    Plaintiffs Allege Facts That Support the Exercise of Jurisdiction over
             NCB ....................................................................................................... 27

    B.    Jurisdictional Discovery is Warranted as to Each Defendant .............................. 32

    C.    Plaintiffs State a Claim Upon Which Relief May Be Granted under the ATA .... 33

        1.    Standards Governing Plaintiffs' Claims under the ATA .......................... 33

        2.    Plaintiffs State a Claim for Secondary Liability against ARB ................. 36

             a.    The FAC Must Be Reviewed Anew Because It Is Not Governed
                 by Prior Decisions Involving ARB .............................................. 36

             b.    ARB Either Knowingly Supported Al Qaeda Terrorists or was
                 Deliberately Indifferent to that Possibility ................................... 37

             c.    The FAC States a Claim for Secondary Liability Against ARB .. 40

             d.    The FAC States a Claim for Primary Liability Against ARB
                 Under the ATA ............................................................................ 44

        3.    Plaintiffs State a Claim for Secondary Liability against SBG ................. 49

             a.    SBG's Causation Arguments Lack Merit ..................................... 49

             b.    Plaintiffs Adequately Allege Scienter Against SBG ................... 50

|  | c. | There is No Merit to SBG's Argument that Plaintiffs Lack Standing ........................................................................................ 51 |
| V. | CONCLUSION | ............................................................................................................. 60 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009).................................................................................................8

*Astoria Fed. Sav. & Loan Assn. v. Solimino,*
 501 U.S. 104 (1991)...............................................................................................56

*Bankers Trust Co. v. Texas & Pacific Ry. Co.,*
 241 U.S. 295, 309 (1916) .......................................................................................53

*Barrett v. Tema Dev.,*
 463 F. Supp. 2d 423 (S.D.N.Y. 2006)..............................................................31, 60

*Bell Atl. v. Twombly,*
 550 U.S. 544 (2007)..................................................................................................8

*Bellepointe, Inc. v. Kohl's Dept. Stores,*
 975 F. Supp. 562 (S.D.N.Y. 1997) ..........................................................................7

*Boim v. Holy Land Found. For Relief & Dev. (Boim III),*
 549 F.3d 685 (7th Cir. 2008) (en banc) ..................................................44-45, 47-49

*Brown v. Lockheed Martin Corp.,*
 814 F.3d 619 (2d Cir. 2016)...................................................................................29

*Burger King Corp. v. Rudzewicz,*
 471 U.S. 462 (1985)..................................................................................................9

*Calder v. Jones,*
 465 U.S. 783 (1984).........................................................................................9-10, 26

*In re Credit Default Swaps Antitrust Litig.,*
 No. 13md2476, 2014 U.S. Dist. LEXIS 123784 (S.D.N.Y. Sept. 4, 2014)............51

*Crum v. Veterans of Foreign Wars,*
 502 F. Supp. 1377 (D. Del. 1980)..........................................................................53

*Daimler AG v. Bauman,*
 134 S. Ct. 746 (2014)..............................................................................................28

*Degulis v. LXR Biotech., Inc.,*
 928 F. Supp. 1301 (S.D.N.Y. 1996)........................................................................40

*Desiderio v. Nat'l Assoc. of Sec. Dealers, Inc.*,
    191 F.3d 198 (2d Cir. 1999)............................................................................8

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)..........................................................................7, 32

*Doe v. Bin Laden*,
    663 F.3d 64, 69 (2d Cir. 2011)................................................................. 53-54

*Elkimya v. Dep't of Homeland Sec.*,
    484 F.3d 151, 154 (2d Cir. 2007)...................................................................55

*Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc.*,
    396 N.Y.S.2d 925 (App. Div. 1977).................................................................59

*First City, Texas Houston, N.A. v. Rafidain Bank*,
    281 F.3d 48 (2d Cir. 2002)..............................................................................32

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................... 37-38

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...................................................... 45-46

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................. *passim*

*Heilweil v. Mount Sinai Hosp.*,
    32 F.3d 718 (2d Cir. 1994)..............................................................................58

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003)............................................................................58

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)........................................................................................6, 47

*In re Hooker Invs.*,
    145 B.R. 138 (S.D.N.Y. 1992)........................................................................31

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
    230 F. Supp. 3d 167 (S.D.N.Y. 2017)..............................................................44

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).........................................................................................9

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952)........................................................................................56

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*,
    536 U.S. 88 ..................................................................................................................54

*Kamen v. AT&T Co.*,
    791 F.2d 1006 (2d Cir. 1986)......................................................................................32

*Klein v. Comm'r.*,
    802 F.2d 260 (10th Cir. 1989) ....................................................................................60

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012).............................................................................................9

*Linde v. Arab Bank PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) ............................................................... 37, 48-49

*Luna v. Am. Airlines*,
    769 F. Supp.2d 231 (S.D.N.Y. 2011).........................................................................55

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003).........................................................................................32

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012).......................................................................................................56

*Moscoto v. MDM Group, Inc.*,
    No. 05 Civ. 10313, 2008 U.S. Dist. LEXIS 58030 (S.D.N.Y. July 30, 2008) .......................60

*Noel v. N.Y. City Taxi & Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012)...........................................................................................58

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009).........................................................................8

*Owens v. BNP Paribas, SA*,
    235 F. Supp. 3d 85 (D.D.C. 2017) ..............................................................................48

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) .....................................................................................43

*PDK Labs., Inc. v. Friedlander*,
    103 F.3d 1105 (2d Cir. 1997)........................................................................................7

*Payne v. Tennessee*,
    501 U.S. 808 (1991).......................................................................................................31

*Pohlmann v. Bil-Jax, Inc.*,
    176 F.3d 1110 (8th Cir. 1999) .....................................................................................60

*Red Lion Broad. Co. v. F.C.C.*,
  395 U.S. 367 (1969)....................................................................................................54

*Redington v. Touche Ross & Co.*,
  592 F.2d 617 (2d Cir. 1978)........................................................................................55

*Rostker v. Goldberg*,
  453 U.S. 57 (1981)...............................................................................................6, 46

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)................................................................................. 48-50

*Ryan v. United States*,
  No. 1:15-cv-2248, 2015 U.S. Dist. LEXIS 162633 (S.D.N.Y., Dec. 3, 2015) .......................32

*U.S. ex rel. Schnitzler v. Follette*,
  406 F.2d 319 (2d Cir. 1969) ........................................................................................36

*Shi Liang Lin v. United States DOJ*,
  494 F.3d 296 (2d Cir. 2007)........................................................................................31

*Solutia, Inc. v. FMC Corp.*,
  385 F. Supp. 2d 324 (S.D.N.Y. 2005).........................................................................59

*State Farm Fire & Cas. Co. v. Swizz Style, Inc.*,
  246 F. Supp. 3d 880, 890 (S.D.N.Y. 2017)................................................................13

*Steamship Co. v. Tugman*,
  106 U.S. 118 (1882).....................................................................................................53

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................. 38-39

*In re Terrorist Attacks on September 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005)................................................................ 7, 14, 36-37

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008)..........................................................................................29

*In re Terrorist Attacks on Sept. 11, 2001*,
  718 F. Supp. 2d 456 (S.D.N.Y. 2010), *aff'd sub nom. O'Neill v. Asat Trust
  Reg.*, 714 F.3d 659 (2d Cir. 2013) .............................................................................29

*In re Terrorist Attacks on Sept. 11, 2001*,
  No. 03 MDL 1570, 2011 U.S. Dist. LEXIS 153138 (S.D.N.Y. Oct. 14, 2011) .....................55

*In re Terrorist Attacks on Sept. 11, 2001*,
  No. 03 CIV. 6978, 2011 U.S. Dist. LEXIS 144936 (S.D.N.Y. Dec. 16, 2011)......................55

*In re Terrorist Attacks on Sept. 11, 2001*,
    840 F. Supp. 2d 776 (S.D.N.Y. 2012) ................................................................................19

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ............................................................................ 5, 14-15, 37

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013), *cert. denied sub nom. O'Neill v. Al Rajhi Bank*,
    134 S. Ct. 2870 (2014) ...................................................................................... *passim*

*Thomas v. Ariel W.*,
    242 F. Supp. 3d 293 (S.D.N.Y. 2017) ..............................................................................58

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) ............................................................................................47

*United States v. General Electric Co.*,
    358 F. Supp. 731 (S.D.N.Y. 1973) ...................................................................................32

*United States v. Moussaoui*,
    591 F.3d 263 (4th Cir. 2010) ............................................................................................25

*United States v. Texas*,
    507 U.S. 529 (1993) ..........................................................................................................56

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ......................................................................................................28

*Waldman v. Palestinian Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016), *petition for cert. docketed, Sokolow v. Palestine
    Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017) ........................................... *passim*

*Wallert v. Atlan*,
    141 F. Supp. 3d 258 (S.D.N.Y. 2015) ................................................................................8

*Weiss v Nat'l Westminster Bank PLC*,
    No. 05-CV-4622, 2017 U.S. Dist. LEXIS 165691 (E.D.N.Y. Sept. 30, 2017) .......................37

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
    933 F.2d 131 (2d Cir. 1991) ......................................................................................... 58-59

*Wolf v. Rand*,
    685 N.Y.S.2d 708 (App. Div. 1999) .................................................................................59

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ............................................................................................................9

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ..........................................................................47

**Statutes**

Justice Against Sponsors of Terrorism Act,
   Pub. Law No. 114-222, 130 Stat. 852 (2016) ................................................ *passim*

8 U.S.C. § 1101 ................................................................................................52

18 U.S.C. § 1111 ...............................................................................................45

18 U.S.C. § 2331 ..............................................................35-36, 44, 46-47, 52

18 U.S.C. § 2332 ........................................................................................ 44-45

18 U.S.C. § 2332a .............................................................................................45

18 U.S.C. § 2332b .............................................................................................45

18 U.S.C. § 2332c .............................................................................................45

18 U.S.C. § 2332f .............................................................................................45

18 U.S.C. § 2333 ........................................................................................ *passim*

18 U.S.C. § 2339A .............................................................. 36, 44-46, 48

18 U.S.C. § 2339B .............................................................. 36, 44-46, 48

18 U.S.C. § 2339C .................................................................44-45, 47-48

28 U.S.C. § 1332 .................................................................................... 53-54

28 U.S.C. § 1605A .................................................................................. 56-57

34 U.S.C. § 20144 .............................................................................................53

**Rules**

Fed. R. Civ. P. 12 ............................................................................ 7-8, 14, 40

Fed R. App. P. 10 .............................................................................................15

**Other Authorities**

RESTATEMENT (SECOND) OF TORTS § 876 (1979) .........................................................35

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES
   § 213 (1986)..................................................................................................... 53-54

5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1351
   (2d ed. 1990) .........................................................................................................32

I.      **INTRODUCTION**

Plaintiffs in 12 separate actions have asserted claims against Al Rajhi Bank ("ARB"),

Saudi Binladin Group ("SBG") and National Commercial Bank ("NCB"), adopting the factual

allegations presented in the *Lloyd's* First Amended Complaint ("FAC") to support their claims.

These plaintiffs include thousands of individual victims of the September 11, 2001 attacks, as

well as insurers that compensated nationals of the United States for substantial property and

business losses resulting from the attacks.  Plaintiffs' claims against ARB, SBG, and NCB arise

principally under the Anti-Terrorism Act ("ATA"), as amended last year by the Justice Against

Sponsors of Terrorism Act, Pub. Law No. 114-222, 130 Stat. 852 (2016) ("JASTA").

The claims alleged in the FAC are predicated on Defendants' activities in support of al

Qaeda in the years leading up to the September 11, 2001 terrorist attacks, through which the

defendants aided and abetted those attacks and conspired with al Qaeda by providing the material

support and resources that enabled the terrorist organization to conceive, plan, coordinate, and

carry out the attacks.  The FAC provides detailed factual allegations regarding al Qaeda's

unrelenting efforts to target the United States and its citizens, from the formation of that terrorist

organization in or around 1989.  *See, e.g.,* FAC ¶¶ 95-112.  From at least the early 1990s, al

Qaeda began using the funds and resources supplied by its supporters to evaluate vulnerabilities

in the United States civil aviation system, and to develop terrorist plots exploiting those

vulnerabilities, specifically directed at the United States.  Plaintiffs specifically allege that the

September 11th attacks were "an adaptation of several earlier al Qaeda plots targeting the civil

aviation system, dating to the early 1990s, which were developed using the resources provided

by al Qaeda's sponsors and supporters."  *Id.* ¶ 104.  Over the next decade, al Qaeda relied on the

logistical support and funding provided by the infrastructure that facilitated its global operations

to acquire and build upon the knowledge, capabilities, and expertise that enabled the attacks.

The factual allegations of the FAC also demonstrate that al Qaeda made clear from its establishment that it would use resources provided by its supporters to attack the United States and its citizens. This specific intent to harm the United States is reflected by public statements of bin Laden himself, and the numerous al Qaeda plots and attacks conceived of and carried out against the United States before September 11, 2001. *Id.* ¶¶ 142-152. The FAC also offers factual detail regarding Defendants' extensive support of al Qaeda in this campaign, including through direct collaborations with Osama bin Laden's organization, and demonstrates that such support was ongoing during the periods immediately preceding the September 11, 2001 attacks. *Id.* ¶¶ 153-92 (ARB), 193-245 (NCB), 246-310 (SBG).

Contrary to Defendants' attempts to suggest otherwise, the factual allegations in the FAC do not rely on mere foreseeability as the basis to confer jurisdiction over Defendants. In fact, Plaintiffs specifically allege, and offer extensive and detailed factual allegations that at least give rise to an inference, that Defendants knowingly participated in a long-running campaign to support al Qaeda, with an awareness that the brunt of the harm resulting from their witting support of al Qaeda would be felt in the United States.

Defendants' motions to dismiss share several common flaws that warrant denial of each motion. Defendants move to dismiss the FAC by relying on an unduly restrictive view of personal jurisdiction that is neither supported by the Second Circuit authority, nor consistent with recent empirical findings of Congress. The allegations of the FAC demonstrate that the defendants' suit-related conduct is sufficiently connected to the United States to support the exercise of specific jurisdiction under the Second Circuit's most recent decision applying due process standards in the terrorism context, *Waldman v. Palestinian Liberation Organization,* 835 F.3d 317 (2d Cir. 2016), *petition for cert. docketed, Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017). In addition to misconstruing *Waldman* itself, Defendants'

arguments that due process principles immunize them for their sponsorship of al Qaeda ignore entirely Congress's empirical findings through JASTA confirming the direct nexus between the sponsorship of foreign terrorist organizations hostile to the United States and resulting harm to United States interests.  Congress presented those empirical findings, and broadened the substantive liability standards of the ATA to encompass aiding and abetting and conspiracy theories, with the intent to eliminate jurisdictional barriers to claims against foreign sponsors of terrorism, recognizing that those barriers imperiled our national security.  Congress's empirical findings and express recognition of secondary liability principles under the ATA are critical to the jurisdictional inquiry.  *See infra* at p.13.

Dismissal of the FAC also is not warranted on the basis that this Court and the Second Circuit previously dismissed the claims of other plaintiffs that sought to recover against ARB, SBG, and NCB, among others, for their roles in the September 11th attacks on personal jurisdiction grounds.[1]  These arguments ignore the full scope of the factual allegations in the FAC and disregard crucial facts that differentiate this case from the record presented by other plaintiffs in those proceedings.  In the fifteen years since the multidistrict litigation was filed, critical new evidence has emerged as to Defendants' roles in the conspiracy that was not a part of the original record before this Court.  In any case, the Second Circuit's rulings precede the enactment of JASTA and Second Circuit's ruling in *Waldman*.  The straightforward application of the standards set forth in that decision, as informed by JASTA, to the factual allegations of the

---

[1] Plaintiffs initially filed this suit in the Western District of Pennsylvania.  Plaintiffs asserted that – given that Defendants were no longer parties to the sprawling multidistrict proceeding and the facts underlying Plaintiffs' claims were not previously before the Court – judicial economy would be furthered by permitting another court with proper jurisdiction to preside over Plaintiffs' narrow and focused claims.  The Judicial Panel on Multidistrict Litigation nonetheless transferred these claims to the multi-district litigation pending before this Court.  Although the JPML noted Plaintiffs' claims "unquestionably share[] factual issues" with the cases in the MDL, the transfer order has no bearing on the extent to which, if at all, Plaintiffs' claims are similar to the previously-dismissed claims against Defendants.  Rather, the JPML held that this Court's "familiarity with these defendants and the entire history of the litigation gives it a decided advantage in assessing any new evidence."  *See* Transfer Order, MDL No. 1570 (JPML Oct. 3, 2016) (MDL Dkt. No. 77).

FAC readily establishes that due process principles do not protect Defendants from the present claims for their intentional sponsorship of al Qaeda.

Claims by ARB and SBG that the FAC fails to state a claim upon which relief can be granted under the ATA are similarly misplaced.  Most notably, JASTA's express and unambiguous recognition of substantive causes of action for aiding and abetting and conspiracy liability eliminates a principal basis for ARB's dismissal from the earlier cases, and removes any question as to whether Plaintiffs state a claim for relief against Defendants under the ATA. Finally, SBG's novel theory that the Insurer Plaintiffs lack standing to pursue claims under the ATA – a position in conflict with the holdings of this Court that has never before been advanced by any defendant in the history of this multidistrict litigation – is contrary to the plain text of the ATA and the most fundamental objectives of that statute, and has no basis in fact or law.

## II.      JASTA PROVIDES PLAINTIFFS WITH THE BROADEST POSSIBLE BASIS FOR RELIEF IN UNITED STATES COURTS

On September 28, 2016, JASTA became law.  By its terms, JASTA applies to "any civil action – (1) pending on, or commenced on or after, the date of enactment of [JASTA]; and (2) arising out of an injury to a person, property, or business on or after September 11, 2001" – which includes the present matter.  JASTA § 7; 130 Stat. at 855.  Congress enacted JASTA as part of an ongoing effort to combat international terrorism through the exercise of legislative authority.  JASTA functions in large measure to correct judicial constructions that limited the effectiveness of United States counter-terrorism laws and thereby undermined national security.

JASTA recognizes that civil litigation directed against the material support of terrorism is an important component of the nation's arsenal of counter-terrorism measures.  The statute's central purpose, and the touchstone for construing its provisions, is "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting or wherever they may be*

4

*found,* that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activity." *See* JASTA § 2(b); 130 Stat. at 853 (emphasis added). To this end, JASTA amended the civil liability provision of the ATA to expressly "recognize the substantive causes of action for aiding and abetting and conspiracy liability." *Id.* at § 2(a)(4); § 4(a); 130 Stat. at 854 (enacting 18 U.S.C. § 2333(d)). Substantively, JASTA directs courts to apply the expansive liability standards set forth in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(5); 130 Stat. at 852. JASTA thus eliminates a principal ground underlying prior dismissals of defendants in this multidistrict litigation, including ARB, for failure to state a claim under the ATA. *See In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 123-25 (2d Cir. 2013) ("*Terrorist Attacks VII*") (holding ATA does not authorize aiding and abetting liability and affirming lower court's dismissal of ARB).

In enacting JASTA, Congress affirmed a number of empirical and policy determinations central to our nation's security. Congress determined that "[i]nternational terrorism is a serious and deadly problem that threatens the vital interests of the United States" and expressly found that "[s]ome foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States." *See* JASTA § 2(a)(1), (3); 130 Stat. at 852-53. In addition, Congress recognized that the United States has a "vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims" against those responsible for their injuries. *Id.* at § 2(a)(7); 130 Stat. at 853.

Consistent with its understanding of the systematic manner in which foreign terrorist organizations and their supporters have targeted United States interests with increasing sophistication over the last several decades, Congress found that "[p]ersons, entities, or countries that knowingly or recklessly contribute material support or resources, *directly or indirectly,* to

persons or organizations that pose a significant risk of committing acts of terrorism that threaten

the security of nationals of the United States or the national security, foreign policy, or economy

of the United States, necessarily direct their conduct at the United States, and should reasonably

anticipate being brought to court in the United States to answer for such activities." *Id.* at

§ 2(a)(6); 130 Stat. at 853 (emphasis supplied).

The Supreme Court's decision in *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28

(2010) establishes that Congress's specific determination that material support for an anti-U.S.

terrorist organization creates a very direct nexus to the United States is entitled to deference, and

properly informs this Court's evaluation of the due process issues at hand.  In *Humanitarian Law*

*Project,* the Supreme Court considered a First Amendment challenge to the ATA.  *Id.* at 7, 25-

40.  While the Court held that the judicial branch does not defer to coordinate branches'

interpretations of the Constitution, the courts should defer to factual and policy assessments that

inform a constitutional determination.  *Id.* at 33-36.  Addressing the national security and

counter-terrorism policies underlying the ATA specifically, the Court held that "when it comes

to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the

part of the courts is marked,' . . . and respect for the Government's conclusions is appropriate."

*Id.* at 34 (citing *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)).  Here, that includes Congress's

specific assessments announced in JASTA that material support for organizations targeting the

United States very directly impacts U.S. interests, and that holding aiders and abettors of such

organizations to account in our courts is essential to our national security.  *See* JASTA § 2(a)(1),

(3), (6), (7); 130 Stat. at 852-53; *see also* Statement of Interest of the United States at p. 2,

*Sokolow v. Palestinian Liberation Org.*, No. 1:04-civ-397 (S.D.N.Y. Aug. 10, 2015) (ECF No.

953-1) (recognizing the "nation's compelling interest in combating and deterring terrorism at

every level").

Congress enacted JASTA to provide these Plaintiffs with the legal basis to bring new claims against parties alleged to have supported al Qaeda, and to have their claims adjudicated in furtherance of these objectives.  JASTA serves as a vehicle for civil litigants that sustained injuries on September 11, 2001 to seek relief against entities that provided direct or indirect material support to terrorists, "wherever acting and wherever they may be found."  JASTA § 2(b); 130 Stat. at 853.  JASTA was intended to and does establish liability for the precise forms of conduct engaged in by these Defendants, as described in detail in the FAC, and the Constitution does not serve to immunize Defendants from its reach and avoid accountability for their witting sponsorship of al Qaeda.

## III.   <u>STANDARD OF REVIEW</u>

To defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, Plaintiffs are required only to make a *prima facie* showing that jurisdiction exists.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84 (2d Cir. 2013); *see also In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 673 (2d Cir. 2013) ("*Terrorist Attacks VII*"), *cert. denied sub nom. O'Neill v. Al Rajhi Bank,* 134 S. Ct. 2870 (2014).  The Court must accept Plaintiffs' allegations as true, and construe all pleadings in the light most favorable to Plaintiffs.  *See PDK Labs., Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997).  To make a *prima facie* showing of jurisdiction, Plaintiffs need only "plead facts which, if true, are sufficient in themselves to establish jurisdiction."  *Bellepointe, Inc. v. Kohl's Dept. Stores*, 975 F. Supp. 562, 565 (S.D.N.Y. 1997).  This Court previously recognized that "Plaintiffs may rely entirely on factual allegations … and they will prevail even if Defendants make contrary arguments."  *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks I*") 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005) (citations omitted).[2]

---

[2] As discussed *infra* at pp. 27, 32-33, there is no basis for NCB's assertion that a more stringent standard applies because a "full jurisdictional-discovery record was developed" in connection with other plaintiffs' claims against NCB.  The other plaintiffs in the multidistrict proceedings did not have the opportunity to conduct discovery critical

With respect to a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  As in a motion to dismiss for lack of jurisdiction, the court must presume that the allegations in the complaint are true and give plaintiffs the benefit of every reasonable inference drawn therefrom.  *Id.* (citing *Desiderio v. Nat'l Assoc. of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999)).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 284 (S.D.N.Y. 2009) (citing *Iqbal,* 556 U.S. at 664).  Plaintiffs are not required to prove their case at the pleading stage.  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Wallert v. Atlan,* 141 F. Supp. 3d 258, 271 (S.D.N.Y. 2015) (citations omitted).

## IV.    LEGAL ARGUMENT

### A.    The Exercise of Personal Jurisdiction over Defendants is Appropriate

#### 1.    Standards Governing the Personal Jurisdiction Analysis

At issue before the Court is whether Defendants' knowing participation in the establishment and support of al Qaeda subjects Defendants to personal jurisdiction in this Court for claims arising from al Qaeda's September 11th attacks against the United States. Defendants claim that the exercise of personal jurisdiction would violate due process.  In fact, the allegations in the FAC readily establish that the exercise of personal jurisdiction over Defendants for the present claims is consistent with the Second Circuit's decision in *Waldman*, its most recent decision applying due process standards in the terrorism arena.

---

to the theories of jurisdiction advanced in the FAC as to NCB and SBG, such as the depositions of the principals of SBG and NCB who were responsible for directing their support for al Qaeda.  As to ARB, the prior plaintiffs had no opportunity to conduct discovery at all.

The exercise of personal jurisdiction requires satisfaction of three requirements. "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Id*. at 327 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank*, *SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). In conducting a due process analysis, the relevant inquiry focuses on whether Defendants' conduct establishes the requisite minimum contacts with the forum – here, the United States – and whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Plaintiffs assert that Defendants are subject to personal jurisdiction under a theory of specific jurisdiction. The baseline principles underlying the controlling "effects" test announced in *Calder v. Jones*, 465 U.S. 783 (1984) are not in dispute. The Supreme Court has recognized that, where actions involving the defendant "were expressly aimed" at the forum, and the defendant knew "that the brunt of that injury would be felt" in the forum, a court has jurisdiction over claims against the defendant arising from that conduct. *Calder*, 465 U.S. at 789; *see also Terrorist Attacks VIII*, 714 F.3d at 674. Due process simply requires that "the defendant's suit-related conduct must create a substantial connection with the forum State." *Waldman*, 835 F.3d at 341. Likewise, while the foreseeability of causing injury in the forum is not, in and of itself, sufficient to satisfy due process, such foreseeability is by no means irrelevant. The foreseeability of causing injury in the forum can establish minimum contacts, where "the defendant's conduct and connection with the forum… are such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). These standards do not provide

9

material supporters of foreign terrorist organizations with any broad protections from being haled into U.S. courts to answer for their conduct, but merely establish that it is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum." *Waldman*, 835 F.3d at 339 (citations and quotations omitted).

On May 27, 2014, the United States filed an amicus brief, at the invitation of the United States Supreme Court, concerning other September 11th plaintiffs' then-pending petition for a writ *certiorari*, which sought review of the Second Circuit's *Terrorist Attacks VIII* holding ("U.S. Amicus"). In its brief, the United States argued that the Second Circuit's due process rulings concerning the claims against certain groups of defendants should be read narrowly, as merely reflecting perceived deficiencies in the allegations or record on a few issues. *See* U.S. Amicus, attached as Exh. 1, at 20.[3] The United States expressly rejected the notion that *Terrorist Attacks VIII* should be read to suggest that personal jurisdiction requires a showing of specific intent to harm the United States. *Id.* at 19-20. To the contrary, the United States confirmed that "one means of establishing that a defendant expressly aimed conduct at a foreign forum is to allege that the defendant took intentionally tortious actions and 'knew that the brunt of th[e] injury would be felt' in the foreign forum." *Id.* (quoting *Calder,* 465 U.S. at 789-90). The United States further explained that this Court may properly exercise jurisdiction for claims over defendants that provided indirect support to al Qaeda, provided that Plaintiffs allege facts supporting the conclusion that Defendants "acted with the requisite knowledge that their contributions would result in an injury that would be felt in the United States." *Id.* at 20.

The Second Circuit's decision in *Waldman* further highlights the limitations of the due process protections afforded to perpetrators of international terrorism in suits arising under the ATA. In *Waldman,* the Second Circuit considered the availability of personal jurisdiction over

---

[3] Citations to "Exh." refer to the exhibits to the Affirmation of J. Scott Tarbutton Transmitting Documents in Support of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motions to Dismiss of Defendants Al Rajhi Bank, Saudi Binladin Group, and National Commercial Bank ("Tarbutton Affirmation").

the Palestine Liberation Organization and the Palestinian Authority for claims arising from various terror attacks that took place in Israel and killed or injured United States citizens.  While the Second Circuit in *Waldman* declined jurisdiction, it did so on the basis that there was no "connection between the conduct on which the alleged personal jurisdiction is based and the forum."  *Waldman*, 835 F.3d at 342.

The Second Circuit explained that "[w]hile the killings and related acts of terrorism are the kind of activities that the ATA proscribes, those acts were unconnected to the forum and were not expressly aimed at the United States."  *Id.* at 337.  In particular, the *Waldman* court emphasized the "random and fortuitous nature of the terror attacks" that took place outside of the United States and did not specifically target American citizens.  *Id.* at 337-38.  The *Waldman* court further explained that a defendants' provision of support to a foreign terrorist organization will not support jurisdiction in the absence of allegations that the terrorist organization was known to be targeting the United States.  *Id.* at 340.  The Second Circuit held that the allegations that the defendants' lobbying efforts were intended to influence United States policy were not sufficient to confer jurisdiction because the plaintiffs' claims did not arise from those contacts. *Id.* at 342.

In reaching its decision, the *Waldman* court drew a stark contrast between the claims before it arising from support for Hamas attacks in Israel and cases arising from the witting sponsorship of al Qaeda.  *Id.* at 338-41.  In particular, the court emphasized that the "specific aim of the group receiving support" is critical to the analysis of personal jurisdiction for claims arising under the ATA, *id.* at 340, and confirmed that al Qaeda has long been known to be targeting the United States.  *Id.*  Where claims under the ATA arise from a defendant's knowing

participation in al Qaeda's targeting of the United States and injuries directly arising out of that campaign, *Waldman* fully support the exercise of jurisdiction.[4]  *Id.* at 343-44.

As further discussed below, a straightforward application of these standards to the factual allegations of the FAC readily supports the Court's exercise of jurisdiction over Defendants for the present claims.  Plaintiffs allege that Defendants provided material support and resources to al Qaeda with knowledge that al Qaeda intended to use those resources to target the United States.  There was nothing random or fortuitous about the nature of the harm inflicted as a result of the September 11th attacks.  To the contrary, al Qaeda was established for the very purpose of targeting U.S. interests, and the attacks were the culmination of a relentless campaign by bin Laden's terrorist organization to carry out acts of terrorism against the United States and its citizens.  *See Waldman*, 835 F.3d at 340.  The factual allegations of the FAC confirm that al Qaeda made clear that it would use resources provided by its material supporters to target the United States.  Plaintiffs also offer detailed facts indicating that Defendants acted with an

---

[4] While *Waldman* plainly supports a finding of personal jurisdiction over Defendants, it should be noted that its holding declining to find personal jurisdiction for the more attenuated conduct at issue in that case is itself the subject to a petition for a writ of *certiorari*.  Amici briefs have been submitted by United States Senators, Exh. 2, the United States House of Representatives, Exh. 3, and Former Federal Officials, Exh. 4, arguing that declining to exercise jurisdiction over terrorist supporters for claims arising under the ATA threatens separation of powers insofar as it effectively nullifies the ATA's intent to provide meaningful civil remedies to victims of terrorism.  *See* U.S. Senators Amicus at 19.  To this end, the amici dispute the Second Circuit's determination that due process is coequal under the Fifth and Fourteenth Amendments and declare it "nonsensical to engage in the wooden formalism of extending Fourteenth Amendment concepts to the national legislature in a manner that frustrates Congress's ability to implement such legislation."  *See* U.S. House of Representatives Amicus at 18.  The former federal officials assert that imposing such a limitation on federal courts' jurisdiction "would weaken the comprehensive statutory framework that Congress has developed and turn the ATA from the effective weapon that Congress intended and the Justice Department welcomed into a cruel hoax on the families that advocated for it."  *See* Former Federal Official Amicus at 13.  The separation of powers and national security concerns raised by the amici would be significantly amplified by a finding that personal jurisdiction is not available for Plaintiffs' claims against Defendants for their witting sponsorship of al Qaeda – a terrorist organization that singularly targeted the United States – resulting in injuries on U.S. soil.  Consistent with these arguments, Plaintiffs respectfully submit that *Waldman* was wrongly decided, and reserve their argument that the due process limitations of the Supreme Court's Fourteenth Amendment jurisprudence do not apply with equal force to the analysis of due process under the Fifth Amendment for claims arising under the ATA, particularly where the Fourteenth Amendment "would impose a unilateral constraint on United States courts" and the exercise of jurisdiction would comport with express legislative principles and national security interests.  *Id.* (summarizing arguments presented by amici and plaintiffs).  Plaintiffs recognize, however, that this Court's analysis is governed by the Second Circuit's holdings.

awareness that al Qaeda would use the resources they provided to attack U.S. interests. Defendants' suit-related conduct, the provision of material support, gave rise to Plaintiffs' claims and directly enabled al Qaeda to bring its plans to fruition, resulting in an attack on U.S. soil. The exercise of jurisdiction under those facts is entirely consistent with due process.

This Court's due process analysis must also take into account Congress's findings and assessments concerning the clear nexus between the sponsorship of foreign terrorist organizations hostile to the United States and resulting harm to U.S. interests, as reflected in JASTA. These findings and assessments confirm that those who aid and abet or conspire with terrorist organizations hostile to the United States engage in conduct that directly harms U.S. interests in various ways. *See* JASTA §2(a)(6); 130 Stat. at 852. Further, Congress has made clear that this resulting harm to U.S. interests arises regardless of whether the support is provided directly or indirectly. *Id.* These findings speak directly to the conduct at issue here, and reinforce that Defendants' "suit-related conduct" – their role in supporting al Qaeda's targeting of the United States – subject those entities to liability under the ATA and "create[s] a substantial connection with the forum State." *State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 890 (S.D.N.Y. 2017) (citing *Waldman,* 835 F.3d at 335).

Plaintiffs have met their *prima facie* burden here. Plaintiffs allege sufficient facts that raise an inference that Defendants expressly aimed their conduct at the United States. To dismiss the claims at the pleading stage would present a significant barrier to the exercise of judicial power over those aiding and abetting terrorist aggression directed at the United States, and would thereby undermine our national security.

### 2. Plaintiffs Allege Facts That Support the Exercise of Personal Jurisdiction over ARB

Throughout its brief, ARB argues that the Court is compelled to dismiss the FAC because in 2005, the MDL court dismissed claims against ARB by other plaintiffs injured on September

11th under then-existing law, and, in 2013, the appellate court affirmed that decision.  *See Terrorist Attacks I*, 349 F. Supp. 2d 765; *Terrorist Attacks VII*, 714 F.3d 118.  ARB argues that the allegations of the FAC are "substantively identical" to those presented in the earlier proceedings against it, ARB Br. at 1, and for purposes of its personal jurisdiction defense, claims that the FAC relies on "defective and attenuated allegations that are substantively identical to those" found deficient to sustain personal jurisdiction over other defendants in the MDL.  *Id.*

Initially, it should be noted that ARB's dismissal from the earlier cases was predicated solely on 12(b)(6) grounds, and JASTA has overturned a principal legal basis for that determination.  *See Terrorist Attacks VII*, 714 F.3d 118 (upholding dismissal of ARB because "plaintiffs cannot allege aiding-and-abetting claims under the Anti-Terrorism Act;" JASTA § 4(a), 130 Stat. at 854 (enacting 18 U.S.C. § 2333(d)).  As a result, ARB's reliance on the prior proceedings against it is without merit, and the resolution of its motion to dismiss must be based on a careful review of the factual allegations of the FAC under current legal standards.

There is, however, a more fundamental problem with ARB's claims that the allegations of the FAC are substantively identical to those presented against ARB in the prior proceedings and considered by this Court and the Second Circuit in dismissing ARB from the prior actions – they are inaccurate.[5]  Indeed, in dismissing ARB from the earlier cases in *Terrorist Attacks I*, this Court considered the allegations presented in the *Burnett* Plaintiffs' More Definite Statement as to ARB filed on August 27, 2003, *Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. and Dev. Corp., et al.*, Case No. 1:02-cv-01616 (JR) (Dkt. No. 266), attached as Exh. 5.  That ruling was thereafter extended to the remaining cases in the MDL on May 5, 2005 (ECF No. 883), based on the stipulation of those other plaintiffs that the allegations in their cases did not differ from those

---

[5] ARB's arguments relating to the purported similarities of the allegations of the FAC and those at issue in the prior cases against it principally concern its arguments for dismissal for failure to state a claim, but they animate its personal jurisdiction arguments as well.  As a result, it is appropriate to correct the record on this point at the outset.

presented in the *Burnett* Plaintiffs' More Definite Statement.  On appeal in 2013, the Second

Circuit's review was constrained to whether the district court correctly held that the record

before it – consisting solely of the allegations in the *Burnett* Plaintiffs' Complaint and More

Definite Statement – failed to state a claim upon which relief could be granted.  *See* Fed. R. App.

P. 10(a) (limiting the record on appeal to "original papers and exhibits filed in the district court,"

transcripts of proceedings, and the docket entries).  Indeed, counsel for ARB made clear at the

outset of his argument before the Second Circuit that "the *Burnett* complaint, which is the only

operative complaint as to Al Rajhi, and that's by stipulation," was the only pleading in issue in

the appeal.  *Terrorist Attacks VII* Tr. 54:7-19, attached as Exh. 6.  Thus, although the appeal was

decided in 2013, the record upon which the Second Circuit ruled closed in 2005 with the lower

court's decision – *i.e.*, both decisions were limited to the allegations stated in the *Burnett*

Plaintiffs' More Definite Statement.[6]

The differences between the content of the *Burnett* Plaintiffs' More Definite Statement

and the allegations presented in the FAC as to our ARB are significant, and the content of the

new facts refutes ARB's claims that plaintiffs have failed to present facts sufficient to make a

*prima facie* showing of personal jurisdiction.  In this regard, the allegations of the *Burnett* More

Definite Statement centered almost entirely on claims that ARB aided and abetted al Qaeda by

providing zakat contributions to charities that were engaged in supporting al Qaeda, and

provided banking services to those same charitable organizations.  In advancing theories based

on those activities, the *Burnett* Plaintiffs' More Definite Statement included a specific allegation

that the charities held themselves out as legitimate organizations.

---

[6] ARB purports to compare the FAC with the record before the district and appellate courts under the heading of "Corresponding Allegations in Previously Dismissed Actions" (Ex. 1 to ARB Br., MDL Dkt. 3703-1).  But even a cursory review reveals that it includes pleadings and materials filed after ARB's dismissal in 2005, including in 2010 (Plaintiff's Summary of Allegations, MDL Dkt. 2241-7) and 2015 (Statement of Zacarias Moussaoui, MDL Dkt. 2927-5).

The factual allegations of the FAC also are materially different.  Most notably, the FAC draws upon information from CIA reports concerning the United States' investigations into ARB's terrorist activities, which was not publicly available at the time ARB was dismissed by the District Court in 2005.  *See* FAC ¶¶ 155-66.  According to the CIA reports cited in the FAC, "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."  *Id.* ¶ 213.  In fact, the CIA reports document that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use ARB.  *Id.* ¶ 162.  In addition, U.S. investigations found that senior ARB officials took actions in the wake of the attacks to circumvent counter-terrorism financing measures, directing ARB's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."  *Id.* ¶ 160.  Based upon the totality of the evidence collected by the United States government, senior U.S. officials debated in the wake of the September 11th attacks whether to formally designate ARB as an al Qaeda sponsor pursuant to Executive Order 13224, and even considered the possibility of covertly interfering with ARB's operations.  *Id.* ¶ 168.  In the end, U.S. officials elected to pursue reforms of ARB through discussions with Saudi authorities.  *Id.*

In addition to the allegations relating to U.S. investigations of ARB that were not part of the record as to ARB in the prior proceedings, the FAC offers new factual allegations based on the testimony of Zacarias Moussaoui.  On the basis of his personal involvement in the creation of the database of al Qaeda's principal donors, and direct dealings with Osama Bin Laden at al Qaeda's headquarters in Afghanistan over an extended period, Moussaoui testifies that Osama bin Laden considered ARB a "good brother" which was responsible for "moving money around," and also a key supporter of al Qaeda charity fronts.  *Id.* ¶ 167.

16

These additional fully support the exercise of personal jurisdiction over ARB under governing standards.  The factual allegations of the FAC describe a broad program of support by ARB for al Qaeda, involving not only the funding of al Qaeda through known fronts, but direct engagements in support of terrorists as well.  Further, the allegations relating to the U.S. government's findings that ARB knew terrorists were using ARB, *id.* ¶ 156, and that principals of ARB sought to circumvent counter-terrorism measures after 9/11, *id.* ¶¶ 160-61, foreclose the conclusion that the allegations of the FAC fail plausibly to allege that ARB "acted with the requisite knowledge that [its] contributions would result in an injury that would be felt in the United States."  U.S. Amicus at 20.  Al Qaeda's dedication to targeting the United States during the relevant time period is, meanwhile, beyond dispute.  FAC ¶¶ 169-92.  Under such facts, the exercise of personal jurisdiction over ARB for Plaintiffs' ATA claims comports with due process.  Indeed, it is fundamentally illogical to suggest that ARB's actions in support of al Qaeda were on the one hand sufficient to warrant designating ARB in order to protect U.S. national security interests, as senior U.S. officials considered doing, but at the same time are insufficient to create a "substantial connection" with the United States.  *See* Exec. Order 13224.

ARB appears to suggest that because ARB did not commit any violation of the ATA within the United States, the suit-related conduct at issue does not create a substantial connection with the forum within the meaning and holding of *Waldman*.  This argument ignores Congress's express finding in JASTA that the provision of support abroad to terrorist organizations hostile to the United States *is* conduct directed at the United States.  *See* JASTA § 2(a)(6); 130 Stat. at 853. More fundamentally, ARB misreads *Waldman*, which in fact supports jurisdiction here.  Indeed, unlike the September 11th attacks, the attacks in *Waldman* "occurred *entirely* outside the territorial jurisdiction of the United States" in Israel and were committed by groups who targeted Israel in seeking to force it to withdraw from Gaza. *Waldman,* 835 F.3d at 836 (emphasis in

original).  Absent an underlying connection to the United States, the Court was forced to ask a different question than that present here: "[w]hat other constitutionally sufficient connection did the commission of *these* torts by *these* defendants have to *this* jurisdiction?"  *Id.* (emphasis in original).

ARB also relies heavily on prior decisions in the MDL in arguing that personal jurisdiction is not present over ARB, but ARB fails to address the analytical changes required by JASTA, nor does it address the new evidence presented in the FAC.  Thus, ARB is wrong when it argues that ARB cannot be subject to this Court's jurisdiction unless it was a primary participant in the September 11th attacks.  Moreover, as Congress explicitly found in echoing the conclusions of U.S. counterterrorism officials, there is a direct causal link between the extensive funding and financial network supporting Al Qaeda and the violence committed on September 11th by al Qaeda terrorists.  *See* JASTA § 2(a)(1); (3); 130 Stat. at 852-53 (congressional finding that foreign terrorists use international funding for attacks against the U.S.); FAC ¶ 112 (9/11 Commission finding that al Qaeda's global infrastructure was absolutely necessary to September 11th attacks); FAC ¶ 113 (Testimony of Undersecretary of Terrorism and Financial Intelligence regarding the importance of financing and fundraising – two tasks aided by ARB – in conducting terrorist attacks).  It is thus the judgment of Congress and the counterterrorism community that providing material support through financial services or funding to a terrorist organization hostile to the United States imperils our national security, enables acts of terrorism against U.S. interests, and therefore is conduct directed at the United States.  This Court should reach the same conclusion and recognize its jurisdiction over ARB under the ATA.

### 3.   Plaintiffs Allege Facts That Support the Exercise of Personal Jurisdiction over SBG

In seeking dismissal from the present actions on personal jurisdiction grounds, SBG relies heavily on the prior determinations that the record in several earlier cases concerning SBG's pre-1994 material support of al Qaeda was insufficient to sustain jurisdiction.  In particular, SBG invokes this Court's finding that SBG's pre-1994 support of al Qaeda was "too temporally remote to establish specific jurisdiction."  *In re Terrorist Attacks on Sept. 11, 2001*, 840 F. Supp. 2d 776, 782 (S.D.N.Y. 2012) ("*Terrorist Attacks VI*").  On review, the Second Circuit likewise focused on whether the record that SBG provided support to Osama bin Laden before 1994 justified the exercise of personal jurisdiction and concluded that it "agree[d] with the District Court that nothing in the record supports the notion that these actions were 'expressly aimed' at the United States or are connected in any meaningful way, for the purpose of establishing personal jurisdiction, to the September 11, 2001 attacks."  *Terrorist Attacks VIII*, 714 F.3d at 676.  Although SBG acknowledges that Plaintiffs have presented factual allegations that were not before this Court or the Second Circuit in the earlier proceedings, it urges this Court to discount those factual allegations, based principally on arguments attacking the ultimate merits of the evidence underlying the allegations and SBG's preferred alternative facts.

SBG's reliance on the rulings in the prior cases declining to find personal jurisdiction over it for claims arising from its pre-1994 support for al Qaeda is misplaced in several respects. Initially, Congress's findings through JASTA make clear that SBG's material support for al Qaeda, from the formation of al Qaeda in 1989 through SBG's alleged severance of ties with Osama bin Laden in 1993, directly impacted U.S. national security interests in myriad respects. Given Congress's express recognition of that nexus, SBG's material support of al Qaeda during the pre-1994 period was expressly aimed at the United States, and due process principles do not preclude the exercise of personal jurisdiction over SBG for claims arising from those activities. Further, the factual allegations of the FAC draw a clear connection between SBG's material

19

support of al Qaeda during this period and the September 11th attacks, including through factual allegations demonstrating that al Qaeda was applying resources provided by SBG and other supporters during that time period to evaluate vulnerabilities in the civil aviation system, and used the knowledge acquired through those efforts to conceive and plan the September 11th attacks. *See* FAC ¶¶ 246-310.  Finally, the new facts presented in the FAC indicate, and at a minimum give rise to an inference, that SBG continued to provide support to al Qaeda for years after it claims to have severed ties with Osama bin Laden, through mechanisms that were never explored in the earlier cases. *Id.*

<blockquote>a.   <u>SBG Provided Material Support to Al Qaeda When Al Qaeda Was Targeting and Attacking the United States</u></blockquote>

At the outset, it should be noted that SBG does not raise any credible challenge to the plausibility of Plaintiffs' allegations that SBG knowingly provided material support and resources to al Qaeda, at times when al Qaeda was targeting the United States and its citizens. *See* FAC ¶¶ 140-41.  In fact, SBG effectively acknowledges that it provided several million dollars to Osama bin Laden, in the form of shareholder distributions, *after* bin Laden established al Qaeda, and does not contest in any way Plaintiffs' allegations that bin Laden created al Qaeda for the very purpose of waging jihad against the United States. *Id.* ¶¶ 142-52.  SBG also does not contest Plaintiffs' factual allegations that al Qaeda did in fact carry out attacks targeting the United States during the time period that SBG sent funds to Osama bin Laden during the early 1990s. *Id.* ¶¶ 268-72.  SBG likewise does not challenge Plaintiffs' allegations that bin Laden was using resources provided to him during this period to develop plots targeting the United States through vulnerabilities in the civil aviation system, *id.* ¶¶ 104-11.  The FAC specifically alleges that the knowledge al Qaeda acquired through those efforts "directly enhanced its capacity" to carry out the September 11th attacks. *Id.* ¶ 105.

Plaintiffs also have offered factual allegations demonstrating that SBG was aware that Osama bin Laden was engaged in a campaign to conduct jihad before SBG allegedly severed ties with him, and SBG's challenges to the plausibility of those allegations are not credible. *Id.* ¶¶ 263-64, 267, 273, 276-78. As SBG admits, it is controlled to this day by the bin Laden family, and Osama bin Laden was himself a shareholder of SBG at the time he formed al Qaeda and for (at least) several years thereafter. *Id.* ¶¶ 140, 249, 260. As a result of its uniquely intimate relationship with Osama bin Laden, SBG was keenly aware of his dedication to conduct jihad against the United States from the outset, a goal he openly declared at least as early as 1990 at the bin Laden family mosque, years before SBG claims to have severed ties with him. *Id.* ¶ 144.

While Plaintiffs' claims are not limited to these factual allegations, SBG's suggestion that they do not matter and that they fail to support the exercise of personal jurisdiction in the present procedural setting is dubious, particularly in light of JASTA and the factual allegations of the FAC drawing a direct relationship between its acknowledged pre-1994 support for al Qaeda and the September 11th attacks. Once again, Congress declared in JASTA that the knowing or reckless provision of material support to foreign terrorist organizations hostile to the United States directly impacts U.S. national security and other vital interests in many respects. *See* JASTA §2(a)(6); 130 Stat. at 852. Congress also found that recognizing theories of secondary liability was necessary to protect our national security, thus confirming that conduct that satisfies the aiding and abetting and conspiracy liability principles of *Halberstam* necessarily is directed at the United States, where the provision of material support to a terrorist organization hostile to the United States is concerned. *Id.*

Here, SBG's conduct in materially supporting al Qaeda with an express awareness that al Qaeda was using resources provided to attack the United States, through which it aided and abetted and conspired with al Qaeda in its targeting of the United States, is the very "suit-related

conduct" that is the focal point of the due process inquiry, and readily establishes a "substantial

connection" with the United States in keeping with Congress's declarations through JASTA.

*Waldman,* 835 F. 3d at 840-41.  This conclusion is particularly appropriate given the factual

allegations confirming that al Qaeda did in fact carry out attacks against the United States during

the period that SBG acknowledges that it was providing significant funding to Osama bin Laden,

and the additional allegations showing how that support was directly applied to develop the

capacities to carry out the September 11th attacks.  *Id.*; *see also Terrorist Attacks VIII,* 714 F.3d

at 678-79 (granting jurisdictional discovery regarding defendants who were alleged to have

knowingly supported bin Laden and al Qaeda).

        b.      <u>The FAC Offers New Facts and Evidence that SBG's Support for<br>Al Qaeda Continued into the Years Immediately Preceding the<br>September 11th Attacks</u>

Plaintiffs' present claims are not, however, predicated solely upon SBG's material

support of al Qaeda prior to 1994, but instead advance new factual allegations that SBG's

support for al Qaeda continued into the years immediately preceding the September 11th attacks.

These factual allegations are predicated upon new evidence provided by individuals with

personal knowledge of al Qaeda's ties to SBG during the relevant time periods, including the

writings of Osama bin Laden himself, and were neither considered nor explored in discovery in

the earlier proceedings in this litigation.  SBG's efforts to evade these additional allegations rest

on improper arguments focused on the ultimate merits of the underlying evidence, which are

implausible and misguided in any case.

Between May 20, 2015 and January 19, 2017, the Office of the Director of National

Intelligence ("ODNI") declassified a limited tranche of documents recovered during the raid on

Osama bin Laden's compound in Abbottabad.  One of the few documents that the ODNI chose

to release at that time was a document that the ODNI identified as "Bin Laden's will."[7]  The

"will" offers new insight into Osama bin Laden's relationship with SBG and its principals in the

years preceding the September 11th attacks, and evidences a funding mechanism established by

SBG for the benefit of al Qaeda that was not before the courts in previous proceedings.

As set forth in the FAC, bin Laden wrote the will to address the disposition of

approximately $29 million of assets in the Sudan, and personally affirmed that "out of this

amount, 12 million dollars came from my brother, Bakr bin Muhammad Bin Laden, on behalf of

Bin Laden Company, for their investment in Sudan."  FAC ¶ 299.  Bin Laden directs in the

document that the funds be returned, and expresses his hope and expectation that they will be

invested to support jihad:  "I hope for my brothers, sisters and maternal aunts to obey my will

and to spend all the money that I have left in Sudan on jihad, for the sake of Allah."  *Id.* ¶ 300.

The FAC further alleges that the "will" was written in the late 1990's, *id.* ¶ 299, an allegation

that is based on statements made by CIA officials to the New York Times contemporaneous with

the document's release.[8]  Collectively, these factual allegations indicate that SBG established a

continuing funding mechanism for al Qaeda, the benefits of which redounded to al Qaeda until at

least into the late 1990's, and that Osama bin Laden understood that his family, including the

head of SBG itself, remained entirely supportive of his jihadist agenda.

The claims of continuing support by SBG of al Qaeda during the years preceding the

September 11th attacks based on bin Laden's own "will" are further bolstered by the FAC's

allegations based on information provided by Zacarias Moussaoui.  On the basis of information

---

[7] More recently, on November 1, 2017, the CIA, through an interagency effort, released nearly 470,000 additional files recovered in the raid on the Abbottabad compound that were outside the scope of the previous declassification reviews.  However, with very limited exceptions, this massive trove of information has been released in raw form, and researchers have indicated it will take considerable time to review and understand the content of the materials.

[8] *See* Matthew Rosenberg, *Osama bin Laden Feared Wife's Tooth Held a Tracking Device*, NY TIMES, March 1, 2016, available at https://www.nytimes.com/2016/03/02/world/middleeast/osama-bin-laden-materials-declassified.html.

provided by Moussaoui, the FAC expressly alleges that SBG continued to aid al Qaeda into the late 1990's, including by providing funding and shipping construction parts to Pakistan that were received by al Qaeda members there and transported to Afghanistan, and used in Afghanistan to build and maintain al Qaeda's training camps. *Id.* ¶ 306. More generally, the FAC alleges on the basis of information provided by Moussaoui that Osama bin Laden maintained warm and supportive relations with his family, including the family members who controlled SBG. *Id.* ¶¶ 305-08. These facts are in conflict with SBG's efforts to cast the relationship between Osama bin Laden and the family members who controlled SBG as hostile during the period after 1993.[9]

SBG's arguments that the Court should disregard the allegations predicated on the content of the will and information provided by Moussaoui are based on procedurally improper challenges to the ultimate merits of the underlying evidence, and are substantively misguided in any case. For example, SBG protests the allegations relating to the will, based on its theory that while "Plaintiffs call it a 'will,' it has no legal indicia of such." SBG Br. at 18. SBG further argues that, given the absence of a date on the face of the document itself, the content of the will is "perfectly consistent with Plaintiffs' oft-repeated allegation . . . that OBL received as much as $1 million a year from his family between the early 1970s and 1993." *Id.*

Beyond the fact that these arguments improperly implore the Court to disregard the well-pleaded allegations of the FAC, the fact of the matter is that they make no sense. Indeed, the ODNI characterized the document as a "will" when it declassified it, and the FAC simply adopts

---

[9] Part Four of the *Report of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001,* which was not made available until July 2016 and is commonly referred to as the "28 Pages," provides further factual support bin Laden family members maintained ties with al Qaeda and Osama bin Laden throughout the 1990s. *See* FAC ¶ 308. For instance, the FAC cites the finding in the 28 Pages that Osama Bassnan, an ardent bin Laden supporter, knew bin Laden's family in Saudi Arabia, and was in telephone contact with "members of the family who are living in the United States." The 28 Pages also reveal that Osama bin Laden continued to travel between Afghanistan and Saudi Arabia during a time when SBG would have the Court believe he was in exile. SBG would have this Court consider such allegations in a vacuum and, indeed, on their own, they may not add much information about SBG's material support of al Qaeda. However, as alleged, these statements directly align with aspects of Moussaoui's testimony, and at least lend circumstantial support for the specific factual allegations that SBG continued to deliver support to Osama bin Laden throughout the 1990s.

the government's characterization.  Meanwhile, SBG's suggestion that the will does not evidence a previously undisclosed funding mechanism for SBG, but instead recounts Osama bin Laden's shareholder distributions between 1979 and 1993, is inherently illogical.  Osama bin Laden did not move to Sudan until 1991, and had the funds at issue in the document been monies that he was entitled to as a shareholder, he would not have been returning them to SBG.

        SBG's arguments concerning the factual allegations of the FAC referencing Moussaoui's statements and related evidence are similarly misguided.  Once again, these arguments improperly urge the Court to ignore the allegations of the FAC itself.  And in doing so, they rest on the claim that any information provided by Moussaoui is inherently incompetent, a claim that is at odds with the assessments of the federal courts that oversaw his criminal prosecution.[10]

        SBG also wrongly accuses Plaintiffs of misrepresenting the information provided by Moussaoui, urging that Moussaoui's testimony should be understood to relate exclusively to Osama bin Laden's contacts with his family, and not SBG.  Beyond the fact that these arguments again ignore the allegations of the FAC, they also ignore the complete dialogue and broader context of the discussion in issue.  Indeed, the very next question posed by counsel, as a follow up to whether the family cut ties with Osama bin Laden, is whether the family also continued to send money to Osama bin Laden.  *See* Moussaoui Stmt. at 21:4-6 (MDL Dkt. No. 2927-5) ("Did you receive any information indicating that the family in general was continuing – continuing to send money to Osama bin Laden?").  Moussaoui's response is instructive.  He does not merely talk about the family.  Rather, with no suggestion from counsel, Moussaoui responded, "Yes, I

---

[10] The Fourth Circuit affirmed the lower court's conviction of Moussaoui in connection with the September 11, 2001 attacks.  *See United States v. Moussaoui,* 591 F.3d 263 (4th Cir. 2010).  The appellate court held that the lower court did not abuse its discretion in holding that Moussaoui was competent to enter a guilty plea.  The Fourth Circuit cited to the proceedings before Judge Leonie M. Brinkema, wherein she explained that she was "fully satisfied that Mr. Moussaoui is completely competent . . . Mr. Moussaoui is an extremely intelligent man.  He has actually a better understanding of the legal system than some lawyers I've seen in court."  *Id.* at 274.

receive – I used to – to enter into database a financial document of money of – of account of the bin Laden group with Saudi Arabia . . . ." *Id.* at 21:7-9.

More generally, SBG's arguments about the new facts and evidence presented in the FAC ignore the broader significance and import of those facts in relation to the personal jurisdiction inquiry, and how they undermine the facts SBG offered to evade the jurisdiction of U.S. courts. In the earlier proceedings, Bakr bin Laden filed an affidavit stating:  "Osama has not received a penny from MBC or SBG or any of their affiliates since, at the latest, June 1993.  Nor has Osama received any other form of support from MBC, SBG or any of their affiliates since that time.  I have not authorized and, indeed, have forbidden any person acting on behalf of MBC, SBG or any of their affiliates to make any payments, do any business with, or otherwise provide any support directly or indirectly to Osama or any of his companies since June 1993."  FAC ¶ 293. The intended import of this testimony was that SBG and the family had cast Osama bin Laden aside in 1993.  The allegations of the FAC indicate otherwise, and thus lend further plausibility to Plaintiffs' express claims that the bin Laden family members who controlled SBG directed continuing support to al Qaeda from SBG well after 1993.

This new evidence draws a clear connection between the operational assistance provided by SBG and the ultimate September 11, 2001 attacks.  The information provided by the will, Moussaoui, and the related investigation creates sufficient reasonable inferences that the foundational support SBG provided to al Qaeda continued through the 1990s, and that SBG knowingly offered that support in aid of al Qaeda's plan to commit an aggressive terrorist strike against the United States.  These detailed factual allegations in the FAC are sufficient to confer jurisdiction under *Calder*.

### 4. Plaintiffs Allege Facts That Support the Exercise of Jurisdiction over NCB

The allegations in the FAC relative to NCB admittedly share more similarities with prior claims than do Plaintiffs' claims relative to ARB and SBG. Despite these similarities, the factual allegations advanced against NCB certainly are sufficient to make a *prima facie* showing to support jurisdiction, particularly given the Second Circuit's intervening decision in *Waldman* and JASTA.[11]

In support of the claims advanced against NCB, the FAC alleges more than mere foreseeability of a possible injury to support the exercise of jurisdiction. Indeed, the FAC alleges that NCB maintained a close and direct relationship with al Qaeda, and that senior personnel of NCB, who were in direct contact and working in concert with al Qaeda members, knowingly used the bank's infrastructure for the purpose of enabling al Qaeda to wage *jihad* against the United States. *See, e.g.,* FAC ¶¶ 201, 204, 223, 226, 234. The direct and intimate relationship between NCB and al Qaeda is manifested, in part, by their collaboration relative to the Muwafaq Foundation, a financial and operational arm of al Qaeda founded by NCB executives Khalid bin Mahfouz and Yassin al Kadi. *Id.* ¶¶ 204-34.

Plaintiffs maintain that NCB channeled resources to Muwafaq, for the purpose of enabling al Qaeda to realize its stated ambition to attack America. *Id.* ¶ 234. NCB provided further support for al Qaeda's jihad via its relationships with the International Islamic Relief Organization and Saudi Joint Relief Committee for Kosovo and Chechnya, two other ostensible charities with intimate financial and operational ties to al Qaeda. *Id.* ¶¶ 204, 235-43. Plaintiffs

---

[11] NCB claims that, because this Court permitted other plaintiffs in other actions encompassed in this multidistrict proceeding to take jurisdictional discovery, Plaintiffs' claims are subject to a more stringent standard of review. *See* NCB Br. at 8-9. NCB is incorrect. Plaintiffs need only make a *prima facie* showing of jurisdiction; this is *not* a post-discovery motion. Plaintiffs have not had the opportunity to take any discovery in the context of this particular action, *see infra* at pp. 32-33. Additionally, insofar as NCB challenges the accuracy of particular allegations, NCB misapplies the standard of review. The relevant inquiry is whether Plaintiffs' allegations, accepted as true, support jurisdiction.

likewise offer detailed facts and evidence to demonstrate that NCB was specifically aware of the terrorist activities of the IIRO and SJRC at relevant times. *Id.* ¶¶ 242-43.

Plaintiffs' allegations are reinforced further by the new evidence provided by Zacarias Moussaoui. Moussaoui testified that, as part of his role in the terrorist network, he built an electronic database that tracked the identities of al Qaeda's financial donors, their contributions, and the source of their monies. *Id.* ¶ 202. Moussaoui confirmed that he documented financial transactions benefiting al Qaeda and involving NCB. *Id.* This allegation was not part of the record in the prior proceedings, and it was not considered by the Second Circuit. When viewed in the broader context of Plaintiffs' claims against NCB, Moussaoui's statements lend plausibility to Plaintiffs' claims that NCB itself provided direct support to al Qaeda. These additional facts further support the inference that NCB was aware that its support would advance al Qaeda's *jihad* against the United States.

NCB's view that the factual allegations of the FAC are insufficient to establish jurisdiction is based on the faulty notion that personal jurisdiction has "receded" in the years since the Second Circuit dismissed it from the multidistrict proceedings, such that it is "even more difficult for a plaintiff to establish personal jurisdiction" under the ATA. *See* NCB Br. at 2. Neither of the cases that NCB cites for this proposition arise under the ATA. *See Daimler AG v. Bauman*, 134 S. Ct. 746 (2014); *Walden v. Fiore,* 134 S. Ct. 1115 (2014). In addition, *Daimler* involves general jurisdiction theories, 134 S. Ct. at 758, and, in *Walden,* the Supreme Court merely held that the foreseeability that a Georgia defendant's conduct would cause harm in Nevada did not support the state court's exercise of jurisdiction. 134 S. Ct. at 1124-25. NCB's contention therefore is misplaced, particularly in view of Congress's enactment of JASTA, which expands the jurisdictional predicates for claims pursued by victims of terrorism.

28

There similarly is no support for NCB's claim that *Waldman* and *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) confirm "narrowed standards in the specific jurisdiction context."  NCB Br. at 3.  NCB's reference to *Brown* is inapposite given that the decision focuses on due process constraints on the exercise of general jurisdiction over a defendant in several states within the United States.  Further, NCB substantially misstates the Second Circuit's holding in *Waldman* as well.  Far from "narrowing" personal jurisdiction in the terrorism context, *Waldman* outlines a framework for the application of due process principles in the civil terrorism context that reinforces the availability of jurisdiction arising under the ATA for claims involving the witting sponsorship of a terrorist organization that has specifically targeted the United States, particularly where the resulting injuries occur here.  *See supra* at 11-13.  In defining the boundaries of jurisdiction, *Waldman* confirms that the exercise of jurisdiction over NCB is consistent with due process.

NCB also misconstrues the Second Circuit's holdings insofar as it suggests that the provision of indirect funding of an organization openly hostile to the United States is insufficient to confer jurisdiction.  NCB Br. at 4, 18-19; *In re Terrorist Attacks on Sept. 11, 2001,* 538 F.3d 71, 94-95 (2d Cir. 2008) ("*Terrorist Attacks III*"); *Terrorist Attacks VIII,* 714 F.3d at 674-75.  As addressed *supra,* the United States expressly rejected the notion that the Second Circuit's decision in *Terrorist Attacks VIII* should be read to "require[] a showing of specific intent to harm the United States."  U.S. Amicus at 19-20.  To the contrary, the United States made clear that pursuant to Supreme Court precedent, claims based on the "*indirect* funding of al Qaeda through purported charities" provided that those claims raise an inference that "despite the indirect nature of each defendant's conduct, each knew that the brunt of the injury would be felt in the United States, or otherwise 'expressly aimed' their conduct at the United States."  *Id.* at 20-21.  Consistent with these standards, this Court may properly exercise jurisdiction for the

claims arising from NCB's alleged indirect funding of al Qaeda, so long as plaintiffs have alleged facts that defendants "acted with the requisite knowledge that their contributions would result in an injury that would be felt in the United States." *Id.* at 20.

JASTA reinforces this conclusion, as reflected by Congress's express assessment in that statute that the indirect funding of terrorist organizations hostile to the United States directly impacts U.S. interests, and determination that recognizing claims for aiding and abetting liability is necessary to protect our national interests from such conduct. *See* JASTA §2(a)(4)-(6); 130 Stat. at 852. NCB's attempts to minimize Congress's findings in JASTA as irrelevant to the due process analysis, by arguing that Congress cannot legislate against due process requirements, miss the point. Congress through JASTA did not legislate due process standards, but instead presented its empirical findings as to the myriad ways in which material support for a terrorist organization hostile to the United States directly impacts U.S. national security and interests, including where provided indirectly. Those empirical findings properly guide this Court's analysis of the nexus between Defendants' conduct and the forum, and whether their conduct in support of al Qaeda should be viewed as establishing a substantial connection with the United States.

The FAC advances ample facts against NCB to conclude that NCB acted knowingly to support al Qaeda's *jihad* targeting the United States, in satisfaction of the foregoing due process standard. *See* FAC ¶¶ 193-245. Once again, the FAC alleges that principals of NCB themselves established one of al Qaeda's primary charity fronts, and then used NCB's infrastructure to broadly channel support to al Qaeda through that mechanism. *Id.* ¶¶ 204-34. One of those executives, Yassin al Kadi, was designated by the United States as an al Qaeda sponsor following the September 11th attacks, confirming the intimacy of the relationship between al Qaeda and NCB. *Id.* ¶ 206. In contrast to pleadings in the prior cases, the FAC does not allege

that the charities held themselves out to NCB or other of the defendants as legitimate entities, but rather presents allegations making clear that those entities made their extremist character well known. *Id.* ¶ 124. Collectively, the factual allegations in the FAC are sufficient to make plausible the claims that NCB's contributions of support, whether direct or indirect, were made with the knowledge, or at least reckless disregard for the likelihood, that those contributions would be used to support al Qaeda's open targeting of the United States. *Id.* ¶¶ 242-45. Consistent with the standards set forth in *Waldman* and views expressed by the United States and Congress, such intentional actions are expressly aimed at the United States and support the exercise of jurisdiction.

There likewise is no merit to NCB's attempts to invoke the doctrine of *stare decisis* to bind Plaintiffs to the court's rulings on a different record. Plaintiffs are not, as NCB suggests, advancing "exactly the same arguments" in support of jurisdiction. NCB Br. at 28. In addition, this argument misapprehends the role of *stare decisis,* which has no application when there has been a substantial change in the applicable law, as with the enactment of JASTA. Indeed, "[s]*tare decisis* is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision." *Shi Liang Lin v. United States DOJ*, 494 F.3d 296, 310 (2d Cir. 2007) (quoting *Payne v. Tennessee,* 501 U.S. 808, 828 (1991)); *see also Barrett v. Tema Dev.,* 463 F. Supp. 2d 423, 428 (S.D.N.Y. 2006) (holding court is not bound by state court's declination of personal jurisdiction where cases assert different causes of action and facts); *In re Hooker Invs.,* 145 B.R. 138, 146 (S.D.N.Y. 1992) ("A court is warranted in shifting position when there has been intervening development in the law, either through the growth of judicial doctrine or further action taken by Congress . . . Changes in the governing law may have removed or weakened the conceptual underpinnings of the prior decision or later law may have rendered the decision irreconcilable with competing legal doctrines or policies");

*United States v. General Electric Co.,* 358 F. Supp. 731, 741 (S.D.N.Y. 1973) ("a subsequent suit between the same parties upon a similar but different cause of action is not barred by a prior judgment where there has been a significant intervening change in the applicable law").

### B.   Jurisdictional Discovery is Warranted as to Each Defendant

Although Plaintiffs submit that the allegations of the FAC are sufficient to establish personal jurisdiction over Defendants for the present claims, they at a minimum demonstrate that jurisdictional discovery should be afforded to resolve any jurisdictional disputes before this Court. *See Dorchester,* 722 F.3d at 84 (recognizing court's "considerable procedural leeway" to permit discovery in aid of motion to dismiss for lack of jurisdiction). It is well settled that "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206-08 (2d Cir. 2003); *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 50 (2d Cir. 2002); *see also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1351, at 253-59 (2d ed. 1990). Jurisdictional discovery is especially appropriate where, as here, information establishing jurisdictional facts is uniquely within the knowledge and control of Defendants. *See, e.g.*, *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986); *Ryan v. United States*, No. 1:15-cv-2248, 2015 U.S. Dist. LEXIS 162633, at *164 n.2 (S.D.N.Y., Dec. 3, 2015).

Here, an opportunity to conduct limited jurisdictional discovery would enable plaintiffs to develop evidence critical to the personal jurisdiction analysis as to each of the Defendants, and should be permitted. As to ARB, plaintiffs in the earlier cases were not afforded an opportunity to conduct any discovery, due to this Court's and the Second Circuit's determination that the limited allegations of the *Burnett* Plaintiffs' More Definite Statement did not state a claim upon which relief could be granted under the pre-JASTA ATA. As discussed above, the allegations of the FAC are substantially different, and readily give rise to an inference that ARB knowingly provided support to al Qaeda, with an awareness that the brunt of the injury would be felt in the

United States.  Discovery as to ARB's activities in support of al Qaeda, including those described in the CIA documents relating to U.S. investigations and the testimony of Zacarias Moussaoui, is likely to adduce evidence demonstrating that ARB expressly aimed its intentional conduct at the United States.

Limited jurisdictional discovery as to SBG and NCB relating to the claims advanced in the FAC is appropriate as well.  Although plaintiffs in the earlier cases had an opportunity to conduct limited jurisdictional discovery as to the claims advanced against the defendants in the earlier proceedings, it did not encompass discovery appropriate under the current record and law. For example, the earlier plaintiffs did not have an opportunity to conduct jurisdictional discovery concerning the funding mechanism described in bin Laden's will.  The earlier plaintiffs also did not have an opportunity to conduct discovery as to SBG's support of al Qaeda through the shipment of construction parts, as described by Moussaoui.  Moreover, plaintiffs in the earlier cases either did not pursue or were not afforded an opportunity to depose Yassin al Kadi, a defendant in the litigation who features prominently in the claims against NCB.[12]

To be clear, Plaintiffs do not wish to re-create the discovery that has already occurred. Rather, Plaintiffs seek the opportunity to conduct discrete inquiries into issues that were not addressed by the earlier discovery.

### C.   Plaintiffs State a Claim Upon Which Relief May Be Granted under the ATA

#### 1.   Standards Governing Plaintiffs' Claims under the ATA

Defendants ARB and SBG move to dismiss the FAC on the additional basis that Plaintiffs fail to state a claim upon which relief can be granted.  Their arguments on this point cannot be reconciled with Congress's enactment of JASTA and express recognition of substantive causes of action for aiding and abetting and conspiracy liability.

---

[12] In its 2013 personal jurisdiction decision, the Second Circuit restored the earlier plaintiffs' claims against al Kadi. *Terrorist Attacks VIII*, 714 F.3d at 678-79. As a result, al Kadi will be deposed in the MDL, and that deposition is likely to produce evidence relevant to Plaintiffs' theories of jurisdiction as to NCB.

Congress, through JASTA, expressly confirmed that the ATA authorizes secondary liability under theories of aiding and abetting and conspiracy.  As noted *supra* at 5, JASTA directs courts to apply the flexible causation standard set forth in *Halberstam* and recognizes that case sets forth the "proper legal framework for how such liability should function in the context" of the ATA.  JASTA § 2(5), 130 Stat. at 852.

In *Halberstam*, the D.C. Circuit canvassed general aiding and abetting law dealing with secondary liability standards.  That court noted that civil aiding and abetting liability depends upon: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation."  *Halberstam*, 705 F.2d at 477.  Further, aiding and abetting liability "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct."  *Id.* at 478.

The aiding and abetting theory of liability requires analysis of "what constitutes knowing substantial assistance or encouragement and the extent to which an aider-abettor is liable for injuries caused by the principal tortfeasor."  *Id.* at 481.  The *Halberstam* court made clear that numerous variables control what constitutes "substantial assistance" for purposes of aiding and abetting liability.  This analysis focuses on: (1) the nature of the act encouraged; (2) the amount and kind of assistance given; (3) the defendant's absence of presence at the time of the tort; (4) the defendant's relation to the tortious actor; (5) the defendant's state of mind; and (6) the duration of the assistance provided.  Moreover, under common law aiding and abetting principles incorporated into JASTA, even minimal aid constitutes "substantial assistance" where the act encouraged is "particularly bad or opprobrious."  *Id.* at 484 & n.13.

*Halberstam* also addresses liability arising from a conspiracy, holding that conspiracy liability may be found upon an agreement to participate in unlawful acts, and harm arising from an overt act done by a party to that agreement in furtherance of it.  *See id.* at 477; RESTATEMENT (SECOND) OF TORTS § 876 (1979).  As with their other claims, Plaintiffs are thus not required to show that Defendants conspired specifically as to the September 11th attacks.  Indeed, "once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.  He need not even have planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy." *Id.* at 481.  *Halberstam* also recognizes liability for conspiracy even if the co-conspirator's participation was remote or not significant; it is the agreement to do wrongdoing that is the critical factor in the causal chain.  *Id.* at 485.

In terms of the scope of liability imposed on a secondary actor under these theories, *Halberstam* directs that those who aid and abet or conspire in support of a tortious endeavor may be held liable for foreseeable acts done in connection with it.  *Id.* at 483-85.

Plaintiffs in certain cases also assert theories of primary liability under the ATA, although those theories have assumed lesser significance in light of JASTA's express endorsement of theories of secondary liability.  Generally speaking, a primary liability theory under the ATA is based on the defendant's own acts of international terrorism, as defined in the statute.  18 U.S.C. § 2333(a).  For an act to be considered an act of international terrorism:  "(1) it must "involve violent acts or acts dangerous to human life"; (2) it must qualify as "a violation of the criminal laws of the United States or of any State" if it were committed within a United States jurisdiction; (3) it must "appear to be intended" to intimidate a civilian population, influence government policy, or affect the conduct of government by certain specified means; and (4) it

35

must occur primarily outside the United States or transcend national boundaries.  18 U.S.C. §

2331(1).  Plaintiffs' primary liability theories here rest on Defendants' activities in support of al

Qaeda's targeting of the United States and its citizens that constitute violations of federal and

state law, or that would if committed in the United States, including the material support

provisions of 18 U.S.C. §§ 2339A and 2339B.

### 2.    Plaintiffs State a Claim for Secondary Liability against ARB

As set forth in the FAC and discussed *supra* at 16-17, ARB collaborated intimately with

al Qaeda for an extended period leading up to the September 11th attacks.  ARB's motion to

dismiss fails to show that it should not face the consequences of those actions, and the Court

should deny the motion in all respects.

#### a.    The FAC Must Be Reviewed Anew Because It Is Not Governed by Prior Decisions Involving ARB

As discussed *supra* at 14, ARB argues throughout its brief that its dismissal is compelled

by the 2005 decision dismissing it from the prior actions for failure to state a claim, and the 2013

Second Circuit decision upholding that ruling.  Those arguments are deeply misplaced, as

JASTA eliminated a principal basis for the Second Circuit's ruling affirming ARB's prior

dismissal, and the current claims present a different factual record.  Under the very authority

cited by ARB, dismissal under *Terrorist Attacks I* and *VII* would be proper only upon a finding

of identical factual and legal circumstances between the More Definite Statement and the FAC.

*See, e.g.*, *U.S. ex rel. Schnitzler v. Follette*, 406 F.2d 319 (2d Cir. 1969) (dismissal of new habeas

petition based on dismissal of prior petition raising "the same factual and legal contentions").

ARB cannot make such a showing and its *stare decisis* arguments should be rejected.  The Court

can and should review the allegations in the FAC anew, in accordance with JASTA.

ARB is wrong as a matter of law because *Terrorist Attacks I* and *Terrorist Attacks VII* were decided under the ATA before JASTA, and thus before Congress codified its findings regarding indirect support for terrorism and expressly amended the standard for liability.  The Court must assess the FAC under ATA as amended, and any holding in *Terrorist Attacks I* or *Terrorist Attacks VII* must be understood in that context.  Further, and as discussed in greater detail *supra* at 14-19, ARB's argument that the present record is identical to the one at issue in the prior proceedings as to ARB is incorrect.  The new allegations regarding ARB's support for al Qaeda both present new evidence to be considered, as well as offer new context to any existing allegations regarding ARB in any prior complaint.[13]  Accordingly, the Court must review the FAC with fresh eyes with no deference to the prior decisions on a different record.

b.     ARB Either Knowingly Supported Al Qaeda Terrorists or was Deliberately Indifferent to that Possibility

The FAC demonstrates that ARB acted in a way that satisfies the ATA's scienter requirement, overcoming the bank's leading argument for dismissal.  Initially, ARB misstates the scienter standard under the ATA, arguing that Plaintiffs' must show that ARB acted with "knowledge and intent."  Plaintiffs must instead state plausible allegations that Defendant acted knowingly or intentionally, with recklessness satisfying intentional conduct for purposes of the ATA.  *See, e.g.*, *Linde v. Arab Bank PLC*, 97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015). ("An organization's knowing provision of material support to a terrorist organization (or its deliberate indifference as to whether or not it provided material support to a terrorist organization) qualifies

---

[13] ARB also repeatedly refers to allegations in the prior actions regarding "routine banking services," and argues that such services do not give rise to a claim under the ATA.  Once ARB knows that the funds will benefit al Qaeda, however, its services are no longer "routine" for liability purposes.  *E.g.*, *Weiss v Nat'l Westminster Bank PLC*, No. 05-CV-4622, 2017 U.S. Dist. LEXIS 165691 (E.D.N.Y. Sept. 30, 2017).  The new allegations provide additional support for an inference of ARB's knowledge that it was supporting al Qaeda.  As a result, even ARB's ordinarily "routine" services to the charity fronts become relevant in determining whether and to what extent ARB aided and abetted, conspired with, or materially supported Al Qaeda terrorists.

as intentional misconduct"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 555 (E.D.N.Y. 2012). "[W]hether it is labeled willful blindness or recklessness, Plaintiffs must show that Defendant knew or was deliberately indifferent to the fact that . . . there was a substantial probability that Defendant was supporting terrorists." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013). As set forth in the FAC, ARB either knew or purposefully ignored that it was supporting terrorists who intended to kill and injure Americans.

ARB first argues that the FAC does not establish knowledge because it does not show that ARB knew that any charity or bank customer supported al Qaeda. This argument ignores that the FAC is not limited to allegations involving the charities or other customers. ARB in fact provided material support directly to al Qaeda: ARB's couriers delivered funds to an Al Qaeda affiliate, it obtained a visa for Osama Bin Laden's second-in-command, and it "moved money around" for al Qaeda. FAC ¶¶ 127, 165-66. These allegations demonstrate that ARB worked intimately with al Qaeda itself, not just through the charity fronts.

ARB is also wrong in its description of the FAC's allegations regarding the charities. In 2003, the CIA concluded that the bank's controlling directors from the Al Rajhi family "probably know that terrorists use their bank." *Id.* ¶ 156. The United States government debated whether to designate ARB itself as a terrorist sponsor for its involvement with the charities, indicating an assessment by U.S. officials that ARB was aware of their terrorist character. *Id.* ¶ 168. Further still, ARB's senior officials acted soon after 9/11 to circumvent counter-terrorism financing efforts by protecting ARB's charitable contributions from Saudi scrutiny. *Id.* ¶ 160. It is thus no surprise that the CIA learned that terrorists were ordered to use ARB for financial services, or that 9/11 conspirator Zacarias Moussaoui testified that Osama bin Laden described ARB as a "good brother" to al Qaeda's extremist activities. *Id.* ¶¶ 162, 167. ARB's claims

Plaintiffs have failed to allege facts giving rise to an inference that it "knew" it was providing material support to al Qaeda, simply are not credible and ignore the clear import of Plaintiffs' allegations and the inferences that flow from them.

These allegations regarding ARB's knowledge are reinforced by the allegations demonstrating that the charities were publicly inculpated in supporting al Qaeda, under circumstances certain to come to ARB's attention.  Indeed, the FAC confirms that ARB was not a mere passive member of the public; it was uniquely positioned to know of the charities support for terrorist activities because of the activities of its founding and controlling family.  *Id.* ¶¶ 173-82.  For instance, Suleiman al Rajhi was simultaneously the Chairman, Managing Director, and largest shareholder of ARB bank, as well as a board member of certain of the charities themselves.  *Id.* ¶¶ 154, 180.  Viewed in light of the allegations of direct support, ARB's knowledge of charity activities through the media as well as its controlling shareholders/directors readily supports an inference that ARB knew it was providing support to terrorists.

ARB is not saved by its argument that the charities had not yet been designated as al Qaeda fronts, and thus it did not know of their support for terrorists.  *See Strauss*, 925 F. Supp. 2d at 428 (finding issue of material fact on support by financial institution because the fact that "the French government and the European Union have decided that they have insufficient evidence to sanction [an alleged terrorist supporter] does not mean that [the supporter] was not supporting a terrorist organization for purposes of the ATA.").  The FAC presents a compelling case that ARB directly aided al Qaeda and that it knew that the charity fronts supported al Qaeda. Even absent a designation, ARB knew that the charity customers supported terrorists for ATA purposes, and thus the lack of designation is not grounds for granting the motion to dismiss.

ARB also claims that the bank should not be charged with the knowledge of the al Rajhi family, as if Suleiman al Rajhi could turn off his extremist inclinations and knowledge of the al Qaeda charities every time he sat in his director's chair.  This argument is not credible, but whether Suleiman al Rajhi's knowledge can be imputed to ARB is not an issue that must be decided on a motion to dismiss.  *E.g.*, *Degulis v. LXR Biotech., Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1996) ("Whether or not knowledge can be imputed [through agents] is a matter of fact that cannot be determined on a motion to dismiss.").  Under ARB's argument the Court can never infer an entity's knowledge from that of its directors or controlling shareholders for purposes of a motion to dismiss absent detailed allegations that are not required to satisfy 12(b)(6).  This is plainly not the law.

*Terrorist Attacks IV* does not compel a different result, and ARB quotes its conclusion out of context.  In the discussion cited by ARB, the court addressed imputed *acts* for purposes of a personal jurisdiction analysis.  718 F. Supp. 2d 456, 483-84 (S.D.N.Y. 2010), *aff'd sub nom. O'Neill v. Asat Trust Reg.*, 714 F.3d 659 (2d Cir. 2013).  *Terrorist Attacks IV* does not address whether *knowledge* can be imputed for substantive purposes under the ATA.  Thus, while the FAC should survive even if the Court does not impute the al Rajhi family's knowledge on ARB, the Court is certainly free to do so and is not constrained by *Terrorist Attacks IV*.   The Court can and should find that ARB knowingly or recklessly supported the terrorists of al Qaeda, both directly and through the charities.  The al Rajhi family's activities only further that inference.

     c.    The FAC States a Claim for Secondary Liability Against ARB

The allegations of the FAC also satisfy the requirements of their aiding and abetting and conspiracy theories against ARB under JASTA.

Plaintiffs state a claim for aiding and abetting by describing ARB's long-running involvement with al Qaeda and its charities to assist al Qaeda in targeting the United States.

FAC ¶¶ 173-86, 190.  ARB's actions satisfy the five-part test for substantial assistance to the international terrorists of al Qaeda, particularly at the pleading stage:  (1) the nature of the act encouraged (violent jihad against the United States); (2) the amount and kind of assistance given (the essential financial and logistical support required for a massive-scale attack); (3) the defendant's absence of presence at the time of the tort; (4) the defendant's relation to the tortious actor (closely involved with the charities and al Qaeda itself); (5) the defendant's state of mind (ARB's knowledge that it supported terrorism); and (6) the duration of the assistance provided (over a decade).  Indeed, even minimal aid constitutes "substantial assistance" where the act encouraged is "particularly bad or opprobrious," *Halberstam*, 705 F.2d at 484 & n.13, a rule that plainly is implicated by ARB's sponsorship of al Qaeda.

ARB does not even attempt to address the *Halberstam* factors incorporated into the ATA through JASTA, a fact that in and of itself requires denial of its motion.  Even beyond failing to address the relevant legal test, its arguments that the forms of support it provided to al Qaeda do not constitute "substantial assistance" are fundamentally at odds with the findings of U.S. counter-terrorism officials.  For instance, the FAC cites the following statements and findings by counter-terrorism officials that directly confirm that the forms of assistance provided by ARB directly enabled al Qaeda to acquire the strike capabilities employed on September 11th:

- United Nations Security Council Committee: "From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring, and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support." FAC ¶ 119.

- 9/11 Commission:  The 9/11 attacks and similar massive-scale activities require funding for planning, command structure, recruiting and training, logistics, access to weapons, a communications network, and an opportunity to test the plan.  FAC ¶¶ 112-13.

- Testimony of Undersecretary of Terrorism and Financial Intelligence: "[Terrorists] depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks.  Disrupting money flows stresses terrorist's networks and undermines their operations."  FAC ¶ 113.

- Deputy Secretary of State:  "[The ATA] reflects our nation's compelling interest in combating and deterring terrorism at every level, including by eliminating sources of terrorist funding and holding sponsors of terrorism accountable for their actions… Further, compensation of victims at the expense of those who have committed or support terrorist acts contributes to U.S. efforts to disrupt the financing of terrorism and to impede the flow of funds or other support to terrorist activity."  FAC ¶ 115.

Indeed, U.S. national security and counter-terrorism officials have concluded that disrupting al Qaeda's financial support was imperative to stopping another 9/11-type attack, demonstrating a substantial link between the financial services and funding provided by ARB and the September 11th attacks.  FAC ¶ 127.

Plaintiffs also state a claim for conspiracy under the *Halberstam* standards as incorporated into the ATA through JASTA.  Plaintiffs must allege that ARB entered an agreement with al Qaeda to participate in wrongful activity.  *Halberstam,* 705 F.2d at 478.  This agreement can be inferred from indirect evidence, including the relationship between the actors and the actions, and the duration of the joint activity.  *Id.* at 481, 487.  Even mere tacit aid over a five year period is enough to satisfy conspiracy liability.  *Id.* at 487.  Contrary to ARB's arguments, Plaintiffs are not required to show that ARB conspired specifically as to the September 11th attacks.  *See id.* at 481 (coconspirator need not even know of the act in question so long as it advanced the object of the conspiracy).  In fact, while the allegations of the FAC go much further, Plaintiffs could establish conspiracy liability even if ARB's support was not substantial, simply on the basis of ARB's agreement to participate in the wrongdoing by al Qaeda supported by its charities.  *Id.* at 485.

The FAC raises a plausible claim that ARB agreed to assist al Qaeda in its violent jihad against the United States.  Plaintiffs allege that the activities of al Qaeda and its charities were well known to ARB at the time it provided services and support to those charities.  ARB's knowledge alone creates an inference that its continued support for al Qaeda's charities reflects an agreement.  The details relating to the investigations of ARB by U.S. intelligence agencies and Moussaoui's statement that Osama bin Laden described ARB as al Qaeda's "good brother," bolster this conclusion.  Further, ARB's support held since at least the early 1990s, when the CIA identified the earliest evidence of a relationship between ARB and terrorist actors.  Even if ARB's role was minimal or remote, which it was not, its agreement to assist al Qaeda is enough to subject it to conspiracy liability and is reason to allow the FAC to survive ARB's motion on these grounds.[14]

---

[14] In a brief paragraph, ARB argues that it cannot be subjected to the treble damages of § 2333 on an aiding and abetting or conspiracy claim under § 2333(d) because it would be an unconstitutional retroactive application of punitive damages.  ARB relies principally on *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), which barred the retroactive application of punitive damages against a foreign sovereign (Sudan) for terrorism-related suits.  *Owens* is distinguishable.

As a primary matter, the treble damages provision of the ATA predated JASTA, 18 U.S.C. § 2333(a), and ARB was thus subject to potential exposure to such damages for conduct in support of al Qaeda long before JASTA's enactment.  In enacting § 2333(d) through JASTA, Congress merely clarified how Congress should approach liability under the existing cause of action under 2333(a), which already imposed punitive damages.  *See* § 2333(d) (defining liability "[i]n an action under subjection (a)", which in turn awards "threefold the damages [the plaintiff] sustains and the cost of the suit, including attorney's fees").  In fact, JASTA is most properly understood as merely restoring Congress's original intent under the ATA by removing judicial limitations that had impaired its correct operation.  *See* Exh. 1, U.S. Amicus at 7-8 (arguing that § 2333(a) authorized aiding and abetting theories when enacted).  In contrast, the newly-added punitive damages provision at issue in *Owens* removed a prior prohibition against punitive damages in the Foreign Sovereign Immunities Act in terrorism-related cases, thereby creating an exposure to such damages where none had previously existed.  864 F.3d at 763, 765.

Further, Congress explicitly stated that § 2333(d) liability under § 2333(a) applies to any new or pending action "arising out of an injury to a person, property, or business on or after September 11th, 2001", such as the injuries described in the FAC.  JASTA § 7, 130 Stat. at 856.  By making § 2333(d) retroactive to conduct resulting in injury on 9/11, Congress necessarily intended to subject ARB and similar defendants to the full scope of damages provided by § 2333(a), which has always included treble damages.  *See Owens*, 864 F.3d at 814 (retroactive application constitutionally permissible upon authorization by Congress).  There is no alternative reading of JASTA under which Congress defined the scope of liability under the existing cause of action of § 2333(a) for injuries suffered as a result of the September 11th attacks, but without the full scope of damages already authorized by that same provision.  Plaintiffs therefore state a claim for punitive damages under both § 2333(d) and § 2333(a), and the Court can deny ARB's motion on this issue as well.

d.     The FAC States a Claim for Primary Liability Against ARB Under the ATA

Plaintiffs have also alleged a claim for primary liability.  As set forth herein, Plaintiffs can establish the existence of an agreement to aid al Qaeda which satisfies the civil conspiracy test set forth in *Halberstam.*  This conspiracy is enough to hold ARB liable as a primary actor under Count III (18 U.S.C. § 2332(b) (conspiring to murder U.S. nationals)) and Counts IV-VI (18 U.S.C. § 2339A-C (each creating liability for a conspiracy to provide material support)).  Having shown the existence of a conspiracy, and acts of homicide and material support in furtherance of that conspiracy committed by al Qaeda and its charity fronts, Plaintiffs can establish primary liability on each claim.  *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017) (recognizing that one who conspires to violate 2339A-C "is a primary violator of Section 2333(a)" and thus a claim for conspiracy to provide material support gives rise to a civil claim).

But even absent Plaintiffs' conspiracy allegations, the FAC states a claim for primary liability against ARB under Counts III through VII.  ARB argues that the FAC does not allege that ARB committed an act of international terrorism in violation of the ATA under the theory that the FAC (a) does not allege any violent or dangerous acts; (b) does not allege any predicate violations, and (c) does not allege intent to intimidate, coerce, or influence.  ARB is incorrect in all respects.

(1)     *The FAC Alleges that ARB Engaged in an Act of International Terrorism*

An act of terrorism is not limited to obviously violent or dangerous conduct.  Plaintiffs have alleged that ARB knowingly provided financial support to al Qaeda, including through the provision of donations and services to "front" charities.  FAC ¶¶ 173-86, 190.  Importantly, the provision of such support to terrorist organizations, even through intermediaries, constitutes "acts dangerous to human life" within the meaning of Section 2331(1)(A).  *See, e.g., Boim v.*

*Holy Land Found. For Relief & Dev.* (*Boim III*), 549 F.3d 685, 690 (7th Cir. 2008) (en banc);

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 415-16, 427 (E.D.N.Y. 2009).  Congress reached a

similar conclusion in JASTA, as described at length herein.  Indeed, as explained in *Boim III*,

funding and supporting a terrorist is like handing a loaded gun to a child:  the act is not itself

violent, but it is dangerous to human life and satisfies the ATA standard.  549 F.3d at 690.

(2)    *The FAC Alleges that ARB Committed the Predicate Offenses*

With respect to the predicate offenses of Sections 2339A, 2339B, and 2339C, the FAC

states a cause of action under each.[15]  Section 2339A criminalizes the provision of material

support, including financial services and currency, that is "used in preparation for, or in carrying

out," various terrorism-related crimes, including: "the unlawful killing of a human being with

malice aforethought," 18 U.S.C. §§ 1111(a); the use "without lawful authority" of a "weapon of

mass destruction … against any person or property within the United States," *id.* § 2332a(a)(2);

an act of terrorism (including killing and assault with bodily injury) transcending national

boundaries that results in death or property destruction, *id.* § 2332b(a); and bombing a place of

public use, government facilities, or public transportation systems with the intent to kill or

destroy property, *id.* § 2332f.  Plaintiffs have alleged that ARB provided such material support,

and that the support was used "in preparation for, or in carrying out" a variety of acts that violate

these criminal statutes, including the killing and injury of thousands of persons in the United

States.

ARB argues that it cannot be liable for a § 2339A violation because, on September 11th,

2001, the statute did not criminalize conduct outside of the United States.  ARB ignores the

---

[15] ARB argues as well as that the FAC fails to state a claim for primary liability in Count II under 18 U.S.C. § 2332(a) through (c).  Plaintiffs pursue ARB on a aiding and abetting theory in Count II, not a primary liability theory.  Moreover, the allegations stated in Count II demonstrate that Plaintiffs claim liability under 18 U.S.C. § 2332a (weapons of mass destruction) and § 2332b (acts of terrorism transcending national boundaries), not subsections of § 2332 as the FAC appears to describe.  FAC ¶ 321.  Plaintiffs concede that there is no claim under § 2332c (repealed) or 2332(c) (actions of physical violence).

definition of international terrorism in § 2331, which includes both acts that are violations of the criminal law of the United States, or "*would be* a criminal violation *if* committed within the jurisdiction of the United States." 18 U.S.C. § 2331(1)(a) (emphasis added). A predicate offense for purposes of a § 2331 claim therefore includes conduct outside the United States, even if the underlying statute is limited to acts within the United States. Plaintiffs have thus sufficiently alleged that defendants violated § 2339A where the FAC describes conduct which would be a violation if committed in the United States.

Plaintiffs also adequately allege that defendants' conduct violated § 2339B, which prohibits persons from "knowingly provid[ing] material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). Plaintiffs allege in detail that defendants knowingly provided such support to al Qaeda.[16] ARB also errs in claiming that it cannot be held liable under § 2339B because none of the "charities" that it supported were designated by the United States as foreign terrorist organizations ("FTOs") prior to September 11, 2001. "[A] violation of § 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the [designated terrorist organization]." *See Goldberg*, 660 F. Supp. 2d at 433 (plaintiffs sufficiently alleged that UBS violated Section 2339B "through UBS's knowledge that the ultimate beneficiary of its wire transfers was Hamas, an FTO"). ARB's alleged conduct plainly meets that test because plaintiffs alleged that ARB knew its financial systems were being used to fund al Qaeda, an FTO.

*Goldberg* and other decisions have rejected ARB's interpretation of § 2339B because, if adopted, it would frustrate the antiterrorism objectives underlying §§ 2333 and 2339B by enabling defendants to escape liability through the contrivance of channeling support through

---

[16] For the reasons set forth above, Count V states a claim under 2339B by alleging a violation of the material support provision in s 2339B(a)(1). Any additional allegations as to § 2339B(a)(2)'s blocking and reporting requirement speak to ARB's knowledge and intent in providing material support, and thus should remain in the FAC as relevant facts to Plaintiffs' ATA claims.

intermediaries when defendants know that their funds will ultimately benefit an FTO. "'[T]errorist groups systematically conceal their activities behind charitable, social, and political fronts,'" and some designated FTOs "'use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.'" *Humanitarian Law Project*, 561 U.S. at 30-31.  Moreover, the United States government does not have the capacity to determine, and designate as an FTO, every entity that supports terrorism.  *Cf. United States v. El-Mezain*, 664 F.3d 467, 512-13 (5th Cir. 2011).[17]

> (3)     *The FAC Alleges Intent for Primary Liability*

ARB further argues that Plaintiffs have not alleged any actions that objectively appear to be intended to coerce or intimidate any civilian population or government within the meaning of Section 2331(1)(A).  However, providing material support to a terrorist organization, including in the form of banking services, can "create[] the objective 'external appearance' … that [the bank] shared the [terrorist organization's] goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion."  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010); *see also Boim III*, 549 F.3d at 693-94.  Because Plaintiffs alleged that ARB provided services to al Qaeda and its front charities with the intent of furthering its terrorist objectives, their allegations were sufficient.

> (4)     *The FAC Alleges Primary Liability Causation under the*
> *ATA*

Plaintiffs meet the "by reason of" causation test which ARB alleges governs the primary liability claims in the FAC.[18]  As set forth herein, the U.S. congressional and executive branches,

---

[17] With respect to § 2339C, Plaintiffs acknowledge that it was enacted after September 11th and that no court has agreed to apply it retroactively.  Plaintiffs disagree with this result, and, moreover, Plaintiffs allege conduct in furtherance of ARB's conspiracy to fund terrorist activities both before and after the statute was enacted (FAC ¶ 160), permitting a finding that a predicate § 2339C offense may be found.

[18] That test has no bearing on Plaintiffs' secondary liability claims.  *See supra* at 41-43.

as well as counter-terrorism experts, have concluded that material support and financing for al Qaeda of the type prohibited by 2339A-C constitutes a direct cause of the September 11th attacks because, absent access to the wealth provided by its material supporters, al Qaeda would have been unable to carry out planning, training, and logistics required to effect the September 11th attacks.  Plaintiffs thus meet their burden on causation for primary liability.

This conclusion is especially appropriate in light of Congress's statements of purpose in JASTA and the statute's remedial purposes.  Even before JASTA, the Seventh Circuit recognized in in *Boim III*, 549 F.3d at 697-98, that a "relaxed" causation standard is necessary for primary liability claims under the ATA because traditional principles of causation would often leave plaintiffs without a remedy since the funding for particular terrorist acts generally cannot be traced back to specific donors.  Consistent with JASTA's remedial purposes, this broader notion of causation for such claims properly recognizes that "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook … Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities."  *Id.* at 698.

*Rothstein v. UBS AG*, 702 F.3d 82 (2d Cir. 2013) does not require a different result, contrary to ARB's arguments in its motion to dismiss.  If *Rothstein* intended but-for causation or another strict standard, it would have said so directly.  *Linde*, 97 F. Supp. 3d at 325.  Accordingly, a showing of proximate causation under *Rothstein* merely requires plausible allegations that a plaintiffs' injury was a natural and probable consequence of defendants' wrongful acts and ought to have been foreseen under the circumstances.  *See Owens v. BNP Paribas, SA,* 235 F. Supp. 3d 85, 97 (D.D.C. 2017).  Because ARB knew the terrorist nature of the groups it was aiding, it was foreseeable that any funds would be used for terrorist activity.  It

is ARB's knowledge that it was assisting al Qaeda to cause harm to the United States which would otherwise not occur that creates causation and thus liability.  *Linde*, 97 F. Supp. 3d at 327 (citing *Boim III*).

Having established a terrorist act, the requisite intent, and a causal link between those acts and the harm suffered by Plaintiffs, the FAC states a claim for primary liability against ARB.

### 3.    Plaintiffs State a Claim for Secondary Liability against SBG

SBG separately moves to dismiss the FAC on the basis that Plaintiffs fail to state a claim upon which relief may be granted.  In support of this argument, SBG asserts that the FAC does not allege the requisite proximate cause or knowledge sufficient to support a claim under the ATA.  SBG further argues that Plaintiffs lack standing to pursue their claims.  SBG's arguments in this regard misconstrue the controlling authority and are unsupported by the factual record. SBG's motion therefore should be denied.

#### a.    SBG's Causation Arguments Lack Merit

SBG challenges ATA's claims on causation grounds, also relying on the Second Circuit's decision in *Rothstein*.  SBG argues that *Rothstein* requires "allegations supporting a direct proximate connection to the September 11th attacks."  SBG Br. at 27.  In making these arguments, SBG does not specify whether they are directed to Plaintiffs' theories of secondary liability under JASTA, or limited to Plaintiffs' primary liability theories under the ATA.  SBG's arguments are misplaced in any case.

To begin with, *Rothstein* has no bearing at all on Plaintiffs' aiding and abetting and conspiracy claims, which are instead governed by the flexible liability and causation standards

set forth in *Halberstam*.[19]  Indeed, *Rothstein*'s analysis of causation was predicated on the

Second Circuit's determination that aiding and abetting liability did not exist under the ATA, and

thus has no bearing on Plaintiffs' claims under JASTA.

Even as to Plaintiffs' primary liability theories under the ATA, SBG misapprehends the

applicable test and its operation to the facts at hand.  Once again, *Rothstein* does not require a

showing of "but-for" or direct causation for purposes of primary liability claims under the ATA.

*See supra* at 49.  Instead, it merely requires plausible allegations that Plaintiffs' injury was a

natural and probable consequence of defendants' wrongful acts and ought to have been foreseen

under the circumstances.  That standard is readily met here.  *See supra* at 19-26 (discussing

allegations of knowledge and material support by SBG).

### b.    Plaintiffs Adequately Allege Scienter Against SBG

In addition, SBG's attempt to impose a heightened scienter requirement on ATA liability

is not supported by the relevant authority.  As discussed in more detail *supra,* Plaintiffs state a

claim under the ATA by alleging plausible facts that SBG provided material support to al Qaeda

recklessly.

Plaintiffs' allegations go much further, and in fact demonstrate a continuing relationship

between Osama bin Laden and his family through the late 1990s and the establishment of

funding mechanisms that allowed money to flow from SBG to al Qaeda from the terrorist

organization's earliest days and through the years leading up to the September 11th attacks.

Plaintiffs also allege that SBG knowingly provided a system through which al Qaeda obtained

construction parts that were used in training camps, to conceive of the plans for the September

---

[19] There can be no dispute that Plaintiffs' injuries occurred "by reason of" the September 11th attacks, in satisfaction of the language of 18 U.S.C. § 2333(a).  Under JASTA's secondary liability provisions, 18 U.S.C. § 2333(d), liability may be imposed on SBG for those injuries under *Halberstam's* aiding and abetting and conspiracy standards, which are met here.

11th attacks, and for terrorist purposes.  The FAC presents facts demonstrating that SBG was in a unique position to know precisely what Osama bin Laden was doing with resources provided to him, fully satisfying the modest burden to present facts giving rise to an inference that SBG provided support to al Qaeda knowingly, or with a deliberate indifference that it was doing so.

c.    <u>There is No Merit to SBG's Argument that Plaintiffs Lack Standing</u>

Notwithstanding this Court's prior holdings to the contrary, SBG advances the novel argument that the Insurer Plaintiffs lack standing, under the theory that § 2333 of the ATA should be construed to apply only to "natural persons."  SBG further urges this Court to conclude that Congress – without saying a word – broadly eradicated doctrines of subrogation for purposes of the ATA, thus immunizing material sponsors of terrorism from liability for any injuries resulting from their terrorist conduct that happen to be insured.  These arguments are in conflict with the plain text of the ATA, and a multitude of cases recognizing corporations organized under the laws of the United States as both citizens and nationals of the United States.  In addition, these arguments are in profound conflict with the remedial purposes and deterrence objectives of the ATA, and, if accepted, would effectively vitiate the express remedy Congress established under the ATA for injuries to "property, or business."  18 U.S.C. § 2333(a).  They ignore entirely Congress's express statement in JASTA that it was amending the ATA to ensure adequate remedies for "*persons or _entities_*" injured as a result of a terrorist attack, and also run afoul of several of the most fundamental canons of statutory construction.  It is hardly surprising that no other defendant has raised these arguments during the fifteen year history of this litigation, to include SBG itself during the prior proceedings against it by other plaintiffs.[20]

---

[20] SBG acknowledged that the FAC and other complaints expressly allege that the Insurer Plaintiffs provided insurance coverage to and compensated "nationals of the United States."  Those well-pled factual allegations are entitled to be accepted as true in the context of the present motion to dismiss.  This standard is no less applicable where the defendants claim that the plaintiff lacks standing to sue.  *See In re Credit Default Swaps Antitrust Litig.*, No. 13md2476, 2014 U.S. Dist. LEXIS 123784, at *20-*27 (S.D.N.Y. Sept. 4, 2014) (denying motion to dismiss for lack of standing).

(1)     *SBG's Standing Argument is Contrary to the Text of the ATA*

The ATA incorporates by reference the textual definition of "national of the United States" from 8 U.S.C. § 1101(a)(22), which provides that a national of the United States includes: "persons who are citizens of the United States, and . . . persons who, though not citizens of the United States, owe permanent allegiance to the United States."  The ATA then provides that, for purposes of the ATA, a "person" includes any "individual or *entity* capable of holding a legal or beneficial interest in property."  18 U.S.C. § 2331(3) (emphasis supplied).  Thus, the ATA expressly provides that a national of the United States includes any "individual or entity capable of holding a legal or beneficial interest in property" that is a "citizen" of the United States.  These definitions foreclose SBG's argument that the civil remedies of the ATA are limited to "natural persons," a phrase that appears nowhere in the definitions.

The fact that the ATA provides an express remedy for losses to "property, or business" 18 U.S.C. § 2333(a), provides further textual evidence in the ATA that SBG's arguments are meritless.  As discussed in further detail *infra* at 59, business interests in the United States are most commonly held through some corporate or similar form, an approach our laws seek to encourage to promote economic development and in furtherance of other important public policies.  Congress was of course keenly aware of these realities and the policies underlying them when it enacted the ATA, and its express endorsement of a remedy for injuries to "business or property" further confirms that the ATA's remedies are not limited to natural persons.  Indeed, Congress made its intent on this point doubly clear by defining person in terms of an individual or entity's capacity to hold a legal or beneficial interest in property.

Moreover, where Congress intends for the remedies of a counter-terrorism statute to be limited to natural persons, it uses that specific term.  For example, in enacting the Justice for Victims of State Sponsored Terrorism Act, which established a fund to provide limited

compensation for terrorist judgments against designated State Sponsors of Terrorism, Congress

limited eligibility to participate in the fund to "United States person[s]," 34 U.S.C. §

20144(C)(1)(A), and then defined that term to include only "a natural person who has suffered

injury arising from the actions" of a designated State Sponsor of Terrorism.  In stark contrast, the

ATA contains no such limitation of its remedies to "natural person[s]."

In all of these respects, SBG's standing arguments are in direct conflict with the text of

the ATA.

     (2) *U.S. Corporations are Citizens and Nationals of the United States*

Equally meritless is SBG's claim, offered without citation to any supporting authority,

that a corporation or other business entity should not be considered a United States citizen for

purposes of the ATA.  Beyond the fact that this view is in direct conflict with the text of the

ATA itself, it is contrary to longstanding authority recognizing in a range of contexts that

corporations and business entities organized under the laws of the United States and its states are

both citizens and nationals of the United States.  Indeed, it is axiomatic that corporations are

accorded "citizenship" status when determining subject matter jurisdiction.  *See* 28 U.S.C. §

1332(c)(1) ("a corporation shall be deemed to be a citizen of every State and foreign state by

which it has been incorporated and of the State or foreign state where it has its principal place of

business . . . .").  And, federally chartered corporations are generally considered citizens of the

United States, though not of any particular state.  *Crum v. Veterans of Foreign Wars*, 502 F.

Supp. 1377, 1379 (D. Del. 1980) (citing *Bankers Trust Co. v. Texas & Pacific Ry. Co.*, 241 U.S.

295, 309 (1916)) (other citations omitted).  Citizenship status also applies with respect to foreign

corporations.  A "corporation of a foreign State is, for purposes of jurisdiction in the courts of the

United States, to be deemed, constructively, a citizen or subject of such State." *Steamship Co. v.

Tugman*, 106 U.S. 118, 121 (1882); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE

UNITED STATES § 213 (1986) ("For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized"); *see also JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (holding that a corporation organized under the laws of the British Virgin Islands was a "citizen or subject" of a foreign state for purposes of alienage diversity jurisdiction under Section 1332(a)(2)).

In keeping with these longstanding principles, corporations and business interests organized under U.S. laws are citizens of the United States, and thus fall squarely in the ATA's textual definition of the term "national of the United States."

(3)     *JASTA Eliminates any Theoretical Ambiguity as to the Rights of Corporations under the ATA*

The plain language of JASTA and Congress's statements concerning the purposes of that statute further eliminate any doubt as to the purpose of the ATA and the intention of Congress to extend its protections to corporations.  Specifically, Congress declared in JASTA that it was amending the ATA to provide "persons and *entities* injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims" against those responsible for their injuries.  *Id.* at § 2(a)(7); 130 Stat. at 853 (emphasis added).  There could be no clearer declaration of Congress's intent that the remedies of the ATA are not limited to "natural persons" and instead extent to entities, and that declaration is entitled to deference in interpreting and applying the ATA.  As the Supreme Court has held, "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."  *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 380-81 (1969).

This Court's rulings prior to JASTA's enactment, authorizing insurer plaintiffs in earlier filed actions to proceed under the ATA and entering judgments in their favor under that statute, further foreclose SBG's arguments.  As stated by the Second Circuit in *Doe v. Bin Laden*, "'Congress is presumed to be aware of a judicial interpretation of a statut[ory section]' and

54

partial amendment of a statute without touching the previously interpreted section 'constitutes an implicit adoption of [the prior] interpretation,' absent a clear indication to the contrary." 663 F.3d 64, 69 (2d Cir. 2011) (quoting *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007)).  Here, this Court (and the Second Circuit) authorized claims by insurers to proceed under the ATA on numerous occasions and in a range of settings, prior to JASTA's enactment. Congress left those interpretations untouched when it amended the ATA through JASTA, and expressly endorsed them by affirming that the remedies of the ATA extended to entities. Accordingly, the passage of JASTA, which both stated an intention to allow corporations and left intact judicial rulings authorizing corporations and insurers to proceed under the ATA, forecloses SBG's argument in its entirety.

(4)   <em>Subrogation Rights are Available under the ATA</em>

SBG's suggestion that Plaintiffs cannot proceed on a subrogation theory is wrong on its face.  In its October 14, 2011 Report and Recommendation, this Court already considered the issue and permitted the subrogation claims to proceed, stating that "[t]o the extent that the Plaintiffs seek to recover amounts paid to their insureds, they unquestionably are subrogated to their insureds' ATA claims."  *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2011 U.S. Dist. LEXIS 153138, at *6 (S.D.N.Y. Oct. 14, 2011), report and recommendation adopted, No. 03 CIV. 6978, 2011 U.S. Dist. LEXIS 144936 (S.D.N.Y. Dec. 16, 2011) (citing *Redington v. Touche Ross & Co.*, 592 F.2d 617, 624 (2d Cir. 1978), *Luna v. Am. Airlines*, 769 F. Supp.2d 231, 248 (S.D.N.Y. 2011)).

SBG begrudgingly concedes that the Court allowed the subrogation claims to proceed, and also acknowledges that subrogation is a well-settled and longstanding doctrine.  Nonetheless, it suggests that Congress can limit or eliminate such rights in a particular legislative setting by

evincing an intent to do so.  It then urges this Court to infer such an intention simply because Congress was silent on the issue in the ATA.  There is absolutely no merit to these arguments.[21]

SBG's contention that Congress eradicated doctrines of subrogation under the ATA by silence is contrary to controlling precedent.  As the Supreme Court repeatedly has held, "'Congress is understood to legislate against a background of common-law … principles.'" *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) (quoting *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991)).  "Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)).  "In such cases, Congress does not write upon a clean slate." *Id.* (citing *Astoria Federal Savings & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991)).  Accordingly, if Congress intends, by passing a statute, to "abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* (citations omitted).

Here, it is beyond dispute that the ATA contains no language addressing longstanding doctrines of subrogation, much less language that "speaks directly" to the issue and suggests an intent to abrogate such doctrines.  The absence of any such language forecloses SBG's arguments on this point.

SBG's suggestion that this Court should infer Congress's intent to abrogate subrogation rights under the ATA based on language in the 2008 amendments to the Foreign Sovereign

---

[21] SBG does not contest the sufficiency or plausibility of the Insurer Plaintiffs' allegations to establishing that the insurers compensated U.S. corporate citizens and business interests for injuries resulting from the September 11th attacks, but instead predicates its arguments concerning the sufficiency of these factual allegations entirely on its claim that the ATA is limited to natural persons.  SBG Br. at 32-33.  For the reasons stated previously, SBG's arguments that the ATA is limited to natural persons are entirely without merit.  Because SBG's arguments concerning the factual sufficiency of the Insurer Plaintiffs' allegations that they are subrogated to the rights of U.S. nationals are predicated entirely on this incorrect understanding of the ATA, those arguments fail as well.

Immunities Act ("FSIA"), through which Congress established a substantive cause of action against designated State Sponsors of Terrorism, *see* 28 U.S.C. § 1605A, is entirely baseless and hardly warrants comment.  Once again, a repeal of longstanding doctrines of subrogation under the ATA could occur only through clear language speaking directly to the issue in the ATA itself, and may not be inferred by implication from passing reference to insurance in a separate statute.  Further, § 1605A was enacted nearly fifteen years after the ATA, in order to address a range of unique and complex problems that had interfered with terror victims' efforts to obtain and satisfy judgments against designated State Sponsors of Terrorism.  Congress established a hierarchy of claims under the statute, presumably due to the limited availability of assets to satisfy judgments against State Sponsors of Terrorism, giving initial primacy to claims for personal injury and death and allowing claims for property losses only in cases where such personal injury or death claims already had been advanced.  Stated simply, § 1605A is a distinct statute, enacted years after the ATA for entirely different purposes, and tailored to address a range of unique and distinct policy and legal considerations.  It provides no insight as to Congress's intent in enacting the ATA years earlier, and certainly no basis to eliminate longstanding doctrines of subrogation under the ATA.

(5) <em>The ATA Should be Broadly Construed to Permit Plaintiffs' Claims</em>

Even beyond all of the points discussed above, SBG's arguments that the remedies of the ATA should be construed to be unavailable to corporations and subrogating insurers are in profound conflict with the remedial goals and basic objectives of the ATA.  As Deputy Secretary of State Anthony Blinken explained in an affidavit filed in proceedings before this Court in 2015, the ATA "reflects our nation's compelling interest in combatting and deterring terrorism at every level, including by eliminating sources of terrorist funding and holding sponsors of terrorism accountable for their actions.  Imposing civil liability on those who commit or sponsor acts of

57

terrorism is an important means of deterring and defeating terrorist activity."  Declaration of Anthony J. Blinken, *Sokolow v. Palestine Liberation Organization*, No. 1:04-civ-397 (S.D.N.Y. Aug. 10, 2015) (ECF No. 953-1).  As a remedial statute, the ATA must be broadly construed to give effect to those purposes.  *See Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 279 (2d Cir. 2003) (citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994) ("Because the [Rehabilitation] Act is a remedial statute, it and the regulations promulgated under it are to be construed broadly")); *Thomas v. Ariel W.*, 242 F. Supp. 3d 293, 299 (S.D.N.Y. 2017) ("As a remedial statute, the ADA must be broadly construed to effect its purpose").

In conflict with these principles, SBG's proposed reading of the ATA would fundamentally undermine the most basic goals and purposes of the ATA.  By suggesting that the remedies of the ATA should be deemed unavailable to corporations, businesses, and insurers, SBG necessarily asks this Court to immunize terrorist organizations and their sponsors from liability under the ATA for broad categories of injury their terrorist conduct is specifically designed to cause.  In fact, under SBG's theory, al Qaeda would be immune from liability under the ATA for the destruction of the World Trade Center complex.  Such a result is fundamentally at odds with the ATA's core objectives.

Moreover, SBG's proposed restrictive reading of the ATA would in operation broadly prevent U.S. citizens who are natural persons from recovering for injuries to their business and property interests, and effectively eviscerate the express remedy the ATA creates for such injuries.  As the Second Circuit has observed, U.S. laws encourage individuals to use corporate structures in their business affairs, in order to promote business development and economic vitality, while protecting the personal assets of the individual.  *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc*., 933 F.2d 131, 139 (2d Cir. 1991) ("the policy behind the

presumption of corporate independence and limited shareholder liability [is the] encouragement of business development").  Where individuals avail themselves of corporate and similar structures, the individual shareholders generally cannot pursue direct claims against tortfeasors and must cede such authority to the entity itself.  *See Solutia, Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) ("Under New York law, '[a]n individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a deprecation or destruction of the value of his corporate stock'") (quoting *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc.*, 396 N.Y.S.2d 925, 927 (App. Div. 1977)).  This rule "applies equally to closely held corporations as to large, publicly traded corporations."  *Id.* (citing *Wolf v. Rand*, 685 N.Y.S.2d 708, 710 (App. Div. 1999)).

Given these principles and realities, SBG's arguments would, if endorsed, broadly foreclose individual U.S. citizens from recovering under the ATA for injuries to their business and property, thereby effectively eliminating the express remedy for such losses under the ATA.  To be sure, individual U.S. citizens broadly hold their principal business interests through some corporate form.  A claim by that business interest is the only mechanism for individual citizens to recover for losses to such business interests from responsible tortfeasors, even in the case of closely held corporations.  However, SBG's reading of the ATA would foreclose such claims, leaving individual citizens without a remedy and functionally negating the ATA's express remedy for business and property losses.  For these additional reasons, SBG's reading of the ATA is profoundly at odds with the remedial goals and purposes of the ATA, and should be rejected on these additional grounds.

(6)     *Res Judicata Does Not Apply to Bar Plaintiffs' Claims*

Finally, Plaintiffs' claims are not precluded by the operation of *res judicata*.  Although previous adjudications of lack of personal jurisdiction may under certain circumstances have a

preclusive effect, the cases at issue must involve the same jurisdictional facts.  In *Moscoto v. MDM Group, Inc.*, No. 05 Civ. 10313, 2008 U.S. Dist. LEXIS 58030 (S.D.N.Y. July 30, 2008), this Court observed that three factors could deprive a prior jurisdictional ruling of preclusive effect:

> When a plaintiff files two actions against the same defendant in the same district, the personal jurisdiction issue is generally identical unless (1) 'subsequent events . . . create a new legal situation,' [*Pohlmann v. Bil-Jax, Inc.*, 176 F.3d 1110, 1113 (8th Cir. 1999)]; (2) the plaintiff alleges new material facts that could not have been previously discovered 'in the exercise of due diligence,' Moore's Federal Practice, § 132.02; *see also Klein v. Comm'r*, 880 F.2d 260, 263 (10th Cir. 1989); or (3) the second complaint alleges a new cause of action that provides a different basis for personal jurisdiction, *see Barrett v. Tema Dev*., 463 F. Supp. 2d 423, 428 (S.D.N.Y. 2006).

*Id.*, at *11-12.  Each of these factors applies here.  As set forth above, subsequent events have created an entirely new legal regime that serves as a framework for assessing the legal principles and facts relevant to the jurisdictional injury – namely, the passage of JASTA and the discovery of new evidence in the years since SBG was dismissed from the case.  These new material facts, including the Abbottabad Documents, the 28 Pages, and the testimony of Zacarias Moussaoui, could not have been previously discovered in the exercise of due diligence.  The empirical findings presented in JASTA and the express endorsement of secondary liability under the ATA clearly provide a different – and much stronger – basis for personal jurisdiction.  Accordingly, *res judicata* does not apply, Plaintiffs have standing to pursue their claims against SBG, and SBG's motion must be denied.

## V.    **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully submit that the motions to dismiss of Al Rajhi Bank, Saudi Binladin Group, and National Commercial Bank should be denied.

Dated:  December 5, 2017                     Respectfully submitted,

                                                  /s/ Sean P. Carter
                                                  Stephen A. Cozen, Esq.
                                                  Sean P. Carter, Esq.
                                                  Elliott R. Feldman, Esq.
                                                  Scott Tarbutton, Esq.
                                                  COZEN O'CONNOR
                                                  1650 Market Street
                                                  Philadelphia, PA  19103
                                                  (215) 665-2000

                                                  Plaintiffs' Executive Committee on behalf of
                                                  Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motions to Dismiss of Defendants Al Rajhi Bank, Saudi Binladin Group, and National Commercial Bank was filed electronically this 5th day of December 2017.  Notice of this filing will be sent to all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.  Parties may access this filing through the Court's ECF system.

/s/
J. Scott Tarbutton

LEGAL\33555737\1