# EXHIBIT 2

No. 16-1071

IN THE

# Supreme Court of the United States

_____

MARK I. SOKOLOW, *et al.*,

Petitioners,

v.

PALESTINE LIBERATION ORGANIZATION, *et al.*,

Respondents.

_____

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Second Circuit**

_____

**BRIEF OF UNITED STATES SENATORS
CHARLES E. GRASSLEY, RICHARD
BLUMENTHAL, TED CRUZ, SHELDON
WHITEHOUSE, JOHN CORNYN, EDWARD J.
MARKEY, DAN SULLIVAN, TAMMY
DUCKWORTH, SHELLEY MOORE CAPITO,
CHRISTOPHER A. COONS, JAMES M. INHOFE,
CATHERINE CORTEZ MASTO, MARCO RUBIO,
BILL NELSON, ORRIN G. HATCH, CHARLES E.
SCHUMER, JOHN BARRASSO, KIRSTEN
GILLIBRAND, DEAN HELLER, ELIZABETH
WARREN, THOM TILLIS, JOHN BOOZMAN,
AND JAMES E. RISCH AS *AMICI CURIAE*
IN SUPPORT OF PETITIONERS**

_____

CARTER G. PHILLIPS
RICHARD D. KLINGLER*
PAUL J. RAY
LUCAS W. E. CROSLOW
SIDLEY AUSTIN LLP
1501 K St., NW
Washington, DC 20005
(202) 736-8000
rklingler@sidley.com

*Counsel for Amici Curiae*

April 6, 2017                    * Counsel of Record

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................. ii

INTEREST OF *AMICI CURIAE* .......................... 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ......................................... 4

  I. THE NATIONAL SECURITY AND SEPA-
     RATION OF POWERS ISSUES PRE-
     SENTED BY THIS CASE WARRANT THIS
     COURT'S REVIEW ...................................... 4

    A. Congress Sought To Advance Core U.S.
       Interests By Designing The ATA To Apply
       To Extraterritorial Attacks On U.S. Per-
       sons ............................................ 4

    B. The U.S. Interests Advanced By Section
       2333 Support Federal Jurisdiction Over
       Claims For Attacks Abroad On U.S. Citi-
       zens ............................................ 10

    C. The Second Circuit's Decision Presents
       Significant Separation Of Powers Issues. 17

CONCLUSION .................................... 22

(i)

ii

## TABLE OF AUTHORITIES

CASES                                               Page

*Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102 (1987) ..................................... 11

*Boim* v. *Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000 (7th Cir. 2002) ........................................... 9, 14

*Boumediene* v. *Bush*, 553 U.S. 723 (2008) ........................................................... 19

*Durand* v. *Hollins*, 8 F. Cas. 111 (C.C.S.D.N.Y. 1860) (No. 4,186) ................ 7

*Harisiades* v. *Shaughnessy*, 342 U.S. 580 (1952) ......................................................... 19

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................... *passim*

*Int'l Shoe Co.* v. *Washington*, 326 U.S. 310 (1945) ......................................................... 11

*J. McIntyre Mach., Ltd.* v. *Nicastro*, 564 U.S. 873 (2011) ..................................... 11, 12, 15

*Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ..................................................... 11

*Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803) .......................................................... 19

*Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) ................................................... 13

*Rostker* v. *Goldberg*, 453 U.S. 57 (1981) ................................................... 18, 19, 21

*Walden* v. *Fiore*, 134 S. Ct. 1115 (2014) ...... 15, 16

*Walters* v. *Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305 (1985) ................. 19

*World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286 (1980) .............................. 11, 13, 15

CONSTITUTION AND STATUTES

U.S. Const. art. I, § 8 .................................... 13

            art. II, § 2 .................................... 13

iii

TABLE OF AUTHORITIES—continued

Page

U.S. Const. art. III, § 2................................ 13

Omnibus Diplomatic Security and Anti-
terrorism Act of 1986, Pub. L. No. 99-399,
100 Stat. 853 ............................................. 6

Antiterrorism and Effective Death Penalty
Act of 1996, Pub. L. No. 104-132, 110 Stat.
1214 ...................................................... 6, 7, 10

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852
(2016) ........................................................... 7, 13

8 U.S.C. § 1101(a)(22) .................................. 5

18 U.S.C. § 2331 ........................................... 5, 16

§ 2332 ........................................... 10, 14

§ 2333 ........................................ 4, 5, 20

§ 2339B......................................... 20

50 U.S.C. § 4605(j)........................................ 10

LEGISLATIVE HISTORY

S. 2465, 101st Cong. (1990).......................... 4

*Antiterrorism Act of 1990: Hearing Before
the Subcomm. on Courts and Admin.
Practice of the S. Comm. on the Judiciary*,
101st Cong. (July 25, 1990) .................. *passim*

*The Antiterrorism Act of 1991: Hearing
Before the Subcomm. on Intellectual Prop.
and Judicial Admin. of the H. Comm. on
the Judiciary*, 102d Cong. (Sept. 18,
1992) ......................................................... 6, 8, 9

*Extraterritorial Jurisdiction over Terrorists
Acts Abroad: Hearings Before the Sub-
comm. on Crime of the H. Comm. on the
Judiciary*, 101st Cong. (May 31, June 13,
and July 13, 1989).................................... 6

iv

TABLE OF AUTHORITIES—continued

Page

136 Cong. Rec. S14279 (daily ed. Oct. 1, 1990) ............................................................. 8, 9

136 Cong. Rec. S4592 (daily ed. Apr. 19, 1990) ............................................................. 7

137 Cong. Rec. S2500 (daily ed. Feb. 28, 1991) ............................................................. 8

137 Cong. Rec. S4511 (daily ed. Apr. 16, 1991) ............................................................. 7

EXECUTIVE ORDERS

Exec. Order 12947, 60 Fed. Reg. 5,079 (Jan. 25, 1995) ...................................................... 10

Exec. Order 13099, 63 Fed. Reg. 45,167 (Aug. 25, 1998) .................................................... 10

Exec. Order 13224, 66 Fed. Reg. 49,079 (Sept. 25, 2001)................................................... 10

RECORD MATERIALS

Brief for the United States as *Amicus Curiae* Supporting Affirmance, *Boim* v. *Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, No. 01-1969 (7th Cir. Nov. 14, 2001) ...................................................... 9

Statement of Interest of the United States, *Sokolow v. Palestine Liberation Org.*, No. 1:04-civ-397 (S.D.N.Y. Aug. 10, 2015) ....... 8, 9

OTHER AUTHORITIES

Edward Keynes, *Undeclared War* (1982) ..... 7

Hugo Grotius, *Rights of War and Peace* (1625) (Dunne ed. 1901)............................ 12

Stephen Shapiro et al., *Supreme Court Practice* (10th ed. 2013) ............................ 18

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are 23 currently serving United States Senators from both parties with distinct interests in the national security and separation of powers issues presented by this case.

Because this case concerns whether the Fifth Amendment's Due Process Clause precludes the Antiterrorism Act ("ATA") from having its intended effect of supporting civil claims against those who engage in acts of terrorism harming U.S. persons abroad, it presents important issues related to the nation's security and the separation of powers. *Amici curiae* have deep expertise and responsibility for the nation's counterterrorism policy and include, for example, eight Members of the U.S. Senate Committee on the Judiciary, eight Members of the U.S. Senate Committee on Armed Services, and five Members of the U.S. Senate Committee on Foreign Relations. They also have particular responsibility for how the Antiterrorism Act and its civil cause of action function as part of the nation's armory of counter-terrorism measures. For example, Senator Grassley, Chairman of the Senate Judiciary Committee, was a principal sponsor of the ATA's civil cause of action in the years leading to its enactment, and he and other *amici* have monitored its operation, which Congress strengthened through amendment as recently as 2016. *Amici* also have a di-

---

[1] Pursuant to Supreme Court Rule 37.6, *amici curiae* state that no counsel for any party authored this brief in whole or in part and that no entity or person aside from counsel for *amici curiae* made any monetary contribution towards the preparation and submission of this brief. Pursuant to Rule 37.2(a), counsel for *amici curiae* timely contacted counsel for all parties, who provided consent to the filing of this brief.

2

rect interest in the proper allocation of the federal government's separated powers and in having the federal judiciary give appropriate weight and effect to the empirical and policy determinations of Congress, especially for matters concerning the nation's security.

## SUMMARY OF ARGUMENT

The Second Circuit's decision effectively deems unconstitutional the single most important feature of a federal statute that is vital to this nation's counter-terrorism capabilities.  In doing so, the court of appeals disregarded Congress's determinations in a manner that presents significant separation of powers concerns.  In both respects, the Second Circuit erred.  For these reasons, this Court's review of the Second Circuit's decision is warranted.

Congress designed the Antiterrorism Act's civil cause of action to address precisely the conduct at issue here: international terrorist attacks harming U.S. persons abroad.  Civil actions based on Section 2333 of the Act deter support for terrorism, buttress the nation's related counter-terrorism initiatives, and provide justice for victims of terrorist attacks.

In enacting Section 2333, Congress determined that federal jurisdiction is warranted because such suits advance vital U.S. interests.  Civil litigation counters and redresses international terrorism, which harms U.S. citizens traveling abroad and U.S. businesses operating overseas, impairs global economic activity, undermines U.S. allies, and often reflects the operation of global enterprises that target U.S. territory as well as engaging in attacks abroad.  In addition, protecting U.S. persons abroad by deterring attacks, and providing justice when attacks do occur, is a separate and significant U.S. interest.

3

The Second Circuit determined that federal courts lack jurisdiction over most claims within the intended scope of Section 2333. That conclusion rested on the Due Process Clause, which, properly construed, provides for federal court jurisdiction over disputes that implicate important U.S. interests. Had the Second Circuit properly identified and given effect to Congress's conclusions that ATA civil actions advance vital U.S. interests—both in deterring terrorist attacks that injure U.S. persons and in providing a forum for redressing such injuries—it would have concluded that jurisdiction exists over the Section 2333 claims at issue here. Nor is there any fundamental unfairness in haling into U.S. courts defendants who engage in international terrorist acts that harm U.S. persons. Quite the contrary: Those defendants should reasonably expect to be subject to the full scope of U.S. governmental responses, with federal court actions among the least significant or surprising.

The Second Circuit's narrow construction of the Due Process Clause and that court's failure to acknowledge and give effect to the nexus between U.S. interests and international terrorist attacks abroad present two significant separation of powers concerns. The decision effectively deems unconstitutional most of the intended operation of Section 2333, which itself justifies this Court's review. In addition, the decision fails to recognize and give effect to the factual and policy determinations of a co-ordinate branch of government that inform the legal issue before the courts. While the federal courts must themselves construe the Due Process Clause, this Court's decisions make clear that they also must defer to Congress regarding such empirical determinations that underlie—or, as in this case, resolve—the legal issues before them.

4

For these reasons, this case merits this Court's review.

## ARGUMENT

### I. THE NATIONAL SECURITY AND SEPARATION OF POWERS ISSUES PRESENTED BY THIS CASE WARRANT THIS COURT'S REVIEW.

#### A. Congress Sought To Advance Core U.S. Interests By Designing The ATA To Apply To Extraterritorial Attacks On U.S. Persons.

Whether the Constitution permits U.S. courts to exercise jurisdiction over Antiterrorism Act claims related to terrorist attacks against Americans abroad depends on whether those attacks implicate vital U.S. interests. See *infra* Part I.B. Congress has extensively considered that question and has repeatedly found a close nexus between such attacks and paramount U.S. interests, confirming that federal court jurisdiction over ATA claims is appropriate and consistent with the Due Process Clause. Those vital interests include protecting Americans abroad as well as deterring and redressing acts of international terrorism that inherently threaten the United States, its citizens, and its allies. The ATA's civil cause of action represents Congress's considered judgment on these points.

Congress enacted the ATA's civil remedy provision, 18 U.S.C. § 2333, to establish federal court jurisdiction over claims arising out of precisely the type of international terrorist attacks on U.S. citizens abroad that are at issue here. The statute is designed to "provide[] extraterritorial jurisdiction over terrorist acts abroad against United States nationals," S. 2465, 101st Cong.

5

(1990), and the Act defines a prohibited act of international terrorism as one "occur[ring] primarily outside the territorial jurisdiction of the United States" or "transcend[ing] national boundaries," 18 U.S.C. § 2331(1)(C). Congress determined that this extraterritorial coverage was necessary to "extend the reach of Federal law enforcement … to a broad range of terrorist[] activities overseas, where 99 percent of all terrorist attacks against Americans occur." *Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. 15 (July 25, 1990) ("*July 25, 1990 Hearing*").

Section 2333 expressly identifies and limits jurisdiction according to the two principal U.S. interests implicated by terrorist attacks abroad, protecting U.S. nationals and combating international terrorism. The provision authorizes only claims brought by U.S. nationals, defined as U.S. citizens or others with "permanent allegiance" to the United States. See 8 U.S.C. § 1101(a)(22). Harm to foreign nationals—even those with strong ties to the United States—does not trigger Section 2333's protections. In addition, the provision authorizes U.S. nationals to claim damages only if they are "injured … by reason of an act of international terrorism." 18 U.S.C. § 2333(a). The ATA provides a clear definition of international terrorism focused on international violence intended to influence or coerce a civilian population or government, see *id*. §§ 2333(a), 2331(1)(B), and provides for recovery only where that definition is satisfied.

Congress has repeatedly determined that international terrorism so directly harms U.S. interests that federal court jurisdiction over terrorists who harm Americans abroad is appropriate. Congress reached

6

this conclusion as early as 1986, when it created criminal penalties for "[t]errorist acts abroad against United States nationals." Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. No. 99-399, § 1202, 100 Stat. 853, 896 (codified as amended at 18 U.S.C. § 2331). Congress has explained that "the Constitution confers upon [it] the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(2), 110 Stat. 1214, 1247 (codified at 18 U.S.C. § 2339B note) ("AEDPA").

Similarly, for the Section 2333 civil cause of action, the House and Senate Judiciary Committees held extensive hearings on versions of the proposed measure over multiple congressional sessions.[2] Witnesses testified before Congress about the due process implications of the legislation. *July 25, 1990 Hearing* 79, 121-31. As a result, Congress tailored the statute to confer jurisdiction only where both vital U.S. interests discussed above are at stake.

In determining that Section 2333 was consistent with the Due Process Clause, Congress emphasized the importance of the national interests at stake. The legislation was prompted by the need to "remove[] the jurisdictional hurdles in the courts confronting victims" of terrorism abroad and to "accord[] victims of

---

[2] *The Antiterrorism Act of 1991: Hearing Before the Subcomm. on Intellectual Prop. and Judicial Admin. of the H. Comm. on the Judiciary*, 102d Cong. (Sept. 18, 1992) ("*Sept. 18, 1992 Hearing*"); *The Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. (July 25, 1990); *Extraterritorial Jurisdiction over Terrorists Acts Abroad: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 101st Cong. (May 31, June 13, and July 13, 1989).

7

terrorism the remedies of American tort law." 137
Cong. Rec. S4511, S4511 (daily ed. Apr. 16, 1991)
(statement of Sen. Grassley). The ATA remedy has al-
ways been limited to victims of international terror-
ism, and Congress has repeatedly declared that "inter-
national terrorism is a serious and deadly problem
that threatens the vital interests of the United States."
AEDPA, § 301(a)(1), 110 Stat. at 1247; see also Justice
Against Sponsors of Terrorism Act, Pub. L. No. 114-
222, § 2(a), 130 Stat. 852, 852 (2016) ("JASTA") ("In-
ternational terrorism … threatens the vital interests
of the United States," including by "harming interna-
tional trade and market stability, and limiting inter-
national travel by United States citizens as well as for-
eign visitors to the United States.").

These vital interests in protecting U.S. nationals
and combating terrorism are linked directly to the as-
sertion of jurisdiction over ATA civil claims. Protect-
ing Americans abroad has been a national priority
since the beginning of the Republic, as reflected in
Congress's 1802 authorization of the use of force to
protect American sailors in the Mediterranean against
pirates based in the Barbary States. See Edward
Keynes, *Undeclared War* 39 & 191 n.31 (1982). By
1860, it was well settled that "[u]nder our system of
government, the citizen abroad is as much entitled to
protection as the citizen at home." *Durand* v. *Hollins*,
8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4,186)
(Nelson, Circuit Justice). In the 1980s, Congress con-
fronted a threat to that interest in the form of sharply
increasing terrorism against Americans abroad. 136
Cong. Rec. S4592, S4594 (daily ed. Apr. 19, 1990)
(statement of Sen. Heflin). Beginning with the bomb-
ing of the United States embassy and military bar-
racks in Beirut in 1983, terrorists attacked and killed
Americans on foreign soil, on airplanes and cruise

8

ships, and at U.S. government facilities abroad. One attack in particular galvanized American public opinion and prompted the introduction of Section 2333: the 1985 murder of the wheelchair-bound Leon Klinghoffer, an American passenger aboard the Italian vessel *Achille Lauro*. The ship was hijacked by four members of the PLO, who executed Mr. Klinghoffer and threw his body into the sea. *July 25, 1990 Hearing* 56. The incident prompted public outcry and a congressional inquiry into the PLO and its finances. *Id.* at 109-17. By enacting Section 2333, Congress intended to "put terrorist[s] on notice[] [t]o keep their hands off Americans" like Leon Klinghoffer. 136 Cong. Rec. S14279, S14284 (daily ed. Oct. 1, 1990) (statement of Sen. Grassley); see also *Sept. 18, 1992 Hearing* 4.

Combating international terrorism is also "an urgent objective of the highest order." *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 28 (2010). By the early 1990s, the United States was "in the middle of a worldwide battle against terrorism," 137 Cong. Rec. S2500, S2500 (daily ed. Feb. 28, 1991) (statement of Sen. Grassley), which included military action in response to foreign terror attacks against Americans. "[O]ur nation's compelling interest in combating and deterring terrorism at every level," Statement of Interest of the United States at 2, *Sokolow v. Palestine Liberation Org.*, No. 1:04-civ-397 (S.D.N.Y. Aug. 10, 2015) (ECF No. 953-1) ("Statement of Interest"), is rooted in Congress's well-founded recognition that terrorism is a "politically motivated act[]," *July 25, 1990 Hearing* 4, directed toward influencing governmental policy. Sometimes terrorist attacks are expressly directed at coercing U.S. policy decisions. Other attacks are directed at "moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations" and "threaten [the] social,

9

economic, and political stability of such governments." *Humanitarian Law Project*, 561 U.S. at 32 (alteration in original). Still others target U.S. military allies, "thereby implicating important and sensitive … security arrangements." *Id.* Redressing and deterring international terrorism, in all these forms, are paramount national interests.

Section 2333, as applied to terrorist attacks on U.S. nationals abroad, directly furthers these compelling interests. Section 2333 was designed to "fill the gap by providing the civil counterpart to" Section 2332's criminal penalties, 136 Cong. Rec. at S14283 (statement of Sen. Grassley), and to create "civil liability at least as extensive as criminal liability" under Section 2332. *Boim* v. *Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1020 (7th Cir. 2002). As the State Department has explained, Section 2333 "discourage[s] sources of terrorist funding and hold[s] sponsors of terrorism accountable for their actions." Statement of Interest at 2. Section 2333 was designed to "put[] terrorists' assets at risk and deter[] them from using the U.S. financial system to hide and augment their wealth," *Sept. 18, 1992 Hearing* 13, thus "cut[ting] off the flow of money to terrorists at every point along the causal chain of violence," *Boim*, 291 F.3d at 1021. The Department of Justice has recognized that Section 2333 is "an effective weapon in the battle against international terrorism" because it "discourage[s] those who would provide financing for this activity." Brief for the United States as *Amicus Curiae* Supporting Affirmance at 2, *Boim*, No. 01-1969 (7th Cir. Nov. 14, 2001). By cutting terrorists' financial lifelines, Section 2333 furthers the United States' longstanding efforts to reduce global terrorism and thus protects Americans here and abroad.

10

These important interests advanced by Section 2333 reinforce other, closely related counter-terrorism initiatives. As noted, the same determinations of national interest underpin the federal courts' criminal jurisdiction over terrorists who kill or injure Americans abroad. See 18 U.S.C. § 2332. More broadly, in the Antiterrorism and Effective Death Penalty Act of 1996, Congress authorized the Secretaries of State and Treasury to designate and freeze the assets of foreign terrorist organizations. AEDPA, § 219(a)(2)(C), 110 Stat. at 1248. The President has likewise issued executive orders blocking assets of certain foreign terrorists after finding that their terrorism "constitute[s] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order 12947, 60 Fed. Reg. 5,079 (Jan. 25, 1995); see also Exec. Order 13224, 66 Fed. Reg. 49,079 (Sept. 25, 2001); Exec. Order 13099, 63 Fed. Reg. 45,167 (Aug. 25, 1998). Congress has imposed strict controls on exports to countries that support international terrorism. See 50 U.S.C. § 4605(j). U.S. military forces have been directed against international terrorists. Indeed, the past decade's most prominent U.S. military commitments, in Afghanistan, Syria, Yemen, and elsewhere, are designed to counter international terrorists who threaten U.S. interests globally. In enacting Section 2333 and designing it to apply to terrorist attacks on U.S. nationals abroad, Congress could hardly have identified a measure more closely related to essential U.S. interests.

### B. The U.S. Interests Advanced By Section 2333 Support Federal Jurisdiction Over Claims For Attacks Abroad On U.S. Citizens.

The Due Process Clause, appropriately construed, readily supports federal court jurisdiction over the

11

types of ATA claims presented in this case. The fundamental fairness required by the Clause is satisfied when jurisdiction is asserted over claims that implicate "the forum State's interest in adjudicating the dispute," *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 292 (1980), which ATA claims do for the reasons Congress identified in enacting and amending the ATA. See *supra* Part I.A; see also *Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102, 113 (1987) ("A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief"). Fundamental fairness is further satisfied when a defendant should reasonably anticipate being subject to U.S. court proceedings and other exercises of U.S. power, as is the case for any party engaged in international terrorism that harms U.S. persons. The Second Circuit's conclusions to the contrary failed to give effect to the national interests at stake or to the basic principles animating the Due Process Clause in this unique context.

1. The Due Process Clause recognizes a broad scope for the exercise of national powers, including the assertion of federal court jurisdiction, to advance national interests. Due process permits U.S. courts to exercise jurisdiction when doing so "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945). To assess whether due process permits jurisdiction, courts "focus[] on the relationship among the defendant, the forum, and the litigation." *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). Where, as here, jurisdiction is assessed on a national basis, federal courts can act where "a litigant [has] the requisite relationship with the United States government." *J. McIntyre Mach., Ltd.* v. *Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion).

12

The interests underlying the ATA's application to attacks abroad—protecting U.S. citizens abroad and countering international terrorism—establish precisely this "requisite relationship" between the United States and defendants who undertake acts of international terrorism harming U.S. persons. This is especially so because the central jurisdictional "question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *Id.* As described *supra* pp. 8-10, international terrorism strikes at the society and economy of the United States, directly and through the nation's alliances and integration with the global economy. In addition, jurisdiction should be even more expansive where, as here, the litigation concerns an intentional tort and violation of United States civil and criminal law. See *J. McIntyre Mach.*, 564 U.S. at 880 (plurality opinion) ("in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws").

As explained *supra* pp. 7-8, the United States' interest in protecting its citizens abroad dates to the beginning of the Republic, and such interests have been recognized since ancient times. See, *e.g.*, Hugo Grotius, *Rights of War and Peace* 285 (1625) (Dunne ed. 1901). Similarly, "the Government's interest in combating [international] terrorism is an urgent objective of the highest order." *Humanitarian Law Project*, 561 U.S. at 28. Due process is even more clearly satisfied when, as under Section 2333, jurisdiction is exercised over cases that implicate both of these interests.

The Due Process Clause requires a nexus between U.S. interests and the exercise of various U.S. powers

13

affecting individuals, and no reason exists to conclude that the nation's powers are unusually limited with respect to civil litigation. This Court has repeatedly recognized that Congress possesses ample authority to legislate extraterritorially and to vest the federal courts with power to adjudicate disputes arising from events occurring abroad. See, *e.g.*, *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Indeed, the Constitution explicitly contemplates federal court jurisdiction for offenses committed abroad. See U.S. Const. art. I, § 8, cl. 10 (Congress has power to "define and punish Piracies and Felonies committed on the high Seas"). The Constitution confers jurisdiction on the federal courts to hear other causes of action arising outside the borders of the United States, *id.* art. III, § 2 (the judicial power extends to "all Cases affecting Ambassadors," "all Cases of admiralty and maritime Jurisdiction," and controversies "between a State, or the Citizens thereof, and foreign States, Citizens, or Subjects"), and contemplates that other components of the federal government will pursue the interests of the United States beyond our nation's borders. See *id.* art. II, § 2, cl. 2 (diplomatic initiatives abroad); *id.* art. I, § 8, cl. 3 (regulating trade with foreign nations); *id.* art. I, § 8, cls. 11-16; art. II, § 2, cl. 1 (deployment of troops abroad).

Another basic due process test confirms that jurisdiction here is clearly consistent with fundamental fairness and the Due Process Clause. A touchstone test for this purpose is whether "the defendant's conduct and connection with the forum … are such that he should reasonably anticipate being haled into court there." *Woodson*, 444 U.S. at 297. Congress has found that terrorists who attack American nationals "should reasonably anticipate being brought to court in the United States to answer for such activities," JASTA,

14

§ 2(a)(6), 130 Stat. at 852, and that conclusion is clearly correct in this context.

For decades, terrorists who attack American nationals abroad have been answerable to U.S. courts and, in appropriate circumstances, subject to the death penalty. 18 U.S.C. § 2332(a), (d). International terrorists and their facilitators may have their assets frozen by the Secretaries of State and Treasury or blocked by the President. Their actions may precipitate stringent export controls against their host countries. And they may find themselves the target of U.S. airstrikes or other military action. None of these sanctions should come as a surprise to those who engage in terrorism, and international terrorists can hardly claim that they could not "reasonably anticipate being haled into court" in the United States to face far lesser penalties as civil defendants.

In any event, the PLO and PA in particular certainly cannot claim surprise at being subject to civil actions for terrorist attacks harming American nationals. Congress enacted Section 2333 in direct response to a deadly PLO attack against a U.S. national abroad. See *supra* p. 8. After hearing extensive testimony about the PLO and its assets, Congress "expand[ed]" a judicial ruling against the PLO to "provide general jurisdiction to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas." *July 25, 1990 Hearing* 12; see also *id.* at 109-17; *Boim*, 291 F.3d at 1010 ("The repeated favorable references to *Klinghoffer* indicate a desire on the part of Congress to extend this liability to land-based terrorism that occurred in a foreign country.").

2. The Second Circuit narrowly and erroneously construed the Due Process Clause to preclude federal

15

court jurisdiction over most ATA claims based on international terrorist attacks harming Americans abroad. In doing so, that court failed to apply the basic principles set out above even as it disregarded Congress's assessment of the relevant national interests fostered by ATA claims, impairing a core counter-terrorism tool.

Although the Second Circuit acknowledged that the Fifth Amendment's Due Process Clause rather than the Fourteenth Amendment's provision governs this case, see Pet. App. 22a, it failed to give effect to the implications of that conclusion. The tests set forth by cases applying the Fourteenth Amendment are designed to determine which among several states are entitled to assert jurisdiction—not, as in the Fifth Amendment context, whether jurisdiction is appropriate in *any* U.S. court. Because "the sovereign power [of each State] to try causes in [its own] courts…. implie[s] a limitation on the sovereignty of all of its sister States," *Woodson*, 444 U.S. at 293, the Fourteenth Amendment "ensure[s] that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292. In contrast, the Fifth Amendment's test sets forth the limits on the nation's sovereignty as a whole, see *J. McIntyre Mach., Ltd.*, 564 U.S. at 884 (plurality opinion), and determines whether any U.S. court can assert jurisdiction. The relevant inquiry is whether a particular case implicates U.S. interests, and the Clause naturally invites reference to Congress's assessment of those interests.

By inflexibly applying *Walden* v. *Fiore*, 134 S. Ct. 1115 (2014), the Second Circuit applied the wrong standard of due process and seriously undermined the nation's fundamental interest in protecting its secu-

16

rity. *Walden* involved limitations on the exercise of jurisdiction by the State of Nevada, *id.* at 1121, and this Court there accordingly relied on its Fourteenth Amendment cases, *id.* at 1121-24. *Walden* provides little guidance for how the Fifth Amendment's Due Process Clause applies to assess the national interests in asserting jurisdiction over international terrorist attacks abroad, or for determining whether U.S. courts should be open to ATA claims such as those at issue here.

In particular, the Second Circuit failed to give effect to Congress's assessment of the compelling national security interests vindicated by Section 2333. See *Humanitarian Law Project*, 561 U.S. at 28-33 (deference to congressional and executive branch determinations on empirical issues); see also *infra* Part I.C. For example, the Second Circuit's conclusion that the attacks here were simply "indiscriminate violence," Pet. App. 36a, failed to "grant weight to [Congress's] empirical conclusions" about how international terrorism works. 561 U.S. at 35. Congress found that international terrorism is not "indiscriminate violence" at all; it is instead a "deliberate political act" that uses "the murder of innocent civilians" as a weapon to influence public policy. *July 25, 1990 Hearing* 64. Indeed, the statutory definition of "international terrorism" reflects that understanding. See 18 U.S.C. § 2331(1)(B).[3]

The Second Circuit likewise ignored Congress's assessment of the policies needed to fight international terrorism when it concluded that defendants' attacks were not aimed at the United States because "[i]n this

---

[3] The Second Circuit even admitted, in light of trial evidence, that the PLO and PA "sought to influence United States policy," but held that some unspecified "other connection" was necessary to warrant jurisdiction. Pet. App. 46a.

17

case, the United States is not the nucleus of the harm—Israel is." Pet. App. 43a.  That conclusion disregards Congress's contrary judgment that international terrorist attacks abroad harm vital U.S. interests—a judgment this Court has accepted.  *Humanitarian Law Project*, 561 U.S. at 32 (finding "no reason to question Congress's finding that international cooperation is required for an effective response to terrorism" and that weakening "foreign terrorist groups that harm the United States' partners abroad" "furthers this international effort" against terrorism).  The Second Circuit erred in not doing likewise.

Had the Second Circuit applied the correct analysis and the broader Fifth Amendment framework, it would have readily concluded that federal court jurisdiction covers these claims.

## C. The Second Circuit's Decision Presents Significant Separation Of Powers Issues.

The Second Circuit's narrow construction of the Due Process Clause and its failure to acknowledge and give effect to the nexus between U.S. interests and international terrorism attacks abroad present significant separation of powers concerns in two basic respects.  First, the decision effectively deems unconstitutional most of the intended operation of Section 2333.  Second, the decision fails to weigh adequately and give effect to the factual and policy determinations of a coordinate branch that determine the resolution of the legal issue presented here.

1. The Second Circuit's construction of the Due Process Clause strips federal courts of jurisdiction over most of the claims that Congress intended Section 2333 to support.  Congress intended Section 2333 to provide "extraterritorial jurisdiction" over terrorist at-

18

tacks against Americans abroad and enacted it in direct response to an attack against an American national occurring wholly outside the United States.  See *supra* pp. 4-8.  Damage caused to a U.S. national by an act of international terrorism linked to a defendant sufficed to establish the nexus to U.S. interests required for jurisdiction.  Under the Second Circuit's approach, however, jurisdiction will exist to address claims arising from such attacks only where, in addition, plaintiffs can establish a defendant's particular intent to harm U.S. nationals.  See *supra* pp. 15-17.  As this case demonstrates, that showing will be extremely difficult for most U.S. victims of terrorist attacks to meet.

By effectively nullifying much of the intended effect of an Act of Congress, the Second Circuit's decision presents a significant separation of powers issue as well as undermines an important counter-terrorism tool.  Considering whether an Act is consistent with the Constitution is this Court's "gravest and most delicate duty," because "[t]he Congress is a coequal branch of government whose Members take the same oath … to uphold the Constitution" as do the Justices of this Court, and whose interpretation of the Constitution is entitled to respect.  *Rostker* v. *Goldberg*, 453 U.S. 57, 64 (1981).  For this reason, this Court almost invariably grants certiorari when a lower court strikes down an Act of Congress, particularly where matters of foreign policy are concerned.  *See, e.g.*, Stephen Shapiro et al., *Supreme Court Practice* § 4.12, at 264-67 (10th ed. 2013).  And, while the Second Circuit did not formally invalidate Section 2333 in all its applications, this Court has not demanded the formal invalidation of federal legislation before exercising its duty to review a decision interfering with "the operation of

19

[a statute] on constitutional grounds." *Walters* v. *Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319 (1985).

The separation of powers concern is especially significant in light of the robust deference owed to congressional judgments "in the context of … national defense." *Rostker*, 453 U.S. at 64. While this Court retains ultimate responsibility in such cases to "say what the law is," *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), "in no other area has the Court accorded Congress greater deference," *Rostker*, 453 U.S. at 64-65. In particular, in "considering both the procedural and substantive standards used to … prevent acts of terrorism, proper deference must be accorded to the political branches." *Boumediene* v. *Bush*, 553 U.S. 723, 796 (2008). That deference is rooted in the political branches' constitutional duty to defend the nation against the threat of armed force, see, *e.g.*, *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 589 (1952), and the distinct institutional advantages those branches possess in executing that duty, see *Boumediene*, 553 U.S. at 797.

2. The Second Circuit's decision failed to give weight and effect to Congress's factual and empirical policy judgments, presenting a further separation of powers concern. While the court was not required to defer to Congress's ultimate determination of the lawfulness of jurisdiction under Section 2333, the Second Circuit was required to carefully attend and give effect to the key empirical and policy determinations that underlay it. Specifically, the court failed to weigh Congress's determinations that terrorist attacks on U.S. persons abroad directly implicate vital U.S. interests and that civil litigation addressing such attacks serves as an important counter-terrorism tool. Both of those determinations are crucial considerations underlying the proper assessment of why the Due Process Clause

20

should not bar jurisdiction in this and similar cases. See *supra* Part I.B.

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1, shows the significance of the Second Circuit's error and the proper framework for evaluating Congress's determinations related to counter-terrorism. The case arose in a closely related context: a First Amendment challenge to the statute prohibiting the provision of material support to designated terrorist organizations, 18 U.S.C. § 2339B—an important counter-terrorism provision that Section 2333 itself is designed to enforce through civil actions. See *id.* § 2333(d)(2) (imposing civil liability for providing material assistance to terrorist attacks on Americans abroad). Although the Court observed that "[w]e do not defer to the Government's reading of the First Amendment," it emphasized that "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' *Rostker*, [453 U.S.] at 65, and respect for the Government's conclusions is appropriate." *Humanitarian Law Project*, 561 U.S. at 34.

In *Humanitarian Law Project*, the Court deferred to determinations of Congress and the Executive Branch that are similar to those at issue here. In that case, the Court considered whether a sufficient nexus existed between the provision of advisory services to designated terrorist organizations and vital U.S. interests in combating terrorism, and deferred to Congress's and the Executive Branch's assessments that vital interests were implicated. See *id.* at 28-33. Here, the issue is whether the courts should give weight to Congress's assessment of the close nexus between terrorist attacks abroad on U.S. persons and U.S. interests, and Congress has similarly concluded that vital U.S. interests in combating terrorism are implicated. See *supra*

21

pp. 6-10.  Had the Second Circuit properly deferred to Congress's key determinations regarding how such attacks implicate U.S. interests, it would have concluded that the Due Process Clause does not limit the intended jurisdictional reach of Section 2333.  See *supra* Part I.B.

Especially for "litigation [that] implicates sensitive and weighty interests of national security and foreign affairs," "Congress's assessment[] is entitled to deference."  *Humanitarian Law Project*, 561 U.S. at 33-34. Indeed, that is especially true when, as in *Humanitarian Law Project* and in this case, the dispute involves "terrorist acts against American citizens abroad," and the relevant "statute addresses acute foreign policy concerns involving relationships with our Nation's allies."  *Id.* at 34.  "It is vital in this context 'not to substitute [a judicial] evaluation of evidence for a reasonable evaluation by the Legislative Branch.'"  *Id.* (quoting *Rostker*, 453 U.S. at 68).  Deference is especially required where, as here, see *supra* p. 6, "Congress has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns," and when it has carefully tailored its legislation to impose as minimal a constitutional burden as possible while achieving its compelling ends.  561 U.S. at 35-36; *Rostker*, 453 U.S. at 64 ("The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the … constitutionality" of its national security measures).

The Second Circuit erred in not applying these basic principles, which lead directly to the conclusion that federal courts have jurisdiction over Section 2333 claims such as those at issue in this case.

22

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for a writ of certiorari and reverse the judgment below.

Respectfully submitted,

CARTER G. PHILLIPS
RICHARD D. KLINGLER*
PAUL J. RAY
LUCAS W. E. CROSLOW
SIDLEY AUSTIN LLP
1501 K St., NW
Washington, DC 20005
(202) 736-8000
rklingler@sidley.com

*Counsel for Amici Curiae*

April 6, 2017                    * Counsel of Record