# EXHIBIT 3

No. 16-1071

IN THE

# Supreme Court of the United States

—————

MARK SOKOLOW, ET AL., PETITIONERS,

*v.*

PALESTINE LIBERATION ORGANIZATION, ET AL.

—————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

—————

**BRIEF FOR THE**
**U.S. HOUSE OF REPRESENTATIVES**
**AS AMICUS CURIAE SUPPORTING CERTIORARI**

—————

THOMAS G. HUNGAR
  *General Counsel*
    *Counsel of Record*
KIMBERLY HAMM
  *Assistant General Counsel*
KRISTIN A. SHAPIRO
  *Assistant General Counsel*

*Office of General Counsel*
*U.S. House of Representatives*
*219 Cannon Building*
*Washington, D.C.  20515*
*(202) 225-9700*
*Thomas.Hungar@mail.house.gov*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................ii

INTEREST OF AMICUS CURIAE.................................1

SUMMARY OF ARGUMENT ..........................................2

ARGUMENT...................................................................3

I.  THE DECISION BELOW EFFECTIVELY INVALI-
    DATES THE ATA ..........................................................3

    A.  The Decision Below Confines The Ap-
        plicability Of The ATA To Circum-
        stances That Will Rarely, If Ever, Exist........4

    B.  The Decision Below Subverts The Pur-
        pose Of The ATA .................................................6

    C.  The Court Of Appeals' Nullification Of
        The ATA Warrants Review .............................8

II. THE DECISION BELOW IMPROPERLY CON-
    STRAINS CONGRESS'S BROAD AUTHORITY TO
    LEGISLATE EXTRATERRITORIALLY IN FURTHER-
    ANCE OF THE NATION'S INTERESTS IN THE AR-
    EAS OF FOREIGN AFFAIRS AND NATIONAL SECU-
    RITY ............................................................................10

    A.  The Court Of Appeals' Erroneous Hold-
        ing That Respondents Are "Persons"
        For Purposes Of The Fifth Amendment
        Undermines The Nation's Ability To
        Combat Terrorism ...........................................11

B.  The Court Of Appeals' Holding That The
    Test For Personal Jurisdiction Is "The
    Same Under The Fifth Amendment And
    The Fourteenth Amendment" Improp-
    erly Constrains Congress's Legislative
    Power And Imperils Numerous Federal
    Statutes ............................................................ 14

    1.  *Contrary to the court of appeals'*
        *holding, the personal-jurisdiction*
        *analysis is not "the same" under the*
        *Fifth and Fourteenth Amendment* .......... 15

    2.  *The court of appeals' holding that*
        *the personal-jurisdiction analysis is*
        *"the same" under the Fifth and Four-*
        *teenth Amendments warrants re-*
        *view* ............................................................ 20

CONCLUSION ................................................................ 22

## TABLE OF AUTHORITIES

*Asahi Metal Indus. Co. v. Superior Court*
    *of California,*
    480 U.S. 102 (1987) ...................................... 21

*Ashcroft v. Am. Civil Liberties Union,*
    542 U.S. 656 (2004) ...................................... 8

*Babbitt v. Youpee,*
    519 U.S. 234 (1997) ...................................... 8

*Blodgett v. Holden,*
    275 U.S. 142 (1927) ....................................................... 8

*Burnham v. Superior Court of California,*
    495 U.S. 604 (1990) ................................................. 16-17

*City of East St. Louis v. Circuit Court for the
    Twentieth Judicial Circuit,*
    986 F.2d 1142 (7th Cir. 1993) .............................. 11, 13

*Daimler AG v. Bauman,*
    134 S. Ct. 746 (2014) ................................................. 15

*EEOC v. Arabian American Oil Co.,*
    499 U.S. 244 (1991) ................................................... 17

*FCC v. Beach Communications, Inc.,*
    508 U.S. 307 (1993) ..................................................... 8

*Foley Bros. v. Filardo,*
    336 U.S. 281 (1949) ................................................... 18

*Haile v. Henderson National Bank,*
    657 F.2d 816 (6th Cir. 1981) ...................................... 18

*Handley v. Indiana. & Michigan Electric Co.,*
    732 F.2d 1265 (6th Cir. 1984) .................................... 18

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ................................................... 13

*Ins. Corp. of Ireland v. Compagnie des Bauxites
    de Guinee,*
    456 U.S. 694 (1982) ................................................... 12

*International Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ............................................. 15, 16

*J. McIntyre Machinery, Ltd. v. Nicastro,*
    564 U.S. 873 (2011) ......................................... 14, 16, 17

*Kiobel v. Royal Dutch Petroleum Co.,*
    133 S. Ct. 1659 (2013) ............................................... 17

iii

*Klein v. Cornelius*,
    786 F.3d 1310 (10th Cir. 2015) ...................................18

*Max Daetwyler Corp. v. R. Meyer*,
    762 F.2d 290 (3d Cir. 1985) ........................................18

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) .................................................21-22

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .........................................................8

*Omni Capital International, Ltd. v. Rudolf*
    *Wolff & Co.*,
    484 U.S. 97 (1987) ..............................................15, 21

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002) ....................................9, 19

*Price v. Socialist People's Libyan Arab*
    *Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ....................11, 12, 13, 14

*Rubin v. Coors Brewing Co.*
    514 U.S. 476 (1995) .........................................................8

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ......................................................11

*Trustees of Plumbers & Pipefitters National*
    *Pension Fund v. Plumbing Services, Inc.*,
    791 F.3d 436 (4th Cir. 2015) ......................................18

*United States v. Bajakajian*,
    524 U.S. 321 (1998) .........................................................8

*United States v. Bennett*,
    232 U.S. 299 (1914) ...............................................17, 20

*United States v. Edge Broadcasting Co.*,
    509 U.S. 418 (1993) .........................................................8

*United States v. Gainey*,
    380 U.S. 63 (1965) ....................................................8, 9

*United States v. Morrison*,
    529 U.S. 598 (2000) .....................................................8

*United States v. National Treasury Employees
    Union*,
    513 U.S. 454 (1995) .....................................................8

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ..........................................15, 16

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ...................................................16

## **Statutes & Constitution**

7 U.S.C. §§ 1-27f (2012)...................................................20

15 U.S.C. § 6(a) (2012) ....................................................21

15 U.S.C. §§ 78a-78qq (2012) ...........................................20

18 U.S.C. § 2331(1) (2012) .................................................5

18 U.S.C. § 2333(a) (2012) .................................................4

18 U.S.C. § 2334(a) (2012) .................................................6

18 U.S.C. § 2334(d) (2012)...............................................6-7

18 U.S.C. §§ 1961-68 (2012)..............................................20

28 U.S.C. § 1350 (2012) ...................................................21

U.S. Const. art I, § 8, cl. 10 .........................................19, 20

## **<u>Legislative History</u>**

Congressional Record

    136 Cong. Rec. S4568-01 (1990) ...................................6

    137 Cong. Rec. S1771-01 (1991) .........................4, 6, 7

    137 Cong. Rec. S4511-04 (1991) ...........................6, 7-8

    138 Cong. Rec. S17252-04 (1992) .........................7, 10

Congressional Reports

    H. Conf. Rep. No. 99-783, tit. XII (1986).....................5

    H.R. Rep. No. 102-1040 (1992) ................................4, 7

    S. Rep. No. 102-249 (1991) .........................................21

    S. Rep. No. 102-342 (1992) ...................................4, 7, 9

Hearings

    Hearing Before the Subcomm. on Courts &
    Administrative Practice of the S. Comm. on
    the Judiciary, 101st Cong. (1990)................................9

    Hearing Before the Subcomm. on Intellectual
    Property & Judicial Administration of the H.
    Comm. on the Judiciary, 102d Cong. (1992) ..........6, 9

## <u>Other Authorities</u>

Wendy Perdue, *Aliens, the Internet, and "Purposeful Availment": A Reassessment of Fifth Amendment Limits on Personal Jurisdiction*, 98 Nw. U. L. Rev. 455 (2004) ..........................17, 18, 19

Eugene Gressman et al., *Supreme Court Practice* (9th ed. 2007)...................................................9

Restatement (Third) of Foreign Relations Law § 404 (1987)...................................................................19

vii

## INTEREST OF AMICUS CURIAE[1]

The U.S. House of Representatives[2] has a compelling institutional interest in preserving its constitutional authority to legislate effectively for the protection of citizens of the United States when they are overseas. This case concerns the effectiveness of the Anti-Terrorism Act of 1992 ("ATA"), which provides a civil remedy to any U.S. national injured by acts of international terrorism. Petitioners – victims of terrorist attacks by the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") – are precisely the sort of individuals that Congress intended the ATA to benefit.

The court of appeals, however, held that the Fifth Amendment's Due Process Clause deprives U.S. courts of personal jurisdiction over international terrorists except in narrow circumstances that will seldom, if ever, exist. That holding not only vitiates the ATA and frustrates Congress's intended exercise of legislative power to combat terrorism, it also threatens to undermine numerous other federal statutes and improperly cabins the broad

---

[1] Pursuant to this Court's Rule 37.6, amicus states that no counsel for a party authored this brief in whole or in part, and no person or entity other than amicus or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. Pursuant to Rule 37.2, amicus states that counsel for the parties received timely notice of intent to file this brief. The parties have consented in writing to the filing of this brief.

[2] The Bipartisan Legal Advisory Group ("BLAG"), which consists of the Speaker, the Majority Leader, the Majority Whip, the Democratic Leader, and the Democratic Whip, voted unanimously to authorize the filing of this brief on behalf of the House. The BLAG "speaks for, and articulates the institutional position of, the House in all litigation matters." Rule II.8(b) of the U.S. House of Representatives.

2

constitutional authority of Congress to legislate extraterritorially for the protection of U.S. interests in the areas of foreign affairs and national security.

## SUMMARY OF ARGUMENT

The Court should grant certiorari to review the court of appeals' deeply flawed and troubling decision, which concerns issues of exceptional importance to the Nation.

*First*, the decision below effectively nullifies the ATA, contravening the considered judgment of the political branches and hobbling an important tool in our Nation's war on terror. The ATA provides a civil cause of action to any U.S. national injured in an international terrorist attack by a non-sovereign actor. In order to effectively address international terrorism, Congress expressly gave that cause of action a broad extraterritorial sweep. And Congress sought to remove jurisdictional hurdles that had previously confronted victims of international terrorism. The court of appeals, however, held that district courts cannot exercise personal jurisdiction over international terrorists unless those terrorists are "at home" in the United States, or "expressly aim" their attacks at the United States or have sufficient suit-related conduct in the United States. In the real world, those requirements – which have no support in Fifth Amendment jurisprudence – will almost never be satisfied when acts of international terrorism are committed abroad. In other words, the court of appeals' decision renders the ATA lifeless with respect to the vast majority of circumstances it was enacted to address.

*Second*, the precedent set by the decision below improperly undermines Congress's constitutional authority to legislate extraterritorially for the protection of U.S. interests. As an initial matter, the court of appeals' holding

3

that international terrorist organizations that function as governments are "persons" for purposes of the Fifth Amendment's Due Process Clause is unprecedented and wrong. If that flawed ruling is allowed to stand, terrorist organizations will be empowered to wield the Due Process Clause as a shield against numerous counter-terrorism measures traditionally employed by the United States, such as freezing the assets of such organizations.

Additionally, the court of appeals' holding that the Fifth Amendment imposes "the same" personal-jurisdiction constraints on the federal government as the Fourteenth Amendment imposes on the States unduly circumscribes Congress's constitutional authority to legislate extraterritorially and imperils the effective application of numerous federal statutes. Far from being compelled by this Court's precedents concerning personal jurisdiction under the Fourteenth Amendment, the court of appeals' holding actually conflicts with those precedents, which make clear that the Fourteenth Amendment's limits on personal jurisdiction are derived in significant part from the need to preserve each State's sovereignty in our federalist system – a concern that is entirely inapposite in the context of the Fifth Amendment. The Court should grant plenary review to remedy the court of appeals' impermissible intrusion upon Congress's Article I powers.

## ARGUMENT

### I.   THE DECISION BELOW EFFECTIVELY INVALIDATES THE ATA

This case warrants further review because the decision below effectively invalidates the ATA, frustrating Congress's attempt to enact meaningful civil remedies for U.S. citizens injured in international terrorist attacks. While the court of appeals did not explicitly strike down

4

the ATA, its decision renders the Act ineffective with re-
spect to the overwhelming majority of international ter-
rorist attacks within its scope – including attacks of the
very type that it was specifically designed to remedy.

### A. The Decision Below Confines The Applicabil-ity Of The ATA To Circumstances That Will Rarely, If Ever, Exist

Congress enacted the ATA in 1992 to "provide the
framework in our legal system for Americans to seek jus-
tice against those who defy all notions of morality and
justice." 137 Cong. Rec. S1771-01 (1991) (statement of
Sen. Grassley). Specifically, the ATA creates a civil
cause of action for the benefit of any "national of the
United States injured in his or her person, property, or
business by reason of an act of international terrorism."
Federal Courts Administration Act of 1992, Pub. L. No.
102-572, § 1003, 106 Stat. 4506, 4522 (codified as
amended at 18 U.S.C. § 2333(a) (2012)).

In light of the ATA's concern with international ter-
rorism, the Act unsurprisingly has a broad extraterrito-
rial sweep. The Act "allows *any* U.S. national injured in
his person, property, or business by an act of interna-
tional terrorism to bring a civil action in a U.S. District
Court." H.R. Rep. No. 102-1040, at 5 (1992) (emphasis
added); S. Rep. No. 102-342, at 45 (1992) (same). And the
Act defines "international terrorism" to include activities
that: (1) "involve violent acts or acts dangerous to human
life that are a violation of the criminal laws of the United
States or of any State, or that would be a criminal viola-
tion if committed within the jurisdiction of the United
States or of any State;" (2) "appear to be intended (i) to
intimidate or coerce a civilian population; (ii) to influence
the policy of a government by intimidation or coercion; or

5

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping;" and (C) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1). Notably, the definition of "international terrorism" is not limited to attacks that target U.S. nationals. *Ibid.*; *see* H. Conf. Rep. No. 99-783, tit. XII (1986) ("Neither the targeted government nor civilian population, or segment thereof, has to be that of the United States.").

The court of appeals held, however, that district courts "could not constitutionally exercise * * * personal jurisdiction" over international terrorists who are not "at home" in the United States and who do not "expressly aim" their attacks at or conduct "suit-related conduct" in the United States. Pet. App. 37a, 50a-51a. This holding dramatically limits the extraterritorial reach of the ATA. Under the decision below, victims will rarely, if ever, be able to establish general jurisdiction, because international terrorists are unlikely to be found "at home" in the United States. And victims will be unable to establish specific jurisdiction over international terrorists except in the relatively rare circumstances in which sufficient evidence has been obtained to establish that the terrorists specifically targeted the victims because they were Americans or conducted activities in the United States related to their foreign attacks. Consequently, the decision below renders the ATA unavailable in the mine run of international terrorist attacks, such as the recent attacks in Nice or London.

6

### B.  The Decision Below Subverts The Purpose Of The ATA

The court of appeals' dramatic limitation of the ATA stands in direct opposition to the goals that the political branches unquestionably sought to achieve by enacting it.  In passing the ATA, Congress recognized that "reluctant courts and * * * jurisdictional hurdles" had often stymied the ability of victims of international terrorism to obtain redress for their injuries.  *See* 136 Cong. Rec. S4568-01 (1990).  Thus, the ATA sought to "*remove* the jurisdictional hurdles in the courts confronting victims" of international terrorism.  *Hearing Before the Subcomm. on Intellectual Property & Judicial Administration of the H. Comm. On the Judiciary*, 102d Cong. 10 (1992) ("1992 Hearing") (letter from Sen. Grassley) (emphasis added); 137 Cong. Rec. S4511-04 (1991) (statement of Sen. Grassley) (same); 137 Cong. Rec. S1771-01 (1991) (statement of Sen. Grassley) (same).

To start with, the ATA provides that "[a]ny civil action * * * may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent," and that "[p]rocess in such a civil action may be served in any district where the defendants resides, is found, or has an agent."  18 U.S.C. § 2334(a).  And the Act further provides that district courts "shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless (1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants; (2) that foreign court is significantly more convenient and appropriate; and (3) that foreign court offers a remedy which is substantially

7

the same as the one available in the courts of the United States." *Id.* § 2334(d).

The ATA's generous jurisdictional provisions were specifically intended to "allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed." S. Rep. No. 102-342, at 22. In other words, Congress enacted the Act for the specific purpose of achieving "[t]he extension of civil jurisdiction to accommodate the reach of international terrorism." H.R. Rep. No. 102-1040, at 5.

Notably, Congress's jurisdictional concerns arose largely in response to the PLO's hijacking of the MS *Achille Lauro*, during which the terrorists killed an American, Leon Klinghoffer, although there was no indication that he was targeted because he was an American. *See ibid.*[3] The family of Mr. Klinghoffer sued the PLO in federal court, and "[o]nly by virtue of the fact that the attack violated certain Admiralty laws and that the [PLO] had assets and carried on activities in New York, was the court able to establish jurisdiction over the case." *Ibid.* Congress was concerned that "[a] similar attack occurring on an airplane or in some other locale might not have been subject to civil action in the U.S.," and therefore passed the ATA to "codify" jurisdiction with respect to such attacks and "make[] the rights of American victims

[3] *See also* 137 Cong. Rec. S1771-01 (1991) (statement of Sen. Grassley) ("The PLO must be held accountable for its crimes and the Klinghoffers are making sure that, at least in some way, the PLO will be brought to justice."); 138 Cong. Rec. S17252-14 (1992) (statement of Sen. Grassley) ("[T]he first and best remedy is to bring these terrorists to justice in our courts of law. But often, the terrorists elude justice, as in the Achille Lauro case, where Leon Klinghoffer, and elderly American was callously murdered by PLO terrorists.").

8

definitive." 137 Cong. Rec. S4511-04 (1991) (statement of Sen. Grassley).

Like the *Achille Lauro* attack, petitioners' ATA claims arise from international terrorist attacks perpetrated by the PA and the PLO, whose indiscriminate violence claimed American lives. By rendering the cause of action created by the ATA inapplicable in such circumstances, the court of appeals has prevented the Act from providing relief to precisely the sort of victims that Congress intended it to benefit.

## C. The Court Of Appeals' Nullification Of The ATA Warrants Review

The court of appeals' effective abrogation of the ATA warrants this Court's review. Notably, "[w]here the decision below holds a federal statute unconstitutional * * * certiorari is usually granted because of the obvious importance of the case." Eugene Gressman et al., *Supreme Court Practice* 264 (9th ed. 2007). Nor does the Court typically wait for a circuit conflict to develop before granting certiorari in such cases. *See*, *e.g.*, *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004); *United States v. Morrison*, 529 U.S. 598 (2000); *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *United States v. Bajakajian*, 524 U.S. 321, 327 (1998); *Babbitt v. Youpee*, 519 U.S. 234 (1997); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995); *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995); *United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993); *FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993); *United States v. Gainey*, 380 U.S. 63 (1965).

Indeed, declaring a statute unconstitutional is the "gravest and most delicate" of judicial tasks, *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.),

9

and consequently the Court has recognized that it has a heightened obligation "to review the exercise of th[at] grave power," *Gainey*, 380 U.S. at 65. Those principles apply with equal force to the decision below, under which international terrorists are "subject to the [ATA] in theory, but are exempt in practice due to the inability of American courts to exercise personal jurisdiction" over them. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 373 (3d Cir. 2002).

While the foregoing analysis suffices to establish that this case warrants further review, certiorari is also necessary here because the ATA was intended not only to provide relief to American victims of international terrorism, but also to "be an important instrument in the fight against terrorism." 1992 Hearing 10 (1992) (letter from Sen. Grassley). "By its provisions for compensatory damages, tre[ble] damages, and the imposition of liability at any point along the causal chain of terrorism," the Act was intended to "interrupt, or at least imperil, the flow of money" to international terrorists. S. Rep. No. 102-342, at 22.[4]   In other words, Congress enacted the ATA to

---

[4] *See also* 1992 Hearing 13 (statement of Rep. Feighan) (noting ATA's "deterrent effect in putting terrorists' assets at risk" and the desire to "raise the cost of doing business for these outlaw organizations"); *Hearing Before the Subcomm. on Courts & Administrative Practice of the S. Comm. on the Judiciary*, 101st Cong. 3 (1990) (statement of Sen. Grassley) ("It also sends a strong warning to terrorists to keep their hands off Americans and an eye on their assets."); *id.* at 25 (statement of Steven R. Valentine, Deputy Assistant Attorney General) ("The enactment of Senate bill 2465 would bring to bear a significant new weapon against terrorists by providing a means of civil redress for those who have been harmed by terrorist acts."); *id.* at 79 (statement of Joseph A. Morris, President & General Counsel, Lincoln Legal Foundation) ("[A]nything that could be done to deter money-raising in the United States, money laundering in the United States, the repose of assets in the United States,

10

strike at "the resource that keeps [international terrorists] in business – their money." 138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley).

By rendering the ATA largely ineffective, therefore, the decision below not only denies relief to American victims of international terrorism, it hobbles an important weapon in our Nation's war on terror, thereby frustrating the considered judgment of the political branches in one of the most important areas of national policy that the United States has addressed in recent decades. The grave importance of these issues and the severe adverse consequences of the decision below compel this Court's review.

## II. THE DECISION BELOW IMPROPERLY CONSTRAINS CONGRESS'S BROAD AUTHORITY TO LEGISLATE EXTRATERRITORIALLY IN FURTHERANCE OF THE NATION'S INTERESTS IN THE AREAS OF FOREIGN AFFAIRS AND NATIONAL SECURITY

This case also warrants review for the additional reason that the decision below impermissibly intrudes upon Congress's constitutional authority to legislate extraterritorially, potentially undermining other counterterrorism measures and threatening numerous other federal statutes.

---

and so on, would not only help benefit victims, but would also help deter terrorism.").

11

A. **The Court Of Appeals' Erroneous Holding That Respondents Are "Persons" For Purposes Of The Fifth Amendment Undermines The Nation's Ability To Combat Terrorism**

As an initial matter, the court of appeals' unprecedented holding that unrecognized foreign governmental entities are "persons" for purposes of the Fifth Amendment is wrong and, if left uncorrected, would pose numerous practical problems in the fight against international terrorism.

Respondents plainly are not "persons" for purposes of the Fifth Amendment. This Court has already held that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), *abrogated in part on other grounds by Shelby County v. Holder*, 133 S. Ct. 2612 (2013). Consistent with *Katzenbach*, the federal courts have consistently held that foreign governments are also not "persons" for purposes of the Fifth Amendment. *E.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) ("[W]e hold that foreign states are not 'persons' protected by the Fifth Amendment."). For similar reasons, the federal courts have also concluded that municipal governments (although not sovereigns in their own right) are also not entitled to status as "persons" for due process purposes. *E.g.*, *City of East St. Louis v. Circuit Court for the Twentieth Judicial Circuit*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities * * * are not 'persons' within the meaning of the Due Process Clause.").

For all the same reasons, international terrorist organizations that function as governments should not be

12

considered "persons" for purposes of the Fifth Amendment. As this Court has explained, the Fifth Amendment's Due Process Clause "recognizes and protects an *individual* liberty interest." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (emphasis added); *see Price*, 294 F.3d at 98. Just as with foreign governments, States, and municipalities, affording Fifth Amendment protections to terrorist governments would not advance *individual* liberty. This is so because terrorist governments "stand on a fundamentally different footing than do private litigants who are compelled to defend themselves in American courts." *Ibid.*

Indeed, for purposes of the interests protected by the Fifth Amendment, respondents are indistinguishable from other foreign governments. As respondents themselves have explained, they "employ more than 100,000 Palestinians in *government* jobs; house and staff their *government* offices; implement and oversee *government* programs and global diplomatic efforts and personnel; train and deploy security forces; apply for and receive foreign aid; obtain and service *government* loans and other public debt; and, provide financial assistance to Palestinians living in the West Bank and Gaza." Resp. C.A. Br. 28 (emphases added). Affording respondents – and other terrorist governments – greater protection than that afforded to recognized foreign governments, and to the States and municipalities that compose our Nation, "would distort the very notion of 'liberty' that underlies the Due Process Clause." *Price*, 294 F.3d at 99.

The court of appeals' contrary holding rests on the gossamer rationale that "[w]hile sovereign states are not entitled to due process protection, * * * neither the PLO nor the PA is recognized by the United States." Pet. App.

13

20a. But this Court has never suggested that status as a "person" for purposes of the Fifth Amendment turns on diplomatic recognition, which is governed by entirely different considerations. Moreover, the court of appeals' assertion that "[a]ll the cases cited by [petitioners] stand for the proposition that *sovereign* governments lack due process rights, and these cases have not been extended beyond the scope of entities that are separate sovereigns, recognized by the United States government as sovereigns," Pet. App. 20a, is simply wrong. As explained above, municipalities – which are not sovereign entities – are not considered "persons" for purposes of the Due Process Clause. *City of East St. Louis*, 986 F.2d at 1144. The decision below cannot be reconciled with the established rule for municipalities.

Additionally, like foreign governments generally, terrorist governments "are external to the constitutional compact." *Price*, 294 F.3d at 97. And where, as here, Congress and the President have unambiguously chosen to exercise their sweeping power over foreign affairs, due respect for the political branches' authority in this arena counsels against judicial interference with their considered judgment absent the clearest constitutional mandate, which is plainly lacking here. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (noting that matters such as the conduct of international relations are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

If allowed to stand, the court of appeals' holding will continue to permit terrorist governments, such as respondents or ISIS, to "cloak themselves in the protections of the Due Process Clause." *Price*, 294 F.3d at 99. The decision below thus threatens crucial counter-terrorism

14

measures that the United States has traditionally employed in the struggle against such terrorist organizations – such as freezing assets, imposing sanctions, or revoking foreign aid – which "could be challenged as deprivations of property without due process of law." *Ibid.* The court of appeals' decision consequently "could tie the hands of [Congress and the President] as they s[eek] to respond" to international terrorism. *Ibid.* Further review is necessary to correct this incorrect and dangerous holding.

**B.** **The Court Of Appeals' Holding That The Test For Personal Jurisdiction Is "The Same Under The Fifth Amendment And The Fourteenth Amendment" Improperly Constrains Congress's Legislative Power And Imperils Numerous Federal Statutes**

The court of appeals compounded its error by holding that the personal-jurisdiction "analysis is the same under the Fifth Amendment and the Fourteenth Amendment," Pet. App. 23a, and by applying this Court's Fourteenth Amendment precedent to reject personal jurisdiction over respondents, Pet. App. 20a-51a. That holding cannot be reconciled with the legal principles governing personal jurisdiction, which require "a forum-by-forum, or sovereign-by-sovereign, analysis." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality). What is more, the court of appeals' holding improperly hamstrings Congress's constitutional authority to enact statutes with extraterritorial reach.

15

1. *Contrary to the court of appeals' holding, the personal-jurisdiction analysis is not "the same" under the Fifth and Fourteenth Amendments*

The court of appeals was simply wrong in concluding that the personal-jurisdiction analysis is "the same" under the Fifth and Fourteenth Amendments. Pet. App. 23a. To be sure, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons," but "[t]his is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)) (additional citation omitted). But where, as here, a federal court exercises federal question jurisdiction pursuant to a federal statute that authorizes nationwide service of process, the Fifth Amendment, rather than the Fourteenth Amendment, marks the outermost limits of that authority. *See Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102-05 (1987).

With respect to the Fourteenth Amendment, this Court has issued multiple decisions defining the limits on the ability of state courts to assert personal jurisdiction over out-of-state defendants. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 316-19 (1945). Consistent with those limits, courts may assert "general" jurisdiction over defendants whose affiliation with the State in which the suit is brought "are so constant and pervasive as to render [them] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (quotation marks omitted). And a court may

16

assert "specific" jurisdiction over a defendant when the defendant's suit-related conduct creates "minimum contacts" with the forum State. *Walden v. Fiore*, 134 S. Ct. 115, 1122 (2014).

Those limitations on personal jurisdiction derived from the Fourteenth Amendment "can be seen to perform two related, but distinguishable, functions." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980). First, those limitations "protect[] the defendant against the burdens of litigating in a distant or inconvenient forum." *Ibid.* Second, those limitations "act[] to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Ibid.*; see *id.* at 293 ("The sovereignty of each State, in turn, implied a limitation on the sovereignty of all its sister States – a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."). The central importance of the latter function in our federal system is clear: "[I]f another State were to assert jurisdiction in an inappropriate case, it would upset the federal balance, which posits that each State has a sovereignty that is not subject to unlawful intrusion by other States." *McIntyre*, 564 U.S. at 884.

Unsurprisingly, therefore, in construing the Fourteenth Amendment, the Court has consistently assessed "the reasonableness of asserting jurisdiction * * * 'in the context of our federal system of government.'" *World-Wide Volkswagen*, 444 U.S. at 293 (quoting *International Shoe*, 326 U.S. at 317). And "[t]o determine whether the assertion of personal jurisdiction is consistent with due process, [the Court] ha[s] long relied on principles traditionally followed by American courts in

17

marking out the territorial limits of each State's authority." *Burnham v. Superior Court of California*, 495 U.S. 604, 608 (1990).

The compelling need to preserve the federal balance between coequal sovereign States that undergirds this Court's Fourteenth Amendment jurisprudence, however, has no place in the Fifth Amendment context. As noted above, personal jurisdiction "requires a forum-by-forum, or sovereign-by-sovereign, analysis." *McIntyre*, 564 U.S. at 583. And where the relevant "sovereign" is the federal government, "[t]here is no reason to assume that the scope of legitimate judicial authority of the United States as it operates in the international community is essentially parallel to the scope of the authority of each of our individual states." Wendy Perdue, *Aliens, the Internet, and "Purposeful Availment": A Reassessment of Fifth Amendment Limits on Personal Jurisdiction*, 98 Nw. U. L. Rev. 455, 461 (2004). Indeed, the Court has admonished that "the limitations of the Constitution * * * preventing [States] from transcending the limits of their authority" afford "no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purposes of shutting the government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *United States v. Bennett*, 232 U.S. 299, 306 (1914).

There can be no doubt that the federal government (in contrast to the States) "has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991); *see Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) ("It is true that Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad.");

18

*Foley Bros. v. Filardo*, 336 U.S. 281, 284 (1949).  In light of Congress's broad authority to legislate extraterritorially and the absence of the countervailing federalism concerns applicable to exercises of State legislative power, it is nonsensical to engage in the wooden formalism of extending Fourteenth Amendment concepts to the national legislature in a manner that frustrates Congress's ability to implement such legislation.  *See* Perdue, 98 Nw. U. L. Rev. at 468 ("[T]he Fifth Amendment ought to be understood to allow personal jurisdiction to the extent Congress has the power to prescribe U.S. law.").

Moreover, the court of appeals' holding that the personal-jurisdiction analysis under the Fifth Amendment is "the same" as that under the Fourteenth also contradicts the decisions of numerous other courts of appeals, which have recognized that "a Fifth Amendment analysis of due process is different from one undertaken under the Fourteenth Amendment." *Handley v. Indiana & Michigan Electric Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984).[5]  As

---

[5] *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015) (rejecting argument that "we must apply the minimum contacts analysis spelled out in *International Shoe*" to the Fifth Amendment (quotation marks omitted)); *Trustees of Plumbers & Pipefitters National Pension Fund v. Plumbing Services, Inc.*, 791 F.3d 436, 444 (4th Cir. 2015) (noting that the Fourteenth Amendment's "minimum contacts" standard "is not relevant when the basis of federal jurisdiction is found in a federal statute containing a nationwide service of process provision"); *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985) ("Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of a federal claim in a federal court."); *Haile v. Henderson National Bank*, 657 F.2d 816, 824 (6th Cir. 1981) ("In an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process, the strictures of *International Shoe* do not apply.")

19

those courts have explained, "under the Fifth Amendment * * * the territorial limitations that apply to the exercise of state jurisdiction * * * are inapposite." *Pinker*, 292 F.3d at 369 (citations omitted).  Thus, "[i]n the federal court context, the [personal jurisdiction] inquiry will be slightly different, taking less account of federalism concerns, and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Id.* at 370-71.

Finally, the court of appeals' misplaced reliance on Fourteenth Amendment standards is especially troubling, and particularly improper, in the context of the ATA, which was enacted pursuant to Congress's constitutional authority "to define and punish * * * Offences against the Law of Nations."  U.S. Const. art I, § 8, cl. 10. Consistent with international law, nations have traditionally asserted universal jurisdiction to punish such offenses even in circumstances where jurisdiction typically would be lacking.  *See* Restatement (Third) of Foreign Relations Law § 404 (1987); *see also id.* cmt. a (noting that "[u]niversal jurisdiction is increasingly accepted for certain acts of terrorism, such as * * * indiscriminate violent assaults on people at large").

Distilled to its essence, the judgment below rests on the indefensible and dangerous proposition that "our Constitution renounces for the U.S. Government an element of sovereignty asserted by other countries and generally accepted as a matter of customary international law."  Perdue, 98 Nw. U. L. Rev. at 465.  That proposition should not be allowed to stand unreviewed, because it "proceeds upon the mistaken supposition * * * that the calling into being of the government under the Constitu-

20

tion had the effect of destroying obvious powers of government instead of preserving and distributing such powers." *Bennett*, 232 U.S. at 306.[6]

## 2. *The court of appeals' holding that the personal-jurisdiction analysis is "the same" under the Fifth and Fourteenth Amendments warrants review*

The court of appeals' erroneous holding sharply circumscribes Congress's authority to legislate extraterritorially. Notably, aside from the ATA, Congress has enacted numerous other extraterritorial statutes providing for civil causes of action and nationwide service of process. *See, e.g.*, Commodity Exchange Act, 7 U.S.C. §§ 1-27f (2012); Securities Exchange Act, 15 U.S.C. §§ 78a-78qq (2012); Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (2012). By unduly constraining Congress's authority, the decision below places in jeopardy the effective extraterritorial application of each of these other statutes as well.

What is more, the decision below frustrates Congress's authority to tailor civil remedies for extraterritorial conduct. As discussed above, in many circumstances Congress has chosen to create broad civil causes of ac-

---

[6] The court of appeals also held that the district court could not assert "universal – or limitless – personal jurisdiction" because "[t]errorism, unlike piracy, war crimes, and crimes against humanity – does not provide a basis for universal jurisdiction." Pet. App. 23a n.10 (quotation marks omitted). That holding cannot be reconciled with the fact that the Constitution reposes in *Congress* the authority "to define" offenses against the law of nations, U.S. Const. art I, § 8, cl. 10, and *Congress* has exercised that constitutional authority by enacting the ATA precisely in order to assert universal jurisdiction over international terrorist entities that injure U.S. citizens.

21

tion for extraterritorial conduct and authorized nationwide service of process. But in other circumstances, Congress has struck a different balance. For example, the Torture Victim Protection Act provides a civil remedy to victims of torture (regardless of nationality) but does not authorize nationwide service of process. *See* 28 U.S.C. §1350 note. By excluding a nationwide service of process provision, Congress tied personal jurisdiction in such cases to the Fourteenth Amendment. S. Rep. 102-249, at 7 (1991). The Sherman Act, by contrast, authorizes nationwide service of process but has a narrower extraterritorial reach, applying only to activities involving "import commerce" or having "a direct, substantial, and reasonably foreseeable effect" on domestic commerce. 15 U.S.C. § 6a (2012). By restricting Congress's ability to adjust the scope of the adjudicative authority of the federal courts, the decision below improperly circumscribes Congress's flexibility in crafting appropriate remedies for objectionable extraterritorial conduct.

Notably, in sharp contrast to the wealth of Fourteenth Amendment personal-jurisdiction cases, this Court has not yet defined what, if any, limits the Fifth Amendment places on the federal government's ability to assert personal jurisdiction over defendants. *See Omni Capital*, 484 U.S. at 102 n.5 (noting that the Court had "no occasion" to consider the Fifth Amendment's limits on personal jurisdiction); *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 n.* (1987) (same). Now that the decision below has created great uncertainty on that score, Congress has a strong interest in obtaining clarification of that question from this Court in order to guide its ongoing legislative efforts. The Court should take this opportunity to resolve the ambiguities generated by the decision below, thereby "preserving a stable background against which Congress can

22

legislate with predictable effects." *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261 (2010).

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

THOMAS G. HUNGAR
*General Counsel*
*Counsel of Record*
KIMBERLY HAMM
*Assistant General Counsel*
KRISTIN A. SHAPIRO
*Assistant General Counsel*

APRIL 6, 2017