# EXHIBIT 4

No. 16-1071

IN THE

# Supreme Court of the United States

————

MARK SOKOLOW, ET AL.,

*Petitioners,*

v.

PALESTINE LIBERATION ORGANIZATION AND
PALESTINIAN AUTHORITY (AKA PALESTINIAN INTERIM
SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN
COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY),

*Respondents.*

————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

————

**BRIEF OF FORMER FEDERAL
OFFICIALS AS *AMICI CURIAE*
IN SUPPORT OF PETITIONERS**

————

PETER RAVEN-HANSEN
GEORGE WASHINGTON
  UNIVERSITY SCHOOL OF LAW
2000 H Street, NW
Washington, DC 20052
(202) 994-8171

ADAM L. FOTIADES
  *Counsel of Record*
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
(202) 778-1800
afotiades@zuckerman.com

*Counsel for Amici Curiae*

April 6, 2017

WILSON-EPES PRINTING CO., INC.   –   (202) 789-0096   –   WASHINGTON, D. C. 20002

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................... iii

INTEREST OF *AMICI CURIAE* ................................ 1

INTRODUCTION AND SUMMARY OF
ARGUMENT ................................................. 1

ARGUMENT ................................................. 5

THE SECOND CIRCUIT'S DECISION TO
APPLY FOURTEENTH AMENDMENT
DUE PROCESS STANDARDS IN THIS
CASE PLACES AN UNWARRANTED
AND DANGEROUS LIMITATION ON
THE PERSONAL JURISDICTION
CONGRESS CONFERRED ON FEDERAL
COURTS IN THE ATA. .............................. 5

   A.  Congress Expressly Authorized
       Personal Jurisdiction Under the ATA
       Over Defendants Committing
       Extraterritorial Acts of Terrorism
       Harming United States Nationals. ................... 5

   B.  Limiting Personal Jurisdiction Over
       International Terrorists Harming
       United States Nationals Abroad
       Would Interfere With Enforcement of
       the ATA and Congressional Policy to
       Thwart Terrorism. ............................ 9

ii

C. Federalism-Based Personal
Jurisdiction Standards Do Not Limit
the Authority of Congress to Invest
Federal Courts With Personal
Jurisdiction Over International
Terrorists Under the ATA. ............................. 13

   1. Fourteenth Amendment
      Standards Are Grounded in
      Federalism................................................ 15

   2. The Fifth Amendment Does Not
      Impose Territorial Restrictions
      on the Jurisdiction of Federal
      Courts in Cases Arising from
      the Extraterritorial Application
      of the Federal Government's
      Anti-Terrorism Laws. ............................. 18

   3. Founding-Era History is
      Incompatible with the Second
      Circuit's Decision to Apply
      Fourteenth Amendment
      Standards to ATA Claims....................... 21

   4. Fifth Amendment Standards in
      Criminal Cases Are Also
      Incompatible with Requiring
      Purposeful Contacts in ATA
      Claims..................................................... 24

CONCLUSION ........................................................ 26

APPENDIX
   *AMICI* BIOGRAPHICAL INFORMATION........... 1a

iii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ali Shafi v. Palestinian Auth.*,
    642 F.3d 1088 (D.C. Cir. 2011)............................. 23

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
    480 U.S. 102 (1987) .................................................. 3

*Bank Markazi v. Peterson*,
    136 S. Ct. 1310 (2016) .......................................... 10

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    510 F. Supp. 2d 144 (D.D.C. 2007).......................... 7

*Bouie v. City of Columbia*,
    378 U.S. 347 (1964) .............................................. 25

*Comptroller of the Treasury of Md. v. Wynne*,
    135 S. Ct. 1787 (2015) .......................................... 16

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) .......................................14, 17

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ................................................ 8

*Goldberg v. UBS AG*,
    690 F. Supp. 2d 92 (E.D.N.Y. 2010) ...................... 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) .............................................. 17

iv

*Hanson v. Denckla*,
  357 U.S. 235 (1958) ................................................ 15

*Harmelin v. Michigan*,
  501 U.S. 957 (1991) ................................................ 23

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ................................................ 17

*In re September 11 Litig.*,
  751 F.3d 86 (2d Cir. 2014) ........................................ 5

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ................................................ 4

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013) ............................................ 6

*Klinghoffer v. S.N.C. Achille Lauro*,
  937 F.2d 44 (2d Cir. 1991) ........................................ 11

*Klinghoffer v. S.N.C. Achille Lauro*,
  795 F. Supp. 112 (S.D.N.Y. 1992) .................................. 11

*Klinghoffer v. S.N.C. Achille Lauro*,
  816 F. Supp. 930 (S.D.N.Y. 1993) .................................. 11

*Livnat, et al. v. Palestinian Auth.*,
  No. 15-7024, 2017 WL 1101106
  (D.C. Cir. Mar. 24, 2017) ...................................13, 14

*McCulloch v. Sociedad Nacional de Marineros de
  Honduras*, 372 U.S. 10 (1963) .................................... 7

*Morrison v. Nat'l Austl. Bank, Ltd.*,
  561 U.S. 247 (2010) ................................................ 6

v

*Nat'l Council of Resistance of Iran v. Dep't of State,*
   251 F.3d 192 (D.C. Cir. 2001)................................. 18

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,*
   484 US 97 (1987) ........................................................ 3

*Price v. Socialist People's Libyan Arab Jamahiriya,*
   294 F.3d 82 (D.C. Cir. 2002)................................... 18

*Pugh v. Socialist People's Libyan Arab Jamahiriya,*
   290 F. Supp. 2d 54 (D.D.C. 2003).......................... 25

*Sisso v. Islamic Republic of Iran,*
   448 F. Supp. 2d 76 (D.D.C. 2006).......................... 26

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) .........................................22, 23

*United States v. Ali,*
   718 F.3d 929 (D.C. Cir. 2013)............................8, 25

*United States v. Bennett,*
   232 U.S. 299 (1914) ................................................ 16

*United States v. Martinez-Hidalgo,*
   993 F.2d 1052 (3d Cir. 1993).................................. 25

*United States v. Palmer,*
   16 U.S. 610 (1818) .................................................. 22

*United States v. Shibin,*
   722 F.3d 233 (4th Cir. 2013) .................................. 22

*United States v. Smith,*
   18 U.S. 153 (1820) ..........................................22, 23

vi

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) .................................24, 25

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014) .......................................15, 20

*Watson v. Emp'rs Liab. Assurance Corp.,*
    348 U.S. 66 (1954) ................................................. 16

*Weiss v. Nat'l Westminster Bank PLC,*
    768 F.3d 202 (2d Cir. 2014) .................................. 5, 6

*Wells Fargo Co. v. Wells Fargo Express Co.,*
    556 F.2d 406 (9th Cir. 1977) ................................. 14

*Wisconsin v. Pelican Ins. Co.,*
    127 U.S. 265 (1888) ............................................... 23

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ............................................... 16

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 10 .................................19, 21

## STATUTES

18 U.S.C. § 2331 .......................................................... 2

18 U.S.C. § 2331(1) ...................................................... 2, 6

18 U.S.C. § 2333(a) ...................................................... 2

18 U.S.C. § 2334(a) ...................................................... 2, 6

18 U.S.C. § 2334(d) ...................................................... 2

vii

18 U.S.C. § 2338 ........................................................... 2

18 U.S.C. § 2339B .................................................13, 23

Antiterrorism and Effective Death Penalty Act of
   1996, Pub. L. No. 104-132,
   110 Stat. 1214 (1996)...................................19, 20, 23

Justice Against Sponsors of Terrorism Act,
   Pub. L. No. 114-222,
   130 Stat. 852 (2016)......................................1, 12, 13

## RULES

Fed. R. Civ. P. 4(k)(1)(A) ........................................... 14

## OTHER AUTHORITIES

1 James Kent, Commentaries on American
   Law (1826) ............................................................ 22

1 M. De Vattel, Law of Nations or Principles of the
   Nature Applied to the Conduct and Affairs of
   Nations and Sovereigns (1796) ............................. 21

4 William Blackstone, Commentaries on the
   Laws of England (1769)....................................21, 23

137 Cong. Rec. S1772 (daily ed. Feb. 7, 1991) ........... 2

*Antiterrorism Act of 1990: Hearing on
   S. 2465 Before the Subcomm. on
   Courts and Admin. Practice of the S. Comm.
   on the Judiciary,*
   101st Cong. 1 (1990) ...............................9, 10, 11, 17

viii

*Antiterrorism Act of 1991: Hearing on
H.R. 2222 Before the Subcomm. on
Intellectual Prop. and Judicial Admin.
of the H. Comm. on the Judiciary,*
102nd Cong. 15 (1992) ........................................... 11

Brief of the United States as *Amicus Curiae
Boim v. Holy Land Found.*, Nos. 05-1815,
05-1816, 05-1821, 05-1822 (Aug. 21, 2008),
2008 WL 3993242 ..................................................... 9

H.R. Rep. 102-1040 (1992) .........................4, 11, 12, 25

Harold Hongju Koh, *Civil Remedies for Uncivil
Wrongs:  Combatting Terrorism Through
Transnational Public Law Litigation,*
22 Tex. Int.'l L. J. 169 (1987) ................................ 10

International Convention for the
Suppression of the Financing of Terrorism,
Dec. 9, 1999, Art. 7(2)(a),
S. Treaty Doc. 106-49, 39 I.L.M. 268 ...................... 8

International Convention for the
Suppression of Terrorist Bombings,
Jan. 12, 1998, S. Treaty Doc. 106-6,
2149 U.N.T.S. 256 .................................................. 8

Lea Brilmayer & Charles Norchi, Federal
Extraterritoriality and Fifth Amendment
Due Process, 105 Harv. L. Rev. 1217 (1992) ......... 15

Restatement (Fourth) of Foreign
Relations Law § 213 (Am. Law Inst.
Tentative Draft No. 2, 2016) ................................... 7

ix

Restatement (Fourth) of Foreign
    Relations Law § 215 (Am. Law Inst.
    Tentative Draft No. 2, 2016) ................................... 7

Restatement (Fourth) of Foreign
    Relations Law § 216 (Am. Law Inst.
    Tentative Draft No. 2, 2016) ................................... 7

Restatement (Fourth) of Foreign
    Relations Law § 217 (Am. Law Inst.
    Tentative Draft No. 2, 2016) ................................... 7

Restatement (Fourth) of Foreign
    Relations Law § 302 (Am. Law Inst.
    Tentative Draft No. 2, 2016) ................................... 7

Restatement (Third) of Foreign Relations Law
    § 404 (1986) .............................................................. 8

Wendy C. Perdue, *Aliens, the Internet and
    "Purposeful Availment": A Reassessment of
    Fifth Amendment Limits on
    Personal Jurisdiction*,
    98 Nw. U. L. Rev. 455 (2004) ......................17, 18, 19

## INTEREST OF *AMICI CURIAE*[1]

*Amici* John D. Ashcroft, Charles W. Blau, Louis J. Freeh, Philip B. Heymann, Joseph I. Lieberman, Joseph A. Morris, Michael J. O'Neil, J. Patrick Rowan, Abraham D. Sofaer, Richard Thornburgh, and Steven R. Valentine are former federal officials. They have a general interest in preserving the ability of the federal government to protect American nationals abroad and a specific interest in restoring the federal courts' personal jurisdiction over those who commit acts of international terrorism against American nationals, as intended by Congress. *See* Appendix (describing relevant biographical information for each *amicus*).

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

There is no disputing—as Congress recently affirmed—that "[i]nternational terrorism . . . threatens the vital interests of the United States," Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 2(a)(1), 130 Stat. 852 (2016), *reprinted in* 18 U.S.C. § 2333 note, whether the terrorist act occurs on American soil or kills an American college student visiting Paris. Congress created the private civil remedies invoked in this case "to punish terrorist[s] and empower [American]

---

[1]   *Amici* gave timely notice of their intention to file this brief and all parties have consented to the brief's filing. No party's counsel authored this brief in whole or in part. No person other than *amici curiae* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

2

victims" injured by acts of international terrorism and to fill a "gap" that existed in the government's own civil and criminal anti-terrorism enforcement powers. 137 Cong. Rec. S1772 (daily ed. Feb. 7, 1991).

In crafting the remedies in the Anti-Terrorism Act (ATA), 18 U.S.C. § 2331 *et seq.*, Congress well knew that the parties responsible for the harms it sought to redress were generally located beyond the reach of ordinary state long arm statutes. Thus, when Congress authorized suits by United States nationals injured by international terrorism—expressly defined in the ATA to include actions outside our nation's borders, 18 U.S.C. § 2331(1)(C)—it conferred exclusive jurisdiction over such actions on "any appropriate district court of the United States," 18 U.S.C. §§ 2333(a), 2338, and gave those district courts personal jurisdiction over a defendant by authorizing nationwide service of process "in any district where the defendant resides, is found, or has an agent," 18 U.S.C. § 2334(a). To assure American victims of terrorism an American forum, it limited *forum non conveniens* dismissal even where a foreign court might also have jurisdiction. 18 U.S.C. § 2334(d)(2)-(3). These provisions were specifically intended to overturn jurisdictional limitations that had impeded prior litigation involving terrorist activity committed by the PLO against United States nationals traveling abroad. *See* pp. 9-13, *infra* (discussing legislative history).

The pressing issue presented by this case is whether Fourteenth Amendment due process standards, which limit state courts in our federal system, should be incorporated into the Fifth

3

Amendment due process analysis to constrain United States courts' power to exercise jurisdiction over terrorists in civil actions seeking redress for harm to United States nationals under the ATA. *Amici curiae* respectfully submit that Fourteenth Amendment federalism-based minimum contacts principles should not be applied to the ATA.

The Second Circuit's decision below applied those principles to limit the authority of federal courts to hear the ATA claims in this case. That decision rests on the faulty assumption that even where, as here, the Federal Government has acted extraterritorially to protect its citizens residing and traveling abroad, the Fifth Amendment incorporates the same interstate federalism principles used to referee jurisdictional conflicts among the states of the union and to confine the territorial reach of state courts under the Fourteenth Amendment.   Pet'rs' App. 22a-23a.   But this Court has never equated Fifth Amendment personal jurisdiction standards with those of the Fourteenth Amendment in the manner that the Second Circuit has done here.   Indeed, this Court has twice noted that the jurisdiction of federal courts raises different questions than the jurisdiction of state courts under the Fourteenth Amendment. *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987);[2] *Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102, 113 n* (1987).   *See*

---

[2]   In *Omni Capital*, this Court held there was no personal jurisdiction because of a lack of authority to serve process, not because the Fifth Amendment denies Congress the power to reach further in authorizing service of process than a state could reach under the Fourteenth Amendment.

4

*also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality) ("Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State.").

Interstate federalism concerns are irrelevant to claims arising under the ATA, despite the textual similarities between the two Due Process Clauses. Placing federalism-based constraints on United States courts in an international system of independent, sometimes hostile states that lack a shared constitution, a common set of neutral courts, and any central authority would create a jurisdictional gap in protection for American nationals traveling or living abroad. It is also inconsistent with founding-era history in which Congress asserted extraterritorial jurisdiction over both civil and criminal matters involving piracy without any requirement that the defendant's conduct be purposefully directed at the United States.

The Second Circuit's decision, if not overturned, would effectively nullify Congress's express intent for the ATA to address a "gap in [Congress's] efforts to develop a comprehensive legal response to international terrorism" by providing a United States forum for families seeking redress for harm to United States nationals from international terrorism. H.R. Rep. No. 102-1040, at 5 (1992). Reversing that decision, however, would not leave accused terrorists who are hauled into United States courts without any due process protections—the Fifth Amendment still prevents federal courts from exercising personal

5

jurisdiction when it would be unreasonable in circumstances that cause genuine unfairness.

This Court should grant certiorari to make clear that when Congress has clearly intended to protect United States nationals from terrorist attacks outside United States territory, and it has satisfied the presumptions against extraterritoriality and of adherence to international law, the only function of the Fifth Amendment Due Process Clause with regard to personal jurisdiction is to prevent real unfairness.

## ARGUMENT

**THE SECOND CIRCUIT'S DECISION TO APPLY FOURTEENTH AMENDMENT DUE PROCESS STANDARDS IN THIS CASE PLACES AN UNWARRANTED AND DANGEROUS LIMITATION ON THE PERSONAL JURISDICTION CONGRESS CONFERRED ON FEDERAL COURTS IN THE ATA.**

### A. Congress Expressly Authorized Personal Jurisdiction Under the ATA Over Defendants Committing Extraterritorial Acts of Terrorism Harming United States Nationals.

In the ATA, Congress explicitly granted federal courts jurisdiction over civil actions arising from extraterritorial acts of terrorism harming United States nationals (*see In re September 11 Litig.*, 751 F.3d 86, 93 (2d Cir. 2014); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.5 & 211 (2d Cir. 2014)), and conferred personal jurisdiction over

6

defendants who commit or provide material support for those acts by authorizing service of process in any district in which the defendant has an agent.   18 U.S.C. § 2334(a).

The statute thus satisfies both judicial presumptions requiring the political branches of government to focus directly on the foreign policy implications of extending United States law to foreign soil.   The first, the presumption against extraterritoriality, requires clear evidence that Congress intended a law to apply outside the United States.  *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247, 255 (2010).  Here, "Congress clearly expressed its intention for § 2333(a) to apply extraterritorially by focusing on 'international terrorism' and defining it to include exclusively activities that 'occur primarily outside the territorial jurisdiction of the United States.' 18 U.S.C. § 2331(1)."  *Weiss*, 768 F.3d at 207 n.5.  Congress's decision to provide a civil remedy for U.S. nationals harmed by extraterritorial acts of terrorism implies a corresponding intent to extend the ATA's jurisdictional reach just as far.  *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1673 (2013) (Breyer, J. concurring in the judgment) ("I would assume that Congress intended the [Alien Tort Statute's] jurisdictional reach to match the statute's underlying substantive grasp.").

The second presumption, known as the *Charming Betsy* presumption of adherence to international law, requires clear evidence that Congress intended extraterritorial application of a statute that violates a norm of international law.

7

*McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963).

But the ATA does not conflict with international law.[3]   As courts have recognized, international law has long provided for a state's jurisdiction with regard to injuries to its nationals (the "passive personality" principle), and "protective jurisdiction" over matters threatening to the state's national security. *See Biton v. Palestinian Interim Self-Gov't Auth.*, 510 F. Supp. 2d 144, 146 (D.D.C. 2007) (passive personality jurisdiction does not require that victims were targeted because of United States nationality; collecting cases).   Acts of international terrorism as defined in the ATA implicate both of those traditional forms of extraterritorial jurisdiction.

Such acts also implicate "universal jurisdiction" of the kind that Congress authorized with regard to piracy in 1790.   All states have prescriptive jurisdiction with regard to certain conduct that is universally condemned.   Restatement (Fourth) of Foreign Relations Law § 217 (Am. Law. Inst. Tentative Draft No. 2, 2016).   The International

---

[3]   Nations have jurisdiction to prescribe—to declare standards of conduct—with regard to conduct that has substantial effects within its territory, Restatement (Fourth) of Foreign Relations Law § 213 & cmt. a (Am. Law Inst. Tentative Draft No. 2, 2016); conduct that threatens the security of the state, *id.* § 216 & cmts. a-b; and conduct that harms one of its nationals, *id.* § 215 & cmts. a-b. A nation's jurisdiction to *adjudicate*—to exercise jurisdiction over a defendant—is generally not limited by modern customary international law. *Id.* § 302, Reporters' Note 1.

8

Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, Art. 7(2)(a), S. Treaty Doc. No. 106-49, 39 I.L.M. 268, provides for universal jurisdiction over the financing of terrorism and, by necessary implication, recognizes universal jurisdiction over acts of terrorism. *See also* International Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, S. Treaty Doc. 106-6, 2149 U.N.T.S. 256.[4] The conduct that occurred here and that is covered by the ATA is universally condemned.

Regardless, "[n]either presumption imposes a substantive limit on Congress's legislative authority." *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013). This Court's decisions limiting extraterritorial actions as a matter of statutory construction do not hint that Congress's extraterritorial legislative power is subject to an additional *constitutional* restraint rooted in the Due Process Clause of the Fifth Amendment. *See, e.g., EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 253 (1991).

---

[4] Even before these conventions were adopted, the Restatement (Third) of Foreign Relations Law § 404 (1986) stated that "perhaps certain acts of terrorism" fell within universal jurisdiction. *See id.* cmt. b (noting that universal jurisdiction includes civil actions such as "a remedy in tort or restitution for victims of piracy" consistent with the Alien Tort Statute).

9

### B.    Limiting Personal Jurisdiction Over International Terrorists Harming United States Nationals Abroad Would Interfere With Enforcement of the ATA and Congressional Policy to Thwart Terrorism.

The Justice Department hailed the ATA's civil remedies as "an effective weapon in the battle against international terrorism."  Brief for the United States as *Amicus Curiae*, *Boim v. Holy Land Found.*, Nos. 05-1815, 05-1816, 05-1821, 05-1822 (Aug. 21, 2008), 2008 WL 3993242, at *1.  Congress made those remedies effective by removing personal jurisdiction obstacles to suits just like this one in which aggrieved family members seek to expose the hidden supporters of foreign terrorism.

Congress was specifically concerned with providing effective remedies to the families of those killed or injured by acts of terrorism occurring outside the territory of the United States.  In his opening statement convening the Senate Judiciary Committee hearing on the ATA in 1990, the bill's principal sponsor, Senator Grassley, promised the "testimony of witnesses whose lives have been forever changed as a result of acts of terrorism."  *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. 1 (1990).  Those witnesses were members of the family of Leon Klinghoffer, whom terrorists seized as a hostage on an Italian-flagged cruise ship then shot and pushed into the Mediterranean in his wheelchair, and members of the families of United

10

States citizens who were killed in the bombing of Pan Am Flight 103 that crashed in Lockerbie, Scotland. Congress intended to "send[] a strong warning to terrorists to keep their hands off Americans."  *Id.* at 3.[5]

The State Department testified that the "bill will provide general jurisdiction [as opposed to the limited admiralty jurisdiction available in the *Klinghoffer* case] to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas."  *Id.* at 12. The ATA thus created a civil right of action to complement existing federal laws providing criminal punishment for acts of terrorism.  *Id.* at 14-15. Although the State Department expressed concerns about piercing foreign sovereign immunity, it supported the bill as a "welcome addition" to the anti-terrorism arsenal.  *Id.* at 12, 17-19.  The Department of Justice also endorsed the bill, again with the proviso that foreign sovereign immunity be preserved and the recommendation that the bill should be modified to prevent civil suits from interfering with criminal cases.  *Id.* at 26-27, 35-36, 37.[6]   Neither

---

[5]   Professor Harold Koh advocated "comprehensive legislation creating civil remedies against terrorism."  Harold Hongju Koh, *Civil Remedies for Uncivil Wrongs:  Combatting Terrorism Through Transnational Public Law Litigation*, 22 Tex. Int.'l L. J. 169, 174 (1987).  *See* 1990 Hearing, at 82 (citing article).

[6]   Congress later enacted an exception to foreign sovereign immunity that permits American nationals to seek money damages "against state sponsors of terrorism in the courts of the United States," including for conduct occurring outside the United States. *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317

11

executive department raised any question about the
constitutionality of the ATA.

The hearing testimony explicitly addressed the
need for the legislation to overcome potential hurdles
to establishing personal jurisdiction. The Klinghoffer
family discussed the reasons their suit had been
allowed to proceed, but expressed concern that
"Americans living in other jurisdictions or those
victimized by other terrorist groups [besides the PLO]
would have difficulty seeking recovery for the harms
inflicted upon them outside the United States." *Id.* at
61.[7] The bill would eliminate the need to rely, as the
Klinghoffers had, on the PLO's presence in New York,
by "allowing the action to be filed in any district of
this country in which the defendant might have a
representative." *Id*; *see also id*. at 63; *Antiterrorism
Act of 1991: Hearing on H.R. 2222 Before the
Subcomm. on Intellectual Prop. and Judicial Admin.
of the H. Comm. on the Judiciary*, 102nd Cong. 15, 18
(1992). H.R. Rep. No. 102-1040, at 5 (1992)
(describing the *Klinghoffer* case, the fortuity of being
able to establish admiralty jurisdiction and personal
jurisdiction based on a New York presence, and the

_____

(2016) (discussing the terrorism exception to jurisdictional
immunity created by 28 U.S.C. § 1605A).

[7] The Second Circuit subsequently vacated the personal
jurisdiction ruling they described. *Klinghoffer v. S.N.C. Achille
Lauro*, 937 F.2d 44 (2d Cir. 1991); 795 F. Supp. 112 (S.D.N.Y.
1992) (finding sufficient presence on remand, but dismissing for
lack of service); 816 F. Supp. 930 (S.D.N.Y. 1993) (upholding a
third party's service on the PLO, *nunc pro tunc*).

12

purpose to "facilitate civil actions against such terrorists").

The House committee report described the ATA as:

- "allow[ing] *any* U.S. national injured in his person, property or business by an act of international terrorism to bring a civil action in a U.S. District Court[;]"

- "exten[ding] … civil jurisdiction to accommodate the reach of international terrorism—*i.e.*, American civil law would be granted the same extra-territorial reach as American criminal law."

*Id.* (emphasis added).

The ATA thus was intended as a crucial building block in Congress's efforts to combat international terrorism by expanding U.S. nationals' access to U.S. courts to redress wrongs caused by acts of international terrorism. Congress has since further expanded the judicial remedies available to U.S. nationals. *See, e.g.,* JASTA, § 3, 130 Stat. at 853 (creating exception to foreign sovereign immunity for suits against foreign states arising out of acts of international terrorism in the United States)[8];

---

[8]  Indeed, in JASTA, Congress asserted that its purpose was "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting and wherever they may be found*, that have provided material support

13

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 18 U.S.C. § 2339B (expanding civil and criminal liability for material support of terrorism). Limiting federal courts' authority to hear ATA cases by applying Fourteenth Amendment standards would weaken the comprehensive statutory framework that Congress has developed and turn the ATA from the effective weapon that Congress intended and the Justice Department welcomed into a cruel hoax on the families that advocated for it.

**C.   Federalism-Based    Personal Jurisdiction Standards Do Not Limit the Authority of Congress to Invest   Federal   Courts   With Personal    Jurisdiction    Over International   Terrorists   Under the ATA.**

In its decision below, the Second Circuit held that its own precedents "clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments." Pet'rs' App. 22a. The D.C. Circuit reached the same conclusion in *Livnat, et al. v. Palestinian Auth.*, No. 15-7024, 2017 WL 1101106 (D.C. Cir. Mar. 24, 2017). But both courts equated Fourteenth and Fifth Amendment due process standards chiefly because prior circuit courts have done so, and the D.C. Circuit expressly conceded that neither it nor this Court has ever "expressly

---

. . . to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b), 130 Stat. at 853 (emphasis added).

14

analyzed whether the Fifth and Fourteenth Amendment standards differ." *Id.* at *7. It also relied upon a flawed equation between "state courts' power relative to other states' courts" and "federal courts' power relative to other nations' courts." *Id.* at *8. For the reasons explained below, *infra* pp. 15-20, these powers are sharply different.

Restrictive Fourteenth Amendment Due Process standards for personal jurisdiction cannot simply be transposed to the Fifth Amendment to limit federal court jurisdiction in ATA cases.[9] Although the language of the two Due Process Clauses is similar, their history, context, and meaning differ, and the federalism-based territorial limitations of the Fourteenth Amendment jurisdictional standard should not be applied to restrict the Federal Government's power to act extraterritorially to protect U.S. citizens residing or traveling abroad from international terrorism. Both Due Process Clauses limit the exercise of judicial power within appropriate bounds, but the bounds of federal judicial power are

---

[9]   Those standards do often govern federal cases invoking a state long arm statute under Fed. R. Civ. P. 4(k)(1)(A). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). That practice explains the assumption in the advisory committee note to the 1993 amendment to Rule 4 that Fourteenth Amendment standards could simply be applied on a national scale under the Fifth Amendment (citing *Wells Fargo Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 418-19 (9th Cir. 1977) (where initial jurisdiction was predicated on state law, personal jurisdiction over additional transactions should be based on aggregate contacts with the United States, and urging amendment of the Federal Rules to that effect)).

15

commensurate with the broader extraterritorial authority of the Federal Government.

> 1.  Fourteenth Amendment Standards Are Grounded in Federalism.

The personal jurisdiction restrictions of the Fourteenth Amendment are principally concerned with regulating the sovereign powers of states within a federal system.   The individual liberty interest principally protected is the right not to be coerced except by lawful judicial power, *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014), but the scope of a state court's lawful power to coerce is defined by principles of interstate federalism.

Even before the adoption of the Fourteenth Amendment, the Framers of the Constitution recognized that state courts might provide a home court advantage to their own citizens; hence the provision for diversity jurisdiction of federal courts in Article III and the First Judiciary Act.  As interstate travel and commerce expanded, this Court recognized that unfettered state court jurisdiction over extraterritorial activity could lead to jurisdictional conflicts and forum shopping.[10]   The personal jurisdiction doctrine that developed under the Fourteenth Amendment was therefore principally

---

[10]   *See Hanson v. Denckla*, 357 U.S. 235, 250-51 (1958); Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1230 (1992).

16

concerned with maintaining the proper division of authority among state courts (which, unlike foreign nations, are constitutionally obligated to enforce each other's judgments) within a federal system.

Just as Constitutional provisions such as the Commerce Clause prevent a state from aggrandizing its own legislative power to the detriment of other states through extraterritorial legislation,[11] the Due Process Clause of the Fourteenth Amendment prevents state courts from encroaching on other states' courts or federal courts through the assertion of extraterritorial judicial power. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) ("The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."). The Due Process Clause of the Fourteenth Amendment in this context "act[s] as an instrument of interstate federalism." *Id.* at 294. The scope of specific jurisdiction under the Fourteenth Amendment is thus aligned with the state's authority to regulate—its "prescriptive jurisdiction" in

---

[11]  *See, e.g., Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1792 (2015) (Commerce Clause requires state to credit tax paid on income earned in another state); *Watson v. Emp'rs Liab. Assurance Corp.*, 348 U.S. 66, 70-71 (1954) (Due Process Clause limits extraterritorial regulation of insurance); *United States v. Bennett*, 232 U.S. 299, 306-07 (1914) (distinguishing federal extraterritorial power from the states').

17

international law terms. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).[12]

But the Fourteenth Amendment's federalism-based jurisdictional limits do not leave state citizens unprotected when they travel within the United States. "First, all the states are governed by the same overriding Constitution. As a result, whatever the rules for personal jurisdiction, they are guaranteed to be reciprocal. Second, any judgment that complies with the rules must be enforced." Wendy C. Perdue, *Aliens, the Internet, and "Purposeful Availment": A Reassessment of Fifth Amendment Limits on Personal Jurisdiction*, 98 Nw. U. L. Rev. 455, 461 (2004).[13] Moreover, traveling state citizens can invoke the protection of neutral federal courts and federal law.

---

[12] Similar concerns about preventing states from encroaching on exclusively federal foreign relations powers (*see Hines v. Davidowitz*, 312 U.S. 52, 62 n. 9 (1941) (citation omitted) (noting the "importance of national power in all matters relating to foreign affairs and the inherent danger of state action in this field. . . .")) also justify limiting the reach of *state* laws and *state* courts into extraterritorial matters that may have foreign policy repercussions for the United States. *See Daimler AG*, 134 S. Ct. at 763.

[13] In written testimony to the Senate Judiciary Committee, Professor Perdue raised several concerns about personal jurisdiction. *Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts and Admin. Practice, Comm. on the Judiciary*, 101st Cong. at 121-25. Those views were premised on the applicability of Fourteenth Amendment standards that she has since concluded are inapplicable to the Fifth Amendment. *See* Perdue, *supra*, 98 Nw. U. L. Rev. at 456.

18

2.    The Fifth Amendment Does Not Impose Territorial Restrictions on the Jurisdiction of Federal Courts in Cases Arising from the Extraterritorial Application of the Federal Government's Anti-Terrorism Laws.

Unlike states, "foreign nations are external to the constitutional compact." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 97 (D.C. Cir. 2002). Foreign states need not follow reciprocal rules; they "sometimes assert broader jurisdiction for themselves than they will recognize by other countries, and there is no guarantee that any judgment will be enforced." Perdue, *supra*, 98 Nw. U. L. Rev. at 461. Moreover, there is no international system of neutral courts comparable to our federal courts, let alone a central authority to enforce a constitutional compact to protect the rights of Americans abroad. Instead, "sovereign states interact with each other through diplomacy and even coercion in ways not affected by constitutional protections such as the Due Process Clause." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001). Restricting the jurisdiction of federal courts over terrorists and those that provide them material support by incorporating the Fourteenth Amendment's federalism-based limits into the Fifth Amendment would impose a unilateral constraint on United States courts, even when, as with the ATA, the political branches of government have concluded that extraterritorial jurisdiction is in the national interest.

19

Furthermore, the Constitution empowers Congress to enact extraterritorial legislation to protect its citizens abroad. In addition to its inherent foreign affairs power, Congress has the explicit authority to "define and punish . . . Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. If the United States has prescriptive but not judicial jurisdiction over acts of international terrorism against its nationals:

> then of necessity it must rely on the courts of other states or countries for its policies to be vindicated. This is far less problematic in the interstate context than in the international one, because states, unlike other countries, have some obligations not to treat the laws of other states with hostility. More importantly, the fundamental differences among the substantive policies of the states are far fewer than among nations.

Perdue, *supra,* 98 Nw. U. L. Rev. at 467 (footnotes omitted). Applying federalism-based limits intended to operate within a harmonious federal system to the national sovereign operating within a cacophonous international system would leave an unjustified and unnecessary jurisdictional gap in the protection of Americans traveling or residing abroad.[14]

---

[14] Congress invoked the duty to protect Americans when it enacted the material support provision on which petitioners in part rely. *See* AEDPA, Pub. L. No. 104-132, § 301(a)(1), 110 Stat. 1214, 1247 (finding that "international terrorism is a serious and deadly problem that threatens the vital interests of the United

20

Within the United States, the states have no comparable power to protect their citizens or residents from other states—that function is performed by the Constitution. *Walden v. Fiore*, 134 S. Ct. 1115 (2014), for example, would have come out differently if Nevada, like the United States, had the power to protect its residents from harm outside its territory. But Nevada does not have *or need* that power; the Constitution affords a Nevadan plaintiff a right to sue in a Georgia state court as if she were a Georgia citizen and to enforce any resulting judgment in any state, and Congress has also given her the right to sue in a federal court in Georgia.

Moreover, allowing Congress to authorize federal courts to exercise personal jurisdiction when there is a "vital interest," as there is in combating international terrorism, would not rob the Fifth Amendment of its protective force for defendants in cases of fundamental unfairness. *See* Part C.4, *infra*.

---

States"). It also expressly found that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and *limiting international travel by United States citizens* as well as foreign visitors to the United States." *Id.* § 301(a)(4) (emphasis added).

21

3.  Founding-Era History is Incompatible with the Second Circuit's Decision to Apply Fourteenth Amendment Standards to ATA Claims.

Founding-era history contemporaneous with the adoption of the Fifth Amendment is incompatible with the personal jurisdiction standard the Second Circuit applied below. The Founders understood that the federal government (unlike the states) had the power to protect United States nationals when they are outside the country's borders.  For example, the function of a passport is to extend the protection of the sovereign to its nationals when outside the country.  4 William Blackstone, Commentaries on the Laws of England 68-69 (1769).  Vattel, the preeminent international law scholar of the Founding era, referred to the duty of a nation to "preserve all its members," 1 M. De Vattel, Law of Nations or Principles of the Nature Applied to the Conduct and Affairs of Nations and Sovereigns, Book I § 17 at 63 (1796), and to avenge injuries to them to secure compensation, Law of Nations, Book II § 71 at 224. "Whoever uses the citizen ill, indirectly offends the state, which ought to protect this citizen." *Id.*

As noted above, *supra* p. 19, the Constitution gives Congress a specific extraterritorial power to legislate with respect to piracy and other offenses against the law of nations (even as to aliens).  U.S. Const. art. I, § 8, cl. 10.   Congress enacted extraterritorial criminal laws against piracy in 1790—like terrorism today, a form of organized non-state

22

violence—and this Court upheld the application of those laws in federal court to pirates without requiring any proof that the pirates had intentionally targeted the United States.  Chief Justice Marshall's opinion in *United States v. Palmer*, 16 U.S. 610, 630 (1818), stated that "[t]he constitution having conferred on congress the power of defining and punishing piracy, there can be no doubt of the right of the legislature to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States." *See also United States v. Smith*, 18 U.S. 153, 161 (1820) ("[A]ll nations [may punish] all persons, whether natives or foreigners, who have committed this offence against any persons whatsoever, with whom they are in amity."); *accord United States v. Shibin*, 722 F.3d 233 (4th Cir. 2013) (piracy directed at German-flagged vessel).

Although *Palmer* addressed only Congress's affirmative authority to enact the law, it refutes by implication the notion that the Fifth Amendment constrains the jurisdiction of federal courts over matters occurring outside United States territory. Discussing *Palmer*, Chancellor James Kent declared "[i]t is of no importance for the purpose of giving jurisdiction, *on whom* or *where* a piratical offense has been committed."  1 James Kent, Commentaries on American Law 174 (1826).

Likewise, the Alien Tort Statute, first enacted in 1789, provided jurisdiction over extraterritorial civil claims by aliens based on violations of universal norms of international law, including piracy. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (relying on

23

Blackstone's description of "Offences Against the Law of Nations," 4 Blackstone Commentaries on the Laws of England 66-73 (1769)); *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1093 (D.C. Cir. 2011).[15] The condemnation of piracy then included what might today be described as "material support": "trading with known pirates or furnishing them with stores or ammunition, or fitting out any vessel for that purpose, or in any wise consulting, combining, confederating or corresponding with them." 4 Blackstone Commentaries 72. It is not coincidental that when it enacted the material support provision (18 U.S.C. § 2339B) at issue here, Congress expressly cited its "power to punish crimes against the law of nations and to carry out the treaty obligations of the United States." AEDPA, § 301(a)(2), 110 Stat. at 1247.

These Founding-era laws—and the understanding of the Constitution that they reflect[16]—are inconsistent with the Second Circuit's decision to impose Fourteenth Amendment jurisdictional

---

[15]  The Alien Tort Statute and laws criminalizing piracy reflected the eighteenth-century consensus "not only on the substantive principle that acts of piracy were universally wrong but also on the jurisdictional principle that any nation that found a pirate could prosecute him." *Sosa*, 542 U.S. at 762 (Breyer, J., concurring) (citing *Smith*, 18 U.S. at 162).

[16]  A law "passed by the first [C]ongress assembled under the [C]onstitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning." *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) (citation omitted); *see also Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) ("The actions of the First Congress . . . are of course persuasive evidence of what the Constitution means").

24

limitations on claims arising under the ATA. This history shows that Congress had the power to align the jurisdictional scope of the ATA with the national interest, at least to reach defendants who commit or support acts of terrorism injuring American nationals traveling or residing abroad. Moreover, the ATA claims in this case do not go nearly so far as the Founding-era laws because they are confined to knowing or intentional conduct causing injury to United States nationals. If Congress in the late 18th century could constitutionally provide jurisdiction over acts of piracy that do not even involve a United States victim, then surely in the 21st century it can provide jurisdiction over terrorist acts that do.

> 4.   Fifth Amendment Standards in Criminal Cases Are Also Incompatible with Requiring Purposeful Contacts in ATA Claims.

The Second Circuit's decision below is also inconsistent with decisions in that and other circuits applying the Fifth Amendment to jurisdiction over criminal defendants who committed offenses outside United States territory.  The Due Process test in criminal cases is not based on Fourteenth Amendment minimum contacts principles but on whether jurisdiction is "arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111-12 (2d Cir. 2003).[17]  It would be a strange rule of Due

---

[17]  "[S]everal . . . circuits have reasoned that before a federal criminal statute is given extraterritorial effect, due process requires a sufficient nexus between the defendant and the

25

Process that would allow for federal courts to exercise more expansive personal jurisdiction in criminal cases than in civil cases arising under the ATA, which are expressly predicated on acts of intentional murder and international terrorism of a type condemned throughout the world. Rather, "[i]t logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals [terrorists], the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts." *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54, 59 (D.D.C. 2003). *See also Goldberg v. UBS AG,* 690 F. Supp. 2d 92, 106-107 (E.D.N.Y. 2010) (applying *Yousef* substantial nexus standard to ATA claim).

Congress intended the ATA to reach as far as federal criminal law. H.R. Rep. No. 102-1040, at 5 (1992). The "animating principle" behind due process limits on criminal charges is the precept that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Ali,* 718 F.3d at 944 (quoting *Bouie v. City of Columbia,* 378 U.S. 347, 351 (1964) (internal quotation marks omitted)). Fair notice concerns certainly would not justify a more restrictive standard

---

United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Ali,* 718 F.3d at 943 (internal quotation marks and citations omitted). Other courts have declined to require any nexus. *E.g., United States v. Martinez-Hidalgo,* 993 F.2d 1052, 1056 (3d Cir. 1993). If a nexus is required, actual harm to United States nationals is sufficient.

26

for jurisdiction over ATA claims based on broadly-condemned criminal conduct. *See Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006) ("[T]hose who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States.").

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

PETER RAVEN-HANSEN
GEORGE WASHINGTON
  UNIVERSITY SCHOOL OF LAW
2000 H Street, NW
Washington, DC 20052
(202) 994-8171

ADAM L. FOTIADES
    *Counsel of Record*
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1800
afotiades@zuckerman.com

*Counsel for Amici Curiae*

**APPENDIX**

1a

# APPENDIX

## *AMICI* BIOGRAPHICAL INFORMATION

**John D. Ashcroft** served as Attorney General of the United States from 2001 to 2005. During his tenure as Attorney General, he led the Department of Justice through the period following the September 11, 2001 terrorist attacks and reorganized the Department to focus on preventing terrorism, resulting in the disruption of over 150 terrorist plots worldwide. Previously, he served as a United States Senator from 1995 to 2001, where he was Chairman of the Senate Subcommittee on the Constitution and a member of the Senate's Judiciary, Foreign Relations, and Commerce Committees.

**Charles W. Blau** served as Deputy Associate Attorney General of the United States from 1986-87 and 1984-85, as Associate Deputy Attorney General from 1985-86, as Chief of the Organized Crime Drug Enforcement Task Force of the Department of Justice and Department of the Treasury, as Chief of the Narcotics Section of the Criminal Division, as Chief of the Money Laundering Task Force in Miami, Florida, and as an Assistant United States Attorney.

**Louis J. Freeh** served as the Director of the Federal Bureau of Investigation from 1993-2001 and as a United States District Judge for the Southern District of New York from 1991-1993. From 1990-1991 he served as a Special Prosecutor for the Department of Justice, and from 1981-1990 he was a federal prosecutor in the Southern District of New York, serving as an Assistant United States Attorney, Chief

2a

of the Organized Crime Unit, Associate United States Attorney, and Deputy United States Attorney.  From 1975-1981, he was a Special Agent in the F.B.I.

**Philip B. Heymann**, after graduating from Harvard Law School and clerking for Justice John Marshall Harlan, served first in the Solicitor General's Office and then in the Department of State.  He then became a professor at Harvard Law School before taking part in the Watergate investigation, becoming Assistant Attorney General in charge of the Criminal Division in the Department of Justice and Deputy Attorney General under President Clinton.  As a professor he has written extensively on terrorism.  His books include *Terrorism and America*, *Terrorism Freedom and Security*, *Laws Outlaws and Terrorists* with Professor Gabriella Blum, and *Protecting Liberty in an Age of Terror* with Juliette Kayyem.

**Joseph I. Lieberman** served as a United States Senator from 1989 to 2013, when Congress enacted the Anti-Terrorism Act.  During his tenure in the Senate, he helped shape legislation in major areas of public policy, including national and homeland security and foreign policy, and co-sponsored the bill that became the Anti-Terrorism Act.  He also served in many leadership roles, including as Chairman of the Senate Committee on Governmental Affairs from 2001 to 2003 and as Chairman of the Committee on Homeland Security and Governmental Affairs from 2007 to 2013.

3a

**Joseph A. Morris** served as Assistant Attorney General and Director of the Office of Liaison Services of the Department of Justice under Attorneys General Meese and Thornburgh from 1986 to 1988. In that capacity he was responsible for the Department's international affairs and liaisons, including relations with justice ministries and similar agencies of other nations. Before that, he was the Chief of Staff and General Counsel of the United States Information Agency and also served as an American delegate to the United Nations Commission on Human Rights at Geneva. He was a principal draftsman of what became the Anti-Terrorism Act of 1992 and testified before the Senate in support of its enactment.

**Michael J. O'Neil** served as the general counsel of the Central Intelligence Agency from 1996-97. Previously, he served as the chief of staff of the Agency where he coordinated the legislative and public affairs strategy and acted as the Agency's liaison to the National Security Council and Intelligence Community agencies. Before the Agency, he was the counselor to the secretary and deputy secretary of defense. In this position he advised the secretary and deputy secretary on policy, organizational and legislative matters. From 1989 to 1994, he served as the counsel to the Speaker of the U.S. House of Representatives, Thomas S. Foley. In addition to advising the Speaker on all legal and national security issues, he acted as liaison to foreign embassies and U.S. national security agencies. Before his work for the Speaker, he served as the chief counsel to the House Permanent Select Committee on Intelligence from 1977 to 1989.

4a

**J. Patrick Rowan** served as Assistant Attorney General for National Security from 2008-2009, where he was responsible for supervising the government's practice before the Foreign Intelligence Surveillance Court, the oversight of intelligence-collection activities, and the coordinated nationwide counterterrorism enforcement program. From 2006-2008, he served as Principal Deputy Assistant Attorney General for the Justice Department's National Security Division. Previously, he served as an Associate Deputy Attorney General, Senior Counsel to the Assistant Attorney General for the Criminal Division, Special Counsel for the Office of General Counsel of the F.B.I., Counsel to the Director of the Executive Office for United States Attorneys, and an Assistant United States Attorney.

**Abraham D. Sofaer** served as Legal Adviser to the United States Department of State from 1985-1990. In this position he advised the Secretary of State on a wide range of legal issues, including terrorism and interstate disputes. In 1989, he received the Distinguished Service Award, the highest State Department award given to a non-civil servant. Before the State Department, he served as a United States District Judge for the Southern District of New York from 1979-1985 and an Assistant United States Attorney for the Southern District of New York from 1967-1969.

5a

**Richard Thornburgh** served as Attorney General of the United States from 1988-1991, as Assistant Attorney General in charge of the Criminal Division of the Department of Justice from 1975-77, and as United States Attorney for the Western District of Pennsylvania from 1969-75. After his service as Attorney General, he became Under-Secretary General of the United Nations, from 1992-93.

**Steven R. Valentine** served as Deputy Assistant Attorney General in the Civil Division of the Justice Department from 1988-1993. His responsibilities as Deputy Assistant Attorney General included testifying before the Subcommittee on Courts and Administrative Practice of the Senate Judiciary Committee on behalf of the Department with regard to the bill that became the Anti-Terrorism Act. Before serving as Deputy Assistant Attorney General, he served as Counselor and as Senior Special Assistant to the Assistant Attorney General for the Civil Division.