# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                             )

IN RE:  TERRORIST ATTACKS ON     )    **Civil Action No. 03 MDL 1570 (GBD) (SN)**
SEPTEMBER 11, 2001            )    **ECF Case**
_____  )

This document relates to:

*Federal Insurance Co., et al. v. al Qaida, et al.*, No. 03-cv-6978
*Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-5970
*Cantor Fitzgerald Assocs., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
*Pacific Employers Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
*Beazley Furlonge Ltd. v. Saudi Binladin Group, Inc., et al.*, No. 16-cv-7456
*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
*McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
*DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
*Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-2003
*The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*,
    No. 17-cv-2129

(more cases listed on inside page)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# RENEWED MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

January 4, 2018

(case listing continued from cover)

*The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
*General Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
*Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
*Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
*Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5471
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-6123
*Allianz Versicherungs-Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-6519
*Fraser, et al. v. Al Qaeda Islamic Army, et al.*, No. 17-cv-7317
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-7914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No 17-cv-8617

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................v

INTRODUCTION ...............................................................................................................1

ARGUMENT ......................................................................................................................3

I.    Plaintiffs Must Allege and Come Forward with Evidence of a
Tortious Act Within the Scope of Office, Employment, or Agency
That Caused the 9/11 Attacks ................................................................................3

    A.    JASTA Requires an Act by an Official, Employee, or
Agent Within the Scope of Office, Employment, or Agency ....................3

        1.    Plaintiffs Fail To Show That JASTA Changes the
Outcome as to the Purported Individual Employees
or Agents .......................................................................................4

        2.    Plaintiffs Fail To Show That JASTA Changes the
Outcome as to the Governmental and
Nongovernmental Charities ...........................................................5

        3.    Secondary Liability Under JASTA Does Not Apply
to Foreign Sovereigns and Does Not Apply Here ..........................8

    B.    JASTA Requires That the Official's, Employee's, or
Agent's Act Be Tortious ...........................................................................9

    C.    JASTA Requires That the Official's, Employee's, or
Agent's Tortious Act Have Caused Plaintiffs' Injuries .............................9

        1.    JASTA Requires But-For Causation ..................................................9

        2.    JASTA Requires Traditional Proximate Cause ............................11

    D.    JASTA Does Not Change Any Pleading or Evidentiary
Requirements ..........................................................................................12

        1.    Plaintiffs Must Plead Concrete Facts and Come
Forward with Competent Evidence ..............................................12

        2.    The 9/11 Report, FBI-CIA Report, and 9/11 Review
Report Are Competent Evidence ..................................................15

        3.    Plaintiffs' Opposing Materials Are Not
Competent Evidence ....................................................................17

|   |   | a. | Preliminary Investigative Materials | 17 |
|   |   | b. | Affidavits of Former Law Enforcement Agents | 18 |
|   |   | c. | Former Commission Members and Senators | 20 |
|   |   | d. | Evan Kohlmann | 20 |
|   |   | e. | Attorneys James Kreindler and Steven Pounian | 21 |
|   |   | f. | Other Exhibits and Footnoted Documents | 21 |

II. Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Individual .................................................................. 22

    A. Omar Al Bayoumi .................................................................. 23

        1. No Action Within Scope of Employment or Agency ......... 23

            a. Florida Bulldog Memorandum ......... 25

            b. Rochford and Mitchell Affidavits ......... 26

            c. Graham Affidavit ......... 27

            d. Moore Affidavit ......... 27

        2. No Tortious Act ......... 28

        3. No Causation ......... 30

    B. Fahad Al Thumairy ......... 31

        1. No Action Within Scope of Employment or Agency ......... 31

        2. No Tortious Act ......... 31

        3. No Causation ......... 32

    C. Osama Basnan ......... 32

        1. No Action Within Scope of Employment or Agency ......... 32

        2. No Tortious Act ......... 33

        3. No Causation ......... 34

D.      Saleh Al Hussayen ........................................................34

E.      Mohammed Al Qudhaieen and Hamdan Al Shalawi...............34

    1.      No Action Within Scope of Employment or Agency ..................34

    2.      No Tortious Act ........................................................35

    3.      No Causation ..........................................................36

F.      Mohammed Jabar Fakihi ..................................................36

    1.      No Action Within Scope of Employment or Agency ..................36

    2.      No Tortious Act ........................................................37

    3.      No Causation ..........................................................37

G.      Omar Abdi Mohamed .....................................................37

    1.      No Action Within Scope of Employment or Agency ..................37

    2.      No Tortious Act ........................................................38

    3.      No Causation ..........................................................39

III.  Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on
      the Acts of Any Charity ......................................................39

A.      The Charities Are Not "Al Qaeda Fronts"................................40

B.      The Charities Are Not Alter Egos of Saudi Arabia ...................41

    1.      Kohlmann's Allegations Are Recycled, Unreliable,
            and Immaterial ........................................................42

    2.      Plaintiffs' General Allegations About the Charities
            Are Unsupported and Insufficient....................................44

        a.      Official Leadership ..........................................44

        b.      Funding ......................................................45

        c.      Work Plans....................................................45

        d.      Diplomatic Status............................................45

        e.      Opening and Closing Offices.................................45

3.      Plaintiffs' Allegations About Particular Charities
Also Fail .................................................................................45

a.      MWL and IIRO.........................................................45

b.      WAMY ......................................................................47

c.      Al Haramain ..............................................................47

d.      Other Charities .........................................................48

C.      The Charities Are Not Agents of Saudi Arabia ...............................48

D.      The Charities Are Not an Integral Part of the Government
of Saudi Arabia ...............................................................................50

E.      Plaintiffs Can Neither Plead nor Prove Any Tortious Act by
Unnamed Officials or the Ministry of Islamic Affairs..................51

F.      No Act of Any of the Charities Caused the 9/11 Attacks ...............53

IV.     Jurisdictional Discovery Is Not Warranted.................................................54

A.      Plaintiffs Have No Prima Facie Case............................................56

B.      There Is No Basis To Expect That Discovery Will Help
Plaintiffs Prove an Exception To Immunity ...................................59

C.      Plaintiffs' Discovery Proposals Are Neither Necessary
nor Appropriate ..............................................................................61

D.      No Evidentiary Hearing Is Warranted ...........................................64

V.      Constitutional Limits on Congress's Power Provide Additional
Reasons To Dismiss.....................................................................................64

CONCLUSION ..............................................................................................................65

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*1964 Realty LLC v. Consulate of Qatar*, No. 14 Civ. 6429 (ER),
2015 WL 5197327 (S.D.N.Y. Sept. 4, 2015).....................................................57

*Alleghany Corp. v. James Found. of New York, Inc.*, 115 F. Supp. 282
(S.D.N.Y. 1953), *aff'd*, 214 F.2d 446 (2d Cir. 1954)........................................26

*Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401
(S.D.N.Y. 2016)....................................................................................................30

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171
(2d Cir. 2010)..................................................................................................13, 14

*Applegate v. Top Assocs., Inc.*, 425 F.2d 92 (2d Cir. 1970) ....................................20

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003).........................................................58

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016)...............2, 5, 6, 13, 33,
55, 56, 59, 62, 63, 64

*Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528 (5th Cir. 1992).........................7, 49

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).....................................................................36

*Ashwander v. TVA*, 297 U.S. 288 (1936)...................................................................64

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289 (S.D.N.Y. 1987).....................14

*Barapind v. Government of Republic of India*, 844 F.3d 824 (9th Cir. 2016).............................14

*Barfield v. Orange Cty.*, 911 F.2d 644, 649 (11th Cir. 1990).........................................15

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) .................................................16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).........................................12, 35, 37

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72 (2d Cir. 2013)...........................13

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008).........................11, 12

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
137 S. Ct. 1312 (2017)..............................................................2, 11, 12, 58

*Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008) .................................................59

*BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677 (8th Cir. 2002)..........................................7

*Breard v. Greene*, 523 U.S. 371 (1998) ..............................................................8

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ...............................................................29

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ...........................16

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003) ...................11, 12, 54

*Burrage v. United States*, 134 S. Ct. 881 (2014) ...............................9, 10, 11

*Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 974 F. Supp. 2d 264
    (S.D.N.Y. 2013), *aff'd sub nom. Byrd v. Republic of Honduras*, 613 F.
    App'x 31 (2d Cir. 2015)...............................................................44

*Cabiri v. Government of Republic of Ghana*, 165 F.3d 193 (2d Cir. 1999) ................................13

*Cargill Int'l, S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993)....................................13

*Chadwick v. Arabian Am. Oil Co.*, 656 F. Supp. 857 (D. Del. 1987)...........................................5

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673
    (S.D.N.Y. 2011) ...............................................................19

*City of New York v. Pullman Inc.*, 662 F.2d 910 (2d Cir. 1981)...................................................18

*Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela*,
    556 F. Supp. 2d 272 (S.D.N.Y. 2008), *aff'd*, 341 F. App'x 722
    (2d Cir. 2009).............................................................59, 61

*Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277 (N.Y. 1993) .........................................5

*Crist v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998)..........................................59

*De Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013) ..............................14

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011)........................................57, 65

*Drexel Burnham Lambert Grp. Inc. v. Committee of Receivers for Galadari*,
    12 F.3d 317 (2d Cir. 1993).........................................................13

*Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2 Cir. 2007 ....................................................57

*EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78 (2d Cir. 2015),
    *cert. dismissed*, 136 S. Ct. 1731 (2016) ...........................5, 6, 42, 45

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ................................55, 61, 62, 63

*Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029 (S.D.N.Y. 1980) .............................................7

*Fields v. Sanders*, 29 Cal. 2d 834 (1947)......................................................................4

*Filetech S.A. v. France Telecom S.A.*:

    157 F.3d 922 (2d Cir. 1998)...................................................................14, 64

    304 F.3d 180 (2d Cir. 2002)...............................................................................57

*Filus v. LOT Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) .......................................56

*First City, Texas – Houston, S.A. v. Rafidain Bank*, 150 F.3d 172 (2d Cir. 1998)................57, 61

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611
    (1983)......................................................................................................5, 6, 7,
                                          8, 42, 46, 48

*Freund v. Republic of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008), *aff'd sub
    nom. Société Nationales des Chemins de fer Français*, 391 F. App'x 939
    (2d Cir. 2010)...................................................................................................59

*Funk v. Belneftekhim*, 861 F.3d 354 (2d Cir. 2017)......................................................57

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) ...........................................50

*GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377
    (2d Cir. 2006).....................................................................................................5

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ....................................................8

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007).................................................58

*Hayden v. Feldman*, 753 F. Supp. 116 (S.D.N.Y. 1990) .............................................41

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................37

*Holmes v. Securities Inv'r Prot. Corp.*, 503 U.S. 258 (1992).........................................9

*International Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251
    (S.D.N.Y. 1995), *aff'd*, No. 99-7644, 1999 WL 1314724 (2d Cir.
    Dec. 29, 1999)....................................................................................................7

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600
    (RLC), 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005), *aff'd sub nom.
    ITIS Holdings Inc. v. Southridge Capital Mgmt., LLC*, 329 F. App'x 299
    (2d Cir. 2009)...................................................................................................21

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001) ...............................27

*Kamen v. AT&T Co.*, 791 F.2d 1006 (2d Cir. 1986)..............................................21, 57

*Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727 (S.D.N.Y. 1986)...............................................6

*Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007) .........................................13

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009)...........................................58

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
  (D.C. Cir. 2004) ...............................................................................11, 12

*Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463 (S.D.N.Y. 2017) ...........................57

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016),
  *cert. denied*, 137 S. Ct. 1332 (2017).................................................................44

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), *appeals pending*,
  Nos. 16-2119 & 16-2134 (2d Cir.).................................................................12

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358 (Cal. 1995)............................5

*Lloyd v. American Exp. Lines, Inc.*, 580 F.2d 1179 (3d Cir. 1978) ...............................15

*LNC Invs., Inc. v. Republic of Nicaragua*, No. 96 Civ. 6360 JFK RLE,
  1997 WL 729106 (S.D.N.Y. Nov. 21, 1997)..................................................63

*London v. Polishook*, 189 F.3d 196 (2d Cir. 1999) ...............................................57

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014)...................14

*Manchester Equip. Co. v. American Way & Moving Co.*, 60 F. Supp. 2d 3
  (E.D.N.Y. 1999)..........................................................................................7

*Maqaleh v. Hagel*, 738 F.3d 312 (D.C. Cir. 2013), *vacated sub nom. Al-Najar v.
  Carter*, 135 S. Ct. 1581 (2015) .................................................................54, 59

*Mateo v. Perez*, No. 98 Civ. 7426 (SAS), 1999 WL 216651 (S.D.N.Y. Apr. 13, 1999)...............57

*Minpeco, S.A. v. Hunt*, 686 F. Supp. 427 (S.D.N.Y. 1988) .......................................7

*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y.
  2017), *aff'd*, No. 17-1157, 2017 WL 6463128 (2d Cir. Dec. 19, 2017)....................17, 62

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994)..................................58

*Mukaddam v. Permanent Mission of Saudi Arabia*, 136 F. Supp. 2d 257
  (S.D.N.Y. 2001).....................................................................................57, 58

*Nelson v. American-West African Line*, 86 F.2d 730 (2d Cir. 1936).............................58

*NFIB v. Sebelius*, 567 U.S. 519 (2012)...............................................................6

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ............................................19

*NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ 7013(TPG),
    2011 WL 524433 (S.D.N.Y. Feb. 15, 2011).....................................................45

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ.0613 GBD,
    2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ....................................................50

*OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015) ..........................................7

*Owens v. Republic of Sudan*:

    531 F.3d 884 (D.C. Cir. 2008)......................................................10, 12

    864 F.3d 751 (D.C. Cir. 2017)............................................................10

*Paroline v. United States*, 134 S. Ct. 1710 (2014).......................................................10

*Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2d Cir. 1991) ............................................18

*Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962 (1986).......................................58

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)...........................14

*Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192 (D.C. Cir. 2004) .................14

*Reiss v. Société Centrale du Groupe des Assurances Nationales*, 235 F.3d 738
    (2d Cir. 2000)...................................................................................57

*Rezulin Prods. Liab. Litig., In re*, 369 F. Supp. 2d 398 (S.D.N.Y. 2005) ....................................30

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001)....................................13, 26

*Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131 (2d Cir. 2012) .................................13

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..........................................10, 11, 39

*Rubin v. Islamic Republic of Iran*, 830 F.3d 470 (7th Cir. 2016), *cert. granted in
    part*, 137 S. Ct. 2326 (2017) ...................................................................6

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) ........................................10, 12

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)........................................................13-14

*Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88
    (2d Cir. 2013)...................................................................................14

*Smith v. Isuzu Motors Ltd.*, 137 F.3d 859 (5th Cir. 1998) ...........................................18

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217
(S.D.N.Y. 2003), *amended*, No. 01 Civ. 10132(HB), 2003 WL 23324214
(S.D.N.Y. May 19, 2003).....................................................................................10

*Sokolow v. PLO*, 60 F. Supp. 3d 509 (S.D.N.Y. 2014)...........................................12, 58

*South African Apartheid Litig.*, *In re*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009) ................7

*Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002).................................8

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832
(S.D.N.Y. 1988) ....................................................................................................41

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556 (2d Cir. 2011) ..........28

*Terrorist Attacks on September 11, 2001*, *In re*:

    714 F.3d 118 (2d Cir. 2013) ("*Terrorist Attacks VI*"), *cert. denied*,
    134 S. Ct. 2870 (2014).................................................................................10, 11

    714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VII*"), *cert. denied*,
    134 S. Ct. 2870 (2014).......................................................................................34

    741 F.3d 353 (2d Cir. 2013) ("*Terrorist Attacks VIII*"), *cert. denied*,
    134 S. Ct. 2875 (2014).................................................................................64, 65

    134 F. Supp. 3d 774 (S.D.N.Y. 2015) ("*Terrorist Attacks IX*"), *vacated*
    *and remanded*, No. 15-3426-cv(L), ECF No. 287 (2d Cir. Feb. 7, 2017)........3, 12, 20, 23,
                                                31, 32, 33, 34,
                                       42, 54, 55, 56, 61, 62

*Theobald v. Botein, Hays, Sklar & Herzberg*, 493 F. Supp. 1 (S.D.N.Y. 1979) ..........15

*Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843
(D.C. Cir. 2000) ......................................................................................................7

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) .............................54

*Ugarte v. Johnson*, 40 F. Supp. 2d 178 (S.D.N.Y. 1999) .............................................21

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)............................................19

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992) ....................................................27

*United States v. International Bhd. of Teamsters*, 141 F.3d 405 (2d Cir. 1998) ..........52

*United States v. Mohamed*, 203 F. App'x 879 (9th Cir. 2006)....................................39

*United States v. Royal Caribbean Cruises Ltd.*, 11 F. Supp. 2d 1358 (S.D. Fla. 1998)......................................................................................61

*University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) ...........................................9

*Valentin v. Hospital Bella Vista*, 254 F.3d 358 (1st Cir. 2001) ....................................................14

*Vera v. Republic of Cuba*, 867 F.3d 310 (2d Cir. 2017)...............................................2, 12, 13, 33

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002) .................13, 14

*Williams v. Illinois*, 567 U.S. 50 (2012) ......................................................................................19

*Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486 (S.D.N.Y. 2014) ...............................................63

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. III ...............................................................................................................3, 64, 65

Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521 (1992)..........................................................................................................................8, 53

Dictionary Act, 1 U.S.C. § 1 ............................................................................................................8

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) .................................. *passim*

    28 U.S.C. § 1605(a)(5)..........................................................................................................3

    28 U.S.C. § 1605(a)(7)........................................................................................................10

    28 U.S.C. § 1605A ..............................................................................................................10

    28 U.S.C. § 1605A(a)(2)(A)(i)(I) .......................................................................................13

    28 U.S.C. § 1610(g)(1) .........................................................................................................6

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B)....................................... *passim*

    28 U.S.C. § 1605B .................................................................................................................8

    28 U.S.C. § 1605B(b) ...........................................................................................3, 9, 11, 53

    28 U.S.C. § 1605B(b)(2).......................................................................................................9

    28 U.S.C. § 1605B(c).............................................................................................................8

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* .........................54

18 U.S.C. § 1001 ...................................................................................................60

18 U.S.C. § 2259(b)(3)(F) ......................................................................................10

18 U.S.C. § 2333 .....................................................................................................8

18 U.S.C. § 2333(d) .................................................................................................8

18 U.S.C. § 2333(d)(1) .............................................................................................8

18 U.S.C. § 2333(d)(2) .............................................................................................8

42 U.S.C. § 1985 .....................................................................................................8

Fed. R. Civ. P.:

    Rule 12(b)(1)................................................................................................21, 58

    Rule 12(b)(6)....................................................................................................14

    Rule 30(b)(6)....................................................................................................62

Fed. R. Evid.:

    Rule 602..........................................................................................................20, 22

    Rule 803..........................................................................................................22

    Rule 803(6)......................................................................................................18

    Rule 803(8)......................................................................................................15

    Rule 803(8)(A)(iii)...........................................................................................15, 18

    Rule 803 advisory committee's note.................................................................18

    Rule 901..........................................................................................................22

    Rule 902..........................................................................................................22

## LEGISLATIVE MATERIALS

162 Cong. Rec. S2845 (daily ed. May 17, 2016)........................................................10

## OTHER MATERIALS

9/11 Review Commission, *The FBI:  Protecting the Homeland in the 21st Century* (Mar. 2015), https://www.fbi.gov/news/pressrel/press-releases/the-fbi-releases-final-report-of-the-9-11-review-commission ............................15, 16, 18, 22, 28, 31, 32

Aff. of Zacarias Moussaoui, *United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va.), attached to Def.'s Mot. To Withdraw Guilty Plea, ECF No. 1857 (filed May 8, 2006) ...........................................................................53

Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. filed May 29, 2009), 2009 WL 1539068, https://www.justice.gov/sites/default/files/osg/briefs/2008/01/01/2008-0640.pet.ami.inv.pdf ...........................................................................................7

Council of Senior Ulema, Resolution 239 (Apr. 2010), *available at* https://www.saudiembassy.net/fact-sheets/council-senior-ulema-fatwa-terror-financing ....................................................................................................24

Natana J. DeLong-Bas, *Wahhabi Islam:  From Revival and Reform to Global Jihad* (2007) ...................................................................................................27

Enclosure to Letter from Robert S. Mueller, Director, FBI, and Porter J. Goss, Director, CIA, to Sen. Pat Roberts, Chairman, Select Committee on Intelligence, United States Senate (Sept. 1, 2005), https://www.dni.gov/files/documents/Newsroom/Executive_Summary_of_Joint_FBI-CIA_Report_on_Extent_of_Saudi_Government_Support_for_Terrorism.pdf ...................30, 33

Final Opening Br. for Defendants-Appellants 24-45, *Owens v. Republic of Sudan*, Nos. 14-5105 et al. (D.C. Cir. filed Aug. 19, 2016), 2016 WL 4415033 .........................10

National Archives, https://www.archives.gov/research/9-11/commission-memoranda.html ........................................................................................59

National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report:  Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://www.9-11commission.gov/report/911Report.pdf....................................................12, 15, 16, 17, 22, 24, 25, 28, 29, 32, 33, 34, 35, 53, 54, 60

Restatement (Second) of Agency (1958)....................................................26, 48, 49, 50

Restatement (Third) of Agency (2006)....................................................................4, 49

John Roth et al., National Commission on Terrorist Attacks Upon the United
   States, *Monograph on Terrorist Financing:  Staff Report to the
   Commission* (2004), https://www.9-11commission.gov/staff_statements/
   911_TerrFin_Monograph.pdf ...................................................................................41, 51

Second Am. Consol. Master Compl., *Ashton v. Al Qaeda Islamic Army*,
   No. 02-cv-6977, ECF No. 38 (S.D.N.Y. filed Aug. 13, 2003) ..........................................55

Statement by the Office of the Director of National Intelligence on the
   Declassification of Part Four of the Senate Select Committee on
   Intelligence and House Permanent Select Committee on Intelligence's
   2002 Report on the Committees' Joint Inquiry into Intelligence Community
   Activities Before and After the Terrorist Attacks of September 11, 2001
   (July 15, 2016), https://www.dni.gov/index.php/newsroom/congressional-
   testimonies/congressional-testimonies-2016/item/1612-statement-by-the-
   odni-on-the-declassification-of-part-four-of-the-ssci-and-hpsci-s-2002-
   report-on-the-committees-joint-inquiry-into-intelligence-community-
   activities-before-and-after-the-terrorist-attacks-of-september-11-2001 ...............17, 33, 39

United Nations, *International Instruments Related to the Prevention and
   Suppression of International Terrorism* (2d ed. 2004):

   Convention of the Organisation of the Islamic Conference on Combating
   International Terrorism (adopted July 1, 1999) ...................................................................21

   The Arab Convention on the Suppression of Terrorism Preamble (in force
   May 7, 1999)..........................................................................................................................24

U.S. Dep't of Justice, *United States Transfers 12 Guantanamo Bay Detainees to
   Afghanistan, Yemen and the Somaliland Region* (Dec. 20, 2009),
   https://www.justice.gov/opa/pr/united-states-transfers-12-guantanamo-
   bay-detainees-afghanistan-yemen-and-somaliland-region ......................................... 38-39

U.S. Dep't of State, *Patterns of Global Terrorism:  1999* (Apr. 2000), http://oai.
   dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=
   ADA467069 ..........................................................................................................................24

Frank E. Vogel*, Islamic Law and Legal System:  Studies of Saudi Arabia* (2000) ......................24

## INTRODUCTION

It is now clear that the Justice Against Sponsors of Terrorism Act ("JASTA") does not affect the result in this case. Like every other development that Plaintiffs have trumpeted in the past – such as the jailhouse testimony of Zacarias Moussaoui that they now barely mention, or the so-called "28 pages" that, once declassified, turned out to be nothing more than uninvestigated speculation – their arguments based on JASTA are a façade to cover their lack of any plausible allegation or competent evidence of any tortious act by Saudi Arabia that caused the 9/11 attacks. Because JASTA does not change the need for such allegations and evidence, it does not help Plaintiffs establish jurisdiction here.

JASTA did give Plaintiffs the benefit of a new exception under the Foreign Sovereign Immunities Act of 1976 ("FSIA") that does not incorporate the entire-tort rule. Accordingly, Plaintiffs might have used the remand occasioned by JASTA to refocus their case on allegations of tortious acts occurring outside the United States, if any such acts had occurred. Yet the Plaintiffs joining in the Consolidated Amended Complaint (the "CAC Plaintiffs") have not done so. Instead, they have largely taken the same allegations that this Court previously rejected – claims that Saudi citizen Omar Al Bayoumi was a covert agent and that he and various associates knowingly helped the 9/11 hijackers – and recycled them in the form of purported expert reports by former FBI agents. Those purported experts are free to disagree with the FBI's conclusion (as well as the conclusions of the 9/11 Commission and the later 9/11 Review Commission) that there was no evidence that Al Bayoumi and others knowingly aided the 9/11 plot. But a mere statement of disagreement is not itself evidence.

Similarly, with respect to the governmental and nongovernmental Islamic charities that Plaintiffs assert funded terrorism, the CAC Plaintiffs largely take the same allegations that they presented previously in an affirmation from their expert Evan Kohlmann and repeat them at

- 1 -

greater length.  Although they claim to have added new points based on discovery from the charities, those claims do not stand up to scrutiny.  This Court has already found that Kohlmann's opinion could not establish that the charities were alter egos of Saudi Arabia, and the CAC Plaintiffs have added nothing that could make a difference.  Their additional assertions that the charities were common-law agents of Saudi Arabia founder for lack of any evidence to establish an agency relationship.

The result should be no different as to the Plaintiffs joining in the two *Ashton* complaints (the "*Ashton* Plaintiffs") – whose claims are (if possible) even less substantial than those of the CAC Plaintiffs.  The purported evidence that they present is embodied in a facially improper affidavit signed by their own two attorneys that mischaracterizes the exhibits it summarizes.  The *Ashton* Plaintiffs have come forward with neither legal nor factual support for their case – much less for their baseless demands for sweeping and intrusive discovery from a foreign sovereign.

Congress, in JASTA, gave Plaintiffs another chance to make their case free from two legal rules Plaintiffs claimed had impeded them:  the entire-tort rule and the discretionary-function exception.  But Congress did not license Plaintiffs to proceed against Saudi Arabia without plausible allegations and competent evidence to support their case.  Indeed, JASTA does not address pleading or evidentiary requirements at all.  And recent judicial decisions applying the FSIA – including *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312 (2017), *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016), and *Vera v. Republic of Cuba*, 867 F.3d 310 (2d Cir. 2017) – reaffirm that courts should give careful scrutiny to allegations and evidence before exercising jurisdiction over an action against a foreign sovereign.  Plaintiffs' claims cannot withstand that scrutiny, and so should once again be dismissed.

## ARGUMENT

I.      **Plaintiffs Must Allege and Come Forward with Evidence of a Tortious Act Within the Scope of Office, Employment, or Agency That Caused the 9/11 Attacks**

JASTA's new exception to FSIA immunity requires Plaintiffs to allege and come forward with evidence of an "act or acts" (1) by an "official, employee, or agent" of Saudi Arabia, "while acting within the scope of his or her office, employment, or agency"; (2) that was a "tort[]"; and (3) that "caused" the 9/11 attacks.  28 U.S.C. § 1605B(b); *see* KSA Mem. 10-18, ECF No. 3668. Plaintiffs have little to say about that clear language.  The CAC Plaintiffs rely on floor statements to argue that legislators who support their cause intended this litigation to proceed. CAC Mem. 1, 4 & n.3, 7 & n.6, 11, 17, 18, ECF No. 3782.  But Congress did not pass (and Article III would not permit, *see infra* Part V) a bill directing the resolution of this motion. Instead, as Plaintiffs ultimately concede, Congress "le[ft] for judicial determination whether JASTA's elements are satisfied."  CAC Mem. 75.  This Court should rule that they are not.

### A.      JASTA Requires an Act by an Official, Employee, or Agent Within the Scope of Office, Employment, or Agency

This Court has already applied to this case the non-commercial-tort exception's requirement of an act "within the scope of . . . office or employment," 28 U.S.C. § 1605(a)(5), concluding that Plaintiffs did "not allege sufficient facts for this Court to conclude that the individuals who allegedly carried out tortious acts in the United States were employees of Defendants acting within the scope of their employment," *Terrorist Attacks IX*, 134 F. Supp. 3d at 784.[1]  JASTA's version of that standard adds the word "agent" and covers acts within the "scope of . . . agency."  28 U.S.C. § 1605B(b).  That addition does not change the outcome here.

---

[1] Short-form citations for earlier opinions in the *Terrorist Attacks* litigation are defined in Saudi Arabia's opening memorandum and listed in the Table of Authorities.

### 1. Plaintiffs Fail To Show That JASTA Changes the Outcome as to the Purported Individual Employees or Agents

With respect to the individuals such as Al Bayoumi and Al Thumairy, Plaintiffs admit (correctly) that JASTA incorporates common-law agency principles, CAC Mem. 11 (citing Restatement (Third) of Agency (2006)), but make no attempt to show that this case involves any non-employee agency relationship.[2]  Instead, they rely on California cases about employer liability, which they assert applies to an employee's wrongful act "even if it is intentional and done with malice and breaches explicit rules set by the employer." *Id.* at 12.  That argument (which has nothing to do with JASTA) does not help Plaintiffs for three reasons.

*First*, the fundamental defect in Plaintiffs' allegations is not merely that Saudi Arabia is a longstanding ally of the United States that has long prohibited support for Al Qaeda (true though that is).  Instead, Plaintiffs' case fails because they have failed to allege properly or to produce evidence that Al Bayoumi, Al Thumairy, or any other relevant individual was "'occupying himself with [Saudi Arabia's] business within the scope of [any] employment,'" *id.* (quoting *Fields v. Sanders*, 29 Cal. 2d 834, 839 (1947)), at the time of any allegedly tortious acts.  That failure is fatal to any theory of vicarious liability under any State's law.

*Second*, the rule that an employer is not liable for an employee's personally motivated outrageous conduct or unauthorized criminal acts, *see* KSA Mem. 11-12 & n.16 (citing New York law and the Restatement (Third)), provides an additional reason to reject Plaintiffs' attempt to hold Saudi Arabia liable for its purported employees' purported assistance to terrorists.  Nor is California law different in any way that matters.  California employers are liable for intentional employee torts only where the "tort [is] engendered by or arise[s] from the work," so that "[t]he

---

[2] The *Ashton* Plaintiffs rely wholly on the scope-of-employment test under New York and California law, with no separate agency argument.  *See Ashton* Mem. 11-16, ECF No. 3781.

employment . . . [is] such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 362 (Cal. 1995). Plaintiffs make no attempt to show that they can meet that test.

*Third*, even if there were a material conflict between New York and California about employer liability, New York law would control at least for present purposes. New York has a stronger interest in allocating liability for the 9/11 attacks because Plaintiffs are (mostly) domiciled in New York and no relevant party is domiciled in California. *See GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384-85 (2d Cir. 2006) (New York looks to domiciles of parties for loss-allocation rules); *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993) (vicarious liability is a loss-allocation rule). The alternative to New York law thus would be not California law, but Saudi Arabia's own law (the domicile of the defendant). Plaintiffs do not contend they can prevail under Saudi Arabian law.[3]

### 2. Plaintiffs Fail To Show That JASTA Changes the Outcome as to the Governmental and Nongovernmental Charities

Plaintiffs err in contending that JASTA's use of the term "agent" enables them to attribute the actions of governmental (or even nongovernmental) charities to Saudi Arabia without carrying their heavy burden under *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), to establish that the charities were alter egos of Saudi Arabia. *Bancec* already incorporates agency principles: its test for alter-ego status considers whether "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *Id.* at 629; *see also, e.g., Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016); *EM Ltd. v. Banco Central de la República*

---

[3] *See Chadwick v. Arabian Am. Oil Co.*, 656 F. Supp. 857, 861 (D. Del. 1987) ("Under Saudi Arabian law, vicarious liability is not recognized unless it is proven that an actor's free will is obliterated by the person directing the actor to act.").

*Argentina*, 800 F.3d 78, 90 (2d Cir. 2015), *cert. dismissed*, 136 S. Ct. 1731 (2016).  Because

Plaintiffs cannot show day-to-day control under *Bancec*, they cannot attribute the charities'

purported actions to Saudi Arabia based on agency.  *See* KSA Mem. 49-58; *infra* Part III.B.

Plaintiffs point to nothing in JASTA's text or history that suggests Congress intended to

make an exception to the "'*Bancec* presumption'" that "government instrumentalities established

as juridical entities distinct and independent from their sovereign should normally be treated as

such."  *Arch Trading*, 839 F.3d at 201.[4]  Further, the FSIA read as a whole shows that Congress

speaks clearly when it means to make an exception to *Bancec*, as it has done with respect to

judgments against designated state sponsors of terrorism.  *See* 28 U.S.C. § 1610(g)(1)

(permitting execution "regardless" of "the level of economic control" and other factors relevant

to *Bancec*); *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 473 (7th Cir. 2016) (observing that

§ 1610(g) "partially abrogates" *Bancec*), *cert. granted in part on other grounds*, 137 S. Ct. 2326

(2017).  JASTA includes no similar provision.  *See, e.g., NFIB v. Sebelius*, 567 U.S. 519, 544

(2012) ("Where Congress uses certain language in one part of a statute and different language in

another, it is generally presumed that Congress acts intentionally.").

Further weighing against Plaintiffs is persuasive authority declaring that "[t]he test for

determining whether a corporation is acting as an agent for a related corporation is the same as

the test imposed under the doctrine of piercing the corporate veil."  *Kashfi v. Phibro-Salomon,

Inc.*, 628 F. Supp. 727, 735 (S.D.N.Y. 1986) (explaining that this rule avoids "undermin[ing] the

strong policy . . . concerning the presumption of separateness and respecting the corporate

---

[4] Plaintiffs attempt to distinguish *Arch Trading* and *EM Ltd.* because neither interpreted JASTA or "consider[ed] the question whether the alter-ego framework is the *only* means by which the tortious acts of an entity can be attributed to a foreign sovereign."  CAC Mem. 16.  But those cases defined the showing necessary to establish "a relationship of principal and agent" between a state and an instrumentality.  *Arch Trading*, 839 F.3d at 201; *EM Ltd.*, 800 F.3d at 90.  They are thus highly relevant to whether Plaintiffs can show such a relationship here.

entity").[5]  There is thus ample precedent for rejecting Plaintiffs' attempt to revive their failed alter-ego claims in the guise of a principal-agent theory.

Plaintiffs cannot avoid that result by urging that *Bancec* applies only to allegations that an agency or instrumentality "operated as components of [a foreign sovereign] for all purposes," while their allegations (they assert) are only that the charities were Saudi Arabia's agents "for the discrete purposes of supporting anti-Western and jihadi activities."  CAC Mem. 15-16.  Even if that distinction were tenable as a matter of law (which it is not),[6] and even if Plaintiffs could show that the charities "support[ed] anti-Western and jihadi activities" (which they have not done), they have neither pleaded nor come forward with evidence of Saudi Arabia authorizing the charities to do so on its behalf.  Instead, the allegations on which they seek to premise agency status concern generic characteristics of the charities such as politically appointed leadership,

---

[5] *Accord Manchester Equip. Co. v. American Way & Moving Co.*, 60 F. Supp. 2d 3, 7 (E.D.N.Y. 1999) (following *Kashfi*); *International Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1256 (S.D.N.Y. 1995) (same), *aff'd*, No. 99-7644, 1999 WL 1314724 (2d Cir. Dec. 29, 1999) (judgment noted at 201 F.3d 431); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 431 n.4 (S.D.N.Y. 1988) (same); *Fidenas AG v. Honeywell Inc.*, 501 F. Supp. 1029, 1037 (S.D.N.Y. 1980) ("The tests for finding agency so as to hold a parent corporation liable for the obligations of its subsidiary . . . are virtually the same as those for piercing the corporate veil."); *but see In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 270-76 (S.D.N.Y. 2009).

[6] The cases on which Plaintiffs rely are irrelevant or cut against their position.  *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000) (rejecting agency allegations that did not establish "'day-to-day' involvement in the affairs" of the purported agent); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 536 (5th Cir. 1992) (rejecting a "broad but vague attribution theory" because U.S. courts "would not allow such generalized conspiratorial allegations against an American government entity to provoke massive discovery"); *see also BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677 (8th Cir. 2002) (no discussion or analysis of *Bancec*).  As for their attempt to rely on the views of the United States concerning pre-JASTA law in *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015) (No. 13-1067), the United States long ago made clear that Plaintiffs had "an insufficient basis for deeming the acts of the charities to be those of Saudi Arabia," Br. for the United States as Amicus Curiae 17 n.4, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. filed May 29, 2009) (emphasizing "the law's respect for corporate personality"), 2009 WL 1539068.

government funding, and general government supervision.  *See infra* Part III.C.  If that were enough to establish a principal-agent relationship, *Bancec* would be a dead letter.

### 3.   Secondary Liability Under JASTA Does Not Apply to Foreign Sovereigns and Does Not Apply Here

Plaintiffs err in contending that JASTA's secondary-liability provision, codified at 18 U.S.C. § 2333(d), permits them to satisfy § 1605B's requirements by attributing to Saudi Arabia the actions of others (such as "the hijackers") not alleged to be officials, employees, or agents. JASTA does not extend secondary liability to foreign sovereigns.  JASTA authorizes Antiterrorism Act ("ATA") suits against sovereigns only "in accordance with [18 U.S.C. §] 2333."  28 U.S.C. § 1605B(c).  Section 2333 creates aiding-and-abetting liability only for a "*person* who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism."  18 U.S.C. § 2333(d)(2) (emphasis added).  To define "person," § 2333(d)(1) refers to 1 U.S.C. § 1, the Dictionary Act, under which "'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  It does not include sovereigns (foreign or otherwise).  *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1307 (D.C. Cir. 2002) (relying on the Dictionary Act to hold a foreign sovereign is not a "person" under 42 U.S.C. § 1985); *see also Breard v. Greene*, 523 U.S. 371, 378 (1998) (per curiam) (a foreign sovereign is not a "'person' as that term is used in [42 U.S.C.] § 1983").

Whether or not secondary liability is legally available, Plaintiffs have not pleaded facts or come forward with evidence to support such liability here.  Aiding and abetting requires an act that "knowingly and substantially assist[s] the principal violation"; conspiracy requires an "overt act . . . pursuant to and in furtherance of [a] common scheme."  *Halberstam v. Welch*, 705 F.2d 472, 477, 478 (D.C. Cir. 1983).  For secondary liability to satisfy JASTA's elements, those

liability-triggering acts would have to be performed by Saudi Arabia through someone "acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605B(b)(2).  As set forth in Parts II and III, Plaintiffs have shown nothing of the kind.

### B.  JASTA Requires That the Official's, Employee's, or Agent's Act Be Tortious

To establish a "tortious" act, 28 U.S.C. § 1605B(b)(2), Plaintiffs must show that Saudi Arabia, through an official, employee, or agent, materially supported terrorists or a terrorist organization with knowledge of or deliberate indifference to the commission of terrorist acts. KSA Mem. 12-14.  Plaintiffs do not argue otherwise.  *See* CAC Mem. 9-10; *Ashton* Mem. 11.

### C.  JASTA Requires That the Official's, Employee's, or Agent's Tortious Act Have Caused Plaintiffs' Injuries

Because JASTA requires that the injuries for which relief is sought be "caused by" the foreign state's tortious act, 28 U.S.C. § 1605B(b), Plaintiffs must show both but-for and traditional proximate causation.  KSA Mem. 14-18.  Their arguments for a looser test fall short.

### 1.  JASTA Requires But-For Causation

To say that an injury is "caused by" an act means, in ordinary language, that but for the act the injury would not have occurred.  Supreme Court cases running from *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), to *Burrage v. United States*, 134 S. Ct. 881 (2014), identify as "one of the traditional background principles 'against which Congress legislate[s]' " that statutory language whose ordinary meaning refers to causation "imposes a requirement of but-for causation."  *Id.* at 889 (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013)) (alteration in original); *see* KSA Mem. 14-15.  The CAC Plaintiffs ignore those cases and make no attempt to show how the controlling words of JASTA ("caused by") can be distinguished from those construed in *Burrage* ("results from"), *Nassar* ("because"), or similar cases.  The *Ashton* Plaintiffs merely argue that those cases did not involve

JASTA or terrorism.[7]   But the Supreme Court's reasoning that a "but-for requirement is part of the common understanding of cause," *Burrage*, 134 S. Ct. at 888, means that courts should give ordinary causal language the same meaning in a broad variety of statutory contexts.  *Rothstein v. UBS AG*, 708 F.3d 82, 94-97 (2d Cir. 2013), and *Terrorist Attacks VI*, 714 F.3d at 125, confirm that ordinary principles of causation apply in terrorism cases.  KSA Mem. 15.[8]

The CAC Plaintiffs err in contending that the Court should look not to JASTA's text but to a legislative floor statement citing D.C. Circuit cases interpreting 28 U.S.C. § 1605(a)(7), the predecessor to current § 1605A.  CAC Mem. 18 (citing 162 Cong. Rec. S2845 (daily ed. May 17, 2016)).  Plaintiffs offer no meaningful response to Saudi Arabia's showing that the text of the statute is clear, the legislative history is ambiguous, legislative floor statements deserve little weight, and the cases cited in the statement do not help Plaintiffs.  KSA Mem. 17-18 & n.21.[9]

---

[7] The *Ashton* Plaintiffs also cite *Paroline v. United States*, 134 S. Ct. 1710 (2014), which construed the phrase "as a proximate result of the offense" in 18 U.S.C. § 2259(b)(3)(F) to permit discretionary restitution awards in child pornography cases proportionate to the harm attributable to an individual defendant.  *See* 134 S. Ct. at 1726-29.  But *Paroline* rejected the permissive causation approach that Plaintiffs advocate.  *See id.* at 1724, 1725 (cautioning against "adopt[ing] aggregate causation logic in an incautious manner" to lump together "the conduct of thousands of geographically and temporally distant offenders acting independently").

[8] Plaintiffs overreach in claiming this Court adopted their view of causation in entering default judgment against Iran.  CAC Mem. 19 (citing ECF No. 2515).  That order was "in the context of [a] default judgment[] which lack[ed] 'the benefit of the adversarial process.'"  *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 227 (S.D.N.Y. 2003), *amended on other grounds*, No. 01 Civ. 10132(HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003).  Nothing bars this Court from considering Saudi Arabia's arguments now.

[9] The CAC Plaintiffs now concede that *Owens v. Republic of Sudan*, 531 F.3d 884, 894 (D.C. Cir. 2008), "found it unnecessary to decide" whether "the FSIA imposes 'but-for' causation," but claim that a later decision – not cited in the legislative history – did so.  CAC Mem. 19 n.13 (citing *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)).  The later *Owens* opinion does not address whether § 1605A requires but-for causation, and it does not appear the issue was raised on appeal.  *See* Final Opening Br. for Defendants-Appellants 24-45, *Owens v. Republic of Sudan*, Nos. 14-5105 et al. (D.C. Cir. filed Aug. 19, 2016), 2016 WL 4415033.  Accordingly, the D.C. Circuit has never considered whether the ordinary-meaning approach to statutory causal language adopted by *Burrage* and similar cases should apply to the FSIA.  As for *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006), that case merely followed

- 10 -

## 2.     JASTA Requires Traditional Proximate Cause

Neither the CAC Plaintiffs nor the *Ashton* Plaintiffs dispute that JASTA requires proximate cause.  Nor does either point to anything in JASTA that suggests this Court should depart from the traditional proximate-cause analysis applied by the Second Circuit in *Rothstein* and *Terrorist Attacks VI* and by Judge Robertson in *Burnett v. Al Baraka Investment & Development Corp.*, 292 F. Supp. 2d 9, 20 (D.D.C. 2003).  KSA Mem. 15-17.  The CAC Plaintiffs argue that JASTA "completely repudiated" *Rothstein*, CAC Mem. 19, but to support that claim point only to the (inapplicable) provision that imposes secondary liability.

Plaintiffs err in arguing that JASTA requires them only to show "jurisdictional causation," which they say is determined by a "lower . . . standard" than that used for "substantive causation . . . at the merits stage."  *Id.* at 18.  Nothing in JASTA says so, and *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312 (2017), forecloses arguments that jurisdiction under the FSIA can be established merely by making a "good argument" that a jurisdictional element is present.  *Id.* at 1316, 1318-19.  Rather, jurisdiction exists only if the plaintiff has made out a "valid claim," *id.* at 1318, supporting an exception to immunity.  Here, to establish jurisdiction, Plaintiffs must have a valid claim that Saudi Arabia committed a "tortious act" that "caused" their injuries.  28 U.S.C. § 1605B(b).

Plaintiffs point to no case recognizing liability for donating to a charity (or any other intermediary) funds later diverted to terrorists.  Instead, Plaintiffs rely on cases in which a government or charity defendant gave money or in-kind assistance directly to terrorists or a terrorist or terrorist-controlled organization.[10]  If this Court were to accept Plaintiffs' theory that

---

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004), which did not have the benefit of *Burrage* and similar authority.  *See* KSA Mem. 15 n.19.

[10] The CAC Plaintiffs' causation cases are *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685 (7th Cir. 2008) (en banc), in which defendant charities allegedly

Saudi Arabia legally caused the 9/11 attacks based merely on Saudi Arabia's funding of charities that in turn allegedly funded terrorism, it would be the first court to venture into that "terra incognita." *Burnett*, 292 F. Supp. 2d at 20. And if Congress had intended such a fundamental change in principles of causation, it would not have used the words "caused by."

### D.   JASTA Does Not Change Any Pleading or Evidentiary Requirements

#### 1.   Plaintiffs Must Plead Concrete Facts and Come Forward with Competent Evidence

Nothing in JASTA changes the procedural framework for deciding an FSIA motion to dismiss. KSA Mem. 18-22. Under that framework, Saudi Arabia has challenged both the legal sufficiency of and the factual basis for Plaintiffs' allegations. Thus, this Court can dismiss because Plaintiffs' allegations fail to pass muster under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); because Plaintiffs fail to meet their "burden of going forward with evidence," *Terrorist Attacks IX*, 134 F. Supp. 3d at 787; or because, after considering all the evidence including the 9/11 Report, the Court "resol[ves] . . . factual disputes," *Helmerich & Payne*, 137 S. Ct. at 1324, in Saudi Arabia's favor and finds it immune.

Plaintiffs' burden of going forward with evidence is confirmed by *Vera v. Republic of Cuba*, decided after Saudi Arabia's opening memorandum. *Vera*'s ability to pierce Cuba's

---

donated funds to Hamas, *id.* at 693-97, or "deliberately funnel[ed] money" to Hamas through a third party, *id.* at 701; *see also id.* at 706 (Rovner, J., concurring in part and dissenting in part) (noting the donations were made in part to charities "controlled by Hamas"); *Owens*, in which defendant Sudan provided funding and logistical support directly to Al Qaeda, 531 F.3d at 894-95; *Rux*, in which the president of Sudan "authorized the entry of Al-Qaeda operatives" into his country, 461 F.3d at 472; and *Kilburn*, in which defendant Libya "directed" terrorist cells to "purchase[] and kill[]" an American hostage, 376 F.3d at 1130. The *Ashton* Plaintiffs also cite *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), *appeals pending*, Nos. 16-2119 & 16-2134 (2d Cir.), where the defendant bank transferred money directly to "leaders of Hamas or their family members" and to charities "controlled by Hamas," *id.* at 303; and *Sokolow v. PLO*, 60 F. Supp. 3d 509 (S.D.N.Y. 2014), where there was evidence that the defendants employed terrorists who committed attacks and gave them weapons and funds, *id.* at 516-23.

sovereign immunity depended on whether Cuba had been designated as a state sponsor of terrorism "as a result of," 28 U.S.C. § 1605A(a)(2)(A)(i)(I), the alleged extrajudicial killing of Vera's father.  *See* 867 F.3d at 313.  Cuba defaulted, putting in no evidence.  *Id.*  In a collateral proceeding against a bank holding Cuban assets, the Second Circuit held that, because "Vera [had] failed to meet his burden to establish that [§ 1605A] applies," the judgment against Cuba was void for lack of subject-matter jurisdiction.  *Id.* at 319.  It did not matter that Vera had an expert witness, because the expert "cited no evidence to support [his] conclusion or specifically link Cuba's terrorist designation to Vera's father's death."  *Id.* at 318.  *Vera* thus establishes not only that Plaintiffs have the burden to come forward with evidence, but that they cannot meet their burden with conclusory assertions – even if endorsed by putative experts.

The CAC Plaintiffs err in contending that, even though Saudi Arabia has made a factual challenge, their allegations are presumed true unless Saudi Arabia "present[s] evidence that calls into question particular jurisdictional facts."  CAC Mem. 22.  That would turn on its head the rule that a FSIA plaintiff has the "burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted," *Cargill Int'l, S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) – a rule recognized by many Second Circuit cases[11] even before *Vera* and derived from the principle that "a foreign state is presumptively immune from the jurisdiction of United States courts," *Saudi Arabia v. Nelson*, 507 U.S. 349,

---

[11] *See Arch Trading*, 839 F.3d at 199 ("burden of production" is on the plaintiff); *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013) ("burden of going forward with evidence"); *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012) (same); *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 176 (2d Cir. 2010) (same); *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (same); *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (same); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (same); *Cabiri v. Government of Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999) (same); *Drexel Burnham Lambert Grp. Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993) (same).

355 (1993).  And the Second Circuit has applied this rule to require dismissal where a plaintiff fails to "sustain its burden under the FSIA." *Anglo-Iberia*, 600 F.3d at 176; *see Virtual Countries*, 300 F.3d at 241 (plaintiff "failed to provide sufficient evidence for [its] contentions").

The CAC Plaintiffs' contrary arguments rest on misleading citations and out-of-context quotations.  CAC Mem. 22-24.  They cite *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998), *overruled on other grounds by Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014), without mentioning the Second Circuit's admonition that "it was error for the district court to accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction." *Id.*  They also cite cases involving legal rather than factual disputes,[12] cases where plaintiffs "presented evidence" rather than relying on mere allegations,[13] cases recognizing the burden that Plaintiffs deny having,[14] and one case that did not involve any presumptively immune sovereign.[15]  None of their cases supports their attempt to shift the burden to Saudi Arabia to come forward with evidence to disprove unsupported allegations.

---

[12] *See Barapind v. Government of Republic of India*, 844 F.3d 824, 829-32 (9th Cir. 2016) (addressing whether intergovernmental memorandum waived immunity; no apparent dispute about contents of memorandum); *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013) (treating motion as a 12(b)(6) motion; no discussion of factual challenge or burdens); *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004) (addressing "legal issue" whether allegations were sufficient).

[13] *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *see also Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88, 90 (2d Cir. 2013) (plaintiff "carried its burden" in part by producing "transaction documents").

[14] *See Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 294, 296 (S.D.N.Y. 1987) (acknowledging the "[p]laintiff['s] . . . burden of going forward with evidence," and finding the plaintiff had not met it).

[15] *See Valentin v. Hospital Bella Vista*, 254 F.3d 358, 361 (1st Cir. 2001) (ordinary diversity jurisdiction case with no sovereign defendant).

2.    **The 9/11 Report, FBI-CIA Report, and 9/11 Review Report Are Competent Evidence**

Although it was not required to do so, Saudi Arabia has put in evidence that disproves Plaintiffs' claims.  That evidence comes in the form of the 9/11 Report, the FBI-CIA Report, and the 9/11 Review Report, all of which investigated and rejected allegations that (1) Saudi Arabia funded Al Qaeda generally or the 9/11 plot in particular; (2) Al Bayoumi, Al Thumairy, or Basnan knowingly helped the 9/11 hijackers; or (3) Al Bayoumi or Basnan were intelligence officers of the Saudi government.  KSA Mem. 3-6, 20-21; *see also id.* at 21-22 (noting important context from the 9/11 Report about Saudi Arabia's cooperation with the United States during the 1990s in attempting to neutralize the threat posed to both countries by Osama Bin Laden).  All three reports are admissible under Federal Rule of Evidence 803(8)(A)(iii).  *See id.* at 20-21.

The CAC Plaintiffs err in contending that the 9/11 Report's findings as "no evidence" reflect only the "limitations of the Commission's knowledge."  CAC Mem. 28 (emphasis omitted).  A finding of no evidence to support an accusation is admissible under Rule 803(8). *See Lloyd v. American Exp. Lines, Inc.*, 580 F.2d 1179, 1183 (3d Cir. 1978) (reversing exclusion of hearing examiner's findings, including a finding of "absolutely no evidence" that the alleged aggressor in a fight had been "intoxicated").[16]  That makes sense because lack of evidence to support an accusation after thorough investigation tends to show the accusation is ungrounded. And, contrary to Plaintiffs' criticisms, the 9/11 Commission was "independent, impartial, thorough, and nonpartisan."  9/11 Report xv; *see* KSA Mem. 3 (size of review).  The 9/11 Report's statement that its authors were "conscious of [their] limits," 9/11 Report xvii, is merely

---

[16] *See also Barfield v. Orange Cty.*, 911 F.2d 644, 649, 651 (11th Cir. 1990) (affirming ruling admitting Equal Employment Opportunity Commission's finding of " 'no reasonable cause' to believe that [the plaintiff's] allegations were true"); *Theobald v. Botein, Hays, Sklar & Herzberg*, 493 F. Supp. 1, 2 (S.D.N.Y. 1979) (admitting finding of "no 'probable cause' " by state agency).

"a frank recognition of the shortcomings intrinsic in any historical investigation," *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (similar language did not "admi[t] . . . lack of trustworthiness"). Likewise, the 9/11 Review Commission undertook an "objective[ and] comprehensive . . . review" of the evidence with access to the FBI's investigation of "over 500,000 leads, over 167,000 interviews, and millions of pages of documents." 9/11 Review Report 4 n.5, 100. Further, although only a summary of the 2005 FBI-CIA Report has been declassified, Plaintiffs offer no reason to doubt the trustworthiness of the FBI and CIA or of then-Directors Robert S. Mueller III and Porter J. Goss, who submitted the report to Congress.

Further, the CAC Plaintiffs fail to show that the 9/11 Report's funding conclusions are "irrelevant" because they were directed to "the Saudi government as an institution" and its "senior officials" rather than to "[i]ndividual [lower-ranking] officials[ ]." CAC Mem. 27. This whole dispute is an attempt to hold the Saudi government as an institution responsible for purportedly funding the 9/11 attacks. A finding of no evidence of such funding is not only relevant but key. And the Report's additional rejection of allegations that "any . . . foreign government official . . . supplied any funding" for the 9/11 attacks, 9/11 Report 172; that Al Bayoumi knowingly supported the hijackers, *see id.* at 218; and that Al Thumairy or Basnan helped the 9/11 plot in any way, *see id.* at 217, 515 n.14, go to the core of Plaintiffs' contentions.

The *Ashton* Plaintiffs' attacks on the 9/11 Report also fail. Their assertion that the 9/11 Report's findings of "no evidence" are "legal conclusions," *Ashton* Mem. 48-49, is wrong: a finding of no evidence is a factual conclusion, not a legal one, and is admissible provided it is trustworthy. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (no bar to admitting "a conclusion or opinion"). Their criticism of the 9/11 Commission for not foreseeing and responding to their current (baseless) arguments, *Ashton* Mem. 49-50, carries little weight. And

their contention that the 9/11 Report's findings were untrustworthy, *id.* at 50-53, casts no serious doubt on its thorough methods and lack of bias, KSA Mem. 20-21.[17]

### 3.   Plaintiffs' Opposing Materials Are Not Competent Evidence

Plaintiffs have come forward with no competent evidence to meet their burden or to contradict the findings of the 9/11 Commission, the FBI, the CIA, and the 9/11 Review Commission.  *See MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 499 (S.D.N.Y. 2017) (evidence received "[o]n a motion to dismiss under Rule 12(b)(1)" is "subject to the familiar standards of admissibility found in Fed. R. Civ. P. Rule 56"), *aff'd*, No. 17-1157, 2017 WL 6463128 (2d Cir. Dec. 19, 2017).  They have again filed thousands of pages of materials as purported support for their oppositions, but those materials are not evidence.  Notably, Part Four of the Joint Inquiry Report (the "28 pages"), which Plaintiffs once told the Second Circuit was so important it "would independently support a remand for further consideration" by this Court even before JASTA,[18] barely appears in their briefing.  And neither the CAC Plaintiffs nor the *Ashton* Plaintiffs address the Joint Inquiry's disclaimer of any "'attempt to investigate and assess the accuracy and significance of th[e] information'" in the 28 pages, which forecloses its use as evidence.  KSA Mem. 22 (quoting ECF No. 3463-2, at 416).

a.   **Preliminary Investigative Materials.**  Plaintiffs cannot carry their burden with memoranda and other documents that state the beliefs or preliminary conclusions of investigators,

---

[17] The *Ashton* Plaintiffs' contention that the 9/11 Report's rejection of allegations against Al Bayoumi was based on the interrogation of Al Qaeda members, *see Ashton* Mem. 51, ignores the Report's statement grounding its finding in the work of "investigators who ha[d] dealt directly with [Al Bayoumi] and studied his background," 9/11 Report 218.  The Report's mention in a footnote of the interrogation of Khalid Sheik Mohammed (who denied knowing Al Bayoumi) does not cast meaningful doubt on its methods.

[18] Reply Br. for Plaintiffs-Appellants 18 n.3, *In re Terrorist Attacks on September 11, 2001*, Nos. 15-3426 et al., ECF No. 248 (2d Cir. filed July 25, 2016).

such as the Florida Bulldog Memorandum.  KSA Mem. 23.  They have attached many such memoranda as exhibits.  *See* Apps. A, B.  Preliminary memoranda drawing inferences or arguing for conclusions that the FBI did not adopt are not "record[s] or statement[s] of a public office" and do not set forth "factual findings from a legally authorized investigation."  Fed. R. Evid. 803(8)(A)(iii); *see City of New York v. Pullman Inc.*, 662 F.2d 910, 914-15 (2d Cir. 1981) (affirming exclusion of "'interim' staff report" under predecessor to Rule 803(8)(A)(iii) as the "tentative results of an incomplete . . . investigation").[19]  Here, the FBI's findings are set forth in the 2005 FBI-CIA Report and the 9/11 Review Report.  Plaintiffs cite no case permitting the introduction of preliminary reports to contradict agency findings.[20]

b.      **Affidavits of Former Law Enforcement Agents.**  The CAC Plaintiffs likewise cannot carry their burden by proffering purported expert testimony from former FBI agents Michael Rochford and David Mitchell to contradict the findings of their own agency and of the 9/11 Commission, the CIA, and the 9/11 Review Commission.  The Rochford (ECF No. 3783-6) and Mitchell (ECF No. 3783-7) Affidavits repeat hearsay – mainly the same hearsay before this Court on the previous motion – and call it fact.  For example, Rochford quotes a conclusory

---

[19] *See also Smith v. Isuzu Motors Ltd.*, 137 F.3d 859, 862 (5th Cir. 1998) ("interim agency reports or preliminary memoranda do not satisfy [predecessor] Rule 803(8)(C)'s requirements" where they "embody the positions and opinions of individual staff members, which the agency ultimately declined to accept"; collecting cases).

[20] Nor are the preliminary memoranda admissible as business records under Rule 803(6), as the CAC Plaintiffs suggest in a footnote (at 33 n.26).  That exception is unavailable where the "supplier of the information does not act in the regular course" of business.  Fed. R. Evid. 803 advisory committee's note (giving an "illustration" of a "police report incorporating information obtained from a bystander:  the officer qualifies as acting in the regular course but the informant does not"); *see Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) ("[E]ntries in a police report which result from the officer's own observations and knowledge may be admitted but . . . statements made by third persons under no business duty to report may not.") (emphasis omitted).  Here, no investigators were present at the relevant events; none of the reports is or could be based on personal knowledge; and Plaintiffs offer no showing that any of the information in the reports was obtained from sources acting in the ordinary course of business.

statement from the Florida Bulldog Memorandum that an unnamed individual "'tasked' both Thumairy and Bayoumi with assisting the hijackers"; he then purports to give a "professional opinion" that this individual must have been a "superior in the Saudi Government."  Rochford ¶ 54; *see* ECF No. 3783-10, at 4.  Because the underlying memorandum is not evidence, and Rochford has no other basis for knowing of any so-called "task[ing]," his opinion is not evidence that anyone told Al Bayoumi or Al Thumairy to do anything.  *See Williams v. Illinois*, 567 U.S. 50, 81 (2012) (plurality) ("[A]n expert's opinion is only as good as the independent evidence that establishes its underlying premises."); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) ("While an expert may rely on hearsay in forming his opinion, he may not 'simply transmit that hearsay to the jury' to prove the truth of the matter asserted."); KSA Mem. 53 & n.51.

Further, Rochford and Mitchell attempt to intrude on the role of the Court by arguing that this Court should infer from purported facts that covert agents of Saudi Arabia aided the 9/11 attacks.  That goes beyond an expert's appropriate role.  *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (expert testimony inadmissible when it "'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's'"); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert may not "usurp . . . the role of the jury in applying th[e] law to the facts before it").  Although the Court, not a jury, is the factfinder here, that does not make the attempted intrusion proper.  In any event, Rochford's and Mitchell's arguments are flawed and unpersuasive for the reasons given in Part II.

The declaration of Stephen Moore, proffered by the *Ashton* Plaintiffs, ECF No. 3780-4, is likewise insufficient.  Moore, who managed the FBI's Los Angeles team investigating the 9/11 attacks from 2001 to 2003, says he believes that Al Thumairy and Al Bayoumi were agents of

Saudi Arabia who aided the 9/11 attacks.  *See id.* ¶¶ 6-8.  Unlike the CAC Plaintiffs, Moore

admits his views are contrary to those of the 9/11 Commission, *see id.* ¶¶ 18-19, though he

ignores the later findings of the FBI, the CIA, and the 9/11 Review Commission.  His declaration

is inadmissible because he does not purport to be an expert; relies on "evidence . . . gathered

during the course of [an] investigation," *id.* ¶ 6, rather than anything he personally observed, *see*

Fed. R. Evid. 602; and testifies to "personal belief[s]," *Applegate v. Top Assocs., Inc.*, 425 F.2d

92, 96 (2d Cir. 1970); *see* Moore Decl. ¶ 22, which are not evidence.

      **c.**    **Former Commission Members and Senators.**  This Court has previously

rejected Plaintiffs' attempt to rely on testimony from former members of the 9/11 Commission or

the congressional Joint Inquiry.  *See Terrorist Attacks IX*, 134 F. Supp. 3d at 787 n.13 (finding

that Plaintiffs cannot prevail based on the "speculative conclusions of Senator Graham and

Secretary Lehman . . . [in] disagreement with the conclusions of the 9/11 Commission and the

FBI"; also rejecting the testimony of Senator Kerrey).  The CAC Plaintiffs now resubmit the

Lehman and Kerrey Affirmations and add a similar declaration from former Commission

member Richard Ben-Veniste.  There is no reason for this Court to depart from its previous

ruling.  Senator Graham has submitted a new, lengthier affirmation holding himself out as an

expert in "intelligence and national security matters" and "high-profile government

investigations."  ECF No. 3783-8, ¶ 18.  That affirmation has the same flaws as the Rochford and

Mitchell Affidavits:  the factual parts are a narrative based on hearsay of which Senator Graham

lacks personal knowledge, and the conclusions attempt to usurp the Court's role as factfinder.

      **d.**    **Evan Kohlmann.**  This Court has previously rejected the testimony of Evan

Kohlmann as "not sufficient for this Court to even reasonably infer that Saudi Arabia controls

. . . the charities at issue."  *Terrorist Attacks IX*, 134 F. Supp. 3d at 784 n.9.  The CAC Plaintiffs

have now submitted a new Kohlmann Affirmation containing much of the same material.  ECF No. 3783-9.  It follows the same template as their other experts:  a lengthy factual narrative assembled indiscriminately from hearsay sources that Kohlmann seeks to use to prove the truth of the matters asserted, followed by attorney-like argument that those facts meet the (erroneous) legal tests that Plaintiffs advocate.  Other flaws in Kohlmann's analysis are set forth in Part III.

      **e.**     **Attorneys James Kreindler and Steven Pounian.**  Counsel for the *Ashton* Plaintiffs, James Kreindler and Steven Pounian, have submitted a 67-page affidavit that consists of (1) factual assertions of which counsel clearly lack personal knowledge and (2) attorney argument – in effect, an unauthorized extension of the *Ashton* Plaintiffs' 62-page legal memorandum.  *See* ECF No. 3780 ("Kreindler-Pounian Affidavit").  Courts have consistently rejected similar filings as "improper."  *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) (on 12(b)(1) motion, court may not rely on "[a]ttorneys' affidavits not based upon personal knowledge").[21]  This Court should disregard the contents of the Kreindler-Pounian Affidavit.[22]

      **f.**     **Other Exhibits and Footnoted Documents.**  Because of the volume of materials Plaintiffs have filed – 9 affidavits, affirmations, and declarations not previously filed with the Court, adding up to a total of 295 pages, plus 447 other exhibits, adding up to a total of 3,807 pages – it is not feasible to discuss each exhibit in this reply (and Plaintiffs do not do so in their own memoranda).  The vast majority of those exhibits are not competent evidence because they

---

[21] *See also Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2005 WL 3370542, at *3 (S.D.N.Y. Dec. 12, 2005) (striking submission "more akin to a memorandum of law than to an attorney's affidavit"), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Capital Mgmt., LLC*, 329 F. App'x 299 (2d Cir. 2009); *see also Ugarte v. Johnson*, 40 F. Supp. 2d 178, 179 n.1 (S.D.N.Y. 1999) (more cases).

[22] To the extent the Kreindler-Pounian Affidavit serves the appropriate function of "present[ing] documents to the court," *Internet Law Library*, 2005 WL 3370542, at *3, the Court should consider its exhibits for what they are worth – which, to be clear, is not a concession that any are material, admissible, or authentic.

(1) are hearsay under Rule 803, including preliminary investigative materials, and including hearsay-within-hearsay statements; (2) are not grounded in personal knowledge as required by Rule 602; or (3) are neither self-authenticating under Rule 902 nor authenticated as required by Rule 901.  Appendices A and B set forth objections for each of the CAC Plaintiffs' exhibits; Appendix C for each of the *Ashton* Plaintiffs' exhibits; and Appendices D through G for the documents cited in the footnotes of Plaintiffs' expert reports.

## II.     Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Individual

Plaintiffs fail to show that any of the eight individuals identified in their Complaints committed a tortious act within the scope of any office, employment, or agency for Saudi Arabia that caused the 9/11 attacks.  KSA Mem. 24-47.  This Court previously rejected Plaintiffs' contention that individual alleged tortfeasors were acting as Saudi Arabia's agents, and Plaintiffs can point to no new factual allegations or evidence to warrant a different result.  Indeed, the CAC Plaintiffs admit that the 9/11 Report and the 9/11 Review Report – which existed at the time of the last dismissals and which reject Plaintiffs' theories, *see* KSA Mem. 4-6 – are "the principal sources" on which they rely for their principal arguments, including those related to Al Bayoumi and Al Thumairy.  CAC Mem. 32.  Their purported expert affidavits and declarations merely rehash allegations that this Court has already held insufficient to establish an FSIA exception.  The *Ashton* Plaintiffs' declaration from Stephen Moore likewise introduces no new allegations; it merely disagrees with the admissible factual findings of the 9/11 Commission. Even if this Court does not reject those materials as a matter of law (as, for the reasons given in Part I.D, it should), they are not enough to carry Plaintiffs' burden to go forward with evidence.

### A.    Omar Al Bayoumi

#### 1.    No Action Within Scope of Employment or Agency

Plaintiffs contend Al Bayoumi was a covert agent whose "assigned role[]" was "to implement the radical agenda" of Saudi Arabia's Ministry of Islamic Affairs, which included "support for jihadists."  CAC Mem. 44-49; *see Ashton* Mem. 13.  They present no new factual allegations or evidence to support that alleged "role."  Instead, they principally repeat their unfounded allegations that Al Bayoumi (1) "monitor[ed] Saudi citizens," (2) posed as a government worker seeking an education in the United States, (3) maintained "systematic contacts with the Saudi embassies and consulates in the United States, and with representatives" of the Ministry of Islamic Affairs, and (4) had so-called "Wahhabi" connections.[23]  CAC Mem. 44-46; *see Ashton* Mem. 7-10.  This Court has already rejected those allegations for lack of "any connection between [Al Bayoumi's employment] and his alleged material support to the hijackers."  *Terrorist Attacks IX*, 134 F. Supp. 3d at 786; *see* KSA Mem. 26-29.

Plaintiffs make one superficial change in their arguments:  earlier they urged this Court to find that Al Bayoumi was a "Saudi intelligence agent," ECF No. 2890-2, ¶ 149, but now they say he was a "covert agent . . . of the [Ministry of] Islamic Affairs[]," CAC Mem. 46, whose mission was "spreading Wahhabi orthodoxy," *id.* at 47.  The flexibility with which Plaintiffs shift from arguing that Al Bayoumi's putative covert role involved gathering intelligence to arguing that it involved spreading religious beliefs (or Plaintiffs' venomous caricatures of religious beliefs) underscores that they have neither concrete allegations nor any evidence to support either version of their theory.  Nor do they plausibly allege that the scope of employment for any such role

---

[23] Saudi Arabia does not use the terms "Wahhabi" or "Wahhabism" to describe its religion or the religion of its citizens.  Plaintiffs define the term as referring to a "radical . . . variant of Islam" that supports "terrorist acts."  CAC Mem. 43.  Saudi Arabia has long held that acts of terrorism are abhorrent to the Islamic religion.

included Al Bayoumi's alleged knowing assistance of terrorism.  A conclusory assertion that the

Ministry of Islamic Affairs had a "radical agenda," CAC Mem. 47-49, does not suffice.[24]

Plaintiffs also have no basis for their accusations that Saudi Arabia or its Ministry of

Islamic Affairs supports or ever supported terrorism.  KSA Mem. 61-62 (discussing CAC

¶¶ 140-154).  Years before the September 11 attacks, Saudi Arabia declared "that terrorist

actions are 'un-Islamic' ";[25] advocated for the principle that the "Islamic Sharia . . . reject[s] all

forms of violence and terrorism";[26] and supported interpretations of Islamic law denouncing

terrorism as a grave crime.[27]  To support their contrary claims, Plaintiffs rely on

mischaracterizations of the 9/11 Report, which nowhere found that Saudi Arabia or the Ministry

---

[24] The *Ashton* Plaintiffs implausibly speculate that an increase in compensation Al Bayoumi received from April 2000 to August 2001 was tied to the assistance he gave the hijackers.  *See Ashton* Mem. 13; 9/11 Report 515 n.18.  The raise does not coincide with the hijackers' stay in San Diego (February 2000 to June 2000 for Al Mihdhar and February 2000 to December 2000 for Al Hazmi).  *See* 9/11 Report 218-20.  Also, the 9/11 Commission investigated and rejected allegations that Al Bayoumi gave the hijackers money.  *See id.* at 219.  The *Ashton* Plaintiffs further rely on their erroneous allegation that a "mark on Bayoumi's passport . . . indicate[d] his affiliation with al Qaeda," but they do not explain how that is relevant to Al Bayoumi's scope of employment.  *Ashton* Mem. 13, 24.  In any event, the 9/11 Commission rejected the passport allegations.  9/11 Report 516 n.19; *see* KSA Mem. 45.

[25] U.S. Dep't of State, *Patterns of Global Terrorism:  1999*, at 52 (Apr. 2000) (quoting 1999 statement by HRH Abdullah bin Abdulaziz Al Saud, then Crown Prince and later King), http://oai.dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=ADA467069.

[26] Convention of the Organisation of the Islamic Conference on Combating International Terrorism, Preface (adopted July 1, 1999), *reproduced in* United Nations, *International Instruments Related to the Prevention and Suppression of International Terrorism* 188 (2d ed. 2004); *see also* The Arab Convention on the Suppression of Terrorism, Preamble (in force May 7, 1999), *reproduced in Prevention and Suppression of International Terrorism* at 158.

[27] *See* Council of Senior Ulema, Resolution 239, at 1 (Apr. 2010) (ruling that "the financing of terrorism, the inception, help or attempt to commit a terrorist act [of] whatever kind or dimension, is forbidden by Islamic Shariah"; collecting citations to earlier rulings in 1988, 1995, 1996, and 2003 denouncing terrorism as a "crime[ ]"), *available at* https://www.saudiembassy.net/fact-sheets/council-senior-ulema-fatwa-terror-financing; *see generally* Frank E. Vogel, *Islamic Law and Legal System:  Studies of Saudi Arabia* 271 (2000) (discussing 1988 decision of the Council of Senior Ulema that addresses terrorism by condemning "sabotage," including "blowing up or hijacking airplanes").

- 24 -

ever supported terrorism;[28] on vague allegations that years after the 9/11 attacks Saudi Arabia

ceased funding "thousands of clerics" as part of a "counter-terrorism effort";[29] and on a hearsay

report criticizing allegedly intolerant language in a Saudi public-school textbook from 2005.[30]

Plaintiffs insist they have come forward with "a much broader . . . record" regarding

scope of employment, CAC Mem. 49, but fail to point to anything in that record to change the

result this Court previously reached.  Of their hundreds of exhibits, the only ones they discuss are

the Florida Bulldog Memorandum and the three affidavits from Rochford, Mitchell, and Moore.

*See id.* at 34-35, 49; *Ashton* Mem. 7-10.  Those materials alter nothing.

     **a.**    **Florida Bulldog Memorandum.**  The Florida Bulldog Memorandum is not

evidence and, because it describes only the preliminary steps of an investigation, cannot even be

used to support plausible allegations.  KSA Mem. 23, 28-29.  Plaintiffs err not only in relying on

the Memorandum's conclusory statement that an unnamed individual "tasked al-Thumairy and

al-Bayoumi with assisting the hijackers," ECF No. 3783-10, at 4, *cited in* CAC Mem. 45, 47, but

---

[28] The portion of the 9/11 Report on which the CAC Plaintiffs rely states only that the Ministry "regulate[s]" certain "charities and international relief agencies"; that it "uses zakat [charity] and government funds to spread Wahhabi beliefs throughout the world"; and that "[s]ome Wahhabi-funded organizations have been exploited by extremists to further their goal of violent jihad against non-Muslims."  9/11 Report 372, *cited in* CAC Mem. 43, 47 58.  There is no finding that the Ministry or its employees knowingly supported extremism or violence.

[29] CAC ¶ 153, *cited in* CAC Mem. 48.  The allegation is recycled from Plaintiffs' previous Averment, ECF No. 2927-1 ("Aver.").  *Compare* CAC ¶ 153 *with* ECF No. 2890-2, ¶¶ 284-285.  It appears to be based on leaked U.S. diplomatic cables discussing post-9/11 efforts to cut funding to imams whose sermons "promot[ed] intolerance."  Aver. Ex. 92, at 1-2; *see* Aver. Ex. 91, at 6-7.  Neither states that previously funded imams were terrorists or advocated for terrorist activities.

[30] ECF No. 3783-11, at 10, 29, *cited in* CAC Mem. 48-49.  The report acknowledges that the textbook "explains[ ] [that] one of the meanings of jihad is self-perfection or 'wrestling with the spirit,' " but argues that it gives too much emphasis to a "more militant meaning."  ECF No. 3783-11, at 29.  Whatever its merits, that dispute sheds no light on Al Bayoumi's scope of employment.  Also, the textbook was allegedly funded by Saudi Arabia's Ministry of Education (not Islamic Affairs).

also in further speculating that the unnamed person doing the "task[ing]" must have been a Saudi Arabian official.  *See Ashton* Mem. 7-8, 12-13, 16; *see also* Mitchell Aff. ¶ 122; Rochford Aff. ¶ 54.  Plaintiffs should not be permitted "to circumvent the jurisdictional hurdle of the FSIA" with such "vague and conclusory allegations of tortious conduct."  *Robinson*, 269 F.3d at 146.[31]

> **b.    Rochford and Mitchell Affidavits.**  Rochford and Mitchell provide nothing new with respect to Al Bayoumi and Al Thumairy.  *See* CAC Mem. 44-46.  They rely mainly on the same hearsay materials that underlie Plaintiffs' allegations, many of which have been previously submitted to the Court.  *See* Apps. D, E.  In substance, their affidavits merely repeat Plaintiffs' allegations about Al Bayoumi.[32]  This Court has already rejected those allegations, as did the 9/11 Commission, the FBI, the CIA, and the 9/11 Review Commission.  KSA Mem. 26-29.

Rochford and Mitchell also provide no analysis of Al Bayoumi's scope of employment. They argue that, because he was a supposed agent of the Ministry of Islamic Affairs, *see* Rochford Aff. ¶¶ 41, 45, 48-50, his job duties must have been to "advanc[e]" a "jihadist, violent, and anti-American Wahhabi agenda," *id.* ¶¶ 96-97; *see* Mitchell Aff. ¶¶ 107, 112 (arguing that,

---

[31] Even if there were some unnamed assigner of tasks, and even if that person were a Saudi Arabian official, employee, or agent, Plaintiffs would still have to establish that person's own scope of office, employment, or agency, which they cannot do.  *See Alleghany Corp. v. James Found. of New York, Inc.*, 115 F. Supp. 282, 296 (S.D.N.Y. 1953) (under New York law, agent "could delegate no greater authority" than he or she possessed), *aff'd*, 214 F.2d 446 (2d Cir. 1954); Restatement (Second) of Agency § 5 cmt. e (1958) (a "master . . . [is] liable to third persons for torts of the subservant within the scope of employment for which the servant is an indemnitor to the master").  Plaintiffs lack any legal basis for their argument that all actions taken pursuant to the direction of an employee or agent of Saudi Arabia can be attributed to Saudi Arabia.  *See* CAC Mem. 44 & n.34, 47.

[32] Those recycled allegations include Al Bayoumi's status as a student (Rochford Aff. ¶¶ 26-30; Mitchell Aff. ¶¶ 18, 71-73, 116); his civil-service job (Rochford Aff. ¶¶ 31-37; Mitchell Aff. ¶¶ 18, 72-77, 116); his alleged contacts with the Saudi government (Rochford Aff. ¶¶ 38-41; Mitchell Aff. ¶¶ 71, 81-82, 116, 125); his alleged monitoring of Saudi citizens (Rochford Aff. ¶¶ 43-50; Mitchell Aff. ¶ 71); his alleged assistance to the hijackers (Rochford Aff. ¶¶ 57-89; Mitchell Aff. ¶¶ 16, 43-56, 119-125); and his alleged association with extremists (Rochford Aff. ¶ 97; Mitchell Aff. ¶¶ 17, 80, 125).

as "an orthodox Wahhabist in the government's Ministry of Islamic Affairs," Al Thumairy

"necessarily" must have "support[ed] militant Islamic extremism").  Neither affiant purports to

have expertise about religion in Saudi Arabia or cites anything that supports their baseless

statements about Islam.[33]  To the contrary, their supposedly expert testimony about

"Wahhabism" – which is not a term that any of the individuals discussed here would ever use to

refer to their own beliefs – is no more than an appeal to religious bias.  *See Jinro Am. Inc. v.*

*Secure Invs., Inc.*, 266 F.3d 993, 1006-08 (9th Cir. 2001) (discussing the bar in civil and criminal

trials on testimony – including supposedly expert testimony – that appeals to racial, ethnic, and

religious bias; citing *United States v. Cruz*, 981 F.2d 659, 663-64 (2d Cir. 1992)).

      **c.**    **Graham Affidavit.**  Plaintiffs cite Senator Graham's affidavit in passing, CAC

Mem. 35, 43, but do not discuss it.  That affidavit also mirrors Plaintiffs' allegations and relies

on hearsay materials, many of which are stale.  *See* App. F.

      **d.**    **Moore Affidavit.**  Moore cursorily rehashes Plaintiffs' allegations that Al

Bayoumi was a spy, Moore Aff. ¶ 17, that Al Bayoumi and Al Thumairy had an "extensive . . .

relationship," *id.* ¶ 12, and that Al Bayoumi aided the hijackers pursuant to Al Thumairy's

direction, *id.* ¶¶ 13-14.  He then expresses personal disagreement with the 9/11 Commission's

findings that Al Bayoumi and Al Thumairy did not wittingly assist the hijackers (though he fails

to mention the later findings of the 9/11 Review Commission and 2005 FBI-CIA Report).  *Id.*

---

[33] The only sources that either Rochford or Mitchell cites or quotes for statements about Islamic theology consist of an article from the Huffington Post news website and a book passage purportedly stating that the "ultra-conservative theology of Wahhabism" teaches that non-adherents "'should all be killed.'"  Mitchell Aff. ¶ 112 (quoting Natana J. DeLong-Bas, *Wahhabi Islam: From Revival and Reform to Global Jihad* 206 (2007)).  Read in context, the full book passage says the exact opposite:  "such killing is *not* supported by Ibn Abd al-Wahhab's writings and in fact is even discouraged."  *Wahhabi Islam* at 206; *see id.* at 279 (concluding that "[t]he militant Islam of Osama bin Laden . . . is not representative of Wahhabi Islam as it is practiced in contemporary Saudi Arabia").

¶¶ 6, 18-19.  None of that bolsters Plaintiffs' factual allegations or is admissible evidence.  As to Al Bayoumi's and Al Thumairy's scope of employment, Moore offers no substance, but merely states that this issue should be "explore[d]" further.  *Id.* ¶ 22.

## 2.    No Tortious Act

Plaintiffs provide no factual allegations or evidence that Al Bayoumi knew of or knowingly disregarded Al Hazmi's or Al Mihdhar's plans.  KSA Mem. 29-30.  They err in contending that such knowledge can be inferred from the totality of "facts and evidence, and inferences."  CAC Mem. 40.  This case calls for the principle that "an overload of irrelevant or nonprobative facts" does not "add up to relevant evidence":  "Zero plus zero is zero."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011).

Plaintiffs point to no probative facts.  They rely on Al Bayoumi's "relationships" with others such as Al Thumairy and Basnan, CAC Mem. 40, but that is mere guilt by association, and in any event Plaintiffs also have no evidence of wrongdoing by any of those individuals.[34] They accuse Al Bayoumi of "ties to terrorism and extremist views," *id.*, but never address the 9/11 Commission's specific contrary finding – after "stud[ying] his background" – that he was an "unlikely candidate for clandestine involvement with Islamic extremists," 9/11 Report 218. Their contention that he provided Al Hazmi and Al Mihdhar with the "forms of assistance . . . needed to assimilate" into the United States, CAC Mem. 40, fails to show that he did more than

---

[34] Plaintiffs also mention Mohdar Abdullah as one of Al Bayoumi's purportedly suspicious acquaintances, but the 9/11 Commission considered allegations that Al Bayoumi had directed Abdullah to assist the hijackers (which Al Bayoumi denied), *see* 9/11 Report 516 n.20, and rejected them when it found "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups," *id.* at 218.  The 9/11 Review Commission also considered further interviews of Mohdar Abdullah, including one stating that he "provided *on his own accord* various types of assistance to the hijackers in San Diego," before concluding that no new information about Abdullah "would definitively change the 9/11 Commission's conclusions regarding Abdullah's pre-9/11 activities."  9/11 Review Report 103 (emphasis added),

- 28 -

help fellow Saudi Arabians acclimate to a foreign country.  And, finally, Plaintiffs have no basis

for their claims that Al Bayoumi was deceitful with investigators.[35]  As the 9/11 Commission

pointed out, Al Bayoumi was the initial source of information about his meeting with Al Hazmi

and Al Mihdhar – hardly consistent with Plaintiffs' attempt to depict him as a calculating spy.[36]

Rochford's and Mitchell's opinions that Al Bayoumi used "espionage tradecraft" – which

Plaintiffs assert shows a "corrupt state of mind," CAC Mem. 40-41 – is not admissible expert

testimony.  Those opinions consist entirely of subjective "judgment call[s]" with no

"methodological underpinning."  *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*

*Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014).  According to Rochford and Mitchell:

- attending to a personal immigration matter in private is a "pretext" for discussing "operational plans . . . in a secure environment," Rochford Aff. ¶¶ 59-61; Mitchell Aff. ¶ 121; *see* Rochford Aff. ¶ 42 (same for visiting one's home country);

- bringing companionship for the drive from San Diego to Los Angeles is an "alibi," Rochford Aff. ¶¶ 62-65; Mitchell Aff. ¶¶ 120, 126;

- getting lost in an unfamiliar city is a "surveillance detection route" and a "cover stop," Rochford Aff. ¶¶ 66-76; Mitchell Aff. ¶ 125;[37]

- wearing Saudi Arabian clothing and observing Islamic prayer practices are " 'coast is clear' signal[s]," Rochford Aff. ¶¶ 77-79, 82;

- requesting "more 'korans' " to distribute to other Muslims is a "parole," a code word used as a "means . . . to request a private meeting," *id.* ¶¶ 80-81; *see also* Mitchell Aff. ¶ 121;

- allegedly asking a fellow expatriate to help two new immigrants is a " 'hidden hand' scenario," Rochford Aff. ¶¶ 83-89; and

- checking in and out of a hotel room without being charged is a sign of a "covert meeting" rather than reflecting dissatisfaction with the room, Mitchell Aff. ¶¶ 18, 42, 119.

---

[35] *See* CAC ¶ 207 (asserting generally that Al Bayoumi lied, but failing to point to any specific alleged untruth).  The *Ashton* Plaintiffs presume Al Bayoumi's guilt and argue that he is deceitful because he asserts his innocence.  *See Ashton* Mem. 8, 11.

[36] *See* 9/11 Report 218 ("We do not know whether the lunch encounter occurred by chance or design.  We know about it because Bayoumi told law enforcement that it happened.").

[37] Moore's contrary belief that Al Bayoumi "mistakenly" went to the wrong establishment, Moore Aff. ¶ 14, underscores the degree to which Plaintiffs' experts are simply relying on their own subjective characterizations of the facts.

That "series of subjective observations" should receive no evidentiary weight.  *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 420, 425 (S.D.N.Y. 2016).

Rochford and Mitchell do not even consistently apply their own criteria for analysis.  As one example, Rochford interprets Al Bayoumi's request for korans both as a secret coded phrase, Rochford Aff. ¶¶ 80-81, and as an actual request for "Wahhabi religious materials," *id.* ¶ 44 & n.28.  As another, Rochford argues that Al Bayoumi must have been familiar with tradecraft because he showed "[s]ecurity consciousness in use of phones," *id.* ¶ 20(r), while Mitchell argues that Al Bayoumi's "extensive" phone contacts are evidence he was a "covert agent," Mitchell Aff. ¶¶ 18, 81-82, 125.  Their open willingness to argue any particular fact one way or another makes clear that their opinions are mere advocacy and not reliable evidence.

Rochford's and Mitchell's failure to "acknowledge or account" for "evidence tending to refute [their] theory" also undermines their reliability.  *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005).  They provide no reason why their review of the public record, *see* Rochford Aff. ¶ 5; Mitchell Aff. ¶ 12, is more reliable than the contrary factual findings of the government entities that have investigated the 9/11 attacks.  With one limited exception, they simply ignore those findings.[38]

### 3.      No Causation

Al Bayoumi's alleged assistance consisted solely of helping Al Hazmi and Al Mihdhar find an apartment and acclimate to the local Muslim community.  Plaintiffs do not contend

---

[38] That exception is Rochford's attempt to explain away the 2005 FBI-CIA Report, which found "no information" that Al Bayoumi "materially supported the hijackers wittingly[] [or was an] intelligence officer[] of the Saudi Government."  2005 FBI-CIA Summary 2.  Rochford incorrectly claims the Report has been "superseded" by the Florida Bulldog Memorandum.  Rochford Aff. ¶ 109.  That Memorandum does not reflect the conclusions of the FBI, KSA Mem. 23, 30; says nothing new about Al Bayoumi's relationship with Saudi Arabia, *see* ECF No. 3783-10, at 3-4; and was considered by the 9/11 Review Commission when that Commission found no evidence sufficient to change the 9/11 Commission's findings, *infra* Part II.B.2.

otherwise.  *See* CAC Mem. 42-43; *Ashton* Mem. 16-17.  It is not plausible that such neighborly

acts caused the 9/11 attacks.  For that reason as well, the Al Bayoumi allegations are not

sufficient grounds to strip Saudi Arabia of sovereign immunity.  KSA Mem. 30-31.

### B.    Fahad Al Thumairy

#### 1.    No Action Within Scope of Employment or Agency

Plaintiffs repeat their contentions that Al Thumairy was an imam employed by the

Ministry of Islamic Affairs, whose "scope of work . . . included support for radical Islamist

activities extending to terrorist acts."  CAC Mem. 43.  Their arguments regarding Al Thumairy's

scope of employment mirror their arguments about Al Bayoumi.  *See id.* at 46-49.  Thus, as with

Al Bayoumi, there is no reason to disturb this Court's prior ruling.  *See Terrorist Attacks IX*, 134

F. Supp. 3d at 787 ("no basis . . . to find that al Thumairy was acting within the scope of his

employment"); KSA Mem. 31-32; *supra* Part II.A.1.

#### 2.    No Tortious Act

Plaintiffs also have no factual allegations or evidence that Al Thumairy assisted the

hijackers.  KSA Mem. 32.  Their contrary argument is based on a false assertion that the 9/11

Review Commission "expressly confirm[ed]" that, once the hijackers arrived, Al Thumairy

"immediately assigned an individual to take care of [them]."  CAC Mem. 37-39.  But footnote

330 of the 9/11 Review Report, which Plaintiffs cite, states only that a "2012 FBI summary of

the status of the effort" – apparently referring to the Florida Bulldog Memorandum – "reported"

that Al Thumairy had done so.  9/11 Review Report 102 n.330.  Further, the 9/11 Review Report

concluded that the FBI materials it had reviewed contained no "new information . . . sufficient to

change the 9/11 Commission's original findings regarding the presence of witting assistance to

al-Hazmi and al-Mihdhar," which included its finding of "no evidence that al-Thumairy provided [such] assistance." *Id.* at 102-03; *see* 9/11 Report 217, 515 n.14.[39]

Nor do Plaintiffs properly allege or produce evidence that Al Thumairy knew of or recklessly disregarded the hijackers' plans. Their arguments mirror their arguments as to Al Bayoumi, *see* CAC Mem. 39-41; *Ashton* Mem. 11, and fail for similar reasons, *supra* Part II.A.2.

### 3.    No Causation

Because Al Thumairy's alleged assistance to the hijackers was even more attenuated than Al Bayoumi's alleged assistance, Plaintiffs have also failed to plausibly allege the 9/11 attacks were caused by Al Thumairy.  KSA Mem. 33.

### C.    Osama Basnan

### 1.    No Action Within Scope of Employment or Agency

Plaintiffs have done nothing to warrant changing this Court's previous finding that their "allegations that [Osama] Basnan was an employee of the Saudi government are entirely conclusory," as are their allegations that he acted "on behalf of the Saudi government." *Terrorist Attacks IX*, 134 F. Supp. 3d at 785; *see* KSA Mem. 33-34.  They point to no new allegations relevant to Basnan's employment or to the scope of any purported agency.  CAC Mem. 50-51; *Ashton* Mem. 8, 10, 51, 57.  The Rochford and Mitchell Affidavits likewise simply repeat the same deficient assertions – including that Basnan was a "covert agent" or "cooptee" of Saudi Arabia – that this Court previously rejected.  *Compare* CAC ¶¶ 199-206, 250-253, *with* Rochford

---

[39] Mitchell speculates that Al Thumairy told taxi driver Qualid Benomrane to assist the hijackers, *see* Aff. ¶¶ 38-40, 110, but concedes the hijackers' "whereabouts are unaccounted for" immediately after their arrival, *id.* ¶ 35.  The 9/11 Commission rejected allegations against Benomrane after finding he had no taxi or driver's license at the relevant time.  KSA Mem. 33 n.30 (citing 9/11 Report 515 n.14).  The CAC Plaintiffs do not now mention Benomrane; the *Ashton* Plaintiffs do so only in passing, ignoring the Commission's finding, *Ashton* Mem. 8.

Aff. ¶¶ 99-103 *and* Mitchell Aff. ¶¶ 90-98, 128-130.  Conclusions of purported experts

unsupported by valid evidence are not enough.  *See Vera*, 867 F.3d at 318.[40]

2.  **No Tortious Act**

Plaintiffs point to no meaningful new allegations or evidence to address the other

independent basis for this Court's prior dismissal – the lack of factual allegations that Basnan

knowingly aided the 9/11 attacks.  KSA Mem. 34 (citing *Terrorist Attacks IX*, 134 F. Supp. 3d at

785); *see also* 2005 FBI-CIA Summary 2; 9/11 Report 516 n.24 (finding "no evidence that Hazmi

or Mihdhar received money from . . . Bassnan").  Plaintiffs' only new allegation is that Al Mihdhar

and Al Hazmi "'contact[ed] . . . Khaled al Kayed . . . about learning how to fly a Boeing jet

aircraft'" and that Al Kayed was a "'close friend'" of Basnan.  CAC Mem. 50-51 (quoting CAC

¶ 203).  There are no allegations that Basnan told Al Mihdhar and Al Hazmi to contact Al Kayed,

let alone that he did so knowing of the terrorists' intentions.  Nor is there any admissible

evidence to support the allegation, which appears to be based on hearsay from Part Four of the

Joint Inquiry Report.  *See* ECF No. 3463-3, at 427.  Indeed, the CAC Plaintiffs themselves admit

that Basnan's "role in providing support to the hijackers" is "as yet undetermined."  CAC Mem.

51.  They thus concede that they "do not yet know what they expect to find from discovery"

about Basnan, *Arch Trading*, 839 F.3d at 207 – and so they should not get any.

---

[40] Rochford and Mitchell also quote selectively from their hearsay sources.  For example, Rochford cites an FBI memorandum repeating a statement from an unnamed "asset" that in 2002 an individual (whose name is redacted) was "advised" by "[c]onsulate officials" to "leave the country," CAC Ex. 41, at 3, which Rochford speculates reflected "special concern" about "exposure to U.S. investigators."  Rochford Aff. ¶ 107; *see* Mitchell Aff. ¶¶ 97, 130.  But the same document states that the individual advised to leave the country was later charged with "visa fraud," CAC Ex. 41, at 2, suggesting he was not in the country legally – an obvious reason to tell him to leave that has nothing to do with the 9/11 attacks.

- 33 -

### 3. No Causation

Plaintiffs also fail to show causation.  KSA Mem. 34.  In particular, even if there were evidence (which there is not) that Basnan knowingly aided Al Mihdhar and Al Hazmi by directing them to Al Kayed for flying lessons, Plaintiffs cannot – and do not – allege that Al Kayed ever taught them to fly.  To the contrary, "[b]y the end of May 2000, Hazmi and Mihdhar had given up on learning how to fly" and became muscle hijackers.  9/11 Report 222, 231.

### D. Saleh Al Hussayen

This Court previously determined that there were no factual allegations or evidence that Al Hussayen "'assisted the hijackers within the scope of his employment or otherwise.'"  KSA Mem. 35-36 (quoting *Terrorist Attacks IX*, 134 F. Supp. 3d at 785).  Plaintiffs ignore that ruling and merely repeat the same arguments they made last time.  Even their putative expert Mitchell admits that "[w]hat contact, *if any*, Hussayen made with the three hijackers is uncertain." Mitchell Aff. ¶ 21 (emphasis added).[41]

### E. Mohammed Al Qudhaieen and Hamdan Al Shalawi

### 1. No Action Within Scope of Employment or Agency

Plaintiffs provide no plausible allegation or any evidence that the airplane incident they speculate was a "dry run" for the 9/11 attacks fell within the scope of any employment or agency relationship between Al Qudhaieen or Al Shalawi, and Saudi Arabia.  KSA Mem. 36-37.  Their assertion that Al Qudhaieen had a similar "profile" to Al Bayoumi is insufficient both because their allegations about Al Bayoumi are insufficient, *supra* Part II.A.1, and because the assertion

---

[41] The CAC Plaintiffs repeat their misplaced argument that *Terrorist Attacks VII*, 714 F.3d 659, allowed jurisdictional discovery against Al Hussayen.  CAC Mem. 55; *see* ECF No. 2926, at 11 (same); *see also* ECF No. 2927-1, ¶ 238.  As previously explained, ECF No. 2948, at 6-7, *Terrorist Attacks VII* concerned Al Hussayen's role with Al Rajhi Bank and did not address his purported acts on behalf of Saudi Arabia.  *See* 714 F.3d at 679.  Nor did the Second Circuit address whether Plaintiffs had evidence to support their allegations (which they do not).

of similarity is baseless, conclusory, and based solely on the inadmissible "belie[fs]" and "speculat[ions]" of unnamed FBI agents.  ECF No. 3783-13, at 434, *cited in* CAC Mem. 52.

Assertions that Saudi Arabia provided funds to Al Qudhaieen and Al Shalawi in general and that it paid for their flight do not plausibly suggest any employment or agency relationship. As Plaintiffs concede, both individuals were "'graduate students' sponsored and paid by the KSA" and were traveling to a "KSA-sponsored event."  *Ashton* Mem. 26.  Al Shalawi's alleged position as an imam at the Islamic Center of Tempe, *id.*, is irrelevant.  Plaintiffs do not allege that the Center is an alter ego of Saudi Arabia, nor would aiding the hijackers fall within the scope of duties of an imam.

### 2.    No Tortious Act

Plaintiffs also fail to support their claims that Al Qudhaieen and Al Shalawi participated in a "dry run" or "real-life test" for the 9/11 attacks during a November 1999 flight.  CAC Mem. 51; *Ashton* Mem. 25-27.  Their only concrete allegations are that the two men switched seats to sit together and that Al Qudhaieen tried to open the cockpit door, *see* CAC Mem. 51-52; *Ashton* Mem. 25-26, for which there are "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, besides wrongdoing – Al Qudhaieen could have mistaken the cockpit for the lavatory, KSA Mem. 37, and Al Qudhaieen and Al Shalawi could have wished to sit together because they were colleagues, *see* CAC Ex. 30, at 4.  Plaintiffs' additional allegation that the two men "ask[ed] the crew . . . suspicious questions," CAC Mem. 51, is conclusory and unsupported by any evidence.

Plaintiffs' allegations are made no stronger by reasserting their unsupported claims that Al Shalawi "traveled to an al Qaeda camp in Afghanistan . . . in the fall of 2000," CAC Mem. 52, which the 9/11 Commission staff described as a "speculative theory," *Ashton* Ex. 69, at 1;[42] or

---

[42] *See* 9/11 Report 521 n.60 (9/11 Commission and FBI not "able to confirm" Al Shalawi's whereabouts at the relevant time).  Al Shalawi "admit[ted] having gone to

that he and Al Qudhaieen had so-called "extensive terrorist connections," CAC Mem. 52.[43]  And

Plaintiffs still fail to offer any plausible explanation why, if the two men were in league with Al

Qaeda, they would have called attention to themselves by filing a civil rights lawsuit before the

9/11 attacks took place.  KSA Mem. 38 & n.39; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)

(court may use "judicial experience and common sense" in evaluating allegations).

### 3.      No Causation

Because Plaintiffs have failed to show that Al Qudhaieen and Al Shalawi were in any

way connected to Al Qaeda or the 9/11 attacks – or for that matter did anything wrong at all –

they also have not shown that those individuals' actions caused the 9/11 attacks.  KSA Mem. 38.

### F.      Mohammed Jabar Fakihi

### 1.      No Action Within Scope of Employment or Agency

The CAC Plaintiffs initially alleged that Fakihi was the "head of the Islamic Affairs

office at the Saudi Embassy," CAC ¶ 288, but now assert merely that he was a "representative"

of the Ministry of Islamic Affairs, CAC Mem. 53; *see* KSA Mem. 39 (pointing to materials

describing him as a "payroll accountant").  As for the scope of his employment, they rely on a

vague and conclusory assertion that he was "charged with advancing the [Ministry's] Islamist

agenda," CAC Mem. 53, proffering no facts or evidence to support that conclusion.

---

Afghanistan, but only once in the late 1980s after the war with the Soviet Union," *id.*, which is
not enough to link him plausibly to Al Qaeda or to the 9/11 attacks.

[43] Those "terrorist connections" appear to consist of (1) hijacker Hani Hanjour allegedly
attending a religious service conducted by Al Shalawi, *see Ashton* Mem. 26; *Ashton* Ex. 22, at
3-4; and (2) Al Qudhaieen and Al Shalawi allegedly associating with alleged Al Qaeda member
Ghassan Al Sharbi, *see* CAC Mem. 52, apparently based on a Guantanamo detention
memorandum stating that this issue "require[d] further exploitation" for intelligence purposes,
CAC Ex. 34, at 3.  Plaintiffs point to no evidence that Al Qudhaieen or Al Shalawi knew that
Hanjour or Al Sharbi was an Al Qaeda member.

### 2.    No Tortious Act

Plaintiffs also come forward with no facts or evidence regarding aid Fakihi supposedly provided to the hijackers.  They argue this Court should "infer[]" such aid from allegations that Fakihi "associat[ed] with . . . terrorist related entities."  CAC Mem. 55-56.  But even if Plaintiffs had evidence to support their allegations (which they do not), it is not tortious merely to "'associat[e] with a foreign terrorist organization.'"  KSA Mem. 41 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010)).  Plaintiffs cannot prevail by pointing to lawful association at most "merely consistent with," *Twombly*, 550 U.S. at 557, unlawful support for terrorism.[44]

### 3.    No Causation

Plaintiffs ignore Saudi Arabia's argument, KSA Mem. 41-42, that they have not shown that any of Fakihi's alleged acts occurred prior to the 9/11 attacks, which would be necessary for plausible causation.  That is another independent basis to reject their allegations as to Fakihi.

### G.    Omar Abdi Mohamed

The CAC Plaintiffs do not respond to Saudi Arabia's arguments relating to Abdi Mohamed and have abandoned any reliance on his alleged conduct.  *Compare* CAC Mem. 31 *with* CAC ¶¶ 36, 302-306.  The *Ashton* Plaintiffs continue to press that baseless theory.

### 1.    No Action Within Scope of Employment or Agency

The *Ashton* Plaintiffs allege that Abdi Mohamed's "job title" was a "Propagator" of Islam, which means a missionary.  *Ashton* Compl. ¶ 39(c); *see* KSA Mem. 42.  They do not contend that his alleged actions fell within the scope of that employment.  Instead, they assert that he received a "covert assignment" to engage in a "fraudulent . . . money laundering scheme."

---

[44] Contrary to Plaintiffs' suggestion, their allegations are not strengthened by the statement of the 9/11 Commission staff that Fakihi "d[id] not appear credible" in his denial that he wrote a letter advocating "the development of mosques across Europe."  CAC Mem. 54, 56 n.41; CAC ¶ 293.  Even if he did, that would not show material support for terrorism.

*Ashton* Mem. 20-21.  That claim is conclusory, and the *Ashton* Plaintiffs have no evidence to support it.  Their own documents show the Ministry of Islamic Affairs asking for reports about "well known personalities . . . who have converted to Islam" and stressing the importance of "holding lectures and distributing Islamic books in the native language" of the country where he worked.  *Ashton* Ex. 50, at 2, 16.[45]  That is consistent with employment as a missionary.

### 2.   No Tortious Act

The *Ashton* Plaintiffs further fail to allege properly or to come forward with evidence that Abdi Mohamed sent funds to Al Qaeda, knowingly or otherwise.  KSA Mem. 43-44.  Their arguments that he did so are empty words.  Their only concrete allegation is that he sent funds of the Western Somalia Relief Agency ("WSRA") using Dahabshiil, a money transfer agency.  Allegations that Al Qaeda members "used" or even "regularly used" Dahabshiil, *Ashton* Mem. 18, 20, do not support a plausible inference that every Dahabshiil transfer was a transfer to Al Qaeda.  And allegations that Al Qaeda members "controlled" Dahabshiil's office in Karachi, Pakistan, even if supported by evidence (which they are not),[46] are immaterial:  the *Ashton* Plaintiffs do not even claim to have evidence that Abdi Mohamed sent money to Karachi.

---

[45] The allegations and documents on which the *Ashton* Plaintiffs rely come from the criminal proceeding against Abdi Mohamed for immigration fraud and are not admissible against Saudi Arabia.  In any event, those documents state at most that he received a "salary" from the Ministry of Islamic Affairs and "raises and bonuses for doing good work," *Ashton* Ex. 44, at 6-7; *see also Ashton* Ex. 50, at 14 (bonus given to "all propagators . . . in America"); and that he once met a Saudi Arabian cultural attaché whose name he did not clearly recall, *see Ashton* Ex. 45, at 95.  The *Ashton* Plaintiffs' assertion that the "good work" was the "WSRA scheme," *Ashton* Mem. 21, is speculation without record support.

[46] The *Ashton* Plaintiffs' source for this allegation is a Guantanamo detention memorandum (which is hearsay) making allegations against the proprietor of the Karachi office, Mohammed Soliman Barre.  *See Ashton* Ex. 48, at 5-6.  The memorandum states that Barre denied those allegations.  *See id.* at 4-5.  The United States later released him to Somalia.  *See* U.S. Dep't of Justice, *United States Transfers 12 Guantanamo Bay Detainees to Afghanistan, Yemen and the Somaliland Region* (Dec. 20, 2009), https://www.justice.gov/opa/pr/united-states-

The *Ashton* Plaintiffs also misstate the facts of Abdi Mohamed's immigration-fraud conviction. *Ashton* Mem. 20. His indictment shows he was not charged with any terrorism offenses. *Ashton* Ex. 41. His sentencing enhancement was not based on a finding that he "had actually committed acts jeopardizing national security." *United States v. Mohamed*, 203 F. App'x 879, 880 (9th Cir. 2006) (explaining that the government had not so asserted). Indeed, the Ninth Circuit acknowledged that the "destination" of the money Abdi Mohamed had sent was "unknown," *id.* – contrary to Plaintiffs' assertions that it went to Al Qaeda.[47]

### 3.    No Causation

Finally, even if there were evidence of some financial connection between Dahabshiil and Al Qaeda (which there is not), that would not be enough because the *Ashton* Plaintiffs have no evidence that the funds Abdi Mohamed sent to Dahabshiil "were in fact sent" to Al Qaeda or that Dahabshiil "would have been unable to fund" terrorism without those funds, *Rothstein*, 708 F.3d at 97, even assuming that it ever did so. Accordingly, causation would still be lacking. *See supra* Part I.C (discussing *Rothstein*'s causation standard and distinguishing Plaintiffs' cases, all of which involved direct funding of terrorists or terrorist-controlled entities).

### III.   Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Charity

Plaintiffs again fail to provide a basis for asserting jurisdiction over Saudi Arabia based on the alleged actions of various governmental and nongovernmental charity organizations. The

---

transfers-12-guantanamo-bay-detainees-afghanistan-yemen-and-somaliland-region. If evidence had borne out the allegations against Barre, it is unlikely the government would have let him go.

[47] The *Ashton* Plaintiffs also falsely state that in 1998 "U.S. authorities found that 'elements of the Saudi Government' engaged in a money laundering scheme based at the King Fahd Mosque in Los Angeles" to transfer funds to Osama Bin Laden. *Ashton* Mem. 18-19. Their source for this baseless allegation is an excerpt from Part Four quoting an unnamed former FBI agent's testimony describing a "belie[f]" or "guess." *Compare Ashton* Mem. 18 *with* ECF No. 3463-3, at 434-35 ("My guess Saudi – it's connected somehow with the Saudis.").

CAC Plaintiffs take a scattershot approach, asserting five different erroneous (and in some cases contradictory) theories:  (1) funding the charities was itself tortious because they were "fronts" for Al Qaeda, CAC Mem. 57-62; (2) the charities were, rather than fronts for Al Qaeda, alter egos of Saudi Arabia, *id.* at 69-70; (3) the charities were agents of Saudi Arabia acting within the scope of their agency when allegedly funding terrorist organizations, *id.* at 66-69; (4) the charities performed "core functions" of the Saudi Arabian government, *id.* at 70-71; and (5) the actions of the charities were attributable to government officials who led them, whose actions could in turn be attributed to Saudi Arabia, *id.* at 63-65.[48]  None of Plaintiffs' theories is supported by proper allegations or competent evidence.

### A.     The Charities Are Not "Al Qaeda Fronts"

The CAC Plaintiffs' lead argument is that "the Saudi government" committed tortious acts by "funding and supporting . . . al Qaeda fronts," purportedly including MWL, WAMY, the Red Crescent, Al Haramain, the SHC, and the SJRC.  CAC Mem. 57-62.  The argument appears to be that the charities were so "intimately intertwined," *id.*, with Al Qaeda itself that they were, themselves, terrorist organizations, making it a tort to fund them.  That theory is not fairly raised by the CAC,[49] which is why (as Plaintiffs observe, *id.* at 62 n.45) Saudi Arabia did not address it

---

[48] The *Ashton* Plaintiffs appear to subscribe to the "agency" and "alter ego" theories, but not the others.  *See Ashton* Mem. 32-41.

[49] *See* CAC ¶¶ 29-37 (alleging four ways in which tortious acts are attributable to Saudi Arabia; the theory that the charities were "fronts" for Al Qaeda is not among them).  Paragraph 33 contains a conclusory allegation that "employees of the Ministry" of Islamic Affairs were "direct[ly] involve[d] . . . in recruitment and fundraising activities for al Qaeda," and there is a conclusory reference to "recruitment and fundraising" in paragraph 150, but those allegations are insufficient on their face to state a claim, and Plaintiffs do not rely on them now.  Nor does the CAC allege that any of the above charities are fronts for Al Qaeda, with the exception of a conclusory description of "an al Qaeda front charity" that may refer to the MWL, *id.* ¶ 64, and a conclusory reference to the SHC as a "terrorist front[ ]" based on evidence that says no such thing, *id.* ¶ 81.  *See* CAC Mem. 62-63; SHC Reply Mem. Part I.A; Aver. ¶¶ 533-534.

in its opening memorandum.  It can be rejected because a "claim for relief may not be amended by the briefs in opposition to a motion to dismiss." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 836 (S.D.N.Y. 1988).

In any event, the assertion that the charities operated as "fronts" for Al Qaeda is conclusory and implausible.  The statement that one organization is a "front" for another is a legal conclusion, not a factual allegation.  *See Hayden v. Feldman*, 753 F. Supp. 116, 119 n.8 (S.D.N.Y. 1990) (rejecting "conclusory" allegations that "entities were 'fronts' or 'shells'"). Here, the governmental charities were created by Saudi Arabia for legitimate charitable purposes,[50] and the nongovernmental charities almost all long predate Al Qaeda and all serve legitimate charitable purposes.[51]  Whether or not some of that money may have been unlawfully diverted for wrongful purposes, there is not and never has been any plausible contention that the charities directly funded by Saudi Arabia were Al Qaeda "fronts."  Accordingly, Plaintiffs could meet JASTA's requirements only if they could show that the charities themselves committed tortious acts and that those acts were attributable to Saudi Arabia – which they cannot do.

## B.      The Charities Are Not Alter Egos of Saudi Arabia

Plaintiffs again fail to defeat the presumption that the charities are separate from Saudi Arabia because they cannot show that any charity is "so extensively controlled" as to be an alter

---

[50] Each governmental charity has submitted a declaration describing the purposes for its creation.  ECF No. 262-3 (SHC); ECF No. 631-3 (SJRC); ECF No. 99-2 (Red Crescent).

[51] *See* Kohlmann Affirm. ¶¶ 37, 174 (MWL was "founded in 1962 to 'promote Islamic unity'"); *id.* ¶ 65 (IIRO was "established in 1978" for the purpose of "provid[ing] 'humanitarian assistance'"); *id.* ¶ 2, at 39 (WAMY, "established . . . in 1972," "advertises itself as the world's largest Muslim youth organization").  Kohlmann does not discuss Al Haramain's founding, but the 9/11 Commission staff described it as "established in the early 1990s," with activities including "provid[ing] meals and assistance to Muslims around the world, distribut[ing] books and pamphlets, pay[ing] for potable water projects, set[ting] up and equip[ping] medical facilities, and operat[ing] more than 20 orphanages."  Terrorist Financing Monograph 114-15.

ego of the state.  *Bancec*, 462 U.S. at 629; *see also EM Ltd.*, 800 F.3d at 91-93 (holding that *Bancec* requires "significant and repeated control" by the sovereign "over the instrumentality's day-to-day operations"); KSA Mem. 49-52.  JASTA did not change the *Bancec* standard, *see supra* Part I.A.2, and Plaintiffs cannot show they meet that standard by rehashing the same meritless arguments through a new affidavit from the same expert – Evan Francois Kohlmann – whose testimony the Court previously rejected.  *Terrorist Attacks IX*, 134 F. Supp. 3d at 784 n.9.

### 1.    Kohlmann's Allegations Are Recycled, Unreliable, and Immaterial

Most of Kohlmann's allegations regarding the connection between Saudi Arabia and the charities are recycled from the previous version of his declaration that this Court rejected – indeed, nearly half of his declaration (110 of 232 paragraphs) are simply repeated verbatim or with immaterial alterations.[52]  Many of the new paragraphs are mere unsupported assertions about Saudi Arabia's alleged control over the charities.[53]  Where he does attempt to support his claims, Kohlmann frequently cites sources that are not in the record and that he only vaguely identifies, including periodicals for which he omits the title of the article and the name of

---

[52] *Compare* Kohlmann Affirm. ¶¶ 19-20 *with* ECF No. 2927-9, ¶¶ 14-15; Kohlmann Affirm. ¶¶ 23-29 *with* ECF No. 2927-9, ¶¶ 16-22; Kohlmann Affirm. ¶ 31 *with* ECF No. 2927-9, ¶ 24; Kohlmann Affirm. ¶¶ 37-45 *with* ECF No. 2927-9, ¶¶ 55-62; Kohlmann Affirm. ¶ 49 *with* ECF No. 2927-9, ¶ 64; Kohlmann Affirm. ¶¶ 51-54 *with* ECF No. 2927-9, ¶¶ 65-68; Kohlmann Affirm. ¶¶ 65-71 *with* ECF No. 2927-9, ¶¶ 69-75; Kohlmann Affirm. ¶¶ 73-75 *with* ECF No. 2927-9, ¶¶ 76-78; Kohlmann Affirm. ¶¶ 77-79 *with* ECF No. 2927-9, ¶¶ 81-83; Kohlmann Affirm. ¶¶ 80-82 *with* ECF No. 2927-9, ¶¶ 88-90; Kohlmann Affirm. ¶ 95 *with* ECF No. 2927-9, ¶ 26; Kohlmann Affirm. ¶¶ 98-127 *with* ECF No. 2927-9, ¶¶ 28-54; Kohlmann Affirm. ¶¶ 128.2-166 *with* ECF No. 2927-9, ¶¶ 91-129.

[53] Kohlmann Affirm. ¶¶ 17, 18, 27, 30, 35, 36, 38, 56, 64, 83, 85, 94, 97, 110, 128, 128.1. Comparing those paragraphs to the ones cited in the previous footnote, it appears that Kohlmann has repeatedly copied and pasted language from his previous affirmation and bracketed it with additional conclusory language about "control."  That is not reliable analysis.

author;[54] apparently unpublished documents identified merely as a lecture, telegram, or letter;[55] publications that Saudi Arabia has been unable to locate after reasonable attempts using standard internet search tools;[56] websites that are no longer active;[57] and apparently unpublished interviews.[58] Thus, to the problem of acting as a conduit for hearsay, *see supra* Part I.D.3.b, Kohlmann adds the problem of relying on unverifiable assertions about his hearsay sources.

Kohlmann's lack of reliability is underscored because, where he uses sources that can be checked (such as discovery from the charities), he repeatedly misstates the contents of documents on which he relies. For example, Kohlmann's statement that Saudi Arabia "routinely directs the dawah organizations' projects and activities," Affirm. ¶ 57, is supported by citations to two letters that lack any such directions.[59] Kohlmann also attributes actions to Saudi Arabia when the documents really show those actions being taken by the charities' own officials[60] and

---

[54] Kohlmann Affirm. nn.156-57, 197, 216, 222-24, 232-33, 304, 315.

[55] *Id.* nn.48, 173, 186-88.

[56] *Id.* nn.80, 86, 97-98, 107-08, 176-77, 206-07, 227-28, 263-64, 268-70, 277, 290, 296-97, 300, 302, 310, 363-64, 374, 376, 394, 399-401, 403-07.

[57] *Id.* nn.31-32, 43, 81, 92-94, 109, 146, 150-51, 153, 158-63, 166-69, 194-95, 198, 204, 231, 234, 240-43, 290, 294-95, 335, 341, 343, 373, 375, 377, 379-84, 395, 402.

[58] *Id.* nn.110, 248, 312, 318, 385-86, 388-90.

[59] *See id.* n.70 (citing MWL 051310 and MWL 051331); Haefele Aff. Ex. 48 (letter from the MWL Secretary General to the Minister of Islamic Affairs regarding a recommendation about building projects in four Balkan countries, asking if the Ministry "will kindly inform the Muslim World League of the steps that have been taken"); Haefele Aff. Ex. 33 (correspondence from the Secretary General of MWL to a government official, discussing the opening of a mosque in Bosnia "whose expenses were covered by [the official's] mother").

[60] *Compare* Kohlmann Affirm. ¶ 90 n.134 (describing IIRO 280045 as "Saudi Embassy initiating inquiry to IIRO Secretary General regarding opening an IIRO office in Yemen") *with* Haefele Aff. Ex. 67 (request initiated by the IIRO, not the Embassy); Kohlmann Affirm. ¶ 90 n.134 (describing IIRO 284660 as an "inquiry into opening office in Jordan from Saudi ambassador in Palestine") *with* Haefele Aff. Ex. 75 (inquiry *from* the IIRO *to* the Embassy).

exaggerates to fit his narrative.[61]  Even if the documents were as Kohlmann inaccurately

describes them, they would not show the charities are alter egos.  But his misstatements about

verifiable facts show that his characterizations of hearsay sources are unreliable and that it would

be imprudent to accept his characterization of unavailable documents.

### 2. Plaintiffs' General Allegations About the Charities Are Unsupported and Insufficient

Plaintiffs have no basis for their claim that "the Kingdom exercised complete control

over the charities."  CAC Mem. 67 (citing CAC ¶¶ 129-132 and Kohlmann Affirm. ¶¶ 19-166).

Their allegations are legally insufficient, factually unsupported, and on the whole – especially as

they are based on cherry-picked examples of official contact with seven different government-

funded organizations over more than a decade – unimpressive.

a.   **Official Leadership.**  Allegations that the charities "have Saudi officials

embedded" within them and are "headed by officials of the Saudi government," CAC Mem. 67,

do not establish alter-ego status.  KSA Mem. 51 (citing *Kirschenbaum v. 650 Fifth Ave. &*

*Related Props.*, 830 F.3d 107, 130 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017)); *see also*

*Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 974 F. Supp. 2d 264, 270 (S.D.N.Y.

2013) ("[I]t is not enough to show that various government entities or officials represent a

majority of the shareholders or constitute a majority of the board of directors[.]"), *aff'd sub nom.*

*Byrd v. Republic of Honduras*, 613 F. App'x 31 (2d Cir. 2015).

---

[61] *Compare* Kohlmann Affirm. ¶ 56 n.65 (describing IIRO 277786-277787 as directing that "*all* refugee relief operations be coordinated by the SRC Society and a committee, under the supervision of the Interior Ministry") (emphasis added) *with* Haefele Aff. Ex. 83 (addressing only "relief provided" with government money to specific "Kosovar Albanian refugees"); Kohlmann Affirm. ¶ 46 (quoting MWL 005138 as stating that "the MWL's revenues consist of 'aid provided by the government of the Kingdom of Saudi Arabia and other Islamic countries'") *with* Haefele Aff. Ex. 9 (stating that MWL's revenues include not only government aid, but also "[o]ther aid, grants, wills and gifts," "income of its properties or investments," "[f]ees or endowments," and other sources).

**b.     Funding.**  Allegations that the charities "receive the vast majority (if not all) of their funding from[ ] the Saudi government," CAC Mem. 67, similarly fall short.  KSA Mem. 51 (citing *NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 7013(TPG), 2011 WL 524433, at *3 (S.D.N.Y. Feb. 15, 2011)).  The related contention that they "must submit their operational budgets to the Saudi government for approval," CAC Mem. 67, is only briefly alleged, *see* CAC ¶ 131(i); not mentioned in the Kohlmann Affirmation; unsupported by evidence; and even if true would not establish day-to-day control, because budgeting is not a daily occurrence.

**c.     Work Plans.**  Allegations that the charities "carry out operations pursuant to work plans provided by the Saudi government," CAC Mem. 67, are asserted in the CAC but not supported by the Kohlmann Affirmation, and are not sourced or further explained.  In any event, the use of work plans for government-funded projects is not day-to-day control.  *See EM Ltd.*, 800 F.3d at 94 (state-imposed "policies and goals" do not create an alter-ego relationship).

**d.     Diplomatic Status.**  Allegations that the charities "frequently benefit from diplomatic status in their host countries based on requests made by the Saudi government to those host countries" and "frequently operate from Saudi government offices, including offices within the Kingdom's diplomatic missions," CAC Mem. 67, have nothing to do with day-to-day government control, and are no more than would be expected for the governmental charities that act as agencies and instrumentalities (which is different from being alter egos).

**e.     Opening and Closing Offices.**  Claims that Saudi Arabia had a role in opening and closing charity offices, CAC Mem. 67, are irrelevant to day-to-day control, because major events such as openings and closings happen only infrequently.

**3.     Plaintiffs' Allegations About Particular Charities Also Fail**

**a.     MWL and IIRO.**  With regard to the MWL and the IIRO, the CAC Plaintiffs rely on general assertions of government control, and the allegation that the MWL and the IIRO are

- 45 -

"'fully government funded,'" CAC Mem. 68 (quoting CAC ¶ 122), which are clearly inadequate to show alter-ego status. Plaintiffs also argue that previous, inaccurate claims by the MWL and the IIRO that they were instrumentalities of Saudi Arabia are important because they "necessarily rest[] on the Kingdom's control over them." *Id.* That argument misses the whole point of *Bancec*, whose very purpose is to distinguish between "*government instrumentalities* established as juridical entities distinct and independent from their sovereign [which] should normally be treated as such," 462 U.S. at 626-27, and those that are controlled so completely that they should not.

The CAC Plaintiffs also argue that the Saudi government controls the MWL and the IIRO because they were allegedly "headed by Saudi government officials." CAC Mem. 64. Even accepted as true, the allegation is insufficient to show day-to-day government control and alter-ego status. *See* KSA Mem. 51; *supra* Part III.B.2. In any event, Plaintiffs overstate the facts. They identify as government officials the individual defendants "Abdullah Naseef, Abdullah bin Saleh al Obaid, Abdullah Mohsen al-Turki, and Adnan Basha," but fail to state what their government roles were (if any) at the time they led particular charities. CAC Mem. 64.[62] Notably, Plaintiffs have alleged elsewhere that Turki served as a Saudi government minister in the 1990s, before his appointment as Secretary General of the MWL in 2000, ECF No. 3024, at 3-4; and they concede elsewhere that Naseef had only a "consultative" government role, CAC ¶ 64 (alleging that he was a member of a "government consultative council").

The *Ashton* Plaintiffs similarly make irrelevant allegations with regard to the MWL and the IIRO (which they incorrectly treat as a single entity). They also make broad, conclusory

---

[62] Kohlmann cites testimony in which Al Obaid identified himself as a member of Saudi Arabia's Supreme Council of Islamic Affairs, but did not describe any duties or responsibilities in that role other than general "responsibility for Saudi Arabia's Islamic policies in other countries." Kohlmann Affirm. ¶ 44. Kohlmann also cites hearsay testimony from a Guantanamo detainee stating that Basha "h[eld] the rank of Minister," *id.* ¶ 71, but that is unreliable on its face.

claims about government control that go far beyond what their (inadmissible) evidence can support, such as the allegation that the "Ministry of Islamic Affairs directed and oversaw the details of the MWL/IIRO's work." *Ashton* Mem. 34 (citing Kreindler-Pounian Aff. ¶¶ 130, 133, 162). That claim is undercut by the documents cited to support it, which show consultation and coordination rather than control.[63]

    **b.**    **WAMY.** The CAC Plaintiffs say little about WAMY specifically, except to allege government funding, *see* CAC Mem. 57, and that the "Minister of Islamic Affairs headed WAMY," *id.* at 64 (citing Kohlmann Affirm. ¶ 130); *see also id.* at 69 (similar). And Kohlmann's discussion of WAMY is virtually identical to the one this Court has already considered and rejected. *Compare* Kohlmann Affirm. ¶¶ 128.1-146 *with* ECF No. 2927-9, ¶¶ 91-109. The *Ashton* Plaintiffs say even less about the relationship between WAMY and the Saudi government. Their argument relies almost entirely on their claim that a list of Saudi officials "directed" the charity's operations. But their list consists of the Minister who headed the organization, one other employee of the Ministry, two members of Saudi Arabia's religious consultative council, and two individuals on the payroll of the Saudi embassy in the United States. *Ashton* Mem. 41. That limited overlap in personnel does not show an alter-ego relationship.

    **c.**    **Al Haramain.** As to Al Haramain, the CAC Plaintiffs rely solely on documents and allegations that have previously been considered by this Court.[64] Similarly, Kohlmann's

---

    [63] *See* Kreindler-Pounian Aff. Ex. 158, at 4 (government response to a request from the MWL, offering information about a foundation in the Philippines: "*we believe* that the foundation deserves financial aid to implement its project (building an Islamic Arabic institute)") (emphasis added); *id.*, Ex. 161, at 2 (MWL letter to the Ministry of Islamic Affairs "regarding the *recommendation proposal* for forming a high-level delegation," and informing the Ministry that "*we* have approved" the recommendation) (emphases added); *id.*, Ex. 206 (letter from the head of the IIRO informing the Minister of Islamic Affairs that "we seek to coordinate").

    [64] *See* CAC Mem. 57 (citing Aver. ¶ 478), 64 (citing Kohlmann Affirm. ¶ 98 (identical to 2015 allegation) and Aver. ¶¶ 478-479), 67 (citing CAC ¶ 121, which in turn cites Aver. ¶ 47).

allegations about Saudi Arabia's past relationship with Al Haramain are identical or materially identical to those in his 2015 Affirmation.  *See* Kohlmann Affirm. ¶¶ 95, 98-128; *supra* note 52. The remainder are irrelevant.[65]  The *Ashton* Plaintiffs' arguments are similarly limited to generalized claims of oversight, supervision, and appointment of charity officials.[66]

      **d.**    **Other Charities.**  The CAC Plaintiffs offer nothing new on the other charities, such as the SJRC and the Red Crescent.  Nor does the Kohlmann Affirmation.  The section on the SJRC, Kohlmann Affirm. ¶¶ 159-166, is the same now as it was in 2015; the section on the Red Crescent, Kohlmann Affirm. ¶¶ 147-152, is similarly stale.  *Supra* note 52 (comparing old and new Kohlmann Affirmations).  The *Ashton* Plaintiffs do not even mention those charities.

      **C.**    **The Charities Are Not Agents of Saudi Arabia**

      The CAC Plaintiffs cannot avoid the showing of day-to-day control required by *Bancec* by invoking theories of common-law agency.  CAC Mem. 14, 69.  Most fundamentally, their attempt to do so runs afoul of the principle that, when dealing with related corporate entities, the test for agency is the same as the test for piercing the corporate veil.  *See supra* Part I.A.2.  But even if Plaintiffs could invoke a general agency standard that would apply to unrelated entities,[67] they still have not pleaded or come forward with evidence to establish the necessary elements.

---

    [65] *See* Kohlmann Affirm. ¶¶ 94 (alleged funding and conclusory reference to "control mechanisms"), 96 (Saudi Arabia closing Al Haramain's offices in 2004 was allegedly "indicative of the Kingdom's control"), 97 (conclusory allegations of control and funding, and citation to a report from the Bangladesh office mentioning government "supervision").

    [66] *See Ashton* Mem. 28 (claiming that Al Haramain's "direct overseers are members of the [Saudi] Royal Family") (alteration in original); *id.* (Minister of Islamic Affairs allegedly supervised Al Haramain and appointed management).  The *Ashton* Plaintiffs also proffer the irrelevant allegation that "[t]he KSA created" Al Haramain "in Pakistan," which is not supported by either the Kreindler-Pounian Affidavit or the underlying source document (a "factsheet" from a website).  *See Ashton* Mem. 27 (citing Kreindler-Pounian Aff. ¶ 66, which cites Ex. 82).

    [67] *See* Restatement (Second) of Agency § 15 ("An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act."); *id.* § 33 ("An agent is authorized to do, and to do only, what it

*First*, no allegation in the CAC or in the Kohlmann Affirmation shows that Saudi Arabia manifested its intent that any of the charities should "act on [its] account."  Restatement (Second) of Agency § 15.  As one of Plaintiffs' own cases recognizes, an "agency theory is deficient" where it "fail[s] to allege any manifestations *by* . . . the alleged 'principal' " that the alleged agent can "act *for*" that principal.  *Arriba*, 962 F.2d at 535-36, *cited in* CAC Mem. 15 n.10.  Here, Plaintiffs point to no such manifestation and to no instance in which a charity was permitted to bind Saudi Arabia in dealings with third parties or in which Saudi Arabia relied on the actions of a charity to satisfy a legal obligation.  Instead, they argue only that Saudi Arabia viewed the work of the charities as helping to fulfill its moral and religious obligations of charitable and missionary work.  CAC Mem. 66, 69.  Plaintiffs cite no authority for their contention that this type of relationship to a charity is an agency relationship.

*Second*, no allegation in the CAC or in the Kohlmann Affirmation shows that any of the charities "consent[ed] . . . to act" as an agent of Saudi Arabia.  Restatement (Second) of Agency § 15.  Nor do the CAC Plaintiffs argue anywhere in their opposition that such consent occurred.

*Third*, Plaintiffs offer no coherent definition of the scope of the purported agency relationship or how it relates to the charities' purported funding of terrorism.  They simply assert that the charities acted on behalf of Saudi Arabia with respect to anything related to Saudi

---

is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations . . . ."); *id.* § 39 ("Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal."); *see also* Restatement (Third) of Agency § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). Plaintiffs do not argue apparent authority, nor could they.  *See generally* Restatement (Second) of Agency § 8 (apparent authority applies to "transactions with third persons" in which one party acts "professedly as agent for the other").

Arabia's "obligation to propagate" Islam, CAC Mem. 69, and then make the further offensive

assertion (without, of course, any support) that funding terrorism was part of supporting Islam.

In sum, the CAC Plaintiffs' agency arguments reflect the mistaken assumption that, if

they cannot show the day-to-day control necessary for alter-ego status (which indeed they

cannot), they can assert a watered-down version of control and call it agency.[68]  That is contrary

to the common-law understanding of agency as a relationship with specific legal elements.  *See*

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL

112948, at *6 (S.D.N.Y. Jan. 22, 2004) (Daniels, J.) ("[T]he authority of an agent can only be

established by tracing it to its source in some word or act of the alleged principal.").[69]

### D.   The Charities Are Not an Integral Part of the Government of Saudi Arabia

The CAC Plaintiffs also renew their meritless argument that, under *Garb v. Republic of*

*Poland*, 440 F.3d 579 (2d Cir. 2006), the governmental and nongovernmental charities alike are

all to be treated as indistinguishable from Saudi Arabia because they purportedly performed

"core functions" of the state.  CAC Mem. 16, 71.  As Saudi Arabia explained in its opening brief,

*Garb* relied on numerous facts about Poland's Ministry of the Treasury that are not true of any of

the charities here, including not only that it was a ministry of Poland but also that under Polish

---

[68] The *Ashton* Plaintiffs do not join the CAC Plaintiffs in advocating for a lower bar to establish that the charities are "agents."  They appear to agree that, to attribute the charities' acts to Saudi Arabia, they must establish that the sovereign exercises day-to-day control over the charities such that the latter were mere alter egos of the former, although they erroneously contend that test can be met here.  *See Ashton* Mem. 23 (arguing that discovery is necessary to show "that the KSA 'so dominates and controls' WSRA that they must be considered principal and agent and that it is appropriate to look past their separate juridical identities and to treat them as aliases").

[69] Restatement (Second) of Agency § 14, on which Plaintiffs rely, CAC Mem. 69, does not suggest that agency may be established merely by some degree of "control."  Instead, it deals with the "right to control" an acknowledged agent, Restatement (Second) of Agency § 14, and states that, where agency is unclear, *lack* of control tends to *rule out* agency, *see id.* cmt. b.

law it was part of the central government of Poland and did not hold property separately from the Polish State.  KSA Mem. 59-60.  Plaintiffs simply ignore those distinctions.

  **E.**  **Plaintiffs Can Neither Plead nor Prove Any Tortious Act by Unnamed Officials or the Ministry of Islamic Affairs**

  The CAC Plaintiffs' conclusory allegation that unnamed "Saudi officials" committed "tortious acts" by "direct[ing]" the charities' alleged "support of al Qaeda," CAC ¶ 135, also fails.  KSA Mem. 60-61.  They now name a few individuals in connection with those allegations, but those allegations are wholly insufficient.  *See supra* Part III.B.3.  Their other attempts to make their allegations concrete likewise fail.

  Several of Plaintiffs' statements about the charities' so-called heads are misleading.  As to WAMY, Plaintiffs state that "[t]he Minister of Islamic Affairs headed WAMY," citing Kohlmann, CAC Mem. 64; but Kohlmann says that the Minister was the head of "WAMY's *Board of Trustees*," while the "daily operations of WAMY are supervised by" its Secretary General.  Kohlmann Affirm. ¶ 130 (emphasis added).  Similarly, Plaintiffs state that Al Haramain was "headed by the Saudi Minister of Islamic Affairs," again citing Kohlmann, CAC Mem. 64; but Kohlmann cites testimony that the Minister "appoint[ed]" Al Haramain's "Board of Directors and senior management personnel."  Kohlmann Affirm. ¶ 98.[70]  Serving on or appointing the members of an organization's board does not plausibly establish involvement in its day-to-day affairs; if anything, such a role suggests the opposite.[71]

---

[70] Plaintiffs also err in stating that the "9/11 Commission separately concluded that at least two Saudi ministers had supervisory authority over al Haramain."  CAC Mem. 64.  The source they cite is the staff's Terrorist Financing Monograph, which does not state findings of the Commission.  Also, the Monograph's actual statement was that "[a]t least two Saudi government officials ha[d] supervisory roles (nominal or otherwise) over al Haramain."  Terrorist Financing Monograph 12.  Plaintiffs' misleading paraphrase of that language to remove the qualifier that the roles could have been merely "nominal" changes its meaning entirely.

[71] As to the IIRO, Plaintiffs state that "various IIRO offices outside of the Kingdom were headed by a representative of the local Saudi embassy."  CAC Mem. 64 (citing Kohlmann

Even if, as alleged, Saudi officials held official roles in the charities that involved "supervisory authority," CAC Mem. 64, Plaintiffs offer no evidence to suggest that those individuals supported Al Qaeda, much less that they did so within the scope of their government offices. For most of the alleged officials, Plaintiffs say only that, because the alleged "charities' sponsorship of al Qaeda" purportedly "spanned many years, and extended to separate branch offices," the "scope and duration" of that sponsorship "confirms that [the charities'] support for al Qaeda was . . . *necessarily* directed by the individuals who headed the organizations." *Id.* (emphasis added).[72] That is nonsense. Such allegations do not "necessarily" place responsibility on charity officials in high-level supervisory positions.

Plaintiffs' theory also fails because the unauthorized criminal acts of an agent cannot be attributed to the principal, particularly where they harm the principal. *See* KSA Mem. 11-12 (citing, *inter alia*, *United States v. International Bhd. of Teamsters*, 141 F.3d 405, 409 (2d Cir. 1998)); *supra* Part I.A.1. Even if individual Defendants' actions when supervising charities could generally be attributed to Saudi Arabia (which they cannot), that rule would still bar

---

Affirm. ¶ 88); but Kohlmann identifies only two purported instances of this, and in one of them he admits the embassy representative was a "chair[ ] [of] the committee supervising the IIRO's branch office in Ethiopia," not the head of the office. Kohlmann Affirm. ¶ 88.

[72] The CAC Plaintiffs also allege (based on hearsay) that Abdullah Naseef met with Al Qaeda leaders and that Wa'el Jelaidan was a "founding al Qaeda member." CAC Mem. 65. Neither individual is alleged to have been a Saudi Arabian government official in any relevant sense. Kohlmann states that Naseef was the Vice Chairman of a religious consultative council. *See* Kohlmann Affirm. ¶ 133. And the CAC Plaintiffs' claim that Jelaidan was a government official is based solely on an alleged "leadership position" in the SJRC, CAC Mem. 65 (citing CAC ¶ 66), a charity that was an instrumentality of Saudi Arabia rather than part of Saudi Arabia itself, and that was dismissed from this case years ago. The *Ashton* Plaintiffs' argument that Defendant Soliman Al Buthe was acting on behalf of Saudi Arabia because he was allegedly a municipal employee of the City of Riyadh at the time he allegedly engaged in a money-laundering scheme in the United States, *Ashton* Mem. 29-30, borders on the ridiculous and is not supported by the (in any event inadmissible) materials that the *Ashton* Plaintiffs cite.

- 52 -

Plaintiffs from so attributing the specific tortious act of supporting Al Qaeda – an enemy of

Saudi Arabia as well as its ally the United States, *see* KSA Mem. 21-22.[73]

### F.    No Act of Any of the Charities Caused the 9/11 Attacks

Plaintiffs also have neither properly pleaded nor come forward with evidence of any

"tortious act or acts" of any charity that "caused" the 9/11 attacks.  28 U.S.C. § 1605B(b).  To

establish causation, Plaintiffs must establish both but-for and proximate causation, KSA Mem.

14-18; *supra* Part I.C; those settled legal standards require Plaintiffs to come forward with actual

proof, not vague assertions that the alleged conduct "inherently cause[d] precisely the harm that

the ATA is designed to prevent and redress."  CAC Mem. 20.

Plaintiffs' one somewhat more specific theory of causation is not viable.  That theory is

that the "financial support flowing through the Kingdom's charities" to Al Qaeda allowed the

terrorist group to pay the Taliban regime in Afghanistan, which convinced the Taliban to grant

Al Qaeda safe haven, which enabled Al Qaeda to maintain training camps, which caused the

9/11 attacks.  CAC Mem. 60.  Plaintiffs thus effectively seek to hold Saudi Arabia responsible

for the actions of the Taliban – a regime with which Saudi Arabia suspended diplomatic relations

---

[73] Also insufficient is the *Ashton* Plaintiffs' baseless claim (in which the CAC Plaintiffs do not join) that Saudi Arabia's intelligence director Prince Turki assisted Al Qaeda by "cleans[ing]" passports. Mem. 24.  The claim is based on the jailhouse statement of Zacarias Moussaoui that Osama Bin Laden told him that, "if I had been Saudi, Turki [apparently meaning Prince Turki Bin Faisal Al Saud] will have renew my passport, and, so, I knew that most of the 19 highjackers [sic] had their passport renewed by Turki with the help of them."  *Ashton* Ex. 54, at 17-18.  That (1) is not evidence because it is not based on any personal knowledge of Moussaoui's; (2) is directly contrary to Moussaoui's previous testimony that he had "complete[ly] fabricat[ed]" his still earlier testimony about the 9/11 attacks and in reality "never knew [the hijackers] or anything about their operation," Aff. of Zacarias Moussaoui ¶¶ 13-15, attached to Def.'s Mot. To Withdraw Guilty Plea, *United States v. Moussaoui*, No. 1:01-cr-455, ECF No. 1857 (E.D. Va. filed May 8, 2006); and (3) is implausible in light of the 9/11 Commission's finding that Prince Turki personally helped the United States pressure the Taliban to expel Bin Laden from Afghanistan in 1998, *see* 9/11 Report 115, 121-22.

in 1998, *see* 9/11 Report 121-22, after the Taliban refused "to expel Bin Ladin so that he could be sent to the United States or to another country for trial," *id.* at 115.

Even if Plaintiffs' conclusory and unsupported allegations were taken as true, their theory is too circuitous to establish proximate cause. *Supra* Part I.C.2 (discussing Judge Robertson's holding in *Burnett*). The independent third-party actors in Plaintiffs' purported chain of causation – not only Al Qaeda, but also the Taliban – defeat proximate cause. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134-35 (2d Cir. 2010) (holding, in a RICO case, that, where "causation is interrupted by the independent actions" of a third party, "any attempt to show proximate cause through generalized proof" is "thwart[ed]").[74]

## IV.    Jurisdictional Discovery Is Not Warranted

From the consolidation of this multi-district litigation in 2004 to this Court's most recent decision dismissing their claims in 2015, Plaintiffs have requested jurisdictional discovery against Saudi Arabia and the SHC only in perfunctory footnotes. ECF No. 397, at 5 n.5; ECF No. 471, at 7 n.3; ECF No. 2926, at 9 n.10. Those vague requests lacked any "specific indication . . . regarding what facts additional discovery could produce that would affect the court's jurisdictional analysis," *Maqaleh v. Hagel*, 738 F.3d 312, 325-26 (D.C. Cir. 2013) (alteration in original), *vacated on other grounds sub nom. Al-Najar v. Carter*, 135 S. Ct. 1581 (2015), and this Court properly rejected them, holding that "jurisdictional discovery is not warranted," *Terrorist Attacks IX*, 134 F. Supp. 3d at 788. The present remand should not enable Plaintiffs to

---

[74] The *Ashton* Plaintiffs do not argue causation with regard to most of the charities discussed in this section. They claim that an "MWL/IIRO scheme to fund al Qaeda was a proximate cause of the 9/11 attacks," *Ashton* Mem. 38, but offer nothing to show that government funding to those two charities was the proximate cause. Their argument about the "MWL/IIRO" is similar to the CAC Plaintiffs' argument about training camps, discussed above. Even if supported by evidence (which it is not), that argument would fail as a matter of law.

reopen that issue, especially because they have not shown that JASTA has changed the law in any way that affects the Court's previous basis for dismissing their claims.

The same goes for the *Ashton* Plaintiffs.  They protest that they have not waived jurisdictional discovery because they filed claims against Saudi Arabia in 2017, after JASTA was enacted.  *See Ashton* Mem. 3, 47.  But *Ashton v. al Qaeda*, No. 02-cv-6977, brought by the same counsel representing largely the same Plaintiffs,[75] has been pending since 2002 and has included claims against the SHC and other Saudi Arabian sovereign defendants since 2003.[76]  Further, the *Ashton* Plaintiffs joined in the 2015 filing in which Plaintiffs relegated jurisdictional discovery against Saudi Arabia to a footnote.  *See* ECF No. 2926, at 9 n.10.  It is well within this Court's discretion to consider the *Ashton* Plaintiffs' previous opportunities to press claims and seek jurisdictional discovery against Saudi Arabia as it evaluates their requests now.

Waiver aside, neither the CAC Plaintiffs nor the *Ashton* Plaintiffs have shown that this Court should grant jurisdictional discovery.  Their new complaints and materials still establish no "reasonable basis for assuming jurisdiction," *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007), just as this Court found in *Terrorist Attacks IX*.  Nor have Plaintiffs set forth any "non-speculative basis for believing" that discovery would "verify allegations of specific facts" or reveal "details [that] establish jurisdiction," *Arch Trading*, 839 F.3d at 207, especially in light of the previous investigations already conducted by the 9/11 Commission, the FBI, the CIA, and the 9/11 Review Commission.  Guided by the FSIA's mandate to "protect[ ] . . .

---

[75] Comparing the dockets in No. 02-cv-6977 and No. 17-cv-2003 suggests that a large majority of the Plaintiffs are the same.  Most additions are additional surviving family members of decedents whose representatives or other family members were already in the case; and the *Ashton* Plaintiffs do not argue that the new ones should be treated differently from the old.

[76] *See* Docket, No. 02-cv-6977; Second Am. Consol. Master Compl. at 82-83, *Ashton v. Al Qaeda Islamic Army*, No. 02-cv-6977, ECF No. 38-2 (S.D.N.Y. filed Aug. 13, 2003) (caption naming SHC, Red Crescent, and SJRC); *see id.* ¶¶ 293-300, 452, 513.

sovereign[s] from the expense, instrusiveness, and hassle of litigation," *id.* at 206, this Court should again deny jurisdictional discovery.

### A.     Plaintiffs Have No Prima Facie Case

For the reasons set forth in Saudi Arabia's opening memorandum and in Parts I through III of this reply, Plaintiffs have altogether failed to a make "a prima facie case that this Court has jurisdiction," which on its own is a sufficient reason to deny jurisdictional discovery. *Terrorist Attacks IX*, 134 F. Supp. 3d at 788.  Their contrary arguments lack merit.

*First*, Plaintiffs mischaracterize *Filus v. LOT Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990), in contending that it authorizes jurisdictional discovery against a sovereign whenever allegations are "not wholly fanciful," *Ashton* Mem. 4, 22; *see also* CAC Mem. 72.  *Filus* permitted extremely circumscribed jurisdictional discovery (two interrogatories) against the former Soviet Union based on allegations that "a Soviet entity or entities inspected, overhauled and serviced" an airplane involved in a crash; and it "condition[ed]" any such discovery on the plaintiff's ability to show that "two [other] elements of FSIA jurisdiction" were met.  907 F.2d at 1333 ("intimat[ing] no view" on those issues).  *Filus* thus supports the proposition that "a district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a 'reasonable basis' for the court first to assume jurisdiction." *Arch Trading*, 839 F.3d at 206-07.  The other cases on which Plaintiffs rely, *Ashton* Mem. 4-5,

likewise permitted jurisdictional discovery only after a prima facie showing that an FSIA exception applied,[77] or are otherwise inapposite.[78]

    *Second*, the *Ashton* Plaintiffs err in asserting that the standard for jurisdictional discovery should be lowered because the jurisdictional issues here are "intertwined" with "the merits of plaintiffs' case." *Ashton* Mem. 6.  Neither of the cases they cite for this argument involved a foreign sovereign defendant,[79] and therefore neither implicated "a sovereign's . . . legitimate claim to immunity from discovery." *First City, Texas – Houston, S.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998).  In the FSIA context, by contrast, the Second Circuit has rejected the argument that a plaintiff's burden is lessened where jurisdictional elements are "intertwined with the merits." *Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180, 182 (2d Cir. 2002) (per

---

[77] *See Funk v. Belneftekhim*, 861 F.3d 354, 367 (2d Cir. 2017) (plaintiffs provided "adequate . . . evidence . . . to give rise to a colorable factual dispute" whether defendant was a "foreign state"); *Reiss v. Société Centrale du Groupe des Assurances Nationales*, 235 F.3d 738, 740, 748 (2d Cir. 2000) (complaint "describe[d] in minute detail the services allegedly rendered" by the plaintiff in the United States at the request of an individual who stated he had authority to act for the sovereign defendant); *1964 Realty LLC v. Consulate of Qatar*, No. 14 Civ. 6429 (ER), 2015 WL 5197327, at *8 (S.D.N.Y. Sept. 4, 2015) (complaint provided "at least a 'reasonable basis'" to conclude an FSIA exception applies); *Mukaddam v. Permanent Mission of Saudi Arabia*, 136 F. Supp. 2d 257, 260 (S.D.N.Y. 2001) (allegations in the complaint made out a "prima facie showing" of jurisdiction; court noted that the sovereign defendant had not raised a factual challenge to those allegations); *Mateo v. Perez*, No. 98 Civ. 7426 (SAS), 1999 WL 216651, at *4 (S.D.N.Y. Apr. 13, 1999) (finding "a material factual dispute" as to whether defendant's actions "were taken in furtherance of his consular duties").

[78] *See Doe v. Bin Laden*, 663 F.3d 64, 66 (2d Cir. 2011) (per curiam) (sovereign defendant had "requested" "jurisdictional discovery . . . if its motion to dismiss were denied"); *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 466 (S.D.N.Y. 2017) (mentioning previous discovery that had already occurred; no discussion or application of standard for jurisdictional discovery).  The CAC Plaintiffs similarly err in citing *Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2d Cir. 2007), to argue that a court may allow jurisdictional discovery "where the plaintiff has made 'legally sufficient allegations of jurisdiction.'"  CAC Mem. 72.  *Ehrenfeld* was a case under New York's long arm statute, *see* 489 F.3d at 548, 550 n.6, and had nothing to do with the FSIA.

[79] *See London v. Polishook*, 189 F.3d 196, 199 (2d Cir. 1999) (discussing the "notion of 'intertwining'" in dictum in a case not involving the FSIA); *Kamen*, 791 F.2d at 1011 ("limited discovery" should have been permitted on non-FSIA jurisdictional issue where defendants' affidavits were "conclusory and hearsay").

- 57 -

curiam) (explaining that the "analysis" of whether a plaintiff has "me[t] its burden" of production "is not altered by [a] claimed interconnection of the merits and jurisdiction").  The Supreme Court's recent decision in *Helmerich & Payne* reinforces that result by making clear that the FSIA contemplates "resolution of factual disputes . . . as near to the outset of the case as is reasonably possible," 137 S. Ct. at 1324, and rejecting arguments that courts should delay resolution when "merits and jurisdiction . . . come intertwined," *id.* at 1319.[80]

*Third*, the *Ashton* Plaintiffs inaccurately state that Saudi Arabia has previously been "required to produce such jurisdictional discovery," *Ashton* Mem. 12, but cite no remotely similar case.  In *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994), the Fifth Circuit noted that the district court had permitted "limited discovery" including the deposition of a Saudi Arabian air force officer who had been involved in a traffic accident in the United States. *Id.* at 172.  There was no discussion of what showing the plaintiff had made to obtain discovery. In *Mukaddam*, discovery was permitted only after the plaintiff survived a 12(b)(1) motion in which (as the court saw the case) Saudi Arabia had not raised a factual challenge to the plaintiffs' allegations.  *See* 136 F. Supp. 2d at 261-62 & n.19.  Here, Saudi Arabia has made clear since its first motion to dismiss in 2004 that it was raising a factual challenge, ECF No. 374-2, at 2-3 & n.3, and has renewed that challenge in the present motion, KSA Mem. 18-19.

---

[80] The *Ashton* plaintiffs rely heavily on discovery standards from cases outside the FSIA context that do not implicate comity concerns.  *See Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009) (no challenge to jurisdiction under the FSIA); *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (same); *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (same); *Nelson v. American-West African Line*, 86 F.2d 730 (2d Cir. 1936) (same); *Sokolow*, 60 F. Supp. 3d 509 (S.D.N.Y. 2014) (same); *Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962 (1986) (same).

**B.      There Is No Basis To Expect That Discovery Will Help Plaintiffs Prove an Exception to Immunity**

Plaintiffs also cannot establish an "adequate basis for expecting" that jurisdictional discovery would prove an immunity exception.  *Arch Trading*, 839 F.3d at 207; *see Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (denying jurisdictional discovery when the request "was based on little more than a hunch that it might yield jurisdictionally relevant facts").[81]  Any contention that Saudi Arabia was involved in the 9/11 attacks has been thoroughly investigated and rejected by the 9/11 Commission, the FBI, the CIA, and the 9/11 Review Commission. Individuals such as Al Bayoumi, Al Thumairy, and others named by Plaintiffs were interviewed numerous times:  in all, the Commission conducted more than 20 interviews with officials or employees of Saudi Arabia or with Saudi Arabian nationals or residents made available at the Commission's request.[82]  The Commission also interviewed hundreds of United States officials who had knowledge of the investigations of the 9/11 attacks, including the President, Vice

---

[81] *See also Maqaleh*, 738 F.3d at 325-26 ("Denying discovery in the absence of some specific indication regarding what facts additional discovery could produce that would affect the court's jurisdictional analysis is a proper exercise of . . . discretion.") (alteration omitted); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 563 (S.D.N.Y. 2008) (denying discovery where existing "materials do not suggest that discovery with respect to these issues would aid the Court's analysis"), *aff'd sub nom. Société Nationales des Chemins de fer Français*, 391 F. App'x 939 (2d Cir. 2010); *Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela*, 556 F. Supp. 2d 272, 282-83 (S.D.N.Y. 2008) ("Absent any indication of the specific facts or statements that plaintiffs could challenge through additional jurisdictional discovery, we decline to impose further litigation burdens upon the defendants, who have made a compelling, if not overwhelming, demonstration of their entitlement to sovereign immunity."), *aff'd*, 341 F. App'x 722 (2d Cir. 2009); *Crist v. Republic of Turkey*, 995 F. Supp. 5, 13 (D.D.C. 1998) (denying discovery where "plaintiffs' claim of jurisdiction is groundless and strung together with a bare thread of speculation and the slimmest of hopes that jurisdictional discovery would unearth some fact to support their otherwise unsubstantiated allegations").

[82] A list of interview memoranda prepared by Commission staff is available on the National Archives website at https://www.archives.gov/research/9-11/commission-memoranda.html. It includes 13 entries for memoranda of individuals whose affiliation is listed as "Saudi Arabia," some of whom are listed as present or former government employees, and seven additional entries for individuals whose affiliation is listed as "Government of Saudi Arabia."  Some of the memoranda reflect interviews or meetings with more than one individual.

President, Secretary of State, and National Security Advisor, as well as members of the National Security Council, the FBI, the CIA, the NSA, and the Armed Forces.  Plaintiffs offer only conclusory speculation that jurisdictional discovery would contradict the findings of the 9/11 Commission and the 9/11 Review Commission that there is no evidence that the Saudi Arabian government funded Al Qaeda or assisted the 9/11 attacks.

The CAC Plaintiffs respond to this point with an unpersuasive, footnoted assertion that "U.S. investigators did not have access to the records of the Saudi government concerning the relevant matters."  CAC Mem. 74 n.51.  Plaintiffs have no basis to say that Saudi Arabia withheld any information the Commission requested, much less that it withheld anything relevant or material.  There is no basis for any such contention in the 9/11 Report or otherwise.  Not even the former Commission members who have provided declarations to support Plaintiffs allege that Saudi Arabia withheld information from the Commission.  The Commission also had access to information that Plaintiffs could never obtain through civil discovery, including investigatory materials from the FBI and the CIA and highly confidential intelligence information from U.S. and Saudi Arabian sources.  *See* 9/11 Report 450 (discussing "instances" in which the Commission was "given access to highly sensitive documents or information").[83]

Nor can Plaintiffs prevail based on their speculative suggestion that depositions of the same individuals already interviewed by U.S. investigators would yield different information because the depositions would be "under oath."  CAC Mem. 74 n.51.[84]  When Plaintiffs made a

_____

[83] Several of the interview memoranda involving Saudi Arabian officials or employees listed on the National Archives website have been redacted to remove classified information or have been withheld in their entirety as classified.  Undersigned counsel do not have access to either U.S. or Saudi Arabian classified information and rely solely on the public record in describing the 9/11 Commission's investigation and findings.

[84] False statements to the Commission's investigators would likely have been subject to criminal prosecution under 18 U.S.C. § 1001, which has been held to apply extraterritorially,

similar suggestion at the last hearing, the Court asked their counsel for his "wishful thinking in terms of what [the witnesses] would say," and counsel conceded that the point of the depositions would simply be to "document the denials" of Plaintiffs' allegations.  ECF No. 2986, at 73. Plaintiffs simply ignore that concession (which makes clear that depositions would be a waste of time) and reargue the same point as if it were new.

Further, Plaintiffs have not plausibly identified any particular discovery that would be likely to support their allegations.  The *Ashton* Plaintiffs rely throughout their brief on conclusory assertions that discovery will "confirm [their] allegations and facts," *Ashton* Mem. 11; "confirm the applicable law" for choice-of-law purposes, *id.* at 15; "confirm the facts" about causation, *id.* at 16; provide vaguely described "key evidence," *id.* at 19; "demonstrate" facts that the *Ashton* Plaintiffs allege have already been "admitted," *id.* at 25; "confirm the facts" about purported misuse of charitable funds, *id.* at 38; and "convert" purportedly "known facts into evidence," *id.* at 57.  Again, the Court's remarks at the 2015 hearing remain on point:  Plaintiffs fail to "articulate anything on any issue that [they] would anticipate that [they] and the Court are going to be more knowledgeable about" as a result of discovery.  ECF No. 2986, at 70; *see also Caromin*, 556 F. Supp. 2d at 284 (denying discovery in part because it would likely be "duplicative and unduly burdensome").

## C.    Plaintiffs' Discovery Proposals Are Neither Necessary nor Appropriate

Even where jurisdictional discovery is appropriate, it "'should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'"  *EM Ltd.*, 473 F.3d at 486 (quoting *First City*, 150 F.3d at 176), *cited in Terrorist Attacks IX*, 134 F. Supp.

---

*see United States v. Royal Caribbean Cruises Ltd.*, 11 F. Supp. 2d 1358 (S.D. Fla. 1998), and which provides a witness with at least as much incentive to tell the truth as the threat of a perjury prosecution arising from a civil deposition.

3d at 788; *see also Arch Trading*, 839 F.3d at 207; *MMA Consultants 1*, 245 F. Supp. 3d at 514 (denying jurisdictional discovery because plaintiff failed to demonstrate that it "s[ought] to substantiate specific claims that would demonstrate an exception to Defendants' sovereign immunity").  There is nothing circumspect about the discovery Plaintiffs propose here, and they have made no attempt to identify specific, crucial facts.  Instead, their blanket discovery requests – served prematurely and without leave of the Court – would cover every Saudi Arabian ministry, agency, embassy, and consulate in the world in an effort to turn up presently unknown facts and create new disputes.  KSA Mem. 68-69.

The CAC Plaintiffs make no attempt to defend their overbroad discovery requests under the governing standard (set forth by the Second Circuit in cases such as *Arch Trading* and *EM Ltd.*, and recognized by this Court in *Terrorist Attacks IX*) that limits FSIA jurisdictional discovery to specific facts and claims.  Instead, they offer a bland assurance that "the scope of discovery can be refined through the meet and confer process and judicial management."  CAC Mem. 74 n.51.  But even if Plaintiffs had established an adequate basis for discovery (which they have not), it would be neither Saudi Arabia's nor the Court's role to devise appropriately narrow, claim-specific discovery requests.  That is Plaintiffs' job, and their refusal to do it is an additional reason for this Court to deny discovery – indeed, that refusal is a further reason to believe that Plaintiffs' discovery requests are grounded in nothing but speculation.

The *Ashton* Plaintiffs fare no better.  They have supplemented their earlier request with a 12-page, single-spaced "discovery plan" requesting hundreds of categories, sub-categories, and sub-sub-categories of documents, most of them going back to 1992, ECF No. 3780-1, at 1-7; 15 depositions, including the deposition of Saudi Arabia's current Minister of Islamic Affairs, and also including at least four separate Rule 30(b)(6) depositions, *id.* at 8-11; and third-party

discovery directed to (among other recipients) the 9/11 Commission, the FBI, and the Department

of Justice, apparently including classified information to be produced "on a confidential basis,"

*id.* at 11.  It would be hard to show greater disregard for "a sovereign's . . . legitimate claim to

immunity from discovery."  *EM Ltd.*, 473 F.3d at 486.

Nor do the *Ashton* Plaintiffs, any more than the CAC Plaintiffs, square their discovery

plan with the governing legal standard.  Their discussions of *Arch Trading* and *EM Ltd.* consist

of mere assertions that those cases are "plainly distinguishable," *Ashton* Mem. 32, ignoring the

Second Circuit's admonitions that the FSIA requires "delicate balancing" of sovereign interests,

*EM Ltd.*, 473 F.3d at 486, and that it "protects defendants from . . . fishing expedition[s]," *Arch

Trading*, 839 F.3d at 207.  And, like the CAC Plaintiffs, the *Ashton* Plaintiffs point to nothing in

JASTA that limits this Court's discretion over discovery or varies the circumspect approach the

Second Circuit has directed district courts to apply.  Their failure to conform their overbroad

discovery requests to precedent should lead this Court to deny those requests entirely.

Saudi Arabia's legitimate claim to immunity from discovery is even stronger here

because Plaintiffs seek discovery into extraordinarily sensitive matters about Saudi Arabia's

diplomatic and intelligence services, as well as depositions of senior governmental officials.  *Cf.

Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 494 (S.D.N.Y. 2014) (applying common-law

foreign-official immunity and recognizing Israel's "standing to prevent disclosure of sensitive

information that implicates its national security"); *LNC Invs., Inc. v. Republic of Nicaragua*, No.

96 Civ. 6360 JFK RLE, 1997 WL 729106, at *3 (S.D.N.Y. Nov. 21, 1997) ("Courts have long

held that foreign governments are entitled to protect their executive deliberations.").  To be sure,

Saudi Arabia could and would assert privilege as appropriate against such discovery requests; it

would be premature for this Court to address specific privilege issues now.  But the overall

tendency of Plaintiffs' requests to threaten the national security of an ally of the United States is another strong reason that this Court should exercise its discretion to deny those requests.

### D.   No Evidentiary Hearing Is Warranted

Finally, the *Ashton* Plaintiffs' request for an evidentiary hearing should also be denied. This Court has discretion either to grant or to deny an evidentiary hearing.  *See Filetech*, 157 F.3d at 932 (stating that on remand the district court "m[ight] hold an evidentiary hearing, if it consider[ed] that such a hearing [wa]s warranted"); *see also Arch Trading*, 839 F.3d at 208 (plaintiffs had "no entitlement . . . to a hearing" even where they produced a "few non-conclusory averments").  The *Ashton* Plaintiffs do not identify any percipient fact witness who would testify at such a hearing.  Their expert testimony is unhelpful to the Court and would result merely in a presentation where witnesses as well as counsel argue the purported facts and law.  *See supra* Part I.D.3.  On the present record, no evidentiary hearing is warranted.

## V.   Constitutional Limits on Congress's Power Provide Additional Reasons To Dismiss

It is not necessary for this Court to determine whether JASTA is constitutional in order to grant Saudi Arabia's motion to dismiss.  Therefore, the Court should avoid doing so.  *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).  Article III constraints on Congress's ability to interfere with the judicial power do, however, reinforce the conclusion that Plaintiffs' complaints should be dismissed.  KSA Mem. 70-75.  For one thing, Plaintiffs do not dispute that Congress neither did nor could direct this Court to decide this motion in a specific way.  *Id.* at 70-71; *see* CAC Mem. 75 (acknowledging that Congress "le[ft] for judicial determination whether JASTA's elements are satisfied").

Even if JASTA's elements were satisfied here, Congress would still have exceeded its power as to those Plaintiffs who were originally bound by this Court's final judgment in Saudi Arabia's favor and who persuaded the Second Circuit to reopen that judgment in *Terrorist*

*Attacks VIII*, 741 F.3d 353, so that this Court could apply the same law that had been applied to

Afghanistan in *Doe v. Bin Laden* – law that this Court then determined did not save Plaintiffs'

claims.  KSA Mem. 71-74.  Plaintiffs respond by arguing that the Second Circuit did not "freeze

the law" in *Terrorist Attacks VIII*.  CAC Mem. 76.  But Saudi Arabia's argument is not that the

Second Circuit expressly barred Congress from amending the statute.  Rather, because (as

Plaintiffs do not appear to dispute) the Second Circuit was necessarily exercising exclusive

Article III power when it reopened certain Plaintiffs' cases, Article III itself prevents Congress

from intruding on the exercise of that power.  In this highly unusual (so far as counsel are aware,

unique) situation, Congress's usual power to change the law prospectively does not apply.

## CONCLUSION

Saudi Arabia's motion to dismiss should be granted.

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of January 2018, I caused a copy of the foregoing document to be served electronically using the Court's ECF system on the consolidated MDL docket, and the individual dockets for the following cases:

*Federal Insurance Co., et al. v. al Qaida, et al.*, No. 03-cv-6978
*Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-5970
*Cantor Fitzgerald Assocs., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
*Pacific Employers Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*,
    No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
*Beazley Furlonge Ltd. v. Saudi Binladin Group, Inc., et al.*, No. 16-cv-7456
*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
*McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
*DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
*Ashton, et al. v. Kingdom of Saudi Araba*, No. 17-cv-2003
*The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-2129
*The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
*General Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
*Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
*Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
*Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5471

I have also caused a copy of the foregoing document to be served by electronic mail on all

counsel of record in the following additional cases:

*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-6123
*Allianz Versicherungs-Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-6519
*Fraser, et al. v. Al Qaeda Islamic Army, et al.*, No. 17-cv-7317
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v.*
    *Kingdom of Saudi Arabia, et al.*, No. 17-cv-7914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No 17-cv-8617

It is my understanding that those cases include all consolidated MDL cases in which the

Kingdom of Saudi Arabia is named as a Defendant.

/s/ *Michael K. Kellogg*
Michael K. Kellogg