UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In re: Terrorist Attacks on
September 11, 2001[1]

No. 03 MDL 1570 (GBD) (SN)

**DECLARATION OF AMMAR CHAOUAT**

_____ )

I, Ammar Chaouat, hereby affirm the following under penalty of perjury and submit this declaration in support of Defendant the International Islamic Relief Organization's ("IIRO") memorandum of points and authorities in opposition to Plaintiffs' motion to compel and motion for sanctions filed in the above-captioned case on December 1, 2017.

## EMPLOYMENT BACKGROUND WITH IIRO

1.      I have been employed by IIRO in various positions since 1988, beginning as a programmer in the Information Technology department at the Head Office, where I developed the accounting system, an in-house financial program at IIRO, by using the dataflex programming language produced by Data Access Corporation located in Miami, as set forth in more detail in ¶¶36-37.

---

[1] *This applies to: Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No.* 02-cv-06977 (GBD) (SN); *Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-09849 (GBD) (SN); *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065 (GBD) (SN); *Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970 (GBD) (SN); *Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279 (GBD)(SN); *Federal Insurance Co., et al. v. A1 Qaida, et al.,* Case No. 03-cv-06978 (GBD) (SN); *O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-01923 (GBD) (SN).

2.     In 1998, I was appointed deputy director of the Information Technology department, and supervised its operations.  In 2014, I became the Oracle Financial Consultant, where I managed the Oracle application utilized by IIRO.

3.     Throughout my experience working at IIRO, I gained a general understanding of IIRO's document management system in Jeddah.

## OVERVIEW OF IIRO

4.     IIRO is a non-governmental Islamic charitable organization, headquartered in Jeddah, Kingdom of Saudi Arabia.  IIRO was established by the Muslim World League in 1978 to provide relief and humanitarian assistance to people in need around the world, providing direct assistance to victims of natural disasters and wars.  IIRO sponsors health, education, and social projects including the construction of hospitals, clinics, nutrition centers, schools, and orphanages, as well as the provision of financial and technical support to a wide variety of economic development efforts.

5.     IIRO has more than 45 offices within the Kingdom of Saudi Arabia and abroad. IIRO works with other international relief organizations such as the United Nations High Commission on Refugees ("UNHCR") and the International Conference of Red Cross ("ICRC") and Red Crescent Societies, engaging in humanitarian activities in more than 120 countries.

## OVERVIEW OF EFFORTS TO COMPLY WITH IIRO'S DISCOVERY OBLIGATIONS

6.     Since the inception of the litigation, I have assisted IIRO's U.S. counsel – first Mr. Martin McMahon and then various attorneys from the offices of Lewis Baach Kaufmann Middlemiss ("LBKM") – on various issues pertaining to IIRO's discovery obligations in this litigation.

7.      Between 2005 and 2013, IIRO was served with 194 documents requests, many of which include several subparts, including exhibits and attachments listing 169 names of individuals and entities that apply to ten of those requests, effectively multiplying by many times the requests served on IIRO.  Between 2006 and 2013, IIRO served, through its U.S. counsel, objections and responses to Plaintiffs' document requests.

8.      As part of my duties, I have worked with our counsel to locate documents responsive to the voluminous document requests made by Plaintiffs over the years.  During this time, I searched for documents responsive to Plaintiffs' requests, including but not limited to document requests specifically addressed in the Court's 2011 orders, and have worked with LBKM during their numerous visits to the Kingdom and abroad to supplement IIRO's document productions to ensure that IIRO was in compliance with its obligations.

9.      Prior to my involvement in this litigation, I had no experience with the U.S. discovery process, having never been involved in litigation in any U.S. court.

### *EFFORTS FACILITATED/OVERSEEN BY MR. MCMAHON*

10.      During the time Mr. McMahon served as IIRO's counsel, I assisted IIRO's efforts to collect, review and produce documents responsive to Plaintiffs' document requests.  As such, I have personal knowledge of the efforts taken by IIRO since 2006 to comply with its discovery obligations in this case.  During this time, I became familiar with the document requests served on IIRO by Plaintiffs.

11.      During this time, I implemented and later oversaw the process by which IIRO personnel collected documents potentially responsive to Plaintiffs' document requests and moved them to a warehouse for safekeeping and ease of access.  The team included six IIRO employees, as well as four contractors, who worked with me to collect IIRO's documents over a

period of two years.  Each of these employees speak and read Arabic as their first language, which was crucial given that approximately 99% of IIRO's documents are in Arabic.

12.     In addition, other members of the IIRO staff and I collected documents stored in IIRO's Head Office.  The documents determined to be potentially responsive to Plaintiffs' requests were segregated into boxes in the same order in which they were kept at the Head Office, and copied for delivery to the US for counsel's review and potential production.

13.     Between 2006 and 2011, I would estimate that the team spent over 10,000 hours reviewing and collecting documents potentially responsive to Plaintiffs' document requests.

14.     During the document collection process, I learned that Mr. McMahon offered Plaintiffs' counsel the opportunity to come to Jeddah to conduct their own review of IIRO's documents.  My understanding is that no limitations were placed on this offer—in other words, it was on an "open-file" basis and Plaintiffs' counsel would be allowed access to the over one million pages of documents located in the warehouse.  Ultimately, I understand that Plaintiffs rejected that offer because of concerns about traveling to Saudi Arabia.  To address those stated concerns, we offered to image all the documents stored in the Jeddah warehouse on the condition that Plaintiffs bear the cost of that task.  I understand further that Plaintiffs rejected that offer as well.

15.     After Plaintiffs rejected each of these offers, the decision was made to provide Plaintiffs with two comprehensive indices cataloging each document stored in the Jeddah warehouse.

16.     All documents stored in the Jeddah warehouse were catalogued into two indices: (1) Correspondences, and (2) Financial documents. The indices we prepared included information such as the date of the documents, a brief description of the documents, and the

4

location of each document in the warehouse.  In addition, the index cataloging the financial documents included information such as the number of the transaction, its date, the internal account name and number, the amount credited or debited, and a brief description of the contribution or disbursement.  When the process was complete, the combined indices totaled more than 6,500 pages and approximately 180,000 entries.

17.     The process of compiling the indices for all documents collected from the Jeddah Head Office and stored in the warehouse was extremely time-consuming.  I would estimate that no less than 5000 hours were spent preparing the indices.

18.     In light of the detailed information provided in the aforementioned indices, it was troubling to learn that counsel for the Plaintiffs stated that they could not make any use of them. Upon hearing this, I understand that Mr. Sameer al-Radhi [former client representative] attempted to explain to Plaintiffs' counsel the manner in which the indices were organized in a conference call.

19.     During the period of Mr. McMahon's involvement, there were a number of issues that led to miscommunication between IIRO representatives and Mr. McMahon, including: (1) the language barrier between Mr. McMahon, who does not speak Arabic, and members of the organization, including myself, who do not have a strong control over the English language; (2) the fact that the vast majority of the documents are in Arabic and Mr. McMahon could not read Arabic; (3) and the technical and voluminous nature of the Plaintiffs' document requests, which were written in English and contained numerous subparts.

20.     Despite these challenges, IIRO endeavored to comply with its discovery obligations and arranged for ways to manage the very complicated process of locating responsive

documents, which included efforts by IIRO employees and representatives to review and identify potentially responsive documents with the advice and assistance of Mr. McMahon.

21.     In addition to the foregoing efforts, I also understand from U.S. counsel that Plaintiffs were given access to numerous boxes of documents returned from the FBI and Homeland Security as well as the tax division of the IRS, which were stored in the U.S. at Mr. McMahon's office.

### *EFFORTS FACILITATED/OVERSEEN BY LBKM*

22.     In November 2012, IIRO sought to address concerns relating to the adequacy of its document productions by changing its counsel in this litigation from Martin McMahon & Associates to a larger firm, LBKM, which IIRO understood had worked on complex legal cases involving companies based in Saudi Arabia.  The determination to change counsel was based on the view that LBKM would be more capable of representing IIRO's interests in this litigation due to its history of working with clients in the Kingdom, the firm's Arabic speaking attorneys, and their ability and willingness to travel to our Head Office in Jeddah.

23.     LBKM was retained in late 2012 to replace Martin McMahon & Associates as counsel for IIRO.  Since LBKM's retention in this litigation, I have worked with attorneys from LBKM to locate additional documents responsive to Plaintiffs' document requests, including but not limited to documents within the categories of documents for which the Court ordered production in 2011. In 2014, my role with IIRO expanded and I was designated as IIRO's representative for purposes of handling various issues arising out of this litigation, including assisting with IIRO's document production efforts.

24.     In addition to my work at the Head Office in Jeddah, I also facilitated worldwide visits of regional offices in the Eastern Province and Riyadh, Saudi Arabia, as well as visits to

foreign branch offices in the Philippines, Indonesia, Pakistan, Bosnia, Albania, Macedonia, Kosovo, Jordan, Tanzania, Kenya, and Sudan.  We also sent representatives to personally assist with LBKM document reviews and collections from the Philippines, Eastern Province, Sudan, Tanzania, Kenya and Jordan.  As part of those efforts, I ensured that the LBKM attorneys had full access to all records that they requested.

25.     Arranging and facilitating the LBKM attorney visits to the 11 foreign branch offices listed in ¶24 over the years was an incredibly cumbersome and time consuming process, undertaken at great expense to IIRO.

26.     The visits to the branch offices also caused great disruptions in IIRO activities in those offices due to the local employees facilitating the review and in some locations conducting the scan efforts of the responsive documents personally in those locations.  Some disruption also occurred as well at Head Office due to employees being sent to accompany the LBKM attorneys on some visits.

27.     Conducting similar visits in the over 35 additional offices worldwide would be an incredibly burdensome and expensive task that would likely take approximately one to two years, if not longer, to complete.  It would require an LBKM attorney to visit each of these offices to conduct the review due to the complicated and voluminous nature of the Plaintiffs' document requests; and necessitate innumerable resources to facilitate access to the documents and the scanning of any documents deemed potentially responsive.

### *Eastern Province*

28.     With regards to the IIRO office located in the Eastern Province of Saudi Arabia, IIRO assisted in efforts that led to the re-opening of this office, which was closed by order of the Kingdom of Saudi Arabia in 2006.  The office was re-opened for the specific purpose of U.S.

counsel reviewing documents stored there and collecting documents responsive to Plaintiffs' document requests in this litigation.

29.     During their visit, LBKM attorneys were given access to the documents stored in the Eastern Province to conduct a responsiveness review and to collect all documents that they deemed responsive to Plaintiffs' requests and the Court's orders.  I understand from U.S. counsel that all responsive documents have been produced.

### *Riyadh Office*

30.     The IIRO Riyadh regional office oversaw the operations of the Pakistan branch office during the relevant discovery period.  Due to the loss of records on account of the burning of records by Mr. Moayid Al Butayri and Amir Jasim in late 2000 or early 2001 as discussed in ¶48, we facilitated a visit to the Riyadh office to search for documents from the Pakistan office during this time.

31.     To the extent that any documents relating to Pakistan from 1992-2001 were maintained in the Riyadh regional office, they were made available to LBKM attorneys for review and all responsive documents were produced.

### *SUMMARY OF OVERALL EFFORTS*

32.     I have worked with attorneys from LBKM since their retention to facilitate their access to records, in Jeddah and abroad, that may have contained documents responsive to Plaintiffs' document requests, including without limitation those enumerated in the Court's April 2011 Orders.  This included, but was not limited to, documents pertaining to senior officials at IIRO, Saudi officials, MWL and IIRO delegations, IIRO annual budgets, Saudi government ministries and embassies, IIRO board of directors, committees, councils, and internal bodies, investigations and alleged arrests of IIRO personnel, alleged raids and closures of IIRO branch

offices, IIRO Islamic Centers and mosques, IIRO's relationship with universities, IIRO's relationship with Wael Jelaidan, El Fatih Hassenein, and Sukarno Hassanein, IIRO's relationship with the SJRC, SHC, SRC, WAMY, TWRA, Rabita Trust, Al Haramain Al Masjid Al Aqsa and other Islamic non-profit organizations, to the extent that any such records existed.  I understand from U.S. counsel that all responsive documents have been produced.

33.     In total, since the inception of the discovery period over 11 years ago I would estimate that I have spent 8000 hours working to facilitate the collection of documents potentially responsive to Plaintiffs' voluminous document requests to IIRO.

34.     As a result of these efforts, I understand from U.S. counsel that millions of pages were reviewed and that IIRO has produced over 340,000 pages of responsive material from across the globe at great expense to the organization.  In addition, I understand that Plaintiffs have also collected and produced over 114,000 pages of combined IIRO and MWL documents from Mr. McMahon's office that, as noted above, were made available to them.

## ELECTRONICALLY STORED INFORMATION

35.     As a result of my employment at the IT department and my role in implementing these systems, I have gained an understanding of the two systems that IIRO utilized between 1992 and 2004 to maintain electronically stored information ("ESI"): the Accounting System and the Electronic Archives.

### *Accounting System*

36.     The accounting system, which I developed using the dataflex programming language produced by Data Access Corporation located in Miami, stores raw data and allows IIRO the ability to generate reports based on that data.  It was implemented by IIRO's IT department in the late 1980s, and was utilized to store the financial department's data from 1992-

2004.   The accounting system is an archaic system that uses the DOS operating system; generating search results for specific names is very time consuming, as is the process of printing out reports, which uses dot matrix printing.

37.      I searched for and printed accounting reports of summaries of contributions from donors and disbursements to selected branch offices.  IIRO's attorneys also provided me with a list of over 300 names of individuals and entities, and I, with the help of one assistant, ran searches of every name on the list.  I printed the reports of the searches that generated results and provided those reports to IIRO's attorneys.  This process took months to complete.

### Saperion Archiving System

38.      The Saperion Archiving System stores scanned copies of IIRO documents from each department, with the exception of the financial department.  The archiving process started in 2003.  Simply stated, this is a system that stores electronic copies of documents already maintained in hard copy by IIRO's departments.  When documents are digitized, the technician has the option to input certain relevant information for each document, such as the date, the reference number, the name of the sender and/or receiver, and a brief description of the document.  Because each department independently provides the IT department with its files to be scanned, the completeness of the digitization of each department's files depends on whether each respective department has provided all its records.

39.      In addition to searches of the hardcopy documents that were conducted, IIRO also conducted searches in the electronic archives system for the list of over 300 names of individuals and entities referenced above.  Because this system requires the user to query the system in various ways to ensure that the results are comprehensive, these searches were very time consuming and the entire process took weeks to complete.

## DOCUMENTS MAINTAINED BY IIRO BRANCH OFFICES

40.     As part of the work I have done over the course of this litigation, I have gained an understanding of some of the ways in which documents have been maintained at certain of IIRO's branch offices.  In particular, I have acquired knowledge concerning IIRO documents stored in the Eastern Province, Riyadh, Philippines, Indonesia, Pakistan, Bosnia, Albania, Kosovo, Macedonia, Kenya, Sudan, Tanzania and Jordan.

41.     Prior to 2004, IIRO did not have a uniform global document storage and organization protocol applicable to the branch offices.  Moreover, whether an office had documents responsive to Plaintiffs' requests varied widely depending on the office, as did the volume of documents and the organization of the documents stored in a particular office.

42.     Furthermore, although there was a protocol implemented requiring offices to submit project and financial reports to Head Office on a regular basis, IIRO branch offices around the world would, at times, periodically submit reports about the activities of their offices and financial reports.  While transmissions of documents occurred periodically, regular and complete transmissions were not made by the various branch offices to Head Office during the relevant time period.

43.     I address below particular aspects unique to certain IIRO branch offices that I discovered during my efforts to locate potentially responsive documents and respond to inquiries from the LBKM attorneys.

### *Indonesia*

44.     IIRO maintains a branch office located in Indonesia.

45.     Some operational files previously located in the branch office in Indonesia were destroyed during a significant flood that occurred in Jakarta in early 2002.

46.     My knowledge of the destruction of these files is based on information provided to IIRO by the joint IIRO/MWL-Indonesia director, Mr. Fahad bin Sanad al-Harbi, who informed Head Office of these floods.

### Pakistan

47.     IIRO maintains a branch office located in Pakistan.

48.     As documented in the records produced in this litigation, former office director Moayid Al Butayri and former office accountant Amir Jasim destroyed files maintained in the branch office located in Pakistan in an attempt to cover up their embezzlement of funds. Specifically, a letter from Shoukat Hayat, the Pakistani Inquiry Officer into the matter, which was produced in this litigation with the Bates number IIRO 168291 states that "Amir Jasim burnt the record of IIRO on the orders of Moayid Al Butayri the then Director General of this office."

49.     Additionally, Mr. Rahmatullah Gari, who was appointed Director of the Pakistan office in February 2001, confirmed that only a small number of records existed at this office when he assumed his duties in February 2001.

### Vienna

50.     Based on my understanding, the IIRO Vienna office oversaw relief efforts in the Balkans stemming from the hostilities in Bosnia, which ceased in late 1995.  In 1998, the Vienna office closed after the necessary residual humanitarian work stemming from the hostilities ceased.

51.     Based on my understanding, some documents from the office were transferred to the IIRO-Bosnia office, which the Vienna office oversaw, and some were returned to the Head

Office.  In efforts to locate IIRO-Vienna documents, IIRO facilitated LBKM attorneys' searches in the Bosnia office and in Head Office.  I also understand from our LBKM attorneys that MWL also provided access to documents stored in the MWL Cultural Center located in Vienna, but no IIRO documents were found there.

52.     To the extent that any documents relating to the Vienna office existed in any location, they were made available to LBKM attorneys for review and all responsive documents have been produced.

## IIRO FINANCIAL RECORDS

53.     Throughout the course of discovery, IIRO has taken great pains to locate and produce bank statements for the 1992 to 2004 time period from the Head office and branch offices visited in the course of our document collection efforts.  In addition, letters were sent to IIRO offices requesting copies of statements for bank accounts held by their offices.  IIRO Head office employees were also sent to the regional offices in the KSA to collect the responsive statements stored in those offices.  Lastly, IIRO sent letters directly to banks requesting statements for its accounts.  I understand from U.S. Counsel all responsive documents have been produced.

54.     In 2016, Plaintiffs provided LBKM attorneys with a list of bank accounts allegedly belonging to IIRO and MWL offices in Pakistan.  I contacted the current Pakistan director to inquire about these accounts, and he contacted the banks in Pakistan to request statements for the accounts belonging to MWL and IIRO.   The banks could not provide the statements as the accounts were either dormant, or were opened by individuals in their personal capacity, and therefore not accessible to IIRO.

55.     Throughout the course of discovery, IIRO also sent letters to branch office directors requesting all audits that were performed between 1992 and 2004.  LBKM attorneys also communicated with the external auditors that performed the Pakistan audit requesting any underlying documents, but were informed that none remain in their possession.  I understand from U.S. counsel that all responsive documents have been produced.

## IIRO HEAD OFFICE COMMITTEES

56.     As part of the operations at the Head office, IIRO regularly creates temporary committees for a specified task, such as to collect and destroy old checkbooks for an account no longer in use or to inventory relief items stored at the warehouse.  These temporary committees existed for a short period of time, until the completion of their purpose, and did not typically maintain regular records.

57.     All potentially responsive documents relating to these committees were made available to LBKM attorneys for review and all responsive documents have been produced.

## SANABELL DOCUMENTS

58.     On behalf of IIRO, I facilitated a meeting with the Financial Director of Sanabell in Saudi Arabia and LBKM attorneys, during which they provided him with a list of categories of documents related to Sanabell.  Sanabell searched their records and isolated potentially responsive documents, which were made available to LBKM attorneys for review and all responsive documents have been produced.

59.     Furthermore, to the extent that any documents related to Sanabell from the relevant time period exist in IIRO's possession, they were made available to LBKM attorneys for review and all responsive documents have been produced.

## KSA GOVERNMENT DOCUMENTS

60.     During the initial search and collection of documents from IIRO's Head Office, documents that were deemed potentially responsive to requests relating to the KSA government were identified and segregated.

61.     After potential claims of privilege with respect to these documents were considered by our U.S. counsel, all responsive documents were produced.  No documents were withheld on the basis of privilege.

## ZAHER ABDELAZIZ

62.     Based on my understanding from documents produced in this litigation, Zaher Abdelaziz was the Executive Director of the Balkans region between 1993 and the date of his resignation in 1996.

63.     To the extent that any documents relating to Zaher Abdelaziz exist, they were maintained either at IIRO-Bosnia or in Saudi Arabia and were made available to LBKM attorneys for review and all responsive documents have been produced.

## MOHAMED JAMAL KHALIFA

64.     Based on my understanding from documents produced in this litigation, Mohamed Jamal Khalifa was the Director of IIRO-Philippines from 1988 to 1993 when he resigned his post.  From 1993 until his death in 2007, he had no connection whatsoever with IIRO, through IIRO-Philippines, or otherwise.

65.     To the extent that any documents relating to Mohamed Jamal Khalifa exist, they were maintained either at IIRO-Philippines or at the Head Office and they were made available to LBKM attorneys for review and all responsive documents have been produced.

I do solemnly declare and affirm under the penalties of perjury that the above foregoing statements are true and correct to the best of my knowledge, information, and belief.


Executed on: _____          _____

                                                  Ammar Chaouat

محكمة الدائرة الجنوبية بنيويورك

|  |
|---|
| بشأن: الهجمات الإرهابية في 11 سبتمبر 2001[1] |
|  |
| No. 03 MDL 1570 (GBD) (SN) |
|  |
| بيان عمار شواط |
|  |

أنا، عمار شواط، أقر بما يلي تحت القسم باليمين وأقدم هذا البيان لدعم مذكرة دفاع المدعى عليها هيئة الإغاثة الإسلامية العالمية ("الهيئة") التي تحتوي على نقاط وسلطات تعارض طلب المدعين بالإلزام وطلب فرض العقوبات والذي تم رفعهما في القضية المذكورة أعلاه بتاريخ 1 ديسمبر 2017.

## الخلفية الوظيفية مع الهيئة

1. لقد عينت من قبل الهيئة في مناصب مختلفة منذ عام 1988، وبدأت كمبرمج في إدارة تقنية المعلومات في الأمانة العامة، حيث صممت النظام المالي وهو برنامج مالي مخصص لاستعماله داخلا في الهيئة، وذلك باستخدام لغة البرمجة داتافلكس التي تنتجها شركة داتا اكسس القائمة في ميامي، على النحو المبين في مزيد من التفاصيل في الفقرتين 36–37.

2. في العام 1998 تم تعييني نائبا لمدير إدارة تقنية المعلومات وأشرفت على عملياتها. وفي العام 2014 أصبحت مستشارا لبرنامج أوراكل المالي حيث قمت بإدارة تطبيق برنامج الأوراكل الذي تستخدمه الهيئة.

---

[1] ينطبق على: *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977 (GBD) (SN); *Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-09849 (GBD) (SN); *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065 (GBD) (SN); *Continental Casualty Co., et al. v. A1 Qaeda et al.*, Case No. 04-cv-05970 (GBD) (SN); *Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279 (GBD)(SN); *Federal Insurance Co., et al. v. A1 Qaida, et al.*, Case No. 03-cv-06978 (GBD) (SN); *O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-01923 (GBD) (SN).

1



3. خلال فترة خبرتي العملية في الهيئة، اكتسبتُ معرفة عامة عن كيفية إدارة وثائق الهيئة في جدة.

### نبذة عامة حول الهيئة

4. الهيئة هي منظمة خيرية إسلامية غير حكومية، يقع مركزها الرئيسي في جدة، المملكة العربية السعودية. تم تأسيسها بواسطة رابطة العالم الإسلامي في العام 1978 لتقديم الدعم الإغاثي والإنساني للمحتاجين حول العالم، وذلك بتقديم العون المباشر لضحايا الكوارث الطبيعية والحروب. تدعم الهيئة مشاريعا صحية وتعليمية واجتماعية بما في ذلك تشييد المستشفيات والعيادات ومراكز التغذية والمدارس ودور الأيتام، فضلا عن توفير الدعم المالي والتقني لمجموعة واسعة في مجالات التنمية الاقتصادية.

5. لدى الهيئة أكثر من 45 مكتبا في المملكة العربية السعودية وخارجها. وتعمل الهيئة مع منظمات اغاثية عالمية أخرى مثل مفوضية الأمم المتحدة السامية لشؤون اللاجئين ("المفوضية") والمؤتمر الدولي للصليب الأحمر وجمعيات الهلال الأحمر، وتمارس أنشطة إنسانية في أكثر من 120 دولة.

### نبذة عامة عن الجهود الرامية إلى الإمتثال بإلتزامات الإستكشاف الخاصة بالهيئة

6. منذ بدء الدعوى، قدمتُ المساعدة لمحامي الهيئة الأمريكين — الأول السيد مارتن مكمان وبعده عدة محامين من مكتب لويس باخ كافمان ميدليس ("LBKM") في عدد من المسائل المتعلقة بإلتزامات إستكشاف الهيئة في هذه الدعوى.

7. بين عامي 2005 و2013، تلقت الهيئة 194 طلبا للوثائق، يتضمن العديد منها عدة أجزاء فرعية، من ضمنها مستندات قانونية ومرفقات تستعرض 169 اسما لأفراد وشخصيات معنوية تنطبق على عشرة من هذه الطلبات، فأدى ذلك الى مضاعفة الطلبات المقدمة للهيئة. وبين عامي 2006 و2013 قدمت الهيئة من خلال محاميها الأمريكين اعتراضات وردود على طلبات المدعين للوثائق.

8. وكجزء من مهامي، عملت مع محامينا على إيجاد الوثائق التي تستجيب لطلبات الوثائق الغزيرة التي قدمها المدعون خلال الأعوام. خلال ذلك الوقت، بحثت عن وثائق تستجيب لطلبات المدعين —



بما في ذلك على سبيل المثال لا الحصر– طلبات الوثائق التي تم تناولها تحديدا في أوامر المحكمة في العام 2011، كما عملت مع محامي LBKM خلال زياراتهم العديدة الى المملكة وخارجها لإستكمال المستندات التي ستقدمها الهيئة لضمان إمتثالها بإلتزاماتها.

9. قبل مشاركتي في هذه الدعوى، لم يكن لدي خبرة بعملية الكشف الإلزامي الخاص بالمحاكم الأمريكية، حيث أني لم أشترك مسبقا بأي دعوى تخص المحاكم الأمريكية.

*جهود سهلها/أشرف عليها المحامي مكمان*

10. خلال الفترة التي عمل فيها السيد مكمان محاميا للهيئة، ساعدت في جهود الهيئة لجمع ومراجعة وتقديم الوثائق المستجيبة لطلبات المدعين. ولذلك، لدي علم شخصي بالجهود التي بذلتها الهيئة منذ العام 2006 للإمتثال بإلتزامات الكشف الالزامي في هذه القضية. وخلال هذا الوقت، أصبحت متآلفاً مع طلبات المستندات التي قدمها المدعون للهيئة.

11. خلال هذا الوقت، نفذت ثم بعدها أشرفت على الإجراء الذي قام به موظفوا الهيئة بجمع الوثائق التي من المحتمل أن تستجيب لطلبات المدعين للوثائق ومن ثم تم نقلها إلى مستودع لحفظها وتسهيل الوصول إليها. شمل الفريق ستة من موظفي الهيئة وأربعة متعاقدين حيث عملوا معي في جمع وثائق الهيئة خلال فترة عامين. كل واحد من هؤلاء الموظفين يتكلم ويقرأ اللغة العربية التي هي لغته الأم، بحيث كان ذلك ضروري خاصة وأن 99% من وثائق الهيئة مكتوبة باللغة العربية.

12. اضافة الى ذلك، قمت مع عدد آخر من موظفي الهيئة بجمع وثائق محفوظة في الأمانة العامة للهيئة. تم فصل الوثائق المستجيبة لطلبات المدعين في صناديق بنفس الترتيب المتبع حفظها في الأمانة العامة، وتم إصدار نسخ لها لإرسالها الى الولايات المتحدة ليراجعها المحامي ومن ثم قد يقوم بتقديمها.

13. بين عامي 2006 و2011، أُقدر بأنه أمضى فريق العمل أكثر من 10,000 ساعة في مراجعة وجمع الوثائق التي يُحتمل أن تكون مستجيبة لطلبات المدعين للوثائق.

14. خلال عملية جمع الوثائق، علمت أن السيد مكمان عرض على محامي المدعين الفرصة للحضور إلى جدة لمراجعة وثائق الهيئة بأنفسهم. وفهمت أنه لم يكن ثمة أي قيود على هذا العرض — أو

3



بمعنى آخر كان عرضا "مفتوحا للملفات" حيث كان سيُسمح للمحامي المدعين الوصول إلى أكثر من مليون صفحة من الوثائق المحفوظة في المستودع. وبالتالي فهمت أن المدعين رفضوا هذا العرض بسبب مخاوف تتعلق بالسفر إلى المملكة العربية السعودية. لمعالجة هذه المخاوف عرضنا القيام بتصوير جميع الوثائق المحفوظة في المستودع في جدة شريطة أن يتحمل المدعون تكاليف هذه المهمة. وفهمت بعدا أن المدعين رفضوا هذا العرض أيضا.

15. بعد أن رفض المدعون جميع هذه العروض، تم اتخاذ قرار بتزويد المدعين بجدولين شاملين يفهرسان كل وثيقة مخزّنة في المستودع في جدة.

16. تمت فهرست جميع الوثائق المحفوظة في مستودع جدة في جدولين كالتالي: (1) المراسلات و(2) الوثائق المالية. تضمنت الجداول التي قمنا بإعدادها معلومات مثل تاريخ الوثائق ووصف موجز لها ومكان حفظ كل وثيقة في المستودع. بالإضافة الى ذلك، تضمن الجدول الذي يفهرس الوثائق المالية على معلومات مثل رقم المعاملة وتاريخها واسم الحساب الداخلي ورقمه والمبلغ الدائن أو المدين ووصف موجز للمساهمة أو الإنفاق. عندما تم استكمال العملية، بلغ إجمالي صفحات الجداول المعدة أكثر من 6,500 صفحة و حوالي 180,000 قيد.

17. لقد استغرقت عملية إعداد الجداول وفهرست جميع الوثائق التي تم جمعها من الأمانة العامة في جدة وحفظها في المستودع وقتا طويلا جدا. وبحسب تقديري، فلقد قضينا ما لا يقل عن 5000 ساعة في إعداد الجداول.

18. على ضوء المعلومات المفصلة الواردة في الجداول الآنفة الذكر، أزعجنا تصريح محامو المدعون بأنهم لن يستفيدوا منهم. وبعد سماع ذلك، فهمت أن السيد سمير الراضي حاول عبر مكالمة هاتفية أن يشرح لمحاميّ المدعين طريقة تنظيم الجداول.

19. خلال الفترة التي شارك فيها السيد مكمان، كان هنالك عدد من المسائل التي أدت إلى سوء التواصل بين ممثلي الهيئة والمحامي مكمان بما في ذلك: (1) الحاجز اللغوي بين السيد مكمان الذي لا يتكلم العربية وبين أعضاء الهيئة بمن فيهم نفسي، إذ أنهم ليسوا أقوياء باللغة الانجليزية، (2) واقع أن أغلبية الوثائق مكتوبة باللغة العربية والمحامي مكمان لا يستطيع القراءة باللغة العربية، (3) الطابع

4



التقني وحجم وطلبات الوثائق الغزيرة من المدعين، والمكتوبة باللغة الإنجليزية والتي تحتوي على الكثير من الأجزاء الفرعية.

20. على الرغم من هذه التحديات، الّا ان الهيئة سعت للامتثال بإلتزاماتها إستكشاف الوثائق ووضعت طرق لإدارة العملية المعقدة جدا لإيجاد الوثائق التي تجيب على طلب المدعين وتضمن ذلك بذل موظفي الهيئة وممثليها جهودا لمراجعة وتحديد الوثائق التي من المحتمل مستجيبة مع الأخذ بمشورة ومعونة السيد مكمان.

21. بالاضافة الى الجهود المذكورة آنفا، فهمت أيضاً من المحامين الأميركين أن المدعين مُنِحوا حق الوصول الى الكثير من صناديق الوثائق التي أعادها مكتب المباحث الفيدرالية والأمن القومي وأيضا شعبة الضرائب في دائرة الإيرادات الداخلية، التي تم حفظها في الولايات المتحدة في مكتب المحامي مكمان.

### *جهود سهلها/أشرف عليها مكتب LBKM*

22. في نوفمبر 2012، سعت الهيئة إلى تناول المسائل المتعلقة بكفاية الوثائق التي قدمتها وذلك بتغير محاميها في هذه الدعوى من المحامي مارتن مكمان وشركاه الى مكتب محاماة أكبر، LBKM، والذي علمت الهيئة أنهم عملوا على قضايا قانونية معقدة تضمنت شركات تقع في السعودية. جاء قرار تغيير المحامين بناء على وجهة النظر بأن LBKM سيكونوا أكثر قدرة على تمثيل مصلحة الهيئة في هذه الدعوى نتيجة تاريخ عملهم الطويل مع موكلين من المملكة ولوجود محامين ناطقين باللغة العربية في مكتبهم وأيضا لقدرتهم واستعدادهم للسفر الى الأمانة العامة في جدة.

23. تم توكيل LBKM في أواخر العام 2012 ليحل محل مارتن مكمان وشركاه كمحام للهيئة. منذ توكيل LBKM لهذه الدعوى عملت مع محامين من LBKM لإيجاد وتحديد المزيد من الوثائق التي تستجيب لطلبات المدعين للوثائق بما في ذلك وعلى سبيل المثال لا الحصر وثائق تندرج ضمن تصنيف الوثائق التي أمرت المحكمة بتقديمها في العام 2011. في العام 2014 توسعت مهمة

5



عملي في الهيئة حيث تم تعييني ممثلا للهيئة لأغراض التعاطي مع العديد من القضايا الناشئة عن هذه الدعوى، بما في ذلك معاونة الهيئة في جهود تقديم الوثائق.

24. بالإضافة إلى عملي في الأمانة العامة في جدة، قمت بتسهيل عدد من الزيارات حول العالم للمكاتب الإقليمية في المنطقة الشرقية والرياض في السعودية، فضلا عن زيارات لمكاتب فرعية خارجية في الفلبين وأندونيسيا وباكستان والبوسنة وألبانيا ومقدونيا وكوسوفو والأردن وتنزانيا وكينيا والسودان. كما أرسلنا ممثلينا شخصيا ليساعدوا LBKM في مراجعة الوثائق وجمعها من مكاتب الفلبين والمنطقة الشرقية والسودان وتنزانيا وكينيا والأردن. وكجزء من هذه الجهود، حرصت على تمكّن محاميّ LBKM من الوصول إلى جميع السجلات التي طلبوها.

25. وكان ترتيب وتسهيل زيارات محامو LBKM الى المكاتب الفرعية الخارجية الإحدى عشرة والمدرجة في الفقرة 24 خلال هذه الأعوام عملية مرهقة للغاية وتستهلك وقتا طويلا، ومكلفة جدا للهيئة.

26. وتسببت أيضا الزيارات إلى مكاتب الهيئة الفرعية بإرباك أنشطة الهيئة في هذه المكاتب بسبب قيام الموظفين المحليين بتسهيل المراجعة وفي بعض الأماكن بذل مجهود شخصي للتصوير الضوئي للوثائق المستجيبة. كما حدث بعض التعطيل أيضا في الأمانة العامة بسبب إرسال موظفين لمرافقة محامي LBKM في بعض الزيارات.

27. إن إجراء زيارات مماثلة في أكثر من 35 مكتب إضافي في جميع أنحاء العالم سيكون مهمة مرهقة ومكلفة جدا ومن المرجح أن تستغرق من عام إلى عامين إن لم يكن أكثر من ذلك لإكمالها. وقد يتطلب الأمر من محامي LBKM بزيارة كل من هذه المكاتب للاطلاع على المستندات نتيجة للطبيعة المعقدة والضخمة لطلبات المدعين للوثائق، والتي تستلزم موارد لا حصر لها لتسهيل الوصول الى الوثائق ولتصوير أي وثائق تعتبر محتملة الإستجابة.

*المنطقة الشرقية*

28. بخصوص مكتب الهيئة الواقع في المنطقة الشرقية للمملكة العربية السعودية، ساهمت الهيئة في بذل الجهود التي أدت إلى إعادة فتح هذا المكتب، الذي تم إغلاقه بناء على أمر من المملكة العربية

السعودية في العام 2006. تمت إعادة افتتاح المكتب لغرض محدد لمراجعة الوثائق المحفوظة من قبل المحامي الأمريكي وجمع الوثائق المستجيبة لطلبات المدعين للوثائق في هذه الدعوى.

29. أثناء زيارة محامو LBKM، أُتيح لهم الوصول إلى الوثائق المحفوظة في المنطقة الشرقية لإجراء مراجعة للمستندات المستجيبة ولجمع كل الوثائق المستجيبة لطلبات المدعين وأوامر المحكمة. وفهمت من المحامين الأمريكيين أنه تم تقديم جميع الوثائق المستجيبة.

### مكتب الرياض

30. أشرف مكتب الهيئة الإقليمي في الرياض على عمليات مكتب الهيئة في باكستان خلال فترة الاستكشاف المعنية، وبسبب فقدان السجلات الناتج عن حرقها من قبل الأستاذ مؤيد البتيري وعامر جاسم في أواخر 2000 أو أوائل 2001 كما تمت مناقشته في الفقرة رقم 48، فقد سهَّلنا زيارة تم إجراؤها إلى مكتب الرياض للبحث عن وثائق تعود لمكتب باكستان خلال ذلك الوقت.

31. في حالة وجود أي وثائق متعلقة بباكستان من 1992 الى 2001 و محتفظة في المكتب الإقليمي في الرياض، فقد تم إتاحتها لمحامي LBKM للاطلاع عليها وقاموا بتقديم كل الوثائق المستجيبة.

### نبذة عامة عن الجهود الإجمالية

32. عملت مع محامين من LBKM منذ تعيينهم لتسهيل حصولهم على السجلات في جدة وخارجها والتي قد تتضمن وثائق تستجيب لطلبات المدعين بما في ذلك وعلى سبيل المثال لا الحصر تلك المذكورة في أوامر المحكمة الصادرة في إبريل 2011. يتضمن ذلك وعلى سبيل المثال لا الحصر وثائق تتعلق بمسؤولين كبار في الهيئة، ومسؤولين سعوديين، ووفود تابعة للهيئة والرابطة، وميزانيات الهيئة السنوية، ووزارات الحكومة السعودية وسفاراتها، ومجلس إدارة الهيئة ولجانها ومجالسها والهيئات الداخلية، والتحقيقات مع موظفي الهيئة واعتقالاتهم المزعومة، والمداهمات المزعومة لمكاتب الهيئة وإغلاقها، ومراكز الهيئة الإسلامية ومساجدها، وعلاقة الهيئة بالجامعات، وعلاقة الهيئة بوائل جليدان وبالفاتح حسنين وبسوكارنو حسنين، وعلاقة الهيئة باللجنة السعودية المشتركة لإغاثة كوسوفو (SJRC) و الهيئة السعودية العليا لإغاثة البوسنة والهرسك (SRC) والندوة العالمية

page number
7



للشباب الإسلامي (WAMY) و وكالة الإغاثة في العالم الثالث (TWRA) و وقف الرابطة والحرمين المسجد الأقصى وغيرها من المنظمات الإسلامية التي لا تهدف للربح، في حال وجود أي من هذه السجلات، فهمت من المحامين الأمريكين أنه تم تقديم جميع الوثائق المستجيبة.

33. إجمالا، ومنذ بداية فترة الإستكشاف قبل أكثر من 11 عاما أقدر أنني قضيت حوالي 8000 ساعة عمل لتسهيل عملية جمع الوثائق المحتملة الإستجابة لطلبات المدعين الكثيفة التي قدمت للهيئة.

34. نتيجة لهذه الجهود، فهمت من المحامين الأمريكين أنه تم مراجعة ملايين الصفحات وأن الهيئة قد قدمت أكثر من 340,000 صفحة من الوثائق المستجيبة من حول العالم وبتكلفة باهظة جدا. إضافة الى ذلك، فهمت أن المدعين جمعوا وقدموا أكثر من 114,000 صفحة من وثائق للهيئة والرابطة مجتمعة من مكتب الأستاذ مكمان، وهي الوثائق التي كما سبق وذكرنا آنفا تم توفيرها لهم.

## المعلومات المخزنة إلكترونيا

35. نتيجة لعملي في إدارة تقنية المعلومات ومهمتي في تنفيذ هذه الأنظمة، إكتسبت معرفة في النظامين التي استخدمتهما الهيئة بين 1992 و 2004 لحفظ المعلومات المخزنة إلكترونيا ("ESI") وهما: النظام المالي و نظام سابريون للأرشفة.

### النظام المالي

36. يقوم النظام المالي، والذي أعددته بإستخدام لغة برمجة داتافليكس، الذي أصدرته شركة داتا اكسس القائمة في ميامي، بتخزين بيانات أولية وتسمح للهيئة إعداد تقارير بناء على تلك البيانات. وقد تم تنفيذ هذا النظام من قبل إدارة تقنية المعلومات في الهيئة في أواخر الثمانينات وتم استخدامه لتخزين بيانات الإدارة المالية بين 1992 و 2004. إن النظام المالي هو نظام قديم يستخدم نظام تشغيل دوس، والحصول على نتائج بحث لأسماء معينة يستغرق وقتا طويلا وكذلك عملية طباعة التقارير والتي تتم بإستخدام طابعات نقطية.



37. بحثت عن وطبعت تقارير مالية عن ملخصات مساهمات المانحين وإنفاقات مكاتب فرعية مختارة، كما قدم لي محاميّ الهيئة لائحة بأكثر من 300 اسم لأفراد وشخصيات معنوية، وقمت أنا وبمعاونة مساعد واحد بالبحث عن كل اسم من الأسماء المذكورة في اللائحة. ثم طبعت تقارير البحوث بالنتيجة التي أعطتها وقدمتها لمحاميّ الهيئة. استغرقت هذه العملية أشهراً لإستكمالها.

## نظام سابريون للأرشفة

38. يحفظ نظام سابريون للأرشفة نسخا مصورة ضوئيا لوثائق الهيئة من كل إدارة ما عدا الإدارة المالية. بدأت عملية الأرشفة في العام 2003. يمكن القول ببساطة أن هذا النظام يحفظ نسخا إلكترونيا للوثائق المحفوظة بنسخ ورقية في إدارات الهيئة. عندما يتم رقمنة الوثائق، يكون للتقني الفني الخيار بإدخال لكل وثيقة بعض المعلومات ذات الصلة لكل وثيقة مثل التاريخ والرقم المرجعي واسم المرسل و/أو المستلم، ووصف مختصر للوثيقة. ولأن كل إدارة تقوم بتزويد، وبصورة مستقلة، ملفاتها لإدارة تقنية المعلومات للتصوير الضوئي، فإن اكتمال رقمنة ملفات كل إدارة يعتمد على ما إذا كانت كل إدارة المعنية قد زودت جميع سجلاتها.

39. بالإضافة إلى عملية البحث عن الوثائق بنسختها الورقية التي تم إجراؤها، قامت الهيئة أيضا بإجراء عمليات بحوث في نظام الأرشفة الإلكترونية للقائمة التي تضم أكثر من 300 اسم من الأفراد والشخصيات المعنوية المشار إليهم أعلاه. ولأن هذا النظام يتطلب من المستخدم الاستعلام من النظام بطرق مختلفة للتأكد من شمولية النتائج، استهلكت هذه البحوث وقت طويلا والعملية برمّتها أخذت أسابيع لإتمامها.

## الوثائق المحفوظة في مكاتب الهيئة الفرعية

40. وكجزء من العمل الذي قمت به خلال فترة هذه القضية، إكتسبت تفهما لبعض الطرق التي تم بها الحفاظ على الوثائق في بعض مكاتب الهيئة. وعلى وجه الخصوص، إكتسبت معرفة عن كيفية حفظ الوثائق في مكاتب الهيئة في المنطقة الشرقية والرياض والفلبين وأندونيسيا وباكستان والبوسنة وألبانيا وكوسوفو ومقدونيا وكينيا والسودان وتنزانيا والأردن.



41. قبل العام 2004، لم يكن لدى الهيئة بروتوكول موحد عالمي لحفظ و تنظيم الوثائق مطبق في مكاتب الفروع. علاوة على ذلك، وسواء كان لدى المكتب وثائق تستجيب لطلبات المدعين فهنالك تباين واسع تبعا للمكتب، ولحجم كمية هذه الوثائق ولطريقة تنظيم الوثائق المحفوظة في مكتب معين.

42. إضافة إلى ذلك، على الرغم من وجود برتوكول مطبق يطلب من المكاتب تقديم للأمانة العامة تقارير عن مشاريع وتقارير مالية بشكل منتظم، إلا أن مكاتب الهيئة حول العالم أحيانا قدمت تقاريرا دورية حول أنشطة المكاتب وتقارير مالية. وفي حين كان إرسال الوثائق يتم بشكل دوري، الا انه لم تقم مختلف المكاتب الفرعية بإرسال تقارير كاملة ومنتظمة إلى الأمانة العامة خلال الفترة الزمنية ذات الصلة.

43. أوضح أدناه عددا من الحيثيات الخاصة بمكاتب محددة للهيئة اكتشفتها خلال فترة جهودي الرامية للبحث عن وثائق التي يحتمل ان تكون مستجيبة والرد على استفسارات محامو LBKM.

### أندونيسيا

44. لدى الهيئة مكتبا فرعيا في أندونيسيا.

45. تعرضت بعض الملفات التنفيذية المحفوظة في مكتب الهيئة في أندونيسيا للتلف خلال فيضان كبر حصل في جاكرتا في أوائل 2002.

46. إن معرفتي بتلف هذه الملفات قائم على معلومات قدمها للهيئة المدير المشترك لمكتبي الهيئة والرابطة في أندونيسيا السيد فهد بن سند الحربي، الذي أبلغ الأمانة العامة بهذه الفيضانات.

### باكستان

47. لدى الهيئة مكتبا فرعيا في باكستان.

48. كما هو موثق في السجلات التي قُدمت في هذه الدعوى، قام كل من مدير المكتب السابق مؤيد البتيري ومحاسب المكتب السابق عامر جاسم بإتلاف الملفات المحفوظة في المكتب الفرعي في باكستان محاولةً للتستر على اختلاسهم لأموال. وعلى وجه التحديد، إن رسالة من شوكت حياة،



ضابط التحقيق الباكستاني في هذه المسألة، والتي تم تقديمها في هذه الدعوى برقم IIRO 168291 تنص على أن "عامر جاسم حرق سجل الهيئة بناء على أوامر من مؤيد البتيري الذي كان مدير عام المكتب آنذاك".

49. إضافة الى ذلك، ان السيد رحمة الله قاري، الذي تم تعيينه مديرا لمكتب باكستان في فبراير 2001 قد أكد أنه كان يوجد في المكتب فقط قليل من السجلات عندما تقلد منصبه في فبراير 2001.

### فيينا

50. بناء على ما فهمته، كان مكتب الهيئة في فيينا يشرف على جهود الهيئة الإغاثية في البلقان الناجمة عن الأعمال القتالية في البوسنة التي توقفت في أواخر 1995. وفي 1998، أغلق مكتب فيينا بعد توقف العمل الإنساني المتبقي اللازم الناجم عن الأعمال القتالية.

51. بناء على مافهمته تم نقل بعض الوثائق من مكتب فيينا إلى مكتب الهيئة في البوسنة والذي كان يشرف عليه مكتب فيينا، بينما تم نقل بعضها الآخر إلى الأمانة العامة.  في إطار جهودنا الرامية لتحديد موقع وثائق مكتب الهيئة في فيينا، قامت الهيئة بمساعدة محامي LBKM في البحث في مكتب البوسنة وفي الأمانة العامة.  كما أنني فهمت من محامي LBKM أن الرابطة مكنتهم من الوصول إلى وثائق محفوظة في المركز الثقافي لرابطة العالم الإسلامي الواقع في فيينا، ولكن لم يتم إيجاد هناك أي وثائق للهيئة.

52. في حالة وجود أي وثائق متعلقة بمكتب الهيئة في فيينا في أي مقر فقد تم إتاحتهم لمحاميّ LBKM للاطلاع عليها وقد تم تقديم جميع الوثائق المستجيبة.

### سجلات الهيئة المالية

53. خلال فترة الإستكشاف، تكبدت الهيئة مشقات كثيرة لإيجاد وتقديم كشوفات الحسابات المصرفية للفترة الممتدة ما بين 1992 و2004 من الأمانة العامة ومن المكاتب الفرعية التي تمت زيارتها خلال جهود جمع الوثائق.  بالإضافة الى ذلك، فقد تم إرسال خطابات لمكاتب الهيئة لطلب نسخ من الكشوفات المصرفية التي تحتفظ بها هذه المكاتب. كما تم إرسال موظفين من الأمانة العامة



للهيئة إلى المكاتب الإقليمية في المملكة العربية السعودية لجمع الكشوفات المستجيبة والمحفوظة في تلك المكاتب. وأخيرا، أرسلت الهيئة رسائل مباشرة للمصارف تطالب فيها بكشوفات حساباتها المصرفية. وكما فهمت من المحامين الاميركين ف قد تم تقديم جميع الوثائق المستجيبة.

54. في العام 2016، قدم المدعون لمحاميّ LBKM لائحة بالحسابات المصرفية التي يزعم أنها تعود لمكتبي الهيئة والرابطة في باكستان. تواصلت مع المدير الحالي لمكتب باكستان لأستفسر عن تلك الحسابات وتواصل بدوره مع المصارف في باكستان لطلب كشوفات الحسابات المصرفية التي تعود للرابطة والهيئة. لم تتمكن المصارف من تقديم الكشوفات حيث أن الحسابات كانت إما نائمة أو أنه تم فتحها بواسطة أفراد بصفتهم الشخصية، وبالتالي لا يمكن للهيئة الوصول اليها.

55. وخلال فترة الإستكشاف، أرسلت الهيئة رسائل لمدراء المكاتب الفرعية تطلب بموجبها كافة تقارير مدققي الحسابات التي تم أداؤها بين 1992 و 2004. كما تواصل محامو LBKM مع المراجعين الخارجيين والذين قاموا بمراجعة حسابات مكتب باكستان وطلبوا أي من الوثائق الأساسية، ولكن تم إبلاغهم أن لا وجود لأي من هذه الوثائق بحوزتهم. وفهمت من المحامين الأمريكين أنه تم تقديم جميع الوثائق المستجيبة.

## لجان الأمانة العامة بالهيئة

56. كجزء من العمليات في الأمانة العامة، تقوم الهيئة بانتظام بإنشاء لجان مؤقتة للقيام بمهام محددة، مثل جمع وإتلاف دفاتر شيكات قديمة لحساب لم يعد قيد الإستعمال أو بجرد المواد الإغاثة المخزنة في المستودع. وجدت هذه اللجان المؤقتة لفترة قصيرة من الزمن الى حين الإنتهاء من غايتها و لم تحتفظ عادة بسجلات منتظمة.

57. قد تم اتاحة جميع الوثائق المتعلقة بهذه اللجان اللتي من المحتمل أن تكون مستجيبة لمحاميّ LBKM للإطلاع عليها وقد تم تقديم جميع الوثائق المستجيبة.

## وثائق سنابل الخير

58. قمت نيابة عن الهيئة بالتنسيق لاجتماع بين المدير المالي لشركة سنابل الخير في السعودية ومحامو LBKM حيث قدم المحامون للمدير لائحة بعدد من فئات الوثائق المتعلقة بسنابل الخير. قامت



سنابل الخير بالبحث في سجلاتهم واستخرجوا وثائق من المحتمل أن تكون مستجيبة وتم اتاحتها لمحامو LBKM للاطلاع عليها وقد تم تقديم  جميع الوثائق المستجيبة.

59. وعلاوة على ذلك، وفي حالة وجود أي وثائق متعلقة بسنابل الخير في حوزة الهيئة من الفترة الزمنية المعينة، فقد تم إتاحتها لمحامو LBKM للاطلاع عليها وتم تقديم جميع الوثائق المستجيبة.

## وثائق الحكومة السعودية

60. خلال عملية البحث الأولي وجمع الوثائق من الأمانة العامة للهيئة، تم تحديد وفصل الوثائق المحتملة الإستجابة للطلبات المتعلقة بالحكومة السعودية.

61. وبعد نظر المحامين في أمريكا في ادعاءات الإمتياز المحتملة فيما يتعلق بهذه الوثائق، تم تقديم جميع الوثائق المستجيبة. ولم يتم حجب أي وثائق على أساس الإمتياز .

## زاهر عبد العزيز

62. بناء على ما فهمته من الوثائق التي تم تقديمها في هذه الدعوى،  كان زاهر عبد العزيز  المدير التنفيذي لمنطقة البلقان منذ 1993 حتى تاريخ استقالته في 1996.

63. وفي حال وجود أي وثائق تتعلق بزاهر عبد العزيز، فقد تم الاحتفاظ بها إما في مكتب الهيئة في البوسنة أو في المملكة العربية السعودية، وأتيحت لمحامو LBKM للاطلاع عليها وقد تم تقديم جميع الوثائق المستجيبة.

## مُحَمَّد جمال خليفة

64. بناء على ما فهمته من الوثائق التي تم تقديمها في هذه الدعوى، فقد كان مُحَمَّد جمال خليفة مديرا لمكتب الهيئة في الفلبين من 1988 الى 1993 عندما استقال من منصبه. ومنذ 1993 حتى وفاته في 2007 لم يكن له أي علاقة بأي شكل من الأشكال بالهيئة لا من خلال مكتب الهيئة بالفلبين  ولا من غير ذلك.

13



65. وفي حال وجود أي وثائق تتعلق بمحمد جمال خليفة، فقد تم الاحتفاظ بها إما في مكتب الهيئة في الفلبين أو في الأمانة العامة، وأتيحت هذه الوثائق لمحامو LBKM للاطلاع عليها وتم تقديم جميع الوثائق المستجيبة.

أقر وأؤكد، تحت طائلة عقوبات شهادة الزور، أن الإفادة الواردة أعلاه حقيقية وصحيحة حسب علمي ومعرفتي واعتقادي.

أبرم هذا الإقرار بتاريخ: 7/01 ~ 12 ~ 2017 ~ 01

عمار شواط:

14