UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: Terrorist Attacks on September 11, 2001[1] | No. 03 MDL 1570 (GBD) (SN)<br><br>**DECLARATION OF MOHAMED FAWZI** |

I, Mohamed Fawzi, hereby affirm the following under penalty of perjury and submit this declaration in support of Defendant the Muslim World League's ("MWL") memorandum of points and authorities in opposition to Plaintiffs' motion to compel and motion for sanctions filed in the above-captioned case on December 1, 2017.

### EMPLOYMENT AND EDUCATIONAL BACKGROUND

1. As set forth in more detail below, I have been employed by MWL in various positions since 1992, and have resided in Mecca, Saudi Arabia since that time.

2. In 1989, I graduated from the Al-Azhar University in Cairo, Egypt with a Bachelor's degree in Accounting.

---

[1] *This applies to: Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977 (GBD) (SN); *Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-09849 (GBD) (SN); *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065 (GBD) (SN); *Continental Casualty Co., et al. v. Al Qaeda et al.*, Case No. 04-cv-05970 (GBD) (SN); *Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279 (GBD)(SN); *Federal Insurance Co., et al. v. Al Qaida, et al.,* Case No. 03-cv-06978 (GBD) (SN); *O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923 (GBD) (SN).

3.     In 1992, I began working with MWL as a general accountant in the financial department at the Head Office.  In this role, I maintained the daily ledgers, recording incoming and outgoing funds and balancing the financial records.

4.     In 1995, I became a budgetary accountant, where I reviewed requests for disbursement and allocated funds as needed.  In 2017, I became the accountant responsible for managing the accounts of the MWL branches abroad.

5.     Throughout my experience working as an accountant at MWL, I gained a general understanding of MWL's document management system in Mecca, especially with regards to documents maintained by the financial department.

## OVERVIEW OF MWL AND MWL'S DOCUMENT ARCHIVES

6.     MWL is an international non-governmental Islamic organization founded in 1962 and headquartered in Mecca, Kingdom of Saudi Arabia.  MWL is engaged in projects centering on education, religion, and culture.  It promotes dialogue with people of other cultures and religions and currently operates approximately 30 offices and cultural centers throughout the world.

7.     Copies of documents from the 1992-2004 date range are maintained in hardcopy only; documents from this date range are not maintained electronically.  Although MWL has for many years aspired to develop electronic document capabilities, it only began to develop its computer center in the last seven years, and has yet to create an electronic archive of all of its hardcopy documents.

8.     No index exists for the MWL documents from the 1992-2004 date range; rather, documents from this time period have been stored in boxes in a document archive that lacked uniform organization.  As a result, the task of searching for documents responsive to Plaintiffs'

voluminous document requests has been time-consuming and taxing on the MWL staff members who have assisted in those efforts over the years. While I, and others with whom I have worked, have endeavored to work with MWL's U.S. counsel to locate documents, the task of searching MWL's document archives has been a very challenging one.

## OVERVIEW OF EFFORTS TO COMPLY WITH MWL'S DISCOVERY OBLIGATIONS

9. Since the inception of the litigation, I have assisted MWL's U.S. counsel – first Mr. Martin McMahon and then various attorneys from the offices of Lewis Baach Kaufmann Middlemiss ("LBKM") – on various issues pertaining to MWL's discovery obligations in this litigation.

10. Between 2005 and 2013, MWL was served with 101 document requests, many of which included subparts, and an exhibit listing 93 names of individuals and entities that applied to six of those requests, effectively multiplying by many times the requests served on MWL. Between 2006 and 2013, MWL served, through its U.S. counsel, objections and responses to Plaintiffs' document requests.

11. As part of my duties, I have worked with defense counsel to locate documents responsive to the voluminous document requests made by Plaintiffs over the years. During this time, I searched for documents responsive to Plaintiffs' requests, including but not limited to document requests addressed in the Court's 2011 orders, and have worked with LBKM attorneys during their numerous visits to the Kingdom to supplement MWL's document productions to ensure that MWL was in compliance with its obligations.

12. Prior to my involvement in this litigation, I had no experience with the U.S. discovery process, having never been involved in litigation in any U.S. court.

## *EFFORTS FACILITATED/OVERSEEN BY MR. MCMAHON*

13. During the time Mr. McMahon served as MWL's counsel, I worked to facilitate MWL's efforts to collect, review and produce documents responsive to Plaintiffs' document requests. As such, I have personal knowledge of the efforts taken by MWL since 2006 to comply with its obligations relating to discovery in this case. During this time, I became familiar with the document requests served on MWL by Plaintiffs.

14. During the period of Mr. McMahon's engagement, however, a number of issues led to or contributed to miscommunication between MWL representatives and Mr. McMahon, including: (1) the language barrier between Mr. McMahon, who does not speak Arabic, and members of the organization, including myself, who do not have a strong control over the English language; (2) the fact that the vast majority of the documents are in Arabic and Mr. McMahon could not read Arabic; (3) the technical nature and number of the Plaintiffs' document requests, which were written in English and contained numerous subparts; (4) the inability of Mr. McMahon to enter Mecca due to local law, which prohibited him from coming to MWL's Head Office to conduct the initial search for potentially responsive documents.

15. Despite these challenges, MWL endeavored to comply with its discovery obligations and arranged for ways to manage the process of locating responsive documents, which included efforts by MWL employees and representatives to review and identify potentially responsive documents with the advice and assistance of Mr. McMahon. Additionally, Mr. McMahon invited counsel for the Plaintiffs to visit Saudi Arabia whereby records would be made available to them to review, but I understand that Plaintiffs rejected his offer.

16. In addition, I understand from U.S. counsel that Plaintiffs were given access to numerous boxes of documents returned from the FBI and Homeland Security as well as the tax division of the IRS, which were stored in the U.S. at Mr. McMahon's office.

### *EFFORTS FACILITATED/OVERSEEN BY LBKM*

17. In November 2012, MWL sought to resolve the concerns relating to the adequacy of its document productions by changing its counsel in this litigation from Martin McMahon & Associates to a larger firm, LBKM, which we understood had worked on complex legal cases involving Saudi Arabia. It was our view that LBKM would be capable of representing MWL's interests due to their history in the Kingdom and its multiple Arabic speaking attorneys in the firm and also their ability to visit our Head Offices in Mecca.

18. LBKM was retained in late 2012 to replace Martin McMahon & Associates as counsel for MWL. Since LBKM's retention in this litigation, I have worked with their attorneys to locate additional documents responsive to Plaintiffs' document requests, including but not limited to documents within the categories of documents for which the Court ordered production in 2011.

19. In addition to my work at the Head Office in Mecca, I also facilitated LBKM's visits of foreign branch offices in London, Indonesia, the Philippines, Pakistan, Kenya, Tanzania, Sudan and Jordan. As part of those efforts, I ensured that the LBKM attorneys had access to all records.

20. Arranging and facilitating the LBKM attorney visits to the 8 foreign branch offices listed in ¶19 over the years was an incredibly cumbersome and time consuming process, and also undertaken at great expense to MWL.

21. The visits to the branch offices also caused great disruptions in MWL activities in those offices due to the local employees facilitating the review and in some locations conducting the scan efforts of the responsive documents personally in those locations.

22. Conducting similar visits in the over 20 additional offices worldwide would be an incredibly burdensome and expensive task that would take approximately one year, if not longer, to complete. It would require an LBKM attorney to visit each of these offices to conduct the review due to the complicated and voluminous nature of the Plaintiffs' document requests; and necessitate innumerable resources to facilitate access to the documents and the scanning of any documents deemed potentially responsive.

## *SUMMARY OF OVERALL EFFORTS*

23. I have worked with attorneys from LBKM since their retention to facilitate their access to records, in Mecca and abroad, that may have contained documents responsive to Plaintiffs' document requests. This included, but was not limited to, documents pertaining to MWL Constituency Council, senior officials at MWL, Saudi officials, MWL and IIRO delegations, MWL and IIRO annual budgets, Saudi government ministries and embassies, MWL committees, investigations and alleged arrests of MWL personnel, alleged raids and closures of MWL branch offices, and records concerning MWL Islamic centers and mosques, universities, the Fiqh Council, and MWL's relationship with the SJRC, SHC, SRC, WAMY, Al Haramain Al Masjid Al Aqsa and other Islamic non-profit organizations, to the extent that any such records existed. I understand from U.S. counsel that all documents responsive to Plaintiffs' requests have been produced.

24. In total, since the inception of the discovery period 11 years ago, I estimate that I have spent thousands of hours working to facilitate the collection of documents potentially responsive to Plaintiffs' voluminous document requests to MWL.

25. As a result of these efforts, I understand from U.S. counsel that millions of pages were reviewed and that MWL has produced over 118,000 pages of documents responsive to Plaintiffs' requests from across the globe at great expense to the organization. In addition, I understand from U.S. counsel that Plaintiffs have collected and produced over 114,000 pages of combined IIRO and MWL documents from Mr. McMahon's office that, as noted above, were made available to them.

## DOCUMENTS MAINTAINED BY MWL BRANCH OFFICES AND CULTURAL CENTERS

26. Prior to 2004, MWL did not have a uniform global document storage and organization protocol applicable to the branch offices and cultural centers.

27. Although there was no formal protocol requiring offices/centers to submit project and financial reports to Head Office, MWL branch offices and cultural centers around the world would, at times, periodically submit reports about the activities of their offices/centers and financial documents. Regular transmissions of documents were not made by the various branch offices to Head Office during the 1992-2004 time period.

28. I address below particular aspects unique to certain MWL branch offices that I discovered during my efforts to locate potentially responsive documents and respond to inquiries from LBKM attorneys.

*Indonesia*

29. MWL maintains a branch office located in Indonesia.

30. Some operational files located in the branch office in Indonesia were destroyed during a significant flood that occurred in Jakarta in early 2002.

31. My knowledge of the destruction of these files is based on information provided to MWL by the MWL-Indonesia director, Mr. Fahad bin Sanad al-Harbi, who informed Head Office of these floods.

*Pakistan*

32. MWL maintains a branch office located in Pakistan.

33. As documented in the records produced in this litigation, former office director Moayid Al Butayri and former office accountant Amir Jasim destroyed files maintained in the branch office located in Pakistan in an attempt to cover up their embezzlement of funds. Based on a letter from Shoukat Hayat, the Pakistani Inquiry Officer into the matter, produced in this litigation with the Bates number IIRO 168291, which states that "Amir Jasim burnt the record of IIRO on the orders of Moayid Al Butayri the then Director General of this office."

34. Additionally, Mr. Rahmatullah Gari, who was appointed Director of the Pakistan office in February 2001, confirmed that only a small number of records existed at this office when he assumed his duties in February 2001.

**MWL BANK ACCOUNT RECORDS**

35. Throughout the course of discovery in this case, MWL has taken great pains to locate and produce bank statements for the 1992 to 2004 time period from its Head Office and branch offices visited in the course of document collection efforts. In addition, letters were sent to MWL offices requesting copies of statements for bank accounts, and all documents responsive to Plaintiffs' requests have been produced.

## RABITA TRUST DOCUMENTS

36. At all times Rabita Trust maintained its own operational and document management systems independent of MWL.

37. In an effort to locate potentially responsive documents concerning Rabita Trust, I facilitated a search for any documents concerning Rabita Trust and all such documents were provided to LBKM attorneys for review in both Mecca and Pakistan. All documents responsive to Plaintiffs' requests have been produced.

## WAEL JELAIDAN DOCUMENTS

38. Mr. Jelaidan was appointed the director of the MWL-Islamabad office in 1990. As reflected in documents produced in this litigation, he held that position until September 22, 1994, when he was transferred afterwards to the MWL Head Office in Mecca, where he remained until his resignation on November 1, 1995. After that date, Mr. Jelaidan was not employed by MWL.

39. To the extent that any documents relating to Wael Jelaidan from the period of 1992-2004 exist, they were made available to LBKM attorneys for review and all documents responsive to Plaintiffs' requests have been produced.

## KSA GOVERNMENT DOCUMENTS

40. During the initial search and collection of documents from MWL's Head Office, documents that were potentially responsive to Plaintiffs' requests relating to the KSA government were identified and segregated.

41. After potential claims of privilege with respect to these documents were considered by our U.S. counsel, all documents responsive to Plaintiffs' requests were produced. No documents were withheld on the basis of privilege.

I do solemnly declare and affirm under the penalties of perjury that the foregoing statements are correct to the best of my knowledge and belief.

Executed on: _____                    _____
                                                                               Mohamed Fawzi

محكمة الدائرة الجنوبية بنيويورك

_____
(
بشأن: الهجمات الإرهابية في 11 سبتمبر 2001[1]     )
)        No. 03 MDL 1570 (GBD) (SN)
)
بيان محمد فوزي                                    )
)
_____

أنا محمد فوزي أقر بما يلي تحت القسم باليمين وأقدم هذا البيان لدعم مذكرة المدعى عليها رابطة العالم الإسلامي (الرابطة) التي تحتوي على نقاط وسلطات تعارض طلب المدعين بالإلزام و طلب فرض العقوبات والذي تم رفعهما في القضية المذكورة أعلاه في 1 ديسمبر 2017 .

### الخلفية الوظيفية والتعليمية

1.  كما سيتم تفصيله أدناه، قد سبق لي أن عملت في الرابطة في مناصب عدة منذ 1992، وكنت أقطن في مكة - السعودية منذ ذلك الوقت.

2.  تخرجت من جامعة الأزهر في القاهرة - مصر في عام 1989 بشهادة بكالوريوس في المحاسبة.

3.  بدأت العمل في الرابطة عام 1992 كمحاسب عام في الإدارة المالية في المكتب الرئيسي، وكانت مهامي الاحتفاظ بالسجلات اليومية وتسجيل الأموال الواردة والصادرة وموازنة السجلات المالية.

4.  وفي عام 1995 أصبحت محاسب الميزانية، فكنت أراجع طلبات الصرف والأموال المخصصة حسب الحاجة، وفي سنة 2017 عملت كمحاسب الذي يدير حسابات المكاتب الخارجية لفروع الرابطة.

5.  ومن خلال خبرتي في العمل كمحاسب في الرابطة، اكتسبت معلومات عامة عن نظام إدارة مستندات الرابطة في مكة، بالأخص المستندات المحفوظة في إدارة المالية.

---

[1] ينطبق على: *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977 (GBD) (SN); *Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-cv-09849 (GBD) (SN); *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065 (GBD) (SN); *Continental Casualty Co., et al. v. Al Qaeda et al.*, Case No. 04-cv-05970 (GBD) (SN); *Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279 (GBD)(SN); *Federal Insurance Co., et al. v. Al Qaida, et al.,* Case No. 03-cv-06978 (GBD) (SN); *O'Neill, Sr., et al. v. Al Baraka et al.*, Case No. 04-cv-1923 (GBD) (SN).

1

**نبذة عامة حول الرابطة وأرشيف مستنداتها**

6. الرابطة هي منظمة عالمية إسلامية غير حكومية تم إنشاؤها عام 1962 ويقع مقرها الرئيسي في مكة - المملكة العربية السعودية، وتشارك الرابطة في مشاريع تتمحور حول التعليم والدين والثقافة. تدعم الرابطة الحوار بين الشعوب من ثقافات وأديان مختلفة، وتدير الرابطة في الوقت الراهن حوالي 30 مكتباً ومركزاً ثقافياً في جميع أنحاء العالم.

7. توجد نسخ ورقية فقط للمستندات التي يرجع تاريخها ما بين 1992-2004، فهذه المستندات لم تحفظ إلكترونياً. وعلى الرغم من أن الرابطة كانت تطمح منذ سنوات عديدة بتطوير قدرات الوثائق الإلكترونية، إلاَّ أنها بدأت في تطوير مركزها الحاسوبي في السنوات السبع الأخيرة، ولم تُنشئ بعد أرشيفا إلكترونيا لجميع وثائقها ومستنداتها المطبوعة.

8. لا يوجد فهرس بمستندات الرابطة للفترة الزمنية المؤرخة من 1992-2004، بدلا من ذلك فقد تم حفظ هذه المستندات لهذه الفترة الزمنية في صناديق في أرشيف الوثائق التي تفتقر إلى تنظيم وترتيب موَحّد. ونتيجة لذلك، فقد كانت مهمة البحث عن مستندات للرد بها على طلبات المستندات الكثيفة التي طلبها المدعين تستغرق وقتا طويلا وتشكل عبأً على موظفي الرابطة الذين ساعدوا في هذه الجهود على مر السنين. وفي الوقت الذي عملت فيه أنا وآخرين مع محامي الرابطة الأمريكي لايجاد المستندات، كانت مهمة البحث في أرشيف الرابطة صعبة جداً.

**نبذة عامة عن الجهود المبذولة للامتثال بالتزامات استكشاف الرابطة**

9. منذ بدء الدعوى، فقد ساعدتُ محامي الرابطة الأمريكي - الأول السيد مارتن مكمان وبعده عدة محامين من مكتب لويس باخ كافمان ميدلمس "LBKM" - في مسائل عدة تخص التزامات استكشاف الرابطة في هذه الدعوى.

10. بين سنة 2005 و 2013 استلمت الرابطة 101 طلب مستندات، تتضمن معظمها أجزاء فرعية، إضافة إلى مستند قانوني يحتوي على 93 اسم لأفراد ولجهات تنطبق على 6 من الطلبات المذكورة، فأدى ذلك إلى مضاعفة الطلبات المقدمة إلى الرابطة. بين سنة 2006 و 2013 قدمت الرابطة، من خلال محاميها في أمريكا، معارضات وردود على طلبات المدعين للمستندات.

2

11. وكجزء من مهامي، عملت مع محامي الدفاع لتحديد مواقع المستندات المستجيبة على طلبات المستندات الكثيفة التي طلبها المُدَّعون على مر السنين. وخلال تلك الفترة، بحثت عن مستندات مستجيبة لطلبات المدعين بما في ذلك - على سبيل المثال لا الحصر- طلبات مستندات تناولتها أوامر المحكمة في 2011، كما عملت مع محامي LBKM خلال زياراتهم العديدة إلى المملكة لاستكمال المستندات التي ستقدمها الرابطة لضمان امتثال الرابطة بإلتزاماتها.

12. قبل مشاركتي في هذه الدعوى، لم يكن لدي خبرة في عملية الإستكشاف الأمريكية بسبب عدم مشاركتي في دعوى داخل أي محكمة أمريكية من قبل.

### جهود تم تسهيلها/أشرف عليها السيد مكمان

13. خلال عمل السيد مكمان كمحامي الرابطة، عملتُ على تسهيل جهود الرابطة لجمع ومراجعة وتقديم مستندات تستجيب لطلبات المدعين. وعلى هذا النحو لدي معرفة شخصية بالجهود التي بذلتها الرابطة منذ عام 2006 للامتثال لالتزاماتها المتعلقة بالاستكشاف في هذه الحالة. و خلال هذا الوقت، أصبحت أعرف طلبات الوثائق التي تقدم بها المدعين علي الرابطة.

14. ولكن خلال فترة عمل السيد مكمان، طرأت عدة مسائل أدت إلى أو ساهمت في سوء تفاهم بين ممثلي الرابطة والسيد مكمان ومن ضمنها: (1) حاجز اللغة بين السيد مكمان، الذي لا يتكلم العربية، وأعضاء المنظمة، وأنا فيهم، الذين ليست لديهم مهارة عالية في اللغة الإنجليزية، (2) غالبية المستندات مكتوبة بالعربية والسيد مكمان لا يقرأ العربية، (3) الطابع التقني وحجم طلبات المدعين للمستندات التي قد كُتبت بالإنجليزية وتضمنت العديد من الأجزاء الفرعية، (4) عدم مقدرة السيد مكمان على الدخول إلى مكة بسبب القانون المحلي الذي منعه من القدوم إلى مكتب الرابطة الرئيسي لإجراء البحث الأولي عن مستندات من المحتمل أن توفي بالاجابة.

15. وعلى الرغم من هذه التحديات، إلاَّ أن الرابطة سعت للامتثال بإلتزامات الاستكشاف ووضعت طرق لإدارة عملية تحديد موقع المستندات المستجيبة والتي شملت جهود موظفي الرابطة وممثليها لمراجعة وتحديد المستندات المحتملة الاستجابة وذلك بمساعدة ومشورة السيد مكمان، حتى أنه قام بدعوة محامي المدعين لزيارة السعودية ليتسنى لهم مراجعة السجلات، ولكن المدعين رفضوا الدعوة على حد علمي.

16. إضافة إلى ذلك، فهمت من المحامين في أمريكا أنه تم إعطاء المدعين تصريح الوصول إلى كم كبير من صناديق المستندات المخزنة في مكتب السيد مكمان في الولايات المتحدة والتي تم إعادتها من المباحث الفيدرالية والأمن القومي وأيضاً من شعبة الضرائب في دائرة الإيرادات الداخلية.

### جهود تم تسهيلها/أشرف عليها مكتب LBKM

17. في نوفمبر 2012، سعت الرابطة إلى حل المسائل المتعلقة بكفاءة إنتاج المستندات عن طريق تغيير محامي هذه الدعوى من مارتن مكمان ومعاونيه إلى مكتب محاماة أكبر وهم LBKM، حيث فهمنا أنهم عملوا على قضايا معقدة أخرى تتعلق بالسعودية. وكان من رأينا أن مكتب LBKM سيكون قادراً على تمثيل مصالح الرابطة نظراً لتاريخهم في المملكة، ولعدد المحامين الناطقين بالعربية في مكتبهم وأيضاً قدرتهم على زيارة المكتب الرئيسي في مكة.

18. وتم توكيل LBKM في أواخر عام 2012 ليحل محل مارتن مكمان ومعاونيه كمستشار للرابطة. ومنذ استلام مكتب LBKM لهذه الدعوى، عملتُ مع محاميهم لتحديد وثائق إضافية تستجيب لطلبات وثائق المدعين من ضمنها - وعلى سبيل المثال وليس الحصر- مستندات من فئات تلك التي أمرت المحكمة بتقديمها في سنة 2011.

19. وبالإضافة إلى عملي في المكتب الرئيسي في مكة، قمت بمهام أخرى لتسهيل زيارات LBKM لمكاتب الفروع في لندن وإندونيسيا والفليبين وباكستان وكينيا وتنزانيا والسودان والأردن. وكجزء من الجهود المبذولة، عملت على التأكد من أن محامي LBKM لديهم القدرة على الوصول إلى كل السجلات.

20. وكان ترتيب وتيسير الزيارات التي قام بها محامو LBKM إلى مكاتب الفروع الأجنبية الثمانية المدرجة في بند 19 على مر السنين عملية مرهقة ومستهلكة للوقت بشكل لا يصدق، وأيضا ذات تكلفة كبيرة للرابطة.

21. وتسببت هذه الزيارات لمكاتب الفروع أيضا في حدوث اضطرابات كبيرة في أنشطة الرابطة في تلك المكاتب بسبب قيام الموظفين المحليين بتيسير المراجعة و في بعض المواقع، شخصيا اجراء جهود مسح الوثائق المستجيبة في تلك المواقع.

22. إن القيام بزيارات مماثلة في أكثر من 20 مكتبا إضافيا في جميع أنحاء العالم سيكون مهمة متعبة و باهظة التكلفة و سوف تستغرق ما يقرب من عام واحد إن لم يكن أطول. وسيتطلب الأمر من محامي LBKM أن يقوم بزيارة

4

كل من هذه المكاتب لإجراء المراجعة بسبب الطبيعة المعقدة والكبيرة لطلبات وثائق المدعين؛ وتستلزم موارد لا حصر لها لتيسير الوصول إلى الوثائق و مسح أي وثائق تعتبر محتملة الاستجابة.

### نبذة عامة عن الجهود الإجمالية

23. لقد عملت مع محامي LBKM منذ تسليمهم القضية لتسهيل امكانية وصولهم الى سجلات، في مكة وخارجها، والتي قد تحتوي على وثائق تستجيب لطلبات المدعين، وتشمل - على سبيل المثال لا الحصر - مستندات متعلقة بالمجلس التأسيسي للرابطة، كبار المسؤولين في الرابطة، مسؤولين سعوديين، وفود الرابطة والهيئة، ميزانيات الرابطة والهيئة السنوية، سفارات ووزارات الحكومة السعودية، لجان الرابطة، تحقيقات عن موظفي الرابطة واعتقالاتهم المزعومة، غارات وإغلاق فروع الرابطة المزعومة، و سجلات تخص المساجد والمراكز الإسلامية التابعة للرابطة، جامعات و المجلس الفقهي وعلاقة الرابطة باللجنة السعودية المشتركة للإغاثة والمجلس الأعلى السعودي والهلال الأحمر السعودي والندوة العالمية للشباب الإسلامي و الحرمين المسجد الأقصى ومنظمات إسلامية خيرية أخرى، في حالة وجد أي من هذه السجلات. فهمت من المحامين في أمريكا أنه تم تقديم كل المستندات المستجيبة لطلب المدعين .

24. وفي المجمل، منذ بداية فترة الاستكشاف قبل 11 سنة، أقدر أنني قضيت آلاف الساعات في العمل على تسهيل جمع المستندات المحتملة الاستجابة للطلبات المدعين الكثيفة التي قدمت للرابطة.

25. ونتيجة لهذه الجهود، فهمت من المحامين في أمريكا أنه تمت مراجعة ملايين الصفحات وأن الرابطة قدمت أكثر من 118,000 صفحة من مستندات تُجيب على طلب المدَّعين من جميع أنحاء العالم وبتكاليف باهظة للمنظمة. وكذلك فهمت من المحامين في أمريكا أن المدعين قد جمعوا وأنتجوا أكثر من 114,000 صفحة من مستندات للرابطة والهيئة مجتمعة والتي أُتيحت لهم وحصلوا عليها من مكتب السيد مكمان، كما سبق ذكره.

### المستندات المحفوظة في مكاتب فروع الرابطة والمراكز الثقافية

26. قبل عام 2004، لم يكن لدى الرابطة بروتوكول موحّد عالمي للتخزين والتنظيم يُطبق على مكاتب الفروع والمراكز الثقافية.

27. وعلى الرغم من عدم وجود بروتوكول رسمي يطلب من المكاتب/المراكز بإرسال تقارير مالية وتقارير للمشاريع للمركز الرئيسي، تقوم مكاتب الفروع والمراكز الثقافية للرابطة حول العالم أحيانا بإرسال تقارير

5

دورية حول نشاطاتها ومستنداتها المالية. لم يتم إرسال المستندات بصورة منتظمة من مكاتب الفروع الى المكتب الرئيسي خلال الفترة الزمنية بين 1992 و 2004.

28. أتناول أدناه جوانب معينة فريدة من نوعها لبعض المكاتب الفرعية التابعة للرابطة التي اكتشفتها خلال جهودي لتحديد المستندات المحتملة الاستجابة لها و الرد على استفسارات محامين LBKM .

### إندونيسيا

29. لدى الرابطة مكتب فرع في إندونيسيا.

30. البعض من الملفات المتواجدة في مكتب إندونيسيا قد دُمرت إثر فيضان جاكارتا في أوائل سنة 2002.

31. المعلومات التي أعرفها عن تلف هذه المستندات تعود إلى المعلومات التي أعطاها مدير مكتب الفرع في إندونيسيا إلى الرابطة السيد فهد بن سند الحربي الذي أعلم المكتب الرئيسي بهذه الفيضانات.

### باكستان

32. لدى الرابطة مكتب فرع في باكستان.

33. كما هو موضح في السجلات المقدمة في هذه الدعوى، قام مدير المكتب السابق مؤيد البتيري والمحاسب السابق عامر جاسم بإتلاف ملفات كانت محفوظة في مكتب الفرع في باكستان كمحاولة لتغطية اختلاسهم للأموال. وبناء على كتاب من المحقق الباكستاني شوكت حياة، وقد تم تقديم هذا الكتاب في هذه الدعوى برقم الختم IIRO168291، فينص الكتاب على أن "عامر جاسم قد أحرق سجل الهيئة بأمر من مؤيد البتيري المدير العام لهذا المكتب حينذاك".

34. بالإضافة إلى أن السيد رحمة الله قاري الذي تم تعيينه مدير لمكتب باكستان في فبراير 2001 أكد أنه كان هناك عدد قليل من السجلات في المكتب عندما تولى منصبه في فبراير 2001.

### سجلات حسابات الرابطة المصرفية

35. طوال فترة الاستكشاف في هذه الدعوى، عملت الرابطة بجهد كبير لايجاد وتقديم كشوفات حسابات مصرفية للفترة الممتدة من 1992 إلى 2004 من مكتبها الرئيسي ومكاتب فروعها التي تم زيارتها خلال فترة تجميع المستندات. بالإضافة إلى ذلك، تم إرسال كتب إلى مكاتب الرابطة لطلب نسخ لكشوفات حسابات مصرفية وتم تقديم كل المستندات المستجيبة لطلب المدعين.

6

## مستندات وقف الرابطة

36. وفي جميع الأحوال كانت وقف الرابطة تدير عملياته ونظام إدارة مستنداتها بشكل مستقل عن الرابطة.

37. وفي محاولة لتحديد الوثائق التي يحتمل الرد عليها بشأن وقف الرابطة، قمت بتسهيل عملية البحث عن أي مستندات تخص وقف الرابطة وجميع المستندات تم تسليمها لمحامي LBKM لمراجعتها في مكة والباكستان. وتم تقديم كل المستندات المستجيبة لطلب المدعين.

## مستندات وائل جليدان

38. تم تعيين السيد جليدان كمدير لمكتب الرابطة في إسلام أباد في 1990. و كما هو مبين في المستندات التي سبق وتقدمنا بها في هذه الدعوة، بقي في هذا المنصب لغاية 22 سبتمبر 1994 ثم تم نقله بعدها الى المكتب الرئيسي في مكة وظل هناك حتى قدم استقالته في 1 نوفمبر 1995، وبعدها لم يعمل السيد جليدان في الرابطة.

39. و في حال كان هنالك مستندات تتعلق بوائل جليدان عن الفترة بين 1992 و 2004، فقد تم اتحاتها لمحامي LBKM للإطلاع عليها وتم تقديم كل المستندات المستجيبة على طلبات المدعين .

## مستندات الحكومة السعودية

40. خلال عملية البحث الأولي وجمع المستندات من مكتب الرابطة الرئيسي، تم تحديد وفصل المستندات المحتملة الاستجابة لطلبات المدعين والمتعلقة بالحكومة السعودية.

41. وبعد نظر المحامين في أمريكا في ادعاءات الامتياز المحتملة فيما يتعلق بهذه المستندات، تم تقديم جميع المستندات المستجيبة لطلب المدعين. ولم يتم اخفاء أي من المستندات على أساس الإمتياز.

أقر وأؤكد بموجب عقوبات القسم باليمين أن البيانات السالفة الذكر صحيحة على حد علمي واعتقادي.

تاريخ التنفيذ: ١٢/٤/١٤٢٩

محمد فوزي