UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*In re* Terrorist Attacks on September 11, 2001

03 MDL 1570 (GBD) (SN)
ECF Case

---

*This document relates to:*

> *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No. 02 Civ. 6977*
> *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 03 Civ. 9849*
> *Federal Insurance Co., et al. v. Al Qaida, et al., No. 03 Civ. 6978*
> *Continental Casualty Co., et al. v. Al Qaeda, et al., No. 04 Civ. 5970*
> *Euro Brokers Inc., et al., v. Al Baraka, et al., No. 04 Civ. 7279*
> *Estate of John P. O'Neill et. al., v. Al Baraka et. al., No. 04 Civ. 1923*
> *World Trade Center Properties, L.L.C. et al. v. Al Baraka Investment and Development Corp., et al., No. 04 Civ. 7280*

## DECLARATION OF GUY FREDERICK NOEL MARTIN IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AGAINST YASSIN ABDULLAH KADI

Guy Frederick Noel Martin declares that the following statement is true:

1.     I am a solicitor of the Senior Courts of England and Wales. I am a senior partner and Head of International Law in the solicitors' firm of Carter-Ruck in London, United Kingdom. I have represented Yassin Abdullah Kadi ("Mr. Kadi") since October 2001.

### My Efforts at Collecting Documents

2.     In October 2001, shortly after Mr. Kadi was listed as a Specially Designated Global Terrorist by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), I and colleagues at Carter-Ruck, along with Maître Saad Djebbar, another lawyer who represents Mr. Kadi, began the process of obtaining every document in Mr.

Kadi's possession, custody or control that could possibly reflect on his activities related to allegations of financing of terrorism or terrorist organizations.

3.      Initially, the only allegations against Mr. Kadi we were aware of were those listed in or referred to in the document known as the "Two-Page Fax" (KADI0005026-27)[1] that I believe OFAC created and sent to authorities in the United Kingdom in October 2001, causing Mr. Kadi to be listed as a supporter of terrorism by the U.K. Subsequent to Mr. Kadi's simultaneous listing by OFAC and Her Majesty's Treasury in the U.K., he was listed by the United Nations and the European Union, and he was investigated by several foreign governments. Mr. Kadi has since been de-listed by each of these jurisdictions (the U.N., OFAC, the U.K. and the E.U.) and each of the investigations was concluded without any adverse action against him. Documents evidencing the de-listings are submitted herewith as Exs. W (E.U.), X (U.K.), Y (U.N.) to this Declaration, and Exhibit V to the Salerno Dec. (OFAC).[2]

4.      I began the process of obtaining documents relevant to Mr. Kadi's business and charitable activities shortly after I was retained in October 2001 by making inquiries and requests of Mr. Kadi and his assistants. Initially, as I have said, these efforts focused on the allegations in the Two-Page Fax.

5.      In the first half of 2002, Maître Djebbar and I made two visits to Mr. Kadi's office in Jeddah and on each occasion spent several days meeting with Mr. Kadi and

---

[1] This Bates number citation is for reference purposes; the document is not supplied as an exhibit to our papers, as we do not think it is necessary for the Court's consideration of Plaintiffs' motion to compel. There are other citations of this nature in our papers. We will of course supply any documents the Court wishes.

[2] Mr. Kadi's exhibits are denoted by letters to distinguish them from Plaintiffs' exhibits; exhibits A through V are to the accompanying declaration of Peter C. Salerno ("Salerno Dec").

members of his staff in order to obtain as much information as possible pertaining to the allegations.

6.     As a result of these meetings I obtained and had sent to my office in London thousands of pages of documents pertaining to Mr. Kadi's charitable and business activities.

7.     I obtained more information about OFAC's allegations against Mr. Kadi after Maître Djebbar and I met with Richard Newcomb, the then-Director of OFAC, and his colleagues at OFAC's offices in Washington, D.C. in August 2002. Consequently, Maître Djebbar and I returned to Jeddah later in 2002 to collect additional documents. As time went on, authorities in jurisdictions other than the United States provided more details about the allegations against Mr. Kadi, as a result of which Maître Djebbar and I made a fourth visit to Jeddah to obtain information and collect documents in 2003. Each of our information-gathering and document-collecting visits took several days and after each visit I had boxes of documents sent to my office. The documents obtained as described in these paragraphs 4-7 were reviewed, and relevant portions uploaded to a litigation support vendor, when jurisdictional discovery began in this case.

8.     Subsequently, I returned to Jeddah for a fifth lengthy visit to collect additional documents after a decision was made by me, together with Salerno & Rothstein, Mr. Kadi's U.S. lawyers in this case, to expand our production beyond the production we had made in December 2014. That original production had been confined to documents pertaining to Mr. Kadi and the Muwafaq Foundation ("Muwafaq"), a charitable organisation founded by Mr. Kadi,

on the theory that the Second Circuit had remanded the claims in this case as against Mr. Kadi solely on the basis of his founding and leadership of Muwafaq. However, after considering Plaintiffs' arguments (in a "deficiency" letter dated May 6, 2015, Pls. Ex. 2) that they were entitled to documents pertaining to virtually all of Mr. Kadi's business and charitable activities, without agreeing with those arguments, we decided to adopt this much more expansive view of what documents to produce in order to avoid litigation about the issue. During this fifth visit, Mr. Kadi recalled that he had documents in a storage room several miles from his office. I spent a portion of this fifth visit reviewing documents in that storage room.

9.      All told, I estimate that I have spent approximately 23 days in Jeddah obtaining information and reviewing and collecting documents related to Mr. Kadi's business and charitable activities. It was clear to me that I, my staff, and Maître Djebbar had unfettered access to all documents in Mr. Kadi's possession, custody, or control.

10.     Additionally, on several occasions since early 2002, I and Carter-Ruck staff visited the offices of the accounting firm Merali's Chartered Accountants and Registered Auditors, Mr. Kadi's accountants, who are located in London, inspected their files related to Mr. Kadi and had copies made of arguably relevant documents in their custody. We have produced to Plaintiffs the non-privileged responsive documents we obtained from Merali's.

11.     Another source of arguably relevant documents was files kept by my firm in connection with successful libel proceedings that Mr. Kadi and his co-trustees of Muwafaq brought against the editor and publisher of a U.K. magazine called *Africa Confidential* in the mid-1990s. *Africa Confidential* had published an article purporting to link Muwafaq to the

-4-

assassination attempt upon then-president of Egypt, Hosni Mubarak. My firm was successful in obtaining a settlement in favor of Mr. Kadi and his fellow Muwafaq trustees, for a substantial sum of money and a public apology. With the exception of documents produced by the *Africa Confidential* defendants, which I am forbidden by U.K. law to disclose outside that litigation, we have provided to Plaintiffs the responsive documents from my firm's *Africa Confidential* files.

12.     I obtained certain bank statements and other documents which had been gathered by McDermott Will & Emery, which I retained in early 2002 on behalf of Mr. Kadi in connection with litigation in federal district court in Chicago pertaining to the Quranic Literacy Institute, to which Mr. Kadi had made a loan. I obtained a significant number of further banking documents by means of disclosure from the Swiss authorities who conducted a six-year investigation into allegations that Mr. Kadi had financed terrorism, ending in their abandonment of their investigation of Mr. Kadi. My firm also obtained banking records from direct requests to banks with which Mr. Kadi (and individuals and entities associated with him) had held accounts during the time period 1992 through 2004, the discovery parameters set by the Court in this case.[3] All banking records that were responsive to Plaintiffs' document requests have been produced to Plaintiffs.

13     Following a meeting at the Swiss Embassy in Riyadh on July 1, 2003 and in response to the request of the Swiss investigators, Mr. Kadi and I obtained bank records pertaining to accounts of Wa'el Jelaidan, with Mr. Jelaidan's cooperation, and of Maram Travel

---

[3] *See* Salerno Dec. at ¶ 13 n.7 for a discussion of the temporal limits on discovery that were set by the Court.

Importation and Exportation Trading Limited Company ("Maram"), a company owned by Mr. Jelaidan and his business partner, Mr. Bayazid. In 1998 Maram was engaged in a project overseeing the transportation and installation of pre-fabricated buildings for university housing at the Al Eman University in Sanaa, Yemen. Plaintiffs do not assert that Mr. Kadi had an ownership interest in Maram (*see* Plaintiffs' MOL at 12-14) and indeed he did not. Rather, he financially supported Maram's university housing project via contributions to Mr. Jelaidan's bank accounts. My efforts to obtain the relevant Jelaidan and Maram bank records are discussed further below in Paragraphs 24 and 25.

14.     Mr. Kadi had numerous and far-flung business and charitable endeavors (*e.g.* in Bosnia, Sudan, Turkey, Albania, Malaysia, and Pakistan). Thus there were many records that he did not maintain in his Jeddah office. Until Mr. Kadi received Plaintiffs' set of 337 wide-ranging document requests in August 2013, he had no reason to retain or gather every document pertaining to every transaction and business from the 1990's. Furthermore, Muwafaq and many businesses endeavors from that era had closed down years before 2002.

15.     I add as a general point, on information and belief, that transactions and dealings that would in the West generate significant documentation are frequently effected by Arab parties with a minimum amount of paperwork. This is especially applicable in the case of Mr. Kadi's business and charitable activities, many of which were carried out in third world countries or areas of crisis such as Sudan.[4] Thus, for example, although Plaintiffs assert that Mr.

---

[4] Our efforts to obtain old documents were most successful with respect to documents in Bosnia, where a former employee who had worked for Mr. Kadi on various commercial and charitable

Kadi should be able to produce more documents than he has pertaining to Rowad, a company

Muwafaq and Loxhall (one of Mr. Kadi's companies) invested in in Sudan, they themselves note

that this company was dissolved in January 1997. (*See* Plaintiffs' MOL at 5).

16.     After Mr. Kadi's New York counsel were served with Plaintiffs' first set

of document requests in August 2013, I had all arguably responsive documents that my firm had

then amassed uploaded to a database that was sent to a U.S. litigation support vendor.  This

universe of documents was the basis for Mr. Kadi's document productions up through December

2014.  Salerno & Rothstein and I made a decision, after considering Plaintiffs' May 6, 2015

"deficiency" letter, to provide every non-privileged responsive document Mr. Kadi had,

regardless of how overly-expansive Plaintiffs' requests were, and to produce all non-privileged

responsive documents responsive to their untimely second set of document requests.

Consequently, I had additional documents that I had obtained from Mr. Kadi uploaded to the

database maintained by our U.S. litigation support vendor.  Further documents were uploaded

after my fifth document-collecting visit to Jeddah.

Alleged Failures to Produce Documents

17.     Many of Plaintiffs' arguments are based on a misunderstanding or

mischaracterization of the facts.  For instance, in an attempt to tie Mr. Kadi to Osama bin Laden

("OBL"), Plaintiffs state that both men were shareholders in Al Shamal Bank.  (Plaintiffs' MOL,

at 4).  In fact, Mr. Kadi was not a shareholder in the bank but a customer of it.  As Mr. Kadi

---

activities had been atypically retentive of documents.  In 2002, this employee at my request
shipped the records she had to London.  All the responsive documents thus obtained have been
produced.

described in a written statement portions of which Plaintiffs themselves rely on, he invested with

Al Shamal, not in it. (*See* Pls' Ex. 5 at 52-53)[5]. He became a customer of Al Shamal Bank

because he learned that Al Shamal was able to produce generous returns while adhering to strict

Islamic principles and because it was convenient to have a bank in Sudan, where he had

charitable activities as well as commercial undertakings. He often obtained good rates of return

from his investments at Al Shamal. *Id.* at 53-54. Furthermore, as Mr. Kadi said in a written

statement he provided to OFAC, dated December 19, 2002 provided to Plaintiffs

(KADI0002199-KADI0002303), while an Al Shamal customer, he was not aware of the

identities of other customers or investors. (*See id.* ¶ 144, KADI0002271-72; these pages, plus

the first and last page of the statement for identification purposes, are submitted herewith as Ex.

Z; *see also* Pls' Ex 5 at pages 53-54). It appears that Plaintiffs' misapprehension of the nature of

Mr. Kadi's relationship to Al Shamal Bank, along with various inferences based on guilt by

association, is the premise for their scurrilous assertion that Rowad Development & Investment

("Rowad") "was a joint venture in the Sudan between Kadi and al Qaeda." Plaintiffs' MOL at 3.

In fact, Muwafaq and Loxhall (not Mr. Kadi personally), and a company alleged to be associated

with OBL, Wadi al Aqiq, were co-investors, with several others, in Rowad. That is not a joint

venture between Mr. Kadi and anyone, let alone between him and al Qaeda. We produced to

Plaintiffs the few documents Mr. Kadi had pertaining to Rowad even though Rowad was not

even named in any of Plaintiffs' 396 document requests.

---

[5] References to pages in Plaintiffs' Exhibits 5 and 6 are to the ECF header pages, as there is no
other source of consistent pagination in those exhibits.

18.     The equally scurrilous accusation that Mr. Kadi "Launder[ed] Bin Laden's Money out of Sudan" (Plaintiffs' MOL at 6-7), and the accompanying demand that we provide additional banking records pertaining to Solano Ltd., a company in which Mr. Kadi had an ownership interest, appear to be based on the tenuous footing that Solano traded in sesame and that the U.S. State Department had said that Wadi al Aqiq had a "near monopoly" in sesame. (*Id.* and Ex. 10 at 1). We have provided numerous banking documents reflecting Solano's trading with Dan Trading, Dan Fodio's affiliate, as to which Plaintiffs now seek more documents (*see* Plaintiffs' MOL at 7). Examples of such documents are KADI0042016, KADI0042097, KADI0042098, KADI0042099, KADI0042100, KADI0042101, KADI42118, KADI0011924, KADI0014390, KADI0014391, KADI0014395, KADI0014426, and KADI0014427. Again, what we have produced is what Mr. Kadi has; no banking records pertaining to Solano trading with Dan Fodio or Dan Trading – or indeed any other responsive documents requested by Plaintiffs – have been withheld on grounds other than privilege or work product.[6]

19.     As for Plaintiffs' complaints that we have produced very little pertaining to the Kingdom of Saudi Arabia's ("KSA") investigation of Mr. Kadi, we have repeatedly explained to Plaintiffs that the KSA is very secretive about its investigations and has refused requests for the investigative documents in its possession. (*See* August 7, 2015 Letter of Peter C. Salerno, (Salerno Dec. Ex. F) at 3; and July 26, 2017 Letter of Peter C. Salerno (Salerno Dec. Ex. L) at 2). Indeed, in one of the documents we provided to Plaintiffs, attached to their MOL as

---

[6] The only other exceptions are documents produced by defendants in the U.K. *Africa Confidential* litigation, pursuant to U.K. law, as noted above (¶ 11); and correspondence with the U.N. Security Council Ombudsperson, since the U.N. requires those documents to be kept confidential. Plaintiffs have not complained about our withholding such documents.

Ex. 6, at 27-40, a lawyer appearing on behalf of the KSA Foreign Ministry in a lawsuit Mr. Kadi

filed against the Foreign Ministry with respect to his listing notes that he was unable to submit to

the court, other than *in camera*, documents evidencing the Foreign Ministry's efforts to intervene

on Mr. Kadi's behalf with the U.N. Security Council because such documents "are confidential

and relevant, in one way or another, to the requirements of Saudi national security and the

international relations of the Kingdom." (*Id.* at 40). As noted above, we have explained to

Plaintiffs that we have produced all documents pertaining to KSA's investigation of Mr. Kadi

that were within his custody or control, within the 1992-2004 discovery date range. (*See* Salerno

Dec. at ¶ 13 n.7). In fact, in addition to these, we provided documents that post-date 2004.

20.    For example, we produced a 2011 letter from the KSA Interior Ministry to

Mr. Kadi (KADI0069751-53), showing that the KSA Interior Ministry stated its support of Mr.

Kadi's de-listing with the U.N. Security Council. Similarly, we produced a 2007 letter from the

KSA Interior Ministry (KADI0067977) evidencing an earlier request by the KSA government to

the U.N. for Mr. Kadi's de-listing.

21.    We also have produced to Plaintiffs the Kadi-relevant portion of the

Malaysian report they seek (*see* Plaintiffs' MOL at 10, seventh bullet point).

(KADI0105513-14). Additionally, at least one category of documents Plaintiffs seek, "reports or

documents concerning the KSA's discussion with the U.N. Security Council's al Qaeda and

Taliban Sanctions Committee in 2010" (Plaintiffs' MOL at 10, eighth bullet point), is outside the

2004 discovery cut-off date.

22.     We have also produced the "[t]wo files in English submitted by Kadi n

[sic] 28/12/1422 AD, to the Foreign Ministry to be handed over to the United Nations."

(Plaintiffs' MOL at 9, 10th bullet point.) (KADI0005568-5921.) (Plaintiffs' reference should

be to Exhibit 6, at 33-34. The Bates number "101322" is not a Kadi Bates number; it is the

number affixed to Plaintiffs' translation of KADI0103322.) The actual date of the cover letter

from my law firm in London is March 1, 2002; it is addressed to the "Permanent Representative

of Saudi Arabia to the United Nations."[7] A Saudi lawyer named Dr. Saad bin Abdullah Al-

Beraik, not my law firm or Maître Djebbar, represented Mr. Kadi in his interactions with the

KSA regarding Mr. Kadi's listing.  I attempted to obtain from Dr. Al-Beraik all documents

pertaining to the KSA investigation; he has confirmed to me that he provided me with every

document in his possession, and all those documents have been produced.

23.     Similarly, we have produced all non-privileged or work-product-protected

documents pertaining to transactions between KA Stan (a construction company in Bosnia

owned by Mr. Kadi, Chafiq Ayadi and Wa'el Jelaidan) and the Saudi High Commission for

Relief for Bosnia and Herzegovina, created between 1992 and 2004. Although we may not have

been able to obtain "all records of international transactions authorized by SHC to KA Stan,

Ayadi, Kadi and Jelaidan including the final beneficiary of these funds" (Plaintiffs' MOL at 12),

we produced what Mr. Kadi has including many documents reflecting the expenses KA Stan

---

[7] The date and addressee discrepancies from the references in Plaintiffs' MOL are due to the fact that 12/28/1442 is a Hijri date that converts to March 12, 2002 on the Gregorian calendar, and the cover letter and files were sent to Mr. Kadi's office in Saudi Arabia from my firm, Carter-Ruck, in London.  Mr. Kadi in turn delivered the letter and files to the Foreign Ministry in Riyadh.

-11-

incurred as a result of construction work it did for the SHC in Bosnia. There are more than 90 such documents, examples of which include: KADI0122405, KADI0122410, KADI0122407, KADI0122408, KADI0122410, KADI0122412, KADI0122415, KADI0122416, KADI0122417, KADI0122496, KADI0125792, and KADI0122510.

24. With respect to Plaintiffs' claim that we should have been able to produce additional banking records related to Jelaidan, Bayazid and Maram (Plaintiffs' MOL at 12-14), I refer the Court to Plaintiffs' own exhibit, Ex. 5, at 2, which is a portion of the submission my law firm made to the Swiss authorities in August 2003, in which we note that our work on investigations in various jurisdictions around the world was impeded by the Turkish government's investigators' seizure of documents in June or July 2003, preventing our access to many Maram-related documents. We did obtain and produce to the Swiss authorities, and to Plaintiffs, Maram corporate records that we were able to obtain from the relevant government authority in Turkey. As noted in ¶ 13 above, Mr. Kadi did not have any ownership interest in Maram. Rather, he provided financial support for the dormitory housing that Maram was providing for a university in Sanaa, Yemen.

25. With respect to Mr. Jelaidan, although he has not for many years been an associate of Mr. Kadi's and is not subject to his control, at my request, Mr. Jelaidan in 2003 signed an authorisation to Faisal Finance, Istanbul, requesting that Mr. Kadi's agent Masood Syed be provided with certified copies of all bank statements etc. "without any limitations" for all Maram corporate accounts. Mr. Jelaidan, again at my request in 2003, signed a similarly broad authorization letter addressed to Faisal Finance, Switzerland, regarding his personal

accounts. As a result of these authorizations, both of which were provided to plaintiffs

(KADI0102988 and KADI0104381), Mr. Kadi was able to produce, as requested by Plaintiffs,

banking records of Mr. Jelaidan's, as Plaintiffs are well-aware since they have used such

documents in their motions to compel and for sanctions against Mr. Jelaidan. (*See* ECF No.

2988, filed Aug. 10, 2015, at 5-6 (Plaintiffs' letter-motion to compel Jelaidan to produce

documents); ECF No. 3744, filed October 6, 2017 (Memorandum of Law in Support of

Plaintiffs' Motion for Sanctions Against Defendant Wa'el Hamza Jelaidan), at 5 and n.3). The

fact that we do not have the debit advices, client authorizations or wire transfers that Plaintiffs

would like to see (Plaintiff's MOL at 13-14) is a function of either or both the age of the

documents and the Turkish government's seizure of many of Maram's records. Plaintiffs'

opinion that these documents are missing "perhaps intentionally" is their opinion but nothing

more. We did not intentionally fail to collect or produce any responsive documents.

### Privileged/Work Product Documents

26.     As to Items 11 and 14-17 on our Privilege Log, I apologise for an error in

designation of these documents as protected by the attorney-client privilege and for the log's

identification of the recipient as Mr. Kadi. In fact, these are work product documents consisting

of translations from Arabic to English created by Maître Saad Djebbar, an Arabic-speaking

attorney who, as noted above, also has represented Mr. Kadi for many years and worked with my

law firm on the proceedings we brought on Mr. Kadi's behalf against Her Majesty's Treasury

with respect to HM Treasury's decision to instruct all financial institutions to freeze Mr. Kadi's

assets. The translations were of documents that Maître Djebbar and my firm determined were of

significance in that litigation.

27.     Item 9 on our privilege log is a letter in Arabic from "Muhammad" to

Maître Saad Djebbar, copied to my law firm, providing names of Muwafaq Foundation founding

members. From my familiarity with Mr. Kadi's files, businesses and legal matters, it is apparent

that "Muhammad" is Muhammad bin Mahfouz, a business associate of Mr. Kadi's who acted on

his behalf in the course of the *Africa Confidential* litigation and that the letter pertains to Maître

Djebbar's request to Mr. bin Mahfouz for information needed to prosecute Mr. Kadi's

defamation action against the editor and publisher of *Africa Confidential*.

28.     Item 34 on our privilege log is a letter from Ajmal Ebrahim Hameed, a

lawyer who represented Mr. Kadi. Both the letter itself and related documents make clear to me

that this letter contains legal advice pertaining to Mr. Kadi's investment in the Abrar Group.

The letter was sent to Ahmed Basodan, an employee of Mr. Kadi's who worked with him and

was authorized to act on his behalf with respect to various investments including Abrar.

29.     Item 35 on our privilege log is another letter from Mr. Hameed to Mr.

Basodan. Again, the contents of the letter and related documents make clear to me that this letter

contains a report on Mr. Hameed's activities pertaining to the legal work he was undertaking for

Mr. Kadi regarding his Abrar investment.

30.     Item 50 on our privilege log, a list of real estate transactions, was found in

Mr. Kadi's files next to a letter from the law firm Albar & Partners, a law firm representing Mr.

Kadi, to Ahmed Basodan, containing legal advice regarding certain of the real estate transactions mentioned in the list. This letter is Item 49 on our log. Notations on the related letter show that it was shared with Masood Syed, Mr. Kadi's in-house accountant who frequently acted on Mr. Kadi's behalf. I respectfully submit that my inference that the list of real estate transactions was included with the Albar & Partners letter is a correct one.

31.     Item 100 on our privilege log, on further review, is only partially privileged. In January 2018 we produced it to Plaintiffs' counsel with a redaction of a note, as described in our log, from Ahmed Basodan, Mr. Kadi's agent, to Ajmal Hameed, an attorney for Mr. Kadi.

32.     Item 175 on our privilege log is a handwritten letter from Maître Djebbar to Siraj El Din Abdul Bari, an employee of the Muwafaq Foundation and Mr. Kadi's manager for Muwafaq in Sudan, asking about Muwafaq's relations with the Sudanese government. I am confident that the letter was written by Maître Djebbar based on my familiarity with Maître Djebbar's handwriting, the letter's placement in the file and my recent conversation with Maître Djebbar confirming that the handwriting is his. This conclusion was also confirmed by an Arabic-speaking paralegal with my firm who noted that this letter is signed by Maître Djebbar. Based on the above, it is obvious to me that Maître Djebbar's inquiry was for the purpose of prosecuting Mr. Kadi's defamation action against the editor and publisher of *Africa Confidential*.

33.     I respectfully submit that I and Mr. Kadi's other representatives, with Mr. Kadi's full cooperation, have been diligent and conscientious in our attempts to produce every non-privileged document in Mr. Kadi's custody or control that is responsive to Plaintiffs' 396

-15-

-16-

document requests.  I believe that we have not withheld any requested documents except for those that fall within the attorney-client privilege or the work product protection (or the other two categories of documents described in ¶ 18 n.6 above) with the exception of Item 100, discussed in ¶ 31 above, as to which we have corrected our error and made a production to Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 19ᵀᴴ, 2018.

_____
GUY FREDERICK NOEL MARTIN