# EXHIBIT W

Declaration of Guy Frederick Noel Martin
In Opposition to Plaintiffs' Motion to Compel
Against Yassin Abdullah Kadi

03 MDL 1570

January 2018

СЪД НА ЕВРОПЕЙСКИЯ СЬЮЗ
TRIBUNAL DE JUSTICIA DE LA UNIÓN EUROPEA
SOUDNÍ DVŮR EVROPSKÉ UNIE
DEN EUROPÆISKE UNIONS DOMSTOL
GERICHTSHOF DER EUROPÄISCHEN UNION
EUROOPA LIIDU KOHUS
ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
COURT OF JUSTICE OF THE EUROPEAN UNION
COUR DE JUSTICE DE L'UNION EUROPÉENNE
CÚIRT BHREITHIÚNAIS AN AONTAIS EORPAIGH
SUD EUROPSKE UNIJE
CORTE DI GIUSTIZIA DELL'UNIONE EUROPEA

EIROPAS SAVIENĪBAS TIESA
EUROPOS SĄJUNGOS TEISINGUMO TEISMAS
AZ EURÓPAI UNIÓ BÍRÓSÁGA
IL-QORTI TAL-ĠUSTIZZJA TAL-UNJONI EWROPEA
HOF VAN JUSTITIE VAN DE EUROPESE UNIE
TRYBUNAŁ SPRAWIEDLIWOŚCI UNII EUROPEJSKIEJ
TRIBUNAL DE JUSTIÇA DA UNIÃO EUROPEIA
CURTEA DE JUSTIȚIE A UNIUNII EUROPENE
SÚDNY DVOR EURÓPSKEJ ÚNIE
SODIŠČE EVROPSKE UNIJE
EUROOPAN UNIONIN TUOMIOISTUIN
EUROPEISKA UNIONENS DOMSTOL

**CVRIA**

**LUXEMBOURG**

**9 4 0 4 2 5**    JUDGMENT OF THE COURT (Grand Chamber)

18 July 2013 *

(Appeal – Common Foreign and Security Policy (CFSP) – Restrictive measures
taken against persons and entities associated with Usama bin Laden, the Al-Qaeda
network and the Taliban – Regulation (EC) No 881/2002 – Freezing of funds and
economic resources of a person included in a list drawn up by a body of the
United Nations – Listing of that person's name in Annex I to Regulation (EC)
No 881/2002 – Action for annulment – Fundamental rights – Rights of the
defence – Principle of effective judicial protection – Principle of proportionality –
Right to respect for property – Obligation to state reasons)

In Joined Cases C-584/10 P, C-593/10 P and C-595/10 P,

THREE APPEALS under Article 56 of the Statute of the Court of Justice of the
European Union, brought on 10 December 2010,

**European Commission,** represented initially by P. Hetsch, S. Boelaert,
E. Paasivirta and M. Konstantinidis, and subsequently by L. Gussetti, S. Boelaert,
E. Paasivirta and M. Konstantinidis, acting as Agents, with an address for service
in Luxembourg,

**United Kingdom of Great Britain and Northern Ireland,** represented initially
by E. Jenkinson and subsequently by S. Behzadi-Spencer, acting as Agents, and
by J. Wallace QC, D. Beard QC, and M. Wood, Barrister,

appellants,

supported by:

**Republic of Bulgaria,** represented by B. Zaimov, T. Ivanov and E. Petranova,
acting as Agents,

**Italian Republic,** represented by G. Palmieri, acting as Agent, and by M. Fiorilli,
avvocato dello Stato, with an address for service in Luxembourg,

*Language of the case: English.
**ECR**



EN

**Grand Duchy of Luxembourg,** represented by C. Schiltz, acting as Agent,

**Hungary,** represented by M. Fehér, K. Szíjjártó and K. Molnár, acting as Agents,

**Kingdom of the Netherlands,** represented by C. Wissels and M. Bulterman, acting as Agents,

**Slovak Republic,** represented by B. Ricziová, acting as Agent,

**Republic of Finland,** represented by H. Leppo, acting as Agent,

interveners in the appeals in Cases C-584/10 P and C-595/10 P,

**Council of the European Union,** represented by M. Bishop, E. Finnegan and R. Szostak, acting as Agents,

appellant,

supported by:

**Republic of Bulgaria,** represented by B. Zaimov, T. Ivanov and E. Petranova, acting as Agents,

**Czech Republic,** represented by K. Najmanová, E. Ruffer, M. Smolek and D. Hadroušek, acting as Agents,

**Kingdom of Denmark,** represented by L. Volck Madsen, acting as Agent,

**Ireland,** represented initially by D. O'Hagan and subsequently by E. Creedon, acting as Agents, and by N. Travers BL and P. Benson, solicitor, with an address for service in Luxembourg,

**Kingdom of Spain,** represented by M. Muñoz Pérez and N. Díaz Abad, acting as Agents, with an address for service in Luxembourg,

**Italian Republic,** represented by G. Palmieri, acting as Agent, and by M. Fiorilli, avvocato dello Stato, with an address for service in Luxembourg,

**Grand Duchy of Luxembourg,** represented by C. Schiltz, acting as Agent,

**Hungary,** represented by M. Fehér, K. Szíjjártó and K. Molnár, acting as Agents,

**Kingdom of the Netherlands,** represented by C. Wissels and M. Bulterman, acting as Agents,

**Republic of Austria,** represented by C. Pesendorfer, acting as Agent, with an address for service in Luxembourg,

**Slovak Republic,** represented by B. Ricziová, acting as Agent,

I - 2

KADI0025953

**Republic of Finland,** represented by H. Leppo, acting as Agent,

interveners in the appeal in Case C-593/10 P,

the other parties to the proceedings being:

**Yassin Abdullah Kadi,** represented by D. Vaughan QC, V. Lowe QC, J. Crawford SC, M. Lester and P. Eeckhout, Barristers, G. Martin, solicitor, and by C. Murphy,

applicant at first instance,

**French Republic,** represented by E. Belliard, G. de Bergues, D. Colas, A. Adam and E. Ranaivoson, acting as Agents,

intervener at first instance,

THE COURT (Grand Chamber),

composed of V. Skouris, President, K. Lenaerts (Rapporteur), Vice-President, M. Ilešič, L. Bay Larsen, T. von Danwitz and M. Berger, Presidents of Chambers, U. Lõhmus, E. Levits, A. Arabadjiev, C. Toader, J.-J. Kasel, M. Safjan and D. Šváby, Judges,

Advocate General: Y. Bot,

Registrar: A. Impellizzeri, Administrator,

having regard to the written procedure and further to the hearing on 16 October 2012,

after hearing the Opinion of the Advocate General at the sitting on 19 March 2013,

gives the following

## Judgment

1   By their appeals, the European Commission, the Council of the European Union and the United Kingdom of Great Britain and Northern Ireland seek to have set aside the judgment of the General Court of the European Union of 30 September 2010 in Case T-85/09 *Kadi* v *Commission* [2010] ECR II-5177 ('the judgment under appeal'), by which that Court annulled Commission Regulation (EC) No 1190/2008 of 28 November 2008 amending for the 101st time Council Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the

KADI0025954

Al-Qaeda network and the Taliban (OJ 2008 L 322, p. 25; 'the contested regulation'), in so far as that measure concerns Mr Kadi.

**Legal context**

*The Charter of the United Nations*

2    Under Article 1(1) and (3) of the Charter of the United Nations, signed at San Francisco (United States of America) on 26 June 1945, the purposes of the United Nations are inter alia to 'maintain international peace and security' and to 'achieve international cooperation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion'.

3    Under Article 24(1) of the Charter of the United Nations, the United Nations Security Council ('the Security Council') is given primary responsibility for the maintenance of international peace and security. Article 24(2) thereof provides that, in discharging those duties, the Security Council is to act in accordance with the purposes and principles of the United Nations.

4    Under Article 25 of the Charter of the United Nations, the Members of the United Nations [UN] agree to accept and carry out the decisions of the Security Council in accordance with that Charter.

5    Chapter VII of the Charter of the United Nations, headed 'Action with respect to threats to the peace, breaches of the peace, and acts of aggression', defines the action to be taken in such cases. Article 39 of that Charter, which introduces Chapter VII, provides that the Security Council is to determine the existence of any such threat, any such breach or any such act and is to make recommendations, or decide what measures are to be taken, in accordance with Articles 41 and 42 of the Charter, to maintain or restore international peace and security. Under Article 41 of that Charter, the Security Council may decide what measures, not involving the use of armed force, are to be employed to give effect to its decisions and it may call upon the Members of the United Nations to apply such measures.

6    By virtue of Article 48(2) of the Charter of the United Nations, the decisions of the Security Council for the maintenance of international peace and security are to be carried out by the Members of the United Nations directly and through their action in the appropriate international agencies of which they are members.

7    Article 103 of the Charter of the United Nations states that in the event of a conflict between the obligations of the Members of the United Nations under that Charter and their obligations under any other international agreement, their obligations under that Charter are to prevail.

KADI0025955

*Actions of the Security Council against international terrorism and the implementation of those actions by the European Union*

8  Since the late 1990s, and even more since the attacks of 11 September 2001 in the United States, the Security Council has adopted a number of resolutions under Chapter VII of the Charter of the United Nations in order to combat terrorist threats to international peace and security. Initially directed solely against the Taliban of Afghanistan, those resolutions were subsequently extended to include Usama bin Laden, Al-Qaeda and persons and entities associated with them. The resolutions provide, inter alia, for the freezing of assets of the organisations, entities and persons identified by the committee established by the Security Council in accordance with Resolution 1267 (1999) of 15 October 1999 ('the Sanctions Committee') on a consolidated list ('the Sanctions Committee Consolidated List').

9  In order to deal with delisting requests made by organisations, entities or persons named on that list, Security Council Resolution 1730 (2006) of 19 December 2006 provided for the establishment of a 'focal point' within the Security Council, responsible for examination of such requests. That focal point was established in March 2007.

10  Under paragraph 5 of Security Council Resolution 1735 (2006) of 22 December 2006, when States propose names of organisations, entities or persons to the Sanctions Committee for inclusion on the Consolidated List, they must 'provide a statement of case; the statement of case should provide as much detail as possible on the basis(es) for the listing, including: (i) specific information supporting a determination that the individual or entity meets the criteria above; (ii) the nature of the information; and (iii) supporting information or documents that can be provided'. Under paragraph 6 of that resolution, States are requested 'at the time of submission, to identify those parts of the statement of case which may be publicly released for the purposes of notifying the listed [on the Sanctions Committee Consolidated List] individual or entity, and those parts which may be released on request to interested States'.

11  Under paragraph 12 of Security Council Resolution 1822 (2008) of 30 June 2008, States must, inter alia, 'for each such proposal [of names to the Security Council for inclusion on the Consolidated List] identify those parts of the statement of case that may be publicly released, including for use by the [Sanctions] Committee for development of the summary described in paragraph 13 below or for the purpose of notifying or informing the listed individual or entity, and those parts which may be released upon request to interested States.' Paragraph 13 of that resolution provides, first, that the Sanctions Committee, when it adds a name to its Consolidated List, is to make accessible on its website 'a narrative summary of reasons for listing' and, secondly, that that committee is to make accessible on the same site, 'narrative summaries of reasons for listing' names on that list before the adoption of Resolution 1822/2008.

I - 5

12    As regards delisting requests, Security Council Resolution 1904 (2009) of 17 December 2009 established an 'Office of the Ombudsperson', whose task, under paragraph 20 thereof, is to assist the Sanctions Committee in the consideration of such requests. Under that same paragraph, the person appointed to be the Ombudsperson must be an individual of high moral character, impartiality and integrity with high qualifications and experience in relevant fields, including law, human rights, counter-terrorism, and sanctions. The mandate of the Ombudsperson, as described in Annex II to that resolution, covers a stage of gathering information from the State concerned and a stage of consultation, in the course of which dialogue may be engaged with the organisation, entity or person requesting delisting from the Sanctions Committee Consolidated List. Following those two stages, the Ombudsperson must draw up a 'comprehensive report' and present it to the Sanctions Committee, which must then consider the delisting request, with the assistance of the Ombudsperson, and after doing so decide whether to approve that request.

13    Since the Member States considered, in a number of Common Positions adopted under the Common Foreign and Security Policy, that European Union action was required in order to implement the Security Council Resolutions on combating international terrorism, the Council adopted a series of regulations providing for, inter alia, the freezing of the assets of organisations, entities and individuals identified by the Sanctions Committee.

14    In parallel with the regime described above, which is aimed solely at organisations, entities and individuals designated by name by the Sanctions Committee as being associated with Usama bin Laden, the Al-Qaeda network and the Taliban, there exists a wider regime of sanctions provided for by Security Council Resolution 1373 (2001) of 28 September 2001, which was likewise adopted in response to the terrorist attacks of 11 September 2001. That resolution, which also provides for asset-freezing measures, differs from the resolutions mentioned above in that the identification of the organisations, entities or persons which it is intended to cover is left entirely to the discretion of the States.

15    At European Union level, Resolution 1373 (2001) was implemented by Council Common Position 2001/931/CFSP of 27 December 2001 on the application of specific measures to combat terrorism (OJ 2001 L 344, p. 93) and by Council Regulation (EC) No 2580/2001 of 27 December 2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism (OJ 2001 L 344, p. 70, and corrigendum, OJ 2010 L 52, p. 58). Those measures contain a list, which is regularly reviewed, of organisations, entities and persons suspected of being involved in terrorist activities.

I - 6

KADI0025957

### Background to the proceedings

*The case which gave rise to the Kadi judgment*

16   On 17 October 2001 Mr Kadi, identified as being an individual associated with Usama bin Laden and the Al-Qaeda network, was listed on the Sanctions Committee Consolidated List.

17   Mr Kadi's name was subsequently added to the list in Annex I to Council Regulation (EC) No 467/2001 of 6 March 2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, and repealing Regulation No 337/2000 (OJ 2001 L 67, p. 1), by Commission Regulation (EC) No 2062/2001 of 19 October 2001 amending, for the third time, Regulation No 467/2001 (OJ 2001 L 277, p. 25). He was subsequently listed in Annex I to Council Regulation (EC) No 881/2002 of 27 May 2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Regulation No 467/2001 (OJ 2002 L 139, p. 9).

18   On 18 December 2001 Mr Kadi brought before the General Court an action seeking the annulment, initially, of Regulations No 467/2001 and No 2062/2001, then of Regulation No 881/2002, in so far as those regulations concerned him. The grounds for annulment were, respectively, infringement of the right to be heard, the right to respect for property and the principle of proportionality, and also of the right to effective judicial review.

19   By judgment of 21 September 2005 in Case T-315/01 *Kadi* v *Council and Commission* [2005] ECR II-3649, the General Court dismissed that action. In essence, the General Court held that it followed from the principles governing the relationship between the international legal order under the United Nations and the European Union legal order that Regulation No 881/2002, being designed to implement a Security Council resolution leaving no latitude in that regard, could not be the subject of judicial review of its internal lawfulness and thus enjoyed immunity from jurisdiction, except as regards its compatibility with rules falling within the ambit of *jus cogens*, understood as a body of rules of public international law binding on all subjects of international law, including the bodies of the UN, and from which no derogation is possible.

20   Accordingly, the General Court, applying the standard of universal protection of the fundamental rights of the human person covered by *jus cogens*, ruled out, in the given case, any infringement of the rights relied on by Mr Kadi. As regards, in particular, the right to effective judicial review, the General Court stated that it was not for it to review indirectly whether Security Council Resolutions are compatible with such fundamental rights as are protected by the European Union legal order, nor to verify that there had been no error of assessment of the facts

I - 7

KADI0025958

and evidence relied on by the Security Council in support of the measures it had taken, nor, again, to review indirectly the appropriateness and proportionality of those measures. The General Court added that any such lacuna in the judicial protection available to Mr Kadi is not in itself contrary to *jus cogens*.

21    By its judgment of 3 September 2008 in Joined Cases C-402/05 P and C-415/05 P *Kadi and Al Barakaat International Foundation* v *Council and Commission* [2008] ECR I-6351 ('the *Kadi* judgment'), the Court set aside the judgment of the General Court in Case T-315/01 *Kadi* v *Council and Commission* and annulled Regulation No 881/2002 in so far as it concerned Mr Kadi.

22    In essence, the Court held that the obligations imposed by an international agreement cannot have the effect of prejudicing the constitutional principles of the EC Treaty, which include the principle that all European Union acts must respect fundamental rights, that respect constituting a condition of their lawfulness which it is for the Court to review in the framework of the complete system of legal remedies established by that treaty. The Court held further that, notwithstanding the fact that undertakings given in the UN context must be observed when implementing Security Council resolutions, it does not follow from the principles governing the international legal order under the United Nations that an act adopted by the European Union such as Regulation No 881/2002 thereby enjoys immunity from jurisdiction. The Court added that there is no basis for such immunity in the EC Treaty.

23    In those circumstances the Court held, in paragraphs 326 and 327 of the *Kadi* judgment, that the Courts of the European Union must ensure the review, in principle the full review, of the lawfulness of all European Union acts in the light of fundamental rights, including where such acts are designed to implement Security Council resolutions, and that the General Court's reasoning was consequently vitiated by an error of law.

24    Ruling on the action brought by Mr Kadi before the General Court, the Court held, in paragraphs 336 to 341 of the *Kadi* judgment, that the effectiveness of judicial review means that the competent European Union authority is bound to communicate the grounds for the contested listing decision to the person concerned and to provide that person with the opportunity to be heard in that regard. The Court stated that, as regards a decision that a person's name should be listed for the first time, for reasons connected with the effectiveness of the restrictive measures at issue and with the objective of the regulation concerned, it was necessary that that disclosure and that hearing should occur not prior to the adoption of that decision but when that decision was adopted or as swiftly as possible thereafter.

25    In paragraphs 345 to 349 of the *Kadi* judgment, the Court added that, since the Council had neither communicated to Mr Kadi the evidence relied on against him to justify the restrictive measures imposed on him nor afforded him the right to be

I - 8

KADI0025959

informed of that evidence within a reasonable period after those measures were enacted, Mr Kadi had not been in a position effectively to make known his point of view in that regard, with the consequence that the rights of defence and the right to effective judicial review had been infringed. The Court also stated, in paragraph 350 of that judgment, that that infringement had not been remedied before the Courts of the European Union, given that the Council had not adduced before them any such evidence. In paragraphs 369 to 371 of that judgment, the Court concluded, on the same grounds, that Mr Kadi's fundamental right to respect for property had been infringed.

26    The effects of the annulled regulation in so far as it concerned Mr Kadi were maintained for a maximum period of three months in order to allow the Council to remedy the infringements found.

*The response of the European Union institutions to the Kadi judgment and the contested regulation*

27    On 21 October 2008 the Chairman of the Sanctions Committee communicated the narrative summary of reasons for Mr Kadi's listing on that committee's Consolidated List to France's Permanent Representative to the UN, and authorised its transmission to Mr Kadi.

28    That summary of reasons is worded as follows:

'The individual Yasin Abdullah Ezzedine Qadi ... satisfies the standard for listing by the [Sanctions Committee] because of his actions in (a) participating in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of; (b) supplying, selling, or transferring arms and related material to; (c) recruiting for; or (d) otherwise supporting acts or activities of; Al-Qaeda, Usama bin Laden or the Taliban, or any cell, affiliate, splinter group or derivative thereof (see United Nations Security Council Resolution 1822 (2008), paragraph 2).

Mr Qadi has acknowledged that he is a founding trustee and directed the actions of the Muwafaq Foundation. The Muwafaq Foundation historically operated under the umbrella of Makhtab Al-Khidamat/Al Kifah (QE.M.12.01), an organisation founded by Mr Abdullah Azzam and Mr Usama Muhammed Awad bin Laden (QI.B.8.01), and the predecessor to Al-Qaeda (QE.A.4.01). Following the dissolution of Makhtab Al-Khidamat/Al Kifah in early June 2001 and its absorption into Al-Qaeda, a number of NGOs formerly associated with Makhtab Al-Khidamat/Al Kifah, including the Muwafaq Foundation, also joined with Al-Qaeda.

In 1992, Mr Qadi hired Mr Shafiq Ben Mohamed Ben Mohamed Al-Ayadi (QI.A.25.01) to head the European offices of the Muwafaq Foundation. During the mid-1990s, Mr Al-Ayadi also headed the Muwafaq Foundation branch in Bosnia and Herzegovina. Mr Qadi hired Mr Al-Ayadi on the recommendation of

I - 9

known Al-Qaeda financier Mr Wa'el Hamza Abd Al-Fatah Julaidan (QI.J.79.02), who fought with Mr bin Laden in Afghanistan in the 1980s. At the time of his appointment by Mr Qadi as the Muwafaq Foundation's European director, Mr Al-Ayadi was operating under agreements with Mr bin Laden. Mr Al-Ayadi was one of the principal leaders of the Tunisian Islamic Front, went to Afghanistan in the early 1990s to receive paramilitary training, and then went to Sudan with others to meet Mr bin Laden, with whom they concluded a formal agreement regarding the reception and training of Tunisians. They later met with Mr bin Laden a second time, securing an agreement for bin Laden collaborators in Bosnia and Herzegovina to receive Tunisian mujahidin from Italy.

In 1995, the leader of Al-Gama'at Al-Islamiya, Mr Talad Fuad Kassem, said that the Muwafaq Foundation had provided logistical and financial support for a mujahidin battalion in Bosnia and Herzegovina. In the mid-1990s, the Muwafaq Foundation was involved in providing financial support for terrorist activities of the mujahidin, as well as arms trafficking from Albania to Bosnia and Herzegovina. Some involvement in the financing of these activities was provided by Mr bin Laden.

Mr Qadi was also a major shareholder in the now closed Sarajevo-based Depositna Banka, in which Mr Al-Ayadi also held a position and acted as nominee for Mr Qadi's shares. Planning sessions for an attack against a United States facility in Saudi Arabia may have taken place at this bank.

Mr Qadi further owned several firms in Albania which funnelled money to extremists or employed extremists in positions where they controlled the firm's funds. Mr Bin Laden provided the working capital for four or five of Mr Qadi's companies in Albania.'

29    That summary of reasons was also published on the website of the Sanctions Committee.

30    On 22 October 2008 France's Permanent Representative to the European Union transmitted that summary of reasons to the Commission, which sent it to Mr Kadi on the same day, informing him that, for the reasons set out in that summary, it envisaged maintaining his listing in Annex I to Regulation No 881/2002. The Commission gave Mr Kadi until 10 November 2008 to comment on those reasons and to provide it with any information that he might consider relevant before it took its final decision.

31    On 10 November 2008 Mr Kadi sent his comments to the Commission. He argued, on the basis of documents certifying that the Swiss, Turkish and Albanian authorities had decided not to pursue criminal investigations against him concerning his alleged support of terrorist organisations or involvement in financial crime, that, whenever he had been given the opportunity to express his point of view on the evidence said to inculpate him, he had been able to

I - 10

demonstrate that the allegations made against him were unfounded, and he requested the production of the evidence in support of the claims and assertions made in the summary of reasons relating to his being listed on the Sanctions Committee Consolidated List and the relevant documents in the Commission's file, and asked that he be allowed to submit comments on that evidence. While drawing attention to the vagueness and generality of a number of the allegations contained in that summary of reasons, he disputed, with supporting evidence, that any of the reasons relied on against him were well founded.

32    On 28 November 2008 the Commission adopted the contested regulation.

33    According to recitals 3 to 6, 8 and 9 of the preamble to that regulation:

'(3)    In order to comply with [the *Kadi* judgment], the Commission has communicated the … [summary] of reasons provided by the … Sanctions Committee, to Mr Kadi … and given [him] the opportunity to comment on these grounds in order to make [his] point of view known.

(4)    The Commission has received comments by Mr Kadi … and examined these comments.

(5)    The list of persons, groups and entities to whom the freezing of funds and economic resources should apply, drawn up by the … Sanctions Committee, includes Mr Kadi …

(6)    After having carefully considered the comments received from Mr Kadi in a letter dated 10 November 2008, and given the preventive nature of the freezing of funds and economic resources, the Commission considers that the listing of Mr Kadi is justified for reasons of his association with the Al-Qaida network.

…

(8)    In view of this, Mr Kadi … should be added to Annex I.

(9)    This Regulation should apply from 30 May 2002, given the preventive nature and objectives of the freezing of funds and economic resources under Regulation … No 881/2002 and the need to protect legitimate interests of the economic operators, who have been relying on the legality of [the regulation annulled by the *Kadi* judgment].'

34    In accordance with Article 1 of the contested regulation and the annex thereto, Annex I to Regulation No 881/2002 was amended to that effect, inter alia, by the addition of the following entry under the heading 'Natural persons':

'Yasin Abdullah Ezzedine Qadi (alias (a) Kadi, Shaykh Yassin Abdullah; (b) Kahdi, Yasin; (c) Yasin Al-Qadi). Date of birth: 23.2.1955. Place of birth: Cairo,

I - 11

KADI0025962

Egypt. Nationality: Saudi Arabian. Passport number: B 751550, (b) E 976177 (issued on 6.3.2004, expiring on 11.1.2009). Other information: Jeddah, Saudi Arabia.'

35  The contested regulation, in accordance with Article 2 thereof, entered into force on 3 December 2008 and is applicable from 30 May 2002.

36  By letter of 8 December 2008, the Commission replied to Mr Kadi's comments of 10 November 2008.

**The procedure before the General Court and the judgment under appeal**

37  By application lodged at the Registry of the General Court on 26 February 2009, Mr Kadi brought an action for annulment of the contested regulation in so far as it concerns him. In support of his claims, he put forward five pleas in law. The second plea alleged breach of the rights of the defence and of the right to effective judicial protection, and the fifth plea alleged a disproportionate restriction on the right to property.

38  In the judgment under appeal, the General Court, relying on paragraphs 326 and 327 of the *Kadi* judgment, first held, in paragraph 126 of the judgment under appeal, that its task was to ensure 'in principle the full review' of the lawfulness of the contested regulation in the light of the fundamental rights guaranteed by the European Union. It added, in paragraphs 127 to 129 of the judgment under appeal, that, so long as the re-examination procedure operated by the Sanctions Committee clearly fails to offer guarantees of effective judicial protection, the review carried out by the Courts of the European Union of Union measures to freeze funds can be regarded as effective only if it concerns, indirectly, the substantive assessments of the Sanctions Committee itself and the evidence underlying them.

39  The argument of the Commission and the Council concerning the Court of Justice's failure to comment, in the *Kadi* judgment, on the scope and intensity of such judicial review was held, in paragraph 131 of the judgment under appeal, to be clearly wrong.

40  In that regard, the General Court held in essence, in paragraphs 132 to 135 of the judgment under appeal, that it is obvious, particularly from paragraphs 326, 327, 336 and 342 to 344 of the *Kadi* judgment, that it was the intention of the Court of Justice that judicial review, in principle full review, should extend not only to the apparent merits of the contested measure but also to the evidence and information on which the findings made in that measure are based.

41  The General Court further stated, in paragraphs 138 to 146 of the judgment under appeal, that, by repeating the essence of its reasoning, in connection with the regime mentioned in paragraphs 14 and 15 of this judgment, in its judgment of 12

I - 12

KADI0025963

December 2006 in Case T-228/02 *Organisation des Modjahedines du peuple d'Iran* v *Council* [2006] ECR II-4665, the Court of Justice approved and endorsed the standard and intensity of judicial review determined in that judgment, namely that the Courts of the European Union must review the assessment made by the institution concerned of the facts and circumstances relied on in support of the restrictive measures at issue and determine whether the information and evidence on which that assessment is based is accurate, reliable and consistent, and such review cannot be barred on the ground that that information and evidence is secret or confidential.

42   After having also emphasised, in paragraphs 148 to 151 of the judgment under appeal, that the effect on Mr Kadi's rights of the restrictive measures to which he had been subject for almost ten years was marked and long-lasting, in paragraph 151 of that judgment the General Court confirmed 'the principle of a full and rigorous judicial review of [freezing measures such as those at issue in this instance]'.

43   Examining, next, the second and fifth pleas in law in support of annulment, the General Court found, in paragraphs 171 to 180 of the judgment under appeal, that there was a breach of  Mr Kadi's rights of defence, after observing, in essence, that:

   –   those rights had been respected only in a purely formal and superficial sense, since the Commission considered itself strictly bound by the findings of the Sanctions Committee and at no time envisaged calling them into question in the light of Mr Kadi's comments or making any real effort to refute the exculpatory evidence adduced by Mr Kadi;

   –   Mr Kadi was refused access by the Commission to the evidence against him despite his express request, whilst no balance was struck between his interests and the need to protect the confidentiality of the information in question, and

   –   the few pieces of information and the vague allegations in the summary of reasons relating to the listing of Mr Kadi on the Sanctions Committee Consolidated List, for example, that Mr Kadi was a shareholder in a Bosnian bank in which planning sessions for an attack on a United States facility in Saudi Arabia 'may have' taken place, were clearly insufficient to enable Mr Kadi to mount an effective challenge to the allegations against him.

44   The General Court also found, in paragraphs 181 to 184 of the judgment under appeal, that the principle of effective judicial protection had been infringed on the grounds, first, that since Mr Kadi was afforded no proper access to the information and evidence used against him, Mr Kadi had been unable to defend his rights with regard to that information and evidence in satisfactory conditions before the Courts of the European Union and, secondly, that that infringement had

I - 13

KADI0025964

not been remedied in the course of the proceedings before the General Court, given that no evidence of that kind or any indication of the evidence relied on against Mr Kadi had been disclosed to the General Court by the institutions concerned.

45   The General Court further held, in paragraphs 192 to 194 of the judgment under appeal, that since the contested regulation had been adopted without Mr Kadi having been able to put his case to the competent authorities, notwithstanding the fact that the measures freezing his assets, given their general application and duration, represented a significant restriction on his right to property, the imposition of such measures constituted an unjustified restriction of that right, and consequently that Mr Kadi's claim that the infringement by that regulation of his fundamental right to respect for property entailed a breach of the principle of proportionality was well founded.

46   The General Court therefore annulled the contested regulation in so far as it concerns Mr Kadi.

### Procedure before the Court and forms of order sought

47   By order of the President of the Court of 9 February 2011, Cases C-584/10 P, C-593/10 P and C-595/10 P were joined for the purposes of the written and oral procedures and the judgment.

48   By order of the President of the Court of 23 May 2011, first, the Czech Republic, the Kingdom of Denmark, Ireland, the Kingdom of Spain and the Republic of Austria were granted leave to intervene in Case C-593/10 P in support of the forms of order of the Council, and, secondly, the Republic of Bulgaria, the Italian Republic, the Grand Duchy of Luxembourg, Hungary, the Kingdom of the Netherlands, the Slovak Republic and the Republic of Finland were granted leave to intervene in Cases C-584/10 P, C-593/10 P and C-595/10 P in support of the forms of order of the Commission, the Council and the United Kingdom.

49   In Case C-584/10 P, the Commission claims that the Court should:

–   set aside the judgment under appeal in its entirety;

–   dismiss Mr Kadi's application for annulment of the contested regulation in so far as it concerns him as being unfounded, and

–   order Mr Kadi to pay the Commission's costs in this appeal and in the proceedings before the General Court.

50   In Case C-593/10 P, the Council claims that the Court should:

–   set aside the judgment under appeal;

I - 14

- dismiss Mr Kadi's application for annulment of the contested regulation in so far as it concerns him as being unfounded, and

- order Mr Kadi to pay the costs in the proceedings at first instance and in the present appeal.

51    In Case C-595/10 P, the United Kingdom claims that the Court should:

- set aside the judgment under appeal in its entirety;

- dismiss Mr Kadi's application for annulment of the contested regulation in so far as it concerns him, and

- order Mr Kadi to bear the United Kingdom's costs in the proceedings before the Court of Justice.

52    Mr Kadi contends in all three cases that the Court should:

- dismiss the appeals;

- uphold the judgment under appeal and declare that it became immediately enforceable on the date of delivery; and

- order the appellants to pay Mr Kadi's costs in the present appeal, including all costs incurred in responding to the observations of intervening Member States.

53    The French Republic, intervener at first instance, claims that in all three cases the Court should:

- set aside the judgment under appeal, and

- give final judgment as to the substance, in accordance with Article 61 of the Statute of the Court of Justice of the European Union, and reject the forms of order sought by Mr Kadi at first instance.

54    The Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, Ireland, the Kingdom of Spain, the Italian Republic, the Grand Duchy of Luxembourg, Hungary, the Kingdom of the Netherlands, the Republic of Austria, the Slovak Republic and the Republic of Finland claim that the judgment under appeal should be set aside and that Mr Kadi's action for annulment should be dismissed.

**The request to reopen the oral procedure**

55    By letter of 9 April 2013, Mr Kadi requested that the Court reopen the oral procedure, claiming, in essence, that statements made in point 117 of the Opinion of the Advocate General in relation to the issue of respect for the rights of the

I - 15

KADI0025966

defence are contradicted by the findings of fact made by the General Court, in paragraphs 171 and 172 of the judgment under appeal, which have not been debated by the parties in the course of these appeals.

56  In that regard, it must be recalled that, first, the Court may, of its own motion, on a proposal from the Advocate General, or at the request of the parties, order the reopening of the oral procedure, in accordance with Article 83 of the Rules of Procedure, if it considers that it lacks sufficient information or that the case should be decided on the basis of an argument which has not been debated between the parties (see judgment of 11 April 2013 in Case C-535/11 *Novartis Pharma* [2013] ECR I-0000, paragraph 30 and case-law cited).

57  Secondly, pursuant to the second paragraph of Article 252 TFEU, it is the duty of the Advocate General, acting with complete impartiality and independence, to make, in open court, reasoned submissions on cases which, in accordance with the Statute of the Court of Justice, require the Advocate General's involvement. The Court is not bound either by the Advocate General's Opinion or by the reasoning on which it is based (see judgment of 22 November 2012 in Case C-89/11 P *E.ON Energie v Commission* [2012] ECR I-0000, paragraph 62 and case-law cited).

58  In the present case, the Court, having heard the Advocate General, considers that it has sufficient information to adjudicate and that the cases need not be decided on the basis of arguments which have not been debated between the parties. There is therefore no need to accede to the request to reopen the oral procedure.

**The appeals**

59  The Commission, the Council and the United Kingdom put forward various grounds in support of their respective appeals. There are, in essence, three. The first ground, raised by the Council, alleges an error of law in that the contested regulation was not recognised as having immunity from jurisdiction. The second ground, raised by the Commission, the Council and the United Kingdom, alleges errors of law with regard to the level of intensity of judicial review determined in the judgment under appeal. The third ground, again raised by those three appellants, alleges that the General Court erred in its examination of Mr Kadi's pleas in respect of infringement of his rights of defence and his right to effective judicial protection, and in respect of infringement of the principle of proportionality.

*The first ground of appeal: error of law in that the contested regulation was not recognised as having immunity from jurisdiction*

Arguments of the parties

60  In relation to the first ground of appeal, the Council, supported by Ireland, the Kingdom of Spain and the Italian Republic, complains that the General Court

I - 16

KADI0025967

erred in law, in particular in paragraph 126 of the judgment under appeal, by refusing, pursuant to the *Kadi* judgment, to recognise that the contested regulation had immunity from jurisdiction. The Council, supported by Ireland, formally requests the Court to reconsider the principles set out in that regard in the *Kadi* judgment.

61 Referring to paragraphs 114 to 120 of the judgment under appeal, the Council, supported by Ireland and the Italian Republic, claims that the refusal to grant the contested regulation immunity from jurisdiction is contrary to international law. That refusal wholly ignores the fact that it is the Security Council which has primary responsibility for determining the measures necessary for the maintenance of international peace and security and ignores the primacy of obligations under the United Nations Charter over those arising under any other international agreement. It disregards the obligation to act in good faith and the duty to provide mutual assistance which must be respected when implementing Security Council measures. That approach leads the European Union's institutions to substitute themselves for the international bodies which have the relevant powers. It amounts to reviewing the legality of Security Council resolutions in the light of European Union law. The uniform, unconditional and immediate application of those resolutions is jeopardised. States which are members both of the United Nations and of the European Union find themselves in an impossible position as regards meeting their international obligations.

62 The refusal to grant the contested regulation immunity from jurisdiction is also contrary to European Union law. It wholly ignores the fact that, under that law, the European Union institutions are bound to comply with international law and with the decisions of organs of the UN, where those institutions exercise, on the international stage, powers that have been transferred to them by the Member States. It disregards the need to strike a balance between the maintenance of international peace and security, on the one hand, and the protection of human rights and fundamental freedoms, on the other.

63 Mr Kadi contends that any challenge to the position that a European Union measure such as the contested regulation does not have immunity from jurisdiction is contrary to the principle of *res judicata*, given that that challenge concerns a question of law which was settled between the same parties by the *Kadi* judgment following consideration of the same arguments as those raised in the present case.

64 Referring to various passages in that judgment, Mr Kadi disputes, in any event, that the refusal to grant the contested regulation immunity from jurisdiction is contrary to international law and to European Union law.

I - 17

KADI0025968

Findings of the Court

65    In paragraph 126 of the judgment under appeal, the General Court held that, in accordance with paragraphs 326 and 327 of the *Kadi* judgment, the contested regulation could not be afforded any immunity from jurisdiction on the ground that its objective is to implement resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations.

66    Various factors, set out in paragraphs 291 to 327 of the *Kadi* judgment, were advanced in support of the position stated by the Court in that judgment, and there has been no change in those factors which could justify reconsideration of that position, those factors being, essentially, bound up with the constitutional guarantee which is exercised, in a Union based on the rule of law (see Case C-550/09 *E and F* [2010] ECR I-6213, paragraph 44, and the judgment of 26 June 2012 in Case C-335/09 P *Poland* v *Commission* [2012] ECR I-0000, paragraph 48), by judicial review of the lawfulness of all European Union measures, including those which, as in the present case, implement an international law measure, in the light of the fundamental rights guaranteed by the European Union.

67    That European Union measures implementing restrictive measures decided at international level enjoy no immunity from jurisdiction has moreover been confirmed in Joined Cases C-399/06 P and C-403/06 P *Hassan and Ayadi* v *Council and Commission* [2009] ECR I-11393, paragraphs 69 to 75, and, more recently, in the judgment of 16 November 2011 in Case C-548/09 P *Bank Melli Iran* v *Council* [2011] ECR I-0000, where it is stated, in paragraph 105, with reference to the *Kadi* judgment, that, without the primacy of a Security Council resolution at the international level thereby being called into question, the requirement that the European Union institutions should pay due regard to the institutions of the United Nations must not result in there being no review of the lawfulness of such European Union measures, in the light of the fundamental rights which are an integral part of the general principles of European Union law.

68    It follows that the judgment under appeal, in particular paragraph 126 thereof, is not vitiated by any error of law with regard to the General Court's refusal, in accordance with the *Kadi* judgment, to afford the contested regulation immunity from jurisdiction.

69    The first ground of appeal must therefore be rejected.

*The second and third grounds of appeal: respectively, errors of law relating to the level of intensity of judicial review defined in the judgment under appeal and errors committed by the General Court in the examination of the pleas for annulment based on infringement of the rights of the defence, the right to effective judicial protection and the principle of proportionality*

70    The second and third grounds of appeal should be examined together, since the subject of both is, in essence, a criticism of errors of law vitiating the

I - 18

interpretation of the rights of the defence and the right to effective judicial protection adopted by the General Court in the judgment under appeal.

Arguments of the parties

71    In relation to the second and third grounds of appeal, the Commission, the Council and the United Kingdom, supported by the Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, Ireland, the Kingdom of Spain, the French Republic, the Italian Republic, the Grand Duchy of Luxembourg, Hungary, the Kingdom of the Netherlands, the Republic of Austria, the Slovak Republic and the Republic of Finland, claim, first, that the judgment under appeal is vitiated by an error of law in that, contrary to what is stated in paragraphs 132 to 147 of that judgment, the *Kadi* judgment contains no indication supporting the General Court's approach concerning the level of intensity of judicial review to be applied to a European Union measure such as the contested regulation.

72    In the first place, the requirement, set out in paragraph 326 of the *Kadi* judgment, that there should be 'review, in principle full review', of the lawfulness of the contested regulation should be placed in the international context to the adoption of that measure, as described, in particular, in paragraphs 292 to 297 of that judgment.

73    In the second place, it is claimed that the General Court wrongly held, in paragraph 138 of the judgment under appeal, that the Court had, in the *Kadi* judgment, endorsed the standard of review determined by the General Court in its case-law relating to the regime referred to in paragraphs 14 and 15 of this judgment. The fact is that the *Kadi* judgment contains no reference to that case-law of the General Court. Further, that argument wholly ignores the fundamental differences between that regime and the regime at issue in the present case, with regard to the discretion of the institutions of the European Union and their access to the information and evidence pertaining to the restrictive measures adopted.

74    Second, the Commission, the Council and the United Kingdom, supported by all the Member States intervening in the appeals, claim, on the basis of arguments taken from international law and European Union law broadly comparable to those set out in paragraphs 61 and 62 of this judgment, that the definition of the level of intensity of judicial review set out in paragraphs 123 to 147 of the judgment under appeal is wrong in law. They add that the excessively interventionist approach followed by the General Court in the judgment under appeal cannot be reconciled with settled case-law in favour of restricted judicial review, limited to manifest error of assessment, when the measures concerned are the outcome of choices resulting from complex assessments and the exercise of a wide discretion exercised in pursuit of broadly defined goals.

I - 19

KADI0025970

75    Third, the Commission, the Council and the United Kingdom claim that the General Court erred, in paragraphs 148 to 151 of the judgment under appeal, in suggesting that the restrictive measures at issue in this case should now be regarded as equivalent to a criminal penalty. Supported by the Czech Republic, Ireland, the French Republic, the Italian Republic, Hungary and the Republic of Austria, they claim that the purpose of those measures, which are essentially precautionary, is to anticipate and prevent current or future threats to international peace and security, and that they can be distinguished from criminal penalties, which are imposed, for their part, in respect of punishable past acts which have been objectively established. Moreover, the measures at issue are intended to be temporary and are accompanied by derogations.

76    Fourth, the Commission, the Council and the United Kingdom claim that the General Court's interpretation, in paragraphs 171 to 188 and 192 to 194 of the judgment under appeal, relating to the requirements, stemming from respect for Mr Kadi's fundamental rights, applicable to the listing of Mr Kadi's name in Annex I to Regulation No 881/2002 following the *Kadi* judgment is legally erroneous.

77    Supported by the Republic of Bulgaria, the Czech Republic, Ireland, the Kingdom of Spain, the French Republic, the Italian Republic, Hungary, the Kingdom of the Netherlands, the Republic of Austria, the Slovak Republic and the Republic of Finland, they claim that the General Court erred in holding that respect for those fundamental rights required the disclosure of the information and evidence relied on against Mr Kadi.

78    That interpretation by the General Court wholly ignores the possibility, stated in paragraphs 342 to 344 of the *Kadi* judgment, that the right of a party concerned to the disclosure of evidence relied on against him might be restricted in order to ensure that the disclosure of sensitive information cannot lead to third parties becoming privy to that information and thereby evading measures taken to combat international terrorism. Moreover, the criticisms made in paragraphs 345 to 352 of that judgment related to the failure to communicate to Mr Kadi the reasons for the listing of his name in Annex I to Regulation No 881/2002, and not to the failure to disclose information and evidence held by the Sanctions Committee.

79    Further, the General Court's approach does not take into account the many material obstacles that exist to the communication of such information and evidence to the European Union institutions, in particular the fact that the source of that information and evidence is a statement of case sent to the Sanctions Committee by a Member of the UN, generally subject to a requirement of confidentiality due to its sensitivity.

80    In the present case, the summary of reasons provided by the Sanctions Committee which was disclosed to Mr Kadi enabled him to understand why his name was listed in Annex I to Regulation No 881/2002. Far from being limited to allegations

I - 20

KADI0025971

against him which were general, unsubstantiated, vague and lacking in detail, that summary, contrary to what is stated in paragraphs 157 and 177 of the judgment under appeal, set out in detail the evidence which had led the Sanctions Committee to take the view that Mr Kadi had personal and direct links with the Al-Qaeda network and with Usama bin Laden.

81    Fifth, the Commission contends that the General Court erred by failing, except as regards the finding of fact made in paragraph 67 of the judgment under appeal, to take into account the parallel proceedings brought by Mr Kadi before courts in the United States in order to dismiss Mr Kadi's objections concerning the alleged lack of effective judicial protection and the alleged impossibility of obtaining access to the relevant information and evidence.

82    Sixth, the Commission, the Council and the United Kingdom claim that the analysis carried out by the General Court, in paragraphs 127 and 128 of the judgment under appeal, of the alterations made to the re-examination procedures established at United Nations level is defective.

83    Supported by all the Member States intervening in the appeals, they claim that the *ex officio* periodic re-examination procedure introduced by Resolution 1822 (2008) has contributed to an improvement in the protection of fundamental rights, as demonstrated by the fact that the names of a great many persons and entities have been removed from the Sanctions Committee Consolidated List. As regards the Office of the Ombudsperson established by Resolution 1904 (2009), its creation represents a decisive new departure in this area by enabling the person concerned to argue his case before an independent and impartial authority, which has the task of submitting, if appropriate, to the Sanctions Committee reasons supporting the requested delisting.

84    Security Council Resolution 1989 (2011) of 17 June 2011 confirms the desire constantly to improve the process for dealing with requests for removal from the Sanctions Committee Consolidated List. In particular, such a delisting is no longer dependent on the unanimous consent of the members of the Sanctions Committee. It becomes effective 60 days after that Committee has completed consideration of a recommendation to that effect and of a comprehensive report both submitted by the Ombudsperson, unless there is a consensus to the contrary within the Sanctions Committee or there is a request that the file be referred back to the Security Council. In the event that the Ombudsperson's recommendation is not followed, the obligation on the Sanctions Committee to state reasons and its duty of transparency have been extended. Resolution 1989 (2011) is also intended to improve the access of the Ombudsperson to confidential information held by the Members of the United Nations and the disclosure of the identity of the States which requested the listing.

85    Mr Kadi responds, first, that the General Court correctly held, in the judgment under appeal, that the Court gave a perfectly clear indication, in the *Kadi*

I - 21

KADI0025972

judgment, of the scope and intensity of judicial review applicable in this case. The Court explicitly stated, in the *Kadi* judgment, that the review of lawfulness should be a full review, extending, subject only to confidentiality requirements relating to public security, to the information and evidence relied on against Mr Kadi. Further, the fact that, unlike the regime referred to in paragraphs 14 and 15 of this judgment, the regime at issue in this case does not involve, prior to the procedure at European Union level, any procedure safeguarding respect for the rights of the defence subject to effective judicial review is an argument which supports the enhancement of effective judicial protection at European Union level, as stated by the General Court in paragraphs 186 and 187 of the judgment under appeal.

86   Second, Mr Kadi does not accept that the requirement stated in the judgment under appeal in relation to the level of intensity of judicial review applicable in this case is incorrect.

87   In the first place, the General Court's approach does not disregard international law. Judicial review of the lawfulness of the contested regulation is not equivalent to review of the validity of the resolution which that regulation implements. That review does not challenge either the primary responsibility of the Security Council in the area concerned or the primacy of the Charter of the United Nations over any other international agreement. Nor is such judicial review intended to substitute the political judgment of the Courts of the European Union for that of the competent international authorities. Its purpose is solely to ensure observance of the requirement that Security Council Resolutions are implemented within the European Union in a manner compatible with the fundamental principles of European Union law. More specifically, such review contributes to ensuring that a balance is struck between the requirements of international peace and security, on the one hand, and the protection of fundamental rights, on the other.

88   In the second place, the General Court's approach is consistent with European Union law, which requires respect for fundamental rights and the guarantee of independent and impartial judicial review, including review of European Union measures based on international law.

89   Third, after noting that the considerations of the General Court on the nature of the restrictive measures at issue are supplementary, Mr Kadi none the less argues that, in his particular case, those measures can no longer be described as preventive and have become punitive, by reason both of their general scope and the fact that he has been subject to them for a very long time, a factor which justifies full and rigorous review of the contested regulation.

90   Fourth, Mr Kadi does not accept that the requirements imposed by the General Court for the purposes of respect for his fundamental rights are vitiated by an error of law.

I - 22

KADI0025973

91  Mr Kadi contends, in this regard, that effective judicial review is impossible when there is a complete failure to disclose the information and evidence held by the bodies of the UN. As these very bodies accept, the narrative summary of reasons provided by the Sanctions Committee is not designed to be used as evidence. It merely comprises a useful indication of the past activities of the person concerned and of the existence of evidence known to members of that committee.

92  The fact that there is no formal procedure for the exchange of information between the Security Council and the institutions of the European Union is no bar to an exchange of the information necessary to ensuring the achievement of their common goal of safeguarding fundamental human rights when applying restrictive measures. In the present case, despite Mr Kadi's express request, the Commission has not even attempted to obtain disclosure by the Sanctions Committee of a detailed statement of the facts or evidence justifying the listing of Mr Kadi's name on the lists at issue.

93  As regards the narrative summary of reasons provided by the Sanctions Committee, it contains a number of general and unsubstantiated allegations, which Mr Kadi has not been in a position effectively to rebut.

94  Fifth, Mr Kadi contends that the legal proceedings in the United States are of no relevance to this case, given that the purpose of those proceedings is the annulment of his listing on the list of the Office of Foreign Assets Control, of the United States Treasury Department, for reasons wholly distinct from the grounds at issue in this case. Those proceedings concern neither the contested regulation nor the Security Council Resolutions which that regulation is designed to implement.

95  Sixth, Mr Kadi contends that, when the contested regulation was adopted, the only re-examination procedure established at United Nations level was that of the Focal Point. As regards the creation of the Office of the Ombudsperson, which, although post-dating that adoption, was taken into account by the General Court, that does not offer any guarantee of judicial protection. In particular, the person seeking the delisting of his name from the Sanctions Committee Consolidated List does not have available to him a detailed statement of the reasons for his being placed on that list, nor the evidence relied on against him, and he does not have the right to be heard by the Sanctions Committee, the body that will exclusively make the decision on delisting. Moreover, the Ombudsperson has no power to compel any action by the Members of the UN or by the Sanctions Committee, which enjoys a discretion. The persistent shortcomings of this procedure have been emphasised by, among others, the Office of the Ombudsperson itself in its first report of January 2011, which drew particular attention to the lack of access to classified or confidential information and the fact that the applicant remains unaware of the identity of the State or States that proposed his inclusion in that list.

I - 23

96   Those shortcomings were not rectified by Resolution 1989 (2011). The recommendations of the Office of the Ombudsperson still do not have binding force. The determination of the criteria for delisting from the Sanctions Committee Consolidated List and the power to decide to delist remain within the discretion of the Sanctions Committee. Where a delisting recommendation is made by the Office of the Ombudsperson, any member of the Sanctions Committee may refer the matter to the Security Council, the five permanent members of which may exercise their veto according to their discretion. The Office of the Ombudsperson depends, moreover, on the willingness of States to cooperate in gathering information.

Findings of the Court

– The extent of the rights of the defence and of the right to effective judicial protection

97   As stated by the General Court in paragraphs 125, 126 and 171 of the judgment under appeal, the Court held, in paragraph 326 of the *Kadi* judgment, that the Courts of the European Union must, in accordance with the powers conferred on them by the Treaties, ensure the review, in principle the full review, of the lawfulness of all Union acts in the light of the fundamental rights forming an integral part of the European Union legal order, including review of such measures as are designed to give effect to resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations (see also, to that effect, *Hassan and Ayadi* v *Council and Commission*, paragraph 71, and *Bank Melli Iran* v *Council*, paragraph 105). That obligation is expressly laid down by the second paragraph of Article 275 TFEU.

98   Those fundamental rights include, inter alia, respect for the rights of the defence and the right to effective judicial protection.

99   The first of those rights, which is affirmed in Article 41(2) of the Charter of Fundamental Rights of the European Union ('the Charter') (see, to that effect, the judgment of 21 December 2011 in Case C-27/09 P *France* v *People's Mojahedin Organization of Iran* [2011] ECR I-0000, paragraph 66), includes the right to be heard and the right to have access to the file, subject to legitimate interests in maintaining confidentiality.

100   The second of those fundamental rights, which is affirmed in Article 47 of the Charter, requires that the person concerned must be able to ascertain the reasons upon which the decision taken in relation to him is based, either by reading the decision itself or by requesting and obtaining disclosure of those reasons, without prejudice to the power of the court having jurisdiction to require the authority concerned to disclose that information, so as to make it possible for him to defend his rights in the best possible conditions and to decide, with full knowledge of the relevant facts, whether there is any point in his applying to the court having

I - 24

KADI0025975

jurisdiction, and in order to put the latter fully in a position to review the lawfulness of the decision in question (see the judgment of 4 June 2013 in Case C-300/11 ZZ [2013] ECR I-0000, paragraph 53 and case-law cited).

101 Article 52(1) of the Charter nevertheless allows limitations on the exercise of the rights enshrined in the Charter, subject to the conditions that the limitation concerned respects the essence of the fundamental right in question and, subject to the principle of proportionality, that it is necessary and genuinely meets objectives of general interest recognised by the European Union (see ZZ, paragraph 51).

102 Further, the question whether there is an infringement of the rights of the defence and of the right to effective judicial protection must be examined in relation to the specific circumstances of each particular case (see, to that effect, Case C-110/10 P *Solvay v Commission* [2011] ECR I-0000, paragraph 63), including, the nature of the act at issue, the context of its adoption and the legal rules governing the matter in question (see, to that effect, as regards compliance with the duty to state reasons, the judgments of 15 November 2012 in Joined Cases C-539/10 P and C-550/10 P *Al-Aqsa v Council* and *Netherlands v Al-Aqsa* [2012] ECR I-0000, paragraphs 139 and 140, and in Case C-417/11 P *Council v Bamba* [2012] ECR I-0000, paragraph 53).

103 In this case, it is necessary to determine whether, in the light of the requirements stated, in particular, in Article 3(1) and (5) TEU and Article 21(1) and (2)(a) and (c) TEU, relating to the maintenance of international peace and security while respecting international law, and specifically the principles of the Charter of the United Nations, the fact that Mr Kadi and the Courts of the European Union did not have access to the information and evidence relied on against him, to which the General Court draws attention, particularly in paragraphs 173, 181 and 182 of the judgment under appeal, constitutes an infringement of the rights of the defence and the right to effective judicial protection.

104 In that regard, as the Court has previously stated, specifically in paragraph 294 of the *Kadi* judgment, it must be emphasised that, in accordance with Article 24 of the Charter of the United Nations, the Security Council has been invested by the members of the UN with the primary responsibility for the maintenance of international peace and security. To that end, it is the task of the Security Council to determine what constitutes a threat to international peace and security and to take the measures necessary, by means of the adoption of resolutions under Chapter VII of that Charter, to maintain or restore international peace and security, in accordance with the purposes and principles of the United Nations, including respect for human rights.

105 In that context, as is apparent from the resolutions, referred to in paragraphs 10 and 11 of this judgment, governing the regime of restrictive measures such as those at issue in this case, it is the task of the Sanctions Committee, on the proposal of a UN member supported by a 'statement of case' which should

KADI0025976

provide 'as much detail as possible on the basis(es) for the listing', the 'nature of the information' and 'supporting information or documents that can be provided', to designate, applying the criteria laid down by the Security Council, the organisations, entities and individuals whose funds and other economic resources are to be frozen. That designation, put into effect by the listing of the name of the organisation, entity or individual concerned on the Sanctions Committee Consolidated List which is maintained at the request of the Member States of the UN, is to be based on a 'summary of reasons' which is to be produced by the Sanctions Committee in the light of the material which the Member State proposing the listing has identified as capable of disclosure, particularly to the party concerned, and which is to be made accessible on its website.

106  When the European Union implements Security Council resolutions adopted under Chapter VII of the Charter of the United Nations, on the basis of a Common Position or a joint action adopted by the Member States pursuant to the provisions of the EU Treaty relating to the common foreign and security policy, the competent European Union authority must take due account of the terms and objectives of the resolution concerned and of the relevant obligations under that Charter relating to such implementation (see the *Kadi* judgment, paragraphs 295 and 296).

107  Consequently, where, under the relevant Security Council resolutions, the Sanctions Committee has decided to list the name of an organisation, entity or individual on its Consolidated List, the competent European Union authority must, in order to give effect to that decision on behalf of the Member States, take the decision to list the name of that organisation, entity or individual, or to maintain such listing, in Annex I to Regulation No 881/2002 on the basis of the summary of reasons provided by the Sanctions Committee. On the other hand, there is no provision in those resolutions to the effect that the Sanctions Committee is automatically to make available to, in particular, the European Union authority responsible for the adoption by the European Union of its decision to list or maintain a listing, any material other than that summary of reasons.

108  Accordingly, both in respect of an initial decision to list the name of an organisation, entity or individual in Annex I to Regulation No 881/2002 and, as in the present case, in respect of a decision to maintain such a listing originally adopted before 3 September 2008, the date of the *Kadi* judgment, Article 7a(1) and (2) and Article 7c(1) and (2) of Regulation No 881/2002, inserted by Council Regulation (EU) No 1286/2009 of 22 December 2009 amending Regulation No 881/2002 (OJ 2009 L 346 p. 42) in order to amend the listing procedure following that judgment, as is explained in recital 4 of the preamble to Regulation No 1286/2009, refer exclusively to the 'statement of reasons' provided by the Sanctions Committee for the purposes of the taking of such decisions.

109  In the particular case of Mr Kadi, it is apparent from the file that the initial listing of his name, on 17 October 2001 in the Sanctions Committee Consolidated List

I - 26

followed a request by the United States on the basis of the adoption on 12 October 2001 of a decision in which the Office of Foreign Asset Control identified Mr Kadi as a 'Specially Designated Global Terrorist'.

110   As is apparent from recital 3 of the preamble to the contested regulation [Regulation No 1190/2008], following the *Kadi* judgment the Commission, by means of that regulation, decided to maintain the name of Mr Kadi on the list in Annex I to Regulation No 81/2002 on the basis of the narrative summaries of reasons which had been transmitted by the Sanctions Committee. As the General Court recorded in paragraph 95 of the judgment under appeal, and as the Commission confirmed at the hearing before the Court, the Commission was not, for that purpose, put in possession of evidence other than such a summary of reasons.

111   In proceedings relating to the adoption of the decision to list or maintain the listing of the name of an individual in Annex I to Regulation No 881/2002, respect for the rights of the defence and the right to effective judicial protection requires that the competent Union authority disclose to the individual concerned the evidence against that person available to that authority and relied on as the basis of its decision, that is to say, at the very least, the summary of reasons provided by the Sanctions Committee (see, to that effect, the *Kadi* judgment, paragraphs 336 and 337), so that that individual is in a position to defend his rights in the best possible conditions and to decide, with full knowledge of the relevant facts, whether there is any point in bringing an action before the Courts of the European Union.

112   When that disclosure takes place, the competent Union authority must ensure that that individual is placed in a position in which he may effectively make known his views on the grounds advanced against him (see, to that effect, Case C-32/95 P *Commission* v *Lisrestal and Others* [1996] ECR I-5373, paragraph 21; Case C-462/98 P *Mediocurso* v *Commission* [2000] ECR I-7183, paragraph 36, and the judgment of 22 November 2012 in Case C-277/11 *M.* [2012] ECR I-0000, paragraph 87 and case-law cited).

113   As regards a decision whereby, as in this case, the name of the individual concerned is to be maintained on the list in Annex I to Regulation No 881/2002, compliance with that dual procedural obligation must, contrary to the position in respect of an initial listing (see, in that regard, the *Kadi* judgment, paragraphs 336 to 341 and 345 to 349, and *France* v *People's Mojahedin Organization of Iran*, paragraph 61), precede the adoption of that decision (see *France* v *People's Mojahedin Organization of Iran*, paragraph 62). It is not disputed that, in the present case, the Commission, the author of the contested regulation, complied with that obligation.

114   When comments are made by the individual concerned on the summary of reasons, the competent European Union authority is under an obligation to

KADI0025978

examine, carefully and impartially, whether the alleged reasons are well founded, in the light of those comments and any exculpatory evidence provided with those comments (see, by analogy, Case C-269/90 *Technische Universität München* [1991] ECR I-5469, paragraph 14; Case C-525/04 P *Spain* v *Lenzing* [2007] ECR I-9947, paragraph 58, and *M.*, paragraph 88).

115   In that context, it is for that authority to assess, having regard, inter alia, to the content of any such comments, whether it is necessary to seek the assistance of the Sanctions Committee and, through that committee, the Member of the UN which proposed the listing of the individual concerned on that committee's Consolidated List, in order to obtain, in that spirit of effective cooperation which, under Article 220(1) TFEU, must govern relations between the Union and the organs of the United Nations in the fight against international terrorism, the disclosure of information or evidence, confidential or not, to enable it to discharge its duty of careful and impartial examination.

116   Lastly, without going so far as to require a detailed response to the comments made by the individual concerned (see, to that effect, *Al-Aqsa* v *Council* and *Netherlands* v *Al-Aqsa*, paragraph 141), the obligation to state reasons laid down in Article 296 TFEU entails in all circumstances, not least when the reasons stated for the European Union measure represent reasons stated by an international body, that that statement of reasons identifies the individual, specific and concrete reasons why the competent authorities consider that the individual concerned must be subject to restrictive measures (see, to that effect, *Al-Aqsa* v *Council* and *Netherlands* v *Al-Aqsa*, paragraphs 140 and 142, and *Council* v *Bamba*, paragraphs 49 to 53).

117   As regards court proceedings, in the event that the person concerned challenges the lawfulness of the decision to list or maintain the listing of his name in Annex I to Regulation No 881/2002, the review by the Courts of the European Union must extend to whether rules as to procedure and rules as to competence, including whether or not the legal basis is adequate, are observed (see, to that effect, the *Kadi* judgment, paragraphs 121 to 236; see also, by analogy, the judgment of 13 March 2012 in Case C-376/10 P *Tay Za* v *Council* [2012] ECR I-0000, paragraphs 46 to 72).

118   The Courts of the European Union must, further, determine whether the competent European Union authority has complied with the procedural safeguards set out in paragraphs 111 to 114 of this judgment and the obligation to state reasons laid down in Article 296 TFEU, as mentioned in paragraph 116 of this judgment, and, in particular, whether the reasons relied on are sufficiently detailed and specific.

119   The effectiveness of the judicial review guaranteed by Article 47 of the Charter also requires that, as part of the review of the lawfulness of the grounds which are the basis of the decision to list or to maintain the listing of a given person in

I - 28

Annex I to Regulation No 881/2002 (the *Kadi* judgment, paragraph 336), the Courts of the European Union are to ensure that that decision, which affects that person individually (see, to that effect, the judgment of 23 April 2013 in Joined Cases C-478/11 P to C-482/11 P *Gbagbo and Others v Council* [2013] ECR I-0000, paragraph 56), is taken on a sufficiently solid factual basis (see, to that effect, *Al-Aqsa v Council* and *Netherlands v Al-Aqsa*, paragraph 68). That entails a verification of the allegations factored in the summary of reasons underpinning that decision (see to that effect, *E and F*, paragraph 57), with the consequence that judicial review cannot be restricted to an assessment of the abstract cogency in the abstract of the reasons relied on, but must concern whether those reasons, or, at the very least, one of those reasons, deemed sufficient in itself to support that decision, is substantiated.

120  To that end, it is for the Courts of the European Union, in order to carry out that examination, to request the competent European Union authority, when necessary, to produce information or evidence, confidential or not, relevant to such an examination (see, by analogy, *ZZ*, paragraph 59).

121  That is because it is the task of the competent European Union authority to establish, in the event of challenge, that the reasons relied on against the person concerned are well founded, and not the task of that person to adduce evidence of the negative, that those reasons are not well founded.

122  For that purpose, there is no requirement that that authority produce before the Courts of the European Union all the information and evidence underlying the reasons alleged in the summary provided by the Sanctions Committee. It is however necessary that the information or evidence produced should support the reasons relied on against the person concerned.

123  If the competent European Union authority finds itself unable to comply with the request by the Courts of the European Union, it is then the duty of those Courts to base their decision solely on the material which has been disclosed to them, namely, in this case, the indications contained in the narrative summary of reasons provided by the Sanctions Committee, the observations and exculpatory evidence that may have been produced by the person concerned and the response of the competent European Union authority to those observations. If that material is insufficient to allow a finding that a reason is well founded, the Courts of the European Union shall disregard that reason as a possible basis for the contested decision to list or maintain a listing.

124  If, on the other hand, the competent European Union authority provides relevant information or evidence, the Courts of the European Union must then determine whether the facts alleged are made out in the light of that information or evidence and assess the probative value of that information or evidence in the circumstances of the particular case and in the light of any observations submitted in relation to them by, among others, the person concerned.

I - 29

KADI0025980

125   Admittedly, overriding considerations to do with the security of the European Union or of its Member States or with the conduct of their international relations may preclude the disclosure of some information or some evidence to the person concerned. In such circumstances, it is none the less the task of the Courts of the European Union, before whom the secrecy or confidentiality of that information or evidence is no valid objection, to apply, in the course of the judicial review to be carried out, techniques which accommodate, on the one hand, legitimate security considerations about the nature and sources of information taken into account in the adoption of the act concerned and, on the other, the need sufficiently to guarantee to an individual respect for his procedural rights, such as the right to be heard and the requirement for an adversarial process (see, to that effect, the *Kadi* judgment, paragraphs 342 and 344; see also, by analogy, *ZZ*, paragraphs 54, 57 and 59).

126   To that end, it is for the Courts of the European Union, when carrying out an examination of all the matters of fact or law produced by the competent European Union authority, to determine whether the reasons relied on by that authority as grounds to preclude that disclosure are well founded (see, by analogy, *ZZ*, paragraphs 61 and 62).

127   If the Courts of the European Union conclude that those reasons do not preclude disclosure, at the very least partial disclosure, of the information or evidence concerned, it shall give the competent European Union authority the opportunity to make such disclosure to the person concerned. If that authority does not permit the disclosure of that information or evidence, in whole or in part, the Courts of the European Union shall then undertake an examination of the lawfulness of the contested measure solely on the basis of the material which has been disclosed (see, by analogy, *ZZ*, paragraph 63).

128   On the other hand, if it turns out that the reasons relied on by the competent European Union authority do indeed preclude the disclosure to the person concerned of information or evidence produced before the Courts of the European Union, it is necessary to strike an appropriate balance between the requirements attached to the right to effective judicial protection, in particular respect for the principle of an adversarial process, and those flowing from the security of the European Union or its Member States or the conduct of their international relations (see, by analogy, *ZZ*, paragraph 64).

129   In order to strike such a balance, it is legitimate to consider possibilities such as the disclosure of a summary outlining the information's content or that of the evidence in question. Irrespective of whether such possibilities are taken, it is for the Courts of the European Union to assess whether and to what the extent the failure to disclose confidential information or evidence to the person concerned and his consequential inability to submit his observations on them are such as to affect the probative value of the confidential evidence (see, by analogy, *ZZ*, paragraph 67).

I - 30

KADI0025981

130    Having regard to the preventive nature of the restrictive measures at issue, if, in the course of its review of the lawfulness of the contested decision, as defined in paragraphs 117 to 129 of this judgment, the Courts of the European Union consider that, at the very least, one of the reasons mentioned in the summary provided by the Sanctions Committee is sufficiently detailed and specific, that it is substantiated and that it constitutes in itself sufficient basis to support that decision, the fact that the same cannot be said of other such reasons cannot justify the annulment of that decision. In the absence of one such reason, the Courts of the European Union will annul the contested decision.

131    Such a judicial review is indispensable to ensure a fair balance between the maintenance of international peace and security and the protection of the fundamental rights and freedoms of the person concerned (see, to that effect, *E and F*, paragraph 57), those being shared values of the UN and the European Union.

132    Notwithstanding their preventive nature, the restrictive measures at issue have, as regards those rights and freedoms, a substantial negative impact related, first, to the serious disruption of the working and family life of the person concerned due to the restrictions on the exercise of his right to property which stem from their general scope combined, as in this case, with the actual duration of their application, and, on the other, the public opprobrium and suspicion of that person which those measures provoke (see, to that effect, the *Kadi* judgment, paragraphs 358, 369 and 375; *France* v *People's Mojahedin Organization of Iran*, paragraph 64; *Al-Aqsa* v *Council* and *Netherlands* v *Al-Aqsa*, paragraph 120, and the judgment of 28 May 2013 in Case C-239/12 P *Abdulrahim* v *Council and Commission* [2013] ECR I-0000, paragraph 70 and case-law cited).

133    Such a review is all the more essential since, despite the improvements added, in particular after the adoption of the contested regulation, the procedure for delisting and *ex officio* re-examination at UN level they do not provide to the person whose name is listed on the Sanctions Committee Consolidated List and, subsequently, in Annex I to Regulation No 881/2002, the guarantee of effective judicial protection, as the European Court of Human Rights, endorsing the assessment of the Federal Supreme Court of Switzerland, has recently stated in paragraph 211 of its judgment of 12 September 2012, *Nada* v. *Switzerland* (No 10593/08, not yet published in the *Reports of Judgments and Decisions*).

134    The essence of effective judicial protection must be that it should enable the person concerned to obtain a declaration from a court, by means of a judgment ordering annulment whereby the contested measure is retroactively erased from the legal order and is deemed never to have existed, that the listing of his name, or the continued listing of his name, on the list concerned was vitiated by illegality, the recognition of which may re-establish the reputation of that person or constitute for him a form of reparation for the non-material harm he has suffered (see, to that effect, *Abdulrahim* v *Council and Commission*, paragraphs 67 to 84).

I - 31

KADI0025982

— The errors of law affecting the judgment under appeal

135   It follows from the criteria analysed above that, for the rights of the defence and the right to effective judicial protection to be respected first, the competent European Union authority must (i) disclose to the person concerned the summary of reasons provided by the Sanctions Committee which is the basis for listing or maintaining the listing of that person's name in Annex I to Regulation No 881/2002, (ii) enable him effectively to make known his observations on that subject and (iii) examine, carefully and impartially, whether the reasons alleged are well founded, in the light of the observations presented by that person and any exculpatory evidence that may be produced by him.

136   Second, respect for those rights implies that, in the event of a legal challenge, the Courts of the European Union are to review, in the light of the information and evidence which have been disclosed inter alia whether the reasons relied on in the summary provided by the Sanctions Committee are sufficiently detailed and specific and, where appropriate, whether the accuracy of the facts relating to the reason concerned has been established.

137   On the other hand, the fact that the competent European Union authority does not make accessible to the person concerned and, subsequently, to the Courts of the European Union information or evidence which is in the sole possession of the Sanctions Committee or the Member of the UN concerned and which relates to the summary of reasons underpinning the decision at issue, cannot, as such, justify a finding that those rights have been infringed. However, in such a situation, the Courts of the European Union, which are called upon to review whether the reasons contained in the summary provided by the Sanctions Committee are well founded in fact, taking into consideration any observations and exculpatory evidence produced by the person concerned and the response of the competent European Union authority to those observations, will not have available to it supplementary information or evidence. Consequently, if it is impossible for the Courts to find that those reasons are well founded, those reasons cannot be relied on as the basis for the contested listing decision.

138   Hence, in paragraphs 173, 181 to 184, 188 and 192 to 194 of the judgment under appeal, the General Court erred in law by basing its finding that the rights of the defence and the right to effective judicial protection and, consequently, the principle of proportionality had been infringed, on the failure of the Commission to disclose to Mr Kadi and to the General Court itself the information and evidence underlying the reasons for maintaining the listing of Mr Kadi's name in Annex I to Regulation No 881/2002, when, as is apparent from paragraphs 81 and 95 of the judgment under appeal, the General Court had recognised, both in order to reject Mr Kadi's application for a measure of organisation of procedure in order to secure that disclosure and in the course of the hearing, that the Commission was not in possession of that information and evidence.

I - 32

KADI0025983

139   Contrary to what is stated in paragraphs 181, 183 and 184 of the judgment under appeal, the passages in the *Kadi* judgment to which the General Court referred in those paragraphs do not indicate that the fact that the party concerned and the Courts of the European Union do not have access to information or evidence which the competent Union authority does not have in its possession constitutes, as such, an infringement of the rights of the defence or the right to effective judicial protection.

140   Further, and bearing in mind that the assessment, by the General Court, of whether the statement of reasons is or is not sufficient is subject to review by the Court on an appeal (see, to that effect, *Council v Bamba*, paragraph 41 and case-law cited), the General Court erred in law by basing, as is apparent from paragraphs 174, 177, 188 and 192 to 194 of the judgment under appeal, its finding that there had been such an infringement on the fact that, in its opinion, the allegations made in the summary of reasons provided by the Sanctions Committee were vague and lacking in detail, even though such a general conclusion cannot be drawn if each of those reasons is examined separately.

141   Admittedly, as the General Court correctly ruled by endorsing, in paragraph 177 of the judgment under appeal, the argument of Mr Kadi set out in the fourth indent of paragraph 157 of that judgment, the last of the reasons stated in the summary provided by the Sanctions Committee, namely the allegation that Mr Kadi had been the owner in Albania of several firms which funnelled money to extremists or employed those extremists in positions where they controlled the funds of those firms, up to five of which received working capital from Usama bin Laden, is insufficiently detailed and specific given that it contains no indication of the identity of the firms concerned, of when the alleged conduct took place and of the identity of the 'extremists' who allegedly benefitted from that conduct.

142   On the other hand, the same cannot be said of the other reasons stated in the summary provided by the Sanctions Committee.

143   The first reason, based on Mr Kadi's acknowledgement that he is a founding trustee and directed the activities of the Muwafaq Foundation, which always operated under the umbrella of Makhtab al-Khidamat/Al Kifah – founded by, among others, was Usama bin Laden, which was the predecessor to Al-Qaeda and which, following the dissolution of Makhtab al-Khidamat/Al Kifah in June 2001, was absorbed into Al-Qaeda – is sufficiently detailed and specific, in that it identifies the entity concerned and Mr Kadi's role in relation to it, together with mention of an alleged link between that entity, on the one hand, and Usama bin Laden and Al-Qaeda, on the other.

144   The second reason is based on the fact that, in order to manage the European offices of the Muwafaq Foundation, Mr Kadi appointed, in 1992, Mr Al-Ayadi on the recommendation of Mr Julaidan, a financier who had fought alongside Usama bin Laden in Afghanistan in the 1980s. When he was appointed, Mr Al-Ayadi was

I - 33

KADI0025984

said to be one of the principal leaders of the Tunisian Islamic Front and to be operated under agreements with Usama bin Laden. Mr Al-Ayadi is said to have gone to Afghanistan, in the early 1990s, to receive paramilitary training there, then, with other individuals, to Sudan to conclude there with Usama bin Laden an agreement regarding the reception and training of Tunisians and, later, an agreement regarding the reception of Tunisian mujahidin from Italy by Usama bin Laden's collaborators in Bosnia and Herzegovina.

145 That second reason is sufficiently detailed and specific, in that it contains the necessary detail concerning the time and context of the appointment in question and information on the individuals involved in the allegation that that appointment was connected with Usama bin Laden.

146 The third reason, which is based on a statement allegedly made in 1995 by Mr Talad Fuad Kassem, the leader of the Al-Gama'at al Islamiyya, to the effect that the Muwafaq Foundation provided logistical and financial support to a mujahidin battalion in Bosnia and Herzegovina, is based on the fact that, that Foundation was said to be involved, in the mid 1990s, alongside Usama bin Laden, in providing financial support for terrorist activities of those mujahidin and to have assisted in the trafficking of arms from Albania to Bosnia and Herzegovina.

147 That third reason is sufficiently detailed and specific, since it identifies the person who made the statement concerned, the forms of activity reported, the time when they were allegedly carried out and their alleged link with the activities of Usama bin Laden.

148 The fourth reason is based on the fact that Mr Kadi was one of the major shareholders in the Bosnian bank Depositna Banka, now closed, in which Mr Al-Ayadi held a position and acted as nominee for Mr Kadi, and where planning sessions for an attack against a United States facility in Saudi Arabia might have taken place.

149 Contrary to what is stated in paragraph 175 of the judgment under appeal, that fourth reason is sufficiently detailed and specific, in that it identifies the financial institution through which Mr Kadi allegedly contributed to terrorist activities and the nature of the alleged terrorist project concerned. The circumstance that the indication that it was in that institution that planning sessions for that alleged project took place is expressed as a possibility is not incompatible with the essential requirements of the duty to state reasons, since the reasons for listing on a European Union list may be based on suspicions of involvement in terrorist activities, without prejudice to the determination of whether those suspicions are justified.

150 Although it emerges from paragraphs 138 to 140 and 142 to 149 of this judgment that errors of law were made by the General Court, it is necessary to determine whether, notwithstanding those errors, the operative part of the judgment under

KADI0025985

appeal can be seen to be well founded on legal grounds other than those maintained by the General Court, in which event an appeal must be dismissed (see, to that effect, the judgment of 19 April 2012 in Case C-221/10 P *Artegodan* v *Commission* [2012] ECR I-0000, paragraph 94 and case-law cited).

&mdash; The unlawfulness of the contested regulation

151   It must be observed, as regards the first reason relied on in the summary of reasons provided by the Sanctions Committee and referred to in paragraph 143 of this judgment, that, in his comments of 10 November 2008 submitted in support of his action before the General Court, Mr Kadi, while acknowledging that he had been a founding trustee of the Muwafaq Foundation, denied that it had provided any support to terrorism and that there was any link between it and Makhtab al-Khidamat/Al Kifah. Attaching to those comments the Muwafaq Foundation's Constitution and Declaration of Trust, Mr Kadi claimed that the objects and purpose of that foundation were exclusively charitable and humanitarian, directed mainly towards providing relief to people suffering famine in the world, in particular in the Sudan. While admitting that he was involved in international strategic decisions of the Muwafaq Foundation, he denied any involvement in the day-to-day management of its activities across the world, particularly in the recruitment of local staff. He also disputed that the Muwafaq Foundation joined Al-Qaeda in June 2001, stating in particular, and providing documents in support of his contention, that the foundation had ceased operations by 1998 at the latest.

152   In its reply of 8 December 2008 to the comments of Mr Kadi, also submitted to the General Court, the Commission contended that the fact that some or all of the activities of the entity concerned had ceased did not rule out the possibility that that entity, having continuous legal personality, had joined Al-Qaeda.

153   It is however clear that no information or evidence has been produced to substantiate the allegations of the Muwafaq Foundation's involvement in international terrorism in the form of links with Makhtab al-Khidamat/Al Kifah and Al-Qaeda. In such circumstances, the indications of the role and duties of Mr Kadi in relation to that foundation are not such as to justify the adoption, at European Union level, of restrictive measures against him.

154   As regards the second reason relied on in the summary of reasons provided by the Sanctions Committee and referred to in paragraph 144 of this judgment, Mr Kadi, in his comments of 10 November 2008, while accepting that he had recruited, in 1992, on the recommendation of Mr Julaidan, Mr Al-Ayadi to head the European offices of the Muwafaq Foundation, none the less asserted that the sole aim of that foundation in Europe was to provide support to refugees from Bosnia and Croatia during the Balkans conflict in the 1990s. Mr Kadi stated that Mr Julaidan, who, at that time, was working with him on a project supporting vocational training for refugees from Croatia, had recommended Mr Al-Ayadi to him because of his professional experience in the management of humanitarian work and because of

I - 35

his integrity. Mr Kadi also claimed that, in 1992, he had no grounds to suspect that Mr Al-Ayadi and Mr Julaidan were supporting terrorist activities, stating that, in the 1980s, Usama bin Laden was regarded as an ally of the West against the Soviet Union, that only after 1996 was Usama bin Laden described as a threat to international security, and that only in October 2001 and September 2002 respectively were Mr Al-Ayadi and Mr Julaidan listed on the Sanctions Committee Consolidated List. Lastly, Mr Kadi asserts that he had no knowledge of the Tunisian Islamic Front and the alleged links between Mr Al-Ayadi and that organisation.

155   In its reply of 8 December 2008 to Mr Kadi's comments, the Commission asserted that the recruitment of Mr Al-Ayadi by Mr Kadi on the recommendation of Mr Julaidan, combined with the fact that Mr Al-Ayadi and Mr Julaidan had contacts with Usama bin Laden, justified the conclusion that those various individuals had acted in concert or were part of one single network. The Commission added that, in such circumstances, it was of no consequence that Mr Kadi claimed to have been unaware of the alleged links between Mr Al-Ayadi and the Tunisian Islamic Front.

156   In that regard, while it is conceivable that the material relied on in the summary of reasons provided by the Sanctions Committee as regards the recruitment by Mr Kadi, in 1992, of Mr Al-Ayadi on the recommendation of Mr Julaidan and the alleged involvement of Mr Al-Ayadi and Mr Julaidan in terrorist activities in association with Usama bin Laden might have been deemed sufficient to justify the initial inclusion, in 2002, of Mr Kadi's name in the list of persons in the annex to Regulation No 881/2002, it must be observed that that same material, not otherwise substantiated, cannot justify maintaining, after 2008, the listing of Mr Kadi's name in that regulation, as amended by the contested regulation. Given how far apart in time those two measures are, that material, which refers to 1992, is no longer sufficient in itself to justify, in 2008, maintaining, at European Union level, the name of Mr Kadi in the list of persons and entities subject to the restrictive measures at issue.

157   As regards the third reason relied on in the summary of reasons provided by the Sanctions Committee and referred to in paragraph 146 of this judgment, in his comments of 10 November 2008, Mr Kadi asserted that he had no knowledge of Mr Talad Fuad Kassem. He also stated that he had never provided financial, logistic or any other support of any kind to that individual, to the organisation which he led or to mujahidin in Bosnia and Herzegovina. Mr Kadi also maintained that, so far as he was aware, neither the Muwafaq Foundation nor any of its employees had ever provided any such support of that kind.

158   In its reply of 8 December 2008 to Mr Kadi's comments, the Commission asserted that the statement of Mr Talad Fuad Kassem served as partial corroboration of the fact that Mr Kadi had used his position for purposes other than ordinary business

I - 36

KADI0025987

purposes. The Commission added that, in such circumstances, it was irrelevant whether or not Mr Kadi knew Mr Talad Fuad Kassem.

159 However, no information or evidence has been submitted which makes it possible to determine the accuracy of the statement attributed to Mr Talad Fuad Kassem in the summary of reasons provided by the Sanctions Committee and to assess, having regard, in particular, to Mr Kadi's claim that he had no knowledge of Mr Talad Fuad Kassem, the probative value of that statement in respect of the allegations that the Muwafaq Foundation was providing support to terrorist activities in Bosnia and Herzegovina in association with Usama bin Laden. In such circumstances, the indication relating to the statement of Mr Talad Fuad Kassem does not constitute sufficient basis to justify the adoption, at European Union level, of restrictive measures against Mr Kadi.

160 As regards the fourth reason relied on in the summary of reasons provided by the Sanctions Committee and referred to in paragraph 148 of this judgment, in his comments of 10 November 2008, Mr Kadi denied ever having provided financial support to international terrorism through Depositna Banka or through any other entity. He explained that he had acquired an interest in that bank for entirely commercial reasons having regard to the prospects of social and economic reconstruction in Bosnia after the Dayton Peace Accord of 1995, and that he had, in order to comply with local law, appointed Mr Al-Ayadi, a Bosnian national, as his nominee to hold his shares in that bank. Relying on reports from international firms of auditors relating to the period from 1999 until 2002 and on the report of a financial analyst engaged by a Swiss magistrate covering the period from 1997 to 2001, he claimed that none of those reports suggest that Depositna Banka was involved in any way in the funding or support of terrorism. Mr Kadi disputed that that bank had been closed, explaining, and providing supporting documents, that it had merged with another bank in 2002. Further, he produced documents relating to an occasion, in 1999, when United States authorities, the manager of Depositna Banka and the political authorities in Bosnia were in contact to discuss legal issues relating to the banking sector in Bosnia and Herzegovina. Lastly, Mr Kadi claimed that if the Saudi Arabian authorities had had grounds to suspect that any attacks were planned, within the Depositna Banka, against United States interests in Saudi Arabia, they would inevitably have questioned him, as the Saudi Arabian owner of that institution. According to Mr Kadi the Saudi Arabian authorities have never done so.

161 In its reply of 8 December 2008 to Mr Kadi's comments, the Commission asserted that the indications that Depositna Banka was used for the planning of an attack in Saudi Arabia serve as partial corroboration that Mr Kadi had used his position for purposes other than ordinary business purposes.

162 However, since no information or evidence has been produced to support the claim that planning sessions might have taken place in the premises of Depozitna Banka for terrorist acts in association with Al-Qaeda or Usama bin Laden, the

I - 37

KADI0025988

indications relating to the association of Mr Kadi with that bank are insufficient to sustain the adoption, at European Union level, of restrictive measures against him.

163   It follows, from the analysis set out in paragraph 141 and paragraphs 151 to 162 of this judgment, that none of the allegations presented against Mr Kadi in the summary provided by the Sanctions Committee are such as to justify the adoption, at European Union level, of restrictive measures against him, either because the statement of reasons is insufficient, or because information or evidence which might substantiate the reason concerned, in the face of detailed rebuttals submitted by the party concerned, is lacking.

164   In those circumstances, the errors of law, identified in paragraphs 138 to 140 and 142 to 149 of this judgment, which vitiate the judgment under appeal are not such as to affect the validity of that judgment, given that its operative part, which annuls the contested regulation in so far as it concerns Mr Kadi, is well founded on the legal grounds stated in the preceding paragraph.

165   Consequently, the appeals must be dismissed.

## Costs

166   In accordance with Article 184(2) of the Rules of Procedure, where the appeal is unfounded, the Court is to make a decision as to costs. Under Article 138(1) of those Rules, which apply to the procedure on appeal by virtue of Article 184(1) of those Rules, an unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the appellants have been unsuccessful and Mr Kadi has applied for costs, they must be ordered to pay the costs. Where an intervener at first instance, which has not itself brought an appeal, participates in the proceedings before the Court, the Court may, under Article 184(4) of those Rules, decide that it is to bear its own costs. Article 140(1) of those Rules provides that Member States which have intervened in the proceedings are to bear their own costs.

167   Since the Commission, the Council and the United Kingdom have been unsuccessful, they must be ordered, in accordance with Mr Kadi's pleadings, to pay the costs.

168   The Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, Ireland, the Kingdom of Spain, the French Republic, the Italian Republic, the Grand Duchy of Luxembourg, Hungary, the Kingdom of the Netherlands, the Republic of Austria, the Slovak Republic and the Republic of Finland, as interveners, are to bear their own costs.

On those grounds, the Court (Grand Chamber):

I - 38

1. **Dismisses the appeals.**

2. **Orders the European Commission, the Council of the European Union and the United Kingdom of Great Britain and Northern Ireland to pay the costs.**

I - 39

KADI0025990

3.    Orders the Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, Ireland, the Kingdom of Spain, the French Republic, the Italian Republic, the Grand Duchy of Luxembourg, Hungary, the Kingdom of the Netherlands, the Republic of Austria, the Slovak Republic and the Republic of Finland to bear their own costs.

| | | |
|---|---|---|
| Skouris | Lenaerts | Ilešič |
| Bay Larsen | von Danwitz | Berger |
| Lõhmus | Levits | Arabadjiev |
| Toader | Kasel | Safjan |
| | Šváby | |

Delivered in open court in Luxembourg on 18 July 2013.

A. Calot Escobar                                          V. Skouris

Registrar                                                      President

Certified a true copy,

Luxembourg,   1 8 -07- 2013

For the Registrar

Lynn Hewlett
Principal Administrator

I - 40

KADI0025991