# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | |
| ) | |
| *In Re* Terrorist Attacks on September 11, 2001 ) | No. 03 MDL 1570 (GBD/FM) |
| ) | ECF Case |
| ) | |

This document relates to:

 *Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-5970

**PLAINTIFFS' EXECUTIVE COMMITTEE FOR COMMERCIAL CLAIMS'
MEMORANDUM OF LAW IN SUPPORT OF THE CONTINENTAL PLAINTIFFS'
OBJECTIONS TO MAGISTRATE JUDGE NETBURN'S
<u>NOVEMBER 27, 2017 REPORT AND RECOMMENDATION</u>**

January 25, 2018

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND PROCEDURAL BACKGROUND ............................................ 1

II.   STANDARD OF REVIEW .................................................................................... 3

III.   ARGUMENT AND OBJECTIONS ....................................................................... 3

    A.   Section 1605A Creates Direct Rights in Favor of Insurers and Reinsurers for Claims for Reasonably Foreseeable Property Losses. ..................................... 5

    B.   Judge Netburn Was Incorrect in Concluding that the Continental Casualty Reinsurers Do Not Have Subrogation Rights. ......................................................... 8

        1.   The Doctrine of Equitable Subrogation Applies to the Continental Casualty Plaintiffs' Reinsurance Payments. ................................................. 9

        2.   Reinsurers May Possess Contractual Subrogation Rights and Rights Arising Under Assignments. ........................................................ 13

    C.   The Court Should Adhere to its Prior Rulings Concerning Prejudgment Interest ........................................................................................................ 16

IV.   CONCLUSION ................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agri-Mark, Inc. v. Niro, Inc.*,
    190 F.R.D. 293 (D. Mass. 2000) ........................................................................11

*Allstate Ins. Co. v. Mazzola*,
    175 F.3d 255 (2d Cir. 1999) ......................................................................10, 17

*Allstate Ins. Co. v. Stein*,
    1 N.Y.3d 416 (2004) ...............................................................................17

*Atl. Mut. Ins. Co. v. Napa Transp., Inc.*,
    399 F. Supp. 2d 523 (S.D.N.Y. 2005) ................................................................17

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab
    Jamahiriya*, 811 F. Supp. 2d 53 (D.D.C. 2011) ......................................................19

*City of Birmingham v. Walker*,
    101 So.2d 250 (Ala. 1958) .............................................................................7

*Collazos v. United States*,
    368 F.3d 190 (2d Cir. 2004) .............................................................................7

*Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co.*,
    115 F.2d 277 (4th Cir. 1940) ...........................................................................7

*CSC Holdings, Inc. v. Alberto*,
    379 F. Supp. 2d 490 (S.D.N.Y. 2005) ...................................................................3

*Cunningham v. Metropolitan Life Ins. Co.*,
    360 N.W.2d 33 (Wis. 1985) ...........................................................................7

*Duncan v. Walker*,
    533 U.S. 167, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001) ................................................6

*Erlich v. Am. Int'l Grp., Inc.*,
    2013 WL 5966053 (N.Y. Cnty. Ct. Nov. 7, 2013) ......................................................15

*Fed. Ins. Co. v. Arthur Andersen & Co.*,
    75 N.Y.2d 366 (1990) ..........................................................................9, 10, 12

*Federal Insurance Co. v. al Qaeda*,
    No. 03-CV-6978, ECF No. 2479 (S.D.N.Y. Oct. 11, 2011) ......................................2, 3, 5, 19

*Federal Insurance Co. v. al Qaeda*,
No. 03-cv-6978, ECF No. 3175 (S.D.N.Y. Dec. 28, 2015) .........................................2, 5, 8, 19

*Gerseta Corp. v. Equitable Trust Co. of N.Y.*,
241 N.Y. 418 (1928) ...........................................................................................................10, 12

*Glacier Gen. Assur. Co. v. G. Gordon Symons Co., Ltd.*,
631 F.2d 131 (9th Cir. 1980) ...................................................................................................11

*Hartford Fire Ins. v. Jainulabdeen*,
2007 WL 1028930 (E.D.N.Y. Mar. 30, 2007) ........................................................................17

*Hunt v. N.C. Logistics, Inc.*,
193 F. Supp. 3d 1253, 1272–73 (D.N.M. 2016) ........................................................................7

*King v. Pelkofski*,
20 N.Y.2d 326 (1967) ...............................................................................................................10

*N.Y. State Thruway Auth. v. Allied Waste Servs. of N. Am., LLC*,
41 N.Y.S.3d 143 (N.Y. App. Div. 2016) .................................................................................17

*Ocean Acc.& Guar. Corp. v. Hooker Electrochemical Co.*,
240 N.Y. 37 (1925) ...................................................................................................................10

*Reliance Insurance Co. v. Aerodyne Engineers Inc.*,
612 N.Y.S.2d 87 (N.Y. App. Div. 1994) ............................................................................12, 13

*Ridge Tool Co. v. Silva*,
515 N.E.2d 945 (Ohio Ct. App. 1986) ........................................................................................7

*State Sec. Ins. Co. v. Frank B. Hall & Co., Inc.*,
109 F.R.D. 99 (N.D. Ill. 1986) .................................................................................................11

*In re Stralem*,
758 N.Y.S.2d 345 (N.Y. App. Div. 2003) ...............................................................................15

*In re Terrorist Attacks on September 11, 2001*,
2016 U.S. Dist. LEXIS 151675 (S.D.N.Y. ) .............................................................................3

*Trans-Resources, Inc. v. Nausch Hogan & Murray*,
746 N.Y.S.2d 701 (N.Y. App. Div. 2002) ...............................................................................15

*United States v. Aetna Cas. & Sur. Co.*,
338 U.S. 366 (1949) ..................................................................................................................11

*Universal Ins. Co. v. Old Time Molasses Co.*,
46 F.2d 925 (5th Cir. 1931) ......................................................................................................11

*Walker v. Stein,*
  758 N.Y.S.2d 451 (N.Y. App. Div. 2003) ........................................................17, 18

*Wolf v. Am. Technical Ceramics Corp.,*
  924 N.Y.S.2d 143 (N.Y. App. Div. 2011) ..............................................................18

**Statutes**

28 U.S.C. § 636(b) .............................................................................................1, 3

28 U.S.C. § 1605A ............................................................................. *passim*

N.Y. Gen. Obligations Law § 13-101 .................................................................15

N.Y. C.P.L.R. § 5001(b) .........................................................................2, 16, 18

**Other Authorities**

Fed. R. Civ. P. 72(b)(3) .........................................................................................3

Fed. R. Civ. P. 17 .................................................................................................11

7-73 New Appleman on Insurance Law Library Ed. § 73.05[2] .......................14

16 Couch on Insurance §222:27 ...........................................................................7

16 Couch on Insurance §222:17 .........................................................................10

Graydon S. Staring and Dean Hansell, Law of Reinsurance § 17:4 (2017) ......11

46A C.J.S. Insurance § 2027 (2007) .....................................................................7

63 N.Y. Jur. 2d Guaranty & Suretyship § 413 (2015) ........................................9

The Plaintiffs' Executive Committee for Commercial Claims ("PECC"), submits this memorandum of law pursuant to 28 U.S.C. § 636(b)(1), in support of the Continental Casualty Plaintiffs' objections to the Report and Recommendation issued by Magistrate Judge Sarah Netburn on November 27, 2017.  ECF No. 3808.

For the reasons set forth below, the PECC respectfully submits that the Court should decline to adopt Judge Netburn's recommendations that:  (1) the Continental Casualty Plaintiffs do not have direct rights under the State Sponsor of Terrorism Exception, 28 U.S.C. § 1605A; (2) the Continental Casualty Plaintiffs do not have subrogation rights with respect to their reinsurance payments; and (3) prejudgment interest for the Continental Casualty Plaintiffs' judgments under both New York law and federal law should be calculated from the date of the individual insurance payments.

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND

On January 5, 2017, this Court entered default judgment as to liability against Defendant Islamic Republic of Iran in favor of Plaintiffs Continental Casualty Insurance Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford, and American Casualty Company of Reading, Pennsylvania (the "Continental Casualty Plaintiffs") for claims arising under 28 U.S.C. § 1605A, the State Sponsor of Terrorism exception to the Foreign Sovereign Immunities Act ("FSIA") ("Section 1605A").  ECF No. 3415 (docketed Jan. 6, 2017).  The Court's January 5, 2017 Order referred the calculation of damages in favor of the Continental Casualty Plaintiffs and against Iran to Magistrate Judge Sarah Netburn.  ECF No. 3415.

On November 27, 2017, Judge Netburn issued her Report and Recommendation ("Report"), ECF No. 3808, only three aspects of which are relevant here:

*First*, Judge Netburn concluded that the Continental Casualty Plaintiffs do not possess direct rights under Section 1605A and that their claims against Iran arise solely under doctrines

1

of subrogation.  Report at p. 4.  In support of that recommendation, Judge Netburn analogized to reasoning provided by Magistrate Judge Frank Maas in previously entering a monetary default judgment against al Qaeda under the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq.* ("ATA"), in this MDL.  *See Federal Insurance Co. v. al Qaeda*, No. 03-CV-6978, ECF No. 2479 (S.D.N.Y. Oct. 11, 2011) ("*Federal Insurance I*"),

*Second,* Judge Netburn recommended that the Continental Casualty Plaintiffs be denied any recovery with respect to any reinsurance payments, reasoning that the Continental Casualty Plaintiffs do not possess subrogation rights with respect to their reinsurance payments because they are not in "contractual privity" with the policyholders who suffered the underlying injuries. Report at pp. 9–10.  Judge Netburn acknowledged that her recommendation on the reinsurance issue was in tension with prior recommendations of Magistrate Judge Maas awarding judgment in favor of reinsurers in *Federal Insurance I* and *Federal Insurance Co. v. al Qaeda*, No. 03-cv-6978, ECF No. 3175 (S.D.N.Y. Dec. 28, 2015) ("*Federal Insurance II*"), both of which were adopted by this Court.  Report at pp. 9–10.

*Third,* Judge Netburn recommended that prejudgment interest begin to accrue, for purposes of the Continental Casualty Plaintiffs' claims arising under both New York law and federal law, not on September 11, 2001, but instead on the date of the insurers' individual payments.  Report at pp. 13–14.  As the claims arising under New York law, Judge Netburn based her recommendation on N.Y. C.P.L.R. § 5001(b) and concluded that a subrogating insurer's claims "accrue" within the meaning of that provision on the date of payment.  *See* Report at pp. 13–14.   As to the federal law claims, Judge Netburn recognized that the Court has broad discretion to determine the date on which prejudgment interest should begin to accrue. However, "for the sake of consistency with" the recommended approach for the New York law claims, and to avoid what was characterized as a potential "windfall," Judge Netburn

recommended that prejudgment interest on the federal law claims also be calculated from the date of the insurers' individual payments to their insureds. *Id*. at p. 14.

For the reasons discussed below, the PECC respectfully submits that the Court should decline to adopt Judge Netburn's recommendations on the foregoing.

## II.    STANDARD OF REVIEW

"A magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States."  28 U.S.C. § 636(b)(3).  This may include a calculation of damages. *E.g., CSC Holdings, Inc. v. Alberto*, 379 F. Supp. 2d 490, 494 (S.D.N.Y. 2005) (referring to magistrate judge for damages calculations under 28 U.S.C. § 636(b)(3)). Where a report and recommendation is made:

> A judge of the court shall make a de novo determination of those
> portions of the report or specified proposed findings or
> recommendations to which objection is made. A judge of the court
> may accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge may
> also receive further evidence or recommit the matter to the
> magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* FED. R. CIV. P. 72(b)(3) (same as it relates specifically to pretrial matters); *In re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (GBD) (SN), 2016 U.S. Dist. LEXIS 151675, at *271 (S.D.N.Y. ) (same).  Where objections are made, the district court's review is *de novo* and it must "'arrive at its own, independent conclusion' regarding those portions of the Report to which objections were made." *In re Terrorist Attacks on September 11, 2001*, 2016 U.S. Dist. LEXIS 151675, at *271 (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 1985) (quoting *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983)).

## III.    ARGUMENT AND OBJECTIONS

The PECC respectfully submits that Judge Netburn's recommendations on the three points identified above should not be adopted by the Court.  As discussed in further detail below,

the text of Section 1605A(d) expressly authorizes a direct action under the statute in favor of insurers for "loss claims under life and property insurance policies," which is not dependent on doctrines of subrogation.  Indeed, subrogation rights do not exist with respect to payments under life insurance policies, and the statute's express authorization of claims for life insurance payments thus necessarily confirms that it establishes a direct cause of action in favor of insurers for the categories of loss payments it references.

Because Section 1605A creates a direct cause of action in favor of insurers, it is not necessary for this Court to reach Judge Netburn's recommendation that the Continental Casualty reinsurers do not possess subrogation rights to pursue claims under Section 1605A, but the PECC respectfully submits that Judge Netburn's conclusion on that point is contrary to principles of equitable subrogation.  Further, any determination as to the full scope of rights available to reinsurers to pursue claims against responsible third parties would require an analysis of the operative insurance and reinsurance agreements and treaties, and any assignment of claims and rights.

Finally, Judge Netburn's recommendation that prejudgment interest on the Continental Casualty Plaintiffs' claims arising under New York law should run from the date of the individual insurance payments is not compelled by the governing statute, and there is in any event no reason to depart from the Court's prior discretionary holding that prejudgment interest on the federal law claims should run from the date of the September 11th attacks.   In this regard, the PECC should emphasize that its concerns with Judge Netburn's recommendation that prejudgment interest should be calculated from the date of the individual insurance payments is grounded substantially in the potential burden that approach would impose on the parties and Court going forward.  Although the PECC does not have particularized claim details for all of the insurance losses at issue in the MDL, it is certain that the aggregate losses encompass

literally thousands (and likely tens of thousands) of individual insurance claims.  In most instances, multiple payments would have issued in relation to each of those individual claims. As a result, calculating prejudgment interest from the date of the individual payments would require the parties and Court to engage in tens of thousands (if not hundreds of thousands) of individual prejudgment interest calculations in relation to any future judgments.  That immense undertaking is not required by governing law, and should be avoided in this MDL proceeding.

The PECC recognizes that Judge Netburn did not receive substantive briefing or submissions from the Continental Casualty Plaintiffs concerning the availability of direct claims under Section 1605A, the equitable and contractual rights of reinsurers, or the practical aspects of the prejudgment interest issue.  To the extent the Court believes it would be helpful for the PECC to present its views on these issues to Judge Netburn for consideration in the first instance at an upcoming hearing, the PECC would welcome that opportunity.

## A.    Section 1605A Creates Direct Rights in Favor of Insurers and Reinsurers for Claims for Reasonably Foreseeable Property Losses.

In evaluating the Continental Casualty Plaintiffs' application for damages, Judge Netburn initially concluded that the Continental Casualty Plaintiffs, as insurers, could recover under Section 1605A only under the doctrine of subrogation.  Report at p. 4.  Stated another way, Judge Netburn concluded that the Continental Casualty Plaintiffs did not have any independent or direct rights to assert claims under Section 1605A.  In support of that recommendation, Judge Netburn analogized to Judge Maas's Report and Recommendation in *Federal Insurance I*, in which he concluded that several insurer plaintiffs' rights of recovery under the ATA arose solely pursuant to doctrines of subrogation.  Judge Netburn expressed her understanding that the analysis from *Federal Insurance I* was thereafter extended by Judge Maas in *Federal Insurance II*, which involved a Section 1605A claim.  "Following these decisions," Judge Netburn stated that she could "not perceive any reason why the subrogation analysis should be distinct under the

FSIA" as compared to the ATA.  Report at p. 4, n.1.  The PECC respectfully submits that Judge Netburn's conclusion that the Continental Casualty Plaintiffs' rights under Section 1605A arise solely under doctrines of subrogation is not correct.

> Section 1605A provides, in relevant part, that:
>
> After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, *and loss claims under life and property insurance policies*, by reason of the same acts on which the action under subsection (c) is based.

28 U.S.C. § 1605A(d) (emphasis supplied).

This plain text of Section 1605A(d), and the language authorizing suits to recover loss claims under property insurance policies in particular, is only properly read as creating an independent and direct remedy in favor of insurers for such losses.  To begin with, a "loss claim under" a "property insurance polic[y]" is a form of claim that resides uniquely and solely with an insurer—an insured simply does not incur a "loss claim under" an insurance policy.   Further, the language of the provision conspicuously differentiates between claims for "reasonably foreseeable property loss, whether insured or uninsured" (phrasing that readily encompasses claims arising under doctrines of subrogation), and the separate category of authorized suits for "loss claims under . . . property insurance policies."  Under well-settled rules of statutory interpretation, the latter phrase is only properly understood to create a direct and independent remedy in favor of property insurers that does not depend on rights of subrogation.  To conclude otherwise would render the language authorizing suits to recover for "loss claims under . . . property insurance policies" entirely superfluous and meaningless, given the preceding language already authorizing claims for "reasonably foreseeable property loss, whether insured or uninsured" (which again, clearly captures claims arising under doctrines of subrogation).  *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001) ("It is our duty

'to give effect, if possible, to every clause and word of a statute'" and to avoid constructions that render words or phrases superfluous) (*quoting United States v. Menasche,* 348 U.S. 528, 538–39, 75 S. Ct. 513, 99 L. Ed. 615 (1955) (*quoting Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S. Ct. 391, 27 L. Ed. 431 (1883))) (internal quotation marks omitted); *Collazos v. United States,* 368 F.3d 190, 199 (2d Cir. 2004) (same).

The incorporated language of this same provision authorizing suits for recovery of "loss claims under life . . . insurance policies" further compels this conclusion.  In this regard, "[i]t is well settled that the doctrine of subrogation has no application to accident or life insurance, for the reason that accident and life insurance are not contracts of indemnity, but are investment contracts."  46A C.J.S. Insurance § 2027 (2007); *accord Cunningham v. Metropolitan Life Ins. Co.*, 360 N.W.2d 33, 37–38 (Wis. 1985) (explaining only contracts of indemnity are entitled to subrogation and not contracts of investment); 16 Couch on Insurance § 222:27 ("No right of subrogation arises by operation of law under life and accident insurance because the indemnity feature is not present."); *Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co.*, 115 F.2d 277, 281 (4th Cir. 1940) (collecting cases); *Hunt v. N.C. Logistics, Inc.*, 193 F. Supp. 3d 1253, 1272–73 (D.N.M. 2016); *Ridge Tool Co. v. Silva*, 515 N.E.2d 945, 946 (Ohio Ct. App. 1986) (collecting cases); *City of Birmingham v. Walker*, 101 So.2d 250, 253 (Ala. 1958).  Because doctrines of subrogation do not apply to payments under life insurance policies, Section 1605A(d) must be read to create an independent and direct right of action in favor of insurers (for loss claims under life and property insurance policies).  Otherwise, the express remedy the provision creates for recovery of loss claims under life insurance policies could never be invoked.

Consistent with the foregoing, the PECC respectfully submits that the Court should conclude that Section 1605A(d) creates a direct and independent remedy in favor of insurers for

"loss claims under . . . property insurance policies," where all other requirements of Section 1605A are met, and that an insurer's rights under Section 1605A do not arise solely under doctrines of subrogation.[1]  To the extent the Court endorses that conclusion, it need not address the separate question of whether the Continental Casualty Plaintiffs possess contractual or equitable subrogation rights with respect to their reinsurance payments.

**B.**      **Judge Netburn Was Incorrect in Concluding that the Continental Casualty Reinsurers Do Not Have Subrogation Rights.**

To the extent the Court concludes that it is necessary to address whether the Continental Casualty Plaintiffs possess subrogation rights with respect to their reinsurance payments, the PECC respectfully submits that Judge Netburn was incorrect in concluding that they do not.  For the reasons discussed in further detail below, the Continental Casualty Plaintiffs are entitled to seek recovery for their reinsurance payments pursuant to longstanding principles of equitable subrogation, a broad doctrine that does not at all depend on contractual privity with the insured party who suffered the loss.  Further, any determination as to the contractual rights of reinsurers would require consideration of the underlying insurance policies and reinsurance treaties and agreements, along with any assignments of rights that may exist, an exercise that did not occur in relation to the damages application of the Continental Casualty Plaintiffs.[2]  Accordingly, the PECC respectfully submits that the Court should adhere to its prior rulings and find that the Continental Casualty Plaintiffs do possess equitable subrogation rights with respect to their reinsurance payments, and that any ruling concerning the subrogation rights of the Continental

---

[1] The PECC should note that it does not read Judge Maas's holding in *Federal Insurance II* as reaching any conclusion on this point.  In that decision, Judge Maas stated, "the Federal Insurance policyholders clearly suffered such losses, for which they have been compensated, thereby entitling the Federal Insurance Plaintiffs to be subrogated." *Federal Insurance II*, at p. 4.  Immediately thereafter, however, Judge Maas also stated, "Indeed, section 1605A expressly authorizes a court to award damages for 'loss claims under . . . property insurance policies, by reason of' terrorist acts.  *Id*. (quoting 28 U.S.C. § 1605A(d)).  This second sentence leaves open whether Section 1605A creates a direct and independent cause of action in favor of insurers, an issue Judge Maas did not need to reach given that he had already concluded that the Federal Insurance plaintiffs were entitled to proceed under Section 1605A as subrogees.

[2] It is the PECC's understanding that the Continental Casualty Plaintiffs did not present any underlying agreements in support of their damages application.

Casualty Plaintiffs with respect to their reinsurance payments should be narrowly confined to the adequacy of the showing of those Plaintiffs as to that issue.

>  1.   The Doctrine of Equitable Subrogation Applies to the Continental Casualty Plaintiffs' Reinsurance Payments.

In recommending that the Continental Casualty Plaintiffs do not possess subrogation rights with respect to their reinsurance payments, Judge Netburn focused on the (presumed) lack of privity between the Continental Casualty reinsurers and the policyholders who directly suffered the underlying losses. Because "contractual privity" did not exist between those parties, Judge Netburn recommended that the Continental Casualty Plaintiffs did not have subrogation rights with respect to their reinsurance payments. Report at pp. 9–10. Putting aside for the moment whatever contractual rights the Continental Casualty Plaintiffs may enjoy by operation of the underling insurance and reinsurance contracts and any related agreements, *see infra* at pp. 13–16, Judge Netburn's recommendation on this point is inconsistent with principles of equitable subrogation.

Subrogation rights arising out of a contract are distinct from those arising by operation of equitable principles. 63 N.Y. Jur. 2d Guaranty & Suretyship § 413 (2015). "Unlike contractual subrogation where the subrogee's rights are defined in an express agreement between the insurer-subrogee and insured-subrogor, the rights of an insurer against a third party as equitable subrogee arise *independently* of any agreement." *Fed. Ins. Co. v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 372 (1990) (emphasis added). "These rights accrue upon payment of the loss and are based upon the principle that in equity an insurer, which has been compelled under its policy to pay a loss, ought in fairness to be reimbursed by the party which caused the loss." *Id.*

As stated by the New York Court of Appeals long ago:

>  Subrogation, an equitable doctrine taken from the civil law, is
>  broad enough to include every instance in which one party pays a
>  debt for which another is primarily answerable and which in equity

> and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability. (Seldon on Subrogation [2d ed.], pp. 2, 4.) Earl, J., in *Cole v. Malcomb* (66 N. Y. 363, 366) said that it is "applicable to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property." Peckham, J., in *Pease v. Egan* (131 N. Y. 262, 272) said -- or repeated what had been said before -- that it was founded upon principles of benevolence. In *Pittsburgh-Westmoreland Coal Co. v. Kerr* (220 N. Y. 137, 144) Chase, J., said, it "includes so wide a range of subjects that it has been called 'the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity, and good conscience ought to pay it.'"

*Gerseta Corp. v. Equitable Trust Co. of N.Y.*, 241 N.Y. 418, 426 (1928); *see also Fed Ins. Co.*, 75 N.Y.2d at 378 (equitable subrogation is "the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity and good conscience out to pay it." (internal quotation marks omitted)); *King v. Pelkofski*, 20 N.Y.2d 326, 334 (1967) (equitable subrogation prevents unjust enrichment); *Ocean Acc.& Guar. Corp. v. Hooker Electrochemical Co.*, 240 N.Y. 37, 47 (1925) ("[The] right of subrogation is based upon principles of equity and natural justice. We recognize[ d] at once the fairness of the proposition that an insurer, who has been compelled by his contract to pay for damages, ought to be reimbursed by the party whose fault has caused such damages, and *the principle of subrogation ought to be liberally applied for the protection of those who are its natural beneficiaries*." (emphasis added)); *Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 260 (2d Cir. 1999) (same).

Thus, even to the extent that a reinsurer does not possess an independent contractual right of subrogation, it may still seek reimbursement from a responsible third party under the equitable doctrine. As Couch on Insurance explains, "Where an insurer effects reinsurance, the same right of subrogation which arises with respect to an insurer also arises with respect to the reinsurer." 16 Lee R. Russ et al., Couch on Insurance § 222:17 (3d ed. 2000) (footnotes omitted); *accord*

10

Graydon S. Staring and Dean Hansell, Law of Reinsurance § 17:4 (2017).  The above is so because the "equitable considerations which give rise to a right of subrogation in favor of an insurer who pays the loss insured against apply in favor of a reinsurer who complies with his obligation to his reinsured, whether that obligation is for the whole or part of the amount of the loss incurred by the latter in favor of the assured."  *Universal Ins. Co. v. Old Time Molasses Co.*, 46 F.2d 925, 927 (5th Cir. 1931).

Consistent with these principles, several courts have deemed reinsurers to be real parties in interest under Federal Rule of Civil Procedure 17 for purposes of a suit against a responsible third party tortfeasor, a conclusion that necessarily recognizes that they possess rights of subrogation.  *See Glacier Gen. Assur. Co. v. G. Gordon Symons Co., Ltd.*, 631 F.2d 131, 133–34 (9th Cir. 1980) (reinsurer deemed real party in interest, though not a necessary party); *Agri-Mark, Inc. v. Niro, Inc.*, 190 F.R.D. 293, 296-97 (D. Mass. 2000) (compelling joinder of reinsurer as a real party in interest); *State Sec. Ins. Co. v. Frank B. Hall & Co., Inc.*, 109 F.R.D. 99, 101 (N.D. Ill. 1986) (deeming reinsurer a real party in interest). These decisions expound upon the basic principle that:

> If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name. If it has paid only part of the loss, both the insured and insurer (*and other insurers, if any, who have also paid portions of the loss*) have substantive rights against the tortfeasor which qualify them as real parties in interest.

*United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 380–81 (1949) (internal citation omitted) (emphasis added).

Here, the doctrine of equitable subrogation clearly applies with respect to the Continental Casualty Plaintiffs' reinsurance payments.  Indeed, the Continental Casualty Plaintiffs were compelled under their applicable reinsurance policies to make those payments, in compensation

11

for terrorist attacks and resulting injuries for which Iran has been deemed liable by this Court. These circumstances thus very directly implicate "the principle that in equity an insurer, which has been compelled under its policy to pay a loss, ought in fairness to be reimbursed by the party which caused the loss." *Fed. Ins. Co.,* 75 N.Y.2d at 372. Again, this principle "is broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter." *Gerseta Corp.*, 241 N.Y. at 425.[3]

Finally on this point, the decision in *Reliance Insurance Co. v. Aerodyne Engineers Inc.*, 612 N.Y.S.2d 87 (N.Y. App. Div. 1994), cited in the Report, does not indicate a contrary result. In that three paragraph decision (in which the analysis is confined to a single paragraph), the Appellate Division, Third Department, merely held (on the basis of the distinct facts before it) that there was no contractual privity between the insured and the reinsurer. *Reliance Ins. Co.,* 612 N.Y.S.2d at 87. The court then agreed with the defendant that "plaintiff [the reinsurer] had no contractual obligation to [the insured] and thus no subrogation rights." *Id*.

There is no indication in the *Reliance Insurance* decision that the court considered or addressed the equitable subrogation principles discussed above. Indeed, the decision contains absolutely no reference to "equitable subrogation" or any of the New York Court of Appeals and other decisions establishing that equitable subrogation is a broad doctrine that encompasses "every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter." *Gerseta Corp.*,

---

[3] Judge Netburn's analysis of the subrogation rights of the Continental Casualty Plaintiffs focused on New York law. As this Court previously recognized, Section 1605A establishes a cause of action under federal law and also serves as a pass through for state law claims. The PECC respectfully submits that the doctrine of equitable subrogation applies to the federal law claims as well. That is especially evident given the remedial purposes of Section 1605A, which was enacted to ensure that designated State Sponsors of Terrorism are held fully accountable for the harm resulting from their terrorist activities. The PECC further submits that the laws of other states may be implicated in the equitable subrogation analysis, but that question does not appear to have been raised by the Continental Casualty Plaintiffs' application.

241 N.Y. at 425.  Given the absence of any reference to those principles, the *Reliance Insurance* decision addresses only whether, on the particular facts of that case, the plaintiff possessed *contractual* rights of subrogation.  This narrow reading is especially appropriate given the brevity of the decision, and fact that a broader reading would bring the decision into clear conflict with the controlling authorities concerning principles of equitable subrogation under New York law discussed above.[4]

        2.      <u>Reinsurers May Possess Contractual Subrogation Rights and Rights Arising Under Assignments</u>.

Given the direct rights conferred upon the Continental Casualty Plaintiffs under Section 1605A and those arising under principles of equitable subrogation, as discussed above, it is unnecessary for the Court to endeavor to determine whether the Continental Casualty Plaintiffs possess any contractual rights of subrogation.  However, as a general principle, the PECC respectfully submits that any determination of the contractual subrogation rights of a reinsurer would require an analysis of the relevant insurance policies, reinsurance treaties, and agreements, and any assignments of rights that may have been executed between or among the relevant parties.  The provisions of reinsurance agreements and treaties may establish contractual rights of subrogation in favor of a reinsurer, particularly when read in conjunction with the underlying policy of insurance between the direct insurer and insured.  Further, reinsurers may hold rights to bring claims pursuant to assignments, contained within the relevant agreements or treaties or executed separately.

While the PECC is not privy to the terms of the Continental Casualty reinsurance treaties or agreements, most reinsurance agreements and treaties contain a provision addressing the

---

[4] As to the New York law claims, *Reliance Insurance* is not on point (for the reasons discussed above), and even if it were, would be neither binding nor persuasive.  As to the federal law claims, the PECC submits that it simply has no bearing whatsoever, and that principles of equitable subrogation plainly apply to those federal law claims.

subrogation rights and interests of the reinsurer.  While there are myriad versions of such a

provision, New Appleman on Insurance offers the following example:

> The Reinsurer shall be subjected, as respects any loss for which the
> Reinsurer shall actually pay or become liable, but only to the
> extent of the amount of payment by or the amount of liability to
> the Reinsurer, to all of the rights of the Company against any
> person or other entity who may be legally responsible in damages
> for said loss. The Company hereby agrees to enforce such rights,
> but if the Company shall refuse or neglect to do so, the Reinsurer is
> hereby authorized and empowered to bring any appropriate action
> in the name of the Company or its policyholders, or otherwise to
> enforce such rights.

7-73 New Appleman on Insurance Law Library Ed. § 73.05[2].

A typical reinsurance agreement or treaty thus confers a contractual right of subrogation

in favor of the reinsurer, to the extent of its payment, and empowers the reinsurer "to bring any

appropriate action" "to enforce such rights" "against any person or other entity who may be

responsible in damages for said loss."  *Id.*  And of course, the underlying insurance policy

between the cedent and the insured will contain a similar provision conferring a contractual right

of subrogation in favor of the insurer.  Thus, the contracts governing a typical insurance

arrangement that includes reinsurance establish:  (1) a contractual right of subrogation in favor of

the insurer, under which the insurer stands in the shoes of the insured to the extent of its

payments; and (2) a contractual interest in the insurer's subrogation claim in favor of the

reinsurer, to the extent of the reinsurer's payments.  In combination, these interrelated contractual

provisions serve to establish a contractual right of subrogation in favor of the reinsurer (running

from the insured to the insurer, and then from the insurer to the reinsurer), with respect to any

loss incurred by the insured, to the extent of the reinsurer's payments in compensation for that

loss.[5]  That contractual right of subrogation is a key part of the consideration provided to the

---

[5] These contractual provisions would also inform the analysis of a reinsurer's equitable subrogation rights.

reinsurer in exchange for assuming the insured risk, and a reinsurer should not be deprived of the benefit of that contractual right.

In addition to such contractual rights, a reinsurer may bring a claim against a responsible third party tortfeasor pursuant to an express or implied assignment of the cedent's subrogation claim. Such an assignment may flow from the language of the reinsurance agreement or treaty itself,[6] or from a separate assignment instrument executed by the cedent in favor of the reinsurer. Where such an assignment has been effected, there is no question that the reinsurer may bring a claim to recover from a responsible third party tortfeasor. *See, e.g., Erlich v. Am. Int'l Grp., Inc.*, No. 652672/2012, 2013 WL 5966053, at *1 & n.3 (N.Y. Cnty. Ct. Nov. 7, 2013) ("since Everest, the reinsurer, ultimately had to pay out on the Policy, it, not [the cedent], brought the subrogation claim" having entered into an assignment agreement with the cedent). Indeed, absent express language to the contrary, contractual rights are generally freely assignable in New York. *In re Stralem*, 758 N.Y.S.2d 345, 347 (N.Y. App. Div. 2003); *see also* N.Y. GEN. OBLIGATIONS LAW § 13-101 (allowing any claim or demand to be transferred except those for personal injury, founded on a grant that is void by statute, or expressly forbidden); *Trans-Resources, Inc. v. Nausch Hogan & Murray*, 746 N.Y.S.2d 701, 703–04 (N.Y. App. Div. 2002) (insured's assignment of claim to reinsurer not violative of public policy). "When a valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights the latter had." *In re Stralem*, 758 N.Y.S.2d at 347.

The PECC recognizes that the Court cannot make a determination as to the contractual and assignment principles discussed above in the abstract, based on a form provision from a typical reinsurance agreement. However, the PECC raises these issues to underscore that a determination as to the subrogation rights, whether equitable or contractual, of a reinsurer

---

[6] In fact, the subrogation provision of the reinsurance treaty or agreement may be construed to effect an assignment of the cedent's subrogation claim to the reinsurer, to the extent of the reinsurer's payment.

requires an analysis of the relevant contracts and agreements.  Thus, any ruling as to the subrogation rights of the Continental Casualty reinsurers should be narrowly limited to those Plaintiffs and the showing they have made in this context.

C. **The Court Should Adhere to its Prior Rulings Concerning Prejudgment Interest.**

As briefly discussed in Section I, Judge Netburn's Report also recommended that prejudgment interest for the Continental Casualty Plaintiffs' claims arising under both New York law and federal law be calculated from the date of the individual payments issued by the Continental Casualty Plaintiffs' payments to their insureds.  For the reasons discussed below, the PECC respectfully submits that approach is not compelled by governing law and should not be adopted, particularly given the Court's prior decisions that prejudgment interest for judgments under Section 1605A shall be calculated from the date of the September 11th attacks, and the immense burden the parties and Court would face in calculating interest from the date of the individual insurance payments.

As the claims arising under New York law, Judge Netburn based her recommendation on N.Y. C.P.L.R. § 5001(b) and conclusion that a subrogating insurer's claims "accrue" within the meaning of that provision on the date of payment.  *See* Report at pp. 13–14.  N.Y. C.P.L.R. § 5001(b) provides as follows:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

*Id*. § 5001(b).  Looking at the express language the inquiry is three-fold: (1) when is the "earliest ascertainable date the cause of action existed"; (2) were damages incurred after that date; and/or (3) were damages incurred at various times.

16

As Judge Netburn correctly noted in her Report, several Appellate Division and federal district court decisions applying the statute in the subrogation context have held that "[b]ecause '[a]n insurer's right of subrogation attaches, by operation of law, upon its payment of an insured's loss,' the date of payment is the earliest ascertainable date the cause of action existed" under New York law. *Hartford Fire Ins. v. Jainulabdeen,* No. 06-CV-2171, 2007 WL 1028930, at *6 (E.D.N.Y. Mar. 30, 2007) (quoting *Mazzola*, 175 F.3d at 260). Consistent with those authorities, Judge Netburn recommended that prejudgment interest on the Continental Casualty Plaintiffs' New York law claims should be calculated from the date of each of the individual insurance payments issued by those Plaintiffs. Report at p. 14.

The PECC respectfully submits that the decisions holding in the subrogation context that the "date of payment" is the "earliest possible date that the cause of action existed" are in conflict with fundamental principles of subrogation and should not be followed. It is well established that "[t]he earliest ascertainable a cause of action for damage to property exists is the time at which the injury occurs." *N.Y. State Thruway Auth. v. Allied Waste Servs. of N. Am., LLC*, 41 N.Y.S.3d 143, 145 (N.Y. App. Div. 2016). Consistent with that rule, the "earliest ascertainable date" that a cause of action exists in a subrogation action is the date of the loss or injury as the subrogee "stands in the shoes of" the insured. *Atl. Mut. Ins. Co. v. Napa Transp., Inc.*, 399 F. Supp. 2d 523, 526 (S.D.N.Y. 2005). This principle has been consistently confirmed by decisions addressing the operation of the applicable statute of limitations for subrogation claims, which hold that the statute of limitations for a subrogation claim begins to run on the date the cause of action existed – the date of the injury—not the date of the insurer's payment. *Allstate Ins. Co. v. Stein*, 1 N.Y.3d 416, 272 (2004); *Walker v. Stein*, 758 N.Y.S.2d 451, 453 (N.Y. App. Div. 2003) (collecting cases). Given that a subrogee's cause of action exists and accrues on the date of the underlying injury for purposes of calculating the statute of limitations,

it follows that it also "exists" on the date of injury for purposes of N.Y. C.P.L.R. § 5001(b).  That conclusion is consistent with the animating principle of subrogation which holds that that a subrogation claim is derivative of the underlying claim and that the subrogee possesses only such rights as the subrogor possessed, with no enlargement or *diminution*."  *Walker*, 758 N.Y.S.2d at 453 (emphasis added).

Even to the extent the decisions holding that a cause of action in subrogation does not exist within the meaning of N.Y. C.P.L.R. § 5001(b) until the date a payment has been made, the Court should select a "single reasonable intermediate date" to be used in calculating prejudgment interest on the Continental Casualty Plaintiffs' (and any future) New York law judgments.  *See* N.Y. C.P.L.R § 5001(b); *Wolf v. Am. Technical Ceramics Corp.*, 924 N.Y.S.2d 143, 145 (N.Y. App. Div. 2011) (calculating prejudgment interest from date halfway between date of first and last salary installments due to plaintiff under employment contract).  Once again, the property damage subrogation claims in this litigation encompass literally thousands of individual claims and, for the majority of those claims, the insurers would have issued multiple payments to their insureds. The equitable considerations in these circumstances weigh strongly against requiring the parties, and the Court, to conduct tens (or hundreds) of thousands of independent prejudgment interest calculations.  Therefore, to the extent that the Court declines to calculate interest on the Continental Casualty Plaintiffs' New York law judgments from the date of injury, the PECC respectfully submits that prejudgment interest should accrue for such claims from a reasonable intermediate date as authorized by §5001(b). The PEC submits that March 11, 2002, six months after the attacks, serves as a reasonable intermediate date for these purposes.

With respect to the federal law claims, Judge Netburn confirmed in her Report and Recommendation that an award of prejudgment interest for federal claims under Section 1605A is purely discretionary.  Nonetheless, Judge Netburn recommended that the Court depart from its

earlier rulings and calculate interest from the date of payment for the "sake of consistency" with her ruling for state law claims, and so as to prevent a windfall.  Report at p. 14.  The PECC respectfully submits that it is appropriate to adhere to the Court's prior rulings for three principal reasons.

*First*, in *Federal Insurance I* and *Federal Insurance II,* Judge Maas recommended that prejudgment interest for the insurer claims should accrue from the date of injury, September 11, 2001.  The Court adopted these recommendations in their entirety.  ECF No. 2502; ECF No. 3229.  Given the magnitude of the multi-district proceedings, it is critical to maintain consistency with issues decided earlier in the proceedings, particularly where, as here, the earlier ruling was purely discretionary and there is no compelling reason to depart from it.

*Second,* for the reasons discussed above, calculating prejudgment interest from the date of the individual insurance payments would impose an immense burden on the parties and Court, which is likely to impair progress in the MDL on other fronts.  These practical considerations counsel in favor of adhering to the Court's prior ruling that prejudgment interest accrues from the date of the injury.

*Third,* requiring Iran to pay prejudgment interest from the date of the attacks is in no way unfair to Iran and would not result in any windfall.  The injuries resulting from Iran's terrorist activity were suffered on September 11, 2001, and calculating prejudgment interest from the date of the injury simply requires Iran to pay full compensation for the injuries resulting from its terrorist conduct.  *See Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 75-76 (D.D.C. 2011) (awarding prejudgment interest from date of attack so as to "fully compensate the victims for the injuries they sustained as a result of Syria's material support of [a terrorist organization]. Such awards compensate the

victims for any delay due to litigation, and prevent Syria from profiting from its terrorist attacks.").

## IV.    CONCLUSION

For all of the foregoing reasons, the PECC respectfully submits that the Court should decline to adopt Judge Netburn's recommendations that:  (1) the Continental Casualty Plaintiffs do not have direct rights under the State Sponsor of Terrorism Exception, 28 U.S.C. § 1605A; (2) the Continental Casualty Plaintiffs do not have subrogation rights with respect to their reinsurance payments; and (3) prejudgment interest for the Continental Casualty Plaintiffs' judgments under both New York law and federal law should be calculated from the date of the individual insurance payments.


Dated:  January 25, 2018                        Respectfully submitted,

                                                /s/ Stephen A. Cozen
                                                Stephen A. Cozen, Esq.
                                                Sean P. Carter, Esq.
                                                Elliott R. Feldman, Esq.
                                                Scott Tarbutton, Esq.
                                                COZEN O'CONNOR
                                                1650 Market Street
                                                Philadelphia, PA  19103
                                                (215) 665-2000

                                                Plaintiffs' Exec. Committee for Commercial Claims