# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:
*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Euro Brokers, Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL DEFENDANT YASIN ABDULLAH KADI TO PROVIDE DOCUMENTS AND TESTIMONY CONCERNING HIS EFFORTS TO RESPOND TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS**

In his Opposition Brief (ECF No. 3876) (Opp. Br.) Yasin Abdullah Kadi ("Kadi") claims he does not have any more responsive documents except those on his voluminous privilege log.  While Plaintiffs take no issue with counsel's representations, it is Mr. Kadi himself who has proven to lack credibility and fails to adequately explain what happened to documents in the obvious gap areas of his production.[1] Kadi further fails to respond to Plaintiffs' requests for more information regarding his privilege log which Plaintiffs challenged during the multiple meet and confer exchanges. In addition, the parties disagree on some of the legal underpinnings relied on by Kadi to withhold certain documents under his broad claim of privilege.

Kadi makes much of his terrorist de-listing by the United States Government as well as other governmental bodies who listed him as an al Qaeda terror supporter for thirteen years.  Kadi overstates the import of the government's action and omits the government's skepticism and its focus on the circumstances existing in 2014.  In the letter from the U.S. Treasury Department to Kadi's attorneys announcing his delisting as a Specially Designated Global Terrorist (SDGT) on the Specially Designated National (SDN) list as of November 26th, 2014, the Office of Foreign Assets Control (OFAC) wrote;

> Please note that OFACs removal of Mr. Kadi's name from the SDN List is based solely on its consideration of Mr. Kadi's *current circumstances* and does not represent determination by OFAC that Mr. Kadi's designation or the denial of his previous request for administrative reconsideration were in error. Additionally, please be advised that OFAC may consider re-designating Mr. Kadi should it become aware of information indicating that he has *resumed* the activities that resulted in his designation as an SDGT or that he has otherwise engaged in activities that would make him subject to designation pursuant to Executive Order 13224 or other authorities administered by OFAC. (Ex. 1 Treasury Department Letter - KADI 103660) [emphasis supplied]

---

[1] PLAINTIFFS' FIRST SET OF JURISDICTIONAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO YASSIN ABDULLAH AL KADI,  served August 22, 2013, contains the following instruction: "If any documents requested herein have been lost, discarded, destroyed, or are otherwise no longer in Defendant's possession, custody or control, they shall be identified as completely as possible including, without limitations, the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document."

OFAC made clear that at one time, "[Kadi] a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, has been consistently identified as a financial supporter of Usama bin Laden and other known Islamic extremists for nearly a decade." (Ex. 2 OFAC Memo Excerpt -  PEC-KADI 15402)

Kadi Businesses and Banking Transactions

Kadi spends much of his opposition arguing against the merits of Plaintiffs' allegations rather than providing concrete explanations as to what happened to the documents.

Kadi argues that Rowad in the Sudan was not a joint venture with Osama bin Laden ("OBL") because "[b]eing one or two of nine shareholders along with another entity is not a joint venture." (Opp. Br. at 6).  But Kadi does not deny that OBL and/or al Qaeda also owned part of this company with Kadi for over six years, nor does he explain what happened to the records regarding this business, regardless of its label.  The al Qaeda holding entity Wadi al Aqiq which was known within al Qaeda as "the mother company" is listed in the Rowad documents as a shareholder and OBL signed as its representative. (Motion to Compel at 3-4) Not surprisingly, the bank used by Rowad which also became an investor, was al Shamal Bank (discussed below).  Muwafaq and Wadi al Aqiq used the al Shamal Bank address as their own. Kadi only proffers Rowad was liquidated in 1996-97 (*Id*. at 7) and leaves us to assume the records were destroyed. Yet a Kadi employee was tasked to oversee the liquidation and generated documentation during the wind down.  Kadi claims he did not invest in al Shamal Islamic Bank in the Sudan, rather merely had "investment accounts at that bank." (*Id*.)  Nonetheless, Kadi appears to admit that he and other wealthy Saudis, including OBL, invested or had investment accounts at the Bank.  He also fails to convincingly argue any material distinction concerning Plaintiffs' characterization of the 1991 meeting he attended in Khartoum, Sudan at the Sudanese government's invitation to fund the Bank, by suggesting that OBL may not himself have been present, rather only other members of al

Qaeda. This is yet another defensive argument over the merits that does not justify failure to produce documents regarding his and others' investments at al Shamal Bank.

Kadi disputes that he and Bin Laden were shareholders in al Shamal Bank in Sudan. He states that, "No document supports the assertion that Mr. Kadi was a shareholder in this bank," (Opp. Br. at 6). Once again Kadi knows this to be untrue. KADI 0018556 is a page from a Swiss Federal Police report dated November 5, 2007. It says, "During meetings with the American treasury department Yassin Abdullah KADI admitted that he was both shareholder and client of Al Shamal Islamic Bank." (Ex. 3 Swiss Federal Police Report Excerpt - KADI 18556)

In light of the fact that Kadi and Bin Laden were shareholders in both Rowad and al Shamal Bank and that al Shamal Bank hosted the meetings of Rowad, it is irrelevant whether Kadi met with Bin Laden or 'merely' met with al Qaeda members, as both tend to support Plaintiffs' allegations with regard to Kadi's knowing support of these terrorists who were responsible for the 9/11 Attacks. Kadi also had a history of meetings with Bin Laden, including at the time of the al Shamal and Rowad investments. Kadi told the U.S. Treasury Department's OFAC, "In Sudan 1992-1993: Mr. Kadi believes there may have been one or possibly two instances when he attended a business or governmental function in Sudan at which Usama Bin Laden may also have been present." (Ex. 4 Kadi Responses to OFAC Questions KADI 2044-45)

Kadi tries to disparage Plaintiffs' allegations by claiming that his large scale investments in Sudanese sesame seeds/oil at the same time that al Qaeda held a monopoly on the Sudanese sesame trade are unconnectedl. But this is by no means a coincidence, and he actually confirms their alliance rather than dispels it. While the Rowad sesame business was, not surprisingly, liquidated when Bin Laden left the Sudan, Kadi and people and entities affiliated with Rowad subsequently established a new set of companies in the late 1990s trading in Sudanese sesame. One of these companies was Bahamas-registered Solano Ltd.

Solano was intertwined with small shell companies and made sets of financial transfers to unknown beneficiaries, yet there is no indication of revenue to Solano from the sale of sesame products. The existing documentary trail produced is incomplete and demonstrates all the ear marks of a money laundering operation in support of terrorism. (Motion to Compel at 6-7.)

In regards to Solano, Plaintiffs have identified three specific targeted gaps in Kadi's documentary production:

- The ultimate beneficiary(s) of the transactions noted in Solano's al Shamal Bank statements;
- The marketing, including broker(s) and purchaser(s) of Solano commodities exported from Sudan; and
- Communications and financial transactions between Solano and Dan Fodio and/or Dan Fodio subsidiaries, the Sudanese company which assisted al Qaeda and Solano in marketing sesame products.

Kadi founded these companies and provided many documents concerning them, but it is clear that there are material gaps in these records. According to his lawyers, "Mr. Kadi has produced everything in his possession that is responsive, and more than Plaintiffs assert, including a substantial number of bank documents reflecting Solano Ltd.'s trading activities, including companies affiliated with Dan Fodio" (Opp Brief at 7-8).

If there is an innocent explanation for the machinations that the 1999-2000 Kadi companies undertook in trading Sudanese sesame, then filling the documentary gap is the best way to demonstrate it. While Kadi claims he does not have more records due in part, to the passage of time, he was put on notice no later than October 12, 2001 that he was being accused of supporting al Qaeda and was using his businesses and bank accounts to launder money for them. The records that Plaintiffs have identified existed at that time and for the most part, concern the immediately preceding 5 years of his business and banking practices.

After all of Kadi's attempts at evasion have failed, he falls back on the incredible assertion that Arabs often do not keep written records. "Transactions and dealings that would in the West generate significant documentation are frequently effected by Arab parties with a minimum amount of paperwork." (Kadi Declaration at 2) As noted in Plaintiffs' Memorandum at page 6, numerous Rowad documents exist which have not been produced, including the liquidation of Rowad as led by a Kadi controlled person. Plaintiffs believe this is one of the specific gaps which Kadi should be compelled to produce.

In addition, it is hard to believe that any bank was functioning in the late 1990s without the use of written records in hard copy and/or in computer data collection files. Several other international money laundering investigations in the 1990s (see e.g. BCCI) obtained numerous records from Middle Eastern countries. Far more likely, based on the 275,383 pages of documents Kadi *did* produce, many originating in Arab countries, Kadi has not produced all of the documents that do in fact exist. Kadi's own admission demonstrates this pattern. Under pressure from Treasury's naming him as an al Qaeda terrorist in October 2001, Kadi's attorneys made two document gathering trips to Saudi Arabia in early 2002, a third trip later in 2002 after meeting with OFAC, and a fourth trip in 2003 after further pressure from the U.S. and other countries. Each trip followed the emergence of new allegations related to Kadi's activities. Following Kadi's "final production" to Plaintiffs in December 2014, and Plaintiffs' letter of May 6, 2015 which identified large gaps in Kadi's production, Kadi's attorney's made a fifth trip to Saudi Arabia. During this trip, thirteen years after his designation, and following his de-listing, "Mr. Kadi recalled that he had documents in a storage room several miles from his office." (Opp. Brief Martin Declaration at 3-4) It appears that Kadi withheld this fifth archive from the U.S. and other governments. It is this pattern of deception that most clearly shows his claim about Arab culture to be self-serving nonsense.

### KSA Investigation of Kadi

Plaintiffs' Motion further seeks to compel production of documents related to the KSA's investigation of Kadi, his petition to the KSA and the KSA response to have him delisted from the KSA designated list of terrorist supporters, including but not limited to, any and all documentation and information that the KSA had that it relied on to freeze his assets and list him as a terrorist.  Kadi claims that the KSA and not he, maintains and controls those documents.   While Kadi claims the KSA is secretive and is withholding documents related to any investigation of Kadi, the limited available records in fact show the KSA was an advocate on behalf of Kadi and lobbied hard for his de-listing.  It is thus more likely than not, that an exchange of documents was shared. Yet from Kadi's production it is impossible to determine if the KSA ever investigated Kadi or engaged at all relative to his international terror listing.  Similar to this Court's instructions to counsel for the individual charity officials, Kadi should request that the KSA provide him with a copy of the requested documents.

### KA Stan

Plaintiffs note a third gap in the Kadi production concerning KA Stan from 1996 to 2001 and its relationship and transactions with the Saudi High Commission ("SHC") as well as transactions via al Baraka Bank in Turkey.  Similar to Solano above, Plaintiffs allege that there are document gaps in the KA Stan transactions with SHC and most importantly, the financial trail of the funds leaving Bosnia. Plaintiffs contend that the documentary trail shows that SHC offices in Bosnia were under the control of al Qaeda and used KSA funds to contract with a company owned by three non-Bosnians (Kadi, Jelaidan and Ayadi) who were later named as SDGT's for their support to al Qaeda during this period of time.

Kadi's response is to claim that Plaintiffs merely assert that since Kadi owned KA Stan along with two other designated terrorists and took millions from another Saudi entity controlled by al Qaeda, he is branded with "guilt by association." (Opp Br. at 9).  Plaintiffs assert that the whole KA Stan/SHC relationship was used to support al Qaeda and seek records necessary to demonstrate the destination or

6

ultimate beneficiary of the missing funds. Kadi also states that the Plaintiffs "do not provide any evidence that Mr. Kadi does or should possess [the banking records]." Yet there is no denying that KA Stan had bank accounts and that KA Stan made transfers to banks outside of Bosnia and that KA Stan is a Kadi owned company. Mr. Kadi therefore has, or had these records in his custody or within his control. He makes no effort at all to explain why they have not produced KA Stan banking records or the transactions with the al Baraka Bank in Turkey.

Privilege Log

Finally, Kadi asserts privilege defenses to a large number of documents (277) but failed to supply adequate information to evaluate those defenses. Plaintiffs advised Kadi that the log appeared to be overbroad and included documents that from the limited description, did not appear to be covered by a privilege and were ordinary business records, even some of those which included an attorney as one of the document's recipient.[2] Defense counsel reviewed the Kadi log and only changed some of the designations from attorney–client to a work product privilege, and provided one additional document with redactions. There continued to be communications between counsel regarding all outstanding issues, including Kadi's threatened motion to compel (which was not filed) and the topics he raised concerning Plaintiffs productions and extensions of time to file the motions. There was however, not much left to discuss concerning the privilege log that Kadi had reviewed and declined to make any additional production or provide more information on the claimed privileges.

---

[2] On September 6, 2017, Plaintiffs advised "Finally, on the privilege log, all the documents identified were created before September 11, 2001 and were therefore not created in contemplation of the 9/11 terror litigation. The rules protect disclosure of mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation. Even were you to claim that the privilege protects documents created for other unrelated litigation (which we believe would not be protected in the 9/11 terror litigation) we note that a large number of documents do not appear to be created in anticipation of *any* litigation. Many of the documents were not created by or for an attorney and appear to be created in the regular course and scope of business. Those documents are not afforded the work product privilege." Ex. 6

Kadi's opposition makes much out of Plaintiffs motion only identifying 11 out of the 277 documents that should not have been withheld on privilege grounds.  But Plaintiffs made very clear these were *examples of a larger pattern* of an overbroad use of the privilege.   Plaintiffs stated, "approximately one third of all those identified do not appear to be privileged or at a minimum do not provide sufficient information to determine if the privilege is valid and not waived." (Motion to Compel at 16)

For instance, there are 101 documents on the privilege log to or from Mr. Siraj Eldin Abdulbari. Mr. Abdulbari was the Executive Director of Muwafaq Sudan and on the Board of Directors of Rowad Development, the entity in which Bin Laden and al Qaeda held shares.  There are 17 documents on the privilege log to or from Mohamed Bin Mahfouz, an officer of the Muwafaq Foundation in Sudan and Pakistan as well as an officer of Solano Ltd.  (Ex. 5 Solano Corporate Resolution KADI 12126)   It is difficult if not impossible to know if all of these fall under a privilege, or if the disclosure to third parties constituted a waiver. If the document or material was generated in the course of normal business activity but later collected by an employee or agent and sent to Kadi's lawyer, the underlying documents should not suddenly become privileged.  Once Plaintiffs challenged Kadi on his privilege log, either during the meet & confer period, or in his opposition, Kadi had the burden to come forward with additional information to justify the privilege.

Plaintiffs motion identified the categories but admittedly did not list each and every document. The documents on the log that fall short of warranting a privilege are listed in the attached Exhibit 7, and while not individually identified in the opening motion, they were described to Kadi by category.  Kadi has the burden to justify the privilege or make the disclosure in full or with redactions as to each document challenged.

In his opposition, Kadi discusses only the individual documents he listed that Plaintiffs identified as an example of a document that does not, on its face, appear to be privileged.  For example, Kadi after

review, admitted that documents 11, 14-17 were "*incorrectly designated ... as attorney-client communications – they are in fact work product*." (Opp. Br. at 14) He identified them as not transfer of funds orders, but translations of said transactions from Arabic to English challenging the UK government's decision to instruct all financial institutions to freeze Kadi's assets after he was designated a terror supporter. He claims they were to assist his attorney, but they appear to have also been disclosed to UK officials – and therefore would constitute a waiver of any purported privilege.

Similarly, Kadi's opposition identified "Muhammad" as a Kadi business associate who provided information to Kadi and his lawyers in connection with a defamation suit.  Not only did Plaintiffs have no way of knowing this based on the limited information in the log, but only the portion of the communication that conveyed mental impressions, conclusions, opinions, legal theories or work created for litigation would be protected, not the portion that provided the business information that in this case, Kadi has said he no longer has for many of his entities or bank transactions.

Kadi's view of what constitutes 'legal advice' appears to be sweeping.  Even when Kadi's attorney provided regular business instructions to a Kadi employee or agent, to act for Kadi on his investments in the Abrar Group and other entities, Kadi claims since it came from a lawyer it must have contained legal advice.  Assuming that some legal advice was given, only that portion of the communication is privileged, evidence of a transaction with third parties would not be privileged.  See Opp. Br. at 16 discussing logged items 34-35. Similarly, Item 50 concerns real estate transactions, presumably with third parties, yet Kadi argues the "inference" is that the transactions were part of the privileged communication and therefore even the transactions with third parties is privileged.  This is not consistent with the law covering privileges.  Privileged communications can be redacted, but the non-privileged portions of the communication are discoverable.  In his entire list of 277 documents, Kadi relents on only one document – item 100 and released a redacted version while drafting the instant opposition. Opp. Br. at 17.

Item 175 stands out in the Kadi opposition because it discusses the relationship between Muwafaq Sudan's relationship with the Sudanese government – an area discussed above that Plaintiffs sought discovery on with regard to Kadi's Sudanese businesses, banks and the Sudanese government intersection with al Qaeda. Kadi now claims this document instead pertains to his UK defamation suit against *Africa Confidential*. Again, any portion of this document concerning legal issues for that litigation can be redacted, but the other portions should be disclosed. Plaintiffs do not know if this, or any of the other documents that Kadi seeks to secret have incriminating information, but this one is the type of document that at a minimum, should be provided to the Court for an in camera inspection on the privilege.

Attorneys' Fees

Plaintiffs have not and do not seek attorneys' fees and costs for bringing this good faith motion. Kadi however, expects to win and consequently seeks such a sanction. Regardless of who prevails in whole or in part, the motion identified several shortcomings in the Kadi disclosure and Plaintiffs have the right to challenge those shortcomings in good faith. Kadi's opposition does not deny that some documents are missing, rather he contends that he no longer has them and we cannot make him locate or request them, or produce documents he wishes to secrete as confidential, even if they fall into some of the categories where he tacitly concedes have gaps in the production.

Plaintiffs respectfully request the Court order Kadi to request and obtain from third parties documents identified by Plaintiffs that he claims he no longer has and respond to the list of documents Plaintiffs challenge on his privilege log after which, if there continues to be a dispute, produce them to the Court for an *in camera* inspection regarding the privilege. Kadi's cross motion for fees and costs should be denied.

Dated:  February 9, 2018					Respectfully Submitted,

/s/ Andrew J. Maloney, III
James P. Kreindler, Esq.
Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER, LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel: (212) 687-8181

Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel:  (215) 665-2000

Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Tel:  (843) 216-9000

Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 278-1000

Robert M. Kaplan, Esq.
FERBER CHAN ESSNER & COLLER, LLP
60 East 42nd Street, Suite 2050
New York, New York 10165
Tel:  (212) 944-2200

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL DEFENDANT YASIN ABDULLAH KADI TO PROVIDE DOCUMENTS AND TESTIMONY CONCERNING HIS EFFORTS TO RESPOND TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS** was filed electronically this 9th day of February 2018. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which all parties may access.

 /s/ Andrew J. Maloney
Andrew J. Maloney, III, Esq. (AM 8684)