I1IP9111

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re:  Terrorist Attacks on
    September 11, 2001
4
                                        03 MD 1570 (GBD)
5   ------------------------------x
                                        New York, N.Y.
6                                       January 18, 2018
                                        10:08 a.m.
7
    Before:
8
                        HON. GEORGE B. DANIELS,
9                                       District Judge
                                -and-
10
                        HON. SARAH NETBURN,
11                                      Magistrate Judge

12                          APPEARANCES

13  COZEN O'CONNOR
         Attorneys for Federal Insurance Plaintiffs
14  BY:  STEPHEN A. COZEN
         SEAN P. CARTER
15       J. SCOTT TARBUTTON

16  MOTLEY RICE, LLP
         Attorneys for PE
17  BY:  ROBERT T. HAEFELE
         JODI W. FLOWERS
18
    KREINDLER & KREINDLER LLP
19       Attorneys for Ashton Plaintiffs
    BY:  JAMES P. KREINDLER
20       ANDREW J. MALONEY, III
         STEVEN R. POUNIAN
21       JUSTIN T. GREEN
         MEGAN W. BENETT
22       JOHN M. QUINN

23  ANDERSON KILL P.C.
         Attorneys for O'Neill Plaintiffs
24  BY:  JERRY S. GOLDMAN
         ROBERT M. HORKOVICH
25       BRUCE STRONG
         KANISHKA AGARWALA

I1IP9111

                              APPEARANCES (cont'd)

KELLOGG, HUBER, HANSEN, TODD EVANS & FIGEL P.L.L.C.
        Attorneys for Defendant Kingdom of Saudi Arabia
BY:  MICHAEL K. KELLOGG
        GREGORY G. RAPAWY
        BENJAMIN D. MARGO

ROBBINS, RUSSELL, ENGLERT, ORSECK UNTEREINER & SAUBER LLP
        Attorneys for Defendant Saudi High Commission
        for Relief of Bosnia & Herzegovina
BY:  ROY T. ENGLERT, JR.
        LUKMAN AZEEZ

WHITE & CASE, LLP
        Attorneys for Defendant Al Rajhi Bank
BY:  CHRISTOPHER M. CURRAN
        NICOLE ERB
        REUBEN J. SEQUEIRA
        NICOLLE KOWNACKI

SQUIRE PATTON BOGGS (US) LLP (DC)
        Attorneys for Defendant National Commercial Bank
BY:  MITCHELL R. BERGER
        ALAN T. DICKEY
        ALEXANDRA E. CHOPIN

JONES DAY (DC)
        Attorneys for Defendant Saudi Binladin Group
BY:  JAMES E. GAUCH
        ESHA MANKODI
        MARK KUBISCH

I1IP9111

1          (Case called)

2          MR. CARTER:  Good morning, your Honors.  This is Sean

3    Carter, Cozen, O'Connor, on behalf of the plaintiffs' executive

4    committee.

5          JUDGE DANIELS:  Good morning.

6          MR. KREINDLER:  Good morning, your Honors.  Jim

7    Kreindler on behalf of the plaintiffs' executive committee and

8    the Ashton plaintiffs.  I'd like to introduce my partner, Steve

9    Pounian.  Steve and I have worked together for 35 years

10   representing victims, and Steve will be speaking to you on

11   behalf of the Ashton plaintiffs.

12         JUDGE DANIELS:  Good morning.

13         MR. PUNION:  Steve Pounian, your Honor, for Kreindler

14   and Kreindler.

15         JUDGE DANIELS:  Good morning.

16         MS. FLOWERS:  Good morning, your Honors.  Jodi Flowers

17   on behalf of the plaintiffs' executive committee and the

18   primary Burnett plaintiffs, many of whom are with us here in

19   the room today.  I just want to take a moment to welcome them

20   all and thank them for being here.  And thank the Court and

21   Court staff for opening up the extra courtrooms.

22         JUDGE DANIELS:  Good morning.

23         MR. MALONEY:  Good morning, your Honors.  Andrew

24   Maloney for the Ashton plaintiffs and liaison counsel for the

25   PEC.

I1IP9111

1          JUDGE DANIELS:  Good morning.

2          MR. GOLDMAN:  Good morning.  Jerry Goldman for the PEC

3    and the O'Neill plaintiffs, the putative class and

4    approximately 300 other families.

5          JUDGE DANIELS:  Good morning.

6          MR. COZEN:  Steve Cozen, Cozen, O'Connor, for the

7    plaintiffs' executive committee, your Honors.

8          JUDGE DANIELS:  Good morning.

9          MR. STRONG:  Bruce Strong from Anderson Kill on behalf

10   the PEC, the O'Neill plaintiffs and the putative class.

11         JUDGE DANIELS:  Good morning.

12         MR. HAEFELE:  Your Honors, Robert Haefele from Motley

13   Rice here for the Burnett plaintiffs and the plaintiffs'

14   executive committee.

15         MR. TARBUTTON:  Good morning, your Honors.  Scott

16   Tarbutton from Cozen, O'Connor for the PEC.

17         JUDGE DANIELS:  Morning.

18         MR. KELLOGG:  Morning, your Honors.  Michael Kellogg

19   on behalf of Saudi Arabia.

20         JUDGE DANIELS:  Morning.

21         MR. RAPAWY:  Good morning, your Honors.  Gregory

22   Rapawy, also for Saudi Arabia.

23         JUDGE DANIELS:  Morning.

24         MR. ENGLERT:  Good morning, your Honors. Roy Englert

25   on behalf of the Saudi High Commission for Relief of Bosnia and

I1IP9111

Herzegovina.

JUDGE DANIELS:  Morning.

MR. AZEEZ:  Good morning, your Honors Lukman Azeez for the Saudi High Commission for Relief of Bosnia and Herzegovina.

JUDGE DANIELS:  Good morning.

So, Mr. Kellogg, am I going to hear from you first?

MR. KELLOGG:  Yes, your Honor.  Thank you, Judge Daniels, Magistrate Judge Netburn.  May it please the Court. At the Court's request, I prepared a binder of materials to which I'll be referring.  With the Court's permission, I'll hand up copies of those.

JUDGE DANIELS:  Hand them to my law clerk.

MR. KELLOGG:  I have only one main point that I want to make this morning, and that is neither JASTA nor plaintiffs' additions to the record, has done anything to call into question the correctness of this Court's 2015 decision dismissing the allegations against Saudi Arabia for lack of subject matter jurisdiction.

The Court in that ruling made three core holdings: First, that plaintiffs had failed to properly allege or present evidence that any individuals acting within the scope of their employment for Saudi Arabia had purposely aided the hijackers.

Second, that plaintiffs failed to properly allege or present evidence that any of those charities that plaintiffs have accused of aiding Al Qaeda were alter egos of Saudi

I1IP9111

1    Arabia.

2            And, third, that plaintiffs were not entitled to

3    jurisdictional discovery because they had failed to put forward

4    a prima facie case that the Court had jurisdiction or to

5    identify any relevant disputed issue on which discovery would

6    make plaintiffs, or the Court, more knowledgeability.

7            All three of those conclusions are equally valid

8    today.  JASTA, of course, created a new exception to sovereign

9    immunity.  There is no whole tort requirement, there's no

10   discretionary function exception, and theres no requirement

11   that the defendant be designated as a state-sponsored

12   terrorist.

13           So one might have expected that, on remand, the

14   plaintiffs would introduce record evidence designed to take

15   advantage of those changes in the statute by, for example,

16   focusing on actions outside the United States taken by Saudi

17   employees, or by introducing direct evidence of Saudi

18   involvement in the 9/11 attacks, or at least identifying

19   specific factual disputes that might be resolved through

20   targeted jurisdiction discovery.  And, yet, they have done none

21   of those things.

22           Instead, they have doubled down on the allegations and

23   the record materials that this Court rightly found inadequate

24   the last time around.  Their whole pitch seems to be that JASTA

25   itself is enough to get them over the line and to establish

I1IP9111

1    jurisdiction, but that is clearly not the case.  The

2    requirements for JASTA's new exception are clear from its text,

3    which is set out in Tab 1 of the binder that I provided, and it

4    focuses on three requirements.  This is in 1605B(b)(2).

5         First, there has to be an act committed by the foreign

6    state or by an official or employee or agent of the foreign

7    state while acting within the scope of his or her office,

8    employment or agency.  Now, as individuals, that is the same

9    test the Court previously applied in dismissing allegations

10   about Bayoumi and others because their alleged actions were not

11   within the scope of employment.

12        And as to charities, it's the same test under the

13   Bancec line of cases, which say that day-to-day control is

14   needed to establish a principal-agent relation with an agency

15   or instrumentality.

16        Now, the second requirement of the new JASTA exception

17   is that the act must be tortious.  For present purposes, that

18   comes down to an act of providing material support for the

19   terrorist organization that perpetrated the 9/11 attacks, and

20   that support, as this Court and the Court of Appeals have held,

21   must be provided with knowledge or deliberate indifference to

22   the commission of the terrorist acts.  And the third

23   requirement of JASTA is that the injuries for which the

24   plaintiffs seek relief must be caused by the act.

25        All three of these elements have to be established

I1IP9111

1   before the Court asserts jurisdiction.  That is the teaching of

2   the recent Supreme Court in Helmerich & Payne case, that the

3   jurisdictional requirements must be met in advance of the

4   exercise of jurisdiction.  And it is as true today as it was

5   three years ago, that plaintiffs cannot meet that burden.

6          It's important to recognize that JASTA did not change

7   the procedural framework for FSIA cases, which the Second

8   Circuit has affirmed, even in cases since the Court's last

9   ruling, plaintiffs must make plausible, concrete allegations

10  and come forward with competent evidence to establish an

11  exception to immunity.  Conclusions, speculation, hearsay are

12  not enough, even if so-called experts endorse them.  That's

13  clear under the older Second Circuit cases, like Virtual

14  Counties, Robinson v. Malaysia, as well as the more recent

15  cases of Arch Trading and Vera.

16         The plaintiffs have submitted 4,000 pages of materials

17  to this Court, but there are no significant facts or evidence

18  in those materials.  They're largely the same allegations that

19  the Court saw the last time, and they still rest on allegations

20  rejected by the 9/11 Commission, by the FBI, by the CIA and by

21  the 9/11 Review Commission.

22         So with the Court's permission, I'm going to talk

23  briefly about the record, the admissible and the inadmissible

24  material, explain why the evidence and the allegations against

25  the individuals are insufficient, and then do the same for the

I1IP9111

1    allegations in evidence about the charities.  And I'll finish

2    with a discussion of why jurisdictional discovery is not

3    warranted.

4              The only significant items of admissible evidence

5    before the Court are the final reports of the 9/11 Commission,

6    the FBI and the CIA report and the 9/11 Review Commission

7    report.  Under Federal Rule of Evidence 803(8)(A)(iii), those

8    reports are admissible as evidence if the findings are true

9    because they are, quote, records or statements of public

10   offices that set out factual findings from legally authorized

11   investigations.

12             Each of those investigations was legally authorized.

13   They set out their factual findings based on exhaustive review

14   of the evidence.  The reports are presumably trustworthy, and

15   it would be the plaintiffs' burden to show otherwise.  The

16   consolidated amended complaint, the plaintiffs have made no

17   effort to show they are not trustworthy.  In fact, they relied

18   on them themselves.  The Ashton plaintiffs have not, in a

19   serious way, tried to attack the credibility of either the

20   Commission, the FBI, the CIA or the 9/11 Review Commission.

21             So I'd like, if I may, to walk through some of the key

22   findings.  First, with the 9/11 Commission report, which is at

23   Tab 2 of your binder.  This was in July of 2004, and among the

24   key findings of the Commission are that there was, quote, no

25   evidence that the Saudi government, as an institution, or

I1IP9111

senior Saudi officials individually funded Al Qaeda, and there
was no evidence that any foreign government, or foreign
government official, supplied any funding for the 9/11 plot
itself.

          As to individuals, the Commission found no credible
evidence that Omar al Bayoumi or Thumairy or Basnan engaged in
any activity -- knowing activity within the scope of their
employment to aid the 9/11 attacks.

          JUDGE DANIELS:  Well, those are the conclusionary
determinations.  The two of you seem to be arguing past each
other on this issue.  Those conclusions are based on facts --

          MR. KELLOGG:  Correct.

          JUDGE DANIELS:  -- or lack of facts.  So the question
really is, given the facts that they want to attempt to allege,
and the conduct and the actions by these individuals and by
officials of Saudi Arabia, what facts do you say that they
allege that the report finds that those facts are not plausible
or true?

          MR. KELLOGG:  Well, they don't actually allege facts
Bayoumi, Thumairy, Basnan and the other.  They make a number of
conclusionary allegations.  For example --

          JUDGE DANIELS:  Well, they do have some facts.  They
start with basic facts.  They say that they were at the same
place at the same time in California.

          MR. KELLOGG:  Right.

I1IP9111

1          JUDGE DANIELS:  Now, whether that is strong or weak

2     evidence to support their claim, those kinds of facts are the

3     facts that will either lead to the conclusion that there is

4     sufficient evidence of involvement, or lead to the conclusion

5     that those facts, whether they're either not true or those

6     facts, even if true, do not support a plausible claim for

7     liability.

8          So I'm not quite sure what I'm supposed to do with the

9     report's ultimate conclusion, as opposed to the facts that both

10    sides are arguing about as to whether or not they are to be

11    accepted, not accepted, and whether or not they're sufficient,

12    too weak still for this Court to independently reach those

13    conclusions.

14         MR. KELLOGG:  Understood, your Honor.  First, I would

15    point out that the Supreme Court in the Beech Aircraft decision

16    made it clear that conclusions and opinions are admissible in

17    the context of a trustworthy investigative report.  In other

18    words, the findings and conclusions that the 9/11 Commission

19    are acceptable as evidence.

20         JUDGE DANIELS:  But they're not determinative.

21         MR. KELLOGG:  They are not determinative.  Certainly

22    if the plaintiffs were to come forward with additional evidence

23    not before the 9/11 Commission that show the contrary, then

24    they are free to do that.  Our point is that they have not done

25    that.  They have concluded conclusionary allegations, for

I1IP9111

1   example, about Bayoumi, that he was an employee of Saudi Arabia

2   tasked with aiding the hijackers, knowing that they were

3   planning to commit some sort of terrorist attack in the United

4   States.  They have absolutely nothing in the way of evidence to

5   support that.

6          JUDGE DANIELS:  All right.

7          MR. KELLOGG:  As I noted, the burden of persuasion

8   under JASTA has not changed.  They have the obligation to come

9   forward with concrete, specific, not conclusionary, allegations

10  and supporting those allegations with evidence.

11         Now, the 9/11 Commission looked at all of that.  They

12  relied on 2.5 million documents.  They interviewed more than

13  1,200 people, and they were culling an FBI investigation that

14  explored 500,000 leads and conducted 167,000 interviews.  So

15  when the 9/11 Commission says we've got no evidence, we found

16  no evidence that Bayoumi was a supporter of radical terrorism

17  or that he did anything to aid the hijackers in support of the

18  attacks, that is very powerful evidence for this Court.

19         And plaintiffs have come back with nothing on the

20  other side, aside from generalized allegations and so-called

21  expert reports that are really just conduits for hearsay from

22  preliminary materials that do not constitute evidence before

23  this Court.

24         I can walk through the same allegations for Thumairy,

25  for Basnan, for each of the eight individuals, and I will, in

I1IP9111

fact, walk through those.  But I would like to stress that the

9/11 Commission report, including its conclusions, certainly

its narrative summary but including its conclusions is

legitimate evidence before this Court.

          And the same holds true of the FBI/CIA report because

there was some matters that the 9/11 Commission asked the FBI

to conduct further investigation, which they did.  And the FBI

came back the following year, the FBI and the CIA, with their

own report saying that there was no evidence that the Saudi

government knowingly provided support for the attacks on

September 11, 2001, or had foreknowledge of the terrorist

operations.

          Again, given the exhaustive nature of the inquiry, the

fact that they found no evidence is quite compelling evidence

in and of itself.

          JUDGE DANIELS:  Well, finding no evidence is not as

compelling as a finding of contrary evidence.

          MR. KELLOGG:  Well, your Honor, philosophers will say

you can't prove a negative.

          JUDGE DANIELS:  You can prove a negative.  I don't

agree with that.  You can prove a negative.  If someone said

that you were in California today, I can prove that negative.

          MR. KELLOGG:  Correct.

          JUDGE DANIELS:  So I'm not sure what you mean by that.

          MR. KELLOGG:  For example, they're alleging, without

I1IP9111

1    any basis for doing so, that Bayoumi -- if you recall, last

2    time around they claimed he was an agent of Saudi intelligence.

3    Now they're claiming he's an agent of the Administrative

4    Islamic Affairs.  They have absolutely zero evidence to support

5    that.

6            JUDGE DANIELS:  But I don't have any specific factual

7    analysis in the report on that particular point.

8            MR. KELLOGG:  Oh, you do, actually, because they go

9    through Bayoumi's history in the narrative, and they explain

10   that he was a student studying there.  He had been an employee

11   of the Department of Civil Aviation in Saudi Arabia.  He was

12   then seconded to Dallah Avco in the United States.  His salary

13   was still paid indirectly by the Civil Aviation to allow him to

14   pursue his studies in California, and that that's what he was

15   doing.  And --

16           JUDGE DANIELS:  Well, that would be true whether or

17   not he isn't otherwise an agent for the Saudi government.

18           MR. KELLOGG:  Right, but the plaintiffs have the

19   obligation to come forward with concrete evidence to support

20   that allegation.

21           JUDGE DANIELS:  Well, that seems to be the more

22   important point.  I mean, in most of these factual

23   determinations, I don't hear you saying that you're identifying

24   in the report contrary evidence to refute their allegations.

25   You're pointing to a lack of evidence in the report to support

I1IP9111

1       such an allegation.

2             MR. KELLOGG:  Well, I don't want to quibble, but I'm

3       really doing both.  I'm saying that the evidence they gathered

4       indicated that Bayoumi was not an intelligence agent.  They

5       even concluded that he was an unlikely candidate for Islamic

6       extremism, that he was pursuing studies, that he was not a

7       witting helper of the hijackers.  Those are affirmative

8       findings by the 9/11 Commission, which were then repeated by

9       the FBI/CIA report in 2005.

10            And then the 9/11 Review Commission, in March of 2015,

11      again reviewed all of the evidence since that time to see if

12      anything changed and, again, said that Bayoumi, Thumairy did

13      not provide witting assistance.  They were not tasked to help

14      the hijackers and that, again, that Saudi Arabia was not either

15      funded directly nor indirectly the attacks.  So I think we do

16      have positive evidence, and the fact that they have zero

17      evidence on the other side, zero admissible evidence, ought to

18      be dispositive.

19            JUDGE DANIELS:  Well, I'm not sure that it is a

20      distinction to be drawn, but it seems to me that saying that

21      they found no evidence is a little different than saying that

22      there's evidence that it is not the case.

23            MR. KELLOGG:  Well, your Honor, given the exhaustive

24      nature of the investigation, given the fact that they stated a

25      number of their findings in affirmative terms, i.e. that

I1IP9111

1    Bayoumi was an unlikely candidate for clandestine activity,

2    that he was a student, that he did not wittingly assist the

3    hijackers.

4              JUDGE DANIELS:  Those are conclusionary statements.

5    That he did not wittingly assist the hijackers, that's based on

6    facts; that is not a fact.  That is a conclusion.

7              MR. KELLOGG:  It is a conclusion drawn after an

8    exhaustive review of the facts, which I think, under Beech

9    Aircraft is considered a legitimate source of evidence before

10   the Court.

11             JUDGE DANIELS:  Sure.  But when you say it's based on

12   exhaustive facts, well, those facts are what I think we ought

13   to be discussing, you know, not the conclusion.  But what are

14   the facts on which they claim that the evidence demonstrates

15   that he was an unwitting participant?

16             MR. KELLOGG:  All right.  Why don't I walk through the

17   specifics of the eight individuals that they allege were agents

18   of Saudi Arabia, supporting the attack.  There are eight of

19   them.

20             Four of them were already considered by this Court in

21   its prior opinion, and only one of them, Fakihi, is affected at

22   all by JASTA because he was outside of the country in Germany.

23             So the first two al Bayoumi and al Thumairy are the

24   main focus, as they were in the past.  This Court, as I noted,

25   has already rejected the substance of plaintiffs' allegations

I1IP9111

1    about al Bayoumi, and the same allegations, as I noted, were

2    considered and rejected by the Commission, the FBI, the CIA and

3    the 9/11 Review.  And the only attempt to come up with

4    something new about al Bayoumi is from supporting affidavits

5    and opinions of former FBI agents and from Senator Graham.

6         You'll recall Senator Graham put in a declaration the

7    last time and the Court said, rightly, that that was not

8    evidence.  It was just his opinion, and he's entitled to

9    disagree with the 9/11 Commission, but his personal agreement

10   or disagreement is not relevant evidence.  And the same is true

11   of the various FBI reports and declarations, where they take

12   issue -- they were part of the investigation, but they take

13   issue with the ultimate conclusions.  Their decisions or their

14   beliefs do not constitute evidence.

15        Take, for example, Agent Moore, he does not claim to

16   be a percipient witness of any of the issues he discusses.  He

17   does not claim to be an expert on terrorism, he's simply

18   stating his personal beliefs, which do not constitute evidence

19   before this Court.

20        JUDGE DANIELS:  Well, how is that different than your

21   reliance on the Commission?

22        MR. KELLOGG:  Oh, there's a very strong difference

23   because the Commission report is the finding of a -- formal

24   findings of a commission that was charged to investigate and

25   report on the matter.

I1IP9111

1          JUDGE DANIELS:  As opposed to the finding of an FBI

2     agent who individually did the investigation?

3          MR. KELLOGG:  No, because the individual FBI agent,

4     who's relying, for example, on interview memos or preliminary

5     investigation memoranda, which the Second Circuit has made

6     clear are not admissible materials because they are hearsay in

7     the City of *New York v. Fulman* case and other cases we cite in

8     our reply brief at 17 and 18, such materials are not considered

9     admissible and that's true, for example, of the 28 pages from

10    the joint inquiry, which is the only new material that was

11    declassified after this Court's decision.

12         JUDGE DANIELS:  But isn't that primarily the evidence

13    that the commissions relied upon, those investigations and

14    reports by federal agencies?

15         MR. KELLOGG:  The joint inquiry of 2002, which was

16    very close after the 9/11 attacks, was an attempt to gather a

17    summary --

18         JUDGE DANIELS:  Right.

19         MR. KELLOGG:  -- of the various investigative leads

20    being followed up.

21         JUDGE DANIELS:  Including FBI investigations and FBI

22    reports that you say independently should not be relied on.

23         MR. KELLOGG:  Well, I'm saying that the joint inquiry

24    report does not contain formal findings.  In fact, they

25    specifically disclaim that.  At 4, 16 they say the joint

I1IP9111

1     inquiries did not attempt to investigate and assess the

2     accuracy of this information independently.  Instead, the joint

3     inquiry referred the information it uncovered to the FBI and

4     the CIA for further investigation.

5             Then they stress it should be clear that the joint

6     inquiry has made no findings or determination as to the

7     reliability or sufficiency of the information regarding these

8     issues.  Then they say it's possible that further investigation

9     could reveal more data.  And, in fact, that's what happened

10    because they kicked this to the 9/11 Commission, and they

11    kicked this to the FBI and the CIA, who issued their report.

12    And the result of their findings was that there was not an

13    adequate basis for suggesting that Bayoumi, Thumairy, Basnan

14    and the others had any witting role in the 9/11 case.

15            JUDGE DANIELS:  What I'm trying to concentrate on is

16    what do you say that the 9/11 Commission had that the other

17    investigative bodies or entities didn't have that you say is

18    compelling to rely separately on the Commission's ultimate

19    approval.

20            MR. KELLOGG:  Obviously, they had access to most of

21    these same materials.

22            JUDGE DANIELS:  Right.

23            MR. KELLOGG:  And my point is that investigative

24    memoranda, where an agent goes and says I went and spoke with

25    such and such a person who said he thought that Bayoumi was a

I1IP9111

1   spy.

2           JUDGE DANIELS:  Right.

3           MR. KELLOGG:  That is not, in itself, evidence.

4           JUDGE DANIELS:  But if the Commission relies on a

5   conclusion by an agent who said, I find that he wasn't a spy,

6   why is the Commission's conclusion, based on that same type of

7   evidence, somehow more compelling?

8           MR. KELLOGG:  Well, it is because the 9/11 Commission

9   was specifically charged with taking all of this mass of

10  material and trying to make sense of it and draw reasonable

11  conclusions from it.  It was not part of the individual FBI

12  agent's job to issue findings or draw conclusions.  There were

13  thousands of FBI agents all over this case.  As I said, they

14  interviewed 167,000 people.  They followed more than half a

15  million leads.  You can imagine that, among these thousands of

16  agents, lots of them had their own views.

17          But the point is, under the federal rules of evidence,

18  that when a body is charged with sorting through this material

19  and reaching formal findings and conclusions, as the 9/11

20  Commission did, as the FBI and the CIA did and as the 9/11

21  Review Commission did, that those are to be given special

22  weight in court that a mere hearsay memoranda reporting a

23  single, isolated interview does not.

24          JUDGE DANIELS:  Well, again, it depends on what those

25  findings are based on, and I'm sure you're not arguing that

I1IP9111

1    those findings are determinative.

2            MR. KELLOGG:  I'm not arguing that they're

3    determinative, but I am arguing that they're evidence.  And I'm

4    also arguing that the plaintiffs have no admissible evidence to

5    set against those findings.  And, frankly, that itself is

6    enough to defeat their case because they have the burden of

7    coming forward with actual evidence to show that the JASTA

8    requirements have been met, to show that somebody, acting

9    within the scope of their employment, committed a tort of

10   aiding and abetting the hijackers, and they cannot do that.

11   They could not do that three years ago when this Court reviewed

12   the record, and nothing that they've added since then can do

13   so.

14           You know, the only thing really that they've added

15   about Bayoumi -- there's two things I should mention, what's

16   called the Florida Bulldog memorandum, which was a 2012 -- I

17   believe it was 2012 document.  It was a status update of the

18   ongoing investigation from an FBI agent.  It described what

19   they, quote, sought to prove, which, of course, is not an

20   indication that they have proved it, but it's seeking to prove

21   and not evidence of anything itself.

22           And in that memorandum, they suggest that some unknown

23   person, who is redacted, who tasked Thumairy and Bayoumi with

24   helping the hijackers.  Well, the 9/11 Commission considered

25   that, but nonetheless concluded, based on the full

I1IP9111

investigation, that al Thumairy and al Bayoumi did not aid the
hijackers, and there was no unknown person who tasked them to
do so.

          Now, they get an FBI agent, former FBI agent, to say,
well, I see that redacted tasked them, my conclusion is that
whoever tasked them must have been a Saudi agent.  He must have
been doing it on behalf of the Saudi government and, therefore,
the Saudi government is responsible for the 9/11 attacks.
Well, that's just utter nonsense.  That chain of reasoning does
not follow at all.  The fact that they can find a former FBI
agent to endorse that chain of reason has no bearing on this
case at all.

          Indeed, on Bayoumi, really aside from the Florida
Bulldog memo, what they add is two FBI agents talking about
spycraft and tradecraft, and suggesting that everything Bayoumi
did was suspicious, including taking occasional trips home,
going to the embassy to get his passport -- his visa renewed
and stopping to get his photo taken for a passport photo before
doing so.

          One of them says, well, he got lost on the way to the
restaurant where he was meeting the hijackers, and the other
said, no, he was doing a surveillance detection unit.  One of
them says, oh, he didn't call the embassy very often;
therefore, he was engaging in spycraft, which means that he
didn't want to expose his contacts with the embassy.  The other

I1IP9111

said he called the embassy a bunch of times; that shows that he was a covert agent.

None of this stuff constitutes proper, legitimate evidence of any wrongdoing by any of these individuals, much less that they were doing something pursuant to instructions from Saudi Arabia as part of the scope of their employment.

Now, I said, as I noted, they shifted now and said, rather than saying Bayoumi was an intelligence agent, they said he was a member of the ministry of Islamic affairs.  And, really, you know, plaintiffs are repeatedly trying to paint Islam itself as a form of terrorism.  There are about two million Muslims in the world who peacefully follow their faith, and plaintiffs are constantly throwing disparaging references to Wahhabism and Dawah organizations and radical Islam, and the attempt to draw inferences from Islamic missionary work, the building of mosques, the provision of Qur'ans to terrorism, and that is not evidence and it's not proper in this court.

For example, Mr. Rockford really substitutes vitreal for evidence, where Bayoumi is concerned.  He says, quote, at Page 19 of his affidavit:  Thumairy and Bayoumi were steeped in the jihadist violence and anti-American Wahhabist agenda, the ministry of Islamic affairs is dedicated to advance globally."  He has no basis for saying that.  He's not an expert in Islam or the ministry of foreign affairs.

Saudi Arabia publicly condemned and said that Islamic

I1IP9111

1  law precludes terrorism long before the 9/11 attacks.  They had

2  expelled Osama bin Laden in 1994 from the Kingdom and revoked

3  his passport.  They, themselves, were the victims of Al Qaeda

4  attacks starting in 1995.  The idea that Saudi Arabia was

5  endorsing Islamic terrorism by Al Qaeda has no basis in this

6  record whatsoever.

7          The allegations against Thumairy are also

8  conclusionary and stand substantially on the allegations

9  against Bayoumi.  They really don't have anything, other than

10  he was an imam, he worked for the Ministry of Islamic Affairs,

11  and he met with Bayoumi.  And from that, they draw the story

12  that we now have evidence that he aided and abetted

13  deliberately the 9/11 attacks.

14          A third individual is Basnan, Osama Basnan.  They have

15  nothing to indicate that he's an employee of Saudi Arabia at

16  all, nothing that he did to help the hijackers, and no material

17  change from the record that was before this Court the last

18  time.  Again, their FBI agent, Rockford, says, at 21:  In my

19  professional opinion, Basnan played, quote, some as yet

20  unidentified role in the 9/11 attacks.  That's evidence?  That

21  kind of speculation, without any concrete details to back it

22  up?

23          The Court rightly dismissed all three of those the

24  last time, as it did with Saleh Al Hussayen, where again,

25  there's no plausible allegation that he was an official of

I1IP9111

Saudi Arabia at all.  They cite one report indicating that he

became a minister sometime after the 9/11 attacks, but at the

time of the 9/11 attacks, there's no indication that he did

anything to help the hijackers.

All they rely on is two newspaper articles that they

claim show he changed hotels to stay with the hijackers the

night before the 9/11 attacks.  But those newspaper articles

don't even say that, and none of their experts discuss -- their

so-called experts even discuss Hussayen.

The fifth and the sixth are Al Qudhaieen and Al

Shalawi, who they claim conducted a dry run of the 2001 attacks

back in 1999 when one of them tried to open the door to the

cockpit, and they were questioned by the FBI.  The FBI, there's

at least one place, speculated that it might have been a dry

run for the 9/11 attacks.  But there's no allegation that they

were employed by Saudi Arabia in any capacity.  They were

students.  They had a stipend to study over here, and they were

headed to a conference sponsored by Saudi Arabia.  But there's

no indication that they had any employee relations.  And the

dry run speculation was known to and investigated by the 9/11

Commission.  It's dealt with in the 9/11 report at 521, note

60, but it never went anywhere.  There's no basis on which

that's been developed.

So the seventh is the one in Germany, in Frankfort,

Mohammed Jabar Fakihi.  He was a payroll accountant at the

I1IP9111

embassy in Germany, whose job it was to write checks, and they claimed that he's alleged to have diverted funds to suspect charities.  The allegations are wholly conclusory.  There's no allegation even that the fund transfer happened before the 9/11 attacks, and there's no allegation that even if he did divert any funds, that that was within the scope of his duties at the embassy.

So, finally, there's Omar Abdi Mohamed, who's not a defendant here.  Neither are the two supposed dry run hijackers defendants here.  The consolidated amended complaint don't even mention him in their opposition brief.  The Ashton plaintiffs do so only very briefly.  They accuse him of money laundering, but he was not charged with any such thing.  He was charged with visa fraud because he didn't explain, disclose that he was paid by Saudi Arabia to act as a propagator of Islamic beliefs, that is a missionary.

But the allegations that he was a money launderer are based solely on an allegation that he once transferred money using Dahab Shil, which is a legitimate money transfer service that is also allegedly used by Al Qaeda members.  And so the contention is that sending money through Dahab Shil supports an inference of sending money to Al Qaeda, which does not follow at all.  It's completely unsupported in the record.

So those are the eight individuals that they claim were agents of Saudi Arabia, employees of Saudi Arabia, who

I1IP9111

1    within the scope of their employment aided and abetted the 9/11

2    attacks.  To repeat, there is simply no evidence to support

3    that.  Whatever allegations they have are wholly conclusionary

4    and based on inadmissible materials.

5            So I'll turn, if I might, to the charities.  There's

6    seven main charities named in the two complaints as purported

7    alter egos of Saudi Arabia that supposedly funded Al Qaeda.

8    The Court dealt with these issues before and found no evidence,

9    no support for the allegations that these were alter ego of the

10   Kingdom under the Bancec test line of cases, which has been

11   further fortified by the Second Circuit in more recent Arch

12   Trading case and the Vera case.

13           So they have five different theories now as to why

14   Saudi Arabia is responsible for the actions of the charities,

15   but despite the multiplication of theories, the real governing

16   standard here is the same one that the Court applied the last

17   time, the Bancec day-to-day controls and the relevant

18   allegations have not significantly changed.

19           This Court previously rejected the declaration of Evan

20   Coleman, who pulled together a lot of hearsay and general

21   allegations about these charities, and then purported to

22   conclude that they were alter egos of the Kingdom.  And the

23   Court found that the material was unreliable, duplicative,

24   inadmissible and did not support that conclusion.

25           He's put in a new affidavit.  It's a little longer.

I1IP9111

 1    It's basically the same, a lot of these same recycled materials

 2    with additional conclusions about control.  And we've shown you

 3    detail in our reply brief that the allegations are not

 4    materially different from what the Court heard the last time.

 5            So plaintiffs' first theory is the day-to-day control,

 6    which they have not supported.  The second theory is that they

 7    were agents of Saudi Arabia under the agency standard

 8    incorporated in JASTA, but that's legally incorrect because

 9    Bancec itself incorporated an agency standard that in common

10    law calling corporate subsidiary an agent of a parent company

11    requires the same showing to pierce the corporate veil, and

12    Bancec takes that principle and applies it to governmental

13    agencies and instrumentalities, as does the Second Circuit in

14    EM Limited and the Arch Trading case.

15            Plaintiffs' theory is also factually wrong because

16    even if they say the charity was an agent, they can't point to

17    anything, authorization by Saudi Arabia to the charities or the

18    charities to support charities on their behalf, which is what

19    they would have to show under an agency theory.

20            The third theory is that the charities are performing

21    core functions of the Saudi state, and again, we're sort of

22    back to the attacks in Islam.  Kingdom of Saudi Arabia is an

23    Islamic state and religion is very important to them.  They do

24    promote Islam.  They do build mosques.  They do send out

25    Qur'ans, et cetera, but to call alleged charities who are

I1IP9111

1    diverting money to Al Qaeda so that it can attack the United

2    States and the Kingdom itself, of course, that that is a core

3    function of the State relies on a serious misreading of the

4    Second Circuit's decision in the Garb case, which involved the

5    Polish ministry of the treasury.

6            Garb was based on findings that the treasury didn't

7    hold properly separately from the Polish state, that it was an

8    arm of the Polish state.  It did not announce some

9    freestanding, freewheeling core function that would apply to,

10   for example, religious propagation.

11           Plaintiffs' fourth theory, which contradicts their

12   other, is that the charities themselves were Al Qaeda fronts;

13   so that giving money to them was the same thing as giving it to

14   Al Qaeda.  That theory was not fairly raised in the

15   consolidated amended complaint.  Regardless, the assertion that

16   they were Al Qaeda fronts is completely inconsistent with the

17   argument that the charities are agencies and instrumentalities

18   of Saudi Arabia, much less alter egos and agents.

19           And there is no basis -- if I may repeat, the 9/11

20   Commission's findings that there is no reason to believe that

21   Saudi Arabia directly supported Al Qaeda generally or the 9/11

22   attacks in particular, and plaintiffs have come up with no

23   information to the contrary.

24           So their fifth and last theories is that because the

25   charities were headed by Saudi officials, that means everything

I1IP9111

1    they did was acting on behalf of Saudi Arabia including when

2    they purportedly diverted funds to Al Qaeda.  There's no

3    plausible evidence or allegations where Saudi Arabian officials

4    were involved in any of the alleged diversion of funds to Al

5    Qaeda.

6            So even if some of these charities did divert funds,

7    there is no evidence or allegations that would attribute that

8    to the Kingdom itself.  Even if some isolated official was

9    responsible at a charity for diverting funds, there's no

10   relevant allegations or admissible evidence that that was

11   acting within the scope of their employment or agency on behalf

12   of Al Qaeda.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I1Is9112

1              MR. KELLOGG:  I walked through the individuals.  I

2    walked through the charities.  Now I want to discuss why there

3    is no basis for jurisdiction of discovery as this court

4    concluded the last time.

5              What the court explained is that plaintiffs had not

6    established the prima facie case.  That has not changed.  This

7    court also stated at the last hearing that plaintiffs had not

8    shown that they would likely find anything that the 9/11

9    Commission had missed or that would otherwise establish

10   jurisdiction.  That has not changed either.  If anything, the

11   law on this has gotten even stronger, and the limited case in

12   the Second Circuit said, before you even get jurisdictional

13   discovery, you must show a reasonable basis for assuming

14   jurisdiction, and this is evident in arts training, a

15   nonspeculative reason for believing that discovery would reveal

16   "details that would establish jurisdiction."  They have done

17   none of that.

18             The last time, of course, they didn't really ask for

19   any discovery except in a single footnote.  They said if there

20   are any issues that facts were disputable, please give us

21   discovery.  They have gone to the opposite extreme this time

22   and asked for everything possible in lengthy requests for

23   documents in other words.

24             They basically have asked for documents on every

25   possible topic for discovery covering every Saudi Arabian

I1Is9112

1    ministry, agency, embassy or consulate anywhere in the world

2    from 1992 through 2004.  I would submit to the court that that

3    is pretty much the equivalent of the footnote that they put in

4    the last time that said, well, any discovery would be helpful.

5    We would like it.  But it is not any attempt to bear their

6    burden of identifying specific details that would allow them to

7    make their jurisdictional case.  Even to get there, they have

8    to, as this court noted, establish a prima facie case of

9    jurisdiction, which they have failed to do.

10           Unless the court has further questions, I'll reserve

11   my time.

12           JUDGE DANIELS:   Thank you.

13           MR. ENGLERT:  Good morning, your Honor.  Like

14   Mr. Kellogg, I have something for the court.  May I approach?

15           JUDGE DANIELS:  Yes.

16           MR. ENGLERT:  I am Roy Englert and I represent the

17   Saudi High Commission for Relief in Bosnia and Herzegovina.  I

18   plan to speak for only about five minutes and I am going to

19   stick to facts.

20           My client should not be here and should never have

21   been here.  It is a legitimate humanitarian organization headed

22   by former Prince, now King, Salman.  In 2004, when this case

23   was pending before the late Judge Casey, we submitted the

24   affidavit of Mr. Al-Roshood explaining in considerable detail

25   what the Saudi High Commission is, what it does, and how it has

I1Is9112

1    been audited by the Bosnian financial police.  That is tab 16

2    of the binder I handed up.

3         The organization was going strong, although it was

4    winding down its affairs in 2004 when Mr. Al-Roshood signed his

5    declaration.

6         MR. CARTER:  I'm sorry, your Honor.  We didn't receive

7    a copy of the binder.  We are not following.

8         MR. ENGLERT:  I apologize.

9         JUDGE DANIELS:  Sure.

10        To repeat, the declaration is tab 16 in that binder.

11   It was submitted to the late Judge Casey in 2004.

12        As Mr. Al-Roshood explains, the Saudi High Commission

13   was formed during the Bosnian war in the early to mid 90s, was

14   still going as of 2004 when he submitted his declaration, but

15   was winding down its affairs.

16        In paragraph 13 of that declaration, he explains the

17   result of an audit by the Bosnian financial police.  Although

18   it is not in the binder, Exhibit 3 to his declaration was the

19   audit in great detail.

20        Now, in our moving papers and again in our reply, we

21   characterized plaintiffs as having made three kinds of

22   allegations against my client:  Guilt by association, remote in

23   time and place, and conclusory and unsubstantiated.  Let me

24   give an example of each.

25        In tab 11 of your binder is a cable from the Embassy

I1Is9112

1    in Sarajevo to the state department in Washington dated

2    June 11, 2002.  It is the so-called dirty dozen cable which

3    names 12 Islamic charities operating in Bosnia that the

4    financial police had some doubts about.

5              We answered that evidence with Mr. Al-Roshood's

6    declaration, which explained that whatever doubts the Bosnian

7    financial police might want to have, they conducted an audit

8    and they found nothing wrong with the expenditures of the

9    Saudi High Commission.  Again, that is paragraph 13 of

10   Mr. Al-Roshood's affidavit at tab 16.  Also what is not in the

11   binder, Exhibit 3 to Mr. Al-Roshood's affidavit.

12             As to allegations remote in time and place from

13   September 11, 2001, an excellent example in tab 8 of your

14   binder, which is the witness statement of Mr. Hammad and the

15   recent submission by Mr. Kreindler of your letter of

16   January 12, 2018, to this court providing further elaboration

17   on what Mr. Hammad said.

18             This is plaintiffs' best evidence, to be blunt.  They

19   have a former Al Qaeda member saying, until I was arrested and

20   jailed in 1997, I had some dirt on the Saudi High Commission.

21   It is not true, but let's assume that everything he said is

22   true.  All of it is about what happened in Bosnia up through

23   1997.  None of it is about what happened in the United States

24   in 2001.  But Mr. Kreindler's January 12 letter contains

25   information not in tab 8, which is followup questions

I1Is9112

1    Mr. Hammad was asked.  He was asked if he knew anything about

2    what Al Qaeda was planning to do.  And he said, as a matter of

3    fact, I do.  Al Qaeda was using its operations in Bosnia to set

4    up additional operations in Europe.  Not in the United States,

5    in Europe.  This is plaintiffs' best evidence.  It says nothing

6    linking Bosnia and that Bosnia mujihadeen to the United States.

7    It does say something linking to Europe, nothing linking him in

8    the United States.

9          The third category of evidence is conclusory and

10   unsubstantiated allegations.  Behind tab 5 of your binder is a

11   CIA report dated June 1, 2003.  The first substantive page of

12   the CIA report says -- and I am paraphrasing, don't rely on

13   this too much -- we really haven't done much of the

14   investigation we plan to do.

15         I would suggest the document is inadmissible, but

16   let's assume it is admissible.  What does that document tell us

17   about two of the 9/11 hijackers?  It tells us that two of them

18   fought in Bosnia.  It doesn't mention the Saudi High

19   Commission.  It doesn't say anything about their role in

20   Bosnia.  It just says they fought in Bosnia.  Fighting in a war

21   does not make a person the enemy of every country that was not

22   in that war.  If the hijackers fought in Bosnia alongside other

23   mujihadeen and if some of mujihadeen were under the sponsorship

24   of the Saudi High Submission, and even if the Saudi High

25   Commission had been infiltrated by Al Qaeda, if we assumed that

I1Is9112

```
1  ║ all of those things are true, so what?  It doesn't have
2  ║ anything to do with the terrorist attacks in New York and
3  ║ Washington and the plane that went down in Pennsylvania in
4  ║ September 11 of 2001.
5  ║          If the court has no further questions, I will rest.
6  ║          JUDGE DANIELS:  Thank you.
7  ║          MR. CARTER:  We are going to add a few things in light
8  ║ of our presentation.
9  ║          JUDGE DANIELS:  Sure.
10 ║          MR. CARTER:  Thank you, your Honor.  May it please the
11 ║ court.
12 ║          I think I would like to begin by talking a little bit
13 ║ about JASTA because we really do believe that the sort of core
14 ║ folly of the kingdoms and the Saudi High Commission's position
15 ║ and proposed approach for resolving the present motion to
16 ║ dismiss is reflected in one of the first comments Mr. Kellogg
17 ║ made in the first line in the reply brief and suggested that
18 ║ this court should conclude that JASTA has no effect on the
19 ║ outcome of this case.
20 ║          Nothing could be further from the truth.  The kingdoms
21 ║ theory is essentially that congress, by enacting JASTA, did
22 ║ nothing to provide the 9/11 families with a better remedy to
23 ║ pursue their claims against the Kingdom and Saudi High
24 ║ Commission aside from removing the entire tour of discretionary
25 ║ functional limitations of the noncommercial torts exception.
```

I1Is9112

1    Despite both having relied nearly exclusively on those defenses

2    in the earlier proceedings in this litigation, they now

3    implausibly claim that the removal of those is an impediment

4    and has no significance in this litigation.

5            The Kingdom has further suggested that congress

6    somehow embedded in JASTA a whole range, a very onerous

7    substantive liability standard that would make it extremely

8    difficult for plaintiffs in terrorism case to move forward with

9    their cases.  In fact, the legislative history, congress'

10   statement of purpose in JASTA, the text and structure of the

11   statute in the broader context in which it was enacted all

12   indicate otherwise.

13           I want to get to some of the particulars of what JASTA

14   did to clear the way for this to go forward.  Before doing so,

15   I want to return for a moment to the elimination of the

16   discretionary function and entire tort rules because the

17   significance of that change in the law would be hard to

18   understate, and we believe that that is reflected in the way

19   that the Kingdom itself has tried to sort of pivot its approach

20   to this litigation since JASTA's enactment.

21           As we mentioned in our opposition brief, for many

22   years, the Kingdom and Saudi High Commission worked very hard

23   to try to persuade this court, the Second Circuit, and even the

24   Supreme Court that plaintiffs' claims against them principally

25   arose from the claim that the Kingdom had committed a tort by

I1Is9112

1    channeling money to Al Qaeda through charities thereby

2    providing material support to terrorist.  That is actually the

3    language they used and that we quoted.

4          Now, that was never completely accurate because it

5    didn't capture the full scope of the claims that we had

6    asserted, but the Kingdom obviously thought there was a

7    strategic advantage to frame the claims in that way because it

8    served to channel the jurisdictional inquiry into its entire

9    tort and discretionary function defenses.

10          The argument was, essentially, this case is all about

11   us giving money to Al Qaeda through these charities, but that

12   funding all occurred outside the United States and is therefore

13   barred by the entire tort rule.  In addition, that funding was

14   part of our broader global Islamic policy and therefore

15   discretionary.  As they have to admit now, those defenses have

16   been completely stripped away, and as a result of that,

17   congress has very clearly paved the way for the claims the

18   plaintiffs have asserted against Saudi Arabia for providing

19   material support in the form of funding channeled through its

20   charitable organizations through Al Qaeda.  That is a claim

21   that has always gone on the record, the Kingdom has always

22   recognized it is out there, and it is completely clear right

23   now as a result of a removal of the defenses they relied upon.

24          It does not depend at all, your Honor, on any

25   attribution of conduct to another to the Kingdom of Saudi

I1Is9112

1    Arabia.  So it doesn't drag anyone down to the weeds of these

2    arguments about agency and whether or not alter ego showing is

3    necessary.  That is a claim about an action of the Kingdom of

4    Saudi Arabia itself, constituting material support for

5    terrorism with a direct relationship to the resulting harm in

6    the United States.

7         Indeed, there are ample allegations in the complaint

8    and in the supporting affidavits that the money provided by the

9    Kingdom of Saudi Arabia was the principal source of funding for

10   the Al Qaeda organization during the years leading up to the

11   September 11 attacks.

12        Putting those claims aside just for one minute, I do

13   want to return.  The elimination of those two limitations that

14   presented an impediment under the tort exception was by no

15   means all that congress did through JASTA to aid the 9/11

16   plaintiffs in this case.  Mr. Kellogg made a number of

17   arguments about what JASTA requires to be proven, and they

18   are in conflict with the text and in conflict with the stated

19   purpose and in conflict with legislative history.

20        JUDGE DANIELS:  I want to make sure that I understand

21   exactly what you're articulating.  JASTA did not provide a

22   cause of action generally for providing financial support to

23   Al Qaeda?

24        MR. CARTER:  Your Honor, JASTA provided an exception

25   to sovereign immunity to allow a claim to proceed.

I1Is9112

1          JUDGE DANIELS:  The claim is not providing financial

2    support to Al Qaeda, that is not the claim.

3          MR. CARTER:  Well, your Honor --

4          JUDGE DANIELS:  The claim is providing financial

5    support for the terrorist acts that were committed on 9/11.

6          MR. CARTER:  Your Honor, I don't think that is a

7    correct articulation of what JASTA did.  JASTA allows a claim

8    to proceed if it is predicated under tortious act of a foreign

9    state --

10         JUDGE DANIELS:  Right.

11         MR. CARTER:  -- that can clearly include material

12   support for terrorism.

13         JUDGE DANIELS:  What is the tortious act that the

14   material support for terrorism is not the tortious act?

15         MR. CARTER:  Your Honor, it is the tortious act, and

16   part of the reason is because JASTA also made available causes

17   of action under the anti-terrorist act.

18         JUDGE DANIELS:  But there is a causation requirement

19   under JASTA.  I want to make sure that we're not -- it sounds

20   like a simpler analysis, but only because of the way you're

21   articulating.  There is still a causation requirement that is

22   related to the injuries and deaths that occurred on 9/11.

23         MR. CARTER:  There is a jurisdictional causation

24   requirement embedded in JASTA.

25         JUDGE DANIELS:  Without that, there is no cause of

I1Is9112

1    action simply for providing financial support to Al Qaeda

2    generally for their nefarious activity.

3         MR. CARTER:  Plaintiff would obviously have to have

4    suffered some harm to bring a claim, that's correct, your

5    Honor.

6         JUDGE DANIELS:  The critical point, the two critical

7    points, it is not just whether or not you can establish that

8    they provided financial support to Al Qaeda, but also alleged

9    sufficient facts to establish that providing that financial

10   support was a cause of and was related to the activities on

11   9/11 and caused those injuries and deaths to occur.

12        MR. CARTER:  Your Honor, there is a jurisdictional

13   causation element that is a part of pleading the exception to

14   immunity --

15        JUDGE DANIELS:  I don't mean to interrupt you.  The

16   reason why I am concentrating on that, isn't that really the

17   critical part of this claim and the critical dispute here, is

18   not whether or not that Saudi Arabia is cozy with Al Qaeda, it

19   is whether or not the allegations themselves are sufficient to

20   demonstrate that their provision of financial support to

21   Al Qaeda was a cause and in support of the activity of 9/11?

22        MR. CARTER:  Your Honor, the causal link that JASTA

23   requires for purposes of the immunity exception is incredibly

24   modest.

25        JUDGE DANIELS:  You define it for me, though, but it

I1Is9112

1   is a requirement.  I mean, as they say modest, I don't usually

2   think of legal requirements as being modest or immodest.  You

3   have to tell me what you mean by that.

4           MR. CARTER:  Your Honor, I think there is a clear way

5   to do that.  The lead sponsors of JASTA indicated in the floor

6   statement before the Senate voted, before the House voted, and

7   before the veto overrides, that they were specifically adopting

8   and incorporating into JASTA the interpretations of three

9   principal holdings of the identical cause by language of the

10  state sponsor of terrorism exception.  And that exception had

11  been interpreted to merely require, for purposes of

12  jurisdiction, a showing of some reasonable connection between

13  the defendants' tortious act in support of terrorism and the

14  harm plaintiff suffered.

15          Those cases -- Rux, Kilburn, and Owens -- have

16  indicated that the showing of causation and material support

17  for purposes of jurisdiction is lower, much lower than the

18  threshold for proving ultimate liability because the role --

19          JUDGE DANIELS:  That is true at this point of any set

20  of allegations in the complaint.  I am trying to figure out why

21  you said that the showing with regard to causation is somehow a

22  lesser showing than any other requirement at this stage of the

23  proceeding.

24          MR. CARTER:  Your Honor, it is a showing of a

25  reasonable correction, and part of that is because JASTA

I1Is9112

1   incorporated principals of secondary liability.  So the

2   standard of causation for purposes of JASTA's jurisdictional

3   standard couldn't be more stringent than any of the underlying

4   substantive cause of action it makes available.

5        JUDGE DANIELS:  I understand that, I just don't

6   understand what you say it is less stringent than.

7        MR. CARTER:  Well, your Honor, it is clearly less

8   stringent than any of the standards Mr. Kellogg has articulated

9   suggesting it is but-for causation or traditional approximate

10  causation.  It is neither of those things.

11       Again, the decisions in Owens, Kilburn, and Rux

12  recognize that this kind of activity in support of a terrorist

13  organization is reasonably connected to the resulted harm.

14       JUDGE NETBURN:  Your basis for that position is the

15  fact that the floor statements relied on those particular

16  cases?

17       MR. CARTER:  Both because the floor statements

18  specifically incorporated them, those cases and the analyses

19  from those cases said they were adopting the specific causation

20  standard in addition to the overall statement of purpose of

21  congress in enacting JASTA, which was to provide terrorism

22  victims with the broader possible basis of relief to pursue

23  claims against foreign states that had provided material

24  support for terrorism, whether directly or indirectly.  In

25  order to honor that central purpose of the statute, the

I1Is9112

1    causation standard authorized for claims to go forward has to

2    be flexible in accommodating to the realities that terrorism

3    victims face.

4           JUDGE NETBURN:  Whether there are any other statutes,

5    whether terrorist or other contexts, where the reasonable

6    connection threshold was required as opposed to higher

7    threshold as opposed to a but-for or proximate cause?

8           MR. CARTER:  Your Honor, off the top of my head, I

9    can't give you a firm answer on that, but obviously they were

10   very specific and very precise about what they were trying to

11   do here and the language they were incorporating.  And it made

12   sense because they were obviously responding to results in this

13   case and they were trying to make sure that the remedy they

14   were crafting was going to be available to these people to

15   assist them in order for their claims to proceed.  And

16   incorporating a but-for causation standard would inhibit that

17   result and, in fact, it would more broadly be contrary to U.S.

18   counterterrorism policy, which recognizes, as the Supreme Court

19   did in the Humanitarian Law project, that every contribution of

20   support to a terrorist organization advances its ability to

21   engage in acts of terrorism.  Because of that, the relationship

22   between providing material support and resulting harm is

23   apparent by virtue of the terrorism context itself.

24           JUDGE DANIELS:  I just want to make sure I understand,

25   as they say, what you want me to do with that.  What element of

I1Is9112

1   your claim has a less modest requirement at this stage?  I

2   mean, causation is one of the elements of your claim that

3   you're going to have to establish for jurisdiction.  What other

4   element of the claim that you say that there is some higher

5   standard that you have to meet?  I'm not sure what you want

6   me --

7           MR. CARTER:  I understand what you're saying.

8           JUDGE DANIELS:  -- to distinguish.  You understand?

9           MR. CARTER:  For purposes of the underlying aiding and

10   abetting claims, for instance, your Honor, the analysis would

11   turn on whether or not the Kingdom had provided substantial

12   assistance to Al Qaeda, and there is six or so factors that

13   inform that analysis.

14           JUDGE DANIELS:  You say that is a higher standard at

15   this point that you must meet than the causation standard?

16           MR. CARTER:  No.  I am saying the jurisdictional

17   causation standard is clearly lower than that because it has to

18   ensure that a claim won't get kicked out of the jurisdictional

19   phase that could ultimately prevail on the merits.  But in

20   terms of the aiding and abetting, and they incorporated in

21   JASTA the standards from Halberstam v. Welch, once you made the

22   showing of substantial assistance, and under Halberstam, where

23   the assistance is provided for particularly appropriate facts,

24   even de minimus assistance can constitute substantial

25   assistance.  The wrongdoing party is responsible for all

I1Is9112

1   foreseeable harm.  So the reasonable connection foreseeability

2   standard, essentially, work in tandem with one another.

3          JUDGE DANIELS:  All right.  I still don't understand

4   how that is different than the analysis with regards to what

5   you characterize as a modest showing on causation.

6          MR. CARTER:  Your Honor, again, the showing on

7   jurisdictional causation we're advocating is the reasonable

8   connection standard that congress required and adopted from

9   Rux, Owens, and Kilburn, which, again, is much lower to make

10  sure than claims can proceed.

11         JUDGE DANIELS:  As I said, much lower than what?

12         MR. CARTER:  Well, again, your Honor, I think

13  implicitly reasonable connection is lower than something like

14  traditional proximate cause.  The analysis is there a

15  reasonable connection between the wrongful conduct and the

16  resulting harm and, again, in this context, because every

17  provision of assistance through a terrorist organization

18  advances its ability to conduct an act of terrorism, and

19  given the way in which we have demonstrated that the Kingdom's

20  provision of support to Al Qaeda was very expansive and

21  provided the bulging of the funding that enabled Al Qaeda to

22  build and sustain the organization, it is more than that here,

23  particularly in the current setting, which is a preliminary

24  motion to dismiss.

25         JUDGE DANIELS:  You think that that has a practical

I1Is9112

1   effect on the analysis at this point?

2          MR. CARTER:  Your Honor, I don't know that as a

3   practical analysis because we pled way beyond this.  My point

4   is that the Kingdom's broad argument is that congress embedded

5   all of these very stringent standards in JASTA that would make

6   it more difficult, and the floor sponsors have been very clear

7   that they did the opposite, and that is our point.

8          JUDGE DANIELS:  Well, the part that I'm not sure I

9   should do anything with is some determination of whether this

10  is a modest standard or a stringent standard and is the

11  standard --

12         MR. CARTER:  It is the standard and the standard is

13  reasonable connection, that's correct.

14         One of the other things that they did in JASTA is to

15  add the term agent.  Now, the Kingdom of Saudi Arabia has

16  argued that the addition of the term agent and language

17  providing that the acts of the agent would be attributable to a

18  foreign state, to the extent that the agent acted within the

19  scope of the agency, did nothing to alter the alter-ego

20  standard acquiring day-to-day control.  That simply makes no

21  sense because congress was acting here and made clear it was

22  acting here for the purpose of removing impediments that it

23  confronted the 9/11 plaintiffs in this case, one of which was

24  the alter-ego regime.

25         The term agent does not appear in other exceptions of

I1Is9112

1    the foreign terrorist immunity act with the exception of the

2    state sponsoring modeling after that.  Again, the floor

3    sponsors were very clear about what they were doing.  They

4    said, by including that language, they intended to incorporate

5    principals of vicarious liability, including responding to

6    superior, common law agency, and secondary liability.

7         So when the Kingdom suggests that the alter-ego

8    standard remains the operative standard for purposes of

9    demonstrating the sufficient relationship to attribute the

10   actions of an agent to the principal, it is simply wrong.  It

11   is a common law agency analysis, which is different.  A

12   manifestation on the part of the principal for the ability to

13   act on its behalf and subject to its control is the standard

14   for purposes of that.

15        The Kingdom effectively compounds its errors about

16   what JASTA requires with confusion about whether it is done

17   anything here sufficient to create the factual challenge to the

18   allegations and other submissions the plaintiffs have offered

19   and what would happen if it had done so.  To the extent that a

20   foreign government in an FSIA case wants to raise a factual

21   challenge to some aspect of the plaintiffs' pleadings, the

22   cases demand that it do so by coming forward with its own

23   evidence, typically in the form of an affidavit, that

24   specifically confront the substance of the allegations relevant

25   to the jurisdictional determination and specifically denied

I1Is9112

1    that it is true.

2            Your Honor asked Mr. Kellogg a number of questions

3    about this, and this goes to the certain part of the matter.

4    They haven't done that here, and what is so conspicuously

5    absent from their filing is anything of that nature.  In other

6    words, your Honor, we made very clear allegations that Omar Al

7    Boyoumi was an agent of the Saudi government, that he was

8    taking instruction from individuals in the Ministry of Islamic

9    Affairs offices, including Fahad Al Thumairy.  There is no

10   affidavit denying any of those facts, even though those are

11   matters clearly within the knowledge and control of the

12   Kingdom.

13           JUDGE NETBURN:  If they are correct that a lot of

14   that, a lot of those allegations are supported by evidence that

15   the court deems inadmissible such that those allegations are

16   struck, is it still your contention that the government needs

17   to put forward its own affirmative evidence to prove that the

18   allegations are false, or is it adequate for them simply to

19   just strike down your allegations as being founded on

20   inadmissible evidence?

21           MR. CARTER:  Your Honor, the way the Kingdom tries to

22   get to this notion that we are required to come forward with

23   admissible evidence at the outset of the case and before

24   discovery is by arguing that they have created a fact challenge

25   and then trying to take refuge in cases that indicate that once

I1Is9112

1    a foreign government has created that kind of fact challenge, a

2    plaintiff has the burden of going forward with evidence.

3        There are a number of Second Circuit cases that are

4    simply wrong, though, about the nature of that burden and what

5    it requires a plaintiff to do.  It does not require a plaintiff

6    to come forward as part of its initial burden of production

7    with any admissible evidence.  It is clearly not the case.

8        The Second Circuit cases, <u>Robinson</u>, <u>Virtual Countries</u>,

9    and all of the others indicate that a plaintiff can meet its

10   burden of production in response to that kind of a challenge by

11   virtue of its allegations, factual allegations, uncontested

12   facts put before the court, or affidavit and other evidentiary

13   materials if it chooses to do so.  All of those cases talk

14   about the court being required, in evaluating the factual

15   challenge, to go and look at the factual allegations of the

16   pleadings.

17       The facts don't disappear.  They still remain and they

18   are certainly sufficient and can be sufficient to carry a

19   plaintiff's initial burden of production.  The Kingdom is

20   simply wrong.  It was required to come forward with admissible

21   evidence at the stage of this proceeding.  We are not there.

22       To take that even a step further, your Honor, by

23   suggesting that the court should be making broad admissibility

24   determinations and weighing their evidence against our

25   evidence, again, we are just not at that stage in the

I1Is9112

proceeding at this point in time.

At this point in time, the question initially is whether or not they have done anything sufficient to raise the fact challenge to the allegations of plaintiffs' complaint and they simply haven't.  They haven't come forward with any affidavit directly challenging these things, and they can't salvage that by the language they point to in the 9/11 Commission report and some of the other documents.

None of these cases support the view that if defendant foreign state can create a fact challenge simply by saying that the U.S. government looked into something and declined to draw inferences.  That does not directly meet the substance of the plaintiffs' factual allegations and deny its truth, which is what has to happen in order for there to be a fact challenge, and that simply hasn't happened here.

Beyond even all of that, your Honor, the cases are quite clear that a plaintiff must be afforded an opportunity to conduct discovery to develop evidence in support of its jurisdictional theories.  So if there is a fact challenge here, the result is discovery with regard to the disputed fact.

The additional problem with the way the Kingdom has approached all this is even to the extent they could credibly claim that the 9/11 Commission report and some of the other documents create a fact challenge to plaintiffs' allegations, they certainly don't create a fact challenge to the degree the

I1Is9112

1    Kingdom implies.  The 9/11 Commission report, for instance,

2    says nothing about plaintiffs' claims that Saudi government

3    money flowed to Al Qaeda through its charitable organizations.

4    In fact, to the extent it says anything about it, it

5    acknowledges a likelihood that charities with sufficient Saudi

6    government sponsorship funded Al Qaeda.

7          So it is entirely in accord with plaintiffs'

8    allegations on those points.  They simply haven't done anything

9    to bring us into this world where they want this case to live,

10   where we are engaging in this sort of bizarre trial on the

11   merits via assessments of whether or not documents are

12   ultimately admissible.  Those kind of determinations can't even

13   be made without the context of a hearing or a trial setting.

14   They simply haven't done anything.

15         JUDGE DANIELS:  Why isn't the determinative analysis

16   still pretty much the same as before JASTA?

17         Isn't the primary issue still whether or not that you

18   have made sufficient factual allegations with regard to these

19   individuals as agents or the charities to demonstrate a

20   plausible case that they have engaged in acts which would make

21   the Kingdom of Saudi Arabia liable?  That still depends on the

22   factual allegations you make and whether or not they support

23   the conclusions that you want drawn from that.

24         For example, to allege that two people conspired

25   together is a conclusion.  If that conclusion is simply based

I1Is9112

1    on the fact that they were in the same city at the same time,

2    that would not be a sufficient factual allegation to support

3    the conclusion that they conspired with each other.

4         I am trying to make sure that I don't see a

5    significantly different way to approach this just in terms of

6    analyzing the plausibility of the theories that you're setting

7    forth.  I want to make sure that there isn't some other

8    significant determinative issue, other than whether or not this

9    new complaint has sufficient additional facts to lead to the

10   conclusions that you want drawn that Saudi Arabia, under JASTA,

11   is responsible as alter ego or through agents who acted on

12   their behalf.

13        MR. CARTER:  Well, your Honor, before getting to that,

14   I want to go back to the point I was making before.  Again,

15   because of this elimination of the entire tort doctrine, JASTA

16   talks about claiming being able to proceed for facts of the

17   foreign state itself in providing material support.

18        Now, your Honor determined in the prior proceedings

19   under the tort exception that the activities that we had

20   described about Saudi Arabia's own state funding of Al Qaeda

21   filtered through its charitable organizations were

22   jurisdictionally irrelevant because of the entire tort rule.

23        Now that the entire tort rule is gone, those claims

24   are now, again, viable on the factual allegations of putting

25   them in the complaint to determine whether or not we made out a

I1Is9112

1   case that can go forward.  That is true.  It is plausibility.

2   Those claims simply weren't assessed at all in connection with

3   the prior proceedings.

4        Now, the Kingdom tries to sort of avoid this result of

5   its own being activities in support of Al Qaeda being viable by

6   making a few arguments.  One is they suggest that they haven't

7   given them fair notice of this theory.  It is a difficult

8   argument to understand, your Honor.  The consolidated amended

9   complaint incorporates the averment from the earlier

10  proceedings in the case.  As I mentioned at the outset, when

11  the Kingdom received that averment and moved to dismiss on the

12  basis of that pleading, it described it as principally alleging

13  that Saudi Arabia committed a tort by funneling money to

14  Al Qaeda through charitable organizations, thereby providing

15  material support for terrorism.  So this idea that they didn't

16  have fair notice when the earlier pleadings incorporated in

17  part and parcel of all this simply doesn't make any sense.

18       The next argument is that we haven't adequately put

19  them on notice of and provided nonconclusory allegations that

20  the charities were fronts.  Now, the idea of this argument

21  appears to be that the funding has to be direct in order to be

22  actionable and, therefore, in their view, we have to prove that

23  the charities were integrated components of Al Qaeda on some

24  level.  Again, that is simply not right.

25       In passing JASTA, the sponsors and the congress in the

I1Is9112

1      statement of purpose was absolutely explicit that it would

2      apply to claims that a foreign state provided material support

3      to a terrorist organization directly or indirectly.  Any idea

4      that there is a distinction between direct and indirect support

5      that remains viable has gone off the table.  In addition, they

6      made clear that it would apply to forms and material support

7      provided whether knowingly or recklessly.  So they specifically

8      rejected the notion that there is some sort of specific intent

9      requirement in order to allege these claims.

10            With regard to those claims, there is an immense

11     amount of factual detail in the pleadings documenting the

12     legacy of the cooperation between the charities that the

13     Kingdom was funding, broadly funding, and Al Qaeda and an

14     awareness on the part of the Kingdom that the money it was

15     pouring into those organizations was being broadly funneled

16     back to the Al Qaeda organization.

17            We have made specific allegations that the Kingdom was

18     very much aware of that and continued to pour money into that

19     apparatus.  In fact, the 9/11 staff monograph on terrorist

20     financing confirms that U.S. officials met with Saudi officials

21     to raise concerns about this funding mechanism on numerous

22     times before the September 11 attacks, but the Saudis were not

23     responsive.  All of that fits the model of a tortious act that

24     JASTA was directly designed to reach.  It reaches that claim

25     here.

I1Is9112

1          JUDGE DANIELS:  Again, still, going back to one of my

2     earlier questions, that is only the beginning of the analysis.

3     Even if you have sufficient allegations that the Kingdom is

4     funneling money to Al Qaeda, the real second question is, what

5     are they doing with that money and whether or not that money

6     was used for the terrorist attacks on 9/11?

7          MR. CARTER:  Your Honor, the showing that is necessary

8     for us to establish liability -- again, we are not at that

9     phase, we are at the phase of whether or not we have brought

10     the case within JASTA's jurisdictional element -- but clearly

11     it does not require us to demonstrate that the money provided

12     by the defendant was used for the September 11 attacks.

13          JUDGE DANIELS:  So you say that there is jurisdiction

14     to assert a claim under JASTA by simply alleging that the Saudi

15     Arabian government gave money to Al Qaeda, that would be

16     sufficient for jurisdiction under JASTA?

17          MR. CARTER:  Your Honor, we would have to demonstrate

18     a reasonable connection between the provision of that support

19     and the resulting harm.

20          JUDGE DANIELS:  Right.

21          MR. CARTER:  Correct.

22          JUDGE DANIELS:  When you articulate what was required,

23     you keep leaving that part out.  I'm just trying to understand,

24     was there some significant reason why you're leaving that out?

25     That is a critical part of it.

I1Is9112

1          MR. CARTER:  No.  It is a component of the immunity

2     exception, your Honor, but perhaps I'm leaving it out because

3     the factual allegations go so far beyond that standard --

4          JUDGE DANIELS:  But JASTA does not cover the provision

5     of -- unless you want to correct me -- JASTA does not cover,

6     even under jurisdictional analysis or any other analysis, the

7     provision of financial support to Al Qaeda by Saudi Arabia

8     outside of the U.S. with no consequence in the U.S.  JASTA

9     would not cover that.

10          MR. CARTER:  Your Honor, the JASTA requires that

11    there have been an act of international terrorism on U.S. soil

12    causing physical harm.

13          JUDGE DANIELS:  Right.  That is a real important part

14    of it.

15          MR. CARTER:  That is an important part of it.

16          JUDGE DANIELS:  That is critical.

17          MR. CARTER:  The causal relationship does not at all

18    require the showing that a contribution of support by the

19    defendant was specifically used for purposes of the act of

20    terrorism.

21          JUDGE DANIELS:  How do you say you demonstrate that it

22    caused the injury in the United States?

23          MR. CARTER:  Your Honor, the way that we described

24    that it caused the injury in the United States is by tracking

25    what U.S. National Security and counterterrorism officials have

I1Is9112

said, which is that Al Qaeda was a sophisticated terrorist

organization, and in order to simply maintain and sustain its

operations, pay its recruits and do all of those things, it

needed about $30 million a year, and that the funding was

essential to the simple existence of the organization and its

ability to carry out sophisticated international attacks.

We describe from the 9/11 Commission all of the

various sort of structural and asset meetings of a terrorist

organization, and then also describe how the money that was

coming to Al Qaeda from the Saudi government via these

charities represented the overwhelming bulk of the funding that

Al Qaeda used to maintain and build the organization and

acquire its global strategy.

JUDGE DANIELS:  Under that theory, would it be that

Saudi Arabia would be responsible for every terrorist act

committed by Al Qaeda?

MR. CARTER:  Your Honor, it wouldn't be responsible

for terrorist attacks that don't occur in the United States.

JUDGE DANIELS:  Regardless of whether or not they were

aware of any terrorist attacks, any terrorist attack, would

that make Saudi Arabia liable for all other terrorist attacks

that Al Qaeda was involved in simply because some of the money

to fund Al Qaeda came from Saudi Arabia, even if Saudi Arabia

had nothing to do, didn't have any agents who supported the

terrorist attack, or didn't give the money specifically for

I1Is9112

1    that terrorist attack, wasn't even aware that that money was

2    going to be used for that terrorist attack?

3            I am not sure.  I am just trying to figure out what

4    the limits of the extent of your argument are.

5            MR. CARTER:  Your Honor, I think, first of all, the

6    winning provision of financial and other support to a terrorist

7    organization certainly exposes you to potential legal

8    liability.  There is no question about that.

9            JUDGE DANIELS:  Only if there is some connection to an

10   injury that occurs in the United States that that money is used

11   for.

12           MR. CARTER:  Right.  The framework for making that

13   determination is the Halberstam substantial assistance.

14           JUDGE DANIELS:  Right.

15           MR. CARTER:  It also incorporates the conspiracy

16   liability standard.

17           JUDGE DANIELS:  Right.

18           MR. CARTER:  The determination ultimately on the

19   merits as to whether or not the contribution of material

20   support is sufficient to establish liability runs through the

21   Halberstam framework, which is multiple factors, the nature and

22   kind of assistance --

23           JUDGE DANIELS:  Right.

24           MR. CARTER:  -- the kind of act being encouraged, the

25   nature of the relationship between the wrongful party and the

I1Is9112

1   ultimate tort feasor.

2        JUDGE DANIELS:  Your analysis leaves all of that out.

3   Your analysis just now doesn't say that had anything to do with

4   the nature of the terrorist act or the intent to support the

5   terrorist act.  I am trying to make sure I understand it.

6        You seem to be arguing that the jurisdictional

7   analysis has only to do with whether or not you have

8   established that Saudi Arabia gave money to Al Qaeda.

9        MR. CARTER:  No.  I think it also requires an analysis

10  of whether or not there is a reasonable connection between that

11  contribution of support and the September 11 attacks.

12        JUDGE DANIELS:  Right.

13        MR. CARTER:  Correct.  Again, we are saying that there

14  was because it was the bulk of the funding that it used to

15  maintain and build the infrastructure that it used on that day

16  to carry out that horrific act.  So there is a reasonable

17  connection.

18        There is much more, your Honor.

19        JUDGE DANIELS:  I don't understand how you make that

20  connection.  If I gave you $10 and you went and bought $5 worth

21  of ice cream, why is it that I gave you $10 to buy ice cream?

22  I want to make sure I understand the analysis.  The analysis is

23  not -- maybe it is, and then I'll see if that is sufficient

24  analysis -- but the analysis is not simply whether Saudi Arabia

25  gave money to Al Qaeda knowing Al Qaeda was a terrorist

I1Is9112

1    organization, so every terrorist act that Al Qaeda commits

2    Saudi Arabia is responsible for.  That is not what JASTA

3    provides.

4              MR. CARTER:  Your Honor, again, the substantive

5    liability claim underneath JASTA may very well authorize

6    liability for the winning provision of material support to a

7    terrorist organization like Al Qaeda that has declared its

8    intention to use any resource provided for it to carry out --

9              JUDGE DANIELS:  What kind of language in JASTA?

10             MR. CARTER:  I was talking about the underlying

11   Halberstam analysis.

12             JUDGE DANIELS:  I am talking about applying that to

13   JASTA.  I don't see where jurisdiction under JASTA is that

14   broad.

15             MR. CARTER:  Your Honor, as I said, and the decisions

16   that JASTA incorporated, like Kilburn, the causation threshold

17   for the immunity exception is lower than for the underlying

18   cause of action.

19             JUDGE DANIELS:  But it still exists.

20             MR. CARTER:  It still exists and it is a reasonable

21   connection and that is the standard.

22             JUDGE DANIELS:  That is what I am trying to

23   concentrate on, on that aspect now.

24             In what way do you say, whatever is the basis, the

25   factual basis for the conclusion that the money given that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1Is9112

1    said money given to Saudi Arabia to Al Qaeda was used to cause

2    9/11?

3          MR. CARTER:  Let me give you a specific example.  One

4    of the charitable entities which this funding mechanism was

5    occurring, the National Islamic Relief Organization, and the

6    U.S. government and diplomatic cables we submitted on record

7    indicated that the IIRO was the principal sponsor of terrorist

8    training camps in Afghanistan during the Taliban regime, and

9    further indicated that Osama bin Laden and his entire IIRO

10   network were for terrorist activities.

11         So this is the money being used to maintain the camps

12   in Afghanistan where the hijackers are being trained.  We have

13   actually submitted CIA reports as well discussing this exact

14   thing.  This is the almost singular source of IIRO's money was

15   with the government of Saudi Arabia, and the money was running

16   directly through IIRO and into Al Qaeda's coffers and being

17   used to maintain these terrorist training camps.

18         Another one of the entities --

19         JUDGE NETBURN:  I'm sorry.  That was established in a

20   CIA report you said?

21         MR. CARTER:  There is a CIA report talking about it

22   being a principal funder of training camps in Afghanistan and a

23   whole range of state department diplomatic cables and our

24   pleadings as well as file of record.

25         JUDGE DANIELS:  What specifically are you alleging

I1Is9112

 1    that occurred at the training camps that Saudi Arabia gave

 2    money to Al Qaeda for that caused 9/11?

 3         MR. CARTER:  Your Honor, again, the allegation is more

 4    fundamental than that.  The allegation is that over the course

 5    of the decade leading up to 9/11, it was Saudi money that

 6    enabled bin Laden to build and maintain the organization and

 7    acquire the straight capabilities and that ran to every aspect

 8    of it.

 9         Again, in our pleadings, we cite countless

10    descriptions from U.S. counterterrorism officials describing

11    this kind of a nexus between providing financial support to

12    terrorism and the capacity of the responsible terrorist

13    organization to carry out terrorist attacks.  They need money.

14    Even the most modest attack requires massive funding to

15    maintain the global infrastructures to support it.

16         So there is this relationship, this very real direct

17    relationship, between providing contributions of financial

18    support to a terrorist organization and resulting acts of

19    terrorism.

20         JUDGE DANIELS:  The reason why I ask it that way -- I

21    don't want to harp on this -- the reason why I ask it that way

22    is because hasn't the issue before JASTA, the issue of whether

23    or not one can assert a claim based solely on the fact that

24    money was provided to a terrorist organization to do terrorist

25    acts, wasn't sufficient for a claim?

I1Is9112

1        I mean, didn't every court that analyzed that issue

2   say that that itself is not sufficient?  That doesn't state the

3   claim.  You can't just simply say, generally, I give money to

4   terrorists, so I am responsible for every act that the

5   terrorist may subsequently do if I can show that they used some

6   of that money to do so.

7        How did JASTA change that?  JASTA didn't change that.

8        MR. CARTER:  Your Honor, I am not sure.  I don't think

9   it is correct that every court had determined that giving money

10  to a terrorist organization is an insufficient basis to hold

11  the donor responsible for committing an act of terrorism.  In

12  fact, that the whole point of the anti-terrorist act is to make

13  that requirement.

14       JUDGE DANIELS:  But the analysis under the act was

15  always that you need more than just simply saying that they

16  provided money to a terrorist organization somewhere across the

17  world and that the terrorist organization's use of that money

18  makes them responsible for all of the terrorist acts.

19       Do you think I am mischaracterizing what the law is on

20  that?

21       MR. CARTER:  I do, your Honor.

22       JUDGE DANIELS:  OK.

23       MR. CARTER:  I do a little bit.

24       JUDGE DANIELS:  On what theory would Saudi Arabia be

25  liable for Al Qaeda's acts if all that was established was that

I1Is9112

1    was Saudi Arabia gave money to Al Qaeda?

2              MR. CARTER:  Your Honor, it is not simply that it gave

3    money to Al Qaeda.  It goes much further.

4              JUDGE DANIELS:  Right.

5              MR. CARTER:  The extent of the money that we're

6    talking about here --

7              JUDGE DANIELS:  It doesn't matter how much money they

8    give.  They can give $10 or they can give a million dollars.

9              The question is:  Does that make them liable for every

10   terrorist act that Al Qaeda subsequently does utilizing any

11   portion of that money?

12             My understanding of the law is no, you need more than

13   that.  You've got to show some real causation with regard to a

14   particular terrorist act.

15             MR. CARTER:  Your Honor, I think the observation that

16   it doesn't matter if you give five or a million dollars changes

17   that because if, for instance, you gave Al Qaeda $30 million

18   and completely funded its entire budget for a year, that would

19   obviously make a difference between if you gave a single dollar

20   for sure.  For sure.

21             JUDGE DANIELS:  Yes, but you have already made the

22   argument, and the legitimate argument, that simply spending

23   $500 to give one of the terrorists a room in a hotel would be

24   sufficient.  It doesn't have to be a million dollars.  Buying

25   that person a plane ticket would be sufficient.

I1Is9112

1          So the amount of money doesn't determine whether or

2    not you're supporting the terrorist act that is committed on

3    9/11.  I'm not sure why that enters into the analysis.

4          MR. CARTER:  Your Honor, again, the cases all instruct

5    that there is not this requirement that you have provided the

6    support for the specific act of terrorist that results in the

7    plaintiffs' harm and that contributions of general support to a

8    terrorist organization can absolutely establish liability.

9    Again, that kind of framework that Halberstam established

10   guides that analysis.

11         Under that, if the provision of support were

12   particularly de minimus assistance, it would impact whether or

13   not it amounted to substantial assistance.  But here we are

14   clearly talking about a level of support that goes well beyond

15   Halberstam's substantial assistance standard and, therefore,

16   readily establishes the aiding and abetting component of the

17   underlying tort claim.  Therefore, it also goes beyond the

18   reasonable connection standard of JASTA's immunity exception,

19   which is where we are.

20         JUDGE DANIELS:  Well, I don't have all the case law in

21   front of me, but the Second Circuit -- I'm trying to figure out

22   which opinion it was.  I just wanted to quote from the Second

23   Circuit in their 2013 opinion where they say that, similarly,

24   the Rule 12(b)(6) defendants are alleged to have provided

25   funding to purported charity organizations known to support

I1Is9112

1    terrorism that, in turn, provided funding to Al Qaeda and other

2    terrorist organizations.  These allegations are insufficient

3    for approximate causation purposes for the same reasons as

4    alleged in Rothstein.

5           We are also not persuaded that providing routine

6    banking services to organizations and individuals to be

7    affiliated with Al Qaeda, as alleged by plaintiff, proximately

8    caused the September 11, 2001 attacks or plaintiffs' injuries.

9           JUDGE NETBURN:  Your argument is that the proximate

10   cause standard is no longer the precedent?

11          MR. CARTER:  The Rothstein proximate cause standard --

12   and I'm sorry for not making up on this earlier -- was

13   repudiated by JASTA.  That is one of the things that JASTA got

14   rid of it.

15          JUDGE DANIELS:  But a causation requirement still

16   exists.

17          MR. CARTER:  A causation requirement still exists.

18          JUDGE DANIELS:  The rule that basically says you don't

19   have a cause of action generally just because a foreign country

20   gives money to Al Qaeda outside of the United States, you still

21   have to have causation.  You seem to be arguing that the thrust

22   of your evidence is that Saudi Arabia gave money to Al Qaeda,

23   and then Al Qaeda used -- obviously, if they're a terrorist

24   organization, any money you give them is going to be used for

25   terrorist acts.

I1Is9112

1          I'm not sure why it is plausible either to state a

2    cause of action or for jurisdictional purposes to simply rely

3    on the facts that Saudi Arabia gave money to Al Qaeda.

4          MR. CARTER:  Your Honor, again, I go back.  It is both

5    the Halberstam aiding and abetting and conspiracy theory.

6          JUDGE DANIELS:  Even without some connection to 9/11,

7    some greater connection to 9/11 other than, well, you gave

8    money to a terrorist organization, the terrorist organization

9    committed a terrorist act, so you're responsible for whatever

10   terrorist act occurred?

11         MR. CARTER:  Again, your Honor, that is not what we

12   have alleged with regard to Saudi Arabia.  We have alleged that

13   the contributions to support that it provided were uniquely

14   important to Al Qaeda being able to do this.

15         JUDGE DANIELS:  My question simply, you say that is

16   required for you to demonstrate or not required?

17         MR. CARTER:  I think what we have said is more than

18   would be required to.

19         JUDGE DANIELS:  Which part is more than what you would

20   be required to?  That's what I am trying to understand.

21         MR. CARTER:  Your Honor, you think we have gone so far

22   to say it was essential to the acts.  I think there may be a

23   lesser showing of support that still is an analysis of

24   substantial assistance under the Halberstam framework.

25         JUDGE DANIELS:  The definition of causation clearly

I1Is9112

1    still means more than simply I gave you money and you did

2    something bad with the money.

3                MR. CARTER:  Your Honor, again, under Halberstam, the

4    question is first whether or not there was substantial

5    assistance.

6                JUDGE DANIELS:  Right.

7                MR. CARTER:  If there is substantial assistance and

8    you're on the hook for any resulting violence.  The substantial

9    assistance inquiry is the first inquiry and, again, there is a

10   number of factors.  One of the factors is that providing

11   support for a particular harm can amount to substantial

12   assistance even if it is de minimus.  And providing funding to

13   a notorious terrorist organization like Al Qaeda, who has made

14   clear how it is going to use it, can actually amount to

15   substantial assistance even if it is minimal.

16               JUDGE NETBURN:  Your view is that question is not

17   before us right now?

18               MR. CARTER:  It is not before you right now.  Again,

19   we have gone way beyond what we're talking about.  I want to

20   make sure I don't take up any of Mr. Pounian's time.

21               JUDGE DANIELS:  Sure.

22               MR. CARTER:  I do want to talk about one or two other

23   things.

24               With regard to this question of whether or not there

25   is enough in the record to establish that the charities were

I1Is9112

agents of the Kingdom of Saudi Arabia, again, that is not the
alter ego where it is a different concept.  We have described
in very particular detail how they were established by the
government of Saudi Arabia to serve as the principal
instruments for carrying out these proselytizing activities
globally, you know, the Kingdom has objected strenuously to our
use of the term Wahhabism and characterizations of this
extreme.

          The fact of the matter is, your Honor, it is not our
term.  It is actually the term that is used in the 9/11
commission report to describe Saudi Islam and the 9/11
Commission report draws a very direct relationship between that
varying of Islam and the ideological foundation for Al Qaeda.

          JUDGE DANIELS:  I'm not sure how that fits into the
definition.

          MR. CARTER:  I'm sorry, your Honor.  I am just simply
responding to the characterization that we are vilifying
Muslims.  We are not.  We are tracking exactly how the 9/11
Commission described this particular problem.

          In the pleadings, we explain how the Wahhabi clerics
who control these charities and broadly used them to support
jihadist activities globally.  This is evident in the whole
history of the legacy of the cooperation between those entities
and bin Laden.  That cooperation was grounded in the Afghan
jihad originally, which served as an infrastructure to support

I1Is9112

1     them meeting there.  They then deployed them to Bosnia where

2     they engaged in the same activity.

3              JUDGE DANIELS:  Again, I am just not following this in

4     relationship to your agency argument.

5              MR. CARTER:  Your Honor, the point is, we have argued

6     these entities were created to serve a particular government

7     purpose, that they were the principal instruments through which

8     the Kingdom fulfilled its obligation under Saudi Arabia's basic

9     law of governance to propagate Wahhabi Islam globally.

10             JUDGE DANIELS:  I don't understand what definition of

11    agency that you're using that, given those facts, that means

12    that they are agents for Saudi Arabia to commit terrorist acts.

13             MR. CARTER:  I understand, your Honor.  In terms of,

14    first of all, I am trying to get to the agent status.

15             JUDGE DANIELS:  Right.

16             MR. CARTER:  Then I'll talk a little bit about the

17    scope.

18             JUDGE DANIELS:  Wait.  When you say their agent

19    status, I am analyzing it as to their agent status for

20    terrorism.  You seem to be saying, well, I'm not saying that

21    they were an agent for terrorism, I am saying they were an

22    agent for other religious purposes and that makes them

23    responsible for the terrorism.

24             MR. CARTER:  Your Honor, we don't describe it that

25    way.  What we are saying is that the program, the Global

I1Is9112

1    Islamist agenda of the clerics who were being provided this was

2    not merely to spread a certain idea of religious thinking.

3    They embraced partnerships with jihadist organizations as a

4    mechanism to fulfill their goal of spreading this particular

5    variance of Islam.

6              JUDGE DANIELS:  You don't say that they are an agent

7    for Saudi Arabia for terrorism?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I1IP9113

1           MR. CARTER:  Well, your Honor, again, bin Laden

2     wouldn't have called what he was doing terrorism.

3           THE COURT:  I don't care what he called it.  I'm

4     trying to figure out how you define it.  As I say, you say it's

5     sufficient to allege that they were an agent of Saudi Arabia

6     for a non-terrorist purpose, but that makes them an agent for

7     the terrorist act.

8           MR. CARTER:  Your Honor, we're saying that the

9     sponsorship and promotion of jihadist activity, including

10    terrorist activity, was not so far removed from the core scope

11    of their mission as to cause defaults on the other agency --

12    let me explain.

13          THE COURT:  Yes.  Okay, but when you say that it is

14    not far removed, even an agent with jihadist ideology doesn't

15    necessarily mean that that entity is going to be involved in

16    murder and terrorist attacks.

17          MR. CARTER:  That's what I was getting to, your Honor.

18          THE COURT:  Okay.

19          MR. CARTER:  I think it's evident, when you look at

20    the actual so-called charities that comprise this religious

21    apparatus, we've offered evidence that every single one of

22    these agencies was pervasively involved in promoting terrorism.

23          THE COURT:  But promoting terrorism is different than

24    committing terrorist acts.

25          MR. CARTER:  Well, your Honor, the descriptions of

I1IP9113

1    what these organizations were doing go beyond just providing

2    support.  They actually talk about being organizationally

3    intertwined with Al Qaeda to a very extensive degree.

4          THE COURT:  That's what I'm trying to understand.  Is

5    your agency theory based on the fact that you claim that

6    they're espousing jihadist ideology, or is it based on the fact

7    that you said they, themselves, are involved in committing

8    terrorist acts?  And, therefore, the terrorist acts that

9    they're involved in committing or supporting, they're doing so

10   as agents of Saudi Arabia?

11         MR. CARTER:  Your Honor, we're saying that the violent

12   activities that these organizations engaged in, the terrorist

13   activities, were part and parcel of the way that they believed

14   it was appropriate to engage in their various missions.

15         THE COURT:  When you say "these organizations" --

16         MR. CARTER:  I'm saying the Saudi government's

17   proselytizing organizations.

18         THE COURT:  Then how is that defined as a terrorist

19   act?  I'm not sure I understand what terrorist acts that you're

20   referring to by these organizations.

21         MR. CARTER:  Your Honor, again, we've gone into really

22   extensive details in the pleadings about the degree of

23   collaboration between these organizations and Al Qaeda.

24         THE COURT:  Just give me an example.  Give me an

25   example of what act you're saying that Saudi Arabia is

I1IP9113

responsible for because one of these organizations was the

agent of Saudi Arabia for that act.

MR. CARTER:  Your Honor, let me try to do this by

providing a statement from the former U.S. Deputy National

Security Advisor, Juan Zarate, who was one of the architects of

our post-9/11 counterterrorism structure.  He observed that the

Saudi's had built an extensive global network spreading a

certain brand of religious thought, but in doing so may have

provided a platform for Al Qaeda and like-minded adherents, who

benefited greatly from this network both financially and in

terms of growth.  Many of the --

THE COURT:  Slow down please.

MR. CARTER:  -- Wahhabi institutions funded out of

Saudi Arabia served as way-stations for Al Qaeda operatives and

fund-raising.  Distinguishing between some of the international

Wahhabi organizations and terrorist networks was nearly

impossible, especially when support for Al Qaeda and support

for spreading Wahhabi beliefs seemed to blend together so

seamlessly.  This was true in the work of some of the branches

of Saudi-based institutions, such as the International Islamic

Relief Organization.  For us, cutting off flows of funds to Al

Qaeda meant much more than just targeting a select few

individuals or institutions.  It was ultimately about changing

the fundamental elements of Saudi policy by constricting how

the Saudis and their institutions funded activities abroad.

I1IP9113

1          THE COURT:  Okay.  So how does that indicate that they

2    are agents for Saudi Arabia committing or supporting terrorism

3    acts.

4          MR. CARTER:  Your Honor, again, we're saying that, you

5    know, part and parcel of what they were doing in the period

6    prior to 9/11 in particular, was trying to advance any western

7    pro-jihadi causes.  Al Qaeda wasn't any western pro-jihadi

8    organization, and there were broad partnerships between these

9    organizations and Al Qaeda, and it was part and parcel of what

10   they were doing globally.

11         JUDGE NETBURN:  And Mr. Kellogg made reference to some

12   of the activities that the Kingdom was engaged in in the mid

13   '90s.  Is that something we should even consider in thinking

14   about whether or not funding these charity organizations was an

15   act of developing an agency relationship with Al Qaeda?

16         MR. CARTER:  In terms of the temporal remoteness, your

17   Honor, is that the question?

18         JUDGE NETBURN:  In terms of what the Court should be

19   looking at in thinking about whether or not you've adequately

20   alleged an agency relationship between the Kingdom and these

21   charities.  These arguments are, as I understand them, that

22   these charities then funded Al Qaeda.  To the extent that there

23   is affirmative evidence that suggests that the Kingdom was

24   anti-Al Qaeda and was doing things affirmatively to kick

25   Al Qaeda out, is that something that we should be considering

I1IP9113

at this stage in the process, or is that something that goes

more towards merits and we shouldn't think about it now?

          MR. CARTER:  I think it goes more towards the merits.

It's a complicated question.  We made the argument that the

Kingdom thought that this was in its interest because it served

to export the religious venom away from Saudi Arabia, and we

ended up suffering harm as a result of that.

          So I don't think it's necessarily exclusive of one

another that they would be trying to protect themselves

internally while being accommodating with pushing its agenda

outside.

          So I'm going to let Mr. Pounian speak because I used a

good bit of his time.  I do just want to say a few things.  You

know, Mr. Kellogg said a bunch of things about the findings of

the 9/11 Commission report and how conclusive they were.  One

of the attachments to the consolidated amended complaint is

what they refer to as the Florida Bulldog memorandum.  It's not

that.  It is an FBI final status report concerning where their

investigation stood in 2012.

          And among other things, your Honor, it confirms that

the FBI included that Fahad al Thumairy immediately assigned

someone to assist the hijackers upon their arrival in the

United States.  So, you know, what we have here is a

confirmation, and this is confirmed in the 2015 9/11 Review

Commission, years after the 9/11 Commission closed its doors.

I1IP9113

1    The 9/11 Review Commission confirms that the FBI continued to

2    maintain an open and ongoing investigation into Fahad al

3    Thumairy and Omar al Bayoumi and their roles in support of the

4    two 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar.

5         The 9/11 Review Commission did not exonerate any of

6    those individuals.  Quite to the contrary.  It said that the

7    investigation was open, and it encouraged the FBI to continue

8    the investigation.  It also went out of its way to cite in a

9    footnote in the 9/11 Review Commission report this 2012 report,

10   which talked about Thumairy's involvement.  The further details

11   in the 2012 report document that Fahad Thumairy and Omar

12   Bayoumi were known to have provided substantial assistance to

13   the hijackers.  These subjects provided and directed others to

14   provide the hijackers with assistance in daily activities,

15   including procuring living quarters, financial assistance and

16   assistance in obtaining flight lessons and driver's license.

17        It goes on to explain that Bayoumi was living in

18   San Diego on a student visa, just not attending classes and

19   receiving a salary from the Kingdom of Saudi Arabia for job

20   duties he never performed.  And lastly, is says that there is

21   evidence that -- the name is blanked out -- Thumairy and

22   Bayoumi were helping in assisting the hijackers.

23        So in terms of what Mr. Kellogg had said about the

24   purported conclusiveness of the 9/11 Commission report in terms

25   of this investigation, it's simply not correct.  The

I1IP9113

1    investigation went on long after that, and it directly

2    confirmed a number of the predicate facts that we have alleged

3    previously and filled in a lot of the gaps that we didn't know

4    about.

5              THE COURT:  Just, the facts that you rely on in your

6    report, for the most part, in the report it concludes that

7    Saudi Arabia was not involved.

8              MR. CARTER:  Your Honor, I don't think that's true.

9    If you're referring to the 9/11 Commission report, again, we

10   don't view anything in that report as concluding that no Saudi

11   agent was involved in the attack.  The language in the report

12   simply says that they hadn't found evidence that Saudi Arabia,

13   as an institution or individual senior Saudi officials, had

14   funded Al Qaeda.  The construction of that sentence seems quite

15   clearly designed to allow for the possibility that they had

16   found evidence that lower-level Saudi officials were involved

17   and that element of the government, but perhaps not the

18   government as an institution, was providing support to

19   Al Qaeda.

20             THE COURT:  I'm not sure that it would be appropriate

21   to conclude that in the absence of that statement in the

22   report.

23             MR. CARTER:  Right, but it's also not appropriate,

24   your Honor, to read that language as a complete exoneration,

25   given the way it's very qualified.

I1IP9113

1          THE COURT:  No, I understand that, but you're both

2     sort of relying on the same report.  You say that certain

3     things that they say in the report lend support to your claim,

4     and they say that, well, rely on the report because the report

5     says there's no evidence to indicate that Saudi Arabia was

6     involved in none of that.

7          MR. CARTER:  Your Honor, again, Mr. Kellogg has

8     characterized, for instance, the 9/11 as having exonerated the

9     Saudi government, but it doesn't do that.  It just doesn't have

10    any language to that effect.

11         THE COURT:  Well, I guess let me be broader on that

12    statement.  Those reports that you both reference, none of

13    those reports say that those facts lead to the conclusion that

14    Saudi Arabia was involved in 9/11.

15         MR. CARTER:  None of the reports have language to that

16    effect, your Honor.

17         THE COURT:  Or anything that means that.  I mean, none

18    of them had that kind of a conclusion or anything similar to

19    that kind of conclusion.

20         MR. CARTER:  I don't think they have a conclusion,

21    your Honor, but obviously, the question here is whether or not

22    there are factual allegations sufficient to state --

23         THE COURT:  And to the extent that they do reach

24    conclusions, the conclusions that they've reached are minimally

25    that there isn't sufficient evidence to conclude that Saudi

I1IP9113

1   Arabia was involved.

2         MR. CARTER:  Or that they declined to draw an

3   inference or that there was no evidence, that's correct, your

4   Honor.

5         JUDGE NETBURN:  Can I ask one question.  My

6   understanding of your principal request is JASTA has changed

7   the landscape and that the threshold for establishing

8   jurisdiction was lowered as a result.  And we had a

9   conversation about what's the causation standard and what does

10  it mean to have added the word "agent" into the statute.

11        The other argument that the defendants have made, one

12  argument, is that the standard is not dramatically lower, but

13  their other argument is that the facts that you're alleging in

14  this complaint are no different than the ones that you alleged

15  previously.

16        Can I give you an opportunity just to tell me if you

17  think there are facts that you're alleging in this complaint

18  that are materially different than the information you had when

19  you filed the original complaint?  I know you've done some

20  discovery now, if you would want to draw to our attention that

21  you say changed the landscape, setting aside what the statute

22  adds to your claims.

23        MR. CARTER:  Yes, your Honor.  There are certainly

24  differences, substantial differences between the material

25  that's been before the Court previously and the material that's

I1IP9113

1    before the Court now and that includes the additional details

2    that we now know about the nature of the involvement of

3    Thumairy and Bayoumi, Thumairy's role in immediately assigning

4    someone to help the hijackers.

5          One of the issues that the Court had concerns about

6    previously is an inability to infer from the factual

7    allegations that Thumairy had provided assistance to the

8    hijackers.  We now have an FBI report saying that he did just

9    that, and that informs all of the other facts in a very

10   substantial way because it places Thumairy very much at the

11   center of the domestic support network for the two hijackers.

12   We knew that they were ill-prepared for a mission in the United

13   States, that Al Qaeda was unlikely to send them here without

14   arranging in advance for someone to receive them.

15         We knew that they spent time at the King Fahad Mosque,

16   where he was the imam in the days immediately after.  The 9/11

17   Commission suggested that the circumstantial evidence made him

18   a logical point of contact.  We now have the FBI reaching the

19   conclusion that he immediately assigned someone, and then from

20   that, all of the remarkable circumstances flow with his

21   engagements with Bayoumi, leading to the provision of the very

22   precise forms of assistance that they needed to settle in the

23   United States.

24         So that's one of the areas, your Honor, where it would

25   be different.  Obviously, the other area is that, you know,

I1IP9113

1    previously, anything that was said about activities outside the

2    United States was irrelevant, and so everything that's in the

3    complaint that talks about the activities that were occurring

4    that allowed the funding of the training camps, all of these

5    activities now have jurisdictional relevance.

6            JUDGE NETBURN:  That's helpful.  Thank you.

7            MR. CARTER:  Thank you, your Honor.

8            MR. POUNIAN:  If I may, your Honor.  May it please the

9    Court, my name is Steven Pounian with the firm of Kreindler and

10   Kreindler.  I represent the Ashton plaintiffs in this case, who

11   are the family members, the husbands, the wives, the mothers,

12   the fathers, the children of the 2,977 people killed in the

13   9/11 attacks, along with thousands who were injured.

14           The first point I'd like to make, your Honor, is we

15   need discovery from Saudi Arabia.  Mr. Kellogg has come forward

16   and said plaintiffs are free to come forward with evidence, and

17   the jurisdictional motion that they've presented here is really

18   equivalent to a summary judgment motion because asking us for

19   evidence on the merits, the key elements of the merits of the

20   case, the tortious act, you know, whether the act is

21   attributable to Saudi Arabia by virtue of an either like scope

22   of employment or alter ego and whether there's causation in the

23   case.  Those are the essential elements of the claim, and we've

24   just brought our complaint.

25           All of our clients are here for the first time, your

I1IP9113

Honor.  They were not involved in the prior case that this

Court heard, and we are coming here for justice.  And Saudi

Arabia has said in this case, well, the balance is a sovereign

has a right to -- a greater right than the plaintiffs have --

to discovery in this case.

Well, I think that's one area that JASTA really

changed that balance because in JASTA it said we're going to

look all over the world for whatever acts, and if anyone comes

and gives support to a terror group that causes injury inside

our country, that affects our sovereignty, the sovereignty of

the United States, and affects the rights of people here at

home, if someone comes and does that, well, that is a different

equation and we're going to give those people, according to

Congress -- they said specifically in the statute, they wrote

in a note that said there's a vital interest of the United

States to provide those victims with full access to the courts.

And full access to the courts means discovery.  You

can't file a jurisdictional motion and say, oh, you know, hold

the discovery behind your back, hold the evidence and say, oh,

you've got to come forward with the evidence.  They have the

evidence.  They have the documents regarding scope of

employments.  They're the employer.  They have those documents.

They have the witnesses.  They have Thumairy.  They have

Bayoumi.  They have their supervisors who were supervising

them, and that's what we need to prove the case.  That is the

I1IP9113

1    essential element of the case.

2              Now, I just wanted to turn to your question, Judge

3    Daniels, about what's new, what's different about the case now

4    before when you last heard it, and I'll focus in first on the

5    United States evidence because, you know, JASTA has added

6    evidence outside the U.S., which I'll cover later.

7              But, first, what have we presented?  What have the

8    Ashton plaintiffs presented that's new?  And there are three

9    things I'd like to focus on.  First, the declaration of Steven

10   Moore, the FBI special agent who led the PENTTBOM team in

11   Los Angeles in the first two years when they're investigating

12   to see all of the trails, who was involved in Los Angeles in

13   supporting the hijackers when they came there.

14             And Mr. Moore has come forward and presented -- he's

15   coming forward, really, as a fact witness.  He's not an expert

16   who's coming in to give us opinions regarding looking at the

17   evidence in the case.  He's coming forward as a fact witness to

18   say what he and his team, team of 400 people, found when they

19   were beating the bushes and looking for the facts in the case.

20   And what he and his team came forward and said was there was a

21   terror cell operating in Los Angeles, populated by Saudi

22   government agents, including Bayoumi and Thumairy, and that

23   Thumairy was the ring leader of this operation, and that he

24   knew ahead of time that the hijackers were arriving.  The

25   reason that he knows that is because he set up a place for them

I1IP9113

1    to go on their arrival.

2            And on top of that, he knew the people were Al Qaeda

3    terrorist and that they had a plan to attack inside the United

4    States using airplanes in some way.  He didn't know -- maybe he

5    didn't know the whole range of the plan, but according to

6    Detective Moore, who's FBI Special Agent Moore, those details

7    were known by Thumairy at that time.

8            And he arranged a place for them to stay, and he

9    arranged for someone to help them immediately upon their

10   arrival, as is shown -- if I could turn the Court to Exhibit 2,

11   which was just referenced here, if I may, the last page, page 4

12   of that exhibit.  It states that Fahad Thumairy was an imam at

13   the King Fahad Mosque near Los Angeles when Hazmi and Mihdhar

14   first arrived in the U.S.  Al Thumairy immediately assigned an

15   individual to take care of them during their time in the

16   Los Angeles area.

17           Now, he knew to immediately assign someone because he

18   knew they were coming to Los Angeles.  He was part of a cell

19   that knew that.  Now, we don't have the hard evidence of that.

20   I need Mr. Thumairy's deposition.  I need to know the details

21   of the evidence that Saudi Arabia has in their possession to

22   know that.

23           We also know that Thumairy and Bayoumi were in contact

24   with each other.  They had a meeting on February 1st, 2000, at

25   the consulate, and we also know the page prior to this, page 3,

I1IP9113

1   that the part that's highlighted, it says:  Shortly after

2   February 4th, 2000, Bayoumi tasked Mohdar to assist Hazmi and

3   Mihdhar.  And according to the first sentence, Mohdar played a

4   key role facilitating the daily lives in assisting the

5   hijackers.

6        So it went from Thumairy to Bayoumi to Mohdar as part

7   of this cell that had been formed in Los Angeles.  Now, that's

8   the first fact.  The details from inside the investigation,

9   conducted and led in Los Angeles by Special Agent Moore.

10        Now, the second fact that's new that was referenced

11   before is on page 4, at the very bottom.  If we turn to the

12   next page, it says:  There is evidence that -- and it's

13   blank -- tasked al Thumairy and Bayoumi with assisting the

14   hijackers.  So someone was involved above Thumairy and Bayoumi.

15        Now, the inference is that it's someone above them in

16   the Saudi government.  We don't know for certain from this

17   document who that is, but we know who Bayoumi -- who Thumairy

18   was reporting to.  His boss was named -- one of his superiors

19   was named Khalid Suwaylim, and he was at the Saudi embassy in

20   Washington, D.C.  And the strange thing is Bayoumi, who's here,

21   if you see on the -- just above the paragraph there, he's

22   living in San Diego on a student visa, despite not attending

23   classes, and receiving a salary from Saudi Arabia for job

24   duties he never performed.  Very strange, mysterious.

25        And what is he doing?  Well, we find out that Bayoumi

I1IP9113

is making phone calls to Thumairy's superior.  And if you turn

to page 25 -- Exhibit 25 in the exhibits, these are -- this is

a record from the FBI of phone calls from Mr. Bayoumi and it's

to the embassy of Saudi Arabia.  And it says, there's a number

there 202-342-3700.  This number was called 30 times.  The

calls, and it's marked out, but we know this is from Bayoumi's

phone.  And it says these calls were made during the period

from January 19th, 2000, to March 24th, 2000.

          Now, we know the hijackers arrived on January 15th in

Los Angeles.  Four days later, Bayoumi is calling Thumairy's

superior in Washington.  Now, how do we know that phone number

is Thumairy's superior in Washington?  If you go to Exhibit 50,

your Honor, you'll see the same phone number on the stationery

of Mr. Suwaylim.  It's the second page.  It's the official

Saudi Arabia stationery that has the phone number.  That is the

same phone number that Mr. Bayoumi, who's on a student visa,

doing job duties that he's never performing in Los Angeles,

suddenly he's calling someone in Washington, D.C., who's

Thumairy's superior.

          We are entitled to discovery on that.  We're entitled

to ask Mr. Bayoumi:  Why are you calling Thumairy's superior?

We're entitled to talk to Mr. Suwaylim, and saying:  Why was

Mr. Bayoumi calling you?

          And the third new element in this, your Honor, is a

totally different element of money laundering that's going on

I1IP9113

1    also, because Mr. Suwaylim, if we go back to Exhibit 50,

2    Mr. Suwaylim is contacting another Saudi employee who's in

3    San Diego.  If you recall, Mr. Bayoumi was living in San Diego,

4    especially an undercover Saudi Arabia employee, who was here on

5    a student visa, essentially violating federal law, working for

6    Saudi Arabia inside the United States as an undisclosed agent.

7    It's against the law to do that, but there was not only

8    Mr. Bayoumi, there was a second person, whose name was Abdi

9    Mohamed.

10           Abdi was also here, he was here on a religious workers

11   visa, but that turned out to be a fraudulent visa.  He was

12   working essentially for -- he was working for the Saudi

13   government as a so-called propagator, and the evidence shows --

14   the documents show, that we have found, and he was essentially

15   brought up on immigration charges in San Diego that are

16   completely independent of the 9/11 investigation.  And

17   according to those immigration charges, he had set up a

18   charity, a relief charity called the Western Somali Relief

19   Agency, and that charity was used to launder money, we've

20   alleged, to Al Qaeda for three years, from 1998 to 2001.

21           And if I may, your Honor, I'd just like to walk

22   through the documents with the Court.  First of all, Exhibit

23   13.  Now, Exhibit 13 is a portion of what's called the 28

24   pages, which was part of the congressional joint inquiry that

25   was conducted right after the 9/11 attacks, and this was not

I1IP9113

released until 2016, just like the other Exhibit 2 was only

released in 2016.  So it came after this Court previously heard

this case.

          And this, the inquiry report, describes the exact

modus operandi of the money laundering scheme in San Diego.  If

I could refer the Court to the bottom of the page, where I have

highlighted it, it says:  There are indications in the FBI file

that elements of the Saudi government may have provided support

to terror networks.  For example, the FBI had identified the

Ibu Tamiyah Mosque in Culver City as a cite of extremist

activity both before and after September 11th."

          Now, that mosque is the same mosque where Thumairy was

the imam, and he was appointed as imam of that mosque by the

Saudi Arabia government, by someone in the government.  So the

mosque that this document is referring to as being the site of

extremist-related activity is Thumairy's mosque.  And not only

was he working as an imam at that mosque, but we know from

Mr. Moore's affidavit that he was handling the finances at that

mosque.  He was in charge of finances there.

          Now, it says several subjects -- if I could keep

reading, your Honor -- several subjects of the investigation

prior to September 11th had close connections to the mosque.

Based on interviews and review of the files, San Diego FBI

agents believed at the time that these subjects were laundering

money through this mosque, first, to Somali non-profit

I1IP9113

1  organizations and then to other entities affiliated with Osama

2  bin Laden.

3              And on the next page, the report gives the timing.  In

4  approximately 1998, the FBI became aware of millions of dollars

5  in wire transfers from the Somali community in San Diego to the

6  Al Barakaat Trading Company and other businesses affiliated

7  with Osama bin Laden.  Now, this Al Barakaat Trading we've

8  shown in our papers it's a Somali money transfer company.

9  There's a form of hawala transfers that are used essentially to

10  hide -- it's not like a bank transfer.  It's a hidden form of

11  transfer of money that's used in a lot of Muslim communities,

12  but it's also used by terrorist organizations to hide the flow

13  of funds.

14              Now, the report continues to say:  At the time, the

15  funding appeared to be originating the Somali community in the

16  form of donations to Somali non-profits; however, the FBI now

17  believes that some of the funding actually originated from

18  Saudi Arabia and that both the mosque and the Islamic Center of

19  San Diego were involved in laundering the money.

20              Now, that is the modus operandi, but now we have the

21  specifics of what was going on in San Diego with this Western

22  Somali Relief Agency, the Somali non-profit that was formed by

23  a Saudi Arabia employee Abdi Mohamed, who was working under

24  Khalid Suwaylim, who was also Mr. Thumairy's boss, and it was

25  being run through the mosque that Thumairy was working at.

I1IP9113

1    So if I could refer, your Honor -- we don't have the

2    records on this, the documents, because the immigration files

3    and the prosecution of Abdi Mohamed was not released publicly,

4    but we have portions of the public files, and that's what I'd

5    like to refer the Court to now.

6    If you go to Exhibit 44, it's a brief that was filed

7    by the U.S. Attorney in that case, and on page 2 of that brief,

8    where we've highlighted, it's referring to Mohamed, which was

9    Omar Abdi Mohamed, and it states that he indicated he was the

10   president and founder of the Western Somali Relief Agency.  He

11   falsely claimed that the agency received no funding and was an

12   entity in name only.

13   However, financial records show that the Western

14   Somali Relief Agency received over $326,000 from the Global

15   Relief Foundation and $5,000 from Al Haramain.  Now, as it

16   states here in the next two sentences Global Relief and

17   Al Haramain were both identified after 9/11 as terrorist

18   organizations because they were funding Al Qaeda.

19   It also states here that Mohamed was questioned about

20   his employers, and he failed to list on his application or tell

21   his interviewers that he was an employee, that he had been an

22   employee of Saudi Arabia for almost ten years.  He was employed

23   for Saudi Arabia in the United States since 1995, and he was

24   here on a false religious visa.

25   He never -- he had signed up for a -- someone had

I1IP9113

surreptitiously got him a job at a mosque in San Diego, but he never actually worked there, and he was in the United States as an employee of Saudi Arabia.  Again, a violation of federal law, something that Saudi Arabia had to know about.  They had to know that their own employee was illegally in the United States as a foreign undisclosed foreign agent.

And what was Abdi Mohamed doing in the United States? If we turn your Honors to page 5, it gives the amounts.  Bank records show that between December 1998 and May 2001, the Western Somali Relief Agency received 16 checks totaling $326,000 from Global Relief.  And on the next page it says, in addition to that hundreds of thousands from Global Relief, they received one check of $5,000 from the Al Haramain Foundation in Ashland, Oregon.

Now, we sued the Al Haramain Foundation in Ashland, Oregon, and the one document -- as your Honor may recall, they defaulted in the case, didn't produce many documents.  All the documents actually went to -- Saudi Arabia seized the documents in 2004.  One of the things we'd like to request are those documents that Saudi Arabia has, but one document we got, your Honor, is the check.  And if we turn to Exhibit 107, there is the check from Al Haramain to the Western Somali Relief Agency, dated March 2nd, 2000.

Now, this check was ordered to be sent to the Western Somali Relief Agency by a Saudi Arabia employee who worked in

I1IP9113

Riyadh, Saudi Arabia, named Buthe, who is also a defendant in

this case, your Honor, and he was designated as a terrorist by

the United States after 9/11, for providing money laundering to

Al Qaeda. $152,000. He went to Oregon, picked up a briefcase

with $152,000 and carried it to Al Qaeda, and then he was made

a designated terrorist.

Of course, he didn't lose his job with Saudi Arabia

after that. In fact, they gave him promotions, they gave him

bonuses, and they started paying him in cash so that he

wouldn't have to worry about the sanctions that came with his

designated terrorist status. So they helped him get around the

sanctions that were imposed as a result of him being a

terrorist.

But this is the only financial record we have from

this scheme, from the WSRA scheme, and our discovery plan asks

for the documents that Saudi Arabia has regarding Abdi

Mohamed's files, the documents from the Western Somali Relief

Agency, the financial records, the communications. And

Mr. Buthe is going to be deposed in this case. We're going to

have this deposition, and we shouldn't have any resolution of

this, any motion, any judgment that Saudi Arabia wants in this

case. We shouldn't have any resolution until we take that

deposition and get the facts, get the evidence that the

families have been denied up until now.

So I'd like to turn back, your Honor, if I may, to

exhibit -- to the Exhibit 44, and I apologize, but the detail
and the number of facts, it's very easy for Saudi Arabia to
come in and say there's no evidence, and then we have to come
forward and it takes time.

There are inferences that need to be made.  There are
details, and it's very difficult and complex, the facts in this
case, and we need -- I need time to get the facts through.  So
on page 6.  Now, what happened to the money that came from
these Al Qaeda funders?  WSRA wrote checks of over $375,000 to
various people.  The vast majority went to Dahab Shil, a money
transmitter.  It specializes in sending money to countries in
the Middle East and Africa.  They wrote over 65 checks to Dahab
Shil; the smallest was 370, the largest was 60,000.

We want the records of any communications with Abdi
Mohamed and Dahab Shil.  We want the records regarding Dahab
Shil.  We believe it's likely, and it's certainly plausible,
that the money, this money, went to Al Qaeda, this $375,000.
And why is that?  Because of the modus operandi that the FBI
found of the money laundering operation from Al Qaeda to the
Saudi elements at the mosque, and because the money that was
coming in, the money that Abdi Mohamed was getting was coming
from these two Al Qaeda funders, Al Haramain and Global Relief
Foundation, known Al Qaeda funders.

There's a third additional factor here, your Honor,
Dahab Shil.  What is Dahab Shil, and what were they back in

I1IP9113

1    2001?  Now, they have a business that's reputable.  I don't

2    know what's going on now, but I can tell you back -- what was

3    going back in 2001.

4            If your Honors would turn to Exhibit 48, this is the

5    record of an interrogation at Guantanamo of a detainee, who was

6    arrested by the Pakistan Security Agency.  And they went and --

7    they went to his residence because of reported ties between

8    Dahab Shil and Al Qaeda.  That's referenced in the first

9    sentence there.

10           And on the next page, he denied everything, but they

11   went and found all of his records, his computers.  They

12   searched them and they assessed him to be an Al Qaeda member, a

13   veteran extremist and a probable associate of Osama bin Laden

14   himself, dating back to 1992.  And he provided direct support

15   to Al Qaeda and other terrorist entities through his Dahab Shil

16   business.

17           It says:  Prior to his capture, detainee was in

18   contact with other Somalis possibly linked to Al Qaeda, who

19   were living in the United States and who may have been involved

20   in terrorist financing operations.  Well, we have alleged, and

21   we believe, that Abdi Mohamed was one of the Somalis in the

22   United States tied to terrorist financing organization, and he

23   was working through Dahab Shil to send money to Al Qaeda.  And

24   we believe that there's a more than plausible basis for that

25   allegation and that we should be permitted discovery on that

I1IP9113

point.

Just one final point on this matter.  Who was
supervising?  As I said before, Abdi Mohamed was being
supervising by Khalid Suwaylim, who was Thumairy's superior.
And if we go to Exhibit 44, page 7, the very last page of the
document, the very first sentence:  Other documents show that
Mohamed received raises and bonuses for doing good work.

Now, we know that he was visited in person by Suwaylim
at sometime while he was -- this Western Somali Relief Agency
program was going on.  So we want to know -- we want his
employment records.  We want to know why Saudi Arabia came to
the conclusion that this Abdi Mohamed was doing good work.

Now, let me turn, your Honor -- that's the third
difference, the third new element to the case that is different
from before.  And as I said, we want jurisdictional discovery,
document requests, depositions of the relevant actors,
Thumairy, Bayoumi, Suwaylim, Abdi Mohamed, their employment job
responsibilities, their supervisors, the details, their
knowledge, their motives, their contacts.

Now, the Court has gone over already the elements of
jurisdiction under JASTA, tortious conduct, here, knowingly
providing material support.  Now, the money, the money that was
sent by Abdi Mohamed, the 375,000, under the law, as dictated
by the Second Circuit, the relevant cases I think are the Weis
case, your Honor, is perhaps a relevant case, and also the case

I1IP9113

1    your Honor mentioned before, the Al Rahji case.

2              The question is whether there is material support to

3    Al Qaeda that's performed knowingly, whether there's a knowing

4    or reckless element to providing material support.  And we

5    believe that we've alleged, in terms of Abdi Mohamed, Thumairy,

6    Bayoumi, that those elements are met.

7              There's no requirement that there be actual knowledge

8    of the attacks or the mission.  In terms of establishing

9    knowledge, the Second Circuit in the Weis case said there's a

10   lenient standard because it's an issue -- it's a question of

11   fact to be decided by the trier of the facts, in this case,

12   your Honor, to decide, after hearing the evidence, after

13   hearing the witnesses.

14             The second element of jurisdiction is scope of

15   employment, your Honor, or alter ego, something attributing it

16   to the sovereign.  And here, it's a question -- it's another

17   question of fact that has to be really resolved by hearing the

18   testimony of the witnesses, by seeing the documents, by seeing

19   what is their job, what are they being told to do, what are

20   their instructions, and it looks at the employee's motive.

21   What is the employee told to do?  What do they believe they're

22   doing?  Whether they believe they're acting for the benefit of

23   the employer.

24             And here, we've shown that Thumairy and Bayoumi, Abdi

25   Mohamed, they were all tasked by someone, they were instructed.

I1IP9113

1   That's what we believe the evidence will show when we get the

2   evidence.  And that tasking establishes scope of employment.

3   If you're told to do something, that means you're acting within

4   your job.  By definition, it's within the scope of employment.

5   Now, the third factor is proximate cause, causation,

6   which we have discussed already, and I think Judge Netburn

7   asked earlier, is there another statute that -- is there

8   another case that has interpreted similar language in the

9   statute.  The language in JASTA is "caused by," is the injury

10   or death caused by the tortious act.  And the words "caused by"

11   were interpreted specifically by the Supreme Court in the

12   Grubart case, an admiralty jurisdiction that we've cited.  And

13   they've interpreted it to mean that it's basic proximate cause,

14   standard, traditional cause.

15   JUDGE NETBURN:  That's different than what the

16   Plaintiffs' Executive Committee's positon is.

17   MR. POUNIAN:  Well, the standard is one of -- is a

18   substantial factor and is reasonably foreseeable.  That is

19   causation, that is what "caused by" has been interpreted to

20   mean by the Supreme Court in Grubart.

21   JUDGE NETBURN:  Right.  The definition, as I

22   understand it, is there a reasonable connection.

23   MR. POUNIAN:  A reasonable connection, there's

24   different interpretations in terms of that.

25   JUDGE NETBURN:  Thank you.

I1IP9113

1          MR. POUNIAN:  Now, what is the cause here?  The two

2     hijackers came in, according to Mr. Moore, they had zero chance

3     of success without the help of the -- of Bayoumi and Thumairy

4     and the others in the cell that had been set up for them in

5     advance.  Money -- your Honor had asked before about how does

6     money connect.  It's really, the cases have said is it

7     substantial and is it timely?

8          In terms of in here, we know the cost of the attacks

9     was about $400,000.  So is the money that's coming in to Al

10    Qaeda, the person who gives the money doesn't have to know that

11    they're funding the attacks, but the amount of money has to be

12    such that it is substantial enough to be a cause and that it is

13    timely.  If it's money that's given 15 years ago, it may not be

14    timely.  If it's a thousand dollars, as opposed to $375,000,

15    that's a factor.  It's a factor that the Court has to weigh and

16    decide as a question of fact.

17         All of these facts, causation, it's not simply a

18    matter of each act piecemeal.  You don't look at each act

19    separately, but we look at all the acts that the Court finds

20    are true or that finds to have support in the evidence, and

21    look at all those acts together, cumulatively, to see if they

22    establish a cause.  So it's not that we look at one element of

23    money to see if this element of money is enough, or this.  But

24    if they give a total of X amount of money, that is what the

25    Court would look at to determine whether there is a cause.

I1IP9113

1    It's the cumulative, aggregate amount of money or the

2    cumulative amount of support, together with the money that's

3    given by Saudi Arabia, which has to await the determination of

4    all the different acts, of all the different things that were

5    done to support Al Qaeda.

6         I just want to briefly look at the reports.  There's

7    been a discussion of three government reports.  Now, whether or

8    not those are admitted into evidence, we can discuss that ad

9    nauseam.  I'm not going to do that right now, but regardless of

10   whether they are, they're all hearsay and the families are

11   entitled to the evidence, the evidence that Saudi Arabia has in

12   their possession because the Supreme Court in Rainy, that

13   Mr. Kellogg cited, specifically stated that the ultimate

14   safeguard to allowing a hearsay report in evidence is the right

15   of the plaintiff, the right of the party to come forward with

16   the evidence, to have the evidence to present to the Court.  So

17   here, we need the evidence.  We're entitled to discovery of the

18   evidence.

19        Now, even with the 9/11 Commission, they conducted --

20   they didn't look at Abdi Mohamed, they didn't look at Suwaylim,

21   they didn't look at the charities overseas, and they said with

22   Thumairy, we can't find the evidence but we know, we know

23   there's evidence of what happened, in terms of the understand

24   funding through the mosque, through the WSRA charity.  And we

25   know that he was tasked by someone -- we have alleged Khalid

I1IP9113

1    Suwaylim at the embassy -- to help the hijackers.  We know

2    that, and we need to get the evidence.

3           Now, the Commission interviewed Thumairy and Bayoumi,

4    but they didn't keep a transcript.  All we have is a memo, and

5    even that is objected to by the Kingdom.  It's a hearsay memo,

6    according to them; so it doesn't go in evidence.  So we have

7    nothing.  There's nothing at all that the families have because

8    they're holding onto the witnesses and to the evidence.

9           Now, the 2005 FBI/CIA report, I'd just like to turn to

10   that, if your Honors could.  It's Exhibit 4 in our binder.

11   Now, Mr. Kellogg pointed out the first bullet point there,

12   which says there's no evidence that the Saudi government or

13   members of the family knowingly provided support for the

14   attacks or had foreknowledge of the terrorist operations.  But

15   that is not the test before this Court.  The test is whether

16   there was material support to Al Qaeda by the Saudi government.

17          And if you look at the very final paragraph here, it

18   says, in the past, in other words, before 9/11, before 2003

19   when they had a change of heart, evidently, according to this

20   document, the Saudi government found itself in a precarious

21   position.  On one hand, it was denouncing Al Qaeda as a threat,

22   and then on the other hand, it was treating the group, the very

23   last five words of the document, treating the group with

24   special consideration.  What is the special consideration that

25   Saudi Arabia was treating Al Qaeda with?  That's what we want

I1IP9113

1    to know from the evidence.  That's what we want to know from

2    the discovery.

3           The other highlighted paragraphs here say that there's

4    evidence, there is evidence, that official Saudi entities and

5    associated non-governmental organizations provide financial and

6    logistical support to individuals in the United States and

7    around the world, some of whom are associated with terrorism.

8    And then it says that the Saudi government and many of its

9    agencies have been infiltrated and exploited by individuals and

10   others sympathetic to Al Qaeda.

11          So this document shows that the Saudi government is

12   providing support to Al Qaeda before 9/11, that there are

13   elements within the government, elements that we've shown, for

14   working through this mosque in Los Angeles to fund Al Qaeda,

15   working through Abdi Mohamed, Thumairy and Bayoumi to support

16   Al Qaeda.

17          Now, the 2015 Review Commission that was cited said

18   that the investigation is ongoing and they supported the

19   ongoing investigation.  And the standard for us in this case,

20   they're looking at it from the perspective of a criminal case,

21   your Honor.  Our case is not a criminal case.  We have a civil

22   case.  Our burden is not the same as for the FBI, in terms of

23   proving a case against the perpetrators.

24          Our burden is a civil law burden of a preponderance of

25   the evidence.  So our evidence can very well justify our case,

I1IP9113

1    where it may not be enough for the FBI to decide they want to

2    prosecute Thumairy or go after -- you know, something that's

3    going to cause an international incident with Saudi Arabia.

4              If I could turn quickly to specifically in terms of

5    the charities, there's two essential arguments that we have,

6    and in terms of our allegations in our complaint.  One is that

7    Saudi Arabia knew, when it was giving money to the charity,

8    there was knowledge on the part of Saudi Arabia when they

9    knew -- when they gave money, that they knew it was going to

10   Al Qaeda, that's one element.  And the second is that the

11   charities were the alter ego of the government.

12             Now, how do we know that Saudi Arabia knew money was

13   going to Al Qaeda?  We have alleged a funding scheme through

14   the IIRO.  Mr. Carter mentioned it before.  And it was going on

15   for about ten years prior to 9/11.  The Saudi government had

16   donated every year, and in the last full year before 9/11,

17   donated $4 million to this orphan program for the IIRO.  And

18   they weren't a passive contributor to the IIRO.  They were

19   actually, according to other documents, the Saudi embassy in

20   Pakistan was steering the work of the IIRO in Pakistan.

21             And we know, as mentioned before, that the IIRO was

22   sponsoring the training camps in Pakistan, where the terrorists

23   went and received their training so that they would be capable

24   to perform the hijackings that they performed and the acts that

25   they performed.

I1IP9113

1              And we also know that for at least ten years there was

2       fraud going on inside the IIRO.  They were writing false

3       paperwork, and in this false paperwork, they were trying to

4       hide the trail of the money.  There was a man named Fadl, who

5       came forward.  He was a defector from Al Qaeda, and he revealed

6       that the charities, they had whole lists of orphans that were

7       fraudulent, and instead of the money going to orphans, the

8       money was going to Al Qaeda.  This was back in the early 1990s.

9              And in 1997, it came out eventually, it became public,

10      and in 1997, the head of the Muslim World League, the IIRO,

11      their associated organizations, and in Pakistan they operate

12      together.  The head of the organization said, well, we

13      acknowledge that funds have been misused in the past, but it's

14      a closed chapter.  It's not going to happen anymore.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I1Is9114

1              MR. POUNIAN:  That head of the charity was also a

2    minister of Saudi Arabia.  He held a ministry level position in

3    Saudi Arabia.  He made that statement in 1997.  In our

4    discovery in this case, we obtained documents from the

5    charities in Pakistan, the Pakistani authorities were

6    investigating the IIRO for fraud.

7              They required that the investigator come in and they

8    hired Ernst & Young to come in and look at the paperwork of the

9    charity.  Ernst & Young did a report from 1996 to 2001 in which

10   they went through all the files of the charity and they found

11   out that the same phony paperwork was going on, the same

12   problem.  They found fake invoices, they found fake receipts,

13   and they found that over half of the money that was supposed to

14   be going to the charity was being lost.

15             We have alleged and we think there is reasonable basis

16   to believe more than plausible allegations that the money went

17   to Al Qaeda given the history and that Saudi Arabia was a

18   knowing participant in that scheme, that they knew the money

19   was going, and that it is the money that funded the training

20   camps.

21             Now, in terms of alter ego, we have shown in our

22   papers that all levels, in terms of the Muslim world IIRO, our

23   discovery in this case is still ongoing.  We need right now

24   to have further discovery to complete our discovery before

25   responding to the motion.  That was the requirement set forth

I1Is9114

by the Second Circuit in the <u>First City</u> case and a prior case

involving Iran where the defendant in the case was the

government of Iran and a party that was alleged to be the

alter ego.  The Second Circuit said, you've got to finish the

discovery of the alter ego first before we decide the

jurisdictional issue.

        The same is true here.  We need discovery of the

alter ego and we need discovery of Saudi Arabia.  What we now

know from the Muslim World League and the IIRO, we have gotten

documents and we have detailed the top to bottom control from

the highest levels on down to the lowest levels.  I can detail

it to the court.  It is in our papers, but they were appointed

the charity -- it is not only a matter of the top level of

appointing people, but it is the lower level doing the project

and grant decisions, hiring, firing employees, budgeting

finances, aid distribution, handling office space, fund

raising, all the elements of running the charity, the

purchasing decisions.  All of these things were handled by

government employees.  The cases cited by Saudi Arabia are

completely different.  There is no elements of actual proof

showing influence and control like we have shown here in our

papers from the discovery so far in this case, although alone

the discovery we have yet to receive from Saudi Arabia.

        I mentioned before the Al Haramain.  We have Saudi

Arabia has Al Haramain documents.  They were found to be an

I1Is9114

1    Al Qaeda organization admittedly by Saudi Arabia.  We have also

2    asked discovery of the hijackers' passport files because Saudi

3    Arabia was cleansing the passports of the hijackers so that

4    they could get U.S. visas.  We have asked for information about

5    the embassy in Afghanistan, how it came to be that the embassy

6    was taken over and became an Al Qaeda guest house during the

7    Taliban reign, how Saudi Arabia allowed Al Haramain and

8    Al Qaeda to take over the embassy, the money laundering and

9    using a construction company in Bosnia, overpaying them

10   hundreds of thousands of dollars, and the construction company

11   was controlled by a founder of Al Qaeda and two other Al Qaeda

12   members, all of whom are defendants in this case.  We haven't

13   had a chance to take their depositions yet, but we plan to and

14   that will be evidence that we will use in the case and evidence

15   that we need before we can respond to the motion.

16           Let me close, your Honor, with a quote from this court

17   from its decision in 2010.  You said -- this is a hard word to

18   say -- "The Labyrinthian means by which Al Qaeda receives

19   material support will not act as a shield to protect the

20   providers of the support from liability."  I think the same is

21   true here, your Honor.  The complex facts, the complex proof to

22   evidence that we need that is essential for the families to

23   properly present their case before the court, to properly

24   answer the jurisdictional challenge that has been raised.  The

25   congress in JASTA intended for families to have that discovery,

I1Is9114

1    to have that free access to the courts to pursue their claims

2    before your Honor.

3              Unless the court has any questions.

4              THE COURT:  No.  Thank you.

5              MR. POUNIAN:  Thank you very much, your Honor.

6              THE COURT:  If you have more than two minutes, let's

7    take a break, and we can finish up before we start the

8    argument.

9              MR. KELLOGG:  That's fine.

10              THE COURT:  Let's come back at 2:10 and we'll pick up

11    and finish this, and then we'll go into the other argument.

12              (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

I1Is9114

                          AFTERNOON SESSION

                             2:15 p.m.

             JUDGE DANIELS:  Let's see if we can line up this

morning.

             MR. KELLOGG:  Thank you, your Honor.  I will be quite

brief.

             Mr. Carter's prominent theme of his talk was that

JASTA has changed the landscaping in all sorts of ways.  I want

to make sure the ways in which JASTA has not changed the

landscape.  First of all, it has not changed the presumption of

immunity that a sovereign nation enjoys, which can be overcome

only if plaintiff satisfies specific exception to that

immunity.

             Second, it does not change the Supreme Court's

decision in Helmerich and Payne saying that even if the merits

and jurisdiction overlap, even if the elements overlap, the

court must resolve and make findings on the jurisdictional

elements before exercising jurisdiction.  The elements here are

a tortious act committed by an agent or employee of Saudi

Arabia within the scope of their employment.  It caused the

9/11 attacks.

             Another thing that has not changed is the burden of

proof, which is clearly on the plaintiffs both to come forward

with allegations, nonconclusory concrete allegations sufficient

under Iqbal and other cases to make out a claim that

I1Is9114

1   jurisdiction is satisfied, as well as where jurisdiction is

2   disputed, coming forward with evidence.

3          The Second Circuit, we cited a number of cases holding

4   that most recently, in the Vera v. Cuba case, a case in which

5   the plaintiffs were trying to invoke an exception that allowed

6   them to pursue somebody who had not been designated a state

7   sponsor of terrorism if the act occurred before their

8   designation, and they were designated in part because of that

9   act.  He claimed her father had been tortured and killed by

10  Cuba and that that was one of the reasons Cuba had been

11  designated to state sponsor of terrorism.  He even put in an

12  affidavit from an expert saying, in my opinion, that is what

13  happened.

14          The court flatly rejected that.  It said in order to

15  invoke the terrorism exception of the FSIA, Vera had the burden

16  to establish that Cuba was designated a state sponsor of

17  terrorism in 1982 as a result of his father's death.  It goes

18  on, it says because the record contains no evidence that

19  specifically links Cuba's terrorist designation to Vera's

20  father's death, Vera failed to meet his burden to establish

21  that the terrorism exception applied.  So too here, they have

22  the burden of coming forward with evidence to show a tortious

23  act by an agent or employee acting within the scope of their

24  agency that caused the 9/11 attacks.

25          Causation, too, is another matter that has not

I1Is9114

changed.  Congress used the ordinary word cause.  The Supreme

Court has repeatedly stated in <u>Burrage</u> and other cases we cite

that that means both but-for and proximate cause, as the Ashton

plaintiffs conceded.

        Now, Mr. Carter spent a lot of time talking about the

<u>Halberstam</u> case in his effort to show that a recused standard

of causation applied.  <u>Halberstam</u>, which is from the D.C.

circuit, is not a causation case; it is a secondary liability.

It is liability for aiding and abetting a principal.  JASTA's

secondary liability provision does not extend to foreign

sovereigns.  It applies only to persons.  This is in and refers

back to the dictionary act of the definition of persons.  The

dictionary act does not include sovereigns in the definition of

persons, so <u>Halberstam</u> is completely irrelevant here.

        Mr. Carter argues that as long as Saudi Arabia gave

money to a charity that it turned diverted funds to Al Qaeda,

that they can be responsible for that.  JASTA did not change

the causation requirements in that respect.  It would not be

tortious unless they had evidence that the Kingdom actually

knew or was recklessly indifferent to the diversion, and it

doesn't satisfy proximate cause as the Second Circuit has held

expressly in both the <u>Rothstein</u> case at 708 F.3d 82 and

<u>Terrorist Attack VI</u>, in this very case, where they said

allegations that you gave money to a charity who, in turn,

diverted it to Al Qaeda are not sufficient to establish

I1Is9114

1  causation.

2       Even if the court were to conclude at their behest

3  that we had a cozy relationship with Al Qaeda, that would not

4  be sufficient in the absence of proximate cause.  In any event,

5  it would be flatly contrary to the finding that the 9/11

6  Commission, the FBI, and CIA, and the 9/11 Review Commission

7  that we did not fund Al Qaeda.

8       What does Mr. Carter come up with in the way of

9  evidence?  A big huge record.  He comes up with one document

10 that he emphasizes to the court, which he says is the CIA

11 document showing that Saudi Arabia was through IIRO funding

12 terrorist training camps in Afghanistan.

13      First of all, that memo attributes to an unidentified

14 clandestine source that the IIRO, not Saudi Arabia, but the

15 IIRO had provided funding for that training camp.  It doesn't

16 even endorse it, it just says not a clandestine source says

17 this.  It doesn't even talk about Al Qaeda.  It just says

18 militant training camps.  That is clearly not admissible and

19 not sufficient to drag Saudi Arabia, a sovereign nation, before

20 the court and establish jurisdiction.

21      All of these charities that they were working with are

22 legitimate charities.  Even if there was some diversion to

23 Al Qaeda, Saudi Arabia cannot be blamed for that.  The second

24 Circuit has made a very high bar for such piercing of the veil

25 or agencies in the EM Limited case.  They said it is not enough

I1Is9114

```
1    to say that the charity was created by the sovereign.  It is
2    not enough to say it was funded and supported.  It's not enough
3    to say they appointed the leadership.  It is not enough if
4    officials served in some positions in the charity.  It is not
5    enough if the sovereign sets goals and policies or if they have
6    to seek approval for certain actions or that it has the power
7    to close them down.  None of that is enough to reach the high
8    standard of attributing the actions of the charities to the
9    Saudi Arabia.  There is no indication that Saudi Arabia ever
10   asked the charities to support Al Qaeda or other terrorists on
11   behalf of the Kingdom.
12        Mr. Pounian picks out one individual largely to focus
13   on and that was be Abdi Mohamed.  Yet, despite all the
14   documents back and forth that he mentioned, there is nothing in
15   there that suggests that he was acting to support terrorism
16   within the scope of his employment for Saudi Arabia.  There is
17   nothing on causation to show that money that went to the
18   Western Somali Relief Organization, whether that was dirty
19   money or not, that it in any way ended up in the hands of
20   Al Qaeda and financed the 9/11 attacks.
21        We are talking here about the most investigated event
22   in U.S. History.  The 9/11 Commission, the FBI, the CIA, the
23   9/11 Review Commission all rejected the suggestion that Saudi
24   Arabia was responsible for that act.  Plaintiffs have not come
25   forward with a prima facie case that would justify even
```

I1Is9114

1   jurisdictional discovery, and they have made no effort to

2   identify specific items that would resolve any jurisdictional

3   disputes that exist.

4         Their allegation, even on their own face, are legally

5   insufficient under Iqbal, but certainly their failure to

6   provide any evidence to counter the findings of the 9/11

7   Commission, the FBI, the CIA, etc., means that the case should

8   be dismissed.

9         Thank you.

10        JUDGE DANIELS:  Thank you.

11        Do you have anything?

12        MR. POUNIAN:  Nothing further from me, your Honor.

13        JUDGE DANIELS:  Thank you.

14        With regard to the second motion, who is arguing that?

15        MR. BERGER:  Mitchell Berger for National Commercial

16   Bank.  I have two colleagues on the defense side.

17        Thank you, your Honor.  With the court's permission,

18   the order of argument on the motions this afternoon will be I

19   will go first for NCB.  Mr. Gauch will follow with bin Laden

20   and Mr. Curran for Al Rahji Bank.  I have one idea to hand up

21   to the court, if I may.

22        If I may proceed, your Honor?

23        JUDGE DANIELS:  Yes.

24        MR. BERGER:  I suppose there is some poetic justice in

25   these three defendants being the second act today, because for

I1Is9114

1    all three of the Lloyd's defendants, this is their second act

2    in the 9/11 cases.  We have been brought back for an encore

3    after having been through proceedings before your Honor, before

4    the Second Circuit, and up to the Supreme Court.  Respectfully,

5    the encore that we are beginning today should be much shorter

6    than the first round of the lawsuits that we went through

7    because, frankly, there is nothing new here and, therefore, the

8    cases can be dismissed on *stare decisis*, which is our primary

9    argument.

10        Based on your Honor's hard work over many years, this

11   court set the foundation for the dismissal of the Lloyd's case,

12   at least against NCB, and my colleagues will speak for their

13   clients and dismissal of all of the other cases that come,

14   Lloyd's complaint.  That is because the Lloyd's case makes the

15   same allegations against NCB that your Honor previously held

16   were insufficient to exercise jurisdiction over NCB in the

17   Federal Insurance, Ashton, and other first-round cases.

18        Precisely because this case is a clone of those

19   first-round cases that your Honor dismissed, the judicial panel

20   on multi-district litigation sent this case here over the

21   plaintiffs' objection when they tried to file in the Western

22   District of Pennsylvania and said that they thought that your

23   Honor's primary rulings would enable this court to make short

24   work of these new cases.

25        Now, plaintiffs know it is the same case.  They

I1Is9114

1    purposely went to the Western District of Pennsylvania.

2    Mr. Cozen, who is also representing Federal Insurance, knew

3    perfectly well your Honor was presiding over these cases, that

4    these cases were the sames the ones that your Honor dealt with,

5    yet they said they needed to take the case to the Western

6    District of Pennsylvania.  They said, Oh, it is because we have

7    new facts and new law, the JPML said, you know what, that is

8    not convincing.  They sent the case here.

9         The JPML said because the allegations in <u>Lloyd's</u> were

10   highly similar to those that were made in the first round of

11   cases, that your Honor could both avail itself of the previous

12   discovery record and apply its prior rulings which, as they

13   noted, were affirmed on appeal.

14        Of course, the <u>Lloyd's</u> complaint has been amended

15   since that time, but even those events have borne out the JPML

16   forecast, because even after amendment, there is nothing new as

17   to NCB that was not in the <u>Federal Insurance</u> case, for example,

18   which Mr. Cozen pursued on behalf of the plaintiffs there in

19   the <u>Lloyd's</u> complaint that Mr. Cozen is here pursuing today.

20   This is the same case.  That is why *stare decisis* is the right

21   doctrine in order to dispose of these cases.

22        Now, there is really no dispute that at least as to

23   NCB, the amended <u>Lloyd's</u> allegations simply recycle the

24   jurisdictionally deficient allegations of the <u>Federal Insurance</u>

25   and other first-round cases.  In order to demonstrate that

I1Is9114

1    lookalike nature of Lloyd's in the first-round cases, we

2    prepared a chart that I gave to your clerk and handed up to

3    your Honor, which was also as attached as Exhibit 1 to our

4    motion to dismiss.  On a side-by-side basis, this chart matches

5    up the allegations of the Lloyd's complaint with the

6    allegations of the previously dismissed complaints, which as I

7    noted were pursued by the same lawyers.

8          Now, in their opposition, the plaintiffs had a full

9    opportunity to contest the accuracy by side-by-side comparison.

10   They didn't.  What do they do instead?  They conceded that

11   their case against NCB is the same one that they advanced and

12   lost in the Federal Insurance and other first-round cases.

13         What do the plaintiffs say?  It doesn't really matter

14   that they're the same.  We have four reasons why the same

15   results shouldn't apply, why these cases shouldn't be dismissed

16   despite the doctrine *stare decisis*.

17         First, plaintiffs put almost all of their faith in

18   JASTA as the supposed game changer, but that premise is utterly

19   unsound because JASTA is a statute and NCB was dismissed on

20   constitutional grounds, constitutional due process grounds.

21   Statutes cannot change constitutional provisions.

22         Whatever the merit might be as to the arguments that

23   your Honor heard this morning about the impact of JASTA on

24   subject matter jurisdiction under the FSIA, what is clear is

25   that JASTA cannot change constitutional due process.  The

I1Is9114

1   statute doesn't even try to, but even if it tried to, it

2   couldn't.

3        The Second Circuit recently reminded us in the Waldman

4   case that federal courts cannot exercise jurisdiction beyond

5   the limits of what the due process clause of the Constitution

6   requires.  It was the due process clause of the Constitution on

7   which your Honor based its initial ruling dismissing NCB and on

8   which the Second Circuit in the O'Neill case affirmed that

9   dismissal.

10        Second, of their four reasons, the Waldman decision is

11   the latest war at personal jurisdiction in ATA cases from the

12   Second Circuit.  Waldman ratified every single aspect of the

13   earlier O'Neill decision, which affirmed this court's dismissal

14   of NCB.  The notion that Waldman somehow helps plaintiffs,

15   which plaintiffs argue is actually preposterous.  Under

16   Waldman, just as under O'Neill, there is no jurisdiction over

17   NCB because NCB took no related actions in the United States

18   and NCB did not take any related actions that targeted the

19   United States.

20        Instead, the Lloyd's complaint simply recycles the

21   same two types of actions allegedly taken by NCB outside the

22   United States:  One providing financial services to NCB

23   customers outside the United States who, in turn, allegedly

24   supported Al Qaeda, and two, donations to or other support of

25   charities outside the United States that NCB supposedly knew

I1Is9114

1   were conduits to Al Qaeda.  Even in the context of the JASTA

2   argument this morning, your Honor, you were asking questions

3   about, isn't it established law that providing indirect support

4   to some entity that, in turn, may have used money or services

5   to assist Al Qaeda, your Honor said isn't that established,

6   isn't it clear that that is not a basis for liability.  Well,

7   indeed, further than that, your Honor, it is clear that neither

8   of those two bases, financial services nor support for

9   charities, can be a basis for jurisdiction.  That is what your

10  Honor held in Terrorist Attacks IV, that is what O'Neill

11  affirmed.

12      Both this court and the Second Circuit said that those

13  two types of activities -- finances services and charitable

14  support -- did not establish the constitutionally required

15  substantial connection between NCB and the United States forum.

16  Waldman specifically reaffirmed that constitutional requirement

17  of a substantial connection.  Waldman also reaffirmed the

18  constitutional requirement that personal jurisdiction cannot be

19  based on alleged acts by third parties because jurisdiction

20  depends on actions taken by the defendant itself, not by third

21  parties that may have some connection with the forum.

22      The third-party rule is particularly important here

23  because when it comes to NCB, plaintiffs put almost all their

24  faith into allegations about Yassin al Kadi, separately

25  represented defendant, and they tried to make allegations about

I1Is9114

1   ties between Kadi, the Muwafaq Foundation, which Kadi ran and

2   NCB.

3         But here are three important things about Kadi and NCB

4   that come out of the O'Neill decision.  In the discussion

5   affirming this court's dismissal of NCB, the Second Circuit

6   never mentioned Kadi despite the fact that plaintiffs'

7   allegations about Kadi were the same then as they are today.

8         Second, in returning Kadi to the court for

9   jurisdictional discovery, the Second Circuit never mentioned

10  any alleged connections to NCB, even though that was the same

11  allegation made then as now.

12        Third, when the Second Circuit dismissed former

13  officers of NCB, Khaled bin Mahfouz and Abdulrahman bin

14  Mahfouz, for lack of jurisdiction.  They said it is not enough

15  that they had some connections personally with the Muwafaq

16  Foundation.  If the ties between an officer of the bank and the

17  Muwafaq Foundation were never enough for jurisdiction over

18  those officers, then you're right, there is no basis for

19  jurisdiction over the bank for whom those individuals served as

20  officers.

21        So the Kadi allegations are simply a distraction.

22  Your Honor previously considered all of them in dismissing NCB.

23  The Second Circuit considered all of them in affirming the

24  dismissal of NCB.  There is simply nothing new here.  I'll say

25  more about that when we get to jurisdiction.  The bottom line

I1Is9114

1    is that actions by Yassin and Kadi are not actions of NCB

2    itself and, therefore, cannot serve as a basis for personal

3    jurisdiction.

4            Now, Waldman also strictly enforced the limits of

5    personal jurisdiction the Supreme Court set down in the Waldman

6    case.  If anything, as a result of Waldman -- Sokolow as it was

7    in the district court -- the parameters for specific

8    jurisdiction are actually narrowed since the time of terrorist

9    attacks.  That means, again, that anything that was not

10   sufficient for jurisdiction under O'Neill, affirming your

11   Honor's dismissal of NCB, that is not enough for specific

12   jurisdiction now, now that the parameters for specific

13   jurisdiction have narrowed.

14           Third, as I mentioned, plaintiffs agree that their

15   allegations against NCB are the same ones that did not support

16   jurisdiction over NCB in their earlier cases, so at least give

17   them credit for some self-awareness.  They concede the

18   allegations in the first amended complaint, Lloyd's first

19   amended complaint, relative to NCB "admittedly share more

20   similarities with prior claims than do plaintiffs' claims

21   against Al Rajhi Bank and Saudi Binladin Group."

22           Beyond that connection, the plaintiffs make only the

23   most half-hearted attempt to say there is nothing new here.

24   All they do is point to the testimony of Zacarias Moussauoi.

25   Other than that, they never contest the chart that I gave to

I1Is9114

1      your Honor, which makes a side-by-side comparison and shows

2      that the allegations today are precisely the same as the

3      allegations previously, which were not enough to support a

4      jurisdiction over NCB.

5             So that leaves Zacarias Moussaoui.  It only requires a

6      moment's thought.  Even if the court made the truly heroic

7      assumption that Zacarias Moussaoui is lucid in reading his

8      testimony, gives plenty of reason to question that he is.  He

9      didn't say anything jurisdictionally meaningful about NCB.  You

10     know this because plaintiffs twice mischaracterize his

11     testimony; first in their first amended complaint, then in

12     their opposition to the motion to dismiss.

13            What plaintiffs say in the first amended complaint is

14     that Moussaoui's testimony confirmed the use of NCB by wealthy

15     Saudi businessmen to transfer large sums of money to Al Qaeda.

16     In fact, all Moussaoui said was some company "the name of which

17     I don't recall" had an account at NCB and sent money "from

18     Jeddah Saudi Arabia to Karachi Pakistan that someone used to

19     "buy material."

20            Now, that is the testimony that the court has to

21     grapple in deciding this motion, not a mischaracterizing

22     allegation.  The law is clear that when there is an actual

23     source of something alleged in the complaint, the actual source

24     trumps the allegation itself.  So even if you credit

25     Moussaoui's testimony, at the very most, all he says is that

I1Is9114

1    some customer of NCB used the same routine financial services

2    that NCB offers to every one of its customers.

3        The Second Circuit in O'Neill held, affirming your

4    Honor, that as a matter of constitutional due process law,

5    jurisdiction over NCB cannot be based on the alleged provision

6    of financial services to overseas customers who, in turn,

7    allegedly aided request.  Your Honor alluded to some of that

8    testimony this morning during the arguments as to the Kingdom.

9        That is three of their four points.  Fourth, and

10   finally, what the plaintiffs say is something that occupied a

11   lot of time this morning, but need not occupy a lot of time as

12   to NCB.  They say, wait a minute, we have got a favorite

13   refrain, we need jurisdictional discovery.  As to NCB, a

14   jurisdictional discovery request has to hit a brick wall

15   because we went through five years of jurisdictional discovery,

16   supervised by Judge Maas, before your Honor granted leave for

17   us to renew our motion to dismiss and then dismiss NCB.  Your

18   Honor upheld every single jurisdictional discovery ruling made

19   by Judge Maas.

20       Many of the jurisdictional discovery requests that

21   Judge Maas dealt with and that your Honor dealt with were

22   propounded by the Federal Insurance plaintiffs, by Mr. Cozen's

23   clients then, and he is here representing Lloyd's now.  The

24   jurisdictional discovery theory that the Federal Insurance

25   plaintiffs advanced then is the same as the one they are

I1Is9114

advancing now.  We need discovery related to Yassin and Kadi
because of this alleged relationship between Kadi, his
foundation, and NCB.  Your Honor expressly rejected those
jurisdictional discovery requests in Terrorist Attacks IV.

The reason why was that your Honor held that, I am
quoting here "they would not be of any evidentiary value in
establishing specific jurisdiction over NCB because the
underlying legal theory is untenable."  It is Terrorist
Attacks IV, 718 F.Supp.2d 487.

Your Honor explained why their legal theory is
untenable, which is what your Honor held, "merely helping an
organization that is hostile to the United States by providing
financial support does not suffice to confer specific personal
jurisdiction over a foreign defendant even when it used the
received funds to continue to engage in violence."  Your Honor
held on that basis it was not even a prima facie case of
personal jurisdiction over NCB and, therefore, denied further
jurisdictional discovery and dismissed NCB.

Now that has to be the same conclusion that the court
has to reach today, because the Lloyd's allegations are, as our
side-by-side chart shows, the same as the allegations your
Honor grappled with in Terrorist Attacks IV.  The one
conclusion that is possible is that now, as then, the
plaintiffs have not made out a prima facie case of personal
jurisdiction over NCB.  Because at the end of the day, the

I1Is9114

1    <u>Lloyd's</u> allegations fall entirely into the same two categories

2    that the Second Circuit and your Honor said were insufficient

3    for jurisdiction:  Financial services to overseas customers and

4    support for overseas charity.

5         To put it mildly, it is outrageous that the

6    plaintiffs' first strike to out run this court by filing a

7    lookalike case in the Western District of Pennsylvania so that

8    they can try to take another run at issues that your Honor had

9    already decided based on the same allegations, and it is

10   oppressive.  Now that the JPML has sent this case to this

11   court, for plaintiffs to say, you know what, we need a complete

12   do-over, there is absolutely nothing new here.  The JPML

13   anticipated that.  They said, therefore, it is efficient to

14   have this case in front of Judge Daniels who has made rulings

15   on these issues.  It is efficient to have this case in front of

16   him because of the prior record that was available.  Indeed

17   they said, you know what, we don't even buy your argument that

18   transferring this case to Judge Daniels will -- and I am

19   quoting the JPML -- the plaintiffs said that transferring here

20   would unduly train the resources of this court.  Hence, the

21   JPML rejected that argument as well.

22        Happily, the doctrine of *stare decisis* is

23   purpose-built to put an end to this second run of the same case

24   against NCB.  As another court said, it is as clear as clear

25   can be that the same issue presented in a later case in the

I1Is9114

1    same court should lead to the same result.  It is the <u>FedEx</u>

2    case that we cite both in our opening brief and in our reply

3    brief.

4            Your Honor, respectfully, it is time to call a halt to

5    this oppressive second round of lookalike cases against NCB.

6    We respectfully request that the court apply its prior rulings,

7    the <u>O'Neill</u> rulings, and dismiss NCB from all of these cases.

8            Thank you, your Honor.

9            JUDGE DANIELS:  Thank you.

10           MR. GAUCH:  May it please the court.  James Gauch,

11   Saudi Binladin Group.

12           Our motion to dismiss raises both absence of personal

13   jurisdiction and failure to state a claim because we have been

14   previously dismissed on personal jurisdiction for the reasons

15   that I'll explain.  Those should be dispositive here as well.

16   I intend to only address personal jurisdiction and then turn

17   the podium over to Mr. Curran who will be discussing, again,

18   overlapping issues with respect to failure to state a claim.  I

19   am happy to entertain any questions that the court has.

20           For us, the personal jurisdiction argument is

21   straightforward.  As you already heard, we are in a very

22   similar position of NCB.  After four plus years of

23   jurisdictional discovery, we made a motion to this court, which

24   this court granted, finding in absence of personal jurisdiction

25   specifically finding in absence of any allegations that would

I1Is9114

1    support an inference that we had, that Saudi Binladin Group had

2    purposely directed its conduct at the United States for

3    purposes of specific jurisdiction.

4          That decision went up to the Second Circuit.  The

5    Second Circuit affirmed.  There has been no relevant change of

6    law.  There are no jurisdictionally significant facts, new

7    facts, and I'll address that in a moment.  Therefore, the prior

8    decision compels the same conclusion here.

9          In arguing in their opposition brief that somehow

10   either JASTA or Waldman has changed the legal analysis

11   applicable to personal jurisdictions.  It is remarkable that

12   the plaintiffs spend virtually no attention to the previous

13   decisions of this court, of Judge Casey, and of the Second

14   Circuit on exactly these facts in exactly this case.

15         In fact, their five-page statement of standards

16   governing personal jurisdiction says virtually nothing about

17   Terrorist Attacks VIII, Terrorist Attacks III, or your Honor's

18   decisions.  But one thing has become clear in this litigation.

19   Over and over again, both this court and the Court of appeals

20   have explained, that for purposes of specific jurisdiction, the

21   defendant, the particular defendant, must engage in conduct

22   that is expressly aimed at the United States or purposely

23   directed.  They mean the same thing.  One comes from the Burger

24   King case, the other comes from Calder v. Jones.

25         The Second Circuit has made that abundantly clear.

I1Is9114

1  This court, in the opinion that we refer to as Terrorist

2  Attacks IV, further elaborated in the terrorism context that

3  what this means is that the defendants' conduct must be

4  intended to directly aid in the commission of a terrorist

5  attack with knowledge that the brunt of the injuries will be

6  felt in the United States.  The Second Circuit has embraced

7  that, the Solicitor General, whom the plaintiffs rely, has also

8  embraced that standard.  That is the standard that controls

9  personal jurisdiction in this case.

10         Plaintiffs have filed a new complaint which, with

11  respect to SBG, repeats virtually the same allegation over

12  again.  Like the other defendants, we attached a chart to our

13  brief.  Two columns:  The column on the left states verbatim

14  the allegations specific to SBG in the Lloyd's amended

15  complaint, and on the right we quote verbatim, again, the

16  allegations from the prior litigation, from prior statements,

17  from their summary of allegations, summary of evidence that

18  they submitted at one point and from their briefs in the

19  Second Circuit.

20         You can see that, overwhelmingly, they line up often

21  word for word, but substantively they are virtually identical.

22  Plaintiffs cover a lot of ground in that complaint as they did

23  in their prior complaints.  We did not in our briefs make an

24  effort to respond to each and every one, all of that is in the

25  prior record, but there are two themes to overriding claims on

I1Is9114

1    which they have relied.

2            One is alleged pre 1993 support in Sudan or elsewhere

3    that they allege Saudi Binladin Group gave, which they have

4    asserted because of what they refer to as the strong familial

5    ties -- they have a few other ways of expressing it as well --

6    put SBG uniquely on notice of Al Qaeda's anti-U.S. aims by, I

7    think they say, 1990 at the latest, if not 1988.

8            The second theme is that after -- I won't restate the

9    history, as your Honor well know from the earlier briefing,

10   Osama bin Laden had been a shareholder with roughly a two

11   percent stake in the Saudi Binladin Group until 1993.  At that

12   point, the company voted to remove him as a shareholder.  That

13   removal was completed 1994.  So this 1993-94 time period is a

14   critical break.  The plaintiffs have consistently, in the prior

15   litigation and now, asserted that SBG continue to provide

16   support to Osama bin Laden thereafter.  Those are the two key

17   themes, both of which your Honor specifically addressed in the

18   prior opinion dismissing Saudi Binladin Group.

19           With respect to the pre 1993 support, the court

20   observed that that was expressly acknowledging that the

21   plaintiffs argued about the strong family ties, etc.  This

22   court accepted, and all that said that regardless, it is too

23   remote from the 9/11 attacks to provide that expressly aimed

24   at the United States conduct that is required for specific

25   jurisdiction and with respect to the continuing assertions of

I1Is9114

1    ongoing support.  This court also found that there were no

2    facts to support that the last time we were here.

3              Those conclusions remain true today.  There is nothing

4    in the record that establishes that we did expressly aim our

5    conduct at the United States through either of those means.

6              (Continued on next page)

I1IP9115

1          MR. GAUCH:  Now, there are several allegedly new

2     things that the plaintiffs bring up, but I want to address each

3     of them briefly; although they're covered in our briefs.  The

4     first -- I would distinguish three different ones.  The first,

5     in paragraphs 299 and 300 of their complaint relates to a

6     document, a so-called will of Osama bin Laden that was captured

7     in the raid at Abbottabad in which Osama bin Laden writes to --

8     writes that he describes monies that he received including

9     allegedly money that he received from the Binladin Group for

10    investment in Sudan, and he describes some other funds, as

11    well.  And he asked his family to -- he expressed his hope that

12    that money would be used for jihad.

13          Now, the document, plaintiffs' say the documents were

14    written in the late '90s, who knows.  When a document was

15    written doesn't matter.  The critical thing is what is the

16    conduct -- if you take it as true, what is the conduct of SBG

17    that they're describing.  That conduct, of course we well know

18    because plaintiffs have had discovery on Saudi Binladin Group's

19    activities in the Sudan.  They were engaged in some

20    construction projects in the Sudan in the early '90s.  Those

21    are the ones that your Honor expressly addressed in a prior

22    opinion, finding that they were too remote to support

23    jurisdiction.

24          This is clearly a reference to the same conduct,

25    conduct that this Court has already found to be inadequate, and

I1IP9115

1    I would submit that the fact that the document itself, as the

2    plaintiffs acknowledge, refers to SBG's investment in Sudan,

3    you couldn't get farther removed from targeting United States

4    than that.  And whatever Osama bin Laden ultimately hoped that

5    money would later be turned to, there's nothing in the

6    documents and there are no other facts that they've alleged to

7    suggest that somehow SBG was involved in that later period.

8         Then there are two aspects of Zacarias Moussaoui's

9    testimony that they focus on in their complaint.  The first in

10   paragraphs 305 and 307 deals with the whole idea that SBG --

11   that we refer to it in shorthand -- the family break in 1993.

12   We have put -- there's been discovery and there's evidence in

13   the record in the prior case about the removal of Osama bin

14   Laden as a shareholder of the Saudi Binladin Group.

15        The testimony that they now quote doesn't cast any of

16   that into question.  Instead, plaintiffs' counsel asked

17   Mr. Moussaoui whether the family, the bin Laden family, had

18   broken off all ties with Osama bin Laden, and he said that was

19   a complete lie.  Of course, it's a complete strawman because

20   there has been discussion in this case -- we debated this back

21   in jurisdictional discovery -- about family visits and other

22   contacts between the two of them.  The issue is not the

23   contact.  The issue is support.  There is nothing there that

24   suggests support.

25        The one thing in their complaint that they zero in on

I1IP9115

1    is this idea of the spare part, and I want to underscore this

2    for your Honor because there's a critical distinction here

3    between what they allege and what the document they're

4    representing actually says.  So in paragraph 306 they allege

5    that Saudi Binladin Group provided spare parts that were used

6    to build training camps for the 9/11 hijackers in Afghanistan.

7         They say that that's what -- they say that,

8    specifically, Moussaoui testifies to that.  Now, nobody debates

9    that your Honor can look at the actual testimony when a

10   document like that or testimony is referred to in the

11   complaint.  What Moussaoui actually said, he referred to a

12   spare part that was bought in Jeddah, which is where Saudi bin

13   Laden -- Jeddah, Saudi Arabia, which is where Saudi Binladin

14   Group is headquartered.

15        Then that part was then sent -- he doesn't say by

16   Saudi Binladin Group.  We don't know who, but that it was sent

17   to Pakistan.  That's all he said.  The idea that this part was

18   used to construct training camps, the idea that those training

19   camps were then used by 9/11 hijackers, and the idea that SBG,

20   even if that were true, was aware of that, is all made up by

21   the plaintiffs.

22        And this is exactly what we talk about when we say

23   that it is impermissible to layer inference upon inference and

24   get from a simple fact to something clearly they're trying to

25   meet the jurisdictional test and they're trying to meet the

I1IP9115

1    concern that your Honor expressed this morning by somehow

2    tieing it back to the 9/11 hijackers.  But there's nothing of

3    that kind in the testimony that they're relying on.  They can't

4    simply assert that.  That is at least three layers of inference

5    that your Honor would have to fill in for them, for which

6    there's no factual support.

7         So in light of that, the new evidence doesn't -- the

8    assertedly new evidence doesn't change the arguments and the

9    conclusions this Court reached six years ago, which is that

10   even if you take the allegations that they've put in front of

11   you as true, there is nothing that establishes that the Saudi

12   Binladin Group expressly aimed its conduct at the United

13   States.  There's nothing to suggest that it directly aided, as

14   your Honor framed the standard in the commission of a terrorist

15   attack, with knowledge that the brunt of it would be felt in

16   the United States.  There's nothing even close.

17        They are going over the same old ground that they

18   did -- if you look at the old briefs and you look at the new

19   briefs, the themes are exactly the same.  The theme that the

20   Saudi Binladin Group, because they are bin Ladens, which I

21   can't deny, that somehow they had a special relationship and so

22   anything that they did, as far back as 1988, is somehow

23   attributable to 2001 and the heinous terrorist attack here, but

24   they can't get there.

25        The Second Circuit has said time and again that you

I1IP9115

1    need more than simply the assertion.  You need more than the

2    argumentative inference that's based on nothing but their own

3    speculation.  And because they have not established anything

4    that, even if true, would get them to a prima facie case of

5    jurisdiction.  These supposed new facts don't warrant yet

6    another round of jurisdictional discovery.

7            Even if you assume what Moussaoui said was true about

8    that spare part, that doesn't supply the necessary connection

9    to establish jurisdiction.  Even if you assume that the

10   document they present as OBL's will is what it says and means

11   what it says, none of that establishes SBG's conduct directly

12   to the United States.  It doesn't make a prima facie case.  If

13   they could prove it, it doesn't establish jurisdiction, and for

14   those reasons we respectfully submit that the Court should

15   dismiss us again.  Thank you.

16           THE COURT:  Thank you.

17           MR. CURRAN:  Good afternoon, your Honor.  Christopher

18   Curran of White & Case for Al Rajhi Bank.  I join in the

19   12(b)(2) personal jurisdiction argument that Mr. Burger and

20   Mr. Gauch have just presented and submit that Al Rajhi Bank,

21   like their clients, does not face factual allegations showing

22   that they have committed tortious acts expressly aimed at the

23   United States.

24           But, your Honor, last time Al Rajhi Bank was through

25   this litigation, Al Rajhi Bank was dismissed not for 12(b)(2)

I1IP9115

1   personal jurisdiction, but 12(b)(6) failure to state a claim.

2   This Court, Judge Casey, dismissed the claims against Al Rajhi

3   Bank, and then it, of course, went up to the Second Circuit and

4   the Second Circuit applied the Rothstein case on proximate

5   causation and dismissed Al Rajhi Bank there.

6          The Second Circuit found that there were no factual

7   allegations that Al Rajhi Bank participated in the 9/11 attack,

8   otherwise supported Al Qaeda directly, or that it donated money

9   to charity, and such money was then passed on to Al Qaeda for

10  support for the 9/11 attack.  And on that basis, Al Rajhi Bank

11  was dismissed for lack of proximate causation.

12         So just like the Binladin Group and just like NCB,

13  we're back again now in this litigation.  We submit that the

14  holding of the Second Circuit still controls and provides the

15  sound basis for the dismissal of Al Rajhi Bank again.

16         Now, the plaintiffs, of course, resist that

17  conclusion, and they say there are some new things that

18  differentiate the situation now from what pertain in the last

19  round of litigation.  And specifically, they say that their

20  allegations are different in certain respects and that the law

21  is different in certain respects; so I'd like to address those

22  two assertions seriatim.

23         First, as to this supposedly new allegations, all but

24  one of the supposedly new allegations come from a 2007 Wall

25  Street Journal article.  Now, the sequencing, the timeline here

I1IP9115

```
 1    is kind of important. Al Rajhi Bank was dismissed by Judge

 2    Casey in 2005.  That dismissal order was not final.  It was a

 3    non-final decision, still subject to change under the rule 54B

 4    of the Federal Rules of Civil Procedure.  So there was no

 5    appeal taken at that time.  The litigation continued as to

 6    other defendants.

 7              In 2007, the newspaper article came out.  The

 8    plaintiffs assert that that newspaper article contains new

 9    material.  We disagree with that.  We think that's just a

10    retread of old allegations, but even if there was something new

11    in there, it doesn't matter because in 2010, the plaintiffs, in

12    the last round of litigation, added that Wall Street Journal

13    article and the accompanying CIA report excerpt to the record

14    and made arguments based on that.

15              Then, in 2011, Judge -- well, your Honor made Judge

16    Casey's dismissal order final.  At that point, the appeal went

17    to the Second Circuit.  At the Second Circuit, the plaintiffs

18    relied expressly on that Wall Street Journal article in

19    alleging that Al Rajhi Bank should not have been dismissed.

20    The Second Circuit did not accept that argument and, instead,

21    applied Rothstein to dismiss Al Rajhi Bank.  So in other words,

22    what the plaintiffs say is new from the 2007 Wall Street

23    Journal article is not new.  It was before the Second Circuit

24    when the Second Circuit affirmed the dismissal based on the

25    Rothstein proximate causation point.
```

I1IP9115

1          Now, with your Honor's permission, I'd like to hand to

2     your Honor, through your clerk, the brief that the

3     plaintiffs -- an excerpt of the brief that the plaintiffs

4     submitted to the Second Circuit because it will show, in plain

5     black and white, that the Wall Street Journal article was a

6     prominent part of the plaintiffs' argument to that court.

7          So, your Honor, this excerpt shows page 102, and I

8     won't belabor this, and you can see prominently on page 102,

9     plaintiffs' brief refers specifically to the Wall Street

10    Journal report.  It uses it to make an argument against Al

11    Rajhi Bank, and it says that the Wall Street Journal report, in

12    fact, isn't new.  It says it corroborates the prior allegations

13    against Al Rajhi Bank.

14         So this little excerpt I've handed you proves two

15    important points:  No. 1, the Wall Street Journal article was

16    before the Second Circuit and was considered by the Second

17    Circuit when it dismissed Al Rajhi Bank; but also, it confirms,

18    in words from the plaintiffs' mouth, that there was nothing

19    substantively new in the Wall Street Journal article.

20         And that statement by the plaintiffs is correct

21    because all along, the allegations of Al Rajhi Bank have

22    basically fallen into three general buckets:  One is that Al

23    Rajhi Bank donated money to charities that, in turn, supported

24    Al Qaeda.

25         Although, there, I would add, your Honor, the only

I1IP9115

1    factual allegation about actual donations by Al Rajhi Bank were

2    three donations in the mid-1990s to Saudi High Commission, and

3    as your Honor hear this morning, the Saudi High Commission is a

4    government-owned-and-operated charity.  So it's hardly damning

5    of Al Rajhi Bank to have donated to that charity in the

6    mid-1990s.

7           The second general bucket that plaintiffs' allegations

8    fall under is the provision of routine banking services for its

9    customers.  There are some allegations that some of Al Rajhi

10   Bank's two million customers were bad actors, and the

11   plaintiffs tried to make Al Rajhi Bank liable because of the

12   conduct, the alleged conduct of those bad actors.  But the

13   courts have consistently concluded that a bank cannot be held

14   liable for the provision of routine banking services under

15   those circumstances.

16          And then the third general bucket of allegations is

17   that Al Rajhi family members, shareholders of the bank, knew or

18   participated in acts that the plaintiffs allege are suspicious.

19   There again, this Court and the Second Circuit found that that

20   category, as well, did not support the basis of the claim

21   against Al Rajhi Bank.

22          So the overwhelming majority of these supposedly new

23   allegations come from the Wall Street Journal article.  I've

24   addressed that.  The only other assertedly new allegation

25   against Al Rajhi Bank is based on, as we heard from my

I1IP9115

1    co-counsel, an assertion by Moussaoui.

2           As to Al Rajhi Bank, he made a very general comment

3    that's in the complaint and it's addressed in our brief, that

4    Al Rajhi Bank was a "good brother" that has moved money around.

5    That assertion by Mr. Moussaoui, whatever it means, is far too

6    vague and imprecise to be damning of Al Rajhi Bank in

7    supporting a reasonable inference under Twombly or Iqbal of any

8    wrongdoing by the bank.

9           It probably benignly means that Al Rajhi Bank was a

10   sharia-compliant bank and the largest retail bank in Saudi

11   Arabia.  So there are no new factual allegations in the

12   complaint here that distinguish this case from the prior case

13   that led to the dismissal in the Second Circuit.

14          Now, turning to the plaintiffs' contention that the

15   law has changed in a material way that distinguishes the prior

16   dismissal.  There, of course the plaintiffs are relying on

17   JASTA.  Of course, JASTA does add new claims.  It provides

18   plaintiffs with the new ability to assert aiding and abetting

19   and conspiracy.  But, your Honor, those new claims do nothing

20   to cure the fundamental deficiencies in the pleading against

21   Al Rajhi Bank.

22          Aiding and abetting still requires proximate

23   causation.  Why do I say that?  For a variety of independent

24   reasons.  The statutory language of JASTA, knowingly providing

25   substantial assistance.  "Substantial assistance," those words

I1IP9115

1    are very close to what the Second Circuit, in Rothstein, said

2    was the definition of proximate causation.  There, they said

3    for something to be proximally caused, it had to be a

4    substantial factor in the responsible chain of causation.  The

5    notion of substantiality is common to both the aiding and

6    abetting claim under JASTA and Rothstein.

7           As your Honor knows, the findings that precede the

8    enactment of JASTA in the section of the bill refers to the

9    Halberstam case by the DC circuit.  That case also supports the

10   notion that, for an actor to be liable for aiding and abetting,

11   the aiding and abetting must be a substantial factor in the

12   chain of causation.  Halberstam says repeatedly throughout its

13   decision that the conduct of the defendant there, who was Linda

14   Hamilton, the live-in companion of the murderer, that her acts

15   were essential, substantial and, indeed, that she was a partner

16   in the commission of the crime through her fencing activities

17   and other actions that enabled the burglaries that led to the

18   murder.

19          So, your Honor, Halberstam -- in addition to the

20   actual language of the aiding and abetting provision in JASTA,

21   Halberstam also supports the notion that substantially and

22   causation is still required.

23          Halberstam also refers to section 876 of the

24   restatement (second) of torts.  That provision in the

25   restatement also tells us that general principles of legal

I1IP9115

1    causation are relevant in establishing whether an actor is

2    liable for aiding and abetting.  So there again, all arrows

3    point in the direction of proximate causation, or its

4    equivalent, being required under aiding and abetting.

5           And then lastly, your Honor, in our briefs we cite

6    some cases from the Second Circuit and from this court,

7    addressing aiding and abetting in other contexts, specifically

8    the securities laws, where aiding and abetting comes up most

9    frequently.  And the decisions of the Second Circuit and this

10   court are uniform in concluding that proximate causation is the

11   test as to whether an actor shall be liable for aiding and

12   abetting.

13          So the Edwards & Hanly case and the Ritchie case,

14   those are the two cases we cite prominently in our reply brief.

15          So there again, as to aiding and abetting, the

16   addition of that as a cognizable claim by virtue of JASTA, does

17   nothing to cure the problem that the Second Circuit found was

18   uncurable on the part of the plaintiffs, and that is the lack

19   of factual allegations supporting that Al Rajhi Bank did

20   anything that proximately caused the 9/11 attacks.

21          As to conspiracy, your Honor, conspiracy -- and I hope

22   I don't spend too much time on this because I think the

23   plaintiffs make only a halfhearted effort to suggest that they

24   have sufficient factual allegations to show that Al Rajhi

25   conspired with Al Qaeda.  All I can say -- and perhaps this is

I1IP9115

1    echoing some of your Honor's comments during the Kingdom

2    arguments earlier -- that conclusionary allegations of

3    conspiracy don't cut it.

4           There have to be factual allegations that give rise to

5    a reasonable inference, to paraphrase the language of Twombly

6    and Iqbal, that there was an agreement between the alleged

7    co-conspirators.  We've got nothing close to that in this

8    complaint.  No factual allegations that Al Rajhi Bank formed an

9    agreement with Al Qaeda to engage in terrorist acts or support

10   terrorist acts or to do 9/11 or anything close to that.

11          So there again, your Honor, the asserted bases that

12   differentiate this case here and now from the Second Circuit's

13   dismissal based on Rothstein in 2013, are futile on the part of

14   the plaintiffs.

15          Beyond that, your Honor, if you don't have any

16   questions, I think I'll reserve the rest of my time for any

17   necessary rebuttal.

18          THE COURT:  All right.  Thank you.

19          MR. CURRAN:  Thank you.

20          MR. COZEN:  If your Honor please, Steve Cozen for the

21   Lloyd's plaintiffs and others who have joined with us.  I feel

22   constrained to simply advise the Court that, to the best of my

23   knowledge, the Waldman case, in its present form, is, for the

24   third time, subject to the request by the Supreme Court for the

25   views of the Solicitor General on the issues raised in that

I1IP9115

1    case.  I don't know whether the Court will take certiorari or

2    not, but this is the third time that they have shown

3    significant interest in those issues.

4           So I just thought that, in the event that your Honor

5    wasn't familiar with that fact, that I would make sure that you

6    did know that that was taking place as to Walden.  That doesn't

7    in any way, shape or form detract from our reliance on the

8    analysis that Judge Koeltl made in Waldman.

9           Your Honor, it is indisputable that on September 28th,

10   2016, the legal environment that is now applicable, both to

11   jurisdiction and liability in civil terrorism cases changed

12   dramatically.  JASTA became law.  Additionally, over the last

13   five to seven years, tens of thousands of pages of previously

14   classified documents were declassified by the United States

15   government, and new expert testimony and new witnesses were

16   obtained.  New case law on issues which effect civil terrorism

17   cases are now instructive.

18          And the plaintiffs now before the Court are litigating

19   in a far more favorable environment when it comes to the

20   questions of personal jurisdictions, specific personal

21   jurisdiction and proximate causation or causation at all, and

22   that is simply the fact.

23          The defendants have dug deep, as established by the

24   various exhibits and comparisons, to recycle arguments, which

25   sometimes before worked for them, but they worked for them in a

I1IP9115

1    totally different environment, where there was no JASTA.  There

2    was no aiding and abetting liability under the ATA.  Rothstein

3    was applicable, which it isn't applicable to today.  All of

4    those things -- and there are more, and I will get to them --

5    change the perspective that this Court must now bring to this

6    case dramatically.

7         But I am here to say to your Honor that, objectively

8    viewed in light of new law, new facts and new cases, their

9    arguments are illogical.  They are inconsistent with the law

10   and the facts which are now before us.

11        There are some key propositions, which I think, your

12   Honor, govern the day.  First, JASTA provides plaintiffs with

13   the broadest possible statutory basis for jurisdictional relief

14   in U.S. courts, consistent with constitutional principles.  Due

15   process is an issue.  It must be addressed.  But as JASTA

16   itself said, we want that issue looked at in the broadest

17   possible way, to give the most access to these plaintiffs, who

18   are victims of terrorism -- and I know you already have in

19   front of you the congressional record, which records the

20   statements of Senator Schumer, Senator Cornyn and Congressman

21   Nadler, to name three, which I think are very, very informative

22   in that respect.

23        Second, our factual allegations do not rely upon mere

24   foreseeability as a basis to confer jurisdiction but, rather,

25   specific and general knowledge and intent on the part of the

I1IP9115

defendants to aid and abet and conspire with Al Qaeda to harm

the U.S.  There is no requirement in the law, nor was there

before a requirement, that someone who gives aid to a known

terrorist, that they have knowledge and intent to participate

or aid in a specific act, at a specific time and a specific

place.

As made clear by congressional findings and purpose,

JASTA was adopted to broaden substantive liability standards of

the ATA and to encompass theories of aiding and abetting and

conspiracy and to eliminate jurisdictional barriers.

Now, we agree that JASTA became law in September 2016,

and when it did, it didn't change the constitutional

requirement of due process for specific jurisdiction.  But,

your Honor, by its very text, its findings and its purpose in

protecting this country and its citizens from acts of

international terrorism, it supplied a new context within which

to make that decision.

You have, I know, before you or in your pile of

papers -- and if you want another copy, I'm happy to give it to

you -- but you have the JASTA provisions; so you can refer to

them.  I would simply make note, your Honor, of the following

provisions, some of which I will refer to, in JASTA that

directly impact upon this Court's decision on the motions

before it.  That's section 2, relating to findings and purpose,

2(a)(3), (a)(4), (a)(5), (a)(6) and 2(b), and under section 4,

I1IP9115

which is aiding and abetting liability for civil actions

regarding terrorist acts, section 4(a), which refers to the

amendment of the Antiterrorism Act under 2333(d).

Now, your Honor, it's become apparent to me as I go

through all of the cases and as I look at the congressional

record and, in fact, spent a good deal of time in those

hearings, in front of those congressional committees that gave

rise to JASTA; so I heard them with my own ears.  After the

Second Circuit drew a line as to the nature of the conduct

necessary to sustain personal jurisdiction in cases where the

defendant aided, abetted or conspired with an international

terrorist group, directly or indirectly, what did Congress

decide?  Congress decided that the courts were wrong and they

redrew the line.  They redrew the line in JASTA.

In setting forth the findings and purpose of JASTA, it

said -- and I refer you now, your Honor, to 2(a)(6) -- persons,

entities or countries that knowingly or recklessly contribute

material support or resources, directly or indirectly, to

persons or organizations that pose a significant risk of

committing acts of terrorism that threaten the security of

nationals of the United States or the national security,

foreign policy or economy of the United States, necessarily,

necessarily, direct their conduct at the United States and

should reasonably anticipate being brought to account in the

United States to answer for such activities.

I1IP9115

1          Does it occur to you, your Honor, that when taken in

2    conjunction with 2(a)(5), which instructs that one of the

3    findings and purposes that Congress had here was to apply

4    Halberstam's standards to making the decision as to aiding and

5    abetting liability and to apply it in the broadest possible

6    sense, was exactly what they had in mind when they wrote

7    2(a)(6).

8          That provision alone, 2(a)(6), before language

9    amending the ATA, when laid next to the plaintiffs' complaint,

10   our first amended complaint, compels the conclusion that the

11   well-pled allegations of the amended complaint establish

12   personal jurisdiction under Congress' redrawn lines.

13         Now, that purpose, your Honor, is further explicated

14   in section 2(b).  What did that say?  The purpose of this act

15   is to provide civil litigants with the broadest possible basis,

16   consistent with the Constitution in the United States, to seek

17   relief against persons, entities and foreign countries,

18   wherever active and wherever they may be found, that have

19   provided material support, directly or indirectly, to foreign

20   organizations or persons that engage in terrorist activities

21   against the United States.  Again, that is its purpose.

22         Now, you will recall, your Honor, that as articulated

23   by Chief Justice Roberts in the Humanitarian Law Project case,

24   great deference is to be paid to the experience and analysis of

25   Congress and congressional or government agencies.  Here, in

I1IP9115

1    JASTA, Congress found that all contributions, all

2    contributions, to foreign terrorist organizations further their

3    acts of terrorism to the detriment of the national security and

4    economic well-being of the United States.

5         I would further observe that under Humanitarian Law

6    Project, courts should defer to congressional factual

7    inferences and conclusions, and which I think are articulated

8    fairly well not only in the findings and purpose section of

9    JASTA, but also in the congressional record that I know was

10   handed up to you.

11        Defendants ignore, in part, Congress' empirical

12   findings through JASTA confirming a direct nexus between

13   sponsorship of foreign terrorist organizations hostile to the

14   United States, and the resulting harm to the United States.

15   They just ignore that, leave it out of there, but that's what

16   Congress found.

17        Keep in mind, if you will, your Honor, that all of the

18   self-described purposes of JASTA was to correct judicial

19   constructions that Congress felt limited U.S. counterterrorism

20   efforts and undermine national security.  Simply stated, after

21   JASTA, folks who knowingly aid and abet international

22   terrorists should reasonably anticipate being brought into a

23   U.S. court to answer when the United States and its citizens

24   are the targets of such terrorists.

25        Doesn't that language kind of ring a bell in terms of

I1IP9115

1    what we expect out of due process?  A certain fairness and the

2    idea that when one should anticipate being hauled into court to

3    answer for one's bad acts, that is a relevant consideration, in

4    fact, a determinative consideration when it comes to

5    determining due process, constitutional due process, and I

6    think we can agree, whether on the Fourteenth or Fifth

7    Amendment, it doesn't make a difference.

8         The criteria for personal jurisdiction then goes

9    something like this, if I may:  One, if service of process is

10   proper and there is a statutory basis for personal

11   jurisdiction -- and that's not disputed here -- then the only

12   question is whether the exercise of personal jurisdiction

13   comports with due process.  Are there minimum contact with the

14   United States, and does exercise of due process comport with

15   traditional notions of fair play?  I don't think that's a very

16   disputable proposition.

17        Two, under Calder, actions expressly aimed at the

18   forum, with knowledge that the forum would bear the brunt of

19   the injury support the assertion of personal jurisdiction.  I

20   don't think that's a disputable proposition.

21        Now, according to Waldman, the -- with which your

22   Honor has a passing familiarity.

23        THE COURT:  Yes.

24        MR. COZEN:  According to Waldman, the conduct of those

25   defendants would have had to have been random, fortuitous or

I1IP9115

1    attenuate.  That is, the conduct of those defendants -- in that

2    case, of course, we were talking about Barghouti and Faransi

3    and the PLO as aiders and abettors of Hamas.  But that conduct

4    has to be random, fortuitous or attenuated in order for there

5    not to be a sufficient connection or relationship which

6    comports with due process, and in order for the Calder test to

7    be met.

8            So I think it's important to take a look at the

9    allegations -- and if your Honor will permit me, I'm going to

10   try to make this brief -- against Al Rajhi Bank, against

11   National Commercial Bank and against the Saudi Binladin Group,

12   and I think you will find, your Honor, that the assertions and

13   the allegations specifically that we make against each of them

14   are not about random, fortuitous or attenuated conduct.

15           Al Rajhi Bank, according to the CIA's 2003 memo, ARB

16   acted as a conduit for extremists financing including Al Qaeda.

17   ARB maintained accounts and accepted donations for Dawah

18   organizations which funded Al Qaeda, including two accounts for

19   a designated sponsor of terrorism, al Haramain.  Extremist

20   groups under the Al Qaeda umbrella or affiliate of Al Qaeda,

21   order operatives throughout six Middle Eastern countries to use

22   ARB.

23           Al Qaeda members used accounts at ARB to fund and

24   facilitate terrorist attacks.  Zacarias Moussaoui testified to

25   his knowledge that ARB was responsible for moving money around

I1IP9115

1    for Al Qaeda.  That was to his personal knowledge, and you

2    either accept him or don't accept him as a credible witness

3    when you try the merits of the case, but not for the purposes

4    of determining the sufficiency of our allegations, for purposes

5    of personal jurisdiction and purposes of stating a claim upon

6    which relief can be granted.

7            ARB, whose chairman was an official of IIRO -- you

8    heard Mr. Carter earlier refer to IIRO and the nefarious role

9    which it played in the extremist world -- maintained numerous

10   accounts for IIRO, which was a major Al Qaeda funder.

11           We heard about some contributions that ARB made over

12   three years to the Saudi High Commission.  Well, it happened to

13   be a million dollars, over a million dollars in total, in three

14   years.  Suleiman Al Rajhi started and funded an organization

15   called SAAR, S-A-A-R, which sent more than $26 million in

16   untraceable funds overseas to leaders of Al Qaeda and

17   co-conspirators.  SAAR was a state-designated global terrorist,

18   and that's paragraph 186.

19           Now, what about National Commercial Bank?  Well,

20   Khalid bin Mahfouz was the major shareholder and CEO of NCB,

21   who collaborated with another outfit called BCCI that was a

22   regular funder of Al Qaeda.  He was indicted and paid a

23   $200 million fine for his participation in their collaborative

24   scheme.

25           Moussaoui, at paragraph 201, testified that Osama bin

I1IP9115

1    Laden picked him to document contributions from NCB.  He

2    personally reviewed and documented transactions with NCB.

3    Khalid bin Mahfouz founded the Muwafaq Foundation in 1991.  He

4    selected Yassin al Kadi manage it.  Al Kadi was a

5    state-designated global terrorist since 2001.  NCB provided all

6    financial services for Muwafaq, including funding and

7    channeling of contributions.  That's in paragraph 213.

8           There's a key paragraph, your Honor, in the first

9    amended complaint.  It's paragraph 234.  Khalid bin Mahfouz and

10   Yassin al Kadi, the top dogs at NCB, established Muwafaq

11   Foundation to support Al Qaeda and use NCB, their bank, to

12   deliver to Al Qaeda critical funding, directly and indirectly,

13   with full knowledge of the relationship with Al Qaeda and its

14   goal to attack the United States, which went back at least as

15   far as 1992, when Osama bin Laden issued his fatwah against the

16   United States.

17          The Saudi Binladin Group.  In 1989 Sudan offered Osama

18   bin Laden safe haven and training facilities in exchange for

19   building roads and ports by the Saudi Binladin Group in south

20   Sudan.  At least from 1992, if not before, the Saudi Binladin

21   Group was aware that Osama had issued the fatwah against the

22   United States, or that his goal was not simply against western

23   civilization but the United States in particular.

24          The Saudi Binladin Group transferred Osama bin Laden's

25   shares to his brother Ghalib in 1993.  In 2000, they were

I1IP9115

1   deposited in the amount of $9.8 million in principal into NCB.

2   But what happened to the distributions over seven years?  They

3   are as yet unaccounted for, but they won't be once we get

4   discovery.

5          In March 2016, long after the cases that my friends

6   rely upon have come to fruition.  The United States government

7   declassified Osama bin Laden's will, which was part of

8   400-and-some-thousand documents that they obtained in

9   Abbottabad, the raid in Abbottabad.  He had $12 million from

10  Bakr bin Laden, who was running the Saudi Binladin Group, in

11  order to invest in Sudan.

12         Moussaoui says that Osama bin Laden maintained strong

13  ties with his family long after Sudan, to Afghanistan, and they

14  visited regularly.  And this is confirmed by something else

15  that came out long after the other cases had been concluded,

16  and that is the 28 pages.  Now, it's up to a trier of fact to

17  say whether or not reasonable inferences could be made that the

18  family members, who were running the company and participating

19  with their brother in providing money to build training camps

20  in Sudan and Afghanistan, were doing that on behalf of their

21  brother as a personal matter or on behalf of SBG.  I just think

22  that's an issue that ought to be decided by a trier of fact,

23  but at least there's a reasonable inference that that's the

24  case.

25         Therefore, can one truly objectively say that the

I1IP9115

1    detailed alleged conduct of these defendants was random,

2    fortuitous or attenuated?  Not under these allegations.

3    Clearly not.  Under Waldman, the test is the knowing, aiding

4    and abetting and conspiring of these defendants with Al Qaeda

5    with knowledge that their substantial resources would be used

6    against the United States.  That's a logical conclusion, and

7    it's the predicate for personal jurisdiction.

8            The bottom line, your Honor, it seems to me, is that

9    under the allegations of the first amended complaint,

10   defendants knowingly participated in a long-running campaign to

11   support Al Qaeda with an awareness that the brunt of the harm

12   resulting from their witting support of Al Qaeda would be felt

13   in the United States.  Every test that needs to be made under

14   the case law relating to personal specific jurisdiction has

15   been made.

16           Plaintiffs have overwhelmingly made a prima facie

17   showing that jurisdiction exists.  It is, therefore, clear that

18   the suit-related conduct, you'll recall in Waldman, I think

19   Judge Lowell said, you really have to look at the suit-related

20   conduct.  The suit-related conduct of these defendants creates

21   a substantial connection to the United States and sustains the

22   assertion of personal jurisdiction.

23           And I would note, parenthetically, your Honor, that if

24   there was enough of substantial connection for the United

25   States government to consider designating ARB, Al Rajhi Bank,

I1IP9115

1    under executive order 13224, designated foreign terrorist

2    organization, there should be enough to meet a due process

3    standard.

4          The United States government, in one of its amicus

5    briefs in terrorist attacks 8 expressly rejected the notion

6    that the opinion should be read to suggest that personal

7    jurisdiction requires a showing of specific intent to harm the

8    United States.  In other words, your Honor -- and I think this

9    brings you back to where you were with Mr. Carter this morning.

10   That is, if you know that there is a likelihood that your

11   contribution will be used for evil directed against the United

12   States, you do not have to have specific knowledge or intent to

13   participate in that specific act at some specific time, at some

14   specific place, in order for these United States courts to

15   assert jurisdiction over you.

16         Indirect support is enough if defendants acted with

17   required knowledge and their contributions would result in an

18   injury that would be felt in the United States.  So I submit

19   that JASTA changed the personal jurisdiction inquiry in a

20   number of ways.  But importantly, it is the clear judgment of

21   Congress and the counterterrorism community that providing

22   material support and/or financial services or funding to a

23   hostile organization imperils national security and is conduct

24   directed against the United States.

25         So as a consequence, indirect funding of Al Qaeda

I1IP9115

1    through ostensible charities passes muster.  The United States

2    government said in one of its amicus briefs that the defendants

3    knew that the brunt of the injury would be felt in the United

4    States or expressly aim their conduct at the United States.

5    They, therefore, acted with the requisite knowledge that their

6    contributions would result in injury felt in the United States.

7            I submit to you, your Honor, that the question before

8    the Court is whether the factual allegations in the first

9    amended complaint, now being judged on the basis of their whole

10   content, their reasonable inferences, JASTA and new case law,

11   whether those factual allegations are sufficient to make

12   plausible the claims that these defendants' contributions of

13   support, whether direct or indirect, were made with the

14   knowledge or reckless disregard for the likelihood that those

15   contributions would be used to support Al Qaeda in their jihad

16   against the United States.  I think the answer is clearly yes,

17   and personal jurisdiction has been established.  So I submit

18   that the motion to dismiss under 12(b)(2) should be denied.

19           I would like to briefly move on, your Honor, and I

20   will try very much to be brief, to the 12(b)(6) motions, which

21   are only -- it's not National Commercial Bank, but only SBG and

22   ARB.  A couple of preliminary comments.  Your Honor, one cannot

23   reconcile their arguments with JASTA's textual support for

24   aiding and abetting claims.

25           JASTA, in 2(a)(5) is very clear in directing courts to

I1IP9115

1    apply a flexible causation standard in accordance with

2    Halberstam.  Aiding and abetting liability focuses on whether a

3    defendant knowingly gave substantial assistance and, as

4    explained previously, substantial assistance can mean different

5    things at different times in different places.  The worst the

6    act of evil by the perpetrator, the minimus the contribution

7    has to be to that perpetrator in order to constitute

8    substantial support or substantial assistance, but knowingly

9    giving substantial assistance to someone who performed a

10   wrongful act, not on whether the defendant agreed to join in

11   that wrongful act or even knew what that wrongful act would

12   specifically be.

13        Under Halberstam, minimal aid constitutes substantial

14   assistance where you have a bad act.  It also recognizes

15   liability for conspiracy, even if the co-conspirators'

16   participation was remote and not significant.  All there has to

17   be is an implicit or explicit understanding of what was going

18   on in the causal chain in order for there to be enough for a

19   conspiracy.

20        Now, terrorist attacks one and seven, which I heard

21   referred to earlier, were decided before JASTA recognized

22   secondary liability and amended the standard for liability.

23   The defendants, the two defendants who have filed the 12(b)(6)

24   motion, say, well, you haven't given us a scienter, there's not

25   enough of scienter in this complaint.

I1IP9115

1          Well, the only scienter requirement under JASTA is not

2     specific knowledge and intent to participate in a wrongdoing,

3     but whether the defendant acted knowingly or with reckless

4     disregard of the likely consequences, period.  That's all we

5     need.  Therefore, either knowing provision of material support

6     to a terrorist organization, or deliberate indifference as to

7     whether it did or didn't provide such support, qualifies as

8     intentional conduct.  And I believe the EverBank case stands

9     for that proposition as well.

10          We submit that ARB, as in Boyne three, which again was

11     referred to this morning and very properly so, your Honor, we

12     submit that ARB is guilty of primary liability under the ATA

13     section 2331(1)(a).  Because under Boyne, and this is

14     pre-aiding and abetting liability under the ATA, but under

15     Boyne, brilliant jurists found that funding and supporting a

16     terrorist is like handing a loaded gun to a child.  The act is

17     not in and of itself violent, but is dangerous to human life

18     and satisfies the ATA standards.

19          Now, you'll see in our brief, your Honor, we argue

20     that material support and financing for Al Qaeda of the type

21     prohibited by 2339(A) to (C) constitutes a direct cause of

22     action and primary liability.  We have clearly met our burden

23     of causation for primary liability as well.  The Court said in

24     Boyne three, a relaxed causation standard is necessary for

25     primary liability.

I1IP9115

1          Is it reasonably related or is it reasonably connected

2     under ATA?  Because if you apply and think of this, your Honor,

3     if you try to apply more stringent causation standards, even

4     traditional causation standards in this terrorism world, you

5     would simply leave people without a remedy, given the

6     difficulty of tracing donations to specific events.

7          The broad test for aiding and abetting liability under

8     Halberstam is required by JASTA.  Simply, the party aided must

9     perform a wrongful act, the defendant must be generally aware

10    of his role, and as part of the overall legal or tortious

11    activity at the time of the assistance, and the defendant must

12    knowingly and substantially assist in the principal's

13    activities.  I think that is clearly laid out in our complaint.

14         ARB and SBG both find that lack of adequate plausible

15    allegations of proximate causation compel 12(b)(6) dismissal.

16    Your Honor, they're dead wrong, and it's illogical.  It is true

17    that the "by reason of" language in 2333(a) of the ATA requires

18    a showing of proximate cause.  No doubt about it.  But you see,

19    what happened in 2010 is that Rothstein first concluded that

20    there was no aiding and abetting liability under the ATA, which

21    allowed it to adopt a more stringent proximate causation

22    application.

23         With the addition of JASTA and, therefore, the

24    amendment of 2333 to add 2333(d), aiding and abetting under

25    JASTA, now what do you got?  One, aiding and abetting liability

I1IP9115

exists.  Two, the 9/11 attack by Al Qaeda was an act of

international terrorism by a foreign terrorist organization; so

the "by reason of" standard is met.

And, three, liability for aiding and abetting now

under JASTA and under the JASTA amendment requires only knowing

provision of substantial assistance or conspiracy, all in

accordance with the broad standards of liability laid out by

Judge Wald in Halberstam.  I submit, your Honor, that all of

the elements of liability or aiding and abetting the

conspiracy, as well as the necessary elements for primary

liability under the ATA, after a careful reading of the first

amended complaint, laying JASTA on the same table next to it

and looking at the correct interpretation of Waldman, lead to

the inexorable conclusions that the 12(b)(6) motions should now

be denied.  Thank you, your Honor.

(Continued on next page)

I1Is9116

1              MR. BERGER:  Thank you, your Honor.  Mitchell Berger

2      again for National Commercial Bank.

3              Mr. Cozen concedes that the allegations against NCB

4      are the same.  What he gave you was a motion for reargument of

5      Terrorist Attacks IV, because the allegations that he pointed

6      to involve Khalid bin Maufouz in BCCI which, by the way, deal

7      with actions that allegedly occurred in the 1980s, a time

8      before the 2001 attack.  They are verbatim, the same, in the

9      Lloyd's complaint as they were in the Ashton complaint, the

10     Burnett complaint and the Federal Insurance complaint.  He has

11     nothing new to offer you factually.  He concedes that.

12             He says, your Honor, I only have two things to offer

13     you.  I don't have any new facts or allegations.  One, Waldman,

14     he says, stands for the proposition that specific jurisdiction

15     exists unless the defendants' actions were random, fortuitous,

16     or attenuated.  I am going to say he has a different copy of

17     the Waldman decision than I do.

18             What Waldman did say, and we lay this out, your Honor,

19     specifically on page eight of our reply brief, Waldman ratified

20     O'Neill, which ratified Calder, in holding that when you have a

21     defendant like NCB who engaged in entirely overseas activities,

22     that there is no specific jurisdiction over that defendant

23     under the due process clause, unless there are overseas actions

24     expressly aimed or purposely directed at the United States.

25             That was the law since Calder, that was the law that

I1Is9116

1    O'Neill used to affirm your Honor's dismissal of NCB, it is the

2    law that Waldman adopted.  You can find that in the Waldman

3    decision at page 339 of 835 F.3d.  Nothing has changed.  It is

4    a creative reading of Waldman.  Certainly, the court concluded

5    in Waldman that under those standards, the defendants' actions

6    were random, attenuated, and fortuitous, but that is not the

7    standard.  The standard remains as expressed, and that is the

8    standard your Honor applied in Terrorist Attacks IV and it is

9    the standard the Court of Appeals applied in O'Neill, which

10   perhaps is why Mr. Cozen started out by saying, your Honor,

11   just in case you didn't know, the Supreme Court has asked for

12   the use of the Solicitor General rule.

13          Well, the Solicitor General has not yet provided views

14   in Waldman.  The Solicitor General twice in Terrorist Attacks,

15   @on the same question presented, did provide it as Mr. Cozen

16   mentioned.  Sometimes the court is interested in these views.

17   What the Solicitor General did twice in Terrorist Attacks was

18   agree that the Second Circuit had the standard right.  That

19   Calder provided the rules you have the decision, and that

20   Terrorist Attacks III and then O'Neill correctly applied the

21   Calder expressly aimed, purposely directedness.

22          The fact that the Solicitor General has been asked to

23   provide views to the Supreme Court in Waldman, it is not

24   probative of anything.  What is probative is this:  Waldman is

25   the law of this circuit.  Whether he likes it or not, that is

I1Is9116

1    the case that governs here and that is the case that requires

2    adherence to O'Neill and the dismissal of NCB.

3            But what he really boils it down to is, take JASTA and

4    lay it side by side with the same other tired recycled

5    allegations.  JASTA created a new legal environment.  Well, it

6    is quite clear that plaintiffs lobbied congress to get JASTA.

7    I get that.  That is totally fine, totally fair.

8    Unfortunately, there was no constitutional convention for them

9    to lobby and they couldn't change the due process laws.  And it

10   doesn't matter what congress said in JASTA when it comes to the

11   due process clause.  Mr. Cozen points to 2(a)(6) of the

12   legislative findings in JASTA saying it is congress' desire

13   that the jurisdiction of the United States Courts be exercised

14   to their fullest extent in terrorist cases.

15           Well, respectfully, your Honor, that was always the

16   law of the ATA even before JASTA's amendments.  It has always

17   been the law that the statutory provisions of the Anti-

18   Terrorism Act for jurisdiction and service of process are

19   intended to reach the full extent of the due process clause.

20   That not only begs the due process question, it doesn't answer.

21   The answer to the due process question comes out of O'Neill, it

22   comes out of Waldman, and it says, with Waldman ratifying

23   O'Neill, that when it comes to the two types of acts alleged

24   against NCB, the overseas provision of financial services to

25   individuals or charity customers or donations to charities

I1Is9116

1    overseas, that those don't meet the due process clause.

2           That legal environment hasn't changed one bit.  The

3    Lelchook case out of the District of Massachusetts, we cite on

4    page six of our reply brief, makes this point precisely.  It

5    says, first of all, legislative findings like 2(a)(6) that

6    Mr. Cozen mentioned, they don't mean anything.  But as a matter

7    of constitutional law, congress cannot prove findings or

8    otherwise alter the dimensions of the due process clause.

9    Perhaps the statutory landscape has changed in some respect.

10   Perhaps it has changed as to subject matter jurisdiction on the

11   FSIA.  That was this morning's argument.  Perhaps it has

12   changed the liability standards, as Mr. Curran and Mr. Gauch

13   held with 12(b)(6).  But when it comes to 12(b)(2) personal

14   jurisdiction, JASTA is beside the point.

15          What Mr. Cozen then did is what every plaintiff's

16   lawyer who tries to change the due process standards argued.

17   They say the Supreme Court in Holder v. Humanitarian Law

18   Project says, We the courts have to pay attention to what

19   congress finds.  Well, that is true, but only as far as it

20   goes.  All the Humanitarian Law Project says when it comes to

21   questions of subject matter jurisdiction, does congress have

22   the power to legislate, to reach certain types of overseas

23   acts.  We defer to congressional findings.  But another Supreme

24   Court case, Walden, which we cite in our briefs, says that when

25   it comes to personal jurisdiction, it is solely a question of

I1Is9116

1    the courts of what the due process clause requires --

2              No congressional finding could alter what the due

3    process clause requires.  The due process clause has been

4    applied consistently from Calder to O'Neill to Waldman.  And in

5    O'Neill, which is not only the law of this case but the law of

6    this circuit, it says NCB should be dismissed on allegations

7    that Mr. Cozen is the first one to concede are no different

8    today than they were previously.

9              Finally, he says, you know, they did try to change the

10   liability standards for the ATA and JASTA by adding the aiding

11   and abetting count.  That must mean something for jurisdiction.

12   Well, the answer is it means nothing.  The reason why is that

13   liability standards do not equate with jurisdictional

14   standards.

15             How do we know this?  What is the Calder test?

16   Intentionally tortious activity, part one; expressly aimed or

17   purposely directed at the United States, that's part two.  All

18   JASTA could do is change the definition of intentionally

19   tortious activity in part one.  It could say things that work

20   regarding tortious before are now regarded as tortious today.

21   It cannot change the constitutional component, which is what is

22   expressly aimed or purposely directed at the United States.

23             So what it boils down to this.  Mr. Cozen offers you

24   two things:  A motion for reargument saying that this court and

25   the Second Circuit were wrong in their application of the due

I1Is9116

process standards in <u>Terrorist Attacks IV</u> and <u>O'Neill</u>.  That is

the decidedly incorrect and contrary to the law of the Circuit

doctrine, and that somehow congress, through legislative

findings, could change the due process as a matter of law.

That is incorrect.

Because of that, there really is nothing new to offer

and that, indeed, is why the JPML sent this case here, so your

Honor could apply the previous rulings made by this court and

by the Second Circuit and dismiss NCB.

Thank you, your Honor.

THE COURT:  Thank you.

MR. GAUCH:  Your Honor, just two brief points.  First,

plaintiffs continue to raise the red herring of specific

intent, which no one, your Honor has not required specific

intent, the Second Circuit has not required specific intent.

It is not that the plaintiffs have to show that a particular

defendant aided a particular attack at a particular place and

time, as Mr. Cozen put it.

As your standard explained it, it is interesting that

when Mr. Cozen paraphrased your standard, he admitted two key

words, which I think are the crux of the issue.  This court

required that the conduct be intended to directly aid the

commission of a terrorist attack with knowledge that the brunt

of the injuries will be felt in the United States.  Mr. Cozen

left out the "with knowledge."

I1Is9116

1          They want to be able to say that any aid to Al Qaeda

2     anywhere in the world is enough for jurisdiction because the

3     brunt of Al Qaeda's activities ended up, on 9/11, tragically

4     being felt in the United States.  But it is that "with

5     knowledge" element that is required.  It is not specific

6     intent, but it is knowledge.  It is clear that your Honor held

7     that, the Second Circuit affirmed that, the Solicitor General

8     agreed with it.  Everybody is on board with that as the

9     requisite knowledge that has to be shown here.

10          Second point.  Mr. Cozen said something that I think

11     illustrates one of the problems that we have here in suggesting

12     that we go into a second go-around in the jurisdictional

13     discovery.  He went through illustrating how this case is

14     really just a do-over.  He went through a whole litany of facts

15     that were put before the court in the first litigation,

16     including the transfer of Osama bin Laden's shares to Ghalib

17     bin Laden and the money being put in the trust in 2000.

18          The question which he raised of what happened to the

19     distributions on the shares between 1993 and 2000.  He said

20     that is unaccounted for.  If they get discovery, that will be

21     accounted for.  It is a good question.  Mr. Haefele asked that

22     question ten years ago.  Judge Maas ordered us in 2008 to

23     address the receipt and subsequent disposition of any dividends

24     distributions or similar payments arising out of the custody --

25          THE COURT:  Slow down.  Slow down.

I1Is9116

1          MR. GAUCH:  The receipt and subsequent disposition of

2     any dividends, distributions, or similar payments arising out

3     of the custody, control, or ownership of Osama bin Laden's

4     shares of SBG stock, and he transferred assignment or pledge of

5     the OBL shares, as well as any income derived thereby, and any

6     increase in the value of OBL's shares.

7          All of this was raised in jurisdictional discovery

8     before.  We addressed it.  We had a hearing before Judge Maas.

9     We addressed these issues.  The short answer here was that

10    there were no distributions, so there is nothing to be

11    accounted for.

12         But the problem here is not that the plaintiffs' have

13    not had jurisdictional discovery.  The problem is they don't

14    like the answers.  Judge Maas cut off discovery when they

15    started going over new ground.  Your Honor affirmed that

16    decision.  Your Honor looked at the evidence the last time

17    around, found there was nothing to support personal

18    jurisdiction.  The Second Circuit affirmed that.  We're back

19    here on virtually the same allegations, and the court should

20    reach the same result.

21         Thank you.

22         THE COURT:  Thank you.

23         MR. CURRAN:  Chris Curran for Al Rajhi Bank on

24    12(b)(6).

25         When Judge Casey addressed our arguments the first

I1Is9116

1    time around and he thought there was aiding and abetting

2    liability.  He addressed Halberstam and still found that the

3    allegations were insufficient under that standard.  Of course,

4    then when it went up to the Second Circuit, Rothstein had

5    intervened, and the Second Circuit affirmed on the basis of

6    proximate causation.

7            My point there being, the prior decisions of this

8    court and the Second Circuit foreclosed the arguments that

9    Mr. Cozen is advancing here, but if this court were to take his

10   invitation and lay side by side the new statute, JASTA, with

11   the allegations being made here, we would lead to the same

12   conclusion in any event.  But we would have to be careful to

13   look at the actual language of both JASTA and the allegations

14   that have been made, because I don't think Mr. Cozen set that

15   forth very clearly.

16           JASTA says, aiding and abetting by knowingly providing

17   substantial assistance.  Again, the notion of proximate

18   causation is famously flexible.  We all know that, not only

19   from Rothstein, but also going back to Palsgraf from law

20   school.  It is a flexible concept.  But, nonetheless, there has

21   to be substantiality, substantial assistance.  The same

22   language we see not only in JASTA, but in Rothstein, in

23   Halberstam, and in all cases dealing with aiding and abetting.

24           Now, Mr. Cozen might have been getting too excited,

25   because a lot of his descriptions of the allegations against

I1Is9116

1    Al Rajhi Bank were quite embellished.  He referred to Al Rajhi

2    Bank having accounts by Al Haramain, the charity which was a

3    designated charity.  Well, Al Haramain of Saudi Arabia wasn't

4    designated until 2008.  That doesn't really advance their

5    position on Al Rajhi Bank's knowledge or causation.

6            Foreign affiliates of Al Haramain, the charity,

7    outside of Saudi Arabia were designated earlier, but not until

8    2002.  So Al Rajhi Bank can't be condemned for having accounts

9    of Al Haramain or other charities, well before they were known

10   to be or alleged to be supporters of Al Qaeda.

11           The amended complaint here is devoid of any allegation

12   that Al Rajhi Bank ever had any designated party as a bank

13   customer or that it transacted business with any designated

14   party.

15           Mr. Cozen also said that Al Qaeda used accounts at

16   Al Rajhi Banks.  There is no factual allegations supporting

17   that.  In any event, even if there were, the use or misuse by

18   customers or others of a bank's routine banking services is not

19   a basis for a cognizable claim.

20           Mr. Cozen also said that Mr. Moussaoui said that the

21   bank moved around money for Al Qaeda.  I just re-read the

22   testimony of Moussaoui.  He doesn't even refer to Al Qaeda in

23   his discussion of Al Rajhi Bank.  He refers to some charities

24   and he refers to the bank being able to move money around.

25   There is no reference to Al Qaeda.

I1Is9116

| | |
|---|---|
| 1 | There is a huge missing link in all of the allegations |
| 2 | against Al Rajhi Bank.  The link is Al Rajhi Bank has no direct |
| 3 | connection to Al Qaeda.  Everything is through some intervening |
| 4 | party.  It is usually the charities, but the plaintiffs |
| 5 | themselves allege in their amended complaint that the charities |
| 6 | hid any wrongdoing they were doing in the context of other |
| 7 | humanitarian aid.  Again, the only charity where there is an |
| 8 | allegation that Al Rajhi Bank donated to was the Saudi High |
| 9 | Commission.  I am not aware of any allegation by the plaintiffs |
| 10 | ever that the Saudi High Commission passed on the money to |
| 11 | Al Qaeda. |
| 12 | Mr. Cozen found it interesting that Al Rajhi Bank |
| 13 | donated $1 million in the mid '90s to this charity.  Usually |
| 14 | people get praised for those kind of corporate acts, not |
| 15 | condemned. |
| 16 | Mr. Cozen also said -- and he referred in this one to |
| 17 | a specific paragraph of the complaint -- he said paragraph 186 |
| 18 | refers to SAAR, which I think he said was a designated party. |
| 19 | That is not true.  SAAR has never been designated.  He said |
| 20 | that SAAR sent $26 million to the leaders of Al Qaeda.  I just |
| 21 | read that paragraph and it doesn't say that.  So if there is |
| 22 | going to be any comparison between JASTA and the allegations of |
| 23 | the complaint, it's got to be done in a meticulous and |
| 24 | assiduous way, and not with a bunch of arm-waving and |
| 25 | embellishment of the allegations. |

I1Is9116

1            Thank you very much, your Honor.

2            THE COURT:  Thank you.

3            Thank you, all very much.  I will get back to you as

4      soon as possible.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25