I1O8INRC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    ------------------------------x
3   IN RE:  TERRORIST ATTACKS

4   ON SEPTEMBER 11, 2001                   03 MD 1570 (GBD)

5   ------------------------------x

6                                           New York, N.Y.
                                            January 24, 2018
7                                           2:00 p.m.

8   Before:

9                       HON. SARAH NETBURN,

10                                          Magistrate Judge

11                         APPEARANCES

12

    MOTLEY RICE
13       Attorneys for the Burnett plaintiffs
    BY:  ROBERT T. HAEFELE
14
    JONES DAY
15       Attorneys for Defendant Dubai Islamic Bank
    BY:  STEVEN T. COTTREAU
16
    MOLOLAMKEN
17       Attorneys for Defendant Dallah Avco
    BY:  ROBERT K. KRY
18
    SALERNO & ROTHSTEIN
19       Attorneys for Defendant Yassin Kadi
    BY:  PETER C. SALERNO
20

21

22

23

24

25

I1O8INRC

1              (In chambers; phone conference)

2              THE COURT:  Good afternoon.  This is Judge Netburn.

3              I am going to request that those lawyers who intend to

4     be sort of leading this conference state their appearances for

5     the record.  I only need those people who are intending to

6     speak to state an appearance because we have a court reporter

7     here, but we are trying to streamline this.

8              Of course if anybody who didn't previously state their

9     appearance then wants to chime in, I will just ask that you

10    state your appearance at that time.

11             A few other ground rules.  Let me remind the parties

12    that I am holding this conference as a courtesy to all of you,

13    and it requires everybody to pay attention to voice cues and do

14    their best effort to avoid speaking over one another, and to

15    speak as slowly as possible.

16             In addition, I will ask that every time you speak, if

17    you can just reintroduce yourself so that your statements can

18    be properly attributed.

19             So let me begin by asking who is here on behalf of the

20    Plaintiffs' Executive Committee.

21             MR. HAEFELE:  Good afternoon, your Honor.  Robert

22    Haefele, from Motley Rice, for the plaintiffs.

23             THE COURT:  Thank you.

24             Anyone else from the plaintiffs intending to speak

25    primarily?

I1O8INRC

1          Who is going to be speaking on behalf of the

2    defendants?

3          MR. COTTREAU:  Good afternoon, your Honor.  Steven

4    Cottreau, from Jones Day, on behalf of Dubai Islamic Bank.  I

5    will be speaking on behalf of the defendants on both

6    jurisdictional discovery and merits discovery.

7          THE COURT:  Thank you.

8          I issued my order at the very beginning of the year --

9    maybe this is my first order of the new year -- identifying a

10   few areas that I had questions and giving you all an

11   opportunity hopefully to do some meet and confer between the

12   sides and also to think about your positions to me.

13         So I think I will just pick up on that order and begin

14   in the first instance.

15         So let me first talk about the distinction between

16   merits discovery and jurisdictional discovery.

17         The proposal contemplates, as I understand it, that

18   those proceedings will run on a parallel course and end at the

19   same time.  I am not quite sure why that has to be and why the

20   jurisdictional discovery defendants would not wrap up their

21   discovery sooner.

22         So let me ask Mr. Haefele his view on that issue.

23         MR. HAEFELE:  Thank you, your Honor.

24         I think the proposal the way it was, with them running

25   parallel at the same time, was with the understanding that the

I1O8INRC

1   merits and the jurisdictional discovery are so intertwined

2   that, absent any artificial restrictions on the jurisdictional

3   discovery process, in our view once we were done with

4   jurisdictional discovery, we didn't anticipate there being more

5   needed.  That will be especially clear in the case, for

6   example, of the charity officials who have relied almost

7   exclusively on the discovery from the relevant charities for

8   their discovery responses.

9           So we understood the issue to be pertinent to

10  defendants Kadi, Dallah Avco and the five charity officials.

11          With each of them it was our position, our view, that

12  if there isn't any artificial blockage of us getting discovery

13  from the defendants, we anticipated being able to cover both of

14  the jurisdictional issue while we were doing the merits issue

15  with the other defendants.

16          THE COURT:  Just so I am clear, you anticipate that

17  you would conduct whatever discovery you would conduct.  There

18  would then be a motion made on the jurisdictional question.  If

19  the court ultimately held that the court did have jurisdiction

20  over the defendants, you would not seek to reopen discovery for

21  merits discovery.

22          MR. HAEFELE:  I think that's generally right.  I guess

23  the one caveat I would have is if the court specifically

24  identifies areas that warrant discovery, then I guess we would

25  go along with what the court identified.

I1O8INRC

1      THE COURT:  OK.  Let me ask you another question,

2   which I think you implicitly answered.  Is there any ability to

3   front-load jurisdictional discovery such that the subsequent

4   motion could be filed before all of discovery would be

5   completed?

6      MR. HAEFELE:  I think that that's harder to do with

7   the charity officials who are explicitly relying upon the

8   discovery from the other defendants to respond to their

9   discovery.  I think perhaps it's possible to do some of that

10   with regard to Dallah Avco and Kadi.

11      THE COURT:  Mr. Cottreau, do you want to be heard on

12   this point?

13      MR. COTTREAU:  Please, your Honor.

14      First, we agree with the plaintiffs that there should

15   be no restriction on the depositions to distinguish between

16   jurisdictional discovery and merits discovery, so long as there

17   is agreement that each witness will only be deposed once.  I

18   think that we have a lot of depositions already in this case

19   and to redepose witnesses is horribly inefficient at this

20   stage.  So we are in agreement, no subject matter limitations

21   so long as each witness is only deposed once.

22      With respect to the suggestion of timing, we are in

23   agreement with your Honor that the jurisdictional defendants

24   should be front-loaded in the discovery process, and here is

25   what we would propose in that regard.

I1O8INRC

1          We would propose trying to get through the

2     jurisdictional defendant witnesses by the fall of this year.

3     And in particular, we think that for the individual

4     jurisdictional defendants, the natural persons who are

5     jurisdictional defendants, of which there are six, we should

6     try to get through those in the first three months of

7     depositions.  So by the end of June.

8          And Dallah Avco, I understand, is a little bit more

9     involved.  They have already listed at least six people who are

10    document custodians and have relevant information.  On behalf

11    of Dallah Avco, we think those depositions that relate to

12    Dallah Avco can be wrapped up by September, the end of

13    September of this year, with the idea being that motions for

14    dismissal on the basis of jurisdiction could be renewed and

15    briefed by the end of the year with hopefully a decision

16    forthcoming in the first quarter of next year.

17         What that would permit, your Honor, is for those

18    defendants in jurisdictional discovery to know whether they are

19    going to remain part of this case on the merits and to still

20    have an additional six months from September -- I'm sorry, from

21    April of 2019 until the close of depositions in September of

22    2019 to take any affirmative depositions that they may want on

23    the merits.

24         So we think that that's the best way to streamline

25    this case and keep the jurisdictional defendants, if they are

I1O8INRC

1    to remain in the case, on the same discovery track that the

2    defendants who are in merits discovery are already on.

3          THE COURT:  Well, that proposal assumes two things

4    that are, as we say, not in evidence, which is, one, that I

5    think it's appropriate for depositions to go all the way

6    through till September of 2019, and, two, that a motion that's

7    filed at the end of 2018 would be decided by, I think you said

8    April of 2019.  I don't know that either of those things are

9    self-evident.

10         Assuming that those two things do not stand, do you

11   still think it makes sense to try and front-load the individual

12   jurisdictional defendants' depositions, recognizing that I

13   think in all likelihood you would not have a decision on the

14   merits of that jurisdictional motion before the close of fact

15   discovery?

16         MR. COTTREAU:  Well, your Honor, with respect to the

17   briefing of the jurisdictional motions, we didn't anticipate

18   that the motion to dismiss would be brought by the end of the

19   year, this year 2018; it would be that they would be fully

20   briefed by then so that we could put together a reasonable

21   briefing schedule.  If discovery of individuals were done in

22   the first three months of discovery, obviously they can start

23   to move to dismiss as soon as the end of summer.

24         But I hear your Honor that it is presumptuous.  It was

25   only made as a proposal for the court to try to streamline

I1O8INRC

1    discovery here and not cause any delay as a result of certain

2    jurisdictional discovery issues remaining outstanding.

3          THE COURT:  Right.  My only point was, just to be

4    clear on that, I would want your proposal to be premised on the

5    guarantee that there would be time on the back end after a

6    decision was issued.  Obviously Judge Daniels is handling these

7    motions.  I don't know whether he would refer to me for R&R,

8    which would only add time, I think.

9          But in any event, regardless of whether there is a

10   report and recommendation or whether he does it in the first

11   instance, I wouldn't assume that from full submission that

12   there will be a three-month turnaround.  That's my only point.

13         MR. COTTREAU:  Yes.  I understand, your Honor.

14         The hope here would be that if the jurisdictional

15   defendants are getting out of the case they wouldn't be forced

16   to participate in all the other merits-related depositions as a

17   contingency.

18         MR. HAEFELE:  Your Honor, there is one other concern

19   that I have with the proposal that Mr. Cottreau put forward,

20   and that is what I highlighted when I spoke a few moments ago,

21   that the individual defendants, charity official defendants are

22   relying on the discovery from the charities.  That's part of

23   the merits discovery.  So it's hard for us to finish the

24   jurisdictional discovery regarding those folks when they are

25   relying on the discovery from the other folks.

I1O8INRC

1        THE COURT:  Which is to say that you need to take

2   depositions of people from IIRO before you can defend a motion

3   to dismiss?

4        MR. HAEFELE:  That would be true for IIRO and Muslim

5   World League.

6        THE COURT:  I don't know that we need to sort of work

7   out this fine issue on whether or not to front-load the

8   witnesses right now, but this is helpful.  So now I have a

9   better sense on that particular issue.

10        Let's now talk about numbers.  I believe that the

11   proposal was that the plaintiffs should take 100 depositions,

12   that the defendants' view was that 50 was a reasonable number,

13   and that in any event there should be parity between the

14   numbers.

15        So I wanted to challenge both of those propositions,

16   first talking about the numbers, and I know that the plaintiff

17   identified dozens and dozens of people that they might be

18   inclined to depose from the various organizations, which got to

19   a number close to 200.  But let me hear from both parties.  I

20   guess let me hear first from the plaintiff on the number.

21        Why don't you go ahead and speak as to the number and

22   your view, if you have one, about whether the defendants should

23   have an equal number.

24        MR. HAEFELE:  Your Honor, I guess I will reverse the

25   order, then, because I think our position is a soft one on

I108INRC

1    whether there should be parity in the sense that we don't

2    really have a strong position as to whether there should be

3    parity other than to say we think that the defendants just

4    don't need as many depositions as the plaintiffs do.  But that

5    being the case, I will address the latter part.

6        Let me emphasize from the very get-go, I think the

7    overarching principle here is the plaintiffs don't want to take

8    anymore depositions than needed either to prove the case for

9    the individual plaintiffs or there are a number of depositions

10   that we would need to take because the defendants have

11   identified witnesses with regard to their defenses.

12       On that point, if we just went through and looked at

13   the Muslim World League/IIRO, collectively, taking out the

14   duplications, they have identified 42 witnesses that they would

15   put forward for their defenses; World Assembly of Muslim

16   Youth, or WAMY, has identified 34; Dubai Islamic Bank has

17   identified I think 16, Jelaidan has identified five, and we

18   haven't seen the witnesses that Kadi, Dallah Avco, or the

19   charity officials, including Mr. Al-Buthe, would identify.

20   Collectively, if we just had those, I think we are up to about

21   97.

22       THE COURT:  Can I ask you to speak a little bit more

23   slowly, particularly when you're identifying complex names.

24       MR. HAEFELE:  Yes.  Thank you.

25       If we just look at the witnesses that the defendants

I1O8INRC

1   themselves have identified, who obviously we would need to

2   depose those witnesses to prevent a situation where we are at a

3   motion to dismiss and suddenly we are getting a declaration

4   from somebody we never had an opportunity to speak to.  Even

5   looking just at those, it's around 100.  And that's before we

6   add any of the distinct individuals that aren't on their

7   witness list that we would need to prove our case.

8           Then if we go through the individual defendants -- I

9   think we have been able to cull down our witness list.  I am

10  talking distinct from who is on the defendants' witness list.

11  In other words, I am not counting people who are already on the

12  defendants' witness list.

13          My witness list, just to be clear, I am talking about

14  Rule 26 disclosures.

15          For Muslim World League/IIRO, I think I said they

16  identified 42 total.  I think we would need an additional 17.

17          WAMY, World Assembly of Muslim Youth, they identified

18  34.  I think we would need in the range of about 10 additional,

19  and that brings us to 44 total.

20          Dubai Islamic Bank, they have identified, I think it's

21  16.  We would need a total of about 21.

22          And that's not addressing -- there are pending search

23  results that are still due in discovery, and we haven't been

24  able to address those additional witnesses that might be

25  identified there.

I1O8INRC

1          For Wa'el Jelaidan, I think most of the discovery

2    would be covered by other defendants, so I am not adding any

3    additional.  There are witnesses, obviously, who would be

4    specific to him, but I think they are covered by the other

5    defendants.

6          As to Mr. Kadi, I think we have identified 11.

7          As to Dallah Avco, we have identified 21.

8          Then as to the charity officials, I think they are

9    covered by Muslim World League/IIRO, and Mr. Al-Buthe is

10   covered by -- probably we could cover him in about five

11   additional witnesses.

12          If we add all of those up, the number that I got to

13   was 163.

14          Our impression is there will be some witnesses that

15   won't be available, and there will be some witnesses that we

16   will be able to cull down based on the witnesses whose

17   depositions we take, and we are committed to getting to the

18   number 100, which is where we were.

19          What I can do, if your Honor is inclined and if you're

20   interested in hearing it, I can go defendant by defendant and

21   tell you the categories of the witnesses and why we think they

22   are necessary, but I wanted to give you the numbers upfront.

23          THE COURT:  I don't think I need an oral report on

24   that.  After this call I am going to take all of this under

25   advisement and if I think it will be useful, I will ask for a

I1O8INRC

1   written submission setting forth that.

2            Mr. Cottreau, do you have a sense, now that the case

3   has developed further, whether or not your witness list, your

4   26(a) witness list, would otherwise be culled down at this

5   point?

6            MR. COTTREAU:  I know that the defendants are all

7   going through the process in front of you in the deposition

8   protocol.  As part of that protocol, the parties jointly agreed

9   and proposed as part of the last submission to you that the

10  parties revise their witness list by March 2nd.  And so I think

11  everyone is taking a very hard look right now in anticipation

12  that the parties have agreed on that supplementation date and

13  that your Honor hasn't raised an issue with it.

14           So it is certainly our hope that we will all cull down

15  our witness list to the point, including the plaintiffs

16  hopefully, to the point where we can come up with a realistic

17  deposition schedule of the priority witnesses on those lists.

18           THE COURT:  OK.  Well, that's helpful and people

19  should definitely be working toward that date, even though I

20  haven't entered the protocol yet.  That date is firm.  So the

21  parties should be complying with that date.

22           Do you want to speak to the issue of parity?

23           MR. COTTREAU:  Yes, your Honor.

24           On the issue of parity, the primary reason why we

25  believe that we need as many depositions as the plaintiffs is

I1O8INRC

1    because we always start with the plaintiffs' last witness

2    disclosure, which is 171 witnesses that they say they have the

3    present intention to obtain testimony from or to secure a

4    declaration from.

5         A lot of those witnesses are witnesses that are either

6    members of al Qaeda -- we don't have any information as to

7    whether the plaintiffs have had access to information from

8    those individuals -- and also government officials.  Again, we

9    have no idea whether plaintiffs have been talking to these

10   government officials or not.

11        So our view would be that we need to depose these

12   people or else we face the possibility that there would be a

13   declaration from these people that we couldn't rebut at summary

14   judgment.

15        So our intention would be to try to prioritize as best

16   we could, collectively on the defense side, the 171 witnesses

17   that plaintiffs have named and get that down within whatever

18   limit your Honor sets.  Obviously that's going to require

19   incredibly hard choices by our side, but we understand that we

20   are up against the limitations of time and resource here.  So

21   we will have to do that.

22        I just point out for your Honor a couple of points.

23        One is that Federal Rule of Civil Procedure 30(a)(2)

24   recognizes this parity principle by limiting presumptively

25   depositions on both sides, as you know, to ten witnesses per

1   side, as well as the <u>VW</u> case that plaintiffs themselves cite

2   recognizes parity.  In light of the fact that plaintiffs named

3   171 witnesses and the defense, by our count, included 115 names

4   on their list, we probably have as many hard choices but

5   probably more than the plaintiffs do in trying to whittle it

6   down within whatever limitation your Honor sets.

7           MR. HAEFELE:  May I respond?

8           THE COURT:  Sure.  Let me just ask one question to

9   both of you, which is, when the March 2nd witness list comes

10  around, are the parties intending voluntarily to identify those

11  witnesses that they intend to secure a declaration from so that

12  each side can make a reasoned decision about deposition

13  testimony?

14          Mr. Cottreau, why don't I ask you first.

15          MR. HAEFELE:  Thank you, your Honor.

16          That wasn't something that obviously we had

17  contemplated under the existing procedure.  It's certainly

18  something that we could consider doing on our side.

19          I suppose we might have a present intention of

20  securing a declaration from someone at this juncture, but in

21  the event that that person was deposed, it may be that we would

22  just rely on the deposition testimony.  But I understand your

23  Honor's concern here.

24          THE COURT:  Right.  It seems like it might be helpful

25  to know which witnesses they are intending declaration

I1O8INRC

1    testimony, the parties are intending declaration testimony, and

2    also to give some inside information.  This should not be a

3    process of surprises.

4         So to the extent that the plaintiffs are identifying

5    al Qaeda witnesses or government witnesses, I think it would be

6    useful to know whether or not those people are on the list

7    because the plaintiffs realistically and reasonably believe

8    they are going to be able to secure their testimony one way or

9    another, either deposition or declaration, or whether they are

10   just on the list but the plaintiffs recognize that the

11   likelihood of securing those depositions or declarations is

12   slim.

13        For instance, I understand, I believe, that there are

14   some witnesses who are in Guantanamo right now and whether or

15   not there is any realistic belief that those people will

16   ultimately be deposed.

17        MR. COTTREAU:  Your Honor, I have to say just from our

18   side as defendants, we would welcome that process, in part

19   because we are all a little bit weary of some of the

20   gamesmanship that we believe the plaintiffs have engaged in on

21   their side.  And specifically I am referring to the fact that

22   they went and took a unilateral, I will call it a deposition,

23   but we weren't even invited to participate, a unilateral

24   deposition of Zacarias Moussaoui.  He was in super max, where

25   you would think it would be very difficult to get access to

I1O8INRC

```
1    them.  They did that with no notice to us and they relied on

2    his testimony in their papers in this case.

3         THE COURT:  Mr. Haefele, any objection to disclosing

4    in the March 2nd disclosure those witnesses about whom you

5    intend not to depose but to seek a declaration from, and also

6    indicating those witnesses who you would otherwise like to

7    depose but you have no realistic pathway to them?

8         MR. HAEFELE:  Your Honor, I think my answer generally

9    is similar to what Mr. Cottreau said, except that I would say

10   that -- the way our disclosure that we provided came about was

11   a bit different in the sense that we really didn't identify, as

12   the defendants have, the witnesses that are their own witnesses

13   that they would put forward.  If you look at their witness

14   list, by and large most of them are individuals that are

15   beholden to the defendants.  They are current or former

16   employees or officials.

17        The witnesses that the plaintiffs put on their list,

18   we tried to be as inclusive as to those people that we thought

19   had information that we would be trying to get witness

20   testimony from.

21        The notion that we have control over these people and

22   have a present-sense intention or ability to get declarations

23   from them is -- I think your Honor has sort of indicated

24   already she understands -- is not the case.  That's by and

25   large true.
```

I1O8INRC

1        If I could go back for a moment, your Honor.  Did I

2   answer your question?  I want to respond to something else.

3        THE COURT:  I think so.  I guess I would summarize it

4   by saying you don't think you could identify who you're going

5   to put forward as a declarant and who you would depose.

6        MR. HAEFELE:  I think that's true, but I would say,

7   though, that we would certainly intend to cull down the list

8   significantly, as I think I intimated when I was identifying

9   the numbers earlier.

10       THE COURT:  What I want to avoid here, because this is

11  not your average case, I want to avoid the problem that happens

12  in most cases where people overdesignate as a CYA and everybody

13  is left with some guessing game.  This litigation should not be

14  run that way.  So I want the parties to be more transparent

15  than their litigation strategies might otherwise incline them

16  and be clear that these are the people we are truly intending

17  to depose and be clear, if you know, that there are people on

18  the list who you're putting as a witness but you have no

19  intention of deposing them because you know you're going to get

20  a declaration, and it seems to me that's information that your

21  adversary should know.

22       MR. HAEFELE:  Understood, your Honor.

23       I just wanted to reiterate that there was a difference

24  between how the lists were created previously defendants versus

25  plaintiffs.

I1O8INRC

1          I also wanted to hit on one point that Mr. Cottreau

2     said about the VW case.  In the VW case the order was

3     specifically related to discovery that would entail discovery

4     that defendants would be doing of plaintiffs, for example, for

5     damages, I believe.  So it contemplated discovery coming from

6     the plaintiffs as well as from the defendants.

7          I think if you look at that particular order, which I

8     believe was cited and may have been included -- I can't

9     recall -- there is a distinct notion that the discovery would

10    be bilateral because it entailed discovery both for damages and

11    liability.

12          THE COURT:  Right.  That's what led me to ask the

13    question of the defendants as to why there was a need for an

14    equal number of witnesses if this is really liability

15    discovery, whether or not the defendants, having access to the

16    primary people that are going to be deposed by the plaintiffs,

17    really have a genuine intention of deposing an equal number of

18    witnesses.

19          MR. COTTREAU:  There is also another consideration in

20    this case from our perspective, which is that we may not be

21    able to get witnesses on the defense side that we would

22    ordinarily expect to come to trial, to be available for trial

23    because of visa and other travel-related issues.  So it may be

24    in this case that we depose witnesses in discovery that we

25    wouldn't ordinarily depose in a case on the chance that they

I1O8INRC

1    couldn't get a visa at the relevant time.

2          As you know, the political situation with respect to

3    visas right now is very unpredictable and who knows how that's

4    going to play out in the future.  But I would make no

5    guarantees in three or four years about which witnesses that

6    were even current employees of my client could be able to get a

7    visa to appear to testify in court.

8          So there is some different considerations in this case

9    in light of the fact that it is so international in nature.

10          THE COURT:  Right.  I think this is a perfect segue to

11    the other topic I wanted to discuss, which is the topic of

12    counting depositions in the context of de bene esse depositions

13    which, to be clear, I would not include the potential visa

14    difficulties as falling into that category.  But to the extent

15    there are depositions that a party seeks for preservation

16    purposes -- well, as I am speaking I am thinking.  Maybe

17    somebody that you genuinely think will never be allowed in the

18    United States to testify would be a preservation deposition.

19          In any event, there was a view that any discovery

20    deposition taken of a preservation deponent would not count

21    toward the ultimate number, and I wanted to hear arguments as

22    to why that is so.

23          MR. HAEFELE:  I have got to confess, I am not sure I

24    understood your Honor's question.

25          THE COURT:  Sure.

I1O8INRC

1          It's the final paragraph in my order.  It begins with

2     "third," which is this question about counting depositions.  As

3     I understand it, there was a dispute between the parties.  If a

4     party wanted to take the deposition of a witness to preserve

5     that testimony and the other side wanted a, quote-unquote,

6     discovery deposition in advance of that preservation

7     deposition, there was a dispute among the parties as to whether

8     or not that discovery deposition, taken in advance of the

9     preservation deposition, should count toward the number that

10    the court sets as far as the limit of depositions.

11          MR. HAEFELE:  I don't know who you want to hear from

12    first, but I am happy to talk about that.

13          THE COURT:  Sure.

14          MR. HAEFELE:  I think putting it in context, and I

15    know your Honor's order indicated that it was the defendants'

16    proposal and that's where you got the language from, but I will

17    confess on behalf of Mr. Cottreau and me that I think that was

18    language that we had bandied about and I am not sure that it's

19    attributable just to them.

20          It comes up really in the context of Dr. Hassan's

21    deposition that happened a few months ago.  I think that's a

22    good example of where the confusion comes from as to how they

23    should be counted.  If you recall, Dr. Hassan was a member of

24    the DIB Sharia Board, who the plaintiffs had identified on

25    their witness list as somebody that they thought had

I1O8INRC

1   information.  Now whether we intended to depose the witness or

2   whether we intended to use him as a witness at trial was a long

3   way away when we identified him in our Rule 26(a) disclosures

4   in 2010, I think.  But DIB insisted that they needed to take

5   his deposition before the other depositions started.  We didn't

6   know whether we were going to take his deposition or not.  But

7   DIB was very clear they wanted to take his deposition for a

8   variety of reasons.

9          Our view was that if they were going to take his

10  deposition and they wanted to do it to preserve his testimony

11  for trial that we needed to take a discovery deposition to know

12  what his trial testimony would be.  And so we did that, and we

13  ended up doing it such that the plaintiffs did a discovery

14  deposition and then DIB did their cross-examination and they

15  did a trial deposition.

16         The question comes up how all of those get counted

17  when it was DIB that initiated wanting to do the deposition in

18  the first instance, and I don't know whether the plaintiffs

19  would have used that as one of their 100 depositions.

20         I think that's where the battle, if you will, started

21  with regard to this particular paragraph, is how do you count

22  those depositions.

23         I think our position is what we ended up setting out

24  in our proposal that -- obviously, I think your Honor is right

25  that any de bene esse depositions don't be counted at all, I

I1O8INRC

1   think is what you said.

2             THE COURT:  It seems to me that the most faithful way

3   to calculate all of this is that a de bene esse deposition

4   would not count because that would be trial testimony.  So it

5   would be testimony that was going to be held in reserve in case

6   the witness could not testify at trial.

7             It's not obvious to me why the opposing side, learning

8   that there was a desire to preserve this witness's testimony,

9   which is sort of the same as an intention of calling that

10  witness at trial, why the discovery deposition should be

11  treated any differently than if the witness was just a regular

12  trial witness.

13            MR. COTTREAU:  The defendants are in agreement with

14  that view.

15            THE COURT:  I appreciate that you're being maybe

16  forced to make your decision in response to the designation of

17  a witness being called for a de bene esse deposition, but I

18  don't think that's materially different than learning that that

19  witness is going to be called at trial and then the plaintiff

20  making a decision whether or not they wanted to take a

21  discovery deposition.

22            MR. HAEFELE:  The dilemma comes up in the following

23  matter.  I think some of it applies to whether there is parity

24  and the number of depositions each side gets and, quite

25  frankly, whether there is gamesmanship that happens.  If there

I1O8INRC

1    is parity, then the defendants just don't need these

2    depositions.  When they start adding witnesses who will testify

3    at trial or get declarations from and suddenly we need to fill

4    in all of the depositions that we need, running around, making

5    sure that we are covering the depositions that they may get,

6    but they are not actually useful to what the plaintiffs need.

7              THE COURT:  Well, I guess one sort has to adopt some

8    level of conspiracy theory in the way that they are handling

9    this case, which I am not prepared to adopt at this point.

10             MR. HAEFELE:  Your Honor, I'm sorry.  If you look at

11   Dr. Hassan's deposition, that's a good example.  They insisted

12   that his deposition go forward, but yet he is not even on their

13   current Rule 26 disclosure.

14             MR. COTTREAU:  If I could maybe respond.

15             THE COURT:  Sure.

16             MR. COTTREAU:  One is, it's our view that we are going

17   to proceed in good faith here, and understand that if we call a

18   de bene esse deposition, there is going to be a reason for it

19   and that that reason will be disclosed to plaintiffs and if

20   they want to challenge that reason, that's fine by us.  In

21   terms of bringing it to your Honor's attention, our hope would

22   be that through meet and confers in good faith on both sides we

23   can avoid this whole issue.

24             With respect to Dr. Hassan, he was an 84-year-old

25   gentleman that plaintiffs injected into this case in their July

I1O8INRC

```
 1    2015 motion to compel with a long litany of allegations against
 2    the body that he was the chairman of.  For that reason we
 3    wanted to preserve his testimony.  We didn't interject him into
 4    the case.  Plaintiffs did.  But we wanted to preserve rebuttal
 5    to plaintiffs' allegations.
 6              THE COURT:  I understand the issues.
 7              Mr. Cottreau, can I ask you to speak to the comment --
 8    in your proposal to this same paragraph 38, you reference both
 9    depositions to perpetuate testimony and then you say, "or
10    notices the deposition of its own witness."  I wasn't sure what
11    you meant by that.
12              MR. COTTREAU:  I don't think it's that important in
13    light of your Honor's proposal, potentially, that the de bene
14    esse depositions would not count as discovery depositions
15    towards the numerical limitations.
16              But all we were trying to capture, and it was probably
17    inartful, was if you were a current or former employee or if
18    you were an individual yourself.  So that's all we were trying
19    to capture with that concept.  But I agree it's ambiguous and
20    probably that language, in light of your Honor's order and the
21    idea for the approach here with respect to these numerical
22    limitations, the language is probably outmoded.
23              THE COURT:  You would concede that if you decided to
24    call the president of Dubai Islamic Bank for a deposition, not
25    for a de bene esse deposition, but if you wanted to take that
```

I108INRC

```
1    witness's deposition, that that would count toward your limit?
2              MR. COTTREAU:  Yes, subject potentially to the idea
3    that we had no faith that he would be able to travel to the
4    United States to give live testimony.  If we had some basis for
5    that and can present that, we would want to preserve the
6    ability that that could be a de bene esse deposition.
7              MR. HAEFELE:  Your Honor, that's raising the issue
8    that we are concerned about, is that suddenly, because many of
9    these witnesses are out of the country, many of them will be
10   noticed as de bene esse depositions and we will be left having
11   to use all of our depositions or many of our depositions to
12   address getting testimony from the witnesses before they go on,
13   quote-unquote, the witness stand.
14             THE COURT:  Why can't we set the rule that a witness
15   who currently would be unable to come to the United States,
16   either because he is on a no-fly list or a terrorism list or
17   whatever it is, the witness would not be able to come to the
18   United States now might make that person eligible to be a de
19   bene esse deposition, but sort of the fear that that person
20   might not be able to come because immigration law may change is
21   not an adequate basis.  Would that be a standard that the
22   parties could adopt?
23             MR. COTTREAU:  Your Honor, that would be fine by us
24   with only this caveat.  To my knowledge, none of my client
25   representatives at Dubai Islam Bank are on a no-fly list or
```

I1O8INRC

1   terrorism list.  Instead, they are people from countries that

2   are not regarded as safe countries by the current

3   Administration.

4         So we may have witnesses, for example, that are from

5   countries like the Sudan who are employed by the bank, who are

6   able to travel freely within the Middle East, but could not

7   travel to either Western Europe or the United States.

8         So with that clarification, so long as we could put

9   forth a record to your Honor for applying for visas and either

10  having no action taken on them or having them being

11  affirmatively rejected, we would be in agreement with that

12  idea.

13        MR. HAEFELE:  Your Honor, our concern continues to be

14  that if the bulk of the defendants' witnesses end up becoming

15  in some matter depositions that don't count against them but

16  they are their witnesses, we are then in a situation -- and

17  they would depose them otherwise, but they are deposing them in

18  a matter of de bene esse because they are not available to come

19  to the U.S., now we have to do a discovery deposition in

20  advance and we don't want that to count against us.

21        THE COURT:  OK.  All right.  I understand the parties'

22  view.

23        MR. COTTREAU:  If I could make one suggestion which

24  may be helpful in terms of the parties' planning.

25        THE COURT:  Yes.

I1O8INRC

1          MR. COTTREAU:  If we could potentially have a view as

2     to whether witnesses could be allowed to testify by video at

3     trial, that could be very helpful here in maybe reducing the

4     number of depositions or reducing the workload of trying to

5     determine whether people are eligible to travel to the United

6     States at this juncture.

7          THE COURT:  Mr. Haefele, do you have a view on that?

8          MR. HAEFELE:  I am not clear on what the proposal is,

9     but I could tell you that my concern -- look, I don't think we

10    have a problem generally with doing video testimony, and I

11    think there is even a provision in your order or the proposed

12    order related to that.

13         What I would be concerned with is if a witness is

14    testifying sitting next to someone that has a senior position

15    to them, then they may be in a situation where they are less

16    candid in their testimony as a result of the pressures they are

17    getting.  For example, some of the witnesses who were

18    interviewed by the 9/11 Commission indicated that their

19    impression was the people they were speaking to were not

20    especially candid, and they attributed some of that to the fact

21    that they were sitting beside some senior Saudi officials who

22    may have had a position of authority over them.  I would not

23    want it to be the situation where that is where the witness

24    would be sitting testifying at a trial.

25         THE COURT:  Just to be clear, I think the protocol

I1O8INRC

1    contemplates video depositions for discovery purposes.  I think

2    what Mr. Cottreau was referring to was whether or not the

3    parties could all agree that certain witnesses be allowed to

4    testify live by video feed at trial, which would therefore make

5    those witnesses who might otherwise be, quote-unquote,

6    unavailable to come to the United States, and therefore subject

7    to a preservation deposition, that there would no longer be

8    that need because they would be available at trial, they would

9    just come by video.  I think that is what Mr. Cottreau was

10   referring to.

11            MR. HAEFELE:  Your Honor, we would be open to some

12   arrangement of that nature.

13            THE COURT:  I think to speak to your concern, two

14   things.  One, presumably if the Saudi government, for example,

15   was asserting pressure on a particular witness, that pressure

16   is going to be hard to uncover and prevent in a general matter.

17   But two, I think we could all agree that witnesses who are

18   testifying at trial would have to sit in a certain environment

19   that the parties and the court would agree upon, which would be

20   one where there was no nobody who could exert undue influence

21   in the room and it would be in a safe or secured location.

22            MR. HAEFELE:  Thank you, your Honor.

23            THE COURT:  I am going to think about all of this,

24   including what the appropriate number of depositions should be

25   in this case.

I1O8INRC

1          My next question, obviously your answer is affected by

2     the number that I allow for depositions, but can we talk

3     generally about the request for depositions to go through

4     towards September 2019.  That's 18 months away.  Even if I

5     permit 100 depositions on either side, given the number of

6     lawyers on this case, 200 depositions is not a number that

7     ordinarily takes a year and a half to complete.

8          I have plenty of highly complex litigation where

9     people are taking dozens of depositions in a month.  It's not

10    clear to me why in this case, where I think there's even more

11    lawyers involved, it would take 18 months to complete 200

12    depositions.

13         Mr. Haefele, do you want to respond first?

14         MR. HAEFELE:  I think some of it has to do with

15    complexity and some of the lawyers that have come on are new.

16    I don't think they are up to speed in terms of the liability.

17         Is your Honor talking about the lawyers that are

18    coming in on the new cases or are you talking about the lawyers

19    who are on the PTC who have been involved in the litigation for

20    some time?

21         THE COURT:  I haven't been assuming that lawyers that

22    have just filed their first case are going to be the people who

23    will be taking a lot of these depositions.  Maybe I am wrong

24    with how you're distributing the workload.  But I assume there

25    are a core group of lawyers who are conducting the majority of

I1O8INRC

these depositions, but I also assume that that core group of
lawyers is at least 20 strong, if not 30 or 40 strong.

          MR. HAEFELE:  I think your Honor is correct in the
sense that it is the core group of lawyers and they are a core
group that are involved more in the briefing and a lot of the
other work.  But in terms of taking the depositions, I think
that number starts to shrink some.

          I think we can certainly try and expand our numbers
and take some of the people who are working in the briefing
capacity and move them over into the deposition-taking
capacity, but I don't think it is where you're looking at that.

          MR. COTTREAU:  We would like to move the case along as
expeditiously as possible.  I think the reason for some of the
scheduling -- we think it is aggressive, even our proposal of
50 depositions per side, we still think it is a very aggressive
schedule.  Some of the defendants are represented by fairly
small law firms with not as many lawyers as my law firm has,
although we have a fairly constrained team on this case as
well.

          We also have other considerations here, which is a lot
of these depositions we anticipate going forth with a
translator.  So they will be stretched out over two to three
days depending on how things play out.  And a lot of these
depositions obviously will be taking place abroad in Western

I1O8INRC

1    Europe.  Working through some of the visa issues and other

2    governmental permissions that we may need for some of the U.S.

3    witnesses, we just anticipate taking year and a half time.

4              MR. HAEFELE:  If I could add on to what Mr. Cottreau

5    said.  I think we are actually in agreement on this.

6              Some of the constraint, in terms of the number of

7    lawyers, concerns the fact that a lot of these, as your Honor

8    probably understands, are going to be done overseas, and you're

9    talking about a number of lawyers traveling, doing multiple

10   depositions perhaps at a time.

11             I think Mr. Cottreau will agree with me that some of

12   the defendants are not available for stretches of time due to,

13   for example, Ramadan and other holidays.  I think your Honor

14   has also indicated previously that in a number of depositions,

15   Friday is off the calendar in terms of the number of days that

16   we can do depositions.

17             THE COURT:  OK.  Let me take a very brief recess for a

18   moment.

19             (Pause)

20             THE COURT:  OK.  I think I have gotten all of the

21   information that I need from all of you.  We will get an order

22   out shortly.

23             I think it was Mr. Cottreau who made a comment about

24   visas and all other bureaucratic complications.  The parties

25   should be moving forward now.  Certainly there are depositions

I1O8INRC

 1     that you know you are going to be taking.  You should be

 2     discussing now when those are going to be start.

 3             It's been my understanding and expectation that the

 4     parties would start taking depositions in April or May, and I

 5     expect that to be in the works now.

 6             So I don't want sort of unnecessary bureaucratic

 7     problems to come up late in this process.  So people should

 8     know when Ramadan is going to be this year and make

 9     accommodations so that there is no surprises toward the end of

10     this process.

11             MR. SALERNO:  At some point I need to clarify

12     regarding point number one on today's agenda.

13             THE COURT:  Sir, we are getting a lot of feedback from

14     your call.  Maybe if you got off speakerphone, if you're on

15     speakerphone.

16             MR. SALERNO:  I am on a headset, but I will try to get

17     off it.  Sorry.

18             Is this better?

19             THE COURT:  Much better.

20             MR. SALERNO:  Our issue with respect to point one -- I

21     don't know if you heard me on that -- I got some sense of the

22     discussion that jurisdictional -- defendants in jurisdictional

23     discovery would have to be covering the merits also.

24             I'm not sure that was what was intended, and we think

25     it's a problem.  Our client, Mr. Kadi, was remanded by the

I1O8INRC

1    Second Circuit only for jurisdictional discovery.  We accept

2    the proposition that if there is anybody at all who is deposed

3    while we are still in the case, we won't want to depose him a

4    second time if, for example, we lose the jurisdictional motion.

5              But if we, having taken certain depositions that we

6    think are necessary, if any -- and, by the way, we haven't

7    thought of any that we need -- we make a motion to dismiss on

8    jurisdictional grounds and lose, we think we should be entitled

9    to merits discovery of witnesses, at least those who had never

10   been deposed before in the case.

11             I just wanted to make it clear.  I would hope that we

12   would have that right, because I think we should.

13             THE COURT:  Well, I am not quite sure how we would

14   protect against that.  This is a massive case where hundreds of

15   thousands of dollars and more like millions of dollars is being

16   spent on the discovery phase, and I don't think it's fair to

17   everybody else in the case for you to come back into deposition

18   mode two years from now when you have had a decision on the

19   jurisdictional issue, go up to the Circuit and potentially the

20   Supreme Court and then come back down and seek to reopen

21   discovery.

22             So I appreciate your client's general interest in a

23   much smaller case that might be prevailing, but I don't know

24   how in this circumstance anything other than requiring your

25   client to take all of the depositions that it would take for

I1O8INRC

1    the merits as well as jurisdiction, how anything other than

2    that would be fair to everybody else.

3            MR. SALERNO:  I understand that position and I guess

4    obviously we have to live with whatever your Honor directs.

5            MR. KRY:  Your Honor, I would just note that we share

6    Mr. Salerno's concern.

7            THE COURT:  There was a mention about whether or not

8    there were certain depositions that could be conducted -- I

9    think Mr. Salerno said this.  If there were depositions that

10   were not taken by the parties as part of the merits discovery

11   because nobody thought witness A needed to be deposed, whether

12   or not it would be fair to allow defendant Kadi or Dallah Avco

13   to depose witness A four years from now.  I guess that's one

14   question we could discuss.  But I guess to require a witness to

15   appear more than once seems unfair to accommodate just these

16   two defendants.

17           MR. SALERNO:  We are not asking any witness to appear

18   more than once.  We accept the proposition that that shouldn't

19   happen.  We are just talking about people who have never been

20   deposed.

21           MR. KRY:  Our position is the same.

22           THE COURT:  So you would like permission to seek leave

23   from the court for some additional depositions that had not yet

24   occurred long after the close of discovery if your client is

25   still in the case?

I1O8INRC

1          MR. SALERNO:  It would be more like if the client

2     comes back in.

3          As I said, we were remanded only for what is normally

4     thought of as a preliminary issue in the case.  Theoretically

5     the scope of the remand is the scope of what we should be doing

6     here.  I assure you we don't want to be back in the case in

7     four years if we get out now.  We may not get out now.  We may

8     be in.  And even then we think we should be entitled to some

9     merits discovery, precisely because that wasn't part of the

10     remand initially.

11          I think we have a right to get our discovery if we are

12     brought back in the case and we get out too, in either

13     situation.

14          THE COURT:  I understand your sort of legal arguments.

15     In the context of a complex litigation like this, it's hard to

16     implement those concerns.

17          For instance, we have been discussing that your client

18     would not be able to object at a deposition that it was going

19     beyond the scope of jurisdictional discovery, that there might

20     be merits questions asked of your witnesses as part of the

21     general discovery that the parties are taking.

22          MR. SALERNO:  That's not our concern, frankly.  First

23     of all, we don't plan to take any depositions in the

24     jurisdictional phase.  We certainly expect that the plaintiffs

25     will.  They will probably want to depose our client.  We don't

I1O8INRC

1    intend to object to any questions posed to our client on the

2    ground that it's outside jurisdictional but might be within

3    merits.  That would not be our position.

4            There we would be relying on the rule that I think we

5    are establishing that every witness gets deposed only once.  We

6    accept that rule.

7            THE COURT:  OK.  I understand your position.  Let me

8    take it under advisement.

9            Anyone other than Dallah Avco and Kadi who take that

10   view?

11           OK.  Well, thank you, all.

12           I appreciate everybody's thoughts, and I will get an

13   order out as soon as possible.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25