# EXHIBIT 8

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA HAND DELIVERY**

March 14, 2014

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

      The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this letter and the accompanying exhibits and respectfully request that the Court enter an Order, pursuant to F.R.C.P. 37(a), compelling defendants World Assembly of Muslim Youth-Saudi Arabia and World Assembly of Muslim Youth-International (collectively referred to as "WAMY"), to: (1) immediately produce in the United States all *responsive* documents WAMY is presently collecting and storing in its Saudi Arabian headquarters and refusing to turn over to plaintiffs; (2) abide by this Court's prior rulings concerning the scope and diligence of searches required of defendants in this litigation; and (3) search for and produce all such responsive documents consistent with this Court's prior discovery rulings that 1992 through 2004 is the appropriate time period for discovery. Plaintiffs further request that the Court advise WAMY that sanctions may follow if it does not promptly comply.

      By letter brief dated December 19, 2013, plaintiffs sought this Court's intervention relative to WAMY's refusal to provide documents relating to its Canadian branch office ("WAMY-Canada"), and failure to make timely production of WAMY's FOIA-related documents. This motion focuses on WAMY's separate efforts to broadly impair plaintiffs from obtaining meaningful access to relevant documents, by refusing to produce the bulk of its responsive documents in the United States, arguing that plaintiffs should instead be required to review thousands of documents collected from its offices around the globe and stored at WAMY's offices in Riyadh. Defendant advocates this position even though WAMY-Saudi

The Honorable Frank Maas
March 14, 2014
Page 2

Arabia ("WAMY-SA") has itself completed four separate document productions in the United States without complication (totaling 8,173 pages),[1] and despite the fact that the practice for all of the other defendants has been to produce documents in the United States. Significantly, the approximately 120,000 pages of responsive documents WAMY seeks to compel plaintiffs to review in Saudi Arabia are not limited to materials normally stored in WAMY's Riyadh offices, but allegedly also include documents WAMY has collected from its branch offices outside of the Kingdom and shipped to its Saudi headquarters, rather than simply send to the United States for production. In an effort to justify this approach, WAMY has created "indices" that purport to identify and catalogue the collected documents, an investment of resources incurred solely to withhold the documents, and that could have been avoided entirely by simply producing them. Relying on this artificially manufactured construct, WAMY asserts that plaintiffs' counsel (and necessary experts and translators) should be required to travel to Saudi Arabia to review, translate, and copy those materials. Such an approach is inefficient and clearly inconsistent with WAMY's discovery obligations under the Federal Rules of Civil Procedure, all the more so given that WAMY's U.S. branch is a mere alter-ego of the parent which has an independent obligation to produce the documents in question.

Moreover, the multiple indices generated by WAMY in an effort to justify the withholding of the documents are plagued with innumerable problems and lack the most basic information that will allow plaintiffs to intelligently and efficiently select documents for review and/or duplication. Indeed, the content of WAMY's indices only underscores the extent to which such catalogues can be manipulated to shroud key documents, bolster raw production numbers through the inclusion of irrelevant and self-serving materials described in the vaguest of terms, avoid the production of critical materials, and compel plaintiffs to waste valuable resources. In light of WAMY's unwillingness to heed this Court's warning not to produce indices that are "nonspecific" or "unintelligible," the preparation of the indices cannot possibly serve as a substitute for locating specific responsive documents and producing the actual documents in the United States, as required by the Federal Rules.

Further, although the indices WAMY provided are woefully lacking in detail, it is apparent from the vague descriptions that have been provided that WAMY's searches have not met the clear standards set by this Court through prior rulings and admonitions during the discovery process. As set forth in Section I(C)(3), plaintiffs also seek an order directing WAMY to expand its searches to meet the standards previously announced by this Court, especially those announced in the context of rulings as to other of the Saudi charity defendants.

Finally, despite clear instruction from the Court that 2004 is the appropriate presumptive cut-off date for discovery in these proceedings, WAMY contends that the scope of discovery is limited to an end date of 2002. WAMY's insistence on this earlier date raises concerns that the defendant is purposely excluding large numbers of responsive documents from its searches and document productions. Plaintiffs respectfully request that WAMY be ordered to comply with

---

[1] WAMY-SA's first document production occurred on March 15, 2012 (WAMY-SA000001-1218), its second production on April 30, 2012 (WAMY-SA001219-1901), its third production on August 31, 2012 (WAMY-SA001902-6537), and its final production on February 19, 2014 (WAMYSA008437-10073).

The Honorable Frank Maas
March 14, 2014
Page 3

this Court's earlier discovery rulings and search for and produce all responsive materials consistent with the 1992-2004 time period as previously directed by the Court.

I. **WAMY SHOULD BE COMPELLED TO IMMEDIATELY PRODUCE RESPONSIVE DOCUMENTATION IN THE UNITED STATES**

   A. **WAMY-SA Should Be Compelled To Produce All Responsive Documents In The United States**

WAMY-SA's efforts to resist production of its documents in the United States should not be countenanced in this complex multi-district litigation in which the practice throughout the case has been for all parties, including every other foreign defendant, to produce all responsive documents in the United States. In fact, a range of security, equitable, and practical considerations uniquely support plaintiffs' request that WAMY-SA be required to promptly produce its responsive documents in the forum where this litigation is pending.

   1. **The Court has the authority to order WAMY-SA to produce all responsive documents in the United States.**

Where a foreign defendant is properly subject to the court's jurisdiction, the court has the authority to direct the foreign defendant to fulfill its discovery obligations within the forum, including ordering the production of documents in the United States which are located abroad. *See United States v. First Nat'l City Bank*, 396 F.2d 897, 900-01 (2d Cir. 1968) ("It is no longer open to doubt that a federal court has the power to require the production of documents located in foreign countries if the court has *in personam* jurisdiction of the person in possession or control of the material."); *Work v. Bier*, 106 F.R.D. 45, 50 (D.D.C. 1985) (holding that a U.S. federal court can require a foreign defendant, subject to its *in personam* jurisdiction, to reproduce copies of documents and records located in a foreign country and ship them to local counsel in the forum jurisdiction for production pursuant to Rule 34 of the Federal Rules of Civil Procedure). Here, where the Court already has resolved that it possesses personal jurisdiction over WAMY-SA, this Court unquestionably has the authority to require WAMY-SA to produce its responsive documents in the United States. Further, the rationale for requiring production in the United States is singularly strong here, based on the personal security, equitable, and practical considerations surveyed below.

   a) <u>Plaintiffs and all other Saudi Arabian defendants have produced discovery documents in electronic format in the United States without objection.</u>

To the extent that other Saudi-based defendants in this litigation have produced any documents, each of their productions have been in this forum, both in response to plaintiffs' merits discovery as well as the substantial jurisdictional discovery that has been done. As the Court is aware, defendants Muslim World League ("MWL") and the International Islamic Relief Organization ("IIRO") have made a number of productions in the United States totaling more than 200,000 pages. Defendants Saudi Binladin Group ("SBG") and National Commercial Bank ("NCB") have similarly produced thousands of pages of documents in this country in response to jurisdictional discovery requests. Several Saudi nationals have also produced documentation directly to plaintiffs in the United States, including defendants Yassin al Kadi, Wa'el Hamza

nydocs1-1029025.1

The Honorable Frank Maas
March 14, 2014
Page 4

---

Jelaidan, Dr. Abdullah al Turki, Dr. Abdullah al Obaid, and Dr. Abdullah Naseef. Moreover, the United Arab Emirates-based Dubai Islamic Bank has produced documents within this forum without objection. While plaintiffs have had issues with many of those productions, defendants have consistently adhered to the practice of producing their responsive documents in the United States.

Importantly, the defendants' document productions have routinely been provided in an electronic medium. Per negotiations between members of the PECs and DEC during a meet and confer held by video conference on March 31, 2011, all parties agreed that documents will be produced in the United States as TIFF images, the format proposed by the DEC. Consistent with that agreement, plaintiffs have themselves converted tens of thousands of hard copy documents into TIFF images for production in these proceedings.

As all other defendants have confirmed through their voluntary conduct, producing responsive documents in the United States does not represent a material burden to foreign defendants in this litigation. WAMY-SA has demonstrated as much itself, by making four separate document productions in the United States in electronic format without objection, and should be required to produce the remainder of its responsive documents in the United States as well.

        b)      <u>Security and safety considerations support an order compelling WAMY-SA to produce all documents in the United States.</u>

WAMY's effort to require plaintiffs' representatives to travel to its headquarters in Saudi Arabia merely to obtain access to relevant documents is unreasonable, given the security climate in the Kingdom and potential safety risks to U.S. citizens. According to the United States Department of State, "security threats [to U.S. citizens visiting the Kingdom] are ongoing and terrorist groups, some affiliated with al-Qaida, may target both Saudi and Western interests. Possible targets include housing compounds, hotels, shopping areas and other facilities where Westerners congregate."[2] In light of the ongoing threat, the Department of State has issued an express travel warning urging "U.S. citizens to carefully consider the risks of traveling to Saudi Arabia." *Id.* Given "the current security situation in Saudi Arabia and the continuing threat posed by terrorism," the State Department has cautioned that U.S. citizens who elect to travel to the Kingdom in the face of the travel warning "should be aware of their surroundings at all times and are also advised to keep a low profile; vary times and routes of travel; exercise caution while driving, and entering or exiting vehicles; and ensure that travel documents and visas are current and valid." *Id.*

Here, the security risks identified by the United States government to U.S. citizens traveling to the Kingdom are especially acute, and provide a singularly compelling argument for requiring WAMY-SA to make its document productions in the United States. Indeed, following the murder in the Kingdom of an individual hired by the *Burnett* plaintiffs to attempt service of process on defendants in Saudi Arabia, Judge Richard Casey recognized the unique dangers travel to Saudi Arabia would pose to representatives of plaintiffs in this case, and therefore ordered that service of process on defendants located in the Kingdom could be accomplished via

---

[2] *See* http://travel.state.gov/content/passports/english/alertswarnings/saudi-arabia-travel-warning.html#.

nydocs1-1029025.1

The Honorable Frank Maas
March 14, 2014
Page 5

publication. ECF No. 445; *see also* Transcript, February 15, 2012 Discovery Hearing, p. 37 (citing murder of *Burnett* plaintiffs' process server as primary factor in authorizing service by publication). That several of the Saudi-based defendants in this very litigation have been designated as foreign terrorist organizations and/or sponsors of terrorism pursuant to Executive Order 13224, only serves to underscore those risks.

Given the continuing threat of attacks by al Qaeda and related terrorist organizations, plaintiffs respectfully submit that requiring plaintiffs' counsel and their representatives to travel to Saudi Arabia simply to obtain access to WAMY's documents would present unjustifiable, and entirely unnecessary, security risks. For this reason alone, WAMY should be compelled to produce all documents in the United States.

      c)  Saudi visa policies will prevent certain plaintiffs' lawyers, staff and experts from entering the Kingdom.

Even if the safety of plaintiffs' lawyers and their representatives could be guaranteed (which plaintiffs do not believe is possible), the Kingdom's visa policies towards persons of Jewish faith and/or Israeli citizenship would present an unreasonable barrier to travel to the Kingdom for certain of plaintiffs' lawyers, representatives, translators and consultants. In fact, it has been well known for some time that individuals with Israeli passports, or those with a passport containing an Israeli stamp, have not been permitted to enter the Kingdom.

In February 2004, Saudi Arabia's tourism website explicitly identified certain categories of people who would not be issued travel visas to enter that country, including the following: (i) "[a]n Israeli passport holder or a passport that has an Israeli arrival/departure stamp;" and (ii) "Jewish People." After former U.S. Congressman Anthony D. Weiner (D-NY) called attention to the now defunct webpage, at Exhibit A, the Saudis eventually pulled the reference to Jewish People, calling it a mistake. Almost a year later in a press release dated January 26, 2005, Congressman Weiner again asked the Saudi government to clarify its visa policy towards Jewish persons. *Id.* Although Congressman Weiner did not receive a formal response, the business visa application on the Saudi Embassy's website still requires applicants to reveal their religion and nationality. *See* http://www.saudiembassy.net/files/PDF/VisaApp.pdf.

As many of plaintiffs' counsel, representatives, and consultants are Jewish, or have travelled to Israel, it is unlikely those persons may be permitted entry into the Kingdom. Nor would it be reasonable to subject them unnecessarily to such scrutiny or discrimination as a result of their religious faith.

      d)  Practical considerations render a review of WAMY-SA's responsive documents in Saudi Arabia infeasible.

Finally, beyond the security and faith-based concerns outlined above, an array of practical and equitable considerations of a more traditional nature also support the conclusion that WAMY-SA should be required to produce its documents in the United States. Although WAMY has not provided descriptions sufficient for plaintiffs to understand the precise nature of the documents presently housed in the Riyadh headquarters, plaintiffs understand that they include documents collected from WAMY field offices throughout the world, and potentially

nydocs1-1029025.1


The Honorable Frank Maas
March 14, 2014
Page 5

publication. ECF No. 445; *see also* Transcript, February 15, 2012 Discovery Hearing, p. 37 (citing murder of *Burnett* plaintiffs' process server as primary factor in authorizing service by publication). That several of the Saudi-based defendants in this very litigation have been designated as foreign terrorist organizations and/or sponsors of terrorism pursuant to Executive Order 13224, only serves to underscore those risks.

Given the continuing threat of attacks by al Qaeda and related terrorist organizations, plaintiffs respectfully submit that requiring plaintiffs' counsel and their representatives to travel to Saudi Arabia simply to obtain access to WAMY's documents would present unjustifiable, and entirely unnecessary, security risks. For this reason alone, WAMY should be compelled to produce all documents in the United States.

    c)  Saudi visa policies will prevent certain plaintiffs' lawyers, staff and experts from entering the Kingdom.

Even if the safety of plaintiffs' lawyers and their representatives could be guaranteed (which plaintiffs do not believe is possible), the Kingdom's visa policies towards persons of Jewish faith and/or Israeli citizenship would present an unreasonable barrier to travel to the Kingdom for certain of plaintiffs' lawyers, representatives, translators and consultants. In fact, it has been well known for some time that individuals with Israeli passports, or those with a passport containing an Israeli stamp, have not been permitted to enter the Kingdom.

In February 2004, Saudi Arabia's tourism website explicitly identified certain categories of people who would not be issued travel visas to enter that country, including the following: (i) "[a]n Israeli passport holder or a passport that has an Israeli arrival/departure stamp;" and (ii) "Jewish People." After former U.S. Congressman Anthony D. Weiner (D-NY) called attention to the now defunct webpage, at Exhibit A, the Saudis eventually pulled the reference to Jewish People, calling it a mistake. Almost a year later in a press release dated January 26, 2005, Congressman Weiner again asked the Saudi government to clarify its visa policy towards Jewish persons. *Id.* Although Congressman Weiner did not receive a formal response, the business visa application on the Saudi Embassy's website still requires applicants to reveal their religion and nationality. *See* http://www.saudiembassy.net/files/PDF/VisaApp.pdf.

As many of plaintiffs' counsel, representatives, and consultants are Jewish, or have travelled to Israel, it is unlikely those persons may be permitted entry into the Kingdom. Nor would it be reasonable to subject them unnecessarily to such scrutiny or discrimination as a result of their religious faith.

    d)  Practical considerations render a review of WAMY-SA's responsive documents in Saudi Arabia infeasible.

Finally, beyond the security and faith-based concerns outlined above, an array of practical and equitable considerations of a more traditional nature also support the conclusion that WAMY-SA should be required to produce its documents in the United States. Although WAMY has not provided descriptions sufficient for plaintiffs to understand the precise nature of the documents presently housed in the Riyadh headquarters, plaintiffs understand that they include documents collected from WAMY field offices throughout the world, and potentially

nydocs1-1029025.1

The Honorable Frank Maas
March 14, 2014
Page 6

---

include documents in a range of presently unknown languages. From their experiences in analyzing documents produced by WAMY and other of the Saudi charities in this litigation, plaintiffs are confident that any meaningful review of the responsive documents would require consultants in a number of different disciplines (in addition to translators with varying language skills), in order to get a basic understanding of the documents. For instance, substantive experts in the field of counter-terrorism would be needed to analyze whether documents reflect significant relationships between WAMY and parties linked to terrorism. Further, the documents collected by WAMY should include detailed financial records relating to WAMY's operations, the analysis of which would require the expertise of professionals in those disparate fields. Thus, any effort to conduct a meaningful review of WAMY's documents in Saudi Arabia would require plaintiffs to bring in an entire team of attorneys, translators and consultants to the Kingdom, for extended periods of time. The imposition of any such investment of resources cannot be justified, given the scant information provided in WAMY's indices.

### B. WAMY-International is required to produce all responsive documents in the United States

Under circumstances identical to those presented here, courts in this Circuit have consistently required a U.S. affiliate of a foreign corporation to produce documents held by the foreign corporation in the United States. *See Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, 2004 U.S. Dist. Lexis 9101, *9-14 (S.D.N.Y. 2004) (concluding that a Hong-Kong-based bank and its New York branch are not separate entities and further finding that the New York branch has the practical ability to obtain the requested documents from the foreign parent and produce them in the United States, the court ordered production of documents in the possession of the Hong Kong bank); *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 U.S. Dist. Lexis 101, *8-10) (S.D.N.Y. 1999) (finding that the nature of the relationship between a U.S. corporate affiliate and its foreign parent "is such that documents ordinarily flow between them," the court ordered the U.S. affiliate to produce requested documents held by the Canadian corporation); *DeSmeth v. Samsung Am., Inc.*, 1998 U.S. Dist. Lexis 1907, *31-34 (S.D.N.Y. 1998) (ordering the U.S. subsidiary of a foreign corporation to produce documents in the United States which are located abroad with the parent company in Seoul, Korea).

This Court previously has endorsed the reasoning and holdings of those cases in these very proceedings, concisely holding as follows:

> THE COURT: Well ... I have certainly said it in relation to other cases – if there's either the practical ability, as a matter of business routine to get documents from a parent company, or if there is an adequate showing that they are alter egos ... then I don't disagree with you. If documents are available from the parent entity on either of those two bases, they would have to be produced.

*See* Transcript, October 19, 2013 Hearing, p. 26.[3]

---

[3] *See also* Transcript, October 28, 2010 Hearing, pp. 16-17 ("[T]o the extent that the U.S. and Saudi entities [of Al Haramain Islamic Foundation] are alter egos of one another – it seems to me that that is correct based on each of the factors that was discussed during oral argument – it seems to me that essentially the Saudi entity controlled in many

The Honorable Frank Maas
March 14, 2014
Page 7

In the instant case, there is no disagreement that WAMY-SA and WAMY-International are alter egos of one another. *See* November 11, 2011 letter to the Honorable Frank Maas submitted jointly by the Plaintiffs' Executive Committees and the Defendants' Executive Committee, Exhibit B, p. 10 (counsel for WAMY representing to this Court that WAMY-SA "does have custody and control" over documents in all of its branch offices, including WAMY-International). Similarly, there is no dispute that WAMY-International has the practical ability to request documents from its Saudi headquarters and produce them in the United States, having successfully done so in these proceedings on four separate occasions in the past. *See* Exhibit C (advising plaintiffs that WAMY-International has "brought some of WAMY Saudi Arabia's documents to our New York office for inspection"); *see also* n. 1 *supra*.

Accordingly, there can be no dispute that WAMY-International, WAMY-SA's U.S. affiliate, is required to produce any responsive documents in the possession of the Saudi headquarters or any of WAMY's branch offices in the United States. Plaintiffs respectfully request that the Court order WAMY-International to promptly do so.

### C.   WAMY's Document Indices Are Nonspecific And Unintelligible

The indices WAMY has provided do not offer any basis for relieving WAMY of its obligation to produce the responsive documents themselves, and in fact provide additional support for the relief plaintiffs seek through the instant motion. Since the commencement of merits discovery, WAMY has on five separate occasions produced indices which purportedly "identify" thousands of responsive documents accumulated and stored in its Saudi headquarters: (1) June 20, 2011 indices identifying documents for WAMY-International (1 page) and WAMY-SA (2 pages), at Exhibit D; (2) November 16, 2011 index identifying documents for WAMY-SA (6 pages), at Exhibit E; (3) March 23, 2012 indices identifying documents for WAMY-SA (137 indices totaling 202 pages), at Exhibit F; (4) April 30, 2012 indices identifying documents for WAMY-SA (13 indices totaling 43 pages), at Exhibit G; and (5) August 30, 2012 indices identifying documents for WAMY-SA (4 indices totaling 28 pages), at Exhibit H.

WAMY contends that it has spent $1.5 million to employ a team of personnel to collect, organize and carefully index these discovery materials. Of course, much of this cost could have been avoided entirely by simply producing the documents themselves in the United States. But in any case, the indices are so fundamentally deficient, lacking even the most basic information from which plaintiffs can intelligently select documents for review and duplication, that they provide little value, if any, to plaintiffs' efforts to obtain responsive documentation and information from the defendant.

The Court will recall that it had an opportunity to review WAMY's initial indices at Exhibit D during an earlier discovery hearing and cautioned the defendant against producing an index that was "nonspecific" or "unintelligible." *See* Transcript, February 15, 2012 Hearing, p. 41. Notwithstanding that clear instruction, WAMY's indices remain plagued with significant problems that make them effectually worthless to plaintiffs, and any suggestion by the defendant

---

respects the U.S. entity and that the two were indistinguishable from one another, which gives rise to a duty to produce.").

The Honorable Frank Maas
March 14, 2014
Page 8

---

that the production of said indices represents a good faith effort to fulfill its discovery obligations in this important litigation and respond to plaintiffs' document demands is disingenuous.

### 1. WAMY's indices lack sufficient information and detail.

One of the principal deficiencies common to all of the indices is the defendant's failure to adequately describe the subject matter of the documents identified therein. In many instances, WAMY merely provides one-word descriptions such as "correspondence," "budget," "donation," "flyer," "distribution," or "request" without offering any further specific information. *See* Exhibit I (offering a variety of examples from each of the indices). Indeed, many of the descriptions are so vague and lacking in detail that it is extremely difficult to assess the potential responsiveness or relevancy of large segments of the documents identified in the indices.

For example, plaintiffs' discovery seeks the production of various types of reporting that are regularly required of WAMY's departments, committees, and all domestic and overseas branch offices, including but not limited to the following: annual reports; operations and activity reports; banking and financial reports; auditing reports; delegation reports; investment and asset reports; and employee reports. *See* Plaintiffs' First Set of Requests for Production of Documents at Exhibit J, Nos. 54, 63; *see also* Plaintiffs Second Set of Requests for Production of Documents at Exhibit K, Nos. 1, 3, 4, 5, and 6. WAMY's indices suggest that the defendant has collected a significant number of "reports" that may be potentially responsive to plaintiffs' discovery requests. However, rather than describe the reports with necessary information and detail (*e.g.*, name or title, type, author, subject matter, and date of the report), WAMY has in most instances proffered exceptionally brief and ambiguous descriptions that offer little or no insight into the nature and content of the documents – descriptions such as "report," "WAMY Report," "documents consisting of reports," "thanks for the report," or "asking to expedite sending the report" are common throughout the indices. *See* Exhibit I.

Furthermore, the defendant's indices omit some of the most basic information essential to plaintiffs' review and assessment. For instance, a majority of the indices fail to provide any information regarding the source of the collected documents. Only a handful of the 137 indices produced by the defendant at Exhibit F do in fact have a "Source" column, but many of the entries within that column merely identify "WAMY" as the source. Importantly, plaintiffs' discovery seeks documents originating not only with the defendant's Saudi headquarters and certain departments therein, but also WAMY's branch offices in the Kingdom and abroad. The indices simply do not provide this relevant and critical information from which plaintiffs can determine whether the defendant is indeed collecting responsive materials from those targeted locations as requested.

The indices also suggest that WAMY has collected a massive amount of correspondence between and amongst various individuals and entities affiliated with WAMY. Unfortunately, in addition to failing to describe the subject matter of the identified correspondence with particularity (proffering limited and obscure descriptions such as "correspondence," "documents consisting of correspondence," or "documents consisting of reports and correspondence"), the indices do not specify whether these communications are letters, facsimiles, emails, internal or external memoranda, or otherwise. Moreover, the indices fail to offer any information regarding

The Honorable Frank Maas
March 14, 2014
Page 9

---

the size of the documents identified therein, or whether attachments to said correspondence are properly affixed to the communication for production.

As yet another example of the glaring omissions that are prevalent throughout the indices, WAMY has produced an index of documents purportedly responsive to plaintiffs' request seeking a list of all publications, newsletters, books, reports, videotapes and/or websites published, authored, or financed by WAMY. *See* Request No. 48 at Exhibit J. Inexplicably, the index at Exhibit H (titled "Responsive to DR 48") fails to identify the most basic and fundamental information relevant to plaintiffs' request, including the title of the publication, the author(s), number of pages, and/or the identification of the WAMY personnel, department, and/or office responsible for publishing and disseminating the literature.

Finally, assuming, *arguendo*, that plaintiffs were satisfied with the information presented in the indices and were prepared to identify documents for copying, the indices do not provide a bates number to quickly and easily identify those materials. Some of WAMY's indices at Exhibits F and G do offer reference or index numbers, which may or may not be helpful, but the remaining indices offer no such information.

### 2. WAMY's indices lack uniformity and consistency.

Additionally disturbing is the fact that WAMY's indices do not present the relevant document information with any uniformity or consistency, failing in numerous instances to provide the same information in one index that may appear in another. The Court will recall that WAMY's initial index at Exhibit D consists of three columns which identify the document, the date of the document, and plaintiffs' document requests to which they are responsive, as illustrated just below.

| Document | Date | Responsive to Document Requests |
|---|---|---|

The second index at Exhibit E differs slightly, omitting the date column which is common to most of the indices.

| Category and Description | Responsive Document Req. Nos. |
|---|---|

The third set of indices (137 in total) at Exhibit F contain the same general information presented in the first index – document description and date – but also include new columns titled "Searched File," "Source," "Reference No.," "Reference No. Incoming," "Reference No. Outgoing," "To," "From," "Sl. No.," and "Document Type." Nevertheless, the 137 separate indices do not provide the information in a single, uniform, master template as may be reasonably expected. Rather, there are at least 15 different column variations offering multiple combinations of information. A few examples are noteworthy:

| Searched File | Ref. No. | Date | From | To | Subject |
|---|---|---|---|---|---|

| Searched File | Source | Subject | Ref. No. Outgoing | Date | Ref. No. Incoming |
|---|---|---|---|---|---|

The Honorable Frank Maas
March 14, 2014
Page 10

| Searched File | Subject | Ref. No. Outgoing | Date |
|---|---|---|---|

| Sl. No. | Searched File | Source | Subject | Ref. No. | Date |
|---|---|---|---|---|---|

| Sl. No. | Searched File | Ref. No. | Date | From | To | Subject | Document Type |
|---|---|---|---|---|---|---|---|

| Searched File | From | Subject |
|---|---|---|

| Searched File | Source | Ref. No. | Date | Subject | Ref. No. Outgoing | Date | Ref. No. Incoming | Date |
|---|---|---|---|---|---|---|---|---|

Defendant's fourth set of indices at <u>Exhibit G</u> includes a new "Index Number" column. Distinctly missing however are the "Searched File," "Source," "Reference No.," "Reference No. Incoming," "Reference No. Outgoing," "To," "From," "Sl. No.," and "Document Type" columns, as seen below.

| Index Number | Date | From | To | Subject |
|---|---|---|---|---|

Finally, WAMY's fifth set of indices at <u>Exhibit H</u> fail to include many of the information columns set forth in the third and fourth set of indices.

| Subject | To | From | Date |
|---|---|---|---|

As a final point, the defendant's indices also do not consistently provide the information in a single language. While most of the indices are in English, some of the indices are entirely in Arabic. *See* <u>Exhibit H</u>. Moreover, in the instances where the date of the document is included, it is generally provided in a non-western format consistent with the Hijri calendar (*e.g.*, 1422/9/11 or 24/5/1419H), but there are also other occasions where the dates are provided according to the Gregorian calendar (*e.g.*, 5/8/1999). Given that the indices are being prepared and presented for use in this litigation in a United States court, it is entirely without reasonable explanation why they are being produced in a language other than English and with non-Western calendar formatting.

### 3. Many of the documents identified in WAMY's indices are not responsive to plaintiffs' discovery requests.

Notwithstanding WAMY's opposition to identifying documents with specificity as directed by this Court, a review of the document descriptions set forth in the indices, as limited and brief as they are, reasonably evidences that many of the documents collected by WAMY personnel have no relevance to the specific issues articulated in plaintiffs' requests, and were instead collected to advance WAMY's own defenses and/or bolster their production page numbers.[4]

---

[4] These and other compelling examples of WAMY's reluctance to collect documents responsive to plaintiffs' focused discovery are set forth in the chart at <u>Exhibit L</u>.

nydocs1-1029025.1

The Honorable Frank Maas
March 14, 2014
Page 11

---

First, plaintiffs' Request No. 10 at <u>Exhibit L</u> seeks documents relating to the Pakistan government's investigation and decision to deport WAMY personnel from that country following the September 11th attacks. A similar request at No. 11 seeks materials regarding the 2002 raid on WAMY's Pakistan office conducted by Pakistani authorities, including copies of all WAMY documents seized by the Pakistan government. WAMY responds by identifying a number of documents that do not appear even closely responsive to these specific requests, including: "Accepting the membership of Muslim union in Karachi of WAMY;" "Attached copy of transfer;" "An invitation to attend the discussion party organized by Kashmir Youth;" "An enclosed check from WAMY as an aid to continue education;" "Attached a check for payments of scholarships;" and "An enclosed check for sponsoring 10 orphans."

Plaintiffs' Request No. 13 seeks documents relating to investigations conducted by the government of India concerning WAMY's support for Islamic terror groups in the Kashmir region such as the Students Islamic Movement of India (SIMI), Lashkar-e-Taibah, and Hizbul Mujahideen. Curiously, WAMY identifies the following documents as responsive: "Thanks for the 1997 report; "Report about the tenth Education Union Camp;" and "The most remarkable achievements of the Muslim Students Union and a report about the eleventh Education camp."

Plaintiffs' Request No. 14 seeks documents relating to the 2002 arrests of two men attempting to transfer money given to them by WAMY official Nazir Qureshi, to terror groups in Kashmir. WAMY responds with the following document descriptions: "Thanks for congratulating Dr. Maneh Al-Johani for nomination as member of the Shoura Council;" and "Attaching proposed names from WAMY Makkah-office."

Plaintiffs' Request No. 63 seeks all annual, semi-annual and periodic reports submitted by WAMY's branch offices to the Saudi headquarters concerning their operations and finances, including financial statements, bank account summaries and audits. WAMY responds with the following: "Greetings on the success of the 11th conference;" "An invitation to attend the 12th conference;" "Enclosing a check for the European Islamic Studies College in France;" and "An invitation to attend the opening of 'two parents Mosque."

Finally, plaintiffs' Request No. 97 seeks documents relating to any internal investigations conducted by WAMY into allegations that WAMY personnel were involved in criminal, extremist, or terrorist activities. Incredulously, WAMY responds with documents about warehouses: "The search for a Warehouse;" "Regarding contacting Adel Batterjee and asking him to agree to rent one of its warehouses;" and "Request for a Warehouse."

As reflected by these examples, many of the documents collected by WAMY and shipped to its Riyadh offices for inspection appear to have no relevance to the requests to which they are allegedly responsive.[5] To the contrary, several of the descriptions suggest that WAMY has collected documents lauding its own charitable endeavors in response to plaintiffs' requests, a tactic that plagued the discovery proceedings pertaining to the MWL and IIRO for several years. Thus, the content of the indices themselves argues further in favor of requiring WAMY to

---

[5] To the extent those documents do in fact respond to the indicated requests, naturally they should be produced. But based on the descriptions, they do not appear responsive – again, further examples of the vagueness of the defendant's descriptions.

nydocs1-1029025.1

The Honorable Frank Maas
March 14, 2014
Page 12

produce its responsive documents in the United States. In addition, the content of the indices also reveals a failure on WAMY's part to conduct comprehensive searches consistent with the standards this Court announced in its prior rulings as to other of the Saudi charity defendants. For that reason, plaintiffs respectfully request that the Court admonish WAMY to conduct searches consistent with the clear standards announced by this Court.

## II. WAMY CONTINUES TO IGNORE THIS COURT'S RULING REGARDING THE TIME FRAME FOR DISCOVERY

As all parties to this litigation are aware, Judge Daniels issued an Order on December 21, 2007 directing that "the appropriate temporal scope of discovery should reasonably begin in 1992." ECF No. 2059. During argument at the April 12, 2011 discovery hearing however, the Court recognized that Judge Daniels' Order did not specify an end date for discovery, and after careful consideration, held that "the end of 2004 is a reasonable cut-off." *See* Transcript, April 12, 2011 Hearing, pp. 42-43. Although counsel for WAMY was in attendance at the hearing and offered no objection to that ruling, WAMY contends that the scope of discovery is limited to a cut-off period of 2002. *See* WAMY's correspondence and discovery responses at Exhibit M: (1) WAMY's March 30, 2012 letter to plaintiffs' counsel (stating that "pursuant to Judge Daniels' Order of December 21, 2007, the scope of discovery is limited to a period from 1992 until 2002"); (2) WAMY's August 31, 2012 Supplemental Responses to Plaintiffs' Request for Production of Documents, p. 3 (same; responding to Request No. 1); (3) WAMY's September 4, 2012 Supplemental Responses to Plaintiffs' Third Request for Production of Documents, p. 23; and (4) WAMY's February 4, 2014 Opposition Brief, p. 13.

WAMY's insistence on a 2002 cut-off date for discovery, despite clear instruction from this Court, raises legitimate concerns that the defendant is purposely disregarding the Court's April 2011 holding and is intentionally excluding large numbers of potentially responsive materials from its searches and document productions. Plaintiffs respectfully request that WAMY be compelled to conduct a comprehensive search and review of all records located in its Saudi Arabian headquarters and all domestic and overseas branch offices for the 1992-2004 time frame consistent with the Court's prior discovery rulings.

Respectfully submitted,

Jerry Goldman

THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

cc: The Honorable George B. Daniels, U.S.D.J. (Via Hand Delivery)
Members of Plaintiffs' Executive Committees (Via Email)
Omar T. Mohammedi, Esq. (Via Email)
Frederick Goetz, Esq. (Via Email)
Alan R. Kabat, Esq. (Via Email)