# EXHIBIT 21

E2jntera                          Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:  TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001
 4                                        03 MDL 1570 (GBD)(FM)

     ------------------------------x
 5

 6                                        New York, N.Y.
                                          February 19, 2014
 7                                        11:25 a.m.

 8   Before:

 9                      HON. FRANK MAAS,

10                                        U.S. Magistrate Judge

11                          APPEARANCES

12   KREINDLER & KREINDLER
          Attorneys for Ashton Plaintiffs
13   BY:  ANDREW J. MALONEY

14   MOTLEY RICE
          Attorneys for Burnett Plaintiffs
15   BY:  ROBERT T. HAEFELE

16   ANDERSON KILL & OLICK
          Attorneys for O'Neil Plaintiffs
17       and Plaintiff's Executive Committee
     BY:  JERRY S. GOLDMAN
18        NICHOLAS MAXWELL

19   COZEN O'CONNOR
          Attorneys for Federal Insurance Plaintiff
20   BY:  SEAN P. CARTER
          SCOTT TARBUTTON

21

22

23

24

25

E2jntera                              Conference

1                            APPEARANCES (Continued)

2    BERNABEI & WACHTEL
          Attorneys for Defendant AHIF
3    BY:  ALAN R. KABAT (via telephone)

4    CLIFFORD CHANCE
          Attorneys for Defendant Dubai Islamic Bank
5    BY:  RONI E. BERGOFFEN

6    OMAR MOHAMMEDI
          Attorney for Defendants WAMY and WAMY International
7          and
     GOETZ & ECKLAND
8          Attorneys for Defendants WAMY and WAMY International
     BY:  FREDERICK GOETZ
9
     LEWIS BAACH
10         Attorneys for Defendants IIRO MWL
     BY:  ERIC LEWIS
11        WALEED NASSAR
          AISHA HENRY  (via telephone)
12
     DOAR, RIECK, KALEY & MACK
13         Attorneys for Defendant Yassin Abdullah Kadi
     BY:  AMY ROTHSTEIN
14.       PETER SALERNO

15

16

17

18

19

20

21

22

23

24

25

```
E2jntera                    Conference
```

1             (In open court)

2             (Case called)

3             MR. KABAT:  Good morning, your Honor.  Frederick Alan

4   Kabat of the law firm of Bernabei & Wachtel.  I represent

5   (unintelligible).

6             THE COURT:  Good morning.

7             MS. HENRY:  Good morning, your Honor, this is Aisha

8   Henry, with Lewis Baach, representing Muslim World League and

9   International Islamic Relief Organization.

10            THE COURT:  As of about 20 minutes ago, you have been

11  admitted pro hac vice.

12            MS. HENRY:  Thank you, your Honor.

13            I think that is it on the phone.

14            THE COURT:  So we gathered.

15            MR. CARTER:  Good morning, your Honor.  Sean Carter

16  Cozen & O'Connor on behalf of the plaintiffs.

17            MR. TARBUTTON:  Good morning, your Honor.  Scott

18  Tarbutton of Cozen & O'Connor.

19            MR. HAEFELE:  Good morning, your Honor.  Robert

20  Haefele, Motley Rice, also for the plaintiffs.

21            MR. GOLDMAN:  Good morning, your Honor.  Jerry

22  Goldman, Anderson Kill for the plaintiffs.

23            MR. MALONEY:  Good morning, your Honor.  Andrew

24  Maloney Kreindler & Kreindler for the Ashton plaintiffs.

25            THE COURT:

E2jntera                    Conference

1          MS. BERGOFFEN:  Good morning, your Honor.  Roni

2    Bergoffen with Clifford chance on behalf of the Dubai Islamic

3    Bank.

4          MS. ROTHSTEIN:  Good morning, your Honor.  Amy

5    Rothstein, Salerno & Rothstein, for Yassim Abdullah Kadi.

6          THE COURT:  Good morning.

7          MR. SALERNO:  Good morning, your Honor.  Peter Salerno

8    of Salerno & Rothstein for Yassim Abdullah Kadi.

9          THE COURT:  All right.

10          MR. LEWIS:  Good morning, your Honor.  Eric Lewis of

11    Lewis Baach, for Muslim World League and International Islamic

12    Relief Organization.

13          MR. MOHAMMEDI:  Good morning, your Honor.  Omar

14    Mohammedi on behalf of WAMY and WAMY International.

15          MR. GOETZ:  Also, your Honor, Frederick Goetz for

16    WAMY.

17          THE COURT:  I know we have the motion related to WAMY.

18    I have it here.

19          Whatever counsel want to deal with first?  Schedule or

20    the application relating to WAMY?

21          MR. CARTER:  Your Honor, we don't have a preference.

22          THE COURT:  OK.  Why don't we talk about schedule

23    first.

24          MR. CARTER:  Sure, your Honor.  We had an opportunity

25    to confer with some of the defense counsel over the course of

E2jntera                    Conference

1   the last week.  In particular, we spoke with Mr. Lewis on

2   behalf of Muslim World League and IRO.  We traded some e-mails

3   with Ms. Rothstein about defendant al-Kadi's productions, and

4   we understand that those defendants are still in the process of

5   collecting documents and are supportive of the view that we

6   should set a uniform June 30 deadline for productions for all

7   parties.

8          We are in agreement with that.  As we have expressed

9   before, we think there are significant concerns about

10  staggering this, not only because we think documents will be

11  forthcoming that relate to other defendants and would be

12  relevant, but also because of the degree to which staggered

13  schedules might distract sort of our attention in six different

14  directions simultaneously.  So we are of the view that the June

15  30 deadline should apply uniformly to all parties.

16         THE COURT:  But as to the personal jurisdiction

17  defendants, presumably it would just be that which relates to

18  that topic.

19         MR. CARTER:  It would be just the jurisdictional

20  discovery we probably have disputes about, the scope of that

21  discovery.  We had a meet and confer this week as well with

22  counsel for Della Avco.  I think there is likely to be an

23  application on that front as well.

24         Coincidentally, your Honor, a June 30 deadline would

25  roughly coincide with the date on which the Supreme Court will

E2jntera                         Conference

1   hold a conference determining whether it takes the pending

2   cert. petition relating to the defendants whose dismissals were

3   affirmed by the Second Circuit and when the Supreme Court is

4   also likely to decide the petition that we understand the

5   Kingdom will be filing sometime in the next month.  So we will

6   have some sense of where the broader litigation is headed at

7   that point as well.

8           THE COURT:  Let me hear from whoever opposes that

9   date.

10          MS. BERGOFFEN:  Your Honor, I don't think there is any

11  opposition at this point.

12          THE COURT:  That makes it easy for me.  June 30 it is,

13  a uniform date.

14          So that obviates the discussion about the number of

15  pages of documents to be produced.  Does that leave anything

16  other than the WAMY application for us to discuss.

17          MR. CARTER:  Your Honor, plaintiffs had requested that

18  your Honor extend the December 26 order so that it would be

19  mutual and apply to all parties.

20          THE COURT:  Insofar as FOIA?

21          MR. CARTER:  Insofar as FOIA, as well as this issue as

22  to whether and how the parties should go about certifying

23  whether they have withheld documents based on objections

24  asserted in their discovery responses.  We are prepared to

25  submit a certification to that fact to WAMY, and actually

E2jntera                         Conference

1    anticipated doing it before the hearing, but the defendants

2    then expressed in their response that there were issues they

3    wanted to discuss on that point with the Court so we thought it

4    best to wait until we understood what the playing field was.

5         MR. MOHAMMEDI:  Your Honor, I think the issue with

6    WAMY has nothing to do with certification.  When we appeared

7    last time on the motion to compel we believed that we made the

8    argument that there was not certification.  We just asked them

9    if they have documents, or not specific requests.

10        THE COURT:  Well, that's the certification that they

11   were being subjected to in paragraph 2 of the December 26

12   order, which says, Plaintiffs shall update their written

13   responses to WAMY's document requests by stating whether any

14   responsive documents have been withheld on the basis of their

15   objections to the requests, that is what you were referring to.

16        MR. CARTER:  That's what we were referring to, your

17   Honor.  We think if we are going to have this requirement

18   relative to WAMY, it should be a universal requirement for all

19   parties as to all of the responses that have been provided.

20        THE COURT:  Is there any objection to that?

21        MR. MOHAMMEDI:  We do believe there was a motion to

22   compel to related to specific requests.  It was not a general

23   certification that WAMY applied for the motion to compel.  I

24   think the other issue is the certification saying that we don't

25   have any documents, that is general.  We are just relating some

E2jntera                      Conference

1    of the requests that we made.

2            THE COURT:  I think, Mr. Carter, you have broadened

3    the request.  I thought the concern was FOIA productions rather

4    than every response to every request, which at this late stage

5    I assume is pretty voluminous.

6            MR. CARTER:  Right, your Honor.  I think our request

7    in the letter applied to both.  They are distinct issues.  With

8    regard to the FOIA, we have some concern that defendants have

9    adopted an interpretation of your Honor's prior FOIA decisions

10   as in some way alleviating them of the burden to produce

11   FOIA-related correspondence to agencies in their possession.

12   To that point, your Honor, we received a FedEx from the

13   Treasury Department on February 18 which included several

14   pieces of correspondence between the Treasury Department and

15   Clifford Chance on behalf of Dubai Islamic Bank relative to the

16   FOIA requests that we submitted to Treasury pertaining to DIB.

17           Those letters generally offer objections to Treasury's

18   proposed disclosure of documents to us.  The materials we have

19   seen refer to a whole broader set of correspondence between

20   counsel for DIB and the Treasury Department going back to 2012,

21   which has elongated the process of us getting responses from

22   Treasury apparently by perhaps two years.

23           THE COURT:  Say that again.

24           MR. CARTER:  So, the Treasury had indicated its

25   intention to produce documents to us as early as 2012, and

E2jntera                    Conference

1   there has then since that time been and extended back and forth

2   between counsel for Dubai Islamic Bank and the Treasury

3   Department about what materials should be disclosed.

4           In most cases it appears that Treasury has overruled

5   DIB's objections and is preparing to make production of the

6   materials.  But the back and forth has extended for a lengthy

7   period of time.  More fundamentally, we just never received

8   these documents from Dubai Islamic Bank in discovery, and they

9   are clearly FOIA related correspondence.

10          MS. BERGOFFEN:  Your Honor, if I may?

11          THE COURT:  Yes.

12          MS. BERGOFFEN:  With regard to the documents

13  Mr. Carter is speaking of, these documents are wholly

14  irrelevant and not covered within the scope of Rule 26 in this

15  case.

16          If I might step back and give you a little bit more

17  detail on that, your prior rulings addressed whether or not

18  documents and correspondence with FOIA can be produced under an

19  attorney-client privilege or work product protection.  The

20  Dubai Islamic Bank has not withheld any of the documents on the

21  basis of either of these privilege arguments.

22          Rather, these documents are well outside the scope of

23  Rule 26 for two reasons:

24          First of all, they deal with transactions that have

25  absolutely nothing whatsoever to do with al-Qaeda 9/11 or any

E2jntera                          Conference

1    other issue in this case.

2          More importantly, these transactions that were at

3    issue that the correspondence with the OFAC office dealt with

4    were from a time period between 2006 and 2011, I believe, which

5    is five to ten years after the attacks of 9/11.

6          Your Honor, to the extent that there was any

7    correspondence between DIB and OFAC that were responsive to a

8    request related to 9/11, we would agree that your order would

9    encompass those, and we have not identified any such documents.

10         I am happy to go back and look again just to confirm.

11   To the extent that any such documents existed, we would, of

12   course, produce them.  The documents that Mr. Carter apparently

13   already has made clear that the documents -- that

14   correspondence with OFAC that he is seeking pertains only to

15   documents that are well outside the scope of Rule 26.

16         THE COURT:  Well, my view, and I thought I said it in

17   December although it didn't find its way to the order, was that

18   the ruling was reciprocal, and I expected everybody to produce

19   responsive FOIA material with no claims of privilege or work

20   product.

21         Obviously, if documents are not within the scope of

22   the request, they need not be produced.  And if they are

23   outside the time period, again they should be produced.  If I

24   didn't make it clear last time I will make it clear today and

25   in a follow-up order that my rulings with respect to FOIA apply

E2jntera                    Conference

1    reciprocally to both sides, and that with respect to FOIA each

2    side should confirm or each party should confirm for its

3    adversaries that it has not withheld any FOIA documents.

4         There were so many requests floating around that I

5    think to just say generically everybody must respond request by

6    request as to whether any documents have been withheld on the

7    basis of objections is not a ruling I am prepared to make

8    requiring that.

9         MR. CARTER:  Your Honor?

10        THE COURT:  In specific instances, if need be, I am

11   glad to address that.

12        MR. CARTER:  Your Honor, one issue with regard to the

13   relevancy objections that counsel for DIB just made.  The

14   defendants came forward and advocated to the Court that all of

15   plaintiffs' FOIA-related correspondence with the agencies were

16   relevant to the discovery process and that production should be

17   compelled.  We had held back some of those on the basis of an

18   assertion of privilege.  In the context of advocating our

19   position on that point we noted that the correspondence at

20   issue bore essentially no relevance to the case and that really

21   it was only the meat of the substantive productions by the

22   agencies that mattered.

23        The defendants countered that and said they were

24   entitled to the correspondence.  If they are entitled to our

25   FOIA requests and our correspondence with the agencies, it is

E2jntera                    Conference

1    our view that any correspondence they have submitted to the

2    agencies pertaining to our requests are by definition also

3    relevant.  They have sort of interjected the relevance of these

4    materials into the case themselves, but then when it comes to

5    their correspondence they are pulling back from that position.

6         MS. BERGOFFEN:  Respectfully, your Honor, I would

7    disagree.  There is a large distinction with regard to

8    plaintiffs' correspondence.  They have placed them on a

9    privilege log, which makes it an admission by plaintiff that

10   those particular documents were relevant.

11        By contrast, your Honor, under the FOIA, plaintiffs

12   are not bound by Rule 26.  They are allowed to ask the

13   government for anything they want, whether it has to do with

14   this case or not.

15        To the extent we need to respond, within our rights

16   and under any exemptions within the FOIA, to requests that are

17   outside of Rule 26, that simply has nothing to do with this

18   case.  I don't know why plaintiff sought documents from OFAC or

19   any other agency that clearly are well beyond the scope of this

20   case, but that is something they chose to do.

21        But respectfully, the fact that plaintiffs chose to

22   seek documents well outside the scope of discovery requirements

23   under Rule 26 does not broaden the obligation of my clients to

24   simply produce things outside of the scope.

25        THE COURT:  I am going to adhere to my ruling.  In any

E2jntera                          Conference

1   event, we are sort of at the periphery of what is potentially

2   relevant.  FOIA is an available option, as counsel said, where

3   relevance any type of rulings that Judge Daniels or I have made

4   are not a concern.  So I am not going to expand my ruling.

5           MR. CARTER:  Thank you, your Honor.

6           MS. BERGOFFEN:  Thank you, your Honor.

7           MR. GOETZ:  Your Honor, may I get clarification on

8   your ruling as to paragraph 2 of your December 26 order.  I am

9   glad Mr. Carter brought it up.  We did reach out to plaintiffs

10  on February 7 asking that we have this very dialogue that we

11  are having in court.  Unfortunately, we didn't get any response

12  to that.

13          But, to be clear, what WAMY was asking for when we

14  brought the motion, there are about a dozen requests for

15  production to which we basically got no response.  There were a

16  bunch of objections not telling us one way or another whether

17  they had documents or not.  That's why we brought the motion.

18  That is the relief that I understood the Court gave us.

19          So the clarification I am seeking is that I would ask

20  the Court to continue the order as I understood it, which is to

21  those requests for production of documents that the plaintiffs

22  have not indicated one way or another whether or not they have

23  responsive documents they just follow the Court's order and

24  indicate whether any responsive documents have been withheld on

25  the basis of their objections.

E2jntera                        Conference

1          THE COURT:  I haven't modified that in any way, and I

2    think Mr. Carter understands that that's the ruling, although

3    he wanted to wait for this conference before responding.

4          MR. CARTER:  Yes.  It's been clarified for us, your

5    Honor.  It's very helpful.  Thank you.

6          MR. GOETZ:  It seemed like we heard --

7          THE COURT:  When can counsel get a response.

8          MR. CARTER:  I can't imagine it would be a problem to

9    do that within the next week.

10         MR. GOETZ:  That would be great.

11         THE COURT:  Anything else before we get to the

12   application related to WAMY?  OK.

13

14         MR. CARTER:  Thank you, your Honor.

15         The application as to WAMY sort of has two components

16   to it.  The first is documents generally relating to the WAMY

17   Canada branch office of WAMY in Canada that was investigated by

18   the Canadian government and had its license revoked.

19         The other issue relates to FOIA matters which have

20   largely I think been dispensed by virtue of the dialogue today,

21   but I will probably will touch upon them.

22         From the plaintiffs' perspective your Honor, with

23   regard to the WAMY Canada documents, we have expressed

24   considerable frustration that we are here today seeking court

25   intervention relative to an issue that was resolved more than

E2jntera                        Conference

1   two years ago following a very lengthy meet-and-confer process

2   between plaintiffs' counsel and counsel for WAMY.

3           The letter application doesn't go into that much

4   detail on this issue, but we initially raised our concerns

5   about WAMY's objection to production of documents in the

6   physical possession of its branch offices way back in May of

7   2011 when we had a lengthy meet and confer by telephone.

8           After that we followed up with an e-mail explaining

9   our legal theory for asserting that WAMY did, in fact, have

10  possession, custody, or control of documents in the physical

11  custody of its branch offices.

12          From that time forward there were nearly 10 pieces of

13  correspondence exchanged back and forth.  We, the plaintiffs,

14  undertook independent investigative efforts to aggregate

15  information from the public domain that supported our factual

16  view that WAMY did, in fact, supervise its offices very closely

17  and had custody and control over the documents.

18          All of that ultimately led to an agreement that was

19  formalized in a letter to the Court explaining that WAMY was

20  withdrawing that objection and acknowledging that it did, in

21  fact, have custody and control over the documents in all of its

22  branch offices.

23          Given that agreement, we don't really feel that we

24  should be subject to the burden of being here today to

25  relitigate that issue with regard to the Canadian branch.  We

E2jntera                    Conference

1    feel simply that WAMY should be ordered to adhere to the

2    agreement and its representation to the Court and make

3    production of the documents through whatever means are

4    necessary to achieve that result.

5          THE COURT:  There are two layers, if you will, to

6    this, one of which is documents related to WAMY Canada that are

7    in the possession of the parent WAMY Saudi Arabia.  And then

8    there's the nettlesome issue of documents that WAMY Canada may

9    have that have not yet been shared with WAMY.

10          MR. CARTER:  That is correct, your Honor.

11          Based on what we see in the limited production that we

12   have from WAMY Saudi Arabia and WAMY International, the U.S.

13   branch of WAMY, there was a relatively fulsome relationship

14   between the headquarters, the U.S. branch, and the Canadian

15   branch over a period of many years.

16          While we have some documents including payments of

17   WAMY Canada's budget, we don't have nearly the spectrum of

18   information that we would expect to have from the headquarters

19   pertaining to the Canadian branch and don't feel that that

20   search has been undertaken.

21          WAMY in its current opposition expresses the view that

22   those documents may not exist because WAMY Canada was long

23   sorts of this rogue branch that didn't really cooperate.  But

24   that representation doesn't really square, your Honor, with,

25   first of all, the payment of its budget on a regular basis

E2jntera                        Conference

1    during relevant periods, the precise periods that are relevant

2    to this litigation, sort of cordial correspondence that we saw

3    back and forth.  It doesn't square with WAMY's representation

4    affirmatively that it had possession over those documents

5    during the course of this litigation.

6            So at the end of the day we think relatively clearly

7    that there is just simply not the production of the stuff in

8    the headquarters branch pertaining to WAMY Canada.  We are

9    particularly concerned about it, your Honor, because the

10   documents in question sort of go to the heart of the case here.

11           You are dealing with WAMY's relationship with

12   designated terrorist entities, including Benevolence

13   International.

14           You are also dealing with the circumstance in which

15   WAMY's director secretary-general in Saudi Arabia filed an

16   affidavit in these court proceedings denying the existence of

17   any such relationship.  So now we see a pattern in which the

18   CRA investigation brings to light the existence of this

19   relationship, shared joint bank accounts --

20           THE COURT:  Shared offices I gather also.

21           MR. CARTER:  Shared offices, shared leadership.

22   Obviously it seems that the documents in the possession of the

23   headquarter organization would shed some light on the

24   headquarter's knowledge of those relationships and whether or

25   not the affidavit was completely accurate.

E2jntera                    Conference

1          With regard to the branch, your Honor, all we would

2     say is there was a lengthy period of time during this

3     litigation during which discovery was ongoing.  WAMY had an

4     obligation to secure responsive documents.  It had an

5     opportunity to obtain the responsive documents from WAMY Canada

6     for a lengthy period.  Even between the time that we reached

7     the agreement on WAMY's withdrawal of the objection to its

8     custody and control over the documents in the branch office,

9     you have at least five months before WAMY Canada allegedly goes

10    rogue and stops cooperating.  So these documents already should

11    have been secured and provided to the plaintiffs before any of

12    this came to pass.

13          But in the end, it's sort of all too convenient that

14    the Canadian office has suddenly become intransigent and

15    unwilling to cooperate.  From the plaintiffs' perspective it

16    seems clear that WAMY would have relief if that were in fact

17    occurring.

18          The Canadian branch is trading on WAMY's name.  It

19    continues to use WAMY's name for its business.  WAMY could

20    clearly step in, in Canadian court proceedings if necessary, to

21    bring that rogue chapter back under control and obtain its

22    documents as necessary to fulfill its obligations in this legal

23    proceeding.

24          THE COURT:  Insofar as WAMY Saudi Arabia didn't take

25    steps prior to the Canadian branch going rogue to secure the

19

E2jntera                        Conference

1    documents, isn't that a little like Al-Haramain USA, which I

2    said there was no showing that it could have been anticipated

3    that the Saudi government basically would lock them out of the

4    documents.

5              MR. CARTER:  It is a little bit different, your Honor,

6    because the Saudi government is taking a regulatory step, which

7    is far different from a relationship where you have the legal

8    capacity to step in and --

9              THE COURT:  Yes.  I am not talking about the capacity

10   to unwind it or trying to ameliorate it.  I'm really talking

11   about it in terms of it potentially not being something that

12   could have been anticipated or should have been anticipated.

13             MR. CARTER:  It is hard to say, your Honor, because on

14   the one hand WAMY says that there is a history of a lack of

15   cooperation with this office.  If that is in fact the case,

16   then clearly it should have been taking more robust steps to

17   deal with that particular office as a problem child.

18             On the other hand, it says that this became a sudden

19   problem after the CRA investigation.  So there is sort of a

20   conflict in WAMY's own arguments that makes it difficult.  If

21   you do buy their view that it was always a problem child and

22   failed to provide reporting as required, there clearly was some

23   reason to anticipate that it was a problem and more robust

24   steps should have been taken.

25             THE COURT:  Thank you.

E2jntera                    Conference

1          MR. MOHAMMEDI:  Can I go to the podium, your Honor?

2          THE COURT:  Yes, sure.

3          MR. MOHAMMEDI:  Thank you.  I think that I would like

4    to mention about WAMY and WAMY Canada, we are not denying that

5    there was cooperation between WAMY and WAMY Canada.  I do not

6    want the plaintiff to paint that as if there was a rogue

7    relationship from the beginning.  There was a relationship.  It

8    was a good relationship.

9          THE COURT:  But during that time wasn't WAMY Canada

10   providing all sorts of material to the parent?  I know

11   technically you explained it may not be a parent/subsidiary

12   relationship, but wasn't WAMY Canada, in exchange for funding

13   providing reams of information?

14         MR. MOHAMMEDI:  Right.

15         Your Honor, I think if the plaintiffs review the

16   documents we have produced to date, the way they are speaking

17   is as we have not produced any documents.  As a matter of fact,

18   they conceded many of the arguments they made were provided

19   from those documents.  Those documents specifically describe

20   the relationship between WAMY and WAMY Canada.  WAMY Canada --

21   WAMY was actually not even involved directly with WAMY.

22         THE COURT:  I'm sorry.  I didn't hear.

23         MR. MOHAMMEDI:  It was not directly involved with

24   WAMY.  It was WAMY USA that was dealing with WAMY Canada.  It

25   was almost like a subchapter of WAMY USA.

E2jntera                        Conference

1              At that point WAMY was not dealing with them directly

2      except for a few projects that WAMY was undertaking in Canada

3      and asking WAMY to make sure that the source of the people were

4      asking for funds are legitimate and they would send it to

5      Canada.

6              However, at that time, 2004 I believe, that's when

7      WAMY USA was not active anymore.  And we produced a lot of

8      documents --

9              THE COURT:  Hang on one second.

10             Let me ask counsel who are on the phone to put their

11     microphones on mute because I think we are hearing some sounds

12     emanating from your end.

13             Go on.

14             MR. MOHAMMEDI:  So plaintiff should have the documents

15     showing the budget we are talking about.  Actually, the budget

16     was not going to WAMY Canada directly.  It was going to WAMY

17     USA and saying to WAMY USA, share some of the budget with WAMY

18     Canada, which was very minimal.  It was like $20,000 a year.

19     That's what they were doing.

20             So WAMY was relying on WAMY USA for everything that

21     was done.  At some point where WAMY USA was not active.  As a

22     matter of fact, the CRA report states specifically that WAMY

23     Canada was not operating well before 2005, at that time.  But

24     WAMY Saudi Arabia had documents relating to WAMY Canada in

25     their offices, which were produced.  It showed a lot of

E2jntera                          Conference

1    communication.  Actually, it showed many things.  I give you,

2    your Honor, a list of those documents that show what we had

3    here:  Balance sheet between 1999 and 2001, there was

4    loss/profit, there was transfer of funds plaintiffs are

5    referring to, audit statements, CRA tax returns, there was a

6    list of donors, WAMY internal financial statements, internal

7    general ledger, and bank statements.

8            All of these were produced to plaintiffs and they have

9    them.  They have them in Arabic, but they do have them.  So to

10   say that WAMY did not have any documents and did not try to

11   inquire about WAMY Canada.  It was inquiring.  Actually, there

12   was a relationship where they said we need some of the reports

13   of what you are doing in Canada.  That was through WAMY USA.

14           As a matter of fact, WAMY USA stopped sending funds,

15   which were very minimal, $6,000 in six months, because they

16   were not receiving funds from Khatib.

17           THE COURT:  They were not receiving?

18           MR. MOHAMMEDI:  I mean, we are not receiving reports

19   from Khatib.  So that is they were doing.  So that's when the

20   relationship stopped.

21           They have those documents.  Al-Jirad came on board and

22   he was complying, and they have all the documents showing what

23   they have been doing, WAMY Canada.  They were sending the funds

24   based on what they were receiving.  So to say that WAMY did not

25   have any funds or they did not try to check if WAMY Canada was

23

E2jntera                          Conference

1    doing anything wrong or they were doing something right, they

2    had that, and that is what we produced to them.

3            The question that became clear to us, it was WAMY

4    after the CRA report when -- and we do believe most of the

5    documents were produced.  Most of them are within the CRA

6    possession, which we got an authorization for plaintiff to

7    receive and see what we are talking about.

8            I don't even know what plaintiffs are trying to do

9    here.  We produced documents.  We got the authorization from

10   the CRA.  We did everything we could to get that.

11           As far as the documents relating to, that were in the

12   possession of CRA, we were able to go to Saudi Arabia and find

13   out what's happened.  The information we got is that as a

14   matter of fact it was one of the directors of WAMY Canada who

15   provided all documents to CRA.  That's what they did.  And from

16   there they didn't have any documents.

17           So for some reason, I don't know what he did, but it

18   seems he gave me many duplicates of what they provided.  And we

19   produced those.  We went in June or July of 2012, in August we

20   produced all those documents and they have them.

21           THE COURT:  Are you saying -- I thought I may have

22   heard you say it, but I want to be clear on whether you did or

23   didn't say it.  That WAMY Canada turned over all its documents

24   to CRA?

25           MR. MOHAMMEDI:  It seems like that is what they did,

E2jntera                           Conference

1     yes.

2               THE COURT:  Such that it no longer has original

3     documents?

4               MR. MOHAMMEDI:  Yeah.  We don't have any -- from our

5     knowledge, we don't even know if they have them.  The record

6     shows that we have been trying so hard with the lawyers.  The

7     lawyers are taking the position that WAMY Canada is a separate

8     organization.  They don't have the obligation to give us those

9     documents.

10              The lawyers might have those documents, and we are

11    trying to get those documents from the lawyers.  We are really

12    trying to get those documents from the lawyers.  As we speak

13    now, as we speak, we have been contacting the lawyers.

14              Mr. Carter mentioned that we have not taken any

15    action.  First of all, we cannot take action except for the

16    name.  But not to get the documents that they have for using

17    WAMY name, and that is what we are working on now.

18              There are many, many things going on behind the

19    scenes.  We cannot come to this Court and say what we are doing

20    between us and our clients in trying to fix whatever was done

21    as far as the documents are concerned.  But I think the

22    majority is being fixed by having the CRA sending all those

23    documents, that they have the authorization, we get the

24    authorization now, it's done, and they can send them to us.

25              The relationship when you start -- it just shows it

E2jntera                    Conference

1    was not a direct relationship between WAMY and WAMY Canada.  As

2    a matter of fact, there were communications where WAMY Canada

3    would contact WAMY Saudi Arabia for funds and we want to deal

4    directly with them and tell them no you need to go through WAMY

5    USA, and they have those documents.

6          THE COURT:  But WAMY USA is within the control of WAMY

7    Saudi Arabia, correct?  Why do they need to go to WAMY USA

8    independently.  I presume WAMY USA is a nonparty.

9          MR. CARTER:  No, they are a defendant as well, your

10   Honor, to whom we have served discovery requests.  So I am not

11   really sure that this conversation about whether WAMY Canada

12   was under the direction of WAMY International or WAMY Saudi

13   Arabia matters at all.

14         MR. MOHAMMEDI:  It does matter, your Honor.

15         THE COURT:  Who represents WAMY USA?

16         MR. MOHAMMEDI:  We do.

17         THE COURT:  OK.  So it seems like we are exalting form

18   over substance.  If there were documents that relate to the

19   funding of WAMY Canada, for example, that were requested by the

20   plaintiffs and they reside with WAMY USA as the direct overseer

21   of WAMY Canada rather than with WAMY Saudi Arabia, it seems to

22   me those should have been produced a long time ago.

23         MR. MOHAMMEDI:  But they have been produced, your

24   Honor.

25         THE COURT:  OK.

E2jntera                        Conference

1          MR. MOHAMMEDI:  They have been produced.  We produced

2      everything we have relating to WAMY USA to plaintiffs a long

3      time ago.  That included WAMY Canada documents.

4          Your Honor, I would like to address some of the issues

5      that were in the reply motion we didn't have a chance to

6      address.

7          THE COURT:  OK.

8          MR. MOHAMMEDI:  One of them, I can address it briefly,

9      conveniently the plaintiffs they use the Khatib example when he

10     was dismissed because from the documents that they have

11     Al-Khatib apparently happened to represent many organizations,

12     and WAMY was not happy with it at that time.  So they were

13     wishing him luck, and wishing him luck to cooperate with the

14     Al-Jirad.  That was through WAMY USA.  I think that was, they

15     said there was a good relationship.  There was a good

16     relationship, but Al-Khatib was not doing a great job, and

17     that's why he was not executive director afterwards.  So that's

18     one issue.  There is a fact that is very clear.

19         THE COURT:  Sorry?

20         MR. MOHAMMEDI:  There is a fact that is very clear

21     now.  It is that WAMY Canada is being hostile to WAMY.  We

22     cannot deny that.  We presented documents showing that.  Our

23     communication with the lawyers that we tried to hire to

24     actually to challenge the CRA report, plaintiffs claimed there

25     were drafts.  Yes, there were drafts but we could not find them

E2jntera                      Conference

1  because WAMY did not have standing to find them because the

2  WAMY Canada officers did not want to sign the retainer to file

3  those documents.

4          So we tried everything we could.  At the end -- as a

5  matter of fact, it was not because of just lately that we

6  worked with trying to get the authorization, as the plaintiff

7  claims to get these things.  We have been working diligently

8  for over a year or two years trying to get that.  And finally

9  we got it.  It was not as easy the way the plaintiffs claims.

10  It was not easy.  Obviously the evidence that we show explains

11  exactly the hostile --

12          THE COURT:  You are talking about Dr. Taher's

13  authorization?

14          MR. MOHAMMEDI:  Yes.  Dealing with his lawyer, and

15  then we hired the lawyer, and the lawyer specifically stated to

16  us they are not willing to share, to sign the retainer to

17  challenge the CRA report because they are not willing to give

18  you even the documents that are within the CRA report.

19          That was not a fabricated fact, which as officers of

20  the Court we find it very offensive that plaintiffs think we

21  fabricated facts.  Those are not fabricated facts.  Those are

22  due diligence by defense attorneys trying to get those

23  documents.

24          They also make a statement about Dr. Wohaibi, and I am

25  going to leave my cocounsel to address that.

E2jntera                          Conference

1        They also made the statement about the CRA report

2   showing that WAMY Canada is not a separate organization, was

3   not a separate organization by making the statement about

4   Dr. Wohaibi going on newspapers and saying that.  You know

5   what, it is a newspaper article.  But what we do have.  We have

6   according to the CRA report January 2011, Amen advised CRA WAMY

7   might change its name and operation.  That was via

8   teleconference.  It is in the CRA report.  Also a letter to

9   WAMY Canada from the CRA report in August 23, 2011 -- and WAMY

10  was never aware of -- stating that we have an audit for you.

11       Afterwards there was notification of an intention to

12  revoke.  WAMY was never aware of the revocation, which occurred

13  on February 11, 2012.  WAMY was also never aware of until it

14  became public.  There was no meeting whatsoever between WAMY

15  officials on the CRA report.

16       Plaintiff, they want us to say there was.  We just say

17  there was not documents showing anything.  There was nothing.

18       THE COURT:  So that, to be clear, WAMY Saudi Arabia or

19  WAMY US had no inkling that there was a CRA investigation until

20  the report came out?

21       MR. MOHAMMEDI:  Yes, your Honor.  They had no

22  knowledge whatsoever.  Obviously plaintiffs are claiming and

23  saying that there are documents.  They are forcing -- they are

24  harassing us to get documents we don't have and documents that

25  do not exist.  In the meantime they are not even telling us if

E2jntera                        Conference

1    documents they have exist or do not exist.

2          There was no communication whatsoever as far as the

3    CRA report until we know, our office knew about it and we

4    communicated with our clients, and that's what we have tried to

5    do with the lawyers in Canada.

6          We did undertake a good-faith effort.  Plaintiffs are

7    claiming we did not.  I think the record shows what we have

8    done so far, as far as going even to Saudi Arabia and trying to

9    meet with the former directors of WAMY Canada, which we believe

10   they were helpful.  They gave us documents.  They explained to

11   us what happened, they gave us the documents, and we produced

12   that to plaintiffs.

13         We just want to let this Court know that we don't have

14   custody and control of WAMY Canada documents if they do exist.

15   If they don't -- they might not even exist documents except

16   for what is produced and what the CRA has, but we do not have

17   the practical means of getting those documents.

18         They also claim --

19         THE COURT:  Before you go on, there were statements

20   made to this Court by WAMY, I guess WAMY Saudi Arabia, saying

21   that you had control of the documents at all of the branches.

22         And yet, as Mr. Carter said, the current position is

23   that WAMY Canada was a bit of a rogue organization even

24   sometime ago.

25         How do you square those two?  You have an admission by

E2jntera                       Conference

1   WAMY Saudi Arabia that it has control over the branches,

2   including presumably or maybe just specifically the Canadian

3   branch, and then suddenly that statement turns out not to be

4   correct?

5          MR. MOHAMMEDI:  Your Honor, I can explain that.  First

6   of all, you know, they also mentioned that we did not want to

7   admit we had custody and control.

8          WAMY has 66 chapters around the world.  Some of them

9   they were able to work with them, some of them they don't work

10  with them very well.  They don't know what is going on, but

11  they try to get as much information from them and ask them

12  please give us the report if we give you the money.  If you

13  don't give us the report we don't give you the money.  Simple.

14         But we did not expect this hostile -- WAMY did not

15  expect this hostile approach by WAMY Canada.  There was some

16  difficulties with WAMY Canada, yes, and this has nothing do

17  with the CRA report as far as that is concerned, because they

18  were not able to get the information they needed through WAMY

19  USA.

20         But they did not expect that WAMY Canada would say, we

21  are a separate organization.  We are not giving you any

22  information to this.  Even though they knew that it might be a

23  separate organization, they thought it would be helpful to WAMY

24  to get this case done and to get all the documents.  They did

25  not expect that WAMY Canada would say, no, we are not going to

E2jntera                          Conference

1    do this.

2              So in good faith actually WAMY said, OK, that is fine.

3    We will try to see whatever documents we have, if there are any

4    more, we will retrieve them, and it just happened we could not

5    retrieve anything.

6              We went through WAMY USA, which we got that, to WAMY

7    Saudi Arabia, and then the CRA report came, and we said was

8    there any documents that is not, you know, that we don't have,

9    that we need to get for the CRA report.  And that's where WAMY

10   Canada said we are not going to produce the documents.  We are

11   a separate organization.

12             THE COURT:  OK.

13             MR. MOHAMMEDI:  WAMY acted in good faith trying to get

14   those documents.

15             THE COURT:  Thanks.

16             MR. MOHAMMEDI:  The other thing that I would like to

17   mention is WAMY, they mentioned that they should get those

18   documents from Morian (phonetic) Bank.  Simple:  We don't have

19   standing to get those statements from the bank, foreign

20   jurisdiction where WAMY has no standing.  We cannot even file a

21   challenge to the CRA report, let alone get a statement on

22   behalf of WAMY Canada.

23             THE COURT:  They are separate, as I understand it,

24   corporations, not in a formal parent/subsidiary relationship of

25   that sort, correct?

E2jntera                    Conference

1          MR. MOHAMMEDI:  Yes, your Honor.  And we have actually

2    the legal opinion for the counsel from WAMY stating that WAMY

3    Canada is established as a separate organization, and we just

4    need to cooperate and work with them.  We have that.  We

5    translated that document, and it is in as an exhibit.

6          I know that the FOIA request is a moot issue, but

7    really would I like to address some of the, we do believe

8    misrepresentations made by plaintiffs here.

9          They said that in June 2013 we produced documents.

10   However, first they claim that we withheld documents, and we

11   showed them we did not.  Afterward they came back and they said

12   we delayed the production of documents.

13         In June 2013, we produced documents related to FOIA.

14   They were a little bit over 300, I believe, 18 documents.  So

15   at that time we have not started making FOIA-to-FOIA requests.

16   We started making the requests at the end of June.  Then in

17   January and February we produced FOIA documents, and we

18   produced them according to your order, your Honor.  They were

19   327 pages.

20         They are saying that we delayed.  We didn't delay.  We

21   reproduced a few documents that came later on.  We reproduced

22   them.

23         As far as FOIA-to-FOIA requests, as you may know,

24   agencies, governmental agencies they take a long time to give

25   you documents.  That is not our delay.  It has been six months,

E2jntera                    Conference

1   and we have been trying in good faith to gather all those

2   documents to produce them.  Damned you do, damned you don't do.

3           THE COURT:  One thing your letter says is WAMY has

4   committed to reproducing all -- that's where it is

5   underscored -- updated documents received in response to not

6   only FOIA, but FOIA-to-FOIA requests as well.  Such documents

7   have and will be produced according to my order.

8           MR. MOHAMMEDI:  Yes.

9           THE COURT:  It seems like all of this is taking a long

10  time.  To the extent that you are saying if new documents are

11  generated you will produce those, I understand that.  But it

12  sounds like the letter is also saying that there are

13  pre-existing documents which have yet to be produced.

14          MR. MOHAMMEDI:  No, your Honor.  Everything we

15  produced in June -- we had we produced.  We didn't have any

16  document that we did not produce.

17          It was after June, your order, that is when we

18  produced afterwards, we produced in January and February

19  FOIA-to-FOIA requests.  There were mostly FOIA-to-FOIA

20  requests.

21          I would like to just mention it.  It seems like it's

22  not fair for plaintiff to blame WAMY for delaying the

23  production of FOIA requests where they start communicating with

24  the agency in 2003.  If we were delayed in six months, then

25  they were delayed 11 years to produce those documents, until

E2jntera                    Conference

1   yesterday.  We produced them before their production, and

2   that's after due diligence, putting them according to your

3   order, and we did produce them.  So I don't even know what the

4   issue here is for them to just raise this issue with the delay

5   and WAMY producing the FOIA requests.

6           There is one last point I would like to mention with

7   respect to FOIA, and I think it was not addressed here.  I

8   think we might need to come back to this Court to address the

9   issue with the plaintiffs' production.

10          In one of the FOIA-to-FOIA productions when we

11  produced to plaintiffs as a matter of fact there were 3,160

12  pictures relating to 9/11.  These were not produced to us.

13          THE COURT:  These were?

14          MR. MOHAMMEDI:  They were not produced to defendants.

15          We have a letter from the Department of Commerce

16  stating that they communicated with Motley Rice, and they

17  produced 3,160 pages.

18          Where are those pictures?  They claim that there were

19  minor issues in trying to review those documents to produce

20  them.  There was 3,160 pictures.

21          MR. HAEFELE:  Your Honor, I could address that pretty

22  quickly.  First off, I haven't seen the request of

23  Mr. Mohammedi is talking about.  But I suspect, your Honor,

24  that may have been a FOIA request from Motley Rice related to

25  9/11 aviation litigation before Judge Hellerstein and not for

E2jntera                        Conference

1    the 9/11 plaintiffs.

2            You, your Honor, have already said when we had

3    information related to other plaintiffs in other litigation, it

4    wasn't necessarily relevant to this litigation.  I am not sure,

5    I haven't looked at it, but I suspect that may be the

6    explanation.

7            I can tell you those photographs he is talking about

8    never came up in our search for the FOIA responses relating to

9    this.  They weren't buried and not produced because of that.

10   They just may not have come up.

11           THE COURT:  Why don't you just go back and make sure

12   they are not responsive to requests here from any of the

13   defendants.

14           MR. HAEFELE:  Sure.

15           MR. CARTER:  Your Honor, if I may run through a few

16   issues in response.

17           THE COURT:  Yes.

18           MR. CARTER:  Mr. Mohammedi indicated that when they

19   made their initial FOIA production in June of 2013, it included

20   all FOIA related documents WAMY had in its possession at that

21   time.  Following the filing of this motion to compel, WAMY made

22   a FOIA production on January 31 or so, and that included at

23   least 25 documents predating June of 2013 that had not been

24   previously produced.

25           They include letters to the Treasury Department,

36

E2jntera                         Conference

1   Department of Justice, FBI, IRS, Department of Justice and

2   again Treasury between September 13, 2011 and April 19, 2013.

3   So this is a relatively significant grouping of FOIA related

4   correspondence which would have been within the scope of your

5   Honor's order.

6           THE COURT:  Let me interrupt you for a second and just

7   say that insofar as FOIA was produced, by way of example on

8   CDs, and because I have already ruled there was no privilege or

9   other protection that pertains those documents, it seems to me

10  that they ought to be produced in the form in which they were

11  received as Rule 34(b)(2)(E) requires, and that that will

12  alleviate some of the problems that you are describing to me

13  now.  If that hasn't been done, that should be done.

14          MR. CARTER:  We are in agreement with that, your

15  Honor.  I think the point we were trying to make is that for

16  some reason there was a group of documents that preexisted the

17  order, that were subject to the June 24, 2013 deadline that

18  were not produced until we brought this motion.

19          The concern is that there have been other searches

20  that may not have been as comprehensive as they should have

21  been.  This relates again to the issue of the WAMY Canada

22  documents.  We have had experiences in this litigation in which

23  some of the foreign defendants have not necessarily fully

24  understood the scope of the searches they are required to

25  undertake, have represented to the Court that they searched and

E2jntera                    Conference

1   found and produced everything, and only later acknowledged that

2   there was a broad spectrum of documents that hadn't been turned

3   over.

4          From what we understand about the reporting

5   obligations, we believe that there should be additional

6   documents relating to WAMY Canada in the Saudi headquarters as

7   well as in the U.S. headquarters.  Mr. Mohammedi mentioned that

8   he produced bank statements.  We have ten pages of bank

9   statements.

10         THE COURT:  Come June, everybody presumably will have

11  to certify that they have produced all the responsive documents

12  or list them on a privileged log.

13         If thereafter there is an indication that documents

14  that should have been produced have not been produced, somebody

15  will have a fair amount of explaining to do presumably.

16         MR. CARTER:  That is correct, your Honor.  That's why

17  I think we felt compelled to bring this to the Court's

18  attention now, so we are not left to bring it up in the first

19  instance at the close of the production deadline and so that

20  it's clear to WAMY that it has an obligation to comprehensively

21  search for these documents.

22         Just with regard to a few of the other issues,

23  Mr. Mohammedi mentioned that there is now an authorization in

24  place from the Canadian branch.  The difficulty here is that

25  WAMY's answer to the problem of one of its own branches going

E2jntera                          Conference

1    rogue is to say that the plaintiff should go out of their way

2    to find alternative means to get these documents.

3           It is our view that WAMY should go out of its way to

4    get these documents from its suddenly rogue organization, and

5    they now have the authorization.

6           It shouldn't be incumbent upon us in every instance to

7    go and take extra steps because they have an employee who

8    doesn't feel like turning them over.  It would be no different

9    than someone taking them out and setting them on fire in a

10   parking lot.  That would be spoliation.  So it's not clear why

11   we should have to go to these lengths.

12          In any event, your Honor, it is important from our

13   perspective that agreements reached after lengthy meet and

14   confers are adhered to and people can't simply change the rules

15   of the game for whatever reason after the fact.  Again, this

16   was a really critical issue from our perspective with regard to

17   WAMY that we worked a long period of time to overcome.

18          THE COURT:  WAMY takes the position that this is not a

19   contrivance, but this is something that unexpectedly occurred.

20   I understand that you have concerns, you and your colleagues,

21   in that regard.

22          But one thing I could do, since Mr. Mohammedi just

23   said several times in letters and in court that WAMY wants

24   these documents as much as you do, and since I guess it may

25   involve retaining Canadian counsel to further that goal, maybe

E2jntera                          Conference

1  the two sides should be splitting the cost of getting the CRA

2  documents.

3           MR. CARTER:  Your Honor, we have already undertaken to

4  do the letters rogatory and taken all those steps.  Again, this

5  is a problem of their sort of creation.

6           THE COURT:  If you take at face value what

7  Mr. Mohammedi said, that his clients report to him such that

8  there was no arrangement whereby at the stage when matters and

9  facts came to light WAMY Canada decided it would no longer

10  cooperate, then I am not sure you can lay it at the doorstep of

11  either WAMY Saudi Arabia or WAMY USA.

12           MR. CARTER:  That certainly would be taking their

13  version of the circumstances at complete face value, your

14  Honor.  The timing is a little suspect insofar as we had a meet

15  and confer with Mr. Mohammedi on March 8, 2012 during which we

16  specifically discussed WAMY Canada, and a specific

17  representation was made at that time that they were working

18  with them on that date to get the documents.

19           Now that's five months or so after the agreement was

20  in place pursuant to which WAMY withdrew its objection about

21  obtaining documents from the branch offices.  It was only two

22  weeks later, when we indicated that we were aware of the CRA

23  report, that suddenly Canada became intransigent, your Honor.

24  The other difficulty is this whole period of time before that

25  in which WAMY had an opportunity to collect these documents

E2jntera                          Conference

1    under it would just be relieved of its burden entirely for

2    having failed to secure them during that time.

3              THE COURT:  But that I think falls within what I said

4    in an earlier decision about Al-Haramain in terms of not being

5    able to anticipate that things would go sour.

6              MR. CARTER:  As we discussed earlier, your Honor, the

7    difference from our perspective is that Al-Haramain can't do

8    anything to go to the Saudi government and force the Saudi

9    government to turn the documents back over.  WAMY has remedies

10   available to it that simply didn't exist in the context of the

11   Al-Haramain dispute.

12             THE COURT:  One of which is attempting to cause WAMY

13   Canada not to be able to use the WAMY name, but I thought I

14   heard Mr. Mohammedi say they are taking steps to try to do

15   that.

16             Did I hear that correctly, Mr. Mohammedi?

17             MR. MOHAMMEDI:  Yes, your Honor.

18             MR. CARTER:  In the context of taking those steps, it

19   doesn't seem that it would be difficult for WAMY to also file

20   some sort of miscellaneous action to seek to compel production

21   of the documents so that it could protect its interests in this

22   litigation.

23             THE COURT:  I will take that under advisement.

24             MR. MOHAMMEDI:  Your Honor, if I can just address, we

25   have been in communication with Canadian lawyers.  We will be

E2jntera                    Conference

1    producing a legal opinion from the Canadian lawyers on this

2    issue specifically where the Canadian lawyer said even if WAMY

3    cannot use the WAMY name, it can sue for the name, but it

4    cannot compel them to produce documents that related to WAMY

5    Canada.

6             We had like various communications with many counsel.

7    As a matter of fact, to show how WAMY Canada has been very

8    hostile, every lawyer that we contacted in Canada, they say, We

9    have a confidence.  What is this confidence?  They tell us we

10   have been contacted by WAMY Canada to fight this.

11            We are trying -- actually, we have communications as

12   we speak now after we filed this response motion showing

13   exactly what we have done so far.  We have had communications

14   with the different attorneys, and there is one attorney we are

15   going to have a conversation with next week or so.

16            Like I said, we want those documents as much as

17   plaintiff wants those documents.  Because, like your Honor

18   said, it was an embarrassment that we want to deal with.  We

19   want to find out what is happened there.

20            Also, I would like to address the issue with the CRA

21   report.  They keep claiming, plaintiffs keep claiming that CRA

22   did not even claim that they say, the plaintiffs said WAMY

23   deliberately financed terrorist organizations that were based

24   in Canada.  That's not what CRA said.  CRA revoked the

25   charitable status of WAMY Canada for the not reporting

E2jntera                        Conference

1  properly.  And related to the issues of WAMY were actually all

2  those claims that they had them in the CRA report were recycled

3  from blogs, from the plaintiffs' claims, and they put them in

4  there without any basis.  That's what we are trying to get to

5  the bottom of.  But we don't have standing for challenging that

6  because WAMY could not file the appeal on that report.

7        MR. GOETZ:  Your Honor, may I just add one thing that

8  strikes me, your Honor, is what practically the plaintiffs

9  would have WAMY do here.  The solution I think the Court seems

10 to be thinking about is to have WAMY retain Canadian counsel to

11 pursue some sort of action.

12        Now, I think we have to define our targets here.  You

13 have WAMY Canada, which may or may not have any documents, we

14 don't know.  Then we have WAMY or we have the Canadian Revenue

15 Agency.  The Canadian Revenue Agency should be more

16 straightforward.

17        We have the authorization.  It is a government agency.

18 Whatever they have I think we can get.  We will join plaintiffs

19 in cooperating with that.  But my concern is that the

20 plaintiffs are basically trying to set WAMY up for an

21 impossible task to come back to seek sanctions.

22        If we cannot get those WAMY Canada documents because

23 they are not going to turn them over, and that's a fact that

24 hasn't changed, despite our representations, when we had that

25 meet and confer, we were laying things out as we understood

E2jntera                         Conference

1   things at that time and we had a plan.  The plan is to reach

2   out to WAMY Canada, and that's what we said, just like any

3   other of the branches.

4          But when the boots hit the ground so to speak and we

5   were trying to get the WAMY Canada documents, that's when they

6   became recalcitrant and intransigent.

7          A couple other points, your Honor.  I think the

8   concern is that when the Court crafts an order for any kind of

9   relief, do not set WAMY up for an impossible task, because we

10  cannot get those WAMY Canada documents, and we don't know what

11  the outcome of any litigation is going to be.

12         We are happy to engage counsel and pursue whatever

13  remedies might be available.  If they are as easy as plaintiffs

14  think they might be, well, then it should be no problem.  But

15  we cannot guarantee any outcome.

16         The other point, your Honor, just because a record is

17  being made here, the plaintiffs in their briefs say that -- and

18  I think they deliberately mislead the Court about WAMY,

19  deliberately misleading the Court about the relationship

20  between WAMY and BIF to the extent that Secretary-General

21  Wohaibi's credibility has been called into question, I just

22  want to state clearly -- this is footnote 6 of their reply

23  brief as well -- that from our perspective the facts are

24  crystal clear, that there is not and has never been any

25  relationship between WAMY and BIF.

E2jntera                         Conference

1            The other also, I think, deliberate misleading of the

2    Court by plaintiffs is in footnote 4 of the reply brief.  We

3    have given plaintiffs documents that show there have been

4    problems between WAMY and WAMY Canada.  The problems have been

5    one of basically they don't have their act together, not that

6    they have been outwardly hostile.  That's the fact that has

7    changed.  Even the CRA report, your Honor, in its findings

8    notes multiple deficiencies of WAMY Canada maintaining books

9    and records in 2001 and 2002.

10           THE COURT:  Thank you.

11           We do not have a date for a further conference.

12    Should we hold one?  I am many not clear whether Judge Daniels

13    has scheduled another conference.

14           MR. CARTER:  There is a conference before Judge

15    Daniels in April, your Honor.  Off the top of my head I can't

16    remember.

17           MS. BERGOFFEN:  It's the 24th.

18           THE COURT:  Let me see whether that is on my calendar.

19    Yes, it is.

20           MS. BERGOFFEN:  I think from the defense side, your

21    Honor, we believe that we can schedule a placeholder conference

22    on the same date as the Judge Daniels conference for now.

23           MR. CARTER:  I think, your Honor, we are likely to

24    have some other motions teed up well before that time.  But, if

25    your Honor would prefer to just do it all on one date in April.

E2jntera                      Conference

1          THE COURT:  Why don't we do that.  He's holding his

2   conference at 11.  I will set aside time immediately after

3   that.  Perhaps, depending on how long you go with him, maybe it

4   will be after lunch.  But we will do it the same day.

5          MR. CARTER:  Thank you, your Honor.

6          THE COURT:  OK.  Thank you.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25