# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF**

March 2, 2018

The Honorable Sarah Netburn, U.S. Magistrate Judge
United States District Court for the S.D.N.Y.
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

    Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

The Plaintiffs Executive Committees ("PECs") write to respond to the February 26, 2018 Status Report of defendant Wa'el Jelaidan (Jelaidan) (ECF No. 3907) and to ask the Court to schedule a conference to address whether contempt or other proceedings are appropriate in connection with Jelaidan's apparent lack of candor and continuing defiance of any order of this Court – whether to produce discovery, to pay sanctions, or to sit for a deposition. *See* Fed. R. Civ. P. 16(f), 37(b)(2)(A)(vii). The short response to the inquiry in Jelaidan's status report is that he remains obligated to full compliance with the Sanctions Orders until payment is made, and to report his efforts toward that end until the payments are completed. What is most conspicuously missing from Jelaidan's status report is any disclosure that he has no (and apparently never had any) intention of paying the Court's sanction upon issuance of the long-awaited license. Jelaidan's conduct, and the participation of his counsel, raise the question of whether contempt proceedings are necessary to address the continued lack of candor and defiance of orders.

Jelaidan's recent "Status Report" (ECF No. 3907), wherein he suggests he should be relieved of any further obligation, is only further evidence of his lack of candor, *particularly* inasmuch as it ignores Jelaidan's recent exchanges with the PECs which addressed this very issue. *See* Exhibits A to O (exchanges between PECs and McMahon). In those exchanges, Jelaidan's attorney, Martin McMahon, indicates that Jelaidan has never intended to pay the sanction, and that it is plaintiffs' obligation to pursue satisfaction through foreign execution proceedings (which he indicated Jelaidan would likely contest). The PECs responded to Jelaidan's view that he had no additional obligations by emphasizing his unsatisfied obligation to comply with the Sanctions Orders and to report his progress toward that end. Exhibits E, G. The Court's reasons for imposing sanctions conclusively establish the longstanding problem of Jelaidan's refusal to comply with discovery orders (ECF No. 2789 at 5-18), and assertions in the recent exchanges (*see, e.g.*, Exhs F, I, and K) evidence Jelaidan's

The Honorable Sarah Netburn
March 2, 2018
Page 2

refusal to comply with the Sanctions Orders or to sit for his deposition.  A brief review of Jelaidan's history of defying this Court's orders is necessary to place his most recent conduct in perspective.

On October 28, 2013, Magistrate Judge Maas imposed sanctions on Jelaidan for his "bad faith" and "willful disregard" of his discovery obligations ("Sanctions Order")(ECF No. 2789), a decision that Judge Daniels adopted in its entirety on April 25, 2014 (ECF No. 2853).  Two years later, on October 23, 2015, Magistrate Judge Maas set the value of the monetary penalties that Jelaidan would be required to pay under the Sanctions Order (ECF Nos. 3073; corrected Oct. 28, 2015 at ECF No. 3087) (collectively, "Fee Order").  On December 2, 2015, Magistrate Judge Maas denied defendant Jelaidan's motion for reconsideration of the Fee Order.  (ECF No. 3139).  On March 9, 2016, Judge Daniels affirmed as final the Fee Order and ordered Jelaidan to inform the Court of the actions taken "to comply with this Court's order awarding monetary relief to plaintiffs" (ECF No. 3228) (collectively with the "Sanctions Order" and "Fee Order," hereinafter "Sanctions Orders").

After the PECs identified Jelaidan's failure to meet the reporting obligation imposed in the March 9, 2016 order (ECF No. 3228) (*see* Exhibit P, Tr. of Oct. 20, 2016 hr'g, at 40:17 to 42:2), the Court *again* ordered Jelaidan to report his efforts to secure an OFAC license "and a timeline *for payment to plaintiffs*" (ECF No. 3372) (emphasis added).  On October 28, 2016, Jelaidan filed a report that confirmed he had made no effort to comply with the Sanctions Orders since April 2016 (ECF No. 3378).[1]  On October 31, 2016, days after receiving the first status report, the Court ordered Jelaidan to employ "diligent efforts" not only to secure an OFAC license, but also "to comply with the orders of this Court."  The Court also directed him to file regular status reports describing not only his efforts to obtain an OFAC license, but also his "*efforts to transfer the necessary funds to plaintiffs*" (ECF No. 3380) (emphasis added).

On May 3, 2017, after Jelaidan missed each of the intervening status report deadlines since the October 31, 2016 order, the PECs again sought to impose more sanctions on Jelaidan for his refusal to comply with the Court's orders (ECF No. 3542).  That same day, the Court ordered Jelaidan to respond to the PECs' application and to report any additional effort to obtain an OFAC license "to comply with the court's prior orders" (ECF No. 3546).  On May 5, 2017 (repeated on May 9, 2017), Jelaidan filed a "status report" (ECF Nos. 3548, 3574) that attached a letter also dated May 5, 2017, addressed generally to OFAC, indicating the first follow up to OFAC in more than a year.  The PECs responded to the "status report" on May 12, 2017, further explaining why additional sanctions were warranted (ECF No. 3582).  Jelaidan surreplied to the PECs' submission with two additional "status reports."  The first, filed on May 12, 2017, attached a three-line letter dated November 1, 2016, addressed generally to OFAC without any reference to assist OFAC in directing the letter to a proper recipient (ECF No. 3583).  The other, filed May 19, 2017, attached new emails exchanged with OFAC on May 18, 2018 (ECF No. 3594).

On May 22, 2017, the Court scheduled a teleconference (ECF No. 3597), which occurred on May 25, 2017 (*see* Tr. of May 25, 2017 hr'g, excerpts at Exhibit Q).  During that conference, Jelaidan's counsel, Martin McMahon, accepted personal responsibility for not having filed timely reports (Exhibit Q, Tr. at 5:10-19), confirmed that little new progress had occurred (*id*, 3:11-14), but nonetheless indicated he anticipated his efforts would become more fruitful (*id*, 3:15-5:9).  At the

---

[1] The Court later characterized the purpose of the initial report as a report of Jelaidan's efforts to secure an OFAC license "in order to satisfy the monetary penalties imposed on him" (ECF No. 3380).

conclusion of the conference, the Court ordered McMahon to file monthly status reports demonstrating "the ways in which [McMahon has] made efforts to move this along, even if it means that [he was] harassing whoever [he was] in touch with at OFAC" (*id*, 7:11-13). The Court also expressed its expectation that McMahon "aggressively pursu[e] this" (*id*, 7:13-14), and warned that it would fine McMahon personally for noncompliance (*id*, 7:17-24). *See* ECF No. 3610.

Between the May 2017 teleconference and February 26, 2018, when Jelaidan finally reported that OFAC had granted him a license, Jelaidan filed eight status reports (ECF Nos. 3635, 3651, 3709, 3724, 3769, 3807, 3845, 3884) which, aside from referencing Jelaidan's counsels' several emails and periodic calls to OFAC's voicemail system, generally underscored just how little progress Jelaidan was making, neither toward obtaining a license nor toward complying with the order to pay sanctions.

On January 30, 2018, OFAC granted Jelaidan a license that allowed him to comply with the Sanctions Orders. Exhibit O. On February 2, 2018, the Chief of OFAC Licensing left a message with PECs member Robert Haefele advising that OFAC had granted Jelaidan a license. After speaking with OFAC on February 5, 2018, the PECs wrote to McMahon on February 6, 2018, requesting a copy of the license, asking him to update the Court, and asking Jelaidan to comply with the Sanctions Orders by making the required payments. Exhibit A. Jelaidan delayed nearly a month before advising the Court on February 26, 2018, that OFAC had granted a license on January 30, 2018. Moreover, he remains noncompliant with the Sanctions Orders.

Rather than updating the Court promptly and complying with the Sanctions Orders, Jelaidan, through McMahon, engaged in bizarre exchanges with the PECs, interjecting extraneous and impertinent issues into the dialogue. *See* Exhibits B, D and F. He injected false notions (1) that, rather than Jelaidan being obligated to comply with the Sanctions Orders, plaintiffs must act to collect a judgment; (2) that plaintiffs must take action in Switzerland against Jelaidan's frozen Swiss accounts; (3) that the Sanctions Orders are somehow invalidated because (according to Jelaidan) the processes to designate Jelaidan were somehow unfair, and (4) that the PECs should appreciate that McMahon has not billed the PECs for his time to secure the OFAC license the Court ordered Jelaidan to secure. *Id*. Although he claims he does not intend to disobey the Sanctions Orders, every other word and action is inconsistence with compliance. Notably, for example, Jelaidan's admonition that (assuming plaintiffs were to seek to enforce the order in Switzerland against his Swiss account) Jelaidan would oppose efforts to force his compliance, contradicts his assurance that he intends to obey the order. *See* Exhibit F. The PECs spent considerable time responding to the extraneous points, including admonitions that the PECs may seek contempt proceedings against Jelaidan (and possibly McMahon) (*see* Exhibits E and G), but Jelaidan has remained noncompliant with the Sanctions Orders.

The PECs suggest that contempt proceedings are necessary not only to address Jelaidan's unabated defiance of the Court's orders, but also to consider McMahon's active role in this and other disputes that have needlessly complicated the MDL proceedings and consumed resources of both the plaintiffs and the Court. While plaintiffs have focused primarily on Jelaidan's defiance, we cannot ignore our concern for the apparent role McMahon has repeatedly played in disputes concerning all five of the clients he has represented in these MDL proceedings. In addition to injecting miscellaneous extraneous issues regarding Jelaidan, McMahon has acted similarly while representing his clients Rabita

The Honorable Sarah Netburn
March 2, 2018
Page 4

---

Trust (Rabita),[2] Sanabel al Kheer/Sana Bell (Sanabel),[3] and MWL and IIRO.[4] In each instance, after wasting years of time and resources in discovery disputes, McMahon ultimately ceased representing each defendant, two of which ultimately defaulted and, in the case of MWL/IIRO, a pair that still face threat of sanctions based on discovery failures while he represented them.

Under the circumstances, the PECs are compelled to raise concerns that McMahon's conduct on Jelaidan's behalf reflects a pattern of conduct to delay and distract the MDL proceedings and consume resources needlessly. Factors informing our view include McMahon's level of experience and sophistication, the history of the proceedings to date, McMahon's failure to alert plaintiffs and the Court previously that Jelaidan (apparently) had no intention to pay the sanctions even after OFAC issued a license (despite representations to the contrary), and McMahon's attempts to interject into the dialogue blatantly irrelevant concepts (such as the notions that the dispute involves a "judgment," that this is about Swiss accounts, or that the underlying processes of Jelaidan's designations matter). Our concern is compounded by McMahon's recent demands that plaintiffs waste even more time

---

[2] McMahon claimed to represent Rabita for a decade, from September 2003, when he first appeared for Rabita in the first-filed *Burnett* action in the District of Columbia (*Burnett*, 1:02-cv-1616-JR (Dist. D.C.) ECF No. 329), until April 2014, when the Court defaulted Rabita (ECF No. 2853) after explaining: "There is no semblance of any attorney-client relationship between Mr. McMahon and Rabita Trust … the Trust ceased paying Mr. McMahon's legal fees long ago … for many years, he has had no contact with anyone who has the power to authorize or direct the Trust's legal representation in these proceedings" (ECF No. 2789). The Court determined default was necessary because Rabita was defunct, had no capacity to assent to any representation, and was unable to represent itself. But McMahon had, nonetheless, for years engaged in drawn-out legal disputes on behalf of the defunct entity. *See, e.g.*, ECF Nos. 54, 166, 202, 206, 356, 493, 2698-99, 2703, 2789, 2795. See also ECF Nos. 2789 and 2804, which summarize McMahon's puzzling and contradictory positions asserted while representing Rabita.

[3] McMahon represented Sanabel from late 2004 (*see* ECF No. 2223-2, para. 6) until at least November 20, 2009, when McMahon claimed, only days before a hearing set to address Sanabel's discovery abuses, that Sanabel had fired him (see ECF No. 2201). Although McMahon moved to withdraw (*see* ECF Nos. 2202-03, 2221-22), the application was opposed (ECF No. 2204) and was never granted. Eventually, similar to Rabita, the Court found that no one was authorized to retain counsel to defend Sanabel, and the Court defaulted Sanabel in July 2016 (ECF No. 3313).

While McMahon represented Sanabel, he repeatedly frustrated discovery from Sanabel by (1) misrepresenting that his client had formally dissolved, until the Court found otherwise in July 2007 (ECF Nos. 2010, 2073); (2) refusing to respond to any discovery demand until the Court ordered him to do so in March 2008 (ECF No. 2073); (3) ignoring plaintiffs' requests for meet and confers for extended periods; (4) promising to provide information about his efforts to locate documents and then ignoring those deadlines; and (5) misrepresenting his efforts to communicate with other counsel about efforts to locate responsive documents. The details about these interactions are spelled out in the PECs' June 24, 2013 letter to the Court requesting that the Court impose sanctions on Sanabel (ECF No. 3127-2, at 2-4, "Procedural History"). When plaintiffs identified these and other related concerns to the Court, McMahon told the Court that Sanabel had fired him, and other counsel then began to appear for Sanabel.

[4] McMahon has represented MWL/IIRO since at least September 2003 (*Burnett*, 1:02-cv-1616-JR (Dist. D.C.) ECF No. 329). Despite a "Praecipe re withdrawal as counsel" that McMahon recently filed on January 18, 2018 (ECF No. 3874), the Court previously reminded McMahon that, under Local Civil Rule 1.4, "an attorney may only withdraw from a case pursuant to Court order" (ECF No. 2201).

This Court is likely well versed in the longstanding, ongoing dispute regarding MWL/IIRO's discovery failures that lead to the PEC's applications for sanctions against MWL/IIRO (ECF No. 3825) and that were the subject of multiple briefings and hearings in 2011. *See* ECF Nos. 3825 at 6-8, 3826, and exhibits referenced therein; *see also* ECF No. 3891 (reply brief on motion for sanctions). McMahon was counsel for MWL/IIRO during the period of much of the activity for which plaintiffs have sought sanctions.

_____

conducting legal research to provide him case law on the irrelevant issues and explain Jelaidan's obligation to comply with a valid court order.  *See* Exhibits D, F.

In light of Jelaidan's extensive, ongoing pattern of deliberate defiance of this Court's orders (including but not limited to his refusal to comply with the Court's Sanctions Orders), which defiance appears will continue unabated despite this Court's imposition of sanctions, and the apparent active participation of Jelaidan's counsel in fostering the pattern, the PECs recommend that the Court consider contempt proceedings and ask that the Court hold a conference to discuss the matter further.

Respectfully submitted,

| COZEN O'CONNOR | MOTLEY RICE LLC |
|---|---|
| By: /s/ *Sean P. Carter*<br>SEAN P. CARTER<br>For the Plaintiffs Exec. Committees | By: /s/ *Robert T. Haefele*<br>ROBERT T. HAEFELE<br>For the Plaintiffs Exec. Committees |

cc: The Honorable George B. Daniels, via ECF
   Martin McMahon, Esquire, via ECF
   All Counsel of Record via ECF