# SUPPLEMENTAL EXHIBIT 1

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
San Diego, California

File No. A44 917 640      April 22, 2004

In the Matter of:

Omar Abdi Mohamed

Respondent.

In Bond Proceedings

before Immigration Judge
Ragusa

DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

APR 2 3 2004

IMMIGRATION COURT
(CCA) SAN DIEGO, CA

## Government Response to Respondent's Brief in Support of Bond

Respondent herein has submitted a request for a bond redetermination before the Immigration Judge. The Immigration and Customs Enforcement [Government] is opposed to this request and argues that the Government has established, through this Brief, that the respondent poses a danger to the community if released from custody, and in the alternative, would be a flight risk if released from custody.

I. Facts

Respondent is a native and citizen of Somalia who entered the United States on or about July 8, 1995, as a Special Immigrant (religious worker) in order to work for the Masjidul Taqwa. Respondent committed fraud by signing a statement before a US Consular Officer in Toronto, Canada claiming that he intended to work for the Masjidul Taqwa. (Exhibit S) In fact, the respondent had no intention of honoring the contract, and that was a material fact in the issuance of the immigrant visa.

Furthermore, the respondent filed an application for Naturalization on April 18, 2000. (Exhibit R) In that application, the respondent failed to disclose several material facts that he is now facing criminal prosecution for in the United States District Court. (See Exhibits G-M) The respondent has been indicted by a Grand Jury on such charges. One of the facts that the respondent failed to disclose was his employment as a foreign agent of the government of Saudi

**Exhibit A**

Arabia. The respondent has been working for the government of Saudi Arabia from 1995-present as a "propagator" and has received over $100,000 as payment for his employment. (See Exhibits A at 17, B at 13-14, O)

Respondent has been charged as removable from the United States pursuant to section 237(a)(1)(A) of the INA. The respondent is being charged that he was inadmissible at the time of entry as 1) an alien who sought to enter the United States for the purpose of performing skilled or unskilled labor, 2) an alien immigrant who was not in possession of a valid unexpired immigrant document required by the INA, and 3) an alien who sought to procure admission into the United States by fraud or willfully misrepresenting a material fact. Respondent has not yet pled to the factual allegations. Respondent is seeking a bond hearing pending a determination of his removability from the United States.

## II. Applicable Law

Title 8 of the Code of Federal Regulations Section 236.1(c)(3) provides the burden of proof for an alien that is eligible for bond as follows:

Such an alien must first demonstrate, by clear and convincing
evidence, that release would not pose a danger to the safety of other
persons or of property. If an alien meets this burden, the alien must
further demonstrate, by clear and convincing evidence, that the alien is
likely to appear for any scheduled proceeding (including any appearance
required by the Service or EOIR) in order to be considered for release
in the exercise of discretion. 8 C.F.R. § 236.1(c)(3)

Title 18 of the United States Code Section 951 defines an agent of a foreign government and the registration requirements imposed on that agent as follows:

Title 18. Crimes and Criminal Procedure (Refs & Annos)
  Part I. Crimes
    Chapter 45. Foreign Relations
      § 951. Agents of foreign governments
(a) Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

2

**(b)** The Attorney General shall promulgate rules and regulations establishing requirements for notification.

**(c)** The Attorney General shall, upon receipt, promptly transmit one copy of each notification statement filed under this section to the Secretary of State for such comment and use as the Secretary of State may determine to be appropriate from the point of view of the foreign relations of the United States. Failure of the Attorney General to do so shall not be a bar to prosecution under this section.

**(d)** For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include--

**(1)** a duly accredited diplomatic or consular officer of a foreign government, who is so recognized by the Department of State;

**(2)** any officially and publicly acknowledged and sponsored official or representative of a foreign government;

**(3)** any officially and publicly acknowledged and sponsored member of the staff of, or employee of, an officer, official, or representative described in paragraph (1) or (2), who is not a United States citizen; or

**(4)** any person engaged in a legal commercial transaction.

**(e)** Notwithstanding paragraph (d)(4), any person engaged in a legal commercial transaction shall be considered to be an agent of a foreign government for purposes of this section if--

**(1)** such person agrees to operate within the United States subject to the direction or control of a foreign government or official; and

**(2)** such person--

**(A)** is an agent of Cuba or any other country that the President determines (and so reports to the Congress) poses a threat to the national security interest of the United States for purposes of this section, unless the Attorney General, after consultation with the Secretary of State, determines and so reports to the Congress that the national security or foreign policy interests of the United States require that the provisions of this section do not apply in specific circumstances to agents of such country; or

**(B)** has been convicted of, or has entered a plea of nolo contendere with respect to, any offense under section 792 through 799 831 or 2381 of this title or under section 11 of the Export Administration Act of 1979, except that the provisions of this subsection shall not apply to a person described in this clause for a period of more than five years beginning on the date of the conviction or the date of entry of the plea of nolo contendere, as the case may be.

### III. Argument

#### A. THE RESPONDENT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT HIS RELEASE WOULD NOT POSE A DANGER TO THE SAFETY OF OTHER PERSONS AND PROPERTY.

The Government argues that the respondent has not adequately shown that if released, he would not be involved in activity, which could pose a danger to the community. This argument is supported by the respondent's recurrent failure to disclose information requested by the Government. For instance, the respondent has not only given false statements about his employment with the Saudi Arabian government, but he has also given false statements regarding his involvement with organizations known to financially support terrorists.

##### 1. The respondent's employment with the Saudi Arabian government is in violation of 18 USC § 951.

Due to concerns of diplomatic relations, the respondent is not being prosecuted criminally for his violation of 18 USC § 951, Failure to Register as a Foreign Agent. However, the evidence the Government has clearly shows that the respondent has been working as a foreign agent of the Saudi Arabian government from 1995 to the present, with a monthly salary of $1700. Exhibits A and O show that the respondent has not only been paid over $100,000 for his employment with the Saudi Arabian government, but that he has been specifically "tasked" by the Saudi Arabian government in intelligence gathering missions in his employment as a "propagator" for that government. (See Exhibits A, O)

As a propagator, the respondent is specifically asked to provide names, occupations, social status, addresses, etc. of Islamic converts in the United States as well as the "propagator's" impressions on how to best deal with these people and what they might need from the Saudi Arabian government. (Exhibit O) The respondent was also tasked with providing a complete survey of the Islamic centers, associations, and schools in the area, regardless of the religious orientation. That list was requested to be accurate and filed as soon as possible. (Exhibit O) The respondent was also tasked with monitoring the media outlets and to serve as a representative to ensure that the views of the Saudi Arabian government were addressed with the media (Exhibit A at 41) Perhaps most importantly, the respondent was awarded for his activities

4

as a propagator. Prince Sultan bin Abd al-Aziz Al-Saud, Second Deputy Prime Minister, Ministry of Defense and Aviation authorized a financial award in May 2000 for the respondent. (Exhibit A at 41)

Due to the nature of the respondent's activities in employment with the Saudi Arabian government, the respondent is considered a "foreign agent" as defined by 18 USC § 951. As such, the respondent needed to register with the Department of Justice under the Foreign Agent Registration Act, 22 USC § 611. The respondent did not register as required. (See Exhibit P) As such, the respondent could face criminal charges for violating 18 USC § 951. Furthermore, the respondent appears to be aware of his need to register as he mentioned it in his naturalization interview. (Exhibit B at 14)

### 2. The respondent was deceitful with the United States Government concerning his employment with the Saudi Arabian government.

The respondent, in his naturalization application, failed to mention employment with the Saudi Arabian government. (Exhibit R) When the respondent was questioned at his second naturalization interview, the respondent only informed the US Government of his employment when he was directly asked if he received funding from the Saudi Arabian government. (Exhibit B at 14) When asked if the respondent met with any representatives of the Saudi government he immediately said "no" (Exhibit B at 15) After being pressed by the examining officer, the respondent gave few details stating that: someone came from the Saudi embassy a long time ago, with no clear remembrance of a name or date, and the person was from the Washington embassy and then the respondent stated the Los Angeles embassy, and then the person was stated to be a diplomat. (Exhibit B at 15) Somehow the "diplomat" showed up at the Somali Eastern African Youth Center, at which the respondent was the director.

It seems the respondent would certainly be better able to explain how his relationship with the Saudi government progressed since the government has paid him well over $100,000 for his services with them. Furthermore, in an application for asylum filed with the country of Canada, the respondent stated that since he entered Canada, he made several trips to Saudi Arabia for "business" purposes. (Exhibit T) However, when questioned by US Government officers, the respondent only traveled to Saudi Arabia on two occasions, both in

5

transit to other destinations. (Exhibit Q) All of these instances show the respondent's consistent deceit with US officials concerning his relationship with Saudi Arabia.

### 3. The respondent has not adequately explained his involvement with Global Relief Foundation and Al-Haramain Foundation, organizations known to provide funding to terrorist organizations.

The respondent in his naturalization application lists under Section 9. Memberships and Organizations, the Western Somali Relief Agency (WSRA), a non-profit organization in operation from 1997 to present. (Exhibit R) When asked about the organization in his initial videotaped sworn statement on May 9, 2002, the respondent stated that he was a "volunteer" for WSRA. (Exhibit C at 13) The respondent furthered that the WSRA couldn't find anyone or anything to help the famine. "If we got a couple of box of clothing or something like that we couldn't be able to ship them because it was too expensive...is kinda relief we set up, we were hoping that it will help the refugee people inside the refugee camps in Kenya, Ethiopia with Famine with all this, but it didn't, it didn't, it didn't make it." (See Exhibit C at 13) The respondent stated that he was the director of the WSRA, but when asked about the funding for the organization, he stated they couldn't get funding and nobody would support it. (Exhibit C at 14)

To the contrary, US Government officials discovered that an agency did indeed support the WSRA. The Global Relief Foundation, an organization designated by United States Treasury Department's Office of Foreign Asset Control (OFAC) as a Specially Designated Global Terrorist for providing funding for terrorist organizations, supported the WSRA by donating over $300,000 to the organization. (Exhibit A at 6-7) Upon review of the WSRA bank account records, it was discovered that between 3/22/99 and 12/1/00, the WSRA received $305,463 from Global Relief. (Exhibit A)

The respondent was again interviewed under oath on January 22, 2004. In this interview, the respondent was asked again about funding for the WSRA. The respondent this time admitted that some money came from an organization in Chicago. He could not recall the name until pressed further by officers. Then, the respondent admitted that the Global Relief Fund was the donating agency. (Exhibit B at 9-10) The respondent then feigned memory loss concerning the events surrounding the receipt and depositing of the funds. (Exhibit B at 10-11) Once shown

6

copies of the checks deposited by the respondent from Global Relief to the WSRA account, the respondent then admitted that he indeed deposited those checks. (Exhibit B at 12) Furthermore, the respondent admitted after being pressed that he was also the treasurer of the WSRA. (Exhibit B at 13)

The respondent also received $5,000 from the Al-Haramain Foundation. (See Exhibits L, M) The Al-Haramain Foundation was designated on March 11, 2002 also as a Specially Designated Global Terrorist by OFAC. The respondent failed to reveal this donation as well in any application or interview.

It is the respondent's burden to prove with clear and convincing evidence that he is not a danger to the community. The respondent's false statements and attempts to mislead the government have only shown that the respondent's word cannot be trusted. The respondent has failed to provide any evidence as to why his activities relating to Specially Designated Global Terrorists do not make him a danger to the community.

### 4. The Government has received information regarding the possible threat the respondent poses to the community.

Although the Government is not charging the respondent with acts of terrorism, and the Government is not labeling the respondent as a terrorist, the Government has received information regarding the respondent which suggests the respondent may pose a danger to the community, namely raising funds for a militant Islamic group. (See Exhibits A at 4-5, D) Certain background facts provided to the Government in the same letter with these assertions hold true regarding this respondent.

For example, the respondent was in fact in Canada, and applied for asylum. Although his application was not granted, his wife's application was. (Exhibit B at 16-17) The respondent was the director and treasurer of a non-profit organization. The respondent was also the director of a youth organization known as Somali and East African Youth Center.

Finally, the anonymous letter describes the respondent as Omar Khadiib. (Exhibit D) The respondent originally denied using any names other than Omar Abdi Mohamed. (Exhibit R) Upon interview, the respondent again denied using any other names, including nicknames. (Exhibit B at 20) Yet, when presented with the name Omar Khatiib during the interview, the respondent finally admitted that he has used the name Omar Khatiib (Exhibit B at 20) The use of

7

this name by the respondent is further corroborated by the Saudi Arabian employment tasking letters, which refer to the respondent as Omar Abdo Al-Khatib. (Exhibit O)

As the respondent has not provided any clear and convincing evidence that he is not a danger to the community, the respondent has not met his burden of proof and is not eligible to be released from the custody of the Government. Furthermore, in response to counsel for the respondent's comments that the US Government has stated that the respondent is "not" a danger to the community in his criminal case, I would offer the transcripts of the US District Court proceedings on bond and the Press Releases from the United States Attorney's Office regarding the respondent. (See Exhibits G-M) At no point does the US Government state that the respondent poses no threat or danger to the community. Instead, it is stated that at the present time, the respondent is not being charged criminally with any acts of terrorism or involvement with terrorist activity. (Exhibit H at 23)

## A. THE RESPONDENT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE, THAT HE IS LIKELY TO APPEAR FOR ANY SCHEDULED PROCEEDING IN ORDER TO BE CONSIDERED FOR RELEASE IN THE EXERCISE OF DISCRETION.

The respondent has not met his burden of showing that he is unlikely to flee if released from custody. In support of this statement, the Government offers several facts as follows.

### 1. The respondent is facing criminal prosecution and deportation, both of which will significantly impact his life and the life of his family.

A Grand Jury has found probable cause that the respondent has made false statements under oath to the US Government. Therefore, it is likely that the respondent will be prosecuted for such offenses, and face some time in custody for commission of such offenses. The nature of those false statements is as described below.

When the respondent entered the United States, he entered under false pretenses. The Imam of Masjidul Taqwa, the organization which sponsored the respondent's admission, was interviewed by the government. The Imam, Wali Fardan, who personally filed the I-360 on the respondent's behalf, stated that he reached an agreement with the Somalis that he would petition for the respondent because the Somalis could not do so on their own with no recognizable

8

institution. The Somalis filled out the application and paid the fees to submit it. It was further agreed that the Somalis would pay for the respondent's care and housing, and in return, the respondent would teach Arabic at the Masjidul Taqwa. Imam Fardan further stated that the Somalis did not keep their word and the respondent never taught Arabic at the Masjidul Taqwa. In addition, he only saw the respondent three times, each for less than 15 minutes. (Exhibit A)

In applying for naturalization, the respondent made the false statement that he indeed worked for the Masjidul Taqwa from 8/1/95 to 2/2/97. (Exhibit R) Furthermore, in a videotaped sworn statement, the respondent attested that indeed he worked for the Masjidul Taqwa during that period of time. (See Exhibit B at 33-36 and C at 7)

The respondent in his naturalization application stated that he was married twice and had a total of 7 children. (Exhibit R) His first wife was deceased. The respondent also attested to these facts in the videotaped sworn statement. The respondent however, failed to disclose another wife he has in Australia and his two youngest children who are also living in Australia. (Exhibits A, F)

Most significantly, the respondent in his naturalization application failed to disclose his employment with the Saudi Arabian government and his non-profit organizations' receipt of over $300,000 from the Global Relief Foundation and $5,000 from Al-Haramain, both organizations that have been blocked by OFAC for providing funding for terrorist organizations. (Exhibits R, C) For these false statements, the respondent is charged criminally and poses a risk of flight to avoid prosecution.

Furthermore, the evidence the Government has provided in this brief as well as what is contained in the Respondent's A file will sustain the removability charges against him. As such, the respondent in this case will be eligible for very limited relief. Since the respondent faces deportation, he stands to lose not only his close ties to his family, all of which are either Legal Permanent Residents or United States Citizens, but he also stands to lose his prominence in the Somali community which he has attempted to develop over the past nine years. The respondent has created a comfortable life in the United States where he only has to work part-time, and is still able to support a family of 9 here in San Diego, and at least two more children in Australia. The Government believes that this alone provides sufficient incentive for the respondent to flee and not attend future court proceedings. However, other factors exist that increase the respondent's risk of flight.

9

> 2. **Respondent has traveled extensively, and has experience in both traveling around the world undetected and in moving "in and out" of countries without going through official immigration channels making him a flight risk.**

The respondent's travel history is summarized in Exhibit Q. As mentioned above, respondent, in an asylum application to Canada, states further that he has additionally traveled to Saudi Arabia on business several times and to Sudan for education. (Exhibit T) The District Court judge calculated the respondent's travel to Australia and stated that the respondent spent approximately 25% of his time in Australia alone between December 2000 and December 2003. (Exhibit J at 8) Since leaving Somalia, the respondent has traveled to Canada, Australia, England, Kenya, Uganda, Saudi Arabia, and Sudan. The respondent has friends and family all over the globe. In fact, he purportedly has a wife in Australia, and he has two children born in Australia, as well as a child in Kenya. (Exhibits R, F) As such, the respondent has sufficient connections to other countries if he decided to flee. It is important to note that the Saudi Arabian government pays for the respondent to visit Saudi Arabia every two years. (Exhibit J at 8)

Furthermore, the District Court described the respondent as a person with the ability to live in a foreign country and to take himself for a long time. (Exhibit J) The District Court also described the respondent as an individual who can find alternate routes to enter countries without the presentation of documents to immigration officials, referring to the respondent's trip to Kenya through Uganda. (Exhibit J at 9) Finally, the District Court stated the respondent is one who could avoid detection and could move around the world undetected under the radar screen of the government. (Exhibit J at 14-15) The Government agrees that the respondent is so experienced in authorized and unauthorized travel, and argues further that were the respondent to be released, there would be no means to ensure the respondent would not disappear.

> 3. **The respondent's evasive and misleading nature with the US Government suggests that the respondent cannot be trusted when the respondent states he will not flee.**

Notwithstanding the false statements respondent is being charged for criminally, the respondent has, at many other times, been evasive and misleading with the US Government. It is clear from reading the respondent's sworn interviews that the respondent engages in game-

10

playing with the US Government officials, only divulging information when he already knew the government was aware of that information.

The respondent has traveled extensively throughout the world in the past and has many alternate places to relocate to. The respondent has in his possession a Somali passport issued in Dubai on 12/21/00. (Exhibit E) There is no reason why the respondent would have needed to obtain a Somali passport. He has always had a travel document issued by the United States to travel on. Furthermore, that Somali passport says it was issued for the bearer who resides in United Arab Emirates. (See Exhibit E) The respondent never indicated to the Government how or why he obtained this document. He also never indicated how he was able to establish that he was a resident of the UAE.

Another misleading aspect of the respondent's case is whether the respondent has ever served in the military. The respondent stated in his naturalization application that he did not serve in the military. (Exhibit R) In addition, during the sworn statement, the respondent when given the opportunity, the respondent simply confirmed that he had not served in the military. (Exhibits B at 16, J at 10) Yet, when the respondent applied for asylum in Canada before he entered the United States, he stated that he did serve in the military. The respondent stated that military service in Somalia is compulsory for one year and that he served for 1 year in 1976. (Exhibit T) Furthermore, the respondent stated in his Canadian asylum application, that he was persecuted in Somalia. (Exhibit T) These are allegations that the respondent never revealed to the Government until pressed during a sworn statement. (Exhibit B at 16) For these reasons, the respondent cannot be trusted when promising to appear for future court hearings.

**Conclusion**

Although there was a bond issued by the United States District Court in the respondent's criminal case, the Government argues the respondent is not eligible for bond in removal proceedings. The respondent has not met his burden of proof that he is not a danger to the community. Furthermore, the respondent has not met his burden of proof that he is not a flight risk if released from custody.

The respondent has more at stake to lose now than he did when he was just facing criminal prosecution. The respondent, his livelihood, and his entire family will be affected by these removal proceedings. The removal charges filed in the respondent's case are sustainable,

11

and when ordered removed, the respondent is only eligible for the limited relief of withholding of removal, if he is not yet convicted in federal court, or protection from the Convention Against Torture.

The Government, in this case, is concerned with many factors regarding this respondent. The respondent is an individual who is on the payroll of a foreign government, not registered with the United States, who works part-time as an Instructional Aide, and is able to support two families globally and able to travel extensively on minimal means. The respondent is also an individual who manages to avoid detection when necessary, and involves himself with people and organizations known for their ties to terrorism. Most importantly, the respondent is an individual who has perpetrated fraud on the US Government on more than one occasion. This is not a person who can be trusted if released from custody.

There are no conditions the Court can set that would ensure the respondent's appearance at future hearings. If a bond is set in this case, the Saudi Arabian government may pay it, another charitable organization may pay it, or the Somali community may pay it, but it will not be coming from the respondent. The respondent has no money in his bank accounts and no property, so if bond in any amount is set, it will not secure the respondent's presence at future hearings.

For all the reasons stated above, the Government requests the Immigration Judge to order the respondent to remain in custody for the duration of his removal proceedings.

Respectfully submitted,

Kerri A. Harlin
Assistant Chief Counsel ICE
San Diego, California

12