# Exhibit 1

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

**IN RE:** Terrorist Attacks on September 11, 2001        **MDL No. <u>1570</u>**

### NOTICE OF POTENTIAL TAG-ALONG ACTION

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial

Panel on Multidistrict Litigation, the Kingdom of Saudi Arabia ("Saudi Arabia"), a defendant in

*In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570-GBD-SN (S.D.N.Y.) ("*Terrorist*

*Attacks MDL*"), hereby notifies the Clerk of the Panel of the following potential tag-along action,

in which Saudi Arabia is also named as a defendant: *Katherine M. Dillaber, et al. v. Islamic*

*Republic of Iran, et al.*, No. 1:18-cv-554-KBJ (D.D.C.). A copy of the *Dillaber* complaint is

attached as Exhibit A, and a copy of the docket sheet is attached as Exhibit B.

The *Dillaber* complaint was filed on March 9, 2018, by seven plaintiffs who allege they

suffered injuries caused by the attacks of September 11, 2001. It names as defendants the

Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"),

and Saudi Arabia. The *Dillaber* plaintiffs have acknowledged in a notice of related cases that

their case "involves common issues of fact" and "grows out of the same event or transaction" as

the cases in this MDL. *Dillaber*, ECF No. 3. Most of the *Dillaber* complaint, as it relates to

Saudi Arabia, appears to have been copied from the Consolidated Amended Complaint filed last

year in the *Terrorist Attacks MDL*, ECF No. 3463 ("CAC"), with only minor modifications.[1]

Timely and efficient transfer will "promote the just and efficient conduct" of the action,

28 U.S.C. § 1407(a), particularly because the viability of the same allegations incorporated by

---

[1] *Compare* Ex. A ¶¶ 114-164 *with* CAC ¶¶ 54-109; Ex. A ¶¶ 166-366 *with* CAC ¶¶ 116-310; Ex. A ¶¶ 372-377 *with* CAC ¶¶ 311-316; Ex. A ¶¶ 394-422 *with* CAC ¶¶ 317 -346; Ex. A ¶¶ 423-472 *with* CAC ¶¶ 363-409; Ex. A ¶¶ 473-479 *with* CAC ¶¶ 418-424.

the *Dillaber* complaint is now being tested in the *Terrorist Attacks MDL*. Saudi Arabia's motion to dismiss the CAC was argued in January and is currently under submission before Judge Daniels. *See Terrorist Attacks MDL*, ECF No. 3667 (motion to dismiss); Docket, *Terrorist Attacks MDL* (unnumbered minute entry for Jan. 18, 2018). Other recently filed actions that incorporate the allegations of the CAC will also be governed by that motion. *See Terrorist Attacks MDL*, ECF No. 3543 (order setting forth procedure for new plaintiffs to adopt the CAC's allegations against Saudi Arabia and one of its instrumentalities). Transferring *Dillaber* to the MDL will allow it to receive the same treatment as those other actions based not only on the same underlying facts but on materially identical allegations.

The *Terrorist Attacks MDL* also contains actions against Iran and MOIS, the other defendants in *Dillaber*. *See, e.g., O'Neill v. Republic of Iraq*, No. 04-cv-1076-GBD-SN (S.D.N.Y.). Judge Daniels has already heard testimony, reviewed evidence, and entered default judgments against Iran and MOIS in several of those actions.[2] He is thus familiar with the underlying facts concerning Iran's alleged responsibility for the September 11 terrorist attacks.

*Dillaber* should be transferred to the Southern District of New York for consolidation into the MDL, consistent with this Panel's previous ruling that "the Southern District of New York serves as the nexus for claims resulting from or related to the terrorist-related aircraft

---

[2] *See, e.g.*, Findings of Fact and Conclusions of Law, *Terrorist Attacks MDL*, ECF No. 2515 (finding Iran liable based on an evidentiary hearing, expert testimony, and other record evidence); Order of Judgment, *Terrorist Attacks MDL*, ECF No. 3022 (final judgment on liability against Iran and MOIS in favor of *O'Neill* plaintiffs); Final Order and Judgment on Compensatory Damages, *Terrorist Attacks MDL*, ECF No. 3905 (incorporating three prior Partial Final Judgments against Iran defendants).

crashes of September 11, 2001." *In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003).[3]

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (phone)
(202) 326-7999 (fax)

March 21, 2018                    *Counsel for the Kingdom of Saudi Arabia*

---

[3] Saudi Arabia has not yet been served with a copy of the *Dillaber* complaint pursuant to the provisions of 28 U.S.C. § 1608(a) and reserves all rights in connection with such service. As it has in other cases in the *Terrorist Attacks MDL*, Saudi Arabia will consider a request for waiver of service at such time as the *Dillaber* plaintiffs make one. For the avoidance of doubt, Saudi Arabia also reserves any other immunities, defenses, or objections under the Foreign Sovereign Immunities Act of 1976 or otherwise, including objections to personal jurisdiction.

BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

**IN RE:** Terrorist Attacks on September 11, 2001      **MDL No. 1570**

## SCHEDULE OF ACTIONS

| Case Caption | Parties | Case No. | Court | Judge |
|---|---|---|---|---|
| *Katherine M. Dillaber, et al. v. Islamic Republic of Iran, et al.* | Plaintiffs:<br>Katherine Marie Dillaber, John Dillaber, Anne Youngblood, Estate of Jacqueline Dillaber, Estate of Philip Dillaber, Mary Jo Clarke, Thomas Clarke, Jr.<br><br>Defendants:<br>Islamic Republic of Iran, Iranian Ministry of Information and Security, Kingdom of Saudi Arabia | 1:18-cv-554-KBJ | D.D.C. | Hon. Ketanji Brown Jackson |

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (phone)
(202) 326-7999 (fax)

March 21, 2018      *Counsel for the Kingdom of Saudi Arabia*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

**IN RE:** Terrorist Attacks on September 11, 2001            **MDL No. 1570**

### PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that copies of the foregoing Notice of Potential Tag-Along Action were served on all parties in the following case electronically via ECF, on March 21, 2018.

**In re: Terrorist Attacks on September 11, 2001, S.D.N.Y., No. 1:03-md-01570-GBD-SN**

I further certify that copies of the foregoing Notice of Potential Tag-Along Action were served on Plaintiffs in the following case via Federal Express, as set forth below. Copies have not been served on the Islamic Republic of Iran or on the Iranian Ministry of Information and Security, which have not appeared by counsel in either case.

**Katherine M. Dillaber, et al. v. Islamic Republic of Iran, et al., D.D.C., No. 1:18-cv-554-KBJ**

**Served via Federal Express:**
Caragh Glenn Fay
Amanda Fox Perry
Fay Law Group, P.A.
777 Sixth Street, N.W., Suite 410
Washington, D.C. 20001
caraghfay@gmail.com
**Counsel for Plaintiffs**

Dated this 21st day of March 2018.

Respectfully submitted,

/s/ *Michael K. Kellogg*
_____

Michael K. Kellogg
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (phone)
(202) 326-7999 (fax)
mkellogg@kellogghansen.com

*Counsel for the Kingdom of Saudi Arabia*

JURY,TYPE-B

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:18-cv-00554-KBJ

DILLABER et al v. ISLAMIC REPUBLIC OF IRAN et al          Date Filed: 03/09/2018
Assigned to: Judge Ketanji Brown Jackson                  Jury Demand: Plaintiff
Cause: 28:1602 Foreign Sovereign Immunities Act           Nature of Suit: 360 P.I.: Other
                                                          Jurisdiction: Federal Question

## Plaintiff

**KATHERINE M. DILLABER**              represented by **Amanda Fox Perry**
*Individually on her own Behalf*                       FAY LAW GROUP, P.A.
                                                       777 Sixth Street, NW
                                                       Suite 410
                                                       Washington, DC 20001
                                                       (202) 589-1300
                                                       Fax: (202) 216-0298
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Caragh Glenn Fay**
                                                       FAY LAW GROUP, P.A.
                                                       777 Sixth Street, NW
                                                       Suite 410
                                                       Washington, DC 20001
                                                       (202) 589-1300
                                                       Fax: (202) 216-0298
                                                       Email: caraghfay@gmail.com
                                                       *ATTORNEY TO BE NOTICED*

## Plaintiff

**JOHN DILLABER**                      represented by **Amanda Fox Perry**
*Individually on his own Behalf*                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

## Plaintiff

**ANNE YOUNGBLOOD**                    represented by **Amanda Fox Perry**
*Individually on her own Behalf*                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

District of Columbia live database
Page 2 of 3
Case 1:03-md-01570-GBD-SN Document 3938-1 Filed 08/21/18 Page 8 of 57

**Plaintiff**

**ESTATEOF JACQUELINE
DILLABER**
*by and through its Administrator, Anne
Youngblood*

represented by **Amanda Fox Perry**
(See above for address)
*LEAD ATTORNEY
PRO HAC VICE
ATTORNEY TO BE NOTICED*

**Plaintiff**

**ESTATE OF PHILIP DILLABER**
*by and through its Administrator, Anne
Youngblood*

represented by **Amanda Fox Perry**
(See above for address)
*LEAD ATTORNEY
PRO HAC VICE
ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARY JO CLARKE**
*Individually on her own Behalf*

represented by **Amanda Fox Perry**
(See above for address)
*LEAD ATTORNEY
PRO HAC VICE
ATTORNEY TO BE NOTICED*

**Plaintiff**

**THOMAS CLARKE, JR.**

represented by **Amanda Fox Perry**
(See above for address)
*LEAD ATTORNEY
PRO HAC VICE
ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ISLAMIC REPUBLIC OF IRAN**

**Defendant**

**IRANIAN MINISTRY OF
INFORMATION AND SECURITY**

**Defendant**

**KINGDOM OF SAUDI ARABIA**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/09/2018 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number 0090-5367707) filed by KATHERINE M. DILLABER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Islamic Republic of Iran, # 3 Summons Ministry of Information and Security, # 4 Summons Kingdom of Saudi Arabia)(Fay, Caragh) (Entered: 03/09/2018) |

| 03/09/2018 | 2 | MOTION for Waiver *of Local Civil Rule 5.1(e)* by KATHERINE M. DILLABER (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Fay, Caragh) (Entered: 03/09/2018) |
|---|---|---|
| 03/09/2018 | 3 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 03-1570 in the U.S. District Court for the Southern District of New York. (Fay, Caragh) (Entered: 03/09/2018) |
| 03/14/2018 |  | Case Assigned to Judge Ketanji Brown Jackson. (zsb) (Entered: 03/14/2018) |
| 03/14/2018 | 4 | SUMMONS (3) Issued Electronically as to IRANIAN MINISTRY OF INFORMATION AND SECURITY, ISLAMIC REPUBLIC OF IRAN, KINGDOM OF SAUDI ARABIA. (Attachment: # 1 Notice and Consent)(zsb) (Entered: 03/14/2018) |
| 03/15/2018 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Amanda Fox Perry, :Firm- Fay Law Group PA, :Address- 777 6th Street NW Suite 410. Phone No. - 202-589-1300. Fax No. - 202-216-0298 Filing fee $ 100, receipt number 0090-5375887. Fee Status: Fee Paid. by KATHERINE M. DILLABER (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Fay, Caragh) (Entered: 03/15/2018) |
| 03/16/2018 | 6 | GENERAL ORDER AND GUIDELINES FOR CIVIL CASES BEFORE JUDGE KETANJI BROWN JACKSON. The Court will hold the parties and counsel responsible for following these directives, and parties and counsel should pay particular attention to the Courts instructions for briefing motions and filing exhibits. Failure to adhere to this Order may, when appropriate, result the imposition of sanctions and/or sua sponte denial of non-conforming motions. Signed by Judge Ketanji Brown Jackson on 3/16/2018. (lckbj1) (Entered: 03/16/2018) |
| 03/19/2018 |  | MINUTE ORDER granting 5 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that Amanda Fox Perry is admitted pro hac vice in this matter as counsel for Plaintiffs. Signed by Judge Ketanji Brown Jackson on 03/19/2018. (lckbj1) (Entered: 03/19/2018) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/21/2018 10:56:24 | | | |
| **PACER Login:** | Khhtef03:4643213:4571577 | **Client Code:** | 04145 |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00554-KBJ |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**KATHERINE MARIE DILLABER**
**Individually On Her Own Behalf**

**and**

**JOHN DILLABER**
**Individually On His Own Behalf**

**and**

**ANNE YOUNGBLOOD**
**Individually On Her Own Behalf**

**and**

**ESTATE OF JACQUELINE DILLABER**
**By Anne Youngblood, Legal Representative**

**and**

**ESTATE OF PHILIP DILLABER**
**By Anne Youngblood, Legal Representative**

**and**

**MARY JO CLARKE**
**Individually on Her Own Behalf**

**and**

**THOMAS CLARKE, JR.**
**Individually on His Own Behalf**

      **Plaintiffs,**

**v.**                                                                          **Civil No.**

**ISLAMIC REPUBLIC OF IRAN**
**Ministry of Foreign Affairs**
**Khomeini Avenue**

**United Nations Street**
**Tehran, Iran**

**and**

**IRANIAN MINISTRY**
**OF INFORMATION AND SECURITY**
**Pasdaran Avenue**
**Golestan, Yekom**
**Tehran, Iran**

**and**

**KINGDOM OF SAUDI ARABIA**
**Ministry of Foreign Affairs**
**Alnassryah Street**
**Riyadh, Saudi Arabia 11544**

   **Defendants.**


## COMPLAINT

   Plaintiffs, by and through undersigned counsel, bring this action seeking damages arising out of the September 11, 2001, terrorist attacks on the United States ("the September 11[th] Attacks" or "9/11"). Plaintiffs allege that the Defendants, the Islamic Republic of Iran ("Iran"), its agency and instrumentality the Ministry of Information and Security ("MOIS"), and the Kingdom of Saudi Arabia ("Saudi Arabia" or "the Kingdom"), were responsible for the terrorist attacks.

   Plaintiffs are legally entitled to assert these claims pursuant to the Foreign Sovereign Immunities Act (28 U.S.C. § 1602 *et seq*.), as amended by § 1083 of the Defense Appropriations Act of 2008, H.R. 4986, Pub. L. No. 110-181 and by § 3(a) of the Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, Pub. L. No. 114-222, 130 Stat. 852, (enacting 28 U.S.C. § 1605B); the Anti-Terrorism Act (18 U.S.C. § 2333 et seq.); and the laws of the jurisdictions of residence of those Plaintiffs suffering injuries as hereinafter alleged.

2

## INTRODUCTION

(1)     On September 11, 2001, nineteen members of the terrorist organization al Qaeda, fifteen of whom were citizens of Saudi Arabia, hijacked four commercial airliners and used them as weapons in a coordinated terrorist attack upon the United States and its citizens. The attacks killed over 3,000 people that day and injured many thousands more.

(2)     The September 11th Attacks represented a single targeted operational strike, carried out as part of al Qaeda's broader ongoing campaign to wage jihad against the United States.

(3)     Al Qaeda's ability to conduct large-scale terrorist attacks was the direct result of the support al Qaeda received from its material sponsors and supporters, including Iran, MOIS, and Saudi Arabia.

(4)     Plaintiffs allege that Iran, MOIS, and its associated terrorist group, Hezbollah, forged alliances with Osama bin Laden and al Qaeda for the purpose of working together against their perceived common enemy, the United States.

(5)     Plaintiffs allege that Iran acted through its officials, officers, agents, employees, agencies and instrumentalities, including Hezbollah, in providing support and resources to al Qaeda. The support provided by Iran included assisting and contributing to the preparations and execution of the plans that culminated in the September 11th Attacks.

(6)     Plaintiffs allege that Saudi Arabia established, funded, directed and controlled da'awa (Arabic for proselytizing) organizations (a.k.a. "charities") to propagate Wahhabi Islam throughout the world, as a core function of the Saudi state under the supervision of Saudi Arabia's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia, and that the da'awa organizations were responsible for providing the funding and material support

3

that allowed Osama bin Laden and al Qaeda to acquire the capabilities employed by al Qaeda on September 11, 2001, and acted as agents and alter egos of the Saudi government in doing so.

(7)     Plaintiffs further allege that individual employees, officials, and agents of the government of Saudi Arabia knowingly provided direct assistance to the September 11th hijackers and al Qaeda organization, while acting in the performance of their duties in promoting the anti-western and anti-American agenda of Saudi Arabia's Ministry of Islamic Affairs.

(8)     Plaintiffs further allege that Saudi Arabia's Ministry of Islamic Affairs and related components of Saudi Arabia's vast government apparatus, established to proselytize Wahhabi Islam, knowingly channeled extensive funds and material support to al Qaeda through the da'awa organizations and other platforms under their control.

(9)     Absent the support of Iran and Saudi Arabia, and their agencies, instrumentalities, employees and officers, al Qaeda would not have had the capacity to conceive, plan, and execute the September 11th Attacks.

**PARTIES**

(10)     On the morning of September 11, 2001, Plaintiff Katherine Dillaber and her sister, Patricia Dillaber Mickley, both civilian employees of the U.S. Department of Defense, were working in their offices in the Pentagon when American Airlines Flight #77 crashed into the western side of the building after being hijacked by al Qaeda terrorists. The offices in which Patricia Dillaber Mickley and Plaintiff Katherine Dillaber worked were destroyed by the explosion. Plaintiff Katherine Dillaber sustained injuries but escaped to safety. Patricia Dillaber Mickley was killed in the attack.[1]

---

[1] The Estate of Patricia Dillaber Mickley is not a party in this case.

(11)    Plaintiff Katherine Dillaber, a resident of the State of Virginia, was injured by an act of "torture" as defined in 28 U.S.C. § 1605A(a) and the Torture Victims Protection Act, 28 U.S.C. §1350, as a result of the September 11th Attacks. Plaintiff Katherine Dillaber brings this action on her own behalf and as the Sibling of Patricia Dillaber Mickley, who was killed in the September 11th Attacks, and is entitled to recover damages on the causes of action set forth herein.

(12)    Plaintiff John Dillaber is a resident of the State of Virginia. He is the brother of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. He brings this action on his own behalf as the Sibling of Katherine Dillaber and Patricia Dillaber Mickley and is entitled to recover damages on the causes of action set forth herein.

(13)    Plaintiff Anne Youngblood is a resident of the State of Virginia. She is the sister of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. She brings this action on her own behalf as the Sibling of Katherine Dillaber and Patricia Dillaber Mickley and is entitled to recover damages on the causes of action set forth herein.

(14)    Plaintiff Jacqueline Dillaber, now deceased, was a resident of the State of Virginia. She was the Mother of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. Plaintiff Anne Youngblood, the Personal Representative of her Estate, brings this action and is entitled to recover damages on the causes of action set forth herein.

(15)    Plaintiff Philip Dillaber, now deceased, was a resident of the State of Virginia. He was the Father of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia

Dillaber Mickley, who was killed in the September 11th Attacks. Plaintiff Anne Youngblood, the Personal Representative of his Estate, brings this action and is entitled to recover damages on the causes of action set forth herein.

(16)     Plaintiff Mary Jo Clarke and her husband, Thomas Clarke, residents of the State of Minnesota, provided volunteer first responder services at the World Trade Center attack site from approximately September 13, 2001 through December 2001. Plaintiff Mary Jo Clarke and her husband, Thomas Clarke, were exposed to smoke, dust, toxic chemicals and other hazardous materials for the duration of their response work and have suffered severe illnesses therefrom.[2] They have one son, Plaintiff Thomas Clarke, Jr., whose life was tragically altered by the September 11th Attack.

(17)     Plaintiff Mary Jo Clarke was injured by an act of "torture" as defined in 28 U.S.C. § 1605A(a) and the Torture Victims Protection Act, 28 U.S.C. §1350, as a result of the September 11th Attacks. Plaintiff Mary Jo Clarke brings this action on her own behalf, as the Spouse of Thomas Clarke, and as the Mother of Thomas Clarke, Jr., who were injured in the September 11th Attacks, and she is entitled to recover damages on the causes of action set forth herein.

(18)     Plaintiff Thomas Clarke, Jr., is a resident of the State of Minnesota. He is the son of Plaintiff Mary Jo Clarke and Thomas Clarke, both of whom were injured in the September 11th Attacks. He brings this action on his own behalf as the Child of Plaintiff Mary Jo Clarke and Thomas Clarke and is entitled to recover damages on the causes of action set forth herein.

(19)     Defendant Islamic Republic of Iran is a foreign sovereign state within the meaning of 28 U.S.C.  § 1603(a). Iran is now and has been designated a state sponsor of terrorism pursuant to

---

[2] Thomas Clarke is not a party in this case.

Section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) and § 620A of the Foreign Assistance Act of 1961 (22 § U.S.C. 2371) since January 19, 1984.

(20)    Defendant Iranian Ministry of Information and Security (MOIS) is an agency of Defendant Iran, whose activities included, at all times relevant to this action, the prosecution of terrorist acts directed against the armed forces of the United States and United States citizens, by and through material support to various terrorist organizations including Hezbollah. MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act.

(21)    Defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. § 1603(a). The Kingdom of Saudi Arabia maintains an Embassy within the United States at 601 New Hampshire Avenue NW, Washington, D.C. 20007.

**JURISDICTION AND VENUE**

(22)    Venue in this Court is proper in accordance with the provisions of 28 U.S.C. § 1391(f)(4) and 18 U.S.C. § 2334(a).

(23)    Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), the Foreign Sovereign Immunities Act (28 U.S.C. § 1602 *et seq*.), and 18 § U.S.C. 2333.

(24)    As herein alleged, actions for personal injury and related torts perpetrated by foreign state Defendants Iran and Saudi Arabia, through their agencies and instrumentalities, and through their officials, employees and agents, fall within the exceptions to jurisdictional immunity under 28 §§ U.S.C. 1605(a)(5), 1605A, and 1605B.

(25)    28 U.S.C. § 1605(a)(5) is the non-commercial torts exception to sovereign immunity. It provides a cause of action against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States as a result of tortious acts of a foreign state or its

7

employee, acting within the scope of his or her employment. The exception does not apply to claims based on discretionary acts, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

(26)     28 U.S.C. § 1605A is the terrorism exception to sovereign immunity. It provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing, or the provision of material support and resources for such acts. This cause of action is available to U.S. nationals, foreign nationals who were killed or injured while acting within the scope of their employment for the U.S. government, members of the armed services, and immediate family members of victims in each of the aforementioned categories.

(27)     28 U.S.C. § 1605B was enacted by the Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, Pub. L. No. 114-222, 130 Stat. 852, for the purpose of providing a jurisdictional grant for plaintiffs to pursue claims against Saudi Arabia for its involvement in the September 11th Attacks. It provides a cause of action against a foreign state for injury and death caused by an act of "international terrorism" occurring *inside* the United States, as defined in 18 U.S.C. § 2331, where plaintiffs can show that the injuries and deaths were caused by a tortious act or acts of a foreign nation, and that the act or acts constitute more than mere negligence, and were intentional, knowing, reckless, willful and/or grossly negligent.

(28)     Pursuant to 28 U.S.C. § 1605B(c), a national of the United States may bring a claim against a foreign state in accordance with 18 U.S.C. § 2333, the Anti-Terrorism Act ("ATA").

(29)     The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

(30)     JASTA further amended the ATA by clarifying that in any action for an injury arising from an act of international terrorism, liability may be asserted as to any person who aids and abets an organization that had been designated as a foreign terrorist organization by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

(31)     The amendments made by JASTA specifically apply to any civil action arising out of an injury to a person, property, or business on or after September 11, 2001.

(32)     Wherever the common or statutory law of a Plaintiff's residence contains rights or makes further damages available that are not duplicative of the recovery afforded under the statutory schemes listed above, Plaintiffs have causes of action under the common or statutory law of the U.S. state or foreign country where they were domiciled at the time of the attack.

## OVERVIEW OF ATTACKS

(33)     On September 11, 2001, nineteen members of the al Qaeda terrorist organization hijacked four commercial airliners and used those planes as weapons in a coordinated terrorist attack upon the United States. The hijackers caused two jets to crash into the World Trade Center Towers in New York City, and a third to crash into the Pentagon building in Arlington County, Virginia. The fourth airliner crashed into a field near the town of Shanksville, Pennsylvania, after passengers challenged the hijackers and prevented them from reaching Washington, D.C., where they may have planned to attack the U.S. Capitol or the White House.

9

(34)    At the time of the September 11th Attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

(35)    The September 11th Attacks resulted in the tragic loss of over 3,000 lives, physical and emotional injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex and the partial collapse of the Pentagon building's western side.

(36)    The September 11th Attacks were an "act of international terrorism" within the meaning of 18 U.S.C. § 2331.

(37)    As confirmed by countless investigations, the September 11th Attacks were the culmination of more than a decade-long campaign by al Qaeda to carry out large-scale terrorist attacks against the United States, set in motion by the formation of al Qaeda in 1989.

(38)    As further detailed below, Defendants provided material support to al Qaeda for more than a decade leading up to the September 11th Attacks, with knowledge of al Qaeda's intent to conduct terrorist attacks against the United States, and an awareness that al Qaeda would use the support provided by the Defendants to achieve that objective.

(39)    As further detailed below, the support provided by the Defendants enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th Attacks, and was essential to the success of those attacks. Indeed, the material support provided to al Qaeda by employees, agents, and alter-egos of the Iranian and Saudi Arabian governments, all of which is attributable to those governments themselves, included direct assistance to the September 11th plotters and hijackers and the massive funding and logistical support that enabled Osama bin Laden to build and sustain the al Qaeda organization.

(40)     In the years since the September 11th Attacks, there have been numerous reports and
investigations which have yielded evidence in support of the claims set forth herein: the Final
Report of the National Commission on Terrorist Attacks Upon the United States ("9/11
Commission"), the findings of the Congressional Joint Inquiry Into the Terrorist Attacks of
September 11, 2001 ("Congressional Joint Inquiry" or "CJI"), the so-called "missing pages" or
"28 pages" of the Congressional Joint Inquiry, which have been made public, and a 2012 report
concerning the status of the ongoing criminal investigation by the Federal Bureau of
Investigation ("FBI") and the U.S. Department of Justice ("DOJ") of Saudi government
employees and agents who provided substantial assistance to the hijackers ("2012 Summary
Report"), among others.

## BACKGROUND ON AL QAEDA

(41)     Al Qaeda Islamic Army ("al Qaeda") is an unincorporated association and terrorist
organization dedicated to the destruction of the United States, Israel and its citizens.

(42)     Al Qaeda uses violence, bombings, murder, mayhem, and other terrorist tactics in order
to pursue its unlawful objectives.

(43)     Al Qaeda was founded by Osama bin Laden in or about 1989.

(44)     Osama bin Laden was the "emir" (prince) of al Qaeda and was its leader at all relevant
times. Members of al Qaeda pledged an oath of allegiance (a "bayat") to Osama bin Laden and al
Qaeda.

(45)     From 1989 until about 1997, al Qaeda was headquartered in Afghanistan and Pakistan. In
or about 1991, the leadership of al Qaeda, including bin Laden, relocated to Sudan. Al Qaeda
was headquartered in Sudan from approximately 1991 until approximately 1996, but also
maintained a presence and activities in other parts of the world.

(46)     In 1996, under pressure from the United States and others to crack down on terrorism,

Sudan exiled bin Laden. Al Qaeda returned to Afghanistan.

(47)     Bin Laden and al Qaeda violently opposed the United States for several reasons. First, the

United States was regarded as an "infidel nation" because it was not governed in a manner

consistent with the group's extremist interpretation of Islam. Second, the United States was

viewed as providing essential support for other "infidel" governments. Third, al Qaeda opposed

the involvement of the United States armed forces in the Gulf War in 1991 and in Operation

Restore Hope in Somalia in 1992 and 1993. In particular, al Qaeda opposed the continued

presence of American military forces in Saudi Arabia following the Gulf War. Fourth, al Qaeda

opposed the United States government because of the arrest, conviction, and imprisonment of

persons belonging to al Qaeda or its affiliated terrorist groups or those with whom it worked.

(48)     For these and other reasons, bin Laden declared jihad, or holy war, against the United

States, which he carried out through al Qaeda and its affiliated organizations.

(49)     At all relevant times, al Qaeda functioned both on its own and through terrorist

organizations operated under its umbrella, including Egyptian Islamic Jihad, which was led by

Ayman al Zawahiri; the Islamic Group (also known as "el Gama'a el Islamiyya"), and a number

of jihad groups in other countries, including Sudan, Saudi Arabia, Yemen, Somalia, Eritrea,

Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the

Philippines, Tajikistan, Azerbaijan, the Kashmir region of India, and the Chechnyan region of

Russia.

(50)     Al Qaeda also maintained cells and personnel in a number of countries to facilitate its

activities, including Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the

United States.

(51)    Al Qaeda had a command and control structure which included a "majlis-ash-shura" (consultation council) which discussed and approved major undertakings, including terrorist operations. Al Qaeda also had a military committee, which considered and approved "military" matters.

(52)    At relevant times, bin Laden and al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan. Those camps were used to instruct members and associates of al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train al Qaeda members in security and counter-intelligence methods, such as the use of codes and passwords, and to teach members and associates of al Qaeda about traveling to perform operations. For example, al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

(53)    One of the principal goals of al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian peninsula) and Somalia through the use of violence. These goals eventually evolved into a declaration of jihad against America and all Americans. Members of al Qaeda issued fatwahs indicating that such attacks on Americans were both proper and necessary.

(54)    Al Qaeda and bin Laden used terrorism as a tool to be used to further political objectives. Al Qaeda has, over the years, directly carried out murders, bombings, and other terrorist acts

13

against its enemies. It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons, and other types of assistance.

(55)    Al Qaeda has often used operatives such as the hijackers to actively engage in terrorist activities against the United States and its citizens. In conducting those terrorist activities, al Qaeda received financial, logistical, and other material support from defendants Iran, Saudi Arabia, and their agencies and instrumentalities.

## IRAN'S LIABILITY FOR THE 9/11 ATTACKS

(56)    Iran has been waging an undeclared war against the United States and Israel for over thirty years. Iran wages this war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, Hamas, al Qaeda, and others.

(57)    In 1984, the U.S. State Department added Iran to the list of designated state sponsors of terrorism, and it has been so designated every year since.

(58)    Iran has repeatedly been found liable for deaths and injuries caused by its activities as a state sponsor of international terrorism under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.,* especially in connection with acts perpetrated by Hezbollah.

(59)    Iran's involvement in international terrorism has been documented in a long line of cases in the U.S. District Court for the Southern District of New York and the U.S. District Court for the District of Columbia, including *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009), *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010), and *Havlish v. bin Laden*, 2012 WL 3090979 (S.D.N.Y. 2012).

(60)    Since the time Iran was designated as a state sponsor of terrorism by the U.S. State Department, evidence has been collected and analyzed which shows conclusively that Iran views

terrorism as an instrument of state policy, like diplomacy or military power, which can and should be used to further political objectives. The evidence shows that Iran has, over the years, directly carried out assassinations, bombings, and other terrorist acts against its enemies through its terrorist proxy, Hezbollah. It has also provided direct and indirect support to international terrorist groups in the form of money, training, sanctuary, documentation, intelligence, and other types of assistance, including to al Qaeda.

(61)     The political structure of Iran is divided: there is a formal governmental structure and a revolutionary structure. Both structures are overseen by the unelected Supreme Leader, Ayatollah Ali Hoseini Khamenei. The Supreme Leader has the power to dismiss the president, overrule the parliament and the courts, and overturn any secular law.

(62)     To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including the Ministry of Information and Security ("MOIS"), other intelligence ministries, the militaries, and various types of quasi-governmental companies and entities which are directly answerable to, and receive instruction from, the Islamic power regime in Iran.

(63)     As described herein, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing direct and material support, and resources, to al Qaeda. The support provided by Iran included assisting and contributing to the preparations and execution of the plans that culminated in the September 11th Attacks.

(64)     Defendant MOIS is a political subdivision of the Islamic Republic of Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law; its head is appointed by the President and subject to confirmation by the

parliament; its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.

(65)     MOIS is a well-funded and skilled intelligence agency with an annual budget of between $100 million and $400 million. MOIS has been a key instrument of the government of Iran for its material support of terrorist groups like Hezbollah and as a terrorist agency of the Iranian government.

(66)     Many of the U.S. State Department's reports on global terrorism over the past 25 years refer to MOIS as Iran's key facilitator and director of terrorist attacks.

(67)     MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act. *See*, e.g., *Sutherland v. Islamic Republic of Iran*, 151 F. Supp.2d 27, 53 n. 6 (D.D.C. 2001).

(68)     With a large budget and extensive organization, MOIS is one of the most powerful ministries in the Iranian government.

(69)     Unlike MOIS, the Islamic Revolutionary Guard Corps ("IRGC") is a military force parallel to the regular Iranian military and to the formal governmental structure. Its responsibilities are described in the Iranian Constitution, and it reports directly to Iran's Supreme Leader rather than to the President. It is both the guardian and the striking arm of the Islamic Revolution.

(70)     The IRGC's special forces division, known as the *Qods* Force, has provided training and funding for terrorism operations targeting American citizens, including support for Hezbollah and al Qaeda, for at least two decades. Terrorism training provided to Hezbollah and al Qaeda by the IRGC is an official policy of the Iranian government.

(71)    The entire apparatus of the Iranian state and government, and many parts of Iran's private sector, including corporations, banks, state-run media, private individuals, and even charities, are at the service of the Supreme Leader, the IRGC, and MOIS when it comes to support of terrorism. The IRGC and MOIS are responsible for carrying out the policies of the Iranian government, and the Iranian government's policies include state support for terrorism. Although much of that state support is done through clandestine means, the government ministries have also been involved in state support for terrorism, generally, and in support for al Qaeda and Hezbollah.

**Iran's Sponsorship of Terrorism and al Qaeda**

(72)    For many years, the U.S. State Department has included Iran on its list of state sponsors of terrorism, going as far as describing Iran as "the most active" state sponsor of terrorism.

(73)    At relevant times, Iran provided material support to bin Laden and al Qaeda, often through Hezbollah. That support included advice and assistance in planning operations against American targets, as well as financial and logistical support for particular operations, including the September 11th Attacks.

(74)    Imad Mughniyah was an agent of the Iranian regime and the terrorist operations chief of Hezbollah. Since the early 1980s, Mughniyah was affiliated with the Islamic regime in Iran and lived in Iran for many years. Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities.

(75)    While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s, noted Islamist leader of the National Islamist Front, Hassan al Turabi, fostered the creation of a foundation and alliance for combined Sunni and Shi'a Muslim opposition to the United States

17

and the West, an effort that was agreed to and joined by bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran.

(76)     The well-known historical religious division between Sunni and Shi'a Muslims did not pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and Hezbollah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001.

(77)     In 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an agreement to cooperate in providing support for actions carried out primarily against Israel and the United States. Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hezbollah.

(78)     On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by radical Palestinian groups, both Islamic and secular. The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities. In doing so, Iran tightened its ties to the radical groups Palestinian Hamas and Islamic Jihad.

(79)     At various times in or about 1992 and 1996, bin Laden and other ranking members of al Qaeda made it known that they favored a policy under which al Qaeda would put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran and Hezbollah, to coordinate attacks against their perceived common enemy, the United States.

(80)     On or before 1994, al Qaeda forged an alliance with the National Islamist Front of Sudan

and with representatives of the government of Iran and Hezbollah, for the purpose of working

together against the United States and other perceived common targets.

(81)     Hezbollah is funded, directed, and controlled by the Iranian government. The amounts of

Iranian government contributions to Hezbollah have varied over the years, ranging from an

estimated $15-20 million dollars annually, to as much as $150-300 million dollars annually.

Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be
> like denying that the sun provides light to the earth. Who can deny
> such a thing?

(82)     Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheik Ibrahim al-Amin,

states:

> We, the sons of Hezbollah's Nation in Lebanon, whose vanguard
> God has given glory in Iran and which has established the nucleus
> of the world's central Islamic state, abide by the orders of a single
> wise and just command currently embodied in the supreme
> examples of Ayatollah Khomeini.
>
> From this basis, we in Lebanon are not a closed organizational
> structural party, nor are we a narrow political framework, but we
> are a nation interconnecting with all Muslims of the World. We are
> linked by a strong ideological and political connection – Islam.
>
> From here what befalls the Muslims in Afghanistan, Iraq, the
> Philippines or anywhere else verily afflicts the body of our own
> Islamic nation of which we are an inseparable part, and moved to
> confront it on the basis of our main legal obligation in light of the
> political view decided by our leader Wilayat al-Faqih [Ayatollah
> Khomeini].

(83)     In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al

Qaeda terrorist and trainer who is now in U.S. prison, Osama bin Laden and Zawahiri met

directly with Iran's master terrorist, Mughniyah, and Iranian officials, including IRGC Brigadier

General Mohammad Baqr Zolqadr, a highly placed member of the Iranian terrorism apparatus.

At the 1993 Khartoum conference, representatives of Iran, Hezbollah, and al Qaeda worked out

an alliance of joint cooperation and support on terrorism. Ali Mohamed, who was charged with

the 1998 bombing of the U.S. Embassies in Kenya and Tanzania, testified as following during

his guilty plea hearing on October 20, 2000:

> I was aware of certain contacts between al Qaeda and al Jihad
> organization, on one side, and Iran and Hezbollah on the other
> side. I arranged security for a meeting in the Sudan between
> Mughniyah, Hezbollah's chief, and bin Laden. Hezbollah provided
> explosives training for al Qaeda and al Jihad. Iran supplied
> Egyptian Jihad with weapons. Iran also used Hezbollah to supply
> explosives that were disguised to look like rocks.

(84)     The 1993 meeting in Khartoum led to an ongoing series of communications, training

arrangements, and operations among Iran, Hezbollah, and al Qaeda. Bin Laden sent more

terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC in

Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how

to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence

and security.

(85)     Throughout the 1990s, the al Qaeda/Iran/Hezbollah terrorist training arrangement

continued. Mughniyah himself coordinated these training activities, including training of al

Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working

undercover at the Iranian embassy in Beirut, Lebanon.

(86)     As a result of the creation of this terrorist alliance, al Qaeda's Zawahiri repeatedly visited

Tehran during the 1990s and met with MOIS officers, including chief Ali Fallahian, and *Qods*

Force chief Ahmad Vahidi.

(87)    At all times, Iran's Supreme Leader, Ayatollah Khamenei, was fully aware that Iran and Hezbollah were training foreign terrorists.

(88)    On June 7, 1996, Ayatollah Khamenei declared that Hezbollah must "reach all continents and all countries."

(89)    In early June 1996, Iran organized a pan-Islamic summit which had a primary objective of establishing an international coordination committee to oversee anticipated escalation in hostilities. Ayatollah Ahmad Jannati, a close associate of Ayatollah Khamenei, emerged as the official spokesperson for the working group. The meeting was organized jointly by the Supreme Council for Intelligence Affairs and IRCG high command. Attending the working group were the following: Ramadan Shallah (head of Palestinian Islamic Jihad); Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah (Hezbollah); Muhammad Ali Ahmad (a representative of al Qaeda and Osama bin Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS); and Abdullah Ocalan (Kurdish People Party). The summit participants agreed on the unification of their financial system and training.

(90)    In or about July of 1996, Osama bin Laden met with an Iranian intelligence official in Afghanistan.

(91)    In early October 1996, Osama bin Laden visited Tehran for consultations. One of the issues addressed was the unification of various Egyptian terrorist organizations. Ali Fallahian, Minister of MOIS, chaired the meeting with representatives from the Iranian Ministry of Interior, Islamic Guidance Ministry, and the Iranian Foreign Ministry. Among the Egyptians attending were the Tehran-based aide of Zawahiri, Kamal Ujayzah, and Mustafa Hamzah. The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the

21

degree of Iran's support depended on the extent of their unity. The Egyptian attendees agreed to form a unified command with Osama bin Laden for operational purposes.

(92)    In or about mid-September 1997, Iranian leadership met to discuss the new course of the anti-American struggle. The participants included Iran's Supreme Leader Ayatollah Khameini. Also present were newly-elected president Mohammad Khatami, former president Ali Akhbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi. Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Moshen Rezai (former Commander in Chief of IRGC, now responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister); Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hoseein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director of the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

(93)    In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world. Among the participants were: Imad Mughniyah and Abdul-Hadi Hammadi (Hezbollah); Ayman al Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan Shallah (chief of Palestine Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

(94)    Participants at the summit examined the Islamists ability to escalate terrorism against the United States and the West. Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

22

(95)    In or about late September 1997, the Iranian leadership met again to discuss the course of
the forthcoming terrorism offensive in light of the resolutions and findings of the recent
international terrorist summit.

(96)    In the second half of November 1997, Ayatollah Khamenei convened a meeting with
General Rahim Safavi and Ahmad Vahidi to discuss the establishment of a new elite terrorist
force to carry out spectacular but deniable terrorist attacks against the United States and the
West.

(97)    Al Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by
United States investigators, showing that nearly 10 percent of the outgoing calls from
Afghanistan were made to Iran.

(98)    The creation of the Iran/Hezbollah/al Qaeda terrorist alliance, which began in the early
1990s, and during which Hezbollah terror chief Imad Mughniyah oversaw the training activities
of members of various terrorist groups until his death in 2008, resulted in a string of deadly
terrorist strikes aimed directly at the U.S. and its allies. Among these terrorist attacks were the
following: in March 1992, a Hezbollah terrorist team operating under Mughniyah's command
bombed the Israeli embassy in Buenos Aires, Argentina; on February 26, 1993, al Qaeda
operatives bombed the World Trade Center; a few months later, an al Qaeda conspiracy to bomb
several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was
disrupted; in July 1994, Mughniyah and a Hezbollah team, under the direction of Iran, MOIS,
and the IRGC, truck bombed the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish
cultural center in Buenos Aires; in December 1994, Algerian terrorists associated with al Qaeda
hijacked a French airliner, intending to crash it into the Eiffel Tower in Paris, a precursor to 9/11;
on July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded by Iran,

23

attempted to assassinate Egyptian President Hosni Mubarak in Ethiopia; on June 25, 1996, Saudi

Hezbollah terrorists, acting on directions from Iran and under planning by the IRGC *Qods* Force

commander, and with assistance from al Qaeda, truck bombed the Khobar Towers housing

complex in Dhahran, Saudi Arabia, where U.S. military servicemen were quartered; on August 7,

1998, two simultaneous attacks, carried out by al Qaeda under the direction of Iran, MOIS, and

the IRGC, and with training by Hezbollah, destroyed the U.S. Embassies in Nairobi, Kenya, and

Dar es Salaam, Tanzania; on October 12, 2000, al Qaeda suicide bombers attacked the U.S.S.

Cole in the harbor of Aden, Yemen.

(99)    Iran was directly linked to the 1996 Khobar Towers bombing. The indictment against

Ahmed Al-Mughassil and others states:

> From some time in the 1980s until the date of filing of this
> Indictment, [Hizballah], or "Party of God" was the name used by a
> number of related terrorist organizations operating in Saudi Arabia,
> Lebanon, Kuwait, and Bahrain, among other places. These
> [Hizbollah] organizations were inspired, supported, and directed
> by elements of the Iranian government. Saudi Hizballah Al-Hijaz,
> was a terrorist organization that operated primarily in the Kingdom
> of Saudi Arabia and that promoted, among other things, the use of
> violence against nationals and property of the United States located
> in Saudi Arabia. Because Saudi Hizballah was an outlaw
> organization in the Kingdom of Saudi Arabia, its members
> frequently met and trained in Lebanon, Syria, or Iran.

(100)   According to the DOJ, information was provided to Iranian officials about the planned

Khobar operation by Saudi Hezbollah. Additionally, an Iranian military officer directed the

plotters to surveil sites for attacks against Americans, and the Saudi Hezbollah leader asserted

that he enjoyed close ties to Iranian officials who were providing his group with financial

support.

(101)   According to the U.S. State Department's *Patterns of Global Terrorism 2000*, Iran

remained the most active state sponsor of terrorism in 2000. It provided increasing support to

numerous terrorist groups, including Lebanese Hezbollah, Hamas, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism.

(102)   The U.S. State Department's *Patterns of Global Terrorism 2000* also stated that Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

(103)   In January 2001, Ayman al Zawahiri and other al Qaeda leaders met with Iranian intelligence officials at a mountain guesthouse near the town of Varamin, just south of Tehran.

(104)   The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and included Imad Mugniyeh. The purpose of the meeting was to plan and coordinate Iranian support for an upcoming al Qaeda operation against the United States.

(105)   On May 4, 2001, a second planning meeting between al Qaeda and Iranian intelligence officials was held in Iran. Attendees at this planning meeting included Ayatollah Khamenei, Ali Akhbar Hashemi-Rafsanjani, and Osama bin Laden's son, Saad bin Laden. Iranian intelligence memos written in the weeks following the meeting advise Iranian operatives to be prepared for U.S. retaliation for an attack planned for September 2001.

## Iran Had Knowledge of the September 11th Attacks

(106)   During the mid-to-late 1980s, Iran began formulating contingency plans for asymmetrical or unconventional warfare against the United States, including terrorist operations. These contingency plans were code-named "*Shaitan dar Atash*."

25

(107)   One of the "Shaitan dar Atash" contingency plans was for the hijacking of the U.S. commercial airliners and crashing them into buildings, particularly in New York City and Washington, D.C.  This contingency plan became the blueprint for the September 11th Attacks.

(108)   Defendants Iran and MOIS has actual foreknowledge of, and were complicit in the planning and coordination of the 9/11 attacks upon the United States which were carried out by members of al Qaeda under the direction of Osama bin Laden.

(109)   In the mid-1990s, when the Iran/Hezbollah/al Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan." This safe Iran-Afghanistan passageway was managed by Defendant MOIS.

(110)   In 2000, Iran facilitated the international travel of al Qaeda's operatives between October 2000 and February 2001, including travel of at least eight of the 9/11 hijackers from Iran into Afghanistan, where bin Laden's training camps were located, and where the 9/11 hijackers trained for the 9/11 operation. Iran thus provided essential material and direct support of the 9/11 attacks.

(111)   The Iranian government materially and directly supported the 9/11 terrorist travel operation by ordering its border inspector not to place telltale Iranian stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Eight to fourteen of the 9/11 hijackers transited Iran on their way to or from Afghanistan, and Iranian border inspectors did not stamp their Saudi passports. The Iranians were aware they were helping operatives who were part of an organization preparing attacks against the United States. The action of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers vastly increased the likelihood of the operation success of the 9/11 plot.

26

(112)   Mughniyah also helped to coordinate other travel by the 9/11 hijackers. In October 2000, Mughniyah visited Saudi Arabia to coordinate future 9/11 hijacker activities there and assisted them in traveling on to Iran during November 2000. During this time period, on their travels in and out of Iran, and through Lebanon, some of the 9/11 hijackers were accompanied by Mughniyah or his Hezbollah associate.

(113)   The actions of Mughniyah, and his Hezbollah associates, in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia, constituted direct and material support for the 9/11 conspiracy.


## THE KINGDOM OF SAUDI ARABIA'S LIABILITY FOR THE SEPTEMBER 11TH ATTACKS

### Material Support for Al Qaeda and the 9/11 Attacks from Saudi Arabia's Proselytizing Agents and Alter Egos

(114)   The emergence of al Qaeda under the patronage of the Saudi government's proselytizing apparatus is rooted in the unique relationship between the House of Saud and Wahhabi Islam.

(115)   The modern Saudi state is a product of a pact forged in the 18th century between Muhammed Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

(116)   Ibd Abd al Wahhab's ideas and teachings form the basis of the Islamic school of thought commonly known as Wahhabism, which forms the ideological foundation for the al Qaeda movement. According to the 9/11 Commission Report, al Qaeda finds inspiration and religious justification for its actions in a "long tradition of extreme intolerance" that flows "through the founders of Wahhabism." *See* 9/11 Commission Report at 362.

27

(117) Pursuant to the compact between the House of Saud and the Saudi Ulema (Wahhabi scholars and clerics), the Ulema provides religious legitimacy for the House of Saud's political rule. In exchange, the House of Saud provides the Ulema with government platforms and resources to promote their Wahhabi religious agenda.

(118) One of the most absolute conditions of this arrangement is the requirement that the Saudi state propagate Wahhabi Islam globally. *See* 9/11 Commission Report at 372.

(119) To comply with this obligation, the Kingdom established several state da'awa organizations to serve as instruments for conducting proselytizing activities and otherwise advancing the Wahhabi agenda of the Saudi Ulema globally, including the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, World Assembly of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF"), al Haramain Islamic Foundation ("AHIF"), Saudi High Commission for Relief of Bosnia and Herzegovina ("SHC"), Saudi Joint Relief Committee for Kosovo and Albania ("SJRC"), and Saudi Red Cross ("SRC"), and Al Haramain al Masjed al Aqsa.

(120) From the formation of al Qaeda in 1988 through September 11, 2001, those Wahhabi proselytizing organizations established, funded, directed, and controlled by the Saudi government, and supervised by the Kingdom's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia, were responsible for providing the massive funding and other forms of support that allowed Osama bin Laden and al Qaeda to acquire the global strike capabilities employed by al Qaeda on September 11, 2001, and were at all times components of the Saudi government itself.

(121) Osama bin Laden's collaboration with the Saudi state da'awa organizations began during the jihad against the Soviet Union in Afghanistan, when several of those organizations formed

the nucleus of a support network to provide funds, arms, and other assistance to the mujahideen, at the direction of the Saudi government and working in close coordination with bin Laden.

(122)   When Osama bin Laden formed al Qaeda to conduct jihad against the United States, the support network established by the da'awa organizations during the Afghan campaign was adapted to support bin Laden's targeting of the United States.

(123)   Indeed, internal al Qaeda documents detailing the formation of bin Laden's terror organization, seized by the U.S. during a 2002 raid of an al Qaeda front charity, indicated that Dr. Abdullah Omar Naseef, the then-head of MWL and a member of the Kingdom's Majlis al Shura (government consultative council), personally met with bin Laden and other founding members of al Qaeda at the time of al Qaeda's formation, and agreed that MWL offices would be used as a platform for the new jihad organization, and that attacks would be launched from MWL's offices.

(124)   Contemporaneous with this agreement, Saudi officials installed founding al Qaeda members in leadership posts of the Saudi da'awa organizations, in locations of strategic importance to al Qaeda.

(125)   For example, Naseef appointed Wael Jelaidan, a founding member of al Qaeda whom the United States designated as a terrorist after 9/11 for "directing organizations that have provided financial and logistical support to al Qaeda" to serve as the head of the Peshawar, Pakistan office of MWL in 1989.

(126)   Naseef also appointed Mohammed Khalifa, another founding al Qaeda member and Osama bin Laden's brother in law, to serve as the director of a new IIRO office the Far East in this time period, another location of strategic importance to the new al Qaeda organization for recruitment and other reasons.

(127)   Shortly after assuming this post, Khalifa used IIRO funds and resources to support a terrorist cell in the Philippines, which included 9/11 masterminds Khalid Sheikh Mohammed and Ramzi Yousef, in relation to the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations or twelve U.S. flag commercial airplanes. That very plot, often referred to as "Operation Bojinka", was adapted by Khalid Sheikh Mohammed, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system, into the September 11th plot.

(128)   The internal documents relating to al Qaeda's establishment and other evidence indicate that founding al Qaeda members held senior posts in WAMY/BIF (Adel Batterjee), SRC (Wael Jelaidan), and AHIF (Aqeel al Aqeel) during the period surrounding al Qaeda's formation.

(129)   In the years surrounding al Qaeda's formation with the direct assistance of the Saudi officials who directed the Kingdom's da'awa organizations, support flowed continuously from the Kingdom's da'awa organizations to al Qaeda, providing the massive funding and other essential resources that enabled bin Laden to build and maintain al Qaeda.

(130)   As the 9/11 Commission's Staff Monograph on terrorist financing explained, "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities."

(131)   State Department cables, U.S. intelligence and counter-terrorism reports, declarations of U.S. officials, foreign intelligence reports, and other evidence confirm that the "Islamic charities" most responsible for channeling this essential support to al Qaeda were MWL, IIRO, WAMY, AHIF, Rabita Trust, SHC, SJRC, SRC, BIF, and Al Haramain al Masjed al Aqsa.

(132)   The tortious acts of those da'awa organizations in support of al Qaeda included:

   a)      Raising and laundering funds on behalf of al Qaeda and its affiliates;

b)     Channeling funds to al Qaeda;

c)     Providing financial and logistical support and physical assets to al Qaeda members;

d)     Directly participating in al Qaeda's terrorist activities, including the planning, coordination, funding, and execution of terrorist attacks;

e)     Permitting al Qaeda members to use ostensible employment with their organizations as a cover for their travels and terrorist activities;

f)     Serving as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence;

g)     Funding and facilitating shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda;

h)     Funding camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers;

i)     Actively recruiting new members for al Qaeda;

j)     Working throughout the world to spread al Qaeda's jihadist ideology and draw new adherents to its cause;

k)     Serving as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media;

l)     Disseminating publications designed to advance al Qaeda's Wahhabi Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds they are "infidels" who do not deserve to live"; and

m)     Openly advocating for young Muslims to take up arms against Western and democratic societies, including the United States.

(133)   The intimate collaborations between the Saudi government da'awa organizations and al Qaeda are further reflected by actions, statements, and reports by the U.S. government pertaining to each in the years immediately before and after the September 11th Attacks.

(134)   For instance, following the September 11th Attacks, the United States designated the entire AHIF organization and its senior leadership pursuant to Executive Order 13224 Specially Designated Global Terrorist program, explaining that AHIF was one of the principal organizations "providing support for the al Qaeda network and promoting militant Islamic doctrine worldwide."

(135)   The United States also designated Rabita Trust on October 12, 2001, "for its close ties to senior al Qaeda leadership and for providing logistical and financial support to al Qaeda." As reflected in this designation, Rabita Trust's director during the period immediately before and through the September 11th Attacks was al Qaeda founding member Wael Jelaidan who was again serving in a position of authority in a Saudi government da'awa organization by appointment of the Saudi government.

(136)   The U.S. designated several offices of the IIRO as well, along with a senior IIRO official in Saudi Arabia (who in that capacity was an employee of the Saudi government), describing him as the "'million dollar man' for supporting Islamic extremists".

(137)   State Department cables further identify IIRO as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime and indicate that Osama bin Laden used the entire IIRO network for his terrorist activities.

(138)   State Department cables similarly reveal that the U.S. Embassy in Sarajevo recommended that the SHC be designated pursuant to Executive Order 13224 based on its activities in support of al Qaeda, and that U.S. counter-terrorism officials included the SHC in a group of terrorist fronts they referred to as "the dirty dozen".

(139)   U.S. Defense Department records likewise confirm the United States' determination that "WAMY is a Tier One Counterterrorism NGO target, defined as those that have demonstrated

sustained and active support for terrorist organizations willing to attack U.S. persons or interests."

(140)  In a confidential communication to UN peacekeeping forces, the United States identified SJRC as an organization that "move[s] money and men" for Osama bin Laden, and noted that SJRC's director, Wael Jelaidan, (once again, by appointment of the Saudi government) was an associate of Osama bin Laden.

(141)  The material support provided by the Saudi da'awa organizations included aid and operational assistance closely related to al Qaeda's efforts to target the United States through large-scale terrorist attacks, including the September 11th Attacks.

(142)  For example, U.S. government reports indicate that IIRO and AHIF funded the terrorist camps where the 9/11 hijackers received their training.

(143)  Sayed Abu Naser, an IIRO official interrogated by Indian officials in relation to a 1999 al Qaeda plot to attack the U.S. diplomatic missions in Calcutta and Madras, confirmed this funding program, telling his interrogators that he personally visited al Qaeda camps in Afghanistan on behalf of IIRO, to assess their funding needs. Naser estimated that as much as 50-60% of IIRO funds were channeled to terrorist training camps in Afghanistan and Kashmir.

(144)  The findings of a partial audit conducted by a Pakistani affiliate of Ernst & Young of funds distributed by IIRO's Saudi headquarters through its office in Pakistan align with this estimate.

(145)  Completed just months before the September 11th Attacks, and covering the period between January 1996 and February 2001, the partial audit found that over half of the funds distributed through the office – totaling millions of dollars – could not be accounted for, and that

33

senior officials of IIRO had engaged in the wholesale fabrication of invoices, receipts, and entire construction projects to conceal the illicit use of funds.

(146)   According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States and testified at length in the African embassy bombing trials, IIRO officials had been using fraudulent orphan distribution lists to conceal the funding of al Qaeda since at least the early 1990s.

(147)   U.S. and foreign investigations also document the direct involvement of both IIRO and AHIF in the planning, coordination, and execution of the 1998 U.S. Embassy bombings in Kenya and Tanzania, as well as IIRO's role in the aviation-related terrorist plot that was adapted and became the September 11th plot.

(148)   In addition, the director of AHIF's office in Belgium, Tarek Maaroufi, was arrested in late 2001 by Belgian authorities and thereafter convicted for involvement in the assassination of anti-Taliban Northern Alliance commander Ahmed Shah Massoud.

(149)   The assassination was a component of the 9/11 plot itself: Massoud was killed in Afghanistan just two days before the September 11th Attacks, as part of al Qaeda's efforts to limit the operational capabilities of the Northern Alliance to mount an offensive against al Qaeda in response to the attacks. Maaroufi, who was hired by AHIF following his release from prison for involvement in the terrorist attack in Belgium, recruited the assassins and provided them with fake passports for the operation.

(150)   A post-9/11 counter-terrorism raid of the Sarajevo office of the SHC uncovered a range of materials confirming the SHC's direct involvement in the portfolio of plots al Qaeda was developing during that time period to attack the American homeland (of which the September 11th Attacks were a component), including photographs of the World Trade Center before and

after its collapse; photographs of the U.S. Embassies in Kenya and Tanzania, and the U.S.S. Cole; files on deploying chemical agents with crop dusters; information about how to make fake State Department badges, and photographs and maps of Washington marking prominent government buildings.

(151)   The subject matter of those materials recovered in the raid of SHC's offices shortly after the September 11th Attacks mirrors several of the plots Zacarias Moussaoui, an al Qaeda associate who was meant to be the "20[th] hijacker" but was detained by immigration officials beforehand, testified that he was sent to the United States by al Qaeda to explore.

(152)   Separately, convicted al Qaeda member and SHC employee Ali Ahmed al Hamad affirmed in his testimony that al Qaeda members were broadly embedded in SHC offices, and were using SHC facilities to plot attacks against the West.

(153)   The SHC's material sponsorship of al Qaeda also encompassed arms trafficking on behalf of Osama bin Laden's organization, and the laundering of millions of dollars for al Qaeda's benefit, as reflected by United Nations and Bosnian investigations. SHC's fundraising activities in support of al Qaeda included money laundering operations carried out in collaboration with Wael Jelaidan, Yassin Kadi and Chafiq Ayadi, all of whom were designated by the United States after the September 11th Attacks pursuant to Executive Order 13224.

(154)   More broadly, statements of U.S. officials and government reports demonstrate how the expansive support provided by the Saudi government da'awa organizations enabled bin Laden to build and sustain the al Qaeda organization and acquire the resources and assets necessary to carry out the September 11th Attacks.

(155)   In this regard, the 9/11 Commission Report expressly found that the "9/11 attack was a complex international operation, the product of years of planning."

(156)   The 9/11 Commission Report further confirms that plans for the attacks were carefully

vetted through al Qaeda's most senior leadership over a period of nearly six years, while those

leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial

supporters; that the individuals selected to participate in the attacks were chosen from an

enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated

with funds provided by the organization's supporters; and that details of the plans were revised

up until the very last minute, through a sophisticated global communication network capable of

evading the surveillance and intelligence operations of the United States and its allies, the

development and existence of which was also dependent on the financial sponsorship of al

Qaeda's supporters.

(157)   The cost of maintaining this essential infrastructure in the years immediately leading up

to the September 11th Attacks was massive: al Qaeda's budget included $20 million in payments

to the Taliban alone, in exchange for the safe haven the Taliban provided to al Qaeda, from

which al Qaeda planned, coordinated, and directed the September 11th Attacks.

(158)   Based on these and other findings of its investigation concerning the relationship between

al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate,

and mount the September 11th Attacks, the 9/11 Commission Report reached the following

conclusions regarding the basic organizational requirements for staging a sophisticated terrorist

attack:

> A complex international terrorist operation aimed at launching a catastrophic attack
> cannot be mounted by just anyone in any place. Such operations appear to require
>
> - Time, space, and ability to perform competent planning and staff work;
>
> - A command structure able to make necessary decisions and possessing the
>   authority and contacts to assemble needed people, money, and materials;

- Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;

- A logistics network able to securely manage the travel of operatives, move money, and transport resources where they need to go;

- Access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological or biological attack;

- Reliable communications between coordinators and operatives; and

- Opportunity to test the workability of the plan.

*See* 9/11 Commission Report at 365-66.

(159)   U.S. counter-terrorism officials have expressed complete agreement with these empirical conclusions, affirming consistently and repeatedly the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th Attacks themselves.

(160)   Plaintiffs' facts and evidence establish that the Saudi government da'awa organizations were principal providers of the funds and other resources used to build and sustain that infrastructure and acquire the organizational assets al Qaeda required to plan and carry out the attacks, thus drawing a direct and clear causal nexus between their contributions of support and the attacks.

### The Tortious Acts of the Kingdom's Da'awa Organizations in Support of al Qaeda are Attributable to Saudi Arabia

(161)   The tortious acts of the Saudi da'awa organizations in support of al Qaeda are attributable to the Kingdom on three separate grounds: (1) the da'awa organizations perform core functions of the Saudi state; (2) the da'awa organizations are agents of the Kingdom; and (3) the Saudi government dominates and controls the da'awa organizations, make them alter-egos of the Saudi government as well.

37

(162)  Saudi Arabia's Basic Law of Governance expressly provides that "[t]he State shall…undertake its duty regarding the propagation of Islam," thus confirming that the propagation of Wahhabi Islam globally is both a core function and duty of the Saudi government.

(163)  Indeed, in a speech on the issuance of the Basic Law of Governance in 1992, then-King Fahd bin Abdulaziz identified the nine bases for the foundation of the modern Saudi state, including "the undertaking of the Propagation of Islam and its dissemination, since the Propagation of Islam is one of the most important functions of an Islamic State."

(164)  During the period from al Qaeda's formation through the September 11th Attacks, MWL, IIRO, WAMY, BIF, AHIF, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust served as the primary agents through which the Saudi government fulfilled this core function and duty to proselytize Wahhabi Islam globally.

(165)  The da'awa organizations are agents of the Saudi government, engaged in the performance of core functions and duties of the Kingdom.

(166)  The Kingdom's proselytizing apparatus is comprised of three principal components: the Supreme Council for Islamic Affairs; the Ministry of Islamic Affairs,; and the individual da'awa organizations themselves (MWL, IIRO, WAMY, AHIF, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust).

(167)  The Supreme Council for Islamic Affairs is the planning body, responsible for the Kingdom's Islamic work abroad, a function that includes coordinating "Saudi activities undertaken by the Islamic da'awa organizations."

(168)  The Ministry of Islamic Affairs is, in turn, an operational body that implements the Supreme Council's decisions, including through its funding, supervision, and direction of the individual da'awa organizations.

38

(169)   The da'awa organizations undertake their proselytizing work pursuant to the policies established by the Saudi government, with funding provided by the government, under the supervision of the Ministry of Islamic Affairs and local embassies and consulates, subject to the approvals of the Saudi government.

(170)   The Kingdom regularly cites the activities of the da'awa organizations as achievements of the state itself, and employees of those organizations have in various settings confirmed that their activities are supervised by the Saudi government, undertaken pursuant to policies set by the Kingdom, and overwhelmingly funded by the Saudi government.

(171)   For example, one senior AHIF official has stated that AHIF works under the supervision of the Saudi government and that 95% of AHIF's funding comes from Saudi Arabia.

(172)   Arafat el Asahi, the director of IIRO in Canada and a full-time employee of the MWL, testified as follows during a Canadian court proceeding:

> Let me tell you one thing, the Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all of our activities and plans by the government of Saudi Arabia. Keep that in mind, please…I am paid by my organization which is funded by the [Saudi] government…the [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.

(173)   Consistent with Asahi's testimony, MWL Secretary General Abdullah Mohsen al Turki confirmed in November of 2000 that the Saudi government provides "over 90%" of MWL's budget.

(174)   Dr. Mutlib bin Abdullah Al Nafissa, Minister of State of the Council of Ministers of Saudi Arabia, has testified that the SHC "is an arm of the Saudi Arabian government. Actions taken by the SHC properly are viewed as actions of the Government of Saudi Arabia." SHC

official Saud bin Mohammed Al Roshood has separately attested that "[t]he largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia."

(175)  Mutaz Saleh Abu Unuq, Financial Director of WAMY, has similarly confirmed that "WAMY is governed principally by its General Assembly and President who was appointed by the Saudi government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia." Officials of WAMY have also confirmed that WAMY is subordinate to the Ministry of Islamic Affairs and supervised by the Ministry of Islamic Affairs. Senior WAMY officials have also confirmed that WAMY's primary source of funding comes from the Saudi government's annual budget.

(176)  Abdulrahman al Swailem, President of SRC, testified that the Government of the Kingdom "sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi government appoints all of its directors."

(177)  He also provided affidavit testimony that the SJRC was created in 1999 pursuant to a High Order issued by the King of Saudi Arabia upon the recommendation of the Council of Ministers of Saudi Arabia and has "always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia."

(178)  These and other facts demonstrating that the da'awa organizations are the principal instruments through which the Saudi government fulfills its state duty to propagate Wahhabi Islam, are funded by the government and headed by government officials, and act in accordance with policies set by the government and under the supervision of the government, readily establish that they are agents of the Saudi government engaged in the performance of core functions and duties of the Kingdom.

(179)   The facts and evidence also demonstrate that the Saudi government rigidly controlled the operations of the da'awa organizations, a showing that both further conforms that they are agents of the Kingdom, and establishes that their conduct is attributable to the Kingdom on the separate legal basis that they also are controlled alter-egos of the Saudi government.

(180)   The Kingdom's complete domination of the da'awa organizations is manifested through a broad range of legal, financial, policy, supervisory, administrative, and operational controls, applied in substantially the same manner as to each of the entities, as evidenced by the following:

a)   The da'awa organizations are established by royal decree, issued by the King of Saudi Arabia and with the formal approval of high-ranking officials of the Saudi government.

b)   The da'awa organizations are funded almost entirely by the government of Saudi Arabia.

c)   Funds are allocated to the da'awa organizations via government grants authorized by the Special Committee of the Council of Ministers, which are paid from Saudi government bank accounts with government funds.

d)   The government of Saudi Arabia appoints the senior officials of the da'awa organizations.

e)   Leadership positions of the da'awa organizations are dominated by high-ranking officials of the Saudi government, who typically hold other senior posts in the Saudi government. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. Additionally, Saleh bin Abdul Aziz al Sheikh, while serving as the Minister of Islamic Affairs, also served as a chairman of WAMY and AHIF. The Secretary General of MWL holds a position equivalent to that of a "Minister" in the Saudi government. As the director of the SRC, Abdulrahman al Swailem held a position at an "Excellency level" per appointment by the Saudi King.

f)   The da'awa organizations report to senior Saudi officials, including in certain cases the King, concerning their operations and activities outside of Saudi Arabia.

g)   The da'awa organizations submit resolutions prepared by their governing bodies to the Saudi government's Council of Ministers for approval.

h)   The da'awa organizations operate under significant administrative guidance and regulation from senior members of the Saudi government. Indeed, the activities

41

and projects undertaken by the da'awa organizations, including the collection and transferring of funds, are approved at the highest levels of the Saudi government.

i)      The da'awa organizations seek approval from the Ministry of Islamic Affairs for the annual operating budgets of projects managed by the da'awa organizations.

j)      Policy making bodies of the Saudi government commonly direct the da'awa organizations concerning the projects and activities they are to conduct abroad, and determines which of the da'awa organizations will conduct those activities.

k)      The provision of aid by the da'awa organizations is subject to the approval of senior Saudi officials, including in certain instances the Saudi Foreign Minister and Ministry of Foreign Affairs.

l)      Senior officials of the Saudi government, including from within the Special Ministers Council, are embedded in the governing bodies of the da'awa organizations.

m)      The Supreme Council for Islamic Affairs issues guidelines concerning relief activities to be undertaken by the da'awa organizations outside of Saudi Arabia.

n)      The Ministry of Islamic Affairs has primary responsibility for supervising and directing the operations and activities of the da'awa organizations in the Kingdom and abroad. The Minister of Islamic Affairs appoints individuals to the organization's board of directors, committees, and senior management.

o)      The Minister of Islamic Affairs has confirmed that the da'awa organizations' activities are based on the institutional principles of the Kingdom, and that the Kingdom provides clear work plans which the da'awa organizations must follow.

p)      Meetings of senior leaders of the da'awa organizations are in certain cases conducted at the government offices of the Ministry of Islamic Affairs.

q)      The operations of the da'awa organizations' overseas branch officers are directed and closely supervised by the local Saudi embassies in the region, under the supervision of the embassy's Islamic Affairs Division.

r)      Operations of the da'awa organizations outside of Saudi Arabia are commonly carried out under the direction of a joint committee consisting of representatives of the da'awa organizations and Saudi embassy personnel.

s)      Saudi officials serving within the Islamic Affairs Departments of the Saudi embassies and consulates abroad simultaneously hold positions in the committees of the local branch offices of the da'awa organizations.

t)      Employees of the Ministry of Islamic Affairs have worked for the da'awa organizations, while being paid by the Ministry of Islamic Affairs.

u)      Internal correspondence of the da'awa organizations confirms that aid distributed by the da'awa organizations abroad is monitored by the Saudi embassies and the committees of the overseas offices, which include representatives of the embassies.

v)      The da'awa organizations have indicated that the operations abroad are undertaken on behalf of the Saudi government and local Saudi embassy in those countries.

w)      The Kingdom commonly requests that host countries grant the da'awa organizations diplomatic status, and issues diplomatic passports to employees of those offices.

x)      Employees of the da'awa organizations have confirmed that the organizations operate as government arms, and that they themselves are Saudi government employees in their roles working for the da'awa organizations.

y)      The branch offices of the da'awa organizations are subject to the direction of the local Saudi embassies on projects undertaken by those offices, as reflected by a 1996 directive from the IIRO's Director of the Overseas Offices Administration reminding "all managers of the IIRO overseas offices, its representatives and delegates" of "the duty to cooperate and coordinate with the brothers in charge in the host country," including the representative of the Ministry of Islamic Affairs office within the Saudi embassy and other government officials.

z)      Branch offices of the da'awa organizations have been opened under the auspices of the local representatives of the Ministry of Islamic Affairs, pending establishment of a local office.

aa)     Internal correspondence of the IIRO indicated that the opening of offices of the da'awa organizations is subject to the approval of the Ministry of Foreign Affairs.

bb)     Officials of the Saudi embassies abroad initiated the opening of offices of the da'awa organizations.

cc)     The da'awa organizations seek approval from the Ministry of Islamic Affairs to establish delegations to visit foreign countries.

dd)     The Saudi government often purchases or leases buildings to house the operations of the da'awa organizations, as for example was the case with MWL's headquarters in the Kingdom, which was donated by the King, and WAMY's office in Washington, D.C., the purchase of which was coordinated by the Under Secretary of the Ministry of Islamic Affairs, and handled by the local embassy.

43

ee)  Representatives of the Ministry of Islamic Affairs directly intervened in personnel decisions of the da'awa organizations at every level, such as the appointment of Abdullah bin Laden to serve as WAMY's representative in the United States.

ff)  Saudi diplomats have held signatory authority over bank accounts of the da'awa organizations.

gg)  The Saudi government has issued diplomatic license plates for vehicles of the da'awa organizations abroad.

hh)  Funds transferred from the organization's headquarters in Saudi Arabia to the overseas branch offices cannot be used for anything other than the objectives for which they are allocated.

ii)  The senior Saudi officials who head the da'awa organizations retain stringent administrative and financial control over the daily operations of the various branch offices and affiliates around the world.

jj)  The senior Saudi officials who head the da'awa organizations have the authority to appoint and terminate employees in the overseas branch offices.

kk)  Per the directives of the senior Saudi officials who head the da'awa organizations, the overseas branch offices are incapable of independent action. All significant administrative or financial decisions or undertakings by the overseas offices, even relatively minor decisions, are reviewed and approved at the highest levels of the organization inside the Kingdom, by the offices of the senior Saudi officials who head those organizations.

ll)  The overseas branch offices are required to submit quarterly and annual operations and financial reports to the senior Saudi officials who head the da'awa organizations.

mm)  The overseas branch offices are required to send copies of their monthly bank statements to the senior Saudi officials who head the da'awa organizations for review.

nn)  The overseas branch offices are required to send monthly expense reports to the senior Saudi officials who head the da'awa organizations.

oo)  Requests for financial aid submitted to the overseas branch offices must be sent to the senior Saudi officials who head the da'awa organizations for review.

pp)  The overseas branch offices are forbidden from opening any bank account, or withdrawing any office funds or capital, without prior written consent of the senior Saudi officials who head the da'awa organizations.

qq)     The overseas branch offices are forbidden from spending their own independently
        raised donations on projects or other activities without authorization from the
        senior Saudi officials who head the da'awa organizations.

(181)   As reflected by the foregoing facts, the Saudi government thoroughly dominates the

da'awa organizations and controls their day-to-day operations.

(182)   The tortious acts of the da'awa organizations in support of al Qaeda were, in turn,

undertaken in furtherance of their core mission to spread Wahhabi doctrine and practice, and

therefore within the scope of their agency as the Saudi government's principal instruments for

spreading Wahhabism globally.

**Tortious Acts of Saudi Government Officials and Employees Who Directed and Controlled
the Kingdom's Da'awa Organizations**

(183)   The Saudi government's proselytizing organizations extensively aided and abetted al

Qaeda's targeting of the United States, and provided funding and other assistance closely related

and essential to the September 11th Attacks.

(184)   Apart from the fact that the tortious acts of those organizations are attributable to the

Saudi state, the tortious acts of the Saudi officials who directed those organizations' support of al

Qaeda, many of whom held broader roles in the Saudi government beyond their positions with

the da'awa organizations, also are attributable to the Kingdom for purposes of both jurisdiction

and liability.

(185)   The facts and evidence documenting the terrorist activities of these so-called charities

reflect broad institutional partnerships between those organizations and al Qaeda, confirming the

involvement of those government officials in directing and facilitating their support for al Qaeda,

as indicated by:

a)      The direct involvement of government officials who headed the da'awa
        organizations in the formation of al Qaeda;

45

b)  The sheer magnitude of the financial and other forms of material support they provided to bin Laden's organization;

c)  The systemic placement of al Qaeda members and collaborators in positions of authority within the da'awa organizations;

d)  The intimacy of their collaboration in al Qaeda's operations, as documented in government investigations;

e)  The evidence showing that offices of the charities throughout the world were simultaneously all acting in identical ways to advance al Qaeda's terrorist agenda;

f)  The duration of their support for al Qaeda, spanning in most cases more than a decade;

g)  The fact that their support for al Qaeda continued without interruption even after offices and employees of those organizations were repeatedly and publicly implicated in terrorist activities; and

h)  Their ideological alignment with al Qaeda's jihadist agenda, as reflected in their own publications, statements, and speeches.

(186)  As also detailed above, the individuals who headed these proselytizing organizations throughout the duration of their institutional partnerships with al Qaeda were Saudi government officials and employees.

(187)  Individuals who controlled and worked in the branch offices of those organizations that were directly involved in al Qaeda's operations were Saudi government employees as well, as reflected by the issuance of diplomatic passports to employees of those offices, the appointment of embassy personnel from the Ministry of Islamic Affairs to the operating committees and leadership positions of those offices, and the statements of numerous employees of those da'awa organizations describing themselves as employees of the Saudi government.

(188)  The material sponsorship of al Qaeda by these da'awa organizations under the direction of these Saudi government officials and employees was in furtherance of their core mission to spread Wahhabism throughout the world, and the tortious acts of the government officials who

46

directed and participated in those organizations' support for al Qaeda thus fall squarely within the scope of their office and employment.

### Tortious Acts of the Ministry of Islamic Affairs and Employees and Officials of the Ministry of Islamic Affairs

(189)   Saudi Arabia's Ministry of Islamic Affairs was broadly involved in the promotion of al Qaeda's terrorist activities during the period leading up to the September 11th Attacks.

(190)   The Ministry of Islamic Affairs has been described as a "stronghold of zealots" during the period before September 11, 2001, and 9/11 Commissioner John Lehman has testified that it was "well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists."

(191)   The Ministry of Islamic Affairs assumed control over the Kingdom's global da'awa apparatus following the Ministry's formation in 1993.

(192)   In the ensuing years, and under the direction and supervision of the Ministry of Islamic Affairs, the Kingdom's da'awa organizations pervasively channeled resources provided to them by the Ministry to al Qaeda, and collaborated intimately with bin Laden's terrorist organization.

(193)   Employees of the Ministry also used additional resources and institutions under their control to launder funds for al Qaeda, including from within the United States.

(194)   For example, in or around 1998, the FBI become aware of millions of dollars of transfers from the Somali community in San Diego to fronts associated with Osama bin Laden. The FBI's further investigations indicated that "some of the funding originated from Saudi Arabia" and that the funds were laundered through mosques and Islamic centers under the control and influence of the Ministry of Islamic Affairs.

(195)   Representatives of the Islamic Affairs offices of the Kingdom's embassies and consulates also provided large cash transfers to al Qaeda. In this regard, U.S. Defense intelligence investigations determined that Saudi embassies in the Far East were providing large sums of cash, including individual transfers totaling several hundred thousand dollars, to the al Qaeda affiliated Umm al-Qura Islamic Foundation, an organization whose "activities in support of terrorism include suspicious money transfers, document forgery, providing jobs to wanted terrorist suspects, and financing travel for youths to attend jihad training."

(196)   In addition, documents recovered from the personal files of Taliban leaders Mullah Mohammed Omar following the September 11th Attacks indicate that on November 21, 1999, Omar instructed the Afghan Ambassador in Pakistan to distribute "$2 million from Saudi aids" to Jon Juma Namangani, a close associate of Osama bin Laden who was then serving as al Qaeda's commander in Uzbekistan.

(197)   The Ministry of Islamic Affairs' broad collaboration with al Qaeda before 9/11 is further reflected by the evidence implicating at least seven employees and agents of the Ministry of Islamic Affairs in providing support to the 9/11 hijackers and plotters, and the fact that employees of the Ministry had been implicated in separate terrorist activities in the Netherlands, Germany, Paris, Brussels, and elsewhere.

(198)   In addition, Zacarias Moussaoui has testified that bin Laden maintained strong relationships with the clerics who controlled the Ministry of Islamic Affairs and related components of the Kingdom's government proselytizing and Wahhabi religious apparatus. Based on his personal knowledge, Moussaoui stated that bin Laden's attitude toward the Saudi Ulema "was of complete reverence and obedience"; bin Laden's activities were conducted with the "consent and directive of the Ulema"; bin Laden would not undertake any operations without the

48