Ulema's approval; and representatives of the senior Ulema regularly traveled to Afghanistan to visit with bin Laden.

(199)   Saudi government imams were deeply involved in recruitment and fundraising for al Qaeda, as reflected in records from the detainee tribunal proceedings at Guantanamo Bay and prominent academic studies.

(200)   Indeed, Saudi government clerics recruited certain of the 9/11 hijackers, as confirmed by the 9/11 Commission's investigation.

(201)   In the wake of the September 11th Attacks, the United States took action to address the extremist activities of the Ministry of Islamic Affairs through its offices in the United States, removing between 60-70 individuals associated with the Ministry of Islamic Affairs and religious offices of the Kingdom's embassies and consulates in what a State Department official described as part of "an ongoing effort to protect the homeland."

(202)   In addition, following al Qaeda's 2003 attacks in Saudi Arabia, the Kingdom itself removed thousands of clerics from the payroll of the Ministry, and has characterized those removals as part of a counter-terrorism effort, thus drawing a direct connection between the Ministry and terrorism in earlier periods.

(203)   The nature and extent of the Ministry of Islamic Affairs' support for al Qaeda and other terrorists demonstrate that collaborating with jihadists was within the scope of the activities of the Ministry and its employees, in furtherance of the Ministry's efforts to propagate Wahhabism.

**Attributable Tortious Acts of Individual Employees and Agents of the Saudi Government in Support of the 9/11 Hijackers and Plotters**

(204)   On July 15, 2016, the United States released a partially declassified version of Part Four of the 2002 Report of the Congressional Joint Inquiry into the Terrorist Attacks of September 11, 2001, commonly referred to as the so-called "28 pages." Thereafter, in December 2016, the FBI

and DOJ released the Summary Report, originally prepared in 2012, describing the status and principal findings of ongoing investigations into sources of support for the 9/11 hijackers. These documents offer additional facts and evidence in support of Plaintiffs' claims that employees and agents of the Saudi government, while engaged in performing functions on behalf of the Ministry of Islamic Affairs and Saudi proselytizing apparatus, directly aided and assisted the 9/11 hijackers and plotters.

(205)   The Saudi government maintained a network of agents in the United States in the years preceding the September 11th Attacks, whose undisclosed functions involved performing activities on behalf of and at the direction of the Wahhabi clerics who populated the Islamic Affairs Offices of the Kingdom's embassies and consulates in the United States.

(206)   Members of that network maintained extensive contacts and supportive dealings with members of al Qaeda and related terrorist organizations.

(207)   Saudi government employees and agents who were members of that network directly aided the 9/11 hijackers at the direction of more senior Saudi officials.

(208)   The FBI has confirmed that Saudi government employees Omar al Bayoumi and Fahad al Thumairy provided "substantial assistance" to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar when they arrived in the United States in January 2000, up until the September 11th Attacks.

(209)   Thumairy and Bayoumi substantially assisted the 9/11 hijackers by, among other things, providing, or directing others to provide, assistance in daily activities, including procuring living quarters, financial assistance, and assistance in obtaining flight lessons and drivers' licenses.

(210) Thumairy, an extremist Wahhabi cleric who held diplomatic credentials with the Saudi consulate in Los Angeles, was responsible for immediately assigning someone to take care of Hazmi and Mihdhar upon their arrival in the United States.

(211) Thumairy was denied re-entry into the United States by the State Department in 2003 based on his ties to terrorism.

(212) Bayoumi, one of the Kingdom's employees and agents in the United States performing undisclosed functions on behalf of the Kingdom's embassies and consulates and reporting to Thumairy, simultaneously maintained extensive ties to terrorists and to Islamic Affairs representatives employed in the Kingdom's embassies and consulates in the United States and elsewhere.

(213) Bayoumi proffered a letter from the Saudi embassy representing that he would be studying in the United States pursuant to "a full scholarship from the Saudi government" but in fact was living in San Diego on a student visa, despite not taking classes and receiving a salary from the Kingdom for a job he never performed.

(214) Another member of the Kingdom's network of agents in the United States, Mohammad al Qudhaeein, participated along with an al Qaeda operative named Hamdan al Shalawi, in a dry run for the 9/11 attacks. The dry run occurred on a flight from Phoenix to Washington, D.C., in November 1999.

(215) During that flight, al Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men [whose airline tickets were paid for by the Saudi Embassy] were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of" operations being planned by al Qaeda and bin Laden.

(216)   The Congressional Joint Inquiry documented numerous other contacts, dealings, and transactions between individuals employed or associated with the Saudi government and known terrorists and extremists, reflecting a broad presence of al Qaeda supporters within Saudi government institutions in the years leading up to 9/11.

(217)   The former head of Alec Station, the CIA's unit established in 1996 to focus exclusively on bin Laden, told U.S. investigators that "it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Osama bin Laden," explaining that "Saudi assistance to the U.S. government on this matter was contrary to Saudi national interests."

### 9/11 Hijackers Nawaf al Hazmi and Khalid al Mihdhar

(218)   Al Qaeda members and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar arrived in Los Angeles on January 15, 2000, to commence critical U.S.-based preparations for the September 11th Attacks.

(219)   As the 9/11 Commission confirmed in its Final Report, Hazmi and Mihdhar were "ill prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Osama bin Laden, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English." *See* 9/11 Commission Final Report at 215.

(220)   For those and other reasons, the 9/11 Commission correctly concluded that it was "unlikely that Hazmi and Mihdhar…would have come to the United States without arranging to receive assistance from one or more individuals in advance of their arrival." *See id*.

(221)   Consistent with the 9/11 Commission's conclusion on this point, the facts and evidence confirm that several individuals with extensive ties to terrorism immediately mobilized to

provide the precise forms of assistance Hazmi and Mihdhar most needed to assimilate into the United States without detection and initiate essential preparations for the attacks.

(222)   Those individuals were employees and agents of the Kingdom of Saudi Arabia, whose duties involved the performance of functions in furtherance of the extremist agenda of the Kingdom's Ministry of Islamic Affairs, including in particular Fahad al Thumairy, Omar al Bayoumi, and Osama Basnan.

### Substantial Assistance Provided by Thumairy, Bayoumi, and Basnan

(223)   Witnesses interviewed by the FBI after 9/11 placed Hazmi and Mihdhar at the Saudi government-funded King Fahd Mosque near Los Angeles in the days immediately after their arrival in the United States. At the time, Thumairy was the resident imam at the mosque, by appointment of the Kingdom's Ministry of Islamic Affairs.

(224)   Thumairy was an extremist Wahhabi cleric employed by the Islamic Affairs Department of the Saudi consulate in Los Angeles, where he held diplomatic credentials, also by appointment of the Kingdom's Ministry of Islamic Affairs.

(225)   As reflected in the 9/11 Commission's Final Report, Thumairy led a particularly radical faction within the local Muslim community, including persons "supportive of the events of September 11, 2001," and "had a network of contacts in other cities in the United States." *See* 9/11 Commission Final Report at 216-17.

(226)   As also detailed in the 9/11 Commission Report, the U.S. State Department banned Thumairy from re-entering the United States in 2003, based on his apparent ties to terrorism. *See id.* at 217.

(227)   Thumairy was squarely at the center of orchestrating the U.S.-based support network for the hijackers upon their arrival in the United States, as reflected by the FBI's 2012 Summary

Report findings that "Thumairy immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area." *See* Summary Report at 4; *see also* 9/11 Commission Final Report at 217 ("the circumstantial evidence makes Thumairy a logical person to consider as a possible point of contact for Hazmi and Mihdhar").

(228)   Just two weeks after the hijackers' arrival in the United States, Thumairy met for an hour in his office at the Saudi consulate with Bayoumi, a Saudi national who was residing in San Diego.

(229)   At the time, Bayoumi was one of several employees and agents of the Saudi government in the United States, whose undisclosed duties involved the advancement of the agenda of the Ministry of Islamic Affairs, under the direction of Thumairy and other more senior representatives of the Ministry's offices in the United States.

(230)   Immediately following that meeting, Bayoumi traveled to a restaurant located in the Los Angeles area, where he met with Hazmi and Mihdhar and promptly offered to assist the future hijackers settle in San Diego, the precise city al Qaeda leadership had identified as the preferred location for the hijackers to carry out their preparations for the attacks.

(231)   Following that meeting, Bayoumi did in fact provide critical assistance to the hijackers, including by helping them find an apartment in San Diego, co-signing the lease for that apartment as a guarantor, opening a bank account for the hijackers with $9000 from his own account, and paying their rent on occasion.

(232)   In addition, Bayoumi took steps to ensure that the hijackers received essential assistance from other members of the San Diego Muslim community who shared the hijackers' extremist views, including Anwar al Aulaqi and Mohdhar Abdullah.

(233)   In this regard, U.S. investigations have confirmed that Hazmi and Mihdhar arrived in San Diego on February 4, 2000, and that Bayoumi spent the day with the hijackers undertaking extraordinary efforts to facilitate their settlement in the area.

(234)   On that same day, four telephone calls were placed from Bayoumi's cell phone to Aulaqi, who would later flee the United State and assume a leadership position in al Qaeda, prompting the United States to target and kill him in a drone attack on September 30, 2011.

(235)   Investigators have determined that additional calls from Bayoumi's cell phone to Aulaqi were placed on February 10, 16, and 18, and that Bayoumi and Aulaqi were in telephone contact another five times between November 1998 and April 2000, and again on December 8, 2000.

(236)   In an interview with 9/11 Commission staff members, Bayoumi admitted to having a relationship with Aulaqi, describing him as someone "with whom he discussed religious matters and ideas similar to those he would discuss with other imams."

(237)   Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations and advocating jihad against the United States, had spent nearly five years as the imam of the al Rabat al Islami Mosque (or "Rabat") in La Mesa, California, northeast of San Diego. Aulaqi had a following of approximately 200-300 people and would become an important religious leader to Hazmi and Mihdhar.

(238)   FBI sources reported that "Aulaqi met consistently and privately with Hazmi and Mihdhar for prayers," and a witness interviewed by the FBI specifically recounted seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with Mihdhar, Hazmi, and another individual, whom Bayoumi had asked to help the hijackers."

(239)   Aulaqi eventually left San Diego in mid-2000 and by January 2001 had relocated to Virginia where he took a position at the Dar al Hijra Mosque in Falls Church, Virginia. The U.S. Treasury Department's Enforcement Communications System ("TECS") contains records stating that that Dar al Hijra "is a mosque operating as a front for Hamas operatives in the U.S.," "is associated with Islamic extremists," "has been under numerous investigations for financing and providing aid and comfort to bad orgs and members," and has "been linked to numerous individuals linked to terrorism funding."

(240)   Hazmi and 9/11 hijacker Hani Hanjour arrived in Virginia in April 2001 to begin critical last-phase preparations for the attacks, and immediately sought out Aulaqi at Dar al Hijra. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to help the hijackers get settled and find an apartment.  They eventually moved into Rababah's friend's apartment in Alexandria, Virginia. On May 8, 2001, Rababah went back to the apartment to pick up Hazmi and Hanjour for a flight to Connecticut, and found they had new roommates – muscle hijackers Ahmed al Ghamdi and Majed Moqed.

(241)   Following the September 11th Attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001. Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specific details of what they discussed. Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing fellow 9/11 hijacker Hani Hanjour. According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

(242)   These contacts and circumstances, coupled with Aulaqi's pervasive connections to terrorism, have led investigators, including 9/11 Congressional Joint Inquiry Co-Chair Senator Bob Graham, that Aulaqi served as Hazmi and Mihdhar's spiritual leader during the year

preceding the September 11th Attacks, and that he was a trusted confidant of the hijackers who was fully aware of the planned 9/11 attacks.

(243)   Bayoumi also introduced Hazmi and Mihdhar to Mohdhar Abdullah and directed Abdullah to assist the two hijackers.

(244)   Abdullah was a member of Aulaqi's mosque over whom both Bayoumi and Aulaqi exercised influence.

(245)   According to the 9/11 Commission, Abdullah was "perfectly suited to assist the hijackers in pursuing their mission" as he "clearly was sympathetic to [their] extremist views" and shared their "hatred for the U.S. government". *See* 9/11 Commission Final Report at 218.

(246)   In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically tasked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, California," and that Bayoumi told him "to assist in any way in their affairs."

(247)   Per Bayoumi's instructions to provide unqualified assistance, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translation between English and Arabic. Abdullah also undertook extensive efforts to secure fake driver's licenses for Hazmi and Mihdhar, driving the hijackers from San Diego to an area in Los Angeles, where Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

(248)   Abdullah also helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000. On June 9, Abdullah traveled with Hazmi and Mihdhar to Los Angeles where they visited the King Fahd Mosque, where Abdullah learned that the hijackers already knew several people at the mosque, including an individual identified as "Khallam."

(249)   FBI investigators believe the individual identified as "Khallam" is Khallad bin Attash, a trusted member of Osama bin Laden's inner al Qaeda leadership circle who is linked to the 1998 U.S. Embassy bombings in Kenya and Tanzania, and the purported mastermind behind the U.S.S. Cole bombing. CIA reports and other evidence indicate that bin Attash was in the United States that same month and was seen in the company of Fahad al Thumairy.

(250)   On June 10, 2000, Los Angeles International Airport security tapes show Abdullah, Hazmi, and an unidentified man (possibly Khallad) using a video camera to scout out the airport.

(251)   During a number of interviews with the FBI following the 9/11 attacks, Abdullah admitted knowing of Hazmi's and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an extremist group in Yemen with ties to al Qaeda.

(252)   Just eight days after the September 11th Attacks, Abdullah "was arrested by FBI in San Diego on charges of immigration fraud for his claim of being a Somali asylee" and "pled guilty to the immigration charges and was deported to Yemen in 2004." *See* Summary Report at 3.

(253)   While "detained in an immigration facility he bragged to two fellow inmates that he assisted the hijackers." *See id.*

(254)   Consistent with this and other evidence, the 2012 Summary Report confirms that "shortly after February 4, 2000, Bayoumi tasked Mohdhar [Abdullah] to assist Hazmi and Mihdhar" and that "Mohdhar [Abdullah] played a key role facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al Hazmi and Khalid al Mihdhar." *See* Summary Report at 3.

(255)   Another close associate of Bayoumi and fellow employee of the Saudi government, Osama Basnan, was in contact with and aided Hazmi and Mihdhar from within the United States as well, as reflected in evidence developed by the FBI and the Congressional Joint Inquiry.

(256)   Like Bayoumi, Basnan was another employee and agent of the Saudi government engaged in performing undisclosed functions for and at the direction of the extremists in the Ministry of Islamic Affairs' offices in the United States and elsewhere.

(257)   Witnesses interviewed by the FBI described Bayoumi and Basnan as "the closest of friends" and confirmed that the two were "close to each other for a long time." According to the FBI, Bayoumi and Basnan were in telephone contact "several times a day while they were both in San Diego" and "phone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one-year period."

(258)   FBI investigations have further confirmed that Basnan had extensive ties to terrorism and was an "ardent UBL [Osama bin Laden] supporter," who spoke of bin Laden "as if he were a god" and was "in contact with UBL family members." According to a federal law enforcement official, Basnan "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been" at a party shortly thereafter.

(259)   As detailed in the Congressional Joint Inquiry Report, "Basnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than Bayoumi did." *See* CJI at 426.

(260)   Consistent with this claim, an October 3, 2001 FBI report indicates that Basnan also was in telephone contact with Aulaqi, and an FBI agent interviewed by the 9/11 Commission indicated that an associate of Basnan was in "phone and email contact with Ramzi Binalshibh in September 2000." At the time of those contacts, Binalshibh was a senior al Qaeda figure who was actively involved in planning and coordinating the September 11th Attacks.

(261)   The FBI's investigation has also documented contact between the hijackers and a close friend of Basnan's, Khaled al-Kayed, a commercial airline pilot and certified flight instructor

living in San Diego. Al-Kayed admitted to the FBI that in May 2000, Mihdhar and Hazmi contacted him about learning to fly Boeing jet aircraft.

(262)  In addition, U.S. investigations have established that contemporaneous with the arrival of Hazmi and Mihdhar in the United States, Basnan's wife began signing checks issued to her by a charity associated with the wife of the Saudi Ambassador to the United States over to Bayoumi's wife.

(263)  According to Senator Bob Graham, Co-Chair of the Congressional Joint Inquiry, these transfers, which coincided with Bayoumi's provision of assistance to the hijackers, "looked suspiciously like another backdoor way of channeling money to Hazmi and Mihdhar."

(264)  9/11 Commissioner John Lehman has, in turn, expressed his understanding based on the investigation conducted by the 9/11 Commission that the charity that issued the payments to Basnan's wife was under the control of "the radicals who worked in the embassy's Islamic Affairs office in Washington."

(265)  During the course of their investigation, members of the 9/11 Commission staff interviewed Thumairy, Bayoumi, and Basnan in Saudi Arabia. During those interviews, all three lied pervasively about their relationships with one another and other material issues raised by the Commission investigators.

(266)  According to the 9/11 Commission's Memorandum for the Record concerning its interviews of Thumairy: "our general impression of Thumairy is that he was deceptive during both interviews. His answers were either inconsistent or, at times, in direct conflict with information we have from other sources. During some of the more pointed exchanges, his body language suggested that he grew increasingly uncomfortable (for instance, he would cross his arms, sit back in his chair, etc.)."

(267)   The memorandum recounting the 9/11 Commission's interview of Basnan similarly explains that "[it] failed to yield any new information of note. Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every subject. This assessment is based on: the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith [Saudi Intelligence] audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence."

(268)   Particularly when viewed collectively, these and Plaintiffs' additional facts and evidence relating to the relationships among Thumairy, Bayoumi, Abdullah, and Basnan; their respective ties to terrorism and extremist views; their concentrated dealings leading to the provision of the precise forms of assistance the hijackers most needed to assimilate into the United States and begin preparations for the attacks without detection; their deceitfulness to U.S. investigators; the findings and focus of the ongoing criminal investigations of Bayoumi and Thumairy; and the broader spectrum of evidence documenting the extensive involvement of elements of the Kingdom's Ministry of Islamic Affairs in supporting al Qaeda, readily establish: (1) that Thumairy, Bayoumi, and Basnan knew that Hazmi and Mihdhar were extremists who were engaged in efforts to target the United States; (2) that Thumairy, Bayoumi, and Basnan knew that they were substantially advancing that tortious endeavor through the assistance they were providing; and (3) that Thumairy, Bayoumi, and Basnan played witting roles in orchestrating and providing a critical support network for Hazmi and Mihdhar.

(269)   Congressional Joint Inquiry Co-Chair Senator Bob Graham has testified, based on his decades of experience in intelligence matters and personal knowledge of the evidence collected

by the Congressional Joint Inquiry, that "I am convinced that there was a direct line between at least some of the terrorist who carried out the September 11[th] Attacks and the government of Saudi Arabia," that "a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance" to two of the hijackers, and that "Bayoumi was acting at the direction of elements of the Saudi government."

(270)   9/11 Commissioner John Lehman has likewise testified, based on his personal knowledge of the 9/11 Commission's separate investigation and his work for more than four decades in the national security arena, that "[b]y the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists," and that "it is implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Departments of the Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support" and that "Fahad al Thumairy and Omar al Bayoumi knew that Mihdhar and Hazmi were bad actors who intended to do harm to the United States."

### Nature and Scope of Employment and Agency

(271)   At the time they were substantially assisting the 9/11 hijackers, Thumairy, Bayoumi, and Basnan were employees and agents of the Saudi government, and their activities in support of the hijackers were directly related to their core functions and duties involving the advancement of the Wahhabi agenda of the Kingdom's Ministry of Islamic Affairs.

(272)   As documented in the 9/11 Commission's Final Report, the FBI's 2012 Summary Report, and numerous other U.S. investigative records, Thumairy held diplomatic credentials with the

Saudi consulate in Los Angeles, where he served as an employee in the consulate's Islamic
Affairs office, and also served as an imam at the Saudi government-funded King Fahd Mosque.

(273)    Thumairy was appointed to both positions by the Kingdom's Ministry of Islamic Affairs.

(274)    The U.S. government's investigations also document Thumairy's extremist beliefs,
jihadist sermons, and terrorist connections, thus reinforcing both the radical character and agenda
of the Ministry of Islamic Affairs and of Thumairy's scope of work for the Ministry.

(275)    Bayoumi and Basnan were, in turn, employees and agents of the Saudi government
whose undisclosed duties involved the performance of activities on behalf of the Saudi
embassies and consulates in the United States, under the direction of the clerics embedded in the
Islamic Affairs offices and other officials of the Kingdom's embassies and consulates.

(276)    Nominally, Bayoumi entered the United States in or around 1994 on a student visa, and
thereafter proffered a letter from the Saudi embassy representing that he would be studying
pursuant to "a full scholarship from the Government of Saudi Arabia." *See* CJI at 423.

(277)    Bayoumi remained in the United States pursuant to student visas for nearly seven years,
until he departed the United States very shortly before the September 11th Attacks, despite never
pursuing any meaningful academic studies during that period. Saudi officials actively
perpetuated the false claim that Bayoumi was undertaking studies in the United States during that
seven year period.

(278)    Throughout that time, including the period when he was substantially assisting the
hijackers, Bayoumi received a salary from the Saudi government for alleged job duties he never
performed.

(279)    As the 2012 Summary Report succinctly confirms, at the time of Bayoumi's critical
meeting with Thumairy and assistance to the hijackers, "Omar al Bayoumi was living in San

Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." *See* Summary Report at 4.

(280) These findings indicate that Bayoumi was an employee and agent of the Saudi government, stationed in the United States to perform undisclosed duties that the Kingdom sought to conceal.

(281) The facts concerning Bayoumi's actual activities while he was in the United States, and receiving a salary from the Saudi government, demonstrate that his undisclosed functions for the Kingdom involved the performance of activities in furtherance of the agenda of the Ministry of Islamic Affairs, reporting to officials in the Kingdom's embassies and consulates, including Thumairy.

(282) In this regard, Bayoumi had extensive and systematic dealings and communications throughout his residency in the United States with the Saudi embassies and consulates in the United States.

(283) An FBI review of Bayoumi's telephone records confirmed that he called Saudi diplomatic missions in the United States at least 74 times during the period between January – March 2000 alone, coinciding with his assistance to the hijackers, including 34 calls to the Saudi consulate in Los Angeles where Thumairy worked.

(284) In addition, U.S. investigations established that Bayoumi was directly connected to numerous employees and officials of Saudi Arabia's embassies and consulates and Ministry of Islamic Affairs, including the Minister of Islamic Affairs in Saudi Arabia; Thumairy; "an individual at the Saudi consulate in London[;]" and "at least three individuals at the Saudi Embassy in Washington, D.C.; two individuals at the Saudi Arabian Cultural Mission in

Washington, D.C.; and three individuals [likely including Thumairy] at the Saudi Consulate in Los Angeles."

(285)   Bayoumi also had pervasive contacts and dealings with Basnan, who was himself deeply intertwined with the Saudi government structure in the United States, and according to FBI reports may have succeeded Bayoumi in 2001.

(286)   This range of contacts with officials of the Saudi diplomatic missions and Ministry of Islamic Affairs, and pattern of communications with the Kingdom's consulates and embassies, reflect that Bayoumi was reporting to officials in the embassies and consulates, including representatives of the Islamic Affairs offices, in relation to his undisclosed work for the Saudi government.

(287)   Bayoumi's "seemingly endless" access to funds from Saudi Arabia, and use of those funds in support of causes within the core mission of the Ministry of Islamic Affairs, is further evidence that Bayoumi's functions for the government involved the performance of activities to advance the Ministry of Islamic Affairs' Wahhabi agenda.

(288)   For instance, as detailed in the Congressional Joint Inquiry Report, "Bayoumi was known to have access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job. On one occasion prior to September 11, the FBI received information that Bayoumi had received $400,000 from Saudi Arabia to fund a new mosque in San Diego." *See* CJI at 424.

(289)   FBI investigations also determined that Bayoumi communicated with AHIF regarding AHIF's "interest in appointing the imam of the mosque in Cajon, California, that Bayoumi managed." *Id.* at 436.

(290)   The construction of mosques outside of Saudi Arabia and placement of Wahhabi imams in mosques and Islamic centers abroad were two of the most important goals and functions of the Ministry of Islamic Affairs during this period, in support of its mission to spread Wahhabism globally.

(291)   Relatedly, at the time of Bayoumi's communications with AHIF about the selection of an imam for the mosque Bayoumi managed, that organization was headed by the Saudi Minister of Islamic Affairs, supervised by the Ministry of Islamic Affairs, and actively coordinating with al Qaeda.

(292)   Bayoumi's other reported activities while in the United States closely relate to the mission and work of the Ministry of Islamic Affairs as well.

(293)   For example, Bayoumi maintained extensive connections to extremist clerics engaged in propagating Wahhabi Islamic doctrine in the United States and elsewhere, with regard to "religious" matters in particular, including Thumairy, Aulaqi, and "Abd al-Rahman Barzanji, and imam in Norway who, according to FBI documents, has suspected ties to high level al Qaeda members."

(294)   In addition, Bayoumi's own writings could "be interpreted as jihadist" according to FBI analysts, and his Saudi passport contained "a cachet that intelligence investigators associate with possible adherence to al Qaeda," according to the 9/11 Commission, further indications of his role in advancing extremist Wahhabi objectives. *See* 9/11 Commission Final Report at 516. The Saudi passports of at least three of the 9/11 hijackers, including Hazmi and Mihdhar, included the same indicator of extremism and "adherence to al Qaeda." *See id*.

(295)   Bayoumi also interjected himself aggressively into the activities of the local Muslim community, and the Saudi student community in particular (despite his advanced age), including through involvement in the Saudi student club.

(296)   Several witnesses who interacted with him in those settings indicated to the FBI that Bayoumi was responsible for monitoring Saudi students and citizens living in the United States, as reflected by his persistent videotaping of their activities and other factors, and described him as some kind of "agent" working for the Saudi government in an undisclosed capacity.

(297)   The covert monitoring of Saudi students living outside the Kingdom was a common function and activity of the Saudi embassies and consulates during that period, carried out principally by the Ministry of Islamic Affairs, as a component of the Ministry's role in protecting the Kingdom's Islamic character.

(298)   In this regard, a report published by the Sydney Morning Herald concerning activities of the Saudi embassy in that country, based on a review of Saudi government cables, is insightful. According to the report, the cables reflect "sustained Saudi efforts to influence political and religious opinion within [local] Arabic and Islamic communities," that the Saudi embassies "pay close attention to the political and religious beliefs of Saudi university students studying [abroad] with reports sent to" officials in the Kingdom, and that the embassies coordinate "funding for building mosques and supporting Islamic community activities."

(299)   Bayoumi's activities undertaken in the United States while receiving a salary from the Saudi government (and performing no other duties for the Kingdom), and while communicating on a systemic basis with the Kingdom's diplomatic missions, align completely with these documented functions of the Kingdom's embassies and consulates.

(300)   The circumstances surrounding Bayoumi's assistance to the hijackers further evidence that his undisclosed duties for the Saudi government involved the performance of tasks assigned to him by the Wahhabi extremists in the Kingdom's embassies and consulates.

(301)   In this regard, U.S. investigations have established that Bayoumi met and offered to assist the hijackers immediately following a meeting with Thumairy in the Saudi consulate, and that a third subject of the ongoing investigation "tasked Thumairy and Bayoumi with assisting the hijackers." *See* Summary Report at 4.

(302)   These facts indicate that Bayoumi was acting within a chain of command and direction in which he was subordinate to Thumairy and a third person with common authority over both of them. The fact that the third individual had such authority over both Thumairy and Bayoumi indicates that that person was a more senior Saudi official.

(303)   The declassified "28 pages" of the Congressional Joint Inquiry Report, meanwhile, draw a direct parallel between Bayoumi's role for the Saudi government and that of another extremist with deep connections to the Saudi government's Wahhabi proselytizing apparatus in the United States, Mohammed al Qudhaeein, who as discussed below also provided aid to the September 11th plotters from within the United States.

(304)   Like Bayoumi, Qudhaeein was purportedly in the United States as a student; was "in frequent contact with Saudi government establishments in the United States;" including officials from the Ministry of Islamic Affairs; was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at 438.

(305)   Based on these and other factors, the FBI described Qudhaeein's "profile" as "similar to that of Bayoumi and Basnan." *See id.* at 434.

68

(306)   This assessment and the facts supporting it, coupled with the related findings pertaining
to Basnan, further evidence that the Saudi government had a network of employees and agents in
the United States prior to 9/11 performing undisclosed functions for the Kingdom; that the duties
of those employees and agents involved in the advancement of the Wahhabi agenda of the
Ministry of Islamic Affairs; and that Bayoumi was one of those employees and agents.

(307)   Basnan's true functions for the Saudi government mirrored those performed by Bayoumi,
with whom Basnan closely interacted and had unusual financial dealings.

(308)   Basnan entered the United States in 1996 on a tourist visa, even though he was in fact
working for the Saudi government.

(309)   Basnan had "many ties to the Saudi Government, including past employment by the
Saudi Arabian Education Mission," a component of the Saudi Embassy falling under the
Ministry of Islamic Affairs' authority. *See* CJI at 417.

(310)   According to a CIA memo, Basnan reportedly received funding and possibly a fake
passport from Saudi government officials. *Id.*

(311)   This funding included substantial transfers from a charity under the control of the
extremists in the Kingdom's embassy in Washington, D.C.

(312)   Like Bayoumi, Basnan had extensive ties to Wahhabi extremists and terrorists in the
United States and elsewhere, and witnesses who interacted with him also described Basnan as
some kind of "agent" for the Saudi government.

(313)   These and other facts establish that Basnan was, like Bayoumi, an employee and agent of
the Saudi government responsible for performing activities in furtherance of the agenda of the
Ministry of Islamic Affairs, under the direction of the Saudi embassies and consulates in the
United States.

(314)   The critical support Thumairy, Bayoumi, and Basnan provided to the 9/11 hijackers as employees and agents of the Saudi government was, meanwhile, well within the scope of their office, employment, and agency in furthering the radical mission and agenda of the Ministry of Islamic Affairs and Kingdom's government proselytizing apparatus.

(315)   Saudi Arabia established the Ministry of Islamic Affairs in 1993, in response to intense pressure from the Kingdom's Wahhabi clerics, who sought greater government resources and platforms to advance their Wahhabi agenda globally.

(316)   As the 9/11 Commission explained, al Qaeda finds inspiration and religious justification for its actions "in a long tradition of intolerance" that flows "through the founders of Wahhabism," and the Kingdom's Ministry of Islamic Affairs "uses zakat and government funds to spread Wahhabi beliefs throughout the world." *See* 9/11 Commission Report at 362, 372.

(317)   Following its formation and under the control of the Kingdom's government clerics, the Ministry of Islamic Affairs quickly evolved into "a stronghold of zealots," with global reach and operations. The Ministry assumed control over Saudi Arabia's da'awa activities outside of the Kingdom, carried out principally through the Kingdom's proselytizing arms under the direction and control of the Ministry, and established offices in the Kingdom's diplomatic missions, which it populated with extremist clerics like Thumairy.

(318)   During the decade preceding the September 11th Attacks, the Ministry of Islamic Affairs used the government platforms and funds available to it to pursue an extremist and anti-American global agenda, which included broad support for jihadist causes.

(319)   Of particular relevance in these respects, 9/11 Commissioner John Lehman has testified that:

> At least until September 11, 2001, the Islamic Affairs Departments of Saudi
> Arabia's diplomatic missions throughout the world were populated and controlled

by Wahhabi imams from the Kingdom Ministry of Islamic Affairs, like Fahad al Thumairy. Wahhabism is a puritanical, intolerant and virulently anti-American strand of Islam, and the state religion of the Kingdom of Saudi Arabia. The Kingdom has dedicated vast sums over the last several decades to promote the Islamist agenda of Saudi Arabia's Wahhabi clerics. This vast Saudi funding has been deployed to promote Wahhabi teachings throughout the world, fueling the jihadist tide that now confronts the civilized world. Wahhabi teachings form the ideological foundation for al Qaeda and a host of other jihad organizations that threaten our national security, including the so-called Islamic State of Iraq and the Levant (ISIL, a.k.a. ISIS).

The links between Saudi Arabia's Wahhabi clerics and al Qaeda did not exist solely at the ideological level, but rather also involved collaboration on financial and logistical fronts. Saudi clerics, paid by the government of the Kingdom and preaching at state funded mosques, issued fatwas that provided religious justification for al Qaeda's terrorist actions. By the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists.

(320)   Commissioner Lehman's testimony concerning the Ministry of Islamic Affairs' extremist agenda, and deep involvement in jihadist causes during the years preceding the September 11th Attacks, is amply supported by the pervasive involvement of the da'awa organizations under its control in supporting al Qaeda; the extensive connections between employees of the Ministry of Islamic Affairs and terrorists; the involvement of employees of the Ministry of Islamic Affairs in recruiting and fundraising activities on behalf of al Qaeda; the jihadist content of literature distributed by the Ministry of Islamic Affairs; and the numerous counter-terrorism initiatives targeting the Ministry of Islamic Affairs after 9/11 (including the Kingdom's removal of 3,500 clerics from the Ministry's payroll and re-education of an additional 20,000).

(321)   The range of terrorist connections maintained by the very employees of the Ministry of Islamic Affairs who aided the 9/11 hijackers, including Thumairy, Bayoumi, and Basnan, further demonstrate the Ministry's extremist character during the period leading up to the September

11th Attacks, and confirm that collaborating with jihadists was within the scope of the office, employment, and agency of those individuals.

### Additional Assistance Provided by Saudi Government Employees and Agents Qudhaeein, Shalawi, Hussayen, Fakihi, and Mohamed

(322)   Plaintiffs' claims concerning the witting involvement of Thumairy, Baoyumi, and Basnan in supporting the September 11th hijackers, and deep connections between the Ministry of Islamic Affairs and terrorism during the period leading up to the attacks, are further reinforced and supported by declassified intelligence documents evidencing the involvement of five additional employees of the Saudi government's religious apparatus in also knowingly providing substantial assistance to the September 11th hijackers, plotters, and al Qaeda: Mohammed al Qudhaeein, Hamdan al Shalawi, Muhammed Jabar Fakihi, Saleh al Hussayen, and Omar Abdi Mohamed.

(323)   The tortious acts of those additional employees and agents of the Saudi government were likewise committed in the course of their employment and agency in advancing the extremist agenda of the Kingdom's Ministry of Islamic Affairs and related components of the Saudi government's Wahhabi proselytizing apparatus.

### Mohammed al Qudhaeein and Hamdan al Shalawi

(324)   Qudhaeein and Shalawi were additional undeclared employees and agents of the Saudi government, whose duties also involved the performance of activities on behalf of the Ministry of Islamic Affairs.

(325)   Like Bayoumi, Qudhaeein was purportedly in the United States as a student. He was "in frequent contact with Saudi government establishments in the United States," was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at 434.

(326) Based on these and other factors, FBI investigators described Qudhaeein's "profile" as "similar to that of Bayoumi and Basnan." *See id.*

(327) During a 1999 flight from Phoenix to Washington, D.C., to attend an event at the Saudi embassy, Qudhaeein participated along with Shalawi, who had trained at the Afghan terrorist training camps, in a dry run for the 9/11 attacks.

(328) During that flight, Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of [UBL]/al Qaeda operations." *See id.* at 433-34.

(329) Shalawi was himself a long time employee of the Saudi government as well, and was receiving a stipend from the Saudi government at the time of the incident.

(330) Both Qudhaeein and Shalawi told investigators that the Saudi embassy in Washington had paid for their tickets. *See id.* at 433.

(331) The event they were traveling to attend was a symposium hosted by the Saudi embassy in collaboration with the Institute for Islamic and Arabic Sciences in America ("IIASA"), a Saudi government proselytizing arm with extensive ties to terrorism.

(332) Following the September 11th Attacks, the United States revoked the diplomatic visas of 16 people associated with IIASA. These individuals were identified as using their diplomatic status as representatives of the Saudi Embassy in Washington, D.C. to promote and spread radical Wahhabi ideology in the United States. According to senior law enforcement officials, in all, approximately 70 individuals with Saudi diplomatic credentials were expelled from the United States as part of "an ongoing effort to protect the homeland."

(333) In response to the revocation of the visas, IIASA issued a "Declaration About the

Revoking of Diplomatic Visas," in which IIASA confirmed that it was a Saudi government arm

conducting da'awa activities under the auspices of the Saudi embassy:

> The Institute of Islamic and Arabic Sciences in America (IIASA) is a non-profit
> educational institution affiliated with Imam Muhammad Ibn Saud Islamic University
> (IMSIU) in Riyadh, Kingdom of Saudi Arabia, which was established by the order of the
> Custodian of the Two Holy Sanctuaries King Fahd Ibn [Abdulaziz] more than fifteen
> years ago. This Institute continues to receive support from the University and from the
> Royal Embassy of the Kingdom of Saudi Arabia…
>
> \*\*\*
>
> Under the auspices of the Royal Embassy of the Kingdom of Saudi Arabia and its
> Ambassador to the USA, the personnel of the Institute were registered at the Imam
> Muhammad Ibn Saud Islamic University and the US State Department as diplomatic
> personnel and consequently were granted A2 visas since the IMSIU is a government
> University.

(334) The U.S. State Department's actions coincided with investigations conducted by the

Internal Revenue Service and Senate Finance Committee into IIASA and its links to terrorist

groups, which eventually led to its closure.

(335) In the years after the 1999 incident, both Qudhaeein and Shalawi held posts as

government employees at IMSIU, the parent of IIASA, a further indication of their longstanding

ties to the Saudi government.

(336) In the fall of 2000, Shalawi received training at an al Qaeda camp in Afghanistan where

several of the 9/11 muscle hijackers were simultaneously receiving training.

(337) Based on intelligence indicating Shalawi's presence at the camp, the United States placed

him on a terrorist watch list and he was denied a visa when he attempted to re-enter the United

States in August 2001, likely as part of an al Qaeda operation.

### Saleh al Hussayen

(338)   Saleh al Hussayen was a senior government cleric who held various positions in the Saudi government over a period of many years.

(339)   In the weeks prior to the attacks, Hussayen was in the United States on a fundraising mission with members of the Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan, which receives money from the Saudi government and other Saudi donors. The IANA has promoted teachings and fatwas issued by radical Saudi clerics Safar Hawali and Salman Ouda, which advocated violence against the United States. Hawali and Ouda were identified in the 1993 World Trade Center bombing trial as spiritual advisors to Osama bin Laden.

(340)   On September 6, 2001, Hussayen arrived in Herndon, Virginia. Then, just days before the September 11th Attacks, Hussayen abruptly moved from his original hotel to the Marriott Residence Inn, where September 11th hijackers Hazmi, Mihdhar, and Hanjour were also staying on the eve of the attacks.

(341)   Directly after the attacks, FBI agents attempted to interview Hussayen in his hotel room. In an apparent attempt to avoid questioning, Hussayen feigned a seizure, prompting his transfer to the emergency room. Physicians found nothing wrong with him, and Hussayen fled the United States before law enforcement was able to locate and re-interview him. *See* CJI at 431.

(342)   The declassified "28 pages" provide further details of the FBI's investigation of Hussayen, including the FBI's determination that Hussayen "is apparently a 'Saudi Interior Ministry employee/official'" and that the FBI agents who interviewed him "believed he was being deceptive" when he "claimed to not know the hijackers." *Id* at 418, 430-31.

(343)   Hussayen's ties to terrorist elements, precipitous relocation to the same hotel as the 9/11 hijackers on the eve of the attacks, deceitfulness to U.S. investigators, and remarkable efforts to

avoid questioning by the U.S. authorities concerning his ties to the hijackers, all indicate that he provided aid and assistance to the hijackers in support of the September 11th Attacks.

(344)   Even before disclosure of the additional facts in the Congressional Joint Inquiry Report, the United States Court of Appeals for the Second Circuit found that Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, as well as his decision to switch hotels to stay in the same hotel as at least three of the hijackers…not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but that also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States." *See O'Neill v. Asat Trust Reg.* (In Re: Terrorist Attacks on September 11, 2001 (Asat Trust Reg.)), 714 F.3d 659, 679 (2d Cir. 2013).

### Muhammed Jabar Fakihi

(345)   Muhammed Jabar Fakihi was an employee of the Ministry of Islamic Affairs, who served as head of the Islamic Affairs offices at the Saudi Embassy in Berlin, beginning in or around June 2000. Like Thumairy, Fakihi was a Wahhabi extremist with extensive ties to terrorism.

(346)   Investigations following the September 11th Attacks revealed that Fakihi was in direct contact with members of the Hamburg al Qaeda cell that coordinated the September 11th Attacks, diverted extensive funds to al Qaeda from Saudi embassy accounts, and was "organizationally involved" in bin Laden's organization.

(347)   The "Hamburg Cell" consisted of key operatives in the September 11th Attacks, including Mohammed Atta (the ringleader of the 19 hijackers and pilot of American Airlines Flight 11), Marwan al Shehhi, Ziad Jarrah, Ramzi Binalshibh, Mounir el Motassadeq, Said Bahaji, Zakariya Essabar, Abdelghani Mzoudi, and others.

(348)   As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi
frequently attended the Saudi funded al Nur Mosque in Berlin.

(349)   A notorious haven for Islamic extremists, the mosque often hosted clerics that preached
intolerance of non-Muslims and justified violence in the name of defending Islam. Dr. Salem
Rafei, a Lebanese cleric who served as an imam at the mosque, openly supported Palestinian
suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam.
Documents containing the mosque's address were seized from individuals detained by Pakistani
authorities who are alleged to have received military training at al Qaeda camps in Afghanistan
in 2001.

(350)   Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology,
advocated for the development of mosques across Europe and told his superiors in the Kingdom
that his ultimate goal was to turn Berlin into an Islamic proselytizing center for Eastern Europe.
In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz
al Ashaikh, proposing to turn the al Nur Mosque into a center for Islamic missionary activity
aimed at "ethnic European" populations in Eastern Europe. Fakihi, who planned to move his
office to the al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic
and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire
rule."

(351)   The expansion of the al Nur Mosque was originally conceived by Ahmed al Dubayan,
Fakihi's predecessor in the Islamic Affairs office in the Saudi embassy in Berlin, who served as a
mentor to Fakihi and likely had contact with members of the Hamburg al Qaeda cell at the al Nur
Mosque as well.

(352)  Fakihi arranged for the expansion of the al Nur mosque consistent with the vision outlined in his letter, using funds from AHIF, one of the al Qaeda affiliated charities supervised and directed by the Saudi Ministry of Islamic Affairs and headed by the Minister of Islamic Affairs.

(353)  Mohammad Atta and other members of the Hamburg cell, including Mounir el Motassadeq, were seen visiting the mosque. German investigators believe Fakihi met with Motassadeq at al Nur. Fakihi's business card was found in the apartment of Motassadeq, who was later arrested and convicted in a German court for being an accessory to murder relative to the September 11th Attacks, given his membership in the Hamburg cell and his knowledge and involvement in the preparation of the plans to hijack the planes.

(354)  In March 2003, German police raided a suspected terrorist cell in Berlin and arrested half a dozen men who were planning a large scale terrorist attack in Germany. Bomb-making equipment, forged passports, flight-simulator software, chemicals and a handbook for brewing poisons were seized during the raid. German police said Fakihi met frequently at the al Nur mosque with the terror cell's leader, Ihsan Garnaoui, a Tunisian al Qaeda member.

(355)  Two days after the arrests, on March 22, 2003, the German Foreign Ministry, following a recommendation from the country's domestic intelligence service, told the Saudi Embassy that Fakihi's diplomatic accreditation would be withdrawn unless he left the country. That same day, Dubayan flew from London to Berlin to meet Fakihi, and Fakihi then flew back to Saudi Arabia the following day.

(356)  Saudi authorities thereafter obstructed the German government's further investigation into links between Fakihi and the members of the Hamburg cell. The Saudi Embassy in Berlin never responded to a formal request from German prosecutors to explain the presence of Fakihi's

business card in Motassadeq's apartment or an alleged meeting between Fakihi and Motassadeq in Berlin shortly before the al Qaeda member's arrest in November 2001. In an interview with the Wall Street Journal in 2003, a German police official stated that the Saudi Embassy failed to cooperate in the probe.

(357)  Nonetheless, evidence presented to U.S. officials led them to conclude that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's al Qaeda network.

(358)  The 9/11 Commission staff conducted an interview with Fakihi in October 2003 in Riyadh relative to his duties with the Ministry of Islamic Affairs, his association with the al Nur mosque, and his relationships with Motassadeq and Garnaoui. The interview was conducted under the watchful eye of the Saudi secret police, the Mabahith. According to the 9/11 Commission's memorandum concerning the interview, Fakihi's testimony on a material issue "did not appear credible."

### Omar Abdi Mohamed

(359)  Omar Abdi Mohamed entered the United States in or around 1998 as a religious worker.

(360)  In fact, Mohamed was an employee of Saudi Arabia's Ministry of Islamic Affairs, holding the title "Propagator," material facts neither he nor the Kingdom disclosed on his visa application.

(361)  Following his entry into the United States and while employed by the Ministry of Islamic Affairs, Mohamed established a purported charity called the Western Somali Relief Agency ("WSRA") in San Diego under supervision of his superiors with the Ministry of Islamic Affairs, to serve as a front for funding al Qaeda.

(362)   Between December 1998 and May 2001, Mohamed issued 65 checks totaling nearly $400,000 to another prominent al Qaeda front called Dahab Shil, the Pakistan office of which was at the time under the control of 9/11 mastermind Khalid Sheik Mohammed, who at that very time was planning the September 11th Attacks and providing funds to the 9/11 hijackers.

(363)   Following the September 11th Attacks, Mohamed was deported from the United States following his conviction on immigration charges, including for failing to disclose that he was employed by the Saudi government.

### Additional Saudi Government Contacts With the 9/11 Hijackers, Plotters, and al Qaeda

(364)   U.S. investigations concerning the September 11th Attacks and sources of support for al Qaeda before the attacks have documented a range of other links between person and institutions associated with the Saudi government and elements of al Qaeda, including the September 11th hijackers and plotters.

(365)   The Congressional Joint Inquiry surveys some of these ties, which indicate additional sources of support from within the Saudi government for al Qaeda and the September 11th plot.

(366)   Discovery relating to these additional linkages between Saudi government officials, employees, and agents and elements of al Qaeda is likely to adduce further evidence in support of Plaintiffs' claims.

### THE TERRORIST ATTACKS

### Executing the September 11th Terrorist Attacks

(367)   On September 11, 2001, Mohammed Atta, Abdulaziz al Omari, Satam al Suqami, Waleed al Shehri, and Wail al Shehri hijacked American Airlines Flight 11, a Boeing 767, which had departed Boston at approximately 7:59 a.m. They flew Flight 11 into the North Tower of the

World Trade Center in Manhattan at approximately 8:45 a.m., causing the collapse of the tower and the deaths of thousands of people.

(368)   On September 11, 2001, Hamza al Ghamdi, Fayez Banihammad, Mohand al Shehri, Ahmed al Ghamdi, and Marwan al Shehhi hijacked United Airlines Flight 175, a Boeing 767, which had departed from Boston at approximately 8:14 a.m.  Upon hijacking United Flight 175, the terrorists murdered the pilot and thereafter flew Flight 175 into the South Tower of the World Trade Center in Manhattan at approximately 9:03 a.m., causing the collapse of the tower and the deaths of thousands of people.

(369)   On September 11, 2001, Khalid al Mihdhar, Majed Moqed, Nawaf al Hazmi, Salem al Hazmi, and Hani Hanjour hijacked American Airlines Flight 77, a Boeing 757, which had departed from Washington National Airport in Virginia, bound for Los Angeles, at approximately 8:10 a.m. They flew Flight 77 into the Pentagon in Arlington, Virginia at approximately 9:37 a.m., causing the deaths of 184 people.

(370)   On September 11, 2001, Saeed al Ghamdi, Ahmed al Nami, Ahmed al Haznawi, and Ziad Jarrah hijacked United Airlines Flight 93, a Boeing 757, which departed Newark, New Jersey for San Francisco at approximately 8:42 a.m. After encountering resistance from the passengers, the terrorists crashed Flight 93 into a field in Shanksville, Pennsylvania, at approximately 10:06 a.m., killing 40 people. Having been given the information from loved ones concerning the terrorist attacks in New York, the passengers and crew of Flight 93 acted on that information and averted further disaster at the expense of their own lives.

(371)   In total, the September 11th Attacks resulted in the murder of 3,029 people, the injury of thousands more, and the devastation and shock of survivors, families and friends of victims, and the nation as a whole.

## U.S. INVESTIGATION FULLY SUPPORTS PLAINTIFFS' CLAIMS

(372)   Investigations conducted by the U.S. government, including those of the 9/11 Commission and Congressional Joint Inquiry, broadly and directly support Plaintiffs' factual allegations and theories.

(373)   As discussed above, 9/11 Commission members John Lehman and Bob Kerrey, along with 9/11 Congressional Joint Inquiry Co-Chair Bob Graham, have provided sworn affidavit testimony, based on their decades of experience in national security matters and direct involvement in two of the principle investigations into the September 11th Attacks, that supports Plaintiffs' claims.

(374)   Further, several additional 9/11 Commission members and staff have joined Secretary Lehman and Senator Kerrey in the last year in directly rejecting the Kingdom of Saudi Arabia's false claims of exoneration and characterizations of the Commission's investigation.

(375)   Most recently, the declassification of the 2012 Summary Report of the ongoing FBI and DOJ investigations of Bayoumi and Thumairy and associated individuals who aided the 9/11 hijackers has confirmed central facts underlying Plaintiffs' claims based on the tortious acts of Bayoumi and Thumairy.

(376)   Separately, Plaintiffs' claims based on the funding and material sponsorship of al Qaeda by the Kingdom's proselytizing arms are fully supported by the 9/11 Commission's finding that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda."

(377)   Stated most simply, U.S. investigations broadly support Plaintiffs' claims that the September 11th Attacks were the culmination of a conspiracy among all Defendants to plan, finance, support and execute terrorist murder.

## COUNT I
### All Plaintiffs v. Iran and MOIS
### 28 U.S.C. § 1605A

(378)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(379)   At all relevant times, Defendants Iran and MOIS were and remain designated as state sponsors of terrorism as required by 28 U.S.C.§ 1605A(a)(2)(A)(i)(I) to maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

(380)   The conduct of the al Qaeda hijackers constituted acts of extrajudicial killing, torture, aircraft sabotage, and hostage taking within the meaning of FSIA § 1605A(a)(1).

(381)   Defendants Iran and MOIS provided material support and resources to al Qaeda in furtherance of those acts of the al Qaeda hijackers.

(382)   At all relevant times, al Qaeda and the hijackers were agents of Iran acting within the scope of their agency.

(383)   The conduct of Defendants Iran and MOIS violated the provisions of the FSIA, in particular 28 U.S.C. §1605A, and all Plaintiffs suffered damages as a result of that violation.

(384)   Plaintiffs' injuries, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of Defendant Iran and MOIS as described herein.

(385)   As a direct and proximate result of the September 11th Attacks, Plaintiffs have been deprived of comfort and support, and have suffered damages including pain and suffering, trauma, emotional distress, loss of life's pleasures, loss of earnings and earnings capacity, and other items of damages as set forth fully in the paragraphs above which are incorporated herein by reference.

(386)   As a result of the intentional, reckless, and negligent acts of the Defendants as described above, the Plaintiffs were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional infliction of emotional distress), and were mentally and physically harmed prior to and after their injuries.

(387)   The actions of Defendants Iran and MOIS were malicious, outrageous, and in willful, wanton, and reckless disregard of the rights of the Plaintiffs. Defendants Iran and MOIS intended to carry out actions that would cause injury to the Plaintiffs.

(388)   Plaintiffs are entitled to solatium and other damages, as stated in 28 U.S.C. § 1605A(c)(4).

(389)   As a result of the intentional, malicious, outrageous, willful and wanton conduct, Defendant Iran is liable to all Plaintiffs for punitive damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants Iran and MOIS, jointly and severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, punitive damages, and solatium, plus pre-and post-judgment interest, costs, fees, and other such relief as the Court may deem appropriate under the circumstances.

### COUNT II
### All Plaintiffs v. All Defendants
### 28 U.S.C. § 1605(a)(5): Liability for Non-Commercial Torts

(390)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(391)   The Defendants forfeited their right to claim immunity of the Foreign Sovereign Immunities Act. Pursuant to 28 U.S.C. § 1605(a)(5), all Defendants who are officials,

employees, or agents of the foreign state defendants are individually liable to Plaintiffs for damages caused by their acts which resulted in the injury of the Plaintiff.

(392)   The Defendants and the actions of their agencies and instrumentalities as described herein are subject to liability for said acts resulting in personal injury and death in the United States caused by the tortious acts or omissions of the foreign state Defendants, their officials, and employees while acting within the scope of their office and employment, and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

(393)   As a direct result and proximate cause of the conduct of the foreign state Defendants and their agencies, instrumentalities, officials, employees, and agents that violated the federal and common laws cited herein, Plaintiffs suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, their agents and instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, punitive damages, and solatium, plus pre-and post-judgment interest, costs, fees, and other such relief as the Court may deem appropriate under the circumstances.

### COUNT III
### All Plaintiffs v. All Defendants
### 18 U.S.C. § 2333(d) (JASTA): Aiding and Abetting and Conspiring with Al Qaeda to Commit the September 11th Attacks Upon the United States

(394)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(395)   As set forth above, Defendants knowingly provided material support, resources, and substantial assistance to, and conspired with, al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11th, 2001.

85

(396)   As set forth above, Plaintiffs' claims against Defendants relating to their tortious acts in support of al Qaeda fall within the exception to sovereign immunity set forth at 28 U.S.C. § 1605B, and Plaintiffs are therefore authorized to assert causes of action against Defendants pursuant to the Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq*.

(397)   Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(d).

(398)   At the time of the September 11th Attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

(399)   The funding and other material support Defendants provided to al Qaeda, as described above, enabled al Qaeda to acquire the global strike capabilities employed on September 11, 2001, and was essential to al Qaeda's ability to carry out the attacks.

(400)   During the decade preceding the September 11th Attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided to it to conduct large-scale terrorist attacks in order to kill innocent civilians, destroy property on a mass scale, and cause catastrophic economic harm.

(401)   The September 11th Attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by Defendants.

(402)   Plaintiffs suffered injuries to their persons and property by reason of the September 11th Attacks and Defendants' tortious acts in support of al Qaeda.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive

damages, pre-and post-judgment interest, attorneys' fees, costs of this action and other such

relief as the Court may deem appropriate under the circumstances.

## COUNT IV
### All Plaintiffs v. All Defendants
### 18 U.S.C. § 2333(a): Aiding and Abetting and Conspiring with al Qaeda to Commit the September 11th Attacks

(403)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(404)   As enacted in 1992, the express civil cause of action established under 18 U.S.C. §

2333(a) authorized claims for aiding and abetting and conspiring to commit an act of

international terrorism.

(405)   Through the tortious acts in support of al Qaeda described above, Defendants aided and

abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the

United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(a).

(406)   The relentless campaign by al Qaeda and its material supporters to carry out terrorist

attacks against the United States and its citizens, which culminated in the September 11th

Attacks, involved continuous acts of violence and acts dangerous to human life that violate the

criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332. *See*

18 U.S.C. 2332(a) (prohibiting conduct transcending national boundaries: killing or attempting to

kill persons within the United States; causing serious bodily injury or attempting to cause serious

bodily injury to persons within the United States; destroying or damaging any structure,

conveyance, or other real or personal property within the United States; or attempting or

conspiring to destroy any structure conveyance, or other real or personal property within the

United States).

(407)   Plaintiffs suffered injuries to their persons by reason of acts committed by al Qaeda that involved the murder and attempted murder of persons within the United States, and the mass destruction of real and personal property within the United States, in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

(408)   Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda to carry out act of international terrorism against the United States and its citizens on September 11th, 2001, in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and 2333.

(409)   Defendants knew at all times that they were providing material support for al Qaeda's campaign to carry out acts of international terrorism against the United States and its citizens, and were aware and intended that the resources they provided would substantially assist al Qaeda in that objective.

(410)   Defendants also agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this Complaint, and committed overt acts in furtherance of the conspiracy. At all relevant times, Defendants knew of the conspiracy and the roles of the al Qaeda elements they were supporting in furtherance of the conspiracy.

(411)   By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to Plaintiffs, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

(412)   By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructure, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens in violation of 18 U.S.C. § 2332,

Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained by reason of the September 11th Attacks.

(413)   The September 11th Attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by Defendants.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

### COUNT V
### All Plaintiffs v. All Defendants
### 18 U.S.C. § 2333: Committing Acts of International Terrorism

(414)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(415)   The actions of the Defendants in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population…to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

(416)   The actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents, and in providing substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th Attacks in violation of 18 U.S.C. § 2333, caused injuries to the persons, businesses, or property of Plaintiffs.

(417)   By participating in the commission of violations of 18 U.S.C. §§ 2339A and 2339B that have caused Plaintiffs to be injured in their persons, Defendants have engaged in acts of international terrorism and are liable pursuant to 18 US.C. § 2333 for any and all damages Plaintiffs have sustained as a result of such injuries.

(418)   By virtue of their willful violations of 18 U.S.C. § 2339C, which proximately caused the injuries suffered by Plaintiffs, Defendants committed acts of international terrorism and are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

(419)   The actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents either occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

(420)   Accordingly, the actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333 and through incorporation of 18 U.S.C. §§ 2339A, 2339B, and 2339C.

(421)   As set forth above, but for the assistance provided by Defendants, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of Defendants' material sponsorship and support of al Qaeda.

(422)   For the reasons set forth above, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have suffered to their persons and property as a result of the September 11th Attacks.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive

damages, pre- and post-judgment interest, attorneys' fees, costs of this action and such other and

further relief as the Court may deem appropriate under the circumstances.

### COUNT VI
### Kathy Dillaber v. All Defendants
### Assault and Battery

(423)   Plaintiff Katherine Dillaber repeats and re-alleges each and every allegation set forth

above with equal effect as if alleged herein.

(424)   As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged,

nonconsensual, grossly negligent and negligent acts of Defendants as described herein, which

culminated in the September 11th Attacks, Plaintiff was placed in apprehension of harmful and/or

offensive bodily contact and suffered harmful, offensive bodily contact, from which she

ultimately suffered serious permanent personal injury.

(425)   By reason of all of the foregoing, Plaintiff was seriously and severely injured, shocked,

bruised and wounded and suffered great physical, mental, and emotional pain and injury, and

required and received medical care and treatment, and incurred medical expenses and will

continue to incur future expenses therefor, and was prevented from attending to the duties of her

employment and prevented from pursuing the furthering of her career and lost salary and

earnings and will lose future salary and earnings thereby.

**WHEREFORE**, Plaintiff demands judgment against Defendants for an amount

authorized by governing law to be determined at trial, together with punitive damages, pre- and

post-judgment interest, and such other and further relief as the Court may deem appropriate

under the circumstances.

### COUNT VII
### Mary Jo Clarke v. All Defendants
### Assault and Battery

(426)   Plaintiff Mary Jo Clarke repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(427)   As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of Defendants as described herein, which culminated in the September 11th Attacks, Plaintiff was placed in apprehension of harmful and/or offensive bodily contact and suffered harmful, offensive bodily contact, from which she ultimately suffered serious permanent personal injury.

(428)   By reason of all of the foregoing, Plaintiff was seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental, and emotional pain and injury, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and was prevented from attending to the duties of her employment and prevented from pursuing the furthering of her career and lost salary and earnings and will lose future salary and earnings thereby.

**WHEREFORE**, Plaintiff demands judgment against Defendants for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

### COUNT VIII
### All Plaintiffs v. All Defendants
### Conspiracy

(429)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(430)   As set forth above, Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate, cooperate and

92

engage in unlawful and tortious acts pursuant to a common course of conduct, namely the promotion and sponsoring of international terrorism, resulting in the injuries sustained by Plaintiffs.

(431) As set forth above, Defendants conspired with, encouraged, furthered, and agreed to provide material support, funding, sponsorship, aiding and abetting and/or other material resources to al Qaeda, Osama bin Laden, and the hijackers in furtherance of this conspiracy.

(432) As set forth above, Defendants engaged in commonly motivated, organized, concerted and conspiratorial acts, efforts, transactions, material support, and activities designed, intended, and foreseeably certain to cause acts of international terrorism including the terrorist attacks on the United States, its citizens and society on September 11, 2001. Co-conspirators herein continue in their quest to attack the United States, resulting in the harm to Plaintiffs, which was done pursuant to and in furtherance of this concert of action, agreement, enterprise, civil and criminal conspiracy and common scheme.

(433) The Defendants' concert of action, scheme, enterprise and conspiracy to support and promote Osama bin Laden, al Qaeda, the hijackers, and international terrorism, was a proximate cause of the September 11th Attacks that injured Plaintiffs.

(434) As a result of Defendants' concert of action and conspiracy to further international terrorism, Plaintiffs have suffered damages as will be shown at trial.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre-and post-judgment interest, and other such and further relied as the Court may deem appropriate under the circumstances.

## COUNT IX
### All Plaintiffs v. All Defendants

93

**Aiding and Abetting**

(435)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(436)   As set forth above, Defendants knowingly and substantially assisted in the sponsorship of al Qaeda in the September 11th Attacks that injured the Plaintiffs.

(437)   At the time of such aiding and abetting, Defendants knew or should have known that their role was part of an overall and ongoing illegal and tortious activity.

(438)   As set forth above, the Defendants aided and abetted in concerted efforts, transactions, acts and activities designed to cause the September 11th Attacks on the United States, its citizens, property, and freedoms.

(439)   The Defendants' aiding and abetting of terrorism through material sponsorship was a proximate case of the September 11th Attacks that injured the Plaintiffs.

(440)   As a result of the Defendants' aiding and abetting activities, Plaintiffs have suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT X**
**All Plaintiffs v. All Defendants**
**Intentional Infliction of Emotional Distress**

(441)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(442)   Defendants intended or knew or should have known that their conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress.

94

(443)   Defendants intended and knew or should have known that the September 11th Attacks would kill, maim, and/or permanently injure people, leaving devastated survivors and family members with ongoing physical, psychological and emotional injuries and ongoing post-traumatic stress disorder on a horrific and massive scale.

(444)   The actions of Defendants were unconscionable, extreme, outrageous, and done with intentional, malicious, and willful disregard for the rights and lives of those murdered, those injured, and the surviving loved ones.

(445)   As a direct and proximate cause of the Defendants' intentional and reckless disregard for human life, Plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical, and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

(446)   The acts and conduct of Defendants were undertaken in an intentional manner intended or reasonably foreseeable to result in the killing and injuring of innocent people. These criminal and tortious acts culminated in the murder and maiming of innocent people on September 11, 2001, and beyond, causing continuing, permanent emotional, mental and physical suffering to the injured victims, their families, and loved ones of decedents.

(447)   Defendants, by engaging in this intentional and unlawful conduct, intentionally inflicted emotional distress upon the Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment, jointly and severally, against the Defendants, in the amount authorized by governing law to be determined at trial, together with

punitive damages, pre- and post-judgment interest, and such other and further relief as the Court

may deem appropriate under the circumstances.

**COUNT XI**
**All Plaintiffs v. Kingdom of Saudi Arabia**
**Liability Pursuant to Restatement (Second) of Torts § 317 and Restatement (Third) of**
**Agency § 7:05:**
**Supervising Employees and Agents**

(448)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(449)   Defendant Kingdom of Saudi Arabia was reckless in its supervision of its agents or

employees, including Fahad al Thumairy, Omar al Bayoumi, Osama Basnan, Saleh al Hussayen,

Mohammed al Qudhaeein, Muhammed Jaber al Fakihi and others, in that Defendant Kingdom of

Saudi Arabia knew of these employees' and agents' propensity for the conduct that caused injury

to Plaintiffs prior to the injuries' occurrence, and the Kingdom of Saudi Arabia failed to exercise

due care in supervising its employees and agents.

(450)   The ability of the above-referenced agents or employees to provide wide-ranging material

support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and

the resulting injuries to Plaintiffs, were caused by reason of the reckless supervision by

Defendant Kingdom of Saudi Arabia of its agents or employees.

(451)   Due to the reckless supervision on the part of Defendant Kingdom of Saudi Arabia,

Plaintiffs sustained injuries.

(452)   The injuries sustained by Plaintiffs, as a result of the recklessness of Defendant Kingdom

of Saudi Arabia, were foreseeable and Defendant Kingdom of Saudi Arabia knew or should have

known of the risk of injury to the Plaintiffs.

(453)   The torts committed by the above-referenced employees and agents of Defendant

Kingdom of Saudi Arabia were committed, among other places, on the premises of the Kingdom

of Saudi Arabia or with the chattels of the Kingdom of Saudi Arabia, as these employees and

agents provided wide-ranging material support to al Qaeda and the September 11th hijackers

from, among other places, facilities owned and operating by the Kingdom of Saudi Arabia using

money and resources of the Kingdom.

   **WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi

Arabia for an amount authorized by governing law to be determined at trial, together with

punitive damages, pre- and post-judgment interest, and other such and further relief as the Court

may deem appropriate under the circumstances.

**COUNT XII**
**All Plaintiffs v. Kingdom of Saudi Arabia**
**Liability Pursuant to Restatement (Second) of Torts § 317 and Restatement (Third) of**
**Agency § 7:05:**
**Hiring, Selecting, and Retained Employees and Agents**

(454)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(455)   Defendant Kingdom of Saudi Arabia was reckless in its hiring, selecting, and retaining

certain individuals as and for its employees and agents, including Fahad al Thumairy, Omar al

Bayoumi, Osama Basnan, Saleh al Hussayen, Mohammed al Qudhaeein, Muhammed Jaber al

Fakihi and others, in that Defendant Kingdom of Saudi Arabia knew of these employees' and

agents' propensity for the conduct that caused injury to Plaintiffs prior to the injuries'

occurrence.

(456)   Defendant Kingdom of Saudi Arabia hired, selected, and retained the above-referenced agents and employees and placed them in a situation where they could create an unreasonable risk of harm to others.

(457)   The ability of the above-referenced agents or employees to provide wide-ranging material support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and the resulting injuries to Plaintiffs, were caused by reason of the reckless hiring, selecting, and/or retention by the Defendant Kingdom of Saudi Arabia.

(458)   The injuries sustained by Plaintiffs, as a result of the recklessness of Defendant Kingdom of Saudi Arabia, were foreseeable and Defendant Kingdom of Saudi Arabia knew or should have known of the risk of injury to the Plaintiffs.

(459)   The torts committed by the above-referenced employees and agents of Defendant Kingdom of Saudi Arabia were committed, among other places, on the premises of the Kingdom of Saudi Arabia or with the chattels of the Kingdom of Saudi Arabia, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operating by the Kingdom of Saudi Arabia using money and resources of the Kingdom.

**WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi Arabia for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and other such and further relief as the Court may deem appropriate under the circumstances.

**COUNT XIII**
**All Plaintiffs v. Kingdom of Saudi Arabia**
**18 U.S.C. § 1962(a)-(d): CIVIL RICO**

(460)  Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(461)  Defendant Kingdom of Saudi Arabia constitutes a "person" as such term is used in 18 U.S.C. § 1961(3).

(462)  Defendant Kingdom of Saudi Arabia, as principal, agent, and co-conspirator, performed "racketeering activity" as defined in 18 U.S.C. § 1961(1) by knowingly providing material support to Osama bin Laden and al Qaeda prior to the September 11th Attacks, as described above.

(463)  Defendant Kingdom of Saudi Arabia, including the agents, officials, officers, and employees of Defendant Kingdom of Saudi Arabia whose attributable conduct in support of al Qaeda is discussed above, and Osama bin Laden and al Qaeda, were associated in fact with a common purpose of spreading extremist Wahhabi doctrine and rule, including through acts of jihad, and constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce (the "RICO Enterprise").

(464)  The RICO Enterprise constitutes an "enterprise" because all members thereof, including but not limited to Defendant Kingdom of Saudi Arabia, had the same goal of spreading Wahhabi doctrine and rule, including through acts of jihad, and in fact worked together to achieve that goal.

(465)  Defendant Kingdom of Saudi Arabia committed two or more of the aforesaid acts of racketeering activity within ten years of one another by continuously participating in the sponsorship of al Qaeda, and thereby committed a "pattern" of racketeering activity as defined in 18 U.S.C. § 1961(5).

(466)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, used and invested, both directly and indirectly, the income and the proceeds of the pattern of racketeering activity, to establish the RICO Enterprise in violation of 18 U.S.C. § 1962(a).

(467)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, maintained, directly and indirectly, an interest in and control of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

(468)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, maintained, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

(469)   Defendant Kingdom of Saudi Arabia, as a person associated with the RICO Enterprise, which engaged in acts of racketeering activity which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d). It was part of the conspiracy that Defendant Kingdom of Saudi Arabia and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions. It was a further part of the conspiracy that Defendant Kingdom of Saudi Arabia and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy.

(470)   Defendant Kingdom of Saudi Arabia violated 18 U.S.C. § 1962 (a-d) by investing in, maintaining an interest in, conducting and participating, directly and indirectly, or by conspiring

to do the same, in the RICO Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including but not limited to:

    a)    18 U.S.C. § 1341 (mail fraud);

    b)    18 U.S.C. § 1343 (wire fraud);

    c)    18 U.S.C. § 1503 (obstruction of justice);

    d)    18 U.S.C. § 1956 (money laundering);

    e)    18 U.S.C. § 2339A (material support to organizations engaged in violent activities); and

    f)    18 U.S.C. § 2339B (material support to designated foreign terrorist organizations)

(471)   The damages suffered by Plaintiffs, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by Defendant Kingdom of Saudi Arabia, acting individually and in concert with other members of the RICO Enterprise.

(472)   The loss of business and property by Plaintiffs includes loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, personal property, support, funeral and burial expenses, and the other economic losses and hardships Plaintiffs incurred and experienced. Such losses were a direct and proximate result of the racketeering activities of Defendant Kingdom of Saudi Arabia.

      **WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi Arabia for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT XIV**
**All Plaintiffs v. All Defendants**
**Violations of International Law**

(473) Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(474) Defendants are liable for Plaintiffs' injuries under the principles of international law.

(475) It is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law.

(476) The September 11th Attacks involved the hijacking of four airplanes. Aircraft hijacking is widely recognized as a violation of international law of the type that gives rise to liability against the hijackers and those who aided or abetted the aircraft hijacking.

(477) Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda in the commission of a violation of international law, aircraft hijacking, because their conduct substantially assisted al Qaeda's commission of the September 11th Attacks.

(478) In addition, and in the alternative, the tortious conduct of the Defendants aided and abetted the violation of the following conventions, agreements, U.N. declarations, resolutions, and principles of international law:

    (1)    Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

    (2)    Allied Control Council Law No. 10 (Dec. 20, 1945);

    (3)    Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277;

    (4)    Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

    (5)    Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)    International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)    International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force April 10, 2002);

(8)    U.N. Security Council Resolution 1267, U.N. Doc. S/Res/1267 (Oct. 15, 1999);

(9)    U.N. Security Council Resolution 1373, U.N. Soc. S/Res/1373 (Sept. 28, 2001);

(10)    Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)    Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 609;

(12)    Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res. 808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S. C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13)    The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. 1121;

(14)    The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15)    The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

(479)  Plaintiffs suffered injuries by reason of the above conduct for which Defendants are responsible.

      **WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action, and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT XV**

**All Plaintiffs v. All Defendants**
**Punitives**

(480)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(481)   As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill, severely injure, and/or inflict personal injuries upon the Plaintiffs.

(482)   As set forth above, all Defendants conspired and agreed to provide material support and resources to al Qaeda, and the bombers in furtherance of al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the Pentagon and the Twin Towers.

(483)   The Defendants' conspiracy resulted in the September 11th Attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs.

(484)   Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

**WHEREFORE,** Plaintiffs demand judgment against all Defendants for an amount authorized by governing law to be determined at trial, together with pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

March  9  , 2018                                Respectfully submitted,

Caragh Fay (Bar No.16955)
FAY LAW GROUP, PA
777 6th Street NW, Suite 410
Washington, D.C. 20001
(202) 589-1300
Caragh.Fay@faylawgroup.com

*Attorneys for Plaintiffs*