# Exhibit S

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001** | 03-MD-1570 (GBD)(FM) ECF Case |

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.* No. 02-CV-6977
*Burnett, et al. v. Al Baraka Investment & Development Corp., et al.,* No. 03-CV-5738
*Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.,* No. 04-CV-05970
*Federal insurance Col, et al. v. Al Qaida, et al.,* No. 03-CV-6978
*Euro Brokers v. Al Baraka Investment and Development Corp., et al,* No. 04-CV-7279
*Estate of O'Neill, et al. v. Al Baraka Investment and Development Corp., et al,* No. 04-CV-1923

### DECLARATION OF MOHAMMED AL KHATIB

I, Mohamad Al Khatib, being duly sworn, hereby declare under penalty of perjury that the following is true and correct:

1. I am not a party in the above captioned matter.
2. I am a Canadian citizen and resident, though I was born in Syria.
3. I was approached by Abdullah Bin Laden, then a Director of World Assembly of Muslim Youth, USA ("WAMY USA"), in 1997 to represent WAMY USA in Canada.
4. Having heard of the good charitable work that WAMY does around the world, I agreed to volunteer with WAMY Canada.
5. From approximately 1997 to 2004, I was a volunteer with WAMY Canada.
6. From approximately 1997 to March 2001, I held the position of the Director of WAMY Canada, in a voluntary capacity. I was told to resign from the position of Director of WAMY Canada in 1999 by Abdullah Bin Laden due to my failure to report back on activities. However, I was again asked to serve by Ibrahim Abdullah in 2000, again as a volunteer, at WAMY Canada, due to my experience running programs in Canada.
7. During my time as Director of WAMY Canada, most of my communications about WAMY Canada matters were with WAMY USA. My communications with WAMY Saudi Arabia were limited, as I was advised that I should go through WAMY USA for most matters, including budgets for WAMY Canada.
8. I barely had any communication with WAMY SA and had minimum contacts with WAMY USA. The relationship was tense.
9. While Director of WAMY Canada, I used my home address as WAMY Canada's address. WAMY Canada did not have a physical office during my tenure as Director.
10. While I was Director, I was responsible for opening WAMY Canada's bank accounts and maintaining WAMY Canada's books of accounts and records.
11. I did not do any fundraising for WAMY. Funds to WAMY Canada's budget came directly from WAMY USA.
12. Funds from WAMY USA were used exclusively for projects and minimal operational and office expenses.

1

13. While I was Director of WAMY Canada, the projects mainly entailed organizing annual camps for girls and boys, basketball tournaments, and Umra trips to Saudi Arabia for the youth.
14. The budget for WAMY Canada was limited – about $10,000 - $15,000 per year, if not less.
15. For a few specific projects, funds were sent from WAMY Saudi Arabia. However, my communications with WAMY Saudi Arabia were very limited.
16. In exchange for receiving funds, I was required to submit reports to WAMY USA explaining the projects completed and the destination of all funds.
17. I did not send regular reports of activities to WAMY USA. This frustrated Abdullah Bin Laden.
18. After Ibrahim Abdullah replaced Abdullah Bin Laden as the Director of WAMY USA in 1999, he eventually stopped sending funds for the budget.
19. To address this issue, in April 1999, I contacted WAMY Saudi Arabia directly, reaching out to Saleh bin Ibrahim Babaer, Assistant Secretary General of WAMY. Babaer responded that I must contact WAMY USA for the money.
20. During my tenure as Director of WAMY Canada, I had a difficult relationship with WAMY USA. Budget issues created the most tension, as I had difficulties receiving funds from WAMY USA. In particular, I had a difficult time working with then WAMY USA Director Ibrahim Abdullah.
21. While volunteering with WAMY Canada, I was an employee of Muslim World League ("MWL"). I was the Public Relations Director as of 2003. I did not disclose the issue of my employment with MWL to WAMY.
22. In 1999, I met Enaam Arnaout at a conference of the Islamic Society of North America ("ISNA"). We became acquainted with each other, as we are both Syrian.
23. Enaam Arnaout told me he was the head of Monathamat El Birr A Doualia known as Benevolence International Foundation ("BIF"). He informed me that BIF was registered in Chicago, Illinois as a charitable organization raising funds for orphans worldwide, particularly Kashmir, Chechnya, and Bosnia.
24. In his capacity as the head of BIF, he approached me and asked me if there was a possibility to expand BIF operations into Canada and if I would be willing to take charge and become BIF's director in Canada. He specifically wanted my assistance with fundraising efforts for orphans through BIF. I agreed and started the process of registering BIF Canada as a non-profit organization in 2000.
25. Without consultation with WAMY Saudi Arabia or WAMY USA, I used WAMY Canada's address for BIF, which was my home address.
26. At no time was WAMY informed of my relationship with Enaam Arnaout or BIF. The reason I did not inform WAMY was I did not believe it was necessary, as I was only a volunteer with WAMY Canada and not an employee. Additionally, I did not believe that my work with BIF would affect or interfere with my work with WAMY Canada.
27. The reason I accepted the request to assist BIF was because Enaam Arnaout had informed me that BIF-USA was helping orphans, and I believe in assisting orphans.
28. Since BIF was an established organization in the United States, it raised no concerns for me to assist it to expand its operations into Canada.

29. BIF hired me as the head of their Canadian office. I worked on a part time basis and earned approximately $8,000 to $9,000 per year from BIF. At no time was WAMY aware of this.
30. I worked for BIF a few hours daily. I mainly built a database of donors, fundraised, and helped with projects.
31. To support my work, Arnaout hired a BIF employee in Toronto to assist me. Her name was Solange Waithe. Enaam Arnaout was in charge of hiring the staff for BIF. No BIF employee ever did any work for WAMY Canada.
32. Since BIF did not have not-for-profit status in Canada, I decided on my own to allow BIF to use WAMY Canada's charitable organization designation, until a charitable organization designation was issued to BIF. I also decided on my own to open a subsidiary account for BIF at the Bank of Montreal (Account # 0430 8086-611) under the name "World Assembly of Muslim Youth o/a BIF."
33. However, BIF funds and WAMY funds were never commingled. BIF had no relationship with WAMY, and WAMY Canada never operated as BIF.
34. At no time did I advise anyone within WAMY USA or WAMY Saudi Arabia that I was accepting BIF funds, fundraising for BIF, and storing those funds in WAMY's sub account belonging to WAMY Canada. To the best of my knowledge, no one at either WAMY USA or WAMY Saudi Arabia was aware that I was doing this.
35. At no time did I advise anyone within WAMY USA or WAMY Saudi Arabia that I had established the subsidiary checking account at the Bank of Montreal with the name "World Assembly of Muslim Youth o/a BIF." To the best of my knowledge, no one at either WAMY USA or WAMY Saudi Arabia was ever aware that I had done this.
36. All of my fundraising for BIF was for orphan projects. I sent the money I raised in Canada for BIF to the Chicago office.
37. To raise funds for orphans, BIF Canada used the same flyers used by BIF USA. The only difference was that BIF Canada's flyers had WAMY's name on it. They indicated the check should be made out to "WAMY/BIF." The decision to have the donation made out to "WAMY/BIF" was mine alone without any permission from WAMY Saudi Arabia or WAMY USA. I alone allowed BIF to use WAMY's name so that donors to BIF could get the tax deduction.
38. What happened with BIF was a mistake on my part and had nothing to do with WAMY Saudi Arabia's or WAMY USA's operations, policies, or objectives. I acted outside the mandate of what WAMY asked me to do.
39. All the operations I was undertaking for BIF were without WAMY USA's or WAMY Saudi Arabia's knowledge. I take full responsibility for this. I thought it was legal to use a tax ID of an organization to raise funds for another organization as the second organization awaits the approval of its charitable status. However, in hindsight, I do believe my conduct can be considered an abuse of power and an abuse of my corporate responsibility towards WAMY Canada.
40. In early March 2001, WAMY continued to express its displeasure at my failure to send reports of activities and spending to WAMY.
41. During the same period in early March 2001, WAMY Saudi Arabia and WAMY USA stated that it became aware that I was representing different organizations at the

same time. WAMY stated that they were, until then, unaware that I was working for BIF while volunteering for WAMY Canada.

42. WAMY was not happy with me, as Director of WAMY Canada, representing other organizations in general. They felt that this may cause confusion in the community about who I represent and for whom I am fundraising. WAMY did not feel comfortable that a director of WAMY would represent different organizations at the same time, as this could create a possible conflict of interest for WAMY.
43. As a result, on March 17, 2001, I was forced to resign from my position as Director of WAMY Canada. I sent my resignation letter to Ibrahim Abdullah on March 20, 2001.
44. During the process of stepping down as Director of WAMY, I transferred out of the subsidiary Account # 0430 8086-611 all BIF funds. This included all funds raised for BIF Canada and all funds sent from BIF USA to BIF Canada. The funds transferred back to BIF included approximately $50,200 that was received into Acct. # 0430 8086-611 in a wire transfer on or about March 20, 2001.
45. This $50,200 was not WAMY funds, to be used for WAMY Canada activities and operations. They were BIF funds for orphan projects that had been stored in the "World Assembly of Muslim Youth o/a BIF" subsidiary account.
46. WAMY USA appointed Talhah Al Jarad as my replacement. WAMY Canada wanted to have a clear delineation after my dismissal, so all bank accounts I had opened were closed. Talhah Al Jarad opened new accounts. As a result, the account with the Bank of Montreal was closed in or around June 2001, and all BIF funds, which did not belong to WAMY Canada, were sent to BIF in Chicago.
47. The work that I did for BIF and the funds I raised on its behalf were, as Enaam Arnaout explained it to me, exclusively for the support of orphans. I do not shy away from helping good causes. I admit that, at the time, I was not aware that keeping funds of different organizations that I represent in the same account was problematic. However, despite sharing the subsidiary account, funds were never shared between BIF and WAMY Canada or mingled in any way.
48. I had no reason to believe than an established U.S. organization such as BIF was doing anything immoral or against the law.

Dated: MARCH 29, 2018

_____
Mohammed Al Khatib

Sworn to before me this____
day of _____, 2018.


_____
Notary Public

4