# EXHIBIT 4

**EXHIBIT 4**

| RELEVANT DISCOVERY RULINGS ISSUED BY MAGISTRATE JUDGE FRANK MAAS |
|---|
| Early in discovery, Magistrate Judge Frank Maas issued several important orders in relation to discovery disputes concerning defendants Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"), but applicable to all defendants in discovery.  Counsel for WAMY participated in those hearings and had a duty to inform his client of the Court's clear orders and ensure that WAMY complied with those directives.  *See Greene v. Netsmart Techs. Inc.,* 2011 U.S. Dist. LEXIS 59710, *24 (E.D.N.Y. Feb. 28, 2011) ("While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects, counsel is responsible for coordinating her client's discovery efforts[,] both in terms of the client's duty to locate relevant information and the client's duty to preserve and timely produce that information.") |

| HEARING | DESCRIPTION |
|---|---|
| April 12, 2011<br><br>(Mr. Mohammedi and Mr. Goetz participated in the hearing.) | On March 16, 2011, plaintiffs submitted a Motion to Compel seeking an order from the Court compelling the MWL and IIRO to abide by agreements reached during the meet-and-confer process and immediately produce all responsive materials relating to the "8 Categories" of documents requested by plaintiffs.  Magistrate Judge Maas granted plaintiffs' motion and ordered the MWL and IIRO to produce all responsive documents relative to the 8 Categories within thirty days.  Judge Maas stated the following:<br><br>    The Court:  ***But the eight categories*** *– and I know there is a dispute as to the extent to which there were or were not agreements back in October of 2007 –* ***some of the eight categories seem to me to be extraordinarily simple in terms of locating documents.*** *I mean take number 8, I am not sure what time period we are talking about, but in general give us the org chart is a pretty straightforward request made in every case of any size. It's something that most organizations have readily available, or if it doesn't exist because of the way your clients do business then the answer would be, sorry, we don't have it.*<br><br>April 12, 2011 Transcript of Record ("Tr.") at 27 (emphasis added). |

| April 26, 2011<br><br>(Mr. Mohammedi and Mr. Goetz participated in the hearing.) | On March 24, 2011, plaintiffs filed a Motion to Compel seeking an order directing the MWL and IIRO to produce *inter alia* documents relating to the Executive Order 13224 designations of the IIRO's branch offices in the Philippines and Indonesia and Abd al Hamid Sulaiman al Mujil, the IIRO's Executive Director of the Eastern Province branch, "for facilitating fundraising for al Qaida and affiliated terrorist groups." During oral argument at the April 26, 2011 hearing, plaintiffs raised concerns that the MWL and IIRO were not living up to their discovery obligations to search for and produce responsive documents:<br><br>    Mr. Carter: ***Our concern, really, at this point, your Honor, is that there seems to be a disconnect between our requests, the rules, and the kind of search that's being carried out by certain of these defendants.***<br><br>April 26, 2011 Tr. at 10 (emphasis added). Judge Maas sent a clear message to counsel for the MWL and IIRO that he must take a greater role in connection with his clients' discovery responsibilities.<br><br>    Court: ***I do think this is the type of stage of the case where you or somebody on your behalf needs to sit down with the folks who are responding to these requests and hold their hand to a certain extent and describe in greater detail what needs to be searched for.*** *It's somewhat inconsistent to say, we have developed this massive index and, yet, not produce documents that relate to the employment of some of these individuals, directives they may have given or received and the like.*<br><br>    *And I recognize that, as Mr. Carter pointed out, there is a significant disconnect between that which was requested and that which has been received. And I'm not so naïve to think that perhaps it won't persist. I hope it doesn't. But if it does, I suppose that will lead to additional motion practice.* ***And if the IIRO or any other defendant has failed to produce documents that manifestly are within its possession, custody, or control, that may lead to consequences that that particular defendant doesn't care for.***<br><br>*Id.* at p. 20 (emphasis added). |
| June 23, 2011 | Plaintiffs sought the Court's intervention at the June 23, 2011 conference in relation to the MWL and IIRO's continued failure to comply with the Court's discovery orders of April 12 and 16, 2011. The |

<table>
<tr>
<td></td>
<td>

Court expressly warned counsel for the MWL and IIRO of the possibility of sanctions for the defendants' continued refusal to comply with the Court's prior orders:

> The Court: *What inevitably may happen in this case is that **if responsive documents are not produced, and Mr. Carter and his colleagues are able to show that the documents exist and should be produced [. . .] If they make a sufficiently persuasive showing, your clients may be faced with the prospect that I issue case-dispositive sanctions.***
>
> *So, I will let you finish talking but I just wanted you to understand my concerns and where we collectively may all be headed.*

June 23, 2011 Tr. at pp. 9-10 (emphasis added).

Magistrate Judge Maas explicitly mentioned the possibility of the entry of default judgments:

> The Court: *I think I have made my position clear which is that if a persuasive showing can be made that MWL and IIRO have not fully complied with the ruling that I made on April 12 and April 26, those organizations may be facing a more formal motion that I would entertain which if my recommendation were to be accepted by Judge Daniels might lead to the entry of default judgments against those organizations.*

*Id.* at pp. 17-18.

</td>
</tr>
<tr>
<td>

November 16, 2011

(Mr. Mohammedi participated in the hearing.)

</td>
<td>

Magistrate Judge Maas was not only clear that the MWL and IIRO were obligated to search every branch office for responsive documents, but that the defendants' failure on that point alone could lead to dispositive sanctions:

> The Court: *It also seems to me that the request, unless Mr. Carter tells me otherwise, **extends to each branch of the organization**. And to the extent that there are nonduplicative files in the branches, those have to be produced, whether it's burdensome or not.*
>
> ***This whole case is about money being diverted toward terrorist goals. As I understand it, the lion's share of the effort is to see where money went. So the notion that this is a***

</td>
</tr>
</table>

*lot of paper or bytes of information and therefore burdensome, Mr. McMahon, doesn't really resonate to me.*

\*\*\*

*Except to the extent that the two sides can agree that some branch office is not relevant, **if each branch office is not queried and the documents from that branch produced, as far as I'm concerned that will have been an inadequate search and may lead to dispositive sanctions**.*

Mr. McMahon: *I hear and appreciate that, your Honor.*

November 16, 2011 Tr. at 14-16 (emphasis added). Judge Maas was also very explicit that the Court expected the MWL and IIRO to produce *both* audits and the underlying financial data:

The Court: *Talk for a moment about audits. It seems to me **the defendants will not have done their job as to audits unless they have searched their own records to make sure that if they have retained copies of audit reports and the documents that underlie the audit reports** – I guess the first of those is more likely than the second – **that that be produced**. Saying, well, we'll contact the auditor and see whether they will give it to us if a copy of the audit report is sitting in IIRO's office doesn't cut it, as far as I'm concerned.*

Mr. McMahon: *I hear your Honor. **You want any and all records produced that are still in the possession or control of the charities that in any way supported the audit**.*

The Court: ***Or that are the audit, yes***.

Mr. McMahon: *Ok.*

*Id.* at 17-19 (emphasis added).

Judge Maas was especially direct with counsel for defendant Wa'el Jelaidan concerning the defendant's production of banking records requested by the plaintiffs. After determining that the account records are in fact within Jelaidan's control given his practical ability to obtain them from the banks, the Court

4

directed the defendant to undertake vigorous and expeditious efforts to obtain the requested banking materials, and to document those good faith efforts:

> The Court: *I guess, Mr. McMahon,* **it comes down to the same thing I said with respect to your other two clients, namely, that there has to be a full-court press.  And, as Mr. Carter indicated and I've said before, it has to be documented.  If you're not sufficiently able to document a vigorous effort to obtain those documents, it may be that sanctions are imposed.**

*Id.* at 33 (emphasis added).

```
                                                             1
          14C7TER1
    1     UNITED STATES DISTRICT COURT
    1     SOUTHERN DISTRICT OF NEW YORK
    2     ------------------------------x
    2
    3     IN RE:  TERRORIST ATTACKS ON
    3     SEPTEMBER 11, 2001                    03 MDL 1570
    4
    4     ------------------------------x
    5
    5                                      April 12, 2011
    6                                      2:00 p.m.
    6
    7     Before:
    7
    8                        HON. FRANK MAAS,
    8
    9                                      Magistrate Judge
    9
   10                        APPEARANCES
   10
   11     ANDERSON KILL & OLICK PC
   11          Attorneys for O'Neill Plaintiffs and PEC
   12     BY:  JERRY S. GOLDMAN
   12
   13     KRIENDLER & KREINDLER LLP
   13          Attorneys for Plaintiff Ashton
   14     BY:  JAMES P. KREINDLER
   14
   15     COZEN O'CONNOR
   15          Attorneys for Plaintiff Federal Insurance
   16     BY:  SEAN CARTER
   16
   17     MOTLEY RICE LLC
   17          Attorneys for Plaintiffs Burnett & Eurobrokers
   18     BY:  ROBERT HAEFFELE
   18
   19     MCMAHON & ASSOCIATES
   19          Attorneys for Defendants IIRO, MWL and Wael Jelaidan
   20     BY:  MARTIN MCMAHON
   20
   21     LAW FIRM OF OMAR T. MOHAMMEDI LLC
   21          Attorneys for Defendants WAMY and WAMY International
   22     BY:  OMAR T. MOHAMMEDI
   22          FREDERICK GOETZ (via telephone)
   23
   24     ALSO PRESENT:  STEVEN COTTREAU
   24                    STEVEN BARENTZEN
   25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

14C7TER1

```
 1                (Case called)
 2                (In open court)
 3                MR. GOLDMAN:  Jerry Goldman for the O'Neill plaintiffs
 4     and the Plaintiffs' Executive Committee.
 5                THE COURT:  Good afternoon.
 6                MR. KREINDLER:  James Kreindler, good afternoon, your
 7     Honor.
 8                MR. CARTER:  Good afternoon, your Honor.  Sean Carter
 9     for the Federal Insurance plaintiffs.
10                MR. HAEFELE:  Good afternoon, your Honor.  Robert
11     Haefele from Motley Rice for the Burnett plaintiffs.
12                MR. MCMAHON:  Good afternoon, your Honor.  Martin
13     McMahon for defendants International Islamic Relief
14     Organization, the Muslim World League and Weal Jelaidan.  How
15     are you doing?
16                THE COURT:  So far so good.
17                MR. MOHAMMEDI:  Good afternoon, your Honor.  Omar
18     Mohammedi on behalf of WAMY and WAMY International.
19                MR. GOETZ:  Good afternoon, your Honor.  Frederick
20     Goetz appearing by telephone as cocounsel also on behalf of
21     WAMY.
22                THE COURT:  Good afternoon.
23                MR. COTTREAU:  Good afternoon, your Honor. Steven
24     Cottreau for Dubai Islamic, and we are just observing today.
25                MR. BARENTZEN:  And Steven Barenstzen.  I am also just
```

3

14C7TER1

1     here to observe, I believe.

2            THE COURT:  We will find out as we go along.

3            As I think I indicated in an order there are

4 essentially three applications that I propose to addressed

5 today:  First, the IIRO, Muslim World League and Wael Jelaidan

6 application; then the plaintiffs' March 16 letter about the

7 Muslim World League and IIRO documents; and then the WAMY

8 application. W-A-M-Y.

9            Before I get to those, one comment I had is that it is

10 hard to deal with discovery requests that you folks are all

11 knowledgeable about when the actual request is not furnished to

12 me in the exact words that were used.  And the local rule, 37.1

13 of the Civil Rules, requires a verbatim quote.  In some

14 instances I was given it, and in some instances I was able to

15 back into it, and in some instances I may have had some other

16 papers, but I believe there were times when I wasn't given

17 anything that told me precisely what the request was.

18            It may be that I was just looking in the wrong places

19 and actually had been furnished it, but in general the more

20 clear you can make it to me in the actual letter requesting or

21 opposing something, the better off we will all be.

22            So, let me turn first to the IIRO, Muslim World League

23 and Wael Jelaidan of March 3 and anything that flows from that.

24            Yes, Mr. McMahon?

25            MR. MCMAHON:  Yes, your Honor, I just want to make a

4

14C7TER1

1  preliminary observation.  Whether through my inadvertence or
2  miscommunication, I was under the impression that we were going
3  to only argue today our application for more specificity in
4  terms of disclosures and also WAMY's application for more
5  specificity disclosures.
6         I have secured some affidavits from Saudi Arabia
7  pertaining to the efforts that my clients have undergone here
8  in terms of discovery, and I think hearing their, I'm going to
9  call it, first motion to compel, your Honor, I think we can
10  defer that to a hearing where we combine the first motion to
11  compel along with the more comprehensive second motion to
12  compel, you know, to save judicial resources.
13         If necessary, I guess I could argue that today.  As
14  counsel commented, I think we are getting closer on the subject
15  matters on the first motion to compel, but I want to go on
16  record, your Honor, that I really thought we were just going to
17  hit the applications, and that might take some time.  I don't
18  know.
19         MR. CARTER:  Your Honor, I think the parties addressed
20  in their letters whether or not that application should be
21  heard today, and I think we were very clear that we thought it
22  should because it was fully briefed.
23         THE COURT:  I thought I had issued an order that said
24  it was going to be discussed today.  Am I mistaken about that?
25         MR. MCMAHON:  No, I saw that, your Honor.  And Mr.

5

14C7TER1

1    Carter knew what my position was in terms of that I didn't
2    think it had been properly, say, teed up, and that it would be
3    better to move that into the more consolidated motion to
4    compel.  But if your Honor prefers, we can argue that today.
5            THE COURT:  And it may be that as to some parts of it
6    I reserve based on what you tell me.  But why don't we see what
7    happens as we go along.
8            So, why don't we first turn to your affirmative
9    application concerning plaintiffs' disclosures.
10            MR. MCMAHON:  First of all, your Honor, thank you for
11    backing us into the afternoon slot.  It avoids me getting up at
12    5:15, 5:30 in the morning.
13            We are now eight years out, your Honor, and we have
14    been hit with these allegations of this worldwide conspiracy to
15    fund international terrorism.  Plaintiffs have accused IIRO,
16    MWL and Wael Jelaidan of participating in this international
17    campaign to fund international terrorists.  Our clients have
18    been sued for a trillion dollars, your Honor.  I guess if you
19    add the triple demand, that's $3 trillion.  They have been
20    accused of heinous international criminal acts although nobody
21    has been indicted.  And I think it's about time that we held
22    the plaintiffs' feet to the fire in terms of specificity, your
23    Honor.
24            I think you know what the case law is here.  The
25    magistrate has issued an opinion, I think it was the Sheila v.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1

1    New York City case.  There was also a case we gave you which
2    was the Sender v. Man case from Colorado, your Honor, involving
3    196 brokers.  If the spoken party will not even make the effort
4    to make a reasonable inquiry of witnesses, then it cannot
5    simply produce a laundry list via the party.  As such, it would
6    defeat the purpose of Rule 26(a).
7            It is our position, your Honor, that they have
8    produced a laundry list to us, and I will tell you what we have
9    been specifically given.
10           We have been given the names of 1,632 individuals.
11   That's if you include attachment A, your Honor.  We have been
12   given Guantanamo Bay detainees who apparently may tell us
13   something.  I am not sure they actually identified which one
14   would tell us what.  I'm pretty sure they don't.
15           THE COURT:  It's probably the first time Osama bin
16   Laden, former Senator Kerry and Diane Feinstein ended up on the
17   same list but...
18           MR. MCMAHON:  It gets more amusing, your Honor.  There
19   are some people on that list who are dead.  I don't know how we
20   are going to talk to them.
21           THE COURT:  Don't understand plaintiffs' counsel; they
22   are nothing if not tenuous.
23           MR. MCMAHON:  I've learned, your Honor.
24           The individual who died is Jamal Khalifa.  Just to
25   educate your Honor, this is the alleged hot button guy in the

14C7TER1
 1   Philippines for IIRO.  What the plaintiffs never mentioned is
 2   that although he was convicted of terrorism charges in absentia
 3   in Jordan, the Jordanian Court of Cassation completely
 4   exonerated him on all of those charges.
 5            We have basically inaccessible evidence, foreign
 6   intelligence reports.  Where do I go, to Paris and ask the
 7   French intelligence agency to give me some documents?
 8            They talk about F.B.I. 302s.  Your Honor, I was in a
 9   big case in Washington, and I actually got all the 302s because
10   they were Brady material.  It was fascinating, and it helped
11   our case tremendously.  But I'm not aware of any mechanism
12   whereby I can get those 302s.  So, I think they are virtually
13   inaccessible.
14            THE COURT:  Well, one of the things that the
15   plaintiffs' disclosure says -- and I went back to check, and I
16   will ask plaintiffs' counsel whether it's correct as to all
17   categories of documents -- there are, as I counted it, 23
18   categories of documents in the amended initial disclosures, at
19   the end of which it says the aforementioned documents are in
20   the possession of the Plaintiffs' Executive Committees.
21            So, as to any of these intelligence reports, or 302s,
22   or whatever, the representation is that you don't have to go to
23   some foreign country or anything but, rather, you can obtain
24   them from plaintiffs' counsel.
25            Is it correct that all 23 categories of documents are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8

14C7TER1

1  in the possession of plaintiffs' counsel or plaintiffs'
2  executive committee?
3        MR. CARTER:  Your Honor, that is true.  And maybe some
4  context would help.  Essentially, you know, the plaintiffs had
5  to build this investigation post-September 11, and in doing
6  that there are essentially a couple categories of information
7  that we have.
8        We have information that we as counsel collected
9  ourselves, and that's sort of a broad array.  You have dozens
10 and dozens of congressional hearings that were held
11 post-September 11 that we filtered through.
12       You have the complete archive of the 911 Commission,
13 at least to the extent it's been released, which is the
14 National Archives in Washington, and we sent people, and we
15 read through all of that.
16       You have 302 statements which may have been released
17 in some sort of prosecution, those kinds of settings.  You have
18 the Department of Defense from Guantanamo Bay, tens and tens of
19 thousands of pages of documents that we filtered through to
20 identify what pieces of information might be relevant to claims
21 in the litigation.
22       So, as a result of those efforts we have collected all
23 of this information and we are in possession of those
24 materials.
25       Now, what the defendants really want is to know what
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

14C7TER1
```
 1    is our investigation and what do you have.  That's essentially
 2    the focus of all the discovery that's being conducted.  In
 3    general terms if you look at the structure of the Federal
 4    Rules, the advisory committee notes, they view with disapproval
 5    efforts to essentially build your case on the back of the
 6    efforts conducted by another party.  And it's in that vein that
 7    a lot of the cases have held you can't simply obtain from
 8    another party documents that they have culled from a massive
 9    public record and select it as being significant.  You can't
10    necessarily get directly from them stuff that they've gone
11    through the effort to obtain via the Freedom of Information
12    Act.
13            Now, with all of that said, we recognize that
14    advancing a global objection to the discovery of that
15    information on work product grounds doesn't advance the ball
16    very much or at all.
17            THE COURT:  You did do that.
18            MR. CARTER:  Well, the objections are there, your
19    Honor, but, you know, what really needs to happen here is that
20    we have some structural problems.  We have this information.
21    To the extent it's generated by government officials or
22    government agencies, you know, we have collected it, and we are
23    prepared to disclose that kind of material in the context of
24    discovery to move the case forward, to the extent it's relevant
25    to the claims.
```

14C7TER1

1              What we need is for this exchange of information to be
2     somewhat simultaneous, and I think that's what the scheduling
3     order contemplated, that we would have a rolling production by
4     both sides, and that preserves some integrity in the process.
5     And we are perfectly happy to do that as long as we are getting
6     reciprocal productions from the other side; and so far we're
7     not.
8              Some of the objections also, your Honor, are in there
9     because in all candor on day one of the rolling production
10    period none of us knew comprehensively everything that was in
11    our possession.  Hundreds and hundreds of thousands and
12    potentially millions of documents, and we have to assert
13    objections to the extent they may cover materials.  At the end
14    of the rolling production period I think everyone is going to
15    see that we have given them the information that we have
16    collected that they are fairly entitled to.
17             The problem is we made a significant production of
18    documents on day 1 of the rolling production period, January 2
19    I believe it was, or right around then.  We didn't receive a
20    single document on that day from any of the defendants, and we
21    have received very little since.
22             And in recent telephone conversations we have been
23    advised that certain of the defendants don't even expect to
24    complete their indexing of potentially responsive documents
25    until June or July.  And what we really need I think in place

14C7TER1

1    at this point, your Honor, is some sort of structure that
2    contemplates that there is going to be this reciprocal
3    exchange, and I think we can get past a lot of these sort of
4    isolated nitpicky fights with one another.
5              THE COURT:  Let me hear some more from Mr. McMahon.
6              MR. MCMAHON:  Well, your Honor, I don't know.  I saw
7    that, and I was going to write Mr. Carter a letter to confirm
8    all of this stuff is indeed available for the record.
9              My concern would be, take the topic of people that are
10   incarcerated in either American or foreign prisons or
11   something, do they have interviews of these people?  Do they
12   have interviews with the Guantanamo detainees?  Or do they have
13   a list of things about Guantanamo?  That's what my problem is.
14             THE COURT:  Well, let's assume that they interviewed
15   somebody.  Unless that person is going to appear at a trial or
16   offer an affidavit or a declaration in opposition to the
17   summary judgment motion, the interview doesn't move the ball
18   forward a whole heck of a lot for them other than this
19   background information.
20             If you say there is no evidence of X, and they have an
21   interview of somebody, it seems to me that Judge Daniels is
22   unlikely to consider the hearsay interview in opposition to a
23   summary judgment motion.  So, ultimately they brought the case
24   and it's their burden to adduce admissible evidence in support
25   of their claims.

14C7TER1

```
 1              MR. MCMAHON:  Well, your Honor, maybe I should just
 2    make this very simple, because I am kind of a simple attorney.
 3              To the extent they claim there are a series of five or
 4    six terrorist incidents -- first the World Trade Center bombing
 5    '93; Khobar Tower bombing in '96; Embassy bombings in '98 in
 6    Eastern Africa; 2000 the attack on the Cole; and 2001 of course
 7    our 9/11 tragedy -- I don't know if it's too much to ask, but I
 8    would like to know who is the individual that says IIRO
 9    supported the attack on the USS Cole, and what is the document
10    that says this?  Not this 19 whatever it is CIA document akin
11    to the golden chain.
12              I would like to know, for example, are you saying that
13    the Muslim World League actually attacked the 9/11 towers?  Or
14    aided in the funding of?  I'm sorry, your Honor, well, who says
15    that?  Who is the individual that says that?  And where is the
16    documents?  That's what I'd like to see, your Honor.  Because
17    the more I read about Rule 26 research, it is designed to cut
18    down on expenses of everybody and get right to it.  And these
19    are the potential witnesses that we will be calling.  And
20    sometimes that will certainly aid in potentially a settlement,
21    for example, that they have somebody who saw the car go through
22    a red light, I don't know.
23              But that's what I'm asking for, your Honor.  That's
24    the relief I seek.  And I don't want to file another motion
25    simply because -- well, let me say this:  I would like to at
```

14C7TER1
 1  least inspect everything they have and then have the right to
 2  come back and renew this application if possible.
 3          THE COURT:  Well, one of the ironies is in complicated
 4  commercial cases there is apparently some sentiment among
 5  commercial lawyers on both sides, plaintiffs and defendants, to
 6  eliminate the Rule 26(a)(2) disclosure requirement and just get
 7  to discovery.  And this case may be a paradigm for why that's
 8  not a bad approach, but I guess we're on the track we are on.
 9          Let me tell you what I think is going to be
10  appropriate, because I do think a list of, I didn't count them,
11  a thousand names or even hundreds of names, many of which are
12  unlikely to testify at the trial -- I would think if Osama bin
13  Laden was cooperating with the plaintiffs he would have some
14  trouble getting into the courthouse to Judge Daniels' courtroom
15  for the trial.  At least I would hope that would be the case.
16          MR. MCMAHON:  Where would he go for the visa, your
17  Honor?
18          THE COURT:  That's right.  But what I think I'm going
19  to direct is that the plaintiffs produce within 30 days a list
20  of all the potential witnesses among those listed on their
21  26(a)(1) disclosures who they have the present ability to
22  depose either because the individual is cooperating with them
23  or because that person is subject to service of process, or for
24  whatever other reasons may exist, and whom they have a present
25  intention either to depose or to secure a declaration from,

14C7TER1
```
 1    which isn't exactly what Rule 26(a) contemplates but should
 2    eliminate dead folks, should eliminate people who are in the
 3    mountains of Afghanistan and the like, and narrow it to what
 4    may still be a large list but hopefully won't be a thousand
 5    people.
 6              MR. CARTER:  Your Honor, I think one of the reasons
 7    that you see certain names of people whom you have identified
 8    as individuals unlikely to show up at the courthouse is because
 9    some of those people may have said things that would be
10    admissible under the rules of evidence even though they're not
11    present in the courtroom.
12              THE COURT:  But that will come in not in the form
13    of -- well, it may come in in the form of a document that
14    encapsulates that statement, and it will only come in, I
15    assume, if there is some proof that a conspiracy existed such
16    that the statement of Osama bin Laden, for example, can be used
17    against a defendant who is actually at the trial.
18              MR. CARTER:  That's correct, your Honor.  And from our
19    perspective we were doing this on the front end before any
20    discovery had occurred, and so we necessarily had to include
21    people who may show up.
22              I can give you a perfect example is Khalid Sheikh
23    Mohammed who is now going to go through this process of being
24    tried in a military tribunal, and we don't know what he may
25    say.  Based on some of his interviews, we think he may say
```

14C7TER1
1   something directly relevant to remaining claims in this
2   litigation.  So, that's how the universe of witnesses was
3   defined, we think in accordance with the requirement of the
4   rule.
5           The complaint seems to be there are too many people
6   who have knowledge.  And I understand that your Honor's attempt
7   to answer that is to have us identify people with whom we're
8   presently able to secure a deposition, or some statement to
9   that effect.  And the plaintiffs don't have a problem with that
10  save for concerns about the efforts that have been ongoing to
11  identify nontestifying consultants.
12          Now, I don't think that they fall within the scope of
13  the order you --
14          THE COURT:  Well, I said somebody who you have the
15  intention to either depose or introduce a statement of.  So, if
16  for example let's assume that there is somebody who is on the
17  terrorist list not in the United States but on plaintiffs'
18  payroll as a consultant, which may be farfetched, but if that's
19  somebody who you are not presently planning to call and don't
20  intend to use directly to support your case, that person
21  wouldn't be on the list I have described.
22          MR. CARTER:  I understand, your Honor.  That's fine.
23          THE COURT:  OK.  But for each person who is on the
24  list I am going to require that you set forth topics as to
25  which you believe that person has personal knowledge of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14C7TER1

```
 1   discoverable information so that we don't have the same list of
 2   seven or eight incredibly broad topics for Senator Feinstein
 3   and Osama bin Laden -- I will pick two people hopefully at
 4   different extremes -- and everybody in between.
 5          And what I am interested in is a description of what
 6   they are knowledgeable about that's not based on conjecture but
 7   based on some good faith basis for believing that they have
 8   some knowledge in that particular area.
 9          Just so we're clear, I'm not directing a list that
10   will supersede your prior 26(a)(1) disclosures.  This is merely
11   a supplement.  So, your list of 1,000 names and main topics
12   will continue to exist as your Rule 26 disclosure.  I guess
13   this is the CliffsNotes version of it.
14          MR. CARTER:  Your Honor, I think one thing that we
15   would like to ask is that there be some similar effort on the
16   part of the defendants to identify witnesses.
17          The difficulty arises because the current structure of
18   Rule 26(a) simply requires a defendant to identify individuals
19   they may use to support a defense.  That doesn't necessarily
20   mean that they're identifying all the witnesses within their
21   organization who have relevant knowledge concerning the claims
22   and defenses.  So, to the extent there are folks within these
23   organizations who have relevant knowledge, we would like to
24   have them identified by the defendants with a disclosure of the
25   nature of their knowledge.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1

 1              THE COURT:  Well, let's take it a step at a time.  I
 2      think I want to limit myself for the moment to 26(a)(1)
 3      disclosures or the modification I have described of it.  And I
 4      know somebody's letter -- perhaps yours -- told me you haven't
 5      gotten a lot of 26(a) disclosures as yet.  And let's just deal
 6      with it as we go along.  Because I think also documents will
 7      inform the discussion once you get documents.
 8              At the same time I want to indicate to the plaintiffs
 9      that I do not expect the sort of nonspecific list of topics
10      that was provided last time, because I don't think you want me
11      to inform the conclusion that, as the defendants allege you are
12      doing, that this is simply a fishing expedition on the
13      plaintiffs' part.  Because if I were to conclude that, I would
14      probably -- notwithstanding the fact that both sides said this
15      is not a case in which the ten witness per side rule ought to
16      apply -- I might nevertheless severely restrict the number of
17      depositions that plaintiffs are allowed if I do conclude that
18      we're just engaged in a fishing expedition here.
19              Let me focus in on the plaintiffs for the moment.
20      After document discovery closes, and you have had an
21      opportunity to review the documents, I may -- I'm not saying I
22      will -- but I may require that the list I have just described
23      be supplemented before discovery closes with a list of
24      contemplated trial witnesses and the subjects that they may
25      testify about, so that defendants can make informed decisions

18

14C7TER1
```
 1  about who they ought to depose rather than looking at a list of
 2  200 potential witnesses, if that's what the number is.
 3          I don't know what number will be provided in response
 4  to my directive about a narrower list, so I'm not at all
 5  certain that I will require anything like that, but that's
 6  something I have been considering.
 7          As to the documents where there is a representation
 8  that all of those documents are in plaintiffs' collective
 9  possession, I guess, I'm not going to require that there be
10  further specificity.
11          And I understand the objection that the plaintiffs
12  have made in terms of attorney work product, and I do think a
13  request that is couched in terms of "give us everything you
14  have that you have collected" would, for example, be improper.
15  And in particular something that said "give us everything that
16  counsel has collected" would be improper.
17          But my view is that if there is a document that
18  counsel have collected that responds to a specific subject
19  matter request, for example, there is a request for all
20  documents reflecting payments direct or indirect from IIRO to
21  terrorists, if there is a document that plaintiffs' counsel as
22  agents for plaintiffs have obtained from whatever source,
23  whether it's a consultant or a trial exhibit in a criminal
24  trial, or somebody flung it over the transom, I do think that
25  document has to be produced.  So, to that extent at least, I
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1

1    don't buy that documents that you have culled don't have to be
2    produced.
3          MR. CARTER:  Your Honor, I think we made clear that we
4    didn't intend to withhold stuff on that basis.
5          Again, our real problem here is that we are showing
6    everything on our side.
7          THE COURT:  Well, we will talk about timing as we go
8    forward.
9          MR. CARTER:  OK.  I mean I want to be clear, your
10   Honor, the stuff that has been produced already is significant.
11   You know, there are references to the 302s, there have been
12   reference to Treasury Department evidentiary memos, for
13   instance, concerning the IIRO and Wael Jelaidan.  Your Honor,
14   we've actually filed those of record in proceedings before you.
15         THE COURT:  Both sides have accused -- well, not both
16   sides.  Some of the defendants' letters suggest that a lot of
17   what was produced was newspaper clippings and the like.
18   Whether that's valid or not, I don't know.
19         MR. CARTER:  Well, your Honor, there were newspaper
20   clippings, but we don't believe that the newspaper clippings
21   weren't subject to production.
22         THE COURT:  No, I think that's right.
23         MR. CARTER:  And we were trying to sequence this, and
24   in trying to sequence it, for instance, with WAMY, we went
25   through and collected all the media publications.  We also went

14C7TER1

 1   through and collected every congressional hearing we had
 2   relative to the issue of terror sponsorship in which a witness
 3   made a reference to WAMY, and we have collected proceedings
 4   from other courts.  So, that stuff has all gone.
 5            And we are making a diligent effort to continue this
 6   rolling production, but it's very difficult when it's just not
 7   coming back.
 8            THE COURT:  And with that in mind, let me turn to
 9   your -- I guess it's your I was going to say March 16 letter.
10            MR. MCMAHON:  Your Honor, can I just make two
11   observations on what you have just gone through?
12            THE COURT:  Sure.
13            MR. MCMAHON:  One is when they come in with these
14   responses, do I get a response that says this is all the
15   material we have on IIROSA's support for the Nigerian Embassy
16   bombing or something?  How detailed is this going to be?  I
17   don't want to come back here and make another application.  The
18   same would go of course for the other clients.
19            THE COURT:  Well, I think implicit in anybody's
20   production is a statement that this is all the material we have
21   at the moment that's responsive to a particular request.  It
22   may be that somebody flings more documents over the transom
23   that they then seasonably have to produce to you.  But am I
24   going to require either side to say this is all we have?  I
25   think that is implied in not turning over additional documents.

14C7TER1

```
 1              I would assume that at some point -- you had suggested
 2    it in terms of one of your witnesses -- that at some point
 3    there will be depositions of document custodians to see what
 4    was or wasn't searched.  Given the myriad sources that
 5    plaintiffs have utilized, that may be more difficult in terms
 6    of defendants questioning plaintiffs, but I would imagine at
 7    some point plaintiffs are going to want to know what was done
 8    by way of searching files at your end.
 9              MR. MCMAHON:  Yes, your Honor.  We prepared two
10    separate affidavits for MWL and IIROSA, and they weren't filed
11    yesterday because, as Mr. Carter reminded me, you want the
12    whole package simultaneously.  That's one of the reasons I was
13    thinking the first motion to compel should be into the second
14    motion.  And you can see for yourself, your Honor, the
15    incredible man hours that these people have expended over the
16    last six or seven years and what's coming down the road --
17    three million pages from MWL, 6,000 thousand folders, two
18    million pages from IIROSA.  Who is going to pay for the
19    scanning and copying of all of that.
20              But there are a lot of issues I think you should hear
21    at a comprehensive motion to compel and definitely read the
22    affidavits, your Honor.  Thank you.
23              MR. CARTER:  Your Honor, the affidavits were submitted
24    pursuant to the briefing schedule for a motion that's not yet
25    before the court, so they're not a part of this record.  And we
```

22

14C7TER1
1    received them yesterday, and our preliminary analysis is
2    ongoing.
3              THE COURT:  OK.  Well, then maybe there is some merit
4    to what Mr. McMahon was saying to me about putting off some of
5    this.
6              One thing I was particularly interested in this was a
7    representation made that there were going to be certain indices
8    about what files existed, and it was in the future tense, "to
9    be provided".  Have they now been provided?
10             MR. MCMAHON:  Yes, your Honor.  At that last
11   conference, if you recall, you had made a suggestion to me that
12   it's fine that there is the warehouse there, can you come up
13   with an index for that.  And we have done that.  It's long,
14   it's in Arabic, and I believe we have sent it to Mr. Carter.
15             There is now an index for the Muslim World League,
16   which is not that long, I think 10 or 12 page, albeit in
17   Arabic, your Honor.  But there is also a website for the Muslim
18   World League that goes back to 1962, your Honor.  I don't know
19   if you know --
20             THE COURT:  They had a website then?
21             MR. MCMAHON:  No.  The website was created about 18
22   months ago, but the materials content goes back to 1962.  John
23   Foster Dulles solicited the support of the Saudi Arabian
24   government to fight Communism and to set up an entity that
25   would propagate faith, religion, even if it was not Islamic.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1
```
 1   That's the nature of the 1962 date.
 2             But, yes, your Honor it's been slow -- I apologize --
 3   but I'm dealing with a different culture, and there have just
 4   been enormous problems.  But I think once you see what effort
 5   they've put into this production, it's quite something, based
 6   upon the case law I've seen.
 7             THE COURT:  Well, I am mindful of perhaps what both
 8   sides have said in terms of not really getting deep into the
 9   merits of these arguments until our next session, but the fact
10   that you have indexed the warehouse, if it doesn't tell them
11   who and where relevant documents would be, it may not be that
12   much of a step forward.
13             MR. MCMAHON:  Well --
14             THE COURT:  They are entitled within reason to have
15   you segregate documents responsive to reasonable and
16   particularized requests.  Maybe the index does that.
17             MR. MCMAHON:  I am hoping, your Honor, that whether
18   they visit the MWL website, or they look at these indexes, that
19   they then come back and state precisely that, Mr. McMahon, we
20   like what you've done, but it doesn't go all the way, and here
21   are the deficiencies.  And then I can deal with that with the
22   culture I'm involved with.
23             THE COURT:  One thing that struck me in everybody's
24   submissions was -- and maybe it's a function of the time period
25   we are talking about -- but I don't think I saw a single
```

14C7TER1

1   reference to electronic materials.  And I would imagine that
2   for at least some of the periods there must be some electronic
3   files that are on both sides.
4         MR. CARTER:  Your Honor, if I could address that and
5   provide some context.  The way that we got to this point with
6   this motion concerning the Muslim World League and the IIRO is
7   that we served our document requests, we received numerous
8   objections to them, and a number of attorneys went down to Mr.
9   McMahon's office to confer with him on how we could get past
10   this stuff.
11         At that time the objections that were raised and the
12   problems that were raised, the predicate for the conversation,
13   are the same problems are you hearing about today:  We have a
14   lot of stuff, it's very hard to find things, I'm dealing with
15   another culture, they doesn't fully appreciate the U.S.
16   litigation process.
17         And through the course of that dialogue what we
18   attempted to do was identify categories of documents that could
19   be readily retrieved and produced to the plaintiffs in the
20   United States as a step of moving the ball forward.  That's how
21   we got to these eight categories of documents, and that's one
22   of the reasons you don't have specific document requests,
23   because this was essentially a compromise.
24         And so these documents were the very documents that
25   were identified as being readily accessible.  And we do

14C7TER1
1   reference in there that we want certain electronic, for
2   instance, lists of recipients.
3           Now, at various times we have been told that there is
4   no electronic record for these organizations.  In an earlier
5   brief we made the point that one of the documents disclosed to
6   us included a reference to a search conducted in 1995 of the
7   IIRO's computer system to determine if they gave aid to a
8   particular recipient.  So, our view is that there is a computer
9   system and it's existed at least to that time.
10          The indices that we received --
11          THE COURT:  Let me interrupt you for a second and ask.
12  They have proffered a sacrificial lamb in terms of somebody who
13  they say is knowledgeable about recordkeeping, it sounded like,
14  worldwide for one of the entities.  Why wouldn't you want to
15  talk to that person?
16          MR. CARTER:  Well, the way this involved initially,
17  your Honor, is that we actually proposed that there may be a
18  possibility at an appropriate time to do the deposition of a
19  records custodian.  Our understanding is that the individual
20  who has been most recently identified had resigned.  Now that's
21  our understanding of what we were told by Mr. McMahon at some
22  point previously.  Now he has obviously returned or maybe the
23  earlier indication was inaccurate.  Who knows.
24          THE COURT:  Or he may have resigned but still be
25  available for this purpose.

14C7TER1

 1              MR. CARTER:  Correct.  The difficulty from our
 2     perspective is we are not really interested in learning the
 3     universe or Muslim World League's or IIRO's documents as a
 4     general matter.  We have a pretty good handle on that, frankly,
 5     based on the limited discovery we've conducted and our own
 6     investigations.  Before we take a deposition of a record
 7     custodian --
 8              THE COURT:  Forget deposition.  I thought Mr. McMahon
 9     was saying come talk to the person, tour an office and see how
10     the records are kept.
11              MR. MCMAHON:  Your Honor, because I saw some case law
12     to this effect, I think a defendant was sort of lectured by the
13     court that it's a little late in the game to be doing this.
14              But three years ago we the started this invitation
15     process specifically because there is some overlap between the
16     MWL and IIROSA.  But there is a New York office, there was a
17     Virginia office, which the F.B.I. raided, and I'm getting back
18     all of those documents.  So, I thought, gee, the 9/11 lawyers
19     would want to go to the MWL office to start with.  But there is
20     a London office that is fairly typical of the worldwide
21     universe.  We have offered London, Gibraltar, Madrid, even one
22     of the countries where the embassy bombings occurred, Tanzania,
23     I think, with the view you can come in and talk to people here
24     and maybe get a better understanding of things and narrow
25     things down.  Because I feel it's in the best interests of

14C7TER1
1    getting them what they say they need -- even though I have some
2    views about this case -- and having our organizations be able
3    to function for the next two years.
4          THE COURT:  But the eight categories -- and I know
5    there is a dispute as to the extent to which there were or were
6    not agreements back in October of 2007 -- some of the eight
7    categories seem to me to be extraordinarily simple in terms of
8    locating documents.
9          I mean take number 8, I am not sure what time period
10   we are talking about, but in general give us the org chart is a
11   pretty straightforward request made in every case of any size.
12   It's something that most organizations have readily available,
13   or if it doesn't exist because of the way your clients do
14   business then the answer would be, sorry, we don't have it.
15         But giving them indices of the whole perhaps worldwide
16   warehouse doesn't necessarily tell them which file to go fish
17   in for the org charts, and it seems to me that you sitting down
18   with your clients, that that at least is something that ought
19   to be fairly easy to say here it is.
20         MR. MCMAHON:  I think so, your Honor.  I think we can
21   narrow our differences on that.  For example, that MWL website
22   I think even has that, but I'm not sure.  I just want you to
23   know, your Honor, at least I have been told -- and we were
24   shocked at this.  I have made six visits to the Kingdom, in
25   fact held up another visit because of the court hearing -- it's

14C7TER1

```
 1    paper.  We were astounded on our first trip.  You just have
 2    paper?  That's it?  And I think Sameer al-Radhi references that
 3    in his affidavit.  It was stunning to me.
 4            Now, in the IIROSA main headquarters they have a whole
 5    series of computers and things, and they may be able to
 6    download that information, but we take the position, your
 7    Honor, that anything after 2001 is irrelevant, because we
 8    litigated this with Judge Daniels I believe, and he set the
 9    parameters from 1994 to 2001.
10            So, today if there is some electronic material -- and
11    I think we sent some up recently -- it's to our opinion
12    irrelevant, your Honor.  But it really was astounding to us
13    that they still do this by paper.  That was way back in 2/2 or
14    2/3 when I made my first visit.  But it is hard to believe, but
15    that's what it is.
16            And Sameer spent an enormous amount of hours coming up
17    with 6,000 folders, your Honor, that he believes, your Honor,
18    are responsive to the document request made to the MWL.
19            THE COURT:  Is that for the entirety of the document
20    request or the eight categories?
21            MR. MCMAHON:  Oh, no, your Honor.  For the entirety of
22    the request.  He's got 6,000 folders, and they are not just
23    these are all MWL documents.  Those are 6,000 folders that have
24    been culled in terms of matching up the Rule 34 requests.  They
25    had some issues, but I think he has done a good job.  So, this
```

14C7TER1

1   6,000 folders are sitting there, your Honor, and that's why we
2   went out and got a cost estimate.
3           THE COURT:  And these are sitting in Jeddah?
4           MR. MCMAHON:  Mecca, but they can be transported to
5   Jeddah, because I specifically said they may hire a Muslim
6   lawyer, but I want to be able to represent to the court if they
7   want to just go to Jeddah, they can certainly go through these
8   folders.  But there are folders that are responsive to the MWL
9   request, your Honor.  This isn't just the MWL universe.
10          MR. CARTER:  Your Honor, let me take a few of these
11  things in turn.  The issue as to whether or not we should be
12  traveling to Jeddah to run through these giant warehouses is
13  the subject of another soon-to-come motion.
14          We had a meet-and-confer with both counsel for Muslim
15  World League and WAMY last week, and we weren't able to resolve
16  our differences.  I am hoping when we present the arguments
17  maybe we will be able to work through it.  So, again that's not
18  on the table today.
19          What we are talking about today is these eight
20  categories.  And the frustration from our perspective is that
21  we went down, and we tried to work through all of these issues
22  and find a path that would create momentum for the discovery
23  process.  We identified these very discrete categories of
24  documents, and now we're back at a hearing years later, and
25  we're being told you should travel around the world to all of

30

14C7TER1
1     our offices to see how they work.
2              Well, you know, the traditional practice in discovery
3     is that you send your requests, and the other side spends back
4     the responsive documents.  Some of the stuff we have seen
5     produced to us thus far gives us tremendous pause about going
6     to any of the offices, because what we get are salutary letters
7     thanking the IIRO and Muslim World League for digging a well.
8     And it's specifically that kind of stuff we've said we don't
9     want; We are not interested in that.
10             THE COURT:  Putting aside the obvious strength of
11    views on both sides in this case, it's been my experience that
12    when you are dealing with foreign discovery in any case, even
13    it's the manufacturer of widgets, getting the very sorts of
14    information that you seek is difficult just because of cultural
15    differences.  And it sounds like Mr. McMahon has done this to
16    some extent, but usually out of frustration I have ended up
17    directing the person in Mr. McMahon's position to go and sit
18    down and sort of walk people through the files and do the types
19    of things that an associate would do in this country, dispatch
20    to somebody's warehouse in Iowa.  And we may get to that.  I
21    hear what you are saying about the eight categories.
22             MR. CARTER:  And, again, I think we want to focus on
23    the eight categories, because everything else is not before the
24    court.  You know, when we start talking about the indices, the
25    indices have 100,000 cells, so there is 100,000 entries in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1

1    effect.  We actually received four indices, and after analyzing
2    them we realized that they had given us duplicates, so that
3    there really only were two.  You know, looking at those two,
4    again you are left with 100,000 cells, and a lot of them just
5    say things like "relief" or "health".  That is not helpful.
6            Now, there are some where the categories are
7    sufficiently specific, and we are only talking about two or
8    three words that enable us to identify them as being of
9    particular interest.
10           But our view was if we could start with these eight
11   categories.  You know, the next focus frankly is on documents
12   pertaining to a gentleman named al-Mujio, who is designated by
13   the U.S. Government and directed one of the IIRO offices in
14   Saudi Arabia; the file for Mohammed Jamal Khalifa, who is
15   alleged to have been a founding member of al Qaeda.  This is
16   pretty dead-on focused stuff that we're trying to get to, and
17   to get to it we don't want to run through a bunch of warehouses
18   everywhere.
19           THE COURT:  One of the problems is, it seems to me --
20   and that's why I picked on item 8, the org charts first -- if I
21   take something at the other end of your list, list of
22   recipients of aid, Mr. McMahon said in his letter that there is
23   18,000 orphans who got aid.  And I assume you are less
24   interested in orphans than projects.
25           MR. CARTER:  Your Honor, I think that's accurate.  The

14C7TER1

1    issue though, the way we arrived at a request for recipients of
2    aid was because Mr. McMahon told us at the meeting that the
3    IIRO and the Muslim World League keep these impeccable records
4    of everyone who has ever received aid, and they can document
5    every single person.  And that led us to the simple solution,
6    well, if you can generate a list of the recipients, send it to
7    us, and at that point we can say we are interested in these
8    projects only, throw the rest of them away.
9              And so I know in a vacuum it's difficult to understand
10   how we got to that, but it was as a result of the conversation.
11             THE COURT:  What time period -- just to stick with
12   recipients of aid, for example -- were you requesting it for?
13   '94 through when?
14             MR. CARTER:  Your Honor, I should clarify that.  Judge
15   Daniels' ruling was actually that discovery would go back to
16   1992.  He did not address whether or not -- and it hasn't been
17   briefed -- as to whether or not the period of discovery should
18   extend past September 11, 2001.
19             THE COURT:  That's why I was asking you, because I
20   knew there was a start date in one of those decisions; I didn't
21   have a recollection of an end date.
22             MR. CARTER:  No, I think when we served these many,
23   many years ago, we went through the present, part of the logic
24   of that being some of the most important evidence may actually
25   be from the period post 9/11, for instance when these

14C7TER1
```
 1   organizations were being implicated in terrorism and logically
 2   would have taken steps to identify people who were problems and
 3   maybe taken action against those people.  So, cutting it off at
 4   September 11, 2001 doesn't make a tremendous amount of sense.
 5   We are willing to deal with a reasonable period after.  It's
 6   just not something that we've discussed yet.
 7            THE COURT:  And notwithstanding what you said about
 8   the 6,000 folders and the indices, Mr. McMahon, and subject to
 9   some decision about the end date, what's so hard about
10   producing a list of recipients of aid?
11            MR. MCMAHON:  Your Honor, I'm going to stand up to
12   clarify something.  There's 40,000 kids in Africa alone who are
13   receiving aid, as Sameer -- Mr. al-Radhi has corrected me.
14            THE COURT:  Directly?
15            MR. MCMAHON:  The way they receive aid, your Honor,
16   it's maybe a remote village in northern Africa, the woman shows
17   up, has her fingerprint, the kid shows up with a fingerprint,
18   and they get two bucks a month I think for that.  That's how it
19   comes out.
20            THE COURT:  And how is that booked on the books of MWL
21   or IIRO?  Is it village A got $20,000?  Or is it Abdul got $2
22   with this person he came with?
23            MR. MCMAHON:  I appreciate your insight, your Honor,
24   trust me.  First of all, MWL is the organization up here that
25   was created in '62.
```

14C7TER1

```
 1              THE COURT:  OK.
 2              MR. MCMAHON:  I forget how many years later there was
 3    a decision made, you know, to actually implement aid we have to
 4    set up another arm which will deal with building wells, going
 5    to people who have suffered in typhoons or whatever, emergency
 6    health care, things like that, and that's IIRO.  So, there
 7    would be IIRO records which I personally looked at in Jeddah,
 8    quite comprehensive.  But I can try to get the names of 40,000
 9    orphans.
10              THE COURT:  Does MWL make direct grants to anybody, or
11    is everything funneled through?
12              MR. MCMAHON:  No, I believe everything is funneled
13    through IIROSA, your Honor, in terms of the issues that they
14    are looking at.  MWL gets its money from the Kingdom, but they
15    don't do I think the orphans.
16              The theory of the plaintiffs, I believe, is that cash
17    can leak out of this system.  I have looked at the system, and
18    I used to be with the Securities Investor Protection
19    Corporation, your Honor, and I tracked money laundering all the
20    time.  And I surprised them with my request to review the
21    records.  No hesitation to do that.
22              So, it's only IIROSA, I think.  And it really is
23    financial records.  These guys want to see whether IIROSA has
24    links to -- for example, did IIROSA send money over to America
25    so that conspirator number 5 got flying lessons in Denver or
```

14C7TER1
```
 1   something.  I think that's where they're going.
 2              THE COURT:  Well, that's I would assume part of it.
 3   They're probably not going to be able to look behind each and
 4   every individual who got his, as you said, $2, but I would
 5   imagine they would be interested in large payments either
 6   because of where they go or when they go or whatever.
 7              MR. MCMAHON:  Your Honor, I think it's going to be
 8   very helpful.  I'm somewhat remiss here.  This is my fourth
 9   production.  We have had Ashton, Burnett.  We had the Treasury
10   Department, OFAC, Office of Foreign Assets Control, and now we
11   have federal.  There are a lot of documents floating around the
12   office, and I just recently got a handle on them.  I gave them
13   to Mr. Carter as a result of our last communication.  But I
14   think categories 1 and 2, annual report and the financial
15   statements, do not pose an issue for us, and I have told that
16   to Mr. Carter.  8 does not pose an issue.  And some of the
17   others I think overlap.  But one of the reasons I deferred the
18   trip to Saudi was to get a better handle on things.
19              For example, on the 6,000 folders of the Muslim World
20   League, can I get some way to identify all the folders that are
21   financial, which they are looking for?  I think that's my job.
22   That's a task down the road.
23              THE COURT:  Just out of curiosity, when you deal with
24   these folks in Saudi Arabia, do they speak English or are you
25   dealing through a translator?
```

14C7TER1

```
 1              MR. MCMAHON:  Sameer is pretty good, your Honor.  But
 2    when I deal with the MWL folks from Mecca and they come into
 3    Jeddah, one of them speaks English but not very well.  And I
 4    have noticed in some of my e-mails with Sameer that there has
 5    been a misapprehension on something, and we tried to correct
 6    it.  And sometimes we even talk on Skype.  I promised him I
 7    would be Skyping him tomorrow after our session today.  So, I
 8    will indeed ask him about the MWL records of 6,000 folders, is
 9    there a category there for financials.
10              THE COURT:  Let me go back to Mr. Carter, since there
11    seems to be a consensus that a lot of this should be the
12    subject of our next session.  Tell me what you want me to deal
13    with today, if anything.
14              MR. CARTER:  Your Honor, when I look at the response
15    that was filed, for, say, five of the eight categories there is
16    an agreement they should be produced.  So, you know, we think
17    that those documents should be produced now because we have
18    been waiting for them for a long time.
19              You know, now there is an argument in there that we
20    can't possibly give you financial reports from the field
21    offices because they are not submitted back to the
22    headquarters.
23              THE COURT:  Which is contrary to the materials you
24    gave me.
25              MR. CARTER:  Right.  And so those do exist, and we do
```

14C7TER1

1   want those periodic financial reports.
2          Again, this is a very, you know, confusing
3   circumstance because we went, we spent all the time to meet and
4   confer, we came up with these categories, we sent a letter back
5   in 2008.  There has never been an indication that there is an
6   inability to comply with it, and we are essentially hitting the
7   restart button again today much later.
8          So, I think all we want to addressed to is the eight
9   categories and have an order entered that those should be
10  produced.
11         THE COURT:  Well, I am looking at Mr. McMahon's letter
12  and category 7, which is summaries of disbursements, which I
13  guess is a CliffsNotes view or a macro view of what is going on
14  in these organizations.  It says will be produced Washington
15  D.C. or Jeddah, depending on the timeframe, see attached annual
16  reports.  I'm not sure I had any attached annual reports.  But
17  it would seem to me if these are summaries of disbursements,
18  Mr. McMahon, they can't be voluminous, and it ought to be
19  fairly simple to produce them if not forthwith then pretty
20  chose to forthwith rather than in Jeddah.
21         MR. MCMAHON:  No, I checked the annual reports, your
22  Honor, and it is in there in detail, the expenditures.  So
23  after reviewing those -- and I have different years.  I have to
24  get them all together -- I don't see any problem with that,
25  your Honor; it's part of the annual report.  And they are

38

14C7TER1

```
 1   audited I think now by KPMG, but there are audited financials
 2   too, which I sent I think four up.
 3           THE COURT:  And you also say that you are going to
 4   produce org charts.  But there is the issue where you have said
 5   that there is no reporting up.  And there seem to be a host of
 6   documents that suggest the contrary.
 7           MR. MCMAHON:  Yes, your Honor.  I was mistaken in
 8   that.  And I will you frankly, this is the most extraordinary
 9   case I have ever had to defend, and I have never been in a case
10   with so many issues.  But I think that was my fault, your
11   Honor.  Again, it stems from this production.  We have had to
12   produce stuff for different plaintiffs and the Treasury
13   Department.  So I think that is part of that is for me.  And
14   Sameer is trying to -- well, as I said, I'm going to be Skyping
15   him tomorrow to get clarification on that issue.
16           THE COURT:  Well.
17           MR. CARTER:  Your Honor, if I --
18           THE COURT:  Please.
19           MR. CARTER:  You know, one of the points of confusion
20   I think here is that we're several years into this with the
21   Muslim World League and IIRO, and Mr. McMahon is presenting an
22   argument that there are no reports up from the field offices to
23   the headquarters, and then withdrawing that when we point out
24   the documents that have been produced.
25           There was an indication today that the Muslim World
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

14C7TER1

1   League does not engage in any direct grants of aid.  The
2   documents previously produced by the Muslim World League very
3   much indicate that it does give aid directly and engages in
4   operational activities on its own independent of the IIRO.
5           So, we are so far along in the process, and there
6   seems to be a lack of understanding of the organizations, and
7   as a consequence we have no confidence that what is coming back
8   to us is complete.
9           What we see when we raise an issue is a production of
10  a limited amount of documentation which doesn't represent the
11  complete universe but something sort of intended to appease us.
12  And what we really want is to get going, and that's it.
13          THE COURT:  And what are you suggesting I do other
14  than say produce these eight categories or copies of the
15  materials responsive to these eight categories in the United
16  States in short order?
17          MR. CARTER:  Nothing further than that, your Honor.
18  Beyond that, you know, we focused, given the timeframe that's
19  available for us to conduct discovery, and that's why we have
20  another motion that we served on Mr. McMahon which focuses very
21  much on the activities of an individual in Saudi Arabia who had
22  control over purse strings and has designated a person in the
23  Philippines who is Osama bin Laden's brother-in-law and has
24  been listed as a terror financier and supporter.
25          One other thing I should mention, there is an effort

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

14C7TER1

 1   to categorize this as being only about financial transactions.
 2   And that's not the case.  In many circumstances what you really
 3   have is these organizations in our view facilitating the
 4   movement of members of al Qaeda by giving them false
 5   credentials so they can enter into Afghanistan, for instance,
 6   and get to an al Qaeda camp.  And when you look at the
 7   Department of Defense summaries for the Gitmo people, you have
 8   witness who say I was at this al Farouq camp, an al Qaeda
 9   training camp, I was an employee of the IIRO.
10           So, it's not just about money; it's about other
11   topics; and we are trying to focus in on all of those.  But I
12   just want to disabuse the idea that if we just get some
13   financial transactions we would be done.
14           MR. MCMAHON:  Your Honor, I think we have given you
15   all the Jamal Khalifa files, just on our last production.  We
16   gave you whatever we have.
17           You are focusing on Wael Jelaidan, but IIROSA has
18   nothing to do with Wael Jelaidan.  The problem, your Honor, is
19   sometimes these offices are overlaid and they share offices.
20           THE COURT:  I have been told by MWL and IIRO.  How
21   does Wael Jelaidan fit in with those two?
22           MR. MCMAHON:  He thinks IIROSA is the employer of Wael
23   Jelaidan, which is not the case.
24           Wael Jelaidan, your Honor, was very important in
25   Afghanistan.  He headed up the refugee mission, and he got to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1

1    know, among other things, Osama bin Laden very well, but that's
2    what his job was.  So much of this case goes back to -- and
3    it's in their papers, your Honor -- goes back to Afghanistan,
4    the occupation, when the CIA and the Saudi intelligence were
5    one-on-one and were getting stingers missiles to the Mujahideen
6    to get rid of the Russians.  That's what is another theme in
7    the disclosures, your Honor.  But Wael Jelaidan only features
8    in that he is an individual defendant and he did have, I
9    believe -- well, he had a relationship with an entity called
10   the Rabita Trust, your Honor, which is in jurisdictional
11   discovery; it's not up for anything today.  He was the
12   executive director of the Rabita Trust.
13            THE COURT:  Well, tell me why I shouldn't -- let me go
14   back a step.  You indicated that you have postponed a trip to
15   the Kingdom for purposes of this conference, and I gather you
16   will be going there soon.  Why shouldn't I say that the
17   documents responsive -- and I think we need to fix an end
18   date -- but the documents responsive to categories 1 through 8
19   have to be produced within three weeks in the United States?
20            MR. MCMAHON:  Well, I could probably use the other
21   week, your Honor.  It's not going to matter I think to them, so
22   I would ask for four weeks, your Honor.  I think that's what
23   they asked for, 30 days, or maybe that was your second motion
24   to compel.  I think you asked for production in 30 days.
25            MR. CARTER:  I think it says 20, your Honor, but...

42

14C7TER1

 1          THE COURT:  It does.  Well, 20 or 30 is not a big
 2   difference.  Suppose I say 30 days but direct that the
 3   documents responsive to those eight categories through 2004 --
 4          MR. CARTER:  That's fine.
 5          THE COURT:  -- '92 through 2004 be produced in the
 6   United States within 30 days.
 7          MR. MCMAHON:  Your Honor, could you just put on the
 8   record why we're moving off?  I'm not sure, and I don't want to
 9   misspeak, but I thought it was 2001 or December of 2001 when
10   the cut-off date was.  I haven't gone back and looked.
11          THE COURT:  OK.  I remembered there was -- maybe I
12   have it with me -- it may have been an exhibit somebody gave
13   me.  I remember Judge Daniels' order saying that the start date
14   was I thought '94.  It may be '92.  We will go back through the
15   file and whatever it is, it is.
16          If Judge Daniels set some other date, and you convince
17   me of that, I will shorten the period.  But failing that, it
18   seems to me the end of 2004 is a reasonable cut-off.  It should
19   get easier to produce it the closer we get to 2011 both in
20   terms of hopefully electronic systems and just in terms of
21   accessibility.
22          MR. MCMAHON:  I just don't think there are any
23   allegations in the complaint that bear on that, your Honor.
24   Basically they allege that you take the World Trade Center and
25   then you go back to say the 1996 Khobar Towers bombing or
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14C7TER1
1   something.
2           THE COURT:  But it's reasonable to look at is there a
3   sudden change in the way disbursements are made such that it
4   shows either a cover-up after the fact or sheds light on
5   something that was unusual about the earlier disbursements.
6   So, I don't think a snapshot rather than sort of a continuum is
7   appropriate.  People can argue about when the period ought to
8   end.  Feel free to send me a letter that tells me that Judge
9   Daniels has already ruled on this, and if he has, I will modify
10  it.  If you want to send me a letter telling me why it should
11  end significantly before 2004, I will read it, and any response
12  I get from plaintiffs, but I'm likely not to change that
13  period.
14          MR. MCMAHON:  I understand, your Honor.  I just
15  thought that was Judge Daniels' call, that's all.
16          THE COURT:  If he has made it --
17          MR. MCMAHON:  No, any subsequent calls.  If he is
18  going to change the timeframe, I thought that's in his
19  bailiwick, not yours, but...
20          THE COURT:  No.  The only reason I'm saying if he
21  set -- and I know he did set a date -- whether it's '92 or '94,
22  I don't remember as I sit here -- I'm not going to contravene
23  that.  If he didn't set a date, trust me if he is asked, he is
24  not going to be upset with me setting a date.  And in fact I
25  assume if I were to reconsider based on new facts and say the

14C7TER1
1   date should start in '89, I don't believe, unless he thinks I'm
2   clearly erroneous, he is going to change that.  I am just
3   saying if he or I decided what the start date is, I don't want
4   to keep revisiting the same issues.
5           MR. MCMAHON:  I understand, your Honor.  Thank you.
6           MR. CARTER:  Your Honor, I am actually looking at
7   Judge Daniels' order concerning the timeframe issue, and it
8   sets '92 as the early date, presumptive early date and it
9   doesn't set a terminal date.
10          THE COURT:  OK.
11          MR. CARTER:  The order was issued on December 21,
12  2004.
13          THE COURT:  Do you have you the docket entry number at
14  the top?
15          MR. CARTER:  I'm sorry, 2007.  There is no docket
16  entry.  But it is Exhibit E, your Honor, to our April 7 letter.
17          THE COURT:  Oh, right, I knew I read it somewhere.
18          MR. CARTER:  So, it's there.
19          With regard to the latter period in 2004, just as one
20  example, your Honor, the Treasury Department evidentiary memo
21  supporting the designation of the IIRO includes language
22  stating that the IIRO's sponsorship of terrorism continued at
23  least through the first half of 2006.  So, there is information
24  of record to justify this later period.
25          You mentioned also, you raised an inquiry about why

14C7TER1

1  Wael Jelaidan might fit into all of this, and Mr. McMahon
2  suggested that he has nothing to do with the Muslim World
3  League or the IIRO.  Wael Jelaidan's CV -- which is one of the
4  only things he's produced to us -- indicates he was the
5  director of the Muslim World League, one of its officers, for a
6  period of many years.  So, it is our understanding that the
7  office in question was a joint Muslim World League/IIRO office,
8  that in the capacity as that director he had the ability to
9  issue papers to purported relief workers; and Jamal al-Fadl had
10 testified before federal agents that Jelaidan did in fact
11 provide humanitarian papers from the IIRO for al Qaeda people.
12 So, that's sort of how he fits into this mess.
13        THE COURT:  Shall we move on to the WAMY request
14 letter?  Mr. Mohammedi, the letter of March 3, I guess, was the
15 start of that chain.
16        MR. MOHAMMEDI:  Yes, your Honor, we have eight issues
17 before this court now.  The first one we believe that
18 plaintiffs' continued argument of discovery given that it was
19 rejected --
20        THE COURT:  I'm sorry, I am having trouble hearing.
21        MR. MOHAMMEDI:  I said plaintiff is using the argument
22 of federal discovery in a way they want to extend the evidence
23 before they produce the documents.  And we are having a hard
24 time understanding the rationale.  We don't believe this is a
25 valid objection.  This is the first objection that they have

14C7TER1
 1   which is a general objection.
 2            Now, the second objection that they have, in all their
 3   general objections what they keep saying is all our requests,
 4   including document requests, are contention interrogatories.
 5   They have not been specific to the specific request that they
 6   think are contention interrogatories.  And your Honor
 7   specifically mentioned that you cannot make a decision based on
 8   abstract.  And their objection is general objections, not
 9   specific objections to specific document requests or
10   interrogatories.
11            We do believe that WAMY and WAMY International need
12   proof, and so far we believe plaintiff has produced mostly
13   newspaper clippings.  We just believe that the plaintiff, if it
14   believes that there is no document available to them, they just
15   need to say so.  However, most of their responses are very
16   vague responses and with general objections such as contention
17   discovery requests.
18            One important issue that they mentioned also is that
19   they keep making more allegations about WAMY, actually Muslim
20   World League being the parent company for WAMY, yet we have not
21   received one single document from them demonstrating that.  And
22   we made the request specifically to those, and we have not
23   received anything about that.
24            Now, the third issue that we would like to address is
25   the privilege.  They have not produced one single document

14C7TER1

1   showing a privilege log.  Most of their argument is the fact
2   that they are claiming that there is some document that came
3   into possession and they deem them to be privilege documents.
4   So, for us to see if those are privilege documents, we would
5   like to receive a privilege log.  And they make the argument
6   that WAMY made the same objection.  But we did produce the
7   privilege document.
8         The other issue that we would like to address is the
9   protective order whereby they are stating that they would
10   withhold documents and identities of witnesses because they're
11   afraid for their safety.  We do believe that if they do have an
12   issue with safety, the proper approach is to produce or to file
13   a motion for a protective order.  And there is a protective
14   order in place as we speak, where Judge Casey had that approved
15   when we were negotiating between plaintiff and defendants.
16         Now, the other issue that I would like to address is
17   issue number 5 and objections to WAMY's interrogatories 4
18   through 12.  What they keep mentioning, they keep referring to
19   RICO statements.
20         THE COURT:  To what statements?  I'm sorry.
21         MR. MOHAMMEDI:  RICO statements.  We do believe that
22   Federal Rules of Civil Procedure, Rule 33, really a party has
23   to answer interrogatories, specifically to the specific request
24   of that interrogatory, not to mention or to refer to documents.
25   And most of those responses are referring to documents to RICO

48

14C7TER1
1   statements.
2           Now, the other issue that we would like to address is
3   issue number 6.  And I think this one you have already made a
4   ruling on it.  We do believe that fact witnesses, they have to
5   produce them.  The identity of fact witnesses, I think they
6   have to produce those witnesses if they have direct knowledge
7   of the facts of the case.  We are not asking them to produce
8   documents of people who they are not calling for trial, but any
9   fact witnesses.
10          THE COURT:  When you say produce, you mean identify.
11          MR. MOHAMMEDI:  Identify, yes.  And that was in
12  response to our interrogatory number 1.
13          Now, if you go to issue number 7, would it be possible
14  with the plaintiffs' production --
15          THE COURT:  Wait.  Let me go back to interrogatory 1.
16  That's not asking who has knowledge of the facts.  That's
17  asking who did you ask for information that relates to all the
18  other interrogatory answers.
19          MR. MOHAMMEDI:  If they are related to facts, we
20  believe that they should be produced.
21          THE COURT:  OK.  I'm sorry to interrupt.  Go on to
22  number 7.
23          MR. MOHAMMEDI:  Number 7 is plaintiff produced 1,072
24  pages of documents on WAMY.  They also claim they produced
25  7,000 pages through Muslim World League which they claimed that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14C7TER1

1    Muslim World League is part of the company.  We don't have the
2    7,000 pages.  However, the problem we have, even the 1,072
3    pages, which we state the fact that they are mostly newspaper
4    clippings, they have not stated specifically which document
5    corresponds to which request.
6              Now, plaintiff I believe they make the arguments that
7    because WAMY's requests were broad, they had to dump documents
8    with WAMY as a response.  I will give your Honor a few
9    examples.
10             WAMY made a request where they ask specifically how
11   WAMY uses its funds to sponsor terrorist activities.  In
12   request 75 specifically it requests that plaintiff show any
13   knowledge that WAMY had that its actions were aiding and
14   abetting al Qaeda.  And they made the argument also that
15   WAMY -- which is not before this court but I just want to
16   clarify the record -- that WAMY are doing the same thing.
17             As a matter of fact, discovery just started, and we
18   specifically had a conference with them, and we told them that
19   we have specific index that relate to specific requests for
20   them to review and then we'll produce these documents.  That's
21   issue number 7.
22             Issue number 8 relates to service.  We do believe that
23   there was no decision made by Judge Daniels on the service
24   issue related to WAMY.  And he was very specific.
25             THE COURT:  Let me cut you short on that one.  I have

14C7TER1
```
 1   read the opposing papers, and as to documents that relate to
 2   service I'm firmly convinced that one side is right, I just
 3   don't know which side is right, but I'm also convinced that the
 4   documents are not voluminous, so as to documents evidencing or
 5   relating to service I'm going to direct that those be produced.
 6   Who wants to speak to the other issues?
 7           Before you do that, we are dealing with a handful of
 8   the parties who are in merits discovery now, but two thoughts I
 9   had as folks were talking.  The first is I don't believe there
10   is a Rule 502 order in this case relating to the production of
11   privileged documents inadvertently or advertently.  And just
12   anticipating issues down the road, if we get to voluminous
13   productions, I wonder whether it's not useful for me sua sponte
14   to simply enter a Rule 502 order.
15           MR. CARTER:  Your Honor, I think the court raised that
16   possibility in one of the earlier hearings concerning defendant
17   Barzinji, and we were receptive to the idea.
18           THE COURT:  OK.  I had forgotten I had done that, but
19   I will probably then do that in fairly short order.  And it
20   won't relate simply to inadvertent production; it will be
21   production.  Because otherwise you get into -- and I may have
22   said it the last time -- battles about was it inadvertent or
23   advertent, and I don't think those are worth worrying about.
24           The other is what Mr. Mohammedi was just talking
25   about, which is giving documents to defendant A but not
```

14C7TER1

1    defendant B and assuming that they will find their way to
2    everybody.  There really is no arrangement on either side, or
3    as a practical matter there probably is on the plaintiffs'
4    side, for some sort of centralized document repository here,
5    correct?
6              MR. CARTER:  There is not an arrangement for a
7    centralized document repository.  The procedure that had been
8    implemented years ago is for the plaintiffs to copy on any
9    productions Mr. Kabat who was serving in a capacity as liaison
10   counsel for the Defendants' Executive Committee, and that was
11   intended to be the vehicle for ensuring everybody received all
12   the documents.
13             THE COURT:  And that's what is continuing to happen?
14   You are giving him a disk or something?
15             MR. CARTER:  That is what is continuing to happen.
16   And, you know, I think the gap here is simply because merits
17   discovery was ongoing as to the Muslim World League and not as
18   to WAMY, and so there was probably a less interest on the part
19   of defendants in collecting discovery when their motions were
20   pending.  But it's not a problem for us to produce the stuff
21   that we have produced previously.
22             MR. MOHAMMEDI:  Your Honor, the issue is not only the
23   fact that there are 5,000 I believe you mentioned, 5,000
24   documents that were supposed to review them and they are
25   related to WAMY.  We really do believe that for a response

52

14C7TER1

 1    document they have to be corresponding to our requests
 2    specifically.
 3              THE COURT:  OK.  Well, you had seven or eight I guess
 4    issues.  Let me hear from Mr. Carter.
 5              MR. CARTER:  Your Honor --
 6              THE COURT:  Let me just interrupt you and go off the
 7    record for a second.
 8              MR. CARTER:  Your Honor, I think potentially we can
 9    take one issue off the table right away with regard to the
10    reference made to procedures for privilege logs.
11              We had lengthy meet-and-confers two weeks ago with
12    counsel for Dubai Islamic Bank and then a general session, and
13    where we left was there was going to be a proposal submitted to
14    plaintiffs about how we were going it approach privilege log
15    issues.  So, we are waiting for that proposal, and then we will
16    see if we can work out something on a collective basis about
17    that.
18              With regard to the issues concerning identifying
19    witnesses, I think that the court has effectively dealt with
20    that through the requirement issued earlier in the context of
21    the Muslim World League's 26(a) motion.
22              Part of the issue here though is that the focus of
23    this motion was in part on identifying consultants who are not
24    expected to testify.  There is no real reason for the identity
25    of those folks to be disclosed.  And this is one of those

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14C7TER1
1   unique cases where there are actually some reasons to have
2   concern.  Putting aside safety, you also have the issue of the
3   problem of liable tourism which has affected folks who work in
4   this area and comment about terrorism and terrorism
5   sponsorship.  So, we just don't see a basis for there having
6   any necessity to identify those folks.
7           With regard to the protective order --
8           THE COURT:  Well, and I'm not sure they fall within
9   26(a)(1), which talks about each individual likely to have
10  discoverable information which a consultant would be.  Well, I
11  guess it's arguable.  But I think you're right that my
12  modification or supplementation of what you need to produce
13  should deal with that issue.
14          Just so the record is clear, I'm not sure I've said
15  it, but non-testifying consultants to my mind need not be
16  identified.
17          MR. CARTER:  Thank you, your Honor.  You know, more
18  broadly, when we sort of look at this motion, again one of the
19  difficulties is that WAMY is essentially urging this court to
20  require plaintiffs to produce everything immediately; and we
21  haven't received a single document from WAMY Saudi Arabia.  And
22  I think a lot of these concerns, objections, all fall by the
23  wayside once we have made our complete production.  There is a
24  concern Mr. Mohammedi has expressed about the production
25  consists of newspapers.  Well, it's a rolling production.  It

54

14C7TER1
```
 1   wasn't just newspapers; it was other things.
 2            THE COURT:  I understand there is a bit of
 3   gamesmanship or brinkmanship here but ultimately -- perhaps not
 4   with any defendant who is here today -- you may get to the
 5   juncture where defendant X has requested documents from you and
 6   yet is not playing fairly in the sense that they haven't
 7   produced anything.  But I don't think I can operate on the
 8   principle that two wrongs make a right.
 9            It may be that you are in the position of producing
10   documents as the way of being able to say either direct that
11   they produce documents that they should have produced and
12   haven't produced or strike their answer or do something
13   Draconian.
14            So, I don't think in each instance you can say until
15   they give us a commensurate number of documents we're sort of
16   slowing up what we're producing or giving them the less
17   important stuff first or anything like that.
18            MR. CARTER:  I don't think that's what I intended to
19   say, your Honor.  My point is more that we have already made an
20   initial production, and, you know, on the defendant's side they
21   are saying let's be realistic about this, it's going to take
22   some time.
23            And we have to go through that process too, and it's a
24   rolling production, and some of the concerns that are being
25   raised simply start to fall away as that production continues.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14C7TER1
```
 1              THE COURT:  Let me also say that -- and I think I have
 2      said it before -- generally speaking I view general objections
 3      as surplusage.  There is a decision by magistrate Judge Grimm
 4      in Maryland.  It may be the Mancia, M-a-n-c-i-a, decision; it
 5      may be one of his other decisions; but he makes the point quite
 6      forcibly that general objections rather than objections that
 7      are tailored to specific requests are not worth the paper
 8      they're written on.  And that pretty much is my view.
 9              So, to the extent there were concerns about
10      withholding of documents based on general objections, I don't
11      view a general objection as a basis for withholding documents.
12      I understand that in your letter there were some explanations
13      for why that was done, but I just thought I would make that
14      point clear.
15              MR. CARTER:  Your Honor, it is one of those things
16      that both sides have included general objections.
17              THE COURT:  Lawyers -- you know, that seems to be part
18      of what must go on in every case.  I guess there is some manual
19      that says that.  And the other is that -- and it certainly
20      happened in this case -- everybody quotes to me the number of
21      documents the other side has produced, and the fact that one
22      side has produced a thousand documents and the other a million,
23      people assume that has some significance.  But there is always
24      the possibility that one side only has 1,000 documents and the
25      other side has millions of documents.  So, the number of
```

14C7TER1

 1   documents, unless it's disproportionate to what seems ought to
 2   exist, really doesn't move me one way or the other.
 3              MR. CARTER:  Your Honor, on that point there was a
 4   suggestion that we're engaged in some attempt to manufacture a
 5   document dump.  That's not happening.  I would say in the first
 6   instance that any documents that we have necessarily relate on
 7   some level to the claims advanced in the litigation.  It's not
 8   as though we just collected every article in the world that
 9   said WAMY's name and sent it back to them.  That's not what
10   happened.
11              The concern with referenced with regard to specific
12   requests or interrogatories I think is driven by a disconnect
13   between the plaintiffs and certain of the defendants about
14   certain of the substantive standards.
15              So, for instance, when there is a request that says
16   any documents that support your claim that this organization
17   aided and abetted the September 11 attacks, the plaintiffs'
18   view, based on our reading of the law, is that general support
19   provided to al Qaeda served to facilitate the organization's
20   ability to carry out the attacks.  So, a broad discovery
21   request for any documents that you may use to support the claim
22   that this organization supported in any way the September 11
23   attacks gets all the documents.  But we did with respect to all
24   of the more narrowly tailored requests identify very
25   specifically.

14C7TER1
```
 1              THE COURT:  Let's stick with the one you just
 2     described.  And is your planned response to that to provide all
 3     the documents that you think are responsive even though it's
 4     voluminous?
 5              MR. CARTER:  Yes.
 6              THE COURT:  OK.  And that's what we have begun the
 7     process of doing.  And of course we're not producing our
 8     internal written memos, those kinds of things.  But that feeds
 9     into what Mr. Mohammedi said about providing a response which
10     indicates which documents support which request.
11              MR. CARTER:  Correct, your Honor.  And there are
12     certain requests that are more specific and narrowly tailored,
13     and with regard to those we can cull from the broader universe,
14     and we have, and we have identified those limited documents
15     that speak to a particular issue.
16              THE COURT:  OK.  So, for example, if it said any
17     disbursements that WAMY made to terrorists, if you had such
18     documents you would reference a narrow group of documents.
19              MR. CARTER:  That would be a narrow group.
20              THE COURT:  OK, go on.
21              One thing I'm not clear on is generally speaking there
22     is a local rule which at the outset of discovery -- and
23     notwithstanding the age of the case, we are at the outset of
24     discovery in most instances -- limits what are permissible
25     interrogatories.  And I'm not sure whether there were other
```

14C7TER1

1  understandings that were reached along the way, or what the
2  circumstance is.
3          MR. CARTER:  There were not, your Honor.  Many, many
4  years ago Judge Casey during a conference indicated that he
5  didn't necessarily intend to adhere strictly to the local rules
6  particularly with regard to interrogatories.  And you know, it
7  really has sort of mushroomed from there sort of beyond what I
8  think everyone expected at the time.
9          I don't know of any order that's actually written on
10  that point.
11          THE COURT:  And have plaintiffs served interrogatories
12  to which there have been responses also?
13          MR. CARTER:  I believe we may have served
14  interrogatories on al Haramain, but that was also subject to an
15  agreement that had been reached, and it was when the case was
16  in D.C.  I do not recall having served interrogatories at all
17  since.
18          THE COURT:  Well, what I am inclined to do -- and
19  maybe since we don't have everybody at this conference, since I
20  presume they will read the transcript of this conference -- is
21  discuss at our next conference whether in fact interrogatories
22  should be limited to those which the local rule contemplates at
23  the outset of discovery.
24          I'm not a big fan of interrogatories.  Folks think
25  that as between a particular defendant and plaintiff that

59

14C7TER1

1  interrogatories move the ball forward.  I'm certainly not going
2  to get into the middle of that, but I would like to get the
3  show on the road, and I think interrogatories, in particular
4  contention interrogatories, or interrogatories that say what
5  interrogatories support contention 3, are not useful at this
6  point.
7          So, what I am inclined to do is say except to the
8  extent the parties otherwise agree, or there is some particular
9  circumstance that causes me to otherwise correct direct,
10  interrogatories will be limited to those very narrow topics
11  that are within the local rule.
12          So, on the defense side you should make that known
13  that that's something I plan to take up next time.
14          MR. CARTER:  I think we may have hit on everything,
15  your Honor.  I could be mistaken.
16          THE COURT:  One thing I wanted to make clear -- and I
17  think I have said in part already -- a request that says "give
18  us all the documents that you contend supports a particular
19  paragraph of the complaint" may implicate work product or
20  privilege, but if it's something more directed to subject
21  matter, such as "give us all the disbursements between A and B
22  or whatever," even if it's something that counsel obtained
23  rather than their clients, I do think it has to be produced.
24          (Continued on next page)
25          THE COURT:  I guess I did say that already.  I want to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14c0terc2
1    make sure I cover the universe here.
2              There is also, on page 5, plaintiff's
3    March 18th letter, a statement that says, in part:  Plaintiff's
4    are not evoking these privileges, namely work product and
5    attorney/client on a wholesale basis in an effort to avoid
6    production.  Plaintiffs have merely raised the objection to
7    preserve the privilege in producing documents in good faith.
8              THE COURT:  I'm not sure I have any idea what that
9    means.
10             MR. CARTER:  Your Honor, I think we addressed a little
11   bit earlier that we were venturing into this process.  And
12   without getting into too much detail about how we all
13   maintained our information and evidence, at the time of the
14   deadline for the responses, we didn't have a complete picture
15   of what we have and so, you know, we have to anticipate that
16   there might be something in there that invokes the privilege
17   but --
18             THE COURT:  Actually by the close of document
19   discovery, I will expect -- and I understand that it's subject
20   to some discussions now, but -- not say by close of discovery,
21   we're going to have to have a discussion about a date by which
22   everybody will produce a privilege log.  Except to the extent
23   that you carve out categories of documents.  Then it may be
24   useful to have a discussion about subjects as to which, or
25   chronological periods, as to which you won't actually schedule

14c0terc2
```
 1    privilege documents on a log.
 2            MR. CARTER:  I think that is precisely the discussion
 3    we intend to have, your Honor.
 4            THE COURT:  I don't know whether any of you have
 5    looked at, but Judge Facciola, who some of you from D.C.
 6    Probably know, together with another author, I forget who it
 7    is, wrote an article in the Federal Court's law review, which
 8    is the on-line journal of the Federal Magistrate Judges'
 9    Association, so it's easy to find on line, that suggested
10    a simple protocol for trying to simplify privilege logs.  And
11    you my find some useful thoughts in there in terms of ways to
12    make the process less burdensome.
13            In terms of the concerns Mr. Mohammedi alluded to
14    about documents from sources who were sensitive and the like, I
15    do agree with Mr. Mohammedi that if something -- if you're
16    proposing to withhold something on the basis that it might
17    endanger somebody, I don't think you can make that decision
18    unilaterally.  There has to be a motion for a protective order,
19    either as to specific documents and categories of documents,
20    and witness names, and the like.  And what I did look at, Judge
21    Casey's protective order.  It didn't have, if I have read it
22    correctly, an attorney's eyes only category which is, again,
23    something that you may want to discuss with the defendants
24    committee.
25            MR. CARTER:  It was, in fact, raised at one of the
```

14c0terc2
1    meet and confers.  It's another issue that is in discussion.
2            THE COURT:  Let me see whether there is anything else
3    on my notes.
4            Mr. Mohammedi mentioned an index.  Has that already
5    been turned over to you folks, or is about to be.
6            MR. MOHAMMEDI:  Working on it.  We have, really,
7    warehouses that our client, they hired about five people to go
8    through documents.  And we are working with them, trying to
9    see -- really, we will get them as soon as -- at least we get
10   some, and we can on a rolling basis, produce them to plaintiffs
11   and then, hopefully, we'll be done with them.  But
12   like plaintiff mentioned, I don't think this would be done by
13   April 26th, just humanly impossible for us to.
14           THE COURT:  I infer from the letters that both sides
15   are planning to make some proposal to me, is that --
16           MR. CARTER:  On this point, we're a bit confused
17   because, your Honor, obviously we had submitted a letter
18   previously suggesting an amendment of the scheduling deadlines.
19   The Defendant's Executive Committee opposed any amendment of
20   it.  And then, very shortly thereafter on a conference call
21   with Mr. Mohammedi and Mr. McMahon, we were told that they
22   didn't foresee any potential in the world that they could
23   comply with the April 29th deadline.  So it seems that some of
24   the defendants agree with us.  We obviously agree that it's not
25   workable.  We're not going to get done by then.

14c0terc2

1           THE COURT:  Well, until it's changed, it is the
2  deadline.  So anybody who thinks that it ought to be changed,
3  needs to get me a proposal that is the result of a meet and
4  confer in fairly short order.
5           MR. McMAHON:  If I can be heard on that.
6           Mr. Carter has put his finger on the nub of the issue.
7  My colleague and I have institutional clients with huge data
8  bases and things.  And I think we're both of the view
9  that there needs to be some amendment there, because these
10  folks are filing these motions to compel because they are
11  coming up against serious deadlines, obviously.  And we would
12  like to comply with their needs.  So I, for one, would go on
13  the record supporting that.  But I think within the defense
14  counsel, especially Mr. Kabat, he wants everything to be
15  concluded, you know, on time.  I think I discussed this in our
16  phone conversation, and Mr. Kreindler had suggested that it has
17  to be global, so I think that's the nature of the problem.
18           THE COURT:  That clearly is right, because for me to
19  set individual deadlines for individual defendants would just
20  lead to chaos down the road.  So you need to get together with
21  the other members of the Defendant's Executive Committee.  And
22  to the extent that there can be a unified proposal which would
23  be submitted, if there were dissenters and, on the defense side
24  if the only dissenters are you folks, you should let me know
25  that.  But something ought to be gotten to me fairly soon.

64

14c0terc2

1           MR. KREINDLER:  Just a suggestion, your Honor.
2   Perhaps IF the defendants took the next week to see if they
3   can adopt a unified position, then we can -- we're not chasing
4   a moving target.  Then they'll get back to us, say they have a
5   unified position or they don't, and then we know what to do.
6           THE COURT:  That seems fair.
7           MR. KREINDLER:  While I'm on my feet stretching for
8   the moment, just to share a little positive development.  We, I
9   think, have worked out an agreement with Mr. Barentzen and Ms.
10  Luque's clients, basically a deal dismissing that whole
11  category of clients in return for getting the documents
12  promptly, an opportunity to interview them and take some quick
13  depositions.  We're working on the language.  And we should
14  have that done in a couple of days.  I would have that
15  submitted to the Court.
16          THE COURT:  Well, that is good news.  Thank you.
17          When is our next regularly-scheduled meeting.
18          MR. CARTER:  Your Honor, our next meeting is April
19  26th.
20          THE COURT:  Okay.  Which is before the
21  April 29th current discovery deadline.  So, hopefully, we can,
22  during that session, talk about the document discovery
23  deadline.
24          MR. CARTER:  If I could just address that issue,
25  briefly.

65

14c0terc2

```
 1              Mr. Kreindler had suggested that maybe the defendants
 2    could confer over the next week.  The deadline is really
 3    coming, and the --
 4              THE COURT:  Why don't I say they should confer by the
 5    end of week.
 6              MR. CARTER:  I think that would be helpful.
 7              Thank you.
 8              THE COURT:  I will so direct.
 9              Anything further from anyone?  Okay.  Thank you all.
10              (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                          1
        14QMTERC
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     IN RE:  TERRORIST ATTACKS ON
  3     SEPTEMBER 11, 2001                03 MDL 1570 (GBD)(FM)
  4
  4     ------------------------------x
  5
  5                                      April 26, 2011
  6                                      11:25 a.m.
  6
  7     Before:
  7
  8                        HON. FRANK MAAS,
  8
  9                                      Magistrate Judge
  9
 10                          APPEARANCES
 10
 11     ANDERSON KILL & OLICK PC
 11          Attorneys for O'Neill Plaintiffs and PEC
 12     BY:  JERRY S. GOLDMAN
 12
 13     KRIENDLER & KREINDLER LLP
 13          Attorneys for Plaintiff Ashton
 14     BY:  JAMES P. KREINDLER
 14
 15     COZEN O'CONNOR
 15          Attorneys for Federal Insurance Plaintiffs
 16     BY:  SEAN P. CARTER
 16          J. SCOTT TARBUTTON
 17
 17     MOTLEY RICE
 18          Attorneys for Burnett Plaintiffs
 18     BY:  BRIAN FRUTIG (by telephone)
 19
 19     FERBER CHAN ESSNER & COLLER
 20          Attorneys for Continental Casualty Plaintiffs
 20     BY:  ROBERT M. KAPLAN (by telephone)
 21
 21     BERNABEI & WACHTEL
 22          Attorneys for Al Haramain USA and the Defendants'
 22          Executive Committee
 23     BY:  ALAN R. KABAT
 23
 24     CLIFFORD CHANCE
 24          Attorneys for Defendant Dubai Islamic Bank
 25     BY:  STEVEN T. COTTREAU
 25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    2
        14QMTERC
1                            APPEARANCES (cont'd)
2   McMAHON & ASSOCIATES
2        Attorneys for Defendants IIRO, MWL and Wael Jelaidan
3   BY:  MARTIN McMAHON (by telephone)
3
4   LAW FIRM OF OMAR T. MOHAMMEDI LLC
4        Attorneys for Defendants WAMY and WAMY International
5   BY:  OMAR T. MOHAMMEDI
5        -and-
6   GOETZ & ECKLAND
6        FREDERICK GOETZ (via telephone)
7
7   STEVEN BARENTZEN (by telephone)
8        Attorney for Defendant Jamal Barzinji
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

3

14QMTERC

```
 1                   (Case called)
 2              THE COURT:  Before I turn to what was suggested as the
 3    agenda items, tell you, if you haven't already seen it, that I
 4    did enter a Rule 502 order yesterday.  And it's sufficiently
 5    short that I'll skip the whereases and just read the operative
 6    language.  It is hereby ordered that pursuant to Federal Rule
 7    of Evidence 502(d), the parties' production of any documents in
 8    this proceeding shall not, for purposes of this proceeding or
 9    any other proceeding in any other court, constitute a waiver of
10    any attorney-client privilege or attorney work product
11    protection applicable to those documents.
12              There was also a letter indicating that there were
13    going to be some dismissals of, I guess, Ms. Luque's clients
14    and maybe some of Mr. Barentzen.
15              MR. KREINDLER:  Yes, your Honor.  When we were before
16    you last time I had reported that we had an agreement in
17    concept.  I have got the agreement with me now that is in
18    final, and we are all signing, exchanging signatures.
19              The essence of it is that group of defendants will
20    cooperate with us, let us look at the documents they have,
21    speak to us in interviews.  And then when we are done we will
22    do some short depositions.  We are paring down the defendants
23    in the case and hopefully getting some useful information.
24              THE COURT:  There was the request to extend the
25    deadline for the rolling production of documents to August 29
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC
```
 1  which I also signed.
 2            I guess that brings us to the suggested agenda, which
 3  will take me a minute to find.  It's not jumping out at me, but
 4  I know there is the motion to compel.  There was also an
 5  indication that at a subsequent date you folks wanted to
 6  propose or least some folks wanted to propose an extension of
 7  the fact discovery deadline, but that was tabled for a later
 8  conference, correct?
 9            MR. KREINDLER:  Yes, your Honor.
10            THE COURT:  Is there anything on the agenda for today
11  other than the motion to compel IIRO and MWL and Wael Jelaidan?
12            MR. McMAHON:  Your Honor, are you saying that the
13  second motion to compel is for oral argument today?
14            THE COURT:  When you say the second motion to compel,
15  tell me which motion you are talking about.
16            MR. McMAHON:  Well, I don't know the exact date when
17  the plaintiffs made application, your Honor.
18            THE COURT:  There is a March 24 letter which says, we
19  want eight categories of documents.
20            MR. McMAHON:  Yes, your Honor.  I refer to that as
21  motion to compel number one.  We had oral argument on that the
22  last time I was in New York before your Honor.
23            THE COURT:  Right.  But then I got an April 21 reply
24  letter which I read, and I wasn't sure whether that was an
25  effort to continue the discussion of the rulings I made last
```

14QMTERC

 1   time or what we were about.
 2              MR. CARTER:  Your Honor, if I can take a step back, I
 3   think there were a few agenda items outside of the motion to
 4   compel.  Your Honor had mentioned that there had been a request
 5   to extend the overall deadline for liability fact discovery.  I
 6   am not sure that it had been tabled.  The parties were about a
 7   month apart on where they propose that that be set.  The
 8   defendants had suggested to us that it would make sense to set
 9   it at the end of January, and we had suggested the end of
10   February.  Prior to the conference this morning I had suggested
11   to Mr. Kabat that we may be split the difference, that two-week
12   period, and try to live with that.  He had not spoken to all of
13   the folks on his side.  That's where we stand on that.
14              The other agenda item --
15              THE COURT:  I did find the letter as you were talking,
16   but go on.
17              MR. CARTER:  There is a slight disagreement as to the
18   use of interrogatories going forward in the litigation.  We had
19   suggested that the parties simply adhere to the local rules.
20   And in the event that any party wanted to go beyond, they would
21   make application to the Court if they couldn't work it out.
22   The defendants have suggested that contention interrogatories
23   should be permitted at some point.  It's our understanding that
24   contention interrogatories are contemplated under the local
25   rules just at the end, at the conclusion of normal fact

6

14QMTERC

```
 1   discovery.
 2              THE COURT:  I may have said it last time, but if I
 3   didn't, let me reveal my bias, which is that I view
 4   interrogatories as a colossal waste of time, except for the
 5   sorts of very basic inquiries that the local rule contemplates.
 6   So I'm not in favor of and it doesn't sound like anybody is
 7   proposing allowing interrogatories as the case moves forward
 8   but for contention interrogatories as a possibility.  And what
 9   I'd like to do is simply table the discussion of contention
10   interrogatories, see how everything else plays out, and at a
11   stage closer to the end of either discovery or fact discovery,
12   probably fact discovery, take up whether contention
13   interrogatories really will move the ball forward.
14              MR. CARTER:  That works from our perspective, your
15   Honor.
16              THE COURT:  And from the defendant's perspective?
17              MR. KABAT:  Your Honor, the concern we have, it was so
18   voluminous that none of the defendants could figure out who to
19   depose.  We understand that you issued an order requiring them
20   to narrow the witness list, and I would expect that witness
21   list to be particularized as to each defendant because even if
22   they go through 1500 to 200, that's still a lot for each
23   defendant to figure out who I depose.  So it would be very
24   helpful if the witness list could be narrowed down as to each
25   defendant.  And then perhaps we may not need contention
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC

1    interrogatories, but I think if the plaintiff could be directed
2    to particularize their witness list, that may avoid some of the
3    reason why we would otherwise need contention interrogatories.
4            THE COURT:  I said it had to be more than detailed and
5    tailored.  I am not sure I said by defendant.  I don't think I
6    said that.  Let me ask what the plaintiffs are contemplating in
7    their revised disclosures.
8            MR. CARTER:  Your Honor, what I would expect is that
9    there will be certain witnesses identified with general
10   information concerning the history of Al-Qaeda, those kinds of
11   general background pieces of information, and that there will
12   be segregated witnesses identified for each of the defendants,
13   which is actually something that we did in the earlier
14   disclosures, and we would carry forward.
15           THE COURT:  With that in mind, we will table
16   discussion of contention interrogatories.
17           Privilege logs you folks had suggested tabling, and
18   that's fine.
19           When is our May conference?
20           MR. KABAT:  May 12, I believe.
21           THE COURT:  You are still discussing it, but the
22   Solomonic solution to the extension of fact discovery sounds
23   appropriate and is probably what I would do if you don't reach
24   a resolution, since you're only one month apart.
25           I guess this is what threw me off.  The last item on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8

14QMTERC
```
 1  the joint letter says:  The parties are currently completing
 2  briefing on a motion to compel served on IIRO on March 24 which
 3  Mr. McMahon tells me he characterizes as motion to compel 1.
 4              MR. CARTER:  Your Honor, I think there is some
 5  confusion with regard to the dates.  Motion to compel number 1
 6  was the eight categories relative to which your Honor heard
 7  argument and issued a ruling.
 8              THE COURT:  Which was the subject of the March 24 and
 9  subsequent letters, at least in part.
10              MR. CARTER:  The initial letter, I think, was filed on
11  March 16.  Our initial letter was served.  We also served
12  Mr. McMahon with a second motion on March 24.  Subsequent to
13  that March 24 date, we had a meet and confer which then
14  triggered the remaining briefing schedule.  Mr. McMahon filed
15  his opposition to that motion which included those affidavits,
16  the Al Radhi affidavits, and then we submitted our reply brief
17  on April 21.  That motion is specific to the IIRO and targets
18  IIRO's relationship with three individuals, as well as a few
19  other areas, the records relating to the Philippine and
20  Indonesian branches of the IIRO which had been designated, as
21  well as the expulsion of some folks from Pakistan shortly after
22  September 11 who were alleged to be associated with the IIRO,
23  and the IIRO's relationship to some training camps and camps in
24  Afghanistan.
25              THE COURT:  I guess I find it confusing in part
```

9

14QMTERC
```
 1   because the reply says:  I write in reply to the April 11
 2   letter brief of IIRO, et cetera.  The April 11 letter from
 3   Mr. McMahon says it's submitted as IIRO and Muslim War of
 4   Leagues opposition to the second motion.  I guess you are on
 5   the same page that it's the second motion.
 6             And then I have the March 24 letter which focuses on
 7   the IIRO.  And in reading that, it talked about broad
 8   categories and then specific requests.  I didn't count the
 9   number.
10             Tell me how this differs from the first application.
11             MR. CARTER:  Your Honor, the first application focused
12   on those eight categories which are organizational documents,
13   some general financial documents, documents relating to
14   recipients of aid.
15             This request focuses on some very specific people who
16   we allege to have been within the inner circle of Al-Qaeda and
17   also associated with the IIRO.  And we came to the view that
18   these individuals were prominent figures within Al-Qaeda and
19   affiliated with the IIRO, not based on some sort of vague
20   reference to their names in media reporting, but, rather, as a
21   result of persistent reporting by the United States Government
22   and formal designations of several of these folks.
23             And this, broadly speaking, is sort of the second
24   phase of an effort on the plaintiff's part to focus the
25   discovery process relative to the IIRO and to some degree the
```

10

14QMTERC

1   Muslim World League on the issues that are the greatest
2   priority that we ensure a rolling production, and we have time
3   to do follow-up discovery as to the issues that are of greatest
4   importance to us and speak most directly to the claims.  And we
5   have submitted as part of the application a fair amount of
6   documentation to sort of give the Court a sense of why we have
7   come to the view that these relationships are so important, and
8   I think those documents speak for themselves and we won't spend
9   a tremendous amount of time on them.
10          Our concern, really, at this point, your Honor, is
11  that there seems to be a disconnect between our requests, the
12  rules, and the kind of search that's being carried out by
13  certain of these defendants.  If you take, for example, our
14  request for documents relating to Mohammed Jamal Khalifa.
15  Mohammed Jamal Khalifa started this office in the Philippines.
16  He's alleged to have been a founding member of Al-Qaeda.  The
17  government has featured him prominently in a number of
18  settings.
19          Recently, Mr. McMahon told us that we would be
20  receiving the entire Khalifa file and there was a statement to
21  that effect during the last court proceeding.
22          When we look at the actual documents, what we have
23  really are a small sampling of documents which Khalifa and some
24  other IIRO official deny that the office he headed was a front
25  for supporting terrorism, and media reports in which he or

11

14QMTERC
```
 1   another IIRO official has denied.  We don't see a complete
 2   production of responsive documents.  This is an individual who
 3   was the head of this office for a period of many years.  We are
 4   not seeing any of the documents relating to the reporting he
 5   would have sent back to Saudi Arabia as a matter of course.  We
 6   are not seeing the documents as to his disbursements, none of
 7   the really operational documents for that office.
 8           With Wael Jelaidan, we were told during the meet and
 9   confer that it's Mr. McMahon's understanding that he's not an
10   employee of the IIRO and never was.  As we discussed at the
11   last conference, he was an employee of the Muslim World League.
12   We understand that he headed a joint office of the Muslim World
13   League and the IIRO and that in his capacity as a Muslim World
14   League director he had authority to issue papers on behalf of
15   the IIRO.
16           Whether or not he's an employee of the IIRO doesn't
17   speak meaningfully to the question of whether the IIRO has
18   documents concerning or relating to Wael Jelaidan, and we are
19   not seeing any of those documents produced, even though the
20   government is telling us in various settings that they exist.
21           The last individual at issue is Abd Al Hamid Suleiman
22   Al Mujil.  Al Mujil was designated by the U.S. Government at
23   the same time the U.S. Government designated the Philippine and
24   Indonesian offices of the IIRO, your Honor, and he was
25   described as the million dollar man within the IIRO for
```

12

14QMTERC

```
 1   supporting terrorism.  Close personal relationship, according
 2   to the U.S. Government, with Khalid Sheikh Mohammed, the
 3   mastermind of the September 11 attacks, the relationship as the
 4   supervisor of the offices in the Philippines and Indonesia.  He
 5   was within Saudi Arabia in the eastern province.  Those three
 6   figures really are central to trying to take meaningful
 7   discovery of the IIRO's relationship to Al-Qaeda.  And we
 8   really need a broad and thorough search for records relating to
 9   those people, as well as the Philippine and Indonesian
10   branches.
11           The last couple of things raised in this motion are a
12   request for some bank records.  Frankly, your Honor, I think
13   that was addressed via the Court's last ruling on the eight
14   categories.
15           THE COURT:  The last ruling dealt with bank
16   statements.  My sense was, although I didn't go and
17   specifically look, request No. 6 is statements, not anything
18   beyond statements, so I guess you are right.
19           MR. CARTER:  What I would say, your Honor, is that the
20   eight categories were the focus of our initial motion so we can
21   try to get a read of what we needed to explore more
22   particularly with regard to financials.  I don't think we need
23   to cross the bridge to other bank records at this point until
24   we see those documents.
25           There is also a request for documents relating to the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC

1    expulsion of some workers from Pakistan in the wake of the
2    September 11 attacks.  There was pretty pervasive reporting
3    that some alleged relief workers were expelled from Pakistan on
4    the theory that they were affiliated with Al-Qaeda.  We
5    understand that several of those folks were from the IIRO.
6             Again, in terms of the integrity of the process, the
7    difficulty is, what we are hearing back from Mr. McMahon is
8    that someone who took over the office several years later is
9    unaware of an IIRO employee being arrested for being a part of
10   Al-Qaeda.  Again, that's different from the question of whether
11   or not they are aware of any IIRO employees who were expelled
12   or disciplined on some other basis, and so we are trying to get
13   to the heart of that matter.
14            THE COURT:  One thing I didn't understand in relation
15   to this case is request No. 57, which relates to the struggle
16   against the Soviet occupation of Afghanistan.
17            MR. CARTER:  Your Honor, as the 9/11 commission itself
18   framed this issue, Al-Qaeda is an outgrowth of the Muji Hadin
19   resistance to the Soviet occupation of Afghanistan, and the
20   relationships were forged in that setting.
21            And, among others, the relationships that were forged
22   were the relationships between and among Mohammed Jamal
23   Khalifa, Wael Jelaidan, and Osama Bin Laden.  In fact, at the
24   last hearing you'll remember that Mr. McMahon mentioned that
25   Jelaidan was a very prominent figure in the Afghan resistance

14

14QMTERC

1    and that he forged a relationship during that time with Osama
2    Bin Laden.
3            Judge Daniels previously addressed how far back we
4    should be permitted to go in discovery.  And he set 1992 as the
5    presumptive date and suggested that in particular
6    circumstances, upon an adequate showing, a earlier inquiry may
7    be warranted.  Judge Daniel's rulings was predicated on the
8    logic that Bin Laden began opening declaring to third parties
9    his intention to strike America in 1992.
10           From our perspective, the departure to an earlier
11   period becomes appropriate where you are dealing with
12   individuals and organizations that were operating within the
13   inner Al-Qaeda circle from those earlier dates.  And that is
14   particularly prevalent with regard to Jelaidan and Khalifa, and
15   the role that they played in supporting those fighters during
16   that period and whether that relationship continued afterwards.
17   It's one of those simple --
18           THE COURT:  It's a little like saying, they all
19   belonged to the union elite club in midtown and that explains
20   how they got together.  That's along the lines of what you are
21   saying.
22           MR. CARTER:  It's along the lines.  More basically,
23   your Honor, if you were deposing a witness in a case who had
24   some personal knowledge regarding the activity of another, the
25   first question is how do you know one another and how did you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                        15
        14QMTERC
 1  first meet and what was the circumstance.
 2              When we are dealing with people who partnered with one
 3  another for purposes of creating a Jihad organization, it's
 4  important for us to be able to at least explore how they got to
 5  know one another in the first instance rather than pick it up
 6  years later.
 7              And so what we would propose in this particular
 8  setting is simply that the date go back to late 1987.  There
 9  was a document produced by the IIRO in the course of discovery
10  already that was dated November 27, 1987 which talks about the
11  Muslim World League and IIRO cooperating to get foreign
12  fighters into Afghanistan for purposes of participating in the
13  Jihad.  And so that's a benchmark at which their own internal
14  documents suggest this activity is ongoing.  The U.S.
15  Government puts the formation of Al-Qaeda just a few months
16  later in 1988.
17              With regard to these few specific categories, what we
18  ask is that we simply be allowed that inquiry back to that last
19  month of 1987 forward.  Thank you, your Honor.
20              THE COURT:  Mr. McMahon.
21              MR. McMAHON:  Yes, your Honor.  I apologize, your
22  Honor, if I was informed that there is going to be oral
23  argument on the second application today.  I just was not aware
24  of that, but I'll try to respond as best as I can under the
25  circumstances.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14QMTERC

```
 1              With respect to Mr. Khalifa, your Honor, I was
 2   informed by Mr. Al Radhi, who gave an affidavit, your Honor, in
 3   support of our opposition that the Khalifa file had been
 4   produced, and I believe I sent that on to Mr. Carter.
 5              Here is where Mr. Khalifa fits in, your Honor.  In
 6   1992 or '93, he is arrested by American authorities, I think
 7   out in California, for immigration violations.  He is then
 8   tried in absentia in Jordan and he is convicted.
 9              However, as we pointed out in our opposition -- no one
10   ever comes up with this -- the Jordanian court of appeals, I
11   think it's called the court of cassation, totally rejected
12   those charges and accused the lower court of accepting
13   affidavits of dubious quality.
14              THE COURT:  But you're arguing the merits, and for all
15   I know you are correct that Mr. Khalifa is not a terrorist or
16   that Mujil isn't or any of the others.
17              But since the complaint has survived a motion to
18   dismiss, it seems to me I have to assume that there is a
19   good-faith basis for seeking discovery as to these individuals.
20   A lot of the thrust of your opposition seems to me to convince
21   me of the ripeness of your cause, and that strikes me as
22   premature.
23              MR. McMAHON:  Your Honor, with respect to Mr. Khalifa,
24   I believe we gave Mr. Carter the entire Khalifa file.  And
25   after we get off this phone call I will certainly reconfirm
```

14QMTERC
```
 1   that with Mr. Al Radhi, that that is the Khalifa file as what
 2   they have in their records at this time.
 3              With respect to Wael Jelaidan, your Honor, he is a
 4   named defendant and we have produced the discovery we had for
 5   Wael Jelaidan, and apparently the plaintiffs are not satisfied
 6   with that.
 7              But the way Wael Jelaidan fits in, your Honor, he was
 8   very active in helping the relief effort in Afghanistan.  And
 9   as Mr. Carter believes that that's the sort of stuff that is
10   liable for activity, he should have named the Central
11   Intelligence Agency, your Honor.  Because with the Saudi
12   intelligence agency, that was the most effective tandem to make
13   sure the Russians were eventually expelled from Afghanistan.
14              THE COURT:  That's why I was asking about that area.
15              MR. McMAHON:  Yes, your Honor.  The plaintiffs just
16   don't seem to accept the fact that the CIA was very much
17   involved.  And Wael Jelaidan was involved in the humanitarian
18   efforts.  He knew Osama Bin Laden very well because he was
19   involved in the humanitarian efforts.
20              With respect to Al Mujil, he is no longer employed by
21   IIROSA and IIROSA has no control over him.  To the extent there
22   are any files, for example, we will turn them over, sure, your
23   Honor.
24              Your Honor, there was a lot of ground there that
25   Mr. Carter covered.  I don't see the need to go back into 1987
```

18

14QMTERC

1    with respect to the Russian occupation of Afghanistan.  This
2    lawsuit should be more focused on the terrorist events that
3    have occurred since 1992, the beginning of discovery.
4              We could take this case for another ten years if we
5    get involved in the Afghanistan stuff, and I don't know what
6    records we have pertaining to any activities in Afghanistan
7    because it was what, almost 20 years ago?
8              THE COURT:  As to the documents which are the subject
9    of the second motion to compel with respect to IIRO, with two
10   exceptions I am going to direct that the documents be produced.
11   One exception is the request for banking records to the extent
12   that it goes beyond that which I ordered as part of the first
13   motion to compel.  The second exception is, I agree with
14   Mr. McMahon that there may be extensive documentation
15   concerning the expulsion of the Soviets from Afghanistan, and
16   I'm not precluding the request.  I'm not saying that it's
17   inappropriate to go back to 1987.  I do think the request is
18   very overbroad.
19             So if a request that's more narrowly focused that
20   basically deals with, how did these folks get together and what
21   were their basic roles, as opposed to giving me every document
22   relating to the IIRO's role in supporting the Mujil Hadin
23   forces in Afghanistan in their struggle against Soviet
24   occupation, I would probably look somewhat favorably upon it.
25   But I think this is sort of a kitchen sink request that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

14QMTERC

1  assuming, as seems to be conceded, that the IIRO played some
2  role in that venture, could lead to a ton of documents with
3  considerable burden on the IIRO, but not shedding a great deal
4  of light necessarily.
5          Those are my rulings with respect to the so-called
6  second motion to compel.
7          Are there other matters that we should be taking up
8  today?
9          MR. CARTER:  Your Honor, I hate to win something and
10 then raise a concern, but when Mr. McMahon was speaking, you
11 probably heard him say that Mr. Al Radhi had told him that they
12 had produced "the Khalifa file" and if they had any Al Mujil
13 documents they would produce them.  There is a significant
14 concern here that there is a file called Khalifa that has
15 personal information, and then there is the file that contains
16 all the operational activities carried out under his auspices
17 and we are only getting the personal file.
18         I think I said last time, or maybe I was just thinking
19 it to myself, it seems to me -- let me go back one step.  There
20 were always difficulties when you are dealing with foreign
21 clients, particularly when their judicial systems are very
22 different than ours and the concept of discovery may be
23 somewhat alien, not to mention the language difficulties.  I do
24 think that all of these requests are reasonably focused.
25 That's part of the reason that I granted both of the motions to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14QMTERC

1   compel in large measure.
2           And I know, Mr. McMahon, you said last time that you
3   had postponed a trip to the kingdom essentially to learn what
4   the rulings are.  I do think this is the type of stage of the
5   case where you or somebody on your behalf needs to sit down
6   with the folks who are responding to these requests and hold
7   their hand to a certain extent and describe in greater detail
8   what needs to be searched for.  It's somewhat inconsistent to
9   say, we have developed this massive index and, yet, not produce
10  documents that relate to the employment of some of these
11  individuals, directives that they may have given or received
12  and the like.
13          And I recognize that, as Mr. Carter pointed out, there
14  is a significant disconnect between that which was requested
15  and that which has been received.  And I'm not so naive to
16  think that perhaps it won't persist.  I hope it doesn't.  But
17  if it does, I suppose that will lead to additional motion
18  practice.  And if the IIRO or any other defendant has failed to
19  produce documents that manifestly are within its possession,
20  custody, or control, that may lead to consequences that that
21  particular defendant doesn't care for.
22          But I assume one stage, at least, between the receipt
23  of whatever additional documents are produced and a further
24  motion would be some depositions, including depositions of
25  document custodians about the type of search that was or was

21

14QMTERC

1    not conducted.  And mindful of the fact that that's inevitably
2    coming, Mr. McMahon, I think you really want to pursue it in
3    far greater detail and in person with the folks who were doing
4    this exhaustive indexing what it is they need to produce,
5    because I do think there is probably a lack of understanding on
6    their part.
7              MR. CARTER:  Thank you, your Honor.
8              MR. McMAHON:  Your Honor, if I can just comment.  As
9    you know, we have offered the records custodian, Mr. Al Radhi,
10   for over a year, I think, maybe even longer, to the plaintiffs
11   to avoid these kinds of problems that you're unfortunately
12   encountering in terms of motion practice.  And for the life of
13   me I don't understand why they don't take us up on that and
14   address some issues to Mr. Al Radhi, and maybe we can clear up
15   this matter a lot easier than bothering you with motion
16   practice.  Mr. Al Radhi has acted in good faith.  He has logged
17   enormous hours, your Honor, if you have read his affidavit.
18   They had to bring on two people for IRROSA alone, and he has
19   spent an enormous amounts of time for the Muslim World League
20   production as well, your Honor, and that is a bit of a problem
21   because they are located in Mecca.
22             I wish your Honor would consider deferring the rulings
23   until such time as the plaintiffs can actually depose the
24   records custodian.  Maybe there is a lot of misinformation
25   here, and they could get to the bottom of it much more directly

22

14QMTERC

```
 1   than through me as counsel, although I am trying to get over
 2   there, your Honor.  I contemplate the necessity for a trip.
 3           These court appearances -- and I apologize for today.
 4   I don't know why I didn't think it was scheduled for today, the
 5   oral argument -- but the court appearances have obviously
 6   impeded my ability to make a quick trip over there.
 7           In any case, I wish your Honor would keep that in
 8   mind.  We offered Mr. Al Radhi for more than a year to avoid
 9   these problems we are running into right now.  Of course, there
10   is -- I think you afforded the plaintiffs three more years,
11   your Honor, '94 -- I mean, 2004.  They are trying to get
12   together the annual reports for 2'2, 2'3 and 2'4, and other
13   categories, which is also a burden to them, because you
14   extended that time frame for three years.
15           THE COURT:  I don't view the requests that I've
16   granted as overbroad.  I think they are reasonably focused.  As
17   I said, I think there is a disconnect between that which is
18   actually required and taking what the plaintiffs say at face
19   value, that which is being produced.  And I base that simply on
20   the fact that if Jelaidan was affiliated with IIRO Pakistan or
21   Khalifa spent a period of time working with IIRO in the
22   Philippines, there must be more documentation that relates to
23   what they did while they were there, which is the sort of
24   documentation that the plaintiffs seek and, rightly or wrongly,
25   believe that they have yet to receive.
```

23

14QMTERC

```
 1              So I don't think, and I'm not going to require the
 2    plaintiffs at this stage to depose the witness you proffer
 3    because I think, first, the documents ought to be produced.
 4    Then certainly at some point the custodian should be deposed,
 5    and we will see how all of that shakes out.
 6              But one of your proposals was they should come look at
 7    the warehouse in Saudi Arabia or look at how the offices
 8    function.  And as to at least some of the offices, other than
 9    the expense of it, I am not sure why they are not taking you up
10    on the offer.  London is not a hardship trip, and they might be
11    able to see the wedding while they were there, but I am not
12    going to second-guess how they are going about this.  I would
13    think seeing some of these offices might be informative,
14    particularly the Philippines.  But, again, I am not going to
15    second-guess the order in which they want to do this.
16    Essentially, the motion to dismiss having been denied, the
17    defendants are in this for all that goes with that in terms of
18    discovery.
19              Yes, sir.
20              MR. MOHAMMEDI:  Your Honor, I don't think this
21    argument is about merit, but I think I feel compelled to say
22    something about a letter that was sent by plaintiff on April 21
23    which I refer to page 6.
24              THE COURT:  Let me get that letter.
25              MR. MOHAMMEDI:  Your Honor, I take issue with some of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

14QMTERC

```
 1   the statements that were made on page 6.  First, I was not even
 2   copied or served on the document that WAMY was mentioned many
 3   times.
 4            The second issue that they have is that they stated
 5   this Court need only to look at statements by United States
 6   Government and its leaders to see that the Saudi charter, such
 7   as Muslim World League, IIRO, and World Assembly of Muslim
 8   Youth, WAMY.  And then they said, continued to be a major focus
 9   of United States counterterrorism investigation years after
10   September 11.
11            And then they go on and they stated that Secretary of
12   State Hillary Clinton, which state that Saudi Arabia remains a
13   critical financial support base for Al-Qaeda.  And they mention
14   Lashkar-e-Taiba and other terrorist groups, including Hamas,
15   and IIRO and the Muslim World League, and WAMY continued to
16   send money to fund extremist overseas.  Hillary Clinton never
17   stated anything like that.  She stated charges.
18            We believe that the plaintiff, they have a lot of
19   statements that are they are producing to this Court.  WAMY was
20   not mentioned anywhere in that Exhibit A that they mentioned.
21            At the same time, we are just asking them to produce
22   evidence to us.  They keep making merit arguments on these
23   issues without producing any meaningful document to us, and I
24   take issue with that.
25            THE COURT:  In response to what they characterized as
```

25

14QMTERC
```
 1   Mr. McMahon's self-serving assertions on behalf of his client,
 2   they essentially made their own self-serving assertions on
 3   behalf of their clients.  And in terms of the merits
 4   discussion, I have to say to both sides, I treat that largely
 5   as punctuation.  The critical facts to me are that with respect
 6   to the defendants who are now in discovery, either there was no
 7   motion or the motion to dismiss was denied.  So those
 8   defendants are in the case.  And the assertions that are made
 9   in the complaint have to be, for the moment, taken at face
10   value.
11           So when Mr. McMahon argues that Muslim World League
12   and the IIRO are the good guys distributing funds in very
13   careful ways to 40,000 needy individuals, that's nice, but it's
14   not something that sways me one way or the other.  And,
15   similarly, when I read excerpts from what Secretary of State
16   Clinton allegedly said, that doesn't move me terribly much
17   either.
18           There is a concept of proportionality in terms of
19   discovery.  And to the extent that I have to consider whether
20   requests are proportional, I certainly have to factor in my
21   assessment of the potential strength of a case or of a
22   particular defense that's being asserted, and I will.  But
23   since the requests in the so-called first and second motions to
24   compel are fairly focused, it seems to me the burden is not
25   overwhelming in light of the seriousness of the allegations in
```

26

14QMTERC

1   the latest complaint and that the discovery is proper.
2           But going forward, playing tit or tat in terms of the
3   merits of the case is really not going to have much, if any,
4   effect on my discovery rulings, and probably is better saved
5   for a later stage of the case, when motions for summary
6   judgment are made.
7           Anything else?
8           MR. McMAHON:  Your Honor, thank you for your careful
9   consideration of everything.
10          I wonder if it would be appropriate if we just have a
11  recap of what your ruling is and what specific documents have
12  to be produced by which date.
13          THE COURT:  I had thought about which date and
14  intentionally didn't go there, but I guess I will.
15          My ruling is, again, that with the exception of the
16  banking records and the records relating to the IIRO's role in
17  supporting the Mujil Hadin forces in Afghanistan, item 4 in the
18  March 24 letter, the documents should be produced.
19          As to the banking records, they only need be produced
20  to the extent that I compelled them as part of the first motion
21  to compel.  As to the effort to kick the Soviets out of
22  Afghanistan, I directed plaintiffs to come up with a more
23  focused request or requests.
24          So those, in a nutshell, are my rulings.  I recognize
25  that there are more documents sought here.  And my initial

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

14QMTERC
```
 1   thought, which I didn't voice, was as to the additional
 2   documents in the second motion to compel to give you an
 3   additional 30 days to produce those documents.
 4              Any thoughts, comments, Mr. McMahon?
 5              MR. McMAHON:  Your Honor, to the extent I can schedule
 6   a trip pretty quickly, I will do so, and that 30 days will
 7   certainly be on my horizon, obviously.
 8              One of the things I want to bring to your Honor's
 9   attention is that there is an entity called the Rabita Trust
10   which has been sued, and we are in jurisdictional discovery,
11   and we have basically given the plaintiffs whatever we have.
12              The Rabita Trust was headed up by Wael Jelaidan and it
13   was founded as an organization to repatriate individuals and
14   had nothing to do with this war and terrorism, whatever.  But
15   they had gotten documents concerning the Rabita Trust and that
16   is when Wael Jelaidan was running in Pakistan.  And as far as I
17   know, Rabita Trust has nothing to do with IIROSA.  It does have
18   something to do with MWL.  I just wanted you to have that as
19   some background information, your Honor, because we will be
20   addressing whether or not the Rabita Trust should be dismissed
21   because of jurisdictional issues.
22              THE COURT:  So noted.
23              See you folks in May.
24                             o0o
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

16N4TERC
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  TERRORIST ATTACKS
3    ON SEPTEMBER 11, 2001                03MDL1570(GBD)(FM)
4
4    ------------------------------x
5
5                                        June 23, 2011
6                                        11:35 a.m.
6
7    Before:
7
8                        HON. FRANK MAAS
8
9                                        Magistrate Judge
9
10                        APPEARANCES
10
11   ANDERSON KILL & OLICK
11        Attorneys for O'Neill Plaintiffs and PECs
12   JERRY S. GOLDMAN
12
13   COZEN O'CONNOR
13        Attorneys for Federal Insurance Plaintiffs and PECs
14   SEAN P. CARTER
14   J. SCOTT TARBUTTON
15
15   MOTLEY RICE
16        Attorneys for Burnett Plaintiffs and PECs
16   ROBERT T. HAEFELE
17
17   CLIFFORD CHANCE
18        Attorneys for Defendant Dubai Islamic Bank
18   BY:  RONI BERGOFFEN (via telephone)
19
19   McMAHON & ASSOCIATES
20        Attorneys for Defendants IIRO, MWL and Wa'el Jelaidan
20   BY:  MARTIN McMAHON (via telephone)
21
21   STEVEN BARENTZEN (via telephone)
22        Attorney for Defendant Jamal Barzinji
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

16N4TERC

```
 1              (Case called)
 2              THE COURT:  Good morning.  I have the joint letter
 3    that's dated June 20, 2011.  I had suggested that, I think I
 4    had suggested that at this conference we would raise the
 5    subject of interrogatories or I may have had said it on the
 6    April 12 conference.  But I gather both sides have agreed to
 7    table that issue.  I also noticed that, I guess we did it by
 8    design, the next scheduled conference is July 12, but then
 9    there is a conference if it is to be held before Judge Daniels
10    on July 13.  I wonder if that makes sense.  I guess, I don't
11    know, perhaps you have not yet discussed whether there will be
12    a July 13 conference before Judge Daniels.
13              MR. GOLDMAN:  It's the plaintiffs' position that there
14    should be a conference on July 13.  There are certain matters
15    that are ripe for Judge Daniels to act on and we would like to
16    address those.
17              THE COURT:  The thought must have been that if the
18    issues I take up that perhaps he can deal with the following
19    day, was that the thinking or was it just accidental that we
20    ended up with potentially you folks making two trips or staying
21    overnight.
22              MR. CARTER:  Your Honor, I think it was accidental.  I
23    do believe at some point we noticed that we had these
24    consecutive dates and intended to propose that we try to
25    consolidate them on July 13.
```

NYDOCS1-970370.1

3
16N4TERC

1          THE COURT:  Why don't I just say that we will do what
2   we did perhaps in the first joint conference; I think it was
3   the second that Judge Daniels and I had.  Namely, if he holds a
4   conference, after he is done I will sit down with you to deal
5   with whatever issues remain.  Alternatively, if he cancels his
6   conference and there is a need for one before me, we will just
7   hold it at 10:00, the time he had indicated.  I gather that the
8   disputes with Dr. Barzinji and his clients have been resolved.
9          MR. CARTER:  That's correct, your Honor.  We have
10  provided a signed agreement that concludes all matters to Mr.
11  Barentzen who will then circulate it with his clients.
12         THE COURT:  If the message was whether Mr. Barentzen
13  needs to be on the phone, today if that's the status, I guess
14  the answer is not any longer.
15         MR. BARENTZEN:  I may just listen in anyway; thank
16  you, your Honor.
17         THE COURT:  Sure.
18         MR. BARENTZEN:  I don't know how long it will last; I
19  might listen in anyway just in case.
20         THE COURT:  No problem.
21         MR. BARENTZEN:  Your Honor, pursuant to the agreement,
22  you should be expecting stipulations of dismissal dismissing
23  plaintiffs' claims against not just Dr. Barzinji against but
24  all of our clients within the next few days.
25         THE COURT:  That should go to Judge Daniels unless
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4
16N4TERC

1    there is 636(c) language in the stipulation.
2            I guess that brings us, Mr. McMahon, to the issues
3    raised in the letter which I know you take the view are not yet
4    ripe related to IIRO and the Muslim World League.  Putting
5    aside the question of ripeness as to some of the detail, one
6    fairly simple directive was that 8 categories of documents were
7    to be produced within 30 days.  I take it the plaintiffs take
8    the view that that didn't happen.
9            I know at one of the last two conferences, I think it
10   was the April 26 one, I said we are really at the stage where
11   you need to sit down with your clients in Saudi Arabia and hold
12   their hands while they go through those 8 categories.  I guess
13   I am curious whether you have been to the kingdom since that
14   session.
15           MR. McMAHON:  Well, your Honor, just to bring you up
16   to speed, I received a very antagonistic email from Sean Carter
17   concerning his level of frustration.
18           THE COURT:  More antagonistic than his letter of June
19   16; I am just trying to get the scale.
20           MR. McMAHON:  Well, your Honor, I replied, because I
21   am somewhat older, in a very conciliatory manner and said,
22   Sean, I am equally frustrated.  I don't read Arabic.  I
23   wouldn't have sent you four indexes, two of which were
24   duplicative, had I known about it.  I don't understand the
25   erosive indexes because they are in Arabic.  So if you are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

16N4TERC
1   unsatisfied with the indexes, there not much I can do about it.
2           Your Honor, here is the suggestion I make.  He doesn't
3   read Arabic.  I don't.  Why doesn't he have his Arabic guy who
4   feels that we are frustrating the process, I gather, plug into
5   our Arabic guy, Mr. al Rahdi, either through Skype or sit down
6   in London with him for three days and just have an entire
7   agenda the indexes for IIRO-SA, we are claiming this, the
8   indexes don't work, and have Mr. al Rahdi explain what the
9   indexes are and why he believes they do work.
10          I would propose before that happens, that Sean and I
11  prepare an agenda and say these are all the big issues, for
12  example, how come they are dissatisfied with the Arabic
13  indexes, the IIRO-SA warehouse, certainly we can narrow that
14  issue, and lay out everything that they are dissatisfied about,
15  your Honor.
16          THE COURT:  Let me interrupt.  Correct me if I am
17  wrong.  The indices are a separate issue from the 8 categories
18  of documents.
19          MR. McMAHON:  Right.  I am referring to Sean's recent
20  email to me.
21          THE COURT:  But I want to focus first on the 8
22  categories of documents that I think on April 12 I said needed
23  to be produced in 30 days, and wholly apart from issues with
24  the indices, those were intended to be focused requests, and I
25  gather they have been kicking around for a very long time.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

16N4TERC

```
 1            MR. McMAHON:  Your Honor, we now have prepared for the
 2    MWL and for IIRO-SA specific responses for those 8 categories.
 3    I can shoot Sean an email this afternoon.  I want to get back
 4    to your earlier question.
 5            THE COURT:  When you say responses, I am not clear
 6    whether you are talking about a formal response to those 8
 7    categories or documents responsive or both.
 8            MR. McMAHON:  Both, your Honor.  We want to show
 9    Mr. Carter that this is what we sent you for 1 through 8 for
10    the Muslim World League, this is what we sent you 1 through 8
11    for IIRO-SA.
12            THE COURT:  So I understand, you are not producing
13    additional documents.  You are basically saying among the
14    documents we previously produced, X is responsive to request
15    number 1, Y is responsive to request number 2.
16            MR. McMAHON:  No, your Honor, we have been producing
17    and we just got in some more documents, we have had an ongoing
18    production, Mr. Carter is not satisfied with it, but there has
19    been an ongoing production, for example, on orphan records, the
20    52,000 orphans.
21            THE COURT:  Their letter said they don't want orphan
22    records, so why are we talking about producing even 12 orphan
23    records.  They have made it clear they could care less which
24    orphans got $2 a month in exchange for their fingerprints.
25            MR. McMAHON:  I thought they wanted the list of the
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

7

16N4TERC

1 orphans and we can't just push a button in the computer and
2 that spits itself out; we have to go in and do the hard copies.
3          THE COURT:  Let's clear that up.  Mr. Carter, whoever
4 wants to chime in, do you want the list of orphans?
5          MR. CARTER:  Your Honor, we don't.  We discussed this
6 very issue at the April 12 hearing.  We had a colloquy with the
7 court during which you said, I take it you don't want the
8 orphan records, and we said, correct, your Honor.  We followed
9 up with emails subsequently making clear that we don't want the
10 orphan records.  So the fact that we are continuing to have
11 this same discussion is a source of frustration.
12          MR. McMAHON:  I just didn't want the record to reflect
13 that we didn't put together these orphan records because at
14 some point I thought they were looking for the beneficiaries of
15 IIRO-SA distributions worldwide.
16          THE COURT:  At some point they were, but since April
17 they haven't been, and I think one of my orders may even have
18 said excluding orphan records or maybe I am not recalling that
19 accurately.  So I don't understand why in late June we are
20 talking about the orphan records.
21          MR. McMAHON:  If it's no longer an issue, that's
22 great.  I want to get back to your question to me.  You don't
23 know this, I put this into the email to Sean, that until some
24 document is signed by the Saudi government with the charities,
25 the charities are unable to send any moneys out even for

16N4TERC

1    attorney fees, so I am way behind on payment of attorney fees
2    and they can't even send me money for an airplane ticket and I
3    just can't finance that, your Honor.
4            I want to make sure you understand on the record that
5    they are frustrated because the kingdom will not allow them to
6    send out funds until such time a certain document is signed.  I
7    have spoken with or emailed with the kingdom's attorney,
8    Michael Kellogg, and he is trying to help me on that issue.
9    But until such time that that's resolved, I couldn't go over
10   there.
11           We have been on Skype with Mr. al Rahdi a great deal
12   in the interim.  I think we have narrowed our differences.  I
13   also sent a couple of emails to Sean about the fact that we
14   received in these banking records for IIRO-SA, but they are
15   very lightly printed, so I said do you have somebody come down
16   and just go through this and see if you want to take a shot at
17   copying all the banking records for IIRO-SA.
18           We also had another file.  The reason I am not up
19   there today, we have a translator in today.  They can't even
20   afford to pay for a translator, so this is coming out of my
21   pocket again.  I want to spend some time with the translator to
22   see what other documents we just received in.  I think they are
23   very responsive.  And as I say, at the close of business today,
24   I was going to send Sean an email saying these are the new
25   records we got in.

NYDOCS1-970370.1

9

16N4TERC

```
 1          THE COURT:  Let me just interrupt.  I understand part
 2   of the difficulty is that you have not been to the kingdom.  I
 3   am not suggesting that you need to invest your own money in the
 4   case.  Quite the opposite; I think that privately retained
 5   attorneys are entitled to be paid, and I have never kept in a
 6   case an attorney who was not getting paid who wished to exit a
 7   case.
 8          But whether it's because of Saudi regulations or
 9   whatever, documents were not produced on a schedule which is
10   consistent with my order which was that these 8 narrow
11   categories were to be produced within 30 days, I think 30 days
12   of April 12.  I am pretty sure it was as of April 12.  Even it
13   was April 26, we are still more than a month beyond the
14   deadline for the 8 narrow categories.
15          So it seems to me, and you are telling me that after
16   the conference rather than shortly before the conference, you
17   are going to be getting back to Mr. Carter, which basically
18   means there is no way to know what the outcome of that would be
19   today.  So I guess I somewhat share plaintiffs' frustration.
20   One thing that your clients ought to be concerned about is that
21   I can't worry about issues like Saudi approvals for attorney
22   fees.
23          What inevitably may happen in this case is that if
24   responsive documents are not produced, and Mr. Carter and his
25   colleagues are able to show that the documents exist and should
```

NYDOCS1-970370.1

10

16N4TERC

1   be produced, some of the tenor of what they said in the prior
2   conferences suggests to me that they may have specimens of
3   documents from whatever sources that enable them to show that
4   there are categories of reports that exist, which at least as
5   of now have not been produced.  If they make a sufficiently
6   persuasive showing, your clients may be faced with the prospect
7   that I issue case-dispositive sanctions.
8            So, I will let you finish talking but I just wanted
9   you to understand my concerns and where we collectively may all
10  be headed.  Go on.
11           MR. McMAHON:  I appreciate that, your Honor.  You have
12  always being struck as being a very level-headed guy and you
13  are trying to satisfy the plaintiffs' needs and you are
14  cognizant of the fact that we are dealing with a foreign
15  country.  What my point is that we have produced everything
16  that was called for in terms of the 8 categories for both MWL
17  and IIRO-SA and we now have that format.  I am going to send
18  that to Mr. Carter in about an hour or so.  I am waiting on our
19  translator to tell me some other things, but we can certainly
20  get that to him.
21           That is our position that we have complied.  I
22  apologize.  It was not timely in terms of if you set this down
23  for 30 days.  Mr. al Rahdi is just super overworked.  He can't
24  get the resources he needs to do all sorts of stuff.  He's been
25  killing himself.  He has produced a ton of things.  I have sent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

16N4TERC

1    also an email to Sean asking him about an initial production
2    and he said it just wasn't a good production.  Well, I can't
3    deal with that; what does that mean.
4           Your Honor, I am fully cognizant of where you are
5    heading and I have tried to apprise my clients of that.  In
6    fact, this morning I sent an email to IIRO-SA about the
7    prospects of my having to withdraw.  I don't really want to do
8    that, your Honor.  I know even though Sean may vigorously
9    disagree, I know our guys are not hiding the ball.  That's why
10   I was hoping a meeting between their Arabian guy and my guy can
11   get to that and hopefully Sean's man will tell them that he is
12   not hiding the ball.
13          It may not be the sharpest discovery process in the
14   world, they don't have a legal background, but that's a
15   different issue.  It's our position we produced everything now,
16   albeit late.  I apologize for that.  There are just so many
17   complicated factors dealing with that kingdom over there and
18   Mr. al Rahdi, and it's just been very, very difficult.
19          That's our position.  We produced, albeit we produced
20   late, I apologize, and we are in an ongoing production process.
21   I think we have now sent out 6,000 pages of financial records.
22   We are in an ongoing discovery process.  The last I heard was
23   that he was going to approach the court I guess about issuing
24   some sanctions, but I didn't see a motion, your Honor, and I
25   wasn't sure what was going to be discussed today.

NYDOCS1-970370.1

16N4TERC

1           THE COURT:  One of the allegations in Mr. Carter's
2    letter is that somebody in effect manufactured documents by
3    cutting and pasting from other documents.  Have you discussed
4    that with Mr. al Rahdi or somebody else on behalf of your
5    clients?
6           MR. McMAHON:  I think I discussed that, your Honor.
7    If he's referring to the Muslim World League committee, I am
8    sorry, the central council, whatever it was --
9           THE COURT:  The constituent council.
10          MR. McMAHON:  Yes.  I think we got those off the MWL
11   website.  There was no cutting and pasting.  We got it off the
12   MWL website as the easiest way to get all this stuff, at least
13   that category.  No, we didn't do that and we didn't create
14   documents as Mr. Carter maintains to show that we produced
15   documents.
16          MR. CARTER:  Your Honor, as an initial matter, I am a
17   little unclear as to Mr. McMahon's position, because at certain
18   points I think he represented that it's the view of the Muslim
19   World League and the IIRO that they have now produced all
20   documents responsive to the 8 categories and then there were
21   references to it being an ongoing production.  One of the
22   reasons we wanted to come here today was to get some
23   clarification on the record as to whether the defendants
24   believe they have produced everything responsive to the 8
25   categories.

13

16N4TERC

```
 1                THE COURT:  Mr. McMahon.
 2                MR. McMAHON:  Yes, your Honor.  To reiterate, we
 3      believe we have produced everything we have that is responsive
 4      to 1 to 8 for MWL and IIRO-SA, but there are other documents
 5      out there that they have been requesting like banking records.
 6      We are still working on that.  We will be getting them up to
 7      Mr. Carter as soon as the translator finishes up with the
 8      latest package.
 9                MR. CARTER:  The banking records were part of the 8
10      categories.
11                THE COURT:  I was just about to say that myself.
12                MR. McMAHON:  Well, we now have, your Honor, I don't
13      know what's officially under banking records definition, but we
14      now have a complete printout on IIRO-SA's bank accounts,
15      although that's the document I made reference to that's kind of
16      light in ink, so I suggest he send his man down here and look
17      at that document.  But the problem is, your Honor, there is one
18      guy, Mr. al Rahdi, who has been dumped upon to do all this
19      massive work.
20                That's why I made the suggestion, come to Jeddah, send
21      your man to London.  I told Mr. Carter, you are so concerned
22      about how an MWL office operates, visit the one in London.  I
23      am frustrated.  I think it's all there.  It's a matter of
24      collating everything.  He is just swamped with this enormous
25      request.  He doesn't read English as he should; he is OK but
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NYDOCS1-970370.1

14

16N4TERC
 1    not that proficient.
 2            THE COURT:  You know, they may have to assign other
 3    folks to help on the project of producing documents.  I assume
 4    at this stage that plaintiffs' counsel are interested in the
 5    documents, but if we are not at this stage yet, my sense is
 6    certainly we are going to get there shortly, where they will
 7    forgo the documents in exchange for a judgment, based either on
 8    the fact that these entities don't have counsel, should it come
 9    to that stage, or that the entities have been shown not to have
10    produced all of the documents that are responsive to the
11    requests.  The fact that they have one guy trying to produce
12    everything is interesting but not exculpatory in relation to
13    that.
14            MR. CARTER:  Your Honor, I think I should probably
15    address what is a pattern of behavior that's manifesting itself
16    again in the lead-up to this conference.  Mr. McMahon mentioned
17    to you that he would be sending to me later today a chart
18    reflecting what they thought they had produced.  He in fact
19    sent me something to that effect yesterday.  It references
20    wholesale categories of documents that are just being mailed.
21            What we encounter every time we run into a problem
22    with the IIRO and the Muslim World League is that as soon as we
23    go to the step of moving the court to compel, we have a
24    hearing, we get a flood or trickle of some responsive documents
25    but not a complete production.  The ball keeps moving.  We keep

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

16N4TERC

 1  talking about this conversation with Mr. al Rahdi.  We have
 2  been through that territory before.
 3          With regard to the constituent council records, they
 4  were not produced as pulled from a website as Mr. McMahon
 5  suggested.  They have been copied over into some kind of Word
 6  document.  In that process, these documents, the Arabic records
 7  words have been transposed so they no longer are legible.  That
 8  was what clued us into the fact that they had been created.
 9  There is no way for us to tell in this format whether they are
10  authentic, whether they are original.
11          We do know from our independent investigations about
12  these constituent council meetings that a handful of press
13  releases and meeting minutes do not represent anything close to
14  a complete production of the documents that are created for
15  purposes of these meetings.
16          We just keep running into the same problems and that
17  is what motivated us in the first place to move to compel some
18  very specific categories of documents and to try to set a
19  timeline so we would have some way to crystallize this issue
20  which I think is becoming crystallized.
21          There is a concern that your Honor acknowledged with
22  Mr. al Rahdi being the only person searching for responsive
23  records.  That's a double concern because you are dealing not
24  only with two organizations but with two organizations with
25  offices not only throughout Saudi Arabia but throughout the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

16N4TERC

```
 1  world.  So I am not really sure how it would be feasibly
 2  possible for Mr. al Rahdi to single-handedly conduct a search
 3  for responsive documents.  It seems impossible.
 4          MR. McMAHON:  Your Honor, in his affidavit Mr. al
 5  Rahdi had pointed out that he had I believe two or three
 6  individuals who were assisting him.  I don't want to have this
 7  come across as he's the only individual; he is overseeing the
 8  process.
 9          THE COURT:  I thought that was in relation to
10  generating the index rather than necessarily harvesting
11  documents; do I recall that incorrectly?
12          MR. McMAHON:  I am sorry, your Honor?
13          THE COURT:  I thought that the reference to two or
14  three other people was that there was a team that was
15  generating this large master index of files.  I don't remember
16  there being a reference to the team harvesting documents.
17          MR. McMAHON:  You may be right, your Honor.  I think
18  what we were making reference to is that Mr. al Rahdi had
19  discovered 6,000 folders that were responsive on the Muslim
20  World League side to the document requests, 6,000 folders, your
21  Honor.  It's going to cost a fortune to do that.  I think
22  that's what he's making reference to.  So perhaps you are
23  right, your Honor.
24          MR. CARTER:  Your Honor, one issue that shouldn't be
25  lost in the conversation about the 8 categories is that the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16N4TERC

1   court issued a subsequent order on April 27, directing the IIRO
2   to produce documents relating to other unrelated issues,
3   distinct from the 8 categories.  Those included records
4   relating to Mohammed Jamal Khalifa, another individual named
5   Wa'el Jelaidan, and the director named al Mujil.
6           Since the April 27 order was issued there has been
7   absolutely no production relative to any of those issues.  So
8   there has been a focus on a few discrete aspects of the 8
9   categories.  We don't think that that is complete.  There has
10  been nothing as to the other order.
11          Adding to the problems, Mr. McMahon suggested there
12  was a conciliatory tone.  What there wasn't was any outreach to
13  us in advance of any of the expirations of these deadlines at
14  all to let us know that there was going to be a problem, to let
15  us know that they were not going to be able to comply with the
16  court's order.  It's all after the fact and only after we
17  invest the time and effort to come before the court again on an
18  issue that really should have been put to bed.
19          THE COURT:  What I am inclined to do is to put this
20  over to the July 12 or 13 conference.  I think I have made my
21  position clear which is that if a persuasive showing can be
22  made that MWL and IIRO have not fully complied with the rulings
23  that I made on April 12 and April 26, those organizations may
24  be facing a more formal motion that I would entertain which if
25  my recommendation were to be accepted by Judge Daniels might

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

16N4TERC

1  lead to the entry of default judgments against those
2  organizations.  By the same token, if you are not getting paid
3  and move to withdraw on another route, they could end up in the
4  same position.
5          So I am inclined to put this off because there is not
6  much point in my simply saying you really have to comply with
7  orders that I last time and the time before said you really
8  have to comply with.  But really the burden is it seems to me
9  on your clients, Mr. McMahon, to establish that they have
10  complied, putting aside questions of timeliness of the
11  compliance.
12          I don't think I said it before, but as far as I am
13  concerned anything that is produced by anybody needs to be
14  Bates-stamped because it's difficult enough that we are dealing
15  with documents in Arabic and there may be translations down the
16  road, if we have piles of documents that are not Bates-stamped,
17  this is rapidly going to spin even more out of control than it
18  may be now.
19          MR. CARTER:  Your Honor, we have a double problem with
20  regard to Bates-stamping as far as the IIRO is concerned.
21  There were documents produced without Bates stamps.  Then there
22  was another production which repeated Bates stamps that were
23  used in an earlier production with regard to different
24  documents.  So for instance, I directed Mr. Haefele to a
25  particular Bates stamp the other day and he was looking at a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16N4TERC

1    document from a 2008 production and I was looking at a document
2    from 2011.  So we have this very difficult problem.
3            THE COURT:  Was there an order originally from Judge
4    Casey or whoever that said everything was to be Bates-stamped;
5    was that part of one of the case management orders?
6            MR. CARTER:  I don't recall it being part of the case
7    management orders; I know that it has been our practice on the
8    plaintiffs' side.
9            THE COURT:  What I am going to do is issue an order
10   that says that all productions to the extent feasible, and by
11   that I mean technologically feasible not in terms of manpower,
12   will be Bates-stamped with non-repetitive numbers.  Mr.
13   McMahon, if your clients have produced un-Bates-stamped
14   documents or documents which bear numbers that have previously
15   been used, they are going to have to reproduce those documents
16   with a new set of Bates numbers that don't use the same Bates
17   numbers for two discrete documents.
18           And I will expect that that also will have been
19   accomplished by July 12 or 13.  So we are clear on that, before
20   July 12 or 13, not around or a day or two after whenever we
21   hold that conference.
22           MR. CARTER:  With regard to holding us over to that
23   July 13 date.
24           THE COURT:  I keep saying July 12 or 13; I guess we
25   have agreed it will be the 13th.

16N4TERC

 1            MR. CARTER:  Correct, your Honor.  With regard to
 2    holding this issue over until that date, in the event there is
 3    a supplemental production that is received only a few days
 4    before, it will be impossible for us to address whether or not
 5    it's complete.  That said, it may be self-evident, I am not
 6    inclined to completely delay the issue to a later date, but
 7    would just want to clarify that we may not be in a position to
 8    fully address whether the production has been complete by that
 9    date.
10            THE COURT:  It may not give you sufficient time, but I
11    will say that any additional documents that are going to be
12    produced in an effort to convince you or me that the production
13    is complete ought to be produced by July 8.
14            MR. CARTER:  Thank you, your Honor.
15            THE COURT:  From the plaintiffs' perspective is there
16    anything else we should take up today?
17            MR. GOLDMAN:  As a follow-up to this one, we are
18    requesting that Mr. Carter's letter of June 16, we have leave
19    to have docketed.
20            THE COURT:  Sure.  Anything else?
21            MR. McMAHON:  I am sorry, can you repeat that.
22            THE COURT:  Mr. Goldman was requesting that
23    Mr. Carter's letter of June 16 be docketed.  But I think what I
24    am going to do is direct that the letter to me of June 20 be
25    docketed and the letter to you as an exhibit to that.  Mr.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16N4TERC
```
 1   McMahon, anything else you wanted to bring up today.
 2           MR. McMAHON:  Your Honor, there will be an ongoing
 3   problem with respect to producing documents for Wa'el Jelaidan.
 4   If you recall, maybe not, he was the humanitarian director
 5   during the Soviet occupation of Afghanistan.  I believe there
 6   were some records and we produced; we just don't have anything.
 7   With respect to the Mr. Khalifa, we have given them everything
 8   we have.  That's the guy who was in the Philippines who was
 9   totally exonerated.  So we are going to have some situations
10   where they have whatever we have and if they don't like it.
11   And of course, with Wa'el Jelaidan, you are going back to 1989,
12   your Honor.
13           THE COURT:  Slow down; you can't see it but the court
14   reporter may keel over.
15           MR. McMAHON:  If you really want to order us in
16   connection with Wa'el Jelaidan, he was the humanitarian
17   director during the Soviet occupation of Afghanistan.  My
18   understanding is he didn't work for IIRO-SA; he helped refugees
19   of course.  We don't have any records for him and we don't have
20   any records for Mr. Khalifa other than those we have produced.
21   They may not like that but that's what our ultimate position is
22   going to be on those people.
23           MR. CARTER:  Your Honor, with regard to Mr. Khalifa in
24   particular, I think we probably need some clarification from
25   the IIRO as to where the documents went, because what we know
```

22

16N4TERC

1   is that he was the director of several offices of the IIRO for
2   a number of years, was responsible for making disbursements,
3   for initiating and managing projects.
4         All we have with regard to Mr. Khalifa are a series of
5   letters and newspaper articles in which he claims his
6   innocence.  So, we are receiving everything that the IIRO has
7   that would present its view that he was not a central figure in
8   using the IIRO to promote Al Qaeda, but we don't have any of
9   the operational documents relating to his tenure as an
10  official.
11        The same thing for Mr. al Mujil.  With regard to
12  Mr. Jelaidan, there are references in the indexes that were
13  provided to Mr. Jelaidan's name, so I suspect that there are
14  records.  So I think it would probably be in Mr. McMahon's best
15  interest to check back.
16        THE COURT:  One would think.  Yes.
17        MR. CARTER:  I suppose we will cross that bridge when
18  we get to it.
19        MR. McMAHON:  Your Honor, you should know that that
20  Khalifa individual, he goes back to 1992.  He is certainly not
21  current.  He was arrested in 1993 by the U.S. authorities and
22  then tried in absentia in Jordan.  As of 1992, that's the end
23  of Khalifa's working days in the Philippines with IIRO-SA.
24        MR. CARTER:  The few documents we have actually say
25  something different from that; they say he was there for some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

16N4TERC
```
 1   period after 1992.
 2            MR. McMAHON:  How can it be?  He was in jail; he was
 3   under arrest.
 4            MR. CARTER:  He was briefly detained in the United
 5   States; he was not in jail throughout that period of time.
 6            THE COURT:  One thing that Mr. McMahon had suggested
 7   was that the person you are relying on to review the documents,
 8   or I guess the indices, have a discussion with the person who
 9   the defendants are using for the same purpose and I guess I
10   don't see much harm in that.  Why should that not occur?
11            MR. CARTER:  There's a whole group of people who need
12   to be used to analyze this information.  The analysis of
13   information in this case requires a rather unique set of
14   skills.  It's not really translating; it's having substantive
15   knowledge regarding particular activities, particular
16   individuals, networks.
17            THE COURT:  I am really focusing, maybe I didn't make
18   it clear, on the indices, the two indices, and how they were
19   generated, what you perceive as the shortcomings, why they
20   perceive them as adequate, and perhaps dealing with some of the
21   issues where you say just the file organization suggests that
22   there must be must be other indices.  I guess what I am
23   proposing is that whoever is generating that belief on your
24   side communicate with whoever thinks they have done an adequate
25   job on their side as part of an informal meet and confer to see
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

16N4TERC

1   whether the two sides can get closer together on that, whether
2   one side has a fundamental misunderstanding, or perhaps just
3   confirm that each side thinks its position is correct and there
4   is no meeting of the minds.
5           MR. CARTER:  The difficulty from our perspective is
6   that there is this constant effort to shift to the plaintiffs
7   the burden of explaining to the Muslim World League and IIRO
8   the nature of their discovery obligations and why they are not
9   fulfilling them.  We have already invested thousands and
10  thousands of dollars to needlessly translate documents that are
11  not responsive or are duplicative.  Mr. McMahon's answer to
12  that is to spend thousands more dollars to fly people around
13  the world talk to his guy.
14          THE COURT:  I am not suggesting a face-to-face
15  discussion.  This can be done by telephone; this can be done by
16  Skype.
17          MR. CARTER:  There is an additional issue that we have
18  been reluctant for a variety of reasons to disclose the
19  identities of our non-testifying consultants who are working.
20  Some of them may have a concern about, a personal concern about
21  identifying their participation and involvement.  That's
22  another layer of the problem.
23          (Pause)
24          THE COURT:  At the stage where you are making a
25  motion, if it comes to that, aren't you going to have to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16N4TERC

1  disclose somebody who is in a position to testify or affirm or
2  declare in a way that reflects personal knowledge what the
3  inadequacies are.  Maybe it can be done by saying what your
4  letter alludes to, that there are attributes of the documents
5  that show that documents ought to be easier to find than
6  through this after-the-fact index that was constructed.  But it
7  seems to me that, and I understand your concern, if you are not
8  willing to disclose at least some of these people, it may be
9  difficult for you to make your case in relation to the motion.
10            MR. CARTER:  We appreciate that at some point for that
11  purpose we may have to disclose someone who can file an
12  affidavit.  Frankly, your Honor, we have not exactly determined
13  as a practical matter how we are going to approach that problem
14  which is something that we are considering.  I think the
15  broader problem with the indexes is that they are not going to
16  move the ball at all.  They are literally that fundamentally
17  deficient of any value, that having a meeting won't help us at
18  all.  What will help is getting the documents that were subject
19  to the two orders.  The indexes were this separate initiative
20  of the IIRO to presumably demonstrate some good faith.
21            With regard to how they were manufactured and created,
22  it seems to me that this is something that the attorneys should
23  be able to discuss in a meaningfully intelligent way between
24  one another.  Mr. McMahon has made it clear that he Skypes with
25  Mr. al Rahdi regularly.  They can have a conversation about how

NYDOCS1-970370.1

16N4TERC

1   he approached putting this index together.  Then we can sit
2   down meet and confer as counsel to try to move forward.  It's
3   not so much that they are in Arabic, your Honor.  We can see
4   translations; we can find ways.
5           THE COURT:  How about an informal meet and confer,
6   again whether it's on Skype or just a conference call, that
7   involves you or whoever the designee is on your side, and I am
8   suggesting an attorney, Mr. McMahon, Mr. al Rahdi, who I gather
9   speaks English, and if need be, an Arabic translator so that if
10  there are problems you can get past them without the consultant
11  or consultants who you don't want to disclose, just to convey
12  what your concerns are and see whether there are some
13  explanations that perhaps you are missing.
14          MR. CARTER:  I don't have an objection to doing that.
15  I don't want to displace the focus on the documents.
16          THE COURT:  It seems to me the focus would be on the 8
17  categories of documents and the additional documents in the
18  April 26 or 27 order.  If we get to the stage of motion
19  practice, but just because we seem to spend a lot of time
20  talking about the indices, I think what I will do is direct
21  that such a meet and confer occur in advance of the July 13
22  conference.  So that said is there anything else either side
23  believes ought to be taken up today?
24          MR. McMAHON:  Yes, your Honor.  With respect to this
25  issue of perhaps a refusal to identify who are these
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

16N4TERC
```
 1    individuals who are saying this is not a good faith production,
 2    I would like to know what their qualifications are if they are
 3    not going to provide me with their names, what are their
 4    qualifications, because we are relying on Mr. Carter's
 5    observations that this has not been produced, that has not been
 6    produced.  I would like to know what the qualifications of
 7    those individuals are.  I don't understand, is it a personal
 8    safety issue, that is, if you identify somebody by the name of
 9    Bill Smith someone is going harm him.  I don't understand that.
10    I would like some clarification on that.
11            MR. CARTER:  With regard to the qualifications, you
12    don't really need any particularized qualifications to stand in
13    front of the court and say we don't really have a document that
14    says the name al Mujil.  That was one of the categories of
15    documents that were to have not been produced.  So, some of these
16    things are more fundamental than requiring some internalized
17    personal knowledge of the operations of these organizations.
18    So, once we get the supplemental production, we will have to
19    reanalyze whether or not there is a need to have someone with
20    personalized knowledge or some expertise serve as the affiant.
21            THE COURT:  I gather you are using two types of
22    people, one as to whom you have security concerns who have
23    knowledge of the operation of these organizations, I am not
24    asking you to say yes or no, but also, and it may be the same
25    people, folks who simply speak Arabic and are looking through
```

NYDOCS1-970370.1

28

16N4TERC
1    the index or other documents and telling you what they say.
2              MR. CARTER:  I think you are correct in the first
3    part.  With respect to the analysis of the Arabic, you still
4    need someone with a background in counterterrorism issues to
5    make any legitimate headway of documents in this area.
6              THE COURT:  I stand by my directive that there be a
7    meet and confer without those folks on your side; maybe it
8    won't move the ball, maybe it will.  But in relation to the
9    total expenditure that both sides are making in this case,
10   having a conference call should not be unduly expensive.  Maybe
11   it will shed some light on these issues.
12             MR. CARTER:  One thing I mentioned earlier is that we
13   would appreciate an explanation regarding documents that no
14   longer exist but did at one time exist and when they were
15   destroyed.  That's part of the instructions in the document
16   requests.  Can we get clarification on the record that to the
17   extent it's the position of the Muslim World League and IIRO
18   that a category of documents relating to a particular category
19   no longer exists, we receive some explanation as to where they
20   went.
21             MR. McMAHON:  Your Honor, I know we produced the
22   document retention policy for the organizations; that was a
23   while ago.  But I can certainly try to get to the bottom of
24   that, to the extent there are no Wa'el Jelaidan documents, when
25   was the last time there were such documents and were they
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

29

16N4TERC
1    disposed of.
2              THE COURT:  Hopefully that can be part of the
3    discussion I just directed.  Anything else on plaintiffs' side?
4              MR. CARTER:  Your Honor, Mr. McMahon and I had an
5    exchange at one point.  We noticed in one of Mr. al Rahdi's
6    affidavits that he took the position that I believe it was the
7    IIRO had two gather categories of documents, public documents,
8    and documents that were essentially documents of the government
9    and the kingdom and therefore immune from production as a
10   result of the kingdom's sovereign immunity.
11             We have asked Mr. McMahon to clarify for us as to
12   whether there is an entire class of documents that are not
13   being searched so that we can determine whether or not we need
14   to file a motion on that issue and I have not heard back.  So
15   I'd simply ask that we a receive response to that as well.
16             MR. McMAHON:  Your Honor, we have been in dialogue
17   with the kingdom's attorneys on that issue to determine what
18   the nature of the documents is.
19             THE COURT:  When you say the kingdom's attorneys,
20   that's Kellogg Huber.
21             MR. McMAHON:  Yes, your Honor.  He's been very busy
22   but we have been trying to go back and forth on that just to
23   narrow the scope of the issues here.  If this is just some
24   mundane correspondence, go at it, but if there is some, as I am
25   told, sensitive attorney-client issues, then I think we just
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

30

16N4TERC

1 have to log them in a privilege log and explain to Mr. Carter
2 why those won't be produced.  I am a little lost until there is
3 a further dialogue, but I am working on that issue.
4          THE COURT:  But you should convey to Mr. Kellogg,
5 although he has been lurking in the shadows, that he and his
6 firm or his client kingdom may have to come to court to clarify
7 this issue also.
8          MR. McMAHON:  The charities are very concerned that
9 they would do anything to violate the kingdom's rulings on
10 something.  I got to the bottom of that.  They are quite
11 fearful that the kingdom will take the view that they did
12 something wrong.  That's what I am trying to get into as an
13 issue, your Honor.
14          MR. CARTER:  One issue I would mention that may
15 expedite the conversations between Mr. McMahon and Mr. Kellogg
16 is that when Mr. Kellogg was representing the kingdom, he did
17 file a brief of record in which the kingdom disclaimed that
18 either the Muslim World League or IIRO were agencies,
19 instrumentalities, or organs of the kingdom.  So I can't
20 conceive how they would have governmental documents if that's
21 the kingdom's position.
22          MR. McMAHON:  I have one final question.  Are we
23 briefing you on these issues before the 13th; are they going to
24 file a motion; where are we?
25          THE COURT:  I will entertain letters.  I would like
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16N4TERC

1  them three days before.  Let me be more clear about that. if I
2  get them Monday by 5:00, that's fine as far as I am concerned,
3  but formal briefing, no, but what I have been trying to
4  indicate is that we may be headed towards formal briefing to
5  the extent that plaintiffs seek sanctions.
6          MR. CARTER:  I am confused about what application the
7  Monday-by-5:00 deadline would apply to, whether or not that is
8  in reference to this question of the documents being subject to
9  sovereign immunity or rather to the question of whether or not
10 the Muslim World League and IIRO have made complete production.
11         MR. McMAHON:  I think it's the latter.  I want to be
12 able to show the judge that we have made complete production on
13 1 to 8 for both MWL and IIRO-SA; I want the judge to see that.
14         THE COURT:  I guess what I am saying is any issues
15 that you want to take up on the 13th, I want letters on by
16 close of business on the 11th.  I recognize that because of the
17 schedule we have been talking about, it may be difficult if not
18 impossible for there to be a joint letter, so individual
19 letters are fine.
20         MR. CARTER:  I have to express some concern.
21         THE COURT:  The two letters or however many letters I
22 get may be addressing different issues without opportunity to
23 respond, I understand that, but we have been muddling our way
24 through this thus far and I guess we will continue to do that.
25         MR. CARTER:  The one concern I have about the

16N4TERC

1    sovereign immunity issue is that, without having received a
2    response, it would put us in a difficult position where the
3    kingdom can now jump in and file some extensive letter
4    asserting immunity as to documents in the possession of the
5    IIRO and Muslim World League.
6              THE COURT:  But it also might explain why there are
7    enormous gaps from your perspective in what you are getting
8    because the MWL and IIRO are taking the position that many of
9    the documents are subject to the kingdom's sovereign immunity.
10   So I would worry less about getting sandbagged and more about
11   hopefully about getting some information that we can deal with
12   on the 13th.
13             MR. CARTER:  OK.  Thank you, your Honor.
14             THE COURT:  Anything else, Mr. McMahon?
15             MR. McMAHON:  I hope you have a wonderful day.  I am
16   exhausted.  Have a wonderful day.
17             THE COURT:  Don't hang up just yet.
18             MR. HAEFELE:  I want to make one clarification.  The
19   invitation for the letters three days before was relative to
20   Muslim World League and IIRO issues, correct; it wasn't an
21   invitation for letters on the multiple other things.
22             THE COURT:  No.  Any other issues that concern other
23   parties, the usual briefing schedule should apply.
24             MR. HAEFELE:  That's all I need, your Honor.
25             THE COURT:  Thank you all.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
                                                            1
        1bgr911c
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    In Re:  TERRORIST ATTACKS ON
3            SEPTEMBER 11, 2001           03 MDL 1570 (GBD)
4
4    ------------------------------x
5                                         New York, N.Y.
5                                         November 16, 2011
6                                         2:30 p.m.
6
7    Before:
7
8            HON. FRANK MAAS
8
9                                         Magistrate Judge
9
10
10
11           APPEARANCES
11
12
12   KREINDLER & KREINDLER LLP
13        Attorneys for Ashton Plaintiffs
13   BY:  JAMES KREINDLER
14        ANDREW J. MALONEY, III
14
15
15   COZEN O'CONNOR
16        Attorneys for Plaintiff Federal Insurance
16   BY:  SEAN CARTER
17        J. SCOTT TARBUTTON
17
18
18   MOTLEY RICE LLC
19        Attorneys for Burnett Plaintiffs
19   BY:  ROBERT T. HAEFELE
20
20
21   ANDERSON KILL & OLICK, P.C.
21        Attorneys for O'Neill Plaintiffs
22   BY:  JERRY S. GOLDMAN
22
23
23   BERNABEI & WACHTEL PLLC
24        Attorneys for Defendants Al Haramain Islamic Foundation
24        and Perouz Seda Ghaty
25   BY:  ALAN R. KABAT
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

```
                                                          2
     1bgr911c
 1              APPEARANCES
 2
 2   CLIFFORD CHANCE US LLP
 3        Attorneys for Defendant Dubai Islamic Bank
 3   BY:  RONI E. BERGOFFEN
 4
 4
 5   STEVEN K. BARENTZEN
 5        Attorney for Dr. Jamal Barzinji
 6
 6
 7   OMAR T. MOHAMMEDI
 7        Attorney for defendants WAMY International, Inc.
 8
 8
 9   MARTIN MCMAHON (telephone)
 9        Attorney for Defendant Muslim World League
10
10
11   LUQUE GERAGOS MARINO LLP
11        Attorneys for Defendant African Muslim Agency
12   BY:  NANCY LUQUE (telephone)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1bgr911c

```
 1               (Case called)
 2               THE COURT:  Good afternoon everyone.  Sorry we are
 3     starting late.  I guess we had some phone issues.
 4               One of the motions that is pending before me relates
 5     to Pete Seda.  I plan to resolve that motion shortly, but I had
 6     some factual questions that I want to make sure I'm accurate in
 7     my understanding in what I recite.
 8               As to the documents that were seized pursuant to a
 9     search warrant, it's not clear to me whether those were seized
10     from Mr. Seda's residence, from AHIF USA, or both.
11               MR. KABAT:  You mean the documents that came from Al
12     Haramain's law firm?
13               THE COURT:  They were documents you say you can't turn
14     over because they were returned to Mr. Seda by the government,
15     and under the Federal Defenders' understanding of the
16     magistrate judge's order in Oregon, those documents can't be
17     produced.  Those documents, as I understand it, were seized
18     pursuant to a search warrant from somewhere.  I just don't know
19     where somewhere is.
20               MR. KABAT:  From where Al Haramain is headquartered,
21     which is also where Mr. Seda lives.
22               THE COURT:  So the office was his house?
23               MR. KABAT:  He lived in the office.  Al Haramain owned
24     the building where he lived.
25               THE COURT:  Fair enough.  That answers one of my
```

4

1bgr911c

 1    questions.  Then were the documents returned to him before
 2    trial, do you know?
 3            MR. KABAT:  Yes.  They were turned over according to
 4    the Rule 16 protective order, that is, after Mr. Seda returned
 5    to this country and before the trial.
 6            THE COURT:  So once the magistrate judge signed the
 7    protective order, then the documents were returned?
 8            MR. KABAT:  I believe that's the correct timing.
 9            THE COURT:  I should be able to determine this from
10    the docket sheet.  I assume that the charges against AHIF USA
11    were dismissed prior to trial, correct?
12            MR. KABAT:  Correct.
13            THE COURT:  I think that's all I wanted to clear up
14    with regard to Mr. Seda.
15            I have the letters that have been submitted with
16    regard to various sanctions applications.  I also have the
17    binder that the plaintiff sent me relating to their October
18    17th motion regarding Wa'el Jalaidan.  There are a number of
19    other groups of exhibits that relate to the MWL/IIRO and Wa'el
20    Jalaidan motions that have been submitted that I don't have.
21    I'm not quite sure what the explanation for that is.
22            In some instances I think I have a reasonable
23    understanding of what the information is.  For example, in the
24    affidavits of Mr. al-Radhi and Mr. al-Mujeel and others that
25    Mr. McMahon submitted, I don't have the affidavits themselves.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

1bgr911c

```
 1   I'm not sure what the explanation is, whether it never got sent
 2   to me, whether it ended up in Judge Daniels' chambers.  They
 3   recarpeted my chambers and moved me in and out, so I may be to
 4   blame.  But I will need copies of the binders other than the
 5   October 17th motion binder of exhibits sent to me in relation
 6   to these motions.
 7          That raises in my mind the related question of
 8   whether, going forward, to the extent that there were motions
 9   similar to these, they should be done on formal motion papers
10   rather than letter motions.
11          MR. CARTER:  Your Honor, we had raised at various
12   times the notion that certain of these motions should probably
13   be docketed just to preserve the record.
14          THE COURT:  Sure, the letters certainly would be
15   docketed or should be docketed.  You're basically saying toss
16   the answer, for example, of MWL/IIRO and put them in a
17   circumstance where a default judgment would be entered
18   eventually.  That's fairly significant relief.  It seems odd to
19   be doing it on a letter application, although the letter
20   application is single space is probably longer than a
21   double-spaced set of motion papers would be.
22          I'm trying to think through, since conceivably there
23   will be a lot more motion practice as we go forward, whether
24   for motions like this it makes sense to proceed by letter or
25   formal motion papers or you don't care.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

1bgr911c

```
 1              MR. CARTER:  Your Honor, I don't think that we care.
 2    It harkens back to one of the original case orders that
 3    requires that all original discovery motions be done by letter,
 4    if my recollection is correct.  We have just adhered to that
 5    practice.
 6              THE COURT:  Unless somebody on the defense side has a
 7    different view, I'm content to go forward that way.  It just
 8    occurred to me that might account for some of the problem I had
 9    in terms of some of the exhibits, although I hadn't had that
10    problem in the past.
11              MR. McMAHON:  Your Honor, this is Mr. McMahon.  I
12    would prefer for you to decide.  I want to get clarified in my
13    mind, we owe you copies of all affidavits that we served with
14    our opposition letter for the motion for sanctions, is that it?
15              THE COURT:  Yes, exactly.
16              MR. McMAHON:  On Wa'el Jalaidan we filed a memorandum
17    letter opposition as well as an affidavit.  Do you have that?
18              THE COURT:  Let me tell you what I have.  I have your
19    September 26th letter relating to MWL and IIRO, and it says,
20    "In addition to the exhibits referenced herein, attached are."
21    The "attached are" part I'm missing.
22              On the plaintiffs' side I have the affirmation of
23    Scott Tarbutton dated October 14, 2011, annexing three
24    exhibits.  In relation to your letter about Wa'el Jalaidan, if
25    the only attachment is his affidavit, I have that.  Is it
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                        7
          1bgr911c
 1   correct, Mr. McMahon, that that is the only affidavit?
 2             MR. McMAHON:  I believe that's the case, your Honor.
 3             THE COURT:  I missed that.  I guess all I'm missing is
 4   the affidavits that relate to your opposition relating to MWL
 5   and IIRO.
 6             MR. McMAHON:  The 9/26 letter exhibits, yes.
 7             THE COURT:  Yes.
 8             MR. McMAHON:  What is the best way, your Honor, to get
 9   you physical possession of those?  FedEx them to your chambers?
10             THE COURT:  Exactly.
11             MR. CARTER:  Your Honor, for clarification on our end,
12   these are the exhibits that were submitted in support of the
13   motion for sanctions as to the Muslim World and IIRO.  Does the
14   Court have something approximating this?
15             THE COURT:  Yes.  Because of its impressive girth, I
16   didn't bring it upstairs today.
17             MR. CARTER:  That's why I made Mr. Tarbutton carry it.
18             THE COURT:  Turning to MWL and IIRO, one of the things
19   Mr. McMahon says in his papers is that he has 12,000 pages of
20   exhibits, possibly more, kicking around his office that you and
21   your colleagues have declined to come look at.
22             MR. CARTER:  Your Honor, we received notification of
23   the existence of those documents on the very day we were filing
24   the motion for sanctions.  We were very reluctant to continue
25   to embrace a moving target relative to what had been produced
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

1bgr911c

1    and what had not been produced.
2            We simply asked Mr. McMahon to brief the dispute on
3    the record that existed as of the deadline that the Court had
4    set and hold those documents to the extent the Court declined
5    to place his clients in default.  Obviously, our papers take
6    the position that that universe of documents still doesn't
7    represent anything nearly close to compliance with the Court's
8    orders.
9            THE COURT:  Just so I'm clear, and I know I've asked
10   this question before, from the plaintiffs' perspective what is
11   the relationship between MWL and IIRO?
12           MR. CARTER:  The Muslim World League is, for lack of a
13   better term, the parent of the IIRO.  The Muslim World League
14   established the IIRO in, if I remember correctly, 1978
15   primarily to serve as an operational arm so that the Muslim
16   World would set broad policies and the IIRO would carry out
17   operational activities that served those general policy
18   interests.  Although, we have seen in many instances that the
19   Muslim World League also maintains operational presences and
20   carries out operations on its own.
21           THE COURT:  Mr. McMahon, I'm not wholly clear on what
22   your present position is as to the extent to which the parent
23   organization or organizations, in the plural, control the
24   branches.  I saw some reference to certain branches being
25   within the control of the central agency, but I thought I saw

9

1bgr911c

1   another one that essentially conceded that all of the branches
2   are under the control of the parent organizations.  Let me get
3   from you what your position is to that.
4           MR. McMAHON:  Yes, your Honor.  I want to get back to
5   the 12,000 pages.  For your information, your Honor, we took
6   the time to put those on CD's, and they are ready to go if Mr.
7   Carter wants those.
8           With respect to your pertinent question here, they are
9   separate entities.  There may be certain parts of the globe
10  where there is an MWL office and an IIRO office, but they are
11  separate entities, have separate charters.  We don't deem IIRO
12  to be a subsidiary of the MWL.
13          THE COURT:  I'm asking a slightly different question.
14  For IIRO, for example, to the extent that the plaintiffs are
15  seeking documents from branch offices, what is your position as
16  to the IIRO's ability to secure documents from the Indonesian
17  branch, the London branch, etc.?  Is it branch-specific or do
18  you concede that all of the branches, in terms of document
19  flow, are within the control of the parent?
20          MR. McMAHON:  No, your Honor, we don't concede that.
21  We would look to IIRO for the different office records in terms
22  of a particular branch, like the Philippines, which the
23  plaintiffs are very interested in.  At one point I think the
24  MWL had presence there, but IIRO has whatever records IIRO it
25  has.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1bgr911c

```
 1              If the Court orders, I don't know what MWL records
 2   exist for the Philippines, because if there was an operational
 3   arm there at some juncture, I thought it was IIRO.  I would
 4   think, your Honor, that you look to the IIRO branch.  Your
 5   Honor, I only did due diligence in the sense that I did it at
 6   six or seven of the offices.  I don't want you to think that I
 7   traveled the globe and visited every one of those offices.  I
 8   haven't.
 9              MR. CARTER:  Your Honor, I think there is a fair
10   degree of specificity within the actual filings concerning the
11   relationship between the headquarters of the IIRO and various
12   branch offices.
13              THE COURT:  When you say the filings, do you mean the
14   letter briefing that I have?
15              MR. CARTER:  Yes, for the sanctions.  They make clear
16   that it is a highly centralized organization, that none of the
17   branch offices engage in any activity from the hiring of an
18   employee, to the opening of a bank account, to the issuance of
19   a check to a potential payee without authorization of the
20   headquarters.  There are controls in place requiring those
21   branch offices to turn documents back to the headquarters on a
22   routine basis.
23              We even see as a practical matter in the course of
24   this litigation Mr. al-Radhi mentions that, among other things,
25   he went to Indonesia at one point and the Indonesian office was
```

11

1bgr911c

 1  directed to give him anything he wanted.  The same is true for
 2  the Muslim World League, and we think that the papers lay that
 3  out.  It's their own documents.
 4          THE COURT:  I understand your position.  I just wanted
 5  to understand Mr. McMahon's.  I'm not sure I fully understand
 6  it now.  I think perhaps the better way to approach this is to
 7  look at some specific requests.
 8          The April 12th order, for the moment focusing on the
 9  first request, asked for annual, semiannual, and other periodic
10  financial reports of the two organizations, including branch
11  offices, including a number of specified documents.  Let's
12  focus on financial reports.
13          I understand that your position, Mr. McMahon, is
14  periodic reports would be submitted, they'd be consolidated
15  into an annual report, and then the periodic reports would not
16  be retained.  Do I have that right?
17          MR. McMAHON:  Yes, your Honor.
18          THE COURT:  I assume what you are telling me when you
19  say that is that IIRO central, for example, in Saudi Arabia,
20  would not keep the periodic reports once it had an annual
21  report.
22          MR. McMAHON:  Right, your Honor.  I think I addressed
23  that on page 13 of our letter opposition response, branch
24  office reporting, number 5.
25          THE COURT:  It's a little hard to understand, if some

12

1bgr911c

1   of these organizations have a thousand or thousands of
2   employees, how 12,000 pages, even if it's all financial
3   records, would be all the financial records, quarterly, etc.,
4   that relate to all of these branches for a multiyear period.
5   Are you representing that in response to this first category
6   somebody, Mr. al-Radhi or somebody else, on behalf of IIRO
7   queried every branch office to secure the documents that
8   plaintiffs have requested?
9            MR. McMAHON:  Your Honor, I believe that's the case.
10  I will have to go back and check his affidavit.  As I said at
11  page 13 paragraph 5, these documents were apparently sent to
12  counsel's office.
13           THE COURT:  Just to avoid the game of chicken, I'm
14  going to direct that you provide that CD to plaintiffs' counsel
15  and also that plaintiffs' counsel review it.
16           MR. McMAHON:  There are 12 CD's.
17           THE COURT:  Like I said, the 12 CD's.  I don't want to
18  leave anybody in suspense.  It's not my intent at the end of
19  today to grant or recommend -- I think it would be a grant,
20  since this is a discovery issue -- dispositive relief in terms
21  of something like striking the answer of any of these
22  defendants.  But I do think, unless I'm convinced otherwise, we
23  may be heading in that direction.
24           MR. McMAHON:  Does your Honor have a viewpoint on the
25  bank documents we have, which are difficult to read?  I asked

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1bgr911c

1  Mr. Cater to send somebody down here to look at these.  We
2  inquired of the bank about a digital format, but that may be
3  months away.  I simply suggest to send somebody down to look at
4  the bank records.
5          THE COURT:  I didn't go back through prior
6  transcripts, but I thought that there was a representation at
7  some prior session that there was no digital version of this.
8  Maybe the representation was just that there was no digital
9  file at these defendants' offices.
10         MR. McMAHON:  I think at that time, your Honor, we
11 didn't have total definition on this issue.  But subsequently,
12 in conference with the bank of Mr. al-Radhi, we discovered that
13 there is a hardcopy, and if they are to have access to the
14 digital records, that would take an enormous amount of time.  I
15 know I referenced that somewhere that that is something that is
16 still --
17         THE COURT:  You say it would take I guess it was at
18 least six months.  One of the things that plaintiffs pointed
19 out was the letter request seeking these documents, I guess
20 from just one bank, was dated August 15th, which hardly
21 suggests that the defendants are proceeding with dispatch.
22         MR. McMAHON:  Your Honor, I addressed this in point 4
23 on page 13, right before 5.  I just want to know what to do
24 with these records, because we do have them.  I want you to
25 know that I made the offer to come and visit and see if they

14

1bgr911c

1  can read these banking records if they so terribly want them.
2  I can't be more definite on what is in here regarding any
3  digital version.
4          MR. CARTER:  Your Honor, my recollection of this is
5  that we were initially told that this was an old dot matrix
6  printout of some banking records and that there were no digital
7  files that could ever be identified.  When we interviewed Mr.
8  al-Radhi at Mr. McMahon's request, what he told us is that
9  these were banking records that were printed out by their banks
10 during the course of this litigation.  That prompted an inquiry
11 from us.
12         If that is the case, then digital files have existed
13 during the course of this litigation.  Has anyone gone and
14 asked them to print it again so that we can have a legible copy
15 or to give us the digital files?  Mr. al-Radhi said we've never
16 asked them.
17         So, the first representation was that we've had
18 checked, it doesn't exist.  The second representation is no one
19 ever asked.  It's just difficult for us to figure out what the
20 actual playing field is.
21         THE COURT:  It seems to me that there is an obligation
22 to produce records not just in the possession of a party but
23 those that are in their custody or control.  To the extent that
24 there are electronic records or files that are available from
25 the banks, those have to be requested in a timely fashion and

15

1bgr911c

1    produced.
2            It also seems to me that the request, unless Mr.
3    Carter tells me otherwise, extends to each branch of the
4    organization.  And to the extent that there are nonduplicative
5    files in the branches, those have to be produced, whether it's
6    burdensome or not.
7            This whole case is about money being diverted toward
8    terrorist goals.  As I understand it, the lion's share of the
9    effort is to see where money went.  So the notion that this is
10   a lot of paper or bytes of information and therefore
11   burdensome, Mr. McMahon, doesn't really resonate to be me.
12           MR. McMAHON:  OK, your Honor.  I went back and tried
13   to find the reference to the banking records.  That's in
14   paragraph 22, I guess, of Mr. al-Radhi's affidavit.  My team
15   has also inquired of the al-Radhi bank if they have a digital
16   record of financial banking transactions, and they have stated
17   such inquiries should be requested to the head office and it
18   might take six months, and we are in the process of doing that
19   accordingly.
20           THE COURT:  I assume if you had a large number of
21   branches, there is also a fairly large number of banks.  What
22   is required here is not one request to one bank but, to the
23   extent that records don't exist in the branches themselves,
24   many requests to many banks.
25           While I said that I'm certainly at this stage not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

1bgr911c

1   going to grant dispositive sanctions, at some point Mr.
2   al-Radhi or somebody else, as a 30(b)(6) witness, is going to
3   testify as to the efforts that these defendants made in
4   response to these requests.
5          Except to the extent that the two sides can agree that
6   some branch office is not relevant, if each branch office is
7   not queried and the documents from that branch produced, as far
8   as I'm concerned that will have been an inadequate search and
9   may lead to dispositive sanctions.
10          MR. McMAHON:  I hear and appreciate that, your Honor.
11          MR. CARTER:  Your Honor, we focused a lot during the
12  discussion today on the financial records and bank statements,
13  but there were a number of other categories.
14          THE COURT:  I had written down, just on the April 12th
15  order, I was going to focus on 1, 3, 4, 6, and 8.  We don't
16  have time to go through each one.  I know 2 is important to
17  you, but you seemed to get a list of orphans, so I skipped that
18  one.
19          3 relates to the annual constituent council meetings
20  where it would appear that there should be centrally located
21  files.  To the extent that there is something from the
22  Philippines' office, as an example, that the main office
23  doesn't have, if the Philippines office has it, it needs to be
24  produced from that office.
25          I guess 4 is similar, although I would imagine Mr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

1bgr911c

```
 1  McMahon is going to tell me that some of this is among the
 2  12,000 documents that he has for your review.
 3              MR. McMAHON:  Yes, your Honor.
 4              MR. CARTER:  Your Honor, with regard to category 2,
 5  for instance, I know that it's been the defendants' response to
 6  that to produce orphan records.
 7              THE COURT:  I thought we had agreed that it's
 8  everything but orphans.
 9              MR. KREINDLER:  It is everything but orphans.  One of
10  the reasons that we want clarification on this issue is because
11  it is about the identity of the parties to whom they
12  transferred money.  The orphans aren't of interest, but some of
13  the organizations that received money are.
14              MR. McMAHON:  As I'm sure you read, your Honor, 50
15  percent of IIRO's annual expenses go to these orphans.
16              THE COURT:  You don't have to segregate out orphans.
17  That's the plaintiffs' problem.  But telling me about widows
18  and orphans doesn't really resolve the problem of producing
19  complete records that relate to who received aid during the
20  years we're talking about from either of the two defendants.
21              MR. McMAHON:  Every entity that receives any kind of
22  aid has to be identified?
23              THE COURT:  Correct.
24              Talk for a moment about audits.  It seems to me the
25  defendants will not have done their job as to audits unless
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                18
        1bgr911c
 1  they have searched their own records to make sure that if they
 2  have retained copies of audit reports and the documents that
 3  underlie the audit reports -- I guess the first of those is
 4  more likely than the second -- that that be produced.  Saying,
 5  well, we'll contact the auditor and see whether they will give
 6  it to us if a copy of the audit report is sitting in IIRO's
 7  office doesn't cut it, as far as I'm concerned.
 8          MR. McMAHON:  I hear your Honor.  You want any and all
 9  records produced that are still in the possession or control of
10  the charities that in any way supported the audit.
11          THE COURT:  Or that are the audit, yes.
12          MR. McMAHON:  OK.
13          THE COURT:  Whether that is found in Saudi Arabia or
14  in the Philippines office doesn't much matter.  Somebody, Mr.
15  al-Radhi or somebody else, in an organized way has to query all
16  of these offices and be in a position to say what was done to
17  follow up, and you really need to document the process.
18          As an example, in the April 26th order there was a
19  requirement that records that relate to Mr. al-Mujeel be
20  produced.  There is a representation that the Indonesian office
21  was checked, but I gather he worked in the eastern province
22  office.  It would be a little like reviewing the files of the
23  Southern District for an Eastern District of New York case.
24  That doesn't seem to be terribly helpful or likely to adduce
25  responsive documents.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1bgr911c

```
 1              MR. McMAHON:  I understand, your Honor.  Thank you.
 2              THE COURT:  I know you understand.  I thought I was
 3    reasonably clear about this in our prior conferences.  We don't
 4    seem to be moving forward.  Perhaps it is that we never will
 5    and that the plaintiffs' motion ultimately will be granted.
 6    Even though you have been to Saudi Arabia, it sounds like folks
 7    don't understand what their duties are.
 8              For example, saying that somebody has contracted to
 9    have a further audit of records to my mind is somewhat
10    inexplicable in that the plaintiffs don't want audit documents
11    created now, they want preexisting financial records and
12    audits.  It's interesting, I suppose, that perhaps as part of
13    your defense somebody is doing an audit, but it really doesn't
14    relate at all, as far as I'm concerned, to document discovery
15    in this case.
16              Let me jump ahead a little.  At some point Mr. McMahon
17    will tell me that these organizations have produced all of the
18    records they have and I have indicated that I think it is going
19    to be appropriate to test that through a deposition of one or
20    more 30(b)(6) witnesses.  Where will a deposition like that
21    take place?
22              MR. McMAHON:  Your Honor, perhaps we can answer that.
23    We can very easily arrange to have that done in London.
24              THE COURT:  That may be the answer.
25              MR. McMAHON:  I think they even have a London office,
```

                                                             20
        1bgr911c
 1   one of these law firms.
 2              THE COURT:  Looking at the number of people in the
 3   courtroom, I'm sure one of these law firms has a London office
 4   or can find a room at Heathrow.
 5              In terms of the indices, I agree that the
 6   responsibility of producing documents can't be shifted from the
 7   defendants to the plaintiffs, but I'm not sure that the
 8   plaintiffs have really looked through the indices to see
 9   whether there are categories of documents that can be excluded
10   or focused on or prioritized or whatever.
11              MR. CARTER:  Your Honor, as I've said, we have had
12   people go through the hundred or so thousand cells within the
13   spreadsheet.  There really is not enough in a descriptive sense
14   to allow us to use them.  So, they have limited value.
15              MR. McMAHON:  Maybe Mr. Carter can send me a brief
16   email on one of those categories, your Honor, to point out why
17   that particular characterization is too limited to afford the
18   9/11 lawyers to say that's the document I want.
19              THE COURT:  I'll go further than that.  You said that
20   there was an attempted meet-and-confer but that plaintiffs'
21   counsel, it appeared to you, didn't have the indices with them.
22              MR. McMAHON:  Right.
23              THE COURT:  I'm going to direct that there be a
24   meet-and-confer where both sides have the indices and you can
25   have a discussion about what they do or don't shed light on.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

21

1bgr911c

 1                MR. McMAHON:  OK.  That would be before our 30(b)(6)?
 2                THE COURT:  Presumably.
 3                MR. McMAHON:  Yes.
 4                THE COURT:  I view the 30(b)(6) as at a very late
 5    stage of this process.  Conceivably, if the defendants produced
 6    all the documents they had and convinced the plaintiffs that
 7    that were so, there would be no need for a 30(b)(6) witness as
 8    to the document search.  But if we are headed in the direction
 9    of dispositive sanctions, I want there to be a clear record.
10                MR. McMAHON:  I understand, your Honor.
11                THE COURT:  I'm picking at random parts of the papers.
12    There is a request for records that relate to the expulsion of
13    some folks from which office?
14                MR. McMAHON:  The expulsion of offices allegedly from
15    Pakistan.  It's based on a newspaper clipping, your Honor.  It
16    refers to Arab charities.
17                THE COURT:  But the response is (a) nobody has been
18    arrested and (b) the conviction was thrown out.  There is a lot
19    of argument on both sides about the merits of this case, which
20    in terms of discovery is largely irrelevant.
21                MR. McMAHON:  There was no conviction, your Honor.
22                THE COURT:  That's fine.  But the request is not for
23    records related to the conviction or the arrest of folks in
24    Pakistan.  It's as to the expulsion of one or more people from
25    Pakistan.  It may be that nobody was expelled, but the response

22

1bgr911c

1    doesn't say that.  It talks about the convictions were thrown
2    out.  It talks about nobody was arrested.  The response, it
3    seems to me, is not responsive.  There either are or are not
4    records that relate to the expulsion of officers or employees
5    from Pakistan.
6              MR. McMAHON:  The reference to Arab charities, your
7    Honor, that's kind of broad.  That's what it says.  That's the
8    problem.  There could be a ton of Arab charities involved, and
9    maybe some of them were expelled for whatever reason.
10             THE COURT:  Let me get back to that portion of the
11   letter of plaintiffs.  It's page 15 of plaintiffs' letter.
12             MR. McMAHON:  It's actually page 9, your Honor.
13             THE COURT:  Page 15 of, I'm sorry, your letter says,
14   and you're quoting from the request, that you haven't produced
15   any documents related to the expulsion of IIRO personnel from
16   the Islamic Republic of Pakistan.  I suffer because I haven't
17   read that al-Radhi affirmation, but you're saying that the fact
18   that that didn't occur is confirmed by the director general's
19   office stating in a letter that "no employee has so far been
20   arrested having a link with al~Qaeda, the government of
21   Pakistan, or any other investigating agency.  The office is
22   running smoothly," etc.
23             The office could be running smoothly, nobody could
24   have been arrested or had a conviction that was affirmed, and
25   yet a dozen people could have been expelled.  If there were no

23

1bgr911c

 1   documents that relate to expulsion because nobody was expelled,
 2   that's one thing, but there needs to be a clear response to the
 3   request.
 4            MR. McMAHON:  That was my understanding, your Honor.
 5   I went over that with Mr. al-Radhi.  It was basically the
 6   newspaper clipping, to the extent he had any records pertaining
 7   to that, they should be produced.  We didn't find any records
 8   for that.  We'll verify that or re-verify.
 9            MR. CARTER:  Your Honor, a few points.  We have
10   invested tremendous time and resources over a period of many
11   months to get to the point where the Court is again directing
12   these defendants to do what it told them to do back in April.
13   The only basis we had to try and maintain integrity in the
14   process was the fact that we did have some independent
15   information verifying that they weren't complying with their
16   discovery obligations.
17            It is only now that we have presented it to them that
18   they are acknowledging some of these gaps.  And now that we
19   have made the case, they are going to start to begin this
20   process of producing the documents.  We have lost time,
21   resources that could have been invested in other aspects of the
22   case.
23            This kind of process of discovery only plays into a
24   broader effort to outlast the plaintiffs by using up all of
25   their resources before they can get to a point of having an
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

24

1bgr911c

 1  opportunity to litigate this case on the merits.
 2          Where we are now is that we are going to have another
 3  meet-and-confer, Mr. McMahon and his clients are going to
 4  peruse droves of additional documents, and we are going to go
 5  back to the beginning with Arabic translators and consultants
 6  and everyone else combing through them in considerable detail
 7  to try and demonstrate that stuff has been withheld again.
 8          I just don't know, given where we have come thus far,
 9  that there is much basis to think that there is going to be
10  true compliance going forward or that there will be a
11  reasonably obtainable methodology for demonstrating
12  noncompliance once we have already sort of showed our hand.
13          MR. McMAHON:  Your Honor my short response to that is
14  Mr. Carter should take a look at the 12 disks, the CD's, the
15  12,000 pages, and maybe comment on that.
16          THE COURT:  I have already directed that he do that.
17  I recognize that the defendants, and perhaps not just these
18  defendants, are a bit of a moving target, but I don't think it
19  is appropriate to say, well, if they didn't give it to us by
20  the date we filed our motion, we're not going to look at it.
21          Part of what I need to consider is prejudice, and it's
22  hard to demonstrate prejudice if Mr. McMahon can say, well, if
23  they'd opened the file or come to my office, all of the records
24  they want are there, admittedly late, but they are there.  I
25  suspect if it's 12,000 documents, it may make a dent in what

25

1bgr911c

1    you are seeking, but it probably makes a fairly small dent.
2              MR. CARTER:  Your Honor, part of the prejudice I think
3    we would identify is that, for instance, the 12,000 documents
4    can include branch office reporting that in one of the early
5    filings we were told didn't exist.  We then invested all the
6    time and resources to have investigators go out and collect
7    information and comb through documents to prove that they did
8    exist.  The prejudice we have suffered so far, is the
9    incredible investment of money, time, and resources simply to
10   get to the point where the defendants acknowledge effectively,
11   yes, there's a whole bunch of stuff that we never looked for.
12             THE COURT:  The alternative, I suppose, is to proceed
13   directly to the 30(b)(6) deposition.  That might put a finer
14   point on what you are telling me and what seems to be correct
15   in terms of what was and wasn't done.  But I'm not sure that at
16   the end of the day I wouldn't have to provide some relief short
17   of throwing out the defendants' answer before taking that step.
18             I guess I understand your frustration.  I'm prepared
19   to move forward on the basis of the motion papers I already
20   have, supplemented as is appropriate so that you are not
21   starting from scratch again.  But I do think we need to take
22   this a step at a time.
23             MR. CARTER:  Your Honor, could we reserve at a minimum
24   that if we get to the end of that process, the Court would
25   entertain an application, if we fall short at the end of an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

1bgr911c

```
 1   actual dispositive motion, for a motion for sanctions to
 2   recover some of the costs and expense we have incurred over
 3   nine months of simply proving that these documents exist?
 4              THE COURT:  Oh, sure.  Yes.
 5              MR. McMAHON:  Your Honor, you should be aware that Mr.
 6   al-Radhi has invited these lawyers to come to London at his own
 7   expense or at the charity's expense to go to an overseas office
 8   and actually learn how the office operates.  It would be a
 9   wonderful education for them.  I wrote them and said WML would
10   pay for that trip.
11              It is extraordinary, I think, the affirmative response
12   from these charities to accommodate these attorneys.  Keep in
13   mind, your Honor, we have been sued for a trillion dollars.  I
14   have never been involved in one of these trillion-dollar
15   lawsuits before.  Now, with these 12,000 pages, we are up to
16   35,000 pages of discovery.  But you have heard my speech
17   before.  I'm sorry.
18              THE COURT:  The trillion-dollar ad damnum and the
19   seriousness that you view it with is hard to square with an
20   earlier stage where I think you were having trouble getting
21   advanced sufficient funds to go to Saudi Arabia.
22              Putting that aside, I think there has to be greater
23   focus here.  I've said in the past that if I were the
24   plaintiffs, I'd take you up on the offer to visit these
25   offices.  But if they want to proceed the way they are and on
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

1bgr911c

1   the record they have, I'm not going to require that they go to
2   London or the Philippines or anyplace else.
3           MR. McMAHON:  Your Honor, we should forget about,
4   then, the vendor proposals that we brought to your attention?
5           THE COURT:  Yes.  Getting a bid to copy every scrap of
6   paper, if that's what the offer is, in Saudi Arabia is a
7   nonstarter.  The duty of identifying responsive documents
8   really belongs to the defendants.  There are also other issues.
9   Once you move documents, for example, from Mecca to another
10  city, I don't know that you can say we're producing them as
11  they are maintained in the ordinary course and therefore the
12  plaintiffs have to come inspect them.
13          MR. McMAHON:  I think in United LEXIS, your Honor --
14  I'll have to go back and double-check -- there would be an
15  analysis of all the documents to say these documents are
16  responsive to number 1 or number 4 or number 6 or number 3.
17          THE COURT:  I'm sorry, I didn't get that.
18          MR. McMAHON:  I think in United LEXIS, your Honor,
19  there certainly was, for instance 2 to 6,000 MWL folders.  That
20  would be an attempt to narrow that down in the sense that these
21  are the documents that are necessarily responsive to X, go
22  through the use of classic work, discovery work.
23          THE COURT:  I have directed that the two sides meet
24  and confer with regard to the indices that either will or won't
25  shed light on this process.  Given the track records so far, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

1bgr911c

1   understand the plaintiffs' reluctance to write a check for
2   files that may or may not be responsive.
3          MR. CARTER:  Your Honor, if I could add one thing to
4   that.  After having spent all the time and money we have to
5   prove that the documents exist, I think we are doubly reluctant
6   to write a check, now that they acknowledge them to exist, for
7   them to produce them.  It's tripling the investment,
8   effectively.
9          THE COURT:  Let's move on, unless somebody wants to
10  add something with respect to MWL and IIRO, to Wa'el Jalaidan.
11         MR. CARTER:  Your Honor, before we move on, I
12  apologize, but we didn't set any time frame for this process.
13         THE COURT:  That's true.  I want to tie it to the
14  discussion of the timetable for fact discovery in this case,
15  which was one of the points you wanted to raise.  In fact,
16  let's do that next rather than moving on to Wa'el Jalaidan.
17         MR. CARTER:  Your Honor, I had some conversations with
18  counsel for Dubai Islamic Bank and some of the other members of
19  the defendants' executive committee about what we contemplated
20  would be a brief extension of the rolling production probably
21  to 60 days.  The process that was just described with regard to
22  the Muslim World League and IIRO gives me some pause to suggest
23  that we can complete everything we are doing and the additional
24  work with those defendants in 60 days.
25         THE COURT:  Is it feasible to have, in terms of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

29

1bgr911c

```
 1  document discovery, two different schedules?
 2             MR. CARTER:  I think that would be fine.  You mean one
 3  as to the Muslim World League and IIRO and one as to other
 4  parties?
 5             THE COURT:  Yes.
 6             MR. CARTER:  That would be acceptable to us, I think.
 7             THE COURT:  For the others you're proposing a 60-day
 8  extension?
 9             MR. CARTER:  Of the rolling production deadline, yes,
10  your Honor.
11             THE COURT:  Which takes us to when?
12             MR. CARTER:  January 30th, if I'm correct.
13             THE COURT:  I don't have a problem with that.
14             MR. KABAT:  Your Honor, we would also request that the
15  summary judgment deadline would be extended correspondingly.
16             THE COURT:  That's obviously going to have to shift
17  other dates.  Candidly, I tried to call Judge Daniels right
18  before this conference to let him know that that was one of the
19  applications and to see whether he had any strong views.
20  Perhaps fortunately for you folks, I wasn't able to reach him.
21  As far as I'm concerned, that necessitates readjusting all of
22  the other dates that we're talking about.
23             What do you suggest as an extension as to MWL and
24  IIRO?
25             MR. CARTER:  Your Honor, in terms of the production of
```

1bgr911c

1   the actual documents, I'm not really sure that it makes sense
2   to give them more time than other defendants by virtue of their
3   failure to make a diligent search to this point.
4           What I would ask, though, because of the track record
5   we have with these particular defendants, is that we have a
6   pause from our obligation to collect everything potentially
7   responsive to their requests and give us an opportunity to
8   focus on making our productions to the other defendants.  I
9   think we would be in a position to produce our documents to the
10  Muslim World League and IIRO say some 30 days after they had
11  completed their production.
12          THE COURT:  I'm not going to do that.  What I'm going
13  to do is extend the rolling discovery deadline for both sides
14  as to those defendants for the same 60 days.  If I see some
15  good-faith effort to move forward in terms of document
16  production, maybe there will be some additional adjustment.  If
17  I don't, there is not much point in me extending this ad
18  nauseam.
19          MR. CARTER:  Thank you, your Honor.
20          THE COURT:  I guess I will do the same with respect to
21  Wa'el Jalaidan.
22          MR. CARTER:  Thank you, your Honor.
23          THE COURT:  It seemed to me there were issues as to
24  whether banking records were in Mr. Jalaidan's position or a
25  representation that they were not in his possession versus the

1bgr911c

 1  plaintiffs' view, which I agree with, that if they are in his
 2  custody or control, they are also producible, and that if he
 3  has the practical ability to get them from his banks, they are
 4  within his control.
 5           Part of the response that I received from you, Mr.
 6  McMahon, was, well, the accounts have all been seized.  I have
 7  no doubt that perhaps he couldn't write a check against one or
 8  more of these accounts, but that's not the same as saying that
 9  he can't obtain records that relate to them.
10           MR. McMAHON:  Your Honor, I have had a lot of
11  experience with designated entities, for good and bad.  Banks
12  are conservative institutions to begin with.  They would
13  hesitate to have any kind of dialogue with respect to alleged
14  designated terrorists because without having procured a
15  license, for example, from OFAC, you can't deal with such
16  people, you're breaking the law.
17           I think they would be very hesitant to do anything.
18  And Jalaidan I guess would have to pay attorney's fees to the
19  bank to hire special counsel to investigate all of this to see
20  whether or not they are even allowed to take a request from him
21  for certain bank records that are no longer in his physical
22  possession but in the bank's control.
23           MR. CARTER:  Your Honor, effectively what Mr. Jalaidan
24  is trying to do is use his designation by the United States and
25  the UN as a shield from the discovery process.  In articulating

32

1bgr911c

 1   that position, all he gave us was a very generic affirmation in
 2   which he said, for instance, that he has contacted some of his
 3   banks but that effectively they won't take his calls.
 4           We don't see any sort of documentation establishing
 5   the kind of diligent effort to obtain the records that one
 6   would expect, particularly from someone who is trying in good
 7   faith to obtain records that in his position to the Court would
 8   exonerate him from the claims in this litigation.  We don't see
 9   letters from counsel or anything of that nature.
10           THE COURT:  Since he is a designated terrorist,
11   apparently, I've indicated how I would expect the record to be
12   made clear with respect to MWL and IIRO.  I would anticipate
13   that there would be some complications whether you're taking
14   his deposition regarding documents or as to the merits of this
15   case.  How do you envision that unfolding if indeed the case
16   goes forward as against him?
17           MR. CARTER:  Your Honor, I think what we had in mind
18   at this point was simply an order for him to undertake all
19   diligent efforts to obtain the bank records and to provide the
20   Court and the plaintiffs with some documentation verifying that
21   he has done that.
22           As your Honor saw, we produced an affidavit from
23   Professor Gerulli, who in large degree was the architect of the
24   executive order 13224 program that liaisoned to the UN relative
25   to its program.  He is quite clear that the programs don't

33

1bgr911c

1  prohibit the banks from sharing this information.  And the
2  record seems to establish that in that one of the banks Mr.
3  Jalaidan says he can't get records from is Faisal Finance,
4  which gave him records three years after his designation.
5           What we are really looking for is some record to
6  establish that he has undertaken those efforts.
7           THE COURT:  He's produced records.  Does that
8  necessarily mean that he obtained them from the bank rather
9  than from his own files?
10          MR. CARTER:  He is producing a 2005 account statement
11 from a bank that froze his account in 2002.
12          THE COURT:  If he had that in his back pocket, then he
13 didn't need to go to the bank.
14          MR. CARTER:  What I'm saying is he is taking the
15 position that from the date of the freezing of his accounts,
16 all of his banks have uniformly refused to deal with him and to
17 provide him bank statements, yet he has a bank statement from
18 three years after that point in time.
19          THE COURT:  I see your point.  I guess, Mr. McMahon,
20 it comes down to the same thing I said with respect to your
21 other two clients, namely, that there has to be a full-court
22 press.  And, as Mr. Carter indicated and I've said before, it
23 has to be documented.  If you're not sufficiently able to
24 document a vigorous effort to obtain those documents, it may be
25 that sanctions are imposed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1bgr911c

1              MR. McMAHON:  Your Honor, if I could ask Mr. Carter
2     this.  What precludes the plaintiffs' lawyers from issuing
3     subpoenas to these banks and demanding the Jalaidan records?
4     Then they might have an excuse to produce the records, that
5     they are not dealing with global terrorists, they are producing
6     records pursuant to a valid subpoena.
7              THE COURT:  I'll let Mr. Carter answer that, but my
8     answer to it is they have the right to ask the defendant
9     produce that which is in his control.  You're saying it's not
10    within his control, but I'm not sure this has adequately been
11    established.
12             MR. McMAHON:  They have a track record, your Honor, of
13    seeking extrajudicial assistance throughout the course of the
14    litigation.  I'm just curious if they even tried one of these
15    things to see what the response was.
16             MR. CARTER:  Your Honor, they are beyond the subpoena
17    power, so it's not a simple matter of issuing a subpoena.  I
18    think what we are running into here is a problem that we have
19    run into consistently, which is an effort to reformulate the
20    discovery process in a manner that deserves the defendants'
21    interests but bears no relationship to the rules.  We have seen
22    it with the Muslim World League and the IIRO, and we are seeing
23    it with Mr. Jalaidan.
24             If there is a record that he has undertaken good faith
25    and diligent efforts to obtain these records and has been

35

1bgr911c

1  unable to, a joint application to this court for letters
2  rogatory to a foreign tribunal may make sense.  But that is a
3  time-consuming process and we are trying to adhere to a
4  schedule.  Until he has undertaken his direct efforts, I don't
5  see a point of going down that road.
6         THE COURT:  I agree.  Can we move on from Mr.
7  Jalaidan?
8         MR. CARTER:  Your Honor, there was one issue in that,
9  and also a request, that the time frame as to Mr. Jalaidan,
10  particularly with respect to bank records, go back to 1988.
11         THE COURT:  I'm going to deny that request without
12  prejudice.
13         MR. CARTER:  Thank you, your Honor.
14         THE COURT:  That brings us to the agenda letter and
15  the remaining points on it.  I appreciate the report that I
16  received as to other defendants.  I know that there was a
17  request regarding the deposition transcripts of Dr. Mirza, Dr.
18  Barzinji, and a third deponent.  What else is there to discuss
19  today?
20         MR. CARTER:  Your Honor, there was the scheduling
21  issue, which I think the Court has addressed.
22         THE COURT:  Right.
23         MR. CARTER:  We have one issue that wasn't on the
24  agenda letter simply because it came up on Monday of this week
25  and has no bearing on any of the defendants here, if I could

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

1bgr911c

```
 1   take a moment.
 2              THE COURT:  Sure.
 3              MR. CARTER:  It deals with your Honor's report and
 4   recommendation on the al~Qaeda default judgment, the monetary
 5   award on behalf of certain of the Federal Insurance plans.
 6              THE COURT:  You haven't collected the full amount yet?
 7              MR. CARTER:  We have not.  There is, however, an
 8   ongoing forfeiture proceeding in the Northern District of
 9   Illinois through which the government is seeking to seize
10   approximately $6.6 million in al~Qaeda assets.  We have
11   appeared in that proceeding.
12              THE COURT:  I thought you sent a letter to Judge
13   Daniels.
14              MR. CARTER:  We did, and a proposed order.  One of the
15   things that we would like to have very much in a somewhat
16   urgent time frame is a ruling on that so that we can present
17   that to the Court in Chicago.
18              THE COURT:  Yes.  I work for him, not the other way
19   around, but I was going to urge him to turn to the Al Haramain
20   objections as well.  I'll try to take up both those issues with
21   him this week.
22              MR. CARTER:  Thank you, your Honor.
23              THE COURT:  Anything else?
24              MR. KREINDLER:  Yes, your Honor.  This is for the next
25   conference.
```

                                                                     37
        1bgr911c
 1                THE COURT:  Do we have a date by the way?
 2                MR. KREINDLER:  It's the December conference.
 3                THE COURT:  There is a date scheduled?
 4                MR. KREINDLER:  Yes.  This is the defendants' request
 5      from us for information on standing and the plaintiffs'
 6      damages.  If I spend two, three minutes on it, I think we can
 7      save hours of future brief writing and discussion.
 8                THE COURT:  Sure.
 9                MR. KREINDLER:  First of all, I think it is important
10      to keep in mind where we are trying to go on this case.  This
11      is not the regular case where there is going to be varying
12      individual damages.  Speaking personally, my goal is a uniform
13      recovery on each death case and each injury case and an
14      allocation to the economic and property damage plaintiffs.  So,
15      any information about whether a victim was married or had
16      children or who is the executor or how many people are involved
17      really isn't going to be relevant here.
18                Second, as a practical matter, the only way this case
19      is going to work --
20                THE COURT:  Wait.  Let me stop you at point one.  I'm
21      probably not the judge who should be asking this question, it's
22      probably Judge Daniels, but let's say that every victim was
23      single and childless or, conversely, every victim was married
24      and had 12 children.  Wouldn't that affect the equation?
25                MR. KREINDLER:  As a practical it's not going to here,
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

1bgr911c

 1    your Honor.  The precedent is the numbers used now by the
 2    foreign claims commission for all terrorist claims against
 3    Libya, which is 10 million a death, 3 million an injury.  That
 4    is our goal.  People receive damages from the VCF, some
 5    received damages from the insurers for American and United.
 6    Some didn't sue at all.
 7           The common element here is driven by and of the
 8    intentional tort punitive damages type of case.  The way we are
 9    handling the case is on that uniform basis.
10           Now, if any one of these defendants or any group of
11    defendants got to the point where they wanted to talk about
12    settlement, it would not be making 25,000 offers on each injury
13    and death case.  As a practical matter, a defendant would come
14    forward and say, we want out of this case, we can put up a
15    hundred million dollars, what can we do?  Then, with the
16    Court's assistance, we would find a mechanism with your Honor
17    or special master to create a fund following the proportions
18    that we have recommended to our clients.
19           THE COURT:  I guess some of this must have been
20    followed in the Libya case?
21           MR. KREINDLER:  Exactly.  It's a paradigm that the
22    state department and the justice department and the
23    administration are using with Libya, and it's the model we're
24    following in other cases, the Mumbai case, etc.
25           Right here I want to say that apart from wasting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

1bgr911c

1    thousands and thousands of hours of going to all these families
2    and saying who was appointed -- it's a colossal waste of time
3    and it doesn't advance the litigation.
4            One specific thing came up, and really this is my
5    request that the defendants withdraw a demand.  What is coming
6    up ahead is an ostensible standing issue under the VCF.  The
7    defendants have focused on the language of the VCF to advance
8    an argument that some plaintiffs may be eligible against some
9    defendants.  It just isn't the case.  Let me lay it out right
10   now.  Here is the legislative history of how the VCF came
11   about.
12           Senator Schumer passed the first version.  Five
13   minutes after it came out, my father and I called him up -- my
14   dad had known him for 30 years -- and said, Chuck, you screwed
15   it up, you forgot to leave the exemption for the suit we're
16   working on against the backers of al~Qaeda.  He said, oops,
17   we'll fix it up.  The fix three or four days later was to
18   permit these very suits that we have been litigating for ten
19   years.  Now, if there is any doubt about what I'm saying, I can
20   have Senator Schumer verify it.  Ken Feinberg will verify it.
21           I would like now to take all these nonissues that will
22   waste hundreds and thousands of hours out of the case so we can
23   be at a point in the very near future where we're not doing
24   exactly what we are doing with you and pulling teeth to get
25   liability documents.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1bgr911c

```
 1              I think the case can move forward.  If the defendants
 2    need Ken Feinberg or Senator Schumer to verify what I'm saying
 3    here on the record, we can do that.  But I'm representing that
 4    that's the fact.  I'd request that they withdraw those demands.
 5              THE COURT:  Let's assume that everything you said, I
 6    have no reason not to, is a hundred percent accurate.  If the
 7    legislation is unambiguous and reads the other way, aren't the
 8    plaintiffs entitled perhaps to discovery but at least to make
 9    the argument that the statute unambiguously requires something
10    other than what you just said?
11              (Pause)
12              THE COURT:  Off the record.
13              (Discussion off the record)
14              THE COURT:  Now we are on the record.
15              MR. KREINDLER:  I wanted to bring it up now.  I think
16    it is unambiguous.  I wanted to say what I just said because I
17    think we can save a lot of time.  Defendants can call me about
18    it tomorrow or next week to discuss it further.  But I would
19    like to focus on the work that must be done and not be diverted
20    by things that are going to wind up being irrelevant.
21              THE COURT:  I guess ultimately, absent some agreement,
22    it becomes a discovery issue as to whether that discovery is or
23    is not appropriate.
24              MR. KREINDLER:  Yes.  Our position is that we are
25    doing liability discovery, which is the defendants' conduct,
```

41

1bgr911c

 1  whether it's called standing or damages, and it's premature to
 2  waste any time on it until we get to the point of the
 3  possibility of the defendants paying money to some of the
 4  victims.
 5          THE COURT:  It may be that discovery gets staged and
 6  that this is stage 2 if it's at any point relevant.
 7          MR. KREINDLER:  Right.
 8          THE COURT:  But I will duck the issue rather than
 9  resolving the issue, which in a sense solves your problem.  I
10  think it is appropriate for the parties, as you said, to talk
11  first, and then we'll talk some more about it in December.
12          MR. KREINDLER:  OK.
13          MS. BERGOFFEN:  Your Honor, if I may respond with
14  regard to the motion on the consolidated requests?
15          THE COURT:  Sure.
16          MS. BERGOFFEN:  As your Honor put it, this is an issue
17  for a discovery brief.  We have submitted to the plaintiffs a
18  brief and given them an extension on a response.  I think, with
19  all due respect, Mr. Kreindler's response oversimplifies the
20  position that we have taken in that brief, and it does need to
21  be fully briefed on the papers to address the legal issues.
22          If I may for a moment, there are many issues with
23  regard to standing.  As you know, standing is an issue as to
24  liability rather than damages.  With regard to the VCF point,
25  as I state in our papers, it's not simply a matter of whether

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                        42
        1bgr911c
  1  or not the VCF allows suits to go forward, it's what the
  2  standard would be once you're under the VCF and once a
  3  potential plaintiff has actually become under the victims
  4  compensation fund.
  5          All of this is borne out in our papers and, with
  6  respect, needs to be fully briefed before the Court.  It isn't
  7  something that can just be summarily dismissed based on Mr.
  8  Kreindler's statements.
  9          THE COURT:  Let's talk about it more next month.
 10          MS. BERGOFFEN:  Very good.  Thank you.
 11          THE COURT:  Why shouldn't I direct that plaintiffs
 12  turn over the three deposition transcripts?
 13          MR. BARENTZEN:  Your Honor, Steven Barentzen on behalf
 14  of Dr. Jamal Barzinji.  Should I walk over that that podium to
 15  speak?
 16          THE DEFENDANT:  Ms. Luque, can you hear?
 17          THE COURT:  You're good where you are.
 18          MR. BARENTZEN:  I prefer to go to the podium if I'm
 19  allowed to, because I've got a place to put my stuff.
 20          THE COURT:  Be my guest.  However, make sure that that
 21  microphone is plugged in, because it may not help you.
 22          MR. BARENTZEN:  I have a pretty loud voice.  I'm not
 23  sure the microphone is going to be necessary.
 24          The short story is we do not and never have had any
 25  objection to any of the current parties to this case ordering
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

43

1bgr911c

```
 1   from the court reporter a copy of the transcripts provided they
 2   are willing to be bound by the confidentiality provisions that
 3   we agreed to in our resolution agreement with the plaintiffs.
 4   I think we shouldn't have to give them over, I think you have
 5   to buy them, but that's besides the point.
 6           I think this letter application that you got is a
 7   classic example of why they have meet-and-confer rules in the
 8   place in the first place.  Had nobody anybody to call us, they
 9   would have known that and maybe I wouldn't have had to come up
10   here.
11           I look at the letter that you are looking at right
12   now.  Four attorneys signed it.  When I got it and looked at
13   it, I said, what is this thing?  I emailed the court reporter
14   and I said, which of those four have actually asked for a copy
15   of the transcript?  Three of them had not.  Only one had, had
16   only asked for one transcript, and that was WAMY's counsel, Mr.
17   Mohammedi.  I'm going to back up a little bit and explain how
18   that happened.
19           I do want to say that there is a legitimate issue as
20   to former defendants who have been dismissed and who are now on
21   appeal at the Second Circuit getting copies of those deposition
22   transcripts.  As to those people, we have objected to them
23   getting them because that was not part of our bargain with the
24   plaintiffs.  We would like an order from the Court to that
25   effect, because I know that at least one of those defendants
```

44

1bgr911c

```
 1   has been trying to get those things.
 2              THE COURT:  Who was dismissed and is seeking the
 3   transcript?
 4              MR. BARENTZEN:  The lawyers for Yousef Jameel.  I
 5   think it is at the Bancroft firm.  A couple of different
 6   lawyers I have been dealing with.  They are not part of the
 7   this application at all.
 8              THE COURT:  I don't see them in the letter
 9   application.
10              MR. BARENTZEN:  They are not part of the application.
11   Four lawyers signed it:  Mr. Mohammedi; Mr. Kabat, who was at
12   the depositions who the day before he signed this letter, I
13   exchanged emails with him about what we are going do at these
14   depositions.  The other two lawyers who signed it were Chris
15   Manning, who I haven't spoken to about this case in two years,
16   and Martin McMahon, who is on the phone, has never been at any
17   of these depositions, I have never heard from.
18              To back up briefly, I think this issue started at the
19   time of the depositions in the first place.  If you remember,
20   they had been noticed on a very short notice by the plaintiffs.
21   We had negotiated confidentiality and finality with our
22   resolution agreement.  That's what we were trying to protect.
23              THE COURT:  Right.  I had forgotten the context.  This
24   was your way out.
25              MR. BARENTZEN:  Exactly.  Due to no fault of our own,
```

45

1bgr911c

 1    the plaintiffs noticed these depositions on very short notice.
 2    Some of the defendants objected, they wanted them moved.  We
 3    said no, we want to hold the plaintiffs' feet to the fire.
 4    That's what we negotiated and that's what we ended up doing,
 5    and I absolutely think it was the right thing to do.
 6            The other defendants counsel, like WAMY's counsel Mr.
 7    Mohammedi, rather than call us, rather than talk to us, they
 8    told you that we were trying to block them from getting into
 9    the depositions.  It was never the case at all.  I think your
10    order actually said something to the effect like it was absurd
11    for us to try to block them from going to the depositions.
12            THE COURT:  I don't remember that.  I just remember
13    saying that it would be without prejudice to anybody's right to
14    say we want a further deposition.
15            MR. BARENTZEN:  There was one part of the order which
16    we interpreted as suggesting that you thought maybe we were
17    trying to block people.  Never the case at all.  We went
18    forward.  Numerous of the defense counsel showed up.
19            THE COURT:  I don't think I suggested that you were
20    trying to block people but were, as you just told me, desirous
21    of standing on your rights to have it done within the
22    particular time period pursuant to the stipulation, which at
23    least as to one lawyer I thought made it impractical or
24    impossible for him to attend.
25            MR. BARENTZEN:  Ms. Luque will get to that lawyer, who
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

46

1bgr911c

1   is Mr. Mohammedi, because we now know what he is doing and why
2   he couldn't get there, which I think you might find
3   interesting.  The point is we did the depositions, took them.
4   Several defendants showed up.  Dubai Islamic Bank's lawyer
5   showed up.  They got the transcripts, no problem.
6         What actually happened was, because these are
7   confidential transcripts, I said to the court reporter at the
8   completion of the three depositions, listen, I don't know who's
9   going to try to get these, it might be some nonparties, it
10   might be some people outside the case.  They are confidential.
11   If somebody asks for them, I'll be the lightning rod.  I don't
12   want you to be in the middle of it.  Just say, listen, call Mr.
13   Barentzen, talk to him.
14         I had absolutely no intention, never have said to
15   anybody, that you can't have these things.  It was never the
16   case other than the nonparties, who I did say that to.
17         As to the actual party that tried to call, the WAMY
18   lawyers, Ms. Luque, they have actually been actively avoiding
19   us.  Instead of talking to us, instead of doing the meet-and-
20   confer, they have actively avoided us and filed this motion.
21         I think maybe now Ms. Luque can explain to you the
22   background as to what has gone on with the WAMY lawyers.
23         MR. McMAHON:  Your Honor, this is Mr. McMahon.  Can I
24   be excused?
25         THE COURT:  Fine by me.

47

1bgr911c

```
 1              MR. McMAHON:  Thank you.
 2              THE COURT:  Ms. Luque?
 3              MS. LUQUE:  Your Honor, I appreciate your going
 4    through the extra efforts to get me on the line.  I wish that
 5    Mr. McMahon hadn't gotten off.  I was very troubled by his
 6    refusal to get me back on the line, particularly since in my
 7    view I was somewhat adverse to him, at least in the position
 8    that Mr. Barentzen is articulating.
 9              I think Mr. Barentzen and I felt that the Court may
10    have been somewhat disappointed in thinking that we were trying
11    to avoid our obligations.  I think that is maybe what we got a
12    sense out of your order.
13              THE COURT:  I guess maybe I had the sense that you
14    were playing hardball but well within your rights.  I may have
15    conveyed that thought.  Maybe I was more subtle, but probably
16    not, I think I might have said this problem would go away when
17    the depositions were adjourned.
18              MS. LUQUE:  Yes.  I appreciate what the Court is
19    saying today.  However, I think what's happened is we have
20    become a bit of a political football here with the defendants.
21    One of the reasons I wanted to speak to the Court is to try and
22    get the Court's help in reminding them of their obligations to
23    talk to us before they write letters which contain what I think
24    are gross inaccuracies.
25              THE COURT:  Wait.  Let me ask, as to folks who are
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

48

1bgr911c

1  currently defendants, is there any objection to producing the
2  transcripts subject to the confidentiality that I gather was
3  designated at the outset of the deposition?
4            MS. LUQUE:  No, your Honor.  The inquiry I got from
5  Mr. Mohammedi was that I provide him with a copy of the
6  transcript, which I don't believe is appropriate.  I think that
7  court reporters everywhere don't like that.
8            THE COURT:  That's true.  Maybe there is no track
9  record here, but I was about to ask what has happened thus far
10  to the extent there have been depositions?  Maybe there haven't
11  been depositions except for NCB a long time ago and things like
12  that.
13            MS. LUQUE:  I believe maybe one of the plaintiffs
14  ordered the transcript directly from the court reporter.  Is
15  that true, Mr. Barentzen?
16            MR. BARENTZEN:  Yes.
17            THE COURT:  I would assume so.  They have to produce a
18  copy to the deponent.
19            MS. LUQUE:  That's true, your Honor.  I you assumed
20  everyone knew that they should order the transcript from the
21  reporter.  It never occurred to me that people would look to us
22  to give them copies.
23            Having said that, I'd like to talk about Mr. Mohammedi
24  just a bit.  If the Court will recall, I think the Court did
25  recall --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

1bgr911c

```
 1          THE COURT:  Wait.  Maybe I can short circuit this.  If
 2  somebody other than Mr. Mohammedi or the other applicants is
 3  going to pay for the transcript, it seems to me it would be the
 4  plaintiff, not the deponent's counsel.  But I'm not sure that
 5  it's appropriate for plaintiffs' counsel to pay for it either.
 6  Either way, I think I get to where Mr. Barentzen was a minute
 7  ago, which is this hasn't been discussed amongst the attorneys,
 8  so it seems to me it's something that ought to be discussed and
 9  brought to me next month.
10          MS. LUQUE:  With one exception, your Honor.  I want to
11  put this on the record because I find it extremely troubling.
12  The Court will recall and recalled a moment ago that Mr.
13  Mohammedi apparently couldn't attend these depositions because
14  he was traveling in Saudi Arabia.  It turned out that he was
15  contacting one of my clients, former clients, in this very
16  matter directly to obtain an interview.
17          When I found out about this, I told Mr. Mohammedi that
18  I wished to be present at least telephonically and then he
19  could proceed with an interview.
20          THE COURT:  You're talking about one of the deponents?
21          MS. LUQUE:  Yes, someone who was overseas.
22          THE COURT:  OK.
23          MS. LUQUE:  What happened, however, was that instead
24  of arranging the interview at a time when I could be present,
25  Mr. Mohammedi arranged for that interview to occur
```

50

1bgr911c

```
 1  simultaneously with one of the depositions he knew would be
 2  occurring in the States and went ahead talking to my client
 3  without my presence.
 4          It is with some distress that I wanted to be in front
 5  of the Court today.  I don't understand why our former
 6  co-defendants are approaching this matter this way.  Your
 7  Honor, it is somewhat troubling to me that somebody before the
 8  Court would take the position they couldn't attend noticed
 9  depositions because they were busy contacting a represented
10  party and then particularly scheduling that interview to
11  coincide with the deposition that that lawyer knew that I had
12  to attend, and then on top of that to object to the Court that
13  it was I that was keeping him from the deposition transcript
14  and somehow impeding him.
15          MR. MOHAMMEDI:  Can I answer this, have an opportunity
16  to answer this?
17          THE COURT:  Yes.
18          MR. MOHAMMEDI:  I think the first time that we were
19  aware of this deposition was when we saw a notice of the
20  deposition that was forwarded to us a few days before we were
21  traveling to Saudi Arabia.  At that time we were not even
22  intending to interview anyone.
23          When we saw that, my associate, who is here in this
24  court, reached out to Ms. Luque and asked her if she could
25  postpone this deposition.  She said to her, no, I will not be
```

51

1bgr911c

1   able to do that, because there is a confidentiality agreement
2   here and there is no way I can do this.  Afterwards, when we
3   heard that, obviously we had to check.  We did reach out to Ms.
4   Luque and we spoke with her.
5              THE COURT:  Did you interview one of Ms. Luque's
6   clients?
7              MR. MOHAMMEDI:  That's where I'm going to.  First I'd
8   like to address this issue about the deposition.
9              THE COURT:  Do it in the order I'd like.  Did you
10  interview Ms. Luque's client?
11             MR. MOHAMMEDI:  I did know that Ms. Luque was
12  representing her client, who was actually working for WAMY.
13             THE COURT:  Who was working for?
14             MR. MOHAMMEDI:  That was a witness.  We were going to
15  interview some of the witnesses.  I sat down with him and I
16  asked him who is representing him.  He said Ms. Luque.  I said
17  to him, now we need to stop this interview, I'd like you to
18  call Ms. Luque and ask her if it's OK to sit down with you in
19  her presence to interview you.
20             For the record, I sent her an email and I mentioned
21  this to her.  Afterwards I called her and spoke to her on the
22  phone, she cannot deny that, for almost an hour where she was
23  arguing why I made this application to the Court to make sure I
24  will not appear in that deposition.  We could not resolve that
25  issue.

52

1bgr911c

```
 1              I asked her about --
 2              THE COURT:  Wait.  If you were able to in that time
 3    slot interview this individual, why couldn't you attend the
 4    deposition by telephone?
 5              MR. MOHAMMEDI:  I was in Saudi Arabia, your Honor.  I
 6    was not here.  The witness was in Saudi Arabia, was not in the
 7    United States.  The deposition was held in the United States.
 8    I could not be in two places.
 9              THE COURT:  Was the deposition by telephone?  How was
10    this done?
11              MR. MALONEY:  It was done in Virginia, your Honor, in
12    Herndon, Virginia, as noticed.  That's where they lived, the
13    three witnesses.  There was a fourth witness, who was not
14    deposed, who I believe resides in Saudi Arabia.
15              THE COURT:  The person we are talking about, Ms.
16    Luque, was not one of the deponents?
17              MS. LUQUE:  No, your Honor.  But, your Honor, just for
18    the record, he was a defendant in this case until the dismissal
19    which just occurred.  Everyone should have known I represented
20    him.
21              MR. MOHAMMEDI:  Your Honor, I made sure --
22              THE COURT:  Wait.  If he was a defendant and if Ms.
23    Luque entered a notice of appearance on his behalf, how could
24    you not know that she was representing him?
25              MR. MOHAMMEDI:  I did not know it when I sat with him.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

1bgr911c

1   Your Honor should note the fact that I stopped the interview
2   right away when he mentioned.  I asked him who was representing
3   him, and he said Ms. Luque, and I said we have to stop this
4   deposition -- I mean this interview.
5          Afterwards, I reached out to her and she said to me, I
6   need to be present, if I can, at least in the beginning of that
7   interview.  I said that's fine.  I sent her an email, which I
8   have, and asked her if she could do it at this time.  I can't
9   remember if she replied to me, she said to me yes, it's fine.
10  I can't remember.  Something like that.
11         MS. LUQUE:  Ha.
12         MR. MOHAMMEDI:  What happened was that afterwards I
13  got a confirmation from her client telling me that Ms. Luque
14  had spoke with her, and she said it was fine, she would not be
15  there, it would be fine if I could sit down and talk to him.
16         MS. LUQUE:  Your Honor, that is not true.
17         MR. BARENTZEN:  I have the emails in my hand, your
18  Honor, which say the opposite.
19         THE COURT:  We are not going to go down this path at
20  4:15 today, because I have another conference.  You may have
21  seen folks gathering in the back.
22         Ms. Luque, if you want to pursue this, that's fine.
23  Send me a letter setting forth what you believe occurred.  I'll
24  let Mr. Mohammedi respond.  What I may end up doing is
25  referring it to the grievance committee of the Southern

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

1bgr911c

```
 1   District, which unfortunately I also sit on but would recuse
 2   myself from this one.  That is likely what I would do, which
 3   may be consistent with what you are seeking.  You haven't told
 4   me your bottom line.
 5          MS. LUQUE:  Your Honor, I will be brief.  My bottom
 6   line -- I will consider doing that although I'm loathe to do
 7   it.  What I am more interested in is causing the lawyers in
 8   this case to proceed with civility and to contact us about the
 9   issues before troubling the Court and causing my clients to
10   incur additional expenses.
11          MR. MOHAMMEDI:  Your Honor, we reached out to Ms.
12   Luque.  If you read the transcript, we called the transcript
13   committee.  We have the email that said that they were directed
14   not to provide the transcript.  We have an email from the court
15   reporter they cannot deny.
16          MR. BARENTZEN:  I have the email I sent her.  I know
17   exactly what I said.
18          THE COURT:  Mr. Barentzen agrees that he said that he
19   instructed the court reporter not to produce it to any
20   requesters, I gather, other than the plaintiff unless he
21   cleared it.  I'm not troubled by that.  But in terms of (a) Mr.
22   Mohammedi and the other signers of the letter, your entitlement
23   to the transcript, who pays for it if you're entitled to it, I
24   want you folks to talk and we'll talk about it next month.
25          MR. BARENTZEN:  The one thing I would ask your Honor,
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

55

1bgr911c

```
 1   and maybe you can rule on it now or not, do you agree with me,
 2   and I have spoken at least informally with Mr. Carter and other
 3   people, that if you are dismissed as a defendant, you went and
 4   asked this Court to get out of this case, this Court has no
 5   jurisdiction on it, you're on appeal, that you are not going to
 6   be entitled to these confidential documents?  If you lose the
 7   appeal and you come back in, different story.  But at least
 8   while you're on appeal, and that's what we negotiated.
 9               THE COURT:  Yes is the short answer.
10               MR. BARENTZEN:  Good.
11               THE COURT:  If you're not a party to the litigation,
12   you're not a party to the litigation.  That may change down the
13   road, but you're the same as somebody passing by the
14   courthouse.
15               MR. BARENTZEN:  Thank you, your Honor.
16               THE COURT:  When is our conference Mr. December?
17               MR. CARTER:  The 14th, your Honor, at 2:00.
18               THE COURT:  How far out have we scheduled conferences?
19               MR. CARTER:  To February 15th, your Honor.
20               THE COURT:  Have we been doing these in the afternoon
21   or you folks don't care?
22               MR. CARTER:  We have been doing them at 2:00.
23               THE COURT:  Why don't I say March 15th and April 12th,
24   just to block out some dates, and May 17th.  Thank you all.
25               (Adjourned)
```