# EXHIBIT 14

                                                                1
        E4OP911M
 1      UNITED STATES DISTRICT COURT
 2      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 3
 3      IN RE:  TERRORIST ATTACKS              CASE NO.
 4            OF SEPTEMBER 11, 2001            03 MD 01570 (GBD)
 4
 5      ------------------------------x
 5
 6                                             New York, N.Y.
 6                                             April 24, 2014
 7                                             2:09 p.m.
 7
 8      Before:
 8
 9                         HON. FRANK MAAS,
 9
10                                        Magistrate Judge
10
11                          APPEARANCES
11
12      COZEN O'CONNOR
13            Attorneys for Plaintiffs Federal Insurance Company and Tig
13      Insurance Co.
14      BY:  SEAN P. CARTER, ESQ.
14           J. SCOTT TARBUTTON, ESQ.
15
15
16      MOTLEY RICE
16            Attorneys for Plaintiffs
17      BY:  ROBERT T. HAEFELE, ESQ.
17
18
18      KREINDLER & KREINDLER, LLP
19            Attorneys for Plaintiffs
19      BY:  JAMES P. KREINDLER, ESQ.
20
20
21      ANDERSON KILL & OLICK, PC
21            Attorneys for O'Neill Plaintiffs and the Plaintiffs'
22      Executive Committee
22      BY:  JERRY S. GOLDMAN, ESQ.
23
23
24      LAW OFFICES OF MELLON, WEBSTER, & SHELLY, PC
24            Attorneys for Plaintiffs
25      BY:  THOMAS E. MELLON, III, ESQ.
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
     E4OP911M
1                    APPEARANCES (Continued)
1
2    BERNABEI & WACHTEL, PLLC
2         Attorneys for Defendant, Abdul Rahman Al-Swailem
3    BY:  ALAN R. KABAT, ESQ.
3
4
4    LAW FIRM OF OMAR T. MOHAMMEDI, LLC
5         Attorney for Defendant, WAMY
5    BY:  OMAR T. MOHAMMEDI, ESQ.
6
6
7    CLIFFORD CHANCE US LLP
7         Attorneys for Dubai Islamic Bank
8    BY:  RONI E. BERGOFFEN, ESQ.
8
9
9    LEWIS BAACH, PLLC
10        Attorneys for Muslim World League (MWL) and International
10   Islamic Relief Organization (IIRO)
11   BY:  AISHA E. R. HENRY, ESQ.
11
12
12   SALERNO & ROTHSTEIN
13        Attorneys for Yassin Abdullah Kadi
13   BY:  PETER C. SALERNO, ESQ.
14        AMY ROTHSTEIN, ESQ.
14
15
15   MARTIN F. McMAHON & ASSOCIATES
16        Attorneys for Defendants, Jelaidin, etc.
16   BY:  MARTIN F. McMAHON, ESQ.  (PRESENT VIA TELEPHONE)
17
17
18   MANNING SOSSAMON
18        Attorney for Defendant, Sanabel Al Kheer
19   BY:  CHRISTOPHER MANNING, ESQ.  (PRESENT VIA TELEPHONE)
19
20
20
21   GOETZ & ECKLAND, PA
21        Attorneys for Defendants, World Assembly of Islamic Youth
22   and World Assembly of Muslim Youth
22   BY:  FREDERICK J. GOETZ, ESQ.
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
                                                                3
      E4OP911M
  1              (In open court)
  2              (Case called)
  3              (Appearances noted)
  4              THE COURT:  Good afternoon, everyone.  I guess there
  5   are two motions that we need to consider today.  First, the
  6   motion to compel WAMY to produce its documents here and related
  7   relief, and then the motion for sanctions.  I don't have any
  8   particular view as to which you should address first.  Any
  9   preferences?
 10              MR. CARTER:  No preferences from our perspective, your
 11   Honor.
 12              THE COURT:  Why don't we start with the motion to
 13   compel, the WAMY motion.
 14              MR. CARTER:  Thank you, your Honor.  I think from the
 15   plaintiff's perspective, your Honor, the papers concerning this
 16   motion are relatively complete themselves, and there are just a
 17   few points that we really would like to emphasize during
 18   argument today.
 19              THE COURT:  Okay.
 20              MR. CARTER:  If we can, we'd like to begin with this
 21   ancillary issue concerning the cutoff date for the merits
 22   discovery concerning the charity defendants.  We think quite
 23   clearly this was an issue the Court previously addressed with
 24   global application; albeit, in the context of the dispute
 25   involving the International Islamic Relief Organization and
```

4

E4OP911M

1   Muslim World League, but both the content of the discussion and
2   the nature of the ruling indicated that it was intended to have
3   broad affect for all of the merits of discovery on defendants.
4           So WAMY's continued resistance to this rule is
5   troubling from our perspective, all the more so insofar as it's
6   tied to this very tenuous argument about the scope of
7   jurisdictional discovery that was permitted as to Saudi Bin
8   Laden group, which as your Honor will recall primarily
9   concerned potential theories of general jurisdiction based on
10  Saudi Bin Laden's presence in the United States.
11          So there's really no analog to the circumstance there.
12  It was jurisdictional discovery and not merits.  On the other
13  hand, WAMY is identically situated to the Muslim World League,
14  IIRO, and all the other defendants, and so for that reason, we
15  think that 2004 was very clearly a rule that was already in
16  place.
17          THE COURT:  Well, I don't disagree with you, and even
18  if it weren't a general rule, I think it would be desirable to
19  have a general rule because there certainly not parties here
20  that individualized findings with respect to each that would
21  result in many different termination dates.
22          And I know you said it in your papers, but you suggest
23  that by asking for 2002 rather than 2004, there were some
24  critical documents that you may be deprived of, or potentially
25  critical documents, and I guess my question is whether those --
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

5

E4OP911M
1  what's the concern?
2          MR. CARTER:  Your Honor, I think the concern that we
3  expressed originally with regard to this issue is that a lot of
4  the investigations that occurred following the events of 9/11
5  didn't really kick into full swing until 2003, 2004.  If you
6  take, as an example, the designations of the IIRO offices,
7  those actually came down in 2006.
8          So there's fair evidence in the record that this
9  matter was really a focal point for a larger period of time
10 than we've suggested.  We know, in particular, that pressure
11 mounted on Saudi Arabia to exercise control over its charities
12 in that 2003, 2004 period, and that the Saudis got somewhat
13 serious about the issues following the bombings in Saudi Arabia
14 in 2003.  So those are, sort of, the basic predicates for
15 thinking that a 2004 rule has a little bit more logic to it.
16         THE COURT:  Anything else you wanted to add?
17         MR. CARTER:  Not on that point, your Honor.  With
18 that, I would turn to the issue of the production of documents
19 here in the U.S.
20         THE COURT:  Yes.
21         MR. CARTER:  And the motion implicates the obligations
22 of two entities, here, both WAMY Saudi Arabia, as well as the
23 U.S.-based entity, WAMY International, and that's significant
24 in some respects.  WAMY really cites no authority that would
25 support the proposition that a foreign defendant that is
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E4OP911M

1   subject to jurisdiction in the United States for claims arising
2   from events and injuries occurring in the United States can
3   faithfully discharge its discovery obligations by shipping
4   documents from all over the world to a remote, inconvenient and
5   potentially dangerous location and telling the other parties to
6   come there.
7           It certainly cites no authority to support the
8   position that a U.S.-based entity with custody and control over
9   the documents can direct a propounding party to go visit a
10  foreign subsidiary somewhere else in the world and thereby
11  discharge its obligations.
12          And if that were the rule, U.S.-based corporations
13  would systematically house critical documents abroad for the
14  specific purpose of creating a barrier to discovery, which is a
15  practice that the U.S. courts have consistently rejected as
16  inappropriate.
17          And so for those reasons, it seems clear that the
18  production of documents in the U.S. is consistent with both
19  general practice and also critical to the efficient management
20  of this MDL proceeding.
21          The cases that WAMY supports in support of its view
22  that it's not obligated to incur copying costs and simply needs
23  to make the documents available for inspection, are readily
24  distinguishable because they all involve circumstances in which
25  the defendant or other party made the documents available at a

7

E4OP911M
```
 1   convenient location, either within the jurisdiction where the
 2   litigation was pending or somewhere nearby and convenient
 3   within the United States.  And that's, again, not the
 4   circumstance we have here, and it's also distinguishable --
 5            THE COURT:  Go on.
 6            MR. CARTER:  It's also distinguishable, your Honor,
 7   because many of the documents at issue presently housed in
 8   Saudi Arabia came from other places and were shipped there,
 9   rather than simply being shipped here, which is an additional
10   problem.
11            THE COURT:  And that was what I was about to ask you.
12   I gather it's not the case that WAMY U.S. shipped its
13   documents; is that correct?
14            MR. CARTER:  We don't believe so, your Honor.
15            THE COURT:  It's just simply saying, as you understand
16   it, to the extent there were any documents that we have control
17   over, they are Saudi Arabia?
18            MR. CARTER:  I think, for instance, your Honor, the
19   documents that would have been in WAMY Pakistan, rather than
20   being shipped to U.S. for production, were shipped to WAMY
21   Saudi Arabia.  WAMY Indonesia, the same sort of practice
22   occurred.
23            THE COURT:  Right.
24            MR. CARTER:  In addition to sort of these general
25   principles, your Honor, there are a range of equitable
```

8

E4OP911M

1    considerations and practicable realities relating to the
2    management of this MDL that counsel are in favor of requiring
3    WAMY, like everyone else, to produce their documents here.  As
4    we've indicated, every party in the litigation, other than
5    WAMY, has agreed to produce its documents, almost without
6    exception, in electronic form here in the United States.  That
7    includes the Saudi defendants.
8            Following the series of decisions that Judge Daniels
9    issued in 2010, we then had meet and confers with the
10   defendants' executive committee.  We certainly would like this
11   agreement to have been more explicit in writing, but there was
12   a dialogue raised by the defendants expressing a preference for
13   production of documents in single-page TIFFs.  Every party,
14   other than WAMY, has since proceeded to produce documents in
15   that matter, at least reflecting through their course of
16   conduct and understanding in common agreement, that it should
17   proceed in that way.
18           The difficulty, were WAMY's view to be endorsed, is
19   that it would lead to a cascade of discovery disputes where
20   parties sought to, tit for tat, impose significant costs of
21   tracking down documents and copying them.  On the other, even
22   if you look at the limited instance of this dispute here, if we
23   were required to pay WAMY to copy its documents and produce
24   them to us, the next step would be our filing a motion seeking
25   to compel WAMY to reimburse us, and for other sanctions for the

E4OP911M

1    costs we incurred to have copied documents that proved to be
2    completely irrelevant or included solely to sort of foster
3    WAMY's own defenses.
4            And the manner in which all other parties have
5    proceeded clearly reflects the understanding by the group, as a
6    whole, that that's not helpful to the efficient process of this
7    litigation and that we're all trying to do it, and it's just an
8    example of WAMY not playing by the same rules that everyone
9    else seemed to agree are appropriate in the litigation.
10           A word or two only, your Honor, about the indices.  I
11   think there are examples in there that pretty clearly
12   demonstrate that the indices are --
13           THE COURT:  I looked at your exhibit compiling some
14   specimen, but I also looked through the indices myself, to the
15   extent I have them.
16           MR. CARTER:  So they're not sufficiently detailed to
17   displace the normal obligation to produce the documents in a
18   reasonable manner.
19           The last thing, your Honor, that we had raised was
20   although the indices are -- well, two related things, your
21   Honor.  Also central to this is that the documents that are
22   being withheld are of core relevancy to the proceedings, at
23   least as near as we can tell; so --
24           THE COURT:  Say that again?
25           MR. CARTER:  These are not fringe issues, but rather,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

10

E4OP911M

1   the core, central, relevant documents in the proceeding.  For
2   instance, the kind of financial records that your Honor already
3   ordered were clearly of central relevance in the context of the
4   Muslim World League and IIRO proceedings.  I think what is more
5   troubling, from our perspective, is that in looking at the
6   indices more closely, we now see there are documents housed in
7   Saudi Arabia relating to WAMY Canada that have never been
8   produced to us here in the United States.
9           And in the connection with the dispute we had with
10  WAMY over the lack of cooperation on the part of WAMY Canada,
11  WAMY made its view known that it had taken every possible step
12  to cure that problem.  But, of course, the first step in curing
13  that problem would have been to send us the documents that are
14  sitting in Saudi Arabia pertaining to WAMY Canada and that had
15  been sent to Saudi Arabia about WAMY Canada.  And that still
16  hasn't happened even after the hearing.
17          THE COURT:  I don't remember an issue as to WAMY
18  Canada's documents.  That was some time ago?
19          MR. CARTER:  No, your Honor, it was at the last
20  hearing.  WAMY Canada, it was the branch that, following the
21  revocation of its registration by the Canada Revenue Agency,
22  had become suddenly uncooperative.
23          THE COURT:  Oh, right.
24          MR. CARTER:  So, you know, what we see here is that
25  there are a host of documents pertaining to WAMY Canada's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M

1  operations in relationship to the Saudi headquarters that,
2  throughout that dispute remained sitting, you know, somewhere
3  on a floor in Riad rather than being produced to us.  You know,
4  that was not only inconsistent with WAMY's obligation in
5  dealing with the lack of cooperation by WAMY Canada, it also
6  precluded us from having a complete record in that dispute.
7  One of the issues that WAMY raised is that this has been a
8  historically contentious relationship and that you can't blame
9  WAMY Saudi Arabia for the sudden decision of WAMY Canada not to
10 cooperate.
11         Well, the documents, at least as far as we can tell
12 from the index, suggest a more cooperative historical
13 relationship, and we're left to wonder whether the sudden lack
14 of cooperation by WAMY Canada was the result of some action or
15 sanction by WAMY Saudi Arabia that had the predictable result
16 of driving them to no longer cooperate.  So these are centrally
17 relevant documents.
18         The last point I think, your Honor, is we've also
19 raised a concern, again based on the indices, although it's
20 hard to fully understand them, that WAMY has not undertaken a
21 search consistent with the Court's prior orders concerning the
22 scope of relevancy for purposes of claims against charity
23 defendants in this case.
24         Your Honor, had, in the context of the IRL and Muslim
25 World League, issued a series of orders requiring the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M
1    production of organizational documents, banking and auditing
2    records, the materials underlying those banking and auditing
3    records.  And we don't see, from the indices, anything
4    suggesting that that kind of a search has been undertaken.
5            So we were also seeking an admonition to ensure that
6    WAMY fulfills the obligations that have already been
7    articulated by the Court.  Thank you, your Honor.
8            THE COURT:  Thank you.  Mr. Mohammedi?
9            MR. MOHAMMEDI:  Yes, your Honor.  I would like to
10   address the production of documents here in the United States,
11   as well as the scope of discovery and leave Mr. Goetz to
12   address the indices.  Your Honor, I'm not going to address the
13   rhetoric that were submitted in their motion, as well as reply
14   brief.  However, I'm going to concentrate on the law, and
15   that's really the issue that, with respect to the cost of
16   production and copying production.
17           THE COURT:  One of the things you say in your letter,
18   and I'm reading from Page 3:  WAMY is not obligated to do
19   anything beyond permit inspection of its voluminous documents
20   as they are kept in its ordinary course of business.
21           MR. MOHAMMEDI:  Right.
22           THE COURT:  But by virtue of shipping the documents
23   from various locations to Saudi Arabia, they're no longer being
24   kept as they were in the ordinary course of business; isn't
25   that so?

13

E4OP911M

1          MR. MOHAMMEDI:  Your Honor, I can give the example you
2   gave a while ago about you taking -- you have cases in your
3   chambers and you want to review documents from your chambers.
4   You take them to here.  You can either mix them with
5   everything, or you can take them as folders, you review them,
6   you bring them back.  This is exactly the same thing what was
7   happening with WAMY.
8          THE COURT:  So you're saying that even though some of
9   the indices, as plaintiffs pointed out, do not indicate sources
10  for each document that's part of the production, you can say
11  from whence it came?
12         MR. MOHAMMEDI:  I mean, some of them you know where
13  they came from, yes.  They are -- some of them are -- some of
14  them are duplicates, your Honor.  Some of them are stored in
15  Saudi Arabia because they have communication with the chapters,
16  and when they ask the chapters to send those documents, they
17  will take them to where they are and they keep them.  And
18  that's how they keep them.
19         If there is no source here, it's not relevant exactly
20  what -- I think the source issue is an issue that we take with
21  plaintiff.
22         THE COURT:  I mean, I understand that, undoubtedly,
23  there are duplicates, but let's assume that someplace in this
24  120,000 documents there's a smoking gun.  The smoking gun
25  appears in the files of WAMY Indonesia rather than in the files

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

14

E4OP911M

1   of some other subsidiary or WAMY Saudi Arabia, but not WAMY
2   Indonesia.  That potentially has significance, which is why I'm
3   asking whether the documents, except for having been moved to
4   Saudi Arabia, are still in a format where, as to each document,
5   you can say a particular location was the source?
6           MR. MOHAMMEDI:  Yes, there are, your Honor.  There are
7   specific forms.
8           THE COURT:  Okay.  Go on.
9           MR. MOHAMMEDI:  And when the search happened, it
10  identified the document.  It kept them where they should be.
11  They just identified the documents that's what they do, but I'd
12  like to go back to the real issue here about the production of
13  documents.  And I think the indices, I believe that Mr. Goetz
14  is going to address in some more detail.
15          I think plaintiffs are either on purpose confusing
16  between production of documents, or they're not making a
17  difference between them.  And I think Federal Rules of Civil
18  Procedure 34(a)(1), parties only need to make requested
19  documents available for inspection and copying.  It is not
20  required to produce copies of natural document, not obligated
21  to pay for the cost of copying and shipping the documents.  And
22  the cases that we cited are very clear on this, and ever the
23  cases that they cited themselves, they support our proposition.
24  And I can go into detail.  Plaintiffs, for instance, cite
25  Cleverview --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M

```
 1              THE COURT:  Just tell me again which part of Rule 34
 2   you were just quoting?
 3              MR. MOHAMMEDI:  It's 34(a)(1).
 4              THE COURT:  Okay.  Go on.
 5              MR. MOHAMMEDI:  So I think the plaintiff, in even
 6   citing that case law, they mention Cleverview Investment v.
 7   Steven Oshatz, in that case specifically, it's discussed the
 8   Federal Rules of Civil Procedure 34(a)(1), where it
 9   specifically stated, and I can --
10              THE COURT:  Well, let's ignore the law for a moment
11   and --
12              MR. MOHAMMEDI:  But, your Honor, this is very
13   important.
14              THE COURT:  I'll let you get back to it.  I just want
15   to ask --
16              MR. MOHAMMEDI:  Sure.
17              THE COURT:  -- a practical question.  Let me assume
18   for purposes of questioning that Mr. Carter is a frequent
19   traveler to Israel and that he and Mr. Goldman, who -- from his
20   name, I assume is Jewish; I shouldn't make the assumption --
21   together --
22              MR. GOLDMAN:  I'll stipulate.
23              THE COURT:  -- they want to go together and travel to
24   Saudi Arabia to look at the documents.  As I understand it,
25   neither of them may be admitted to the country for that
```

E4OP911M

1   purpose.
2          MR. MOHAMMEDI:  It doesn't matter -- sorry.
3          THE COURT:  And I suppose you can tell me that, you
4   know, there's lots of plaintiffs' lawyers, and they can find
5   people who qualify.  But why shouldn't that be a concern of
6   mine?
7          MR. MOHAMMEDI:  Your Honor, like you mentioned, there
8   are plenty of lawyers out there, first.
9          Second, Saudi Arabia is not a place where there are no
10  foreigners, there are not a place where there are no Jewish
11  people visiting, there are not a place where investors are
12  going,  there are not a place where business people are going.
13  They make Saudi Arabia as a war zone, where they're so afraid
14  to go.
15         They could not support their claim.  They could not
16  provide any information to support that claim, plus the fact
17  they didn't even try.  Did they apply for a visa to Saudi
18  Arabia?  They didn't even try to do that.  Now, they cannot
19  come to this Court and say we cannot do it without even trying.
20  Here they claim against WAMY --
21         THE COURT:  Let me just understand what you're saying.
22  You're representing that if an attorney on the plaintiffs'
23  side, who has Israel as a stamp in their passport, although I'm
24  not sure the Israelis frequently stamp U.S. passports, but
25  assuming they did, and Mr. Goldman applied for visas, they

E4OP911M

1   would be granted?
2           MR. MOHAMMEDI:  I am not making that representation.
3   What I am saying is that they have not tried.
4           THE COURT:  Okay.
5           MR. MOHAMMEDI:  That's what I'm saying.
6           THE COURT:  Okay.  Go on.  I'm sorry.  I interrupted
7   you when you were about to tell me about the law.
8           MR. MOHAMMEDI:  Sure.  You know, in the same case that
9   I cited -- by the way, that case, it was a split of cost, and
10  issue was one party did not inform the other party that they
11  would charge them for copying costs.  And during that
12  conversation, with the case law which I can give that to you if
13  your Honor wants, it's very clear.  Here, if you go to Page 2,
14  it specifically allowing party to make original documents
15  available for inspection without any copying to be at
16  adversary's expense.
17          The law specified that when the party believes it will
18  be facing enormous production costs, the presumption is that
19  the responding party must bear the expense for complying with
20  the discovery request, but he may involve the District Court
21  discretion in their Rule 26; therefore, protecting him from
22  undue burden of expense in doing so.
23          And many cases cited the difference between having
24  documents available for production, which is the production
25  itself, and the copying costs, which is the reproduction.  So I

E4OP911M
```
 1     think they are mixing the two and making it sound as if WAMY
 2     did not comply with the discovery obligation.  WAMY did.
 3             They also make the -- they make this argument that
 4     they, WAMY, has to show that they are not able to afford the
 5     discovery cost.  And they cite Zubulake v. UBS Warburg.  As a
 6     matter of fact, this case speaks about the retrieving data,
 7     which was very expensive for the party.  WAMY already done
 8     that, and they spent 1.5 million in there.  It was not about
 9     copying costs.
10             THE COURT:  Well, the cost of the indices could have
11     been spared had a document -- I mean, money that was spent
12     preparing indices could have been spent simply converting them
13     to an electronic form and shipping a handful of disks or a hard
14     drive to the U.S., correct?
15             MR. MOHAMMEDI:  Yeah, but, you know, when you make
16     copies or make scanning the documents, most of the documents
17     were not in electronic version.  They were almost all of them
18     in hard copies.  They were reviewed.  When they were reviewed,
19     they were taking notes, and that's where the indices came from.
20     Obviously, when you review the documents, you are taking notes;
21     so it became part of retrieving the data, which is different
22     from copying costs.  Even though they had the copy, they would
23     still have to go through that.  That's what differentiates
24     between production of documents, which WAMY has done, and
25     copying costs or scanning of documents.
```

E4OP911M

1          THE COURT:  Well, but how about the fact that we're
2   talking about the difficulty of reviewing them in Saudi Arabia
3   when many of the documents were in countries that may have been
4   more accessible to plaintiffs' counsel, and WAMY simply decided
5   to move them to Saudi Arabia?
6          MR. MOHAMMEDI:  Your Honor, where?  Example, where did
7   they think they would be accessible?  Much of them are
8   hotspots, such as Pakistan.  Do you want to plaintiffs to go to
9   these places to review the documents?  We made it easier for
10  them.  We made it easier for them.
11         THE COURT:  That's why I backed off picking a WAMY
12  country because I recognize that none of these places --
13         MR. MOHAMMEDI:  That's the reason they we are in this
14  lawsuit because WAMY happened to be in this hotspot; so that's
15  why plaintiffs are suing WAMY for that purpose.
16         Now, I think also the hardship issue, I think it's not
17  something that WAMY will have to show because the hardship is
18  what retrieving there, but I will just mention something about
19  the argument that plaintiff made about Kingdom Saudi Arabia
20  offered a grant of $33,000, which is about the equivalent of
21  about 100,000 Saudi riyal.  Isn't that what the not-for-profit
22  organization do?  They get grants.
23         You're not going to have Merck, who is a billion
24  dollar company get a grant for $33,000, but that's beside the
25  point.  I just want to make sure that -- WAMY, it is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M
```
 1   not-for-profit organization, no matter what plaintiff said.
 2            Now, as far as them saying that MDL cases, they favor
 3   cost sharing, I have no idea where they get that from.  As a
 4   matter of fact, in the Merck case, it was not order of the
 5   judge.  It was an agreement between the two parties, which was
 6   entered into an order, and -- but they forget to just go
 7   through other case law that they say we did not support our
 8   with any authority, we did.  They did not.  They did not
 9   provide any case law that says that a party is obligated to pay
10   for the cost of copying and shipping.
11            THE COURT:  Well, but they also say that this was,
12   although not reduced to writing, the agreement among the
13   various parties, or at least among the two executive
14   committees; is that the representation?
15            MR. CARTER:  That's correct, your Honor.
16            THE COURT:  So that the two executive committees, one
17   of which represents WAMY's interests, among others, they say
18   agreed that this would be the ground rules.
19            MR. MOHAMMEDI:  We were not part of that agreement.
20   Only thing I can tell you is we reach out to plaintiffs for an
21   agreement and they refuse.  We ask them to split the cost, and
22   they refuse.  So in other cases that I mentioned that --
23   actually, in those cases the Cleverview and the other cases,
24   and we have another case actually issued from California, that
25   specifically the issue became there was no agreement to show.
```

E4OP911M

```
 1              And even in those cases, the Court they split,
 2     sometimes the Court, they did not say -- even with Merck, they
 3     say we have a specific number of documents that we have -- the
 4     requesting party will have to pay.  And so that's what we tied
 5     to do with plaintiff.  We have been trying to do this with them
 6     for a long time, and they just basically refusing to do so.
 7              So that's why we are here, trying to find a way to
 8     explain our position that reproduction of document, it is not
 9     obligation of the party producing the documents.  And we cannot
10     be forced to do so while we did everything we could to search
11     for those documents and produce those document then make them
12     available.  We gave them two options, and even though their
13     admission they cannot proceed, we say okay, then that's fine.
14     We can ship those documents to you at your cost.  I think that
15     was a fair proposition, and plaintiffs just ignored it and
16     didn't want to respond to it.
17              THE COURT:  What's the cost of shipping the documents?
18              MR. MOHAMMEDI:  I think -- We don't know.  We don't
19     know the cost.  I mean, the issue here is either shipping the
20     documents or scanning them, and that's really what's going to
21     be.  We can scan those documents for them, and it would be the
22     cost of scanning them.  And there has been an electronic -- so
23     far, most of the documents have been produced in electronic
24     version.  They have not been produced most of the time.
25              THE COURT:  What percentage of your documents are
```

E4OP911M

1   electronic?
2           MR. MOHAMMEDI:  What we have in electronic, we have
3   produced to them so far.  Your Honor, we produced 25,000
4   documents.  They make it sound like we have not produced
5   anything.  We have produced 25,000 documents to them.
6           And I'd like to go to the point where they said about
7   WAMY International and WAMY Saudi Arabia.  I think Mr. Carter,
8   he misconstrued the letters to him about getting the documents.
9   The documents that we asked them to take them.  These were
10  documents that us, as counsel, brought from Saudi Arabia, not
11  WAMY International get those documents from Saudi Arabia.
12  So -- and we said, remember, your Honor, it was following the
13  hearing that we had, and I stood up and I said, in good faith,
14  we are going to bring some documents for plaintiff to -- for
15  plaintiff production.  I think it was about two or three
16  thousand documents, and that's what happened.  We asked them to
17  come and get them.
18          So let me see if there's anything else I forgot to
19  mention.
20          THE COURT:  Sure.  One thing you haven't talked about
21  is the cutoff date.
22          MR. MOHAMMEDI:  Yes, that's what I'm going to mention
23  now.  The cutoff date.  We do believe that the MWL and IRO
24  hearing did not apply to us.  First, we never briefed this
25  issue before, and second, we believe that the transcript showed

23

E4OP911M

```
 1    that it was specifically addressed to the IRO and MWL.
 2              Now, as far as their argument that this should be
 3    general rule, I do believe, actually, plaintiff, that there are
 4    some defendants here that can attest to that.  They entered
 5    into an agreement with some other defendants to designate
 6    specific scope of discovery.  If they do believe this is a
 7    general, apply to everyone, why would they do that?
 8              So it is not a general rule.  It was applied to IRO
 9    and Mr. Mordley.  And as far as their trying to establish the
10    relevance why these documents are responsive to them, I think
11    they made an example of Jelaidin being invited by WAMY.
12    Therefore, WAMY should participate, and they said speak of one
13    of the conference in no way establish that WAMY is a Saudi
14    charity that has served as a fully integrated component of
15    Al-Qaeda organization structure by inviting Jelaidin in 2008.
16    In fact, we were in a hearing with Judge Daniels, just in the
17    motion that was held before this Court -- I mean, before we had
18    this sitting with your Honor.
19              The conduct of WAMY to invite Jelaidin does not raise
20    to a claim.  If that's the case, then Jimmy Carter, where he
21    met with Meshal, then Jimmy Carter -- then people would have a
22    claim against Jimmy Carter when he met with Meshal, who was
23    head of Hamas.  So I don't think that -- I think it's not an
24    argument for them to use, because of that the extension of
25    discovery should be 2004.
```

24

E4OP911M

 1              As far as the investigation that they're talking
 2     about, you know, we have no issue producing those documents
 3     related to investigation, but they have to be specific to
 4     investigation.  We cannot make a general rule that everything
 5     from 1992 to 2004, that everything that we're asking should be
 6     produced to us.  If that's what they're requesting, that's
 7     fine.  We can provide that to them.  If we have them, we'll
 8     produce them, but they cannot be spread to all other requests.
 9     I think they need to be specific to the 2002 request.
10              I think that's all.  Thank you, your Honor.
11              MR. GOETZ:  May I stand?  I've been sitting for a
12     while.
13              THE COURT:  Yes.
14              MR. GOETZ:  Your Honor, as I understand, the purpose
15     of the indices, they are to facilitate plaintiffs' inspection
16     and copying of the records that are in WAMY's file room.  From
17     my reading of the transcript of the February 15, 2012, hearing,
18     the Court really had two broad requirements for these indices.
19     They have to be intelligible and workable.  So with those broad
20     concepts in mind, we've produced the 155 indexes.
21              They are not meant, as I understand it, to replace the
22     documents themselves or the evidence themselves.  It's
23     basically a tool to say, all right, these are some documents
24     we're interested in, we want to inspect and copy these
25     documents.  These other ones, they don't pertain to our claims.

25

E4OP911M

1   We're not interested in them.  And that's what these indices
2   do.
3           The Court's reviewed them and, ultimately, your Honor
4   is the one that matters.  But you note that they correlate to
5   specific document requests.  So by definition, if we're talking
6   about a document request for reports and we give an index
7   that's responsive to that, well, these are all reports, they're
8   within that category.  So by tying the documents in the
9   indices to the requests, specific requests, that's a
10  definitional exercise or definitional statement that makes them
11  intelligible and workable.
12          Beyond that, and the Court has reviewed Exhibits E
13  through H in plaintiffs' motion, the documents -- the indices,
14  most of them they give a description of the subject, they state
15  who the document is to, who the document is from, and they give
16  the date.  And all I think plaintiffs' argument is really
17  putting form over substance.  Well, we don't have it, whether
18  it's an annual report or a quarterly report.
19          THE COURT:  Refresh my recollection.  How did we get
20  to indices in the first place as opposed to the documents?  I
21  know my recollection is that WAMY was not the only defendant to
22  resort to indices.  Do I have that right?
23          MR. CARTER:  That's correct, your Honor.
24          THE COURT:  But refresh my recollection as to how the
25  indices came about.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

E4OP911M

```
 1              MR. GOETZ:  Well, my understanding is that, I think,
 2    MWL had the first indices, and they were problematic because,
 3    as I understand it, they were not specific document-by-document
 4    breakdowns.  They were broad descriptions that were not tied to
 5    specific requests.
 6              But as I understand, as I said the purpose and how we
 7    got here, is basically when you're talking about a file room
 8    full of hard copies, documents, the purpose of the indices are
 9    to facilitate -- production having been made to facilitate the
10    inspection and the copying.  That's what I understood the
11    purposes.  They're not to replace the documents themselves, but
12    to help plaintiffs exercise and fulfill the discovery they want
13    to do.  So I think that's the ultimate test.  The Court gave
14    the standard, are they intelligible and are they workable?  And
15    they are.
16              Plaintiffs arguments, as I said, they really put form
17    over substance.  They talk about lack of uniformity.  They are
18    in different formats.  They had different teams working on
19    them.  They gave different products.  But, again, does that
20    mean index A is not intelligible and workable because it's in a
21    different format from index B?  No, it doesn't, not at all.
22              There are, for example, the complaint or the issue was
23    made, well, as to correspondence.  It doesn't matter -- well,
24    it's not described as an e-mail or a letter or a memorandum.
25    Well, it's the substance, the subject of the document that
```

E4OP911M
```
 1   should be important because I can't believe if you have a
 2   correspondence confirming wire transfer to Osama Bin Laden,
 3   it's going to matter whether or not that's a letter or an
 4   e-mail.  They're going to want to get it.
 5           THE COURT:  I thought Mr. Mohammedi was telling me if
 6   it was an e-mail, it was already produced, unless perhaps it
 7   exists in paper form also.  I thought he said everything
 8   electronic had been produced.  Did I misunderstand that?
 9           MR. MOHAMMEDI:  Your Honor, the electronic format we
10   produced them, most of them were produced, and those indices
11   were made two years ago.  Right?  And now, WAMY Canada, when --
12   Mr. Carter mentioned WAMY Canada, doesn't mean that all the
13   documents in the indices are not produced.  There are some
14   documents, many of them, that have already been produced.  They
15   were used as an example.
16           THE COURT:  So the answer to my question is, if
17   there's something in the indices, that's in electronic form, it
18   has been produced?
19           MR. MOHAMMEDI:  In good faith, for what we think,
20   that's been produced.  For what we believe, that -- I mean, I
21   cannot page a representation a hundred percent, but most of
22   them, we believe were produced.
23           MR. GOETZ:  And most of the records that I've seen,
24   your Honor, are not electronic communications.  Those are the
25   letters, memo, but my point, setting aside e-mails for this
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

E4OP911M
1    example, it doesn't matter whether it's a memo, a
2    correspondence or a card, again, I think that's form over
3    substance.
4              Plaintiffs make the argument that, well, the
5    description are insufficient but, yet, on the other hand,
6    they're arguing that there's a number of these documents that
7    are just not relevant.  So I think, to some extent, there must
8    be some intelligible aspects to these that they're able to make
9    that differentiation.
10             WAMY has identified the particular documents that it
11   believes are within the scope of discovery, and to some extent,
12   your Honor, what we have here is the pot calling the kettle
13   black.  Because, if you recall, this came up at the
14   February 15, 2012, hearings when, at that time, WAMY was
15   chastising or complaining about the plaintiffs producing all
16   these newspaper clippings that really had nothing to do.
17             And the Court said, well, that doesn't really control.
18   If the producing party feels that they're responsive, they
19   produce whatever responded.  And I think the Court said whether
20   they're garbage or not, in the receiving parties' view, is not
21   controlling.
22             Just because these document in some instances may not
23   support the plaintiffs' claims does not mean that they're not
24   within the scope of discovery that might be responsive to that
25   particular request.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

29

E4OP911M

1            And one point for clarification, your Honor, in
2   reviewing these indices, I want to make clear that Exhibit D is
3   a different type of index.  Exhibit D -- and this was some
4   confusion, I think, from the February 15, 2012, hearing.
5   Exhibit D is an index of documents that have been produced.  So
6   the other exhibits, G, E through H, are the index of the
7   documents that are in the file room in Riad.
8            And one unfortunate thing, your Honor, speaking about
9   the February 15 of 2012, is that that is the last time that
10  this issue, the sufficiency or insufficiency of these indexes,
11  came up.  I mean, all of these issues and complaints that we're
12  hearing today, the first time we heard about those on
13  March 14 of 2014, over two years later.
14           And there have been absolutely no indications from the
15  plaintiffs between February 15, 2012, and February -- or
16  March 14 of 2014, that there was any insufficiency.  And I
17  would note to the Court your comments on February 15th when
18  this issue of the indexes came up.  You said, well, until the
19  two sides have a more focused discussion about that with
20  respect to the WAMY documents, I'm not going to address it any
21  further.  And, unfortunately, that focused discussion has never
22  come up.  Many of these issues about details about "to,"
23  "from," "subject," those things could have been worked out.
24           And, your Honor, I would note that in terms of
25  supplementing, last night we did finally receive from the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

30

E4OP911M

1   plaintiffs, at 9:00-something p.m., the supplemental answers
2   that were the subject of the December 26th hearing, or
3   December 26th order that we brought up again on February 15,
4   20 -- I'm sorry, February 19th of 2014 was the last time we
5   were together.  And we did just get those finally last night.
6           One other point, your Honor, that was brought up by
7   Mr. Carter.  The WAMY Canada documents that are referenced on
8   the index, copies being in Saudi Arabia.  We believe copies
9   have been produced, and if they have any questions about a
10  specific document, well, where's this report or where's this
11  letter, we'd be happy to caucus with them about that.  And if
12  there's something they think they're missing, then we'll
13  produce that because we certainly stood before the Court
14  before, and we continue to maintain, that we believe we've
15  produced every WAMY Saudi Arabia document that pertains to WAMY
16  Canada.
17          THE COURT:  Thank you.
18          MR. GOETZ:  That's all I have.
19          THE COURT:  Anything further?
20          MR. CARTER:  Yes, your Honor, if you don't mind, a few
21  things that I'll try and address.  The legal rationale WAMY is
22  relying upon is that the party need simply make available for
23  inspection the documents that are responsive.  But the
24  discovery rules have a reasonableness requirement embedded in
25  them.  And as an example of that, the courts have consistently

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

E4OP911M

1    held that a parties that has a woefully disorganized filing
2    system can't simply tell the party seeking discovery to go into
3    that woefully disorganized file room and try and find the stuff
4    that's responsive.
5              And as the analogy, the decision to try and make
6    documents from a variety of locations available for inspection
7    in a location where the State Department has said it is ill
8    advised for U.S. people to travel, whether they can get a visa
9    or not, doesn't comply with that baseline reasonableness
10   standard.  And at the end of the day, WAMY International here
11   in the U.S. has care, custody and control over these documents.
12   It's a U.S.-based party.  It has an obligation to produce the
13   documents here, where it resides and where the plaintiffs in
14   the litigation also reside.  So all of those things --
15             THE COURT:  What's the basis for saying that WAMY
16   International in the U.S. can cause WAMY Saudi Arabia to
17   produce documents?
18             MR. CARTER:  Your Honor, we see within the discovery
19   materials very free flow of information back and forth, when
20   even they have acknowledged, when WAMY Saudi Arabia wanted
21   something to happen to WAMY Canada, it sent the request to U.S.
22   entity to facilitate that role and back and forth.  The
23   correspondence all indicate that it is able to go and get
24   documents from WAMY Saudi Arabia.  So those are all sort of
25   evident in the documents that they've produced themselves.

32

E4OP911M

1              With regard to the feasibility of going to Saudi
2     Arabia, you know, Mr. --
3              THE COURT:  One of the things -- before you get to
4     that, what Mr. Mohammedi said was the other locations are
5     equally bad, if not worse.  Do you agree with that?
6              MR. CARTER:  You know, I don't know that WAMY's office
7     in the U.S. was particularly disturbing to us.  I think it may
8     have maintained an office in London for several years.  It
9     maintained an office in Canada.  So, you know, not all of its
10    offices are in so-called hotspots.  There were plenty of WAMY
11    locations where the documents could have been shipped without
12    presenting this security risk, and it's not just a security
13    risk, as informed by the State Department warning.
14             As your Honor indicated, there's a potential that the
15    attorneys have Israeli visa stamps or Jewish religious
16    affiliation.  There's also the matter of the consultants that
17    one would need to meaningfully review these, and I can say with
18    a level of confidence that they would not be allowed into Saudi
19    Arabia, period.  The nature of this case, the kind of
20    consultants you need to deal with counter-terrorism expertise
21    are not going to be allowed into Saudi Arabia for the purposes
22    of doing this kind of inspection.
23             WAMY, throughout the process, based on the agreements
24    between the defendants' executive committee and the plaintiffs
25    executive committee, has benefited substantially from
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

33

E4OP911M

1    plaintiffs' adherence to produce documents in single page TIFF
2    format.  Literally, tens and tens and thousands of documents
3    have been collected by plaintiffs in hard copy format.
4              Everything that came back to us from FOIA was produced
5    in hard copy format.  Documents we got from foreign governments
6    were produced in hard copy format.  We converted all of those
7    to electronic format and produced them to the defendants, and
8    WAMY's gained that benefit.
9              The only thing that allowing WAMY to impose costs on
10   us does is trigger a request by us for a corresponding
11   reimbursement for all of the costs we incurred to collect our
12   documents and produce them to WAMY.  And that kind of back and
13   forth really doesn't make any sense from a management
14   perspective.  Obviously, your Honor has the discretion in
15   managing discovery in an MDL proceeding, to set rules that will
16   ensure that we don't mire ourselves down in certain pointless
17   disputes for many, many years.  And this is a circumstance
18   where it seems that the parties' course of conduct, other than
19   WAMY, supports the view that such a rule should exist.
20             There was an indication that all of the electronic
21   documents, including e-mails, have been produced.  We don't
22   recall seeing any e-mails.  I raise it only because there was a
23   suggestion that e-mails existing in electronic form had been
24   produced, but we really don't recall seeing e-mails.  So that's
25   one consideration.

E4OP911M

```
 1              Again, Mr. Mohammedi said that the discussion about
 2    single-page TIFF productions didn't apply to WAMY, but he was a
 3    participant in the videoconference; so it's hard for us to
 4    understand how a silence during the course of a discussion
 5    between the executive committees, can later absolve you of the
 6    agreement that everyone else understands to have been reached.
 7              THE COURT:  Let me interrupt you for a second.  Were
 8    you part of that videoconference?
 9              MR. MOHAMMEDI:  Your Honor, I cannot recall.  I really
10    cannot recall.
11              THE COURT:  Anything else, Mr. Carter?
12              MR. CARTER:  No, your Honor.  I think that's it.
13              MR. MOHAMMEDI:  Your Honor, can I just say a few
14    things?
15              THE COURT:  Sure.
16              MR. MOHAMMEDI:  We tried to reach an agreement with
17    plaintiffs.  We talked to them.  We asked them to split the
18    cost.  They refused.  We didn't ask them to go to Saudi Arabia
19    if they didn't want to go.  So I think the issue here is the
20    cost.  It's not about traveling anywhere else.
21              As far as the e-mails, I'd like to make very clear
22    that I was not referring to e-mails.  I was referring to
23    electronic documents, whether they had them, whether they were
24    scanned or whatever.  I can't make this representation that all
25    e-mails have been produced because I'm not sure, but I want to
```

E4OP911M

```
 1   make sure, it was an example that Mr. Goetz made to this Court.
 2            So we were willing, and we are still willing, to work
 3   with plaintiffs.  If only plaintiff can reach out, we can go
 4   into -- we can reach an agreement to do it.  We tried.  We did
 5   our best.  However, this does not mean we violated our
 6   obligations to search for documents and have them available for
 7   production, which is contradictory to what plaintiffs are being
 8   said all along against WAMY.  Thank you.
 9            THE COURT:  As to the situs of production, I wasn't
10   being inattentive when counsel were speaking.  If you saw me
11   looking at the laptop computer on my bench, I was pulling up
12   again the State Department web page that talks about travel to
13   Saudi Arabia, which contains numerous cautions.  Although, it
14   acknowledges that the climate in recent years has been getting
15   better, but it makes it perfectly reasonable to believe that,
16   assuming all of the attorneys who might wish to review the
17   documents could get into Saudi Arabia would be granted visas,
18   that there's legitimate reasons why they might not wish to be
19   in Saudi Arabia, and assuming that many of the consultants and
20   interpreters, who might be required to assist in the review of
21   the documents, would be viewed as turncoats, I do not view it
22   as practical to turn to plaintiffs' counsel and say, go to
23   Saudi Arabia to review the documents, particularly when, for
24   many of the documents, Saudi Arabia is a location that WAMY
25   chose, for whatever reason, they chose to consolidate the
```

36

E4OP911M

1   documents there, any more than I would consider it reasonable
2   if the plaintiffs said, well, we have the documents spread out
3   among law offices in numerous locations.  Some of the documents
4   are at Mr. Haefele's office in South Carolina; so start with
5   Mr. Kreindler's offices in New York, then tour South Carolina
6   and the location where Mr. Carter's office is.
7            It seems to me, in a litigation of this scope, an MDL
8   litigation in particular, the only practical solution is to
9   have each side produce its documents to the other side, rather
10  than having plaintiffs, by way of example, have to go to Saudi
11  Arabia.  So for those two reasons, I do not view viewing the
12  documents in Saudi Arabia as a practical solution.
13           With respect to the indices, the indices clearly are
14  better than some of the indices in the past in this case.  As
15  counsel said, they are document specific it appears, but this
16  was, obviously, a significant undertaking and many of the
17  indices really don't tell you much of anything.  I'm looking at
18  the first page of -- well, it's not the first page, but a page
19  of one of the exhibits, copy, and the subject is copy of a news
20  published in one of the Pakistani newspapers and replied with,
21  which tells you virtually nothing.  And there were other
22  equally uninformative descriptions attached.  "Copy of
23  transfer" is another one that I noted.
24           I spent more time than I care to, at times, looking at
25  privilege logs, which are equally unenlightening.  And I'm not

E4OP911M
1   a fan of privilege logs, the way they're currently done, nor of
2   these indices.  But I don't think the indices really move the
3   matter forward, nor do I think it's practical at this stage to
4   talk about redoing the indices as a way to specify a subset of
5   documents to be produced to the plaintiffs.
6           In terms of the cutoff date, I'm of two minds, I
7   suppose.  I acknowledge that we were having a specific
8   discussion at the time that we discussed a 2004 rather than a
9   2002 cutoff date, and it was in the context of setting the
10  other parameter for what was a generic start date that, I
11  guess, Judge Daniels or Judge Casey, I think it was Judge
12  Daniels, had set.  But I'm going to reserve decision with
13  respect to the cutoff date and try to move things along by
14  ensuring that at least through 2002, presumably, the documents
15  are produced in relatively short order.
16          As to the cost, I understand that WAMY is a charity.
17  As I said, I never have viewed the indices of any of the
18  parties -- except for, obviously, the need to produce privilege
19  logs -- I haven't viewed the indices as a particularly
20  practical way to proceed for anybody.  I think it was
21  unrealistic to think that the indices would somehow focus the
22  discussion or review and, therefore, lead to less burden.
23          And taking what WAMY says at face value, obviously, a
24  large sum of money has been spent preparing the indices.  But
25  if I were to say that WAMY and the plaintiffs don't have a deal

E4OP911M

1  as to costs or that the deal that, evidently, was struck by the
2  two executive committees didn't bind WAMY, as Mr. Carter said,
3  then by all rights, plaintiffs will be entitled to bill back
4  for the documents that they produced and the cost of some
5  allocable share of producing those in TIFF format, and then we
6  get into battles about the extent to which the documents were
7  responsive to the requests or garbage, on both sides.
8              So I am going to require that WAMY produce the
9  documents at its cost, and notwithstanding the agreement that
10 documents should be produced in TIFF form, I will leave it to
11 the WAMY defendants to decide whether they wish to ship the
12 documents here, so long as they can be made available in a
13 location where the plaintiffs can practically review them and
14 indicate that which they have to have or wish to have copied,
15 or whether it's produced in TIFF form, whichever better suits
16 defendants, I will permit them to pursue.
17             But either TIFFs have to be made available with
18 reasonable dispatch or the hard copy documents.  And certainly,
19 any electronic documents that have not been produced, if
20 e-mails have not been produced, there's no longer any reason
21 why e-mails should not have been produced, and those should be
22 produced forthwith.
23             So I think that I've addressed the issues as to the
24 cutoff date.  Again, I want to see where we end up with the
25 production through 2002, and I said I am reserving decision on

39

E4OP911M

1    that.  I'm not reserving it for a week or two.  I'm going to
2    wait to see what happens with production through 2002, and then
3    we'll worry about 2002 through 2004.  Although, I do think
4    there's some merit.
5         If it's really, Mr. Carter, particular types of
6    documents that plaintiffs are looking for, I'd encourage you to
7    have discussions with WAMY's counsel and see whether production
8    for that area can be narrowed.
9         MS. BERGOFFEN:  Your Honor, if I may.  With regard to
10   the cutoff date, and as it applies to any other party or the
11   defendants in general, a couple of points there.  I think I
12   speak on behalf of the other defendants as well.  Our
13   understanding is that this would just apply to WAMY.  I know
14   that in the case we generally try to have universal things like
15   this apply, but this is not a case in which it should for a few
16   reasons.
17        If I may use my client, the Dubai Islamic Bank, as an
18   example.  Mr. Mohammedi alluded to before to an agreement.  We
19   actually have an express agreement with plaintiffs, which was
20   on a document-request-by-document-request basis as to what that
21   particular cutoff should be.  In some cases the agreement was
22   that it would be serving documents through 2001 and in others
23   it was through present.
24        So I mean, to the minimum, I believe this would apply
25   to other defendants as well, and I encourage anybody else to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

E4OP911M
1   speak up, but with regard to the Dubai Islamic Bank, we would
2   certainly urge that you not make that ruling apply to us
3   because we have an express agreement already in place with
4   regard to specific dates.
5              THE COURT:  Well, anybody who has an express
6   agreement, I'm certainly not going to meddle with those
7   agreements.
8              MS. BERGOFFEN:  Very good.  Thank you, your Honor.
9              THE COURT:  Unless somebody tells me there's
10  disagreement as to what the agreement is.  That will read oddly
11  in the transcript, but go on.
12             MR. CARTER:  Your Honor.
13             MR. MOHAMMEDI:  May I -- Go ahead.
14             MR. CARTER:  Your Honor, just a couple of minor
15  points.
16             THE COURT:  Yes.
17             MR. CARTER:  I think it's implicit in your Honor's
18  order that you're reserving judgment as to the 2002 to 2004
19  period for WAMY, that there's a continuing obligation to
20  preserve documents from that period that are responsive.
21             THE COURT:  Clearly.
22             MR. CARTER:  Is the Court inclined to set a deadline
23  for this production to occur?
24             THE COURT:  I had thought about that, and I'd like the
25  two sides to confer.  If you can't reach agreement on that,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

41

E4OP911M

 1    then submit a joint letter to me setting forth the two
 2    positions.
 3              MR. CARTER:  And the last thing, your Honor, was we
 4    had already asked in our motion --
 5              THE COURT:  Let me just interrupt you for a second and
 6    say, I recognize also that Mr. Mohammedi may file objections to
 7    this.  Although, I think I'm correct that every single
 8    objection to a discovery ruling of mine has been denied, at
 9    least since Judge Daniels has been the district judge, but I
10    recognize that that possible exists.
11              MR. CARTER:  You are, in fact, batting a thousand,
12    your Honor.  The one last issue, your Honor, was that we had
13    asked in the motion --
14              THE COURT:  Although, defendants, or whoever objected
15    this time got a longer decision than some of the other ones.
16              MR. CARTER:  That's correct.  We had asked just that
17    there be a clarification that the rulings concerning the sort
18    of central relevance of, for instance, the auditing reports and
19    the supporting documents for the auditing reports for charity
20    defendants, be made clear so that when we get this production,
21    we're sure it encompasses everything that the Court has already
22    acknowledged to be relevant and quoted the claims in the
23    litigation.
24              THE COURT:  Let me try it this way and see whether it
25    deals with your concern.  Obviously, anything that's responsive

42

E4OP911M

1    to your request, except to the extent that I've sustained an
2    objection, needs to be produced.
3              MR. CARTER:  That's fine.  Thank you, your Honor.
4              THE COURT:  Anything else as to this?
5              MR. MOHAMMEDI:  I think Mr. Carter already addressed
6    some of the questions we were going to ask.
7              THE COURT:  Okay.  Let's move on then to the
8    application for fees and costs.
9              MR. HAEFELE:  Good afternoon, your Honor.  Robert
10   Haefele from Motley Rice.  We're here for the -- what I think
11   you had identified as the sanctions motions.  The sanctions
12   motion is, thankfully, behind us.  This is the fee petition
13   related to the sanction motion as a result of that, which as I
14   understand, was upheld in one of the decisions that --
15             THE COURT:  Right.
16             MR. HAEFELE:  -- Judge Daniels issued yesterday, or
17   three of the decisions, I guess.  The two that are before your
18   Honor today is one petition that was done jointly related to Al
19   Haramain and to Wael Jelaidin.  And, you know, we went through
20   most of what we need to say, I think, in the papers, just like
21   we said -- Mr. Carter said about the WAMY motion.  I think most
22   of what we had to say was laid out in the papers, and then the
23   reply papers.
24             There is a lingering issue, I suppose, as to whether
25   or not the motion for the surreply granted -- allows the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E4OP911M
1    opportunity for the surreply, but I'm not sure that really
2    matters because the arguments in the surreply were essentially
3    the arguments that had been made earlier.
4            THE COURT:  I, obviously, ignored the motion to strike
5    the surreply.  And when I was reading it today, I'm not sure it
6    adds much or it's cause for concern; so....
7            MR. HAEFELE:  I think that our whole point was not a
8    motion to strike.  It was the opposition to their motion to
9    file a surreply, but regardless, I think it all comes to the
10   same point.  Our objection was their surreply made the same
11   arguments.
12           THE COURT:  And I suppose, to the extent it did, I
13   should file an objection also, but --
14           MR. HAEFELE:  At any rate --
15           THE COURT:  At the end of the day, I think the issues
16   have been fully briefed at this point.  One thing that concerns
17   me is, obviously, the longer you're on the bench, the more out
18   of date your views of going rates become.  But looking at the
19   billing rates and noting, for example, that your firm is in
20   South Carolina, although I know it has a somewhat unique
21   practice, 750 bucks an hour for you, just to pick on you as an
22   example, seemed like a pretty high rate.
23           MR. HAEFELE:  I do feel sort of targeted, your Honor.
24   It's interesting that you should raise me --
25           THE COURT:  Would you rather I pick on Mr. Flowers?

44

E4OP911M

```
 1              MR. HAEFELE:  No, but it is interesting that you would
 2    choose me because none of my practice is in South Carolina.
 3    Honestly, the ironic thing, and I've had this discussion with a
 4    number of folks, is that I moved to South Carolina to work in
 5    New York.
 6              THE COURT:  And I saw you're not admitted in South
 7    Carolina.
 8              MR. HAEFELE:  No, no, no.  I am admitted in South
 9    Carolina because I must be, but because I hold an office in
10    South Carolina, I have to be.  So I am admitted in South
11    Carolina, but my point in the brief, your Honor, was that I am
12    not admitted in the District Court in South Carolina, the
13    Federal Court in South Carolina, I am not admitted.
14              And that was the suggestion, that why should he get
15    the billing rate that a lawyer practicing in a Federal District
16    Court in South Carolina.  The truth of the matter is, most of
17    my practice is in the Southern District of New York, and I am
18    admitted in the Southern District of New York, I am admitted in
19    New York, and I think that's pretty much what the rule says.
20    And a number of cases that were cited is -- the question is
21    what venue do you apply the billing rates.  It's the --
22              THE COURT:  Before you get to that, then let me pick
23    on Mr. Flowers, unless you're going to tell me that he's
24    similarly situated.  The representation is that, for South
25    Carolina clients, he's billing 800 bucks an hour?
```

E4OP911M
1              MR. HAEFELE:  First off, the only reason I'll first
2    start out picking on you about it is it's Miss Flowers.
3              THE COURT:  Oh, Miss, I'm sorry.  Yes.
4              MR. HAEFELE:  And Ms. Flowers' situation is similar;
5    although she is admitted in South Carolina.  Again, it goes
6    back to the particular nature of the practice of Motley Rice.
7    Our practice is all over the country, and we go all over the
8    country to litigate, usually mass tort cases all over the
9    country.  I don't know if you had an opportunity to look at the
10   brochure about the firm that was in the profiles section of our
11   submission, but, I mean, we're talking about the tobacco
12   litigation all over the country.  We represented -- the firm's
13   predecessor firm that Ms. Flowers was at, which was Ness Motley
14   at the time, represented the attorneys general all over the
15   country in the tobacco litigation.
16             Similarly related all over the country in asbestos
17   litigation, and much of Miss Flowers' practice, too, is in
18   New York, Washington, D.C. and elsewhere throughout the
19   country.  So, yes, she is admitted in South Carolina, but her
20   practice is all over the country.  And I think in that
21   circumstance, to be honest, I can't remember, but I think a lot
22   of it was by pro hac vice admission.  But it is a uniquely
23   national practice as opposed to a local one.
24             THE COURT:  But I guess also a lot of it is
25   contingency fee work, right?

E4OP911M

```
 1              MR. HAEFELE:  Excuse me?
 2              THE COURT:  A lot of it is contingency fee work?
 3              MR. HAEFELE:  A lot of it would be contingency fee
 4     work, that's correct, your Honor.  I don't -- Well, yeah, the
 5     tobacco litigation, it was uniquely -- it was a unique
 6     contingency fee work, but it was still contingent.
 7              THE COURT:  So then I guess that leads to the
 8     question, and certainly your firm's not unique in this respect,
 9     but the billing rate per hour, therefore, to a certain extent,
10     it is a contrived number because if you're getting a percentage
11     of a recovery, what rate you deem yourself to be billing at may
12     not be an accurate rate.
13              MR. HAEFELE:  I would say this, actually, your Honor.
14     I maybe spoke too quickly.  The firm also has a very large
15     portion of the firm, relatively speaking, within the firm, that
16     does securities litigation, and we do have billing rates for
17     that.  We have assigned billing rates that are assigned for
18     that purpose.
19              THE COURT:  And do they -- it may be different lawyers
20     but for matters that are billed on an hourly basis, do the
21     rates correspond to the rates that are represented in your
22     application to me?
23              MR. HAEFELE:  I actually think the rates here are --
24     they generally correspond, but I think for the folks that were
25     in the leadership position here, they might be a little bit
```

E4OP911M

1  higher.  For the folks that are, for example, in a piece of
2  litigation where you were one of many lawyers and you were not
3  necessarily the decision maker, the billing rate might be
4  different.
5           In this litigation, where the folks that are on that
6  list, particularly Jodi and myself, Ms. Flowers and myself, are
7  on the plaintiffs' executive committee, have different
8  responsibilities, broader responsibilities, representing more
9  than just the Burnett plaintiffs.  We come here and we are
10 going to have -- this is a particularly good example, where I'm
11 arguing on behalf of all the different plaintiffs in the case,
12 I think the billing rate was a little higher.
13          THE COURT:  Okay.  One infirmity that was raised in
14 opposition is that there's only an affidavit, I guess, from
15 you.  You're not in a position to know the billing rates of
16 other law firms firsthand; so at a minimum, one thing I'm going
17 to want is an affidavit from each of the applicant firms with
18 respect to its billing rates.
19          And I understand that there's some case law.  I guess
20 it was Judge Fox, most recently, who may have said it, saying
21 that that should not be provided in reply, but I think that's
22 wholly within my discretion, and the view is dotting I's and
23 crossing T's; so I am going to ask that that be submitted to
24 me, say, within two weeks.
25          Bear with me a second.  Well, there's also the matter

48

E4OP911M

1   of -- and Motley Rice may be the wrong firm to use as an
2   example.  But there is Judge Peck's decision which interprets
3   Arbor Hill as requiring that billing be at the rate of the
4   forum jurisdiction or the rate in the locality where the
5   attorney's office is, if that's lower or whichever is lower.
6   I'm not sure whether that actually effects any of the firms.  I
7   guess, Mr. Carter, you're from out of town.
8           MR. CARTER:  Philadelphia, your Honor.
9           MR. HAEFELE:  Well, your Honor, I think there's a
10  couple of responses I have to that, as I'm reading -- I mean, I
11  know that's language from one case, but there's multiple other
12  Second Circuit cases and Southern District cases that are
13  pretty particular to the relevant community.  And this is --
14  actually, this is the language I'm reading from Arbor Hill.
15          THE COURT:  And the irony is Arbor Hill was using it,
16  I forget which law firm he was at, but I remember it was, I
17  think --
18          MR. HAEFELE:  I believe it was the Western District of
19  New York, wasn't it?
20          THE COURT:  No, but the law firm was a New York law
21  firm.  I think the lawyer was Mitchell Carlin, if memory
22  serves.  But by saying the forum jurisdiction, they were
23  picking -- Judge Walker, I think it was who wrote the decision,
24  was in effect picking the lower number.  Here, potentially, you
25  could have the reverse, which I guess is where --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

E4OP911M

```
 1              MR. HAEFELE:  I'm looking not just at Arbor Hill, but
 2    I'm also looking at a case called AR v. New York City
 3    Department of Education, which the language in that case is the
 4    community is typically measured by the geographic area where
 5    the action was commenced and litigated, and then in Puglisi --
 6              THE COURT:  There's no question that that's what the
 7    Second Circuit said, and I'm sure you can find decisions where
 8    I've done that, or quoted Arbor Hill and not considered whether
 9    there should be the lower rate.  And I understand your position
10    that, at least for some of the plaintiffs, New York may not
11    have been their first forum, and there's a debate about who, at
12    the MDL stage, urged that the cases be cited here.
13              MR. HAEFELE:  I think that was the explanation that I
14    provided in the brief, was that that leads to a whole host of
15    disputes within the decision itself.  I mean, all the firms
16    that are here on the plaintiffs' side, they all have New York
17    offices, every single one of them.  And among the plaintiffs'
18    lawyers that were represented in there, for example, one of the
19    Motley Rice lawyers that worked on them is in the billing
20    records, though she's a Motley Rice lawyer, her office was, at
21    one point in Manhattan but at another point was in DC.  But,
22    yet, she was working on this case and doing the briefing
23    related to the case in the Southern District of New York.
24              It runs a -- and then you have the example of me, not
25    admitted in the South Carolina District Court but practicing,
```

E4OP911M

1    for the most part, in the Southern District of New York and
2    admitted in Southern District of New York.  It runs -- the rule
3    that the Second Circuit generally applies is a much cleaner
4    rule that provides, you know, with much clearer guidance than
5    having to have ad hoc determinations based on each of the
6    individual lawyers.
7              THE COURT:  Okay.  There was one other question I
8    wanted to ask.
9              MR. HAEFELE:  And while you're looking --
10             THE COURT:  There was one firm as to which, and I'm
11   not sure whether it was your firm or Kreindler and Kreindler.
12   Oh, no.  I'm sorry.  It was your firm, Judge Forester noted --
13   and I'm obviously reading from Mr. Kabat's papers, that Motley
14   Rice did not keep time sheets.  I take it with respect to this
15   MDL matter, Motley Rice has kept time sheets?
16             MR. HAEFELE:  Your Honor, yes.  It's a word that I
17   consistently forget, and I complained to one of my colleagues
18   that I can't remember, but I know I used it three times when I
19   referred to that particular example, but it's just an anecdote.
20   He went -- Mr. Kabat went through and he found one situation
21   where some lawyers from Motley Rice, for a different team
22   within my firm, practicing in a different court on a different
23   matter, didn't keep time.  And they went back and they
24   recreated it.
25             But yes, in the circumstance -- I mean, like I said to

E4OP911M

1   you, we have other teams within our firm, practice groups is
2   what we call them, that keep time.  And this circumstance, you
3   know, the -- and it says so in our declaration, that the time
4   records were contemporaneously kept time records; so it's not a
5   situation that's analogous exactly to the circumstance that you
6   had in the anecdote quotation or the circumstance that
7   Mr. Kabat gave.
8           THE COURT:  Assuming it's accurate, I will want the
9   affidavit from somebody knowledgeable at each firm to say
10  what's implicit in the application, which is that summaries are
11  based on contemporaneous time records.
12          MR. HAEFELE:  And I'm assuming that from Motley Rice,
13  the one you received already is okay?
14          THE COURT:  Yes.
15          MR. HAEFELE:  Since it's signed by Motley Rice.
16          THE COURT:  Unless there's something that I conclude,
17  based on the defendant's argument, that should be supplemented,
18  that's accurate.  Anything else?
19          MR. HAEFELE:  Not unless your Honor has any -- I mean,
20  I had planned to go through each of the things, but they're
21  pretty much mostly what we said.  I would add one thing, your
22  Honor, just to give you a notion of the reasonableness of the
23  fees, or the reasonableness of the billing hours -- I'm sorry,
24  the billing rates.
25          When I went through and looked at the billing rates, I

E4OP911M
1    took the average of the billing rates that were there, and came
2    up with, I think the average billing rate was $650.
3              THE COURT:  Blended rate amongst all the firms?
4              MR. HAEFELE:  Blended rates amongst all the lawyers.
5              THE COURT:  That's what I meant, but among the four
6    applicant firms?
7              MR. HAEFELE:  I took, yes, all of the lawyers that
8    were listed on there, added them up and calculated the median,
9    and it was $650 an hour.
10             THE COURT:  Right.
11             MR. HAEFELE:  And then I went to the --
12             THE COURT:  The median or the mean?
13             MR. HAEFELE:  First off, let me say at least in the
14   sources that we cited, the median billing rate in New York
15   cited by one of the sources it was $650 an hour, $656 an hour,
16   and with some rates over a thousand, some rates tipping in at
17   almost $2,000 an hour.  Obviously, we're not there.
18             THE COURT:  Yet.
19             MR. HAEFELE:  But the median rate identified in the
20   fee petition was just slightly under $650 an hour.  But also,
21   if you added up the median number of years of experience, was
22   18.  And if you look at the Laffey rate adjusted for New York,
23   that $750 for an 18-year-experienced lawyer.
24             THE COURT:  I have the Laffey rate in that one
25   decision.  I don't consider it particularly significant.  I had
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

53

E4OP911M

1   to deal with DC rates in that case; otherwise, I would have
2   gone for my career never citing the Laffey cases.
3           MR. HAEFELE:  I understand what your Honor is saying,
4   but it happened to be something that was available to provide a
5   resource to compare different years in the different locations.
6   But I think the other sources that we cited were fairly
7   consistent with that as well.  So I think, all things
8   considered, what we provided to your Honor was a good
9   indication as to the reasonableness of the fees of the hourly
10  rates.
11          THE COURT:  Okay.  Thank you.
12          MR. HAEFELE:  Thank you, your Honor.
13          MR. KABAT:  Thank you, your Honor.  There are some
14  fundamental flaws with plaintiffs' $1 million fee petition,
15  which requires either striking it entirely or drastically
16  reducing it.  I'm going to argue with respect to Al Haramain
17  and Mr. McMahon can respond to his client.
18          First of all, we need to look at the context of this.
19  Plaintiffs are seeking $636,000 for one discovery motion as to
20  one defendant, Al Haramain.  Plaintiff had three discrete,
21  independent discovery issues that they raised.  They only
22  prevailed on one issue, arguably the least important issue, the
23  delay in producing documents.
24          Plaintiffs also sought either a default judgment or an
25  adverse inference as to Al Haramain.  Your Honor denied either

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

E4OP911M

1   sanction, and that's the framework we need to look at.
2              As Judge Hellerstein, handling the aviation
3   litigation, had some very appropriate words that I do want to
4   note.  He recognized that the wounds of September 11 will not
5   be easily assuaged, but neither should they be exacerbated by
6   rich rewards of fees and benign indifference to unreasonably
7   large rewards.  That's the situation we have here, and we cited
8   a number of cases where the courts have not hesitated to strike
9   entirely fee petitions that were, quote, outrageous and
10  excessive, and unsupported by adequate documentation.
11             Now, the first issue that your Honor raised was the
12  excessive rates.  You know, we cited extensive Second Circuit
13  precedent, which makes clear that in New York City there are
14  multiple legal markets.  There's the, quote, Wall Street rate
15  for corporate and securities work, the lower rates for
16  intellectual property work, and there's even lower rates for
17  the rest of us.  And that's the rate we should be looking at
18  now.
19             Plaintiff relies on newspaper articles and surveys,
20  should be entitled little weight because those surveys were
21  looking at the top 350 or top 250 law firms in the country,
22  particularly those with over a thousand attorneys.  I mean,
23  this court --
24             THE COURT:  Sorry, I -- you don't have to spend a lot
25  of time convincing me that what Cravath charges its clients is

E4OP911M

1  simply not relevant in terms of deciding what these firms
2  should be charging.  But Mr. Carter is at Cozen and O'Connor,
3  right?
4           MR. CARTER:  That's correct, your Honor.
5           THE COURT:  Which is not a small firm, by any stretch;
6  so, you know, all of the information, I suppose, potentially
7  enters into the mix in deciding what the reasonable --
8           MR. KABAT:  Well, let me move on.
9           THE COURT:  -- rate is, but I think that's probably
10 less of an issue than the reasonableness of the hours billed,
11 from your perspective.
12          MR. KABAT:  Well, Judge Peck of this court, in the
13 Ryan case, had it exactly right when he said that the rates
14 were created solely for the purpose of charging defendants.
15 These are not rates that the plaintiffs charged their own
16 paying clients, which is yet another reason to strike the fee
17 petition.
18          The plaintiffs in their reply brief raised the
19 argument, which is why we did a surreply, that the reason this
20 case when transferred here was, quote, largely at the
21 defendants' insistence.  Well, that was really strange because
22 I've been in this case for twelve years now, and the record of
23 the judicial panel on both sides of this litigation made clear
24 that all of the plaintiffs here today wanted the case to stay
25 with Judge Robertson in the District of Columbia, and it was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

E4OP911M

```
 1   only a few days after Judge Robertson dismissed two of the
 2   deep-pocket defendants, Prince Sultan and Prince Turki, that
 3   the plaintiffs suddenly switched sides at the hearing before
 4   the JPML, scrambling somehow to claim that the case should be
 5   consolidated in New York.  In fact, they admitted on the record
 6   because of Judge Robertson's decision, that they switched
 7   sides.
 8          So let me turn back --
 9          THE COURT:  If that's correct, assuming it is, do you
10   want me to use prevailing DC rates?
11          MR. KABAT:  Pardon?
12          THE COURT:  You're saying that, but for the
13   plaintiff's trying to get away from Judge Robertson after one
14   of his initial decisions, somebody in Washington, D.C. would be
15   having this discussion with you.  And I'm asking whether,
16   therefore, you're saying I should be applying reasonable
17   Washington, D.C. rates?
18          MR. KABAT:  No.  Actually, I'm making a slightly
19   broader point, that the plaintiffs, in their reply, chose to
20   completely misrepresent their own representation to the
21   Judicial Panel on Multi-district Litigation, which does concern
22   me.
23          The second issue I'd like to raise is that despite our
24   repeated requests, and clearly Second Circuit decisions in this
25   court, plaintiffs still have not produced their contemporaneous
```

E4OP911M

1    time records.  Now, Mr. Haefele claims that in his firm, well,
2    there's some practice groups that don't keep time records, but
3    we do.  I find that very hard to believe.  I've never heard of
4    a law firm where some attorneys were able to make up time as
5    they go along and other attorneys are keeping contemporaneous
6    time records.
7            THE COURT:  Well, one of the problems with producing
8    all of the time records in their original form is they then
9    have to be heavily redacted, and that's a cumbersome exercise.
10   But if you want to test the waters, I will permit you, for each
11   firm, to request the originals, appropriately redacted, for two
12   months.
13           MR. KABAT:  Well, your Honor, the redactions would not
14   need to be that great because if you notice in their
15   spreadsheet, they do give some level of detail.  So,
16   presumably, if there really are contemporaneous records, that
17   same level of detail is in those time records and --
18           THE COURT:  Well, they've represented, and I have no
19   reason to believe that they haven't verbatim copied
20   electronically entries from time sheets or that their
21   timekeeping system.  You've suggested that the summaries are
22   suspect.  The rules of evidence, if this were a trial matter,
23   say that when summaries are used rather than the originals, the
24   originals should be made available to the adverse party.
25           I'm saying if you doubt the accuracy of the summary

58

E4OP911M

1   charts, feel free to ask for each of the four applicant law
2   firms for two random months' worth of the original records.  I
3   mean, all of us nowadays is electronics; so original is a
4   misnomer.  But if you want to see it as it's spit out from the
5   system for particular months, for a maximum of two months, feel
6   free to do that.  And if you discover that the summaries are
7   inventions rather than accurate reproductions of the relevant
8   entries, I'm sure you'll let me know.
9              MR. KABAT:  Yes, we certainly would request the time
10  records and --
11             THE COURT:  Okay.  Well, I partly granted that request
12  and --
13             MR. KABAT:  Right.
14             THE COURT:  And I'll give you two weeks to -- well,
15  I'll give you one week to make that request, and one week for
16  the firms to respond, and a third week for you to send me a
17  further letter if you have concerns about the accuracy of the
18  tables I've been given.
19             MR. KABAT:  That's fine.  And I should mention part of
20  the reason why --
21             THE COURT:  Hang on just a minute.
22             MR. KREINDLER:  Your Honor, I have a 4:00 doctor's
23  appointment, which I thought would give me plenty of time, but
24  I'm going to have to run to that.
25             THE COURT:  No problem.

59

E4OP911M

1           MR. KREINDLER:  Thank you, your Honor.
2           THE COURT:  I thought you were protesting something
3   about the billing records.
4           MR. KREINDLER:  No, your Honor.  I thought I'd go back
5   and get our numbers up to a thousand, 2,000 an hour.  We're way
6   behind the times.  Thank you, your Honor.
7           MR. HAEFELE:  Can I clarify one thing on what your
8   order is?
9           THE COURT:  Sure.
10          MR. HAEFELE:  And it will be quick, I promise.  You're
11  talking about -- I just want to get a sense of what redactions
12  would be involved.  You're talking about getting billing --
13  basically the spit-outs of the records that were used to
14  generate that spreadsheets?
15          THE COURT:  For two random months that they will tell
16  you.
17          MR. HAEFELE:  Okay.
18          THE COURT:  So they can tell your firm X month and Y
19  month, and Goldman's firm, A and B months.
20          MR. HAEFELE:  I just wanted to make sure that we
21  weren't talking about us having to produce information about
22  other aspects of the case that we've already worked on.
23          THE COURT:  Well, what you would be doing for those
24  two months is producing the printout as if you were rendering a
25  bill for that month, but you would redact the subject matter on

E4OP911M

1    the entries that don't relate to the application.
2            MR. HAEFELE:  Okay.  All right.  I'm not sure how that
3    works, but okay.  There will be a lot of redaction then.  I can
4    tell you that with regard to these entries, I think the only
5    thing that might be redacted would be like names of, you know,
6    certain people that I may have met with that I didn't want to
7    provide them with the information about.
8            THE COURT:  I'm not telling you how to redact it.  It
9    may be within these entries there would also be redactions, but
10   I think it more likely would relate to other aspects of what
11   you're doing in these cases.
12           MR. CARTER:  Your Honor, could I just raise one
13   practical consideration?  There are days where I have many,
14   many time entries on a time sheet, and I think I'd want to be
15   careful about the redaction process.
16           THE COURT:  Are you talking about block billing
17   entries?
18           MR. CARTER:  No, no.  When I enter time, you know,
19   there are individual entries for as little as one-tenth of an
20   hour and two-tenths of an hour.  As a consequence, the number
21   of entries in an individual day can grow quite large, and so
22   the process of vetting those to make sure that we're only
23   providing the material relevant to this dispute could take a
24   little bit more time than a week.
25           THE COURT:  Fine.  I'll modify that to two weeks.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

E4OP911M

```
 1                  MR. CARTER:  That's fine, your Honor.  Thank you.
 2                  THE COURT:  Okay.  Go on, Mr. Kabat.
 3                  MR. KABAT:  Thank you.  The third issue I'd like to
 4       address is the limited success.  Namely, both the Supreme Court
 5       and the Second Circuit have required that the fee award be
 6       proportionate to the results obtained, and the degree of
 7       success is the most critical factor.  The Supreme Court has
 8       said that in the case Farrar v. Hobby, 1992, and Hensley v.
 9       Eckerhart, 1983.
10                  And here, as I mentioned at the outset, plaintiff only
11       prevailed on one of three discrete discovery issues as to Al
12       Haramain.  That, alone, requires a reduction of the fee
13       petition by two-thirds, as the issues were discrete, not
14       intertwined.  Moreover, plaintiffs didn't even obtain either a
15       default judgment or an adverse inference, which requires a
16       further substantial reduction.
17                  Plaintiffs completely ignored the law in their brief
18       and, instead, they relied upon a 1980 decision in their reply
19       brief.  Well, that 1980 decision is no longer good law, in
20       light of the subsequent Supreme Court decisions in Farrar and
21       Hensley.  And, I mean, they're inconsistent with views not only
22       on this issue but on every issue, to acknowledge controlling
23       Supreme Court and Second Circuit precedent is deeply troubling.
24                  And the fourth factor I want to look at that
25       Mr. Haefele, perhaps wisely, skipped was their request for a
```

E4OP911M
```
 1   50 percent Lodestar enhancement.  While the Supreme Court --
 2             THE COURT:  I'm sorry, I missed the last thing you
 3   said.  The Supreme Court?
 4             MR. KABAT:  That their request for a 50 percent
 5   Lodestar enhancement, but they ignored the Supreme Court.
 6             THE COURT:  Let me save you some time.  There's not
 7   going to be a Lodestar.
 8             MR. KABAT:  Thank you.  And the last issue I want to
 9   address is that, you know, neither the Court nor the other side
10   should have to put on their eye shades and spend hours going
11   through the fee petitions to identify excessive hours,
12   overstaffing, double billing, redundant work.  I spent more
13   time than I care to remember going through color coding and
14   cross-referencing of fee petitions, the fee affidavits.
15             Probably the most egregious example is routinely
16   billing five or six attorneys to attend status conferences,
17   even though only Mr. Haefele argued as to Al Haramain.  Judge
18   Hellerstein in the aviation litigation held that time sending
19   multiple attorneys to a status conference is not compensable.
20             And even then, plaintiffs billed wildly inconsistent
21   time for attending status conferences.  I mean, in one case, we
22   have the Kreindler firm billed two attorneys for one hour each
23   for a status conference only one-and-a-half page of the
24   transcript is devoted to Al Haramain.  The other firm didn't
25   even bill Al Haramain for that conference.
```

63

E4OP911M

1            The other discovery conferences have wildly divergent
2   time estimates between the firms, but all of those time
3   estimates exceed the actual time devoted to Al Haramain.  Judge
4   Patterson in this court some time ago said overbilling or
5   double billing was sufficient ground to strike a fee petition.
6   Judge Ellis also reduced fee petition for duplicative billing.
7            THE COURT:  And one thing I can assure both sides is,
8   if I conclude that there should be reductions in the bill,
9   although from time to time in fee decisions I have gone line by
10  line, here, the amounts sought and the number of time entries
11  is sufficiently large that there is no possibility that I will
12  do that.
13           If there's a haircut, it will be a percentage haircut,
14  putting aside the billing rate issue.  Certainly, that will be
15  based on my review of the time entries, but I appreciate,
16  having done it in other cases, how time consuming it is to go
17  through entries line by line, and I am highly unlikely to
18  resort to that technique in terms of deciding what, if any, the
19  appropriate number here is.  Go on.
20           MR. KABAT:  Well, your Honor, in the Romeo and Juliet
21  case very recently you held that a 75 percent reduction was
22  appropriate in a Rule 37 fee petition.  Judge Fox similarly
23  held a 75 percent reduction in the Bravia Capital case.  Judge
24  Francis, 80 percent reduction in the Antonmarchi case.
25           So that kind of drastic reduction, given the limited

64

E4OP911M

1    success, the overbilling, overstaffing, double billing, and we
2    think that a similar substantial reduction in any fee petition,
3    if any award should be made, is warranted here.  I mean, what
4    plaintiffs have done is exactly what the courts have warned
5    about.  They submitted excessive fee petitions in the hope that
6    the Court will merely reduce their fees to some slightly lower
7    amount, and the courts have decided, on Pages 4 and 5 of our
8    opposition, have not hesitated to strike fee petitions
9    entirely.  They are so outrageously excessive, as here, where
10   plaintiffs are not only seeking $636,000 for a discovery
11   motion, but throughout their fee petition and their reply
12   brief, they consistently refuse to acknowledge Supreme Court
13   and Second Circuit precedent that is directly contrary to all
14   of their argument.
15            I mean this Court would commit reversible error if it
16   grants plaintiffs what they improperly seek, which is why you
17   would be justified in striking the fee petition entirely for
18   misrepresentations of the history of this case and for its,
19   quote, outrageous and excessive demand.  Thank you.
20            THE COURT:  Before I get back to you, Mr. Haefele,
21   Mr. McMahon?
22            MR. MC MAHON:  Yes, your Honor.  Good afternoon.  How
23   are you?
24            THE COURT:  I'm well.  Thank you.
25            MR. MC MAHON:  I will be brief.  I think the fee

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

E4OP911M

1  application is excessive, and I do think case law allows you to
2  make a substantial cut in the application.  One of the
3  departure points that we have with plaintiffs counsel, and it's
4  obviously going to be your call, as a matter of discretion, is
5  I think they view this as a matter of deterrence.  And at least
6  the Southern District case law we saw, Romeo and Juliet, Page 2
7  of our memo, doesn't really get into that.  Maybe you can read
8  something like that into the award, but I think that is a
9  difference that we have.
10          No. 2, there are, obviously, no contemporaneous time
11  records.  And I'm not sure if you decided this, but I think
12  Mr. Carter references the fact that he does have the time
13  sheets but never produced them.  Am I right on that?
14          THE COURT:  Well, no.  Let me extrapolate from what
15  has been said.  I think my understanding is that each of the
16  firms has the electronic billing records and can spit out a
17  complete set of entries in chronological order to demonstrate
18  that the records are contemporaneous but would have to redact
19  from what may be many months, if not years, of time entries
20  those which do not relate to their present application.
21          And I indicated to Mr. Kabat, and certainly the offer
22  is available to you as well, if you don't believe that
23  representation, you can ask to have two random months' worth of
24  entries produced such that you can see that the system is
25  generating something that applies to these cases as a whole,

E4OP911M

1   rather than being some artificial construct that was created
2   after the fact, which apparently was the case in the matter
3   that was before Judge Forester in another Motley Rice matter.
4         But if you or -- if you and Mr. Kabat are going to
5   make that request, I'd ask that you confer and ask for the same
6   two random months; so that you're not asking each firm to
7   collectively give you four months' worth of redacted billing
8   records.  So does that clarify where we're at?
9         MR. MC MAHON:  Yes, your Honor, and I'll accept that
10  proposal.  There is, obviously, overbilling in the application.
11  Three attorneys would show up, and Sean Carter was the only one
12  who was there to argue the case.  I'm not sure that we have any
13  basis in the record to say, oh, those other attorneys were
14  essential to bring forth the form that Mr. Carter was arguing.
15  I don't see that.
16        Travel time, I think you should knock that down at
17  least 50 percent, now that there are telephone conferences,
18  among other things that we can utilize.  Although, I know that,
19  given the nature of the proceedings, they wanted to appear in
20  front of you personally, but I think you need to knock that
21  down.
22        Hearings involving other parties, your Honor, I tried
23  to give you some examples of some excessive fee applications on
24  7 and 8 of our memorandum and various cases, including Unlucky
25  Trucking and Romeo and Juliet.  I think Romeo and Juliet had

67

E4OP911M
1  75 percent reduction, and then in the Unlucky Trucking, I think
2  they concluded, the Court concluded that 33 hours was a bit
3  much.  And in one of the cases, extraordinary, 437 hours on a
4  single rule 37 motion, that was ridiculous, and I think we
5  cited something on Page 7 to that proposition.
6          In the Leviathan case, which we stated on 8, I think
7  36 hours was held to be unreasonable.  My simple point, your
8  Honor, you know this, you've been around the track, you have
9  authority to knock the fee application down for various good
10 reasons.
11         The other departure for one of the plaintiffs, I
12 think, is I don't see how a 50 percent enhancement is available
13 to them --
14         THE COURT:  Well, you missed that part, where I
15 assured Mr. Kabat that there's not going to be a 50 percent
16 enhancement here.
17         MR. MC MAHON:  Okay, your Honor.  Well, as I get
18 older, I seem to miss more points.  So I will conclude with
19 that, and I wanted to thank you for making it available by
20 telephone conference because I couldn't get up to New York, as
21 much as I love to appear in front of you and say hello.
22         But, anyway, I think that's it, and I think, as you
23 pointed out, your Honor, we briefed this case thoroughly.  I
24 don't think there's any issue we really didn't brief for you.
25 You may disagree with our interpretation of some Southern

E4OP911M

1   District New York case law, but anyway, that concludes my
2   presentation, your Honor.  And nice chatting with you again.
3           THE COURT:  Let me just also note that some of the
4   materials I have I looked at online.  I printed out some of the
5   materials, and although I'm confident that everybody probably
6   sent me hard copy, today, I didn't see hard copies of some of
7   the documents.  And so you may receive a call from my chambers
8   asking you to send duplicate courtesy copies of one or more of
9   the submissions.
10          MR. HAEFELE:  Okay.
11          THE COURT:  Anything else we should take up today?
12          MR. KABAT:  Your Honor?
13          MR. MC MAHON:  Your Honor, just a suggestion.  I was
14   on pins and needles since 11:00 -- not pins and needles, but I
15   thought since Judge Daniels had entered his orders, we'd just
16   start with you.  I realize that my colleagues don't have their
17   cell phones; so there's no way to say, hey, Martin, we're going
18   to get together at 2:00.  It's just a housekeeping matter.  I
19   think Mr. Manning and I just decided, well, we'll wait and
20   eventually somebody will contact us.
21          MR. HAEFELE:  Your Honor, I'm not shocked that the
22   defendants think that the submission was excessive, since it's
23   their clients who presumably have to pay it.  So it doesn't
24   surprise me that they would think it was excessive.
25          THE COURT:  And I've actually never had somebody whose

E4OP911M

```
 1   response was, yup, that seems reasonable.  Who do I make the
 2   check payable to?
 3             MR. HAEFELE:  Right.  But, you know, Mr. Kabat
 4   indicates that we threw out these numbers in sort of a
 5   negotiation phase.  Of course, I would respond and say they
 6   throughout their laundry list of objections in an effort to
 7   negotiate it down to zero.  But when push comes to shove, this
 8   is a sanctions motion, your Honor.
 9             This was a result of a sanctions motion, and they come
10   and they want it back to zero, which would make the sanction
11   that your Honor imposed a paper tiger.  The defendants have
12   done something wrong.  Mr. McMahon thinks that this is not
13   about deterrence, but quite frankly, that is much of what Rule
14   37 is about.  It's preventing the defendants from doing
15   obstreperous -- or preventing the parties from doing
16   obstreperous behavior in the course of discovery and imposing
17   sanctions to deter those defendants and other defendants from
18   doing it again.
19             THE COURT:  But I do think, even if that's correct --
20   and I'm not quarreling with you -- that, ultimately, I have to
21   decide what is reasonable in the circumstances.
22             MR. HAEFELE:  I don't disagree with that, your Honor.
23   I would agree with that, but in terms of -- and I understand
24   the way we presented it was giving your Honor the discretion
25   whether or not to impose a lodestar, and I understand your
```

E4OP911M

1    Honor's decision not to impose a lodestar, which does
2    significantly deflate the numbers that Mr. Kabat kept putting
3    out about over a million dollars.
4            And to put it in perspective, your Honor, the numbers
5    that we're looking at here, are $263,592 for Mr. Jelaidin and
6    $387,474 for Al Haramain, which are significantly lower.  Then,
7    on top of that, your Honor, is the $65,000 and some change for
8    the various briefings that went into this.
9            And, your Honor, for those, what we would propose is
10   that, to the extent you grant those, and those are hard costs,
11   I think, for the time that went into this, those should be much
12   less debatable.  But at any rate, that they be imposed joint
13   and severally.  To the extent -- What we are concerned about is
14   that there may be one defendant that may default and not pay.
15           To the extent that these briefs were done jointly for
16   both, I would have done essentially the same brief for one with
17   maybe a section of it cut out, maybe Mr. Jelaidin's section
18   wouldn't be appearing in the brief, but essentially most of the
19   law applied to both defendants.  And one defendant shouldn't
20   get the benefit of the other's default.
21           THE COURT:  That is something I will look at.
22           MR. HAEFELE:  All right.  But in terms of the
23   reduction that they've requested for the, quote, lack of
24   success.  Our goal, your Honor, the plaintiffs' goal was to
25   obtain sanctions against the defendants to deter the defendants

E4OP911M

1   from the kind of behavior.  And, quite frankly, you know, we
2   believe that we will have done that depending much on how harsh
3   the fee petition sanctions result and what the result of those
4   are.  So in a sense, whether or not we've achieved our goal
5   really depends on the message that your Honor sends in imposing
6   it.
7            In terms of the allegations of excessive hours, I
8   think there were two allegations, the overstaffing, too many
9   lawyers at conferences and the redundant work, too much
10  conferencing among the lawyers.  You know, in this case, as we
11  indicated in the briefing, your Honor, it's a hotly contested
12  case, as your Honor knows.  We're in front of you periodically,
13  probably more than you would like us to be here.  As much as I
14  know you love us, I'm sure you'd rather not see us as much.
15           THE COURT:  I don't recall ever saying I love you.
16           MR. HAEFELE:  But you love us --
17           THE COURT:  And just for the record -- Go on.
18           MR. HAEFELE:  You love us and hate us equally.  I'm
19  sorry.  But there is this need for vigorous preparation when
20  it's as hotly contested as it is, where the lawyers do need to
21  confer.  Even though we are -- even though I'm standing here
22  today, it is not just me.  I have conferred with my colleagues
23  behind the scenes.
24           The fact that one lawyer, based primarily on a CMO
25  that was entered in this case creating the plaintiffs'
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E4OP911M

1  executive committees, we're obligated to, behind the scenes,
2  work together so that when we come to the court and come to the
3  defendants, we put forth, as much as we can, one voice.
4          Sometimes it can't be done, but quite frankly, all of
5  us have benefited by the almost universal aspect of, we have
6  come and either Mr. Carter or I or somebody else, presents one
7  argument primarily for the whole group.  But that doesn't mean
8  that Mr. Carter is the only one that's ever worked on it.
9          And, you know, based on what the folks on the other
10 side of the aisle have said, it seems very nice that some of
11 the other folks on the aisle are apparently showing up here and
12 not billing their clients.  I'm pretty sure that's not the
13 case.  The lawyers that come to the litigation, even though
14 they're not arguing, when they're sitting in the courtroom,
15 they are working.  And I think that the fact that they would
16 imply that these lawyers come here and shouldn't be billing for
17 their time is sort of an odd goose and gander sort of thing
18 from the other side because I'm pretty sure they're all billing
19 for their time.
20         MR. KABAT:  Your Honor, if I may to respond for one
21 minute?
22         THE COURT:  Well, let me just see whether Mr. Haefele
23 is done.
24         MR. HAEFELE:  Your Honor, the biggest -- I think there
25 were two, maybe three reductions, two that I can think of off

73

E4OP911M

1    the top of my head, that we've already done.  We've already
2    gone through and we've cut out -- we had, it was called to our
3    attention by the defendants, that we had billed full time for
4    travel time, regardless of whether or not work was done.
5          We went through and we did reduce the travel time
6    billing by 50 percent to the extent that work wasn't performed.
7    I think there was one or two instances where there were no
8    indication in the billing records that work -- I'm sorry, there
9    were one or two instances where there was indication that work
10   was performed.
11         I can candidly tell you that I know, myself, when I'm
12   traveling to the hearing, I'm working, because I'm preparing
13   for the hearing, particularly when I'm the one that's going to
14   be arguing.  And almost all the instances, I'm working.  But if
15   it wasn't represented in the billing record, we didn't bill for
16   it.  And maybe, this might not be the case going home, but in
17   all instances that's actually where the defense got a windfall.
18         Other circumstances, as Mr. Kabat indicated, where
19   there are some disputes, they don't represent instances where
20   the time should be cut.  They represent instances where the
21   defendants got the windfall, where one lawyer didn't pick up
22   the billing instance and put it in the submission.  I mean,
23   these submissions aren't all the billing records of the firms.
24   They are the billing records for the instances that we
25   identified as being related to this.  If the lawyer didn't do

74

E4OP911M

1    it, didn't identify it, that's an instance where they got a
2    windfall where the lawyer didn't ask them to pay.
3            THE COURT:  I have never pad a circumstance where the
4    records are pristine.  You have five people at a conference,
5    there were different time indicators, frequently, for each of
6    them, which can be explained by people being present for
7    different portions of the conference or people not being
8    completely accurate in their billing one way or another.
9            MR. HAEFELE:  Instances where real life gets in the
10   way?
11           THE COURT:  Exactly.  So I'm mindful of all of that,
12   and all of those are factors that I will consider in deciding.
13           MR. HAEFELE:  And I just want to make sure that your
14   Honor was aware that I think there was an allegation that we
15   had charged time for -- or I'm sorry, charged expenses for
16   meals.  I don't know -- honestly, I never really figured out
17   whether that was allowed or not, but we made a conscious
18   decision to strike all the meals from that.  So the expenses
19   don't reflect meals.
20           And other instances -- there were other potentials for
21   adding billing time.  There were a number of staff members
22   that, you know, I know in a number of litigations we worked on,
23   where we have submitted billing, in securities litigation for
24   example, the paralegal work time and the staff time is
25   included.  Other than there's only one instance where one of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M

```
 1    the staff members was included, but by and large, I know I had
 2    at least four other folks that time could have gone on, but we
 3    consciously made the decision to exclude that.
 4              So there has been some, if you will, some haircutting
 5    done already, in addition to the haircutting where we went and
 6    we cut off about $20,000 when we did the re-revision.  We cut
 7    down some of it by 50 percent on the travel time and some other
 8    things.  But in terms of having multiple lawyers here, again,
 9    you know, we're representing multiple plaintiffs on a multiple
10    PEC's and having multiple lawyers here, the same way the
11    defendants have -- Randy has two lawyers here today.  It's not
12    unheard of and it's not a particularly deciding issue.
13              THE COURT:  Thank you.
14              MR. KABAT:  I'll be very brief.  Mr. Haefele, for the
15    first time, did suggest that there might be joint and several
16    liability, which I think he means that somehow Al Haramain
17    might be liable for Mr. Jelaidin.  Is that what you meant?
18              MR. HAEFELE:  I'm not sure I understood the question.
19              MR. KABAT:  You made the issue of joint and several
20    liability.
21              MR. HAEFELE:  Oh, I was purely speaking responsibility
22    for payment of that portion, not joint and several liability
23    for the litigation.  I think he's referencing --
24              THE COURT:  Well, let's assume that -- and I have not
25    looked through the billings.  I have no preconceived notion,
```

E4OP911M

```
 1   but let's -- I'll take a very low number.  Let's assume that I
 2   conclude that one defendant should pay 50,000 and the other
 3   should pay 40,000.  You're saying that if one of them defaults,
 4   the other should pay 90?
 5                 MR. HAEFELE:  No.
 6                 THE COURT:  That was, I think, what Mr. Kabat's
 7   understanding --
 8                 MR. HAEFELE:  Maybe I was unclear and, hopefully, the
 9   transcript bears out what I said, but let me reiterate what I
10   meant.  There's really, as I see it, three portions of the
11   award, if you will.  There's one portion of the award that is
12   for Al Haramain for the time and expense of the Al Haramain
13   sanction proceedings.  There's the time and expense for the
14   Wael Jelaidin sanctions proceedings, and then there is the time
15   to prepare the briefs related to what we're here for today.
16   And that was done -- I mean, it was related equally to both of
17   them, for the most part.
18                 THE COURT:  So you're saying for that last piece of
19   it, you're seeking joint and several --
20                 MR. HAEFELE:  Responsibility, if you will.
21                 THE COURT:  It's really you're just saying -- Well,
22   yes.  What you're seeking is joint and several liability such
23   as if Al Haramain doesn't pay, Jelaidin would or vice versa.
24                 MR. HAEFELE:  That's correct, your Honor.
25                 THE COURT:  As to that piece?
```

E4OP911M

1                   MR. HAEFELE:  As to that piece alone, yes.
2                   MR. KABAT:  I appreciate that clarification.  Since
3      according to their spreadsheet, the time for the fee petition
4      is only five percent, roughly, of the total fee; so we're
5      talking about a microscopic amount.
6                   Now, Mr. Haefele claimed that between the original fee
7      petition and the reply brief, they made some reduction.  Your
8      Honor, that was a microscopic reduction.  It was under five
9      percent, which in the context of a million dollar fee petition,
10     isn't much, unfortunately.
11                  Mr. Haefele mentioned the issue of conferencing and
12     the different time involved.  What I don't understand is how
13     one firm can claim several hours for a plaintiffs' executive
14     committee conference that no other firm even recorded.  So that
15     clearly calls into question the nature of what was billed, how
16     it was billed, and which is why we're looking forward to seeing
17     the contemporaneous time records from all four firms.
18                  THE COURT:  Okay.  I've given you those.
19                  MR. KABAT:  That's why we're looking forward to seeing
20     them.
21                  THE COURT:  Is there anything new you wish to add?
22                  MR. KABAT:  Thank you.
23                  THE COURT:  Okay.
24                  MR. KABAT:  One issue, your Honor.  Judge Daniels set
25     a status conference on July 15 at 11:00; so we would suggest

78

E4OP911M
```
 1   that the next discovery status conference be on the same day
 2   following the conference with Judge Daniels, however long that
 3   takes, if your Honor is free on that day, July 15th at
 4   11:00 a.m.
 5            THE COURT:  I'm in California that day; so that
 6   doesn't work for me.
 7            MR. CARTER:  Your Honor, I was just going to mention
 8   that we may have a need or reason for a conference before that.
 9   I don't know specifically right now.  My suggestion would be
10   that if that need arises, we'll just write to the defendants
11   and try to reach an agreement.
12            THE COURT:  Okay.  But it probably would be useful
13   to -- I know the summer it's not an easy time.  I'm going to,
14   just so that we have some time reserved, set July 21, which is
15   a Monday, at 2:00 p.m.  I'll be glad to cancel that if there
16   are no issues.
17            MR. HAEFELE:  What time, your Honor?
18            THE COURT:  2:00.  That way, people don't have to
19   travel on a Sunday if they're coming.  And I don't know whether
20   everybody had their calendars, I suspect not.
21            MS. BERGOFFEN:  Actually, I have a conflict that day,
22   your Honor, but if it's possible, to move it.  If not, I could
23   see if somebody else can cover it.
24            MS. HENRY:  Likewise, your Honor.  There are two
25   different attorneys that have conflicts in our office on that
```

79

E4OP911M
```
 1   day.  If it could be moved, that would be great.
 2               THE COURT:  Let's see.  I have a trial starting the
 3   22nd.  July 10th at 2:00 p.m.  That's a Thursday.
 4               MR. KABAT:  At what time?
 5               THE COURT:  2:00 p.m.  And what I may do is confer
 6   with Judge Daniels and see whether he has availability that
 7   morning, so that it's all on the same day, but I just can't
 8   rearrange my schedule to be available on the 15th.
 9               MR. MOHAMMEDI:  Your Honor, I don't have my calendar
10   here; so I won't be able to confirm if I have conflict or not.
11               THE COURT:  Okay.  We're probably not going to have
12   complete unanimity, in any event.  Okay.  Thank you all.
13               MR. HAEFELE:  Your Honor, one last thing.
14               THE COURT:  Yes.
15               MR. HAEFELE:  It's just short.  Hopefully this might
16   help.  I'm not sure.  But a variety of numbers were bandied
17   about.  I would like to give you the number that the plaintiffs
18   are looking for, without -- I understood you said no
19   enhancement, if I can just give you those numbers and you,
20   obviously, can do as your Honor --
21               THE COURT:  Sure.  Why don't you do that -- in fact,
22   rather than spreading it on the record, when you make the
23   other -- You're not making a submission to me, but why don't
24   you send me a letter that has the numbers.
25               MR. HAEFELE:   Okay.  All right.
```

80

E4OP911M
```
 1                THE COURT:  Okay?  Thank you.
 2                MR. HAEFELE:  Thank you, your Honor.
 3                (Adjourned)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```