```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In re:  TERRORIST ATTACKS ON           03 MDL 1570 (GBD)
             SEPTEMBER 11, 2001
 4                                          Conference
     ------------------------------x
 5
                                            New York, N.Y.
 6                                          April 12, 2018
                                            4:00 p.m.
 7

 8   Before:

 9           HON. SARAH NETBURN

10                                          Magistrate Judge

11
             APPEARANCES
12

13   KREINDLER & KREINDLER
             Attorneys for Plaintiffs
14   BY:  JAMES P. KREINDLER
             STEVEN R. POUNIAN
15           ANDREW MALONEY

16   COZEN O'CONNOR
             Attorneys for Plaintiffs
17   BY:  STEPHEN COZEN
             SEAN P. CARTER
18
     MOTLEY RICE LLC
19           Attorneys for Plaintiffs
     BY:  ROBERT T. HAEFELE
20
     ANDERSON KILL P.C.
21           Attorneys for Plaintiffs
     BY:  JERRY S. GOLDMAN
22
     KELLOGG HANSEN TOOD FIGEL & FREDERICK PLLC
23           Attorneys for Saudi Arabia
     BY:  MICHAEL K. KELLOGG
24           MARK C. HANSEN
             GREGORY G. RAPAWY
25           ANDREW C. SHEN
```

```
 1              (Case called)

 2              THE COURT:  Welcome.

 3              One housekeeping issue.  I have been asked to request

 4    that counsel state your name before you begin to speak.  That

 5    will assist the court reporter so that he can make sure that he

 6    is keeping everybody straight.

 7              The primary purpose of today's conference is to

 8    discuss a discovery schedule for the jurisdictional discovery

 9    that Judge Daniels authorized in his March 28th memorandum

10    decision and order.  I want to talk with the parties about the

11    types of discovery that is contemplated, the participants from

12    whom discover is going to be sought, and how long the parties

13    expect this discovery process to take.

14              In addition, I have applications, primarily from the

15    plaintiffs' executive committee, asking for a modification to

16    the process for adding new cases to this MDL, which I

17    understand is an application unopposed by the defendants.  We

18    will address that secondarily.

19              Let's begin to talk about the discovery here.  Can I

20    ask one question, which may betray some ignorance here.  What

21    is the status of Mr. Thumairy and Mr. al Bayoumi.  Where are

22    they?  Are they alive?  Does anyone have contact with them?

23              MR. KELLOGG:  They are both alive.  They are in Saudi

24    Arabia.  My understanding is that Mr. al Thumiary continues to

25    work for the Ministry of Islamic Affairs, but Mr. Bayoumi is
```

1    retired.

2            THE COURT:  I assume that they are aware of Judge

3    Daniels' decision?

4            MR. KELLOGG:  I'm not sure if they are or not, your

5    Honor.

6            THE COURT:  Then you can't answer my second question,

7    which is whether or not they intend to cooperate with

8    discovery.

9            MR. KELLOGG:  Certainly Mr. al Thumairy continues to

10   be a government employee and will make every effort to ensure

11   that both he and their former employee Mr. al Bayoumi

12   cooperate.

13           THE COURT:  Wonderful.  Thank you.  Why don't I begin

14   with the plaintiffs here.  Mr. Carter, are you going to take

15   the lead on this, since you're sitting in the hot seat?

16           MR. CARTER:  Your Honor, I'm going to take the lead,

17   Mr. Pounian may fill in any gaps.  At the outset we would like

18   to make a relatively basic observation that we view the

19   discovery process as a truth-seeking exercise.  Our sole

20   objective-agenda-priority here is to carry out that truth-

21   seeking exercise with regard to the matters for which discovery

22   has been authorized in the most efficient, fair, and practical

23   way possible.  That is our only objective.

24           THE COURT:  May I interrupt you for one second.  Can

25   you move the microphone closer to you.

1          MR. CARTER:  Sure.

2          THE COURT:  Thank you.  I did hear what you said

3     though.

4          MR. CARTER:  As plaintiffs, we have an interest in

5     moving this process forward quickly and as quickly as is

6     reasonable while still honoring the ultimate objective of

7     getting to the facts.  We have confidence in our case.  We

8     think that once all the relevant information comes out and the

9     evidence is on the table, we are going to be authorized to

10    proceed to a full merits proceeding, and we obviously want to

11    get to that.  We understand that the defense may not agree with

12    our perspective on this issue.  But our goal here is to do this

13    as quickly as possible.

14         Your Honor hit at the key issues: what are we

15    expecting to do; how are we expecting to do it; and given what

16    we contemplate doing, where we are seeking discovery, what is a

17    reasonable schedule to do that.

18         The first thing we want to observe is that although we

19    had been proceeding on two tracks to some degree with the

20    Ashton plaintiffs on a separate complaint and separate briefing

21    from the consolidated amended complaint plaintiffs, our intent

22    is to proceed with discovery on a coordinated, consolidated

23    basis.

24         THE COURT:  Good.

25         MR. CARTER:  To that end we have had a number of

1    conferences together to bring everybody under the tent and

2    address how to do this.  A working group of the committee had a

3    long meeting yesterday, we have another one scheduled for next

4    week.  That is all with the aim of getting on the same page and

5    getting us focused and precise as we can with our areas of

6    discovery.

7              In terms of what we intend to do, there is nothing

8    exotic about the methodologies of discovery we intend to use

9    here to try and get to the truth.  We want to serve document

10   requests.  Our sense is that we will be through the process of

11   meeting and getting everyone on a same page to serve those

12   within two weeks from today.

13             THE COURT:  Upon whom do you intend to serve those?

14             MR. CARTER:  The document request will be directed to

15   the kingdom.  We think we would be in a position to serve these

16   within two weeks.  We also believe some initial interrogatories

17   are going to be helpful in ferreting out facts relevant to

18   jurisdictional inquiry contemplated in the Court's decision.

19             We are mindful that this is not a circumstance in

20   which we have rule 26 initial disclosures, so we want to ask

21   some questions to enable us to identify witnesses with relevant

22   knowledge through some identification interrogatories.  We do

23   think some additional interrogatories about chains of command,

24   the nature of the roles that were being carried out by certain

25   individuals at the heart of the court's decision will move the

1    ball substantially forward.  We expect to serve those at

2    essentially the same time.

3           THE COURT:  Within two weeks?

4           MR. CARTER:  We would be in a position within two

5    weeks.  That triggers some process on the other side that I

6    think you will hear about from the kingdom.  We have had two

7    meet-and-confers with the kingdom over the last several days.

8    They have indicated that they would be in a position to respond

9    to document requests and present their responses and

10   objections, not the documents, on an expedited basis, within

11   ten days.

12          Once we receive the responses and objections, I think

13   we will have a better sense of two things: one, the extent of

14   the objections they are raising to the scope of the discovery

15   that we are pursuing through our document requests and whether

16   or not they believe that we have gone beyond the scope of

17   discovery authorized by the court's order; second, the nature

18   of any other objections or privileges that the kingdom might be

19   asserting and interposing to avoid producing documents that

20   might be responsive.

21          With regard to the scope issue, the kingdom has said

22   it has an incentive to get that resolved early so it can

23   conduct searches to retrieve the documents.  We have no problem

24   prioritizing that once we get the responses.  They are talking

25   ten days after we serve the document requests.  If we could do

1    that motion practice within the next 30 days, that's fine by

2    us.  With regard to the interrogatories, those answers can just

3    be provided in accordance with the rules.

4           There is third-party discovery contemplated and in

5    fact already ongoing as well, your Honor.  Let me give you a

6    couple of examples.  Judge Daniels' decision cited a number of

7    facts that we had offered from relevant portions of FBI reports

8    and FBI investigations.  Most notable just by way of example

9    was the content of the FBI report saying that an individual

10   whose name was relationship redacted from the report was tasked

11   by al Thumairy with assisting the hijackers.  We have

12   subpoenaed the FBI seeking further information relating to that

13   investigation, the investigation in which Bayoumi and Thumairy

14   are subjects.  That is material directly cited in the Court's

15   opinion.

16          Another example.  Thumairy said during the course of

17   interviews of the 9/11 commission that his role for the

18   government included working as an imam in carrying out

19   functions at the King Fahad Mosque.  So the King Fahad Mosque

20   is an entity, a third party, in direct possession in our view

21   of documents relating to Thumairy's role, function, and scope

22   of agency with the government of the Saudi Arabia.

23          There are also some subagents identified in our

24   pleadings, people who were undertaking activities at the behest

25   of Thumairy and Bayoumi.  Those are third parties from whom we

 1    would be seeking information about the instructions they

 2    received, from whom they received them, and the activities they

 3    carried out.

 4              THE COURT:  Those are also agents of the Saudi

 5    kingdom?

 6              MR. CARTER:  The Court's order contemplated under-

 7    taking discovery about the activities of the agents and their

 8    superiors as well as the subagents that they enlisted to carry

 9    out support for the hijackers.  When I was referring to those

10    individuals, those are the subagents who actually dealt

11    directly with the hijackers in most cases.

12              We have some third-party discovery, mostly via

13    subpoenas, that will go out to these third parties to gather

14    information.  Our view is that the Second Circuit FSIA cases

15    actually encouraged the gathering of information from third

16    parties because it is not an encroachment on the immunity of a

17    foreign sovereign.  So it is a traditional process, one we

18    think is entirely appropriate, and we are prepared to move

19    forward with again on a relatively quick basis.

20              Once we get through all that, we are going to get to a

21    point where we expect there is going to be some motion practice

22    with regard to the document requests and the other discovery.

23    Again, we indicated that once we get the objections to scope,

24    we can deal with that relatively early on.

25              THE COURT:  As I'm understanding the process, it

1     sounds like there are two different buckets of discovery.  With

2     respect to the discovery as against Saudi Arabia, your

3     intention is to propound framing document requests to see what

4     their response is and then propound a broader set of document

5     demands once you and counsel for Saudi Arabia have either

6     reached agreement or failed to reach agreement on the scope of

7     discovery?  Is that what you are contemplating?

8              MR. CARTER:  No, your Honor.  We are planning to serve

9     our actual document requests in two weeks.  We expect from our

10    conversations that the kingdom is going to take a view that

11    some of those requests go beyond the scope of the discovery

12    authorized by the Court and that they should not be compelled

13    to search for information responsive to those.

14              What we are envisioning is when we got those

15    responses, say, around May 6th or so, there would be a 30-day

16    period for us to try and brief the scope issues separately.

17    There may be objections based on privilege or other grounds, we

18    don't know yet.  Those in our view could be a bit more nuanced

19    legally, maybe even somewhat esoteric.  We believe those can be

20    addressed in a second phase separate briefing.

21              THE COURT:  Got it.  Let me ask you a question with

22    respect to the other what I call bucket of discovery, which is

23    the third-party discovery.  You identified the FBI and the King

24    Fahad Mosque.  With respect to the FBI, I have to believe that

25    your committee is in contact with relevant people there.  Do

1    you have a sense of whether or not that is going to be objected

2    to?  Have you spoken with the government in the sense of

3    whether they are going to be cooperative with any subpoena that

4    you serve upon them?

5            MR. CARTER:  Your Honor we don't know, in part because

6    it took several days to get the subpoena served.  It is a bit

7    of an unusual process.  The process server has to wait in the

8    lobby for someone from the general counsel's office to come

9    down and take it.  They frequently tell them there is no one

10   available, go home and come back tomorrow.

11           It was served, if I recall correctly, two days ago,

12   and we haven't heard from them.  Years ago there was some

13   contacts in the FBI.  I don't know that we have any designated

14   liaison person within the FBI at this moment to deal with us,

15   but it is something that we are hoping to get.

16           THE COURT:  With respect to the mosque, the documents

17   that you are seeking are going back several decades.  Do you

18   have a sense of whether or not the documents have been

19   preserved, if there are preservation orders issued in earlier

20   litigations?  Do you have any sense of what you are going to

21   get?

22           MR. CARTER:  We do not, your Honor.  I think we

23   probably likely have a subpoena that we plan to issue to the

24   state department as well.  If your Honor will recall from the

25   briefing, the state department was the component of the U.S.

1    government that made the assessment that Thumairy was connected

2    to terrorism and ultimately decided to deny him reentry to the

3    United States on that basis.  That is in the 9/11 Commission

4    report.  There are underlying state department records relating

5    to that.  We are going to ask for those.

6            We are not talking about a hundred subpoenas here.  We

7    are talking about a universe of subpoenas that go right to the

8    heart of allegations we have made in support of our claims

9    about the nature of the activities undertaken by these

10   individuals and their agency that we are trying to verify

11   through the discovery process.  That will go forward in part

12   based on how responsive the recipients of the subpoenas are,

13   just like in any other case.

14           Beyond that, we want to take some depositions,

15   including of representatives of the kingdom and former

16   representatives of the kingdom.  Your Honor raised the question

17   that we also raised.  We asked about three witnesses in

18   particular to begin the dialogue about their availability and

19   to try and start moving that process forward and get dates,

20   even if after document discovery, to have a sense of whether we

21   are going to depose these folks.

22           With Bayoumi, as Mr. Kellogg mentioned, we are told

23   that he is no longer an employee of the government and that it

24   is not possible for the kingdom at this moment to commit to

25   whether or not he would be available.  So we may have to assess

1    whether or not there are legal processes available to the

2    kingdom to make witnesses in this jurisdiction with knowledge

3    relative to our proceeding here available.  That is something

4    we want to pursue because he is a critical witness.

5            The same with Khalid al Swailem, who is the

6    representative of the Ministry of Islamic Affairs set above

7    Thumairy at the embassy in Washington.  We asked about him.  So

8    far we have been told that the kingdom isn't sure where he is

9    right now, whether he is employed.  We are still waiting on

10   that.

11           We don't know yet who is going to be identified as a

12   witness with knowledge.  We can see within the Dallah Avco

13   discovery that we have received that there are a number of

14   individuals within the ministry of defense and aviation who

15   were involved in some way in coordinating, maintaining the

16   secondment that we view as a coverage op.  So we have those

17   people.  We obviously have people directly involved.

18           We may also want to have a 30(b)(6) witness.

19   Particularly to the extent that some of these people are no

20   longer available, we need to gather information from a

21   knowledgeable party in that way.

22           My co-counsel is urging me to be clear that with

23   regard to the third-party discovery, we are not talking about a

24   hundred.  It is not specifically limited to the FBI and the

25   King Fahad Mosque.  I mentioned the state department.  There

1   are probably a few others that we will determine whether we

2   should go forward with.

3           With all of that out there, we think the document

4   phase of this can be done over the course of several months,

5   that we can then take depositions, and that we should be in a

6   position to complete this in line with the schedule that is

7   already in place for jurisdictional discovery as to the other

8   defendants, which is January 31st.  That will be our proposal.

9           We view active engagement with the Court throughout

10  this process to set interim deadlines as vital to this.  We

11  would be supportive of conferences every few weeks based on

12  what your Honor thinks is most appropriate.  We had that

13  process at one point with Judge Maas, and it was pretty

14  effective when we were in a very active phase of discovery.  We

15  think it makes sense to make sure we stay on track here and

16  that we resolve any disputes as they arise.

17          Thank you.

18          THE COURT:  When we did merits discovery in the case,

19  as you will recall, we had a full-blown deposition protocol

20  which I thought was really important given the number of moving

21  parties.  For this phase of the litigation I don't think that

22  is necessary.  Do you think the parties need to come up with

23  some sort of protocol to agree upon, locations, etc?  Some of

24  the witnesses may be unable or unwilling to come to the U.S.

25  for deposition.  There may be issues about where depositions

1    take place.  Do you think at this point that is something the

2    parties can work out together or do you envision rolling out

3    protocol like we did for the merits discovery?

4            MR. CARTER:  Your Honor, one of the reasons that we

5    started trying to talk about depositions now was to determine

6    whether or not we needed to enter into a dialogue about a

7    formal process.  We are just not sure at this point.  It may be

8    a little premature to iron that out without knowing who the

9    witnesses all are because we haven't seen the documents.

10           We have been down that road.  We are happy to go there

11   if necessary.  We were focused, given your Honor's order, on

12   looking at the schedule and trying to figure out what we wanted

13   to do, and therefore adopt a schedule that reasonably would

14   accommodate that but still get us done as quickly as possible.

15   We are happy to pursue dialogues about any sort of formalities

16   within the process that are necessary procedurally,

17   logistically, or otherwise.

18           THE COURT:  Good.  It looks like you have put a lot of

19   thought towards this.  I appreciate that.

20           Mr. Kellogg.

21           MR. KELLOGG:  Thank you, your Honor.  Our objectives

22   here are twofold.  First, we want to fully and in good faith

23   comply with the discovery directed by the district court.

24   Second, at the same time we want to ensure that the process

25   proceeds expeditiously and is not an undue burden on a

1    sovereign nation.  The way to do that we think is to comply

2    strictly with the scope of discovery as articulated by Judge

3    Daniels.

4            Specifically, that is discovery to confirm specific

5    allegations made by the plaintiffs and therefore limited to

6    persons, time frames, and subject matters directed by the

7    Court.  The Court's remark on this is that it is discovery

8    critical to answering a single question: whether and to what

9    extent Thumairy, Bayoumi, and their agents took action in 2000

10   at the direction of more senior Saudi officials to provide

11   assistance to Hazmi, Mihdhar, and other 9/11 hijackers.

12           The focus as we see it is vertical.  Thumairy and

13   Bayoumi, he says it is alleged that an unknown supervisor

14   directed them to help the hijackers and they in turn recruited

15   subagents to help the hijackers.  It is a very vertical line of

16   inquiry.

17           We think going off on a side tangent with third-party

18   discovery would not be consistent with the Court's directive,

19   which basically said the reason he was ordering discovery was

20   that the information relevant to the issues was in the

21   possession of the kingdom itself.  We are prepared to provide

22   that discovery within the limits set by the Court, but we think

23   it is very important to have presumptive limits on the time

24   frame for discovery and on the scope of discovery.

25           Where we disagree with the plaintiffs is on both of

1   those issues.  We would rather have things go faster and have

2   any issues regarding appropriate scope resolved early on.

3   Specifically, they already served discovery requests.  Both the

4   Ashton plaintiffs and the executive committee served

5   illustrative discovery requests.  Some of those requests are

6   pertinent to the discovery ordered by the district court.

7         We don't really see why it should take them two weeks

8   to develop a new set of specific document production requests

9   or interrogatories.  We would propose a faster schedule that

10  would have them, say, next Friday, the 20th, provide the new

11  consolidated document request.  We would be subject to the same

12  schedule if we had any document request.  And also to limit the

13  number of interrogatories presumptively to five at the outset

14  per side.  If showing is made later on that more are required,

15  we can revisit the issue at that time.

16        Then we would like, as Mr. Carter said, to try to

17  provide any objections to the requests for production within 10

18  days of that time, that is, by April 30th, and then have an

19  expedited process for bringing any existing disputes after the

20  meet-and-confer to the attention of the Court so they can be

21  resolved up front.

22        By mid May our hope is to go to Saudi Arabia for a

23  two-week period to gather the relevant documents, make sure we

24  are complying fully with the Court's instructions, and provide

25  a preliminary set of document production to the plaintiffs as

1    well as their interrogatory answers by the end of May.

2            Part of our hurry is, frankly, driven by the Muslim

3    holidays of Ramadan, which starts in mid May.  That is still a

4    time when we can get over there and recover documents.  At the

5    end of Ramadan, they have a significant holiday after that

6    period which then blends into the summertime.  We are advised

7    by Saudi counsel that it would be much better for us to do our

8    document gathering in the latter half of May.  That's why we

9    are proposing that schedule.

10           We then proposed a tentative date for complete

11   document discovery of July 31st, at which point there would be

12   45 days for depositions.  We propose an initial limit of 5

13   depositions.  Again on good cause showing, based on documents

14   or other 30(b)(6) witnesses, they could ask for additional

15   depositions on request and leave of the Court.  The idea is to

16   target a complete end of discovery by October 15th so that

17   renewed motions to dismiss could be filed by as early as

18   December 1st and the Court could have those before it.

19           One of the reasons we do not believe in going sideways

20   in terms of discovery, such as the rather expansive subpoena

21   that they have served on the FBI, is that the Touhy process in

22   pressing such a subpoena could easily last a year or more.

23   They already have numerous documents declassified by the FBI

24   involving the interview memos and such that they have tried to

25   rely on before the Court.  We have pointed out to the Court

1   that those are not actually admissible evidence because they

2   simply report second-hand interviews.  The only relevant

3   evidence is the final reports of the 9/11 Commission and the

4   FBI and the CIA, all of which dismissed their allegations.

5        We do not see any productive basis for the plaintiffs

6   to try to gather additional nonadmissible hearsay materials,

7   such as 302 reports of agents regarding interviews.  We think

8   they have gotten declassified information as well and that the

9   Court was really contemplating this sort of vertical discovery,

10  not tangential horizontal discovery which plaintiffs will then

11  using as a reason for dragging out the discovery process.

12       They will be coming back to the Court saying the FBI

13  hasn't responded to our subpoena yet, we have to go through

14  this lengthy process, everything should be held up, we can't

15  conduct depositions.  None of that is really relevant to the

16  specific issues the Court identified.  The specific issue

17  really is Thumairy, Bayoumi, their alleged supervisor, what

18  instructions they were given, what instructions in turn did

19  they give to their alleged subagents.

20       We are happy to cooperate with providing a list of

21  names to try to determine where these people are if we know, if

22  they are still employed by Saudi Arabia, if they are still

23  alive, where they are living to the extent that we have that

24  information.  We strongly urge the Court to cabin it along the

25  lines that Judge Daniels articulated and believe that it will

1   be possible to end discovery by mid October if we do so.

2          THE COURT:  Thank you.

3          Mr. Carter, anything you want to say in response?

4          MR. CARTER:  Your Honor, I would like to offer a

5   response.  The reason I began by saying we view this as a

6   truth-seeking exercise is because we anticipated this response.

7   None of the limitations that Mr. Kellogg has proposed are

8   geared at getting to the truth and helping the Court gather the

9   evidence that would answer the questions raised in its March

10  28th decision.  Quite to the contrary, they are incompatible

11  with that view.

12         If we just look at the FBI report that we are talking

13  about -- we are trying to get a less redacted version of it --

14  it is that report that includes the name of the person who

15  tasked Bayoumi and Thumairy.  But that name has been redacted.

16  We are trying to persuade the FBI to give us that name.

17         It may very well be that that information resides

18  totally in the FBI from its investigation and would provide the

19  name from whom we want to seek a deposition of the kingdom.  So

20  the information in these third-party sources goes to the direct

21  heart of this matter.

22         There is nothing in the Court's decision that suggests

23  that it contemplated that the traditional tools of discovery

24  would not be available, and there is no burden on the kingdom

25  in the event that the FBI agrees that it should turn this stuff

1   over and gives it to us.

2         Mr. Kellogg began his speech by saying the purpose of

3   this is for us to verify the allegations that we have offered

4   as to these people.  Part of that is verifying what the FBI

5   found.  He said that none of the reports that we have offered

6   are evidence.  If that's the case, then we need to go back to

7   the FBI and get as much information as possible so we can

8   distill this information into admissible evidence.  All of this

9   is geared to making it less like that we will ultimately come

10   to a fulsome truth in the proceeding.

11        THE COURT:  I do take a little issue with the except

12   that this process is about the search for truth.  I understand

13   that that sounds nice.  But Judge Daniels did limit the scope

14   of discovery.  Your burden right now is not to find out whether

15   or not Saudi Arabia is complicit in the 9/11 attacks.  Your

16   burden right now is to find out whether or not these two

17   individuals acted as agents for the government in support of

18   the terrorist attacks.  The search for the truth is always what

19   we say litigation is about, but in this instance we are

20   focusing on a narrow area.

21        In my reading of the decision I identified nine topics

22   that Judge Daniels relied upon as allegations that the

23   plaintiffs pointed to, things like phone communications, things

24   like the scope of the job, those types of topics.  When Mr.

25   Kellogg talks about a vertical approach to discovery, the way I

1   see it, and I'm not sure if we are speaking at odds, is there

2   are a set of topics that Judge Daniels has identified.  Like I

3   said, my count was about nine areas.

4         Within each area I think the plaintiffs are entitled

5   to probe or drill down into those particular areas, but I do

6   intend to cabin you to those areas.  So, if you serve discovery

7   on the kingdom that it opposes that seeks information that does

8   not appear in Judge Daniels' decision and seems to me to be

9   part of your effort in the search for truth but not something

10  you alleged in your complaint, I am going to deny that

11  discovery.

12        All of your discovery demands -- we are talking about

13  pages 19 to 23 I think, so we are talking about four pages here

14  which I intend to keep by my side at all times during this

15  process -- all discovery that you are seeking needs to be

16  tethered to one of those allegations that Judge Daniels relied

17  upon and is allowing you to pursue.

18        So yes, we are searching for truth, but it is not

19  global truth, it is truth as to these particular allegations.

20  I want to urge you to make sure that your discovery is tailored

21  to that because you won't be successful in your discovery

22  demands if they do go off the rails.

23        That said, I am going to allow the plaintiffs to probe

24  within each of those areas of factual allegations that Judge

25  Daniels identified.  For instance, he talks about

1   communications between Thumairy and Bayoumi regarding their

2   February 1st, 2000, meeting at the Saudi consulate in Los

3   Angeles.  I am going to allow full discovery into that meeting

4   and what happened at the meeting and how it was set up and if

5   there was any information or plans that came after that.

6          That doesn't mean that I'm going to allow discovery

7   into every single point of contact with the consulate.  But

8   that was a meeting that was alleged to be something you suspect

9   as part of this conspiracy.  I want to make sure that all of

10  your discovery demands, and I'm sure you will do this, are

11  tethered to the allegations in the complaint.

12         To facilitate this process, it might be in your

13  interest for each discovery demand to identify at least in some

14  simple form, if you can orchestrate this, why this demand is

15  specific to this particular allegation.  Or maybe issue your

16  demands in groups so that you say we are searching for

17  documents that speak to this particular allegation.  That will

18  help the parties, and ultimately the Court if necessary, to

19  decide whether or not the discovery that you are seeking truly

20  is tailored toward a particular allegation that you need to

21  prove or is beyond that scope.

22         MR. CARTER:  Your Honor, a couple of things.  We are

23  very much mindful that we are conducting discovery pursuant to

24  the Court's order, and pages 19 to 23 of the decision are ones

25  that have been right here in front of me.  It is relative to

1   those allegations that are described in those pages that we are

2   pursuing some of this third-party discovery.  We are not asking

3   every question that could potentially be relevant with the FBI

4   about Saudi Arabia being bad.  That is not the intention.

5          But it is clear that these third parties do have

6   information that speaks directly to it.  I mentioned earlier

7   that it is the FBI report that talks about there being a person

8   who tasked Bayoumi and Thumairy.  That is clearly something

9   contemplated by the Court's order that be we are trying to

10  develop through the third-party process.

11         THE COURT:  I don't know that the committee has

12  standing to object to your efforts to uncover discovery from

13  the FBI.  To the extent what Mr. Kellogg fears is realized,

14  meaning that if that process bleeds beyond the limited time

15  frame that I impose, I'm not going to allow that to hold up the

16  kingdom's right to file a new motion to dismiss once a

17  reasonable period of discovery has concluded.  But I think that

18  is an issue we can deal with if it arises.

19         MR. CARTER:  We do as well, your Honor.  Also, Mr.

20  Kellogg mentioned two other things.  He suggested setting as we

21  sit here today presumptive limits on the number of depositions

22  at 5, a presumptive limit on the number of interrogatories at

23  5.  We think that those limits are unwarranted and incompatible

24  with the Court's decision.  Even if we are just looking at the

25  precise actors who were involved in the activities described in

 1    the decision, we get beyond 5.  And we haven't seen who

 2    internally in the government was within this chain of command

 3    and involved.

 4            THE COURT:  I'm not going to set a limit on

 5    depositions now.  I will set a limit, but I think it is fair to

 6    at least look at the documents and see what we are talking

 7    about.  It may be that 5 is all you need and it may be that the

 8    number is much larger.  We will deal with that when we get

 9    there.  So I'm not going to set a limit for the number of

10    depositions.

11            I also think 5 interrogatories is too few.  I was

12    curious if you have a sense of what you are talking about here.

13    Are we talking about 25 interrogatories?  Are we talking about

14    500 interrogatories?

15            MR. CARTER:  We are talking about 25, your Honor.

16            THE COURT:  I think that's reasonable.

17            Mr. Kellogg asks you to serve those discovery requests

18    by April 20th rather than April 24th, something like that.  The

19    difference seems slightly immaterial to me.  I'm fine if you

20    take the two weeks, but do you think you can accommodate

21    defendants and get that request served by next Friday, or do

22    you want your weekend?

23            MR. CARTER:  We have been shuffling a lot of

24    schedules.  We really do look at this pretty aggressively.

25            THE COURT:  I think the difference between 7 business

1    days and 10 business days is not material.  You should serve

2    your discovery demands 2 weeks from today.  Since it is not my

3    courtroom, I didn't take my calendar with me.  I think that

4    would be the 26th of April.

5         The kingdom has represented that it will make its

6    initial responses and objections within 10 business days, I'm

7    assuming.  Mr. Mendieta can we go two weeks beyond that.

8    Presumptively the kingdom's response will be May 11th.  That

9    gives you two weeks.  I assume when you said 10 days you were

10   speaking business days.  So May 11th.

11        MR. KELLOGG:  Yes.

12        THE COURT:  Why don't we schedule a follow-up call to

13   check in.  Let's say a conference.  I'll ask you whether it

14   should be a call in a minute.  Do you think if we schedule for

15   the end of May, that will be enough time for the plaintiffs

16   committee as a whole to meet and confer and then for the

17   parties to meet and confer?

18        MR. CARTER:  We do, your Honor.

19        MR. KELLOGG:  Yes, your Honor, that should be fine

20   subject to our trip to Saudi Arabia.  We'll try to work around

21   that.

22        THE COURT:  Okay.  I will schedule a conference for --

23   I may need to look at my calendar.  I'm not sure I can do it

24   from here.  Let me ask another question.  Do we think this

25   should be an in-person conference or telephone conference?

1   Maybe I'll help you come up with an answer there.

2          If we think this is going to be a substantive

3   discussion about the scope of discovery and the like, I'm

4   inclined to have it be in person.  If we think it is going to

5   be a check-in about where things stand and is only going to be

6   15 minutes or so, we can do it by phone.  Otherwise, I think in

7   person probably is better.

8          MR. CARTER:  Our view is that if we schedule an

9   in-person, we all have it on our schedule, and we can always

10  change it if it becomes unnecessary to be here in person.

11         MR. KELLOGG:  Your Honor, it will almost certainly be

12  substantive.  We are happy to appear before you.

13         THE COURT:  I am going to schedule a conference for

14  Thursday the 24th in the morning rather than schedule it for

15  the Friday before Memorial Day weekend in the afternoon, which

16  is a favor I'm offering to everybody in the room.

17         MR. CARTER:  Thank you, your Honor.

18         THE COURT:  Let's schedule that for 10 o'clock on

19  Thursday the 24th.  We will issue an order so we have that

20  there.  I will probably ask for some letters in advance just so

21  I know where things stand.  At that point we can start to talk

22  about depositions and deadlines.  I think we will have a better

23  sense then about production and hopefully even where some of

24  the third-party discovery is.

25         I appreciate the kingdom's representation that they

1    believe that discovery can and should be completed by the

2    middle of October.  I think everybody shows an interest in

3    moving this case forward.  If that is possible, we will get

4    there.  January 31st is what the plaintiffs committee proposed

5    should be sort of a back end.  Let's see whether between mid

6    October and the end of January we can complete this process.

7    I'm not going to set a deadline today until we have a better

8    sense of exactly what we are talking about.  I think that makes

9    the most sense.

10           Anything else for us to discuss at this time on

11   discovery?

12           MR. KREINDLER:  Your Honor, Jim Kreindler.  One thing

13   to add that might become relevant, because I think you like to

14   know of all 9/11-related events.  This may turn out to be

15   nothing, but it may happen.

16           This week in both the Senate and the House,

17   Republicans and Democrats, are discussing a resolution to call

18   for the release of millions of pages of 9/11 documents that the

19   government has.  I want to alert your Honor to that discussion.

20   That there might be such a resolution and there might be a

21   significant release of information, hopefully in the near

22   future.

23           We don't know what's happening.  Washington is hard to

24   predict.  But I do want to mention it because it bears upon the

25   information we might have to draw on.

1              THE COURT:  That's fine.  Thank you.

2         The second issue that we were to discuss today is the

3    plaintiffs executive committee's request that we modify the way

4    the new complaints are being filed.  I want to talk about this

5    issue.  I see Mr. Maloney will be leading the conversation.

6    Let me tell you some concerns I have here.

7         One thing I would like to hear from you is what's

8    wrong with the system we have and why you think it needs to be

9    modified.  My concern with what you have proposed, which as I

10   understand it is essentially to file something akin to a notice

11   in any existing complaint that says we are now adding the

12   following 100 people as plaintiffs to this case, my concern

13   with that is manyfold.

14        One, I am concerned that those names will never make

15   their way onto the caption of the docket; we would have

16   problems with issuing judgments should that time come, also

17   with public access to the information and not having every

18   party's name on the complaint.

19        That may also cause problems if and when anyone should

20   be removed from the caption either because they elect to

21   withdraw or -- I don't envision this happening -- to the extent

22   some cases settle out and other cases go forward.  I don't

23   think that lends itself to that particular concern of mine, but

24   it is one.

25        I am also concerned about it from the court's

1    perspective.  Typically, we manage MDLs by having individual

2    cases filed.  It is strongly held preference of our clerk of

3    court as far as management of the court's docket on the whole

4    to have these cases filed individually.

5          So I am reluctant to conclude, at least not on the

6    record before me, that there is a real problem with what we

7    have, given some of the competing interests that the public has

8    and that the court has as far as its administration.  With that

9    as my preamble, let me hear from you.

10          MR. MALONEY:  We were trying to make it easier for the

11   court and the clerk's office than more difficult.  Many years

12   ago, when we first started, Judge Casey issued a case

13   management order that allowed the plaintiffs to periodically

14   amend the complaint by adding new names to the caption.  They

15   were uploaded back then.

16          Since we have filed the case against the kingdom last

17   year, we have had additional plaintiffs retain various members

18   of the committee.  We have also had other plaintiffs retain

19   other counsel.  As your Honor knows, other complaints have been

20   filed.  They have been sort of me-too complaints, they have

21   been issued new docket numbers, and they are represented by

22   other counsel who are not on the committee but they essentially

23   are sort of riding the coattails.

24          For plaintiffs that are retaining members of the

25   committee or lawyers that already have existing complaints, we

1    thought it would be logistically easier for the clerk's office

2    for us to amend them and add them and make sure that they were

3    bound to any of the prior or future rulings for those

4    particular cases.

5            We can do it either way.  We can file a new complaint

6    that essentially mirrors what we already have with a new

7    caption, with new plaintiffs.  We thought that would actually

8    clog up the docket more than keeping it as small as we could.

9            THE COURT:  I know you can't really answer this

10    question, but I'll ask it anyway.  Do you have a sense of how

11    many more plaintiffs are likely to appear in the case?  We've

12    got another eight months under the statute of limitations.

13            MR. MALONEY:  The January 2, 2019 date, we are looking

14    at as the end.  There are arguments for extending that, but we

15    plan on making sure everybody who is retaining us has retained

16    us and has a complaint on file before then.  Right now there

17    are probably a few thousand additional plaintiffs, which is a

18    combination of additional death cases, solacium claims that are

19    separate and apart from them but tied to death cases, and then

20    personal injury claims.  So there are several thousand more.

21            THE COURT:  When you say a few thousand, you're

22    referring to claims by estates for people who died as a result

23    of the attacks, the solacium claims of those family members,

24    and individuals who did not die or were injured as a result of

25    the attacks?

1              MR. MALONEY:  Correct, your Honor.

2              THE COURT:  You think that number is several thousand?

3              MR. MALONEY:  I don't want to hazard a guess.  It is

4    certainly a few thousand collectively, not just my firm but all

5    the other firms that I am aware of.

6              THE COURT:  I can tell you that the strongly held view

7    of the administrative arm of the court is that we continue to

8    file new cases with new docket numbers and that those cases

9    proceed under the protocol that I put in place in May, so they

10   automatically get related and they get bound by every decision

11   of the MDL.  That is the system that our MDL coordinator

12   prefers, that our clerk of court prefers.

13             I don't think there is any reason to have piecemeal

14   filings, at least of the firms that are already in the case.

15   They can file one complaint in October or November that lists

16   all of their new clients rather than file seriatim.  But I

17   think we are going to want to have new docket numbers with new

18   captions and have those cases related over.

19             MR. MALONEY:  We can do that, your Honor.  It's not a

20   problem.  We thought it might be easier for the Court when we

21   talk about the Ashton case that we know that the Kreindler firm

22   is essentially the lead counsel for the Ashton cases and now

23   the Kreindler firm may have Ashton and Jones and Smith.  We are

24   trying to avoid that.  But whatever the Court decides is fine.

25             THE COURT:  I appreciate that.  I think we want

1    Ashton, Jones, and Smith as opposed to just one.

2            MR. HAEFELE:  Your Honor, that may be one thing I want

3    your Honor to consider.  There is a circumstance that came up

4    in a case of the Iran judgments where there is at least a

5    rationale to have the solacium claims put together with the

6    estates that they are part of.  That may be a reason to perhaps

7    address the solacium claimants, amending and adding them in

8    with the estates in the same case.  I'm asking that your Honor

9    consider that as one middle ground regarding at least a group

10   of the claims.

11           THE COURT:  You have instances where the estate has

12   already filed a complaint but maybe the spouse never filed her

13   own complaint?

14           MR. HAEFELE:  The spouse or child.  For example, some

15   of them were minors at the time and they may not have been

16   named, and they may be of majority age now and they may want to

17   have a claim of their own as a solacium claim as a child or a

18   spouse or a sibling or a parent.

19           THE COURT:  I agree with you as a general matter that

20   it is preferable, though maybe not critical, that solacium

21   claims are in the same case as the underlying death claim.

22           MR. HAEFELE:  I think it would help your Honor to

23   manage the judgments as well.  Least from what we saw with

24   Iran, it seems it is easier if they are all in the same

25   judgment from the same case.

1    THE COURT:  Potentially.  But I think in that instance

2  the court as a whole, not just me, would prefer the filing of

3  an amended complaint that adds the names.  That may not be

4  preferable from an administrative perspective on your end.  Let

5  me think about that particular issue and whether or not there

6  should be two different sections, one for entirely new cases

7  where nobody has filed yet and one for cases where we have part

8  of a family already proceeding and we want to add new family

9  members.

10    MR. HAEFELE:  Thank you.

11    THE COURT:  Thank you.  Anything further on that

12  particular issue?

13    MR. MALONEY:  No, your Honor.

14    THE COURT:  I will see you all on the 24th.  I will

15  issue an order with those dates.  Thank you everybody.

16    (Adjourned)

17

18

19

20

21

22

23

24

25