# Exhibit A

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to:*
  *ALL CASES*

### PLAINTIFFS' FIRST SET OF CONSOLIDATED JURISDICTIONAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE KINGDOM OF SAUDI ARABIA

THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES

Sean P. Carter
COZEN O'CONNOR
One Liberty Place
1650 Market Street
Suite 2800
Philadelphia, PA 19103
Tel. (215) 665-2105

Robert T. Haefele
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel. (843) 216-9184

James P. Kreindler
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel. (212) 687-8181

Jerry S. Goldman
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel. (212) 278-1000

April 26, 2018

### PLAINTIFFS' FIRST SET OF CONSOLIDATED JURISDICTIONAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE KINGDOM OF SAUDI ARABIA

Pursuant to the March 28, 2018 Memorandum Decision and Order of the Honorable George B. Daniels, U.S.D.J., and the April 20, 2018 Order of the Honorable Sarah Netburn, U.S.M.J., the Plaintiffs' Executive Committees on behalf of the Plaintiffs in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, 03 MDL 1570, with claims asserted against the Kingdom of Saudi Arabia ("the Kingdom" or "the Saudi government" or "Defendant"), propound and serve on Defendant the following Consolidated Requests for Production of Documents to be answered fully and under oath, pursuant to Rule 34 of the Federal Rules of Civil Procedure, within 30 days of their service.

The Plaintiffs in this multidistrict litigation seek to hold the Kingdom of Saudi Arabia and other defendants liable for providing material support to Osama bin Laden and the terrorist organization known as al Qaeda, for the physical destruction, deaths, and injuries suffered as a result of the terrorist attacks on September 11, 2001 ("the 9/11 Attacks").  In a decision of the United States District Court for the Southern District of New York on March 28, 2018 (ECF No. 3946), the Court denied the Kingdom's motion to dismiss and authorized the Plaintiffs' Executive Committees, on behalf of all the plaintiffs in the multidistrict litigation who have claims pending against the Kingdom, to serve jurisdictional discovery against the Kingdom limited.  The requests included below seek Documents relevant to the following areas of inquiry, concerning which the Court authorized jurisdictional discovery pursuant to its March 28, 2018 Memorandum Decision and Order (ECF No. 3946) ("Opinion"):

- The Complete Nature and Scope of Fahad al Thumairy's Roles, Functions, and Assignments for the Kingdom of Saudi Arabia in the United States;[1]

- The Complete Nature and Scope of Omar al Bayoumi's Roles, Functions, and Assignments for the Kingdom of Saudi Arabia in the United States;[2]

- The Identity and Involvement of "more senior Saudi officials" With Authority Over Thumairy and/or Bayoumi in the Support Network for the 9/11 Hijackers;[3]

- The Identity and Involvement of Subagents Enlisted by Thumairy, Bayoumi, and Their Superiors to Support the Hijackers;[4]

- The Acts Undertaken by Persons Associated With the Support Network to Arrange and Provide Support for the Hijackers;[5]

---

[1] *See* Opinion at 19-20, 23 (indicating that (1) Thumairy was an "accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs at the Saudi Consulate in Los Angeles, a position in which he reported to more senior officials inside the Saudi Embassy in Washington, D.C.:" (2) Thumairy was an "imam at the Saudi-funded King Fahd Mosque…where he was employed and appointed by Saudi Arabia's Head of Islamic Affairs in Washington, D.C.;" (3) Thumairy was involved in "orchestrating the U.S – based support network for two of the 9/11 hijackers;" (4) "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with … Bayoumi for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles;" (5) "Following the meeting with Thumairy … Bayoumi met with Hazmi and Mihdhar" The "nature and scope of [Thumairy's] agency is somewhat unclear").

[2] *See* Opinion at 19- 21, 23 (indicating that (1) "Bayoumi was a Saudi national living in San Diego, California, who had been employed by Saudi Arabia since at least the 1970s;" (2) "Bayoumi moved to the United States in 1994" claiming status as a student "on a scholarship provided by the Saud government," and "one year later … was granted a secondment by the Saudi government to work as an employee of the Dallah Avco Trans Arabia," "despite his failure to perform any work or enroll in classes;" (3) From 1994 through 2001, "Saudi Arabia continued paying Bayoumi approximately $3,000 per month, and a stipend of about $465, despite his failure to perform any work or enroll in classes;" (4) In April 2000, Bayoumi received a "sharp increase in the stipend he received from Saudi Arabia via Dallah Avco of about $4,000 [per month], which Plaintiffs attribute to the assistance Bayoumi was providing to the hijackers;" (5) "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with … Bayoumi for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles;" (6) "Following the meeting with Thumairy … Bayoumi met with Hazmi and Mihdhar;" (7) "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C.;" (8) "Also coincident with the hijackers' arrival in the United States, Bayoumi telephone records reveal" extensive contact with Saudi diplomatic missions in the United States." The "nature and scope of [Bayoumi's] agency is somewhat unclear").

[3] *See* Opinion at 19, 21 (indicating that Thumairy "reported to more senior Saudi officials" and orchestrated the support network for the hijackers "at the direction of an unnamed senior Saudi official;" (2) "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar…" (3) "Thumairy and his associates were charged by more senior Saudi officials to provide Hazmi and Mihdhar with such assistance."

[4] *See* Opinion at 21-23 (indicating that (1) "Thumairy designated others, including Bayoumi, to carry out his directives;" (2) Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; (3) Baoyumi "provided [assistance] to Hami and Mihdhar, including [through] the individuals he put them in touch with;" (4) a "Jordanian national named Eyad al Rababah … found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia").

[5] *See* Opinion at 18, 20-21, 23 (indicating that (1) "Thumairy designated others, including Bayoumi, to carry out his directives;" (2) "Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official, with providing substantial assistance to [the hijackers];" (3) "Bayoumi immediately assisted Hazmi and Mihdhar by finding them an apartment in San Diego, co-signing their lease as a guarantor, helping them open a bank account, and paying their rent

- The Relationships Among the Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[6]

- The Terrorist Connections of the Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[7]

- The Travel and Activities of the Hijackers in the United States and Their Contacts and Connections With Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[8]

- Government Investigations and Findings.[9]

---

on occasion;" (4) "Bayoumi also provided Hazmi and Mihdhar with his cell phone;" (5) Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; (6) at Bayoumi's instruction, Abdullah helped Hazmi and Mihdhar locate and apply to English language and flight schools and assisted them in translating between English and Arabic;" (7) Abdullah also helped Hazmi and Mihdhar obtain multiple fake driver's licenses and perform surveillance of Los Angeles International Airport, including through the use of video camera recording equipment").

[6] *See* Opinion at 19, 21-23 (indicating that "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar…;" "Thumairy and his associates were charged by more senior Saudi officials to provide Hazmi and Mihdhar with such assistance;" "Thumairy designated others, including Bayoumi, to carry out his directives;" "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with an individual named Omar al Bayoumi;" "Also coincident with the hijackers' arrival in the United States, Bayoumi's telephone records reveal" extensive contact with Saudi diplomatic missions in the United States; In April 2000, Bayoumi received a "sharp increase in the stipend he received from Saudi Arabia via Dallah Avco of about $4,000 [per month], which Plaintiffs attribute to the assistance Bayoumi was providing to the hijackers;" Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; "Abdullah … was a member of Aulaqi's mosque at the time;" Bayoumi "provided [assistance] to Hami and Mihdhar, including [through] the individuals he put them in touch with;" A "Jordanian national named Eyad al Rababah … found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia."

[7] *See* Opinion at 20-21 (indicating that Aualqi was "a covert recruiter for al Qaeda;" Dallah Avco … is a wholly owned subsidiary of the Dallah al Baraka Group, which is owned by a wealthy Saudi businessman named Saleh Abdullah Kamel … [who] has been publicly identified on the 'Golden Chain' as one of al Qaeda's principal financiers."

[8] *See* Opinion at 19, 21-22 (indicating that "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with an individual named Omar al Bayoumi;" "Also coincident with the hijackers' arrival in the United States, Baoyumi's telephone records reveal" extensive contact with Saudi diplomatic missions in the United States; Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; "Abdullah … was a member of Aulaqi's mosque at the time;" Bayoumi "provided [assistance] to Hazmi and Mihdhar, including [through] the individuals he put them in touch with;" "When Hazmi and … Hanjour arrived in Virginia in April 2001, they immediately sought out Aulaqi, who put them in contact with a Jordanian national named Eyad al Rababah … [who] found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia."

[9] *See* Opinion at 19-21 (indicating that (1) "As detailed in the 9/11 Commission Report, Hazmi and Mihdhar were 'ill-prepared for a mission in the United States;" (2) "Accordingly, the 9/11 Commission concluded, 'it is unlikely that Hazmi and Mihdhar … would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival;" (3) "Bayoumi immediately assisted Hazmi and Mihdhar by finding them an apartment in San Diego, co-signing their lease as a guarantor, helping them open a bank account, and paying their rent on occasion" (citing 9/11 Commission Report); (4) "Bayoumi also provided Hazmi and Mihdhar with his cell phone" (citing 9/11 Commission Report); (5) Abdullah "told U.S. law enforcement that Bayoumi specifically tasked him" to assist the hijackers (citing statements to U.S. investigators cited in 9/11 Commission Report).

## <u>INSTRUCTIONS</u>

1.      In responding to these requests, You shall produce all responsive Documents and other things, in Your possession, custody, or control, regardless of whether such Documents or things are possessed directly by You or by Your employees, agents, attorneys, accountants, auditors, investigators, or other representatives.  A Document shall be deemed to be within Your control if You have the practical ability to obtain the document or a copy of the document from another person having possession or custody of the Document.

2.      Documents are to be produced in full; redacted Documents will not constitute compliance with this request. If any requested Document or thing cannot be produced in full, Defendant is requested to produce it to the extent possible, indicating which Document or portion of that Document is being withheld and the reason that Document or portion of that Document is being withheld.

3.      In producing Documents, Defendant is to produce the original of each Document requested together with all non-identical copies and drafts of that Document. If the original of any Document cannot be located, an identical copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

4.      Documents shall be produced as they are kept in the usual course of business or the Documents shall be organized and labeled to correspond to the categories in this request. All Documents shall be produced in the original file folder, binder, covers, envelope, or other container in which the Documents are kept or maintained by Defendant. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

5.      Documents shall be produced in such fashion as to identify any organization, department, branch, or office in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each Document's custodian.

6.      Documents attached to each other should not be separated.

7.      If any Documents requested herein have been lost, discarded, destroyed, or are otherwise no longer in Defendant's possession, custody or control, they shall be identified as completely as possible, including without limitation the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the Document.

8.      Unless the parties agree otherwise, the form of production shall be as follows:

a.      Hardcopy Documents should be scanned as multipage PDF files.  The Documents should be logically unitized (*i.e.*, distinct Documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business.  If an original document contains color necessary to understand the meaning or content of the document, the document must be produced in a manner with sufficient color distinction and clarity to understand the meaning or content of the document.  This includes, but is not limited to, color or graphs, charts, presentations, edits, or highlighting made by hand or electronically on the original.  Multi-page Optical Character Recognition ("OCR") text for each document should also be provided. The OCR software should maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

b.      Documents kept in their usual course of business in electronic format, or ESI, are to be produced in their native format.  Any key, password, or other protection necessary to access the Documents are to be produced with the documents.

c.      All images should show any and all text and images which would be visible to the reader using the native software that created the Document. For example, images of email messages should include the BCC line. PowerPoint Documents should disclose hidden slides and all speaker notes.

9.      Each of these requests shall be continuing. If at any time after Defendant responds to this request any information becomes available that calls for any supplement to a previous response, provide such Documents within a reasonable time period from the time when it becomes available.

10.      If Defendant asserts a privilege or other authorized protection with respect to any Document requested herein, Defendant must produce all non-privileged/protected portions of the document with those portions as to which a privilege/protection is claimed redacted, and Defendant must provide a privilege log that conforms with the requirements set out in the November 19, 2012 Order Governing Identification of Privileged Documents (ECF No. 2644), including providing the following information concerning each individual Document withheld or redacted:

      a.  The type of Document or information (e.g., letter, notebook, telephone conversation, etc.);
      b.  The general subject matter of the Document;
      c.  The date of the Document;
      d.  The authors of the Document, the addressees of the Document and any other recipients, and where not apparent, the relationship of the authors, addressees, and recipients to one another;
      e.  If the Document is an electronic Document, its file size; and

      f.   Each and every basis for the privilege or protection claimed; and if a privilege or protection asserted is based upon or governed by a law, statute, regulation, or rule, the specific law, statute, regulation, or rule being invoked.

11.    For the purpose of these discovery requests, except to the extent specifically indicated in the "Definitions" section of this Set of Requests, the words used herein are considered to have, and should be understood to have, their ordinary, everyday meaning and Plaintiffs refer Defendant to any collegiate dictionary such as *Webster's New World Dictionary,* Second College Edition by Prentice Hall Press. In the event Defendant asserts that the wording which has been used is somehow vague, ambiguous, unintelligible, indecipherable, confusing or such other boiler plate objections to avoid squarely addressing the specific discovery request, Plaintiffs refer Defendant to *Webster's Dictionary* for the plain meaning of the terms defined herein.

12.    If You object to any request for production, the objection must state whether any responsive materials are being withheld on the basis of that objection; and the objection must state whether the objection is to all or part of the request; and if to only part of the request, it must state to which part of the request the objection is made and produce all Documents responsive to the rest.

13.    If You object to any request for production on the ground that it is overbroad, is unreasonably burdensome, or seeks information which is not relevant to the subject matter of this action, You should state the specific reasons for that objection, state what You contend to be the proper scope of the request for production, and respond in accordance with what You contend is the proper scope, and produce Documents within the scope You contend to be proper.

14.    Any request referring to any entity, organization, office, association, or government includes any official, employee, representative or agent of that entity, organization, office, association, or government.

15. Unless the nature or subject matter of the request indicates otherwise, or a different time period is specified, the relevant time periods for these requests are:

| | |
|---|---|
| Section I | Thumiary – January 1, 1998 – September 11, 2001 |
| Section II | Bayoumi – January 1, 1994 – September 11, 2001 |
| Section III | Sowailem – January 1, 1998 – September 11, 2001 |
| Section IV | Additional Transactions, Relationships and Events – January 1, 1998 – September 11, 2001 |

## DEFINITIONS

1. All terms used herein that are defined in Local Civil Rule 26.3 have the meaning as defined therein, unless specified otherwise in these directions. To the extent that any term is defined herein in a manner that is inconsistent with Local Civil Rule 26.3, the rule governs.

2. The terms "Document**"** or "Documents" are defined to be synonymous in meaning and equal in scope to the usage of the terms "documents or electronically stored information" and "any designated tangible things" as used in Fed. R. Civ. P. 34(a)(1)(A) and (B).  Specifically, the term "Document" as used herein shall include "electronically stored information" and "any designated tangible things."   A draft or non-identical copy is a separate document within the meaning of this term.

3. The term "electronically stored information," or "ESI," includes the original (or identical copies when originals are not available) and any non-identical copies (whether different from the originals because of notes made on such copies or otherwise) of electronic data of any kind or description, whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Such data may include, but is not limited to, all text files (including word processing documents), presentation files (such as PowerPoint), spreadsheets, electronic mail files and information concerning electronic mails (including electronic mail receipts and/or transmittals, logs of electronic mail history and usage, header information, and deleted files), internet history

of files and preferences, graphical files in any format, databases, calendar and scheduling information, task lists, telephone logs, contact managers, computer system activity logs, computer programs (whether private, commercial, or work-in-progress), programming notes or instructions, output resulting from the use of any software program including, but not limited to, database files, charts, graphs, outlines, operating systems, source codes of all types, programming languages, linkers and compilers, peripheral drivers, .PDF and .TIFF files, batch files, native files and all ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the medium or media on which they reside and regardless of whether such electronic data is in an active file, deleted file, or file fragment. ESI includes, but is not limited to, any and all items stored on any electronic media, computers, networks or "cloud" computing services and all backup files containing electronically stored data. ESI also includes the file, folder tabs, metadata, personal electronic backup media, including thumb drives, and/or containers and labels appended to or associated with any physical storage device associated with each such original and/or copy. ESI includes all text messages, instant messages, internet messages, intranet messages, electronic bulletin board messages, blog entries, website postings of any nature, and all other methods by which messages may be transmitted by or through electronic means.

4.     The term "Plaintiffs" shall refer to Plaintiffs in cases in the above-referenced MDL proceedings, *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, (including plaintiffs in cases filed and indicated as being "associated" or "related to" the MDL proceedings), who have claims asserted against the Kingdom of Saudi Arabia.

5.     The terms "Defendant," "You," "Your," "the Kingdom of Saudi Arabia," "the Kingdom," or "the Saudi government" shall refer to the government of the Kingdom of Saudi Arabia, including without limitation any ministry, council, agency, instrumentality, organ, political

subdivision, government committee, Saudi embassy or consulate, or component of the Saudi government, as well as any official or employee of the Saudi government.

6.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether oral or written.

7.      The term "person" is defined as any natural person or any business, legal, or government entity or association.

8.      The term "Subagent" includes the following persons: Oualid Benomrane, Mohdar Abdullah, Omar Abdi Mohamed, Anwar al Aulaqi, Osama Basnan, Ziyad Khreiwesh, Osama ("Sam") Mustafa, Yazid al Salmi, Omar Bakarbashat, Hassan Abukar, Caysan Bin Don aka Isamu Dyson and Lafi Harbi.  Additional identifying information concerning the listed Subagents is included in Appendix A.

9.      The term "Subagent organization" includes the following organizations: Western Somali Relief Agency (WSRA), Al Haramain Islamic Foundation (AHIF), Islamic Center of San Diego (ICSD), Al-Ribat al-Islami aka Jamiat al-Ribat al-Islamia , al Barakaat Trading Company, Dahabshil, al Ansar Mosque aka the Somali Mosque in San Diego, Somali non-profits in San Diego, as defined in the Joint Congressional Report "28 pages" (Exhibit X).  Additional identifying information concerning the listed Subagent organizations is included in Appendix A.

10.     The "King Fahad Mosque" (KFM) is also known as the Islamic Foundation of Sheikh Ibn Tayymiah and is and at all relevant times was located on Washington Boulevard in Culver City, CA.  King Fahad Mosque includes affiliated institutes, corporations and commercial enterprises.

11.     The term "Saudi Embassy" as used in these requests is the Embassy of the Kingdom of Saudi Arabia in Washington, D.C.

12.     The term "Saudi Consulate in Los Angeles" as used in these requests is the Consulate General of the Kingdom of Saudi Arabia in Los Angeles, California.

13.     The term "Ministry of Islamic Affairs" shall mean the ministry of the Saudi government also known as the "Ministry of Islamic Affairs, Dawah and Guidance" or the "Ministry of Islamic Affairs, Endowments, Dawah and Guidance," including any member, official, employee, representative or office of the Ministry of Islamic Affairs, as well as any Islamic Affairs or Da'awah office of any Saudi diplomatic mission.

14.     The term "Saudi diplomatic mission" shall mean any embassy or consulate of the Kingdom of Saudi Arabia, including any office or organization located within any such embassy or consulate, as well as any agency engaged in diplomatic, consular, or related activities under the control and direction of the government of Saudi Arabia.

15.     The term "9/11 Hijackers" shall mean any of the 19 men who hijacked aircraft on September 11, 2001, and crashed the aircraft into the World Trade Center buildings in New York, the Pentagon in Virginia, and a field in Shanksville, Pennsylvania, including:

| | |
|---|---|
| Abdulaziz Mohamed al Omari; | Mohamed Atta; |
| Ahmed Abdullah al Nami; | Mohand al Shehri; |
| Ahmed Ibrahim al Haznawi; | Nawaf Mohamed al Hazmi; |
| Ahmed Saleh al Ghamdi; | Salem Mohamed al Hazmi; |
| Hamzeh Saleh al Ghamdi; | Satam al Suqami; |
| Hani Saleh Hanjour; | Saeed Abdullah al Ghamdi; |
| Fayez Banihammad; | Wail Mohamed al Shehri; |
| Khalid Mohamed al Mihdhar; | Walid Mohamed al Shehri; and |
| Majed al Moqed; | Ziad Jarrah. |
| Marwan al-Shehhi; | |

16.     The term "payment" shall mean the act of paying or transferring any monies, salaries, fees, expenses, living allowances, reimbursements, or other transfer of value.

17.     The use of the singular form of any word includes the plural and vice versa.

18.     The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

19.     The terms "all," "any" and "each" shall be construed as encompassing any and all.

20.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## DOCUMENTS REQUESTED

### I.  Fahad al Thumairy

1.      Please provide all Documents concerning Thumairy's hiring, including without limitation any resume, applications, educational records, writings, or recommendations provided or considered in relation to his hiring, and any Documents concerning any job interview.

**ANSWER:**


2.      Please produce all Documents prepared by any person, including but not limited to any Saudi government Ministry and/or Thumairy, concerning, defining, or identifying Thumairy's duties, responsibilities, functions, and authorities as (1) an imam at the King Fahd Mosque; (2) a representative of the Ministry of Islamic Affairs at the Saudi Consulate in Los Angeles; (3) an accredited diplomat at the Saudi Consulate in Los Angeles; or (4) in any other role or capacity on behalf of the Saudi government.

**ANSWER:**


3.      Please produce all Documents comprising Thumairy's personnel file, including without limitation any performance reviews.

**ANSWER:**


4.      Please produce all Documents concerning any training or instruction provided to Thumairy in relation to any and all of his duties, responsibilities, functions, and authorities.  The relevant time period for this request is January 1, 1995 through December 31, 2003.

**ANSWER:**

5.      Please produce all Documents submitted to or received from the United States between January 1, 1995 through December 31, 2003, concerning the diplomatic status and/or credentials of Thumairy, including but not limited to any request that Thumairy be afforded diplomatic status or credentials; that Thumairy's diplomatic status or credentials be renewed or extended; or that Thumairy's diplomatic status or credentials be terminated.

**ANSWER:**

6.      Please produce all passports and visa records concerning Thumairy, including but not limited to applications for passport(s) and visa(s) valid during the applicable time period.

**ANSWER:**

7.      Please produce all Documents concerning, defining, or identifying the chain of supervision, command, or reporting applicable to any and all of Thumairy's duties, responsibilities, functions, and authorities.

**ANSWER:**

8.      Please produce all Documents identifying each person who supervised, oversaw, or provided direction to Thumairy, or to whom Thumairy reported, to any and all of Thumairy's duties, responsibilities, functions, and authorities.

**ANSWER:**

9.      Please produce all Documents concerning Thumairy's supervision of any representative, agent, or employee of the Saudi government in the United States, who was not disclosed or identified to the United States as an employee, representative, or agent of the Saudi government.

**ANSWER:**


10.     Please produce all Documents concerning Thumairy's supervision of any propagators.

**ANSWER:**


11.     Please produce all travel records for Thumairy from January 1, 1998 through December 31, 2003.

**ANSWER:**


12.     Please produce all phone records or call logs for any home, work, or cell phone used by Thumairy.

**ANSWER:**


13.     For the period from November 1999 though and including September 11, 2001, please produce any and all calendars, appointment logs, visitor logs, or other records identifying persons who met, communicated, or spoke with Thumairy.

**ANSWER:**

14. Please produce all Documents concerning any meeting, communication, contact, transaction, or relationship between Thumairy and (1) Omar al Bayoumi; (2) Khalid al Sowailem; (3) any Subagent or Subagent organization; (4) any of the 9/11 Hijackers; (5) the "individual" who was "immediately assigned" by Thumairy to "take care" of hijackers Hazmi and Mihdhar "during their time in the Los Angeles area," FBI 2012 Summary Report; (6) any person(s) who tasked al-Thumairy [and/or] al-Bayoumi with assisting the hijackers," FBI 2012 Summary Report; (7) the "individual who was known to have extremist views, and was identified as having met with Omar al Bayoumi in private on the same day as Bayoumi's alleged 'chance' first meeting with 9/11 hijackers…," FBI 2012 Report; (8) any person affiliated with al Qaeda or identified as a possible jihadist or extremist; (9) any "radical faction" or person "supportive of the events of September 11, 2001," 9/11 Commission Report at 216-7.

**ANSWER:**


15. Please produce all Documents concerning the purpose of any visit by Thumairy to the Saudi Embassy.

**ANSWER:**


16. Please produce all Documents concerning the purpose of any visit by Thumairy to Saudi Arabia.

**ANSWER:**


17. For the period from November 1999 though and including May 2000, please produce all communications or directives sent to Thumairy by any superior, supervisor, or person

17

with authority over him, including without limitation any superior, supervisor, or person with authority over him associated with the Saudi government or the King Fahd Mosque.

**ANSWER:**


18.　　Please produce all Documents concerning any reprimand, disciplinary action, complaint, investigation, inquiry or review concerning Thumairy, regardless of the date, including without limitation Documents concerning the statement in the 9/11 Commission Report that "the Saudi Arabian government and the leadership of the [King Fahd Mosque] attempted to discipline him [Thumairy] in the summer of 2002 and early 2003 for espousing extremist views."  9/11 Commission Report, p. 515 n. 13.

**ANSWER:**


19.　　Please produce all Documents concerning Thumairy's "conduct [that] was the subject of internal debate among some Saudi officials," 9/11 Commission Report, p. 217, and all Documents concerning that internal debate.

**ANSWER:**


20.　　Please produce all Documents concerning Thumairy's attempt to enter the United States in 2003, the denial of his entry by United States authorities, and the reasons and requirements provided by the U.S. for that denial, including but not limited to the determination of the State Department that Thumairy "might be connected with terrorist activity," as stated in the 9/11 Commission Report, p. 217.

**ANSWER:**

21.     Please produce all Documents concerning any apartment or residence maintained by the Saudi government or King Fahd Mosque in the Los Angeles area and used to house Saudi citizens visiting the United States.

**ANSWER:**


22.     Please produce all Documents concerning any apartment or residence maintained by the Saudi government or King Fahd Mosque in the Los Angeles area, to which Thumairy had access or where Thumairy had authority to house visitors or guests.

**ANSWER:**


23.     Please produce all Documents concerning any compensation or funding provided to Thumairy, including records of any payment, salary, pay adjustments, awards, bonuses, allowances, stipends, or reimbursements, from January 1, 1998 through and including the date of Your responses to these requests.

**ANSWER:**


24.     Please produce all Documents concerning any bank, credit, hawala money transfer, financial account or any source of funding from Saudi Arabia to which Thumairy had access, including without limitation all Documents concerning any withdrawal, payment or money transfer received, initiated or authorized by Thumairy.

**ANSWER:**

25.     Please produce all Documents concerning Thumairy's interview by the 9/11 Commission.

**ANSWER:**


26.     Please produce all Documents concerning Thumairy provided to or shared with the United States.

**ANSWER:**

### II.  Omar al Bayoumi

27.     Please produce all Documents concerning any educational or academic activities of Omar al Bayoumi in the United States, including without limitation any applications, transcripts, records concerning courses attended and completed, scholarships or stipends concerning his studies, or communications with any academic institutions.  The timeframe for this request is January 1, 1993 through December 31, 2001.

**ANSWER:**


28.     Please produce any and all employment records for Omar al Bayoumi, including without limitation any personnel or employment file, resume, application, report or summary of activities, or performance reviews.  The timeframe for this request is January 1, 1994 through September 11, 2001.

**ANSWER:**


29.     Please produce all Documents concerning any task, duty, assignment, job, act, or initiative carried out by Bayoumi at the request, direction, behest, or urging of the Saudi

government; any official, employee, or representative of the Saudi government; or any person whose activities were directly or indirectly supervised, directed, controlled, or financed by the Saudi government.

**ANSWER:**


30.     Please produce all Documents concerning Bayoumi's relocation or transfer to the United States, including without limitation any Documents concerning any deliberations concerning Bayoumi's relocation to the United States, any purpose for Bayoumi's relocation to the United States, and the selection of the San Diego area as Bayoumi's place of residence in the United States.  The timeframe for this request is January 1, 1993 through December 30, 1995.

**ANSWER:**


31.     Please produce all Documents concerning Bayoumi's secondment to Dallah Avco, including without limitation all Documents concerning the decision to second Bayoumi to Dallah Avco, each decision to extend or renew Bayoumi's secondment to Dallah Avco, the titles assigned to Bayoumi during his secondment to Dallah Avco, that rationale for all changes in Baoyumi's title during his secondment to Dallah Avco, and any work performed by Bayoumi within the context of his secondment to Dallah Avco.

**ANSWER:**


32.     Please produce all Documents concerning Bayoumi's duties, responsibilities, functions, authorities, or activities on behalf of the Saudi government in the United States.

**ANSWER:**

33.     Please produce all Documents concerning any compensation or funding provided to Bayoumi, whether directly or indirectly, including records of any payment, salary, pay adjustments, awards, bonuses, allowances, stipends, or reimbursements, from January 1, 1994 through and including the date of Your responses to these requests.

**ANSWER:**


34.     Please produce all Documents concerning any bank, credit, hawala money transfer, financial account or any source of funding from Saudi Arabia to which Bayoumi had access, including without limitation all Documents concerning any withdrawal, payment or money transfer received, initiated or authorized by Bayoumi and his "access to seemingly unlimited funding from Saudi Arabia" as set forth in the Congressional Joint Inquiry Report, p. 174.

**ANSWER:**


35.     Please produce all Documents concerning any training or instruction provided to Bayoumi in relation to any duties, responsibilities, functions, roles, tasks, assignments, or jobs he performed in the United States at the request, direction, behest, or urging of the Saudi government; any official, employee, or representative of the Saudi government; or any person whose activities were directly or indirectly supervised, directed, controlled, or financed by the Saudi government.

**ANSWER:**

36.     Please produce all Documents concerning the chain of supervision, command, or reporting applicable to any and all of Bayoumi's duties, responsibilities, functions, roles, tasks, assignments, or jobs.

**ANSWER:**

37.     Please produce all Documents concerning the identity of each person who supervised, oversaw, or provided direction to Bayoumi, or to whom Bayoumi reported in relation to any and all of Bayoumi's duties, responsibilities, functions, roles, tasks, assignments, or jobs.

**ANSWER:**


38.     Please produce all records concerning any involvement of Bayoumi in supervising, training, overseeing, directing, or working in concert with any employee, agent, representative, or official of the Saudi government, including any undisclosed employee, agent, representative, or official of the Saudi government.

**ANSWER:**


39.     Please produce all videotapes, videos, films, or photographs taken or provided by Bayoumi to the Saudi government, including without limitation any videotapes; videos; films; or photographs of Nawaf al Hazmi, Khalid al Mihdhar, Khallad bin Attash, or any 9/11 Hijacker.

**ANSWER:**


40.     Please produce all reports, surveys, memos, analyses, or communications provided to the Saudi government by Bayoumi.

**ANSWER:**


41.     Please produce all calendars, logs, or summaries concerning Bayoumi's activities.

**ANSWER:**

42.     Please produce all Documents concerning any visit by Bayoumi to the Saudi Embassy or the Saudi Consulate in Los Angeles.

**ANSWER:**


43.     Please produce all Documents concerning any meeting between Bayoumi and any Saudi official, representative, or employee in Saudi Arabia.

**ANSWER:**


44.     Please produce all videotapes, videos, films, photographs, recordings, or visitor, parking or access records, concerning any visit by Bayoumi to any Saudi government diplomatic mission or office, including but not limited to Bayoumi's February 2000 visit to the Saudi Consulate in Los Angeles.

**ANSWER:**


45.     Please produce all Documents concerning Bayoumi's February 2000 visit to the Saudi Consulate in Los Angeles.

**ANSWER:**


46.     Please produce all Documents concerning any visa issue raised, discussed, or addressed during Bayoumi's February 2000 visit to the Saudi Consulate in Los Angeles.

**ANSWER:**

47.     Please produce all religious materials provided to Bayoumi during his February 2000 visit to the Saudi Consulate in Los Angeles, or Documents concerning or identifying any religious materials provided to Bayoumi during his February 2000 visit to the Saudi Consulate in Los Angeles.

**ANSWER:**


48.     Please produce all passports and visa records concerning Bayoumi for the relevant time period, including but not limited to applications for passport(s) and visa(s) valid during the applicable time period.

**ANSWER:**


49.     Please produce all travel records for Bayoumi.

**ANSWER:**


50.     Please produce all phone records or call logs for any home, work, or cell phone used by Bayoumi.

**ANSWER:**


51.     Please provide all Documents concerning any assistance provided by Bayoumi to Saudi citizens in the United States, including Nawaf al Hazmi or Khalid al Mihdhar.

**ANSWER:**

52.     Please produce all Documents concerning any meeting, communication, contact, relationship, or transaction between Bayoumi and (1) Fahad al Thumairy; (2) Khalid al Sowailem; (3) any Subagent or Subagent organization; (4) any of the 9/11 Hijackers; (5) the "individual" who was "immediately assigned" by Thumairy to "take care" of hijackers Hazmi and Mihdhar "during their time in the Los Angeles area," FBI 2012 Summary Report; (6) any person(s) who tasked al-Thumairy [and/or] al-Bayoumi with assisting the hijackers,"  FBI 2012 Summary Report; (7) the "individual who was known to have extremist views, and was identified as having met with Omar al Bayoumi in private on the same day as Bayoumi's alleged 'chance' first meeting with 9/11 hijackers…," FBI 2012 Report; (8) the then Saudi Minister of Islamic Affairs, or any other representative, official, or employee of the Ministry of Islamic Affairs; (9) any Saudi diplomatic mission in the United States, or any employee, representative, official, or agent of any Saudi diplomatic mission in the United States; or (10) any person affiliated with al Qaeda or identified as a possible jihadist, extremist, or "deviant;"

**ANSWER:**


53.     Please produce all Documents concerning any writings of Bayoumi that could be interpreted as jihadist, or that refer to the words or phrases "jihad," "Western Cultural attack," Osama bin Laden, al Qaeda, or terrorism.

**ANSWER:**


54.     Please provide all Documents concerning any known or suspected contact or relationship between Bayoumi and any known or suspected member or associate of al Qaeda, or any known or suspected member or associate of any Foreign Terrorist Organization.

**ANSWER:**

55.     Please produce all Documents concerning any reprimand, disciplinary action, complaint, investigation, inquiry or review concerning Bayoumi, conducted at any time, and related in any way to:  the 9/11 attacks; the 9/11 Hijackers; Bayoumi's potential tasking of individuals to assist Nawaf al Hazmi and Khalid al Mihdhar; Bayoumi's relationship or dealings with Thumairy; or Bayoumi's "guidance" to Muslims in the United States.

**ANSWER:**

56.     Please produce all Documents concerning Bayoumi's interview by the 9/11 Commission.

**ANSWER:**

57.     Please produce all Documents concerning Bayoumi provided to or shared with the United States.

**ANSWER:**

### III.  Khalid al Sowailem

58.     Please provide all Documents concerning Sowailem's hiring, including without limitation any resume, applications, educational records, writings, or recommendations provided or considered in relation to his hiring, and any Documents concerning any job interview. Please

provide all Documents concerning Sowailem's appointment or assignment to the Saudi Embassy in Washington, D.C.

**ANSWER:**


      59.    Please produce all Documents prepared by any person, including but not limited to any Saudi government Ministry and/or Sowailem, concerning, defining, or identifying Sowailem's duties, responsibilities, functions, and authorities as (1) a representative of the Ministry of Islamic Affairs at the Saudi Embassy in Washington, D.C.; (2) an accredited diplomat at the Saudi Embassy in Washington, D.C.; or (3) in any other role or capacity on behalf of the Saudi government.

**ANSWER:**


      60.    Please produce all Documents from Sowailem's personnel file from the relevant time period, including without limitation any performance reviews.

**ANSWER:**

      61.    Please produce all Documents concerning any training or instruction provided to Sowailem in relation to any and all of his duties, responsibilities, functions, and authorities. The relevant time period for this request is January 1, 1995 through December 31, 2003.

**ANSWER:**


      62.    Please produce all Documents submitted to or received from the United States between January 1, 1995 through December 31, 2003, concerning the diplomatic status and/or credentials of Sowailem, including but not limited to any request that Sowailem be afforded

diplomatic status or credentials; that Somailem's diplomatic status or credentials be renewed or extended; or that Sowailem's diplomatic status or credentials be terminated.

**ANSWER:**


63.     Please produce all passports and visa records concerning Sowailem for the relevant time period, including but not limited to applications for passport(s) and visa(s) valid during the applicable time period.

**ANSWER:**


64.     Please produce all Documents concerning, defining, or identifying the chain of supervision, command, or reporting applicable to any and all of Sowailem's duties, responsibilities, functions, and authorities.

**ANSWER:**


65.     Please produce all Documents identifying each person who supervised, oversaw, or provided direction to Sowailem, or to whom Sowailem reported, in relation to any and all of Sowailem's duties, responsibilities, functions, and authorities.

**ANSWER:**


66.     Please produce all Documents concerning Sowailem's supervision of any representative, agent, or employee of the Saudi government in the United States, who was not disclosed or identified to the United States as an employee, representative, or agent of the Saudi government.

**ANSWER:**

67.    Please produce all Documents concerning Sowailem's supervision of any propagators.

**ANSWER:**

68.    Please produce all travel records for Sowailem from January 1, 1995 through December 31, 2003.

**ANSWER:**

69.    Please produce all phone records or call logs for any home, work, or cell phone used by Sowailem.

**ANSWER:**

70.    Please produce any and all calendars, appointment logs, visitor logs, or other records identifying persons who met, communicated, or spoke with Sowailem.

**ANSWER:**

71.    Please produce all Documents concerning any meeting, communication, contact, transaction, or relationship between Sowailem and (1) Fahad al Thumairy; (2) Omar al Bayoumi; (3) any Subagent or Subagent organization; (4) any of the 9/11 Hijackers; (5) the "individual" who was "immediately assigned" by Thumairy to "take care" of hijackers Hazmi and Mihdhar "during their time in the Los Angeles area," FBI 2012 Summary Report; (6) any person(s) who tasked al-

Thumairy [and/or] al-Bayoumi with assisting the hijackers," FBI 2012 Summary Report; (7) the "individual who was known to have extremist views, and was identified as having met with Omar al Bayoumi in private on the same day as Bayoumi's alleged 'chance' first meeting with 9/11 hijackers…," FBI 2012 Report; (8) any person affiliated with al Qaeda or identified as a possible jihadist or extremist; or (9) any propagators in the United States who were compensated by the Saudi government.

**ANSWER:**


72.     Please produce all Documents concerning the purpose of any visit by Sowailem to the Saudi Consulate in Los Angeles.

**ANSWER:**



73.     Please produce all Documents concerning the purpose of any visit by Sowailem to Saudi Arabia.

**ANSWER:**


74.     For the period from November 1999 though and including May 2000, please produce all communications or directives sent to Sowailem by any superior, supervisor, or person with authority over him, including without limitation any superior, supervisor, or person with authority over him associated with the Saudi government or the King Fahd Mosque.

**ANSWER:**

75.     Please produce all Documents concerning any reprimand, disciplinary action, complaint, investigation, inquiry or review concerning Sowailem, regardless of the date.

**ANSWER:**


76.     Please produce all Documents concerning any apartment or residence maintained by the Saudi government or King Fahd Mosque in the Los Angeles area, to which Sowailem had access or where Thumairy had authority to house visitors or guests.

**ANSWER:**


77.     Please produce all Documents concerning any compensation or funding provided to Sowailem, including records of pay, pay adjustments, awards, bonuses, allowances, stipends, or reimbursements, from January 1, 1998 through and including the date of Your responses to these requests.

**ANSWER:**


78.     Please produce all Documents concerning any bank, credit, hawala money transfer, financial account or any source of funding from Saudi Arabia to which Sowailem had access, including without limitation all Documents concerning any withdrawal, payment, or transfer received, initiated, or authorized by Sowailem.

**ANSWER:**


79.     Please produce all Documents concerning any investigation or inquiry concerning Sowailem by any government, including without limitation any United States or Saudi government

inquiry or investigation, conducted at any time, and related in any way to: (1) the 9/11 attacks; (2) the 9/11 Hijackers; (3) support provided to any of the 9/11 Hijackers; (4) the tasking of Omar al Bayoumi, Fahad al Thumairy or any other individuals to assist Nawaf al Hazmi and Khalid al Mihdhar; (5) Sowailem's relationship or dealings with Fahad al Thumairy, Omar al Bayoumi, or any Subagent or Subagent organization; (6) financial transfers or irregularities; or (7) any potential ties to any person affiliated with al Qaeda or identified as a possible jihadist or extremist.

**ANSWER:**


80.   Please produce all Documents concerning Sowailem provided to or shared with the United States.

**ANSWER:**


**Additional Transactions, Relationships, Events**

81.   Please produce all Documents created, authored, revised, edited, modified, or sent between January 1,  1999 through and including September 11, 2001, concerning any of the 9/11 Hijackers.

**ANSWER:**


82.   Please provide all Documents concerning any contact or communication between any employee, representative, official, or agent of the Saudi government and Osama bin Laden or any known or suspected representative of Osama bin Laden or al Qaeda.

**ANSWER:**

33

83.    Please  provide  all  Documents  concerning  the  involvement  of  any  employee, representative, official, or agent of the Saudi government in escorting and/or facilitating the entry of persons into the United States without being required to undergo the standard check and/or record requirement ordinarily enforced by U.S. immigration authorities.

**ANSWER:**

84.    Please provide all Documents concerning the review of the diplomatic status of any individuals holding Saudi diplomatic credentials in the United States between September 11, 2001 and December 31, 2004, including any Documents concerning the revocation or non-renewal of the diplomatic credentials of any such individuals, or the departure of any such individuals from the United States, including but not limited to as part of any joint effort with the United States.

**ANSWER:**

85.    Please  produce  all  Documents  concerning  any  inquiry,  investigation,  remedial action, or joint effort with the United States, between September 11, 2001 and December 31, 2005, concerning the activities of the Ministry of Islamic Affairs in the United States; any offices of the Ministry  of  Islamic  Affairs  in  the  United  States;  any  representatives,  agents,  employees,  or officials  of  the  Ministry  of  Islamic  Affairs  in  the  United  States,  including  any  undisclosed representatives, agents, employees, or officials of the Ministry of Islamic Affairs in the United States.

**ANSWER:**

34

86.     Please produce all Documents concerning any possible violations of the Foreign Agent Registration Act by any person acting as an agent of the Saudi government, as defined in the Foreign Agent Registration Act, between January 1, 1998 and December 31, 2005.

**ANSWER:**

87.     Please produce Documents identifying any Saudi official, representative, employee, or agent who served on the Board of Directors of the King Fahad Mosque.

**ANSWER:**

88.     Please produce Documents concerning lodging or lodging reservations at any location in California in January and February 2000 made or arranged by Fahad al Thumairy, Omar al Bayoumi, the Saudi Consulate and/or the King Fahad Mosque, including but not limited to: (a) rentals at the Avalon Westside Apartments in Los Angeles; (b) rentals at the Parkwood Apartments in San Diego; (c) hotels/motels in the vicinity of the Los Angeles International Airport, the King Fahad Mosque, or the Saudi Consulate in Los Angeles.

**ANSWER:**

89.     Please produce Documents concerning the July 1999 conference held by the Ministry of Islamic Affairs in Los Angeles, including but not limited to the attendance at that conference by Thumairy, Bayoumi and/or Sowailem.

**ANSWER:**

90.     Please produce Documents concerning the organizational chart for the Ministry of Islamic Affairs.

**ANSWER:**


91.     Please produce all Documents identifying any representative, employee, or agent of the Ministry of Islamic Affairs in the United States.

**ANSWER:**


92.     Please produce Documents concerning any visit(s) of the Minister of Islamic Affairs to California, including without limitation any contacts, communications, or meetings with Fahad al Thumairy, Omar al Bayoumi, or Khalid al Sowailem.

**ANSWER:**


93.     Please produce Documents concerning money transfer(s) from the Saudi government to the King Fahad Mosque, including but not limited to the origin of the funds, the purpose of the funds, and the identity of any personnel involved in the transfer(s) from the Ministry of Islamic Affairs, the Embassy of Saudi Arabia, or the Saudi Consulate in Los Angeles.

**ANSWER:**


94.     Please produce Documents concerning the secondment by the Saudi government of persons located or to be located in the United States, including any secondment with Avco Overseas or Dallah Avco, including without limitation any agreements and terms concerning any such secondment and lists of persons seconded.

**ANSWER:**


95.     Please produce Documents concerning any payments made to or received by the 9/11 Hijackers, or to the surviving family members of the 9/11 Hijackers, at any time.

**ANSWER:**


96.     Please produce Documents concerning any surveillance of the 9/11 Hijackers.

**ANSWER:**


97.     Please produce any and all sound recordings, photographs, videos of any of the hijackers in the United States during the applicable time period, including without limitation any videos taken by Bayoumi of Hazmi or Mihdhar.

**ANSWER:**


98.     Please produce the passports, passport records, visas and visa records of the 9/11 Hijackers.

**ANSWER:**


99.     Please produce Documents concerning the indicators and/or markings placed inside passports issued by the Kingdom to show that passport bearer has links to al Qaeda and/or Islamic extremism linked to al Qaeda, as found by U.S. government investigators in the passports of Bayoumi, Hazmi and Mihdhar.

**ANSWER:**

100.    Please produce Documents concerning any communications between Abu Zubaydah and any representative, official, agent, or employee of the Saudi Embassy in Washington, D.C. or any representative, official, agent, employee, or person affiliated with Aspcol Corporation.

**ANSWER:**

101.    Please produce all Documents identified in Your answers to Plaintiff's interrogatories.

**ANSWER:**

Dated:  April 26, 2018                              Respectfully,

COZEN O'CONNOR                          MOTLEY RICE LLC

By:  /s/ Sean P. Carter                    By:  /s/ Robert T. Haefele
     SEAN P. CARTER                            ROBERT T. HAEFELE
     For the Plaintiffs Exec. Committees        For the Plaintiffs Exec. Committees

KREINDLER & KREINDLER LLP               ANDERSON KILL P.C.

By:  /s/ James P. Kreindler                By:  /s/ Jerry S. Goldman
     JAMES P. KREINDLER                        JERRY S. GOLDMAN
     For the Plaintiffs Exec. Committees        For the Plaintiffs' Exec. Committees

## CERTIFICATE OF SERVICE

I, Andrew J. Maloney III, hereby certify that a true copy of the Plaintiffs' First Set of Consolidated Jurisdictional Requests for Production of Documents Directed to the Kingdom of Saudi Arabia are being served via electronic mail and U.S. first-class mail, postage prepaid, this 26th day of April 2018, upon:

      Michael K. Kellogg
      MKellogg@kellogghansen.com
      Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
      Sumner Square
      1615 M Street, N.W., Suite 400
      Washington, D.C. 20036
      (Counsel for the Kingdom of Saudi Arabia)

         - and -

      Alan R. Kabat
      Kabat@BernabeiPLLC.com
      Bernabei & Kabat, PLLC
      1775 T Street, N.W.
      Washington, D.C.   20009-7102
      (Defendants' Executive Committee's appointed representative to receive discovery
      requests and responses in MDL 1570)


                          /S/ Andrew J. Maloney
                          Andrew J. Maloney III

# APPENDIX A

## I.   SUBAGENTS

Oualid Benomrane – Oualid Benomrane is a member of the King Fahd Mosque tasked by Fahad al Thumairy to assist 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar upon their arrival in the United States in January 2000.  *See* 9/11 Commission Final Report at 515, n.14.  In an interview with the Federal Bureau of Investigation ("FBI"), Benomrane told investigators that "he was told by Sheik Fahad Althumairy to keep the presence of the two Saudis to himself," and that "the Saudi Consulate knew about the two Saudis because it was the consulate that told Sheik Fahad to take care of the Saudis."  *See* October 25, 2002 FBI Report, *Fahad Althumairy (NON-USPER), IT – OTHER (UBL/AL-QAEDA)*.

Mohdar Mohamed Abdullah – Mohdar Mohamed Abdullah is a close associate of Omar al Bayoumi and was tasked by Bayoumi "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."  *See* 9/11 Commission Final Report at 516, n.20.  According to the 9/11 Commission, Abdullah, "a key associate of Hazmi and Mihdhar," was "perfectly suited to assist the hijackers in pursuing their mission" as he "clearly was sympathetic to [their] extremist views" and shared their "hatred for the U.S. government."  *Id.* at 218, 220.  Per Bayoumi's instructions, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.  *Id.* at 220.

Omar Abdi Mohamed – Omar Abdi Mohamed is an employee of Saudi Arabia's Ministry of Islamic Affairs who fraudulently obtained a visa to enter the United States and provided funding for al Qaeda through the Western Somali Relief Agency ("WSRA") in San Diego, CA.  According to the U.S. government, Mohamed was in the United States participating in "intelligence gathering missions" as a "propagator" for the Saudi Arabia government under the direction of Fahad al Thumairy.  *See* ECF No. 3930-1 and 3930-2.

Anwar Aulaqi – Anwar Aulaqi is a senior recruiter for al Qaeda who served as the imam of the Al Rribat Al Islami Mosque in La Mesa, CA and was a religious mentor to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  According to FBI sources, "Aulaqi met consistently and privately with Alhazmi and Almidhdir for prayers."  *See also* 9/11 Commission Final Report at 517, n.33.  U.S. investigations have determined that on February 4, 2000, the same day that Hazmi and Mihdhar arrived in San Diego at Omar al Bayoumi's invitation, four telephone calls were placed from Bayoumi's cell phone to Aulaqi.  *Id.*  In January 2001, Aulaqi relocated to Virginia to become the imam at the Dar al Hijra Mosque.  Hazmi and Hani Hanjour arrived at Dar al Hijra in April 2001 and Aulaqi tasked a member of the mosque, Eyad al Rababah, to assist the future hijackers.  *Id.* at 229-30.

Osama Basnan – Osama Basnan is a close associate of Omar al Bayoumi and a Saudi government employee who was in contact with and aided 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  FBI investigations have confirmed that Basnan had extensive ties to terrorism and was an "ardent UBL [Osama bin Laden] supporter," who spoke of bin Laden "as if he were a god" and was "in contact with UBL family members."  As detailed in the declassified

"28 Pages" of the Report of the Congressional Joint Inquiry Report at 426, "Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did."

Ziyad (Iyad) Kreiwesh – Ziyad Kreiwesh is the manager of the Texaco gas station in La Mesa, CA where 9/11 hijacker Nawaf al Hazmi worked.  *See* 9/11 Commission Final Report at 518, n.42.  According to the 9/11 Commission, "as of August 2001, Iyad Kreiwesh and other employees at the Texaco station where Hazmi had worked suddenly were anticipating attention from law enforcement authorities in the near future."  *Id.* at 249-50.  Moreover, Fahad al Thumairy presided over Kreiwesh's wedding at the King Fahd Mosque around September 2000.  *Id.* at 518, n.42.  The wedding was attended by Mohdar Abdullah and Oualid Benomrane.  *Id.*

Osama ("Sam") Mustafa – Osama Mustafa is the owner of the Texaco gas station in La Mesa, CA where 9/11 hijacker Nawaf al Hazmi worked.  *See* 9/11 Commission Final Report at 518, n.42.

Yazid al Salmi – Yazid al Salmi is a close associate of Mohdar Abdullah and was 9/11 hijacker Nawaf al Hazmi's roommate.  *See* 9/11 Commission Final Report at 222, 249.  On September 5, 2000, Hazmi deposited $1,900 of traveler's checks into his bank account he received from Salmi.  *Id.* at 222.  Following the September 11, 2001 attacks, Salmi confided to Abdullah that he had previously known 9/11 hijacker Hani Hanjour.  *Id.*  Salmi is the nephew of Omar al Bayoumi's superior at the Saudi Presidency of Civil Aviation, Mohammed Ahmed al Salmi.  *Id.* at 518, n.41.

Omar Bakarbashat – Omar Bakarbashat is a close associate of Mohdar Abdullah and employee at the Texaco gas station in La Mesa, CA.  Bakarbashat met 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar at the Al Rribat Al Islami Mosque and "admitted helping Hazmi to learn English and taking over the operatives' first apartment in San Diego after they moved out.  Bakarbashat apparently had downloaded stridently anti-American Web pages to his computer's hard drive."  *See* 9/11 Commission Final Report at 221.  According to the 9/11 Commission, "early on the morning of September 10, [Mohdar] Abdullah, Osama Awadallah, Omar Bakarbashat, and others behaved suspiciously at the gas station.  According to the witness, after the group met, Awadallah said 'it is finally going to happen' as the others celebrated by giving each other high fives."  *Id.* at 250.

Hassan Abukar – Hassan Abukar is a leader of the Islamic Center of San Diego ("ICDS") mosque and Mohdar Abdullah's "spiritual advisor."  Abukar regularly visited Fahad al Thumairy at the King Fahd Mosque regarding financial matters.

Caysan bin Don (a/k/a Isamu Dyson) – Caysan bin Don is an associate of Omar al Bayoumi who traveled with him to the Saudi Consulate in Los Angeles, CA on February 1, 2000 where Bayoumi met with Fahad al Thumairy.  Following their stop at the Saudi Consulate, Bayoumi and bin Don met 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar over lunch at the Mediterranean Café.

<u>Lafi al Harbi</u> – Lafi al Harbi is a Saudi Naval officer who was posted to San Diego, CA for training with the U.S. Navy while 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar were living there.  As detailed in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 431, Harbi was in telephone contact with Hazmi and Mihdhar "on nine occasions from March 11, 2000 to March 27, 2000."

## II.    SUBAGENT ORGANIZATIONS

<u>Western Somali Relief Organization</u> – The Western Somali Relief Organization ("WSRA") is a California non-profit organization in San Diego, CA, headed by Omar Abdi Mohammed, an employee of Saudi Arabia's Ministry of Islamic Affairs, which was used to send substantial funds to the al Qaeda terrorist organization, as well as receive money from various sources affiliated with al Qaeda.

<u>Al Haramain Islamic Foundation</u> – The Al Haramain Islamic Foundation ("AHIF") is a Saudi Arabia-based ostensible charity (da'awa organization) which was designated in its entirety by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDGT") entity, pursuant to Executive Order 13224, "for having provided financial and material support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations."  As described in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 436, Omar al Bayoumi had contacts with the U.S.-based office of AHIF.

<u>Islamic Center of San Diego</u> – The Islamic Center of San Diego ("ICSD") is the mosque where 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar sought out Omar al Bayoumi on February 4, 2000.  Bayoumi was a member of the ICSD.  Hazmi used the ICSD administrator's bank account to receive a $5,000 wire transfer from Khalid Sheikh Mohammed's nephew, Ali Abdul Aziz Ali (a/k/a Ammar al Baluchi), in the United Arab Emirates.  *See* 9/11 Commission Final Report at 220.

<u>Al Rribat Al Islami Mosque</u> – The Al Rribat Al Islami (a/k/a Jamiat al Ribat al Islamia) is the mosque where Anwar Aulaqi served as imam and "developed a close relationship" with 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  *See* 9/11 Commission Final Report at 221 and 517, n.33.  Mohdar Abdullah and Omar Bakarbashat were also members of Al Rribat Al Islami. *Id.* at 221.

<u>Al Barakaat Trading Company</u> – The Al Barakaat Trading Company is a money transfer company that was at the center of a U.S. government money laundering investigation.  As described in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 435, in approximately 1998, the FBI became aware of millions of dollars in wire transfers to Al Barakaat Trading Company and other businesses affiliated with Osama bin Laden.  "The FBI now believes that the some of the funding actually originated from Saudi Arabia and that both the Ibn Tamiyah Mosque in Los Angeles and the Islamic Center of San Diego were involved in laundering the money." *Id.*

<u>Dahabshil</u> – Dahabshil is a money transfer company used by the Western Somali Relief Organization ("WSRA") and Omar Abdi Mohammed, an employee of Saudi Arabia's Ministry of Islamic Affairs, to send over $350,000 to al Qaeda.

<u>Al Ansar Mosque</u> – The Al Ansar Mosque (a/k/a the Somali Mosque in San Diego) is the mosque Fahad al Thumairy visited with Hassan Abukar, leader of the Islamic Center of San Diego ("ICDS") mosque and Mohdar Abdullah's "spiritual advisor."

<u>Somali Non-Profits in San Diego</u> – The Somali Non-Profits in San Diego are those entities implicated in the FBI's investigation of a massive money-laundering scheme in San Diego, CA that allowed elements of "the Saudi Government to provide al-Qa'ida with funding through covert or indirect means."  *See* the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 434-35.

LEGAL\35602740\1