# Exhibit B

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to*:
All Actions

### PLAINTIFFS' FIRST SET OF INTERROGATORIES
### REGARDING JURISDICTIONAL DISCOVERY
### DIRECTED TO THE KINGDOM OF SAUDI ARABIA

THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES

Sean P. Carter
COZEN O'CONNOR
One Liberty Place
1650 Market Street
Suite 2800
Philadelphia, PA 19103
Tel. (215) 665-2105

James P. Kreindler
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel. (212) 687-8181

Robert T. Haefele
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel. (843) 216-9184

Jerry S. Goldman
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel. (212) 278-1000

April 26, 2018

**PLAINTIFFS' FIRST SET OF INTERROGATORIES
REGARDING JURISDICTIONAL DISCOVERY
DIRECTED TO THE KINGDOM OF SAUDI ARABIA**

Pursuant to the March 28, 2018 Memorandum Decision and Order of the Honorable George B. Daniels, U.S.D.J., and the April 20, 2018 Order of the Honorable Sarah Netburn, U.S.M.J., the Plaintiffs' Executive Committees on behalf of the Plaintiffs in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, 03 MDL 1570, with claims asserted against the Kingdom of Saudi Arabia ("the Kingdom" or "the Saudi government" or "Defendant"), propound and serve on Defendant the following Interrogatories Regarding Jurisdictional Discovery to be answered fully and under oath, pursuant to Rule 33 of the Federal Rules of Civil Procedure, within 30 days of their service.

The Plaintiffs in this multidistrict litigation seek to hold the Kingdom of Saudi Arabia and other defendants liable for providing material support to Osama bin Laden and the terrorist organization known as al Qaeda, for the physical destruction, deaths, and injuries suffered as a result of the terrorist attacks on September 11, 2001 ("the 9/11 Attacks").  In a decision of the United States District Court for the Southern District of New York on March 28, 2018 (ECF No. 3946), the Court denied the Kingdom's motion to dismiss and authorized the Plaintiffs' Executive Committees, on behalf of all the plaintiffs in the multidistrict litigation who have claims pending against the Kingdom, to serve jurisdictional discovery against the Kingdom limited.   The interrogatories included below seek responses relevant to the following areas of inquiry, concerning which the Court authorized jurisdictional discovery pursuant to its March 28, 2018 Memorandum Decision and Order (ECF No. 3946) ("Opinion"):

2

- The Complete Nature and Scope of Fahad al Thumairy's Roles, Functions, and Assignments for the Kingdom of Saudi Arabia in the United States;[1]

- The Complete Nature and Scope of Omar al Bayoumi's Roles, Functions, and Assignments for the Kingdom of Saudi Arabia in the United States;[2]

- The Identity and Involvement of "more senior Saudi officials" With Authority Over Thumairy and/or Bayoumi in the Support Network for the 9/11 Hijackers;[3]

- The Identity and Involvement of Subagents Enlisted by Thumairy, Bayoumi, and Their Superiors to Support the Hijackers;[4]

- The Acts Undertaken by Persons Associated With the Support Network to Arrange and Provide Support for the Hijackers;[5]

---

[1] See Opinion at 19-20, 23 (indicating that (1) Thumairy was an "accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs at the Saudi Consulate in Los Angeles, a position in which he reported to more senior officials inside the Saudi Embassy in Washington, D.C.:" (2) Thumairy was an "imam at the Saudi-funded King Fahd Mosque…where he was employed and appointed by Saudi Arabia's Head of Islamic Affairs in Washington, D.C.;" (3) Thumairy was involved in "orchestrating the U.S – based support network for two of the 9/11 hijackers;" (4) "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with … Bayoumi for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles;" (5) "Following the meeting with Thumairy … Bayoumi met with Hazmi and Mihdhar" The "nature and scope of [Thumairy's] agency is somewhat unclear").

[2] See Opinion at 19- 21, 23 (indicating that (1) "Bayoumi was a Saudi national living in San Diego, California, who had been employed by Saudi Arabia since at least the 1970s;" (2) "Bayoumi moved to the United States in 1994" claiming status as a student "on a scholarship provided by the Saud government," and "one year later … was granted a secondment by the Saudi government to work as an employee of the Dallah Avco Trans Arabia," "despite his failure to perform any work or enroll in classes;" (3) From 1994 through 2001, "Saudi Arabia continued paying Bayoumi approximately $3,000 per month, and a stipend of about $465, despite his failure to perform any work or enroll in classes;" (4) In April 2000, Bayoumi received a "sharp increase in the stipend he received from Saudi Arabia via Dallah Avco of about $4,000 [per month], which Plaintiffs attribute to the assistance Bayoumi was providing to the hijackers;" (5) "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with … Bayoumi for an hour inside Thumairy's office at the Saudi Consulate in Los Angeles;" (6) "Following the meeting with Thumairy … Bayoumi met with Hazmi and Mihdhar;" (7) "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C.;" (8) "Also coincident with the hijackers' arrival in the United States, Bayoumi telephone records reveal" extensive contact with Saudi diplomatic missions in the United States." The "nature and scope of [Bayoumi's] agency is somewhat unclear").

[3] See Opinion at 19, 21 (indicating that Thumairy "reported to more senior Saudi officials" and orchestrated the support network for the hijackers "at the direction of an unnamed senior Saudi official;" (2) "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar…" (3) "Thumairy and his associates were charged by more senior Saudi officials to provide Hazmi and Mihdhar with such assistance."

[4] See Opinion at 21-23 (indicating that (1) "Thumairy designated others, including Bayoumi, to carry out his directives;" (2) Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; (3) Baoyumi "provided [assistance] to Hami and Mihdhar, including [through] the individuals he put them in touch with;" (4) a "Jordanian national named Eyad al Rababah … found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia").

[5] See Opinion at 18, 20-21, 23 (indicating that (1) "Thumairy designated others, including Bayoumi, to carry out his directives;" (2) "Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official, with providing substantial assistance to [the hijackers];" (3) "Bayoumi immediately assisted Hazmi and Mihdhar by finding them an apartment in San Diego, co-signing their lease as a guarantor, helping them open a bank account, and paying their rent

3

- The Relationships Among the Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[6]

- The Terrorist Connections of the Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[7]

- The Travel and Activities of the Hijackers in the United States and Their Contacts and Connections With Persons Involved in Orchestrating the Support Network or in Providing Support to the Hijackers;[8]

- Government Investigations and Findings.[9]

---

on occasion;" (4) "Bayoumi also provided Hazmi and Mihdhar with his cell phone;" (5) Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; (6) at Bayoumi's instruction, Abdullah helped Hazmi and Mihdhar locate and apply to English language and flight schools and assisted them in translating between English and Arabic;" (7) Abdullah also helped Hazmi and Mihdhar obtain multiple fake driver's licenses and perform surveillance of Los Angeles International Airport, including through the use of video camera recording equipment").

[6] *See* Opinion at 19, 21-23 (indicating that "Thumairy and Bayoumi were directed by someone within the Saudi Embassy in Washington, D.C. to help Hazmi and Mihdhar…;" "Thumairy and his associates were charged by more senior Saudi officials to provide Hazmi and Mihdhar with such assistance;" "Thumairy designated others, including Bayoumi, to carry out his directives;" "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with an individual named Omar al Bayoumi;" "Also coincident with the hijackers' arrival in the United States, Bayoumi's telephone records reveal" extensive contact with Saudi diplomatic missions in the United States; In April 2000, Bayoumi received a "sharp increase in the stipend he received from Saudi Arabia via Dallah Avco of about $4,000 [per month], which Plaintiffs attribute to the assistance Bayoumi was providing to the hijackers;" Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; "Abdullah … was a member of Aulaqi's mosque at the time;" Bayoumi "provided [assistance] to Hami and Mihdhar, including [through] the individuals he put them in touch with;" A "Jordanian national named Eyad al Rababah … found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia."

[7] *See* Opinion at 20-21 (indicating that Aualqi was "a covert recruiter for al Qaeda;" Dallah Avco … is a wholly owned subsidiary of the Dallah al Baraka Group, which is owned by a wealthy Saudi businessman named Saleh Abdullah Kamel … [who] has been publicly identified on the 'Golden Chain' as one of al Qaeda's principal financiers."

[8] *See* Opinion at 19, 21-22 (indicating that "[J]ust two weeks after 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles, Thumairy met with an individual named Omar al Bayoumi;" "Also coincident with the hijackers' arrival in the United States, Baoyumi's telephone records reveal" extensive contact with Saudi diplomatic missions in the United States; Bayoumi tasked others, including Anwar al Aulaqi and Mohdhar Mohamed Abdullah, to provide substantial assistance to the hijackers; "Abdullah … was a member of Aulaqi's mosque at the time;" Bayoumi "provided [assistance] to Hazmi and Mihdhar, including [through] the individuals he put them in touch with;" "When Hazmi and … Hanjour arrived in Virginia in April 2001, they immediately sought out Aulaqi, who put them in contact with a Jordanian national named Eyad al Rababah … [who] found [hijackers] Hazmi and Hanjour an apartment in Alexandria, Virginia."

[9] *See* Opinion at 19-21 (indicating that (1) "As detailed in the 9/11 Commission Report, Hazmi and Mihdhar were 'ill-prepared for a mission in the United States;" (2) "Accordingly, the 9/11 Commission concluded, 'it is unlikely that Hazmi and Mihdhar … would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival;" (3) "Bayoumi immediately assisted Hazmi and Mihdhar by finding them an apartment in San Diego, co-signing their lease as a guarantor, helping them open a bank account, and paying their rent on occasion" (citing 9/11 Commission Report); (4) "Bayoumi also provided Hazmi and Mihdhar with his cell phone" (citing 9/11 Commission Report); (5) Abdullah "told U.S. law enforcement that Bayoumi specifically tasked him" to assist the hijackers (citing statements to U.S. investigators cited in 9/11 Commission Report).

## <u>INSTRUCTIONS</u>

1.      Each Interrogatory is to be answered separately and fully in writing under oath. Each person who makes the answers must sign them, and the attorney who objects must sign any objections.

2.      You are required, in responding to these Interrogatories, to obtain and furnish all information available to you that is in your possession, custody, or control, or in the possession, custody or control of any of your representatives, officers, directors, employees, agents, servants, or attorneys.

3.      As to each individual interrogatory, you are required to state with specificity the grounds for objecting to any interrogatory.

4.      If you decline to answer any Interrogatory or any portion of any Interrogatory due to a claim of any privilege or other authorized protection, Identify each Person having knowledge of the factual basis on which the privilege or other ground is asserted, respond in full to the remainder of the interrogatory, comply with Local Civil Rule 26.2, and where any Document or information is withheld based on the assertion of the privilege or the authorized protection, comply with the requirements set out in the November 19, 2012 Order Governing Identification of Privileged Documents (ECF No. 2644), including providing a privilege log that provides the following information concerning each individual Document or information withheld:

     a. The type of Document or information (e.g., letter, notebook, telephone conversation, etc.);
     b. The general subject matter of the Document or information;
     c. The date of the Document;
     d. The authors of the Document, the addressees of the Document and any other recipients, and where not apparent, the relationship of the authors, addressees, and recipients to one another;
     e. If the Document is an electronic Document, its file size; and

f.   Each and every basis for the privilege or protection claimed; and if a privilege or protection asserted is governed by a federal or state statute, regulation, or rule, the specific federal or state statute, regulation, or rule being invoked.

5.     These Interrogatories are deemed to be continuing and you must, in a timely manner, supplement or correct any response that you learn is, in any respect, incomplete or incorrect. Should you obtain information or Documents subsequent to your response(s) that would add to or otherwise change your response(s), including the Documents produced to you, you must supplement your response in a timely manner, and produce such additional or different information or Documents to the undersigned attorneys immediately upon your discovery or receipt of such information or Documents.

6.     For the purpose of these discovery requests, except to the extent specifically indicated in the "Definitions" section of this Set of Requests, the words used herein are considered to have, and should be understood to have, their ordinary, everyday meaning and Plaintiffs refer Defendant to any collegiate dictionary such as *Webster's New World Dictionary*, Second College Edition by Prentice Hall Press. In the event Defendant asserts that the wording which has been used is somehow vague, ambiguous, unintelligible, indecipherable, confusing or such other boiler plate objections to avoid squarely addressing the specific discovery request, Plaintiffs refer Defendant to *Webster's Dictionary* for the plain meaning of the terms defined herein.

7.     If You object to any interrogatory, the objection must state whether any responsive information is being withheld on the basis of that objection; and the objection must state whether the objection is to all or part of the interrogatory; and if to only part of the interrogatory, it must state to which part of the interrogatory the objection is made and respond to the rest of the interrogatory.

8.      If You object to any interrogatory on the ground that it is overbroad, is unreasonably burdensome, or seeks information which is not relevant to the subject matter of this action, You should state the specific reasons for that objection, state what You contend to be the proper scope of the interrogatory, and respond in accordance with what You contend is the proper scope.

9.      Any interrogatory referring to any entity, organization, office, association, or government includes any official, employee, representative or agent of that entity, organization, office, association, or government.

10.      Unless otherwise specified: the applicable time period for requests regarding Omar al Bayoumi is January 1, 1994 through and including September 11, 2001, and the applicable time period for the remaining requests (unless otherwise indicated) is January 1, 1998 through and including September 11, 2001.  With regard to those requests that ask the Defendant to identify a person and then request additional information regarding that person, such additional information should be provided as of the applicable time period.  With regard to those requests that ask the Defendant to identify a Document, any responsive Document that was operative and in use during the applicable time period should be identified, even if it was prepared before the applicable time period.  If a Document is undated, the date of its preparation cannot be ascertained, and the Document is otherwise responsive to Request, the Document shall be identified.

## DEFINITIONS

1.      All terms used herein that are defined in Local Civil Rule 26.3 have the meaning as defined therein, unless specified otherwise in these directions. To the extent that any term is defined herein in a manner that is inconsistent with Local Civil Rule 26.3, the rule governs.

2.      The terms "Defendant," "You," "Your," "the Kingdom of Saudi Arabia," "the Kingdom," or "the Saudi government" refer to the government of the Kingdom of Saudi Arabia,

including without limitation any ministry, council, agency, instrumentality, organ, political subdivision, government committee, Saudi embassy or consulate, or component of the Saudi government, as well as any official, employee or agent of the Saudi government.

3.     The term "Subagent" includes the following persons: Oualid Benomrane, Mohdar Abdullah, Omar Abdi Mohamed, Anwar al Aulaqi, Osama Basnan, Ziyad Khreiwesh, Osama ("Sam") Mustafa, Yazid al Salmi, Omar Bakarbashat, Hassan Abukar, Caysan Bin Don aka Isamu Dyson and Lafi Harbi.   Additional identifying information concerning the listed Subagents is included in Appendix A.

4.     The term "King Fahad Mosque" refers to the King Fahad Mosque, also known as the Islamic Foundation of Sheikh Ibn Tayymiah, located on Washington Boulevard in Culver City, CA, and includes affiliated institutes, corporations and commercial enterprises of the King Fahad Mosque.

5.     The term "Saudi Embassy" refers to the Embassy of the Kingdom of Saudi Arabia in Washington, D.C., including any office, organization, agency or ministry located within any such Embassy under the control and direction of the Kingdom.

6.     The terms "Los Angeles Consulate" and the "Saudi Consulate in Los Angeles" refers to the Consulate General of the Kingdom of Saudi Arabia in Los Angeles, including any office, organization, agency or ministry located within any such Consulate under the control and direction of the Kingdom.

7.     The term "Saudi diplomatic mission" shall mean any embassy or consulate of the Kingdom of Saudi Arabia, including any office or organization located within any such embassy or consulate, as well as any agency engaged in diplomatic, consular, or related activities under the control and direction of the government of Saudi Arabia.

8.      The term "Dallah Avco" refers to the Dallah Avco Trans Arabia Company.

9.      The term "Ministry of Islamic Affairs" refers to the ministry of the Saudi government also known as the "Ministry of Islamic Affairs, Da'wah and Guidance" or the "Ministry of Islamic Affairs, Endowments, Da'wah and Guidance," including any member, official, employee, representative or office of the Ministry of Islamic Affairs, as well as any Islamic Affairs or Da'awah office of any Saudi diplomatic mission.

10.      The terms "Document" or "Documents" are defined to be synonymous in meaning and equal in scope to the usage of the terms "documents or electronically stored information" and "any designated tangible things" as used in Fed. R. Civ. P. 34(a)(1)(A) and (B).  Specifically, the term "Document" as used herein shall include "electronically stored information" and "any designated tangible things."   A draft or non-identical copy is a separate Document within the meaning of this term.

11.      The term "electronically stored information," or "ESI," includes the original (or identical copies when originals are not available) and any non-identical copies (whether different from the originals because of notes made on such copies or otherwise) of electronic data of any kind or description, whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Such data may include, but is not limited to, all text files (including word processing documents), presentation files (such as PowerPoint), spreadsheets, electronic mail files and information concerning electronic mails (including electronic mail receipts and/or transmittals, logs of electronic mail history and usage, header information, and deleted files), internet history of files and preferences, graphical files in any format, databases, calendar and scheduling information, task lists, telephone logs, contact managers, computer system activity logs, computer programs (whether private, commercial, or work-in-progress), programming notes or instructions,

output resulting from the use of any software program including, but not limited to, database files, charts, graphs, outlines, operating systems, source codes of all types, programming languages, linkers and compilers, peripheral drivers, .PDF and .TIFF files, batch files, native files and all ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the medium or media on which they reside and regardless of whether such electronic data is in an active file, deleted file, or file fragment. ESI includes, but is not limited to, any and all items stored on any electronic media, computers, networks or "cloud" computing services and all backup files containing electronically stored data. ESI also includes the file, folder tabs, metadata, personal electronic backup media, including thumb drives, and/or containers and labels appended to or associated with any physical storage device associated with each such original and/or copy. ESI includes all text messages, instant messages, internet messages, intranet messages, electronic bulletin board messages, blog entries, website postings of any nature, and all other methods by which messages may be transmitted by or through electronic means.

12.     The use of the singular form of any word includes the plural and vice versa.

13.     The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

14.     The terms "all," "any" and "each" shall be construed as encompassing any and all.

15.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## **INTERROGATORIES**

1.      Identify the following persons: (a) Omar al Bayoumi; (b) Fahad al Thumairy; (c) Khalid al Sowailem; (d) Musaed al Jarrah; (e) Majed Ghesheyan; (f) Mazyed I. Mazyed; (g) the head of the Ministry of Islamic Affairs in the United States. For each person, in addition to providing their present or last known address and present or last known place of employment, please state their complete employment history, including place(s) of employment and job title(s), since September 11, 2001.

**ANSWER:**

2.      List the name of each repository, archive, or file where Documents relating to Bayoumi or Thumairy have been located since September 11, 2001, state the location of each such repository, archive, or file, including but not limited to the office, Ministry, or office in possession or control of such Documents, and identify each person who is the custodian of such Documents.

**ANSWER:**

3.      Identify each person who supervised, oversaw, or provided direction to Thumairy, or to whom Thumairy reported, and state their job title(s), work address(es) and the period they supervised, oversaw, or directed Thumairy, or received any report from Thumairy.

**ANSWER:**

4.      Identify each person whom Thumairy supervised, oversaw, or provided direction to, or who reported to Thumairy, and state their job title(s), work address(es) and period they were supervised, overseen, or directed by Thumairy, or provided any report to Thumairy.

**ANSWER:**

5.      Identify each person who supervised, oversaw, or provided direction to Bayoumi, or to whom Bayoumi reported, and provide their job title(s), work address(es) and the period they supervised and/or oversaw Bayoumi.

**ANSWER:**

6.      Identify each person whom Bayoumi supervised, oversaw, or provided direction to, or who reported to Bayoumi, and provide their job title(s), work address(es) and the period they were supervised and/or overseen by Bayoumi.

**ANSWER:**

7.      Describe Bayoumi's job, responsibilities, assignments and instructions and list each task, duty, assignment, job, act, or initiative carried out by Bayoumi at the request, direction, behest, or urging of the Saudi government; any official, employee, or representative of the Saudi government; or any person whose activities were directly or indirectly supervised, directed, controlled, or financed by the Saudi government; and, identify each person who gave Bayoumi such task, duty, assignment, job, act or initiative and provide their job title and work address currently and at the time they gave Bayoumi such task, duty assignment, job, act or initiative.

**ANSWER:**

8.      Identify each person who instructed, determined, reviewed and/or approved that Bayoumi should receive increases in pay, bonus, or "other allowances" in the year 2000 and provide their job title(s) and work address(es) currently and at the time they made the

determination or approval.

**ANSWER:**


9.      Identify all personnel at the Kingdom of Saudi Arabia's Ministry of Islamic Affairs at the Saudi Embassy and/or Los Angeles Consulate and provide their job title(s) and work address(es).

**ANSWER:**


10.     Identify any Documents in the possession of the Saudi government concerning and identify each person known, purported, alleged or suspected of being (a) the person(s) who the FBI stated "tasked al-Thumairy and al Bayoumi with assisting the hijackers"; (b) the "individual" that the FBI stated was "immediately assigned" by Thumairy to "take care" of the hijackers Hazmi and Mihdhar "during their time in the Los Angeles area"; and (c) the "individual who was known to have extremist views, and was identified as having met with Omar al Bayoumi in private on the same day as Bayoumi's alleged 'chance' first meeting with 9/11 hijackers…," as set forth in the 2012 FBI Report.

**ANSWER:**


11.     Identify each and every person who participated in any evaluation, inquiry, or debate relating to Thumairy's possible extremist or radical views, including without limitation (a) the "internal debate among some Saudi officials" regarding "Thumairy's conduct" and (b) the "arguments…within the Saudi government over whether to allow reputedly radical imams, including Thumairy, to work for the Saudi government within the United States," as stated in the

13

9/11 Commission Report, p. 217, 514 n. 12, and describe the debate and arguments.

**ANSWER:**


12.    Identify each official, employee, or representative of the Kingdom or the King Fahad Mosque who was involved in any contemplated or actual disciplinary action involving Thumairy in 2002 and 2003, including without limitation the attempt to discipline Thumairy for espousing extremist views, as stated in the 9/11 Commission Report, p. 515 n. 13.

**ANSWER:**


13.    State the date of each visit of Bayoumi to any Kingdom of Saudi Arabia facility, including but not limited to any Saudi diplomatic mission or Saudi Ministry, and for each such visit: state the location and purpose of the visit; identify each person that encountered and/or met with Bayoumi; and, describe any materials, instructions or advice that Bayoumi received during or as a result of the visit.

**ANSWER:**


14.    State the date of each communication of Bayoumi with any personnel at any Saudi diplomatic mission or Saudi Ministry and for each such communication: identify each person that communicated with Bayoumi and state their job title and work address at the time they communicated with Bayoumi; describe the content and purpose of the communication; and, describe any materials, instructions or advice that Bayoumi received during or as a result of the communication.

**ANSWER:**

15.     State the date of each visit of Thumairy to the Saudi Embassy or any Kingdom of Saudi Arabia Ministry in Saudi Arabia, and for each such visit:  state the location and purpose of the visit; identify each person that encountered and/or met with Thumairy and state their job title and work address at the time they encountered and/or met with Thumairy; and describe any materials, instructions or advice that Thumairy received during or as a result of the visit.

**ANSWER:**


16.     State the date of each visit of any Subagent to the Los Angeles Consulate, and for each such visit: state the name of the Subagent who made the visit and describe the purpose of the visit; identify each person that encountered and/or met with the subagent; and describe any materials, instructions or advice that the Subagent received during or as a result of the visit.

**ANSWER:**


17.     Identify all Documents which explain the markings in the passports of Bayoumi, Mihdhar and Hazmi that were "indicators of Islamic extremism linked to al Qaeda" as described by U.S. investigators in the 9/11 and Terrorist Travel, Staff Report, Aug. 21, 2004 (attached as Exhibit 2).

**ANSWER:**


18.     Have Bayoumi, Thumairy or Sowailem travelled outside Saudi Arabia since January 1, 2004?  If so, state the dates and places of all travel outside of Saudi Arabia for each of them from January 1, 2004 to the date that this interrogatory is answered.

**ANSWER:**

19.     Identify each official or employee of the Kingdom with personal knowledge of the duties, responsibilities, assignments and instructions that were given to (a) Bayoumi and (b) Thumairy.

**ANSWER:**

Dated:  April 26, 2018                          Respectfully,

COZEN O'CONNOR                         MOTLEY RICE LLC

By:  /s/ Sean P. Carter                      By:  /s/ Robert T. Haefele
     SEAN P. CARTER                              ROBERT T. HAEFELE
     For the Plaintiffs Exec. Committees          For the Plaintiffs Exec. Committees

KREINDLER & KREINDLER LLP             ANDERSON KILL P.C.

By:  /s/ James P. Kreindler                  By:  /s/ Jerry S. Goldman
     JAMES P. KREINDLER                          JERRY S. GOLDMAN
     For the Plaintiffs Exec. Committees          For the Plaintiffs' Exec. Committees

## CERTIFICATE OF SERVICE

I, Andrew J. Maloney III, hereby certify that a true copy of the Plaintiffs' First Set of Interrogatories Regarding Jurisdictional Discovery Directed to the Kingdom of Saudi Arabia are being served via electronic mail and U.S. first-class mail, postage prepaid, this 26th day of April 2018, upon:

> Michael K. Kellogg
> MKellogg@kellogghansen.com
> Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
> Sumner Square
> 1615 M Street, N.W., Suite 400
> Washington, D.C. 20036
> (Counsel for the Kingdom of Saudi Arabia)
>
>      - and -
>
> Alan R. Kabat
> Kabat@BernabeiPLLC.com
> Bernabei & Kabat, PLLC
> 1775 T Street, N.W.
> Washington, D.C.  20009-7102
> (Defendants' Executive Committee's appointed representative to receive discovery requests and responses in MDL 1570)

_/S/ Andrew J. Maloney_____
Andrew J. Maloney III

17

# APPENDIX A

## I.    SUBAGENTS

Oualid Benomrane – Oualid Benomrane is a member of the King Fahd Mosque tasked by Fahad al Thumairy to assist 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar upon their arrival in the United States in January 2000.  *See* 9/11 Commission Final Report at 515, n.14.  In an interview with the Federal Bureau of Investigation ("FBI"), Benomrane told investigators that "he was told by Sheik Fahad Althumairy to keep the presence of the two Saudis to himself," and that "the Saudi Consulate knew about the two Saudis because it was the consulate that told Sheik Fahad to take care of the Saudis."  *See* October 25, 2002 FBI Report, *Fahad Althumairy (NON-USPER), IT – OTHER (UBL/AL-QAEDA)*.

Mohdar Mohamed Abdullah – Mohdar Mohamed Abdullah is a close associate of Omar al Bayoumi and was tasked by Bayoumi "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."  *See* 9/11 Commission Final Report at 516, n.20.  According to the 9/11 Commission, Abdullah, "a key associate of Hazmi and Mihdhar," was "perfectly suited to assist the hijackers in pursuing their mission" as he "clearly was sympathetic to [their] extremist views" and shared their "hatred for the U.S. government."  *Id.* at 218, 220.  Per Bayoumi's instructions, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.  *Id.* at 220.

Omar Abdi Mohamed – Omar Abdi Mohamed is an employee of Saudi Arabia's Ministry of Islamic Affairs who fraudulently obtained a visa to enter the United States and provided funding for al Qaeda through the Western Somali Relief Agency ("WSRA") in San Diego, CA.  According to the U.S. government, Mohamed was in the United States participating in "intelligence gathering missions" as a "propagator" for the Saudi Arabia government under the direction of Fahad al Thumairy.  *See* ECF No. 3930-1 and 3930-2.

Anwar Aulaqi – Anwar Aulaqi is a senior recruiter for al Qaeda who served as the imam of the Al Rribat Al Islami Mosque in La Mesa, CA and was a religious mentor to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  According to FBI sources, "Aulaqi met consistently and privately with Alhazmi and Almidhdir for prayers."  *See also* 9/11 Commission Final Report at 517, n.33.  U.S. investigations have determined that on February 4, 2000, the same day that Hazmi and Mihdhar arrived in San Diego at Omar al Bayoumi's invitation, four telephone calls were placed from Bayoumi's cell phone to Aulaqi.  *Id.*  In January 2001, Aulaqi relocated to Virginia to become the imam at the Dar al Hijra Mosque.  Hazmi and Hani Hanjour arrived at Dar al Hijra in April 2001 and Aulaqi tasked a member of the mosque, Eyad al Rababah, to assist the future hijackers.  *Id.* at 229-30.

Osama Basnan – Osama Basnan is a close associate of Omar al Bayoumi and a Saudi government employee who was in contact with and aided 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  FBI investigations have confirmed that Basnan had extensive ties to terrorism and was an "ardent UBL [Osama bin Laden] supporter," who spoke of bin Laden "as if he were a god" and was "in contact with UBL family members."  As detailed in the declassified

"28 Pages" of the Report of the Congressional Joint Inquiry Report at 426, "Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did."

Ziyad (Iyad) Kreiwesh – Ziyad Kreiwesh is the manager of the Texaco gas station in La Mesa, CA where 9/11 hijacker Nawaf al Hazmi worked. *See* 9/11 Commission Final Report at 518, n.42. According to the 9/11 Commission, "as of August 2001, Iyad Kreiwesh and other employees at the Texaco station where Hazmi had worked suddenly were anticipating attention from law enforcement authorities in the near future." *Id.* at 249-50. Moreover, Fahad al Thumairy presided over Kreiwesh's wedding at the King Fahd Mosque around September 2000. *Id.* at 518, n.42. The wedding was attended by Mohdar Abdullah and Oualid Benomrane. *Id.*

Osama ("Sam") Mustafa – Osama Mustafa is the owner of the Texaco gas station in La Mesa, CA where 9/11 hijacker Nawaf al Hazmi worked. *See* 9/11 Commission Final Report at 518, n.42.

Yazid al Salmi – Yazid al Salmi is a close associate of Mohdar Abdullah and was 9/11 hijacker Nawaf al Hazmi's roommate. *See* 9/11 Commission Final Report at 222, 249. On September 5, 2000, Hazmi deposited $1,900 of traveler's checks into his bank account he received from Salmi. *Id.* at 222. Following the September 11, 2001 attacks, Salmi confided to Abdullah that he had previously known 9/11 hijacker Hani Hanjour. *Id.* Salmi is the nephew of Omar al Bayoumi's superior at the Saudi Presidency of Civil Aviation, Mohammed Ahmed al Salmi. *Id.* at 518, n.41.

Omar Bakarbashat – Omar Bakarbashat is a close associate of Mohdar Abdullah and employee at the Texaco gas station in La Mesa, CA. Bakarbashat met 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar at the Al Rribat Al Islami Mosque and "admitted helping Hazmi to learn English and taking over the operatives' first apartment in San Diego after they moved out. Bakarbashat apparently had downloaded stridently anti-American Web pages to his computer's hard drive." *See* 9/11 Commission Final Report at 221. According to the 9/11 Commission, "early on the morning of September 10, [Mohdar] Abdullah, Osama Awadallah, Omar Bakarbashat, and others behaved suspiciously at the gas station. According to the witness, after the group met, Awadallah said 'it is finally going to happen' as the others celebrated by giving each other high fives." *Id.* at 250.

Hassan Abukar – Hassan Abukar is a leader of the Islamic Center of San Diego ("ICDS") mosque and Mohdar Abdullah's "spiritual advisor." Abukar regularly visited Fahad al Thumairy at the King Fahd Mosque regarding financial matters.

Caysan bin Don (a/k/a Isamu Dyson) – Caysan bin Don is an associate of Omar al Bayoumi who traveled with him to the Saudi Consulate in Los Angeles, CA on February 1, 2000 where Bayoumi met with Fahad al Thumairy. Following their stop at the Saudi Consulate, Bayoumi and bin Don met 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar over lunch at the Mediterranean Café.

Lafi al Harbi – Lafi al Harbi is a Saudi Naval officer who was posted to San Diego, CA for training with the U.S. Navy while 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar were living there.  As detailed in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 431, Harbi was in telephone contact with Hazmi and Mihdhar "on nine occasions from March 11, 2000 to March 27, 2000."

## II.   SUBAGENT ORGANIZATIONS

Western Somali Relief Organization – The Western Somali Relief Organization ("WSRA") is a California non-profit organization in San Diego, CA, headed by Omar Abdi Mohammed, an employee of Saudi Arabia's Ministry of Islamic Affairs, which was used to send substantial funds to the al Qaeda terrorist organization, as well as receive money from various sources affiliated with al Qaeda.

Al Haramain Islamic Foundation – The Al Haramain Islamic Foundation ("AHIF") is a Saudi Arabia-based ostensible charity (da'awa organization) which was designated in its entirety by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDGT") entity, pursuant to Executive Order 13224, "for having provided financial and material support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations."  As described in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 436, Omar al Bayoumi had contacts with the U.S.-based office of AHIF.

Islamic Center of San Diego – The Islamic Center of San Diego ("ICSD") is the mosque where 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar sought out Omar al Bayoumi on February 4, 2000.  Bayoumi was a member of the ICSD.  Hazmi used the ICSD administrator's bank account to receive a $5,000 wire transfer from Khalid Sheikh Mohammed's nephew, Ali Abdul Aziz Ali (a/k/a Ammar al Baluchi), in the United Arab Emirates.  *See* 9/11 Commission Final Report at 220.

Al Rribat Al Islami Mosque – The Al Rribat Al Islami (a/k/a Jamiat al Ribat al Islamia) is the mosque where Anwar Aulaqi served as imam and "developed a close relationship" with 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.  *See* 9/11 Commission Final Report at 221 and 517, n.33.  Mohdar Abdullah and Omar Bakarbashat were also members of Al Rribat Al Islami.  *Id.* at 221.

Al Barakaat Trading Company – The Al Barakaat Trading Company is a money transfer company that was at the center of a U.S. government money laundering investigation.  As described in the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 435, in approximately 1998, the FBI became aware of millions of dollars in wire transfers to Al Barakaat Trading Company and other businesses affiliated with Osama bin Laden.  "The FBI now believes that the some of the funding actually originated from Saudi Arabia and that both the Ibn Tamiyah Mosque in Los Angeles and the Islamic Center of San Diego were involved in laundering the money."  *Id.*

<u>Dahabshil</u> – Dahabshil is a money transfer company used by the Western Somali Relief Organization ("WSRA") and Omar Abdi Mohammed, an employee of Saudi Arabia's Ministry of Islamic Affairs, to send over $350,000 to al Qaeda.

<u>Al Ansar Mosque</u> – The Al Ansar Mosque (a/k/a the Somali Mosque in San Diego) is the mosque Fahad al Thumairy visited with Hassan Abukar, leader of the Islamic Center of San Diego ("ICDS") mosque and Mohdar Abdullah's "spiritual advisor."

<u>Somali Non-Profits in San Diego</u> – The Somali Non-Profits in San Diego are those entities implicated in the FBI's investigation of a massive money-laundering scheme in San Diego, CA that allowed elements of "the Saudi Government to provide al-Qa'ida with funding through covert or indirect means."  *See* the declassified "28 Pages" of the Report of the Congressional Joint Inquiry Report at 434-35.