KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 21, 2018

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

Pursuant to this Court's April 20, 2018 Order, ECF No. 3968, the Kingdom of Saudi Arabia submits this letter regarding outstanding discovery disputes between the parties.

**I.     Document Discovery**

**A.     Discovery from Saudi Arabia**

Judge Daniels has directed that "limited and targeted" discovery against Saudi Arabia should occur "in a prompt and expeditious manner by focusing only on those allegations of specific facts described [in his opinion] relevant to the FSIA immunity determination." ECF No. 3946, at 5, 23 ("March 28 Order"). Those specific facts concern "whether and to what extent [Fahad Al] Thumairy, [Omar Al] Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to [Nawaf Al] Hazmi, [Khalid Al] Mihdhar, and other 9/11 hijackers." *Id.* at 23. That is consistent with the Second Circuit's guidance that discovery against a foreign sovereign defendant "'should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" *Id.* at 7 (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)). Your Honor has confirmed that "all discovery . . . needs to be tethered to one of those allegations that Judge Daniels relied upon and is allowing [Plaintiffs] to pursue," April 12, 2018 Tr. at 21, and has suggested that Plaintiffs "identify at least in some simple form" how their discovery requests relate to "particular allegation[s]" in pages 19 through 23 of the March 28 Order, *id.* at 22.

Plaintiffs have ignored that guidance and served more than a hundred document requests, many of which lack any connection to any specific allegation of fact on which Judge Daniels relied. As examples, they have demanded that Saudi Arabia produce "[a]ll Documents . . .

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 2

concerning any of the 9/11 Hijackers," Ex. A, at 33 (No. 81);[1] "[a]ll Documents concerning any contact or communication between any employee, representative, official, or agent of the Saudi government and Osama bin Laden or any known or suspected representative of Osama bin Laden or al Qaeda," *id.* (No. 82); "all Documents identifying any representative, employee, or agent of the Ministry of Islamic Affairs in the United States," *id.* at 36 (No. 91); and "Documents concerning the secondment by the Saudi government of persons located or to be located in the United States, . . . including without limitation any agreements and terms concerning any such secondment and lists of persons seconded," *id.* (No. 94).

Plaintiffs' discovery demands also violate the limits set by Judge Daniels by seeking documents related to allegations that Judge Daniels specifically rejected in parts of the March 28 Order as to which he declined to grant jurisdictional discovery, such as the individuals Osama Basnan and Omar Abdi Mohammed and the charity Al Haramain, as well as other individuals and organizations who are not mentioned in pages 19 through 23 of the March 28 Order or in any allegation on which those pages rely.[2]

Despite the great breadth of Plaintiffs' demands and their refusal to tie them to specific facts, Saudi Arabia has worked to propose reasonable accommodations with regard to most of those requests. For 79 of the 101 requests for production and for 15 of 18 interrogatories, Saudi Arabia has proposed to conduct an investigation and produce responsive information – with, in some cases, reasonable narrowing of Plaintiffs' requests. To minimize disputes about what investigation is reasonable, Saudi Arabia has explained which agencies it intends to search, including (1) the Ministry of Islamic Affairs, (2) the General Authority of Civil Aviation ("GACA"), the successor to the Presidency of Civil Aviation ("PCA"), (3) the Saudi Embassy in Washington, D.C., (4) the Saudi Consulate in Los Angeles, California, and (5) the Saudi Arabian

---

[1] Exhibits A through G consist of the parties' discovery requests, responses, and objections, and are attached to the parties' joint letter submitted today. Exhibits H through J are attached to this letter.

[2] *Compare* Ex. A, at 11 (Definition Nos. 8, 9) (defining "Subagent" to include individuals such as Omar Abdi Mohamed and Osama Basnan, and "Subagent Organization" to include organizations such as the Western Somalia Relief Agency ("WSRA"), Dahabshiil, and Al Haramain) *with* March 28 Order at 24-25 (dismissing claims based on allegations about Basnan), 28-31 (dismissing claims based on allegations about Abdi Mohamed, the WSRA, and Dahabshiil). In addition, the definition of "Subagent" also includes Ziyad Kreiwesh, Osama Mustafa, Omar Bakarbashat, and Hassan Abukar, and the definition of "Subagent Organization" includes the Islamic Center of San Diego ("ICSD"), the Al Ribat Al Islami Mosque ("Al Ribat Mosque"), the Al Barakaat Trading Company, the Al Ansar Mosque, and unnamed "Somali non-profits in San Diego." None of those individuals or organizations is mentioned in pages 19 through 23 of the March 28 Order or in any allegation on which those pages rely, except for background references to the ICSD and the Al Ribat Mosque that do not suggest either organization assisted the 9/11 hijackers. *See* ECF No. 3463, ¶ 179; ECF No. 3463-1, ¶ 161.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 3

Cultural Mission in Fairfax, Virginia, which maintains records on Saudi students in the United States.  Saudi Arabia has generally agreed to search for documents and information from January 1, 1998, to September 11, 2001, and for certain requests, to go as far back as 1993.

Saudi Arabia selected the governmental entities and time periods that it would search based on Plaintiffs' allegations discussed in pages 19 through 23 of the March 28 Order.  The allegations identifying Saudi Arabian governmental entities and time periods are:

- from 1998 to 2001, Al Thumairy was the imam at the King Fahad Mosque, "appointed by Saudi Arabia's Head of Islamic Affairs in Washington, D.C.," March 28 Order at 19;

- from 1998 to 2001, Al Thumairy "was an accredited Saudi diplomat working for Saudi Arabia's Ministry of Islamic Affairs at the Saudi Consulate in Los Angeles" and "reported to more senior officials inside the Saudi Embassy in Washington, D.C.," *id.*;

- in January 2000, Al Thumairy "orchestrat[ed] the U.S.-based support network for two of the 9/11 hijackers . . . at the direction of an unnamed senior Saudi official based in the Saudi Embassy in Washington, D.C.," *id.*;

- on February 1, 2000, Al Thumairy and Al Bayoumi met "inside Thumairy's office at the Saudi Consulate in Los Angeles," *id.*;

- in 1994, Al Bayoumi "moved to the United States . . . to study English at San Diego State University on a scholarship provided by the Saudi government," *id.* at 20;

- in 1995, Al Bayoumi "was granted a secondment by the Saudi government to work as an employee of the Dallah Avco Trans Arabia Company" – "a contractor for Saudi Arabia's civil aviation authority," GACA (formerly PCA), *id.* at 20 & n.11; and

- in early 2000, Al Bayoumi aided the hijackers in various ways, *see id.* at 20-21.

The searches Saudi Arabia has proposed give reasonable effect to Judge Daniels' admonition to "focus[] only on th[e] allegations of specific facts described" in the March 28 Order, *id.* at 5, and to Your Honor's statement at the April 12 hearing that "all discovery . . . needs to be tethered to one of those allegations," April 12, 2018 Tr. at 21.  Although Plaintiffs have made various complaints about Saudi Arabia's proposals and objections, none of those complaints has merit.

### 1.    Searches of Specific Agencies

In meet-and-confer discussions, Plaintiffs proposed that Saudi Arabia search six more government agencies:  the Ministry of Foreign Affairs, the Ministry of Education, the Ministry of Defense, the Ministry of Civil Service, the Ministry of Finance, and the General Intelligence Directorate.  The day this letter was due, they sent an e-mail further proposing the National Guard, the Ministry of Interior, the Presidency of State Security, the General Investigation

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

The Honorable Sarah Netburn
May 21, 201
Page 4

Directorate, and Saudi Arabia's Embassy and Consulates in the United Kingdom, as well as "[i]nvestigative and similar files relating to the September 11th attacks" held by any other agency of Saudi Arabia. Ex. J. Plaintiffs' position is roughly equivalent to suing the United States and seeking discovery from the State Department, Education Department, Defense Department, Office of Personnel Management, Treasury Department, CIA, National Guard, Interior Department, and FBI. None of the additional agencies is mentioned in pages 19 through 23 of the March 28 Order or (with immaterial exceptions) in any allegation cited in those pages.[3] Nor have Plaintiffs made any showing that the additional agencies are likely to have responsive, non-duplicative documents that would warrant the additional time required to search them.

Expanding Saudi Arabia's search to include the Ministry of Defense, the Presidency of State Security, and the General Intelligence and Investigation Directorates would be especially inappropriate. Those agencies are responsible for Saudi Arabia's national security and intelligence functions. Even in cases where a foreign government or similar entity is otherwise subject to discovery, courts have discretion to bar discovery requests for "intelligence materials" that would "undermine important interests" of that government. *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 968 (D.C. Cir. 2016) (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987)), *cert. denied*, 138 S. Ct. 88 (2017). Here, where discovery is authorized only if "critical to answering" a specific question, March 28 Order at 23, the most straightforward way to protect Saudi Arabia's legitimate national security and intelligence interests is to recognize that discovery from agencies with national security and intelligence mandates is not critical and should be out of bounds.[4]

Even if such discovery were within the scope authorized by Judge Daniels, it would be unlikely to yield discoverable material. Like the United States, Saudi Arabia can invoke the state secrets privilege to prevent disclosures that would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of

---

[3] The Ministry of Defense is mentioned briefly in one cited allegation from Plaintiffs' Averment of Facts, which states that Al Bayoumi was "[a]n employee of the Saudi Arabian Presidency of Civil Aviation ('PCA') . . . , a branch of the Saudi Ministry of Defense." ECF No. 3463-1, ¶ 153. PCA is now GACA (and no longer part of the Ministry of Defense), and Plaintiffs have offered no reason why other parts of that Ministry are relevant here or should be searched. The *Ashton* Complaint makes conclusory assertions that Al Bayoumi worked for the Ministries of Defense and Higher Education, *see* No. 17-2003, ECF No. 1, ¶¶ 44(b), 44(d), but Judge Daniels did not mention those allegations and cited those paragraphs only for other statements about Al Bayoumi's alleged conduct. *See* March 28 Order at 19, 20.

[4] Plaintiffs' Averment asserted that Al Bayoumi was a "Saudi intelligence agent," ECF No. 3463-1, ¶ 149; *see also id.* ¶¶ 187-189, but that contention was rejected by the FBI and the CIA, and Plaintiffs did not argue it in their recent pleadings. Nor did Judge Daniels rely on that allegation. Instead, he authorized discovery on whether "Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official," to help the hijackers. March 28 Order at 23.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 5

diplomatic relations with foreign governments." *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (footnotes omitted); *see LNC Invs., Inc. v. Republic of Nicaragua*, 1997 WL 729106, at *3 (S.D.N.Y. Nov. 21, 1997) ("Courts have long held that foreign governments are entitled to protect their executive deliberations."); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 25 (S.D.N.Y. 1984) (foreign government may assert privilege to protect "important military secrets, extremely sensitive foreign policy questions, and other national security-related issues") (citations omitted); *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 590 (D. Mass. 1979) (same). It is practically certain that responsive materials from the Ministry of Defense, Presidency of State Security, and the General Intelligence and Investigation Directorates would be covered by privilege.

Saudi Arabia's compelling interests would be impaired by requiring it even to search for responsive materials from those agencies. As this letter is being written, undersigned counsel and his colleagues are personally in Saudi Arabia conducting interviews and arranging for document collection. Saudi Arabia's government agencies do not have in-house counsel familiar with U.S. discovery and are not well-positioned to determine responsiveness or privilege under U.S. law. To require Saudi Arabia to search its national security and intelligence agencies would thus require it to turn over to counsel (who are U.S. nationals) highly sensitive information and documents – a step that, even if Saudi Arabia then successfully asserted privilege, would still damage its national security interests. *Cf. General Dynamics Corp. v. United States*, 563 U.S. 478, 487 (2011) (recognizing the risk of "indirect[ ] disclos[ure]" of state secrets if the government must assert the privilege on a document-by-document basis).

To be clear, Saudi Arabia's objection also extends to information that may previously have been shared with the United States on a confidential basis as part of the two countries' close security and intelligence cooperation. For example, when the 9/11 Commission's investigators visited Saudi Arabia in 2003, they conducted five interviews that remain wholly classified for national security reasons and two for which substantial classified information has been redacted from the public record.[5] Plaintiffs' requests clearly contemplate an inquiry whether Al Thumairy or Al Bayoumi were mentioned in the portions of those interviews that are classified under U.S. law. That cannot be what Judge Daniels had in mind in authorizing limited, targeted discovery.

## 2.      Diplomatic and Consular Files

The Vienna Convention on Diplomatic Relations ("VCDR"), 23 U.S.T. 3227 (done Apr. 18, 1961; ratified Dec. 13, 1972), and the Vienna Convention on Consular Relations ("VCCR"),

---

[5] A list of interview memoranda prepared by Commission staff is available on the National Archives website at https://www.archives.gov/research/9-11/commission-memoranda.html. Of the listed memoranda about interviews in Saudi Arabia, Nos. 2610777, 2610784, 2610785, 2610792, and 2610840 have been withheld from the public as classified, and Nos. 2610782 and 2610786 have been released with significant redactions of classified material.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 6

21 U.S.T. 77 (done Apr. 24, 1963; ratified Dec. 24, 1969), generally make the Saudi Embassy, Saudi Consulate, and Saudi Arabian Cultural Mission (which is part of the Saudi Embassy), and their employees, immune from discovery.  Both the "premises" and the "property" of an embassy are "immune from search," VCDR art. 22, §§ 1, 3; its "archives and documents" are "inviolable at any time and wherever they may be," *id.*, art. 24; *see id.*, art. 27, § 2; and a "diplomatic agent is not obliged to give evidence as a witness," *id.*, art. 31, § 2.[6]  Those absolute privileges are "binding upon federal courts to the same extent as domestic statutes" and are not subject to judicially crafted exceptions.  *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993).  The Vienna Conventions apply fully in a case under the FSIA.  *See* 28 U.S.C. § 1604 (FSIA applies "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act"); *Zaire*, 988 F.2d at 297 (citing similar language in § 1609 and explaining that "diplomatic and consular immunities of foreign states recognized under various treaties remain unaltered by the [FSIA]").

Although the VCDR and the VCCR provide ample grounds to resist discovery of Saudi Arabia's diplomatic facilities entirely, Saudi Arabia has voluntarily undertaken to conduct a tailored search of the Saudi Embassy, Saudi Consulate in Los Angeles, and Saudi Arabian Cultural Mission – reserving, for now, the question whether any responsive documents must be produced or listed on a privilege log.  Those searches will include documents created, sent, or received by the Ministry of Islamic Affairs, the Ministry of Higher Education, or GACA concerning communications with Al Thumairy or Al Bayoumi (or Khalid Al Sowailem, another individual identified by Plaintiffs), as well as relevant information in personnel files or similar records; travel records; call logs, visitor logs, or similar records; phone records or phone bills; and communications with the United States regarding travel by relevant individuals.  Ex. E, at 9-10 (General Objection No. 4); Ex. F, at 7-9 (General Objection No. 4).  Those searches will appropriately target documents and information most likely to be within the scope of permissible discovery while excluding core diplomatic communications.  Plaintiffs are entitled to no more.

**3.    Date Range for Searches**

As to Al Thumairy, Al Sowailem, and some of their other requests, Plaintiffs have generally sought documents created, modified, sent, or received from 1998 to 2001, Ex. A, at 9 (Instruction No. 15); Ex. B, at 7 (Instruction No. 10).  Saudi Arabia has generally agreed to this date range.  Ex. E, at 4 (Objection No. 10 to Instructions); Ex. F, at 4 (Objection No. 7 to Instructions).  Saudi Arabia has further agreed to search earlier dates for certain specific documents likely to be found earlier, such as documents concerning Al Bayoumi's relocation to

---

[6] The VCCR similarly provides that "[t]he consular archives and documents shall be inviolable at all times and wherever they may be," VCCR art. 33; *see id.*, art. 31, § 2; art. 35, § 2; and that "[m]embers of a consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions or to produce official correspondence and documents relating thereto," *id.*, art. 44, §§ 1, 3; *see id.*, art. 43, § 1.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 7

the United States.[7]  As to Al Bayoumi, however, Plaintiffs have sought a general date range for documents and information from 1994 to 2001, which is excessive and not tied to any allegation on which Judge Daniels relied.  Plaintiffs' allegations concern assistance supposedly provided to Al Hazmi and Al Mihdhar in early 2000.  General requests for documents years before that date are neither limited nor targeted.

   For some of their requests, Plaintiffs have also sought documents created, modified, sent, or received after September 11, 2001.  Those requests are inconsistent with Judge Daniels' direction for "limited and targeted jurisdictional discovery critical to answering" the question whether Al Thumairy and Al Bayoumi were directed to assist Al Hazmi and Al Mihdhar.  The documents and information critical to answering that question are *contemporaneous* documents that are evidence of who, what, where, when, and how the alleged directions and assistance were (or were not) provided.  Documents created after the fact are not critical.  And there is no stopping point to Plaintiffs' post-2001 requests:  several request documents "regardless of the date" or created "at any time," Ex. A, at 18 (No. 18); *id.* at 27 (No. 55); *id.* at 32-33 (Nos. 75, 79), preventing Saudi Arabia from reasonably targeting its searches.[8]

   The main thrust of Plaintiffs' post-9/11 requests is to determine whether Saudi Arabia itself has ever investigated Al Thumairy, Al Bayoumi, or Al Sowailem and to obtain all documents concerning any such investigation.  *See id.* at 18 (No. 18); *id.* at 27 (No. 55); *id.* at 32 (No. 75).  That is not an attempt to "verify allegations of specific facts," March 28 Order at 7, and is improper for that reason alone.  Further, a litigant cannot ordinarily probe its adversary's investigation of disputed facts (as opposed to the facts themselves):  as to a private party, work-product protection would apply, and as to a federal or state government, national-security and law-enforcement agencies can assert exemptions from Freedom of Information Act disclosure, *see* 5 U.S.C. § 552(b)(1), (5), (7), and privileges against discovery, *see, e.g.*, *In re The City of New York*, 607 F.3d 923, 944 (2d Cir. 2010).  This Court should reject Plaintiffs' attempt to obtain in limited discovery against a foreign sovereign defendant what they could not obtain in ordinary discovery against either a private or governmental U.S. defendant.

   Plaintiffs' post-9/11 requests also target information shared with the United States, including the 9/11 Commission.  But information about the Commission's work is either already

---

   [7] The agreed earlier date range applies to Plaintiffs' RFPs No. 4, 5, 27, 28, 30, 33, 61, 62, and 68, *see* Ex. J, which relate to training, instruction, diplomatic status and credentials, educational and academic activities, employment records, relocation to the United States, compensation and funding, and travel records.

   [8] Saudi Arabia has agreed to search for certain specific documents and information after 2001 where Plaintiffs have identified particular timeframes and issues, including an alleged inquiry into Al Thumairy's conduct within the Ministry of Islamic Affairs that Plaintiffs say took place in the summer of 2002 and early 2003.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 8

public (and so not needed from Saudi Arabia) or else classified under U.S. law (and so should not be available to Plaintiffs).  *See supra* p. 5.

### 4.    Specific Refusals To Answer

Saudi Arabia has refused to respond in whole or in significant part to 22 requests for production and three interrogatories.  Plaintiffs have no basis to challenge those refusals.

**a.    RFP Nos. 14, 52, and 71, and Interrogatory No. 16** concern "Subagent[s]" and "Subagent organization[s]."  Ex. A, at 17, 26, 30-31; Ex. B, at 15.  Those requests are improper to the extent Plaintiffs define "Subagent" and "Subagent organization" to include persons and organizations outside the scope of discovery.  *See supra* p. 2 & note 2.  Some also include vague, overbroad requests such as for communications with "any person affiliated with al Qaeda or identified as a possible jihadist, extremist, or 'deviant.'"  Ex. A, at 26 (No. 52).

**b.    RFP Nos. 19 and 54, and Interrogatories Nos. 11, 17, and 18** either do not seek to verify allegations of specific facts, are too vague to enable a meaningful response, or both.[9]

**c.    RFP Nos. 25 and 56** seek "all Documents concerning" Al Thumairy's and Al Bayoumi's "interview[s] by the 9/11 Commission."  Ex. A, at 20, 27.  Similarly, **RFP Nos. 26, 57, and 80** seek "all Documents concerning" Al Thumairy, Al Bayoumi, and Al Sowailem "provided to or shared with the United States."  *Id.* at 20, 27, 33.  Those requests are not aimed at verifying specific factual allegations, are not limited to a reasonable timeframe, and are not likely to reveal non-privileged information that Plaintiffs do not already possess.  *See supra* pp. 5, 7-8.

**d.    RFP Nos. 81-86, 91-96, and 98-100** seek a broad variety of information under the heading of "Additional Transactions, Relationships, Events."  Ex. A, at 33-38.  None concerns specific factual allegations discussed in the March 28 Order.

_____

[9] RFP No. 19 seeks "all Documents concerning [an] internal debate" regarding Al Thumairy's "conduct."  Ex. A, at 18.  RFP No. 54 seeks "all Documents concerning any known or suspected contact or relationship between Bayoumi and any known or suspected member or associate of al Qaeda, or any known or suspected member or associate of any Foreign Terrorist Organization."  *Id.* at 26.  Interrogatory No. 11 seeks "every person who participated in any evaluation, inquiry, or debate relating to Thumairy's possible extremist or radical views" and a description of "the debate and arguments."  Ex. B, at 13-14.  Interrogatory No. 17 asks Saudi Arabia to "[i]dentify all Documents which explain the markings on the passports of Bayoumi, Mihdhar, and Hazmi that were 'indicators of Islamic extremism linked to al Qaeda.'"  *Id.* at 15.  Interrogatory No. 18 asks whether Al Bayoumi, Al Thumairy, or Al Sowailem have "travelled outside of Saudi Arabia since January 1, 2004," well after the events in question.  *Id.*  Plaintiffs have stated that Interrogatory No. 18 aims to gather information about potential deposition locations.  Saudi Arabia will meet and confer with Plaintiffs regarding depositions at the appropriate time.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
May 21, 201
Page 9

**B.     Discovery from Third Parties**

Plaintiffs have also served subpoenas on the FBI and the State Department that (like their requests to Saudi Arabia) ignore the limitations that Judge Daniels has imposed on discovery. For example, Plaintiffs have demanded from the FBI "[a]ny and all records referring or relating to" Abdi Mohamed and the WSRA. Ex. H, Attachment A, at 2. But the Court has already dismissed Plaintiffs' allegations concerning Abdi Mohamed and the WSRA and has rejected discovery regarding those allegations. *See* March 28 Order at 28-31. As to the State Department, Plaintiffs' demands include: "[a]ny and all documents concerning" Al Thumairy, Al Bayoumi, Abdi Mohamed, nine other purported employees of the Ministry of Islamic Affairs, and the King Fahad Mosque, Ex. I, Attachment A, at 4-6; "[a]ny and all documents containing a list of all persons with diplomatic and consular privileges for the Kingdom of Saudi Arabia from January 1, 1998 through and including September 11, 2001," *id.* at 6-7; and other similar demands far exceeding the scope of permissible discovery.[10]

At the April 12 hearing, Your Honor questioned whether Saudi Arabia had standing to challenge third-party discovery. But the question is not one of standing: the Court has independent authority to prevent a party from circumventing judicial limits on discovery through third-party requests. *See Chevron Corp. v. Donziger*, 2012 WL 6634680, at *2-5 (S.D.N.Y. Dec. 19, 2012) (exercising discretion to quash third-party subpoenas "inconsistent with the scope of discovery already drawn by this Court"), *appeal dismissed*, No. 13-332 (2d Cir. Apr. 10, 2013); Order at 3, *FHFA v. HSBC N. Am. Holdings Inc.*, Nos. 11 Civ. 6189 (DLC) et al., ECF No. 583 (S.D.N.Y. Dec. 18, 2013) (ordering defendants to "cease efforts to obtain from third parties the types of documents and information that this Court has previously ruled they may not obtain"). This Court should quash Plaintiffs' subpoena to the FBI to the extent it concerns Abdi Mohamed and WSRA and quash the subpoena to the State Department in its entirety.

**C.     Discovery from Plaintiffs**

Saudi Arabia has served modest discovery requests on Plaintiffs: four requests for production and three interrogatories. Ex. C, at 6-7; Ex. D, at 6-7. These requests seek the evidence on which Plaintiffs will rely to support their claims regarding Al Thumairy, Al

---

[10] Those include "[a]ny and all documents concerning any review and/or determination of the Department of State that any person with diplomatic or consular privileges of the Kingdom of Saudi Arabia had committed a serious offense, including a felony or crime of violence, between February 1, 1998 and December 31, 2004," Ex. I, Attachment A, at 7; "[a]ny and all documents concerning any review of the diplomatic status of any person(s) holding Saudi diplomatic credentials in the United States between September 11, 2001 and December 31, 2004," *id.*; and "[a]ny and all documents concerning any inquiry, investigation, or remedial action, between September 11, 2001 and December 31, 2005, concerning the activities of the Ministry of Islamic Affairs in the United States," *id.*

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

The Honorable Sarah Netburn
May 21, 201
Page 10

Bayoumi, or subagents acting on their behalf, as well as evidence that contradicts those claims. Such requests are a well-accepted discovery practice that prevents unfair surprise. *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 109 (S.D.N.Y. 2013) (document requests); *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273 F.R.D. 367, 369 (S.D.N.Y. 2010) (interrogatories). These requests are especially appropriate here because, in the prior two motions to dismiss, Plaintiffs have submitted voluminous documents with their opposition briefs that Saudi Arabia has been forced to address for the first time on reply. Requiring Plaintiffs to disclose their evidence in advance will increase the quality of briefing presented to the Court.

Saudi Arabia has also sought any materials that are produced to Plaintiffs in third-party discovery. Ex. C, at 7 (No. 4). That request is even more clearly reasonable because Saudi Arabia will not otherwise have access to any materials Plaintiffs receive from third parties. Saudi Arabia further requests that Plaintiffs be directed to produce such materials on a continuing basis as they are received.

Plaintiffs have categorically refused to respond to any of Saudi Arabia's discovery requests. They claim that Saudi Arabia never made a request to the Court to conduct jurisdictional discovery from Plaintiffs and therefore has waived its right to seek such discovery. *See* Ex. G, at 1-2. But Saudi Arabia does not need to make a special request for discovery because Plaintiffs are not protected by sovereign immunity. In any case, at the April 12, 2018 hearing, counsel for Saudi Arabia expressly indicated that it was contemplating serving discovery requests on Plaintiffs, *see* April 12, 2018 Tr. at 16, and neither Plaintiffs nor the Court suggested that doing so would be improper.

## II.   Depositions

This Court's Order of April 20 directs the parties to address the appropriate number of depositions for jurisdictional discovery. ECF No. 3968. In meet-and-confer discussions, Plaintiffs have stated that they believe it is premature to determine the number of depositions now. Saudi Arabia agrees that discussions about the number of depositions will likely be better informed once document discovery is underway.

Respectfully submitted,

*/s/ Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:   Chambers of the Honorable George B. Daniels (via facsimile)
       All MDL Counsel of Record (via ECF)