I5O2TERC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  In re:  TERRORIST ATTACKS ON          03 MDL 1570(GBD)
                SEPTEMBER 11, 2001
4  ------------------------------x          Conference

5                                         New York, N.Y.
                                          May 24, 2018
6                                         10:15 a.m.

7  Before:

8                          HON. SARAH NETBURN,

9                                         Magistrate Judge

10

11                          APPEARANCES

12  KREINDLER & KREINDLER
           Attorneys for Plaintiffs
13  BY:  JAMES P. KREINDLER
           STEVEN R. POUNIAN
14         ANDREW J. MALONEY

15  COZEN O'CONNOR
           Attorneys for Plaintiffs
16  BY:  STEPHEN A. COZEN
           SEAN P. CARTER
17         J. SCOTT TARBUTTON

18  MOTLEY RICE LLC
           Attorneys for Plaintiffs
19  BY:  ROBERT T. HAEFELE
           JODI WESTBROOK FLOWERS
20

21  ANDERSON KILL P.C.
           Attorneys for Plaintiffs
21  BY:  JERRY S. GOLDMAN
22         KANISHKA AGARWALA
           ALEXANDER LITT
23

24  KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
           Attorneys for Saudi Arabia
24  BY:  MICHAEL K. KELLOGG
25         GREGORY G. RAPAWY
           DANIEL V. DORRIS

I5O2TERC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your names

 3    for the record.

 4              MR. CARTER:  Good morning, your Honor.  Sean Carter on

 5    behalf of the PECs.

 6              THE COURT:  Good morning.

 7              MR. POUNIAN:  Steven Pounian, also on behalf of the

 8    PECs.

 9              MR. HAEFELE:  Good morning, your Honor.  Robert

10    Haefele on behalf of the PECs.

11              MR. COZEN:  Good morning, your Honor.  Steve Cozen on

12    behalf of the PECs.

13              MR. GOLDMAN:  Good morning, your Honor.  Jerry Goldman

14    on behalf of the PECs.

15              MR. MALONEY:  Good morning, your Honor.  Andrew

16    Maloney on behalf of the PECs.

17              MR. KREINDLER:  Good morning, your Honor.  Jim

18    Kreindler.

19              MS. FLOWERS:  Good morning.  Jodi Flowers on behalf of

20    the plaintiffs and the PECs.

21              MR. TARBUTTON:  Good morning, your Honor.  Scott

22    Tarbutton, of Cozen O'Connor, on behalf of the PECs.

23              MR. KELLOGG:  Good morning, your Honor.  Michael

24    Kellogg on behalf of Saudi Arabia.  With me are my colleagues

25    Greg Rapawy and Dan Dorris.  Mr. Dorris has not yet filed a *pro*
```

I5O2TERC

1    *hac vice*, but is going to do so shortly.  We also have with us

2    our Saudi counsel, Abdulaziz al Fahad.

3          THE COURT:  Thank you.  Welcome, and we will look

4    forward to your *pro hac vice* application.

5          Let me just reminded everybody to be sensitive to the

6    court reporter.  We have a lot of people in the room.  If you

7    haven't made an appearance and you intend to speak, certainly

8    introduce yourself.

9          (Discussion off the record between the court and court

10   reporter)

11         THE COURT:  In case you doesn't hear that, because she

12   not on mike, everyone needs to speak into the microphone.  This

13   courtroom is absolutely glorious but has terrible acoustics, so

14   please be sure you are speaking into the microphone so that

15   everybody can hear you.

16         Okay.  We are here primarily to check in on the status

17   of jurisdictional discovery as against the Kingdom of Saudi

18   Arabia.

19         I have received the parties' May 21 letters, and so I

20   want to talk about where things stand with respect to that

21   discovery, give you some preliminary reactions to the disputes

22   that are at least raised.  It appears that the parties don't

23   contemplate these letters to be their briefs, though I think I

24   can give you a little bit of guidance to make narrow some of

25   the disputed issues.

I5O2TERC

1          In addition, I want to talk about sort of the end

2    game, as it were, and what the parties are thinking as far as

3    returning this part of the litigation back to Judge Daniels.  I

4    have some thoughts about that.

5          And then, lastly, I want to speak about the letter

6    that was filed by the Plaintiffs' Executive Committee on May 23

7    regarding the requests for short-order forms with respect to

8    new plaintiffs against Iran and parties that wish to join the

9    Ashton complaint against Saudi Arabia.

10         I don't know whether or not there are any issues that

11   the Defendants' Executive Committee wants to be heard on this

12   particular issue, and I don't believe anybody from the

13   Defendants' Executive Committee is here, so maybe that issue is

14   best tabled since they may have a view, but I want to discuss

15   it at least in part.

16         Why don't I ask Mr. Kellogg to begin by just telling

17   us where you view things.  I know you just returned back from

18   Saudi Arabia and you have done some investigation, so why don't

19   you tell me, from your perspective, where things stand and what

20   you think you can be able to produce and when.

21         MR. KELLOGG:  Thank you, your Honor.

22         We just spent a week, a little over a week in Saudi

23   Arabia.  We saw a number of agencies and individuals to begin

24   the process of gathering documents.  So far, what we have been

25   mainly focused on is understanding where repositories of

I5O2TERC

1    documents might be held.  We are getting, sort of, charts from

2    the various agencies we talked to.

3            We went to the General Authority on Civil Aviation,

4    which was the successor of the PCA, which is where Omar Bayoumi

5    worked for 20 years before he went to the United States and

6    where he returned to after and recently retired from.

7            We went to the Ministry of Islamic Affairs, where both

8    Fahad al Thumairy and Khalid al Suwailem, who were the focus of

9    their document requests, worked.

10           We are in the process, we are going to go back at the

11   end of the month, after the Ramadan and the post Ramadan

12   holiday, which complicates our discovery, in order to gather

13   relevant documents for the court, for the plaintiffs.

14           THE COURT:  So your mission in Saudi Arabia was an

15   investigatory one but not a fact-gathering one or a

16   document-gathering one?  Is that a fair assessment?

17           MR. KELLOGG:  Well, we gathered some of the

18   low-hanging fruit, like the complete personnel file of Omar

19   Bayoumi.  We gathered materials that they had on hand about

20   Mr. al Thumairy.

21           But really, you know, we have to determine whether

22   they -- what kind of records they kept in 2000, the e-mail

23   versus payment records and electronic files and what they might

24   have in terms of --

25           THE COURT:  What can you tell us about that particular

I5O2TERC

1   issue?  Is it an electronic document or is this a paper-heavy

2   file.

3          MR. KELLOGG:  It is pretty clearly not going to be a

4   lot of electronic stuff, if any.  We are talking about 20 years

5   ago.  So far as we could tell, none of the agencies that we

6   have talked to were using e-mail at that time.  Even the

7   embassies were using faxes and cables back and forth, rather

8   than electronic media.  So we are going to check in detail to

9   see if there are any electronic files or backup files, but we

10  don't really expect a volume of that.

11         So mostly what we are dealing with is paper, and Saudi

12  Arabia is not a heavily papered society.  In other words, they

13  don't document things the way a corporation in the United

14  States would in 2018.  So we are going to have to dig deep to

15  try to get everything that would be responsive.

16         THE COURT:  When we were last here four weeks ago, six

17  weeks ago, you had a very ambitious schedule.

18         MR. KELLOGG:  We did.

19         THE COURT:  How do you feel about that schedule now?

20         MR. KELLOGG:  I feel chastened about that schedule.

21  It is a cumbersome process, and of course we need Arabic

22  speaking individuals with us, not only to do the interviews,

23  but then to examine documents to decide whether things are

24  responsive.  And we are going to have to collect those and then

25  bring them back and arrange for translations for our own

I5O2TERC

1    purposes so we know exactly what is responsive, and then

2    produce them and turn them over.

3            I think more realistically we are talking about the

4    end of summer before we can finish substantial document

5    production, but we intend to do rolling productions along the

6    way, as we get documents.  And much will depend -- and,

7    frankly, the guidance we are going to need the most from the

8    court today is the repositories we should be searching.  We set

9    our list of repositories based on Judge Daniels' opinion pages

10   19 to 23, ones who are mentioned either by Judge Daniels or any

11   allegations that he cited in that portion of the opinion.  They

12   are the places where the relevant actors worked or visited or

13   were otherwise involved in.  That was the GACA, the General

14   Authority of Civil Aviation.  It was the Ministry of Islamic

15   Affairs, which plaintiffs claim that a senior official of

16   theirs charged Thumairy and Bayoumi of aiding the hijackers.

17   Those are the two main agencies in Saudi Arabia that we have

18   looked at.

19           In the United States, we have gone to the embassy in

20   Washington, we have gone to the consulate in Saudi Arabia, and

21   we have gone to what's called the Saudi Arabia Cultural

22   Ministry, which is now in Fairfax, Virginia, to look for

23   educational records there that they might have.

24           So those are the five places that we focused on.

25   Plaintiffs have suggested 11 additional potential repositories,

I5O2TERC

1    and I would love to talk about each of those in turn, because

2    we think it would substantially increase the burden without any

3    real likelihood of producing responsive documents, particularly

4    since none of these agencies are dealt with or the allegations

5    about them are dealt with in pages 19 to 23 of Judge Daniels'

6    opinion.  I can run through those very quickly if they would be

7    helpful to the court.

8            THE COURT:  It may be helpful at a later moment, but I

9    don't think I need you to do that right now.

10           So I understand what you are contemplating, and I see

11   in your letter you indicate that you think you will be able to

12   respond at least in part to, you say, 79 of the 101 requests

13   for production and 15 of the 18 interrogatories.  In stating

14   that, is it correct to understand that you are going to be

15   gathering documents from these four or five entities' you

16   indicate, five entities' you indicate repositories, as you

17   describe them, and then searching for responsive documents to

18   those discovery demands?  Is that what you are contemplating?

19           MR. KELLOGG:  Yes, your Honor.

20           THE COURT:  Let me ask you to speak generally about

21   dates, if you wouldn't mind.  I understand that there is large

22   agreement between the parties about dates, though I also

23   understand that the plaintiffs are seeking at least some

24   earlier documents with respect to, I believe, al Bayoumi and,

25   more generally speaking, documents that post date September 11.

I5O2TERC

1            MR. KELLOGG:  Correct, your Honor.

2            The plaintiffs, in their document requests and

3    interrogatories, generally set a date range from January 1 of

4    1998 to 9/11/01, and we had no problem with that, although

5    Judge Daniels' opinion focused on early 2000.  We thought it

6    was fair that they were asking for some context about the

7    second move and such of how Bayoumi and al Thumairy ended up at

8    the King Fahd Mosque and at the L.A. consulate.  So we agreed

9    to those date ranges.

10           A number of them ask for materials even further back,

11   to 1994, 1995, particularly for al Bayoumi.  After our

12   meet-and-confer, we sent an e-mail saying we would search for

13   those.  I listed the document requests in which they asked for

14   earlier documents and said we would respond to those.

15           The post-9/11 documents, pose two issues:

16           One, the most what it is asking for, which is like

17   travel records, compensation, entry and exit visa information,

18   etc., there is a whole series which we layed out in our letter

19   of the specific document requests, in our view will not throw

20   light on what Judge Daniels said was the question, which is,

21   what happened in early 2000 and whether somebody traveled or

22   where they traveled and what kind of visas they got and other

23   such materials don't seem to be particularly relevant.  So

24   that's one set.

25           But they are also asking for any investigations that

I5O2TERC

1   Saudi Arabia itself performed into the 9/11 attacks as well as

2   materials shared with the 9/11 Commission and such, and we feel

3   that those are problematic in a couple of respects.  One, to

4   the extent that they are showing an investigation by what would

5   be the Presidency of State Security, which includes the entity

6   that they called the Mabahith, which is responsible, like our

7   F.B.I., for internal state issues and security issues and

8   criminal issues.  To the extent that they conducted an

9   investigation, we think that their theories, reactions,

10  impressions, etc., are not properly within the scope of what

11  Judge Daniels has requested.  They are also, under Saudi law,

12  classified and potentially, to the extent that we were sharing

13  materials with the F.B.I. or with the 9/11 Commission, it was

14  the understanding of both parties that the materials shared

15  back and forth were to be confidential.

16          So to the extent the -- the 9/11 Commission has

17  produced, I believe, a tremendous amount of material, posted it

18  on the Web.  To the extent that they have withheld certain

19  materials, we don't think it is appropriate for the plaintiffs

20  to come and try to get it sort of through the back door through

21  us, and that it would be inconsistent with our agreements with

22  the U.S. investigators.

23          THE COURT:  Let me ask you a question with respect to

24  the dates.  If this were a less charged court action you could

25  envision communications and documents that post date the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I5O2TERC

accident as being relevant and probative because it might

indicate state of mind, knowledge, oh my gosh, I can't believe

this Cuisinart actually exploded in the kitchen.  We thought it

might those kind of *post hoc* communications by people with

knowledge that would be discoverable in an ordinary tort case.

         And so my reaction generally to the date range issue

is that it doesn't seem reasonable to make 9/11 the cutoff

date, at least for all matters, because to the extent there are

relevant communications -- let's get Bayoumi and al Thumairy

out of the country quickly because of what they just

orchestrated, for example -- that they should be entitled to

those documents.  So I see that as different than the category

of documents that were either an internal investigation that

the Kingdom conducted or documents that were provided to

various intelligence agencies, including the F.B.I. or the CIA

or the 9/11 Commission.

         But generally speaking, if you are searching for

communications between or about these two individuals, let's

say that the Ministry of Islamic Affairs might have, it seems

to me that there should be some dates, some searching,

postdating 9/11.

         MR. KELLOGG:  Understood, your Honor.

         You know, this is not an ordinary 26(b)(1) case, and

Judge Daniels did focus very much on whether instructions were

given at a specific time and communications regarding those,

I5O2TERC

1    and we think the most relevant materials are contemporaneous

2    documents.  If the court wants us -- as I said, most of what

3    they are asking for post 9/11 falls into two categories.  One

4    category is just the same stuff they were looking for pre-9/11

5    of communications with Thumairy, communications with Bayoumi,

6    travel information, exit visa information.  We could gather

7    that.  Of course we don't think it is within the scope, but we

8    could gather that in the ordinary course.  We have a bigger

9    concern with investigative and intelligence materials which

10   they also request.

11              THE COURT:  Okay.  I am going to come back to you, but

12   let me turn to the plaintiffs for a minute.

13              Mr. Carter, you are in the hot seat, so I assume you

14   will be taking the lead here.

15              MR. CARTER:  I am, your Honor.  I will kick us off and

16   Mr. Pounian may very well have some things to add on certain

17   subjects.

18              THE COURT:  Okay.

19              So you heard from Mr. Kellogg that you will be

20   receiving documents from at least these five repositories.  I

21   think you heard me that I am inclined to order that we go past

22   9/11 as a cutoff for searching ordinary internal

23   communications, e-mails, memos, etc.  Talk to me about -- why

24   don't I tell you what I am thinking about, and then maybe you

25   can tell me what you think.

I5O2TERC

1          MR. CARTER:  Sure.

2          THE COURT:  Judge Daniels identified very specific,

3    tailored allegations that the plaintiffs have put forward

4    establishing the jurisdiction over Saudi Arabia.  I had

5    reviewed your discovery demands, and I think they are, in large

6    measure, beyond the scope of what he has authorized.  It may be

7    that ultimately the court's conclusion is that the case should

8    go forward with the merits discovery, in which case the types

9    of demands that you are seeking may in fact be appropriate, but

10   at this stage I do think they are beyond what is contemplated

11   by his decision or what I contemplated when we were together in

12   April.

13          What I am contemplating right now is that you obtain

14   as quickly as possible -- and Mr. Kellogg says the end of the

15   summer, but I'm hoping we can move that date up some -- and

16   that you review those documents and see what you learn before

17   you make an application to compel the response to any number of

18   discovery demands that you have propounded at this point, given

19   that my sense, since it wasn't in the complaint or the

20   decision, is that those paths of discovery are ones that you

21   think may be lucrative, but don't have a firm foundation for

22   pursuing, and that the better course may be for you to see

23   what you learn, and if there is something in the batch that I

24   think we can all agree is an appropriate batch of discovery,

25   you can then make an application to the court to compel

1    responses.

2           MR. CARTER:  Your Honor, we had a slightly different

3    approach in mind, although the one your Honor has proposed may

4    very well work.

5           Our view on this was that the principal issue,

6    overarching issue at this point is how is Saudi Arabia going to

7    go about collecting documents and information?  And your Honor

8    had mentioned that Mr. Kellogg had referenced searching and

9    producing documents from five repositories.  In fact, what we

10   have is an agreement on their part to search through five

11   repositories, three of which may be subject to very broad

12   assertions of privilege under the two Vienna Conventions,

13   pursuant to which the Kingdom has said it is not permitting

14   providing any of the documents or the information learned and

15   that it may not even be willing to provide a privilege log.

16          Our view, in terms of how this should proceed, is

17   relatively simple.  The Supreme Court held in its *Republic of*

18   *Argentina v. NML Capital* decision that where discovery is

19   proceeding under the FSIA, the normal rules of discovery under

20   the federal rules apply to the discovery that has been

21   authorized.  From that flow a couple of very simple, basic

22   principles, in our view.

23          First, under Rule 34, a party who is engaged in

24   discovery has an obligation to produce documents in its care,

25   custody, and control if they are relevant and unless they are

I5O2TERC

privileged.  So we think application of that basic rule here is

appropriate, that the Kingdom should be obligated to do what

any litigant in federal court subject to discovery would be

obligated to do consistent with the Supreme Court's holding and

look in the places where the documents are located.

Now, we have asked a very simple interrogatory on that

front that asked the Kingdom to identify repositories where

documents related to Bayoumi and Thumairy are located.  We

believe that they already have that information.  So we think

it is all the more important that they have a search that

captures all of the repositories, given the way that they have

articulated their privileges.  We may not be getting anything

from three of the places they are talking about searching; and,

to the extent documents from those places were sent, for

instance, to the Foreign Ministry or somewhere else, the

privilege that attached to archives and consular or diplomatic

properties may have been waived.  So that's the first

principle.

The second is simply, with regard to the

interrogatories --

THE COURT:  I want to interrupt you so I understand.

So you think that, in response to that interrogatory, the

kingdom would respond that documents related to these two

individuals would be located in repositories outside of the six

that they have agreed to search.

I5O2TERC

1          MR. CARTER:  I think we are relatively certain that

2     that would be the case from what we know.  We have identified

3     in our letter certain contacts that occurred with other

4     ministries.  We know that senior people from the Ministry of

5     Defense and Aviation, which is the parent of now the GACA, what

6     was the Presidency of Civil Aviation were involved in Bayoumi's

7     secondment, and so it stands to reason that there may very well

8     be documents in the parent ministry that aren't resident in the

9     Presidency of Civil Aviation.  And, again, this is simply a

10    matter of adhering to the normal approach under the rules as to

11    the scope of a document collection effort.  We think that they

12    likely already know where all of the documents are and can

13    provide them to us.

14         THE COURT:  What you are saying now I think is

15    slightly different than what you propounded in your discovery

16    demand, which was unusual.  If you believe there is a clear

17    chain of litigation that you can point to about particular

18    secondment that had to go to the Ministry of Finance or some

19    other agency for approval or for signoff, or for whatever it

20    is, it seems to me that that can be a very tailored discovery

21    demand.

22         But I think, generally speaking, the broad discovery

23    demands that you have propounded and saying look at every

24    agency that could ever have any possible touch to the 9/11

25    attacks is overbroad and is not what was contemplated by

I5O2TERC

1   Judge Daniels.

2          So I hear you that you are saying we have very strong

3   reason to believe that this particular memo had to go to this

4   particular agency in order for Bayoumi's secondment to happen,

5   for example.  That seems different to me than saying the

6   Kingdom needs to search its entire filing system to search for

7   a needle in a haystack.

8          MR. CARTER:  Well, your Honor, just take, for example,

9   our request that The kingdom search the Mabahith.  Mr. Kellogg

10  had suggested today that it is an intelligence agency, the

11  equivalent the F.B.I., and therefore everything categorically

12  that might come out of it would be privileged in their view.

13  Our view that in the course of the Kingdom's own

14  investigations, certain original documents would have all

15  gotten transported over there and that this is one-stop

16  shopping for most virtually everything that we are entitled to

17  and would want.  There may very well be assessments, analyses

18  that occurred after 9/11 that would validly be privileged.  But

19  with respect to the stuff that was identified and collected for

20  purposes of determining specifically what Bayoumi and Thumairy

21  were doing, who may have been directing them, that is an

22  appropriate place for them to be searching and it really -- the

23  exercise that they have gone through previously is the one that

24  the federal rules contemplates, to look around, gather the

25  documents, gather the information, and put it in a central

I5O2TERC

1    place.  And to the extent that's already been done, we think

2    that that's the first place that the Kingdom should begin

3    searching, especially given the potential that the other

4    repositories are going to essentially be or potentially be

5    regarded by the Kingdom to be off limits.

6         And so we are happy to make a showing, your Honor, as

7    to why we think particular repositories should be searched at

8    the outset of this.  We obviously could not have canvased those

9    issues, as your Honor surmised, in a ten-page letter brief on

10   the status.  And so we are happy to do that up front and

11   explain legally our position about how the federal rules should

12   operate in the context of this and why we think these are

13   appropriate places for them to be looking.

14        THE COURT:  Mr. Kellogg, if it is correct that this

15   agency -- what's the name of the agency you describe as like

16   our F.B.I.

17        MR. CARTER:  It's the Mabahith.

18        MR. KELLOGG:  No.  It is the Presidency of State

19   Security, your Honor.  There are only two agencies.  There is

20   the Presidency of State Securities, which is the equivalent of

21   the F.B.I., and what Mr. Carter calls the Mabahith is contained

22   within that.  There is also the GID, General Intelligence

23   Directive, which is their equivalent of the CIA, and Mukhabarat

24   is contained -- what they are what they are calling Mukhabarat

25   is contained within that.

I5O2TERC

1          THE COURT:  If there were documents that the

2    Presidency of State Security gathered from various other

3    agencies, Islamic Affairs, etc., agencies that you have said we

4    are prepared to search, if it is true that, following the

5    September 11 attacks, this particular agency, this intelligence

6    agency went around to the various agencies that it thought

7    might have information and physically grabbed paper documents

8    for the purposes of its investigation, originals, faxes from

9    the year 2000, grabbed them for purposes of its own

10   investigation, would it be your position that those documents

11   would be otherwise off limits because they were part of the

12   documents that you were using for investigation or would you be

13   prepared to search that collection, which has already been

14   gathered, without necessarily even revealing whether they were

15   part of the investigation gathering or not, but simply as an

16   original document that would be responsive to the discovery

17   demands?

18          MR. KELLOGG:  Absolutely, your Honor.  In fact, we

19   have begun that process.  We had a lengthy meeting with

20   Presidency of State Security.  We think the plaintiffs'

21   assumption that a large investigation was done and materials

22   were gathered is mistaken; but, to the extent that any

23   materials were gathered, original materials from the various

24   agencies we are searching or otherwise, we would be prepared to

25   work with the Presidency of State Security to turn those over.

I5O2TERC

| | |
|---|---|
| 1 | THE COURT:  So you are prepared, you identified five |
| 2 | repositories, but I think I hear you saying you are prepared to |
| 3 | also review that collection of material, which I am |
| 4 | interpreting as different than that agency's own investigative |
| 5 | files, its own original work that it is creating, but you would |
| 6 | search the file cabinet, as it were, of documents that it |
| 7 | seized from other agencies and that it reviewed as part of its |
| 8 | own internal investigation. |
| 9 | MR. KELLOGG:  Correct, your Honor.  To the extent |
| 10 | that, say, PSS received documents from the Ministry of Islamic |
| 11 | Affairs or from GACA, and those files are no longer with those |
| 12 | agencies because they took the originals, then absolutely we |
| 13 | believe we should turn those over. |
| 14 | THE COURT:  Okay.  And would you commit to turning |
| 15 | over any responsive document that is in that intelligence |
| 16 | gathering set of documents, even if it is not from the five |
| 17 | repositories that you identified?  So let's say some other |
| 18 | ministry, the Ministry of Finance, also had relevant documents |
| 19 | that, when the Presidency of State Security opened its own |
| 20 | internal investigation, for whatever reason, its catchment of |
| 21 | documents was broader, it brought everything under its own |
| 22 | house and then now, in reviewing those documents, if you see |
| 23 | documents that are responsive to the discovery demands, but |
| 24 | maybe don't come from those five identified repositories, do |
| 25 | you commit to turning that over as well? |

I5O2TERC

1          MR. KELLOGG:  Yes, your Honor, subject -- it's a

2     hypothetical because, based on our discussions with them, we

3     think their role was mainly cooperating with the United States

4     and supporting the United States's investigation, rather than

5     doing any extensive investigation of their own.  But to the

6     extent that they gathered responsive documents from the

7     relevant periods, then we would commit to searching for those

8     documents.

9          THE COURT:  Okay.

10          MR. KELLOGG:  Subject to any kind of, you know --

11     there may be some sources and methods issues that come up that

12     require redaction or otherwise, but we do anticipate doing

13     that.

14          And with respect to the diplomatic documents, we

15     talked about the embassy, we talked about the consulate.  We

16     met personally with the Minister of Foreign Affairs, and he

17     made it quite clear that they are prepared to turn over

18     relevant documents.  They don't want, you know, a general

19     rummaging in their diplomatic files, but the sort of targeted,

20     focused gathering of documents we do not anticipate -- this

21     could change, I'm saying based on our discussions, we do not

22     anticipate that they will be claiming diplomatic privilege for

23     those.

24          THE COURT:  Okay.

25          MR. KELLOGG:  But we did have to, in the letter,

I5O2TERC

1    preserve all our rights and privileges, otherwise they would

2    say we waived them.

3            THE COURT:  Understood.  Thank you.

4            Mr. Carter, I was with you, but I wanted to get some

5    clarity.  So now we have a little bit, I think, better sense.

6            So not only is the Kingdom committing to search these

7    five repositories independently, it is also committing to doing

8    exactly what you wanted, which is, in the weeks and months

9    after 9/11, to the extent Saudi Arabia conducted its own

10   investigation, either for its internal purposes or for purposes

11   of cooperating with any foreign agency, and it is holding those

12   documents in a particular place, that it will also search those

13   documents.

14           So if they lifted a personnel file from where it

15   should be and brought it into this intelligence agency, it

16   would not be protected, and they would search for it and

17   produce it unless there was some other independent ground, but

18   the fact that it was housed in the intelligence agency

19   wouldn't, in and of itself, make it nondiscoverable.

20           MR. CARTER:  That's what I understood as well, your

21   Honor.

22           THE COURT:  Okay.

23           MR. CARTER:  There obviously are, as your Honor

24   alluded, some very specific cases with regard to the approval

25   of Bayoumi's secondment, for instance, with regard to certain

I5O2TERC

1    financial transfers where we have a very specific reason for a

2    very specific issue that we believe a particular ministry would

3    have a document and we would like to have an opportunity to

4    make that showing with respect to those entities.

5             THE COURT:  Do you believe that the discovery demands

6    that you already served are narrow and targeted in that

7    particular way or are they broad in your mind and would capture

8    the specific thing you are seeking but you wanted whatever else

9    would come along as well?

10            MR. CARTER:  I think that they likely would have --

11   some of them would have to be clarified in a way that says:

12   With respect to this particular request, we are asking

13   specifically for this ministry because we have the following

14   information to suggest that there are documents there.

15            THE COURT:  Okay.  I think that that would be a

16   helpful thing.  So you can review discovery demands.  If there

17   is something outside of what we have been discussing here,

18   maybe something from, I'm going to keep using the Ministry of

19   Finance, that you have a particular reason to believe is going

20   to be relevant to explain that, so that we can have a targeted

21   search and so they can respond more specifically to what the

22   request is.

23            MR. CARTER:  Thank you, your Honor.

24            We also do believe that the General Intelligence

25   Directorate is the repository that would house documents

I5O2TERC

relating to the activities of Thumairy and Bayoumi that are
described in the court's March 28 decision; and, in fact, we
put affidavits in the record that the intelligence agency would
have been a secondary customer of the activities that Bayoumi
and Thumairy were engaged in, and so we have evidence as well
that Thumairy was in fact involved in supervising people who
were engaged in intelligence-gathering activities, and so it
naturally follows that there would have been reporting to that
agency relating to what Bayoumi and Thumairy are doing.

         The Kingdom's response to that is to say, That's our
CIA, and therefore everything that could possibly come out of
that would be a state secret.  That kind of blanket assertion
of a privilege based on state secrets doesn't comport with the
federal rules and it is not even something that the CIA or
F.B.I. could do if they were litigating a discovery dispute in
U.S. courts.  There is a very specific showing.  They have to
come forth.  They can't simply say, We are an intelligence
agency, so anything in our files necessarily becomes a state
secret.  Actually they have to bring forward the head of the
agency to personally invoke the privilege, to say that he or
she has given it personal consideration, and that it is
necessary to hold the documents back.  So the mere fact that we
are talking about an intelligence agency doesn't foreclose the
possibility that there are documents there that we are entitled
to.  We candidly question whether or not the states secret

I5O2TERC

privilege is available to Saudi Arabia in these proceedings.
What we would simply like to do is to ensure that that
repository is searched.

When we spoke on the phone with Mr. Kellogg, we asked
specifically, with regard to your common law privileges, state
secret deliberative process, would you provide a privilege log,
and the answer at that time was yes.  So that's all we are
expecting here.  If they have valid assertions of privilege,
they will provide us with a privilege log, and we can go
forward from there.  But we do believe that there are documents
in that repository that are highly relevant here.

THE COURT:  Mr. Kellogg, have you spoken with the
folks from the General Directorate?

MR. KELLOGG:  We have not spoken with anyone from the
General Intelligence Directorate, your Honor, nor do we think
that plaintiffs have made even remotely a showing that that
agency is likely to have relevant documents that have anything
to do with the allegations within pages 19 to 23 of Judge
Daniels' opinion.  The only thing they cite in their letter as
a basis for a broad search of effectively the CIA is that they
say that the F.B.I. had, quote, strong suspicions that Bayoumi
was a Mukhabarat agent.  In fact, the F.B.I. expressly rejected
that in their 2005 joint report with the CIA.  And plaintiffs
did not argue in the recent round of pleadings that Bayoumi was
an intelligence agent, and Judge Daniels did not rely on any

I5O2TERC

|  |  |
|---|---|
| 1 | such allegation.  So there is, accordingly, no basis, no basis |
| 2 | under Judge Daniels' opinion to do a search of the GID, |
| 3 | particularly given all the sensitivities to a foreign sovereign |
| 4 | and their intelligence agency.  The CIA would never allow a |
| 5 | foreign government to search into its files or prepare |
| 6 | privilege logs after doing so, and we are really not in a |
| 7 | position to go to the GID and say, We want to take a look |
| 8 | through your files. |
| 9 | THE COURT:  Okay. |
| 10 | MR. POUNIAN:  Your Honor, may I be heard on one thing? |
| 11 | Mr. Kellogg said there was no evidence in the record about |
| 12 | Mr. Bayoumi being an intelligence agent.  On the motion record, |
| 13 | we submitted an affidavit from the head of the PENTTBOM |
| 14 | investigation, the official 9/11 investigation, who was the |
| 15 | head of the team in Los Angeles, and he said that they found |
| 16 | substantial evidence that Mr. Bayoumi was a Saudi intelligence |
| 17 | agent.  So that is something that is in the record, that was in |
| 18 | the record before the court, and is an allegation that we have |
| 19 | made with the court, and I just wanted to correct that |
| 20 | statement. |
| 21 | THE COURT:  What I was proposing, and this is a good |
| 22 | example of my concern, is given the sensitivity to this agency |
| 23 | and the likelihood that a lot of information is appropriately |
| 24 | protected by privilege, it seems to me that the better course |
| 25 | here is for you to get the underlying documents relating to |

I5O2TERC

al Bayoumi, the types of communications that were going on; and
to the extent there is something in that record, some actual
evidence, contemporaneous evidence that you could then bring
back to the court and say, Look, here is communication, here is
a memo, here is some specific document.  But the fact that the
9/11 Commission or some agent said that, We had suspicions or
we thought this or we made this conclusion, that's not
evidence.  So it seems to me that you should have access to the
types of documents that would be able to help the court draw
that conclusion.  I can't rely on the conclusion of others.

          MR. POUNIAN:  I understand that.  I understand what
you are saying, your Honor, but they have to assert the
privilege in a certain way.  They have to say where they have
the documents, and we are entitled to investigate this.  And
under JASTA, we are supposed to be allowed full access for this
type of discovery.  The JASTA action is specifically geared to
this type of activity occurring by a foreign state taking this
action in the United States.  We are kind of blazing a new
trail here for the first time, your Honor, in this
circumstance, and I think that it is a critical issue.  If the
foreign government is sending an agent here who is authorized
to provide a support network for al Qaeda inside the United
States, that is something I think this court is entitled to
allow discovery on.

          THE COURT:  But that's just your argument.  The Saudi

I5O2TERC

1    government isn't saying that --

2            MR. POUNIAN:  I understand.  But we have presented

3    proof -- it is argument, your Honor, but we have presented

4    proof from the PENTTBOM investigation that they did assemble

5    evidence of this.  You know, we are not -- we don't have access

6    to all of those details, but we have presented evidence in the

7    motion record regarding that.

8            THE COURT:  Okay.

9            MR. CARTER:  Your Honor, could I make a practical

10   suggestion on this point?

11           THE COURT:  Sure.

12           MR. CARTER:  We don't really see any problem simply

13   having Mr. Kellogg ask the General Intelligence Directorate

14   whether it has documents relating to Bayoumi and Thumairy

15   dating to the period '98 through 2001, and we will get an

16   answer to that question.  I'm sure they have the capabilities

17   of simply saying yes or no.  I'm sure they know the people they

18   have documents about.  And once we know whether or not the

19   documents exist, which is the point of the interrogatory we

20   asked, we can take the next step to see whether or not it makes

21   sense to go down that road.

22           THE COURT:  My guess -- I'm happy to hear Mr. Kellogg

23   clog before I predict what he is going to say.  Mr. Kellogg,

24   are you planning to answer this interrogatory?

25           MR. KELLOGG:  I'm sorry your Honor?

I5O2TERC

1          THE COURT:  Are you planning on answering this

2     interrogatory?

3          MR. KELLOGG:  We are planning on answering the

4     interrogatories.

5          THE COURT:  The specific interrogatory as to whether

6     or not --

7          MR. KELLOGG:  Just --

8          THE COURT:  -- whether or not --

9          MR. KELLOGG:  About repositories, we are going to

10    answer them based on the places we have undertaken to search.

11         THE COURT:  I think what Mr. Carter is proposing is

12    that you answer an interrogatory as to whether or not the

13    General Intelligence Directorate has documents related

14    to al Bayoumi or whether he was an agent of that agency.

15         MR. KELLOGG:  And our suggestion is that they haven't

16    made a proper showing that would justify that sort of inquiry

17    into the intelligence agency of a foreign sovereign.  The

18    evidence that they are referring to is speculation that when

19    Bayoumi went to the L.A. consulate allegedly to get his

20    passport renewed, he was in fact engaging in spycraft to

21    disguise the fact that he was an intelligence agent.  That is

22    not evidence.  It is not a sufficient basis.  Judge Daniels did

23    not rely upon it in 19 to 23, and I think it would be a

24    significant affront to a foreign government.  Certainly the CIA

25    would not answer such a question.  They always refuse to

I5O2TERC

confirm or deny, because denial means -- implies confirmation

when they don't deny.  So I think it would put us in a very

awkward position, your Honor, and I think that they haven't

made a sufficient showing to request that.

THE COURT:  Okay.

MR. CARTER:  Your Honor, on that point, I think

simply, if that's the Kingdom's position, that they can't be

obligated to look or do something, that statement needs to come

from an official of the Kingdom, as opposed to just a

representation by counsel.  That is the way it would work if

the CIA were in a discovery proceeding and were telling the

court, We can't tell you this, because it would itself

implicate a state secret, the head of the agency would come

forward, invoke the privilege, say that he or she has given it

personal consideration, and it would flow under the rules that

apply to asserting that privilege.  It is a relatively straight

forward question.

THE COURT:  Okay.

Mr. Kellogg, I want you to do better than the end of

summer for this what I'm going to call a first tranche of

production.  I would like to get these documents to the

plaintiffs by July 31.  That gives you a little over two

months, which I think should be enough time.

MR. KELLOGG:  And as I said, we will do rolling

production.  We have personnel files already, and we just want

I5O2TERC

1   to make sure that they are complete, and we will endeavor to

2   do, and I would love to have it done by July 31, your Honor.

3   It is just logistically, there are some issues, but we will do

4   our best.

5           THE COURT:  Okay.  And where appropriate, I want you

6   to look through December 31, 2002.  So that gives us a little

7   bit over a year past 9/11.  And I want you to look through the

8   repositories that you have agreed to look through as well as

9   the Presidency of State Security file, to the extent that they

10  assembled documents for their purposes whether for their own

11  internal investigation or for purposes of sharing information

12  with other intelligence agencies.

13          I am not going to direct that you respond to the

14  interrogatory or search the General Intelligence Directorate,

15  but that is a ruling without prejudice.  I want you,

16  Mr. Carter, and your colleagues to look through the documents

17  you that receive, and then we are going to set up an

18  opportunity for proper motion practice, where you can put

19  forward to me what documents you believe you are now further

20  entitled to in light of the first tranche of production.  But

21  what I want you to get is sort of the core documents that we

22  are talking about here, so everything related to these two

23  individuals' employment, the secondment, their communications

24  with the various consulates, their sort of role with the

25  various -- with the aviation agency.  Obviously you are getting

I5O2TERC

whatever you are getting from Dallah Avco.  I am pretty sure I
have a pending motion to compel on that front, so maybe you
don't have that much from them, but I want to do this in a
tranched and phased way, because I think we will have a better
sense of what is there, and it may be that the discovery
indicates that there really is a good-faith basis to expand
much more broadly the scope of discovery.

So, Mr. Kellogg, you should advise your client that is
this is not the end of it, this is our first phase, and then we
will see what we have.

I think we should have, and I'm going to leave it to
the parties to agree on exactly what it looks like, but a
privilege log should be produced.  I don't have a sense yet,
given the agencies that we are looking at, what privilege is
going to be asserted and whether or not it is the type of thing
where we can do categories.  So, in the first instance, I'm
going to look to the parties to try and coordinate and
cooperate on that front.  If there are categories that give the
plaintiffs adequate understanding of what is actually
encompassed in those categories, that may be sufficient for
purposes of asserting a privilege, but obviously your
categories have to be meaningful, meaning they can't just be,
Privileged documents are in this category, and we are asserting
a privilege.

So let's do that.  It's going to be a rolling

I5O2TERC

 1   production on July 31.

 2          I think, then, what I would like to do is give the

 3   parties an opportunity to have a review of the documents and a

 4   meet-and-confer and then see whether or not you can resolve any

 5   of those disputes on your own and agree to expand or search for

 6   additional discovery.

 7          Let me just pause for one moment.

 8          Mr. Kellogg, in addition to the general discovery

 9   demands, the plaintiffs are going to give you more targeted

10   discovery which may be slightly beyond what I am directing

11   today, so it might be a different agency, but it should be

12   targeted.

13          And, Mr. Carter, you should be candid and clear about

14   what it is you are seeking and why, to give Mr. Kellogg and his

15   team as much information to do as meaningful a search as

16   possible.

17          MR. CARTER:  Sure, your Honor.

18          THE COURT:  I am thinking that mid September would be

19   an adequate amount of time for you to receive these

20   documents -- I don't know if we are going to have translation

21   issues, which is going to cause complications.  Obviously there

22   is going to be translation done in the first instance.  Are the

23   parties  agreeing to share translators?  Is that something that

24   we can do?

25          MR. CARTER:  Your Honor, there was provision in, I

I5O2TERC

1   believe, the case management order number two, going back to

2   2003, that essentially required the parties to share existing

3   translations of documents, but not share translations that were

4   done during the course of the litigation, for purposes of the

5   litigation.

6           THE COURT:  Can we revisit that topic?  Is it

7   possible?  Look.  If Mr. Kellogg and his team are getting a

8   bunch of documents in Arabic, they are then hiring a translator

9   to translate them so that they can do a review and determine

10   whether they are responsive or privileged, then to turn over

11   the Arabic versions, and for you to then hire your own

12   interpreter seems problematic.  It delays the process, it is

13   more expensive, and I would hate for there to be sort of a

14   battle of the interpreters, as well.

15           Is it possible that the parties could agree on a

16   neutral interpreter who could review this?  And now that I am

17   thinking out loud, there are going to be issues, I assume,

18   about privilege that you may have problems with.

19           MR. KELLOGG:  Well, there are, your Honor.  And,

20   frankly, we were planning to do initially a fairly quick and

21   dirty and perhaps even machine translation in order for us to

22   determine whether the documents are generally responsive,

23   whether there is a privilege issue as well, and there will

24   probably be only a subset down the road that we get a certified

25   translator to do.  And there will inevitably translation

I5O2TERC

1     issues, where dueling translators say, no, this means X, Y, and

2     Z and somebody else says, no, it means A, B, and C.  I suspect

3     it won't be possible for us to come to an agreement on that.

4                THE COURT:  Do you intend to produce your translated

5     version along with your --

6                MR. KELLOGG:  No, your Honor.

7                THE COURT:  -- Arabic version?

8                MR. KELLOGG:  No.  We just plan to produce the Arabic

9     version.

10                THE COURT:  So is it possible that we are going to

11    have motion practice, whenever we have it, where I have dueling

12    English versions of the same document?

13                MR. KELLOGG:  My understanding is, your Honor -- I

14    have never done a case like this before, but my understanding

15    is that there are dueling translators even in depositions who

16    argue over whether the, you know, question has been interpreted

17    properly to the deponents and whether the deponent's answer has

18    been interpreted properly back.  I am afraid it is something of

19    a mess that can't be avoided.

20                THE COURT:  Okay.  Let's just pause on the idea that

21    we can try to avoid it and maybe you can speak.  It seems to me

22    that there could be, in theory, an agreement that the ABC

23    Corporation, which does excellent translation for high-level

24    corporations and government agencies, could be the translation

25    company that both sides agree to, and that you agree to use the

I5O2TERC

1    same company for depositions, for document translations.  It

2    seems to me that rather than have this, at least in the first

3    instance, rather than create an unnecessary dispute, to say

4    nothing about time delays and costs, that this might be a way

5    to move the case along.  And it could be without prejudice to

6    each side at a later date saying we are actually challenging

7    the designated interpreter because we have taken this

8    particularly important document to another interpreter, and

9    that interpreter says it is something else.  But for your

10   ordinary course of documents, where there is not going to be a

11   whole lot of dispute about what is being reported, it seems to

12   me you can save a lot of heartache by sharing interpreters.

13            MR. KELLOGG:  I am happy to discuss that with

14   Mr. Carter, subject to the caveat you mentioned, which is,

15   either side is free to dispute the agreed-upon translation.

16            THE COURT:  I would never let a lawyer not make an

17   argument.

18            MR. CARTER:  I am happy to speak with Mr. Kellogg and

19   the cast of characters on our side as well.

20            THE COURT:  I think you should.

21            MR. CARTER:  Sure.

22            THE COURT:  I have to believe that there must be some

23   agency that we could agree upon would be adequate for this

24   purpose, and that way you can share costs.  And then when

25   Mr. Kellogg's team is translating a document for purposes of

I5O2TERC

1   discovery, you can get the translation because it is the one

2   that we all agreed upon.  And, again, you would be free to

3   dispute even the translator that was agreed upon, but then we

4   don't have to delay another month to have all these documents

5   translated.

6          So I am going to throw that out there to you all, but

7   I think it is something you should seriously consider.

8          So I want documents produced on a rolling basis on the

9   documents we have agreed upon with the dates that we have been

10  discussing.  Final production should be July 31.

11         There should be some form of privilege log to the

12  extent you are withholding documents on the basis of privilege.

13  In the first instance, I'm going to leave it to the parties to

14  try to work out an agreement.  Again, maybe there are no

15  documents that are privileged.  Maybe it is so large that

16  categories are appropriate.  So, without any more information,

17  I'm going to hold off on a direction on that particular front.

18         MR. KELLOGG:  Just as a clarification, your Honor.  My

19  understanding is your ruling with respect to the PSS, we are

20  going to look for documents that they gathered from other

21  places and brought together, and I don't have to put a

22  privilege log of any of their impressions or notes or such,

23  like, investigative materials.  It's in order to get documents

24  that say the Ministry of Islamic Affairs had --

25         THE COURT:  Correct.

I5O2TERC

1          MR. KELLOGG:  And then I don't anticipate a problem.

2          THE COURT:  Correct.  That's correct.  Okay.

3          Then what I want is for you all to spend the next 45

4    days reviewing those documents for the Plaintiffs' Executive

5    Committee to determine whether or not, based on that

6    production, you believe that they need to go back either into

7    the same repositories or whether they need to expand their

8    searches, whether there is targeted discovery that you think

9    you can identify a particular memo, for instance, that's

10   referenced, or whether or not you think the discovery

11   demonstrates that we should have a larger production, sort of

12   more akin to the types of discovery demands that you initially

13   propounded.

14          I want the parties to have a meet-and-confer on that

15   issue, and then I think probably, rather than have a status

16   letter, we should just set a deadline for motion to compel.  I

17   think that's probably the most efficient process.  I don't have

18   a calendar here.  I will look at the calendar.  But it will be

19   a mid September deadline for the motion to compel.  So we will

20   set an order for that, and it will be the plaintiffs' motion to

21   compel responses or additional discovery, and your motion will

22   be most successful if you can provide me with the types of

23   evidence that justifies further inquiry.

24          I want to talk about the Kingdom's request for

25   discovery from the plaintiffs.  My reaction to that is that it

I5O2TERC

is not appropriate, but I am sensitive to the concern that you

raised about a potential sandbag.  So I want to talk for one

moment -- I don't know if people have started thinking about

this -- about the end game here, which is how we are going to

go back to Judge Daniels.

I think what Judge Daniels anticipates is a renewed

motion to dismiss filed by the Kingdom.  What I want to propose

is that the plaintiffs -- I'm not ready to order this, but here

is what I am thinking might make sense -- that the plaintiffs

set forth something like findings of fact in advance of the

motion to dismiss, setting forth the basis that the Plaintiffs

Executive -- I don't want an amended complaint -- nobody wants

an amended complaint -- but a statement on this particular

issue, say, findings of fact *à la* Rule 56.1, although that's

not what we are talking about here, so some version of that, so

a statement with supporting documents that the Kingdom can

review and rely upon in making its motion.

In theory, how does something like that sound?

MR. CARTER:  Your Honor, in theory it sounds fine.  We

have actually done something similar in the context of some of

the personal jurisdiction motions that occurred earlier in the

case and came forward after discovery with affirmations of

facts in evidence that we were going to rely upon in support of

our opposition to those motions.  I think we have to talk about

the timing of all of that; but, in theory, I don't think it is

I5O2TERC

a problem.  We are not trying to play hide the ball.  We just

didn't think this was the appropriate time to do this kind of

discovery because we are principally waiting to get the

information from them.  But once we have it, we are perfectly

happy to show our cards.

            THE COURT:  Okay.  That was sort of my takeaway, as

well.

            Any response or reaction from the Kingdom?

            MR. KELLOGG:  No, your Honor, as long as it does not

delay the process too much.  The plaintiffs' responded last

night to our discovery request, and in it they said they would

provide us copies of all materials that they obtained through

third-party subpoenas, which I think it is appropriate for us

to be able to see, as well, going to be important.

            THE COURT:  Okay.  Good.

            All right.  As far as timing goes, I know we talked

about motions being filed in October.  I don't think that

that's realistic, but I am looking to get motions or get this

back to Judge Daniels hopefully by the end of this year or

early next year.  That time frame seems like a reasonable one

for me, and I know there are other discovery motions that are

pending before me.  When this one comes in, I will prioritize

it, given the sensitivity and the timeliness issues.

            Any other issues with respect to the discovery that we

should be discussing at this point?

I5O2TERC

1          MR. KELLOGG:  Your Honor, there is the issue of the

2     third-party discovery which we raised, that the third-party

3     subpoenas served on the State Department and the F.B.I. go well

4     beyond the scope of discovery that Judge Daniels has ordered.

5     I realize, your Honor, the question of whether we have standing

6     to object, and I know a representative of the United States is

7     here and presumably will be responding to that.  But it does --

8     they have already served, I believe, six or seven third-party

9     subpoenas.  So to the extent that they are expanding well

10    beyond what Judge Daniels talked about in pages 19 to 23 and

11    even seeking information about individuals that he expressly

12    rejected the allegations concerning as insufficient, it

13    significantly increases the burden on us and the potential for

14    delay.

15          THE COURT:  How does it increase the burden on you?

16          MR. KELLOGG:  Because we have to monitor all this

17    stuff as it comes in and take a look at it.  To the extent that

18    there are 30(b)(6) depositions and such, we are going to have

19    to attend those.

20          THE COURT:  A couple of points.  One, the Plaintiffs'

21    Executive Committee is moving on multiple fronts, so it is

22    possible -- I haven't canvased these subpoenas closely -- that

23    there is information that's being sought that may speak to

24    other elements of this much larger case.

25          MR. KELLOGG:  I think that's not the case, your Honor,

I5O2TERC

1    you will find if you read them.

2              THE COURT:  Okay.  And then my initial concern for you

3    is whether or not the Kingdom has standing, and I don't see the

4    argument.  Your burden of having to review it seems slight in

5    this instance and it hasn't -- I suppose if the State

6    Department intends to make the same arguments that you are

7    making, that Judge Daniels has not authorized this type of

8    broad discovery, I think they are the ones who need to make

9    that argument to me.  I'm not sure that you really have the

10   standing.

11             MR. KELLOGG:  That's fair enough.  Two points, your

12   Honor:

13             One is that we would ask that the State Department,

14   the Department of Justice, be made aware of the limitations

15   that Judge Daniels has imposed upon the discovery so they can

16   make their own judgment.

17             Second, we did cite the court a couple of opinions, I

18   know one from Judge Cote and another from the Southern

19   District, in which they note that the court has independent

20   authority to say this third-party subpoena is going beyond the

21   scope of proper discovery in this matter.  So although we don't

22   contemplate filing a motion to quash and your Honor has

23   indicated you don't think we have jurisdiction, we just wanted

24   to bring the issue to the attention of the court.

25             THE COURT:  Okay.  Thank you.

1            Anything you would like to say in response?

2            MR. CARTER:  Your Honor, all I would say is that -- a

3    few things.  One, we are obviously in a conversation with the

4    Department of Justice representing the agencies, and one of the

5    things the Department of Justice wants to know is how is this

6    relevant to an inquiry that's appropriately ongoing in the

7    proceeding?  So the agencies are well represented by the

8    Department of Justice relative to the issues that Mr. Kellogg

9    has raised.  We are not of a view necessarily that discovery of

10   the agencies is cabined in the same way discovery of the

11   Kingdom is; but, even putting that aside, we firmly believe

12   that the things we have asked for go straight to the heart of

13   the discussion on pages 19 to 23, and it is up to us to

14   convince the agencies and the Department of Justice that it's

15   relevant, and we are going to go through that process.

16           THE COURT:  Can you represent to me that the agencies

17   are aware of the posture that the court is in, meaning that

18   Judge Daniels has issued this decision and authorized discovery

19   as to these particular allegations?

20           MR. CARTER:  I can say that.  Sarah Normand from the

21   U.S. Attorney's office is here.  I think she could probably

22   affirm that she is very much aware of the posture of the

23   litigation, having monitored it for many, many years.

24           THE COURT:  Okay.  Ms. Normand, do you want to just

25   step up?  But I need to you to come borrow Mr. Carter's

I5O2TERC

1    microphone.

2            MS. NORMAND:  Sarah Normand, from the U.S. Attorney's

3    Office for the Southern District of New York.  And we are

4    representing both the Department of Justice and the State

5    Department in relation to the subpoenas that have been issued

6    as well as the *Touhy* requests that are accompanying those.

7            As the court may be aware, each agency has a set of

8    regulations that govern requests that are made to agencies when

9    the agencies are nonparties, and those regulations differ among

10   agencies and they outline various considerations that need to

11   be taken into account in evaluating requests.

12           And so the agencies involved in this case, the F.B.I.

13   and the Department of Justice and the State Department, are

14   reviewing the subpoenas.  We have made an interim response to

15   the Plaintiffs' Executive Committees that seeks more

16   information with regard to the F.B.I. subpoena.

17           With regard to the State Department subpoena, we are

18   still reviewing that.  We certainly will hear from the Kingdom

19   of Saudi Arabia with regard to its objections to understand the

20   basis for those.

21           We have very much been following this.  We are here

22   today obviously, and we were here at the prior conference, as

23   well, and we are asking for information about any applicable

24   court orders that affect the scope of discovery with regard to

25   these parties; but also, to the extent the plaintiffs are

I5O2TERC

1    seeking material that relates to other claims, if in fact they

2    are seeking that material, we have asked them to identify the

3    applicable parties' claims, court orders, etc., so we can make

4    the relevant evaluations.

5              THE COURT:  Excellent.  Sounds like the U.S.

6    government is well represented.

7              MS. NORMAND:  Thank you, your Honor.

8              THE COURT:  Thank you.

9              Let me move briefly to the request filed, I think it

10   was yesterday regarding, the short-form complaint, and the

11   like.

12             Let me ask you a really basic question.  Yes?  Are you

13   going to be taking the lead here?

14             MR. MALONEY:  I am, your Honor.

15             THE COURT:  Thank you.  It is Mr. Maloney?

16             MR. MALONEY:  Yes.  Andrew Maloney.  Sorry.

17             THE COURT:  My first question for you is one maybe I

18   should know the answer to, but I will betray my ignorance in

19   open court to all, what is the statute of limitations for the

20   claims against Iran?

21             MR. MALONEY:  Arguably, it's January 2, 2019.

22             THE COURT:  Under JASTA because of the JASTA --

23             MR. MALONEY:  Under the ATA, actually, which is the

24   Antiterrorism Act, that JASTA helped to amend.

25             THE COURT:  So under JASTA --

I5O2TERC

1          MR. MALONEY:  It's JASTA and the ATA.

2          THE COURT:  The ATA as amended by JASTA you believe

3    allows claims brought by January --

4          MR. MALONEY:  The ATA was actually amended before that

5    on the statute of limitations.  I believe it gave ten years.

6    And then JASTA came along and added to that.  But I don't think

7    it -- it added some teeth to the ATA, but not on the statute of

8    limitations, but that was done to --

9          THE COURT:  So I confess that I didn't look it up

10   again, but that was my recollection, that it was a ten-year

11   statute of limitations going off of 1996.

12         MR. MALONEY:  No, not 1996.  2009.  You may be

13   thinking of the prior FSIA, the Foreign Sovereign Immunities

14   Act, that came out in 1996 that eventually helped us with the

15   Libya action.  But later, in 2009, the ATA was amended and

16   expanded -- it started the clock, reset the clock for claims

17   for another ten years from 2009.

18         THE COURT:  Okay.  And that amendment allowed for

19   claims that -- it allowed the clock to run anew as of 2009 for

20   an additional ten years?

21         MR. MALONEY:  Yes.

22         THE COURT:  It wasn't allowing a ten-year statute of

23   limitations from the moment of the tort.

24         MR. MALONEY:  Correct.

25         THE COURT:  Okay.

I5O2TERC

1          So like I said, I think I should at least give an

2     opportunity for the Defendants' Executive Committee -- have you

3     spoken to them about this at all?

4          MR. MALONEY:  I haven't spoken to them about the

5     application we filed yesterday.  We did run by them and got

6     their essentially consent to the prior motion that we made to

7     amend the complaints.  If you recall, the last time we were in

8     court, that was a pending motion that we dealt with that your

9     Honor said, rather than amending, why don't you use the short

10    form?  It was a clerk docketing issue.  And at the time, when

11    the court suggested that and ultimately ruled that way, I did

12    not realize, and perhaps the court did or didn't realize, that

13    the existing order to adopt by a short-form complaint, adopt

14    the existing complaints only specifically dealt with the CAC,

15    the consolidated amended complaint, that was filed against the

16    Kingdom of Saudi Arabia.  Our motion that was under

17    consideration at the time asked for amending any complaint in

18    the MDL.

19         We are interested in -- we are interested in filing

20    new complaints against Saudi Arabia and also Iran.  So the

21    Defendants' Executive Committee doesn't represent either of

22    those two defendants.  Obviously Saudi Arabia is represented by

23    counsel here in court today.  Iran has never appeared, has

24    defaulted.  So those are the only two defendants that are

25    affected by the application that we have made to be able to use

I5O2TERC

1    the short form to adopt existing complaints on those two

2    defendants.

3              THE COURT:  Okay.  Let's talk about these claims

4    differently.  Obviously the claims against Saudi Arabia are, I

5    think, different procedurally because of JASTA, whereas the

6    claims against Iran, I guess the reason why we never issued an

7    order regarding adding the claims is because we just assumed

8    they were all there.  So this is the first I am hearing that

9    there are plaintiffs out there who have never sued Iran and who

10   wish to now bring claims against Iran.

11             MR. MALONEY:  That's correct, your Honor.

12             THE COURT:  Do you have any sense of the volume of

13   plaintiffs we are talking about?

14             MR. MALONEY:  It is mainly solacium relatives of the

15   decedents that were killed on 9/11.  So that number starts with

16   the number of decedents, but a number of them have already

17   restated and gotten default judgment.  So I don't know that the

18   volume is huge, but for every death case you may have a handful

19   of siblings or parents, so that expands -- it is one estate,

20   but it expands it by the number of plaintiffs.

21             THE COURT:  So you don't believe that there are

22   decedents who have not brought claims, that there are estates

23   that have not brought claims.

24             MR. MALONEY:  That's true.  The majority have, but

25   there are a few hundred decedents' cases that have not been

I5O2TERC

1    filed.  But this would also allow solacium for current and

2    future amending or new complaints.  We would actually identify

3    the solacium family members in order that they get a default

4    judgment hopefully and be able to participate in the Iran fund,

5    which creates some time sensitivity because the Iran fund has

6    been operating in phases.  I know your Honor has signed off on

7    some of those defaults.

8            That is the basis for the application, so that we get

9    additional plaintiffs who are interested in suing Iran, they

10   are going to have to serve, we are going to have to serve those

11   complaints against Iran and get hopefully eventually a default

12   that we can then use with the Iran fund.

13           THE COURT:  Okay.  Just so I understand what's coming,

14   you believe that there are a few hundred estates that have not

15   yet sued Iran.

16           MR. MALONEY:  Correct.

17           THE COURT:  And then for each estate there is half a

18   dozen solacium claims related?

19           MR. MALONEY:  Correct, your Honor.

20           THE COURT:  Okay.

21           MR. MALONEY:  Phase one for the Iran fund, so your

22   Honor knows, closes out September 14.  So that's why it is time

23   sensitive.  We had intended to get this before your Honor

24   sooner, but when we realized as a result of your Honor's ruling

25   on using the short form there was no procedural process for us

I5O2TERC

1   to do this in the way that we are seeking to do it now, rather

2   than starting all over again and translating a brand new

3   complaint, we wanted to be able to adopt the existing

4   complaints using the short form, translate that, and have that

5   served.

6          THE COURT:  So Exhibit A to your letter is the Iran

7   short form complaint, which appears to adopt the Ashton and

8   Burnett Iran complaints.

9          MR. MALONEY:  Well, it gives you the option to adopt

10  either one of those.  But, yes, we are not seeking to start all

11  over again.  The new plaintiffs would adopt one of the existing

12  complaints and have to be subject to all of the prior rulings.

13  They would also have to serve, if they have not been a

14  plaintiff before suing Iran, they would have to serve those

15  complaints, just like the prior complaints --

16         THE COURT:  So they would serve a short-form complaint

17  and the underlying complaint?

18         MR. MALONEY:  Yes.  Well, we would prefer just to be

19  able to serve the short form.  The underlying complaint is

20  already -- we could attach that.  It's been translated.  It's

21  been served multiple times against Iran.

22         THE COURT:  Okay.  I have spoken extensively with our

23  Clerk of Court about this case and our MDL clerk, a person I

24  assume you all are familiar with.  They are flooded by this

25  case.  It is absolutely overwhelming the Clerk's Office.  I

I5O2TERC

```
 1   have an obligation and a desire to facilitate their work over

 2   your work, to be candid.  Their preference, I think, is going

 3   to be to file one new case per decedent.  So if you are telling

 4   me there are 300 new decedents, they are going to want 300 new

 5   complaints.

 6            MR. MALONEY:  If that's what the court orders, we will

 7   do that.  I think that will probably make it more difficult for

 8   them, rather than easier.  If you had, say, 300 on one

 9   complaint, you have one complaint, like we have had for Ashton,

10   for example.  I'm not sure how that facilitates efficiency for

11   the Clerk's Office.  But if that's what your Honor prefers or

12   the clerks prefer, we could do it that way.  It seems to be the

13   opposite, but --

14            THE COURT:  Having these cases with 300 people or

15   more --

16            MR. MALONEY:  We would have to serve each of those

17   complaints individually, as well.  That creates more

18   logistical, more costly for the plaintiffs.  It just seems to

19   me to be inefficient but. . .

20            THE COURT:  I don't know more it would be more costly.

21   You can either serve one envelope or you can serve 300

22   envelopes.

23            MR. MALONEY:  The State Department charges a fee for

24   each complaint, I think $2,000 to serve each one.  That is

25   multiplied by something like 300 right there.
```

I5O2TERC

1        THE COURT:  I thought our filing fee was expensive.

2        MR. MALONEY:  Sorry?

3        THE COURT:  I said and I thought our filing fee was

4    expensive.

5        Okay.  I will take that under consideration.

6        The second application is adding to the Ashton

7    complaint, and so I understand this as being very similar to

8    what we agreed to previously, only clients of, I think, the

9    Kreindler firm wish to join the Kreindler firm complaint, which

10   is the Ashton complaint.

11        MR. MALONEY:  Correct, your Honor.

12        THE COURT:  So this is the same thing we agreed to

13   previously, except instead of going to the consolidated amended

14   complaint, it's to the Ashton complaint.

15        MR. MALONEY:  Correct, your Honor.

16        THE COURT:  Same question.  Do you have any sense of

17   the volume of new cases we are talking about here?

18        MR. MALONEY:  As I indicated at the last conference,

19   they would include personal injury cases, and there are a few

20   thousand of those.

21        THE COURT:  Do we think all of the Kreindler client

22   death cases are in at this point?

23        MR. MALONEY:  Yes, your Honor.  In fact, new death

24   cases are now essentially being -- now essentially retaining

25   the entire committee, at least on the personal injury and death

I5O2TERC

1   side.  So Mr. Goldman, from Anderson Kill, has been handling

2   the new decedent cases that have been coming in since the fall

3   of 2016.  So we are not -- the Kreindler firm, the Ashton case,

4   is not taking on new death cases.  That's not what we are

5   seeking to use the short form for.  It will be personal injury

6   and solacium.

7          (Counsel confer)

8          MR. MALONEY:  I'm told we have about a dozen death

9   cases that still haven't been added to the Ashton case before

10   the time where we decided to have new estates retain the

11   Plaintiffs' Executive Committee.

12          THE COURT:  All right.

13          Mr. Kellogg, anything you would like to say about any

14   of this?

15          MR. KELLOGG:  No.

16          THE COURT:  All right.

17          MR. KELLOGG:  I haven't studied it, but I doubt we

18   will have any objection.

19          THE COURT:  My sense is that what's being proposed for

20   your client is a very similar form to what we have already got

21   in place for the consolidated amended complaints, but we have a

22   second complaint in that case, the Ashton complaint, so this is

23   for Ashton clients to just join that one.  So I don't see an

24   issue with that.

25          Okay.  I will turn to this right away.  I know there

I5O2TERC

1    is time sensitivity here.

2              Let me just reminded you, if you want judgments by

3    September 14, I will share with you that I take a vacation in

4    August and Judge Daniels might as well and so --

5              MR. MALONEY:  We understand, your Honor.

6              THE COURT:  Okay.  I will issue at least two orders

7    from this conference, one on this last issue we are talking

8    about about the short forms, and the second one will be on a

9    schedule for any motions to compel discovery on the

10   jurisdictional issue.

11             I really do want the parties to continue doing their

12   best to meet and confer and reach agreement.  I know you have

13   done that in large part.  Hopefully, the discovery that you

14   received, Mr. Carter, will help you make better arguments to

15   Mr. Kellogg; and Mr. Kellogg, hopefully you will be

16   accommodating where appropriate so the parties can get this

17   phase of the litigation completed and get back to Judge Daniels

18   on the new motions.

19             Anything further from either side?

20             MR. CARTER:  No, your Honor.

21             MR. KELLOGG:  No, your Honor.

22             THE COURT:  Thank you, everybody.  Happy holiday.

23             COUNSEL:  Thank you, your Honor.

24                              oOo

25