**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                          :

IN RE:                      :       <u>MEMORANDUM DECISION</u>

                          :        <u>AND ORDER</u>

TERRORIST ATTACKS ON        :

SEPTEMBER 11, 2001          :        03-MDL-1570 (GBD)

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Charter Oak Fire Ins. Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of
    Saudi Arabia, et al.*, No. 17-cv-07914

GEORGE B. DANIELS, United States District Judge:

Plaintiffs in this multidistrict litigation seek to hold multiple defendants liable for allegedly

financing, sponsoring, conspiring to sponsor, aiding and abetting, or otherwise providing material

support to Osama bin Laden and the terrorist organization known as al Qaeda, for the physical

destruction, deaths, and injuries suffered as a result of the terrorist attacks on September 11, 2001

(the "9/11 Attacks").[1] Plaintiffs principally allege here that Defendants National Commercial Bank

("NCB"), Al Rajhi Bank ("ARB"), and the Saudi Binladin Group ("SBG") knowingly provided

material support to Osama bin Laden and/or al Qaeda and its affiliates in the form of funds and

financial services, thereby enabling al Qaeda to successfully carry out the 9/11 Attacks. (*See*

---

[1] The relevant procedural background of this multidistrict litigation was discussed at length in this Court's opinions dated June 17, 2010, (ECF No. 2252), September 13, 2010, (ECF No. 2312), and January 11, 2012, (ECF No. 2527), among others, and is incorporated by reference herein. This Court will only restate relevant factual background as necessary to address the pending motions.

*generally* First Am. Compl. ("FAC"), *Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.* ("*Lloyd's*") (No. 16-cv-07853), ECF No. 56.)[2]

Defendants NCB and ARB (the "Bank Defendants"), as well as Defendant SBG (collectively, the "Moving Defendants"), move to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. (*See* NCB Mot. to Dismiss ("NCB Mot."), ECF No. 3691, at 1; SBG Mot. to Dismiss ("SBG Mot."), ECF No. 3700, at 1; ARB Mot. to Dismiss ("ARB Mot."), ECF No. 3702, at 1–2.) Defendants ARB and SBG move, in the alternative, to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[3] (*See* SBG Mot. at 1; ARB Mot. at 1–2.) All three Moving Defendants were previously dismissed from this multidistrict litigation, though not all for the same reasons.[4] *See In*

---

[2] The *Lloyd's* action was filed in January 2016 in the United States District Court for the Western District of Pennsylvania. The Judicial Panel on Multidistrict Litigation thereafter transferred it to this Court and consolidated it with this multidistrict litigation, finding that it "unquestionably shares factual issues with the previously-centralized actions," especially because "highly similar claims against [NCB, SBG, and ARB] previously have been adjudicated during the course of the MDL proceedings, and the transferee court's rulings dismissing the defendants were affirmed on appeal." (*See* Transfer Order, ECF No. 3351, at 2.) Plaintiffs in the ten separate actions identified above have adopted the factual allegations set forth in the *Lloyd's* FAC. (*See* Pls.' Mem. in Opp'n to Defs.' Mots. to Dismiss ("Opp'n"), ECF No. 3835, at 1.) Plaintiffs claim that the allegations in the *Lloyd's* FAC were adopted by the plaintiffs in two other actions, *Fraser, et al. v. Al Qaeda Islamic Army, et al.*, 17-cv-7317, and *Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-8617, (*see id.*), but it does not appear that they, in fact, have.

[3] Also pending before this Court are motions to dismiss for lack of subject matter jurisdiction brought by Defendants Kingdom of Saudi Arabia ("Saudi Arabia") and the Saudi High Commission for Relief of Bosnia and Herzegovina ("SHC"). (*See* ECF Nos. 3667, 3670.) For logistical reasons, however, this opinion addresses only the motions to dismiss brought by the Bank Defendants and SBG; the motions to dismiss brought by Saudi Arabia and SHC are addressed in a separate opinion filed today.

[4] United States District Judge Richard C. Casey, who presided over this multidistrict litigation until March 2007, previously denied without prejudice motions to dismiss for lack of personal jurisdiction brought by Defendants NCB and SBG and ordered them to participate in limited jurisdictional discovery as to their relevant contacts with the United States. *See In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks I*"), 349 F. Supp. 2d 765, 820, 822 (S.D.N.Y. 2005). Jurisdictional discovery proceeded for almost three years under the close supervision of Magistrate Judge Frank Maas before renewed motions to dismiss were filed in July 2008 and September 2010, respectively, and granted. (*See* ECF Nos. 2110, 2252, 2283, 2527.)

*re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks VI*"), 840 F. Supp. 2d 776, 780–82 (S.D.N.Y. 2012) (dismissing claims against SBG for lack of personal jurisdiction), *aff'd*, 714 F.3d 659 (2d Cir. 2013); *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks IV*"), 718 F. Supp. 2d 456, 478, 487–88 (S.D.N.Y. 2010) (dismissing claims against NCB for lack of personal jurisdiction), *aff'd*, 714 F.3d 659 (2d Cir. 2013); *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks I*"), 349 F. Supp. 2d 765, 831–33 (S.D.N.Y. 2005) (Casey, J.) (dismissing claims against ARB for failure to state a claim), *aff'd*, 714 F.3d 118 (2d Cir. 2013).

Plaintiffs claim that since this Court last dismissed the Moving Defendants, two things have happened that support the exercise of jurisdiction where none may have been appropriate before. First, in September 2016, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B), which Plaintiffs claim was intended to allow victims of the 9/11 Attacks to hold accountable parties that provided assistance to al Qaeda "wherever acting and wherever they may be found." (Opp'n at 7 (quoting JASTA § 2(b), 130 Stat. at 853).) Second, as part of this multidistrict litigation, Plaintiffs' counsel took the deposition of Zacarias Moussaoui, a federal prisoner and former al Qaeda operative, and the self-described "20th hijacker," who is serving six life sentences for his role in the 9/11 Attacks. (*See* Moussaoui Dep. Tr., Aff. of Sean P. Carter dated February 3, 2015, Ex. 5, ECF No. 2927-5.) According to Plaintiffs, Moussaoui's testimony establishes new facts showing that the Moving Defendants aided Osama bin Laden and al Qaeda by providing funds and other forms of material support in furtherance of the 9/11 Attacks. (Opp'n at 16, 23–25, 28.) This Court heard oral argument on the Moving Defendants' motions to dismiss on January 18, 2018.

For substantially the same reasons this Court previously dismissed Defendants NCB and SBG from this multidistrict litigation for insufficient contacts with the United States, the Moving

Defendants' motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2) are GRANTED.[5]

## I.  **JURISDICTIONAL FACTS**

### A. The Bank Defendants

Defendant NCB is a Saudi-based financial institution with its principal place of business located in Jeddah, Saudi Arabia. (FAC ¶ 68.) Nonetheless, it maintains operations around the world and offers a broad range of financial services, including Sharia-compliant financial products and services, to institutional and individual clients alike. (*Id.*) Plaintiffs allege that NCB provided funds and financial services to charities that operated as fundraising front organizations for al Qaeda, including the International Islamic Relief Organization ("IIRO") and the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"). Plaintiffs also allege that NCB was one of al Qaeda's preferred banks and that it frequently funneled contributions from wealthy Saudi businessmen to Osama bin Laden and al Qaeda. (*Id.* ¶¶ 201–02, 204, 214–15, 235–41.)

In addition, Plaintiffs allege that Khalid bin Mahfouz, NCB's president and chief executive officer, founded the Muwafaq Foundation ("Muwafaq") in 1991 and provided up to $30 million for its operations. (*Id.* ¶¶ 194, 206–07.) Plaintiffs allege further that during the 1990s, Muwafaq provided resources to al Qaeda to support its jihad against the United States by, for example, laundering contributions from wealthy sympathizers and funding terrorist training camps in

---

[5] Because this Court finds that it lacks personal jurisdiction over all three Moving Defendants, it does not consider the alternative grounds for dismissal advanced by ARB and SBG under Rule 12(b)(6). *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 397 (2d Cir. 2009) ("Because of the primacy of jurisdiction, jurisdictional questions ordinarily must precede merits determinations in dispositional order.") (citation and quotation marks omitted); *see also Phillips v. Reed Grp, Ltd.*, 955 F. Supp. 2d 201, 224 (S.D.N.Y. 2013) ("Where the grounds for a motion to dismiss include lack of personal jurisdiction . . . and failure to state a claim upon which relief can be granted, the Court must first consider the jurisdictional claim[] before considering the merits of the case.").

4

Afghanistan and Bosnia. (*Id.* ¶ 210.) According to Plaintiffs, NCB also provided financial services "and other support" to Muwafaq, which merged with al Qaeda in 2001.[6] (*Id.* ¶¶ 210, 212.)

Defendant ARB is also a Saudi-based financial institution that offers Sharia-compliant banking and investment products. (*Id.* ¶ 153.) Plaintiffs allege that in the years leading up to the 9/11 Attacks, ARB, as well as members of the Al Rajhi family, provided funds and financial services to numerous charitable organizations that operated as fronts for al Qaeda, including IIRO and the Al Haramain Islamic Foundation ("AHIF"), among others. (*Id.* ¶¶ 173–74, 183.) For instance, Plaintiffs allege that ARB maintained at least twenty-four bank accounts and handled "unusual" transactions for AHIF, which operated as a front for al Qaeda in thirteen different countries. (*Id.* ¶ 158.) According to a July 2007 press account, a top AHIF official deposited $130,000 into an ARB account in Saudi Arabia in 2000, which was then sent to al Qaeda fighters in Chechnya. (*Id.*) That same article also describes the Al Rajhi family's longstanding support of Islamic charities suspected of funding terrorism, including by allegedly trying to "conceal and disguise unusual transfers" through such entities to evade government authorities. (*Id.* ¶¶ 159–61.) According to Plaintiffs, ARB and members of the Al Rajhi family knew that the charities were acting as fronts for al Qaeda because members of the family held leadership positions with several of those organizations and were thus privy to their terrorism connections. (*Id.* ¶¶ 174, 180–81.)

Plaintiffs allege further that al Qaeda and other terrorist organizations ordered their operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to use ARB to fund and facilitate terrorist attacks. (*Id.* ¶¶ 162–63.) Consistent with those directives, Plaintiffs claim that multiple instances have been discovered where bank accounts at ARB were used to fund

---

[6] The FAC cites "press accounts" which reference an audit of NCB performed by the Saudi government in 1998 that found $3 million in bank funds had been improperly funneled to Muwafaq, which allegedly transferred the money to Osama bin Laden. (FAC ¶ 228.)

terrorist attacks. (*Id.* ¶ 163.) For example, Plaintiffs claim that funds were funneled through ARB to members of an al Qaeda cell in Hamburg, Germany. (*Id.*) One of the members of that cell was 9/11 hijacker Abdulaziz al Omari, who received funds in his ARB account as late as September 7, 2001—just four days before the 9/11 Attacks. (*Id.*) Plaintiffs also allege that Omari utilized a credit card issued by ARB when he was planning the 9/11 Attacks. (*Id.*)

In addition to providing al Qaeda and its operatives with financial services, Plaintiffs allege that ARB provided al Qaeda with other forms of operational support. (*Id.* ¶ 165.) For instance, Plaintiffs claim that ARB's couriers delivered money to an al Qaeda affiliate in Indonesia. (*Id.*) According to Plaintiffs, ARB also sponsored a travel visa for a money courier who worked for Ayman al Zawahiri, Osama bin Laden's second-in-command. (*Id.* ¶ 166.) Plaintiffs allege that this type of support and the nature of the services ARB generally provided to al Qaeda played a critical role in enabling it to carry out the 9/11 Attacks. (*Id.* ¶ 195.) Indeed, Plaintiffs describe ARB as "one of al Qaeda's most essential and critical partners in the years preceding" the 9/11 Attacks. (*Id.* ¶ 155.)

**B. The Saudi Binladin Group**

Defendant SBG is a Saudi-based construction company founded by Osama bin Laden's father and still controlled by the bin Laden family. (*Id.* ¶ 69.) Plaintiffs allege that SBG is an "integral part" of the al Qaeda network and that the assistance it provided to the terrorist organization during its early years was essential in allowing al Qaeda to carry out the 9/11 Attacks. (*Id.* ¶ 246.) In particular, Plaintiffs allege that before SBG removed Osama bin Laden as a shareholder in 1993, it provided significant financial support to him while he was establishing a haven for al Qaeda in Sudan, with knowledge that, at the time, he was targeting the United States.[7] (*Id.* ¶¶ 142–46, 250–

---

[7] Osama bin Laden left Saudi Arabia for Sudan in the early 1990s, before moving to Afghanistan in 1996. (FAC ¶¶ 262, 274.) According to Plaintiffs, it was in Sudan that Osama bin Laden developed al Qaeda "from

78.) According to Plaintiffs, SBG's controlling shareholders—the bin Laden family—had "intimate knowledge of al Qaeda's objectives" and provided "extensive support to al Qaeda with the intent of furthering its objectives [of] harming the United States." (*Id.* ¶ 279.) For instance, Plaintiffs allege, one of SBG's corporate subsidiaries sponsored a visa application to the United States for Mohammed Jamal Khalifa, whom they describe as one of al Qaeda's founding members.[8] (*Id.* ¶ 280.)

Plaintiffs also allege that even after SBG removed Osama bin Laden as a shareholder in 1993, it maintained a "financial lifeline" to him throughout the period leading up to the 9/11 Attacks. (*Id.* ¶¶ 283–84). For example, Plaintiffs allege that despite being ousted from SBG in 1993, the value of Osama bin Laden's shares were not placed in a trust until April 2000, and even then, not all of the funds were deposited, suggesting that funds continued to flow from SBG to Osama bin Laden after he was removed as a shareholder. (*Id.* ¶¶ 290–95.) According to Plaintiffs, some of those funds still "remain[] unaccounted for."[9] (*Id.* ¶ 295.)

---

a small jihadist army to what the 9/11 Commission Report deemed 'a true global terrorist network.'" (*Id.* ¶ 260.)

[8] Plaintiffs, however, do not allege that Khalifa ever traveled to the United States on that visa, much less that he was connected in any material way to the 9/11 Attacks. In fact, Plaintiffs allege that Khalifa was tasked with leading IIRO's branch office in the Philippines. (FAC ¶ 280.) Moreover, this Court previously dismissed Khalifa from this multidistrict litigation after finding "[t]he allegations of [his] involvement in terrorist activities, during the 1990's . . . insufficient to demonstrate that the injuries suffered, on September 11, 2001, are related to or arise from [his] intentional tortious activities." *In re Terrorists Attacks on Sept. 11, 2001* ("*Terrorist Attacks V*"), 740 F. Supp. 2d 494, 509 (S.D.N.Y. 2010).

[9] Plaintiffs allege that when SBG removed Osama bin Laden as a shareholder in 1993, his shares were transferred to his brother, Ghaleb, to hold in trust. (FAC ¶¶ 290–93.) Plaintiffs further allege that between 1993 and 2000, Ghaleb bin Laden invested substantial sums of money in Bank al Taqwa ("BAT"), which was designated by the United States Treasury Department as a terrorist entity after the 9/11 Attacks for its support of al Qaeda in the 1980s. (*Id.* ¶ 296.) Significantly, however, Plaintiffs do not allege that any of SBG's funds ever made their way to Osama bin Laden, or that SBG had any interest or control over them once they were given to Ghaleb. Nor do Plaintiffs claim that the funds Ghaleb allegedly diverted to BAT were used to help finance, or otherwise facilitate, the 9/11 Attacks.

## C. Zacarias Moussaoui Deposition Testimony

At a deposition conducted by Plaintiffs' counsel, former al Qaeda operative Zacarias Moussaoui offered testimony concerning all three Moving Defendants. According to Plaintiffs, Moussaoui was handpicked by Osama bin Laden to build an electronic database recording the identities of al Qaeda's financial donors, their contributions to the organization, and the sources of those funds. (*Id.* ¶ 202.) Moussaoui testified at his deposition that, in that capacity, he "personally reviewed and documented financial transactions benefiting al Qaeda involving NCB." (*Id.* ¶ 202.) Moussaoui also testified that Osama bin Laden described ARB to him as a "good brother" who "mov[ed] money around" for al Qaeda. (*Id.* ¶ 167.) According to Moussaoui, Osama bin Laden also told him that ARB was one of the primary financial supporters of charities that operated as fronts for al Qaeda's fundraising activities. (*Id.*)

As for SBG, Moussaoui testified that even after Osama bin Laden was formally removed as a shareholder, he continued to maintain strong ties to his family and that he enjoyed the support of his family and SBG long after he relocated from Sudan to Afghanistan. (*Id.* ¶ 305.) Moussaoui further testified that between 1998 and 2000, when Osama bin Laden was in Afghanistan, he regularly received visits from his family members in Saudi Arabia, including his mother. (*Id.*) Accordingly, Moussaoui called SBG's claims throughout this multidistrict litigation that the bin Laden family and the SBG cut ties with Osama bin Laden in 1994 a "complete . . . and absolute lie." (*Id.* ¶ 307.) Plaintiffs also allege that SBG assisted al Qaeda in building the terrorist training camps where the hijackers responsible for the 9/11 Attacks were trained. (*Id.* ¶ 306.) This allegation is ostensibly based on Moussaoui's testimony that in the late 1990s, SBG "covertly" shipped construction parts from Saudi Arabia to Pakistan, where they were received by al Qaeda members and later transported to Afghanistan. (*Id.*)

## II.   **LEGAL STANDARDS**

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff has the burden of making a prima facie showing that personal jurisdiction over the defendant exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).  Where jurisdictional discovery has taken place, as here, the plaintiff must allege facts that, if credited by the ultimate trier of fact, would be sufficient to establish jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). In assessing personal jurisdiction on a Rule 12(b)(2) motion, the court is neither required to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (internal quotation marks and citation omitted), nor must it "accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted).

It is axiomatic that a court cannot exercise personal jurisdiction over a defendant unless doing so comports with constitutional due process principles.[10]  *Licci*, 673 F.3d at 60.   The due process analysis consists of two discrete components: "the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).  Under the minimum contacts inquiry, the court "must determine whether the defendant has sufficient minimum contacts with the forum . . . to justify the court's exercise of personal jurisdiction." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Once the court is satisfied that a defendant has sufficient contacts with the forum to justify the court's exercise of

---

[10] In addition, personal jurisdiction cannot be exercised unless "service of process upon the defendant [was] procedurally proper" and "there [is] a statutory basis for personal jurisdiction that renders such service of process effective." *Licci*, 673 F.3d at 59.  Here, however, the Moving Defendants do not challenge personal jurisdiction on either of these grounds.

personal jurisdiction, it must then determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloe*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316). If the court determines that a defendant lacks the requisite contacts, it need not consider the second prong of the due process test to determine whether the exercise of jurisdiction would be reasonable under the particular circumstances of the case. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996) (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).

For purposes of the minimum contacts analysis, a distinction is made between general and specific jurisdiction. In most instances, general jurisdiction may be exercised only where the defendant's "affiliations with the [forum] . . . 'are so constant and pervasive as to render it essentially at home in the forum.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)). By contrast, the exercise of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (discussing general versus specific jurisdiction).

Here, Plaintiffs claim this Court has personal jurisdiction over the Moving Defendants only under a theory of specific jurisdiction. (*See* Opp'n at 9.) "For the purpose of establishing specific personal jurisdiction, the necessary fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks VII*"), 714 F.3d 659, 674 (2d Cir. 2013) (internal quotation marks and citations

omitted). Indeed, the Second Circuit has recognized "two fundamental requirements necessary to establish specific personal jurisdiction with regard to other defendants involved in this multi-district litigation": (1) the defendant must have "'expressly aimed' intentional tortious acts at residents of the United States[,]" and (2) the "plaintiffs must plead facts to show that their injuries 'arise out of or relate to those activities.'" *Terrorist Attacks VII*, 714 F.3d at 674 (quoting *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks III*"), 538 F.3d 71, 93, 95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousef*, 560 U.S. 305 (2010)).

Since the Second Circuit last considered the issue of personal jurisdiction within the context of this multidistrict litigation, the Supreme Court decided *Walden v. Fiore*, 134 S. Ct. 1115 (2014). In *Walden*, the Court emphasized that the only relevant contacts for specific jurisdiction purposes are those of the defendant's. *Id.* at 1121–22. As the Court held, it is "the *defendant's* suit-related conduct [that] must create a substantial connection with the forum." *Id.* at 1121 (emphasis added). Stated differently, the "necessary relationship" between the defendant and the forum must arise out of contacts that the "defendant *himself*" creates with the forum; "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 1122.

In addition, the Court held, "[d]ue process requires that a defendant be haled into court in a forum . . . based on his own affiliation with the [forum], not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [forum]." *Id.* at 1123 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)). That harm in the forum is merely foreseeable is thus insufficient for the purpose of establishing specific personal jurisdiction over a defendant. *Walden*, 134 S. Ct. at 1124–25 (explaining that a foreseeability test "improperly attributes a plaintiff's forum connections to the defendant and makes those connections decisive in the jurisdictional analysis"); *see also Terrorist Attacks III*, 538 F.3d at 95 ("[F]oreseeability is not

the standard for recognizing personal jurisdiction.  Rather, the plaintiffs must establish that the [defendants] expressly aimed intentional tortious acts at residents of the United States.") (internal quotation marks and citation omitted); Br. of the United States as Amicus Curiae at 14, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Feb. 22, 2018) ("[A] court may not exercise specific jurisdiction merely because a defendant could foresee that his conduct would have some effect in the forum.").

Accordingly, the issue before this Court is whether the Moving Defendants *themselves*—through their own conduct—are alleged to have expressly aimed intentional tortious acts at residents of the United States and whether Plaintiffs' injuries arise out of or relate to those activities.

## III. PLAINTIFFS DO NOT ALLEGE SUFFICIENT CONTACTS TO ESTABLISH SPECIFIC JURISDICTION OVER THE MOVING DEFENDANTS

"[N]o matter how horrendous the underlying attacks or morally compelling . . . [P]laintiffs' claims" are, this Court cannot exercise jurisdiction "beyond the limits prescribed by the due process clause of the Constitution[.]" *Waldman*, 835 F.3d at 344.  Plaintiffs' recycled allegations were previously rejected as insufficient to establish personal jurisdiction and still do not support the inference that the Moving Defendants expressly aimed their conduct at residents of the United States. *Terrorist Attacks VII*, 714 F.3d at 674.  Neither JASTA, the sworn deposition testimony provided by Zacarias Moussaoui, nor anything else asserted by Plaintiffs here compel a different result.

### A. The Bank Defendants

Plaintiffs' allegations do not provide a basis for exercising personal jurisdiction over the Bank Defendants.  Indeed, the Second Circuit has repeatedly held similar, if not identical, allegations concerning both the banks' and their principals' alleged funding of front organizations for al Qaeda insufficient to establish specific jurisdiction for claims arising out of the 9/11 Attacks.

12

*See Terrorist Attacks VII*, 714 F.3d at 676 ("[A]llegations that [a defendant] donated money to various purported al Qaeda fronts, even if true, are not a sufficient basis . . . to exercise specific personal jurisdiction over him."); *Terrorist Attacks III*, 538 F.3d at 95 (holding that knowingly "[p]roviding indirect funding to an organization that was openly hostile to the United States does not constitute" conduct sufficient to allow a court to exercise personal jurisdiction over a foreign defendant); *see also Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 22–23 (D.D.C. 2003) ("[A]llegations . . . that [a defendant] personally donated money to the IIRO[] . . . and Al-Haramain, knowing that those foundations funded terrorist organizations including Al Qaeda. . . . stops well short of alleging that [his] actions were expressly aimed or purposefully directed at the United States.") (internal quotation marks and citation omitted). In addition, the Second Circuit has expressly rejected the argument advanced by Plaintiffs here that "(1) knowingly maintain[ing] bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and (2) that those accounts were used for al Qaeda operations" are sufficient bases to support the exercise of specific jurisdiction. *See Terrorist Attacks VII*, 714 F.3d at 669, 676. Therefore, the Bank Defendants' provision of funds and services to charities and individuals who supported al Qaeda do not, under the circumstances presented here, render them subject to the jurisdiction of this Court.[11] *See id.* at 676, 677 n.13.

---

[11] Similarly inadequate are Plaintiffs' allegations concerning operational level support ARB allegedly provided to an al Qaeda affiliate in Indonesia and a courier for Ayman al Zawahiri. (FAC ¶¶ 165–66.) Neither allegation shows that ARB expressly aimed its conduct at the United States—the FAC does not even identify the type of travel visa ARB allegedly obtained for the courier—nor do they reasonably support an inference that Plaintiffs' injuries arose out of or related to such conduct. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 482 ("Generalized allegations that a defendant provided financial or other material support to al Qaeda, without the reasonable inference of the temporal, geographical[,] or causal connection, or proximity to the 9/11 [A]ttacks, is an insufficient basis for the Court's exercise of jurisdiction over a foreign defendant.").

Equally unavailing are Plaintiffs' attempts to assert personal jurisdiction over the Bank Defendants based on alleged connections between individuals affiliated with the banks and both al Qaeda and its alleged front organizations. (*See* FAC ¶¶ 159–61, 173–74, 181, 206–14, 219–30.) As the Supreme Court held in *Walden*, the "defendant-focused 'minimum contacts' inquiry" may not be satisfied "by demonstrating contacts between plaintiff (or third parties) and the forum." 134 S. Ct. at 1122. Moreover, substantively similar allegations were previously considered by this Court and the Second Circuit and rejected as insufficient to establish specific jurisdiction. *See Terrorist Attacks VII*, 714 F.3d at 676–77 (finding inadequate similar, if not identical, allegations as to members of the Al Rajhi family and NCB executives); (*see also* Opp'n at 27 ("The allegations in the FAC relative to NCB admittedly share . . . similarities with prior claims"); Mem. in Supp. of NCB Mot., Ex. 1, ECF No. 3692-1, at 9–21 (comparing the FAC's allegations with allegations previously held insufficient to establish personal jurisdiction).)

Plaintiffs' attempts to bolster their allegations by relying on Moussaoui's deposition testimony miss the mark. At his deposition, Moussaoui testified that he "personally reviewed and documented financial transactions benefiting al Qaeda *involving* NCB." (FAC ¶ 202 (emphasis added).) Significantly, however, Plaintiffs do not claim that NCB *itself* donated funds directly to al Qaeda. (*Contra* Opp'n at 28.) Rather, they allege only that *third parties* used NCB to transfer money to al Qaeda, (*see* FAC ¶¶ 163, 202, 212), an allegation that, as noted, cannot be used to establish specific jurisdiction over NCB. Plaintiffs also point to Moussaoui's testimony that Osama bin Laden had described ARB as a "good brother" who "mov[ed] money around" for al Qaeda and supported charities that operated as fronts for fundraising activities. (*Id.* ¶ 167.) Accepting Moussaoui's vague and conclusory testimony as true, it at most supports the inference that ARB provided funds and financial services to individuals and organizations that were affiliated with al

14

Qaeda—an allegation that has been rejected by this Court and the Second Circuit time and again as insufficient to establish specific jurisdiction over entities like ARB.

Without any new or materially different allegations to support their claims for specific jurisdiction, Plaintiffs are forced to rely on the recently enacted Justice Against Sponsors of Terrorism Act. (*See* Opp'n at 13, 17–18, 30.). Congress passed JASTA into law in September 2016 to add an exception to the Foreign Sovereign Immunities Act and to expand civil liability under the Antiterrorism Act for those charged with aiding and abetting or conspiring with a person who committed an act of international terrorism. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 320 (2d Cir. 2018); *Lelchook v. Islamic Republic of Iran*, 224 F. Supp. 3d 108, 113 n.1 (D. Mass. 2016). Importantly, it did not otherwise address the authority of federal courts to enter judgments against foreign defendants sued thereunder. Nevertheless, Plaintiffs argue that "[t]his Court's due process analysis must . . . take into account Congress's findings and assessments concerning the clear nexus between the sponsorship of foreign terrorist organizations hostile to the United States and resulting harm to U.S. interests, as reflected in JASTA." (Opp'n at 13.) Specifically, Plaintiffs point to Congress's finding that persons or entities who knowingly provide material support to terrorists "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6), 130 Stat. at 852.

Plaintiffs' reliance on JASTA is misplaced. Plaintiffs are incorrect that one must consider as part of the due process analysis the congressional findings of fact set forth in JASTA; as at least one other court has noted, those portions of the statute do not have any binding legal effect. *See Lelchook*, 224 F. Supp. 3d at 113 n.1; *see also Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 66 (D.C. Cir. 2016) ("Findings, like a preamble, may contribute to a general understanding of a statute, but, unlike the provisions that confer and define agency powers, they are not an operative

part of the statute.") (internal quotation marks and citation omitted). In any event, it is well established that this Court's constitutional due process analysis cannot be altered by legislative enactment. *See Terrorist Attacks III*, 538 F.3d at 80 ("Of course, [a statute] cannot create personal jurisdiction where the Constitution forbids it."); *accord Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1121 (9th Cir. 2002). Ultimately, the responsibility for determining whether the Bank Defendants have sufficient contacts with this forum such that personal jurisdiction may be exercised over them in a manner consistent with due process rests not with Congress, but with the courts. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Plaintiffs' reliance on the Second Circuit's recent decision in *Waldman v. Palestine Liberation Organization*, (Opp'n at 10–12, 29), is similarly inapposite. There, the Second Circuit considered, among other things, the availability of specific jurisdiction over the Palestine Liberation Organization and the Palestinian Authority for claims brought by American citizens arising out of terrorist attacks in Israel allegedly committed by the defendants' agents and employees. *Waldman*, 835 F.3d at 322. The Court of Appeals concluded that specific jurisdiction did not exist because the defendants' actions abroad were neither connected to, nor expressly aimed at, the United States. *Id.* at 337. The fact that American citizens happened to be among the injured was not enough to subject the defendants to suit in the United States; as the court explained, "the Constitution requires much more purposefully directed contact with the forum." *Id.* at 337–38.

Although the 9/11 Attacks undoubtedly occurred on United States soil, and left thousands of American citizens injured or killed, still absent is a "constitutionally sufficient connection" between "*these* defendants"—the Bank Defendants—and "*this* jurisdiction." *Id.* at 336. As the court in *Waldman* recognized, a forum's exercise of jurisdiction over a foreign intentional tortfeasor

16

"must be based on intentional conduct by the *defendant* that creates the necessary contacts with the

forum." *Id.* at 337 (emphasis added) (quoting *Walden*, 134 S. Ct. at 1123). Neither *Waldman* nor

*Walden* did anything to disturb the well-settled rule that the "unilateral activity of another party or

a third person" is insufficient to render an out-of-state defendant, who otherwise lacks a connection

to the forum, subject to specific jurisdiction there. *Helicopteros Nacionales de Colombia, S.A. v.

Hall*, 466 U.S. 408, 417 (1984). To the contrary, the Second Circuit in *Waldman* reaffirmed its

earlier ruling in *Terrorist Attacks III* that even if a defendant who provided funding to charitable

organizations affiliated with al Qaeda "could and did foresee that . . . [the affiliates] would use their

donations to finance the September 11 attacks, providing indirect funding to an organization that

was openly hostile to the United States [does] not constitute the type of intentional conduct

necessary to constitute purposeful direction of activities at the forum." *Waldman*, 835 F.3d at 339

(citing *Terrorist Attacks III*, 538 F.3d at 95–96). The same reasoning holds true with respect to the

funding and financial services that the Bank Defendants are alleged to have provided here.

The Bank Defendants' motions to dismiss for lack of personal jurisdiction are GRANTED.

**B. SBG**

Plaintiffs' allegations as to Defendant SBG do not establish any more of a basis for this

Court to exercise jurisdiction over SBG than they did the last time they were asserted.[12] As this

Court has repeatedly held, SBG's pre-1993 support of Osama bin Laden and his activities is "too

temporally remote to establish specific jurisdiction." *Terrorist Attacks VI*, 840 F. Supp. 2d at 782;

*see also Terrorist Attacks IV*, 718 F. Supp. 2d at 483 ("Defendants' alleged provision of financial

and other material support to al Qaeda in the early 1990's, enabling it to expand its base of operations

in the Sudan, is too remote to the terrorist attacks of September 11, 2001, to confer specific

---

[12] (*See generally* Mem. in Supp. of SBG Mot., Ex. 1, ECF No. 3701-1 (comparing the FAC's allegations as to SBG with allegations previously rejected as insufficient to establish specific jurisdiction).)

jurisdiction."); *Terrorist Attacks IV*, 718 F. Supp. 2d at 486–87 ("The alleged acts of rendering support to al Qaeda during its formative years . . . are too remote and attenuated to support the exercise of specific jurisdiction.") On appeal, the Second Circuit agreed "that the pre-1993 'support' provided by SBG to Osama [b]in Laden does not provide a valid basis . . . to exercise personal jurisdiction over the company." *Terrorist Attacks VII*, 714 F.3d at 677. In addition, the Second Circuit expressly rejected the argument that SBG's "distributions to Osama [b]in Laden as a shareholder" and its support for him through "government infrastructure contracts that SBG had in the Sudan" in the late 1980s and early 1990s were "expressly aimed at the United States or . . . connected in any meaningful way, for the purpose of establishing personal jurisdiction, to the September 11, 2001 attacks." *Id.* at 676 (citation and quotation marks omitted). For the same reasons this Court and the Second Circuit previously rejected Plaintiffs' allegations about SBG's pre-1993 support of Osama bin Laden, they are again rejected here.

In support of their argument for specific jurisdiction, Plaintiffs point to two new sets of allegations, neither of which is sufficient. The first concerns documents recovered from the raid on Osama bin Laden's compound in Abbottabad, Pakistan. (*See* FAC ¶ 299.) Among the documents recovered is what Plaintiffs describe as a "will" allegedly executed by Osama bin Laden in the late 1990s. (*Id.*) According to Plaintiffs, the document, which has not been reproduced here, indicates that at the time it was executed, Osama bin Laden had approximately $29 million in Sudan, of which $12 million came from SBG for Sudanese investments. (*Id.*) The document purports to direct that those funds be returned to the bin Laden family with wishes that the funds be used to pursue jihad. (*Id.* ¶ 300.) Plaintiffs argue that this newly recovered document suggests that "SBG established a continuing funding mechanism for al Qaeda, the benefits of which redounded to al Qaeda until at

least into the late 1990's, and that Osama bin Laden understood that his family, including the head

of SBG itself, remained entirely supportive of his jihadist agenda." (Opp'n at 23.)

These allegations fail for a number of reasons. First, as noted, allegations that SBG

disbursed funds to Osama bin Laden when he was in Sudan in the 1980s and 1990s are inadequate

to support specific jurisdiction for claims arising out of the 9/11 Attacks. *See Terrorist Attacks VII*,

714 F.3d at 677. Second, even if Plaintiffs' allegations as to the putative Osama bin Laden will are

true, they at most reflect *his* intent as to how any inherited funds should be used, not what his family

members—assuming they were even involved with SBG—actually did with those funds. Nor do

these allegations, by themselves, suggest one way or another whether Osama bin Laden's family

was supportive of his activities. Third, these allegations still do not support the inference that SBG

"expressly aimed" its conduct at residents of the United States. *Terrorist Attacks VI*, 840 F. Supp.

2d at 780. As noted, it is insufficient to allege that SBG should have foreseen harm occurring in the

United States, or even that SBG provided indirect funding to an organization openly hostile to the

United States. Rather, Plaintiffs must show that the "necessary relationship" between SBG and this

forum arises out of contacts that SBG *itself* creates. *Walden*, 134 S. Ct. at 1122. In this regard,

Plaintiffs' allegations about Osama bin Laden's ties to his family, as allegedly reflected in the

putative "will," fall short.[13]

The second set of new allegations relate to Moussaoui's deposition testimony about SBG.

(*See* FAC ¶¶ 305–06.) These allegations, however, also fail to establish personal jurisdiction over

---

[13] For the same reasons, this Court rejects as insufficient Plaintiffs' allegations, based on recently declassified portions of the Congressional Joint Inquiry Report on the 9/11 Attacks, that Osama bin Laden maintained contact with his family through an individual in the United States and another individual allegedly responsible for flying him between Afghanistan and Saudi Arabia. (*See* FAC ¶¶ 308–09). Even if those allegations are true, they say nothing about whether those individuals were involved with SBG or that these connections are related in any jurisdictionally significant way to the 9/11 Attacks.

SBG. First, for the reasons already stated, vague allegations about Osama bin Laden's contacts with his family members do not support an inference that *SBG* created sufficient contacts with the forum by expressly aiming its conduct at residents of the United States. Plaintiffs do not even allege that the family members Osama bin Laden remained in contact with after his exile from Saudi Arabia had any connection to SBG or, for that matter, the 9/11 Attacks.[14] *See In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks Discovery Order*"), No. 03-MDL-1570 (GBD) (FM), 2008 WL 8183819, at *3 (S.D.N.Y. May 21, 2008) (Maas, Mag. J.) (denying Plaintiffs' requests for discovery as to SBG based on family members' visits to Osama bin Laden since "such trips do not . . . show that SBG materially supported [his] terrorist activities").

Second, the FAC considerably mischaracterizes Moussaoui's testimony as to SBG's alleged provision of construction materials for the building of terrorist training camps. At his deposition, Moussaoui was asked by Plaintiffs' counsel whether he had received information indicating that Osama bin Laden's family "in general" sent money to him, to which he responded, in relevant part, "when we wanted to buy spare part of—okay, the—the spare part were bought by the Saudi bin Laden group [sic], and was sending to—to Jeddah, and, then, after to Karachi." (Moussaoui Dep. Tr. at 21:4–12.)[15] Thus, contrary to the FAC's allegations, Moussaoui did not testify that SBG sent construction parts to al Qaeda to build *terrorist training camps*, nor does his testimony even suggest that the transfers were done surreptitiously. But even if that were his testimony, it would still not be enough to establish jurisdiction over SBG absent allegations that SBG *itself* engaged in

---

[14] Similarly insufficient is Moussaoui's conclusory testimony calling it a "complete lie" that the bin Laden family severed all ties with Osama bin Laden after his removal from SBG in 1993. (FAC ¶ 307.)

[15] "In deciding a motion to dismiss for lack of personal jurisdiction, the court may consider factual issues beyond the pleadings," *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 168 n.3 (E.D.N.Y. 2015), including documents referenced in the complaint. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

intentional tortious conduct expressly aimed at the United States. *Waldman*, 835 F.3d at 337; *see also Terrorist Attacks VII*, 714 F.3d at 676 ("[W]e decline to say that the provision of . . . services to an entity that carries out a terrorist attack on United States citizens could make a defendant, in the circumstances presented here, subject to the jurisdiction of American courts.").

Defendant SBG's motion to dismiss for lack of personal jurisdiction is GRANTED.

## IV.  PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY

Plaintiffs seek limited jurisdictional discovery to allow them to "develop evidence" necessary to establish personal jurisdiction over the Moving Defendants. (Opp'n at 32.)  Plaintiffs argue they are entitled to discovery because the relevant information "establishing jurisdictional facts is uniquely within [Defendants]' knowledge and control." (*Id.*)  Specifically, Plaintiffs seek discovery "as to ARB's activities in support of al Qaeda," including those described in Zacarias Moussaoui's testimony, and the deposition of an individual allegedly affiliated with NCB who helped manage Muwafaq. (*Id.* at 32–33.)  They also seek discovery concerning SBG's alleged support of al Qaeda through the shipment of construction materials, as described by Moussaoui, as well as the funds described in Osama bin Laden's putative will. (*Id.* at 33.)

"A party seeking jurisdictional discovery, like a party seeking other kinds of discovery, bears the burden of showing necessity." *Molchatsky v. United States*, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011).  Courts have "wide latitude to determine the scope of discovery" and it is typically within the court's discretion to deny jurisdictional discovery where a plaintiff has failed to demonstrate a prima facie case for jurisdiction. *Frontera*, 582 F.3d at 401 (citations omitted); *see also Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 314 (S.D.N.Y. 2015) (denying jurisdictional discovery where Plaintiff did not make a prima facie showing that jurisdiction exists).  Even if a plaintiff cannot make a prima facie showing of jurisdiction, jurisdictional discovery may

still be appropriate where the "plaintiff has identified a genuine issue of jurisdictional fact." *Terrorist Attacks I*, 349 F. Supp. 2d at 812 (citations omitted).

Here, Plaintiffs have done neither. As noted, Plaintiffs have already had several years of jurisdictional discovery as to NCB and SBG monitored under the close supervision of Magistrate Judge Maas. Their efforts thus far have failed to uncover facts sufficient to demonstrate a prima facie case for jurisdiction and Plaintiffs have failed to articulate a reasonable basis for believing it would be any different this time. Although Plaintiffs have not yet had jurisdictional discovery with respect to ARB, none is warranted, much less "necessary," since, for the reasons explained, the underlying legal theories upon which Plaintiffs seek to premise jurisdiction over ARB are untenable. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 487. Nor do Plaintiffs point to a single genuine issue of jurisdictional fact justifying additional discovery as to any of the Moving Defendants. This Court will not sanction jurisdictional discovery that forces the Moving Defendants to simply "go over old ground." *Terrorist Attacks Discovery Order*, 2008 WL 8183819, at *3.

Moreover, the extensive nature of Plaintiffs' own allegations and the history of this multidistrict litigation, including the years of jurisdictional discovery that have been undertaken on these very issues, refute Plaintiffs' contention that the Moving Defendants have unique knowledge and control of information necessary to establish jurisdictional facts. Even if they did, Plaintiffs still have not identified what facts they hope to discover to support a claim for personal jurisdiction that do not rely on the legal arguments already rejected by this Court and the Second Circuit. *See Vista Food*, 124 F. Supp. 3d at 315 ("Discovery need not be granted to allow a plaintiff to engage in an unfounded fishing expedition for jurisdictional facts.") (citation omitted).

Accordingly, Plaintiffs' request for leave to take jurisdictional discovery is DENIED as futile.

# V. **CONCLUSION**

The Moving Defendants' motions to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction are GRANTED.

The Clerk of the Court is directed to close the motions at ECF Nos. 3691, 3700, and 3702, accordingly.

Dated: March 28, 2018
      New York, New York

SO ORDERED.

GEORGE B. DANIELS
United States District Judge