**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM) <br> ECF Case |

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army*, *et al.*, 02-cv-6977 (GBD)(FM)

## MEMORANDUM OF LAW IN SUPPORT OF THE ASHTON PLAINTIFFS' MOTION FOR FINAL JUDGMENTS

For the reasons set forth below, and the statements contained in the declaration of James P. Kreindler, Esq. ("Kreindler Declaration") and accompanying exhibits, the *Ashton* plaintiffs, by and through their counsel Kreindler & Kreindler LLP, respectfully move this Court to issue final judgments against the Islamic Republic of Iran ("Iran") and award solatium damages for the losses suffered by certain non-immediate family members of victims killed in the September 11, 2001 terrorist attacks in the amounts set forth herein; and award prejudgment interest on those damages as set forth below in the amount of 4.96% per year, compounded annually.

This motion is made on behalf of the *Ashton* claimants listed in Exhibit A to the Kreindler Declaration ("*Ashton V* Plaintiffs") in light of this Court's previous orders granting permission to allow remaining *Ashton* plaintiffs to move for this relief. *See e.g.* 03-md-1570 (S.D.N.Y.) (GBD) (FM), Doc. No. 3300, Filed 06/16/2016. The solatium claimants for whom relief is presently sought have the functional equivalent of an "immediate family member" relationship to decedents who died in the September 11, 2001 terrorist attacks, and the intimate nature of their emotional connection with their lost loved ones and the anguish and grief they have suffered as a result of the attacks is detailed in the declarations included as Exhibit B to the Kreindler Declaration. Because these claimants' relationships to their loved ones were functionally equivalent to the

1

biological relationships that this Court has previously found formed the basis of damages awards, the *Ashton V* Plaintiffs should be awarded solatium damages under the Foreign Sovereign Immunities Act.

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *Ashton V* Plaintiffs listed in Exhibit A to the Kreindler Declaration, any award issued to those individuals will constitute final awards and judgments against the Islamic Republic of Iran for the *Ashton V* Plaintiffs.

## I.      Procedural Background

Based on evidence and arguments submitted by various plaintiffs in this consolidated multi-district litigation arising out of the September 11, 2001 terror attacks, this Court previously issued a default judgment on liability against Iran to all *Ashton* plaintiffs for claims arising out of the deaths of the plaintiffs' decedents (the "*Ashton* plaintiffs").  *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3008, Filed 08/26/2015.  Thereafter, the *Ashton* plaintiffs moved for partial summary judgment for the conscious pain and suffering that their decedents suffered before death, which this Court granted, and certain *Ashton* plaintiffs moved for default judgments on economic damages suffered as a result of their decedents' wrongful deaths as well. This Court granted those motions. *See, e.g.,* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. Nos. 3229, Filed 03/09/2016 (adopting December 28, 2015 Report and Recommendation awarding damages for conscious pain and suffering) and 3356, Filed 10/11/2016 (awarding damages for economic loss).

In addition, certain *Ashton* plaintiffs previously moved for solatium damages suffered by those family members eligible to recover such damages under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"). *See* 03-md-1570 (02-cv-6977),

Doc. Nos. 3295, Filed 06/08/2016 (Motion for Final Judgment for *Ashton I* claimants including claims for solatium damages); 3356, Filed 10/11/2016 (Motion for Final Judgment for *Ashton II* claimants including claims for solatium damages); 3686, Filed 8/16/17 (Motion for Final Judgment for *Ashton III* claimants solely for solatium damages); and 3977, Filed 4/24/2018 (Motion for Final Judgment for *Ashton IV* claimants solely for solatium damages). This Court granted these motions, finding that an award to the immediate family members of each decedent was proper and that prejudgment interest on the solatium loss amounts was warranted. *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. Nos. 3300, Filed 06/16/16; 3387, Filed 10/31/2016; 3706, Filed 8/17/17; and 3979, Filed 4/25/2018.

As to the availability of solatium damages to non-immediate family members, this Court has previously addressed the criteria necessary to establish that a claimant and a decedent had the "functional equivalent" of an immediate family member relationship. See 03-md-1570 (S.D.N.Y.) (11-cv-7550) (GBD) (SN), Doc. No. 3363, Filed 10/14/16. The test established by the Court considers several factors, including long-term residence or cohabitation of the decedent and the claimant, the guardian or custodian-like role between the decedent and the claimant and the absence of the biological relative from the claimant's or decedent's life. *See id.*, pp. 10 – 12.

On the issue of prejudgment interest, a December 28, 2015 Report and Recommendation, adopted by this Court, concluded that to the extent the *Ashton* wrongful death plaintiffs' claims arose out of injuries in New York State the rate of prejudgment interest was 9 percent per annum from September 11, 2001 until the date judgment was entered and to the extent the injuries arose elsewhere 4.96 percent interest per annum compounded annually was appropriate. *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3175, Filed 12/28/2015, pp. 1 – 2. A subsequent Report and Recommendation issued on October 12, 2016, also adopted by this Court,

however, concluded that the rate of prejudgment interest of 4.96 percent for all pain and suffering and solatium claims was more appropriate. *See* 03-md-1570(11 cv 7750) (S.D.N.Y. (GBD) (SN), Doc Nos. 3358, Filed 10/14/2016; 3383, Filed 10/31/2016.  Accordingly, the *Ashton I, Ashton II, Ashton III* and *Ashton IV* plaintiffs were awarded prejudgment interest at the rate of 4.96 percent per annum.

For the reasons below as well as those set forth in the prior motions for summary judgment on liability and prior motions for judgment for solatium damages made on behalf of other *Ashton* wrongful death plaintiffs, the *Ashton V* Plaintiffs listed in Exhibit A to the Kreindler Declaration now move this Court to grant the proposed Order, attached to the Kreindler Declaration as Exhibit C, awarding them compensatory damages for their solatium losses in a manner consistent with Magistrate Judge Netburn's October 14, 2016 Report and Recommendation, and directing that pre-judgment interest be assessed at 4.96 percent per annum.  All *Ashton* plaintiffs also ask for permission to continue to submit applications in subsequent stages on behalf of those claimants not included in the attached exhibit.

## II.   Damages

Under 28 U.S.C. § 1605A ("Section 1605A"), which applies to the claims against Iran, damages are available under the federal law and include money damages "for personal injury or death." *See* 28 U.S.C. § 1605A(a)(1) and (c)(4).  The damages available to plaintiffs in a Section 1605A action include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).  That is, the "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 83 (D.D.C. 2010).  Plaintiffs who are considered "family members" for

4

purposes of the statute are therefore entitled to compensation under Section 1605A for the solatium

losses suffered as a result of the wrongful death of each of their decedents.

### A. Solatium Damages

Section 1605A specifically provides for solatium damages. Under that provision, family

members of the decedents may recover for "the mental anguish, bereavement, and grief that those

with a close relationship to the decedent experience as a result of the decedent's death, as well as

the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of*

*Iran*, 281 F.Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds*, 404 F.Supp. 2d 261

(D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very

definition extreme and outrageous and intended to cause the highest degree of emotional distress."

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In FSIA cases solatium

claims have therefore been treated as comparable to claims for intentional infliction of emotional

distress, in which the immediate family members of the decedent are treated as direct victims. *See,*

*e.g. Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts

have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but

also at the victims' families."); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5

(D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional

infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d

128, 135 n.11 (D.D.C. 2001)).

Accordingly, this Court has previously awarded solatium damages to "immediate family

members" who, though not physically present at the site of the terrorist attacks, were nevertheless

intended victims of the terrorist activities. *See e.g.* 03-md-1570 (11-cv-07550) (S.D.N.Y.) (GBD)

(SN) Doc. No. 3358, Filed 10/12/2016; 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) Doc. No. 3300 Filed 06/16/16.

### i.   Nature of the Relationship – "Functional Equivalent" of Immediate Family Members

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived the September 11, 2001 deaths of their loved ones were entitled to recover for their solatium losses, and set forth a framework for other family relationships that fell outside of those four categories. *See* 03-md-1570 (11-cv-7550) (S.D.N.Y.) (GBD) (SN), Doc. No. 3363, Filed 10/14/2016.

The October 14, 2016 Report and Recommendation recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with the September 11, 2001 decedent.  These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. *See* 03-md-1570 (11-cv-7550) (S.D.N.Y.) (GBD) (SN), Doc. No. 3300, Filed 10/14/16.

In that report, three factors were identified as especially relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of a traditional immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (*i.e.* did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id.*, pp. 10-12.  In weighing

these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*. In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*., pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all claimants listed in Exhibit A to the Kreindler Declaration had the "functional equivalent" of a biological relationship and they are therefore entitled to an award for solatium damages.[1]

ii.     **Quantum of Damages**

To fashion a solatium award adequately compensating the surviving family members in the litigation against Iran, this Court previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer "profound agony and grief and, "[w]orse yet, … are faced with frequent reminders of the events of that day." *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. Nos. 2623, Filed 10/03/12; 2618, Filed 07/30/12, pp. 10 – 12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," The Court ordered that solatium damages in the following amounts would be awarded to the immediate family members of those individuals killed on September 11, 2001:

---

[1] In one case, the "functional equivalent" relationship was in the nature of a parental relationship, but because the decedent was the same-sex partner of the decedent prior to the legalization of same-sex marriage, the children are not technically step-children. *See* Kreindler Decl., Exh. B, (declarations of Joseph Walsh (B-6), Kevin Walsh (B-7), and Kristin Walsh (B-8)). The details of the relationship set forth in the children's declarations, however, should leave no doubt that they had the functional equivalent of a parental relationship with the decedent, warranting solatium awards here.

| Relationship to Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.*, p. 4.

As for non-immediate family members, the Court concluded that the damages framework above would be used when assessing solatium damages awards for qualifying non-immediate family members. *See* Doc. No. 3363, p. 16. For step-parents, step-children and step-siblings, the Court noted that

> Stepparents and stepsiblings who became part of the family when the decedent was in early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who were in the same range when the decedent became part of the family shall be deemed fully equivalent to biological children. Stepparents and stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half and stepchildren who were in this age range when the decedent [omit] became part of the family shall receive half damages as well.

*See* Doc. No. 3300, Filed 10/14/16, pp. 15-16.

The losses claimed in this motion are legally and factually comparable to those suffered by other claimants previously awarded solatium damages in this litigation. Each of the deaths in this case were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose deaths were intended to create an environment of fear and terror. The claimants here were not attenuated victims – they had intimate relationships with the decedents and were directly and irrevocably harmed by the terrorist acts and consequences.

8

Many of the claimants can visit no private cemetery plot or gravestone to visit their loved ones but are instead resigned to never have the closure that might otherwise be expected. The presumptive amount of solatium damages previously adopted by the Court in the other *Ashton* cases as well as the other claimants involved in this litigation should apply equally to the *Ashton V* Plaintiffs with deviations based on the previously established criteria for non-immediate family as noted below.

The relationships between the decedents and the *Ashton V* Plaintiffs are set forth below and in more detail in the statements from the surviving family members submitted as Exhibit B to the Kreindler Declaration. All of the *Ashton V* Plaintiffs identified below have the sort of intimate relationships previously recognized as qualifying for solatium damages; all of the *Ashton V* Plaintiffs survived the deaths of their loved ones on September 11; and all of the *Ashton V* Plaintiffs have verified under penalty of perjury the nature of the relationships with their deceased loved ones.

Based on the representations in those statements attached as Exhibit B to the Kreindler Declaration and summarized below, the *Ashton V* Plaintiffs respectfully request that this Court issue a final judgment ordering payment of solatium damages to the *Ashton V* Plaintiffs in the amounts set forth below:

1.     ***Claimant Crystal Barkow, stepchild of Colleen Barkow.***
       **Presumptive Award: $8.5 million**
       **Requested Award: $8.5 million**

Decedent Colleen Barkow married claimant Crystal Barkow's father in 2001 after dating him for six years. Colleen acted as a stepmother to Ms. Barkow for the duration of the time that she dated Ms. Barkow's father. Ms. Barkow resided with Colleen on weekends and holidays during the school year and full-time during the summer from the time she was five years-old until the decedent's death on September 11, 2001, when the claimant was eleven years-old. Because her

biological mother had personal issues that rendered her unreliable, Ms. Barkow considered the decedent to be the primary female caretaker in her life. The decedent fulfilled Ms. Barkow's financial, emotional, and social needs. Following the decedent's death, Ms. Barkow was devastated, and she suffered from insomnia and nightmares related to the murder of her stepmother. Based on the claimant's tender age at the time Colleen became part of the family and her close relation to the decedent, Ms. Barkow, should be awarded the full solatium damages award of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

**2.** ***Claimant Kayla Barkow, stepchild of Colleen Barkow.***
**Presumptive Award: $8.5 million**
**Requested Award: $8.5 million**

Decedent Colleen Barkow married claimant Kayla Barkow's father in 2001 after dating claimant's father for six years. Colleen acted as a stepmother to Ms. Barkow for the duration of the time she dated Ms. Barkow's father. Ms. Barkow resided with Colleen on weekends and holidays during the school year and full-time during the summer from the time she was two years-old until the decedent's death on September 11, 2001, when she was eight years-old. Ms. Barkow considered the decedent to be the primary female caretaker in her life. The decedent fulfilled Ms. Barkow's financial, emotional, and social needs. Following the decedent's death, Ms. Barkow was devastated, and she suffered from insomnia and nightmares related to the murder of her stepmother. Based on the claimant's tender age at the time Colleen became part of the family and her close relation to the decedent, Ms. Barkow, should be awarded the full solatium damages award of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

3.   ***Claimant John Leinung, stepparent of Paul Battaglia.***
     **Presumptive Award: $8.5 million**
     **Requested Award: $8.5 million**

Claimant John Leinung became stepfather to decedent Paul Battaglia when he married Paul's mother Elaine in 1984, when Paul was two years-old. Mr. Leinung resided with Paul from the time the decedent was two years-old until his death on September 11, 2001. Paul had little to no relationship with his biological father and only saw him on rare occasions. For all intents and purposes, Mr. Leinung was Paul's father, and Paul called him "Dad." Mr. Leinung took care of all of the decedent's financial, emotional, and physical needs. Due to Paul's tender age when Mr. Leinung joined the family and the close father-son relationship that they shared, Mr. Leinung should be awarded the full damages of $8.5 million otherwise awarded to the biological or adoptive parents of September 11, 2001 decedents.

4.   ***Claimant Anthony (DeNiro) Graffino, stepchild of Peter Carroll.***
     **Presumptive Award: $4.25 million**
     **Requested Award: $8.5 million**

Decedent Peter Carroll became part of claimant Anthony (DeNiro) Graffino's family when Mr. Graffino was ten years-old and he started dating Mr. Graffino's mother. Following Peter's marriage to Mr. Graffino's mother two years later, claimant resided with Peter full-time until his death on September 11, 2001. Mr. Graffino never had a relationship with his biological father. Peter was the only father he knew. Peter provided for all of his Mr. Graffino's financial, emotional and social needs, and Mr. Graffino shared an extremely close father-son relationship with him. Peter's death on September 11, 2001 devastated Mr. Graffino's family. Mr. Graffino continues to suffer from extreme grief and anxiety related to Peter's death.

This case warrants an upward departure from the Court's framework because the nature of the relationship between Mr. Graffino and the decedent was so intimate that it closely mimicked that

of a biological parent to his child; because Mr. Graffino never had a relationship with his biological father or any other father figure; and because Mr. Graffino was at the cusp of early childhood when Peter entered his life and became, functionally, his father.  It is therefore appropriate in this case, that the claimant be awarded the full damages otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

5.    ***Claimant Dana Ann DeNiro, stepchild of Peter Carroll.***
      **Presumptive Award: $8.5 million**
      **Requested Award: $8.5 million**

Decedent Peter Carroll became part of claimant Dana Ann DeNiro's family after he began dating claimant's mother when she was seven years-old.  Following Kevin Smith's marriage to the claimant's mother, Ms. DeNiro resided with her stepfather from the age of ten until he died on September 11, 2001, when Ms. DeNiro was a senior in high school.  Ms. DeNiro did not have a relationship with her biological father.  Peter was the only father she knew.  Peter provided for all of her financial, emotional and social needs, and Ms. DeNiro shared a close father-daughter relationship with him.  Peter's death on September 11, 2001 devastated Ms. DeNiro.  Ms. DeNiro continues to suffer from extreme grief and anxiety related to his death.  Based on the tender age that Ms. DeNiro was when Peter became part of the family and the intimate relationship they shared, Ms. DeNiro should be awarded the full damages of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

6.    ***Claimant Joseph Walsh, stepchild of Carol Flyzik.*** [2]
      **Presumptive Award: $8.5 million**
      **Requested Award: $8.5 million**

Claimant Joseph Walsh resided with his stepmother, decedent, Carol Flyzik from the time he was seven years-old until her death on September 11, 2001. Carol was Mr. Walsh's biological mother's partner. Carol was the parent who taught him the fundamentals of life during his most formative years, such as how to shave and how to tie a tie. The decedent provided for all of Mr. Walsh's financial, emotional and social needs. Based on Mr. Walsh's tender age at the time that Carol became part of the family and the close, mother-son relationship they shared, Mr. Walsh should be awarded the full solatium damages award of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

7.    ***Claimant Kevin Walsh, stepchild of Carol Flyzik.***
      **Presumptive Award: $4.25 million**
      **Requested Award: $8.5 million**

Claimant Kevin Walsh resided with his stepmother, decedent, Carol Flyzik from the time he was nine years-old until Carol's death on September 11, 2001. Carol was Kevin's biological mother's partner. Carol was a second mother to Mr. Walsh. Carol was the parent who taught him the fundamentals of life during his most formative years, such as how to shave and how to tie a tie. The decedent provided for all of Mr. Walsh's financial, emotional and social needs.

This case warrants an upward departure from the Court's framework because the decedent entered Mr. Walsh's life when he was still at the threshold of early childhood and immediately took on the role of biological parent. The nature of the relationship between Mr. Walsh and the decedent was so intimate that it closely mimicked that of a biological parent to her child, and Mr.

---

[2] As noted above, Joseph Walsh and his siblings, Kevin and Kristin Walsh, are not technically the stepchildren of Carol Flyzik since the family relationship was formed prior to the legalization of same-sex marriage.

Walsh was still at a sufficiently impressionable age as to treat his biological mother's partner as a second parent. As such, the decedent adopted him in all but name. It is therefore appropriate in this case that the claimant be awarded the full damages otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

8.    ***Claimant Kristin Walsh, stepchild of Carol Flyzik.***
      **Presumptive Award: $4.25 million**
      **Requested Award: $4.25 million**

Claimant Kristin Walsh resided with her stepmother, decedent, Carol Flyzik from the time she was thirteen years-old until early adulthood. Carol was Ms. Walsh's biological mother's partner. Ms. Walsh had a close and personal relationship with Carol, who she considered to be a second parent to her and her two brothers. Carol was a dynamic parent to Ms. Walsh and her brothers, playing basketball with the boys and going shopping with Ms. Walsh. Even after Ms. Walsh moved out of the family home, she remained very close to Carol and continued to make time to visit her and spend holidays and special occasions with her. Due to Ms. Walsh's age at the time Carol became part of the family, the close relationship that they shared, and the Court's prior framework, Ms. Walsh should be awarded $4.25 million, half the full solatium damages award otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

9.    ***Claimant Robert Callanan, stepchild of Richard P. Gabriel.***
      **Presumptive Award: $8.5 million**
      **Requested Award: $8.5 million**

Decedent Richard Gabriel became stepfather to claimant Robert Callanan in 1966 after he married Mr. Callanan's mother when the claimant was two years-old. Mr. Callanan never had a relationship with his biological father, and the decedent is the only father he has ever known. Richard completely supported Mr. Callanan financially, emotionally, and socially. After the decedent divorced Mr. Callanan's mother, Mr. Callanan went to live with the decedent until he left

14

for college.  The decedent raised Mr. Callanan as a single father.   Based on the tender age that Mr. Callanan was when Richard became his stepfather and the decedent's ongoing role as the sole paternal figure in the claimant's life, Mr. Callanan should be awarded the full damages of $8.5 million otherwise awarded to the biological or adoptive parents of September 11, 2001 decedents.

10.   ***Claimant J. Linzee Whittaker, stepparent of Karen E. Hagerty.***
      **Presumptive Award: $4.25 million**
      **Requested Award: $8.5 million**

Claimant J. Linzee Whittaker married decedent Karen Hagerty's mother when the decedent was nine years-old.  Mr. Whittaker resided with the decedent from the time she was nine years-old until she left for college.  Mr. Whittaker and his stepdaughter had an extremely close relationship.  Karen's biological father was largely absent from her life, and she had very little relationship with him.  The decedent called Mr. Whittaker "Dad" and regarded him as her father. Mr. Whittaker completely supported her financially, emotionally and socially. After Karen moved out of the family home, she continued to have a close relationship with Mr. Whittaker.  The two would meet each other every day in downtown Manhattan to discuss their days.  Mr. Whittaker misses his stepdaughter tremendously and cannot speak about her murder on September 11, 2001 without becoming extremely emotional.

This case warrants an upward departure from the Court's framework because Mr. Whittaker entered the decedent's life when she was still at the threshold of early childhood and immediately took on the role of biological parent.  Mr. Whittaker's relationship with Karen mimicked a biological father-daughter relationship.  Since the decedent did not have a relationship with her biological father, Mr. Whittaker became the "functional equivalent" of a father to her and due to Karen's young age when Mr. Whittaker joined the family, she viewed him as her father.  Mr. Whittaker and the decedent had an extremely close relationship that continued until her death.

Therefore, Mr. Whittaker should be awarded the full damages of $8.5 million otherwise awarded to the biological or adoptive parents of September 11, 2001 decedents.

11.   ***Claimant LaKimmie Smith, stepchild of Ronnie Lee Henderson.***
      **Presumptive Award: $8.5 million**
      **Requested Award: $8.5 million**

Decedent Ronnie Lee Henderson became part of claimant LaKimmie Smith's life when she was toddler.  Following the marriage between Ronnie and the claimant's mother, Ms. Smith resided with the decedent from the time she was four years-old until she was an adult in her early twenties.  Ms. Smith did not have a relationship with her biological father, and Ronnie is the only man in her life that she considers to be her father.  The decedent completely took care of all of Ms. Smith's financial, emotional and social needs.  Ms. Smith is a self-proclaimed "daddy's girl" and shared a very close relationship with the decedent.  After Ronnie's death on September 11, 2001, Ms. Smith experienced tremendous grief, depression and anxiety.  She underwent long-term counseling and continues to experience fear and grief related to the attacks.  She moved to Georgia to escape the memories of the September 11, 2001 terror attack.  Based on the tender age that Ms. Smith was when Ronnie became part of the family and the close relationship that they shared, Ms. Smith should be awarded the full damages of $8.5 million otherwise awarded to the children of September 11, 2001 decedents.

12.   ***Claimant Marshall Lashon Ross, stepchild of Ronnie Lee Henderson.***
      **Presumptive Award: $8.5 million**
      **Requested Award: $8.5 million**

Decedent Ronnie Lee Henderson became part of claimant Marshall Lashon Ross' life when he was a young child.  Following the marriage between Ronnie and the claimant's mother, Mr. Ross resided with his stepfather from the time he was six years-old until Ronnie Lee Henderson's death on September 11, 2001. Mr. Ross did not have a relationship with his biological father, and the

decedent is the only man in his life that he considers to be his father. The decedent completely took care of all of Mr. Ross's financial, emotional and social needs. Even after reaching the age of majority and his parents' divorce, Mr. Ross continued living with his stepfather. After Ronnie's death on September 11, 2001, Mr. Ross experienced tremendous grief and anger. The decedent's body was never found, and this continues to haunt Mr. Ross to this day. Mr. Ross moved to Georgia to escape the memories of the September 11, 2001 terror attack.

Based on the Mr. Ross' tender age when Ronnie became part of the family and the close relationship that they shared, Mr. Ross should be awarded the full damages of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

13.  ***Claimant Gregory Rakovsky, stepchild of Eugueni Kniazev.***
     **Presumptive Award: $4.25 million**
     **Requested Award: $4.25 million**

Claimant Gregory Rakovsky was approximately eleven years-old when his stepfather, decedent, Eugueni Kniazev began dating his mother and became part of the family. The decedent married Mr. Rakovsky's mother when he was twelve years-old. Mr. Rakovsky and his stepfather resided together from the time claimant was twelve years-old until Mr. Rakovsky left for college in the fall of 2001. Mr. Rakovsky rarely saw his biological father and the decedent was the primary paternal caretaker in his life. Eugueni provided for all of Mr. Rakovsky's financial, emotional, and financial needs. Mr. Rakovsky relied on Eugueni for the guidance and love that a son typically expects from his biological father and they shared a very close relationship.

Due to the young age that Mr. Rakovsky was when the decedent became part of his life, the especially close relationship they shared, and the Court's prior framework, Mr. Rakovsky should be awarded $4.25 million, half the full solatium damages award otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

14. ***Claimant Kjell Youngren, stepchild of Robert LeBlanc.***
    **Presumptive Award: $8.5 million**
    **Requested Award: $8.5 million**

Decedent Robert LeBlanc married claimant Kjell Youngren's mother when claimant was four years-old. Mr. Youngren resided with his stepfather from the time he was four years-old until he left for college at the age of eighteen. Robert was Mr. Youngren's primary male caretaker and father figure. Mr. Youngren rarely saw his biological father and considered Robert to be "Dad." The decedent provided for all of Mr. Youngren's financial, emotional and social needs.

After Mr. Youngren moved out of the family home for college and medical school, he maintained a traditional father-son relationship with the decedent. The decedent's murder on September 11, 2001 had a tremendous impact on Mr. Youngren's life. Based on Mr. Youngren's tender age at the time that Robert became part of the family and the close, father-son relationship they shared, Mr. Youngren should be awarded the full solatium damages award of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

15. ***Claimant Nissa Youngren, stepchild of Robert LeBlanc.***
    **Presumptive Award: $8.5 million**
    **Requested Award: $8.5 million**

Decedent Robert LeBlanc married claimant Nissa Youngren's mother when she was two years-old, but he was the father figure in her life since she was five months-old. Ms. Youngren resided with her stepfather, Robert, from the time she was two years-old until she moved out for college. Robert was the primary male caretaker in her life and the man she called "Dad." The decedent provided for all of Ms. Youngren's financial, emotional and social needs.

After Ms. Youngren moved out of the family home for college, she maintained a traditional father-daughter relationship with the decedent. Robert's death devastated Ms. Youngren. Based on Ms. Youngren's tender age at the time that Robert became part of the family and the close,

18

father-daughter relationship they shared, Ms. Youngren should be awarded the full solatium

damages award of $8.5 million otherwise awarded to the biological or adopted children of

September 11, 2001 decedents.

16.   ***Claimant Liza Sloan, cousin, godchild and "daughter" / "sibling" of Jeffrey A.***
      ***Palazzo.***
      **Presumptive Award: $4.25 million**
      **Requested Award: $4.25 million**

Claimant Liza Sloan went to live with her cousin and godfather, decedent, Jeffrey A. Palazzo

when she was four years-old after her biological mother passed away.  Ms. Sloan never had a

relationship with her biological father, who passed away when she was ten or eleven years-old.

Ms. Sloan resided with Jeffrey and his parents, her maternal uncle and aunt, from the time she was

four years-old until she was fourteen years-old.  At the age of fourteen, she moved with Jeffrey

and his wife to Staten Island.  On September 11, 2001, at the time of his death, Ms. Sloan was still

residing with the decedent.

The decedent's role in Ms. Sloan's life evolved as he grew older.  When she first moved in

with Jeffrey, Ms. Sloan viewed him as a brother.  Later, he took on the role of a father to her.

During the claimant's early teens until September 11, 2001, the decedent became fully responsible

for all of her financial, emotional, and social needs.  She had a very close relationship with him.

Jeffrey's death on September 11, 2001 devastated Ms. Sloan, and she describes it as having lost a

third parent.

After Ms. Sloan was orphaned at a young age, Jeffrey became the "functional equivalent"

of both an immediate family member and parent in her life.  He adopted her in all but name.  Since

he was both a brother to her in her tender years and a father to her during her teenage years, the

appropriate solatium award for Ms. Sloan's claim is $4.25 million, which would reflect full

damages awarded to siblings of September 11, 2001 decedents and the half damages awarded to the older stepchildren of September 11, 2001 decedents.

17. ***Claimant Darcie Bailey-Scauso, stepchild of Dennis Scauso.***
**Presumptive Award: $8.5 million**
**Requested Award: $8.5 million**

Decedent Dennis Scauso married claimant Darcie Bailey-Scauso's mother when Ms. Bailey-Scauso was five years-old. Ms. Bailey-Scauso resided with her stepfather, Dennis, from the time she was five years-old until his death on September 11, 2001. He is the only man in her life that she considers to be her father. Ms. Bailey-Scauso called Dennis "Daddy" and adopted his last name, which she retains to this day. The decedent completely supported Ms. Bailey-Scauso financially, emotionally, and socially. Ms. Bailey-Scauso shared a very close father-daughter relationship with her stepfather. Dennis' death on September 11, 2001 devastated her family and his absence continues to be extremely painful to her. Based on the tender age that Ms. Bailey-Scauso was when Dennis became part of the family and the close relationship that they shared, Ms. Bailey-Scauso should be awarded the full damages of $8.5 million otherwise awarded to the biological or adopted children of September 11, 2001 decedents.

18. ***Claimant Nichole Scochemaro, stepchild of Kevin Smith.***
**Presumptive Award: $4.25 million**
**Requested Award: $4.25 million**

Decedent Kevin Smith became part of claimant Nichole Scochemaro's life when she was approximately thirteen years-old. Following Kevin's marriage to Ms. Scochemaro's mother, the claimant resided with the decedent, her stepfather, from the time she was fourteen-years old until Kevin's death on September 11, 2001. Kevin was the primary male caretaker in Ms. Scochemaro's life, and she describes him as being more of a father to her than her biological father. Kevin completely provided for Ms. Scochemaro financially, emotionally and socially. They shared a

close father-daughter relationship.  Ms. Scochemaro describes her family as being destroyed by Kevin's death.  She still is haunted by the fact that his body was never found.  She and her siblings continue to experience depression, grief and anger as a result of his death.  Due to the Ms. Scochemaro's age at the time the decedent became part of the family, the close relationship that they shared, and the Court's prior framework, Ms. Scochemaro should be awarded $4.25 million, half the full solatium damages award available to the biological or adopted children of September 11, 2001 decedents

19. ***Claimant Anthony J. Viola, stepchild of Kevin Smith.***
   **Presumptive Award: $4.25 million**
   **Requested Award: $4.25 million**

Decedent Kevin Smith became part of claimant Anthony J. Viola's life when he was about nine years-old.  Following Kevin's marriage to Mr. Viola's mother, the claimant resided with the decedent until Kevin's death on September 11, 2001, when Mr. Viola was nineteen years-old. Kevin was the primary male caretaker in Mr. Viola's life, and the decedent took care of all of Mr. Viola's financial, emotional and social needs.  They shared a very close father-son relationship. When Kevin was killed on September 11, 2001, Mr. Viola was destroyed.  He experienced tremendous grief.  He described that it felt like he was living in fog.  Kevin's body was never found, and this greatly disturbs Mr. Viola to this day.

Due to the Mr. Viola's age at the time the decedent became part of the family, the close relationship that they shared, and the Court's prior framework, Mr. Viola should be awarded $4.25 million, half the full solatium damages award available to the biological or adopted children of September 11, 2001 decedents.

21

20. ***Claimant Vincent Viola, stepchild of Kevin Smith.***
    **Presumptive Award: $4.25 million**
    **Requested Award: $4.25 million**

Decedent Kevin Smith became part of claimant Vincent Viola's life when he was ten years-old. Following Kevin's marriage to Mr. Viola's mother the claimant resided with the decedent, his stepfather, from the time he was eleven years-old until he left to join the military upon reaching the age of majority. Kevin was the primary male caretaker in Mr. Viola's life, and the decedent took care of all of Mr. Viola's financial, emotional, and social needs. They shared a very close father-son relationship. Mr. Viola extended his military service to continue fighting in the decedent's honor. Due to the Mr. Viola's age at the time the decedent became part of the family, the close relationship that they shared, and the Court's prior framework, Mr. Viola should be awarded $4.25 million, half the full solatium damages award available to the biological or adopted children of September 11, 2001 decedents.

21. ***Claimant Jessica (Schoenholtz) Murphy, stepsibling of Alexander Steinman.***
    **Presumptive Award: $2.125 million**
    **Requested Award: $4.25 million**

Claimant Jessica (Schoenholtz) Murphy became the stepsibling of Alexander Steinman when she was six years-old and he was fourteen years-old, after their widowed parents married one another and consolidated households. Being so young when their families came together, Ms. Murphy never thought of Alexander as her stepbrother. She always referred to him as her brother. Ms. Murphy remained close with Alex after he moved out of the family home. They talked on the phone frequently and met for dinners on a regular basis. After the September 11, 2001 attacks, Ms. Murphy went from hospital to hospital trying to find the decedent. She has devoted her entire life's work to rebuilding the World Trade Center and revitalizing Lower Manhattan in honor of his memory.

Although Alexander was a teenager when the siblings began residing together, Ms. Murphy was of the tender age that should warrant the Court's upward departure from the presumptive award of $2.125 million to the full solatium damages award available to the biological or adoptive siblings of September 11, 2001 decedents. The solatium award is intended to compensate the relatives of September 11, 2001 decedents for their own loss and grief. Here, Ms. Murphy met Alexander when she was merely six years old. She does not remember a time when she did not know Alexander as her brother. Alexander was the equivalent of a biological brother for the duration of her formative years. They continued a close relationship even after he moved out of the family home, and she has devoted her life to honoring his memory. Their relationship mimicked that of an older brother-younger sister relationship, and was the equivalent of a biological relationship in all but name. It is therefore appropriate to award her the full solatium damages of $4.25 million for the loss of the only person she knew of as her brother for the majority of her life.

22.   ***Claimant Linda Steinman, stepparent of Alexander Steinman.***
      **Presumptive Award: $4.25 million**
      **Requested Award: $4.25 million**

Claimant Linda Steinman became stepmother to decedent Alexander Steinman when he was fourteen years old after she married the decedent's father. Ms. Steinman resided with the decedent while he was a teenager, and continued to parent him as he went through college and his young adult life. The decedent's mother died when he was a child, and Ms. Steinman was the sole maternal figure in his life. Although they became a family in his teenage years, Ms. Steinman and the decedent shared a close bond. They spent a great deal of time together and she provided for all of his financial, emotional, and psychological needs as a teenager and young adult. Ms. Steinman was devastated by Alexander's death on September 11, 2001. She continues to keep a

keepsake of his in her handbag so that she could always carry a piece of him with her.  Due to the decedent's age at the time Ms. Steinman became part of the family, the close relationship that they shared, and the Court's prior framework, Ms. Steinman should be awarded $4.25 million, half the full solatium damages award otherwise awarded to the biological or adoptive parents of September 11, 2001 decedents.

23.    ***Claimant Fern Rosenbaum, stepmother of Brooke D. Rosenbaum.***
       **Presumptive Award: 8.5 million**
       **Requested Award: $8.5 million**

Claimant Fern Rosenbaum became part of the decedent Brooke D. Rosenbaum's family when the decedent was seven years-old.  Ms. Rosenbaum married the decedent's father when Brooke was nine years-old.  Following her marriage to the decedent's father, Ms. Rosenbaum resided in the household with Brooke on a full-time basis from the time he was nine years-old until he moved out of the family home in his twenties.  Brooke's biological mother was practically absent from his life, and lived in Florida while Brooke and his brother lived in New York with their father and Ms. Rosenbaum.  The decedent's biological mother would see him only a few times during the year.

Ms. Rosenbaum was Brooke's mother for all intents and purposes.  She took care of all of his financial, emotional, and social needs.  Ms. Rosenbaum and the decedent maintained a strong mother-son relationship after he moved out of the family home.  They would meet frequently for meals and talk on the phone on a near-daily basis.  Ms. Rosenbaum suffered from tremendous grief following his death.

Based on Brooke's age at the time that Ms. Rosenbaum took on the role of mother in his life and the close relationship they shared, claimant, Fern Rosenbaum, should be awarded the full

24

solatium damages award of $8.5 million otherwise awarded to the biological or adoptive parents of September 11, 2001 decedents.

**24.** ***Claimant Esther E. Heymann, stepparent of Honor Elizabeth Wainio.***
**Presumptive Award: $8.5 million**
**Requested Award: $8.5 million**

Claimant Esther E. Heymann, stepmother to decedent Elizabeth Wainio, became part of the decedent's family when Elizabeth was three years-old after Ms. Heymann began dating the decedent's father. Following Ms. Heymann's marriage to the decedent's father, Ms. Heymann lived with Elizabeth full-time from the time the decedent was five years-old until she left for college. Ms. Heymann and her husband had full and exclusive custody of Elizabeth. Ms. Heymann was the primary female caretaker in the decedent's life. The decedent called Ms. Heymann "Mom." Ms. Heymann took care of all her daughter's financial, emotional, and social needs. The two shared a very close, loving mother-daughter relationship. Ms. Heymann continues to mourn the loss of her beloved daughter to this day. Due to Elizabeth's tender age when Ms. Heymann joined the family and the close mother-daughter relationship that they shared, Ms. Heymann should be awarded the full damages of $8.5 million otherwise awarded to the parents of September 11, 2001 decedents.

**25.** ***Claimant Jason Tucker, stepsibling of Brian Warner.***
**Presumptive Award: $ 2.125 million**
**Requested Award: $2.125 million**

Claimant Jason Tucker and the decedent Brian Warner first became part of each other's families after their parents began dating when Mr. Tucker was ten years-old and the decedent was approximately fifteen years old. After Mr. Tucker's father married the decedent's mother, Mr. Tucker lived with the decedent, his stepbrother, from the age of eleven until the decedent moved out of the family home upon reaching the age of majority. After the decedent moved out of the

family home, he and Mr. Tucker continued to have a relationship where they saw each other and spoke on the phone regularly.  Mr. Tucker was devastated by the loss of his older brother.  Due to the boys' ages when they moved in together, the closeness of their relationship, and the Court's prior framework, Mr. Tucker should be awarded $2.125 million, half the full solatium damages award otherwise awarded to the biological or adopted siblings of September 11, 2001 decedents.

**B. Prejudgment Interest**

As in prior applications, the *Ashton V* Plaintiffs ask that this Court direct that prejudgment interest of 4.96% on the solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New York be assessed, as was done previously in the *Ashton I, Ashton II, Ashton III* and *Ashton* IV cases, as well as for other plaintiffs in this consolidated litigation.

**III.     Conclusion**

For all of the reasons herein, as well as those set forth in the previous submissions of the *Ashton* plaintiffs and other plaintiffs, the *Ashton V* Plaintiffs respectfully request that this Court grant the proposed order attached to the Kreindler Declaration as Exhibit B and (1) award them solatium damages as set forth in the attached Exhibit A, (2) direct that prejudgment interest of 4.96% on the solatium awards running from September 11, 2001 until the date of judgment be assessed; and (3) permit remaining *Ashton* claimants to submit motions for final judgment in future stages.

Dated: New York, New York
       July 19, 2018

Respectfully submitted,

KREINDLER & KREINDLER LLP

BY:   /s/ James P. Kreindler
James P. Kreindler, Esq.
Andrew J. Maloney III, Esq.

26

750 Third Avenue, 32nd Floor
New York, New York 10017
Tel: (212) 687-8181
*Attorneys for Ashton Plaintiffs*