IAC6TER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    In re:  TERRORIST ATTACKS ON              03 MDL 1570(GBD)
              SEPTEMBER 11, 2001
4                                              Conference
     ------------------------------x
5                                              New York, N.Y.
                                               October 12, 2018
6                                              10:45 a.m.

7    Before:

8                            HON. SARAH NETBURN,

9                                        Magistrate Judge

10

11                           APPEARANCES

12   KREINDLER & KREINDLER
          Attorneys for Plaintiffs Executive Committee
13   BY:  STEVEN R. POUNIAN

14   COZEN O'CONNOR
          Attorneys for Plaintiffs
15   BY:  SEAN P. CARTER
          J. SCOTT TARBUTTON
16

     MOTLEY RICE LLC
17        Attorneys for Plaintiffs
     BY:  ROBERT T. HAEFELE
18

     ANDERSON KILL P.C.
19        Attorneys for Plaintiffs
     BY:  JERRY S. GOLDMAN
20

     MARTIN F. McMAHON & ASSOCIATES
21        Attorney for Defendant Jelaida
     BY: MARTIN F. McMAHON
22

     WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
23        Attorney for M. McMahon
     BY:  ELIZABETH B. SANDZA

24

25

IAC6TER1

Appearances (Cont'd)


BERNABEI & KABAT, PLLC
     Attorneys for Defendants
BY:  ALAN KABAT

SALERNO & ROTHSTEIN
     Attorneys for Defendant Kadi
BY:  PETER C. SALERNO
     AMY ROTHSTEIN

LEWIS BAACH KAUFMANN MIDDLEMISS, PLLC
     Attorneys for Defendants
BY:  ERIC L. LEWIS
     AISHA E. R. BEMBRY
     WALEED NASSAR

ANDERSON KILL
     Attorneys for Defendants
BY:  ARTHUR R. ARMSTRONG
     BRUCE STRONG

MOLO LAMKEN
     Attorneys for Defendants
BY:  ERIC R. NITZ
     ROBERT K. KRY

IAC6TER1

```
 1              (Case called; in open court)
 2              THE COURT:  Good morning everyone.  Please be seated.
 3              THE DEPUTY CLERK:  Your Honor, this is in the matter
 4     of Terrorist Attacks of September 11th, 2001, Case No.
 5     03-MD-1570.
 6              Counsel, would you please state your appearance for
 7     the record.
 8              MR. POUNIAN:  Steven Pounian for the Plaintiffs
 9     Executive Committee.
10              MR. CARTER:  Good morning, your Honor.  Sean Carter
11     for the Plaintiffs Executive Committee.
12              MR. HAEFELE:  Robert Haefele for Plaintiffs Executive
13     Committee.
14              MR. McMAHON:  Martin McMahon.
15              THE COURT:  I ma sorry, Mr. McMahon sorry.
16              MR. GOLDMAN:  Jerry Goldman for the Plaintiffs
17     Executive Committee.
18              MR. TARBUTTON:  Scott Tarbutton for PEC.
19              MR. SALERNO:  Good morning, your Honor.  Peter
20     Salerno, Salerno & Rothstein for Kadi.
21              MS. ROTHSTEIN:  Good morning, your Honor.  Amy
22     Rothstein, Salerno & Rothstein for Kadi.
23              MS. BEMBRY:  Good morning, your Honor.  Aisha Bembry
24     from Lewis Baach for MWL and IIRO.
25              MR. NASSAR:  Waleed Nassar from Lewis Baach on behalf
```

IAC6TER1

1    the charity officials Drs. Obaid, Turki, Naseef and Basha.  And

2    then also on behalf of Mr. Naseef and International Islamic

3    Relief Organization.

4            MS. SANDZA:  Good morning, your Honor.  Elizabeth

5    Sandza from Wilson Elser here on behalf of Mr. McMahon.

6            I apologize for our delayed flight, and thank you for

7    your consideration.

8            MR. LEWIS:  Good morning, your Honor.  Eric Lewis on

9    behalf of the Muslim World League and the IIRO.

10            MR. KABAT:  Good morning, your Honor.  Alan Kabat on

11    behalf Basha and Turki.

12            THE COURT:  Thank you.

13            Yes.

14            MR. STRONG:  Bruce Strong from Anderson Kill on behalf

15    of Plaintiffs Executive Committee and the O'Neill plaintiffs.

16            MR. ARMSTRONG:  Good morning, your Honor.  Arthur

17    Armstrong also from Anderson Kill.

18            MR. KRY:  Your Honor, Robert Kry from Molo Lamken for

19    Dallah Avco.

20            MR. NITZ:  Eric Nitz also from Molo Lamken for Dallah

21    Avco.

22            THE COURT:  I think we have more appearances than we

23    needed because the 10:00 conference is really to address the

24    issue facing Mr. Jelaidan and Mr. McMahon.  So I appreciate

25    everybody else being here for this conference, but I think it

IAC6TER1

1    is really a conference for Mr. McMahon and his counsel and the

2    representative of Plaintiffs Executive Committee, who will be

3    addressing this issue.

4         One housekeeping matter.  Let me remind everybody

5    given the cavernous courtroom we are everyone can be sure to

6    speak into their microphone so most importantly the court

7    reporter can hear you.

8         So we're here to address both the motion for sanctions

9    or additional sanctions against Defendant Jelaidan as well as

10   whether or not those sanctions should be simultaneously opposed

11   jointly and severally against Mr. McMahon and additionally

12   whether or not I should grant Mr. McMahon's motion to withdraw.

13   I think I will begin with that motion first.

14        Ms. Sandza.

15        MS. SANDZA:  I am here to oppose the joint and several

16   suggestion.  Mr. McMahon brought the motion to withdraw

17   himself.

18        THE COURT:  So then I will speak with you, Mr.

19   McMahon, in the first instance.

20        So in your application to withdraw as counsel, you

21   raise a number of grounds for that motion.  You assert that

22   your relationship with your client has deteriorated such that

23   you are unable to communicate effectively with him.  You also

24   assert that you have not been paid and that that is a basis for

25   withdrawal.  Finally, you assert that not only that you are

IAC6TER1

1   unable to speak effectively with your client directly and

2   particularly when there are urgent matters but that you are

3   unable to speak regularly with your Saudi counterpoint, who is

4   the person that you have been communicating with in order to

5   interact with your client.  Lastly, you make a rather vague

6   representation that there are irreconcilable conflicts.  I

7   assume one of those conflicts is the issue that Ms. Sandza is

8   here to address about your potential exposure for any sanction.

9           I wanted to confirm whether there was any other basis

10  for you to allege that there is an irreconcilable conflict?

11          MR. McMAHON:  I think that will do it, your Honor.

12          THE COURT:  So let's talk about the payment issue.  As

13  you know the law does permit a lawyer to withdraw when there is

14  a failure to make payment.  In your application you say that

15  you have not been paid, you say things like at times payment

16  has been late, or you don't believe Mr. Jelaidan has the assets

17  to continue to pay you.  In apposing that motion for your

18  withdraw, Mr. Jelaidan's primary argument is that he paid you a

19  lump sum of money with the expectation that that would cover

20  all legal fees and that is why he opposes it because he says he

21  doesn't have anymore money.

22          So where is the truth here?

23          MR. McMAHON:  Well, your Honor, in terms of the truth,

24  I did enter what is called a fixed-fee legal agreement, but

25  that did not encompass certain issues like the ones that were

IAC6TER1

1    unforeseeable at the time but developed.  One was this

2    discovery issue.  I told him that he had to produce all

3    discovery that was required under Rule 34 requests, and we

4    didn't produce I think enough documentation.

5            THE COURT:  So what was unanticipated about discovery?

6            MR. McMAHON:  I am sorry?

7            THE COURT:  You said that you had a fixed fee that

8    covered your representation but it didn't cover unexpected

9    matters and then you began to talk about discovery.

10           MR. McMAHON:  Yes, your Honor.  The fact that we would

11   be embroiled in an ancillary proceeding regarding sanctions for

12   not providing the necessary documentation overseen by then

13   Magistrate Maas.  I never contemplated that, your Honor.  And

14   evidence that we departed from whatever contract there was, I

15   for the last two years have been sending statements to him

16   regarding the additional work that has been imposed on me and

17   sometimes he has paid that.  And of course recently I found out

18   that he is broke and he cannot pay, for example, my expenses

19   for coming here or any time that I incur.  We departed from

20   whatever that contact was a couple years ago, and I sent him

21   statements and sometimes it would take as much as six or seven

22   months to get paid.  I have no prospect, your Honor, of getting

23   paid in this case.

24           THE COURT:  Can't you make it more clear for me.  I

25   thought what you said, which is consistent with what

IAC6TER1

1    Mr. Jelaidan side, is that you had a contract -- a retainer

2    agreement I presume -- that entitled Mr. Jelaidan to your

3    representation for some scope of work for a fixed fee.

4              MR. McMAHON:  Yes, your Honor.

5              THE COURT:  So it sounds like what you are saying is

6    that at a certain point you decided that the representation you

7    were providing exceeded the scope of the original retainer

8    agreement?

9              MR. McMAHON:  Yes, your Honor.  His counsel Basim Alim

10   agreed and that is why I started sending independent fee

11   statements.  In other words, my sending these statements were

12   inconsistent with, say, a fixed-fee contract.  So I started

13   sending out statements because I was embroiled in a whole host

14   of things, which a litigator would normally not encounter in

15   any standard litigation.

16             THE COURT:  I am not sure discovery disputes is

17   outside of standard litigation.

18             MR. McMAHON:  Discovery disputes, your Honor, with all

19   due respect is one thing; but I never thought we would be on

20   the wrong end of a hearing and sanctions motion that resulted

21   in $147,000 fine.  This was not just a discovery dispute, your

22   Honor, with all due respect.

23             THE COURT:  Have you provided the Court with your

24   initial retainer agreement?

25             MR. McMAHON:  I looked for it, your Honor.  It was so

IAC6TER1

1    long ago I couldn't find it and we just moved our offices on

2    August 1st.  I will renew my efforts to find it, but I can

3    represent to the Court that it was a fixed-fee contract in the

4    sense that I will take care of this litigation.  Again, it was

5    at least an understanding that we wouldn't, for example, the

6    whole issue with OFAC, that I would be asked to cooperate in

7    terms of securing a license.

8         THE COURT:  Just to be clear, your client is being

9    accused of materially supporting the 9/11 terrorist attacks.

10   So the idea this would be an easy representation is not really

11   credible.

12        MR. McMAHON:  Well, I wouldn't say easy, your Honor,

13   but I have secured eight dismissals in this case and I thought

14   I might be able to secure his dismissal for a lot of reasons,

15   your Honor.  So, no, it is not an easy case by any means and it

16   is the most complicated case I think in America based upon a

17   New Years Times article I read.

18        I certainly didn't envision an easy case.  I am a

19   litigator with some experience and I try to vigorously all

20   clients.  I certainly never viewed this as an easy case.

21   Everything case is going to have some issues; but the discovery

22   disputes that I have been involved with, your Honor, when I was

23   with some very large law firms, discovery disputes are

24   something I am going to put this into the logbook and say it is

25   confidential.  We can dispose of some issue like that as a

IAC6TER1

1     discovery dispute probably in a short hearing in front of a

2     judge.  So discovery disputes that I envisioned were certainly

3     not with what I ended up being involved in.

4                THE COURT:  So you had a retainer agreement.

5                Did Mr. Jelaidan sign that agreement?

6                MR. McMAHON:  Did he have it, your Honor?

7                THE COURT:  Did he sign the retainer agreement?

8                MR. McMAHON:  Oh, sure.  Your Honor.

9                THE COURT:  Did the retainer agreement obligate

10    Mr. Jelaidan to pay a flat fee or somebody else?

11               MR. McMAHON:  Oh, no.  It obligated Mr. Jelaidan to do

12    that.

13               THE COURT:  Did he in fact pay that flat fee?

14               MR. McMAHON:  I am sorry?

15               THE COURT:  Did he in fact pay that flat fee?

16               MR. McMAHON:  I think for the last payment he did,

17    your Honor.  I guess I would concede that he substantially

18    complied with that.

19               THE COURT:  How much was that flat fee for?

20               MR. McMAHON:  How much?

21               THE COURT:  Yes.

22               MR. McMAHON:  I don't know whether, your Honor, I am

23    intruding on confidential information here.

24               THE COURT:  I don't think retainer agreements are

25    confidential.

IAC6TER1

1          MR. McMAHON:  I am saying the amount of money that is

2     involved.

3          Can I confer with counsel, your Honor?

4          THE COURT:  Sure.

5          (Pause)

6          MR. McMAHON:  Your Honor, we take the position that

7     that is part of an attorney-client communication.  And whether

8     the amount was a million dollars or something else, I don't

9     know whether that is even relevant to the issue before this

10     Court, whether I somehow interfered with the plaintiffs'

11     ability to secure the monies that the judgment provided for.

12          THE COURT:  Well, I don't know that it is necessarily

13     relevant to the question of whether you should be sanctioned,

14     but it is relevant to the question of whether or not you should

15     be permitted to withdraw.

16          Your argument as I understand it is primarily you lead

17     with the argument that you are not being paid for your work.

18     Mr. Jelaidan says we agreed on a flat fee and I paid it.  If

19     the flat fee that you agreed upon was $20 and your view is that

20     the scope of the engagement was so slight that it is no longer

21     fair for me to continue working, that would be one thing.  If

22     the scope of the engagement was such that it was agreed that he

23     would be paid you a million dollars, that would be another

24     thing.

25          MR. McMAHON:  Well, your Honor, I have no problem with

IAC6TER1

1    conveying the amount of money he agreed to in chambers or

2    something or some other way to do this.  It was not a

3    substantial million-dollar sum by my means I can assure the

4    Court.  Again, your Honor, the fact that I was sending out

5    statements for the last two years -- independent statements, if

6    he labored under the presumption or his attorney did Basim Alim

7    that we had fixed-fee contracts, surely he would have sent back

8    something to me:  Martin, look, we have a fixed-fee contract.

9    Why did you send me that statement?  Well, I sent the

10   statement, your Honor, because we had agreed that all of the

11   work that kept coming up here was totally not contemplated in

12   terms of somebody acting in good faith and fair dealing with

13   respect to the interpretation of the contract.

14            THE COURT:  You said a moment ago that you believe he

15   has substantially complied with whatever terms --

16            MR. McMAHON:  Well, whatever the --

17            THE COURT:  Can I finish my sentence?

18            MR. McMAHON:  Yes, I would have to concede that.

19            THE COURT:  You said earlier that he substantially

20   complied.  When was the last invoice that you sent and when was

21   the last invoice that was paid?

22            MR. McMAHON:  I believe that was some time last year

23   for approximately $6,000 and it was overdue by a number of

24   months in connection with some of the proceedings I have

25   already described here.  That is not the concern I had, your

IAC6TER1

Honor, with respect to his breaking the contract.

      The concern I had is that I no longer had at least a year ago and perhaps longer -- a condition of the contract was that you have to have an attorney in general -- I forget what the word is, but an attorney in Saudi Arabia -- that I can work with.  Wael Jelaidan has no knowledge of the system and has no legal training, Sometimes I would send stuff over there and without Basim's attention, nothing would happen.  That is why I feel that I have been sort of in a chasm here in the sense that I cannot communicate with my client and I cannot communicate with my local counsel.  How do I effectively represent him, your Honor?  I guess this goes to the motion to withdraw so I don't want to get off on that tangent that, but that is the big concern I have, your Honor.  When we have a contract, money is a consideration obviously; but I couldn't perform under that contract if we don't have a local counsel that I can deal with in terms of attorney issues.

      THE COURT:  So is the problem with your local counsel, or is the problem with Mr. Jelaidan?

      MR. McMAHON:  The problem is Jelaidan is broke, your Honor.

      THE COURT:  Jelaidan is broke, but you entered into an agreement with an individual to provide legal representation in this case.  It sounds like what you just told me was that a requirement of your representation was that Mr. Jelaidan secure

IAC6TER1

1    Saudi counsel who spoke English so that you would have a

2    counterpoint in Saudi Arabia with whom you could communicate

3    and who could then communicate.

4                Is all of that correct?

5                MR. McMAHON:  That's correct.

6                THE COURT:  What you are saying now is that you are

7    unable to communicate effectively with Mr. Jelaidan, and it

8    sounds like the problem is not because Mr. Jelaidan is being

9    unresponsive because you never communicated directly with him.

10   It sounds like the problem is that the Saudi lawyer is being

11   unresponsive.

12               MR. McMAHON:  Well, it is both, your Honor.  The

13   problem with Mr. Jelaidan is illustrated by the answers we

14   initially received to your questions.  Now, as soon as we got

15   your questions, your Honor, we sent that stuff over to Basim

16   Alim.  Get on this.  Wael is going to have to answer this

17   question.  We didn't hear anything.  We sent out an email

18   Monday and Friday.  We kept pestering him about it.

19               We finally got some answers in and they were

20   incomplete and in one case he didn't answer.  It was obvious to

21   me that Basim Alim, a George Town law graduate, was not

22   advising him about preparing answers and I don't think he knew

23   what the consequences were.  So I basically sent him some

24   emails and said some of these issues are referenced in emails

25   but your counsel has them.  Go to him and talk to him about it.

IAC6TER1

1          So that is part of Wael Jelaidan's problem and Basim

2     Alim's problem.  Again, Basim bails out at some stage, your

3     Honor.  For what reason?  He is probably not being paid.  So I

4     while Wale Jelaidan when I entered into a contract with him, it

5     was represented that he had sufficient financial resources and

6     we'll be together for a while and that petered out for a lot of

7     reasons.

8          I wanted to apologize, your Honor, to the Court for

9     the conduct of Mr. Jelaidan.  He is a far different man today

10    than he was 10, 11 years ago when we contracted and so is Basim

11    Alim.  Circumstances change.  Something happened where he is no

12    longer communicado and for some reason Basim Alim --

13          THE COURT:  He being whom?

14          MR. McMAHON:  Wale Jelaidan.  But Basim Alim is the

15    same.  As I say an integral part of that contract, and probably

16    every contract I have had regarding foreign clients, is that I

17    have to have somebody who has some legal training and

18    background to dialogue with.  You have to answer these

19    interrogatories.  What are interrogatories?

20          THE COURT:  I understand.

21          Here is the problem:  All I know is that you were paid

22    some sum of money apparently on a fixed-fee agreement.  I don't

23    know what that agreement is and I don't know how much money it

24    was.  You then tell me that you started periodically sending

25    invoices some of which were paid and some of which were not

IAC6TER1

1   suggesting that maybe the course of conduct would have changed

2   the original retainer agreement such that it was understood

3   that you were no longer working for a fixed fee but you were

4   working for an hourly rate or some other blended agreement.

5   That sounds like it is just a course of conduct and not a

6   written agreement.

7         Mr. Jelaidan is opposing the motion for your

8   withdrawal on the argument that he entered into a contract for

9   you to represent him in this proceeding based on a flat fee.

10   So he says, I paid my lawyer.  I don't want to have to find

11   another lawyer.  I don't have a whole lot of information here.

12   I am getting conflicting information from what has been

13   provided to me.

14         What you are now telling me is that you have received

15   substantially all of your payments, which is not great but it

16   is also not no payments, and that the weak link in the

17   relationship seems to be your Saudi counterpoint more than

18   Mr. Jelaidan.  So I am wondering whether or not that is the

19   problem and we need to address that problem.

20         MR. McMAHON:  Well, if Mr. Jelaidan, your Honor,

21   wasn't broke and he could pay local counsel, I think I would

22   have a local counsel to work with.  That is the nub of the

23   issue.  So you may want to devide Wale Jelaidan from Basim

24   Alim, but I don't know if that is possible under the

25   circumstances.

IAC6TER1

1          The question I have, your Honor, if he wants me to

2     stay in -- I guess opposing counsel wants me to stay in, too --

3     what are the services that I could perform under these

4     circumstances?  If you go back to Judge Magistrate Maas, who I

5     had a great relationship, your Honor, he wrote an opinion when

6     he entered a default judgment on behalf of I think Rabbeted

7     Trust, a charity in Pakistan.  Your Honor, that is from

8     October 28th, 2013.  "It is axiomatic that a lawyer cannot act

9     on a client's behalf without its consent and cooperation."

10    Well, today, your Honor, I may have his consent to oppose

11    additional sanctions, and I can address if you want.  I don't

12    have his cooperation and I don't have his agent's cooperation,

13    Basim Alim.  And Frank Maas's words to me are prophetic in

14    terms of where I find myself.

15          The other thing, your Honor, what is it that I can do

16    if I stay in the case?  I offered to plaintiffs' counsel come

17    to Jeddah or do a Skype deposition.  Find out where this man's

18    assets are.  I offered that I don't know whether it was.  What

19    else can I do to represent him other than oppose, say,

20    additional sanctions?  What is my role in the case when I am

21    going to call up or send a fax or send an email to counsel and

22    he doesn't get back to me?  How do I tell these folks, well,

23    we're not going to do that deposition?

24          THE COURT:  Will Mr. Basim Alim appear in this court?

25          MR. McMAHON:  I am sorry?

IAC6TER1

1          THE COURT:  Your Saudi counterpoint, Mr. Basim Alim,

2     appear in this court?

3          MR. McMAHON:  Has he?

4          THE COURT:  Will he?  If I order him to appear in this

5     court, will he appear?

6          MR. McMAHON:  Your Honor, I think that is part of the

7     reason, and I am glad you brought it up, about the broad

8     speculative nature of the relief.  I don't represent him.  I

9     think you have the authority if you have sufficient grounds to

10    do so to order him to appear.  My guess is that he --

11         THE COURT:  I am not sure I have that authority.

12         MR. McMAHON:  I am sorry?

13         THE COURT:  I am not sure if I have that authority if

14    he is in Saudi Arabia.

15         MR. McMAHON:  My guess is that he would not show up,

16    and I will give you an illustration why not.  I had

17    interrogatories prepared for a charity client who is now

18    represented by somebody else and they refused to sign the

19    interrogatories because they heard these terrible things about

20    the 9/11 cases.  You get them turned in and you get sued for a

21    trillion dollars.  They wouldn't even try to sign the

22    interrogatories.  So the folks over there, your Honor, a quite

23    paranoid about the 9/11 case, which has been going on for,

24    what, 14 years.  I am sure he has known -- I shouldn't say I am

25    sure.  I am speculating, your Honor, if it helps you I don't

IAC6TER1

1    think he would show up.

2                    THE COURT:  Speculation doesn't help.

3                    Let me ask you another question.  In apposing the

4    initial motion for your withdrawal, the Plaintiffs Executive

5    Committee highlight an email that you sent on February 8th of

6    2018 to Mr. Haefele in which you said, Mr. Jelaidan has no -- I

7    am paraphrasing -- intention of paying me sanction award.  This

8    was a week or two after OFAC issued the license.  So you said

9    that in an email to Mr. Haefele on February 8th.

10                   In response to my questions to Mr. Jelaidan in his

11   sworn affidavit, he says that the first time he heard from you

12   regarding the OFAC license was February 28th.  So 20 days after

13   you told Mr. Haefele that your client was not going to be

14   paying the award.

15                   So my question for you is when you sent that email on

16   February 8th, were you doing that at the direction of your

17   client?

18                   MR. McMAHON:  Well, I believe I discussed that with

19   Wale Jelaidan because there is an email that you can look at,

20   your Honor -- I think it was January 31st, 2016 -- in which I

21   present to Basim Alim the different options he has.  Number

22   one, terminate us as U.S. counsel.  If Wale doesn't want to

23   cooperate with the Court's sanction order and does not want to

24   assist us in making his foreign based bank accounts available

25   to the Court, then he cannot comply with our ethical

IAC6TER1

obligations Court and we'll have to withdraw as counsel.

So I don't know, your Honor.  It has been a while
since I had that conversation, but maybe I had a poor choice of
words and should have said, He is broke.  I know I said that
somewhere else.  He is broken.  Even if he wanted to comply
with the sanction order, he doesn't have the money to pay.  So
I never sensed that Wael wouldn't pay.  I sensed that he felt
this unbelievable pressure which I learned later on about these
creditors and everything.  I never knew that issue would arise
when we signed that contract, for example.  Again, I would have
to be borrowing money from all over the place to pay attorney
fees.  Had I known that, I never would have entered into that
contract.

I am saying, your Honor, we laid out in that email,
Terminate us, do nothing, hire Swiss counsel.  That statement,
your Honor, clearly shows that I don't want to, Martin McMahon,
breach you my ethical obligations to the Court so do something
about it or fire him.  So I think that is convincing evidence,
your Honor, that at no time did I try to misrepresent
plaintiffs' counsel any in way.  I made a poor choice of words
and I apologize if that is case.

Again, I apologize for the conduct of Wale Jelaidan.
We're eating up valuable Court time.  For what?  He owes
$147,000.  Now with interest maybe 200 K.  I don't know.
Fining him another 50,000 or $100,000, I don't know whether

IAC6TER1

1    that is something that will be effective.  I know an equity

2    court doesn't do scuffy debts, worthless.  I probably misspoke

3    when I said that.  He had every intention to pay.  He thought

4    it was unfair and unjust and everything, but I explained this

5    is the system.  He didn't produce documentation.  So, your

6    Honor, I probably misspoke with that and I apologize.

7         THE COURT:  Who wants to speak on behalf of the

8    Plaintiffs Executive Committee?  I will give you a few moments.

9    I read your opposition briefs and I think the real question is

10   as between Mr. McMahon and his client and what the Court should

11   permit.  I am happy to hear from you briefly.

12        MR. HAEFELE:  Thank you, your Honor.  I think your

13   Honor is right that most of the factors that we solved were

14   covered in the brief for the most part, but I do have a few

15   words to respond to what Mr. McMahon has said here today.

16        Your Honor, your Honor has already indicated that

17   Mr. Jelaidan opposes the release of Mr. McMahon and I think

18   there would be a problem if Mr. Jelaidan were left in the

19   litigation without representation.  That would cause a problem

20   for the entire litigation to have an unrepresented defendant

21   who is not being given advice from counsel as to how to

22   proceed.  We have already had problems when he does counsel.  I

23   cannot imagine that that will be facilitated if he doesn't have

24   U.S. counsel advising him how to proceed through the

25   litigation.

IAC6TER1

1      THE COURT:  What more do you want from Mr. Jelaidan?

2  Do you want to take his deposition?

3      MR. HAEFELE:  Two answers to that, your Honor.  One of

4  my next comments was if you were to default Mr. Jelaidan for

5  his continued noncompliance as part of the additional sanctions

6  and after the default were imposed, I suppose that Mr.

7  McMahon's continued representation issues would presumably --

8      THE COURT:  Assume that I am not going to default him

9  for discovery abuses.

10      MR. HAEFELE:  Well, one of the things that I think

11  would be appropriate would be to have Mr. Jelaidan sit for a

12  deposition.  Now, Mr. McMahon has indicated that he has offered

13  us to do a Skype deposition of the defendant.  The problem with

14  that, your Honor, is it just continues the same pattern that

15  has continued for years of the defendant and Mr. McMahon

16  facilitating it, completely showing lack of respect to the

17  Court, to its orders and to the plaintiffs.

18      Your Honor has already addressed this in the

19  deposition protocol where you've indicated there are four

20  locations that are presumptively acceptable locations to

21  conduct depositions -- New York, London, Rome, and Madrid.  You

22  specifically, your Honor, said that plaintiffs' counsel would

23  not be forced to go to Riyadh to do a deposition.  You

24  specifically, your Honor, had said that to the extent that

25  there were going to be remote depositions, they would be done

IAC6TER1

1      on consent of all parties involved.

2               What is happening is the defendants are repeatedly

3      insisting that the plaintiffs have to do something that your

4      Honor has said was something that can be done on consent.

5               THE COURT:  I am going interrupt you.  I know this is

6      an issue that relates to other defendants.  I have written on

7      the issue already.  I want to focus on what it is that you

8      still need to prosecute your claim.

9               You have served discovery demands on Mr. Jelaidan.  He

10     has responded in the way that he has.  The Court has taken

11     action in the way that it has.  I wouldn't anticipate you are

12     going to be getting anything more as far as document discovery

13     from Mr. Jelaidan.

14              The question I have for you is:  It sounds like you

15     want to take his deposition, setting aside where it is going to

16     be?

17              MR. HAEFELE:  Well, we would want to take his

18     deposition and we would certainly obviously want to continue

19     that he would pay the sanctions.  We also think that given

20     complicity, Mr. McMahon should be jointly and severally liable

21     or the sanctions issue.  I think information and the

22     satisfaction of the sanctions are already imposed.

23              THE COURT:  Thank you.

24              MR. HAEFELE:  Candidly our concern with Mr. McMahon is

25     his complicity in the noncompliance.  By the way, your Honor,

IAC6TER1

1    it isn't just this recent event.  It dates back a decade or

2    more.  One of the things that is very interesting and very

3    telling here is that when your Honor has called out Mr.

4    McMahon, suddenly his communications are very clear, very

5    concise and he is calling out the lack of understanding of his

6    client.  He is calling out and calling to our attention the

7    insufficiency of the responses.  If he had done one of two

8    things a decade ago, perhaps the complicity of Mr. McMahon

9    would have been resolved.  In other words, if he had done what

10   he tried to get out of representing the defendant a decade ago

11   and not facilitated all of the shenanigans over the course of a

12   decade, he would be on the hook now today as well or if he had

13   called the defendant --

14           THE COURT:  What do you mean complicated shenanigans?

15   Let's assume that Mr. Jelaidan was noncooperative and was not

16   going to be producing these documents for whatever reasons.  Is

17   your position that Mr. McMahon had a duty to the Court or to

18   the Plaintiffs Executive Committee to withdraw 10 years ago

19   rather than continue to try and represent his client in this

20   court?

21           MR. HAEFELE:  Your Honor, I think he had a duty to

22   withdraw before he engaged in the kind of conduct to facilitate

23   misleading the Plaintiffs Executive Committee for a decade.

24   Mr. McMahon's communications about Wale Jelaidan show that he

25   had no communications for good gaps of time and yet he was

IAC6TER1

making representations, and one your Honor called to Mr.
McMahon's attention.  He has communicated with the Plaintiffs
Executive Committee with the plaintiffs as though he has had
communications with the defendant and he has not, which by the
way is a pattern that your Honor will see throughout the day.

Mr. McMahon's communications to the Court continue to
pass on suspect information to the Court and to the plaintiffs
facilitated the the delay, facilitated the interference in
imposing the sanctions.  We started with these sanctions years
ago and there was a long period of delay in terms of getting
the OFAC order, which your Honor may recall.

Your Honor, I don't recall if it was ever indicated,
but a month before the order came out, I started calling OFAC
and following up and within a month the sanctions order or the
license happened.  I cannot tell you whether it was my calling
and being the annoyance or not that made a difference, but it
did happen fairly quickly from the time I started calling and
following up.  I posit that quite frankly Mr. McMahon just
wasn't following through sufficiently.

Regardless, there is a long pattern of obfuscation,
evasiveness, delay that long proceeded the imposition of the
sanctions and that is what caused the sanctions.  A lot of that
had to do with Mr. McMahon and the arguments that he is
interposing.  He continued to do that with arguments like the,
Plaintiffs need to go to the Swiss court to get judgments

IAC6TER1

1    enforced.  A spurious disagree argument with the argument that

2    Wael Jelaidan's designation and U.S. processes that designated

3    Jelaidan had anything to do with the Court's imposition of the

4    sanctions.  It did not.  What it had to do with the imposition

5    of the sanctions was Wael Jelaidan and Mr. McMahon's

6    evasiveness and their noncompliance with the Court's orders for

7    a long-standing period of time.

8              So, your Honor, it is our position that not just

9    Mr. Jelaidan but Mr. McMahon and his facilitation of

10   Mr. Jelaidan's evasiveness and delay which wasted the Court's

11   time in many proceedings before both your Honor and Judge Maas,

12   it wasted all of the members of the Plaintiffs Executive

13   Committee time and resources.  Quite frankly in the delay, the

14   substantial delay, if anything is to be believed by what

15   Mr. Jelaidan's current finances are, the delay also facilitated

16   diminishment or the depletion of the funds to satisfy the

17   sanctions order.

18             So, your Honor, our position is that if Mr. McMahon

19   had not done what he had done to facilitate it, then

20   Mr. Jelaidan would not have been in the best position to

21   continue the debt.  I don't know what Mr. Jelaidan would have

22   done.  My sense is he probably would have delayed with another

23   lawyer or he probably would have said, I don't have a lawyer.

24   The fact is what happened throughout that decade-long process

25   is that Mr. McMahon facilitated the delay, and I can posit

IAC6TER1

1   pretty safely that that delay would have come to a head much

2   earlier if --

3           THE COURT:  Are you suggesting that Mr. McMahon was

4   actually engaged in something more nefarious, that he was

5   encouraging his client not to participate in discovery or

6   telling him it was not important?  Are you suggesting he is a

7   coconspirator in Mr. Jelaidan's failure to produce documents?

8           MR. HAEFELE:  Well, your Honor, I think the answer is

9   that Mr. McMahon had an obligation to explain the discovery

10  rules to his client.  Judge Maas has made clear in proceedings

11  years ago to Mr. McMahon that he had an obligation to go over

12  to his client, sit with his client in person and ensure that --

13  by that point Judge Maas was fed up with the back and forth and

14  having to come before him.  The refrain seemed to be at some

15  point, My client doesn't understand the obligations.  And Judge

16  Maas said, Then go explain it to him.  Go over there and sit

17  with them and tell them their obligations and make it clear.

18  Either Mr. McMahon didn't follow through with that or he did

19  and still nothing happened.

20          I think that the fact that nothing happened with

21  Mr. Jelaidan and we continued to get obfuscation and delay and

22  then you juxtapose that with the letter that your Honor got

23  recently where Mr. McMahon is very clearly and concisely saying

24  I sent him this and I called him out and I said, You had to

25  answer this question better and you have to get more

IAC6TER1

1    information, that is the kind of communication that we never

2    saw before.

3         THE COURT:  We're getting a little bit late and I

4    don't want to too much delay our 11:00 proceeding.

5         MR. McMAHON:  Your Honor, I would like to respond to

6    some of the comments he has made.

7         THE COURT:  Okay.

8         MR. McMAHON:  You don't know this, your Honor.  Go

9    back and look at the emails.  There is this personal ad hominem

10   attack on me.  Why?  I don't know.  I haven't filed a bar

11   complaint against him, but he is taking this case rather

12   personally.  I don't know why, but he is.

13        Anyway, your Honor, I would like to read into the

14   record based upon the status reports we gave us this is how I

15   slowed down the proceedings at OFAC:  April 8th letter to OFAC.

16   Letter May 5th per status report.  July 14th and 20th call.

17   Letter July 25th per July 26th status report.  August 11th,

18   August 23rd call.  September 19th, 26th and 27th call.

19   October 11, week of October 2nd, and October 27 law clerk call.

20   Followup November 21st.  The associate called on November 27th.

21   I called twice personally December 26th the day after

22   Christmas.

23        I called on three separate occasions and finally

24   received a communication with a friend of mine there named

25   Heather Epstein, and it is all in the status reports.  She said

IAC6TER1

1   she would try to facilitate a response from OFAC, and I

2   distinctly remember what she said, your Honor.  You can call

3   her to the stand.  Martin, you know how the process works.  We

4   cannot do anything with OFAC.  So the license comes out.  Mr.

5   Haefele for some reason thinks that I have this incredible

6   authority and I can interfere in an OFAC proceeding.  Nonsense.

7   Sheer nonsense.

8           Now, he also doesn't tell, your Honor, that

9   Mr. Jelaidan is under house arrest.  Now, I don't fully know

10  what that means, but he can't get leave the country.  So he

11  cannot go for to London.  He cannot go to Madrid.  I came up

12  with a solution, and I don't whether they want to, your Honor,

13  but I think he would be willing to sit for a deposition live in

14  Jeddah.  I don't know if his counsel will be there, but he has

15  indicated that to me, your Honor.

16          THE COURT:  Why is he on house arrest?

17          MR. McMAHON:  Why?

18          THE COURT:  Yes.

19          MR. McMAHON:  Well, there is an agreement between

20  Saudi Arabia, your Honor, after 9/11.  The agreement was that

21  Saudi Arabia would do everything possible to join the fight on

22  terror.  One of the things was that there were some Saudi

23  citizens who were on the radar of the American authorities and

24  Wael is on that radar and they asked the government I guess to

25  have a house arrest.  He couldn't traveler around the globe and

IAC6TER1

1    do other things consistent with what I think is the wrong

2    image.  So I think the Saudi government in an effort to placate

3    American law enforcement authorities put him under house

4    arrest; but he cannot leave the country, your Honor.  So let

5    them come to Jeddah.  Let them do Skype.  If they are

6    unsatisfied with Skype, maybe they can get back to you and ask

7    you to do something else.

8            One other point, your Honor.  I don't know if your

9    Honor familiar with the authority known as --

10           THE COURT:  The court reporter did not hear the case.

11           MR. McMAHON:  *Halberstan v. Welsh*, the D.C. Circuit,

12   your Honor.  My friend and colleague Jay Stein did that case.

13   Why is it important?  You referenced civil conspiracy.  I would

14   love that they would sue me as a civil conspirator, your Honor.

15   In terms of Mr. McMahon did this to make sure we couldn't

16   collect.  I see.  Well, *Halberstan* requires you to lay out the

17   activities that the coconspirator gave him.  Well, he actually

18   helped him get an OFAC license and he badgered them almost

19   every day.  He invited us to Jeddah to take the man's

20   deposition.  In other words, your Honor, there is no basis for

21   this civil conspiracy claim.  I am glad you brought it up.

22           I will accept service of process, sir, and expect a

23   vigorous counterclaim personally against you for all the

24   personal attacks you have made upon me.

25           Sorry, your Honor, but my integrity has been impugned

IAC6TER1

1    by that man.

2              THE COURT:  Understood.

3              Let me let your counsel speak on your behalf and then

4    we will wrap this up.

5              MS. SANDZA:  Thank you, your Honor.  I know you have

6    heard a lot here.  This is my first ever appearance in this

7    group, and I can see that there is a lot of frustration.  That

8    is not at issue.  What happened 10 years ago is not at issue.

9    What is at issue is whether Mr. McMahon should be held jointly

10   and severally liable for Judge Maas's sanctions.  If you read

11   that long opinion that Judge Maas issued, nowhere does he say

12   that Martin McMahon in any way frustrated the discovery or did

13   anything wrong or violated any court order.

14             First of all, to fine a party, to sanction a party

15   under Rule 37, it is similar to a contempt procedure, your

16   Honor.  You need to give notice to the target.  You need to

17   tell the target what the sanctions would be.  You need to

18   produce evidence in a hearing of what proof you have that he,

19   not Jelaidan, but he, Mr. McMahon, did wrong.  We're all

20   excited here at this hearing; but if you really look at the

21   May 1st letter, which started it, where they moved I guess you

22   could say for joint and several sanctions, I would call it

23   half-hearted.

24             There is no proof in this letter.  All it says is

25   "various indicators" that McMahon did something and most of it

IAC6TER1

1    is about Jelaidan.  And then the argument is due to Mr.

2    McMahon's "apparent role in intentionally frustrating."  As he

3    just stated, he didn't intentionally frustrate anybody's

4    efforts.  He, if anything, offered suggestions.  They didn't

5    like those suggestions apparently to do a Skype deposition or

6    to maybe register the judgment.  I don't why that is such a

7    flashpoint, but it is.

8            As far as OFAC goes, I have personal experience

9    applying for licenses before OFAC.  The last one took two

10   years.  When the process began, the investigator at OFAC told

11   me, We will not communicate with you.  There is nothing you can

12   do to speed this this up.  You will hear from us when you hear

13   from you us.  That did not even involve a designated national.

14   I think Mr. Haefele must have just hit the jackpot that he made

15   the last call and then the license came out in the ordinary

16   course.

17           I think what you have here is a lawyer who is not --

18   and we can all sigh a sigh of relief here.  We don't guarantee

19   our client's performance.  We are not guarantors under the New

20   York professional rules for lawyers.  We can be sanctioned if

21   we personally disobey a court order or if we personally don't

22   follow through with our own obligations.  We do not guarantee

23   our client's performances.  So all that Judge Maas found wrong

24   was done by Jelaidan, not by McMahon.  For that reason this

25   motion if you want to call the May 1st letter is way out of

IAC6TER1

1    line.

2              THE COURT:  Thank you.

3              MR. HAEFELE:  Your Honor, may I have one quick

4    response to one thing?

5              THE COURT:  Incredibly quick.

6              MR. HAEFELE:  Your Honor, both of them are making it

7    out like this is a one-off sort of thing.  Mr. McMahon is in a

8    particularly useful or he is in a position that he absolutely

9    knew what was going on with regard to Mr. Jelaidan's conduct

10   and he knew and here why we know he knew.  He did the same

11   thing at least twice if not three times before.

12             Mr. McMahon spoke earlier about one of the other

13   defendants, but he has represented two other defendants who

14   have been defaulted for essentially the same pattern of

15   conduct.  He represented Sanabil Akir and he represented

16   Rabbeted Trust that he mentioned earlier, both of which were

17   defaulted for lack of compliance with this Court's discovery

18   orders.  That is three instances.  Your Honor, we came to the

19   Court with regard to similar instances of noncompliance with

20   regard to IIRO and Muslim World League who withdrew from Mr.

21   McMahon and went over to another counsel and have worked with

22   the new counsel and fired Mr. McMahon as I understand.

23             So it is not just there is an individual instance.  It

24   is a pattern of repeated conduct.

25             THE COURT:  Thank you.  We're a little bit late

IAC6TER1

1    starting our 11:00 conference.  We're going to take a brief

2    recess.

3         Mr. McMahon, I am going to reserve on a decision on

4    both your motion to withdraw and the motion to be held jointly

5    and severally liable so that I can digest all of the

6    information that I have heard.

7         I am likely to ask for *in camera* production of your

8    retainer agreement, which you tell me you don't have.  But if

9    you can find your retainer agreement and the proof of both

10   sending invoices to Mr. Jelaidan and the proof of payment so

11   that I can assess whether or not how you have been paid and

12   what the expectations were for the parties.  Again, I am in a

13   slightly unusual situation where the client is requesting that

14   I not let you go and in part because the client is saying that

15   he has already paid for the services.  So I would like to

16   evaluate that especially since you are telling me that you are

17   due money as a basis for your withdraw.

18        MR. McMAHON:  Your Honor, how do I preserve on my

19   attorney-client argument?  Because I have no permission to

20   waive that relationship that Wale Jelaidan gave me.  I

21   appreciate the *in camera*.  I also would like to take the

22   opportunity to explain to you why those charities fired me,

23   your Honor.  I think you would look on the case entirely

24   different as to what Mr. Haefele is trying to suggest that

25   somehow I was doing something wrong.

IAC6TER1

1          So I understand your concern, your Honor.  I never

2     encountered some case like this.  I will do my best to work

3     with you.  I just want to be protected, your Honor, in terms of

4     that attorney-client relationship.  I don't want Wale Jelaidan

5     going to the New York Bar and saying, Mr. McMahon waived the

6     attorney-client relationship.  I don't know whether we can work

7     out some compromise, but I will try to elicit Mr. Sandza's

8     assistance on this, your Honor.  I want the record to show that

9     I have no authority to waive that privilege.

10          MR. HAEFELE:  Your Honor, first off Mr. Jelaidan

11     apparently would be the other person who would have at

12     authority to waive that if in fact there is a privilege that

13     applies.

14          THE COURT:  I am not sure that it is privilege and I

15     think the Court can order it.

16          MR. HAEFELE:  I agree with your Honor on that.

17          On a very closely related issue, Mr. Jelaidan's

18     responses to the 10th question asked he does indicate, I have

19     also signed a one-time fixed-fee agreement with Mr. McMahon.

20     In addition, direct costs were paid by Good Samaritans.  To the

21     extent that there is any information regarding payments

22     received by Good samaritans I think your Honor should see that

23     as well.

24          THE COURT:  Thank you.

25          We'll take a brief recess.  Those people who no longer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IAC6TER1

1   need to be at counsel table, should move.  Those who should be

2   at counsel table, should step up.  We'll be back up hopefully

3   in a matter of minutes.

4                                    o0o