Iac6ter2

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re:  TERRORIST ATTACKS ON          03 MDL 1570(GBD)
            SEPTEMBER 11, 2001
4                                         Conference
    ------------------------------x
5                                         New York, N.Y.
                                          October 13, 2018
6                                         11:45 a.m.

7   Before:

8                         HON. SARAH NETBURN,

9                                         Magistrate Judge

10

11                         APPEARANCES

12  JEFFREY S. BERMAN
         United States Attorney for the
13       Southern District of New York
    SARAH S. NORMAND
14  JEANNETTE A. VARGAS
         Assistant United States Attorneys

15
    KREINDLER & KREINDLER
16       Attorneys for Plaintiffs
    BY:  STEVEN R. POUNIAN
17       MEGAN WOLFE BENETT

18  COZEN O'CONNOR
         Attorneys for Plaintiffs
19  BY:  STEPHEN A. COZEN
         SEAN P. CARTER
20       J. SCOTT TARBUTTON

21  MOTLEY RICE LLC
         Attorneys for Plaintiffs
22  BY:  ROBERT T. HAEFELE

23  ANDERSON KILL P.C.
         Attorneys for Plaintiffs
24  BY:  JERRY S. GOLDMAN
         ARTHUR R. ARMSTRONG
25       BRUCE STRONG

Iac6ter2

Appearances (cont'd)

KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
        Attorneys for Saudi Arabia
BY:  MICHAEL K. KELLOGG
        GREGORY G. RAPAWY
        ANDREW C. SHEN

BERNABEI & KABAT, PLLC
        Attorneys for Defendants
BY:  ALAN KABAT

SALERNO & ROTHSTEIN
        Attorneys for Defendant Kadi
BY:  PETER C. SALERNO
        AMY ROTHSTEIN

MOLO LAMKEN
        Attorneys for Defendants
BY:  ERIC R. NITZ
        ROBERT K. KRY

LEWIS BAACH KAUFMANN MIDDLEMISS, PLLC
        Attorneys for Defendants
BY:  ERIC L. LEWIS
        AISHA E. R. BEMBRY
        WALEED NASSAR

Iac6ter2

```
1              (In open court; case called)
2              THE COURT:  Everyone.  Please be seated.
3              THE DEPUTY CLERK:  Your Honor, this is the matter of
4     Terrorist Attacks of September 11th, 2001, Case No. 03-MD-1570.
5              Counsel, would you please state your appearance for
6     the round.
7              MR. POUNIAN:  Steven Pounian for the Plaintiffs
8     Executive Committee.
9              MR. CARTER:  Your Honor, Sean Carter on behalf of the
10    Plaintiffs Executive Committee.
11             MR. HAEFELE:  Your Honor, Robert Haefele from Motley
12    Rice for the Plaintiffs Executive Committee.
13             MS. VARGAS:  Your Honor, Jeannette Vargas from the
14    U.S. Attorney's Office for the Southern District of New York.
15             MS. NORMAND:  Sarah Normand also from the U.S.
16    Attorney's Office also on behalf of the United States.
17             MR. KREINDLER:  Good morning, your Honor.  Jim
18    Kreindler for the Plaintiffs Executive Committee.
19             MR. GOLDMAN:  Jerry Goldman for the Plaintiffs
20    Executive Committee.
21             MR. TARBUTTON:  Good morning again, your Honor.  Scott
22    Tarbutton from Cozen O'Connor.
23             MR. SALERNO:  Good morning.  Peter Salerno of Salerno
24    & Rothstein for Yassin Kadi.
25             MS. ROTHSTEIN:  Good morning again, your Honor.  Amy
```

Iac6ter2

1    Rothstein for Yassin Kadi.

2            MR. KELLOGG:  Good morning, your Honor.  Michael

3    Kellogg on behalf the Kingdom of Saudi Arabia.  I am here with

4    two of my partners, Gregory Rapawy and Andrew Shen.

5            THE COURT:  Thank you.

6            MR. NASSAR:  Good morning, your Honor.  Waleed Nassar

7    on behalf of the Charity Officials as well as the Muslim World

8    League and International Islamic Relief Organization.

9            MR. LEWIS:  Eric Lewis for the Charity Officials, the

10   International Islamic Relief Organization, and Muslim World

11   League.

12           MR. KABAT:  Good morning, your Honor.  Alan Kabat on

13   behalf of the Charities Officials.

14           MS. BEMBRY:  Good morning, your Honor.  Aisha Bembry

15   from Lewis Baach Kaufmann Middlemiss for Muslim World League

16   and the IIRO.

17           MR. GUHA:  Good morning, your Honor.  Samidh Guha from

18   Jones Day on behalf of Dubai Islamic Bank.

19           MR. KRY:  Good morning, your Honor.  Robert Kry from

20   Molo Lamken for Dallah Avco.

21           MR. NITZ:  Eric Nitz from Molo Lamken for Dallah Avco.

22           MR. ARMSTRONG:  Good morning again, your Honor.

23   Arthur Armstrong for Plaintiffs Executive Committee.

24           MR. STRONG:  Bruce Strong from Anderson Kill for the

25   Plaintiffs Executive Committee.

Iac6ter2

1          THE COURT:  Thank you.

2          My agenda for today's conference is the following:

3          I want to discuss the status of the Kingdom's document

4     production, see where we are on that.

5          I granted the Plaintiffs Executive Committee an

6     extension of time to file any motion to compel, which right now

7     is due on October 30th.  I want to make sure we're on track if

8     necessary to file that motion at that time and to see whether

9     or not there any other outstanding discovery disputes that need

10    to be addressed today.

11          I would like to hear from Mr. Kabat in connection with

12    the order that I issued on August 30th and specifically with

13    respect to Mr. Kabat's communication with defendant's al-Turki

14    and Mr. Naseef.

15          Lastly, I would like to hear from the government

16    regarding the subpoenas and their document review and where you

17    see things today on that issue.  I know that Plaintiffs

18    Executive Committee is eager to file a motion to compel; but my

19    understanding from the letters at least is that the government

20    is inclined to at least get some more formal responses out,

21    both to allow the parties to truly focus on what is in dispute

22    and to avoid a distraction on your efforts to review those

23    documents.

24          Anything else for the agenda?

25          MR. POUNIAN:  Your may I propose a reorder of the

Iac6ter2

1    agenda.

2              THE COURT:  Sure.

3              MR. POUNIAN:  I would appreciate if the Court would

4    allow the FBI, DOJ issue to go first.  First, because I think

5    it is going to provide an overall framework regarding our

6    discovery and also because Ms. Normand has a child at home who

7    is ailing.  So I would appreciate if the Court could do that.

8              THE COURT:  No objection.

9              MS. NORMAND:  Thank you, your Honor.

10             THE COURT:  Anything else that we want to add to the

11   agenda?

12             Good.

13             So where do you want to begin?

14             MS. NORMAND:  Thank you very much, your Honor.

15             I would like to just begin by giving you an overview

16   of what has occurred to date.  I am pleased to report that we

17   have had some recent discussions with the plaintiffs and I

18   think we're moving forward at least right now in a way that is

19   acceptable to certainly to the government and I think to the

20   plaintiffs at least at this stage.

21             We received in April a subpoena -- I am going to focus

22   first on the FBI -- that was really extraordinary in its

23   breadth and the types of documents that were requested, which

24   include a wide number of classified and privileged materials

25   pertaining to an ongoing FBI investigation.  The Court may be

Iac6ter2

familiar with what are called 2-E regulations, which are a set

of regulations that require agencies to when they receive

subpoena or other type of request for production in a case in

which they are not a party to apply a number of considerations

in evaluating that.  Pursuant to the 2-E regulations our office

of the U.S. Attorney evaluated the subpoena and responded with

an interim response, which noted a number of objections as to

breadth and classification and privilege and other objections.

Nevertheless, despite the breadth and despite the objections,

our office has worked very hard with the FBI to identify a

subset of documents that we think may be relevant potentially

to the matters on which the Court has authorized limited

jurisdictional discovery to proceed.

          That process of identifying documents took some

months.  Once we had a group of documents identified, our

office asked the FBI to conduct a declassification and

privilege review of those records.  I want to emphasize that

the review that is being conducted by the FBI is not a typical

review.  This is not simply a review to identify whether the

documents contain information that continues to be currently

and properly classified or privileged; but the FBI is going a

step beyond that to determine whether even for information that

remains properly classified at this time whether it can

nevertheless be released in the interest of discretion and

consistent with national security and law enforcement

Iac6ter2

1    interests.

2         That process has continued.  The FBI can assure the

3    Court, and I have advised the plaintiffs, has devoted

4    substantial resources to this effort and they are working very

5    hard.  A working group has been assembled that consists of both

6    field officials as well as a number of headquarter's personnel.

7    That working group is meeting regularly.  I can represent that

8    Ms. Vargas and I have ourselves been involved in roughly weekly

9    meetings and phone calls to ensure that progress is being made

10   on a regular basis to identify issues that need to be followed

11   up and the like.  In our experience the mobilization and the

12   attention that is being paid to this is really quite

13   extraordinary.  That said, I do want to emphasize what a

14   difficult task this is.  We're talking about looking at

15   documents literally on a line-by-line basis, conferring with

16   multiple components, subject matter experts, brief higher level

17   officials, and trying to reach consensus on these issues.  So

18   it is a time-consuming process.

19        In terms of the Court's question, which is where are

20   we now, the FBI has determined that it is likely going to be in

21   a position to produce documents in response to the subpoena and

22   the 2-E requests.  We expect that production would be made on a

23   rolling basis.  I should add that production would need to be

24   made pursuant to an appropriate Privacy Act and protective

25   order because there are Privacy Act equities in these records,

Iac6ter2

and we're going to be working with the plaintiffs to try to
come up with and agreed upon order that we can submit to the
Court.  Assuming that can be worked out, and I think it can be,
we anticipate that the first tranche will be ready for
production hopefully by early November but by mid-November at
the latest.

    We know that there is at least a second and third
tranche.  The second tranche of documents has been identified
and review has begun.  It is currently being worked.  I am not
able to provide a time frame for that because we're not as far
along with that tranche as we are with the first tranche.  Even
as to the first tranche, there are still several levels of
review by stakeholders and a final sign-off that needs to
happen; but we're far enough along on the first group that I
can represent to the Court that I think we're in the final
stages.

    There will be a second tranche.  There also will be I
third tranche, and I divide that into three groups because we
recently had some discussions with the Plaintiffs Executive
Committee that have been helpful to us in understanding and
gaining insight into the types of documents that they are
looking for.  As a result of those more recent discussions, we
are searching for some additional records.  We don't yet know
volume, and it may not be a large volume, but they are likely
to be some additional records that are added that would become

Iac6ter2

1  a third tranche of materials.

2         We have been working and certainly understand that the

3  Court has indicated it would like to complete discovery in this

4  matter by early 2019.  We have been working as hard as we can

5  and the development of our process has been with that in mind,

6  your Honor.  I can't provide a firm deadline, but we are

7  certainly are working to complete the process as quickly as we

8  can.  We do think to the extent there are any disputes

9  ultimately about what is produced and what is not produced, we

10  think any motion practice should await what is actually

11  produced, further meet and confers and alike; but it is my

12  understanding -- plaintiffs will correct me certainly -- that

13  is the plan at the current time.

14         THE COURT:  The tranches, I am wondering whether or

15  not, let's say, once you've produced Tranche 1 and the

16  plaintiffs say, well, I don't see Documents A, B and C, is it

17  because they are coming potentially in Tranche 2 or 3; or will

18  you know in Tranche 1's production what sort of documents you

19  will the not be producing?  Another way of trying to pose my

20  question is:  I am trying to figure out whether or not it would

21  make sense to have a motion to compel if necessary after each

22  tranche, or whether or not the plaintiffs won't know the full

23  scope of production until everything has been produced, which

24  normally would be the case?

25         MS. NORMAND:  It would not be efficient to have motion

Iac6ter2

1    practice after the first tranche because I think we know for

2    certain now that there are certain documents that the documents

3    are interested in that are not until the first tranche.

4             THE COURT:  They may be produced in the second

5    tranche?

6             MS. NORMAND:  They will be reviewed in the second

7    tranche.  Our plan as we go through these is to provide

8    whatever material can be provided, and then to the extent

9    material is not provided in that tranche to provide some

10   indication of that.  So I think there will be information

11   provided to the plaintiffs when the first production is made as

12   to what information is being withheld from that first group.

13   We can certainly begin having meet and confer discussions as to

14   that material.  I don't yet know the volume of that material so

15   I cannot speak to whether there are likely to be disputes or

16   not.

17            My initial instinct is that it would make sense to at

18   least to look at the first and second groups.  One of the

19   documents, for example, that we know the plaintiffs are

20   interested in is a 2012 summary report that they provided in

21   redacted form that was produced under FOIA in the last few

22   years.  I know that that document is in the second tranche for

23   example.  To the extent that one is not as far along as the

24   first group -- the first group I have indicated to the

25   plaintiffs consist largely of records of interviews, 302s.

Iac6ter2

1    They are not all in that format but that type.

2            THE COURT:  That answers my next question which was

3    going to be:  Can you give transparency to plaintiffs' counsel

4    what is the derivation of each tranche?  Meaning, this tranche

5    is coming from this particular set of documents.  Can you give

6    that transparency?

7            MS. NORMAND:  We have tried to.  We have tried to give

8    as much as we can.  The first group as I said is largely

9    records of interviews.  The second group includes the 2012

10   interview report as well as portions of two other classified

11   reports that were requested for declassification review or

12   requested to be produced in the subpoena, which are both

13   classified.  Those are in the second group as well.  There is

14   additional material that is more analytical in nature in terms

15   of the type of document.

16           That's about all I can say now about the scope of that

17   second group.  Because the documents in the second group are

18   more analytical in nature, they present somewhat more difficult

19   challenges and that is why they are in the second group.  I

20   will say we're actively working on it.  It is not a situation

21   where we're not looking at Group 2 until we produce Group 1.

22   We're actively looking at Group 1 and have been for some time.

23   In fact, we have meetings scheduled the week after next almost

24   the entire week to look at some of these issues.

25           THE COURT:  Great.

Iac6ter2

1              Can I ask one housekeeping question?

2              MS. NORMAND:  Certainly.

3              THE COURT:  Which is about me.  My security clearance

4     has expired and under new DOJ regulations, I need to go through

5     a process in order to get it reinstated.  I know you have no

6     idea what the future holds.  Does it make sense for me to be in

7     the process?  Is there likely to be a scenario in which there

8     is a motion practice where I am being asked to look at

9     confidential documents for which I would need a security

10    clearance and my law clerk?

11             MS. NORMAND:  I don't know whether that will happen;

12    but I think it is wise to make sure that if that does happen,

13    we're not starting from ground zero in terms of trying to do

14    whatever clearance is necessary.  So with the Court's

15    permission, I will reach out to the Department of Justice's

16    office that conducts those kinds of clearances.

17             THE COURT:  I think it makes sense for myself and law

18    clerk to probably get cleared.

19             MS. NORMAND:  I will have to defer on that in terms of

20    the types of material.  I know that with regard to Article III

21    judges there is automatic clearance.  With regard to magistrate

22    judges, there is a necessity of doing the clearance.

23             THE COURT:  The process just changed from the last

24    year.

25             MS. NORMAND:  I am not an expert in that process, but

Iac6ter2

```
 1   I certainly will reach out to -- it is on office within the

 2   Department of Justice that does it.  I will have them contact

 3   your chambers next week.

 4              THE COURT:  That will be great.

 5              MS. NORMAND:  In terms of the nature of the clearance

 6   and who gets cleared and to what level, we'll have those

 7   discussions with that office as well as the relevant agencies.

 8              THE COURT:  Thank you.

 9              MS. NORMAND:  You are welcome.

10              There was a question about the other subpoenas.  My

11   understanding is that they are not teed up for any judicial

12   decision at this point, but I can say we're working with the

13   plaintiffs and the three other agencies -- the State

14   Department, the Central Intelligence Agency, and the Treasury

15   Department.  We've been meeting and conferring.  Some records

16   have been produced.  Some records are being gathered and

17   reviewed by the State Department.  I think we do have some

18   questions about the scope of some of those, but we're actively

19   meeting and conferring with plaintiffs' counsel.  There may be

20   issues down the line, but we're engaged on the process on all

21   three of those agents.

22              THE COURT:  Thank you.

23              MS. NORMAND:  Thank you.

24              MR. POUNIAN:  Your Honor, on the FBI documents we did

25   have I series of very productive meet and confer sessions with
```

Iac6ter2

DOJ.  We ARE hopeful about the process.  We think it is the
best way under the circumstances to proceed.  We will not know
until we get the documents and actually see them.  There is
some uncertainty right now, but we're willing to proceed with
that uncertainty.

          The one issue that I may have is in our discussions we
had the understanding that the final tranche would be coming at
some time in mid-January.  That was our understanding.  I just
wanted to be clear on the record.  Given the scheduling in the
case, I think that would will be a helpful issue to have clear
on the record.

          MS. NORMAND:  In response to requests made in our meet
and confer, which we were asked what do we envision as a final
time frame, I hope I was clear in saying we couldn't give a
firm time frame.  We are hopeful that it will be done by
January.  I do want to caveat that with a few things.

          First, as I said this is a very intensive and careful
process requiring many levels of review, and unexpected things
do happen.  Because We are still looking for some records, it
is difficult to say now that we can be done by a certain period
of time.  That said, we are working as hard as we can to finish
along the timetable the Court has proposed for discovery
generally.

          Second, there is a category of records, and we have
mentioned this to the plaintiffs, that relate to banking and

Iac6ter2

1    phone records that we are experiencing some logistical

2    difficulties getting access to the records.  Assuming we can

3    get access, there may be technical issues in extracting them

4    and putting them into a producible format.  Because we have not

5    worked out those issues yet, I am really not able to provide a

6    firm deadline.  We are actively working those issues and our

7    hope is that we would be done by January, but I do want to make

8    sure everyone is aware that there are contingencies here that

9    we don't yet know.

10           Here is what I would like to do:  I would like to set

11   a deadline of November 2nd, which is a Friday, to have the

12   parties file a proposed Privacy Act protective order so that we

13   have that squared away in time for the first tranche of

14   production.  That is due on November 2nd.  If the parties

15   cannot reach agreement on that, then they should submit

16   separate proposed orders with a short letter brief as to why

17   they are seeking their version and not their adversary's

18   version.  Why don't we set a status letter due on

19   November 20th, which is the Tuesday before Thanksgiving, for

20   the parties to report back on the status of the production.

21           maybe you can take the lead, Ms. Normand, on that

22   letter.

23           MS. NORMAND:  Certainly, your Honor.

24           THE COURT:  Hopefully it will be reporting that

25   Tranche 1 has been in fact produced and reporting on the status

Iac6ter2

1    of Tranches 2 and 3 and if appropriate the other subpoenas with

2    respect to the other agencies and where that stands.  That way

3    we can check in and reevaluate the situation a little over a

4    month from now.

5              MS. NORMAND:  Certainly, your Honor.

6              THE COURT:  Anything further on this issue?

7              You all are free to leave if you like.

8              MS. NORMAND:  Thank you, your Honor.  I think

9    Ms. Vargas may stay just in case.  Thank you.

10             THE COURT:  Thank you.

11             Let's move to Saudi Arabia.

12             Mr. Kellogg, why don't I begin with you.  If you can

13   give me your report on where things stand where respect to

14   production.

15             MR. KELLOGG:  Certainly, your Honor.

16             We substantially completed production as the Court

17   directed on July 31st.  We provided 3,818 documents just under

18   certain thousand pages.  We did a short supplemental production

19   on August 14th and four redacted documents after that that were

20   redacted at the request of United States.  We have heard

21   nothing from the plaintiffs since that time until this week

22   when on Wednesday Mr. Carter sent me an email identifying what

23   he said were some gaps and also they served new discovery

24   requests on us at that time.

25             Last night at 6:38 p.m. I got an email from

Iac6ter2

 1   Mr. Pounian saying that they are going to move today for a

 2   further extension of time for the motion to compel, which we

 3   very much oppose and we would like to walk through some of the

 4   reasons why.  The main reason he gave for wanting to delay was

 5   just what you heard about, that the FBI production is going to

 6   be delayed and going to take some time.

 7            The Court may recall at the April 12th hearing when I

 8   raised concerns about the very broad FBI subpoena.  I said to

 9   the Court, Plaintiffs will then be using this as a reason for

10   dragging out the discovery process.  They will be coming back

11   to the Court saying that FBI hasn't responded to our subpoena

12   yet and the whole schedule has to be pushed back.  I recall

13   your Honor responded to that and said, To the extent what Mr.

14   Kellogg fears is realized, meaning that if the process bleeds

15   beyond the limited time frame that I impose, I am not going to

16   allow that to hold up the Kingdom's right to file any motion to

17   dismiss.

18            Of course as predicted that is exactly what they are

19   doing, and that won't be the end of it.  Because as you heard

20   the first tranche is going to be 302 memos, all of which are

21   hearsay.  They are reports of interviews.  And then they are

22   going to say they need new discovery in light of that and it is

23   totally antithetical to limited discovery that Judge Daniels

24   directed both in scope and in time frame and the Court's

25   objective to give the case back to Judge Daniels for the motion

Iac6ter2

1   by the end of this year or early next year.

2          Now, they have raised a second issue concerning the
3   document production.  As I said, they served some new document
4   requests.  You will recall the whole reason we had the May 24
5   hearing was in order to resolve as many issues as possible
6   upfront so that we would have a direction on where to go in
7   producing discovery.  We identified to the Court the specific
8   agencies we would be searching and the specific documents and
9   items we would be searching for, and the Court approved that in
10  its order with two caveats.  The Court said that first to the
11  extent that the plaintiffs have targeted requests for specific
12  agencies for specific documents, they should submit those to
13  us.  That was May 24 that the Court gave that direction.  We
14  have received no such requests in the intervening period.

15         The second thing the Court said was that there could
16  be follow up on the first tranche, that once they receive that
17  they may need to -- I will get the Court's extract words --
18  that they may be able to identify additional documents tied to
19  the first tranche that they say that they need.

20         So what we got on Wednesday was a list of seven names
21  and a request to provide basically every document we might have
22  concerning those seven individuals.  There was no meet and
23  confer beforehand.  There was no effort to specifically
24  identify the individuals other than to say they were Saudi
25  employees even then or perhaps now.  There was no effort to tie

Iac6ter2

these requests to anything in the first tranche of documents.
In his email Mr. Carter said some of them are mentioned in the
documents -- some of the individuals -- and some of them of
course are not.  But they did not make any effort to follow the
Court's instructions to specifically explain why the initial
tranche of documents leads to these additional names.

As I said, they waited until this week to do this in
order to set up their request for extension of time.  They have
had the documents.  It is not a massive production.  It is
under 7,000 pages.  They have had the documents for longer than
it took us to go to Saudi Arabia and conduct additional
interviews, identify likely repositories, search those
repositories, organize the documents, get them translated and
to produce them.  They have had more time than it took us to do
all that and yet they are now going to tell you that they need
another month.

Of course, at the end of that they are going to say,
We got the first tranche from the FBI and we'll need a second
tranche.  It is going to push into January.  None of which
should be relevant to the very specific discovery that Judge
Daniels ordered into the two individuals that they claim are
Saudi agents charged with aiding and the highjackers.  We
provided that information and we are ready to move on.  There
has been no word about depositions, who they may want to depose
or when they might want to depose them.  We are eager to move

Iac6ter2

```
 1    this along and we think consistent with Judge Daniels' orders
 2    and the Court's prior orders that we should do so.
 3             THE COURT:  Thank you.
 4             MR. POUNIAN:  There is a lot there to deal with, your
 5    Honor.
 6             THE COURT:  Okay.
 7             MR. POUNIAN:  First of all, it was not until late last
 8    night that we had our final meet and confer.  After a
 9    seven-month process with the FBI, we finally reached an
10    agreement last night.  After that I then sent a message to Mr.
11    Kellogg informing him that we were going to ask the Court today
12    for a modest extension, a reasonable extension on the motion to
13    compel that is due now under the Court's order on the 30th of
14    this month.
15             Now, regarding the FBI documents, the 9/11 families
16    have waited for years for this moment, for the FBI to come into
17    this courtroom and tell the families that they are actually
18    going to produce documents in this litigation.  In this past
19    September the Senate passed a resolution -- the Senate of the
20    United States -- asking that the government agencies, including
21    the FBI, produce the documents relevant to the litigation so
22    that the families would be in a position to present their case
23    before the Court and to know precisely what the contents of the
24    FBI investigation were regarding Saudi government complicity in
25    the 9/11 attacks.  We are on the verge, your Honor, of getting
```

Iac6ter2

that information.  The government is going to be providing that
information in the next two months over the course of these
tranches.  We have been negotiating with them and we finally
have we believe an agreement.  Of course, we'll look at the
documents and see what happens there.

          Now, with regard to the documents from Saudi Arabia
that we received, they are all in Arabic.  Now, none of us are
Arabic speakers.  We had to have the documents translated.  It
was a long, laborious and very expensive process that is still
not completed because the translations are very rough and
difficult.  The documents responded not in response to each one
of our document requests, but they intentionally provided them
in a big mass of documents, with no index and with
categorization whatsoever.  We had no idea where they were
coming from within the government.  We had to piece it
together.  We are still trying to piece it together.  It just
has been a very difficult process.

          There are four different law firms working on this and
we are all working separately and together trying to
collaborate to get the job done, and I think we have done a
remarkable job on the documents where we have come to a point
now where we feel within the next few weeks that we will be
able to start a meet and confer process with Mr. Kellogg about
what we have found in those documents.  We believe that it
would make sense to take another month on the motion to compel

Iac6ter2

```
1    to the end of November so that we can look at the first tranche

2    of FBI documents and also so that we can meet and confer on the

3    various items that we are finding in the documents.

4            For instance, we have not found any evidence

5    whatsoever in the documents regarding Mr. Thumairy's

6    activities, any communications, anything he did in southern

7    California for the three years he was sent there by the Saudi

8    government and was a diplomatic at their consulate.  Not a

9    shred of evidence regarding what his activities were.  We have

10   found other documents that are open source documents from court

11   records in California where we found such evidence.  Yet, it

12   hasn't been produced by the Saudi government.

13           So we need to go through the meet and confer process

14   with them, show them what we have and go through it.  It is

15   going to be laborious process because we they will have to go

16   back and talk to their client and we'll have to go through this

17   step by step.  It is a painstaking process.

18           THE COURT:  Are you finding documents that should have

19   been within the Saudi government's control?

20           MR. POUNIAN:  We have references to documents that

21   should be in the Saudi government's control that were not

22   produced.  Yes, your Honor.

23           THE COURT:  The FBI documents, as I understand it

24   those are going to investigative notes that you will be

25   receiving.
```

Iac6ter2

1          MR. POUNIAN:  The first tranche should be mainly

2     interview notes is what I understand either in the form of 302s

3     or other communications that contain notes of interviews with

4     witnesses.

5          THE COURT:  Right.  I imagine those documents are

6     going to be largely, but not entirely, documents that you might

7     be interested in potentially for merits discovery of Saudi

8     Arabia; but we are in a more narrow focus for discovery at this

9     point.  Judge Daniels' order was quite targeted as to what he

10    wanted the parties to engage in.

11         MR. POUNIAN:  I understand, your Honor.

12         THE COURT:  Even if you are seeing all these other

13    documents through the FBI, that is not going to be the opening

14    of the door.

15         MR. POUNIAN:  I would imagine, your Honor, that some

16    of those documents may not be relevant to the jurisdictional

17    inquiry before the Court at this time, which is in essense a

18    merits inquiry to some extent because it is looking at the

19    conduct of Saudi officials, whether they are acting within the

20    scope of their employment.  Those are merits issue, but those

21    are the key of the jurisdictional dispute.  The documents will

22    be of interviews, which are from the subfile investigation

23    which is the FBI's investigation that was focused specifically

24    on Saudi government involvement in the 9/11 attacks,

25    specifically Thumairy and Bayoumi and others who participated

Iac6ter2

1    with them in supporting al-Qaeda in Los Angeles, a whole

2    network cell that was operating there, the ringleader of which

3    was Mr. Thumairy.  Those documents are going to go we expect to

4    the heart of that issue.  So that is what we are going to be

5    focusing on and looking at from those documents.  I think that

6    they will provide background that is going to tell us about

7    more documents that should have been produced by Saudi Arabia,

8    and we think we should be looking at that before we are putting

9    together the motion to compel process.

10           As I said, I think it is even more important in the

11    sense that we haven't really been able to engage yet because we

12    just finished the Arabic translation process.  It is still

13    really ongoing.  We are dealing with rough translations.  We

14    are finding gaps in the production.  We want to take those to

15    Mr. Kellogg and discuss them with him to see if they can be

16    resolved.  I think that is going to take at least two or three

17    weeks to get that process completed.  When that is done, we are

18    going get the FBI documents and that is why we suggest a

19    deadline for the motion to compel as of November 30th.

20           Also, what I was going to propose to your Honor, and I

21    have not yet raised this to Mr. Kellogg, but we have been

22    starting the process of non-party depositions.  We are doing

23    that.  I believe that is going to be an ongoing process.  In

24    terms of Saudi government witnesses, we are going to propose

25    that on the date that the motion to compel is due that we

Iac6ter2

 1   provide a list to Mr. Kellogg.  Of course, he knows that we are

 2   interested in Mr. Thumairy, Mr. Bayoumi and Mr. Sowailem.

 3           We still don't know whether Mr. Bayoumi will be

 4   produced by Saudi Arabia and we also don't know whether

 5   Mr. Sawaylum will be produced by Saudi Arabia.  So those are

 6   issues that we have to deal with them in the meet and confer

 7   process in terms of setting up the depositions.

 8           THE COURT:  Why haven't you raised any of these issues

 9   with Saudi Arabia previously?  Mr. Kellogg's complaint is that

10   on Wednesday night he heard for the first time that there are

11   these gaps, and then you are also telling me that you haven't

12   had a chance to review everything.

13           MR. POUNIAN:  What I am saying is that we are just

14   starting to identify the gaps after translating the documents

15   from the Arabic, reading through the production, which was

16   produced in a manner that was very difficult for us to organize

17   it and understand where everything was.  I cannot say where Mr.

18   Thumairy are without going through the whole 6,000 pages and

19   understanding where they are.  There is different spellings of

20   names.  It is not possible to do a search on the documents that

21   we have right now in a way that I would normally be able to do

22   to locate keywords.  So it has been a very lengthy, laborious

23   process.

24           We have just reached the point now when we are ready

25   to sit down and do that.  We have already given him four

Iac6ter2

1   categories.  Mr. Carter sent him an email earlier this week

2   with four categories of documents, which we don't see in the

3   production which we believe should be there.  In addition, we

4   are putting together a list of additional gaps, including the

5   one I mentioned earlier where we know that there is a Saudi

6   government document because of files in other litigation in the

7   United States that has been pursued.  We know the document

8   exists, but it hasn't been produced.  That leads us to believe

9   that there may be files that were not searched or were not

10  looked at during the production and we wanted to raise that

11  with Mr. Kellogg to go through the process with him.

12          THE COURT:  Right.  As Mr. Kellogg pointed out, I

13  certainly authorized the parties to identify targeted documents

14  that they know should be in the file that were not and so that

15  should be brought to their attention.

16          Do you want to respond to the argument that -- I will

17  give you a moment, Mr. Kellogg.  Just let me finish with

18  Mr. Pounian, please--  Mr. Kellogg made about identifying seven

19  new individuals.

20          Is he okay?

21          UNIDENTIFIED PERSON:  No.

22          THE COURT:  Let's take a quick recess.

23          (Recess)

24          THE COURT:  Mr. Pounian, I was asking you about this

25  contention raised by Mr. Kellogg that you identified seven new

Iac6ter2

 1    people that you would like the Saudi government to search for

 2    and only some of them are referenced in the documents that were

 3    previously produced.

 4            MR. POUNIAN:  Yes, your Honor.

 5            We have been engaged in this past summer in an

 6    investigation ourselves, a private investigation.  Very

 7    intense.  We have had investigators in California scouring

 8    various leads.  We have also been looking at recent evidence

 9    that we found in conjunction with evidence that we have had for

10    many years and looking at it in a new light for the first time.

11    We then received the documents from Saudi Arabia and we found

12    in those documents certain names.  A conjunction of these three

13    things -- the evidence we had from before, our own

14    investigation and the Saudi Arabia documents in which certain

15    people are named -- we identified seven additional Saudi

16    government personnel who we believe are involved with Bayoumi

17    and Thumairy in the events in some way, shape or form.

18            It is an issue that is probably better addressed in

19    motion papers because of the level of detail that is involved.

20    We have not yet had a chance to meet and confer with Mr.

21    Kellogg, but it was our obligation, our duty to when we had

22    brought this evidence together that we have and put it

23    together, we believe that we had to serve document requests

24    immediately given that the urgency of the timetable of this

25    litigation.  We did not want to wait.  It was not a matter

Iac6ter2

where there was a request that was already made where one of

these gentleman was the subject of the request.  We had never

named them before so we thought it was essential to add an

additional document request naming each one the individuals,

which we did.

THE COURT:  One concern that I have, and I am sure Mr.

Kellogg has, is that you will be given a tranche of information

from the FBI and potentially these other agencies in the coming

months.  What is to stop you from arguing every month that I

set a motion to compel deadline that you think you are getting

more documents and you want to review those?  Saudi Arabia has

a real interest in wrapping up this discovery and moving

forward to the motion practice and I appreciate that the

families have a real interest in developing as best they can

under difficult circumstances their evidence so that they can

ultimately have this case proceed forward onto the merits.  I'm

balancing interests here.  This case has been going on for 15

years.  I know the claim against Saudi Arabia have not been

going on for quite that long.  I think the families would like

to have closure as soon as possible in this case.

MR. POUNIAN:  There is no doubt about that, your

Honor.

THE COURT:  Each day we put this off is another day

beyond when we have a trial.  I am reluctant to continue moving

the case forward.  So 30 days is not a big deal, but the

Iac6ter2

1      arguments that you are raising to me today are arguments you

2      can make to me on November 20th when you come in and say we

3      want to have until the end of year and then we want to have

4      until January.  There is probably an endless source of

5      information you can be seeking here and at a certain point we

6      need to move forward.

7            MR. POUNIAN:  I don't know if it is endless, your

8      Honor.  Among the people who we identified are five people who

9      are assigned by Saudi Arabia to Southern California and who

10     specific ties to Samari and Baumi and also the King Fahd

11     Mosque, which is also the center of the operation which we

12     believe was to support the hijackers in California.  They were

13     all there at the relevant times and places.  So I believe it is

14     highly relevant information and something that is imperative.

15            Now, this is a jurisdictional issue, your Honor, but

16     at heart it is a very complex evidentiary issue that involves

17     in part the merits of the case.  The FBI had a subfile

18     investigation that started in 2007 and went through 2016, nine,

19     10 years investigating specifically this Saudi government

20     involvement.  Here we are, the families, we are getting

21     documents from Saudi Arabia in Arabic and tranches of documents

22     from the FBI for the first time.  I don't believe it is

23     unreasonable in this situation to make a modest accommodation

24     under the circumstances when we have been waiting for years for

25     the FBI to come forward and for years for this opportunity

Iac6ter2

1    before this court.  As I said, it is a jurisdictional issue but

2    it goes to the merits of the case.

3         It is a very complex issue.  There are issues of

4    circumstantial evidence.  We have to painstakingly put the case

5    together so that we are prepared for the motion to dismiss.  It

6    involves steps that have to be taken one by one and we are

7    doing that work.  It's difficult but the committee is working

8    together to do that work and we need a small amount of

9    additional time to do that.

10        Now, if we come back in November and say we just found

11   a statement that we think is relevant, that may have happen,

12   your Honor, but then your Honor will have to address that or

13   consider that in light of what has transpired up until that

14   time and what the information is.  That is why we went forward

15   with the seven names now because we expect these seven names to

16   be in some of those statements, to be in some of the

17   information that we get from the FBI.  So we are advancing the

18   process along by pushing it forward with Saudi Arabia now.

19   That is why we stepped forward with these names and that is why

20   we believe it is important to give us just some more time at

21   this juncture given all the things that are happening at once

22   to proceed with the case.

23        THE COURT:  I will ask you a couple of follow-up

24   procedural questions.

25        And then, Mr. Kellogg, I know you want to be heard.

Iac6ter2

1      One question is with respect to depositions.  You

2   mentioned the possibility of taking the depositions of three

3   individuals.

4      MR. POUNIAN:  Yes, Mr. Thumairy who is a diplomatic at

5   the Saudi Consulate and the imam at the King Fahd Mosque

6   appointed by Saudi Arabia.  Mr. Bayoumi, who I believe you

7   know, your Honor, who lived in San Diego and was a Saudi

8   government agent.  And also Mr. Sowailem, who is Mr. Thumairy's

9   superior in Washington.

10      THE COURT:  Are there other people that you foresee

11   wanting to depose for this purpose?

12      MR. POUNIAN:  Yes, your Honor, there are.

13      THE COURT:  Do you have a sense of either who those

14   people are or how many there are.

15      MR. POUNIAN:  We have a sense of who they are and how

16   many.  He wanted a chance to put our list together with the

17   benefit of the FBI documents so that we had the most available

18   information.  I know that there are people at the Los Angeles

19   consulate, one of whom is the consul general who Thumairy

20   reported to.  Mr. Thumairy, who we believe was the ringleader

21   of the plot to support the hijackers, really reported to

22   several different people.  One was the consul general in Los

23   Angeles; another was Mr. Sowailem, who was the Ministry of

24   Islamic Affairs in Washington; and the third was -- there was

25   another chain of command, which led up to through the Ministry

Iac6ter2

1    of Foreign Affairs, which had a separate Islamic Affairs

2    Department in Washington D.C., which he reported to a gentleman

3    called Mr. Ghesheyan.  So there are three separate lines.

4    There is also a line that goes to Riyadh, a man named Jraithen,

5    who we have designated as one of the seven people, your Honor.

6            So those people are all among the people who we were

7    going to include in our list to Mr. Kellogg.  We propose doing

8    that at the same time that we file the motion to compel so that

9    we would have an opportunity to finish the review of their

10   documents and also have an opportunity to look at the FBI

11   documents for the first time and see if there were any things

12   that we had missed.  So we wanted to cross our t's and dot our

13   i's on that.

14           THE COURT:  Procedurally, and this will portray maybe

15   my ignorance as understood, will you then be filing an amended

16   complaint once you're done with this discovery, which the

17   government will move against?  I assume that is the procedural

18   posture.

19           MR. POUNIAN:  That is a possibility, your Honor.  We

20   have to consider that.

21           MR. CARTER:  Your Honor, if I may.

22           We had a discussion about this issue at one of the

23   prior conferences.  I cannot remember if it was the conference

24   in April or May.  Your Honor had proposed something possibly

25   other than an amended complaint.  Alternatively something in

Iac6ter2

the form of a statement of facts and evidence that we would be

relying upon in support of jurisdiction theories.

            THE COURT:  Okay.

            MR. CARTER:  I think what is what we were planning to

do.

            While I have the microphone just two quick points that

might have been lost in the shuffle.  With regard to the

documents from the FBI, in our dialogue with the Department of

Justice regarding the FBI's search, the DOJ has been pretty

clear that their search is focused on the matters discussed in

pages 18 to 23 of the Court's March 28th decision.  They are

looking for a core set of documents related to that.  So we do

believe that the focus of the FBI's search and the content of

the documents it will be producing do run to the heart of the

jurisdictional inquiry for which discovery has been authorized.

            Related to that we do think the names that we are

going to see in the statements are likely to resolve some areas

of dispute that might otherwise exist.  For instance, with

regard to the supplemental production or supplemental document

requests for seven names, it may very well be that the

existence of those names in the statements, the 302s, helps

provide clarity as to why we are asking those questions and why

those people are appropriately the subject of discovery for

instance because they dealt directly with Thumairy and the

hijackers for instance, your Honor.

Iac6ter2

```
 1              With regard to the overall process, Mr. Kellogg
 2      suggested that there has been terrible delays on our part.
 3      Just to take a step back, the Kingdom had represented to the
 4      Court that it would be making its production on a rolling
 5      basis.  It indicated in one of the earlier hearings that
 6      it already grabbed low-hanging fruit, like personnel records
 7      and records related to Thumairy.  Nonetheless, we didn't get
 8      anything until the deadline, July 31s.  At that time we ran out
 9      and went to translators.  We found the best solution that we
10      could with a very large team of translators; but we told the
11      Court at that time, the translation process as estimated to us
12      was going to run through September, and it did.  When we got
13      the documents back during the September process and we began to
14      dissect them, we realized that there are things missing and
15      things we needed to follow up about.  So we are just continuing
16      the process as quickly as we can, your Honor.
17              THE COURT:  Before I switch over to Mr. Kellogg so I
18      understand the relief that you are seeking to move the motion
19      to compel to November 30th and you think by that deadline you
20      will also be able to make some determinations about
21      depositions.
22              Is that accurate?
23              MR. CARTER:  That's correct, your Honor.  Candidly the
24      November 30th we realize that waiting for the entirety of FBI
25      production was not going to be viable for the Court.  We
```

Iac6ter2

thought having the benefit of the first tranche we would just

have the statements with the names would be the best possible

sort of solution under the circumstances, and that is why we

proposed the November 30th date, which is I think maybe just

two weeks after we got from the FBI.

MS. VARGAS:  Just a couple of points, your Honor, I

wanted to clarify with respect to what the scope of the first

tranche, second tranche of the FBI production and another point

as well.  There is a characterization of the FBI investigation,

the subfile investigation, from which these documents are

coming as being investigation specifically of the Kingdom.  We

wouldn't characterize it that way.  What we have done, however,

and I think it is accurate to say is we have looked in what is

called the subfile records for documents that pertain to the

matters on which the Court has authorized jurisdictional

discovery and we have attempted in specifically the first and

second tranches to identify a core set of documents that seemed

relevant to those issues.  In meet and confers with the

plaintiffs they have also highlighted certain names, certain

subject matters that they also wanted us to broaden our search

and look at.  That is a lot of what will be the third tranche I

believe.

So that is in some way the division of the tranches,

but it is the case that the first two tranches specifically do

compromise what we have been calling the core documents.  The

Iac6ter2

third tranche is largely coming out of our meet and confers

with plaintiffs.  It is a minor point, but I did want to

clarify what it is that we are producing and the order that we

are proceeding in.

THE COURT:  Thank you.

Mr. Kellogg.

MR. KELLOGG:  Your Honor, first I would like to

correct a statement made by Mr. Pounian.  We did not dump the

documents willy-nilly on the plaintiffs.  Each document was

coded to indicate precisely where it came from.  In their

document requests, they asked us specifically to keep the

documents in the form in which we found them in the files of

the various agencies.  So all the general authorities of civil

aviation documents, which relate to Bayoumi were coded

accordingly and provided, including his entire personnel file.

All the Ministry of Islamic Affairs documents concerning al

Sowailem and Thumairy were produced and coded appropriately.

All the embassy documents, all the consulate documents.  So it

is not like there was a difficult determination on their part

to figure out which documents were relevant to which issues and

which individuals.  That was all extremely clear.

We have been in contact with the plaintiffs throughout

July on issues about confidentiality and otherwise.  We made it

clear to them because of the Ramadan holiday and the

difficulties of translation and gathering, the production was

Iac6ter2

going to take place on July 31st rather than having a rolling

production as we had hoped.  They made no complaint about that

at the time.  They only raised it after we agreed to the

initial extension request and they raised that in the letter.

          We are happy to meet and confer with them.  We have

been waiting to meet and confer with them.  I think it is

inappropriate for counsel to start talking about specific

complaints when we haven't had a chance to talk and to rebut

those claims.  We'll be happy to do so.  With respect to any

gaps that they consider to be in the documents, we'll be happy

to meet and confer about these seven individuals.

          I will tell you that I am very concerned because we

have been through the documents of Dr. al Bayoumi, al Sowailem,

and there is nothing that supports the allegations that they

are making in this case.  So now they have come up with seven

new names and they are going to want to take a look at that.

They have had hundreds, if not thousands, of declassified

documents from the FBI that they have used in the case before.

Indeed, that they have used successfully to get the Court to

order jurisdiction discovery.  There is no reason to think that

suddenly the new tranche of documents is going to change the

whole story and provide them with the evidence particularly

since it is all going to be hearsay in any event.

          So we would urge the Court to keep the schedule that

they had.  We'll meet and confer with plaintiffs whenever they

Iac6ter2

1    want on the various issues they would want to raise.  We would

2    like to see us keep on a schedule so that the depositions can

3    be completed at the very least by the end of January when

4    official discovery with the other defendants ends and so that

5    we can get this back to a motion to dismiss.

6            THE COURT:  With respect to depositions, do you have

7    any information about whether or not these individuals that

8    have been identified are going to sit for a deposition or

9    anything to add about the volume of deposition that might be

10   anticipated?

11           MR. KELLOGG:  We met with all individuals.  I don't

12   anticipate any problem getting them to sit for depositions.

13   Two of them are current employees of the Saudi government.  One

14   is a former employee, but he showed no concerns about being

15   available for a deposition.

16           THE COURT:  Will they be able to sit for a deposition

17   at one the presumptive locations?

18           MR. KELLOGG:  Your Honor, you may recall that in

19   January you said the deposition protocol does not apply to the

20   jurisdictional discovery against the Kingdom.  That said, I

21   will urge them assuming they can do so to do one of the

22   locations -- Rome, Madrid, London.  If that is not possible,

23   some depositions are taking place in Milan.  Clearly that is

24   something that the plaintiffs can do as well.  I fully expect

25   them to sit through depositions.  We are happy to meet and

Iac6ter2

1    confer on that.

2            THE COURT:  All right.

3            MR. KELLOGG:  We think there should be a handful of

4    depositions directed specifically to allegations in 19 to 23.

5    It is clear that they are contemplating 25 and 30, whatever.

6    We think that is completely out of bounds.

7            THE COURT:  Let me ask questions probably better posed

8    to the plaintiffs; but since I am speaking to you I will ask

9    you.  I do think it makes sense for the parties to have a meet

10   and confer on these recently raised disputes as Mr. Kellogg is

11   inviting.  I also want to have a deadline for those meet and

12   confers to be productive and be brought to my attention.  I am

13   wondering what that deadline is.

14           Is two weeks adequate time for the parties to have a

15   conversation and reach agreement?  If not, come to me.

16           MR. POUNIAN:  That is fine, your Honor.

17           MR. KELLOGG:  Absolutely, your Honor.

18           THE COURT:  Let's begin by setting a deadline for

19   that.  Today is October 12th.  Let's set a deadline of

20   October 26th.  I will ask for a five-page letter from the

21   Plaintiffs Executive Committee raising any outstanding

22   discovery disputes with an opposition letter from the Kingdom

23   on November 2nd and any three-page reply brief on Wednesday,

24   November 7th.

25           MR. KELLOGG:  Just for clarification, your Honor, that

Iac6ter2

 1    is on the documents, or is that also on the seven new

 2    individuals?

 3              THE COURT:  That is on the new issues that have been

 4    raised with respect to -- sorry the new discovery that has been

 5    raised.

 6              MR. KELLOGG:  The seven?

 7              THE COURT:  The seven people.  Exactly.

 8              MR. KABAT:  The other is in a complaint about Nasheed.

 9    It is starting next week they will tell us on a rolling basis

10    what documents they think are missing, were not produced.  They

11    are kind of separate issues.

12              THE COURT:  Okay.  What I am going to do and this may

13    overlap -- Mr. Pounian.

14              MR. POUNIAN:  Your Honor, I was just standing up

15    anticipating to speak.

16              THE COURT:  I am going to give the Plaintiffs

17    Executive Committee one additional month for their motions to

18    compel.  I do think in the interest of justice that is

19    appropriate.  Given what remains to be done in this case, I

20    don't think an additional 30 days is going to so severely

21    prejudice the Kingdom.  I hope I have been clear certainly to

22    the lawyers in the room and also to the family members in the

23    room.  My primary goal is to move this case forward.  I want

24    the parties to have their opportunity to be heard and to

25    develop their claims and defenses in a reasonable way and I

Iac6ter2

1    think giving an additional month in light of the fact that the

2    FBI first tranche is going to happen in November is reasonable,

3    but I am very much disinclined to move that deadline again.  I

4    will set November 30th as a deadline for the Plaintiffs

5    Executive Committee motion to compel.

6              Mr. Kellogg, how long do you think -- I know you don't

7    know what the motion looks like -- you would like to oppose it?

8    And to the extent it affects you or your family's Christmas

9    obviously is on the 25th.

10             MR. KELLOGG:  As you say, your Honor, we don't know

11   the extent of the motion --

12             THE COURT:  The question is:  Do you want before or

13   after the holiday break?

14             MR. KELLOGG:  I think three weeks.

15             THE COURT:  I am going to set that for December 21st.

16   I will give the Plaintiffs Executive Committee, because I am

17   both a judge and human being, I will give you until January 4th

18   to file any reply brief.  We'll issue an order with these

19   dates.

20             I will hear from the parties starting on October 26th.

21   Since we don't know what we are talking about here if the

22   disputes that are raised on the -- what I am trying to do is

23   have the parties resolve any disputes regarding new discovery

24   requests that are being asked in the letter briefing of

25   October 26th.  So that is not intended to be the motion to

Iac6ter2

compel discovery that you served properly and has been
responded to and I don't think you have gotten appropriate
responses.  That is the November 30th motion to compel.

        October 26th is an opportunity for you all to speak
about these new discovery issues that you think -- really these
seven people -- should be explored to meet and confer.  It may
be that the Kingdom says, We'll go ahead and look for these
documents, in which case there will be no need for letter
briefing.  If the parties cannot reach agreement on these
narrow set of discovery demands, then that is what is to be
briefed on the October 26th letters.

        Understood?

        MR. POUNIAN:  Yes, your Honor.

        MR. KELLOGG:  One thing I might note, your Honor, when
you set the original schedule for motion to compel and
response, you said no replies.

        THE COURT:  You are right.  I did.  I did. I will
stick with that.

        MR. CARTER:  Can I speak to that, your Honor?

        The Kingdom's response to the motion to compel could
very well include evidentiary material such as affidavits,
invoking privilege like state secrets, or undue burden or other
things.  We are not going to see any of that or for that matter
the full dimension of the arguments they are making.  In our
sense the character of the disputes that are likely to be

Iac6ter2

1    addressed in the motions uniquely require a reply brief because

2    there will be matters that we simply will not have had a chance

3    to see in advance of the opposition brief.

4              THE COURT:  Okay.  I will let you file the reply

5    brief.  I was going to suggest I can get a letter from you, but

6    I am sure that letter will tell me that you think there is

7    something there.  So rather than have people writing me letters

8    during Christmas, I will give you the reply brief January 4th

9    as the deadline.

10             MR. CARTER:  Thank you.

11             THE COURT:  I think that addresses all the issues with

12   respect to the Kingdom.

13             Mr. Kabat, that leaves us with this final issue, which

14   was raised in my August 30th order in response to concerns

15   raised by the Plaintiffs Executive Committee that you have been

16   taking litigation positions on behalf of your clients and not

17   withstanding the fact that your clients are not in a position

18   or have not been in touch with you, which raises real concerns

19   about your authority.

20             Can you address those?

21             MR. KABAT:  Your Honor, I want to provide the Court

22   with some background information and explain how we got to that

23   point in time --

24             THE COURT:  I know you lifted your microphone.  Slide

25   it even closer to the edge of the table so that it is closer to

Iac6ter2

1    you.

2        MR. KABAT:  With respect to our four clients -- Dr. al

3    Turki, Dr. al Obaid, Dr. al Basha and Dr. Naseef -- who we have

4    represented for the past 14 years, in order to clarify any

5    uncertainty raised in your August 31st letter, as a threshold

6    matter since the attorneys in our law firm do not speak Arabic,

7    we necessarily relied upon intermediary to communicate with our

8    clients.  While three of them went to college in this country

9    or in England, that was decades ago and they are no longer

10   fluent in spoken English.  Although, some of them can read and

11   write in English to a limited extent.  So over the past 14

12   years, we worked with intermediaries, several Arab speaking

13   attorneys who were educated in this country and several current

14   or former employees at the Muslim World League and the

15   International Islamic Relief Organization.

16       THE COURT:  Can you slow down.  It is hard to hear you

17   and you are speaking quickly.  I want to make sure we are

18   getting a full record.

19       MR. KABAT:  Let me just repeat.

20       The over the 14 years we have worked with

21   intermediaries and Arabic speaking attorneys who were educated

22   in this country and several current and former employees of the

23   Muslim World League and the International Islamic Relief

24   Organization.  These individuals were able to communicate

25   directly with the client and our law firm.

Iac6ter2

1          Starting in 2004 when we were doing the original

2    motion to dismiss on jurisdictional grounds, we worked with two

3    other attorneys who communicated directly with the clients.

4    They obtained factual information for the client's affidavit

5    and they reviewed the affidavit with the client.  A more senior

6    attorney in my firm did most of the work on drafting those

7    affidavits.  I was not involved in that process.

8          Now, after discovery started as to these defendants in

9    2013 nearly a decade later, we learned that three of them who

10   were retired by then -- Dr. al Obaid, Dr. Naseef, Dr. Basha --

11   did not have documents in homes relating to their work, and

12   that Dr. al Turki, who retired fairly recently, also did not

13   have any documents in home or a "personal" file separate from

14   the work file at the office.  In the Production in 2013 we

15   learned that.  Therefore, they had little to produce on their

16   own because nearly all the responsive documents were in the

17   possession of the MWL and IIRO's, which have collectively have

18   produced nearly 575,000 pages of documents.  Also in 2013, Eric

19   Lewis entered and his colleagues entered an appearance on

20   behalf of the MWL and IIRO which expedited the document

21   production then.

22          In particular in October 2015, about years ago, we

23   submitted an opposition to plaintiff's motion to compel -- ECF

24   3064 (October 7, 2015).  The first page told both Judge Maas

25   and plaintiff counsel that these charity officers did not have

Iac6ter2

1    personal files for documents relating to their work.  We had a

2    full paragraph on that.  That is three years ago.

3          Now, plaintiff in their reapply brief did not contest

4    that point.  Instead, they have argued that the four defendants

5    should have directed the charity to search for documents, which

6    in fact two of them did before they retired.

7          Commencing in 2016, after the Court's ruling on the

8    motion to compel as to both defendants, we contacted the

9    individual defendants through an intermediary, who at that time

10   worked at the IIRO.  He told us in April and June of 2016 that

11   he had just met with all four of them and that they did not

12   have their passports for time frame, '92 to 2002.

13         THE COURT:  I just want to make sure your comments

14   will focus on the issue that I think it is before the Court,

15   which is not so much about their discovery production but about

16   concerns that have been raised as to whether or not you have

17   had regular contact with your clients.  Because issues were

18   raised by the Plaintiffs Executive Committee that you were

19   making representations about your clients; but then when the

20   issues of the passports came up, your clients represented in

21   their sworn statements that they haven't talked to a lawyer in

22   years and so they couldn't have known to produce a passport.

23         So I am less interested today in what they did about

24   their passports.  I am more concerned about whether or not you

25   are making representations in this proceeding without the

Iac6ter2

1    authority of your clients.

2              MR. KABAT:  Your Honor, back in 2015 and 2016 we

3    learned that they did not have the documents and they did not

4    have the passports.  So in 2017 and 2018 we were not making

5    those representations.  I knew for two to three years before

6    they didn't have documents and they did not have passports.

7    That turned out to be --

8              THE COURT:  The court reporter missed what you said.

9    That turned out to be?

10             MR. KABAT:  Dr. Naseef, the one who is in the

11   hospital, he spoke to our intermediary in 2016 and he told him

12   that he did not have his passport.

13             THE COURT:  I appreciate your standing because that is

14   the appropriate thing to do, but it may be easier for you to

15   stay seated and move the microphone over.  Again, the courtroom

16   is poorly set up and it makes it very hard to hear.  Maybe if

17   you sit and bring the microphone closer to you as though you

18   were testifying before a Senate hearing.

19             MR. KABAT:  In 2016 we were told that Dr. Naseef had

20   told our intermediary he did not have his passport.  And then

21   Eric Lewis and his colleagues conducted Dr. Naseef earlier this

22   year.  Dr. Naseef is now in the hospital, and the son was able

23   to find a notepad but his father did not know he had.

24             THE COURT:  Okay.  To be clear is it your position

25   that the information that you are representing to this Court

Iac6ter2

1   was based on your prior communications with your clients that

2   you believed had not changed even though you hadn't conferred

3   with your client over that periods of years?

4           MR. KABAT:  Correct, your Honor.  Because we have been

5   told they had no documents so we had no reason to believe that

6   all of a sudden they would have documents.

7           THE COURT:  Now, with respect to Mr. Naseef, who we

8   have now received our first status letter indicating he is

9   quite ill and incapacitated, do you have a way of communicating

10  either with him or his family members for purposes of the

11  litigation?

12          MR. KABAT:  Through his son.

13          THE COURT:  You have a direct line to that person?

14          MR. LEWIS:  We do, your Honor.

15          THE COURT:  Does anyone from Plaintiffs Executive

16  Committee want to speak to this issue.

17          MR. HAEFELE:  Yes, your Honor.

18          Your Honor, I want to focus what the attention is and

19  what this issue is.  I think your Honor has already alluded to

20  that.  In your Honor's August 30th order (ECF 4137 page 7-8)

21  the Court summarized what we would characterize as but one

22  symptom of a much longer, on-going problem in the MDL and that

23  is the cavalier lack of respect of a number of the defendants

24  and at least in some instances their counsel that has been

25  exhibited to the authority of the Court in the discovery

Iac6ter2

1    process that the Court oversees.

2              In the August 30th order the symptoms of the lack of

3    that respect and the cavalierness of the approach were

4    presented in the following examples:

5              During the period between 2016 when the defendant Dr.

6    Abdul Turki left Muslim World League and July 2018, we know

7    from sworn testimony of Dr. Turki that he had no contact, no

8    communication whatsoever with any lawyer.  We also know from

9    sworn testimony of doctors who were treating Dr. Naseef that

10   due to an incapacity he was prevented from communicating with

11   his lawyers.

12             During that time period -- and that dated back at

13   least to the beginning of this year -- Mr. Kabat made

14   representations apparently geared towards indicating to

15   plaintiffs' counsel that Mr. Kabat had been in contact with

16   defendants and that he spoke to the Court with the authority of

17   the clients and that those defendants were participating in

18   their defense.  Specifically the PEC sent a February 6th letter

19   to all the defendants, including Mr. Kabat, identifying a

20   series of witnesses.  Mind you, your Honor, this was a week

21   after your Honor had entered into the deposition protocol,

22   which came at the end of January.  So about a week or less than

23   a week later, we sent out a list of defendants that we

24   anticipated noticing their deposition to start the meet and

25   confer process.

Iac6ter2

1          Writing for the defendants on February 12th, about a

2     week later, Mr. Kabat wrote purportedly in response to the

3     February 6th letter, but the February 6th letter asked whether

4     the witnesses would be available to be deposed in New York or

5     in one of the other alternative locations -- I think we

6     indicated London -- or whether they will be available to be

7     deposed in any of the presumptively acceptable locations.  I

8     think I already indicated, your Honor, you identified four --

9     London, New York, Madrid, and Rome.  In response, Mr. Kabat a

10    series of unrelated responses that didn't respond to whether or

11    not any of the witnesses were available for those locations.

12         The following day on February 13th, the PEC responded

13    to Mr. Kabat and pointedly asked Mr. Kabat, number one, whether

14    the individual defendants intended to appear for depositions;

15    number two, whether assuming there was no impediment to

16    obtaining visa, they would appear in New York or one of the

17    presumptively acceptable locations that the Court had

18    authorized.

19         On February 26th two weeks later, writing for

20    Defendant Turki, Obaid, Naseef and Basha, Mr. Kabat wrote a

21    purported response to the February 13th letter.  And although

22    he had not had any communication with his clients, particularly

23    Dr. Turki or Dr. Naseef since 2016, he communicated that

24    Dr. Naseef was unable to -- I am sorry.  Mr. Kabat made the

25    following representations to the PEC in that letter:  He said

Iac6ter2

1    that Dr. Turki and Dr. Naseef would need an Arabic translator.

2    Now, whether or not that is true is besides the point because

3    what we don't know is -- or what we do know is he hadn't

4    communicated with the defendants at that point.

5              THE COURT:  Presumably he knows whether his clients

6    speak English.  So the fact that he might have represented to

7    you in February that his clients needed a translator doesn't

8    necessarily say anything about his communication or

9    misrepresentation to Plaintiffs Executive Committee.

10             MR. HAEFELE:  That's an interesting point, except in

11   one of the declarations from one of the witnesses it indicates

12   that he reads and communicates in English.  Although, when we

13   did do his deposition, he needed a translator.  So I think you

14   raise an interesting point as to whether or not he did or

15   didn't know, but the fact is he hadn't communicated with him

16   for at least several years.

17             It is almost beside the point because other

18   communications that he indicated -- in the same letter he also

19   indicated that one or more of his clients -- carefully avoiding

20   which of the clients they were -- would be unable to travel

21   outside of their home country due to medical illness.

22   Presumably we understand that is Dr. Turki -- sorry, Dr.

23   Naseef.

24             THE COURT:  Dr. Naseef.

25             MR. HAEFELE:  Number one, he doesn't say which one and

Iac6ter2

he doesn't indicate whether there are others.  Most importantly

it is an indication that they are willing to testify somewhere.

Dr. Naseef's circumstance, it was a bit misleading because what

he doesn't say in that very communication is he is incapable of

defending himself in any place, whether here or anywhere.  That

is material to whether we are going to move forward to try to

compel his deposition.  It leaves out a particularly important

fact.  Instead of telling the PEC that he wasn't able to

communicate at all on behalf of his client, he indicates that

it is just an administrative issue as to where the deposition

is going to take place and when it is going to take place,

which wasn't true.

On April 11th during the meet and confer, the parties

had a meet and confer where the PECs were together and we had a

telephone conference call with some of the defendants, and Mr.

Kabat participated along with Mr. Patrope, counsel for DIB

Bank.  The PECs asked Mr. Kabat pointedly when he was last in

contact with his clients and whether they were participating in

discovery.  Instead of being able to respond to us in that

meeting, which is presumably something, your Honor, he ought to

know, he said he would have to confer with his clients and get

back to us.

We made a followup call several days later and when we

all joined on the call -- I think it was April 16th -- Mr.

Kabat was conspicuously missing from the call and Mr. Patrope

Iac6ter2

1    participated and obviously didn't have the answers to those

2    questions.  Later that day Mr. Kabat responded in a letter, but

3    that was the first time he acknowledged that Dr. Naseef was in

4    the hospital and was too ill to be deposed.  So from February

5    to mid-April we were left unknowing of that relatively

6    important fact that the witness was not participating in

7    discovery.

8          He also represented that he had communicated with

9    Dr. Turki, which wasn't true, and that Dr. Turki could be

10   deposed only in Saudi Arabia, which also wasn't true, and that

11   Dr. Turki could not sit for his deposition during Ramadan and

12   needed a translator, which both of those may or may not have

13   been true; but the fact is he hadn't communicated with the

14   witness.  In short, the letter still declined to answer the

15   very material questions that we had already asked him and we

16   were left unknowing those answers -- are these witnesses

17   intending to sit for deposition, are you in contact with them,

18   and are they participating in discovery.

19         On June 4 the PECs served depositions notices because

20   we hadn't gotten any answer as to what times they were

21   available.  So we exercised the provision in the deposition

22   protocol that allowed us to having sought to meet and confer

23   and being unable to come to an agreement serve deposition

24   notices on the back end and we tried to do the meet and confer.

25   In the cover letter to the deposition notices, we included

Iac6ter2

again pointed questions asking Mr. Kabat when did Mr. Kabat

last successfully communicate with any witness who purports to

be unavailable and whether Mr. Kabat is in a position to

affirmatively represent that each of the witnesses intends to

appear for a deposition.

On June 8th Mr. Kabat wrote back suggesting that the

PECs -- suggesting to the PECs that he was in fact in contact

with Dr. Turki, telling the PEC that Dr. Turki was available

either in Saudi Arabia in August, which the Court and the PECs

had already dismissed as something that was not going to

happen, or in London in September if he could get a visa.  So

again he still is not telling us when the witness is going to

be available.  He is just saying if he can get a visa, he will

be there that day.

THE COURT:  I obviously ruled on these deposition

issues already.

MR. HAEFELE:  Yes.

THE COURT:  Have you taken these depositions?  Do you

have dates?  Have you made progress on that particular front?

MR. HAEFELE:  We have deposed Dr. Obaid and Dr. Turki.

Obviously for reasons that your Honor understands, we have not

deposed Dr. Naseef.  We are in discussions with regard to Mr.

Basha's deposition.

THE COURT:  Okay.

MR. HAEFELE:  Your Honor, there is one more.  Those

Iac6ter2

1    four witnesses are individuals that are related to the Muslim

2    world League and IIRO.  There is a fifth individual, Mr. al

3    Buthe, who is also represented by Mr. Kabat.  There is an issue

4    hanging out there where we have noticed his deposition.  It was

5    supposed to have taken place in London at the same time when we

6    were doing the depositions of the other two witnesses I

7    indicated.  And before the deposition, Mr. Kabat indicated in

8    an informal setting that Mr. al Buthe would refuse to appear at

9    the deposition.

10           Now, this is one of the individuals that your Honor

11   had addressed a motion for protective order and denied and

12   ordered them to appearance and ordered them to appear and I

13   believe you ordered them to appear in London and for no reason.

14   I think some of the others had personal reasons and couldn't.

15   In one instance there were issues of visa.  In this instance he

16   indicated that he wouldn't appear simply because he was

17   exercising his constitutional rights not to incriminate

18   himself, which as your Honor likely understands doesn't

19   necessarily excuse you from appearing at a deposition.  It is

20   just something you raise on a question by question basis.

21           Now, we told Mr. Kabat that we needed him to put that

22   in writing to us and to your Honor and he has declined to do

23   that.

24           THE COURT:  Is Mr. al Buthe the only defendant for

25   whom you have an outstanding question about the deposition, or

Iac6ter2

1    do you have an answer about Mr. Basha?

2         MR. HAEFELE:  Mr. Basha was also subject to a

3    protective order motion and your Honor had denied it.  After

4    that Mr. Basha's counsel approached us with a little bit more

5    information about his rationale for declining to travel to

6    London.  We have tried to accommodate that and I think we are

7    likely still on dialogue about the when and where.

8         THE COURT:  Good.  It seems like we need some

9    resolution about Mr. al Buthe.

10        MR. HAEFELE:  That's correct.

11        THE COURT:  Anything further?

12        MR. HAEFELE:  Your Honor, I guess one other thing that

13   I would make sure your Honor understands is there are the two

14   other misrepresentations that were made about the defendants'

15   communication and that during that time period there were also

16   supplemental discovery responses that presumably would have

17   been something that the defendants counsel had to run by the

18   defendant to ensure that they were accurate and truthful and

19   they were served obviously during a time period where that

20   could not have happened because there was no communication with

21   the defendants during that time.  That would be July 2, 2017

22   and September 26th, 2017.  There were supplemental discovery

23   responses that were produced without the defendants'

24   understanding.

25        The depositions we just talked about, your Honor, if I

Iac6ter2

1    can take a minute to run through --

2            THE COURT:  I'm pressing up against an afternoon

3    conference.

4            MR. HAEFELE:  I will try to be quick.  Your Honor,

5    maybe this can expedite it.  What I would like to do is give

6    you, your Honor, if I may approach excerpts from the deposition

7    so your Honor can just read later on as to what was said during

8    the deposition.  I can give you the highlights.

9            THE COURT:  Sure.

10           MR. HAEFELE:  If lovely assistant Mr. Pounian can

11   provide them.

12           THE COURT:  This is the deposition of whom?

13           MR. HAEFELE:  These are excerpts from the depositions

14   Dr. al Obaid and Dr. al Turki.

15           THE COURT:  Do you have copies for counsel?

16           MR. HAEFELE:  I do.

17           THE COURT:  I am not going to spend my time right now

18   reading a deposition transcript.

19           MR. HAEFELE:  No.  I can tell you what particular

20   points I think are raised in the deposition.

21           When Dr. al-Obaid was questioned about an affidavit,

22   which I think was raised by Mr. Kabat, in the transcript from

23   pages 319 through 324, to summarize it back in 2004 when

24   someone drafted a document and submitted it to the Court as a

25   piece of evidence and put it before Dr. Obaid to sign the

Iac6ter2

document under penalty of perjury without ever having read the

document with an eye towards whether the content he was

attesting to was true, he signed the document.  During the

deposition he was asked questions about his understanding of

what was in the document.  He basically said, your Honor, I

have never signed anything understanding anything was under

both.

The reason why that is important is that it is a

further indication that there is a lack of respect for the fact

that when you are submitting evidence to this Court, your

Honor, and you are signing it under penalty of perjury that it

has to be understood it is under penalty of perjury.  It says

so right in the document.  If counsel is putting those kinds of

things in front of the witness and serving it to the Court as

though it is true for the truth of the matter asserted in it,

there is a real problem with that.  It shows further lack of

respect to the Court.  If your Honor can just take a look

through it, I will go through the details about what it says

but your Honor can read it yourself.

Similarly it was surprising to us that Mr. Kabat

purportedly has been representing these defendants since the

beginning of this litigation.  When Dr. Obaid was asked about

Mr. Kabat during the deposition, he didn't know who Mr. Kabat

was even though Mr. Kabat was sitting in the room with him

three seats away from him for two days.  That is an indication,

Iac6ter2

1   your Honor, I think that after being the gentleman's lawyer for
2   over a decade that there is a serious lack of respect for the
3   Court to represent a witness or represent a defendant and not
4   have the defendant in communication with his lawyer enough to
5   even know who the man is.

6           THE COURT:  What the relief you are seeking?

7           MR. HAEFELE:  The relief, your Honor, I think is
8   twofold.  I think one should be simple, that this defense
9   counsel and all the defense counsel need to understand the
10  respect for the Court, and quite frankly for the plaintiffs and
11  for the process needs to be followed and that in this instance
12  of Mr. Kabat needs to cease the false representations and we
13  need to have an understanding that -- I think that is pretty
14  much it.

15          I will say this:  What we haven't sought, and I don't
16  think we have considered it, is the same sort of relief that we
17  sought with regard to Mr. McMahon.  So if your Honor is asking
18  that, we have not sought that.

19          THE COURT:  Thank you.

20          Yes, counsel.

21          MR. LEWIS:  Thank you, your Honor.

22          If I may, your Honor, Eric Lewis for the four
23  individual defendants MWL and IIRO.

24          Your Honor is very effective --

25          THE COURT:  Can I ask you for one quick question.

Iac6ter2

1    Remind me of your relationship with Mr. Kabat.  You are

2    co-counsel for the same defendants?

3            MR. LEWIS:  Since early July we are co-counsel for the

4    four of the five defendants -- individual defendants.  Then we

5    are also counsel for MWL and IIRO.  We've advised the clients

6    of the relationship and we have signed retainers from the

7    individuals.

8            THE COURT:  You are now also representing Mr. al

9    Obaid, Mr. Naseef, Ms. al Turki, and Mr. al Buthe.

10           MR. LEWIS:  Not al Buthe.

11           THE COURT:  And Basha is also your client?

12           MR. LEWIS:  Yes, your Honor.

13           MR. HAEFELE:  Your Honor, just to be clear, counsel

14   defended those depositions we talked about.  He was the lawyer

15   present during those depositions.  We understood that he was

16   representing those defendants.

17           THE COURT:  Okay.  Good.

18           Proceed, sir.

19           MR. LEWIS:  Your Honor is very effective at solving

20   problems that come up and we have tried to solve problems as

21   well.  I think saying that Mr. Kabat has a cavalier lack of

22   respect for the Court is unfair and without basis.  I think

23   these charges are labels.  There is no evidence of any cavalier

24   lack of regard.

25           Mr. Kabat has reached out to us on a few occasions to

Iac6ter2

say, Can you help me out here.  He doesn't speak Arabic.  He

hasn't been to Saudi Arabia.  That is a difficulty.  Saudi

Arabia is a place where you need to go and sit across the table

from someone.  That is what we did.  We would have been able to

do it earlier.  I was supposed to meet with Dr. al Turki in

May.  It was my fault.  I had a family medical emergency.  I

could not go to Saudi Arabia.

So we then moved the meeting so that I could sit with

Dr. al Turki and ask him about his health condition in detail,

whether he felt he could travel and alike.  The fact that it

was after your Honor issued her order was entirely fortuitous.

This meeting had been scheduled for July 9th after I was unable

to go in May of.

The affidavit that is referred to was done 14 years

ago.  To be honest, Dr. al Obaid and Dr. al Turki gave their

depositions.  Both of them are nearing or at the age of 80.

They do not have an understanding of how our system works.

They did not really have a recollection of things that happened

14 or 15 years ago.

Yes, they didn't recognize Mr. Kabat because they had

not met him.  Mr. Kabat had dealt through intermediaries who

are English speaking.  Sometimes it was effective.  Sometimes

it was not.  It was not because of any lack of effort on his

part.  So we reached out and it is a process that develops.

You asked the pertinent question:  Have these

Iac6ter2

depositions gone forward?  The answer is:  Yes, they have.  Two
of them have.  And the third we have given three weeks of
potential dates and we are trying to coordinate Dr. Basha with
some other depositions.

         If the question is have these depositions gone forward
and have they gone forward in a timely way within the context
of the Court's scheduling orders, the answer to that is yes.

         On the passports, Mr. Kabat got some information from
intermediaries.  It turned out not to be right.  He called me
up and I made some inquiries and we got what the actual
position was.  We did not represent the individuals.  We
decided in July after I had the meeting with Dr. al Turki and
he indicated his concerns and he did note that intermediaries
had tried to contact him, but Mr. Kabat did not speak to him.
He is only as good as how effective the intermediaries are.

         We have come into the case because we have Arabic
speakers and we have an ability to function on the ground in
Saudi Arabia so these problems don't reoccur.  I think it is
unfair to question Mr. Kabat's bona fides or his respect for
the Court.  He also has played a very effective role as the
coordinating counsel for defendants.  It makes me surprised
that plaintiffs have gone after him this way.  He really works
hard to make sure that things get done.  When they don't, he
tries to push it forward as best he can.

         Now, things went wrong.  I think to suggest that it

Iac6ter2

1    was a function of some either lack of effort or character

2    defect or disrespect for the Court on the part of Mr. Kabat is

3    without basis and completely unfair and not useful in dealing

4    with what is a very difficult case.

5              THE COURT:  Briefly, sir.

6              MR. HAEFELE:  Thank you, your Honor.

7              Your Honor, Mr. Lewis put a good point in front of us,

8    particularly because Mr. Kabat is in the role of doing the

9    coordination for the defendants; but even if he weren't, one of

10   the problems that has been presented by the conduct that

11   happened here -- this it goes to your Honor's question about

12   what we are looking for or what  our remedy is here -- is that

13   because of the lack of transparency, the misleading statements,

14   the deflection that has happened and the response that came

15   from Mr. Kabat.

16             It took us six months to get two depositions.  Your

17   Honor is trying to move this case along, as well as hopefully

18   all of us are.  The lack of coordination from somebody who is

19   allegedly trying to coordinate the case is part of the problem.

20   That is part of the delay.  So one of the things we are trying

21   to bring to your Honor's attention is that these sorts of

22   miscues are causing a huge amounts of delay in the litigation

23   and we are trying to get that to stop.

24             One other point, your Honor.  One of the depositions I

25   gave you, I want to give you a sense of what to look for and

Iac6ter2

1    where.  In Dr. Turki's depositions pages 71 to 72 and page

2    82 -- I am sorry.  Dr. Turki's deposition it is pages 435 and

3    436.

4                In the earlier proceedings, your Honor, in

5    September 2, 2015 and March 22, 2016 the Plaintiffs Executive

6    Committee made clear to the Court that among the things we were

7    looking for were personal items at the individual's homes.

8    That is part of the reason why we were emphasizing the need to

9    not just rely on what came from Muslim World League and IIRO;

10   but these gentlemen had to go back to their homes and look for

11   personal indicia of what they did in their work in their

12   positions within the Muslim World League and IIRO.  They have

13   high offices.  They were men of positions of great respect and

14   they met with individuals around the world who were leaders.

15   In some of those roles, they would have memoriams of their

16   trips, photographs of who they met with, and thank you's from

17   individuals they met with.  Things along those lines.

18               Dr. Turki acknowledged in his deposition that he was

19   never asked to collect those things and he had some of them at

20   home, but he was never asked to collect them.  I think that

21   goes to the heart of some of the issues related to the lack of

22   communication and with regard to what was and wasn't produced.

23   That is in the transcript.  I wanted to bring that to your

24   Honor's discussion.

25               THE COURT:  Very briefly.  This is really unfair to

Iac6ter2

1   the court reporter.

2           MR. LEWIS:  Your Honor, the translation -- they gave

3   testimony in Arabic.  We have 45 days.  That transcript is not

4   an approved and agreed to transcript.  Your Honor obviously can

5   read what your Honor chooses, but there are huge translation

6   problems.  The translator, I think everyone would agree, was

7   not a good translator.  I would not want the Court to be

8   confused that everything there is as it was said.

9           I can also say that they have been asked to check for

10  all that.  I think somebody may have had a plaque.  They don't

11  have photographs in their house.  I just don't want your Honor

12  to be confused.  They were asked prior to the deposition and

13  even long before that as to whether they had their own

14  documents at home or even photographs.

15          THE COURT:  Great.  I will direct you to follow up to

16  the extent there were deposition questions asked for that even

17  if.

18          MR. KABAT:  Your Honor, it is incorrect to say that

19  this year was the first time that we notified plaintiff that

20  Dr. Naseef was in the hospital.  In fact, on October 20 of last

21  year (ECF No. 3704) I submitted a declaration where I said that

22  Dr. Naseef was unable to communicate and was in ill health

23  incapacitated.  I also explained that we had not heard anything

24  lately from Mr. al Turki.

25          And then what happened in March I had a call with

Iac6ter2

1    counsel who had recently met with Dr. Basha and they learned

2    from the contact that the Muslim World League, that three of

3    the four defendants -- meaning all but Dr. Naseef -- would be

4    able to sit for a deposition.  That is why I put in my April 16

5    letter that the deposition would probably have to be take place

6    by videoconference.  Recently I had learned from the Muslim

7    World League that the three defendants were available by

8    deposition.  Less than two months later on June 8th I was able

9    to update that based on information I got from the Muslim world

10   League intermediary that two of them -- Dr. al Turki and Dr. al

11   Obaid could travel.  So we had information from the Muslim

12   World League about the ability of their former officer to

13   appear for a deposition and whether or not they can travel in

14   the Spring of this year.

15              THE COURT:  Thank you.

16              MR. KABAT:  Thank you.

17              THE COURT:  Thank you everybody.

18              I will hold onto these deposition transcripts and

19   myself or somebody on my staff will look over them.  If we

20   think there is a need for a revised translation, I will call

21   upon it.

22              At this point I will just remind everybody of their

23   obligations to be in touch with their clients.

24              I appreciate, Mr. Kabat, that it is difficult to speak

25   with clients who speak a foreign language.  I am pleased that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Iac6ter2

1    the Lewis Baach firm has got involved in this case.  I think

2    everybody would agree that responsiveness to discovery has

3    improved as a result of having Arabic-speaking lawyers who have

4    the capacity to be in Saudi Arabia and meeting with clients.  I

5    think we have seen a better responsive rate.  I don't think it

6    is because Mr. Kabat has been acting inappropriately, but I

7    think he has been facing hurdles that I think the Lewis Baach

8    firm hasn't seen at this point.  I think everyone has seen an

9    improvement on that.

10           I don't think there is any relief to be granted here.

11   I will remind everybody of their obligation to be candid with

12   one other, to clear with your clients, and make sure that you

13   are having regular contacts with your clients.  Obviously from

14   the defendant's perspective, your clients are being charged

15   with very serious allegations.  I am sure they take the charges

16   seriously, but they cannot just ignore the case.  They need to

17   participate in the case and they need to be in regular contact

18   with you.  So I encourage you all to have any number of ways to

19   get ahold of your clients should the need be called upon.

20   Other than that admonishment, I don't think there is any relief

21   that is necessary.

22           Can I ask plaintiffs counsel to bring to my attention

23   if necessary issues related to al Buthe deposition if there are

24   open issues how that is going to go forward.  I don't need to

25   hear about them now, but don't let it slip away.

Iac6ter2

1          MR. CARTER:  Your Honor, we will.  We may have some

2     issues with regard to tweaks to the deposition protocol now

3     that we have done this a few times.  There was a mention by

4     Mr. Lewis about difficulties with the Arabic translation.  We

5     may have some proposals on that front, but we'll bring them to

6     you separately.

7          THE COURT:  Please do have a meet and confer.

8          Thank you, everybody.

9                              -o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25