# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS ON       :
SEPTEMBER 11, 2001           :     MDL 03-1570 (GBD)(SN)

**This Document Relates To:**

*Havlish, et al. v. bin Laden, et al.,* **Case No. 03-CV-09848**
*Ashton, et al. v. al Qaeda Islamic Army, et al.,* **Case No. 02-CV-06977**
*Burnett, Sr., et al., v. Islamic Republic of Iran,* **Case No. 15-CV-9903**
*Burlingame, et al. v. bin Laden, et al.,* **Case No. 02-CV-07230**
*Bauer, et al. v. al Qaeda Islamic Army, et al.,* **02-CV-07236**
*O'Neill, Sr., et al. v. Republic of Iraq, et al.,* **Case No. 04-CV-1076**
*Federal Insurance Co., et al. v. al Qaida, et al.,* **Case No. 03-CV-06978**

----
*Dillaber, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-03162**
*Agyeman, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05320**
*Morris, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05321**
*Derubbio, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05306**
*Schlissel, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05331**
*Kamardinova, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05339**
*Ades, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-07306**

## MEMORANDUM OF LAW
### IN SUPPORT OF THE *HAVLISH* PLAINTIFFS' RENEWED MOTION
### FOR AN ORDER CREATING A COMMON BENEFIT FUND AND
### AUTHORIZING CERTAIN DISBURSEMENTS THEREFROM

The *Havlish* Plaintiffs, by and through their counsel, respectfully present this

memorandum in support of their renewed motion to this Court, pursuant to its inherent equitable

powers, to enter an Order to create a common benefit fund, and, further, authorizing certain

disbursements therefrom. This motion pertains to all member cases of this MDL that have

named as defendant(s) the Islamic Republic of Iran and/or its agencies and instrumentalities,

which the *Havlish* Plaintiffs have endeavored to list above (the second group is cases that have

not yet proceeded to judgment). There are other cases which have been subsumed under the

*Ashton* case.

## I.    SUMMARY OF THE RELIEF REQUESTED

Over the last two and one-half years, this Court, has granted numerous motions for entry of partial final default judgment against the Islamic Republic of Iran and certain of Iran's political subdivisions and agencies and instrumentalities (collectively referred to as "Iran") in various actions within this multi-district litigation.  A detailed list of said actions and default judgments is appended hereto and hereinafter referred to collectively as the "Responding Plaintiffs" or "Respondents").

As the basis for their judgments, each and every one of the Responding Plaintiffs used, and exclusively relied upon, the evidence and legal argument developed and presented to this Court in *Havlish, et al. v. bin Laden, et al.*, 03-CV-09848.  The *Havlish* evidence and argumentation was the product of tens of thousands of attorney hours and the investment of millions of dollars in costs and expenses borne solely by the *Havlish* attorneys.  The Responding Plaintiffs and their attorneys are now poised to reap the benefit of that evidence, having contributed nothing to its development and presentation.

This Court denied without prejudice the original motion of the *Havlish* Plaintiffs for an order creating a common benefit fund by its order of August 2, 2016 (*In Re: Terrorist Attacks on September 11, 2001*, MDL Doc. No. 3322, attached as Exhibit 1), which adopted the July 12, 2016 Report and Recommendation of Magistrate Judge Maas.  Doc. No. 3309, attached as Exhibit 2.  The Court's concern, as expressed in the Order of August 2, 2016, was that: "Magistrate Judge Maas based his recommendation on the fact that it would be premature to reach the merits of the motion because at this point the amount of effort Respondents will expend to collect their award from Iran, and the sums, if any, that they will actually recover, would be pure speculation."  Doc. No. 3322 at 1.  This renewed motion is now ripe because the

Respondents will, in early 2019, recover substantial sums of money, in amounts fairly estimable, from the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") with no effort other than to file an application form.  http://www.usvsst.com/faq.php.  Exhibit 3 to the Renewed Motion is a list of member cases in this MDL that have proceeded to a liability and damages judgment, and the number of plaintiffs receiving a damages judgment therein, or only a liability judgment.  All, or most, of these judgment holders appear to be eligible for VSST awards.  Other cases are still being filed.  *E.g.*, *Parker, et al. v. Islamic Republic of Iran*, 18-CV-11416.  This motion is intended to apply to all cases against Iran and its agencies and instrumentalities filed in this MDL, including any newly filed or yet to be filed.

The USVSST Fund was created and funded by an act of Congress, 34 U.S.C. §20144, "to provide compensation to a specific group of international terrorism victims harmed by state sponsored terrorism.  In general, the USVSST Fund is designed to award compensation to those victims of international state sponsored terrorism who (1) have secured final judgments in a United States district court against a state sponsor of terrorism, or (2) were held hostage at the United States Embassy in Tehran, Iran from 1979 to 1981 (and their spouses and children)." http://www.usvsst.com/faq.php.

The USVSST Fund was originally funded by Congress' designation of a portion of certain monies derived from U.S. Department of Justice prosecutions against entities that violated U.S. sanctions against Iran and other state sponsors of terrorism.[1] The USVSST Fund is replenished, on a continuing basis, through "qualifying case deposits" from further such

---

[1]  The Consolidated Appropriations Act, 2016 (H.R. 2029, Pub. L. No. 114-113), provides for the creation of the United States Victims of State Sponsored Terrorism Fund, which earmarks funds from fines and penalties paid into the U.S. Treasury by banks that settled federal prosecutions for money laundering for foreign state sponsors of terrorism, principally Iran.  *See* Pub. L. No. 114-113, Sec. 404, pp. 766-776.

prosecutions by the Justice Department.[2]

January 1, 2019 is the statutory deadline for the Special Master of the USVSST Fund to authorize the second round of payments on a *pro rata* basis to claimants with eligible claims. http://www.usvsst.com/important.php.  The total "qualifying case deposits" to be distributed in early 2019 are, as of the present, $1.095 billion. "The USVSST Fund has allocated $1.095 billion for second-round payments.  The Special Master will authorize second-round payments on a pro rata basis to claimants with eligible claims by January 1, 2019."  *See*  http://www.usvsst.com "Important Announcement."  The VSST has just recently started to send out the notification letters to claimants last week; the undersigned counsel received the first such letters on Friday, December 14, 2018.

The USVSST Fund will continue, through January 1, 2026, to disseminate any further monies deposited into the Fund on an annual basis in any year in which the Fund exceeds $100,000,000 or in which the Attorney General deems there is enough money in the Fund to warrant a distribution.  34 U.S.C. §20144 (b)(1)(A)(ii); §20144 (e)(6)(B).  For those succeeding years, no substantial legal or administrative work is needed on behalf of qualified claimants other than updating the information in their claim forms.

The *Havlish* Plaintiffs request an order, detailed below, creating a common benefit fund for the purpose of compensating and reimbursing the *Havlish* attorneys for services performed

---

[2] Such "qualifying case deposits are defined as:
   For proceeds or penalties to qualify for deposit in the USVSST Fund, the underlying matter must arise "from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (IEEPA) or the Trading with the Enemy Act (TWEA), or any related conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism." *Id.*  (internal citations omitted.)  For criminal matters, all funds and the net proceeds from the sale of property from such violations must be deposited in the USVSST Fund.  *Id.*  For civil matters, one-half of all funds, and one-half of all proceeds from the sale of property, must be deposited.  *Id.*
http://www.usvsst.com/deposits.php

and expenses incurred in developing and presenting the evidence and legal argument that resulted in the *Havlish* Findings of Fact and Conclusions of Law and established liability against Iran.  The *Havlish* evidence and the *Havlish* Findings of Fact and Conclusions of Law were subsequently used to produce liability and damages findings and, ultimately, final judgments for each of the Responding Plaintiffs.  In light of these facts, and the case law, discussed *infra*, and the facts surrounding the expected recovery from the USVSST Fund by the Responding Plaintiffs (except for the *Federal Insurance* Plaintiffs), the *Havlish* Plaintiffs seek an order directing the Responding Plaintiffs to deposit the sum of twelve percent (12%) of their recoveries into the common benefit fund.  The *Havlish* Plaintiffs acknowledge that their motion filed two years ago, deemed premature by the Court, requested eight percent (8%), but, the passage of time and clarification of the USVSST Fund status as well as the entry of the Responding Plaintiffs' judgments indicated the revision.  The *Havlish* Plaintiffs look to the Court for its judgment to set the most appropriate percentage under the facts surrounding this matter.

Further, the *Havlish* Plaintiffs request that the Court authorize payments to the *Havlish* attorneys of all sums placed into the common benefit fund by virtue of USVSST Fund distributions received by the Responding Plaintiffs in 2019 and continuing through all future years of the USVSST.  In particular, the *Havlish* Plaintiffs seek an order:

(1) directing the Responding Plaintiffs to set aside twelve percent (12%) of any amounts collected on the Responding Plaintiffs' judgments by any means;

(2) directing counsel for the Responding Plaintiffs to deposit such assessed amounts into a common benefit fund escrow account to be established and maintained by lead counsel for the *Havlish* Plaintiffs, and to notify *Havlish* lead counsel of the origin or source of such collected funds;

(3) to the extent such deposited funds were derived from payments to Responding

Plaintiffs by the USVSST Fund, directing the distribution of such funds to the *Havlish*

attorneys as reimbursement of costs associated with, and compensation for, the benefit

bestowed upon Responding Plaintiffs; and

(4) ) to the extent such deposited funds were derived from judgment collection sources

other than the USVSST Fund, whenever they occur, directing that distribution of such

funds to the *Havlish* attorneys, or to other attorneys, or returned to the Responding

Plaintiffs and their counsel who made the deposit, in whole or in part, be subject to the

Court's consideration of the particular facts and circumstances surrounding such

judgment collection(s), and be subject to further order(s) by the Court.

## II.    FACTUAL BACKGROUND

### A.    THE *HAVLISH* PLAINTIFFS' DEVELOPMENT AND PRESENTATION OF EVIDENCE ESTABLISHING THE LIABILITY OF THE ISLAMIC REPUBLIC OF IRAN

On December 9, 2003, the Judicial Panel on Mutidistrict Litigation transferred to this

Court all lawsuits brought by plaintiffs seeking "to hold liable an array of defendants who

allegedly promoted, financed, sponsored, or otherwise supported the acts of terrorists that led to

the deaths and injuries arising from the September 11, 2001 attacks on the United States." *See*

03-md-1570, MDL Doc. No. 1, Conditional MDL Transfer Order.  In five of the actions

consolidated pursuant to that Order, plaintiffs have asserted claims against the Islamic Republic

of Iran.[3]

---

[3] Through this motion, the *Havlish* Plaintiffs seek an order requiring the Responding Plaintiffs to compensate and reimburse the *Havlish* attorneys for their expertise, effort, and investment in developing and presenting evidence that led to judgments for Responding Plaintiffs.  Plaintiffs in another pending action, *Hoglan, et al. v. Islamic Republic of Iran, et al.*, Case No. 11-CV-07550 (GBD(SN), also sought a judgment against Iran through use of the evidence presented in *Havlish*.  The same is true of the soon-to-

The claims asserted in the *Havlish* action are more focused and narrowly tailored than the claims asserted by the Responding Plaintiffs.  While the pleadings in all of these actions include common defendants Osama bin Laden, al Qaeda, and the 9/11 hijackers, the defendants being pursued by the Responding Plaintiffs include both Iran and the Kingdom of Saudi Arabia and also a number of businesses, charities, commercial organizations, and individuals located in the United States, Saudi Arabia, and other parts of the Middle East.  As clearly demonstrated by the court dockets and the many hearings in these MDL proceedings, the Responding Plaintiffs actions have devoted their efforts and resources almost exclusively to pursuing claims against the Kingdom of Saudi Arabia and related non-sovereign state defendants.

By contrast, the *Havlish* action was pursued against bin Laden and al Qaeda, and also the Islamic Republic of Iran, political subdivisions of Iran, including two individuals who are/were heads of state and government, and agencies and instrumentalities of Iran.  Initial investigation into the factual background of the events of 9/11, furthered by the information and ending sentence of the subsection at pages 240-41 of the 9/11 COMMISSION REPORT, led the *Havlish* attorneys to believe that the sovereign state primarily responsible for providing direct and material support to the 9/11 hijackers was the Islamic Republic of Iran and its political subdivisions and agencies and instrumentalities.  Thereafter, the *Havlish* attorneys focused their efforts on establishing liability against Iran and Hezbollah.

Over a ten-year period, the *Havlish* legal team invested tens of thousands of hours of attorney time and underwrote nearly $2 million in costs and expenses in pursuit of evidence

---

be filed *Ray* case.  However, the *Hoglan* and *Havlish* Plaintiffs are represented by common attorneys (with a couple of exceptions) and the *Hoglan* Plaintiffs have agreed contractually to compensate the *Havlish* attorneys in a manner similar to the common benefit fund mechanism that the *Havlish* Plaintiffs seek here.  For that reason, the *Havlish* Plaintiffs have not included *Hoglan* or *Ray* among the Responding Plaintiffs' actions.

against Iran.  *See Havlish* Doc. No. 301, at Ex. M, Affidavit of Thomas E. Mellon, Jr., Regarding

Attorney Expenses.  Among other things, *Havlish* attorneys identified, located, and interviewed

or consulted with dozens of expert and fact witnesses, in the United States, Canada, Europe, and

the Middle East.  Those witnesses included the first president of the Islamic Republic of Iran and

a number of defectors from the Iranian military, the Islamic Revolutionary Guards Corps

("IRGC"), and Iran's Ministry of Information and Security ("MOIS").  Also among them were

numerous persons connected with terrorist organizations, counter-terrorism agencies and

organizations, domestic federal and international law enforcement, the militaries of several

countries, as well as several 9/11 Commissioners and Commission staff, and other individuals

knowledgeable about terrorist operations, recruitment, financing, travel, planning, training,

and/or communications, as well as the history, methodology, and purposes of state-sponsored

terrorism.  During the course of the investigation, *Havlish* counsel conducted extensive research,

including a review of innumerable books, treatises, and government reports in order to develop

familiarity with, and in fact gain some level of expertise in terrorism and new areas of law, as

well as geography, history, language, religion, culture, and governments of the Middle East, and

even weaponry and explosives.  Some of the work was risky, and even dangerous, other parts

simply uncharted, complex, or arduous.

　　　　All of the *Havlish* investigation and legal work was entirely necessary.  The Congress

and the 9/11 Commission had both conducted investigations, and both had placed responsibility

for the September 11, 2001 terrorist attacks on al Qaeda.  However, although both found

indications of potential state sponsor involvement in the attacks, neither concluded that there

was, or wasn't, any such state sponsor.  Yet, the 9/11 Commission, significantly, had found

evidence of Iran's and Hezbollah's involvement, based upon the Commission's eleventh-hour

examination of National Security Administration ("NSA") satellite intercepts.[4]  The Commission inserted into its 9/11 COMMISSION REPORT (holding up final publication in order to do so) a two-page section entitled "Assistance from Hezbollah and Iran to al Qaeda," which concludes with the following sentence: "We believe this topic requires further investigation by the U.S. government."  9/11 COMMISSION REPORT at p. 241.  Since then, there has been no publicly-acknowledged investigation of this topic by the U.S. government.  The *Havlish* team pursued the further investigation.

While the *Havlish* attorneys devoted all of their efforts to discovering and presenting evidence of Iran's liability to this Court, the Plaintiffs' Executive Committee ("PEC")[5] considered the development of such evidence to be of little consequence in the broader MDL. Indeed, in 2010, lead counsel in *Ashton* openly declared that the Plaintiffs' Executive Committee "vigorously opposed" the *Havlish* Plaintiffs' request to make their presentation of evidence against Iran in this Court, referring to the *Havlish* case and the efforts of the *Havlish* attorneys as "the hair on the tail of the dog doing something that we think could kill the dog."  *See* Exhibit 4, Transcript of Conference held April 15, 2010, at pp. 16-18 (*highlighted*).

In the face of opposition from the PEC, and in light of the conclusions of the 9/11 Commission, the *Havlish* Plaintiffs made every effort to ensure that its case against Iran was both factually and procedurally solid.  In their original pleadings, the *Havlish* Plaintiffs had asserted

---

[4]  According to 9/11 Commission Staffer Janice Kephart, "On July 30, 2004, the work of the *9/11 Commission* was done. A week prior, it seemed that the statutory shutdown of Commission work was more than untimely: there had been a new stash of materials found at NSA pertaining to potential Iranian support for al Qaeda's 9/11 operation against the United States …."  *See* Exhibit 8, https://www.linkedin.com/pulse/honor-privilege-serving-911-commission-janice-kephart.  *See also* Exhibit 9, Philip Shenon, The Commission, at pp. 370-73 (underscoring and markings by reader, not specifically for this motion).
[5]  In the early stages of this litigation, this Court appointed counsel in two of the Responding Plaintiffs' actions, *Ashton* and *Federal Insurance*, as Chairs of the PEC.  *See* MDL Doc. No. 248, Case Management Order No. 3.

claims against Iran pursuant to §1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA"),
28 U.S.C. §1602, *et seq.*, as well as a number of state and federal common law and statutory
claims.  In August 2008, the *Havlish* Plaintiffs filed a motion for default judgment against Iran.
*See Havlish* Doc. No. 233.  Around the same time, Congress repealed the FSIA's §1605(a)(7)
and replaced it with §1605A, which created a federal private right of action against foreign state
sponsors of terrorism.  The *Havlish* Plaintiffs thereupon filed a motion for leave to amend their
Complaint in order to proceed under the new statutory scheme.  The *Havlish* motion set out the
background and substance of the new law and the basis for its retroactive application.  *Havlish*
Doc. No. 250.  This Court granted that motion on June 17, 2010.  *Havlish* Doc. No. 262.

Having ensured the proper procedural framework, the *Havlish* Plaintiffs filed their proof
on liability comprising three separate legal memoranda, totaling 176 pages, a twenty-three (23)
page appendix containing additional relevant material, and eighty-five (85) exhibits, with an
index to the ten experts' affidavits. *Havlish* Doc. Nos. 270, 273-276, 280, 283.  Among the 85
exhibits were the sworn videotaped testimonies of four Iranian witnesses taken overseas by
*Havlish* counsel, comprising, collectively, approximately thirty (30) hours.  Due to the highly
sensitive nature of some of the presented material and the dangers posed to the witnesses, the
Court granted the *Havlish* Plaintiffs' motion to file under seal the testimony of three of the
witnesses, the accompanying exhibits, and several related affidavits and declarations, as well as
the lengthy legal memorandum discussing that evidence.  *Havlish* Doc. Nos. 278-280.  The
testimony of Iran's first president, Abolhassan Banisadr, was filed without seal.  None of this
sealed evidence was available through open sources.

Included in the *Havlish* evidence were sworn affidavits, with exhibits, totaling
approximately 1,000 pages, by ten experts in the fields of terrorism, intelligence, criminal

investigation, and the structural aspects of the state, the government, and the agencies and instrumentalities of the Islamic Republic of Iran.  These ten experts included three senior staff members of the 9/11 Commission, three former CIA operatives or analysts, the most esteemed American expert on Iran's government and economics, France's preeminent terrorism prosecutor, the top terrorism and military intelligence investigative journalist in Israel, and the former top U.S. official of Interpol.  One of the witnesses, an authoritative American investigative journalist and author, worked hundreds of hours with *Havlish* counsel throughout the investigation, domestically and overseas.  The *Havlish* attorneys spent innumerable hours selecting, vetting, retaining and tasking, consulting with, and reviewing the affidavits of, each of these ten expert witnesses.  Most of this evidence was not available through open sources; that portion which was available required a great deal of work to find, analyze, assemble, and present through experts.

Further, *Havlish* counsel spent hundreds of hours interviewing and consulted with scores of other experts, witnesses, and current and former government officials in the U.S., Europe, and the Middle East.  Many of these subject matter experts provided insights into potential areas of investigation; others provided advice and/or information about pertinent fields of intelligence, history or politics, security, language, customs, or backgrounds of potential sources.  The *Havlish* team also retained consultants who were subject matter experts from the United States, Europe, and the Middle East who reviewed portions of the evidence and work product gathered or produced by the *Havlish* attorneys to evaluate it for accuracy, materiality, credibility, corroboration with known facts or intelligence, persuasiveness, or validity.

One *Havlish* attorney made fourteen (14) separate trips overseas during the investigation, most of them quite lengthy, some with the aforementioned American investigator.  He also met

with innumerable experts and consultants domestically from coast to coast.  The investigator, who was retained by the *Havlish* attorneys, made several other international journeys to find witnesses, debrief them, ascertain their willingness to testify, and, further, debriefed numerous governmental officials and other authoritative sources regarding the witnesses' credibility and trustworthiness.  The *Havlish* attorney and the investigator spent weeks overseas debriefing and vetting each witness, establishing their bona fides, and submitting each to exhaustive interrogations and vetting before taking their sworn videotaped testimony.  They also undertook efforts to make these witnesses and/or their information available to U.S. law enforcement and other governmental authorities, and, subsequently, to protect each of them from harm.

Another *Havlish* attorney made four trips abroad in connection with the investigation and the testimony, as well as consulting with many experts and consultants domestically.  Other *Havlish* attorneys also traveled internationally in connection with the investigation, and all of the team members, on innumerable occasions, travelled extensively within and across the United States for purposes of meeting with experts, consultants, and each other.

The founding leader of the *Havlish* consortium of attorneys, Thomas E. Mellon, Jr., worked valiantly on the case for more than a decade while being treated for advanced cancer; indeed, he continued to work on the case and lead the *Havlish* consortium until the day he died, on January 15, 2013.

The assembly of the *Havlish* evidence, and the briefing, took months, with the briefs going through countless drafts to make sure that the evidence was presented carefully and accurately in every detail.  The gravity of the case demanded no less.

Subsequent to the filing of the evidence, *Havlish* counsel requested an opportunity to present the evidence in open court, which this Court granted, despite the opposition of the PEC.

At a hearing on July 13, 2011, the co-chairman of the PEC argued to this Court that such a

hearing should not be afforded to the *Havlish* Plaintiffs because it would, somehow, interfere

with a vaguely described notion of diplomatic negotiations emanating from the birth of the state

of South Sudan, which would then "start a cascade of resolutions with other defendants over

time."

```
13         I want to comment on the Havlish motion that your
14    Honor addressed.  We are very concerned with timing.  If a
15    hearing occurs at the wrong time, it will or it could derail
16    resolution with Sudan.  . . . . .
. . . .
23    . . . .  But we have a well-thought-out strategy for the
24    thousands of death cases, the thousands of injury cases, and
25    the property damage, and we are very concerned with the timing.
 1    If a hearing there occurs at the wrong moment, it could kill
 2    the process with Sudan . . . .
```

*See* Exhibit 5, filed herewith, Transcript of Conference held July 13, 2011, at pp. 10-11

(*highlighted*).[6]  This Court nevertheless granted an evidentiary hearing over the objections of the

Plaintiffs' Executive Committee.

At the evidentiary hearing on December 15, 2011, the *Havlish* attorneys made an in-

depth presentation of the public evidence, and some aspects of the sealed evidence, in open

court.  Based upon that evidence, this Court found that the *Havlish* Plaintiffs had proven their

case by evidence satisfactory to the Court, as required by the FSIA.  *Havlish* Findings of Fact

and Conclusions of Law, *Havlish* Doc. No. 294, at p. 49; *see* 28 U.S.C. §1608(e).  The Court

shortly thereafter adopted and entered fifty-three (53) pages of detailed Findings of Fact and

Conclusions of Law proposed by the *Havlish* attorneys.  *Havlish* Doc. No. 294.  The Court

---

[6] Notably, the *Havlish* Plaintiffs did not pursue a judgment against Sudan, or South Sudan, and there is
not a scintilla of evidence offered to the Court or in available open source information that any such
diplomatic negotiations regarding these liability cases were affected in the slightest by the *Havlish*
hearing, or, indeed, that they ever occurred.

entered a liability judgment against Iran in favor of the *Havlish* Plaintiffs on December 22, 2011.
*Havlish* Doc. No. 295.

Shortly thereafter, the Court ordered a damages inquest, heard initially by Magistrate
Judge Maas.  The *Havlish* Plaintiffs submitted voluminous damages inquest briefing and
evidence that included not only evidence from the *Havlish* Plaintiffs themselves, but also from
two experts.  The first was an expert in economic analysis of lost earnings; the other was retired
Rear Admiral Alberto Diaz, Jr., M.D., of the United States Navy who was, *inter alia*, Chief of
Staff for the Navy's Bureau of Medicine and Surgery.  Dr. Diaz attested to the overwhelming
physical, psychological, and neurophysiological aspects of the horrific deaths of the 9/11
victims.  In significant part, the expert testimony of Admiral Diaz underpinned the pain-and-
suffering awards of $2 million for each decedent that ultimately comprised a portion of the
*Havlish* judgment.  In his July 30, 2012, Report and Recommendation on Damages, Magistrate
Judge Frank Maas relied specifically upon Dr. Diaz's report regarding his "chilling account of
the horrific conditions" encountered by each of the 9/11 decedents and their "unimaginable pain
and suffering on September 11, 2001," as well as case law cited in the *Havlish* Plaintiffs'
damages inquest memorandum, recommending that this Court award $2 million in pain-and-
suffering damages to each decedent estate.  *Havlish* Doc. 314, p. 8.  This Court adopted
Magistrate Judge Maas' Report and Recommendation in its entirety, also citing Plaintiffs' expert
report by Dr. Diaz, and awarded $2 million for each decedent's pain and suffering.  *Havlish* Doc.
316, p. 3.

Further, this Court awarded solatium compensatory damages to all of the qualified
immediate family member plaintiffs, including some functional equivalents of immediate family
members, in *Havlish* in the following amounts: $12,500,000 for each spouse of a 9/11 decedent;

$8,500,000 for each child; $8,500,000 for each parent; and $4,250,000 for each sibling.  Each of those solatium award amounts represents an enhancement from solatium awards in other terrorism cases, which the *Havlish* attorneys had advocated in their damages inquest briefing, based upon the special circumstances of, and the continuing, and sometimes overwhelming, public attention to the September 11, 2001 terrorist attacks.  *Havlish* Doc. No. 314 at pp. 10-11, *Havlish* Doc. No. 316, p. 4.

This Court also awarded prejudgment interest dating from September 11, 2001 to the date of final judgment.  *Havlish* Doc. No. 314, pp. 13-14, and *Havlish* Doc. No. 316, p. 5.

Finally, this Court awarded punitive damages at a ratio of 3:44 to 1, adopting Magistrate Judge Maas' recommendation that was based upon case law cited in the *Havlish* Plaintiffs' damages inquest brief.  *Havlish* Doc. 314, pp. 12-13, and *Havlish* Doc. No. 316, p. 5.

This Court entered final judgment in *Havlish* on October 12, 2012.  *Havlish* Doc. 317.

**B.**     **USE OF THE *HAVLISH* EVIDENCE IN RESPONDING PLAINTIFFS' ACTIONS IN THIS MDL**

On October 12, 2012, the same day this Court entered judgment against Iran in *Havlish*, the Responding Plaintiffs commenced the required *initial* step in obtaining default judgments by filing a request for a Clerk's Certificate of Default against Iran.  *See Ashton* Doc. No. 651.

Two and a half years later, the Responding Plaintiffs filed motions for leave to file amended complaints in order to proceed under §1605A of the FSIA.  These were classic "me too" motions wherein the Responding Plaintiffs relied almost exclusively on the legal analysis, reasoning, and result obtained by the *Havlish* attorneys in their 2008 filing.  *See* MDL Docket 03-1570, MDL Doc. No. 2968 (joint motion of *Federal Insurance* and *Ashton* Plaintiffs), and MDL Doc. No. 2922 (motion of the *O'Neill* Plaintiffs).

At the same time, the Responding Plaintiffs filed motions for entry of default judgments against Iran.  MDL Doc. Nos. 2969, 2970, 2994-2995, 3000.  The Responding Plaintiffs specifically cited the *Havlish* liability evidence, and the Findings of Fact and Conclusions of Law resulting from them, thoroughly and repeatedly, and cited virtually nothing else (except one expert's testimony, also from another case), while contributing no new evidence themselves. MDL Doc. Nos. 2970, *passim*; *see also O'Neill*, MDL Doc. No. 3000.[7]

The Court, correctly assessing that the Responding Plaintiffs' motions for default judgment were entirely derivative of *Havlish*, ordered counsel in all the Iran cases in this MDL to file revised proposed forms of default judgment that "track the language and format of the Order of Judgment issued in *Havlish, et al. v. bin Laden, et al.,* 1:03-CV-09848 (GBD), such that all proposed orders are uniform but for any substantive differences (*e.g.*, the individual defendants at issue)."  MDL Doc. No. 3004.  The Court granted those refiled motions.  MDL Doc. Nos. 3020-3022.

In their damages submissions, the Responding Plaintiffs in *Ashton* again utilized the evidence and findings from *Havlish* to support their requests for damages awards.  Indeed, the *Ashton* Plaintiffs predicated their compensatory and punitive damages entirely upon the *Havlish* compensatory and punitive damages awards and the testimony of the *Havlish* Plaintiffs' pain-and-suffering expert, Admiral Diaz, in support of their request for $2 million compensatory damages awards, and punitive damages set at a ratio of 3:44 to 1 for each *Ashton* estate Plaintiff. *Ashton*, MDL Doc. No. 3123, *passim*.  As to Admiral Diaz specifically, the *Ashton* Plaintiffs

---

[7] The *Ashton* and *Federal Insurance* Plaintiffs' memorandum acknowledged that it did not offer any new or different evidence and relied entirely on the *Havlish* evidentiary record and findings, stating: "Although additional materials could be offered to augment that record, the Court's holdings in *Havlish* render any such supplementation unnecessary. . . ."  The *Ashton* and *Federal Insurance* Plaintiffs then asked for default judgment to be entered on the basis of the [*Havlish*] evidence the Court previously received and analyzed . . . ."  MDL Doc. 2970, at p. 21.

stated: "Despite this challenge, the magistrate judge found that while 'the specifics of each decedent's demise remain largely unknown,' the expert report of a retired Navy Rear Admiral established 'that many, if not all, of the decedents in this case experienced unimaginable pain and suffering on September 11, 2001.'" *Id.*, p. 7.[8]

On December 28, 2015, Magistrate Judge Maas issued a Report and Recommendation regarding the *Ashton* and *Federal Insurance* Plaintiffs' damages. Regarding *Ashton*, he recommended pain-and-suffering damages of $2 million per decedent estate, and punitive damages at the ratio of 3:44 to 1, both the same as in *Havlish*, citing the *Havlish* evidence and awards upon which *Ashton* had relied. MDL Doc. No. 3175, at pp. 2-3. On March 9, 2016, this Court adopted the Report and Recommendation in its entirety and awarded default judgments in those amounts. MDL Doc. No. 3229.[9]

The cases of the Responding Plaintiffs have all proceeded to partial final judgments with compensatory damages awards of $2 million for pain and suffering per decedent, and $12.5 million in solatium damages for each spouse of a 9/11 decedent, $8.5 million in solatium damages for each parent and each child of a 9/11 decedent, and $4.25 million in solatium damages for each sibling of a 9/11 decedent. In *Ashton* (and its subsumed cases), *Bauer*,

---

[8] The *Ashton* Plaintiffs requested:

> that in light of the Court's recent Order of Default Judgment on Liability against Iran in their behalf, and on the basis of the facts detailed in the damages submissions provided by the *Havlish* plaintiffs in connection with the Damages Decision and the Damages Judgment in that matter, this Court grant the *Ashton* plaintiffs compensatory damages of $2,000,000 for the conscious pain and suffering experienced by each of their decedents and a punitive damages award at the rate of 3.44 times the compensatory damages award (as it did in the *Havlish* cases) . . . .

*Id*. at p. 2.

[9] The punitive damages portion of the Responding Plaintiffs' judgments remains under reconsideration, and the Responding Plaintiffs received prejudgment interest awards that differed from the *Havlish* Plaintiffs; neither presents any material issue for purposes of this motion because the USVSST Fund ignores both punitive damages and prejudgment and post-judgment interest; the USVSST bases its *pro rata* awards entirely on compensatory damages. *See* 34 U.S.C. §20144 (c)(2) and (j)(3).

*Burlingame*, and *Burnett,* some 3,339 plaintiffs have received such judgments based entirely on the *Havlish* evidence and Findings of Fact and Conclusions of Law and compensatory damages determinations.  *See* Exhibit 3.  So far, the judgments entered against Iran and in favor of the Responding Plaintiffs far exceed $10 billion.  MDL Doc. Nos. 3226, 3229, 3233.[10]

Some of the Responding Plaintiffs have stated their intentions to file claims with the USVSST Fund, and the *Havlish* Plaintiffs believe that all or most have done so.  The number of USVSST claims spiked from 2,883 in 2016 (for the 2017 payout), of which 2332 were eligible and authorized for first-round payments, to 5,858 claims in 2018 (for the 2019 payout).  The Special Master has published that 2,116 claims from 2016 remain eligible for second-round payments in 2019, and the difference of 3,742 claims appears to be attributable entirely, or almost entirely, to the Responding Plaintiffs' judgments.  *See* http://www.usvsst.com Exhibit 6, USVSST "Claim Statistics," found at http://www.usvsst.com/index.php, and Exhibit 7, Report From The Special Master, at p. 7, found at

http://www.usvsst.com/docs/USVSST%20Fund%20Congressional%20Report%201-9-17.pdf.

Thus, the Responding Plaintiffs figure to receive approximately two-thirds of the USVSST Fund payments in 2019, *i.e.*, approximately $700 million or more, in satisfaction of their judgments.[11]

---

[10]  Damage determinations of the *O'Neill* Plaintiffs and the *Ashton* personal injury Plaintiffs (*i.e.*, those injured but not killed on 9/11) remain pending.  This motion is intended to encompass those cases as well, should judgments be entered in favor of those Plaintiffs.  The *Ashton* personal injury Plaintiffs also seek identical $2 million compensatory damages and 3:44 ratio punitive damages awards, predicated almost entirely on the *Havlish* Report and Recommendation and the *Havlish* evidence.  *See Ashton* Motion for Partial Summary Judgment, MDL Doc. No. 3191, pp. 2-4.

[11]  The *Federal Insurance* Plaintiffs are excluded in this regard because companies are not eligible for USVSST awards.  Thus, although the *Federal Insurance* Plaintiffs should still be required to pay into the common benefit fund from other sources of judgment collection, how those funds would be paid out, or returned, would be subject to further orders of the Court.  The *O'Neill* Plaintiffs, and the Plaintiffs in other cases against Iran in this MDL also have not moved for final judgment, but, should they do so and receive judgments against Iran, its agencies or instrumentalities, the *Havlish* Plaintiffs request that they be held subject to the same common benefit fund orders as *Ashton*, *Burnett*, *Bauer*, and *Burlingame*.

III.   **ARGUMENT**

    A.   **THIS COURT HAS INHERENT EQUITABLE AUTHORITY TO CREATE THE COMMON BENEFIT FUND REQUESTED HERE BY THE *HAVLISH* PLAINTIFFS**

For well over one hundred years, the United States Supreme Court has recognized the inherent equitable power of federal courts to correct the type of injustice that has manifested in these cases involving the liability of Iran, and the federal courts in all circuits routinely do so, especially in the context of an MDL proceeding.  Through this motion, the *Havlish* Plaintiffs ask this Court to exercise that equitable power here.

This Court unquestionably has the equitable authority to grant the relief sought here by the *Havlish* Plaintiffs.  In U.S. courts, attorney fees are generally subject to the "American Rule," under which each party is responsible for the attorney fees charged by its retained counsel and is not responsible for attorney fees of any other counsel.  *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 264-65 (1975).  However, there are exceptions to the American Rule; one exception is the "common fund" or "common benefit" doctrine.  Under the common benefit doctrine, attorneys who provide a substantial benefit to a successful class or group of plaintiffs are entitled to fees for the work performed and expenses incurred in delivering that benefit.  *See In re Vioxx Products Liability Litigation*, 760 F.Supp.2d 640, 647 (E.D. La. 2010); *see generally* Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. Law Rev. (2014).

Three of the earliest common benefit cases – *Trustees v. Greenough*, 105 U.S. 527 (1881), *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), and *Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939) – are instructive on the scope of a court's equitable authority to grant the relief sought here by the *Havlish* Plaintiffs.  The seeds for what is now recognized as the common benefit doctrine were planted long ago in *Greenough*, where one Francis Vose, a

large holder of railroad bonds, filed suit to preserve certain assets of a trust fund that served as security for his bonds. After a decade of litigation, Vose's lawsuit resulted in the restoration of substantial fund assets, the appointment of a receiver to manage the trust, and the recovery of money and dividends to the bondholders. *Greenough*, 105 U.S. at 529.

Vose bore the entire cost of the litigation that had bestowed benefits on all bondholders. He therefore petitioned the court for reimbursement of his costs from the trust fund. The court granted the requested relief and ordered reimbursement from the fund. The Supreme Court upheld the decision and found that order to be appropriate based on principles of equity:

> [denial of Vose's reimbursement request] would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage. He has worked for them as well as for himself; and if he cannot be reimbursed out of the fund itself, they ought to contribute their due proportion of the expenses which he has fairly incurred. To make them a charge upon the fund is the most equitable way of securing such contribution.

*Id*. at 532.

Thus, the Court in *Greenough* determined that, where a party litigant has incurred costs that resulted in a benefit to similarly situated litigants and non-litigants, an order requiring reimbursement of those costs from a common fund is an appropriate use of a court's equitable authority. Four years later, in *Pettus*, another case involving railroad bondholders, the Court extended that reasoning to an attorney's petition for common benefit legal fees.

In *Pettus*, a small number of unsecured railroad corporation bondholders hired attorneys to prosecute litigation aimed at protecting the bondholders' interest in certain corporate property. After obtaining a successful result, the attorneys petitioned the court for an award of fees to be paid by non-client bondholders who had reaped the benefits of the attorneys' work. The non-client bondholders objected on the grounds that the attorneys had been compensated under fee agreements with their clients. *Pettus*, 113 U.S. at 125. In response to that argument, the Court

observed that it was clear that the attorneys "had the right to demand, and would demand, such additional compensation as was reasonable, in respect of unsecured creditors who accepted the fruits of their labor …." *Id*.

The absence of a contract of employment between the attorneys and the non-client bondholders was of little concern to the *Pettus* Court. Rather, the Court noted that the work of the attorneys had provided a clear benefit to the non-client bondholders, particularly because the successful litigation had allowed the bonds to retain their value in the financial marketplace. *Id*. at 126. The Court then observed that those who accepted the "fruits of the labors" of the attorneys should expect to be called upon to contribute to the expenses, including reasonable attorney fees. *Id*. at 127. To secure their right to those fees, the lawyers were given a lien on the railroad assets which had been preserved for the bondholders through the litigation.

While the common benefit doctrine was initially applied primarily to attorney fee awards in class actions, courts have long recognized that its application is not limited to the class action context. For instance, the Supreme Court in *Sprague, supra,* upheld the district court's power to grant reimbursement for a plaintiff's litigation expenses even though she had sued only on her own behalf and not for a class, because her success would have a *stare decisis* effect entitling others to recover out of specific assets of the same defendant. Although those others were not parties before the court, they could be required to contribute to the costs of the suit by an order reimbursing the plaintiff from the defendant's assets out of which their recoveries later would have to come. The Court observed that "the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree – hardly touch[es] the power of equity in doing justice as between a party and the beneficiaries of his litigation." *Sprague*, 307 U.S. at 167.

In recent years, it has become clear that the common benefit doctrine has particular significance and value in the MDL context.

> As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area. The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit.

*In re Vioxx Product Liability Litigation*, 760 F.Supp.2d 640, 647 (E.D. La. 2010). Thus "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *Id.* The Fifth Circuit in *In re Air Crash Disaster at Florida Everglades*, 594 F.2d 1006 (5th Cir. 1977), expressed a similar view: where attorneys in an MDL setting perform "duties beyond their responsibilities to their own clients," assessment of prospective recoveries to reimburse counsel is "a necessary incident to the goals of multi district litigation." *Id.* at 1011. *See Smiley v. Sincoff,* 958 F.2d 498, 501-02 (2d Cir. 1992); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* MDL No. 05-1708 (DWF/AJB), 2006 U.S. Dist. LEXIS 9232 (D. Minn. Feb. 15, 2006); *In re MGM Grand Hotel Fire Litig.,* 660 F.Supp. 522, 525-29 (D. Nev. 1987).

### B. THE CIRCUMSTANCES HERE PRESENT A COMPELLING CASE FOR THE CREATION OF THE COMMON BENEFIT FUND REQUESTED BY THE *HAVLISH* PLAINTIFFS

The case law discussed above provides strong support for the creation of a common benefit fund under the circumstances presented here. It is beyond question that the *Havlish* attorneys have conferred a substantial benefit upon plaintiffs in the Responding Plaintiffs' actions. Like the non-client bondholders in *Pettus*, the Responding Plaintiffs and their counsel have accepted and used the "fruits of the labor" of the *Havlish* attorneys; *i.e.*, the evidence which the *Havlish* attorneys developed both as to liability and as to damages. The Responding Plaintiffs cited the *Havlish* liability evidence, and the Findings of Fact and Conclusions of Law

resulting from them, thoroughly and repeatedly – and cited virtually nothing else (except one expert's testimony, also from another case), while contributing no new evidence themselves. MDL Doc. Nos. 2970, and 3123, *passim*; *O'Neill*, MDL Doc. No. 3000.[12]

In their motions, the Responding Plaintiffs requested the entry of judgments against Iran by relying exclusively on the evidence that was developed and presented by the *Havlish* Plaintiffs' counsel through great effort and at great cost, and upon the Court's Findings of Fact and Conclusions of Law entered in *Havlish* based upon that evidence. In support of their judgments, the Responding Plaintiffs developed and offered none of their own fact witnesses, no expert witnesses, no documentary evidence, nor any other form of evidence, apart from a few references to an expert not of their own, but from another case. Instead, the Responding Plaintiffs cite the *Havlish* evidence and the *Havlish* Findings of Fact and Conclusions of Law repeatedly and extensively, quote the experts' testimony presented in *Havlish* affidavits, and point to the "complete identity" of their claims and the *Havlish* claims. While they clearly intended to, and did, reap the benefit of the *Havlish* work product, the Responding Plaintiffs provided no assistance whatsoever to the *Havlish* team.[13] To the contrary, the Responding

---

[12] The *Ashton* memorandum of law argued:

> On December 22, 2011, in connection with the *Havlish* Order for Default Judgment on Liability, this Court concluded that the plaintiffs had "established by evidence satisfactory to the Court that [The Islamic Republic of Iran] had provided material support and resources to" the perpetrators of the September 11th terrorist attacks, by, "inter alia, planning funding, [and] facilitat[ing] . . . the hijackers' travel and training," and providing the hijackers with "services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." *See* 03-md-1570 (03-cv-9848) (GD) (S.D.N.Y.) (GD)(FM), Doc. No. 2515, Entered 12/22/2011 ("Findings of Fact and Conclusions of Law"), pp. 50– 53. ….
> As liability against Iran has now been established ….

*Ashton* memorandum of law, MDL Doc. No. 3123, at p. 5.

[13] As noted above, a substantial portion of the *Havlish* evidence from fact witnesses was submitted to the Court under seal due to its sensitive nature. The fact that the Responding Plaintiffs and their counsel have relied upon, and reaped the benefit of, evidence they have never seen or read – and may not even know exists – is a clear indication of the manifest injustice that should be corrected here.

Plaintiffs "vigorously opposed" the *Havlish* effort to develop and present the evidence they now cite repeatedly and with such zeal.

That the Responding Plaintiffs are far more numerous than the *Havlish* Plaintiffs, a fact derisively described by the PEC co-chairman as "the hair on the tail of the dog," only magnifies the propriety of application of the common benefit doctrine in these cases.  It would be patently unjust for the far more numerous Responding Plaintiffs to be permitted to secure their judgments against Iran and, soon, obtain the financial benefits thereof without contributing in any way to the fees and costs incurred in investigating the matter, or procuring the evidence on which those judgments are based.  The Responding Plaintiffs' attorneys even opposed the *Havlish* Plaintiffs' presentation of that evidence at an evidentiary hearing.  The common benefit device is designed for the purpose of correcting exactly this type of injustice.  It is for that reason that the *Havlish* Plaintiffs ask the Court to utilize the common benefit device here.

The Responding Plaintiffs should now be required to contribute to the legal fees and other costs incurred in procuring that benefit.  The question previously deemed premature by this Court is now ripe for decision because the Responding Plaintiffs are now poised to collect large sums of money on their judgments.  Indeed, the compensatory damages judgments held by the Responding Plaintiffs collectively far exceed the *Havlish* Plaintiffs' judgments (and the *Hoglan* Plaintiffs' judgments) due to the far larger number of Responding Plaintiffs.  The Responding Plaintiffs and their attorneys are now poised to recover more than seven hundred million dollars ($700,000,000), and much more in the future, that they would not stand to receive without the work done by the *Havlish* Plaintiffs' attorneys.

C.     THE *HAVLISH* PLAINTIFFS' PROPOSE AN APPROPRIATE METHODOLOGY FOR CREATING AND ADMINISTERING THE COMMON BENEFIT FUND

The *Havlish* Plaintiffs propose that the common benefit fund be created by requiring

primary counsel for the Responding Plaintiffs to set aside twelve percent (12%) of any amount recovered pursuant to, and/or in full or partial satisfaction of, their judgments against Iran, by whatever method or form, including the USVSST or any other U.S. Government payment, and deposit that amount into a common benefit escrow account that will be administered by lead counsel for the *Havlish* Plaintiffs.  In a typical MDL setting, the defendants would be tasked with setting aside the common benefit amount from each settlement or award.  Here, however, defendant Iran has defaulted and is not likely ever to appear, and therefore collection will likely occur only as a result of judgment enforcement and collection litigation, or from U.S. Government action, such as the USVSST.  The value of the benefit bestowed upon the Responding Plaintiffs is evidenced by the fact that the time-sensitive victim compensation provisions of the USVSST Fund are predicated upon the claimants' having first secured a judgment, such as those the Responding Plaintiffs have secured or will secure as a result of using the *Havlish* evidence.  Under these circumstances, responsibility for procuring and transmitting the amounts set aside must rest with each plaintiff's counsel.  This procedure is consistent with the cases such as *Pettus* and *Sprague*, where the common benefit fund was created without the involvement of defendants.

Appointing lead counsel in *Havlish* as the administrator of the escrow fund is also appropriate under the circumstances here.  In a typical MDL setting, the common benefit escrow account is managed and administered by a special master or other third party. That administrator is then responsible for distributing common benefit funds to attorneys who performed common benefit work.  Here, however, only *Havlish* attorneys performed common benefit work.  It is therefore more efficient and practical for *Havlish* lead counsel to administer the common benefit fund, subject to court supervision, and determine the appropriate distribution among the *Havlish*

attorneys.

Because part of the Court's reasoning for deferring any decision on the *Havlish* group's previously filed motion on this issue was that the amount of work necessary to collect on the Responding Plaintiffs' judgments was not yet determinable, the *Havlish* Plaintiffs here request that the common benefit fund be established as set forth above, but with the notation that, at this time, only funds emanating from the USVSST payments in 2019 and in the remaining years of the USVSST be paid out by the common benefit fund to the *Havlish* attorneys, until further order by the Court.  That is, collections by the Responding Plaintiffs on their judgments other than from the USVSST would be subject to the 12% payment into the common benefit fund, but disbursement shall be subject to further application to the Court for authority to pay such monies out to the *Havlish* attorneys, if and as warranted, or to other attorneys who merit such distributions, or back to the Responding Plaintiffs' attorneys, in whole or in part, if circumstances warrant.

### D.   THE PROPOSED AMOUNT OF THE COMMON BENEFIT FUND ASSESSMENT IS CONSISTENT WITH THE PRACTICE IN MDL PROCEEDINGS AND IS APPROPRIATE UNDER THE PRESENT CIRCUMSTANCES

The *Havlish* Plaintiffs propose an assessment equal to 12% of amounts recovered pursuant to their judgments against Iran.  That assessment percentage is well within the range of assessments levied in MDL proceedings in recent years. The following is a sample of fee assessments imposed pursuant to the common benefit doctrine by MDL courts:

- *In re Orthopedic Bone Screw Prods. Liab. Litig*.       17% assessment
  1996 WL 900349 (E.D. Pa. 1996)

- *In re Genetically Modified Rice Litigation,*       10% assessment
  Case No. 4:06-md-1811 (E.D. Mo. 2009)

- *Turner v. Murphy Oil USA, Inc*.,       12% assessment
  422 F.Supp.2d 676 (E.D. La. 2006)

- *In re Fresenius Granuflo/Naturalyte Dialysate*      9% assessment
  *Products Liability Litigation*
  Case No. 13-md-2428 (D. Mass,)

- *Smiley v. Sincoff*, 958 F.2d 498 (2d Cir. 1992)      8% assessment

- *In re MGM Grand,* 660 F.Supp. 522 (D. Nev. 1987)      7% assessment

- *In re Air Crash Disaster,* 549 F.2d 1006 (5th Cir. 1977)      8% assessment

- *In re Avandia Prods. Liab. Litig*.,      7% assessment
  Case No. 07-md-1871 (E.D. Pa. 2009)

- *In re Diet Drugs Prods. Liab. Litig*.,      6% assessment
  553 F.Supp.2d 442 (E.D. Pa. 2008)

- *In re Vioxx Prods. Liab. Litig.*,      3% assessment
  MDL 1657 (E.D. La. 2005)

- *In re Silicone Gel Breast Implants Prods. Liab. Litig.,*      4% assessment
  MDL No. 926, 92-CV-10000 (N.D. Ala. 1993)

The evidence developed by the *Havlish* attorneys and the Findings of Fact and Conclusions of Law entered in *Havlish*, as well as the Report and Recommendation of the Magistrate Judge and this Court's adoptions of same, were used in all of the Responding Plaintiffs' actions to establish liability against Iran and the amounts of compensatory damages awards. These compensatory damages awards collectively resulted in the Responding Plaintiffs judgments that total well in excess of $10 billion, and counting. Given the level of investment by the *Havlish* attorneys in terms of time, expertise, effort, risk, and money to develop that evidence, the *Havlish* Findings of Fact and Conclusions of Law, and the judgments obtained as a result of that evidence, a 12% assessment for purposes of a common benefit fund, as set forth herein, is reasonable in the present case.

### E.   PAYMENT INTO THE COURT REGISTRY WHILE THIS MOTION IS PENDING

The statutory deadline for the USVSST's authorization of payments to eligible claimants is January 1, 2019.  *See* http://www.usvsst.com/important.php.  The experience from the 2017 payments was that, by year end 2016, the USVSST notified claimants by letter of their eligibility, or ineligibility, for an award, and that notifications of amounts followed in January, and that actual payments occurred on a rolling basis in February, March, and April.  Thus, in the event that the Court's consideration of this motion takes longer than the time for payments to be made, the *Havlish* Plaintiffs request that the Court order the Responding Plaintiffs to deposit into the U.S. District Court registry the sum of 12% of their USVSST payments received, pending resolution of this Motion, or to order a similar arrangement to ensure that the funds in question are secured and not dispersed.  During the pendency of this motion, the *Havlish* Plaintiffs will notify the Court of pertinent announcements by the USVSST, notably, any announcements regarding timing of payments, the number of claims found to be eligible, or the percentage of payments upon which the *pro rata* payments are to be made.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court should enter an order (1) requiring the Responding Plaintiffs to set aside 12% of all amounts paid to the Responding Plaintiffs from the U.S. Victims of State Sponsored Terrorist Fund, or any other source, as collection on pursuant to, and/or in full or partial satisfaction of, any of their judgments against Iran or its agencies or instrumentalities; (2) directing counsel in the Responding Plaintiffs' actions to deposit assessed amounts into a common benefit escrow account to be established and maintained by lead counsel for the *Havlish* Plaintiffs; (3) authorizing the distribution of such funds that were sourced from the USVSST and were paid into the common benefit fund escrow account to the *Havlish*

attorneys as reimbursement of costs associated with, and compensation for, the benefit bestowed

upon Plaintiffs in the Responding Plaintiffs' actions; and, (4) directing that disbursements of

funds paid into the common benefit fund escrow account from other sources of collections upon

the Responding Plaintiffs' actions be subject to further order of this Court.

Respectfully Submitted,

Date: December 18, 2018                    /s/ Timothy B. Fleming
                                          Timothy B. Fleming (DC Bar No. 351114)
                                          WIGGINS CHILDS PANTAZIS
                                          FISHER GOLDFARB, PLLC
                                          1211 Connecticut Avenue, N.W., Suite 420
                                          Washington, DC  20036
                                          (202) 467-4489

                                          Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
                                          WIGGINS CHILDS PANTAZIS
                                          FISHER GOLDFARB, LLC    (*Lead Counsel*)
                                          The Kress Building
                                          301 19th Street North
                                          Birmingham, AL  35203
                                          (205) 314-0500

                                          Richard D. Hailey (IN Bar No. 7375-49)
                                          Mary Beth Ramey (IN Bar No. 5876-49)
                                          RAMEY & HAILEY
                                          3905 Founders Road
                                          Indianapolis, 46268
                                          (317) 582-0000

                                          Robert M. Foote (IL Bar No. 03124325)
                                          Craig S. Meilke (IL Bar No. 03127485)
                                          FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
                                          10 West State Street, Suite 200
                                          Geneva, IL  60134
                                          (630) 232-7450

                                          John A. Corr (PA Bar No. 52820)
                                          LAW OFFICE OF JOHN A. CORR
                                          301 Richard Way
                                          Collegeville, PA 19426
                                          (610) 482-4237

Stephen A. Corr (PA Bar No. 65266)
BEGLEY, CARLIN & MANDIO, LLP
680 Middletown Boulevard
Langhorne, PA  19047
(215) 750-0110

David C. Lee (TN Bar No. 015217)
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
  YEGELWEL, P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
EDWARD H. RUBENSTONE, LLC
812 N. Fairway Rd.
Glenside, PA 19038
(215) 887-9786

Donald J. Winder (UT Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

**Attorneys for the *Havlish* Plaintiffs**