# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE TERRORIST ATTACKS ON | : | 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | : | |

_____

**This Document Relates To:**

*Havlish, et al. v. bin Laden, et al.,* Case No. 03-CV-09848
*Ashton, et al. v. al Qaeda Islamic Army, et al.,* Case No. 02-CV-06977
*Burnett, Sr., et al., v. Islamic Republic of Iran,* Case No. 15-CV-9903
*Burlingame, et al. v. bin Laden, et al.,* Case No. 02-CV-07230
*Bauer, et al. v. al Qaeda Islamic Army, et al.,* 02-CV-07236
*O'Neill, Sr., et al. v. Republic of Iraq, et al.,* Case No. 04-CV-1076
*Federal Insurance Co., et al. v. al Qaida, et al.,* Case No. 03-CV-06978
----
*Dillaber, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-03162
*Agyeman, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-05320
*Morris, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-05321
*Derubbio, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-05306
*Schlissel, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-05331
*Kamardinova, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-05339
*Ades, et al. v. Islamic Republic of Iran, et al.,* Case No. 18-CV-07306

## MEMORANDUM OF THE PLAINTIFFS' EXECUTIVE COMMITTEES, AND PLAINTIFFS IN THE ABOVE-IDENTIFIED CASES, IN OPPOSITION TO THE *HAVLISH* PLAINTIFFS' RENEWED MOTION FOR AN ORDER CREATING A COMMON BENEFIT FUND AND AUTHORIZING CERTAIN DISBURSEMENTS THEREFROM

February 15, 2019

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    **A.**    *Havlish* counsel refused to coordinate with the PECs ....................................... 3

    **B.**    *Havlish* Counsel's efforts duplicated work performed by responding counsel. 6

    **C.**    The requirements under the FSIA are not so onerous to entitle *Havlish* counsel to the relief they request ........................................................................ 8

    **D.**    Compensation from the U.S. Victims of State Sponsored Terrorism Fund is unrelated to any efforts undertaken by *Havlish* counsel ................................. 10

ARGUMENT ........................................................................................................................... 11

    **I.**    THE MOTION REMAINS PREMATURE FOR THE SAME REASONS IDENTIFIED BY THIS COURT IN DENYING THE 2016 FEE APPLICATION .................................................................................................. 11

    **II.**    *HAVLISH* COUNSEL HAVE NOT CREATED A "COMMON FUND" FROM WHICH EQUITABLE ATTORNEYS FEES MAY BE AWARDED. ................................................................................................................. 14

    **III.**    *HAVLISH* COUNSEL'S EFFORTS IN OBTAINING A DEFAULT JUDGMENT AGAINST IRAN WERE NOT AUTHORIZED BY MDL LEADERSHIP AND DO NOT CONSTITUTE "COMMON BENEFIT WORK" UNDER THE PRINCIPLES GOVERNING AWARD OF FEES IN AN MDL ................................................................................................................... 17

    **IV.**    *HAVLISH* COUNSEL HAVE NOT JUSTIFIED THEIR EXORBITANT FEE REQUEST. ................................................................................................. 20

CONCLUSION ........................................................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885) ............................................14, 15

*Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994).....................................9

*Gates v. Syrian Arab Republic*, 580 F. Supp.2d 53 (D.D.C. 2008) ...........................................9

*In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977) .... 18

*In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp.2d 31 (D.D.C. 2009) .......... 5, 8, 9

*In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640 (E.D. La. 2010) ......................................... 18

*In re Zyprexa Prod. Liab. Litig.*, 594 F.3d 113 (2d Cir. 2010) .......................................14, 16, 18

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp.2d 248 (D.D.C. 2001).....................................................................................................................9

*Rimkus v. Islamic Republic of Iran*, 575 F. Supp.2d 181 (D.D.C. 2008) .................................9

*Smiley v. Sincoff*, 958 F.2d 498 (2d Cir. 1992) ..................................................................... 4, 19

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp.2d 217 (S.D.N.Y. 2003) ......................8

*Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939)............................................................14, 15

*Trustees v. Greenough*, 105 U.S. 527 (1881).......................................................................14, 15

*Ungar v. Islamic Republic of Iran*, 211 F. Supp.2d 91 (D.D.C. 2002).......................................8

*Wolff v. Ampacet Corp.*, 673 N.E.2d 745 (Ill. 1996)................................................................ 16

### Statutes

18 U.S.C. § 2339A(b)(1) ...............................................................................................................9

28 U.S.C. § 1605(a)(7)...................................................................................................................8

28 U.S.C. § 1605A.............................................................................................................8, 9, 10

28 U.S.C. § 1608(e) ....................................................................................................................8, 9

34 U.S.C. § 20144(d)(3)(A)(ii)(III) ........................................................................................... 11

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* ................................3, 8

### Other Authorities

Duke Law Center for Judicial Studies, Standards and Best Practices for Large and Mass-Tort MDLs (2014)...............................................................................................11, 17, 19

Judge Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation,* 74 LA. L. Rev. 371 (2014) ...................................................................................................................... 17

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.22 (2015) ..................................................4

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2015) ................................................ 12

*Restatement (Third) of Restitution and Unjust Enrichment* § 29, comment e (2011) ...... 14, 16

## INTRODUCTION

The Plaintiffs' Executive Committees ("PECs"), along with Plaintiffs in the above-captioned lawsuits subject to this motion (excluding the *Havlish* plaintiffs), submit this Consolidated Memorandum of Law in opposition to the application filed by attorneys who represent a few dozen of the thousands of 9/11 plaintiffs (*Havlish* counsel) asking that the Court create a so-called "common" fund that personally benefits *only Havlish* counsel for work they did for *only* their own clients; work that was duplicative of what the PEC firms had already done and work that far exceeded what was necessary for a default judgment ("Application") (ECF Nos. 4291-92). Specifically, the Application seeks the contribution of 12% of the gross amount of all payments on judgments against Iran—regardless of the source of the payment and without consideration of the efforts undertaken by the plaintiffs' own counsel in representing them in this long-running MDL—based solely on *Havlish* counsel's unilateral efforts to obtain a default judgment against a single non-appearing defendant— the Islamic Republic of Iran.

When *Havlish* counsel previously sought such fees in 2016, they requested a "common benefit" fee award of "only" 8% of any recoveries against Iran. ECF No. 3236 at 2. They now brazenly demand a 50% increase on their 2016 application despite having performed no additional work since that time. Moreover, they disregard the 25% cap on attorney's fees for any compensation received from the U.S. Victims of State Sponsored Terrorism Fund ("USVSSTF") and the fact that their 12% demand seeks nearly half of that maximum fee and exceeds the contractual contingency fee for certain plaintiffs within the MDL.

*Havlish* counsel's legal argument is bereft of merit and should not be taken seriously. For at least three separate reasons, the Court should simply dismiss the application without the need for any detailed consideration of *Havlish* counsel's arguments about the extent of their work or its purported benefits to other plaintiffs:

*First*, the motion remains premature.  When Magistrate Judge Maas recommended denial of *Havlish* counsel's 2016 fee application, he observed that two factors essential for awarding common benefit fees remained unclear: the total amount of money to be recovered by the MDL plaintiffs and the relative effort expended by various attorneys to obtain that result. ECF No. 3309 at 4.  Both factors remain equally unclear today.  Only some of the responding Plaintiffs will receive a small fraction of their judgments against Iran from the USVSSTF; many more will receive no recovery from the Fund. Moreover, although *Havlish* counsel consider only the claims against Iran, this MDL encompasses substantially more than that.  And, despite substantial progress, the MDL remains far from completion.  Just as in 2016, at this point in time, it is not possible for the Court to assess the relative contributions of all MDL counsel to the common benefit;

*Second*, there is no "common fund" created by the *Havlish* counsel for the benefit of other plaintiffs, an essential component for a fee award under the common fund doctrine.  *Havlish* counsel did not create the USVSSTF, nor do they claim to have done so.  And that Fund is not a corpus available to the Court out of which to award fees;

*Third*, *Havlish* counsel, despite their nominal membership on the PECs, have done little or no MDL common benefit work, as that term is properly understood: legal work undertaken pursuant to a request by Plaintiffs' lead counsel for the efficient administration and resolution of the MDL.  *Havlish* counsel may have been within their rights to seek permission from the Court to move for a default judgment against Iran without coordinating their efforts with lead counsel and the PECs, but it is not their right to demand an MDL common benefit fee for having taken such unilateral action.

Each of the foregoing arguments is itself a sufficient reason for denying the pending motion without even considering the obvious deficiencies in the *Havlish* counsel's fee application.  The application falls woefully short of documenting counsel's claim to "have invested tens of thousands of hours of attorney time and underwrote nearly $2 million in costs and expenses in pursuit of evidence

2

against Iran," ECF No. 4292 at 7-8; *Havlish* counsel simply assert these figures without any documentation. Nor do they even attempt to demonstrate the value of their work toward other plaintiffs recovering from the USVSSTF which, as *Havlish* counsel are forced to concede, does not permit recoveries for punitive damages or pre- or post-judgment interest, ECF No. 4292 at 17 n. 9. Moreover, the USVSSTF prohibits recovery by commercial plaintiffs, such as plaintiffs in the *Federal Insurance* case, as well as certain plaintiffs who previously recovered from the 9/11 Victims Compensation Fund; yet *Havlish* counsel also seek a 12% fee award from any future recoveries by these plaintiffs as well.

As explained in Responding Plaintiffs' opposition to the earlier fee application, the actual value of *Havlish* counsel's work in obtaining a default judgment against Iran was *de minimis*: it relied on precedent developed by other counsel in the D.C. Circuit that established a relatively low threshold for default judgments under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and rested almost entirely on public information and other information known to the PECs long before *Havlish* filed.

*Havlish* counsel's motion should be denied in its entirety.

## BACKGROUND

### A.    *Havlish* counsel refused to coordinate with the PECs

*Havlish* counsel's failure to abide by the parameters set by the Plaintiffs' General Steering Committee and the PECs in this MDL provides compelling evidence that they were not working for the common benefit of other plaintiffs.[1] In MDLs, the district court determines procedures by "which

---

[1] Other indications of *Havlish* counsel's intention to benefit only their own clients are demonstrated by *Havlish* counsel's abandonment of class allegations included in the original *Havlish* complaint, and *Havlish* counsel's efforts to enforce their judgments against assets for the benefit of only *Havlish* plaintiffs. While the original *Havlish* complaint contained class allegations, those allegations were abandoned in the *Havlish* Second Amended Complaint, filed on September 30, 2005, at which point *Havlish* counsel proceeded solely on behalf of the named *Havlish* plaintiffs.

one or more attorneys are selected and authorized to act on behalf of other counsel and their clients with respect to specified aspects of the litigation." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.22 (2015). In such a structure, "[a] Committee depends for it[s] success on cooperation among its members and would function less effectively if its members were to compete with one another and with the Committee itself to serve plaintiffs' attorneys on an individual basis." *Smiley v. Sincoff*, 958 F.2d 498, 502 (2d Cir. 1992). The goal of such a structure is to operate efficiently and "avoid unnecessary duplication of efforts and control fees and expenses" without jeopardizing fairness to the parties. *Id.*

On June 16, 2004, Judge Casey issued Case Management Order #3 ("CMO3", ECF No. 248) in this MDL regarding "Organization of Counsel." CMO3 established a Plaintiffs' General Steering Committee and two PECs (one for wrongful death and personal injury plaintiffs and the other for plaintiffs asserting commercial and property damage claims). The PECs were empowered to "coordinate discovery and motion papers to the extent practicable to promote judicial economy, avoid duplicative effort, and limit the burden on parties responding to discovery." *See* CMO3 at ¶3. Further, the PECs "shall conduct all pretrial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all plaintiffs. The members of the Plaintiffs' General Committee shall, at the request of the Plaintiffs' Executive Committees, provide assistance as required in handling the liability pretrial proceedings." *Id.* at ¶10. The PECs were also authorized to "coordinate the work of plaintiffs' counsel and perform such other functions as necessary and appropriate to complete pretrial proceedings in the Consolidated Action and/or as may be authorized by the Court." *Id.* at ¶11.g.

Here, *Havlish* counsel, although granted seats on one of the PECs, chose to operate outside the Court-approved plaintiffs' leadership structure, in order to pursue putative benefits for their respectively small number of clients without notifying the PECs of their efforts. *Havlish* counsel never

4

sought, much less obtained, PEC approval for the work that they conducted or the expenditures they incurred.  Nor did *Havlish* counsel consult with other members of the PECs regarding any evidence respondents had obtained related to Iran or its agencies and instrumentalities, nor did they share their work product with the remainder of the PECs to ensure that their work was not duplicative of work already conducted.  In short, *Havlish* counsel seek to be rewarded for deliberately running afoul of this Court's mandates pursuant to CMO3 and for engaging in a unilateral approach that is inimical to the efficient conduct of MDLs generally.

*Havlish* counsel now focus considerable energy on attempting to demonstrate that members of the PECs opposed their efforts to pursue default proceedings against Iran in 2010 and 2011 to somehow argue that there was no intention on the part of the PECs to pursue default proceedings against Iran in the future.  That is simply untrue.  Strategic considerations, including the need to prioritize and focus resources, dictated the PECs' approach, because the PECs were actively involved in litigating claims for *all* of the plaintiffs in the MDL against represented defendants who were battling before the Court, and distracting the Court's attention and resources from the active portions of the litigation to hold hearings on default proceedings against Iran was deemed to be an unwise use of the PECs' and the Court's limited time and resources at that stage.  At the time, no USVSSTF existed and judgments against Iran were considered to be merely "Pyrrhic victories" for plaintiffs.  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp.2d 31, 129 (D.D.C. 2009).  Furthermore, *Havlish* counsel's refusal to coordinate with other members of the PECs made it impossible to determine whether *Havlish* counsel would be proceeding in a manner consistent with the interests of all plaintiffs and not to the detriment of outstanding and pending claims against other providers of material support or resources to Al-Qaeda and the 9/11 hijackers.

With hindsight, *Havlish* counsel's approach may be explained, at least in part, by their efforts to benefit their own clients by joining the litigation to attach the property at 650 Fifth Avenue in

Manhattan.  While *Havlish* counsel originally filed a motion for judgment by default against Iran in 2008, they did not immediately move the Court for a decision on that motion.  Rather, before doing so—and without any notice to the PECs—they submitted a verified claim in the *In re 650 Fifth Avenue* litigation, relying on their complaint naming Iran in connection with the 9/11 attacks, stating that they had "now" compiled the information they believed necessary to support the entry of a final default judgment against Iran, which would allow them to join the *In re 650 Fifth Avenue* matter.  *See* 08-cv-10934 (S.D.N.Y.) (LAP), ECF No. 85 (Filed 03/01/2010).  *Havlish* counsel thereafter submitted their memoranda in support of their application for a judgment against Iran.  *See Havlish* Dkt, ECF Nos. 273, 274, 275 (Filed 05/19/2011).  By obtaining a default judgment against Iran, *Havlish* counsel secured their clients' place in line should the property at 650 Fifth Avenue ultimately be subject to creditors' claims—an interest that inures to the benefit *only* of the *Havlish* clients and to no one else in the MDL.

  *Havlish* counsel completely abandoned the coordinating structure established by the Court through the PECs, seeking to pursue their own interests, even when advised by the PECs that the timing of their actions could work to the detriment of the other plaintiffs in this MDL.  *Havlish* counsel's attempt to rewrite history to claim that they were acting for the common benefit of all plaintiffs with claims against Iran in this MDL is belied both by their refusal to work within the PEC structure and by their self-interested efforts to secure an interest in the 650 Fifth Avenue property for their clients alone.

  **B.**  ***Havlish* Counsel's efforts duplicated work performed by responding counsel**

  Aside from working outside the confines of the PECs' coordination, *Havlish* counsel's failure to coordinate with other members of the PECs left them engaging in duplicative and unnecessary work—especially within the strictures of FSIA precedent in cases against Iran.  While the PECs were pursuing litigation against defendants who had hired counsel from some of the most prominent

defense firms in the nation, *Havlish* counsel instead sought to litigate against no one—pursuing a default judgment against a non-appearing defendant against whom a blueprint for liability had already been established in other cases.  Furthermore, contrary to *Havlish* counsel's assertions, responding counsel was in possession of all necessary evidence and proofs (in addition to having retained experts) to obtain a default judgment against Iran without the need for *Havlish* counsel's efforts, and intended to do so at a time the PECs determined would be most appropriate.

While *Havlish* counsel concentrated all of their efforts on Iran's culpability in providing support or resources to Al-Qaeda, responding counsel on behalf of the PECs were engaged in more extensive investigation and discovery related to *all* of the sources of material support or resources for Al-Qaeda and for the 9/11 attacks.  This larger, broader investigation of liability across the spectrum of defendants allowed responding counsel to be privy to and in possession of all of the requisite evidence and proofs to establish default liability against Iran without the need for *Havlish* counsel to depart so starkly from the coordinated efforts of the PECs.

The PECs' activities included extensive and professional investigative efforts relating to Iranian support for Al-Qaeda and the 9/1l attacks, including locating and interviewing witnesses, obtaining documents, translating documents, gathering publicly available information, consulting with experts, and analyzing information.  Respondents respectfully incorporate by reference their prior submission to the Court in 2016 that addressed these issues and the Declarations that accompanied that submission.  *See* ECF No. 3272 at 18-20.  This included active members of the PECs retaining a former Israeli Military Intelligence officer and renowned expert on Iranian-sponsored terrorism who helped to develop evidence for use in default proceedings against both Iran and Sudan.  Active members of the PECs also retained a group of counter-terrorism consultants to develop an evidentiary portfolio using international contacts and resources concerning Al-Qaeda's global infrastructure and

the sources of support that allowed the terror organization to plan, coordinate, and conduct the 9/11 attacks.[2]

Any intimation by *Havlish* counsel that the PECs somehow failed to undertake their investigative efforts and obligations is farcical.  In fact, responding counsel was in possession of all of the principal evidence relied upon by *Havlish* counsel to obtain their liability default judgment at the time that it was filed.  *See* ECF No. 3272 at 21-22 (listing evidence in the PECs' possession).

### C.    The requirements under the FSIA are not so onerous to entitle *Havlish* counsel to the relief they request

The default proceedings at issue here emanate from claims primarily arising from what is known as the terrorism exception to sovereign immunity located at 28 U.S.C. § 1605A (which replaced the original terrorism exception for state sponsors of terrorism codified at 28 U.S.C. § 1605(a)(7)).  *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp.2d 31 (D.D.C. 2009).  The FSIA imposes lenient standards for securing default judgments against foreign state defendants.   Under the FSIA, a "judgment by default . . . against a foreign state" requires only that "the claimant establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  A plaintiff must present a "legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp.2d 91, 98 (D.D.C. 2002).  In the Second Circuit, this evidentiary burden is simply "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp.2d 217, 222 (S.D.N.Y. 2003) (adopting plaintiff's argument that the evidentiary burden is "less than normally required.")  Establishment of a prima facie case permits the entry of a default judgment.  *See Ungar*, 211 F. Supp.2d at 98.  Evidence may be submitted in the form of affidavits and exhibits to satisfy § 1608(e), without an evidentiary hearing. *See Comm. Bank of Kuwait*

---

[2] *Havlish* counsel seek a windfall based on responding plaintiffs' efforts to conserve judicial resources by not relitigating the issue of Iran's liability.  But, as is clear from the evidence discussed herein and previously, responding plaintiffs had already developed the evidence necessary to obtain a liability judgment irrespective of *Havlish* counsel's motion.

*v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (finding evidence in the form of affidavits and exhibits sufficient to satisfy § 1608(e)); *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp.2d 248, 252 n.4 (D.D.C. 2001). Courts are to "accept plaintiffs' uncontroverted evidence as true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp.2d 181, 193 (D.D.C. 2008).

The burden of proof is similarly accommodating under the broad liability standards imposed by the state sponsor of terrorism exception to the FSIA.  Under 28 U.S.C. § 1605A, a designated state sponsor of terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources.  28 U.S.C. § 1605A(a)(1); (c).  A court need only "determine whether a defendant country has provided material support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp.2d 53, 67 (D.D.C. 2008).  The courts apply both the broad standard of "material support or resources" in 18 U.S.C. § 2339A(b)(1) and also a minimal causation standard.  A "plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp.2d at 44.  "[T]here is no 'but-for' causation requirement with respect to cases that rely on the material support component of the terrorism exception to foreign sovereign immunity." *Id.*  The extensive case law against Iran specifically as a state sponsor of terrorism involved in attacks against Americans further buttresses the notion that the burden held by *Havlish* counsel was *de minimis*.

Thus, the burden facing *Havlish* counsel was minimal; yet they now claim that the liability default proceedings at issue here required "tens of thousands" of hours of attorney time and millions of dollars in expenses.  This is despite the fact that virtually all of the evidence necessary to meet the standard set forth under 28 U.S.C. § 1605A was publicly available.  *Havlish* counsel alone should bear

the consequences for any unnecessary work they chose to undertake without the approval of the PECs.

### D. Compensation from the U.S. Victims of State Sponsored Terrorism Fund is unrelated to any efforts undertaken by *Havlish* counsel

The evident basis for *Havlish* counsel's renewed application is the fact that the USVSSTF—a claims fund administered by the U.S. Department of Justice pursuant to statute—made a distribution to eligible claimants in January 2019. To be eligible for the USVSSTF, a claimant must have obtained a damages judgment from a federal court pursuant to 28 U.S.C. § 1605A against a designated state sponsor or terrorism. *See* http://www.usvsst.com/faq.php, FAQ 2.1. Among those claimants who were found eligible for payment from the USVSSTF were certain immediate family members of individuals killed on 9/11.

*Havlish* counsel make no claim that they played any role in establishing the USVSSTF. The USVSSTF is providing pro rata compensation on judgments against any designated state sponsor of terrorism—not just Iran—and claimants include victims of attacks that range from the bombing of the U.S. Marine barracks in Beirut in the early-1980s to suicide bombings in Israel to 9/11 victims. The compensation provided by the USVSSTF does not derive from payments made by any state sponsor of terrorism.[3]

*Havlish* counsel have not made any claim—nor could they—that (a) they had any role in establishing the USVSSTF; or (b) they were involved in any way in the selection of persons who paid fines or criminal penalties that were deposited into the USVSSTF. To the extent that any of respondents' plaintiffs received or are receiving compensation from the USVSSTF based on default judgments against Iran, *Havlish* counsel had no role in the establishment of the Fund from which they will receive compensation. Moreover, the USVSSTF does not provide compensation for commercial

---

[3] Rather, the sources of compensation in the USVSSTFF are, essentially, civil and criminal fines or forfeitures for violations of trade sanctions. 34 U.S.C. § 21044(e)(2)(A).

or property-damage claims, and it imposes a limitation on which individuals may obtain compensation (even with a default judgment in hand) leaving anyone who has obtained an "award or an award determination under Section 405 of the Air Transportation Safety and System Stabilization Act [also known as the September 11th Victim Compensation Fund, the Zadroga Fund, VCF1, and VCF2]" unable to receive compensation from the USVSSTF.  *See* 34 U.S.C. § 20144(d)(3)(A)(ii)(III); *see also* FAQ 4.6, http://www.usvsst.com/faq.php.  This language has been used by the USVSSTF to deny payment to widows/widowers and children who had been financially dependent on the parent killed on 9/11.  Yet, *Havlish* counsel now demand a common benefit fee award from these uncompensated plaintiffs as well.

## ARGUMENT

## I.     THE MOTION REMAINS PREMATURE FOR THE SAME REASONS IDENTIFIED BY THIS COURT IN DENYING THE 2016 FEE APPLICATION.

On August 2, 2016, this Court adopted in its entirety the Report and Recommendation of Magistrate Judge Maas and denied *Havlish* counsel's prior fee motion without prejudice to its later renewal.  ECF No. 3322.  Magistrate Judge Maas had recommended denying the motion as premature. Contrary to *Havlish* counsel's contentions, *see* ECF No. 4292 at 2 ("This renewed motion is now ripe . . ."), the pending motion is just as premature as its predecessor.

Magistrate Judge Maas observed that a determination of common benefit fee awards in an MDL depends on at least two critical factors: the total amount of money to be recovered by the MDL plaintiffs and the relative effort expended by various attorneys to obtain that result.  ECF No. 3309 at 4 ("the Court at this point can only speculate as to the amount of effort the Respondents will expend to collect that award and the sums, if any, that they will actually recover").  For that reason, common benefit fee awards are typically set only at or near the time that the MDL is finally resolved or settled. *Id.* at 5-6 (*quoting* Duke Law Center for Judicial Studies, Standards and Best Practices for Large and Mass-Tort MDLs 68 (2014) ("[T]he court usually will defer setting the precise percentage of settlement

proceeds that will fund the [common benefit fund] until the MDL is resolved or settled when the value of the common benefit work is known."); and MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2015) ("Generally, the factor given the greatest emphasis [in determining the common benefit fee] is the size of the fund created.")).

The present MDL is simply not at that point. Claims against numerous defendants have yet to be resolved, and there is no way to estimate the total amount that plaintiffs will eventually recover. Even as to Iran, it remains unclear how much plaintiffs will obtain. The current round of payments from the USVSSTF is expected to amount to little more than a small fraction of all of the claims presented for payment. How much more will eventually be recovered—whether from future awards from the USVSSTF, from the seizure and sale of Iranian assets, or from an eventual settlement with the government—cannot be determined, let alone the legal effort that will be expended in order to make those recoveries. Indeed, numerous MDL plaintiffs—including both commercial plaintiffs and those who received eligibility determinations from the 9/11 Victims Compensation Fund—are ineligible for recoveries from the USVSSTF, yet *Havlish* counsel also seek a fee award against them, despite the absence of any certainty about when, if, or how much they may eventually recover or the effort that may be involved in obtaining their recoveries.

And, of course, the *Havlish* plaintiffs, like others in this MDL, also have claims against other defendants that have been actively pursued by the PECs. If those efforts ultimately bear fruit, it is likely that *Havlish* counsel will be obliged to share some of their contingency fees as common benefit fees with other counsel. Who will ultimately "come out ahead" in the distribution of common benefit fees simply cannot and should not be determined at this time.

*Havlish* counsel seem to believe that common benefit fee awards can be handled on a defendant-by-defendant basis, based on who did the work against that particular defendant, but that has never been the practice in large, multi-defendant MDLs. The PECs know of no cases in which

counsel who contributed substantially to common benefit work, at the direction of MDL leadership, have been told that they were not entitled to share in a common benefit fee award simply because the particular defendant they led the litigation against was dismissed or the bellwether case they tried resulted in a defense verdict. Indeed, *Havlish* counsel's narrow-minded focus on their work against Iran highlights their lack of commitment to the "common benefit" of all plaintiffs before this Court.

*Havlish* counsel's renewed application demonstrates no effort to comply with this Court's 2016 Order. To the contrary, *Havlish* counsel have now dramatically increased their demand. It is not simply that they have increased their proposed fee from 8 to 12%, despite not having performed any additional work. The 2016 application sought fees in only three cases in which default judgments had been entered against Iran.

The renewed application, by contrast, asserts claims against (a) multiple sets of plaintiffs lacking even liability judgments against Iran (*Dillaber*, *Agyeman*, *Morris*, *Derubbio*, *Schlissel*, *Kamardinova*, *Ades,* and "all future Plaintiffs that obtain judgment against Iran" (*see Havlish* counsel's brief at 2)), and (b) plaintiffs who—even if they had final judgments against Iran—are ineligible to collect any compensation from the USVSSTF (*Federal Insurance* and other plaintiffs who are ineligible for payment from the USVSSTF under the USVSSTF's application of the rules).

Moreover, *Havlish* counsel do not limit their application to presently identifiable payments from the USVSSTF. They instead ask for a guaranteed 12% share of any future recoveries, regardless of how those recoveries are obtained or the amount of the recovery in issue. This is in direct contravention of the requirements Magistrate Judge Maas established in his prior opinion for considering a fee application, wherein both the amount of any recovery and the work involved in obtaining it had to be established *before* an application for common benefit fees could be considered. For this reason, Respondents who are not eligible to participate in the USVSSTF respectfully request

that the Court strike the application of the *Havlish* counsel and award to those Respondents their reasonable fees incurred in opposing the motion.

For all of these reasons, the pending fee motion is both premature and inconsistent with the 2016 ruling of this Court. It can and should be denied on that basis alone.

## II.    *HAVLISH* COUNSEL HAVE NOT CREATED A "COMMON FUND" FROM WHICH EQUITABLE ATTORNEYS FEES MAY BE AWARDED.

Turning to the merits, *Havlish* counsel have attempted to make an argument for fees by cobbling together two separate lines of precedent: one arising under the traditional, equitable common-fund doctrine and the other based on MDL precedent.  They fall far short of meeting the requirements for an award of fees under either line of authority.

*Havlish* counsel first invoke the traditional restitution doctrine derived from cases like *Trustees v. Greenough*, 105 U.S. 527 (1881), *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), and *Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939), *see* ECF No. 4292 at 19-21, but they overlook the central requirement for a fee award under this precedent: the existence of a "common fund" in which all parties hold an interest, that was "created, preserved, or made more valuable by the intervention of the claimant."  *Restatement (Third) of Restitution and Unjust Enrichment* § 29, comment e (2011); *see also In re Zyprexa Prod. Liab. Litig.,* 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring) (the common fund doctrine "permits litigants or lawyers *who recover a common fund* for the benefit of persons other than themselves to obtain reasonable attorney's fees out of the fund, thus spreading the cost of the litigation to its beneficiaries") (emphasis added).  In both *Greenough* and *Pettus,* attorneys representing certain bondholders brought suit to preserve the value of assets securing their bonds, and sought payment for their efforts from other bondholders out of their interests in those assets.  In *Sprague* the holder of an interest in a bank trust obtained a lien against certain bonds that secured multiple trusts and sought payment from other trustholders whose interests were secured by the same bonds.  In

*Greenough* and *Pettus*, the attorney's costs or fees were paid out of the assets of the "common fund" preserved by the litigation, lest the other bondholders be unjustly enriched by the successful outcome of the litigation without sharing in its costs.[4]

By contrast, *Havlish* counsel's efforts here did not involve the creation or protection of a "common fund." They do not claim to be responsible for the creation of the USVSSTF for the benefit of other victims of 9/11 or other acts of state-sponsored terrorism. They simply established a legal precedent that other plaintiffs relied on as *res judicata* in obtaining default judgments against Iran. There is, at present, no fund before the Court from which it can award fees.

This distinction is critical. As the *Restatement of Restitution* explains:

> *e. The significance of the "common fund."* The rule of this section authorizes a restitution claim only against a person who is an acknowledged or adjudicated holder of an interest in property that has been created, preserved, or made more valuable by the intervention of the claimant; only when the property so identified serves as the nexus of common ownership interests linking the claimant and the defendant; and only to the extent that the defendant may satisfy the restitution claim without being required to make a net outlay of money. These conditions are generally satisfied when a court can identify what is called a "common fund" that the claimant's intervention has either created, preserved, or enlarged. . . .

> [One] limiting function of the definition of "common fund" . . . is to guard against overextending the rationale of the claim. The nature of the legal system is such that the successful assertion of one person's claim may confer a demonstrable benefit on a range of others: persons similarly situated (in some respect at least), but whose relation to the transaction is increasingly remote. At one end of the spectrum are the core cases for "common fund," such as the claim between beneficiaries of the same trust; at the other is the claim asserted against an unrelated litigant, who stands to take advantage of a favorable precedent established in the claimant's case. The requirement of this section that there be an identifiable fund to which the beneficiaries are "entitled to share by reason of their common or parallel interests therein" establishes the

---

[4] In *Sprague,* where the plaintiff had "neither purported to sue for a class nor formally established by litigation a fund available to the class," the Supreme Court concluded that those facts did not preclude the District Court in equity from entertaining a petition for reasonable counsel fees and litigation expenses, where the attorney's efforts "for all practical purposes created [such a fund] for the benefit of others." 307 U.S. at 166-67. The Court acknowledged that: "Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it." *Id.* at 167. For present purposes, the important fact here is that *Havlish* counsel did not create any fund available to other plaintiffs, either "formally" or "for all practical purposes." *See* Section ___, *supra.*

minimum connection between the claimant, the fund, and the defendant, without which the benefits in question are either too generalized or too remote to justify a liability to pay for unrequested services.

*Restatement (Third) of Restitution and Unjust Enrichment* § 29, comment e.

The *Restatement* provides an illustrative example of a situation in which restitution would not be appropriate that bears similarities to the situation confronting this Court:

> X Corp. receives a notice of deficiency from the state tax commissioner. X retains Attorney to contest the state's assessment, arguing that a provision of the revenue code has been improperly interpreted to apply to X.  X prevails after extended litigation, obtaining a ruling by the state's highest court that the relevant statute does not apply to a taxpayer in X's position.  The tax in question has also been assessed against one other taxpayer in X's position, Y Corp.  Attorney approaches Y, offering to represent it in related proceedings before the tax commission.  Y declines, then retains its own counsel and promptly obtains a tax refund. Attorney sues Y, asserting that final judgment in the X case conferred a valuable benefit on Y, entitling Attorney to a reasonable fee.  Although Attorney's efforts on behalf of X have indeed resulted in a substantial benefit to Y, taking the form of reduced taxes and saved legal expenses, Attorney is not entitled to restitution by the rule of this section.  The first of several reasons is that Attorney has not created a fund in which both X and Y are entitled to share.

*Id.,* Illustration 17 (based on *Wolff v. Ampacet Corp.*, 673 N.E.2d 745 (Ill. 1996).

Here, too, some of the responding Plaintiffs at most relied on precedent created as a result of the default judgment obtained by *Havlish* counsel.[5]  *Havlish* counsel did not "recover a common fund for the benefit of persons other than themselves."  *In re Zyprexa*, 594 F.3d at 128.  They are therefore not entitled to an award of fees from other plaintiffs under the common fund doctrine and their motion should be denied.

---

[5] Unlike *Wolff*, however, Plaintiffs herein vigorously dispute the extent of the work carried out by *Havlish* counsel, as well as the benefit it conferred on them. *See* Part IV, *infra.*

III.   *HAVLISH* COUNSEL'S EFFORTS IN OBTAINING A DEFAULT JUDGMENT
AGAINST IRAN WERE NOT AUTHORIZED BY MDL LEADERSHIP AND DO
NOT CONSTITUTE "COMMON BENEFIT WORK" UNDER THE
PRINCIPLES GOVERNING AWARD OF FEES IN AN MDL.

Apart from the common fund doctrine, many MDL courts have recognized their authority to
award common benefit attorney's fees as a part of their inherent managerial authority over complex
litigation.  It is often necessary for an MDL judge to impose some organizational structure on the
attorney representation so that the MDL litigation can proceed in an efficient and effective manner.
*See, e.g.,* Judge Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation,* 74 LA. L. Rev. 371, 373
(2014).  To accomplish this task, MDL courts regularly appoint both lead counsel and also plaintiffs'
executive and/or steering committees to direct the litigation.  These plaintiff committees are charged
with responsibility to direct all pretrial proceedings in the litigation, to promote judicial economy and
efficiency, and to avoid unnecessary duplicative work.  They may also assign work to other plaintiffs'
counsel in the MDL in order to assist with these tasks.  *See* Duke Law Center For Judicial Studies,
Standards and Best Practices for Large and Mass-Tort MDLs 62 (2014) ("In large and mass-tort
MDLs, the transferee judge should encourage the leadership team to provide work for the common
benefit of the cases to other attorneys who are qualified and available to perform the work, unless
doing so would create inefficiency in the prosecution of the claims.").

As discussed in Background Section A., *supra,* this is almost precisely the organizational model
adopted by this Court in this MDL.  In CMO3, ECF No. 248 (filed June 16, 2004), this Court
established one Plaintiffs' General Steering Committee and two PECs (one for wrongful death and
personal injury plaintiffs and the other for plaintiffs asserting commercial claims), named Co-Chairs
and members of both PECs, assigned to the PECs responsibility to "conduct all pretrial proceedings
involving common legal and factual issues . . . on behalf of all plaintiffs," and to "coordinate discovery
and motion papers to the extent practicable to promote judicial economy, avoid duplicative effort,
and limit the burden on parties responding to discovery."  CMO3 authorized the Co-Chairs to assign

work to other plaintiffs' counsel "in such a manner as to promote the orderly and efficient conduct of this litigation, and shall avoid unnecessary duplication and unproductive effort." Finally, CMO3 declared that each PEC "shall have final authority with respect to matters pertaining to the claims of its constituencies." *Id.,* ¶¶ 1, 3-7, 9-10, 12.

Because the work of such an appointed plaintiffs' leadership team "inures to the common benefit of all plaintiffs and their primary counsel (the counsel that they employed), MDL transferee courts usually establish a procedure for creating a common benefit fee to compensate the members of the [PEC] and the members of any subcommittees who have done common benefit work." *Id.* at 374. As the Fifth Circuit Court of Appeals explained in *In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972,* 549 F.2d 1006, 1016 (5th Cir. 1977), "if lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation." The Second Circuit came to the same conclusion in *In re Zyprexa*, 594 F.3d at 130:

> The same equitable considerations that warrant payment of class counsel out of common funds generated by their efforts apply in these circumstances as well. The desirability—indeed, the compelling need—to have pretrial proceedings managed or at least coordinated by lead counsel or a steering or executive committee demands the existence of a source of compensation for their efforts on behalf of all.

*Havlish* counsel seek to invoke this body of MDL doctrine to justify their fee request. *See* ECF No. 4292 at 22. But they ignore and attempt to evade[6] the most critical aspect of this precedent: the Court's inherent authority to manage complex litigation before it provides a legal justification for an award of common benefit fees to plaintiffs' counsel appointed by the Court to conduct and direct the

---

[6] *Havlish* counsel cherry-pick selected phrases from both *Florida Everglades* and also *In re Vioxx Prod. Liab. Litig.,* 760 F.Supp.2d 640 (E.D. La. 2010), that on their face appear to support their position, without ever acknowledging that both cases involved justifications for an award of common benefit fees to the attorneys appointed to lead the MDL for the plaintiffs, not to rogue attorneys who engage in unapproved litigation activities that they themselves believed to be "beneficial to all MDL plaintiffs." *In re Vioxx*, 760 F.Supp.2d at 647.

litigation for all plaintiffs, as well as other work that has been assigned and is supervised by lead counsel. *See Smiley v. Sincoff,* 958 F.2d 498, 501 (2d Cir. 1992) ("District courts have *exercised this power to establish fee structures designed to compensate committee members for their work* on behalf of all plaintiffs involved in consolidated litigation.") (emphasis added); *cf.* Duke Law Center For Judicial Studies, Standards and Best Practices for Large and Mass-Tort MDLs 62 ("In most cases, courts expressly authorize other counsel to perform work on the case *so long as the work has been assigned and is supervised by lead counsel.*") (emphasis added).  It does not provide a justification for an award of fees to attorneys who choose to engage in legal work outside of, and without the approval of, the leadership structure established by the Court.

This Court invited *Havlish* counsel to participate in common benefit work in this MDL by appointing them to two seats on the PECs.  *See* CMO3, ECF No. 248 (assigning *Havlish* counsel 2 of the 13 seats on the wrongful death/personal injury PEC, with those seats currently occupied by Dennis Pantazis and Richard Hailey).  But *Havlish* counsel have declined to avail themselves of this opportunity, essentially abdicating their PEC roles or responsibilities years ago by declining to participate in pretrial litigation activities approved by the Co-Leads or the PECs, and instead choosing to focus solely on default judgments against Iran solely for *Havlish* plaintiffs and on ancillary matters related to those judgments.  Indeed, of the nearly 4,400 docket entries in the MDL docket, *Havlish* counsel are responsible for only about 100, and virtually all of those are specific to the claims against Iran or the plaintiffs they represent.  By contrast, almost all of the other docket entries reflect the work of the PECs, including responding counsel here.

Most importantly, *Havlish* counsel did not obtain PEC approval before filing their motion for a default judgment against Iran.  As *Havlish* counsel readily acknowledge in their papers, they

proceeded to obtain this default judgment against the direction of the PECs.  ECF No. 4292 at 12-13.[7]

Because *Havlish* counsel's work on obtaining the default judgment had not been authorized by the PECs, it does not fall within MDL precedent authorizing an award of attorney's fees pursuant to the Court's inherent managerial authority for work undertaken or approved by the Court-appointed Plaintiff leadership team for the common benefit of all plaintiffs in the MDL.  To the contrary, to award them fees would effectively undermine the Court's managerial authority to promote litigation economy and efficiency, by rewarding a rogue actor for acting outside of, and in direct conflict with, the leadership structure approved by the Court.  For this reason, as well, the pending fee motion is legally insupportable and must be denied.

## IV.    *HAVLISH* COUNSEL HAVE NOT JUSTIFIED THEIR EXORBITANT FEE REQUEST.

If, despite the foregoing, the Court nevertheless decides to entertain the *Havlish* fee request, it should immediately become apparent that the request is both exorbitant and unjustified.  *Havlish* counsel grossly overstate the time, expense, and value of their efforts in obtaining a default judgment against Iran.  As set forth at length in the Background Section above, and in the 2016 opposition, *Havlish* counsel's work was not only unauthorized by the PEC, but also largely duplicative, available from public sources, and unnecessary.  It was a foregone conclusion that Iran would not defend against the motion and, given the FSIA's lenient burden of proof and causation requirements, as well as prior terrorism precedent involving Iran, a foregone conclusion that a default judgment would be entered. Members of the PECs possessed all of the necessary evidence to establish a default judgment against

---

[7] The PECs had no substantive objection to seeking a default judgment against Iran, but did object to the timing, which leadership feared would interfere with ongoing efforts to make progress in litigation against other defendants. The PECs also objected, more generally, to *Havlish* counsel's efforts, which were largely duplicative and unnecessary, in light of work the PECs had already done. *See, supra,* Section "Background" B. at 6-8.

Iran, and *Havlish* counsel's efforts, which they refused to coordinate with the PEC, largely duplicated work that had already been carried out by other, active members of the PECs. *See, e.g.*, ECF No. 3272 at 18-22.

Apart from boldly asserting the centrality of their labors to the entry of the default judgment against Iran, *Havlish* counsel have made no effort to meaningfully document or justify the purported time, expense, and value of their work. If the Court is at all inclined to entertain their fee demand, not only must they be required to come forward with much more substantial documentation of their claim, and the PECs given a full opportunity to respond, but also the Court should give full consideration to the common benefit work of the entirety of the PECs. Many of the PECs' clients' participation in this MDL was dependent upon their counsel seeking accountability for *all* defendants who were involved in providing support to Al-Qaeda and the 9/11 attacks, not just Iran. The work and funding invested by counsel for those plaintiffs to fulfill and maintain that required scope of representation dwarfs even the exaggerated and undocumented investment claimed by *Havlish* counsel in support of their motion. The entire investment by Respondents in representing their respective clients in the MDL would need to be considered in evaluating any fee request. In fact, those *Havlish* plaintiffs who were not already named in other cases have since filed new complaints joining the Consolidated Amended Complaint against the Kingdom of Saudi Arabia. *See* ECF No. 4325 (noting that Short Form Complaints adopting the Consolidated Amended Complaint against the Kingdom of Saudi Arabia were filed in the *Rosenthal*, *Soulas*, *Homer*, and *McGuire* cases).

Nevertheless, as explained in earlier sections of this memorandum, consideration of *Havlish* counsel's claim for fees is unnecessary, because *Havlish* counsel have utterly failed to put forward even a rudimentary legal justification for their claim. Their work did not create a common fund for the benefit of all MDL plaintiffs, they have performed no legal work for the common benefit of MDL plaintiffs, their work was not conducted pursuant to authorization from the Court-appointed Co-

21

Chairs or the PECs, and, in any event, at this stage of the litigation, it is impossible to assess the relative value of their efforts to any ultimate recovery by all MDL plaintiffs. Each of these, in and of itself, is a sufficient ground to deny the fee application.

## CONCLUSION

For the foregoing reasons, the *Havlish* Plaintiffs' Renewed Motion for an Order Creating a Common Benefit Fund and Authorizing Certain Disbursements Therefrom should be denied in its entirety.

February 15, 2019                                                  Respectfully submitted,

MOTLEY RICE LLC                                    COZEN O'CONNOR

By:  */s/ Robert T. Haefele*                         By:  */s/ Sean P. Carter*
    JODI WESTBROOK FLOWERS              SEAN P. CARTER
    ROBERT T. HAEFELE                        J. SCOTT TARBUTTON
    MOTLEY RICE LLC                          COZEN O'CONNOR
    28 Bridgeside Boulevard                  One Liberty Place
    Mount Pleasant, SC 29465                 1650 Market Street, Suite 2800
    Tel.: (843) 216-9184                     Philadelphia, Pennsylvania 19103
    Email: rhaefele@motleyrice.com           Tel.: (215) 665-2105
                                Email: scarter@cozen.com

*For the Plaintiffs' Exec. Committees*                 *For the Plaintiffs' Exec. Committees*

KREINDLER & KREINDLER LLP

By: */s/ Andrew J. Maloney*
    JAMES P. KREINDLER
    ANDREW J. MALONEY
    KREINDLER & KREINDLER LLP
    750 Third Avenue
    New York, New York 10017
    Tel.: 212-687-8181
    Email: amaloney@kreindler.com

    *For the Plaintiffs' Exec. Committees*

cc:      The Honorable George B. Daniels, via ECF
         All Counsel of Record via ECF