IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON : |
| SEPTEMBER 11, 2001 : MDL 03-1570 (GBD)(SN) |

**This Document Relates To:**

*Havlish, et al. v. bin Laden, et al.,* **Case No. 03-CV-09848**
*Ashton, et al. v. al Qaeda Islamic Army, et al.*, **Case No. 02-CV-06977**
*Burnett, Sr., et al., v. Islamic Republic of Iran,* **Case No. 15-CV-9903**
*Burlingame, et al. v. bin Laden, et al.*, **Case No. 02-CV-07230**
*Bauer, et al. v. al Qaeda Islamic Army, et al*., **Case No. 02-CV-07236**
*O'Neill, Sr., et al. v. Republic of Iraq, et al.*, **Case No. 04-CV-1076**
*Federal Insurance Co., et al. v. al Qaida, et al.,* **Case No. 03-CV-06978**
----
*Dillaber, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-03162**
*Agyeman, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05320**
*Morris, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05321**
*Derubbio, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05306**
*Schlissel, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05331**
*Kamardinova, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-05339**
*Ades, et al. v. Islamic Republic of Iran, et al.,* **Case No. 18-CV-07306**

## *HAVLISH* REPLY MEMORANDUM

The *Havlish* Plaintiffs respectfully present this reply memorandum in support of their renewed motion, pursuant to the Court's inherent equitable powers, to enter an Order to create a common benefit fund.  It is important to note what Responding Plaintiffs ("RP's") do not dispute:  (1) While RP's assert they could have gotten their judgments all on their own, the fact is they did not.  They do not dispute that they used, and exclusively relied on, evidence developed and presented in *Havlish v. bin Laden, et al.*, Case No. 03-CV-09848.  (2) This MDL has been pending for 15 years and to date the only substantial recoveries have been for judgments against Iranian entities obtained in reliance on *Havlish v. bin Laden, et al.*, Case No. 03-CV-09848.  (3) Some of RP's filed cases for thousands of new plaintiffs and obtained judgments just in time to apply for, and obtain, compensation from the USVSST Fund; all of the RP's' judgments were obtained in reliance on *Havlish v. bin Laden, et al.*, Case No. 03-CV-09848.  It is anticipated that RP's have or will recover in excess of $600,000,000 from the

USVSST Fund.  (4) The PEC objected to the efforts by *Havlish* counsel when they sought to proceed to an evidentiary hearing to obtain the *Havlish* judgment against Iran.  (5) RP's admit that *Havlish* Counsel "established a legal precedent that other plaintiffs relied on as *res judicata* in obtaining default judgments against Iran."  PEC Mem. at 15.  (6) The efforts of RP's and the PEC on the cases against Saudi Arabia have yielded no recoveries to date and may never.  (7) RP's' did not need to expend much time or effort to assist clients to apply for the USVSST Fund.

I.   THIS MOTION IS NO LONGER PREMATURE

The Court's concern in the order of August 2, 2016 was that "it would be premature to reach the merits of the motion *because at this point the amount of effort Respondents will expend to collect their award from Iran, and the sums, if any, that they will actually recover, would be pure speculation.*"  (MDL Doc. No. 3322 at 1.) (*Emphasis added*.)  We now know precisely the amount of effort expended by RP's to collect the judgments against Iran and related entities: virtually none.  RP's relied exclusively on *Havlish* to obtain their judgments and then merely filed claims with the USVSST Fund.  The claim process itself is straightforward and not at all onerous, and RP's do not contend otherwise.  What is required, essentially, is to submit an application providing basic claimant information, amounts recovered from other sources, if any, and notifications to family members.  RP's did not have to expend time or money to find Iranian assets subject to collection, domesticate their judgments overseas, or litigate any collection case.

The USVSST Fund notified eligible claimants in December 2018 and commenced payments in January of this year.  RP's know precisely the amounts actually recovered.  The Court's concerns as to recovery from the USVSST Fund have been completely resolved, and this motion is ripe for resolution.  The motion does not seek any award for recoveries not received, only a set-aside of a portion of recoveries so that such future questions may be timely addressed.

RP's suggest the Court should wait until the entire MDL in completely wrapped up.  The

MDL, already fifteen years old, could go on for another ten or fifteen years, and collection efforts could last far longer still. Yet, three of RP's themselves – in their opposition to the original motion three years ago – clearly identified the payout from the USVSST Fund to 9/11 families in their cases as exactly the right time to consider this motion:

> …. The regulations regarding compensation from the [USVSST] fund of seized assets have yet to be promulgated by the newly appointed Special Master Kenneth Feinberg. As the law currently reads, victims of Iranian terror who have recovered money from the 9/11 Victims Compensation Act ("VCF") must wait until other Iranian terror judgments are satisfied from a limited fund and, in the end, could be unable to share at all in this fund. …. Hopefully, other developments will occur which will enable the 9/11 families and victims to recover on the basis of their judgments against Iran. Only at that time can this Court properly establish the value of the purported *Havlish* efforts and expenditures, if any, to the realization of an actual recovery from Iran, as compared to the actual contributions of others.

Three RP's / PEC Members' Mem. at 4-5, n.4. (May 5, 2016).

## II. *HAVLISH* COUNSEL NEED NOT HAVE CREATED THE FUND TO BE ENTITLED TO COMMON BENEFITS FEES

No rule of law or equity requires *Havlish* counsel to have secured the precise source of collection. Rather, as made clear by the Supreme Court, it is the "common benefit" bestowed by the efforts of *Havlish* counsel that is the touchstone of this matter.

> Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation — the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree — hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 167 (1939).

The distinction between "common fund" and "common benefit" is manifest: "MDL courts have consistently cited the *common fund* doctrine as a basis for assessing *common benefit fees* in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *In re Vioxx Prod. Liab. Litig.*, 760 F.Supp.2d 640, 647 (E.D. La. 2010) (*emphasis added*).

Thus, while the traditional "common fund doctrine" is the basis for the "common benefit fees," there is no requirement that the attorneys providing the common benefit also procure the common fund. Indeed, common benefit fees have been imposed by a federal court MDL against funds recovered in state court proceeding by an attorney who was not a signatory to the MDL fee sharing agreement. *In re Avandia Mktg. Sales Practices*, 658 F.App'x 29, 33 (3d Cir. 2016).

The RP's note the *Havlish* motion requests a 12% set-aside rather than 8%, as requested three years ago. Since then, it became clear that RP's' counsel had to do very little in order to recover from the USVSST Fund on their Iran judgments. Moreover, the motion makes clear that 12% is cited as an appropriate level, but *Havlish* respects the Court's "judgment to set the appropriate percentage under the facts surrounding this matter." *Havlish* Mem. at 5.[1]

### III.   THE HAVLISH BURDEN WAS CERTAINLY NOT *DE MINIMIS*

RP's attempt to minimize the effort necessary to obtain the *Havlish* judgment, suggesting it could have been accomplished with minimal legal work because *Havlish* was litigating "against no one," or "against a single non-appearing defendant" and because the FSIA standard is "lenient." PEC Mem. at 1, 8-9. First, the FSIA standard is not lenient. It is different from the usual civil standard because there is no appearing defendant, whose own evidence normally would be placed on the balance scale. Instead, the law imposes an obligation to satisfy the court with admissible evidence, which means plaintiffs' burden is to convince the most discerning lawyer in the courtroom – the judge.[2] It is not knowable what quantum and quality of evidence this Court would have accepted as satisfactory in the RP's' cases, but the *Havlish* attorneys never took lightly the task of presenting the strong evidence that the Court should consider before

---

[1] RP's note the USVSST law limits attorney fees to 25%. Even at 12%, more than half is left for the RP's' attorneys. The *Havlish* group has no knowledge whether 12% exceeds the contractual fee arrangement for any of the RP's' attorneys, but RP's are not specific and do not substantiate the point.

[2] Early in this case, before the creation of the MDL, Judge Robertson of the District of the District of Columbia admonished all the plaintiffs, "don't bring me intelligence, bring me evidence."

rendering one of the most significant decisions possible pertaining to the most devastating terrorist attack in world history.  We did not presume a *de minimis* showing would have sufficed.  Rather, we presumed the proper way to present such a momentous case, on both liability and damages, was to present reliable, credible, and convincing hard evidence of facts, backed by admissible testimony and buttressed by comprehensive expert analysis.  The *Havlish* consortium was not looking for "merely 'Pyrrhic victories.'"  RP's Mem. at 5.[3]

What differentiates *Havlish* from virtually every other terrorism lawsuit in history is that the U.S. Government and its intelligence community did not provide the bulk of the evidence against Iran on the central liability question.  The 9/11 Commission traces some of the history of Iran's involvement in many of history's most heinous attacks,[4] but, the 9/11 Commission "found no evidence that Iran or Hezbollah was aware of the planning for what later became the 9/11 attacks."  9/11 REPORT at 241.  Had the U.S. government provided any such evidence to the 9/11 Commission, that statement would not have been written.  But as detailed in Philip Shenon's book, THE COMMISSION, and discussed in the *Havlish* briefs, the 9/11 Commission did not start looking at the National Security Agency's satellite intercepts until virtually the last minute – and then literally held the presses for several days so that the section entitled "Assistance from Hezbollah and Iran to al Qaeda" at pages 240-241 could be written and inserted in the 9/11 REPORT.[5]  The 9/11 Commission ended that passage with the following one-sentence paragraph:

---

[3] 9/11 was the most important single world event in many decades and would define much about the decades to come in America and throughout the world.  It is often said that 9/11 changed everything.  Finding the truth and establishing accountability for 9/11 was not a Pyrrhic victory.  Further, the *Havlish* consortium never intended to demur on collection of a judgment in this case.

[4] These included the Marine Barracks and U.S. embassy bombings in 1983 and 1984 in Beirut, Lebanon, and the Khobar Towers bombing in Saudi Arabia in 1996.

[5] Notably, too, the 9/11 Commission did not name the "senior Hezbollah operative," although the *Havlish* evidence established not only his identity but also the fact of his extensive and fundamental engagement in the 9/11 operation: Imad Mugniyeh, the head of Hezbollah's military wing and for many years the most dangerous, and most wanted, terrorist in the world.  Nor did the 9/11 REPORT present any substantive information about how the 9/11 operation was actually designed.  The *Havlish* investigation did.

5

"We believe this topic requires further investigation by the U.S. government." *Id.* Nothing is publicly known of any such further investigation by the U.S. government, but a further investigation was conducted, by the *Havlish* consortium.

Conducting an international field investigation of the world's preeminent state sponsor of terror, its terror apparatus, and its terrorist proxy organization, is not the sort of *de minimis* effort the RP's suggest was all that was necessary to obtain a judgment. *Havlish* attorneys and their investigative consultant undertook many international trips, some of them dangerous, and produced thirty (30) hours of sworn videotaped testimony by four witnesses: three defectors from the Iranian intelligence apparatus and the first president of the Islamic Republic of Iran. The defectors also provided, and authenticated, valuable documentary evidence to back up their testimony. None of that evidence was available publicly or possessed by the PEC (although they do claim their "investigative consultant interview[ed]" interviewed one of the defectors. Three RP's / PEC Members' Mem. at 22, n.18 (May 5, 2016).

The evidence presented in *Havlish* was among the most comprehensive evidentiary records ever entered in a terrorism case. Given the momentous underlying event, the nature of the case cutting across the grain of conventional wisdom, and as the "further investigation" envisioned by the 9/11 COMMISSION REPORT, as well as the historic findings of this Court, no less was required. The RP's' assert they were "in possession of all necessary evidence and proofs (in addition to having retained experts) to obtain a default judgment against Iran without the need for *Havlish* counsel's efforts," RP's Mem. at 7, but it is unknown whether their unsubmitted evidence would have been satisfactory to the Court. Perhaps the RP's could have, and perhaps they would have, but the only known facts are they did not present anything of their own, and, instead, the PEC tried to stop the *Havlish* attorneys from presenting their case.

### IV. THE PEC'S APPROVAL WAS NOT NECESSARY

Although the PEC was empowered to "coordinate discovery and motion papers to the extent practicable to promote judicial economy, avoid duplicative effort, and limit the burden on parties responding to discovery," RP's Mem. at 17, the RP's assert more: "*Havlish* counsel did not obtain PEC approval before filing their motion for a default judgment against Iran." *Id.* at 19. Nothing in this Court's order required that; this Court was always clear that each set of attorneys remained responsible for their own cases. Moreover, *Havlish* counsel's efforts were disclosed to the PEC in open court and were opposed by the PEC.[6] The Court overruled the PEC's objections and allowed *Havlish* counsel to go forward.

Further, *Havlish* counsel never created any problem for the PEC nor duplicated its efforts. The *Havlish* evidence was partially comprised of open source material, but the vast majority of it was not.[7] In contrast, almost all of the evidence listed in the PEC's brief three years ago was books, magazine articles,[8] and other open source material. The PEC hired an Israeli expert, but only until 2006, to come up with supporting evidence. (The *Havlish* group met with him as well, but did not retain him.) In sum, the PEC's list of evidence does not come close to the quantity or quality of the evidence that *Havlish* placed before the Court, and none of it was ever seen or evaluated by the Court.

The *Havlish* liability and damages efforts largely concerned proof for trial rather than the

---

[6] The RP's' assert the PEC did not oppose the *Havlish* effort to pursue default proceedings against Iran in 2010 and 2011. Anyone in the courtroom that day understood clearly that the PEC was doing exactly that. *See* Ex. 5 to *Havlish* Mem. on Renewed Motion.

[7] The critically important thirty hours of testimony, with supporting exhibits, were clearly not open source, nor were the significant sealed affidavits. *Havlish* also assembled an array of experts, several of whom viewed the testimony and addressed the veracity and consistency of these firsthand witnesses. The experts included three members of the 9/11 Commission staff, two former CIA analysts, the foremost terrorism prosecutor in Europe, the preeminent terrorism and intelligence investigative journalist in Israel, a former head of U.S. Interpol, and two of the most widely respected Iran experts in the U.S.

[8] Among the PEC's cited magazine articles are several by Kenneth Timmerman, an investigative journalist who was the *Havlish* consortium's retained expert/investigator for many years.

sort of pretrial matters which would have been under the auspices of the PEC.  There was no discovery directed to Iran because neither none of the Iranian defendants appeared.  The activities of *Havlish* counsel were mostly aimed at investigation of the liability issues, memorialization of admissible evidence, and development of methods to present proof of damages.  Upon all of this, the RP's relied and all of it undeniably inured to their benefit.[9]

The bottom line is that the PEC chose not to pursue actively their cases against Iran, preferring to push those cases off for another day, or, rather, another year.  *Havlish* counsel did pursue the Iran case, and the results of those efforts greatly benefited RP's.  As for the activities of the PEC chair holders, everyone on the PEC understood *Havlish* was pursuing the Iran investigation and the rest of the PEC focused on Saudi Arabia.  In fact, at the time, the *Havlish* group had referred all of its clients to *Burnett* counsel to be represented in regard to claims against the Saudis.  The PEC stopped communicating with the *Havlish* chair holders altogether.

The RP's also make an issue of the *In Re: 650 Fifth Avenue and Related Properties* proceedings.  Those cases are collection matters beyond the scope of the MDL.  Any plaintiff with a timely judgment against Iran could have sought intervention in *650 Fifth Avenue*.  That *Havlish* did so, and the RP's did not because they lacked judgments is of no relevance to the MDL or to this motion.  The issue is the common benefit provided by *Havlish* counsel to enable the RP's to obtain their recent judgments against Iran which rendered them eligible to participate in the USVSST Fund.  What *Havlish* counsel did to collect in *650 Fifth Avenue*, which began years before most of the RP's obtained their judgments, is wholly irrelevant.

### V.   *HAVLISH* HAS PROVIDED PROOF OF TIME AND EXPENSES

The RP's misstate the record in suggesting *Havlish* counsel has never provided the Court

---

[9] The RP's denigrate the *Havlish* attorneys' motives by asserting they abandoned their class allegations.  RP's Mem. at 3.  The class allegations were unnecessary because thousands of the potential class members were were represented by counsel, and class proceedings would only have made the litigation more difficult and protracted.

8

with justification for the time and expenses involved in procuring the proof to obtain the judgments against the Iranian entities. *Havlish* counsel has provided the Court with evidence as to the time and money spent through the affidavit of Thomas E. Mellon, Jr. (*Havlish* Doc. 301, Ex M). Further, the ultimate proof is reflected in the extensive evidence, comprehensive briefs, and elaborate Findings of Fact and Conclusions of Law that supported not only the *Havlish* judgment, but all of the judgments obtained by the RP's.

### VI. RP'S MISCONSTRUE THE REMEDY SOUGHT

*Havlish* counsel does not suggest they will be entitled to 100% of all funds set aside from every future recovery. Rather, *Havlish* counsel requested the Court order 12% of any amounts actually collected by RP's on their Iran judgments be set aside. The only amounts *Havlish* counsel requested be authorized for distribution now is the portion of monies being distributed to RP's during the *current* round of payments from the USVSST Fund. That is because the efforts needed to obtain those funds is now fully known. Distributions of the 12% set-aside from future recoveries would be subject to further order of the Court. Further, *Havlish* does not ask for any set-aside or fee award from anyone who did not actually receive compensation. At issue at this time are only the amounts the RP's have or will receive from the USVSST Fund because of advocacy by *Havlish* counsel. Yet, in fact, *Havlish* counsel was instrumental in preserving the rights of a large number of RP's to obtain the current and future USVSST payments.

### VII. *HAVLISH* PRESERVED RP'S' ABILITY TO SHARE IN THE USVSST FUND

During the spring and summer of 2016, the USVSST Fund Special Master publicly stated that he was going to deny payments to anyone who received money that emanated from the 9/11 Victims Compensation Fund ("VCF1"), regardless of amount and how they received it, including inheritances from estates that received an award. The Special Master also said he intended to offset USVSST Fund payments by any insurance proceeds resulting from 9/11 deaths and by any

9

pension benefits triggered by a 9/11 death. On a nationwide town-hall style conference call, *Havlish* counsel challenged the Special Master on these issues (and was the only attorney who did so). *See* Ex. 1, Declaration of Timothy B. Fleming. The Special Master stuck to his position and announced he intended to issue interpretations disqualifying those who inherited VCF1 money and setting off amounts collected on insurance policies and through pension benefits. *Havlish* counsel then submitted detailed written comments setting forth why these implementation decisions were contrary to the statute and congressional intent. Ex. 2, Public Comments, June 29, 2016. Subsequently, the Special Master reversed position and implemented regulations and interpretations embracing the *Havlish* position: he did not disqualify 9/11 family members who inherited VCF1 money from estates as ineligible for USVSST Fund payments, and, he decided not to offset insurance or pension proceeds. *See* http://www.usvsst.com/faq.php, *e.g.*, FAQ 4.8. The RP's were not present to weigh in. Some *Havlish* judgment holders benefited, but many more RP's' future USVSST Fund claims were thus preserved and protected.

     As stated above, the PEC argued to this Court three years ago that it was problematic whether and when the 9/11 families would be entitled to recover from the USVSST Fund. *See* pp. 3-4, *supra*. But the *Havlish* and *Hoglan* judgment holders blazed the trail for an actual USVSST recovery for many such 9/11 families in 2016. *Havlish* counsel challenged the Special Master's interpretations that would have eliminated many 9/11 family members from USVSST payments and created substantial offsets in the payments to others – and succeeded. If those "other developments" had not occurred, the RP's would not be sharing in, indeed receiving the large majority share (60-65%) of the USVSST Fund 2019 payments. We are very glad that those families are able to recover and are receiving their shares of the USVSST Fund. We only seek to recover fair compensation for our part in making that happen.

## VII. CONCLUSION

For the reasons set forth above, the Court should grant the *Havlish* motion and enter an appropriate order.

Date: March 1, 2019   /s/ Timothy B. Fleming
Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
1211 Connecticut Avenue, NW, Suite 420
Washington, DC  20036
(202) 467-4489

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC       (*Lead Counsel*)
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

John A. Corr (PA Bar No. 52820)
LAW OFFICE OF JOHN A. CORR
301 Richard Way
Collegeville, PA 19426
(610) 482-4237

Stephen A. Corr (PA Bar No. 65266)
BEGLEY, CARLIN & MANDIO, LLP
680 Middletown Boulevard
Langhorne, PA  19047
(215) 750-0110

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134

(630) 232-7450

David C. Lee (TN Bar No. 015217)
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
   YEGELWEL, P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
EDWARD H. RUBENSTONE, LLC
812 N. Fairway Rd.
Glenside, PA 19038
215-887-9786

Donald J. Winder (UT Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

**Attorneys for the *Havlish* Plaintiffs**