J2QTTERA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  TERRORIST ATTACKS ON
   SEPTEMBER 11, 2001
4                                      03 MDL 1570 (GBD)(SN)

   ------------------------------x
5                                      New York, N.Y.
                                       February 26, 2019
6                                      3:00 p.m.

7  Before:

8                      HON. SARAH NETBURN,

9                                          Magistrate Judge

10                        APPEARANCES

11  KREINDLER & KREINDLER
         Attorneys for Plaintiffs' Executive Committee
12  BY:  JAMES KREINDLER
         STEVEN POUNIAN
13       MEGAN BENETT
         ANDREW MALONEY
14
   MOTLEY RICE
15       Attorneys for Plaintiffs' Executive Committee
   BY:  ROBERT T. HAEFELE
16
   ANDERSON KILL & OLICK
17       Attorneys for Plaintiffs' Executive Committee
   BY:  JERRY S. GOLDMAN
18       ARTHUR ARMSTRONG
         STEPHEN WAH
19       BRUCE STRONG

20  COZEN O'CONNOR
         Attorneys for Plaintiffs' Executive Committee
21  BY:  STEPHEN COZEN
         SEAN P. CARTER
22
   KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
23       Attorneys for Defendant
   BY:  GREGORY RAPAWY
24       ANDREW SHEN
         MATTHEW HUPPERT
25

J2QTTERA

1            (Case called)

2            MR. GOLDMAN:  Jerry Goldman, Anderson Kill, on behalf

3    of the Plaintiffs' Executive Committee and a number of

4    plaintiffs.  With me are several of my colleagues, Arthur

5    Armstrong, Stephen Wah and Bruce Strong.  Good afternoon, your

6    Honor.

7            THE COURT:  Good afternoon.

8            MR. COZEN:  Steve Cozen, your Honor, from Cozen

9    O'Connor on behalf of the Plaintiffs' Executive Committee.

10            MR. MALONEY:  Good afternoon, your Honor, Andrew

11    Maloney from Kreindler & Kreindler on behalf of the Plaintiffs'

12    Executive Committee.

13            MR. HAEFELE:  Good afternoon, your Honor, Robert

14    Haefele, Motley Rice, for the Plaintiffs' Executive Committee.

15            MR. CARTER:  Good afternoon, your Honor, Sean Carter,

16    Cozen O'Connor, Plaintiffs Executive Committee.

17            MR. KREINDLER:  Good afternoon, your Honor, Jim

18    Kreindler for the Plaintiffs' Executive Committee.

19            MS. BENETT:  Good afternoon, your Honor, Megan Benett

20    with Kreindler & Kreindler for the Plaintiffs' Executive

21    Committee.

22            MR. POUNIAN:  And good afternoon, Steve Pounian for

23    the Plaintiffs' Executive committee.

24            THE COURT:  Good afternoon.

25            MR. RAPAWY:  Good afternoon, your Honor, Gregory

Rapawy for the Kingdom of Saudi Arabia.  And Mr. Kellogg asked

me to express his regrets for not being able to attend.  He's

currently not able to travel for medical reasons.

THE COURT:  Okay.  I wish him a speedy recovery.

MR. SHEN:  Good afternoon, your Honor, Andy Shen from

the Kellogg Hansen firm for the Kingdom of Saudi Arabia.

MR. HUPPERT:  Good afternoon, your Honor, Matthew

Huppert from the Kellogg Hansen firm also on behalf of the

Kingdom of Saudi Arabia.

THE COURT:  Good afternoon to all counsel and to

everybody that's here today.  I want to particularly welcome

the family members who are here.  We appreciate your attendance

in the court and we're happy we're able to accommodate you.  I

hope all of you were able to find a seat.  There are still some

seats available in the front, so hopefully everybody was able

to find some space.

A few housekeeping matters, both for the benefit of

the people in the gallery and for the benefit of the court

reporter, who is arguably the most important person in the

room.  I want to make sure that everybody always speaks slowly

and into a microphone.  We have the podium here and it may be

easiest if, when people are addressing the Court, they come to

the podium.  It may be that at a certain point in the

conversation we're having a more freewheeling conversation such

that it doesn't make sense for people to get up and down from

J2QTTERA

1    the podium, so if you are speaking from your counsels' table,

2    if you could make sure that you have a microphone close to you

3    so that everybody can hear you.

4           We're here today on a number of motions.  I have lots

5    of things today.  I'm also going to thank the lawyers for the

6    excellent work that you all did on the motions.  We have a

7    motion regarding supplemental discovery from the kingdom, a

8    motion to compel additional discovery from the kingdom, and

9    then the motion to seal.  All of these briefs were excellent,

10   they were very clear, and I feel like I have a pretty good

11   understanding about what the parties are arguing and what their

12   positions are and how they're supported.  I'm not going to rule

13   from the bench today, so I will give the end of the story

14   first.  And I don't know that I need a significant amount of

15   regurgitation of the motion papers.

16          With respect to motions for discovery, I'm going to

17   invite counsel, if they have some salient points that they want

18   to reinforce to me or if there are particular documents that

19   you think are especially important to highlight for my review.

20   I have read all of the briefs and looked at all of the

21   documents.  I think the most efficient way for me to proceed is

22   to hear any final arguments that the parties want to make and

23   then go back and issue a written decision on these discovery

24   disputes.

25          So I will give you an opportunity to speak, but I want

J2QTTERA

1   to encourage counsel to make your best effort not to reiterate

2   the voluminous briefing that I have received and reviewed.  The

3   same goes for the motion to seal.  I have a couple of questions

4   also with respect to that, but again, I have read the briefing

5   and understand the parties' legal arguments, so I don't need

6   full blown argument on the same.

7          The other issue I believe is an open issue for us,

8   which I think is an easy issue, was the 1202 certification that

9   the Plaintiffs' Executive Committee submitted on February 20.

10  There was a flurry of letters related to this certification in

11  a matter of days.  I guess just on this particular housekeeping

12  matter, maybe I will address this to the kingdom, have you

13  looked at the proposed order that the Plaintiffs' Executive

14  Committee attached to its February 20 letter?

15         MR. RAPAWY:  Yes, your Honor, we did.

16         THE COURT:  I understand that you have objections to

17  the plaintiffs' statements of fact as undisputed in their

18  letters.  I read their proposed order.  I don't think they are

19  asking me to make a judicial finding with respect to those

20  statements of fact.  And so my question is whether or not you

21  had any objection to the proposed order just so that I can make

22  that certification and get the documents over.

23         MR. RAPAWY:  No, your Honor.  If you don't find it

24  necessary to rely on the statement of facts in their letter,

25  the order itself is not objectionable to us.

J2QTTERA

1          THE COURT:  I don't think so.  It seems to me that we

2     could clean the order up slightly.  I don't know that it

3     matters one way or the other.  In the order it has the Court

4     conclude that the subpoenaed records regarding the issuance or

5     refusal of visa permits to enter the United States may contain

6     relevant information.  And there's a comma, and it says

7     "including," and then it has some of the factual statements

8     that the Plaintiffs' Executive Committee are pursuing.  It

9     seems to me we get could have a full stop at "may contain

10    relevant information," and that would be adequate.  To extent

11    there's any objection with even the characterization of why

12    these things are relevant, I don't know that it really matters

13    one way or the other.

14          MR. RAPAWY:  Whatever your Honor wants to do on that

15    issue is fine with us.

16          THE COURT:  Mr. Pounian?

17          MR. POUNIAN:  Our one concern, your Honor, was that we

18    had negotiated this with the Department of Justice and the

19    Department of State, and we went back and forth on the

20    language, and they required specific findings in the order so

21    that they would then --

22          THE COURT:  Findings of relevance as to those specific

23    factual categories?

24          MR. POUNIAN:  Yes.  And they could go back and make a

25    decision in house to what their position would be as to whether

J2QTTERA

1    or not they would release the documents.  So they really wanted

2    to know what our litigation position was, which I tried to

3    present sort of generally in the order.

4            THE COURT:  Understood.  Okay.  Then it seems to me it

5    makes sense to sign this as is.  Again, it's not the Court

6    making any conclusions of fact related to the plaintiffs'

7    position, it is simply concluding that the material that is

8    being sought from the FBI and the State Department may contain

9    relevant information to certain categories of inquiry.

10           MR. RAPAWY:  I understand, your Honor.

11           THE COURT:  Great.  So I will go ahead and sign that

12   proposed order this afternoon.

13           Let me begin on the discovery question, and I have a

14   question I would like answered from Saudi Arabia before we

15   begin, which is if you could just describe for me what the

16   document world looks like in 1998 to 2002 that you have been

17   looking through.  And what I'm trying to better understand is:

18   Are these electronically stored documents?  Are you looking

19   through emails, if emails existed then?  Are we talking about

20   boxes, actual hard copy files that you're looking through?  If

21   you could give me a sense of what type of documents and how you

22   conducted your searches generally in the production that you

23   made thus far.

24           MR. RAPAWY:  Yes, your Honor.  Am I audible at this

25   point if I speak like this?

J2QTTERA

1          THE COURT:  I think so.

2          MR. RAPAWY:  So there is very little electronic

3     material available from that period.  Email did exist, it

4     generally was not used by the relevant agencies and

5     individuals; not to say that no one in the agency was using it,

6     but we did not find any responsive email files that are

7     contemporaneous.

8          There is one work computer I think is addressed a

9     little bit in the papers that belonged to Mr. Al Bayoumi before

10    his retirement, and we did review that and produce essentially

11    everything on it from the relevant date range.  There wasn't

12    very much of it, and I don't think plaintiffs found it helpful.

13    There was a back and forth about that.

14         THE COURT:  You don't think?

15         MR. RAPAWY:  I don't think plaintiffs found it

16    helpful.  It had to do with his job responsibilities, it didn't

17    have to do with anything related to this case.

18         Most of the documents are therefore paper.  They are

19    stored in various different places either in Saudi Arabia or in

20    the United States in the diplomatic facilities that we

21    searched.  We searched the office -- I don't want to recap what

22    is already in the addendum to our brief, your Honor, but I also

23    want to answer your question.

24         We went to the offices of GACA, that the General

25    Authority of Civil Aviation in both Riyadh and Jeddah, and they

J2QTTERA

1    have a subsidiary called Saudi Air Navigation Services, SANS,

2    that's also in Jeddah.  That's the successor to the ANSS

3    project on which Mr. Al Bayoumi was seconded.  So we went to

4    their offices, we went to their warehouses, to the extent they

5    had warehouses, and they had several.

6         We did the same procedure, essentially, with the

7    Ministry of Islamic Affairs in Riyadh.  They had documents in

8    their offices, they also had two offsite warehouses, so we went

9    and looked for documents that were relevant there.  We also

10   made a number of follow-up requests afterwards, so some

11   documents come to us in electronic form because they were

12   scanned in response to our requests later.

13        With respect to the facilities in the United States,

14   again it was pretty much all paper.  We found one set of

15   back-up tapes that we restored.  I don't think it had anything

16   at all from the relevant period.

17        The documents at the embassy and the consulate in

18   particular were not really organized by office, and that's the

19   reason that we changed our search protocol.  This is noted a

20   little bit in our addendum.  And so far as we could manage it,

21   we found every piece of paper mentioning these individuals from

22   the embassy or the consulate during the relevant period, 1998

23   to 2002.

24        Now all this stuff that we're pulling in, with a few

25   exceptions, is almost entirely in Arabic.  So we had

J2QTTERA

1    Arabic-speaking attorneys or assistants on site with our

2    attorneys when we were pulling these documents.  And we hired

3    Navigant to do the document production as well and they had

4    Arabic-speaking folks with us as well.  Pretty much everything

5    was pulled on site and brought back to the United States.  We

6    got sort of hurried work product translations so we could view

7    the documents for relevance and then loaded them onto an

8    electronic platform and there did the review using the

9    electronic platform.  But it was all in paper in the first

10   instance, or almost all; and unfortunately with Arabic, OCR

11   doesn't work very well, so we weren't able to do keyword

12   searches.  You have to go pretty much page by page through

13   every document to determine whether it was responsive.

14             THE COURT:  Okay, that was helpful.  Thank you.

15             Why don't I turn to the plaintiffs.  And I don't know

16   who is going to be speaking from this table.

17             Mr. Pounian, let me reiterate that my hope is not to

18   have you recite again chapter and verse the extensive briefing

19   that I have reviewed for today, but if there are certain areas

20   of discovery that you would like to highlight for me, things

21   that you think are particularly important, I am happy to hear

22   from you.

23             MR. POUNIAN:  Thank you, your Honor.

24             We just heard Saudi Arabia say they produced every

25   piece of paper with Mr. Thumairy or Mr. Bayoumi's name on it at

J2QTTERA

1  their embassy or consulate.  And we know that's not true, your

2  Honor.  We know that's not true because we obtained documents

3  ourselves, documents that were produced in litigation of the

4  Omar Abdi Mohamed case in San Diego in 2004.

5       And those documents were obtained because the FBI

6  raided Omar Abdi Mohamed's house in San Diego and found out

7  that he was illegally working inside the United States as a

8  propagator for the government of Saudi Arabia.  And he was

9  working in fact under Mr. Thumairy at the embassy in Los

10  Angeles.  One of the documents that was seized went by the

11  FBI -- and I had prepared an entire PowerPoint presentation,

12  your Honor, which I will not go through with the Court, but if

13  I could just show this one document, which I believe is

14  document 8.

15       I had prepared a book that is with your Honor.

16       THE COURT:  Yes, I have it.

17       MR. POUNIAN:  This is the Arabic version of document,

18  your Honor.  You can see it's from the embassy in Washington,

19  and about if we go to the English version of the document, on

20  the next page, it's a document from the embassy signed by

21  Khalid Suwaylim, who is the director of the Da'wah office in

22  America, who is Thumairy's direct supervisor in Washington at

23  the embassy.

24       This document is dated in January of 1998 and states

25  that this is to inform the propagator that the director of

J2QTTERA

Da'wah for Europe and America and Australia has approved the

nomination of Fahad Thumairy to oversee the propagators in the

State of California.  And it says, "Please cooperate with him."

The propagator is being instructed to cooperate with

Mr. Thumairy to promote propagation activities in the State of

California.  This propagator is in San Diego.  And this

document tells us that Mr. Thumairy has a boss, Mr. Suwaylim,

that someone nominated Mr. Thumairy to this position to oversee

propagators, and that someone in Saudi Arabia, a director in

Riyadh, approved the nomination.

Now we asked for this specific document from the

Kingdom of Saudi Arabia.  We asked for it repeatedly.  And to

this day, it has not been produced, despite the search that

they say they have conducted.  And this document shows that

there is a whole chain of command above and below Mr. Thumairy

in California going to the embassy and going to Riyadh.  That

has been denied by Saudi Arabia in this case.

So on the first slide, your Honor, is the answer of

Saudi Arabia to our interrogatory in which they state they're

not currently aware of the identity of any person who

supervised, oversaw, provided direction to, or received reports

from Al Thumairy during the stated period.  Then they go to say

specifically at the end, "Mr. Sowailem did not supervise the

substance of Al Thumairy's work."  This is their answer to the

interrogatory that we received before any of the documents.

J2QTTERA

1          And the problem, your Honor, is that in the order of

2     this Court on May 4 of last year, Saudi Arabia was allowed to

3     limit the places that it looked for documents and the manner in

4     which it looked for documents.  And we're very concerned that

5     as a result of those limitations, we're not finding documents

6     that the kingdom has.  We have no explanation for why this

7     document of Mr. Thumairy has not been produced, as it shows, as

8     I said, a chain of command that's within the government.

9          THE COURT:  Sorry, can you walk me through one more

10    time why Exhibit 8 shows what you are saying it shows?

11         MR. POUNIAN:  Of course.

12         THE COURT:  It's a memo from Mr. Suwaylim.

13         MR. POUNIAN:  It's a letter from Mr. Suwaylim to a

14    propagator in San Diego, California whose name is Omar Abdi

15    Mohamed.  The name on the letter is actually an alias that Omar

16    Abdi Mohamed was using.

17         THE COURT:  So the director of this office in America

18    is telling this propagator --

19         MR. POUNIAN:  The director is the person who is

20    Thumairy's superior in Washington who they have identified as

21    his superior in the interrogatory answer, except they claim

22    he's handling only administrative matters.  In the

23    interrogatory they say he's only handling things like vacation

24    requests.

25         Here we have a letter in which that same man,

1    Suwaylim, who is in the embassy in Washington, is directing

2    another Saudi government employee, a propagator named Omar Abdi

3    Mohamed, who in this is called Omar Abdo Al-Khatib, that's his

4    alias who is sponsored in America by Ministry of Islamic

5    Affairs.  They're informing him that Riyadh has approved of the

6    nomination of Thumairy to oversee the propagators in

7    California, and he's also instructing him to cooperate with

8    Thumairy --

9              THE COURT:  Sorry, where does it --

10             MR. POUNIAN:  -- for the propagation activities.

11             THE COURT:  I'm not trying to be difficult, I want to

12   make sure I understand, because I know these are the types of

13   documents that you want me to rely on in order to conclude that

14   more discovery needs to be provided.

15             So this letter says that the director of the Da'wah

16   for other areas, Europe, America and Australia, has approved

17   that nomination.

18             MR. POUNIAN:  That's correct.  He's the superior to

19   Mr. Suwaylim.

20             THE COURT:  The director.

21             MR. POUNIAN:  The person who is the director for

22   Europe, America and Australia is not named here.

23             THE COURT:  And you have been saying that Riyadh

24   approved this --

25             MR. POUNIAN:  That's the person who is in Riyadh.

J2QTTERA

1          THE COURT:  The director is in Riyadh, that's what you

2     mean when you say "Riyadh?"

3          MR. POUNIAN:  Yes.

4          And the nomination, we don't know -- we have no

5     documents, we have no documents at all.  We did not receive

6     this document from Saudi Arabia.  We don't have any of the

7     documents regarding the nomination, the process of the

8     nomination or any documents regarding how this was communicated

9     to Mr. Thumairy, also the propagators that were working

10     underneath Mr. Thumairy.

11          In fact, in this record, your Honor, there's not a

12     single document that is authored by Mr. Thumairy except for

13     vacation requests.  There's not a single document from

14     Mr. Thumairy to a propagator, not a single document from

15     Mr. Thumairy doing any day-to-day work activities for the

16     kingdom.  And their claim is that he was sent to work as an

17     imam at the King Fahd Mosque in Los Angeles.

18          I want to show your Honor another example.  This next

19     slide, your Honor, is a letter again from Mr. Suwaylim to --

20     this is now to all propagators, it's blank, and this was found

21     in Omar Abdi Mohamed's house in San Diego.  And it's a letter

22     giving instruction to a propagator in San Diego.  And it was

23     obviously sent to all propagators in the United States because

24     it says "blank" on it.  And it's instructing the propagators to

25     engage in conversion of non-Muslims, and places an emphasis on

J2QTTERA

1   doctors, engineers and pilots.

2           And this is a March 1996 document, which is two months

3   before Mr. Thumairy came to the United States.  We don't have

4   any documents that Mr. Thumairy -- we don't have a single

5   document that Mr. Thumairy ever received -- a work document

6   that Mr. Thumairy ever received from Mr. Suwaylim similar to

7   this work document that was only found and that we only have

8   because the FBI raided Omar Abdi Mohamed's house in San Diego.

9   So this is an example of that.

10          And if we go to the next slide, we can also see this

11  is another document from Mr. Suwaylim to Omar Abdi Mohamed that

12  encloses a bonus to him that is being granted to all

13  propagators by Prince Sultan, who was the Minister of Defense

14  and Aviation, who just happens to be the same minister who is

15  above the PCA that was paying Omar Bayoumi.  It's the same

16  minister who paid -- whose department was paying Bayoumi was

17  also paying the propagators a bonus.  And this is in the year

18  2000 at the time that the hijackers were in California.

19          If we go to the next slide, this is another document I

20  wanted to highlight.  This is a portion of the transcript from

21  the Omar Abdi Mohamed trial, and in the transcript they read a

22  letter into the record, and the letter states that there's a

23  propagators' conference, a gathering for propagators in Los

24  Angeles in July of 1999.  And there's no question that Thumairy

25  must have played a key role at this conference.  He must have

J2QTTERA

 1    been an organizer of the conference, because this was where he

 2    was sent and where he was in charge of all propagators in the

 3    state.

 4         And we asked Saudi Arabia for the documents about this

 5    conference.  We knew about it from the Omar Abdi Mohamed case.

 6    We did not get the letter that was read into the record at the

 7    Omar Abdi Mohamed trial, but we got -- if I could turn your

 8    Honor's attention to the next document, which is under seal,

 9    it's at tab 12, and to the second page, there is a reference

10    there, your Honor.

11         MR. RAPAWY:  Your Honor, I object to the discussion of

12    materials under seal in open court.

13         MR. POUNIAN:  I'm not discussing it, I was going to

14    refer the Court to --

15         THE COURT:  The highlighted portion.

16         MR. POUNIAN:  The highlighted portion, yes.

17         So your Honor, we've asked for the program, the

18    attendees, the documents received by Mr. Thumairy, because this

19    is at a critical time, at a time six months before the

20    hijackers arrived in Los Angeles, and we have received nothing

21    except this under-seal document.

22         Now your Honor, they claim that Mr. Thumairy was

23    working at -- that his job, his sole work was at the King Fahd

24    Mosque, which they describe as a private charity.  And we found

25    from the California Secretary of State, your Honor, the list of

1       the board of directors of the charity that was set up.

2               This document was filed in 1997 by the foundation that

3       leads the mosque, and on the list of the directors are seven

4       Saudi government officials, and there are twelve people on the

5       board.  So in 1997 the Saudi government essentially took over

6       control of the King Fahd Mosque by having appointed seven of

7       the twelve directors of the mosque.  And if we look at the list

8       of people that are described as being on the board of the

9       mosque as of 1997, they continued in that role until at least

10      August of 2001.

11              Number four on the list is Mr. Suwaylim, who is

12      Mr. Thumairy's supervisor at the embassy in Washington.  So

13      Mr. Suwaylim was not only sending letters to propagators in

14      California, letters to all propagators in the United States,

15      all of which Mr. Thumairy should have received and which we

16      have never received in this litigation, but Mr. Suwaylim was

17      overseeing the board that was overseeing Mr. Thumairy at the

18      mosque in Los Angeles.

19              Now in addition to Mr. Suwaylim on the board were two

20      other gentlemen.  Number six is the Director of Islamic Affairs

21      at the embassy.  And he is a gentleman, your Honor -- if I

22      could beg your indulgence to turn back to tab number seven,

23      this is the interview of Mr. Thumairy with the 9/11 Commission.

24              And he was asked:  Do you report to anyone?

25              He said:  I report to the Consul General at the Los

J2QTTERA

1    Angeles Consulate.

2           And he was asked:  Is there anyone in the Saudi

3    Embassy in Washington that you report to?

4           He said he had the most contact with Dr. Majid,

5    responsible for Islamic affairs at the embassy.

6           Also I want to point your Honor to the very beginning

7    where Mr. Thumairy said, when asked, he said he spent 60 to

8    70 percent of his time at the consulate and only about

9    20 percent at the mosque, where he claimed to be an unpaid

10   volunteer.

11          If we go back to the list of the board of directors of

12   the mosque as of 1997 through 2001, we can see not only is

13   Mr. Suwaylim there as number four, but number six is the person

14   in Washington that Mr. Thumairy said that he reported to,

15   Dr. Majid, Islamic Affairs Director at the embassy.

16          And number seven is the consul general, who Thumairy

17   said was his direct supervisor at the time of his interview

18   before the 9/11 Commission.

19          And by the way, your Honor, the 9/11 Commission

20   interview that was conducted is another document we have

21   requested.  We only have a memo of that interview, we don't

22   have the actual transcript, which we believe is in the

23   possession of Saudi Arabia.  The transcript or a recording of

24   the interview.  We would like his actual words and not have to

25   call in witnesses to try to prove what he said.

J2QTTERA

1      So at the time Mr. Thumairy was working at the mosque

2  he was under the control of the Saudi government.  He was not

3  only under their control on the board, but they are the ones

4  who appointed Mr. Thumairy themself.  It's not like he had

5  anything to do with that process.  He was sent there by the

6  Saudi government, that was his assignment, and they chose him

7  for that assignment.  And yet we have no documents regarding

8  the decision they made, who appointed him, how that was made,

9  or the process that was conducted.

10      And those are documents that we want because we want

11 to know who directed that process, who was in charge of Fahad

12 Thumairy and his role in the United States, who was the person

13 behind the scenes above him who was directing him.  That's the

14 purpose of the discovery that we're seeking in this case.

15      Their story is that Fahad Thumairy, straight out of

16 school, went for his first job and they sent him out to Los

17 Angeles without any supervision, any direction, any help, no

18 instructions, no training, and that he was just there working

19 on his own and didn't get any letters from Mr. Suwaylim, didn't

20 get any correspondence with anyone, and just put in vacation

21 requests every year.  That's what they're saying to us.  And

22 that he didn't do anything for the kingdom.  It does not make

23 any sense.

24      Now we have engaged in discovery with the mosque

25 itself.  We have served subpoenas on them.  And one of the

J2QTTERA

1   subpoenas shows the financial control that Saudi Arabia

2   exercises over the mosque.  They're not only on the board, they

3   not only appointed the leader, the imam, Mr. Thumairy, but they

4   paid the entire construction expenses of the mosque, and in

5   addition, they're paying the ongoing expenses.

6       And this is an example, this is a letter from the

7   Consul General of Saudi Arabia, and the date of this letter is

8   January 31st, 2000.  The hijackers are in Los Angeles, it's

9   almost on the day that they met Omar Bayoumi when he took them

10  under his wing and took them to San Diego.  And this letter

11  shows that the consulate is sending a check for $12,000 to the

12  mosque to cover salaries, and that they're waiting for a check

13  from the royal highness, the prince, to pay back that $12,000

14  because they're paying the salaries at the mosque.

15      One of the salaries at the mosque was that of Fahad

16  Thumairy, who got $700 a month from the mosque, and in addition

17  he got other payments, including at one time he got a gift

18  payment of $10,000 from the mosque that came out of an account

19  that was funded by Saudi Arabia.  Yet Saudi Arabia refuses to

20  give us any documents regarding its financing of the mosque.

21      Now at this time, your Honor, the hijackers were at

22  the mosque.  They were at the mosque.  That's where they went

23  during this two-week period when they were in Los Angeles.

24  They were in the neighborhood and they were at the mosque.

25  This is where they found shelter in Los Angeles.  And Saudi

J2QTTERA

Arabia will not give us the documents regarding the financing

of the mosque.

Now even the limited documents that Saudi Arabia has

produced show that there were people supervising and directing

Thumairy, and I want to point your attention, your Honor, it's

under seal, it's on tab 15.

And this is the performance review of Thumairy signed

by Suwaylim.

Your Honor, we also asked for work trips of

Mr. Thumairy to show what he was doing.  If he's assigned to

just the mosque, why is he taking work trips?

So we made a request for his work trips and got two

documents in total, one of which was at the next tab,

Exhibit 36 under slide 16, regarding work trips, and this is

all the information we got.  We're entitled to documents to

explain the purpose of the trip, the location of the trip, how

it relates to work.  What is the trip about?

And from our own investigation, your Honor, if we go

to the next tab, it would be on the screen, we found from Al

Jazeera online that there was a propagators' conference in

Europe in September of 2001, that Fahad Thumairy attended.  And

according to the news article, on September 11, 2001, Fahad

Thumairy was working for Saudi Arabia giving lectures in a

prison in Sweden.  And yet we found no -- we received no

documents whatsoever from Saudi Arabia regarding this work trip

and no substantive documents regarding any work trip of Fahad
Thumairy.  And Saudi Arabia had claimed during this time that
he was on a personal leave from the United States on
September 11, 2001.

So if I could turn your Honor to Mr. Bayoumi, I want
to address a few points with regard to the documents related to
him.  And we heard earlier about his quote, unquote, job
responsibilities as the president of civil aviation.

Well, from 1995 to 2001, we know that Mr. Bayoumi
lived in the United States and he was paid a salary by Saudi
Arabia, and he had six different job titles, each one of which
was completely phony.  He didn't perform any one of those job
titles.

You heard before about his work computer that they
produced to us, which included documents from a date range that
covered our requests.  Well, it's the first 550 pages of the
production in this case, your Honor.  Mr. Bayoumi's name does
not appear on any single page in those 550 pages.  There's no
evidence whatsoever that he was ever doing any actual work for
the kingdom, any actual work.  From the documents we have
received, there's no evidence that he was ever doing any actual
work.  The question is:  What was he doing for the kingdom?
Why were they paying him a salary?

I just want to show you, your Honor, if I could, two
exhibits to show the nature of his phony employment.  The first

J2QTTERA

is an April 1999 letter from Saudi Arabia to Dallah Avco, and

it instructs Dallah Avco to hire Bayoumi.  And he was hired by

them at this time as a quote, unquote, account supervisor.  And

the letter shows -- the first paragraph shows Dallah Avco did

not want to hire Mr. Bayoumi.  The letter states:  You do not

have the desire to renew the secondment of Mr. Bayoumi.

And Dallah Avco was informed by Saudi Arabia, it says:

Headquarters desired to second him for one year only to

complete the task for which headquarters agreed upon his

secondment.

There's no documents regarding what this task is or

why Saudi Arabia was requesting that Bayoumi receive this job,

this phony job.  There's nothing in the record that we have

been provided; no documents, no background to this.

And this was an order from Saudi Arabia, and the final

paragraph says:  The company shall draft a letter and serve it

on headquarters with all due speed.  Which they did the next

day, hiring Mr. Bayoumi another year as an account supervisor

in the United States in San Diego for a job he never did.

The next year, in May 2000, when his secondment for

that year was over, he returned to Saudi Arabia for two months.

We have no idea what he was doing then, no documents to show

what he was doing.  But during that time he got another order

to go back to the United States and work, this time with a job

title of a senior DSS programmer, whatever that is, but it's a

J2QTTERA

completely phony job.  It does not exist for Mr. Bayoumi.  He never performed that job.

They have not produced a document to explain why he was given these series of phony jobs.  And at the time of this last order from Saudi Arabia to Dallah Avco to hire Bayoumi as a programmer, Bayoumi was suddenly given a doubling of his compensation.  There's no explanation in the record from Saudi Arabia as to why that was.  None whatsoever.

So the question is:  What was Bayoumi's actual role, and who was instructing him at this time?  Who was giving him orders?

And we have also asked for documents about all of the contacts that Bayoumi had with various government officials for the government of Saudi Arabia.  It's a highly unusual number of contacts that he had.  In the first five months of 2000 he had almost a hundred calls with Saudi Arabia government officials, including 30 calls to Mr. Suwaylim's office.  30 calls.  And these calls occurred between January 17, and I don't recall the date exactly in March -- March 24, 2000, your Honor.

Now the hijackers arrived in Los Angeles on January 15, 2000, and early in February they went -- Bayoumi met them in late January, early February, and then brought them to San Diego early in February.  And they were there until June, one of them left, and then until December.

1          And this document shows that Mr. Bayoumi was

2     contacting Mr. Suwaylim at the time he was just about to pick

3     up the hijackers, and at the time he was first starting to

4     arrange all the things he did to take care of them, from

5     signing financial guarantees for them, to finding them an

6     apartment which was right next door to his in the same

7     building, to setting them up with other people that he knew

8     from the mosques that he went to who provided them with false

9     IDs and set them up for flight lessons.  That's Mr. Bayoumi.

10         And Bayoumi is calling Suwaylim, and we asked for the

11    phone records of Mr. Suwaylim.  Where are the phone records of

12    Mr. Suwaylim?  No, they don't exist.  We don't have them.

13    What's the explanation?  I don't know.  I don't know where the

14    phone records are.  That's not satisfactory, your Honor.  You

15    should order them to produce the records, because this is key,

16    this is key to understanding who was directing Bayoumi and

17    Thumairy at this time.  This is at the very heart of the case.

18         Now we also, from our own investigation, have found

19    there are other contacts of Mr. Bayoumi with other Saudi

20    government officials, these from the same ministry as

21    Mr. Suwaylim, Ministry of Islamic Affairs.

22         On December 20, 1999, several weeks before the

23    hijackers arrived in Los Angeles, Mr. Bayoumi checked into a

24    hotel.  He lived in San Diego, he's checking into a hotel in

25    Los Angeles near the King Fahd Mosque, and he's checking into

J2QTTERA

1    the hotel with someone named Abdullah Jraithen.

2          And we've had this document, it was produced by the

3    FBI as part of the 9/11 investigation.  Abdullah Jraithen was

4    never identified.  And we conducted an investigation and found

5    his name is spelled incorrectly.  The English spelling is

6    Jason.  And it turns out that he is a Ministry of Islamic

7    Affairs official in Riyadh who is senior to Mr. Thumairy.

8          So on December 20, 1999, Bayoumi, who lives in San

9    Diego, is checking into a hotel near the mosque where Thumairy

10   works with a senior official from Riyadh of the Ministry of

11   Islamic Affairs.  This is at the time that he's an account

12   supervisor for Dallah Avco

13         If we go to the next slide, the FBI 2015 report also

14   shows that Bayoumi, in addition to assisting the two hijackers,

15   assisted two other men named Sadhan and Sudairy.  And again, we

16   did not know who these people were.  We did an investigation,

17   it's in the affidavit of our investigator, and they were also

18   identified as two Ministry of Islamic Affairs officials from

19   our investigation.  And we also learned that they were in San

20   Diego in the year 2000, and they stayed at the same rooming

21   house as the hijackers in San Diego.  We don't know if the

22   times exactly coordinate, but we know that they were there.

23         Now the questions raised by all these activities of

24   Mr. Bayoumi are answered in the affidavit of Michael Rochford.

25   He's the former chief of the espionage section of the FBI

J2QTTERA

counterintelligence division, a 30-year veteran of the FBI.  He

reviewed all the evidence and concluded that Bayoumi was a

covert operative of Saudi Arabia working under the direction of

personnel in the Ministry of Islamic Affairs, along with

Thumairy.

          The basis of his opinions include all the cover jobs

that were provided by the kingdom to pay Bayoumi, all of his

extensive contacts by phone and in person with various Saudi

government employees, Bayoumi's use of tradecraft in the way

that he met with the hijackers and dealt with the hijackers,

all of the lies that Bayoumi and Thumairy told, which we have

documented in the record, your Honor.  They told lies about

each other, about their contacts with each other and their

contacts and the manner in which they assisted the hijackers,

key events they tried to shield from the authorities who were

investigating.

          Who helped the hijackers?  Who helped these two

hijackers, who couldn't speak English when they arrived and

found a welcome mat at the King Fahd Mosque, and Thumairy and

Bayoumi who provided all the assistance to them?  Also the

tasking that Bayoumi provided through others is a classic

espionage operation in which he tasked others who he could

separate himself from with the tasks of the phony ID, with the

task of the flight schools.

          And finally, there's the FBI report, the 2012 FBI

J2QTTERA

1   report which your Honor has seen before, which states that

2   Bayoumi and Thumairy were tasked with assisting the hijackers.

3   They were given that task.  And the reasonable conclusion,

4   really the only reasonable conclusion is someone in the Saudi

5   government gave them that task.  And this is one of the

6   documents we have requested from the FBI for the FBI to produce

7   without the redaction in this case.

8        Now your Honor, Mr. Rochford also submitted a

9   supplemental affidavit, which I could refer the Court to.  It's

10  under seal because it refers to the FBI documents.

11       Now in this Court's May 24 order, this Court accepted

12  the kingdom's proposal to direct that the discovery proceed in

13  stages.  The first stage, the kingdom was allowed to search

14  only limited, specified locations that they selected to start

15  the search.  They said that those are the places we will find

16  the documents that respond to the plaintiffs' requests.

17       And this Court order agreed that we should proceed in

18  stages, and that they did not have to search for documents or

19  information that were prepared by its intelligence or law

20  enforcement agencies before 9/11.  In other words, if there was

21  someone directing Bayoumi and Thumairy, we would not be able to

22  see that.  They would be able to answer the interrogatories and

23  say oh, they didn't do anything, no one was directing them,

24  because they weren't looking at where the information was

25  actually located.

1           And your Honor, I think it's critical now at this

2    stage where we're at that we move forward to the second stage

3    of discovery with the discovery that we have outlined in our

4    proposed order.

5           And the first step in that process that we have

6    requested is an interrogatory, that Saudi Arabia answers our

7    interrogatory and identifies each repository where responsive

8    documents for Bayoumi and Thumairy are located.  We should not

9    be forced to play games wondering where documents are located.

10   We don't know how Saudi Arabia keeps its documents.

11          Your Honor asked the question.  I don't know, I cannot

12   answer that question.  We should not be playing games in this

13   type of case, in this type of litigation where we're saying you

14   have to prove that a document exists before you can get it.

15   Well, we have proved it.  We have shown that they have not

16   produced documents that are in their possession or should be in

17   their possession in this case.  We have done that, and we're

18   not in a place now where we should have to be guessing.

19          They should also produce the documents they haven't

20   produced.  They should produce them or a privilege log.  They

21   have the out of a privilege log, preparing a list, submitting

22   it to your Honor, possibly showing documents in camera.  That

23   is the proper procedure under the federal rules.  The procedure

24   is not we'll search A, B and C when they know the documents are

25   in Z.  That's not the proper procedure for us to follow.

J2QTTERA

1          THE COURT:  Are you suggesting at this point that they

2     do search their intelligence agencies --

3          MR. POUNIAN:  Yes, your Honor.

4          THE COURT:  -- for the documents that they reviewed?

5          MR. POUNIAN:  We believe that's imperative.

6          THE COURT:  And speak to me about sort of the concerns

7     that the kingdom has raised about comity and international

8     relations.  We are here on jurisdictional discovery.  The

9     kingdom remains a sovereign nation.  Talk to me about why you

10    think the law entitles the plaintiffs to inquire into a

11    nation's deliberative processes and investigative efforts when

12    they're here not on merits discovery.  The Court has not yet

13    concluded that it has jurisdiction over this country.

14         MR. POUNIAN:  I understand, your Honor.

15         THE COURT:  So at this stage your presentation was

16    helpful and I appreciate it.  I understand why these documents

17    are so critical to you.  But there's a tension here, because

18    the kingdom is only partially in this Court at this point.  And

19    it may be that ultimately you are able to put forward

20    sufficient evidence so that they are fully engaged in the

21    litigation, at which point in time some of these arguments I

22    think will be more compelling.  But if you could help me

23    evaluate or balance those competing interests, which I think

24    are real.

25         MR. POUNIAN:  Thank you, your Honor.

J2QTTERA

1    Your Honor referred to what it's trying to protect is

2    investigative documents.  We're not seeking investigative

3    documents, we're seeking who directed Bayoumi and Thumairy to

4    assist the hijackers.  That's the information we really want to

5    obtain, the names of the persons in the Saudi government who

6    were responsible for that.  That is the information.  It's a

7    different inquiry than seeking investigative documents after

8    9/11.  We're looking for documents from before 9/11.

9    THE COURT:  I understand, but I thought you were

10   saying you wanted me to direct the kingdom to look at

11   repositories from those post 9/11 investigations which might

12   include memos, which might include contemporaneous records.

13   MR. POUNIAN:  That is included in our request, your

14   Honor, but I'm focusing now in terms of intelligence on the

15   pre-9/11, what the instructions were that were given and the

16   directions that were given to Bayoumi and Thumairy before 9/11;

17   not the investigation that was conducted after, but the

18   directions that were given to them in the time, in 2000, who

19   met with them and who directed them.

20   And in terms of comity, your Honor, in this case,

21   comity works both ways.  They're a sovereign.  They're a

22   sovereign nation.  There's comity for their sovereignty.  But

23   this case involves an attack on United States sovereignty.

24   There are comity considerations of this country that are

25   embodied in the JASTA legislation, the JASTA statute.

J2QTTERA

| | |
|---|---|
| 1 | The purpose of JASTA is precisely to permit the |
| 2 | discovery that we're seeking regarding the conduct of foreign |
| 3 | government agents who came into the United States to perform |
| 4 | these acts.  If this had happened outside of the United States, |
| 5 | then the comity balance may be different, but when there is |
| 6 | support to terrorism that results in the worst terror attack in |
| 7 | history inside the United States, in that situation the balance |
| 8 | of comity is not something that has ever been considered by any |
| 9 | other court before.  It's unprecedented. |
| 10 | THE COURT:  I was going to ask you:  Is there any law |
| 11 | for the proposition that you're stating? |
| 12 | MR. POUNIAN:  There is law.  There is a case in the |
| 13 | Ninth Circuit. |
| 14 | THE COURT:  The *Lu* case? |
| 15 | MR. POUNIAN:  The *Lu* case, yes. |
| 16 | THE COURT:  Isn't that a case where China was being |
| 17 | sued in its capacity?  It was not in jurisdictional discovery. |
| 18 | MR. POUNIAN:  Well, there was an FSIA issue in the |
| 19 | case, but the court ruled they were subject to jurisdiction |
| 20 | under the FSIA.  That is correct, there is no case -- |
| 21 | THE COURT:  Do you think that's a meaningful |
| 22 | distinction? |
| 23 | MR. POUNIAN:  I don't think in this case it is, |
| 24 | because jurisdictional discovery under the JASTA bill is |
| 25 | essentially the same as merits discovery.  We have to prove the |

J2QTTERA

same elements of the merits case for our JASTA discovery.  And

for us to say "comity" in this situation, given the facts that

we have presented to the Court, given the evidence that is in

our under seal submissions, I believe this Court is justified

in proceeding.

I mean this Court could decide to go through several

additional stages; it could decide to have interrogatories

first, it could decide to do certain documents that are very

targeted depending upon how it wanted to balance the equation,

but there's no justification for holding back.  We should know

the answer to the question of whether someone in the Saudi

government instructed Bayoumi and Thumairy to assist the

hijackers, because their assistance was critical to the entire

9/11 attacks, and it is the key issue in this case, and it is a

fundamental issue here.

The answer to that question is also the answer to

liability, and I think the answer is on the board right now

with the FBI document that someone did do it.  We're not coming

in here like we're fishing for something that may have

happened, we know that it happened.

And our government hasn't decided to go after Saudi

Arabia or after these people, they let them out on diplomatic

grounds.  They let Thumairy go, they let Omar Abdi Mohamed go

and everyone go because it was too difficult a pill for them to

swallow diplomatically.  But that was resolved in the JASTA

J2QTTERA

case.  We have a civil remedy that Congress expressly enacted

to permit the remedy that we are here today before this Court.

And if we're going to be denied the discovery of the

essential facts in the case, then it's as if there is no remedy

at all that was provided by Congress.  Congress provided the

remedy so I would be here to argue and get the documents from

Saudi Arabia.  That is the point.

THE COURT:  Part of your argument generally is we have

all these reasons to believe that these two agents were in fact

being directed by higher authority, and we have received no

documents to substantiate that, but we see a lot of

circumstantial evidence.  Is there a reason to believe those

documents do in fact exist?  If it is true what you are

proposing, that these two individuals were covert agents, is it

possible that there are no documents because people didn't put

anything in writing?

MR. POUNIAN:  I believe there are because I believe

that the lack of any documents whatsoever from Saudi Arabia,

that the type of discovery that we received, the failure to

provide proper discovery, the manner of the discovery indicates

that there is a lie at the core of this that is being secreted.

And Bayoumi and Thumairy's lying confirms it, and it's repeated

now by the behavior of Saudi Arabia in this case.  So I believe

that.

THE COURT:  By "that," I assume you're referring to

J2QTTERA

1   the issue as to whether or not they're going to represent that

2   he was an employee of --

3            MR. POUNIAN:  Why didn't we get the documents of

4   Thumairy?  Why didn't we get the document appointing him to be

5   in charge the propagators?  Why was that withheld from

6   production?

7            There's a pattern in their production.  They withheld

8   entire files of documents that we know exist.  They claim that

9   the mosque is a private charity.  It's not a private charity,

10  they were controlling it.  So it's like:  What is going on?

11  Why the phony jobs for Bayoumi?  Everything is pointing to the

12  same conclusion as Mr. Rochford put forth in his affidavit, in

13  both of his affidavits.

14           So it strains credulity.  The facts are there straight

15  out in front of our faces.  The facts are there.

16           THE COURT:  Okay.  I would like to give Mr. Rapawy

17  time to respond.

18           MR. POUNIAN:  If I could say one more thing, I would

19  appreciate it.

20           THE COURT:  Sure.

21           MR. POUNIAN:  Judge Daniels ordered discovery

22  precisely because Saudi Arabia had not submitted any evidence

23  in response to our submissions in opposition to the motion to

24  dismiss, and Judge Daniels said they were in the best position

25  to shed light on the inquiry, that Saudi Arabia was in the best

J2QTTERA

1    position.  And we come in here, we were proceeding with

2    discovery, and we're in the same situation now.  We're waiting.

3    And in Judge Daniels' words, it's time for Saudi Arabia to shed

4    some light on the questions in this case.

5            That's all I have, your Honor.

6            THE COURT:  Thank you.

7            MR. CARTER:  Your Honor, I have one or two points.

8            THE COURT:  They need to be said into a microphone.

9            MR. CARTER:  Thank you, your Honor.

10           THE COURT:  If you could keep it brief, I would

11   appreciate it.

12           MR. CARTER:  I will, your Honor.  Your Honor asked a

13   moment ago about our request that Saudi Arabia search in its

14   intelligence files and raise the issue of investigative

15   matters, and I do think that's a bit of a red herring.

16           The essential issue that we're most interested in here

17   runs to the heart of the agency question for which discovery

18   was authorized.  And the question is essentially whether or not

19   Omar Al Bayoumi, Fahad Al Thumairy, or any of the other

20   government officials for whom the Court has authorized

21   discovery were recruited by, trained by, tasked by, funded by,

22   receiving direction from or reporting to representatives of

23   Saudi intelligence who most certainly were housed in the

24   embassies and consulates where both had substantial

25   connections.

 1          With regard to your Honor's question about the

 2     difference as between jurisdictional discovery and merits

 3     discovery, I don't believe that there's any distinction as to

 4     matters for which discovery has been authorized, your Honor.

 5     So the matters for which discovery has been authorized, the

 6     federal rules apply as if in any other case, again, with regard

 7     to those matters.  And that would require Saudi Arabia, like

 8     any defendant, to search in any repositories where it

 9     reasonably believes that responsive documents are located.

10          Now in the context of the consideration of JASTA,

11     Saudi Arabia was well represented by many lobbyists and law

12     firms who consistently argued to Congress that Congress should

13     not pass JASTA because JASTA cases would invariably involve

14     discovery into sensitive intelligence matters.  And Congress

15     said:  Tough luck, we're going to allow this to go forward.

16          If Saudi Arabia wants to claim that responsive

17     documents in those files are protected in some way, it has to

18     invoke the traditional process of the rules; it can provide a

19     privilege log, they can ask your Honor to review them in

20     camera.  But the answer is not simply to broadly immunize Saudi

21     Arabia from ever looking or telling us if the documents are

22     there.

23          Virtually any JASTA case, your Honor, will involve

24     activities most likely to have been carried out through an

25     intelligence agency.  And let me give your Honor two examples.

J2QTTERA

1    There have been concerns for a long time in U.S. national

2    security circles that North Korea could mobilize its

3    substantial hacking capabilities to cause a catastrophic

4    physical event on U.S. soil; attacking a nuclear facility,

5    attacking a transportation hub, something of that nature.  That

6    is a quintessential JASTA case.  That activity by North Korea

7    would be carried out by its intelligence agency.  So to

8    immunize discovery is to gut JASTA.

9           The same goes for Vladimir Putin sending agents out to

10   the United States to kill somebody he doesn't like who happens

11   to be in the U.S., something that he reportedly has done in

12   Europe.  Again, that would be done by an intelligence arm.  And

13   the essential question in that case under JASTA would be:  Were

14   they acting as agents of that foreign government?  And the

15   answer to that question would reside solely in the intelligence

16   agency.

17          And so that is why it's essential that we find out

18   whether or not these people were taking direction.  And we have

19   given quite a bit of information to suggest that they were.

20   Mr. Pounian mentioned the extensive tradecraft surveyed in

21   Mr. Rochford's affidavit employed by Bayoumi in providing

22   support for the hijackers.  Again, that is very compelling

23   evidence that he was trained by Saudi intelligence.  His

24   contacts with the embassy and consulate are such that one would

25   almost certainly be sure that intelligence would have reporting

J2QTTERA

1    about what he was doing.

2            So there's some matters that we've put in the record

3    that I can't discuss in an open courtroom, but certainly

4    Mr. Rochford's supplemental affidavit at paragraph 48 and

5    reference to an FBI document bearing Bates stamp 44, as well as

6    paragraph 32, I think provide substantial predication for this

7    request, along with the overall affidavit.

8            One other thing, your Honor, just big picture here,

9    we're obviously concerned that the reason we don't see the

10   documents is because we don't think Saudi Arabia has looked in

11   the right places using the right search terms or during the

12   right time periods.

13           Let me give your Honor one example.  Saudi Arabia said

14   it would search the Ministry of Islamic Affairs for any

15   documents referencing Thumairy by name.  And on its face that

16   sounds somewhat appealing.  The problem is we know from the

17   documents in the Abdi Mohamed case that Saudi Arabia

18   communicated to people who were acting as propagators via

19   generalized communiques to all propagators.  Thumairy would

20   have received those in that role, but none of them have his

21   name on them.  So we have asked that we receive all of the

22   communiques that were issued to propagators in the United

23   States during the relevant time period.  They will show the

24   hierarchy of command, they will show what the duties and

25   responsibilities of these folks were, and they will shed some

J2QTTERA

1   light on what Thumairy was really doing here.  If there are no

2   documents by his name, we need to understand what people in his

3   position did.

4            Those are the principal issues that I wanted to raise.

5            THE COURT:  Thank you.

6            All right.  Mr. Rapawy, you may proceed.

7            MR. RAPAWY:  Thank you, your Honor.

8            Your Honor, Saudi Arabia has been thorough and open in

9   complying with the limited, targeted jurisdictional discovery

10  ordered by this Court, and that jurisdictional discovery is

11  circumscribed, as your Honor acknowledged earlier, to

12  accommodate Saudi Arabia's legitimate interests as a foreign

13  sovereign.

14           THE COURT:  Do you want to address Mr. Carter's

15  comment that although the scope of the discovery may be limited

16  by Judge Daniels' order, the depth of that discovery should not

17  be limited, it should be as deep and comprehensive as the rules

18  permit?

19           MR. RAPAWY:  So I do think that your Honor's May order

20  directly recognized that the balancing continues as you

21  implement the scope of Judge Daniels' order.  And we had

22  proposed, and the Court accepted with some modifications,

23  limits on the scope of jurisdictional discovery.  For example,

24  you added some time and you added the PSS documents that were

25  in their possession that were originally with other agents,

J2QTTERA

1      security documents, and we did produce those.

2              I think to say that -- I'm not sure exactly what

3      Mr. Carter means, but if the idea is that once we're into

4      jurisdictional discovery all bets are off and every filing in

5      the possession of Saudi Arabia is potentially open to

6      discovery, we very much disagree with that.  I think your Honor

7      rejected that before, and I don't think there's any way to

8      reconcile that with the idea of limited and targeted

9      jurisdictional discovery.

10             So we have gone forward on the basis of your Honor's

11     earlier order authorizing us to search specific places,

12     specific times, and those searches have produced no information

13     suggesting that Mr. Al Bayoumi or Mr. Al Thumairy were acting

14     at the direction of some unnamed senior Saudi official in the

15     embassy or elsewhere.

16             To the contrary, discovery has undermined plaintiffs'

17     theory, in particular by failing to show any evidence about the

18     formerly crucial meeting of Mr. Al Thumairy and Mr. Al Bayoumi

19     at the consulate before Mr. Al Bayoumi met the two hijackers at

20     the restaurant.  That was absolutely a key part of plaintiffs'

21     previous showing.  And I don't know if they would have gotten

22     jurisdictional discovery if they hadn't made that allegation.

23     Their recent filings have moved sharply away from that.  It did

24     not happen.  There is no reason to think that renewed or

25     broadened searches would reveal any such evidence.

1          THE COURT:  Do you want to speak specifically to some

2    of the gaps that Mr. Pounian referenced?  The fact that there

3    were conferences that were planned that Mr. Thumairy would have

4    undoubtedly been involved in, no documents regarding that work

5    was provided, or documents related to official travel which we

6    know was approved, but we don't know where he was going or why

7    he was going and what his assignment was for that.  Or with

8    respect to Mr. Bayoumi, the piece that Mr. Pounian highlighted

9    with respect to requiring Dallah Avco to renew the secondment.

10          MR. RAPAWY:  Yes, your Honor.  With regard to --

11   sorry, the second point was travel documents, the first point

12   was --

13          THE COURT:  The conference in '99.

14          MR. RAPAWY:  We did in fact produce documents about

15   that conference, your Honor.  We did not exclude any documents

16   relating to Mr. Al Thumairy in that conference.  It was in

17   1999.  There are actually no allegations about it within pages

18   19 to 23, but insofar as we had that document, we produced it,

19   we didn't withhold anything about that conference that we're

20   aware of, and certainly nothing about Mr. Thumairy's

21   involvement in that conference.

22          With regard to Mr. Carter's argument about only

23   searching for Mr. Al Thumairy's name, when Mr. Carter raised

24   that point with us, when plaintiffs raised that point with us

25   in meet and confer negotiations, we actually agreed to go back

J2QTTERA

1    and look more generally for documents that deal with the

2    responsibilities of people with job title of propagator or

3    guide.  So that is actually not something we refused to do, it

4    was something that didn't happen before the motion to compel

5    because it was raised fairly late in the game.  And the letters

6    back and forth on that issue are all part of Plaintiff's

7    Exhibit 7.  I don't have an exact cite for your Honor.

8         So then the travel documents.  We looked for travel

9    documents.  We actually produced a fair number of travel

10   documents that are cited in our brief.  The argument is here

11   there must have been more, there must have been more details

12   about what he was doing in his travels and why.  And that is

13   not a basis to grant a motion to compel.

14        We haven't withheld documents about why Mr. Al

15   Thumairy was traveling to particular places.  We haven't

16   refused to look for documents for why Mr. Al Thumairy was

17   traveling to particular places.  Those documents, as far as we

18   can tell, the embassy and the consulate don't have them,

19   neither does the Ministry of Islamic Affairs, which we've also

20   searched.  And recognizing, your Honor, that these are

21   20-year-old documents, that they're in another language, that

22   we're doing the best we can and it's always possible that we'll

23   make mistakes, but we have made a reasonable search.

24        I also want to go quickly to the document that

25   Mr. Pounian referenced at the start of his presentation, which

J2QTTERA

1    has Bates number DOJ 10.  It's a letter that they got from the

2    Abdi Mohamed proceeding.

3                Now as an initial matter, discovery concerning

4    Mr. Abdi Mohamed was specifically denied by Judge Daniels in

5    the March 28 order.  But leaving that aside, when they came to

6    us and said well, we want to see this document, we did not say

7    we won't look for it, we said we'll go back and look for it

8    again.

9                And DOJ produced a copy of the document -- it's not

10   sealed, it's an unsealed version of the document that you

11   saw -- shortly before the motion to compel.  And with that, we

12   went back and looked again.  We do not have that particular

13   document, but as a result of follow-up searches that we

14   voluntarily agreed to do, we have found a related document that

15   is addressed to Mr. Al Thumairy, and I expect we'll be

16   producing that to plaintiff shortly.

17               So with regard to the idea that there are gaps in our

18   production, we did not refuse to meet and confer with

19   plaintiffs about the alleged gaps.  We did not refuse to go

20   back and look for a lot of things that plaintiffs wanted us to

21   look for.  And that is set forth in Exhibit 7.  And we have a

22   count of how many of those requests we agreed to in our

23   addendum, and it was quite a few.

24               So our approach through this process has been to try

25   to approach it in a reasonable and cooperative fashion.  But

J2QTTERA

1    the only thing that would actually satisfy plaintiffs would, of

2    course, be documents proving our client's guilt, which don't

3    exist because the things that plaintiffs say happened did not

4    in fact happen.

5         THE COURT:  When we began this conference I asked you

6    if you could tell me generally sort of what the documents look

7    like, whether they were electronic or paper, and sort of how

8    you went about your investigation to find responsive documents.

9    And you the mentioned to me, if my notes are accurate, that in

10   addition to searching the embassy and the consulate, that there

11   are also warehouses I think in Jeddah, that you searched for

12   the aviation agency and the Ministry of Islamic Affairs, is

13   that correct?

14        MR. RAPAWY:  If I recall correctly, your Honor, the

15   Islamic Affairs warehouses were in Riyadh, and there were --

16   the warehouse was for the aviation agency, but yes, that's

17   correct.

18        THE COURT:  And with respect to the Ministry of

19   Islamic Affairs, my understanding based on the motion, which is

20   stylized as a motion for supplemental discovery, which is

21   different than the motion stylized as the motion to compel, so

22   this is the motion on the supplemental discovery that was

23   sought from the kingdom --

24        MR. RAPAWY:  Yes, your Honor.

25        THE COURT:  -- before the motion to compel, that you

J2QTTERA

1    were objecting in large part to searching the Ministry of

2    Islamic Affairs other than for sort of very targeted documents

3    such as personnel files and other limited information, but

4    that, generally speaking, you were really focusing your efforts

5    at the embassy and the consulate.  Is that an accurate

6    representation?

7            MR. RAPAWY:  I think it is largely an accurate

8    representation, your Honor.  Mr. Shen was actually going to

9    address the supplemental discovery motion, but I could

10   certainly answer the question.

11           We have not certainly refused entirely to go back to

12   Islamic Affairs.  We were going to focus on personnel files

13   with regard to individuals.

14           Insofar as activities in the United States, we thought

15   it was a reasonable position to get the personnel files from

16   the whole ministry, whatever that happened to be, and then look

17   for documents about specific activities in the embassy and

18   consulate.  That seemed like a reasonable compromise or

19   limitation.

20           MR. SHEN:  Your Honor, if I could interject here, what

21   Mr. Rapawy was discussing was with respect to the supplemental

22   discovery of the additional individuals.  With respect to

23   Mr. Al Thumairy, we did do a comprehensive search of the

24   Ministry of Islamic Affairs.  It was not all limited to the

25   personnel files.

J2QTTERA

1      THE COURT:  So you searched for documents that would

2  include who was tasking him for what type of assignment, why he

3  was being nominated for positions and renewed for positions,

4  and all of that?

5      MR. SHEN:  Yes, your Honor, we did.

6      MR. RAPAWY:  Yes.  I apologize if I was unclear, your

7  Honor.  The supplemental discovery limits that we proposed are

8  separate from the much broader searches that we did in the

9  first round of discovery.  And to the extent we found documents

10  about who was being assigned to do what, we certainly

11  considered those responsive and we searched for them.  We would

12  not have excluded those from the search of the Ministry of

13  Islamic Affairs.

14      I think what you're largely faced with is a complaint

15  that although we did the searches, we must have done the

16  searches unreasonably because there must have been more

17  documents.  And that, I don't think, is how this Court should

18  proceed on a motion to compel.

19      I wanted to address briefly plaintiffs' general

20  request for a search of all documents in the possession of

21  Saudi Arabia or possibly an interrogatory answer that would

22  effectively have the same result, since we would have to verify

23  what the documents were before we could give that answer.

24      We do think that would be inconsistent with the

25  concept of limited, targeted jurisdictional discovery.  The

J2QTTERA

1  cases that they cite in the reply on this point was the

2  *Argentina* case in the Supreme Court in 2014, which is, I think,

3  completely distinguishable because that case involved a

4  situation in which the foreign sovereign waived jurisdictional

5  immunity, was found liable, and was contesting the scope of

6  discovery in aid of execution.  And there the Supreme Court

7  said well, the FSIA has nothing really to say about discovery

8  in aid of execution once you've been found liable.  But the

9  FSIA certainly does have something to say about need to find a

10  foreign sovereign properly subject to the jurisdiction of the

11  Court before the burdens of litigation and of discovery can be

12  imposed on it.

13         And as far as the *Lu* case from the Ninth Circuit is

14  concerned, I just wanted to note the Ninth Circuit relied on

15  public findings that had already been made in the courts of

16  Taiwan.  It's a little confusing because they say the Republic

17  of China, but in this case that's referring to Taiwan.  And

18  there was no discovery ordered into intelligence agencies

19  there.

20         With respect to potential searches of the intelligence

21  agencies, there is no showing that material contemporaneous

22  documents are likely to be located in the possession of those

23  agencies.  Judge Daniels did not rely on their allegations that

24  Omar Al Bayoumi was a spy, and discovery has not given them

25  anything in support of that.

J2QTTERA

1        I can't discuss the FBI productions in open court, but

2   your Honor has them, and you have already stated you read them.

3   And I'm confident that from that you will draw the conclusion

4   that those documents have not strengthened their hand.

5        If they had the evidence, you would be seeing it cited

6   directly in their papers, you would not see references to the

7   affidavits of Mr. Rochford, who is basically purporting to act

8   as an expert but really attempting to tell the Court what

9   inferences it should draw from essentially innocent facts.

10       I'm not sure how much they're currently focusing on

11   post 9/11 investigative files, but we do also strongly object

12   to the suggestion those are properly within the scope of

13   discovery.  Those files would be confidential for much of the

14   same reasons that the FBI in this case, to the extent it made a

15   production, has insisted that those files be kept confidential

16   from foreign nationals.  So our own co-counsel who are working

17   on our case, to the extent they're Saudi nationals without a

18   permanent presence in the United States and not within the

19   jurisdiction of this Court, can't see the FBI documents because

20   the FBI considered the sovereign interests of the United States

21   to outweigh any right those individuals might have to see it.

22       And of course, Saudi Arabia could not obtain any

23   similar protections.  Plaintiffs are not -- in Saudi Arabia are

24   not subject to the jurisdiction of this Court.  And once the

25   documents were produced -- frankly, your Honor, our firm is not

J2QTTERA

1    in Saudi Arabia, we're not subject to its jurisdiction.  It

2    would be problematic even for the attorneys of our firm to be

3    asked to review those types of documents for the purpose of

4    determining whether they could be placed in a privilege log,

5    which is why I think that is not an adequate suggestion.

6         They mentioned a number of other agencies in their

7    proposed order, but they didn't really come up today; foreign

8    affairs, interior, finance, a couple of others, and I will rest

9    on the briefs with regard to those.  I don't want to

10   unnecessarily prolong this.

11        With regard to the timeframe question, the focus of

12   jurisdictional discovery here is the portion of the year 2000

13   during which two 9/11 hijackers were in San Diego, first in Los

14   Angeles and then San Diego.  And the only concrete

15   allegations --

16        THE COURT:  I'm sorry, could you speak a little more

17   slowly, please?

18        MR. RAPAWY:  Yes.

19        THE COURT:  Thank you.

20        MR. RAPAWY:  The concrete allegations from that period

21   focus on the very first case of February 2002 when Mr. Al

22   Thumairy supposedly met with Mr. Al Bayoumi at the consulate

23   and Mr. Al Bayoumi supposedly helped the two men find an

24   apartment.

25        So the purpose of jurisdictional discovery here is to

J2QTTERA

1  verify or to refute plaintiffs' allegations that these two men

2  assisted the hijackers during that period based on instructions

3  from some unnamed senior official of the Saudi government.

4  Leaving aside they found no support for that, the 9/11 report

5  itself indicates that Al Qaeda began planning the 9/11

6  operation in earnest in late to 1998 to early 1999.  That's

7  page 150 of the 9/11 report, which is already in the record.

8  So the suggestion you will find documents relevant to this

9  targeted exercise by going before 1998 is difficult to fathom.

10        The documents after 2002 are not within the scope

11  because the only documents that you're going to find from that

12  period are the post investigative documents.  We have made

13  certain limited voluntary exceptions to that, such as documents

14  relating to Mr. Al Thumairy's expulsion from the United States.

15  We searched for the documents, we produced them, plaintiffs

16  have them.

17        We also voluntarily produced entire personnel files

18  regardless of date range because those documents were all in

19  one place.  It was easy to collect them.  The burden wasn't

20  great.  We found no reason to withhold them.  But to go back

21  now and add more searches for more ministries or for a broader

22  time frame would delay this process for no real purpose.

23        And I do want to address in that context Mr. Pounian's

24  suggestion that there should be multiple stages to sort of ease

25  into this, and maybe start with interrogatories first and come

J2QTTERA

back again.  We very much disagree with that, your Honor.  We

think that your Honor should issue an order, and if you tell us

to do more, we will go and do more, and we will do it as

quickly as we can.  And we want to get to depositions and our

renewed motion to dismiss, because we are quite confident at

the end of the day that the Court would not -- there would not

be a basis for the Court to find jurisdiction here.

          With regard to specific complaints about our search of

production, some of which I already addressed, the question of

Mr. Al Thumairy's employment, his job during the relevant

period was indeed imam at the King Fahd Mosque.  He didn't have

an office at the consulate.  He didn't work there.  If you dig

through the confidential documents, there are certainly

conflicting statements in the documents about that issue, but

we have given plaintiffs and you our best understanding based

on our reasonable investigation, which has included interviews

of the individuals we could access and were likely to have

knowledge of that information.

          And then on top of that, we went to the embassy and

the consulate and we looked for all the documents that we could

find.  We produced those, and those do not suggest anything

contrary to what we're telling the Court today.  So the

plaintiffs have responsive documents, they have answers to

their interrogatories.  I'm not sure what they want.  If they

would like to ask Mr. Thumairy about his prior statements at

1    his deposition, that's completely fair game, but they don't

2    need more documents to do that.

3              With regard to scope of the --

4              THE COURT:  Could I ask you a question about funding

5    of the mosque?

6              MR. RAPAWY:  Yes, your Honor.

7              THE COURT:  Mr. Pounian discussed, both when he

8    provided the registration or the filing of the California

9    Secretary of State for the letters of incorporation for the

10   mosque indicating that it was largely controlled by Saudi

11   officials, and a reference to Saudi funding of the mosque, and

12   the reference to the appointment of Al Thumairy by Saudi

13   officials, so can you talk a little bit about the role Saudi

14   Arabia played with respect to the mosque?

15             MR. RAPAWY:  Yes, your Honor.  So the mosque has been

16   run by an organization called the Ibn Taymiyah Foundation,

17   which is, contrary to Mr. Pounian's statements, a private

18   California charity.

19             There actually was -- I wanted to address one point

20   they made in their reply papers on this subject.  The Ibn

21   Taymiyah Mosque existed even before it became the King Fahd

22   Mosque.  So when Mr. Thumairy originally went out there, it was

23   before the mosque was called the King Fahd Mosque, and also I

24   believe it was before any of the individuals were on the board.

25   They were added to the board as part of the change of the name

J2QTTERA

of the mosque that the foundation runs when the late King Fahd

gave a large donation to have the mosque rebuilt, and it was

named after him after that occurred.  We have searched for and

produced documents related to the composition of the board of

the mosque, which was one of plaintiffs' document requests.

And we did not, frankly, find much, but we gave them anything

in that category that we found.

          And then at some later date the mosque began to --

some of this stuff is confidential, your Honor, the documents

are in the papers.  But the California Secretary of State

filings are public, and what they show is after a certain

number of years the other members of the board of the mosque,

the ones who were not Saudi Arabia officials, went back to the

California Secretary of State and said these people who were

named as officials by Saudi Arabia have not been coming to

board meetings or actively participating in the management of

the mosque.  This was all cited in the papers as part of a

third-party production from the mosque which plaintiffs got.

          And after that, I don't actually know whether the

California Secretary of State formally approved the removal of

those individuals from the board, but I do know that to the

extent there were additional payments made to the mosque, there

were donations of various sorts, and there was at least one --

that's confidential.

          Sorry, your Honor, it's difficult to do this without a

J2QTTERA

1   redacted copy in front of me.

2           THE COURT:  I understand.  I am familiar with the

3   arguments in your brief, so if you want to rest on that.

4           MR. RAPAWY:  I think the main point is to the extent

5   this is alleged to have been a Saudi government run or

6   controlled mosque, we don't think they have shown that.  We

7   don't think that was actually the case.  And the funding was

8   largely -- not entirely, but largely the one large donation

9   that King Fahd made to rebuild the mosque which was renamed

10  after him, and that was well before the -- I mean the idea that

11  that had something to do with 9/11 attacks is completely

12  unsupported speculation and there is no basis for the

13  suggestion.

14          So we produced the letter, or we have found -- we will

15  produce the letter concerning Mr. Thumairy's supervisory

16  responsibilities.  I wanted to say in that context, or to refer

17  the Court back to the portions of the May 28 order that discuss

18  the Abdi Mohamed allegations in which Judge Daniels found that

19  there was no non-speculative basis that anyone who was a Saudi

20  propagator had done anything to help the hijackers.

21          I would like to touch briefly on the questions with

22  regard to Mr. Al Bayoumi's employment.  We have produced

23  documents showing that during the relevant period he was an

24  employee of the Presidency of Civil Aviation.  He was either

25  seconded Dallah Avco under the ANSS contract or he was on

J2QTTERA

unpaid leave.  His own responsibilities, so far as we have been
able to determine, during the period of his secondment and
leave, was pursuing his education in the United States.  And I
think that Plaintiff's Exhibit 5 says this.  So I would
disagree with the suggestion that was made earlier that we have
produced no documents about this.

     We have also produced documents about what his
education was, transcripts showing that he attended classes,
computer English classes, computer classes, an unfinished
course of study in accounting, and ultimately two master's
degrees.  So the statement in the papers that he just didn't
attend classes are not true.

     There have been many documents in the Dallah Avco
production showing how he was paid through the ANSS contract,
and some of those have been discussed before.  All I could
really say about those documents is that they don't suggest we
withheld them.  Dallah Avco had those documents as the
contractor of the ANNS contract.  They have produced them,
plaintiffs have them, and they can make what use they like of
them at Mr. Bayoumi's deposition.

     I do not think that those documents show or suggest
that he was acting in some kind of covert role as a spy or a
secret agent, and they certainly do not suggest the key point
which the Court is going to have to decide on the renewed
motion to dismiss, which is that he was acting on instructions

J2QTTERA

1    from some hidden source when he met with the two hijackers.

2              With regard to the question about his pay raise, we

3    have produced everything we have on that.  I understand that

4    the aviation authority's documents show that he was on unpaid

5    leave.  Dallah Avco documents show he was rehired and needed to

6    be paid.  Whatever that is worth and whatever it can prove, you

7    have the documents from both parties on this, and there's

8    simply nothing further for the Court to compel.

9              And I wanted to also touch briefly on the fact -- it

10   was towards the end of Mr. Pounian's argument he raised the

11   allegations about Mr. Al Dryfan, Mr. Al Sadan and Mr. Al

12   Sudairy.  I'm sure the Court recalls this, but supplemental

13   discovery of those individual was explicitly denied.  So the

14   complaint that we did not produce documents on those I think is

15   in the nature of a motion for reconsideration, and I don't

16   think that it's timely or there's a sufficient basis laid for

17   it.

18             Does your Honor have further questions with regard to

19   the motion to compel?

20             THE COURT:  I don't believe so.

21             MR. RAPAWY:  As I mentioned, my colleague, Mr. Shen,

22   is planning to address the motion on supplemental discovery and

23   will also address the confidentiality motion.

24             THE COURT:  Okay.

25             MR. RAPAWY:  Thank you, your Honor.

J2QTTERA

1          MR. POUNIAN:  May I be heard briefly, your Honor?

2          THE COURT:  Briefly.  I started this conference by

3    saying I did not want to have a full-blown oral argument on the

4    discovery motion, and here we are two hours into it.

5          MR. POUNIAN:  I think I may have had something to do

6    with that, your Honor.

7          Up one of the slides I had to show your Honor was

8    Mr. Kellogg's statement before this Court when he was standing

9    here in 2015, and he told the Court that Mr. Thumairy was an

10   employee of the embassy, that he was working for the embassy.

11   And now in 2019 when it's time for discovery, we hear from

12   Saudi Arabia he was not an employee of the embassy or the

13   consulate.  And yet from the documents we find, we find

14   Suwaylim sending documents announcing Thumairy's position as

15   lead propagator in California, which is indicating that he is

16   reporting to the embassy in Washington.  So there's a conflict

17   here in facts, and we're entitled to discovery on that.

18         And their position has changed over time.  It's

19   changed from 2015 to today.  Before JASTA and then after JASTA

20   they have altered their position in the facts, and they're now

21   trying to escape producing discovery that they have.

22         Now they say they have one letter.  Where is it?  What

23   is it?  Why don't they have the letter that we found that was

24   seized by the FBI?  And at the time that they seized that

25   letter there were 60 documents on the letterhead of the Kingdom

J2QTTERA

of Saudi Arabia that were seized from Abdi Mohamed.  We haven't

gotten any document that was sent to Thumairy.  Why is that?

What is the reason for that?

          In terms of Bayoumi being a student, why was he given

a phony job?  Was he just brought here as a student?  Why all

the shenanigans with the DSS programmer, account supervisor,

what was the reason for that?  Why didn't he just come in as a

student?  And in the final year, in 2000 when he came back, he

didn't even have a student visa, he couldn't even be a student.

          And the FBI in their report that I showed your Honor

earlier found that he did not attend classes.  So it's a

classic -- one of Mr. Rochford's analysis actually is that it's

a classic cover for someone to be a student to get into the

student community, because his job was to do intelligence on

local Saudis in the community.  So it was all part of what he

was doing for Saudi Arabia.

          All we've heard from Saudi Arabia is there's no

evidence that they presented.  As Judge Daniels said, they have

not come forward with evidence, they're coming forward with

words.  There's no affidavits.  They're not willing to answer

questions.  They're just saying shut discovery down, we don't

want to do discovery.  That's wrong, your Honor.  They should

have to come forward and answer questions that are based on

what we have shown today before your Honor.

          One element that was just raised, talking about the

1    meeting at the consulate, that somehow our theory has been

2    undermined because now there's a question about the meeting at

3    the consulate.  I urge the Court it's a completely misleading

4    argument regarding the facts.  The facts are in the sealed

5    documents before your Honor.

6         But I can tell you one thing that is in the public

7    record and what Bayoumi truly lied about was he said he never

8    went to the King Fahd Mosque that day.  That's what he said.

9    He said:  I didn't go to the mosque.  He was trying to hide his

10   connection with the mosque on that day.  And actually there's

11   also evidence in the public record he went there twice that

12   day.  Twice that day.  And there's additional facts in the

13   under seal documents before your Honor that shows some of what

14   was going on during those visits.

15        I think that's all I have for now, your Honor.  I

16   think Mr. Carter may have some more.

17        THE COURT:  I think that Mr. Rapawy wanted to say

18   something briefly.

19        MR. RAPAWY:  I did, your Honor, very briefly on the

20   subject of Mr. Kellogg's previous statement, because he isn't

21   here to defend himself.  That was a hearing on a motion to

22   dismiss, and at the time we accepted plaintiffs' allegation

23   that Mr. Thumairy was an embassy employee.  Discovery has shown

24   otherwise.  Thank you, your Honor.

25        THE COURT:  Thank you.

J2QTTERA

1          MR. CARTER:  Your Honor, I will be very brief.  Just

2     initially I wanted to say that Mr. Rapawy repeatedly suggested

3     the scope of discovery was essentially limited to whether or

4     not there's some phone call or communique from a senior Saudi

5     official to Thumairy telling him to go do this.  And that's not

6     correct.  And I think we outlined in the papers the scope of

7     discovery concerns the agency by Thumairy and the others that

8     were involved.

9          And the decision in *Reese*, which is cited in the

10    papers, I think is most directly on point.  It's an FSIA case

11    about agency, and it makes clear that agency just doesn't

12    materialize at a moment in time in an individual transaction,

13    you need context, you need to understand the origins of it.

14    Which is why we asked, to better understand why Bayoumi was

15    deployed in the United States, what was going on with the King

16    Fahd Mosque that resulted not only in the funding but the

17    contemporaneous deployment of Thumairy to work at that

18    facility.

19          You also heard Mr. Rapawy say that when we raised the

20    issue of the duties of propagators they agreed to look for

21    documents about the duties of the propagators.  The problem is

22    what we really asked for is communiques that were being issued

23    to communicate with the propagators and guides in the United

24    States during this period so we could better understand what

25    kind of communications were being received by Thumairy and his

J2QTTERA

1    peers.  That's a different set of documents than they're

2    talking about.

3          It's the same scenario we get when we approach them

4    about the document from Suwaylim to Abdi Mohamed.  They agreed

5    to go back and look for that document, but our real complaint

6    was that the letter describes a nomination process, an approval

7    process, a communication from Saudi Arabia to Suwaylim telling

8    them that Thumairy has been approved, and then a communication

9    going out from Suwaylim telling other people.  We're interested

10   in all of it, not just a single document.

11         With regard to the issue of the scope of discovery and

12   jurisdiction, Mr. Rapawy talked about the Supreme Court

13   decision in *NML Capital*.  Any suggestion that the Court's

14   holding in that case is limited to circumstances involving

15   execution proceedings with a foreign sovereign has been found

16   liable is not credible.  The holding of that case is that there

17   are no special rules with regard to discovery in FSIA cases.

18   The FSIA says nothing about discovery, and the federal rules

19   authorize discovery.

20         And the last thing I would say, your Honor, is the

21   suggestion that was made that Bayoumi was in the United States

22   receiving multiple master's degrees and performing a diligent

23   course of study is not supported by the documents.  There's an

24   entire year.  The papers describe it, but the documents do not

25   reflect a serious course of study that he was somehow here for

J2QTTERA

1    seven years and extended for another two years when he was

2    going elsewhere.  So it's just not credible, your Honor.  Thank

3    you.

4              THE COURT:  Thank you.

5              Mr. Shen.

6              MR. SHEN:  Your Honor, I will be very brief discussing

7    the supplemental discovery issues.

8              First, to address the point that Mr. Carter made,

9    they're simply wrong that ordinary rules of civil discovery

10   apply to jurisdictional discovery at issue here.  This Court in

11   its March 28 order was explicit that jurisdictional discovery

12   should be limited, targeted and circumspect.  The Second

13   Circuit has held that a sovereign under FSIA jurisdictional

14   discovery, that any discovery must be balanced against that

15   sovereign's legitimate interest to immunity and to comity

16   concerns.  And the Second Circuit has also held that any

17   jurisdictional discovery requires a non-speculative basis to

18   believe that that discovery will lead directly to jurisdiction

19   in this case.  Now to that end, this Court has already

20   instructed the parties that it will carefully scrutinize any

21   request, and that those requests for discovery must be tethered

22   specifically to the allegations at pages 19 to 23 of Judge

23   Daniels' order.

24             With respect to supplemental discovery requests, that

25   involves three individuals.  They are incredibly broad

J2QTTERA

1    requests.  They indiscriminately asked for all responsibilities

2    for these individuals, all activities of these individuals in

3    the State of California, notwithstanding the fact that two of

4    the individuals actually lived in California during the

5    relevant period.  So effectively plaintiffs are asking for

6    every single act that these individuals conducted during the

7    relevant time period.  They asked for diplomatic status, all

8    travel that these individual engaged in, all contacts that

9    these individuals had with a laundry list of other individuals,

10   who they supervised, who supervised them, and the

11   responsibilities of those individuals.  Those requests aren't

12   at all tethered to the specific allegations in pages 19 through

13   23 of the Court's March 28 order.

14          Your Honor has our papers in front of her.  What we

15   have done is proposed what we would submit is a very reasonable

16   broad discovery of those three individuals.  In broad strokes,

17   we have agreed to conduct a search of the embassy and the

18   consulate.  The embassy is where Al Jarrah worked, the

19   consulate is where Mr. Muhanna worked.  And we have agreed to

20   pull every document in those two diplomatic missions that even

21   reference any of the three individuals.  And we'll produce

22   those documents to the plaintiffs, notwithstanding the fact

23   that all of those documents would otherwise be completely

24   immune from discovery because they're inviable under the Vienna

25   Convention.  In addition, the kingdom has offered to go to the

J2QTTERA

1  actual ministries that employed these individuals to conduct

2  searches of those ministries.

3  So your Honor asked the question about the Ministry of

4  Islamic Affairs with respect to Al Muhanna, who worked at the

5  Ministry of Islamic Affairs.  We agreed to go there and do a

6  broad-based search for documents responsive to their

7  supplemental request.

8  THE COURT:  So you would be searching not just for

9  personnel files but for documents, including assignments,

10  tasks, et cetera?

11  MR. SHEN:  That's right, your Honor.

12  With respect to Al Mana, there's no basis to believe

13  that Al Mana was employed by the Ministry of Islamic Affairs,

14  but in our papers we had also agreed to conduct a search to see

15  whether or not Ministry of Islamic Affairs has a personnel file

16  and if there are other documents at the Ministry of Islamic

17  Affairs that contain responsive information.

18  With respect to Al Jarrah, he was an employee of the

19  Ministry of Education.  We have agreed to go to the Ministry of

20  Education to look for his personal file.  We have also agreed

21  to go to the Imam Muhammad bin Saud University to search for

22  his personnel file.  And with respect to these personnel files,

23  we are going to be producing every document contained in those

24  personnel files regardless, so they would get a broad scope in

25  response to this request.  And of course, they're going to get

1    every document that is at the consulate and at the embassy as

2    well.

3              THE COURT:  Could I ask you to speak up a little bit?

4              MR. SHEN:  Sure.  We have also agreed to conduct

5    additional targeted searches at other ministries.  For

6    instance, we agreed to search the Ministry of the Interior for

7    passport renewal records for entry and exit information.  And

8    we have also agreed to ask these individuals whether they will

9    voluntarily produce their passports.  We did the same thing

10   with Mr. Al Bayoumi, Mr. Al Thumairy and Al Suwaylim, and they

11   received documents through that process.

12             And so we believe that this proposal is inherently

13   reasonable.  If the Court has any specific questions on

14   particular requests, I am happy to answer those questions.

15             THE COURT:  With respect to the request for day-to-day

16   activities, on the one hand I understand your objection that

17   that could encompass one's entire life.  You've already

18   answered through your colleague that there wasn't that much

19   email traffic at this time, but are there calendars, are there

20   memos or reports to supervisors that would give us any

21   indication as to what these three individuals were doing?

22             MR. SHEN:  I think the answer is different with

23   respect to the three individuals.  With respect to Al Muhanna,

24   he was assigned to the King Fahd Mosque as an imam, and our

25   understanding, based on our intelligence, based on our

J2QTTERA

1   interview with Mr. Muhanna –– we actually traveled to Riyadh

2   immediately after the Court's November 29 meeting to meet with

3   Mr. Muhanna –– is that we don't expect there to be the type

4   documents that the Court has referenced.  And that's because

5   his job was to lead prayer several times a day, and our

6   understanding is there's not a lot of documentary record of his

7   activities.

8          With respect to Al Mana, he was working on a

9   day-to-day basis in the LA consulate.  So to the extent that we

10   are pulling every document that references Al Mana, plaintiffs

11   are going to get documents pertaining to his day-to-day

12   activity.

13          The same is true with respect to Al Jarrah.  He was

14   working inside the embassy in Washington DC, so with respect to

15   the request pertaining to him, they are going to get his

16   day-to-day activity also because we also agreed to pull every

17   reference to Mr. Al Jarrah.

18          THE COURT:  Specific targeted question about

19   calendars, which can sometimes be incredibly illuminating.

20   Have you see looked to whether or not there are calendars in

21   the relevant time?

22          MR. SHEN:  We have.  That's a specific search we

23   conducted.

24          THE COURT:  And if you found anything, I presume you

25   turned it over.

J2QTTERA

1          MR. SHEN:  Yes, your Honor.

2          THE COURT:  Okay.  I think you answered all of my

3    questions.

4          MR. SHEN:  Thank you, your Honor.  I'm happy to

5    address the sealing order as well.

6          THE COURT:  Let me give the Plaintiffs' Executive

7    Committee an opportunity, if they wish, to respond to this

8    particular area of discovery.

9          MR. POUNIAN:  Yes, your Honor, briefly.

10          First of all, Mr. Shen referred to some Second Circuit

11    cases on the jurisdictional discovery issue.  Those are

12    commercial cases, your Honor, they don't involve the same

13    considerations as JASTA and the considerations of comity that

14    are involved in a case involving criminal activity inside the

15    United States.  And I submit to the Court that in that

16    situation, in the JASTA situation, the balance is completely

17    different than in a commercial setting in terms of comity,

18    because the comity of the United States is directly involved in

19    the attack, in the 9/11 attacks.

20          In terms of the personnel files, your Honor, in their

21    submissions they said personnel files should contain most, if

22    not all, of the documents regarding an employee's duties,

23    responsibilities, functions, authorities and secondments.

24    That's what they said in their letter to the Court, the brief

25    on December 14.

J2QTTERA

1          What we know from Mr. Thumairy's personnel file, who

2     was working alongside Mr. Muhanna, is that it didn't include

3     any of those things.  And we are very concerned.  We hear all

4     the words about the search.  There's no proof of anything.

5     There's no affidavit to support any of the searches that have

6     been conducted.  We have not gotten a single calendar that's

7     been produced in the case.

8          So we have a sharp concern about what is actually

9     going to be produced.  If they're saying it's going to be a

10    personnel file, the concern is what they have done to date is

11    simply produce personnel files and go through sort of a cursory

12    search, which is the reason why they didn't find any of the

13    documents regarding Mr. Thumairy which they should have found.

14    And there should have been many documents regarding all the

15    supervision that he did of propagators in California, and there

16    was not a single document.  So that is the concern.  I'm

17    throwing out that question mark, your Honor, and Ms. Benett

18    will be arguing the sealing motion.

19          THE COURT:  Okay.  Let's take a three-minute recess.

20          (Recess taken)

21          THE COURT:  All right.  So the last topic on my agenda

22    is to discuss the motion to seal.  This is another motion that

23    I'm going to take under advisement.  I have read everybody's

24    excellent briefs as well as the letter that was filed on behalf

25    of the New York Times.  And so I had a few questions to pose,

J2QTTERA

1    but if there's some opening remarks you want to make, I'm happy

2    to hear from you.

3              MR. SHEN:  Thank you, your Honor.

4              Currently there are 218 documents that have been filed

5    in connection with the motion to compel and the supplemental

6    discovery motions that are under seal.  136 of those documents

7    were produced by the kingdom, they have kingdom Bates numbers

8    on them.

9              The kingdom is not seeking to seal the entirety of the

10   discovery record or all communications within the Saudi

11   government, instead we have very narrowly and carefully

12   identified documents that are not appropriate for public

13   disclosures.  And those documents consist of 73 Bates numbered

14   documents that we're seeking to seal in their entirety and 12

15   documents that are we seeking to redact.

16             Now the redactions involve personal information,

17   financial information.  I don't believe that's a dispute.

18   Currently the plaintiffs have stated that they're willing to

19   meet and confer about that issue.

20             THE COURT:  Have you given them proposed redactions?

21             MR. SHEN:  Yes, your Honor.

22             THE COURT:  Have they had an opportunity to respond to

23   that?

24             MR. SHEN:  We have not met and conferred about that,

25   but they certainly have had the opportunity to respond.

J2QTTERA

1        THE COURT:  Okay.  Maybe with respect to the

2   redactions, which I believe is in the plaintiff's reply or

3   opposition, indicated that things like Social Security numbers

4   and medical information and the like they would not object to.

5   Maybe if I could just ask the parties to in fact complete that

6   meet and confer and submit a letter to me in a week, does that

7   seem like a reasonable amount of time on that very narrow

8   issue?

9        MR. SHEN:  Yes, your Honor.

10        MS. BENETT:  That's fine, your Honor.

11        THE COURT:  I'm not at my desk so I don't have my

12   calendar, but I believe it's March 5th.  So let's have a joint

13   letter on March 5th letting me know the status of those limited

14   redactions.  So that would then just leave us with the 73

15   documents that the kingdom is seeking to file under seal.

16        MR. SHEN:  Yes, your Honor.  With respect to those 73

17   documents, those are traditionally non-public government

18   documents.  The government documents of a foreign sovereign

19   have a higher interest, and international comity and privacy

20   and other privileges, as your Honor alluded to earlier, the

21   deliberate process privilege, justify the sealing of those

22   documents.

23        And your Honor is aware that there's no absolute right

24   to public access to judicial documents.  The Second Circuit in

25   the *Lugosch* decision said that the weight of any presumption

J2QTTERA

1      sits on a sliding scale.  The weight of that presumption is

2      highest when the Court is conducting its core adjudicatory

3      functions, when its deciding the merits on the case, when the

4      actual case is in the merits.

5            The Second Circuit has also said that the presumption

6      of public access is at its lowest where the discovery documents

7      are before the Court solely for the Court to ensure their

8      irrelevance.

9            Now here, of course, we're not in the context of

10     summary judgment, as was the case in *Lugosch*.  We're not on any

11     adjudicatory proceeding on the merits.  We are in

12     jurisdictional discovery in the context of a motion to compel.

13     And the discovery documents that are before the Court are

14     before the Court so that the Court can decide whether or not

15     those documents suggest that the kingdom should conduct

16     additional searches for other documents.  And in this context,

17     we would submit that the weight of the presumption of public

18     access is at its lowest.

19           The Second Circuit has also made clear that whatever

20     presumption applies, that presumption of public access needs to

21     be balanced, it need to be weighed against countervailing

22     factors and against higher values, including higher values of

23     international comity, including whether the documents that are

24     sealed are sensitive documents containing traditionally

25     non-public government information, which these documents are,

J2QTTERA

1    and it needs to be balanced against privacy rights and other

2    privileges like the deliberative process privilege.

3            Now I mentioned that there are 73 documents we're

4    seeking to seal.  The lion's share of those documents, 63 of

5    those documents, are protected under the Vienna Convention.

6    And what the Vienna Convention provides is that all archives

7    and documents of diplomatic missions, as well as all

8    correspondence relating to the functions of a diplomatic

9    mission, are inviable.  The Second Circuit has held in the *767

10   Third Avenue v. Republic of Zaire* case that there are no

11   exceptions to that inviability.

12           THE COURT:  How does the fact that you produced the

13   documents affect that analysis?

14           MR. SHEN:  Your Honor, the circuit courts have held

15   that diplomatic documents protected by the Vienna Convention

16   are completely immune from discovery.  The only reason that the

17   plaintiffs have these documents is because we voluntarily

18   disclosed the documents.

19           The case law is also clear that you do not waive

20   inviability of diplomatic documents by producing them.  In

21   fact, the Vienna Conventions themselves have no provision for

22   the waiver of inviability of diplomatic documents.  To the

23   extent that they address a waiver rule at all, and that's only

24   in the context of the privileges and immunities given to

25   consular officers, they make clear that any such waiver must be

J2QTTERA

expressed and it must be in writing.  Of course, that hasn't

occurred here.  And I refer the Court to the Vienna Convention

on Consular Relations, Article 45, which sets that out

explicitly.

Moreover, the fact that the kingdom has produced the

documents voluntarily for purposes of this litigation does not

mean it's waived its higher interest in the confidentiality of

those documents.  The law recognizes that a party may produce

documents for litigation purposes while continuing to assert

that the documents should remain confidential.  And that's

especially true in the case of a foreign sovereign with respect

to documents that have a legitimate confidentiality interest or

that are protected by privilege.

And there I would point the Court to two cases that

were cited in our brief, the *Strauss v. Credit Lyonnaise* case

in the Eastern District of New York, and the *Omari v. Al Khaima*

case out of the Southern District of New York.  In both cases a

foreign sovereign produced documents and the courts held that

the mere production of those documents doesn't mean that you

waive your interest in confidentiality.  And given higher

interests in international comity and given the confidentiality

interests of that foreign sovereign, the court determined that

those documents were required to be held under seal.

So with respect to the Vienna Convention, as I

mentioned, the vast majority of the documents at issue are

J2QTTERA

1   subject to that protection.  The kingdom produced those

2   documents voluntarily, but it produced those documents in

3   reliance on the protections of this Court's protective order

4   and in reliance on the procedures for filing documents under

5   seal.

6        In the same way the FBI has produced documents in

7   response to plaintiffs' subpoenas, every single one of those

8   documents, to the extent it's been attached to a public filing,

9   has been permanently sealed.  Every discussion of those

10  documents has been permanently redacted, and no party has

11  objected to the sealing of that material.  Interests of comity

12  also dictate that the kingdom's documents, the most sensitive

13  documents from its diplomatic missions, should also be kept

14  under seal.

15       If the Court were to decide that some of these

16  diplomatic documents that have been produced from the kingdom's

17  missions should appear on the public docket, the kingdom may

18  need to take serious consideration into whether it will produce

19  these documents voluntarily.  These are documents that the

20  plaintiffs are not entitled to, they're completely immune from

21  discovery, and this is a very sensitive topic that the kingdom

22  would need to consider further.

23       Now the remaining categories of protection for the

24  documents, there's 32 documents that are also highly sensitive

25  internal communications.  These are high level communications

J2QTTERA

of Saudi officials from the deputy minister level or above.

Now these 32 documents, they overlap substantially with the Vienna Convention documents, so there's only eight documents that fall in this category that are not protected by the Vienna Convention.

Now with respect to these documents, the majority of those documents are themselves labeled confidential and/or secret.  This is akin to a US document that has been labeled classified or secret, and interests of comity dictate that those documents, high level communications involving sensitive topics of high level Saudi officials, those should be kept under seal as well.

We mentioned deliberative process earlier in this argument.  There are 21 documents that fall under that category.  However, every single one of those documents are either protected independently by the Vienna Convention or also protected because they are high-level communications between Saudi officials.  The law recognizes that the deliberative process privilege is designed to protect open and frank discussion.  Those documents should also be protected here.

THE COURT:  In order to qualify under the deliberative process privilege, do you believe you need to make a more detailed showing about the nature of the deliberation, who was involved in it, what the ultimate outcome was?  The law seems to put a high burden on parties seeking to rely on the

J2QTTERA

deliberative process privilege.

MR. SHEN:  With respect to that category, the documents, we would submit, on their face show what the deliberations are, what the recommendations were being made, and the deliberations between the various Saudi government officials that did or did not lead to an ultimate government decision.

I do want to note that all of the final decisions here where we have asserted the deliberative process privilege, they're all ancillary to the central allegation in the case. They're not deliberations on whether to provide instructions to Mr. Al Bayoumi or Mr. Al Thumairy to assist the terrorists.  In fact, no such instructions were ever given or contemplated. They are completely ancillary.  They are things like whether to continue the employment of some individual, whether to expend his secondment, that sort of ancillary --

THE COURT:  Some individual or Bayoumi or Thumairy?

MR. SHEN:  Certainly with respect to -- there are certain documents pertaining to Al Thumairy and Al Bayoumi, but there's also documents --

THE COURT:  But that seems like it goes to core of what the plaintiffs are seeking.  Their argument that they presented earlier this afternoon is that these officials were basically placed in Southern California with a particular agenda directed by the kingdom.  I know that you vehemently

J2QTTERA

1   dispute that characterization, but that's their argument.  And

2   particularly with respect to Mr. Bayoumi, there's been some

3   documents to suggest that his secondment to Dallah Avco was a

4   sham of some sort.  And so to the extent that there are

5   documents reflecting the decision to impose upon Dallah Avco

6   that they renew his secondment, that doesn't seem ancillary at

7   all to me.

8          MR. SHEN:  Those documents, to be clear, have been

9   produced to the plaintiff.  So the question is not whether we

10  searched for and produced those documents, the question is

11  whether or not those documents are protected by the

12  deliberative process privilege.  And the documents that fall

13  within that category are pre-decisional documents, they're

14  communications between Saudi officials pertaining to those

15  final decisions, but they're not the final decisions

16  themselves, and the law recognizes that those should be kept

17  confidential.

18          THE COURT:  All right.

19          MR. SHEN:  The other categories of documents, there

20  are two documents that are protected by the Federal Educational

21  Rights and Privacy Act.  I don't know that there's any dispute

22  with the plaintiffs with respect to those documents.  Those

23  protect information, for instance, in Mr. Al Bayoumi's

24  transcript and his grades.

25          The plaintiffs have made the argument that some of the

J2QTTERA

information in these 73 documents is already public.  As an

initial matter, the presence of some publicly available

information doesn't render the entire document public.  The

Second Circuit has addressed that issue in the *United States v.*

*Amodeo* case.  And in any event, plaintiffs are just wrong in

asserting that these documents contain information that's

already public.

In Exhibit C, which accompanies our January 25th

submission, we have painstakingly gone document by document and

identified the non-public information that is contained within

those documents.  Plaintiffs have consistently and falsely

asserted that information in the sealed documents has been made

public.

Your Honor referenced a flurry of letters that came in

last week.  Plaintiff's February 20 letter made reference to

information that is only available in a sealed document that

was produced from a Saudi diplomatic mission.  We pointed that

issue out to the Court on the 21st.  The plaintiffs wrote a

letter to the Court on the 22nd where they claim that the

information was made public in a heavily redacted FBI document.

We have that document here.  The very information that

plaintiffs claim was available in that redacted FBI document

was in fact redacted.  So that is a blatant violation of the

protective order, but more foundationally, it is just an

example that plaintiffs' assertion that information is public

J2QTTERA

1    is not true.  We detailed all the information that is not

2    public in Exhibit C accompanying our January 25th letter.

3                THE COURT:  Thank you very much.

4                Ms. Benett.

5                MS. BENETT:  Thank you, your Honor.

6                Let me start with that last point about publicly

7    available information, that the defendant's representation that

8    everything are in their proposed sealed documents is not

9    public.  With respect to the reference to Al Thumairy, as we

10   said in our February 22nd reply -- which, by the way, the

11   kingdom never moved to seal our reply in which we said that

12   Thumairy was an administrative officer of the kingdom, which

13   any Google search would reveal, nevertheless, that title is a

14   piece of information that the kingdom continues to assert has

15   to be under seal.

16               And I think one of reasons that we're in the situation

17   that we're in now is Judge Casey's original order in 2006

18   granted almost entirely the kingdom's request -- the

19   Defendants' Executive Committee's request with respect to a

20   confidentiality protective order covering discovery documents

21   on a generalized good cause showing that, as Judge Casey said,

22   would not ordinarily be sufficient to warrant the protective

23   order, but under the unique circumstances of the case at that

24   time, he would rely upon, in granting the protective order,

25   that would pertain only to the discovery documents.  And

J2QTTERA

despite the kingdom's representation recently that that order
didn't contemplate the issue of judicial filings, that's not
accurate.  The kingdom's proposed order had a paragraph
concerning judicial -- the filing of any designated
confidential documents under seal, and Judge Casey rejected
that.  It was the only part of the proposed order that he did
reject.

So they're working from what I would call sort of a
liberalized perspective with respect to their ability to
designate documents as confidential that was based only on this
generalized good cause showing.  Then they've leveraged that
now to keep every document that they marked as confidential
sealed since the end of July until today.  They have been
producing documents from March until July, and when they
produced the documents in July, the only information we had
about the basis for the confidentiality designation was the
name of the document custodian.  They listed where the document
came from and gave us no other argument for why those materials
were confidential.

Now at this stage what we have is barely more.  We
have statements about the Vienna Convention and statements
about deliberative process.  To the Court's question of
deliberative process, the very issue we are litigating is
whether kingdom officials tasked Bayoumi and Thumairy with
assisting the hijackers.  Any decision the kingdom made, any

J2QTTERA

decision-making process about tasking Thumairy and Bayoumi that

may be in these documents goes to the heart of the substance of

litigation.  It's completely outside of the deliberative

process exception.

        And even if it fell within the deliberative process

exception, the kingdom hasn't done anything to meet, as the

Court knows, the standards required to assert that protection.

They haven't produced -- just like with the discovery

materials, we haven't seen a single sworn statement from a

records custodian or from an agency head, which is what they

have to produce if they're asserting that privilege.  So

they're relying on conclusory statements by counsel to assert

the deliberative process exception when it doesn't even apply

to begin with.

        The Vienna Convention they're asserting -- let me

point the Court's attention to a couple of documents listed in

their log, one that was filed as Plaintiffs' Exhibit 53, which

was Bates stamped KSA 1830 and 1831, which are documents that

we received independently through third-party subpoenas that

are simply certificates of completion for English language

studies issued to Bayoumi.  But the kingdom has designated it

as confidential because they chose to produce that through

their consulate and through their embassy.

        And the fact they're using the repository of the

information as a sword to protect themselves from any

disclosure is not what the Vienna Convention contemplates.  As
the Times said in its letter to the Court, the Vienna
Convention addresses the privileges a diplomatic mission enjoys
with respect a host country and establishes that the host
country cannot interfere with the guest country's diplomatic
relations.

The documents they have produced, they have not made a
sufficient showing that those materials and the information in
there are core to the diplomatic mission without a specific
factual showing that those communications would be core to the
diplomatic mission, putting aside the waiver issue, which we
still assert.  By producing the material, they have already
waived whatever argument they may have had with respect to the
convention, but they have yet to put forth a specific factual
showing as to how the information in those materials produced
from the consulate and from the embassy are core to the
diplomatic mission.  The Vienna Convention simply doesn't
contemplate protecting that from the public.

THE COURT:  Could I ask you to take a step back -- not
physically, stay near the microphone -- and talk to me about
the continuum that the *Lugosch* case addresses.  Because one
thing that I think is critical for me to evaluate on this
particular motion is where, on that continuum that the Second
Circuit has instructed me to think about, where this
application falls.

J2QTTERA

1          And as was discussed previously by defense counsel,

2     this is not a motion to dismiss, this is not a motion for

3     summary judgment, these documents are being used to support and

4     reject arguments about the completion of discovery.  And so I'm

5     not even being asked to rely on them so much for the facts of

6     their statement but rather what they show about the possibility

7     of more discovery.  It seems to me that, given what the

8     substantive motion is, the discovery motion, that we're pretty

9     low on the continuum that the Second Circuit has instructed

10    courts to think about.

11          MS. BENETT:  So I think that might be true were

12    discovery not so inextricably intertwined here with subject

13    matter jurisdiction.  Essentially what we are litigating at

14    this stage is access to information that will be dispositive in

15    this case.  And that's why on the *Lugosch* continuum, the

16    Court's adjudicatory function is at its maximum.

17          This discovery dispute is not an ordinary argument

18    over a deposition protocol or over an interrogatory response,

19    this is core to the Court's subject matter jurisdiction that is

20    going to determine whether or not this Court continues to hear

21    the 9/11 case or dismisses it in the kingdom's favor.  So I

22    would say that certainly there is a continuum, but this falls

23    far on the side of the Court's key adjudicatory function at

24    which point the public's right to access the information is at

25    its apogee.

J2QTTERA

1          THE COURT:  I appreciate both the subject matter of

2     this case and the significance of the discovery disputes before

3     me, but I am instructed to follow a higher authority, the Court

4     of Appeals, and I'm unaware of cases that would allow me to

5     move the needle along the continuum because the case is really

6     significant or because discovery will make or break the case.

7     And I don't say that to undermine the seriousness of the case

8     and of the discovery before me, but at the end of the day, this

9     is a discovery dispute, and typically the public's right to see

10    documents that are being attached in support or against further

11    discovery is pretty low.

12          MS. BENETT:  So I will take maybe two steps back and

13    talk a little bit about -- just very, very briefly, about both

14    the Justice Against Sponsors of Terrorism Act and the recent

15    senate resolution that passed unanimously last fall, both of

16    which contained specific expressions of support from the United

17    States government that this particular litigation was to give

18    plaintiffs the broadest possible relief available, and in the

19    senate resolution in particular, was in support of public

20    access to the information about the 9/11 investigation and the

21    specific liability facts underlying this lawsuit.  So I would

22    say that this is -- I understand the Court appreciates this,

23    but the discovery issues are unique and are different than in

24    any other civil litigation.

25              So starting from that perspective, and then

J2QTTERA

1  understanding that, just as in a summary judgment motion, the

2  issue is not whether it's a summary judgment or a motion to

3  dismiss, I believe the same standard would apply under a

4  12(b)(6) motion, that it's whether the case is at a dispositive

5  stage.  And so if the issues that we're litigating now go to

6  the core of subject matter jurisdiction, and therefore go to

7  the viability of the lawsuit itself, the public's interest is

8  at its maximum.

9            THE COURT:  Okay.

10           MS. BENETT:  I would just point out that we saw today

11  some of the problems we're having with engaging in a robust

12  conversation about the issues when we are hamstrung by the

13  kingdom's unilateral designation of information as

14  confidential.  We presented not just the kingdom, some of the

15  other defendants as well, the document that we obtained from

16  the California Secretary of State reporting the appointment of

17  the board of directors at the King Fahd Mosque, the seven Saudi

18  high-level officials.  That had been produced by the mosque

19  itself with the mosque designating it as confidential, where

20  that information was obtainable from a public source by

21  plaintiffs so we could share it with the Court.  If we hadn't

22  been able to get that, we would have been restricted in our

23  ability to discuss that in open court in front of the press, in

24  front of the public, in front of our clients.

25           The same issue arises with the discussion about the

J2QTTERA

propagators' conference in Los Angeles, which we were able to

discuss openly only because we had obtained the transcript from

to the Abdi Mohamed trial, which specifically refers to the

July 1999 ten-day conference in Los Angeles.  If we had relied

only on the kingdom's unilaterally designated confidential

materials, we couldn't have discussed that publicly.  There's

no reason that that discussion should have been sealed from the

public.

So I think that's the risk that we're facing, and

that's the reason that we believe that the kingdom's

representations in its log filed with this Court on January 15

are simply insufficient for the extraordinary sealing of what

everybody has agreed are judicial documents.  I think the

disagreement is where on the spectrum of the right to public

access do they fall.  Thank you.

THE COURT:  Thank you very much.

All right.  Mr. Shen, anything to add?  I don't want

to belabor it, I think I understand your argument.

MR. SHEN:  No, your Honor, thank you.

THE COURT:  Let me end the same away that I began --

Oh, yes?

MR. RAPAWY:  I'm very sorry, your Honor, but on the

question -- we had had an outstanding request for a briefing

schedule on the identity and number of deponents, and the Court

had kind of put that off.  And I understand the Court's ruling

J2QTTERA

1    on that but didn't want it to slip through the cracks entirely.

2    Would your Honor consider setting a schedule for that when you

3    issue your ruling on the motion to compel?

4             THE COURT:  You want a schedule on briefing of the

5    number of depositions, is that what you're seeking?

6             MR. RAPAWY:  Yes.  Your Honor had directed plaintiffs

7    to give us a preliminary list, and we got that preliminary list

8    back, and it contains, by my count, more than 60 depositions.

9    So we're pretty far apart on the number of the depositions.  I

10   think it would help move the case forward if we move that

11   argument forward.

12            THE COURT:  I guess my concern is I am assuming that

13   the plaintiffs are going to tell me that until they receive the

14   final tranche, or at least the next tranche, which I think is

15   coming in March from the FBI, that they're not going to be in a

16   position to know the full scope of the depositions they want.

17   So they may be saying 60 now but they may be saying 100 later.

18            MR. RAPAWY:  That wouldn't surprise me, your Honor.  I

19   had thought your Honor previously ruled that the scope of --

20   the duration of the jurisdictional discovery was not going to

21   be extended because of any delays in the FBI production, and

22   that was basis for our position.

23            THE COURT:  I'm sure I did rule that at some point.

24            Where are you all on figuring out how many depositions

25   you want to take?

J2QTTERA

1          MR. CARTER:  Your Honor, I think, first of all, we

2     would like to see the totality of the universe of witnesses,

3     including based on any further discovery your Honor directs the

4     kingdom, so we could make informed choices about who we want to

5     depose rather than arguing in a vacuum and then coming back to

6     your Honor and saying oh, there are ten more important people

7     that we just learned about, and we need to brief this all over

8     again.  It all seems premature and only likely to invite

9     iterative briefings before your Honor.

10          In terms of the number of people on the list we

11     provided to the kingdom, it's a fraction of the people

12     identified in the kingdom's documents that have relevant

13     information.  We're hopeful the kingdom will say we'll produce

14     all the people and it will agree to produce all these people,

15     but the first step is your Honor directed us to meet and

16     confer.  We would like to get an understanding about whether

17     they have objections to producing anyone.  We want to gather

18     that kind of information.  It's just way too early to start

19     briefing this in a vacuum.

20          THE COURT:  Do you know when the FBI is making its

21     next production?

22          MR. CARTER:  My understanding is March 15, your Honor.

23          THE COURT:  Okay.  I think I will not set a briefing

24     schedule now, but I will keep it on my to-do list.

25          MR. RAPAWY:  Thank you, your Honor.

J2QTTERA

1          THE COURT:  So I will end the same way I began, which

2     is the briefing on all these motions was excellent, so thank

3     you for that.

4          To the families who are here, again I want to thank

5     you for coming.  I know a lot of this may go over your head

6     because it's a lot of lawyer talk, and I am incredibly

7     sympathetic about the fact that it's 2019 and this process

8     feels like it's still in the beginning phases.  Know that the

9     Court takes this case very seriously, know that we are working

10    incredibly hard to move the case forward.

11         I will turn to these motions, which I appreciate are

12    so important to the lawyers and to the families as quickly as I

13    can.  Yours is not my only case, but I will prioritize getting

14    this done.  It will probably be a few weeks, at least, before I

15    get a decision out, so don't bother your lawyers this week to

16    find out.

17         And the other thing that I will just say is some of

18    the stuff we have been talking about here is the serious issues

19    that are presented in this case.  Given the events of 9/11, and

20    my obligation as a federal judge and my obligation to apply the

21    law as I believe it needs to be applied, it may at times feel

22    arbitrary or inconsistent with your larger concerns or larger

23    mission, and know that I am one piece of your own efforts for

24    resolution personally.  And so I just want you to know that I

25    see my job as both an effort for closure to this incident, this

J2QTTERA

1    tragedy, but also needing to protect the rule of law and the

2    cases that have come before this one, and to make sure that

3    justice is done for all parties.  And so I thought I would

4    mention that since so many of you are here today.

5             So with that, we are adjourned.  Thank you everybody.

6             MR. POUNIAN:  Thank you, your Honor.

7             MR. RAPAWY:  Thank you, your Honor.

8             (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25