# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Abel et al. v. Islamic Republic of Iran (1:18-CV-11837) (GBD) (SN)*

## THE *ABEL* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT II

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:    212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        jglen@andersonkill.com
        vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:    267-216-2711
Fax:    215-568-4573
Email:  aarmstrong@andersonkill.com

Dated:  August 20, 2019
        New York, New York

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

I.   Procedural Background ...................................................................................... 2

II.  Damages ............................................................................................................. 2

   A.  Solatium Damages .................................................................................... 3

   1.   Individuals Not Named in the Complaint Entitled to Solatium Damages ..................... 6

      **(a)** *Frank Camaj, sibling of Roko Camaj* ............................................. 6

      **(b)** *Kole Camaj, sibling of Roko Camaj* .............................................. 7

      **(c)** *Preta Berisha, sibling of Roko Camaj* ........................................... 7

   2.   Functional Equivalents of Immediate Family Members ................................. 8

      a.   *Julio Masa Lebron, parent equivalent of Ana M. Centeno* ....................... 9

      b.   *Diana Patricia Castano, spousal equivalent of Alejandro Castano* ...................... 12

   B.  Punitive Damages .................................................................................... 14

   C.  Prejudgment Interest ................................................................................ 15

Conclusion ................................................................................................................ 17

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ........................................................................15

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ............................................................................4

*Estate of Bland v. Islamic Republic of Iran*,
  831 F. Supp. 2 1 50, 156 (D.D.C. 2011) ..........................................................4, 15

*Dammarell v. Islamic Republic of Iran*,
  281 F. Supp. 2d 105 (D.D.C. 2003), vacated on other grounds, 404 F. Supp.
  2d 261 (D.D.C. 2005) ..............................................................................................3

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ........................................................................4

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) ........................................................................4

*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010) ......................................................................3, 4

*World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September
  11th Litigation*),
  2015 U.S. App. LEXIS 16619 (2d Cir. Sept. 17, 2015) ......................................16

**Statutes**

28 U.S.C. § 1605A(a)(1)..............................................................................................2

28 U.S.C. § 1605A(c)(4)........................................................................................2, 14

Federal Air Transportation Safety and System Stabilization Act ("ATSSSA")
  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. §
  40101) ....................................................................................................................16

ii

## INTRODUCTION

For the reasons set forth below, and the statements contained in the declaration of Jerry S. Goldman, Esq., which is filed contemporaneously with this memorandum of law, along with the exhibits appended thereto (the "Goldman Declaration"), certain plaintiffs in the above-referenced matter who are identified on Exhibit A to the Goldman Declaration (collectively, the "*Abel II* Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court to award solatium damages for the losses suffered by the relatives[1], or functional equivalents thereof, of an individual killed as a result of the terrorist attacks on September 11, 2001 ("9/11 decedent"), in the same amounts previously awarded by this Court to other similarly situated plaintiffs against the Islamic Republic of Iran ("Iran"); award prejudgment interest on those damages; and permit the *Abel II* Plaintiffs to seek punitive damages and economic and other appropriate damages at a later date, for the reasons set forth below.  This motion is made only on behalf of the *Abel II* Plaintiffs listed in Exhibit A attached to the Goldman Declaration,[2] which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *Abel II* Plaintiffs, any award issued to those individuals will

---

[1] The plaintiffs listed on Exhibit A are the relatives, or functional equivalents of a relative, of a 9/11 decedent.  In the case of a relative who died subsequent to the 9/11 decedent, the claim is brought by the personal representative of the relative's estate.  As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative.  Goldman Decl. at ¶ 5.

[2] Exhibit A only includes plaintiffs who intend to submit US VSST applications in 2019.  The *Abel* plaintiffs who are not included on Exhibit A have either already filed a motion for liability and damages (*In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4872-4875) or intend to file a motion seeking damages at a later date.

constitute final awards and judgments against the Islamic Republic of Iran for those solatium claimants listed in Exhibit A to the Goldman Declaration.

**I.     Procedural Background**

On August 15, 2019, certain *Abel* Plaintiffs filed a Motion for Default Judgment Against the Islamic Republic of Iran for Liability and Damages. *In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4872-4875 (hereinafter "*MDL*").

The moving *Abel II* Plaintiffs listed on Exhibit A[3] now seek: (1) judgment as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; and (3) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

**II.    Damages**

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs

---

[3] Where a plaintiff's name is the subject of a pending Motion to Amend to Correct Errors, the corrected plaintiff's name is listed on Exhibit A.

can recover punitive damages. *MDL*, ECF No. 2623 at 2-3 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)).

Plaintiffs identified in Exhibit A are comprised of immediate family members or functional equivalents of such family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents or other documents signed under penalty of perjury, which attest to a family relationship eligible for recovery, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[4] *See* Goldman Decl. at ¶¶ 3-7.

Once liability has been established in this matter, each such family member will be entitled to solatium damages in the amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks"). In accordance with the terms of the FSIA, the Plaintiffs identified in Exhibit A are entitled to compensation under Section 1605A for their solatium damages and are also entitled to prejudgment interest.

### A. Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously

---

[4] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

3

noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 1 50, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lambert's framework in *Heiser* was appropriate. In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer, "profound agony and grief" and "[w]orse yet, . . . are faced with frequent reminders of the events of that day." *MDL*, ECF No. 2618, at 10-12. Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the victims'

families . . . ." *Id.* at 11.  In that Report, with which this Court later agreed, Magistrate Judge

Maas recommended that solatium damages be awarded to the immediate family members of the

victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, *MDL*, ECF

No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of

certain of the *Ashton* Plaintiffs, *MDL*, ECF No. 3300, and in the September 12, 2016 Order

pertaining to plaintiffs in the *Bauer* case, *MDL*, ECF No. 3341, and in the October 14, 2016

Report and Recommendation and October 31, 2016 Order in the *Hoglan* case, *MDL*, ECF Nos.

3363, 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order

relating to the claims of additional *Ashton* Plaintiffs, *MDL*, ECF No. 3977 at 6–7.  The same

amounts were recently adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final

Default Judgment in the matter known as "Burnett/Iran II,"[5] No. 15-cv-09903, ECF No. 101.

The solatium losses suffered by the *Abel II* Plaintiffs before the Court in this application

are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*,

---

[5] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. *MDL*, ECF No. 3666.

*Bauer*, *Hoglan* and *Burnett* cases. As such, Plaintiffs identified on Exhibit A respectfully request

that the Court grant awards of solatium to the immediate family members and functional

equivalents as identified on Exhibit A in the same amounts indicated herein, consistent with this

Court's application of those values established and applied in *Havlish*, and subsequently adopted

and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.

### 1. Individuals Not Named in the Complaint Entitled to Solatium Damages

Pursuant to paragraph 5 of Section ii(d) of the Plaintiff's Executive Committee Letter,

dated January 23, 2017, MDL, ECF No. 3433, which was adopted by the Court through Order,

dated January 25, 2017, MDL, ECF No. 3435, individuals who are not named in the complaint,

but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for

solatium based upon their relationship to the 9/11 decedent and where there is a pending claim

by the personal representative of that decedent's estate.  The letter provides "[i]n instances where

a default judgment is sought by a personal representative in favor of a solatium claimant who is

not a named plaintiff in the action in which the award is sought, counsel requesting the judgment

will be asked to confirm that: (1) the personal representative has requested that a judgment be

sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and

affirmed that he or she authorized the personal representative to seek the judgment in his or her

favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is

being sought has not retained other counsel or been named in any other action or, if he or she

has, that counsel has communicated with the claimant's counsel and received authorization to

seek the judgment via the estate's representative."  MDL, ECF No. 3433.

### (a) *Frank Camaj, sibling of Roko Camaj*

Frank Camaj is an individual who is not named in the complaint but is otherwise a

member of the 9/11 decedent's, Roko Camaj, family entitled to receive a judgment for solatium

6

based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435.  Goldman Declaration at ¶ 16.

Accordingly, judgment should be entered in favor of Frank Camaj's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

**(b)**     ***Kole Camaj, sibling of Roko Camaj***

Kole Camaj is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Roko Camaj, family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435.  Goldman Declaration at ¶ 17.

Accordingly, judgment should be entered in favor of Kole Camaj's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

**(c)**     ***Preta Berisha, sibling of Roko Camaj***

Preta Berisha is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Roko Camaj, family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's

requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435.  Goldman

Declaration at ¶ 18.

Accordingly, judgment should be entered in favor of Preta Berisha's favor as if they were

named plaintiffs, in the same amounts indicated herein, consistent with this Court's application

of those values established and applied in *Havlish*, and subsequently adopted and applied to

plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

### 2.  Functional Equivalents of Immediate Family Members

The October 14, 2016 Report and Recommendation recommended that in addition to

those individuals who are considered traditional "family members," damages could also be

awarded to non-immediate family members who met certain criteria establishing that she or he

had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an

immediate family member.  These categories of non-immediate family members included

fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins.  *See*

*MDL*, ECF No. 3363.

In that report, three factors were identified as relevant to the determination of whether a

close non-immediate family member was the "functional equivalent" of an immediate family

member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household;

2) whether the non-immediate family member ever played a guardian or custodian-like role in

the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role

the "functional equivalent" individual played was absent from the family life (i.e. did the non-

immediate family member step in to play a "functionally equivalent" role because of the death or

long-term absence of the biological family member).  *Id*. at 10-12. In weighing these different

factors, the Court stated it would consider whether the non-immediate family member supported

the decedent financially and emotionally, or vice versa, and whether the decedent and claimant

8

shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*. With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id*., pp. 14-15. In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*., pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected on Exhibit A to the Goldman Declaration, had the "functional equivalent" of a biological or spousal relationship and they are therefore entitled to an award for solatium damages.

> a. ***Julio Masa Lebron, parent equivalent of Ana M. Centeno***
> **Presumptive Award: $8.5 Million**
> **Requested Award: $8.5 Million**

Ana M. Centeno was an accountant at Marsh & McLennan who died on September 11, 2001 when the World Trade Center collapsed. Julio Masa Lebron was the stepfather of Ana M. Centeno, and for the reasons set forth below, and in the accompanying Declaration of Julio Masa Lebron ("Lebron Decl."), the Declaration of Ana M. Centeno's mother, Antonia Torres Ayala ("Ayala Decl.") and the Declaration of Ana M. Centeno's sister, Maria Zayas ("Zayas Decl.") annexed as Exhibits B-D to the Goldman Declaration, respectively, Plaintiffs submit Julio Masa Lebron should be deemed a parent equivalent.

9

In 1968, Julio Masa Lebron, first met Ana M. Centeno, who her family affectionately called "Mel," when he started dating Ana M. Centeno's mother and his wife of over fifty years.[6] *See* Goldman Decl., Ex. B: Lebron Decl., at ¶ 3; Goldman Decl., Ex. C: Ayala Decl. at ¶ 3, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 3.  Mel was only 6 years old at the time.

A year later in 1969, they all moved in together as a family along with the Julio and Mel's mother other children and lived in Jersey City, New Jersey.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 4; Goldman Decl., Ex. C: Ayala Decl. at ¶ 4, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 4.

Julio has always been considered as Mel's father and he has always considered Mel his child, along with Mel's other siblings.  Mel was his child in every way, especially because Mel's biological father, who lived in Puerto Rico, was not in her life, did not financially support her, and passed away when Mel was 15 years old. Goldman Decl., Ex. B: Lebron Decl., at ¶ 5; Goldman Decl., Ex. C: Ayala Decl. at ¶ 5, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 5.

While Mel's mother worked occasionally, Julio was the main provider and the primary financial supporter in their family.  Julio maintained Mel along with the rest of her family and also filed income tax returns with Mel and other siblings as dependents.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 6; Goldman Decl., Ex. C: Ayala Decl. at ¶ 6, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 6.

In addition to this financial support, Julio treated Mel like his daughter, emotionally and socially.  Julio would give Mel advice (and, of course, discipline) like any loving father and as to the outside world, there was no question that Mel was his child.  Goldman Decl., Ex. B: Lebron

---

[6] Ana M. Centeno's mother and her stepfather Julio Masa Lebron have been together for over fifty years and were legally married on May 5, 1990.  Goldman Decl., Ex. B: Lebron Dec., at ¶ 3; Goldman Decl., Ex. C: Ayala Dec. at ¶ 3, and Goldman Decl., Ex. D: Zayas Dec. at ¶ 3.

10

Decl., at ¶ 7; Goldman Decl., Ex. C: Ayala Decl. at ¶ 3, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 7.

He taught Mel how to ride a bike and drive a car.  He enjoyed taking Mel and other siblings to the park and their family camping trips as well as to the arcade in Long Branch, New Jersey.  When Mel was older, their relationship as father and daughter remained.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 8; Goldman Decl., Ex. C: Ayala Decl. at ¶ 8, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 8.

Mel lived with her mother and Julio until she became a young adult and moved out around 1984 when she was in her early 20s.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 9; Goldman Decl., Ex. C: Ayala Decl. at ¶ 9, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 9.

Even though she no longer lived at their family home, she moved close by in New Jersey and would visit Julio and mother often. Goldman Decl., Ex. B: Lebron Decl., at ¶ 10; Goldman Decl., Ex. C: Ayala Decl. at ¶ 10, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 10.

In 1998, Julio and Mel's mother moved to Puerto Rico where Mel continued to visit Julio and her mother often.  Mel also started to financially help them when they needed it, such as when they were buying our house in Puerto Rico.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 11; Goldman Decl., Ex. C: Ayala Decl. at ¶ 11, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 11.

On September 11, 2001, Mel was taken from her family. Goldman Decl., Ex. B: Lebron Decl., at ¶ 12; Goldman Decl., Ex. C: Ayala Decl. at ¶ 12, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 12.

Julio and the rest of the family held on hoping Mel had escaped.  Unfortunately, after a few days, and knowing that her car was still in the same parking space she had left it, Julio and her family had to accept the fact that Mel was one of the victims and shortly thereafter held a

11

funeral in her name.  It was a difficult loss for the entire family and Julio treasures with memories with Mel.   Goldman Decl., Ex. B: Lebron Decl., at ¶ 13; Goldman Decl., Ex. C: Ayala Decl. at ¶ 13, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 13.

In sum, Ana M. Centeno's was very much Julio Masa Lebron's daughter and they considered each-other to be father and daughter in every way.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 14; Goldman Decl., Ex. C: Ayala Decl. at ¶ 14, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 14.

Julio was in Mel's life since she was a small child, lived with her entire childhood, supported her financial and emotionally as a father, and will miss her always as a father who lost his daughter.  Goldman Decl., Ex. B: Lebron Decl., at ¶ 15 and Ex. 1; Goldman Decl., Ex. C: Ayala Decl. at ¶ 15 and Ex. 1, and Goldman Decl., Ex. D: Zayas Decl. at ¶ 15 and Ex. 1.

Based on Julio Masa Lebron's extremely traumatic experience in losing his stepdaughter Ana M. Centeno and the only father in her life at the time of her death, Julio Masa Lebron should be awarded the full solatium damages award of $8.5 Million otherwise awarded to the parents of September 11, 2001 decedents.

> **b. *Diana Patricia Castano, spousal equivalent of Alejandro Castano***
> **Presumptive Award: $12.5 Million**
> **Requested Award: $12.5 Million**

Alejandro Castano was a delivery man for Empire Distributing Corp. who died on September 11, 2001 when the World Trade Center collapsed. Diana Patricia Castano was the life partner of Alejandro Castano, and for the reasons set forth below, and in the accompanying Declaration of Diana Patricia Castano ("Castano Decl.") annexed as Exhibit B to the Goldman Declaration, Plaintiffs submit Diana Patricia Castano should be deemed a spousal equivalent.

Alejandro Castano ("Alex") and Diana Patricia Castano started dating in 1984 when he was 18 years old and Diana was 19 years old.   Goldman Decl., Ex. B: Castano Decl., at ¶ 3.

After three years of dating, they moved in together in 1987 in Bergenfield, New Jersey and welcomed their son, Stephen Alejandro Castano, the following year in 1988.   Goldman Decl., Ex. B: Castano Decl., at ¶¶ 4-5.  Shortly after their son was born, Alex proposed to Diana and they bought a house together a couple of years later in 1990 in Englewood, New Jersey. Goldman Decl., Ex. B: Castano Decl., at ¶¶ 6-7.

Alex and Diana continued to live in that house until 1993 when they had to move into Alex's mother's house also in Englewood, New Jersey.  Goldman Decl., Ex. B: Castano Decl., at ¶¶ 8.

As with any relationship, Alejandro and Diana did have their ups and downs but they always felt they treated each other as husband and wife, including living together, raising their child together, sharing expenses and owning real estate together.  To this day, Alex's mother sees Diana as Alex's wife.  Goldman Decl., Ex. B: Castano Decl., at ¶ 9.

At the time of his death, while Alex and Diana were not living together, they were very much still involved and in a relationship. They continued to share their lives together, raise their child together, go on vacations together, share birthday celebrations and did things as family. Goldman Decl., Ex. B: Castano Decl., at ¶ 10.

The day before 9/11, Diana never would have imagined it was the last time she would see him.  Goldman Decl., Ex. B: Castano Decl., at ¶ 11.

The morning of September 11, 2001, Diana remembers coming home after dropping off their son at school and seeing the terrible events unfold on the television screen.  Goldman Decl., Ex. B: Castano Decl., at ¶ 12.

Diana immediately called Alex's mother and quickly made her way to her house as they tried to find out more information about Alex since the authorities would not let the family go

13

downtown.  A fellow co-worker of Alex who had survived the attacks met Diana at Alex's mother's house as he was the last person to see him alive.  Goldman Decl., Ex. B: Castano Decl., at ¶ 13.

The next day and for the next few days, Alex's sister, Claudia Castano, and Diana went to the World Trade Center to try to find him or find out any information about him.  Goldman Decl., Ex. B: Castano Decl., at ¶ 14.  Unfortunately, they came to the realization and had to accept the terrible truth that Alex was one of victims.  Goldman Decl., Ex. B: Castano Decl., at ¶ 15.

On April 2, 2002, Diana was appointed Administratrix of Alex's estate in Bergen County. Goldman Decl., Ex. B: Castano Decl., at ¶ 16 and Ex. 1.

The person who Diana shared a life with over the past 17 years and the father of her child was gone.  Diana and her son feel the loss every day and share fond memories of Alex.  In sum, Alejandro Castano, was very much Diana's partner they considered each-other to be husband and wife in every way.   They shared a life together for 17 years when Alex passed away and Diana will always miss him with fond memories.  Goldman Decl., Ex. B: Castano Decl., at ¶¶ 17-19 and Ex. 2.

Based on Diana Patricia Castano's extremely traumatic experience in losing her life partner and father of her son, Diana Patricia Castano should be awarded the full solatium damages award of $12.5 Million otherwise awarded to the spouses of September 11, 2001 decedents.

### B.  Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages.  28 U.S.C. § 1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising

14

out of' terrorist attacks." *MDL*, ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  *MDL*, ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, *MDL*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); *MDL*, ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); *MDL*, ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying a 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  *MDL*, ECF No. 3363 at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  *MDL*, ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date.  *See, e.g.*, *MDL*, ECF No. 3666 (Judge Daniels' order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

## C.  Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest

15

at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment. *MDL*, ECF No. 2618 at 13-14. This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states. *See MDL*, ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *World Trade Ctr. Props. LLC v. Am. Airlines, Inc.* (*In re September 11th Litig.*), 802 F.3d 314, 343 (2d Cir. 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id.* Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks. *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims.

16

*MDL*, ECF No. 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  *MDL*, ECF No. 3384 at 6.  Thereafter, in *Burnett II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in the *Hoglan* and *Burnett* matters, applying the 4.96 percent rate to prejudgment interest, the *Abel II* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

**Conclusion**

For all of the reasons herein, plaintiffs respectfully request: (1) judgment as to damages on behalf of the *Abel II* Plaintiffs identified on Exhibit A only, which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent, in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment for damages; and (3) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

17

Respectfully submitted,

/s/ Jerry S. Goldman, Esq.

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:    212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
            bstrong@andersonkill.com
            jglen@andersonkill.com
            vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
(pro hac vice)
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:    267-216-2711
Fax:    215-568-4573
Email:  aarmstrong@andersonkill.com
Attorneys for Plaintiffs

Dated:  August 20, 2019
          New York, New York

18