# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Roberta Agyeman et al. v. Islamic Republic of Iran, No. 1:18-cv-05320 (GBD) (SN)*

## THE *AGYEMAN* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT II

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:     212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
            bstrong@andersonkill.com
            jglen@andersonkill.com
            vpichardo@andersonkill.com
Arthur R. Armstrong, Esq. *(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel: 267-216-2711
Fax: 215-568-4573
Email: aarmstrong@andersonkill.com

Dated: New York, New York
           August 20, 2019

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

                                                                  **Page**

INTRODUCTION .................................................................................................................... 1

I.      Procedural Background .................................................................................................. 2

II.     Damages ........................................................................................................................ 2

          A.      Solatium Damages ............................................................................................. 4

                1.      Functional Equivalents of Immediate Family Members .............................. 6

          B.      Pain and Suffering Damages (Corrigan Estate) ...................................................... 10

          C.      Economic Damages (Corrigan Estate) .................................................................. 11

          D.      Punitive Damages ........................................................................................... 13

          E.      Prejudgment Interest ...................................................................................... 14

III.    Conclusion .................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
   775 F. Supp. 2d 48 (D.D.C. 2011) ......................................................................................14

*Belkin v. Islamic Republic of Iran*,
   667 F. Supp. 2d 8 (D.D.C. 2009) ..........................................................................................4

*Estate of Bland v. Islamic Republic of Iran*,
   831 F. Supp. 2d 150 (D.D.C. 2011) ................................................................................5, 13

*Dammarell v. Islamic Republic of Iran*,
   281 F. Supp. 2d 105 (D.D.C. 2003), vacated on other grounds, 404 F. Supp.
   2d 261 (D.D.C. 2005) ...........................................................................................................4

*Flatow v. Islamic Republic of Iran*,
   999 F.Supp. 1 (D.D.C. 1998) ..............................................................................................11

*Estate of Heiser v. Islamic Republic of Iran*,
   466 F. Supp. 2d 229 (D.D.C. 2006) ............................................................................4, 5, 11

*Roth v. Islamic Republic of Iran*,
   78 F. Supp. 3d 379 (D.D.C. 2015) ......................................................................................11

*Surette v. Islamic Republic of Iran*,
   231 F. Supp. 2d 260 (D.D.C. 2002) ......................................................................................4

*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................................3, 5, 11

*World Trade Ctr. Props. LLC v. Am. Airlines, Inc.* (*In re September 11th Litig.*),
   802 F.3d 314 (2d Cir. 2015) ................................................................................................15

**Statutes**

28 U.S.C. § 1605A(a)(1) ................................................................................................................3

28 U.S.C. § 1605A(c) .....................................................................................................3, 11, 13

49 U.S.C. § 40101 ........................................................................................................................15

# **TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

Air Transportation Safety and System Stabilization Act,
    Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. §
    40101) ..........................................................................................................................14, 15

Foreign Sovereign Immunities Act 28 U.S.C. §§ 1602, et seq. ............................................ *passim*

## INTRODUCTION

For the reasons set forth below, and the statements contained in the declaration of Jerry S. Goldman, Esq., along with the exhibits appended thereto (the "Goldman Declaration"), certain plaintiffs in the above-referenced matter who are identified on Exhibit A to the Goldman Declaration (collectively, the "*Agyeman II* Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court for an order awarding: (1) as to the solatium claims for the losses suffered by the relatives of an individual killed as a result of the terrorist attacks on September 11, 2001 (a "9/11 decedent"),[1] judgment for solatium damages in the same amounts previously awarded by this Court to other similarly situated plaintiffs against the Islamic Republic of Iran ("Iran"); (2) as to a claim asserted by the estate of a 9/11 decedent, damages for pain and suffering and economic damages; (3) as to all claims, prejudgment interest on the damages awarded; and (4) permission for the *Agyeman II* plaintiffs to seek punitive damages and economic and other appropriate damages at a later date. This motion is made only on behalf of the *Agyeman II* Plaintiffs listed in Exhibit A attached to the Goldman Declaration.[2]

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *Agyeman II* Plaintiffs, any award issued to those individuals will

---

[1] The plaintiffs listed on Exhibit A are the relatives or personal representative of a 9/11 decedent. In the case of a relative who died subsequent to the 9/11 decedent, the claim is brought by the personal representative of the relative's estate. As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative. Goldman Declaration at ¶ 5.

[2] Exhibit A only includes plaintiffs who intend to submit US VSST applications in 2019, including Laura Buck, as the Personal Representative of the Estate of Georgine R. Corrigan, deceased, and on behalf of all survivors and all legally entitled beneficiaries and family members of Georgine Corrigan (the "Corrigan Estate"), which did not receive an award from the Victim's Compensation Fund. The plaintiffs in the above matter who are not included on Exhibit A have either already filed a motion for damages (*MDL*, ECF 4786) or intend to file a motion seeking damages at a later date.

constitute final awards and judgments against Iran for those plaintiffs listed in Exhibit A to the Goldman Declaration.

## I. Procedural Background

On or about May 23, 2019, the *Agyeman II* Plaintiffs filed a Motion for Default Judgment Against the Islamic Republic of Iran for Liability Only. *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (hereinafter "*MDL*"), ECF Nos. 4534-4535, 4537, 4554. On June 21, 2019, the Court granted the Motion and referred the matter to Magistrate Judge Netburn for determination of damages. *MDL,* ECF No. 4597.

The *Agyeman II* Plaintiffs[3] listed on Exhibit A now seek: (1) as to the solatium claims, judgment for damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) as to the Corrigan Estate claim, compensatory damages for pain and suffering in the amount of $2,000,000 and economic damages in the amount of $6,410,658; (4) as to all claims, prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment for damages; and (5) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

## II. Damages

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office,

---

[3] Where a plaintiff's name is the subject of a pending Motion to Amend to Correct Errors, the corrected plaintiff's name is listed on Exhibit A.

2

employment, or agency.  28 U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  *MDL*, ECF No. 2623 at 2-3 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)).

Plaintiffs identified in Exhibit A are comprised of immediate family members, the functional equivalent thereof, or the personal representative of an individual killed on 9/11, as demonstrated by documentary evidence of each plaintiff's relationship or authority to represent the estate of a 9/11 decedent.  Such documentary evidence includes, birth or marriage certificates, sworn affidavits, letters of administration, or other official documents or documents signed under penalty of perjury, which attest to a familial relationship eligible for recovery or the authority to represent the decedent's estate, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[4]  *See* Goldman Declaration at 3-7.

As liability has been established in this matter, each moving plaintiff is now entitled to damages in the amounts set forth on Exhibit A, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks").  In accordance with the terms of the FSIA, the Plaintiffs identified in Exhibit A are entitled to compensation under Section 1605A for their

---

[4] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

solatium, pain and suffering and economic damages, as applicable, and are also entitled to prejudgment interest.

    **A.**    **Solatium Damages**

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when

circumstances warrant.  *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lambert's framework in *Heiser* was appropriate.  In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, . . . are faced with frequent reminders of the events of that day."  *MDL*, ECF No. 2618 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . . ."  *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| **Relationship of Decedent** | **Solatium Award** |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, *MDL*, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, *MDL*, ECF No. 3300, in the September 12, 2016 Order

5

pertaining to plaintiffs in the *Bauer* case, *MDL*, ECF No. 3341, in the October 14, 2016 Report and Recommendation, *MDL*, ECF No. 3363, and in the October 31, 2016 Order in the *Hoglan* case, *MDL*, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* Plaintiffs, *MDL*, ECF No. 3977 at 6–7.  The same amounts were recently adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "Burnett/Iran II,"[5] No. 15-cv-09903, ECF No. 101.

The solatium losses suffered by the family members identified on Exhibit A are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.  As such, the family members and functional equivalents thereof identified on Exhibit A respectfully request that the Court grant awards of solatium damages in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.

### 1. Functional Equivalents of Immediate Family Members

The October 14, 2016 Report and Recommendation recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member.  These categories of non-immediate family members included

---

[5] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. *MDL*, ECF No. 3666.

fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. *See MDL*, ECF No. 3363.

In that report, three factors were identified as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member. Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id*. at 10-12. In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*. With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id*., pp. 14-15. In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*., pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected on Exhibit A

to the Goldman Declaration, had the "functional equivalent" of a biological or spousal relationship and they are therefore entitled to an award for solatium damages.

> **(a)** *Reginald Colon, child equivalent of Jaime Concepcion*
> **Presumptive Award: $8.5 Million**
> **Requested Award: $8.5 Million**
>
> *Rosa Colon, child equivalent of Jaime Concepcion*
> **Presumptive Award: $8.5 Million**
> **Requested Award: $8.5 Million**

Jaime Concepcion died on September 11, 2001 when the World Trade Center collapsed. Reginald Colon and Rosa Colon were the stepchildren of Jaime Concepcion, and for the reasons set forth below, and in the accompanying Declaration of Reginald Colon ("Reginald Decl.") and Rosa Colon ("Rosa Decl.") annexed as Exhibits B and C, respectively, to the Goldman Declaration, Plaintiffs submit Reginald and Rosa Colon should each be deemed a child equivalent.

Rosa was born in 1990 and Reginald was born in 1991; shortly thereafter, their mother Arelis Manon was killed.  *See* Reginald Decl. at ¶ 3 and Rosa Decl. at ¶ 3.[6]  Their biological father was never in their lives, and they were thus without any biological parents from the very start of their lives. *See* Reginald Decl. at ¶ 4 and Rosa Decl. at ¶ 4.

Fortunately, their aunt Juana adopted them, and her boyfriend at the time (and future husband) Jaime Concepcion brought them into their life and raised Rosa and Reginald as their own children. *See* Reginald Decl. at ¶ 5 and Rosa Decl. at ¶5; *see* also Exhibit 1 to the Reginald Decl. and Rosa Decl., the Affidavit of Helen Speransky, Clinical Social Worker (the "Speransky Aff.") at ¶ 2; *see also* Exhibit 2 to the Reginald Decl. and Rosa Decl, family photographs.  Rosa

---

[6] All references to the Reginald Decl. and exhibits thereto are references to Exhibit B the Goldman Declaration.  All references to the Rosa Decl. and exhibits thereto are references to Exhibit C to the Goldman Declaration.

8

and Reginald lived together in the same household with Jaime for all their lives life until he was taken away from them by the 9/11 attacks, when they were only ten years old.  *See* Reginald Decl. at ¶ 5 and Rosa Decl. at ¶ 5; *see also*, Speransky Aff., Ex. 1 at ¶ 2.  Neither Rosa nor Reginald ever met their biological father; Jaime was the only true father they had ever known.  *See* Reginald Decl. at ¶ 7 and Rosa Decl. at ¶ 7.

Juana was stricken with an illness, Lupus, which prevented her from working.  *See* Reginald Decl. at ¶ 8 and Rosa Decl. at ¶ 8; *see also*, Speransky Aff., Ex. 1 at ¶ 4.  But Jaime worked hard as a restaurant manager at the Windows of the World in the World Trade Center to provide for Juana and Reginald, along with 4 other children who made up their family.  *See* Reginald Decl. at ¶ 9 and Rosa Decl. at ¶ 9; *see also*, Speransky Aff., Ex. 1 at ¶ 4.  In addition to this financial support, he treated me them like his children, emotionally and socially, always made sure they did their homework and properly focused on school.  *See* Reginald Decl. at ¶ 10 and Rosa Decl. at ¶ 10.  Jaime helped each with afterschool programs and extra-curricular activities like baseball for Reginald and dance for Rosa.  *See* Reginald Decl. at ¶ 10 and Rosa Decl. at ¶ 10.  They would all regularly go to the park, pool, and beach at Coney Island in their free time.  *See* Reginald Decl. at ¶ 11 and Rosa Decl. at ¶ 11.  They would also take vacations to the Dominican Republic as a family. *See* Reginald Decl. at ¶ 12 and Rosa Decl. at ¶ 12.

When the family heard news of the attacks, they all gathered at the house and tried to reach Jaime without success.  *See* Reginald Decl. at ¶ 14 and Rosa Decl. at ¶ 14.  They went to the hospitals and contacted the fire department.  *See* Reginald Decl. at ¶ 15 and Rosa Decl. at ¶ 15.  They submitted an official missing person's report and filed out all the necessary forms and provided material for DNA analysis at the Victim's Assistance Center. *See* Reginald Decl. at ¶ 16 and Rosa Decl. at ¶ 16.

Eventually, everyone realized Jaime was never coming home. *See* Reginald Decl. at ¶ 17 and Rosa Decl. at ¶ 17. It was devastating to Reginald and Rosa. *See* Reginald Decl. at ¶ 17 and Rosa Decl. at ¶ 17. The family held a spiritual prayer service at the house to honor and remember him. *See* Reginald Decl. at ¶ 18 and Rosa Decl. at ¶ 18. After his death, Reginald and Rosa lost interest in school, became quiet and introverted and suffered from depression. *See* Reginald Decl. at ¶ 19 and Rosa Decl. at ¶ 19. To this day Reginald continues to this day to see a therapist to help me cope with this loss. *See* Reginald Decl. at ¶ 19.

Regarding the Victim's Compensation Fund, Reginald applied as the functional equivalent of Jaime's son and Rosa as the functional equivalent of Jaime's daughter. *See* Reginald Decl. at ¶ 20 and Rosa Decl. at ¶ 20. Each was awarded $100,000. *See* Reginald Decl. at ¶ 21 and Rosa Decl. at ¶ 21; *see* also Exhibit 3 to the Reginald Decl. and Rosa Decl., September 11th Victims Compensation Fund Distribution Plan.

Based on Rosa and Reginald's extremely traumatic experience in losing their stepfather and the only father they had ever known, Reginald Colon and Rosa Colon should each be awarded the full solatium damages award of $8.5 Million otherwise awarded to the children of September 11, 2001 decedents.

### B.     Pain and Suffering Damages (Corrigan Estate)

As noted above, the plaintiffs identified in Exhibit A include the estate of one individual, Georgine Corrigan, killed in the 9/11 Attacks, which seek damages for the decedent's pain and suffering. This Court previously assessed the entitlement and value of pain and suffering awards to estates for their decedents' deaths in this litigation. 03-md-1570, ECF Nos. 2618 at 7-9. For the reasons articulated by this Court in the context of the *Havlish* case, the Corrigan Estate respectfully requests that the Court grant awards for the decedent's pain and suffering in the

amount of $2,000,000 per estate. *See id*. at 9; 03-md-1570, ECF No. 2624 at 1, 3-4 (Judge Daniels awarding $2,000,000 per estate in *Havlish*).

### C. Economic Damages (Corrigan Estate)

The FSIA specifically provides for economic damages. *See* 28 U.S.C. § 1605A(c). The economic damages provision is "designed to compensate [a] decedent's heirs-at-law for economic losses which result from [the] decedent's premature death." *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 27 (D.D.C. 1998). Accordingly, "the beneficiaries of each decedent's estate [are] ...entitled to recover the present value of economic damages, including lost wages that the decedents might reasonably have been expected to earn but for their wrongful deaths." *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 81-82 (D.D.C. 2010), citing *Heiser,* 466 F.Supp.2d 229. Thus, for example, United States District Court Royce C. Lambreth of the District of Columbia, in a series of decisions issuing final judgments against the Islamic Republic of Iran under the FSIA, has held Iran "liable for the economic damages caused to decedents' estates." *Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 399-400 (D.D.C. 2015), quoting *Valore,* 700 F.Supp.2d at 78.[7] The *Corrigan* Estate is the only 9/11 Decedent Estate[8] included on Exhibit A, which seeks economic damages, similar to the plaintiff in the *Havlish* case.

---

[7] In adopting this estate-accumulations calculation, Judge Lambreth recognized that case law under the FSIA was "develop[ing]... a federal standard" and looked to the law of the District of Columbia, which it concluded was "an appropriate model" to adopt and which calculated economic damages as the loss of accretions to the decedent's estate. *Roth,* 78 F.Supp.3d at 82.

[8] To the extent other estates are referenced on Exhibit A, these are estates of family members of 9/11 decedents who themselves have passed away in the years following the September 11th attacks.

11

Previously, this Court awarded economic damages in each *Havlish* case for the "economic losses stemming from the wrongful death of the decedent[.]" *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), ECF No. 2623, Entered 10/03/12, at 2-3. In doing so, it adopted the economic loss calculations set forth in the *Havlish* plaintiffs' economic expert reports.

In this case, plaintiffs retained the services of economic expert Stan V. Smith, Ph.D. to evaluate the economic losses resulting from Ms. Corrigan's death. Goldman Declaration at 15. Dr. Smith prepared an economic loss expert report date December 6, 2004, a copy of which is attached to the Goldman Declaration as Exhibit D. Goldman Declaration at 16 and Ex. D. Plaintiffs also retained John F. Beauzile, who possesses a Master's Degree in Actuarial Science from Columbia University, to prepare a supplemental update to Dr. Smith's expert report, a copy of which is attached to the Goldman Declaration as Exhibit E. Goldman Declaration at 17 and Ex. E.

By way of summary, the economic damage amounts determined by Dr. Smith and as updated by Mr. Beauzile total $6,410,658, which is comprised of the following sums:

| | |
|---|---|
| Present Value[9] of Lost Earnings: | $397,288 |
| Present Value of Lost Replacement Services: | $1,087,982 |
| Present Value of Lost Enjoyment of Life: | $3,369,994 |
| Present Value of Lost Relationship: | $1,555,394 |
| **Total** | **$6,410,658** |

Goldman Declaration at 18.

---

[9] The discount rate applied is 1.06%. *See* Ex. E.

The expert reports of Mr. Smith and Mr. Beauzile include the detailed analyses of each expert in reaching these conclusions, along with a description of their methodology and curricula vitae.  Goldman Declaration at 19.

Based on the foregoing, the *Agyeman II* plaintiffs respectfully ask that this Court award economic damages to the Corrigan Estate in the amount of $6,410,658 as supported by the expert reports attached to the Goldman Declaration as Exhibits D and E.

### D.     Punitive Damages

Under the FSIA plaintiffs are also entitled to punitive damages.  28 U.S.C. § 1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  *MDL*, ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  *MDL*, ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, *MDL*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); *MDL*, ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); *MDL*, ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  *MDL*, ECF No. 3363 at 28.  Judge Daniels

13

adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  *MDL*, ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date.  *See, e.g.*, *MDL*, ECF No. 3666 (Judge Daniels' order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### E. Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment.  *MDL*, ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See MDL*, ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

14

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *World Trade Ctr. Props. LLC v. Am. Airlines, Inc.* (*In re September 11th Litig.*), 802 F.3d 314, 343 (2d Cir. 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id.* Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks. *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. *MDL*, ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. *MDL*, ECF No. 3384 at 6. Thereafter, in *Burnett II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in the *Hoglan* and *Burnett* matters, applying the 4.96 percent rate to prejudgment interest, the *Agyeman II* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

**III.    Conclusion**

For all of the reasons herein, plaintiffs respectfully request: (1) as to the solatium claimants identified on Exhibit A, judgment as to damages in the same per plaintiff amounts

15

previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) as to the Corrigan Estate, compensatory damages for pain and suffering in the amount of $2,000,000 and economic damages in the amount of $6,410,658 to the Corrigan Estate; (3) as to all *Agyeman* II claims, prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment for damages; and (4) permission for the *Agyeman II* Plaintiffs listed on Exhibit A to seek punitive damages and economic and other appropriate damages at a later date.

Respectfully submitted,

/s/ Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:   212-278-1000
Fax:   212-278-1733
Email:  jgoldman@andersonkill.com
          bstrong@andersonkill.com
          jglen@andersonkill.com
          vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:   267-216-2711
Fax:   215-568-4573
Email:  aarmstrong@andersonkill.com
*Attorneys for Plaintiffs*

Dated:  August 20, 2019
        New York, New York