**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*Jessica DeRubbio et al. v. Islamic Republic of Iran, No. 1:18-cv-05306 (GBD) (SN)*

## THE *DeRUBBIO* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT II

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:    212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        jglen@andersonkill.com
        vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:    267-216-2711
Fax:    215-568-4573
Email:  aarmstrong@andersonkill.com

Dated:  August 20, 2019
       New York, New York

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.   Procedural Background ........................................................................................... 2

II.  Damages .................................................................................................................. 2

   A.  Solatium Damages ............................................................................................ 3

   1.   Individuals Not Named in the Complaint Entitled to Solatium Damages ...................... 6

      **(a)**  *Timothy Geraghty, sibling of Edward F. Geraghty* ................................. 7

   2.   Functional Equivalents of Immediate Family Members ................................ 7

      **(b)**  *George A. Cuellar, spousal equivalent of Luke Dudek* ........................... 8

      **(c)**  *Rebecca Loethen, spousal equivalent of Julie M. Geis* ........................... 10

   B.  Punitive Damages ........................................................................................... 14

   C.  Prejudgment Interest ....................................................................................... 15

Conclusion ......................................................................................................................... 17

docs-100192655.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
    775 F. Supp. 2d 48 (D.D.C. 2011) ........................................................................15

*Belkin v. Islamic Republic of Iran*,
    667 F. Supp. 2d 8 (D.D.C. 2009) ............................................................................4

*Estate of Bland v. Islamic Republic of Iran*,
    831 F. Supp. 2d 1 50, 156 (D.D.C. 2011) ...........................................................4, 14

*Dammarell v. Islamic Republic of Iran*,
    281 F. Supp. 2d 105 (D.D.C. 2003), vacated on other grounds, 404 F. Supp.
    2d 261 (D.D.C. 2005) ..............................................................................................4

*Estate of Heiser v. Islamic Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) ........................................................................4

*Surette v. Islamic Republic of Iran*,
    231 F. Supp. 2d 260 (D.D.C. 2002) ........................................................................4

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ......................................................................3, 4

*World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September
    11th Litigation*),
    2015 U.S. App. LEXIS 16619 (2d Cir. Sept. 17, 2015) .......................................16

**Statutes**

28 U.S.C. § 1605A(a)(1)...............................................................................................2

28 U.S.C. § 1605A(c)(4)...........................................................................................2, 14

Federal Air Transportation Safety and System Stabilization Act ("ATSSSA")
    Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. §
    40101) ..............................................................................................................13, 16

docs-100192655.1

## INTRODUCTION

For the reasons set forth below, and the statements contained in the declaration of Jerry S. Goldman, Esq., which is filed contemporaneously with this memorandum of law, along with the exhibits appended thereto (the "Goldman Declaration"), certain plaintiffs in the above-referenced matter who are identified on Exhibit A to the Goldman Declaration (collectively, the "*DeRubbio II* Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court to award solatium damages for the losses suffered by the relatives[1], or functional equivalents thereof, of an individual killed as a result of the terrorist attacks on September 11, 2001 ("9/11 decedent"), in the same amounts previously awarded by this Court to other similarly situated plaintiffs against the Islamic Republic of Iran ("Iran"); award prejudgment interest on those damages; and permit the *DeRubbio II* Plaintiffs to seek punitive damages and economic and other appropriate damages at a later date, for the reasons set forth below. This motion is made only on behalf of the *DeRubbio II* Plaintiffs listed in Exhibit A attached to the Goldman Declaration,[2] which includes an individual who is not named in the complaint but is entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *DeRubbio II* Plaintiffs, any award issued to those individuals will

---

[1] The plaintiffs listed on Exhibit A are the relatives, or functional equivalents of a relative, of a 9/11 decedent. In the case of a relative who died subsequent to the 9/11 decedent, the claim is brought by the personal representative of the relative's estate. As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative. Goldman Decl. at ¶ 5.

[2] Exhibit A only includes plaintiffs who intend to submit US VSST applications in 2019. The *DeRubbio* plaintiffs who are not included on Exhibit A have either already filed a motion for damages (*In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4720, 4722, 4725, 4752) or intend to file a motion seeking damages at a later date.

constitute final awards and judgments against the Islamic Republic of Iran for those solatium claimants listed in Exhibit A to the Goldman Declaration.

## I.      Procedural Background

On May 3, 2019, certain *DeRubbio* Plaintiffs filed a Motion for Default Judgment Against the Islamic Republic of Iran for Liability Only. *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (hereinafter "*MDL*"), ECF Nos. 4508-4511. On May 28, 2019, the Court granted the Motion and referred the matter to Magistrate Judge Netburn for determination of damages. *MDL*, ECF No. 4563.

The moving *DeRubbio II* Plaintiffs listed on Exhibit A[3] now seek: (1) judgment as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; and (3) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

## II.     Damages

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4). Courts

---

[3] Where a plaintiff's name is the subject of a pending Motion to Amend to Correct Errors, the corrected plaintiff's name is listed on Exhibit A.

addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. *MDL*, ECF No. 2623 at 2-3 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)).

Plaintiffs identified in Exhibit A are comprised of immediate family members or functional equivalents of such family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents or other documents signed under penalty of perjury, which attest to a family relationship eligible for recovery, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[4] *See* Goldman Decl. at ¶¶ 3-7.

As liability has been established in this matter, each such family member is now entitled to solatium damages in the amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks"). In accordance with the terms of the FSIA, the Plaintiffs identified in Exhibit A are entitled to compensation under Section 1605A for their solatium damages and are also entitled to prejudgment interest.

### A.  Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and

---

[4] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

3

comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress.  *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id.*  This formula, however, may be adjusted upward or downward when circumstances warrant.  *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 1 50, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lambert's framework in *Heiser* was appropriate.  In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer, "profound agony and grief" and "[w]orse yet, . . . are faced with frequent

reminders of the events of that day." *MDL*, ECF No. 2618, at 10-12.  Judge Maas noted in his

July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the victims'

families . . . ." *Id.* at 11.  In that Report, with which this Court later agreed, Magistrate Judge

Maas recommended that solatium damages be awarded to the immediate family members of the

victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, *MDL*, ECF

No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of

certain of the *Ashton* Plaintiffs, *MDL*, ECF No. 3300, and in the September 12, 2016 Order

pertaining to plaintiffs in the *Bauer* case, *MDL*, ECF No. 3341, and in the October 14, 2016

Report and Recommendation and October 31, 2016 Order in the *Hoglan* case, *MDL*, ECF Nos.

3363, 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order

relating to the claims of additional *Ashton* Plaintiffs, *MDL*, ECF No. 3977 at 6–7.  The same

amounts were recently adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final

Default Judgment in the matter known as "Burnett/Iran II,"[5] No. 15-cv-09903, ECF No. 101.

---

[5] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. *MDL*, ECF No. 3666.

The solatium losses suffered by the *DeRubbio II* Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases. As such, Plaintiffs identified on Exhibit A respectfully request that the Court grant awards of solatium to the immediate family members and functional equivalents as identified on Exhibit A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.

### 1. Individuals Not Named in the Complaint Entitled to Solatium Damages

Pursuant to paragraph 5 of Section ii(d) of the Plaintiff's Executive Committee Letter, dated January 23, 2017, MDL, ECF No. 3433, which was adopted by the Court through Order, dated January 25, 2017, MDL, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate.  The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative."  MDL, ECF No. 3433.

(a)     *Timothy Geraghty, sibling of Edward F. Geraghty*

Timothy Geraghty is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Edward F. Geraghty, family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435. Goldman Declaration at 14.

Accordingly, judgment should be entered in favor of Timothy Geraghty's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

## 2. Functional Equivalents of Immediate Family Members

The October 14, 2016 Report and Recommendation recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member.  These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins.  *See MDL*, ECF No. 3363.

In that report, three factors were identified as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role

7

the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id.* at 10-12. In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id.* With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id.*, pp. 14-15. In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id.*, pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected on Exhibit A to the Goldman Declaration, had the "functional equivalent" of a biological or spousal relationship and they are therefore entitled to an award for solatium damages.

    **(b)**    ***George A. Cuellar, spousal equivalent of Luke Dudek***
                **Presumptive Award: $12.5 Million**
                **Requested Award: $12.5 Million**

Luke Dudek died on September 11, 2001 when the World Trade Center collapsed. George A. Cuellar was the life partner of Luke Dudek, and for the reasons set forth below, and in

the accompanying Affidavit of George Cuellar, ("Cuellar Aff.") annexed as Exhibit A to the Goldman Declaration.  Plaintiffs submit he should be deemed a spousal equivalent.[6]

On the night of September 10, 2001, George Cuellar said goodnight to his life partner of 19 years, Luke Dudek, full of anticipation for the next day when their joint business was to open its new location.  After 18 years in business, they had found, bought and renovated their own building for their florist shop.  However, September 11, 2001 ended up being like no other day before.  This couple of nearly 20 years began their day at their home in Livingston, New Jersey with George leaving for the flower shop and Luke for New York.  George Cuellar was the manager of Coqui Designs in Cedar Grove, and Luke Dudek was a food and beverage controller for Windows on the World at the top of Tower One of the World Trade Center.  Later that morning the world changed for many, including George Cuellar.

A mutual friend from Bermuda called and told George to turn on the television.  George frantically tried to reach Luke and left many messages but the sound of Luke's voice on the answering machine was the last George heard.  In the aftermath of the attack, Mr. Cuellar was joined by a friend to go to the train station to get Luke's car.  When Luke hadn't called home, George knew it was likely he would not be found alive.  George traveled to the Victim's Family Assistance Center in Jersey City to fill out an official missing person's report, where he filed all the necessary forms and provided material for DNA analysis.  At this point, George Cuellar came to realize that his partner of 20 years would not be coming home.  *See* Goldman Decl., Ex. A, Cuellar Aff., at Exhibits 2, 3, 4, 6 and 7.

---

[6] Mr. Cuellar was also appointed as the personal representative of the Estate of Luke Dudek and has asserted a claim in this capacity on behalf of all survivors and legally entitled beneficiaries and family members of Mr. Dudek.

Luke and George shared a life together for nearly 20 years, a business for 18 and a home together for 15 years.  They devoted their free time to each other.  Luke was an only child and his parents had died over a decade before.  After the death of Luke's parents, he and George created wills leaving their Estates to each other, and designating the other as their Executor. *See* Goldman Decl., Ex. A, Cuellar Aff., at Exhibit 4 (referring to George as his "partner"). George was Luke's family, and having been born in El Salvador where his parents and siblings remained, Luke was George's only family in the United States.  *See* Goldman Decl., Ex. A, Cuellar Aff., at Exhibit 5.

George was almost unable to function.  For months, he could not sleep – the needs of the business forced him to leave the house, but he still hoped for the day when Luke would walk through the door.  At 35 years old, George had lost his life-long love and the security of the partner he had been with since he was 16 years old.

Based on George Cuellar's extremely traumatic experience in losing his life partner, Luke Dudek, as described above, Mr. Cuellar should be awarded the full solatium damages award of $12.5 Million otherwise awarded to the spouses of September 11, 2001 decedents.

    **(c)**    ***Rebecca Loethen, spousal equivalent of Julie M. Geis***
                  **Presumptive Award: $12.5 Million**
                  **Requested Award: $12.5 Million**

Julie M. Geis died on September 11, 2001 when the World Trade Center collapsed. Rebecca Loethen was the life partner of Julie M. Geis and for the reasons set forth below, Plaintiffs submit she should be deemed a spousal equivalent.[7]

---

[7] Ms. Loethen was also appointed as the personal representative of the Estate of Julie M. Geis and has asserted a claim in this capacity on behalf of all survivors and legally entitled beneficiaries and family members of Ms. Geis.

In 1990, Julie and Rebecca Loethen met for the first time during their employment with the Postal Service in Columbia, Missouri. It was at this time that their lifelong partnership began. Rebecca was working in the finance department and Julie as a management trainee. After quickly becoming best of friends and spending more and more time together, Rebecca and Julie realized they were soul mates. The two soon developed a loving, committed, and monogamous relationship. They purchased wedding bands for one another as a sign of their commitment to each other and held themselves out to the world as domestic life partners.[6]

Together, they purchased a house in an affluent suburb of Kansas City and shortly thereafter, Rebecca retired from her work at the Post Office to take care of their home and pets while Julie focused on her career. The relationship flourished over the years, and their families and friends universally accepted them, without compromise or hesitation, as life partners.

Julie and Rebecca jointly owned a checking account, their home and its furnishings, automobiles, and other personal assets. They traveled together, were passionate about playing golf together, and spent virtually all of their free time together. Julie named Rebecca as her sole beneficiary and Personal Representative in her Will, in addition to naming Becky as the beneficiary on several insurance policies. *See* Goldman Decl., Ex. B, Affidavit of Rebecca Loethen ("Loethen Aff.") at Exhibits 1 and 2.

At the time of Julie's death, the couple was in the process of searching for land closer to Nebraska where they were planning on building their dream house: one that would fulfill their needs and also allow for them to visit Julie's family more frequently. Julie's death shattered these dreams, and devastated Becky indescribably, causing both physical and emotional trauma, including a Post-Traumatic Stress Disorder diagnosis, and other health problems. *See* Goldman Decl., Ex. B, Loethen Aff., at Exhibit 3. Since 9/11, Becky has undergone various forms of

11

therapy, including prescription anti-depressants and steroids.  These physical and emotional

sequela demonstrate the depth and extent of the couple's relationship and that Becky's loss is, in

all respects, the loss of a spouse.

In sum, Julie Geis and Becky Loethen shared their lives as only two people with the

deepest kind of love for one another can.  Despite making every effort to move on with her life,

Becky still struggles on a daily basis with Julie's death.  Julie will always be a significant and

substantial part of what and who Becky Loethen is.  Becky loved Julie dearly, and misses her

deeply.  For these reasons, it would be a terrible injustice to treat Becky as anything other than

Julie's spouse.

On September 10, 2001, Julie and Becky traveled to New York City together to enjoy the

sights and sounds of the City, to take in a Yankees' game, and to allow Julie to fulfill a few days

of work related responsibilities.  The AON Corporation employed hundreds of people on many

of the upper floors of the South Tower of the World Trade Center, and Julie was on the 102nd

floor of the South Tower on the morning of September 11 in a meeting with her staff members

when the terrorists crashed the first plane into the North Tower.  Julie immediately called Becky

back at their hotel room.  She told Becky that she had just seen an airplane crash into the North

Tower, not-to worry, that she was okay and that she was in the South Tower.  Julie then told

Becky to turn her television on.  Becky, who until then had been completely unaware of the

events unfolding around her, turned her television on and, like the rest of America, was

immediately riveted by the tragedy unfolding just blocks from her and Julie's room.  At

precisely 9:03 a.m., literally just a few short minutes after finishing what had been a

"comforting" conversation with Julie, Becky watched in utter disbelief as United Airlines Flight

175 crashed into the South Tower (between the 78$^{t}$h and 84th floors).

Transcripts released from the Port Authority of New York and New Jersey reveal numerous calls for help being made after the impact from the 87th floor and above of the South Tower.  Callers from the South Tower above the crash zone describe a terror filled scene with smoke everywhere — and no way to escape.  Julie, on the 102nd floor, unquestionably survived the impact and was, like the rest of those above the inferno, trapped, most certainly scared and very aware that she was in imminent danger.

Forty-seven minutes after UAL 175 hit the South Tower, at 9:50 a.m. and in "real time," Becky watched the television in her hotel room in horror as the South Tower suddenly collapsed.  Looking out the window of her room in the minutes that followed, she soon saw lower Manhattan engulfed in smoke and dust - tangible evidence that the South Tower had indeed crashed to the ground.

Despite what she had seen, and driven by hope and faith, Becky *knew* that somehow, someway, her Julie had survived the collapse or managed to escape the building before it came down.  As soon as she could grasp the magnitude of what had happened and was able to get around, Becky was as close as she could get to Ground Zero, handing out pictures of Julie, searching, asking anyone and everyone if they had seen her — including a tearful plea for help on CNN.  She recalls that Julie was #329 on the form listing missing individuals, and she went through the names of hundreds of survivors, forcing herself to review lists of body parts and composite pictures.

Refusing to give in, Becky turned in Julie's toothbrush and hairbands to be used for gathering DNA samples.  Despite Becky's unsuccessful efforts to find some trace of Julie in the emergency rooms in Manhattan, the Armory, or anywhere else in New York City that week, Becky simply would not give up her belief that somehow, someway, her soul mate had found a

13

way to survive.  After a week, though, she began to accept the unacceptable and allowed her friends to take her back to the Geis family home in Nebraska where she spent time with Julie's family.  Days passed, hope faded and the reality that Julie was not coming back began to settle in.  Julie's remains were never recovered from Ground Zero.

Based on Becky Loethen extremely traumatic experience in losing her life partner, Julie Geis, as described above, Ms. Loethen should be awarded the full solatium damages award of $12.5 Million otherwise awarded to the spouses of September 11, 2001 decedents.

### B.  Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages.  28 U.S.C. § 1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  *MDL*, ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  *MDL*, ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, *MDL*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); *MDL*, ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); *MDL*, ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying a 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  *MDL*, ECF No. 3363 at 28.  Judge Daniels

14

adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  *MDL*, ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date.  *See, e.g.*, *MDL*, ECF No. 3666 (Judge Daniels' order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C. Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment.  *MDL*, ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See MDL*, ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *World Trade Ctr. Props. LLC v. Am. Airlines, Inc.* (*In re September 11th Litig.*), 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. *MDL*, ECF No. 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  *MDL*, ECF No. 3384 at 6.  Thereafter, in *Burnett II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in the *Hoglan* and *Burnett* matters, applying the 4.96 percent rate to prejudgment interest, the *DeRubbio II* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

**Conclusion**

      For all of the reasons herein, plaintiffs respectfully request: (1) judgment as to damages on behalf of the *DeRubbio II* Plaintiffs identified on Exhibit A only, which includes an individual who is not named in the complaint but is entitled to receive judgments for solatium based on their relationship to the 9/11 decedent, in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment for damages; and (3) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

Respectfully submitted,

/s/ Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-278-1000
Fax: 212-278-1733
Email: jgoldman@andersonkill.com
         bstrong@andersonkill.com
         jglen@andersonkill.com
         vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA 19103
Tel: 267-216-2711
Fax: 215-568-4573
Email: aarmstrong@andersonkill.com
*Attorneys for Plaintiffs*

Dated: August 20, 2019
      New York, New York

17