# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Alexander Jimenez et al. v. Islamic Republic of Iran, 1:18-cv-11875 (GBD) (SN)*

## THE *JIMENEZ* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT II

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:   212-278-1000
Fax:   212-278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        jglen@andersonkill.com
        vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:   267-216-2711
Fax:   215-568-4573
Email:  aarmstrong@andersonkill.com

Dated:  August 20, 2019
        New York, New York

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

I.  Procedural Background ........................................................................................ 2

II.  Damages ............................................................................................................. 2

   A.  Solatium Damages ..................................................................................... 3

   1.  Individuals Not Named in the Complaint Entitled to Solatium Damages ...................... 6

      **(a)**  *Anthony B. McMahon, sibling of Robert Dismas McMahon* ................................. 7

      **(b)**  *Irene McMahon, sibling of Robert Dismas McMahon* ............................................. 7

   2.  Functional Equivalents of Immediate Family Members ................................................. 8

      a.  *Jody Howard, child equivalent of Alan LaFrance* .................................................. 9

      b.  *Jem Howard, child equivalent of Alan LaFrance* ................................................. 14

   B.  Punitive Damages ..................................................................................... 18

   C.  Prejudgment Interest ................................................................................ 19

Conclusion ............................................................................................................... 21

docs-100192659.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ....................................................................19

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ........................................................................4

*Estate of Bland v. Islamic Republic of Iran*,
  831 F. Supp. 2d 1 50, 156 (D.D.C. 2011) .......................................................4, 18

*Dammarell v. Islamic Republic of Iran*,
  281 F. Supp. 2d 105 (D.D.C. 2003), vacated on other grounds, 404 F. Supp.
  2d 261 (D.D.C. 2005) ........................................................................................4

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ...................................................................4

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) ...................................................................4

*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010) ..................................................................3, 4

*World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September
  11th Litigation*),
  2015 U.S. App. LEXIS 16619 (2d Cir. Sept. 17, 2015) ....................................20

**Statutes**

28 U.S.C. § 1605A(a)(1)........................................................................................2

28 U.S.C. § 1605A(c)(4).....................................................................................2, 18

Federal Air Transportation Safety and System Stabilization Act ("ATSSSA")
  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. §
  40101) ..............................................................................................................20

N.Y. Surr. Ct. Proc. Act Law § 1414 (Consol., Lexis Advance through 2019
  released Chapters 1-147, except for 96 and 106)................................................1

## INTRODUCTION

For the reasons set forth below, and the statements contained in the declaration of Jerry S. Goldman, Esq., which is filed contemporaneously with this memorandum of law, along with the exhibits appended thereto (the "Goldman Declaration"), certain plaintiffs in the above-referenced matter who are identified on Exhibit A to the Goldman Declaration (collectively, the "*Jimenez II* Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court to award solatium damages for the losses suffered by the relatives[1], or functional equivalents thereof, of an individual killed as a result of the terrorist attacks on September 11, 2001 ("9/11 decedent"), in the same amounts previously awarded by this Court to other similarly situated plaintiffs against the Islamic Republic of Iran ("Iran"); award prejudgment interest on those damages; and permit the *Jimenez II* Plaintiffs to seek punitive damages and economic and other appropriate damages at a later date, for the reasons set forth below.  This motion is made only on behalf of the *Jimenez II* Plaintiffs listed in Exhibit A attached to the Goldman Declaration,[2] which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

---

[1] The plaintiffs listed on Exhibit A are the relatives, or functional equivalents of a relative, of a 9/11 decedent.  In the case of a relative who died subsequent to the 9/11 decedent, the claim is brought by the personal representative of the relative's estate.  As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative, except in the case of the deceased relative John F. McHale, where Elizabeth ("Beth") McCarthy (nee McHale) has filed a petition to be so appointed, which petition, on information and belief, is unopposed, but has not yet been granted.  Goldman Decl. at ¶ 5.  N.Y. Surr. Ct. Proc. Act Law § 1414 (Consol., Lexis Advance through 2019 released Chapters 1-147, except for 96 and 106).

[2] Exhibit A only includes plaintiffs who intend to submit US VSST applications in 2019.  The *Jimenez* plaintiffs who are not included on Exhibit A have either already filed a motion for liability and damages (*In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4876-4879) or intend to file a motion seeking damages at a later date.

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *Jimenez II* Plaintiffs, any award issued to those individuals will constitute final awards and judgments against the Islamic Republic of Iran for those solatium claimants listed in Exhibit A to the Goldman Declaration.

## I.   Procedural Background

On August 15, 2019, certain *Jimenez* Plaintiffs filed a Motion for Default Judgment Against the Islamic Republic of Iran for Liability and Damages. *In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4876-4879 (hereinafter "*MDL*").

The moving *Jimenez II* Plaintiffs listed on Exhibit A[3] now seek: (1) judgment as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; and (3) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

## II.   Damages

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts

---

[3] Where a plaintiff's name is the subject of a pending Motion to Amend to Correct Errors, the corrected plaintiff's name is listed on Exhibit A.

addressing the damages available under the statute have held that, among other damages

recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs

can recover punitive damages. *MDL*, ECF No. 2623 at 2-3 (quoting *Valore v. Islamic Republic of

Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)).

Plaintiffs identified in Exhibit A are comprised of immediate family members or

functional equivalents of such family members of those killed on 9/11, as demonstrated by

documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage

certificates, sworn affidavits, official documents or other documents signed under penalty of

perjury, which attest to a family relationship eligible for recovery, and, in the case of a

subsequently deceased family member, a death certificate or sworn affidavit which reflects that

the claimant did not predecease the 9/11 victim.[4]  *See* Goldman Decl. at ¶¶ 3-7.

Once liability has been established in this matter, each such family member will be

entitled to solatium damages in the amounts previously established and applied by this Court in

this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11

Attacks").  In accordance with the terms of the FSIA, the Plaintiffs identified in Exhibit A are

entitled to compensation under Section 1605A for their solatium damages and are also entitled to

prejudgment interest.

### A.  Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages.

Under § 1605A, family members of a decedent may recover for "the mental anguish,

bereavement, and grief that those with a close relationship to the decedent experience as a result

of the decedent's death, as well as the harm caused by the loss of a decedent's society and

---

[4] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF
No. 4045.

3

comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress.  *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id.*  This formula, however, may be adjusted upward or downward when circumstances warrant.  *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 1 50, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lambert's framework in *Heiser* was appropriate.  In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer, "profound agony and grief" and "[w]orse yet, . . . are faced with frequent

4

reminders of the events of that day." *MDL*, ECF No. 2618, at 10-12.  Judge Maas noted in his

July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the victims'

families . . . ." *Id.* at 11.  In that Report, with which this Court later agreed, Magistrate Judge

Maas recommended that solatium damages be awarded to the immediate family members of the

victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, *MDL*, ECF

No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of

certain of the *Ashton* Plaintiffs, *MDL*, ECF No. 3300, and in the September 12, 2016 Order

pertaining to plaintiffs in the *Bauer* case, *MDL*, ECF No. 3341, and in the October 14, 2016

Report and Recommendation and October 31, 2016 Order in the *Hoglan* case, *MDL*, ECF Nos.

3363, 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order

relating to the claims of additional *Ashton* Plaintiffs, *MDL*, ECF No. 3977 at 6–7.  The same

amounts were recently adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final

Default Judgment in the matter known as "Burnett/Iran II,"[5] No. 15-cv-09903, ECF No. 101.

---

[5] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. *MDL*, ECF No. 3666.

The solatium losses suffered by the *Jimenez II* Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases. As such, Plaintiffs identified on Exhibit A respectfully request that the Court grant awards of solatium to the immediate family members and functional equivalents as identified on Exhibit A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.

## 1. Individuals Not Named in the Complaint Entitled to Solatium Damages

Pursuant to paragraph 5 of Section ii(d) of the Plaintiff's Executive Committee Letter, dated January 23, 2017, MDL, ECF No. 3433, which was adopted by the Court through Order, dated January 25, 2017, MDL, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate.  The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative."  MDL, ECF No. 3433.

6

(a)    *Anthony B. McMahon, sibling of Robert Dismas McMahon*

Anthony B. McMahon is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Robert Dismas McMahon, family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435.  Goldman Declaration at ¶ 14.

Accordingly, judgment should be entered in favor of Anthony B. McMahon's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

(b)    *Irene McMahon, sibling of Robert Dismas McMahon*

Irene McMahon is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Robert Dismas McMahon, family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's sibling.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435. Goldman Declaration at ¶ 15.

Accordingly, judgment should be entered in favor of Irene McMahon's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

**2. Functional Equivalents of Immediate Family Members**

The October 14, 2016 Report and Recommendation recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. *See MDL*, ECF No. 3363.

In that report, three factors were identified as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member. Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id*. at 10-12. In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*. With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id*., pp. 14-15. In previous cases, the Court relied on the

8

statements from the claimant about the nature and quality of the relationship with decedents. *Id.*, pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected on Exhibit A to the Goldman Declaration, had the "functional equivalent" of a biological or spousal relationship and they are therefore entitled to an award for solatium damages.

### a. *Jody Howard, child equivalent of Alan LaFrance*
### Presumptive Award: $8.5 Million
### Requested Award: $8.5 Million

Alan LaFrance died on September 11, 2001 when the World Trade Center collapsed. Jody Howard was the stepson of Alan LaFrance, and for the reasons set forth below, and in the accompanying Declaration of Jody Howard ("Jody Howard Decl.") annexed as Exhibit B to the Goldman Declaration, Plaintiffs submit Jody Howard should be deemed a child equivalent.

Alan LaFrance came into Jody Howard's life in 1980 when he started dating Jody's mother.  Jody was only 9 at the time. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 3.

Six months later, on September 27, 1980, Alan and Jody's mother were married and, along with his brother Jem, they became a family.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 3 and at Ex. 1.

Jody never knew his biological father growing up.  Jody's biological father left his mom when he was 3 years old (although Jody did meet him once briefly when he was 16).  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 5.

Alan (who Jody only ever referred to as "Dad") was the only true father Jody ever knew. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 6.

9

Alan worked hard to provide for Jody, his mother, and his brother. Among other jobs, Alan worked as an audio/visual specialist at Windows of the World in the World Trade Center. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 7 and at Ex. 2.

In addition to this financial support, Alan treated Jody like his son, emotionally and socially. Alan would give Jody advice (and, of course, discipline) like any loving father and as to the outside world, there was no question that "Jody was his son." *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 10 and at Ex. 3.

Alan's whole side of the family treated Jody that way. He was a "nephew" to Alan's brothers and a "grandson" to Alan's parents. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 11.

Alan would take Jody and his brother to the movies in Manhattan and the Bronx and they would always take short trips to places like six flags, Amish country and along with other family members to Maine. Jody and his brother loved it. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 12.

Alan, Jody and the rest of their family lived in the same household for 10 years and Jody moved out when he was 19, although Jody still kept in touch with his parents through regular telephone calls and visits to the house. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 13.

Even after Jody began to live on his own, Jody still regularly took family trips with Alan and the rest of his family. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 14.

For example in February 1994, Alan planned a trip for himself, Jody and his brother to go to Arizona and California. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 15.

They made a similar trip later that year, which is when Jody proposed to his wife. Jody had borrowed money to purchase the ring from his dad Alan, but when Jody later tried to repay

it, Alan would have none of it and told him to keep it.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 16.

After Jody was married, his mom and dad Alan would also visit them in Virginia and Indiana.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 17.

Jody was 30 years old and living in Chattanooga, Tennessee, on September 11, 2001. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 18.

Jody was at a Jehovah's Witness ministry when a woman arrived and asked if he had heard that a plane had hit the World Trade Center. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 19.

This is when Jody first learned of the September 11th terrorist attacks.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 20.

At first, Jody thought his dad Alan would have been out of harm's way because he worked nights.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 21.

Jody was trying to call his mom, who still lived in the Bronx, all day to confirm Alan was safe, but the telephone lines were busy.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 22.

Eventually, Jody got through and heard the devastating news that Alan was working that day and had not been heard from since that morning.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 23.

Jody immediately began making preparations to travel to New York (a fifteen hour drive).  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 24.

Jody's mother was in complete shock and had been taken to a friend's house to be consoled. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 25.

11

Jody's brother was also grieving; Jody tried his best to stay strong for his mom and try to do everything he could to find his dad Alan. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 26.

After a brief visit from a traveling minister who provided words of encouragement, they planned to go down to the hospitals searching for their dad, but ultimately were directed to go to the Armory. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 27.

They arrived at the Armory and filled out various missing persons forms and other paperwork while they waited in line. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 28.

A reporter from the weekly standard asked if he could tag along as they waited and searched; they agreed so long as he gave us space. Ultimately, he wrote two articles regarding their experience. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 29 and at Exs. 4, 5, and 6.

Jody's mom was a nervous wreck and completely broke down when, upon reaching the front of the line, the Red Cross nurse asked them "what was your father's name?" *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 30.

Jody talked to her and tried to calm her down. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 31.

Alan's name was not on the list. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 32.

Later, they travelled to lower Manhattan; there was white debris and a terrible burning smell everywhere. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 33.

Jody also provided material for DNA analysis at the Victim's Family Assistance Center. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 3 and at Ex. 7.

They slowly came to the devastating realization that his dad was gone forever. *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 35.

Unfortunately, they never located Alan's remains.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 36.

Alan remained in New York for a month, which was a very emotional time, but Jody continued to do his best to be strong for his mom.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 37.

Eventually, Jody gathered the family together (including the extended family on his dad's side) because they had to make a decision about what to do when they didn't find his body.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 38.

They decided to hold a memorial.  In planning for the memorial, Jody asked an elder official from their faith if he would help us plan and then preside over the ceremony.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 39.

At one point while they were planning, the elder said that because Jody was not Alan's biological son, Jody technically did not get to have input.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 40.

Because of this comment, Jody's aunts, uncles, and other family members said they wanted a different elder to officiate because that comment was so contrary to how his father and Jody, and all of them, felt.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 41.

They subsequently held a memorial service on Sept 29th, two days after Jody's parents' anniversary where his mom was going to give Alan a new wedding ring (he had lost his).  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 42.

In Jody's dad obituary, Jody was listed as his son.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 43 and at Ex. 8.

13

It was only when Jody was heading back home in October that, as soon as he passed over the GW Bridge, he could no longer hold back the emotion and he totally broke down.   He pulled over after his wife insisted she drive because he was an emotional wreck.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 44.

Thereafter, Jody suffered from PTSD and was struck with a fear of flying for the next 12 to 13 years.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 45.

In sum, Alan LaFrance was Jody's father and they considered each-other to be father and son in every way.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 46.

Alan was in Jody's life for 22 of his 30 years on this earth and will always miss him dearly.  *See* Goldman Decl., Ex. B, Jody Howard Decl. at ¶ 47 and at Ex. 9.

Based on Jody Howard's extremely traumatic experience in losing his stepfather and the only father in his life at the time of Alan LaFrance's death, Jody Howard should be awarded the full solatium damages award of $8.5 Million otherwise awarded to the children of September 11, 2001 decedents.

    **b.** ***Jem Howard, child equivalent of Alan LaFrance***
        **Presumptive Award: $8.5 Million**
        **Requested Award: $8.5 Million**

In addition to Jody Howard, Jem Howard was also the stepson of Alan LaFrance, and for the reasons set forth below, and in the accompanying Declaration of Jem Howard ("Jem Howard Decl.") annexed as Exhibit C to the Goldman Declaration, Plaintiffs submit Jem Howard should also be deemed a child equivalent.

Alan LaFrance came into Jem Howard's life in 1980 when he started dating Jem's mother.  Jem was only 10 at the time. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 3.

Six months later, on September 27, 1980, Alan and Jem's mother were married and, along with his brother Jody, they became a family. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 3 and at Ex. 1.

Jem never knew his biological father growing up. Jem's biological father left his mom when he was 3 years old (although Jem did meet him once briefly when in 2005 when he was 35 and made it clear to his biological father that "[his] father died in 9/11"). *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 5.

Alan (who Jem only ever referred to as "Dad") was the only true father Jem ever knew. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 6.

Alan worked hard to provide for Jem, his mother, and his brother. Among other jobs, Alan worked as an audio/visual specialist at Windows of the World in the World Trade Center. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 7 and at Ex. 2.

In addition to this financial support, Alan treated Jem like his son, emotionally and socially. Alan would give Jem advice (and, of course, discipline) like any loving father and as to the outside world, there was no question that "Jem was his son." *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 10 and at Ex. 3.

Alan's whole side of the family treated Jem that way. He was a "nephew" to Alan's brothers and a "grandson" to Alan's parents. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 11.

Alan would take Jem and his brother to the movies in Manhattan and the Bronx and they would always take short trips to places like six flags, Amish country and along with other family members to Maine. Jem and his brother loved it. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 12.

15

Alan, Jem and the rest of their family lived in the same household for 11 years and Jem moved out when he was 21, although Jem still kept in touch with his parents through regular telephone calls and visits to the house. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 13.

In fact, after Jem moved out, his dad Alan and Jem actually became closer. It was only then that Jem realized what a blessing it was that Alan was so strict with Jem growing up. Jem never understood it as a child, but when Jem was grown and had two daughters of his own, only then could he really appreciate how much his dad Alan cared. His dad's discipline made sure Jem lived his life the right way, never joining a gang nor having issues with the law. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 14.

Alan was also an excellent grandfather to Jem's children. Alan and Jem's mom would always come over to Jem's house to visit them throughout the year as well as take them on vacations in the summertime. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 15.

And when the mother of my children and I were sharing custody, his dad Alan and his mom would always help Jem by picking up and dropping them off if Jem was stuck at work. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 16.

Jem generally worked nights, including at the time of the September 11th attacks. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 17.

Therefore, when it happened, Jem was at home watching it unfold on live television. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 18.

At first Jem just felt so bad for the people in those buildings; Jem had to turn the TV off when they started showing people jump from the buildings. But he wasn't worried about his dad Alan, because he worked nights like Jem. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 19.

16

But then Jem's brother called him and told him their dad was at work at the time, because he was covering a shift for someone else.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 20.

Jem didn't believe him, so he called their mom and she said, yes he was, but everything was going to be alright.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 21.

Jem went to the house immediately.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 22.

His mom had her friends and Jem's brother there as well as Jem supporting her.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 23.

Jem tried to keep a brave face for his mom's sake, but could only keep it up so long as Jem was devastated.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 24.

Jem was an emotional wreck and didn't want his mom to see me like that, so Jem kept his work schedule.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 25.

Going into work allowed Jem to focus on other things because, otherwise, all Jem could think about was how he would never see his dad again.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 26.

Unfortunately, the whole family eventually realized Alan had been lost in the attacks; they never located his remains.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 27.

The family gathered together (including the extended family on his dad Alan's side) because they had to make a decision about what to do when his body was not located.  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 28.

They decided to hold a memorial service on Sept 29th, two days after Jem's parents' anniversary where his mom was going to give his dad a new wedding ring (he had lost his).  *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 29.

In his dad Alan's obituary, Jem was listed as his son. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 30 and at Ex. 3.

To this day, Jem cannot go south of Canal Street. He will always use an alternate route so he does not have to travel through the financial district. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 31.

On the upcoming anniversary of 9/11, Jem is going to try for the first time to visit the 9/11 memorial with his girlfriend there as support. It's just been too hard to do. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 32.

In sum, Alan LaFrance was Jem's father and they considered each-other to be father and son in every way. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 33.

Alan was in Jem's life for 21 of his 31 years on this earth and will always miss him dearly. *See* Goldman Decl., Ex. C, Jem Howard Decl. at ¶ 34.

Based on Jem Howard's extremely traumatic experience in losing his stepfather and the only father in his life at the time of Alan LaFrance's death, Jem Howard should be awarded the full solatium damages award of $8.5 Million otherwise awarded to the children of September 11, 2001 decedents.

## B. Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages. 28 U.S.C. § 1605A(c)(4). In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." *MDL*, ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). *MDL*, ECF No. 2623 at 2. The Court has applied that ratio to awards for

plaintiffs in other related cases.  *See, e.g.*, *MDL*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); *MDL*, ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); *MDL*, ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying a 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  *MDL*, ECF No. 3363 at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  *MDL*, ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date.  *See, e.g.*, *MDL*, ECF No. 3666 (Judge Daniels' order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C. Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment.  *MDL*, ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's

19

reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See MDL*, ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *World Trade Ctr. Props. LLC v. Am. Airlines, Inc.* (*In re September 11th Litig.*), 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. *MDL*, ECF No. 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of

the claims.  *MDL*, ECF No. 3384 at 6.  Thereafter, in *Burnett II*, the Court again awarded

prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in the *Hoglan* and *Burnett* matters, applying the 4.96

percent rate to prejudgment interest, the *Jimenez II* Plaintiffs identified in Exhibit A respectfully

request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per

annum, compounded annually, running from September 11, 2001, until the date of the judgment.

**Conclusion**

For all of the reasons herein, plaintiffs respectfully request: (1) judgment as to damages

on behalf of the *Jimenez II* Plaintiffs identified on Exhibit A only, which includes individuals

who are not named in the complaint but are entitled to receive judgments for solatium based on

their relationship to the 9/11 decedent, in the same per plaintiff amounts previously awarded by

this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other

cases; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for

the period from September 11, 2001, until the date of the judgment for damages; and (3)

permission for such plaintiffs to seek punitive damages and economic and other appropriate

damages at a later date.

Respectfully submitted,

/s/ Jerry S. Goldman, Esq.

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Jeffrey E. Glen, Esq.
Vianny M. Pichardo, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:    212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        jglen@andersonkill.com
        vpichardo@andersonkill.com

Arthur R. Armstrong, Esq.
*(pro hac vice)*
1760 Market Street, Suite 600
Philadelphia, PA  19103
Tel:    267-216-2711
Fax:    215-568-4573
Email:  aarmstrong@andersonkill.com
*Attorneys for Plaintiffs*

Dated:  August 20, 2019
        New York, New York

22