**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
| This document relates to:<br><br>*Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | 15-cv-9903 (GBD)(SN)<br>ECF Case |

<u>**MEMORANDUM OF LAW FOR ENTRY OF PARTIAL**</u>
<u>**FINAL DEFAULT JUDGMENTS ON BEHALF OF**</u>
<u>**BURNETT/IRAN PLAINTIFFS IDENTIFED AT EXHIBIT A**</u>

*(BURNETT / IRAN X)*

  For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A[1] to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order entering partial final default judgments against the Iran Defendants[2] and awarding the Plaintiffs identified in Exhibit A (1) solatium damages for the losses they suffered as functional equivalents of immediate family members of decedents killed on 9/11 (as indicated in Exhibit A) in the same per plaintiff amounts previously awarded by this Court to other similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran* plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

---

[1] The references throughout this document to Exhibits are to Exhibits to the Eubanks Declaration dated August 30, 2019, filed contemporaneously with this motion.

[2] Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the deaths of plaintiffs' decedents in the 9/11 Attacks.

This motion is made on behalf of the *Burnett/Iran* claimants listed in Exhibit A *("Burnett/Iran X* Plaintiffs")* in light of this Court's previous orders granting permission to allow *Burnett/Iran* plaintiffs whose damages judgments had not previously been awarded to move for this relief. *See e.g.* 03-md-1570 (S.D.N.Y.) (GBD) (FM), ECF Nos. 3666 and 4023. The solatium claimants for whom relief is presently sought each have the functional equivalence of an "immediate family member" relationship to decedents who died in the September 11, 2001 terrorist attacks, and the intimate nature of their emotional connection with their lost loved ones and the anguish and grief they have suffered as a result of the attacks is detailed in the declarations included as Exhibits B through FF to the Eubanks Declaration. Because these claimants' relationships to their loved ones were functionally equivalent to the biological relationships that this Court has previously found formed the basis of damages awards, the *Burnett/Iran X* Plaintiffs should be awarded solatium damages under the Foreign Sovereign Immunities Act, applicable case law, and the law of the case.

Plaintiffs sued the Iran Defendants in connection with the deaths of plaintiffs' decedents in the 9/11 Attacks. On December 1, 2016, all plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Dkt. No. 15-cv-9903 (GBD) ("*Burnett/Iran*"), moved for judgment as to liability only. 15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69. On January 31, 2017, the Court granted plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85. The plaintiffs that are party to this application, as identified in Exhibits A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for default judgment as to solatium damages. Other subsets of plaintiffs in the *Burnett/Iran* case previously requested and were granted similar judgments in the Court's orders dated July 31, 2017 and June 8, 2018 (ECF Nos. 3666 and 4023). The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims in the amounts indicated in Exhibit A.

## I.     Procedural Background

Addressing the availability of solatium damages to non-immediate family members, this Court has previously addressed the criteria necessary to establish that a claimant and a decedent had the "functional equivalent" of an immediate family member relationship. *See* 03-md-1570 ECF Nos. 3363 and 3676 (in the

2

context of the *Hoglan v. Islamic Republic of Iran*, 11-cv-7550 (GBD) (SN)). The factors considered by the Court for determining whether domestic partners and fiancées were functional equivalents of a spouse included duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation, and the presence or absence of a formal engagement. *See id*. at 14-15.  The factors considered by the Court for determining whether stepsiblings or stepparents were functional equivalents of a decedent included the age of the decedent at the time when the stepsibling or stepparent became part of the family, whether the stepsibling or stepparent continuously cohabited with the decedent, and whether the stepsibling or stepparent established that he or she otherwise had a close and longstanding relationship. *See id. at* 15-16; *see also* ECF No. 3676 at 13-14 (reaffirming the framework set out in ECF No. 3363 and clarifying that the stepsiblings must have cohabited for a period of time, presumptively at least two years, and must have essentially "[grown] up together").  For stepsiblings or stepparents who became part of the same family when the decedent (and stepsibling) were in their early childhood (roughly birth through age eight), and who lived together for at least two years, the Court deemed them fully functional equivalent to biological siblings and found them entitled to full solatium damages. ECF No 3363 at 15; *see* ECF No. 3676 at 13-14. For stepsiblings or stepparents who became part of the same family after the decedent reached early childhood but while still living in the family home (roughly ages 9 through 17), the Court would award solatium damages reduced by one-half.  *Id.*  If the decedent was aged 18 or above, then the stepsiblings or stepparents would not be entitled to solatium damages. The analysis for stepchildren followed this same pattern of when the step-child joined the family: birth through age eight (full solatium); age nine through age 17 (half solatium); age 18 and older (no solatium).  ECF No. 3363 at 16.

## II.     The *Burnett/Iran* Plaintiffs

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903 ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903 ECF No. 67.  On December 1, 2016,

Plaintiffs requested judgment as to liability against the Iran Defendants, 15-cv-9903 ECF Nos. 65, 66, which application was amended on December 6, 2016 (15-cv-9903 ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903 ECF No. 85. On July 26, 2017, and June 8, 2018, different subsets of the plaintiffs in *Burnett/Iran* filed for entry of partial final default judgments (03-md-1570 ECF Nos. 3656-57, and 4021-22), which the Court granted on July 31, 2017, and June 8, 2018 (03-md-1570 ECF Nos. 3666, and 4023). In each of the judgments entered for plaintiffs in the *Burnett/Iran* case, the Court has applied the same dollar values for solatium awards for family members that the Court initially applied in *Havlish*, *compare* 03-md-1570, ECF No. 2623 at 4 *with* ECF Nos. 3666 and 4023 and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3666 and 4023.

For the reasons below as well as those set forth in the prior motions for judgment for solatium damages made on behalf of other *Burnett/Iran* wrongful death plaintiffs, the *Burnett/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court grant the proposed Order, filed with this motion, awarding them (1) solatium damages for the losses they suffered as non-immediate family members (in this instance, a domestic partner and a stepsibling) of their decedents killed on 9/11 (as indicated in Exhibit A) in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran* plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit  A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

**III.     Damages Under § 1605A**

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material

support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1).  Under 28 U.S.C. § 1605A ("Section 1605A"), which applies to the claims against Iran, damages are available under the federal law and include money damages "for personal injury or death." *See* 28 U.S.C. § 1605A(a)(1) and (c)(4). The damages available to plaintiffs in a Section 1605A action include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  03-md-1570, ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Accordingly, Plaintiffs identified in Exhibit A, who are (as indicated below) functional equivalents of family members of decedents killed on 9/11, are each entitled to solatium damages based on this Court's previous determinations in the amounts as previously established and applied by this Court in this and other related cases arising from the 9/11 Attacks.  Moreover, as indicated below, Plaintiffs identified in Exhibit A are also entitled to prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment.

### a.        Solatium Damages

Section 1605A specifically provides for solatium damages. Under that provision, family members of the decedents may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran,* 281 F.Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds,* 404 F.Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have therefore been treated as

comparable to claims for intentional infliction of emotional distress, in which the immediate family members of the decedent are treated as direct victims. *See, e.g. Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts have uniformly held that a terrorist attack—by its nature— is directed not only at the victims but also at the victims' families."); *Surette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).   Accordingly, this Court has previously awarded solatium damages to "immediate family members" who, though not physically present at the site of the terrorist attacks, were nevertheless intended victims of the terrorist activities. *See e.g.* 03-md-1570 (11-cv-07550) (S.D.N.Y.) (GBD) (SN) ECF. No. 3358; and 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) ECF No. 3300.

### i.   Nature of the Relationship — "Functional Equivalent" of Immediate Family Members

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived the September 11, 2001 deaths of their loved ones were entitled to recover for their solatium losses, and also set forth a framework for other familial relationships that fell outside of those four categories. *See* 03 -md-1570, ECF Nos. 3363; 3676.

In this Court's October 14, 2016 Report and Recommendation, adopted in pertinent part by the Hon. Judge George B. Daniels, U.S.D.J. (ECF No. 3384), the Court recognized that, in addition to awarding damages to individuals considered traditional "family members," the Court may also award damages to non-immediate family members who meet certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with a September 11, 2001 decedent. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews, and cousins. *See* 03-md-1570 (11-cv-7550) (S.D.N.Y.) (GBD) (SN), ECF No. 3363.

In that Report, the Court identified factors the Court would consider as relevant for determining whether, for awarding damages, a domestic partner would be considered the "functional equivalent" of a spouse and whether a stepsibling would be considered the "functional equivalent" of a sibling.  The factors that the Court

6

identified as relevant in the context of domestic partnership are "the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement." *Id*. at 14-15. The framework that the Court adopted in the context of step-relations is this: "… stepsiblings who became part of the family when the decedent was in early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who were in the same range when the decedent became part of their family shall be deemed fully equivalent to biological children," ". . . stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent who became part of the family shall receive half damages as well," and ". . . stepsiblings who became part of the decedent's family when the decedent had nearly finished his secondary education (roughly age 18 and above) and/or did not cohabit with the decedent for a significant period of time will likely not be deemed functional equivalents of immediate family members and shall not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family. In all cases, the Court will recommend solatium awards only for those step-relatives that cohabited with the decedent and establish that they otherwise had a close and longstanding relationship." *Id*. at 15-16.

The information in the accompanying declarations of the individuals for whom solatium damages are sought in this motion confirms that the claimants listed in Exhibit A had the "functional equivalent" of a biological relationship and they are therefore each entitled to an award for solatium damages.

### ii.    Quantum of Damages

To fashion a solatium award adequately compensating the surviving family members in the litigation against Iran, this Court previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer "profound agony and grief and, "[w]orse yet, ... are faced with frequent reminders of the events of that day." *See* 03-md-1570, ECF Nos. 2623 and 2618 at 10-12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and

their indelible impact on the lives of the victims' families," The Court ordered that solatium damages in the following amounts would be awarded to the immediate family members of those individuals killed on September 11, 2001:

| Relationship to Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 4.

As indicated above, the Court concluded that the damages framework above would be used when assessing solatium damages awards for qualifying non-immediate family members, except that the value for stepsiblings would be dependent on the age of the two stepsiblings at the time the relationship began. *See* ECF Nos. 3363 at 16; 3676 at 13-14.

The losses claimed in this motion are legally and factually comparable to those suffered by other claimants previously awarded solatium damages in this litigation. The deaths here were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose deaths were intended to create an environment of fear and terror. The claimants here were not attenuated victims — they had intimate relationships with the decedents and were directly and irrevocably harmed by the terrorist acts and consequences.  Accordingly, the presumptive values for solatium damages previously adopted by the Court for spouses and siblings in the other *Burnett/Iran* cases as well as the other claimants involved in this litigation should apply equally to the *Burnett/Iran X* Plaintiffs.

The relationships between the decedents and the *Burnett/Iran X* Plaintiffs are set forth below and in more detail in the statements from the surviving family members submitted as Exhibits B through FF. The *Burnett/Iran X* Plaintiffs identified below have the sort of intimate relationships previously recognized as qualifying for solatium damages; they survived the deaths of their loved ones on September 11; and they have verified under penalty of perjury the nature of the relationships with their deceased loved ones.

8

The *Burnett/Iran X* Plaintiffs respectfully request that this Court issue a partial final judgment ordering payment of solatium damages to the *Burnett/Iran X* Plaintiffs in the amounts set forth below and in Exhibit A:

> **iii.   *Plaintiff Deborah L. Barrett***
> ***Fiancee of 9/11 decedent Brian Cummins***
> **Presumptive Award:   $12.5 million**
> **Requested Award:      $12.5 million**

Brian Cummins was a partner at Cantor Fitzgerald and was killed in the 9/11 Attacks. Outside of his work life, Mr. Cummins was planning his life in the future with his fiancée Deborah L. Barrett. Mr. Cummins proposed to Ms. Barrett on Christmas Day 2000, and the couple was scheduled to close on the purchase of a home together only two days after the September 11 attacks. *See* Ex. B, Dec. of Deborah L. Barrett. In preparation for their nuptials, Mr. Cummins and Ms. Barrett were engaged in pre-marital counseling at Tower Hill Catholic Church in Red Bank, New Jersey – where they planned to get married – as Mr. Cummins was Catholic and Ms. Barrett was not. *Id.* Mr. Cummins and Ms. Barrett had cohabitated together for nearly three years at the time he was killed. *Id.* After getting engaged, the couple began fertility counseling at East Coast Infertility and IVF Clinic in Little Silver, New Jersey to determine if they were good candidates for assisted pregnancy. *Id.* They commingled their assets and bank accounts and lived like a normal married couple. *Id.* They had plans to marry, were engaged in counseling with the Catholic Church to make this a reality, were exploring pregnancy options to build a family together, and they were purchasing a home together with the closing scheduled only days after Mr. Cummins' untimely death.

> **iv.   *Plaintiff Theresa Bevilacqua***
> ***Stepdaughter of 9/11 decedent Stephen F. Masi***
> **Presumptive Award:   $8.5 million**
> **Requested Award:      $8.5 million**

Stephen F. Masi was employed by Cantor Fitzgerald and was killed in the 9/11 Attacks. Theresa Bevilacqua never knew another father than her stepfather Stephen F. Masi. In fact, she never knew the name of, or met, her biological father. *See* Ex. C, Dec. of Theresa Bevilacqua. Ms. Bevilacqua's mother began dating Mr. Masi when Theresa was only eight months old. *Id.* While Theresa's mother Joan and Mr. Masi did not get married until Theresa was 12 years old, she cohabitated with Mr. Masi for nearly 21 consecutive

years until she left home at age 21. *Id.* While growing up, Mr. Masi was Theresa's father, and he did what fathers do with all of their children: he helped her with homework, helped her decipher right from wrong, taught her how to drive, instilled a sense of family in her, and gave her the experience of a two-parent household with a loving and doting father. *Id.* Even after she left the family home, Theresa would return for special occasions to see the only father she had ever known, and she also received financial support in adulthood from Mr. Masi when it was needed. *Id.* In short, Mr. Masi was the only father that Theresa has ever had. She even left New York after he was killed because the memories were too painful for her. *Id.*

> **v.    *Plaintiff Susann Carol Brady***
> ***Fiancee of 9/11 decedent Gavin Cushny***
> **Presumptive Award:    $12.5 million**
> **Requested Award:    $12.5 million**

Gavin Cushny was a computer analyst at Cantor Fitzgerald and was killed in the 9/11 Attacks. Mr. Cushny was scheduled to marry Susann Carol Brady on the Isle of Lewis, Scotland on October 26, 2001. *See* Ex. D, Dec. of Susann Carol Brady. Mr. Cushny and Ms. Brady had cohabitated together as husband and wife for approximately two years prior to his death; however, they had been together as a couple for four years. *Id.* Ms. Brady had already purchased her wedding gown, and Mr. Cushny had already purchased the wedding ring. *Id.*

In preparation for their lives together, the couple traveled to Mr. Cushny's home in Scotland and met with his family on multiple occasions where she was accepted as his bride-to-be. *Id.* Susann and Gavin had been shopping for a home together to live in upon their return from their wedding. *Id.* The couple had also engaged in family planning and possible in vitro fertilization and a reversal of Mr. Cushny's vasectomy to facilitate pregnancy; however, following Mr. Cushny's death, Ms. Brady has never experienced the joy of having her own children. *Id.* The depth and permanence of their relationship was underscored by the fact that Ms. Brady was named as Mr. Cushny's beneficiary for retirement accounts and life insurance policies, she has been appointed the administrator of his estate, and she was awarded benefits from the State of New York's Workers Compensation Board as the Domestic Partner of Gavin Cushny. *Id.*

10

> ### vi.   *Plaintiff Rebecca Chang*
> ### *Stepdaughter of 9/11 decedent Salvatore "Sal" Fiumefreddo*
> **Presumptive Award:   $8.5 million**
> **Requested Award:       $4.25 million**

Salvatore "Sal" Fiumefreddo was working on the phone system at Cantor Fitzgerald when he was killed in the 9/11 Attacks. Sal had married his wife Joan on September 29, 2000, and Joan and her daughter Rebecca Chang – who was seven years old at the time – began cohabitating with Sal. *See* Ex. E, Dec. of Rebecca Chang. Rebecca and Sal had the opportunity to gel as father and daughter as Joan worked a long distance from home, and Sal typically worked nights, so Rebecca was often spending time with Sal when her mother was at work. *Id.* He cared for her, making her breakfasts and lunches, engaging her in conversation about school and her day, and staying by her side when she was hospitalized. *Id.* Rebecca's biological parents had divorced when she was three years old, so Sal was the only true father figure in her life, and his presence and subsequent loss left an indelible in-print on her life. *Id.* Due to the shorter period of cohabitation, Plaintiffs are seeking only half of the presumptive award for a child for Ms. Chang's claims.

> ### vii.   *Plaintiff Douglas C. Cleary*
> ### *Fiance of 9/11 decedent Elizabeth C. Logler*
> **Presumptive Award:   $12.5 million**
> **Requested Award:       $12.5 million**

Elizabeth C. Logler was Vice President for Investor Relations at Cantor Fitzgerald when she was killed in the 9/11 Attacks. *See* Ex. F, Dec. of Douglas C. Cleary. Douglas Cleary and Ms. Logler had romantically cohabitated for approximately five years and had been together romantically for seven years at the time of Elizabeth's death. *Id.* Elizabeth and Douglas had been engaged to be married for nearly two years at the time of her death, and their wedding was planned for December 30, 2001. *Id.* The couple had traveled extensively together and were looking forward to family planning in the near future. *Id.*

> ### viii.   *Plaintiff Cheryl D. Cooper*
> ### *Domestic Partner of 9/11 decedent Donald A. Foreman*
> **Presumptive Award:   $12.5 million**
> **Requested Award:       $12.5 million**

Donald A. Foreman was a police officer with the Port Authority of New York and New Jersey when he killed in the 9/11 Attacks. Mr. Foreman and Cheryl D. Cooper had cohabitated as husband and wife for

sixteen years leading up to the 9/11 Attacks.  *See* Ex. G, Dec. of Cheryl D. Cooper.  They lived together in the house they had bought together as their family home along with Ms. Cooper's two daughters.  *Id.*  Ms. Cooper's children were four years old and a newborn when she first became romantically involved with Mr. Foreman, and he played the role of father in their lives as well.  *Id.*  In much the same manner as a married couple, Ms. Cooper was the beneficiary of Mr. Foreman's life insurance and pension after his death.  *Id.*  Despite the length of their relationship, Cheryl and Donald discussed getting married by the end of 2001, but that was never able to happen.  *Id.*  They had planned to retire, travel, and watch Cheryl's daughters grow into adulthood, but Donald's death made this impossible. *Id.*

### ix.   *Plaintiff Mary Coughlin*
   *Domestic Partner of 9/11 decedent Kevin W. Donnelly*
   **Presumptive Award:   $12.5 million**
   **Requested Award:      $12.5 million**

Lt. Kevin W. Donnelly was serving with Ladder Company 3 when he was killed in the 9/11 Attacks. To family and friends, Lt. Donnelly held himself out as the husband of Mary Coughlin with whom he had cohabitated in Mineola, New York for six years and with whom he had been romantically involved for approximately twelve years.  *See* Ex. H, Dec. of Mary Coughlin.  Kevin and Mary did everything together: lived together, went to church together, share expenses together, even registered to vote together.  *Id.*  While never married, exactly one year prior to the attacks, Lt. Donnelly purchased a diamond ring for Mary as a sign of their commitment to one another.  *Id.*  Following Lt. Donnelly's death, Mary Coughlin was recognized by the FDNY, the Twin Towers Fund, the Uniformed Firefighters Association, the New York City Crime Victims Board, the World Trade Center Relief Fund, and the Families of Freedom Scholarship Fund as either Lt. Donnelly's widow or his domestic partner.  *Id.*

### x.   *Plaintiff Margaret E. Cruz*
   *Domestic Partner of 9/11 decedent Patricia McAneney*
   **Presumptive Award:   $12.5 million**
   **Requested Award:      $12.5 million**

Patricia McAneney was employed by Guy Carpenter insurance in 1 World Trade Center when she was killed in the 9/11 Attacks.  For nearly two decades prior to her death, Ms. McAneney and Margaret Cruz were life partners in life's journey.  *See* Ex. I, Dec. of Margaret E. Cruz.  As Ms. Cruz states, "We cooked

together, vacationed together, shopped together, woke up each morning together, and lived in every other way like a married couple." *Id.* Margaret received the proceeds of Patricia's life insurance and investment accounts, and with the exception of the inability for same-sex partners to marry in New York in 2001, they were very much spouses to one another. *Id.*

> **xi.     *Plaintiff John Cuccinello***
> ***Step-Child of 9/11 decedent William J. McGovern***
> **Presumptive Award:     $8.5 million**
> **Requested Award:        $8.5 million**

William J. McGovern was a Battalion Chief in the FDNY and was killed in the 9/11 Attacks.  In 1987, Mr. McGovern married his wife, Mary Sue, who had an eight-year-old son name John Cuccinello. *See* Ex. J, Dec. of John Cuccinello.  John's biological parents divorced when he was either four or five years of age, and his biological father did not play a significant role in his life from that time forward. *Id.* Due to William's job as a firefighter and his time on and off shift, a strong bond developed between William and John where William fully fulfilled the role of father and best friend for John as he was growing up. *Id.* John referred to William as his dad, and William referred to John as his son. *Id.* William taught John how to play sports, how to drive a car, and William subsequently paid for John's college when his biological father failed to live up to his obligation to do so. *Id.* William was in this role of father to John Cuccinello from the age of 8 until William's death when John was 21 years old.

> **xii.    *Plaintiff William G. Dietrich***
> ***Fiance of 9/11 decedent Karen Lynn Seymour***
> **Presumptive Award:     $12.5 million**
> **Requested Award:        $12.5 million**

Karen Lynn Seymour was working for the ETC division of Garban Intercapital when she was killed in the 9/11 Attacks.  For eleven years prior to the Attacks, Ms. Seymour and William G. Dietrich lived together as husband and wife. *See* Ex. K, Dec. of William G. Dietrich.  The couple had two children together and lived in the home that they purchased together. *Id.* While having agreed to get married – Ms. Seymour was wearing an engagement ring and a wedding band on 9/11 – the couple had not yet held a wedding ceremony. *Id.* Upon Karen's death, William was appointed the Administrator of her estate. *Id.* Karen and

William had plans to spend the rest of their lives together raising their children and growing old together, but those plans were cut short by the 9/11 Attacks. *Id.*

> **xiii.**   ***Plaintiff Robert Giallombardo***
> ***Step-Parent of 9/11 decedent Paul Richard Salvio***
> **Presumptive Award:   $8.5 million**
> **Requested Award:      $8.5 million**

Paul Richard Salvio was a broker at Carr Futures when he was killed in the 9/11 Attacks. Paul's mother, Rosemarie, married Robert Giallombardo in 1976 when Paul was two years old. *See* Ex. L, Dec. of Robert Giallombardo. Paul's never knew his biological father, and he was never involved in his life. *Id.* Paul and Robert resided together for 25 years, and Paul was the older brother to the three biological children that Robert and Rosemarie had after getting married. *Id.* Robert put Paul through Catholic school education and always treated him in the same manner as his biological children. *Id.* Paul would seek guidance from Robert in all aspects of his life. *Id.* They would refer to each other as father and son. *Id.*

> **xiv.**   ***Plaintiff Veronica A. Glascoe a/k/a Veronica A. Squef***
> ***Registered Domestic Partner of 9/11 decedent Keith A. Glascoe***
> **Presumptive Award:   $12.5 million**
> **Requested Award:      $12.5 million**

Keith A. Glascoe was a firefighter with FDNY Ladder Company 21 when he was killed in the 9/11 Attacks. For approximately five years prior to his death, Keith and Veronica A. Glascoe had cohabitated together with their two children, ages 1 and 2, and Veronica was pregnant with their third child. *See* Ex. M, Dec. of Veronica A. Glascoe. As a sign of their commitment to one another, Keith and Veronica registered as domestic partners with the City of New York in 1999. *Id.* In 2002, Veronica legally changed her last name to Glascoe. *Id.* Keith and Veronica had plans to purchase a home together in which to raise their children; however, the 9/11 Attacks left their children fatherless and destroyed those plans. *Id.*

> **xv.**   ***Plaintiff Lisa C. Goldberg-McWilliams***
> ***Domestic Partner of 9/11 decedent Martin McWilliams***
> **Presumptive Award:   $12.5 million**
> **Requested Award:      $12.5 million**

Martin McWilliams was a firefighter with FDNY Engine Company 22 when he was killed in the 9/11 Attacks. At the time of his death, Mr. McWilliams had been cohabitating with Lisa C. Goldberg-

McWilliams for approximately three-and-one-half years and had welcomed their first child into the world on April 12, 2001. *See* Ex. N, Dec. of Lisa C. Goldberg-McWilliams. In addition to their baby together, Martin was also closely involved in the life of Lisa's other daughter and treated her as his own daughter. *Id.* Martin and Lisa were in the process of purchasing a home together when he was killed, and Lisa had to remove Martin's name from the purchase agreement to accommodate the purchase of the property after his death. *Id.* Martin and Lisa had planned to get married in December 2001 after they had gotten settled into their new home. *Id.* When Martin died, Lisa was appointed Administrator of his estate and was awarded the lifetime health benefits typically awarded to spouses of fallen firefighters by the FDNY. *Id.* Martin and Lisa intended to spend the rest of their lives together raising their children, working toward retirement, and growing old together; however, the 9/11 Attacks destroyed these hopes and dreams.

> **xvi.    *Plaintiffs Lydeda Grant and Anthony Newsome***
> ***Step-Children of 9/11 decedent Johnnie Doctor, Jr.***
> **Presumptive Award:    $8.5 million each**
> **Requested Award:      $8.5 million each**

Johnnie Doctor, Jr. was on active duty in the U.S. Navy when he was killed in the 9/11 attack on the Pentagon. Johnnie married Andrea Doctor in approximately 1992 and became a father to Andrea's two children, Lydeda Grant and Anthony Newsome. *See* Exs. O and P, Decs. of Lydeda Grant and Anthony Newsome. Lydeda was approximately four or five years old when Johnnie became her father, and Anthony was approximately seven or eight years old. *Id.* Johnnie was the only father either of them really knew for nine years leading up to his death as their biological father played little to no role in their lives. *Id.* Johnnie guided Anthony through learning right from wrong, learning how to drive a car, how to open a bank account, saving for the future, always showing up on time, respecting authority, and molding him into the man he is today. Ex. P. Lydeda and Johnnie bonded over basketball with him coaching her and teaching her the game while also teaching her important lessons about life and molding her into the woman she is today. Ex. O.

   **xvii.**  ***Plaintiff Monica Ianelli a/k/a Monica Palatucci***
        ***Fiancee of 9/11 decedent Joseph A. Ianelli***
   **Presumptive Award:**  **$12.5 million**
   **Requested Award:**   **$12.5 million**

   Joseph A. Ianelli was an accountant with Marsh & McLennan when he was killed in the 9/11 Attacks. For two years prior to the attacks, Joseph cohabitated with Monica Ianelli (nee Palatucci) who he proposed marriage to on December 23, 2000. *See* Ex. Q, Dec. of Monica Ianelli. The couple was scheduled to be married on September 1, 2002 at the New Rochelle Country Club in New Rochelle, New York. *Id.* They had been together as a couple romantically for three years when he was killed. *Id.* They maintained a joint checking account, Monica was named as the beneficiary on Joseph's employer-provided life insurance policy, and Monica was awarded benefits provided to domestic partners by the State of New York Workers Compensation Board. *Id.* Monica legally changed her last name to Ianelli after Joseph's death to commemorate him and their commitment to one another. *Id.*

   **xviii.**  ***Plaintiff Frank G. Jensen***
        ***Fiance of 9/11 decedent Suzanne M. Calley***
   **Presumptive Award:**  **$12.5 million**
   **Requested Award:**   **$12.5 million**

   Suzanne M. Calley was a passenger aboard Flight 77 when she was killed when the plane crashed into the Pentagon on 9/11. For twenty years leading up to the 9/11 Attacks, Ms. Calley had cohabitated with Frank G. Jensen. *See* Ex. R, Dec. of Frank G. Jensen. The couple had been engaged to be married for 15 years but had not gotten married due to negative tax consequences for them being married; however, they had decided during a vacation in August 2001 that they would finally get married in September 2002. *Id.* They jointly held businesses, bank accounts, investment accounts, and physical assets and lived entirely like a married couple for 20 years. *Id.* They referred to each other as their spouse, and Suzanne wore an engagement ring that Frank gave her in 1986 as both an engagement ring and as a wedding ring. *Id.*

> xix.    *Plaintiff Kerri Kelly*
> *Step-Child of 9/11 decedent Joseph Leavey*
> **Presumptive Award:    $8.5 million**
> **Requested Award:       $8.5 million**

Joseph Leavey was a lieutenant with the FDNY when he was killed in the 9/11 Attacks.  Joseph began dating his soon-to-be wife Carole when Carole's daughter Kerri was only six years old.  *See* Ex. S, Dec. of Kerri Kelly.  Joseph and Carole were married when Kerri was eight years old, and she cohabitated with Joseph for the next 17 years of her life.  *Id.*  Kerri's biological father separated from her mother when Kerri was two years old, and Kerri never resided with her biological father after that time.  *Id.*  Because of his work schedule, Joseph was often home during the day to allow him to be the primary caregiver for Kerri and her half-siblings driving Kerri to school, teaching her how to swim, how to catch a ball, attending softball games, assisting with homework, teaching her how to drive, teaching her how to balance a checkbook and the importance of saving for the future, and generally teaching her right from wrong.  *Id.* When Kerri got married in 2000, Joseph Leavey walked her down the aisle.  *Id.*  She has committed her life to community service based on the example that Joseph set in her life.  *Id.*

> xx.    *Plaintiff Ina Leventhal*
> *Fiancee of 9/11 decedent Joshua S. Vitale*
> **Presumptive Award:    $12.5 million**
> **Requested Award:       $12.5 million**

Joshua S. Vitale worked the Trading Sales Desk at Cantor Fitzgerald when he was killed in the 9/11 Attacks.  Joshua and Ina Leventhal had known each other since they were 13 years old and had been living together for five months at the time of his death after having alternated their living arrangements between their two apartments for two years prior.  *See* Ex. T, Dec. of Ina Leventhal.  Joshua proposed to Ina on May 21, 2001 presenting her with her deceased mother's wedding band.  *Id.* Their marriage was scheduled to take place on July 3, 2002 at Beth Torah Temple in Dix Hill, New York.  *Id.* Joshua and Ina did everything together and were planning for the rest of their lives together after having been best friends for the prior fifteen years.  *Id.*

> ### xxi.   *Plaintiff Camille Nicole Martin*
> ### *Grandchild of 9/11 decedent Charles Augustus Laurencin*
> **Presumptive Award:   $8.5 million**
> **Requested Award:   $8.5 million**

Charles Augustus Laurencin was a security worker at the World Trade Center where he was killed in the 9/11 Attacks.  In 1991, Charles and his wife Barbara were appointed the legal guardians of their granddaughter Camille Nicole Martin because her father was incarcerated (and subsequently murdered in 1997) and her mother was a habitual drug abuser unable to care for her.  *See* Ex. U, Dec. of Camille Nicole Martin. Charles fulfilled the role of father for Camille through teaching her to ride a bicycle, instilling in her a love of art, taking her on vacation, and all of the other little memories that exist between fathers and daughters.  *Id.*  Charles was killed when Camille was only ten years old, and she was left without that father figure in her life.  *Id.*

> ### xxii.   *Plaintiff Chelsea McCarthy*
> ### *Step-Child of 9/11 decedent Kevin M. McCarthy*
> **Presumptive Award:   $8.5 million**
> **Requested Award:   $8.5 million**

Kevin M. McCarthy was a bond trader at Cantor Fitzgerald when he was killed in the 9/11 Attacks. Kevin married his wife Debra in approximately 1993 at which time Debra's daughter, Chelsea, was three years old.  *See* Ex. V, Dec. of Chelsea Rhea McCarthy.  From age three through age 11, Chelsea cohabitated with Kevin.  *Id.*  When Chelsea was seven years old, a petition was filed by Kevin and her mother with the Probate and Family Court Department of the Commonwealth of Massachusetts to change her surname to "McCarthy" with the consent of her biological father.  *Id.* Chelsea's biological father played no role in her life, and Kevin was a stay-at-home dad for a few years after her twin half-siblings were born and raised all three children as if they were his biological children.  *Id.* The admiration that Chelsea had for Kevin as her father was exemplified in an essay she wrote after his death when she was 12 that is attached to her Declaration.  *Id.*

          **xxiii.**   *Plaintiff Rhonda McCleary*
                 *Step-Child of 9/11 decedent James Durward Cleere*
**Presumptive Award:**   **$8.5 million**
**Requested Award:**     **$4.25 million**

James Durward Cleere was a guest at the Marriott Hotel located at the World Trade Center when he was killed in the 9/11 Attacks. Rhonda McCleary was approximately ten years old when her mother married James, and they became a family. *See* Ex. W, Dec. of Rhonda McCleary. Rhonda's biological father was significantly out of her life after her biological parents divorced when she was five years old, and James fulfilled all father roles and duties in her life from the time he came into it. *Id.* Rhonda would purchase Father's Day cards for James, and her own son referred to James as his grandfather and vice versa. *Id.* Because Rhonda McCleary was already ten years old when she began cohabitating with James, Plaintiffs are only seeking half the presumed value for this claim. *See* ECF No. 3363 at 15-16.

          **xxiv.**   *Plaintiff Noreen V. McDonough*
                 *Fiancee of 9/11 decedent Mitchel Scott Wallace*
**Presumptive Award:**   **$12.5 million**
**Requested Award:**     **$12.5 million**

Mitchel Scott Wallace was a Court Office with the State Supreme Court and a trained EMT who ran to help at the World Trade Center and was killed in the 9/11 Attacks. He and Noreen V. McDonough had been cohabitating for three years when he was killed. *See* Ex. X, Dec. of Noreen V. McDonough. Mitchel had proposed to Noreen on December 9, 1998, and they had planned to be married prior to September 11, 2001; however, health issues with both Noreen's father and Noreen caused them to postpone their marriage. *Id.* Days before the attacks, Noreen and Mitchel had agreed to get married in October 2001. *Id.* Noreen was the beneficiary of Mitchel's State Court Officers Life Insurance and receives payments as a domestic partner from the New York State Workers Compensation Board. *Id.* They had plans in place for their life together that were dashed by the 9/11 Attacks.

>          **xxv.    *Plaintiff Vincent A. Milotta***
>                   ***Fiance of 9/11 decedent Joann Tabeek***
>          **Presumptive Award:    $12.5 million**
>          **Requested Award:      $12.5 million**

Joann Tabeek was a Vice President at Cantor Fitzgerald when she was killed in the 9/11 Attacks. Joann and Vincent A. Milotta had cohabitated together as a couple for six years prior to her death. *See* Ex. Y, Dec. of Vincent A. Milotta. The couple had gotten engaged to be married approximately one year prior to the 9/11 Attacks and planned to wed in September 2002. *Id.* Vincent wears Joann's engagement ring around his neck to this day. *Id.* They had plans for Joann to retire within three years and then to move to Florida where they had visited looking for their retirement home. *Id.*

>          **xxvi.   *Plaintiff Catherine M. Nolan***
>                   ***Fiancee of 9/11 decedent Michael J. Armstrong***
>          **Presumptive Award:    $12.5 million**
>          **Requested Award:      $12.5 million**

Michael J. Armstrong was a Vice President with Cantor Fitzgerald when he was killed in the 9/11 Attacks. Michael had been involved romantically with Catherine M. Nolan since 1997, and they became engaged to be married on February 15, 2001. *See* Ex. Z, Dec. of Catherine M. Nolan. Michael and Catherine were schedule to married at the Church of St. Thomas More in New York City on October 6, 2001 with a reception to follow at the Wainright House in Rye, New York. *Id.* Michael and Catherine were actively planning their future together including starting a family and raising children together. *Id.* The events of 9/11 destroyed those plans for this couple less than a month before they were to be married.

>          **xxvii.  *Plaintiff Gina Pinos***
>                   ***Fiancee of 9/11 decedent James N. Pappageorge***
>          **Presumptive Award:    $12.5 million**
>          **Requested Award:      $12.5 million**

James N. Pappageorge was a firefighter with FDNY Engine Co. 23 when he was killed in the 9/11 Attacks. James had been romantically involved with Gina Pinos for approximately seven years, and they had lived together for approximately three-and-one-half years with her son Justin. *See* Ex. AA, Dec. of Gina Pinos. In fact, James had been in the delivery room with Gina when Justin was born and cared for him as a father would care for his own son. *Id.* James proposed to Gina in 2000, and they had planned to get married

in 2002 and had given a booking deposit to the Crest Hollow Country Club on Long Island for their reception. *Id.* On September 10, 2001, Gina had taken a pregnancy test and determined that she was pregnant with James' baby, but she did not tell him because she wanted to verify the results with a second test on the morning of September 11. *Id.* It was subsequently determined that Gina was approximately three months pregnant when she miscarried following the trauma of losing James in the 9/11 Attacks. *Id.* As Gina states, "The terrorist attacks on 9/11 not only took the life of my soul mate, but I believe also took the life of our unborn baby." *Id.*

> xxviii. *Plaintiff Cheryl Rinbrand*
> *Fiancee of 9/11 decedent Daniel Maurice Van Laere*
> Presumptive Award:   $12.5 million
> Requested Award:   $12.5 million

Daniel Maurice Van Laere worked for AON Corporation when he was killed in the 9/11 Attacks. Daniel and Cheryl Rinbrand had been living together as husband and wife for eleven years prior to his death. *See* Ex. BB, Dec. of Cheryl Rinbrand. They began their relationship as high school sweethearts. *Id.* Their house was in both of their names with rights of survivorship, they commingled their assets, and Cheryl was the sole beneficiary of Daniel's AON life insurance policy. *Id.* Approximately six years prior to his death, Daniel and Cheryl were formally engaged, and they were pursuing the requisite tasks for them to be married in the Catholic Church as Ms. Rinbrand was previously divorced and not Catholic. *Id.*

> xxix. *Plaintiff Silveria Segura*
> *Domestic Partner of 9/11 decedent Juan G. Salas*
> Presumptive Award:   $12.5 million
> Requested Award:   $12.5 million

Juan G. Salas worked at the Windows on the World Restaurant when he was killed in the 9/11 Attacks. Juan and Silveria Segura had resided together as husband and wife continuously for approximately eight years during which time they had two children together. *See* Ex. CC, Dec. of Silveria Segura. When Juan died, Silveria was appointed Administrator of his estate, and a life insurance policy held by Juan was made payable to their son, Juan Luis Salas. *Id.* Silveria and Juan made plans for their life and the lives of their children, but those plans were destroyed by the events of 9/11. *Id.*

> ### xxx.    *Plaintiff Patricia Skic*
> ### *Domestic Partner of 9/11 decedent Michael Matthew Miller*
> ### Presumptive Award:    $12.5 million
> ### Requested Award:    $12.5 million

Michael Matthew Miller was a Bond Trader with Cantor Fitzgerald when he was killed in the 9/11 Attacks.  On Christmas 2000, Michael surprised Patricia Skic by asking her to marry him.  *See* Ex. DD, Dec. of Patricia Skic. To allow Patricia's family who would be traveling from Australia to attend, the wedding was scheduled for September 28, 2001.  *Id.*  In March 2001, the couple leased a car together, and in May 2001, they were pre-qualified for a home mortgage loan and began looking for a home in the Hamptons.  *Id.* At the time of Michael's death, the couple was having remodeling work done on their condominium in New Jersey.  *Id.*  After Michael's death, Patricia was adjudged by the State of New York Workers Compensation Board to be Michael's domestic partner and was awarded benefits accordingly.  *Id.*  Michael and Patricia were weeks from their wedding and had made significant plans regarding their future together that were destroyed by the 9/11 Attacks.

> ### xxxi.    *Plaintiffs Jose A. Franco-Suarez and Joscelyn C. Franco-Suarez*
> ### *Step-Children of 9/11 decedent Benjamin Suarez*
> ### Presumptive Award:    $8.5 million each
> ### Requested Award:    $8.5 million each

Benjamin Suarez was a firefighter with FDNY Ladder Company 21 when he was killed in the 9/11 Attacks.  In 1994, Benjamin and his future wife Sally began living together as a family with Sally's two children Jose A. Franco-Suarez and Joscelyn C. Franco-Suarez.  *See* Exs. EE and FF, Decs. of Jose A. Franco-Suarez and Joscelyn C. Franco-Suarez.  Joscelyn was seven years old in 1994, and Jose was five years old.  *Id.*  Neither of the children have any memories of their biological father, and to them, Benjamin was their father until the day that he died.  *Id.*  Benjamin would introduce Jose and Joscelyn as his children to other firefighters and bring along other members of firehouse to recitals or sporting events for the children. *Id.* The fatherly influence that Benjamin Suarez played for both Jose and Joscelyn has shaped the adults they are today.  *Id.*

Based on the facts set forth above and in Exhibits B through FF to the Eubanks Declaration, Plaintiffs respectfully submit that solatium damages for these individuals be awarded in the amounts set forth on Exhibit A to the Eubanks Declaration for each individual.

> **b.    Punitive Damages**

Under the FSIA, plaintiffs are also entitled to punitive damages.  *See* 28 U.S.C. §1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (03-md-1570, ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (03-md-1570, ECF No. 2623).  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, 03-md-1570, ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); 03-md-1570, ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply 3.44 multiplier); 03-md-1570, ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  03-md-1570, ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  03-md-1570, ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

c.       **Prejudgment Interest**

As in prior applications, the *Burnett/Iran X* Plaintiffs ask that this Court direct that prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New York be assessed, as was done previously in the *Burnett/Iran I* and *Burnett/Iran II* judgments, as well as for other plaintiffs in this consolidated litigation.

**III.       Conclusion**

For all of the reasons set forth herein, as well as those set forth in the previous submissions of the *Burnett/Iran* plaintiffs and other plaintiffs, the *Burnett/Iran X* Plaintiffs respectfully request that this Court grant the proposed order included with this motion: (1) awarding solatium damages as set forth in the attached Exhibit A, (2) awarding prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment be assessed; and (3) permitting the *Burnett/Iran X* plaintiffs to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit  A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  August 31, 2019                              Respectfully submitted,

                                                     MOTLEY RICE LLC

                                                     BY:  /s/ John M. Eubanks
                                                          John M. Eubanks, Esq.
                                                          MOTLEY RICE LLC
                                                          28 Bridgeside Blvd.
                                                          Mount Pleasant, SC 29464
                                                          Tel: 843-216-9218
                                                          Fax: 843-216-9450
                                                          Email: jeubanks@motleyrice.com