# EXHIBIT I

# Smith Economics Group, Ltd.
### A Division of Corporate Financial Group
*Economics / Finance / Litigation Support*

Stan V. Smith, Ph.D.
President

July 30, 2019

Mr. John M. Eubanks
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

    Re: Marcin

Dear Mr. Eubanks:

You have asked me to calculate the value of certain losses subsequent to the death of Hilda Marcin.  These losses are: (1) the loss of retirement income; (2) the loss of housekeeping and household management services; and (3) the loss of the value of life ("LVL"), also known as loss of enjoyment of life.

## QUALIFICATIONS AND EXPERIENCE

I am President of Smith Economics Group, Ltd., headquartered in Chicago, IL, which provides economic and financial consulting nationwide.  I have worked as an economic and financial consultant since 1974, after completing a Research Internship at the Federal Reserve, Board of Governors, in Washington, D.C.  My curriculum vitae lists all my publications in the last 10 years and beyond.

I received my Bachelor's Degree from Cornell University.  I received a Master's Degree and my Ph.D. in Economics from the University of Chicago; Gary S. Becker, Nobel Laureate 1992, was my Ph.D. thesis advisor.  The University of Chicago is one of the world's preeminent institutions for the study of economics, and the home of renowned research in the law and economics movement.

As President of Smith Economics, I have performed economic analyses in a great variety of engagements, including damages analysis in personal injury and wrongful death cases, business valuation, financial analysis, antitrust, contract losses, a wide range of class action matters, employment discrimination, defamation, and intellectual property valuations including evaluations of reasonable royalty.

I have more than 40 years of experience in the field of economics.  I am a member of various economic associations and served for three years as Vice President of the National Association of Forensic Economics (NAFE) which is the principal association in the field.  I was also on the Board of Editors of the peer-reviewed journal, the Journal of Forensic Economics, for

1165 N. Clark Street • Suite 600 • Chicago, IL 60610 • Fax 312-943-1016 • Tel 312-943-1551
www.SmithEconomics.com

SEG

over a decade; I have also published scholarly articles in this journal. The JFE is the leading academic journal in the field of Forensic Economics.

I am the creator and founder of Ibbotson Associates' <u>Stock, Bonds, Bills, and Inflation</u> (SBBI) Yearbook, Quarterly, Monthly, and SBBI/PC Services.  SBBI is currently published by Duff & Phelps and is also available on various Morningstar, Inc. software platforms.  SBBI is widely relied upon and regarded as the most accepted and scholarly reference by the academic, actuarial and investment community, and in courts of law.  The SBBI series, which acknowledges my "invaluable role" as having "originated the idea" while Managing Director at Ibbotson Associates, is generally regarded by academics in the field of finance as the most widely accepted source of statistics on the rates of return on investment securities.

I wrote the first textbook on Forensic Economic Damages that has been used in university courses in various states; as an adjunct professor, I created and taught the first course in Forensic Economics nationwide, at DePaul University in Chicago.  I have performed economic analysis in many thousands of cases in almost every state since the early 1980s.

<u>BACKGROUND</u>

Hilda Marcin was a 79.8-year-old, Caucasian female, who was born on ███████████████, and died on September 11, 2001.  Mrs. Marcin's remaining life expectancy is estimated at 9.8 years to July 26, 2011.  This data is from the National Center for Health Statistics, <u>United States Life Tables, 2015</u>, Vol. 67, No. 7, National Vital Statistics Reports, 2018.  I assume an estimated trial or resolution date of January 1, 2020.

In order to perform this evaluation, I have reviewed the following materials: (1) tax records for Hilda Marcin from 1997 through 2001; (2) the employment file for Hilda Marcin from the Mount Olive Board of Education; and (3) the case information form.

My methodology for estimating the losses, which is explained below, is generally based on past wage growth and consumer prices, as well as studies regarding the value of life.

My estimate of the real wage growth rate is 1.00 percent per year.  This growth rate is based on Business Sector, Hourly Compensation growth data from the Major Sector Productivity and Costs Index found at the U.S. Bureau of Labor Statistics website at www.bls.gov/data/home.htm, Series ID: PRS84006103, for the real increase in wages primarily for the last 20 years.

SEG

The real growth rate is net of inflation based on the Consumer Price Index (CPI-U), published in monthly issues of the U.S. Bureau of Labor Statistics, CPI Detailed Report (Washington, D.C.: U.S. Government Printing Office) and available at the U.S. Bureau of Labor Statistics website at www.bls.gov/data/home.htm, Series ID: CUUR0000SA0.  The rate of inflation for the past 20 years has been 2.16 percent.

I. LOSS OF RETIREMENT INCOME

Tables 1 through 3 show the loss of retirement income for Hilda Marcin.  Ms. Marcin retired from the Mount Olive, NJ Board of Education on June 30, 2001.  Ms. Marcin had a retirement pension from the New Jersey Division of Pension and Benefits, which in 2000 totalled $13,808.  Ms. Marcin also received Social Security retirement benefits which in 2000 totaled $8,866.

I illustrate the loss of retirement income for Ms. Marcin at $22,674 in year 2000 dollars based on her 2000 pension and Social Security retirement income.  The retirement income for Ms. Marcin is grown at the Social Security "Cost of Living Adjustment" (COLA) of 2.6 percent in 2001, 1.40 percent in 2002, 2.10 percent in 2003, 2.70 percent in 2004, 4.10 percent in 2005, 3.30 percent in 2006, 2.30 percent in 2007, 5.80 percent in 2008, zero percent in 2009 and 2010, and 3.60 percent in 2011.

Personal consumption is an offset of the income.  I use a personal consumption offset based on a study by Ruble, Patton, and Nelson, "Patton-Nelson Personal Consumption Tables 2011-12," Journal of Legal Economics, Vol. 21, No. 1, 2014, pp. 41-55, based on data from the U.S. Department of Labor, Bureau of Labor Statistics, "Consumer Expenditure Survey, 2011-12," Washington DC, 2012, which shows personal consumption in this case to be 90.60 percent of income for a single person.

Based on these assumptions, and Hilda Marcin's life expectancy of 89.6 years, my opinion of the loss of retirement income is $24,649 ▶ Table 3.

II. LOSS OF HOUSEHOLD/FAMILY HOUSEKEEPING AND HOUSEHOLD MANAGEMENT SERVICES

Table 4 shows the pecuniary loss of tangible housekeeping chores and household management services for Hilda Marcin.  The number of hours of housekeeping and household management services is 23.37 hours per week based on the average number of hours for single, retired females.  This data is based on the American Time Use Survey published by the Bureau of Labor Statistics, www.bls.gov/tus, usefully summarized in a publication by Expectancy Data, The Dollar Value of A Day: 2017 Dollar Valuation, Shawnee Mission, KS, 2018.

SEG

The hourly value of the housekeeping and household management services is based on the mean hourly earnings of painters, construction and maintenance; childcare workers; waiters and waitresses; cooks, private household; laundry and dry-cleaning workers; maids and housekeeping cleaners; landscaping and groundskeeping workers; bookkeeping, accounting and auditing clerks; and taxi drivers and chauffeurs, which is $15.30 per hour in year 2018 dollars.  This wage data is based on information from the U.S. Bureau of Labor Statistics, Occupational Employment Statistics, May 2018 National Occupational Employment and Wage Statistics found at www.bls.gov/oes.  This figure is corroborated by the average hourly values published by Expectancy Data, The Dollar Value of A Day: 2017 Dollar Valuation, Shawnee Mission, KS, 2018, which is also based on the BLS Occupational Employment Statistics.

I assess such services at their estimated market value which includes a conservative estimate of 50 percent hourly non-wage component reasonably charged by agencies or free-lance individuals who supply such services on a part-time basis, and who are responsible for advertising, hiring and vetting, training, insuring and bonding the part-time service provider, and who are also responsible for pay-related costs such as social security contributions, etc.  If a person were to hire a free-lance employee directly instead of going through an agency, then he or she would have to take on the responsibility for all the non-wage costs that the agency would otherwise incur and then charge for.  The money the person would pay directly in wages would be only a portion of the total costs. The total costs would include those items discussed above that the agency would otherwise incur.

Adding the non-wage component to the hourly wage is consistent with labor market theory and competitive market behavior.  Peer-reviewed economic research supports this theory and shows that the non-wage costs can average up to 300 percent for the wage. See, for example, Cushing, Matthew J. and David I. Rosenbaum, "Valuing Household Services: A New Look at the Replacement Cost Approach," Journal of Legal Economics, Vol 19, No. 1, 2012, pp. 37-60, wherein the authors found that non-wage costs exceed wage costs by 167 percent.  This is more than triple the 50 percent non-wage costs amount I use, discussed above.  Also see Smith, David A., Stan V. Smith, and Stephanie R. Uhl, "Estimating the Value of Family Household Management Services:  Approaches and Markups," Forensic Rehabilitation & Economics, Vol 3, No. 2, 2010, pp. 85-94.  According to this research, the statistical probability is 99 percent that the non-wage costs exceed 250 percent of the wage cost.  The use of only a 50 percent non-wage cost makes my estimate very conservative, and it far more than compensates for two possible variations: variations in the national wage depending on locality, and variations in different types of services actually performed in the household.  Thus even

4

SEG

if one or more of the different types of services are not performed, and even if the services are provided in low wage areas, my use of the low, 50 percent non-wage costs more than compensates for these factors.

According to Merry Maids, a national home cleaning service agency, the charges for their services within the largest 100 Metropolitan Statistical Areas with populations of 500,000 and up range from $40 to $65 per hour, averaging $49 per hour, in 2012. This hourly rate reflects non-wage costs of 250 percent of wages, and after adjusting for market factors, is four times the non-wage costs figure that I use, resulting in an hourly rate of more than double the rate that I use. Thus my use of only a 50 percent addition for non-wage costs is, in fact, very conservative. The hourly value of these services grows at the same rate as the wage growth rate discussed above.

Based on these assumptions, and Hilda Marcin's life expectancy of 89.6 years, my opinion of the loss of the value of housekeeping and household management services is $205,987 ▸ Table 4.

III. LOSS OF VALUE OF LIFE

Table 5 shows the loss of the value of life for Hilda Marcin. Economists have long agreed that life is valued at more than the lost earnings capacity. My estimate of the value of life is based on many economic studies on what we, as a contemporary society, actually pay to preserve the ability to lead a normal life. The studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies. Based on the average value of a statistical life and life expectancy of 89.6 years, my opinion of the loss of the value of life for Hilda Marcin is $1,109,051 ▸ Table 5.

My estimate of the value of life is consistent with estimates published in other studies that examine and review the broad spectrum of economic literature on the value of life. Among these is "The Plausible Range for the Value of Life," Journal of Forensic Economics, Vol. 3, No. 3, Fall 1990, pp. 17-39, by T. R. Miller. This study reviews 67 different estimates of the value of life published by economists in peer-reviewed academic journals. The Miller results, in most instances, show the value of life to range from approximately $1.6 million to $2.9 million dollars in year 1988 after-tax dollars, with a mean of approximately $2.2 million dollars. In "The Value of Life: Estimates with Risks by Occupation and Industry," Economic Inquiry, Vol. 42, No. 1, May 2003, pp. 29-48, Professor W. K. Viscusi estimates the value of life to be approximately $4.7 million dollars in year 2000 dollars. An early seminal paper on the value of life was written by Richard Thaler and Sherwin Rosen, "The Value of Saving a Life: Evidence from the Labor

5

SEG

Market." in N.E. Terlickyj (ed.), Household Production and Consumption. New York: Columbia University Press, 1975, pp. 265-300.  The Meta-Analyses Appendix to this report reviews additional literature suggesting a value of life of approximately $5.4 million in year 2008 dollars.

Because it is generally accepted by economists, the economic methodology for the valuation of life has been found to meet the Daubert and Frye standards by many courts, along with the Rules of Evidence in many states nationwide.  My testimony on the value of life has been accepted in approximately 225 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions.  Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts.  Proof of general acceptance and other standards is found in a discussion of the extensive references to the scientific economic peer-reviewed literature on the value of life listed in the **Value of Life Appendix** to this report.

The underlying, academic, peer-reviewed studies fall into two general groups: (1) consumer behavior and purchases of safety devices; (2) wage risk premiums to workers; in addition, there is a third group of studies consisting of cost-benefit analyses of regulations.  For example, one consumer safety study analyzes the costs of smoke detectors and the lifesaving reduction associated with them.  One wage premium study examines the differential rates of pay for dangerous occupations with a risk of death on the job.  Just as workers receive shift premiums for undesirable work hours, workers also receive a higher rate of pay to accept a increased risk of death on the job.  A study of government regulation examines the lifesaving resulting from the installation of smoke stack scrubbers at high-sulphur, coal-burning power plants.  As a hypothetical example of the methodology, assume that a safety device such as a carbon monoxide detector costs $46 and results in lowering a person's risk of premature death by one chance in 100,000.  The cost per life saved is obtained by dividing $46 by the one in 100,000 probability, yielding $4,600,000.  Overall, based on the peer-reviewed economic literature, I estimate the central tendency of the range of the economic studies to be approximately $4.9 million in year 2019 dollars.

------------------------------------------

Other factors may be weighed to determine if these estimated losses for Hilda Marcin should be adjusted because of special qualities or circumstances that economists do not as yet have a methodology for analysis.

In each set of tables, the estimated losses are calculated from September 11, 2001 through Ms. Marcin's estimated life

6

SEG

expectancy.  These estimates are provided as a tool, an aid, and a guide to assist the evaluation by others.

All opinions expressed in this report are clearly labeled as such.  They are rendered in accordance with generally accepted standards within the field of economics and are expressed to a reasonable degree of economic certainty.  Estimates, assumptions, illustrations and the use of benchmarks, which are not opinions, but which can be viewed as hypothetical in nature, are also clearly disclosed and identified herein.

In my opinion, it is reasonable for experts in the field of economics and finance to rely on the materials and information I reviewed in this case for the formulation of my substantive opinions herein.

If additional information is provided to me, which could alter my opinions, I may incorporate any such information into an update, revision, addendum, or supplement of the opinions expressed in this report.

If you have any questions, please do not hesitate to call me.

Sincerely,

Stan V. Smith, Ph.D.
President

7

SEG

## APPENDIX: HOUSEHOLD SERVICES VALUATION

Courts have long recognized claims for the value of tangible household family services as an element of damages in personal injury and wrongful death cases, as an aspect of the pecuniary loss in such cases.  These services are those that are provided by the injured family member to himself or herself and to other family members, without charge or cost.  Other family members who may receive such services can include spouses, children, parents or siblings; such family members do not necessarily have to reside in the same household to receive such services.

Economists and courts have also long recognized that an appropriate method in valuing such tangible services is to value their estimated market-based costs by examining costs paid in labor markets that provide generally comparable services for. Thus, economists can value the service by looking at market equivalents from which a pecuniary standard can be established. This approach is set forth in the 1913 U.S.Supreme Court Decision, <u>Michigan Central Railroad Company v. Vreeland</u>, 227 U.S. 59 (1913).  So this method is a century old.

The Supreme Court's suggesting in valuing compensable services in the Vreeland decision is a standard that is not rigid, but actually rather general: "[The] pecuniary loss or damage must be one which can be measured by some standard.... Compensation for such loss manifestly does not include damages by way of recompense for grief or wounded feelings."  <u>Michigan Central v. Vreeland</u>.

Examples of lost household services that used to be performed by persons (whether fatally or non-fatally injured) can include physical chores such as mowing the lawn, painting the house, cleaning the windows, doing the laundry, washing and repairing the car, preparing the meals and doing the dishes, among others. For many decades economists have met the Supreme Court's general standard by using labor market equivalents for cooks, laundry workers, gardeners, maids, etc. in valuing the physical chores regarding housekeeping services.

Additionally, economists have recognized that tangible services to family members include services well beyond the physical housekeeping chores.  For example, William G. Jungbauer and Mark J. Odegard, in Maximizing Recovery in FELA Wrongful Death Actions, in <u>Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption</u>, Lawyers & Judges Publishing Co., 1999, pp. 284, indicate that a complete analysis of all services performed by family members includes much, much more than the physical housekeeping chores. Frank D. Tinari, in a peer-reviewed, scientific, economic journal article "Household Services: Toward a More Comprehensive Measure," <u>Journal of Forensic Economics</u>, Vol. 11, No. 3, Fall

8

SEG

1998, pp. 253-265, expresses the same view.  Dr. Tinari has been a tenured Professor at Seton Hall University, and is a former president of the National Association of Forensic Economics. There has been no peer-reviewed critique of this article since it appeared.

Jungbauer and Odegard indicate that a person may have provided services of many other professions such as that of a chauffeur, driving other family members to appointments, or that of a security guard, especially regarding the injury to a male spouse, etc.  Every family member acts as a companion to other family members.  And it is common for family members to act as counselors for one another, typically providing advice and counsel on important personal, family, medical, financial, career or other issues.  The marketplace can and does value such items of loss. If the person cannot provide these services, or does so at a reduced capacity or rate, there is a distinct and definite loss to the other family members.  These losses have a definite and easily measurable pecuniary value.  Vreeland requires only that a "reasonable expectation" of loss of services be proven and that such loss be valued by some standard, presumably a reasonably-based economic standard, to allow recovery.

The economic literature on recovery of loss of services discusses an estimated market-oriented valuation cost method to assess the pecuniary value of the loss of accompaniment services, as well as the value of advice, guidance and counsel services that family members provide to one another, within a broadly defined scope of family services.  See, for example, Frank D. Tinari, "Household Services: Toward a More Comprehensive Measure, " Journal of Forensic Economics, Vol. 11, No. 3, Fall 1998, pp. 253-265.

Finally, according to Chief Justice Robert Wilentz of the Supreme Court of New Jersey, in Green v. Bittner, 85 NJ 1, 1980, pp. 12, accompaniment services, to be compensable, must be that which would have provided services substantially equivalent to those provided by the companions often hired today by the aged or infirm, or substantially equivalent to services provided by nurses or practical nurses; and its value must be confined to what the marketplace would pay a stranger with similar qualifications for performing such services.

In valuing the household services that are provided by family members to one another, beyond the physical housekeeping chores, both the U.S Supreme Court and the New Jersey Supreme Court discuss looking at labor markets for the equivalent value of such services.  This methodology is identical to the traditional approach that economists have been using for over four decades in valuing the physical chores involved in housekeeping services.
5206

9

## SEG

**APPENDIX: VALUE OF LIFE**

The economic methodology for the valuation of life has been found to meet the <u>Daubert</u> and <u>Frye</u> standards by many courts, along with the Rules of Evidence in many states nationwide.  My testimony on the value of life has been accepted in approximately 225 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions.  Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts.  The <u>Daubert</u> standard sets forth four criteria:

1.   Testing of the theory and science

2.   Peer Review

3.   Known or potential rate of error

4.   Generally accepted.

**Testing of the theory and science** has been accomplished over the past four decades, since the 1960s.  Dozens of economists of high renown have published over a hundred articles in high quality, peer-reviewed economic journals measuring the value of life.  The value of life theories are perhaps among the most well-tested in the field of economics, as evidenced by the enormous body of economic scientific literature that has been published in the field and is discussed below.

**Peer Review** of the concepts and methodology have been extraordinarily extensive.  One excellent review of this extensive, peer-reviewed literature can be found in "The Value of Risks to Life and Health," W. K. Viscusi, <u>Journal of Economic Literature</u>, Vol. 31, December 1993, pp. 1912-1946.  A second is "The Value of a Statistical Life: A Critical Review of Market Estimates throughout the World." W. K. Viscusi and J. E. Aldy, <u>Journal of Risk and Uncertainty</u>, Vol. 27, No. 1, November 2002, pp. 5-76.  Additional theoretical and empirical work by Viscusi, a leading researcher in the field, can be found in: "The Value of Life", W. K. Viscusi, John M. Olin Center for Law, Economics, and Business, Harvard Law School, Discussion Paper No. 517, June 2005.  An additional peer-reviewed article discusses the application to forensic economics: "The Plausible Range for the Value of Life," T. R. Miller, <u>Journal of Forensic Economics</u>, Vol. 3, No. 3, Fall 1990, pp. 17-39, which discusses the many dozens of articles published in other peer-reviewed economic journals on this topic.  This concept is discussed in detail in "Willingness to Pay Comes of Age: Will the System Survive?" T. R. Miller, <u>Northwestern University Law Review</u>, Summer 1989, pp. 876-907, and "Hedonic Damages in Personal Injury and Wrongful Death

10

SEG

Litigation," by Stan V. Smith in Gaughan and Thornton, eds., Litigation Economics, Contemporary Studies in Economic and Financial Analysis, Vol. 74, pp. 39-59, JAI Press, Greenwich, CT, 1993. Kenneth Arrow, a Nobel Laureate in economics, discusses this method for valuing life in "Invaluable Goods," Journal of Economic Literature, Vol. 35, No. 2, 1997, pp. 759. See the Meta-Analyses Appendix for an additional review of the literature.

**The known or potential rate of error** is well researched. All of these articles discuss the known or potential rate of error, well within the acceptable standard in the field of economics, generally using a 95% confidence rate for the statistical testing and acceptance of results. There are few areas in the field of economics where the known or potential rate of error has been as well-accepted and subject to more extensive investigation.

**General Acceptance** of the concepts and methodology on the value of life in the field of economics is extensive. This methodology is and has been generally accepted in the field of economics for many years. Indeed, according to the prestigious and highly-regarded research institute, The Rand Corporation, by 1988, the peer-reviewed scientific methods for estimating the value of life were well-accepted: "Most economists would agree that the willingness-to-pay methodology is the most conceptually appropriate criterion for establishing the value of life," Computing Economic loss in Cases of Wrongful Death, King and Smith, Rand Institute for Civil Justice, R-3549-ICJ, 1988.

While first discussed in cutting edge, peer-reviewed economic journals, additional proof of general acceptance is now indicated by the fact that this methodology is now taught in standard economics courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide as well as the fact that it is taught and discussed in widely-accepted textbooks in the field of law and economics: Economics, Sixth Edition, David C. Colander, McGraw-Hill Irwin, Boston, 2006, pp. 463-465; this introductory economics textbook is the third most widely used textbook in college courses nationwide. Hamermesh and Rees's The Economics of Work and Pay, Harper-Collins, 1993, Chapter 13, a standard advanced textbook in labor economics, also discusses the methodology for valuing life. Other textbooks discuss this topic as well. Richard Posner, a Judge and former Chief Judge of the U.S. Court of Appeals for the highly regarded 7th Circuit and Senior Lecturer at the University of Chicago Law School, one of most prolific legal writers in America, details the Value of Life approach in his widely used textbooks: Economic Analysis of Law, 1986, Little Brown & Co., pp. 182-185 and Tort Law, 1982, Little Brown & Co., pp. 120-126.

As further evidence of general acceptance in the field, some surveys (albeit non-scientific) published in the field of

11

SEG

forensic economics show that hundreds of economists nationwide
are now familiar with this methodology and are available to
prepare (and critique) forensic economic value of life estimates.
Indeed, some economists who indicate they will prepare such
analysis for plaintiffs also are willing to critique such
analysis for defendants, as I have done.  That an economist is
willing to critique a report does not indicate that he or she is
opposed to the concept or the methodology, but merely available
to assure that the plaintiff economist has employed proper
techniques.  The fact that there are economists who indicate they
do not prepare estimates of value of life is again no indication
that they oppose the methodology: many claim they are not
familiar with the literature and untrained in this area.  While
some CPAs and others without a degree in economics have opposed
these methods, such professionals do not have the requisite
academic training and are unqualified to make such judgements.
However, as in any field of economics, this area is not without
any dissent.  General acceptance does not mean universal
acceptance.

Additional evidence of general acceptance in the field is found
in the teaching of the concepts regarding the value of life.
Forensic Economics is now taught as a special field in a number
of institutions nationwide.  I taught what is believed to be the
first course ever presented in the field of Forensic Economics at
DePaul University in Spring, 1990.  My own book, Economic/Hedonic
Damages, Anderson, 1990, and supplemental updates thereto, co-
authored with Dr. Michael Brookshire, a Professor of Economics in
West Virginia, has been used as a textbook in at least 5 colleges
and universities nationwide in such courses in economics, and has
a thorough discussion of the methodology. Toppino et. al., in
"Forensic Economics in the Classroom," published in The Earnings
Analyst, Journal of the American Rehabilitation Economics
Association, Vol. 4, 2001, pp. 53-86, indicate that hedonic
damages is one of 15 major topic areas taught in such courses.

Lastly, general acceptance is found by examining publications in
the primary journal in the field of Forensic Economics, which is
the peer-reviewed Journal of Forensic Economics, where there have
been published many articles on the value of life.  Some are
cited above.  Others include: "The Econometric Basis for
Estimates of the Value of Life," W. K. Viscusi, Vol 3, No. 3,
Fall 1990, pp. 61-70; "Hedonic Damages in the Courtroom Setting."
Stan V. Smith, Vol. 3, No. 3, Fall 1990, pp. 41-49; "Issues
Affecting the Calculated Value of Life," E. P. Berla, M. L.
Brookshire and Stan V. Smith, Vol 3, No. 1, 1990, pp. 1-8;
"Hedonic Damages and Personal Injury:  A Conceptual Approach." G.
R. Albrecht, Vol. 5., No. 2, Spring/Summer 1992, pp. 97-104; "The
Application of the Hedonic Damages Concept to Wrongful and
Personal Injury Litigation." G. R. Albrecht, Vol. 7, No. 2,
Spring/Summer 1994, pp. 143-150; and also "A Review of the Monte
Carlo Evidence Concerning Hedonic Value of Life Estimates," R. F.

12

SEG

Gilbert, Vol. 8, No. 2, Spring/Summer 1995, pp. 125-130.
Professor Ike Mathur, while Chairman of the Department of Finance
at Southern Illinois University wrote an article on how the value
of life studies can be used to provide a basis for estimating the
value of life per year in application to litigation.  This
article corroborates my approach: "Estimating Value of Life per
Life Year."  I. Mathur, Journal of Forensic Economics, Vol. 3,
No. 3, 1990, pp. 95-96.  As do many of the authors of
applications of the value of life literature to litigation
economics, Professor Mathur has frequently testified in court,
and courts have admitted his testimony.

It is important to note that this methodology is endorsed and
employed by the U. S. Government as the standard and recommended
approach for use by all U. S. Agencies in valuing life for policy
purposes, as mandated in current and past Presidential Executive
Orders in effect since 1972, and as discussed in "Report to
Congress on the Costs and Benefits of Federal Regulations,"
Office of Management and Budget, 1998, and "Economic Analysis of
Federal Regulations Under Executive Order 12866," Executive
Office of the President, Office of Management and Budget, pp. 1-
37, and "Report to the President on Executive Order No. 12866,"
Regulatory Planning and Review, May 1, 1994, Office of
Information and Regulatory Affairs, Office of Management and
Budget.  Prior presidents signed similar orders as discussed in
"Federal Agency Valuations of Human life," Administrative
Conference of the United States, Report for Recommendation 88-7,
December 1988, pp. 368-408.  926

Smith Economics Group, Ltd. ▪ *312-943-1551*

## SEG

## APPENDIX: META-ANALYSES AND VALUE OF LIFE RESULTS SINCE 2000

Below I list the principal systematic reviews (meta-analyses), since the year 2000, of the value of life literature, and the values of a statistical life that they recommend.  In statistics, a meta-analysis combines the results of several studies that address a set of related research hypotheses.  Meta-analysis increase the statistical power of studies by analyzing a group of studies and provide a more powerful and accurate data analysis than would result from analyzing each study alone.  Based on those reviews, the Summary Table suggests a best estimate. The following table summarizes the studies and their findings.

These statistically based studies place the value between $4.4 and $7.5 million, with $5.9 million in year 2005 dollars representing a conservative yet credible estimate of the average (and range midpoint) of the values of a statistical life published in the studies in year 2005 dollars.  Net of human capital, a credible net value of life based on all these literature reviews to be $4.8 million in year 2005 dollars, or $5.4 million in year 2008 dollars.

The actual value that I use, $4.1 million in year 2008 dollars ($4.9 million in year 2019 dollars) is approximately 24 percent lower than a conservative average estimate based on the credible meta-analyses.  This value was originally based on a review conducted in the late 1980s, averaging the results published by that time.  I have increased that late 1980s value only by inflation over time, despite the fact a review of literature over the years since that time has put obvious upward pressure on the figure that I use.

14

SEG
_____

## VALUE OF STATISTICAL LIFE SUMMARY TABLE

Mean and range of value of statistical life estimates (in 2005 dollars) from the best meta-analyses and systematic reviews since 2000 and characteristics of those reviews.

| Study | Formal Meta-Analysis? | Number of Values | Best Estimate (2005 Dollars) | Range | Context |
|---|---|---|---|---|---|
| Miller 2000 | Yes | 68 estimates | $5.1M | $4.5-$6.2M | US estimate from all |
| Mrozek & Taylor 2002 | Yes | 203 estimates | $4.4M | + or - 35% | Labor market |
| Viscusi & Aldy 2003 | Yes | 49 estimates | $6.5M | $5.1-$9.6M | Labor market, US estimate from all |
| Kochi et al. 2006 | Yes | 234 estimates | $6.0M | + or - 44% | Labor market survey |
| Bellavance 2006 (published in 2009) | Yes | 37 estimates | $7.5M | + or - 19% | Labor market |

Adapted from Ted R. Miller's paper "Hedonic Damages," Journal of Forensic Economics, Vol. 20, No. 2 (October 2008), pp. 137-153.

15

SEG

Miller (2000) started from the Miller 1989 JFE estimates and used statistical methods to adjust for differences between studies. It also added newer studies, primarily ones outside the United States. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression.  Miller, Ted R, "Variations between Countries in Values of Statistical Life", Journal of Transport Economics and Policy, Vol. 34, No. 2 (May 2000), pp. 169-188.

Mrozek and Taylor (2002) searched intensively for studies of the value of life implied by wages paid for risky jobs. They coded all values from each study rather than a most appropriate estimate. A statistical analysis identified what factors accounted for the differences in values between studies. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression.  Mrozek, Janusz R. and Laura O. Taylor, "What Determines the Value of Life?  A Meta-Analysis", Journal of Policy Analysis and Management, Vol. 21, No. 2 (2002), pp. 253-270.

Viscusi and Aldy (2003) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate.  W.K. Viscusi and J.E. Aldy, "The Value of a Statistical Life:  A Critical Review of Market Estimates Throughout the World", Journal of Risk and Uncertainty, Vol. 27, No. 1 (2003), pp. 5-76.

Kochi et al. (2006) searched intensively for studies of the value of life implied by wages and coded all values from each study rather than a most appropriate estimate. They did not filter study quality carefully. The best estimate was derived by statistical methods based on the distribution of the values within and across studies.  Kochi, Ikuho, Bryan Hubbell, and Randall Kramer, "An Empirical Bayes Approach to Combining and Comparing Estimates of the Value of a Statistical Life for Environmental Policy Analysis", Environmental and Resource Economics, Vol. 34 (2006), pp. 385-406.

Bellavance et al. (2009) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate.  Bellavance, Francois, Georges Dionne, and Martin Lebeau, "The Value of a Statistical Life: A Meta-Analysis with a Mixed Effects Regression Model," Journal of Health Economics, Vol. 28, Issue 2, (2009), pp. 444-464.  3A22

16

# SEG

## SUMMARY OF LOSSES FOR HILDA MARCIN

| TABLE | DESCRIPTION | ESTIMATE |
|-------|-------------|----------|
| ***** | ******************************* | ********** |
| | **INCOME** | |
| 3 | LOSS OF RETIREMENT INCOME, NET OF PERSONAL CONSUMPTION | $   24,649 |
| | ----------------------------------------- | |
| | **HOUSEHOLD/FAMILY SERVICES** | |
| 4 | LOSS OF HOUSEHOLD/FAMILY HOUSEKEEPING AND HOME MANAGEMENT SERVICES | $  205,987 |
| | ----------------------------------------- | |
| | **LOSS OF ENJOYMENT OF LIFE** | |
| 5 | LOSS OF VALUE OF LIFE | $1,109,051 |

The information on this Summary of Losses is intended to summarize losses under certain given assumptions.  Please refer to the report and the tables for all the opinions.

17

Table 1

LOSS OF PAST RETIREMENT INCOME

2001 - 2011

| YEAR | AGE | WAGES | CUMULATE |
|------|-----|---------|-----------|
| **** | *** | ******** | ******** |
| 2001 | 80 | $7,075 | $7,075 |
| 2002 | 81 | 23,589 | 30,664 |
| 2003 | 82 | 24,085 | 54,749 |
| 2004 | 83 | 24,735 | 79,484 |
| 2005 | 84 | 25,749 | 105,233 |
| 2006 | 85 | 26,599 | 131,832 |
| 2007 | 86 | 27,210 | 159,042 |
| 2008 | 87 | 28,789 | 187,831 |
| 2009 | 88 | 28,789 | 216,620 |
| 2010 | 89 | 28,789 | 245,409 |
| 2011 | 90 | 16,833 | $262,242 |

HILDA MARCIN $262,242

Table 2

LOSS OF PAST PERSONAL CONSUMPTION
2001 - 2011

| YEAR | AGE | PERSONAL CONSUMPTION | CUMULATE |
|------|-----|----------------------|----------|
| **** | *** | ********** | ********* |
| 2001 | 80 | -$6,410 | -$6,410 |
| 2002 | 81 | -21,372 | -27,782 |
| 2003 | 82 | -21,821 | -49,603 |
| 2004 | 83 | -22,410 | -72,013 |
| 2005 | 84 | -23,329 | -95,342 |
| 2006 | 85 | -24,099 | -119,441 |
| 2007 | 86 | -24,652 | -144,093 |
| 2008 | 87 | -26,083 | -170,176 |
| 2009 | 88 | -26,083 | -196,259 |
| 2010 | 89 | -26,083 | -222,342 |
| 2011 | 90 | -15,251 | -$237,593 |

HILDA MARCIN  -$237,593

SMITH ECONOMICS GROUP, LTD.  312/943-1551

Table 3

ECONOMIC LOSS TO DATE
2001 - 2011

| YEAR | AGE | WAGES | PERSONAL CONSUMPTION | TOTAL | CUMULATE |
|------|-----|-------|--------------------|-------|----------|
| 2001 | 80 | $7,075 | -$6,410 | $665 | $665 |
| 2002 | 81 | 23,589 | -21,372 | 2,217 | 2,882 |
| 2003 | 82 | 24,085 | -21,821 | 2,264 | 5,146 |
| 2004 | 83 | 24,735 | -22,410 | 2,325 | 7,471 |
| 2005 | 84 | 25,749 | -23,329 | 2,420 | 9,891 |
| 2006 | 85 | 26,599 | -24,099 | 2,500 | 12,391 |
| 2007 | 86 | 27,210 | -24,652 | 2,558 | 14,949 |
| 2008 | 87 | 28,789 | -26,083 | 2,706 | 17,655 |
| 2009 | 88 | 28,789 | -26,083 | 2,706 | 20,361 |
| 2010 | 89 | 28,789 | -26,083 | 2,706 | 23,067 |
| 2011 | 90 | 16,833 | -15,251 | 1,582 | $24,649 |

HILDA MARCIN $262,242   -$237,593   $24,649

SMITH ECONOMICS GROUP, LTD.  312/943-1551

Table 4

LOSS OF PAST HOUSEHOLD SERVICES
2001 - 2011

| YEAR | AGE | HOUSEHOLD SERVICES | CUMULATE |
|------|-----|--------------------|----------|
| **** | *** | ********* | ******** |
| 2001 | 80 | $5,320 | $5,320 |
| 2002 | 81 | 17,851 | 23,171 |
| 2003 | 82 | 18,791 | 41,962 |
| 2004 | 83 | 19,620 | 61,582 |
| 2005 | 84 | 20,217 | 81,799 |
| 2006 | 85 | 21,003 | 102,802 |
| 2007 | 86 | 21,861 | 124,663 |
| 2008 | 87 | 22,504 | 147,167 |
| 2009 | 88 | 22,741 | 169,908 |
| 2010 | 89 | 23,020 | 192,928 |
| 2011 | 90 | 13,059 | $205,987 |

HILDA MARCIN   $205,987

Table 5

LOSS OF PAST VALUE OF LIFE OF HILDA MARCIN
2001 - 2011

| YEAR | AGE | LVL | CUMULATE |
|------|-----|-----|----------|
| **** | *** | ********** | ********** |
| 2001 | 80 | $29,936 | $29,936 |
| 2002 | 81 | 100,782 | 130,718 |
| 2003 | 82 | 102,677 | 233,395 |
| 2004 | 83 | 106,024 | 339,419 |
| 2005 | 84 | 109,650 | 449,069 |
| 2006 | 85 | 112,436 | 561,505 |
| 2007 | 86 | 117,023 | 678,528 |
| 2008 | 87 | 117,128 | 795,656 |
| 2009 | 88 | 120,314 | 915,970 |
| 2010 | 89 | 122,119 | 1,038,089 |
| 2011 | 90 | 70,962 | $1,109,051 |

HILDA MARCIN $1,109,051