**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to: *All Actions*

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' INITIAL MOTION TO**
**COMPEL THE FEDERAL BUREAU OF INVESTIGATION**
**TO PRODUCE DOCUMENTS FROM ITS INVESTIGATION OF**
**SAUDI GOVERNMENT OFFICIALS' ASSISTANCE TO 9/11 HIJACKERS**

---

## Table of Contents

Page(s)

Table of Contents ................................................................................................. i

Table of Authorities .............................................................................................. ii

I.     Introduction ................................................................................................ 2

II.    Procedural Background ............................................................................. 4

III.   Governing Legal Standard ....................................................................... 7

IV.    Argument ...................................................................................................... 8

    A.    Documents Concerning FBI Investigations of Four Saudi
            MOIA Officials Who Worked with Both Thumairy and
            Bayoumi in California in 1999-2000 are Relevant and Should
            Be Produced ......................................................................................... 8

    B.    The FBI's Continued Withholding of Key Information from
            the 2012 Summary Report is Improper. ..........................................15

          1.    The State Secrets Privilege Has Not Been Asserted. ..........18

          2.    The FBI Has Not Invoked the Law Enforcement
               Privilege, Which Must Yield to Plaintiffs' Superior
               Interests in Disclosure in Any Case. ....................................20

          3.    The Confidential Source and Confidential Foreign
               Government Source Privilege Redactions Have Not
               Been Invoked. ...........................................................................22

          4.    There is No Basis for Withholding Information Based
               on Personal Privacy Consideration. ......................................22

          5.    The National Security Act Has Not Been Invoked and
               Does Not Establish a Privilege. .............................................23

    C.    The Court Should Order the FBI to Immediately Produce an
            Unredacted Copy of the 2012 FBI Summary Report For
            Review by the Court *in camera* ......................................................25

V.     Conclusion ...................................................................................................25

# Table of Authorities

**Page(s)**

## Cases

*Albit v. CIA,* 848 F.3d 305 (4th Cir. 2017) ........................................................................ 18

*Allison v. Clos-ette Too, L.L.C.,* No. 14-cv-1618 (LAK) (JCF), 2015 WL 136102
(S.D.N.Y. Jan. 9, 2015) .................................................................................................. 15

*City of New York v. FedEx Ground,* No. 13 Civ. 9173 (ER), 2017 U.S. Dist. LEXIS
151797 (S.D.N.Y. Sept. 18, 2017) ................................................................................ 16

*Clavir v. United States,* 84 F.R.D. 612 (S.D.N.Y. 1979) ...................................................... 23

*Davis v. United States DOJ,* No. 00-2457 (CKK), 2003 U.S. Dist. LEXIS 27467 (D.D.C.
March 21, 2003) ............................................................................................................ 22

*Dinler v. City of New York,* 607 F.3d 923 (2d Cir. 2010) ............................................... 20, 21

*Doe v. CIA,* 576 F.3d 95 (2d Cir. 2009) ........................................................................ 18, 19

*Ellsberg v. Mitchell,* 709 F.2d 51 (D.C. Cir. 1983) ............................................................. 18

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.,* 284 F.R.D. 132 (S.D.N.Y. 2012)  15

*Freeman v. Seligson,* 405 F.2d 1326 (D.C. Cir. 1967) .......................................................... 24

*Friedman v. Bache Halsey,* 738 F.2d 1336 (D.C. Cir. 1983) .................................................. 24

*In re Grand Jury Subpoena dated August 9, 2000,* 218 F. Supp. 2d 544 (S.D.N.Y. 2002) .. 18

*In Re Sealed Case,* 856 F.2d 268 (D.C. Cir. 1988) ............................................................... 20

*In re Terrorist Attacks on September 11, 2001,* 298 F. Supp. 3d 631 (S.D.N.Y. 2018) .... 4, 5,
10, 13

*In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659 (2d Cir. 2013) ............. 4, 10, 14

*Kelly v. City of San Jose,* 114 F.R.D. 653 (N.D. Cal. 1987) ................................................. 16

*Kronisch v. United States,* No. 83 Civ. 2458 (KMW), 1994 U.S. Dist. LEXIS 13591
(S.D.N.Y. Sept. 27, 1994) ............................................................................................. 24

*Lexalt v. McClatchy,* 809 F.2d 885 (D.C. Cir. 1987) ...................................................... 23, 24

*Luv N' Care, Ltd. v. Eazy-PZ, LLC,* 18-MC-491 (JPO), 2018 WL 6067231 (S.D.N.Y. Nov. 20, 2018) ................................................................................................ 12

*Mackey v. IDT Energy, Inc.,* No. 19 Misc. 29 (PAE), 2019 WL 2004280 (S.D.N.Y. May 7, 2019) ................................................................................................ 12

*Micillo v. Liddle & Robinson, LLP,* No. 15-CV-6141 (JMF), 2016 U.S. Dist. LEXIS 67247 (S.D.N.Y. May 23, 2016) ........................................................... 16

*Mohamed v. Jeppesen Dataplan, Inc.,* 614 F.3d 1070 (9th Cir. 2010) .................................... 18

*National Lawyers Guild v. Attorney Gen.,* 96 F.R.D. 390 (S.D.N.Y. 1982) ....................... 19

*United States v Painting,* No. 06 Civ. 12994 (RJS)(KNF), 2008 U.S. Dist. LEXIS 49171 (June 25, 2008 S.D.N.Y.) .................................................................. 16

*United States v. Reynolds,* 345 U.S. 1 (1953) .......................................................................... 19

*United States v. Wey,* 252 F. Supp. 3d 237 (S.D.N.Y. 2017) ............................................... 20

*VR Optics, LLC v. Peloton Interactive, Inc.,* No. 16-CV-6392 (JPO), 2019 WL 2121690 (S.D.N.Y. May 15, 2019) ................................................................. 12

*Zurkerbraun v. General Dynamics,* 935 F.2d 544 (2d Cir. 1991) ......................................... 18

**Statutes**

5 U.S.C. § 552a ......................................................................................................................... 23

5 U.S.C. § 552a(b)(11) ............................................................................................................. 23

50 U.S.C. § 3024(i)(1) ....................................................................................................... 17, 24

**Other Authorities**

*Policies and Procedures Governing Invocation of State Secrets Privilege,* Office of the Attorney General (September 23, 2009), available at https://www.justice.gov/archive/opa/documents/state-secret-privileges.pdf ....... 19

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................................... 7

Fed. R. Civ. P. 26(b)(1) .................................................................................................. 8, 12, 13

During the earliest phases of its 9/11 investigation, the FBI identified two Saudi government officials, Omar al Bayoumi and Fahad al Thumairy, as suspects in providing support for the hijackers and arranging for others to assist them.  In 2007, the FBI's investigation of the Saudi government terror support group intensified when a 9/11 case "subfile" was opened.  It ultimately uncovered new evidence, including proof of the direct criminal involvement of additional Saudi government officials, including a more senior individual who "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."

To date, the United States government has maintained a virtual stranglehold on much of the evidence from its case subfile relating to Bayoumi, Thumairy, and other Saudi government officials.  The present motion seeks to pull back the veil of secrecy that our government has placed around the evidence of Saudi government complicity in the September 11th attacks in two critical respects.

First, the motion seeks to compel the FBI to produce documents concerning four Saudi government officials investigated by the FBI because of their work with both Bayoumi and Thumairy in California, and their operational roles in arranging support for the 9/11 hijackers.

Second, plaintiffs seek an order compelling disclosure of redacted information in the 2012 Summary Report of the FBI subfile investigation, including the name of the subject(s) who instructed Bayoumi and Thumairy.

Plaintiffs have found no legal precedent that supports the withholding of similar evidence from crime victims under any remotely comparable circumstances.  Nearly two decades after the relevant events, there can no longer be any justifiable reason for the United States government to continue to redact the names and evidence regarding the Saudi government officials who directed and participated in the criminal scheme with Thumairy and Bayoumi to provide substantial assistance to the 9/11 hijackers, and which led directly to the 9/11 Attacks.

Plaintiffs urge the government to fulfill its moral and legal obligations to the 9/11 community and the American public in general, and to release this critical evidence now. Otherwise, this Court must enter an appropriate order.

Plaintiffs respectfully move to compel the FBI to:

1.     Conduct searches of the FBI's files and databases for documents, information, and evidence relating to Abdullah Ali Saleh al-Jaithen a/k/a Abdullah A.S. al-Jraithen, Adel Mohamed al-Sadhan, Mutaeb Abdelaziz al-Sudairy, and Omar Abdi Mohamed a/k/a Omar al-Khateeb, and produce responsive documents identified through those searches to plaintiffs; and

2.     Produce a version of the 2012 Summary Report of the FBI's subfile investigation, removing the redactions the 9/11 plaintiffs have challenged as improper. Plaintiffs further request that an unredacted version of the 2012 Summary Report be served on the Court by the DOJ for an *in camera* inspection while this motion is pending.

In support of their motion, plaintiffs offer the arguments below and the accompanying declarations of Sean P. Carter, Andrew J. Maloney, Bassem Youssef and Catherine Hunt.[1]

## I.     Introduction

Well over a year ago, plaintiffs served a subpoena and *Touhy* request on the Federal Bureau of Investigation ("FBI"), seeking evidence critical to plaintiffs' claims against the Kingdom of Saudi Arabia and other defendants. The subpoena includes ten demands for documents and evidence concerning FBI investigations of Saudi government employees Omar al Bayoumi and Fahad al Thumairy, both of whom are (according to the FBI's own documents) "known to have provided substantial assistance" to September 11th hijackers Nawaf al Hazmi and Khalid al Mihdhar; their associates and superiors who conspired with them to provide that assistance; and a special "subfile" investigation the FBI opened in 2007 that has determined that Bayoumi and Thumairy were "tasked" to assist the hijackers by a person whose name the FBI continues to withhold. For over a year, plaintiffs repeatedly have made clear to the Department of Justice ("DOJ") and FBI that plaintiffs'

---

[1] These declarations are hereinafter referenced as Carter Declaration, Maloney Declaration, Youssef Declaration, and Hunt Supplemental Declaration. The Hunt and Youssef Declarations are Exhibits 1 and 2 to the Maloney Declaration.

demand for an unredacted version of the 2012 Summary Report of the "subfile" investigation, which identifies the person who tasked Bayoumi and Thumairy to assist Hazmi and Mihdhar, should be treated as a highest priority.

Rather than simply complying with the subpoena by conducting good faith searches for responsive documents and assigning appropriate priority to the review of the 2012 Summary Report, the FBI has insisted on pursuing an alternative approach of its own formulation, which has now proven grossly deficient. Under the FBI's unilateral approach, it has insisted on proceeding with a search (1) limited to the 2007 "subfile;" (2) for a set of "core documents;" (3) that, in the FBI's view, are relevant to the inquiry discussed in pages 18 through 23 of this Court's March 28, 2018 Decision authorizing discovery as to Saudi Arabia. More than a year later, this approach has yielded 364 pages in total—less than a page per day—even though the FBI unquestionably is in possession of several thousand pages of directly relevant evidence. Had the FBI simply reviewed the subfile records in accordance with processing rates commonly imposed in FOIA litigation, it could have completed a review and production of the entire subfile by now. And even though the FBI represented to the Court in October of last year that the 2012 Summary Report was being "processed" as part of the second tranche due before the end of 2018, the FBI still "has not made a final determination" with respect to that four page document.

Amidst growing concerns about the adequacy of the FBI's searches and approach, plaintiffs demanded that the FBI specifically advise whether its searches encompassed several key individuals and topics, and that the FBI provide a certain timeline for completion of its review of the 2012 Summary Report. In several cases, the FBI's response again failed to provide answers to several of plaintiffs' straightforward questions. However, the FBI did—for the first time—advise that it did not intend to conduct searches for four individuals directly linked to Bayoumi and Thumairy by the FBI's own investigations (Abdullah Ali Saleh al-Jaithen a/k/a Abdullah A.S. al-Jraithen, Adel Mohamed al-

3

Sadhan, Mutaeb Abdelaziz al-Sudairy, and Omar Abdi Mohamed a/k/a Omar Al Khateeb). In addition, the FBI again refused to provide a timeline for completion of its review of the 2012 Summary Report.

While the broader deficiencies in the FBI's methodology for searching for and producing responsive documents are likely to require further motion practice if not cured by forthcoming productions, the disputes as to the FBI's refusal to conduct searches for the four individuals and to finalize its position with regard to the redactions in the 2012 Summary Report require the Court's intervention at this time.

## II. Procedural Background

Plaintiffs in this MDL are pursuing claims against defendants who are alleged to have aided and abetted, provided material support for, or enabled the September 11th attacks. Of particular relevance to the present motion are plaintiffs' claims against defendants Dallah Avco and the Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia").

In 2013, the Second Circuit remanded claims against Dallah Avco, for discovery relating to Dallah Avco's relationship with Omar al Bayoumi. In particular, the Second Circuit directed discovery to determine whether Dallah Avco provided "cover employment" or a "ghost job" to Bayoumi to conceal his true role as a covert agent for the Saudi government, and whether Bayoumi coordinated support for Hazmi and Mihdhar in that covert role. *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 679 (2d Cir. 2013).

On March 28, 2018, this Court issued a Decision authorizing jurisdictional discovery as to the Kingdom itself. *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018). The March 28 Decision found that plaintiffs had offered plausible facts that Bayoumi and Thumairy had provided substantial assistance to the 9/11 hijackers, working in concert with one another and others. *Id.* at 648-50. The Court's March 28 Decision further found that plaintiffs had presented credible

facts indicting that a superior in the Saudi government had specifically "tasked" Bayoumi and Thumairy to assist the hijackers. *Id.* at 650-51. The Court concluded that plaintiffs' allegations warranted discovery concerning the true nature of the roles Bayoumi and Thumairy were performing for the Saudi government; their roles in providing and coordinating support for the hijackers; the identities of others (including additional Saudi government employees) who may been associated with the support network for the hijackers; and the involvement of more senior Saudi officials in tasking Bayoumi and Thumairy to support the hijackers. *Id.* at 651. In so ruling, the Court cited extensively to allegations based on (partially) declassified FBI documents, including most especially the 2012 "Summary Report" of the "subfile" investigation. *Id.* at 648-51.

Immediately following the Court's Decision, plaintiffs issued a subpoena and *Touhy* request to the FBI for relevant records, both of which were formally served on the FBI on April 10, 2018. As discussed above, the FBI has refused to comply with the subpoena's actual category demands, and declared that it would instead conduct what it has called a "core documents" search solely within the subfile. In an effort to steer that ambiguous and apparently subjective process to some productive end, the 9/11 plaintiffs provided the FBI with an expert affidavit on September 26, 2018 identifying several Saudi officials who were known to have been linked to Bayoumi and Thumairy by the FBI's own investigations. The affidavit included a (non-exhaustive) list of documents within the subfile that are of critical relevance to the jurisdictional inquiries as to the Kingdom and Dallah Avco.

On October 12, 2018, the DOJ advised this Court that the FBI intended to produce documents, and described how that process was expected to proceed. The DOJ indicated that review and production of the so-called "core documents" would be completed in three tranches: a first tranche consisting principally of witness statements and interview summaries; a second tranche comprised of documents of a more analytical nature; and a third tranche consisting primarily of phone and banking records. The DOJ advised that the FBI was working to complete the entire process by

early 2019. The DOJ further told the Court that the recent communications with the PECs (referring

to the September 28, 2018 affidavit and related conversations) had been helpful to the FBI and DOJ

"in understanding and gaining insight into the types of documents that [the plaintiffs] are looking for"

and that "[a]s a result of those more recent discussions, we are searching for some additional records."

In addition, the DOJ also made clear that the FBI understood that the unredacted 2012 Summary

Report was a document that "we know the plaintiffs are interested in" and represented that "we know

that document is in the second tranche" due before the end of 2018.

Initially, the content of the first tranche provided grounds for cautious optimism, as it

included 106 pages of previously unreleased documents reflecting how ███████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████  The second tranche contained 122 pages of additional

██████   ███████████████████████████

███████████. However, the second tranche did not include the 2012 Summary Report, or any

statement from the FBI concerning its status. When plaintiffs' counsel inquired what had happened,

representatives of the DOJ indicated that the FBI had worked in earnest to complete the review

of the 2012 Summary Report for the second tranche, but had fallen short of that goal. At that time,

the DOJ advised that the review would be completed for the third tranche. When the FBI thereafter

produced its third tranche on March 15, 2019, it again did not include the 2012 Summary Report and

consisted of a meager 28 pages in total, 9 of which previously had been publicly released in

substantially similar form over twelve years ago, and 4 cover pages without substantive information.

Following the third tranche production, the PECs raised concerns with the DOJ during a call

on March 20, 2019, and in a follow-up letter sent on March 25, 2019. The March 25, 2019 letter

explained the PECs' concerns related to the third tranche and FBI's response to the subpoena more

generally, and requested that the FBI provide concrete answers to a number of long outstanding

questions regarding the FBI's process, searches, and the content of its further productions. The PECs' included a chart to make it easy for the FBI to provide that information.

The DOJ responded on April 2, 2019. Although the response did not address many of the basic questions presented in the PECs' March 25 letter, it did provide clarity on the two issues that are the subject of this motion. First, the FBI advised, for the first time and despite prior indications to the contrary, that it was not willing to conduct searches for four Saudi government officials directly implicated in the FBI's 9/11 investigations of Bayoumi and Thumiary. Second, the FBI made clear that it remained unwilling to commit to any deadline for completing its review of the 2012 Summary Report. Those refusals necessitated the present motion to compel.

The FBI produced its Fourth Tranche on April 6, 2019, which included an "interim" version of the 2012 Report. Hunt Supplemental Declaration, Exhibit 7 at FBI 361-364. That interim version—which the DOJ states is still under review—continues to withhold the name of the subject(s) who tasked Thumairy and Bayoumi to assist the hijackers and other key information.[2] Pursuant to this Court's May 16, 2019 Scheduling Order, plaintiffs sent a letter to the DOJ on May 22, 2019 identifying the redactions in the interim version of the 2012 Summary Report that they are challenging through this motion. *See* Exhibit 1, Carter Declaration at Exhibit 10.

## III.   Governing Legal Standard

The FBI's obligations in responding to plaintiffs' subpoena are governed by Fed. R. Civ. P. 26. Pursuant to Rule 26, plaintiffs are entitled to discovery concerning "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the party's access to

---

[2] While the name of the more senior Saudi official remains concealed, the interim 2012 Report did release ███████████████████████████████████████████████████████████████████████████████████████████████████████████████"

7

relevant information, the party's resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).   The FBI has not objected to the discovery at issue in the present motion on proportionality, undue burden, or expense grounds.   Rather, it has resisted discovery as to the four Saudi government officials implicated in its subfile investigation solely on relevancy grounds, and is continuing to withhold information in the 2012 Summary Report presumably based on the possibility that it may invoke as yet unasserted claims that one or more privileges applies.   Those are the only issues before the Court.

## IV.    Argument

### A.    Documents Concerning FBI Investigations of Four Saudi MOIA Officials Who Worked with Both Thumairy and Bayoumi in California in 1999-2000 are Relevant and Should Be Produced.

The facts are set forth in the accompanying Supplemental Declaration of Catherine Hunt, who found that the FBI investigated the four Ministry of Islamic Affairs ("MOIA") officials concerning their work for Saudi Arabia in California, their involvement in supporting the 9/11 plot, and their relationships and interactions with Thumairy and Bayoumi during the critical time period just before and during the hijackers' stay in California.   These facts are summarized as follows.

**Abdullah al-Jaithen a/k/a Abdullah A.S. al-Jraithen**, was a MOIA official in Riyadh, Saudi Arabia senior to Thumairy. Hunt Supplemental Declaration at 4.   Jaithen had no known Saudi government work relationship with Bayoumi.   Nevertheless, he flew to the United States in December 1999, and met in Los Angeles with Bayoumi, who travelled there from his workplace and home in San Diego.   *Id.* at 4-5.   On December 20, 1999, just over three weeks before the hijackers' arrival, Jaithen and Bayoumi checked in together at the same Travelodge Motel that ███████████████████ ███████████████████████████████ nearby the King Fahad Mosque.   *Id.*   These circumstances demonstrate that Jaithen met not only with Bayoumi but also with his MOIA subordinate, Thumairy.

*Id.* at 6. ███████████████████████████████████

████████████████████████ ██ ████ █████████████
████████████ and the two men made numerous cell and landline calls to each other

between December 1999 and 2000. *Id.* at 5.  Plaintiffs' investigation also found that Jaithen had

extremist views: in 2003, he publically advocated Jihad against the United States. *Id.* at 7.

      **Adel Mohamed al-Sadhan** and **Mutaeb Abdelaziz al-Sudairy** were ████████████

who arrived in the U.S. in 1999 and were assigned by the Kingdom to work alongside Bayoumi at the

El Cajon mosque outside San Diego area, where Bayoumi served as the "manager." *Id.* ██

█████████████████████████████████████████████

████████████████████████████████ *Id.* at 8. ████████

████████████████████████████ is a MOIA office number in

Riyadh. *Id.*  During its 9/11 subfile investigation, the FBI found that Bayoumi not only assisted the

hijackers—but also al-Sadhan and al-Sudairy. *Id.* at 7. Plaintiffs' own investigation determined

that Bayoumi made arrangements in 2000 for the two men to stay at the same five-room boarding

house in San Diego where the hijackers lived. *Id.* at 8. ████████████████████

███████████████████████████████████████████

████████████████ *Id.*  Other discovery in this litigation shows that in 1999 al-Sudairy

represented on a bank application that he was working at the Kingdom's Washington Embassy as an

"Administrative Officer," the same title held by Thumairy at the Kingdom's Los Angeles Consulate.

*Id.* at 9. ████████████████████████████████████

███████████████████████████████████████████

█████████ ██

      **Omar Abdi Mohamed a/k/a Omar al- Khateeb** worked for Saudi Arabia as a MOIA

Propagator in San Diego from 1995 through 2004. *Id.*  He was instructed to report to Thumairy, and

also received direction from another MOIA official and Saudi Embassy diplomat, Khalid al-Sowailem.

*Id.* ████████████████████████████████████████████████████████████

████████ *Id.* at 10. ████████████████████████████████ the Western Somali Relief Agency, the

charity founded by Abdi Mohamed where he served as President and handled all operations. *Id.* Abdi

Mohamed used the Somali charity as cover to launder money for other charities associated with al

Qaeda. *Id.* Abdi Mohamed was a subject of investigations by the FBI, INS and the 9/11 Commission.

*Id.* Court documents in Mohamed's immigration fraud case state that the government decided not to

pursue further criminal prosecutions of Mohamed "for diplomatic reasons," based on his work for

Saudi Arabia. *Id.*

The Second Circuit ruled that plaintiffs were entitled to jurisdictional discovery of Dallah Avco

regarding the "cover employment" it provided to Bayoumi in the United States and its knowledge

concerning Bayoumi's actual work. *In re Terrorist Attacks of September 11, 2001*, 714 F.3d 659, 679 (2d

Cir. 2013). Judge Daniels ordered jurisdictional discovery of the Kingdom of Saudi Arabia concerning

Bayoumi, Thumairy, their Saudi government superiors, and their subagents, and the support network

they established for the 9/11 hijackers in California in 2000. *In re Terrorist Attacks of September 11, 2001*,

298 F. Supp. 3d at 648-51. The approved discovery encompassed whether Bayoumi and Thumairy

acted as agents of Saudi Arabia, the scope of their agency, and the more senior Kingdom official(s)

who tasked them to assist the hijackers. *Id.* at 651.

The FBI discovery concerning the four MOIA officials is directly relevant to the plaintiffs'

jurisdictional claims against defendants Kingdom of Saudi Arabia and Dallah Avco, and properly seeks

information about:

- the support network for the hijackers established by Saudi government officials in California in 2000;

- the nature and extent of Thumairy and Bayoumi's work, agency, and authority for the Kingdom;

- the work relationships of Thumairy and Bayoumi with other Kingdom officials, including each other;

- the stated purposes of Saudi Arabia for the entry of Jaithen, Sadhan, Sudairy and Abdi Mohamed into the United States;

- the work that Bayoumi was actually performing during his "secondment" for Dallah Avco, the cover provided for Bayoumi by Dallah Avco, and its knowledge of his actual work;

- the credibility not only of Thumairy and Bayoumi, but of the Kingdom itself, given the numerous denials of any work relationship between Thumairy and Bayoumi, Thumairy's claim that he did not know Bayoumi, the repeated claims that Bayoumi was a "student," and the Kingdom's answers to interrogatories denying that Thumairy or Bayoumi had any substantive work relationships with other Saudi government officials.

The requested FBI discovery will help answer a series of highly relevant questions, including:

- What Saudi government business caused senior MOIA official Jaithen to travel to Los Angeles to meet up with Bayoumi and check into the Travelodge motel with him on December 20, 1999?

- At that time, did Jaithen give instructions to Bayoumi and/or Thumairy to prepare for the arrival of the al Qaeda terrorists?

- What individuals participated in the chain of phone calls that occurred after the motel meeting, other than Bayoumi, Thumairy, and al-Qaeda supporter Anwar Aulaqi?  For instance, did Jaithen, Sadhan, and/or Sudairy participate in those calls?

- What work assignment did the Kingdom give to MOIA Propagators Sadhan and Sudairy in California, and what was the assistance that Bayoumi provided to the two men, as found by the FBI?

- How—and why—did Sadhan and Sudairy end up living in the same boarding house as the hijackers?

- Did Thumairy or other MOIA officials give directions to Abdi Mohamed?

- Why did Bayoumi have contacts with Abdi Mohamed?

- For what purposes did Bayoumi ███████████████████████████████████ ████████████████████████████?

- Under what circumstances did MOIA Propagators reporting to Thumairy end up working with Bayoumi?

11

- Was Bayoumi working as a covert agent for the Saudi government during the period of his secondment to Dallah Avco?

- What was the actual work given by the Kingdom to Bayoumi and Thumairy—and in particular, were they provided assignments by Saudi intelligence?

The discovery is also directly relevant to the Kingdom's defenses and issues of credibility. The Kingdom claims that neither Thumairy nor Bayoumi had any day-to-day work responsibilities for the Kingdom; that Thumairy had only "nominal supervision," reported to no one, and did not supervise any government employees; and, that in 2000 Bayoumi was a 43 year old "student" pursuing his education in California and was "seconded" to work at Dallah Avco. Thumairy denied even knowing Bayoumi, let alone that his subordinates were in regular contact with him.

All of these claims are belied by the proof regarding the assignments of the four MOIA officers in California and their work relationships with Bayoumi and Thumairy. Non-party discovery may be pursued solely for the purpose of impeachment, regardless of whether the discovery is ultimately admissible in evidence. *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2019 WL 2121690, at *7 (S.D.N.Y. May 15, 2019) (approves non-party discovery of third party witness "to obtain evidence that may not be admissible but could be used for impeachment of witness"); *Luv N' Care, Ltd. v. Eazy-PZ, LLC*, 18-MC-491 (JPO), 2018 WL 6067231, at *2 (S.D.N.Y. Nov. 20, 2018) (subpoena of non-party to obtain evidence of defendant CEO's "prior acts of perjury would surely be relevant to his credibility, regardless of the ultimate admissibility of the specific evidence…").

As discussed above, the singular question on this motion is simply whether the requested discovery is relevant to any claim or defense. Fed. R. Civ. P. 26(b)(1); *Mackey v. IDT Energy, Inc.*, No. 19 Misc. 29 (PAE), 2019 WL 2004280, at *3 (S.D.N.Y. May 7, 2019) ("The relevance standard of Fed. R. Civ. P. 26(b)(1) applies to discovery of non-parties."). For the reasons discussed above, it most certainly is, and that conclusion properly ends the inquiry in plaintiffs' favor.

The only reason cited by the FBI to deny production is that its hands are tied by this Court's November 29, 2018 Order, ECF 4261, which denied the PECs' supplemental document requests against the Kingdom regarding Jaithen, Sadhan and Sudairy; and, Judge Daniels' March 28, 2018 Order, which denied discovery regarding allegations of Abdi Mohamed's role in a charity money laundering scheme for al Qaeda. 298 F. Supp. 3d at 653-55; Exhibit 1, Carter Declaration at Exhibit 9, April 2, 2019 letter of DOJ at 3, 4 n.3.

The FBI's reliance on those rulings is misplaced for several reasons. To begin with, there is no proper reason to deny plaintiffs access to relevant documents from the FBI that bear directly on the jurisdictional issues defined by the Second Circuit and Judge Daniels. The prior Orders were based on motions that did not include any information either from the FBI Tranches, which

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Any burden on the FBI to find and produce the documents involving these four individuals is small. The records can be located by the FBI within seconds (if they have not been found already). Plaintiffs have nowhere else to obtain the information, and the FBI's investigation offers a unique view into the work of MOIA officials in California at the critical time, the actual employment duties of Thumairy and Bayoumi, and the agency and scope issues at the heart of the jurisdictional inquiry.

Indeed, any narrowing of discovery by the Court as to Saudi Arabia may have been predicated on unique considerations arising when a foreign state claiming sovereign immunity is subjected to jurisdictional discovery. Such considerations do not extend to the FBI, whose obligations are governed by Rule 26(b)(1).

Moreover, the FBI's reliance on the Court's discovery orders as to Saudi Arabia ignores the relevance of the discovery ordered by the Second Circuit on plaintiffs' separate claims against Dallah Avco concerning: (1) whether Bayoumi was in fact serving in a covert or undisclosed agent for the Saudi government during the period of his secondment to Dallah Avco; and (2) whether the "cover" provided by Dallah Avco was used by or enabled Bayoumi to provide aid to the hijackers. 714 F.3d at 679. Evidence that Bayoumi had extensive dealings with numerous Saudi officials is highly probative of that issue, particularly where those dealings involve secretive and covert meetings carried out under circumstances reflecting the use of espionage tradecraft to deliver support to the hijackers.

In addition, while Plaintiffs' separate claim regarding Abdi Mohamed and money laundering was dismissed by Judge Daniels, discovery regarding Abdi Mohamed's work in California, and his work relationships with his direct supervisor Thumairy and Bayoumi, is relevant to the jurisdictional questions of agency and scope of employment, particularly because Saudi Arabia continues to deny that Thumairy and Bayoumi had any substantive work connections with other Saudi government officials.

The FBI offers a fallback argument that it has identified "core records" collected in response to Plaintiffs' requests, which may (or may not) include documents referencing the four MOIA officials. The FBI, however, has not identified any such core records to Plaintiffs, and it does not appear that such records have been produced to date. Most if not all of the documents in the first four tranches were items specifically identified and requested by Plaintiffs during the meet and confer process. The FBI has offered no proof regarding the methods employed in its search and what was actually located. Plaintiffs are entitled to receive the relevant documents they requested, not documents selected by the FBI.

We know, for instance, that the FBI case subfile investigated Sadhan and Sudairy because of evidence that Bayoumi provided unspecified "assistance" to them. The evidence collected by the FBI

about Sadhan and Sudairy will not only help Plaintiffs understand the support network for the hijackers, but the nature and scope of Bayoumi's job, and why he provided assistance. That evidence will also bear on Thumairy's work, ███████████████████████████████

Likewise, Jaithen was investigated by the FBI because he checked into a motel with Bayoumi several weeks before the hijackers arrived. Plaintiffs are entitled to know about the investigation of Jaithen, how he came to meet Bayoumi in Los Angeles, whether Thumairy was also involved, what happened after their meeting, and what those facts demonstrate about the actual work of Bayoumi and Thumairy. The same is true of Abdi Mohamed, ███████████████████████████

███████████████████████████████

## B.     The FBI's Continued Withholding of Key Information from the 2012 Summary Report is Improper.

Plaintiffs' subpoena includes a specific demand for production of an unredacted copy of the 2012 Summary Report. There is absolutely no dispute that the 2012 Summary Report is relevant to plaintiffs' claims and to the jurisdictional inquiry discussed in the Court's March 28 Decision. Indeed, the report includes the name of the individual(s) the FBI has determined was responsible for tasking Bayoumi and Thumairy to assist the hijackers, one of the most critical issues for which the Court authorized the discovery that has now been ongoing for a year. Given the undisputed and paramount relevance of the 2012 Summary Report, it has been incumbent on the FBI since the subpoena was served to either comply with the subpoena by producing the document, or come forward with evidence substantiating some proper legal grounds for withholding it. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.,* 284 F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery.") (citation omitted); *Allison v. Clos-ette Too, L.L.C.,* No. 14-cv-1618 (LAK) (JCF), 2015 WL 136102, at *8 (S.D.N.Y. Jan. 9, 2015).

More than a year later, the FBI has done neither. In fact, even now the FBI says that it "has not made a final determination" with regard to the 2012 Summary Report, and is uncertain whether it

intends to assert any privileges with respect to any of the information it continues to withhold. Particularly given the singular importance of the information at issue in a case of historical significance, and the complexity of these proceedings generally, the FBI's staggering delays in relation to the 2012 Summary Report are entirely unacceptable and should not be countenanced by this Court.[3]  Because plaintiffs have established that the 2012 Summary Report is relevant, and the FBI has made no effort to properly invoke or substantiate any claim of privilege with respect to the withheld information, the Court should direct the FBI to immediately produce a version of the report removing all of the redactions that have been challenged by plaintiffs.

Although it has not done so to this point, plaintiffs anticipate that the FBI may belatedly seek to invoke certain privileges in response to the present motion, further delaying and complicating the evidence-gathering process the Court is working diligently to oversee.  In this regard, the FBI produced an "interim" version of the 2012 Summary Report on April 6, 2018, which included new "deletion codes" for the numerous redactions that remain.  The legend for the cited deletion codes describes them as follows:  1) Code A – information that is properly classified and, if disclosed, will cause damage to the national security or U.S. foreign relations; 2) Code B – information that would reveal the identity of an informant; 3) Code C – confidential foreign government information; 3) Code G – information which, if disclosed, would impede or impair a current or future investigation; 4) Code H – information which, if disclosed, would impair investigative technique, method or procedure of

---

[3] The FBI's use of redaction codes amount to nothing more than *ipse dixit* assertions of counsel that fail to satisfy the government's burden of providing a "clear and specific evidentiary showing as to the harm that would be caused by disclosure." *City of New York v. FedEx Ground*, No. 13 Civ. 9173 (ER), 2017 U.S. Dist. LEXIS 151797, at *10 (S.D.N.Y. Sept. 18, 2017) (collecting cases wherein government either waived privileges or had to supplement evidentiary support for privileges); *Micillo v. Liddle & Robinson, LLP*, No. 15-CV-6141 (JMF), 2016 U.S. Dist. LEXIS 67247 (S.D.N.Y. May 23, 2016) (city agency could not invoke law enforcement privilege based on conclusory and *ipse dixit* assertions).  Moreover, the required affidavits and other evidentiary support must presented promptly before a motion to compel because the government's delay prejudices both the party seeking disclosure and the court. *United States v Painting*, No. 06 Civ. 12994 (RJS)(KNF), 2008 U.S. Dist. LEXIS 49171, at * 3-4 (June 25, 2008 S.D.N.Y.); *Kelly v. City of San Jose*, 114 F.R.D. 653, 670 (N.D. Cal. 1987)(timely provision of evidentiary support for government privileges "is important to the court as well because in our adversary system the court looks to the opposing parties to help it probe and measure the strength of [the parties] submissions").

the FBI; 5) Code P-1 – information which, if disclosed, would be unwarranted invasion of personal privacy; 6) Code S – personal identifying information of law enforcement personnel; and 7) Code J-1 – redactions based on the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024(i)(1).

As the FBI and DOJ know well, merely referencing deletion codes that describe potential grounds for classifying or withholding information in other contexts provides no legal basis for withholding information in response to plaintiffs' subpoena. To the contrary, in order to legally justify the withholding of relevant information, the FBI must present competent evidence and meet its burden to establish an applicable privilege justifying non-disclosure. Again, the FBI has made no attempt to do so to date, and has not even said one way or another whether it actually intends to invoke any privileges with respect to the withheld information. As a result, there are no substantive arguments for plaintiffs to respond to at this time.

With that said, plaintiffs understand certain of the deletion codes to have been included in an attempt to preserve the FBI's right to later invoke the state secrets and law enforcement privileges, or to claim that the withholding of information is somehow justified by the National Security Act or unspecified "personal privacy" considerations. While it obviously is impossible for plaintiffs to respond to privileges that have not yet been asserted, plaintiffs nonetheless briefly overview below the standards governing the potential privileges suggested by the FBI's deletion codes, to familiarize the Court at the outset with the significant hurdles the FBI would face if it were to decide to raise those purported privileges. In the context of that discussion, plaintiffs address how the deletion codes presented with the interim version of the 2012 Summary Report differ from the limited exemptions the FBI claimed in the prior *Broward Bulldog* FOIA litigation involving the same document. Those

discrepancies and other factors discussed in the accompanying Declaration of Bassem Youssef strongly indicate that the FBI cannot establish valid grounds for withholding the subject information.[4]

### 1.   The State Secrets Privilege Has Not Been Asserted.

The 2012 Summary Report contains 31 redactions referencing deletion Code A, which according to the key the FBI provided relate to allegedly classified information, the disclosure of which will harm national security and/or conduct of foreign relations of the United States. The Code A redactions presumably were added by the FBI in an attempt to preserve its right to belatedly invoke the state secrets privilege, pursuant to which the executive branch may seek to protect against the disclosure of information that will cause serious harm to the "'nation's defense capabilities, []  intelligence-gathering methods or capabilities," or "diplomatic relations with foreign governments.'" *In re Grand Jury Subpoena dated August 9, 2000,* 218 F. Supp. 2d 544, 559 (S.D.N.Y. 2002) (*quoting Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C. Cir. 1983).

Should the FBI belatedly seek to invoke the state secrets privilege, it will need to do much more than merely intoning that the information is classified. Indeed, "an executive decision to classify information is insufficient to establish the privilege" and "the privilege may not be used to shield any material that is not strictly necessary to prevent injury to national security." *Abbit v. CIA,* 848 F.3d 305, 312 n. 5. (4th Cir. 2017) (*quoting Mohamed v. Jeppesen Dataplan, Inc.,* 614 F.3d 1070, 1082 (9th Cir. 2010). Thus, any attempt to claim the state secrets privilege would require the FBI to show not only that the information is properly classified, but also that "'there is a reasonable danger that disclosure

---

[4] Because the FBI has not properly invoked or substantiated any of the privileges referenced in its deletion codes, plaintiffs are under no obligation to address the substantive merits of any such claims at this time. Most obviously, plaintiffs cannot address arguments that have not yet been presented. The Court's Scheduling Order requires the FBI to submit any affidavits or declarations in support of privileges claimed in relation to the 2012 Summary Report with its opposition, and contemplates that plaintiffs will respond to such submissions in their reply. Nonetheless, plaintiffs preview here some of the apparent substantive shortcomings in the FBI's privilege assertions to help orient the Court at the outset of the briefing.

of the particular facts in litigation will jeopardize national security.'" *Doe v. CIA,* 576 F.3d 95,103 (2d Cir. 2009) (*quoting Zurkerbraun v. General Dynamics,* 935 F.2d 544, 546-547 (2d Cir. 1991).

As a prerequisite to any attempt to claim the state secret privilege, the FBI would be required to file a formal affidavit by the head of the department having control over the requested information, based on personal knowledge and consideration, specifying why producing the requested information will cause significant harm to national security. *United States v. Reynolds*, 345 U.S. 1 (1953); *Doe v. CIA,* 576 F.3d 95, 104 (2d Cir. 2009). The strict procedural safeguard of a *Reynolds* affidavit is not a mere technical requirement. *National Lawyers Guild v. Attorney Gen.*, 96 F.R.D. 390, 396 (S.D.N.Y. 1982). Rather, it ensures that the privilege is claimed only by an official in the executive branch with sufficient authority and responsibility to permit a court to determine that the privilege was prudently invoked. *Id.* Second, after the executive branch files the required affidavit from the head of the relevant agency, the court must conduct an independent assessment to determine if the privilege has been properly invoked under the circumstances, without disclosing the privileged information. *Reynolds*, 345 U.S. at 7; *Doe*, 576 F.3d at 104. The court's analysis commonly entails reviewing the classified information *in camera.*

For at least a year after the subpoena was served, it does not appear that the FBI initiated any efforts to obtain a *Reynolds* affidavit in support of any of the redactions, and as of the hearing on May 13, 2019, had not even commenced the DOJ's internal process for reviewing any proposed assertion of the state secrets privilege[5] with respect to the 2012 Summary Report. Likewise, the FBI did not raise the state secrets privilege in the *Broward Bulldog* FOIA litigation pending in the Eleventh Circuit

---

[5] *See Policies and Procedures Governing Invocation of State Secrets Privilege,* Office of the Attorney General (September 23, 2009), available at https://www.justice.gov/archive/opa/documents/state-secret-privileges.pdf. Pursuant to the DOJ's own policy, any request that the DOJ defend an assertion of the state secrets privilege requires, *inter alia,* reviews by the Assistant Attorney General for the department responsible for the matter, a state secrets review committee comprised of senior DOJ officials, the Deputy Attorney General, and the Attorney General, who must make the ultimate decision based on personal consideration.

concerning the same 2012 Summary Report. *See* Youssef Declaration at 13.   Under those circumstances, the Court should view with considerable skepticism any belated attempt to invoke the state secrets privilege at this stage.

### 2.   The FBI Has Not Invoked the Law Enforcement Privilege, Which Must Yield to Plaintiffs' Superior Interests in Disclosure in Any Case.

The FBI similarly has failed to present any affidavit invoking the law enforcement privilege (referenced in deletion codes G and H), and even if it were to do so now and could establish that the privilege applies, plaintiffs' compelling interests in disclosure far outweigh any purported law enforcement interests the privilege is intended to protect.  This conclusion is particularly evident here, given the protections afforded by the strict protective order governing documents produced by the FBI.  For these reasons, it is not surprising that the FBI did not cite the FOIA law enforcement exemption with respect to the withheld name of the individual who tasked Bayoumi and Thumairy to aid the hijackers in the *Broward Bulldog* FOIA litigation, in direct conflict with the law enforcement deletion codes it has added for those redactions here.

If for some reason the FBI did decide to raise the law enforcement privilege in response to this motion to compel, nearly two decades after the relevant events in California, it would (as with state secrets) need to submit an affidavit from the head of the relevant department to invoke the privilege. *United States v. Wey,* 252 F. Supp. 3d 237, 250-251 (S.D.N.Y. 2017) (citing *In Re Sealed Case,* 856 F.2d 268, 271 (D.C. Cir. 1988)).  Upon receipt of the affidavit, the court would undertake a four part analysis to evaluate the claimed privilege. *Dinler v. City of New York,* 607 F.3d 923, 947 (2d Cir. 2010).  The party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents in question." *Id.* at 944 (adopting the holding in *In re Sealed Case,* 856 F.2d 268, 271-72 (D.C. Cir. 1988).[6]

---

[6] To meet this burden, the party asserting the law enforcement privilege must show that the documents contain information that the law enforcement privilege is intended to protect, by establishing that the documents contain information which,

Even where the government meets its burden to establish that the privilege applies, the party seeking the withheld information may rebut any presumption of non-disclosure by showing that: (1) the suit is non-frivolous and brought in good faith; (2) the information sought is not available from other sources; and (3) the information is important enough that the party has a compelling need for the information. *Id.* Where the party seeking the withheld information makes that showing, the court then weighs the public interest in nondisclosure against the needs of the party seeking disclosure, to decide if disclosure is warranted. *Id.* Finally, the court can tailor a protective order, like the one already in effect here, to minimize the effects of disclosure. *Id.*

Here again, the FBI has done nothing to invoke the law enforcement privilege, much less to establish that it would justify the withholding of information in this litigation. And even if it were to attempt to do so, the existing record shows that the disclosures plaintiffs seek would not implicate current law enforcement interests in any significant respect. As a preliminary matter, at the urging of the FBI, plaintiffs agreed to and the Court entered a stringent attorneys' eyes only protective order governing FBI documents. Thus, the FBI already has negotiated for and secured the protection it deemed necessary to protect law enforcement interests.

Further, it is unclear whether the subfile investigation remains as "active" as the FBI has suggested. As discussed in the declaration of former FBI Unit Chief Youssef, our government decided not to proceed with criminal charges against the Saudi government officials responsible for assisting the 9/11 hijackers. Further, the FBI already has disclosed many details concerning the subfile investigation and identified several of its principal subjects publicly, and conspicuously did not invoke the FOIA based law enforcement exemptions in regards to the withholding of the name of the third subject of the investigation in the *Broward Bulldog* FOIA litigation. For these and other reasons, it is

---

if disclosed, would imperil law enforcement techniques and procedures; undermine the confidentiality of sources; endanger witnesses or law enforcement personal; violate the privacy rights of individuals; or seriously impair the ability of law enforcement to conduct investigations. *Dinler*, 607 F.3d at 948.

dubious to suggest that current law enforcement efforts would be jeopardized by disclosure of the information in the 2012 Summary Report pursuant to the protective order, and plaintiffs' compelling interests in disclosure would outweigh any such interests if they did exist in any case.[7]

### 3. The Confidential Source and Confidential Foreign Government Source Privilege Redactions Have Not Been Invoked.

The 2012 Summary Report includes one Code B "confidential source" redaction [FBI 00013623, paragraph 4] and nine Code C confidential "foreign government" information redactions. *See* FBI 000361, paragraph 2; FBI000362, paragraph 4; FBI000363, paragraph 3. These deletion codes appear to be intended to preserve the FBI's right to assert other subsets of the law enforcement privilege, which require the FBI to establish that the information was provided under an express or an implied agreement of confidentiality. *Davis v. United States DOJ,* No. 00-2457 (CKK), 2003 U.S. Dist. LEXIS 27467, at * 33 (D.D.C. March 21, 2003). The FBI has not presented any evidentiary proffer to invoke either of these purported privileges, and they can be addressed only when and if it does so.

### 4. There is No Basis for Withholding Information Based on Personal Privacy Consideration.

The interim version of the 2012 Summary Report also includes several P-1 deletion codes, which the FBI has indicated relate to "information, the disclosure of which would be an unwarranted invasion of personal privacy." Because the FBI has (here again) presented this claim in wholly conclusory fashion, plaintiffs are not entirely clear whether the P-1 deletion codes are intended to

---

[7] Of note, the documents the FBI has produced to date do not reflect ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████ ███████████████████████████████████████████████████████
████████████████████████████████████ █████████████████████████████
█████████████████████████████████████████████ ███████████████████
████████████████████████████████████████████████████████████████
██████████ █████████████ ████████████████████████████████████████
██████████████

suggest that the information in issue may be privileged. The description provided for that code mirrors the law enforcement privacy exemptions of FOIA, but FOIA exemptions do not create a privilege to withhold information in response to a subpoena.

To the extent the P-1 deletion codes are intended to preserve the FBI's right to assert the Privacy Act 5 U.S.C. § 552a as grounds for withholding information from the 2012 Summary Report, any withholding on that grounds would be equally baseless. Specifically, the Court already has issued a Privacy Act protective order at the request of the FBI. That order moots any concerns the FBI could otherwise raise about the improper use of any information it discloses. ECF No. 4255. Even more fundamentally, the Privacy Act does not establish a statutory privilege that could be invoked to withhold information in this proceeding. *Lexalt v. McClatchy*, 809 F.2d 885 (D.C. Cir. 1987); *Clavir v. United States*, 84 F.R.D. 612 (S.D.N.Y. 1979). Indeed, the Privacy Act expressly authorizes a court to order the disclosure of information protected by the Act. *See* 5 U.S.C. § 552a(b)(11) (authorizing disclosure of information covered by the Privacy Act "pursuant to the order of a court of competent jurisdiction"). Because the Privacy Act is not a statutory privilege it "cannot be used to block the normal course of court proceedings, including court ordered discovery." *Clavir*, 84 F.R.D. at 614.

While plaintiffs do not believe the FBI could make any proffer that would provide a legal justification for withholding information in the 2012 Summary Report on personal privacy grounds, the fact of the matter is that the Court already has entered a stringent Privacy Act protective order that protects any personal privacy interests that may exist.

### 5. The National Security Act Has Not Been Invoked and Does Not Establish a Privilege.

Finally, the FBI has included deletion codes referencing the National Security Act, Section 102(A)(i)(1) (the "NSA"). That provision provides, in relevant part, as follows:

> (1) The Director of National Intelligence shall protect intelligence sources and methods from *unauthorized* disclosure.

23

50 U.S.C. § 3024(i)(1) (emphasis supplied).

Again in this case, the FBI has provided no affidavit to present any claim of privilege pursuant to the National Security Act, or to show that the referenced provisions of the National Security Act apply to any of the information in issue. As a result, no claim of "privilege" based on that statute has been validly presented. And even assuming the FBI were to come forward with an affidavit asserting that withheld information fell within the Section 102(A)(i)(1), plaintiffs respectfully submit that that provision establishes only a withholding statute governing the general treatment of intelligence sources and methods, and not a statutory privilege providing grounds for withholding such information in response to a subpoena.[8]

Even beyond those issues, the 2012 Summary Report already publically releases the details regarding the involvement of Thumairy, Bayoumi and the (redacted) subject(s), along with the details of the "substantial assistance" they provided to the 9/11 hijackers in California. Further, the events occurred nearly 20 years ago. Under those circumstances, there is no credible argument that disclosing the name of the criminal subject(s) named in the 2012 Summary Report would imperil a national security source or method. As Former Unit Chief Youssef explains, "[t]here can be no reasonable justification for the FBI's continued redaction of the name of the subject(s) involved in that plot, and the related evidence regarding the subject(s)." Youssef Declaration at 15.

---

[8] A statutory ban on the disclosure of information to the public does not necessarily create a privilege that shields that information from civil discovery. *Freeman v. Seligson*, 405 F.2d 1326 (D.C. Cir. 1967); *Friedman v. Bache Halsey*, 738 F.2d 1336 (D.C. Cir. 1983); *Laxalt v. McClatchy*, 809 F.2d at 889. "'Where Congress has thought it necessary to protect against court use of records it has expressly so provided by specific language.'" *Laxalt*, at 1333-1334 (quoting *Freeman*, 405 F.2d at 1351.). No such specific language exists in the NSA and while plaintiffs concede that the NSA does shield sources and methods from disclosure to the public under FOIA, Congress has not barred such disclosure in civil discovery through the NSA. Instead, the FBI must establish that the information it seeks to protect is privileged under the state secrets privilege. *But see Kronisch v. United States*, No. 83 Civ. 2458 (KMW), 1994 U.S. Dist. LEXIS 13591 (S.D.N.Y. Sept. 27, 1994) (unreported decision holding that the NSA does create a statutory privilege but without conducting statutory interpretation analysis to determine if Congress intended to create a privilege).

C.     **The Court Should Order the FBI to Immediately Produce an Unredacted Copy of the 2012 FBI Summary Report for Review by the Court** *in camera*.

Plaintiffs suggest that to avoid any further delay in these proceedings that the Court order the FBI to immediately produce the 2012 Summary Report to the Court for inspection *in camera*. No matter what privileges, if any, are ultimately asserted by the FBI, this Court will have the opportunity to view the Report. Further, the FBI already has provided unredacted copies of the Report to the district court and Eleventh Circuit in the *Broward Bulldog* FOIA litigation. There is no reason to delay or defer that process while the FBI continues its long delayed deliberations.

## V.     Conclusion

Plaintiffs' motion to compel the FBI should be granted. The Court should order the FBI to produce discovery regarding the four MOIA officials who worked with Thumairy and Bayoumi in California in 1999-2000, namely Abdullah Ali Saleh al-Jaithen, Adel Mohamed al-Sadhan, Mutaeb Abdelaziz al-Sudairy, and Omar Abdi Mohamed.

The Court should also order the FBI to produce an unredacted copy of the 2012 FBI Report. Since the briefing of that issue will be delayed until the FBI makes its final determination regarding the privileges it intends to raise, the Court should immediately order the FBI to produce an unredacted version of the 2012 FBI Summary to the Court for an *in camera* review now.

Respectfully submitted,

COZEN O'CONNOR

By: */s/ Sean P. Carter*
   SEAN P. CARTER
   COZEN O'CONNOR
   One Liberty Place
   1650 Market Street, Suite 2800
   Philadelphia, Pennsylvania 19103
   Tel.: (215) 665-2105
   Email: scarter@cozen.com

*For the Plaintiffs' Exec. Committees*

KREINDLER & KREINDLER LLP

By:
   STEVEN R. POUNIAN
   ANDREW J. MALONEY
   KREINDLER & KREINDLER LLP
   750 Third Avenue
   New York, New York 10017
   Tel.: 212-687-8181
   Email: spounian@kreindler.com

*For the Plaintiffs' Exec. Committees*

MOTLEY RICE LLC

By: */s/ Robert T. Haefele*
   ROBERT T. HAEFELE
   MOTLEY RICE LLC
   28 Bridgeside Boulevard
   Mount Pleasant, SC 29465
   Tel.: (843) 216-9184
   Email: rhaefele@motleyrice.com

*For the Plaintiffs' Exec. Committees*