UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
...............................................................x

In re Terrorist Attacks of September 11, 2001          03 MDL 1570(GBD)(SN)

...............................................................x

**MEMORANDUM OF LAW OF NON-PARTY THE FEDERAL BUREAU OF
INVESTIGATION IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL THE
FBI TO CONDUCT ADDITIONAL SEARCHES FOR AND PROCESS RECORDS
REGARDING FOUR INDIVIDUALS AND TO PRODUCE THE 2012 FBI SUMMARY
REPORT FOR *IN CAMERA* INSPECTION**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2709
*Attorney for Federal Bureau of Investigation*

SARAH S. NORMAND
JEANNETTE A. VARGAS
Assistant U.S. Attorneys
   *—Of Counsel—*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT ...................................................................................................................11

    I.    The Court Should Review the FBI's Discovery Response Under the APA's
        Arbitrary and Capricious Standard of Review ......................................................11

    II.   The FBI Did Not Act Arbitrarily, Capriciously or Otherwise Unlawfully in
        Declining to Conduct Additional Searches for and Process Records Concerning
        Four Individuals Who the Court Has Ruled Are Beyond the Limited Scope of
        Jurisdictional Discovery .......................................................................................13

        A.    The Court Should Not Grant Third-Party Discovery of the FBI That Is
               Broader Than the Scope of Jurisdictional Discovery Authorized Against the
               Parties ......................................................................................................14

        B.    The PECs' Proposed Order Is Unduly Burdensome and Seeks Information
               That Is Classified and Privileged ................................................................18

        C.    Portions of the Declaration of Bassem Youssef Should Be Stricken or
               Disregarded ..............................................................................................22

    III.  The PECs' Request for *In Camera* Review of the 2012 FBI Summary Report Is
        Premature and Unwarranted ..................................................................................23

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

*Cases*

*Abraham v. Town of Huntington*, 2:17-cv-3616 (ADS)(SIL), 2018 WL 2304779
(E.D.N.Y. May 21, 2018)............................................................................................... 22, 23

*Agility Public Warehousing Corp. K.S.C.P. v. U.S. Dep't of Defense*, 246 F. Supp. 3d 34
(D.D.C. 2017)....................................................................................................................... 17

*Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW), 2011 WL 781198
(S.D.N.Y. Mar. 4, 2011)...................................................................................................... 17

*Broward Bulldog, Inc. v. United States Dep't of Justice*, No. 16-61289, 2017 WL 746410
(S.D. Fla. Feb. 27, 2017)................................................................................................. 4, 19

*Butler v. Suria*, 17 Civ. 3077 (KPF), 2018 WL 4278338 (S.D.N.Y. June 27, 2018) .................. 17

*COMSAT Corp. v. National Sci. Found.*, 190 F.3d 269 (4th Cir. 1999)................................ 12, 21

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ........................................................ 16

*Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646 (9th Cir. 1980) ...................................... 16

*Doe v. CIA*, 576 F.3d 95 (2d Cir. 2009)........................................................................................ 24

*Edwards v. U.S. Dep't of Justice*, 43 F.3d 312 (7th Cir. 1994) ..................................................... 21

*EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir. 2012) .................................................. 18

*Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774 (9th Cir. 1994) ................................. 17

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 11 Civ. 6189 (DLC), 2014 WL
12791752 (S.D.N.Y. Jan. 8, 2014)..................................................................................... 15

*Goldstein v. FDIC.*, 494 B.R. 82 (D.D.C. 2013) ......................................................................... 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC), 2006 WL 2642192
(S.D.N.Y. Sept. 13, 2006) ................................................................................................. 15

*In re S.E.C. ex rel. Glotzer*, 374 F.3d 184 (2d Cir. 2004)....................................................... 11, 12

*In re Sept. 11 Litig.*, 621 F. Supp. 2d 131 (S.D.N.Y. 2009) ........................................................ 18

*In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018)........ passim

*LaFleur v. Whitman*, 300 F.3d 256 (2d Cir. 2002) ....................................................................... 12

*Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011) ........................................................................... 23

*Moore v. Armour Pharm. Co.*, 927 F.2d 1194 (11th Cir. 1991) ............................................ 12, 17

*Moran v. Pfizer*, No. 99 Civ. 9969 (WHP)(HBP), 2000 WL 1099884
  (S.D.N.Y. Aug. 4, 2000) ........................................................................................................ 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................. 12

*Reynolds v. United States*, 345 U.S. 1 (1953) ............................................................................. 24

*United States v. Mitchell*, 463 U.S. 206 (1983) ......................................................................... 11

*United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446 (S.D.N.Y. 2018) ...................... 23

*U.S. EPA v. General Elec. Co.*, 197 F.3d 592 (2d Cir. 1999) ...................................................... 11

*U.S. EPA v. General Elec. Co.*, 212 F.3d 689 (2d Cir. 2000) ...................................................... 11

*Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991) ...................................... 24


**Statutes**

Administrative Procedure Act, 5 U.S.C. § 701 *et seq* .................................................................. 11

5 U.S.C. § 702 ............................................................................................................................ 11

5 U.S.C. § 706(2)(A) .................................................................................................................. 12


**Rules, Regulations and Executive Orders**

Fed. R. Civ. P. 26(b)(1) ................................................................................................................ 4

Fed. R. Civ. P. 45(d)(3)(A)(iv) ..................................................................................................... 4

28 C.F.R. §§ 16.21-16.29 ............................................................................................................. 2

28 C.F.R. § 16.26(a)(1) ........................................................................................................... 3, 14

28 C.F.R. § 16.26(a)(2) ................................................................................................................. 4

28 C.F.R. § 16.26(b) ..................................................................................................................... 4

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ................................................. 6, 7, 20

***Other Authorities***

7–34 Moore's Federal Practice—Civil § 34.02 (2013) ............................................................. 15

## Preliminary Statement

The Court should deny the PECs' motion to compel the Federal Bureau of Investigation

("FBI"), a non-party, to conduct broad searches for and process and produce "all documents,

information, and evidence" concerning four individuals—Abdullah Ali Saleh al-Jaithen

("Jaithen"), Adel Mohamed al-Sadhan ("Sadhan"), Mutaeb Abdelaziz al-Sudairy ("Sudairy"), and

Omar Abdi Mohamed ("Mohamed")—all of whom this Court has previously ruled are beyond the

scope of the "limited and targeted jurisdictional discovery" authorized by the Court.  The FBI has

gathered and continues to process a group of "core" documents that may be relevant to the specific

jurisdictional inquiry identified by the Court:  "whether and to what extent Thumairy, Bayoumi,

and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide

assistance to Hazmi, Mihdhar, and other 9/11 hijackers." *In re Terrorist Attacks on September 11,*

*2001*, 298 F. Supp. 3d 631, 651 (S.D.N.Y. 2018).  To be clear, if any of the four individuals

identified in the PECs' motion are mentioned in the core documents, that information will either

be produced to the PECs or withheld on grounds of privilege or other protection that the FBI will

substantiate at the appropriate time.  The narrow question raised by the PECs' motion, however,

is whether the FBI should be required to respond to broad additional discovery requests concerning

the four individuals that are untethered to the jurisdictional inquiry identified by the Court.  The

answer is no.  This Court has already held that the Kingdom of Saudi Arabia (the "Kingdom" or

"KSA")—"the party in the best position to shed light on that inquiry," *id.*—need not produce

documents regarding the four individuals.  The PECs should not be permitted to circumvent that

ruling by seeking the same discovery from the FBI.  This is particularly true given the

extraordinary burdens associated with the PECs' document requests, which ask the FBI to search

for, process and produce classified and privileged records concerning an ongoing counterterrorism investigation.

The Court should also deny the PECs' premature request for *in camera* inspection of the 2012 FBI Summary Report, which is still undergoing review by the FBI.  Pursuant to the Court-ordered schedule, the FBI will complete processing of the report by July 12, 2019, and will assert all applicable privileges (potentially including the state secrets privilege) and oppose the PECs' motion to compel production of information withheld from the report by August 30, 2019.  The PECs offer no legal basis for the Court to conduct *in camera* review of a classified and privileged document before any dispute is ripe for review.  To the contrary, the Second Circuit has instructed that *in camera* review may not be warranted when the state secrets privilege is asserted, and that a decision as to whether *in camera* review is warranted should only follow an assessment of the adequacy of the government's declarations.

## BACKGROUND

On April 10, 2018, the PECs served on the FBI a subpoena and a request pursuant to the Department of Justice's so-called "Touhy" regulations, 28 C.F.R. §§ 16.21-16.29, for production of a large volume of investigatory and other records.  *See* Declaration of Sarah S. Normand, dated June 21, 2019 ("Normand Decl."), Exh. A.  The Touhy request and subpoena sought ten categories of records from the FBI, including:

- Any and all records (including all PENTTBOM records)[1] referring or relating to Omar al-Bayoumi, Fahad al Thumairy, Mohdhar Abdullah, Omar Abdi Mohamed, Khalid Sowailem, the King Fahd Mosque, and the Western Somali Relief Agency;

- Any and all records referring or relating to the work and investigation of the PENTTBOM "subfile" team;[2]

---

[1] "PENTTBOM" refers to the FBI's investigation of the attacks of September 11, 2001, among the largest investigations in FBI history.  Declaration of Duel W. Valentine ("Valentine Decl.") ¶ 4.

[2] As described in The 9/11 Review Commission Report, the subfile investigation is an investigation into individuals known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-

- The 2012 FBI Summary Report; and

- Any and all records referring or relating to any person(s) referenced in the 2012 FBI Summary Report as "subjects" of the investigation described in that report.

Normand Decl., Exh. A; *see also id.*, Exh. B at 1-2 & nn.1-3.

On May 2, 2018, the government provided an interim response to the Touhy request and objections to the subpoena. Normand Decl., Exh. B. The interim response explained that under the Touhy regulations, Department of Justice officials and attorneys must consider several factors in determining whether disclosure is appropriate in response to a discovery demand. *Id.* at 3. The government must consider whether disclosure is appropriate under the rules of procedure governing the case, *see* 28 C.F.R. § 16.26(a)(1), including the Court's orders limiting the scope of jurisdictional discovery. The government explained that, in authorizing "limited and targeted jurisdictional discovery" against the Kingdom on the discrete issue of "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and the 9/11 hijackers," it is not clear that Judge Daniels intended to authorize third-party discovery at all, particularly given the Court's recognition that KSA is "the party in the best position to shed light on that issue." Normand Decl., Exh. B at 3-4 (quoting *In re Terrorist Attacks*, 298 F. Supp. 3d at 651). The government noted that, if the Court permits third-party discovery, the broad categories of records sought in the Touhy request and subpoena substantially exceed the limited scope of jurisdictional discovery authorized by the Court. *Id.* at 4-6. The FBI thus objected to the Touhy request and subpoena to the extent they seek records beyond the scope of jurisdictional discovery as defined by the Court. *Id.* at 6.

---

Mihdhar, Valentine Decl. ¶ 4 & n.1, not an "investigation of Saudi government officials' assistance to 9/11 hijackers," as the title of the PECs' motion ("Pl. Br.") suggests.

The FBI also objected to the Touhy request and subpoena because of the extraordinary, disproportionate, and undue burden they would place on the FBI, both in their exceptionally broad scope and insofar as they seek production of classified and privileged records as well as the entire investigatory file relating to the FBI's subfile investigation. *See id.* at 6-11; Valentine Decl. ¶ 4 (subfile investigation is an ongoing counterterrorism investigation involving over 1,000 "serials," not including attachments); Fed. R. Civ. P. 26(b)(1) (discovery must be proportionate to the needs of the case); Fed. R. Civ. P. 45(d)(3)(A)(iv) (court must quash or modify a subpoena that imposes an undue burden). The Touhy regulations require Department of Justice officials to consider whether a discovery demand seeks disclosure of privileged information, and bar officials from authorizing disclosure of classified information, information that would reveal confidential sources, and other categories of protected information. *See also* 28 C.F.R. §§ 16.26(a)(2), 16.26(b). Yet the PECs' Touhy request and subpoena on their face seek voluminous classified and privileged information. For example, the PECs seek information in the 2012 FBI Summary Report concerning the subfile investigation that another district court has already ruled (in a FOIA case) is currently and properly classified, protected from disclosure by statute, and/or protected by the deliberative process or law enforcement privileges. Normand Decl., Exh. B at 8-10; *see Broward Bulldog, Inc. v. United States Dep't of Justice*, No. 16-61289, 2017 WL 746410, at *16-18 (S.D. Fla. Feb. 27, 2017), *appeal pending*, Nos. 17-13787, 14-264 (11th Cir.). In light of these objections, the government asked the PECs to narrow significantly the scope and breadth of the request and subpoena. *Id.* at 11-12.

The PECs declined to do so. *See* Normand Decl., Exh. C. In a May 25, 2018 letter, the PECs refused to narrow in any respect six of the ten categories of the Touhy request and subpoena, and thus adhered to their broad request for "any and all records" concerning the FBI's entire subfile

investigation and any subjects of that investigation (*see* categories 4-6). *Id.*, Exh. A (table) at 2-3. And as to the other categories, the PECs' proposals did little to narrow the extraordinary scope of records sought in the subpoena, and nothing at all to address the government's concern that the subpoena on its face sought a wide swath of classified and privileged records. For example, the PECs proposed to exclude the Western Somali Relief Agency, but only if the FBI agreed to search for and produce "any and all records" regarding the subfile investigation. *Id.*, Exh. A at 1-2.

In light of the PECs' unwillingness to significantly narrow their Touhy request and subpoena, the government attempted to craft a response that would balance, on the one hand, the parties' and the Court's interest in obtaining relevant, non-privileged records relating to the specific issues on which the Court had permitted limited jurisdictional discovery to proceed, and on the other hand, the FBI's interests in narrowing the scope of materials to a manageable universe and maintaining the confidentiality of classified and privileged information pertaining to its ongoing counterterrorism investigation. To that end, the FBI's subject matter experts identified a core group of the documents potentially relevant to the issues as to which the court has allowed jurisdictional discovery. Valentine Decl. ¶ 6. The FBI explained its approach to the Court and the PECs by letter dated September 13, 2018, and at the status conference on October 12, 2018. Normand Decl., Exh. D & Exh. E at 6-12. The government made clear that the core documents being gathered and reviewed by the FBI were limited to the issues on which the Court had granted "limited and targeted jurisdictional discovery," namely, "whether and to what extent Thumairy and Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." *In re Terrorist Attacks*, 298 F. Supp. 3d at 651; *see* Normand Decl., Exh. D at 2 (explaining that "the FBI has identified a subset of records that may be relevant to the allegations on which the Court has permitted limited

jurisdictional discovery"), Exh. E at 7.  This was consistent with the government's position from the beginning that any discovery of the FBI should be narrowly tailored, and no broader than the limited jurisdictional discovery authorized against the Kingdom itself.

With respect to those core records, a team of personnel from the FBI's Counterterrorism Division, New York Field Office, Office of the General Counsel, and the U.S. Attorney's Office, assisted by members of the Classification Unit in the FBI's Information Management Unit, have been conducting a line-by-line review of each document to determine whether information in the documents is and remains properly classified or is subject to the law enforcement privilege or any other privilege.  Valentine Decl. ¶¶ 7-8.  In addition to evaluating whether information remains currently and properly classified and/or privileged, the FBI has agreed to conduct a declassification review, which considers among other things whether information that is currently and properly classified should nevertheless be declassified in the FBI's discretion under section 3.1 of Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).  Valentine Decl. ¶¶ 8, 15.  That section provides:

> It is presumed that information that continues to meet classification requirements under this order requires continued protection.  In some exceptional cases, however, the need to protect such information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified.  When such questions arise, they shall be referred to the agency head or the senior agency official.  That official will determine, as an exercise of discretion, whether the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure.[3]

The type of declassification review that is being conducted by the FBI in this case imposes an extraordinary burden on the agency.  As the FBI explains:

> The review is painstaking and time-consuming.  It requires a line-by-line review of each document by the Team to determine whether it is subject to law enforcement or other privilege, whether information is properly classified, and if so, whether pursuant to section 3.1(d) of Executive Order (EO) 13526, specific classified can nonetheless be released in the public interest and the exercise of discretion.  With

---

[3] Section 3.1(d)(2) explicitly states that this provision "does not . . . create any substantive or procedural rights subject to judicial review."

respect to internal memoranda, the review typically requires research by the Team into the original source of information contained in the document in order to determine whether release is permissible under law and policy, whether authority for release needs to be sought from another government agency or foreign government, and whether release might compromise sensitive sources and methods. In undertaking this review, the FBI must consider not only whether release of information could interfere with the subfile investigation or the PENTTBOM investigation, but whether it could interfere with other current and future investigations as well as its impact on the national security of the United States as per Executive Order 13526.

Valentine Decl. ¶ 8. Notably, many of the FBI personnel working on the response to the subpoena have ongoing, regularly assigned investigative and operational duties and responsibilities. *Id.* ¶ 9. Their primary duty is, and must be, investigative and operational, to address new and evolving threats to national security and the American people. *Id.* The FBI estimates that, to date, the review team has expended over 2000 hours searching for, reviewing, and processing records in response to the Touhy request and subpoena. *Id.* ¶ 9.

Between November 19, 2018 and May 1, 2019, the FBI produced four tranches of records, totaling 364 pages, in response to the Touhy request and subpoena. Valentine Decl. ¶ 10. These records contain redactions, with accompanying codes identifying the basis for each redaction. *Id.* To date, the government has also provided a privilege log identifying eight documents that are privileged and protected from disclosure in their entirety because they contain confidential human source reporting, intelligence information, communications with foreign governments, or a combination thereof. *Id.*

The PECs suggest that the FBI's production has proceeded more slowly than they expected. Pl. Br. 3, 5-6. Contrary to the PECs' contentions, *id.* 5-6, however, the government never committed to complete its review in three tranches or to complete the entire process by early 2019. At the October 12, 2018 status conference, government counsel explained that productions would be made on a rolling basis, that the first tranche of records would be ready for production by mid-

November, and that there would be "at least a second and third tranche."  Normand Decl., Exh. E at 8-9.  Government counsel explicitly stated that it was not possible to provide a firm deadline for the second tranche or for completion of the review, but that the government understood the Court (at that time) hoped to complete jurisdictional discovery by early 2019, and with that in mind the government was working to complete the process as quickly as it could.  *Id.* at 9-10, 15; *see also* Normand Decl., Exh. D at 2.  Government counsel also emphasized the difficult and time-consuming nature of the FBI's review, given the highly sensitive nature of the records the PECs have requested.  Normand Decl., Exh. E at 8, 15.

One of the reasons the FBI's review has extended beyond three tranches is that the FBI agreed to conduct several supplemental searches at the request of the PECs, which in some cases resulted in additional records being included in the group of core documents.  Valentine Decl. ¶ 6.  For example, in response to meet and confer discussions with the PECs in October 2018, the FBI conducted supplemental searches and added several interview reports to the processing queue.  *Id.*  The FBI also conducted supplemental searches for other records that the PECs requested, including a purported parking ticket alleged to have been issued at LAX airport in January 2000 (which the FBI did not locate in its files).  *Id.* ¶ 17.  On January 2, 2019, the PECs provided a list of particular records or categories of records that they "wanted to make certain were included in the FBI's searches"; the list included a summary of previously requested items and several additional requests.  Normand Decl., Exh. F.  The FBI undertook additional supplemental searches in response to the January 2 letter, and located further documents that were then added to the set of core records.  Valentine Decl. ¶ 6.

Another factor affecting the timing of the FBI's review is the need to consult with other government agencies or components, as well as foreign governments, regarding whether specific

records or information could be released to the PECs.  *Id.* ¶ 15.  The FBI is still awaiting responses from certain foreign governments.  *Id.*

On April 2, 2019, in response to the PECs' request, the government provided the PECs with detailed information regarding the status of its ongoing review, including the specific records or categories of records requested in the January 2, 2019 letter.  Normand Decl., Exh. G.  One of the requests in the January 2, 2019 letter sought records about Sadhan and Sudairy.  With regard to that request, the government reiterated its longstanding position that the FBI's search and review efforts were appropriately limited to records within the scope of the limited jurisdictional discovery authorized by the Court, noted that the Court had rejected the PECs' request for document discovery from the Kingdom regarding Sadhan and Sudairy, and explained that the FBI therefore does not believe additional searches for records about those individuals are warranted.  *Id*. at 3-4 n.3; *see* ECF No. 4261 (denying the PECs' request to obtain document discovery from the Kingdom regarding four individuals, including Sadhan and Sudairy).[4]  The government noted that the FBI's original search for core documents was calculated to identify "records regarding individuals who may have tasked or acted in concert with Bayoumi and Thumairy, or their subagents," but the FBI did not intend to undertake additional searches for other records regarding individuals as to whom the Court has ruled that jurisdictional discovery is not appropriate. Normand Decl., Exh. G at 4 n.3.

The government's April 2 letter also explained that, consistent with the approach outlined to the Court and the parties in September and October, the FBI was not willing to conduct broad

---

[4] The FBI's position on this issue was not advanced "for the first time" in the April 2 letter or "despite prior indications to the contrary," as the PECs suggest.  Pl. Br. 7.  The FBI has always taken the position that its searches and processing would be limited to documents relevant to the limited and targeted jurisdictional discovery authorized by the Court.  *See, e.g.*, Normand Decl., Exh. B at 4, Exh. D at 2, Exh. E at 7.

new searches for records as suggested in Appendix 1 to the September 26, 2018 declaration of Catherine Hunt.  *Id.* at 4.[5]  The government noted that Appendix 1 to the Hunt declaration is objectionable for many of the same reasons as the PECs' original Touhy request and subpoena, including because it seeks records well beyond the scope of the limited jurisdictional discovery authorized by the Court; it purports to identify subjects of investigation and effectively asks the FBI to confirm or deny whether it has opened investigations regarding those individuals; it seeks broad swaths of classified and privileged records; and thus any search premised on Appendix 1 would be overbroad and unduly burdensome.  *Id.* at 4-5.

The PECs sought a discovery conference with the Court.  ECF No. 4487.  At the conference on May 13, 2019, the PECs indicated that they intended to file a motion to compel the FBI to conduct additional searches and produce records regarding not only Sadhan and Sudairy, but also a third individual (Jaithen) as to whom this Court had ruled the PECs had not identified a sufficient basis to obtain document discovery from the Kingdom.  Normand Decl., Exh. I at 6-7, 19-20; *see* ECF No. 4261.  The PECs' motion to compel also seeks discovery concerning a fourth individual (Mohamed) as to whom Judge Daniels similarly denied jurisdictional discovery in his March 28, 2018 decision and order.  *See In re Terrorist Attacks*, 298 F. Supp. 3d at 653-55.

---

[5] Contrary to the PECs' suggestion, Pl. Br. 5-6, the government has never suggested that the FBI was undertaking new searches for documents based on Appendix 1 to the September 26, 2018 declaration of Catherine Hunt, which references broad swaths of classified and privileged records.  *See* Normand Decl., Exh. G at 4-5, Exh. H at 2.  Rather, the cited statements to the Court at the October 12, 2018 conference concerning the FBI's supplemental searches for "some additional documents," Normand Decl., Exh. E at 9, referred to targeted additional searches the FBI performed in response to specific requests by the PECs during a meet and confer call on October 9, 2018, which government counsel noted may not (and ultimately did not) yield a large volume of additional records.  Normand Decl., Exh. E at 9, Exh. H at 2.

## ARGUMENT

**I.     The Court Should Review the FBI's Discovery Response Under the APA's Arbitrary and Capricious Standard of Review**

It is well-established that the United States and its agencies, as sovereigns, cannot be sued without its consent.  *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  An action seeking to compel a federal agency or federal employee to provide discovery to a third party "is barred by sovereign immunity in the absence of a waiver."  *U.S. EPA v. General Elec. Co.* ("*EPA I*"), 197 F.3d 592, 597 (2d Cir. 1999), *modified on other grounds*, 212 F.3d 689 (2d Cir. 2000) ("*EPA II*").

The Second Circuit has held that "the only identifiable waiver of sovereign immunity that would permit a court to require a response to a subpoena in an action in which the government is not a party is found in the [Administrative Procedure Act or "APA"]."  *Id.* at 598.  Specifically, section 702 of the APA, 5 U.S.C. § 701 *et seq.*, provides, in pertinent part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

Although the APA provides the requisite waiver of sovereign immunity, a denial of a Touhy request can be challenged either through a separate civil action or through a motion to compel compliance with a non-party subpoena pursuant to Federal Rule of Civil Procedure 45. *EPA I*, 197 F.3d at 599.  The Second Circuit has left undecided whether section 706 of the APA or Rule 45 provides the appropriate standard of review when a challenge is brought pursuant to a motion to compel.  *See GE II*, 212 F.3d at 689-90; *accord In re S.E.C. ex rel. Glotzer*, 374 F.3d

184, 190 (2d Cir. 2004).  Though other circuits are divided on the question, the better view is that the APA standard of review applies.  Because the only applicable waiver of sovereign immunity is found in section 702 of the APA, and the Court's jurisdiction to review a Touhy determination is thus derived solely from the APA, the Court's jurisdiction is necessarily limited by the other provisions of the APA, including section 706.  *See COMSAT Corp. v. National Sci. Found.*, 190 F.3d 269, 277 (4th Cir. 1999); *Moore v. Armour Pharm. Co*., 927 F.2d 1194, 1197 (11th Cir. 1991); *Moran v. Pfizer*, No. 99 Civ. 9969 (WHP)(HBP), 2000 WL 1099884 (S.D.N.Y. Aug. 4, 2000); *see also Glotzer*, 374 F.3d at 191-92 (discussing circuit split).  As the Fourth Circuit explained, as "subpoena proceedings fall within the protection of sovereign immunity," the APA only "permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner."  *COMSAT*, 190 F.3d at 277.

The Court's review of agency action under the APA is "narrow."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Section 706 of the APA requires that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A); *see also State Farm*, 463 U.S. at 43.  An agency action is "arbitrary and capricious" within the meaning of section 706(2)(A) if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43; *see also LaFleur v. Whitman*, 300 F.3d 256, 267 (2d Cir. 2002).

II.     **The FBI Did Not Act Arbitrarily, Capriciously or Otherwise Unlawfully in Declining to Conduct Additional Searches for and Process Records Concerning Four Individuals Who the Court Has Ruled Are Beyond the Limited Scope of Jurisdictional Discovery**

The PECs seek discovery of the FBI regarding four individuals—Jaithen, Sadhan, Sudairy, and Mohamed—who the Court has already ruled are beyond the scope of the limited jurisdictional document discovery authorized against the Kingdom. The FBI has already gathered and processed core records pertaining to the activities of Bayoumi and Thumairy on which the Court permitted jurisdictional discovery. To the extent any of these four individuals are referenced in the core documents relating to the activities of Bayoumi and Thumairy, those documents have been or will be processed by the FBI and non-classified, non-privileged information released to the PECs. Thus, the FBI has not categorically refused to process records describing the relationship between these individuals and Bayoumi and Thumairy, to the extent such documents exist. Rather, the instant dispute concerns only the FBI's decision not to separately search for documents that fall outside the core documents pertaining to Bayoumi and Thumairy and that pertain instead to purported FBI investigations into the four individuals.[6]

The FBI, as a non-party, should not be subjected to discovery that is broader and more burdensome than that approved against the Kingdom. This is particularly the case given that

---

[6] In arguing that the information that is the subject of this motion to compel is relevant to the PECs' jurisdictional claims, the PECs list a number of topics that concern Bayoumi and Thumairy, such as the "nature and extent of Thumairy and Bayoumi's work, agency, and authority for the Kingdom;" the "work relationship of Thumairy and Bayoumi with other Kingdom officials;" and the "work that Bayoumi was actually performing during his 'secondment' for Dallah Avco, the cover provided for Bayoumi by Dallah Avco, and its knowledge of his actual work." Pl. Br. at 10-11. Documents bearing on these topics are not the subject of the instant motion to compel, however. The FBI has agreed to search for and produce core records related to Bayoumi and Thumairy, including core records that may bear on their employment by the Kingdom. Rather, the FBI has only refused to perform separate searches for records that pertain to the four individuals. Moreover, as Judge Daniels noted, Saudi Arabia is "the party in the best position to shed light" on "the nature and scope of [Bayoumi and Thumairy's] agency." *In re Terrorist Attacks*, 298 F. Supp. 3d at 651.

discovery of the FBI—which is also a sovereign entity—raises a host of concerns about disclosure of classified and privileged information that could harm national security or ongoing law enforcement and counterterrorism investigations.  The PECs' proposed order, which would compel the FBI to search for and produce "all documents, information, and evidence relating to" the four individuals (*see* Proposed Order ¶ 2), regardless of whether the documents relate to those officials' interactions with or relationship to Bayoumi and Thumairy, is manifestly overbroad, unduly burdensome, and seeks production of classified and privileged documents and information.  The motion to compel the FBI to conduct additional searches for and process records relating to Jaithen, Sadhan, Sudairy, or Mohamed should be denied.

### A.  The Court Should Not Grant Third-Party Discovery of the FBI That Is Broader Than the Scope of Jurisdictional Discovery Authorized Against the Parties

The Department of Justice's Touhy regulations require that "[i]n deciding whether to make disclosures pursuant to a demand, Department officials and attorneys should consider . . . [w]hether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose."  28 C.F.R. § 16.26(a)(1).  In the instant case, the FBI, relying upon the Court's prior rulings in this case, reasonably responded to the Touhy request by agreeing not only to process, but also to conduct a labor-intensive declassification review of, a subset of core records related directly to Bayoumi and Thumairy that are potentially central to the jurisdictional inquiry.  Because of the significant burdens this process imposes upon the FBI, however, the FBI appropriately declined to broaden the scope of its search and processing to include an unknown number of additional documents pertaining to purported FBI investigations of four additional individuals who the Court had previously held were not the proper subjects of discovery.  Whether reviewed under the APA's arbitrary and capricious standard, or under Rule 45's undue burden analysis, this decision should be upheld.

14

Third-party subpoenas should not be used to circumvent discovery orders or to seek discovery not permissible from a party. *See Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 11 Civ. 6189 (DLC), 2014 WL 12791752, at *1 (S.D.N.Y. Jan. 8, 2014) (noting that court had ordered defendants to "cease efforts to obtain from third parties the types of documents and information that this Court has previously ruled they may not obtain from [the plaintiff]"); *Goldstein v. FDIC*, 494 B.R. 82, 87 (D.D.C. 2013) ("[A] 'Rule 45 [subpoena] . . . should not be used to obtain pretrial production of documents or things . . . from a party in circumvention of discovery rules or orders.'" (citing 7–34 Moore's Federal Practice—Civil § 34.02 (2013))); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC), 2006 WL 2642192, at *2 (S.D.N.Y. Sept. 13, 2006) (quashing subpoena to third party that would have "circumvent[ed] [the court's] prior decision" that such documents could not be sought from plaintiffs). Here, the Court has squarely ruled that the PECs may not seek discovery from the Kingdom regarding all four individuals identified in the instant motion to compel. On this basis alone, the motion to compel should be denied.

In its March 28, 2018 Memorandum Decision and Order, Judge Daniels reviewed the PECs' allegations that Omar Abdi Mohamed "was part of the same Southern California al Qaeda cell as Thumairy and Bayoumi, among others, and that Mohamed provided money-laundering services for al Qaeda at the direction of senior Saudi officials." *In re Terrorist Attacks*, 298 F. Supp. 3d at 654. These allegations included evidence that Thumairy "was appointed 'to oversee the propagators working in the State of California.'" *Id*. at 654. Judge Daniels found that this evidence "does not support the inference that Mohamed was part of the cell that Thumairy directed to provide support to the 9/11 hijackers upon their arrival in California. Nor does it suggest, as Plaintiffs argue, that Thumairy, or any other Saudi official, directed Mohamed to deliver funds to

al Qaeda." *Id.* at 655.  Judge Daniels denied the PECs' request for jurisdictional discovery with respect to Mohamed, finding that the PECs "must first demonstrate that a reasonable basis for jurisdiction exists based on Mohamed's alleged tortious acts," and "Plaintiffs' allegations as to Omar Abdi Mohamed come up short." *Id.* at 655.

With regard to the other three individuals identified in the PECs' motion to compel, this Court specifically rejected the PECs' request to include them within the scope of jurisdictional discovery against the Kingdom.  In a sealed letter motion filed on October 26, 2018, the PECs sought supplemental discovery concerning seven individuals:  (1) Musaed al-Jarrah, (2) Smail Mana, (3) Mohamed Sulaiman al Muhanna, (4) Jaithen, (5) Sadhan, (6) Sudairy, and (7) Sharif al Batikhi.  On November 29, 2019, the Court ruled that the PECs had set forth a reasonable basis to conduct document discovery from the Kingdom concerning three of these individuals (Jarrah, Mana, and Muhanna), but denied the PECs' supplemental document requests regarding Jaithen, Sadhan, Sudairy and Batikhi.  ECF No. 4261.  The Court thus squarely rejected the PECs' request to expand jurisdictional discovery to include Jaithen, Sadhan, and Sudairy.

The PECs cannot compel production of documents from the FBI, a third party and a sovereign, that it is precluded from seeking from the defendant, the Kingdom of Saudi Arabia. Notably, the PECs cite no cases suggesting that it would be appropriate to subject the FBI to much broader and more burdensome discovery demands than are imposed on the defendant.  To the contrary, it is well-established that under Rule 45(d)(1), "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998); *see e.g.*, *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) ("[T]here appear to be quite strong considerations indicating that discovery would be more limited to protect third parties from harassment, inconvenience, or disclosure of confidential

documents."); *Butler v. Suria*, 17 Civ. 3077 (KPF), 2018 WL 4278338, at *2 (S.D.N.Y. June 27, 2018) (declining to enforce subpoena that sought "sensitive" documents from third party, noting that a court may "'take steps to relieve a non[-]party of the burden of compliance even when such accommodations might not be provided to a party.'" (citation omitted)); *Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW), 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011) ("[S]pecial weight [should be given] to the burden on non-parties of producing documents to parties involved in litigation.").

These considerations apply with particular force when the third party in question is the United States government, and the subpoena in question seeks classified national security information and sensitive documents pertaining to ongoing law enforcement and counterterrorism investigations. *See, e.g.*, *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (holding that, in adjudicating requests for discovery from government agencies, courts should give special consideration to "the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations"); *Moore*, 927 F.2d at 1197–98 (upholding Touhy decision to deny discovery on grounds that burdens imposed by discovery request would divert the government's limited resources from its critical public health mission); *Agility Pub. Warehousing Corp. K.S.C.P. v. U.S. Dep't of Defense*, 246 F. Supp. 3d 34, 44 (D.D.C. 2017) (objecting that "Agility treats this case as if this is an ordinary civil discovery dispute, in which the thumb is on the scale of more production rather than less," and holding instead that in a Touhy case a litigant was not entitled to relevant evidence from a federal agency where the agency articulated rational reasons for denying the request). Indeed, Judge Hellerstein gave particular consideration to these factors when he upheld the FBI's denial of a Touhy request in the September

17

11 civil litigation against the aviation defendants, finding that the requested discovery was "likely to impose substantial burdens on the government and on the court, and create unacceptable risks of inadvertent disclosures of protect[ed] information." *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 145 (S.D.N.Y. 2009).[7]

In light of the Court's prior orders strictly limiting the scope of jurisdictional discovery against the Kingdom, and explicitly holding that Mohamed, Jaithen, Sadhan and Sudairy are outside the scope of that discovery, the FBI reasonably declined to conduct additional searches regarding these individuals. As the government made clear to the PECs, however, that does not mean that the FBI is refusing to process any records in the group of core documents that may refer to these individuals. To the contrary, to the extent any of the core documents regarding the activities of Bayoumi and Thumairy refer to these individuals, the FBI did not exclude those documents from the group of records to be processed.

**B. The PECs' Proposed Order Is Unduly Burdensome and Seeks Information That Is Classified and Privileged**

The PECs state that the FBI has not raised any "proportionality, undue burden, or expense" objections to the request for discovery regarding these four individuals, and claim that the FBI's argument is solely limited to relevance. Pl. Br. 8; *see also* Pl. Br. 12 (the "singular question" raised on this motion is "whether the requested discovery is relevant to any claim or defense"). That is

---

[7] Nor is *EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir. 2012), to the contrary. That case is inapposite, as the sole issue presented was whether Argentina's claim of sovereign immunity precluded third-party discovery of assets that were themselves immune from attachment. *Id.* at 207-09. Moreover, in holding that third-party discovery could proceed, the Second Circuit cited two "principal reason[s]." *Id.* at 210. First, Argentina had waived sovereign immunity and thus the court "conclusively had jurisdiction," as opposed to when "a plaintiff seeks to initially establish that the court has subject matter jurisdiction," when the issues of "discovery and immunity are almost invariably intertwined." *Id.* at 209-10. Second, the two third parties from which discovery was sought were "commercial banks that have no claim to sovereign immunity." *Id.* at 210. Neither of those factors is present in the instant case, as this Court has not yet determined whether it has jurisdiction over the Kingdom, and the target of the subpoena and Touhy request is a sovereign in its own right.

incorrect.  It is true that the FBI has consistently objected to any discovery that exceeds the narrow scope of jurisdictional discovery authorized by the Court, including discovery regarding any of the four individuals.  Normand Decl., Exh. B, at 4-6; *id.* at 5 n.4; *id.* Exh. G at 3-4 & n.3, *id.* Exh. I at 19-20.  But the FBI has also objected to the subpoena and the PECs' request for supplemental searches for records about the four individuals, among others, because they seek information that is potentially classified and law enforcement privileged (and otherwise privileged), because the requests are overbroad, and because responding to the requests would impose an undue burden upon the FBI.  *Id.* Exh. B at 6-11, Exh. G at 4-5.  These grounds provide additional bases to uphold the FBI's decision and to deny the motion to compel.

In their motion, the PECs speculate that the FBI has opened investigations regarding Jaithen, Sadhan and Sudairy, but with the exception of Bayoumi and Thumairy, the FBI is unable to confirm or deny whether particular individuals are or are not subjects of the FBI's subfile investigation without revealing information that is classified and privileged.  Valentine Decl. ¶¶ 5, 12.  Plaintiffs' bald assertion that "there can no longer be any justifiable reason" for information about the subfile investigation to remain classified or privileged, Pl. Br. 1, is demonstrably incorrect.  Another district court ruled in 2017 that the identity of the "third subject" described in the 2012 FBI Summary Report is both properly classified and protected from disclosure by statute. *Broward Bulldog*, 2017 WL 746410, at *16.

The PECs also suggest that the FBI could review records more quickly, citing to the processing times common for FOIA requests.  Pl. Br. 3.  But this fundamentally misunderstands the nature of the review being conducted by the FBI in this case.  The FBI's review is not a FOIA review, but a declassification review.  Valentine Decl. ¶¶ 8, 15.  The PECs have not merely requested that the FBI engage in a routine review for civil procedure privileges.  They have

effectively asked the FBI to conduct an analysis of whether "the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure" under section 3.1(d) of Executive Order 13526.  Given the nature and volume of the records at issue, this type of declassification review is an extraordinarily time-intensive and labor-intensive process.  It involves a painstaking line-by-line review of documents, research into the sources of information and the potential harms of disclosure, and coordination with numerous subject matter experts.  Valentine Decl. ¶ 8.

A FOIA review does not typically consider whether information may be declassified under this provision, but rather focuses on whether information meets the procedural and substantive criteria for classification.  Declaration of David Hardy, dated June 20, 2019 ("Hardy Decl.") ¶ 6. The FBI has also affirmatively requested authorization from foreign governments to release certain information, something that is not typically done in response to a FOIA request.  Valentine Decl. ¶ 15.  FOIA processing times therefore do not provide an appropriate comparator.

Plaintiffs argue that the burden on the FBI in processing the additional requested documents would be small (even though the universe of such documents is unknown to them). But that claim is belied by the record in this case.  As the PECs themselves point out, to date the FBI has completed processing of 403 pages (including the interim release of the 2012 report). Valentine Decl. ¶ 10.  The work in processing these records, and the additional records in the final tranche, has already consumed in excess of 2,000 hours.  *Id.* ¶ 9.  More fundamentally, given the nature of the documents at issue, and the type of discretionary declassification review that the FBI has undertaken, the processing of these records has involved substantial involvement from individuals whose primary duties are operational, including Special Agents and supervisors from the Counterterrorism Division, as well as high-level officials within the FBI.  *Id.* ¶ 7.  Indeed,

ultimately, any assertion of the state secret privilege that is made with respect to any document in this case must be personally considered by high-level officials within the Department of Justice, including the Attorney General.  *See infra* Point III.  Thus, the burden of processing and asserting privilege with respect to these classified records cannot be dismissed as insubstantial.

The burdens on the FBI, moreover, must be viewed in the context of its overall law enforcement and counterterrorism mission.  The more the FBI is asked to mobilize its finite resources to protect against disclosure of classified and law enforcement sensitive information in this civil case, the more current FBI agents investigating other counterterrorism matters are diverted from their critically important operational duties.

In the Touhy context, courts afford DOJ considerable discretion to determine whether and to what degree it should divert resources from critical operations to respond to civil discovery demands.  *See, e.g.*, *Edwards v. United States Dep't of Justice*, 43 F.3d 312, 317 (7th Cir. 1994) ("It is clear from the Department of Justice regulations governing the disclosure of confidential information, as well as the common law doctrine in Touhy and the litany of succeeding case law, that the United States may restrict the release of its information.").  As the Fourth Circuit has observed, "[w]hen an agency is not a party to an action, its choice of whether or not to comply" with a Touhy request "is essentially a policy decision about the best use of agency resources." *COMSAT*, 190 F.3d at 278.  The FBI's Touhy response, pursuant to which it has agreed to expend a tremendous amount of time and resources to process core documents that are directly related to the scope of jurisdictional discovery permitted by the Court but has declined to search for and process records that the Court has excluded from the scope of discovery, appropriately balances both the PECs' significant interests in jurisdictional discovery and the FBI's significant interests related to its law enforcement and counterterrorism mission.

21

In light of the limited and targeted scope of jurisdictional discovery, the FBI's status not only as a third party but also a government agency leading an ongoing counterterrorism investigation, and the significant burdens on the FBI of responding to the subpoena—including the unique burdens attendant to requests for classified and privileged records and information—the Court should not permit discovery of the FBI that it has disallowed against the Kingdom.  Nor should the Court enter the PECs' proposed order, which is overbroad, unduly burdensome and disproportionate on its face, seeking "all documents, information, and evidence relating to" four individuals who the Court has already determined are outside the scope of jurisdictional discovery.

### C.  Portions of the Declaration of Bassem Youssef Should Be Stricken or Disregarded

In support of their motion to compel, the PECs have submitted a declaration from a former FBI Special Agent, Bassem Youssef.  Youssef was not assigned to either the PENTTBOM investigation into the events of September 11 or the subsequent subfile investigation, and has no personal familiarity with any of the documents that are the subject of this motion to compel. Declaration of Bassem Youssef, dated May 30, 2019, ¶¶ 2-7.  Nor does he claim that he ever worked in the FBI unit in charge of processing FOIA requests.  *Id.*; *see also* Hardy Decl. ¶ 8. Despite this lack of personal knowledge, he nonetheless purports to opine on the extent to which responsive documents are likely to be classified, *id.* ¶ 23; opines on the amount of time it would take to determine if information in a document is classified and to redact such information, and the amount of time it would take to declassify a document, *id.* ¶¶ 24, 26; and attempts to extrapolate from the processing time for reviews done by the FBI in FOIA matters the estimated time for completing the review of the documents at issue here, *id.* ¶ 29.  The FBI moves to strike these statements, or asks the court to disregard them, as they are speculative, lack foundation, and are not based upon personal knowledge.  *See Abraham v. Town of Huntington*, 2:17-cv-3616

(ADS)(SIL), 2018 WL 2304779, at *3-*4 (E.D.N.Y. May 21, 2018) (motion to strike appropriate if declaration is not made on the basis of personal knowledge or contains speculation).

In any event, the declarations submitted by the FBI conclusively refute Youssef's unsupported conjecture on these points.   In particular, the FBI's declarations establish that the documents that have been processed by the FBI in this case do in fact contain a substantial amount of classified information, and that a comparison of FOIA processing times is inapt because those matters are of varying complexity, the FBI's FOIA unit routinely denies requests seeking documents from pending investigations, the FOIA unit does not seek approval from foreign governments to release information, and FOIA reviews do not implicate the more involved process for discretionary declassification reviews.   Hardy Decl. ¶¶ 5-7; Valentine Decl. ¶¶ 13-17.   These declarations are entitled to a presumption of good faith.   *See, e.g.*, *United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446, 456 (S.D.N.Y. 2018) ("'[G]overnment officials are presumed to act in good faith.'"); *see also Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011).

## III.   The PECs' Request for *In Camera* Review of the 2012 FBI Summary Report Is Premature and Unwarranted

In accordance with the schedule ordered by the Court, ECF No. 4524, the FBI will complete its processing of the 2012 FBI Summary Report (and other core documents) by July 12, 2019, and the government will assert all applicable privileges and other protections from disclosure on August 30, 2019, when the government responds to that portion of the PECs' motion to compel. In light of this court-ordered schedule, there is no basis for the PECs' contention that "the FBI has made no effort to properly invoke or substantiate any claim of privilege," or that the FBI's anticipated assertions of privilege will be "belated." Pl. Br. 16.  The report remains under review; the FBI produced an interim version at the request of the PECs; and the FBI will assert all applicable privileges on August 30, as the Court ordered.

Nor is there any basis for the PECs' request that the Court should "order the FBI to immediately produce the 2012 Summary Report to the Court for inspection *in camera*." Pl. Br. 25. Plaintiffs tellingly cite no legal authority for their extraordinary request that the Court should review a classified and privileged document *in camera* before privileges have even been asserted. Indeed, the law is to the contrary. The government's review of the 2012 FBI Summary Report will include consideration of whether the Attorney General will assert the state secrets privilege to protect certain information in the report. Normand Decl., Exh. I at 24-25; *see Doe v. CIA*, 576 F.3d 95, 102, 104 (2d Cir. 2009) (state secrets privilege may only be asserted by the head of the department with control over the matter after personal consideration (citing *Reynolds v. United States*, 345 U.S. 1, 8 (1953), and *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991))). The Second Circuit has made clear that in the state secrets context, *in camera* inspection is not always warranted: "[t]he trial court may not 'automatically' require the government to produce the material for which secrecy is claimed, . . . even for perusal of the judge in chambers." *Doe*, 576 F.3d at 104 (quoting *Reynolds*, 345 U.S. at 10)). Whether or not a court reviewing an assertion of the state secrets privilege needs to review the classified material itself will depend on a variety of considerations, including the sufficiency of the government's supporting declaration(s). *See id.* at 104-05 (noting that "[i]n some cases, the required scrutiny will be relatively modest, permitting the court to rely on nothing more than the complaint and the government's declaration," and quoting statement in *Zuckerbraun*, 935 F.2d at 547, that "'[W]e conclude that it is self-evident,' in light of the government's declaration describing the subject matter of the information sought, 'that disclosure of secret data and tactics concerning the weapons systems of the most technically advanced and heavily relied upon of our nation's warships may reasonably be viewed as inimical to national security.'").

The Court is in no position to evaluate at this early stage—before all applicable privileges have been even asserted, let alone supported with declarations and briefing—whether it will be necessary for the Court to review the 2012 FBI Summary Report *in camera* in order to rule on any disputed privilege assertions.  Indeed, without declarations and briefing, reviewing the document *in camera* would serve no purpose as the Court would lack basic information regarding the bases for the privileges being asserted.  Plaintiffs' request for *in camera* inspection should therefore be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the PECs' motion to compel the FBI to conduct supplemental searches for and produce responsive records regarding Jaithen, Sadhan, Sudairy and Mohamed, and deny their request to review the 2012 FBI Summary Report *in camera* before the government's privilege assertions with regard to that document are ripe for judicial resolution.

Dated:      June 21, 2019
            New York, New York

                        Respectfully submitted,

                        GEOFFREY S. BERMAN
                        United States Attorney for the
                        Southern District of New York

                  By:   */s/ Sarah S. Normand*
                        SARAH S. NORMAND
                        JEANNETTE A. VARGAS
                        Assistant United States Attorneys
                        86 Chambers Street, 3rd Floor
                        New York, New York 10007
                        Tel.  (212) 637-2709/2678

25