UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
:
IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001      03 MDL 1570 (GBD)(SN)
:
:
------------------------------------------------------------------X

## DECLARATION OF DUEL W. VALENTINE

I, Duel W. Valentine, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a Supervisory Special Agent of the Federal Bureau of Investigation (FBI), assigned to the FBI's Counterterrorism Division in Washington, D.C. I am familiar with the subpoena for records and *Touhy* request served on the FBI on April 10, 2018 and with subsequent additional requests from Plaintiffs in connection with this matter and am familiar with the FBI's ongoing response to the subpoena/*Touhy* request and subsequent additional requests (hereinafter "the subpoena").

2. The matters stated herein are based on my personal knowledge and my review and consideration of information available to me in my official capacity, including information furnished by other FBI and Department of Justice personnel in the course of their official duties.

3. I am submitting this declaration in support of the Government's memorandum of law in opposition to the Plaintiffs' Motion to Compel filed under seal on or about May 31, 2019 requesting that the Court order the FBI to conduct additional searches and process additional records regarding four individuals. To assist the Court's consideration of the motion, this declaration explains the procedures followed by the FBI in responding to the subpoena, and

why the additional searches and processing requested would be unduly burdensome. This declaration also attempts to clarify and correct certain statements made in support of Plaintiffs' Motion to Compel.

4. The subpoena served on the FBI sought a very broad range of documents from pending FBI investigations relating to the September 11, 2001 terrorist attacks. Among other things, the subpoena asked for the entire so-called "subfile" investigation[1] into individuals known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar. There are well over 1,000 serials in the "subfile" investigation, many of which refer to or attach other documents. The subpoena also called for documents from the PENTTBOM investigation into the 9/11 attacks, which is among the largest investigations in FBI history.

5. In my experience I have observed that the FBI's Counterterrorism Division protects non-public information—and in many instances, classified information—relating to ongoing counterterrorism investigations, out of concern that release of the information would reveal the subject(s) of the investigation, the status and results of the investigation and the sources and methods used in the investigation, disclosure of which could interfere with the investigations at issue or other current or future investigations. However, because of the extraordinary nature of the subject civil lawsuit, the FBI, in consultation with the U.S. Attorney's Office for the Southern District of New York, agreed to identify, search for and review for potential disclosure a core group of the documents potentially relevant to the issues as to which the court has allowed jurisdictional discovery, which I understand is "whether and to what extent Thumairy, Bayoumi and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11

---

[1] The 9/11 Review Commission Report refers to this as the "subfile" investigation.

hijackers."

6. The initial set of core documents were identified by subject matter experts in the FBI New York Field Office who currently or formerly were assigned to the subfile investigation, in conjunction with the Counterterrorism Division at FBI Headquarters, which oversees the subfile investigation, and attorneys in the FBI's Office of the General Counsel and the U.S. Attorney's Office. These consisted of interview reports and internal analytical reports relating to the activities of Bayoumi and Thumairy. In addition, included in the initial set of core documents were certain documents specifically identified in the subpoena, namely, the 2012 FBI Summary Report[2] and any portions of the November 2004 Office of Inspector General report or the 2005 FBI/CIA joint intelligence report pertaining to Bayoumi or Thumairy. Additional searches were completed and more interview reports were added to the set of core documents after discussions between Plaintiffs' counsel and the U.S. Attorney's Office in or about October 2018, which followed the submission of a declaration from Plaintiffs' investigator, former FBI agent Catherine Hunt on or about September 26, 2018. After receipt of a letter on or about January 2, 2019 from Plaintiffs in which they identified specific documents or categories of documents, that they considered especially important for the FBI to include in the core documents, additional searches were conducted and additional documents were added to the set of core documents.

7. The FBI's search for and review of documents in response to the subpoena is being handled by FBI personnel in the Counterterrorism Division at FBI Headquarters, the New York Field Office, and the National Security and Cyber Law Branch and the Litigation Branch of the

---

[2] The FBI produced a redacted, interim release of the 2012 FBI Summary Report as part of the fourth tranche; however, those redactions are still pending and a finalized release will be forthcoming.

FBI's Office of the General Counsel ("OGC"), with assistance from the U.S. Attorney's Office and the FBI's Information Management Division (the "Team"). Because the documents being sought by Plaintiffs pertain to pending investigations relating to the 9/11 attacks, I have been informed that decisions regarding the scope of the FBI's response have been discussed at the highest levels in the Counterterrorism Division and the General Counsel's Office, and the review of each document involves a team of personnel from the FBI's New York field office, FBI Headquarters, and the U.S. Attorney's Office.

8. The review is painstaking and time-consuming. It requires a line-by-line review of each document by the Team to determine whether it is subject to the law enforcement or other privilege, whether information is properly classified and, if so, whether pursuant to section 3.1(d) of Executive Order (EO) 13526, specific classified information can nonetheless be released in the public interest and the exercise of discretion. With respect to internal memoranda, the review typically requires research by the Team into the original source of information contained in the document in order to determine whether release is permissible under law and policy, whether authority for release needs to be sought from another government agency or foreign government, and whether release might compromise sensitive sources and methods. In undertaking this review, the FBI must consider not only whether release of information could interfere with the subfile investigation or the PENTTBOM investigation, but whether it could interfere with other current and future investigations as well as its impact on the national security of the United States as per EO 13526.

9. All of the FBI personnel in the Counterterrorism Division, the New York Field Office, and the OGC National Security and Cyber Law Branch working on the response to the subpoena have ongoing, regularly assigned investigative and operational duties and responsibilities.

Their primary duty is, and must be, investigative and operational, to address new and evolving threats to national security and the American people. To my knowledge, the FBI does not maintain records on the number of hours spent by FBI personnel in responding to the subpoena, but a conservative estimate is that at least 2,000 hours have been spent.

10. In response to the subpoena, the FBI has released four tranches, which contain approximately 364 pages, and intends to make an additional release of documents in July 2019. To the extent that these documents contain redactions, the FBI has provided sets of deletion codes which explain the basis for the redactions. To date, the FBI has processed and withheld in their entirety, eight documents, totaling approximately 39 pages, which have been included on a privilege log. These documents have been withheld in full because each contains confidential human source reporting, intelligence information, communications with foreign governments, or a combination of this type of information.

11. I am aware that the motion to compel asks the court to order the FBI to conduct searches for and produce documents relating to the following four individuals: (1) Abdullah Ali Saleh al-Jaithen aka Abdullah A.S. al-Jraithen (hereinafter "Jaithen"); (2) Adel Mohamed al-Sadhan (hereinafter "Sadhan"); (3) Mutaeb Abdelaziz al-Sudairy (hereinafter "Sudairy"); and (4) Omar Abdi Mohamed aka Omar al-Khateeb (hereinafter "Abdi Mohamed). Records show that Abdi Mohammed was criminally prosecuted for false statements in connection with his immigration application and naturalization and for possession of entry documents obtained by fraud.[3] However, to my knowledge, there has been no public disclosure of the nature or extent of the FBI's investigation, if any, into Abdi Mohammed's connections to Bayoumi or Thumairy. Similarly, beyond a very brief reference to Sadhan and Sudairy in the 9/11 Review

---

[3] *See U.S. v. Mohamed*, No. 3:03-cr-03433 (S.D. Cal.)

Commission Report and to Jaithen in the two documents noted in the Supplemental Catherine Hunt declaration, ¶¶ 8 and 13, to my knowledge, there has been no public disclosure of the nature or extent of the FBI's investigation, if any, into their connections to Bayoumi or Thumairy. While Ms. Hunt speculates that the FBI has "investigated" Jaithen, Sadhan and Sudairy, to my knowledge, the FBI has neither confirmed or denied whether any of those individuals is or was the subject of FBI investigation, nor has the FBI publicly identified any subjects of the "subfile" investigation, apart from Bayoumi and Thumairy, as that information is classified and privileged.

12. The Team conducted its searches using the FBI case management system, known as Sentinel, which in most instances results in responses virtually instantaneously. It has been my experience that the process of reviewing the results to determine relevance (including whether the individual named in the search result is the same as the individual at issue), and the process of potentially declassifying documents and reviewing them for other privileges is a very time-consuming process. As noted previously and in my experience, this is especially the case if the documents found relate to an ongoing investigation or include reporting from confidential sources and other government agencies or foreign governments.

13. I have reviewed the May 30, 2019 Declaration submitted by former Special Agent Bassem Youssef in which he opines, among other things, that "based on his expertise"[4] the FBI "could

---

[4] Mr. Youssef claims at ¶ 4 that as the FBI Legal Attache in Riyadh, he "reviewed and approved the classification/declassification" of all documents drafted by FBI employees in that office. The FBI has provided training establishing that every FBI employee has derivative classification authority, which means that every FBI employee is authorized to determine the proper classification of documents which the employee is drafting. But Mr. Youssef does not claim to have been an Original Classification Authority or Declassification Authority, see Executive Order 13526 (December 29, 2009), § 3.1, and it is my understanding that only persons holding that authorization can declassify documents.

6

have reviewed, processed, and produced all of the documents in the subfile case to the Plaintiffs by now." Youssef Decl. ¶ 30. Based on my experience, I believe that a number of Mr. Youssef's assertions in support of this opinion need clarification or correction.

14. First, the number of pages being processed in connection with FBI FOIA litigation has no bearing on the FBI's response to the subpoena in this case. I have been informed that the processing of documents relating to FOIA requests is handled by the Records/Information Dissemination Section ("RIDS") in the FBI's Information Management Division (IMD). In this instance, the FBI's response to the subpoena is being handled by FBI personnel in the Counterterrorism Division at FBI Headquarters, the New York Field Office, and the National Security and Cyber Law Branch and the Litigation Branch of the FBI's Office of the General Counsel (OGC), with assistance from the U.S. Attorney's Office and members of the Classification Unit in IMD.

15. Additionally, I have been informed that the FBI generally denies FOIA requests for any records related to a pending investigative file. Here, as noted previously, because of the extraordinary nature of this matter, the FBI has been and continues to conduct a thorough declassification and privilege review of the records identified as "core documents," i.e., those that the Team has determined to be potentially most responsive and relevant to the issues for which I have been informed the court has authorized jurisdictional discovery. In addition, I am advised that in response to a FOIA request, the FBI does not normally seek authorization from foreign government agencies to release information which is properly classified or is otherwise restricted from dissemination without the approval of the foreign government. Here, in response to the subpoena and the extraordinary nature of this matter, the FBI has sought such approval and is still awaiting responses from certain governments.

7

16. In support of his opinion, Mr. Youssef also asserts that if a document or a portion of a document is unclassified, it should be released immediately without redactions. Youssef Decl. ¶¶ 20, 24. It is my belief that this assertion ignores there are numerous considerations other than classification (e.g., grand jury secrecy, statutory restrictions, confidential sources, law enforcement and other privileges) that affect the determination whether or not to release material. It is my experience that without firsthand knowledge of the information contained within an investigative file, these determinations cannot be made. Mr. Youssef seems to suggest that there is no reason to protect reporting by a Confidential Human Source (CHS) so long as the source's name and identifying information are not in the documents. Youssef Decl. ¶ 16. However, the nature of the information provided by the CHS may be source identifying. In other words, the number of people with access to that information may be so limited that disclosure of the information would risk disclosure of the CHS's identity.

17. Another assertion underlying Mr. Youssef's opinion is that "All FBI records are stored electronically." Youssef Decl. ¶ 13. Here, in response to the subpoena, the FBI has spent, and is continuing to spend, considerable time and effort searching for the paper versions of the telephone toll records and bank records of Bayoumi and Thumairy, which are not stored electronically. Following a direct request from Plaintiffs' counsel, the FBI also spent considerable time and effort searching for the original version of a parking ticket allegedly issued in January 2000 at Los Angeles International Airport ("LAX"). To date, no such parking ticket has been located.

18. Mr. Youssef also asserts that FBI policy would require the preparation of an annual Letterhead Memorandum (LHM) summarizing the developments and future investigative plans in the "subfile" investigation. *Id.* at ¶ 12. That is not accurate. Since the Attorney General

8

Guidelines for Domestic FBI Operations were implemented in or about December 2008, there has been no requirement of an annual LHM in such cases.

19. To the extent that the core documents included references to the four individuals or their interactions, if any, with Bayoumi or Thumairy, those documents were not excluded from the core documents, and they are being processed by the FBI.

Executed this 21st day of June 2019.

_____
Duel W. Valentine