```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3    ---------------------------------------X
                                            :
 4    IN RE:                                :   03-MD-1570 (GBD)
                                            :
 5         TERRORIST ATTACKS OF             :   500 Pearl Street
           SEPTEMBER 11, 2001              :   New York, New York
 6                                          :
                                            :
 7                                          :   December 13, 2019
      ---------------------------------------X
 8

 9         TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
                 BEFORE THE HONORABLE SARAH NETBURN
10                  UNITED STATES MAGISTRATE JUDGE

11
      APPEARANCES:
12
      For the Plaintiffs:       JODI WESTBROOK FLOWERS, ESQ.
13                              JOHN M. EUBANKS, ESQ.
                                MotleyRice LLC
14                              28 Bridgeside Boulevard
                                Mount Pleasant, South Carolina 29464
15
                                MEGAN W. BENETT, ESQ.
16                              ANDREW J. MALONEY, III, ESQ.
                                NOAH H. KUSHLEFSKY, ESQ.
17                              Kreindler & Kreindler LLP
                                750 Third Avenue
18                              New York, New York 10017

19    For the Estate of         SAMANTHA E. SMITH, ESQ.
      John P. O'Neill, Sr.:     Anderson Kill
20                              1251 Avenue of the Americas
                                New York, New York 10020
21

22
      Court Transcriber:        MARY GRECO
23                              TypeWrite Word Processing Service
                                211 N. Milton Road
24                              Saratoga Springs, New York 12866

25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1          THE COURT:  Hi, this is Judge Netburn.  Who do I have

2    on the phone?

3          MS. FLOWERS:  Hi, Judge Netburn.  This is Jodi

4    Flowers.  Good afternoon.

5          THE COURT:  Good afternoon.

6          MS. FLOWERS:  I've also got John Eubanks from my

7    office here.

8          THE COURT:  Thank you.

9          MS. BENETT:  Hi, Judge.

10          THE COURT:  Hi.

11          MS. BENETT:  Hi, Judge.  It's Megan Benett and Andrew

12    Maloney from Kreindler and Kreindler.  Hi.

13          MR. MALONEY:  Good afternoon, Your Honor.

14          MS. SMITH:  Hi, Judge.  This is Samantha Smith from

15    Anderson Kill.

16          THE COURT:  Great.  I have you here with my new law

17    clerk, Joshua, on the case and I'm recording the call so if

18    anyone wants to make a transcript you can request that a

19    transcript be made, but I don't have a court reporter here.

20    Because of that, if everybody can introduce themselves before

21    they speak so that we're assured to attribute the appropriate

22    person to each statement.

23          So I wanted to follow up on the letter that you

24    submitted regarding the future and specifically with respect to

25    the victims fund.  I'm less concerned, as I indicated in my

1   order, with the first three categories of cases, the estate
2   wrongful death claims, the immediate family member solatium
3   claims and the functional equivalent claims.  I am concerned
4   about the personal injury claims given that there was some
5   suggestion that it might be, by my read of the letter but maybe
6   I'm misreading it, as few as 17,000 and potentially
7   significantly more.  I realize in your follow-up letter you
8   said that there may be some changes and so now you think the
9   number might be smaller.
10          So the purpose of this call is one, to get a little
11   more clarity on what the number you think is going to look
12   like, and then to talk about how best to proceed with assessing
13   these individual claims in a timely way.  Who's going to take
14   the lead here?
15          MS. BENETT:  Judge, this is Megan Benett from
16   Kreindler and Kreindler.  Just sort of by way of background
17   with clarification act, the attorneys who are on the call now
18   were all involved substantially in the effort and ultimate
19   modification of the act and there was a recognition that the
20   statutory language as drafted in the clarification act would
21   allow those folks with injury claims, not just the day of
22   injury claims, to participate.  And the feedback we got from
23   the congressional staffers with whom we were working was that
24   the language would not change even when that was flagged.
25   However, since it was enacted at the end of last month, the VCF

4

1  Special Master has -- I don't know if the rules have been

2  formally issued yet, but there has been a policy change within

3  the VCF and we expect the rules to be published shortly that

4  will effectively -- will result in most of those VCF-2

5  claimants opting not to proceed with any claim with the USVSST

6  Fund.  And it is those VCF-2 claimants that represented the

7  largest number of the personal injury claimants we identified

8  in our letter to the Court.

9            THE COURT:  And so are those --

10           MS. BENETT:  The rule change will --

11           THE COURT:  So does that rule change mean that people

12  who suffered injuries but not from the day of would be

13  excluded?  Is that the category of being excluded?

14           MS. BENETT:  That's the category and the rule change,

15  the effect of the rule change, the VCF will consider any award

16  from the USVSST fund as an offset against a VCF award and will

17  not consider the USVSST fund award complete until the end of

18  the ten year period.  And so we'll hold any VCF claim for ten

19  years before then calculating the offset.  So it would be for

20  almost all of the VCF, not 100 percent, but for almost all

21  those VCF-2 claims it would not be in their interest to proceed

22  with a USVSST claim.

23           THE COURT:  Got you.  So can you ballpark for me the

24  number we're talking about that would be seeking a judgment by

25  mid-February?

1        MS. BENETT:  For the Kreindler firm, we're not 100

2   percent sure we'll submit any but if we do it would be fewer

3   than -- it would probably be fewer than 25.

4        MS. FLOWERS:  Your Honor, this is Jodi Flowers from

5   Motley Rice.  Just for the record, I have to be clear that our

6   firm is not involved in the language of this change.  We do

7   read it as allowing not only on the day injuries but subsequent

8   injuries.  And I hear, I agree with everything Megan said but I

9   had to make that clear.  And I think for us we anticipate -- we

10  have 351 on the day that we are actively going through and

11  preparing under the same set of precedents and procedures that

12  have taken place in the DC circuit with respect to injury

13  claims and we are preparing those to file just as quickly as we

14  can.  I do not think it will be the full 351 on the day

15  injuries that are able to be worked up in the time frame that

16  we have but we do anticipate there will be some number.  I

17  would estimate maybe 100.  We know for certain that there are a

18  few that are sort of already worked out.  So those we would --

19  and we can certainly tell you in more real time as we work

20  through them how many.  We can modify our number.  So that's

21  sort of one set that we would put to one category, the people

22  injured on the day.

23       I think the more difficult issue is really the folks

24  that Megan was referencing that got sick later and that's where

25  my personal view is that test cases would be helpful so that we

6

1   are able to advise people better and people are better able to

2   make decisions about whether or not they can prove causation

3   and whether or not it's worth their time, or at least would

4   help us advise them about their rights beyond the day of.  And

5   with that, I'd really like to ask John Eubanks if he has

6   anything else to add.

7        MR. EUBANKS:  Your Honor, this is John Eubanks from

8   Motley Rice.  I guess one of the issues, and it's something

9   that Ms. Benett flagged a few minutes ago is that for those who

10  were already paid, for example, on a recognition VCF-2 claim,

11  the Special Master of the VCF has announced that they will have

12  to make a notice to the fund that they were seeking a

13  collateral offset payment from the US Victims of State

14  Sponsored Terrorism Fund.  What that means is not particularly

15  clear from the Special Master's guidance.  It could mean that

16  they're seeking a claw back of past paid funds and possibly a

17  garnishment of the new award.  It could mean that they're

18  waiving that right but the fund does reserve that right.  So

19  that's one of the things that is causing us to say while we

20  have 351 day of injuries, we may have a significantly smaller

21  universe because while they may have filed with the VCF-1, they

22  also have VCF-2 related injuries that have been contemplated or

23  that are in the process of being contemplated and therefore may

24  not want to impair their rights vis-à-vis the VCF by pursuing

25  it.  So that's another issue that were trying to get to the

7

1  bottom of at the present time which is why we can't give a

2  definite number of how many claims that we're trying to proceed

3  on.

4        THE COURT:  Okay.  When Ms. Flowers mentioned the

5  idea of test cases and that that might be helpful, are you

6  suggesting that test cases would run and be decided before the

7  mid-February deadline?

8        MS. FLOWERS:  Yes --

9        THE COURT:  And how do you --

10       MS. FLOWERS:  I'm sorry, this is Jodi Flowers.  And I

11 don't know that it could be done with the Court's current work

12 load without the assignment of someone assigned just to that

13 task.  Yes, we suggested a Special Master because I do think it

14 would be a full-time job for one person to do.  Say there are

15 100 claims and we're able to get them in by January 15th by some

16 act of God, then that Special Master would have what, one

17 month?  I don't -- you know, we could --

18       THE COURT:  Well, a Special Master would have less

19 than one month because if you want judgments in hand, they need

20 to get to the Court.  I mean eventually the Court needs to

21 enter a judgment potentially on the, you know, on the

22 recommendation and advice of a Special Master, but the Special

23 Master obviously can't enter a judgment.

24       MS. FLOWERS:  Right.  And so how much time will that

25 take?  There is some serious question about whether it can be

1   done in time.  But we feel that our obligations under the law

2   are to attempt to do so.

3           THE COURT:  Okay.  So you say -- and you don't know

4   how many people would fall in that category because that's not

5   the day of people.

6           MS. FLOWERS:  This is Jodi Flowers again.  I would

7   anticipate that we would not want to do more than maybe five

8   test cases, try to pick exemplars if you will, a cancer case,

9   you know, one of the, you know, a different injury type case

10  and put them before a Special Master to see whether or not or

11  how the Court is going to interpret the case law.

12          THE COURT:  Right.  I mean --

13          MS. BENETT:  Sorry, this is Megan Benett and Andrew

14  Maloney joining in again because I accidentally hung up.

15  Sorry.

16          THE COURT:  I mean one of the, in preparing for

17  today's conference, one of the thoughts was whether or not

18  these claims could be broken into categories.  I mean I think

19  it needs to be slightly more nuanced than a person is sick.

20  You know, I think there's shades within that category.  And so

21  you know, one idea I had was coming up with categories, maybe

22  there are 10 or 20 categories, and then within each category

23  there are exemplars, you know, maybe five exemplars.  And then

24  those would be evaluated on the merits to give us some sense of

25  range which we then could apply to everybody within a category.

1   Because even if you have test cases --

2           MS. FLOWERS:  This is Jodi Flowers --

3           THE COURT:  Even if you have test cases, let's just

4   say, you know, you're able to get to some Special Master by the

5   second week of January, test cases, you know, and just let's

6   assume that you're able to put on evidence and have this

7   adjudicator, whether it's me or a Special Master, say okay,

8   I've heard these five cases and I think the proper number is X

9   and Y for another and Z for a third.  That then needs to be

10  applied to the group and the group is nuanced.  And so I guess

11  all that's to say, you know, that the test cases is only part

12  of the process because in order for the test cases to have

13  meaning, they need to be representative of categories and then

14  we need to evaluate whether or not claimants fall within the

15  appropriate categories and assign them damages based on test

16  cases.

17          Have any of these people been through any claims made

18  process yet which is to say has any of them been awarded

19  anything by either the 9/11 Fund or any of these other funds?

20          MS. BENETT:  This is Megan from Kreindler.  Yes.  So

21  for our clients, almost all of them have gone through either,

22  and I believe all of them, have gone through and received

23  compensation from either the VCF-1, those are the day of injury

24  cases, or VCF-2 for the more chronologically remote health

25  injury cases.  But the process there is it's all governed by

1   scheduled injuries.  So once you establish your presence at

2   Ground Zero and have one of the qualifying medical conditions,

3   the compensation is set by schedule which I mean we could

4   provide to the Court or to the Special Master if that's

5   helpful.  These are presumptions on this, the pain and

6   suffering, and then there are economic, then there are economic

7   loss awards.

8          MS. FLOWERS:  Your Honor, this is Jodi Flowers.  Can

9   I ask for a point of clarification, please?  Are you

10  thinking -- I think the suggestion of breaking them into

11  categories is an excellent one and I'm wondering if you're

12  thinking about that both for the day of individuals as well as

13  the more latent injuries.

14         THE COURT:  I was thinking about them for both

15  categories because it wasn't clear to me that we might not have

16  to deal with the second group.  So I was assuming that we were

17  looking at tens of thousands of claims and trying to make

18  rational sense of that.  It sounds like we might not be looking

19  at quite such an enormous number though I've only heard from

20  Motley Rice and Kreindler and Kreindler about what they think

21  the number looks like.  And so the need to have such a

22  comprehensive schedule may be less so.  I mean if we're only

23  dealing with people who were either fleeing from the attack on

24  the day of or entering into the attack on the day of, you know,

25  and it's been established that they were present that day

1   through some either prior claims made, processed, or through

2   some other way, because they're a member of the fire department

3   or something like that so we know that they came to the site.

4   You know, maybe it's slightly easier than people who are more

5   attenuated.

6          MS. BENETT:  This is Megan from Kreindler.  One of

7   the things -- maybe it would be helpful to get a sense from the

8   Court if -- I think for our, for example, for all of our VCF-2

9   cases we have affidavits of presence or we have proof of

10  presence.  Medical causation in VCF-2 is presumed if you were

11  present and you have one of these health injuries you are

12  entitled to compensation.  Would that approach be the one that

13  the Court would also adopt or would we be expected to put on

14  additional proof to establish legal causation?

15         THE COURT:  I don't have an answer for you I'm afraid

16  because I don't really know exact -- I don't have a sense of

17  what you already have established.  I mean are you saying --

18  nor do I know from what has been the process in other forums.

19  So are you saying that if you apply to the VCF funds and you

20  can establish presence and you can establish illness that

21  causation is then presumed in those funds?

22         MS. BENETT:  This is Megan, Your Honor.  Yes, that is

23  correct.  If you have presence and a qualifying health injury,

24  causation is presumed.

25         MS. FLOWERS:  This is Jodi Flowers.  I would simply

1  answer that causation standard and review underwent a very

2  rigorous medical challenge by NIOSH and others.  It's not as if

3  a bureaucrat in a room made these decisions.  These were

4  qualified medical positions who came to the conclusion over

5  time that causation was established vis-à-vis the listed

6  eligible injuries.  So I do think that is something that could

7  be very instructive to the Court.  Obviously we have to brief

8  that to you.

9         THE COURT:  Right.  I mean look, if some other

10  entity, and as Ms. Flowers was suggesting, you know, rigorously

11  evaluate each of these claims previously, I think I would be

12  comfortable to rely on that.  I don't know whether or not

13  everybody who's going to be applying for this February deadline

14  falls within that category.  If that's true that they do fall

15  into that category, I think that's very helpful.  You know, to

16  the extent that those funds have also awarded damages, I know

17  not in a judicial way, but have assessed value, I guess one

18  question that I would have is why is that not presumptively the

19  correct number?  Why should the Court be coming up with a

20  different number?

21         MS. FLOWERS:  Your Honor, this is Jodi Flowers.  I

22  think the answer to that is also in the briefing that we would

23  have to present to you.  There's a large body of law not

24  dissimilar to what is the basis for the current numbers that

25  are being awarded on injury claims in this setting.  And they

1  range, based on our research to date, anywhere between 2

2  million and 12 million depending on whether you've got somebody

3  with burns over 80 percent of his body, for example, or versus

4  somebody who has a broken bone at the lower end.  That's simply

5  a comment as to the on the day of.

6           With respect to the more latent injuries, the

7  cancers, the digestive disorders, we can begin to group those.

8  I think that's a little bit different and probably more

9  difficult analysis.

10          MS. BENETT:  Your Honor, this is Megan Benett from

11  Kreindler & Kreindler again.  My partner, Noah Kushlefsky, is

12  with us as well and he handles all of the VCF-2 work.  And I

13  know that on the question of causation and this grouping

14  injuries into different categories, we talked about that

15  internally, and Noah has some ideas about [inaudible] at the

16  broadest level between inhalation cases and cancer cases

17  because the proof on causation on those was meaningfully

18  different when presented and incorporated into the VCF

19  regulations and I don't know if the Court wanted to hear

20  anything more detailed about that, but Noah could speak to it.

21          THE COURT:  Sure.  I'm happy to hear.

22          MR. KUSHLEFSKY:  Well, Your Honor, in the original

23  Zadroga Act in 2010 only upper and lower respiratory injuries

24  were included by Congress.  And they did that based on the

25  science that was available at the time.  And they made the

1  decision to ignore any external factor that could have

2  contributed and basically said that we know that these

3  constituents in the air caused these respiratory illnesses,

4  we're not going to get into qualitative discussion of whether a

5  person was a smoker, whether a person worked in an industry

6  that might have contributed to -- and we're not even going to

7  be concerned with whether they had the respiratory condition

8  before so long as it was exacerbated.  And that was relatively

9  straightforward.  They specifically excluded, Congress

10  specifically excluded cancer because of the causation issues

11  which became really mostly a political issue at the time.  And

12  instead, what Congress created was the Science and Technology

13  Advisory Commission where someone could petition to have any

14  condition added over time as the science became better.  The

15  cancer issue was controversial but all of the New York

16  legislators made a petition and it became apparent that there

17  was a groundswell to get cancers included.  And the way they

18  got to including the cancers was really by looking at medical

19  literature to see what the constituents in the air could cause

20  and then adding those cancers.  The science wasn't there at the

21  time and I don't know that it's advanced much beyond that at

22  this point.  But they really used to some degree statistics but

23  mostly if, for example, jet fuel had benzene and benzene could

24  cause these five cancers, we'll include them.  So they kind of

25  reverse engineered them into inclusion as a presumption again

1   ignoring any other environmental exposures, occupational

2   exposures that could have contributed.

3           THE COURT:  And so it came to be that the fund then

4   allowed cancers to come in as a matter of law?

5           MR. KUSHLEFSKY:  Yes.  They basically through

6   regulation -- what the VCF does is it accepts what the health

7   program accepts.  So the [indiscernible] commission made the

8   recommendation to the health program, the health program NIOSH

9   through regulation added them, and the VCF therefore

10  presumptively accepts them.

11          THE COURT:  Thank you.  That was helpful.  And so --

12          MR. KUSHLEFSKY:  The whole process was designed to

13  avoid having to go to court to prove it.

14          THE COURT:  Right.

15          MR. KUSHLEFSKY:  Oh, I'm sorry, and with respect to

16  your observation before as to whether the VCF is awarding

17  numbers that would be kind of the presumptive damages, one

18  thing that I think is important to note is that a lot of the

19  numbers in the VCF have become numbers based on policy, not

20  actual damages.  For example, in VCF-1 if you had a decent

21  respiratory condition that was disabling, they paid you 125,000

22  and 90,000 for non-disabling.  When VCF-2 opened, COPD and

23  bronchitis and sarcoidosis would get 90, but asthma would get

24  60, 65.  When it was re-authorized, they dropped bronchitis and

25  COPD and asthma and all other upper respiratory conditions down

1  to 20,000.  So you have people who have identical conditions,

2  identical severity, identical age, et cetera.  One of them got

3  125 and one of them got 20.  So it's very difficult to look at

4  those numbers as having any real bearing on actual damages.

5          THE COURT:  Okay.

6          MS. FLOWERS:  This is Jodi Flowers.  I agree with

7  that.  I would simply add that I do think there's guidance in

8  the context of the anti-terrorism laws and FSIA that does give

9  sort of a different set of damages for the Court to consider.

10 And we have not a lot of clients but quite a hearty handful of

11 vociferous clients who really had never, for whatever reason,

12 either did not seek medical treatment within the 72 hours

13 required in the first VCF because they were in shock or they

14 didn't do well at all in the second for whatever reason but who

15 are seriously and severely disabled who've never been able to

16 recover much at all.  And I think those are probably -- I don't

17 know how much the Court -- I guess I would ask for the Court's

18 guidance about how much you believe that information is

19 relevant to your decisions here.

20         THE COURT:  Right.  So these are the people who did

21 not apply for the VCF?

22         MS. FLOWERS:  This is Jodi again.  No, people that

23 perhaps did apply but got $20,000 or something like Noah was

24 suggesting, but have since developed severe conditions and not

25 gone to VCF-2 for whatever reason.

1          THE COURT:  Okay.  This is obviously hugely

2   complicated.  Let me -- you had mentioned briefing.  I guess,

3   you know, I mean we are obviously engaged on this issue and we

4   will do our very best to be as accommodating as we can.  And it

5   may be that it makes sense for there to be a Special Master to

6   handle all of this.  I know you recommended two people.  Have

7   you been in touch with both of those people?

8          MS. FLOWERS:  This is Jodi.  Yes, we have.

9          THE COURT:  And both I assume would be available to

10   work in January?

11          MS. FLOWERS:  Yes, Your Honor.

12          THE COURT:  Okay.  Does it make sense for you to

13   brief all this to me in whatever short fashion you can do it

14   and so we can come up with -- and give me a recommendation of

15   how you think we should proceed?  I mean you all have more

16   information than I do.  This is been a very helpful conference

17   for me.  But I think I'd like to hear from you on what you

18   think is the most efficient way to proceed and what you think

19   the Court can rely on, what assumptions and presumptions the

20   Court can accept and think about whether or not we should be

21   sending test cases to a Special Master or whether they should,

22   if they're not that many of them, maybe they can come to me.  I

23   guess again we don't know exactly what numbers we're talking

24   about here.

25          MS. FLOWERS:  Your Honor, this is Jodi Flowers again.

18

1   I think that's right, we don't know the numbers, but I can tell

2   you that as we work on this each day the numbers are going

3   down.  The numbers we presented to you in a letter were in

4   broad strokes here are the most we think are possible.  And

5   that is coming down.  And so that has had me at least asking

6   that same question you just post about will we need a Special

7   Master after all?  Maybe that's something we cross, a bridge we

8   cross when we get there.  I do think a briefing on the sword of

9   the state of personal injury damage claims under the FSIA is an

10  appropriate brief to present to you as well as the factual

11  underpinnings that we've touched on today with respect to the

12  different eligibility determinations and causation issues that

13  have already sort of preceded where we are today.  I don't know

14  if it makes sense to do that all in one brief or if we should

15  do a brief on the damages, a separate brief on causation.  I do

16  think the eligibility piece is the easiest lift because if

17  these people went to either fund they've been deemed eligible,

18  they are who they say they are.  But I guess I'd ask for the

19  Court's guidance if you'd rather have it all in one brief or if

20  we can chop it up a little bit.  For example, on the damages

21  piece, if they could get it to you sooner, I would like a

22  little more time particularly with my co-counsel to confer on

23  the causation piece.  But if you want it all at once, we'll

24  make it happen.

25          THE COURT:  I guess that in the damages piece it's a

1  little cart before the horse.  I'm not quite sure what I would

2  do with that information without having a better sense of how

3  we're going to be evaluating these claims.  So tell me why you

4  think, other than it's easier for you why you think getting me

5  the damages component advances this conversation without the

6  rest of it.

7      MS. FLOWERS:  Your Honor, that was simply because

8  we've done that work up.

9      THE COURT:  Okay.  That's a good answer.

10      MS. FLOWERS:  Absolutely.  But we absolutely can put

11  it together with the others so you don't have to read more than

12  one paper.

13      THE COURT:  Right.  I mean there's that but more

14  importantly I just -- I'm trying to get sort of a big picture

15  here and I worry that if I get half of it and it's sort of the

16  second half, meaning the damages, without an understanding of

17  how we get there, it's going to be more confusing than not.

18      MS. FLOWERS:  Agreed.

19      THE COURT:  So why don't we set a deadline for a

20  submission that includes I think history as you put it of these

21  different funds and what people have gone through and what has

22  been established for these claims meaning, you know, I thought

23  it was helpful for me to understand that in certain funds

24  already if you establish presence and you've establish a

25  qualifying health injury that's sort of the end of the story.

1   It would be helpful for me to know which regimes have adopted

2   that practice and then among the claimants how many of them

3   have already been sort of certified as it were.  If many of the

4   people that we're talking about here have been certified by

5   some other authority, then I have much greater confidence in

6   moving into the damages phase.  My concern before this call was

7   that all of that was going to be something that the Court had

8   to take on in the first instance.  You know, were you actually

9   there?  Are you actually injured?  And if that is happened,

10  then the bite is a lot smaller.  So whatever information you

11  can provide to me about the different regimes, who's been

12  through these regimes, whether or not all of the anticipated

13  claimants have been through these regimes, and what they have

14  adopted and established.  And then I think the damages

15  information which I think would include at least the

16  information that -- Noah, I'm forgetting your last name,

17  apologies, but Noah was explaining about the different damages

18  awards and how it sort of diminished over time because of

19  policy consideration and then what other either cases or

20  regimes the Court could look to to establish appropriate

21  damages to these claimants.  And then, you know, what your

22  recommendation is to actually get through this process by mid-

23  February.  And again, if everybody or nearly everybody that's

24  going to be submitting a claim has been, I'll use the term

25  certified, and the question is really what sort of damages

1    should be awarded in the context of this terrorism case, I feel

2    much more comfortable doing that rather than having to get a

3    Special Master involved.  By contrast, if we need to establish

4    that these people are even entitled to damages, then that's

5    more complicated.

6            And then the last thing I'll say, because this came

7    up in some of the other cases, is I'm not going to issue

8    judgments for people who are not plaintiffs.  I just want to

9    make that clear.  This happened a couple of months ago.  So

10   anybody who wants a judgment from the Court needs to be a

11   plaintiff in this case.  And so to the extent anyone hasn't --

12           MS. BENETT:  This is --

13           THE COURT:  Yes, Ms. Benett?

14           MS. BENETT:  Sorry, this is Megan.  So to make sure I

15   understand, this is just a question of people who had not been

16   added by notice of amendment to the suit against Iran, any of

17   the suits against Iran, but moved for judgments nevertheless?

18           THE COURT:  Correct.  We had a situation, there were

19   a series of court orders.  I don't believe there were any of

20   your clients I think.  But there were a series of judgments

21   that were entered in other cases where the lawyer was sort of

22   assuming that, for instance, a family member, even a legitimate

23   family member, a spouse, would be able to get a judgment even

24   though the only party in the action was the estate.  And by my

25   read of the law, you can't get a judgment without being a

1    party.  And so I just want to make that point explicit because

2    we had that issue in September and I don't want to have to deal

3    with that a second time.  So if any of these however many we're

4    talking about claimants are not parties in an action against

5    Iran that are seeking a judgment against Iran, they need to

6    file a notice of amendment make sure they're in the case.  And

7    so that's just another procedural layer that needs to be taken

8    care of in advance of any request for a judgment.

9              MS. BENETT:  This is Megan.  Understood.  We had one

10   question.  The Court uses the word certification and we weren't

11   sure if that is meant as a proxy for causation in the way that

12   the word is being used meaning that if -- it seems to me at

13   least that it would be for the Court to decide ultimately

14   whether being, for example, eligible for payment from the VCF,

15   which is different than being certified within the VCF is a

16   qualifying injury along with presence, but whether VCF

17   eligibility will suffice.  I mean I think that's ultimately --

18   the Court is going to have to make that decision if the

19   presumptions satisfy whatever causation requirement are

20   demanded in order to get a judgment.  But when the Court

21   says -- so I guess the question was since the Court already

22   reached a decision or is inclined towards a decision that

23   certification -- sorry, that eligibility or certification with

24   the VCF would establish causation.  Or is that what you want

25   to -- I mean we can address what the requirements for

1  certification and for eligibility, but we just weren't sure if

2  that was being used as a proxy for legal causation or damages

3  judgment before the Court.

4  　　　　THE COURT:  I'm not sure I understand what you just

5  said but --

6  　　　　MR. KUSHLEFSKY:  Judge, this is Noah Kushlefsky.  If

7  I can just jump in.  So what you can pull from eligibility of a

8  victim compensation fund is they have very strict proof of

9  presence requirements.  So a determination that someone is

10  eligible for the VCF I think should ultimately satisfy the

11  Court that the person was present and has the requisite

12  exposure to potentially tie any illness or injury to that

13  exposure.

14  　　　　The next part is certification for the injury is

15  simply that they meet the exposure and they certify the injury

16  as eligible for compensation.  The compensation part takes the

17  leap that they presume the causation and therefore are

18  compensated.  When Your Honor was describing certification, the

19  question was whether you were saying --

20  　　　　THE COURT:  Yeah, no, I get you, I get you.

21  　　　　MR. KUSHLEFSKY:  -- [inaudible] VCF eligibility.

22  　　　　THE COURT:  I understand.  I was not using the word

23  certification to mean anything of any particular legal

24  significance.  What I expect is that in this brief that we're

25  discussing that the lawyers would set forth for me all of the

sort of bureaucracy that happens in these funds.  So this is

what you need to establish.  This is the type of review and

this is how the funds sort of make decisions, and to let me

know that these category of people have already been through

this process and have been found to be eligible and what that

eligibility actually means so that I can then say to myself all

right, if it's good enough for this fund, is it good enough for

the Court?  So when I was talking about certification, I didn't

mean for it to have any greater legal significance by

appropriating a term that's used in the VCF process.  I want

you to educate me on that process, educate me on what a

claimant would be to do to establish recovery and whatever

legal conclusions the funds have made.  So presence, you've

explained to me that as long as somebody can establish presence

and establish a qualifying health injury, that's enough, and

therefore, they can move on to get a damages recovery.  And so

I'd like you to explain to me what that process is so I can get

a sense of how rigorous it is and whether or not it's

satisfactory to me.  It may be that based on my review if

somebody has gone through the process and has been deemed

eligible for funding, that that may be enough for me too.

        MS. FLOWERS:  Your Honor, this is Jodi Flowers.  I

just wanted to add that for our cases, our 351 that we referred

to earlier, they are all plaintiffs in the litigation and they

are also already were on our default motion.  So they've got

25

1    the liability default.

2              THE COURT:  Good.  So let's talk about dates.

3              MS. FLOWERS:  Okay.

4              THE COURT:  Today is the 13th of December.  I

5    recognize that a significant holiday is coming up, many of

6    them.  Do you want to get me something by very early January or

7    do you want to try to get it to me sooner?

8              MS. FLOWERS:  Your Honor, this is Jodi Flowers.  My

9    personal preference would be early January.

10             MS. BENETT:  No objection from the Kreindler side.

11             THE COURT:  What if we said Monday, January 6th?  Do

12   we think that's going to be enough time?

13             MS. FLOWERS:  Yes.

14             MS. BENETT:  Yes.

15             THE COURT:  Okay.  And I'm assuming this is going to

16   be one submission.

17             MS. FLOWERS:  Correct.

18             MS. BENETT:  Yes.

19             THE COURT:  So let's say Monday, January 6th.  With

20   respect to the Special Master, I'm not sure what to do because

21   I don't know what you're going to tell me.  And so I don't know

22   whether or not you want to be in touch and, you know, obviously

23   those people have professional lives and need to know whether

24   or not they're going to be engaged or not.  I guess I'm at a

25   loss as to what we should do with respect to those people.

1          MS. FLOWERS:  Your Honor, this is Jodi Flowers.

2     Would it make sense between now and January 6th, because we're

3     going to know a lot more each day frankly about our numbers,

4     to -- and I do believe it's just the Kreindler firm and the

5     Motley Rice firm who are at issue here.  I don't believe the

6     O'Neill plaintiffs who are on the phone are having to bring

7     this round and I'm not aware of anyone else who is.  As I look

8     at it, I think that that is a little bit fluid and I would

9     suggest that we try to get to you something on that before

10    January 6th.

11         THE COURT:  I think that's a great idea.

12         MS. FLOWERS:  So that we can --

13         THE COURT:  I think that's a great idea.  Could we

14    get a status letter maybe the end of next week?

15         MS. FLOWERS:  Yes.

16         THE COURT:  So let's get a status letter on the 20th,

17    and that status letter should give me a sense of where we think

18    the numbers are.  I'm not going to hold anybody to it but where

19    we think the numbers are.  And to the extent you want to

20    preview what you think you're going to propose to the extent

21    you know, maybe you don't, so I don't need to have the sort of

22    background, but if you think you're going to be able to --

23    you're going to propose, you know, that there are going to be

24    150 claimants and you think that you can have me look at 20 and

25    make decisions from there, for instance, that might be a

1  helpful thing for me to know.  And you know, a scenario like

2  that I think I can do without having to engage a Special

3  Master.

4        MR. EUBANKS:  Your Honor, this is John Eubanks from

5  Motley Rice.  Would it behoove the Court if, for example, we

6  have a certain  number of claims prepared to be submitted in a

7  form that could be adjudicated by Your Honor then between now

8  and that January 6th time period that we submit those for your

9  consideration so that you have an idea of what you're looking

10 at in addition to the status letter to kind of get a better

11 idea as to how many number -- what the numbers look like going

12 forward?

13        THE COURT:  That's fine.  I too will be acknowledging

14 the upcoming holidays so I don't know how much between December

15 20th and January 6th I'm going to be able to do on this case as

16 compared to other cases that I intend to be working on over

17 those holidays.  But if you have them and you want to submit

18 them, we're not going to bounce them.

19        MS. BENETT:  This is Megan Benett at Kreindler.  I

20 have one last question that is semi-related to -- well, it

21 relates to the proposed order we are set to submit on Monday.

22 I gather that we can pull off the list [inaudible] the order on

23 the personal injury cases.

24        THE COURT:  I'm sorry, what?

25        MS. BENETT:  I think the Court had directed us to

28

1  submit proposed uniform judgments that were going to be used

2  going forward before the next USVSST deadline in connection

3  with solatium, estate, and personal injury --

4          THE COURT:  Yes.

5          MS. BENETT:  -- motions for a final judgment.

6          THE COURT:  Yes.

7          MS. BENETT:  Should we hold off on the personal

8  injury form until after these questions have been addressed?

9          THE COURT:  I think so.  I don't have that order in

10  front of me.  I consider the solatium claims personal injury

11  claims.  So those we want to have covered.  But I think these

12  sort of direct personal injury we should hold off on.

13          MS. BENETT:  And on the -- I just wasn't sure if the

14  Court on the estate claims has updated all of the economic loss

15  figures for our clients we have the original economic loss

16  numbers and the volume of what we would be submitting to the

17  Court in support of our motion for those estate claims are

18  going to be pretty substantial because it's the 400 original

19  economist reports by 400 some updated calculations.  And I

20  wasn't sure if the Court might prefer that we submit those by

21  disk or this is something that we should address in whatever we

22  file on Monday.

23          THE COURT:  I don't think our computers take disks

24  anymore so I'm not sure that's a good solution.  I'm being told

25  they do.  I guess probably that makes sense.  I don't want to

1   crash the system any more than it already crashes when we

2   opened up this case.

3            MS. BENETT:  Yeah.  Indeed, indeed.

4            THE COURT:  Right.  And again, we need you to help us

5   help you as it were.  And so the more uniformity where we can

6   sort of be looking always in the same place for the relevant

7   information, that's what we want.  So I'm not looking for

8   pretty prose.  I'm looking for like something that we can sort

9   of go through, satisfy ourselves that we're doing the right

10  thing, but we can't possibly be reading thousands and thousands

11  of pages of submissions.  And so whatever you can do -- which

12  is why we wanted the exemplar proposal so that we at least can

13  sort of agree on some simplicity here.

14           MS. BENETT:  Got it.

15           MS. FLOWERS:  Your Honor, in terms of -- this is Jodi

16  Flowers.  In terms of the personal injury cited, we have

17  thought about that form obviously and the form is a short

18  affidavit from the injured person telling their story.

19           THE COURT:  Okay.

20           MS. FLOWERS:  But I don't know based on our

21  conversation today I'm not sure that you need that Monday.  I

22  think it makes more sense to me to include it in the January 6th

23  filing but we will do what helps the Court the most.

24           THE COURT:  I don't think I need that before then.

25           MS. FLOWERS:  Okay.  Thank you.

1        THE COURT:  Right.  And I guess I assume a lot of

2   those affidavits have already been prepared.  To the extent

3   they have not been prepared, you know, I would just urge you to

4   have a sort of just the relevant facts in these affidavits.

5   Nobody's going to -- I don't think anybody's claim is going to

6   be adjudicated based on how descriptive or how many adjectives

7   anybody's using here.  You know, we want to just sort of try

8   and get as much objective information as possible.

9        MS. FLOWERS:  This is Jodi Flowers.  Understood, Your

10  Honor.  And we will certainly do that.  I'm going to warn you

11  about the exception of one client that I simply can't

12  control --

13        THE COURT:  Understood.

14        MS. FLOWERS:  -- who wants to write her book, but I

15  will cut it way back.

16        THE COURT:  Understood.  I was a lawyer before I was

17  a judge.

18        MS. FLOWERS:  Okay.  Thank you.

19        THE COURT:  Okay.  So I think we have a plan.  So I'm

20  going to hear from you on this issue that we've been discussing

21  for the last hour on the 20th with an update status letter.  And

22  then we will get a brief with a recommended course of action by

23  January 6.  And we will anticipate that January 6 motion and be

24  ready to act on it right away.  All right?  Anything further

25  from anyone?

31

1          MS. FLOWERS:  Thank you, Your Honor.

2          THE COURT:  All right.  Well, thank you all for

3    making time this afternoon on short notice and I wish everybody

4    a happy holiday season.

5          MR. KUSHLEFSKY:  Thank you, Your Honor.

6          MS. FLOWERS:  Same to you.  Thank you.

7          MS. BENETT:  Thank you, Your Honor.

8                        * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32

1        I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    *Mary Greco*
                          _____

6                                    Mary Greco

7   Dated:   December 29, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25