# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) <br> ECF Case |

This document relates to:

*Cheryl Rivelli, et al v. Islamic Republic of Iran (1:18-cv-11878) (GBD) (SN)*

## THE *RIVELLI* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT III (Functional Equivalent)

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Vianny M. Pichardo, Esq.
Bruce E. Strong, Esq.
Stephen Wah, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:    212-278-1000
Fax:    212-278-1733
Email:  jgoldman@andersonkill.com
         vpichardo@andersonkill.com
         bstrong@andersonkill.com
         swah@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  January 2, 2020
        New York, New York

# TABLE OF CONTENTS

**Page**

I.   Procedural Background ................................................................................................ 2

II.  Damages ....................................................................................................................... 2

   A. Solatium Damages ................................................................................................... 3

   1.   Individuals Not Named in the Complaint Entitled to Solatium Damages ....................... 6

      **(a)** *Christopher Michael Ruggieri, child equivalent of Joseph Rivelli, Jr.* ..................... 6

      **(b)** *Phylicia Ruggieri, child equivalent of Joseph Rivelli, Jr.* ......................................... 7

   2.   Functional Equivalents of Immediate Family Members ............................................... 7

      **(a)** *Christopher Michael Ruggieri, child equivalent of Joseph Rivelli, Jr.*
           Presumptive Award: $8.5 Million Requested Award: $8.5 Million ........................ 9

      **(b)** *Phylicia Ruggieri, child equivalent of Joseph Rivelli, Jr.*
           Presumptive Award: $8.5 Million Requested Award: $8.5 Million ........................ 9

   B. Punitive Damages ................................................................................................... 14

   C. Prejudgment Interest .............................................................................................. 15

Conclusion ......................................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya,*
   775 F. Supp. 2d 48 (D.D.C. 2011) ................................................................................14

*Belkin v. Islamic Republic of Iran,*
   667 F. Supp. 2d 8 (D.D.C. 2009) ...................................................................................4

*Estate of Bland v. Islamic Republic of Iran,*
   831 F. Supp. 2d 1 50, 156 (D.D.C. 2011) ..................................................................4, 13

*Dammarell v. Islamic Republic of Iran,*
   281 F. Supp. 2d 105 (D.D.C. 2003), vacated on other grounds, 404 F. Supp.
   2d 261 (D.D.C. 2005) ...................................................................................................3

*Estate of Heiser v. Islamic Republic of Iran,*
   466 F. Supp. 2d 229 (D.D.C. 2006) ...............................................................................4

*Surette v. Islamic Republic of Iran,*
   231 F. Supp. 2d 260 (D.D.C. 2002) ...............................................................................4

*Valore v. Islamic Republic of Iran,*
   700 F. Supp. 2d 52 (D.D.C. 2010) ..............................................................................3, 4

*World Trade Farmers Market, Inc. v. American Airlines, Inc. (In Re: September
   11th Litigation),*
   2015 U.S. App. LEXIS 16619 (2d Cir. Sept. 17, 2015) ...............................................14

**Statutes**

28 U.S.C. § 1605A(a)(1) ........................................................................................................2

28 U.S.C. § 1605A(c)(4) .....................................................................................................2, 13

Federal Air Transportation Safety and System Stabilization Act ("ATSSSA")
   Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. §
   40101) ........................................................................................................................14

## INTRODUCTION

For the reasons set forth below, and the statements contained in the declaration of Jerry S. Goldman, Esq., which is filed contemporaneously with this memorandum of law, along with the exhibits appended thereto (the "Goldman Declaration"), certain plaintiffs in the above-referenced matter who are identified on Exhibit A to the Goldman Declaration (collectively, the "*Rivelli III* Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court to award solatium damages for the losses suffered by the relatives,[1] or functional equivalents thereof, of an individual killed as a result of the terrorist attacks on September 11, 2001 ("9/11 decedent"), in the same amounts previously awarded by this Court to other similarly situated plaintiffs against the Islamic Republic of Iran ("Iran"); a determination that Christopher Michael Ruggieri and Phylicia Ruggieri are the functional equivalent of Joseph Rivelii, Jr.'s children, a firefighter who died on September 11, 2001 when the World Trade Center collapsed; award prejudgment interest on those damages; and permit the *Rivelli III* Plaintiffs to seek punitive damages and economic and other appropriate damages at a later date, for the reasons set forth below.  This motion is made only on behalf of the *Rivelli III* Plaintiffs listed in Exhibit A attached to the Goldman Declaration,[2] which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

---

[1] The plaintiffs listed on Exhibit A are the relatives, or functional equivalents of a relative, of a 9/11 decedent.  In the case of a relative who died subsequent to the 9/11 decedent, the claim is brought by the personal representative of the relative's estate.  As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative.  Goldman Decl. at ¶¶ 3-8.

[2] Exhibit A only includes plaintiffs who intend to submit US VSST applications in 2020.  The *Rivelli* plaintiffs who are not included on Exhibit A have either already filed a motion for liability and damages (*In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4868-4871 ("*Rivelli I*")) or intend to file a motion seeking damages at a later date.

As the awards set forth in the attached proposed order represent the only direct recovery against Iran on behalf of the *Rivelli III* Plaintiffs, any award issued to those individuals will constitute final awards and judgments against the Islamic Republic of Iran for those solatium claimants listed in Exhibit A to the Goldman Declaration.

## I.   Procedural Background

On August 15, 2019, certain *Rivelli* Plaintiffs filed a Motion for Default Judgment Against the Islamic Republic of Iran for Liability and Damages. *In Re Terrorist Attacks on September 11, 2001*, No. 03-md-1570, ECF Nos. 4868-4871 (hereinafter "*MDL*").  On September 3, 2019, the Court granted the Motion as to liability as to all Plaintiffs in the case, and granted judgment as to damages to those Plaintiffs specifically named therein. *MDL* at ECF No. 5047 (*Rivelli I*).  The Plaintiffs set forth on Exhibit "A" have been added pursuant to a Notice of Amendment being filed contemporaneously with this Motion as discussed in Section II-A-1, herein.

## II.   Damages

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs

can recover punitive damages. *MDL*, ECF No. 2623 at 2-3 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010)).

Plaintiffs identified in Exhibit A are comprised of immediate family members or functional equivalents of such family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents or other documents signed under penalty of perjury, which attest to a family relationship eligible for recovery, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[3]  *See* Goldman Decl. at ¶¶ 3-8.

As liability has been established in this matter, each such family member is now entitled to solatium damages in the amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks"). In accordance with the terms of the FSIA, the Plaintiffs identified in Exhibit A are entitled to compensation under Section 1605A for their solatium damages and are also entitled to prejudgment interest.

### A. Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously

---

[3] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 1 50, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lambert's framework in *Heiser* was appropriate. In *Havlish*, Judge Maas explained that an upward departure was warranted because the decedents' immediate family members suffered, and continue to suffer, "profound agony and grief" and "[w]orse yet, . . . are faced with frequent reminders of the events of that day." *MDL*, ECF No. 2618, at 10-12. Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the victims'

families . . . ." *Id.* at 11.  In that Report, with which this Court later agreed, Magistrate Judge

Maas recommended that solatium damages be awarded to the immediate family members of the

victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, *MDL*, ECF

No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of

certain of the *Ashton* Plaintiffs, *MDL*, ECF No. 3300, and in the September 12, 2016 Order

pertaining to plaintiffs in the *Bauer* case, *MDL*, ECF No. 3341, and in the October 14, 2016

Report and Recommendation and October 31, 2016 Order in the *Hoglan* case, *MDL*, ECF Nos.

3363, 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order

relating to the claims of additional *Ashton* Plaintiffs, *MDL*, ECF No. 3977 at 6–7.  The same

amounts were recently adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final

Default Judgment in the matter known as "Burnett/Iran II,"[4] No. 15-cv-09903, ECF No. 101.

The solatium losses suffered by the *Rivelli III* Plaintiffs before the Court in this

application are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*,

---

[4] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this
Court's order of July 31, 2017. *MDL*, ECF No. 3666.

*Ashton*, *Bauer*, *Hoglan* and *Burnett* cases. As such, Plaintiffs identified on Exhibit A respectfully request that the Court grant awards of solatium to the immediate family members and functional equivalents as identified on Exhibit A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan* and *Burnett* cases.

### 1. Individuals Not Named in the Complaint Entitled to Solatium Damages

Pursuant to paragraph 5 of Section ii(d) of the Plaintiff's Executive Committee Letter, dated January 23, 2017, MDL, ECF No. 3433, which was adopted by the Court through Order, dated January 25, 2017, MDL, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate.  The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative."  MDL, ECF No. 3433.

### (a) *Christopher Michael Ruggieri, child equivalent of Joseph Rivelli, Jr.*

Christopher Michael Ruggieri is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Joseph Rivelli, Jr., family entitled to receive a

judgment for solatium based upon his family relationship, as the 9/11 decedent's stepchild that should be deemed the functional equivalent of Joseph Rivelli, Jr.'s child.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435. Goldman Declaration at ¶ 15.

Accordingly, judgment should be entered in favor of Christopher Michael Ruggieri's favor as if he was a named plaintiff, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

(b)   ***Phylicia Ruggieri, child equivalent of Joseph Rivelli, Jr.***

Phylicia Ruggieri is an individual who is not named in the complaint but is otherwise a member of the 9/11 decedent's, Joseph Rivelli, Jr., family entitled to receive a judgment for solatium based upon his family relationship, as the 9/11 decedent's stepchild that should be deemed the functional equivalent of Joseph Rivelli, Jr.'s child.  The personal representative of the relevant 9/11 decedent is a named party in this litigation and has complied with the Court's requirements pursuant to its January 25, 2017 Order.  *See* MDL, ECF No. 3435.  Goldman Declaration at ¶ 16.

Accordingly, judgment should be entered in favor of Phylicia Ruggieri's favor as if she was a named plaintiff, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton, Bauer, Hoglan* and *Burnett* cases.

## 2.  Functional Equivalents of Immediate Family Members

The October 14, 2016 Report and Recommendation recommended that in addition to those individuals who are considered traditional "family members," damages could also be

awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. *See MDL*, ECF No. 3363.

In that report, three factors were identified as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member. Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id.* at 10-12. In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id.* With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id.*, pp. 14-15. In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id.*, pp. 17-28.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected on Exhibit A to the Goldman Declaration, had the "functional equivalent" of a biological or spousal relationship and they are therefore entitled to an award for solatium damages.

(a) ***Christopher Michael Ruggieri, child equivalent of Joseph Rivelli, Jr.***
**Presumptive Award: $8.5 Million**
**Requested Award: $8.5 Million**

(b) ***Phylicia Ruggieri, child equivalent of Joseph Rivelli, Jr.***
**Presumptive Award: $8.5 Million**
**Requested Award: $8.5 Million**

Joseph Rivelli, Jr. was a firefighter who died on September 11, 2001 when the World Trade Center collapsed. Christopher Michael Ruggieri was the stepson of Joseph Rivelli, Jr. and Phylicia Ruggieri was the stepdaughter of Joseph Rivelli, Jr. For the reasons set forth below, and in the accompanying Declaration of Christopher Michael Ruggieri ("C. Ruggieri Decl."); the Declaration of Phylicia Ruggieri ("P. Ruggieri Decl."); and the Declaration of Cheryl Rivelli ("Rivelli Decl.") annexed as Exhibits B, C, D to the Goldman Declaration, respectively, Plaintiffs submit that Christopher Michael Ruggieri and Phylicia Rugguiero should be deemed child equivalents.

Christopher Michael Ruggieri and Phylicia's biological parents separated in 1992 when Christopher and Phylicia were about 2 and 6 years old, respectively. They lived with their mother at the time. In 1995, their biological parents were divorced. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 3; Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 3; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 3.

In 1992, Joseph Rivelli, Jr., or Joey as he was affectionately called by family and friends, came into Christopher and Phylicia's life when he started dating their mother Cheryl. Joey worked as a firefighter with Ladder Co. 25 in Manhattan. Christopher and Phylicia were 2 and 6

years old at the time, respectively.  After they started dated, Joey started staying with Christopher and Phylicia and would later move in with them and Cheryl.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 4 and Exhibit 1; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 4 and Exhibit 1; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 4 and Exhibit 1.

When Joey started dating Christopher and Phylicia's mother, their families immediately became very close as Joey and Cheryl had family in common by marriage.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 5; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 5; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 5.

In 1994, Cheryl and Joey purchased their family home in Inwood, New York.  Joey was already staying with Christopher and Phylicia before purchasing the home as it was already their family home.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 6; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 6; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 6.

On October 10, 1997, Joey and Cheryl were married.  Joey was 39 years old at the time. After they were married, Joey, Cheryl, Phylicia and Chistopher officially became a family. However, they were a family long before Joey and Cheryl were married as Christopher and Phylicia had been living with Joey for years and Christopher and Phylicia had long considered Joey their father.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 7 and Exhibit 2; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 7 and Exhibit 2; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 7 and Exhibit 2.

Even though they had a relationship with their biological father, Christopher and Phylicia also always considered Joey as a real father in their life and the one they truly counted on.  As early as they can remember, Joey had always been there for them.  They do not have any

memories without him before his passing. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 8;
Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 8; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 8.

As a firefighter, Joey worked hard to provide for Christopher, Phylicia, and their mother.
He was the financial support in their family, particularly since they rarely received child support
from Christopher and Phylicia's biological father. As soon as Joey and Cheryl were married,
Joey added Christopher and Phylicia to his health benefits and Christopher and Phylicia were
listed as Joey's dependents on his tax returns. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶
9; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 9; and Goldman Decl., Ex. D: Rivelli Decl. at ¶
9.

In addition to his financial support, Joey treated Christopher and Phylicia like his
children, emotionally and socially to everyone he came across. Joey did not have any biological
or adopted children. Christopher and Phylicia respected Joey as their dad. He would give
Christopher and Phylicia advice (and, of course, discipline) like any loving father and as to the
outside world, there was no question that Christopher was his son and Phylicia was his daughter.
In fact, Christopher and Phylicia had never heard Joey refer to them as his stepson or
stepdaughter. He only referred to them as his children. And after he passed away on 9/11, it was
special and comforting to Christopher and Phylicia to hear stories from Joey's friends that Joey
always referred to Christopher and Phylicia as his children and that he was so proud of them. In
fact, the media coverage regarding Joey's death shows that he referred to Christopher and
Phylicia as his children and that he was a loving father to them. *See* Goldman Decl., Ex. B: C.
Ruggieri Decl., at ¶ 10 and Exhibit 3; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 10 and
Exhibit 3; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 10 and Exhibit 3.

Phylicia and Christopher were both very close to Joey.  Joey was changing Chris' diapers since he was a baby.  He taught Christopher how to ride a bike.  He would do the school shopping with his wife Cheryl, Phylicia and Christopher before the start of every school year. He read to Phylicia and Christopher at bedtime.  He was Christopher's football coach since Christopher started playing football at age 6 and went to both of Christopher and Phylicia's sporting practices and their games.  He was always there cheering them on.  He was still Christopher's football coach when he passed away.  He would give Phylicia advice about boys. In fact, Phylicia remembers how strict Joey was with her regarding dating since she was in highschool.  Other favorite memories include Christopher visiting Joey at the firehouse where Joey would let Christopher sit in the firetruck, their yearly vacations to Jamaica in the Spring, bi-yearly vacations to the Poconos in the Winter and Summer, and their frequent trips to Lake George.  Overall, Joey was always very active in Christopher and Phylicia's lives.  They never considered him someone other than their dad.  They went to him if they ever had a problem or needed advice.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 11 and Exhibit 4; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 11 and Exhibit 4; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 11 and Exhibit 4.

On September 11, 2001, their family was forever changed.  *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 12; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 12; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 12.

Christopher and Phylicia were 10 and 15 years old, respectively, and living in their Inwood home with Joey on September 11, 2001. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 13; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 13; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 13.

On that fateful day, Christopher was at school on his way to lunch and stopped by to say hi to his mother who also worked at the school. When he walked into her office, she was in tears after witnessing the second tower collapse on the TV. She later explained that earlier in the morning she had spoken with Joey as he was getting ready to leave to go to the World Trade Center. She had sensed tensions were high at the firehouse, but Joey assured her he would be ok. When Christopher and Phylicia got home, they waited for word regarding Joey along with family and friends. But no one ever came or called with news. It was a hard reality to face. Joey's firefighter family and Christopher and Phylicia's family rallied around them and supported them during this difficult time and continue to check in on them. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 14; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 14; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 14.

In November, Phyclia would speak at Joey's memorial service about what Joey meant to them. After the memorial service, Christopher and Phylicia also remember the day vividly around the New Year when they were told Joey's body had been found. A FDNY vehicle was waiting outside their house and they confirmed the news they all feared but knew was coming. Joey was outside the South tower along with a civilian he tried to rescue. To this day, Christopher and Phylicia miss having Joey's fatherly voice and know that it would have guided them through my childhood and now. But instead at the age of 11, with his passing, Christopher had to step up and be the man of the house as much as I could at that young age. Phylicia still gets emotional thinking about her loss, that they were not able to have him be part of so many life moments in our lives, and the many times in her twenties and throughout her life when she wishes he was there for her to go for fatherly advice and support but she did not have him. The patriarch of their family was gone and they've had to live on without him ever since. *See*

Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 15; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 15; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 15.

After 9/11, Phylicia and Christopher received social security benefits and children's fund benefits relating to firefighters. *See* Goldman Decl., Ex. D: Rivelli Decl. at ¶ 16.

In sum, Joseph Rivelli, Jr., was very much a father in Christopher and Phylicia's lives and they considered each other to be father and child in every way as did everyone that knew them. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 16; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 16; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 17.

Joey was in Christopher and Phylicia's lives for most of their young lives when he passed away and they continue to miss him with fond memories. *See* Goldman Decl., Ex. B: C. Ruggieri Decl., at ¶ 17 and Exhibit 5; Goldman Decl., Ex. C: P. Ruggieri Decl., at ¶ 17 and Exhibit 5; and Goldman Decl., Ex. D: Rivelli Decl. at ¶ 18 and Exhibit 5.

Based on Christopher Michael Ruggieri and Phylicia Ruggieri's extremely traumatic experience in losing their stepfather and a real father in their life at the time of Joseph Rivelli, Jr.'s death, both Christopher Michael Ruggieri and Phylicia Ruggieri should each be awarded the full solatium damages award of $8.5 Million otherwise awarded to the children of September 11, 2001 decedents.

## B. Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages. 28 U.S.C. § 1605A(c)(4). In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." *MDL*, ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive)

to 1 (compensatory). *MDL*, ECF No. 2623 at 2. The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, *MDL*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); *MDL*, ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); *MDL*, ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying a 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. *MDL*, ECF No. 3363 at 28. Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages. *MDL*, ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See, e.g.*, *MDL*, ECF No. 3666 (Judge Daniels' order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

## C. Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment. *MDL*, ECF No. 2618 at 13-14. This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's

reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate

of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed,

that prejudgment simple interest at the New York State statutory rate of nine percent per annum

was appropriate in cases where the injuries arose in New York and the prejudgment interest used

in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those

cases where the injuries arose in other states. *See MDL*, ECF Nos. 3229 at 2; 3300 at 1; 3341

at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate

should apply to the damages awarded to World Trade Center complex leaseholders in their

litigation against American Airlines and United Airlines brought under the federal Air

Transportation Safety and System Stabilization Act ("ATSSSA"). Pub. L. No. 107-42, 115 Stat.

230 (2001) (codified as amended at 49 U.S.C. § 40101); *World Trade Ctr. Props. LLC v. Am.*

*Airlines, Inc. (In re September 11th Litig.)*, 802 F.3d 314, 343 (2d Cir. 2015). In that case, the

Second Circuit concluded that a federal cause of action under the ATSSSA must look to state

rules concerning prejudgment interest. *Id.* Accordingly, the Second Circuit held that New

York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted

under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks. *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the

4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims.

*MDL*, ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its

entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of

the claims. *MDL*, ECF No. 3384 at 6. Thereafter, in *Burnett II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in the *Hoglan* and *Burnett* matters, applying the 4.96 percent rate to prejudgment interest, the *Rivelli III* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

**Conclusion**

For all of the reasons herein, plaintiffs respectfully request: (1) judgment as to damages on behalf of the *Rivelli III* Plaintiffs identified on Exhibit A only, which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent, in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; (2) a determination that Christopher Michael Ruggieri and Phylicia Ruggieri are the functional equivalent of Joseph Rivelii, Jr.'s children, a firefighter who died on September 11, 2001 when the World Trade Center collapsed; (3) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; and (4) permission for such plaintiffs to seek punitive damages and economic and other appropriate damages at a later date.

Respectfully submitted,

/s/ Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Vianny M. Pichardo, Esq.
Bruce E. Strong, Esq.
Stephen Wah, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:   212-278-1000
Fax:   212-278-1733
Email:  jgoldman@andersonkill.com
        vpichardo@andersonkill.com
        bstrong@andersonkill.com
        swah@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  January 2, 2020
        New York, New York