**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
| This document relates to:<br><br>*Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | 15-cv-9903 (GBD)(SN)<br>ECF Case |

<u>**MEMORANDUM OF LAW FOR ENTRY OF PARTIAL**</u>
<u>**FINAL DEFAULT JUDGMENTS ON BEHALF OF**</u>
<u>**BURNETT/IRAN PLAINTIFFS IDENTIFIED AT EXHIBIT A**</u>
<u>**WHO WERE NOT IMMEDIATE FAMILY MEMBERS**</u>
<u>**OF A 9/11 DECEDENT**</u>

***(BURNETT / IRAN XV)***

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A[1] to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order entering partial final default judgments against the Iran Defendants[2] and awarding the Plaintiffs identified in Exhibit A (1) solatium damages for the losses they suffered as functional equivalents of immediate family members of decedents killed on 9/11 (as indicated in Exhibit A) in the same per plaintiff amounts previously awarded by this Court to other similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran* plaintiffs identified in Exhibit A

---

[1] The references throughout this document to Exhibits are to Exhibits to the Eubanks Declaration dated January 3, 2020, filed contemporaneously with this motion.

[2] Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the deaths of plaintiffs' decedents in the 9/11 Attacks.

to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

This motion is made on behalf of the *Burnett/Iran* claimants listed in Exhibit A ("*Burnett/Iran XV* Plaintiffs") in light of this Court's previous orders granting permission to allow *Burnett/Iran* plaintiffs whose damages judgments had not previously been awarded to move for this relief. *See e.g.* 03-md-1570 (S.D.N.Y.) (GBD) (FM), ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5092, 5138, 5151, and 5356. The solatium claimants for whom relief is presently sought each have the functional equivalence of an "immediate family member" relationship to decedents who died in the September 11, 2001 terrorist attacks, and the intimate nature of their emotional connection with their lost loved ones and the anguish and grief they have suffered as a result of the attacks is detailed in the declarations included as Exhibits B through M to the Eubanks Declaration. Because these claimants' relationships to their loved ones were functionally equivalent to the biological relationships that this Court has previously found formed the basis of damages awards, the *Burnett/Iran XV* Plaintiffs should be awarded solatium damages under the Foreign Sovereign Immunities Act, applicable case law, and the law of the case.

Plaintiffs sued the Iran Defendants in connection with the deaths of plaintiffs' decedents in the 9/11 Attacks. On December 1, 2016, all plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Dkt. No. 15-cv-9903 (GBD) ("*Burnett/Iran*"), moved for judgment as to liability only. 15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69. On January 31, 2017, the Court granted plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85. The plaintiffs that are party to this application, as identified in Exhibits A, are a subset of the plaintiffs who have been granted

judgment as to liability only, and rely on that judgment as to liability only for their request for default judgment as to solatium damages. Other subsets of plaintiffs in the *Burnett/Iran* case previously requested and were granted similar judgments (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5092, 5138, 5151, and 5356). The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims in the amounts indicated in Exhibit A.

## I.       Procedural Background

Addressing the availability of solatium damages to non-immediate family members, this Court has previously addressed the criteria necessary to establish that a claimant had the requisite "functional equivalent" relationship with a 9/11 decedent to be treated the same as an immediate family member for purposes of solatium damages. *See* 03-md-1570 ECF Nos. 3363 and 3676 (in the context of the *Hoglan v. Islamic Republic of Iran*, 11-cv-7550 (GBD) (SN)). The factors considered by the Court for determining whether domestic partners and fiancées were functional equivalents of a spouse included duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation, and the presence or absence of a formal engagement. *See id*. at 14-15. The factors considered by the Court for determining whether stepsiblings or stepparents were functional equivalents of a decedent included the age of the decedent at the time when the stepsibling or stepparent became part of the family, whether the stepsibling or stepparent continuously cohabited with the decedent, and whether the stepsibling or stepparent established that he or she otherwise had a close and longstanding relationship. *See id. at* 15-16; *see also* ECF No. 3676 at 13-14 (reaffirming the framework set out in ECF No. 3363 and clarifying that the stepsiblings must have cohabited for a period of time, presumptively at least two years, and must have essentially "[grown] up together"). For stepsiblings

or stepparents who became part of the same family when the decedent (and stepsibling) were in their early childhood (roughly birth through age eight), and who lived together for at least two years, the Court deemed them fully functional equivalent to biological siblings and found them entitled to full solatium damages.  ECF No 3363 at 15; *see* ECF No. 3676 at 13-14. For stepsiblings or stepparents who became part of the same family after the decedent reached early childhood but while still living in the family home (roughly ages 9 through 17), the Court would award solatium damages reduced by one-half.  *Id.*  If the decedent was aged 18 or above, then the stepsiblings or stepparents would not be entitled to solatium damages. The analysis for stepchildren followed this same pattern of when the step-child joined the family: birth through age eight (full solatium); age nine through age 17 (half solatium); age 18 and older (no solatium).  ECF No. 3363 at 16.

## II.      The *Burnett/Iran* Plaintiffs

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank of Iran was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903 ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903 ECF No. 67.  On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, 15-cv-9903 ECF Nos. 65, 66, which application was amended on December 6, 2016 (15-cv-9903 ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903 ECF No. 85.  Between July 26, 2017 and the present, numerous other subsets of the plaintiffs in *Burnett/Iran* filed for entry of partial final default judgments which the Court subsequently granted. *See* ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5092, 5138, 5151, and 5356. In each of the judgments entered

for plaintiffs in the *Burnett/Iran* case, the Court has applied the same dollar values for solatium awards for family members that the Court initially applied in *Havlish* and applied an interest rate of 4.96 percent per annum, compounded annually. *See id.*

For the reasons below as well as those set forth in the prior motions for judgment for solatium damages made on behalf of other *Burnett/Iran* wrongful death plaintiffs, the *Burnett/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court grant the proposed Order, filed with this motion, awarding them (1) solatium damages for the losses they suffered as non-immediate family members of their decedents killed on 9/11 (as indicated in Exhibit A) in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran* plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## III.   Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1).  Under 28 U.S.C. § 1605A ("Section 1605A"), which applies to the claims against Iran, damages are available under the federal law and include money damages "for personal injury or death." *See* 28 U.S.C. §

1605A(a)(1) and (c)(4). The damages available to plaintiffs in a Section 1605A action include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). Courts addressing the damages available under the statute have held that, among other damages recoverable, "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  03-md-1570, ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Accordingly, Plaintiffs identified in Exhibit A, who are (as indicated below) functional equivalents of family members of decedents killed on 9/11, are each entitled to solatium damages based on this Court's previous determinations in the amounts as previously established and applied by this Court in this and other related cases arising from the 9/11 Attacks.  Moreover, as indicated below, Plaintiffs identified in Exhibit A are also entitled to prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment.

a.      **Solatium Damages**

Section 1605A specifically provides for solatium damages. Under that provision, family members of the decedents may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran,* 281 F.Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds,* 404 F.Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have therefore been treated as comparable to claims

for intentional infliction of emotional distress, in which the immediate family members of the decedent are treated as direct victims. *See, e.g. Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."); *Surette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).  Accordingly, this Court has previously awarded solatium damages to "immediate family members" who, though not physically present at the site of the terrorist attacks, were nevertheless intended victims of the terrorist activities. *See e.g.* 03-md-1570 (11-cv-07550) (S.D.N.Y.) (GBD) (SN) ECF. No. 3358; and 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) ECF No. 3300.

### i.   Nature of the Relationship — "Functional Equivalent" of Immediate Family Members

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived the September 11, 2001 deaths of their loved ones were entitled to recover for their solatium losses, and also set forth a framework for other familial relationships that fell outside of those four categories. *See* 03 -md-1570, ECF Nos. 3363; 3676.

In this Court's October 14, 2016 Report and Recommendation, adopted in pertinent part by Judge Daniels (ECF No. 3384), the Court recognized that, in addition to awarding damages to individuals considered traditional "family members," the Court may also award damages to non-immediate family members who meet certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with a September 11, 2001 decedent. These categories of non-immediate family members included fiancées and domestic partners, step-relatives,

7

aunts, uncles, nieces, nephews, and cousins. *See* 03-md-1570 (11-cv-7550) (S.D.N.Y.) (GBD) (SN), ECF No. 3363.

In that Report, the Court identified factors the Court would consider as relevant for determining whether, for awarding damages, a domestic partner would be considered the "functional equivalent" of a spouse and whether a stepsibling would be considered the "functional equivalent" of a sibling. The factors that the Court identified as relevant in the context of domestic partnership are "the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement." *Id*. at 14-15. The framework that the Court adopted in the context of step-relations is this: "… stepsiblings who became part of the family when the decedent was in early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who were in the same range when the decedent became part of their family shall be deemed fully equivalent to biological children," ". . . stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent who became part of the family shall receive half damages as well," and ". . . stepsiblings who became part of the decedent's family when the decedent had nearly finished his secondary education (roughly age 18 and above) and/or did not cohabit with the decedent for a significant period of time will likely not be deemed functional equivalents of immediate family members and shall not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family. In all cases, the Court will recommend solatium awards only for those step-relatives

that cohabited with the decedent and establish that they otherwise had a close and longstanding relationship." *Id.* at 15-16.

The information in the accompanying declarations of the individuals for whom solatium damages are sought in this motion confirms that the claimants listed in Exhibit A had the "functional equivalent" of a biological relationship and they are therefore each entitled to an award for solatium damages.

### ii.        Quantum of Damages

To fashion a solatium award adequately compensating the surviving family members in the litigation against Iran, this Court previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer profound agony and grief and, "[w]orse yet, ... are faced with frequent reminders of the events of that day." *See* 03-md-1570, ECF Nos. 2623 and 2618 at 10-12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," The Court ordered that solatium damages in the following amounts would be awarded to the immediate family members of those individuals killed on September 11, 2001:

| Relationship to Decedent | Solatium Award |
|:---:|:---:|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 4.

As indicated above, the Court concluded that the damages framework above would be used when assessing solatium damages awards for qualifying non-immediate family members, except that the value for step-relatives would be dependent on the age of the two step-relatives at the time the relationship began. *See* ECF Nos. 3363 at 16; 3676 at 13-14.

The losses claimed in this motion are legally and factually comparable to those suffered by other claimants previously awarded solatium damages in this litigation. The deaths here were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose deaths were intended to create an environment of fear and terror. The claimants here were not attenuated victims — they had intimate relationships with the decedents and were directly and irrevocably harmed by the terrorist acts and consequences.  Accordingly, the presumptive values for solatium damages previously adopted by the Court for spouses and siblings in the other *Burnett/Iran* cases as well as the other claimants involved in this litigation should apply equally to the *Burnett/Iran XV* Plaintiffs.

The relationships between the decedents and the *Burnett/Iran XV* Plaintiffs are set forth below and in more detail in the statements from the surviving family members submitted as Exhibits B through M. The *Burnett/Iran XV* Plaintiffs identified below have the sort of intimate relationships previously recognized as qualifying for solatium damages; they survived the deaths of their loved ones on September 11, 2001; and they have verified under penalty of perjury the nature of the relationships with their deceased loved ones.

The *Burnett/Iran XV* Plaintiffs respectfully request that this Court issue a partial final judgment ordering payment of solatium damages to the *Burnett/Iran XV* Plaintiffs in the amounts set forth below and in Exhibit A:

> **iii.** ***Plaintiff Justin Benitez***
> ***Stepson of 9/11 decedent James N. Pappageorge***
> **Presumptive Award:** **$8.5 million**
> **Requested Award:** **$8.5 million**

James N. Pappageorge was a firefighter with FDNY Engine Co. 23 when he was killed in the 9/11 Attacks.  James had been romantically involved with Gina Pinos for approximately seven years, and they had lived together for approximately three-and-one-half years with her son Justin.

Mr. Pappageorge was present from the very beginning of Justin's life as he was present during Justin's birth at Mt. Sinai Hospital in Manhattan on August 30, 1995. *See* Ex. B, Dec. of Justin Benitez at ¶3. Justin's mother and Mr. Pappageorge were involved in a romantic relationship even prior to Justin's birth. *Id.* At some point in 1997, when Justin was no more than two years old, Mr. Pappageorge and Justin's mother began cohabitating together along with Justin until Mr. Pappageorge was killed on September 11, 2001. *Id.*at ¶4. Justin's biological father was not involved in his life and did not provide financial, emotional, spiritual, or any other type of support to Justin. *Id.* at ¶5. James Pappageorge served every fatherly role for Justin: he was present at Justin's birth, changed Justin's diapers, read bedtime stories, taught Justin to read, drop off and pick up at preschool and kindergarten, teach him appropriate behavior, stressed appropriate nutrition for Justin, and more. *Id. generally.* As Justin states in his Declaration, "Every man can be a dad, but not every man can be a father. James Pappageorge was my father in all ways and I am the man I am today because of him." *Id.* at ¶13. James Pappageorge was present and active in Justin's life during his formative years from birth until he was six years old, and now at age 24, Justin still considers James Pappageorge the only father that has been in his life. Justin meets the criteria for a stepchild to be considered the functional equivalent of a biological child and should be granted the full requested award.

### iv.   *Plaintiff Paula Carucci*
### *Stepdaughter of 9/11 decedent Ronald Golinski*
**Presumptive Award:**$8.5 million
**Requested Award:**   $8.5 million

Col. Ronald Franklin Golinski (Ret.) was killed on September 11, 2001 at the Pentagon in Arlington, Virginia where he was working as a civilian in the office of the Deputy Chief of Staff for Personnel. Paula Carucci was nine years old in 1976 when her mother and Col. Golinski began residing with one another, and Paula resided with Col. Golinski continuously until 1988 when she

left to attend college at age 21. *See* Ex. C, Dec. of Paula Carucci at ¶3. Paula has only seen her biological father a handful of time since her biological parents were divorced when she was four years old, and she received no financial support from him. *Id.* at ¶4. Col. Golinski was the only father figure in Paula's life from the time she moved in with him in 1976 until he was killed on September 11, 2001. *Id.* at ¶¶5-7. Col. Golinski performed all of the tasks of a biological father: he instilled discipline in Paula with love and patience, he attended sporting events and school functions to display his parental support of Paula, he taught her how to play golf, as a man of faith he took her to church regularly and she was baptized in the church at age 13, he taught Paula how to drive, he instilled a respect for the military and history, helped her with her academics and selecting a college to attend, and he walked Paula down the aisle when she got married. *Id.* at ¶¶10-18. As Paula succinctly states, "I am the parent I am today in part because of the example set by Col. Golinski and the life lessons he imparted to me during my formative years and beyond." *Id.* at ¶19. While Paula only began residing with Col. Golinski when she was nine years old, the extent of their relationship as father and daughter was so deep and longstanding that Plaintiffs submit she should be entitled to the full presumptive award for the child of a 9/11 decedent in the same manner as his biological children and her own biological brother, David Eschenbaum, who was younger than Paula when the two were taken in by Col. Golinski.

          **v.**     ***Plaintiff Robert Dow***
               ***Domestic Partner of 9/11 decedent Ruth Ellen Ketler***
      **Presumptive Award:** **$12.5 million**
      **Requested Award:**   **$12.5 million**

Ruth Ellen Ketler was a Senior Vice President and head of research with Fiduciary Trust Company International and was killed at her office in the World Trade Center in the 9/11 Attacks. At the time of her death, Ms. Ketler had been cohabitating with Robert Dow for eight years. *See* Ex. D, Dec. of Robert Dow at ¶3. During the time of their cohabitation, Ms. Ketler and Mr. Dow

held themselves out to the work as a married couple and considered each other husband and wife despite not having observed the formalities of marriage. *Id.* at ¶6. After Ms. Ketler's death, Mr. Dow was recognized as Ms. Ketler's domestic partner by the New York State Workers' Compensation Board, the September 11th Victim Compensation Fund, and the New York State Crime Victims Board. *Id.* at ¶¶7-9. Ms. Ketler had also designated Mr. Dow as the beneficiary of an employer-issued life insurance policy; however, the documentation of this designation was lost when the towers fell on September 11, 2001. *Id.* at ¶10. Prior to her death, Ms. Ketler and Mr. Dow had been in discussions to have children either through natural childbirth or adoption, and they were also planning to purchase a home together for their future retirement. *Id.* at ¶¶11-12. As Mr. Dow states in his Declaration, "Ruth and I depended on each other for financial, emotional and spiritual support." *Id.* at ¶4. Based on the length of their cohabitation, the recognition by state and federal agencies of their relationship as equivalent to a married couple, and the fact that they had made concrete plans to build a family and continue their life together through retirement, Plaintiffs submit that Plaintiff Robert Dow is entitled to the presumptive judgment of $12,500,000.00 for a spouse of a 9/11 decedent.

> ### vi.   *Plaintiff David Eschenbaum*
> ### *Stepson of 9/11 decedent Ronald Golinski*
> **Presumptive Award:** **$8.5 million**
> **Requested Award:**   **$8.5 million**

Col. Ronald Franklin Golinski (Ret.) was killed on September 11, 2001 at the Pentagon in Arlington, Virginia where he was working as a civilian in the office of the Deputy Chief of Staff for Personnel. David was eight years old when his mother began cohabitating with Col. Golinski in 1976. *See* Ex. E, Dec. of David Eschenbaum at ¶3. David continuously cohabitated with Col. Golinski from 1976 until he turned 18 years old in 1986. *Id.* at ¶3. His mother and biological father divorced when David was three years old, and his biological father has never had any role in his

life and never provided financial support for David's upbringing. *Id.* at ¶4.  Col. Golinski performed all of the tasks of a biological father: he instilled discipline in David with love and patience, he taught David how to play golf and they played "innumerable rounds of golf together", he purchased David's first rifle and instilled the importance of gun safety, he helped David set up a paper route, as a man of faith he took David to church regularly and David was baptized in the church at age 12, he taught David how to drive, he instilled a respect for the military and history, and he helped David with schoolwork and "navigat[ing] the awkward teenage years". *Id.* at ¶¶10-17.  As David notes in his Declaration, "As a father, I have tried to emulate the example set by Col. Golinski in raising me, and I have instilled in my son the values I learned from him.  I am the father I am today in large measure because of Col. Golinski." *Id.* at ¶18.  Pursuant to this Court's prior determinations, given that David Eschenbaum resided with Col. Golinski from age 8 until he was an adult in the role of father and son, he should be entitled to the presumptive judgment of $8,500,000.00 for the child of a 9/11 decedent.

### vii.    *Plaintiff Serena Giovi*
####         *Fiance of 9/11 decedent Stephen J. Colaio*
**Presumptive Award: $12.5 million**
**Requested Award:   $12.5 million**

Stephen J. Colaio was a bonds trader at Cantor Fitzgerald in the World Trade Center when he was killed in the 9/11 Attacks.  At the time of his death, Mr. Colaio was preparing for his upcoming marriage to Serena Giovi which was scheduled to take place on October 19, 2001.  *See* Ex. F, Dec. of Serena Giovi at ¶6.  While Stephen and Serena had known each other for nearly ten years having met at St. John's University in Queens, they had been dating for three years and were engaged to be married in May 2000.  *Id.* at ¶4-5.  They had been cohabitating for just under a year at the time that Stephen was killed.  *Id.* at ¶3.  After the engagement, Stephen's parents insisted that Serena call them mom and dad, and she also had a close relationship with Stephen's brother Mark

(who was also killed on 9/11) and his wife.  *Id.* at ¶¶9, 12.  While Stephen was the primary source of income, Serena would cook, clean, and run errands to contribute to their household.  *Id.* at ¶12. During the planning of their wedding, Stephen and Serena had discussed where they would buy their first home and when they would start a family – things they were never able to accomplish together.  *Id.* at ¶13.  The depth of Serena's loss can be summed up in her statement, "When I buried Stephen, I buried him with my wedding dress as a remembrance to our love and the marriage and life we had planned for together."  *Id.*at ¶15.  Being a month away from their nuptials after all of the planning had been completed for the wedding in addition to cohabitating together and truly being in a singular and loving relationship, Plaintiffs submit that Serena Giovi should be considered the functional equivalent of a spouse to Stephen J. Colaio and should be entitled to the presumptive judgment of $12,500,000.00 for the spouse of a 9/11 decedent.

> **viii.**  ***Plaintiff Kara Lydia Jerez***
> ***Stepdaughter of 9/11 decedent Robert D. Cirri, Sr.***
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

Robert D. Cirri, Sr., was a lieutenant with the Port Authority of New York and New Jersey who was killed in the 9/11 Attacks while he and four other offices attempted to carry a woman to safety when the North Tower collapsed.  Kara Lydia Jerez had resided in the same home with Mr. Cirri for nearly ten years from the time that she was approximately one year old, and his mother and Mr. Cirri were married in 1999.  *See* Ex. G, Dec. of Kara Lydia Jerez at ¶3.  While Kara has only vague memories of her biological father, Mr. Cirri provided for her both financially and emotionally, and they would speak every day.  *Id.*at ¶¶4-6.  When Mr. Cirri and Kara's mother were married, they became a blended family with children coming from both sides of the marriage; however, he "never treated my sisters and me any differently than my stepsiblings.  He raised all of us as if we were all his biological children."  *Id.* at ¶7.  Mr. Cirri was a father in all respects:

providing for every day needs, taking her and her siblings to amusement parks, surprising the family with a trip to Disney World in early-2001 creating an indelible memory for Kara, taking Kara to doctor's appointments, school functions, soccer practice, soccer games, cheering for her at her soccer games, cooking for Kara and her sisters every night, and various other everyday things that fathers do for their children. *Id.* at ¶¶8-17. As Kara states, "I did not know a life without him until his untimely death on September 11, 2001." *Id.* at ¶18. He was also her father and never referred to as her stepfather. *Id.* at ¶¶21-22. Given the length of cohabitation, the lack of a role of her biological father, and the fatherly role that Robert D. Cirri, Sr., played in her life, Plaintiffs submit that Kara Lydia Jerez is entitled to the presumptive judgment of $8,500,000.00 as the functional equivalent of a child to Robert D. Cirri, Sr.

> ix. ***Plaintiff Jessica Nardone Feldman***
> ***Domestic Partner of 9/11 decedent Scott Thomas Coleman***
> **Presumptive Award: $12.5 million**
> **Requested Award:   $12.5 million**

Scott Thomas Coleman was a broker with Cantor Fitzgerald when he was killed in the World Trade Center as part of the 9/11 Attacks. Jessica Nardone Feldman had been cohabitating with Mr. Coleman for approximately two years at the time of his death, and they had been romantically involved for approximately three years at that time. *See* Ex. H, Dec. of Jessica Feldman at ¶3. At the time of his death, Mr. Coleman and Ms. Feldman were in the process of buying an apartment together for which they had been approved both by the co-op board and also by the mortgage provider and were simply waiting on a closing date for the sale. *Id.*at ¶6. They had planned to get married in 2002 after completing the purchase of their apartment and getting settled, and they had already begun making plans for the wedding. *Id.* at ¶7. They had discussed when they would plan to have children and were going to wait until after they had gotten married and settled into their new apartment. *Id.* at ¶8. As Ms. Feldman notes, "All the plans that Scott

and I had made for a lifetime together – getting married, purchasing a home, having children and raising a family, travelling, and growing old together – were destroyed on 9/11 and my life will never be the same." *Id.* at ¶9. Plaintiffs submit that the concrete steps made toward cementing their lives together in terms of purchasing a house, planning to get married and have a family, should provide a sufficient basis for the Court to issue a judgment that Ms. Feldman is entitled to a judgment of $12,500,000.00 as the functional equivalent of the spouse of Scott Thomas Coleman.

> **x.** ***Plaintiff Paige Marie Rollison***
> ***Stepdaughter of 9/11 decedent Claude Michael Gann***
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

Claude Michael Gann was attending the Risk Waters conference at Windows on the World when he was killed in the 9/11 Attacks. Paige Marie Rollison had cohabitated with Mr. Gann from the age of five until the age of ten when he was killed. *See* Ex. I, Dec. of Paige Rollison at ¶3. Paige's biological father played no role in her life, and she referred to Mr. Gann as her father, his parents as her grandparents, and her stepsiblings and simply her siblings. *Id.* at ¶¶4, 8-9. She would speak with Mr. Gann every day, and he would take her to doctor's appointments, school functions, soccer practice, and guitar lessons, help her with schoolwork, encouraged her in extracurricular activities such as playing the guitar and playing soccer, and instilling a desire to learn. *Id.* at ¶¶6, 12-17. He had a pet name for Paige, and he always treated her as his own biological child. *Id.* at ¶¶11, 13. Plaintiffs submit that the relationship between Paige Marie Rollison and Claude Michael Gann was functionally equivalent to a parent-child relationship justifying the presumptive judgment of $8,500,000.00 for Paige Marie Rollison as the daughter of Claude Michael Gann.

xi.   *Plaintiff Sarah Elizabeth Rollison*
      *Stepdaughter of 9/11 decedent Claude Michael Gann*
**Presumptive Award:** **$8.5 million**
**Requested Award:**   **$8.5 million**

Claude Michael Gann was attending the Risk Waters conference at Windows on the World when he was killed in the 9/11 Attacks.  Sarah Elizabeth Rollison is the younger sister of Paige Marie Rollison and cohabitated with Mr. Gann from the age of approximately two until the age of seven when he was killed.  *See* Ex. J, Dec. of Sarah Elizabeth Rollison at ¶3.  Sarah's biological father was absent from her life, and the only father in her life was Mr. Gann.  *Id.* at ¶¶5, 7.  Mr. Gann taught Sarah how to ride a bike and how to play the guitar and encouraged her to attend religious classes at their church while stressing the importance of education.  *Id.* at ¶¶8-10.  Sarah "always felt secure in his presence and never doubted that he would never let anything bad happen to" her.  *Id.* at ¶13.  She always referred to Mr. Gann as her father and not as a stepfather.  *Id.* at ¶12.  Plaintiffs submit that the relationship between Sarah Elizabeth Rollison and Claude Michael Gann was functionally equivalent to a parent-child relationship justifying the presumptive judgment of $8,500,000.00 for Sarah Elizabeth Rollison as the daughter of Claude Michael Gann.

xii.   *Plaintiff David Spivock, Jr.*

      *Fiance of 9/11 decedent Renee A. May*
**Presumptive Award:** **$12.5 million**
**Requested Award:**   **$12.5 million**

Renee A. May was a flight attendant on American Airlines Flight 77 and was killed when the airplane was hijacked and crashed into the Pentagon in Arlington, Virginia on September 11, 2001. At the time of her death, Renee A. May was pregnant with the father of the child being David Spivock, Jr. *See* Ex. K, Dec. of David Spivock, Jr. at ¶3.  At the time of her death, Renee and David had been cohabitating for over two years sharing equally in household expenses and chores.  *Id.* at ¶4.  After determining that they were expecting a child, Renee and David became engaged to be

married and were preparing for a spring 2002 wedding. *Id.* at ¶5. They had discussed baby names, where the baby's room would be, and having their baby baptized in the Catholic Church. *Id.* at ¶6. David had been introduced to Renee's family around the country in preparation for becoming a family unit as a married couple with a child. *Id.* at ¶¶7-8. Not only did David Spivock, Jr. lose the woman with whom he intended to spend the remainder of his life, he also lost a child that he and Renee had anticipated. For these reasons, Plaintiffs submit that David Spivock, Jr. qualifies as the functional equivalent of a spouse to Renee A. May and should be awarded the presumptive judgment of $12,500,000.00.

> **xiii.** ***Plaintiff Jacqueline Steed***
> ***Stepdaughter of 9/11 decedent Charles A. Laurencin***
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

Charles A. Laurencin was a security guard for Morgan Stanley who was killed in the 9/11 Attacks on the World Trade Center. Jacqueline Steed lived with Mr. Laurencin from the time she was one year old when her mother married Mr. Laurencin until she moved out at the age of 26. *See* Ex. L, Dec. of Jacqueline Steed at ¶4. Jacqueline was 35 years old at the time of Mr. Laurencin's death. *Id.* at ¶3. Jacqueline has only vague memories of her biological father who played no role in her life; however, she spoke with Charles Laurencin almost daily including the last time they spoke on his parents' anniversary on September 7, 2001. *Id.* at ¶¶5-6. He served every function of a father in Jacqueline's life: taking her to doctor's appointments, school functions, and church, teaching her to read, helping her with homework, emphasizing the importance of education, cooking for her siblings and her, and other parental duties as needed. *Id.* at ¶¶8-11. She states that he raised all of his children as if they were his biological children with no distinctions. *Id.* at ¶9. Mr. Laurencin was present for the birth of Jacqueline's daughter, and she always referred to him as her father and not as her stepfather. *Id.* at 12-14. For these reasons, Plaintiffs submit that Jacqueline

Steed qualifies as the functional equivalent of a child to Charles A. Laurencin and should be awarded to the presumptive judgment of $8,500,000.00 for the child of a 9/11 decedent.

> ### xiv. *Plaintiff Tanya Villanueva Tepper*
> ### *Domestic Partner/Fiance of 9/11 decedent Sergio Villanueva*
> **Presumptive Award: $12.5 million**
> **Requested Award:    $12.5 million**

Sergio Villanueva was a firefighter with the FDNY and was killed at the World Trade Center as a result of the 9/11 Attacks. At the time of his death, Mr. Villanueva and Tanya Villanueva Tepper had been cohabitating together as a couple for six years and had been romantically involved for seven years. *See* Ex. M, Dec. of Tanya Villanueva Tepper at ¶4. They owned their apartment and vehicle together and shared expenses for both. *Id.* at ¶¶5-6. Beginning in 1999, they also started a business together where Tanya worked at full-time, and Sergio worked there after hours and on his off days from the FDNY. *Id.* at ¶7. They were registered in 1999 as Domestic Partners with the City of New York. *Id.* at ¶8. On June 30, 2001, they became engaged to be married with the wedding to take place on August 1, 2002. *Id.* at ¶9. They had booked a venue in New Rochelle, New York for the wedding and reception and were scheduled to meet with wedding planners on September 13, 2001. *Id.* at ¶10. Tanya and Sergio's mother were each awarded Sergio's life insurance, death benefits, and deferred compensation plan savings from both the FDNY and from Sergio's time with the NYPD. *Id.* at ¶11. As Tanya states, "Sergio and I had made a lifetime of plans together and we were making good on those plans when terrorist destroyed everything we had been working toward together." *Id.* at ¶13. Plaintiffs submit that based on the duration of their cohabitation, the intermingling of their finances, and the steps taken to formalize their relationship from a registered domestic partnership to marriage speak to how Tanya Villaneuva Tepper was the functional equivalent of Sergio Villanueva's wife and should be awarded the presumptive judgment of $12,500,000.00 for the spouse of a 9/11 decedent.

Based on the facts set forth above and in Exhibits B through M to the Eubanks Declaration, Plaintiffs respectfully submit that solatium damages for these individuals be awarded in the amounts set forth on Exhibit A to the Eubanks Declaration for each individual.

### b.    Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. §1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (03-md-1570, ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (03-md-1570, ECF No. 2623).  The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, 03-md-1570, ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); 03-md-1570, ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply 3.44 multiplier); 03-md-1570, ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  03-md-1570, ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  03-md-1570, ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address

the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### c.      Prejudgment Interest

As in prior applications, the *Burnett/Iran XV* Plaintiffs ask that this Court direct that prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New York be assessed, as was done previously in other judgments issued for *Burnett/Iran* plaintiffs, as well as for other plaintiffs in this consolidated litigation.

## III.    Conclusion

For all of the reasons set forth herein, as well as those set forth in the previous submissions of the *Burnett/Iran* plaintiffs and other plaintiffs, the *Burnett/Iran XV* Plaintiffs respectfully request that this Court grant the proposed order included with this motion: (1) awarding solatium damages as set forth in the attached Exhibit A, (2) awarding prejudgment interest of 4.96% per annum on the solatium awards running from September 11, 2001 until the date of judgment be assessed; and (3) permitting the *Burnett/Iran X* plaintiffs to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  January 3, 2020

Respectfully submitted,

MOTLEY RICE LLC

BY:  /s/ John M. Eubanks
John M. Eubanks, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9218
Fax: 843-216-9450
Email: jeubanks@motleyrice.com