**E X H I B I T   1**



# STANDARDS AND BEST PRACTICES

# FOR LARGE AND MASS-TORT MDLS

# DUKE LAW CENTER FOR JUDICIAL STUDIES

Duke Law School
Center for Judicial Studies
December 19, 2014

# CHAPTER 3

## ESTABLISHMENT AND USE OF COMMON FUNDS

A perennial challenge for a transferee judge managing a large or mass-tort MDL is the issue of compensating plaintiffs' counsel, who almost exclusively work on contingency. Litigation can last years and require the investment of millions of dollars in law-firm time, resources, and out-of-pocket expenses.  During the litigation, some attorneys will devote themselves nearly entirely to the case from the outset, particularly those who are appointed to the steering committee or as liaison counsel, while others (for example, those whose clients file cases well after commencement of the litigation and establishment of the MDL) will benefit from the work done by other counsel.  Similarly, leadership counsel often agree to "front" the bulk of the costs and expenses of the litigation, assuming a significant expense and risk of nonpayment, while other plaintiffs and their counsel reap the benefits of those expenditures.

To address this equitable problem, MDL courts have recognized an inherent authority to establish and operate common funds, to assess parties and their counsel, and to apportion and distribute the pooled monies.  As its name suggests, a common benefit fund (CBF) is meant to compensate attorneys for the costs borne and work performed for the common benefit of all plaintiffs and their counsel.  Hence, the primary theory underlying such funds is the common benefit doctrine, which holds that persons who obtain the benefits of a lawsuit without contributing to defraying its costs are unjustly enriched at the successful litigant's expense.

The transferee court has a variety of powers and doctrines at its disposal in creating and overseeing a CBF.  For example, the ability to assess common benefit attorneys' fees is

recognized as within the courts' inherent managerial authority.[166]   It is well settled that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and plaintiffs' steering committees and to ensure that they are properly compensated for their work.[167]   Courts also have found the related authority to assess common benefit attorneys' fees in the terms of agreements entered into among plaintiffs' counsel and between plaintiffs' counsel and defendants.[168]   As the Fifth Circuit explained in the seminal

---

[166]*See Boeing Co. v. Van Gemert*, 444 U.S. 473, 478 (1980); *see also MCL* § 14.121 (4th ed. 2004) (discussing American Rule and common-benefit exception in complex cases). The doctrine has been articulated and applied in a series of Supreme Court decisions, including *Central R.R.& Banking v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164 (1939); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing*, 444 U.S. 472; and *Blum v. Stenson*, 465 U.S. 886, 900 (1984).   Traditionally, the "American Rule" required prevailing litigants to pay their own attorney's fees.  In multi-party litigation, the American Rule can inequitably benefit those who avoid sharing the full burden and expense of litigation by relying on the work of others.  The common benefit doctrine is based in the power of equity in doing justice between a party and the beneficiaries of his litigation. *See Sprague*, 307 U.S. at 166; *MCL* § 14.121.  In *Sprague*, the Court emphasized the Court's historic equitable power to spread the costs among others who were similarly situated and benefited from the plaintiff's efforts.  307 U.S. at 166-67.   The common benefit doctrine was initially applied to attorney fee awards in class actions where an attorney, on behalf of an individual plaintiff, recovers a fund for the benefit of a group of individuals. 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 13:76 (4th ed. 2002).  But its application is not limited to the class action context.  "As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area.  The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010).  Thus, "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *Id.*

[167]*See Vincent v. Hughes Air West. Inc.*, 557 F.2d 759, 773-75 & n.15 (9th Cir. 1977); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1014-15 (5th Cir. 1977); *McAlister v. Guterman*, 263 F.2d 65, 69 (2d Cir. 1958).  Courts have used this inherent authority to compensate common benefit counsel in complex litigation.  *See, e.g., In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 546–47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2004) ("An MDL court's authority to establish a trust and to order compensations to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."), *aff'd*, __ F.3d___, 2014 WL 4116482 (8th Cir. Aug. 22, 2014); *see also MCL* § 22.62.  At least one commentator has opposed a court's inherent authority to oversee a common benefit fund:  "[T]he judicially created quasi-class action contravenes Article III of the Constitution, deprives litigants of their due process and jury trial rights, violates the Rules Enabling Act, impermissibly expands the scope of judicial authority under the multidistrict litigation statute, and does an end-run around the requirements of the class action Rule 23.  Moreover, private settlement agreements consummated as quasi-class actions may, if unchecked, violate the spirit if not the letter of the court's *Amchem* and *Ortiz* decisions." Linda S. Mullenix, *Dubious Doctrines: The Quasi-Class Action*, 80 U. CIN. L. REV. 389, 412 (2011).  This view appears to be a minority opinion and one that, to date, has not been shared by any court.

[168]*See* Jeremy T. Grabill, *Judicial Review of Private Mass Tort Settlements,* 42 SETON HALL L. REV. 123, 124 (2012); *see also In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005); *In re Vioxx Products Liab. Litig.*, 574 F. Supp. 2d 606, 609 & n.8 (E.D. La. 2008), *on reconsideration in part on other grounds*, 650 F. Supp. 2d 549 (E.D. La. 2009). Courts should therefore be aware that any matters addressed by agreement of the parties that

*Florida Everglades* air disaster case: "[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."[169]

Typically, the transferee judge creates the architecture for the CBF at the outset of litigation, but it will usually remain unfunded until much later in the litigation process, when cases are resolved through trial or settlement.  This means that the court usually will defer setting the precise percentage of settlement proceeds that will fund the CBF until the MDL is resolved or settled when the value of the common benefit work is known.  (In some instances, a defendant's partial settlement or partial payment may fund the common benefit fund prior to the end of the case).  The CBF's function is to compensate plaintiffs' counsel for their work based on their relative contributions to the outcome of the case.  Its purpose is to ensure that all who benefit from the CBF will have contributed proportionately to the costs of the litigation, which is particularly important in a mass-tort MDL where the value of bellwether trials often exceeds the value of the particular claims being tried.

Despite the widespread use of CBFs, the implementation of these funds in any particular case is often hotly disputed.  If the transferee court does not, at the outset, establish a process to

---

expressly confer authority on the court may result in future challenges and rulings bearing on the parties' interests, such as attorney's fees—*e.g.*, a court's consideration of the receipt of a contingency fee as a ground to reduce an award of attorney's fees.  *See In re Sulzer Orthopedics*, 398 F.3d at 780.  But such an interpretation is not always clear.  Despite a court's contrary view, plaintiffs' attorneys have not always agreed that the settlement agreement terms vested the courts with the authority to impose contingency fee caps. *See* Morris A. Ratner, *Achieving Procedural Goals Through Indirection: The Use of Ethics Doctrine to Justify Contingency Fee Caps in MDL Aggregate Settlements*, 26 GEO. J. LEGAL ETHICS 59, 73 (2013) ("It is safe to assume at this point that lawyers involved in mass torts are on notice of this issue.  It will be interesting to see whether such awareness limits the ability of court-appointed common benefit counsel to negotiate global agreement terms that both render individually-retained counsel's fees vulnerable to caps, and prompt widespread participation in MDL aggregate settlements.").

[169] *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1016.

implement a fund or funds (if and when monies become available), disagreements among counsel can arise, both during the MDL and certainly at the resolution or remand of individual cases.  If the issue is left unresolved, the transferee judge invites avoidable disharmony at the MDL's conclusion, and may be confronted with a Gordian Knot, which is not easily undone.

Litigation funding is a complex matter and one that varies with the needs of the case.  In addition to CBFs, the plaintiffs' leadership team usually establishes a "housekeeping fund," which it uses to pay communal litigation expenses like expert fees, filing charges, document depository costs, and deposition fees.  (These expenses are distinct from "held costs," such as travel expenses and copying costs, which are incurred for the common benefit but carried by the attorneys until a settlement is reached.)  The housekeeping fund is funded with periodic assessments paid by the leadership team (the Plaintiff Executive Committee (PEC) or Plaintiff Steering Committee (PSC)).  The court typically has no involvement in creating or overseeing the housekeeping fund.

In some cases the court may establish a joint housekeeping fund, funded by assessments to both the plaintiffs' leadership team and the defendants, to pay common expenses like special master fees.  When the court creates a joint housekeeping fund, the assessments should be sufficient to cover the recurring expenses with a cushion for unexpected expenses.  The court will likely want to establish a process for documentation, submission, and judicial or special-master review of all claims against the housekeeping fund.  The court should, with input from the parties, select a bookkeeper or accountant and a bank to manage the fund.  All documentation and yearly audit reports should be maintained throughout the MDL and contained in the final accounting.  Before creating and implementing a joint housekeeping fund, the court should consult with the lead plaintiff and defense attorneys.  In most cases a joint housekeeping fund is

not necessary because common expenses can simply be apportioned and paid directly to the provider by defense counsel and the PSC.  A joint housekeeping fund may be useful in some cases, and thus is noted here as one potential feature that a transferee judge may consider in structuring the MDL process.

In lengthy and complex cases, the transferee judge may choose to establish a fund to make interim reimbursement payments to plaintiffs' counsel for costs and expenses incurred during the course of the litigation.[170]  This fund is separate from the housekeeping fund and is intended to defray expenditures by lead counsel who "front" the bulk of the costs and expenses of the litigation.  The court should assess plaintiffs' counsel ratably and place the proceeds in this fund for periodic distribution.  Such reimbursements can greatly ease the financial burden on firms that have invested substantially in the litigation, but who will receive no compensation until settlement, which may be years in the future.

> **MDL STANDARD 5**: **The transferee judge should consider setting aside a portion of the anticipated monetary proceeds from a settlement to establish a common benefit fund (CBF) for the purpose of paying reasonable attorneys' fees, costs, and expenses from that fund.**

This standard uses the term "anticipated" intentionally.  It reflects in part the forward-looking nature of CBFs – that at the outset of the litigation, the judge needs to set parameters and provide guidance for common benefit work, if it expects to utilize a CBF upon completion of the case.  (While CBFs are usually unnecessary in most "small" MDL cases, courts have found them to be beneficial in the large and mass-tort MDLs that are the focus of this report.)

---

[170] *See, e.g.*, *Mills*, 396 U.S. at 389 (having proven defendant's liability, "petitioners [sh]ould have been entitled to an interim award of litigation expenses and reasonable attorney's fees"); *see also generally In re: Diet Drugs*, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) (noting that a CBF was established to pay, *inter alia*, "the out-of–pocket and pre-settlement litigation expenses of plaintiffs' counsel approved by the court for reimbursement").

But "anticipated" also refers to the fact that cases may be resolved in favor of the defendant. One aspect of the MDL process is determining whether the allegations are true. The litigation may be resolved through motion practice that results in a dismissal by the court, or rulings that effectively end the litigation. The scope of the MDL may also be narrowed as particular types of claims are determined to be without legal merit. When there is no recovery by the plaintiffs, there will be no common benefit funding. Instead, plaintiffs' counsel will bear the loss of sunk costs and invested time; it is not expected that the judge will order reimbursement from the MDL parties to the leadership team members and other attorneys that bore these costs. (This potential outcome underscores the risk of MDL finance and its consequences for leadership appointments, as discussed in more detail in Chapter 2.)

Even if the claims survive motion practice, the MDL may not result in a settlement. If the cases are instead remanded, this creates yet another dynamic for the MDL judge. Typically, the MDL judge will remand with a directive that a certain percentage of any recovery by the plaintiff be paid to the CBF. But there is a risk of underfunding or overfunding because the transferee judge cannot know what percent of the remanded cases will resolve favorably and thus how large the CBF will become.

Sometimes some of the cases in the MDL are resolved early, whether through individual or small-group settlements, or through trials. Establishing a CBF early in the case will avoid later complications arising from staggered resolutions of the constituent cases. One transferee judge who did not implement a CBF protocol early in the case observed that failing to deduct a common benefit assessment from early-settled cases created a "horrible" situation where the later-settling plaintiffs had to either bear the whole burden or claw back monies from the early-settling plaintiffs and their counsel. Requiring the defendant to make up the shortfall was not a

viable alternative, because the defendant would likely compensate by decreasing the settlement offers made to the later-settling plaintiffs.

These preliminary remarks are simply intended to place into context the discussion of the CBF that follows—and the importance of careful consideration by the transferee judge of whether and how the fund will operate, early in the case.

> *Best Practice* 5A: As early as practicable in the litigation, the transferee judge should consider planning and establishing any common benefit funds to be employed in the course of the litigation or in the event of settlement. In doing so, the court should communicate its expectations and provide guidance to the parties with regard to the purpose and operation of these funds and invite the participation of counsel.[171]

Transferee courts often establish a framework for implementation and operation of a CBF early in the life of the MDL.[172] Providing this guidance early allows counsel to effectively manage the process and minimizes conflict at the end of the litigation. Courts find it useful to obtain the counsels' input, both to ensure that counsel have a sense of ownership over the process and to clarify the court's expectations. Allowing counsel the opportunity to ask questions about the procedures and to suggest modifications should curtail later disputes.

> *Best Practice* 5B: At the outset of the case, the transferee judge should issue a "common benefit fund order" or "assessment order." The order should establish parameters for how the common benefit fund will be funded, define the compensable functions of counsel, determine the method of compensation,

---

[171] *See MCL* § 14.215; *see also In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006) ("[I]t has been a common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common-benefit funds for later distribution."). While some courts maintain that it would be premature to establish a common benefit fund early in the litigation before an opportunity for discovery and an accounting, the prevailing view of courts and the *Manual of Complex Litigation* is that "[e]ven if no common benefit compensation had yet been earned, there [is] a need to put a holdback method into place promptly." *In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006).

[172] The Third Circuit Task Force Report recommended "that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel." THIRD CIRCUIT TASK FORCE REPORT, *COURT AWARDED ATTORNEY FEES*, 108 F.R.D. 237, 255 (1986).

specify what records must be kept, and create guidelines for allowable fees and expenses.[173]

The court's order should establish rules for the documentation of attorney time, costs, expenses, and procedures for counsel to submit claims to the fund and for those claims to be reviewed.   The order will typically provide for later payment of common benefit costs and common benefit attorney's fees to court-appointed counsel and to others who advanced costs or performed services for the common benefit.

> *Best Practice* 5C:  The transferee judge should consider what actions should be taken to address common benefit work that benefits parties in parallel state litigation.

Parallel state litigation presents a significant complication for the CBF.   There is a substantial question as to whether the MDL court has jurisdiction over state court parties, with many transferee judges concluding that they lack the authority to order state plaintiffs and their counsel to contribute to the CBF.   The court may consider addressing this issue with the state judges early in the litigation, and encourage those judges to enter orders requiring participation in the CBF as a condition for accessing MDL discovery.   At a minimum, the court should discuss issues of protocol and fairness with state judges to facilitate resolution of any eventual dispute.[174]

One approach that has been used to side-step this problem is for the federal court to order the defendant to pay into the MDL's CBF for not only the MDL cases it settles but also the state cases; the defendant will effectively reduce its offer to state court plaintiffs to cover this amount.

---

[173] *See generally* Leonard A. Davis & Phillip A. Garrett, *Case Time and Cost Management for Plaintiffs in Multidistrict Litigation,* 74 La. L. Rev. 483, 495-96 (Winter 2014); *see also* Case Management Order Number 16 (Establishing Common Benefit Fee and Expense Fund), *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Nov. 13, 2012) (ECF No. 61).

[174] State courts have generally followed the federal courts' lead in the establishment of common benefit funds.  For example, a Rhode Island court overseeing state Kugel Mesh product liability litigation established a plaintiffs' steering committee, designated liaison counsel, and ordered that 12% of the anticipated recovery be set aside for the common benefit fund (8% for attorney's fees and 4% for costs and expenses).  Decision, *In re: All Individual Kugel Mesh Cases*, No. PC-2008-9999, 2009 WL 3328368 (R.I. Super., Aug. 11, 2009). Attorneys who filed dozens of cases after the court appointed the PSC and liaison counsel challenged the procedures on constitutional grounds, but the court rejected their challenges while affording them the opportunity to be heard at the appropriate time. *Id.*

But because this approach takes the common benefit payment off the top, a state court plaintiff may end up bearing a greater share of the assessment relative to his attorney as compared with a similarly situated federal court plaintiff.

When defendants agree to a global settlement of both federal and state litigation, the parties may include a provision in the settlement agreement that establishes a common benefit award. Making the assessment a matter of contract avoids the jurisdictional issue. Of course, this option is only available when the defendant is willing to enter into this type of global settlement, rather than offering a federal settlement and a separate state court settlement.[175]

When federal and state cases settle separately, state court parties and counsel may object to paying for common benefit assessments. As one attorney explained, "We don't want your discovery, your rulings, or anything else − and don't charge us for it − I am litigating this case on my own." For this reason, some common benefit orders presume that state court parties have benefited from the work of plaintiffs' counsel in the federal litigation, but allow the counsel objecting to the assessment to show that he or she really did litigate the case without utilizing the common benefit work.

The opposite problem can also arise. In some MDLs, state court lawyers may have done substantial work. State court plaintiffs' counsel often have a substantial head start on discovery and because they often reach trial first, their results may be informing the MDL settlement talks. Because they are working on contingency, these attorneys may not have kept detailed time records. If their cases had no link to the MDL, they were under no obligation to review the

---

[175] In the *Vioxx* litigation, for example, a significant number of cases was filed and consolidated in both federal and state courts. When the federal and state cases settled for an aggregate amount of $4.85 billion, the federal court ordered that $315,250,000 (or 6.5%) be set aside as a common benefit fund for attorneys' fees and expenses, to be distributed by order of the federal court. *See In re: Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010).

transferee judge's orders on recording time and expenses, and they may have even done the work before any orders were entered.  This can create a substantial problem for the federal transferee judge, as these attorneys have clearly contributed common benefit work but do not have records that satisfy the requirements for receiving awards from the CBF.

One emerging approach involves sending regular notices out to the state court attorneys, acknowledging that they may be doing important work that will benefit the MDL and that they should submit their hours to the MDL.  The notice explains that a presumption will operate against hours that are not submitted contemporaneously, such that attorneys who may want to seek common benefit funds should err toward submitting now.  Judges who have used this approach say that the notices have agitated state counsel, but they keep sending out the notices and the attorneys "think we don't mean it − but at the end of the day, I'll review the hours, and then require them to tell me why they didn't read our orders or pay attention."  While the judges are optimistic that this approach helps legitimize the process, they note that the approach is too new for any firm conclusion.

The same judges also report that they have found it difficult to coordinate with state court judges on these issues, because the judges generally take the view that "my people don't want to do that, I'm not going to force them to do it − we can wait until we are closer to settlement to deal with that," and do not understand why contemporaneous time records are essential to an MDL common benefit assessment.  The *Toyota* MDL provides some corroboration of the difficulties in coordination. There, the Texas state court judge ordered a common benefit assessment percentage that was lower than the MDL percentage; as a result, Texas attorneys wanted to pay the lower percentage and opposed any effort to assess them the higher percentage.

Still other state court judges noted that they do not believe under their state law they even have the authority to order parties to pay into a CBF.  One judge noted that under his state's law, he cannot order the party to pay, and he cannot order the party's attorney to pay a portion of his contingency fee.  This state of law may again suggest the need for an agreed-upon contractual provision rather than a court-imposed order.

The hip implant cases provide an exemplar of the range of approaches possible in dealing with state court parties.  In the *DePuy* MDL, a plaintiff who wanted to participate in the global settlement had to agree to pay 1%, and his counsel had to agree to pay 5% to the CBF.[176]  In contrast, in another hip implant case, the New Jersey state case had moved forward before the MDL began, and plaintiffs' counsel in the MDL therefore benefitted from the work product of the state counsel.  There, the MDL common benefit assessment expressly excluded the New Jersey cases.

Many judges have lauded efforts to contractualize common benefit assessments as avoiding jurisdictional issues, while still allowing the judge to determine the common benefit amount in order to preserve the legitimacy of the assessment.  More broadly, the judges noted that caution should be used if the transferee judge is going to offer any percentage range guidance early in the litigation.  An order suggesting too high of a common benefit assessment may increase the tension between state and federal counsel, decreasing the potential for cooperation and increasing the likelihood of inefficient duplication as the state counsel seek to avoid paying a high assessment.  Ordering too low of an assessment may hurt the MDL by disincentivizing counsel from performing common benefit work, in turn delaying litigation.

---

[176] *See* Order Regarding Registration of ASR Related Cases and Claims 9-10, *In re: DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, MDL 2197, No. 1:10-md-02197-DAK (N.D.Ohio Nov. 22, 2013) (ECF No. 637).

Thus, the transferee judge must find the "magic figure" that motivates counsel to work collaboratively to resolve the case.  Some suggest that this is easier once the litigation has progressed enough that the transferee judge can make an informed determination about the extent of work that will likely be necessary to resolve the case.

Because discovery and other work product may be shared among plaintiffs' counsel in the federal and state court litigation, the judge may consider including provisions to reimburse costs and award fees to counsel who have performed common benefit work in state court proceedings, and to collect a percentage of settlements and judgments from state court cases. The order should also address issues such as settlement confidentiality, if necessary.[177]

> *Best Practice* 5C(i): Early in the case and to the extent practicable, the transferee judge should establish a transparent procedure for the later allocation of common benefit funds to reduce the potential for disputes among counsel and to encourage counsel to cooperate and avoid duplication of effort.

Early in the litigation, if not in the initial case management orders, the transferee judge should issue clear guidelines regarding the types of expenses that will (and will not) be reimbursed by the CBF and the contemporaneous record-keeping requirements for common benefit hours.  The transferee judge may solicit proposed orders regarding the CBF.  Because the dynamics of litigation funding incentivize self–policing by counsel, judges can often accept proposals with little modification.

Establishing an allocation process that is transparent will help create a fair and open environment for all interested attorneys to perform work for the common benefit of all claimants and create a factual record for the eventual applications for common benefit fees.[178]  As a general

---

[177]   For an example, see the *Mirena* litigation orders.

[178] *See In re Vioxx Products Liab. Litig.*, MDL 1657, 2014 WL 31645, at*5 (E.D. La. Jan. 3, 2014); *see also* Fallon, 74 LA. L. REV. at 381 ("The total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data."). Two

matter, clear guidelines and housekeeping directives at the outset of the litigation about how time
will be reported, what will be compensable, and the like are almost always helpful in providing
clear expectations and in turn reducing conflict.   However, the extent to which an allocation
methodology, percentage caps, or other case-specific guidance can or should be provided early in
the case is more variable.   In some cases, there may be sufficient prior case developments, such
that the transferee judge can comfortably set these expectations.   But, in many cases, it will take
time for the case to progress to the point that the transferee judge and even the parties know what
work will be important, how much will be required to settle the case, and other key input
variables.   In those cases, some caution may be warranted as premature rulings followed by
revisions can undermine the very normative goals the judge is seeking to further − to say nothing
of potentially limiting the extent to which counsel will trust that this is the final set of guidelines
and be able to conform their practices accordingly.

> *Best Practice* 5C(ii):  The transferee judge should inform counsel early in the
> litigation that if they wish to be paid attorney's fees from the common benefit
> fund they must keep detailed and contemporaneous records of their work and
> periodically submit reports to the court or a designee, such as a special master or
> accountant.[179]

The transferee judge should establish procedures to ensure the fairness of the allocation

process.   The court should require counsel to keep contemporaneous billing records/timesheets

---

decisions provide good examples of a transparent and non-transparent process.  In *In re High Sulfur Content
Gasoline Products Liability Litigation,* the lead plaintiffs' counsel in a class action persuaded the district court,
during an *ex parte* hearing and without the benefit of supporting data, to divide a lump-sum attorney's fee award
among more than six dozen plaintiffs' lawyers.  517 F.3d 220, 223 (5th Cir. 2008).  At that same hearing, the court
"accepted [l]ead [c]ounsel's proposed order sealing the individual awards; preventing all counsel from
communicating with anyone about the awards; requiring releases from counsel who accepted payment; and limiting
its own scope of review of objections to the allocation." *Id.* at 223-24.  Because "the record [was] bereft of factual
information essential to ... appellate review," and because the sealing of the record "protect[ed] no legitimate
privacy interest that would overcome the public's right to be informed," the Fifth Circuit vacated the award. *Id.* at
229-30.  In contrast, in *In re Diet Drugs,* the court held that the fee allocation process was sufficiently transparent.
582 F.3d 524, 538-39 (3d Cir. 2009).

[179] *See* Christopher A. Seeger, James A. O'Brien III, *Administrative Housekeeping and Ethical Matters in Mass Tort
MDLs and Class Actions,* 13 SEDONA CONF. J. 171, 173-74 (2012).

and periodically submit time and expense reports; the court should also provide a process to review the reasonableness of the submitted time and expenses, and create a process by which an impartial arbiter can review the initial findings.  The court  should consider entering an order that any MDL attorney who wishes to make a claim against the anticipated CBF must first obtain PSC approval before performing the work absent exigent circumstances or court approval.[180]

Because the time records can be voluminous, some courts appoint a bookkeeper, accountant, or similar professional to review the records and provide periodic reports to the court; costs are borne by plaintiffs' counsel's housekeeping fund.[181]  Appointed bookkeepers, accounting firms, and special masters can play valuable roles in ensuring accurate review and resolution of any objections or disputes, as well as identifying any matters that must be resolved by the court.  For example, the judge may appoint a CPA early in the litigation with whom the judge meets every month to review the hours billed for incongruities.  Alternatively, the judge may appoint a special master, whose decisions the judge reviews if an attorney requests, which serves a similar function in making contemporaneous determinations about the hours reported − catching problems while they are easier to spot, but also allowing for corrective prospective action rather than allowing the amount in dispute to continue to accrue and escalate the monetary stakes.

Generally, parties and judges prefer contemporaneous reporting requirements, even though valuation is often best reserved until the case is resolved.  But the form that this takes can

---

[180] *See, e.g.,* Order No. 5 (Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses) 6, MDL 2434, No. 7:13-md-02434-CS-LMS (N.D. Ohio July 10, 2013) (ECF No. 207) ("Counsel are forewarned that no application for approval to incur common benefit fees, costs, or expenses will be considered by this Court unless counsel have first obtained approval from Lead Counsel.").

[181] *See Evans v. TIN, Inc.,* No. 11-2067, 2013 WL 4501061, at *5 (E.D. La. Aug. 21, 2013); *In re Vioxx Prods. Liab. Litig.,* 760 F. Supp. 2d 640, 643 (E.D. La. 2010); *see also* Pretrial Order #6 at 4, *In re Vioxx Prods. Liab. Litig.,* MDL 1657, 2:05-md-01657-EEF-DEK (E.D. La. Apr. 8, 2005) (ECF No. 245).

vary.  The key normative principle is that the individual selected to monitor the lawyers' work should be someone familiar enough with the case to spot not simply egregious errors (billing 30 hours in a day), but work that does not align with the needs of the case.  At the same time, the selected individual should ideally be close enough to the legal profession to spot those more subtle reporting "errors" but not in a position that requires them to maintain the parties' favor. Although this makes a judge's immediate supervision laudable, judges looking for a similar but less personally labor-intensive system might create a similar system in which a magistrate judge does a first-round review, paring down what the judge must review directly.  Again, there is no single formula; rather the right approach is one that addresses these concerns within the unique resource constraints, needs, and competing demands of each MDL.

These practices encourage attorneys to maintain adequate and contemporaneous records and allow the court an opportunity to timely detect any problems or issues.[182]   The contemporaneous records are the evidence the court will use to determine how to allocate fees. Counsel who fail to maintain contemporaneous and accurate time records throughout the course of a MDL do so at their own peril as the absence of such records could result in forfeiture of the attorney's fee claim.

> *Best Practice* 5D:   When individual cases in the MDL begin to settle, or when a global settlement or other final resolution is reached, the transferee judge should determine an appropriate assessment to be made from the gross recovery in each case. The transferee judge should order the defendant to withhold the specified percentage of the recovery from settlement proceeds and deposit that amount into the CBF under the court's direction.

Courts typically establish a percentage that ranges from 3% to 6% of the gross amount of the settlement.  (In some cases, usually involving smaller settlements, the percentage may be as

---

[182]*Id.*; *see also MCL* § 14.214.

high as 12%.)  The appropriate percentage depends upon the circumstances of the case, so this range should not be considered exclusive.  Of course, the court should invite counsel's input as to the appropriate percentage and should also examine precedent from other MDL courts as applied to the facts and circumstances of the particular MDL.  In soliciting counsel input, the judge should be aware that the CBF is drawn from the contingency fees of the individual, originating attorneys.  Because these monies are not added to the defendant's payout, and because they are disproportionately going to the plaintiffs' leadership, the judge should carefully consider proposals made by plaintiffs' counsel.[183]

The determination of the assessment percentage often is made after there is a global settlement or judgment, when the transferee judge has a firm grasp of the value of the PSC work and the level of expenses.  The court may want to make this determination earlier, however, if individual cases begin to settle or are resolved through trial.

> *Best Practice* 5D(i):  If a settlement is subject to a common benefit assessment, the assessment should parallel the regular fees and costs allocation.

Specifically, to the extent possible, the plaintiff should bear a share of the costs, but typically the attorney's fee portion should come from the plaintiff's individual attorney's share of the award rather than the plaintiff's. This allocation is intended to preserve the original allocation of fees and costs between the attorney and client, reducing the extent to which the plaintiff must bear extra fees for additional attorneys while the individual attorney is able to reduce the time spent on the matter without a concurrent decrease in compensation.

---

[183] Some judges noted that they were surprised to learn that not all plaintiffs' attorneys, even those in leadership, will necessarily push for higher assessments.  While many do support a high percentage for obvious reasons, some counsel worry that high assessments have created a cottage industry of "making work" that does not directly inure to the benefit of the group.  These attorneys argue that the primary compensation for leadership should come from the resolution of their own cases, with the common benefit merely serving to offset free-riding but not becoming the primary focus of an attorney's efforts.  These attorneys typically favor an assessment closer to the 3% end of the spectrum.  This report does not make a judgment about the right number, which is of course, case-specific, but instead merely flags a point for transferee judges that their colleagues found surprising.

In the large and mass-tort MDL context, settlements typically involve a complicated opt-in resolution of individual personal injury claims.  Most claimants have retained their own attorneys and entered into contingent-fee agreements with their attorneys.[184]  Courts at times cap the amount of those contingent-fee contracts to prevent overcompensation and eliminate the inconsistency of fees for attorneys doing roughly the same work.[185]  The capping of contingent fees in large and mass-tort MDLs, however, has not been without criticism. [186]

The CBF assessments are calculated by multiplying the gross settlement proceeds by the common benefit percentage, e.g., 4% of total gross settlement proceeds.  The assessment is typically deducted from the portion of the settlement allocated to the claimant's primary attorney.[187]  As a result, individual claimants' attorneys who rely on the efforts of common benefit counsel to litigate the case and create a recovery will not receive a windfall, and claimants will not be effectively charged twice.

The CBF assessment also covers the MDL costs.  Where possible, the CBF order should specify the percentage of the assessment that is allocated to fees and the percentage that is allocated to costs, so that the costs may be apportioned by the claimant and the individual attorney as specified in their retention agreement.

---

[184]*See In re Vioxx*, 760 F. Supp. 2d at 653.

[185]*See, e.g.*, *In re Vioxx Prods Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008) (capping plaintiffs' counsels' contingent fees at 32%); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 496 (E.D.N.Y. 2006) (capping plaintiffs' counsels' contingent fees at 35%).

[186]*See* Aimee Lewis, Note, *Limiting Justice:  The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 Rev. Litig. 209 (2012).

[187]*In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457 (E.D. Pa. Apr. 8, 2008) *aff'd*, 582 F.3d 524 (3d Cir. 2009); *see also In re Zyprexa Prods Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) ("The Court of Appeals for the Second Circuit has sanctioned a common benefit fund derived from a fixed percentage of fees earned by individual *attorneys*.").

*Best Practice* 5E: The transferee judge should request all interested parties to make submissions concerning the procedures the judge should use to award interim or final attorney's fees.[188]

Before any CBF distributions are made, the transferee judge should give all parties the opportunity to be heard and to seek appropriate information on the CBF distributions.[189]  The transferee judge should also permit objections and, in appropriate circumstances, allow objectors to take limited discovery.[190]

*Best Practice* 5F: When determining the CBF amount, the court should decide what method for calculating the amount is most appropriate for the particular settlement.

Courts generally use one of three methods for determining the amount of fees to award to counsel who performed common benefit work: the *percentage method* (designating a percentage of the settlement fund as the common benefit fee); the *lodestar method* (multiplying the reasonable hours expended on the case by the reasonable hourly rate); or the *blended method* (designating a percentage and then comparing that amount to the amount derived using the lodestar method, as adjusted by a multiplier analysis).

*Best Practice* 5F(i): Although the percentage method is appropriate in many cases, the transferee judge should consider using a blended method to ensure that the fee award is reasonable.[191]

---

[188] 582 F.3d at 538-39.

[189] *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *7 (E.D. Mo. Feb. 24, 2010).

[190] Finally, the court required the auditor and plaintiffs' liaison counsel to submit volumes of data reflecting the time and money that class counsel spent on the diet drugs litigation—data that the court put on the public record and used to support the fee award that it ultimately granted.

[191] As the Third Circuit Task Force observed, "[g]iven the substantial problems with the lodestar approach generally, the Task Force is highly skeptical about the use of the lodestar even as a cross-check when awarding a percentage of the common fund." TASK FORCE REPORT, at 422.  Accordingly, the Third Circuit Task Force concluded that the percentage fee, "tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel." *Id.* at 355; *see also In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) ("In common fund cases such as this one, the percentage-of-recovery method is generally favored.") (citation omitted); 6 BROMBERG & LOWENFELS ON SECURITIES FRAUD § 8:18 (2d ed.) (noting that after Task Force Report, "most courts returned to a percentage of recovery or settlement formula with some latitude in the percentage").  For the same reasons, the percentage fee method has been approved by the Supreme Court as well as several courts of appeals. *See, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("[T]he [Supreme] Court . . .

The majority of courts use the percentage method in common fund cases, with many using a lodestar multiplier as a cross-check for reasonableness (i.e., a blended approach).[192]  In most cases, the percentage method aligns the interests of common benefit lawyers with that of their clients; the greater the recovery, the greater the fee award.  This method can be efficiently administered by the courts and eliminates knotty issues of lodestar inequities.[193]  On the other hand, the percentage method might result in a windfall to common benefit lawyers who achieve a substantial recovery with little effort.   The percentage method may also undercompensate counsel in cases where a small recovery is achieved due to circumstances beyond the control of the lawyers, such as a limited-fund situation or the absence of a critical mass of injured claimants sufficient to support the litigation effort. By contrast, using the lodestar method may penalize counsel who negotiate an early settlement even though they were able to achieve substantial

---

explicitly described a percentage calculation as a 'reasonable fee' in [common fund] cases.") (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984)); *accord Camden Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and the foregoing cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case.") (collecting cases).

[192]  *See* NEWBERG ON CLASS ACTIONS § 1:18 (5th ed. database updated June 2014) ("The majority of state and federal courts use a percentage of fund method, with or without a lodestar cross-check, to calculate fee awards"); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 832 (2010) (finding that 69% of judges use the percentage of fund method with or without the lodestar cross-check); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 267 (2010) (finding that the lodestar cross-check is becoming more commonly used, with roughly 42.8% of courts using both lodestar and percentage methods between 2003-2008, whereas approximately 24.3% of courts used both between 1993-2002).

[193]  *See Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676, 682 (E.D. La. 2006) ("As the Federal Judicial Center has noted, '[i]n practice the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation. In addition, the lodestar method creates inherent incentive to prolong the litigation until sufficient hours have been expended.'  *MCL* § 14.121 (2004).  In light of the problems that have emerged with the lodestar method, the majority of Courts of Appeals have adopted the percentage-fee method in common-fund cases, either as a primary or secondary method of calculating fees.").

savings on litigation expenses.  To avoid the potential shortcomings of the percentage and lodestar methods, many courts use the blended method to determine a reasonable fee.[194]

> *Best Practice* 5G: In determining the amount of fees to be paid to individual attorneys from the CBF, the transferee judge will need to determine the customary hourly rate.  In large and mass-tort MDLs, the judge may find it appropriate to use a national rate for certain purposes.

In calculating attorney's fee awards, courts typically use either the customary rate an attorney charges clients hourly or the hourly rates charged by attorneys of similar skill in the court's locale.  Some courts have used standardized rates when awarding attorney's fees in common fund cases to ensure that all counsel are compensated fairly.  A seminal case in this regard was the *Agent Orange* litigation, in which the court established flat hourly rates for partners and associates and awarded fees to all counsel using those rates.[195]  In a lengthy discussion, the Second Circuit noted that courts should normally use the hourly rate charged by attorneys in the area but approved the use of a national hourly rate under the circumstances, which included the length of the litigation and the large number of attorneys from across the country who were involved.[196]

Courts have also used national rates for a more limited purpose, such as in performing a lodestar crosscheck on a percentage of the fund fee award.[197]  By using standardized rates, a

---

[194]*See* Fallon, 74 LA. L. REV. at 384; *see also In re Diet Drugs*, 582 F.3d at 545 n.25; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-51 (9th Cir. 2002).

[195]*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1349-50 (E.D.N.Y. 1985), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987).

[196] 818 F.2d at 231-34.

[197] *See, e.g., Martin v. FedEx Ground Package System, Inc.*, No. C 06-6883 VRW, 2008 WL 5478576, at *6-7 (N.D. Cal. Dec. 31, 2008) (using the *Laffey* matrix, a widely recognized compilation of attorney and paralegal rate data, to establish standardized rates based on attorneys' years of experience and then adjusting for California's higher cost of living).

court can more accurately compare the multiplier in the case before it with the multipliers awarded in other cases.[198]

> *Best Practice* 5G(i): The transferee court may also award fees at current rates, rather than historical rates, if the litigation has spanned many years, although the practice is disfavored in limited-fund cases.

District courts have the discretion to compensate prevailing parties for delays in the payment of fees by awarding fees at current rather than historical rates, in order to adjust for inflation and loss of use of those funds.[199]  As the Supreme Court has explained, "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings."[200]  There have been exceptions to this prevailing practice.  In certain circumstances, such as a limited-fund settlement, it may be more appropriate for a court to use historical rates to calculate the fee award.[201]

> *Best Practice* 5G(ii):  The transferee court should appoint a common-fund fee committee, comprised of members of the plaintiffs' leadership team, or designate a special master or magistrate judge, to make fair and impartial allocation recommendations to the court, although the court retains ultimate control over the allocation and distribution of funds.[202]

---

[198]*See id.* at *6 ("Standardized hourly rates result in a meaningful comparison among multipliers in various cases.  If the standardized rates are lower than actual rates billed by attorneys, then a comparison of multipliers in many cases will indicate a higher standard multiplier.  Thus, counsel need not worry whether the standardized rates reflect their actual billing practices; the court seeks only to compare lodestar multipliers calculated at the same standardized hourly rates across many common fund cases.").

[199]*See Fischel v. Equitable Life Assurance Society of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002); *Murray v. Weinberg,* 741 F.2d 1423, 1433 (D.C. Cir. 1984) ("Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys.").

[200]*Missouri v. Jenkins*, 491 U.S. 274, 283 (1989).

[201]*See Fanning v. Acromed Corp.*, 1014, 2000 WL 1622741, at *8 n.19 (E.D. Pa. Oct. 23, 2000) ("In apportioning the gross fee among Petitioners, the court will refer to the historical lodestar rather than the current lodestar. . . . the court is confronted with a limited fund and a percentage of recovery that is less than the current or historical lodestars.  Here, it seems most equitable for the court to use the actual, historical lodestar in allocating the award.").

[202] *See, e.g.,* Amended Order No. 25: Common Benefit Order, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices & Products Liability Litigation*, MDL 2151, No. 8:10ML2151-JVS(FMOx) (C.D. Cal. June 9, 2013) (ECF No. 3754).

Distribution of the CBF to attorneys who performed common benefit work should be done in a manner that promotes fairness and efficiency.  Although the court is, of course, the final arbiter, it should avail itself of the experience and insights of the PSC, or some subset thereof, whose members have stewarded the litigation efforts and who have observed the common benefit efforts of other non-PSC attorneys throughout the entire arc of the litigation. The court may request that the PSC make a proposal for allocating fees among the attorneys who performed common benefit work.[203]  In the *Guidant Defibrillator* litigation, the court established a "fee and cost allocation committee" to make a proposal to the court about the allocation of attorney's fees and costs among all counsel who were entitled to share in the CBF.[204]

Special masters can assist the court with the allocation of common benefit funds, particularly when a MDL proceeding has progressed over a period of years through dispositive motions, fact and expert discovery, substantive hearings, multiple bellwether trials, and potentially interlocutory appellate review.[205]  Courts have appointed special masters to oversee the disbursement of attorney's fees from a settlement fund, including conducting hearings on disputed matters and issuing recommendations to the court on their findings.[206]  Some courts

---

[203] *See* Fallon at 387-88 (describing the process used by the allocation committee appointed by the court in the *Vioxx* litigation to gather information and make a recommendation).

[204] *In re Guidant Corp. Implantable Defibrillator Prods. Liab. Litig.*, No. 05-1708, 2008 WL 451076, at *1 (D. Minn. Feb. 15, 2008).

[205] *See, e.g.,* Order Appointing Special Masters, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, No. 6:11-md-02299-RFD-PJH (W.D. La. Apr. 11, 2012) (ECF No. 532).  The appointment of a special master is typically unnecessary in cases involving a small number of plaintiffs' law firms, and should be considered only in those complex cases where the number of counsel is so great and their efforts so varied and potentially obscured that individual contributions may have escaped the district court's notice.

[206] In the *Zyprexa* litigation, for example, the court appointed four special masters to oversee settlement negotiations and administer settlement agreements, and the court gave the special masters the discretion to order reductions or increases in the amount of attorney's fees awarded to claiming counsel. *In re Zyprexa Products Liab. Litig.*, 594 F.3d 113, 116 (2d Cir. 2010);  Courts have also appointed special masters to address disputes over the allocation of attorney's fees.  *See In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010); *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 799 (E.D. La. 2008) (appointing a special master to allocate fees from the

appoint an accounting firm or similar professional to provide accounting services such as compiling submissions and providing reports to the court.[207]

Ultimately, the transferee judge must decide the appropriate allocation. Even when presented with a reasonable recommendation from the PSC or a special master that is undisputed, the court must reach an independent conclusion that the allocation is fair and reasonable. Judge Fallon, who presided over the *Vioxx* litigation, summarized his approach to issuing a ruling on the allocation of attorney's fees:

> At this point the court had before it the report of the allocation committee; the transcript and documents compiled by the allocation committee; the depositions, briefs, and transcript compiled by the Special Master, as well as his report; and the data showing the hours logged, costs expended, and the nature of the work performed. The court prepared a summary chart listing the name of each fee applicant, a cross column for each category of work performed by the applicant, and the total time logged in performing that task. The categories included such things as: preparing pleadings; taking or assisting in depositions; participating in written discovery; writing briefs; arguing motions; preparing for trial; participating in trials, appeals, or settlement negotiations; and administration and committee leadership. Each category was assigned a number with categories such as participating in trials, participating in settlement negotiation, taking depositions, writing briefs, and committee leadership having a larger number. A total of these numbers generally revealed the individuals who performed the most significant work in resolving the litigation.[208]

> *Best Practice* 5H:  Courts should explain their reasoning for the allocation to further the goal of transparency, to provide feedback to interested parties, and to ensure that any reviewing court has a sufficient record.[209]

---

common benefit fund after the PSC was unable to achieve agreement). In *Turner*, the special master implemented a process that required attorney-fee applicants to submit ten-page affidavits in support of their requested fee awards, allowed five-page challenge affidavits in response, and gave counsel an opportunity to serve limited written discovery (consisting of five interrogatories and two requests for production) on other applicants, and notice depositions. 582 F. Supp. 2d at 803-04. The special master also held a hearing after issuing his preliminary report at which counsel were allowed to call up to two witnesses and present five-minute closing arguments. *Id.* at 806.

[207] *See* Davis & Garrett, *supra* note 60, at 495-96; *In re Vioxx Products Liability Litigation*, 760 F. Supp. 2d 640, 643-44 (E.D. La. 2010).

[208] Fallon, 74 LA. L. REV. at 388-89.

[209] "The court awarding [attorney's fees] should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable." *MCL* § 24.121, at 206.

The transferee judge should endeavor to create a complete and well-documented record, as well as a detailed explanation for the court's allocation decisions. The court should permit, and indeed require, counsel to brief any disputes, and it should issue written or on-the-record opinions citing the reasons for the method and amount of allocation and legal precedent.  Some settlement agreements contain a provision that requires any plaintiff accepting the settlement to also waive objection to the court's fee determinations.[210]

> *Best Practice* 5H(i):  In imposing fee assessments, the transferee judge should promote fairness among counsel, compensate counsel who made the recovery possible, and suppress perverse incentives among non-performing counsel. This may include imposing fees on attorneys representing individual clients who opt out, yet use MDL discovery materials or otherwise enjoy the fruits of common benefit counsels' efforts. It may also include extending the fee structure to non-MDL participants, if the defendant agrees to a global settlement.[211]

Another issue the court may face is whether plaintiffs represented by non-leadership counsel should be charged with some of the discovery costs.  As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense."[212]  However, in determining whether to impose fees on non-participating plaintiffs' counsel, and if so to what extent, the court should consider the work product created. Depending upon the timing of the settlement and other factors, the work product may be of more or less value to non-participating counsel.

When a defendant enters into a global settlement of claims filed in different courts (for example, if some lawsuits have not been incorporated into the MDL), the other courts generally

---

[210] *Id.* at 380-81.

[211] *See generally In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977) (requiring those who benefit from lead counsel's work to consolidated litigation to bear a portion of the fee award and reducing their contingent fee liability to their non-participating attorneys accordingly).

[212] *Mills v. Elec Auto-Lite Co.*, 396 U.S. 375, 392 (1970).

have attempted to adhere to the MDL's procedures (including the establishment of a CBF) for the sake of efficiency and fairness.[213]   Again, the court should be careful to assess the contribution of all attorneys, as state-court attorneys may have made a meaningful contribution that was not − at the time undertaken − submitted to the MDL.

---

[213]*See, e.g.*, *Roberts v. Johnson & Johnson*, No. MID-L-009782-06, 2010 WL 7504814 (N.J. Super. Ct. Law Div., Aug. 11, 2010) ("Order Approving the Settlement") (ordering CBF payments be made in accordance with orders of federal MDL court).