# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
| --- | --- |

This document relates to:

*Jessica DeRubbio et al. v. Islamic Republic of Iran*, No. 1:18-cv-05306 (GBD) (SN)
*Roberta Agyeman et al. v. Islamic Republic of Iran*, No. 1:18-cv-05320 (GBD) (SN)
*Horace Morris et al. v. Islamic Republic of Iran*, No. 1:18-cv-05321 (GBD) (SN)
*Laurence Schlissel et al. v. Islamic Republic of Iran*, No. 1:18-cv-05331 (GBD) (SN)
*Bakahityar Kamardinova et al. v. Islamic Republic of Iran*, No. 1:18-cv-05339 (GBD) (SN)
*Audrey Ades et al. v. Islamic Republic of Iran*, No. 1:18-cv-07306 (GBD) (SN)
*Lloyd A. Abel, Sr. et al. v. Islamic Republic of Iran*, No. 1:18-cv-11837 (GBD) (SN)
*Chang Dom Kim et al. v. Islamic Republic of Iran*, No. 1:18-cv-11870 (GBD) (SN)
*Alexander Jimenez et al. v. Islamic Republic of Iran*, No. 1:18-cv-11875 (GBD) (SN)
*Moody-Theinert, et al. v. Islamic Republic of Iran*, No. 1:18-CV-11876) (GBD) (SN)
*Cheryl Rivelli, et al v. Islamic Republic of Iran*, No. 1:18-cv-11878 (GBD) (SN)
*Aamoth et al. v. Islamic Republic of Iran*, No. 18-CV-12276 (GBD) (SN)
*Marinella Hemenway et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD) (SN)
*Matthew Rowenhorst et al. v. Islamic Republic of Iran*, No. 1:18-cv-12387 (GBD) (SN)
*John P. O'Neill et al. v. Islamic Republic of Iran*, No. 04-cv-01076 (GBD) (SN)

## DECLARATION OF JOHN E. BEAUZILE

JOHN E. BEAUZILE hereby states under penalty of perjury that:

1.      I am an actuarial analyst with a master's degree in actuarial science from Columbia University, a bachelor's degree in mathematics with a minor in economics from Marist College and a bachelor's in business administration degree from Pace University with a major in public accounting.   I have experience working with businesses, consulting firms and accountancies, have fulfilled the Validation by Educational Experience requirements of the Society of Actuaries ("SOA") in economics, corporate finance and applied statistics and have also SOA and Casualty Actuarial Society ("CAS") exams in probability, financial mathematics, models for financial economics, short term actuarial mathematics, models for stochastic

1

processes and statistics, and models for life contingencies. My curriculum vitae is attached hereto as Exhibit D-1. Since 2018, I have been working with the Columbian Financial Group and have been, among other things, performing data validation and analysis, preparing financial analytics for income statements and assisting in the quantification of financial consequences of extreme financial events.

2. I was hired by Anderson Kill, P.C. to update economic loss figures for estates of individuals killed in the September 11, 2001 terrorist attacks. I provided those present-value figures for economic loss to estates along with an explanation of the materials upon which I relied, presented in cover letters followed by updated calculation summaries in every estate case for which I was provided a prior economic loss calculation.

3. The methodology I employed in reaching the present-value figure depended on what information was available in the original economic loss to estate calculations. In some cases, I reviewed and relied on files maintained by the Department of Justice in connection with the September 11th Victim Compensation Fund ("VCF") and in other cases I reviewed and relied on economic loss reports prepared previously by an expert. A copy of a portion of the VCF's Frequently Asked Questions, dated April 13, 2004 and describing the VCF methodology for calculating economic loss, is attached hereto as Exhibit D-2.

4. In cases for which I had VCF information and files, I proceeded as follows:

    a. First, I would identify the VCF award letter to determine what the VCF paid for economic loss to the estate.

    b. I would then identify the valuation files that the VCF used to support the economic loss amounts. Assumptions based on age, income, benefits, tax and discount rates, work- and life-expectancy and all other assumptions needed to

calculate the economic loss amounts.

    c.   Using those valuation files, I would update the presumed loss by calculating the loss up until the date of my review. Any values that pre-dated the date of valuation were not adjusted, while values post-dating the date of valuation were.

5.    If the VCF award letter was available but not the valuation files, I made the following assumptions, which were reasonable using generally-accepted economic modeling practices and information contained in other VCF valuation files.

    a.   The VCF award did not include payment for replacement services;

    b.   Pension benefit was assumed at 4% of pre-tax income, which is the figure that the VCF Special Master used as a default value when no information was available;

    c.   Medical benefits were assumed to be $2,400 for 2001, which was the figure that the VCF Special Master used as a default when no information was available, and was adjusted for applicable inflation going forward.

    d.   The inflation rate was set equal to the age-specific earnings growth rate.

6.    Using those assumptions as well as those prescribed by the VCF Special Master, which I presumed to be the same presumptions employed in those cases for which VCF valuation files were available, I proceeded to compute an "implied" tax-and-personal-consumption-adjusted earnings for 2001. This was done as follows:

    a.   I calculated the present value of medical benefits as of the date of the award letter by using the expected work-life (which depends on the decedent's age), then subtracted from the award amounts;

3

b.  The remaining amount depended on earnings (which, in turn, depended on 2001 earnings and age), work-life expectancy and discount rate (both of which also depended on age).

c.  By combining the age-specific growth rates with the discount (to get adjusted discount rates for each year) and 2001 earnings with taxes and personal consumption (to get the 2001 adjusted earnings), the balance of the award after subtracting medical benefits can be written as a factor of 2001 adjusted earnings and an adjusted present value factor (APVF), where APVF is the sum of the annual adjusted discount rates. Given, the person's age, APVF is easily calculated.

d.  Using APVF, 2001 adjusted earnings was computed by dividing balance of award by APVF. Note that pension benefit is a function of earnings, therefore the 4% assumption for pension benefit would be included in the APVF calculation.

e.  Armed with the information above, I was able to calculate a new APVF using the chosen valuation date (that is, the date of my report) then multiplying by the 2001 adjusted earnings to get the updated loss amount or all of the annual adjusted earnings can be calculated by setting taxes and personal consumption equal to zero (they are included with earnings) then discounted to the new valuation date.

7.      In cases in which an expert previously prepared an economic loss report, I reviewed the original reports and all supporting exhibits (summarized in my updates) to understand what assumptions were made, how the original calculations were performed and the

4

methodology employed by the original expert economist.  I then used the same methodology and assumptions to update the economic loss amounts of the new valuation data.  The updated economic loss amounts in those cases in which expert reports had been previously prepared reflect present valuation for earnings and benefits as well as personal consumption.  If the original expert reports did not include exhibits demonstrating, for example, lost benefits, then I used the same methodology and presumptions prescribed by the VCF to update the original loss figures.

8.     Expert reports upon which I relied sometimes had different future growth estimates depending, for example, on whether the VCF assumption for age-specific future growth rates was applied or whether the victim had an actual historical wage growth rate greater than the VCF assumption, in which case a higher growth rate was applied.  In those cases, I provided updated present valuation for all scenarios.

9.     I am confident to a reasonable degree of accounting and actuarial certainty that the present valuations of economic loss figures that I have calculated and provided to Anderson Kill, P.C. are correct.

Dated: January 10, 2020
       New York, NY

John E. Beauzile

# Exhibit D-1

# JOHN E. BEAUZILE

jeb2235@columbia.edu

28 Penny Lane, Binghamton, NY 13905 • (914) 227-4048

## EDUCATION

**Columbia University**, *MS in Actuarial Science*, New York, NY                      Jan 2013 – May 2014

**Marist College**, *BA in Mathematics;* Minor in Economics; GPA 3.75, Poughkeepsie, NY      Jan 2010 – Dec 2011

**Pace University,** *BBA in Public Accounting*; GPA 3.79; Pleasantville, NY          Sep 2004 – Jun 2007

## WORK ELIGIBILITY
Eligible to work in the U.S. with no restrictions

## ACTUARIAL EXAMS
**Exams Passed**: P, FM, MFE, ST, LC
**VEE Fulfilled:** Economics, Corporate Finance, Applied Statistics

## PROFESSIONAL EXPERIENCE
**Kreindler & Kreindler, LLP—***Actuarial Analyst (Contractor)*; New York, NY          Aug 2017—May 2018
- Understand the methodology promulgated by the Special Master of September 11th Victim Compensation Fund
- Review 500+ Economic Loss Award analyses prepared by various economists and actuarial experts back in 2002—2004
- Forecast or determine forecasted incomes, fringe benefits (including pension), tax and personal consumption rates, life and work-life expectancies, household and other care services
- Calculate the present value of presumed economic damages of victims

**The Hartford – ***Workers' Comp Reserving and Claims Analytics (Contractor)*; Hartford, CT      Feb 2016 – Jul 2016
- Prepare variance analysis of average cost of claims and their drivers to company's management
- Analyze duration of temporary total disability payments and percentage of workers receiving such payments
- Provide analysis of the workers' compensation line claims settlement rates to management
- Prepare and distribute to senior management a summary report on large losses
- Support the Workers' Comp Reserving actuary with the reserve review and SOX documentation

**ACE Group – ***Corporate Actuarial, Intern*; New York, NY                      Nov 2014 – Dec 2015
- Under direct supervision of the Senior Vice President of Corporate Pricing, complete assigned projects and prepare summary reports for company's senior management
- Prepare analysis of rate changes for senior management
- Analyze potential impact of economic conditions on losses of Accident & Health line of business in Europe
- Analyze the relationship between the macro-economy and P&C profitability
- Model the relationship between the macro-economy and Workers' Compensation loss frequency

**IBM – ***Professional Accountant*; Somers, NY                          Jun 2007 – May 2009
- Prepare and process month-end and year-end journal entries including closing, reclassifications, accruals, deferrals
- Review contracts for revenue recognition purposes
- Reconcile various general ledger accounts including Software, Maintenance, and other Prepaid Assets
- Provide various analyses of gross spending on services contracts

## OTHER EXPERIENCE
**Quantitative Risk Management Term Project**                          Fall 2013
- Simulate at monthly intervals Assets and Liabilities of an insurance company and compare them to the risk-return profile of the S&P500
- Assets were invested equally in S&P500, 10-year, and 30-year treasuries; Amounts were then used to pay Liabilities starting with S&P500 proceeds, then 10-year bonds, then 30-year bonds
- S&P500 returns were simulated using a Double Exponential Jump Diffusion Process; Bonds' interest rates were simulated using a multi-factor Cox-Ingersoll-Ross model; Liabilities were simulated by a Gamma process

## COMPUTER SKILLS AND INTERESTS
**Computer Skills:** Excel, PowerPoint, SAS, VBA, SQL, ResQ, MATLAB, R, and JAVA

# Exhibit D-2

## VICTIM COMPENSATION FUND FREQUENTLY ASKED QUESTIONS
### (Updated April 13, 2004)

### Section 5 – Compensation for Deceased Victims

#### 5.1    Who gets the money?

Awards will generally be made to the qualified Personal Representative, who **must** distribute the award in a manner consistent with the law of the decedent's domicile, ruling by a court of competent jurisdiction or at the direction of the Special Master. In some cases, the Special Master may make provision for separate distributions to comply with a court approved distribution plan.  An example would be payments to a minor that may need to be paid as an annuity.

In order to assure that the families of Victims receive adequate compensation, the Personal Representative must provide a proposed distribution plan in the Compensation Form. Notwithstanding any other provision of these regulations or any other provision of State law, in the event that the Special Master concludes that the Personal Representative's plan for distribution does not appropriately compensate the Victim's spouse, children, or other relatives, the Special Master may direct the Personal Representative to distribute all or part of the award to such spouse, children, or other relatives.

#### 5.2    How much money can I receive from the Fund?

If you are the Personal Representative of a deceased Victim, you can look at the Presumed Loss Tables to see an approximation of your presumed award for economic and non-economic loss (available at www.usdoj.gov/victimcompensation or by calling the Helpline for a copy (call [removed])). The tables are intended to illustrate an average or typical award. Each individual's award will vary depending on the exact income, the benefits and other compensation that individual received from his or her employment, the Victim's effective tax rate, and the household size. The tables include both calculations of presumed economic loss and presumed non-economic loss. The non-economic loss is presumed to be equal to $250,000 for each deceased Victim plus an additional $100,000 for the Victim's spouse and each of the Victim's dependents. This aggregate amount is added to the presumed economic loss to determine the entire presumed award for economic and non-economic loss. Additional amounts could be added such as medical expenses or burial/memorial costs. This total amount will then be reduced by other sources of compensation, such as government programs or life insurance (but not monies from privately funded charitable entities), you have obtained or are entitled to obtain.

#### 5.3    How do I figure out from the charts how much I will get?

If you are the representative of a deceased Victim, you can get an approximation of the award by looking at the compensation tables at (available at www.usdoj.gov/victimcompensation or by calling the Helpline for a copy (call [removed])).

- First, pick the most appropriate chart (for example, if the Victim was married with 1 child, look at the chart for married Victims with 1 dependent).

- Then, look for the age and income level in the chart that is closest to the age and income level of the Victim. For income, you should include all elements of income including salary, tips, bonus, and employer contributions to pension plans and to health insurance plans.

The amount in the appropriate age and income box is the approximate amount of the economic and non-economic loss for that Victim. The actual amount will vary a bit depending on the age of the dependent child, for example. To determine the total award, you should add to this amount any other items of loss, such as burial expenses. Then you should deduct the amount you have received or are entitled to receive from any collateral source. For example, if you have received payment from a life insurance company of $25,000 for the Victim's death, you should deduct this amount from the total. The amount after that deduction is the approximate amount of the award you should receive.

For questions about the effect of collateral source offsets on compensation awards, see below or contact the Helpline at [removed] or visit one of the Claimant Assistance Sites.

**5.4     Will the awards be subject to Federal estate or Federal income tax?**

No. The awards are not subject to Federal income tax and, because of the new legislation, in most cases they would not be subject to Federal estate tax. The Victims of Terrorism Tax Relief Act of 2001 (Pub. Law No. 107-134) provides income and estate tax relief to the families of Victims of terrorism.  The law waives the income tax liability of a Victim who died in one of the attacks for both the year of the attack and the previous year, and ensures that a minimum benefit of $10,000 is provided to the family of each Victim.  In addition, the law shields the first $8.5 million of a Victim's estate from the Federal estate tax.  For example, prior to the new law, citizens or residents of the United States who died in the September 11, 2001 terrorist attacks, were able to utilize the maximum state death tax credit allowed for Federal estate tax purposes, and had made no prior taxable gifts would have had Federal estate tax liabilities as follows:

- A decedent with a Federal taxable estate valued at $2,000,000 would have had a Federal estate tax liability of approximately $460,650;
- A decedent with a Federal taxable estate valued at $4,000,000 would have had a Federal estate tax liability of approximately $1,339,850; or
- A decedent with a Federal taxable estate valued at $8,000,000 would have had a Federal estate tax liability of approximately $3,047,050.

As a result of the new law, no Federal estate tax would be due in each case.

**5.5     What is non-economic loss?**

Each person who was killed or injured in the September 11 attacks suffered grievous harm, and each person experienced the unspeakable events of that day in a unique way. Some Victims experienced terror for many minutes, as they were held hostage by terrorists on an airplane or trapped in a burning building. Some Victims had no warning of what was coming and died within seconds of a plane hitting the building in which they worked. While these circumstances may be knowable in a few extraordinary circumstances, for the vast majority of Victims these circumstances are unknowable.

After extensive fact finding, public outreach, and review of public comments, the Special Master and the Department have concluded that the most rational and just way to approach the imponderable task of placing a dollar amount upon the pain, emotional suffering, loss of enjoyment of life, and mental anguish suffered by the thousands of Victims of the September 11 attacks is to assess the non-economic losses for categories of claimants. The most obvious distinction is between those who died and those who suffered physical injury but survived. The regulations therefore set a presumed award for non-economic losses sustained. For those Victims who died as a result of the September 11 aircraft crashes, the presumed non-economic losses will be $250,000, plus an additional $100,000 for the spouse and each dependent of the deceased Victim. That $250,000 figure is roughly equivalent to the amounts received under existing federal programs by public safety officers who are killed while on duty, or members of our military who are killed in the line of duty while serving our nation. See 38 U.S.C. §1967 (military personnel); 42 U.S.C. § 3796 (Public Safety Officers Benefit Program). The latter figures -- $100,000 for the spouse and each dependent -- include a non-economic component of "replacement services loss."

### 5.6    What amount is provided for non-economic loss?

For those Victims who died as a result of the September 11 aircraft crashes, the presumed non-economic losses will be $250,000, plus an additional $100,000 for the spouse and each dependent of the deceased Victim.

### 5.7    The Victim had an income that was greater than $231,000.  How do I determine the award?

The presumed award methodology will calculate awards based on income up to $231,000.  The regulations provide that for persons who made more than the top 2 percent of persons in the United States, the Special Master will compute a presumed award that assumes that the Victim would have made the amount equal to $231,000 (plus standard increases) for the rest of his or her working life. In extending the presumed awards only up to the 98th percentile, we merely recognized that the calculation of awards for many Victims with extraordinary incomes beyond the 98th percentile could be a highly speculative exercise and that, moreover, providing compensation above that level would rarely be necessary to ensure that that the financial needs of a claimant are met.  Calculation of an award beyond that point using the presumed award methodology without a detailed record could very well produce inappropriate results.  Accordingly, we permitted applicants with extraordinary prior earnings to accept awards at the 98th percentile or seek calculation of an award based upon more detailed record.  We also note that the Special Master has express authority under the Act to consider the "individual circumstances of the claimant" in fashioning awards, including the **financial needs** of Victims and surviving families in rebuilding their lives.  As indicated, the Special Master will strive to deliver a fair and equitable sum to each eligible claimant.

### 5.8    What does it mean to have a presumed award, and what if I feel I can prove that the Victim would have earned more than $231,000?

3

Any claimant may seek review of the presumed award or may request a hearing immediately. If a claimant seeks review of a presumed award, the Special Master may consider a range of information, including demographic information on retirement trends for high wage earners, the individual's historical expenses, savings, and any other factors he deems relevant, including economic trends, information available from the Bureau of Labor Statistics, the Census Bureau and other entities on average income and retirement age for the Victim's profession or for the Victim's former employer.

**5.9    Is there a minimum award? Does this mean someone could get no payment at all?**

The regulations provide that the minimum amount of presumed economic and non-economic loss, before subtracting amounts for "other sources," will be $300,000 for single deceased Victims and $500,000 for any deceased Victim who has one or more dependents or is married. There is no minimum for persons suffering injury.

The Act does not permit the Special Master to create a mandatory legal rule requiring minimum payouts for all eligible **after** collateral source deductions.  Nevertheless, the Special Master is permitted to consider the individual circumstances of each claimant, including the needs of the Victim's family.  The Special Master has announced his expectation that, when the total needs of deceased Victims' families are considered, it will be very rare that a claimant will receive less than $250,000, except in unusual situations where a claimant has already received very substantial compensation from collateral sources.

**5.10    If the award distribution is based on State law, will that mean that different distributions will occur depending on where the Victim lived?**

Yes. It is certainly possible that there will be different distribution schemes in different states.

**5.11    How are burial/memorial costs handled?**

This loss shall be calculated on a case-by-case basis, using documentation and other information submitted by the Personal Representative and includes the burial/memorial costs that were not reimbursed.

**5.12    In estimating the presumed economic and non-economic awards, how do I use the existing charts to compute an award amount if there are more than 2 dependents?**

Use the table entitled "Presumed Economic and Non-Economic Loss For a Married Decedent With 2 Dependent Children." Look up the amount of estimated award based on the compensation and age of the decedent. The actual impact of dependents greater than 2 will vary with each computation based on the compensation level of the decedent and ages of the family members. However, for estimation purposes, increasing the award amount on the table entitled "Married Decedent With 2 Dependent Children" table by 1% for each additional dependent child beyond the first 2 children will provide a reasonable estimate of the economic impact of additional dependents.

To calculate the non-economic award for additional dependents, add an additional $100,000 for each dependent beyond the third dependent. Add this amount to the total computed above.

You should then deduct the amount you have received or are entitled to receive from any collateral sources as described above.

### 5.13    Would you provide more information about the procedures for calculating the presumed economic loss?

Please look at the detailed information provided in the Presumed Economic and Non-Economic Loss Tables.  You can find these on the web site, or you can call the Helpline at [removed] to get a copy.

The calculation of presumed economic loss will use the following procedures and assumptions for death claims:

1.  Establish the Victim's age and compensable income.[1]  Income will be determined based on the claimant's submissions.  Generally, the Special Master will consider the past three years of income data.  For some cases the most recent year will be the primary basis of the award -- other claims may require analysis of trends adjusted to current dollars.  The Special Master adopted this approach as the one likely to be more favorable to claimants because it relies on recent salaries which were relatively high during the past few years.

2.  Determine after-tax compensable income by applying the average effective combined Federal, State and local income tax rate for the Victim's income bracket currently applicable in the State of the Victim's domicile for tax purposes, state and locality.  The Special Master will consider the Victim's tax returns as well as effective income tax rates derived from published Internal Revenue Service (IRS) data on selected income and tax items for Individual Income Tax Returns by State.[2]  Effective income tax rates derived from IRS data for New York are attached as Table 1.

3.  Add the value of employer provided benefits.  These benefits will be set at actual levels if data are provided.  If the claimant does not provide data, the pension is assumed at 4% of pension-eligible compensable income and medical benefits are assumed to be $2,400 per year in current year dollars and will be adjusted for applicable inflation.  (To prepare the presumed award tables, the Special Master assumed that individuals would have benefits equal to 4% of compensable income and medical benefits of $2,400 per year.)

4.  Determine a measure of the Victim's expected remaining years of workforce participation using the tabulated work-life expectancies for the Victim's age contained in the publication

---

[1]  Income up to the IRS 98th percentile of wage earners is considered.  This income level was $231,000 for the year 2000.

[2]  Average combined effective income tax rates by earnings bracket were calculated based on an analysis of IRS data for the most recent tax years available: 1997, 1998 and 1999.  In consideration of future income tax rate reductions and other tax reforms included in the Economic Growth and Tax Relief Reconciliation Act of 2001 (HR 1836) signed by President Bush on June 7, 2001, the calculated average combined effective income tax rates were reduced by an estimated 5%.  It is recognized that HR 1836 actually provides for smaller graduated rate reductions beginning July 2001 through 2006 and remaining in effect only through 2010.  The one-time immediate reduction of 5%, assumed to remain in effect for all future years, including years beyond 2010, was applied to facilitate projections and eliminate speculation as to future tax law modifications.

"A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity in 1997-1998," by James Ciecka, Thomas Donley, and Jerry Goldman in the *Journal of Legal Economics*, Winter 1999-2000. These are the most recent and generally accepted tables of work-life expectancy regarding the general population available.

Work-life expectancies are based on actual experiences and behavior of the general population and measure the estimated remaining time in years an individual a given age will be in the labor force (either employed or actively seeking work), allowing for age-specific mortality risks and rates of workforce transitions. The Special Master will use the expected work-life for "All Active Males" to compute expected remaining years of workforce participation for both male and female Victims. These work-life expectancies are attached as Table 2. Because published estimated work-life expectancies by gender are lower for women than men, this specification increases the duration of estimated foregone earnings, and thus presumed economic losses, for female Victims and was implemented by the Special Master to accommodate for potential increases in labor force participation rates of women.

5. Project compensable income and benefits through the Victim's expected work-life using growth rates which incorporate an annual inflationary or cost-of-living component, an annual real overall productivity or scale adjustment in excess of inflation, and an annual real life-cycle or age-specific increase derived using data on average full-time year round earnings by age bracket from the March 2001 Current Population Survey (CPS), a monthly survey of households conducted by the Bureau of the Census for the Bureau of Labor Statistics. This survey is widely recognized as the primary source of data on employment status and workforce characteristics of the civilian non-institutional population ages 16 years and older. Because age-specific observed life-cycle increases for all males were higher than observed life-cycle increases for both men and women combined, the Special Master elected to incorporate the life-cycle increases for males into earnings growth for all Victims, both male and female.[3]

Independent of life-cycle increases, inflation and real overall productivity increases of 2% and 1%, respectively, were applied each year. These rates of increase are consistent with the long-term relationship between economy-wide wage growth and risk-free interest rates, which currently reflect lowered inflationary expectations.[4] A schedule containing age-specific earnings growth rates reflecting the combined inflation, overall productivity and life-cycle increases is attached as Table 3. The Special Master has determined that individual age-specific growth rates, rather than growth dependent on a particular age bracket at death, better reflects the expected pattern of earnings over one's career[5] and results in more

---

[3] An examination of real life-cycle earnings growth for males by education level revealed that career real life-cycle increases computed for all males across education levels mimicked the career earnings profile of the highest educated group. For this reason, the Special Master elected to apply the growth pattern for all males for the sake of consistency and to better advantage all claimants.

[4] The assumed 1% annual real overall productivity increase also agrees with assumed ultimate long-term annual average covered real-wage differentials used by the Board of Trustees of the Social Security Trust Funds to project the financial condition of the trust funds.

[5] Real life-cycle increases are typically higher in the earlier stages of one's career, one reason being unrealized opportunities for advancement and promotion that individuals in later stages of their careers have already experienced. During the course of an individual's career, the rate of annual real life-cycle growth tends to gradually decline until a peak real earnings level is attained. Although CPS and other data used to study lifetime

equitable and consistent projections for Victims close to each other in age with otherwise similar family and employment characteristics.

6. To better reflect contingencies that the Victims would have faced, all future earnings amounts are adjusted for a factor to account for the risk of unemployment because lifetime jobs are not representative of the modern economy. This adjustment is made because work-life expectancies are based on years of expected workforce participation, which, as defined by the Bureau of Labor Statistics, include periods an individual is either working or seeking work. Historical unemployment rates were examined and a comparatively low reduction factor of 3% was applied to presumed earnings to account for this risk.[6]

7. Subtract from annual projected compensable income and benefits, the Victim's share of household expenditures or consumption as a percentage of income, using expenditure data by income level obtained from "Table 2. Income before taxes: Average annual expenditures and characteristics, Consumer Expenditure Survey, 1999," published by the Bureau of Labor Statistics (BLS). This subtraction is a standard adjustment in evaluating loss of earnings in wrongful death claims because some amount of the income the Victim would have contributed to the household would have been consumed personally by the deceased and not available to other household members. A Victim's expenditures were calculated as a share, based on household size, of certain expenditure categories. For married or single with dependents, these expenditure categories include Food, Apparel & Services, Transportation, Entertainment, Personal Care Products and Services, and Miscellaneous. For single without dependents, Housing, Education and Health are also included.[7] For lower income categories where total expenditures exceed income, expenditures were scaled to income, so as not to reduce income for expenses potentially met by other forms of support. This approach was intended to avoid a penalty to the claimant. Table 4 shows calculated consumption rates by income bracket and for various household sizes.

In determining household size, children were assumed to remain in the household through age 18. Consumption rates calculated using alternative techniques were considered but found to produce higher personal consumption rates and were not ultimately used to determine Victim's household consumption offset.[8] Although the consumption rates determined from BLS data actually represent household expenditures as a percent of before-tax household income, the actual consumption reduction used to determine the Victim's personal expenditures was calculated as a percent of lower after-tax income, which significantly reduces the resulting offset. In addition, the Victim's consumption is determined as a share of the Victim's own earnings only, rather than the standard share of total household earnings.

---

earnings profiles indicate that peak real earnings typically decline at some point, in calculating life-cycle earnings growth in excess of inflation and overall productivity adjustments for Victims, the Special Master has assumed that peak earnings are maintained.

[6] Application of individualized unemployment rates by age or occupation was infeasible and determined to be unnecessary. An examination of trends in unemployment rates demonstrated that the 3% adjustment factor utilized was low by historical standards.

[7] Other standard expenditure categories sometimes included in litigation, namely Reading, Cash Contributions, Alcoholic Beverages, and Tobacco Products, were excluded.

[8] These alternative techniques included an analysis of BLS data on household expenditures reported by household size, with expenditure categories allocated equally among household members or allocated according to the methodology suggested by authors Robert Patton & David Nelson in their 1991 Journal of Forensic Economics article, "Estimating Personal Consumption Costs in Wrongful Death Cases."

This further lessens the resulting subtraction, compared to personal consumption offsets typically applied in litigation, if there are other earners in the household.

8. Calculate the present value of projected compensable income and benefits using discount rates based on current yields on mid- to long-term U.S. Treasury securities, adjusted for income taxes using a mid-range effective tax rate.[9]   Because the period of presumed economic losses is either longer or shorter, depending on the Victim's age, the present value calculations are performed using yields on a blend of securities with longer or shorter times to maturity.  For computational efficiency, three blended after-tax discount rates were used, depending on the Victim's age as of date of death, and assumed to apply for all years forward. These rates are shown on Table 5, attached.[10]

9. The computation methodology adopts a number of assumptions implemented to facilitate analysis on a large scale.  When viewed in total, these assumptions are designed to benefit the claimants and are more favorable than the standard assumptions typically applied in litigation. For example, the Special Master considered that over the course of their projected careers, younger Victims could expect to cross into higher income brackets, and be subject to corresponding higher income tax rates, on account of experience-based real lifetime earnings growth in excess of economy-wide national wage increases.  To calculate presumed economic losses, however, whatever income tax rate corresponded to the Victim's determined compensable income bracket as of date of death was assumed to apply for the remainder of the Victim's career, without increase.  Likewise, the calculations of presumed economic losses also assume that the personal consumption percent corresponding to the Victim's determined compensable income bracket as of date of death applies for the remainder of the Victim's career, without decrease.   It was determined that the net effect of these and other facilitating assumptions was to increase the potential amount of presumed economic loss to the benefit of the claimant.

---

[9] The tax rate used to determine after-tax interest rates is the computed combined Federal, State and Local income tax rate of 18.44% for New York for the $70,000 earnings bracket.  Although it is recognized that a different after-tax interest rate could theoretically be calculated for each age, income, and state combination, such a computation was impracticable for the large-scale valuations to be undertaken here.  It was determined that the benefit to the claimants of calculating the Victim's personal consumption offset as a percent of after-tax individual earnings more than outweighed the potential effect of discounting future amounts by income-specific after-tax discount rates.  Moreover, computation of the after-tax discount rate using a relatively high combined New York income tax rate, compared to other states, results in a lower after-tax discount rate.  The lower the after-tax discount rate, the higher the present value of presumed economic loss.

[10] The blended discount rates, before tax adjustment, shown on Table 5 imply real interest rates in excess of inflation of 3.1%, 2.8%, and 2.2%, depending on the average time to maturity consistent with the average duration of presumed losses.

**Table 1**

**Presumed Future Effective Combined Federal, State and Local Income Tax Rates for New York**

Income

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5.27% | 8.50% | 10.46% | 12.25% | 14.03% | 14.72% | 15.41% | 16.10% | 17.27% |
| 18.44% | 19.50% | 20.55% | 21.60% | 25.00% | 26.35% | 27.70% | 29.05% | 30.39% |

Note
Calculated from data reported in United States Selected Income and Tax Items for Individual Income Tax Returns:  Forms 1040, 1040A & 1040EZ  for Tax Years 1997, 1998 and 1999  (files 97IN33NY.XLS, 98IN33NY.XLS and 99IN33NY.XLS obtained from the IRS website www.irs.gov).  Rates shown reflect a reduction of 5% from the reported data.

**Table 2**

**Expected Remaining Years of Workforce Participation**

| Age | All Active Males |
|---|---|
| 25 | 33.63 |
| 30 | 29.36 |
| 35 | 25.04 |
| 40 | 20.78 |
| 45 | 16.65 |
| 50 | 12.64 |
| 55 | 8.97 |
| 60 | 5.97 |
| 65 | 4.20 |

Source: "A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity in 1997-98," by James Ciecka, Thomas Donley and Jerry Goldman in the Journal of Legal Economics, Winter 1999-2000.

**Table 3**
**Presumed Age-Specific Earnings**
**Growth Rates**
**(Including Life-Cycle, Inflation, and Overall**
**Productivity Increases)**

| Age | Earnings Growth Rate |
|-----|----------------------|
| 18 | 9.744% |
| 19 | 9.580% |
| 20 | 9.419% |
| 21 | 9.263% |
| 22 | 9.055% |
| 23 | 8.847% |
| 24 | 8.640% |
| 25 | 8.434% |
| 26 | 8.227% |
| 27 | 8.021% |
| 28 | 7.816% |
| 29 | 7.611% |
| 30 | 7.406% |
| 31 | 7.201% |
| 32 | 6.997% |
| 33 | 6.794% |
| 34 | 6.591% |
| 35 | 6.388% |
| 36 | 6.185% |
| 37 | 5.983% |
| 38 | 5.781% |
| 39 | 5.580% |
| 40 | 5.379% |
| 41 | 5.179% |
| 42 | 4.979% |
| 43 | 4.779% |
| 44 | 4.579% |
| 45 | 4.380% |
| 46 | 4.182% |
| 47 | 3.984% |
| 48 | 3.786% |
| 49 | 3.588% |
| 50 | 3.391% |
| 51 | 3.194% |
| 52+ | 3.000% |

*Note: Nominal percentage changes assume annual inflation or cost of living increases of 2.0% plus overall productivity adjustments of 1.0% per year. The underlying real life-cycle percentage change is calculated using a regression analysis of log of total earnings on experience and experience squared using earnings for full-time year-round male workers from the 2001 Current Population Survey (CPS) table PINC-04*

**Table 4**

**Decedent's Personal Expenditures or Consumption as Percent of Income**

Income

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Single | 76.4% | 74.6% | 73.5% | 71.6% | 68.0% | 64.4% | 63.5% | 62.6% | 61.7% |
| Single, 1 dependent child | 21.6% | 21.6% | 21.6% | 21.6% | 20.6% | 19.7% | 19.0% | 18.3% | 17.8% |
| Married, no children | 30.7% | 28.3% | 26.7% | 26.7% | 24.7% | 22.8% | 20.5% | 18.3% | 17.8% |
| Married, 1 dependent child | 19.0% | 17.6% | 16.9% | 16.9% | 15.9% | 14.9% | 13.6% | 12.4% | 12.1% |
| Married, 2 dependent children | 13.6% | 12.8% | 12.5% | 12.5% | 11.8% | 11.1% | 10.2% | 9.4% | 9.1% |
| | | | | | | | | | |
| Single | 60.8% | 53.5% | 48.0% | 48.0% | 48.0% | 48.0% | 48.0% | 48.0% | 48.0% |
| Single, 1 dependent child | 17.4% | 15.1% | 13.7% | 13.7% | 13.7% | 13.7% | 13.7% | 13.7% | 13.7% |
| Married, no children | 17.4% | 14.5% | 12.5% | 12.5% | 12.5% | 12.5% | 12.5% | 12.5% | 12.5% |
| Married, 1 dependent child | 11.8% | 9.9% | 8.7% | 8.7% | 8.7% | 8.7% | 8.7% | 8.7% | 8.7% |
| Married, 2 dependent children | 8.9% | 7.6% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% |

**Table 5**

**Assumed Before-tax and After-tax Discount Rates**

| Age of Victim | Before-Tax Discount Rate | After-Tax Discount Rate |
|---|---|---|
| 35 & Under | 5.1% | 4.2% |
| 36-54 | 4.8% | 3.9% |
| 55 & Over | 4.2% | 3.4% |

Note:
The present value of presumed economic loss is calculated by applying the after-tax discount rate corresponding to the victim's age at death to all future periods. For example, projected earnings and benefits for a victim who was 30 years old at the time of death will be discounted to present value at 4.2% per year for all future years, and projected earnings and benefit for a 45-year-old victim will be discounted to present value at 3.9% per year for all future years.

11

**5.14    What do the Presumed Economic and Non-Economic Loss Tables mean?**

The economic loss tables are intended to illustrate an average or typical award before collateral sources are offset.  Each individual's award will vary depending on the exact income, the benefits and other compensation that individual received from his or her employment, the Victim's effective tax rate, and the household size.  The tables should be used as a guide to get a general understanding of the size of the typical award for presumed economic and non-economic loss.

**5.15    What is economic loss?  How is economic loss determined?**

Economic loss is an estimate of the compensation that would have been available to the family if the tragedy had not occurred.  Please look at the economic loss tables for additional information on how presumed awards for economic loss are calculated.  These tables cover deceased Victims only.

**5.16    What do I do if the age of the Victim is not on the presumed economic loss table?  For example, if the Victim was more than 65 years old?**

If the Victim was older than 65, or between 18 and 25, you should call the Helpline at [removed] and ask for an estimate.  If the Victim was younger than 18, please refer to FAQ 5.17.

**5.17    How will the methodology calculate the economic loss for a victim that was a child?**

The regulations specify that victims who were minors will be compensated based on the average of all wage earners in the US. The average income for all wage earners in 2000 was $32,864. The methodology assumes that the economic loss calculation begins immediately as if the minor Victim was 20 years old as of September 11, 2001. The same economic loss calculation methodology will otherwise be employed. Thus, the presumed economic and non-economic loss amount would be approximately $803,000.

**5.18    How will the economic loss be calculated for Victims who were retired or not working?**

The Special Master will calculate an award based on the economic value of replacement services using standard values as provided by relevant studies, or similar approaches.

**5.19    Can you define replacement service as used in Section 104.43?**

Replacement service means the value of household services the decedent provided to the household. This will be used for deceased Victims who were not working at the time of the tragedy. Replacement services will also be considered on a case-by-case basis as part of the hearing process, should claimants elect that option.

**5.20    How should work history be treated if Victim had less than three years of work history (or if there was a break in work)?**

The Special Master will consider all relevant factors in determining the appropriate level of earnings for calculating economic loss. If there is less than a three-year work history, the Special Master will consider the data that are available possibly in conjunction with industry or employer-specific information.

### 5.21   How will the Special Master determine the amount of my collateral source benefits?

The Act defines collateral sources to mean all such sources, including life insurance, pension funds, death benefit programs and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001. The Act and the Rule require the Special Master to reduce the total amount of compensation by the amount of the collateral source compensation the Victim's beneficiaries has received or is entitled to receive as a result of the terrorist-related aircraft crashes.

The Special Master will exercise discretion in valuing the appropriate deductions for collateral offsets including by determining:

1. Whether the particular offsets fall within the definition of collateral sources;
2. Whether beneficiaries of the Fund are "entitled" to receive compensation from those collateral sources;
3. Whether the collateral source compensation is certain or can be computed with sufficient certainty to enable its deduction while ensuring that the beneficiaries receive the total compensation that is appropriate; and
4. The appropriate amount of the compensation that should be deducted, taking into account the time value of money and contributions made before death by the Victim in the nature of investment or savings.

### 5.22   What may be excluded from the definition of a "collateral source" benefit?

While it is not possible to define in advance every possible collateral source deduction, a few general illustrations should provide guidance.

1. The Special Master has discretion to exclude from consideration life insurance proceeds that are distributed to persons other than the beneficiaries of this Fund.
2. The Special Master has the discretion to adjust the amount of offsets to exclude premiums or assets that were accumulated by the Victim through self-contributions paid into a life insurance program to build up a tax-deferred cash value.
3. The Special Master may reduce the amount of the offset for a pension to take account of self-contributions to that plan over the decedent's lifetime.
4. The collateral source offsets will not include monies or other investments in Victim's 401(k) accounts.

Moreover, the Final Rule provides that tax benefits received from the Federal government as a result of the enactment of the Victims of Terrorism Tax Relief Act of 2001 (Pub. Law No. 107-

134) will **not** be treated as collateral source compensation.  (See also FAQ 5.23).

**5.23    Are tax benefits received from the Federal government as a result of the enactment of the Victims of Terrorism Tax Relief Act of 2001 treated as collateral source compensation?**

The Victims of Terrorism Tax Relief Act of 2001 provides very substantial relief to many Victims, and that relief will *not* be treated as collateral source compensation for purposes of determining awards from the Fund.

**5.24    How will the Special Master calculate the appropriate offset for "contingent" benefits?**

Some survivors may be eligible for benefits or payments from certain programs that provide periodic payments subject to adjustment or termination depending on potential future events that cannot be predicted.  Examples include Social Security survivor benefits to the spouse of the Victim.  Such benefits are paid only under certain conditions and only for certain periods of time.  Further, the benefits are paid periodically over a period of years.

Where the benefits to be paid due to death of the Victim are uncertain, unpredictable or contingent on unknown future events, the amount of compensation to which the survivor is entitled can be impossible to compute with accuracy.  In those instances, the Special Master has discretion not to require a **full** deduction where the amount of the collateral source compensation cannot be determined with reasonable certainty.

Thus, for example, the Special Master has determined that workers' compensation benefits that are payable only if the spouse does not re-marry will only be offset to the extent they have already been paid.  Likewise, Social Security and similar benefits payable to a surviving spouse only if the spouse does not re-marry or does not earn income above a certain threshold will be offset only to the extent they have already been paid.  By contrast, survivor benefits from the Social Security Administration and from the military to children of Victims — who generally are entitled by law to periodic payments until they reach the age of 17 or 18 — can be reasonably computed and will be offset.

**5.25   Will collateral offsets that are paid periodically be reduced for the time value of money?**

Yes. The Special Master will only offset the present value of collateral source compensation. This has the effect of decreasing offsets and, thus, increasing the amount of awards. As an example, in the case of Social Security children's benefits, the Special Master would determine the monthly benefit to the child, multiply that benefit by the number of months remaining until the child reaches age 18 (taking into account possible limits such as maximum family benefits available), include — if consistent with Social Security guidelines — a factor for inflation, and then discount the total to present value to determine the amount of the offset. (See also FAQs 5.35 and 5.38.)

**5.26   Are charitable gifts offset? Will a benefit from a charity managed by a government agency be considered as a collateral offset?**

No. The Final Rule clarifies that benefits from charities (privately-funded charitable entities) disbursing private donations will not be treated as collateral source compensation, even if such charities were created or managed by governmental entities.

**5.27   Will my workers' compensation be treated as a collateral offset?**

The Special Master has determined that workers' compensation benefits that are contingent on future events will only be offset to the extent they have already been paid.

**5.28   Will my social security survivor benefits that I am receiving for myself as a surviving spouse and for my children be counted as a collateral offset?**

Social Security and similar benefits payable to a surviving spouse only if the spouse does not re-marry or does not earn income above a certain threshold will be offset only to the extent they have already been paid.  Survivor benefits from the Social Security Administration and from the military to children of Victims — who generally are entitled by law to periodic payments until they reach the age of 17 or 18 — can be reasonably computed and will be offset.

**5.29   Will the money the Victim spent on premiums for his/her life insurance plan be included in the offset?**

The Special Master has discretion to adjust the amount of offsets to exclude premiums or assets that were accumulated by the Victim through self-contributions paid into a life insurance program to build up a tax-deferred cash value.

**5.30   Will the money the Victim contributed to his/her pension be included in an offset?**

The Special Master may reduce the amount of the offset for a pension to take account of self-contributions to that plan over the decedent's lifetime.

**5.31   How can I find out more about how collateral offset rules will effect my claim?**

Potential applicants can meet with the Special Master or his representative consultants in order to advise such applicants whether particular types of benefits or payments will fall within the definition of "collateral source compensation," and how such types of collateral sources will be valued.

To be clear, this consultation will focus on broad categories of benefits and will **not** provide applicants with a precise determination of their eventual award.  The determination of an appropriate award requires a deliberative review of a Victim's file, including the types of detailed financial records that the application requires.

**5.32   How have non-economic damage awards changed?**

The presumed non-economic losses awards for decedents in the Final Rule are $250,000, plus an additional $100,000 for the spouse and each dependent of the deceased Victim.

**5.33   How have the presumed economic damage awards changed?**

The Final Rule makes some important changes that will increase the amount of compensation in the Special Master's presumed award charts. Overall, it is important to understand that the basic factor that affects the economic loss analysis is the Victim's own data: each presumed award will be calculated using the Victim's data regarding actual compensation, including fringe benefits and forms of compensation and effective tax rate.  It is also important to emphasize that the presumed award methodology is intended to make possible the computation of a large number of awards without the review of detailed data that might typically be employed in a lengthy economic loss analysis in an individual case.  To achieve this objective, the Special Master specifically adopted assumptions that are intended to be favorable to claimants and to enable prompt analysis and payment.

**5.34   Are the presumed economic awards gender and race neutral?**

Yes.  The Special Master's original presumed economic loss methodology relied upon expected work life data from the publication "A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity in 1997-1998," by James Ciecka, Thomas Donley, and Jerry Goldman in the *Journal of Legal Economics*, Winter 1999-2000.  Contrary to the assertions of some commentators, the Special Master did ***not*** use data from the 1970s; rather, the study was conducted in 1997 and 1998.  Also, the Special Master's original presumed award methodology did ***not***, as some suggested, discriminate against women. Rather, the original methodology relied upon the same assumptions for men and women – the combined average of All Active Males and All Active Females.  However, in order to increase awards for all claimants by maximizing the duration of expected foregone earning and accommodating potential increases by women in the labor force, the Special Master's revised presumed economic loss methodology uses the most general data available.  Specifically, the new methodology used the All Active Males table for all claimants.  The methodology is gender and race neutral.

**5.35   How do the presumed economic awards account for inflation and wage growth?**

The Special Master has adjusted the wage growth assumptions to growth rates that incorporate annual adjustments for inflation, productivity in excess of inflation and life cycle increases using data from the March 2001 Current Population Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics. For life cycle increases, the Special Master is applying the higher age-specific life cycle increases (those for males) for all claimants. For inflation and productivity increases, the Special Master has applied rates of 2 percent and 1 percent, respectively. These rates are consistent with the long-term relationship between wage growth and risk-free interest rates. The net effect of this adjustment is to better represent the expected earning patterns of the Victims over their expected careers.

### 5.36   How will the economic awards reflect a Victim's "personal consumption" of earnings?  Will personal consumption be calculated before taxes or after taxes?

As with the original presumed award calculations, the Special Master subtracts from the annual projected compensable income the Victim's "consumption" as a percentage of after-tax income instead of before-tax income. While the consumption adjustment is standard, the application of the adjustment to after-tax income lowers the amount of the consumption offset below the amount that would typically apply in an economic loss calculation. In addition, as with the initial model, the Special Master's assumptions eliminate some of the components typically used in estimating consumption, thereby further limiting the consumption deduction.

### 5.37   Do the presumed economic awards account for the risk of future unemployment?

Yes. To better reflect typical life cycle earnings expectation, the Special Master has incorporated into the calculation a factor to account for risk of unemployment — again, a common factor in the calculation of future lost earnings.

### 5.38   How will the Special Master evaluate the "present value" or "time value of money?"

The Special Master has elected to use three blended after-tax discount rates to compute the present value of the award and has adjusted the discount rate to reflect current yields on mid- to long-term U.S. Treasury securities. The after tax rates are:

- For Victims 35 and under, 4.2 %;
- For Victims 36-54, 3.9 %; and
- For Victims 55 and over, 3.4%.

The blended discount rates, before tax adjustment, imply real interest rates in excess of inflation of 3.1%, 2.8%, and 2.2%, depending on the average time to maturity consistent with the average duration of presumed losses. Although this adjustment creates a more complex computational process, the Special Master believes that the effect will be to better reflect the different ages of the Victims and the fact that the survivors will receive awards reflecting different assumed future years of work life. Future collateral offsets that are not contingent on future events are discounted at the long-term before-tax presumed annual discount rate of 5.1%.

### 5.39   Is there a "cap" on economic damages?

No. The "presumed awards" methodology addresses incomes only up to the 98th percentile. In extending the presumed awards only up to the 98th percentile, we merely recognized that calculation of awards for many Victims with extraordinary incomes beyond the 98th percentile could be a highly speculative exercise and that, moreover, providing compensation above that level would rarely be necessary to ensure that the financial needs of a claimant are met. Calculation of an award beyond that point using the presumed award methodology without a detailed record could very well produce inappropriate results. Accordingly, we permitted applicants with extraordinary prior earnings to accept awards at the 98th percentile or seek calculation of an award based upon a more detailed record. We also note that the Special Master has express authority under the Act to consider the "individual circumstances of the claimant" in fashioning awards, including the **financial needs** of Victims and surviving families in rebuilding their lives. As indicated, the Special Master will strive to deliver a fair and equitable sum to each eligible claimant.

**5.40    What is included in the definition of income for military personnel?**

The Interim Final Rule has been amended to clarify the Special Master's discretion to consider on a prorated basis a Victim's income from 2001 as well as published salary scales for government or military employees. In addition, the Interim Final Rule is amended to clarify that military service members' and uniformed service members' compensation includes all of the various components of compensation, including, but not limited to, basic pay (BPY), basic allowance for housing (BAH), basic allowance for subsistence (BAS), Federal income tax advantage (TAD), overtime bonuses, differential pay, and longevity pay.

**5.41    What will be offset against the awards for deceased military Victims?**

1. The $6,000 death gratuity will be offset.

2. The rent-free government housing for 180 days or the tax-free allowance for housing for 180 days will not be offset. This is not considered a survivor benefit but is instead the military's effort to not cut off for a defined period of time the housing that was provided to the families of military as part of the deceased service person's compensation.

3. The life insurance purchased automatically by service members ($250,000 automatic that can be declined) will be offset.

4. Dependency and Indemnity Compensation (DIC) will not be offset as to the spouse because it is contingent on remaining unmarried. It will be offset as to the children who receive this flat rate of $234 per month for each child until age 18 regardless and without any contingencies. This amount will change in family structures where there is no surviving spouse.

5. Uniform Services Survivor Benefit Plan (SBP) will not be offset because it is contingent on remaining unmarried until age 55. If a spouse is 55 or over, it is not contingent upon remaining unmarried; so if there are any such spouses, it will be offset because it is no longer contingent. To the extent the SBP is payable to children, the net amount payable will be

offset. (*Note that SBP will only be applicable if the amount is greater than the DIC since the DIC is offset against the SBP.*)

6. Unused leave will not be offset under the same theory as not cutting off free housing for 180 days.

7. Health benefits are available to un-remarried spouse and minor dependents for three years — not offset because contingent or not quantifiable.

### 5.42   How can I determine if someone who is not listed on the Victim's 2000 Federal tax return could have been claimed as a dependent?

The Special Master will use the Internal Revenue Service's definition of dependent. The IRS applies five dependency tests:

- Member of household or relationship test
- Citizen or resident test
- Joint return test
- Gross income test
- Support test

**Please note that for purposes of determining dependency under the Fund, the Special Master will not apply the "citizen or resident test." Therefore, a person who is not a citizen or national of the United States, resident alien, or a resident of Canada or Mexico may nevertheless be considered a dependent under the Fund. All four other tests must be satisfied. Please refer to IRS Publication 501, Exemptions, Standard Deductions, and Filing Information, beginning on page 9, for more information on who qualifies as a dependent. You can find this form from the IRS website at http://www.irs.gov.**

### 5.43   Do siblings of the Victim need to be notified that a claim is being filed? (see Exhibit B of Compensation Form)

Yes. The definition of immediate family includes brothers and sisters of the Victim. Siblings are listed on Exhibit B of the Compensation Form for Deceased Victims.

### 5.44   What benefits payable to survivors of NYPD or FDNY victims will be considered collateral offsets?

The Fund will count as collateral source compensation subject to offset the following:

a. The present value of the survivor pension benefit to the extent it exceeds the present value of the victim's vested pension as of Sept. 11, 2001.

b. The present value of children's social security benefits (if applicable).

c.   Life Insurance, including both privately purchased policies and policies provided by the City or Department net of premiums paid by the victim or beneficiary and net of funds invested in such vehicles by the victim or beneficiary.

d.   Mayor's office benefit (usually one year's pay).

e.   Contractual benefit ($25,000).

**5.45   How will the Fund compute the present value of the FDNY and NYPD Line of Duty Death Benefit for purposes of computing the offset amount?**

The Fund will compute the annual benefit based on the victim's salary as of September 11 in accordance with the benefit rules.  If the family has already received a benefit or estimate, the Special Master will use that figure.  Then, the Fund will apply the long-term before tax discount rate specified in the tables described in the "Explanation of Economic Loss Calculations for FDNY or NYPD victims" and calculate the present value of the future benefits assuming the death benefits will be paid for the life of the surviving spouse.  If there is no spouse, the Fund will determine the duration of any benefit in accordance with New York law.  The Fund will assume that there is <u>no</u> increase in the benefit payable over time.  The calculation will deduct from the Line of Duty Death Benefit offset the present value of the victim's pension that was vested before September 11.  If the Death Benefit is not paid on an annual basis but is instead paid as a lump sum, then the Fund need not compute a present value and will simply deduct the lump-sum amount actually paid or to be paid.

**5.46   Will the Public Safety Officers Benefit ("PSOB") payable to families of uniformed victims be offset?**

No.

**5.47   Is the value of the pension earned by the victim taken into consideration in computing claim award amounts?**

Yes.  The value of the pension that the victim would have received but for the death on September 11th is considered as an income component as part of the victim's employer provided benefits.

**5.48   Are payments made by the various State Victim of Crime Boards funded with federal funds considered collateral offsets?**

No.

**5.49   Explanation of FDNY and NYPD Calculations**

**1.  Procedures for Determining Economic Loss.**

To calculate the victim's compensation for purposes of determining economic loss, the Fund will include: all forms of compensation — including overtime, shift differential, longevity premium — PLUS the pension that the firefighter or police officer would have received after 20 or 25 years on the force, PLUS the Fund will assume that the firefighter or police officer will continue to earn an income equivalent to that earned on the force even **after** the pension begins. In addition, the Fund will count any earnings from a second job that can be documented.

The Fund will apply the wage growth assumptions to the earnings of the firefighter or police officer so that **each year** the earning level will go up. At the time the pension is assumed to commence, the pension will be based on the earnings projected **at that date**.

This means that in computing economic loss for the beneficiaries of a firefighter or police officer (1) the Fund will assume that the compensation level of the firefighter or police officer will continue through the average work life, even though the firefighter or police officer might have retired after 20 or 25 years, (2) that after 20 or 25 years on the force the firefighter or police officer would have received a pension (calculated based on the salary after 20 to 25 years on the force) in addition to the compensation calculated in number (1), and (3) that any second source of income will also continue after the pension begins. Therefore, after 20 or 25 years on the force, the formula will count: (1) compensation, including earnings from a second job, as increased in accordance with the regular methodology through average work life; plus (2) firefighter or police pension through average life expectancy.

## 2. Pension/In-the-Line-of-Duty Death Benefit Offsets.

To comply with the Act's requirement that the Fund deduct from any award collateral source compensation including pensions and death benefits, the Fund will deduct from the award the present value of the death benefit that the survivor obtains from New York. If the death benefit is paid on an annuity basis, that deduction will be computed based on the annual value of the death benefit for the expected life span of the spouse of the victim (or the relevant period of time the benefit is payable to children or parents) in accordance with current rules governing the payment of death benefits. The calculation assumes that the death benefit will **not** be increased over time, as any increases must be legislatively mandated. This means that the offset will be based on the firefighter or police officer's salary without increases as of September 11 (which is lower than the future salary with increases that will be projected in computing the economic loss). As a general rule, the offset for the in-the-line-of-duty death benefit will be less than the amount computed as economic loss because the economic loss will include presumed salary increases and promotions each year and because the economic loss will include lost pension on top of that. The methodology is set up so that the Fund will **not** include in the offset the amount of the pension that was vested as of September 11. Since this reduction in the offset is like a credit or pre-payment to the survivor of the victim's vested pension, the economic loss will make up the remaining portion of the victim's lifetime pension benefits that would have been earned for continued service after September 11.

## 3. Public Safety Officers Benefit.

The Fund will **not** offset the $250,000 Public Safety Officers Benefit.

## ILLUSTRATION

**September 11th Victim Compensation Fund of 2001**
*Illustration of Presumed Economic and Non-Economic Loss Calculation -- FDNY Claimant*

**Assumptions**

| | | |
|---|---|---|
| Victim Name: | | FDNY Claimant |
| Date of Death: | | 09/11/01 |
| Age: | | 30.0 |
| Marital Status: | | M |
| Number Children Under Age 18: | | 2 |
| Children's Ages at 09/11/01: | Child #1 | Age 9 |
| | Child #2 | Newborn |
| Primary Employer: | | FDNY |
| Total Annual Earnings From All Employers: | | $80,000 |
| FDNY Annual Earnings: | | $75,000 |
| Years in FDNY as of 09/11/01: | | 6.0 |
| Assumed Start Date of FDNY Pension: | | 10/01/20 |

| | |
|---|---|
| **Total Economic Losses Before Collateral Offsets:** | |
| Loss of Earnings & Benefits Including Loss of Lifetime FDNY Pension Benefits From Continued FDNY Service After 09/11/01* | $2,712,391 |
| **Total Non-Economic Losses** | $550,000 |

\* Includes the excess of the victim's "vested pension" over the value of the survivor pension, if any, assuming
  FDNY survivor annuity is elected instead of lump sum.

**Less:**

| | | |
|---|---|---|
| **Known Offsets:** | | |
| Present Value of FDNY Survivor Annuity Pension Benefit Reduced by Present Value of Victim's FDNY Vested Pension as of 09/11/01: | | |
| FDNY Survivor Benefits | $1,354,813 | |
| Less: Victim's Vested Benefit | ($89,395) | $1,265,418 |
| Present Value of Estimated Children's Social Security Benefits | | $359,350 |
| FDNY Group Life Insurance | | $8,500 |
| Mayor's Office Benefit (one year's pay) | | $75,000 |
| Contractual Benefit | | $25,000 |
| **Total Known Offsets** | | $1,733,268 |

| | |
|---|---|
| **Amount of Award** | $1,529,123 |

**5.50    What part of the payment will go through the estate and what part will not?**

This may depend on the specific circumstances of the claim and the domicile of the Victim. Generally speaking, the victim's non-economic loss portion of the payment will typically be distributed to the beneficiaries of the estate, while the remainder of the award will go directly to the family or other recipients based on the wrongful death statute of the state of domicile and the approved final distribution plan.

**5.51   Where can I get copies of the deceased Victim's state tax returns, specifically from New York?**

The following web site provides a list of the tax authorities for each state.  The link is http://www.taxsites.com/agencies.html.

The Personal Representative can request copies of the Victim's 1998, 1999, and 2000 tax returns from the NY State Tax Department.  The cost is $0.25 per page.  Each return is two pages long, plus attachments.  The Department suggests sending in a check for $1.00 to cover the copying costs for each tax return requested.  The address is:

> New York State Tax Department
> Central Photocopying Unit
> Building #8
> State Office Campus
> Albany, New York 12227

The request must include the following information:

- Taxpayer's name (Victim's name)
- Taxpayer's social security number (Victim's SSN)
- The tax year(s) for which tax returns are being requested (1998, 1999, and 2000)
- The taxpayer's address for each year that a tax return is being requested (i.e., Victim's address in tax year 1998, 1999, and 2000)
- Notarized authorization that the person requesting the tax return(s) represents the taxpayer's estate (this can be copy of the Court Order or Letter of Administration showing the Personal Representative's appointment as (1) Personal Representative, (2) Executor of the Will, or (3) Administrator of the Estate)
- Requestor's name and telephone number (Personal Representative's name telephone number, in case the NY State Tax Department has any follow up questions)

In addition, the request should mention that the tax return(s) are being requested for a Victim of the World Trade Center September 11th attacks and are needed for the September 11th Victim Compensation Fund claims package.

The Personal Representative can call the New York State Department of Taxation and Finance's Taxpayer Assistance Call Center at 1-800-225-5829 if she or he has further questions.  The caller should follow the prompts for personal income tax questions.

**5.52   Where can I find information on the Tax Advantage (TAD) that a deceased military Victim received?**

The Tax Advantage (TAD) usually does not appear on the Victim's Military Leave and Earnings Statement.  To get this information, the Personal Representative should contact the Casualty Assistance Claims Officer (CACO).  The Personal Representative can also calculate this by going to the Office of the Secretary of Defense Regular Military Compensation Calculator web

site and enter information on the Victim's rank (grade), years of service, location, and family size.  The web address is: http://militarypay.dtic.mil/actives/pay/calc/index.html.

**5.53    Are FICA and Medicare payments considered fringe benefits and added to the income for award determination?**

No.  FICA and Medicare are not considered as income components, and the value of future retirement benefits (to the spouse) are not considered as collateral offsets.

**5.54    FAQ has been removed and is no longer valid.**

**5.55    I have read the "Explanation of Process for Computing Presumed Economic Loss" and I am still having difficulty replicating the computations found in the "Presumed Economic and Non-Economic Loss" matrices. Is any additional guidance available?**

Several inquiries have been made about various aspects of the compensation model and duplicating it with various degrees of success. Typical errors we have seen in efforts to duplicate the model may be avoided by considering the following:
Compensation level: This should include total compensation excluding employer-provided benefits.

Benefits: The model assumes 4% of pension-eligible compensation and annual medical benefits starting at $2,400. The medical benefits are increased yearly at the same rate as earnings. (Actual employer-provided benefits are considered when each claim is evaluated and will be used when higher than the presumed award fringe benefit assumptions. If the actual benefits are less than the assumptions, the Fund will use the assumptions.)

The "Presumed Age-Specific Earnings Growth Rates" must be applied each year, according to the age that year, through the assumed work-life expectancy. The same work-life tables are used for all victims based on the reported average for "All Active Males" the same age as the victim at death.

The 3% Unemployment Factor is subtracted from total compensation (including employer-provided benefits). This adjustment is necessary because the probability of unemployment is not included in the published work-life expectancy figures.

The "Decedent's Personal Expenditures or Consumption" deduction is subtracted from the total of after-tax compensation (including employer-provided benefits). It is applied each year, based on the before-tax compensation level as of date of death and changes over time as dependent children grow up and leave the household.
The discount period used in the matrices was assumed to extend from the end of work-life expectancy back to September 11, 2001. Actual awards will be calculated back to 2002.

In addition, there have also been suggestions regarding some of the core assumptions in the compensation model. For instance, some have stated that alternative amounts to the inflation

assumption may be more appropriate. However, any change in assumptions should be applied consistently throughout the model. As a result, adjusting both the growth and discount rates to include an alternative inflation assumption would not change the awards significantly.

**5.56    How will economic awards for Port Authority fire and police victims be determined, including treatment of accidental death benefits to survivors?**

The calculation of presumed economic loss for victims who were members of the New York State and Local Police and Fire Retirement System ("Port Authority Fire or Police") will use the same general procedures and assumptions used to calculated presumed economic losses for death claims involving NYPD or FDNY victims.[11]

Like the NYPD and FDNY victims, Port Authority Fire or Police victims under the Special 20-Year Retirement Plan would have been eligible to retire from Port Authority Fire or Police employment with 20 years of service[12] and collect an immediate pension equal to at least 50% of last pay.  According to Port Authority representatives, the average length of service for Port Authority Fire or Police is 25 years.  The presumed awards will therefore assume that after 25 years of creditable service[13], the victim would have begun collecting a pension pursuant to the terms of the Special 20-Year Retirement Plan, and at the same time continued to receive wage or salary income elsewhere equivalent to the victim's last projected Port Authority compensation plus any supplemental outside income, if applicable, adjusted for annual increases, through the individual's expected remaining working years.  The Port Authority Fire or Police pension is assumed payable through the victim's life expectancy.[14]

Consistent with all presumed economic loss calculations,
1.  Income up to the IRS 98th percentile of wage earners of $231,000 is considered;
2.  Included are the value of fringe benefits, including medical insurance coverage, and potential pension benefits related to post-Fire or Police employment estimated at 4% of compensation;
3.  Growth of income and benefits through the victim's expected work-life incorporates an annual inflationary or cost-of-living component, an annual real overall productivity or scale adjustment in excess of inflation, and an annual real life-cycle or age-specific increase;
4.  An unemployment risk factor of 3% is applied to earnings and benefits other than Fire or Police pension payments;
5.  All amounts are adjusted for the estimated personal consumption of the victim and reduced for estimated combined federal, state and local income tax (to the extent applicable); and
6.  Future amounts are adjusted to present value using current yields on risk-free treasury

---

[11]  Refer to the "Explanation of Economic Loss Calculations for FDNY or NYPD Victims."
[12]  Based on discussions with Port Authority representatives, the Special 20-Year Retirement Plan is the plan elected by virtually all New York State and Local fire and police.
[13]  For victims who had already attained the average years of credited service for fire or police retirees, one additional year of creditable service will be assumed.   In general, this maximizes the present value of projected future pension benefits because they start earlier.
[14]  According to provisions of the Special 20-Year Retirement Plan, a portion of the fire or police retirement benefit is increased by a cost of living adjustment after attaining age 55 and 10 years out or age 62 and 5 years out.

—

securities.

Refer to Tables 1-5 accompanying the general "Presumed Loss Calculation Tables Before any Collateral Offsets" explanation for additional information on Presumed Future Effective Combined Federal, State and Local Income Tax Rates for New York (Table 1), Expected Remaining Years of Workforce Participation (Table 2), Presumed Age-Specific Earnings Growth Rates (Table 3), Decedent's Personal Expenditures or Consumption as Percent of Income (Table 4), and Assumed Before-tax and After-tax Discount Rates (Table 5).

To comply with the Act's requirement that the Fund deduct from any award collateral source compensation including pensions and death benefits, the Fund will deduct from the award the present value of the death benefit that the survivor obtains under the New York State and Local Police and Fire Retirement System. Any lump sum survivor benefit is offset, or if the death benefit is paid on an annuity basis, that deduction will be computed based on the annual value of the death benefit for the expected life span of the spouse of the victim (or the relevant period of time the benefit is payable to children or parents) in accordance with current rules governing the payment of death benefits.[15]  The calculation assumes that the death benefit will <u>not</u> be increased over time, as any increases must be legislatively mandated. The methodology is set up so that the Fund will <u>not</u> include in the offset the amount of the Fire or Police pension that was vested as of September 11. Since this reduction in the offset is like a credit or pre-payment to the survivor of the victim's vested pension, the economic loss will make up the remaining portion of the victim's lifetime pension benefits that would have been earned for continued Fire or Police service after September 11.

---

[15]   Under the Special 20-Year Retirement Plan for fire or police, the Special Accidental Death Benefit pension equal to 100% of the victim's salary is payable to a surviving widow or widower for life.

# ILLUSTRATION

## September 11th Victim Compensation Fund of 2001
### *Illustration of Presumed Losses for Port Authority Fire or Police*

**Assumptions**

| | | |
|---|---|---|
| Victim Name: | | Port Authority Fire or Police |
| Date of Death: | | 9/11/01 |
| Age: | | 30 |
| Marital Status: | | M |
| Number Children Under Age 18: | | 2 |
| Children's Ages at 09/11/2001: | Child #1 | 9 |
| | Child #2 | newborn |
| Occupation: | | Police |
| Employer: | | Port Authority |
| Total Annual Earnings From All Employers: | | $70,000 |
| Fire or Police Annual Earnings: | | $70,000 |
| Hire Date at Last Employer: | | 9/11/95 |
| Years of Creditable Fire or Police Service at 09/11/2001 | | 6.0 |
| Assumed Start of New York State or Local Fire or Police Pension: | | 10/1/20 |

**Total Economic Losses Before Collateral Offsets**

| | |
|---|---|
| **Loss of Earnings & Benefits Including Loss of Lifetime Port Authority Pension Benefits From Continued Port Authority Service After 09/11/2001\*** | **$2,454,281** |

| | |
|---|---|
| **Total Non-Economic Losses** | **$550,000** |

| | |
|---|---|
| **Total Losses Before Collateral Offsets** | **$3,004,281** |

\* Includes amount of pension projected at ultimate retirement less amount of vested benefit prepaid in the form of survivor benefits.

**Less:**

**Known Offsets:**

| | | |
|---|---|---|
| Present Value of Survivor Lump Sum Pension Benefit Reduced by Present Value of Victim's Vested Pension as of 09/11/2001: | | |
| | | |
| **Past Survivor Benefits** | $68,036 | |
| **Present Value Future Survivor Benefits** | $1,263,387 | |
| **Less: Victim's Vested Benefit** | ($40,718) | **$1,290,705** |
| | | |
| Social Security One-time Lump Sum Death Benefit | | $255 |
| Past Social Security Survivor Benefits | Spouse | $0 |
| | Children | $52,356 |
| Present Value of Children's Future Social Security Survivor Benefits | | $317,386 |
| Basic Life Insurance (3 times pay) | | $210,000 |
| | | |
| **Total Known Offsets** | | **$1,870,702** |

| | |
|---|---|
| **Amount of Total Award** | **$1,133,579** |

**5.57    Is the calculation of economic awards for Port Authority civilian victims the same as Port Authority fire and police victims?**

Because the two groups are covered by different pension plans, the calculation of economic awards for Port Authority civilian victims differs from the calculation for Port Authority fire and police victims.  The calculation of presumed economic awards for Port Authority civilian victims, who are covered by the New York State and Local Employees' Retirement System (ERS), applies the same method as the calculation of presumed economic awards for all non-uniformed victims covered by standard defined benefit pension plans.  These plans, including ERS, enable a retiree to collect upon retirement a monthly pension for life based on his or her final average pay and years of service at retirement.  As is the case with ERS, unreduced retirement benefits are typically not payable before age 55, with at least 30 years of service, or later ages, with less service.   (In contrast, the pension plan applicable to Port Authority police and fire, similar to plans covering other uniformed personnel in the United States military, NYPD and FDNY, provides for an immediate pension equal to 50% of final pay upon attaining 20 years of service, regardless of age).

**The presumed economic loss calculations for Port Authority civilian victims incorporate all of the assumptions and methodology set forth in the Explanation of Process of Computing Presumed Economic Loss, except instead of the default 4% of pay in the form of pension benefits, the calculations compute pension benefits according to ERS.  Specifically, the calculations assume that victims covered by ERS would have remained in civilian employment with the Port Authority for the remainder of their expected working years and begin collecting for life a monthly pension at the age eligible to collect unreduced retirement benefits.  The projected monthly pension at end of work-life is calculated using the applicable ERS pension formula applied to the victim's projected length of service to work-life date and projected 3-year average pay at work-life.**

**5.58    Are accidental death benefits to survivors of Port Authority civilian victims considered a collateral offset to awards?**

Yes.  Any lump sum benefit already received is subtracted from the presumed award, or if the death benefit is paid on an annuity basis, that deduction will be computed based on the present value of the accidental death benefit for the relevant period of time the benefit is payable to children or parents of victims.  For benefits paid to spouses of victims, unlike accidental death survivor pension benefits payable to spouses of Port Authority fire and police victims, the benefit to civilian Port Authority survivors stops if the spouse is remarried before age 55.  Therefore the offset will not include any future Port Authority survivor pension benefits to spouses who are not yet age 55 when they submit a claim to the Fund.   Any future calculations assume that the death benefit will not be increased over time, as any increases must be legislatively mandated.  The methodology is set up so that the Fund will not include in the offset the amount of the victim's Port Authority civilian pension that was vested as of September 11.  Since this reduction in the offset is like a credit or pre-payment to the survivor of the victim's vested pension, the economic loss will make up the remaining portion of the victim's lifetime pension benefits that would have been earned for continued Port Authority service after September 11.

**5.59    How will economic awards for Military victims be determined?**

## ILLUSTRATION

### September 11th Victim Compensation Fund of 2001
*Illustration of Presumed Economic and Non-Economic Loss Calculation -- Military Claimant*

**Assumptions**

| | | |
|---|---|---|
| Victim Name: | | Representative Military |
| Date of Death: | | 09/11/01 |
| Age: | | 33 |
| Marital Status: | | M |
| Children's Ages at 09/11/01: | Child #1 | Age 9 |
| | Child #2 | Newborn |
| Employer: | | U.S. Military E-7 |
| Total Annual Compensation Including BAH, BAS and | | |
| Tax Advantage at 9/11/2001: | | $54,210 |
| Military Basic Pay as of 9/11/2001: | | $31,057 |
| Years in Military Service as of 9/11/2001: | | 15 |

| **Total Economic Losses Before Collateral Offsets** | |
|---|---|
| Loss of Earnings & Benefits Including Loss of Lifetime Military Pension Benefits From Continued Military Service After 09/11/01 | $1,787,580 |
| **Total Non-Economic Losses** | $550,000 |

| **Total Economic and Non-Economic Losses Before Known Collateral Offsets** | **$2,337,580** |
|---|---|

Less:

| **Known Offsets:** | |
|---|---|
| Past and Present Value Future Children's Social Security Benefits | $214,175 |
| Past Spouse's DIC Benefits | $13,024 |
| Past and Present Value Future Children's DIC Benefits | $62,394 |
| Death Gratuity | $6,000 |
| Service Members Group Life Insurance | $250,000 |
| Total Known Offsets | $545,593 |

| **Amount of Award** | **$1,791,987** |
|---|---|

**5.60    How will the Special Master treat claims on behalf of decedents who had unusually high incomes?   Is it possible that some claimants will receive awards higher than the highest numbers on the Presumed Award charts?**

Yes, it is possible that some claimants will receive awards higher than the highest numbers on the Presumed Award charts.  The regulations provide that the Special Master may depart from the presumed awards and methodology based upon "extraordinary circumstances."  The figures provided on the Special Master's presumed award charts do not constitute any form of "cap" on awards.  To the contrary, the Special Master has the authority to exercise discretion by considering the individual circumstances of each claimant in arriving at  an appropriate award.

As stated in the regulations, those claimants who have extraordinary individual circumstances may request a hearing as an alternative to, or subsequent to, participating in the presumed award process.  There is no limitation on what information claimants may provide in explaining their individual circumstances.  Thus, claimants are permitted to provide any evidence that they wish regarding their economic losses and individual circumstances.  However, they should be aware that lost income is merely one component of the award by the Special Master.  The statute requires the Special Master to consider not only "economic loss," but also the individual circumstances of the claimant.  These circumstances include factors such as families' needs and resources in rebuilding their lives.  Thus, while some have argued for a purely mechanical calculation of lost income that would lead to awards for "high income" claimants of 20, 30, 40 or even 50 times as much as other claimants, such an approach is not consistent with the purposes of the statute creating the Fund.

While claimants may present any evidence that they think might establish extraordinary circumstances to justify departure from a presumed award, the Special Master has made clear that the program is not designed to provide greater awards to those who obtain counsel or experts.  Moreover, information regarding extraordinary earnings histories will not be viewed in isolation, but will instead be considered in light of all of the other individual circumstances.  The Regulations make it clear that in evaluating economic loss for high income earners attempting to demonstrate extraordinary circumstances, the Special Master will not apply the presumed award methodology to any income level above $231,000.  Claimants therefore should not expect that the Fund will apply some or all of the presumed award assumptions to higher incomes.  Instead, the Special Master must consider each such claim on an individual basis.  Thus, while claimants are permitted to submit evidence of extraordinary earnings, they should be aware that if they choose to do so, the Special Master will require that they also submit individualized evidence regarding other aspects of their economic loss claim.  The Special Master may and will consider a range of information in evaluating the economic loss, including, but not limited to, the following:  earnings history beyond three years; the components of claimed income such as contingent bonus, commissions, or stock options or sales (each of which may be more or less risky or speculative); the certainty or uncertainty of future income (based on industry trends, industry work life); victim-specific factors such as tax rates, personal consumption, household structure, and dual incomes (consumption will likely apply to before-tax household income); industry-specific factors such as positive or negative growth rates, work life expectancies, and turnover and longevity; and individual family circumstances (including special needs).  Most importantly, the Special Master will, pursuant to the statute, exercise appropriate discretion to assure awards that are just and fair in light of the individual circumstances of the claimant.

While this process might result in awards greater than the presumed awards for some claimants, the guidance given in the Preamble to the regulations makes clear that "[c]laimants should not expect awards grossly in excess of the highest awards listed on the Special Master's presumed award chart." The Preamble to the Final Rule creating the Fund predicted that it would be rare for claimants representing deceased victims to receive less than $250,000 after collateral source offsets, or for claimants to receive more than $3 million or $4 million tax-free. While awards between $3 and $4 million (after collateral source deductions) have turned out to be more common than originally anticipated, there have not yet been many awards in excess of $4 million. The regulations clearly indicate that any methodology that does nothing more than mechanically calculate a theoretically possible future income stream would lead to awards that are insufficient relative to some victims and excessive relative to others. Accordingly, the final award will reflect a <u>discretionary</u> evaluation of all individual factors and will not simply be the projection of an assumed net income by an assumed work life.

**5.61    I am the parent of a minor child who is a beneficiary of an award. What are the options for payment of a minor child's award?**

There are several options available for the receipts of payments on behalf of minor children. First, the entire award, including the minor child's award, can be paid to the personal representative. Under this option, a court will generally supervise the distribution of the award and take steps to safeguard the minor's portion of the award.

Second, the minor child may receive benefits directly from the Fund. Under this option, a guardian must be appointed by a court of competent jurisdiction to receive an award directly on behalf of the child. Normally it is a simple and relatively quick process for a natural or adoptive parent to be appointed a guardian. However, court supervision or a bond may be involved when a guardian is appointed.

Third, if you are a natural or adoptive custodial parent of a minor, you may apply to receive benefits directly on behalf of the child as a "representative payee." As a representative payee, you assume full responsibility for ensuring that the award to the child is spent for the child's current needs, and, if not currently needed, saved for the child's future needs. Court supervision or bonding is not required. However, you are still obliged - like a trustee -to ensure that funds are used in the child's best interest. This includes a duty to prudently invest funds, maintain separate accounts, and maintain records. If you would like to apply to become a representative payee, you should request that the Fund send you the Application for Representative Payee Form to fill out in which you request to receive the funds as a representative payee on behalf of your child and in which you agree to perform the responsibilities this role requires. This form can also be downloaded from the Fund's website.

**5.62    I am applying to be the representative payee of my minor child.  If I do not know the exact amount being awarded to my child, what amount do I input on the form (#7)?**

There are two options.  You can either leave the award amount blank or input the same percentage listed on the final approved distribution plan.  If you choose to enter an amount and

that amount does not agree with the final approved distribution amount, you will be required to submit a new representative payee form.

**5.63    When should I submit my payment information (i.e. ACH form, Application for Representative Payee)?**

Payment information should be submitted by either the date provided to you by the Fund or May 1, 2004, whichever is earlier.

**5.64    Can payments be made through direct deposit to foreign banks?**

No.  Payments to offshore recipients cannot be made through direct deposit. These payments must be in the form of checks. The U.S. Department of the Treasury will issue the checks and forward them to the Department of Justice.  The Department of Justice will send them out via express mail.

**5.65    Can direct deposit payments be made to money market or brokerage accounts?**

No. The U.S. Department of the Treasury only uses ACH payments.  Thus, the Fund can only make direct deposit payments to a regular checking or savings account.

**5.66    How will the Special Master compute compensation awards with foreign income or foreign collateral source offset components?**

When computing compensation awards for victims who were paid in other than United States currency, the Special Master will use the date of 9/11/01 as the conversion date for denominating foreign currencies into U.S. dollars for computing the awards.  For valuation of collateral source offsets, the Special Master will use March 11, 2002 as the conversion date.  This is when the Compensation forms were first available for completion.

**5.67    I am submitting a claim for a FDNY deceased victim, what information do I need to provide to the Special Master in order for him to calculate my presumed award?**

1.    Line of Duty (LOD) benefit notification document.
2.    FDNY appointment date.
3.    Equated date (Start of uniformed city service immediately preceding date one entered the Fire Department).
4.    Non-Uniformed Prior City Time (if applicable).
5.    LOD benefit type received – Lump Sum Death Benefit or Annual Pension (Annuity).
6.    Electronic fund transfer statement or other deposit information showing LOD pension payment.
7.    If LOD received as an annuity, the relationship and birth dates of the recipient(s).
8.    Social Security Administration Notice of Award.
9.    2000 or 2001 Tax Return *if dependents were claimed*.

Please note that if the deceased had compensation from other employers from

1998 – 2001, other documentation will need to be provided such as W-2s and year-end pay statements.

In addition, documentation of any life insurance or other survivor benefits from sources other than the FDNY must be provided.

**5.68    How are "collateral sources" deducted from a final award?**

Generally, collateral source payments, also known as collateral offsets, will be applied against the share of the individual who received the benefit. Any excess benefit will be applied against the remaining shares of the award. However, a departure from this general policy may be warranted in certain circumstances. For instance, if the Personal Representative believes that a hardship is created by applying collateral offsets against individual shares, he/she may send a written request to the Special Master for a reallocation of collateral offsets. The Special Master will determine whether a reallocation is appropriate under the circumstances and will advise the claimant accordingly. Likewise, where the Personal Representative submits a consensual distribution plan, signed and notarized by all adult interested parties, it is assumed that the interested parties have agreed to a distribution of the net award and, as such, the collateral offsets will be taken off the top of the award.

**5.69    Does the Special Master take into account a claimant's economic loss before evaluating need-based circumstances?**

Yes. The Special Master does and always has taken into account a claimant's economic loss at hearings before evaluating individual circumstances, including need.

**5.70    Does the economic loss figure on my final award document reflect the results of the economic loss analysis conducted prior to any need-based or replacement service determination?**

No. Final award documents, which are disseminated mainly to demonstrate how an award has been apportioned, include several categories of information, one of which is a category entitled "economic loss." This economic loss category, however, does not reflect the results of the economic loss analysis conducted prior to any need-based or replacement service determination. Rather, this figure has already been appropriately adjusted (for purposes of assisting with distribution) to include any need-based or replacement service determination.