UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

    TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001

-----------------------------------------------------------------X

03-MDL-01570 (GBD)(SN)

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

    Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al., 15-cv-9903 (GBD)(SN)

On January 31, 2017, the Honorable George B. Daniels granted the Burnett Plaintiffs an Order of Judgment by default against the Islamic Republic of Iran. See Order of Judgment, ECF No. 3443. The Court has issued numerous orders addressing the Burnett Plaintiffs' requests for damages. Here, pursuant to § 1605A of the Foreign Sovereign Immunities Act, plaintiffs seek an award of solatium damages on behalf of twelve non-immediate family members of victims of the terrorist attacks on September 11, 2001. ECF No. 5433. Plaintiffs' motion should be GRANTED in part and DENIED in part.

## DISCUSSION

The Court assumes the parties' familiarity with the extensive rulings related to this multi-district litigation. As relevant here, on October 14, 2016, the Court detailed a framework to evaluate damages requests by non-immediate family members of the victims of the September 11 attacks. ECF No. 3363, adopted by, ECF No. 3384 ("Hoglan II"). The Court clarified this framework in a subsequent decision issued on August 8, 2017. ECF No. 3676, adopted by, ECF

No. 3795 ("Hoglan IV"). This motion asks the Court to apply the legal principles set forth in Hoglan IV and award solatium damages to twelve "functional equivalents" of immediate family members. In addition, in keeping with the Court's prior rulings, plaintiffs seek 4.96 percent per annum from September 11, 2001, until the date of judgment, permission to seek punitive or other damages at a later date, and permission to file applications for any remaining Burnett/Iran Plaintiffs at a later date.

## THE BURNETT XV PLAINTIFFS' CLAIMS

Consistent with the framework set forth in Hoglan IV, the Court analyzes each plaintiff's claim for solatium damages individually using the objective criteria set forth therein. See generally Hoglan IV.

### A.  Justin Benitez

Justin Benitez is the stepson of 9/11 decedent James N. Pappageorge. James was present during Justin's birth in 1995, by which time James and Justin's mother had been dating for several years. ECF No. 5435-2, Justin Benitez Decl. ¶ 3. Justin began residing with James sometime in 1997, when James and his mother began cohabiting, until James died on September 11, 2001. Id. ¶ 4. Justin's biological father was not present in his life and played no role in raising him. Id. ¶ 5. James provided Justin with financial, emotional, and spiritual support from the day Justin was born until the day James died. Id. ¶ 6. James clothed Justin, fed him, provided him a home, and kept him safe. Id. When Justin was a baby, James changed his diapers and fed him food. Id. ¶ 7. As Justin got older, James took and picked Justin up from school. Id. ¶ 8. James took Justin to the market and stressed the importance of a proper nutrition. Id. ¶ 10. James introduced Justin and his mother to his fellow firefighters as his family. Id. ¶ 11. Because James N. Pappageorge lived with and parented Justin since his birth, the Court recommends that Justin

Benitez be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### B.  Paula M. Carucci

Paula M. Carucci is the stepdaughter of 9/11 decedent Col. Ronald Franklin Golinski (Ret.). Paula was nine years old when her mother and Col. Golinski began living together in 1976. ECF No. 5435-3, Paula M. Carucci Decl. ¶ 3. Paula's mother married Col. Golinski in 1978, and Paula continuously resided with them in the family home until 1988 when she left to attend college at the age of 21. Id. Paula's mother divorced Paula's biological father when Paula was approximately four years old, and Paula has seen him only two or three times since then. Id. ¶ 4. Paula's biological father played no role in her life. Id. Col. Golinski assumed all the responsibilities of raising Paula from the time he came into her life in 1976 until he was killed on September 11, 2001. Id. ¶ 6. Throughout the time Paula resided in his household, Col. Golinski provided parental guidance to her, nurtured her, fed her, clothed her, and never treated her differently than his own biological children. Id. ¶ 7. Col. Golinski attended Paula's sporting events, school functions, and other childhood events. Id. ¶ 11. Col. Golinski taught Paula how to drive a car, and helped her select and pay for college. Id. ¶¶ 14, 17.

Plaintiffs submit that Paula should be entitled to the full presumptive award for the biological or adopted children of 9/11 victims because the extent of Paula's relationship with Col. Golinski was so deep and longstanding. However, the Court in Hoglan II determined that stepparents who become part of the family when the decedent has passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half. See Hoglan II at 15. While Col. Golinski began continuously living with Paula when she was nine years old, he only became her

step-father when she was 11 years old, two years past the presumptive cut-off age between the full award and the half award under the Court's framework. The Court must apply the terms of the Hoglan framework equally among all claimants, and is therefore constrained to DENY in part plaintiffs' request and limit Paula Carucci's award to $4,250,000, half the amount paid to the biological or adopted children of 9/11 victims.

### C. Robert Dow

Robert Dow was the domestic partner of 9/11 decedent Ruth Ellen Ketler. At the time of Ruth's death, Ruth and Robert had been living together for eight years. ECF No. 5435-4, Robert Dow Decl. ¶ 3. Ruth and Robert depended on each other for financial, emotional, and spiritual support. Id. ¶ 4. Throughout their eight years living together, Ruth and Robert shared all their living expenses and responsibility for household chores. Id. ¶ 5. Ruth and Robert considered themselves married to each other and held themselves out to the world as a married couple. Id. ¶ 6. Before her death, Ruth and Robert discussed having children together, and at the time of her death, they were in the process of searching for a home to purchase together. Id. ¶¶ 11, 12. Following her death, Robert received a death benefit payment as Ruth's domestic partner pursuant to the New York State Workers' Compensation laws and from the September 11th Victims Compensation Fund. Id. ¶¶ 7, 8. Despite the fact that Ruth and Robert were not formally married, they held themselves out as a married couple with nearly a decade of cohabitation and the comingling of finances. As such, the Court recommends that Robert Dow be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

### D. David E. Eschenbaum

David E. Eschenbaum is the stepson of 9/11 decedent Col. Ronald Franklin Golinski (Ret.). David was eight years old in 1976 when his mother and Col. Golinski began living together. ECF No. 5435-5, David E. Eschenbaum Decl. ¶ 3. David's mother and Col. Ronald Franklin Golinski married approximately two years later in 1978, when David was ten years old, and David continued to reside with them in the family home until he turned 18 in 1986. Id. David's mother divorced David's biological father when David was approximately three years old, and he has played no role in David's life. Id. ¶ 4. Col. Golinski assumed all the financial, moral, and spiritual responsibilities of raising David from the time he came into David's life in 1976 until he was killed on September 11, 2001. Id. ¶ 6. Col. Golinski nurtured David, fed him, clothed him, and protected him, treating him no differently than his own biological children. Id. ¶ 7. Col. Golinski bought David his first rifle, helped him set up a paper route, and as David approached his sixteenth birthday, taught him to drive a car. Id. ¶¶ 12, 13, 16.

Plaintiffs submit that David should be entitled to the full presumptive award for the biological or adopted children of 9/11 victims because Col. Golinski began parenting David from the age of eight years old. However, the Court in Hoglan II determined that stepparents who become part of the family when the decedent has passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half. See Hoglan II at 15. Col. Golinski did not marry David's mother, and formally become part of the family, until David was ten years old. The Court awards damages to step-children based on the step-child's age at the time the step-parent married into the family, rather the age when cohabitation began. See ECF No. 4170, Final Order of Summary Judgment, at 3, 4. The Court must apply the terms of the Hoglan framework

equally among all claimants, and is therefore constrained to DENY in part plaintiffs' request and limit David E. Eschenbaum's award to $4,250,000, half the amount paid to the biological or adopted children of 9/11 victims.

### E.  Serena Giovi

Serena Giovi was the fiancé of 9/11 decedent Stephen J. Colaio. At the time of his death, Serena was 30 years old and had been residing in the same home with Stephen for just under a year after becoming engaged. ECF No. 5435-6, Serena Giovi Decl. ¶ 3. Stephen met Serena about ten years before his death, and they became formally engaged in May of 2000. Id. ¶¶ 4, 5. In total, they dated for about three years. Id. ¶ 5. Serena and Stephen's wedding date was set for October 19, 2001, and they had jointly paid for all the wedding plans, including the venue, the wedding dress, the caterer, florist, and tuxedos in preparation for the ceremony. Id. ¶ 6. As they were planning their wedding, Serena and Stephen discussed their future together including where they would buy their first home and when they would start their family. Id. ¶ 13. Because of Serena and Stephen's formal engagement, long term relationship, mutual financial dependence, and almost a year of cohabitation, the Court recommends that Serena Giovi be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

### F.  Kara Lydia Jerez

Kara Lydia Jerez is the stepdaughter of 9/11 decedent Robert D. Cirri, Sr. At the time of Robert's death, Kara was eleven years old and had been residing in the same home as Robert since she was about one year old. ECF No. 5435-7, Kaya Lydia Jerez Decl. ¶ 3. Robert provided for Kara, her sisters, and her stepsiblings both financially and morally. Id. ¶ 4. Kara has only vague memories of her biological father, who played no role in her life and offered no financial

or moral support. Id. ¶ 6. Robert paid for Kara's extracurricular activities as well as her daily needs. Id. ¶ 8. Robert also bought their family home, where Kara and the rest of the family lived with him until the time of his death. Id. ¶ 9. Robert took Kara to doctor appointments, school functions, soccer practice, and soccer games. Id. ¶ 13. Robert would cheer at Kara's soccer games, and cook dinner every night for Kara and her sisters. Id. ¶¶ 14, 15. Robert taught Kara how to tie her shoes, ride a bike, and read. Id. ¶ 16. Because Robert D. Cirri, Sr. fathered Kara Lydia Jerez from a young age, the Court recommends that Kara be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### G. Jessica Nardone Feldman

Jessica Nardone Feldman was the domestic partner of 9/11 decedent Scott Thomas Coleman. At the time of his death, Scott and Jessica had been living together for approximately two years, and had been romantically involved with each other for approximately three years. ECF No. 5435-8, Jessica Nardone Feldman Decl. ¶ 3. During the approximately two years they lived together, Scott and Jessica shared all household expenses as well as household chores. Id. ¶ 4. Scott and Jessica were in the process of buying an apartment into which they intended to move after the sale was complete. Id. ¶ 6. At the time of Scott's death, they were waiting on the lawyers to provide them with a date for the closing to complete the purchase. Id. Scott and Jessica intended to be married in 2002 after they moved into their new apartment, and had begun making plans for their wedding. Id. ¶ 7. Scott and Jessica also intended to have children after they were married and living in their new apartment. Id. ¶ 8.

While the Court recognizes the close relationship between Scott and Jessica, the Court is constrained to conclude that Scott and Jessica do not meet the requirements set forth by the Court to be considered functional equivalents of one another's fiancé or domestic partner. As the Court

wrote in Hoglan IV, "the Court considers that the presence or absence of a formal engagement is virtually dispositive for any fiancée claim where no legal barrier would have impeded the couple from getting married." Hoglan IV at 12. Based on Jessica's declaration, Scott and Jessica were not engaged at the time of his death on September 11, and the absence of an engagement is a "virtually dispositive" factor in the Court's determination.

Although the Court also stated in Hoglan IV that that it "may still entertain claims by domestic partners who cannot prove a formal engagement in extraordinary circumstances (such as decades of relationship or cohabitation, coupled with comingling of finances)," Scott and Jessica do not meet this criterion either. Id. They only lived together for approximately two years, shorter than the amount of time the Court cited in Hoglan IV and the amount of time that the Court has typically found sufficient to consider two people long-term domestic partners. Accordingly, the Court recommends that Jessica Nardone Feldman's claims for solatium damages be DENIED.

### H.  Paige Marie Rollison

Paige Marie Rollison is the stepdaughter of 9/11 decedent Claude Michael Gann. At the time of Claude's death, Paige was ten years old, and had resided in the same home as Claude since she was about five years old. ECF No. 5435-9, Paige Marie Rollison Decl. ¶ 3. Paige not only thought of Claude as her father, but viewed his entire family as her family. Id. ¶ 4. Claude provided for Paige, her sister, and her stepsiblings financially and morally. Id. ¶ 5. Claude carried Paige on his health insurance, and claimed her as a dependent on his tax forms. Id. ¶ 7. Paige has only vague memories of her biological father, who was absent from her life. Id. ¶ 9. When Paige was young, Claude took her to doctor appointments, school functions, soccer practice, and guitar lessons. Id. ¶ 12. Claude helped Paige with her homework after school, and would assume all of

the family responsibilities when Paige's mother was travelling for work. Id. ¶¶ 14, 15. Because Claude Michael Gann fathered Paige Marie Rollison from a young age, the Court recommends that Paige be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### I. Sarah Elizabeth Rollison

Sarah Elizabeth Rollison is the stepdaughter of 9/11 decedent Claude Michael Gann. At the time of Claude's death, Sarah was seven years old and had been living with Claude for approximately four years. ECF No. 5435-10, Sarah Elizabeth Rollison Decl. ¶ 3. Claude assumed all the responsibilities of being a parent to Sarah financially, emotionally, and spiritually. Id. ¶ 4. Sarah's biological father was absent from her life, and she has only vague memories of him. Id. ¶ 5. Claude provided for Sarah and her sister's health insurance, and claimed Sarah and her sister as dependents on his income tax returns. Id. ¶ 6. Claude was the father figure in Sarah's life and raised Sarah as if she was his biological child. Id. ¶ 7. Claude encouraged Sarah to attend religious classes at church and taught her how to ride a bike. Id. ¶ 9, 10. When Sarah's mother was required to travel for work, Claude assumed all the responsibilities of running the household, including making sure Sarah was ready for school on time, preparing breakfast, making sure homework was done, and picking Sarah and her sister up from school. Id. ¶ 11. Because Claude Michael Gann fathered Sarah Elizabeth Rollison from a young age, the Court recommends that Sarah be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### J. David Spivock, Jr.

David Spivock, Jr. was the fiancé of 9/11 decedent Renee A. May. At the time of Renee's death, Renee and David each maintained a home, and their time living together was spent

between their respective homes. ECF No. 5435-11, David Spivock, Jr. Decl. ¶ 4. Renee and David had been living in this way for over two years, and they shared equally in the household expenses and household chores. Id. Shortly after discovering that they were expecting their first child, Renee and David became engaged to be married and began planning for a spring 2002 wedding. Id. ¶ 5. David and Renee were excited about their future life together raising a family, discussing possible baby names and which of their two homes they would live in. Id. ¶ 6. David and Renee traveled together throughout the country so Renee could introduce David to her family members and close friends in anticipation of their marrying. Id. ¶ 7. Although Renee and David were not cohabiting in a single home, they shared their expenses, intended to raise their child together, and were formally engaged, which the Court considers to be "virtually dispositive." See Hoglan IV at 12. Accordingly, the Court recommends that David Spivock, Jr. be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

### K. Jacqueline Steed

Jacqueline Steed is the stepdaughter of 9/11 decedent Charles A. Laurencin. Jacqueline resided in the same home as Charles since she was one year old, when her mother married him, until she moved out at the age of 26. ECF No. 5435-12, Jacqueline Steed Decl. ¶ 4. Jacqueline has only vague memories of her biological father, who played no role in her life. Id. ¶ 5. Jacqueline spoke with Charles almost every day. Id. ¶ 6. Charles carried Jacqueline on his health insurance. Id. ¶ 7. When Jacqueline was young, Charles took her to doctor appointments, school functions, and church. Id. ¶ 8. Charles raised Jacqueline and her siblings as if they were all his biological children. Id. ¶ 9. Charles taught Jacqueline how to read, helped her with her homework, and would always cook dinner for her and her siblings. Id. ¶¶ 10, 11. Because

Charles A. Laurencin fathered Jacqueline Steed from a young age, the Court recommends that Jacqueline be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### L. Tanya Villanueva Tepper

Tanya Villanueva Tepper was the domestic partner and fiancé of 9/11 decedent Sergio Villanueva. At the time of his death, Sergio and Tanya had been living together as a couple for six years, beginning in the summer of 1995. ECF No. 5435-13, Tanya Villanueva Tepper Decl. ¶ 4. They had been romantically involved with each other since 1994. Id. Sergio and Tanya owned their apartment together in Queens, were both named on the deed and on the mortgage they carried on the property, and shared all household chores and expenses equally. Id. ¶ 5. Sergio and Tanya also owned a vehicle together, and shared all expenses to maintain, store, and operate the car. Id. ¶ 6. Sergio and Tanya started a business together in 1999, running a small gift shop a few blocks from their apartment. Id. ¶ 7. In 1999, Sergio and Tanya registered as domestic partners with the City of New York. Id. ¶ 8. On June 30, 2001, Sergio and Tanya became engaged to be married and set their wedding date for August 1, 2002. Id. ¶ 9. Sergio and Tanya booked a venue in New Rochelle for the wedding ceremony and reception, and were scheduled to meet with the wedding planners there on September 13, 2001. Id. ¶ 10. Tanya, along with Sergio's mother, were the named beneficiaries on Sergio's life insurance policy and his deferred compensation plan. Id. ¶ 11. Because of Sergio and Tanya's formal engagement, long term relationship, mutual financial dependence, and six years of cohabitation, the Court recommends that Tanya Villanueva Tepper be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

## CONCLUSION

For the foregoing reasons, plaintiffs should receive solatium damages as follows:

| Number | Decedent | Plaintiff | Relationship | Solatium Damages |
|---|---|---|---|---|
| 1 | James N. Pappageorge | Justin Benitez | Stepchild | $8,500,000 |
| 2 | Col. Ronald Franklin Golinski (Ret.) | Paula M. Carucci | Stepchild | $4,250,000 |
| 3 | Ruth Ellen Ketler | Robert Dow | Domestic Partner | $12,500,000 |
| 4 | Col. Ronald Franklin Golinski (Ret.) | David E. Eschenbaum | Stepchild | $4,250,000 |
| 5 | Stephen J. Colaio | Serena Giovi | Fiancé | $12,500,000 |
| 6 | Robert D. Cirri, Sr. | Kara Lydia Jerez | Stepchild | $8,500,000 |
| 7 | Claude Michael Gann | Paige Marie Rollison | Stepchild | $8,500,000 |
| 8 | Claude Michael Gann | Sarah Elizabeth Rollison | Stepchild | $8,500,000 |
| 9 | Renee A. May | David Spivock, Jr. | Fiancé | $12,500,000 |
| 10 | Charles A. Laurencin | Jacqueline Steed | Stepchild | $8,500,000 |
| 11 | Sergio Villanueva | Tanya Villanueva Tepper | Domestic Partner and Fiancé | $12,500,000 |

The solatium claims for Jessica Nardone Feldman should be DENIED under the principles established in Hoglan IV.

Plaintiffs should also be awarded prejudgment interest on these damages from September 11, 2001, through the date of judgment, at a rate of 4.96 percent per annum, compounded annually. See ECF No. 3358, adopted by, ECF No. 3383.

Plaintiffs may apply for punitive damages at a later date consistent with any future rulings made by the Court on this issue.

Finally, any <u>Burnett</u> Plaintiffs not appearing in this motion and who were not previously awarded damages may still submit applications for solatium and/or economic damages awards.

_____<br>
SARAH NETBURN<br>
United States Magistrate Judge

DATED:   January 21, 2020<br>
         New York, New York

\* \* \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge George B. Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).