## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
| This document relates to:<br>*Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | 15-cv-9903 (GBD)(SN)<br>ECF Case |

## <u>MEMORANDUM OF LAW FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF *BURNETT/IRAN* PERSONAL-INJURY PLAINTIFFS</u>

### (*BURNETT / IRAN* PERSONAL INJURY 1)

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order awarding them  (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett*/*Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.  In this case, the assessment of personal-injury damages is a matter of first impression as there have been no motions filed to date that have

addressed the award of damages to individuals who were physically injured in the Terrorist Attacks on September 11, 2001 but survived to pursue damages against the Defendants.

Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the 9/11 Attacks. On December 1, 2016, all plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), moved for judgment as to liability only. 15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69. On January 31, 2017, the Court granted plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85. The plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims.

## I.     Procedural Background

### A.     Related Cases

Relying on evidence and arguments[1] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of

---

[1] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for[, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4. The Court has applied the same solatium values to claims of other solatium plaintiffs in the *Burnett/Iran* case (ECF No. 3666) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See, e.g.*, ECF Nos. 3175 at 2; 3300 at 1; 3358 at 9; 3363 at 16; 3399; and 3977 at 7.

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in the *Ashton* case. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards

previously awarded in *Burnett/Iran*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16 and 3363 at 28.  Judge Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5).  In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and has applied the nine percent interest rate in multiple instances in the *Ashton* and *Bauer* matters. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.  However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all of the solatium claims. ECF Nos. 3358 at 17-20 and 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2 and 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett/Iran*.  *See, e.g.,* ECF No. 3666.

B.  *Burnett, et al. v. Iran* **Defendants**

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903, ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903, ECF No. 67.  On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, 15-cv-9903 ECF Nos. 65, 66, which application was amended on December 6, 2016 (15-cv-9903, ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903, ECF No. 85.  On July 31, 2017, June 8, 2018, August 28, 2018, September 13, 2018, September 4, 2018, September 3, 2019, September 6, 2019, September 11, 2019, and December 13, 2019 (ECF Nos. 3666, 4023, 4126, 4175, 4146, 5061, 5062, 5087, 5138, and 5356), the Court granted orders of judgement to different subsets of *Burnett/Iran* plaintiffs who filed for entry of partial final default judgments.

The *Burnett/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett/Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later

date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## II.     Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.     Personal-Injury Damages

The plaintiffs identified in Exhibit A include individuals who were either on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); Arlington, Virginia (in or around the Pentagon); or Shanksville, Pennsylvania (where United Flight 93 crashed), or who were among those who entered the premises in the vicinity of the World Trade Center or the Pentagon and were injured on September 11, 2001 by subsequent damage resulting from the attacks.  The range of injuries of individuals who were injured on September 11, 2001 range from pulmonary issues resulting from smoke inhalation to broken bones to significant burn injuries to limb amputations.  One non-physical injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the melee of the attacks on September 11, 2001.  Under the FSIA,

these injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered to flee from the scene, the proximate causation of these injuries cannot truly be in question.

This Court has previously looked to precedent in the U.S. District Courts for the District of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28 U.S.C. § 1605A.  Well-established caselaw exists in the D.C. District Court regarding the measurement of pain and suffering damages in personal-injury cases such as this one.  In *Cohen v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages."  268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This "baseline" figure for personal-injury damages may also be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment."  *Peterson*, 515 F. Supp. 2d at 52.  Less severe injuries to the plaintiff may show it is appropriate to move the award downward in the range of $2 million to $3 million whereas a more permanent injury or impairment may justify a larger award between $7 million and $12 million.  *See Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp.2d at 38).  In the latter situation, the upward adjustment has been found appropriate "in more severe instance of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for

dead." *See Barry v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 150491, at *29 (D.D.C. Sept. 4, 2019) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)). The downward departure "has been found appropriate where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,'… or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Id.* (quoting *Valore* and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).

### B.   Upward Departure for Damages Resulting from the Terrorist Attacks on September 11, 2001

Whereas the D.C. District Court has established certain parameters for addressing damages for personal-injury claims under the FSIA, this Court has previously addressed the nature of the Terrorist Attacks on September 11, 2001 and the indelible mark they have left on this country and more specifically on the victims.  Many of the personal-injury victims whose claims are being submitted to the Court in these proceedings continue to live in close proximity to the areas where they sustained their injuries, and for those in New York, the reminder of the attacks is inescapable—annual commemorations of the lost on September 11, 2001 at Ground Zero, the illumination of the skyline with two beams of light representing the Twin Towers during the same time period each year, and simply watching the building of the Freedom Tower on the site of the two fallen towers.  Furthermore, these attacks are ingrained in the consciousness of the American public.  The attacks are taught in American schools, and the popular-culture references can evoke triggers in many of these victims who suffer from some level of either post-traumatic stress disorder or other emotional distress as a result of their involvement as victims of the attacks.

As Magistrate Judge Maas first held in 2012—based in part on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day"— "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11[th] attacks,

and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).  While Judge Maas' decision—adopted by Judge Daniels— applied to solatium damages for family members of individuals who were killed on September 11, 2001, the logic equally applies to individuals who were present and physically injured in the attacks on September 11, 2001 and continue to experience the same reminders in their everyday life that would impact these other family members.  In fact, it is arguable that the impact would be more severe for someone who was physically present and whose life was endangered by the attacks.

For the solatium damages, the upward departure adopted by this Court constituted an upward increase of 56.25% for spouses (from $8 million to $12.5 million); 70% for parents and children (from $5 million to $8.5 million); and 70% for siblings (from $2.5 million to $4.25 million).  A similar upward departure should be adopted by this Court for personal-injury claimants who sustained physical injury as a direct result of the Terrorist Attacks on September 11, 2001. Individuals who were in harm's way on September 11, 2001 as a result of the terrorist attacks and sustained physical injury while experiencing a true fear for their lives in addition to the physical injuries they sustained while also experiencing what can only be described as a battle scenario with death all around them should have the $5 million baseline award increased in accordance with the increase to parent and children solatium awards for wrongful death to $8.5 million as the baseline for personal-injury claims arising on the day of September 11, 2001.  Furthermore, more severe injuries with severe or permanent impairment should be granted an upward departure in the range of $12 million to $20 million.  Finally, any downward departure should be in the range of $2.5

million to $5 million for those claims where the physical injuries are less severe but rather accompanied by severe emotional damages.  As the D.C. District Court decisions have stated, "[t]he award of damages for physical injuries 'assume[s] severe psychological injuries." *Barry*, 2019 U.S. Dist. LEXIS 150491, at *29.

### C. Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages.  *See* 28 U.S.C. §1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623).  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g*., ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request leave to address the issue

of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### D.    Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14).  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  *World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619,

*66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.   Individualized Case Assessments

In an effort to provide the Court with a cross-section of the types of claims that they intend to submit in advance of the Court's January 31, 2020 deadline, Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to the Court on January 10, 2020. *See* ECF No. 5484. While Plaintiffs' motion addresses claims in multiple categories, by narrowing down the categories in which these claims arise, Plaintiffs are attempting to assist the Court in addressing these claims in an efficient manner.

### A.   George Joseph Bachmann
###      Injury Category: Building Collapse Injuries
###      Severity: Severe

George Joseph Bachmann was a firefighter with the "Ten House," the fire station across the street from the World Trade Center. *See* Eubanks Dec., Ex. B, Dec. of George Joseph Bachmann at ¶1. After the first plane strike, Mr. Bachmann entered the North Tower and climbed to a staging area on the 37th Floor. At that point, the building began to shake—from the collapse of the South Tower—and he began to evacuate back to the lobby level. *Id.* at ¶6. As the North Tower began to collapse, Mr. Bachmann and another firefighter took cover behind a girder. *Id.* at ¶9. Mr. Bachmann was temporarily buried in the rubble following the collapse of the North Tower, but was subsequently medevacked to a hospital in New Jersey. *Id.* at ¶10. The injuries that Mr. Bachmann sustained on September 11, 2001 included herniated lumbar discs, herniated cervical discs, lumbar and cervical injuries, burns on his neck, face, and head, severe head and neck trauma, and his back was broken in two places. *Id.* at ¶11. He has plate in his head for the trauma in addition to receiving regular epidural injections for his back. *Id.* He has been unable to work since September 11, 2001 due to the continuing pain from his physical injuries and the toll of his emotional injuries related to post-traumatic stress disorder but also arising from the death of his wife who developed lung cancer from her work at Ground Zero after the attacks and passed away in 2011. *Id.* at ¶¶15, 17. Based on his permanent and debilitating injuries and his loss coupled with survivor's guilt that has almost driven him to brink of ending his life, Plaintiffs submit that Mr. Bachmann should be granted an upward departure from any baseline damages award for the injuries he sustained on September 11, 2001.

**B.      Mary Ellen Barbieri**
         **Injury Category: Impact Injuries**
         **Severity: Severe**

Mary Ellen Barbieri was employed by Kramer & Devries, LLP but happened to be in the lobby of One World Trade Center when the first plane struck the building.  *See* Eubanks Dec., Ex. C, Dec. of Mary Ellen Barbieri at ¶4.  The force of a blast from a nearby elevator tossed Ms. Barbieri in the air, and she subsequently landed on her head and lost consciousness.  *Id.* at ¶5. When she regained consciousness, she could not move as she was pinned down by a beam and her legs were numb. *Id.* She could tell that other individuals who had been close to her at the time of the explosion had been killed.  *Id.*  A woman in the lobby helped her up and out of the building. *Id.*  As a result of the terrorist attacks, Ms. Barbieri sustained head trauma, lower back sprain, cervical neck spinal injury, and left hand and bilateral knee injuries. *Id.* at ¶6.  Due to a concussion that she suffered from landing on her head, Ms. Barbieri suffered from fainting spells which caused significant additional, secondary injuries as a result of her fainting including fractured ribs and other orthopedic injuries.  *Id.*  In 2002, Ms. Barbieri underwent surgery on her cervical spine; however, she continues to suffer from cervical neck pain.  *Id.* at ¶7.  She has also received steroid injections, epidurals, lumbar medical branch blocks, lumbar facet blocks and fluoroscopy-guided radiofrequency medical nerve branch blocks to reduce pain in her lumbar spine.  *Id.* Despite attempts to work, her continuing physical pain and emotional distress have prevented Ms. Barbieri from working in any continuous manner since the attacks on September 11, 2001.  *Id.* at ¶9.  Ms. Barbieri's post-traumatic stress disorder has been so intrusive in her life that her doctor advocated for her to have a service dog, and she has had service dogs to assist her since 2009.  *Id.* at ¶10. Given the severe injuries that Ms. Barbieri sustained which resulted in permanent disability due to continuous pain and her inability to work coupled with her severe emotional injuries, Plaintiffs

submit that Ms. Barbieri should be granted a significant upward departure from any baseline damages award for the injuries she sustained on September 11, 2001.

C. **Richard Beatty**
**Injury Category: Building Collapse Injuries**
**Severity: Devastating**

Richard Beatty was a police officer with the Port Authority of New York and New Jersey who was called to the World Trade Center after the first plane struck. *See* Eubanks Dec., Ex. D, Dec. of Richard A. Beatty at ¶3. He was assigned to try to evacuate 2 World Trade Center floor by floor. Rather than taking an elevator, he walked up to the 30th floor at which time the second plane struck Tower 2. *Id.* at ¶4. He began evacuating the building from the 30th floor down. The tower came down while he was in the lobby of 2 World Trade Center. He was able to find some level of safety in a building stairwell. *Id.* at ¶6. Upon exiting the now-fallen building, Mr. Beatty regrouped in front of 1 World Trade Center which then began to fall. He sought shelter in the U.S. Customs building, but he was hit by debris and buried in the rubble for four to five hours. *Id.* at ¶7.

As a result of being caught in the collapse of both of the towers, Mr. Beatty sustained a severely broken hand, burns to his left arm, and crushing injuries to both his left arm and left knee. *Id.* at ¶14. He could not have surgery on his broken hand until his burns had healed, and in February 2002, he underwent a 12-hour surgery to rebuild his wrist as the ligaments and tendons had been severed. He lost 75% of the use of his hand and could no longer hold a position as a police office with the Port Authority as a result of his injuries. He has been informed by his physicians that—despite treatment for draining and lubricating his knee joint performed in regular intervals—he will need to have a knee replacement as a result of the crush injuries he sustained in his knee when the building fell on him. *Id.* at ¶¶10-11. Mr. Beatty suffers from post-traumatic

15

stress disorder and sees a psychotherapist monthly for therapy. *Id.* at ¶12.  Mr. Beatty was caught in the collapse of both buildings and trapped twice—for several hours—on September 11, 2001 as a responding officer to the scene.  He sustained significant and permanently debilitating injuries that have forced him into early retirement with additional medical procedures likely to be necessary in the coming years for his continuing conditions.  He has also sustained severe emotional trauma. Based on these facts, Plaintiffs submit that Mr. Beatty should be granted a significant upward departure based on the extent and type of injuries he sustained on September 11, 2001.

### D.     Jean M. Hunt
        Injury Category: Impact Injuries
        Severity: Devastating

Jean M. Hunt was a civilian Senior Program Analyst for the Army working on the second floor of a newly renovated section of the Pentagon on September 11, 2001.  *See* Eubanks Dec., Ex. E, Dec. of Jean M. Hunt at ¶4.  When American Airlines Flight 77 struck the Pentagon, it literally knocked the phone out of Ms. Hunt's hand.  *Id.* at ¶5.  She rushed to an exit but then was overcome by the smoke-filled air; however, two naval officers were able to grab her and drag her into the courtyard of the Pentagon.  *Id.*   As she left the Pentagon, she began experiencing significant physical distress including tingling and numbness across her face and head and a significant headache. *Id.* at ¶6.  Later in the day after returning home, she experienced complete loss of vision with her headache and tingling and numbness across her face continuing.  *Id.* Doctors later concluded that Ms. Hunt had experienced a stroke immediately following the attack on the Pentagon.  *Id.* She has since suffered two additional strokes—one the following day and one in November 2001—that caused her to lose vision in both of her eyes and also caused hemorrhaging from her nose that required cauterization.  *Id.* at ¶7.  She continues to suffer from headaches and numbness in addition to insomnia and nightmares as part of her continuing emotional distress.  *Id.*

16

Ms. Hunt was the sole provider for herself and her disabled husband, and she has been unable to provide for her family since the terrorist attack on the Pentagon due to her strokes and her severe emotional injuries. *Id.* 9.  She has a fear that she will lose her home in the future as a result of her inability to earn money. *Id.*  Based on the severe debilitating injuries that Ms. Hunt sustained on September 11, 2001 including smoke inhalation followed by a stroke, her life has been altered beyond comprehension.  She is unable to take care of her family, and she is now in a position where her life is dictated by her physical and emotional injuries that all stem from the events of September 11, 2001.  Based on her injuries, Ms. Hunt should be granted an upward departure from the baseline amount of damages to be awarded by the Court.

      **E.**     **David Kletsman**
               **Injury Category: Escape Injuries/Falling Debris Injuries**
               **Severity: Severe**

David Kletsman was working at the New York Metropolitan Transportation Council on the 82nd Floor of the North Tower when the first plane struck.  *See* Eubanks Dec., Ex. F, Dec. of David Kletsman at ¶7.  It took Mr. Kletsman and his co-workers approximately one hour to get down the stairs to the ground floor due to confusion and smoke filling the staircase.  The first tower collapsed as Mr. Kletsman was standing outside the towers having made it safely out of the North Tower.  *Id.* He was hit by falling debris that caused injury to his shoulder which was exacerbated as he assisted carrying another person away from the scene.  *Id.*  While Mr. Kletsman experienced physical injury from the falling debris, his primary injury following the attacks has been his fight with post-traumatic stress disorder.  He took off a month from work to rehabilitate his shoulder and also to seek mental-health therapy.  He has experienced nightmares, flashbacks, anxiety, and depression, and despite taking medications at various points to combat the effects of post-traumatic stress disorder, he continues to seek treatment for this condition.  Due to his less severe physical

injuries coupled with his severe emotional distress and injuries, Plaintiffs submit that Mr. Kletsman should be granted a judgment that is subject to a small downward departure from the baseline damages judgement value.

**F.      Daniel Kruesi**
**Injury Category: Escape Injuries**
**Severity: Severe**

Daniel Kruesi was an accountant working for Fiduciary Trust on the 90th Floor of 2 World Trade Center. *See* Eubanks Dec., Ex. G, Dec. of Daniel Kruesi at ¶¶4-5. When the first plane hit 1 World Trade Center, Mr. Kruesi saw the explosion and immediately began to try to leave the building by taking the elevator from the 90th Floor to the 78th Floor and then attempting to take the stairs down the remaining way to the ground floor.  *Id.* at ¶7.  When the second plane hit the building that Mr. Kruesi was attempting to exit, he was thrown off his feet in the stairwell and sustained injuries to his back and neck.  *Id.* According to his medical records, he sustained a permanent compression fracture to his T11 and T12 vertebrae as a result of this fall in the stairwell. Upon exiting the building, Mr. Kruesi ran to the Staten Island Ferry and boarded the ferry as the first tower came down. *Id.* He was treated at a hospital in Staten Island for his injuries and was evaluated for acute stress disorder.  He has since suffered from bouts of depression and anxiety that continue to this day.  *Id.* at ¶10.  Based on the permanent injuries he sustained and the emotional trauma that he has endured and continues to endure, Plaintiffs submit that Mr. Kruesi should be granted the baseline damages judgment as established by this Court.

**G.      John R. La Sala**
**Injury Category: Falling Debris Injuries/Escape Injuries**
**Severity: Significant**

John R. La Sala was a Fire Marshal with the Port Authority of New York and New Jersey who was working at LaGuardia Airport at the time that the first plane struck 1 World Trade Center.

*See* Eubanks Dec., Ex. H, Dec. of John R. La Sala. After the planes struck, he assembled a team to traveled to Ground Zero to help in any capacity that they could. *Id.* When he arrived on scene, the connector from the financial center to the World Trade Center collapsed, and Mr. La Sala was struck by the debris which caused him to briefly lose consciousness. *Id.* After being taken to an EMS tent nearby, he witnessed both of the towers falling from only two blocks away and sustained further injury when attempted to escape after the towers fell. *Id.* Mr. La Sala sustained an extruded disc at L4 to L5, severe compression of the exiting right L4 root, disc herniation and mild to moderate facet/ligament hypertrophy. *Id.* These injuries have causes him severe and chronic lower back pain, radiculopathy, and neuropathy which have not entirely subsided. *Id.* He has also suffered from severe post-traumatic stress disorder, depressive disorder, and anxiety disorder as a result of his presence at Ground Zero on September 11, 2001. *Id.* Based on the severe orthopedic injuries that he sustained on September 11, 2001 in addition to the severe emotional distress that he continues to endure, Plaintiffs submit that Mr. La Sala should be granted the baseline damages judgment as established by this Court.

      **H.**    **Veronica O. Li**
              **Injury Categories: Escape Injuries/Falling Debris Injuries**
              **Severity: Severe**

Veronica O. Li was a Claims Supervisor at Frenkel & Co., Inc. located on the 36th Floor of World Trade Center 2. *See* Eubanks Declaration, Ex. I, Dec. of Veronica O. Li at ¶4. Ms. Li was on her way to work when the first plane struck World Trade Center 1. *Id.* When the first place struck the World Trade Center 1, Ms. Li was standing on the subway platform at the Cortland Street-World Trade Center subway station. As she attempted to exit the subway, others were crowding into the station to escape the chaos that had ensued on street level after the first plane struck the Towers; however, soon thereafter, everyone was asked to exit the subway station, and

Ms. Li exited the subway at the far end of Church Street and Vesey Street, directly below World Trade Center 1.  *Id.* at ¶7.  It was then that she saw the hole in the building and could see people jumping from the tower and landing near her on the street level. As she witnessed this, the second plane—United Flight 175—struck the other tower.  Pieces of the fuselage of the plane began to rain down where Ms. Li was standing, and she determined later that the engine from Flight 175 was found not far from where she had been standing.  *Id.* She had been knocked over, but when she attempted to get up and run, she felt the pain in her knee that radiating through her hip and her back.  She was finally able to stand but was then ushered under a canopy as additional debris continued to fall where she saw individuals who had been killed by the fallen debris.

As a result of the Terrorist Attacks of September 11, 2001, Ms. Li sustained a tear of the meniscus in her left knee, a lumbar sprain, left hip pain, and right knee pain in addition to contusions on her face, back, and both knees and abrasions to both of her eyes.  *Id.* at ¶6.  She underwent surgery to repair her left knee followed by three years of physical therapy.  *Id.* at ¶8. She continues to experience pain in her knee and was deemed partially, permanently disabled as a result of the injuries she sustained on September 11, 2001. *Id.* She also suffers from post-traumatic stress disorder as a result of the trauma she experienced that day. *Id.* at ¶6.  Based on the nature of her injuries and the ongoing pain that she has sustained coupled with the emotional distress that continues to this day, Plaintiffs respectfully submit that Ms. Li should qualify for an upward departure based on the nature of her injures.

**I.    James Raymond McCarthy**
    **Injury Category: Escape Injuries**
    **Severity: Severe**

James Raymond McCarthy worked for Oppenheimer Funds, Inc. and was present on the 31st Floor of 2 World Trade Center when the terrorist attacks took place.  *See* Eubanks Declaration,

Ex. J, Dec. of James Raymond McCarthy at ¶3.  When the first plane struck, Mr. McCarthy proceeded to the lobby of 2 World Trade Center and proceeded out of the building through broken glass; however, he was subsequently trampled when the second plane hit almost directly above him.  *Id.*at ¶6.  He fell in the ensuing chaos and stampede and was kicked and trampled until he was removed from the pathway and thrown into a dumpster.  *Id.* Despite finally being able to escape by bus and then water ferry, Mr. McCarthy suffered from injuries to his back, head, and nerves as a result of being trampled in addition to herniated discs at L5-S1 subsequently resulting in lumbosacral radiculopathies to his S1 and L4 nerves.  The nerve damage has cause a change to his gait in addition to numbness and tingling in his lower extremities.  He has also suffered from memory loss as a result of the trampling he underwent on September 11, 2001.  *Id.* at ¶7.  He has also been diagnosed and treated for post-traumatic stress disorder following the events of September 11, 2001.  *Id.*at ¶8.  Due to severe emotional distress he has experienced in addition to the continuing pain from which he suffers in his back and radiating pain through his nerves, Plaintiffs respectfully submit that Mr. McCarthy should qualify for an upward departure from any baseline damages amount based on the nature of his injuries and the length of time during which he has sought treatment.

       **J.**      **Nancy Marie Morrison**
                 **Injury Category: Escape Injuries**
                 **Severity: Devastating**

Nancy Marie Morrison worked for Deloitte Touche in the World Trade Center at the time of the Terrorist Attacks on September 11, 2001.  *See* Eubanks Declaration, Ex. K, Dec. of Nancy Marie Morrison at ¶4.  Ms. Morrison was in the lobby of the North Tower when the first plane struck and believed she should try to get out to the street to get away from the buildings.  In doing so, she saw people jumping from the upper floors followed by the second plane striking the other

tower.  In the ensuing chaos, Ms. Morrison was knocked down and trampled to a state of unconsciousness causing severe injuries including: left clavicle and rib fracture, bruising to the left anterior chest wall, medial meniscal tearing in her right knee, left knee injury, lower back injury, and lower back and right hip pain.  *Id.* at ¶6.  The pain has continued to this day, and Ms. Morrison recently had two ablation procedures in hopes of alleviating worsening lower back pain; however, she fears that these procedures were unsuccessful.  *Id.* at ¶9.  She continues to attend to physical therapy in hopes of regaining some level of functioning nearly 20 years later; however, the injuries she sustained have caused her to lose her job and networking capabilities due to the impairments created by her injuries including the inability to walk any significant distances and the inability to stand for any extended period of time without significant pain.  *Id.* at ¶¶7, 9.  Ms. Morrison has also been diagnosed as suffering from post-traumatic stress disorder with her emotional triggers including hearing sirens blaring in the distance which would cause her to almost lose her ability to stand. *Id.* at ¶10.  Based on the extent of her injuries and the last impact they have had on her life and her ability to function in her prior vocation, Plaintiffs submit that Ms. Morrison should be granted a significant upward departure from any baseline damages award for the injuries she sustained on September 11, 2001.

**K.      Kofi Osei Nyantakyi**
**Injury Category: Escape Injuries**
**Severity: Severe**

Kofi Osei Nyantakyi was a doorman at the Millenium Hilton Hotel that was across the street from the World Trade Center complex.  *See* Eubanks Dec., Ex. L, Dec. of Kofi Osei Nyantakyi at ¶¶3, 5.  After the towers had fallen, Mr. Nyantakyi was struck by debris and was trampled by other people trying to flee the scene.  As a result of the trampling, Mr. Nyantakyi sustained lacerations and bruises on his right hand and both forearms; injuries to his knees, right

wrist, and gluteals; injuries to his neck with radiating pain to his arms; stiffness and numbness in his neck and arms; and injuries to his back where he sustained neuroforaminal disc herniation at L4 to L5, left lateral disc herniation at L2 to L3 and L3 to L4. *Id.* at ¶7. Mr. Nyantakyi is no longer capable lifting weights over 30 pounds due to the pain he experiences in his back. *Id.* Mr. Nyantakyi also suffers from post-traumatic stress disorder and fears of returning to downtown Manhattan and something similar occurring again. *Id.* at ¶8. Due to the injuries—both physical and emotional—that Mr. Nyantakyi sustained on September 11, 2001, Plaintiffs submit that he should be granted an upward departure from the baseline damages amount to account for the permanent limitations he has sustained to his back and the continuing emotional difficulties.

      **L.**      **Sharon Premoli**
              **Injury Category: Building Collapse Injuries**
              **Severity: Devastating**

Sharon Premoli was working on the 80th Floor of the North Tower at the time that the North Tower was hit by the first plane on September 11, 2001. *See* Eubanks Dec., Ex. M, Dec. of Sharon Premoli at ¶2. Ms. Premoli descended the stairs to the lobby of the North Tower where she fell and cut her hand and foot on cement and debris and then proceeded to the Plaza level of 5 World Trade Center. *Id.* at ¶¶3-4. At this point, the South Tower began to collapse, and the torrent of materials from the building threw Ms. Premoli into the air and through a plate glass window where she fell to ground unconscious and covered in a shroud of debris. *Id.* at ¶4. She was found by a New York City detective in rubble lying on top of a deceased body and barely conscious with her airway blocked by dust and dirt from the building that had just collapsed on top of her. *Id.* at ¶5. Once they were able to access the outside, the North Tower began to collapse, and Ms. Premoli was again struck by the torrent of the second tower coming down. *Id.* at ¶6. Ms. Premoli suffers from near-debilitating post-traumatic stress disorder that has caused her to leave her successful

business career and relocate to Vermont.  She has been diagnosed with a traumatic brain injury that has caused her to suffer from full-body neuropathy, muscle weakness, cognitive impairment, impaired hearing, and uninterrupted tinnitus.  In addition, she has reduced lung function and chronic rhinosinusitis as a result of the large amount of toxic dust that she consumed/inhaled as a result of the towers collapsing in such close proximity to her.  Based on the injuries she sustained and her fully debilitating post-traumatic stress disorder, Plaintiffs submit that Ms. Premoli should be granted an upward departure from the baseline damages judgment as established by this Court.

### M. Bryan Rodrigues
### Injury Category: Building Collapse Injuries/Pulmonary Trauma Injuries
### Severity: Severe

Bryan Rodrigues was a New York City Police Officer assigned to Transit Bureau District 2 in the vicinity of the World Trade Center.  *See* Eubanks Dec., Ex. N, Dec. of Bryan Rodrigues at ¶3.  After the second plane struck, Officer Rodrigues entered the Concourse Level of the World Trade Center.  As 2 World Trade Center began to collapse, it created a rush of wind on the Concourse Level that picked up Officer Rodrigues and carried him before he was thrown to the ground sustaining significant injuries to his back.  *Id.* at ¶7.  He was in debris so thick he could not see more than a few feet in front of him. *Id.* at ¶8.  After the second tower fell, he was taken by EMS to St. Vincent's Hospital.  *Id.*  Officer Rodrigues required total disc replacement surgery for herniated discs located at L5 to S1 in his lower back.  *Id.*at ¶10.  He continues to suffer from constant back pain that prevents him from standing, sitting, or walking for any extended periods and causing everyday exertion to be difficult and painful.  *Id.*  Also, based on his inhalation of significant amounts of dust and fumes after 2 World Trade Center collapsed, he has suffered from asthma and is being monitored by the World Trade Center Health Program for his breathing difficulties.  *Id.* at ¶12.  His injuries forced him into retirement with the police department.  *Id.* at

¶11.   Based on his inability to continue working due to the permanent disabling injuries he sustained on September 11, 2001, Plaintiffs submit that Officer Bryan Rodrigues should be granted an upward departure for his injuries in excess of the baseline damages value to be established by the Court.

### N.   Julio Roig, Jr.
### Injury Category: Pulmonary Trauma Injury
### Severity: Significant

Julio Roig, Jr. was in his office at M.E.P. Consulting Engineering Company one block from the World Trade Center when the attacks occurred.  *See* Eubanks Dec., Ex. O, Dec. of Julio Roig, Jr. at ¶3.  He remained in his office at 29 Broadway until after the towers fell, and he and his co-workers took all precautions to gird against the toxic fumes that were created by the collapsing buildings.  *Id.* at ¶4.  He left Manhattan approximately one hour after the second tower collapsed; however, his breathing issues began almost immediately.  *Id.* at ¶6.  In November 2001, Mr. Roig had 10% of his right lung removed which revealed large quantities of silicates and the presence of multiple, well-defined pulmonary granuloma.  *Id.* at ¶7.  His physicians concluded that Mr. Roig's illness was most likely caused by exposure to dust at the World Trade Center, particularly the inhalation of heavy metals that were known to be present based on air-sampling studies in the first 48 hours following the collapse of the buildings.  *Id.* at ¶8.  Given Mr. Roig's lack of any other conduct or travel to locations that would account for his diagnosis and the presence of a clean chest X-ray only six months prior to the attacks, the causation between the attacks and his pulmonary condition is clear.  *Id.* at ¶9.  Once a lung-transplant candidate, Mr. Roig's lungs are being monitored due to significant scarring from his inhalation injuries, and it is unclear whether he will, in fact, need a lung transplant in the future.  *Id.* at ¶10.  Given Mr. Roig's significant pulmonary issues that were nonexistent prior to his exposure on September 11, 2001, Plaintiffs submit that he

should be granted an upward departure from the baseline damages judgment as established by this Court.

**O.      Kevin Shaeffer**
**Injury Categories: Impact Injuries**
**Severity: Devastating**

Lt. Kevin Shaeffer was a member of the staff of the Chief of Naval Operations worked at the Navy Command Center in the Pentagon when the area in which he was working was struck by American Airlines Flight 77 as it crashed into the Pentagon.  *See* Eubanks Dec., Ex. P, Dec. of Kevin Shaeffer at ¶¶3-4.  Lt. Shaeffer was working in the command center when the entire command center exploded in a gigantic fireball as the plane struck the Pentagon.  Mr. Shaeffer was on fire and attempted to extinguish himself while he was in a completely black environment where he was breathing unknown toxins.  Once he was able to find an opening and see daylight, he was rescued and taken to Walter Reed Medical Center in Washington, DC and then transported to Washington Hospital Center's Burn Unit where he remained as an inpatient until December 2001.  *Id.* at ¶5.

Lt. Shaeffer's injuries were catastrophic.  He received second- and third-degree burns over 41% of his total body surface area and was hospitalized for three months and three days after September 11, 2001.  *Id.* at ¶6.  He was on a ventilator for two months due to damage to his lungs from smoke inhalation.  *Id.*  He fought fluid buildup in his lungs, at once became septic, and went into cardiac arrest on multiple occasions while he was in inpatient care.  *Id.* He has undergone seventeen surgeries and skin grafts, and he continues to bear scars over 50% of his body.  *Id.* He described the pain of the burns as a white hot pain that persisted and continues to persist at times. *Id.*  Lt. Shaeffer's life will never be the same in any respect.  His military career was ended the moment that the plane struck the Pentagon.  He has been in a fight for his life with excruciating

pain for the past 18+ years.  For these reasons, Plaintiffs submit that Lt. Kevin Shaeffer be granted the highest upward departure that the Court deems appropriate as he will live with the scars of these burns that cover his body and remind him daily of what happened to him on September 11, 2001.

**P.**     **Donna Singer**
         **Injury Category: Escape Injuries**
         **Severity: Significant**

Donna Singer was working on the 63rd Floor of 2 World Trade Center—and five months pregnant—at the time the first plane struck the North Tower.  *See* Eubanks Dec., Ex. Q, Dec. of Donna Singer at ¶¶3, 5.  She immediately went to the stairwell to descend, and when she reached the 17th Floor, the second plane struck the tower where she was descending.  *Id.* at ¶5.  When she arrived at the lobby, she was disoriented from the smoke and began to crawl on the ground to be able to see.  *Id.* As she exited the buildings—despite debris and bodies falling all around—she ran and took cover in a gym as the South Tower fell.  *Id.* at ¶6.  As a result of the attacks and her escape, she experienced complications with her pregnancy including shortening of her cervix and premature dilation from walking from the 63rd floor of the South Tower to Brooklyn.  She was required to be bedridden for the remaining four months of her pregnancy.  *Id.* at ¶8.  She has also experienced severe post-traumatic stress disorder and panic attacks since September 11, 2001.  *Id.* at ¶9.  Due to the lower severity of Ms. Singer's injuries and her emotional distress, Plaintiffs submit that Donna Singer should be granted a judgment that is subject to a slight downward departure from the baseline damages judgement value.

**Q.      Eugenia "Gigi" Singer**
**Injury Category: Impact Injuries**
**Severity: Devastating**

Eugenia "Gigi" Singer was employed by AON, a worldwide insurance brokerage and risk-management consulting company, on the 103rd floor of the South Tower.  *See* Eubanks Dec., Ex. R, Dec. of Eugenia S. Singer at ¶4.  Ms. Singer was on the 103rd floor of the South Tower when the first plane struck the North Tower.  *Id.* at ¶5.  She made it to the 78th Floor sky lobby area when the second plane crashed into the South Tower.  Ms. Singer was thrown across the sky lobby floor and was injured when a piece of the United Airlines plane landed just a few feet away from her. *Id.* Despite severe injuries, Ms. Singer still willed herself to make it out of the building before its collapse.  The severe injuries she sustained were a compound and open fracture of the distal radius and ulna near her left wrist, third-degree burns on both arms, hands, and fingers, a concussion, left shoulder fracture, left clavicle fracture, left scapula fracture, three fractured ribs on her left side, and contusions and lacerations on her head that required cauterization.  *Id.* at ¶6.  She has undergone two skin-graft surgeries for her burns, had a metal plate and four pins inserted in her left wrist, and has severe scarring and hypersensitivity in areas impacted by her burns.  *Id.* In addition to severe emotional distress, Ms. Singer has suffered from chronic fatigue, excessive weight loss, nausea, dizziness, and abnormal blood tests resulting from four surgical procedures and blood transfusions she has received.  *Id.* at ¶7.  Following the attacks, she was hospitalized for three weeks before convalescing at her parents' home after discharge.  *Id.* at ¶8.  Based on the severity of the injuries and permanence of the pain and scarring from the burns that she sustained and the numerous injuries, Plaintiffs submit that Ms. Singer should be granted a significant upward departure from the baseline damages judgment value to be established by the Court.

**R.** **Lauren A. Smith**
**Injury Category:  Impact Injuries**
**Severity: Severe**

Lauren A. Smith was employed by Keefe, Bruyette & Woods, Inc. on the 89th Floor of the
South Tower on September 11, 2001. *See* Eubanks Dec., Ex. S, Dec. of Lauren A. Smith at ¶3.
When the first plane hit Tower One, Ms. Smith saw the flames and decided to evacuate using the
elevators.  At approximately the 25th floor, the second plane hit the South Tower, and the elevator
in which Ms. Smith was traveling began to free fall.  *Id.* at ¶4. The elevator abruptly came to a
stop due to the emergency brakes, and the abrupt stop caused something in the elevator car to
impact with Ms. Smith's leg causing a hematoma.  *Id.* When the elevator stopped, a fire broke out
inside though it was wedged between floors.  Ms. Smith jumped from the elevator to the lobby
floor below, but she fell into the elevator shaft and landed on a beam fracturing multiple ribs and
collapsing a lung.  *Id.* at ¶5.  Ms. Smith was hospitalized for two weeks and underwent two
surgeries to drain the hematoma and re-contour her leg.  *Id.* at ¶6.  Based on the injuries she
sustained—including the free fall in the elevator that induced a true fear-of-death scenario above
and beyond the circumstances of September 11, 2001—Plaintiffs submit that Ms. Smith should be
granted a significant upward departure from the baseline damages judgment value to be established
by the Court.

**S.** **Kenneth Summers**
**Injury Category: Impact Injuries**
**Severity: Devastating**

Kenneth Summers was employed by Empire BlueCross BlueShield located on the 27th
Floor of Tower One.  *See* Eubanks Dec., Ex. T, Dec. of Kenneth A. Summers at ¶2.  Ms. Summers
in the lobby of the building when the first plane struck Tower One, and he began leaving the
building.  Debris was falling, so he re-entered the lobby of Tower One when he was struck by a

fireball of jet fuel that came out of the elevator shaft and blew him through the glass doors to the building.  He was blown approximately 50 feet and had been engulfed in flames.  *Id.* at ¶3.  He sustained head wounds and second- and third-degree burns on his face, head, neck, arms, and hands.  *Id.* at ¶5.  He underwent ten reconstructive surgeries on his hands and continues to experience intense nerve damage and cannot close his hands into a full fist. *Id.*  The burns have caused increases in blood sugar requiring him to take insulin (which he was not taking previously), and he continues to suffer from post-traumatic stress disorder to this day.  *Id.* at ¶¶6, 8.  Based on the number of surgical interventions, his burns, his scarring, and the permanent damage and disfigurement, in addition to his emotional distress, Plaintiffs submit that Mr. Summers should be granted a significant upward departure from the baseline damages judgment value to be established by the Court.

> **T.    Michael A. Telesca**
> **Injury Category: Building Collapse Injuries**
> **Severity: Severe**

Michael A. Telesca was the Battalion Chief of the New York City Fire Department, Battalion 19, Bronx, and he responded to the World Trade Center Towers after they were struck by the planes.  *See* Eubanks Dec., Ex. U, Dec. of Michael A. Telesca at ¶3.  He reported to the lobby of the Marriott at 3 World Trade Center; however, immediately after arriving, the South Tower collapsed and crashed through the entirety of the 29 floors of the Marriott.  *Id.* at ¶5.  Mr. Telesca was hit in the head by falling debris as the building collapsed around him.  *Id.* at ¶6.  After losing consciousness, he awoke vomiting dust he had inhaled as the building came down around him.  *Id.*  He and other firefighters were trapped in the debris for a short period before escaping onto West Street; however, soon thereafter, they were caught in the subsequent collapse of One World Trade Center.  *Id.* at ¶7.  Mr. Telesca was diagnosed with partial disc desiccation a diffuse

posterior bulging at L4 to L5 and L5 to S1.  He was also diagnosed with discogenic disease in his lumbar spine.  *Id.* at ¶9.  He has also undergone numerous procedures related to his inhalation of toxic materials from the collapse of both buildings including, but not limited to, removal of one-third of his colon in 2010, surgery for sinusitis in 2012, surgery to remove cancerous lesions on his back in 2012, and a diagnosis of sleep apnea in 2012.  *Id.*  He has also been diagnosed with post-traumatic stress disorder as a result of the events he endured on September 11, 2001.  *Id.* at ¶10.  Furthermore, Mr. Telesca has not been able to work in his chosen field as a firefighter since he was forced into retirement in 2003, and the loss in earnings potential has been significant.  *Id.* at ¶11.  Based on the orthopedic injuries he has sustained in addition to the gastrointestinal issues related to his inhalation of toxic dust and fumes from the collapse of the towers, and his inability to work causing him to lose earnings potential, Plaintiffs submit that Mr. Telesca should be a granted an upward departure from the baseline damages judgment value to be established by the Court.

> **U.  Bidiawattie Tewari**
> **Injury Category: Escape Injuries**
> **Severity: Significant**

Bidiawattie Tewari was employed as a clerk at Fiduciary Trust and International Company on the 97th Floor of Tower Two.  *See* Eubanks Dec., Ex. V, Dec. of Bidiawattie Tewari at ¶¶4-5. After the first plane struck Tower One, Ms. Tewari and other coworkers began fleeing their offices and proceeding down the stairs to exit the building.  During her attempt to escape, Ms. Tewari fell down a flight of stairs causing significant injuries.  *Id.* at ¶6.  She sustained the following injuries as a result of her fall: sprained shoulders, sprained right elbow, sprained hands, left lateral herniation at L3 to L4, diffuse disc bulge at L4 to L5, spondylosis at C6 to C7, and thickening of the posterior spinal ligament at C6 to C7.  *Id.* at ¶7.  She has received significant physical therapy

and chiropractic care in the years since the attacks, but she has been unable to work with any consistency due to continuing physical pain as a result of the injuries she sustained on September 11, 2001. *Id.* at ¶¶7-8. Based on the injuries she sustained while trying to flee the South Tower and her continuing pain levels and inability to engage in meaningful work for any extended period since the attacks, Plaintiffs submit that Ms. Tewari should be granted the baseline damages judgment value to be established by the Court.

### V.     Denise Thompson
### Injury Category: Escape Injuries
### Severity: Significant

Denise Thompson was at work at the Commodity Futures Trading Commission on the 37th Floor of the North Tower at the time of the first plane strike on September 11, 2001. *See* Eubanks Dec., Ex. W, Dec. of Denise Thompson at ¶¶4-5. During her attempt to flee the building, she fell down a flight of stairs resulting in injuries to her back. She also suffered from smoke inhalation in the stairwell. *Id.* at ¶6. She suffered a traumatic sprain/strain to her lower back which required physical therapy for approximately one year. *Id.* at ¶8. She also received treatment for post-traumatic stress disorder and suffered from bouts of anxiety and depression. *Id.* Based on the injuries she sustained and the emotional distress that she underwent, Plaintiffs submit that Ms. Thompson should be granted a downward departure from the baseline damages judgment value to be established by the Court.

### W.     John Lewis Thurman
### Injury Category: Impact Injuries/Pulmonary Trauma Injuries
### Severity: Severe

John Lewis Thurman was a Major in the United States Army working as an operations research analyst on the second floor of a newly renovated section of the Pentagon on September 11, 2001. *See* Eubanks Dec., Ex. X, Dec. of John Lewis Thurman at ¶4. When the plane struck

the Pentagon, the force of the blast pushed Mr. Thurman backwards and away from his desk and plunged him into darkness with smoke filling the room. *Id.* at ¶5. Two coworkers who were trying to escape with him died of smoke inhalation before they could reach safety. *Id.* Due to his significant smoke inhalation, Mr. Thurman was taken to Arlington Hospital and was in the Intensive Care Unit for two days and in the hospital as an inpatient for a week. *Id.* at ¶7. He received another year of medical intervention before he was cleared for his smoke inhalation; however, he still deals with asthma and recurrent bronchitis that were not present prior to his injuries. *Id.* Mr. Thurman suffers from emotional distress including post-traumatic stress disorder as a result of the events of September 11, 2001, losing dozens of friends at the Pentagon, and having survivor's guilt. *Id.* at ¶8. Based on his proximity to the events, the fact that his coworkers died next to him, his severe smoke inhalation, and lasting medical conditions in conjunction with his emotional injuries, Plaintiffs submit that Mr. Thurman should be granted the baseline damages judgment value to be established by the Court.

> **X.    Phidia Wong**
> **Injury Category: Escape Injuries**
> **Severity: Devastating**

Phidia Wong was on her way to work on September 11, 2001 at Salomon Smith Barney at 7 World Trade Center walking from the Chambers Street subway station. *See* Eubanks Dec., Ex. Y, Dec. of Phidia Wong at ¶4. When the second plane hit the South Tower, chaos broke out and Ms. Wong was knocked out. She in unsure exactly what caused her physical injuries—being trampled, being hit by debris, being hit as part of the collapse of the building—but her injuries were overwhelmingly severe. She had a collapsed lung, fractures involving the C7 lamina, the right orbital floor, the thoracic spine at T6, sternum, right ribcage, pubic rami, and sacrum. *Id.* at ¶6. She underwent a 13-hour surgery to stabilize her spine in addition to surgery for her right

orbital fracture. *Id.* She was in the hospital for over two months. *Id.* On the scene, paramedics thought she was dead because she was nonresponsive. *Id.* at ¶7. After discharge from the hospital, she receive home medical care for another two months before relocating to Hong Kong to receive care from her family. *Id.* at ¶8. She was unable to work for nearly three years due to her physical injuries and post-traumatic stress disorder. *Id.* She continues to this day to go through physical therapy once a week, and she sees a neurosurgeon once per year. *Id.* at ¶9. Based on the severity of her injuries and the extended period of hospitalization and inability to work coupled with her continued care through physical therapy and regular visits to her neurosurgeon combined with her emotional injuries, Plaintiffs submit that Ms. Wong should be granted a significant upward departure from the baseline damages judgment value to be established by the Court.

## IV.   Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the *Burnett/Iran* plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett*/*Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to

submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: January 21, 2020                    Respectfully submitted,


**/s/**  John M. Eubanks
John M. Eubanks, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
Email: jeubanks@motleyrice.com
Email: rhaefele@motleyrice.com

Attorneys for the *Burnett/Iran* Plaintiffs