USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/23/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In Re:

TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

-----------------------------------------------------------------X

03-MDL-01570 (GBD)(SN)

REPORT AND
RECOMMENDATION

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

> Matthew Rowenhorst, et al. v. Islamic Republic of Iran, No. 1:18-cv-12387 (GBD)(SN)
> Roberta Agyeman, et al. v. Islamic Republic of Iran, No. 1:18-cv-05320 (GBD)(SN)
> Abel, et al. v. Islamic Republic of Iran, No. 1:18-cv-11837 (GBD)(SN)
> Jessica DeRubbio, et al. v. Islamic Republic of Iran, No. 1:18-cv-05306 (GBD)(SN)
> Chang Dom Kim, et al. v. Islamic Republic of Iran, No. 1:18-cv-11870 (GBD)(SN)

On September 3, 2019, the Honorable George B. Daniels granted the Rowenhorst, Abel, and Kim Plaintiffs an Order of Judgment by default against the Islamic Republic of Iran. See Order of Judgment, ECF Nos. 5053, 5048, 5049. The Honorable George B. Daniels similarly granted the Agyeman Plaintiffs an Order of Judgment on June 21, 2019, see ECF No. 4597, and granted the DeRubbio Plaintiffs an Order of Judgment on May 28, 2019, see ECF No. 4563.

Since then, the Court has issued numerous orders addressing plaintiffs' requests for damages. Here, pursuant to § 1605A of the Foreign Sovereign Immunities Act, members of the Rowenhorst, Agyeman, Abel, DeRubbio, and Kim Plaintiffs seek an award of solatium damages on behalf of thirteen non-immediate family members of victims of the terrorist attacks on September 11, 2001. ECF Nos. 4930, 4914, 4910, 4918, and 4934. Plaintiffs' motions should be GRANTED in part and DENIED in part.

**DISCUSSION**

The Court assumes the parties' familiarity with the extensive rulings related to this multi-district litigation. As relevant here, on October 14, 2016, the Court detailed a framework to evaluate damages requests by non-immediate family members of the victims of the September 11 attacks. ECF No. 3363, adopted by, ECF No. 3384 ("Hoglan II"). The Court clarified this framework in a subsequent decision issued on August 8, 2017. ECF No. 3676, adopted by, ECF No. 3795 ("Hoglan IV"). This motion asks the Court to apply the legal principles set forth in Hoglan IV and award solatium damages to thirteen "functional equivalents" of immediate family members. In addition, in keeping with the Court's prior rulings, plaintiffs seek 4.96 percent per annum from September 11, 2001, until the date of judgment, and permission to file applications for any remaining plaintiffs at a later date.

Consistent with the framework set forth in Hoglan IV, the Court analyzes each plaintiff's claim for solatium damages individually using the objective criteria set forth therein. See generally Hoglan IV.

**The Rowenhorst Plaintiffs' Claims**

**A. John Proodian**

John Proodian is the stepson of 9/11 decedent Richard Thomas Muldowney, Jr. John first met Richard in 1994 when he was approximately four years old. ECF No. 4932-2, John Proodian Decl. ¶¶ 3, 4. John's mother married Richard in 1998, at which time Richard, John, John's sister, and John's mother began living together as a family. Id. ¶¶ 5, 6. John's biological parents got divorced in 1994, and John's biological father passed away in 1998. Id. ¶¶ 3, 7. John always considered Richard to be his real father. Id. ¶ 8. Richard provided financial support to John, his sister, and his mother, and treated John like his son emotionally and socially. Id. ¶¶ 9, 10.

Richard's family also treated John as Richard's son. Id. ¶ 11. Richard taught John how to play baseball, and Richard and John would go fishing and crabbing together, as well as take family vacations and long bike rides. Id. ¶¶ 12, 14. Because Richard began parenting John from the age of eight, and because of their subsequent period of over two years of cohabitation and guardianship, the Court recommends that John Proodian be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

## The Agyeman Plaintiffs' Claims

### B. Reginald Colon

Reginald Colon is the stepchild of 9/11 decedent Jaime Concepcion. Reginald's biological father was absent from his life, and when he was one year old, Reginald's mother was killed. ECF No. 4916-2, Reginald Colon Decl. ¶¶ 3, 4. Reginald's aunt Juana adopted him, and her boyfriend at the time and future husband, Jaime Concepcion, helped raise Reginald as his own. Id. ¶ 5. Reginald lived in the same household as Jaime from that point on and until he was ten years old, when the September 11, 2001 attacks occurred. Id. ¶ 6. Jaime provided Reginald with financial support, and treated Reginald like a son emotionally and socially. Id. ¶ 10. Jaime made sure Reginald always did his homework and properly focused on school. Id. He helped him with afterschool programs and extra-curricular activities like baseball. Id. Because Jaime began parenting Reginald from a very young age, and because of their subsequent period of extended cohabitation and guardianship, the Court recommends that Reginald Colon be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### C. Rosa Colon

Rosa Colon is the stepchild of 9/11 decedent Jaime Concepcion. Rosa's biological father was absent from her life, and when she was two years old, Rosa's mother was killed. ECF No. 4916-3, Rosa Colon Decl. ¶¶ 3, 4. Rosa's aunt Juana adopted her, and Juana's boyfriend at the time and future husband, Jaime Concepcion, helped raise Rosa as his own. Id. ¶ 5. Rosa lived in the same household as Jaime from that point on and until she was ten years old, when the September 11, 2001 attacks occurred. Id. ¶ 6. Jaime provided Rosa with financial support and treated Rosa like a daughter emotionally and socially. Id. ¶ 10. Jaime made sure Rosa always did her homework and properly focused on school. Id. He helped her with afterschool programs and extra-curricular activities like ballet, dancing, and singing. Id. Because Jaime began parenting Rosa from a very young age, and because of their subsequent period of extended cohabitation and guardianship, the Court recommends that Rosa Colon be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted children of 9/11 victims.

### The Abel Plaintiffs' Claims

### D. Diana Patricia Castano

Diana Patricia Castano was in a long term relationship with 9/11 decedent Alejandro ("Alex") Castano. Diana and Alex began dating in 1984, when Alex was 18 years old and Diana was 19 years old. ECF No. 4912-5, Diana Patricia Castano Decl. ¶ 3. After three years of dating, Diana and Alex moved in together in 1987 and lived in New Jersey. Id. ¶ 4. Diana had their son, Stephen, the following year in 1988. Id. ¶ 5. Shortly after Stephen was born, Alex proposed to Diana. Id. ¶ 6. Diana and Alex bought a house together in 1990, which they continued to live in until 1993 when they moved into Alex's mother's house. Id. ¶¶ 7, 8. Diana and Alex raised their child together, shared expenses, and owned real estate together. Id. ¶ 10.

On the record provided, the Court is constrained to conclude that Diana was not Alex's spousal equivalent. While the Court recognizes the deep relationship they had, their 1988 engagement, and their shared child, the record is vague as to the state of their relations at the time of Alex's death. Alex and Diana moved out of the home they bought in 1993 to live with Alex's mother. The record is unclear whether that property continued to be a shared asset after 1993 or how long Diana lived with Alex at his mother's home. But Diana asserts that she was no longer living with Alex's mother on 9/11. Although an extended engagement could suggest a continued bond; the fact that Diana and Alex no longer lived together also suggests that they may have separated.

The Court considers not only the duration of the relationship and the presence of a formal engagement, but also the degree of mutual financial dependence and the duration of cohabitation. See Hoglan IV at 11. Without any indication of continuing mutual financial dependence or cohabitation at the time of Alex's death, or signs of an intention to soon be legally married, the Court cannot find Diana and Alex to be spousal equivalents. Accordingly, the Court recommends that Diana Patricia Castano's request for solatium damages be DENIED. To the extent Diana has further evidence to support her claim, she may file it with any objection.

### E. Julio Masa Lebron

Julio Masa Lebron is the stepfather of 9/11 decedent Ana M. ("Mel") Centeno. Julio met Mel when she was six years old in 1968, when he began dating her mother Antonia Torres Ayala. ECF No. 4912-2, Julio Masa Lebron Decl. ¶ 3. Julio and Antonia married over fifty years ago. Id. In 1969, Julio, Antonia, Mel, and her siblings moved in together as a family in New Jersey. Id. ¶ 4. Mel's biological father was not in her life growing up and passed away when Mel was 15 years old. Id. ¶ 5. Julio considered Mel his child, serving as the main provider and

primary financial supporter in their family. Id. ¶¶ 5, 6. Julio treated Mel like his daughter, emotionally and socially, and provided her with advice and discipline. Id. ¶ 7. Julio taught Mel how to ride a bike and drive a car. Id. ¶ 8. Mel lived with Julio and Antonia until 1984, when she was in her early 20s and moved out of the house. Id. ¶ 9. Because Julio Masa Lebron continuously lived with Ana M. Centeno from the age of six until she became a young adult, and parented her for most of her life, the Court recommends that Julio be awarded $8,500,000 in solatium damages, the full amount paid to the biological or adopted parents of 9/11 victims.

The DeRubbio Plaintiffs' Claims

### F.  George A. Cuellar

George A. Cuellar was the spousal equivalent of 9/11 decedent Luke Dudek. While same-sex marriage was not permitted under the law during their time together, George and Luke were life partners. ECF No. 4920-2, George A. Cuellar Decl. ¶ 2. George and Luke shared a life together for nearly 20 years, and cohabitated for 15 years. Id. ¶ 10. George and Luke had created wills leaving their estates to each other and designating the other as their Executor. Id. ¶ 11. George and Luke also shared a business together for 18 years. Id. ¶ 4. Despite the fact that George and Luke were not formally engaged at the time of Luke's death, they were in a long-term relationship of nearly 20 years, with 15 years of cohabitation. Their shared home and business, as well as their wills leaving their estates to one another, indicate their mutual financial dependence and investments in a common life together. Accordingly, the Court recommends that George A. Cuellar be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

### G. Rebecca Sue Loethen

Rebecca Sue Loethen was the life partner of 9/11 decedent Julie Marie Geis. While same-sex marriage was not permitted under the law during their time together, Rebecca was Julie's spousal equivalent. ECF No. 4920-3, Rebeca Sue Loethen Decl. ¶ 2. Rebecca met Julie for the first time in 1990, when their lifelong partnership began. Id. ¶ 3. Rebecca and Julie developed a loving, committed, and monogamous relationship, and purchased wedding bands for one another as a sign of their commitment to each other, holding themselves out to the world as domestic life partners. Id. ¶ 5. Rebecca and Julie purchased a home together in a suburb of Kansas City. Id. ¶ 6. Shortly thereafter, Rebecca retired from her job to take care of their home and pets while Julie focused on her career. Id. Over the years, their relationship flourished and their families and friends came to accept them as life partners. Id. ¶ 7. Rebecca and Julie jointly owned a checking account, as well as their home and its furnishings, automobiles, and other personnel assets. Id. ¶ 8. They traveled together, played golf together, and spent virtually all of their free time together. Id. At the time of Julie's death, Rebecca and Julie were in the process of searching for land closer to Nebraska to build their dream house. Id. ¶ 9. Despite the fact that Rebecca and Julie were not formally engaged at the time of Julie's death, they were in a long-term relationship with many years of cohabitation and mutual financial dependence. Accordingly, the Court recommends that Rebecca Sue Loethen be awarded $12,500,000 in solatium damages, the full amount paid to the unmarried domestic partners of 9/11 victims.

**The Kim Plaintiffs' Claims**

### H. Margaret Ann Williams

Margaret Ann Williams is the aunt of 9/11 decedent Peggie Maxine Hurt. Margaret seeks to be deemed the functional equivalent of Peggie's sister. ECF No. 4936-2, Margaret Ann

Williams Decl. ¶ 2. Margaret was born in 1952, and Peggie was born in 1965. Id. ¶ 3. Although they are a generation apart, Margaret and Peggie were raised together in the home of Margaret's parents (Peggie's maternal grandparents). Id. Peggie's birth mother lived in the same house until her death in 1987, when Peggie was 22 years old. Id. Peggie and Margaret grew up like sisters, and lived in the same residence until she left for college. Id. Margaret was, for all practical purposes, Peggie's older sister from the time of her birth until she went to college. Id. ¶ 5. She advised Peggie on all the usual problems of growing up, including school, friends, boys, and dealing with her mother and Margaret's parents. Id. Peggie's father was never around, which Margaret thinks contributed to the extent to which she functioned as Peggie's older sister. Id.

Despite the close relationship that Margaret had with her niece, the Court is constrained to conclude that Margaret is not the functional equivalent of Peggie's sister. Application of the framework that the Court has outlined for stepsiblings is dependent on the fact that a child who does not have a relationship with the decedent at birth becomes the functional equivalent of a brother or sister. See Hoglan II at 15. This framework is inapplicable in the present case, where Margaret and Peggie already had a relationship by blood, as an aunt and niece. The record does not present any indication that Margaret and Peggie were raised by one set of parents as sisters: Peggie was parented by her mother (Margaret's sister), who also lived with her; whereas Margaret was parented by her own parents (Peggie's grandparents). The fact that Peggie and Margaret lived in the same residence and were close with one another, does not alter their aunt-niece relationship. Accordingly, the Court recommends that Margaret Ann Williams's request for solatium damages be DENIED.

### I. Christine Sandra Wilson, Katherine Wynn, Edith Otelia Harris, Estate of Lelia Wynn, and Estate of Dorothy Lee Coles

Five other aunts, Christine Wilson, Katherine H. Wynn, Edith Otelia Harris, Lelia Wynn, and Dorothy Coles, two through their estates, submit that they should each be deemed an immediate family member equivalent of Peggie Maxine Hurt. ECF No. 4935, Kim Plaintiffs' Memorandum of Law, at 13-14. Because the analysis regarding all five aunts turns on the same facts and the same law, the Court will discuss their claims together.

The Hurt family, of which Peggie, her five aunts, and Margaret Ann Williams were all a part, was and remains a close-knit family in which all the members provide mutual support, care, and solace. ECF No. 4936-3, Christine Wilson Decl. ¶ 3. Peggie lived in the family house in Kenbridge, Virginia as a child and through her college years, with her maternal grandparents, her mother, as well as with her aunt Margaret Ann Williams. Id.; ECF No. 4936-2, Margaret Ann Williams Decl. ¶ 3. Personal relations between the generations were extremely close in the Hurt family, with all the aunts looked at as a band of mothers and sisters. ECF No. 4936-3, Christine Wilson Decl. ¶ 4.

Each aunt had a similarly close, but unique, relationship with Peggie. As someone who was fifteen years apart in age from Peggie, Christine Wilson was to some degree a confidential sibling, and to some degree a more experienced adult who would provide motherly care and advice. Id. After college, Peggie stayed with Christine while she began an accounting job until she got her own place. Id. ¶ 6. Peggie often went on trips with Katherine Wynn and her daughter Connie, and Katherine looked on Peggie as another daughter. ECF No. 4936-4, Katherine Wynn Decl. ¶¶ 4, 5. Edith Harris's daughter Dolores, who lived about a mile away from Peggie growing up, was inseparable from Peggie. ECF No. 4936-5, Edith Otelia Harris Decl. ¶ 5. Peggie was particularly close with her aunt Lelia's daughter Carlene Wynn, who also served in the

military and lived with her mother just five miles from Peggie. ECF No. 4936-6, Carlene Wynn Decl. ¶¶ 3, 5. After Peggie's mother died when Peggie was 22, Dorothy Lee Coles became more involved in raising Peggie, and Peggie would come to her for advice on personal relations, planning her future, and dealing with problems at work or school. ECF No. 4936-7, Brenda Grant Decl. ¶¶ 5, 6.

Plaintiffs argue that although the Court has declined to allow aunts and uncles to claim immediate family status unless they cohabited with their decedent, the Court should make an exception here because, unlike the cases of other plaintiffs in this litigation, the 9/11 Victim Compensation Fund ("VCF") accepted the claims of the five aunts as immediate family members and granted them economic damages over the objections of Peggie's absent biological parent. ECF No. 4935, Kim Plaintiffs' Memorandum of Law, at 14-15. Plaintiffs suggest that the VCF's determination serves as an independently verifiable limiting qualification for consideration for an award, such that to award the five aunts here would not open a floodgate of additional analogous claims, because no other example exists of plaintiffs who are members of a decedent's extended family obtaining the economic loss portion of a VCF award over the objection of an absent biological parent. Id. at 17-18.

The Court recognizes the unique factors in this case, both regarding the communal way in which the Hurt family raised their children and the award from the VCF. The Court, however, is not bound by the VCF's determination, and it must follow judicial precedent in making its award determinations. Plaintiffs provide a reproduced copy of the VCF's "Hearing Decision," in which the Deputy Special Master notes that under the federal regulations governing the VCF, the Special Master may direct the Personal Representative (i.e. the biological parent) to distribute all or part of the award to the decedent's spouse, children, or other relatives in the event that the

Special Master concludes that the Personal Representative's plan for distribution does not approximately compensate the victim's family. Id. at 16. The Court does not have similar discretion in deciding these matters.

As the Court articulated in Hoglan IV, we apply an "adopted in all but name" standard in the case of aunts and uncles. Sullivan v. Ford Motor Co., No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000). While the Court does not require a legal custodian relationship as existed in Sullivan as a *sine qua non* of demonstrating functional equivalence for these categories of plaintiffs, only in the rarest cases will such a plaintiff be able to demonstrate functional equivalence absent one. Such a showing could be made where both parents were wholly absent from the decedent's life, such that the relevant individual fulfilled the entirety of the parental role. See Hoglan IV at 10.

In this case, none of the aunts had legal custody of Peggie, and none of the aunts cohabited with Peggie for extended periods of time. Both of Peggie's parents were also not wholly absent from Peggie's life as she was growing up; Peggie's birth mother, Mary Magdalene Hurt, lived in the same house as Peggy until Mary's death when Peggie was 22 years old. ECF No. 4936-2, Decl. of Margaret Williams ¶ 3. While Peggie's biological father was largely absent, and Peggie's aunts provided significant care for her, these facts do not meet the exacting standard set by Sullivan. They do not even meet all three of the general factors the Court uses to determine any functional equivalency: long-term cohabitation, a custodian-like role, and absence of the relevant biological family member. See Hoglan IV at 7-8. Accordingly, the Court recommends that Christine Wilson, Katherine Wynn, Edith Otelia Harris, the Estate of Lelia Wynn, and the Estate of Dorothy Lee Coles' requests for solatium damages of be DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs should receive solatium damages as follows:

| Number | Decedent | Plaintiff | Relationship | Solatium Damages |
|---|---|---|---|---|
| 1 | Richard Thomas Muldowney, Jr. | John Proodian | Stepchild | $8,500,000 |
| 2 | Jaime Concepcion | Reginald Colon | Stepchild | $8,500,000 |
| 3 | Jaime Concepcion | Rosa Colon | Stepchild | $8,500,000 |
| 5 | Ana M. Centeno | Julio Masa Lebron | Stepfather | $8,500,000 |
| 6 | Luke Dudek | George A. Cuellar | Spousal Equivalent | $12,500,000 |
| 7 | Julie Marie Geis | Rebecca Sue Loethen | Spousal Equivalent | $12,500,000 |

The solatium claims for Diana Patricia Castano, Margaret Ann Williams, Christine Wilson, Katherine Wynn, Edith Otelia Harris, the Estate of Lelia Wynn, and the Estate of Dorothy Lee Coles should be DENIED under the principles established in Hoglan IV.

Plaintiffs should also be awarded prejudgment interest on these damages from September 11, 2001, through the date of judgment, at a rate of 4.96 percent per annum, compounded annually. See ECF No. 3358, adopted by, ECF No. 3383.

Plaintiffs may apply for punitive damages at a later date consistent with any future rulings made by the Court on this issue.

Finally, any Rowenhorst, Agyeman, Abel, DeRubbio, and Kim Plaintiffs not appearing in this motion and who were not previously awarded damages may still submit applications for solatium and/or economic damages awards.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   January 23, 2020
         New York, New York

*          *          *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).