UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br><br>ECF Case |
| This document relates to:<br><br>*Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | 15-cv-9903 (GBD)(SN)<br><br>ECF Case |

### MEMORANDUM OF LAW FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF *BURNETT/IRAN* PERSONAL-INJURY PLAINTIFFS

### (*BURNETT / IRAN* PERSONAL INJURY 2)

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order awarding them  (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett*/*Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.  In this case, the assessment of personal-injury damages is a matter of first impression as there have been no judgments entered to date that have

addressed the award of damages to individuals who were physically injured in the Terrorist Attacks on September 11, 2001 but survived to pursue damages against the Defendants.

Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the 9/11 Attacks.  On December 1, 2016, all plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), moved for judgment as to liability only.  15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69.  On January 31, 2017, the Court granted plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85.  The plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims.

I.      **Procedural Background**

A.      **Related Cases**

Relying on evidence and arguments[1] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of

---

[1] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for[, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.  The Court has applied the same solatium values to claims of other solatium plaintiffs in the *Burnett/Iran* case (ECF No. 3666) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See, e.g.,* ECF Nos. 3175 at 2; 3300 at 1; 3358 at 9; 3363 at 16; 3399; and 3977 at 7.

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5.  The Court has applied that 3.44 multiplier also to judgments in the *Ashton* case. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards

previously awarded in *Burnett/Iran*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16 and 3363 at 28. Judge Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8. Judge Daniels adopted the magistrate judge's report and recommendation and has applied the nine percent interest rate in multiple instances in the *Ashton* and *Bauer* matters. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1. However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all of the solatium claims. ECF Nos. 3358 at 17-20 and 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2 and 3384 at 6. The Court applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett/Iran*. *See, e.g.,* ECF No. 3666.

## B. *Burnett, et al. v. Iran* Defendants

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903, ECF No. 67 at ¶¶ 3-4. At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903, ECF No. 67. On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, 15-cv-9903 ECF Nos. 65, 66, which application was amended on December 6, 2016 (15-cv-9903, ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67. The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017. 15-cv-9903, ECF No. 85. On July 31, 2017, June 8, 2018, August 28, 2018, September 13, 2018, September 4, 2018, September 3, 2019, September 6, 2019, September 11, 2019, and December 13, 2019 (ECF Nos. 3666, 4023, 4126, 4175, 4146, 5061, 5062, 5087, 5138, and 5356), the Court granted orders of judgement to different subsets of *Burnett/Iran* plaintiffs who filed for entry of partial final default judgments.

The *Burnett/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett/Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later

date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## II.     Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.     Personal-Injury Damages

The plaintiffs identified in Exhibit A include individuals who were either on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); Arlington, Virginia (in or around the Pentagon); or Shanksville, Pennsylvania (where United Flight 93 crashed), or who were among those who entered the premises in the vicinity of the World Trade Center or the Pentagon and were injured on September 11, 2001 by subsequent damage resulting from the attacks.  The range of injuries of individuals who were injured on September 11, 2001 range from pulmonary issues resulting from smoke inhalation to broken bones to significant burn injuries to limb amputations.  One non-physical injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the melee of the attacks on September 11, 2001.  Under the FSIA,

these injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered to flee from the scene, the proximate causation of these injuries cannot truly be in question.

This Court has previously looked to precedent in the U.S. District Courts for the District of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28 U.S.C. § 1605A.  Well-established caselaw exists in the D.C. District Court regarding the measurement of pain and suffering damages in personal-injury cases such as this one.  In *Cohen v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages."  268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This "baseline" figure for personal-injury damages may also be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment."  *Peterson*, 515 F. Supp. 2d at 52.  Less severe injuries to the plaintiff may show it is appropriate to move the award downward in the range of $2 million to $3 million whereas a more permanent injury or impairment may justify a larger award between $7 million and $12 million.  *See Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp.2d at 38).  In the latter situation, the upward adjustment has been found appropriate "in more severe instance of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for

dead." *See Barry v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 150491, at *29 (D.D.C. Sept. 4, 2019) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)). The downward departure "has been found appropriate where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,'… or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Id.* (quoting *Valore* and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).

### B.   Upward Departure for Damages Resulting from the Terrorist Attacks on September 11, 2001

Whereas the D.C. District Court has established certain parameters for addressing damages for personal-injury claims under the FSIA, this Court has previously addressed the nature of the Terrorist Attacks on September 11, 2001 and the indelible mark they have left on this country and more specifically on the victims.  Many of the personal-injury victims whose claims are being submitted to the Court in these proceedings continue to live in close proximity to the areas where they sustained their injuries, and for those in New York, the reminder of the attacks is inescapable—annual commemorations of the lost on September 11, 2001 at Ground Zero, the illumination of the skyline with two beams of light representing the Twin Towers during the same time period each year, and simply watching the building of the Freedom Tower on the site of the two fallen towers.  Furthermore, these attacks are ingrained in the consciousness of the American public.  The attacks are taught in American schools, and the popular-culture references can evoke triggers in many of these victims who suffer from some level of either post-traumatic stress disorder or other emotional distress as a result of their involvement as victims of the attacks.

As Magistrate Judge Maas first held in 2012—based in part on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day"— "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11[th] attacks,

and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).  While Judge Maas' decision—adopted by Judge Daniels— applied to solatium damages for family members of individuals who were killed on September 11, 2001, the logic equally applies to individuals who were present and physically injured in the attacks on September 11, 2001 and continue to experience the same reminders in their everyday life that would impact these other family members.  In fact, it is arguable that the impact would be more severe for someone who was physically present and whose life was endangered by the attacks.

For the solatium damages, the upward departure adopted by this Court constituted an upward increase of 56.25% for spouses (from $8 million to $12.5 million); 70% for parents and children (from $5 million to $8.5 million); and 70% for siblings (from $2.5 million to $4.25 million).  A similar upward departure should be adopted by this Court for personal-injury claimants who sustained physical injury as a direct result of the Terrorist Attacks on September 11, 2001. Individuals who were in harm's way on September 11, 2001 as a result of the terrorist attacks and sustained physical injury while experiencing a true fear for their lives in addition to the physical injuries they sustained while also experiencing what can only be described as a battle scenario with death all around them should have the $5 million baseline award increased in accordance with the increase to parent and children solatium awards for wrongful death to $8.5 million as the baseline for personal-injury claims arising on the day of September 11, 2001.  Furthermore, more severe injuries with severe or permanent impairment should be granted an upward departure in the range of $12 million to $20 million.  Finally, any downward departure should be in the range of $2.5

million to $5 million for those claims where the physical injuries are less severe but rather accompanied by severe emotional damages.  As the D.C. District Court decisions have stated, "[t]he award of damages for physical injuries 'assume[s] severe psychological injuries." *Barry*, 2019 U.S. Dist. LEXIS 150491, at *29.

       **C.**    **Punitive Damages**

       Under the FSIA, plaintiffs are also entitled to punitive damages.  *See* 28 U.S.C. §1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623).  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

       However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384, at 6.

       In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request leave to address the issue

of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### D.    Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14).  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  *World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619,

*66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.   Individualized Case Assessments

In an effort to provide the Court with a cross-section of the types of claims that they intend to submit in advance of the Court's January 31, 2020 deadline, Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to the Court on January 10, 2020. *See* ECF No. 5484. While Plaintiffs' motion addresses claims in multiple categories, by narrowing down the categories in which these claims arise, Plaintiffs are attempting to assist the Court in addressing these claims in an efficient manner.

A.   **Yvonne Abdool**
     **Injury Category:[2] Escape Injuries**
     **Severity: Significant**

Yvonne Abdool was employed by Frankel & Co., Inc. and was working on the 36th floor of the World Trade Center Tower Two. *See* Eubanks Dec., Ex. B, Dec. of Yvonne Abdool at ¶¶4-5. In a rush to escape, Ms. Abdool fell and landed on her left knee. Ms. Abdool sustained physical injuries in her escape and the collapse of the building including, but not limited to, a left knee injury. *Id*. at ¶¶5-6. She had surgery on her knee on November 30, 2001 to fix the immediate injury, but she later required a knee replacement on August 20, 2003. *Id*. at ¶9. After the second surgery, she was diagnosed with Reflex Sympathetic Dystrophy. *Id*. She also has had two Stellate Ganglion Blocks, but they have not given her complete relief. *Id*. Ms. Abdool has also suffered from post-traumatic stress disorder. *Id*. Based on the physical injuries sustained by Ms. Abdool and the emotional trauma she sustained, Plaintiffs submit that she should be granted the baseline damages judgment as established by this Court.

B.   **Ingrid Alleyne-Robertson**
     **Injury Category: Escape Injuries**
     **Severity: Severe**

Ingrid Alleyne-Robertson was a Technical Associate/Client Specialist at AON Group working on the 99th Floor of the South Tower on September 11, 2001. *See* Eubanks Dec., Ex. C, Dec. of Ingrid Alleyne-Robertson at ¶¶3-4. After the first plane hit the North Tower, it took Ms. Alleyne-Robertson and colleagues approximately ten minutes to determine what had happened, and then they decided to take the stairs down out of the building. *Id.* at ¶7. As she reached the 67th floor, the second plane struck the South Tower jolting Ms. Alleyne-Robertson onto her back in the stairwell where she could see a large crack in the building. *Id.* She then fell down the stairs

---

[2] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14.

on her back to the 66th floor, and despite the pain she felt, she continued down the remaining 66 flights of stairs. *Id.* She ran from the building with her shoes in hand and reached Park Row a few blocks from the Towers when the South Tower collapsed. *Id.* In the collapse and the choking dust and debris, Ms. Alleyne-Robertson either ran into a wall or was pushed into a wall. *Id.* As a result of the attacks, Ms. Alleyne-Robertson sustained disc herniation at L5 to S1, bulging discs and L3 to L4 and L4 to L5, mild narrowing of the L5 to S1 disc space, straightening of the normal curvature of the lumbosacral spine, and dessication of the L4 to L5 disc space. *Id.* at ¶6. She experiences radiating pain from her back injuries, undergoes epidural injections for pain, and wears a back brace; however, she cannot sit for long periods of time, and she occasionally uses a cane for ambulation. *Id.* She also suffers from debilitating post-traumatic stress disorder. *Id.* at ¶¶6, 7. Ms. Alleyne-Robertson was almost at the top of the South Tower when the attacks began, but she was able to escape to safety only to obtain serious and debilitating physical injuries to her back and crippling emotional trauma from the fear associated with such a near-death experience and the memories that remain with her to this day. Plaintiffs submit that Ms. Alleyne-Robertson should be granted an upward departure from the baseline damages judgment as established by this Court.

## C.    Frances Berdan
   Injury Category: Escape Injuries
   Severity: Severe

Frances Berdan was the receptionist at Union Bank of California on the 14th Floor of the South Tower. *See* Eubanks Dec., Ex. D, Dec. of Frances Berdan at ¶3. After the first plane struck the North Tower, Ms. Berdan resolved to leave the building fearing it was a terrorist attack like the one that took place at the World Trade Center in 1993. *Id.* at ¶¶4-5. In the rush to depart, Ms. Berdan fell and landed with all of her weight on her arm breaking her arm and shoulder. *Id.* at ¶5. After being able to leave lower Manhattan and reaching Queens, she was taken to Mount Sinai

Hospital where she underwent surgery on September 12, 2001 to repair the eight fractures in her left arm resulting in ten screws and a metal plate being placed in her arm to stabilize it. *Id* at ¶10. She was hospitalized for nine days as she contracted pneumonia while in the hospital, and she lost seven months of work due to the injury and the physical therapy she underwent. *Id.* She continues to have limitations in using her left arm and has an extensive scar along the arm that serves as a reminder of the terrorist attacks on September 11, 2001. *Id.* at ¶¶10, 11. Ms. Berdan has also suffered from post-traumatic stress disorder. *Id.* at ¶13. Based on the injuries she sustained and the emotional distress that continues to impair her, Plaintiffs submit that Ms. Berdan should be granted the baseline damages judgment as established by this Court.

> **D.    Deborah Berk**
> **Injury Category: Escape Injuries**
> **Severity: Severe**

Deborah Berk was employed at Rittenhouse Securities, Inc., and she was at the Port Authority Transit Hub in the North Tower when the planes hit the towers. *See* Eubanks Dec., Ex. E, Dec. of Deborah Berk at ¶¶4-5. Ms. Berk sustained physical injuries in her escape and the collapse of the buildings including, but not limited to, a closed head injury with resultant brain injury, a broken foot, knee injuries, and severe emotional distress. *Id*. at ¶6. When she exited the building, people who had jumped from the upper floors of the Towers landed immediately next to her. *Id*. at ¶7. In January 2002, she had surgery on her knee to correct the injury from her escape. *Id*. Ms. Berk has been unable to work due to her PTSD, and has been placed in in-patient psychiatric care multiple times. *Id*. at ¶6. She continues to have difficulty sleeping and experiences frequent anxiety as a result of the atrocities she witnessed. *Id*. at ¶7. She is still being treated for her PTSD with several prescriptions and out-patient counseling. *Id*. at ¶6. Based on the physical injuries she sustained including her traumatic brain injury, her inability to work for any period of

time, and the gripping anxiety and emotional trauma that she still battles, Plaintiffs submit that Deborah Berk should be granted an upward departure from the baseline damages judgment as established by this Court.

> **E.     Michael Brodbeck**
> **Injury Category: Escape Injuries**
> **Severity: Severe**

Michael Brodbeck was a firefighter with the New York Fire Department, Engine 210, Ladder 110. *See* Eubanks Dec., Ex. F, Dec. of Michael Brodbeck at ¶4.  He was dispatched to the towers after the first plane hit. *Id.*  Mr. Brodbeck and his company entered the North Tower and went up to the thirty-first floor to help people evacuate. *Id.*  He was inside the North Tower as it began to sway, and the Lieutenant decided they all should evacuate. *Id.*   During the evacuation, Mr. Brodbeck gave his mask to a woman who was having issues breathing. *Id.*  Minutes after exiting the building, the North Tower collapsed, and he was thrown 10 feet into the side of a truck by the wave of dust and debris. *Id.*  This resulted in a broken arm and thumb. *Id.*  After getting up to continue his escape in the close of dust, Mr. Brodbeck ran and fell 5 feet between a curb and tire which resulted in crushing and dislocating his right shoulder. *Id.*  Mr. Brodbeck sustained physical injuries in his escape and the collapse of the buildings including, but not limited to, a broken and dislocated shoulder, broken arm, broken thumb, and severe emotional distress.  *Id.* at ¶5.  He still lives with survivor's guilt, as on September 11, another firefighter asked if they could switch positions for the day. *Id.* at ¶6.  Mr. Brodbeck declined, and he survived, but the other firefighter did not. *Id.* at ¶6.  He also described the scene of seeing people exploding on impact with the ground and those in the elevators as well as those whose skin was falling off because of the jet fuel. *Id.*  All of this, plus the loss of so many people he knew, resulted in severe PTSD. *Id.* Due to the significant physical injuries that he sustained and the emotional trauma that he has

undergone, Plaintiffs submit that Michael Brodbeck should be granted an upward departure from the baseline damages judgment as established by this Court.

F.    **Boris Bronshteyn**
      **Injury Category: Escape Injuries**
      **Severity: Severe**

Boris Bronshteyn was employed by ABM Industries, Inc. and was working on Level B-6 in the basement in the mechanical room located between the North Tower and the South Tower when the first plane struck the North Tower.  *See* Eubanks Dec., Ex. G, Dec. of Boris Bronshteyn at ¶¶4-5.  Mr. Bronshteyn sustained physical injuries in his escape and the collapse of the buildings including, but not limited to, a broken shoulder and severe emotional distress, anxiety, and sleeping issues as a result of the emotional trauma he sustained.  *Id.*at ¶¶5-6.  His best friend was working with him on September 11, 2001, and this friend died while Mr. Bronshteyn was holding his hand. *Id.*at ¶8.  Mr. Bronshteyn has been diagnosed as totally and permanently psychiatrically disabled as a result of emotional trauma he sustained on September 11, 2001. *Id.* at ¶6.  He has trouble sleeping, engaging in social situations, and spending any significant time outside his house, and he also becomes upset and nervous when questioned about the events of September 11, 2001.  *Id.*at 7. He continues to suffer pain in his shoulder due to the chronic condition caused by his physical injuries on September 11, 2001 which only serve to trigger his emotional injuries.  *Id.* at Ex. B. As recently as 2016 the pain he continues to experience in his shoulder remains an 8-9 out of 10 on a pain scale causing him to take excessive amounts of NSAIDs which cause further medical issues. *Id.*  Due to the permanent injuries that Mr. Bronshteyn sustained and his inability to engage in normal social or vocational activities since the September 11, 2001 terrorist attacks and the continued pain and emotional trauma from which he suffers, Plaintiffs submit that Mr. Bronshteyn

should be granted an upward departure from the baseline damages judgment as established by this Court.

G.    **Sharron L. Clemons**
      **Injury Category: Escape Injuries**
      **Severity: Significant**

Sharron Clemons was employed by Praxis Housing Initiatives Inc. located at 17 Battery Place in lower Manhattan.  *See* Eubanks Dec., Ex. H, Dec. of Sharron L. Clemons at ¶3.  Around the time that the first plane hit the North Tower, Ms. Clemons was in the Court Street area of downtown Brooklyn; however, given the seeming emergency and her on-call status with her company, she believed she needed to go to her main office in Manhattan to see if her assistance was needed.  *Id.* at ¶¶3-5.  She arrived at the Rector Street subway station at approximately 9:15am which was only blocks away from the World Trade Center complex.  *Id.* at ¶6.  After exiting the Rector Street station, she headed off in the direction of her main office; however, as she crossed a subway grate, the grate gave way—likely as a result of the tremors emanating from the planes striking the Towers—and Ms. Clemons fell approximately 20 feet the subway platform below.  *Id.* at ¶9.  After an excruciating set of subway rides with the assistance of other passengers and emergency medical technicians, Ms. Clemons reached the first station in Brooklyn where she collapsed on the platform and was then carried to the surface and taken to the hospital where she was immediately admitted.  *Id.* at ¶¶10-20.  The injuries she sustained from the fall at the Rector Street station included a burst fracture and compression of her L1 vertebral body, mid-foot dislocation on her left foot, and a pilon fracture on her left foot.  *Id.* at ¶21. In October 2001, Ms. Clemons underwent surgery to repair the fracture in her left foot.  *Id.* at Ex. B. Ms. Clemons has also suffered from post-traumatic stress disorder and major depression secondary to orthopedic injury following the terrorist attacks and her injuries sustained on September 11, 2001.  *Id.* at ¶22.

Based on the physical injuries she sustained and the emotional trauma with which she must cope, Plaintiffs submit that Ms. Clemons should be granted the baseline damages judgment as established by this Court.

> ### H.    Flory Danish
> ### Injury Category: Building Collapse Injuries
> ### Severity: Significant

Flory Danish was working at the Port Authority of New York and New Jersey and was working at the North Tower on the 86th floor when the terrorist attacks occurred. *See* Eubanks Dec., Ex. I, Dec. of Flory Danish at ¶3.  Mr. Danish sustained physical injuries in his escape and the collapse of the buildings including, but not limited to, a left shoulder injury that caused fluid within the rotator cuff and partial tearing of the small acromial spur and mental disorders such as PTSD, Panic Disorder, and Major Depressive Disorder NOS secondary to PTSD. *Id.*at ¶14.  He saw the shadow of the plane approach the building and experienced the aftershock of the hit. *Id*. at ¶4.  When he realized he was uninjured, he checked on his coworker and had to help her escape after she was paralyzed with fear. *Id*. at ¶¶4-5.  Together, Mr. Danish and his coworker began their descent but had to follow another group after their stairwell came to an end. *Id*.  As he and his coworker entered the concourse, the North Tower collapsed. *Id*. at ¶7.   Mr. Danish and his coworker began running as the dust cloud approached them, but they became separated when his coworker fell and he fell backwards onto his shoulder. *Id*.  He continued crawling as he was pelted with debris, and eventually reached firefighters who led a group of dust-covered survivors to street level. *Id*. at ¶8.

Mr. Danish was unable to return to work until spring of 2003. *Id*. at ¶15.  When he did return, he worked in the office in Jersey City rather than New York. *Id*.  He describes it as tortuous when he must return to the New York office for meetings at the headquarters. *Id*.  Mr. Danish

suffered from depression, anxiety, difficulty focusing and remembering, flashbacks, and sleeping problems. *Id*. at ¶16. He avoids New York City and airports, and he lives in a constant state of fear that he or his family will be involved in a terrorist attack in the future. *Id*. Mr. Danish also still feels immense guilt for becoming separated from his coworker, who also survived the attacks. *Id*. at ¶17. He still lives with the intense sensory feeling of knowing whether a plane is coming toward him or going away from him. *Id*. Based on the injuries sustained by Mr. Danish and the emotional trauma he sustained, Plaintiffs submit that he should be granted the baseline damages judgment as established by this Court.

I.    **Michael T. Dempsey**
      **Injury Category: Escape Injuries**
      **Severity: Significant**

Michael T. Dempsey was working for Credit Suisse First Boston at 5 World Trade Center on the morning of September 11, 2001 when the first plane struck the North Tower. *See* Eubanks Dec., Ex. J, Dec. of Michael T. Dempsey at ¶3. When the second plane struck the South Tower, Mr. Dempsey was exiting 4 World Trade Center and was trampled in the ensuing chaos by individuals evacuating the scene. *Id.* He was taken to NYU Downtown Hospital where he was being treated for a head injury, severe concussion, multiple contusions, internal bleeding, smoke inhalation, and severe respiratory injuries. *Id.* at ¶¶3-4. When the South Tower fell, he inhaled a significant amount of dust and debris, and on November 8, 2001, a pulmonologist document with "a reasonable degree of certainty that [he] was acutely exposed to significant amounts of material which are likely to be noxious to the upper and lower respiratory tracts," and his symptoms "appear to be predominantly a consequence of upper airway inflammation which has been corroborated by the pulmonary function/spirometric finding." *Id.* at ¶4. He has also been diagnosed with post-traumatic stress disorder which was exacerbated as he was in the vicinity of the mass shooting in

Las Vegas on October 1, 2017 at the Mandalay Bay hotel and casino. *Id.* at ¶¶4-5. Mr. Dempsey continues to suffer from bouts of anxiety, confusion, and irritability following triggers for his emotional trauma. *Id.* ¶6. Based on the trampling injuries that Mr. Dempsey sustained and the continuing emotional distress from which he suffers, Plaintiffs submit that he should be granted the baseline damages judgment as established by this Court.

      **J.**      **John Drapas, Jr.**
              **Injury Category: Impact Injuries**
              **Severity: Severe**

John Drapas, Jr. was a civilian contractor with Electronic Data Systems Corporation working on a contract with the Department of the Army's Information Management Center at the Pentagon at the time of the terrorist attacks on September 11, 2001. *See* Eubanks Dec., Ex. K, Dec. of John Drapas, Jr. at ¶3. When the plane impacted the Pentagon, Mr. Drapas could hear a thunderous crash followed by subsequent crashed growing in volume and intensity that caused the lights to go off in his office following by a force of wind and whooshing sound flowing over him and causing the ceiling and walls to collapse around him. *Id.* at ¶4. Mr. Drapas believed he would be killed as he expected the entirety of the five-story building to collapse on him. *Id.* He was able to exit the building under his own power and reach a first-aid station where he was put on a stretcher due to feeling faint and having lost a lot of blood. *Id.* at ¶5. Mr. Drapas was diagnosed as having a moderate traumatic brain injury from the attack where he obtained a concussion and required 12 stitches to close a laceration on his head. *Id.* at ¶¶6-7. The scarring from this laceration on his forehead serves as a continual reminder to Mr. Drapas of the events of September 11, 2001. *Id.* at ¶7. In addition to the traumatic brain injury which has left Mr. Drapas slower, less articulate, unable to recall and process information quickly, and unable to learn new information in the same manner that he could do prior to the attacks, Mr. Drapas also suffers from post-traumatic stress

disorder and depression. *Id.* at ¶8. Mr. Drapas has numerous triggers that cause him to become startled or fearful while also being unable to complete normal, everyday tasks at the same speed that he could previously. *Id.* at ¶¶8-9. Due to the significant physical injuries that he sustained and the crippling emotional trauma that he has undergone, Plaintiffs submit that John Drapas, Jr. should be granted an upward departure from the baseline damages judgment as established by this Court.

### K. Hernando Fernandez
### Injury Category: Impact Injuries
### Severity: Severe

Hernando Fernandez was employed by Summit Security Service, Inc. and was working as a security guard in the lobby of the North Tower. *See* Eubanks Dec., Ex. L, Dec. of Hernando Fernandez at ¶4. Mr. Fernandez sustained physical injuries in the impact and his escape of the building including, but not limited to: a sprain and strain of a ligament in his left knee; sprain and strain of a ligament in his left ankle and foot; contusion to his forehead; contusion to his left knee; and contusion to his left lower leg and calf area. *Id.* at ¶6. He was speaking with his coworker when the plane hit, and they witnessed the fireball and explosion in the elevator as it plummeted into the lobby. *Id.* at ¶4. Mr. Fernandez was thrown across the lobby into a glass wall or door as he witnessed his coworker get sucked into the fireball. *Id.* His scalp and skin was burned, and he was in excruciating pain. *Id.* He also suffers from PTSD due to all he witnessed that day. *Id.* at ¶7. Mr. Fernandez, in addition to PTSD, developed anxiety and depression, a sleep disorder, and nightmares. *Id.* For a time after September 11, he could not even take public transportation without feeling bouts of panic. Due to the injuries that Mr. Fernandez sustained and the emotional trauma from which he suffers, Plaintiffs submit that Mr. Fernandez should be granted an upward departure from the baseline damages judgment as established by this Court.

L.     **Paul E. Gonzales**
       **Injury Category: Impact Injuries**
       **Severity: Devastating**

Paul Gonzales was working for the Deputy Comptroller for Program and Budget for the United States Defense Intelligence Agency in the Pentagon. *See* Eubanks Dec., Ex. M, Dec. of Paul E. Gonzales at ¶4. He was in a colleague's office cubicle when the plane crashed into the building. *Id*. Before Mr. Gonzales could comprehend what happened, he was lifted off the ground in a fireball. *Id*. at ¶5. When he processed what happened, he looked down and saw the skin on his hands had peeled back. *Id*. at ¶6. He heard screaming and rushed to remove flaming debris from an injured colleague. *Id*. He rushed back toward his own office, and he found that there was no one who was going to make it out of that section of the building alive. *Id*. at ¶7. Mr. Gonzales later learned he was only about 35 feet from where the cockpit voice recorder was recovered at the Pentagon. *Id*. He then led other survivors on his hands and knees through the smoke to an escape route. *Id*. at ¶8. Upon reaching the courtyard, Mr. Gonzales collapsed. *Id*.

Mr. Gonzales suffered from the following injuries: acute inhalation injury; closed fracture of second cervical vertebra; pulmonary insufficiency following trauma and surgery; acidosis; third-degree burns to hands and other parts of body; mixed conductive and sensorineural hearing loss; conjunctive hemorrhage; benign paroxysmal positional vertigo; contusions to face, scalp and neck; dysphagia; hypotension; and PTSD. *Id*. at ¶10. He was on life support as a result of chemical and smoke burns, and his wife was told he would die without extraordinary medical measures. *Id*. at ¶11. Mr. Gonzales returned to work, but later retired for medical reasons in 2005. *Id*. ¶12. Over time, his left hand has atrophied, and he has neurological damages and severe brain atrophy. *Id*. at ¶13. Mr. Gonzales has also had several surgeries, including on his spine. *Id*. His right ear no longer functions, one eye does not open all the way, and his breathing is impaired. *Id*. He also

continues to have balance issues. *Id.* Plaintiffs submit that Mr. Gonzales' injuries should be subject to a significant upward departure from any baseline injury damages amount based on his total disability, his physical deformity, the number of surgeries he has undergone, and the emotional injuries that he continues to battle.

> **M.     Ruben Gordillo**
> **Injury Category: Building Collapse Injuries**
> **Severity: Severe**

Ruben Gordillo was working at the Marriott World Trade Center on the fifth floor of the hotel when the first plane struck the North Tower. *See* Eubanks Dec., Ex. N, Dec. of Ruben Gordillo at ¶¶3-4. He helped evacuate guests to the hotel lobby and then led New York City firefighters through the basement of the hotel to the South Tower and another group of firefighters to the concourse of the North Tower. *Id.* at ¶4. While he was in the lobby of the North Tower, the South Tower collapsed causing the North Tower to shake and an impact that threw Mr. Gordillo against a door thus disorienting him to his situation. *Id.* at ¶5. He exited to the West Side Highway and took a bus from Battery Park where he ended up at the NYU Medical Center. He was treated for back pain and shortness of breath and then released. *Id.* at ¶6. On September 12, 2001, he was treated at St. John's Queens for smoke inhalation. *Id.* Only a few days later did he begin experiencing pain in his shoulders, knees, and back. *Id.* He sustained contusions and sprains to both shoulders, chest contusions, a broken rib, and torn meniscus in both knees. *Id.* at ¶8. He has undergone arthroscopic surgery for his knees, and he has undergone psychological treatment for post-traumatic stress disorder. *Id.* at ¶¶9-11. He has undergone multiple surgeries to repair his knees. Based on the injuries sustained by Mr. Gordillo, Plaintiffs submit that he should be granted the baseline damages judgment as established by this Court.

**N.**     **Rafael Gudmuch**
           **Injury Category: Escape Injuries**
           **Severity: Significant**

Rafael Gudmuch was working in the Greenhouse Café at the Marriott World Trade Center when the first plane struck the North Tower on September 11, 2001. *See* Eubanks Dec., Ex. O, Dec. of Rafael Gudmuch at ¶¶3-4. Upon exiting the building, Mr. Gudmuch stopped to help a woman who was on the ground at which time the second plane struck the South Tower. *Id.* at ¶6. In the ensuing chaos, Mr. Gudmuch fell down and was trampled as others escaped the area. *Id.* He eventually reached the Brooklyn Bridge, and after he crossed, he witnessed the South Tower's collapse. *Id.* at ¶8. Due to being trampled, Mr. Gudmuch sustained sprains and strains of the cervical and lumbar portions of his back. *Id.* at ¶10. He was also diagnosed with post-traumatic stress disorder which prevented him from working for a significant period of time. *Id.* at ¶¶10, 12. He continues to suffer from back pain from being trampled in the escape from the World Trade Center, and his post-traumatic stress disorder continues to impede his ability to cope with the trauma he sustained. *Id.* at ¶13. Based on the injuries sustained by Mr. Gudmuch from being trampled and the emotional trauma he sustained, Plaintiffs submit that he should be granted the baseline damages judgment as established by this Court.

**O.**     **Robert Hall**
           **Injury Category: Impact Injuries**
           **Severity: Devastating**

Robert Hall was working for ABM Engineering on Level B4 in World Trade Center Tower 1 when the terrorist attacks took place. *See* Eubanks Declaration, Exhibit P, Dec. of Robert Hall at ¶3. When the first plane struck the building, it severed the 50 Car freight elevator cable causing the elevator to come crashing down into Mr. Hall's work space causing him to be blown off his feet. *Id.* at ¶6. In an effort to escape the basement, Mr. Hall and other coworkers approached a

freight elevator; however, the doors of that elevator exploded into a fireball blowing Mr. Hall through a steel door. *Id.* When he was able to escape the building onto Vesey Street, Mr. Hall was confronted with dead bodies strewn on the street. Soon thereafter, the second plane struck, and steel began to rain down on him and his companions. One of the individuals who had allowed Mr. Hall to borrow his phone to call his wife was cut in half by a falling piece of steel that narrowly missed Mr. Hall. *Id.* The psychological trauma that Mr. Hall experienced as result of his injuries and also his presence on the scene has accompanied him since the terrorist attacks and limited his ability to fully function in society due to fears arising from this experience related to post-traumatic stress disorder. *Id.* at ¶¶6-9.

In addition to the severe emotional distress that he has sustained, Mr. Hall also suffered from a displaced fracture to his scaphoid bone and severe damage to his ulnar nerve and both his elbow and wrist due to crush injuries in his dominant arm. These injuries have caused him to have a "claw deformity" in his hand due to muscle weakness and persistent numbness due to the crush injuries to his arm. He has undergone three surgeries on his right arm and is unable to work as an engineer because he can no longer hold or use the tools of his trade. *Id.*at ¶5. The injuries Mr. Hall sustained were severe, life-altering, and permanent. Plaintiffs submit that his injuries should be subject to a significant upward departure from any baseline injury damages amount based on his total disability, his physical deformity, the number of surgeries he has undergone, and the debilitating emotional injuries that he continues to battle.

**P.     David J. King, Jr.**
**Injury Category: Impact Injuries**
**Severity: Devastating**

David J. King, Jr. was a Major in the U.S. Army Special Forces working for the Deputy Chief of Staff of the Army and was present in 1D518 at the Pentagon when American Airlines

26

Flight 77 was flown into the Pentagon on September 11, 2001.  *See* Eubanks Dec., Ex. Q, Dec. of David J. King, Jr. at ¶¶3-4.  He remembers that when the plane struck the Pentagon, his office erupted into flames, and he found himself surrounded by rubble.  *Id.* at ¶5.  He was physically protected by a column and large filing cabinets that shielded his workspace from the worst of the impact.  *Id.*  He sustained burns trying to reach Staff Sergeant White whose desk was only a few feet away from his.  *Id.* at ¶6.  As he surveyed the room, he could not find an escape route, and his polyester pants were beginning to melt to his legs.  *Id.* With burns on his arms, legs, and face, he located a hole that allowed him to reach the E-ring of the Pentagon.  *Id.* After providing a report to a colonel on his escape route, he proceeded to the triage area where coworkers removed the clothing that had melted to his body, and he was evacuated to the Burn Unit at Washington Hospital Center.  *Id.*

David J. King, Jr. sustained third and fourth-degree burns on 22% of his total body surface area requiring a six-week hospital stay, multiple surgeries, and extensive physical rehabilitation. *Id.* at ¶7.  The VA rated his disabilities as follows: 20% for burn scars of the left upper extremity; 40% for burn scars on the right upper extremity; 50% for facial burn scars; 40% for traumatic brain injury from the explosion; and 50% for post-traumatic stress disorder. *Id.*  He continues to suffer from post-traumatic stress disorder as the experience of the September 11 attack was like no other experience he had in his 29 years in the Army with most of his service in the Special Forces.  *Id.* at ¶8.  Based on the devastating physical injuries, the inability to save his coworkers, the length of his hospitalization and rehabilitation, the permanence of his injuries, and the continuing emotional trauma from his physical traumatic brain injury and the psychological diagnosis of post-traumatic stress disorder, Plaintiffs submit that David J. King, Jr. should be granted a significant upward departure from the baseline damages judgment as determined by the Court.

Q.    **Evelyn A. Lugo**
      **Injury Category: Falling Debris/Building Collapse Injuries**
      **Severity: Significant**

Evelyn A. Lugo worked as an administrative assistant at ABM on the 35th Floor of 2 World Trade Center.  *See* Eubanks Dec., Ex. R, Dec. of Evelyn A. Lugo at ¶4.  As she exited the building, she was struck by falling debris, and as the first tower came down, the sound caused her to have ringing in her ears.  *Id.* at ¶6.  She was treated at St. Vincent's Hospital for her injuries on September 11, 2001.  *Id.* As recently as December 2019, she was seen for consultation regarding a left ear perforation that occurred on September 11, 2001, and for which she has experienced constant tinnitus since that time.  *Id.*  Further, for fifteen years after the attack, Ms. Lugo could not travel south of Canal Street due to her anxiety and emotional trauma from the events of September 11, 2001.  *Id.* at ¶9.  Based on the injuries she sustained including the constant ringing in her ears, her inability to work for any period of time (*id.* at ¶7), and the gripping anxiety and emotional trauma that she still battles, Plaintiffs submit that Evelyn Lugo should be granted the baseline damages judgment as established by this Court.

R.    **Antonio Quinones**
      **Injury Category: Impact/Building Collapse Injuries**
      **Severity: Severe**

Antonio Quinones worked for ABM Industries in the North Tower and typically worked on floors 92-98, but on September 11, 2001, he was told by a co-worker there was no need to go to the 96th floor where he was initially headed that day.  *See* Eubanks Dec., Ex. S, Dec. of Antonio Quinones at ¶5.  He went to the 43rd floor to see his mother and stepfather in the cafeteria.  *Id.* When the first plane struck the tower, Mr. Quinones was coming out of the elevator on the 43rd floor and was thrust forward 10-15 feet, and the ceiling collapsed on top of him.  *Id.*  He had to traverse multiple stairwells to avoid flames before reaching the lobby with his mother and

28

stepfather about 45 minutes after the plane struck their tower.  *Id.* at ¶¶6-8. As he exited the building, he could hear the sound of bodies of individuals hitting the pavement who had jumped from the upper floors of the tower.  *Id.* at ¶9.  The South Tower began to collapse while Mr. Quinones was still very close to the entrance to the North Tower. *Id.* at 11.  He ran but was engulfed by the cloud created by the tower's collapse and then found shelter in a Duane Reade approximately a block away where he remained during the collapse of the North Tower.  *Id.* at ¶¶11-13.  Mr. Quinones sustained injuries to his head, neck, back, leg, third-degree burns, six herniated discs, severe smoke inhalation, post-traumatic stress disorder, and numerous secondary issues related to his inhalation of dust from the collapsing buildings. *Id.* at ¶14.  Diagnostic follow-up establish that he suffered from post-concussion syndrome; cervicodorsal derangement with herniated discs at C3 to C4 and C5 to C6; cervical myeloradiculopathy; lumbosacral derangement with bulging discs at L4 to L5 and L5 to S1; lumbar radiculopathy; post-traumatic adjustment reaction with depression and anxiety; and post-traumatic stress disorder.  *Id.* at Ex. B.  He continues to suffer from emotional distress as a result of the events of September 11, 2001 including bouts of depression, lack of sleep, and loss of enjoyment.  *Id.* at ¶15.  Based on the injuries sustained by Mr. Quinones, Plaintiffs submit that he should be granted an upward departure from the baseline damages judgment as established by this Court.

**S.      Joseph Rotondi**
**Injury Category: Escape Injuries**
**Severity: Severe**

Joseph Rotondi was employed as a machinist at R.R. Donnelley & Sons Company at 75 Park Place approximately one block away from the Towers on September 11, 2001.  *See* Eubanks Dec., Ex. T, Dec. of Joseph Rotondi at ¶¶4-5.  He was on the roof of the building when the second plane struck the South Tower.  *Id.* at ¶5.  In his escape, Mr. Rotondi sustained injury to his left

knee which already suffered from pre-existing pain.  An MRI in October 2001 indicated a posterior horn tear of his medial meniscus, and he subsequently underwent arthroscopic surgery on this knee.  *Id.* at Ex. C.  Mr. Rotondi's knee injuries continue to require treatment and steroid injections; however, he suffers dramatically from post-traumatic stress disorder for which he continues to receive treatment.  *Id.* at ¶6.  He has become afraid of going to Manhattan, of airplanes, of tall buildings, and spending time away from his home as he suffers from severe anxiety and panic attacks arising out of his experiences on September 11, 2001.  *Id.* at ¶7.  He suffers from survivor's guilt, and his entire demeanor has changed since September 11, 2001.  *Id.* at ¶8.  Based on the injuries—both physical and emotional—that Mr. Rotondi sustained on September 11, 2001, Plaintiffs submit that he should be granted an upward departure from the baseline damages judgment as established by the Court.

> **T.**     **Glenn Savery**
> **Injury Category: Building Collapse Injuries**
> **Severity: Severe**

Glenn Savery was working as a Field Manager of Security Services for Summit Security Services on the B-2 level of 2 World Trade Center at the time of the attacks.  *See* Eubanks Dec., Ex. U, Dec. of Glenn Savery at ¶3.  When the attacks began, Mr. Savery engaged in trying to evacuate individuals from the lobby of the South Tower and then began to try and evacuate people in the concourse level evacuating individuals through building five.  *Id.* at ¶4.  As he felt the building was going to collapse, he attempted to escape, but the force of the building's collapse propelled him across the street causing him to strike his head and chest on objects in his path and causing a jolt to his lower back.  *Id.*  As a result of his experiences, he sustained lumbar derangement, lumbosacral radiculopathy, TR myofascitis of the lumbar spine, chest wall contusion, post-concussion syndrome with moderate cognitive deficiency, vertigo, tinnitus,

vestibular contusion, costochondritis, and post-traumatic stress disorder.  *Id.* at ¶5.  He witnessed his boss die immediately next to him in the building collapse, and he is haunted by the fact that this could have been him who died that day.  *Id.* at ¶6.  Based on the extensive injuries sustained by Mr. Savery on September 11, 2001 including his continued emotional trauma, Plaintiffs submit that the Court should grant him an upward departure from the baseline damages judgment as established by the Court.

      U.      **Barbara Williams**
              **Injury Category: Escape Injuries**
              **Severity: Significant**

Barbara Williams worked for Bowles Corporate Security providing security for Morgan Stanley on the 44th Floor of the 2 World Trade Center on September 11, 2001.  *See* Eubanks Dec., Ex. V, Dec. of Barbara Williams at ¶4.  She was wearing dress shoes for work but abandoned them when she realized she needed to flee the building.  *Id.* at ¶6.  As a result, she traversed the entire 44 floors of stairs and the debris outside the towers in stocking feet causing injuries to her feet and legs as a result.  *Id.*  She was also present in the vicinity when both of the towers collapsed and was covered in soot and debris as a result.  *Id.*  She was later diagnosed with asthma, chronic rhinitis, and esophageal reflux as a result of her inhaling the dust from the collapsed buildings.  *Id.* at ¶8.  She was also diagnosed with back issues resulting from her escape from the South Tower on September 11, 2001.  *Id.*  She has also suffered from emotional distress as a result of the events of September 11, 2001.  *Id.* at ¶9.  Based on the injuries she sustained and the emotional trauma she endured, Plaintiffs submit that Ms. Williams should be granted a downward departure from the baseline damages judgment as established by the Court.

## IV.     Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the *Burnett/Iran* plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett/Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: January 29, 2020                       Respectfully submitted,


**/s/**  John M. Eubanks
John M. Eubanks, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
Email: jeubanks@motleyrice.com
Email: rhaefele@motleyrice.com

Attorneys for the *Burnett/Iran* Plaintiffs

32