K1DHTERO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re Terrorist Attacks on              03 MD 1570 (GBD)(SN)
    September 11, 2001
4                                           Oral Argument

    ------------------------------x

5
                                            New York, N.Y.
6                                           January 13, 2020
                                            10:20 a.m.
7
    Before:
8
                        HON. SARAH NETBURN,
9
                                            U.S. Magistrate Judge
10
                            APPEARANCES
11
    COZEN O'CONNOR
12       Attorneys for Federal Insurance Plaintiffs
    BY:  SEAN P. CARTER
13
    MOTLEY RICE, LLP
14       Attorneys for Burnett and Euro Brokers Plaintiffs
    BY:  ROBERT T. HAEFELE
15
    KREINDLER & KREINDLER LLP
16       Attorneys for Ashton Plaintiffs
    BY:  STEVEN R. POUNIAN
17       ANDREW J. MALONEY

18  ANDERSON KILL P.C.
         Attorneys for O'Neill Plaintiffs
19  BY:  JERRY S. GOLDMAN

20  KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, P.L.L.C.
         Attorneys for Defendant Kingdom of Saudi Arabia
21  BY:  GREGORY G. RAPAWY
         ANDREW C. SHEN
22       MICHAEL K. KELLOGG

23

24

25

K1DHTERO

1                              APPEARANCES CONTINUED

2     SALERNO & ROTHSTEIN
            Attorneys for Defendant Yassin Abdullah Kadi
3     BY:   PETER C. SALERNO

4     MOLO LAMKEN LLP
            Attorneys for Dallah Avco Trans Arabia Co.
5     BY:   ROBERT K. KRY
            ERIC R. NITZ
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1DHTERO

1              (Case Called)

2              MR. POUNIAN:  Steve Pounian from Kreindler &

3    Kreindler, for the plaintiffs.

4              MR. CARTER:  Good morning, your Honor.  Sean Carter

5    from Cozen O'Connor, on behalf of plaintiffs.

6              MR. HAEFELE:  Good morning, your Honor.  Robert

7    Haefele, Motley Rice, for the plaintiffs.

8              MR. GOLDMAN:  Good morning, your Honor.  Jerry

9    Goldman, Anderson Kill.

10             MR. MALONEY:  Good morning, your Honor.  Andrew

11   Maloney from Kreindler & Kreindler, for the plaintiffs.

12             MR. TARBUTTON:  Good morning, your Honor.  Scott

13   Tarbutton, Cozen O'Connor, for the plaintiffs.

14             MR. RAPAWY:  Good morning, your Honor.  Gregory Rapawy

15   from Kellogg, Hansen, for the Kingdom of Saudi Arabia.

16             MR. SHEN:  Andy Shen from Kellogg, Hansen, for Saudi

17   Arabia.

18             MR. KELLOGG:  Good morning.  Michael Kellogg from

19   Kellogg, Hansen, on behalf of Saudi Arabia.

20             MR. KRY:  Robert Kry, Molo Lamken, for Dallah Avco.

21             MR. NITZ:  Eric Nitz, your Honor, also from Molo

22   Lamken, for Dallah Avco.

23             THE COURT:  Thank you.

24             Mr. Salerno is here.

25             MR. SALERNO:  Yes, I am here, your Honor.  There's a

K1DHTERO

```
 1    very good chance I wouldn't speak.  That's why I didn't stand
 2    up.
 3              THE COURT:  Welcome anyway.
 4              Happy New Year to everybody.  Thank you all for being
 5    here.  Thank you to all the families who are here.
 6              So we are here to talk about the next step of
 7    discovery in this case, namely, the depositions of the
 8    representatives of the Kingdom of Saudi Arabia.  I have the
 9    letter filed on December 6 from the plaintiffs' executive
10    committee and some follow-up letters from that, and the other
11    letter that I'm looking at is the October 28 letter that the
12    Kingdom filed in connection with its proposal for how to move
13    forward.
14              As I said in my order scheduling today's conference, I
15    don't think additional briefing is necessary.  These are not
16    really legal issues so much as sort of proportionality issues,
17    and so I wanted to talk to the parties about how to move
18    forward into the next phase of the litigation.
19              From my perspective, the topics for today's conference
20    are the number of depositions that are appropriate, the
21    location of those depositions, the issue that's raised in the
22    October 28 letter about if a party affirmatively puts forward a
23    declaration and the opposing party seeks to depose that person,
24    how that deposition should be treated.  I think there's also an
25    issue about whether or not there should be additional formal
```

K1DHTERO

written discovery at this stage in the litigation.  There's

also the question of expert discovery and whether or not the

Court should allow that.  And then, finally, moving toward the

renewed motion to dismiss.

So I reviewed the list that the plaintiffs' executive

committee provided to me on December 6.  The reason I wanted

this list is to get a sense of exactly what categories of

individuals the plaintiffs' executive committee seeks to

depose; how many people they are seeking to depose within each

category; and whether or not, based on their representation in

this list, it seemed to me that there was a lot of duplication

or not.  So I calculated approximately 55 people on this list.

I know that this list is not -- I guess it's probably both

overinclusive and underinclusive, would be my guess, is how the

plaintiffs would present it.  But maybe I will begin, and we'll

start the conversation about numbers.

I'll ask, Mr. Pounian, are you going to speak on

behalf of --

MR. POUNIAN:  Actually, we both are, your Honor.

Excuse me.  Mr. Carter was planning on beginning the

presentation.

THE COURT:  OK.  That's fine.

Let me just remind everybody that this courtroom is

gorgeous, but the acoustics are terrible.  So if you could

please speak into the microphone for my stake, for the

K1DHTERO

1    families' sakes, but most importantly, for the court reporter's

2    sake.

3            MR. CARTER:  Sure, your Honor.

4            As Mr. Pounian said, I'm going to begin.  I'd like to

5    discuss some general baseline considerations that I think

6    should inform the Court's assessment of the number of

7    depositions that are appropriate, and then Mr. Pounian will

8    address some of the more specifics about the categories of

9    witnesses.

10           The first issue that we think should inform this

11   analysis, your Honor, is the documented propensity of certain

12   of the principal witnesses to lie and the likelihood that many

13   of the witnesses are going to be reluctant to be completely

14   forthcoming in the context of deposition testimony.  The 9/11

15   Commission obviously indicated its assessment that Fahad

16   al-Thumairy did not tell the truth with regard to the very

17   basic and material facts and that there were problems with Omar

18   Bayoumi's testimony to the commission as well.

19           We think that was borne out in the discovery process

20   that we have seen so far, and because of that problem,

21   plaintiffs need access to a fair number of witnesses who have

22   personal knowledge of the events, transactions, and

23   relationships to build the basic factual record.  Some of those

24   witnesses are only going to have a piece of the puzzle simply

25   by virtue of the scope of their interactions being more limited

K1DHTERO

1    than some of the principals.

2              We also think it's important to ensure that there's a

3    context in which this unfolds that ensures that there's real

4    peril for witnesses who might have an inclination to not tell

5    the truth and the full truth, and that peril will exist only if

6    there's a chance they're going to be confronted with other

7    witnesses who know the facts who are going to say something

8    very different than they testify to.

9              A second consideration is the lack of documentary

10   evidence that's been provided with regard to some of the most

11   basic issues that are relevant to the Court's jurisdictional

12   inquiry, as well as the inconsistencies that we've seen in some

13   of the documents.  As we've already indicated to the Court, we

14   don't have basic documents on the day-to-day activities of some

15   of these principals.  We've been told that they don't exist at

16   all, and as a consequence, the only way to really develop

17   evidence with regard to those issues is to go out and talk to

18   witnesses who have knowledge about those issues and to build a

19   record through that kind of process.

20             The related consideration, your Honor, is that the

21   Kingdom has obviously objected to conducting certain searches

22   of repositories for records, and the Court has applied a

23   balancing test.  The Kingdom's argument has essentially been

24   that searches of these large government repositories would be

25   an undue burden for some of these things, but in many of those

K1DHTERO

cases, a deposition of witnesses who have relevant knowledge

concerning the relationships and transactions is a far more

simple, less burdensome, and elegant way that you go about

ensuring that plaintiffs have the opportunity to develop

evidence in support of their jurisdictional theories.

        In terms of the burden associated with that, we think

that the Kingdom's own behavior over the course of the

deposition process with regard to the merits and personal

jurisdiction defendants bears out that there is no real burden

from the Kingdom's perspective associated with participating in

depositions.  The Kingdom has sent, in most cases, multiple

representatives to each and every one of the personal

jurisdiction and merits discovery depositions, even though they

fall outside of the scope of the jurisdictional inquiry

presently before the Court.  In some cases there have been as

many as four Kingdom representatives at those depositions.

        We now understand that the Kingdom's involvement has

gone beyond mere attendance at those depositions and involved

far more active participation.  We understand from one of the

recent depositions, for instance, that there is a joint defense

agreement in place between the Kingdom and the defendants

which, we gather, has included involvement in the preparation

of those witnesses for their depositions.  In the context of

the King Fahd Mosque depositions, your Honor, we know that

there were communications between the Kingdom lawyer and

K1DHTERO

counsel representing those witnesses as well.  So the Kingdom

has made clear that attending depositions is not really a

meaningful burden.

        The fourth consideration, your Honor, is the nature of

the Kingdom's own argument and defenses.  The first part of

that is that the Kingdom has offered its own narratives with

regard to evidentiary issues where the record is relatively

incomplete.  Just to take an example, your Honor heard during

prior argument that the Kingdom's position is that Omar

al Bayoumi was, in fact, in the United States conducting a

legitimate, sustained course of study to obtain what the

Kingdom represented was effectively a graduate master's degree.

        In order to address the Kingdom's narrative with

regard to that point, we need to go out and take discovery of

the educational institutions where he claims to have studied.

We received some documentary evidence from them.  The

transcripts include codes that we need people to ferret out.

We believe that the evidence that we've gathered from them is

inconsistent with the Kingdom's narrative, but again, because

that's the Kingdom's position, we need to be able to go to

witnesses who know about it, who can testify about the actual

rigors of the classes associated, what the codes on certain of

the transcripts mean which seem to indicate involuntary

withdrawal from classes for failing to attend.  So we need to

go through all of that.

K1DHTERO

1        The other thing that the Kingdom --

2        THE COURT:  Those would be non-Kingdom depositions, is

3  that correct?

4        MR. CARTER:  Those are not, your Honor.

5        THE COURT:  Those are not non-Kingdom or those are

6  not --

7        MR. CARTER:  No, I think Mr. Pounian will address

8  this.  There's a good number of third-party witnesses, and

9  those are people that we want to go and depose and relative to

10  which the burden on the Kingdom is particularly minimal.

11        The other argument the Kingdom has offered your Honor

12  will recall in the context of the motion to dismiss, the

13  Kingdom offered layered argument about the admissibility of

14  every government document we've offered in support of our

15  claims, claiming that they were hearsay or that they were

16  preliminary investigative reports, and demanding that the only

17  way plaintiffs could sustain their burden in the FSIA context

18  was to come forward with some sort of direct testimonial or

19  similar evidence in support of each and every basic point that

20  might be in play in the litigation.

21        We, obviously, think the Kingdom is fundamentally

22  wrong in regards to its claims about the FBI reports.  They are

23  admissible.  They're government reports.  They're not

24  preliminary investigative reports of an administrative body.

25  But it would be particularly inappropriate to allow the Kingdom

K1DHTERO

1  to argue, on the one hand, that plaintiffs must come forward

2  with testimonial direct evidence on virtually every point while

3  at the same time trying to prevent plaintiffs from having

4  access to the very witnesses who have that testimonial and

5  evidence.

6         We think, your Honor, that that broadly is what this

7  is really about.  The draconian efforts the Kingdom is making

8  to limit the number of depositions that we have access to is

9  part of a broader effort simply to limit the channels available

10  to plaintiffs to develop admissible evidence in support of

11  their claims.  Your Honor will recall at the outset of

12  discovery the Kingdom suggested, for example, that we should be

13  limited to only five depositions; that we should have no

14  opportunity to go out and obtain discovery from third parties.

15  And these are all part of a broader strategy here, your Honor,

16  to simply limit our ability to get to the admissible evidence

17  the Kingdom is then going to claim that we have to have in

18  order to proceed with our claims.

19         With that context, I'll turn it over to Mr. Pounian to

20  discuss some of the specifics.

21         THE COURT:  OK.

22         MR. POUNIAN:  Thank you, your Honor.

23         I think, as Mr. Carter explained, the depositions here

24  are not only to pursue discovery of the Kingdom, but they're

25  also necessary for us to preserve the record that we need to

K1DHTERO

1    present at the jurisdictional hearing.  We need the evidence of

2    these witnesses over whom we have absolutely no control.  None

3    of the witnesses in this case, your Honor, are under the

4    control of the plaintiff, unlike the Kingdom.  We have to find

5    the witnesses, where they are, and they're scattered across the

6    world.  None of them are within the subpoena range of this

7    Court.  It's a laborious, difficult process for us to go ahead,

8    go through that, to do that.  We're ready to go ahead and do

9    it, but we need the freedom and the flexibility to do it.

10           Our suggestion to your Honor is, first of all, we need

11   a deposition protocol in effect with the Kingdom.  One of the

12   key parts of that is last February we served on the Kingdom a

13   preliminary list of witnesses.  We never heard any response

14   from them as to whether or not they were available or not,

15   whether they had any objections to producing those witnesses.

16   And then in December we again served a list, more expanded

17   list, with actual descriptions of testimony, which we served in

18   December.  We still have not yet heard whether those witnesses

19   available and whether the Kingdom is going to oppose the

20   production of any of those witnesses for depositions in this

21   case.  So we believe that process has to be determined first,

22   before we can sit down and say there's going to be a certain

23   number of depositions that we take.

24           THE COURT:  Sorry.  Why is that so?  I agree you need

25   to know who's going to be produced, but why do we have to wait

K1DHTERO

1    to find out that answer?  The number that I order will not be

2    driven by how many are going to be objected to or produced.

3             MR. POUNIAN:  Well, if a certain witness is

4    unavailable, your Honor, we may need -- it may change the

5    calculus in terms of other witnesses that we need.  For

6    instance, the one witness they have said is ill, we don't know

7    if he's available or not, Mr. Sowailem.  If his testimony's not

8    available, we may need two or three people from his office to

9    testify to replace the knowledge of Mr. Sowailem to present in

10   the record before the Court.

11            So it's that type of calculus.  We're dealing a little

12   bit in the blind because we don't know -- we don't really know

13   what the situation is from the Kingdom's perspective and who

14   they're going to actually say this person's not available or

15   this person we won't produce, and then we have to resolve those

16   issues before your Honor for the Court's decision.

17            There's also issues regarding the protocol itself

18   regarding the location of the depositions, your Honor, that we

19   think may be best first decided on a meet-and-confer basis to

20   determine on specific witnesses if there can be any basis to

21   agree, or not, before we go forward with that process, which

22   your Honor mentioned would be here today.

23            In terms of the witnesses, in terms of the number,

24   it's a question really of getting into the testimony, finding

25   out what witnesses say.  Depending on the testimony, as

K1DHTERO

Mr. Carter said, if someone lies during the testimony, then we
have to call the FBI witness who was present at the 302 to
challenge that testimony or we have to present another witness
to challenge the testimony.  So the number --

          THE COURT:  Sorry to interrupt you, but some of those
witnesses -- for instance, in that hypothetical, if the Kingdom
puts forward a witness that you believe has lied during his
deposition and your basis is because an FBI agent that you're
working with tells you otherwise, wouldn't that FBI agent just
be able to put forward a declaration setting forth her
particular view of the facts?  That wouldn't be an additional
deposition, would it?

          MR. POUNIAN:  Well, we would need -- first of all, we
have no control over that FBI agent to have them submit a
declaration.  We would have to go through the process with the
Department of Justice of taking the deposition.  And there's a
whole process.  There's regulations that we have to follow in
seeking the permission of the Department of Justice to take the
deposition.  We can't simply go and get a declaration in that
instance.

          THE COURT:  Have you started that process?

          MR. POUNIAN:  Well, we're waiting for the testimony.
We've discussed the issue.  I think we've raised the issue in
terms of the list that we presented because the FBI agents that
we need, or we anticipate we'll need, are on our list.  So

K1DHTERO

they're there, but it's a question first of hearing the

testimony and then securing the witness.  We can't take the

testimony of the witness before we take the testimony, let's

say, of Mr. Thumairy to know what he has said to then say, is

that -- to get the contrary testimony to prove the truth.

Because, first, if Mr. Thumairy says, "I never met the

hijackers," and then we have other proof from the record that

shows that he did, then that has to go in after Mr. Thumairy

testifies to show that his testimony is false.

THE COURT:  I understand all of that.  To the extent

that government bureaucracy is slow and you know there are

certain agents you're going to want to depose --

MR. CARTER:  Your Honor, if I could just address that

very quickly.  One of the catch-22s of the *Touhy* process, as

your Honor is familiar with, is that the government often won't

present a witness to testify if there's a potential that the

testimony's available from another source.  So I think we are

going to get caught in situations here where we may ask for

testimony and the government may very well tell us, well, let's

see if other people testify to those facts, thus obviating the

need of this person to testify.  There's a little bit of a

sequencing issue with regard to that.  I just wanted to address

that.

THE COURT:  I think it's worth it to maybe have a

conversation.  I don't know if it's with Ms. Vargas and

K1DHTERO

1  Ms. Normand, who I don't think are in the courtroom today, just

2  to discuss what makes sense as far as moving forward on that.

3  It may be that there are preliminary things that can be done

4  just to start that process, and then if the holdup is going to

5  be, well, we need you to prove that this information cannot be

6  obtained from defendant witness X, at least you can get

7  clearance, assuming you can make that showing, rather than

8  having to start the entire process once the witness has

9  testified in a way that you think justifies the need for the

10  FBI deposition.

11        OK.  You can proceed.

12        MR. POUNIAN:  Thank you, your Honor.  I think that

13  would make sense for us to go ahead and do that.

14        In terms of the discovery today, we have noticed four

15  depositions.  The first one we noticed, we served a subpoena in

16  September of 2018 on a Mr. Al Thumairy.  The deposition still

17  has not taken place, through no doing of our own.  There's been

18  extensive motion practice of which your Honor's aware, and we

19  still don't have a date for the deposition.  It hopefully will

20  take place next month, but that has been an 18-month process to

21  get a single deposition from a key witness in the case.

22        Similarly, Mohdhar Abdullah, last May we served

23  letters rogatory for his deposition in Sweden, and the

24  deposition is now set for March.  But I'm told from Swedish

25  counsel that the witness, the witness may choose not to appear

K1DHTERO

1   at the first instance and only can be then -- the process of

2   bringing the witness to court only begins after the witness

3   does not appear the first time.  So it may take -- we're hoping

4   the witness appears in March.  That's our plan, but it may be

5   that he doesn't appear, so we'll have to go back to take that

6   testimony.

7           So the process involving all of these witnesses over

8   whom we have no control, it has to take into account the fact

9   of serving the subpoenas, working with other lawyers, and

10  working with the government to get the witnesses and to

11  assemble it all and timing -- with the King Fahd Mosque, we had

12  to negotiate for six months with the Mosque to work out a

13  window of time when the witnesses were here in the United

14  States.  And then on the very eve of the depositions, there was

15  an emergency application to delay the depositions, which we

16  then had to go in and successfully oppose, and then the Kingdom

17  changed its position to allow the deposition to go forward.

18          So we don't know, your Honor, what issues like this

19  are going to come up, and we need the system to be flexible to

20  account for what may happen so that we can get the proof that

21  we need to assemble what we need for the hearing.  As I said

22  before, this is our only opportunity to do that.  These are

23  like the equivalent of the *de bene esse* depositions for the

24  trial, and we don't have -- you mentioned before going and

25  getting a declaration from someone to come in and bring before

K1DHTERO

1    the Court.  We don't have that luxury.  We don't have control

2    of the witnesses to do that.  The only option we have is to

3    take the depositions, and that's why the number has to

4    accommodate our need to preserve that evidence for the hearing

5    and for the trial, because there's no other -- we have no other

6    remedy, nowhere else to turn, to get the evidence.

7            And the Kingdom's argument about ten depositions from

8    Rule 30, Rule 30 actually says that that number must

9    accommodate, must be altered to accommodate the requirements of

10   Rule 26.  Relevance, proportionality, that is the test that

11   applies here, what are the relevant depositions that plaintiffs

12   need, how many relevant depositions do we need that are not

13   cumulative, but that we meet that relevance test.  That is the

14   test that really is at play here, your Honor, not an arbitrary

15   number.  Because the proof in this case is extraordinary, and

16   unprecedented in terms of the number of different issues

17   involved and the fact that it involves a criminal conspiracy

18   conducted by Saudi government officials exactly 20 years ago,

19   right now as we're here in this courtroom, in the year 2000 in

20   California, and that requires that we be allowed to ferret out

21   the facts, go to witnesses.  There's so much conflicting proof

22   in the record that it's like a maze.  We have to present it all

23   to get to the truth.  That's the process that we have to go

24   through, your Honor.

25           I don't know if your Honor has any specific questions

K1DHTERO

1    about the list itself and the categories in the list.  I'd be

2    happy to answer those.

3        THE COURT:  I don't.  The categories and the

4    information which was helpful for me was more for me to get a

5    sense of the types of people that you anticipate calling and

6    the subject matter.  So I don't have a specific inquiry, and I

7    would not direct that you depose person A over person B.

8    Obviously, I'll leave that to your discretion.

9        Before I turn over to the Kingdom, you mentioned

10   needing a protocol and you mentioned wanting to have further

11   meet-and-confer with the Kingdom with respect to the location

12   of the depositions.  Can you tell me sort of how long you think

13   that process would take, whether or not a deposition protocol

14   is necessary?  I know we had quite an extensive one for the

15   other defendants because I think there were a little bit more

16   moving parts, so it was a little bit more complicated.  And

17   here, we're dealing with a sovereign nation, so I think some of

18   the interests are different than they were in connection with

19   the other depositions and that deposition protocol.

20       Can you give me a sense of what you think, I guess, of

21   whether or not there's a need for a protocol; if so, how long

22   you think that will take for you and the Kingdom to talk about

23   that; and the issue of locations.

24       MR. POUNIAN:  Mr. Carter's going to address that.

25   Thank you, your Honor.

K1DHTERO

1              THE COURT:  Sure.

2              MR. CARTER:  Your Honor, as a general matter, we think

3    the existing protocol provides a very good baseline in most

4    areas.  This is a matter of a handful of areas where we think

5    tweaks are appropriate, and we probably assume that the Kingdom

6    would be of the same mind.

7              As part of that process, I think we'd give a bit more

8    thought as to specific witnesses and whether or not we can

9    reach agreement on at least some subset of witnesses on

10   location before having to present a dispute to your Honor for

11   resolution with regard to others.  I would think that we could

12   complete that conversation and have the issue fully -- any

13   disputed issues fully before your Honor by this time in

14   February without too much trouble.

15             THE COURT:  A month?

16             MR. CARTER:  Well, I'm just -- it could be three

17   weeks.  I'm just assuming, with schedules, we can start having

18   the conversation this week.  It may very well be we can do in

19   two weeks.

20             THE COURT:  OK.  Great.  Thank you.

21             Who's going to be speaking on behalf of the Kingdom?

22             MR. RAPAWY:  That will be me, your Honor.

23             THE COURT:  That's you, Mr. Rapawy.

24             MR. RAPAWY:  Thank you, and good morning.

25             Your Honor, Judge Daniels authorized limited targeted

K1DHTERO

discovery in March 2008.  We are now coming up on two years of

that process.  In the document phase of that discovery, we

produced more than 5,000 documents, more than 8,700 pages, and

that's involved multiple searches of government facilities,

including some very sensitive diplomatic facilities that we

were not obligated to search but did so voluntarily as part of

our cooperation with this process.

In our view, that process has not produced any shred

of evidence to support the allegation that Mr. Al Bayoumi and

Mr. Al Thumairy acted at the direction of senior Saudi

government officials in assisting the hijackers, allegedly.  In

fact, the FBI has now described the origin of that allegation

as an investigative theory, and we look forward to an

opportunity to show that that the investigative theory was not

and has never been supported by any evidence.

I think the Court has previously recognized Saudi

Arabia's interest in wrapping up this discovery process and

getting to our renewed motion to dismiss, and we think that

that is best served by setting a reasonable limited period for

a reasonable limited number of depositions.  We think it should

be about ten depositions and in about three months.

I think the witness list that plaintiffs have provided

only underscores the need for the Court to set those limits,

which I understand the Court is looking at doing today.  You

had counted 55 current or former Saudi officials on their list.

K1DHTERO

1    We had gotten to 54, but some of them are categories, so it's

2    kind of a judgment call on how you count.  Most of those

3    individuals cannot be compelled to testify without voluntary

4    consent of either Saudi Arabia or the original individual or,

5    in some cases, both for a number of reasons.  One of those

6    reasons is that many of them are current or former diplomatic

7    or consular employees who are immune from compelled testimony

8    under the Vienna Convention.  Another is that a number of them

9    are high-ranking officials who cannot be deposed without a

10   special showing of need that we do not believe can be made on

11   this record.  And a third is that a number of those individuals

12   are former employees not currently employed by the Saudi

13   government and outside the subpoena jurisdiction of the court.

14   So they would be appearing, if they choose to do so,

15   voluntarily.

16          THE COURT:  Let me ask you a question on this topic.

17   One of the things that, I think it was Mr. Carter, but the

18   plaintiffs raised was a frustration that they had provided you

19   with this list in December and hadn't heard anything back from

20   the Kingdom with respect to the willingness to produce certain

21   witnesses.  How quickly can you respond to that list from the

22   December letter, indicating whether or not these individuals

23   would be available and presented for deposition?

24          MR. RAPAWY:  Your Honor, we had not responded to that

25   list.  And the previous list in February was also mentioned.  I

K1DHTERO

 1    think we indicated this at the time.  We didn't view either of

 2    those lists as being reasonable, good faith efforts to identify

 3    a specific number of people who were going to be deposed in

 4    this case.  I think --

 5          THE COURT:  But I think one of their issues would be

 6    if there's ten people on a particular topic and you say, for

 7    whatever reason, I'm not producing five of them because of

 8    various immunities or for whatever reasons you have, they would

 9    like to know that before they select the person that they're

10    going to call for a deposition.

11          MR. RAPAWY:  You know, your Honor, I think we can

12    certainly -- if your Honor directs us to respond to the list,

13    we can, of course, respond to the list.  I think it will

14    probably take us at least a couple of weeks to figure out.

15    We've started this process, to be honest, internally of trying

16    to identify the particular issue -- there's two issues that

17    require a little bit of verification on that.  One of them is

18    making sure we are sure who is and isn't subject to Vienna

19    Convention protection for compelled testimony which the Kingdom

20    hasn't waived yet, and I'm certainly not authorized to waive

21    that today.  The other is making sure that we understand who is

22    a current or former employee with respect to their employment

23    status with the Kingdom, because those individuals who are

24    former employees would have to voluntarily agree to testify.

25    It might take a little bit of time to, I mean, determine who of

K1DHTERO

1   the former employees would be willing to voluntarily testify.

2   We haven't met with all the individuals on this list, but I can

3   certainly -- we can certainly start that process right away if

4   that's what your Honor wants us to do.

5           THE COURT:  OK.  Thank you.

6           MR. RAPAWY:  I do think that ten depositions could, in

7   theory, cover the individuals who are actually likely,

8   reasonably likely, to have personal knowledge of the events

9   here.  I mean, that would include Mr. al Bayoumi, Mr. al

10  Thumairy, three or four candidates for the senior official who

11  allegedly gave them these directions, and three or four for the

12  subagents who carried out directions from them, plus

13  one 30(b)(6) representative.  That gets to ten.

14          I think -- obviously, it's in your Honor's discretion.

15  We're not saying that you don't have discretion to vary that

16  and choose what you see fit, but I don't think it's an

17  unreasonable proposal.  In fact, I think it is a reasonable

18  one.  The Mosque depositions that are already taken should

19  count against that limit.  I don't know that they helped

20  plaintiffs a great deal.  We told them at the time they should

21  count against whatever limit your Honor would ultimately set,

22  and I think that's consistent with the rules.  They've

23  also mentioned or they've also noticed --

24          THE COURT:  Were you responsible as counsel for

25  organizing those depositions?  Were you their lawyer?

K1DHTERO

1          MR. RAPAWY:  No.  No, your Honor.

2          THE COURT:  OK.

3          MR. RAPAWY:  Our proposal is a limit that includes

4    third-party depositions.  Obviously, if your Honor is

5    restricting it specifically to Kingdom of Saudi Arabia

6    witnesses, that would be a different -- it's a different

7    question, I suppose.

8          I do want to emphasize that on the question of the

9    burden, the burden that we're concerned about is not the burden

10   on our law firm of appearing at depositions.  We can do

11   whatever your Honor wants.  The burden that I think is relevant

12   with regard to these witnesses and with regard to Saudi

13   Arabia's legitimate interest in being protected from litigation

14   where there's no jurisdiction over it is the burden on the

15   witnesses, the individuals, the current employees who can be

16   forced to testify only because they are employees of a

17   sovereign government and the former employees who, well, as I

18   indicated, can't be forced to testify at all.

19         I also don't think that -- I understand your Honor may

20   not be including the third-party depositions in the same list,

21   but I don't think we should go into this on the assumption that

22   *Touhy* requests will necessarily be granted by the United

23   States.  My understanding is that they generally haven't been

24   with regards to the merits discovery.  Of course, as you

25   indicated, Ms. Normand and Ms. Vargas are not here to speak to

K1DHTERO

that, but I don't think forming this schedule around an

expectation that the *Touhy* process is necessarily going to be

complete or going to be successful before the process ends is

realistic or justified.

There was some brief discussion of the location

issues.  What we indicated in our letter was that we would be

happy to meet and confer on that issue on an individual basis

once we've identified a reasonable number of individuals who

are going to be deposed.  I think some may voluntarily consent

to travel outside the Kingdom, and I do think that the existing

protocol, as your Honor had -- as your Honor's comments may

have indicated, I don't want to characterize, was not

negotiated with bearing in mind the interest of a sovereign

nation in not being compelled to produce its own government

employees outside its borders, which I think does situate us

differently from the other defendants.

That is really pretty much all I have on the question

of the number of depositions.  Obviously, there's also the

question of timing, but it may make more sense to address that

once your Honor has given us a sense for what you have in mind

with regard to the number.

THE COURT:  Very well.  Can I just ask one question

while you're standing, and then I'll just confirm with the

plaintiffs.

In your October letter, you indicated this concept of

K1DHTERO

1    certain witnesses who would be affirmatively put forward by way

2    of written declaration and that there would be an understanding

3    that the receiving side could then depose that person and it

4    would not count against the deposition count. Is that correct?

5          MR. RAPAWY:  That was what we had proposed, your

6    Honor, and I do think that is a good way to avoid surprise.

7    We've heard today that they have no witnesses under their

8    control who are likely to provide -- who they can call to

9    provide declarations.  If that's the case, then I guess their

10   list will not consist of anyone.  But we think that mutual

11   identification at an early point in the process, while there's

12   still time to take those depositions, will avoid a situation in

13   which, frankly, either side submits a declaration and the other

14   side said I didn't know that person was going to testify.

15         THE COURT:  I assume, for purposes of this discussion,

16   that we are not talking about what could broadly be described

17   as an expert witness.  I'm assuming we're talking about sort of

18   personal knowledge witnesses?

19         MR. RAPAWY:  Yes, your Honor.  The proposal had been

20   for fact declarants to be exchanged.  Our position, as we set

21   forth in the letter, was that there should not be any expert

22   witnesses in this limited jurisdictional discovery.  I

23   understand, of course, there's disagreement on the other side

24   about that, but we weren't intending to propose that as

25   occurring this early in the stage -- in the process.

K1DHTERO

1      THE COURT:  I think those are all of my questions for

2  you.  I checked before I took the bench.  Ramadan this year

3  starts on April 23 and goes through May 23.  Is it safe to

4  assume that that 30-day period is one that would make it

5  difficult for your clients to appear for deposition?

6      MR. RAPAWY:  I think, yes, your Honor.  I think that

7  probably is accurate, and I appreciate the consideration.  We

8  do think that most, if not all, the depositions can and should

9  be wrapped up before that time, but if they're not going to be,

10  that month would probably be a problem for the observant

11  witnesses, which are going to be most of them on our side, if

12  not at all.

13      THE COURT:  Well, you tell me that it's going to take

14  you, I'm going to say, three weeks for you to get back to the

15  plaintiffs just on who on their list is going to voluntarily

16  appear and for whom you will not object.  So that gets us

17  pretty close to the middle of February.  Let's assume that you

18  all could even agree on depositions within another couple of

19  weeks.  That's getting us into March.  I think it's going to be

20  tough to do that.  That was my hope as well, but I think it may

21  be tough to accomplish that.

22      MR. RAPAWY:  I think if you're going to order us to

23  respond to the entire 60-person list before they have to pick,

24  then, yes, that introduces a complication I hadn't previously

25  considered, your Honor.

K1DHTERO

| | |
|---|---|
| 1 | THE COURT:  OK.  With respect to responding to that |
| 2 | list, do you think you could simultaneously indicate who |
| 3 | would -- so there's at least two questions to answer:  One is |
| 4 | whether or not the person will be produced, understanding that |
| 5 | there are various grounds on which somebody might not be |
| 6 | produced, meaning, they may choose not to participate, the |
| 7 | government may preclude them from participating; and then |
| 8 | secondly, if someone is willing to appear for a deposition, |
| 9 | whether or not they would appear voluntarily outside of Saudi |
| 10 | Arabia.  Do you think both of those questions could be answered |
| 11 | within the next three weeks? |
| 12 | MR. RAPAWY:  I can't promise we won't have any |
| 13 | stragglers, your Honor, if there are people who are hard to get |
| 14 | ahold of.  We could certainly make a good faith effort to do |
| 15 | that, and it doesn't seem unreasonable. |
| 16 | THE COURT:  OK.  Thank you. |
| 17 | MR. RAPAWY:  I'm sorry, your Honor. |
| 18 | (Counsel confer) |
| 19 | MR. RAPAWY:  Also, a good caveat, there are one or two |
| 20 | people on the list who we don't actually agree are Saudi |
| 21 | government officials.  One of them is Alp Karli. |
| 22 | THE COURT:  Al? |
| 23 | MR. RAPAWY:  I'm sorry.  The name is Alp Karli, A-l-p, |
| 24 | K-a-r-l-i.  Your Honor will probably recall that there was some |
| 25 | dispute as in between the plaintiffs, the Kingdom, and Dallah |

K1DHTERO

1   Avco as to who exactly he worked for at the time, but to the

2   extent that we're not able to find individual people, then that

3   would be another -- that may be the case with regard to some

4   individuals.

5            THE COURT:  OK.  Thank you.

6            Anything the plaintiffs would like to add?

7            MR. CARTER:  Your Honor, I have one or two very quick

8   points.  I think Mr. Pounian has a few.  Mr. Rapawy indicated

9   that they were seeking --

10           THE COURT:  Could you bring your microphone a little

11   closer.

12           MR. CARTER:  Sure.  Mr. Rapawy indicated they would be

13   seeking a limit that would apply to third-party witnesses.

14   Your Honor, we don't think that's appropriate.  Mr. Rapawy

15   noted that the burden that the Kingdom's concerned about here

16   is not the burden on the law firm and traveling to depositions,

17   it's on the burden of the government officials in appearing.

18   That's not implicated with regard to the third parties.  And

19   the limit that they're proposing wouldn't even cover the people

20   who have direct dealings with Bayoumi, Thumairy, and the

21   hijackers.  It, obviously, would not also extend to third

22   parties like the educational institutions where Bayoumi

23   allegedly studied and who we need to now depose because of the

24   Kingdom's narrative.  We just don't think that the third-party

25   issue should be part of this at all.

K1DHTERO

1          With that, I'll turn it over to Mr. Pounian.

2          MR. POUNIAN:  Your Honor, we are willing to start

3     depositions now and start a process of doing some of these

4     third-party witnesses that Mr. Carter discussed so that we're

5     not wasting any time and that we're moving ahead.  I guess part

6     of the problem has been since the Kingdom last year said --

7     came up with this ten-limit concept, it's kind of put a chill

8     on us, saying I don't want to go out and take a deposition of a

9     college in San Diego if somehow we're going to be limited in

10    the number of depositions we can take in the case.

11         I'm not going to respond to -- I'll let the papers

12    we've submitted to the Court respond to the claims that Saudi

13    Arabia has made about the FBI 2012 report which involves a

14    criminal investigation that was against three Saudi government

15    officials.  So we're here not to debate those issues, your

16    Honor, which are very serious, but we are willing to proceed.

17    We want to proceed fast.  We don't want to take more

18    depositions than we have to.  We just want to take enough to

19    prove our case, but we need the flexibility to do that, your

20    Honor.  That's the point I wanted to make.

21         THE COURT:  Understood.

22         Yes.

23         MR. RAPAWY:  I'm sorry, your Honor, one more point I

24    wanted to just raise, which is this question of the 35 unnamed

25    third-party witnesses, if what your Honor is contemplating

K1DHTERO

1    today includes third-party witnesses, but we do believe that to

2    the extent that they have a list of third-party witnesses, at

3    some point that should be disclosed to us.  And if, as they

4    have suggested, they are not comfortable disclosing that

5    information to the Kingdom, that's a matter on which they

6    should seek relief from the Court and do so promptly, rather

7    than simply suggest that there's this unidentified pool of

8    witnesses out there that they don't know who they are -- or,

9    rather, they do know who they are, we don't know who they are,

10   and the process should be conformed around that list.

11            THE COURT:  Understood.

12            Yes.

13            MR. POUNIAN:  We could submit the list *ex parte* to the

14   Court, but I don't know if the Court would allow that or the

15   Kingdom would object to that.  But there are witnesses who have

16   fears of having their names released to the Kingdom, I think

17   legitimate fears given the history --

18            THE COURT:  And these are individuals that have come

19   forward to the plaintiffs?

20            MR. POUNIAN:  That we have met with, that we've talked

21   to, yes, your Honor.

22            THE COURT:  So you're in contact with these people?

23            MR. POUNIAN:  Yes, your Honor.

24            THE COURT:  Would these people -- I don't think I

25   gave you an opportunity to respond, so you can also respond

K1DHTERO

```
 1    more broadly to the proposal where a party would be able to
 2    submit a declaration on the facts, and the receiving party
 3    could then depose that person and it would not count toward the
 4    deposition count.
 5          So two questions for you:  One is do you agree with
 6    that concept?  And two, with respect to these 35 individuals,
 7    are they individuals that you would depose yourself, or are
 8    they individuals that you would put forward a declaration?
 9          MR. POUNIAN:  We would depose them ourselves, your
10    Honor.  As I said, we have no control over people to -- I can't
11    go, say, please fill out this -- sign this declaration.  I
12    don't think we're in that kind of situation.  We're taking --
13    we're going to have to take depositions.
14          THE COURT:  And there are people who either will
15    voluntarily appear for deposition or are within the Court's
16    subpoena power?
17          MR. POUNIAN:  Well, all the witnesses, I believe, are
18    going to have to be subpoenaed, your Honor, wherever they are,
19    wherever they are located.
20          We have not yet received any list from Saudi Arabia of
21    its witnesses in this case is another issue.  But in terms of
22    the concept of identifying people who will be presented in
23    terms of by declaration instead of in person -- I apologize,
24    your Honor -- that concept, I think, broadly makes sense, but
25    it's how it's executed is an issue.  There will have to be --
```

K1DHTERO

1    those people will be deposed regardless.  They have to be

2    available to be deposed regardless.  So it's a matter, really,

3    of scheduling the depositions of those persons, and their

4    testimony will be taken, and that will be the trial testimony

5    that's in the case for the hearing in the case that will be

6    conducted on jurisdiction.

7              THE COURT:  Yes.

8              MR. RAPAWY:  Your Honor, very briefly.  We certainly

9    would object to an ex parte submission that we would not get to

10   see about these individuals.  If the question of witness

11   safety -- if the implication is that they want an attorneys'

12   eyes only protective order, we don't agree that that would be

13   justified, but it's something they could move for, and then the

14   Court could decide how to proceed.  But this is not a situation

15   that ought to -- at the very least, our firm needs to know who

16   these individuals are so we can prepare to take their

17   depositions.

18             THE COURT:  Understood.

19             OK.  What I would like to do is direct that by

20   February 3, which is three weeks from today, the Kingdom is to

21   respond to the list.  I think your count is correct,

22   Mr. Rapawy, it's 54, of the witnesses on the December 6 letter.

23    Advise the plaintiffs' executive committee whether or not --

24   as to each witness whether or not they will be produced for a

25   deposition.  If they will not be produced for a deposition, if

K1DHTERO

1  that's because they refuse to voluntarily appear and they're

2  not under the control of the Kingdom or because the Kingdom is

3  asserting some sort of immunity or privilege or whatever reason

4  is the grounds for that person not appearing.  And if the

5  person is prepared to appear for a deposition, to indicate

6  whether that person will voluntarily appear outside of the

7  Kingdom or whether that person is going to insist on the

8  deposition taking place within the Kingdom.  Also, you

9  mentioned that there are potentially a couple of witnesses on

10  this list that the Kingdom does not believe are either Saudi

11  citizens or former employees.  You should also indicate, with

12  respect to those witnesses, if that's the reason why you can't

13  produce them yourself.  So that's going to be on February 3.

14          Then I would like the parties to meet and confer with

15  respect to that.  Then on February 21, I want you to file with

16  the Court a proposed deposition protocol.  I haven't looked at

17  the old deposition protocol recently, so I don't know whether

18  or not it's correct to say that that is a good model.  I know

19  it's one that was heavily negotiated.  There may be things in

20  it that are appropriate to include, and we may not need all of

21  the information in it.  So you should be working towards that.

22  It seems to me that that's something that can happen, at least

23  in the first instance, even before the Kingdom gets back to the

24  plaintiffs' executive committee on individuals.  The goal is to

25  get me a final draft by the 21st, but I do think issues about

K1DHTERO

location are important to discuss then.

I'm going to set aside, for now, a deadline for these depositions to take place.  I will tell you, to give you all some sense of what I came to the bench thinking, was that it would close on May 13.  So that gives you a sense of what I'm thinking about.  And that contemplated 30 days from today towards scheduling.  I realize now, given what we've just discussed, that we may need a little bit more time than that just to figure out who, in fact, will be produced and will not be produced and for the parties to discuss that.  So I think it's going to take more than 30 days from today for the parties to agree on witnesses and pick dates for their deposition, but that gives you some sense of how I was thinking about this.

I agree with the plaintiffs that depositions of the Kingdom should be counted separately than nonparty or third-party depositions, and so my numbers are going to be -- one would not count towards the other.  I've looked over all of the information that's been presented to me, and I've thought about what is appropriate in this case.  I think 25 depositions of Kingdom officials is a fair number.  I think that will give the plaintiffs sufficient time to depose more than one person in each category provided, and in some instances, I've assumed that there will be multiple individuals per category.  Again, I'm not directing who should be deposed, but I think that number contemplates the needs that the plaintiffs have fairly

K1DHTERO

set forward.

        With respect to nonparty witnesses, I'm going to allow
15 depositions, and I do think the Kingdom -- I'm sorry, the
Mosque depositions should count towards that.  So some of that
15 has already been used.

        With respect to this category of individuals, these
potential witnesses, I'm not exactly sure what to do with them.
I don't know that the plaintiffs' executive committee giving me
a list of these people is going to be particularly meaningful
to me, and I don't know exactly who these people are or how you
anticipate calling them in for a deposition.  Nor do I know
whether or not they would be potentially appropriate people for
this declaration category, which I do think should be part of
the protocol.  I do think it's an appropriate concept.

        So I think I'm going to table that issue and ask that
the parties meet and confer on that.  Again, I don't have
enough information to understand whether or not having the
plaintiffs share that list with the Kingdom's lawyers on an
attorneys' eyes only basis, which I think would address the
plaintiffs' and these witnesses' concerns, I don't know whether
or not the Kingdom is going to be involved in presenting these
witnesses for deposition.  I'm a little bit confused as to
exactly what's happening with these witnesses or how they're
ever going to appear for deposition.  So I think that that's
something that the parties should talk about and incorporate

K1DHTERO

1    into any deposition protocol.

2            I'll just note with respect to location, I know in the

3    original deposition protocol we did contemplate every place

4    other than the Kingdom would be an appropriate place for

5    depositions.  I think the interests are different in this case,

6    given that these are potentially and likely either current or

7    former employees of a sovereign nation, and so I don't think

8    the presumption is the same as it was with respect to the other

9    category of defendants.

10            I also appreciate the plaintiffs' concerns and those,

11   obviously, play out the same, I think, in this case except on

12   the other side of the scale, I think, is a different

13   circumstance.  So I'm not going to categorically rule one way

14   or another right now, and I'm going to encourage the parties to

15   try to work to a compromise position.  But to assist in your

16   negotiations, I don't have the same view here in this instance

17   as I did with respect to the other depositions as to what would

18   be an appropriate location for depositions.

19            Here's where we are.  By the 3rd of February, the

20   Kingdom is to respond to all of the individuals identified in

21   this list.  I know that that number is larger than the number

22   that I'm authorizing, but the Kingdom is to respond to all of

23   them, and the plaintiffs will make decisions based on that

24   information.

25            By the 21st, which is a Friday, I want the parties to

K1DHTERO

submit to me a proposed deposition protocol.  I'm hoping it

will be submitted with a one-page cover letter that says this

is agreed to by all of the parties.  If not, each side can

submit a short letter on issues of dispute for me to resolve.

The plaintiffs will be entitled to 25 depositions of

individuals under the Kingdom's control and 15 nonparty

witnesses.  We'll also adopt the protocol with respect to

declarations, and you all should discuss an appropriate date by

which you need to identify those declarants and then an

appropriate date by which you're going to provide that

declaration so that everybody is on notice as to how that will

proceed.

          I'm hoping that you all can come to me with a clear

idea about these 35 other individuals and exactly who they are.

I still don't totally understand what category they even fall

into, but hopefully you can meet and confer.  To the extent the

plaintiffs have contact with these individuals, you should be

talking with them about what's appropriate.  It seems to me,

based on what you're telling me, that it would be most

appropriate for these individuals to submit declarations.  If

they're outside of the Court's jurisdiction, I don't know that

you'll be able to force their deposition.  In any event, you

need to think a little bit more about how to handle these folks

and talk with the Kingdom about them, and if appropriate, those

conversations should be under an attorneys' eyes and ears only

K1DHTERO

discussion.

I'm not going to set a close date for the depositions, but keep in mind that the date that I was thinking I was going to set when I took the bench was May 13.  That contemplated about 30 days to sort of get up and running, and now I think it's a little bit longer than that.  But that contemplated, in my mind, needing about 30 days to get up and running and then about 60 days to take these depositions and then an additional 30 days to sort of clean up and wind down.  So I think that can give you some guidance.  If those numbers are a little bit off, the parties should meet and confer and propose something to me, but that is around what I was thinking about.

I'm not ready to rule on expert witnesses.  What I think I'm going to want -- and maybe you can give this to me on the 21st as well -- I still don't have a good idea about what the plaintiffs are contemplating with respect to expert witnesses and whether or not they would be appropriate in this instance.  So I think what I would like would be a list of the expert or experts that the parties intend to or would offer if permitted and the subject matter of their testimony.  I don't need that by the 21st, but what I do want by the 21st is a schedule to get that to me plus or minus 30 days from February 21st, something like that, so that we can start to think about whether expert disclosure is appropriate or not.  If I'm going to authorize expert disclosure, it's going to be right on the

K1DHTERO

heels of the close of these depositions and maybe even some

overlap.

        I want to keep moving us forward, and so some of these

experts I appreciate you might need the testimony in order for

them to render their expert opinions, some of them you might

not, depending on who it is you're thinking about calling.  If

you're thinking about calling somebody -- I don't know that

this is necessary or appropriate -- but on the history and

relationship between the Kingdom of Saudi Arabia and the United

States, that person doesn't need to wait for depositions.  So

I'd like to know who you're thinking about, and then we can

figure out a schedule, if they're going to be permitted at all.

 I am going to also speak with Judge Daniels on that particular

topic, because he will ultimately be the decider for the final

stage in this process.  And so I think he has skin in the game

as to whether or not this type of testimony would be useful for

him.

        So by the 21st, if you can just include for me a

schedule -- I don't need the information yet -- but a

schedule to get me these expert disclosures, again, identifying

the individual and identifying the subject matter to allow the

Court to evaluate whether or not that would be appropriate.

        I think that covers everything that I wanted to cover

today.  Is there anything else?  Yes, Mr. Carter.

        MR. CARTER:  Your Honor, I had one minor point of

K1DHTERO

1    clarification.  Your Honor mentioned 15 nonparty depositions,

2    and I'm just trying to understand whether or not that would be

3    15 essentially substantive nonparty depositions or would that

4    also encompass nonparty depositions that are essentially

5    necessary for us to authenticate documents, understand codes on

6    documents.  We have quite a bit of, for instance --

7              THE COURT:  Can I interrupt you.  Can I ask that you

8    and the Kingdom talk about that.

9              MR. CARTER:  Sure.

10             THE COURT:  I don't know exactly if there's hundreds

11   of those people or if there's two of those people.  If you

12   could talk and make a proposal.  If it's pure authentication,

13   it may be appropriate for that not to count towards the 15 cap.

14   I don't know who you're thinking you might need and how close

15   it would bleed into a substantive deposition.  So why don't you

16   all discuss that category of people and let me know on the 21st

17   what you think is appropriate.

18             MR. CARTER:  Sure, your Honor.  Thank you.

19             THE COURT:  Is that fair?

20             MR. CARTER:   Yes.  Thank you, your Honor.

21             MR. RAPAWY:  Your Honor, one further clarification.

22   With regard to the 25 and the 15, to the extent that former

23   Kingdom officials who are on the list of 54 are voluntarily

24   appearing, those go in the 25 bucket not in the 15 bucket, is

25   that correct?

K1DHTERO

1          THE COURT:  The 25 would be everybody who's under the

2    Kingdom's control, even if they're voluntarily appearing as

3    part of the process.  I think former employees would fall

4    within that category.

5          MR. RAPAWY:  I think our view is those individuals

6    aren't necessarily under our control, but I understand what

7    your Honor is saying.

8          THE COURT:  OK.  Let me make one last point, which is

9    that I view formal paper discovery to now be over.  We've had

10   some litigation on this particular topic.  I view now formal

11   paper discovery to be over.  I know that plaintiffs are waiting

12   on motions for the FBI.  Obviously, those need to be ruled on,

13   and we'll get to those as soon as I can.

14          I'm also not including in that statement the

15   possibility and, I assume, the likelihood that during a

16   deposition someone would indicate a particular document or

17   category of documents that was not reasonably sought or maybe

18   was sought and not found but now the deposition makes clear

19   that it does exist, and so follow-up in the sort of ordinary

20   course that everybody is familiar with.

21          Yes, Mr. Pounian.

22          MR. POUNIAN:  Yes, your Honor.  You saw me jumping to

23   my feet.  We've been engaged in meet-and-confer with Saudi

24   Arabia regarding its last production that this judge -- that

25   your Honor ruled them to produce documents, and we have a

K1DHTERO

1    motion that we'd like to bring to your Honor on those

2    documents.  I was going to ask your Honor if we could simply

3    bring the motion and not go through the preliminary step of

4    asking for a pre-motion conference, but that motion is –- we

5    could probably have that motion ready next week to file before

6    your Honor.  We've already gone through the meet-and-confer

7    process with Saudi Arabia, and it's a motion that we've not had

8    yet the opportunity to demand that they produce documents that

9    they have so far refused to produce.

10          Specifically, one of the issues on it is they have

11   said they've gone to the prince's office, Prince Abdulaziz's

12   office for documents.  They say it's a private office, but we

13   have proof from the record that the prince was actually a

14   minister of state, a member of the cabinet of Saudi Arabia, and

15   that they never searched any of the cabinet offices of the

16   prince for documents.  I'm not going to argue the motion right

17   now, your Honor, but that's essentially the number one issue in

18   the motion.  There are other issues in the motion, but it is a

19   clear issue where we have a disagreement with Saudi Arabia

20   regarding the parameters of their search and what they searched

21   for and that they didn't look in the places where we believe

22   the documents would be located.

23          MR. CARTER:  Your Honor, if I could just add to that.

24   We had the meet-and-confer.  We went through a whole host of

25   issues for a call that lasted for a very long time, maybe an

K1DHTERO

1    hour and a half, and we sent a letter after.  I believe there

2    are essentially three discrete issues that we want to move on.

3    This is not a monster motion like some of the ones your Honor

4    has seen before.  It's three issues where we think either the

5    searches just weren't conducted in accordance with your Honor's

6    order and they need to be and one instance where we just have a

7    disagreement, and we've asked for a 30(b)(6), which I think

8    we'd get anyway as part of the deposition process on the nature

9    of the searches that were conducted.  So it's really three

10   discrete, limited issues about the compliance with the Court's

11   order.

12            THE COURT:  OK.  Kingdom want to be heard on this?

13            MR. RAPAWY:  I mean, your Honor, this was the motion

14   that I think they mentioned at the November 15 hearing that

15   they said would be ready to file in two to three weeks at that

16   time.  They got us their list of issues on December 16, which

17   was already outside that window.  We followed up promptly on

18   every communication they made.  I mean, we had been

19   anticipating that your Honor probably would permit them to file

20   it, and if so, should get that done.  I don't actually think

21   there would be anything unfair with saying that written

22   discovery has closed now, though we did ask for that as long

23   ago as November.  This has already taken a lot longer than they

24   suggested it would through no fault of ours.

25            THE COURT:  OK.  Let's set a date for the motion.  Are

K1DHTERO

1    you anticipating a brief versus a letter motion?

2                MR. POUNIAN:   That's fine, your Honor, either way.

3                THE COURT:  I'm asking.

4                MR. POUNIAN:   I think a brief would be preferable,

5    your Honor.   If we could have 15 pages for a brief.

6                THE COURT:   Today is Monday, the 13th.   When would you

7    like to file it?

8                MR. POUNIAN:   In a week.

9                THE COURT:   A week.   Would you like to not file it on

10   MLK Day?

11               MR. POUNIAN:   Yes, your Honor.

12               THE COURT:   OK.

13               MR. POUNIAN:   How about a week from Wednesday?

14               THE COURT:   A week from Wednesday.   So you'll file it

15   on the 22nd of January.

16          When would the Kingdom like to respond?   It's a

17   15-page brief.

18               MR. RAPAWY:   I think we could do it in two weeks, your

19   Honor.

20               THE COURT:   So you will respond on February 5, and

21   I'll give you 15 pages as well.

22          I will give the plaintiffs eight pages in a reply

23   brief.   Can you get that in a week?

24               MR. POUNIAN:   That's fine, your Honor.

25               THE COURT:   So your reply brief is due February 12,

K1DHTERO

1    which I think might be George Washington's birthday or Abraham

2    Lincoln's birthday.  OK.  January 22, 15-page brief;

3    February 5, a 15-page opposition; February 12, an eight-page

4    reply brief.

5            Very well.  Anything further from either side?

6            OK.  So I'll hear from you by way of a brief on the

7    22nd of January, and then I'll hear from both sides on the 21st

8    of February with a proposed deposition protocol and letter

9    briefs on the outstanding issues.  Thank you all for being

10   here.

11           Again, thank you to all the families for coming in.  I

12   appreciate it.  Happy New Year.

13           (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25