**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) <br> ECF Case |
|---|---|
| This document relates to: <br> *Ashton et al. v. al Qaeda Islamic Army*, *et al.*, | 02-cv-6977 (GBD)(SN) <br> ECF Case |

<u>**MEMORANDUM OF LAW FOR ENTRY OF PARTIAL**</u>
<u>**FINAL DEFAULT JUDGMENTS ON BEHALF OF**</u>
<u>***ASHTON/IRAN* PERSONAL-INJURY PLAINTIFFS**</u>

(***ASHTON / IRAN* PERSONAL INJURY 1**)

For the reasons set forth below and in the accompanying declaration of James P. Kreindler ("Kreindler Declaration"), the Plaintiffs identified in Exhibit A to the Kreindler Declaration filed contemporaneously with this application, by and through their counsel, Kreindler & Kreindler LLP, respectfully move this Court for an Order awarding them  (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Ashton*/*Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Ashton/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed. The assessment of personal-injury damages is a matter of first impression as there have been no orders by the Court yet that have addressed the award of damages to individuals who were

physically injured on September 11, 2001 in the Terrorist Attacks but survived to pursue damages against the terrorist-sponsor defendants.

Plaintiffs named the Islamic Republic of Iran ("Iran") as a defendant in their lawsuit against the sponsors of the September 11, 2001 Terrorist Attacks.  *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-2 at 17, ECF No. 11-5 at 45 - 49.  On July 9, 2015, the *Ashton* plaintiffs moved for judgment as to liability only. 03-md-1570 (S.D.N.Y.) ECF No. 2970.  On August 31, 2015, the Court granted the *Ashton* plaintiffs' application for judgment as to liability only. 02-cv-6977 (S.D.N.Y.) ECF No. 759.  The plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The plaintiffs identified in Exhibit A now request entry of partial final default judgment against Iran as to their claims.

## I.      Procedural History

### A.      Background Cases

Relying on evidence and arguments[1] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the

---

[1] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011 hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

*Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for[, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4. The Court has applied the same solatium values to claims of other solatium plaintiffs in the *Ashton/Iran* case. *See, e.g.,* ECF Nos. 3295, 3356, 3686, 3977, 4100, 4120, 4149, 4158, 4478, 4601, 4716, 4890, 5094, 5132, 5428. It has also done so in other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See, e.g.,* ECF Nos. 3175 at 2; 3300 at 1; 3358 at 9; 3363 at 16; 3399; and 3977 at 7.

This Court also previously found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. *See* ECF No. 2623 at 5; ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Ashton/Iran*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16 and 3363 at 28. Judge

Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos.

3383 at 2 and 3384 at 6.

On the issue of prejudgment interest, a December 28, 2015 Report and Recommendation,

adopted by this Court, concluded that to the extent the *Ashton* wrongful death plaintiffs' claims

arose out of injuries in New York State, the rate of prejudgment interest was 9 percent per annum

from September 11, 2001 until the date judgment was entered, and to the extent the injuries arose

elsewhere, 4.96 percent interest per annum compounded annually was appropriate.  *See* ECF No.

3175 at 1 – 2.  Subsequently, however, this Court concluded that the rate of prejudgment interest

of 4.96 percent was more appropriate. ECF No. 3384 at 6.   *See* 03-md-1570 (11-cv-7550).

**B.**     *Ashton, et al. v. al Qaeda Islamic Army, et al.*

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the

sponsors of the September 11, 2001 terrorist attacks, which included allegations against Iran. *See*

02-cv-6977 (S.D.N.Y.) ECF No. 1.  Iran was listed as a named defendant in the *Ashton*

Plaintiffs' Consolidated Amended Complaint, filed on March 6, 2003. *See* 02-cv-6977

(S.D.N.Y.) ECF No. 11-2 at 17, ECF No. 11-5 at 45 - 49.  This Consolidated Amended

Complaint (the "CAC") was served in compliance with FSIA requirements through diplomatic

channels, but Iran has never answered. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 424 at 2; *see also*

02-cv-6977 (S.D.N.Y.) ECF No. 358.  The *Ashton* Plaintiffs moved for a Certificate of Default,

which the Clerk of the Court issued. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 651.

Based on evidence and arguments submitted by various plaintiffs in this consolidated

multi-district litigation arising out of the September 11, 2001 terror attacks, the *Ashton* Plaintiffs

moved for a judgment of liability against Iran for claims arising out of the deaths of the

plaintiffs' decedents. ECF No. 3008.  In their motion for a liability default judgment, the *Ashton*

Plaintiffs relied on the Certificate of Default entered in the *Ashton* case, which was premised on

the CAC that Iran had never answered. ECF No. 2970 at 2.  They then moved for a default

judgment of liability against Iran only as to those causes of action established under the FSIA.

ECF No. 2970 at 2, 10 – 18.  This Court granted that motion for a default judgment of liability.

ECF No. 3014.[2]

The *Ashton/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court

grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts

commensurate with the injuries these individuals sustained during the Terrorist Attacks on

September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the

District of Columbia in similar cases factoring in an upward departure on damages values based

on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest

at the rate of 4.96 percent per annum, compounded annually for the period from September 11,

2001 until the date of the judgment; and (3) leave for the *Ashton*/*Iran* Personal-Injury plaintiffs

identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later

date; and (4) for all other *Ashton/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to

submit applications for damages awards in later stages, to the extent such awards have not

previously been addressed.

## II.    Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception

to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the

provision of material support or resources for acts of terrorism where the acts or provision of

---

[2] The *Ashton* Plaintiffs at the same time also moved for permission to file an Amended Consolidated Complaint against Iran, asserting the same jurisdictional allegations as in the prior complaints, adding a claim based on the new provision of the FSIA enacted subsequent to the filing of the original suits against Iran and adopting and incorporating by reference the prior *Ashton* allegations against Iran. ECF Nos. 2968, 2968-1 at 1 - 2 (adding allegations under 28 U.S.C. § 1605A).  The Court issued an Opinion and Order that allowed the *Ashton* Plaintiffs to amend their pleadings as to Iran without requiring service of the amended pleadings. ECF No. 3227.  Plaintiffs thereafter filed the Amended Consolidated Complaint on the docket. ECF. No. 3237.

support or resources were engaged in by an official, employee, or agent of the foreign state while

acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1).

The statute specifies that damages are available "for personal injury or death," 28 U.S.C. §

1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and

punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.       Personal-Injury Damages

The plaintiffs identified in Exhibit A include individuals who were on site at the time of

the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding

area) or who were among those who entered the premises in the vicinity of the World Trade

Center or the Pentagon and were injured on September 11, 2001 by subsequent damage resulting

from the attacks.  The range of injuries of individuals who were injured on September 11, 2001

range from broken bones to significant burn injuries to traumatic brain injuries.  One non-

physical injury that accompanies nearly all of these physical injuries is the onset of post-

traumatic stress disorder for most of the individuals who were caught in the melee of the attacks

on September 11, 2001.  Under the FSIA, these injuries are all compensable, and given that these

injuries occurred on September 11, 2001 either as a direct result of the attacks, the ensuing chaos

from the attacks in the immediate aftermath, or as a result of first responders attempting to assist

the injured or endangered to flee from the scene on September 11, 2001, the proximate causation

of these injuries cannot truly be in question.

This Court has previously looked to precedent in the U.S. District Courts for the District

of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28

U.S.C. § 1605A.  Well-established caselaw exists in the D.C. District Court regarding the

measurement of pain and suffering damages in personal-injury cases such as this one.  In *Cohen*

*v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that

it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages."  268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This "baseline" figure for personal-injury damages may also be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment."  *Peterson*, 515 F. Supp. 2d at 52.  Less severe injuries to the plaintiff may show it is appropriate to move the award downward in the range of $2 million to $3 million whereas a more permanent injury or impairment may justify a larger award between $7 million and $12 million.  *See Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp.2d at 38). In the latter situation, the upward adjustment has been found appropriate "in more severe instance of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead."  *See Barry v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 150491, at *29 (D.D.C. Sept. 4, 2019) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)). The downward departure "has been found appropriate where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,'… or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Id.* (quoting *Valore* and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).

## B.     Upward Departure for Damages Resulting from the Terrorist Attacks on September 11, 2001

Whereas the D.C. District Court has established certain parameters for addressing damages for personal-injury claims under the FSIA, this Court has previously addressed the nature of the Terrorist Attacks on September 11, 2001 and the indelible mark they have left on

7

this country and more specifically on the victims. Many of the personal-injury victims whose claims are being submitted to the Court in these proceedings continue to live in close proximity to the areas where they sustained their injuries, and for those in New York, the reminder of the attacks is inescapable—annual commemorations of the lost on September 11, 2001 at Ground Zero, the illumination of the skyline with two beams of light representing the Twin Towers during the same time period each year, and simply watching the building of the Freedom Tower on the site of the two fallen towers. Furthermore, these attacks are ingrained in the consciousness of the American public. The attacks are taught in American schools, and the popular-culture references can evoke triggers in many of these victims who suffer from some level of either post-traumatic stress disorder or other emotional distress as a result of their involvement as victims of the attacks.

As Magistrate Judge Maas first held in 2012—based in part on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day"— "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)). While Judge Maas' decision—adopted by Judge Daniels—applied to solatium damages for family members of individuals who were killed on September 11, 2001, the logic equally applies to individuals who were present and physically injured in the attacks on September 11, 2001 and continue to experience the same reminders in their everyday life that would impact these other family members. In fact, it is arguable that the

impact would be more severe for someone who was physically present and whose life was endangered by the attacks.

For the solatium damages, the upward departure adopted by this Court constituted an upward increase of 56.25% for spouses (from $8 million to $12.5 million); 70% for parents and children (from $5 million to $8.5 million); and 70% for siblings (from $2.5 million to $4.25 million). A similar upward departure should be adopted by this Court for personal-injury claimants who sustained physical injury as a direct result of the Terrorist Attacks on September 11, 2001. Individuals who were in harm's way on September 11, 2001 as a result of the terrorist attacks and sustained physical injury while experiencing a true fear for their lives in addition to the physical injuries they sustained while also experiencing what can only be described as a battle scenario with death all around them should have the $5 million baseline award increased in accordance with the increase to parent and children solatium awards for wrongful death to $8.5 million as the baseline for personal-injury claims arising on the day of September 11, 2001. Furthermore, more severe injuries with severe or permanent impairment should be granted an upward departure in the range of $12 million to $20 million. Finally, any downward departure should be in the range of $2.5 million to $5 million for those claims where the physical injuries are less severe but are accompanied by severe emotional damages. As the D.C. District Court decisions have stated, "[t]he award of damages for physical injuries 'assume[s] severe psychological injuries." *Barry*, 2019 U.S. Dist. LEXIS 150491, at *29.

## C.   Punitive Damages

Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. § 1605A(c)(4). Previously in this case, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This

Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, a different magistrate judge recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28.  Judge Daniels adopted that recommendation, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, the *Ashton* Plaintiffs request permission to address the issue of punitive damages at a later date.  *See, e.g.*, ECF No. 3666 (Judge Daniels' order authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

D.      **Prejudgment Interest**

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  In light of the Court's prior orders granting motions for damages for the deaths and injuries suffered on September 11, 2001 in the Terrorist Attacks which applied the 4.96 percent rate to prejudgment interest, the *Ashton/Iran* Plaintiffs identified in Exhibit A

respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.  Individualized Case Assessments

Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to the Court on January 10, 2020 in an effort to assist the Court in addressing these claims in an efficient manner.  *See* ECF No. 5484.

### A.  Andrzej Cieslik[3]
### Injury Category: Building Collapse / Escape Injuries
### Severity: Severe

Andrzej Cieslik, born in Krakow, Poland but living in the United States since 1982, was forty-eight years old on September 11, 2001 and was working at 2 World Trade Center in the lobby of the second floor on a molding machine for a company based out of Tennessee.  Andrzej had trained as an electrician in Poland, was a carpenter by trade in New York and was a long-time member of the Carpenter & Joiners Union Local 608.  He became a naturalized United States citizen after September 11, 2001, but before he died in 2006.[4]

---

[3]. Andrzej Cieslik died intestate and his next-of-kin are in the process of having a personal representative appointed to administer his Estate. On January 29, 2020, Andrzej Cieslik's surviving spouse Zofia Cieslik submitted a motion to substitute as plaintiff (ECF No. 5768) and asked this Court to grant damages on her behalf as the anticipated representative of the Estate, but that motion was denied (ECF No. 5787). The Cieslik family nevertheless is asking for a judgment on behalf of Andrzej Cieslik with any such recovery relating to that judgment to be held in escrow pending formal appointment of a representative of the Estate. In the alternative, if the Court is disinclined to hold any collection of judgment pending appointment of the Estate representative, we ask that any denial be without prejudice to renew upon formal appointment of the Estate representative.

[4] The Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"), provides that a "court shall hear a claim" arising out of an act of terrorism for which a designated state sponsor of terrorism has been held responsible if "the claimant or the victim was, at the time the [terrorist] act" that caused the injuries "occurred" was a United States national (among other categories.)  While the initiating *Ashton* suit against Iran claimed jurisdiction under the FSIA, among other statutes, subsequently, the Justice Against Sponsors of Terrorism Act, 28 U.S.C. § 1605B ("JASTA"), provided an additional jurisdictional basis, and JASTA has been included in all short form complaints against Iran since this Court adopted that process.  Under JASTA, "a national of the United States may being a claim against a foreign state" when a "national of the United States … by reason of an act of international terrorism, or his or her estate, survivors, or heirs" has been "injured in his or her person[.]" 28 U.S.C. § 1605B(c) and 18 U.S.C. § 2333(a). Though Andrzej Cieslik was not a national of the United States on September 11, 2001, he was one at the time that he brought this claim.

When United Airlines Flight 175 hit 2 World Trade Center, the force from the crash and subsequent explosion rushed down the elevator shafts, blew through the ground level elevator doors and sent a near-explosive column of hot air into the lobby.  The pressure from this event knocked Andrzej off his feet and slammed him against a marble pillar.

Andrzej hit the pillar hard with his right side upper back, shoulder and neck.  The sounds and force of the explosion were terrifying and Andrzej feared for his life.  After the impact, Andrzej shakily got to his feet and managed to escape from the building.  He saw an injured co-worker on the ground and helped him out of the building, as well.  When the two were outside, a police officer directed them to go to a fire station on Liberty Street for first aid.  At the fire station, Andrzej was examined and given pain medication.

The first building fell when Andrzej was still at the fire station.  The sound of the building collapse was deafening and the sight terrifying.  Andrzej feared for his life again as a huge white cloud of dust and debris rapidly started to approach near him and covered everything in sight.  Everyone in the fire station, including Andrzej, began to run in panic.  When the cloud began to overtake him, Andrzej could not see ahead of him and did not know what to do or where to go.  He was having trouble breathing and could hear masses of people running through the streets.  He was terrified he would be trampled in the rush.  He waited near a mailbox on Fulton Street, and was cowering underneath it when the second building fell.  After a while, an eerie darkness descended and Andrzej decided to try to escape the area.  He was disoriented, dizzy and weak and had trouble breathing.  He did not get far before he lost consciousness and fell to the ground.  A nearby ambulance took him to Beth Israel Hospital.

After 6 to 7 hours at the hospital, where Andrzej's eyes were treated, he was given a general examination received back and neck x-rays and was given pain medication, he left

The x-rays from Andrzej's emergency room visit revealed no broken bones or dislocations.  The treating physician did, however, detect tissue damage and recommended that Andrzej get an MRI.  This was done on January 3, 2002.  The MRI was then reviewed by two neurosurgeons in February 2002.  Both agreed that Andrzej had a herniated cervical spinal disc at C6-C7, and that it was causally related to his impact with the pillar on September 11, 2001.  Both also agreed that he may ultimately require surgery, but wanted to try non-invasive treatment first.

On September 12, 2003, Andrzej began receiving worker's compensation benefits and was sent to a neurologist by the New York Worker's Compensation Board for an independent medical examination.  The examining physician confirmed the existence of the herniated disc and also identified bulged discs at the C3-C4 and C5-C6 levels.  He also diagnosed Andrzej with cervical radiculopathy, which is a dysfunction of the nerve roots at the cervical spine.  The physician prescribed physical therapy three times per week for eight weeks and recommended postponing surgery until the results of the therapy could be assessed.

Andrzej returned to this physician in October 2002 for a follow up examination.  The doctor concluded that the physical therapy had been of no assistance and stated that surgery was a reasonable next step.  He also noted that Andrzej had increased pain radiating down his right arm with numbness and tingling in his first, second and third fingers.  This, he said, was indicative of more advanced stages of cervical radiculopathy.  Finally, noting that Andrzej was a right-handed carpenter with degenerative symptoms in his right hand, the doctor indicated to the worker's compensation board that Andrzej had a moderate partial work disability.

During the months following September 2001, Andrzej also experienced acute pain in his right shoulder.  In December 2002, he had an MRI of that area that showed a full thickness tear in one of his tendons.  This too was attributed to his accident.  Andrzej underwent corrective

surgery for the tear in January 2003.  However, during a follow up visit in July 2003, his surgeon noted that a partial tear still existed. In addition to the severe and debilitating injury he sustained on September 11, 2001, up until the time of his death on October 25, 2006, Andrzej had to live with pain on a daily basis.  Additionally, he suffered extreme fear of death during the events of September 11 and his multiple attempts to escape the area.  In the years after September 11, 2001, he struggled with nightmares, severe anxiety, anger and sleep disorders.

**B.    Leonard Ardizzone**
**Injury Category: Building Collapse Injuries**
**Severity: Devastating**

On September 11, 2001 Leonard Ardizzone was buried under the rubble of Two World Trade Center for eight agonizing hours.

On the day of the Terrorist Attacks, Leonard, known as "Lenny," had worked for the Port Authority of New York and New Jersey for nearly 28 years.  He was the Director of Maintenance for the World Trade Center and supervised up to 130 workers over the course of a typical day.  On February 26, 1993, Lenny had been working on the second basement level of One World Trade Center when terrorists set off a bomb in the building.  That day, Lenny heroically joined the rescue efforts, receiving awards for his bravery.

Given his past direct experience with a terrorist attack, when the first plane hit on September 11, 2001, Lenny's instincts and memory led him instantly to the conclusion that the crash was no accident.  He immediately began assisting fire department personnel upon their arrival to One World Trade Center and helped evacuate the building.  He shepherded hundreds of people safely out of One World Trade Center and, in the midst of horrific conditions, also directed emergency medical teams and injured civilians to a triage area that he had established award from glass windows.

Soon thereafter, the head of Port Authority security asked Lenny to go to Two World Trade Center to help secure the command center that had been abandoned.  Disregarding his own safety, Lenny went to fulfill what he felt was his duty.  He was walking into the lobby of Two World Trade Center when the building began to collapse.  Lenny ultimately fell three stories to the B3 level where he was buried under a crushing weight of debris for a total of eight grueling hours.  During that time, he was in terrible pain and fell in and out of consciousness.

Around 3:00 pm that afternoon, a firefighter was crawling through the rubble beneath what had been Two World Trade Center when he heard Lenny's faint cry for help.  The firefighter "crawled over chunks of concrete down what had been an *escalator and another 300 feet towards the sound.*" *See* Kreindler Decl., Exh. D (*New York Daily News* "WTC Survivor Meets his Rescuers," January 20, 2002).

Lenny recalls that, *"I was crying out for a long time. When I saw the light from the flashlight, I knew I was saved."*  They knew that they had to hurry because there was a fire below them and they smelled smoke. First they had, to clear a *"40 foot chasm."* Lenny was in excruciating pain, but they had to get out of there because the area was unstable. Because Lenny was unable to stand up, a firefighter dragged him away by rolling him onto his back, "like a human sled."  They then slowly made their way back to where four other firefighters were clearing a tunnel. They could all see that Lenny was in bad shape. The bone was protruding through the skin of his left leg and his head was split open.  Two of the firefighters splinted Lenny's legs and bandaged all of his wounds with whatever was available at the time.  They all made it out at 5:25 pm, narrowly escaping the collapse of Seven World Trade Center just 20 minutes later, which buried the tunnel they had just used.  The route to safety had almost become their tomb.

Lenny was initially treated at St. Vincent's Hospital, where he had surgery and remained for two weeks.  The injuries that Lenny Ardizzone sustained on September 11, 2001 included open fractures of both legs; multiple lacerations and third degree burns on his face, forehead, scalp, nose, chin, right arm, right elbow and right hand requiring surgery; cerebral concussion with post-concussion syndrome; traumatic brain injury; daily headaches; partial amputation of left ear with disfigurement and loss of hearing; mild loss of hearing in his right ear; multiple traumatic orthopedic derangements; disruption of normal vision; sleep disturbances; post-traumatic stress disorder and major depression; respiratory difficulties; residual pain; and ongoing orthopedic limitations.

Based on his permanent and debilitating injuries and his loss coupled with the related and ongoing mental, psychological and emotional anguish, Plaintiffs submit that Leonard Ardizzone should be granted an upward departure from any baseline damages award for the injuries he sustained on September 11, 2001.

## IV.   Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the *Ashton/Iran* plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Ashton*/*Iran* Personal-

Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Ashton/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: January 31, 2020                     Respectfully submitted,

                                            KREINDLER & KREINDLER LLP

                                            BY:    /s/ James P. Kreindler
                                            James P. Kreindler, Esq.
                                            750 Third Avenue, 32nd Floor
                                            New York, New York 10017
                                            Tel: (212) 687-8181
                                            Attorneys for the *Ashton/Iran* Plaintiffs