**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br><br>ECF Case |
| This document relates to:<br>*Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | 15-cv-9903 (GBD)(SN)<br><br>ECF Case |

<u>**MEMORANDUM OF LAW FOR ENTRY OF PARTIAL**</u>
<u>**FINAL DEFAULT JUDGMENTS ON BEHALF OF**</u>
<u>***BURNETT/IRAN* PERSONAL-INJURY PLAINTIFFS**</u>

**(*BURNETT / IRAN* PERSONAL INJURY 3)**

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order awarding them  (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett*/*Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.  In this case, the assessment of personal-injury damages is a matter of first impression as there have been no judgments entered to date that have

addressed the award of damages to individuals who were physically injured in the Terrorist Attacks on September 11, 2001 but survived to pursue damages against the Defendants.

Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the 9/11 Attacks.  On December 1, 2016, all plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), moved for judgment as to liability only.  15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69.  On January 31, 2017, the Court granted plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85.  The plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims.

## I.     Procedural Background

### A.     Related Cases

Relying on evidence and arguments[1] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of

---

[1] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

2

plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for[, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.  The Court has applied the same solatium values to claims of other solatium plaintiffs in the *Burnett/Iran* case (ECF No. 3666) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See, e.g.,* ECF Nos. 3175 at 2; 3300 at 1; 3358 at 9; 3363 at 16; 3399; and 3977 at 7.

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5.  The Court has applied that 3.44 multiplier also to judgments in the *Ashton* case. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards

previously awarded in *Burnett/Iran*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16 and 3363 at 28.  Judge Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5).  In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and has applied the nine percent interest rate in multiple instances in the *Ashton* and *Bauer* matters. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.  However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all of the solatium claims. ECF Nos. 3358 at 17-20 and 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2 and 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett/Iran*.  *See, e.g.,* ECF No. 3666.

B.     *Burnett, et al. v. Iran* **Defendants**

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903, ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903, ECF No. 67.  On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, 15-cv-9903 ECF Nos. 65, 66, which application was amended on December 6, 2016 (15-cv-9903, ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903, ECF No. 85.  On July 31, 2017, June 8, 2018, August 28, 2018, September 13, 2018, September 4, 2018, September 3, 2019, September 6, 2019, September 11, 2019, and December 13, 2019 (ECF Nos. 3666, 4023, 4126, 4175, 4146, 5061, 5062, 5087, 5138, and 5356), the Court granted orders of judgement to different subsets of *Burnett/Iran* plaintiffs who filed for entry of partial final default judgments.

The *Burnett/Iran* plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett/Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later

date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## II.     Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.     Personal-Injury Damages

The plaintiffs identified in Exhibit A include individuals who were either on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); Arlington, Virginia (in or around the Pentagon); or Shanksville, Pennsylvania (where United Flight 93 crashed), or who were among those who entered the premises in the vicinity of the World Trade Center or the Pentagon and were injured on September 11, 2001 by subsequent damage resulting from the attacks.  The range of injuries of individuals who were injured on September 11, 2001 range from pulmonary issues resulting from smoke inhalation to broken bones to significant burn injuries to limb amputations.  One non-physical injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the melee of the attacks on September 11, 2001.  Under the FSIA,

these injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered to flee from the scene, the proximate causation of these injuries cannot truly be in question.

This Court has previously looked to precedent in the U.S. District Courts for the District of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28 U.S.C. § 1605A.  Well-established caselaw exists in the D.C. District Court regarding the measurement of pain and suffering damages in personal-injury cases such as this one.  In *Cohen v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages."  268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This "baseline" figure for personal-injury damages may also be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment."  *Peterson*, 515 F. Supp. 2d at 52.  Less severe injuries to the plaintiff may show it is appropriate to move the award downward in the range of $2 million to $3 million whereas a more permanent injury or impairment may justify a larger award between $7 million and $12 million.  *See Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp.2d at 38).  In the latter situation, the upward adjustment has been found appropriate "in more severe instance of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for

7

dead." *See Barry v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 150491, at *29 (D.D.C. Sept. 4, 2019) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)). The downward departure "has been found appropriate where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,'… or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Id.* (quoting *Valore* and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).

**B.** **Upward Departure for Damages Resulting from the Terrorist Attacks on September 11, 2001**

Whereas the D.C. District Court has established certain parameters for addressing damages for personal-injury claims under the FSIA, this Court has previously addressed the nature of the Terrorist Attacks on September 11, 2001 and the indelible mark they have left on this country and more specifically on the victims. Many of the personal-injury victims whose claims are being submitted to the Court in these proceedings continue to live in close proximity to the areas where they sustained their injuries, and for those in New York, the reminder of the attacks is inescapable—annual commemorations of the lost on September 11, 2001 at Ground Zero, the illumination of the skyline with two beams of light representing the Twin Towers during the same time period each year, and simply watching the building of the Freedom Tower on the site of the two fallen towers. Furthermore, these attacks are ingrained in the consciousness of the American public. The attacks are taught in American schools, and the popular-culture references can evoke triggers in many of these victims who suffer from some level of either post-traumatic stress disorder or other emotional distress as a result of their involvement as victims of the attacks.

As Magistrate Judge Maas first held in 2012—based in part on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day"—"[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks,

and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).  While Judge Maas' decision—adopted by Judge Daniels— applied to solatium damages for family members of individuals who were killed on September 11, 2001, the logic equally applies to individuals who were present and physically injured in the attacks on September 11, 2001 and continue to experience the same reminders in their everyday life that would impact these other family members.  In fact, it is arguable that the impact would be more severe for someone who was physically present and whose life was endangered by the attacks.

For the solatium damages, the upward departure adopted by this Court constituted an upward increase of 56.25% for spouses (from $8 million to $12.5 million); 70% for parents and children (from $5 million to $8.5 million); and 70% for siblings (from $2.5 million to $4.25 million).  A similar upward departure should be adopted by this Court for personal-injury claimants who sustained physical injury as a direct result of the Terrorist Attacks on September 11, 2001. Individuals who were in harm's way on September 11, 2001 as a result of the terrorist attacks and sustained physical injury while experiencing a true fear for their lives in addition to the physical injuries they sustained while also experiencing what can only be described as a battle scenario with death all around them should have the $5 million baseline award increased in accordance with the increase to parent and children solatium awards for wrongful death to $8.5 million as the baseline for personal-injury claims arising on the day of September 11, 2001.  Furthermore, more severe injuries with severe or permanent impairment should be granted an upward departure in the range of $12 million to $20 million.  Finally, any downward departure should be in the range of $2.5

million to $5 million for those claims where the physical injuries are less severe but rather accompanied by severe emotional damages.  As the D.C. District Court decisions have stated, "[t]he award of damages for physical injuries 'assume[s] severe psychological injuries." *Barry*, 2019 U.S. Dist. LEXIS 150491, at *29.

### C.     Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages.  *See* 28 U.S.C. §1605A(c)(4).  In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623).  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g*., ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request leave to address the issue

of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### D.   Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14).  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  *World Trade Farmers Market, Inc. v. American Airlines, Inc.* (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619,

*66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.   Individualized Case Assessments

In an effort to provide the Court with a cross-section of the types of claims that they intend to submit in advance of the Court's February 3, 2020 deadline, Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to the Court on January 10, 2020. *See* ECF No. 5484. While Plaintiffs' motion addresses claims in multiple categories, by narrowing down the categories in which these claims arise, Plaintiffs are attempting to assist the Court in addressing these claims in an efficient manner.

A.    **Lynette Bangaree**
       **Injury Category:[2] Escape Injuries**
       **Severity: Significant**

Lynette Bangaree was employed a few blocks from the World Trade Center complex at 180 Maiden Lane, but because it was such a nice day, she was walking a few extra blocks to work near the World Trade Center when she witnessed the second plane strike the South Tower.  *See* Eubanks Dec., Ex. B, Dec. of Lynette Bangaree at ¶¶3-5.  She inexplicably injured her ankle in the chaos that ensued following the second impact, and she was assisted in reaching her office a few blocks away.  *Id.* at ¶¶5-6.  It was later determined that Ms. Bangaree had sustained a fractured calcaneus (heel bone) that caused her to be out of work for approximately six months.  *Id.* at ¶¶6-7.  She has also experienced emotional distress through panic attacks and post-traumatic stress disorder.  *Id.* at ¶8.  Based on the injuries she sustained on September 11, 2001, Plaintiffs submit that Ms. Bangaree should be granted a downward departure from the baseline damages judgment as determined by the Court.

B.    **Eduardo E. Bruno**
       **Injury Category: Impact Injuries**
       **Severity: Severe**

Eduardo E. Bruno was an active duty member of the United States Army working at the Pentagon working as a Personnel and Administrations Sergeant in the Office of the Administrative Assistant to the Secretary of the Army in Room 1E517 in Wedge 2.  *See* Eubanks Dec., Ex. C, Dec. of Eduardo E. Bruno at ¶¶2-3.  He was discussing the attack on the World Trade Center when he began to feel the building shake and heard what he believed to be jet engines roaring.  *Id.* at ¶6.  An explosion sent him backwards through a wall into the next room where he lost consciousness.  *Id.* at ¶7.  When he awoke, his lungs were burning, and he was surrounded by an incredibly intense

---

[2] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14.

heat from burning jet fuel. *Id.* at ¶8. He was pinned to the floor by ceiling girders and debris. *Id.* He heard people crying out for help, and then he heard his friend Roxane cry out which caused him to muster his energy to get out from under the debris. *Id.* at ¶10. After freeing Roxane, he encountered April Gallop whose infant child was thrown from his baby carrier in the attack. After locating the baby, Mr. Bruno helped carry the baby to safety. *Id.* at ¶¶11-12. He was diagnosed as having post-traumatic stress disorder; traumatic brain injury with associated severe migraine headaches; right knee strain/contusion; medial meniscus tear; sprain/strain of the lumbar spine with degenerative disc disease; and radiculopathy of the right lower extremity. *Id.* at ¶17. He continues to suffer from his emotional trauma in addition to the traumatic brain injury which prevents him from performing many physical tasks with any consistency. He is unable to hold a job due to his physical and emotional limitations, and he was discharged from the military. *Id.* at ¶¶29-30. He has been determined as totally and permanently disabled by the VA. *Id.* at ¶31. Based on the severe injuries he sustained and the severe emotional trauma he suffers, Plaintiffs submit that Mr. Bruno should be granted an upward departure from the baseline damages judgment as determined by this Court.

C. **Richard Collins**
**Injury Category: Impact/Escape/Building Collapse Injuries**
**Severity: Severe**

Richard Collins was a Building Engineer for ABM Industries Inc. on the 7th floor of One World Trade Center on September 11, 2001. *See* Eubanks Dec., Ex. D, Dec. of Richard Collins at ¶3. Mr. Collins had been in lavatory close to the 50 Car elevator when the first plane struck the North Tower. *Id.* at ¶5. After the impact, Mr. Collins heard the 50 Car elevator plummeting followed by its cables, and he then heard a number of explosions. *Id.* at ¶6. An I-beam crashed through the ceiling next to the elevator and struck the floor adjacent to where Mr. Collins was

standing. *Id.* He attempted to find safety, but he was stuck in the storage room near the elevators at which point an explosion was set off that blew him against the door and set the room on fire. *Id.* at ¶¶7-8. Battling flames and smoke, he was able to open the door, look for other coworkers, and then proceeded to the stairwell where he collapsed because he could not breathe from the smoke inhalation. *Id.* at ¶¶9-10. Two men carried him down the staircase and they exited through the Marriott Hotel. *Id.* at ¶11. It was at this point that United Airlines Flight 175 struck the South Tower. *Id.* at ¶12. He was beginning to re-enter the Marriott for rescue and recovery operations when the South Tower began to collapse. *Id.* at ¶13. He attempted to run across West Side Highway, but he was lifted off of his feet, thrown to the pavement and lifted up again and being slammed onto his knees. *Id.* He was buried under debris from the collapse. *Id.*

As a result of his experiences on September 11, 2001, Mr. Collins sustained a left knee contusion with a tear of the posterior horn of the medial meniscus; bilateral chondromalacia; Hepatitis C; loss of hearing in his left ear; lower right forearm contusion; eye trauma including loss of vision in his right eye; irritant-induced asthma; chronic sinusitis; esophageal reflux; and Reactive Airways Disease Syndrome (RADS). *Id.* at ¶17. He has also been diagnosed with post-traumatic stress disorder. *Id.* He has undergone multiple medical procedures, lost his job, and he was subsequently determined to be permanently and totally disabled based on the injuries he sustained on September 11, 2001. *Id.* at ¶23. Based on his experiences escaping death at numerous points in his ordeal and the permanent injuries he sustained both physical and emotional, Plaintiffs submit that Mr. Collins should be granted an upward departure from the baseline damages judgment as established by this Court.

**D.    Walter Henry Cramer, Jr.**
      **Injury Category: Falling Debris Injuries**
      **Severity: Severe**

Walter Henry Cramer, Jr.—a Vice President of Tax Services at Fiduciary Trust Company in the South Tower—was at the corner of Liberty Street and Cedar Street at the time that the first plane struck the North Tower. *See* Eubanks Dec., Ex. E, Dec. of Walter Henry Cramer, Jr. at ¶¶3-4. In order to avoid falling debris as he was standing exposed on the street, Mr. Cramer dover into a nearby loading dock. *Id.* at ¶5. His brother and sister-in-law were in the towers when the attacks took place, and he learned later that they had not survived the attacks. *Id.* at ¶¶3, 5. Mr. Cramer sustained severe back damages and injuries to his hands. He had mild to moderate disc desiccation and degeneration at L3 to L4; slightly lesser degree of disc desiccation at L4 to L5 and L5 to S1; moderate right posterolateral disc herniation at L5 to S1; moderate left far lateral bulging/hernation at L4 to L5; mild diffuse annular bulging at L4 to L5; and right S1 radiculopathy and left L5 radiculopathy. *Id.* at ¶6. These injuries made sitting at a desk incredibly difficult, and he was forced to retire in January 2003 due to the strain that work was placing on his back. *Id.* at ¶7. He suffers from acute stress reaction and post-traumatic stress disorder which manifests in nightmares, intrusive thoughts, feelings of sadness and remorse, and intense feelings of survivor's guilt. *Id.* at ¶8. He has also sustained the loss of his brother who was his best friend. *Id.* Based on the serious and debilitating injuries that Mr. Cramer sustained on September 11, 2001, Plaintiffs submit that he should be granted an upward departure from the baseline damages judgment as established by the Court.

E.     **Clifford Jenkins**
       **Injury Category: Falling Debris Injuries**
       **Severity: Significant**

Clifford Jenkins was employed at One World Financial Center; however, he was standing outside the North Tower at the time of the attacks on September 11, 2001. *See* Eubanks Dec., Ex. F, Dec. of Clifford Jenkins at ¶3.  Mr. Jenkins was struck with debris that fell from the towers causing shoulder impingement, a concussion, and also smoke inhalation injuries on September 11. *Id.* at ¶4.  His emotional distress is also severe as he suffers from insomnia, flashbacks, periods of dejection, dysphoria, irritability, guardedness, brooding, and depression in addition to weight gain and persistent anxiety coupled with survivor's guilt.  *Id.* at ¶5.  Based on the injuries he sustained and the emotional trauma from which he continues to suffer, Plaintiffs submit that Mr. Clifford should be granted a downward departure from the baseline damages judgment as established by this Court.

F.     **Mark D. Joseph**
       **Injury Category: Falling Debris Injuries**
       **Severity: Severe**

Mark D. Joseph worked on the 22nd floor of the North Tower for Anderson, Davis & Cooper and had just gotten off the elevator when the first plane struck the North Tower.  *See* Eubanks Dec., Ex. G, Dec. of Mark D. Joseph at ¶3.  He heard an explosion behind him and ran into his office to tell people to leave after which we proceeded down the stairs to the lobby.  *Id.*  In the lobby, a set of elevator doors seemingly exploded and a ball of fire engulfed anyone in its path. *Id.*  He began running past the North Tower, but others with him were killed by jumpers from the North Tower.  *Id.*  He was subsequently struck by something falling which knocked him to the ground and knocked out his upper front teeth and caused him to bleed from his head.  *Id.*  He continues to have scarring and pressure headaches from the debris that struck him on September

11, 2001, and particles of the debris remain lodged in his head. *Id.* at ¶4. He suffered from emotional trauma including post-traumatic stress disorder with flashbacks, despair, withdrawal from others, and suicidal ideation. *Id.* at ¶5. Even though he was never a smoker, he developed nodules on his lungs and other respiratory issues, and the medications intended to treat his emotional problems have led to cardiac problems in addition to his stress and anxiety. *Id.* at ¶6. Based on the injuries and resulting physical and emotional trauma that Mr. Joseph endured on September 11, 2001 and in the years since, Plaintiffs submit that he should be granted the baseline damages judgment as determined by this Court.

G.    **Susanne Kikkenborg**
      **Injury Category: Building Collapse Injuries**
      **Severity: Significant**

Susanne Kikkenborg was a demi-chef working at the Marriott World Trade Center on September 11, 2001 when the terrorist attacks took place. *See* Eubanks Dec., Ex. H, Dec. of Susanne Kikkenborg at ¶4. As she tried to escape after the first plane hit, she was forced back into the hotel due to falling debris. *Id.* at ¶5. As the hotel began to fill with dust, debris, and smoke, she escaped and crossed the West Side Highway at which point the second plane struck the South Tower. *Id.* She was five blocks away when the South Tower collapsed enveloping her in its dust cloud, and she spent eight hours in the disaster area where she was exposed to significant amounts of dust and debris from the collapsed towers. *Id.* Ms. Kikkenborg has been diagnosed with interstitial lung disease, chronic respiratory disorder, chronic rhino sinusitis, GERD, RADS, and extrinsic asthma while also developing certain autoimmune diseases including lupus, methylenetetrahydrofolate reductase and diverticulitis. *Id.* at ¶6. She has also been severely impacted by post-traumatic stress disorder resulting in an alcohol dependency that she has since overcome. *Id.* at ¶7. Based on the exposure and the emotional trauma she sustained on September

18

11, 2001, Plaintiffs submit that Susanne Kikkenborg should be granted a downward departure from the baseline damages judgment as determined by this Court.

> ### H.   Stephen J. King III
> ### Injury Category: Building Collapse Injuries
> ### Severity: Severe

Stephen J. King III was working as a Battalion Chief for the New York City Fire Department and was present near the World Trade Center when the second plane struck the South Tower on September 11, 2001. *See* Eubanks Dec., Ex. I, Dec. of Stephen J. King III at ¶¶3-4. Mr. King witnessed the North Tower get hit from his post in Brooklyn and immediately called for a first-responder team to head toward the World Trade Center. *Id.* at ¶7. He and his aide Bobby Crawford ran into the tower to help the evacuation effort, and Mr. King served at the command post in the North Tower. *Id.* He received a radio transmission that the tower was collapsing, and as the South Tower fell, Mr. King's life truly flashed before his eyes. *Id.* When the rumbling came to a stop, Mr. King realized he was alive, but he was covered in heavy dust, unable to breathe, and he had shattered his left knee. *Id.* He escaped out of the tower, and as the North Tower began to fall, Mr. King threw himself down a subway staircase to survive which caused him to lose consciousness. *Id.* He sustained a shattered meniscus in his knee, ongoing muscular problems in his knee, hearing loss, tinnitus, lung scarring and nodules, Barrett's esophagus, various gastrointestinal issues, and post-traumatic stress disorder. *Id.* at ¶6. He lost over half of the battalion of firefighters for whom he was responsible including his aide Bobby Crawford who ran into the building with him. *Id.* at ¶7. As part of his emotional distress, he is unable to stand near high-rise building and he dreads going over bridges. He has experimented various methods of addressing his emotional injuries, but the experience of September 11, 2001 is always with him. *Id.* at ¶8. Based on the injuries he sustained from being in the North Tower as the South Tower

fell and only a short distance away when the North Tower fell, in addition to his emotional injuries, Plaintiffs submit that Stephen J. King III should be granted an upward departure from the baseline damages judgment as determined by this Court.

I.   **Joseph Pesce**
     **Injury Category: Escape Injuries**
     **Severity: Significant**

Joseph Pesce was a maintenance worker for ABM Engineering Services at One World Trade Center on September 11, 2001 and was on a break on the 7th floor when the first plane hit the North Tower in which he was working.  *See* Eubanks Dec., Ex. J, Dec. of Joseph Pesce at ¶4. He immediately ran down the seven flights of stairs to the lobby level and walked north to Penn Station.  *Id.*  In his escape from the building, Mr. Pesce sustained injuries to his heel and knee in addition to some hearing loss.  *Id.* at ¶6.  Further, he has suffered from severe post-traumatic stress disorder based on what he witnessed that day which has included suicidal ideation and planning. *Id.* at ¶7.  Based on his experiences and his injuries—both physical and emotional—in the terrorist attacks on September 11, 2001, Plaintiffs submit that Mr. Pesce should be granted a downward departure from the baseline damages judgment as established by this Court.

J.   **Nathan Peterson, Jr.**
     **Injury Category: Escape Injury**
     **Severity: Significant**

Nathan Peterson, Jr. was employed by ABM Maintenance Company and was working on the 58th floor of the South Tower when the first plane struck the North Tower on September 11, 2001.  *See* Eubanks Dec., Ex. K, Dec. of Nathan Peterson, Jr. at ¶3.  After being jolted by the resultant explosion of the first airplane strike, Mr. Peterson proceeded down the stairwell where he was knocked down multiple times until he reached the 44th floor where other coworkers were posted.  *Id.* He was able to escape to the plaza in front of the South Tower and witnessed the plane

strike the South Tower. *Id.* He began running, and he ran all the way to his home not noticing his injuries due to adrenaline and shock until hours and days later. *Id.* He sustained a torn ligament in his shoulder with pain in his neck and lower back as a result of his falls in the stairwell as he descended, and he was diagnosed with left shoulder tendinitis, lumbar radiculopathy, certical sprain, and post-traumatic stress disorder. *Id.* at ¶4. He has also been treated for Reactive Airway Disease Syndrome (RADS) based on his exposure to the dust, and he sustained a mild heart attack in 2003 that was attributed to the anxiety he continued to experience in the aftermath of the September 11, 2001 terrorist attacks. *Id.* The emotional distress and trauma he experienced has severely impacted his ability to perform normal activities of dialing living as he was unable to return to work due to the psychological trauma and remained in denial for some time that the attacks even took place. *Id.* at ¶5. Based on physical injuries he sustained and the severe emotional trauma that has gripped Mr. Peterson since September 11, 2001, Plaintiffs submit that he should be granted the baseline damages judgment as established by this Court.

**K.      Juan Ramirez**
**Injury Category: Escape Injuries**
**Severity: Severe**

Juan Ramirez was working near the Greenhouse Restaurant at the Marriott World Trade Center when the first plane struck the North Tower on September 11, 2001. *See* Eubanks Dec., Ex. L, Dec. of Juan Ramirez at ¶5. He ran out of the building and then saw the second plane hit the South Tower. *Id.* At this point, Mr. Ramirez tried to return to the hotel to assist his coworkers, but as he reached the area, the South Tower began to rumble and then collapsed. *Id.* He fell in his escape and was then escorted to Battery Park by a firefighter who helped him up. *Id.* In his escape, Mr. Ramirez suffered a fractured left scapula, sprained left elbow, and a torn left rotator cuff. *Id.* at ¶7. He required arthroscopic surgery in October 2001 on his left rotator cuff, and he continues

to feel pain in that area to this day.  *Id.* at ¶8.  He has been diagnosed with post-traumatic stress disorder and continues to have flashbacks and bouts of anger and anxiety as a result of the emotional trauma from September 11, 2001.  *Id.* at ¶9.  He moved to Florida to distance himself from New York, and he has not returned since 2006.  *Id.*  Based on the injuries he sustained on September 11, 2001 including the emotional trauma with which he still contends, Plaintiffs submit that Mr. Ramirez should be granted the baseline damages judgment as established by this Court.

**L.      Grace Rivera**
**Injury Category: Escape Injuries**
**Severity: Devastating**

Grace Rivera was in the lobby of One World Trade Center with her husband, Edwin Rivera, at the time of the first attack as she worked in the building with Empire Blue Cross and Blue Shield of New York on the 28th floor.  *See* Eubanks Dec., Ex. M, Dec. of Grace Rivera at ¶3.  After the plane struck the tower, the freight elevator in the lobby had its doors blown off at which point Mrs. Rivera and her husband began running to exit the building. *Id.* at ¶3.  As they reached the outer doors, they were thrown out of the building by a gust of wind and fire that came through one of the elevator shafts behind them.  *Id.*  Ms. Rivera suffered extensive injuries and burns over her back, shoulder, hands, arms, right and left forearms, and both legs. *Id.* at ¶5.  She also sustained a laceration of her left anterior knee area.  *Id.*  She underwent surgical debridement and split-thickness skin grafting due to third-degree burns on her left shoulder.  *Id.* at ¶6.  She suffered second- or third-degree burns on 23% of her total body surface area as a result of the terrorist attacks.  *Id.* at ¶7.  She also had various visible signs of internal bleeding.  *Id.*  She was not discharged from the hospital for her initial stay until October 2, 2001, but her burn injuries remain permanent, painful and disfiguring.  *Id.* at ¶¶8-9.  She has also suffered from post-traumatic stress disorder with symptoms including recurring flashbacks, nightmares, bouts of anger, impaired

concentration, intrusive and vivid recollections, hyper-vigilance, startle response, mood lability, and tendency to avoid certain situations. *Id.* at ¶10. Given the severity of her injuries with severe burns on such a large portion of her body accompanied by emotional distress, Plaintiffs submit that Mrs. Rivera should be granted a significant upward departure from the baseline damages judgment as established by this Court.

> ### M.    Edwin Rivera
> ### Injury Category: Escape Injuries
> ### Severity: Devastating

Edwin Rivera was in the lobby of One World Trade Center with his wife, Grace Rivera, at the time of the first attack as he worked in the building with Empire Blue Cross and Blue Shield of New York on the 28th floor. *See* Eubanks Dec., Ex. N, Dec. of Edwin Rivera at ¶3. After the plane struck the tower, the freight elevator in the lobby had its doors blown off at which point Mr. Rivera and his wife began running to exit the building. *Id.* at ¶4. Mr. Rivera sustained third-degree burns to his left hand, fingers, forearm, elbow, left arm, left posterior shoulder and back, and he also experienced second-degree burns on his forehead, both ears, and upper eyelids. *Id.* at ¶6. He also sustained inhalation injuries to his lungs and trauma to his left shoulder. *Id.* at ¶7. Mr. Rivera had second- and third-degree burns on 25.4% of his total body surface area from the September 11, 2001 terrorist attacks. *Id.* at ¶9. He has experienced significant scarring from his burns on different part of his body, and he will continue to feel pain as a result of the burns and scarring for the rest of his life. He also suffers from post-traumatic stress disorder which bothers him to this day. *Id.* at ¶¶12-13. Given the severity of his injuries with severe burns and scarring on large portions of his body accompanied by emotional trauma, Plaintiffs submit that Mr. Rivera should be granted a significant upward departure from the baseline damages judgment as established by this Court.

N.     **John R. Rogers**
       **Injury Category: Escape Injuries**
       **Severity: Severe**

John R. Rogers was a detective with the NYPD assisting in the evacuation of the World Trade Center Towers on September 11, 2001 when the North Tower began to collapse. *See* Eubanks Dec., Ex. O, Dec. of John Rogers at ¶3. He was struck by the force of the collapse, thrown to the ground by debris striking him, and covered in rubble rendering him semi-conscious. *Id.* at ¶5. As part of the collapse, he also inhaled large amounts of dust from the building as the collapse completely engulfed him. *Id.* He was taken to St. Luke's-Roosevelt Hospital Center to be treated. *Id.* He sustained lacerations and injuries to his left cheek and nose resulting in a deviated septum and permanent sinus complications. *Id.* at ¶6. He also sustained serious spine injuries requiring a discectomy at his C6 to C7 and spinal fusion surgery in addition to numerous rounds of epidural steroid injections to relieve pain. *Id.* He also developed a large hematoma in his lumbar region that prevented additional surgical intervention in his spine in addition to bacterial prostatitis. *Id.* Due to the dust inhaled in the collapse, he has developed a number of issues including chronic sinus infections leading to pneumonia, chronic bronchitis, esophageal reflux, abnormal blood cell counts, and polycythemia that resulted in deep vein thrombosis requiring the need for long-term anticoagulant therapy. *Id.* Because of his limitations following the injuries he sustained, he can no longer work for the NYPD, and he needed to modify his home to allow for his parents to move in with him to provide care as he is limited in his ability to perform daily living tasks. *Id.* at ¶¶8-9. In addition to the physical injuries, Mr. Rogers has also sustained severe emotional trauma which has caused him difficulty in establishing and maintaining interpersonal social relationships. *Id.* at ¶10. Based on the severity of his injuries and the permanent disability—both physical and emotional—that Mr. Rogers sustained as a result of the September 11, 2001

terrorist attacks, Plaintiffs submit that he should be granted an upward departure from the baseline

damages judgment as established by this Court.

**O.    Abida Shaikh**
**Injury Category: Escape Injuries**
**Severity: Significant**

Abida Shaikh was working on the 63rd floor of the North Tower for the Port Authority of

New York and New Jersey when the North Tower was hit by the first plane on September 11,

2001.  *See* Eubanks Dec., Ex. P, Dec. of Abida Shaikh at ¶3.  In the 63-floor descent, Ms. Shaikh

injured her back but continued to press on until she had reached the Brooklyn side of the Brooklyn

Bridge.  *Id.* at ¶4.  She sustained the following injuries to her back: severe lower back pain, lumbar

radiculopathy, degenerative disc disease, and herniated nucleus pulposis on the lumbar L4 to L5

and L5 to S1 as well as left side sciatica.  *Id.* at ¶5.  She has received physical therapy, epidural

steroid injections, and chiropractic care to try to alleviate her back pain to no avail.  *Id.* at ¶6.  As

a result of the injuries that she sustained on September 11, 2001 and emotional distress she suffered

as a result of the attacks, Plaintiffs submit that Abida Shaikh should be granted a downward

departure from the baseline damages judgment as determined by this Court.

**P.    Dennis J. Valentin**
**Injury Category: Escape Injuries**
**Severity: Severe**

Dennis J. Valentin was working as a Banquet Houseman at the Marriott World Trade

Center on September 11, 2001.  *See* Eubanks Dec., Ex. Q, Dec. of Dennis J. Valentin at ¶4.  He

felt the building rumble when the first plane struck the North Tower, but he continued to work

until a large glass window shattered in his vicinity, and he began to feel heat from burning fuselage

from the plane in the courtyard adjacent to him.  *Id.* He took the escalator to the lobby level, but

he fell and was trampled in the process.  *Id.*  He exited the building and began running toward

Battery Park but then began running back to the hotel to ensure that all of his coworkers had gotten out. *Id.* As he began to feel the tremors of the South Tower beginning to fall, he turned back around headed to Battery Park but was engulfed in the collapse and was subsequently engulfed in the second collapse. *Id.* He sustained the following physical injuries as a direct result of the attacks: cuts and bruises all over his body, four protruding discs in his lower back, a broken right foot and three broken toes, bilateral torn rotator cuffs, and cracked clavicle on his left side. *Id.* at ¶6. He also suffered from post-traumatic stress disorder and vertigo. *Id.* As a result of his injuries, Mr. Valentin has been rendered disabled and could not work. *Id.* He has undergone five surgeries for his injuries including the insertion of six screws in his back and an implanted stimulus machine to assist him in walking. *Id.* at ¶7. Based on the severity and duration of his physical injuries along with the severe emotional trauma he has sustained, Plaintiffs submit that Mr. Valentin should be granted an upward departure from the baseline damages judgment as established by this Court.

> **Q.** **Lauren Manning**
> **Injury Category: Impact Injuries**
> **Severity: Devastating**

Lauren Manning was a partner and managing director at Cantor Fitzgerald located on the 105th floor of the North Tower who was in the lobby of the tower at the time the tower was hit by the first plane. *See* Eubanks Dec., Ex. R, Dec. of Lauren Manning at ¶4-5. As she turned to the elevators, a wall of fire exploded out of the elevators, and the fire engulfed everything in its path including Ms. Manning. *Id.* at ¶5. She was covered in flames which were intensifying as she exited the building, crossed West Side Highway, and found a small patch of grass to smother the flames that had overtaken her body. *Id.* Others who had been caught on fire escaped with her only to die where they fell. *Id.* She watched as the second plane struck the South Tower, but the pain she was feeling from the burns she sustained continued to go deeper and deeper with the only

imaginable relief being that she would die and no longer be in pain. *Id.* She determined to remain conscious and fight relentless pain from the burns. *Id.* She was transported to St. Vincent's Hospital, but they were not familiar with dealing with burn victims, so while Ms. Manning remained conscious and in ever-increasing pain, the hospital was ill-equipped to help her or alleviate any of her pain. *Id.* at ¶6. She was only intubated at approximately 3:00pm to allow her to be sedated after six hours of excruciating pain had passed. *Id.*

She was transported to New York Presbyterian Hospital's Weill Cornell Medical Burn Center at approximately 7:00pm on September 11, 2001 where the doctors concluded that she had suffered burns over 82.5% of her total body surface area and thus giving her a grave prognosis. *Id.* at ¶7. Ms. Manning was hospitalized at Weill Cornell for three months, and seven and a half weeks of that time was spent in a medically induced coma. *Id.* When out of the coma, her pain could not be managed, and she underwent more than 25 operations constituting more than 60 individual surgical procedures including skin grafts. *Id.* Even more painful was Ms. Manning's time in the "tank" almost daily in which she was debrided and scrubs using water hoses and stiff brushes to try and ward off infections which came even with this treatment. *Id.* She was discharged to Burke Rehabilitation Hospital for another three-month stay in which she endured extensive, daily physical and occupational rehabilitation to try to be able to use her severely altered hands and body. *Id.* at ¶8. To this day, she has a daily routing of physical and occupational therapy along with 24-hour home health care assistance. *Id.*

In addition to the burns, she also broke her right ankle and foot trying to cross West Side Highway which was not discovered until she broke them again at a later time. *Id.* She has significant scarring throughout her body; lung and nasal damage; partial amputation of four fingers; the loss of the DIP joints of two other fingers; the loss of her left ear; spinal cord

compressions between L3 and L7 and throughout her sacral area; deformities to joints including fingers, elbows, wrists, and shoulders; and fused joints in her hands pinned with titanium. *Id.* at ¶9. She endures chronic pain, anxiety, and claustrophobia arising from the risk-level of her injuries even today and how they impact her ability to live anything approaching a "normal" life. *Id.* at ¶10. She has also had to watch as her son—who was 10.5 months old on September 11, 2001— has grown up with her injuries and how his emotional distress manifested later in his life for the impact that the September 11, 2001 attacks had on his life and his ability to grow up with a mother who was able to do all of the "normal" things a mother would do. *Id.* at ¶¶12-13. While he will be able to graduate high school later this year, the indelible impact of his situation has made this possible only through a team of therapists, physicians, and interventionists. *Id.* at ¶13.

Lauren Manning is likely the individual with the most devastating injuries arising out of the September 11, 2001 terrorist attacks. Since that day, she has not had a day of normalcy or a day free from pain—even when she was in a medically induced coma. The physical toll that her injuries have had upon her is so monumental that it is a testament to her character that she continues to fight and will herself to live despite the continuous pain and the future medical procedures that always linger on the horizon for her. The destruction that these injuries have wreaked upon her family, and specifically her son, cannot be underestimated as he has grown up with a parent who requires almost constant care as a result of the acts of terrorists. For these reasons, Plaintiffs submit that there is no figure that will provide an appropriate measure of the damages that Ms. Manning has suffered, but Plaintiffs submit that any award should be at such a level that any defendant who engaged in activity that would lead to such a catastrophic result would hesitate before doing so again because of the monetary toll of such activity. Plaintiffs submit that Ms. Manning be awarded

a multiple of an upward departure for the injuries she sustained on September 11, 2001 and the pain and suffering that she will endure for the remainder of her life.

## IV.     Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the *Burnett/Iran* plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burnett/Iran* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: January 31, 2020                    Respectfully submitted,


                                           /s/  John M. Eubanks
                                           John M. Eubanks, Esq.
                                           Robert T. Haefele, Esq.
                                           MOTLEY RICE LLC
                                           28 Bridgeside Blvd.
                                           Mount Pleasant, SC 29464
                                           Tel: 843-216-9000
                                           Fax: 843-216-9450
                                           Email: jeubanks@motleyrice.com
                                           Email: rhaefele@motleyrice.com

                                           Attorneys for the *Burnett/Iran* Plaintiffs