## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army, et al.*, 02-cv-6977 (GBD)(SN) (and member case *Burlingame v. Bin Laden, et al.,* 02-cv-7230 (GBD)(SN))

### The *Burlingame XI* Personal Injury Plaintiffs' Motion for Partial Final Judgments

For the reasons set forth below, and the statements contained in the declaration of Frank H. Granito III, Esq. ("Granito Declaration"), the *Burlingame XI* subset of *Ashton* plaintiffs[1] reflected on the annexed Exhibit ("*Burlingame XI* Plaintiffs")[2] by and through their counsel,

---

[1] The *Burlingame* (02-cv-7230) and *Ashton* (02-cv-6977) matters were Ordered consolidated for liability purposes and mandated to proceed under the *Ashton, et al. v. al Qaeda Islamic Army, et al*. (hereinafter "Ashton") master docket number 02-cv-6977, with the filing of a consolidated master complaint, and attorney James Kreindler was appointed Liaison Counsel for the consolidated actions within the *Ashton* master complaint. See 02-cv- 6977, Doc. No. 15, Entered 11/19/2002. The *Burlingame* plaintiffs, including the 9/11 personal injury plaintiffs named on Exhibit A, remain segregated within all consolidated *Ashton* filings and are identified therein according to their separate docket number and counsel. See, e.g., 02-cv-6977, Doc. No. 465, filed 03/30/2005.

[2] There have been ten prior motions by members of the *Burlingame* subset of plaintiffs seeking solatium and economic damages for the losses of their loved ones in the September 11th attacks. *See* 02-cv-7230, Doc. No. 15, Filed 04/27/2018 ("*Burlingame I*"), Doc. No. 18. Filed 05/25/2018 ("*Burlingame II*"), Doc. No. 28. Filed 08/06/2018 ("*Burlingame III*"),  Doc. No. 31. Filed 08/09/2018 ("*Burlingame IV*"), Doc. No. 63 Filed 07/02/2019 ("*Burlingame V*"), Doc. No. 71 Filed 08/16/2019 ("*Burlingame VI*"), Doc No. 85 Filed 12/20/2019. ("*Burlingame VIII*"), Doc. No. 88 Filed 12/26/2019 ("*Burlingame IX*") and Doc. No. 95  Filed 01/10/2020 ("*Burlingame X*"). Recently, a motion was filed on behalf of certain plaintiffs in *Dickey v. Republic of Iran*, 18-cv-11417, who also appear in the *Burlingame* caption.

Speiser Krause, PC, respectfully move this Court for an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Burlingame XI* Personal-Injury plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burlingame* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

The plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims. This motion is made only on behalf of the *Burlingame* claimants listed in Exhibit A attached to the Granito Declaration ("*Burlingame XI* Plaintiffs"), in light of this Court's previous orders granting permission to allow remaining *Burlingame* plaintiffs to move for this relief. *See, e.g.,* 03-md-1570 (02-cv-7230) (S.D.N.Y.) (GBD) (SN), Doc. No. 17 Entered 04/30/18, Doc. No. 22 Entered 05/29/18, Doc No. 30 Entered 08/07/2018, Doc No. 42 Entered 09/12/18, Doc. No. 68 Entered 07/29/19 and Doc No. 78 Entered 09/03/2019.

## I.      Procedural Background

Based on evidence and arguments submitted by various plaintiffs in this consolidated multi-district litigation arising out of the September 11, 2001, terror attacks, this Court previously issued a default judgment on liability against Iran to all *Ashton* plaintiffs (including the *Burlingame XI* plaintiffs listed on Exhibit A) for claims arising out of their personal injuries suffered as a direct result of the September 11, 2001 terrorist attacks in New York, New York (at the World Trade Center complex or surrounding  area); Arlington, Virginia (in or around the Pentagon); and Shanksville, Pennsylvania (where United  Flight 93 crashed) (Ashton personal injury plaintiffs). *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3008, Entered 08/26/2015. Thereafter, the *Ashton* wrongful death plaintiffs moved for partial summary judgment for the conscious pain and suffering that their decedents suffered before death, which a December 28, 2015 Report and Recommendation to this Court recommended be granted, and recommended awarding a default judgment  against Iran in the amount of $7,556,880,000,  representing compensatory damages of $2 million per decedent and punitive damages of $6.88  million per decedent.  *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3175, Entered  12/28/2015.  Certain *Ashton* wrongful death plaintiffs (including certain *Burlingame* plaintiffs) moved for default judgments on economic damages as well.  This Court granted those motions.  *See, e.g.,* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. Nos. 3229, Entered 03/09/2016 (adopting December 28, 2015 Report and Recommendation awarding damages for conscious pain and suffering); 3386, Entered 10/31/2016 (awarding damages for economic loss); Doc. No. 3386, Entered 5/29/2018 (awarding damages for economic and non-economic losses); Doc. No. 5466, Entered 01/08/2020 (awarding damages for economic and non-economic losses) and Doc. No. 5467, Entered 01/08/2020 (awarding damages for economic and non-economic

losses).

The Report and Recommendation also concluded that to the extent the *Ashton* wrongful death plaintiffs' claims arose out of injuries in New York State the rate of prejudgment interest was 9 percent per annum from September 11, 2001, until the date judgment was entered and to the extent the injuries arose elsewhere 4.96 percent interest per annum compounded annually was appropriate. *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3175, Entered 12/28/2015, pp. 1-2.  In addition to awarding pre-death conscious pain and suffering in certain wrongful death actions, this Court previously considered the issue of solatium damages suffered by certain of the *Ashton* plaintiffs and the economic damages arising out certain of the *Ashton* plaintiffs' cases.  In connection with a first group of *Ashton* plaintiffs *( "Ashton I"),* this Court found, among other things, that an award to the immediate family members of each decedent was proper and that prejudgment interest on the solatium loss amounts was warranted. *See* 03-md-1570 (02-cv- 6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 2623, Entered 10/03/12, pp. 4 – 5; 03-md-1570 (S.D.N.Y.) (GBD) (FM), Doc. No. 3300, Filed 06/16/2016, p. 1.  The District Court adopted that Report and Recommendation in its entirety in connection with the application made by the *Ashton I* claimants. *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3229, Entered 03/09/2016.

In connection with the motion for final judgment for a different group of plaintiffs, an October 14, 2016 Report and Recommendation disagreed with the prior conclusion on punitive damages and permitted plaintiffs to file supplemental briefing at a later date to justify their claim to punitive damages. *See* 03-md-1570 (11-cv-7550) Doc. No. 3358, Entered 10/12/2016, pp. 1 1 – 16.  The October 14, 2016 Report and Recommendation also adopted a rate of prejudgment

interest of 4.96 percent, regardless of where the injuries arose. *Id.,* p. 20. A second group of *Ashton* plaintiffs *("Ashton II")* moved for final judgment on all claims against the Islamic Republic of Iran, asking to defer the issue of punitive damages and employing the 4.96 percent prejudgment interest rate previously adopted by this Court. *See* 03-md-1570 (11-cv-7550) Doc. No. 3370, Entered 10/21/2016.   On October 31, 2016, this Court granted the *Ashton II* proposed order. *See* 03-md-1570 (02-cv-6977), Doc. No. 3387, Entered 10/31/2016. A third group of Ashton plaintiffs ("*Ashton III*") then moved for final judgments as well, also employing the 4.96 percent prejudgment interest rate. See Doc. No. 3686, Entered 08/16/2017 (Motion for Final Judgment for *Ashton III* claimants including claims for solatium damages). On 08/22/2017 this Court granted the *Ashton III* proposed order. Doc. No. 3706. A fourth group of Ashton Plaintiffs followed ("*Ashton IV*"), and the Court granted their similar request employing a 4.96 percent prejudgment interest rate. *See* 03-md-1570 (02-cv-6977), Doc. No. 3977, Entered 04/24/2018 (Motion for Final Judgment for *Ashton IV* claimants including claims for solatium damages) Doc. No. 3979 Entered 04/25/2018 (granting proposed order).   On April 27, 2018, the first of the *Burlingame* subset of Ashton plaintiffs moved for final judgments, similarly employing a 4.96 percent prejudgment interest rate. See Doc. No. *See* 02-cv-6977, Doc. No. 897, Entered 04/27/2018. The Court granted the *Burlingame* Plaintiffs' proposed Order. *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (FM), Doc. No. 3987, Filed 04/30/2018. The previous *Burlingame* Plaintiffs to have moved this Court for economic damages employed a 4.96 percent prejudgment interest rate. 02-cv-7230 (S.D.N.Y.)(GBD)(SN), Doc. No. 3386, Entered 5/29/2018.

In addition to economic losses, certain *Ashton* and *Burlingame* plaintiffs have previously moved this court for solatium damages suffered by those family members eligible to recover such

damages under 28 U.S.C. § 1605A. *See* 03-md-1570 (02-cv-697), Doc. Nos. 3295, Entered 06/08/2016 (Motion for Final Judgment for *Ashton I* claimants including claims for solatium damages), 3356, Entered 10/11/2016 (Motion for Final Judgment for *Ashton II* claimants including claims for solatium damages); 3686, Entered 08/16/2017 (Motion for Final Judgment for *Ashton III* claimants including claims for solatium damages); and Doc. No. 3977, Entered 04/24/2018 (Motion for Final Judgment for *Ashton IV* claimants including claims for solatium damages). Multiple groups of *Burlingame* plaintiffs have also moved this court for solatium damages under 28 U.S.C. § 1605A. See, e.g., *Burlingame I*, Doc. No. *See* 02-cv-6977, Doc. No. 897, Entered 04/27/2018, *Burlingame II* 02-cv-7230 Doc. No. 18, Entered 05/25/2018,  Burlingame *III,* Doc. No. 28, Entered 08/06/2018 and *Burlingame IV*, Doc. NO. 31 Entered 08/09/2018. This Court granted all these motions, finding that awards to the immediate family members of each decedent were proper and, as set forth above, that prejudgment interest on the solatium loss amounts was warranted.  *See* 03-md-1570 (02-cv-6977) (S.D.N.Y.) (GBD) (SN), Doc. Nos. 3300, Entered 06/16/16, 3387, Entered 10/31/2016, 3706, Entered 08/22/2017, 3987, Entered 04/30/2018, 4156, Entered 09/12/2018; and (02-cv-7230)(S.D.N.Y.) (GBD) (SN), Doc. No. 22, Entered 05/29/2018 and Doc. No. 30, Entered 08/07/2018.

For the reasons below as well as those set forth in the prior motions made by the *Ashton* and *Burlingame* wrongful death plaintiffs, the *Burlingame XI* personal injury Plaintiffs listed in Exhibit A to the Granito Decl. now move this Court to grant the attached proposed Order awarding them n o n - economic  damages as described below, and directing that pre-judgment interest be assessed at the rates previously awarded in connection with the p r e v i o u s *A s h t o n* and *B u r l i n g a m e* plaintiffs' motion s. The remaining *Burlingame* plaintiffs also ask for permission  to conti nue  to submit applications  in subsequent stages on behalf of those

claimants for whom  motions have not been submitted, should other applications be warranted.

## II.     Damages

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). Under 28 U.S.C. § 1605A ("Section 1605A"), which applies to the claims against Iran, damages available include money damages "for personal injury or death." *See* 28 U.S.C. § 1605 A(a)(1) and (c)(4). The damages available to plaintiffs in Section 1605A action include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605 A(c)(4).

### A.     Personal Injury Damages

The plaintiffs identified in Exhibit A include individuals who were either on site at the time of the terrorist attacks in New York, New York, at the World Trade Center complex or surrounding area, or Arlington, Virginia, in or around the Pentagon. The range of injuries of individuals who were injured on September 11, 2001 range from pulmonary issues resulting from smoke inhalation to broken and severed bones to traumatic brain injuries and significant burn injuries. One non-physical injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the  individuals who were caught in the melee of the attacks on September 11, 2001.  Under the FSIA, these injuries are all compensable, and given that these injuries occurred either as a direct result of  the attacks or the ensuing chaos from the attacks in the immediate aftermath, the proximate  causation of these injuries cannot truly be in

question.

This Court has previously looked to precedent in the U.S. District Courts for the District of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28 U.S.C. § 1605A. Well-established caselaw exists in the D.C. District Court regarding the measurement of pain and suffering damages in personal-injury cases such as this one. In *Cohen v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." 268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This "baseline" figure for personal-injury damages may also be adjusted based on the "nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment." *Peterson*, 515 F. Supp. 2d at 52. Less severe injuries to the plaintiff may show it is appropriate to move the award downward in the range of $2 million to $3 million whereas a more permanent injury or impairment may justify a larger award between $7 million and $12 million. *See Cohen*, 268 F. Supp. 3d at 24 (citing *Wultz*, 864 F. Supp.2d at 38). In the latter situation, the upward adjustment has been found appropriate "in more severe instance of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *See Barry v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 150491, at *29 (D.D.C. Sept. 4, 2019) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)). The downward departure "has been found appropriate where victims suffered relatively more minor

injuries, such as 'minor shrapnel injuries,'… or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Id.* (quoting *Valore* and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).

   **B.      Upward Departure for Damages Resulting from the Terrorist Attacks on September 11, 2001**

   Whereas the D.C. District Court has established certain parameters for addressing damages for personal-injury claims under the FSIA, this Court has previously addressed the nature of the Terrorist Attacks on September 11, 2001 and the indelible mark they have left on this country and more specifically on the victims. Many of the personal-injury victims whose claims are being submitted to the Court in these proceedings continue to live in close proximity to the areas where they sustained their injuries, and for those in New York, the reminder of the attacks is inescapable—annual commemorations of the lost on September 11, 2001 at Ground Zero, the illumination of the skyline with two beams of light representing the Twin Towers during the same time period each year, and simply watching the building of the Freedom Tower on the site of the two fallen towers. Furthermore, these attacks are ingrained in the consciousness of the American public. The attacks are taught in American schools, and the popular-culture references can evoke triggers in many of these victims who suffer from some level of either post-traumatic stress disorder or other emotional distress as a result of their involvement as victims of the attacks.

   As Magistrate Judge Maas first held in 2012—based in part on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day"— "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y.

July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)). While Judge Maas' decision—adopted by Judge Daniels—applied to solatium damages for family members of individuals who were killed on September 11, 2001, the logic equally applies to individuals who were present and physically injured in the attacks on September 11, 2001 and continue to experience the same reminders in their everyday life that would impact these other family members. In fact, it is arguable that the impact would be more severe for someone who was physically present and whose life was endangered by the attacks.

For the solatium damages, the upward departure adopted by this Court constituted an upward increase of 56.25% for spouses (from $8 million to $12.5 million); 70% for parents and children (from $5 million to $8.5 million); and 70% for siblings (from $2.5 million to $4.25 million). A similar upward departure should be adopted by this Court for personal-injury claimants who sustained physical injury as a direct result of the Terrorist Attacks on September 11, 2001. Individuals who were in harm's way on September 11, 2001 as a result of the terrorist attacks and sustained physical injury while experiencing a true fear for their lives in addition to the physical injuries they sustained while also experiencing what can only be described as a battle scenario with death all around them should have the $5 million baseline award increased in accordance with the increase to parent and children solatium awards for wrongful death to $8.5 million as the baseline for personal-injury claims arising on the day of September 11, 2001. Furthermore, more severe injuries with severe or permanent impairment should be granted an upward departure in the range of $12 million to $20 million. Finally, any downward departure should be in the range of $2.5 million to $5 million for those claims where the physical injuries are less severe but rather accompanied by severe emotional damages. As the D.C. District Court decisions have stated, "[t]he award of damages for physical injuries 'assume[s] severe psychological injuries." *Barry*,

2019 U.S. Dist. LEXIS 150491, at *29.

### C.   Prejudgment Interest

Additionally, the *Burlingame XI* Plaintiffs ask that this Court direct that prejudgment interest of 4.96% on the solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New York be assessed, as was done previously in the *Ashton* cases, including for the *Burlingame I-IX* claimants in this consolidated litigation.

### D.   Punitive Damages

Previously, in connection with a motion for final judgment on behalf of other *Ashton* claimants, this Court asked that to expedite issuance of final judgments,  they defer decision as to the appropriate quantum of punitive damages. *See* 03-md-1570 (S.D.N.Y.) (GBD)(SN), Doc. No. 3362, Entered 10/14/2016. The *Burlingame* Plaintiffs ask that this Court allow them to submit future applications for punitive damages consistent with any future rulings of this Court.

### III.   Individualized Case Assessments

Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to  the Court on January 10, 2020. *See* ECF No. 5484. By narrowing down the categories in which Plaintiffs' claims arise, Plaintiffs are attempting to assist the Court in addressing these claims in an efficient manner. Plaintiffs request the Court award damages in the highest category available to each individual plaintiff.

> **Ling Young**
> **Injury Category: Impact Injuries**
> **Severity: Devastating**

Ling Young, a resident citizen of the State of New Jersey, was a was working for the New York State Department of Taxation and Finance on September 11th as a tax auditor. See Granito Dec., Ex. B, Dec. of Ling Young at ¶¶ 1, 3. Mrs. Young witnessed American Airlines Flight 11

strike the North Tower of the World Trade Center and could see and feel the heat of the resulting fire in her office on the 86th Floor of the South Tower. *Id*. at ¶6. She decided to leave. *Id*. When United Flight 195 struck the south tower of the World Trade Center, Ms. Young was in the 78th Floor Sky Lobby, awaiting an elevator to take her down to safety while she heard a second explosion and heard glass breaking. *Id*. at ¶ 7. She immediately lost consciousness. *Id*. When she awoke, she was on the floor and things were on top of her, though she couldn't see because her glasses were covered with blood.  *Id*. She was bleeding from cuts on my face and forehead and felt extremely hot. *Id*.  Although clouded by dense smoke, Mrs. Young saw a wasteland before with dead bodies all around her, and flames in every direction.  *Id*. at ¶ 8.

Mrs. Young sat in the 78th floor lobby and waited for help. *Id*. at ¶ 10. Colleagues with whom she had entered the lobby were dead. *Id*. The lobby was dark and filled with smoke; there were bodies and body parts all around, and there were many people crying out for help.  *Id*. Out of the darkness, a young man appeared wearing a red bandana; he directed Mrs. Young to enter a staircase that he had located just off of the lobby. *Id*. at ¶ 12. After guiding her toward safety that young man returned to the sky lobby to help more victims. *Id*. He did not survive. *Id*. Mrs. Young attempted to assist another woman who could not walk, but when the woman put her arm around her. Mrs. Young's burns were so painful that she had to put the woman down.  *Id*. To this day, Mrs. Young is haunted by her inability to help the woman who did not survive. *Id*. Mrs. Young was guided to a service elevator on the 40th floor and, miraculously, it took her to the lobby where she was able to exit the building and locate an ambulance.  *Id*. at ¶ 13. She was immediately taken to the Cornell Burn Unit, where it was determined that she was burned over 40% of her body.  *Id*. at ¶¶ 14-16. The rest of her body was used to harvest skin for skin grafts for the areas with third degree burns, causing the equivalent of new second-degree burns in those areas.  *Id*. Based on Mrs.

Young's unusual skin type, her body is now covered with thick and raised keloid scar tissue that limits her movements and contorts her appearance. *Id*. Mrs. Young has undergone more than 40 surgeries to repair her burns. *Id*. Each of these skin graft operations was followed by excruciating debridements in which her raw skin would be scrubbed with sponges to exfoliate dead skin. *Id*. After 40 of these surgeries, Mrs. Young decided she could no longer tolerate the stress and fear associated with each surgery – and instead has resigned herself to a life of increasing disability and disfigurement. *Id*. at ¶¶ 17-18.

Mrs. Young is a shell of the person she once was. *Id*. at ¶ 20. She still has nightmares about the screams that she heard and the sights she saw in that Sky lobby. *Id*. She is haunted by thoughts of those whom the survivors were forced to leave on the 78th floor because they could not move due to their injuries. *Id*. Mrs. Young will never again lead a normal life. *Id*. Photographs of Ling Young's burn injuries, and excerpts from her medical records are annexed as Exhibit C to assist the Court in assessing the magnitude of Mrs. Young's injuries.[3] Based on the number of surgical interventions, her burns, his scarring, and the permanent damage and disfigurement, coupled with her survivor's guilt and continuing physical pain and mental suffering, Plaintiffs submit that Ling Young should be granted the highest upward departure from any baseline damages award for the injuries she sustained on September 11, 2001.

**Virginia DiChiara**
**Injury Category: Impact Injuries**
**Severity: Devastating**

---

[3] Because these records include confidential health information, in accordance with the January 22, 2020, Order of Magistrate Judge Sarah Netburn, 03-md01570 Doc. No. 5716, Entered 01/22/2020, these medical records are being filed with the Clerk of Court on disc, to be filed under seal.

On the morning of Tuesday, September 11, 2001, Virginia DiChiara, then a resident citizen of the State of New Jersey, currently a resident citizen of Florida, arrived at work in the North Tower of the World Trade Center about an hour later than usual. See Granito Dec., Ex. D, Dec. of Virginia DiChiara, at ¶ 3. She had just stepped into a bank of elevators on the 78th floor, on her way to her office on the 101st floor,  when American Airlines Flight 11 struck Tower One and jet fuel engulfed the elevator shaft in flames. *Id*. At that moment, six hundred fifty-eight of Ms. DiChiara's colleagues at Cantor Fitzgerald were trapped by the impact of that aircraft.  *Id*. The elevator doors on the 78th Floor were forced partially open, but an exit from the elevator was fraught with danger.  *Id*  at ¶ 4. Live electrical wires swung wildly about the elevator and jet fuel streamed down its shaft. *Id.* Ms. DiChiara made a conscious decision to escape, and seconds after she leapt through a wall of fire in front of the elevator into the hallway, the elevator plummeted to the ground.  *Id*. Ms. DiChiara's body was on fire, so she rolled on the ground to extinguish the flames.  *Id. at*  ¶ 5. The fuel and flames charred almost every inch of Ms. DiChiara's body with first, second, and third-degree burns. *Id.* In the burning hallway with the dead and injured victims, Ms. DiChiara recognized a Cantor colleague who helped her descend the 78 flights of stairs to safety.  *Id.*  Other victims in the stairwell would gasp and scream at the sight of Ms. DiChiara's injuries.  *Id.* On the ground, emergency workers directed Ms. DiChiara to a triage center where she was lifted into an ambulance and taken to the hospital.  *Id.* at ¶6 . Minutes after the ambulance left the scene, the first tower collapsed. *Id.*

 Virginia DiChiara suffered burns to nearly 50% of her body, about a quarter of which consisted of third-degree burns. *Id*. at ¶ 7. She suffered burns to her back and left side, from her shoulders to her fingertips on both arms, and second-degree burns to her face. *Id*. The burns and swelling blocked blood from reaching other tissues Ms. DiChiara's upper extremities. *Id*. at ¶ 9.

14

To relieve the pressure caused by this blockage and to avoid the amputation of both of her arms, doctors cut cavernous incisions into the burned skin of Ms. DiChiara's hands and arms, exposing the fat and muscle tissue below. *Id*. Despite the massive disfigurement that resulted, this procedure saved both arms from amputation. *Id*. These open wounds were then repeatedly debrided – a process Ms. DiChiara describes as feeling like having her wounds scrubbed with steel wool. *Id*.

After her nearly one-month initial hospitalization, Ms. DiChiara has undergone numerous additional operations and has regularly attended physical therapy, occupational therapy and chiropractic sessions. *Id*. at ¶ 11. Ms. DiChiara's burns and the resulting contractures have resulted in severely limited range of motion, especially in her left arm and shoulder, creating a vicious cycle of decreased mobility and increased pain and stiffness, and requiring additional surgical procedures to decompress her left shoulder. *Id*. Virginia DiChiara still carries the massive scarring from her the second and third degree burns on both her arms and hands, as well as on her back and face. *Id*. Ms. DiChiara has been unable to return to work, or life as she knew it, since the September 11th attacks.

Virginia DiChiara suffers from survivor's guilt syndrome, an affliction commonly seen among war veterans. *Id*. at ¶ 12. In addition to the overwhelming guilt associated with being among the very few among her colleagues to survive the attacks, Ms. DiChiara's burn injuries reopened the wounds that resulted from losing her only brother in a fire when they were both small children. *Id*. These feelings of grief and guilt are present every minute of every day but are intensified when she is confronted with reminders of September 11th, especially around the anniversary of the attacks. *Id*. Photographs of Virginia DiChiara's burn injuries, and excerpts from her medical records are annexed as Exhibit E to assist the Court in assessing the magnitude of Ms.

15

DiChiara's injuries.[4]  Based on  the number of surgical interventions, her burns, and the permanent scarring and disfigurement, coupled with her continuing physical pain and mental suffering, Plaintiffs submit that  Virginia DiChiara should be granted the highest upward departure from any baseline damages award for the  injuries she sustained on September 11, 2001

> **Kathy Cordero**
> **Injury Category: Impact Injuries**
> **Severity: Devastating**

On the morning of September 11th, Kathy Cordero, a resident citizen of the State of Maryland, was sitting at her desk her office inside the Pentagon, where she worked as a civilian Senior Financial Resources Manager for the Department of Defense, and where a television was broadcasting coverage of the attacks on the World Trade Center. *See* Granito Dec., Ex. F, Dec. of Kathy Cordero, at ¶ 3. Before she knew what was happening, Ms. Cordero was suddenly thrown across the office and covered in debris and jet fuel. *Id*. at ¶ 4. She was trapped under sections of the ceiling that had fallen on her, but Ms. Cordero's colleague helped move the debris off of her body to help her escape. *Id*. Orange flames and thick, choking black smoke were everywhere. Kathy Coredero's arm was on fire. *Id*. The heat was unimaginable – Ms. Cordero recalls it  felt like the air was on fire. *Id*. She and her colleagues tried to escape, but in every direction there were walls of fire. *Id*. at ¶ 5. There were no lights and the black smoke was blinding as they climbed over the debris. *Id*. At one point they came across a puddle of water so Ms. Cordero dipped her burning arm into the puddle, and watched the flesh melting off her arm. *Id*. It is a vision that still haunts her. Ms. Cordero suggested to her colleagues that they dip their shirts into the puddle and then they covered their mouths and noses with the wet fabric in an effort to breathe. *Id*.

---

[4] These records are being furnished to the Court on disc. *See* note 3, *supra*.

Kathy Cordero followed the sound of a colleague's voice to a hole he had broken through in one of the walls. *Id*. at ¶ 6. On the other side of that wall, there was a hallway, still filled with black smoke so thick that they couldn't see anything. *Id*. One of the men who was on that side of the wall led Ms. Cordero down the end of the hallway to a courtyard, and, finally, outside. *Id*. Ms. Cordero recalls the scene was utter chaos with debris everywhere and people running and screaming that another plane was coming. *Id*. Thankfully, the incoming planes belonged to the U.S. military. *Id*.

Ms. Cordero was placed in a police car and taken to the hospital where it was determined she had suffered second and third degree burns to her face and left arm as well as severe inhalation injuries and injuries to her shoulder and spine as a result of the debris that fell on her in the initial impact. *Id*. at ¶¶ 7-8. Ms. Cordero was placed in a medically induced coma before doctors could perform any surgeries. *Id*. She developed pneumonia from the smoke inhalation and aspiration injuries. *Id*. Ms. Cordero remained in the intensive care unit until my lungs began to improve enough that the surgeons were confident she could withstand surgery. *Id*. On September 18th, Ms. Cordero underwent the first skin graft surgery on her left arm, with her thigh used as a donor site. *Id*. at ¶ 9. She remained hospitalized for the remainder of September, forced to withstand additional skin grafting and frequent, excruciating debridements. *Id*.

Because of Ms. Cordero's specific skin type, her left arm developed raised keloid scars and abnormal hypo and hyper-pigmentation while her forehead developed a hyperpigmentation. *Id*. at ¶ 10. The scars on Ms. Cordero's left arm have caused contractures that left her with carpal tunnel syndrome in her left wrist. *Id*. The inhalation injuries she suffered resulted in a permanent change to her voice, and have left her unable to speak for extended periods of time. *Id*. Ms. Cordero loses her breath quite easily, and as a result, cannot even walk great distances without being

overcome and short of breath. *Id*. Ms. Cordero is extremely self-conscious of her scars, and as a result wears long sleeves to cover her left arm and hand while coating her forehead in thick makeup in an effort to hide the discoloration. *Id*. This once active and social person has become little more than a recluse, unable to return to work and uncomfortable out in public. *Id*. at ¶¶ 10-13.

Kathy Cordero continues to see her orthopedist in relation to the injuries to her acromioclavicular (AC) joint and cervical and lumbar spine. *Id*. at ¶ 11. Ms. Cordero is emotionally unable to withstand the trauma of another surgery, so despite her surgeon's recommendations that she undergo the surgical decompression of her AC joint, she has chosen instead to undergo periodic steroid injections. *Id*. Ms. Cordero attempted to return to work after the attacks, in an effort at patriotism, or an attempt to return to normalcy. *Id*. at ¶ 15. It was quickly apparent that she could not work, and was determined by the U.S. Department of Labor to be completely and permanently disabled. *Id*.

Ms. Cordero is unrecognizable to herself – either physically or emotionally. Photographs of Kathy Cordero's burn injuries, and excerpts from her medical records are annexed as Exhibit G to assist the Court in assessing the magnitude of Ms. Cordero's injuries.[5] Based on her permanent and catastrophic injuries coupled  with her continuing physical pain and mental suffering, Plaintiffs submit that  Kathy Cordero should be granted a significant upward departure from any baseline damages award for the  injuries she sustained on September 11, 2001.

**Edward Nicholls**
**Injury Category: Impact Injuries**
**Severity: Devastating**

Edward Nicholls arrived at his office on the 102nd floor of the World Trade Center's

---

[5] These records are being furnished to the Court on disc. *See* note 3, *supra*.

South Tower around 8:30 a.m. *See* Granito Dec., Ex. H, Dec. of Edward Nicholls, at ¶ 2. At 8:46 a.m., he heard a loud,  strange sound, while out the window he saw an incredible amount of paper floating all over the sky. *Id.* They decided to leave, and walked down to about the 76th floor, where Mr. Nicholls ran into a colleague and friend coming up the stairs and who told him to turn around and go back up to 78. *Id. at* ¶ 5. The 78th floor was the "sky lobby", where elevator banks ran to the main lobby. *Id.* Mr. Nicholls went back up to the 78th floor, where people were standing throughout the sky lobby, waiting to take the elevators down to the main lobby. *Id. at* ¶ 5.

As they waited, all of a sudden the 78th floor went completely dark at the same time of a horrific noise. *Id.* ¶ 6. Mr. Nicholls thought it was a bomb, just like in 1993. *Id.* Seconds later, a force came through the lobby area that threw Ed face down on the floor, with his friend lying next to him. *Id.* Debris and pieces of the building were flying all over. *Id.*  Mr. Nicholls looked at his friend, and gently pushed her and called out her name to see if she was all right. *Id.* There was no response. *Id.* Suddenly a piece of something crashed next to Mr. Nicholls' head, sparing his life for the sake of inches. *Id.*  Mr. Nicholls tried to get up and out of the Sky Lobby, but he could not lift himself up with his right arm. *Id.* It was like it wasn't there. *Id.* The right side of Mr. Nicholls' suit was covered in blood and in shreds, and he could not feel the upper part of his arm. ¶ 7 Mr. Nicholls was not aware of it at that moment, but the debris from the crash had also torn open his abdomen.

Mr. Nicholls walked over a broken window trying to get fresh air as he choked on the air in the building, filled with dust and debris. *Id.* at ¶ 8. He determined that he had to find the staircase he had originally walked down. *Id.* The smoke was getting very bad, so he covered his mouth with a handkerchief, and started walking through the smoke where we guessed the stairs to be. *Id. at* ¶¶ 9-10. Mr. Nicholls and two other survivors started to walk through the rubble, which

he could barely negotiate because of his arm, as the fire was growing rapidly. *Id.* On the floors right above them were loud crashing noises, which they assumed were beams collapsing above as they climbed over collapsed beams right in front of them. *Id. at ¶ 10.* They made their way to the 40th floor, where they found a working elevator, and found the elevator with an EMS worker inside. *Id. at ¶¶ 11-12.* They got in and were taken to the lobby which Mr. Nicholls describes as too eerie for words, with no one but a policeman here, a fireman there, and a thick cloud of dust covering the floor and all through the air. *Id.* Edward Nicholls was led outside the building by NYPD police officer Moira Smith, who helped him to a triage area. *Id. at ¶ 13.* After assisting Mr. Nicholls, Officer Smith went back into the building to help others. *Id.* She did not survive. *Id.* A photo taken of Edward Nicholls being assisted by Officer Smith has become one of the most iconic images related to the attacks, and Mr. Nicholls is hopeful that the image honors Officer Smith and her family. *Id.*

Edward Nicholls was put in an ambulance and hospitalized for surgery to address his open abdominal wound which had to be resolved prior to performing another surgery on his arm. *Id. at ¶ 14.* Days after his abdominal surgery, he was then transferred to the Hospital for Special Surgery, where doctors performed multiple surgeries to repair the damage to Mr. Nicholls' right arm and shoulder, including replacing the missing proximal end of his humerus with a prosthetic, reconstructing the missing portions of the scapula, and repairing the remainder of his shoulder joint, including the removal of infected muscle and connective tissue and the reconstruction of what remained. *Id. at ¶ 16.* Ed was discharged from the hospital on September 28th on heavy doses of antibiotics, as a positive indication of infection was discovered during the surgery at HSS. *Id.* Because the antibiotics included a form taken intravenously twice a day, a PICC line was inserted through a vein in his arm down to his heart before he could be discharged from the hospital. *Id.* Ed

will remain on these of antibiotics for the rest of his life. *Id.*

Ed Nicholls was determined to have lost 30% use of his arm, a degree of disability that is permanent and functionality that will not return. *Id. at ¶* 20. Ed underwent physical therapy sessions three times per week, at least two hours per session, for more than a year, until therapists told him they could do no more for him, but that he was to continue daily prescribed exercises if he wished to maintain the level of functionality achieved. *Id. at ¶* 18. Ed cannot lift his right arm to any height, cannot swing  the arm or lift anything of significant weight. *Id. at ¶* 20. Ed has very little strength and limited motion in the arm. Ed has been advised that if he maintains the rigorous exercise regimen prescribed by his physical therapists, including swimming exercises every other day, at best he will stave off the loss of additional functionality. *Id.* Though he is a stoic individual, likely out of extreme survivor's guilt, Mr. Nicholls rarely gives in to his physical pain and emotional suffering. Despite his efforts to suppress these feelings, the attacks have left a huge impact on Ed Nicholls' life. Mr. Nicholls  has become fearful in vulnerable places like trains or train stations and he is now deathly afraid of heights. He deals with the painful effects of a lifelong regimen of antibiotics and works incessantly to hang on to the remaining function in his right arm, knowing full well that as he ages, he will lose most of the remaining function in his right arm. *Id. at ¶¶* 18-23.

The iconic photograph of Edward Nicholls being escorted from the World Trade Center and excerpts from his medical records are annexed as Exhibit I to assist the Court in assessing the magnitude of Mr. Nicholl's injuries.[6] Based on his permanent and catastrophic injuries resulting in his permanent disability and disfigurement, and his continuing physical pain and mental

---

[6] These records are being furnished to the Court on disc. *See* note 3, *supra.*

suffering, Plaintiffs submit that Edward Nicholls should be granted a significant upward departure from any baseline damages award for the injuries he sustained on September 11, 2001.

**Valecia Parker**
**Injury Category: Impact Injuries**
**Severity: Devastating**

Valecia Parker was a civilian employee of the Department of the Army working as a Staff Actions Control Assistant working at her desk in the Pentagon the moment the plane hit. *See* Granito Dec., Ex. J, Dec. of Valecia Parker, at ¶ 1. Valecia felt what she thought was the tremor of an earthquake, so she moved into the frame of an open doorway, as she had been taught when she lived in California. *Id*. That was the last thing Valecia remember. When American Airlines Flight 77 crashed through the Pentagon, the impact caused the overhead foundations to collapse, sending steel from the higher levels of the structure to crash down on top of Valecia's office in an interior ring of the Pentagon, rendering her unconscious. *Id*. at ¶ 2. Upon regaining consciousness, she was covered in debris and drenched in jet fuel, with heavy computer equipment on her head. She was found by two Army colleagues who rescued her from the rubble and carried Valecia to the triage center. *Id*.

Valecia was transported to DeWitt Army Hospital for treatment, having suffered a severe closed-head injury, burns to her torso and legs from the jet fuel, smoke inhalation, torn shoulder and back muscles, and a serious kidney infection. *Id*. at ¶ 3. Valecia's most serious and lasting physical and mental injuries have resulted from her closed head injuries. *Id*. These diagnosed injuries include post-traumatic stress disorder (PTSD), post-concussion syndrome, post-traumatic vestibulopathy, and convergence insufficiency. *Id*. Valecia's recovery has been very slow with loss of cognitive functions such as memory loss, difficulty with math, spelling, reading, problems with balance, dizziness, headaches, loss of urinary control and anxiety. *Id*. at ¶ 4.

Valecia continues to require treatment by a neurologist, neuropsychiatrist, opthalmologist/optometrist, rehabilitative medicine specialist, internist, psychologist and psychiatrist. *Id*. at ¶ 6. Valecia has been determined by the U.S. Department of Labor to be fully disabled and unable to return to the workforce. *Id*. She will require regular medical attention for the remainder of her life. *Id*. at ¶ 7. Prior to the September 11th attacks Valecia was in outstanding physical shape, an avid competitive bodybuilder, having established herself as a top regional competitor, for whom fitness was a passion. *Id*. at ¶ 7. Prior to September 11th, Valecia Parker had no history of psychological treatment. *Id*. She is now relegated to a sedentary life in which her days are marked by cloudy thinking, diminished mental capacity, pain and depression. *Id*.

Ms. Parker has significant memory lapses and, in particular, short term memory is very difficult. *Id*. at ¶ 8. Ms. Parker must now live with her adult daughter who helps care for her. *Id*. Her independence has been taken away from her. *Id*. Ms. Parker has had to undergo mental health counseling and occupational therapy, and visits with a psychiatrist and social worker, and takes numerous medications to help her function. *Id*. Valecia Parker has been declared by the U.S. Department of Labor to be totally and permanently disabled. *Id*. at ¶ 6. Excerpts from Valecia Parker's medical records are annexed as Exhibit K to assist the Court in assessing the magnitude of Ms. Parker's injuries. Based on the particularly terrifying circumstances of her impact injuries and being buried in debris from the crash, her permanent and catastrophic injuries and resulting permanent disability, coupled with her continuing physical pain and mental suffering, Plaintiffs submit that Valecia Parker should be granted a significant upward departure from any baseline damages award for the injuries she sustained on September 11, 2001

### IV.    Conclusion

For all the reasons herein, as well as those set forth in the previous submissions of the

*Ashton* plaintiffs and specifically *Burlingame I-X* plaintiffs, the *Burlingame XI* plaintiffs set forth

on Exhibit A respectfully request that this Court grant the proposed Order attached to the Granito

Declaration and (1) compensatory damages for pain and suffering in amounts commensurate

with the injuries these individuals sustained during the Terrorist Attacks on September 11,

2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia

in similar cases factoring in an upward departure on damages values based on the indelible impact

of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent

per annum, compounded annually for the period from September 11, 2001 until the date of

the judgment; and (3) leave for the *Burlingame XI* Personal-Injury plaintiffs identified in Exhibit

A to seek punitive damages, economic damages, or other damages at a later date; and (4) for

all other *Burlingame* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit

applications for damages awards in later stages, to the extent such awards have not previously

been addressed.

Dated: Rye Brook, New York
      January 31, 2020

                               Respectfully submitted,

                               SPEISER KRAUSE, PC
                               By: /s/ Frank H. Granito
                               Frank H. Granito, III, Esq. (FG9760)
                               Douglas A. Latto, Esq. (DL3649)
                               Jeanne M. O'Grady, Esq. (JO3362)
                               Speiser Krause, PC
                               800 Westchester Avenue, Suite S-608
                               Rye Brook, New York 10573
                               Tel: (914) 220-5333
                               Fax: (914) 220-5334
                               f3g@speiserkrause.com
                               dal@speiserkrause.com
                               jog@speiserkrause.com