IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 1:03-md-01570-GBD-SN |
| *This document relates to:* | ORAL ARGUMENT REQUESTED |
| *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922, and *O'Neill, et al. v. Republic of the Sudan, et al.*, No. 18-cv-12114. | |

**MEMORANDUM OF LAW
IN SUPPORT OF SUDAN'S MOTION TO DISMISS**

**WHITE & CASE**

701 Thirteenth Street, NW
Washington, DC 20005

*Counsel for the Republic of the Sudan,
and all of its constituent parts*

February 3, 2020

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ......................................................................................................................3

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER 28 U.S.C. §§ 1605A AND 1605B ..............................................................................................4

    A.    The Complaint Fails To Allege Facts Sufficient To Show Jurisdictional Causation Under Both § 1605A And § 1605B ........................................5

    B.    Sudan Is Immune From Claims Of Family Members Of Victims Under Both § 1605A(a) And § 1605B(b) ........................................................14

    C.    The Jurisdictional Limitations Period Under § 1605A(b) Has Expired ................16

II.    NO OTHER EXCEPTION TO SOVEREIGN IMMUNITY APPLIES...........................18

III.    THE COURT LACKS PERSONAL JURISDICTION OVER SUDAN..........................21

CONCLUSION.................................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*,
    600 F.3d 171 (2d Cir. 2010).............................................................................. 18-19

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)..........................................................................................6

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)........................................................................................3, 21

*Ashton v. Al Qaeda Islamic Army (In re Terrorist Attacks on Sept. 11, 2001)*,
    298 F. Supp. 3d 631 (S.D.N.Y. 2018)............................................................. *passim*

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017)....................................................................................3, 4, 14

*Chettri v. Nepal Rastra Bank*,
    834 F.3d 50 (2d Cir. 2016)..............................................................................19, 20

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ...........................................................................6

*First Inv'rs Corp. v. Liberty Mut. Ins.*,
    152 F.3d 162 (2d Cir. 1998).............................................................................16

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) .............................................................10, 11

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
    602 F.3d 69 (2d Cir. 2010)..............................................................................20

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)........................................................................................15

*Havlish v. Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*,
    No. 03-md-1570, 2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011)..................5, 7, 8

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)............................................................................................6

*Hijazi v. Permanent Mission of Saudi Arabia*,
    689 F. Supp. 2d 669 (S.D.N.Y. 2010)...............................................................19

*Holmes v. Secs. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)........................................................................................6, 7

*Martin v. Republic of South Africa*,
 836 F.2d 91 (2d Cir. 1987)........................................................................................20

*O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on Sept. 11, 2001)*,
 714 F.3d 109 (2d Cir. 2013).........................................................................................1

*Owens v. Republic of Sudan*,
 864 F.3d 751 (D.C. Cir. 2017), *cert. pending and cert. granted on other
 grounds sub nom. Opati v. Republic of Sudan*, 139 S. Ct. 2771 (Jun. 28, 2019)................7, 8

*Paroline v. United States*,
 572 U.S. 434 (2014)..........................................................................................6, 7, 8, 14

*Republic of Argentina v. Weltover*,
 504 U.S. 607 (1992)..........................................................................................18, 19, 20

*Robinson v. Government of Malaysia*,
 269 F.3d 133 (2d Cir. 2001)..........................................................................................4

*Rogers v. Petroleo Brasileiro, S.A.*,
 673 F.3d 131 (2d Cir. 2012).........................................................................................20

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013).......................................................................................6, 7, 8

*Rubin v. Islamic Republic of Iran*,
 138 S. Ct. 816 (2018)..............................................................................................14, 15

*Saudi Arabia v. Nelson*,
 507 U.S. 349 (1993)....................................................................................................3

*Verlinden B.V. v. Cent. Bank of Nigeria*,
 461 U.S. 480 (1983)..................................................................................................3, 21

*Virtual Countries, Inc. v. Republic of South Africa*,
 300 F.3d 230 (2d Cir. 2002)..........................................................................................4

## STATUTES AND RULES

28 U.S.C. § 1330(a) ...................................................................................................3

28 U.S.C. § 1330(b) ................................................................................................1, 21

28 U.S.C. § 1603(a) ...................................................................................................3

28 U.S.C. § 1603(b) ...................................................................................................3

28 U.S.C. § 1603(d) ..................................................................................................18

28 U.S.C. § 1604 ................................................................................................................3

28 U.S.C. § 1605 ...........................................................................................................3, 21

28 U.S.C. § 1605(a)(2) .......................................................................................4, 18, 19, 20

28 U.S.C. § 1605(a)(5) .......................................................................................4, 18, 20, 21

28 U.S.C. § 1605(a)(7) (repealed 2008) .........................................................14, 15, 16, 17

28 U.S.C. § 1605A .................................................................................................... *passim*

28 U.S.C. § 1605B .................................................................................................... *passim*

28 U.S.C. § 1606 ...........................................................................................................3, 21

28 U.S.C. § 1607 ...........................................................................................................3, 21

28 U.S.C. § 1608 ..............................................................................................................21

28 U.S.C. § 1610 ..............................................................................................................15

National Defense Authorization Act for Fiscal Year 2008,
   Pub. L. No. 110-181, 122 Stat. 3 (Jan. 28, 2008) .......................................2, 16, 17

Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 20, 1998) ....................................12

Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999) .................12

## RULES

Fed. R. Civ. P. 12(b)(1).....................................................................................................14

Fed. R. Civ. P. 12(b)(2).....................................................................................................21

Fed. R. Civ. P. 15(a)(2).......................................................................................................2

Fed. R. Civ. P. 15(d) ..........................................................................................................2

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-702 (1994)......................................................................................14, 15

H.R. Rep. No. 104-383 (1996)...........................................................................................15

H.R. Rep. No. 105-48 (1997)..............................................................................................15

Sudan unequivocally condemns the 9/11 Attacks and expresses its deepest condolences to the victims and their families.  As the Complaint acknowledges, the terrorist organization Al Qaeda and its leader, Osama Bin Laden, committed those heinous attacks.  Sudan categorically denies providing material support or resources for the attacks and, if necessary, will prove that the Complaint's allegations to the contrary are unfounded.  But making such a showing should not even be necessary, because, even accepting the factual allegations of the Complaint as true for purposes of this Motion, all claims against Sudan must be dismissed for lack of subject-matter jurisdiction and personal jurisdiction.

The Complaint must be dismissed for lack of subject-matter jurisdiction because:  (i) the Complaint does not contain factual allegations sufficient to make a showing of jurisdictional causation under both § 1605A and § 1605B of the Foreign Sovereign Immunities Act of 1976, as amended; (ii) the majority of Plaintiffs are family members whose claims do not fall within the jurisdictional grant of either § 1605A(a) or § 1605B(b); (iii) § 1605A cannot be the basis of the action because the jurisdictional limitations period under § 1605A(b) has expired; and (iv) no other exception to sovereign immunity applies.

The Complaint also must be dismissed for lack of personal jurisdiction because courts in the United States lack personal jurisdiction over foreign states unless one of the exceptions to sovereign immunity applies, and none applies here.  *See* 28 U.S.C. § 1330(b) (requiring both subject-matter jurisdiction and proper service for personal jurisdiction over a foreign state).

## PRELIMINARY STATEMENT

On March 10, 2004, the *O'Neill* Plaintiffs filed a complaint against Sudan (and other foreign sovereigns) alleging that Sudan provided "material support" to Al Qaeda thereby "causing" the terrorist attacks on September 11, 2001.  *See* Class Action Compl., No. 04-cv-01922, ECF No. 1 ("2004 Complaint").  On September 30, 2005, Plaintiffs amended their complaint, but did

not amend any allegations or claims against Sudan.  *See* First Consol. Compl., No. 04-cv-01922 (filed in No. 03-md-01570, ECF No. 1569) ("2005 Amended Complaint").

More than a decade later, on December 21, 2018, these same *O'Neill* Plaintiffs initiated a new action in a new civil case docket and filed — without leave — a "Supplemental Class Action Complaint" purporting to "supplement, but not supplant or supersede" the 2005 Amended Complaint "*solely* in order to add new causes of action."  Suppl. Class Action Compl. ¶ 1 (emphasis added), No. 18-cv-12114, ECF No. 1 ("2018 Complaint").  Although the allegations in the 2018 Complaint regarding Sudan are virtually identical to those in the 2005 Amended Complaint (*compare* 2018 Compl. ¶¶ 27-55, *with* 2005 Am. Compl. ¶¶ 77-104), the 2018 Complaint purports to assert six new causes of action (*see* 2018 Compl. at 15-25), including causes of action under amendments to the FSIA that were enacted in January 2008 and September 2016.

To the extent § 1605A forms the basis of these new causes of action, the 2018 Complaint is time-barred because no attempt was made to bring the action under new § 1605A pursuant to the rules and deadlines expressly set forth in § 1083 of the National Defense Authorization Act for Fiscal Year 2008.  *See infra*, Section I.C.

Similarly, to the extent § 1605B (or any other exception to sovereign immunity) forms the basis of the new causes of action, the 2018 Complaint is an unauthorized second amended complaint.  Plaintiffs did not seek leave to further amend their 2005 Amended Complaint, nor did they move the Court for permission to file a supplemental pleading, as required by Rule 15 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 15(a)(2), (d) (requiring leave of court for amendments and the court's permission for supplemental pleadings).

Procedural deficiencies aside, even when taking the allegations regarding Sudan as true, the Complaint fails to allege facts sufficient to show any direct causal relationship, or even any

reasonable connection, between Sudan's purported conduct and the 9/11 Attacks. Instead, the Complaint offers only vague and conclusory allegations of material support, or allegations so far removed in time, place, and fact from the 9/11 Attacks, that they cannot support a showing of jurisdictional causation under §§ 1605A or 1605B (or satisfy the elements of any other exception to sovereign immunity). The Complaint therefore must be dismissed in its entirety for lack of subject-matter jurisdiction and personal jurisdiction.

## ARGUMENT

The Foreign Sovereign Immunities Act ("FSIA") provides the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see* 28 U.S.C. §§ 1330(a), 1604. Under the FSIA, a foreign state, its political subdivisions, and its agencies and instrumentalities are presumptively immune from the subject-matter jurisdiction of U.S. courts, subject to specified exceptions to sovereign immunity. 28 U.S.C. §§ 1604-1607; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (stating the FSIA "starts from a premise of immunity and then creates exceptions to the general principle" (internal quotations omitted)).

The Complaint acknowledges that the Republic of the Sudan is a "foreign state" under § 1603(a) of the FSIA (*see* 2005 Am. Compl. ¶ 31; 2018 Compl. ¶ 13) and alleges that other Defendants are "agencies or instrumentalities" of Sudan under § 1603(b) (*see* 2005 Am. Compl. at 2-3 & ¶ 34; 2018 Compl. at caption & ¶ 16). Therefore, Sudan and its alleged agencies and instrumentalities are presumptively immune, unless one of the FSIA's exceptions to sovereign immunity applies.

Where the foreign-sovereign defendants challenge only the "legal sufficiency" of a complaint, as Sudan does here, dismissal is required when the complaint fails to contain factual allegations that "show (and not just arguably show)" that the elements of an exception to sovereign immunity are satisfied. *Helmerich*, 137 S. Ct. at 1324 (addressing standard for plaintiffs' showing when facts are stipulated); *see also Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) ("If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." (citations omitted)).  The Second Circuit is clear that "bald assertions" or "[c]onclusory allegations" are insufficient to establish jurisdiction under the FSIA. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (citations omitted).

The Complaint asserts that Sudan is not immune from the Court's jurisdiction under the exceptions to immunity set forth in 28 U.S.C. §§ 1605(a)(2), 1605(a)(5), 1605A, and 1605B.  *See* 2005 Am. Compl. ¶ 15; 2018 Compl. ¶ 20.  But the Complaint fails to allege sufficient facts that would bring the case within any of these exceptions to immunity.

## I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER 28 U.S.C. §§ 1605A AND 1605B

Section 1605A withdraws sovereign immunity in cases against foreign states involving "personal injury or death that was *caused by* an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources *for* such an act." 28 U.S.C. § 1605A(a)(1) (emphases added).  The provision also requires that the relevant tortious act be "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  *Id.*

Section 1605B withdraws sovereign immunity in cases against foreign states involving "physical injury . . . or death occurring in the United States *caused by* an act of international terrorism in the United States, *and* a tortious act or acts *of* the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred." 28 U.S.C. § 1605B(b) (emphases added).  This Court has held that the tortious act requirement, similar to § 1605A, "includes the knowing or deliberately indifferent provision of material support to terrorists."  *Ashton v. Al Qaeda Islamic Army (In re Terrorist Attacks on Sept. 11, 2001)*, 298 F. Supp. 3d 631, 643 (S.D.N.Y. 2018).

Neither of these exceptions to sovereign immunity applies as to Sudan in this case because: (a) the Complaint fails to allege facts sufficient to show jurisdictional causation under any standard; (b) Sudan is immune from claims of family members of victims under §§ 1605A(a) and 1605B(b); and (c) § 1605A cannot be the basis of the action because the jurisdictional limitations period under § 1605A(b) has expired and thus the action under § 1605A is time-barred.

### A.    The Complaint Fails To Allege Facts Sufficient To Show Jurisdictional Causation Under Both § 1605A And § 1605B

This Court's decisions in this multidistrict litigation confirm that causation is a jurisdictional requirement under both § 1605A and § 1605B.  *See Havlish v. Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*, No. 03-md-1570, 2011 U.S. Dist. LEXIS 155899, at *202 (S.D.N.Y. Dec. 22, 2011) (addressing § 1605A); *Ashton*, 298 F. Supp. 3d at 644-46 (addressing § 1605B).  In those decisions, this Court held that the causation requirement "is satisfied by a showing of proximate cause."  *Havlish*, 2011 U.S. Dist. LEXIS 155899, at *202; *see also Ashton*, 298 F. Supp. 3d at 645.

In *Paroline v. United States*, the Supreme Court held that proximate cause generally "refers to the basic requirement that . . . there must be some *direct relation* between the injury asserted and the injurious conduct alleged," and is "often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." 572 U.S. 434, 444-45 (2014) (alteration in original) (emphasis added) (citation omitted); *see also Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (holding proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient" (quoting *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 271, 274 (1992)) (citations omitted)); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (stating that when analyzing proximate causation "the central question [a court] must ask is whether the alleged violation led *directly* to the plaintiff's injuries" (emphasis added)); *Holmes*, 503 U.S. at 268-69 (recognizing that the common-law concept of proximate cause includes "a demand for *some direct relation* between the injury asserted and the injurious conduct alleged" (emphasis added)).

Courts have applied this direct-relationship standard in terrorism cases. Relying in part on *Paroline*, *Anza*, and *Holmes*, the Ninth Circuit recently held in *Fields v. Twitter* that the proximate cause standard requires a "direct relationship" between the alleged acts of material support and injury. 881 F.3d 739, 749-50 (9th Cir. 2018) (affirming dismissal of ATA claims for failure to allege that "Twitter's provision of communication equipment to ISIS . . . had any direct relationship with the injuries that Plaintiffs-Appellants suffered"). Similarly, in *Rothstein v. UBS AG*, the Second Circuit explained that a direct relationship between the defendant's conduct and the injury must exist to establish proximate causation. 708 F.3d 82, 91-92 (2d Cir. 2013); *id.* at 95 (holding "proximate cause" under § 2333(a) requires that conduct was "a substantial factor in the sequence of responsible causation" and "the alleged violation *led directly*" to plaintiffs' injury,

which was "reasonably foreseeable or anticipated as a natural consequence" (emphasis added) (citations omitted)); *id.* (stating "we can only assume [Congress] intended [the words 'by reason of'] to have the same meaning that courts had already given them" in the Sherman Act and the Clayton Act, and requiring that "defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause" (quoting *Holmes*, 503 U.S. at 267-68)).

Sudan recognizes that in *Havlish* and *Ashton*, this Court concluded that proximate cause "may be established by a showing of a reasonable connection between the material support provided and the ultimate act of terrorism." *Havlish*, 2011 U.S. Dist. LEXIS 155899, at *202 (citation omitted); *see also Ashton*, 298 F. Supp. 3d at 645 ("[T]his Court adopts the traditional test for proximate causation that has been applied elsewhere in the FSIA context: some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." (citation omitted)). But *Havlish* was decided in 2011 — three years before the Supreme Court's decision in *Paroline* — and was in the context of a default judgment against a foreign sovereign (Iran).

Similarly, *Ashton* relies on numerous cases that predate *Paroline* and that emerged from default judgments. *See* 298 F. Supp. 3d at 645 (citing cases). In particular, *Ashton*'s reliance on the D.C. Circuit's decision in *Owens v. Republic of Sudan* is misplaced. *See Ashton*, 298 F. Supp. 3d at 645-46 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). *Owens* emanates from a default judgment and is currently pending review by the Supreme Court. 864 F.3d 751, *cert. pending and cert. granted on other grounds sub nom. Opati v. Republic of Sudan*, 139 S. Ct. 2771 (Jun. 28, 2019). And Sudan has placed the issue of jurisdictional causation before the Supreme Court. *See* Pet. for Writ of Cert. 30-33, *Republic of Sudan v. Owens*, No. 17-1236 (U.S. Mar. 2, 2018); Reply Br. in Supp. of Pet. for Writ of Cert. 10, *Owens*, No. 17-1236 (U.S.

May 22, 2018); Br. for Respondents 27-28, *Opati v. Republic of Sudan*, No. 17-1268 (U.S. Nov. 22, 2019).

Even accepting the causation standard articulated in *Havlish* and *Ashton* for present purposes, the Complaint's factual allegations regarding Sudan's purported conduct are insufficient to show that there was a reasonable connection — let alone a direct relationship — between Sudan's alleged conduct and the 9/11 Attacks.  Specifically, this Court has previously required that:  (1) "the defendant's conduct 'must be a substantial factor in the sequence of events that led to the plaintiff's injury'" and (2) "the plaintiff's injury 'must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's actions.'"  *Ashton*, 298 F. Supp. 3d at 645-46 (quoting *Owens*, 864 F.3d at 794).  These requirements, of course, "preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Id.* at 646 (quoting *Paroline*, 572 U.S. at 445); *see also Rothstein*, 708 F.3d at 91 ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct . . . ." (citation omitted)); *id.* at 92 (explaining that "an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause").

In *Ashton*, this Court considered — and deemed *insufficient* under § 1605B — allegations that the Saudi High Commission for Relief in Bosnia and Herzegovina ("SHC"), a foreign state under the FSIA, (1) "provided funding and other forms of material support to al Qaeda during the 1990s [and as late as 1999] that enabled it to acquire the global strike capabilities employed with devastating effect on September 11, 2001," (2) "al Qaeda members were 'broadly embedded' in SHC offices and used SHC facilities 'to plot attacks against the West,'" and (3) that SHC had

"direct involvement in the portfolio of plots al Qaeda was developing . . . to attack the American homeland." *Ashton*, 298 F. Supp. 3d at 646.  This Court stated:

> These allegations do not provide a basis to assert jurisdiction under JASTA over the claims asserted against the SHC. Plaintiffs fail to plead any specific, non-conclusory allegations that the SHC, or any of its employees or agents operating within the scope of their employment or agency, knowingly or with deliberate indifference provided material support directly to al Qaeda to aid in planning or facilitating the 9/11 Attacks.  Nor do they plausibly allege that any of the SHC's conduct during the 1990s bears any reasonable connection whatsoever to the 9/11 Attacks.  Indeed, *all* of the factual allegations as to SHC relate to its support of al Qaeda's activities far removed, both in time and place, from the 9/11 Attacks.

*Id.* at 647.  This Court similarly found allegations regarding certain individuals allegedly connected to the Kingdom of Saudi Arabia to be *insufficient* to show jurisdictional causation.  *Id.* at 651-53.

The allegations here regarding Sudan's purported conduct are even more attenuated and are farther "removed, both in time and place, from the 9/11 Attacks" (*id.* at 647) than the allegations already held insufficient by this Court in *Ashton*.  The allegations against Sudan, therefore, are perforce insufficient to show the jurisdictional causation required for an exception to immunity under §§ 1605A and 1605B.  In particular, the Complaint fails to allege facts sufficient to show any causal connection (let alone a direct causal connection) between any purported acts of Sudan's officials, employees, or agents while acting within the scope of their authority, and the 9/11 Attacks.

The Complaint has 29 paragraphs of allegations supposedly relating to Sudan's purported conduct.  *See* 2018 Compl. ¶¶ 27-55.  Of these 29 paragraphs:

- Seven fail to rise above vague and conclusory assertions that may not be credited (*see id.* ¶¶ 27-30, 35-36, 55);

- Five are wholly irrelevant as they fail to allege any facts concerning actions taken by Sudan or its officials (*see id.* ¶¶ 43, 46, 48-50);

- Four are entirely untethered in time such that any purported connection between Sudan's alleged conduct and the 9/11 Attacks is impossible to divine (*see id.* ¶¶ 33, 44, 53-54);

- Three concern totally unrelated parties, like Iraq (*see id.* ¶¶ 37-38) and other foreign terrorist organizations (*see id.* ¶ 34), that are alleged to have received support from Sudan that these entities then allegedly used to provide material support to Al Qaeda generally, again making it impossible to determine any purported connection between Sudan's alleged conduct and the 9/11 Attacks; and

- The remaining ten (*see id.* ¶¶ 31-32, 39-42, 45, 47, 51-52) concern conduct that purportedly occurred in Sudan between 1991 and 1996 (the Complaint acknowledges that Bin Laden was "expelled" from Sudan in 1996 and went to Afghanistan (*id.* ¶ 52)).  These ten paragraphs concern purported conduct of Sudan that occurred five to ten years before the 9/11 Attacks — far too remote in time to establish a direct (or even reasonable) causal connection between the conduct alleged (e.g., hosting Al Qaeda and Bin Laden in Sudan years before Al Qaeda and Bin Laden were even designated as a terrorist organization or terrorist by the United States) and the 9/11 Attacks by Al Qaeda in the United States in 2001.

These allegations are far too conclusory and attenuated, and are much too remote in time and place to form the basis of subject-matter jurisdiction in this case.  *See Ashton*, 298 F. Supp. 3d at 646-47 (finding complaint failed to allege that support provided to Al Qaeda in the 1990s bore "any reasonable connection whatsoever to the 9/11 Attacks"); *id.* at 659 (declining to exercise jurisdiction over a sovereign defendant without "any definite and specific, articulable connection to the 9/11 Attacks or those who carried them out"); *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 563, 572 (E.D.N.Y. 2012) (finding transactions with alleged terrorist organizations four to

eight years before the attack too distant in time to establish that defendant's acts "proximately caused plaintiff's injuries"); *id.* at 557 (finding the defendant's acts on which the plaintiff relies "so remote in time and attenuated in their inferential value as proof of an element of any cause of action as to constitute less than a scintilla").

The Complaint's allegations regarding Sudan's purported pre-1996 activity particularly suffer from their temporal and factual remoteness from the 9/11 Attacks. The Complaint contains allegations about Bin Laden's presence in Sudan — that Sudan purportedly permitted Bin Laden's "entrance" into Sudan (2018 Compl. ¶ 40), "openly harbored" Bin Laden and members of Al Qaeda (*id.* ¶ 31), and allowed Bin Laden to "establish his headquarters" and "training camps" in Sudan (*id.* ¶¶ 31, 39). Similarly, the Complaint contains generalized allegations of Al Qaeda's presence in Sudan. *See id.* ¶¶ 27, 31, 33, 36, 39-40, 44, 48, 54. But the Complaint fails to allege any facts sufficient to show a direct relationship or reasonable connection between this alleged support of Al Qaeda or Bin Laden in the early 1990s and the 9/11 Attacks in 2001. The Complaint does not allege any facts suggesting that any participant in the 9/11 Attacks trained at any purported camps in Sudan, visited the alleged headquarters in Sudan, or even entered Sudan at all.

The Complaint also alleges that Bin Laden "forged business alliances" and "ventures" with "wealthy Sudanese," including some "senior members of the NIF," and that Bin Laden owned a company "jointly" with "the Sudanese government." *Id.* ¶¶ 41-42. But the Complaint does not allege sufficient facts showing that any of these individuals were officials, employees, or agents of Sudan or that they acted within the scope of that authority when entering into these purported "business alliances," as § 1605A(a)(1) requires. Nor does the Complaint allege any facts showing that such joint ownership, or any activity by Sudan in relation to Bin Laden's businesses generally, had any connection whatsoever to the 9/11 Attacks.

–11–

The Complaint points to two alleged interactions in the early 1990s between Bin Laden, Al Qaeda, and unnamed alleged Sudanese officials.  In one instance, "[i]n or about the early 1990s" members of Al Qaeda allegedly met with "representatives of . . . the Sudanese army" regarding "joint manufacture of chemical weapons."  2018 Compl. ¶ 45.  In another, Bin Laden purportedly worked with an NIF official "[a]t various times between in or about 1992 and 1996" "to obtain communications equipment on behalf of the Sudanese intelligence service."  *Id.* ¶ 47.  But the Complaint fails to allege in either instance that any official was acting on behalf of Sudan and within the scope of his or her authority, or that these purported activities somehow were related to the 9/11 Attacks that occurred at least five years later.

The only Sudanese individual mentioned in the Complaint is Hassan al-Turabi.  *See id.* ¶¶ 40, 51, 52.  The Complaint alleges that "[i]n or about 1991, Sudan through Hassan al-Turabi . . . allowed the terrorist Osama bin Laden and his al Qaeda party entrance into Sudan."  *Id.* ¶ 40.  The Complaint later alleges that al-Turabi, "under pressure from the United States and others, expelled Osama bin Laden from the Sudan in 1996 but allowed him to move to Afghanistan."  *Id.* ¶ 52.  But these allegations fail to provide facts showing how Bin Laden and purportedly Al Qaeda's presence in Sudan beginning in 1991 and Bin Laden's subsequent expulsion from Sudan in 1996 had a direct or even reasonable connection to the 9/11 Attacks.  Quite to the contrary, the expulsion of Bin Laden from Sudan, and his later residence in Afghanistan, establish an undeniable *break* in any purported causal chain.  Indeed, the United States had not designated Bin Laden as a terrorist at the time of his expulsion, and would not do so until over two years later.  Exec. Order No. 13,099, 63 Fed. Reg. 45,167, 45,167 (Aug. 20, 1998).  And the United States did not designate Al Qaeda as a foreign terrorist organization until October 8, 1999.  Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112, 55,112 (Oct. 8, 1999).

–12–

The Complaint also alleges that, in 1995, al-Turabi organized a conference at which Bin Laden "was able to meet with militant groups" from other countries.  2018 Compl. ¶ 51.  But the Complaint fails to allege that any of these contacts allegedly made by Bin Laden related to or proximately caused the 9/11 Attacks *six years later*, or that al-Turabi organized the event "for" the 9/11 Attacks.

The Complaint fails to allege facts sufficient to show that Sudan's purported conduct with respect to Bin Laden and Al Qaeda was a "substantial factor in the sequence of events that led to" the 9/11 Attacks or that the 9/11 Attacks were "reasonably foreseeable or anticipated as a natural consequence of [Sudan's] actions."  *Ashton*, 298 F. Supp. 3d at 646 (citations omitted).  Indeed, only one allegation in the section of the Complaint discussing Sudan's purported conduct (2018 Compl. ¶¶ 27-55) even mentions the 9/11 Attacks, and it does so in wholly conclusory terms devoid of facts.  *Id.* ¶ 55 ("The support provided by the Sudan and its agencies and instrumentalities to Osama bin Laden and al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the September 11th Attacks and the extrajudicial killing of the Decedents.").

Ultimately, the Complaint fails to allege facts sufficient to show that the purported support provided by Sudan proximately caused the 9/11 Attacks, that such support was "for" the attacks, or that any officials of Sudan provided such support while acting within the scope of their authority.  None of the factual allegations concerning purported conduct by Sudan has a direct relation — or even a reasonable connection — to the 9/11 Attacks, and all are either untethered in time or concern alleged activities from more than five years before the attacks occurred.  The allegations are so "far removed, both in time and place" (*Ashton*, 298 F. Supp. 3d at 646), as well as in fact, that "the causal link between conduct and result is so attenuated that the consequence is

more aptly described as mere fortuity" (*id.* at 647 (quoting *Paroline*, 572 U.S. at 445)).  The Complaint should therefore be dismissed in its entirety under Rule 12(b)(1) for lack of subject-matter jurisdiction under §§ 1605A and 1605B.

> **B.**     **Sudan Is Immune From Claims Of Family Members Of Victims Under Both § 1605A(a) And § 1605B(b)**

This Court lacks subject-matter jurisdiction over the claims of the relatives of the decedent victims of the September 11 attacks.  Section 1605A(a)(2)(A)(ii) withdraws a foreign state's immunity for certain claims if "the claimant or the victim" satisfies specified criteria (i.e., U.S. citizenship or employment by the U.S. Government).  28 U.S.C. §§ 1605A(a)(1), (a)(2)(A)(ii). The natural meaning of § 1605A is that it withdraws immunity for claims of either (i) a "victim" who was injured and has the requisite U.S. nationality or employment; or (ii) a "claimant" acting as the legal representative of a person who was killed or incapacitated (a "victim") if either the claimant has or the victim had the requisite U.S. nationality or employment.  28 U.S.C. § 1605A(c). Use of the term "claimant" is necessary in the statute because in the case of a killing or incapacitation, the "victim" will not be the one asserting the claim.

The Supreme Court in *Helmerich* underscored the importance of analyzing the provisions of the FSIA against the statute's purpose and legislative history.  137 S. Ct. at 1319-21; *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018) (interpreting other provisions of the FISA "consistent with the history and structure of the FSIA").  Here, the FSIA's legislative history confirms Sudan's interpretation that the Court lacks subject-matter jurisdiction over the claims of family-member claimants.

An early version of § 1605(a)(7), the now-repealed predecessor to § 1605A, first used the term "claimant," and the House Report explained:  "[W]here the victim is not alive . . . the victim's legal representative or . . . a proper claimant in an action for wrongful death may bring suit."  H.R.

Rep. No. 103-702, at 5 (1994); *see also* H.R. Rep. No. 104-383, at 62 (1996) ("[A] lawsuit proceeding under [§ 1605(a)(7)] will be brought either by the victim, or on behalf of the victim's estate in the case of death or mental incapacity."); H.R. Rep. No. 105-48, at 2 (1997) (intending "American nationals who are victims of such acts or their *surviving claimants* [to] bring an action" (emphasis added)).  Congress's intention to permit "suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death" is consistent with its earlier expression that these "suits" are brought by the "victim or on behalf of the victim's estate."  H.R. Rep. No. 104-383, at 62.  And even the statement by opponents of a 1994 version of the bill — that § 1605(a)(7) would amend the FSIA to allow claims by "U.S. citizens who are the victims or family members of victims" — confirms Sudan's position that victims or, if they are unable, their family members, may bring claims.  H.R. Rep. No. 103-702, at 11.

      If "claimant" applies to anyone who brings a claim, then even "victims" are "claimants" and Congress's deliberate effort to separate these concepts would be reduced to "altogether redundant" words.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (interpreting statute consistent with the principle of statutory construction that the Court will avoid a reading that renders some words redundant).  In contrast, Sudan's interpretation of § 1605A(a) properly gives meaning to both "claimant" and "victim" as used in the statute.  Moreover, Sudan's interpretation allows § 1605A(a) to be read in harmony with § 1605A(c).  *See Rubin*, 138 S. Ct. at 823-25 (interpreting § 1610(g) in view of and consistent with other subsections in § 1610).  That is, a foreign state's immunity would only be withdrawn for claims of persons who qualify to bring claims under the exclusive federal cause of action in § 1605A(c).  Accordingly, this court lacks subject-matter jurisdiction to hear family-member claims under § 1605A.

Section 1605B(b) similarly withdraws a foreign state's immunity for cases "in which money damages are sought against a foreign state for *physical injury* to person or property or death occurring in the United States."  28 U.S.C. § 1605B(b) (emphasis added).  While the FSIA does not define "physical injury," the Second Circuit has drawn a distinction between physical injury and emotional distress.  *First Inv'rs Corp. v. Liberty Mut. Ins.*, 152 F.3d 162, 166 (2d Cir. 1998) (explaining that policyholders "sought damages for emotional distress, even though they had sustained no physical injury").  None of the family-member Plaintiffs here, including the four named O'Neill plaintiffs (as well as the purported family-member class members), has alleged any physical injury arising out of the 9/11 Attacks.  Accordingly, this Court lacks subject-matter jurisdiction to hear those family-member claims under § 1605B.

### C.   The Jurisdictional Limitations Period Under § 1605A(b) Has Expired

The Complaint was filed on December 21, 2018 — seven years after the expiration of the ten-year limitations period in § 1605A(b) for actions brought under § 1605A(a).  This Court therefore lacks subject-matter jurisdiction over the Complaint to the extent the Complaint is based on § 1605A.

The 2018 Complaint cannot rely on or "relate back" to the 2005 Amended Complaint to satisfy the limitations period.  Congress comprehensively amended the FSIA's so-called state-sponsor-of-terrorism exception on January 28, 2008 through § 1083 of the National Defense Authorization Act.  *See* National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-41 (Jan. 28, 2008), codified at 28 U.S.C. § 1605A note.  Through those amendments, Congress repealed the previous terrorism exception to immunity, § 1605(a)(7), and enacted the new state-sponsor-of-terrorism exception, codified at § 1605A.  The jurisdictional predicate for establishing an exception to immunity under § 1605A

remained largely identical to § 1605(a)(7), with the most significant amendment being the creation of a new private cause of action under § 1605A(c).

The limitations provision of § 1605A provides in pertinent part: "An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under § 1605(a)(7) (before the date of the enactment of [§ 1605A]) . . . not later than . . . 10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). Congress provided a mechanism for plaintiffs who had previously filed timely actions under the now-repealed § 1605(a)(7) to bring those § 1605(a)(7) actions under the new § 1605A. Specifically, § 1083(c) of the 2008 NDAA provided transition rules that authorized certain plaintiffs with an action previously filed under § 1605(a)(7) to bring his or her action under § 1605A, by either (i) moving to convert the § 1605(a)(7) action into a § 1605A action by March 28, 2008; (ii) refiling the action under § 1605A by March 28, 2008; or (iii) filing a related action by the later of March 28, 2008 or within 60 days after judgment was entered in the § 1605(a)(7) action. 2008 NDAA §§ 1083(c)(2)-(3).

Thus, an action under § 1605A arising from the 9/11 Attacks was timely if it was commenced by September 11, 2011 (i.e., within the ten-year limitations period) or, in certain cases, if an action had been timely commenced under § 1605(a)(7) before § 1605A's enactment on January 28, 2008 and was brought under § 1605A pursuant to the deadlines set forth in the transition rules (i.e., by March 28, 2008, or within 60 days after judgment was entered in the § 1605(a)(7) action). Here, the 2004 Complaint and 2005 Amended Complaint relied on § 1605(a)(7) as a basis for immunity. *See* 2004 Compl. ¶¶ 12, 14, 127-32; 2005 Am. Compl. ¶¶ 13, 15, 127. But no attempt was made to bring the action under § 1605A pursuant to any of the transition rules or deadlines set forth in the NDAA § 1083. Instead, a new action was filed under

–17–

§ 1605A in 2018, some ten years after the March 28, 2008 deadline.  *See* 2018 Compl. ¶¶ 19-20, 62-77.

The 2018 Complaint is based in part on § 1605A and was filed on December 21, 2018 — well more than seven years after the expiration on September 11, 2011 of the ten-year statute of limitations in § 1605A(b).  Therefore, the 2018 Complaint is time-barred to the extent it is based on § 1605A, and the Court lacks subject-matter jurisdiction over claims brought under § 1605A (including claims under § 1605A(c)).

## II.   NO OTHER EXCEPTION TO SOVEREIGN IMMUNITY APPLIES

The Complaint invokes the following additional exceptions to sovereign immunity: §§ 1605(a)(2) (the commercial-activity exception) and 1605(a)(5) (the noncommercial-tort exception).  2005 Am. Compl. ¶ 15; 2018 Compl. ¶ 20.  Neither of these exceptions applies.

Invoking § 1605(a)(2), the 2005 Amended Complaint contends that Sudan "conducted commercial activity that had a direct effect in the United States."  2005 Am. Compl. ¶¶ 15, 125.  But the 2018 Complaint is silent on the commercial-activity exception, and thus has abandoned this as a basis for subject-matter jurisdiction.  In any event, for the commercial-activity exception to sovereign immunity to apply, the Complaint must allege that Sudan conducted "commercial activity" and that Sudan's commercial activity had a "direct effect" in the United States.  The Complaint does neither.

The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  An activity is deemed commercial "by reference to the nature of the course of conduct or particular transaction, rather than by reference to purpose."  *Republic of Argentina v. Weltover*, 504 U.S. 607, 612 (1992) (quoting 28 U.S.C. § 1603(d)).  Specifically, the "foreign government" must act not "as regulator of a market" but rather as "a private player within it."  *Id.* at 614.  *See also Anglo-Iberia*

*Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*, 600 F.3d 171, 177-78 (2d Cir. 2010) (holding that a government-run health insurance system was "sovereign" rather than "commercial" in nature); *Hijazi v. Permanent Mission of Saudi Arabia*, 689 F. Supp. 2d 669, 674-75 (S.D.N.Y. 2010) (determining that an employee could not bring suit against a foreign sovereign under the commercial-activity exception because the employee's duties were "governmental" and "sufficiently intertwined" with the sovereign's diplomatic activity).

The 2005 Amended Complaint fails to allege that Sudan engaged in any commercial activity. *See* 2005 Am. Compl. ¶¶ 77-104. The allegations in the Amended Complaint focus on either the alleged business activity of Bin Laden and Al Qaeda (*see, e.g.*, *id.* ¶¶ 81, 90, 91, 92) or the alleged business activities of unnamed individuals whose relationship with Sudan is unclear (*see id.* ¶ 91). Section 1605(a)(2), by its terms, looks to commercial activity "by the foreign state" itself. 28 U.S.C. § 1605(a)(2); *Weltover*, 504 U.S. at 614 (explaining that the commercial activity exception depends on "the particular actions that the foreign state performs"). The only allegation concerning possible commercial activity by Sudan is that "the Gum Arabic Company Ltd. was owned jointly by Osama bin Laden and the Sudanese government." 2005 Am. Compl. ¶ 91. But the Amended Complaint makes no further allegations regarding the "nature" of this company or whether, by virtue of this joint ownership, Sudan acted "in the manner of a private actor." *Weltover*, 504 U.S. at 614. The Supreme Court in *Weltover* is clear that the commercial activity analysis focuses on "the outward form of the conduct that the foreign state performs" rather than "the *reason*" for the conduct — but the Complaint provides no information to indicate the "nature" of this joint ownership as either sovereign or commercial. *Id.* at 617.

Any alleged commercial activity must also have a "direct effect" in the United States for the exception to apply. 28 U.S.C. § 1605(a)(2). For an effect to be "direct," it must "follow[] as

an immediate consequence" of the foreign state's activity.  *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 57 (2d Cir. 2016) (quoting *Weltover*, 504 U.S. at 618).  The "mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Id.* (quoting *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010)).  Rather, the commercial activity's effect in the United States must be "immediate," that is, having "no intervening element, but, rather, flow[ing] in a straight line without deviation or interruption."  *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 139 (2d Cir. 2012) (quoting *Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir. 1987)).

Regardless of the nature of Sudan's purported activity, the harm as alleged in the Complaint did not follow as an immediate consequence of any alleged activity (commercial or otherwise) by Sudan.  Again, the allegations in the Complaint concerning Sudan's purported conduct are divorced in time, place, and fact from the 9/11 Attacks.  Over five years lapsed between the Complaint's most recent date-specific allegation from 1996, and the 9/11 Attacks in 2001.  And the Complaint itself alleges that Sudan expelled Bin Laden in 1996 — certainly an "intervening element" and "interruption" to any possible "direct effect."  As a result, § 1605(a)(2) does not provide a basis for subject-matter jurisdiction in this case.

Both the 2005 and 2018 Complaints invoke § 1605(a)(5)'s so-called noncommercial-tort exception as a basis for subject-matter jurisdiction.  *See* 2005 Am. Compl. ¶¶ 15, 126; 2018 Compl. ¶ 20.  Section 1605(a)(5) withdraws sovereign immunity in any case "in which money damages are sought against a foreign state for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  As the Second

Circuit has held, however, "'the entire tort' must [have been] committed in the United States" for § 1605(a)(5) to apply.  *O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 109, 116-17 (2d Cir. 2013) (holding that allegations of provision of material support to Bin Laden and Al Qaeda for the 9/11 Attacks were "insufficient to satisfy the requirements of" § 1605(a)(5) because the alleged support was provided outside of the United States)).

Here, the Complaint does not allege that Sudan or any of its agents committed any tortious act in the United States — in fact not one the Complaint's allegations concerning Sudan's alleged conduct involves *any* activity by Sudan in the United States.  Therefore, § 1605(a)(5) cannot establish subject-matter jurisdiction here.

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER SUDAN

Courts in the United States lack personal jurisdiction over foreign states unless one of the exceptions to sovereign immunity applies and service of process is proper under 28 U.S.C. § 1608. 28 U.S.C. § 1330(b); *Amerada Hess*, 488 U.S. at 435 n.3 (concluding "personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions for foreign sovereign immunity in §§ 1605-1607 applies" (citing *Verlinden B.V.*, 461 U.S. at 485, 489 n.14)).  Here, the Court should dismiss the claims against Sudan for lack of personal jurisdiction under Rule 12(b)(2) because, as established above, no exception to sovereign immunity applies in this case.

## CONCLUSION

For the foregoing reasons, Sudan respectfully requests that the Court dismiss with prejudice the claims against Sudan in their entirety for lack of subject-matter and personal jurisdiction. Sudan expressly preserves all of its rights, privileges, immunities and defenses, including its defenses on the merits and its right to move to strike the Complaint's impermissible request for punitive damages and a jury trial.

Dated:   February 3, 2020
        Washington, DC

Respectfully submitted,

**WHITE & CASE**

/s/ *Christopher M. Curran*

Christopher M. Curran
Nicole Erb
Claire A. DeLelle
Matthew S. Leddicotte (*pro hac vice* motion
   pending)
Nicolle Kownacki (*pro hac vice* motion
   forthcoming)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:    + 1 202 626 3600
Facsimile:    + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
cdelelle@whitecase.com
mleddicotte@whitecase.com
nkownacki@whitecase.com

*Counsel for the Republic of the Sudan,
and all of its constituent parts*

–22–