**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 2/7/2020 __

**03-MD-01570 (GBD)(SN)**

**REPORT AND**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

      Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al., No. 15-CV-9903
      (GBD)(SN)

      On January 31, 2017, the Honorable George B. Daniels granted the Burnett Plaintiffs an

Order of Judgment by default against the Islamic Republic of Iran. See Order of Judgment, ECF

No. 3443. The Court has issued numerous orders addressing the Burnett Plaintiffs' requests for

damages. Here, pursuant to § 1605A of the Foreign Sovereign Immunities Act (FSIA), plaintiffs

seek an award of pain and suffering damages on behalf of 24 personal injury plaintiffs injured in

the terrorist attacks on September 11, 2001. ECF No. 5711. Plaintiffs' motion should be

GRANTED.

**DISCUSSION**

      The Court assumes the parties' familiarity with the extensive rulings related to this multi-

district litigation. This motion asks the Court to award compensatory damages for pain and

suffering in amounts commensurate with the injuries these Plaintiffs sustained during the

terrorist attacks on September 11, 2001. In addition, in keeping with the Court's prior rulings,

Plaintiffs seek prejudgment interest at the rate of 4.96 percent per annum compounded annually

for the period from September 11, 2001, until the date of judgment, permission to seek punitive damages, economic damages, or other damages at a later date, and permission to file applications for all other Burnett Personal Injury Plaintiffs for damages awards in later stages, to the extent such awards have not previously been addressed.

In this case, assessment of personal injury damages is a matter of first impression as there have been no decisions that have addressed the award of damages to individuals who were physically injured in the terrorist attacks on September 11, 2001, but survived to pursue damages against the Defendants.

## I.   PERSONAL INJURY DAMAGES

### A.  Damages under § 1605A of the FSIA

Section 1605A of the FSIA creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and includes "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).

Upon obtaining a default judgment, "successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e. more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al., 892 F.3d 348, 353 (D.C. Cir. 2018) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)). On January 31, 2017, the Court

2

entered a Judgment by Default against the Islamic Republic of Iran. ECF No. 3443. Because

Plaintiffs' injuries occurred either as a direct result of the 9/11 attacks, the ensuing chaos from

the attacks in the immediate aftermath, or as a result of first responders attempting to assist the

injured or endangered fleeing from the scene, the proximate causation of these injuries is not in

question. Accordingly, the only remaining task is the determination of Plaintiffs' damages.

### B.  Pain and Suffering

To determine pain and suffering awards for the survivors of a terrorist attack, courts

consider a number of factors, including "the severity of the pain immediately following the

injury, the length of hospitalization, and the extent of the impairment that will remain with the

victim for the rest of his or her life." O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46

(D.D.C. 2012) (quoting Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 n.26

(D.D.C. 2007)). Because "the Court must take pains to ensure that individuals with similar

injuries receive similar awards," Peterson, 515 F. Supp. 2d at 54, courts confronting FSIA claims

have developed a framework for the calculation of damages. See, e.g. Valore v. Islamic Republic

of Iran, 700 F. Supp. 2d 52, 84 (D.D.C. 2010) (articulating and applying such a framework).

Courts generally "begin[] with the baseline assumption that persons suffering substantial

injuries in terrorist attacks are entitled to $5 million in compensatory damages." Wultz v. Islamic

Republic of Iran, 864 F. Supp. 2d 24, 37-38 (D.D.C. 2012) (citing Peterson, 515 F. Supp. 2d at

54). Courts may adjust the award amount upward or downward to reflect the severity of the

injuries. An upward adjustment to $7-12 million has been found appropriate "in more severe

instances of physical and psychological pain, such as where victims suffered relatively more

numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or

were mistaken for dead." Valore, 700 F. Supp. 2d at 84. A downward departure to $1.5-3 million

has been found appropriate where victims suffered relatively minor injuries, such as "minor shrapnel injuries," id., or "severe emotional injury accompanied by relatively minor physical injuries," Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 186 (D.D.C. 2013). The award of damages for physical injuries "assume[s] severe psychological injuries." Schertzman Cohen v. Islamic Republic of Iran, No. 17-CV-1214 (JEB), 2019 WL 3037868, at *6 (D.D.C. July 11, 2019) (citing Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 92-93 (D.D.C. 2014). In determining compensatory damages for pain and suffering, courts have found that "more relevant than *type* of injury is the *extent* of the injury. Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 74 (D.D.C. 2006) (emphasis in original).

The Court recognizes the difficulty in making exact comparisons between injuries, and notes that the "strict application of precedent could lead to conflicting conclusions about an appropriate award." Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 57 (D.D.C. 2009). The Court "readily acknowledge[s] that it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." Id. (citing Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)). Each victim's suffering is unique, and therefore comparing victims' physical and mental injuries is an inexact science.

In determining appropriate damages awards in the past, the Court has emphasized the "interest [in] promoting uniformity of determinations with respect to [state sponsored terrorist acts]," and that "generally accepted legal standards of the states provide the only steady foundation for the rules of decision." Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d. 20, 24 – 25 (D.D.C. 2009). The Court will therefore determine the appropriate amount of damages based on the categorization of an injury's severity, duration, and permanence, rather

than comparing each injury with the others to determine their relative seriousness. This approach is consistent with that taken by this Court in its determination of pain and suffering damages for wrongful death victims. See ECF No. 2618 (determining that it would be impossible to calculate a precise award for each decedent's individual pain and suffering and recommending a $2 million award for all decedents equally, despite the fact that certain decedents may have experienced different levels of pain and suffering because of their location).

Plaintiffs argue that the Court should grant an upward departure from the awards adopted by the D.C. District Court. Previously, Magistrate Judge Maas recommended an upward departure—which the Court adopted—based on the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" – "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families. Havlish v. bin Laden, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)). While Judge Maas's recommendation was made in the context of solatium damages, "[i]n determining the appropriate compensatory damages for plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium." Prevatt v. Islamic Republic of Iran, 421 F. Supp. 2d 152, 160 (D.D.C. 2006).

For similar reasons, I find that an upward departure is appropriate. Like the surviving family members of decedents, personal injury plaintiffs cannot escape the memory of 9/11. The terrorist attacks are part of our national history, consciousness and conversation. In reviewing the declarations and exhibits, the Court is reminded of the life-altering effect that September 11, 2001, had on so many people, and of the heroism that ordinary men and women displayed when

5

an act of terror turned their lives upside down. By recommending an upward departure from the D.C. District Court's baseline, the Court recognizes that Plaintiffs' pain and suffering is never relieved because they are continually confronted with reminders of that tragic day.

Accordingly, the Court grants plaintiffs' request for an upward departure from the $5 million baseline. Based on Judge Maas's calculations for solatium damages and a survey of the relevant D.C. District Court opinions, the Court establishes a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million. The Court, however, reserves its discretion to award further upward departures in exceptional cases.

Because of the inherent difficulty in applying numerical awards consistently to such a large number of plaintiffs, the Court will tie these three award amounts to the three categories of injuries suggested by plaintiffs: significant, severe, and devastating. To be sure, there will be some claims in each category that are more or less significant than others. But by limiting the range of awards to three categories, the Court hopes the claims will be evaluated consistently across all current and future 9/11 personal injury motions. See, e.g. Schooley v. Islamic Republic of Iran, No. 17-CV-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (dividing the pain and suffering claims of over 100 claimants into three categories); cf. Wamai, 60 F. Supp. 3d at 91-92 (identifying six categories of plaintiffs, but recognizing that different special masters applying the same guidelines "brought about recommendations of different awards even for plaintiffs who suffered very similar injuries").

The first category of injuries, which will be awarded a downward departure from the baseline, includes the injuries that plaintiffs label as "significant": single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthma from inhalation

of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries. See Valore, 700 F. Supp. 2d at 84 (awarding a downward departure for a plaintiff who experienced severe emotional trauma after helping pull 100 men from the debris of exploding buildings, with some body parts detaching in his hands); see also Goldstein v. Islamic Republic of Iran, 383 F. Supp. 3d 15, 20 (D.D.C. 2019) (awarding a downward departure for a plaintiff with lasting hearing difficulties and lasting emotional injury affecting his ability to function in everyday life). Courts have awarded a downward departure from the baselines damages for claimants that continue to suffer from some hearing loss, or have ongoing hearing issues such as some ringing in the ears. See Cohen v. Islamic Republic of Iran, 268 F. Supp. 3d 19, 25 (D.D.C. 2017), abrogated by Goldstein, 383 F. Supp. 3d 15. Individuals who did not seek or require urgent medical care for their injuries will also fall into this category.

The second category of injuries, which will be awarded the baseline, includes the injuries that plaintiffs label as "severe": multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas. Courts have also awarded baseline damages to plaintiffs who suffer from constant ringing in the ears, little sense of smell and taste, lower back pain, multiple shrapnel wounds, leg fractures, and ruptured eardrums. See Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 39 (D.D.C. 2012). Other

courts have awarded baseline damages for severe flesh wounds and scars on the arms, legs and face, and a mix of serious hearing or vision impairment, serious spinal or head trauma, and other permanent injuries. See Peterson, 515 F. Supp. 2d 25 at 54; Wamai, 60 F. Supp. 3d 84 at 92-93. Some of these injuries have required lengthy hospital stays, see Cohen, 2019 WL 3037868 at *6, as well as stitches and plastic surgeries, see Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 23-24 (D.D.C. 2016). Psychological injuries include severe paranoia, anxiety, a speech impediment, and fear of loud noises and the dark. See Bluth, 203 F. Supp. 3d at 23-24.

    The third category of injuries, which will be awarded an upward departure from the baseline, includes the injuries that plaintiffs label as "devastating": loss of limbs or multiple digits; severe pulmonary traumas; strokes; paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category. Courts have also awarded an upward departure from the baseline when claimants consciously suffered for nearly one month after the attack or were re-hospitalized or placed in rehabilitation. See Wultz, 864 F. Supp. 2d 24 at 38; Haim, 425 F. Supp. 2d 56 at 74. Physical injuries include blindness in one eye, deafness in both ears, substantial loss of use of a hand, and permanent disfiguring effects, including a skull fracture, resulting in permanent brain injury and permanent nerve damage. See Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 12 (D.D.C. 2001). Claimants have been awarded an upward departure when they were initially thought dead and placed in a body bag, see Peterson, 515 F. Supp. 2d 25 at 54, and when they became permanently quadriplegic, see Spencer, 2014 WL 12773915 at *10.

Plaintiffs who were awarded an upward departure from the baseline have typically suffered from emotional and psychological injuries, such as Post-Traumatic Stress Disorder ("PTSD"), insomnia, mood swings, and nightmares. See id. Plaintiffs in this category also include those who suffered a concussion and lost consciousness for approximately one week. Id. Plaintiffs have been awarded an upward departure from the baseline where, because of a particular medical condition, doctors did not provide as much pain medication as they otherwise would have given to someone with similar injuries, resulting in the plaintiff enduring even more pain than they otherwise would have experienced with severe burn and blast injuries. See Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 22 (D.D.C. 2002). An upward departure has also been granted where a plaintiff developed HIV, a "chronic, serious, and stigmatizing disease requiring a lifetime of treatment," even though they otherwise suffered only minor physical injuries. See Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 79 (D.D.C. 2014).

The absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination. See Spencer v. Islamic Republic of Iran, No. 12-CV-00042 (RCL), 2014 WL 12773915, at *10 (D.D.C. Feb. 3, 2014), report and recommendation adopted, 71 F. Supp. 3d 23 (D.D.C. 2014). In cases where victims have suffered from pre-9/11 injuries of a similar type to the injury suffered on 9/11, the Court will attempt to determine whether the injuries sustained on 9/11 caused the pain and suffering for which the plaintiffs seek relief, relying if available on medical records. If the Court is not able to ascertain causation to a reasonable degree of certainty, the Court may lower the plaintiff's damage award by one category.

While the Court's categorization seeks to provide guidance on which types of injuries are more likely to receive which level of award, these categories cannot exhaustively include every

injury the Court will likely have to address. Where new injuries are presented, the Court will have to reason by analogy. Moreover, the Court anticipates that some victims will have suffered from injuries across the categories. And where some victims may have only sustained one or two injuries, others may have sustained many more. The Court will attempt in these cases to award each victim the amount that mostly fairly corresponds to all of their injuries, taken together, focusing on their severity, duration, and permanence.

## II.   __BURNETT I__ PERSONAL INJURY PLAINTIFFS

Consistent with the framework set forth above, the Court analyzes each plaintiff's claim for pain and suffering damages individually using the objective criteria set forth herein.

### A.  George Joseph Bachmann

George Joseph Bachman was a firefighter who was at the World Trade Center during the 9/11 attacks. ECF No. 5713-2, George Joseph Bachman Decl. ¶ 3. George was climbing up the stairs of the North Tower when the South Tower collapsed. Id. ¶ 6. After exiting the North Tower and witnessing the destruction outside, George was buried in the rubble from the tower's collapse. Id. ¶ 10. He was rescued by a group of firefighters some time later, and medevacked to a hospital in New Jersey. Id. George suffered from herniated lumbar discs, a herniated cervical disc, and lumbar and cervical injuries. Id. ¶ 11. He was burned on his neck, face, and head. Id. He had severe head and neck trauma, and now has a plate in his head. Id. His back was broken in two places, and he received regular epidural shots. Id. He lost his short-term memory of the days surrounding 9/11, which gradually recovered, and he is now retired and on disability, receiving a three-quarter disability from the F.D.N.Y. on October 24, 2003, for his 9/11 injuries. Id. ¶ 12, 14. He continues to experience PTSD and medical problems and is unable to work. Id. ¶ 15. Without any medical records, the Court cannot accurately assess the duration and permanence of many of

these injuries. Because these injuries as described fall into the second category, including burns, significant injuries from being buried including head trauma and severe orthopedic injuries, and mental health trauma, the Court recommends that George Joseph Bachmann be awarded $7 million.

### B.  Mary Ellen Barbieri

Mary Ellen Barbieri was in the lobby of the North Tower of the World Trade Center during the 9/11 attacks. ECF No. 5713-3, Mary Ellen Barbieri Decl. ¶ 3. While standing in the lobby, the force of a blast from the nearby elevator catapulted her several feet in the air. Id. ¶ 5. She landed on her head and lost consciousness. Id. When she awoke, a beam was pinning her to the ground and she could not move. Id. Mary Ellen suffered from head trauma, a lumbar back sprain, a cervical neck spinal injury requiring surgery, and left hand and bilateral knee injuries. Id. ¶ 6. The multiple falls she experienced escaping the building resulted in a concussion and accompanying fainting spells, headaches, and nausea. Id. Due to her falls, Mary Ellen severely reinjured her left hand, which her doctors had surgically repaired a month before 9/11. Id.

As a result of continuing fainting spells, Mary Ellen has since sustained a fractured finger, an injured right elbow, multiple head injuries, a fractured rib, and a shoulder joint injury, and continues to suffer from chronic knee pain, severe neck pain, headaches, chronic low back pain, leg pain, and diminished mobility. Id. Mary Ellen underwent an anterior cervical corpectomy and fusion procedure of her cervical spine in 2002 and continues to treat her back and neck pain with pain medications and spinal injections. Id. ¶ 7. Due to her inhalation of jet fuel, Mary Ellen's doctors have diagnosed her with a deviated septum, which will require surgery in the future. Id. ¶ 8. Because of the continuing physical pain and emotional distress, she has been unable to work since 9/11. Id. ¶ 9. Mary Ellen continues to suffer from PTSD,

depression, insomnia, lightheadedness, shortness of breath, anxiety, heart palpitations, and nightmares, and has been assisted by service dogs since 2009. Id. ¶ 10. The Court finds these injuries, evaluated as a whole, to be devastating. Because these injuries fall into the third category, including a traumatic brain injury, diminished mobility, need for further surgery years after 9/11, and fainting spells continually causing significant injuries post-9/11, the Court recommends that Mary Ellen Barbieri be awarded $10 million.

### C.  Richard A. Beatty

Richard A. Beatty was at the World Trade Center as a police officer during the 9/11 attacks. ECF No. 5713-4. Richard A. Beatty Decl. ¶ 3. Richard was walking up the stairs of the South Tower when it was hit. Id. ¶ 4. The concussion from the collapsing building threw him against the wall, eight feet away. Id. ¶ 6. After escaping the South Tower, surviving the collapse from inside, Richard was hit by debris from the falling North Tower and buried in rubble for four to five hours. Id. ¶ 7. His left hand was broken, right leg was not functioning properly, and left forearm was burnt. Id. After using a removable cast on his hand for five months until his burns healed, Richard had 12-hour surgery on both sides of his hand, and had his whole wrist rebuilt. Id. ¶ 10. He has lost 75% use of his hand. Id. He could no longer work as a police officer and was put on long-term disability. Id. ¶ 11. Richard is close to getting a new knee, after it was crushed when he was hit by debris. Id. He continues to suffer from emotional distress and PTSD, and arthritis in his wrist and forearm. Id. ¶ 12. Although most of these injuries fall within the second category, including injuries from being buried, broken bones, and severe flesh wounds, the considerable loss of mobility Richard has suffered owing to the substantial loss of use of his left hand places his injuries in the third category. Accordingly, the Court recommends that Richard A. Beatty be awarded $10 million.

**D.  Jean M. Hunt**

Jean M. Hunt was at the Pentagon during the 9/11 attacks. ECF No. 5713-5, Jean M.

Hunt Decl. ¶ 3. The ceiling collapsed over her head, and Jean was coughing and choking as the

smoke filled the air and two naval officers dragged her out of the burning building. Id. ¶ 5. As

she left the building, she began to experience significant physical distress, including tingling and

numbness across her face and her head and a tremendous headache. Id. ¶ 6. She began to

experience pain and tightness in her chest and later that day lost almost complete vision in both

her eyes. Id. She later learned that she had experienced a stroke, causing her to be unable to

touch the top of her head for weeks after 9/11. Id. Jean suffered from a second stroke on

September 12, 2001, and a third stroke on November 12, 2001. Id. ¶ 7. The numbness has by

now traveled completely down her left side. Id. Jean began to suffer extremely frequent

headaches, insomnia, and nightmares. Id. She continues to suffer from PTSD, anxiety, and bouts

of depression. Id. ¶ 8. Jean was never able to return to work due to the disabling consequences of

her strokes and PTSD. Id. ¶ 9. Because these injuries fall into the third category, including three

strokes, one of which occurred two months after 9/11, and mental health trauma and disorders,

the Court recommends that Jean M. Hunt be awarded $10 million.

**E.  David Kletsman**

David Kletsman was at the North Tower during the 9/11 attacks. ECF No. 5713-6, David

Kletsman Decl. ¶ 3. As a result of the attacks, David suffered from acute, intense pain in his left

shoulder from falling debris and the strain of carrying another person from the building. Id. ¶ 6.

He also suffers from anxiety, PTSD, uncontrolled Hypertension, restrictive lung disease, chest

pain, and palpitation. Id. As a result, David was unable to return to work for a month after 9/11.

Id. While prescription medications and therapy have helped, the experience of 9/11 will never

leave him. Id. ¶ 8. David suffered and continues to suffer from anxiety and bouts of depression. Id. ¶ 10. The Court finds these injuries to be significant, but not severe. Because these injuries fall into the first category, including sprains, chest pain, and significant mental health disorders, the Court recommends that David Kletsman be awarded $5 million.

### F.  Daniel Kruesi

Daniel Kruesi was at the South Tower during the 9/11 attacks. ECF No. 5713-7, Daniel Kruesi Decl. ¶ 3. Daniel was on his way down the stairwell as the second plane hit, and was thrown down the stairs, injuring his back. Id. ¶ 7. According to his medical records, Daniel sustained a permanent compression fracture to his T11 and T12 vertebrae. ECF No. 5713-7, Ex. B at 70-72. His heart also suffered trauma from the stress of the event itself and possibly from the fall down the stairs. Kruesi Decl. ¶ 6. Daniel has lived with significant back pain since that day, and is unable to do many of the physical activities, including boxing, that he once enjoyed. Id. He has suffered from bouts of depression due to the events of 9/11 and continues to suffer from severe emotional distress. Id. ¶ 8. The Court finds these injuries to be significant, but not severe. Because these injuries fall into the first category, consisting of orthopedic injuries including fractures and mental health disorders, the Court recommends that Daniel Kruesi be awarded $5 million.

### G.  John R. La Sala

John R La Sala was a fire marshal arriving on the scene of Ground Zero during the 9/11 attacks. ECF No. 5713-8, John R La Sala Decl. ¶ 3. John was running into the scene when the connector from the financial center to the World Trade Center collapsed on him and he was covered in debris and briefly lost consciousness. Id. ¶ 7. As a result of the attacks, John experienced severe, chronic lower back pain, extruded disks in back causing compression of

nerve roots, radiculopathy, neuropathy, severe PTSD, depressive disorder, and anxiety disorder. Id. ¶ 6. Because of these injuries, he has not worked since 9/11. Id. The effects of PTSD are still with John to this day, and he continues to seek medical attention for his injuries. Id. ¶ 8, 9. According to John's medical records, he suffered a prior injury to his lower back twenty years prior to 9/11, and experienced minor pain in his right hip two days before 9/11. ECF No. 5713-8, Ex. H. at 10, 67. Because of John's pre-existing injuries, the Court is unable to determine the severity of the orthopedic injuries he sustained on 9/11. Accordingly, the Court finds that his injuries fall into the first category, including being covered in debris, significant orthopedic injuries, and mental health disorders, and recommends that John R. La Sala be awarded $5 million.

### H.  Veronica O. Li

Veronica O. Li was on her way to work at the World Trade Center during the 9/11 attacks. ECF No. 5713-9, Veronica O. Li Decl. ¶ 3. Standing below the North Tower, a ball of fire and metal flew towards Veronica and knocked her down. Id. ¶ 7. After falling down, she was trapped and felt a ringing sensation in her knee and pain running up to her hip and back. Id. As a mob of people tried to escape over her, Veronica curled into a ball and protected her head. Id. After a while Veronica was able to get up and walk away from Ground Zero. Id. She underwent surgery to repair her left knee and three years of physical therapy, but she still has pain in her knee and was deemed partially, permanently disabled. Id. ¶ 8. She also sustained bruises to her face, back, and both knees, as well as abrasions to both of her eyes. Id. ¶ 6. She suffered, and continues to suffer, from severe emotional distress, anxiety, and bouts of depression, and has trouble sleeping. Id. ¶ 7, 9. The Court finds these injuries to be significant, but not severe. Because these injuries fall into the first category, consisting of significant orthopedic injuries,

lacerations, mental health disorders, the Court recommends that Veronica O. Li be awarded $5 million.

**I.   James Raymond McCarthy**

James Raymond McCarthy was on the 31st floor of the World Trade Center during the 9/11 attacks. ECF No. 5712-10, James Raymond McCarthy Decl. ¶ 3. After running out of the North Tower, James was directly below the impact of the second plane hitting the South Tower. Id. ¶ 5, 6. The crowd around him started a stampede away from the tower and headed right towards him, causing James to fall and be kicked in the head hundreds of times. Id. ¶ 6. As he was being kicked and piled on, someone picked him up and put him in a dumpster. Id. James sustained back, brain, head and nerve injuries, and a herniated disc at the L5-S1 location, which causes chronic pain in his lower back region. Id. ¶ 7. The back injury also caused him to suffer from lumbrosacral radiculopathies to the S1 and L4 nerves, sciatica, an antalgic gait, and numbness and tingling in his toes. Id. He also experienced a severe concussion while being trampled, which has caused him to suffer memory loss and dizziness. Id. He sustained an injury to his right finger, as well as stress-related heart disease and diabetes. He continues to suffer from PTSD, including panic attacks, nightmares, anxiety, and depression. Id. ¶ 8. Because these injuries fall into the second category, including a concussion and other significant bodily injuries from being trampled, and mental health disorders, the Court recommends that James Raymond McCarthy be awarded $7 million.

**J.   Nancy Marie Morrison**

Nancy Marie Morrison was in the lobby of the North Tower during the 9/11 attacks. ECF No. 5713-11, Nancy Marie Morrison Decl. ¶ 3. In the chaos of people running from the towers, Nancy was knocked down and trampled by people frantically fleeing, losing consciousness as a

result. Id. ¶ 5. Nancy's injuries included a left clavicle and rib fracture, bruising to left anterior chest wall, and a right knee injury, causing altered gait and lower back spasms. Id. ¶ 6. She subsequently developed a left knee injury, a lower back injury and required a right hip replacement. Id. Nancy has since lost her job, and she is unable to walk great distances or stand for a length of time. Id. ¶ 7. She recently had two ablation procedures to alleviate her worsening lower back pain, but has gained no relief. Id. ¶ 9. She has become arthritic wherever she was injured, and she over-uses her right arm to compensate for the pain in her left clavicle. Id. She goes to physical therapy twice a week, and continues to suffer from PTSD. Id. ¶ 8, 9. The Court finds these injuries to be severe, but not devastating. Although Nancy's physical movements continue to be somewhat curtailed by her injuries, these injuries do not rise to the level of immobility caused by the loss of use of limbs or digits or paraplegia. Because her injuries fall into the second category, including significant injuries from being trampled and orthopedic trauma requiring several procedures and causing constant pain, the Court recommends that Nancy Marie Morrison be awarded $7 million.

### K.  Kofi Osei Nyantakyi

Kofi Osei Nyantakyi was across the street from the World Trade Center during the 9/11 attacks. ECF No. 5713-12, Kofi Osei Nyantakyi Decl. ¶ 3. As Kofi ran to escape from the area, the crowd started to stampede and people ran over him, and he was covered with debris and ash. Id. ¶ 6. He suffered from lacerations and bruises to his right hand and both forearms, injuries to his knees, right wrist, and gluteal area, and injuries to his neck, which cause pain to radiate to both arms accompanied by stiffness and numbness. Id. ¶ 7. He also sustained injuries to his back, specifically the lumbar spine where he endured a neuroforminal disc herniation at L4-5 with spinal cord stenosis and left lateral disc herniation at L2-3 and L3-4 with left neuroforminal

narrowing. Id. Kofi can no longer lift more than thirty pounds due to the injuries he sustained. Id. He experienced and continues to experience PTSD, including anxiety, apprehension, dysphoria, distress, bouts of dejection, hyperactivity, irritability, and nightmares. Id. ¶ 8. Because these injuries fall into the second category, including significant injuries from being trampled and mental health disorders, the Court recommends that Kofi Osei Nyantakyi be awarded $7 million.

### L.  Sharon Premoli

Sharon Premoli was working on the 80th floor of the North Tower during the 9/11 attacks. ECF No. 5713-13, Sharon Premoli Decl. ¶ 2. Down in the lobby, Sharon fell and cut her hand and injured her foot against the cement and debris. Id. ¶ 3. She was thrown into the air by the force of the South Tower's collapse, and then hurled full-force into a plate glass window and fell to the ground, unconscious and covered in debris. Id. ¶ 4. As a detective found Sharon in the rubble and tried to administer her oxygen, she was chocking, numb, catatonic, her eyes caked in glass and dirt and her lungs burning, with pain intensifying in her chest and limbs. Id. ¶ 5. Experiencing severe trauma, Sharon experienced two "disassociations," a split with reality where she believed she was dead. Id. She experienced shock for several days after the attacks. Id. ¶ 6. She also experienced pain and memory problems for weeks and could not read properly for almost ten years. Id. Today, Sharon suffers from full-body neuropathy, muscle weakness, cognitive impairment, loss of hearing on the left side, uninterrupted tinnitus, and reduced lung function and chronic rhinosinusitis. Id. ¶ 7; ECF No. 5713-13, Ex. M at 31. She also suffered from traumatic brain injury and related severe cognitive impairment, and continues to suffer from profound post-traumatic stress. Id. ¶ 8. Because these injuries fall into the third category, including traumatic brain injury, acute systemic trauma, and lost hearing in one ear, the Court recommends that Sharon Premoli be awarded $10 million.

### M. Bryan Rodrigues

Bryan Rodrigues was a New York City Police Officer at the scene of the World Trade Center during the 9/11 attacks. ECF No. 5713-14, Bryan Rodrigues Decl. ¶ 3. Bryan was on the Concourse Level of the World Trade Center when a strong wind picked him up and threw him several feet to the ground, severely injuring his back. Id. ¶ 7. Bryan was afterwards able to exit the building and was taken away from the scene by ambulance. Id. ¶ 8. Bryan's back injury resulted in back surgery involving L5-S1 total disc replacement for herniated discs. Id. ¶ 9. As a result, he is unable to stand, sit, or walk for long periods, and climbing or descending stairs is difficult and painful. Id. ¶ 10. He also suffered from extreme smoke inhalation, increased blood pressure, and significant eye irritation. Id. Due to these injuries, Bryan was ultimately placed on permanent accidental disability retirement. Id. ¶ 11. Bryan also continues to suffer from asthma. Id. ¶ 12. Because his injuries fall into the second category, including orthopedic injury from a fall requiring a significant surgery, the Court recommends that Bryan Rodrigues be awarded $7 million.

### N.  Julio Roig, Jr.

Julio Roig, Jr. was in his office one block from the World Trade Center during the 9/11 attacks. ECF No. 5713-15, Julio Roig, Jr. Decl. ¶ 3. An hour after the North Tower collapsed, Julio and his coworkers decided to leave the office and head to safety. Id. ¶ 5. He walked to Battery Park surrounded by debris and a huge grey wall of toxic dust, and then was transported by tugboat to Hoboken where he as quarantined. Id. He started suffering from breathing problems almost immediately. Id. ¶ 6. On October 16th, Julio went to the doctor because he had general body aches, sore throat, coughing, wheezing, and shortness of breath. Id. ¶ 7. In November 2001, he underwent an invasive surgical procedure where 10% of his right lung was

removed in order to determine the cause of his breathing difficulties. Id. Tests revealed large quantities of silicates and the presence of multiple, well-defined pulmonary granuloma, and Julio was diagnosed with lung disease. Id. He had no history of respiratory disorders before 9/11, and the heavy metals he inhaled were known to be present at the site of the attacks. Id. ¶ 8, 9. His lung capacity has diminished to such an extent that he has become a candidate for a lung transplant. Id. ¶ 10. The Court finds these injuries to be severe. Because these injuries fall into the second category, including pulmonary trauma more severe than the respiratory ailments included in the first category, the Court recommends that Julio Roig, Jr. be awarded $7 million.

**O.  Kevin Shaeffer**

Kevin Shaeffer was at the Navy Command Center located in the Pentagon during the 9/11 attacks. ECF No. 5713-16, Kevin Shaeffer Decl. ¶ 3. Kevin was working at his desk when the command center exploded in a gigantic fireball, and he felt himself being slammed to the desk by a massive shock wave. Id. ¶ 5. Smoke burned his mouth and throat as he struggled to breath. Id. Kevin escaped through a hole that had been blown out in the brick wall. Id. As a result of the attacks, Kevin suffered from 41% total body surface area burns with second and third degree burns and was hospitalized for over three months. Id. ¶ 6. As a result of the smoke inhalation, his lungs were damaged, and he was put on a ventilator for two months. Id. Due to the fluid buildup in his lungs, Kevin was strapped to a rotating bed for several weeks. Id. At one point he became septic, and he went into cardiac arrest twice. Id. He has undergone 17 surgeries, and continues to bear the scars of that day on nearly 50% of his body. Id. He has nerve damage on the right side of his body that numbs portions of both his right arm, right hand, and right foot. Id. He has arthritis-like pain in the joints of his fingers and both his elbows, and was diagnosed in early 2003 with sleep apnea. Id. Because these injuries fall into the third category and are

particularly devastating, including devastating burns, multiple surgeries and lengthy hospital stays, the Court recommends that Kevin Shaeffer be awarded $12 million.

### P.  Donna Singer

Donna Singer was working on the 63rd floor of the South Tower during the 9/11 attacks. ECF No. 5713-17, Donna Singer Decl. ¶ 3. Donna, who was five months pregnant at the time, headed for the stairs to get down to the lobby, and then ran from the building. Id. ¶ 5, 6. She took cover in a gym to escape the falling debris and dust cloud from the tower's collapse. Id. ¶ 6. As a result of her walk during the attacks from the 63rd floor to Brooklyn, Donna had several complications in her pregnancy, including shortening of the cervix and premature dilation. Id. ¶ 8. She was bedridden and monitored by a nurse for the remaining four months of her high-risk pregnancy. Id. Donna also experienced and continues to experience severe PTSD and panic attacks. Id. ¶ 9. Although the effects on Donna's pregnancy do not fall squarely into the three categories delineated above, the extent and severity of these complications are most closely analogous to the other injuries in the first category. Because of this, and because of the effects of 9/11 on her mental health, the Court recommends that Donna Singer be awarded $5 million.

### Q.  Eugenia S. Singer

Eugenia S. Singer was on the 103rd floor of the South Tower of the World Trade Center during the 9/11 attacks. ECF No. 5713-18, Eugenia S. Singer Decl. ¶ 3, 5. Eugenia had made it down to the 78th floor, to the sky lobby area, when the second plane crashed, and she was thrown across the sky lobby floor. Id. ¶ 5. She sustained physical injuries when part of the plane landed just a few feet away from her. Id. Eugenia suffered a compound, open fracture of the distal radius and ulna near her left wrist. Id. ¶ 6. She suffered third degree burns which covered her left and right arms, hands and fingers, and required two skin graft surgeries. Id. She suffered

a concussion, and contusions and lacerations on her head that required multiple cauterization treatments. Id. Her left shoulder was fractured, as were her left clavicle and left scapula. Id. The fourth, fifth, and sixth ribs on her left side were also fractured. Id. Her lengthy recovery included the insertion of a metal plate and four pins in her left wrist to hold her hand together. Id. The plate and pins were eventually removed so that her range of motion could be increased. Id. Eugenia also has suffered and continues to suffer from PTSD, anxiety, chronic fatigue, excessive weight loss, nausea, and dizziness. Id. ¶ 7. She was in the hospital for three weeks, followed by a period of further convalescence at her parents' home and further surgeries. Id. ¶ 8. Because these injuries fall into the third category, including severe burns, loss of mobility in her hand, a lengthy hospital stay of close to one month, and multiple surgeries, the Court recommends that Eugenia S. Singer be awarded $10 million.

### R.  Lauren A. Smith

Lauren A. Smith was in her office on the 89th floor of the World Trade Center during the 9/11 attacks. ECF No. 5713-19, Lauren A. Smith Decl. ¶ 3. After the first plane hit, Lauren evacuated using the elevators. Id. ¶ 4. But when they reached the 25th floor, the impact of the second plane caused the elevator to free-fall. Id. When the elevator landed, something hit Lauren's leg, severely injuring it and causing a hematoma. Id. As Lauren jumped from the elevator to the lobby below, she fell into the elevator shaft and landed on a beam, fracturing four to five ribs and collapsing a lung. Id. ¶ 5. She was carried out of the building on a stretcher and was put into an ambulance across the street when the second tower fell, covering the area in debris and forcing Lauren to walk to the hospital. Id. ¶ 6. She was hospitalized for two weeks and underwent two surgeries to drain the hematoma and re-contour her leg. Id. Lauren also suffered from injuries to her thigh, pelvis, lung, back, and ribs. Id. ¶ 7. Due to her fall, her pelvis

was out of alignment, requiring chiropractic treatment for the next twelve years. Id. She suffered, and continues to suffer, from PTSD and severe emotional distress, including depression, anxiety, flashbacks, and nightmares. Id. ¶ 9. Because these injuries fall into the second category, including pulmonary trauma and orthopedic trauma requiring multiple surgeries, the Court recommends that Lauren A. Smith be awarded $7 million.

### S.  Kenneth A. Summers

Kenneth A. Summers was in the lobby of the South Tower of the World Trade Center during the 9/11 attacks. ECF No. 5713-20, Kenneth A. Summers Decl. ¶ 2. He exited the west side of the building after hearing a boom, but went back into the lobby to avoid the falling debris. Id. ¶ 3. He was in the revolving doors when a giant fireball from the jet fuel came towards him out of the elevator shaft, engulfing him in flames. Id. He was blown fifty feet from the impact and landed in the street with a glass door on top of him. Id. He went into shock, but managed to push the door off. Id. Severely burned and bleeding profusely from head and arm wounds, Kenneth staggered away and was helped by a young man to escape on a ferry to New Jersey. Id. ¶ 4. Kenneth suffered from head wounds and second and third degree burns on his face, head, neck, arms, and hands. Id. ¶ 5. He was in the hospital and trauma center for three weeks, underwent skin grafts, and had a total of ten reconstructive surgeries on his hands, continuing to suffer from intense nerve damage. Id. After years of occupational therapy, he cannot close his hands into a full fist. Id. He has suffered from other side effects from the burns including diabetes and its effects, including toe ulcers. Id. ¶ 6. He suffered, and continues to suffer, from PTSD and severe emotional distress. Id. ¶ 8. Because these injuries fall into the third category, including severe burns, loss of mobility, and multiple surgeries, the Court recommends that Kenneth A. Summers be awarded $10 million.

### T.  Michael A. Telesca

Michael A. Telesca was a firefighter present at the World Trade Center during the 9/11 attacks. ECF No. 5713-21, Michael A. Telesca Decl. ¶ 3. After arriving in the lobby of the Marriott Hotel at 3 World Trade Center, the hotel began to collapse, causing falling debris to hit Michael on the head as the building came crumbling down around him. Id. ¶ 5, 6. He suffered a herniated disc in his back and multiple lacerations, as well as a severe contusion of his right foot. Id. ¶ 6. He passed out, and when he regained consciousness, he was vomiting dust that he had inhaled during the destruction of the building. Id. Following his escape from the lobby, Michael was caught in the subsequent collapse of the North Tower, and was completely covered in dust and debris. Id. ¶ 7. His doctors diagnosed him as having discogenic disease of his lumbar spine. Id. ¶ 9. In the years after 9/11, Michael had to have surgeries to remove one third of his colon, for sinusitis, and to remove potentially cancerous lesions on his back. He has been diagnosed with sleep apnea. Id. Michael also began to suffer from profound post-traumatic stress, causing him to retire on disability from his job as a firefighter. Id. ¶ 10. Because these injuries fall into the second category, including orthopedic trauma and multiple surgeries, the Court recommends that Michael A. Telesca be awarded $7 million.

### U.  Bidiawattie Tewari

Bidiawattie Tewari was at the South Tower of the World Trade Center during the 9/11 attacks. ECF No. 5713-22, Bidiawattie Tewari Decl. ¶ 3. She was on the 97th floor when the plane plunged into the tower. Id. ¶ 5. While attempting to flee, Bidiawattie fell down a flight of stairs and suffered injuries to both her shoulders, right elbow, and lower back. Id. ¶ 6. She sprained her shoulders, right elbow, and hands, and had a left lateral herniation at L3 to L4, diffuse disc bulge at L4 to L5, spondylosis at C6 to C7, and thickening of the posterior spinal

ligament at C6 to C7. Id. ¶ 7. She also developed sinusitis and asthma, for which she continues to receive treatment. Id. These injuries have left her disabled and unable to work. Id. ¶ 8. Because these injuries fall into the first category, including significant orthopedic trauma causing continuing pain, the Court recommends that Bidiawattie Tewari be awarded $5 million.

### V.  Denise Thompson

Denise Thompson was at the North Tower of the World Trade Center during the 9/11 attacks. ECF No. 5713-23, Denise Thompson Decl. ¶ 3. While Denise was attempting to escape from the 37th floor, she fell down a flight of stairs and significantly injured her back. Id. ¶ 6. She also suffered from smoke inhalation injuries following the attacks. Id. Denise has also begun to suffer profound post-traumatic stress. Id. ¶ 7. She sought medical attention for her injuries for approximately a year after the attacks, receiving physical therapy for her injured back and treatment from a counselor for her post-traumatic stress. Id. ¶ 8. Because these injuries fall into the first category, consisting of significant orthopedic injuries and mental health disorders, the Court recommends that Denise Thompson be awarded $5 million.

### W.  John Lewis Thurman

John Lewis Thurman was at the Pentagon during the 9/11 attack. ECF No. 5713-24, John Lewis Thurman Decl. ¶ 3. When the plane hit the building, the force of the blast pushed John backwards and away from his desk. Id. ¶ 5. As the room completely filled with smoke, he held his breadth and found an exit. Id. John suffered from severe smoke inhalation, which required a two-day stay in the Intensive Care Unit. Id. ¶ 7. He stayed in the hospital for a week to recover from his injuries, followed by a year of medical treatment. Id. The smoke inhalation caused him to suffer from both asthma and recurrent bronchitis. Id. John also suffered, and continues to suffer, from severe emotional stress and PTSD. Id. ¶ 8. The Court finds these injuries to be

significant, not severe. Because these injuries fall into the first category, including respiratory ailments and mental health trauma, the Court recommends that John Lewis Thurman be awarded $5 million.

### X. Phidia Wong

Phidia Wong was at the World Trade Center during the 9/11 attacks. ECF No. 5713-25, Phidia Wong Decl. ¶ 3. To the best of her recollection, there was smoke and chaos when she got out of the Chambers Street subway station, and after the second plane hit, people began running in all directions and she was knocked out. Id. ¶ 5. Phidia received physical injuries from the collapse of the towers, but has no clear recollection of what happened because she lost consciousness. Id. When she woke up, she was screaming with pain. Id. Her entire body and numerous bones were fractured. Id. ¶ 6. Specifically, she fractured the C7 lamina, right orbital floor, thoracic spine at T6, sternum, right ribcage, pubic rami, and sacrum. Id. Her lung collapsed, and she underwent a spinal stabilization surgery. Id. Phidia was hospitalized for over two months. Id. When the paramedics first found her, they first thought she was dead because her injuries were so severe that she was unresponsive. Id. ¶ 7. Phidia also has PTSD and was on anti-depressants for a long time. Id. ¶ 8. She could not work for three years after the attack and had to be cared for by her family in Hong Kong during her recovery. Id. Because these injuries fall into the third category, including being mistaken for dead, severe pulmonary traumas, severe orthopedic trauma requiring significant surgery, and a lengthy hospitalization, the Court recommends that Phidia Wong be awarded $10 million.

**CONCLUSION**

For the foregoing reasons, Plaintiffs should receive pain and suffering damages as follows:

| Number | Plaintiff | Pain and Suffering Damages |
|:---:|:---:|:---:|
| 1 | George Joseph Bachmann | $7,000,000 |
| 2 | Mary Ellen Barbieri | $10,000,000 |
| 3 | Richard A. Beatty | $10,000,000 |
| 4 | Jean M. Hunt | $10,000,000 |
| 5 | David Kletsman | $5,000,000 |
| 6 | Daniel Kruesi | $5,000,000 |
| 7 | John R. La Sala | $5,000,000 |
| 8 | Veronica O. Li | $5,000,000 |
| 9 | James Raymond McCarthy | $7,000,000 |
| 10 | Nancy Marie Morrison | $7,000,000 |
| 11 | Kofi Osei Nyantakyi | $7,000,000 |
| 12 | Sharon Premoli | $10,000,000 |
| 13 | Bryan Rodrigues | $7,000,000 |
| 14 | Julio Roig, Jr. | $7,000,000 |
| 15 | Kevin Shaeffer | $12,000,000 |
| 16 | Donna Singer | $5,000,000 |
| 17 | Eugenia S. Singer | $10,000,000 |
| 18 | Lauren A. Smith | $7,000,000 |
| 19 | Kenneth A. Summers | $10,000,000 |

| 20 | Michael A. Telesca | $7,000,000 |
| 21 | Bidiawattie Tewari | $5,000,000 |
| 22 | Denise Thompson | $5,000,000 |
| 23 | John Lewis Thurman | $5,000,000 |
| 24 | Phidia Wong | $10,000,000 |

Plaintiffs should also be awarded prejudgment interest on these damages from September 11, 2001, through the date of judgment, at a rate of 4.96 percent per annum, compounded annually. See ECF No. 3358, adopted by, ECF No. 3383.

Plaintiffs may apply for punitive damages, economic damages, or other damages at a later date consistent with any future rulings made by the Court on this issue. Any application for punitive damages should not be filed until after the Supreme Court has issued a decision in Opati v. Republic of Sudan, 139 S. Ct. 2771 (2019).

Any Burnett Personal Injury Plaintiffs not appearing in this motion and who were not previously awarded damages may still submit applications for damages awards in later stages.

Finally, the Court recognizes that in order to participate in the next distribution from the United States Victims of State Sponsored Terrorism Fund ("VSSTF"), Plaintiffs must have a judgment by February 19, 2020. Accordingly, the Burnett I Plaintiffs are ORDERED to notify the Honorable George B. Daniels no later than **Wednesday, February 12, 2020**, whether any plaintiff intends to file an objection. For claims for which no objections are anticipated, the Court will issue judgments by the VSSTF deadline. For claims for which objections are filed, the Court will make every effort to address the objections by the VSSTF deadline, but a judgment cannot be guaranteed. And, to protect the due process rights of all parties, any objection timely filed

within the 14-day period but after a judgment has been entered, will result in a stay of execution

of the judgment until further order of the Court.

SARAH NETBURN
United States Magistrate Judge

DATED:      February 7, 2020
            New York, New York

                    *               *               *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation

to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. A party may respond to another party's objections within fourteen days after

being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk

of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels

at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any

opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for

an extension of time for filing objections must be addressed to Judge George B. Daniels. The

failure to file these timely objections will result in a waiver of those objections for purposes of

appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S.

140 (1985).