# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO AL RAJHI BANK'S MOTION FOR THE COURT TO DECIDE THE BANK'S PENDING RULE 12(b)(6) MOTION TO DISMISS

February 10, 2020

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ..................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.   THE COURT HAS NO AUTHORITY TO ADDRESS MERITS ISSUES AT THIS STAGE OF THE PROCEEDINGS .................................................................................... 3

II.  THIS COURT IS BOUND BY THE SECOND CIRCUIT'S MANDATE TO CONDUCT JURISDICTIONAL DISCOVERY ........................................................... 5

III. ARB'S RULE 12(b)(6) MOTION IS WITHOUT MERIT ........................................... 8

   A.   Plaintiffs State a Claim for Secondary Liability Under an Aiding and Abetting Theory ........... 8

      1.   The Second Circuit's Panel Decision Resolved The Issue of the Sufficiency of Plaintiffs' Aiding and Abetting Allegations ........................................................ 8

      2.   ARB's Arguments Regarding the Sufficiency of the Plaintiffs' Allegations are Without Merit ........................................................................................................ 12

   B.   Plaintiffs State a Claim for Secondary liability Under a Conspiracy Theory ............................ 23

   C.   Plaintiffs State A Claim For Primary Liability Under § 2333(a) .................................................. 26

      1.   ARB Engaged in Acts of International Terrorism ............................................................ 27

      2.   ARB Acted Knowingly and with the Intent to Support al Qaeda's Terrorism Against the United States .................................................................................... 28

      3.   Plaintiffs Have Alleged Facts Establishing Causation .................................................... 29

CONCLUSION ..................................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AUSA Life Ins. Co. v. Ernst & Young*,
206 F.3d 202 (2d Cir. 2000) ...................................................................................... 30

*Averbach v. Cairo Amman Bank*,
2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ................................................................ 22

*Aviall, Inc. v. Ryder Sys., Inc.*,
110 F.3d 892 (2d Cir. 1997) ...................................................................................... 12

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ................................................................................ *passim*

*Burnett v. Al Baraka Inv. & Dev. Corp. ("Terrorist Attacks I")*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................................... *passim*

*Burrell v. United States*,
467 F.3d 160 (2d Cir. 2006) ......................................................................... 1, 2, 5, 6, 7

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012) ........................................................................................ 5

*In re Coudert Brothers LLP*,
809 F.3d 94 (2d Cir. 2015) .................................................................................. 6, 7, 8

*In re Distilled Spirits*,
78 U.S. 356 (1870) ..................................................................................................... 18

*In re Fairfield Sentry Ltd.*,
690 Fed. App'x 761 (2d Cir. 2017) .............................................................................. 7

*Fidelity Bank, N.A. v. Avrutick*,
740 F. Supp. 222 (S.D.N.Y. 1990) ....................................................................... 17, 18

*Fields v. Twitter, Inc.*,
881 F.3d 739 (9th Cir. 2018) ...................................................................................... 32

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) ......................................................................................... 30

*Freeman v. HSBC Holdings PLC*,
2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ........................................................... 32

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ........................................................................................14

*Gelb v. Royal Globe Ins. Co.,*
    798 F.2d 38 (2d Cir. 1986) ..........................................................................................12

*Gelboim v. Bank of Am.,*
    823 F.3d 759 (2d Cir. 2016) ........................................................................................24

*Goldberg v. UBS AG,*
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................. 27, 29

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................................*passim*

*Havlish v. 650 Fifth Ave. Co.,*
    934 F.3d 174 (2d Cir. 2019) .......................................................................................5, 6

*Honickman v. Blom Bank SAL,*
    2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) ..............................................................23

*Hu v. City of New York,*
    927 F.3d 81 (2d Cir. 2019) ..........................................................................................19

*Hussein v. Dahabshiil Transfer Servs. Ltd.,*
    230 F. Supp. 3d 167 (S.D.N.Y. 2017) ................................................................... 26, 27

*Jazini v. Nissan Motor Co.,*
    148 F.3d 181 (2d Cir. 1998). (*Id.* at 2.) ....................................................................10

*Kaplan v. Lebanese Canadian Bank, SAL,*
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ....................................................................*passim*

*Leh v. Gen. Petroleum Corp.,*
    382 U.S. 54 (1965) ......................................................................................................23

*Lightfoot v. Cendant Mortg. Corp.,*
    137 S. Ct. 553 (2017) ....................................................................................................3

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ..................................................................................*passim*

*LLM Bar Exam, LLC v. Barbri, Inc.,*
    271 F. Supp. 3d 547 (S.D.N.Y. 2017),
    *aff'd,* 922 F.3d 136 (2d Cir. 2019) ..............................................................................5

*McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.,*
    857 F.3d 141 ................................................................................................................19

*Metro. Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983) ................................................................................................30

*Miller v. Arab Bank, PLC,*
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................................ *passim*

*Minpeco, S.A. v. Conticommodity Servs., Inc.,*
    673 F. Supp. 684 (S.D.N.Y. 1987) ..........................................................................18

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.,*
    352 F.3d 599 (2d Cir. 2003) ...................................................................................12

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians,*
    94 F.3d 747 (2d Cir. 1996) .....................................................................................12

*O'Neill v. Al Rajhi Bank,*
    714 F.3d 118 (2d Cir. 2013) ..................................................................... *passim*

*O'Neill v. Asat Trust Reg.,*
    714 F.3d 659 (2d Cir. 2013) ..................................................................... *passim*

*O'Sullivan v. Deutsche Bank AG,*
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ................................................ 23, 30

*ONY, Inc. v. Cornerstone Therapeutics, Inc.,*
    720 F.3d 490 (2d Cir. 2013) .....................................................................................4

*Owens v. BNP Paribas, S.A.,*
    235 F. Supp. 3d 85 (D.D.C. 2017) ..........................................................................32

*In re Peters,*
    642 F.3d 381 (2d Cir. 2011) ...................................................................................12

*Phelan v. Middle States Oil Corp.,*
    210 F.2d 360 (2d Cir. 1954) ...................................................................................18

*Puricelli v. Argentina,*
    797 F.3d 213 (2d Cir. 2015) .....................................................................................6

*In re Rationis Enters., Inc.,*
    261 F.3d 264 (2d Cir. 2001) .....................................................................................3

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) .....................................................................................32

*Ruhrgas AG v. Marathon Oil Co.,*
    526 U.S. 574 (1999) ..................................................................................................4

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) .................................................................... 11, 13, 14, 19

*Sinochem Int'l v. Malaysia Int'l Shipping*,
    549 U.S. 422 (2007) ................................................................................................ 4

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) .................................................................................. 4

*Staples v. United States*,
    511 U.S. 600 (1994) .............................................................................................. 14

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ............................................................................................... 3, 4

*In re Terrorist Attacks on September 11, 2001*,
    295 F. Supp. 3d 416 (S.D.N.Y. 2018) ................................................................... 3

*In re Terrorist Attacks on September 11, 2001*,
    740 F. Supp. 2d 494 (S.D.N.Y. 2010) ................................................................... 5

*In re Terrorist Attacks on September 11, 2001*,
    538 F.3d 71 (2d Cir. 2008) .................................................................................... 9

*Title Guarantee & Trust Co. v. Pam*,
    232 N.Y. 441 (N.Y. 1922) ................................................................................... 18

*United States v. Kearney*,
    672 F.3d 81 (1st Cir. 2012) .................................................................................. 30

*Waldman v. Palestinian Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) .................................................................................. 9

*Weiss v. Nat'l Westminster Bank PLC*,
    381 F. Supp. 3d 223 (E.D.N.Y. 2019) ................................................................ 30

*U.S. ex rel. Wood v. Allergan, Inc.*,
    899 F.3d 163 (2d. Cir. 2018) ............................................................................... 19

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................ 29

**Statutes and Rules**

18 U.S.C. § 2331 ...................................................................................... 26, 27, 29

18 U.S.C. § 2333 ...................................................................................... 13, 14, 26

18 U.S.C. § 2339A .................................................................................... 26, 27, 31

18 U.S.C. § 2339B ........................................................................................ 26, 27, 28, 29, 31

18 U.S.C. § 2339C ................................................................................................. 26, 27, 31

JASTA ............................................................................................................................. *passim*

Fed.R.Civ.P. 12(b)(2) ....................................................................................................... 3

Fed.R.Civ.P. 12(b)(6) ............................................................................................... *passim*

**Other Authorities**

RESTATEMENT (SECOND) OF JUDGMENTS § 27 ....................................................... 12

## INTRODUCTION AND SUMMARY

As the Second Circuit recognized, this case presents no issue of unwitting provision of banking services.  Instead, Plaintiffs allege that Al Rajhi Bank ("ARB"), at the behest and direction of its most senior officials who worked extensively with al Qaeda's most senior leaders and its operatives, supported al Qaeda and its anti-U.S. terrorist objectives by knowingly opening its doors to providing financial and other services to al Qaeda operatives and making direct financial contributions to al Qaeda.  *See* First Amended Complaint ("FAC")  ¶¶ 130-139, 153-192 & Exhibit A.  Indeed, that support enabled al Qaeda's development of international terrorist capabilities and directly assisted the September 11th attackers in both Germany and the United States.  *Id.* ¶¶ 156-158, 163.

On October 15, 2019, the Second Circuit found that Plaintiffs had pled facts sufficient to warrant jurisdictional discovery on their claims against ARB, and it "remand[ed] for jurisdictional discovery" to determine discrete "factual issues" related to the details of the alleged support and whether countervailing evidence of intent existed concerning "whether the support was 'earmarked' for use … not directed at the United States."  Second Circuit Panel Op. at 4.  The Panel specifically relied on the sufficiency of Plaintiffs' "allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States," as well as the sufficiency of "the support [to al Qaeda] alleged here" by Plaintiffs.  *Id.*

The Second Circuit's decision plainly requires dismissal of ARB's motion for resolution of its 12(b)(6) motion for three reasons.  *First*, the Second Circuit ordered further proceedings to resolve whether jurisdiction exists, and established U.S. Supreme Court and Second Circuit precedents do not permit the Court to assume jurisdiction and address a Rule 12(b)(6) motion without resolving that issue.  *See* Part I *infra*.  *Second*, the Second Circuit's mandate expressly ordered that this Court move to jurisdictional discovery, and the Panel did so despite ARB's repeated arguments to it that the matter should be resolved by addressing the case on the merits rather than jurisdiction.  *See Burrell v. United*

*States*, 467 F.3d 160, 165 (2d Cir. 2006) (scope of mandate determined by "'both the [mandate's] specific dictates … as well as the broader 'spirit of the mandate,'" and by "'the issues that had been presented in the appeal.'"). *See* Part II *infra. Third*, the Panel's conclusions regarding the sufficiency of Plaintiffs' allegations with respect to *both* ARB's support to al Qaeda and ARB's knowledge and intent to foster terrorism against the United States, combined with the scope of Plaintiffs' allegations, establish that ARB's 12(b)(6) motion should be denied even if the merits of the motion were relevant to whether ARB should be allowed to bypass jurisdictional discovery.  ARB and Plaintiffs argued the elements of the Anti-Terrorism Act ("ATA") aiding and abetting claim extensively before the Second Circuit, because those elements also provide the basis for jurisdiction.  ARB itself stated that Plaintiffs' "jurisdiction theory … requires sufficient aiding-and-abetting allegations," ARB 28(j) Letter, p. 1 (Sept. 12, 2019) (Doc. 182), which concedes that the Second Circuit's later ruling in Plaintiffs' favor on jurisdiction also necessarily determined the sufficiency of Plaintiffs' aiding and abetting allegations. Indeed, the Panel applied and found that Plaintiffs had met a *higher* standard of intent than that required to state an ATA claim for aiding and abetting terrorism ("specific intent" rather than action undertaken with general knowledge of the defendant's role in advancing al Qaeda's terrorist objectives, *see Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018)).  *See infra* pp. 8-9.  And, the Second Circuit's decision precludes any argument that Plaintiffs' current allegations concern only routine banking services, a principal basis for the court's rejection of the 2005 record as establishing primary liability.  *See infra* pp. 9.

Especially in light of the Second Circuit Panel's ruling, ARB's motion to have the Court address its Rule 12(b)(6) motion is procedurally improper and substantively wrong, and the Court should deny the motion so the parties can commence jurisdictional discovery without further delay.

**ARGUMENT**

The Second Circuit's Order is unequivocal: "we remand for jurisdictional discovery." Panel Op. at 4. Yet ARB asks this Court to disregard this injunction and to consider ARB's motion to dismiss Plaintiffs' claims under the theory that "such discovery would be futile because Plaintiffs' allegations are facially insufficient to state a claim against the Bank under the ATA." ARB Memo at 3 (ECF No. 5385). The Court should deny ARB's request that it bypass personal jurisdictional discovery. This Court lacks authority to rule on the merits of Plaintiffs' claims, and such a ruling would violate the Second Circuit's mandate. And, even if the strength of ARB's Rule 12(b)(6) motion were relevant, that motion is without merit.

**I.    THE COURT HAS NO AUTHORITY TO ADDRESS MERITS ISSUES AT THIS STAGE OF THE PROCEEDINGS**

ARB's motion should be denied because the Court lacks authority to address the merits of Plaintiffs' ATA claims before it resolves the pending jurisdictional issues. "A court must have the power to decide the claim before it (subject-matter jurisdiction) and power over the parties before it (personal jurisdiction) *before* it can resolve a case." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 563 (2017) (emphasis added). "'The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.'" *In re Rationis Enters., Inc.*, 261 F.3d 264, 267 (2d Cir. 2001) (citation omitted). Indeed, this Court recognized these principles when it refused to address ARB's simultaneous motion to dismiss under Rule 12(b)(6) after it granted the Rule 12(b)(2) motion to dismiss for lack of jurisdiction. *See In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 3d 416, 421 n.5 (S.D.N.Y. 2018) (citing cases).

Moreover, in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998), the Supreme Court prohibited the practice of exercising "hypothetical jurisdiction," *i.e.*, assuming jurisdiction for purposes of addressing a merits issue that a court deems easier to resolve. Assuming the existence of

3

jurisdiction "for the purpose of deciding the merits" is improper because it "carries the courts beyond the bounds of authorized judicial action." *Id.* at 94. This prohibition applies to both subject matter jurisdiction and personal jurisdiction, because each one is an "'essential element[s] of the jurisdiction of a district ... court.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999); *see Sinochem Int'l v. Malaysia Int'l Shipping*, 549 U.S. 422, 430-31 (2007) (*Steel Co.* "clarified that a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)"). Thus, without a finding of personal jurisdiction over ARB, this Court is "'powerless to proceed to an adjudication'" on ARB's Rule 12(b)(6) motion. *Ruhrgas*, 526 U.S. at 584.[1]

These fundamental principles and controlling authorities are fatal to ARB's motion. ARB is asking this Court to sidestep the dispute over personal jurisdiction and go straight to the merits, which is precisely what *Steel Co.* forbids. Oddly, ARB fails even to address that case and its unequivocal holding. ARB's motion is particularly inappropriate because the Second Circuit's Order specifically identified unresolved jurisdictional fact issues. As a result, any decision now assuming hypothetical jurisdiction would be impermissible, and would "produce[] nothing more than a hypothetical judgment." *Steel Co.*, 523 U.S. at 101.

ARB wrongly suggests that determining personal jurisdiction before addressing the merits is merely a "prudential" consideration. ARB Memo at 3. ARB relies on a brief footnote in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013), but that language is inapplicable here and if applied would be inconsistent with the Supreme Court's holdings in *Steel Co., Ruhrgas*, and *Sinochem* noted above. In *ONY,* the Second Circuit permitted the merits to be adjudged before

---

[1] Judge Calabresi suggested in his concurrence in *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346-47 (2d Cir. 2018), that *Steel Co.*'s rule does not apply to personal jurisdiction, because subject matter jurisdiction and personal jurisdiction differ in relevant respects, *e.g.*, personal jurisdiction is waivable. The Panel did not accept this analysis, which is unsurprising because the Supreme Court expressly recognized that *Steel Co.*'s. rule applies to personal jurisdiction. *Sinochem*, 549 U.S. at 430-31; *see also Ruhrgas*, 526 U.S. at 583-84.

jurisdiction for one defendant only because that case involved multiple defendants who collectively challenged the legal sufficiency of the complaint and personal jurisdiction "indisputably" existed as to some of them. *Id.* In such circumstances, a federal court does not exceed its authority because its "analysis is based on the undisputed personal jurisdiction of the other defendants," *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012); *see LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 574 n.8 (S.D.N.Y. 2017) *aff'd*, 922 F.3d 136 (2d Cir. 2019), and applies directly to similarly-situated co-defendants. No such circumstances are present here. ARB is the sole defendant, providing no basis for the Court to address the merits.[2]

ARB also relies upon *In re Terrorist Attacks on September 11, 2001* ("*Terrorist Attacks V*"), 740 F. Supp. 2d 494 (S.D.N.Y. 2010), but that decision is plainly inapplicable. ARB Memo at 3. In *Terrorist Attacks V*, certain defendants "abandoned [their personal jurisdiction] defense and voluntarily submitt[ed] to the jurisdiction of the Court." 740 F. Supp. 2d at 511. Having "withdr[awn] their personal jurisdiction defense," there was no need for jurisdictional discovery and the Court was free to rule on a Rule 12(b)(6) motion. *Id.* Here, in contrast, ARB continues to press its jurisdictional challenge, precluding the Court from addressing the merits until the jurisdictional issues are decided.

## II.     THIS COURT IS BOUND BY THE SECOND CIRCUIT'S MANDATE TO CONDUCT JURISDICTIONAL DISCOVERY

Even if jurisdiction *could* be assumed at this stage, ARB's motion should be denied because this Court is bound by the Second Circuit's mandate to conduct jurisdictional discovery.

The mandate rule is straightforward. It provides that "'where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court.'" *Burrell*, 467 F.3d at 165; *see also Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 181 (2d

---

[2] ARB points to the dismissal of allegations against ARB in *O'Neill v. Al Rajhi Bank*, 714 F.3d 118 (2d Cir. 2013), but *O'Neill* neither provides any authority to the Court to address the merits now nor even addresses the same factual allegations or legal framework applicable to ARB's current motion to dismiss. *See infra* pp. 12, 29-30.

Cir. 2019) (citation omitted) (""[a] district court must follow the mandate issued by an appellate court.""). "In following a mandate, the lower court must carry out its duty to give the mandate 'full effect.'" *In re Coudert Brothers LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (citations omitted). The scope of an appellate court's mandate is determined by "both the [mandate's] specific dictates … as well as the broader spirit of the mandate," and by "the issues that had been presented in the appeal." *Burrell*, 467 F.3d at 165 (internal quotations omitted).

The mandate rule requires ARB's motion to be rejected for two related reasons. *First*, "where a mandate directs a district court to conduct specific proceedings and decide certain questions, generally the district court must conduct those proceedings and decide those questions." *Puricelli v. Argentina*, 797 F.3d 213, 218 (2d Cir. 2015). Under these principles, this Court must proceed to jurisdictional discovery because the Second Circuit directed it to do so. Panel Op. at 4 (remanding for jurisdictional discovery to "determine" identified jurisdictional issues). Only by allowing such discovery can this Court "conduct those proceedings and decide those questions" required by the Second Circuit, thus giving the Order its "full effect." *Puricelli*, 797 F.3d at 218; *Coudert Brothers*, 809 F.3d at 98.

*Second*, the district court must follow the Second Circuit's rulings on issues that it decided, whether explicitly or implicitly. *Burrell*, 467 F.3d at 165. Here, the Second Circuit's mandate ordered that this Court move to jurisdictional discovery despite ARB's repeated arguments to it that (1) Plaintiffs' allegations concerning ARB's mental state and support for al Qaeda should be deemed deficient; and (2) the matter could and should be resolved by addressing the case on the merits rather than by addressing jurisdiction. ARB raised those precise issues on appeal. *See* ARB App. Br. at 60 (asking the Second Circuit to "affirm dismissal on the alternative ground that Plaintiffs have failed to allege any basis for liability under the ATA" because the court "may reach the merits *before* personal jurisdiction" and ARB "fully briefed the issues of aiding and abetting and conspiracy liability under

their arguments for personal jurisdiction") (emphasis added); *id.* at 1 (urging dismissal of the FAC either as "failing to state a claim" or "failing to allege personal jurisdiction"); *see also* ARB 28(j) Letter at 1 (arguing that supplemental authority "precludes Plaintiffs' substantive aiding-and-abetting claim and their jurisdictional theory that requires sufficient aiding-and-abetting allegations").  The Second Circuit, however, addressed jurisdiction only and did not adopt ARB's position that the merits could be addressed before jurisdiction is established.  The Second Circuit's rejection of ARB's alternative argument was directly indicated by its grant of jurisdictional discovery.  *See, e.g., In re Fairfield Sentry Ltd.*, 690 Fed. App'x 761, 764-66 (2d Cir. 2017); *Coudert Brothers*, 809 F.3d at 99-100 (mandate rule extends to matters which were "'necessarily implied'").

The Second Circuit's reversal of a district court decision in *Coudert Brothers* also directly forecloses ARB's motion.  In its first *Coudert Brothers* order, the Second Circuit reversed the denial of a motion to reconsider the disallowance of a bankruptcy claim and remanded for the court to "apply Connecticut's choice of law rules" in revisiting the issue.  *Coudert Brothers*, 809 F.3d at 99.  On remand, the trial court found that the choice-of-law analysis "led to no 'clear answer,'" and so decided the case on an alternative ground for relief—specifically, waiver.  As a result, the trial court ruled that it could depart from the Second Circuit's mandate.  *Id.* at 99-100.

The Second Circuit reversed, finding that the district court violated the mandate rule by giving its remand order "no legal effect."  *Id.* at 99.  The remand order had "impliedly foreclosed" any consideration of the waiver argument because if the initial Second Circuit Panel had "thought an alternative, dispositive holding would altogether preclude" the choice-of-law issue, it would have affirmed the trial court's order on that basis rather than remanded with instructions.  *Id.* at 100-01.  That failure to include any "express language" addressing alternative issues or leaving them open for reconsideration defined the scope of its mandate as much as the Order's express words.  *Id.* at 102.

Under *Coudert Brothers*, the Court cannot decline to order jurisdictional discovery and instead address ARB's Rule 12(b)(6) motion. The Order "impliedly forecloses" any consideration of the merits at this stage, especially given ARB's express invitation that it do so, and doing so would impermissibly give the Order "no legal effect."

## III.   ARB'S RULE 12(b)(6) MOTION IS WITHOUT MERIT

Argument on the merits is premature, because the Court should follow the Second Circuit's Order to conduct jurisdictional discovery. As shown above, any other course would exceed the Court's jurisdiction and violate the well-established mandate rule.[3] ARB's claim that discovery would be futile given its motion to dismiss would provide no basis to bypass jurisdictional discovery even if accurate, but ARB's 12(b)(6) motion is in any event without merit.

### A.   Plaintiffs State a Claim for Secondary Liability Under an Aiding and Abetting Theory

#### 1.   The Second Circuit's Panel Decision Resolved The Issue of the Sufficiency of Plaintiffs' Aiding and Abetting Allegations

The Second Circuit Panel concluded that jurisdictional discovery is warranted based on the sufficiency of "the support alleged here" for al Qaeda's terrorism and the sufficiency of "allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States" by providing that support. Panel Op. at 4. Because Plaintiffs' jurisdictional theory upheld by the Panel was directly based on allegations related to ATA secondary liability, and because those allegations of "support" and "intent" are the very allegations ARB argues are insufficiently pled with respect to aiding and abetting liability, the Panel's decision establishes that ARB's motion to dismiss is without merit with respect to aiding and abetting liability.

---

[3] After discovery and a jurisdictional finding, the Court will have authority to consider the Rule 12(b)(6) motion. If necessary, Plaintiffs can further amend their allegations because ARB's concerns are largely curable and focused on technical issues.

The Panel's personal jurisdiction determination directly rests on allegations of aiding and abetting a terrorist organization. Allegations establishing support for a terrorist organization targeting the United States, plus allegations that such actions were directed toward harming the United States, underpin any finding that jurisdiction has been sufficiently alleged. *See Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (discussing *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 681-82 (2d Cir. 2013)). The Panel applied the due process test of whether the defendant undertook "'intentional conduct' that is expressly aimed … at residents of the United States." *See* Panel Op. at 4 (quoting *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008)) (ellipses in original). It found that Plaintiffs' allegations of support and intent met this standard. As a result, the Panel necessarily rejected arguments that Plaintiffs alleged only the provision of "routine banking services," only "indirect" support to al Qaeda, or actions and intent unattributable to the bank itself. It necessarily found instead that ARB acted with awareness and specific intent to foster al Qaeda's anti-U.S. terrorist agenda and that "the support alleged here" provided by ARB accomplished precisely that objective. *Id.*

The particular arguments before the Second Circuit confirm this conclusion. Plaintiffs argued at length that allegations of intent and support, sufficient to establish aiding and abetting liability under the ATA, also established personal jurisdiction over a defendant that provided support to al Qaeda in order to advance its anti-U.S. terrorist objectives. They canvassed how their allegations—related to extensive dealings of ARB's senior officials with al Qaeda officials, ARB officials' extensive control over the particular operations of the bank and its financial contributions to al Qaeda-affiliated entities, the bank's other types of support to al Qaeda operatives (including the September 11th attackers in Germany and the U.S.), and other indicia of knowledge and sympathy for al Qaeda's objectives—all readily supported the inference that the bank's actions supported and were undertaken in order to advance al Qaeda's anti-U.S. objectives. *See* Appellants' Br. at 29-53, 69-74. ARB, in response,

advanced various arguments why Plaintiffs' allegations failed to state an aiding and abetting claim,[4]

principally asserting that Plaintiffs did not establish that ARB itself had any intent to harm the United

States or provided support to that end.  ARB Br. at 30-45.  Those arguments are, of course, the very

ones rejected by the Panel when it concluded to the contrary.

ARB itself has acknowledged the nexus between the jurisdictional and secondary liability

allegations, and the significance of the Panel's holding.  It asserted to the Second Circuit Panel that

Plaintiffs' "jurisdictional theory … requires sufficient aiding-and-abetting allegations."  ARB 28(j)

Letter at 1.  It also acknowledged that "[t]he Panel now appears to have held in its summary order that

such allegations *do* establish a prima facie case of personal jurisdiction."  ARB Oct. 29, 2019 Petition

for Rehearing at 1-2 (Doc. 191) (emphasis in original).  ARB also noted that had the Panel not

concluded that Plaintiffs' allegations established a *prima facie* case, then that would violate clear

principles established by *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185-86 (2d Cir. 1998).  *Id.* at 2.  Such

a violation is inconceivable, and the Panel clearly did find that Plaintiffs established a *prima facie* case,

because ARB pointed the Second Circuit Panel to *Jazini* in its briefs, at oral argument, and at length

in its rehearing petition and because *Jazini*'s author was an active member of the Panel that issued the

decision in this case.

This obvious and conceded overlap between the personal jurisdiction issues resolved against

ARB and the aiding and abetting elements at issue here distinguish this case sharply from the

circumstances weighing against preclusion in *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d

525, 536 n.6 (S.D.N.Y. 2019).  *See* ARB Memo at 11-12 (asserting *Kaplan* applies here).  In *Kaplan*, this

Court merely pointed out that the basis for personal jurisdiction found in a prior decision (defendant's

use of a New York correspondent bank account) had nothing to do factually with the issue of knowing

---

[4] ARB also argued that the personal jurisdiction test required a showing of proximate causation.  However, *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) established that proximate causation for purposes of an ATA secondary liability claim is satisfied by the causation related to the terrorist attack itself—which the September 11th attacks readily satisfy.

support for terrorism that was before the Court and asserted to be precluded.  *Id.*  This Court further noted that the previously decided legal issue (allegations of aiding a "violation of the law of nations under customary international law") had no bearing on the ATA issue before the Court.  *Id.*   *Kaplan* does not suggest that a prior determination is not preclusive where the same issue and allegations were addressed in the previous decision, merely because the initial decision addressed jurisdiction.

Nor is there any merit to ARB's claim that Judge Casey's 2005 decision requires a different result, for several reasons.  *See* ARB Memo at 8-9 (citing *Burnett v. Al Baraka Inv. & Dev. Corp.*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) *("Terrorist Attacks I")*).  *First*, a long-ago district court decision addressing a different complaint and different plaintiffs could not displace the Second Circuit's recent decision even if the district court's earlier decision applied the same law.  *Second*, the 2005 decision did not apply the same law. The legal framework for determining the adequacy of ATA aiding and abetting allegations has changed dramatically since 2005.  Such allegations must now be assessed in light of Congress's particular objectives set out in JASTA, which confirmed that the ATA provides a robust basis for secondary liability, and in light of the extensive guidance regarding relevant considerations provided in recent Second Circuit decisions.  *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019); *Linde v. Arab Bank*, *PLC*, 882 F.3d 314 (2d Cir. 2018).  Judge Casey, in contrast, did not have the benefit of any of these sources of law, applied a standard that he believed required "extra-careful scrutiny of Plaintiffs' allegations" given "the extreme nature of the charge of terrorism," and rested his analysis on "New York law and the courts interpreting the ATA in *Boim*."  *Terrorist Attacks I*, 349 F. Supp. 2d at 831, 832.

*Third*, the allegations in the FAC differ considerably from those in the complaint before Judge Casey.  The current complaint relies extensively on allegations of fact drawn from an abundance of documentary sources produced *after* 2005. Those allegations include facts concerning the operational and policy control over ARB exercised by persons with extensive dealings with al Qaeda leaders, al

11

Qaeda's perception of ARB as providing ongoing and sympathetic support, the U.S. government's assessments of ARB's objectives and its findings regarding ARB's extensive sponsorship of al Qaeda, efforts by ARB to conceal its relationship with al Qaeda, extraordinary services like delivering money to al Qaeda affiliates and obtaining travel visas for key al Qaeda operatives, and the opinion of Osama bin Laden that ARB was a "good brother" because it was "moving money around" for al Qaeda.  *See* FAC ¶¶ 156-162, 165, 167-172, 191; *see also* Reply Br. at 8.  A chart of these new allegations is attached as Exhibit 1.  The absence of these additional facts led Judge Casey to analyze the earlier allegations quite differently from the ones here; he considered whether ATA liability was adequately predicated on a theory that ARB "donat[ed] to certain Defendant charities and act[ed] as the bank for [those charities]."  *Terrorist Attacks I*, 349 F. Supp. 2d at 832-833.  Of course, the theory here is that ARB directly supported al Qaeda financially and otherwise, and purposefully opened its doors to al Qaeda operatives in a manner that directly facilitated support for the September 11th attackers themselves.[5]

2.     <u>ARB's Arguments Regarding the Sufficiency of the Plaintiffs' Allegations are Without Merit</u>

ARB's arguments in support of its motion to dismiss rest on basic errors of law and ignore central facts set forth in the complaint and Plaintiffs' theories for the relevance and sufficiency of those allegations.  Initially, ARB misstates the applicable law in fundamental ways.  *First*, it repeatedly suggests that the complaint must establish that ARB knew of or provided resources used in the particular terrorist attack.  ARB Memo at 9-10.  The Second Circuit has repeatedly rejected that standard.  *See Siegel*, 933 F.3d at 224 (citing *Linde*, 882 F.3d at 329-30); *Linde*, 882 F.3d at 329-30

---

[5] Even if all this were wrong, Judge Casey's determination would not be controlling.  The Second Circuit affirmed Judge Casey's ATA determination on the basis that the ATA did not provide for secondary liability, and declined to address or endorse his evaluation of the merits of an ATA aiding and abetting claim.  *See O'Neill v. Al Rajhi Bank*, 714 F.3d at 123-25.  When a district court determination is affirmed on alternative grounds, "the law of the case [doctrine] does not extend to issues an appellate court did not address."  *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (internal quotation omitted).  Similarly, "there is no collateral estoppel as to [an] unreviewed ground."  *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986); *see also In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011); *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 897 (2d Cir. 1997); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996); RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. o (1982).

("awareness does not require proof of ... specific intent" or knowledge "of the specific attacks at issue"); *see also Kaplan*, 405 F. Supp. 3d at 534-45 (same). ARB's position is also inconsistent with the ATA's plain terms. *See* 18 U.S.C. § 2333(d) ("liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with *the person* who committed such an act of international terrorism") (emphasis supplied). It is also inconsistent with the governing framework established by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5) (*Halberstam* "provides the proper legal framework for how [aiding and abetting and conspiracy] liability should function"); *Linde*, 882 F.3d at 329-30) (same). In *Halberstam*, the defendant provided general support for the burglary enterprise, in the form of bookkeeping and accounting, and provided no support for the killing or burglary that gave rise to secondary liability. 705 F.2d at 474-76.

*Second*, ARB mistakenly claims that Plaintiffs must, but fail to, allege that ARB's pervasive support for al Qaeda was a "'substantial factor in causing' the [September 11th] attacks." ARB Memo at 9. That argument simply ignores *Linde*'s holding that the causation analysis for secondary ATA liability focuses exclusively on the relationship between the "act of international terrorism" (here the attacks in the United States) and Plaintiffs' injury. *Linde*, 882 F.3d at 331. Because ARB "does not – and cannot – dispute the sufficiency of the evidence to prove that [the September 11th attacks] caused plaintiffs' injuries … causation provides no ground for" dismissal of Plaintiffs' aiding and abetting claims. *Id.* ARB also ignores the *Halberstam* six factor test for determining substantial assistance and its fact-based nature. The Second Circuit in *Linde* confirmed that determining whether assistance is "'substantial enough' to constitute aiding and abetting requires consideration of [the six factor test]." *Linde*, 882 F.3d at 330. ARB's brief fails to acknowledge, much less discuss, the individual factors. Those factors are plainly met here. *See infra* pp. 19-23.

ARB also fails to acknowledge crucial allegations or the inferences that are reasonably drawn from them. As the FAC shows, Plaintiffs allege facts showing ARB's substantial and knowing support

for al Qaeda, satisfying the requirements of aiding and abetting liability.  Plaintiffs' current claims involve substantial allegations of a direct link between ARB and al Qaeda and must be considered in light of JASTA's statement of purpose "to provide civil litigants with the broadest possible basis . . . to seek relief against persons, entities, and foreign countries . . .  that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activity."  JASTA § 2(b); *see Siegel*, 933 F.3d at 223; *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).

To establish aiding and abetting liability under the ATA, Plaintiffs must show that ARB (i) was generally aware of its role in facilitating al Qaeda's tortious activity, and (ii) knowingly provided "substantial" aid which advanced al Qaeda's overall tortious activities.  *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 487); *Siegel*, 933 F.3d at 223 (same).  Plaintiffs satisfy both elements in the FAC.

### a.   ARB was Aware of the Role it Played in al Qaeda's Campaign of Violent and Life-Threatening Terrorism

Section 2333(d)'s awareness standard is met upon a showing that the defendant was "'generally aware' that it was . . . playing a 'role' in [the tortfeasor's] violent or life-threatening activities."  *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477).  Plaintiffs may rely on inferences drawn from circumstantial evidence in pleading the facts showing awareness.  *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) ("knowledge can be inferred from circumstantial evidence"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (same).  Moreover, Plaintiffs need not allege that ARB "knew of the specific attacks at issue when it provided financial services," nor are Plaintiffs required to meet the specific intent standard of criminal aiding and abetting.  *Linde*, 882 F.3d at 329.  Awareness may be inferred by evidence predating the attacks at issue which "could have alerted the bank that the transfers being requested therein" were part of the tortfeasor's violent acts.  *Id.*; *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019) (bank aware of its role in terrorist activities when it was informed that insurance payments it made were for deaths caused by "Martyr Operation" and that it "cleared fund transfers for entities . . . later designated as terrorist

organizations").  Awareness may be inferred where the services were provided "in an unusual way under unusual circumstances." *Id.* (quoting *Halberstam*, 705 F.2d at 487).

As Plaintiffs allege, U.S. officials traveled to Saudi Arabia in 1999 to warn ARB that the bank was being used to fund al Qaeda.  Joint Appendix ("JA") at 323-24.  Later investigations by the CIA and others confirmed ARB's awareness.  *See, e.g.*, FAC ¶ 156 (new allegations regarding 2003 CIA report finding, *inter alia*, that senior al Rajhi family members "know that terrorists use their bank"); ¶¶ 159-162, 164-165, 170 (new allegations regarding other investigations); ¶ 191 (new allegations on Senate Subcommittee summarizing extensive findings regarding ARB).  In *Linde*, the Second Circuit held that a jury could conclude that such communications would "alert[] the bank that the transfers being requested therein were payments for suicide bombings," making "the bank aware "that by processing future transfers it was playing a role in violent or life endangering acts."  882 F.3d at 330.  ARB also advertised on behalf of al Qaeda's component charities, expressly seeking contributions to be paid into ARB accounts "for the action most loved by Allah"—suicide bombings and martyrdom in the course of terrorist activities.  FAC ¶ 178.  Such advertisements represent an affirmative step by ARB to support al Qaeda and definitively show its awareness of the role it played in al Qaeda's violent attacks.  *Miller*, 372 F. Supp. 3d at 48 (knowing payments to martyrs evidenced awareness of role as to violent terrorist acts by Hamas).  ARB also contributed its own funds to al Qaeda through its front charities.  FAC ¶ 183.

ARB's provision of atypical banking measures to al Qaeda and its affiliates is further evidence of its awareness.  *See Miller*, 372 F. Supp. 3d at 48 (quoting *Halberstam*, 705 F.2d at 487).  ARB delivered money to al Qaeda affiliates using couriers and obtained a visa for an al Qaeda operative close to Osama bin Laden.  *Id.* ¶¶ 165-166 (new allegations).  ARB was later found by United States officials to have taken steps to conceal its relationship with the al Qaeda charities using a "unique computer

code," and ARB made efforts in the wake of the attacks to avoid scrutiny and circumvent counter-terrorism measures.  FAC ¶¶ 160-161 (new allegations).

ARB's awareness can also be inferred from other allegations in the FAC showing the extremely close relationship between ARB, al Qaeda, and the al Qaeda component charities.  Osama Bin Laden viewed ARB as a "good brother," according to Zacarias Moussaoui, one of the al Qaeda operatives who planned and executed the September 11th attacks.  FAC ¶ 167 (new allegation).  Extremist leaders acted accordingly, "order[ing] operatives in Afghanistan, Pakistan, Saudi Arabia, Turkey, and Yemen to use Al Rajhi Bank."  FAC ¶ 162 (new allegation).  ARB maintained accounts during the period in which the al Qaeda front International Islamic Relief Organization ("IIRO") "was repeatedly implicated in terrorist activities" and even engaged in joint fundraising activities with the charity network, demonstrating a high degree of connectivity and coordination.  FAC ¶¶ 178-179.  ARB also provided support to Al Haramain Islamic Foundation, another charity repeatedly implicated in al Qaeda's terrorist activities during the relevant period and so deeply intertwined in al Qaeda's operations that the United States formally designated all of its global offices as anti-U.S. terrorists. FAC ¶ 158; FAC Exhibit A ¶¶ 129-168.

Plaintiffs allege a direct link between ARB's founder and controlling officials and the "charitable" affiliates, placing ARB officials in key decisional roles in both ARB *and* the al Qaeda charities simultaneously when those organizations were alleged to be components of al Qaeda itself, dedicated to facilitating al Qaeda's anti-U.S. objectives, populated by al Qaeda operatives, and directly advancing al Qaeda operations.  FAC ¶¶ 180-190.  As a result, the ARB officials ensured that ARB's finance capabilities would be available to those organizations to assist al Qaeda and that those organizations' receipt of funds directly from ARB would be directed to al Qaeda.  FAC ¶¶ 159, 173, 174, 175-183.  The most significant link between ARB and the al Qaeda charities is ARB founder Suleiman al Rajhi, whose name appeared on the "Golden Chain," a list of "al Qaeda's most important

wealthy donors" who has committed to use the organizations they controlled to assist al Qaeda.  FAC ¶¶ 131-132.  During that same period – *i.e.*, while he was funding al Qaeda and pledging to use his resources and controlled entities to support al Qaeda – Suleiman al Rajhi was the Chairman, Managing Director, and largest shareholder of ARB.  FAC ¶ 154.  That control was operational, extending to its "charitable" contribution and its banking practices related to potential terrorists.  In assessing ARB's awareness of its relationship to al Qaeda, the CIA concluded that "Senior al-Rajhi family members have long supported Islamic extremists," that "family members control the bank's most important decisions," and that the "principal managers answer directly to Sulayman [Suleiman al Rajhi]."  FAC ¶ 156 (new allegation).  Moreover, while Suleiman al Rajhi was the Chairman and Managing Director of ARB, he served on the Executive Council of the IIRO and founded the SAAR network of charities to covertly channel resources to al Qaeda.  FAC ¶ 180, 185.

ARB argues that the alleged knowledge of Suleiman al Rajhi cannot be imputed to ARB, citing *Terrorist Attacks I*, 349 F. Supp. 2d at 833, and *Fidelity Bank, N.A. v. Avrutick*, 740 F. Supp. 222 (S.D.N.Y. 1990).  But *Terrorist Attacks I* addressed whether the al Rajhi family's direct support of al Qaeda could be imputed to ARB for purposes of making ARB liable, *Terrorist Attacks I*, 349 F. Supp. 2d at 833, not whether the al Rajhi family's relationship with al Qaeda and its control over ARB's operations shows ARB's awareness of the role it played assisting al Qaeda.  The rules recognized in *Fidelity Bank* are also not applicable here.  *Fidelity Bank* decided a motion for summary judgment on notice issues arising under the UCC, thus addressing the standard of proof rather than sufficiency of pleading.  740 F. Supp. at 224.  At this stage, it is enough that the family's activities, viewed most favorably to Plaintiffs, support a plausible inference that ARB was aware of its role in supporting al Qaeda.  Even if the same principles did apply, however, Plaintiffs allege that the CIA concluded that the al Rajhi family knew of the wrong doing, allege that Suleiman al Rajhi *himself* participated in the funding of al Qaeda, and allege that Suleiman al Rajhi sat on the board of key al Qaeda charity IIRO.

17

*See Fidelity Bank*, 740 F. Supp. at 237 (knowledge cannot be imputed unless actor participated in wrongdoing or "obviously knows" the facts). Contrary to *Fidelity Bank's* summary of the law applicable in the UCC context, courts have long recognized that a director's knowledge can be imputed to the corporation even if it was acquired outside of his official duties, because that information would be present in the mind of the individual at the time he performed his duties. *See, e.g. In re Distilled Spirits*, 78 U.S. 356, 366 (1870) ("if the agent, at the time of effecting a purchase, has knowledge of any prior lien, trust, or fraud, affecting the property, no matter when he acquired such knowledge, his principal is affected thereby"); *Phelan v. Middle States Oil Corp.*, 210 F.2d 360, 365-66 (2d Cir. 1954) (principal charged with knowledge if "the information was in the agent's mind when he acted for the principal on the occasion under scrutiny."); *Title Guarantee & Trust Co. v. Pam*, 232 N.Y. 441, 453-54 (N.Y. 1922) (Cardozo, J.) (accepting inference that information was "present in the[] minds" of trust company's officers who were "informed in such circumstances as to make forgetfulness impossible" while acting as directors of another corporation); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 693 (S.D.N.Y. 1987) (actor learned of conspiracy during prior employment and inference could be drawn that he had this "information in mind" when conducting transactions in later employment).

Moreover, Suleiman al Rajhi is a significant link showing ARB's knowledge of al Qaeda's activities and objectives, but he is not the only one. Abdul Aziz Al-Khereiji, an executive on the Board of ARB between April 3, 1999 and autumn 2000, was also a principal owner of the al Qaeda affiliate Muwaffaq. JA 321-322. From late 1999 Al-Khereiji also served as one of Muwaffaq's two directors. *Id.* This Court can also rely on ARB's link to Saleh Al-Hussayen, who served as a member of ARB's Sharia Board for five years. In the weeks before the September 11th attacks, Al-Hussayen traveled to the U.S. visiting locations in New York City and elsewhere, including the vicinity of the World Trade Center, and then in the days before the attacks, switched hotels in Northern Virginia to one where three of the September 11th attackers were staying. *O'Neill v. Asat Trust Reg.*, 714 F.3d at 679. As the

Second Circuit explained, Al-Hussayen's travel activities around the time of the September 11th attacks "cast his activities at [ARB] and his alleged indirect funding of al Qaeda in a different light." *Id.*[6] The same logic applies to Suleiman al Rajhi and Abdul Aziz Al-Khereiji, whose support for al Qaeda and its charities is not separate from their activities for ARB, but rather provides context for them and gives them meaning. These facts are more than sufficient to warrant an inference of awareness and knowledge because ARB actively supported the al Qaeda charities and provided extensive services to al Qaeda and its affiliates *at the same time* that its controlling officials directly supported al Qaeda. This close nexus between the principals of al Qaeda, ARB, and the al Qaeda charities demonstrates that ARB was well aware it had placed its resources at al Qaeda's disposal.

> b.    ARB Provided Substantial Aid to al Qaeda

A court examines allegations of substantial aid by considering "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84). Substantial aid is found where the defendant "encourage[s]" violent attacks or "provide[s] funds" or other support to terrorists engaging in such conduct. *Siegel*, 933 F.3d at 225. Even indirect contributions or assistance (including banking services) satisfy the *Halberstam* test, establishing that a terrorist's abettor acted to foster the terrorist's scheme. *Linde*, 882 F.3d at 330.

As described below, the FAC alleges that ARB provided years of extensive and ongoing support through financial contributions and services to al Qaeda. *See, e.g., Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) ("financial angels" that support terrorist

---

[6] The Court can take judicial notice of the allegations and findings regarding Al-Hussayen when deciding the motion to dismiss. *See, e.g., Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (information for which judicial notice is taken properly considered under Rule 12(b)(6)); *U.S. ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 169 n.5 (2d. Cir. 2018) (judicial notice of court filing (complaint)); *McCulloch Orthopedic Surgical Servs., PLLC v. Aetna, Inc.*, 857 F.3d 141, 148 n.4 (judicial notice of court filing (*amicus* brief)). And, the Second Circuit's conclusions regarding Al-Hussayen make Plaintiffs' other allegations with respect to ARB even more plausible.

organizations serve as "the terrorists' lifeline"); JASTA § 2(a)(3)&(5), 130 Stat. at 854. Such support was critical to al Qaeda's financial support network, and in fact ARB's controlling officials were part of the inner circle of al Qaeda facilitators known as "the Golden Chain," dedicated to using their personal resources, including the organizations they controlled, to support al Qaeda's terrorist objectives. *See* FAC ¶ 90 (describing Golden Chain); ¶ 132 (including Suleiman al Rajhi among Golden Chain donors); ¶ 166 (ARB founder Saleh al Rajhi's personal contact information found in address book of bin Laden's personal secretary); ¶ 185 (SAAR network of charities established by Suleiman al Rajhi to launder money to al Qaeda). The further details of this support satisfy the *Halberstam* factors.

Four of the factors go to the type of support offered by ARB – the nature of the act encouraged, the amount of assistance, the period of assistance, and the defendant's presence or absence at the commission of the wrongdoing. These factors weigh heavily in favor of Plaintiffs. For years leading up to the September 11th attacks, ARB gave al Qaeda significant assistance by purposefully providing access to a vast banking network which was essential to its violent terrorist activities. *See* FAC ¶ 156 (new allegations identifying support since at least the mid-1990s). Although ARB was nominally a bank, it functioned as an operational partner of al Qaeda in carrying out al Qaeda's terrorist objectives. United States intelligence reports conclude that ARB played a critical role in facilitating the terrorist activities of al Qaeda. FAC ¶¶ 157-158 (new allegations). For example, ARB held at least twenty-four accounts for the Al Haramain Islamic Foundation, a charity which the U.S. Treasury has identified as an al Qaeda front in thirteen countries. *Id.* ¶ 158 (new allegation). In just one instance, an Al Haramain official deposited funds with ARB in an irregular manner which were then sent by ARB to al Qaeda fighters in Chechnya. *Id.*[7] The banking services purposefully provided by ARB provided a "safe haven" for al Qaeda, leading the United States to require significant

---

[7] The United States later prosecuted an Al Haramain official, and, as part of that proceeding, sought documents from ARB. It refused. FAC ¶ 158.

reforms at ARB as a result of its investigations following September 11th, including in partnership with the Saudi government. *Id.* ¶¶ 168-172 (new allegations). Terrorist leaders viewed ARB as an essential partner, ordering their operatives to use ARB in numerous countries in which they operated. *Id.* ¶¶ 162 (new allegation). Indeed, ARB was trusted to provide extraordinary services above and beyond ordinary banking services. ARB used couriers to deliver funds to an al Qaeda affiliate operating in Indonesia, which later used those funds to purchase weapons and build bombs. *Id.* ¶ 165 (new allegation). An al Qaeda courier for Osama bin Laden's second-in-command traveled on a visa obtained for ARB. *Id.* ¶ 166 (new allegation). Osama bin Laden himself described ARB to September 11th mastermind Zacarias Moussaoui as a "good brother" because, as Moussaoui explained, ARB was a big supporter of Al Haramain and other charities, and was responsible for "moving money around." *Id.* ¶ 167 (new allegation).

ARB also provided direct support to al Qaeda through contributions laundered through the "charity" front organizations used by al Qaeda to facilitate its terrorist acts. *Id.* ¶ 173. ARB itself donated money to al Qaeda in this manner, and it advertised the existence and account numbers of the charities, seeking contributions using a euphemism for terrorist martyrdom–"the action most loved by Allah." *Id.* ¶¶ 173-178. Chief amongst the charities supported by ARB are the IIRO and Al Haramain Islamic Foundation, both of which worked hand-in-glove with Osama bin Laden and al Qaeda to fund and operate al Qaeda in multiple countries. *Id.* ¶¶ 175-182; FAC Exhibit A ¶¶ 30-158.

Plaintiffs allege that senior ARB officials acted directly with senior al Qaeda officials, and the bank's support directly facilitated the planning and execution of the September 11th attacks. The bank's founders, brothers Suleiman al Rajhi and Saleh al Rajhi, both donated to al Qaeda charities, and both had close personal connections with al Qaeda and Osama bin Laden; Suleiman appeared in the Tareekh Osama ("Osama's History") file containing a list of al Qaeda's most important donors, and Saleh's personal contact information appeared in the address book of Osama bin Laden's personal

21

secretary.  FAC ¶¶ 129-132, 166.  In addition, consistent with the instruction that al Qaeda operatives use ARB, ARB executed funds transfers for the September 11th attackers' U.S. mission.  FAC ¶ 163. September 11th hijacker Abdulaziz al Omari maintained an account with ARB and was issued a debit/credit card through the bank.  *Id.*  Just four days before the attacks, on September 7, 2001, al Omari received a wire transfer from ARB.  *Id.*  And as noted, shortly before September 11th, ARB official Saleh Al-Hussayen traveled to the United States, switching hotels during his visit so that he could stay in the same hotel as at least three of the hijackers.  *O'Neill v. Asat Trust Reg.*, 714 F.3d at 679 (allegations regarding Al-Hussayen's travel to United States and relationship with al Qaeda charities warranted jurisdictional discovery).

The remaining factors concern ARB's state of mind in providing the support and the relationship between ARB and al Qaeda, both of which are addressed and established *supra* in the discussion of ARB's awareness of al Qaeda's anti-U.S. terrorist agenda and its relationship to al Qaeda's terrorist acts (issues especially clearly established by the Second Circuit Panel's decision).  In addition, the provision of banking services over many years despite an awareness of terrorist acts is evidence of a "culpable state of mind."  *Miller*, 372 F. Supp. at 47.  Maintaining accounts for multiple terrorist organizations (as ARB did) is similarly evidence which "demonstrates [a financial institution's] close relationship with the perpetrators."  *Id.*

ARB's substantial and pervasive support for al Qaeda, provided with the awareness that it was performing the critical function of "moving money around," as well as the design of senior ARB officials to use their powers over the bank's operation to assist al Qaeda, distinguish Plaintiffs' aiding and abetting case from other ATA cases in which aiding and abetting liability was not found.  *See, e.g.,* *Averbach v. Cairo Amman Bank*, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) (mere arms' length business relationship with customers supporting Hamas, without allegation of knowledge, insufficient for ATA claim); *Honickman v. Blom Bank SAL*, 2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) (no allegations bank

knew or should have known it was providing banking services to customers supporting Hamas); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) (no allegation bank knew its services would be directed to terrorist). Unlike those cases, Plaintiffs have alleged facts showing direct links and powerful indirect links between ARB and al Qaeda generally, as well as evidence showing the ways in which ARB's financial services were both extraordinary and critical to many violent acts, including the September 11th attacks. Such allegations are more than sufficient to support a claim for aiding and abetting liability should the Court consider ARB's motion now.

### B.   Plaintiffs State a Claim for Secondary Liability Under a Conspiracy Theory

ARB mistakenly contends that Plaintiffs have failed to state a claim for conspiracy because the FAC "does not allege that the Bank reached an *agreement* with Al Qaeda itself to participate in Al Qaeda's efforts to attack the United States." ARB Memo at 11 (emphasis in original). The facts alleged in the FAC, however, clearly provide the necessary indicia of an agreement between ARB and al Qaeda to advance al Qaeda's campaign of anti-U.S. terrorism.[8] Indeed the Second Circuit's decision confirms this conclusion.

To state a claim for conspiracy, a plaintiff must allege "an agreement between two or more persons" to "participate in an unlawful act, or a lawful act in an unlawful manner." *Halberstam,* 705 F.2d at 477. The agreement need relate only to the broad object of the conspiracy, not the particular attack resulting in harm. *See, e.g., Leh v. Gen. Petroleum Corp.,* 382 U.S. 54, 59 (1965). Thus, it is sufficient for Plaintiffs to show that ARB agreed to advance the anti-U.S. agenda and operations of al Qaeda and its affiliated charitable entities. This Court has confirmed that, to establish a conspiracy agreement related to terrorism, a plaintiff must show an "unlawful agreement" based on a "factual basis for …

---

[8] ARB quite mistakenly claims that Plaintiffs "cannot now assert [their conspiracy] claims" because they "disclaimed" them in the Second Circuit briefing. ARB Memo at 3-4 (citing authorities on "judicial estoppel"); *see also id.* at 1 (suggesting that Plaintiffs' conspiracy claims may have been "abandoned"). The issue before the Second Circuit was personal jurisdiction, and in any event Plaintiffs presented their conspiracy allegations as a basis for jurisdiction at length. (Br. at 50-52; 70-74.) Indeed, the Panel expressly acknowledged Plaintiffs' argument that jurisdiction existed "because Al Rajhi Bank and al Qaeda entered into a conspiracy to target U.S. interests." Panel Op. at 4.

allegations that would lead one to infer that Defendant shared any common goal of committing an act of international terrorism." *Kaplan*, 405 F. Supp. 3d at 534.

Such an agreement may be based on indirect or circumstantial evidence. *Halberstam,* 705 F.2d at 480. "[C]onspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Gelboim v. Bank of Am.,* 823 F.3d 759, 781 (2d Cir. 2016). Courts look to several types of such behavior, including the evidence of assistance itself and the length of time the two parties worked together. *Halberstam,* 705 F.2d at 478, 481. Support over a period of years can establish a common plan. *Id.* A third consideration is the extent of the relationship between the parties, including the frequency of communication. *Gelboim,* 823 F.3d at 781.

The Second Circuit's jurisdictional findings alone indicate that the complaint sufficiently alleges the relevant agreement reflecting how ARB and al Qaeda "shared [a] common goal" of advancing al Qaeda's terrorism campaign. *Kaplan,* 405 F. Supp. 3d at 534. The Second Circuit found that Plaintiffs' "allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States" were a sufficient predicate for jurisdictional discovery, and that ARB's alleged support of al Qaeda was "'more direct and one step closer to al Qaeda'" as compared to previous defendants where jurisdiction was lacking. Panel Op. at 4. The conclusion that ARB had a specific intent to further al Qaeda's terrorism directed against the United States necessarily means that ARB shared al Qaeda's objectives and had a "common goal" of harming the United States through acts of terror. The Second Circuit's finding that the complaint alleges a "direct" relationship between ARB and al Qaeda, and its approval of the sufficiency of "the support alleged here," also confirm that Plaintiffs are alleging that both parties understood that they were working together. *Id.*

Even absent the Second Circuit's jurisdictional findings, the facts alleged in the FAC reflect the extensive evidence supporting an inference that ARB shared al Qaeda's terrorism-related goals,

and thus are sufficient allegations of an agreement for purposes of stating a conspiracy claim.  For example, Plaintiffs allege that the relationship between ARB and al Qaeda and the support provided by ARB, fully knowing of al Qaeda's anti-U.S. agenda, were longstanding:  the complaint details support knowingly provided by ARB to al Qaeda (and its affiliates) from the early 1990s through the attacks, as well as efforts to avoid detection and disruption of the relationship thereafter.  The FAC further alleges that the relationship was intimate and extensive: the complaint describes al Qaeda's view of ARB, as functioning as a "good brother" for al Qaeda and moving money on its behalf, and directing its operatives to take advantage of that cooperative relationship.  FAC ¶¶ 156, 162, 165, 167, 174-182.

ARB's working relationship with al Qaeda in support of its goals is supported by allegations that ARB's founder and controlling officers were in ongoing contact with al Qaeda's leaders, offered to contribute resources to assist al Qaeda, provided support to al Qaeda, and in their capacity as ARB officials directed ARB's own provision of support to al Qaeda.  FAC ¶¶ 127, 132, 154, 159-161, 163, 173, 178-179.  Those officials also served in organizations that were operationally intertwined with al Qaeda and that were completely familiar with its terrorist objectives, and which had been directly organized by Osama bin Laden to act in a coordinated fashion to assist al Qaeda and advance their common anti-U.S. objective.  FAC ¶¶ 162, 175-181, 184-192.  And the proof of assistance is varied and ongoing: ranging from unusual support for carriage of funds, to direct and indirect financial contributions, to very direct support for the al Qaeda operatives launching the September 11th attacks. FAC ¶¶ 156, 158-165, 167, 174, 183.

ARB wisely does not argue that the FAC fails to satisfy the requirement that a plaintiff allege an overt act in furtherance of the conspiracy.  The allegations are clearly sufficient.  A conspirator can be liable even if it did not actively participate in or benefit from the wrongful action.  *Halberstam*, 705 F.2d at 481.  A conspirator need not even plan or know about the particular overt act that caused the

injury, so long as the purpose of the act was to advance the overall objective of the conspiracy. *Id.* at 481, 487. Here, ARB's various acts that supported al Qaeda, directly and indirectly, advanced al Qaeda's anti-U.S. campaign, the object of the conspiracy. Allegations of facts related to ARB's further acts in support of the September 11th attacks themselves underscore the point but are unnecessary to allege conspiracy.

### C.    Plaintiffs State A Claim For Primary Liability Under § 2333(a)

ARB may be found liable under a primary liability theory in addition to the aiding and abetting and conspiracy theories recognized in JASTA.[9] Primary liability claims under the ATA are based on the defendant's own acts of international terrorism as defined in 18 U.S.C. § 2333(a). For an act to be considered an act of international terrorism:  (1) it must "involve violent acts or acts dangerous to human life;" (2) it must qualify as "a violation of the criminal laws of the United States or of any State" if it were committed within a United States jurisdiction; (3) it must "appear to be intended" to intimidate a civilian population, influence government policy, or affect the conduct of government by certain specified means; and (4) it must occur primarily outside the United States or transcend national boundaries. 18 U.S.C. § 2331(1). Plaintiffs have alleged facts in the FAC establishing those elements; in fact, ARB's conspiracy with al Qaeda (*see* Section III.B) is enough to hold ARB liable as a primary actor. *See, e.g., Hussein v. Dahabshiil Transfer Servs. Ltd.,* 230 F. Supp. 3d 167 (S.D.N.Y. 2017) (recognizing that one who conspires to violate 2339A-C "is a primary violator of Section 2333(a)" even without JASTA amendments). Even absent that conspiracy, however, the FAC states a claim for primary liability under the ATA, and ARB fails to show otherwise.

---

[9] ARB baselessly argues that a single sentence in Plaintiffs' Reply brief "disclaimed their primary liability claims ... in representing the scope of their suit while on appeal" in an effort to "avoid the conclusive effect of" *O'Neill.* ARB Memo at 4. ARB ignores that the only issue on appeal was personal jurisdiction over ARB, not a full merits analysis of Plaintiffs' claims, and that Plaintiffs were addressing defects in ARB's argument that personal jurisdiction cannot be found based on causation principles or prior decisions in this case. The scope of Plaintiffs' claims for relief must be found in the FAC; ARB cannot claim "waiver" on the ground that Plaintiffs' arguments on appeal merely responded to ARB's arguments on jurisdiction because the merits issues were not before the Court.

1.    ARB Engaged in Acts of International Terrorism

ARB's support for al Qaeda constitutes "acts dangerous to human life" within the meaning of § 2331(1)(A) and (B).[10]  Such acts include conduct which is not inherently violent outside of the context of material support for terrorism. The Second Circuit has recognized that financial contributions to a terrorist organization are "acts dangerous to human life."  *See Boim*, 549 F.3d at 690 (funding and supporting a terrorist is like handing a loaded gun to a child: the act is not itself violent, but it is dangerous to human life and satisfies the ATA standard.)  The FAC identifies numerous instances of money flowing directly from ARB to the al Qaeda charity front organizations used to fund its operations.  *See, e.g.*, FAC ¶ 173 (ARB funding and servicing "virtually all of al Qaeda's most critical charity fronts"); ¶ 174 (ARB "contributed its own zakat [Islamic charity] and haram [money ARB could not keep under Islamic law]" to al Qaeda fronts); ¶ 183 (describing donations to al Qaeda charity arms).  Standing alone, this provision of funding to al Qaeda satisfies the definition of an act dangerous to human life.

The FAC also alleges the extensive provision of banking services to al Qaeda and its affiliates, recognized by Second Circuit law as sufficient to create primary liability.  *See Linde*, 882 F.3d at 327 (providing financial services to a known terrorist organization may afford material support to the organization even if the services do not involve violence or endanger life).  As described in relation to Plaintiffs' aiding and abetting claim, ARB provided significant and critical banking services to al Qaeda, including the transfer of funds and other services which have a direct connection to the September 11th attacks.  *See* FAC ¶ 156 (new allegations identifying support since at least the mid-1990s).  Although ARB was nominally a bank, it functioned as an operational partner of al Qaeda in carrying

---

[10] The FAC alleges acts within the scope of the material support statutes in § 2339A-C, which means it also alleges the necessary predicate acts under the ATA.  *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009) (finding sufficient allegations in complaint for predicate acts based on finding of sufficient allegations in complaint regarding acts under § 2339A-C).

out al Qaeda's terrorist objectives.  United States intelligence reports conclude that ARB played a critical role in facilitating the terrorist activities of al Qaeda.  FAC ¶¶ 157-158 (new allegations).[11]  As explained in *Linde*, even if such allegations do not establish material support as a matter of law, they are sufficient to warrant consideration and decision by a jury.

Moreover, ARB's services were not limited to "routine" banking acts.  Indeed, ARB was trusted to provide usual services above and beyond ordinary banking services.  Again, ARB used couriers to deliver funds to an al Qaeda affiliate.  *Id.* ¶ 165 (new allegations).  An al Qaeda courier for Osama bin Laden's second in command traveled on a visa obtained for ARB.  *Id.* ¶ 166 (new allegations).  These actions each indicate extraordinary steps taken to support al Qaeda's violent terrorist agent.

2.   ARB Acted Knowingly and with the Intent to Support al Qaeda's Terrorism Against the United States

ARB's knowledge of its support for al Qaeda is detailed in Section III.A.3.b, addressing awareness under aiding and abetting liability, which in fact requires *more* than the material support statute in 18 U.S.C. § 2339B.  *See Linde*, 882 F.3d at 329-330 (material support "requires *only* knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." (emphasis added).   As those allegations show, ARB knowingly provided support to al Qaeda even as it conducted a massive campaign of terror against the United States.  "[A] violation of § 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the [designated terrorist organization]."  *See Goldberg v. UBS AG,* 660 F. Supp. 2d 410, 433 (E.D.N.Y. 2009) (plaintiffs sufficiently alleged that UBS

---

[11] For example, ARB held at least twenty-four accounts for the Al Haramain Islamic Foundation, a charity which the U.S. Treasury has identified as an al Qaeda front in thirteen countries.  *Id.* ¶ 158 (new allegations regarding relationship with charities); ¶¶ 168-172 (new allegations regarding the "safe haven" provided by ARB for al Qaeda and reforms imposed upon ARB as a result after September 11th attacks); ¶ 162 (new allegations regarding importance of ARB to terrorists, who were ordered to use the bank in numerous countries); ¶ 167 (new allegation of Zacarias Moussaoui testimony that ARB was "moving money around" for al Qaeda).

violated Section 2339B "through UBS's knowledge that the ultimate beneficiary of its wire transfers was Hamas, an FTO"). ARB's alleged conduct plainly meets that test because Plaintiffs allege that ARB knew its financial systems were being used to fund al Qaeda, supported al Qaeda's charities, and jointly solicited donations for martyrdom payments through an al Qaeda charity. FAC ¶¶ 156, 173-178. The Second Circuit's decision on appeal endorses this reading of the FAC. The Panel rejected ARB's argument that Plaintiffs failed to allege any facts showing knowing participation by ARB in al Qaeda's terrorist campaign (ARB Br. at 32) and, instead, recognized ARB's specific intent with respect to the acts alleged in the FAC. Panel Op. at 4.

ARB further argues that Plaintiffs have not alleged any actions that objectively appear to have been intended to coerce or intimidate any civilian population or government within the meaning of § 2331(1)(A). However, providing material support to a terrorist organization, including in the form of banking services, can "create[] the objective 'external appearance' … that [the bank] shared the [terrorist organization's] goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion." *Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 49 (D.D.C. 2010); *see also Boim*, 549 F.3d at 693-94. Because Plaintiffs allege that ARB provided services to al Qaeda and its front charities with the intent of furthering its terrorist objectives, their allegations are sufficient.

### 3. Plaintiffs Have Alleged Facts Establishing Causation

ARB's acts in support of al Qaeda caused the damages suffered by Plaintiffs on September 11th. This Court's decision in *Terrorist Attacks I* is not conclusive as to the causation analysis. In reviewing the complaint filed in 2003, this Court held that there was "no basis for a bank's liability for injuries funded by money passing through it on routine banking business." 349 F. Supp. 2d at 833. Causation could not be found on such facts without a showing that ARB knew it was supporting terrorism. *Id.* at 832. As alleged herein, the FAC includes significant new allegations regarding ARB's

direct support of al Qaeda charities, the extraordinary actions by ARB going above and beyond routine banking services, ARB's efforts to conceal its work for al Qaeda, and the hand-in-glove relationship between ARB leadership and al Qaeda's charity network.[12]  Moreover, the causation analysis in *O'Neill* and *Terrorist Attacks I* examined proximate cause in light of the "precise language of the statute and the clear intentions of Congress" under the ATA *as it existed in 2013*, not as amended.  *See O'Neill v. Al Rajhi Bank*, 714 F.3d at 123 (examining then-effective version of ATA to determine congressional intent as well as whether allegations satisfied causation standard).  The record and legal landscape have shifted significantly, making the result in *O'Neill* immaterial.

The causation analysis "involves a judgment based upon some social idea of justice or policy," *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767-70 (2d Cir. 1994) (citations omitted).  Thus, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 n.7 (1983); *see AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 217 n.8 (2d Cir. 2000) (proximate cause "has been an extraordinarily changeable concept").  As a result, the primary liability causation analysis must now be understood in light of Congress's statements of purpose in JASTA and the statute's remedial purposes. "[A]ny proximate cause standard must be understood and applied in terms of the precise language of the statute and the clear intentions of Congress," *United States v. Kearney*, 672 F.3d 81, 96 (1st Cir. 2012). Here, the express purpose of the amendments in JASTA were "to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, *to seek relief against persons, entities, and*

---

[12] The allegations regarding the charities and their role as part of al Qaeda's funding operations also distinguish the FAC from the facts in *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223 (E.D.N.Y. 2019), which involved no allegations that the charities at issue "participated in, planned, trained the perpetrators of, requested that someone carry out, or were the cause of the attacks giving rise to Plaintiffs' claims," and *O'Sullivan v. Deutsche Bank*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019), in which the bank's Iranian government customers supported terrorist organizations that supported other unrelated organizations.

*foreign countries*, wherever acting or wherever they may be found, *that have provided material support, directly or indirectly*, to foreign organizations or persons that engage in terrorist activity." JASTA § 2(b); 130 Stat. at 853 (emphasis added).

Plaintiffs thus clearly satisfy the "by reason of" standard argued by ARB when considering the statement of purpose in JASTA seeking to broaden the potential avenues for relief for victims of terrorism.  As set forth herein, the U.S. congressional and executive branches, as well as counter-terrorism experts, have concluded that material support and financing for al Qaeda of the type prohibited by §§ 2339A-C constituted a direct cause of the September 11th attacks because, absent access to the wealth provided by its material supporters, al Qaeda would have been unable to carry out planning, training, and logistics required to execute the September 11th attacks.  *See* FAC ¶ 113 (importance of al Qaeda infrastructure and resources); ¶¶ 156-162 (new allegations of critical nature of ARB network to al Qaeda); ¶¶ 168-172 (new allegations regarding "safe haven" for al Qaeda created by ARB).  Al Qaeda specifically used ARB to obtain funds to launch the September 11th attacks as well as provide money to the operatives who would later conduct the hijacking.  *Id.* ¶ 163.  By reason of the vast financial resources provided by ARB, al Qaeda was able to plan and execute the September 11th attacks, and thus Plaintiffs meet their burden on causation for primary liability.

The Second Circuit's Panel decision appears to confirm the causal relationship between ARB's conduct and the losses suffered by Plaintiffs.  The arguments ARB raises on remand are identical to the arguments it raised on appeal with regard to personal jurisdiction; indeed, the centerpiece of ARB's jurisdictional argument was that personal jurisdiction requires a showing of proximate causation under the ATA standard.  *See, e.g.*, ARB Br. at 46 ("Plaintiffs, however, fail to allege facts supporting a plausible inference that the Bank proximately caused their injuries.").  The Second Circuit rejected those arguments, implicitly rejecting ARB's current argument that Plaintiffs' fail to allege a causal link for primary liability purposes.

*Rothstein v. UBS AG,* 708 F.3d 82 (2d Cir. 2013) does not require a different result.  If *Rothstein* intended but-for causation or another strict standard, it would have said so directly, and no Second Circuit case has adopted such a standard after JASTA.  Accordingly, a showing of proximate causation under *Rothstein* merely requires plausible allegations that a plaintiff's injury was a natural and probable consequence of defendants' wrongful acts and ought to have been foreseen under the circumstances. *See Owens v. BNP Paribas, S.A.,* 235 F. Supp. 3d 85, 97 (D.D.C. 2017).  Thus, ARB is wrong in declaring that ATA decisions since the Bank's Motion to Dismiss overwhelmingly confirm that dismissal is appropriate here for failure to allege proximate causation." ARB Memo at 7.  None of those involve analogous fact patterns or comparable allegations.  *Fields v. Twitter, Inc.,* 881 F.3d 739 (9th Cir. 2018), involved a material support claim not controlled by *Linde* or other Second Circuit law, in which there were *no* allegations that Twitter was aligned with terrorists.   Unlike the direct support alleged here, *Freeman v. HSBC Holdings PLC,* 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019), addressed banking services to Iranian intermediaries with "legitimate operations" without showing a direct connection between the "financial services provided by Defendants and an organization directly involved in acts of terrorism."  *Id.* at *14.  In effect, both *Fields* and *Freeman* attempted unsuccessfully to convert negligence claims into ATA claims, while Plaintiffs here have painstakingly detailed a close relationship between ARB and al Qaeda itself involving extraordinary services and direct funding.

This Court's decision in *Kaplan* is similarly distinguishable.  Like other cases failing to state an ATA claim, but unlike Plaintiffs' claims here, *Kaplan* did not include allegations showing that senior officials with ownership control and operational control over bank business had a specific intent to advance the terrorist organization's agenda.  *See infra* pp. 19-20.  The reasonable inference to be drawn is that the officials controlling ARB were effective in deploying ARB's resources as intended.  *Kaplan* and other banking cases also did not include CIA reporting that the leadership of the terrorist organization specifically directed members to use the defendant-banks, confirming that funds were in

fact transferred to al Qaeda in accordance with the intent of ARB's leadership.  FAC ¶ 156.  And in keeping with that instruction, the allegations here show that ARB executed the funds transfer for the money that launched the September 11th attackers on their U.S. mission, and September 11th hijacker al Omari maintained an account and debit/credit card with ARB, and in fact received a wire transfer from ARB four days before the attacks.  *Id.*  Neither *Kaplan* nor any other case involves a bank official traveling to the site of the attacks shortly before they occurred and deliberately choosing to stay in the same hotel as the attackers.  *See O'Neill v. Asat Trust Reg.*, 714 F.3d at 679 (describing allegations regarding ARB official).  The allegations showing the complete integration of the charities at issue into al Qaeda's infrastructure further distinguish the claims here from these other cases, FAC ¶¶ 116-152, and confirms ARB's support for al Qaeda itself, as the Second Circuit's decision on jurisdiction recognized.

Because ARB knew al Qaeda was a terrorist group, and knew the charities were al Qaeda operations, it was foreseeable that any support would be used for terrorist activity.  It is ARB's knowledge that it was assisting al Qaeda to cause harm to the United States which would otherwise not occur that creates causation and thus liability.  *See Boim*, 549 F.3d at 694 (foreseeable that support to Hamas would allow Hamas to try to kill or wound more people in Israel).  Having established a terrorist act, the requisite intent, and a causal link between those acts and the harm suffered by Plaintiffs, the FAC states a claim for primary liability against ARB.

## CONCLUSION

The Second Circuit held that Plaintiffs had pleaded facts sufficient to warrant jurisdictional discovery on their ATA claims against ARB and directed this Court to begin such discovery.  The Court should reject ARB's effort to bypass this jurisdictional inquiry, because to do so would impermissibly assume jurisdiction, violate the mandate rule, and misread the Second Circuit's Order.  Even if this Court considered the merits of ARB's motion to dismiss, however, the facts set forth in

Plaintiffs' First Amended Complaint are more than sufficient to state a claim for relief under the ATA. The Court should deny ARB's motion immediately and allow the parties to commence jurisdictional discovery consistent with the Second Circuit's Order.

Dated: February 10, 2020

COZEN O'CONNOR

By:   /s/  Sean P. Carter
Stephen A. Cozen, Esq.
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103
Tel:  (215) 665-2000

*Attorneys for Lloyd's Syndicate 2 and Muenchener Rueckversicherugs-Gesellschaft Plaintiffs*

STROOCK & STROOCK & LAVAN LLP

By:   /s/  James L. Bernard
James L. Bernard, Esq.
Patrick N. Petrocelli, Esq.
180 Maiden Lane
New York, New York 10038
Tel:  (212) 806-5400

*Attorneys for Arrowood Plaintiffs*

NAPOLI SHKOLNIK PLLC

By:   /s/  Christopher R. LoPalo
Christopher R. LoPalo, Esq.
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel:  (212) 397-1000

*Attorneys for Aguilar, Adesso, Hodges, Aiken, Abarca, Abbate, and Abedhajajreh Plaintiffs*

SHEPS LAW GROUP, P.C.

By:    _/s/  Robert C. Sheps_
          Robert C. Sheps, Esq.
          25 High Street
          Huntington, New York 11743
          Tel:  (631) 249-5606

          *Attorneys for Charter Oak Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of Plaintiffs' Memorandum of Law in Opposition to Al Rajhi Bank's Motion for the Court to Decide the Bank's Pending Rule 12(b)(6) Motion to Dismiss was filed electronically this 10th day of February 2020.  Notice of this filing will be sent to all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.  Parties may access this filing through the Court's ECF system.

*/s/  J. Scott Tarbutton*
J. Scott Tarbutton

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

**PLAINTIFFS' EXHIBIT 1 TO THEIR MEMORANDUM OF LAW IN OPPOSITION TO
AL RAJHI BANK'S MOTION FOR THE COURT TO DECIDE THE BANK'S PENDING RULE
12(b)(6) MOTION TO DISMISS**

| FAC | NEW ALLEGATION |
| --- | --- |
| ¶ 121 | A November 14, 2002 CIA report titled "Saudi-*Based Financial Support for Terrorist Organizations"* similarly confirms that "Saudi Arabia is a key base of financial support for al-Qa'ida" and that "Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs)." |
| ¶ 122 | A separate April 25, 2002 CIA report concerning sources of al Qaeda's vast financing, titled "Identifying *Al-Qa'ida's Donors and Fundraisers: A Status Report,*" likewise concludes that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical funding sources for al-Qa'ida," and documents how wealthy financiers within al Qaeda's inner-circle use purported charities and businesses as middlemen in an effort to conceal their roles in channeling resources to bin Laden's organization:<br><br>Donors generally channel money intended for terrorist-related activities through middlemen – including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen – rather than giving the funds directly to Bin Ladin or other senior al Qa'ida members. This practice hides the donors' role and allows them to deny knowing the funds went to terrorists. |
| ¶ 125 | Given the intimacy of the so-called charities' collaborations with al Qaeda and their complete integration into al Qaeda's infrastructure, Juan Zarate ("Zarate"), who served as both deputy national security advisor for combating terrorism and the first ever assistant secretary for the Treasury for terrorist financing and financial crimes, observed in his book *Treasury Wars* that "Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly. This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO)." |
| ¶ 127 | In the wake of the September 11th attacks, the United States determined that the fight against al Qaeda and prevention of future attacks like those carried on September 11, 2001 urgently required that the United States disrupt and dismantle the financial and logistical support network of wealthy donors, charities, and banks that had made 9/11 possible. As Juan Zarate has explained the mindset of U.S. national security and counter-terrorism officials at the time: |

1

| | |
|---|---|
| | The next attacks needed to be crippled and stopped.  Following and disrupting the money flows within the Al Qaeda system became an imperative.  The Al Qaeda financial networks – charities, deep-pocket donors, and front companies – and the means by which Al Qaeda moved money around the world – banks, couriers, wire transfers, hawaladars – would become our targets. |
| ¶ 132 | According to Zarate, "Prominent and wealthy names long familiar to law enforcement appeared on the list. Not surprisingly, many of these men were prominent Saudis – *such as Suleiman al Rajhi and Khalid bin Mahfouz.*" (emphasis supplied). |
| ¶ 137 | These wealthy patrons were "not just passive contributors, but demanding investors in a cause.  Over time, the donor class would grow increasingly demanding of Al Qaeda, asking to hear directly from bin Laden and requiring that their funds be leveraged to launch significant attacks." *Treasury Wars* at p. 80. |
| ¶ 156 | The nature and scope of the collaboration between Al Rajhi Bank and al Qaeda that prompted the United States to focus on the bank were detailed in a 2003 Report of the Central Intelligence Agency. According to that report: |
| | Al-Rajhi Bank: Conduit for Extremist Finance (S/NF) |
| | Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principal managers answer directly to Sulayman.  The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities. |
| ¶ 157 | The Wall Street Journal ("WSJ") reviewed the 2003 report, along with other reports authored by the CIA and other U.S. agencies concerning Al Rajhi Bank's extensive sponsorship of al Qaeda and allied terrorist organizations, and issued a detailed report in 2007 describing the principal findings of U.S. intelligence investigations.  *See* July 26, 2007 Report by Glenn Simpson of the Wall Street Journal, titled *U.S. Tracks Saudi Bank Favored By Extremists.* |
| ¶ 158 | According to the WSJ, the U.S. intelligence reports confirm that Al Rajhi Bank played a critical role in facilitating the terrorist activities of al Qaeda's integrated charity fronts, and "describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist groups."  For example, the intelligence reports indicate that Al Rajhi Bank maintained at least twenty-four (24) accounts and handled unusual transactions for the Al Haramain Islamic Foundation, "a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries."  The report states that in 2000, a top official from al-Haramain deposited $130,000 in $1,000 traveler's checks into an Al Rajhi account in Riyadh.  According to a U.S. indictment, the funds were then sent to al-Qaeda fighters in Chechnya. In connection with the resulting federal prosecution of |

| | |
|---|---|
| | an al Haramain official, the U.S. government issued an administrative subpoena to Al Rajhi Bank, requesting that Al Rajhi Bank produce documents relevant and essential to the prosecution.  Al Rajhi Bank refused to comply. |
| ¶ 159 | Consistent with Suleiman al Rajhi's inclusion on the Golden Chain, the intelligence reports reviewed in the article also document the longstanding involvement of Suleiman al Rajhi and al Rajhi family members in supporting extremists through purported charities, explaining that "Mr. Al Rajhi and family members have been major donors to Islamic charities that are suspected by Western intelligence agencies of funding terrorism, according to CIA reports and federal-court filings by the Justice Department." |
| ¶ 160 | Confirming the depth of Al Rajhi Bank's commitment to supporting al Qaeda and related terrorist organizations, the "2003 CIA Report claims that a year after Sept. 11, with a spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board 'to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny.'"  A few weeks earlier, "Mr. Al Rajhi 'transferred $1.1 billion to offshore accounts – using commodity swaps and two Lebanese banks – citing a concern that U.S. and Saudi authorities might freeze his assets.'" |
| ¶ 161 | The 2003 CIA Report also discusses efforts by Suleiman and Saleh al Rajhi to conceal and disguise unusual transfers through purported charities.  The report says that Suleiman and Saleh transferred $4 million to parties in Germany and Pakistan in December 1998 using "a unique computer code to send funds at regular intervals to unspecified recipients, suggesting that they were trying to conceal the transactions and that the money may have been intended for illegitimate ends." |
| ¶ 162 | The U.S. investigations also confirmed that al Qaeda and other terrorist organizations had absolute confidence in Al Rajhi Bank's commitment to their terrorist cause, as reflected by the United States' finding that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank. |
| ¶ 165 | U.S. investigations also documented very hands-on dealings between Al Rajhi Bank and terrorists at operational levels.  In this regard, the 2003 CIA Report says that Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."  Kompak is an al Qaeda affiliate, which also received funding through al Haramain Islamic Foundation. |
| ¶ 167 | Consistent with the findings of U.S. intelligence agencies, Zacarias Moussaoui, the only al Qaeda member convicted to date for involvement in the September 11th attacks, has testified that Osama bin Laden personally described Al Rajhi Bank to him as "like a good brother."  Moussaoui explained that Al Rajhi Bank was responsible for "moving money around" for al Qaeda, and was one of the main supporters of the Saudi charity fronts used by al Qaeda, including the Al Haramain Islamic Foundation. |
| ¶ 168 | Faced with a wealth of compelling evidence of Al Rajhi Bank's long-standing material support for al Qaeda, "officials from the National Security Council, CIA, Treasury and State Departments debated a proposal for legal and political action against the bank, including the possibility of covert operations such as |

| | interfering with the bank's internal operations," according to the WSJ. U.S. officials further debated designating the bank pursuant to Executive Order 13224, an action that can only occur where persons knowingly "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism." Ultimately, U.S. officials chose to seek reforms of the bank via direct negotiations with the Saudi government, and there have since been significant leadership and managerial changes at the bank. Of particular note, Suleiman al Rajhi stepped down as head of the bank and relinquished his control over it. |
|---|---|
| ¶ 169 | U.S. State Department diplomatic cables confirm the urgency and gravity of the engagements between U.S. officials and their Saudi counter-parts concerning Al Rajhi Bank's sponsorship of al Qaeda. The cables indicate that U.S. officials conveyed their "real concerns about the financial activities facilitated by Al-Rajhi" to senior Saudi officials, and sought unprecedented reform at Al Rajhi Bank in the years following the September 11th attacks. |
| ¶ 170 | According to a September 27, 2004 cable titled "Terrorist Financing: Al-Rajhi Bank," Treasury Assistant Secretary Juan Zarate met with Saudi banking officials and explained that the United States needs "to be assured that Al-Rajhi is doing everything possible regarding compliance and cooperation. Particular accounts of concern need to be investigated and the bank's compliance structure needs to be reviewed." |
| ¶ 171 | After U.S. officials "provided the Saudi government with information documenting specific instances of terrorists using the Al Rajhi Bank, including information about specific accounts and transactions of interest," Saudi Arabia agreed to conduct a joint review with Treasury Department officials "to ensure the institution is not operating in a way that provides safe haven for the financial transactions of terrorists and their supporters." |
| ¶ 172 | A November 25, 2004 diplomatic cable titled "Joint Examination of Al Rajhi Bank Through the Joint Terrorist Financing Task Force," bluntly explains the reason underlying the diplomatic engagements with the Saudis concerning the bank, confirming that Al Rajhi Bank had been "used by al Qaida and like-minded terrorist groups." |
| ¶ 191 | In 2013 the United States Senate Permanent Subcommittee on Investigations issued a report entitled U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing, in which it surveyed much of the foregoing evidence concerning Al Rajhi Bank's terrorist connections. Succinctly describing the import of the various, independent sources of evidence and connections to terrorism, the report states: "Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple links to suspect banks and accountholders – present an unusual array of troubling allegations about a particular financial institution." |