EXHIBIT 3

A/HRC/41/CRP.1

19 June 2019

English only

**Human Rights Council**
**Forty-first session**
24 June - 12 July 2019
Agenda item 3
**Promotion and protection of all human rights, civil,**
**Political, economic, social and cultural rights,**
**including the right to development**

### Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi*

---

\* Reproduced as received.

GE.19-10061(E)







# Contents

| | Page |
|---|---|
| Executive summary | 4 |
| Introduction | 8 |
| **PART I. THE TIMELINE OF THE EXECUTION OF JAMAL KHASHOGGI** | 14 |
| Allegations of Surveillance of Jamal Khashoggi and Others by Saudi Arabia | 14 |
| Before the murder | 14 |
| Planning and preparation | 15 |
| The disappearance and murder of Jamal Khashoggi | 19 |
| The Turkish authorities learn of Mr. Khashoggi's disappearance. | 21 |
| Saudi 15 member-team leaves Turkey | 21 |
| Initial reactions and the beginning of Turkey's investigative process | 23 |
| Saudi Arabia's continual denials and scene clean-up | 24 |
| Turkish investigators enter the Consulate and the Residence | 26 |
| Saudi Arabia's admission and arrests | 28 |
| Some international reaction to the Saudi admission | 29 |
| The Turkish investigators continues | 30 |
| Indictments and trials in Saudi Arabia | 31 |
| Other countries impose sanctions on Saudi officials | 33 |
| Saudi Arabia trials | 34 |
| Other Saudi measures | 36 |
| **PART II. THE EXECUTION OF MR. KHASHOGGI, STATE AND INDIVIDUAL RESPONSIBILITIES** | 38 |
| The right to life | 39 |
| Analysis of the facts of the execution of Mr. Khashoggi | 40 |
| State responsibility for the execution of Mr. Khashoggi | 42 |
| State responsibility for international wrongful acts | 44 |
| Individual criminal responsibilities for the killing of Mr. Khashoggi | 47 |
| **PART III. INVESTIGATION INTO THE EXECUTION OF JAMAL KHASHOGGI** | 54 |
| The standards: an overview | 54 |
| Immunity, jurisdiction and access to the crime scene | 56 |
| Saudi implementation of its duty to investigate | 57 |
| Turkey's implementation of its duty to investigate | 60 |
| **PART IV. RESPONSIBILITY TO PROTECT AND THE DUTY TO WARN** | 65 |
| International standards | 65 |
| The responsibility to protect applied to the execution of Mr. Khashoggi | 72 |
| The responsibility to protect and to warn following the execution of Mr. Khashoggi | 75 |
| **PART V. PROSECUTION, REMEDIES AND REPARATION** | 77 |
| Legal challenges | 77 |

Steps taken to date ................................................................................................................ 79

Remedies and reparations ....................................................................................................... 82

**PART VI. INTERNATIONAL ACCOUNTABILITY** .................................................... 84

A follow-up criminal investigation of the execution of Mr. Khashoggi ........................................ 85

Universal jurisdiction ............................................................................................................. 86

Targeted and State sanctions ................................................................................................... 88

Corporate social accountability ............................................................................................... 90

Symbolic responses ................................................................................................................ 91

Support to Freedom of Expression in the Gulf region ................................................................ 91

Re-enforcing the capacities of the UN to respond to acts of violence against, and
killings of, journalists, human rights defenders and other activists ............................................. 92

**PART VII. RECOMMENDATIONS** ......................................................................... 95

# Executive summary

## State Responsibilities

1.  Mr. Khashoggi's killing constituted an extrajudicial killing for which the State of the Kingdom of Saudi Arabia is responsible. His attempted kidnapping would also constitute a violation under international human rights law. From the perspective of international human rights law, State responsibility is not a question of, for example, which of the State officials ordered Mr. Khashoggi's death; whether one or more ordered a kidnapping that was botched and then became an accidental killing; or whether the officers acted on their own initiative or ultra vires.

2.  The killing of Mr. Khashoggi further constituted a violation of the Vienna Convention on Consular Relations (thereafter VCCR) and of the prohibition against the extra-territorial use of force in time of peace (customary law and UN Charter). In killing a journalist, the State of Saudi Arabia also committed an act inconsistent with a core tenet of the United Nations, the protection of freedom of expression.  As such, it can be credibly argued that it used force extra-territorially in a manner "inconsistent with the Purposes of the United Nations."

3.  Further, the circumstances of the killing of Mr. Khashoggi may constitute an act of torture under the terms of the Convention Against Torture, ratified by Saudi Arabia. Finally, the killing of Mr. Khashoggi may also constitute to this date an enforced disappearance since the location of his remains has not been established.

## Individual liability

4.   The Special Rapporteur has determined that there is credible evidence, warranting further investigation of high-level Saudi Officials' individual liability, including the Crown Prince's.  She warns against a disproportionate emphasis on identifying who ordered the crime, pointing out that the search for justice and accountability is not singularly dependent on finding a smoking gun and the person holding it. The search is also, if not primarily, about identifying those who, in the context of the commission of a violation, have abused, or failed to fulfill, the responsibilities of their positions of authority.

## Duty to investigate and consular immunity

5.   The Special Rapporteur has found that both the investigations conducted by Saudi Arabia and Turkey failed to meet international standards regarding the investigation into unlawful deaths.

6.   Saudi officials were present in the Saudi consulate and residence in Istanbul from 6 to 15 October during which time they presumably investigated the killing. However, the Special Rapporteur was not provided with any information regarding the evidence they may have collected during this period. The Saudi Public Prosecution made public a few of their findings on 15 November but the statement was light on details, limiting itself to a few general allegations. Other statements regarding the actions and responsibilities of specific individuals were a welcomed step. However, the Special Rapporteur notes that some of the individuals allegedly referenced in these statements and the identity of 11 perpetrators currently on trial do not match. Further, the Saudi authorities have yet to disclose the whereabouts of the remains of Mr. Khashoggi.

7.   The Special Rapporteur found that under the terms of the VCCR, Saudi authorities were under no legal obligation to grant access to the Consular premises to the Turkish investigators. However, Saudi Arabia was under an international obligation to cooperate with the Turkish authorities in the investigation of the killing of Mr. Khashoggi. Such cooperation necessarily demanded that they gave access to the consulate to the Turkish authorities in a prompt and effective fashion and in good faith. Consular immunity was never intended to enable impunity.

8.     The Special Rapporteur found credible evidence pointing to the crime scenes having been thoroughly, even forensically, cleaned. These indicate that the Saudi investigation was not conducted in good faith, and that it may amount to obstructing justice.

9.     Turkish investigators, accompanied by Saudi investigators, only had access to the Consulate on the 15th October for 6 hours and to the Consul' residence on 17th October for around thirteen hours, where they also had to search the whole consular vehicle fleet. Their scientific and forensic inquiries were limited to "swabbing" and they were not allowed to drain a well located in the residence. The limitations imposed by Saudi Arabia on the Turkish investigation cannot be justified by the need to protect Consular operations.

10.    Turkish investigators decided not to search the Saudi Consulate without proper authorization from the Saudi authorities. The Special Rapporteur found that this was the appropriate way to proceed: creating an exception to the VCCR grounded inviolability of the Saudi Consular premises for the purpose of an investigation would have been unnecessary and disproportionate.

11.    She also found that Turkey's fear over an escalation of the situation and retribution meant that the consular residences or consular cars were also not searched without permission even though they are not protected by the VCCR.

12.    The Special Rapporteur regrets that it appears no international body or other State came forward with an offer to "mediate" between the two parties to negotiate prompt and effective access to the crime scene.  This could have been done to also help de-escalate the crisis, protect equally the VCCR and human rights, and address as well the fear of retaliation. Instead, it appears that other Member States pondered rather only their own national and strategic interests. The United Nations either considered it had no evident means of intervention or elected not to intervene. In retrospect, it is evident that the ultimate casualty of these considerations was justice and accountability for Jamal Khashoggi.

## Duty to protect and to warn

13.    On the basis of credible information at her disposal, the Special Rapporteur has concluded that there is insufficient evidence to suggest that either Turkey or the United States knew, or ought to have known, of a real and imminent or foreseeable threat to Mr. Khashoggi's life. There was credible evidence to suggest that, had Mr. Khashoggi returned to Saudi Arabia, or been lured there, he would have been detained, possibly disappeared, and harmed. These risks were not linked to his life or presence in his countries of residence, namely the US or Turkey.  She did not secure credible evidence that US authorities had intercepted the Saudi Crown Prince's communications or that such intercepts had been assessed before the time of the killing of Mr. Khashoggi.

14.    The killing of Mr. Khashoggi has highlighted the vulnerabilities of dissidents living abroad, and the risks they are facing of covert actions by the authorities of their countries of origin or non-State actors associated to them. The States of the countries where they have found residence or exile are under an obligation to respect their human rights, and protect them against violence by the States of the countries they have escaped from.  This obligation should entail, namely:

(a)     The duty to protect is triggered whenever Governments know or ought to know of a real and immediate threat or risk to someone's life;

(b)     Such an obligation to protect includes, but is not limited to, a duty to warn the individual of an imminent threat to their life

(c)     The obligation to protect, including the duty to warn, is imposed on all Governments agencies and institutions, and thus includes Intelligence Agencies

(d)     The obligation to protect applies regardless of the status of citizen or alien on the territories of the State.

(e)     The obligation to protect, including the duty to warn, demands that risks assessment take into account whether some individuals may be particularly at risk because of their identity or activities, such as journalists or human rights defenders.

(f)    The obligation to protect, including the duty to warn, may be triggered extra-territorially, whenever States exercise power or effective control over individual's enjoyment of the right to life.

## Duty to prosecute and reparations

15.    The Kingdom of Saudi Arabia has taken timid steps towards addressing its State responsibilities in terms of prosecution and reparation. But these stop short of what is required under international law. The accountability gap is all the more worrying given that it concerns a crime that has received an unprecedented level of attention and outcry internationally, including official public condemnation the world over.

16.    The on-going trial in Saudi Arabia of 11 suspects in the killing of Mr. Khashoggi, while an important step towards accountability, fails to meet procedural and substantive standards. The trial is held behind closed doors; the identity of those charged has not been released nor is the identity of those facing death penalty. At the time of writing, at least one of those identified as responsible for the planning and organizing of the execution of Mr. Khashoggi has not been charged.

17.    The Government of Saudi Arabia has invited representatives of Turkey and of the permanent members of the Security Council to attend at least some of the hearings.  However, the Special Rapporteur has been told that this trial observation was conditional upon agreement to not disclose its details. Trial observation under those conditions cannot provide credible validation of the proceedings or of the investigation itself. It is particularly concerning that, given the identity of the observers, the institution of the UN Security Council itself has been made complicit in what may well amount to a miscarriage of justice.

18.    In view of her concerns regarding the trial of the 11 suspects in Saudi Arabia, the Special Rapporteur calls for the suspension of the trial.

19.    To date the Saudi State has failed to offer public recognition of its responsibility for the killing of Mr. Khashoggi and it has failed to offer an apology to Mr. Khashoggi's family, friends and colleagues for his death and for the manner in which he was killed. The Special Rapporteur obtained information regarding a financial package offered to the children of Mr. Jamal Khashoggi but it is questionable whether such package amounts to compensation under international human rights law.

20.    The restructuring of the Intelligence Services announced by King Salman is insufficient. There has been no subsequent information elaborating on the impact of the restructuring (or any other measures) on the decision-making, training, and codes of ethics of the Security Agencies, to name a few issues of concern.  Instead, one would expect the Kingdom of Saudi Arabia to demonstrate non-repetition including by releasing all individuals imprisoned for the peaceful expression of their opinion and belief; investigating all allegations of torture and lethal use of force in formal and informal places of detention; investigating all allegations of enforced disappearances and making public the whereabouts of individuals disappeared. It should also undertake an in-depth assessment of the actors, institutions and circumstances that made it possible for the execution of Mr. Khashoggi to be carried forward and identify the reforms required to ensure non-repetition.

## Universal jurisdiction

21.    The Special Rapporteur believes that the killing of Mr Kashoggi constitutes an international crime over which States should claim universal jurisdiction. The killing of Mr. Khashoggi is a violation of a jus cogen norm. It violates the VCCR and the prohibition against the extraterritorial use of force in times of peace. The circumstances of the execution may amount to an act of torture under the Convention Against Torture. It is a continuing case of enforced disappearance since the remains of Mr. Khashoggi have not been located. It concerns a journalist in self-imposed exile. His execution has an enduring international impact.

## Accountability

22.     The Special Rapporteur is concerned that legal accountability for the execution of Mr. Khashoggi is being made difficult to obtain.  The trial underway in Saudi Arabia will not deliver credible accountability. Turkey has not initiated proceedings yet and hopes for credible accountability are weak in a country with such a track record of imprisonment of journalists. Jurisdictional challenges and the impossibility of conducting a trial in absentia mean that a trial in the US will face many challenges. The Special Rapporteur makes a number of proposals for how some of these issues may be addressed while warning that no one proposal on its own will deliver credible accountability.

23.     The Special Rapporteur emphasizes that the search for accountability and justice should include other means, including political, diplomatic, financial, symbolic. Actions to celebrate and recall the life of Jamal Khashoggi have an important part to play in ensuring public accountability for his execution.

## Introduction

*"But a yearning for freedom is deeply embedded within us, even if it is hidden and buried by oppression and fear; it emerges with the very first glimpse of emancipation from tyranny… Freedom emerged from within them, as freedom is part of human nature."[1]*

24.     By appointment, on 2 October 2018, Mr. Kashoggi entered the Consulate of the Kingdom of Saudi Arabia in Istanbul, to obtain papers he needed to pave the way for his marriage to his fiancée, Ms Hatice Cengiz.  She waited outside the Consulate for him to return, but brutally slain within the Consulate, he never would; the bitter reality of his murder made all the more poignant by the joyous purpose for which he entered the Consulate in the first place.

25.     The months following his disappearance, as it was thought to be initially, were characterized by intensive diplomatic and political action on the part of the two States involved and many others concerned.  Extensive media coverage also ensued.  However, despite requests from Special Procedures, non-Governmental organisations, scholars and some Member States for an international, UN-led investigation, by the end of 2018, there was no sign from the international system of an official demand for such an investigation nor any signal that an international criminal investigation, leading to criminal proceedings as appropriate, would be initiated.

26.     In January 2019, the Special Rapporteur on extrajudicial, summary or arbitrary executions announced that she would initiate a human rights inquiry, under the terms of her Mandate[2], into the unlawful death of Mr. Khashoggi, and report her findings to the 41st session of the UN Human Rights Council (HRC). This report highlights the findings of her inquiry.

27.     In keeping with the practice of an annual report to the HRC, its focus is on the complex legal and policy questions raised by what in this report is found to be the extrajudicial execution of Mr. Khashoggi.

28.     The legal questions are triggered by the interplay, including possible conflicts, between a number of treaties and bodies of law, including the peremptory and customary norms regarding the right to life, international criminal law, the UN Charter and international customary law prohibiting the extraterritorial use of force in peace time, and the Vienna Convention for Consular Relations (thereafter VCCR).

29.     Mr. Khashoggi's execution is emblematic of a global pattern of targeted killing of, and threats against, journalists and media workers that is regularly denounced by States, UN agencies, Special Procedures, and by numerous international and national human rights organisations.  Responding to the pattern of impunity for the majority of these crimes, the United Nations General Assembly proclaimed 2 November to be the 'International Day to End Impunity for Crimes against Journalists'. The date was chosen in commemoration of the assassination of two French journalists in Mali on 2 November 2013. Resolution A/RES/68/163 also urges Member States to implement definitive measures to counter this prevailing culture of impunity. It calls on Member States to do their utmost to prevent violence against journalists and media workers to ensure accountability, bring to justice perpetrators of crimes against journalists and media workers, and ensure that victims have access to appropriate remedies. It further calls upon States to promote a safe and enabling environment for journalists to perform their work independently and without undue interference.

30.     The execution of Mr. Khashoggi is also emblematic of another pattern which, albeit less frequent than the killing of journalists, is no less serious. That is the pattern of extraterritorial threat or use of force, outside an armed conflict situation, by one State against people located on the territory of another State, resulting in human rights violations, including extrajudicial killing, kidnapping and rendition that may result in torture, imprisonment,

---

[1]  https://hrf.org/jamal-khashoggis-writings-from-the-oslo-freedom-forum/.

[2]  https://www.ohchr.org/EN/Issues/Executions/Pages/Inquiry.aspx.

disappearance and death.  Other resulting violations may also include violations of freedom of expression or the right to privacy.  Fleeing abroad in search of safety has become less and less a reliable form of protection.

31.     Thus the killing of Mr. Khashoggi sits at the juncture of global patterns and concerns that not only figure large amongst the priorities of the international community and the United Nations but which have also proven challenging to address effectively.  This inquiry into his unlawful killing also seeks to shed light on the critical normative, legal and policy issues that Member States, the United Nations, civil society and corporate actors must consider in order to strengthen preventative and protective mechanisms.

32.     Ultimately however, it is Mr. Khashoggi who is at the center of this report, just as he was the heart and soul of the inquiry.  The duty to establish the facts of his gruesome killing was the inquiry's primary trigger.  The Special Rapporteur hopes that her findings as presented here will be compelling enough to prompt the Human Rights Council and Member States to respond accordingly, taking action to ensure that such executions become a memory of the distant past.

# I.   Methodology of this Report

33.     This human rights inquiry into the killing of Mr. Jamal Khashoggi was initiated in January 2019. An initial visit to Turkey (Istanbul and Ankara) was undertaken late January followed by visits to Washington, Ottawa, Paris, London and Berlin. An additional visit to Istanbul was made and meetings held in New York City, Geneva and Brussels. The Special Rapporteur requested a country visit to Saudi Arabia, but no response to the request was received.  The Saudi authorities promised an official response by May 30 to her joint communication with specific questions in relation to the killing of Mr. Khashoggi.

34.     The Special Rapporteur wishes to thank Carolyn Horn and Bach Avezdjanov, senior legal adviser and legal adviser respectively for the inquiry; as well as Baroness Helena Kennedy, Queen's Counsel; Paul Johnston, major crimes investigation consultant; Duarte Nuno Vieira, Full Professor of Forensic Medicine and Forensic Sciences and of Ethics and Medical Law at the University of Coimbra; Eye Witness; the International Bar Association Human Rights Institute; and Walden Macht & Haran LLP for their invaluable assistance, expertise and briefings.

35.     The Special Rapporteur consulted with colleagues and friends of Mr. Khashoggi and with a broad range of experts and other stakeholders, including officials of various Governments.  She wishes to thank all those who provided information and shared their opinions. She is very grateful for the frank exchange of views with State officials.  She is particularly grateful to the Government of Turkey and specifically to the  Chief Prosecutor of Istanbul for the access provided to some of the crucial information about Mr. Khashoggi's murder.

36.     In order to assess which of the allegations related to the killing of Jamal Khashoggi were credible, and to appraise them legally, the Special Rapporteur analysed information from a variety of sources including official Turkish, Saudi, US and other statements, written forensic and police reports, flight details, CCTV recordings, audio recordings, and interviews of officials, witnesses and experts. The majority of the interviews have been referenced in the report in general terms because many of those interviewed wished to remain anonymous. Media reports were also reviewed.  However, unless otherwise indicated, these were used only to corroborate information gathered independently by the inquiry.

37.     This human rights inquiry into the killing of Mr. Khashoggi raised many challenges. By the time the inquiry was initiated, much had already been reported about the killing and the likely responsibilities of various individuals.  The risks of confirmation bias (the tendency to bolster a hypothesis by seeking evidence consistent with it while disregarding inconsistent evidence) were particularly high.

38.     A second and related challenge was that most of the information related to the killing comes in the form of Intelligence material or leaks from Intelligence sources – all of which by their nature are difficult to authenticate and triangulate.  Throughout the inquiry, The

Special Rapporteur found a worrying tendency to value Intelligence information and leaks of it, over facts and evidence.

39.    Intelligence gatherers generally operate in anticipation of an event that may, or may never, take place and in pursuit of information, rather than evidence, that may provide a government, institution, or corporation with an advantage.  Intelligence gathering is an open-ended process, and there is rarely a definitive point at which "enough" intelligence has been harvested.  Think of a conveyer belt moving information from often disparate sources constantly in front of intelligence officers.  At some point, there comes a time when an intelligence service or operative simply has to make a stab at assimilating what all this means.  There is rarely space for scrutiny from anyone outside the intelligence system.  Outsiders may be readily manipulated given they are unlikely to access the raw data or its sources.  All these considerations figured large in the Special Rapporteur inquiry and in her assessment of the information to which she had access.

40.    The Special Rapporteur was provided access to recordings of conversations inside the Saudi Consulate – from 28 September to 2 October, 2019 and pre-dating the killing of Mr. Kashoggi.  She also had access to a recording of the killing on the afternoon of October 2 of Mr. Kashoggi inside the Consulate itself.

41.    Her review of these recordings has a number of limitations:

    (a)    Recordings of only seven different conversations over a two-day period were made available to the inquiry. Combined these amounted to 45 minutes of tape, when, according to Turkish Intelligence, they had access to at least seven hours of recordings. The remaining six hours and 15 minutes may or may not be relevant to the inquiry, but without doubt there remains much more recorded information than that made available to the Special Rapporteur.

    (b)    The Special Rapporteur was not allowed to obtain clones of the recordings so she could not authenticate any of the recordings. Among other aspects, such authentication would have involved examination of the recordings' metadata such as when, how the data were created, the time and date of creation and the source and the process used to create it.

    (c)    The Special Rapporteur was accompanied by her own Arabic-English interpreter.  However, she was not permitted to retain any transcript of the recordings not even what was purported to be an accurate English transcript.  Her delegation was also asked not to take notes while listening to the recordings.

    (d)    Raw intelligence materials do not "divulge" their full stories immediately, as those close to Turkey's investigation advised.  Background noises have to be interpreted; conversations thought to be insignificant initially can become meaningful once more information comes to light. In this instance, some of the available recordings were less clear acoustically than others, making identification of those speaking difficult and making interpretation of what was happening at any given time difficult too. For instance, on the basis of recordings, the Special Rapporteur could not reach firm conclusions about what they were told was the sound of a "saw" in operation.  The Turkish authorities undoubtedly have more information and intelligence about events in the Saudi Consulate than they were willing or able to share with the inquiry.

## Standards of credibility

42.    To avoid privileging allegations or information shaped to a particular narrative, the Special Rapporteur sought to consider equally all the facts that were brought to her attention and subject these to a similar standard of validation.

43.    To determine the credibility of information she received, the Special Rapporteur sought, through cross-checking, to pay careful regard to the relevance, weight and reliability of sources as well as to their relationship to the body of information, as a whole or evaluated it by inductive reasoning.  An allegation was deemed to be credible "if there was a reasonable

basis to believe, at the time of the inquiry, that the underlying act or event occurred. This standard gives rise to a legal responsibility for the State or other actors to respond…"[3]

44.     To evaluate the recordings, in the absence of copies or clones, she asked for the expert opinion of others who had access to the recordings, including representatives of foreign governments. Their opinions were given to her informally. She also, to the extent possible, triangulated Intelligence (information and analysis) with other facts, such as CCTV footage, interviews, contextual information, historical patterns, etc.

45.     This report lists allegations for which no independently verified evidence could be identified, including allegations made in media articles reporting on information supposedly leaked by US Intelligence officials, in the first place, from the CIA.  Such evidence is not considered to be a sufficient basis on which to extract definite conclusions. This does not mean that such allegations are incorrect. It means that to date the Special Rapporteur has not been able to substantiate them.

46.     The Special Rapporteur reviewed four potentially credible hypotheses related to the unlawful death of Mr. Khashoggi: 1) premeditated killing: 2) rendition with premeditated killing if rendition proved unsuccessful; 3) the result of an accident in the course of rendition; 4) a decision to kill on site by members of the Saudi team.

47.     As is commonly the case in criminal investigations, the Special Rapporteur relied on facts and logical inference to draw her conclusions. It is also accepted in law that circumstantial evidence when taken together can offer compelling evidence of responsibilities. Conduct preceding specific incidents can also give rise to justifiable inferences as can evidence as to the nature of relationships between relevant actors. For instance, knowledge of the decision-making approach and hierarchy within a Government can allow reasonable inferences to be drawn as to who had knowledge of a well organised, resourced and carefully conducted mission by state personnel.

**Overlapping legal frameworks**

48.     The inquiry into the killing of Jamal Khashoggi sought to select and evaluate facts against international human rights law. Such an approach, however, was not sufficient. For instance, the killing raises questions of jurisdiction over its adjudication which go to the heart of accountability. Similarly, the fact that the killing took place in a consulate, in violation of the Vienna Convention on Diplomatic and Consular Relations (VCDCR), is central to the analysis of the facts and to any assessment of responsibilities. This inquiry has thus recognized and is grounded in the recognition of the complementarity of international criminal and human rights law. In addition, it analysed the facts against the VCDCR and the UN Charter provisions on the extraterritorial use of force.

49.     This inquiry does not amount to a criminal investigation whose findings could be presented in a court of law. However, it could not ignore questions related to individual liability given the facts of the case, the focus on accountability and the effort to address impunity.  Fact finding into killings of human rights defenders or journalists cannot confine itself to identifying State responsibilities alone. To the extent possible, such fact finding should establish the criminal responsibility of the perpetrators of the crime and of the crime's intellectual authors.  Where the Special Rapporteur found there was credible and compelling evidence regarding the responsibilities of specific individuals, including high-level officials, she called for additional criminal investigation or prosecution.

**Naming alleged perpetrators**

50.     To meet these accountability objectives, the Special Rapporteur also had to determine whether or not to disclose the names of those who are suspected of involvement in the execution of Mr. Khashoggi. The decision not to disclose names usually stems from the necessity to avoid prejudicing the fairness of future trials and to prevent reprisals. In the case of the killing of Mr. Khashoggi, the names of (at least) 19 persons have been disclosed by

---

[3]  Report of the Secretary-General's Panel of Experts on Accountability in Sri Lanka, 2011, https://www.un.org/News/dh/infocus/Sri_Lanka/POE_Report_Full.pdf.

Turkish documents as well as the US and Canadian Sanction Lists. Saudi Arabia has referred to a number of individuals by their official positions without giving their names.

51.     After five months of research, the Special Rapporteur has opted to name individuals. One alternative would have been to refer to their official positions but such an approach would have generated speculation, guess work and rumors which in turn will be highly detrimental to transparency and accountability.  She has also opted identify by their names Saudi, Turkish and other States officials who made public statements in relation to the execution of Mr. Khashoggi.

## II.   Mr. Jamal Khashoggi[4]

52.     The circumstances of his death place Mr. Khashoggi at the center of this report.  Who he was and how he lived his life are also central.  So, while respecting his privacy and that of his loved ones, the Special Rapporteur wishes to present to an extent relevant to this inquiry an account of the man he was as relayed to her  through interviews with multiple sources.

### A personal man

53.     Killed just a few days before his 60th birthday, to those who knew him personally, Mr. Khashoggi was a complex man.  His life's journey saw him pass through many different phases.  His was a compartmentalized life, perhaps necessarily so, and no one claims to have known him in all of his life's dimensions. In person, Mr. Kashoggi was reportedly an unassuming, polite and intellectually curious man; even in disagreement, he was kind.

54.     As of late 2017, his life in exile was based in Washington but far from easy.  With little income, little personal security for the future and little status in his professional circle, Mr. Khashoggi had been lonely and unhappy.

55.     His private life, however, was just that - private.  He was a father who, when with friends, spoke warmly of his children. However, his decision to remarry was not widely known beyond his immediate family. To those friends who did know, it was a sign that he was wanting to build, in exile, a new, settled life.  His purchase with his fiancée, of a house in Turkey just before his killing, conveys his confidence in and commitment to that future.

### A professional man

56.     He was a high-profile, well respected, and active journalist, editor, media manager and intellectual; a man excited about his work and by the public response to it.

57.     One of the region's most important journalistic voices, he considered journalism from within, about and for the region to be vital.  In his final article, published posthumously, he called for "a platform for Arab voices … the creation of an independent international forum, isolated from the influence of nationalist governments spreading hate through propaganda…"[5] To other journalists reporting on Saudi Arabia, because of his insight and openness he was the man to see.

58.     He had a passionate vision for the potential of Arab press freedom, investing considerable time and resources to expand possibilities for it, including through establishment of a television station in Bahrain, which was to be shut down by the Government on its first day of public transmission.

59.     In recent times, his was also an active on-line presence (having 2 million Twitter followers[6]) while his interest in media projects was wide-ranging: from work to enhance reporting on state media-monitoring to countering State propaganda on-line, to means of expanding democracy to promotion of freedom of expression and address hate speech.

---

[4]  This section is largely based on interviews of Mr. Khashoggi friends and colleagues.

[5]  https://www.washingtonpost.com/opinions/global-opinions/jamal-khashoggi-what-the-arab-world-needs-most-is-free-expression/2018/10/17/adfc8c44-d21d-11e8-8c22-fa2ef74bd6d6_story.html?utm_term=.3ab34ebc6dfc.

[6]  https://www.cbc.ca/news/theinvestigators/khashoggi-journalism-saudi-arabia-1.4870528.

**A man of conscience more than of politics**

60.     His work as a journalist was long standing but his alienation from KSA something far more recent.  Mr. Khashoggi was not seen by dissidents to be naturally "one of them"; being someone who had moved in circles of influence they did not share or necessarily trust.

61.     Described by many as a "traditionalist", his earlier patterns of reporting and some of his ideas and associations (e.g. his early-career reportage on al-Qaeda[7]; his association with the Qatar Emir's media adviser; his 2017 CNN Arabic article on the Muslim Brotherhood) meant he was at times very frustrating to the many who actively campaign for political freedoms in Saudi Arabia, to such an extent that some even wondered if he might be an "informant".

62.     Indeed, he was well connected with establishment figures. He knew the President of Turkey personally and, for many years, had been close to the Saudi administration and to the Saudi Royal Court.

63.     His political journey, as widely characterized, was an evolution over time. From his earlier career sympathy for moderate Islamist movements, he had moved by later life to a far more liberal view point.  Events - specifically the Arab spring - changed him.  Over the years, falling in and out of favor with the Saudi authorities, Mr. Khashoggi's analysis eventually took him to a point where he believed he could no longer be silent, as he explained in his first piece for the Washington Post in September 2017, even though he never expressed publicly opposition to the house of Saud, nor urged change of the country's administration nor called for replacement of MBS[8].

64.     Nevertheless, his later public stance on the country came at great personal cost, long before he paid the ultimate price. His column in the Saudi newspaper al-Hayat had been cancelled under political pressure. In 2016 authorities had banned him from writing, appearing on television, and attending conferences; this as a result of remarks he made that were interpreted as criticizing the newly elected President of the United States, according to multiple media sources. His exile from the Kingdom of Saudi Arabia was self-imposed but he believed he had no other choice - no choice but to leave.

65.     In doing so, he lost his wife, who was forced to divorce him, and his children, some of whom endured a travel ban, property, possessions, income and status.  Many in his family and friendship network turned their backs on him.[9]

66.     In the months leading up to his death, Mr. Kashoggi spoke often of his anxiety about the ongoing consequences of his speaking out and of their possible escalation, citing examples of intimidation against and abuse of others by Saudi authorities, both within Saudi Arabia and beyond (citing, for example, the scholars arrested in the Kingdom and the dissidents pressured into talking favorably of the Kingdom under threat of imprisonment if they did not.)

67.     Despite their assurances and ongoing effort, the Saudi authorities could not induce Mr. Khashoggi to return to Saudi Arabia.  He was certain that he could not do so safely; the campaign against him in the Saudi media being but one reason why.  However, he appears to have been very confident that he was safe in Turkey – noting that, in his view, Turkey not only enjoyed good security, but that Saudi Arabia shared a good relationship with Turkey – one that it would not want to hurt. To many around him, and likely to Mr. Khashoggi himself, his own killing, particularly outside of Saudi Arabia, was just unthinkable.

---

[7]   https://www.washingtonpost.com/world/from-travels-with-bin-laden-to-sparring-with-princes-jamal-khashoggis-provocative-journey/2018/10/07/c1290f28-ca3d-11e8-ad0a-0e01efba3cc1_story.html?utm_term=.5a762859f7e7.

[8]   https://www.economist.com/open-future/2018/07/26/how-free-expression-is-suppressed-in-saudi-arabia.

[9]   https://www.washingtonpost.com/world/from-travels-with-bin-laden-to-sparring-with-princes-jamal-khashoggis-provocative-journey/2018/10/07/c1290f28-ca3d-11e8-ad0a-0e01efba3cc1_story.html?utm_term=.320832897f67.

# PART I – The timeline of the execution of Jamal Khashoggi

## I.   Allegations of Surveillance of Jamal Khashoggi and Others by Saudi Arabia

68.     On 1 October 2018, Citizen Lab, a Canadian academic research lab, reported that the cellphone of Saudi political activist Omar Abdulaziz had been infected with Pegasus spyware which is produced and sold by NSO Group.[10]  Citizen Lab attributed the infiltration to a Pegasus operator linked to Saudi Arabia.  Pegasus had allowed the Saudi-linked operator to access Mr. Abdulaziz's phone contacts, photos, text messages, online chat logs, emails, and other personal files. The operator also had the ability to use the phone's microphone and camera to secretly view and eavesdrop on Mr. Abdulaziz.

69.     Mr. Abdulaziz has lived in Montreal, Canada, since 2009. At the time his phone was infected, Mr. Abdulaziz was in frequent contact with Mr. Khashoggi. The two discussed human rights issues in Saudi Arabia and projects to strengthen human rights in their homeland. In some messages, Mr. Khashoggi also criticized the policies of the Crown Prince Mohammed bin Salman (MBS). In one message, Mr. Khashoggi said "Arrests are unjustified and do not serve [MBS] (logic says), but tyranny has no logic, but he loves force, oppression and needs to show them off. He is like a beast 'pac man' - the more victims he eats, the more he wants. I will not be surprised that the oppression will reach even those who are cheering him, then others and others and so on. God knows."[11]

70.     In December 2018, Mr. Abdulaziz filed a lawsuit in Israel against the NSO Group alleging that the company helped Saudi authorities to infiltrate his phone and spy on Mr. Khashoggi.[12]  The lawsuit claims that in the months before the killing, the Saudi authorities had access to Mr. Khashoggi's communications with Mr. Abdulaziz by infecting Mr. Abdulaziz's phone with Pegasus spyware. NSO Group has denied the allegations. Mr. Abdulaziz has also filed lawsuits against Twitter and the American consultancy firm McKinsey & Company.[13]

71.     Mr. Abdulaziz is not the first Saudi activist targeted. In August 2018, Amnesty International reported that Yahya Assiri, the director of a human rights advocacy organization ALQST, as well as an Amnesty researcher, were also targeted with *Pegasus*.[14]

## II.   Before the Murder

72.     Jamal Khashoggi went into a self-imposed exile in September 2017, leaving Saudi Arabia for the United States. In May 2018, Mr. Turan Kislakci, a friend and journalist associated with the Turkish-Arab Media Association,  introduced Mr. Khashoggi to Hatice Cengiz, who wanted to interview him.[15]  In July 2018, Mr. Khashoggi travelled to Istanbul where he again saw Ms. Cengiz at a public musical event.  Soon after Mr. Khashoggi told Mr. Kislakci that he wanted to marry Ms. Cengiz. He asked Mr. Kislakci to help him obtain the approval of Ms. Cengiz's father for the marriage.

73.     In August 2018, Ms. Cengiz told Mr. Khashoggi that to be married in Turkey, he needed to obtain a certificate of marriage eligibility from the Saudi authorities. According to two sources, in August-September, Mr. Khashoggi contacted the Saudi Embassy in Washington to obtain the certificate, and was told to obtain the document from the Saudi embassy in Turkey.[16]

---

[10]  https://citizenlab.ca/2018/10/the-kingdom-came-to-canada-how-saudi-linked-digital-espionage-reached-canadian-soil/ .

[11]  https://www.cnn.com/2018/12/02/middleeast/jamal-khashoggi-whatsapp-messages-intl/index.html.

[12]  https://www.nytimes.com/2018/12/02/world/middleeast/saudi-khashoggi-spyware-israel.html.

[13]  Interview with OA.

[14]  https://www.amnesty.org/en/latest/news/2018/08/staff-targeted-with-malicious-spyware/.

[15]  Interview with Witness F.

[16]  Interviews with OA and KG.

74.     On 8-9 September, 2018, Mr. Khashoggi met with Ms. Cengiz's father who approved the marriage on the conditions that the marriage was a civil one, rather than just religious, and that an apartment be purchased by Mr. Khashoggi in Istanbul that Ms. Cengiz would co-own. Mr. Khashoggi agreed.

75.     In September, while in Istanbul, Mr. Khashoggi was hospitalized.  Ms. Cengiz accompanied him.[17] Worried that something may go wrong, she asked Mr. Khashoggi for details of his emergency contacts. He told her that in an emergency she should contact Dr. Yasin Aktai, Advisor to the President of the AK Party, whom he considered a close friend. After spending three to four hours at the hospital, Mr. Khashoggi recovered sufficiently to participate in a conference that evening. He then returned to London.

76.     Turkey's National Intelligence Organization (Turkish Intelligence) reported that on 27 September 2018, a Saudi Security Screening Team swept the Saudi Consulate in Istanbul for bugs and other surveillance equipment.[18]

## III.    Planning and Preparations

77.     On the morning of 28 September, Mr. Khashoggi and Ms. Cengiz went to a marriage bureau in Istanbul to clarify whether or not there was a way for them to get married without a Saudi document stating that Mr. Khashoggi was unmarried.[19] However, at the bureau they were told that the document was absolutely necessary. Unannounced, Mr. Khashoggi and Ms. Cengiz went to the Saudi Consulate. Mr. Khashoggi left his phones with his fiancée because he knew that, as per Consulate procedure, he would need to relinquish his phones to consular security and he did not feel comfortable leaving his devices with Saudi officials.[20] He entered the Consulate at 11:50.[21]  He spent around 45 minutes inside and was treated very well. Ms. Hatice recalled that Mr. Khashoggi "left the consulate very happy. He felt relieved and did not hesitate going there again."[22]  Consular officials he spoke to told him that he would need to return on 2 October 2018 to obtain the marriage document. Mr. Khashoggi flew back to London on the afternoon of 28 September at 14:40.[23]

78.     According to Turkish Intelligence, even before Mr. Khashoggi's plane took off from Istanbul at 14:40, information that he had been at the Consulate, and would return on October 2, had been relayed to Riyadh. The Special Rapporteur listened to two phone calls made at 14:22 and 14:27 on 28 September. In the first call, a security attaché stationed at the Consulate (SA), spoke to Mr. Maher Abdulaziz Mutreb. Mr. Mutreb said he had informed "the communications office[24] about the information Hatim[25] gave me." SA responded, "I conveyed the videos and images. Can you make sure that it's closed?"  In the second conversation, SA said he "spoke to the communications office.  He didn't give me the full information."  Mr. Mutreb asked if Mr. Khashoggi would be returning to the Consulate on October 2. SA responded, "Yes, we were all shocked. We just spoke. I said how are you? There isn't anything official but it's known that he is one of the people sought. [26] However,

---

[17]  Interview with Hatice Cengiz.

[18]  Interview with Chief of Turkish Intelligence.

[19]  Al Jazeera Interview with Hatice Cengiz https://www.youtube.com/watch?v=snu-0lGABUI&t=1538s.

[20]  Special Rapporteur's Interview with Ms. Cengiz .

[21]  Documents from Turkish Intelligence.

[22]  Al Jazeera Interview with Hatice Cengiz – 22:11 -22:40 https://www.youtube.com/watch?v=snu-0lGABUI&t=1538s.

[23]  Interview.

[24]  The "communication office" may refer to the department directed by Saud al-Qahtani, a close advisor to Crown Prince Mohammed bin Salman, who earned the sobriquets "Mr. Hashtag" and "Lord of the Flies" for managing Saudi Arabia's image online as well as attacking dissenters and anyone else questioning the Crown Prince's policies.

[25]  The individual named "Hatim" has not been identified.

[26]  On 21 October 2018, Reuters reported that an anonymous Saudi official presented its journalist with internal Saudi intelligence documents which appeared to describe an initiative to bring dissidents back to Saudi Arabia, including Mr. Khashoggi  www.reuters.com/article/saudi-khashoggi-

we did not receive any letter from our service regarding whether there is any problem or not on him."

79.     Later that same day, at 19:08, Mr. Mohammed Alotaibi, Saudi Arabia's Consul General in Istanbul, spoke to an individual (AA).[27]  It is not clear that all of this conversation was captured on the tape made available to the Special Rapporteur.  However, AA was to be heard saying that the "head of state security called me and they have an assignment. They are asking for anyone from your delegation for a special issue. They are asking for someone who is in your protocol. He said that they need a person from your protocol for a special and a top secret mission. He can even get permission if required." AA asked "Is this man trustworthy?" He continued, "They will make arrangements. Let him buy a ticket, I will tell other things. They will arrange them because it is a holiday."  In addition, he stressed the urgency of the mission by noting that "there is no time for correspondence after because it will drag on." He stated that "If the assignment is security related, we have Asyeri."[28]  The Consul General replies "Yes, the assignment is security related." AA noted that "He is saying that the mission is a duty. He is asking for him for just four-five days.  They will arrange everything including accommodation.  Send me his number. I will send it to them an hour later. They will get in touch."

80.     At 20:04, Consul General Alotaibi then spoke to AMA,[29] a member of the Consular staff.  AMA asked "*Is there anything?*"  Mr. Alotaibi replied "*Yes, there is an urgent training in Riyadh. They called me from Riyadh. They told me they asked for an official who worked on protocol. But the issue is top secret. Nobody should know at all.  Even none of your friends will be informed.*"  He told AMA that "*The best is to buy a ticket for yourself and family.*" He then repeated that there "will be a training but the issue is top secret. Nobody should know at all, it is almost five days." He said that "they" had asked for a "reliable and nationalist" consular official. The Consul General explained that security staff of the (Saudi) Ambassador had called him and the Consul General had told the security officer, "*Look, this man has a wife and children.  He doesn't want to leave them.  I'll ask and see.  It seems like there is no problem with the reservation tomorrow.*"  Consul Alotaibi then told AMA that he would send his name to the Ambassador, who then would pass it to "Yasin's friends"[30] and "*then he will coordinate with you. You will tell them what time you'll arrive. They must have arranged where you will accommodate. Everything for sure.*" AMA asked, "*Isn't anything there?*" The Consult General replied that "*No, there is the issue. However, the issue is very important and developed rapidly. I guess they suggested the consul. However, those who are stationed in the Ministry, I mean. There is no need, maybe.*"  The two men then discussed various flight options departing from Istanbul to Riyadh. AMA asked if the training was tomorrow, and the Consul General said, "*Yes, they say so.*"  They discussed purchasing a flight departing at 01:00 the night of the call, but AMA said that he could not make it. They agreed on a flight departing Istanbul at 20:00 or 21:00 on September 29.

81.     On 29 September 2018, two security attachés from the Istanbul Consulate, YK and AAA, departed for Riyadh at 15:15.  Meanwhile, the Saudi officials which according to Turkish Intelligence had allegedly inspected the Consulate for bugs on September 27 departed on a separate flight at 17:15.

82.     At 16:30 on 1 October 2018, the two security attachés returned to Istanbul on commercial flight number SF263. They were accompanied by three Saudi men who were identified eventually as members of the fifteen-member team accused of the killing of Mr. Khashoggi:

> **(i)**     Naif Hasan Alarifi
>
> **(ii)**    Mohammed Saad Alzahrani

---

official/amid-scepticism-saudi-official-provides-another-version-of-khashoggi-death-idINKCN1MV053.

[27]  The Special Rapporteur has been unable to identify AA's official position. He has not been charged or sanctioned in Saudi Arabia, or elsewhere, nor listed in any sanctions.

[28]  The Special Rapporteur has not identified this individual.

[29]  There does not appear to be a record of AMA going to Riyadh.

[30]  The Special Rapporteur has not been able to determine the identity of Yasin or his friends.

### (iii)    Mansour Othman Abahussain

The three officials checked into the Wyndham Hotel at 17:30.  At 19:00, they went to the Consulate and remained there for several hours, returning to their hotel at 22:40. A few hours earlier, at 17:30, consular attaché ASA drove to the Belgrade Forest located some twenty kilometers away from Istanbul.

83.    The same day, at 19:20, AMA spoke to Mr. Alotaibi and an employee of a tourism company about hotel options for Saudis who were planning to come to Istanbul. They discussed the proximity of several hotels with sea views to the Consulate, and requested three suites and seven rooms for three days.

84.    On October 1, a Saudi official[31] contacted a Saudi national, MAA, also known as "Ghozan," who owned a farmhouse in Yalova; a city on the coast of the Sea of Marmara. He asked Ghozan how far the house was from Istanbul, and Ghozan responded "*The bridge has been opened.  It takes one hour and fifteen minutes to get there via highway.  It takes 45 minutes from the airport.*"  He asked "*Is there anyone there*?"  Gozan replied: "*No, there is nobody.  Just a caretaker.*"  He responded with, "*Very nice.*"

85.    On October 1, at 21:48, AA, SA and another unidentified individual spoke. The Special Rapporteur could not identify who said what. One man said that "*A commission is coming from Saudi Arabia tomorrow; they have something to do in the Consulate. They will have something to do on my floor in the office.*"  "*Ok, so on the first floor?[32]*" "*No, next to my office.*"  "*Their work inside will take two or three days and they do not have any staff member who will take the responsibility of the office upstairs.*"  "*All right I will be at the Consulate at 8:00.*"  "*The name of the man who will come is Mr. Maha, and the commission is a Saudi commission; they will enter with the pass of the head of the commission.*"

86.    In the early hours of 2 October, at 03:30, nine additional Saudi officials arrived in Istanbul on a private plane (HZ-SK2) operated by Sky Prime Aviation, a jet charter company based in Riyadh. According to official documentation, the flight plan for plane HZ-SK2 was filed at 19:30 UTC.[33] However, at 20:19 UTC it was cancelled, and re-filed at 20:23 UTC with a diplomatic clearance.[34]  The passengers were listed as:

   (i)    Faad Shabib Albalawi

   (ii)    Thaar Ghaleb Alharbi

   (iii)    Mustafa Mohammed Almadani

   (iv)    Badr Lafi Alotaibi

   (v)    Turki Musharraf Alshehri

   (vi)    Waleed Abdullah Alshehri

   (vii)    Saif Saad Alqahtani

   (viii)    Maher Abdulaziz M Mutreb

   (ix)    Dr. Salah Mohammed Tubaigy

This group of nine men checked into the Movenpick Hotel in Istanbul at 04:50.

87.    The Turkish authorities communicated to the Special Rapporteur that "*our authorities do not have any x-ray information about the belongings of the Saudi team*.[35]"

---

[31]  https://af.reuters.com/article/worldNews/idAFKCN1NV0SB.

[32]  The Saudi Consulate in Istanbul has five floors, labeled -3, -2, -1, 0, 1, and 2. The first floor refers to the floor above floor 0 (the ground floor).

[33]  Flights records from the European Organization for the Safety of Air Navigation.

[34]  Diplomatic clearance must be obtained for aircrafts used in military, police, customs and other state services to cross national borders. https://www.eurocontrol.int/publications/eurocontrol-specifications-harmonized-rules-euroat.

[35]  Such an assertion is contradicted by Turkish journalists in their book, "*Diplomatic Atrocity: The Dark Secrets of the Khashoggi Murder*."

A/HRC/41/CRP.1

Table A: The 15-Man Saudi Team[36]

| Name | Government Position | Arrival Date |
| --- | --- | --- |
| Mansour Othman Abuhussain | Entered Turkey on a diplomatic passport | October 1 |
| | Major General or Intelligence Officer | |
| | Worked in the Office of the Crown Prince | |
| Naif Hasan Alarifi | First Lieutenant | October 1 |
| | External Intelligence | |
| | Worked in the Office of the Crown Prince | |
| Mohamed Saad Alzahrani | Intelligence Officer | October 1 |
| Khalid Aedh Alotaibi | Royal Guard | October 2 |
| | Seen in the Presence of the Crown Prince during his 2017 visit to the USA | |
| Abdulaziz Mohammed Alhawsawi | Member of the Crown Prince's Security Team | October 2 |
| Meshal Saad Albostani | First Lieutenant in the Saudi Air Force | October 2 |
| Maher Abdulaziz Mutreb | Diplomatic passport | October 2 |
| | Worked in the Saudi Embassy in London | |
| | Intelligence Officer | |
| | Worked with Saud Alqahtani, the Crown Prince's advisor | |
| Waleed Abdullah Alshehri | Royal Guard | October 2 |
| | Promoted to the rank of major by the Crown Prince | |
| Fahad Shabib Albalawi | Royal Guard | October 2 |
| Badr Lafi Alotaibi | Major, External Intelligence | October 2 |
| | Possibly knew Mr. Khashoggi from the time when Mr. Khashoggi advised the Head of External Intelligence | |
| Dr. Salah Mohammed Tubaigy | Forensic doctor with the Ministry of Interior | October 2 |
| | Professor in the Department of Criminal Evidence at Naif Arab University | |
| Mustafa Mohammed Almadani | Brigadier General | October 2 |
| | High Ranking Intelligence Officer employed at the Royal Palace | |

---

[36] The Saudi authorities have not publicized the official ranks of the fifteen officials sent to Istanbul. The information in this table has been collected from the Turkish Intelligence, journalistic and open sources, and interviews.

| Name | Government Position | Arrival Date |
|---|---|---|
| Thaar Ghaleb Alharbi | Promoted from major to lieutenant for his courage during an attack on the Crown Prince's Palace | October 2 |
| Saif Saad Alqahtani | Worked as a training specialist in the Saudi Air Force | October 2 |
|  | Worked in the Office of the Crown Prince |  |
| Turki Musharraf Alshehri | Intelligence Officer | October 2 |

88.     According to witness testimonies obtained by the Chief Public Prosecutor in Istanbul[37], the Consul General ordered non-Saudi staff at the Consulate to either not report to work on 2 October or to leave the Consulate at noon. Other witnesses recalled that they were told to remain in their offices and not to leave the Consulate because of a planned arrival of an investigator or a diplomatic meeting. Similarly, the staff at the Consul General's Residence were told not to enter or to leave the Residence because an engineer was supposedly expected to make repairs.

## IV.    The Disappearance and Murder of Jamal Khashoggi

89.     Ms. Cengiz recalled that on the morning of 2 October, Mr. Khashoggi called the Consulate to tell them that he would be going there. A consular official told him that they would call him back. Forty minutes later someone from the Consulate called him and told him to arrive at 13:00.[38]

90.     On 2 October, between 10 and 11 in the morning, the fifteen Saudi officials split into two groups. Five went to the Consul General's Residence, while the remaining ten went to the Consulate.

Table B: Locations of the Saudi Officials during the Murder

| Consul General's Residence | Consulate |
|---|---|
| Mansour Othman Abahussain, | Mohammed Saad Alzahrani, |
| Naif Hasan Alarifi, | Maher Abdulaziz Mutreb, |
| Abdulaziz Mohammed Alhawsawi, | Waleed Abdullah Alshehri, |
| Khalid Aedh Alotaibi, | Fahad Shabib Albalawi, |
| Meshal Saad Albostani | Badr Lafi Alotaibi, |
|  | Dr. Salah Mohammed Tubaigy, |
|  | Mustafa Mohammed Almadani, |
|  | Thaar Ghaleb Alharbi, |
|  | Saif Saad Alqahtani, |
|  | Turki Musharraf Alshehri |

91.     At 13:02, inside the Consulate, Mr. Mutreb and Dr. Tubaigy had a conversation just minutes before Mr. Khashoggi entered. Mr. Mutreb asked whether it will "*be possible to put*

---

[37]  According to Turkish Intelligence 44 witnesses had been interviewed by Turkish Investigators.
[38]  Al Jazeera Interview with Hatice Cengiz, 23:16 – 23:40.

the trunk in a bag?" Dr. Tubaigy replied "*No. Too heavy.*"  He expressed hope that it would "*be easy. Joints will be separated. It is not a problem. The body is heavy. First time I cut on the ground. If we take plastic bags and cut it into pieces, it will be finished. We will wrap each of them.*" "*Leather bags.*"  There was a reference to cutting skin. Dr. Tubaigny also expressed concerns: "*My direct manager is not aware of what I am doing. There is nobody to protect me.*" At the end of the conversation, Mr. Mutreb asked whether "*the sacrificial animal*" has arrived. At 13:13, a voice said "he has arrived." In these recordings heard by the Special Rapporteur, Mr. Khashoggi's name was not mentioned.

92.     At 13:15, Mr. Khashoggi entered the Consulate by himself, after leaving his phones with Ms. Cengiz, who remained outside. Turkish Intelligence assessed that he may have been dead within ten minutes after entering the Consulate.[39]

93.     Reconstruction of the events that transpired when Mr. Khashoggi was inside the Consulate relies largely on the recordings, the forensic work conducted by Turkish Investigators, and information available from the ongoing trials of the suspects in Saudi Arabia.

94.     Once inside the Consulate, Mr. Khashoggi appears to have been met by someone he knew.  He also said something about the Consul General being present.  He was invited to the office of the Consul General located on the second floor of Consulate.  According to recordings, the conversation with him first focused on whether Mr. Khashoggi would come back to Saudi Arabia, and he responded that he wanted to return in the future.  Mr. Khashoggi was then told[40]: "*We will have to take you back. There is an order from Interpol. Interpol requested you to be sent back. We are coming to get you.*". Mr. Khashoggi replied that "*there isn't a case against me. I notified some people outside; they are waiting for me; a driver is waiting for me.*" Later on, Mr. Khashoggi is heard to say that there was no driver but that his fiancée is waiting for him.  On several occasions, a Saudi official told Mr. Khashoggi "*let's make it short.*"  At 13:22, Mr. Mutreb asked whether Mr. Khashoggi had phones.  Mr. Khashoggi replied "*Two phones.*"  "*Which brands?*" "*Apple phones.*" "*Send a message to your son.*" "*Which son?  What should I say to my son?*" Silence. "*You will type a message – let's rehearse; show us.*" "*What should I say? See you soon? I can't say kidnapping.*" "*Cut it short.*" "*Take off your jacket.*" "*How could this happen in an embassy?*" "*I will not write anything.*" "*Cut it short.*" "*I will not write anything.*" "*Type it, Mr. Jamal.  Hurry up. Help us so that we can help you because at the end we will take you back to Saudi Arabia and if you don't help us you know what will happen at the end; let this issue find a good end.*" At 13:33, Mr. Khashoggi said "*there is a towel here.  Are you going to give me drugs?*" "*We will anesthetize you.*"

95.     In the recordings, sounds of a struggle can be heard during which the following statements could also be heard: "*Did he sleep?*"  "*He raises his head.*"  "*Keep pushing.*" "*Push here; don't remove your hand; push it.*"  Assessments of the recordings by intelligence officers in Turkey and other countries suggest that Mr. Khashoggi could have been injected with a sedative and then suffocated using a plastic bag. Turkish Intelligence also noted that the Saudi members of the 15 persons team spoke of a rope, but they could not conclusively determine if the rope was used to tie Mr. Khashoggi or possibly to move his body, or if it was used at all.

96.     Sounds of movement and heavy panting could be heard in the remainder of the recordings. The sound of plastic sheets (wrapping) could also be heard. Turkish Intelligence concluded that these came after Mr. Khashoggi's death while the Saudi officials were dismembering his body. The Turkish Intelligence assessment identified the sound of a saw at 13:39. The Special Rapporteur and her delegation could not make out the sources of the sounds they heard.

---

[39]  The exact time of Mr. Khashoggi's death could not be confirmed with certainty. The ten minutes reference is based on the fact that after ten minutes, Mr. Khashoggi voice was not heard.

[40]  Turkish Intelligence official prohibited the Special Rapporteur from taking notes of the recordings at this point. The conversations from this point on have been reconstructed from memory.

97.    Around 15:00, CCTV cameras captured a consular van and another vehicle leaving the Consulate's garage and arrive at the Consular General's Residence at 15:02. The cameras recorded three men[41] enter the Residence with what seem like plastic trash bags, and at least one rolling suitcase. Turkish Investigators have not been able to identify the size, the shape or the type of bags that the three Saudis carried into the Residence or where they may have purchased them.[42]

98.    At 15:53, CCTV cameras recorded Mr. Almadani accompanied by Mr. Alqahtani exit from the Consulate's back door. Mr. Almadani wore what appeared to be Mr. Khashoggi clothes. Mr. Alqahtani had a white plastic bag with him. The two got into a taxi and traveled to the Sultanahmet District.  At 16:13, they entered the Blue Mosque where Mr. Almadani changed clothes. At 16:29 they got into a taxi that took them to the Levent Metro Station. Somewhere near the metro station they threw away the plastic bag into a garbage bin. They returned to the Movenpick Hotel at 18:09.

## V.    The Turkish Authorities Learn about Mr. Khashoggi's Disappearance

99.    At 16:41 on 2 October, Ms. Cengiz phoned Mr. Khashoggi's emergency contact, Mr. Yasin Aktai. She explained to him that Mr. Khashoggi had entered the Saudi Consulate but not returned. Uncertain on how to proceed, Mr. Aktai called a friend, a Saudi dissident.[43] The dissident fumed that "many times" he had told Mr. Khashoggi never to enter the Consulate. The dissident suggested that Mr. Aktai should contact the Office of President Erdogan. Following this advice, Mr. Aktai contacted the Office of President Erdogan as well as the head and the deputy head of Turkey's National Intelligence Organization. Mr. Aktai said, "President Erdogan was informed, and thought it was something serious, and he sent the secretary and I gave them all of the information. They took the issue of Jamal Khashoggi disappearance seriously." [44]

100.    Mr. Aktai also remembered that he called the Saudi Ambassador to Turkey, who was in Ankara at the time. "He told me this was the first time he heard of it. He asked to give him ten minutes so that he could call the Consulate and he would call me back." However, the Ambassador never called back "I kept calling and sending text messages, and he didn't reply."[45]

101.    At 16:30, Ms. Cengiz also called Mr. Turan Kislakci who was not available at first, but the two eventually spoke. After Ms. Cengiz explained the situation, Mr. Kislakci reached out to his senior contacts in the Turkish government and requested them to put pressure on Saudi Arabia to release Mr. Khashoggi. Between 18:30 and 19:00, Mr. Kislakci went to the Consulate. He contacted TRT, Reuters Al Jazeera and other news outlets about Mr. Khashoggi's disappearance.

## VI.    Saudi 15 members team leaves Turkey

102.    Turkish Intelligence reported that at 16:53, Mr. Mutreb, Mr. Alharbi, and Dr. Tubaigy left the Consul General's Residence in a consular car but without the bags and suitcases that were brought into the Residence. The Special Rapporteur could not ascertain how this conclusion was reached.

103.    A Sky Prime Aviation private plane with the identification number HZ-SK1 had departed Riyadh at 10:47 UTC (13:47 in Istanbul).[46] The flight plan for the plane was prepared at 07:39 UTC but filed at 10:30 UTC (13:30 in Istanbul). The plane landed in

---

[41] The Special Rapporteur received contradictory information as to the identity of the men who carried the bags into the Consul General's Residence.
[42] Interview with Turkey Chief Prosecutor.
[43] In an interview with the UN Special Rapporteur, Mr. Aktai said that he could not name the dissident.
[44] Interview with Yasin Aktai.
[45] Interview with Yasin Aktai.
[46] Flight records.

Istanbul's Ataturk Airport at 17:15. According to the Turkish authorities, the plane was empty when it landed.

104.    Mr. Mutreb and five others, Mr. Alotaibi, Mr. W. Alshehri, Mr. T. Alshehri, Mr. Albalawi, and Mr. Alharbi, boarded the plane HZ-SK1, which departed at 18:30. The plane flew to Cairo, where it remained overnight. It left Cairo at 20:29 UTC on 3 October. It is uncertain whether the six officials were all on the plane when it returned to Riyadh. The Special Rapporteur was unable to ascertain why the plane made the stop-over.

105.    Dr. Tubaigy, Mr. Alhawsawi, and Mr. Alotaibi left the Consulate for Ataturk Airport and arrived there at 19:40.[47]  Mr. Alzahrani, Mr. Abuhussain, Mr Alarifi, and Mr. Albostani arrived at Ataturk Airport at 20:24.[48]  Allegedly, by this time, the Turkish Police had aleterd the airport security that a kidnapping may have been in progress. The seven Saudi officials left Turkey at 22:54[49] on a Sky Prime Aviation plane HZ-SK2 for Dubai.[50] According to public flight tracking resources, HZ-SK2 left Dubai for Riyadh on the evening of 3 October. It is uncertain if the seven Saudi officials were on board.

106.    Mr. Almadani and Mr. Alqahtani flew to Riyadh from Istanbul at 01:25 on a Turkish Airlines flight TK144.[51]

Table C: Departure Modes and Times of the 15 Officials on the Team

| 18:30 Departure on HZSK1 With a stop-over in Cairo | 20:24 Departure on HZSK2 With a stop-over in Dubai | 01:25 Departure on a Commercial Flight |
|---|---|---|
| Fahad Shabib Albalawi | Abdulaziz Mohammed Alhawsawi | Mustafa Mohammed Almadani |
| Thaar Ghaleb Alharbi | Dr. Salah Mohammed Tubaigy | Saif Saad Alqahtani |
| Badr Lafi Alotaibi | Khalid Aedh Alotaibi | |
| Waleed Abdullah Alshehri | Mansour Othman Abahussain | |
| Turki Musharraf M Alshehri | Mohammed Saad Alzahrani | |
| Maher Abdulaziz Mutreb | Naif Hassan Alarifi | |
| | Meshal Saad Albostani | |

107.    ASA, the consular attaché who drove to Belgrade Forest on October 1, left Turkey with his family on 2 October at 23:28. He returned to Turkey on his own on 4 October.

---

[47]  CCTV footage.
[48]  CCTV footage.
[49]  CCTV footage.
[50]  Flight records.
[51]  CCTV footage.

## VII.   Initial Reactions and the Beginning of Turkey's Investigative Process

108.   According to the Chief Public Prosecutor, the Turkish authorities opened an investigation into the disappearance of Mr. Khashoggi on the evening of 2 October, after Ms. Cengiz called the local police about Mr. Khashoggi's disappearance. The police then contacted the prosecutor on call who in turn wrote instructions on how to proceed with the case. That same evening, Turkish Intelligence began reviewing what they say were seven hours of raw recordings from the Consulate that they had in their possession. In their own words, the assessment of the raw footage was complex and it took them several days to reach a firm conclusion regarding the fate of Mr. Khashoggi. Their initial assessment of the recordings led them to believe that Mr. Khashoggi had been injected with something, passed out, and taken alive from the Consulate in some box or container.[52]

109.   According to Turkish Intelligence, on 3 October, Consulate staff was prevented to go to the second floor of the Consulate. Around 11:00, the inner part of the Consulate was cleaned. Between 16:00 and 21:00, CCTV cameras recorded a fire in a barrel in the backyard of the Consulate. The Consul General did not leave the residence the whole day.

110.   The same day, Saudi Arabia issued a statement to the Associated Press claiming that Mr. Khashoggi had left the Consulate. The statement read, "Mr. Khashoggi visited the consulate to request paperwork related to his marital status and exited shortly thereafter. The government of Saudi Arabia follows up diligently on any reports related to the safety of any of its citizens and will continue to follow up on these reports."[53] Mr. Ibrahim Kalin, a spokesman to President Erdogan, contradicted the Saudi statement later that evening, "According to the information we have, this person who is a Saudi citizen is still at the Saudi Consulate in Istanbul. We don't have information to the contrary."[54]

111.   In an interview with the Special Rapporteur, Mr. Hakan Fidan, the director of Turkish Intelligence, recalled that on 3 October, or possibly the day after, he spoke with "the head of the Kingdom of Saudi Arabia"[55] and asked him to return Mr. Khashoggi.

112.   On 4 October, Turkey's Ministry of Foreign Affairs summoned Saudi Arabia's Ambassador Waleed Elhereiji to Ankara, over the disappearance of Mr. Khashoggi.[56] The Ambassador denied knowing anything about Mr. Khashoggi's disappearance and promised to inform the Turkish authorities once he obtained further information. The same day, the Saudi Press Agency issued a statement that the Consulate in Istanbul was "carrying out follow-up procedures and coordination with the Turkish local authorities to uncover the circumstances of the disappearance of Jamal Khashoggi after he left the consulate building."[57]

113.   At 09:35 on October 4, the Turkish authorities detected smoke coming from the backyard of the Consulate. At 16:05, Saudi consular staff were observed burning papers in a barrel in the backyard of the Consulate.[58]

114.   At some point on 4 October, Turkish Intelligence finalized its assessment of what transpired in the Consulate, concluding that Mr. Khashoggi had been killed. Mr. Aktai confirmed that the Turkish Authorities knew of Mr. Khashoggi's death, recalling that he was notified of it by the Office of President Erdogan on 4 October.[59]

---

[52] Interview with Turkish Intelligence.
[53] https://www.latimes.com/world/la-fg-saudi-journalist-20181003-story.html.
[54] https://www.latimes.com/world/la-fg-saudi-journalist-20181003-story.html.
[55] According to *Al Jazeera,* Mr. Fidan spoke to the Crown Prince
https://www.aljazeera.com/news/2019/03/jamal-khashoggi-body-burned-large-oven-saudi-home-190304011823218.html.
[56] https://www.reuters.com/article/us-saudi-politics-dissident-idUSKCN1ME1DC.
[57] https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1822222.
[58] CCTV footage.
[59] Interview with Yasin Aktai.

115.    At 09:41 on October 5, unidentified consular staff drove the mission vehicle allegedly used to transport Mr. Khashoggi's remains to a carwash. [60] The same day, Turkish investigators were granted a warrant to search the Consulate, but were unable to execute it because of the authorities' concerns regarding diplomatic immunity.

116.    On 5 October, in an interview with Bloomberg, Crown Prince Mohammed bin Salman was asked about Jamal Khashoggi. The Crown Prince insisted that Mr. Khashoggi had left the Consulate and that the Saudi authorities were working with their Turkish counterparts to identify what happened. "We hear the rumors about what happened. He's a Saudi citizen and we are very keen to know what happened to him. And we will continue our dialogue with the Turkish government to see what happened to Jamal there." [61] Pressed on whether Mr. Khashoggi faced charges in Saudi Arabia, the Crown Prince responded "Actually, we need to know where Jamal is first." Asked again, he said "If he's in Saudi Arabia I would know that."

117.    On 6 October, the Consul General Alotaibi took Reuters' journalists to tour the Consulate to "confirm that... Jamal is not at the consulate nor in the Kingdom of Saudi Arabia, and the consulate and the embassy are working to search for him." [62] During the visit, the journalists learned that although the building was equipped with cameras, they failed to record anything the day Mr. Khashoggi disappeared. The Consul General added that "the idea of kidnapping a Saudi citizen by a diplomatic mission is something that should not be put forward in the media." [63] He also said "the consulate was equipped with cameras but they did not record footage."

118.    On the evening of 6 October, Turkish officials communicated to the press that "The initial assessment of the Turkish police is that Mr. Khashoggi has been killed at the consulate of Saudi Arabia in Istanbul. We believe that the murder was premeditated, and the body was subsequently moved out of the consulate." [64]

## VIII.    Saudi Arabia's continual denials and scene clean-up

119.    At 05:30 on 6 October, ten members of the Mabahith, the Saudi secret police, landed in Istanbul. [65] The delegation arrived at the Saudi Consulate in Istanbul at 14:45.

120.    On 7 October, the Saudi Press Agency published a statement from an unnamed Saudi official who had dismissed reports from Reuters that Mr. Khashoggi had been killed in the Consulate. "The official strongly denounced these baseless allegations, and expressed his doubt that they came from Turkish officials that are informed of the investigation or are authorized to comment on the issue." [66] The unnamed source "stressed that the Kingdom holds the safety and wellbeing of its citizens wherever they are, and that relevant authorities in the Kingdom are diligently following up on this matter to uncover the complete facts." [67]

121.    On 8 October, in a message to a journalist the Saudi Ambassador to the United States, Prince Khalid bin Salman, denied all allegations of the Saudi government's involvement in Mr. Khashoggi's disappearance, "I assure you that the reports that suggest that Jamal Khashoggi went missing in the Consulate in Istanbul or that the Kingdom's authorities have detained him or killed him are absolutely false, and baseless." [68]

---

[60]  Information from Turkish Intelligence.
[61]  https://www.bloomberg.com/news/articles/2018-10-05/saudi-crown-prince-discusses-trump-aramco-arrests-transcript.
[62]  https://www.reuters.com/article/us-saudi-politics-dissident-consulate-idUSKCN1MG0RC.
[63]  https://www.reuters.com/article/us-saudi-politics-dissident-consulate/saudi-arabia-opens-up-consulate-after-journalist-vanishes-idUSKCN1MG0RC.
[64]  https://www.reuters.com/article/us-saudi-politics-dissident-idUSKCN1MG0HU.
[65]  Information from Turkish Intelligence. The Special Rapporteur has the identity of all these individuals but has opted not to disclose it.
[66]  https://www.spa.gov.sa/viewfullstory.php?lang=en&newsid=1823102.
[67]  https://www.spa.gov.sa/viewfullstory.php?lang=en&newsid=1823102.
[68]  https://www.axios.com/trump-wants-audio-from-khashoggi-interrogation-ca7b0cc5-ad18-4fcb-8cad-

122.    On 9 October, Saudi Arabia sent a diplomatic note to the Turkey Ministry of Foreign Affairs inviting the Turkish authorities to visit the Consulate General.[69] The same day, the Second Criminal Court in Istanbul issued a comprehensive three-day search warrant for the Consulate, the Consul General's Residence and consular vehicles.[70]

123.    At 22:30 on 9 October, a Turkish delegation met with the Saudi delegation, to discuss the process of conducting a search of the Saudi Consulate. During the meeting, the Head of the Saudi delegation is alleged to have demanded that the Turkish authorities give his team Mr. Khashoggi's phones, laptop and other digital equipment.[71] The Turkish authorities responded that such requests had to be directed to Turkey's Ministry of Justice. The head of the Saudi delegation also reportedly asserted that Turkish investigators could conduct only a visual examination of the Consulate, and that a forensic examination could not be permitted at that point. The Saudi delegation agreed to consider Turkey's request for a full forensic investigation after it received a list of the "staff that will carry out the examination, the methods that will be used, the areas that will be examined and the length of the examination." The meeting ended at midnight.[72]

124.    On 10 October, Turkey's newspaper, the Daily Sabah, released the names, photos and other details about the fifteen Saudi officials suspected of involvement in the killing of Mr. Khashoggi.[73]

125.    On 10 October, two additional Mabahith representatives landed in Turkey. Turkish Intelligence determined that they worked in the Genetics Test Department and the Criminal Evidence Department.

126.    On 11 October, five additional Saudi officials arrived in Istanbul. The men arrived in two groups, of two and three. The first two arrived at 07:35 in the morning, and according to Turkish Intelligence included a toxicology expert. The other three landed in Istanbul at 17:00 and, according to Turkish Intelligence, were members of the Mabahith "Technical Team."

127.    On October 11, Al Arabiya, a Saudi-owned, pan-Arab media company, issued a media report that the fifteen Saudi suspects were rather tourists falsely accused of killing Mr. Khashoggi.[74] The article was in line with two other Al Arabiya publications from 8 and 10 October which labeled Mr. Khashoggi's disappearance as "fake news." In an article published on 8 October [75] Al Arabiya claimed that Mr. Khashoggi had not been killed.[76] On 10 October, Al Arabiya wrote that "the mystery over missing Saudi journalist Jamal Khashoggi has been riddled with misreported news, dubious sources and orchestrated media campaigns." It further claimed that Ms. Cengiz had connections to Qatar and that Mr. Kislakci, a friend of the couple, was associated with an anti-Saudi organization.[77]

128.    Also on 11 October, the Turkish authorities announced that following a conversation between King Salman and President Erdogan, Turkey agreed to form a joint working group

c4c29ec2af34.html.
[69] Information from Turkish Intelligence.
[70] A copy of the Court Order.
[71] In an interview with Turkey's Chief Public Prosecutor, the Special Rapporteur highlighted the risks associated with the Saudi authorities obtaining Mr. Khashoggi's phones and other digital equipment. The Turkish Prosecutor exclaimed that the Turkish Authorities would never give the Saudi authorities Mr. Khashoggi's mobile phones and computer.
[72] Report of the Chief Public Prosecutor on the October 10 meeting with the Saudi Delegation.
[73] https://www.dailysabah.com/investigations/2018/10/15-member-saudi-intel-squad-sent-to-target-wps-khashoggi-identified.
[74] https://english.alarabiya.net/en/News/gulf/2018/10/11/WATCH-Who-are-the-15-Saudi-tourists-falsely-accused-of-killing-Khashoggi-.html, https://www.middleeasteye.net/news/timeline-how-saudi-narrative-khashoggi-evolved.
[75] https://english.alarabiya.net/en/News/world/2018/10/08/Jamal-Khashoggi-mystery-Deleted-tweets-unnamed-sources-and-fake-funeral.html.
[76] https://english.alarabiya.net/en/News/world/2018/10/08/Jamal-Khashoggi-mystery-Deleted-tweets-unnamed-sources-and-fake-funeral.html.
[77] https://english.alarabiya.net/en/News/world/2018/10/10/The-link-between-3-figures-behind-the-Jamal-Khashoggi-mystery.html.

with Saudi Arabia to determine what happened to Mr. Khashoggi.[78] The same day, Turkey's Ministry of Justice requested the Saudi authorities to provide it with any information about Mr. Khashoggi's visits to the Consulate, copies of CCTV footage from the Consulate, information on the number of cameras in the Consulate, a list of all consular officers in Istanbul (noting those who did not report to work on October 2), information on consular drivers, GPS data from consular vehicles, times when the fifteen Saudi officials entered and exited the Consulate, and information on whether or not they were in Turkey on a consular assignment.[79]

129.    On 12 October, the Saudi Press Agency published two official statements denying the killing of Mr. Khashoggi. In the first statement, the Minister of the Interior, Prince Abdulaziz bin Saud bin Naif bin Abdulaziz, denounced "false accusations circulated in some media on the Saudi government and people against the background of the disappearance of the Saudi citizen Jamal Khashoggi."[80] He added that claims that the journalist had been killed were "lies and baseless allegations against the government of the Kingdom, which is committed to its principles, rules and traditions and is in compliance with international laws and conventions."[81] The second statement, from an unnamed official source, announced that Saudi Arabia had formed a bilateral expert-level Joint Action Team to discover what happened to Mr. Khashoggi in Istanbul.[82]

130.    The Turkish Prosecutor sought another search warrant on 12 October. In the meantime, at 14:45, the three men allegedly belonging to the Mabahith "Technical Team" entered the Saudi Consulate.[83] They remained in the Consulate all day and night, eventually leaving it on October 13, at 08:00. The team returned to the Consulate at 21:00. The Turkish Intelligence alleged that the team conducted a cleanup of the crime scene.

131.    On 14 October, the Saudi Press Agency published a statement from an unnamed official that read, "the Kingdom affirms its total rejection of any threats and attempts to undermine it, whether by threatening to impose economic sanctions, using political pressures, or repeating false accusations that will not undermine the Kingdom and its staunch positions and Arab, Islamic and international status, the outcome of these weak endeavors, like their predecessors, is a demise."[84]

132.    Later that day, at 23:00, the three-person Mabahith "Technical Team" once again entered the Consulate and remained there until 04:00 the next morning.

133.    On 15 October, United States President Donald Trump tweeted that he had spoken to the Crown Prince who had denied knowledge of "whatever happened to Mr. Khashoggi."[85] Later in the day, commenting on his conversation with the Crown Prince, Mr. Trump said that "I don't want to get into his mind — but it sounded to me like maybe these could have been rogue killers. Who knows? We're going to try getting to the bottom of it very soon. But his was a flat denial." To the Special Rapporteur's knowledge, this was the first instance when the "rogue actor" theory was suggested. The Saudi authorities officially offered this version of the killing on 21 October.

## IX.    Turkish investigators enter the consulate and the residence

134.    At 07:30 on 15 October, a commercial cleaning crew arrived at the Saudi Consulate.[86] The same day, the 10th Criminal Court granted a search warrant to the Chief Public

[78]   https://www.nytimes.com/2018/10/11/world/middleeast/jamal-khashoggi-turkey-erdogan-bin-salman.html.
[79]   Copy of the request from Turkey's Ministry of Justice to the Saudi Consulate.
[80]   https://www.spa.gov.sa/1827596 .
[81]   https://www.spa.gov.sa/1827596 .
[82]   https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1825404
[83]   Information from Turkish Intelligence.
[84]   https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1827989.
[85]   https://www.npr.org/2018/10/15/657522089/rogue-killers-may-have-murdered-saudi-journalist-trump-suggests.
[86]   https://www.commondreams.org/news/2018/10/15/you-couldnt-make-bunch-mops-cleaners-and-

Prosecutor in Istanbul for the Saudi Consulate, the Consul General's Residence, and consular vehicles.[87] The warrant granted permission for the Chief Public Prosecutor to conduct a search within four days of 15 October during daytime, and if necessary at night.

135.    Between 13:00 and 15:00, Turkish and Saudi officials held a meeting on the search of the Consulate.[88]

136.    At 14:00, the office of Public Prosecutor in Istanbul issued a search warrant for the house that Mr. Khashoggi had purchased to live in Istanbul.

137.    At 19:18, officials from Turkey's Office of Public Prosecutor and the Security General Directorate arrived at the Consulate. At 20:18, four Turkish crime scene investigative units went into the Consulate. Saudi officials accompanied each team. The Turkish investigators collect two samples of all evidence, one for themselves and one for the Saudi team.[89]

138.    Turkish investigators did not detect DNA or blood in the Consul General's Office. In the neighboring briefing room, the investigators found several areas that reacted to UV light and luminol liquid tests. On a carpet near the briefing table, investigators found "a path in which drops follow each other within certain distances and generates an irregular curved line."[90] Not much else has been found. A Turkish Investigator recalled, "We collected luminal reactions. What was strange in our opinion was that the reactions of the luminal were not very clear. Do you understand what I mean? Even in a normal room, we would expect more reactions."

139.    On 16 October, Turkish Investigators requested entry to the Consul General's Residence. However, according to the Chief Public Prosecutor, the Saudi Authorities obstructed the efforts of the investigators to search the Residence. The Chief Public Prosecutor recalled "[it] was like anger management because they didn't let us conduct an inquiry. We had to push and push to be allowed in."[91]

140.    On the same day, the Saudi Press Agency published another statement questioning Mr. Khashoggi's disappearance. Sheikh Dr. Abdullah bin Mohammed bin Ibrahim Al Al-Sheikh, Speaker of the Shura Council of the Kingdom of Saudi Arabia, "affirmed that misleading campaigns against the Kingdom of Saudi Arabia will not impede the Kingdom to commit its principles and values and will not affect its position at the Arab, Islamic and international arenas."[92]

141.    At 16:40, Turkish Investigators entered the Consulate General's Residence to conduct a search of the premises and consular vehicles. Turkish investigators had a search dog, which reacted to a refrigerator located in a small storage area at the Residence.[93] The investigators collected samples from the refrigerator. Subsequent analyses were non-conducive. During the search, the investigators discovered a well on the property. They requested permission from Saudi Officials to allow fire fighters to come into the Residence to investigate the well, but the Saudis refused on the ground that the fire fighters were not pre-approved to enter the Residence. On 17 October, Turkey's Ministry of Foreign Affairs contacted its Saudi counterpart with a request to examine the well in the residence, but allegedly never received a response.[94]

142.    At 17:00 on 16 October, Consul General Alotaibi left Turkey.[95] On 17 October, press reports began circulating that Consul General Alotaibi had been fired.[96]

---

trash-bags-delivered-saudi-consulate-ahead.

[87]  Copy of the search warrant provided to the Special rapporteur by the Turkish authorities.

[88]  Information from Turkish Intelligence.

[89]  Copies of Turkish Investigative Reports.

[90]  Copy of the Turkish Investigative Report (2).

[91]  Interview with Chief Public Prosecutor in Istanbul

[92]  https://www.spa.gov.sa/viewfullstory.php?lang=en&newsid=1829557.

[93]  Interview with the Chief Public Prosecutor.

[94]  Letter from the Chief Public Prosecutor to Turkey's Ministry of Justice, dated 15 January 2019.

[95]  Information from Turkish Intelligence.

[96]  For example, https://www.standard.co.uk/news/world/sevenminute-audio-captures-screams-of-

143.    The Turkish investigators examined fifteen or sixteen consular vehicles, including their interiors and wheels. An investigator recalled that the Saudi Officials present during the search were "showing resistance at all times. They were telling us to be careful with the interior of the car. We were struggling with them as we were collecting the samples. On the day of our investigation of the cars, it started raining and we asked them to move the cars to protect them. But they refused to move the vehicles, so we had to work under a sheet that we brought and under the rain."[97]

144.    On 18 October, the Turkish Investigators completed their search of the Consul General's Residence and the consular vehicles at 05:30. At 15:20, two members of the Saudi team that Turkey accused of participating in the post-murder cleanup, departed Turkey.

145.    On that day, the Chief Public Prosecutor's Office in Istanbul began the process of interviewing local staff who worked at the Consulate General's Office in Istanbul. The same day, the Crime Scene Investigative Unit sent samples that it obtained from the Consulate, the Consul General's Residence, and the consular vehicles for an analysis to see if anyone of them matched with Mr. Khashoggi's DNA. The Special Rapporteur has not been informed of any DNA match.

## X.    Saudi Arabia's admission and arrests

146.    On 19 October, in a statement on Saudi state television, the country's chief prosecutor admitted that Mr. Khashoggi had been killed in the Consulate. He said that a fistfight broke out between Mr. Khashoggi and suspects in the Consulate, which led to Mr. Khashoggi's death.[98]

147.    On the same day, the Saudi authorities also announced that King Salman ordered the restructuring of the General Intelligence Presidency and appointed the Crown Prince to lead the effort.[99] In another statement it was announced that King Salman dismissed a Senior Adviser of the Royal Court[100] and Deputy Director of General Intelligence.[101] Additionally, King Salman dismissed several senior military officials, including Deputy Director of General Intelligence, Deputy Head of General Intelligence for Human Resources, and General Director of Security and Protection of General Intelligence.[102]

148.    On 20 October, Saudi Arabia's Ministry of Foreign Affairs published a statement from the Saudi Public Prosecutor admitting that Mr. Khashoggi had been killed inside the Consulate.[103] The statement said that Mr. Khashoggi's disappearance *"drew the attention of Saudi Arabia at the highest levels"* and accordingly the authorities *"took the necessary procedures to clarify the truth and immediately dispatched an investigation team to Turkey on October 6th, 2018."* The statement continued, *"the investigations were carried out by the Public Prosecution and it investigated a number of suspects on the basis of information provided by the Turkish authorities."* According to the statement, the suspects had attempted to convince Mr. Khashoggi to return to Riyadh; this conversation took place in the presence of the Consul General Alotaibi; the situation escalated with a fight taking place between Mr.

dismembered-dissident-journalist-jamal-khashoggi-a3964306.html.

[97]  Interview with Chief Public Prosecutor.

[98]  https://www.middleeasteye.net/news/saudis-now-say-khashoggi-killed-consulate-after-claiming-he-left-alive.

[99]  https://www.saudiembassy.net/news/recommendations-ministerial-committee-restructure-general-intelligence-presidency-gip%C2%A0.

[100]  According to some media reports, despite his dismissal from the Royal Court, Mr. Alqahtani continues to advise the Crown Prince.

[101]  https://www.washingtonpost.com/news/world/wp/2018/10/19/saudi-government-acknowledges-journalist-jamal-khashoggi-died-while-in-that-countrys-consulate-in-istanbul/?utm_term=.5890cee8e7cf .

[102]  https://www.saudiembassy.net/news/his-majesty-issues-royal-order-dismissing-senior-saudi-government-officials.

[103]  https://www.cnn.com/2018/10/19/middleeast/saudi-arabia-khashoggi-statement/index.html.

Khashoggi and the suspects; this led to Mr. Khashoggi's death; the suspects then attempted to conceal Mr. Khashoggi's death.

149.    On 21 October, the three-man Mabahith "Technical Team" travelled from Istanbul to Ankara and entered the Embassy of Saudi Arabia in Ankara at 18:30.[104]

150.    On 26 October, two additional Mabahith officials flew to Ankara where they searched the Saudi Embassy.[105] The two men returned to Istanbul on October 27.

151.    On October 21, in an interview with Fox News, Saudi Foreign Minister Adel al Jubeir explained that it took eighteen days to confirm Mr. Khashoggi's death because the Saudi authorities had reports indicating that he left the Consulate.  According to the Minister, eventually an investigating team in Turkey had found discrepancies. He dismissed claims that the Crown Prince knew about the killing, calling it a "rogue operation". Minister al Jebeir added, "Even the senior leadership for the intelligence services was not aware of this. This was a rogue operation. This was an operation where individuals ended up exceeding the authorities and responsibilities they had. They made a mistake when they killed Khashoggi in the consulate and they tried to cover up for it."[106]

152.    That same day, Saudi authorities announced that they detained eighteen individuals as suspects in the murder of Jamal Khashoggi. The suspects included the fifteen individuals identified by Turkey, as well as three consular security attachés. The Saudi authorities did not release any names besides those of the consular staff.[107]

153.    On 21 October, Reuters published a story mentioning that an anonymous Saudi official presented its journalists with "intelligence documents which appeared to describe an initiative to bring dissidents home to Saudi Arabia, including the specific one involving Khashoggi."[108]

154.    On 22 October, the two officials from the Saudi Criminal Evidence Department and toxicology expert, accused by Turkish Intelligence of aiding in the cleanup of the Consulate, left Turkey.[109] The same day, a third man, who was part of the three-man Mabahith "Technical Team" also left Turkey.[110]

## XI.    Some international reactions to the Saudi admission

155.    On 19 October, the United States White House said, in a statement, that "The United States acknowledges the announcement from the Kingdom of Saudi Arabia that its investigation into the fate of Jamal Khashoggi is progressing and that it has taken action against the suspects it has identified thus far. We will continue to closely follow the international investigations into this tragic incident and advocate for justice that is timely, transparent, and in accordance with all due process. We are saddened to hear confirmation of Mr. Khashoggi's death, and we offer our deepest condolences to his family, fiancée, and friends."[111] In separate comments during an event, President Trump said that the Saudi admission was a "great first step," but reiterated his disapproval of sanctions for Mr. Khashoggi's death.[112]

---

[104]   Information from Turkish Intelligence.
[105]   Information from Turkish Intelligence.
[106]   https://outline.com/AXHkLJ.
[107]   Information from Turkish Intelligence.
[108]   https://www.reuters.com/article/saudi-khashoggi-official/amid-scepticism-saudi-official-provides-another-version-of-khashoggi-death-idINKCN1MV053.
[109]   Information from Turkish Intelligence.
[110]   Information from Turkish Intelligence.
[111]   https://www.npr.org/2018/10/19/658732039/turkey-questions-employees-of-saudi-consulate-over-journalists-disappearance.
[112]   https://twitter.com/PressSec/status/1053427595885326336/photo/1.

156.    On 20 October, Germany's Chancellor Merkel, speaking at a regional convention of her political party, said that the events surrounding Mr. Khashoggi's murder still "haven't been cleared up and of course we demand that they be cleared up"[113]

157.    Also on 20 October, France's Foreign Minister Jean-Yves Le Drian said that "France condemns this murder in the strongest terms." He added that "the confirmation of Mr. Jamal Khashoggi's death is a first step toward the establishment of the truth. However, many questions remain unanswered."[114]

158.    On the same day, Denmark's Prime Minister noted that the Saudi authorities have not been straightforward with Mr. Khashoggi's disappearance and said that "the fact that the Saudis last night confirmed that he died, after previously insisting he left the consulate alive, shows that we haven't been told the full truth, and we must insist on getting that."[115]

159.    Australia also announced that in light of the Saudi admission it "determined that official Australian representation at the forthcoming Future Investment Initiative event in Riyadh is no longer appropriate."[116]

## XII.    The Turkish investigation continues

160.    On 23 October, Turkish Security searched a Saudi consular car found in an Istanbul underground carpark. Turkish Security identified personal belongings of a former Saudi narcotics attaché, who had worked at the Saudi Consulate in Istanbul.

161.    On 24 October, the Public Prosecutor's Office in Istanbul took testimonies from local staff who worked at the Saudi Consulate. A consular driver said that he and a security guard were told not to come to work on 2 October.[117] Others recalled that they were told to leave the Consulate because "an investigator would arrive" or "diplomats would hold a meeting." Some witnesses remarked that "there was an extraordinary commotion at the Consular Office." One witness remembered that security attaché[118] had driven a consular car, which was odd since consular vehicles were usually driven by consular drivers.[119]

162.    On 25 October, Saudi Arabia's Office of the Attorney General declared that based on information received through the Joint Working Team of Saudi Arabia and Turkey, it had determined that the killing of Mr. Khashoggi was pre-meditated.[120]

163.    On 27 October, Saudi Foreign Minister al-Jubeir remarked upon the killing of Mr. Khashoggi at a conference held at the International Institute for Strategic Studies. He said that, "This issue has become fairly hysterical.  I think people have assigned blame on Saudi Arabia with such certainty before the investigation is complete.  We have made it very clear that we will have a full and transparent investigation the results of which will be released, we have made it very clear that those responsible will be held responsible and will be held to account, and we have made it very clear that we will put in place mechanisms to ensure that this does not happen again."[121] He added that "on the issue of extradition, the individuals are Saudi nationals and they are detained in Saudi Arabia and the investigation is in Saudi Arabia and they will be prosecuted in Saudi Arabia."

164.    On 28 October, a five-member delegation, led by Saudi Chief Prosecutor Saud Abdullah Al-Mojeb, began a three-day mission to Turkey. He met twice with the Chief Public

---

[113] http://time.com/5430335/angela-merkel-european-leaders-facts-khashoggis-death/.

[114] https://www.reuters.com/article/us-saudi-khashoggi-france/frances-le-drian-condemns-khashoggis-murdering-calls-for-in-depth-research-idUSKCN1MU0SS.

[115] http://time.com/5430335/angela-merkel-european-leaders-facts-khashoggis-death/  .

[116] https://www.reuters.com/article/us-saudi-khashoggi-australia/australia-withdraws-from-saudi-investment-summit-over-khashoggi-death-iduskcn1mu0ad .

[117] Interview with Turkey's Chief Public Prosecutor.

[118] According to Turkish Intelligence, Mr. Muflih was one of the eighteen men detained by the Saudi authorities in relation to the killing of Mr. Kashoggi.

[119] Information from Turkish Intelligence.

[120] https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1833775.

[121] https://www.apnews.com/629de7f60ec64e8593167ed2bd9b3981.

Prosecutor in Istanbul. At the meeting, the Turkish Prosecutor requested that his Saudi counterpart provide information on: the whereabouts of Mr. Khashoggi's body, any details that the Saudi investigations obtained about the planning of the murder, and the identity of the "local collaborator" who allegedly assisted the fifteen Saudi officials. According to the Turkish Prosecutor, the Saudi authorities have never responded to their request. In turn, the Saudi Prosecutor requested that: the investigation be kept confidential; a joint working group be established and the Turkish prosecutor share the investigative file with Saudi Arabia.[122] On 30 October, the Turkish Prosecutor provided the Saudi Prosecutor with the evidence in his possession.[123]

165.    Further, in an interview with the Special Rapporteur, Turkey's Chief Public Prosecutor said that the Saudi Prosecutor extended an invitation for him to go to Saudi Arabia, which he rejected. Overall, the Turkish Prosecutor was disappointed with the meetings with Saudi officials and said publicly that "despite our well-intentioned efforts to reveal the truth, no concrete results have come out of those meetings."[124]  During their three days in Turkey, the Saudi Prosecutor also visited the Saudi Consulate as well as the offices of the Turkish National Intelligence Organization in Istanbul.[125] The Saudi Prosecutor and his delegation departed Turkey on 31 October.

166.    On 4 November, the remaining members of the Saudi Mabahith team left Turkey.[126] The same day, during a CNN interview, Mr. Khashoggi's sons, Salah and Abduallah Khashoggi, asked the Saudi authorities to return their father's body so they could perform a traditional burial.[127]

167.    On 5 November, the Third Criminal Court in Istanbul issued arrest warrants for the fifteen Saudi officials and three members of the Consular staff who assisted them (Mr. Muflih Almuslih, AAA and SA). The same day, the Chief Public Prosecutor issued extradition requests for the eighteen.

168.    On 12 November, the Saudi Ambassador to Germany, Prince Khalid Bin Bander, reasserted that the Saudi authorities were investigating Mr. Khashoggi's killing. He said, "Our government is investigating the case very carefully.  We have to wait for the results of the investigation.  We will know who did what and when.  We take this very seriously and our authorities have already arrested 18 suspects in Saudi Arabia.  There have been layoffs in the security apparatus.  We will ensure that those responsible are punished."

## XIII.    Indictments and trials in Saudi Arabia

169.    On 15 November, Shalaan Alshalaan, Saudi Deputy Public Prosecutor and Spokesperson, announced that the Saudi authorities had detained twenty one individuals in relation to Mr. Khashoggi's killing[128], and indicted eleven. He added that the Prosecutor's Office would seek the death penalty for five of those detained. Mr. Alshalaan did not name either the eleven or those facing the death penalty, but he did mention several individuals by their positions. He said that the former "Deputy President of the General Intelligence

---

[122]   Letter of 15 January 2019, from the Chief Public Prosecutor in Istanbul to the Ministry of Justice of Turkey.

[123]   According to the Letter from the Chief Public Prosecutor in Istanbul to the Ministry of Justice of Turkey from 15 January 2019, the evidence included CCTV footage of Mr. Khashoggi entering and leaving the Consulate, CCTV footage of the fifteen officials in Turkey, including images from the hotel, images of Mr. Almadani in Sultanahmet District and of him changing his clothes, footage of consulate vehicles used by the Saudi 15 persons team, and footage of a consular car that went to Belgrade Forest.

[124]   https://www.reuters.com/article/us-saudi-khashoggi-turkey/istanbul-prosecutor-says-khashoggi-was-suffocated-in-saudi-consulate-idUSKCN1N50PO.

[125]   http://www.hurriyetdailynews.com/saudi-prosecutor-in-istanbul-for-khashoggi-investigation-report-138354.

[126]   Information from Turkish Intelligence.

[127]   https://www.reuters.com/article/us-saudi-khashoggi-sons/sons-of-slain-saudi-journalist-khashoggi-appeal-for-return-of-his-body-idUSKCN1NA00Y.

[128]   The Special Rapporteur has been able to identify 19 of the individuals detained.

A/HRC/41/CRP.1

Presidency," had issued "an order to bring back the victim by means of persuasion, and if persuasion fails, to do so by force."[129]  This order was issued to the "leader of the mission." The leader of the mission formed a fifteen-member team that "consisted of three groups (negotiations/intelligence/logistics) to persuade and return the victim."[130]  The leader of the mission had suggested the Deputy President of the General Intelligence Presidency that he "assign a former colleague to head the negotiation group in the team because of his previous relationship with the victim.  This former colleague was assigned at the time to work with a former Advisor."   The former Deputy President contacted the former Advisor "to request assignment of the individual with whom the victim had a previous relationship.  The former advisor agreed to this request and asked to meet the leader of the mission."   The former Advisor "met with the leader of the mission and the negotiation team" to "share with them information relevant to the mission based on his specialization in media."   The former Advisor communicated to them that Mr. Khashoggi "was coopted by organisations and states hostile to the Kingdom and that the victim's presence outside of Saudi Arabia represents a threat to national security and he encouraged the team to persuade the victim to return, noting that his return represents a significant achievement of the mission."[131]

170.    The Saudi Prosecutor asserted additional details as to what his office alleged had occurred.  The "leader of the mission contacted a forensics expert to join the team for the purpose of removing evidence from the scene in the case force had to be used to return the victim.  The forensics expert joined the team without the knowledge of his superiors."  The "leader of the mission contacted a collaborator in Turkey to secure a safe location in case force had to be used to return the victim."  "After surveying the Consulate, the head of the negotiation team concluded that it would not be possible to transfer the victim by force to the safe location in case the negotiations with him to return failed.  The head of the negotiation team decided to murder the victim if the negotiations failed."[132]  The "investigation concluded that the crime was carried out after a physical altercation with the victim where he was forcibly restrained and injected with a large amount of a drug resulting in an overdose that led to his death".  The Prosecutor asserted that five individuals had confessed to the murder.  After the murder, "the victim's body was dismembered by the individuals that have committed the murder and was transferred outside the consulate building."  The "body was removed" from the building "by (five) individuals."  "The individual who delivered the body to the collaborator has been identified."   "Based upon the description provided by the individual who delivered the body to the collaborator, a composite sketch of the collaborator has been produced."  At some point, the Turkish authorities requested information on the collaborator, but the Saudi authorities were provided only with the said sketch.[133]

171.    Also, the Saudi Prosecutor noted that between 17 and 31 October his Government had sent three letters to the Turkish authorities requesting "evidence and information, including any audio recordings in the possession of the Turkish authorities related to the case," and to sign "a special cooperation mechanism specific to this case in order to provide them with the results of the investigation." Allegedly the Turkish authorities never responded to their requests.

172.    On November 16, Turkey's Office of Chief Public Prosecutor issued a letter stating it had learned from media reports that the Saudi Chief Public Prosecutor indicted some suspects and that it had requested a copy of the indictments.[134]

---

[129]  https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1841715.
[130]  https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1841715  Reuters has reported that Mr. Mutreb was the leader of the negotiation team.  Mr. al-Madani was the leader of the intelligence team, and Mr. Albostani was the leader of the logistics team.  https://www.reuters.com/article/us-saudi-khashoggi-suspects-factbox/factbox-who-are-the-15-saudis-who-came-to-turkey-ahead-of-khashoggi-killing-idUSKCN1MX2XG.
[131]  https://www.spa.gov.sa/viewstory.php?lang=en&newsid=184171.5
[132]  https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1841715.
[133]  Interview with the Minister of Foreign Affair.s
[134]  Copy of the letter from the Office of the Chief Public Prosecutor to the Competent Judicial Authorities of the Kingdom of Saudi Arabia, dated 16 November 2018.

## XIV.    Other countries impose sanctions on the Saudi officials.

173.    On October 13, President Trump vowed "severe punishment" for Saudi Arabia if it was found responsible for Mr. Khashoggi's death, but he rejected all ideas of sanctions on weapons deals.[135]

174.    On 25 October, in a single reading, the European Parliament adopted a "Resolution on the Killing of Journalist Jamal Khashoggi in the Saudi Consulate in Istanbul".[136] The resolution condemned the killing, urged the Saudi authorities to disclose the whereabouts of Mr. Khashoggi's remains, and recalled that the "systematic practice of enforced disappearances and extrajudicial killings constitute[d] a crime against humanity." The resolution called further for an independent and impartial international investigation. It called on the European Members States to "stand ready to impose targeted sanctions, including visa bans and asset freezes against Saudi individuals, as well as human rights sanctions against the Kingdom of Saudi Arabia" on both the perpetrators of and the masterminds behind the killing.

175.    On 15 November, several hours after the announcement of indictments by the deputy Saudi Prosecutor, the U.S. Department of the Treasury's Office of Foreign Assets Control imposed sanctions on seventeen Saudis for their involvement in the killing of Mr. Khashoggi. The announcement stated:

176.    "Saud Al-Qahtani is a senior official of the Government of Saudi Arabia who was part of the planning and execution of the operation that led to the killing of Mr. Khashoggi in the Saudi Consulate in Istanbul, Turkey on October 2, 2018.  This operation was coordinated and executed by his subordinate Maher Mutreb, and involved participation of at least 14 other Saudi government officials:  Salah Tubaigy; Meshal Albostani; Naif Alarifi; Mohammed Alzahrani; Mansour Abahussain; Khalid Alotaibi; Abdulaziz Alhawsawi; Waleed Alsehri; Thaar Alharbi; Fahad Albalawi; Badr Alotaibi; Mustafa Almadani; Saif Alqahtani; and Turki Alsehri.  The Saudi Consulate in Istanbul, where Mr. Khashoggi was killed, was overseen by Consul General Mohammed Alotaibi.  All of these individuals are designated for being responsible for, or complicit in, or having directly or indirectly engaged in serious human rights abuse."[137]

177.    On 19 November, Germany issued travel bans against eighteen Saudis. However, the Foreign Ministry did not release the names of those sanctioned, citing limitations imposed by Germany's privacy laws.[138] The travel restrictions, coordinated with France and the United Kingdom, applied to the European Union's Schengen Area.[139] At the same time, Germany also suspended weapon sales to Saudi Arabia.

178.    On 20 November, President Trump issued a statement that the "crime against Jamal Khashoggi was a terrible one, and one that our country does not condone." His statement also said that "Representatives of Saudi Arabia say that Jamal Khashoggi was an "enemy of the state" and a member of the Muslim Brotherhood, but my decision is in no way based on that." The statement continued that "it could very well be that the Crown Prince had knowledge of this tragic event – maybe he did and maybe he didn't! That being said, we may never know all of the facts surrounding the murder of Mr. Jamal Khashoggi." President Trump declared that whatever the outcome or findings of an investigation, the United States relationship with Saudi Arabia would not change. [140]

---

[135] https://www.theguardian.com/world/2018/oct/13/donald-trump-jamal-khashoggi-saudi-arabia-cbs-interview.
[136] https://oeil.secure.europarl.europa.eu/oeil/popups/summary.do?id=1559341&t=d&l=en.
[137] https://home.treasury.gov/news/press-releases/sm547.
[138] https://www.dw.com/en/germany-issuing-travel-bans-to-18-saudis-over-khashoggis-death/a-46354147.
[139] https://www.bloomberg.com/news/articles/2018-11-19/germany-says-18-khashoggi-suspects-barred-from-european-travel.
[140] https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-standing-saudi-arabia/.

179.    On 22 November, France also imposed sanctions, including travel bans, on eighteen Saudis. Like Germany, France has not released the names of the individuals it sanctioned.[141]

180.    On 29 November, Canada imposed sanctions on seventeen Saudis. The sanctions froze the individuals' assets in Canada and rendered them inadmissible to Canada under the Immigration and Refugee Protection Act.[142]

181.    On December 21, the Turkish Authorities issued arrest warrants for Mr. Asiri and Mr. Alqahtani.[143] These were followed by extradition requests on 12 March 2019.

## XV.    Saudi Arabia Trials

182.    On 3 January 2019, the Saudi Press Agency issued a statement from the Saudi Public Prosecutor advising that an initial hearing concerning the eleven indicted individuals had been held in the Criminal Court of Riyadh. In the statement, the Prosecutor noted there was a continuing investigation into the culpability of other suspects in custody and noted that the Turkish Public Prosecutor had yet to respond to their letters requesting access to evidence relevant to the killing.[144] The Special Rapporteur learned from interviews that representatives of the United States, the United Kingdom, France, Russia, China and Turkey had attended the hearings.[145] This trial observation was based on an agreement of non-disclosure.[146] According to some reports, observers were summoned on short notice and barred from bringing interpreters.[147]

183.    The Special Rapporteur was informed by various governments' sources that the eleven individuals on trial in Saudi Arabia include the following persons, with the first five facing death penalty:

| | |
|---|---|
| **(i)** | Fahad Shabib Albalawi |
| **(ii)** | Turki Muserref Alshehri |
| **(iii)** | Waleed Abdullah Alshehri |
| **(iv)** | Maher Abdulaziz Mutreb |
| **(v)** | Dr. Salah Mohammed Tubaigy |
| **(vi)** | Mansour Othman Abahussain |
| **(vii)** | Mohammed Saad Alzahrani |
| **(viii)** | Mustafa Mohammed Almadani |
| **(ix)** | Saif Saad Alqahtani |
| **(x)** | Muflih  Shaya Almuslih |
| **(xi)** | Ahmad Mohammed Asiri |

184.    On 15 January 2019, Istanbul's Chief Public Prosecutor followed-up the 16 November request for the Saudi Prosecutor to share copies of the indictments and noted that at the current stage of its investigation, "it has become necessary to request a copy of all records and documents in the case file including the statements of suspects, the statements of witnesses, the indictment, the interrogation records, the minutes of hearing and the official

---

[141] https://www.reuters.com/article/us-saudi-khashoggi-france/france-imposes-sanctions-on-18-saudi-citizens-over-khashoggi-killing-idUSKCN1NR1VJ
[142] https://www.canada.ca/en/global-affairs/news/2018/11/jamal-khashoggi-case.html.
[143] Copy of extradition requests.
[144] https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1859811.
[145] https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=24421&LangID=E.
[146] Interview.
[147] https://www.reuters.com/article/us-saudi-khashoggi/royal-adviser-fired-over-khashoggi-murder-absent-from-saudi-trial-sources-idUSKCN1R50E1.

correspondences within the investigation and the proceedings conducted by the Judicial Authorities of Saudi Arabia."[148]

185.    On 31 January, a second hearing took place in Saudi Arabia. According to interviews conducted by the Special Rapporteur, this hearing was attended by a legal representative of Mr. Khashoggi's family.  Mr. Asiri was present but his lawyer did not attend the hearing. At this second hearing, the suspects' lawyers claimed that the defendants were state employees and could not object to the orders of their superiors. Mr. Turki, Mr. Albaladwi, and Mr. W. Alshehri said that Mr. Khashoggi started screaming, so they covered his mouth to prevent him from making noise, which resulted in them accidentally killing him. Mr. Almadani, the Saudi operative who pretended to be Mr. Khashoggi, said that it "was his duty" to do it. Mr. Asiri conceded that he had ordered the team to convince Mr. Khashoggi to return to Saudi Arabia, but had never ordered the use of force.[149]

186.    In February, reports surfaced that the Saudi Public Prosecutor had hired Kroll, a large private security firm, to conduct a forensic examination of a cellphone belonging to Mr. Alqahtani, the Crown Prince's Adviser. The review focused on WhatsApp messages exchanged between the Crown Prince and Mr. Alqahtani on 2 and 3 October 2018.  The report did not consider conversations that the two might have had using other devices applications or channels. According to the Wall Street Journal, which saw a draft of the Kroll Report, one message had been deleted from Mr. Alqahtani's phone.  Kroll was advised by the Saudi Public Prosecutor that "Mr. Qahtani had sent that message, realized it contained a typographical error, deleted it and then sent a corrected message."[150]   After reviewing the report, the Saudi Public Prosecutor concluded that none of the WhatsApp messages exchanged between Crown Prince Mohammed and Mr. Alqahtani concerned Mr. Khashoggi or his murder. The Kroll report has not been made public.

187.    On 17 March, at a follow-up Court hearing, according to interviews conducted by the Special Rapporteur, Mr. Almuslih claimed that he had no knowledge that the car he drove from the Consulate to the Residence contained Mr. Khashoggi's remains. Allegedly, it was only after his arrest that he learned that he had transported Mr. Khashoggi's remains. Mr. Albalawi said that Mr. Mutreb ordered him to dissect Mr. Khashoggi's body. The next hearing was scheduled for 24 March.

## XVI.    Other Saudi measures

188.    On 1 March, at the request of Turkey's Ministry of Justice, Interpol issued red notices for the arrest of twenty Saudis.[151]

189.    On 14 March, Bandar bin Mohammed Alaiban, the Head of the Saudi Human Rights Commission, delivered remarks to the U.N. Human Rights Council in Geneva in which he stated that Saudi Arabia has taken the measures required "for us to resolve this heinous crime". He added that Saudi Arabia would not accept calls to "internationalize" the ongoing legal proceedings, which would be perceived as foreign interference with domestic affairs.[152]

190.    On 1 April, media reports surfaced stating that Mr. Khashoggi's children had received large financial packages from the Saudi government. The Special Rapporteur learned of these allegations from other sources as well.

191.    On 10 April, Salah Khashoggi, Mr. Khashoggi's son, rejected the claim that a settlement has been reached, "The trial is taking place and no settlement discussion had been

---

[148]  Copy of a letter from the Office of the Chief Public prosecutor in Istanbul to the Competent Judicial Authority of the Kingdom of Saudi Arabia, dated 15 January 2019.

[149]  Interview.

[150]  https://www.middleeasteye.net/news/interpol-issues-red-notices-20-suspects-khashoggi-killing-including-top-mbs-adviser.

[151]  https://www.middleeasteye.net/news/interpol-issues-red-notices-20-suspects-khashoggi-killing-including-top-mbs-adviser.

[152]  https://www.npr.org/2019/03/14/703590542/saudi-arabia-rejects-calls-for-independent-investigation-into-khashoggi-killing.

or is discussed. The people who committed and were involved in this crime will all be brought to justice and face punishment." At the same time, he noted that King Salman and the Crown Prince "are considered and regarded as guardians of all Saudis. Acts of generosity and humanity come from the high moral grounds they possess, not admission of guilt or scandal."[153]

192.    On 8 April, the United States Department of State issued a list of sixteen Saudis designated in the murder of Mr. Kashoggi, one less than the seventeen named in the Department of Treasury sanctions from 15 November. The State Department sanctions did not include Consul General Mohammed Alotaibi. The designation was issued under the Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act of 2019 (Section 7031(c)), which provides that "in cases where the Secretary of State has credible information that officials of foreign governments have been involved in significant corruption or gross violations of human rights, those individuals and their immediate family members are ineligible for entry into the United States. The law requires the Secretary of State to publicly or privately designate such officials and their immediate family members."[154]

---

[153]   https://twitter.com/salahkhashoggi/status/1115942752385212423.
[154]   https://www.state.gov/r/pa/prs/ps/2019/04/290986.htm.

*Table D: Legal and Other Proceedings Against Those Allegedly Involved in the Execution*

|  | Name | Turkey Arrest Warrant | KSA Arrests | KSA Indictment | US Treasury Sanctions | US State Department Sanctions |
|---|---|---|---|---|---|---|
| 1. | Mansour Othman Abuhussain | x | x | x | x | x |
| 2. | Naif Hasan Alarifi | x | x | NO | x | x |
| 3. | Mohamed Saad Alzahrani | x | x | x | x | x |
| 4. | Khalid Aedh Alotaibi | x | x | NO | x | x |
| 5. | Abdulaziz Mohammed Alhawsawi | x | x | NO | x | x |
| 6. | Meshal Saad Albostani | x | x | NO | x | x |
| 7. | Maher Abdulaziz Mutreb | x | x | x(D) | x | x |
| 8. | Waleed Abdullah Alshehri | X | x | (D) | x | x |
| 9. | Fahad Shabib Albalawi | x | x | x(D) | x | x |
| 10. | Badr Lafi Alotaibi | x | x | NO | x | x |
| 11. | Dr. Salah Mohammed Tubaigy | x | x | x(D) | x | x |
| 12. | Mustafa Mohammed Almadani | x | x | x | x | x |
| 13. | Thaar Ghaleb Alharbi | x | x | NO | x | x |
| 14. | Saif Saad Alqahtani | x | x | x | x | |
| 15. | Turki Musharraf Alshehri | x | x | x(D) | x | x |
| 16. | Mohamed Alotaibi | No | NO | NO | x | No |
| 17. | Muflih Almuslih | X | X | X | No | No |
| 18. | SA | X | X | No | No | No |
| 19. | YK | | | | | |
| 20. | AAA | X | X | No | No | No |
| 21. | ASA | | | | | |
| 22. | Ahmad Mohammad Asiri | X | X | X | No | No |
| 23. | Saud Alqahtani | X | No | No | X | X |

*The 15 Man Team* (rows 1–15)

*\*(D) stands for death penalty*

# PART II. The execution of Mr. Kashoggi, state and individual responsibilities

## I.   The right to Life

193.   The right to life is a foundational and universally recognized right, applicable at all times and in all circumstances, including during armed conflict or other public emergency. This right to life is a norm of jus cogens, and is protected by international and regional treaties, customary international law and domestic legal systems.  The "preservation of this right is one of the essential functions of the state and numerous provisions of national legislations establish guarantees to ensure the enjoyment of this right."[155]  This responsibility to respect the right to life applies extraterritorially, at a minimum to those under the effective control of the State.[156]

194.   The right to life has two components. The first and material component is that every person has a right to be free from the arbitrary deprivation of life: it places certain limitations on the use of force. The second and more procedural component is the requirement of proper investigation and accountability where there is reason to believe that an arbitrary deprivation of life may have taken place.

195.   States are required to respect and to protect the right to life "by law": "Deprivation of life is, as a rule, arbitrary if it is inconsistent with international law or domestic law."[157]  The "notion of 'arbitrariness' is not to be fully equated with 'against the law', but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability, and due process of law as well as elements of reasonableness, necessity, and proportionality." [158]  Arbitrary deprivation of life includes the intentional and often premeditated use of lethal State force outside of the judicial process – killings often referred to as extra-judicial executions.

196.   Abuse of state power to bring about a politically sanctioned arbitrary killing against a specific group or individual ignores state obligations to ensure due process, and constitutes a violation of the fundamental right to life as well as a violation of the rule of law. Moreover, the wider impact that an intentional targeted killing has on society is an element that may distinguish these acts from other violations of the right to life.  As a result of this abhorrent abuse of power and blatant disregard for the rule of law, extrajudicial killings have been considered, by the International Commission of Jurists, as a "grave human rights violation".[159] This categorization does not limit the scope of what falls under grave human rights violations but merely serves as an effort to describe the severity of extrajudicial killings. [160]

197.   Saudi Arabia is subject to this peremptory and customary norm and is obligated to respect the right to life.  The Arab Charter on Human Rights, which Saudi Arabia has ratified, recognizes that "[e]very human being has the inherent right to life", that the "right shall be protected by law", and that "[n]o one shall be arbitrarily deprived of his life."[161]  In making this declaration of rights, the Arab Charter "reaffirms the principles of the Charter of the United Nations, the Universal Declaration of Human Rights and the provisions of the

---

[155]   A/37/564, p 22

[156]   General Comment 36, para. 63.

[157]   General Comment 36, para. 12

[158]   Ibid

[159]   International Commission of Jurists, Enforced Disappearance and Extrajudicial Execution: Investigation and Sanction A Practitioners Guide, http://icj.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/Universal-Enforced-Disappearance-and-Extrajudicial-Execution-PGNo9-Publications-Practitioners-guide-series-2015-ENG.pdf, 86.

[160]   The terms of reference of the Special Rapporteur's mandate "are not best understood through efforts to define individually the terms "extrajudicial", "summary" or "arbitrary", or to seek to categorize any given incident accordingly."  Report of the Special Rapporteur, Philip Alston, E/CN.4/2005/7, 22 December 2004 para. 6.

[161]   Arab Charter on Human Rights, Article 5.

International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights."[162]  In addition, Saudi Arabia has also ratified the Convention Against Torture[163].

## II.    Analysis of the facts of the execution of Mr. Khashoggi

198.    In analyzing the facts, the Special Rapporteur reviewed four potentially credible hypotheses related to the unlawful death of Mr. Khashoggi: 1) premeditated killing; 2) kidnapping with premeditated killing if kidnapping proved impossible or unsuccessful; 3) the result of an accident in the course of kidnapping; 4) a decision to kill on site by members of the Saudi team.  From an international human rights law perspective, all four hypotheses would point to a crime constituting a serious human rights violation.  She has reached the conclusion that either the first or second hypothesis are the most credible.

### *The Planning of the Crime*

199.    **The interception of Mr. Khashoggi was the result of a planned and elaborate mission involving extensive coordination and resources.**  Evidence from Canada shows that Mr. Khashoggi had been at least the indirect object of Saudi surveillance.  The recordings of communications in the two days preceding the execution indicate that Mr. Khashoggi was known to be one of several individuals "being sought" by Saudi authorities.[164]  When the opportunity arose[165], an operation was launched in Riyadh, managed at high levels of the Saudi government.  Turkish intercepts reveal the involvement of an employee (Mr. Mutreb) of a senior advisor within the Court, the Consul General and others. The logistics were complex, with Saudi officials making the practical arrangements including travel and accommodation.  The operation involved multiple flights, including two private jets, one under diplomatic clearance.  It entailed training, with two Saudi attachés from Istanbul flying to Riyadh for "top secret", "urgent" training and preparation, and it required planning and execution in Istanbul.  Deceptive countermeasures appear to have been taken, such as the suggestion that tickets should be booked for family members on the trip to Riyadh and the use of a tourism company to book Istanbul hotels with a "sea-view" for the team of Saudi officials.[166]  The fact that a team was put together and operational within 48 hours tends to point to a "Special Operation" scenario, with core team members already appointed and in place, ready to act whenever the order comes. Such a level of preparation is unlikely to have occurred otherwise.[167]

200.    At the Consulate itself, further planning and preparation were required and undertaken.  The first group of team members appears to have assessed the Consulate, the day before the killing, to determine the best way to proceed.  An interrogation or disposal site was discussed that day.  An attaché stationed in the Consulate went to the Belgrad Forest, possibly to assess a disposal site.  On the day of the crime, the Consul General cleared the Consulate of most non-Saudi employees and ensured that any employees remaining at the Consulate stayed put in their offices.  According to Turkish officials, consulate cameras were disabled, although one news organization reports that tapes from consulate cameras were instead deleted.

---

[162]  Arab Charter on Human Rights, Preamble.
[163]  https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/SessionDetails1.aspx?SessionID=1011&Lang=en
[164]  Leaked reports suggest the existence of a Saudi "Rapid Intervention Group."
     https://www.nytimes.com/2019/03/17/world/middleeast/khashoggi-crown-prince-saudi.html
[165]  The Special Rapporteur has been informed that Mr. Khashoggi attempted to obtain the needed marriage documents online and within the United States but was told he needed to obtain them in Turkey.
[166]  The Saudi-owned al-Arabiya allegedly reported on October 2 that the members of the operations team were "tourists".  https://www.washingtonpost.com/world/middle_east/turkey-releases-passport-scans-of-men-it-says-were-involved-in-journalists-killing/2018/10/16/f425892e-d163-11e8-83d6-291fcead2ab1_story.html?utm_term=.0b142b25a131.
[167]   Interviews

A/HRC/41/CRP.1

201.   **Saudi high-level officials planned, oversaw and/or endorsed the mission:** The Saudi Prosecutor issued a statement on 15 November, 2018, claiming that the operation was planned by the "former" deputy chief of intelligence, most likely Mr. Ahmed Asiri, who is currently indicted, and asserting that he ordered the "leader of the mission" to "bring back the victim by means of persuasion, and if persuasion fails, to do so by force". Mr. Asiri requested that a "former" Senior Advisor at the Royal Court, allocates one of his employees, to the team. Subsequent documents and statements identified the adviser as Mr. Saud Alqahtani and his employee as Mr. Mutreb who allegedly became the head of the team responsible for "negotiating" with Mr. Khashoggi. Mr. Mutreb, Mr. Alqahtani's employee, was involved in the planning of this mission from the very start, soon after Mr. Khashoggi first arrived at the Saudi Consulate on 28 September: within hours, he was discussing Mr. Khashoggi's schedule with Consulate staff. Mr. Mutreb states he informed the "Communications office" of Mr. Khashoggi's Consulate visit. According to the Saudi prosecutor, Mr. Alqahtani also met with the "negotiation" team in advance of the mission and sought Mr. Khashoggi's return, saying that he was a "threat to national security."

### Credible Evidence of Premeditation of Murder

202.   **Dr. Tubaigy's presence on the team:** the 15-man team included a forensic doctor, Dr. Tubaigy. There is little plausible explanation for his role, other than the role he filled – dismembering and disposing of the body. On 15 November, 2018, the Saudi Prosecutor suggested that Dr. Tubaigy was recruited for removing evidence, should force be used on Mr. Khashoggi in returning him to Saudi Arabia. This explanation is dubious. If that were the case, more appropriate candidates for such a task would be scientific, forensic or technical experts of the kind that came to Turkey after the execution of Mr. Khashoggi.

203.   Credible evidence suggests that the decision to kill Mr. Khashoggi was made before the plane carrying Dr. Tubaigy and Mr. Mutreb had left Saudi Arabia. According to an Intelligence expert involved in "Special Operations" consulted by the Special Rapporteur, the initial team in place at the Consulate the day before the others arrived, likely assessed the location and either confirmed a decision to kill or decided it was necessary. Dr. Tubaigy does not appear to have been a core team member but to have been newly recruited to the team, given his concern that he was unprotected since his boss was unaware of his involvement. Hence, it is likely that he was recruited specifically for this mission for the role he ultimately filled: disposal of the body.

204.   **Presence of a Look-Alike, Mr. Almadani:** The presence of a look-alike, intended to make it seem that Mr. Khashoggi had left the Consulate, likewise suggests that murder was pre-planned. If this were a mission to convince him to return to Saudi Arabia, a look-alike certainly would not be needed as his return would have been public. A special operations expert has informed the Special Rapporteur that, if this were a kidnapping, a look-alike would be unnecessary. To the Special Rapporteur's knowledge, no look-alike has been used by Saudi Arabia in previous kidnappings: the person was simply taken. A look-alike is more likely intended to mask an enforced disappearance, or a killing to create a counter-story (which was in fact the story initially presented by officials in Saudi Arabia). Moreover, Mr. Almadani's role was clearly pre-planned: he wore a false beard when posing as Mr. Khashoggi, a costume that required advance preparation. Mr. Almadani's presence on the team suggests that murder was planned prior to Mr. Almadani's leaving Saudi Arabia for Istanbul.

205.   Team members assigned to Residence: The decision to have five members of the team remain at the Residence also suggests a pre-planned role that was to be carried out specifically at the Residence of the Consul General – a role that appears in fact to have been put into effect when Mr. Khashoggi's body was taken to the Residence. If the team members were simply resting and waiting for their role, they would likely have remained in their hotels.

206.   Recording of Mr. Khashoggi's Death: Dr. Tubaigy discussed dissection of a body in the Consulate at 13:02 on 2 October, thirteen minutes before Mr. Khashoggi arrived. Dr. Tubaigy expressed hope that a dissection would be easy, explained that separating the joints should not be a problem, and commented that he had never cut something "on the ground". He felt that the torso would be too heavy to be carried in a bag. He described how a heavy body could be cut into pieces, wrapped and placed into plastic bags. Someone, reportedly

Mr. Mutreb, asked whether the "sacrificial animal" had arrived.  Given the context, this could only be meant to refer to Mr. Khashoggi.  At 13:15, Mr. Khashoggi arrived and he was taken to the second floor of the building, to or near the office of the Consul General.  He was asked whether he would return to Saudi Arabia and he explained that he may, in the future.  Someone suggests that Interpol has issued a Red Alert Notice and that he must return.  Mr. Khashoggi replies that there is no such case against him.  He was asked to text his son two or three times and he refused.  He was asked to take off his jacket, at which point he appears to have seen a syringe and asked whether he was going to be drugged.  During this exchange, one person is heard telling Mr. Khashoggi repeatedly to "cut it short."  The sounds of struggle last approximately seven minutes;  sounds that intelligence experts have interpreted as asphyxiation using a bag.  At 13:39, just 24 minutes after he arrived at the Consulate and 37 minutes after the discussion of dismemberment, a sound could be heard that Turkish Intelligence assessed to be saw.[168]  The sound of plastic sheets (wrap) could also be heard.  Turkish Intelligence concluded that these sounds came after Mr. Khashoggi's death and when Saudi team members were dismembering his body.[169]

207.    One should use common sense when considering and evaluating this evidence, giving it "a reasonable and fair construction in the light of … common knowledge".[170]  If dismemberment of a body is discussed half an hour before the body is in fact dismembered, one can conclude that killing and dismemberment were intended, particularly when the perpetrators had the necessary tools to hand.  Murder was intended to occur at some point.  Whether this was meant to occur within the first 40 minutes of Mr. Khashoggi arrival in the consulate cannot be ascertained.

208.    It also seems improbable that this plan to murder was hatched by the team on its own, or as has been apparently argued at trial, by the team leader alone, once on site.  The presence of the pathologist on the 15-man team is relevant to determining what the original intent of the mission was by those who commissioned it.  His presence suggests one of three options: 1) that murder was the primary intent of the mission; 2) that murder was planned after several days of interrogation; or 3) that murder was the immediate second option should Mr. Khashoggi refuse to return to Saudi Arabia.

209.    It would appear improbable that any leader of a special operations team, would unilaterally change the mission to murder without authorization from his superiors.  A unilateral decision to kill, in defiance of orders, would seem only to put the team, and particularly the team leader at risk.  It is hard to accept the theory that the 15 persons team leader planned this murder without any authorization from superiors in Riyadh.

210.    It is less clear, from the evidence, who on the 15 persons team was aware of the plan to kill.  Experts consulted have suggested that Special Operations team members are usually all aware of the precise roles they will play and that they usually knew the exact purpose of the mission.  However, it is not known whether those conventions applied here.  It is the Special Rapporteur's understanding that some of the individuals on trial in Saudi Arabia are disclaiming any advance knowledge that Mr. Khashoggi was to be killed.

211.    The Saudi Prosecutor is seeking the death penalty allegedly against Mr. Mutreb, Dr. Tubaigy, Mr. Turki Alsehri, Mr. Fahad Albalawi and Mr. W. Alsehri.  At a hearing on 17 March, it is reported that the official who drove the car from the Consulate to the Residence, insisted that he had no knowledge that he was transporting Mr. Khashoggi's remains.  Three team members are seen on CCTV carrying the bags, apparently containing Mr. Khashoggi's remains, into the Residence.  Mr. Almadani and Mr. Alqahtani performed a ruse to make it seem like Mr. Khashoggi had left, with Mr. Almadani wearing clothes taken from Mr.

---

[168]  The Special Rapporteur and her colleagues were not able to make that assessment. Pathologists consulted suggested that any cutting instrument can be used for the purpose of dislocating and dissecting a body, including kitchen tools although professional instruments (scalpels, surgical shears, etc.) would be best.

[169]  One possible theory proposed by pathologists is that the blood was drained from the cadaver before dismemberment or aspirated during the dissection.

[170]  Proposed jury instructions, https://www.justice.gov/atr/case-document/united-state-proposed-jury-instructions.

Khashoggi. The Consul General made arrangements at the Consulate and Residence. It is unclear what the remaining members of the team did and what their knowledge and intent were. However, even if they were aware that the objective of the mission was a kidnapping, this too would have been an illegal operation for which they will be liable.

### Possible Accident

212.    The suspects in the Saudi trial have suggested that Mr. Khashoggi's death was an accident. While the Special Rapporteur does not know specifically what the defendants are saying, it has been suggested that they are arguing Mr. Khashoggi was either overdosed (according to the Prosecutor's statement in November) or possibly accidentally smothered. At the trial in Saudi Arabia, three of the officials on trial have allegedly said that Mr. Khashoggi started screaming, so they covered his mouth to prevent him from making noise, which accidentally killed him.

213.    The evidence of premeditation strongly weighs against any claim of accidental death. In the tape that the Special Rapporteur heard of Mr. Khashoggi's killing, Mr. Khashoggi did not start screaming. There were no expressions of surprise or shock at his death among the Saudi officials present at the scene. There were no sounds or words that suggested an attempt to resuscitate him. The sounds and conversation appear inconsistent with an unexpected death. The Special Rapporteur notes that it is possible that some members of the Special Mission Team, particularly those who were not physically present in the room, were told or believed that the death was accidental.

## III.    State Responsibility for the execution of Mr. Khashoggi

### Determination of State responsibilities: Applicable Standards

214.    "Deprivation of life involves an intentional or otherwise foreseeable and preventable life-terminating harm or injury, caused by an act or omission."[171] The "intentional taking of life by any means is permissible only if it is strictly necessary in order to protect life from an imminent threat."[172]

215.    A State is obligated to take all necessary steps to ensure its officials do not perpetrate an attack causing an extrajudicial killing or arbitrary deprivation of life.[173] In particular, a State must take all necessary steps to prevent killings resulting from the "excessive or illegal use of force by a public official or other person acting in an official capacity or by a person acting at the instigation, or with the consent or acquiescence of such person".[174] To prevent such killings, a State must "ensure strict control, including a clear chain of command over all officials responsible for apprehension, arrest, detention, custody and imprisonment" and shall "prohibit orders from superior officers or public authorities authorizing or inciting other persons to carry out" any such killings.[175] In other words, State officials have an obligation both to control and adequately supervise their officers and to ensure that their own statements cannot be construed, correctly or incorrectly, as encouraging murder.

216.    rticle 7 of the International Law Commission Draft Articles on the Responsibility of States for Internationally Wrongful Acts (thereafter ILC States responsibilities) provides that the conduct "of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the … person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions." The Commentary explains:

---

[171]  GC 36, para. 6
[172]  GC 36, para. 12
[173]  Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions, 1989.
[174]  UN Principles,1989, para. 1.
[175]  (1989 UN Principles, paras. 2-3).

The State cannot take refuge behind the notion that, according to the provisions of its internal law or to instructions which may have been given to its … agents, their actions or omissions ought not to have occurred or ought to have taken a different form.  This is so even where the organ or entity in question has overtly committed unlawful acts under the cover of its official status or has manifestly exceeded its competence.  It is so even if other organs of the State have disowned the conduct in question.[176]

This "rule evolved in response to the need for clarity and security in international relations"[177] and is now "firmly established".[178]

217.    The "central issue to be addressed in determining the applicability of article 7 to unauthorized conduct of official bodies is whether the conduct was performed by the [agent] in an official capacity or not."[179]  A distinction must be made between "[c]ases where officials acted in their capacity as such, albeit unlawfully or contrary to instructions" and "cases where the conduct is so removed from the scope of their official functions that it should be assimilated to that of private individuals, not attributable to the State."[180]  Applying this distinction, States have been found responsible, under international law, for murders and other acts committed by their officials, when those officials acted "under cover of their status as officers and used means placed at their disposal on account of that status."[181]  State have even been found responsible when officers used their governmental powers as "a mere pretext for taking private vengeance"[182] – the critical factor being that they used the government powers and means in taking those acts.  Finally, a State organ acting ultra vires or in breach of the rules governing its operation has also been found to be acting in the name of the State.[183]

218.    In sum, a State cannot evade responsibility for the acts of their officials by claiming that they acted "rogue."  Otherwise, "one would end by authorizing abuse, for in most cases there would be no practical way of proving that the agent had or had not acted on orders received."[184]

### *The Responsibility of the Kingdom of Saudi Arabia for the commission of the execution*

219.    Various explanations and accusations have been offered on the circumstances of Mr. Khashoggi's death, but none alters State responsibility.  It is legally irrelevant to State responsibility which high level officials actually ordered Mr. Khashoggi's death, or whether one or all of them ordered a kidnapping that was botched with an accidental killing, or whether the officers acted on their own initiative to render Mr. Khashoggi back to Saudi Arabia and killed him in the process, or whether the officers acted ultra vires (the so-called rogue state agents theory) and killed him intentionally.  The above analysis of the facts of the killing has already well demonstrated State Responsibility. Some, although not all, of the evidence is summarized below.

---

[176]  Draft Articles on the Responsibility of States for Intentionally Wrongful Acts, Art. 7, Commentary, para. 2

[177]  Ibid., Art. 7, Commentary, para. 3.

[178]  Ibid., para. 4.

[179]  Ibid., para. 7.

[180]  Ibid.

[181]  Ibid., para. 5 (quoting the *Caire* case)

[182]  Mallén (Mex.) v. United States, 4 R.I.A.A. 173, 177 (Gen. Cl. Comm'n 1927); Youmans (U.S.) v. United Mexican States, 4 R.I.A.A. 110, 116 (Gen. Cl. Comm'n 1926)(finding Mexico responsible for the acts of soldiers who fired on Americans rather than protecting them); Caire, 5 R.I.A.A. _ Mexico found responsible when soldiers executed French citizen when he would not pay bribe); see generally Chimène Keitner, "Categorizing Acts by State Officials: Attribution and Responsibility in the Law of Foreign Official Immunity," 26 Duke J. Comp. & Int'l L. 451 (2016).

[183]  ILC, para.13

[184]  Draft Articles on the Responsibility of States for Intentionally Wrongful Acts, Art. 7, Commentary, para. 3.

 (a) High level officers planned, supervised and thus authorised the mission, exhorted the team members about the importance of the mission to national security, and expected the team to report back to headquarters.

 (b) The officers who killed Mr. Khashoggi acted "under cover of their status as officers and used means placed at their disposal on account of that status."185

 (c) The killing was only possible because of the pretense of government service: Mr. Khashoggi entered the Consulate, on a prearranged date, to obtain an official government document.

 (d) The killing occurred at the Consulate in or near the Consul General's office.

 (e) The killing was premeditated and prepared in Saudi Arabia; with the possible exception of the pathologist, most of the 15-persons Team was likely in place before 28 September.

 (f) Nine team members flew into Turkey on a private jet with diplomatic clearance.

 (g) Two members of the team used diplomatic passports.

 (h) State security agency officials arranged for all travel, including the private jets and accommodations.

 (i) The Consul General used the power of his office to clear the Consulate and Residence of witnesses.

 (j) The security team used government vehicles, apparently to transfer the body.

There can be no doubt that these officials acted in their capacity as State officials, with State means at their disposal, whether or not those on the ground "contravened instructions." Accordingly, Mr. Khashoggi's killing constituted an extrajudicial killing for which State responsibility attaches. Such a conclusion is further re-enforced by the failure of the State to investigate the execution of Mr. Khashoggi in accordance with international standards186, a failure which constitutes a separate violation of Mr. Khashoggi's right to life.

## IV. State Responsibility for International Wrongful Acts

220. An internationally wrongful act of a State "may consist of one or more actions or omissions or a combination of both"187.  Whether an act is wrongful is derived from treaties obligations or customary law obligations which the State in question may have violated. There is an internationally wrongful act of a State when "conduct consisting of an action or omission a) constitutes a breach of an international obligation of the State and b) is attributable to the State under international law"188.

221. Initially and generally, the concept of an international wrongful act has been applied bilaterally, i.e., an act done by one State against the "injured State," in violation of the first State's international obligations.  Increasingly, "it has been recognized that some wrongful acts engage the responsibility of the State concerned towards several or many States or even towards the international community as a whole."189

222. The State's violation of Mr. Khashoggi's right to life has been established. In addition to violating Mr. Khashoggi's right to life, Saudi Arabia can also be credibly argued to have committed a wrongful act against Turkey, violating multiple obligations to that State, a wrongful act against the United States, and a wrongful act against the entire international community, given its violation of the peremptory and customary norm against extrajudicial

---

185 Ibid., para. 5 (quoting the *Caire* case).
186 See Part III of this report.
187 Draft Articles on the Responsibility of States for Internationally Wrongful Acts, with commentaries (2001), Article 1, para. 1.
188 Ibid., Art. 2.
189 Ibid., Art. 1, para. 4.

killings, its violation of the sanctity of the Consulate and its unjustified use of deadly force extraterritorially. This creates not only rights on the part of Turkey and the international community but also obligations on all States to ensure that the violation ends and is non-recurring.[190]

### Violation of the Vienna Diplomatic and Consulate Immunities[191]

223.    Mr. Khashoggi's killing occurred in the Consul General's office with the involvement of at least some people who had diplomatic immunity.  This State act constituted a gross and egregious violation of the Vienna Convention on Consular Relations (VCCR) and stymied efforts on the part of Turkey to investigate the crime. Using a consulate to kill and hide the crime undoubtedly violated Turkey's rights under the VCCR, but it also undermined core principles critical to the functioning of international relations.

224.    That the killing violated the VCCR does not require explanation.  Consular premises "shall not be used in any manner incompatible with the exercise of consular functions" (Art. 55(2)), and officers are required to "respect the laws and regulations of the receiving State" (Art. 55(1)).  Murder, as well as kidnapping, is an incompatible use and does not respect Turkey's domestic law.

225.    The location of the murder, and the diplomatic and consular immunity of some of the perpetrators, undermined efforts of Turkey to respond to this crime.  Article 31 of the VCCR, "Inviolability Of The Consular Premises," provides that the receiving State may not enter that part of the consular premises "used exclusively for the purpose of the work of the consular post" except with the consent of the head of the consular post or his designee or the sending state's ambassador.  Once Turkey publicly announced its awareness that Mr. Khashoggi had been murdered, Saudi Arabia deliberately used consular immunity to stall Turkey's investigations until the crime scene could be thoroughly cleaned.[192]

226.    The International Court of Justice has emphasized the critical role of the VCCR and VCDR in facilitating international relations and preserving the peace.  The "institution of diplomacy, with its concomitant privileges and immunities, has withstood the test of centuries and proved to be an instrument essential for effective cooperation in the international community, and for enabling States, irrespective of their differing constitutional and social systems, to achieve mutual understanding and to resolve their differences by peaceful means".[193]  The maintenance of these rules "is vital for the security and well-being of the complex international community of the present day, to which it is more essential than ever that the rules developed to ensure the ordered progress of relations between its members should be constantly and scrupulously respected."[194]

### Violation of the customary law against extraterritorial use of force

227. Article 2(4) of the United Nations Charter provides that all members "shall refrain in their international relations from the threat or use of force against the territorial integrity or

---

[190]  Ibid., Art. 41, 48.
[191]  Turkey's interception or monitoring of the Saudi consulate's official communications is discussed in Part VI of the report.  It most likely violated the VCCR provisions regarding the inviolability of the Saudi Consular communications. But it is questionable whether such violation amounts to an international wrongful act. Further, it cannot be seen to be on par with the use of a Consulate for an extrajudicial execution.
[192]  The VCCR's limits on interviewing and prosecuting consulate employees did not apply in this case. Most of those responsible had already left the country before Turkey was fully aware of the magnitude of the crime, but if they had remained, Turkey would have been able to arrest them, despite any immunity, for a 'grave crime' (VCCR, Art. 41).  Turkey also was able to compel witness testimony, as that testimony relates to a murder, not consular functions (VCCR, Art. 44).
Interestingly, and no doubt not coincidentally, the private plane transporting the team that killed Mr. Khashoggi revised its flight plan to flag the flight as diplomatic, thereby triggering immunities under the VCCR.  They left the country before their immunity could be tested.
[193]  Case concerning United States Diplomatic and Consular Staff, Order of 15 December 1979, para. 39.
[194]  Case concerning the United States Diplomatic and Consular Staff in Tehran, Judgement of 24 May 1980, para. 92.

political independence of any state, or any other manner inconsistent with the purposes of the United Nations."[195]

228. The Security Council has previously condemned one extraterritorial extrajudicial killing as "aggression, perpetrated … against the sovereignty and territorial integrity" of a nation, "in flagrant violation of the Charter of the United Nations, international law and norms of conduct". It has called upon all States "to prevent such acts against the sovereignty and territorial integrity of all States."[196]

229. One purpose of the United Nations is to achieve international cooperation "in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion."[197] These include the "right to freedom of expression and opinion recognized by the Universal Declaration of Human Rights, and subsequent International and Regional Treaties." [198] There can hardly be a greater "interference" with freedom of opinion and expression than killing a journalist or disappearing him in an apparent attempt to silence him. The State of Saudi Arabia thereby committed an act inconsistent with a core tenet of the United Nations.  As such, it can be credibly argued that it used force in a manner "inconsistent with the Purposes of the United Nations."

230. It can be credibly argued as well that the killing of Mr. Khashoggi interfered with the right of a sovereign state, most particularly Turkey but also that of the United States, "to conduct its affairs without outside interference."[199]  It is "[t]he duty of a State to refrain from any economic, political or military activity in the territory of another State without its consent."[200]  The extrajudicial execution of Mr. Khashoggi, a Washington Post columnist, in order to silence him, interfered with the liberties of the United States, enshrined in the United States Constitution.[201]

### Other violations

231.   As well elaborated upon by the International Law Commission Draft Articles on the responsibility of States for Internationally Wrongful Acts (Draft Articles), the fact that one particular State, such as Turkey, or indeed the United States, has been injured "does not exclude that all State parties may have an interest of a general character in compliance with international law[202].  "[C]ertain obligations are owed to the international community as a whole" and "by reason of 'the importance of the rights involved' all States have a legal

---

[195] See also the repertoire of the Practice of the Security Council: "The *Repertoire*, mandated by the General Assembly …, provides comprehensive coverage of the Security Council's interpretation and application of the United Nations Charter and its own Provisional Rules of Procedure since 1946.  Its primary purpose is to provide Member States, including those elected to serve on the Security Council, the United Nations system, academics and others with a source of information regarding the evolving practice of the Security Council." About the Repertoire, https://www.un.org/securitycouncil/content/repertoire/about-repertoire

[196] Resolution 611 (1988)(condemning a killing carried out by Israel on Tunisian soil), paras. 1-2.

[197] Repertoire of the Practice of the Security Council, Part III: Purposes & Principles of the Charter of the United Nations, 20th Supplement (2016–2017), Art. 1, para. 3 (emphasis added).

[198] U.N. Declaration on Human Rights art.  19 ("Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.").

[199] *Case Concerning Military and Paramilitary Activities In and Against Nicaragua* (*Nicaragua. v. U.S.*) ("*Nicaragua*"), 1986 ICJ at 106, para 202.

[200] Declaration on the Inadmissibility of Intervention and Interference in the Internal Affairs for States ("Non-Intervention Declaration") Part II(o).

[201] Lee Bollinger, prominent First Amendment scholar, has suggested that "The murder of a prominent journalist writing for a U.S. newspaper is a prime example of the sort of "censorship abroad" that, in today's increasingly and inherently globalized discourse, undermines freedom of speech and the press here in the United States." https://www.washingtonpost.com/opinions/how-the-us-could-prosecute-jamal-khashoggis-killers/2019/03/31/1f8a7f4c-5180-11e9-88a1-ed346f0ec94f_story.html?utm_term=.5554a98db1a1

[202] Non-Intervention Declaration, Chapter III, Serious Breaches of Obligations Under Peremptory Norms of General International Law, para 2.

interest in their protection. [203] "   A serious breach of a peremptory norm of general international law, constituting a "gross or systematic failure by the responsible State," is such an obligation: it has an *erga omnes* character, giving all States a legal interest in its protection.

232.   The Committee Against Torture in its recent follow-up to its concluding observations on Saudi Arabia suggests that the circumstances of the extrajudicial killing of Mr. Khashoggi point to a possible act of torture.[204]   Both the possible torture of Mr. Khashoggi and his continuing disappearance because of the unknown location of his remains, qualify as a gross failure by Saudi Arabia, requiring an international response.

233. Saudi Arabia's violation of the VCCR and its extraterritorial use of force constitute serious breaches which concern all States. Indeed, the International Law Commission has specifically cited the violent breach of an embassy as an example where injury to one state "does not exclude that all States parties may have an interest of a general character in compliance with international law and in the continuation of international institutions and arrangements which have been built up over the years[205]."

234. Article 41 of the Draft Articles provides that States "shall cooperate to bring to an end through lawful means of any serious breach within the meaning of article 40."  Although arguably the breach of international law has ended – Mr. Khashoggi is dead – serious breaches continue.  Mr. Khashoggi's remains have not been recovered and returned to his family, Saudi Arabia has not met its obligation to investigate this crime properly under international law, and, to the Special Rapporteur's knowledge, Saudi Arabia has failed to comply, in good faith, with the obligation of non-repetition.

## V.   Individual criminal responsibilities for the killing of Mr. Khashoggi

235.   It is the conclusion of the Special Rapporteur that Mr. Khashoggi has been the victim of a deliberate, premeditated execution, an extrajudicial killing for which the state of Saudi Arabia is responsible under international human rights law.  In addition, the execution of Mr. Khashoggi demands that those responsible be identified and held to account for their role in the execution of Mr. Khashoggi.

236.   Yet, some eight months after the execution of Mr. Khashoggi, the determination and assignment of individual responsibilities remain clouded in secrecy and lack of due process.

(a)   The trial of 11 suspects has been undertaken in Saudi Arabia. While the Government of Saudi Arabia has not made their identity public, reliable information obtained by the Special Rapporteur indicates that some members of the 15-man team identified by Turkey as well as other officials have not been charged. The Saudi government investigated 10 individuals in addition to those charged but no information has been issued as to whether that investigation continues.

(b)   Turkey intends to prosecute individuals for the crime but it also has not made public the identity of those it will seek to try.

(c)   Other States, including the United States, France, Germany, and the UK, as well as the European Union have instituted sanctions against individuals.  The United States has sanctioned all individuals in the 15-man team made public by Turkey, as well as two more: the Crown Prince Adviser, Saud Alqahtani and the Consul General Mohammed Alotaibi – a different group of individuals than is currently on trial in Saudi Arabia.

Specifically, it has not sanctioned Ahmed Asiri, the person whom the Saudi prosecutor appears to claim organized the mission, but has sanctioned Saud Alqahtani whom Saudi

---

[203]   ILC, Art. 40, para.8
[204]   The Committee Against Torture has determined that the killing of Mr. Khashoggi may have possibly violated the Convention Against Torture, ratified by Saudi Arabia.
https://tbinternet.ohchr.org/Treaties/CAT/Shared%20Documents/SAU/INT_CAT_FUL_SAU_33228_E.pdf
[205]   Draft Articles on the Responsibility of States, Art. 42, para. 9

Arabia has not yet charged.  No country has offered explanations as to how they selected the targeted individuals and why they excluded others.[206]

237.    The inquiry undertaken by the Special Rapporteur is not that of a court of law. As such it has neither the mandate nor the resources to make final judgement as to the criminal liability of specific individuals. What it can do and has done is to assess the facts, as developed to date, to determine, on that basis, **whether there are reasonable grounds suggesting criminal liability warranting further investigations**.

238.    This objective raises the question of the legal framework against which individual responsibilities for the execution of Mr. Khashoggi are to be analysed.  The Special Rapporteur is referencing below the standards of individual liability that may be found in the International Convention on the Protection of All Persons Against Enforced Disappearance and the Convention Against Torture, as well as international criminal law. In setting these forth, the Special Rapporteur is not advocating for a specific form of responsibility or making a judgement between various theories of criminal responsibility.  The standards she outlines are intended only to provide context for the facts described and are not intended to suggest that individuals should be charged with a particular crime.  The decision as to the appropriate legal framework and what charges, if any, should be brought against which individual is left to whatever forum or tribunal might be constituted to further investigate this matter.

### Individual Liability Standards

239.    Under the International Convention against Enforced Disappearances, "any person who commits, orders, solicits or induces the commission of, attempts to commit, is an accomplice to or participates in an enforced disappearance" should be held criminally responsible[207].   Under international criminal law, any person who "planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution" of a crime is "individually responsible for the crime."[208]  This includes those who physically perpetrated the crime as well as those who jointly committed the crime or did so through another person.[209]

240.    Both the International Criminal Court ("ICC") and ad hoc tribunals have articulated theories of co-perpetration or joint action.  The ICC has imposed criminal responsibility on individuals under Article 25(3)(a) for performing "an essential task in the joint commission of the crime"[210].  This concept of co-perpetration requires (a) the "existence of an agreement or common plan between two or more persons", which "include[s] an element of

---

[206]  Please refer to Table D, Part I of this Annex.

[207]  International Convention for the Protection of All Persons from Enforced Disappearances, Article 6(1

[208]  Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Law Committed in the Territory of the former Yugoslavia since 1991, 32 ILM 1159, (1993), as amended by Security Council Resolution 1660 of 28 February 2006 ("ICTY Statute"), Art. 7(1); Statute for the International Tribunal for Rwanda, (1994) 33 ILM 1602, as amended by Security Council Resolution of 26 March 2004 ("ICTR Statute"), Art. 6(1); see The Prosecutor v. Delalic et al ("Celebici"), Case No. IT-96-21, Judgement, 16 Nov. 1998, para. 319-21 (finding that this constituted international customary law).

[209]  Unlike the statutes constituting the ad hoc tribunals of the former Yugoslavia and Rwanda, the Rome Statute of the International Criminal Court provides a hierarchy of responsibility under Article 25(3)(a)-(d).  See Rome Statute of the International Criminal Court, entered into force 1 July 2002, UN Doc. A/CONF. 183/9(1998) ("Rome Statute"), Art. 25.  The Special Rapporteur does not address this hierarchy and any differences with the jurisprudence of the ICTY and ICTR, particularly as to whether various levels of involvement represent different degrees of criminal responsibility.  Article 25(3)(a) of the Rome Statute covers "the notions of direct perpetration (commission of a crime in person), co-perpetration (commission of a crime jointly with another person) and indirect perpetration (commission of a crime through another person, regardless of whether the other person is criminally responsible)."  The Prosecutor v. Lubanga (ICC-01/04-01/06-803-tEN), Decision on the Confirmation of Charges, Pre-trial Chamber 1, 29 January 2007, para. 318.

[210]  Lachezar D. Yanev, Theories of Co-perpetration in International Criminal Law (Leiden, Brill I Nijhoff, Leiden, 2018), 32.

criminality"[211] and (b) an essential contribution by each co-perpetrator in the commission of a crime.[212]

241.    The ICC courts recognize "indirect perpetration" as a form of direct criminal responsibility under Article 25(3)(a), under which, because of the "hierarchical relationship" between the perpetrator and his subordinate, the perpetrator commits a crime "through another person".[213]   In recent years, that concept has been expanded to include indirect co-perpetration.  Under this theory, individuals can be held responsible when he "acts jointly with another individual" and that other individual "controls the person used as an instrument".[214] This form of responsibility contemplates an "organized and hierarchical apparatus of power" where the "execution of the crimes must be secured by almost automatic compliance" with orders.[215]

242.    Both direct and indirect forms of responsibility are designed to capture the likely involvement of superiors, and both are often charged against individual officials in international criminal cases, as it is not always possible to prove a specific order.

243.  National criminal law differs on the respective weight attributed to the criminal conduct (*actus reus*) and the mental state (*mens rea*), and whether various forms of complicity (e.g., aiding and abetting) lead to the same level of criminal responsibility.  However, there is considerable consensus across systems over the types of criminal conducts, including commission and omission liability, and over the different mental states, including purpose, knowledge and *dolus eventualis* (somewhat similar to recklessness or wanton disregard).  Intent in the form of *dolus eventualis* (or indeed criminal negligence) is sufficient to result in liability for murder.  Inciting the commission of a murder, along with aiding and abetting (or complicity) in the commission of a murder may also result in liability for murder or manslaughter across national systems.[216]

### *Responsibility of High-Level Officials or Command Responsibility[217]*

244.    A critical question is the potential criminal liability of high-level officials – those who are often "most responsible" as the "masterminds or architects" of the crime.  Much attention has been focused on whether the Crown Prince himself ordered the murder.   However, this focus on "ordering" the crime and on finding the "smoking gun" creates expectations which legal systems, both domestic and international, may not be able to meet.  The search for justice and accountability for human rights violations should also and as importantly require identifying those that have abused their influence and power or failed to act with the diligence required of their positions.

245.    The International Convention on Enforced Disappearances   (Article 6(1)) also demands that States hold Superiors criminally responsible if they (i) knew, or consciously disregarded information which clearly indicated, that subordinates under his or her effective authority and control were committing or about to commit a crime of enforced disappearance; (ii) Exercised effective responsibility for and control over activities which were concerned with the crime of enforced disappearance; and (iii) Failed to take all necessary and reasonable measures within his or her power to prevent or repress the commission of an enforced disappearance or to submit the matter to the competent authorities for investigation and

---

[211]   *Lubanga* Decision on the Confirmation of Charges, paras. 343-344.

[212]   *Lubanga* Decision on the Confirmation of Charges, para, 345.

[213]   Ibid., para. 318, 341, n. 420.

[214]   *Prosecutor v. Katanga and Chui,* Decision on the Confirmation of Charges, ICC-01/04-01/07-717, 30 September 2008, para. 493.

[215]   *Prosecutor v. Ntaganda*, Decision on the Prosecutor's Application under Article 58, ICC-01/04-02/06, 13 July 2012, para. 67.

[216]   See e.g. Kevin Jon Heller and Markus D. Dubber (eds), *The Handbook of Comparative Criminal Law,* Stanford University Press, 2010; Markus D. Dubber, Criminal Law in Comparative Context, in *Journal of Legal Education*, Vol. 56, No. 3 (September 2006), pp. 433-443; Mathias Reimann and Reinhard Zimmermann (eds)*, The Oxford Handbook of Comparative Law*, Oxford University Press, 2006

[217]   For an overview of what command responsibility entails, including under the Convention for the Protection of All Persons Against Enforced Disappearances, please see: https://www.legal-tools.org/doc/7441a2/pdf/

prosecution. Enforced disappearance is a crime even when it is committed sporadically, and not on a gross scale or systematic basis.

246.    The Convention, along with the jurisdiction developed by the International Criminal Court (ICC) and ad hoc tribunals, stipulates that superiors can be criminally responsible if there is "the existence of a superior-subordinate relationship"; they "knew or consciously disregarded information which clearly indicated that subordinates were about to commit or had committed criminal acts; and "the superior failed to take the necessary and reasonable measures to prevent the criminal act or punish the perpetrator thereof." [218]    The superior/subordinate relationship need not be formal, as long as the superior had "effective control" [219] over the subordinate, and superior officers can be held responsible for subordinates of subordinates[220].  Conversely, superiors whose subordinates are committing crimes upon the orders of even higher-level officials remain responsible for taking reasonable and necessary steps to prevent and punish these crimes.[221]

247.    The superior becomes responsible for their inaction "from the point at which he 'knew or had reason to know' of the crimes committed".[222]  A superior had reason to know "only if information was available to him which would have put him on notice of offences committed by subordinates."[223]

248.    Failure to punish is a crime in and of itself, and punishing the crime after the fact does not excuse or eliminate liability for any prior failure to prevent the crime.[224]  The response must be "necessary and reasonable" and the thoroughness of any investigation is a factor in deciding whether this obligation has been met.[225]  Effectively, the question is whether the superior "genuinely tried to prevent or punish" the crimes.[226]  If the superior knows that reporting to authorities is "likely to trigger an investigation that was a sham, such a report would not be sufficient to fulfil the obligation to punish offending subordinates."[227]

249.    The responsibility of high-level officials is not a derivative form of criminal responsibility but instead is designed to impose individual criminal responsibility for a superior's own role in permitting gross violations of international criminal law to occur or, by failing to investigate or punish those violations, to recur[228].

### Credible Evidence Warranting Further Investigation of Top Saudi Officials

250.    The Special Rapporteur addresses the question of credible evidence warranting further investigation of high-level officials currently not being criminally charged, specifically Saud Alqahtani, and the Crown Prince Mohammed bin Salman. No conclusion is made as to guilt.

---

[218]  Prosecutor v. Delalić, Mucić, Delić and Landžo, Case No. IT-96-21-T, Judgement, 16 November 1998 (Čelebići Trial Judgement), para. 346.  Article 28(b)(i) of the Rome Statute; UN Convention on the Protection of All Persons from Enforced Disappearance, Article 6(1)(b). The Rome Statute and the UN Convention  requires conscious disregard, while the Ad Hoc tribunals use the standard "knew or had reason to know."

[219]  Čelibići Trial Judgement, para. 378.

[220]  Boas, Gideon et al., International Criminal Law Practitioner Library: Vol. 1, Forms of Responsibility in International Criminal Law (Cambridge University Press: Cambridge 2008) at 191.

[221]  *Prosecutor v. Popović et al,* Case No. IT-05-88-A, Appeal Judgement, 30 January 2015, para 1931.

[222]  Prosecutor v. Kvočka et al, Case No. IT-98-30/1-T, Trial Judgement, 2 November 2001, para 317.

[223]  Prosecutor v. Delalić, Mucić, Delić and Landžo, Case No. IT-96-21-A, Appeal Judgement, 20 February 2001, para 241.

[224]  Boas, Gideon et al., Forms of Responsibility in International Criminal Law, at 179.

[225]  Boas, Gideon et al., Forms of Responsibility in International Criminal Law, at 233.

[226]  *Prosecutor v. Popović et al,* para. 1927.

[227]  *Prosecutor v. Boškoski and Tarčulovski,* Case No. IT-04-82-A, Appeal Judgement, 19 May 2010, para. 234.

[228]  Prosecutor v. Blaškić, Case No. IT-95-14-T, Judgement, 3 March 2000, para. 261 (individual criminal responsibility if superior did not "prevent crimes from being committed by his subordinates or, where applicable, punish them").

The only conclusion made is that there is credible evidence meriting further investigation, by a proper authority, as to whether the threshold of criminal responsibility has been met.

251.    The Special Rapporteur notes in addition that the following high-level officials were fired subsequent to Mr. Khashoggi's murder: the Deputy Head of General Intelligence for Human Resources and the General Director of Security and Protection of General Intelligence.  Their discharge suggests that they might have had some involvement or that they failed to act after they became aware of the crime.  The Government of Saudi Arabia should provide information as to the reasons for their being discharged.

252.    The Special Rapporteur is not addressing here the potential criminal liability of lower level officials.  However, she notes the unexplained discrepancy between those that the Kingdom of Saudi Arabia detained and those that it charged, including members of the 15-man team and certain security attachés.  See Section I, Table D.

**Saud Alqahtani**

253.    A senior advisor in the Royal Court Saud Alqahtani was responsible for social media communications for the Crown Prince.  There is credible evidence that he personally directed a campaign targeting activists and political opponents.  For example, he is alleged to have harassed individuals online and at one point he urged his followers to name those who supported Qatar and tweet them to #the black list.  He tweeted: "They will be sorted.  They will be followed up on from now" (Tweet, August 17, 2017).  He threatened those who attempted to conceal their identities online: "Does a pseudonym protect you from #the_black_list? No 1) States have a method to learn the owner of the pseudonym 2) the IP address can be learned using a number of methods 3) a secret I will not say." (Tweet, August 18, 2017).  He claimed he was acting under orders from the Monarchy: "*Do you think that I make things up with guidance?  I am a trustworthy employee who carries out the orders of my boss the king and my boss the crown prince*" (Tweet, August 17, 2017).

254.    Information available to the Special Rapporteur indicates that there are reasonable grounds to believe the following:

        (a)    The Special Rapporteur was informed that he was one of two officials who personally interrogated and threatened Prime Minister Saad Hariri of Lebanon,        during his detention in a private residence on the compound of the Ritz-Carlton        in Riyadh, in November 2017, to force him to resign.  People close to the incident suggested the Prime Minister had been the victim of "psychological torture" and treatment which may amount to cruel, inhuman and degrading.[229]

        (b)    According to UN reports and a person interviewed during the inquiry, Saud Alqahtani was personally involved in the arrest and torture of female activists Six     women activists have reported torture while in Saudi prison: Samar Badawi, Shadan al-Onezi, Aziza al-Yousef, Eman al-Nafjan, Loujain al-Hathloul, and Nouf al-Dosari.  Two have allegedly stated that Saud Alqahtani was physically present during their torture. According to an official February 2019 communication from Special Procedures to the Kingdom of Saudi Arabia, Al Qahtani told one of the women: "I'll do whatever I like to you, and then I'll dissolve you and flush you down the toilet."[230]

        (c)    It is notable that when Mr. Khashoggi walked into the Istanbul consulate on 28 September, the officer recognized him as "one on the people sought".  Mr. Mutreb, the alleged head of the Team responsible for "negotiating" with Mr. Khashoggi, and one of the initial officials involved in planning the mission, was himself an employee of Saad al-Qahtani, according to the Saudi Prosecutor.

        (d)    According to the Saudi Prosecutor statement of November 15, 2018, Saud Alqahtani was one of the senior officials directly involved in the mission. He is alleged to

---

[229]  Interviews
[230]  https://alqst.org/eng/confirms-new-details-of-torture-of-saudi-women-activists-as-british-mps-seek-access-to-prisons-to-investigate/

have personally exhorted members of the team to return Mr. Khashoggi to Saudi Arabia. He accused Mr. Khashoggi of being a national security threat.

(e)    The evidence suggests that the murder was premeditated and that the direction from superiors was to kill Mr. Khashoggi, at the very least if he would not agree to return. At a minimum, however, given the size and nature of the mission, a kidnapping was planned – a violation under international human rights law - and those who planned or endorsed the mission willingly accepted the risk of death or serious injury to Mr. Khashoggi during the commission of that crime.

(f)    There is no evidence that Saud Alqahtani at any point attempted to prevent crimes during the campaign against activists or during the mission targeting Mr. Khashoggi. There is similarly no evidence that he took steps to punish subordinates for any crimes that were committed.

(g)    The firing of Saud Alqahtani reflects some acknowledgement by the Government of Saudi Arabia of his involvement and responsibility. His criminal responsibility should be investigated further.

**Crown Prince Mohammed bin Salman**

255.    The Special Rapporteur understands the extreme sensitivity of considering the criminal responsibility of a person who, in conjunction with his father, the King, is running the operations of the State of Saudi Arabia. Academic research on Saudi Arabia tends to suggest that the level of control exerted by the Crown Prince over the management of the country's political, security and economic affairs is extremely high. The Crown Prince is less subject to the constraints that historically distributed power amongst the Royal Family and the Court.

256.    She also recognizes the unlikelihood that individuals still under the Crown Prince's control, would testify as to his involvement. Addressing this inherent difficulty is one of the primary purposes of the theories of criminal liability articulated and implemented since the days of Nuremberg: they are designed to ensure that no person, no matter his status, has impunity.

257.    The information available to the Special Rapporteur indicates that there are reasonable grounds to believe the following:

(a)    Based on her inquiry, the Special Rapporteur has found that Mr. Khashoggi was himself fully aware of the powers held by the Crown Prince, and fearful of him. Witnesses report that various Saudi emissaries (including Saud Alqahtani) did attempt to convince     Mr. Khashoggi to return to Saudi Arabia, with promises of work and a position. They further report that Mr. Khashoggi expressed fear about what would happen to him, should he return. He himself stated that much in private communications subsequently made public.

(b)    In the years preceding the execution of Mr. Khashoggi, United Nations Special Procedures and international human rights organisations reported a large number of arbitrary detentions of journalists and human rights defenders, but also Princes, businessmen and one Head of State[231]. The operation against Mr. Khashoggi has to be understood in relation to this organized and coordinated crack-down, one that included repeated unlawful acts of torture and physical harm. At a bare minimum, Crown Prince condoned this behavior and allowed the repetition and escalation of these crimes. He took no action to prevent or punish those responsible. The Crown Prince willingly took the risk that other crimes, such as the killing of Mr. Khashoggi, would be committed, whether or not he directly ordered the specific crime.[232]

---

[231]  See, e.g.
https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=23967;
https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=24291
At the time of writing, there are reports of new arbitrary detentions.
[232]  Prosecutor v. Tadić, Case No. IT-94-1-A, Appeals Chamber (15 July 1999), para. 220.

(c)     The Crown Prince played an essential role in permitting this campaign against dissidents and political opponents to occur, as the forces of the State could not be used in this manner without his agreement or acquiescence.

(d)     Evidence points to the 15-person mission to execute Mr. Khashoggi requiring significant government coordination, resources and finances.  While the Saudi government claims that these resources were put in place by Ahmed Asiri,   every expert consulted finds it inconceivable that an operation of this scale could be implemented without the Crown Prince being aware, at a minimum, that some sort of mission of a criminal nature, directed at Mr. Khashoggi, was being launched.

259.   As highlighted in the following Part of this report following the execution of Mr. Khashoggi, the Saudi authorities permitted, if not directed, what the Special Rapporteur has concluded amounted to destruction of evidence, in violation of the State obligations under international law. By October 5, three days after Mr. Khashoggi's murder but before it was publicly confirmed, the Crown Prince demonstrated that he was closely following the matter. He spoke about Mr. Khashoggi's disappearance in a television interview and said that Turkish authorities were welcome to search the Consulate.  Thereafter, Saudi officials proceeded to take multiple steps apparently designed to destroy evidence, while simultaneously denying Mr. Khashoggi's death, until the government was forced to acknowledge the murder.  This destruction of evidence could not have taken place without the Crown Prince's awareness.[233]

---

[233] The Kingdom of Saudi Arabia has insisted that it was investigating the crime during this period, but the burden is on Saudi Arabia to demonstrate that this claim is true and to produce the evidence that it claims to have collected.

# PART III - Investigation into the execution of Jamal Khashoggi

258.    The duty to investigate is central to upholding the right to life.[234] It asserts the inviolability and inherent value of the right to life through mechanisms of accountability, while simultaneously promoting remedies where violations have occurred. To this end, the duty gives practical effect and worth to a State's obligations to respect and protect life.  The obligation of investigation also includes duties of international cooperation,[235] no doubt heightened in a case such as the execution of Mr. Khashoggi, given the location of the crime (in a consulate). The obligation of cooperation was imposed on both Turkey and Saudi Arabia.

259.    This section will assess the extent to which Turkey and Saudi Arabia met their international obligations to investigate the execution of Mr. Khashoggi, and to cooperate while doing so. It will analyse the complex legal issues the duty to investigate has generated and particularly how on the part of Turkey this duty may have conflicted with its obligation to respect the inviolability of the Saudi Consulate, as established by the VCCR. Some of the questions the section will seek to address are as follow:

(a)     Whether the Kingdom of Saudi Arabia was under any obligation to grant access to the Consulate to the Turkish authorities for the purpose of an investigation;

(b)     Whether Turkey could have entered the Consular premises for the purpose of investigating, without the consent of the Consul or other recognised Saudi authorities;

(c)     What was the impact of the Turkish and Saudi interpretation of their obligations under the VCCR on the effectiveness of the investigation into the killing of Mr. Khashoggi?

## I.    The standards: an overview[236]

### *An intrinsic part of the right to life*

260.    States have a procedural and moral obligation to investigate unlawful or suspicious deaths, whether the death occurs at the hands of State actors or private persons or persons unknown, and regardless of whether there is evidence of criminal action requiring investigation and prosecution under criminal law.[237]  An investigation is not dependent on a formal complaint or request from a next of kin, rather it should be automatically triggered.[238]

261.    The consequences of non-investigation are extremely serious, including the violation of the right to life; the continuation of policies and practices which may impact on the right to life; and the perpetuation of a range of violations and bad practices because of the veil of ignorance or secrecy surrounding them.

---

[234] ECtHR, McCann and others v. United Kingdom, Judgment (Grand Chamber), 27 September 1995, para. 161; IACtHR, Montero-Aranguren and others (Detention Center of Catia) v. Venezuela, Judgment, 5 July 2006, para. 66; African Commission on Human and Peoples' Rights (ACHPR), General Comment No. 3 on the Right to Life, November 2015, paras. 2, 15; Human Rights Committee, General Comment No. 31, paras. 15 and 18; The Minnesota Protocol on the Investigation of Potentially Unlawful Death (2016), Office of the United Nations High Commissioner for Human Rights, New York/Geneva, 2017.

[235] IACtHR, *La Cantuta* v. *Peru*, Judgment, 29 November 2006, §160.

[236] Based on Minnesota Protocol 2016

[237] Cyprus v. Turkey (2002) 35 E.H.R.R. 731, and Kelly and Others v. United Kingdom CEDH 2001 4.05.2001.

[238] Nelson Mandela Rules, Rule 71(1); ECtHR Varnava and others v Turkey, ECtHR [GC], GC], nos. 16064/90, 16065/90, 16066/90, 16068/90, 16069/90, 16070/90, 16071/90, 16072/90 and 16073/90, 18 September 2009.

262.    A State's responsibility to conduct an effective investigation extends beyond its borders. States must take necessary steps to secure relevant evidence from other States. States have a duty to cooperate internationally in investigations of potentially unlawful death, particularly when it concerns an alleged international crime.[239] For instance, in Europe, although primary responsibility for investigating death lies with the State of jurisdiction (i.e. where the body has been found or the victim has died), all parties to the European Convention on Mutual Assistance in Criminal Matters are under an obligation to assist the investigating State, where a legal request for such assistance has been sought.[240]

## Cooperation

263.    States have duties of international cooperation in investigations of potentially unlawful deaths, particularly when they concern alleged international crimes such as extrajudicial execution or enforced disappearance.[241] Such obligations are no doubt further heightened in the case of Mr. Khashoggi's murder, given the location of the crime (abroad, and in a consulate) and the complex legal issues it generates. The obligation of cooperation was imposed on both Turkey and Saudi Arabia.

## Principles

264.    International law requires that investigations be: (i) prompt; (ii) effective and thorough; (iii) independent and impartial; and (iv) transparent.[242]

265.    Investigators and investigative mechanisms must be, and must be seen to be, independent of undue influence. They must be independent institutionally and formally, as well as in practice and perception, at all stages. Investigations must be independent of any suspected perpetrators and the units, institutions, or agencies to which they belong.

266.    Investigative processes and outcomes must be transparent, including through openness to general public scrutiny, and to that of the families of victims. Transparency promotes the rule of law and public accountability and enables external monitoring of the efficacy of investigations. It also enables the participation of the victims, defined broadly, in the investigation. States should adopt explicit policies regarding the transparency of investigations. States should, at a minimum, be transparent about the existence of an investigation, the procedures to be followed in an investigation, and an investigation's findings, including their factual and legal basis.

## A key role for family members

267.    Family members have the right to take part in an investigation into an unlawful death, and to obtain available information on the causes of death.  Family members have the right to equal and effective access to justice; to adequate, effective and prompt reparation; to recognition of their status before the law;[243] and to have access to relevant information concerning violations and accountability mechanisms.

## Objectives

268.    Investigations must, at a minimum, take all reasonable steps to:

   (a)    Identify the victim(s);

---

[239]  IACtHR, La Cantuta v. Peru, Judgment, 29 November 2006, para. 160.

[240]  European Convention on Mutual Assistance in Criminal Matters, adopted 20 May 1959, entered into force 12 June 1962, Council of Europe Treaty Series (CETS) No 30, Chart of signatures and ratifications of Treaty 030, http://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/030/signatures?p_auth=N4ZRRk5p : accessed 15 March 2017

[241]  IACtHR, La Cantuta v. Peru, Judgment, 29 November 2006, §160.

[242]  Human Rights Committee, General Comment No. 31, op. cit., §15.

[243]  Art. 24(6) ICPED obliges States Parties to adopt adequate measures (for example, issuing certificates of absence due to enforced disappearance) to regulate the legal status of a disappeared person and his/her relatives in fields such as social welfare, family law and property rights. See WGEID, General comment on the right to recognition as a person before the law in the context of enforced disappearances, General Comment No. 11, 2011, in UN doc. A/HRC/19/58/Rev.1 (2012), para. 42.

(b)    Recover and preserve all material probative of the cause of death, the identity of the perpetrator(s), and the circumstances surrounding the death;[244]

(c)    Identify possible witnesses and obtain their evidence in relation to the death  and the circumstances surrounding the death;

(d)    Determine the cause, manner, place, and time of death, and all of the surrounding circumstances. In determining the manner of death, the investigation should distinguish between natural death, accidental death, suicide, and homicide[245] and,

(e)    Determine who was involved in the death and their individual responsibility for the death.

This can extend across multiple contexts, encompassing both the individual circumstances of death and wider trends.

269.    States should also take appropriate measures in their investigations to establish the truth relating to the events leading to the deprivation of life; including the reasons and legal basis for targeting certain individuals and the procedures employed by State forces before, during and after the time in which the deprivation occurred, and the identification of the bodies of individuals who have lost their lives.[246] The right to know the truth[247] extends to the society as a whole, given the public interest in the prevention of, and accountability for, violations of the right to life.

### International sources

270.    In 1989, the U.N. Economic and Social Council adopted the well-regarded Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions[248] ("1989 U.N. Principles") to reinforce the substantive obligation of states to protect life and to prevent extrajudicial killings. The Principles require states to prohibit "all extra-legal, arbitrary and summary executions" and to "ensure that any such executions are recognized as offences under their criminal laws and are punishable by appropriate penalties which take into account the seriousness of such offences."

271.    The United Nations adopted the Manual on the Effective Prevention and Investigation of Extra-Legal, Arbitrary and Summary Executions[249] ("1991 U.N. Manual") to complement the 1989 Principles. In 2016, the United Nations published the Minnesota Protocol on the Investigation of Potentially Unlawful Death, to reaffirm and extend the principles contained in the 1991 U.N. Manual.

## II.    Immunity, jurisdiction and access to the crime scene

272.    International standards, best practice and common sense demand that a crime scene should be secured at the earliest possible opportunity and unauthorized personnel shall not be permitted entry. The "crime scene" is defined as "any physical scene where investigators may locate, record, and recover physical evidence. The term 'crime scene' is used without prejudice to the determination of whether a crime has actually occurred."[250] The crime scene may be a place where a person's body or skeletal remains is found, as well as any relevant building, vehicle, or place in the environment, including individual items within that environment such as clothing, a weapon, and personal effects.

---

[244]  This should include telephone logs or reports, as well as digital evidence contained on mobile telephones, computers, cameras, and other electronic devices.

[245]  IACtHR, *Vélez Franco* et al. v. *Guatemala,* 2011, §191.

[246]  Human Rights Council, General Comment 36, paragraph 28

[247]  Art. 2, ICCPR and Art. 24, ICPED. See also Principles 2-5, Updated Set of principles for the protection and promotion of human rights through action to combat impunity, UN doc. E/CN.4/2005/102/Add.1; and see also UN docs. E/CN.4/2004/88 and E/CN.4/2006/91.

[248]  U.N. Doc. E/RES/1989/65 (May 24, 1989

[249]  U.N. Doc. E/ST/CSDHA/12 (1991)

[250]  The Minnesota Protocol on the Investigation of Potentially Unlawful Death, 2016, para 58-59 https://www.ohchr.org/Documents/Publications/MinnesotaProtocol.pdf

273.    In the case of Mr. Khashoggi's killing, the crime scenes include the Saudi Consulate, the Saudi General Consul's residence, consular vehicles, the hotel rooms reserved for the members of the 15 persons team, as well as Mr. Khashoggi's residence, the various locations visited by the Saudi team members until their departure, and their private jets used to come to and leave Turkey.

274.    Access to several of these crime scenes raises legal challenges and conflicts of law because they may be protected by the VCCR.  Turkey is under a positive obligation to undertake an effective and prompt investigation into the killing, but it is also under the obligation to respect the inviolability of the consulate and more generally to abide by its international obligations under the VCCR.[251]

275.    Article 31(1) of the VCCR establishes the inviolability of the Consular premises while under Article 31 (2), the authorities of the receiving State shall not enter that part of the consular premises which is used exclusively for the purpose of the work of the consular post except with the consent of the head of the consular post or of his designee or of the head of the diplomatic mission of the sending State, or in case of fire or other disaster requiring prompt protective action.

276.    The VCCR provides for no privileges for the residence of a consular officer or the head of a consular post.[252]

277.    As far as the inviolability of the agents of the receiving state, Article 41(1) VCCR provides that: "Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority." Article 41(2) provides for the committal of a consular officer to imprisonment in cases of a grave crime.

278.    Article 31(4) VCCR immunizes the means of transport of the consular post from requisition for purposes of national defence or public utility but it does not protect the consular car or vehicle from search.

279.    Article 55(1) VCCR insists that "it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State." This being stated, "any violation of this duty to respect domestic law does not remove the privilege and immunities of consular or diplomatic agents, except as otherwise provided for in the Conventions. Similarly, Article 55(2) VCCR … stipulates that consular and diplomatic premises shall not be used in any manner incompatible with the exercise of consular or diplomatic functions (which, obviously, do not include murder)."[253]

## III.    Saudi implementation of its duty to investigate

280.    In an October 5th interview with Bloomberg journalists, the Crown Prince of Saudi Arabia "welcomed" search of the Saudi premises by the Turkish government. "The premises are sovereign territory, but we will allow them to enter and search and do whatever they want to do. If they ask for that, of course, we will allow them. We have nothing to hide."  That same day, the Turkish Chief Prosecutor was granted a search warrant. Despite the "welcome" from the Crown Prince, in practice the negotiations towards a joint investigation of the crime scenes were long and were hampered by lack of trust. Turkish officials suggested that on or around 11 October, they were invited in: "Saudis told us they would open the door to the consulate, show us around and even offer us coffee."   Turkish officials turned down this

---

[251]   The Inquiry sought to inquire as to whether Saudi Arabia had entered a specific contract to extend the inviolability of the Consulate to the residence. Turkish officials confirmed that there were no such agreements. Consequently, the VCCR is the main and only reference to assess Turkey and Saudi Arabia obligations.

[252]   See Vienna Convention on Consular Relations (VCCR), at 360-361.

[253]   M. Milanovic, "The Murder of Jamal Khashoggi:  Immunities, Inviolability and the Human Right to Life," p.12, 2019 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360647.

invitation, on the ground that they could only enter the scene with police and forensic teams, a reasonable demand in view of the purpose of the visit, an investigation into a murder.

281.    There is no doubt that Saudi authorities were under no legal obligation to grant access to the Consular premises under the terms of the VCCR. Indeed, there does not appear to be any precedents, of sending State authorities or Consuls, granting access to consular premises to authorities of the receiving States for the purpose of an investigation. The killing of Mr. Khashoggi, on the premises of the Consulate, at the hands of officials, is highly unusual and one would not necessarily expect precedents to exist.

282.    That Saudi Arabia did eventually grant access to Turkish investigators, for the express purpose of an investigation, is thus a positive step and a precedent that should be welcomed. From a diplomatic standpoint, it would be reasonable to expect Saudi Arabia, which was in the wrong, to grant access to the Consulate as soon as possible, in view of the nature of the incident, and the potential for rapid escalation (as indeed occurred).

283.    It is however regrettable that the negotiations between Turkey and Saudi Arabia regarding a joint crime scene investigation took place over a two weeks' period, during which time some 17 Saudi officials were present on the premises, engaging in their own activities which, whatever else they might have accomplished, resulted in a cleaning up of the crime scenes.

284.    Saudi Arabia was under an international obligation to cooperate with the Turkish authorities in the investigation of the killing of Mr. Khashoggi. Such cooperation necessarily demanded that they give access to the consulate to the Turkish authorities and that they do so in a prompt and effective fashion and in good faith.

285.    Consular immunity was never meant to become a basis, tool or factor for impunity. Guarantees of immunity were never intended to facilitate the commission of a crime and exonerate its authors of their criminal responsibility or to conceal a violation of the right to life.

286.    Saudi Arabia was entitled to protect the consular premises, including its confidential documents held on-site, against Turkish intrusion. This could have been achieved through and by negotiations, and by protecting confidential information and documents in relation to consular functions.  Such process should have been done within a reasonable amount of time given the seriousness of the matter being investigated. The "protection" of confidential documents should not have included any items in relation to the execution of a killing. For instance, one would not expect this protection to require a thorough, forensic cleaning of the consulate.

287.    Seventeen Saudi officials in total, allegedly all Mabahith officials (thereafter the post-execution teams), came to Turkey, as part of the official Saudi response to the disappearance and murder.  The first team, made up of 10 persons, was present at the Consulate by 2:45 pm on 6 October. A second delegation, arrived on 10 October. They were followed on 11 October by a delegation of two, including a toxicology expert and a few hours later by another delegation of 3 persons.

288.    Official Turkish records indicate that the post-execution teams were present in the Consulate and the residence until 15 October, working often late in the night.  However, it does not appear that they or the Saudi Chief Prosecutor shared with their Turkish counterparts the evidence they may have collected during this period. The Saudi Public Prosecution made public a few of their findings on 15 November[254] but the statement was light on details, limiting itself to a few general allegations.

289.    Evidence of a clean-up are twofold. First, a logical and reasonable inference may be drawn from the fact that Turkish investigators found limited reaction to Luminol and other tests, even though the dismemberment of Mr. Khashoggi body had reportedly taken place in the premises. To the extent that neither Turkey nor Saudi Arabia have subsequently challenged or rejected the allegation of dismemberment, the absence of reactions to blood or other body fluid points to two possibilities, alone or together.  It may first indicate that many

---

[254] https://www.spa.gov.sa/viewstory.php?lang=en&newsid=1841715

precautions had been taken at the time of the crime, to protect against the loss of blood and other fluids in the room, therefore supporting the hypothesis according to which the murder had been planned and pre-meditated.

290. A second possibility is that the crime scenes were the objects of a thorough and "professional" cleaning immediately after the killing and thereafter. Turkish investigators have told the Special Rapporteur that they found evidence of possibly changes in pieces of carpets in the briefing room of the consulate. There is also evidence of locally recruited cleaners coming on site on 15 October, at 7:30 am, for the purpose of cleaning. On 5 October, one of the consulate cars, which allegedly had been used to transport Mr. Khashoggi's remains, was sent for a car-wash.[255]

291. On 15 October, at 20:18, the Turkish investigators were finally given access to the Consulate, shadowed by Saudi officials. Turkish officials explained that the only reason they were finally given access was because of they were relentless in demand: *"We had to push and push to be allowed in; there was a lot of anger management on our part."*

292. The scope and conditions of the crime scene investigation at the Consulate were not conducive to professional and thorough work. The fact that the Turkish teams were shadowed at every point by Saudi counterparts is understandable and cannot be faulted. The notion that every piece of evidence collected on site needed to be done in double, one for each of the national investigation teams, is also not under dispute.

293. What is far more concerning is the fact that the investigation of the crime scene was so sharply limited in time, that Turkish investigators were racing against time to proceed with their work, and that the scientific and forensic inquiries were limited to "swabbing". The Saudis limited Turkish investigators to just over six hours in the Consulate and around thirteen hours in the Residence, where they also had to search the whole consular fleet. The limitations in time and in scope imposed on Turkey investigators cannot be explained by the necessity to protect the Consulate and the Consulate functions, including confidential ones, against unwarranted attention. They clearly intended to create difficulties for the Turkish investigation. Along with evidence of professional, thorough, if not forensic cleaning of the crime scenes, they prevented an effective and thorough Turkish investigation and amount to obstruction.

294. The quality of the Saudi investigation over the 10 days or so the post-execution teams were in the consulate is difficult to assess given the lack of transparency of the process, itself in violation of international standards. Still, a number of issues may be raised.

295. First, the number and range of official explanations, including by State representatives, for the disappearance first, and murder later of Mr. Khashoggi, over a short period of time, raise concerns regarding the independence and impartiality of the investigation. Mr. Khashoggi was said first to have walked out of the Consulate within an hour of his arrival, second to have been punched during his interview at the Consulate and losing his life as a result, thirdly to have been the victim of a premediated murder by rogue officials.

296. Second, a clear focus of any investigation into a murder ought to be the body of the victim. At the time of writing this report, the Saudi authorities have yet to disclose the whereabouts of the remains, despite having 11 perpetrators on trial. The Saudi prosecution publicly declared that it identified an individual who had delivered Mr. Khashoggi's body to a local collaborator,[256] a theory disputed by the Turkish investigators. The continued disappearance of Mr. Khashoggi's remains is an ongoing violation of international law under Article 17 of the UN Declaration on the Protection of All persons from Enforced Disappearances. As the Working Group on Enforced and Involuntary Disappearances notes, "the act begins at the time of the abduction and extends for the whole period of time that the

---

[255] Turkish intelligence believes that prior to 15 October, up to four attempts were made to eliminate forensic evidence from the consulate. This included re-painting of parts of the consulate and possibly re-carpeting of a room. The Special Rapporteur could not substantiate this claim.

[256] https://www.middleeasteye.net/news/mohammed-bin-salmans-aide-briefed-khashoggi-murder-team-saudi-prosecutor

crime is not complete, that is to say until the state acknowledges the detention or releases information pertaining to the fate or whereabouts of the individual."[257] Further, the Human Rights Committee and the Committee against Torture have determined that enforced disappearance constitutes an act of torture within the meaning of Article 1 of the Convention Against Torture. The extreme distress caused to the surviving family and loved ones by not knowing what has happened is recognized under international law as a form of torture.[258] If the Government asserts that it does not know the whereabouts of Mr. Khashoggi's remains, it nonetheless should disclose all aspects of its efforts to locate them, including the details of any witness interviews that it has undertaken.

297.    Third, while Saudi Arabia may suggest that they have cooperated, in so far as they created a joint investigative team, and allowed Turks to investigate the residence, and even sent its Chief Prosecutor to Istanbul, the Saudi investigators and Chief Prosecutor have not shared their findings, with the Turkish team, including forensic and scientific evidence collected during the 10 days they were present in the Consul and residence on their own and the testimonies of witnesses, some of whom were later charged with the killing of Mr. Khashoggi.

298.    Upon reviewing the steps taken by Saudi Arabia in the aftermath of the killing of Mr. Khashoggi, and on the basis of the evidence available, the Special Rapporteur can only conclude that Saudi Arabia violated its procedural obligation to investigate Mr. Khashoggi's death, on multiple grounds, such as effectiveness, transparency and international cooperation.

## IV.    Turkey's implementation of its duty to investigate

299.    The Turkish investigation took place not only under the shadow of Saudi Arabia control over the crime scenes, but also under the shadow of the Turkish Government, and in particular the Turkish President, Erdogan, whose public statements on the killing dominated the international news agenda for some three months. There is little doubt that the high level of interest and control by the highest political authorities of the country would have impacted on the conduct and independence of the investigation itself, although the nature and extent of that impact is harder to ascertain.

300.    The Turkish investigation:

(a)    Reviewed thousands of hours of CCTV to piece together the movements of various members of the Saudi teams dispatched at the Consulate, investigating the routes they followed, the hotels rooms they occupied, etc. Allegedly, some 3500 hours of footage were screened to determine the identity and whereabouts of the Saudi teams involved in the killing.

(b)    Identified possible witnesses, including the staff of the Consulate, and obtained their evidence in relation to the killing of Mr. Khashoggi and the circumstances surrounding the killing

(c)    Gathered evidence in the various crime scenes for which it was granted access and the forensic and scientific police analysed the evidence

(d)    Issued 21 extradition requests

(e)    Requested that Interpol issued 20 Red Alert Notices, including 18 on 16 November and 2 more on 21 December.

---

[257] Working Group on Enforced or Involuntary Disappearances, *General Comment on Enforced Disappearance as a Continuous Crime,* available at
http://Khashoggi.ohchr.org/Documents/Issues/Disappearances/GC-EDCC.pdf

[258] UN Human Rights Committee, "El-Megreisi v Libyan Arab Jamahiriya", Communication No. 440/1990, UN Doc. CCPR/C/50/D/440/1990 (1994); Rafael "Mojica v. Dominican Republic", Communication No. 449/1991, UN Doc. CCPR/C/51/D/449/1991 (1994). The UN Human Rights Committee ruled specifically on enforced disappearance as a form of torture in Sri Lanka in "Sarma v Sri Lanka", Views, 31 July 2003, para. 9.5

301.	The Special Rapporteur was not able to ascertain with certainty the exact date and time when the Saudi Chief Prosecutor was informed about Turkish conclusions regarding the cause, manner, place, and time of death.

302.	The Turkish investigation was limited in three different ways. First, their access to the main crime scene, mainly the Consulate, was wholly inadequate. Second, the Turkish investigators did not search the Consul Residence, even though they could have done so under the terms of the VCCR. Thirdly, they did not interview the Consul himself and other Saudi members of the Consulate who left Turkey on or after 6 October.

### Access to the Crime Scene

303.	As highlighted, Saudi Arabia authorities granted woefully inadequate time and access to Turkish investigators to conduct a professional and effective crime-scene examination and search. Crime-scene protection and meticulous examination are key to every criminal investigation the world over, especially when it comes to the most serious crimes. Every minute that passes between the commission of a crime and the examination of the crime scene is a diminished opportunity to discover crucial evidence. Every minute that passes without protecting the integrity of the crime scene makes the collection of evidence more problematic with adverse consequences as to its admissibility.  Mr. Khashoggi was murdered on the 2nd of October. However, Turkish investigators, accompanied by Saudi investigators, only had access to the Consulate on the 15th October and to the Consulate residence on 17th October.

304.	In spite of these efforts, given sufficient time, skilled and well-equipped crime-scene investigators would still expect to find 'trace-evidence' of the commission of a murder such as that of Mr. Khashoggi. However, premises the size of the Consulate and the residence would take many days to examine thoroughly, especially if 'clean-ups' had taken place.  Delayed and limited access imposed by the authorities of Saudi Arabia to the criminal forensic investigation severely limited its potential to produce telling evidence.

305.	In the Consulate residence (not protected by the VCCR), the Turkish investigators were prevented by Saudi officials from draining a well, even though it is difficult to understand in which ways this could have impacted on the ability of Saudi Arabia to perform its consular functions.  They were told that the CCTV recordings of the Consulate and residence were out of order.

### Could the investigation into the killing of Mr. Khashoggi constitute an exception to the inviolability of the Consulate?

306.	Turkey could have considered entering the premises on the ground that the disappearance of Mr. Khashoggi first, later confirmed to be a murder, constituted a "disaster" under Article 31 (2), justifying Turkey's entry into the Consulate.

307.	In his analysis of Turkey's duty to protect Mr. Khashoggi's life, human rights academic Marco Milanovic concludes that "entry by Turkish authorities into the consulate during the attack on Khashoggi would arguably not have violated Article 31 VCCR, either because of the assumed consent exception in Article 31(2) or because of an implicit exception for entry without consent justified by the urgent need to protect human life.[259]" Milanovic bases his arguments on a careful review of the VCCR scholarship and jurisprudence, including the various interpretations made of the "fire and disaster" clause.

308.	He further suggests that even if Turkey had breached the inviolability of the consulate under the VCCR, "that wrongfulness would have been precluded by distress,"  under the rule codified in Article 24(1) Articles on State Responsibility:  '[t]he wrongfulness of an act of a State not in conformity with an international obligation of that State is precluded if the author of the act in question has no other reasonable way, in a situation of distress, of saving the author's life or the lives of other persons entrusted to the author's care.'

309.	Milanovic focuses on the extent of Turkey's obligation to protect Mr. Khashoggi's life and not on the duty to investigate. However, to the extent that in the early days of Mr.

[259]	M. Milanovic, "The Murder of Jamal Khashoggi:  Immunities, Inviolability and the Human Right to Life," at 36, 2019 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360647

Khashoggi's killing, the incident was treated as one of disappearance[260], the argument may be made that Turkey, until it had fully concluded that Mr. Khashoggi was dead, that is officially on 4 October, could have entered the premises for the purpose of investigating an enforced disappearance, thus for the purpose of protecting Mr. Khashoggi's life, because there was no other reasonable way of saving his life or at the very least of protecting him against abduction.

310.    Such arguments, however, cannot be advanced for the period following the official recognition that Mr. Khashoggi had been killed; that is after the Turkish Intelligence knew with a high degree of certainty that they were dealing with a killing.

311.    At this point in time, that is on or around 4 October, the question is thus whether Turkey's duty to investigate the killing takes precedence over their obligation to abide by the VCCR.  In other words, does ICCPR article 6 takes precedence over Article 31 of the VCCR?

312.    In the absence of a clear hierarchy of international norms and bodies guiding the analysis of the conflict between the VCCR and the obligation to conduct an effective and prompt investigation into an alleged extrajudicial execution, one possible way of addressing the conflict between the VCCR and the ICCPR is to apply the three part test that is used to rule over conflicts of rights or interests.

313.    Given that both are derived from international and Turkish law, the analysis of the conflict relies on an appreciation of whether the exception to the inviolability of the Consulate constituted a necessary and proportionate response to the duty to investigation.

314.    There are no reasons to suggest that the forced entry into the Consulate would have been necessary or proportionate to the interest at stake, namely the implementation of the duty to investigate. In explanation, two factors may be advanced:

(a)    First, Turkey could, and indeed, did, negotiate diplomatically with Saudi Arabia to gain lawful access to the consulate.

(b)    Second, Turkey had the possibility of investigating a number of other crime scenes, including the residence of the consul and the vehicles of the consulateSuch assessment of other crime scenes of lesser importance, may be  unsatisfactory from an investigatory standpoint.  But this must be weighed against the centrality and importance of the Vienna Conventions on Consular and Diplomatic Relations, to international relations and governance.

315.    Turkey therefore should have been in a position to benefit from Saudi Arabia's own implementation of its duty to implement a prompt and effective investigation, including of the crime scenes upon which it had jurisdiction. The onus was thus on Saudi Arabia which should have not only consented to Turkey lawfully gaining entry to the premises for the purpose of crime scene investigation, but invited Turkey to do so promptly after the reported disappearance or killing, and effectively.

316.    Most importantly, the onus was on Saudi Arabia to protect the crime scene for future Turkish investigation or at the very least to share all evidence collected.

317.    On balance, creating an exception to the inviolability of the Saudi Consular Premises was neither necessary nor proportionate to Turkish interests (and obligations) at stake, conducting an investigation into an unlawful death, which could or should have been achieved through other means.

### *Access to the Consular Residence Premises*

318.    The VCCR sets out that Consular premises cannot be entered or searched without permission, but the private residence of a Consul could be.[261]  "Neither the consul's residence nor property has any inviolability."[262] In other words, Turkey did not require Saudi consent to search the consul premises, or accept any limits on how and to what extent the search is to

---

[260]  Interview, Chief Prosecutor, Turkey, January 2019
[261]  ILC Draft Articles on Consular Relations, with commentaries, para. 9 (noting that only a very few bilateral conventions and municipal systems recognized the inviolability of a consular residence).
[262]  Foakes and Denza, para. 8.39.

be conducted. Nevertheless, Turkey failed to investigate the residence as soon as it had deemed it connected to the killing and disappearance of Mr. Khashoggi. It sought to gain access through Saudi authorization, which was granted on 17 October and for a limited amount of time. Strikingly, the Saudi authorities prevented Turkish investigators from emptying a well on the residence premises where the body of Mr. Khashoggi could have been hidden.[263] A strict reading of the VCCR would thus have allowed Turkey to conduct its crime scene investigation of the residence.

319.   That it did not was partly a reflection of the oft-mentioned fear of avoiding escalation of the crisis, and partly a reflection of strong practices across States of not entering consulate residence without permission. Given the complexity of international relations and the political constraints it may be understandable that Turkey decided not to proceed. The same applies to the other two actions which the Turkish investigators could have taken, namely the interview of the Consul and the search of the Saudi Consul Fleet.

### *Interviewing Saudi Persons of Interest*

320.   Turkish authorities also did not stop Saudi persons of Interest from leaving the Turkish authorities even though a number of them did so after the Turkish police had first concluded that a serious incident had occurred in the Consulate, and later that Mr. Khashoggi had been killed. These include the Saudi Consul, who left Turkey on October 16th. Consul Al-Otaibi was entitled to privileges and immunities, since he was the head of the consular post in Istanbul. But these immunities are not unqualified.[264] Article 41(1) of the VCCR permits the arrest or detention of a consular officer for a 'grave crime,' while Article 44 allows the receiving state to compel a consular officer to give evidence on matters not connected with the exercise of their functions, as murder obviously is not.[265]

321.   "There was, in short, nothing in consular law that would have prevented Turkey from arresting al-Otaibi or at least questioning him as a witness and prohibiting him from leaving the country, as any reasonable line of inquiry would have required for an investigation to be effective. He was simply not a diplomat, and the immunities he was entitled to were of a lesser and more qualified kind"[266]

### *Search of the Consular Vehicles*

322.   On 10 October, eight days after the killing, the Office of the Chief Prosecutor issued its first comprehensive search warrant for the 15 vehicles of the Consulate, for a three-day period. It appears though that the search warrant was not acted upon, probably because of the belief within the Investigator team, that consent from the Saudi Arabia authorities was required. Indeed, press reports at the time have suggested that Turkish authorities could not search the Consulate fleet because of consular immunity.[267] Yet, unlike a diplomatic car, a consular vehicle enjoys no immunity or inviolability: Article 31(4) VCCR immunizes the means of transport of the consular post only from requisition for purposes of national defence or public utility, and does not protect them from search.[268]

### *Intelligence and Political Oversight and Realpolitik*

323.   In the Special Rapporteur's opinion, three factors may have complicated the effectiveness of the Turkish investigation. They include the interest and involvement of the highest levels of the Turkish Government, in the investigation of the execution of Mr.

---

263   Interview, Istanbul, Chief prosecutor
264   Lee and Quigley, at 435-436.
265   ibid., at 487-488.
266   Milanovic, 2019, 44.
267   See, e.g., 'Jamal Khashoggi: Saudi consulate car found abandoned in Istanbul, Turkish police say,' *The Independent*, 22 October 2018, at https://www.independent.co.uk/news/world/asia/jamal-khashoggi-dead-saudi-arabia-consulate-car-istanbul-turkey-latest-police-investigation-a8596086.html.
268   Milanovic, 2019. He further suggests that this is a deliberate choice of the drafters of the VCCR; the original proposal of the ILC was to give consular vehicles the same inviolability as the consular premises, reproducing *mutatis mutandis* the text of Article 22 VCDR – see ILC Draft Articles on Consular Relations, with commentaries, at 109.

Khashoggi, the preeminent role of the Intelligence services, and the frequent public reports and leaks of new and often gruesome or emotional details. International media outlets played a key role as the main recipients, including of various leaks, over domestic media, as commented upon by many during the inquiry. While all of these contributing to keeping the killing of Mr. Khashoggi on the international agenda, there is little doubt that they would not have facilitated the work of the police and prosecutors responsible for investigating a sensitive and difficult murder.

324.    Some commentators have suggested that the public behavior of the Turkish President, along with leaks by the Intelligence sources, indicated that Turkey was not seeking a diplomatic solution to what was quickly becoming a crisis. The Special Rapporteur's analysis differs.   She believes that a "diplomatic solution" to the crisis was part of the objectives, whatever this solution may have entailed. Access to the crime scene was a matter, which could only be solved through diplomatic means.

325.    Turkish officials and others have consistently insisted that the Government and the investigators were seeking "not to escalate" the issue, including for fear of retaliation by the Saudi authorities.  Concerns over the Saudi capacity for retaliation figured very high on the agenda at the time, according to many mid-level officials. These would have largely driven the decisions not to enter the Saudi consulate residence, or search the Consulate cars or detain Saudi persons of interest who were not protected by the VCCR or VDCR. Time and time again, officials commented on the risks of escalation, on the risks for their Turkish citizens, including State representatives based in Saudi Arabia and on the necessity to avoid placing them in harms' way.

326.    Ultimately, the killing of Mr. Khashoggi raises important questions regarding the legal implementation and limitations of the diplomatic immunity guarantees and demonstrates the difficulties of enforcement whenever these guarantees are violated, particularly in complex international and regional political environments. There is here an important role for the international community, including for the United Nations decision-making bodies and Member States that require further scrutiny and elaboration.

327.    The Special Rapporteur regrets that no international body or State appears to have come forward to propose to "mediate" between the two parties to negotiate a prompt and effective access to the crime scene so as to de-escalate the crisis, address the fear of retaliation and protect equally the VCCR and human rights obligations. Instead, it appears that other Members States were pondering their various national and strategic interests while the United Nations had no evident means of intervention or elected not to intervene. In retrospect, the ultimate victim of these considerations, tit-for-tat and other maneuvers was justice for Jamal Khashoggi and accountability.

# PART IV. Responsibility to protect and the duty to warn

328.    There has been speculation that Turkey and the United States may have had advance knowledge of the fate that ultimately befell Khashoggi and therefore that they violated their obligation to protect him. It has also been suggested that the United States in particular failed in its duty to warn Mr. Khashoggi of an imminent threat to his life.

329.    These allegations highlight several issues related to the nature and extent of States' obligation to protect against extrajudicial execution and, more generally, against unlawful death.  These include:

- When and how an obligation to protect individuals against risks to their life may be invoked;

- Whether States have an obligation to protect against actions by other States and what are the implications of this;

- Whether such an obligation to protect applies to non-citizens;

- Whether such an obligation includes a duty to warn;

- Whether such obligation may be invoked extra-territorially.

This Section will seek to address these questions and then consider their implications in respect of the execution of Mr. Khashoggi.

## I.    International standards

330.    International human rights law imposes on States a duty to respect, protect and ensure human rights. Under the obligation to protect, States must act with due diligence to protect against actions by a Third Party that may infringe on a persons' human rights, including their right to life. A State may incur international responsibility for failing to do so.

331.    The responsibility to protect has been the object of much elaboration, including by Treaty Bodies, Special Procedures, regional and national courts around the world and expert legal and policy scholarship.  This section will limit itself to presenting the issues relevant to the case of Mr. Khashoggi.

332.    A key source for understanding the obligation to protect the right to life is the Human Rights Committee (HRC) General Comment 36 (thereafter GC 36)[269], which summarises the HRC's main observations and jurisprudence on the right to life, along with that of other well-recognised sources under international law.

### The standard of due diligence

333.    According to GC36, the obligation to protect includes establishing by law adequate institutions and procedures for preventing deprivation of life:  States parties are under a due diligence obligation to undertake reasonable positive measures, which do not impose on them disproportionate burdens, in response to reasonably foreseeable threats to life.

334.    The standard of due diligence, as applied to the responsibility to prevent an unlawful death, tends to rely on an assessment of: (a) how much the State knew or should have known; (b) the risks or likelihood of foreseeable[270] harm; and (c) the seriousness of the harm.[271]

335.    The principles of due diligence applied to the protection against unlawful death have been articulated by a range of courts around the world. Worth highlighting because of its direct impact on Turkey's human rights obligations, is the European Court for Human Rights decision in Osman v. The United Kingdom, which involved claims against British police for

---

[269]  CCPR/C/GC/36
[270]  The regional and national jurisprudence includes a test of "immediacy" or "imminence" in addition to foreseeability.
[271]  *Osman v. The United Kingdom*, ECHR Case No. 87/1997.871/108 (1998) at 32-33.

failing to appropriately act on information indicating that a local school teacher was going to harm one of his students and the student's family.[272]

336.    The European Court of Human Rights ("ECHR") interpreted the protection of the right to life as imposing a **duty on government authorities "to take appropriate steps to safeguard the lives of those within its jurisdiction" and "to take preventive operational measures to protect an individual whose life is at risk from the criminal acts of another individual."[273]**   "[W]here there is an allegation that the authorities have violated their positive obligation to protect the right to life in the context of their above-mentioned duty to prevent and suppress offences against the person  …, **it must be established to its satisfaction that the authorities knew or ought to have known at the time of the existence of a real and immediate risk to the life of an identified individual or individuals from the criminal acts of a third party and that they failed to take measures within the scope of their powers which, judged reasonably, might have been expected to avoid that risk."[274]**  In order to sue government authorities for failing to comply with this duty, **"it is sufficient for an applicant to show that the authorities did not do all that could be reasonably expected of them to avoid a real and immediate risk to life of which they have or ought to have knowledge."[275]** "This is a question which can only be answered in the light of all the circumstances of any particular case."[276]

337.    This principle, when applied by a court, has been translated to mean whether authorities did all that could be reasonably expected of them to avoid a real and immediate risk to life of which they had or ought to have knowledge, a question which could only be answered in the light of all the circumstances of any particular case.

338.    In determining the question of knowledge, and particularly whether the authorities "ought to have known," a common feature in rulings around the world is the degree to which **State authorities had already recognized a risk of harm to the victim and/or her family members, but had failed to act diligently to protect them**.[277]  In other words, authorities ought to have recognized that "a threat to life exists after following a logical staged process for researching and managing a threat to life by making further enquiries or investigations."[278]

(a)    The jurisprudence on the implementation of the due diligence principle, and operationalization by Police Forces point to consideration of the following elements:

b.    Whether there are credible threats objectively verifiable; that is to say supported by reference to a range of sources of information.

c.    Whether the perpetrators have the intention to implement their threats, whether they are in a position, including physical proximity, whether they have the capabilities, to carry out the threats;

d.    Whether the risk is immediate, meaning continuing and soon;

e.    Whether the identity of the victim places him/her in specific situations of vulnerabilities or risks;

e.    Whether there are patterns of violence against groups of individuals by virtue of their identities.

---

272  The Osman family brought a case under the European Convention on Human Rights because its negligence case was dismissed in English courts.

273  *Osman v. The United Kingdom*, ECHR Case No. 87/1997.871/108 (1998) at 32-33.

274  Osman, at 33.

275  Osman at 33.

276  The European Court of Human Rights noted that, under British law, in order for a private citizen to make out a negligence claim based on a government authority's violation of its duty, she must show that she was "in a relationship of proximity to the [authority], that the harm caused was foreseeable and that in the circumstances it was fair, just and reasonable" to hold the authority liable.  *Osman* at 41.

277  IACHR, Jessica Lenahan (Gonzales) v. USA, 2011

278  https://www.staffordshire.police.uk/media/4673/Threat-to-Life/pdf/Threat_to_Life.pdf

### Actions by Other States

339.    While the responsibility to protect has been invoked largely in response to threats originating from private persons and entities (for instance in the context of preventing domestic violence and feminicide), it may be invoked as well against threats by other States, international organizations and foreign corporations operating within the territory of a State or in other areas subject to their jurisdiction.[279]

340.    This recognition is particularly important in view of the patterns identified earlier of the extra-territorial outreach of States seeking to violate human rights violations, including the right to life, but also the right to freedom of expression or privacy through surveillance and harassment.

341.    The extra territorial use of force is defined here as the use of potentially lethal force by a State against an individual or a group of individuals located on the territory of another State.  Extraterritorial use of force is not a new phenomenon. It has been repeatedly invoked in the name of "self-defense" and countering "terrorism" and is the object of many legal analyses which are beyond the focus of this annual report[280].  Previous Special Rapporteurs have thoroughly analysed the extraterritorial use of force including targeted killings through drones.[281]  For the purpose of a report on the responsibility to protect and warn, the following aspects of extra territorial use of force will be highlighted.

342.    First, it is important to highlight and insist that Article 2 (4) of the Charter of the United Nations and customary international law prohibit the threat or use of inter-State force, subject to limited exceptions: consent and self-defense. A State may consent to the use of force on its territory by another State, while the UN Charter allows action taken in self-defence.

343.    Outside these narrowly defined conditions, the use of force extra territorially is unlawful under international law governing intra-states relationship. It is also unlawful under international human rights law in that a State party cannot perpetrate violations of its obligations on the territory of another State, which it could not perpetrate on its own territory[282].  That human rights treaty obligations apply to the conduct of a State outside its territory has been confirmed by, among others, the International Court of Justice, the Human Rights Committee, the Inter-American Commission on Human Rights and the European Court of Human Rights[283].

344.    Further, customary law prohibits states from sending their agents to the territory of another state to execute their own laws or policies: *"This ban on the extraterritorial enforcement of a state's laws or policies comes from international law's basic rules on jurisdiction. While states enjoy jurisdiction to prescribe laws governing some conduct beyond their borders—e.g., by their own nationals—and states can use their courts to adjudicate matters taking place abroad, enforcement of a state's laws or policies on another state's territory without the permission of the other state is unlawful.[284]"*The jurisprudence on rendition and extraordinary rendition further suggests that the obligation to protect against acts by foreign States may be invoked whether or not these foreign States acted with the acquiescence or agreement of the receiving State[285].

---

[279]  GC36, para 22

[280]  For an in-depth review of the jurisprudence, State positions and academic literature see for instance: Noam Lubell, Extraterritorial use of force against Non-State actors, Oxford: Oxford University Press, 2010; Jan Arno Hessbruegge, Human Rights and Personal Self-Defense in International Law, Oxford University Press, 2017.

[281]  See for instance A/68/382; A/HRC/1424 Add.6

[282]  A/68/382

[283]  See for instance Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, para. 109; General comment No. 31 (2004), on the nature of the general legal obligation imposed on States parties, para. 10; Coard and others v. United States, case 10.951, Report No. 109/99, 29 September 1999, para. 37' Al-Skeini and others v. the United Kingdom, application No. 55721/07, Grand Chamber judgement of 7 July 2011, paras 106-186;

[284]  https://www.lawfareblog.com/khashoggi-murder-how-mohammed-bin-salman-underestimated-international-law

[285]  Concluding Observations Poland (2010), para 15.  The Human Rights Committee has also ruled that

345.   One evident implication of the obligation to protect against actions by other States is that its implementation is likely to involve Intelligence agencies whose mandates includes monitoring foreign States within and outside national territories.

346.   The responsibility of Intelligence agencies to protect the right to life also stems from the well-recognized principle according to which State's obligation to protect applies to all Governmental institutions:

> *"The duty to protect by law the right to life also requires States parties to organize all State organs and governance structures through which public authority is exercised in a manner consistent with the need to respect and ensure the right to life, [52] including establishing by law adequate institutions and procedures for preventing deprivation of life, investigating and prosecuting potential cases of unlawful deprivation of life, meting out punishment and providing full reparation."[286]*

347.   The duty to protect demands that States be particularly aware of the vulnerabilities of some individuals, whose lives may be particularly at risk because of their activities or because of their identity. "These include human rights defenders, officials fighting corruption and organized crime, humanitarian workers, journalists, prominent public figures, witnesses to crime, and victims of domestic and gender-based violence and human trafficking."[287]

### A duty to warn

348.   Once a risk to life has been identified, "States parties must respond urgently and effectively in order to protect individuals who find themselves under a specific threat, by adopting special measures such as the assignment of around-the-clock police protection, the issuance of protection and restraining orders against potential aggressors and, in exceptional cases, and only with the free and informed consent of the threatened individual, protective custody. "[288]

349.   Various authoritative sources around the world have recognized a duty by law enforcement to warn intended victims of threats to their safety.  For instance, British police departments have responded to Osman by enacting policies that require officers to warn intended victims if they have intelligence of a real and immediate threat to the intended victim's life.  In fact, in 2017, the police in England and Wales issued more than 776 so-called "Osman warnings" or "threat to life" notices.[289]  Between 2012 and 2015, police forces throughout the U.K. issued 1,948 notices.[290]

350.   A particularly well-developed and public elaboration of the duty is found in the US Intelligence Community Directive 191, which was issued in 2015 by Director of National Intelligence, James Clapper.[291]  Its key features are as follows:

(a)   The Directive states that if a U.S. intelligence agency "acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping," that agency has a duty to warn the intended victim.

---

to surrender a prisoner knowingly to another State where there are substantial grounds for believing that he would be in danger of being tortured, runs counter to the object and purpose of the prohibition against torture enshrined in article 7 of the ICCPR. The same conclusion applies to surrendering a prisoner to a situation where he/she could be killed or disappeared. See Articles 2, 3, 10 and 14 of the United Nations Declaration on the Protection of All Persons from Enforced Disappearance.

[286]   *GC36, para 19*

[287]   CCPR/C/GC36, para. 23

[288]   GC36, para 23; Regional Courts have further given practical meaning to States' responsibility to protect through the enaction of protectionary or interim measures or urgent measures the States must take to avoid irreparable harm to persons or groups of persons who are in imminent peril.

[289]   *See* https://www.thesun.co.uk/news/6938036/osman-warning-death-threat-life-police/.

[290]   *See* https://www.huffingtonpost.co.uk/2015/10/28/osman-warning-letters-life-in-danger_n_8405568.html?

[291]   *See* Intelligence Community Directive 191, available at https://www.justsecurity.org/wp-content/uploads/2018/10/Intelligence-Community-Directive-ICD-191-duty-to-Warn.pdf.

(b)    The duty to warn is owed to all intended victims, regardless of whether they are U.S. or non-U.S. persons.   Specifically, the Directive states that intelligence agencies are "require[d] to warn U.S. and non-U.S. persons of impending threats of intentional killing, serious bodily injury, or kidnapping."

(c)    Importantly, however, the Directive explicitly does not create a legal right under which citizens may sue.  It states: "This Directive is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies, or entities, its officers, employees or agents, or any other person."[292.]

351.    Anecdotal evidence indicates that Intelligence agencies, other than those of the United States, do warn individuals against imminent risks to their life, although they do not report or comment publicly on this role. For instance, a Rwandan dissident living in Belgium, Faustin Twagiramungu, reported in 2014 he had been warned by Belgian security services of an apparent plot by the Rwandan government to assassinate him[293].  In 2018, Hasan Cücük, a Turkish reporter, who had been in Denmark since the 90s, was reportedly rushed to a safe place by the Danish Security and Intelligence Service (Politiets Efterretningstjeneste or PET) after a serious threat to his life was detected.[294] In 2018, a number of European Security agencies took actions to protect Iranian dissidents residing on their territories against credible threats to their life[295].  In May 2019, Norwegian security authorities took actions to protect a dissident living on its territory against credible threats from Saudi Arabia[296].

352.    How the duty is actually implemented may only be inferred from such anecdotes given the secrecy under which most Intelligence operations are conducted, including those aimed at protecting someone's life. Of particular concern are the circumstances under which Intelligence agencies determine that the duty to warn should not be pursued. For instance, the US Directive allows for a waiver of the duty in limited circumstances, including (1) when the intended victim is already aware of the threat, is at risk only as a result of participation in an armed conflict, or is involved in drug trafficking or violent crime; (2) when any attempt to warn the intended victim would unduly endanger the personnel, sources, methods, intelligence operations, or defense operations of the U.S. government or a foreign government with whom the U.S. has formal agreements or liaison relationships; and (3) when there is no reasonable way to warn the intended victim.

353.    While the US Directive stipulates that close cases "should be resolved in favor of informing the intended victim", there is no way of knowing whether or not this is faithfully implemented, in the absence of public reporting on the implementation of the duty to warn, in the United States or elsewhere.

*Citizens and non-Citizens alike*

354.    It may be worth repeating here that Article 6 recognizes and protects the right to life of all human beings. Paragraph 1 of Article 6 of the Covenant lays the foundation for the obligation of States parties to respect and to ensure the right to life, to give effect to it through

---

[292]  Following the execution of Mr. Khashoggi, the Knight Institute and CPJ specifically sought documents on the implementation of their duty to warn from the Office of the Director of National Intelligence, the NSA, CIA, FBI, and Department of State. Responses are available here: https://knightcolumbia.org/content/knight-institute-and-committee-protect-journalists-v-cia-foia-suit-records-governments-duty

[293]  'Rwandan dissident in Belgium warned of suspected targeted attack,' *The Globe and Mail*, 14 May 2014, at https://www.theglobeandmail.com/news/world/rwandan-dissident-in-belgium-a-suspected-target/article18653424/

[294]  https://observatoryihr.org/priority_posts/erdogans-thugs-plot-to-kill-turkish-journalist-in-denmark/ Efforts by the Special Rapporteur to get the allegation story confirmed elicited a "No Comment" from the Danish authorities.

[295]  In January 2019, the Dutch government alleged that Iranian authorities were behind the murder of two Dutch citizens on its territory. The allegations based on credible evidence led the European Union to adopt a range of sanctions against Iran. https://www.consilium.europa.eu/en/policies/sanctions/iran/

[296]  Personal communication

legislative and other measures, and to provide effective remedies and reparation to all victims of violations of the right to life.

355.    There is no question that States' obligation to protect applies to both citizens and non-citizens alike on the territory of the State. This is well emphasized by the Human Rights Committee when it explains that "a State party has an obligation to respect and to ensure the rights under Article 6 of all persons who are within its territory and all persons subject to its jurisdiction, that is, all persons over whose enjoyment of the right to life it exercises power or effective control."[297]

356.    Returning to the execution of Mr. Khashoggi and to avoid any doubt: his immigration status in the USA or in Turkey had no bearing on the responsibility of the two States to protect him against foreseeable threats to his life. This same principle would also apply in any other countries to which he may have travelled.

### *Extra-territorial application*

357.    The Human Rights Committee goes further in its understanding of the scope of responsibility to protect, which in its view extends to "all persons subject to the State's jurisdiction, that is, all persons over whose enjoyment of the right to life it exercises power or effective control."

358.    This analysis of the responsibility to protect the right to life is in keeping with developments with regard to the protection of economic rights where it has been determined that "*Extraterritorial obligations arise when a State Party may exercise control, power or authority over business entities or situations located outside its territory, in a way that could have an impact on the enjoyment of human rights by people affected by such entities' activities or by such situations[298]*" or with the protection of child's rights[299]

359.    As emphasized by Milanovic, the Human Rights Committee GC36 thus "shifts the focus of the jurisdictional inquiry from that of power or control over territory or over the person, to that of power or control over the enjoyment of the right to life. In doing so, the Committee effectively endorsed the functional theory of the extraterritorial application of human rights treaties."[300]

360.    The Special Rapporteur deducts from the above that a State's responsibility to protect may be invoked extra-territorially in circumstances where that particular State has the capacities to protect the right to life of an individual against an immediate or foreseeable threat to his or her life.[301]

361.    Such understanding of the scope of the responsibility to protect is particularly relevant when applied to agencies whose mandate may have an extra-territorial scope.  To the extent

---

[297]  General Comment 36, para. 63.
[298]  E/C12/60, para 33
[299]  CRC/C/GC/16, Section C
[300]  M. Milanovic, "The Murder of Jamal Khashoggi:  Immunities, Inviolability and the Human Right to Life," at 36, 2019 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360647Milanovic, 2019, p.25; Yuval Shany, 'Taking Universality Seriously: A Functional Approach to Extraterritoriality in International Human Rights Law,' (2013) 7 *The Law & Ethics of Human Rights* 47. European Court Judge Bonello argued, in his concurring opinion on Al-Skeini, that "*Very simply put, a State has jurisdiction for the purposes of Article 1 whenever the observance or the breach of any of these functions is within its authority and control... In relation to Convention obligations, jurisdiction is neither territorial nor extraterritorial: it ought to be functional*." In Al-Skeini v. UK, Eur. Ct. H.R (2011), para 9.  Andrew Clapham has adopted a capacity-based approach to the human rights obligations of non-State actors. Andrew Clapham, Human Rights Obligations of Non-State Actors, *Oxford University Press, 2006*.  In her report on the human rights obligations of non-State actors the Special Rapporteur also suggests that the obligations of Armed non-State Actors stem from their (uniquely located) capacities to respect or protect the human rights, including the right to life, of people over which they have some degree of control. A/HRC/38/44
[301]  Additionally, and worth highlighting, the HRC imposes on Member States a duty to protect individuals outside their territories against foreseeable threats to life by corporations headquartered on their territories.

that they perform their functions outside national borders, or that their functions concern other States, such functions should include, whenever they may reasonably do so, the protection of those whose lives are under a foreseeable threat.

362.   US Intelligence Community Directive 191 suggests that the duty to warn may be implemented outside the territory of the United States. Paragraph 9 (f) stipulates that *"If the intended victim is located inside the United States or its territories, IC (Intelligence Community) elements should consult with the Federal Bureau of Investigation to determine how best to communicate threat information to the intended victim."* It can only be inferred from this paragraph (and from the mandate and operations of the CIA) that the CIA duty to warn extends to both US and non-US persons located inside and outside the territories of the United States.[302]

363.   The implementation of a duty to protect extra-territorially raises complex legal and operational questions - opposing the ideal of a universal application of international human rights law to the reluctance of States to assume burdensome obligations[303], some of which are beyond the scope of this inquiry and report[304]. This report will limit its analysis of these questions to the issue at hand: the protection to protect and warn extraterritorially against threats by other States.

364.   First, as highlighted by Yuval Shany, whether States can take on the obligation to protect and warn will be context dependent; there is "no one-size- fits-all approach".[305]  One key contextual consideration is the nature and extent of the State's extra-territorial activities, such as the nature of the extent of a State's Intelligence gathering activities. The Special Rapporteur will not comment about generic and most specific aspects of surveillance carried out by a state except for calling for surveillance to be carried out in accordance with human rights law.[306]  She emphasizes though that if a State is engaged in such activities directed at specific countries, and comes across information indicating that individuals may be at risk of human rights violations, including violation of the right to life, then it has the obligation to assess the nature and imminence of the risks and threats and to determine how it may protect those whose lives may be at risk.

365.   Second, the acts required for effective protection may not necessarily constitute a heavy financial, political or "intelligence" burden.  In many circumstances, it may suffice to inform the security agencies of the countries where such individuals are located.  For instance, it is unlikely that protecting Mr. Khashoggi while he was in Turkey would have raised particularly difficult concerns. Western Intelligence agencies presumably could have found ways of informing their Turkish counterparts of the existence of a credible and immediate threat against Mr. Khashoggi for them to take action, including by warning him. In May 2019, it was widely reported that the CIA informed the Norwegian Police Security Service, that Palestinian-born Arab Spring activist Illia Baghdadi, residing in Norway, was under credible threats originating from Saudi Arabia.  He and others were warned against traveling to specific countries where Saudi Arabia is said to have influence, and were instructed to take a wide range of precautions.[307]

366.   Where cooperating with the Security Agencies of other States is not feasible, intelligence agencies or national authorities may be in a position to inform the States

---

[302]   Human Rights Committee, Concluding observations on the fourth periodic report of the United States of America*, CCPR/C/USA/CO/4, 23 April 2014, paragraphs 4-

[303]   See Marko Milanovic, *Extraterritorial Application of Human Rights Treaties: Law, principles and Policy,* Oxford Monograph in International Law, 2011

[304]   Concerns regarding the extra-territorial use of force have been most notably raised with reference to the targeted killing of "terrorists" in the context of international and non-international armed conflicts as well as outside an armed conflict situation. New technologies, and especially unarmed combat aerial vehicles or "drones", have made it easier to kill targets, with fewer risks to the targeting State. A/HRC/14/24/Add.6

[305]   Shany, 2013, p.22

[306]   See for instance the 2019 report (A/HRC/40/63) on Intelligence Oversight, by the UN Special Rapporteur on the Right to Privacy
https://www.ohchr.org/Documents/Issues/Privacy/StatementHRC_40_Privacy.pdf

[307]   Personal Communication

concerned that they are aware of credible risks to specific individuals' right to life, thus possibly preventing further escalation.

367.   They may also be in a position to directly warn the individual concerned, even if they cannot implement any other specific protection measures themselves. There is no evidence that such a warning could constitute, under the US Directive 191, one of the circumstances for which a waiver to the duty may be granted. Warnings could be framed in such a way that the individuals whose lives are at risk would not know anything about the methods used to obtain the relevant information, so that there was no risk that the methods in question could be compromised or publicly exposed.[308]

368.   The question may be raised as to whether such direct warnings to individuals could violate the principle according to which a state cannot take measures on the territory of another state by means of enforcement of national laws without the consent of the latter. The Special Rapporteur takes the position that there must be a presumption that such warnings which aimed at protecting a jus cogen norm such as the right to life[309], or an obligation erga omnes, or at preventing a crime that may be the object of universal jurisdiction, do not violate the aforementioned principle and should not be opposed by other states.[310]

369.   In conclusion, if the United States (or any other party to the ICCPR) knew, or should have known, of a foreseeable threat to Khashoggi's life and failed to warn him, while he was in Turkey (or elsewhere), and under circumstances with respect to which it could be argued that he was under their functional jurisdiction, then the United States or any other State would have violated their obligations to protect Mr. Khashoggi's life.

## II.   The responsibility to protect applied to the execution of Mr. Khashoggi

370.   This section will now turn to an analysis of the responsibility to protect as applied to the execution of Mr. Khashoggi, with a particular focus on the circumstances before the attack on his life. **The question is whether Turkey or the United States knew or ought to have known of a real and imminent or foreseeable threat to Mr. Khashoggi's life. This includes an assessment of** whether, in light of what they knew or were told, the authorities should have undertaken further enquiry or investigation.

371.   This analysis is hampered by the lack of access to Intelligence assessment and by the inability to authenticate leaks reported by journalists. However, on the basis of the information available to, and authenticated by, the Special Rapporteur, the following evaluation may be offered.

### A real and credible threat?

372.   There are good reasons to believe that the Saudi consulate was already under surveillance by the time Mr. Khashoggi entered it for the first time on 28 September, although this is denied by the Turkish authorities. Such surveillance may have been conducted as a routine exercise with regard to a number of foreign actors on Turkish territory. There are good reasons to believe that Turkish authorities were focused on a range of real or perceived threats in the year of and preceding Mr. Khashoggi's killing, in light of the national and regional situations.

---

[308] Extrapolation from Milanovic thoughtful analysis of the responsibility to protect Mr. Khashoggi, 2019, p. 21

[309] Such presumption applies in particular force to situations involving individuals with whom States have a special relationship that renders them particularly well situated to protect that said individuals. See Yuval Shavy, 2013, p.69.

[310] This proposal is in keeping with a range of doctrinal and strategic developments, including at the level of the United Nations, such as the Responsibility To Protect (R2P), the Protection of Civilians (POC), the development of Early Warning Capacities, and more recently the Secretary General call for a culture of prevention within the UN and amongst member States.
https://www.un.org/sg/en/priorities/prevention.shtml

373.    Turkish alleged surveillance of the Saudi consulate generated information that Mr. Khashoggi's life may be at risk of imminent harm dating back to 30 September and 1 October. The execution of Mr. Khashoggi on 2 October was also recorded. However, there is no evidence that the Turkish surveillance of the Consulate was conducted in real time (a labour and time intensive activity).   It is likely that analysis of the recordings linked to activities inside the Saudi consulate was conducted only after Mr. Khashoggi had been declared "disappeared," and it took several days of assessment before firm conclusions could be drawn regarding his murder.

374.    As far as the United States are concerned, media organizations have reported that, prior to Mr. Khashoggi's killing, U.S. intelligence agencies intercepted communications in which Saudi officials discussed a plan to capture Mr. Khashoggi.[311] Other leaked information suggested that the Saudi Crown Prince, Mohammed bin Salman, had told a top aide that he would 'use a bullet' on Khashoggi if he did not return to Saudi Arabia and end his criticism of the government. [312] However, the Special Rapporteur was not able to substantiate independently such reports, which relied, allegedly, on leaked intelligence.[313]  It was also reported that the recordings of these conversations were only transcribed and analyzed after Mr. Khashoggi's death, and probably as a result of his death.[314]

375.    The allegation regarding the Crown Prince, nevertheless, raises two interrelated questions: First, should these intercepts that allegedly included such key words as 'bullet' and 'abduction' have been prioritized for analysis? Second, had the CIA analysed the intercepts when they received/captured them, or shortly thereafter, would its analysts have concluded that the threats against Mr. Khashoggi were real, credible and immediate, which would have obliged implementation of their duty to warn and beyond. If not, should they have reached such a conclusion?

376.    The Special Rapporteur will venture to suggest that the first question should elicit a positive response: intercepts involving the Crown Prince and key trigger words that can only suggest violence, should have been picked up, prioritized and analysed.  With regard to the second question, the limited information available regarding the wording of the intercepts does not allow a conclusive finding as to the credibility or immediacy of the threat.

377.    However, and at the very least, such a threat should have triggered further investigation into its credibility and immediacy. Such assessment, in turn, would require evaluating whether the identity and activities of Mr. Khashoggi put him at risk, and whether there were systemic patterns of violence against individuals like him.

## *Pattern of Violence*[315]

---

[311]  Loveday Morris et al., *Saudis Are Said To Have Lain in Wait for Jamal Khashoggi*, Wash. Post (Oct. 9, 2018), https://perma.cc/82WY-EUJT

[312]  See 'Year Before Killing, Saudi Prince Told Aide He Would Use 'a Bullet' on Jamal Khashoggi,' *New York Times*, 7 February 2019, at https://www.nytimes.com/2019/02/07/us/politics/khashoggi-mohammed-bin-salman.html?emc=edit_na_20190207&nl=breaking-news&nlid=47276260ing-news&ref=headline.

[313]  In response to Freedom of Information requests regarding the application of their duty to warn to Mr. Khashoggi, the CIA, the FBI, the NSA, and ODNI responded that they could "neither confirm nor deny" that they have any documents related to the duty to warn Mr. Khashoggi, meaning that any response could endanger national security. https://knightcolumbia.org/content/knight-institute-and-committee-protect-journalists-v-cia-foia-suit-records-governments-duty

[314]  Ibid.  It has also been alleged that the United States has 11 encrypted messages between the crown prince and al-Qahtani, exchanged in the hours before and after Khashoggi's death, but does not know their contents. 'CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi,' *Wall Street Journal*, 1 December 2018, at https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460.  The Special Rapporteur could not substantiate this allegation.

[315]  The Special Rapporteur acknowledges that other important developments occurred in Saudi Arabia although they fall outside her mandate. Many commentators have pointed to remarkable and visible social transformations in the country, the most publicized of which being the Crown Prince's decision to permit women in Saudi Arabia to drive. Other themes that dominated these narratives included the relative stability of Saudi Arabia; the recent economic reforms undertaken; the clampdown on

378.   Contextually speaking, in the year or two preceding his killing, the United Nations and human rights organisations had reported a deterioration of the human rights situation in Saudi Arabia, characterized by arbitrary detention, imprisonment, unfair trial, the use of torture, and enforced disappearances. [316] The Kingdom also imprisoned princes and businessmen in the Riyadh Ritz-Carlton on accusations of corruption. There is further, evidence of a programme of abduction of princes and princesses, living abroad. The Special Rapporteur was informed of the abduction of Sultan Ben Turki Al-Saoud, Turki Ben Bandar Al-Saoud, Saoud Ben Saif Al-Nasr, and Tarek Obaid. The most brazen of the acts attributed to the Kingdom of Saudi Arabia took place in November 2017 when Saudi Arabia detained and placed under house arrest Lebanese Prime Minister Saad Hariri, forcing him to resign on public television.

### The identity and activities of Mr. Khashoggi

379.   An assessment of whether Turkey or the United States "knew or should have known" of the threats to Mr. Khashoggi's life should also focus on Mr. Khashoggi, and whether his national identity and activities put him at particular risk.

380.   He was a Saudi citizen living abroad in self-exile because of his fear for his life and liberty in his country of birth. In the year preceding his death, he published a number of pieces in the Washington Post in which he criticized the absence of press freedom in Saudi Arabia. From his exile, he had confided to many that, if he were to return to Saudi Arabia, he would be detained and possibly harmed. He had reiterated to many that he could not return to jis home country. Likewise, there may have been Intelligence Intercepts suggesting that if he were to be lured back to Saudi Arabia, he would be detained. [317] Such risks, however, were not linked to his life and presence in the countries where he had sought to live, namely the US and Turkey. There is no evidence of Mr. Khashoggi or anyone connected to him approaching security agencies with information regarding possible risks or threats to his life or well-being, let alone imminent threats, of abduction.

381.   On balance, on the basis of information available to the Special Rapporteur, and the information she could substantiate, she has concluded that Turkey or the United States did not violate their obligation to protect Mr. Khashoggi: the due diligence threshold for the obligation to protect against the killing was not reached.   She finds it hard to comprehend that intercepts of the Crown Prince's communications would not have been assessed shortly after they were intercepted, and certainly since September 2017 considering the critical role of Saudi Arabia in US domestic and foreign policies. But she has no evidence to prove that there were intercepts or that they had been assessed before the killing of Mr. Khashoggi. If, however, the allegations that the CIA knew of threats to Mr. Khashoggi's life and had assessed such threats accordingly before his death - are substantiated, then the implications must be considered. [318] Similarly, if it is made known that Intelligence agencies from other

---

religious extremism; Saudi Arabia's support for the fight against "terrorism", etc.  Themes such as these to a large extent also drove the Western agenda and its understanding and assessment of interests and threats. Interviews, Paris, London, Washington DC, Berlin, Ottawa.

[316]  See e.g.
https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=23522;
https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=23967;
https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=24291
When the Canadian Minister for Foreign Affairs called for the release of two women's rights activists in August 2018, within a few days, the Saudi authorities had declared the Canadian ambassador persona non grata and expelled him from the country, while trade relationship with Canada were broken off.

[317]  https://www.washingtonpost.com/world/national-security/crown-prince-sought-to-lure-khashoggi-back-to-saudi-arabia-and-detain-him-us-intercepts-show/2018/10/10/57bd7948-cc9a-11e8-920f-dd52e1ae4570_story.html?utm_term=.0098fa2c501c

[318]  A lawsuit has been filed by the Knight First Amendment Institute at Columbia University, pursuant to the Freedom of Information Act, asking for a judicial order compelling the relevant agencies to disclose records in their possession regarding Saudi threats to Khashoggi and their failure to warn him thereof. https://knightcolumbia.org/content/knight-institute-and-committee-protect-journalists-v-cia-foia-suit-records-governments-duty

countries had been in possession of information indicating a clear and foreseeable threat to Mr. Khashoggi's life, they too could be found to be in breach of their responsibility to protect, including to warn him.

## III.   The responsibility to protect and to warn following the execution of Mr. Khashoggi

382.    The principle of due diligence has a long history in the international legal system and standards on state responsibility.  It has been applied in a range of circumstances to mandate States to prevent, punish, and provide remedies for acts of violence, when these are committed by either State or non-State actors.[319]  Due diligence has been widely interpreted in the context of a State legal obligation regarding the principle of non-refoulement of those seeking safety. However, the Special Rapporteur observes that such a principle has not been widely interpreted with regard to the content of States' legal obligations towards the protection of citizens or non-citizens, living in exile on, or passing by their territories, who may be facing threats from their State of origin. These include, in the first place, journalists, human rights defenders or so-called dissidents.

383.    The killing of Mr. Khashoggi has highlighted their vulnerabilities, and the risks they face of covert actions by the authorities of their countries of origin or non-State actors associated with them. Such actions amount to human rights violations and may include extrajudicial execution, abduction and enforced disappearance, threats, harassment and electronic surveillance. They may also include threats of a more psychological nature, focusing on threats to the dissident's loved ones who have remained behind.

384.    The States of the countries where journalists, human rights defenders or dissidents have found residence or exile are under an obligation to respect their human rights, and to protect them against violence by the States of the countries from which they have escaped. Obligations to protect the rights of this population, including their right to life, should figure large on a State priorities given the implications for national security and territorial integrity posed by the extraterritorial reach of other States. On the other hand, the obligation to protect should not impose such a disproportionate burden that it may discourage States from providing refugee status, residency or citizenship to journalists, human rights defenders or dissidents.

385.    This section has provided an analysis of what the obligation to protect should entail, namely:

(a)    The duty to protect is triggered whenever Governments know or ought to know of a real and immediate threat or risk to someone's life;

(b)    Such an obligation to protect includes, but is not limited to, a duty to warn the individual of an imminent threat to their life;

(c)    The obligation to protect, including the duty to warn, is imposed on all Governments agencies and institutions, and thus includes Intelligence  Agencies;

(d)    The obligation to protect is triggered regardless of the status of citizen or alien on the territories of the State;

(e)    The obligation to protect, including the duty to warn, demands that risks assessment considers whether some individuals may be particularly at risk because of their identity or activities, such as journalists or human rights defenders;

(f)    The obligation to protect, including the duty to warn, may be triggered extra-territorially, whenever States exercise power or effective control over individual's enjoyment of the right to life.

386.    In the aftermath of the execution of Mr. Khashoggi, and in view of the information and cases that his killing has generated, the Special Rapporteur recommends that Intelligence, Security and Law enforcement agencies should review their policies and procedures to

---

[319]   Jessica Lenehan (Gonzales) v. United States, para 19.

determine whether they are meeting their due diligence obligation to protect the right to life, and prevent threats and violence by Foreign States and non-State actors against their citizens or non-citizens on their territories.  She notes that there is evidence of an increase in the number of persons seeking safety abroad, including journalists, human rights defenders or political dissidents.  Anecdotal evidence also indicates that the extraterritorial use of targeted force against people perceived as "dissidents" is on the increase.  She thus advises that existing policies and procedures may need updating and upgrading to meet the challenges of the changing global environment.

387.    In particular, in the aftermath of Mr. Khashoggi's execution and considering the failure of the Kingdom of Saudi Arabia thus far to investigate and prosecute in accordance with international standards or to acknowledge the responsibilities of the State, it is incumbent upon State Parties to take all necessary measures to protect Saudis abroad and others who may be targeted by the State of Saudi Arabia because of their activism and/or expression on-line and off-line.

# PART V.    Prosecution, remedies and reparations

388.    An important element of the right to life is the obligation on States parties, to prosecute extrajudicial executions and all other unlawful deaths in accordance with international standards. States parties must generally refrain from addressing violations of the right to life through administrative or disciplinary measures. A criminal investigation is normally required, which should lead, if enough incriminating evidence is gathered, to a criminal prosecution. "Immunities and amnesties provided to perpetrators of intentional killings and to their superiors, and comparable measures leading to de facto or de jure impunity, are, as a rule, incompatible with the duty to respect and ensure the right to life, and to provide victims with an effective remedy."[320]

389.    Principle 18 of the 1989 UN Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions provides that: "Governments shall ensure that persons identified by the investigation as having participated in extra-legal, arbitrary or summary executions in any territory under their jurisdiction are brought to justice. Governments shall either bring such persons to justice or cooperate to extradite any such persons to other countries wishing to exercise jurisdiction. This principle shall apply irrespective of who and where the perpetrators or the victims are, their nationalities or where the offence was committed."[321]

390.    States must punish individuals responsible for violations in a manner commensurate with the gravity of their crimes. The legal duty to punish those individuals responsible for violations of the right to life is not a formality and neither is it a question of revenge. By enforcing the legal norms that States have established regarding the respect due to human life, prosecution and trials are meant to ensure there can be no impunity for such crimes and at the same time play a fundamental role in their prevention.

391.    The process of holding accountable those responsible for the killing of Mr. Kashoggi raises complex legal questions, on top of the sensitive political and geo-strategic environment in which they are raised.  This Section will first analyse the legal challenges that the prosecution of Mr. Khashoggi's killers raise. It will review the steps taken to date by prosecutors or lawyers in the three countries where prosecution of the alleged perpetrators and mastermind, and formal legal accountability for the killing of Mr. Jamal Kashoggi is, or may be, considered, namely the Kingdom of Saudi Arabia, Turkey and the United States.  It will then turn to an examination of the remedies and reparations available to date.

## I.    Legal challenges

### *Resolving the conflicts of jurisdiction*

392.    Both Turkey and Saudi Arabia can assert jurisdiction but there are practical obstacles to be overcome. Turkey clearly has territorial jurisdiction, which is considered the primary basis for jurisdiction under international law; while Saudi Arabia can claim jurisdiction based on the nationality (both active and passive personality, given both the perpetrators and the victim were Saudi nationals) and possibly territorial responsibility, given that a number of the constituent acts of the crime (i.e. planning, conspiracy) took place in Saudi Arabia.

393.    Where there is a conflict between States' claims to jurisdiction, there is no clear rule of international law that confers jurisdiction on the state with the strongest nexus to a situation. Principles like non-intervention, sovereign equality, and proportionality have been cited to limit how jurisdiction can be exercised. Arguments can be made on "reasonableness" or primary nexus, but there is no clear rule of law.

---

[320] GC36, para 27

[321] UN Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions, adopted by the UN Economic and Social Council (ECOSOC) in its Resolution 1989/65 of 24 May 1989, Principle 18 (emphasis supplied). The Principles were welcomed by the UN General Assembly in its Resolution 44/159 of 15 December 1989.

394.    The Special Rapporteur is recommending that a follow-up criminal investigation to her own inquiry seeks to address questions and conflict of claims around jurisdiction. For her part, she recommends that jurisdictional claims based on territory or personality be assessed against 1) the nature of the crime(s) committed: violation of a *jus cogen* norm on the right to life, and of norms enshrined in two treaties (the Convention Against Torture and the Convention on the Protection of All persons from Enforced Disappearance); violation of the VCCR and violation of the prohibition against extraterritorial use of force in times of peace; and 2) the willingness and ability of the two States concerned to prosecute such crimes, in accordance with international standards.

### Admissibility of evidence

395.    Any future trial of the alleged perpetrators of Mr. Khashoggi is likely to raise questions regarding the admissibility of some of the evidence that has been made public over the last six months: in the first place, recordings of the Saudi consulate obtained by the Turkish Intelligence, or transcripts purporting to be those of some of the recordings, as well as possible intercepts by the United States and others.

396.    Article 31, 33, and 35 of the Vienna Convention on Consular Relations together establish the "inviolability" of consular property, archives, and communications.  Article 31 states that consular premises are inviolable and forbids authorities from the host state to enter areas "used exclusively for the purpose of the work of the consular post except with the consent of the head of the consular post or his designee" or the sending State's ambassador. It further states that "[t]he consular archives and documents shall be inviolable at all times and wherever they may be," without qualification.[322]  Finally, Article 35, "Freedom Of Communication," provides that "[t]he receiving State shall permit and protect freedom of communication on the part of the consular post for all official purposes," and that "official correspondence," defined as "correspondence relating to the consular post and its functions," is inviolable.  Even where the receiving State believes that a consular bag is not being used to carry "official correspondence and documents or articles intended exclusively for official purpose," its remedy is limited to a right of inspection, and it may not seize or view consular communications without consent.

397.    Whether or not the Turkish government obtained evidence from the Saudi consulate illegally may depend on the particulars of how that evidence was obtained.  Commentators seem to agree that, although intercepting communications is acknowledged to be a common practice, the interception or monitoring of a consulate's official communications is prohibited[323], in part because the VCDR and VCCR are treaties that are intended to embody customary international law.[324]

398.    In an international forum at least, a review of the rules of evidence and jurisprudence conducted by the Special Rapporteur shows that the admissibility of the tapes and potentially other intercepts relating to Mr. Khashoggi's death will depend on the form in which they are ultimately produced, their reliability, the fairness to the defendants of using such evidence, and the interest of the international community in providing justice to Mr. Khashoggi and his family.

---

[322]  Indeed, the inviolability of the consular premises and documents is so respected that the VCCR provides that even when two states are in armed conflict and consular relations are therefore severed between them, the host state is still obligated to "respect and protect the consular premises, together with the property of the consular post and the consular archives."  VCCR art. 27; *cf. In re United States Diplomatic & Consular Staff in Tehran (United States v. Iran),* I.C.J. Reports 1980, p. 3, at ¶ 86 (May 24, 1980) ("Even in the case of armed conflict or in the case of a breach in diplomatic relations [the Vienna Conventions on Diplomatic Relations and Consular Relations] require that both the inviolability of the members of a diplomatic mission and of the premises, property and archives of the mission must be respected by the receiving state.").

[323]  Cindy Buys, "Reflections on the 50th Anniversary of the Vienna Convention on Consular Relations, 38 S. Ill. Univ. L. J. 58, 62 (2013); Sanderijn Duquet & Jan Wouters, "Diplomacy, Secrecy & the Law," Leuven Center for Global Governance Studies, Working Paper No. 151, at 8-9 (2015);

[324]  Jovan Kurbalija, "E-Diplomacy and Diplomatic Law in the Internet Era," Peacetime Regime for State Activities in Cyberspace, 393, 417 (2013)

## II.    Steps taken to date

### *Prosecution in Saudi Arabia*

399.    At the time of writing this report, the Kingdom of Saudi Arabia has initiated prosecution and trial of 11 persons in relation to the execution of Mr. Kashoggi. The death penalty is being sought against five of the eleven.  Five hearings have allegedly taken place from January to April 2019.

400.    The fact that the Saudi authorities are currently prosecuting 11 individuals for their involvement in the killing of Mr. Khashoggi, all or the majority of whom are members of elite National Security Agencies is not a negligible step. But there are many problems with the way the authorities have proceeded with this trial; problems which undercut the original positive step.

401.    Some of the violations of international standards, both in terms of proceedings and substance include the following:

(a)    The identities of those on trial has not been released and neither have the detailed charges brought against them. Under Saudi law, the names of those indicted are rarely made public. However, as highlighted above, this trial is not only a domestic, Saudi, matter. Provisions regarding the identity of those indicted should thus be deemed inapplicable.  Moreover, the Government of Saudi Arabia has ignored these privacy provisions when it has served its purposes, such as in the on-going trial of women's rights advocates when it released the identity of three women, including Aziza al-Yousef, Loujain al-Hathloul, Eman al-Nafjan and Hatoon al-Fassi.

(b)    Twenty one individuals had originally been detained. The Saudi judicial authorities have to date not explained whether the other ten individuals have been released, and if so, on what grounds.

(c)    One of the persons identified named in original statements by the Prosecutor, Mr. Saud Al Qahtahni, has not been charged to date. There is no evidence of any proceedings being initiated against him for his part in the execution of Mr. Khashoggi.

(d)    The trial, taking place at the Riyad Criminal Court, is held behind closed doors. The law of Saudi Arabia does not preclude public trial.  Article 154 of the Criminal Code of Procedure states that: "Court sessions shall be public. The court may exceptionally consider the action or any part thereof in closed sessions or may prohibit certain categories of people from attending those sessions for security reasons, observance of public morality, or if it is necessary for determining the case." The rules therefore leave it up to judges' discretion to decide whether the session will be public.  In the case of the trial of Mr. Khashoggi's alleged killers, the judge appears to have "ruled" against opening the trial to the public but has failed to issue a public demonstration as to why this is the case.

(e)    Saudi Arabia has insisted throughout the last six months that it was committed to and capable of delivering justice for the killing of Mr. Khashoggi, including by prosecuting those allegedly responsible.  This can only be demonstrated through a public hearing that adheres strictly to fair trial guarantees, as recognized under international law:

> *"The publicity of hearings ensures the transparency of proceedings and thus provides an important safeguard for the interest of the individual and of society at large. Courts must make information regarding the time and venue of the oral hearings available to the public and provide for adequate facilities for the attendance of interested members of the public, within reasonable limits, taking into account, inter alia, the potential interest in the case and the duration of the oral hearing."*[325]

---

[325]  Communication No. 215/1986, *Van Meurs v. The Netherlands*, para. 6.2.

Only under exceptional circumstances,[326] may courts have the power to exclude all or part of the public. In the opinion of the Special Rapporteur, such circumstances do not apply to the trial of Mr. Kashoggi.

(f)     The Government of Saudi Arabia has invited representatives of the permanent members of the Security Council and of Turkey to attend at least some of the hearings for the eleven individuals charged. However, the Special Rapporteur has been told that this was dependent on a non-disclosure agreement. As such, the observation is not a credible validation of the proceedings or of the investigation itself. One of the key objectives of trial observation ought to be exercising and enforcing the right to a public trial and the right to a fair trial.  Those who agreed to observe ought to, at the minimum, release information regarding the circumstances, rules and outcomes of their observation. A shadowy presence of international observers cannot, although clearly meant to, lend credibility to eminently problematic proceedings. It is particularly concerning that, given the identity of the observers, it is the institution of the UN Security Council altogether, that has been made complicit in what may well amount to a miscarriage of justice.

(g)     The Prosecutor has demanded the death penalty for five of the defendants even though the aforementioned issues point to unfair proceedings and a risk of miscarriage of justice. If the death penalty was to be carried forward, it will amount to an arbitrary killing by the State.

402.     In view of her concerns regarding the effectiveness, independence and transparency of the investigation highlighted in Part III of this report, and these grave concerns regarding the trial of the 11 suspects in Saudi Arabia, the Special Rapporteur is calling for the suspension of the trial.

403.     She understands that while the Saudi Code of Criminal Procedure may in principle prohibit withdrawal (Article 5), she notes that it also recognizes exceptions to the rule. First, retrials can be ordered in cases of death penalty (Articles 10 and 11): if the Supreme Court does not uphold the death sentence, said sentence shall be overturned and the case shall be remanded to the court of first instance for retrial by other judges. Secondly, Article 204 allows for a "reconsideration of a final judgment": if a person is convicted for committing an act and another person is convicted for committing the same act, resulting in contradiction entailing that one of the two persons should not have been convicted; the judgment is based on documents that turn out to be forged, or on testimony that is found by the competent authority to be perjurious; if, after judgment, new evidence or facts that were unknown at the time of trial appear, which could have led to the acquittal of the accused or mitigation of the punishment.  The Special Rapporteur notes in particular that a full and impartial investigation is likely to lead to "new evidence or facts" that would bear on the motivations and culpability of those currently on trial.

404.     The Special Rapporteur also points out that the conduct of criminal prosecutions in an alternative jurisdiction would be justified on the basis that Saudi Arabia appears unwilling or

---

[326]  CCPR/C/GC/32: General Comment No. 32 on Article 14: Right to equality before courts and tribunals and to a fair trial, states that "Article 14, paragraph 1, acknowledges that courts have the power to exclude all or part of the public for reasons of morals, public order (*ordre public*) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would be prejudicial to the interests of justice. Apart from such exceptional circumstances, a hearing must be open to the general public, including members of the media, and must not, for instance, be limited to a particular category of persons. Even in cases in which the public is excluded from the trial, the judgment, including the essential findings, evidence and legal reasoning must be made public, except where the interest of juvenile persons otherwise requires, or the proceedings concern matrimonial disputes or the guardianship of children."
https://tbinternet.ohchr.org/_layouts/treatybodyexternal/Download.aspx?symbolno=CCPR%2fC%2fGC%2f32&Lang=en

unable to prosecute those high-ranking officials and other persons suspected of conspiracy or participation in the killing of Mr. Khashoggi.[327]

## Prosecution in Turkey

405.    At the time of writing this report, the Chief Prosecutor of Turkey had informed the Special Rapporteur that steps were being taken towards the laying of charges, for the purpose of holding a trial.  The Special Rapporteur was informed that a trial in absentia could proceed but would not deliver sentences. A judicial process in Turkey would allow the evidence in possession of the Turkish authorities to be aired publicly and critically examined which would constitute an important step. However, notwithstanding the issue of jurisdiction and the limitations of a trial in absentia, the Special Rapporteur is concerned that the legitimacy of Turkey to deliver justice to Mr. Khashoggi is seriously weakened by fact of what Special Rapporteurs and others report as being the country's repeated and widespread arbitrary detentions, and unfair trials, of journalists and others on the basis of their exercise of their right to freedom of expression.[328]

## Prosecution in the United States

406.    The United States government has an interest in punishing this extra-judicial killing. Mr. Khashoggi was a resident of Virginia and a columnist for the Washington Post.  He had applied for, and received, an EB-1 visa and was awaiting his Green Card.  His killing was intended to silence his free speech, a core liberty within the United States and one that is protected as a fundamental international human right.  Should this murder have been a result of a conspiracy, and any act of the conspiracy took place within the United States, potentially even wire transfers, then the United States would have authority to prosecute this crime as a violation of 18 U.S.C. § 956 (conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country).[329]  The Federal Bureau of Investigation is authorized to, and should, investigate such a crime.

407.    Civil suits could also be brought in the United States, although any suit directly against the perpetrators or the relevant State, will likely be challenged, successfully or not, on grounds that the United States lacks jurisdiction over the perpetrators or by claims of sovereign or diplomatic immunity.[330]  For example, the Torture Victim Protection Act[331] provides that any individual who "subjects an individual to extrajudicial killing" shall be liable for damages to "any person who may be a claimant in an action for wrongful death", thereby potentially providing a remedy to individuals harmed by Mr. Khashoggi's death. Civil suits can also seek access to documents and other materials within the possession of the United States that might provide evidence as to who is responsible for Mr. Khashoggi's death and whether the United States had prior information suggesting that Mr. Khashoggi was at risk.  The Open Society Justice Initiative filed a Freedom Of Information Act (FOIA) request related to Mr. Khashoggi's killing, "including but not limited to the CIA's findings on the circumstances under which he was killed and/or the identities of those responsible"[332], and has since filed suit against the government for its failure to respond.  FOIA requests were made by the Knight First Amendment Institute at Columbia University and the Committee to Protect Journalists seeking documents related to the United States government's duty to

---

[327]  She notes that if those on trial are finally convicted or acquitted of the offence, those persons may be protected from further prosecution in a foreign criminal jurisdiction or international criminal jurisdiction by the principle of double jeopardy under international law.

[328]  See e.g. A/HRC/35/22 Add.3; OSCE Representative on Freedom of the Media, Official Visit to Turkey Concluding Statement, June 14 2019.

[329]  Lee C. Bollinger, President of Columbia University, has suggested several bases on which to claim jurisdiction given the vital interests of the United States at issue. https://www.washingtonpost.com/opinions/how-the-us-could-prosecute-jamal-khashoggis-killers/2019/03/31/1f8a7f4c-5180-11e9-88a1-ed346f0ec94f_story.html

[330]  The Special Rapporteur expresses no opinion as to the merits of those defences.

[331]  28 U.S.C. § 1350 note.

[332]  https://www.opensocietyfoundations.org/press-releases/freedom-information-filing-seeks-disclosure-cia-records-khashoggi-killing

warn under Intelligence Community Directive 191, but the United States has produced almost nothing in response.  Accordingly, both filed suit, seeking the production of documents responsive to their request.[333]  For an international crime of this magnitude, the United States should fulfill its responsibility under international human rights law to cooperate fully in the investigation of the crime and produce as much information as possible to those seeking to hold the perpetrators accountable.

## III.    Remedies and reparations

408.    *Remedies* and *reparations* are a cornerstone of international law. They are the mirror to the State's duty to protect. In other words, "[r]ights suppose a correlative obligation on the part of the State . . . without a remedy, a right may be but an empty shell."[334]  Under the human rights framework, individuals have an undisputed right to claim reparations from the State. The victims' right to remedy includes rights to the following: "(a) Equal and effective access to justice; (b) Adequate, effective and prompt reparation for harm suffered; (c) Access to relevant information concerning violations and reparation mechanisms."[335] In the case of an unlawful death, reparation may include compensation, satisfaction, and guarantees of non-repetition.[336] Each form of reparation responds to a specific aspect or type of harm caused by a violation.

409.    *Satisfaction* measures focus on the State duty to investigate, prosecute, and punish.[337] Such measures include any or all of the following, where appropriate: effective measures aimed at the cessation of continuing violations; verification of the facts and full and public disclosure of the truth to the extent that such disclosure does not cause further harm or threaten the safety and interests of the victim; search for the disappeared; an official declaration or a judicial decision restoring the dignity, reputation, and rights of the victims; a public apology; judicial and administrative sanctions against persons liable for the violations; commemorations and tributes to the victims, etc.[338]

410.    The principle of satisfaction raises serious concerns regarding the State's investigation of the execution of Mr. Khashoggi and prosecution of those suspected of playing a role in the execution.

411.    *Compensation* measures should be provided for any economically-assessable damage, as appropriate and proportional to the gravity of the violation and the circumstances of each case: physical or mental harm; lost opportunities, including employment, education, and social benefits; material damages and loss of earnings, including loss of earning potential; moral damage; costs required for legal or expert assistance, medicine and medical services, and psychological and social services.[339]

412.    The Special Rapporteur obtained information regarding a financial package offered to the children of Mr. Jamal Khashoggi, which mirrors the information released by the Media[340]. However, it is questionable whether such package amounts to compensation under international human rights law or to an official apology.  The trial of the 11 suspects is on-going.  Salah Khashoggi, one of Mr. Khashoggi's children, tweeted that the financial package did not amount to an admission of guilt by King Salman and Crown Prince Mohammed bin

---

[333]  https://knightcolumbia.org/content/knight-institute-and-committee-protect-journalists-v-cia-foia-suit-records-governments-duty

[334]  Christine Evans, The Right to Reparation in International Law for Victims of Armed Conflict, Cambridge University Press 126 (2012).

[335]  G.A. Res. 60/147, Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of IHRL and Serious Violations of IHL 3 (Dec. 16, 2005) [hereinafter Basic Principles and Guidelines].¶ 11.

[336]  *Id.* at 7-9.

[337]  *Id.* ¶ 22.

[338]  Id. ¶ 22.

[339]  *Id.*, ¶ 20.

[340]  See, e.g. https://www.washingtonpost.com/world/national-security/khashoggi-children-have-received-houses-in-saudi-arabia-and-monthly-payments-as-compensation-for-killing-of-father/2019/04/01/c279ca3e-5485-11e9-8ef3-fbd41a2ce4d5_story.html?utm_term=.4f9fbb02a8c4

Salman: "Acts of generosity and humanity come from the high moral grounds they possess, not admission of guilt or scandal. We, Jamal Khashoggi's family, were brought up by our parents to thank acts of good not disavow."

413.   Taking accountability seriously means that the Saudi Arabia government must accept State responsibility for the execution. The Saudi leadership must provide a public recognition and apology to Mr. Khashoggi's family, friends and colleagues for the execution. It must also apologise to the Turkish government for the abuse of its diplomatic privileges and the violation of the prohibition against extra territorial use of force. Finally, the Saudi government must also apologise to the United States for executing its resident and, through this act, undermining and attacking their constitution's First Amendment.

414.   *Guarantees of non-repetition,* similar to some satisfaction measures, contribute to prevention, and include the following: ensuring effective civilian control of military and security forces; ensuring that all civilian and military proceedings abide by international standards of due process, fairness, and impartiality; strengthening the independence of the judiciary; protecting the media, and human rights defenders; providing, on a continued basis, human rights and IHL education to all sectors of society and training for law enforcement officials as well as military and security forces; promoting the observance of codes of conduct and ethical norms; reviewing and reforming laws as necessary.[341]

415.   The Saudi authorities announced that King Salman had ordered a restructuring of the General Intelligence Presidency, under the leadership of the Crown Prince. Five senior Saudi officials were fired, including two that have been specifically mentioned for their role in planning the killing of Mr. Kashoggi, including Royal Adviser Saud AlQahtani, and Deputy Director of General Intelligence Ahmed Assiri. Subsequent reports, including official statements from Western Governments, have suggested however, that at least Mr. Al Qahatani is still in place, performing his advisory functions.

416.   The restructuring of the Intelligence Services may thus demonstrate Saudi Arabia implementation of an international obligation regarding non-repetition. But it is difficult to reconcile such an interpretation with the identity of the person in charge of the restructuring – who is the very same person against whom there is sufficient credible evidence to warrant further investigation of his part in the execution of Mr. Khashoggi. Further, there has been no subsequent information elaborating on the intended impact of the restructuring (or any other measures) on the decision-making, training, and code of ethics of the Saudi Security agencies, to name but a few issues of concern. Lastly, since the beginning of 2019, more journalists and political activists have been detained by the authorities. At the time of writing this report, the Special Rapporteur had received credible evidence that the CIA had notified four Western countries of foreseeable and immediate threats against their residents who had fled Saudi Arabia or another Gulf country. The Special Rapporteur can only conclude that the Kingdom of Saudi Arabia has failed thus far to demonstrate that it is implementing its obligation of non-repetition or that steps are taken in good faith.

417.   Instead, one would expect the Kingdom of Saudi Arabia to demonstrate non-repetition including by releasing all individuals imprisoned for the peaceful expression of their opinion and belief; investigating all allegations of torture and lethal use of force in formal and informal places of detention; investigating all allegations of enforced disappearances and making public the whereabouts of individuals disappeared. It should also undertake an in-depth assessment of the actors, institutions and circumstances that made it possible for the execution of Mr. Khashoggi to be carried forward and identify the reforms required to ensure non-repetition.

418.   The Kingdom of Saudi Arabia has taken timid steps towards addressing its State responsibilities in terms of prosecution and reparation. But these stop short of what is expected under international law. The accountability gap is all the more worrying given that it concerns a crime that has received an unprecedented level of attention and outcry internationally, including official public condemnation the world over,s.

---

[341] *Id.* ¶ 23.

# PART VI – International accountability

419.    This report has shown that the execution of Mr. Khashoggi constituted a violation of his right to life for which the State of Saudi Arabia is responsible. This violation has been compounded by Saudi Arabia's failure to effectively investigate the execution and fairly prosecute those responsible. The secrecy attached to both the investigation and the prosecution also violates the right to know and the right to truth of the international community, his family, friends, colleagues and many around the world who also have a right to know what happened to Mr. Khashoggi; to know the nature and extent of Saudi Arabia responsibilities, the identity of the mastermind and of the other perpetrators and their respective roles in the execution of the premediated murder. This inquiry has gone some way towards fulfilling those rights by analyzing the information available to it, through the lens of international human rights law. However, far more is required to shed full light on the fate of Mr. Khashoggi.

420.    This report has also demonstrated that the execution of Mr. Kashoggi in the Saudi consulate located on the Turkish territory violated two core rules of the international system: the prohibition on extraterritorial use of force and the requirement that states use consular missions for official purposes. These rules established in international law, in turn raise to the level of obligations erga omnes which are owed to the international community as a whole.

421.    The Special Rapporteur has also argued that the extrajudicial execution of Mr. Khashoggi, in order to silence him, a Washington Post columnist, interfered with the United States.

422.    Thus, the execution of Mr. Khashoggi raises at least three distinct international harms for which remedies must be identified and sought: 1) the violation of Mr. Khashoggi's right to life, 2) the violation of the VCCR, and 3) the violation of the prohibition against extraterritorial use of force. The rights to remedies associated with the violation of Mr. Khashoggi's right to life are distinct from those of Turkey and the United States, and distinct from those of the international community. Therefore, there are potentially four categories of "rights-holders" who should be able to claim redress in connection to his killing.  It is troubling that to date the execution of Mr. Khashoggi has led to so few effective international responses, whether legal, political or diplomatic. In keeping with the terms of her Mandate, the Special Rapporteur will focus her analysis to the search for accountability for the violation of Mr. Khashoggi right to life.[342]

423.    The Special Rapporteur points to previous violations of international law by the Kingdom of Saudi Arabia.  This includes the attempted abduction and ill-treatment of the elected Prime Minister of a sovereign State – an extraordinarily brazen act – which was not the object of a UN Security Council Resolution. Violations of international humanitarian and human rights law by Saudi Arabia and other parties to the conflict in Yemen have been well documented by the United Nations [343] and they are the objects of repeated UNSC Resolutions.[344] The extrajudicial execution of Mr. Khashoggi came in the wake of a well-evidenced campaign of human rights violations against activists and journalists as well as against businessmen and Saudi princes documented by UN Special Procedures. These violations have been the object of a joint statement by 36 States at the Human Rights Council[345].    Yet, following Mr. Khashoggi execution, new violations have been credibly

---

[342]  She had found that the remedies available in response to Saudi Arabia's violation of the VCCR are largely diplomatic and that Turkey can only find relief with support of the international community, a community that has also been injured by these acts. With regard to the extraterritorial use of force, Turkey or indeed any Member State should be able to bring a dispute or situation that "might lead to international friction" to the attention of the Security Council. Once raised, the Security Council may "recommend appropriate procedures or methods of adjustment" for settlement. See U.N. Charter arts. 34–41.

[343]  See for instance https://www.ohchr.org/EN/HRBodies/HRC/YemenGEE/Pages/Index.aspx

[344]  https://osesgy.unmissions.org/security-council-resolutions

[345]  https://www.government.is/diplomatic-missions/embassy-article/2019/03/07/Joint-statement-on-the-human-rights-situation-in-Saudi-Arabia/

documented, including against activists living abroad.  This is deeply regrettable.  Saudi Arabia should instead not only be prepared to account for the execution of Mr. Khashoggi but also take active steps to demonstrate non-repetition.

424.   The Special Rapporteur identifies below a range of options by which legal accountability for the execution of Mr. Khashoggi could be delivered.  However, she warns that the search for accountability cannot privilege justiciability over all other means.  His execution should result in all those responsible being held to account before a court of law and in provision by the State of remedies and reparations. But the search for, and narrative about, justice for Mr. Khashoggi cannot be left hanging on complex questions of jurisdiction and State claims to immunity and on the whims of the Saudi legal system. The onus is on the international community (States, civil society, corporate actors, United Nations) to search for, identify and implement other tools of accountability, including political, diplomatic, economic and symbolic.

425.   Finally, the Special Rapporteur believes that search for accountability for the execution of Mr. Khashoggi should be commensurate with Mr. Khashoggi's courageous stands for democracy, transparency and press freedom, including in Saudi Arabia and for the Middle East more generally.  Steps should be taken to lift the cloud of secrecy so that the State and the individuals responsible for his killing cannot hide behind their power and influence under a pretense of accountability which too many it seems are prepared to accept.

## I.   A follow-up criminal investigation for the execution of Mr. Khashoggi

426.   The UN Human Rights Council ("UNHRC"), the Security Council[346] or the UN Secretary General should demand a follow-up criminal investigation into Mr. Khashoggi's killing. The UN largely devotes its investigative powers to human rights and cases of international conflict.[347]   The execution of Mr. Khashoggi raises an egregious underlying set of facts, as well as violations of fundamental human rights as well as of international law. The steps taken by Saudi Arabia, in response to the execution, are not only insufficient. Their responses have themselves violated international human rights standards, both substantively and procedurally and failed to address the violations of international law. The Human Rights Council, the Security Council or the UNSG should recognize this for the exceptional case that it is and proceed with an international follow-up criminal investigation.

427.   It has been argued that for the UNSG to initiate an international criminal investigation into the killing of Mr. Khashoggi, Turkey must formally request such an investigation. While the Special Rapporteur encourages Turkey or indeed Saudi Arabia to officially demand such a follow up criminal investigation, she disagrees with the narrow understanding according to which Turkey should trigger such an investigation.  The interest and rights of Mr. Khashoggi should not be linked to or dependent upon his presence on the territory of Turkey at the time of his execution, no more than they should they be linked to or dependent upon his country of citizenship, responsible for his killing.  It would be absurd to limit the intervention of the UNSG to such scenarios, although, practically and politically, the cooperation of the States concerned is an important step towards the delivery of accountability.  Nevertheless, any state should be able to make claims on behalf of Mr. Khashoggi and the violation of his right to life, to the UN Secretary General (and any other UN bodies). Most importantly, the Secretary

[346] Article 34 of the U.N. Charter grants the Security Council investigatory power deriving from its mandate to ensure "the maintenance of international peace and security."

[347] *See, e.g.,* United Nations, "International Commissions of Inquiry, Fact-finding Missions: Home," *available at* http://libraryresources.unog.ch/factfinding (listing U.N. investigations from 1963 to the present, including missions in, e.g., Timor-Leste, Lebanon, and Afghanistan); *see also* United Nations Security Council, "Commissions & Investigative Bodies," *available at* https://www.un.org/securitycouncil/content/repertoire/commissions-and-investigative-bodies (listing U.N. commissions and investigative bodies from 1946 to the present, including those dedicated to, e.g., Rwandan genocide and demobilization of armed resistance in Nicaragua).

General himself should be able to establish an international follow-up criminal investigation without any trigger by a State.[348]

428.   However, the success of any criminal investigation will require the cooperation of both Turkey and Saudi Arabia, and of any other State whose intelligence or other services may be in possession of evidence relating to the offences, in the first place the United States. A criminal investigation should seek to access empirical evidence not made available to the Special Rapporteur and to address the legal issues and context that the Special Rapporteur could not explore sufficiently here. As already highlighted, this human rights inquiry is not a substitute for a criminal investigation nor is it a court of law. In particular, this inquiry did not have the resources, technical support or authority to establish a full basis on which to draw and give effect to definitive conclusions as to culpability or legal liabilities. However, it has identified compelling evidence that demands further investigation, including into specific situations and identifiable individuals, particularly for the purpose of determining individual liability conclusively and to legal standard. A criminal investigation in follow-up to this inquiry should seek to do just that and if it concludes that such an outcome is warranted it should put forward proposals towards judicial accountability. Options may include the establishment of an extraordinary ad hoc tribunal or a hybrid tribunal.

## II.   Universal Jurisdiction

429.   The Special Rapporteur believes that the killing of Mr Kashoggi constitutes an international crime falling within the parameters of universal jurisdiction. Definitions of international crimes and lists of international crimes are almost as diverse as there are eminent legal experts[349] or indeed national jurisdictions. However, they tend to agree on the more basic characteristics of an international crime, particularly that: 1) it impacts on the peace or safety of more than one state; 2) it shocks the conscience of humanity; 3) it is derived from an international treaty or from customary international law; 4) its violation attracts the criminal responsibility of individuals.

430.   Universal Jurisdiction over the execution of Mr. Khashoggi may be made under the Convention Against Torture to the extent that his killing was considered by the Committee Against Torture as falling within the terms of the Convention.

431.   The Special Rapporteur is of the opinion that, in the absence of clear and consensus-based rules on what constitutes an international crime and on which crimes attract universal jurisdiction.[350] a number of arguments may be made in support of the position that the execution of Mr. Khashoggi does rise to the level of an international crime attracting universal jurisdiction.

432.   First, his killing may have amounted to an act of torture or ill-treatment, prohibited by the Convention Against Torture. Article 14 of the Convention, which contains no geographic restriction, requires each state party to ensure in its legal system that any victim of an act of torture, regardless of where it occurred, obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible.[351]

---

[348]   There is at least one precedent when Secretary General Ban Ki Moon established a Panel of Experts on Accountability in Sri Lanka, UN Doc. SG/2151 (26 May 2009)

[349]   Compare for instance G. Werle, *Principles of International Criminal Law*, 2nd edn. T.M.C. Asser Press: The Hague 2009, p. 29; A. Cassese, International Criminal Law, Oxford University Press: Oxford 2003; Cherif Bassiouni, 'International Crimes: The *Ratione Materiae* of International Criminal Law', in: M. Cherif Bassiouni (ed.), *International Criminal Law. Vol. I: Sources, Subjects and Contents,* 3rd ed., Martinus Nijhoff Publishers: Leiden 2008; Y.Q. Naqvi, *Impediments to Exercising Jurisdiction over International Crimes*, T.M.C. Asser Press: The Hague 2010,

[350]   The lack of consensus was well reflected by the UNGA sixth committee discussion on universal jurisdiction.

[351]   Christopher Keith Hall, The Duty of State Parties to the Convention Against Torture To Provide Procedures to Permit Victims to Recover reparation for Torture Committed Abroad, EJIL (2007), Vol. 18 No. 5, 921–937; Committee, Conclusions and recommendations, 34th Sess., 2 – 20 May 2005, UN Doc. CAT/C/CR/34/ CAN, 7 July 2005, paras 4(g), 5(f)

433.   Second, as highlighted previously, under international human rights law, the killing of Mr. Khashoggi is a violation of a jus cogen norm; a norm that "holds the highest hierarchical position among all other norms and principles. As a consequence of that standing, jus cogens norms are deemed to be "peremptory" and non-derogable."[352]  The prohibition against arbitrary deprivation of life, such as an extrajudicial killing, is also part of customary law.  The killing of Mr. Khashoggi further attracts the matter of individual responsibilities of the State officials responsible for the execution. In addition, the circumstances of the execution of Mr. Khashoggi mean that at least two additional international obligations have been violated, namely those arising from the VCCR and the prohibition against extraterritorial use of force under the UN Charter.

434.   These characteristics give rise to the second compelling argument as to why the execution of Mr. Khashoggi constitutes an international crime.  Violations of jus cogens norms by definition, "affect the interests of the world community as a whole because they threaten the peace and security of humankind and because they shock the conscience of humanity."[353]

435.   A counter-argument may be that a single state premeditated killing, as gruesome as its execution may have been, does not "shock humanity," and therefore that it does not reach the level of gravity required for an international crime. On the other hand, there is no valid legal argument according to which a single crime is deemed less "serious" or less shocking than several.  A single war crime violates international humanitarian law and may constitute an international crime providing for universal jurisdiction. Several crimes may attract a higher sentence than a single one does, however that does not make the single crime less "serious". Ultimately, "gravity" is about ethical and political considerations, and determinations may also reflect cultural and other sensitivities.  Governments, parliaments and the judiciary have used their discretion (including prosecutorial discretion) to determine which crimes in their respective jurisdiction are deemed 'international' (in addition to war crime, crimes against humanity, genocide and the crime of aggression) and thus able to attract universal jurisdiction

436.   The position that the execution of Mr. Khashoggi constitutes an international crime calling for universal jurisdiction may raise concerns over extended jurisdiction. At this point the Special Rapporteur is not suggesting that all single extrajudicial executions should be universally investigated and prosecuted.  However, she emphasizes that there are no a priori legal or normative reasons to suggest that a single execution cannot rise to the level of an international crime.  Contextual, case by case, analysis should be the guide.  As far as the execution of Mr. Khashoggi is concerned, the nature of this single crime is both unusual and serious enough (i.e. cross-border; use of a consulate; extraterritorial use of force; a journalist in exile in the US and Turkey; a possible act of torture, a continuing disappearance, persistent international impact), alongside the aforementioned problems regarding its investigation and prosecution to date, to raise it to the level of an international crime over which States should claim universal jurisdiction.

437.   As a consequence of the analysis that the nature of the execution of Mr. Khashoggi amounts to an international crime attracting universal jurisdiction, the Special Rapporteur is calling on States to take the necessary measures to establish their competence to exercise jurisdiction under international law over this crime of extrajudicial execution when the alleged perpetrator(s) are present in any territory under its jurisdiction, unless it extradites or surrenders the alleged offender to another State in accordance with its international obligations or surrenders him or her to an international tribunal with jurisdiction over the alleged offences. Perpetrators should not be allowed to benefit from any legal measures exempting them from criminal prosecution or conviction.  All States have an obligation to ensure that any persons identified as individually responsible by an independent, impartial and effective investigation into the extrajudicial execution of Jamal Khashoggi are promptly brought to justice.

---

[352]  M. Cherif Bassiouni, International Crimes: Jus Cogens and Obligatio Erga Omnes, 59 Law & Contemp. Probs. 63 (1996), p.67
[353]  Bassiouni, 1996, p.69

## III.    Targeted and State Sanctions

438.    On November 15, 2018, the US Department of Treasury's Office of Foreign Assets Control ("OFAC") sanctioned 17 individuals for their roles in the killing of Mr. Khashoggi, blocking all of their assets within US jurisdiction, and imposing a visa ban.[354]  The individuals included the "senior official of the Government of Saudi Arabia who was part of the planning and execution of the operation," his subordinate, and the Saudi Consul General for Turkey[355]. Subsequently, Canada, the UK, France, Germany, the EU, to name but a few, issued under various legal regimes, their own targeted sanctions against Saudi officials.

439.    While the Special Rapporteur welcomes these steps taken shortly after the execution, she notes the following issues:

(a)    None of the Governments responsible for issuing such sanctions has provided a well-evidenced explanation as to why these particular individuals have been targeted for sanction.  In general, public advice of decisions do not specify the standards of proofs that has been used and offer no substantiation for the decisions. In the case of Mr. Khashoggi, this practice has added to the lack of transparency that characterizes the steps taken to date to deliver accountability, mirroring the execution itself which was hidden behind the walls of a consulate and insulated from scrutiny by diplomatic immunity. This is highly regrettable and makes no contribution to the delivery of justice for the execution of Mr. Khashoggi.

(b)    At the time of writing, the highest ranked officials on the lists of these targeted for sanctions are Mr. Saud AlQahtahni, one of the alleged masterminds behind the execution of Mr. Khashoggi and an adviser to the Crown Prince, and Mr. Mohammed Alotaibi, the Saudi Consul General in Turkey.  In comparison with sanctions that have been imposed around the world in response to gross human rights violations, the individuals sanctioned in the aftermath of the execution of Mr. Khashoggi are relatively middle to low-level officials and cannot be said to be members of the Saudi leadership.[356] Yet, the execution of Mr. Khashoggi rises to the level of **State responsibility**.  Therefore, the level of seniority of the individuals targeted must be assessed in relation to the system of governance in place in Saudi Arabia. Thus far, none of the individuals targeted for sanctions can be said to be a "senior official".

(c)    As a result, the impact of these sanctions is questionable. Studies have shown that the lower an individual is placed in the hierarchy of decision-making, the less effective

---

[354]  Department of Treasury, "Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi," https://home.treasury.gov/news/press-releases/sm547

[355]  These sanctions were based in part on the Global Magnitsky Human Rights Accountability Act (the "Global Magnitsky Act"), enacted in December 2016, according to which the American President[355] may impose sanctions on "any foreign person the President determines, based on credible evidence, is responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights committed against individuals in any foreign country who seek (A) to expose illegal activity carried out by government officials; or (B) to obtain, exercise, defend, or promote international recognized human rights and freedoms, such as the freedoms of . . . expression . . . ." Pub. L. 114-328, Sec. 1263(a)(1). The Global Magnitsky Act permits two forms of sanctions.  First, it makes violators inadmissible into the United States.  Second, it permits "[t]he blocking, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), of all transactions in all property and interests in property of a foreign person if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person." Following the adoption of the US act, Canada, the UK, Estonia and Lithuania have followed suit. The EU Parliament is currently considering the adoption of a Magnitsky-type legislation.

[356]  See for instance, the list of the 13 individuals who were the first targets following the enactment of the new Global Magnitsky Act in December 2017: https://home.treasury.gov/news/press-releases/sm0243. More recently, the US has imposed sanctions against Abdulhamit Gul, Turkey's justice minister, and Suleyman Soylu, the interior minister, over the detention of an American pastor being held on espionage charge.

will be the sanctions' economic and psychological impact, and associated stigmatization, on the targeted individuals.[357]

440.    The analysis above is not meant to question the use of targeted sanctions in response to Mr. Khashoggi execution.  But it is difficult to escape the impression that these particular sanctions against 17 or more individuals may act as a smokescreen, diverting attention away from those actually responsible. The current sanctions simply fail to address the central questions of chain of command and of senior leadership's responsibilities for and associated with the execution.

441.    Targeted sanctions against the individuals and/or entities in Saudi Arabia that were likely involved in the murder of Mr. Khashoggi must continue. However, in view of the credible evidence into the responsibilities of the Crown Prince for his murder, such sanctions ought also to include the Crown Prince and his personal assets abroad, until and unless evidence is provided and corroborated that he carries no responsibilities for this execution. The Special Rapporteur recognizes the political sensitivity of this matter, but stresses that under the laws of immunity and inviolability there is no prohibition against sanctioning individuals holding positions such as that of the Crown Prince.

442.    It may be argued that, in the absence of clear evidence, sanctioning the Crown Prince violates the principle according to which everyone is innocent until proven guilty. However, this legal principle does not appear to be guiding sanctions regimes researched by the Special Rapporteur. The Special Rapporteur has highlighted her concern at the absence of transparency regarding the standards of proof met to adjudge the various sanction regimes. However, until and unless those standards are made public, and their application to specific individuals well elaborated, there is no reason why sanctions should not be applied against the Crown Prince and his personal assets.  Indeed, this human rights inquiry has shown that there is sufficient credible evidence regarding the responsibility of the Crown Prince demanding further investigation. Further, the sanction regimes that the Special Rapporteur has researched include an appeal process upon which the Crown Prince should rely. If anything, such an appeal could shed light on possible evidence exonerating him.

### State Sanctions

443.    The above-mentioned targeted sanctions fail to correspond to the gravity of the crime or to the fact that the State of Saudi Arabia is ultimately responsible for the violation of Mr. Khashoggi's right to life. While the EU Parliament has passed a non-binding resolution urging a European Union-wide arms embargo on Saudi Arabia in response to the execution of Mr. Khashoggi, Germany is the only Western government to suspend future arms sales to Saudi Arabia, the world's largest arms importer.

444.    The execution of Mr. Khashoggi has also raised serious concerns about domestic and extraterritorial surveillance of the private communication of individuals whose only "crime" has been the peaceful expression of their views and on the export of surveillance technology. As highlighted by the UN Special Rapporteur on the promotion and protection of the right to freedom of expression, in his June 2019 report to the Human Rights Council "*it is imperative that States limit the uses of such technologies to lawful ones only, subjected to the strictest forms of oversight and authorization, and that States condition private sector participation in the surveillance tools market – from research and development to marketing, sale, transfer and maintenance – on human rights due diligence and a track record of compliance with human rights norms.*"  He further recommends that Governments should also impose an "*immediate moratorium on granting licences for the export of surveillance technologies, until there is convincing evidence that the use of these technologies can be technically restricted to lawful purposes that are consistent with human rights standards, or that these technologies will only be exported to countries in which their use is subject to authorization*

---

[357]   See for instance the studies in T. Biersteker, S. Eckert and M. Tourihno, eds., Targeted Sanctions: the impacts and effectiveness of United nations action, Cambridge University Press, 2016.

*– granted in accordance with due process and the standards of legality, necessity and legitimacy – by an independent and impartial judicial body.*[358]"

445.   The Special Rapporteur endorses these recommendations. Governments should impose an immediate moratorium on granting licences for the export of surveillance technologies to Saudi Arabia until Saudi Arabia demonstrates that it is limiting the domestic and extraterritorial use of such technologies to lawful purposes under international human rights law. Any allegations that equipment exported to date may be or have been misused should be the object of independent investigation by the relevant authorities with the findings made available to the public at large.

## IV.   Corporate social accountability

446.   At the time when more detailed news reports of the circumstances under which Mr. Khashoggi began to circulate, the Kingdom of Saudi Arabia was hosting a major business conference, to which many large companies from around the world were invited. Concerned about the reputational risk of being associated with the country, many sought to distance themselves by not participating in the event, or by sending more junior delegates to the conference. The Chair of the UN Working Group on Business and Human Rights, said on this occasion that the decision by business executives "to withdraw from the conference underlines how companies can use their leverage to address human rights concerns. Business leaders need to take a strong interest in keeping civic space open wherever they operate. For it is only in an environment where journalists and human rights defenders are able to speak freely that businesses can effectively identify and prevent negative human rights impacts."[359]

447.   Yet, since the beginning of 2019, most companies have moved quietly to repair their relationships with the Kingdom, with some announcing new investments or business deals. While most companies may bear no direct legal responsibility for the actions taken by Saudi Arabia, they nonetheless should take concrete and verifiable steps to ensure that their conduct is consistent with international human rights standards, in particular the UN Guiding Principles for Business and Human Rights.

448.   Even if a company bears no direct responsibility for a specific act, the UN Guiding Principles are still relevant and they expect companies to conduct due diligence wherever they operate, and to use their leverage to reduce harm and mitigate human rights risks. Companies considering trade and investment deals with Saudi Arabia need to ensure that:

1.   They affirm their commitment to human rights standards;

2.   They make the Kingdom of Saudi Arabia aware of those commitments;

3.   They use their leverage to ensure that their business partners in Saudi Arabia adhere to those commitments;

4.   They establish a monitoring mechanism to ensure that their own conduct and the conduct of their associates does not cause any harm to human rights;

5.   They establish explicit policies to ensure that they would avoid entering into business deals with businesses, business people, or organs of the state that have had a direct or indirect role with Mr. Khashoggi's execution, or with other grave human rights abuses, to reduce their risk of exposure to complicity in such abuses;

6.   They adhere to international human rights standards within their own operations, and use their leverage to address human rights concerns with their associates.

449.   These recommendations apply with particular force to companies selling surveillance technology to Saudi Arabia and other countries given the extraordinary risk of abuse of

---

[358] A/HRC/41/35, para 49.
[359] https://www.ihrb.org/other/governments-role/rights-wrongs-business-as-usual-in-saudi

surveillance technologies.   In particular, the Special Rapporteur endorses the specific measures identified by the UN Special Rapporteur on the promotion and protection of the right to freedom of expression in his June 2019 report to the Human Rights Council focusing on surveillance technologies (A/HRC/41/35, para 60).

450.   Experts consulted for the purpose of this inquiry have also pointed to the important role played by lobbyists, public relations firms, media outlets and journalists contracted by the Saudi Government, Saudi private individuals and companies.  These have been used to help protect the reputation of the Kingdom abroad and to assist the authorities respond to negative reporting about the country in relation to, for example, to the attacks of the 11 September 2001, commonly known as 9/11, public executions and the killing of Mr. Khashoggi. In the course of this inquiry, the work of one company in particular was mentioned for the monitoring and analysis of social media they undertake to help identify messages and messengers critical of Saudi Arabia.

451.   Do such companies bear some responsibility for the use made of their services, such as their strategic, technical and communications analyses or well-placed articles and quotes? They certainly ought to apply the UN Guiding Principles as other companies ought to.  In an era where propaganda and disinformation are denounced as risks to democracy and human rights, including to the right to freedom of expression, such questions ought to be seriously considered by those in the business of selling analytical and narratives communication products. The many companies around the world that are contracted to monitor negative narratives and respond to them, by creating and spreading positive stories, developing national and global communication and political lobbying strategies, ought to determine whether their functions and outputs could be used to violate human rights in and outside Saudi Arabia. They also ought to assess whether their products may be used to cover up human rights violations. Finally, the Special Rapporteur believes that companies should consider speaking up in the face of systematic or continuous human rights abuse. While silent complicity is unlikely to result in legal liability, there are moral considerations to be met, along practical issues of reputation and image to be managed by the company or business.

## V.   Symbolic responses

452.   The execution of Mr. Khashoggi exemplifies a violation of a foundational and fundamental human right: the right to life. We cannot turn our gaze away from such violations. To the contrary, there should be a memorialization of what Mr. Khashoggi stood for and for what he died. The Special Rapporteur is thus recommending that governments, corporate actors, civil society organisations and international organizations respond also through the creation of symbolic tributes such as awards, scholarship, or events in his honor.

453.   As the International Organization for Public-Private Cooperation, the World Economic Forum should consider, as part of its annual "Davos" meeting, convening of an annual panel discussion in Mr. Khashoggi's name.  That panel could explore issues related to the social and economic merits of investigative journalism, including in the fight against corruption, as well as issues related to transparency, political and civil freedom and the role of corporate actors in global governance of respect for human rights.

454.   Following the example of initiatives in Washington DC, the city of Istanbul or the State of Turkey should erect a memorial to Mr. Khashoggi's stand for freedom of the press in front of the Saudi Consulate.  The Special Rapporteur has ascertained that there is sufficient space for this purpose.  Alternatively, as in Washington DC, the street should be renamed in his honor.

## VI.   Support to freedom of expression in the gulf region

455.   The Special Rapporteur believes that ultimately, the most effective way to ensure non-repetition and reparation is to support expansion of press freedom and democracy in the Middle East. In the months that preceded his death, Mr. Khashoggi was working, with fellow activists and journalists in exile, on a number of projects seeking to protect freedom and human rights in the Gulf region and beyond.  Mr. Khashoggi, his friends and colleagues

understood the double edged sword of the on-line world as both a powerful tool for liberty and a powerful tool for control and propaganda. They were developing projects to better monitor use of social media to instill fear, promote propaganda, and control State media with a view to developing effective counter strategies and messages.  As highlighted throughout this report, before he was executed, Mr. Khashoggi had been subjected to silencing and censorship, with his large number of followers and his articles for the Washington Post perceived as unacceptable threats. There is no more fitting legacy than to ensure that others like him are both protected and supported in their efforts to counter incitement, hatred and threat, both on-line and off-line.

456.    The Special Rapporteur is thus recommending that institutional and private donors allocate funds to projects and programs in memory of Jamal Khashoggi. Donors could come together to establish a Jamal Khashoggi fund for the purpose of supporting the protection and advance of freedom of expression and democracy in the Middle East.

457.    Turkey, in turn, should build on its response to the killing of Mr. Khashoggi by freeing all those currently detained for the peaceful expression of their views and opinions, and should refrain from bringing such charges in the future.

458.    Saudi Arabia must release all individuals imprisoned for the peaceful expression of their opinions and beliefs; investigate all allegations of torture and lethal use of force in formal and informal places of detention; and, investigate all allegations of enforced disappearances and making public the whereabouts of individuals disappeared.

## VII.    Re-enforcing the capacities of the UN to respond to acts of violence against, and killings of, journalists, human rights defenders and other activists.

459.    Impunity has been found repeatedly to be a major driver of the high incidence of murders of journalists and human rights defenders.  Such impunity prevails in many countries, including in those that possess a legal system that at least on its surface is characterized by generality, equality, and certainty. There are a range of reasons why those who kill journalists or human rights defenders are not brought to justice in domestic legal systems, including intimidation, fear and undue influence through corruption.   While impunity for such crimes may be most apparent at the conclusion of court processes, e.g. at the point of a non-guilty verdict, it is often enough the failure to investigate effectively the crime that brings that impunity about (e.g. A/HRC/20/22, para 43).

460.    Many initiatives of the United Nations, including Special Procedures, aim at better institutionalizing protection and tackling impunity. These include the UN Declaration on Human Rights Defenders, a milestone in the protection of defenders whose 20th anniversary was celebrated in 2018[360], and the UN Plan of Action on the Safety of Journalists[361].

461.    Special Procedures, as noted by a former Special Rapporteur[362], have a mandate to cover all countries (not only those that have ratified particular human rights treaties).  They do not require the exhaustion of domestic remedies and they have the ability to move quickly. To help achieve accountability, they can communicate allegations to States promptly when journalists have been killed. Special Procedures in the global and regional systems have also made joint declarations condemning the killing of journalists or defenders. Of particular importance for prevention, however, is their power to send urgent appeals to States where journalists and others are under threat.

462.    The Special Rapporteur has found that the failure to investigate effectively, impartially, independently, in good faith and promptly, constitutes a key driver for impunity. The Special Rapporteur further believes that her human rights inquiry into the execution of Mr. Khashoggi can enhance efforts to promote effective investigation and thus that hers should not be a one-off exercise. This first experience should be enhanced for the purpose of

---

[360]  https://www.ohchr.org/en/issues/srhrdefenders/pages/declaration.aspx
[361]  https://en.unesco.org/un-plan-action-safety-journalists
[362]  A/HRC/20/22

strengthening the protection of human rights defenders and journalists and better addressing the impunity that so often characterizes acts of violence against those who are targeted because of their work on behalf of human rights, journalism, political expression and so on.

463.    Given that investigation and prosecution take place within States, the failings of justice systems must be addressed by States.[363] However, the Special Rapporteur believes that the UN System also has a role to play, and importantly, a role beyond that of capacity-building.  She is calling for strengthening of the UN's role in the fight against impunity and in this regard, is recommending, as follows, three concrete steps that could work side by side.

### i.    *Gather best practices to enhance standard-setting for investigation of threats*

464.    The Special Rapporteur notes that assessment of threats stands at the heart of an effective protection and prevention response. Attacks against human rights defenders and journalists are very often preceded by threats that were not effectively investigated or properly assessed by security forces, intelligence agencies, or indeed by the victims' employers, colleagues and friends or the victims themselves.

465.    Building on the increasing awareness of the "duty to warn" and on civil society initiatives,[364] the Special Rapporteur is recommending a comprehensive international review of best practices in the investigation, assessment and/or response to threats and risks and of the underlying national and international legal framework, including laws and jurisprudence. Such a review would be aimed at: a) Setting standards to guide national and local authorities, along with civil society, journalists and defenders, in their response to threats and risks, b) Strengthening the institutional capacity of the State to protect and investigate, and to empower those who are under threat and risks.  The Special Rapporteur is prepared to take the lead in coordinating such a standard-setting exercises with other relevant Special Rapporteurs and the OHCHR.

### ii.    *Establish a task-force on safety, prevention and protection*

466.    A second step would be to establish a Task-Force, located with the OHCHR Special Procedures, and composed of Special Rapporteurs whose mandates are relevant to the issues or countries under consideration and other experts.  On a preliminary basis, in response to situations of violence or killings of journalists, human rights defenders or dissidents where such cases meet certain criteria, such as those related to the prevalence or likelihood of impunity, the Task Force could undertake rapid response missions, and engage with the authorities, the Media and civil society: a) to advocate for, and support, effective investigations or monitor their progresses; b) to review or seek to strengthen prevention and protection measures; c) to undertake fact-finding into specific situations or allegations; d) to identify and call on international or regional actors to support protective measures.

467.    Operational funding for the Task-Force could originate from the Friends of Journalists Safety and other Member States who have prioritized the protection of journalists and human rights defenders.

### iii.    *Establish a standing Instrument for the investigations of violent crimes against journalists, human rights defenders and other activists and dissidents targeted for the peaceful expression of their opinions*

468.    The lack of accountability – legal and political – for targeted killings of journalists, human rights defenders and political activists is well evidenced. Ineffective investigation leads to weak prosecution before courts whose procedures, at times, are below standard, leading to impunity for those responsible from the hit men to the masterminds to the officials who failed in their obligation of due diligence. The implications of this impunity for societies

---

[363]  A/HRC/20/22

[364]  This includes CEJIL's "Esperanza" Protocol, which seeks to place the obligation to investigate threats within broader public policy efforts The Protocol is named after the town where Honduran environmental activist Berta Caceres was murdered. https://www.cejil.org/en/hope-defenders-addressing-investigation-threats-international-level-promote-local-change

as a whole, as well as for global peace and security, have been the object of multiple studies and denunciation, including by Special Procedures.

469.    As the inquiry into Mr. Khashoggi's killing has highlighted, such implications are further compounded when the victims of such acts live in exile.  The circumstances that triggered the human rights inquiry into the execution of Mr. Khashoggi, the many interviews conducted along with her research into the scale of the problem, have led the Special Rapporteur to conclude that this inquiry should not be a one-off.  The United Nations should equip itself with the means and instruments to effectively investigate targeted killings and disappearances. The proposal that follows is offered as a preliminary reflection on what this means.

470.    A Standing Investigatory and Accountability Mechanism is proposed that would have interrelated functions such as:

        (a)    To investigate, in accordance with criminal law standards (international or national standards), allegations of targeted killing or disappearances by collecting and analysing evidence of such violations;

        (b)    To facilitate strengthened judicial accountability, including by identifying possible avenues for the administration of justice at national, regional and international levels;

        (c)    To prepare files to facilitate and expedite fair and independent criminal proceedings in accordance with international, regional or national law standards,  in courts or tribunals that have, or may have in the future,  jurisdiction  over  the  crimes  being investigated;

        (d)    To identify other mechanisms for delivery of justice and ending impunity, including at political and diplomatic levels.

471.    Such a standing instrument could be established through a resolution of the    United Nations General Assembly or a resolution of the Human Rights Council. It could be activated by a member State in writing to the Secretary General or to the President of the Human Rights Council.

472.    The Standing Instrument should be composed of independent international experts in investigations and prosecutions, as well as Special Procedures and Treaty-Bodies members. It could be supported by a secretariat that may be in use for other purposes such as that for the International Impartial and Independent Mechanism (IIM) or the Secretary General's Mechanism for Investigation of Alleged Use of Chemical and Biological Weapons. The Secretariat should have operational and administrative autonomy and flexibility to allow for the realization of the Mandate of this instrument to be fully implemented.

# PART VII.    Recommendations

## A.    To the United Nations Secretary-General

473.    **Initiate a follow-up criminal investigation into the killing of Mr. Khashoggi to build-up strong files on each of the alleged perpetrators and identify mechanisms for formal accountability, such as an ad hoc or hybrid tribunal. The Secretary General himself should be able to establish an international follow-up criminal investigation without any trigger by a State.**

474.    **As part of the UN Reform process, strengthen the System-wide capacity to promote safety of journalists, and ensure that UN Country Teams are fully equipped for implementing the *UN Plan of Action on the Safety of Journalists and the Issue of Impunity* at local level in the concerned countries.**

## B.    To the members of the United Nations Security Council

475.    **Convene an Arria-formula meeting to consider the implications for peace and stability of the execution of Mr. Khashoggi and more generally of the extraterritorial targeting of individuals.**

## C.    To the United Nations Human Rights Council or the United Nations General Assembly

476.    **Establish a Standing Instrument for the Criminal Investigation into Allegations of Targeted Killing, or other acts of violence against journalists, human rights defenders or others targeted because of their peaceful activities or expressions. This instrument should: investigate such violations, in accordance with criminal law standards; identify possible avenues for the administration of justice at national, regional and international levels; prepare files to facilitate and expedite fair and independent criminal proceedings in accordance with international, regional or national law standards, in courts or tribunals that have or may in the future have jurisdiction over the crimes being investigated; identify other mechanisms for delivery of justice and ending impunity, including at political and diplomatic levels.  The Standing Instrument should rely on Special Procedures, Treaty-Bodies and other experts in investigation and prosecution. It should be supported by a secretariat which may be already in use for other purposes such as that of the International Impartial and Independent Mechanism (IIM) or the Secretary General's Mechanism for Investigation of Alleged Use of Chemical and Biological Weapons.**

## D.    To the United Nations Human Rights Council

477.    **Support the establishment of a Special Procedures Task-Force to undertake rapid responses missions, engage with authorities to support and ensure effective investigations; engage in fact-finding, in response to the unlawful death, acts of violence or credible threats against journalists, human rights defenders, or other individuals targeted for the peaceful expression of their opinion.**

## E.    To UNESCO and UN Network of Focal Points on Safety of Journalists

478.    **Take actions to ensure the implementation of the UN Plan of Action *on the* Safety *of* Journalists *and the Issue of Impunity* (UN Plan) at local level in the concerned countries.**

## F.    To Special Procedures / OHCHR

479.   **Establish a Prevention and Accountability Task-Force, located within the OHCHR Special Procedures, composed of individual Special Procedures and other experts, to undertake rapid responses missions, engage with authorities to support and ensure effective investigations, prevention and protection measures, and/or engage in fact-finding, in response to the unlawful death, acts of violence or credible threats against journalists, human rights defenders, or other individuals targeted for the peaceful expression of their opinion.**

## G.    To the Kingdom of Saudi Arabia

480.   **Issue a public recognition and apology to Mr. Khashoggi's family, friends and colleagues for his execution. Accountability demands that the Saudi Arabia government accept State responsibility for the execution. This also includes State-based financial reparations for the family of Mr. Khashoggi.**

481.   **Apologise to the Turkish government for the abuse of its diplomatic privileges and the violation of the prohibition against extra territorial use of force.**

482.   **Apologise to the United States for executing its resident and, through this act, attacked a fundamental freedom.**

483.   **Demonstrate non-repetition by: releasing all individuals imprisoned for the peaceful expression of their opinion and belief; independently investigating all allegations of torture and lethal use of force in formal and informal places of detention; and independently investigating all allegations of enforced disappearances and making public the whereabouts of individuals disappeared.**

484.   **Undertake an in-depth assessment of the actors, institutions and circumstances that made it possible for the execution of Mr. Khashoggi to be carried forward, issue public report and identify the reforms required to ensure non-repetition. The Special Rapporteur further recommends that the relevant agencies of the United Nations offer their assistance to the Saudi authorities in this reform process.**

485.   **Suspend current trial; collaborate with and support UN-led additional criminal investigation and implement decisions regarding the location and structure of a future trial. Failing that, undertake additional investigations and a retrial with UN and international input, support and oversight, in full accordance with fair trial guarantees under international law.**

486.   **Reply exhaustively to the UNESCO Director-General's request for information on the steps taken in response to Mr. Khashoggi's execution, in accordance with the Decisions on the Safety of Journalists and the Issue of Impunity, adopted by the Intergovernmental Council of UNESCO International Programme for the Development of Communication (IPDC) since 2008; as well as the 2011 Resolution 53 of UNESCO's General Conference that charged the Organization with monitoring "*the status of press freedom and safety of journalists, with emphasis on cases of impunity for violence against journalists, including monitoring the judicial follow-up through (…) IPDC and to report on the developments in these fields to the biennial General Conference.*"**

487.   **Ratify the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women, the Second Optional Protocol to the International Covenant on Civil and Political Rights, aiming at the abolition of the death penalty.**

## H.    To Turkey

488.   **Officially request United Nations Secretary General office that it implements a follow up criminal investigation and fully collaborate with the process.**

489.    **Conduct a public inquest into the killing of Mr. Khashoggi, releasing information and evidence at its disposal.**

490.    **Erect a Statute representing Freedom of the Press in front of the Saudi Consulate (the Special Rapporteur has been able to ascertain that there is enough space for such a statute).  Alternatively, as was attempted in Washington DC, rename the Street where the Consulate is located in the honor of Mr. Khashoggi.**

491.    **Take all the necessary measures to implemented related recommendations of the Special Rapporteur on freedom of expression, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, and the Working Group of Enforced Disappearances, following their respective missions to Turkey in 2016 and subsequently. These include dropping all charges against journalists, academics, and others targeted for the peaceful expression of their opinions.**

492.    **Reply exhaustively to the UNESCO Director-General's request for information on the steps taken in response to the execution of Mr. Khashoggi, in accordance with the IPDC Decision on the Safety of Journalists and the 2011 Resolution 53 of UNESCO General Conference**

## I.    To the United States

493.    **Open a FBI investigation into the execution of Mr. Khashoggi, if one is not already open, and pursue criminal prosecutions within the United States, as appropriate.**

 **Provide a determination under Section 1263(d) of the Global Magnitsky Human Rights Accountability Act of 2016 as to the responsibility of the Crown Prince of Saudi Arabia, as well as the relevant information documenting how the administration came to this determination.**

494.    **Hold hearings within the United States Congress to determine the responsibility of high-level Saudi officials, and demand access to the underlying classified materials.**

495.    **To the greatest extent possible consistent with national security, declassify and release to the public all materials relating to the murder of Mr. Khashoggi, including all intercepts.**

## J.    To Member States

496.    **Support international statements, calls or resolutions that seek to ensure or strengthen accountability for the execution of Mr. Khashoggi.**

 **Take the necessary measures to establish their competence to exercise jurisdiction over the execution of Mr. Khashoggi under international law when the alleged offender(s) is present in any territory under their jurisdiction, unless they extradite or surrender the alleged offender to another State in accordance with their international obligations or surrender alleged offender(s) to an international tribunal which has jurisdiction over the alleged offences.**

497.    **Adopt legislation designing and sanctioning individuals, including high-level State officials, against whom there is credible evidence they are responsible for, or have benefitted from, human rights violations, including the killing of Mr. Jamal Khashoggi.**

498.    **Impose targeted sanctions against individuals allegedly involved in the killing of Mr. Khashoggi. These should include the Crown Prince of Saudi Arabia, focusing on his personal assets abroad, until and unless evidence has been produced that he bears no responsibility for the execution of Mr. Khashoggi.**

499.    **Respond to the execution of Mr. Khashoggi through symbolic measures such as awards, scholarship, art or events in his honor.**

500.    **Allocate funds to support projects and programs for the protection of freedom of expression, freedom of the Media and opinion in the Gulf region.  Establish a Jamal Kashoggi fund for the purpose of supporting freedom of expression and democracy in the Middle East.**

501.   Impose an immediate moratorium on the export, sale, transfer, use or servicing of privately developed surveillance tools to Saudi Arabia and other states until a human rights-compliant safeguards regime is in place; any allegations that such equipment may have been misused should be the object of independent and transparent investigations by the relevant authorities. Implement other measures recommended by the UN Special Rapporteur on the Promotion and Protection of Freedom of Expression in his report A/HRC/41/35, paragraph 66.

502.   Review and if needed strengthen policies and procedures to ensure security agencies and other relevant actors are meeting their due diligence obligation to protect the right to life of those who may be targeted by States and non-State actors for their peaceful expression and activities on-line and off-line. In particular, assess and strengthen the implementation of the duty to warn, including in situations outside national territories where States have the power, control or authority over the enjoyment of the right to life.

503.   Strengthen the development of both formal and informal national mechanisms for the prevention of and protection against threats and attacks on journalists and freedom of expression; support the development and implementation of National Action Plans for the Safety of Journalists.

504.   Assess steps taken towards implementing the recommendations related to the safety of journalists (A/HRC/20/22) and the safety of women human rights defenders and women journalists (A/HRC/40/60; A/72/290) and adopt remedial measures where required

505.   Support the establishment of a Standing Mechanism for Criminal Investigation and Accountability (see above).

506.   Support the establishment of a Fact-Finding Task-Force, hosted by the OHCHR Special Procedures (see above).

507.   Support and contribute to the Special Rapporteur proposal to undertake a comprehensive review of laws and best practices regarding the investigation, assessment and/or responses to threats against, and risks faced by, journalists, human rights defenders or others targeted for their peaceful expression and activities, with the view of developing a Protocol on the Investigation and Responses to Threats and Risks.

## K.   To corporations

508.   Affirm commitment to human rights standards and make the Kingdom of Saudi Arabia aware of those commitments; use leverage to ensure that their business partners in Saudi Arabia adhere to those commitments; establish a monitoring mechanism to ensure that own conduct and the conduct of their associates do not cause any harm to human rights.

509.   Establish explicit policies to avoid entering into business deals with businesses, businesspeople, or organs of the state that have had a direct or indirect role with Mr. Khashoggi's execution, or other grave human rights violations.

510.   Adhere to international human rights standards within their own operations and use their leverage to address human rights concerns with their associates. This includes, for instance: determining whether their functions and outputs could be used to violate human rights or *cover up* violations; turning down such contracts; speaking up in the face of systematic or continuous human rights abuse.

511.   Private surveillance companies should implement measures recommended by the UN Special Rapporteur on the Promotion and Protection of Freedom of Expression in his report A/HRC/41/35, paragraph 67.

## L.   To the World Economic Forum

512.   As part of its annual Davos meeting, constitute a standing annual panel discussion in the name of Jamal Khashoggi and other killed journalists, addressing issues related to the social and economic merits of investigative journalism, the fight

against corruption, the role of corporate actors in the global governance of respect for human rights, and related issues.

## M.  To civil society

513.  **Advocate, support and contribute to the implementation of the above recommendations.**

————————