# EXHIBIT 10

**9/11 Families & Survivors United for *Justice Against Terrorism*** 
**Post Office Box 70** 
**New Vernon, New Jersey 07976** 
**Email: tsholty@aol.com** 
**Tel: (973) 945-7420**

March 29, 2017

The Honorable Jeff Sessions 
United States Attorney General 
U.S. Department of Justice 
950 Pennsylvania Avenue, NW 
Washington, DC 20530-0001

Re:   **9/11 Families' Request for National Security Investigation Into Potential Criminal Violations of the Foreign Agents Registration Act by Agents of the Saudi Arabian Government**

Dear Mr. Attorney General:

On our own behalves and on behalf of the 9/11 VICTIMS' FAMILIES AND SURVIVORS UNITED FOR JUSTICE AGAINST TERRORISM, an organization comprised of thousands of injured individuals and families of those killed in the 9/11 attacks, we write to request that the Department of Justice commence an immediate national security investigation into potential widespread criminal violations of the Foreign Agents Registration Act ("FARA"), by foreign agents retained to conduct what we view as an unprecedented foreign influence campaign on behalf of the Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia"). The apparent goal of the massive Saudi-funded foreign agent offensive is to delude Congress into passing unprincipled and unwarranted amendments to the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016), a counter-terrorism law that passed with overwhelming bi-partisan support just six months ago. Available evidence indicates that the proposed amendments were drafted in the first instance by the Saudi government and its lobbyists, and their sole purpose is to shield the Kingdom from any inquiry into the involvement of its agents in supporting the September 11th attacks.

In service of this dangerous effort to influence Congress into passing legislative text promoted by a foreign power, the Kingdom and its foreign agents have targeted U.S. veterans nationwide through a campaign that deeply mischaracterizes JASTA, and even more importantly has been conducted in ways that conceal the fact that the influence and propaganda onslaught has been and continues to be orchestrated and financed by the Saudi government and foreign agents working on its behalf.

Several U.S. veterans targeted by this Saudi initiative have come forward to complain that the Kingdom's foreign agents and materials those agents disseminated deceived them into serving as unwitting advocates for the Saudi government, a circumstance that itself indicates widespread violations of FARA.

Although we are providing here information that we believe to be true based an assessment of the information that we are providing, we believe that the best determination as to whether any violations have occurred will come following a thorough investigation by the Department of Justice.

The Honorable Jeff Sessions
March 29, 2017
Page 2 of 17

Accordingly, we ask that you direct the proper authorities within the Department to begin such an investigation.

### Summary of the apparent criminal violations of FARA

Based on testimonials of several veterans who claim they were in fact duped by the Saudi program, multiple media reports of a widespread astroturfing campaign, and records filed with the Department of Justice, we believe that the potential criminal violations of FARA by agents working on the Saudi government's behalf may include:

(1) the complete failure by persons working on behalf of the Saudi government to register as foreign agents in violation of 22 U.S.C. § 612;

(2) failures to include any label or disclosure on informational materials and political propaganda distributed on behalf of the Saudi government indicating that those materials were being distributed by a foreign agent on behalf of the Saudi government, in violation of 22 U.S.C. § 614(b);

(3) failures to provide statements to the Department of Justice of all things of value spent, disbursed, or disposed of on behalf of the Saudi government, in violation of 22 U.S.C. § 612(a)(5) and (8);

(4) failures to submit comprehensive and detailed statements of the activities and proposed activities undertaken on behalf of the Saudi government, in violation of 22 U.S.C. § 612(a)(4);

(5) failures to file informational materials and political propaganda distributed on behalf of the Saudi government with the Department of Justice, in violation of 22 U.S.C. § 614(a);

(6) failures to include a statement on materials prepared for submission to members of Congress and the U.S. government disclosing that those materials were prepared by a foreign agent of the Saudi government, in violation of 22 U.S.C. § 614(e);

(7) failures to file documents as necessary to make registration statements and other materials submitted to the Department of Justice not misleading, in violation of 22 U.S.C. § 612(a)(11);

(8) failures on the part of the officers and directors of entities acting as foreign agents for the Saudi government to fulfill their independent individual obligations to ensure that those entities complied with the requirements of FARA, in violation of 22 U.S.C. § 617;

(9) aiding and abetting of violations of FARA by persons directing and supervising the Saudi influence campaign, in violation of 18 U.S.C. § 2 ("Principals"); and

(10) conspiring to commit violations of FARA and related offences against the United States, in violation of 18 U.S.C § 371 ("Conspiracy to commit offence or to defraud United States").

We believe that these possible pervasive violations of FARA pose a clear national security risk to the United States, as they appear to arise from an insidious and unheard-of campaign by a foreign government to directly interfere with U.S. legislative processes, by deceiving U.S. veterans, as well as

The Honorable Jeff Sessions
March 29, 2017
Page 3 of 17

the general population, in an effort to secure the enactment of specific legislation that would weaken U.S. counter-terrorism laws for the singular benefit of that foreign government.

### FARA's role in policing foreign interference in U.S democratic processes

The following statement from the September 2016 Report of the Department of Justice's Office of the Inspector General provides helpful context concerning FARA's origins, purpose, and role in protecting against foreign manipulation of U.S. citizens and democratic processes:

> FARA was enacted in 1938 in response to recommendations of a special congressional committee investigating anti-American activities in the United States. The committee studied the rise of propaganda activity by European fascist and communist governments to determine whether the United States needed a new means to protect its citizens from political propaganda from foreign sources. A significant finding of the committee's study was that the Nazi German government had established an extensive underground propaganda apparatus using American firms and citizens.

As President Trump has recognized, foreign government lobbying and propaganda efforts can be especially pernicious where, as here, the registered agents include former senior U.S. officials, given their unique access to senior policymakers and agencies. Recognizing the seriousness of the problem, President Trump has imposed a lifetime ban on any executive appointees of his Administration from engaging in any activities on behalf of a foreign government covered by FARA, at any time following their employment with the United States government.

FARA's requirement that foreign agents label "informational materials" with a clear disclosure that they are being disseminated on behalf of a foreign government, and mandate that foreign agents file any such materials with the DOJ, are among the most critical protections against foreign manipulation and deception of U.S. citizens. These obligations are the principal mechanisms that provide notice to U.S. citizens and officials that they are receiving communications from and being lobbied on behalf of a foreign power.

The term "informational materials" was substituted for the phrase "political propaganda" through the December 19, 1995 amendments to FARA (effective January 1, 1996), in order to eliminate the inherent stigma associated with the word "propaganda," but without altering FARA's transparency requirements and purposes. *See* Charles Lawson, Shining the "Spotlight of Pitiless Publicity' on Foreign Lobbyists? Evaluating the Impact of the Lobbying Disclosure Act of 1995 on the Foreign Agents Registration Act, 29 Vand. J. Transnat'l L. 1151, 1180 (1996). The types of materials FARA's labeling and filing requirements have long been understood to apply to include:

> Any oral, visual, graphic, written, pictorial, or other communication or expression … which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with

>        reference to the foreign policies of the United States or promote in the
>        United States racial, religious , or social dissensions…[1]

*Id.* at 1158.

### The Saudi Government's army of foreign agents

Congress enacted JASTA on September 28, 2016 following overwhelming votes in both chambers to override President Obama's veto, a veto which President Trump decried at the time as "shameful," "a disgrace" and a "low point" of the Obama presidency.

Even before JASTA's enactment, the Saudi government had a massive and high-powered lobbying and PR team on its payroll working to prevent JASTA's passage.  Records filed with the Department of Justice indicate that the Kingdom's lobbyists and PR agents had literally hundreds of separately reportable communications with members of Congress and their staffs and Obama Administration officials in the months leading up to JASTA's enactment.  These contacts by the Kingdom's foreign agents were, of course, entirely separate from the many direct audiences Saudi officials had with senior Obama Administration officials and members of Congress to press their interests directly through all instruments of political leverage available, itself a level of access to U.S. officials in regards to the consideration of JASTA that was not even remotely offered in kind to the 9/11 families.  Stated simply, the Kingdom's diplomats and powerful lobbyists had ample opportunity to make their case to U.S. officials openly and directly during JASTA's consideration.  Notwithstanding the Kingdom's access and multiple congressional hearings at which JASTA was discussed, including a July 2016 hearing dedicated exclusively to JASTA, Congress was not persuaded.

When Congress enacted JASTA despite the Saudi government's lobbying assault and overt threats, the Kingdom refused to accept or respect the U.S. Congress' overwhelming bi-partisan determination that JASTA was an important and narrowly tailored counter-terrorism tool necessary to protect U.S citizens and interests.  Instead, the Kingdom went on a foreign agent spending spree, hiring (directly or through sub-agent arrangements) more than 100 foreign agents to work on its behalf to wage an assault on JASTA.  No expense has been spared in the Kingdom's unparalleled campaign to build a state of the art and nationwide lobbying and propaganda apparatus for the sole purpose of bending U.S. legislative process to its will.  According to media reports and records filed with the Department of Justice, the Kingdom has been paying at least $1.3 million per month to registered foreign agents, the majority of whom are registered solely to work on the Kingdom's campaign to undermine JASTA.

Recognizing that Congress had already rebuffed Saudi Arabia's direct entreaties when it overwhelmingly voted to enact JASTA last year, a cunning new plan was devised to pursue enactment of the Kingdom's legislation by: (1) bombarding the U.S. public generally, and the U.S. veterans' community specifically, with misinformation about JASTA to create the misimpression that JASTA (which concerns only the sovereign immunity of **foreign states** for acts of terrorism on U.S. soil)

---

[1] All informational materials must be labeled with the required disclosure.  22 U.S.C. § 614(b).  Within 48 hours of first transmission, all informational materials must be filed with the DOJ if they are distributed in print, "or in any other form that is reasonably adapted to being, or which he believes will be, or which he intends to be, disseminated or circulated among two or more persons…"  Emails are, by definition, "readily adapted to being…circulated among two or more persons," as they can be forwarded to a mass audience merely by forwarding them.  *See* 22 U.S.C. § 614(a).

somehow poses a direct and immediate threat to U.S. veterans[2] (a claim that is completely at odds with JASTA's narrow scope and has been directly repudiated by one of the country's foremost international law scholars[3]); (2) falsely advocating in communications with veterans that the amendments drafted by the Kingdom and its foreign agents to shield Saudi Arabia from an inquiry into its role in the September 11th attacks would somehow ameliorate those manufactured risks (even though the amendments themselves do not even mention veterans or military personnel); and (3) recruiting veterans to serve as surrogates to lobby Congress for the Kingdom's proposed legislative changes, including by offering veterans throughout the country cash and lavish, all expense-paid trips to Washington, D.C. in exchange for writing emails and making visits to Congressional offices to express supposed concerns about JASTA.

Numerous veterans have now stepped forward and provided evidence that foreign agents working for the Kingdom misled them and broadly concealed Saudi Arabia's involvement in the offensive. As a result, these veterans did not question the misinformation about JASTA they received from the Kingdom's foreign agents (who in many cases appear to have deceptively presented themselves as concerned veterans' advocates even though they were in fact doing the Kingdom's bidding), and were deceived into becoming unwitting surrogates for the Kingdom. Many of these veterans joined the U.S. military following the September 11th attacks to protect America from terrorists who were indoctrinated in jihadist Islam by the government of Saudi Arabia. These veterans are understandably angry at having been tricked into working on behalf of the Saudi government as part of an effort to weaken U.S. counter-terrorism laws.

Although the breadth of the enterprise in which the Kingdom and its agents have engaged is uncertain, the following summaries of reported interactions between veterans and foreign agents working for the Kingdom, which are based on accounts of veterans who were themselves involved and press reports concerning their experiences, evidence potential widespread violations of FARA and other federal statutes that require immediate investigation. Though much of the available evidence understandably is limited to activities of persons who interacted directly with veterans who have now come forward, the commonalities among the agents' activities more than suggest communication of additional information and the possible involvement of others.

### Nationally coordinated astroturfing activities

The earliest public demonstration of the lobbyists' coordinated effort to manufacture a false appearance of spontaneous grassroots opposition to JASTA started as early as October and November 2016, when different authors in multiple major newspapers throughout the country began publishing what were portrayed as independent opinion pieces criticizing JASTA. But the subterfuge that those articles were independent was ultimately belied by the use of nearly identical language throughout the writings, indicating that a single source had a prominent hand in writing all of the pieces.

---

[2] For instance, one vet has recounted that Saudi foreign agents told him and a group of nearly 50 other vets that "if they ever traveled again in Iraq or Afghanistan or Saudi Arabia, they could be stopped at a checkpoint and taken into custody as a terrorist thanks to JASTA." Paul Sperry, *Vets Say They Were Duped Into Helping Saudi Arabia Dodge Payouts to 9/11 Victims*, NY Post, March 5, 2017.

[3] *See* Brian McGlinchey, "Veterans Being Misled On JASTA, Says International Law Expert," 28Pages.org (Feb. 19, 2017) (William S. Dodge, a former counselor on international law at the U.S. State Department, debunks myths the Saudi government and its foreign agents are aggressively circulating about JASTA).

A December 5, 2016 article by Eric Owens in the Daily Caller (**Exh. 1** (Eric Owens, EXCLUSIVE: Saudi Arabia Is Astroturfing America to Roll Back 9/11 Law, Daily Caller (12/5/2016)) summarizes the commonalities among articles purportedly by five unrelated authors from newspapers in Tennessee, Colorado, Michigan, New Hampshire, and Florida. Owens makes the point that, throughout their writings, the five purportedly unrelated authors "use virtually the same – or exactly the same – words to make their arguments." After surveying the writings, Owens concludes that that the likely common source for the writings is the army of lobbying firms recently hired for millions of dollars by the Kingdom of Saudi Arabia.

An investigation should determine the extent to which the authors, or those who coordinated the authors, were engaged as agents ultimately for the Kingdom, the disclosures that should have accompanied the articles or the communications that resulted in the authors writing what appears to have been commonly sourced articles, and what violations of federal laws may have occurred in what appears to have been conduct aimed at shielding the fact that the articles were ultimately written on behalf of the Kingdom.

> **Activities of N.M.L.B. VETERANS ADVOCACY GROUP / Jason E. Johns / Deacon Taylor, Dustin and Dan Tinsley**
> - **Madison, WI, Milwaukee, WI, & Washington, DC**

Jason Johns, founder and president of N.M.L.B. Veterans Advocacy Group, filed a short form FARA statement on October 31, 2016, to render services to the Kingdom of Saudi Arabia. Mr. Johns filed under Registration No. 5483, indicating that he would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work he would render to the Kingdom as: "Outreach to media, influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel." In his statement, Mr. Johns listed his business address as 104 King Street, Suite 301, Madison, WI 53703, which is the office address for his business, N.M.L.B. Veterans Advocacy Group, a law firm that focuses on assisting veterans and their families. Mr. John's FARA statement reports that he has accepted $100,000.00 in compensation for his services on behalf of the Kingdom. **Exh. 2** (Jason Johns FARA Statement).

Veterans who have spoken out and emails apparently from Mr. Johns indicate that he was a primary organizer of what has been characterized by reporters as a Saudi-supported plan to dupe veterans into unwitting opposition to JASTA. Veterans who have been on trips to D.C. at Mr. Johns' solicitation report that he has organized multiple veteran "Fly-Ins" to D.C. so that groups of 40 or so veterans could meet House and Senate members and staff in what has been orchestrated to appear as grassroots, patriotic opposition to JASTA. The evidence indicates that Mr. Johns, an agent of the Kingdom, has recruited veterans, arranged travel, and prepared and circulated itineraries in the form of OPORDs (Operational Orders) to carry out a charade that the veterans' activities were a patriotic "military action" as opposed to activities done in service to the Kingdom of Saudi Arabia. *See* **Exh. 3** (OPORD: JASTA Fly-In 23-26 JAN 2017).

Witnesses who have been on the trips have described the trips organized by Mr. Johns and others as lavishly funded excursions that, in addition to loosely choreographed meetings with legislators and their staff, include all expense-paid travel, extravagant meals, expensive hotels, and substantial drinking – all paid for by the Kingdom of Saudi Arabia. *See* **Exh. 4** (Eric Owens, EXCLUSIVE: Saudi Cash is Sending Veterans on LUXURY Trips to Washington to Oppose 9/11

The Honorable Jeff Sessions
March 29, 2017
Page 7 of 17

Law, Daily Caller (Feb. 7, 2017)); **Exh. 5** (Brian McGlinchey, EXCLUSIVE, Veterans Say Organizers Concealed Saudi Sponsorship of Their Trip to Lobby for Changes to 9/11 Lawsuit Legislation, 28Pages.org (Feb. 23, 2017)).

    For at least some, and perhaps even most, of the veterans making the trip to D.C., information circulated to them to encourage their participation or to arrange their travel plans included no indication that those planning the activities were acting on behalf of the Kingdom or that the Kingdom was funding the trip. In fact, three of the veteran participants have explained that, during at least one of the trips, in Mr. Johns' opening remarks at the dinner welcoming the veterans, Mr. Johns volunteered an out-of-place disclaimer that "none of this is being taken care of by Saudi Arabia." *See* **Exh. 5** (28Pages.org (2/23/2017)). The veterans explained that, before the disclaimer, they had not even asked or suspected that the Kingdom was involved. From that point on, their suspicion continued to grow. They explained that the organizers were evasive when asked who had organized the trip and instructed the veterans to "be vague when members of Congress and staffers … asked who had organized their visit." *Id.*

    Other individuals who the veterans say aided Mr. Johns to organize and facilitate the trips to D.C. include two brothers, Dustin and Dan Tinsley, from Milwaukee, WI and Deacon Taylor, also from Wisconsin. The two Tinsley brothers were described as key organizers and leaders of the trips to D.C. *See* **Exh. 5** (28 Pages.org (2/23/2017)). In addition, Dustin has posted information on multiple occasions on LinkedIn, Facebook, and Twitter offering the Saudi-based talking points in opposition to JASTA. *See, e.g.*, **Exhs. 6, 7**, and **8** (Dustin Tinsley LinkedIn articles and Facebook post). Mr. Taylor was an active participant in a number of the D.C. trips and has been an outspoken opponent of JASTA on multiple social media platforms, even long after public reporting made clear that the campaign he was promoting was being conducted in service of the Kingdom. (*See, e.g.*, https://www.facebook.com/deacon.taylor.1/videos/10103415886503053/ (video posted on Facebook by Mr. Taylor). Based on the information available, it appears likely that Taylor and the Tinsleys were working in close coordination with the Kingdom's foreign agents. Under these circumstances, we believe their posts and other communications should have included a disclosure that they were being disseminated on behalf of the Saudi government, which they do not. Likewise, none of the biography descriptions of the men on the social media platforms where they posted the information contained any information that they were offering their services to the Kingdom of Saudi Arabia. **Exhs. 9, 10**, and **11** (LinkedIn and Facebook bios of Dustin Tinsley and Facebook bio of Mr. Taylor).

    Identifying the two Tinsley brothers as "key leaders" "running the show" on one of the trips, one of the visiting veteran's, Tim Cord, described encountering Daniel Tinsley late one night while Daniel was apparently intoxicated and in the company of another person identified as a "lobbyist". According to Cord, in a discussion he had with Daniel Tinsley after the lobbyist left, Tinsley acknowledged he did not care about JASTA or the 9/11 community, but saw the engagement as an opportunity to enhance his own profile. Perhaps more importantly, Tinsley then acknowledged that the Kingdom was footing the bill for the entire effort. Cord related that, almost immediately after that, a black Bentley SUV pulled up to the hotel and a man "with a turban" stepped out and handed Tinsley "$1,200 ostrich boots." **Exh. 5** (28 Pages.org (2/23/2017)). But up to that point, the Saudi connection had been kept secret from the visiting veterans – and in fact, Johns had denied it.

    Based on this available information, we believe the possible FARA violations relating to the activities of Johns, Taylor and the Tinsley brothers may include, among others: the failure of persons

The Honorable Jeff Sessions
March 29, 2017
Page 8 of 17

working on behalf of the Saudi government to register pursuant to FARA; the failure to label and file informational materials; and the failure to submit detailed statements of activities undertaken on behalf of the Saudi government.

### Activities of ADVOCACY GROUP INC. / Michael Gibson / Sara Raak
- **Washington, DC**

Based on the available information, we believe that Michael Gibson and Sara Raak, through their company, Advocacy Group Inc. ("AGI"), were central to arranging and coordinating the veterans' Congressional visits referenced in connection with NMLB Veterans Advocacy Group, and Messrs. Johns and Taylor and the Tinsley brothers.

Mr. Gibson and Ms. Raak, president and director, respectively, of AGI, both filed short form FARA statements – Mr. Gibson's stamped October 28, 2016 and Ms. Raak's stamped October 31, 2016 – to render services to the Kingdom of Saudi Arabia. **Exhs. 12** and **13** (FARA Statements of Michael Gibson and Sara Raak). Both Mr. Gibson and Ms. Raak filed under Registration No. 5483, indicating that they would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work they would render to the Kingdom as: "Outreach to media, influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel." In their statements, they both listed their business address as 1800 M Street, NW Suite 450 South, Washington, DC 20036, which is the office address for their business, Advocacy Group Inc., a public affairs consultancy that "provides strategic counsel and implementation support for a variety of businesses by helping them optimize their high-impact, advocacy campaigns." Based on a search of FARA registrations, it does not appear that Mr. Gibson's and Ms. Raak's company, AGI, filed a registration statement.

The available evidence indicates that Mr. Gibson's and Ms. Raak's company, the Advocacy Group, offered administrative and other support work to facilitate the "Fly-in" visits by many (or all) of the veterans Mr. Johns had solicited to travel to D.C. The so-called OPORD (or Operational Orders) circulated by Mr. Johns and the other organizers of the "Fly-Ins" referred to the Advocacy Group with primary registrant, Qorvis, as providing "administrative and other support" for the Fly-ins (**Exh. 3** ("OPORD")). One of the veterans, U.S. Marine Corps and Iraq war veteran David Casler, stated that the Advocacy Group arranged his travel. **Exh. 5** (28 Pages.org (2/23/2017)). An email from Mr. Johns to one of the veterans was copied to Mr. Gibson. **Exh. 4** (Daily Caller (2/7/2017)). Other emails from the corporate travel company sending veterans their travel itineraries were also copied to both Mr. Gibson of AGI and Mr. Johns of NMLB. **Exh. 4** (Daily Caller (2/7/2017)); **Exh 18** (Dec. 23, 2016, e-mail copying veteran's itinerary to Mr. Gibson).

Despite the indications that Mr. Gibson, Ms. Raak, and AGI were involved in a national campaign to misinform veterans in an effort to create the false impression of a groundswell against JASTA, there is no indication that Mr. Gibson or Ms. Raak provided any disclosure in any communication of information to the veterans that the work they were performing or services they were providing was in service to the Kingdom. We believe the communications they circulated were, by their nature, intended to induce veterans to lobby against JASTA and to recruit other veterans also to do so. However, we believe that those communications were not labeled with any statement indicating that they were being disseminated on behalf of the Saudi government.

Based on this available information, we believe the possible FARA violations relating to the activities of Gibson, Raak, and AGI may include, among others: the failure of persons working on behalf of the Saudi government to register pursuant to FARA; the failure to label and file informational materials; and the failure to submit detailed statements of activities undertaken on behalf of the Saudi government. We further believe that their involvement in the overall campaign may constitute aiding and abetting and conspiracy to commit violations of FARA, in violation of 18 U.S.C. § 2 ("Principals") and 18 U.S.C § 371 ("Conspiracy to commit offence or to defraud United States").

### Activities of Shelbi Brooke Lewark
- **Denver, CO**

Shelbi Brooke Lewark filed a short form FARA statement on October 31, 2016, to render services to the Kingdom of Saudi Arabia. Ms. Lewark filed under Registration No. 5483, indicating that he would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work he would render to the Kingdom as: "Outreach to media, influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel." In her statement, Ms. Lewark listed her business address as P.O. Box 102963 Denver, CO 80250. **Exh. 14** (Shelbi Brooke Lewark FARA Statement)).

Email chains among Ms. Lewark, Mr. Johns of NMLB, and veterans who were provided misinformation to lobby against JASTA, indicate that while Ms. Lewark was in service of the Saudi Kingdom, she circulated information to veterans encouraging them to travel to D.C. to lobby against JASTA. In a December 21, 2016 email (**Exh. 15**), Ms. Lewark writes to seven veterans to invite them on an "all expenses paid" trip to D.C., "like a 5 star vacation," where the vets are offered lodging at the Trump hotel, which Ms. Lewark describes as "incredibly nice." *Id.* Although Ms. Lewark also tells the veterans that they "don't have to know anything about JASTA" to participate in the trip, the email included links to selective materials in opposition to JASTA. Nothing in the email or any link in the email indicates that Ms. Lewark included any language reflecting that she was working in the service of the Kingdom when she disseminated information to the veterans and encouraged them to lobby against the law.

On the same day that Ms. Lewark first reached out to the veterans, Jason Johns of NMLB emailed one of the same veterans to arrange for him to travel to D.C. (**Exh. 16**). Within days, Johns had put the veteran in touch with the travel agency used to book many of the veteran's travel and the veteran's travel plans were booked. Copies of the veteran's travel itinerary were sent to Mr. Johns and to Mr. Gibson of AGI (**Exhs. 17, 18**). Though the communications among the three registered agents for the Kingdom indicate that they were coordinating their activities for the Kingdom, still, no communication from Lewark, Johns, or Gibson advised the veteran that all of the communications and the planning were in service of the Kingdom.

Based on this available information, we believe the possible FARA violations relating to the activities of Lewark may include, among others: the failure to label and file informational materials; and the failure to submit detailed statements of activities undertaken on behalf of the Saudi government.

**Activities of Sarah Durand (and possibly Paul Stanley)**
- **Kentucky (& Collierville, TN)**

According to the account of one veteran, Sarah Durand, who has not filed any FARA registration, is responsible for attempting (through another unnamed veteran) to recruit veteran and Tennessee resident Malachias Gaskin to travel to D.C. to oppose JASTA. Although Mr. Gaskin ultimately rejected the offer of an expense-paid trip to Washington, D.C., his account of the recruitment effort and Ms. Durand's advocacy against JASTA matches the recruitment and trip experience of the other veterans who traveled to D.C. at the behest of the Kingdom (*see* **Exh. 4** (Daily Caller (2/7/17)) and **Exh. 19** (Brian McGlinchey, Saudi Lobbyists Recruiting Veterans to Kill 9/11 Lawsuit, 28Pages.org (Feb. 9, 2017))), and emails place her in the organizational circle of Jason Johns, of NMLB Veterans' Advocacy (**Exh. 4** (Daily Caller (2/7/17, including emails))).

Mr. Gaskin explained that after he expressed interest in an inquiry, Ms. Durand responded to thank him for his interest. Ms. Durand – who we understand also happens to be the former chief of staff for Kentucky first lady Glena Bevin, and before that, president of the Louisville Tea Party – told Mr. Gaskin that she had sent his information to "the trip coordinator" and that she would call him back once she knew details of the trip. She then sent him selected links to information about the opposition to JASTA. **Exh. 4** (Daily Caller (2/7/17, including emails)). The email communication providing those selective documents did not include any disclosure that they were being disseminated on behalf of the Saudi government. A day later, Mr. Gaskin received an email from Mr. Johns of the NMLB Veterans Advocacy Group explaining that he would send Mr. Gaskins a copy of the "OPORD," the instructions that Mr. Johns was circulating to all of the veterans recruited to travel to D.C. to lobby Congress in service to the Kingdom. **Exh. 4** (Daily Caller (2/7/17, including emails)).

Because Mr. Gaskin was curious about the project, he performed independent research, which caused him to conclude that JASTA was good law and should not be opposed. That conclusion caused him to ask more questions about the effort to recruit veterans to travel to D.C. to oppose the law. **Exh. 4** (Daily Caller (2/7/17)). Mr. Gaskin wrote to Ms. Durand again, this time expressing doubt about the trip and asking for additional information. Ms. Durand responded to Mr. Gaskin's inquiry by providing him with email attachments including materials critical of JASTA, mirroring the efforts of the other agents working with Saudi lobbyists. **Exh. 4** (Daily Caller (2/7/17, including emails)).

From the chain of emails identifying Ms. Durand, Mr. Gaskins, and Mr. Johns, it appears that she was working in close coordination with foreign agents for the Kingdom, and potentially directly with FARA registrant Mr. Johns. Given the relationship between Ms. Durand's exchanges and the overall lobbying efforts of the Kingdom to recruit veterans to travel to D.C., we believe that her communications to convince Mr. Gaskin (and any other veterans with whom she similarly communicated) should have contained language alerting the recipient of the information that the information was provided in service of the Kingdom of Saudi Arabia. Neither her emails, nor the attachments, contained language alerting of the Saudi association.

Because Ms. Durand recruited Mr. Gaskins from Tennessee, we believe that she may have been working with Tennessee FARA registrant for the Saudi Kingdom, Paul Stanley. Mr. Stanley is a Tennessee-based consultant that was paid a lump sum of $12,000 to render services to the Kingdom of Saudi Arabia. Mr. Stanley filed under Registration No. 5483, indicating that he would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work he would render to the Kingdom as: "Outreach to media,

influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel." In his statement, Mr. Stanley listed his business address as P.O. Box 10, Collierville, TN 38027 **Exh. 20** (FARA Statement of Paul Stanley).

Based on this available information, we believe the possible FARA violations relating to the activities of Durand may include, among others: the failure of persons working on behalf of the Saudi government to register pursuant to FARA; the failure to label and file informational materials; and the failure to submit detailed statements of activities undertaken on behalf of the Saudi government.

### Activities of ORGANIZED KARMA / Shannon Bilbray-Axelrod / Aida Blankenship / Ronni Council / Charity Stevens / Dario Herrera
- **Las Vegas, NV**

On October 31, 2016, four women with ties to Nevada-based consulting firm Organized Karma – Shannon Bilbray-Axelrod, who also represents the 34th District in the Nevada State Assembly, Aida Blankenship, Ronni Council, and Charity Stevens – filed FARA short form registrations statements to render services to the Kingdom of Saudi Arabia. **Exhs. 21, 22, 23, 24** (FARA Statements of Shannon Bilbray-Axelrod, Aida Blankenship, Ronni Council, and Charity Stevens). The nearly identical statements were all associated with Registration No. 5483, indicating that they would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work they would render to the Kingdom as: "Outreach to media, influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel" **Exhs. 21, 22, 23, 24** (FARA Statements of Bilbray-Axelrod, Blankenship, Council, and Stevens).

All four statements list the agent's business address as 438 E. Sahara Ave., Las Vegas, NV 89104, the address of the Las Vegas-based professional messaging entity known as Organized Karma, where Ms. Bilbray-Axelrod was previously identified as a producer.[4] Organized Karma's website indicates that Ms. Council opened Organized Karma and that Ms. Stevens is vice president of Alchemy Associates, LLC, an entity closely associated with Organized Karma. Ms. Blankenship identifies herself as a project manager at Organized Karma. Organized Karma describes itself by stating that its professionals will provide "a multi-faceted approach to marketing, advertising, earned media, research, field strategy, campaign message . . . grassroots organizing and community relations."[5] As near as we can tell, Organized Karma has not itself filed a FARA registration statement.

---

[4] http://www.reviewjournal.com/politics/elections/assembly-district-34. After news broke of Ms. Bilbray-Axelrod's involvement as a registered foreign agent for Saudi Arabia, Ms. Bilbray-Axelrod resigned from Organized Karma on March 16, 2017.
http://www.reviewjournal.com/news/politics-and-government/nevada/nevada-assemblywoman-resigns-consulting-job-after-ties-saudi

[5] http://www.organizedkarma.com/ ("about us"); https://www.linkedin.com/in/aida-blankenship-8741128a.

  Through an Organized Karma email address, Dario Herrera, another Las Vegas politician, has been contacting veteran organizations, urging them to speak out against JASTA. One series of email exchanges on January 30, 2017 (two at 8:41 pm and a third at 8:56 pm, *see* **Exhs. 25, 26, and 27**), from Mr. Herrera, using an email address of dario@organizedkarma.org, to Steve Sanson, President of Veterans in Politics International, exhorts the veterans group to oppose JASTA using language straight from the Saudi lobbyists' playbook. We have been unable to identify any FARA registration for Mr. Herrera. Further, none of his emails described above, nor any attachment to an email, includes any legend or other language indicating that the communication was done in performance of services rendered for the Kingdom of Saudi Arabia.

  In two of the emails (both at 8:41 pm, *see* **Exhs. 25 and 26**), Mr. Herrera thanks VPI President Sanson for taking the time to discuss the existing outreach campaign in which Organized Karma has been engaged and offers "background info" regarding the campaign's approach to "reform JASTA." Each of the "Facts about the Law" in the first email comprise the essence of the Saudi's opposition to JASTA. Nothing in the email presents the facts that undergirded Congress's long and careful consideration of JASTA, the considered debate in multiple congressional hearings about JASTA, or Congress's cautious determination to overwhelmingly pass JASTA in an historic veto override after considering the very arguments that Mr. Herrera suggests.

  The second of the two emails includes contact information for four House and Senate members and proposes draft emails that Mr. Herrera asked VPI President Sanson to distribute to veteran members of the organization to influence Congress. The second email also includes an attachment, titled "The Plan to Fix JASTA – December 2016."

  A third email (at 8:56 pm, *see* **Exh. 27**), which Mr. Herrera may have offered to facilitate circulation to other veterans, was a short email with the subject line "Call to Action." In that email, Mr. Herrera exhorts the veterans group, saying "We need VETERANS ASAP to reach out to a few designated federal representative to help fix JASTA. All it takes is 4 simple emails that we can help you write! Please contact Dario Herrera at dariohlv@gmail.com or 415-405-5847 to get involved now."

  In an earlier December 22, 2016 Facebook posting (*see* **Exh. 28** Facebook post), Mr. Herrera solicits communication from "combat veterans" speaking as though from the Saudi talking points. Without any indication that he is communicating in connection with services rendered to the Kingdom, he explains that he is "working on an outreach campaign to inform key federal representatives about the legal exposure our service men and women can potentially face while serving abroad as a result of the unintended deficiency in JASTA's legislative language."

  None of the emails, nor the attachment, nor the Facebook post, nor Mr. Herrera's Facebook biography (**Exh. 29**) contained any indication that the communications were in furtherance of services being rendered to the Kingdom of Saudi Arabia.

  Based on this available information, we believe the possible FARA violations relating to the activities of Billbray-Axelrod, Blankenship, Council, Stevens, Herrera, and Organized Karma may include, among others: the failure of persons working on behalf of the Saudi government to register pursuant to FARA; the failure to label and file informational materials; the failure to submit detailed statements of activities undertaken on behalf of the Saudi government; and the failure to include a statement on materials prepared for submission to members of Congress disclosing that those materials were prepared on behalf of a foreign government.

**Activities of <u>Dauntless Communications</u> / Eric Eisenhammer / Collier ("Cole") Azare,**
- **Rosewood, CA, Reno, NV, Washington, DC**

Eric Eisenhammer, founder and CEO of California-based digital communications and public affairs company, Dauntless Communications, filed a short form FARA statement on October 31, 2016, to render services to the Kingdom of Saudi Arabia. **Exh. 30** (FARA Statement of Eric Eisenhammer). Mr. Eisenhammer filed under Registration No. 5483, indicating that he would render services to the Kingdom in support of primary registrant MLSGroup Americas d/b/a QorvisMLSGroup, describing the work he would render to the Kingdom as: "Outreach to media, influencers, state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)" and "Describing the unintended consequences that JASTA poses to U.S. interests, including potential legal liabilities arising for U.S. military, intelligence, and diplomatic personnel." In his statement, Mr. Eisenhammer lists his business address as 1220 Melody Lane, Suite 110, Roseville, CA 95678, which is the office address for his business, Dauntless. Based on our research, we do not believe Dauntless Communications has itself filed a FARA registration statement.

From the available information, we believe that Mr. Eisenhammer and Dauntless have participated in recruiting veterans to sign pre-written letters to members of Congress asking for an amendment to JASTA. Based on one report, Dauntless must meet a quota of producing 200 letters to Congress per month. In one example of emails from Mr. Eisenhammer to a veteran that Mr. Eisenhammer was soliciting for help in recruiting veterans to write Congress in opposition to JASTA (*see* **Exh. 31**, email dated December 27, 2016, with attachments), Mr. Eisenhammer provided sample pre-written letters that he acknowledged he had written and directed other veterans to send to Congress. Neither the emails, nor the draft letters, nor (presumably) the letters that went to Congress from the other veterans at Mr. Eisenhammer's direction, contained any legend indicating that they were communications rendered in service to the Kingdom of Saudi Arabia.

Multiple Facebook posts authored under Mr. Eisenhammer's name since early October 2016 circulated information about JASTA. We believe such Facebook posts are, by their very nature, information that is intended to be disseminated or circulated among two or more persons as that requirement is used in FARA. *See* 22 U.S.C. § 614(a). In an October 1 post, Mr. Eisenhammer circulated information in a Facebook post reiterating the same message used by Saudi lobbyists – namely, that "JASTA puts American service men and women in jeopardy to make lawyers richer" – a claim rejected by international law expert Professor Dodge. *See* fn 3. On October 2, Mr. Eisenhammer circulated information in a Facebook post asserting that "horrible consequences of JASTA are already starting." In a series of exchanges following that posting, Mr. Eisenhammer solicited others to "contact[] your representatives about [JASTA]." On October 4, Mr. Eisenhammer circulated information in a Facebook post asserting that "Washington is realizing JASTA was a giant mistake." On October 6, Mr. Eisenhammer circulated information in a Facebook post repeating comments from a purported veteran alleged to be speaking out against JASTA. In comments that followed the post, Mr. Eisenhammer advised that he supports President Obama's veto of JASTA. In an October 11 Facebook post, Mr. Eisenhammer circulated information in a Facebook post asserting that "[i]f Congress fails to act on JASTA we could face a global economic collapse and the loss of good American jobs" and encouraged readers to read an article that he links to in his post. **Exh. 32** (Facebook posts of Eric Eisenhammer dated October 1, 2, 4, 6, 11, 19, November 3, 18, December 7, 22, February 1, 6).

In a post on November 3, 2016, Mr. Eisenhammer went beyond his earlier opposition to JASTA, by adding arguments suggesting that the Kingdom (like those killed in the 9/11 attacks) was also a victim of Al Qaeda. In his post, Mr. Eisenhammer suggests that he somehow knows the intentions and strategy of the 9/11 plotters, writing: "Al Qaeda . . . purposely recruited Saudis for 9/11 to undermine the US-Saudi relationship." "[Osama bin Laden's] intention was to drive a wedge between his two enemies, the United States and the Saudi government. Fifteen years after the attack, the JASTA legislation appears to be doing just that." In our view, this is quintessentially the kind of information that should be accompanied by a qualifier that the person delivering the information is an agent of the nation being defended in the commentary. **Exh. 32**

Similarly, in a post on December 22, 2016, Mr. Eisenhammer posted a graphic of information to oppose JASTA. In our view, the information is another quintessential example of the kind of information that needs to be accompanied with an indicator that it is being circulated by an agent for the foreign state asserting the position staked out in the graphic. **Exh. 32**

Mr. Eisenhammer does not include any indication anywhere in any of his posts, nor on his Facebook "About" page, describing himself as a foreign agent for the Kingdom (**Exh. 33**), or that his communications were rendered in service to the Kingdom of Saudi Arabia.

Based on available information, through Dauntless, we believe Mr. Eisenhammer recruited, directed, and compensated other individuals to render services to the Kingdom. For example, we understand that, at Mr. Eisenhammer's direction, Navy veteran Collier ("Cole") Azare has recruited numerous veterans with offers of lavish all expenses paid trips to Washington, D.C. to lobby Congress to "amend" JASTA based on the Saudi-created false narrative that JASTA puts U.S. military at risk of being sued for their service to our country. Mr. Azare has also included his name on at least one document distributed to Congress on letterhead of the veterans' organization "Omega Delta Sigma National Veterans Fraternity, Inc." *See* **Exh. 34** (ODS Letter). Although Mr. Azare signed the document as chair of the organization, we understand that he was simultaneously working in concert with Mr. Eisenhammer, reportedly aware of Mr. Eisenhammer's affiliation with the Kingdom. However, the letter does not contain any legend indicating that it was written or circulated to Congress as part of services rendered to the Kingdom.

At the same time that the letter from Mr. Azare was circulated to Congress, another letter was circulated on letterhead from the "Military Order of the Purple Heart." *See* **Exh. 35** (MOPH Letter). While nothing apparent on the face of the letter from the MOPH organization indicates that the signatories of the MOPH letter knew the letter was written in support of the Saudi agenda, it raises two questions – first, whether the party soliciting the letter from the MOPH was an agent of the Kingdom that failed to disclose that association (for example, another FARA registrant, Jason E. Johns, is a National Senior Commander of the MOPH (*see* **Exh. 36** (MOPH Johns Bio)) and second, whether the circumstances surrounding the drafting and delivery of that and other letters to Congress required that the letters and circulated drafts of the letters contain a disclosure statement, and that the letters and circulated drafts of the letters be filed with the Department of Justice.

In another example of services rendered to the Kingdom, we understand that Messrs. Eisenhammer and Azare rented an exhibition booth at a local gun show in Reno, Nevada, displayed a red-white-and-blue banner stating: "protect our troops from JASTA backlash," advocated against JASTA, and provided a sign-up sheet to collect names and contact information. *See* **Exh. 37** (photo from gun show) and **Exh. 38** (photo of sign-up sheet from gun show). The gun show activities were reported by Eric Owens at the Daily Caller in a February 7, 2017 article titled, "Exclusive: Saudi Cash

Is Sending Veterans on LUXURY Trips to Washington to Oppose 9/11 Law." **Exh. 4**. The stated purpose of the sign-up sheet at the gun show was to identify people interested in traveling to Washington, D.C., writing letters to Congress, or signing a pre-written petition opposing of JASTA. Neither any identifying information at the booth nor the sign-up sheet included any indicator that the communications were in the service of the Kingdom of Saudi Arabia.

Similar to Mr. Eisenhammer's Facebook posts, Mr. Azare has also posted or reposted information suggesting the need to re-visit the JASTA legislation, without any indication that his efforts are being done in connection with registered agents of the Kingdom. *See* **Exh. 39** (Facebook posts by Collier Azare dated January 16, 18, February 1, 10, 23, 27). In a post on February 10, 2017, for example, Mr. Azare reposted information from Dustin Tinsley and added a comment that "[t]his law [JASTA] is a travesty and anyone that actually understands legislation and international relations knew that."

As best as we have been able to determine, none of the disclosed communications from Mr. Eisenhammer or Mr. Azare to solicited veterans (nor their profiles on their respective Facebook pages where they posted information about JASTA (*see* **Exhs. 33 and 40**), included any admonition that the communication was to render services on behalf of the Kingdom of Saudi Arabia.

Based on this available information, we believe the possible FARA violations relating to the activities of Eisenhammer, Azare, and Dauntless (and potentially other Dauntless employees) may include, among others: the failure of persons working on behalf of the Saudi government to register pursuant to FARA; the failure to label and file informational materials; the failure to submit detailed statements of activities undertaken on behalf of the Saudi government; and the failure to include a statement on materials prepared for submission to members of Congress disclosing that those materials were prepared on behalf of a foreign government.

### History of alleged FARA violations by Qorvis representing the Kingdom

This is not the first time that MSLGroup's transparency regarding FARA obligations concerning its work for the Kingdom of Saudi Arabia has been questioned. In 2004, the U.S. Justice Department raided the offices of Qorvis MSLGROUP – then called Qorvis Communications – in downtown Washington, D.C. and northern Virginia as part of a criminal investigation into Saudi payments to Qorvis. In the wake of the 9/11 Attacks, the Kingdom allegedly hired Qorvis to polish the Kingdom's image. According to accounts of the incident, the Kingdom, through Qorvis, ran media advertisements in 2002 under the name of an organization called "Alliance for Peace and Justice" ("APJ"). A concerned group investigated and learned that the address attributed to the APJ was a Qorvis office, and that Qorvis had created the entity for its client, the Kingdom of Saudi Arabia. But the ads from the APJ contained no statement about their source. An activist opposing the Kingdom's activities at the time commented, "We were just incensed here that a foreign country appeared to be trying to put out propaganda ads without attribution to that country." *See* **Exh. 41** (Josh Gerstein, The New York Sun, P.R. Effort By Saudis Sparks Justice Probe, Dec. 20, 2004). We are unaware of the results of that investigation.

The Honorable Jeff Sessions
March 29, 2017
Page 16 of 17

> **A thorough investigation of all potentially involved parties is a matter of national security to prevent foreign insidious propaganda from influencing the U.S. legislative process.**

The activities outlined here and in the various media reports, which we believe evidence a highly coordinated, commonly-rooted scheme, demand investigation to determine the full scope of possible FARA violations committed in connection with the Saudi campaign to undermine JASTA, and the identities of all persons who have participated in any such violations. If the coordination among the involved parties is not patently evident from the singular message delivered by each of the agents, other common features underscore the apparent coordination. All of the agents' FARA statements are stamped by the Department of Justice on (or close to) October 31, 2016, and indicate that they are all rendering services to the Kingdom through the same primary registrant – namely MLSGroup Americas, d/b/a QorvisMLSGroup. The agents' responses to questions 11 and 12 in each agent's FARA statements, indicating the service they rendered to the Kingdom, are identical. For response 11, they all answered: "Outreach to media, influencers, and state and federal elected officials regarding the Justice Against Sponsors of Terrorism Act (JASTA)." For response 12, they all answered: "Describing the unintended consequences that JASTA poses to US interests, including potential legal liabilities arising for US military, intelligence, and diplomatic personnel." Finally, the "opinion" items in the astroturf campaign uncovered in the Daily Caller's December 5, 2016 article (**Exh. A**) and each of the foreign agents' communications with veterans oppose JASTA using arguments identical to the Kingdom's.

Taken individually, each of the separate sets of activities referenced in this letter would warrant investigation for FARA violations. But considered collectively, we believe they represent a massive, highly coordinated, and exceedingly funded scheme to deceive the U.S. public, and ultimately the U.S. Congress, with the ultimate goal of convincing Congress to enact legislation that would not only permit the Saudi government to escape accountability for its alleged direct role in the worst terrorist attack on the U.S. homeland, but would also result in weakening U.S. counter-terrorism laws.

To protect the U.S. citizenry, our legislative process, and other national security interests placed at risk by the dangerous undue influence of insidious, deceptive foreign propaganda, we ask that the Department of Justice commence an immediate national security investigation to determine the scope and breadth of involvement and prosecute any criminal violations of FARA, or other federal laws, by persons engaged in what we believe to be an unprecedented foreign influence campaign on the behalf of the Kingdom of Saudi Arabia.

Most Respectfully,

**9/11 FAMILIES & SURVIVORS UNITED FOR JUSTICE AGAINST TERRORISM**

**NATIONAL CHAIR**

Terry Strada, *Widow of Tom Strada, North Tower*

**COMMITTEE**

Sylvia Carver – *Sister of Sharon Carver, Pentagon*
Veronica Carver – *Sister of Sharon Carver, Pentagon*
Bill Doyle – *Father of Joseph Doyle, North Tower*

The Honorable Jeff Sessions
March 29, 2017
Page 17 of 17

      Gordon Haberman – *Father of Andrea Haberman, South Tower*
      Alice Hoagland – *Mother of Mark Bingham, Flight 93*
      Emanuel Lipscomb – *Survivor, civilian rescuer, NYC*
      Margaret Mathers, *Widow of Charles Mathers, North Tower*
      Joan Molinaro – *Mother of fallen hero Carl Molinaro, FDNY, Ladder Company 2*
      Sharon Premoli – *Survivor, North Tower*

**9/11 Families & Survivors United for Justice Against Terrorism** is comprised of over 9,000 victim's family members and survivors seeking justice, accountability, and the truth regarding all perpetrators of the September 11, 2001 attacks.

cc:    Mary B. McCord
       Acting Assistant Attorney General for National Security
       U.S. Department of Justice, National Security Division
       FARA Registration Unit
       600 E Street, NW
       BICN - Room 1300
       Washington, DC 20004
       nsd.public@usdoj.gov
       fara.public@usdoj.gov