# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Stephen A. Cozen, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

March 2, 2020

VIA ECF
The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

Plaintiffs respond to Saudi Arabia's February 27, 2020 letter, ECF No. 6017, which asks for a conference to address the PECs' February 21 letter and the Declaration submitted by Andrew J. Maloney (ECF No. 6003-2), and seeks to obtain the identity of witnesses who told the PECs that they were fearful of testifying against Saudi Arabia, and about specific threats that the witnesses reported were directed at them and their families. The Kingdom's letter fails to acknowledge the legitimate and well-founded safety concerns that have been raised by witnesses, and the degree to which the Kingdom's demands for broad identification of witnesses who may or may not agree to testify would derail Plaintiffs' efforts to obtain testimony.

The PECs treat with the utmost seriousness the concerns that have been raised by witnesses concerning their safety and security. For that very reason, Mr. Maloney, as an officer of the Court, submitted a sworn declaration to summarize the safety concerns that have been raised by witnesses.[1] The statements made were necessarily circumspect to protect the witnesses and avoid chilling the very appearances Plaintiffs are attempting to secure. We raised the issue

---

[1] Three of the four witnesses cited in the Maloney Declaration advised that they had or would report the information to the appropriate law enforcement or intelligence officials. The PECs do not have information on actions taken by the fourth witness.

to prevent witness names from being released as a group to Saudi Arabia before necessary safeguards could be put in place.

The Kingdom relies on the declaration of Saudi Minister of State Mohamed Al Sheikh who, less than 48 hours after the PECs' submission, presents an incredible and conclusory denial that "[n]o Saudi Arabian government official, employee, agent, or anyone acting on Saudi Arabia's behalf has attempted to threaten any potential witness or any witness's family members in this proceeding." Sheikh Dec'l at ¶ 7. The declaration is inconsistent with the facts.

1. <u>The Murder of Jamal Khashoggi</u>. Long before the multiple witnesses discussed in the Maloney Declaration raised concerns that their appearance as witnesses would put their safety at risk, the Kingdom's actions in the murder of Washington Post journalist Jamal Khashoggi interfered with the PECs efforts to obtain evidence.

Mr. Khashoggi was himself a potential witness in this case, and was interviewed by Plaintiffs' investigator on October 26, 2017. Maloney Dec'l at ¶ 9. Mr. Khashoggi sent a text to senior Saudi officials that same day, *id.* at ¶ 10, and less than a year later on a trip outside the U.S. he was brutally murdered and dismembered by the Kingdom inside its Consulate in Istanbul, Turkey. Ex. 3. Minister Sheikh's Declaration does not address the Kingdom's cover-up of Khashoggi's premeditated murder.

A United Nations investigation confirmed the responsibility of the Saudi government, including the most senior Saudi officials, in the murder of Jamal Khashoggi. Ex. 3.

Minister of State Mohamed Al Sheikh is thus plainly wrong in claiming that "[n]o Saudi Arabian government official, employee, agent, or anyone acting on Saudi Arabia's behalf has attempted to threaten any potential witness or any witness's family members in this proceeding." Sheikh Dec'l at ¶ 7.

After committing the murder, Saudi officials engaged in extensive efforts to conceal the grizzly crime and obstruct official international investigations. For instance, the Kingdom issued an official press statement that Mr. Khashoggi had "visited the consulate to request paperwork related to his marital status and exited shortly thereafter," *id.* at 23. In fact, Saudi officials arranged in advance for a "look-alike" — a Saudi "General" described as a "High Ranking Intelligence Officer employed at the Royal Palace" who resembled Mr. Khashoggi — to walk out of the Consulate wearing the murdered man's own clothes past video cameras, to support the Kingdom's false story that Mr. Khashoggi had actually left the Consulate. *Id.* at 18, 21, 35, 40.

At the same time, the Saudi government issued blanket denials of responsibility. Saudi Prince Khalid bin Salman thereafter stridently denied all allegations of the Saudi government's involvement in Mr. Khashoggi's disappearance, "I assure you that the reports that suggest that Jamal Khashoggi went missing in the Consulate in Istanbul or that the Kingdom's authorities have detained him or killed him are absolutely false, and baseless." *Id.* at 24. Investigators later concluded that at the same time the Kingdom was publically denying responsibility, it had actively employed teams of Saudi government officials to methodically destroy a variety of evidence of Mr. Khashoggi's murder. *Id.* at 24-26. To this day, Saudi Arabia is still hiding the location of Mr. Khashoggi's body. *Id.* at 59. And the Kingdom's highest leadership later

engaged in a cyberattack as retaliation against press coverage of Mr. Khashoggi's murder. Maloney Dec'l. at ¶¶ 21-22.

In resisting appropriate protections for witnesses, the Kingdom conspicuously ignores proof that the concerns the witnesses have raised are well-founded, and grounded in the Kingdom's own misconduct. As more than 100 journalists and activists emphasized in a letter to the United Nations shortly thereafter, the murder of Jamal Khashoggi "constitute[d] nothing less than an act of state terror intended to intimidate journalists, dissidents, and exiled critics the world over."[2]

2. <u>Illegal Monitoring, Intimidation, and Repatriation of Perceived Critics and Adversaries</u>. Likewise, The Kingdom has engaged in an aggressive and illegal campaign to monitor, intimidate, and in some cases repatriate, perceived critics and adversaries throughout the world, leading several governments to assess that individuals subjected to those activities faced potential personal safety risks.

Discussing the Kingdom's extensive cyber intrusion activities, David Kaye, the UN Special Rapporteur on freedom of expression, indicated that the available evidence pointed "to a pattern of targeted surveillance of perceived opponents and those of broader strategic importance to the Saudi authorities, including nationals and non-nationals."[3] The Department of Justice, meanwhile, recently revealed that these activities included the illegal recruitment of Twitter employees who, "[a]cting in the United States under the direction and control of Saudi officials, … are alleged to have obtained private, identifying information about users of Twitter who were critical of the Saudi government." Ex. 11. The DOJ's Complaint, Ex. 12, directly implicates officials of the "charitable" and "private" offices[4] of a member of the Saudi Royal Court identified as Royal Family Member – 1, elsewhere reported to be Crown Prince Mohammed bin Salman,[5] in this government monitoring campaign.

Several governments have reportedly assessed that targets of these activities faced personal safety risks from the Saudi government. In fact, reporting indicates that FBI officials issued personal warnings to several perceived critics of the Saudi government residing in the United States.[6] Additional reports indicate that the Saudi government has "repatriated" several critics of the government from abroad, as part of a broader campaign targeting "those whom the Saudi leadership consider to be working against the interests of the state: dissidents, students, rogue royals, prominent businessmen, and the Crown Prince's personal enemies in nearly a

---

[2] https://pen.org/investigate-jamal-khashoggi-disappearance-murder/.

[3] https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25488&LangID=E.

[4] The involvement of these so-called "private" and "charitable" offices of a member of the Royal Court in these espionage activities is highly relevant to other matters before the Court.

[5] https://www.washingtonpost.com/national-security/former-twitter-employees-charged-with-spying-for-saudi-arabia-by-digging-into-the-accounts-of-kingdom-critics/2019/11/06/2e9593da-00a0-11ea-8bab-0fc209e065a8_story.html.

[6] https://www.middleeasteye.net/news/exclusive-saudi-dissidents-us-warned-fbi-after-khashoggi-killing.

dozen countries, including the U.S., Canada, the U.K., France, Switzerland, Germany, Jordan, the United Arab Emirates, Kuwait, Morocco, and China."[7]  This is in addition to the well documented arrests of various Saudi Royals and businessmen inside the Kingdom shortly after Prince Mohamed bin Salman was named Crown Prince for purported corruption violations. Press reports state that many were held at the Ritz Carlton in Riyadh and not permitted to leave until they agreed to turn over a collective total of $100 billion dollars to regain their freedom.[8]

       3.       <u>Obstruction of the U.S. Justice System</u>.  Further still, the FBI recently confirmed that "KSA officials almost certainly assist US-based KSA citizens in fleeing the United States because of legal issues, undermining the US judicial process.  Ex. 16.  The FBI concluded that the Saudi government has engaged in a systematic effort to remove its citizens from the United States to avoid the "embarrassment" of criminal charges involving traffic violations and serious felonies, including rape, child pornography and manslaughter.  *Id.*  To be certain, the Kingdom's interests in the present litigation are far more serious.

* * *

As these examples readily establish, witnesses with knowledge implicating Kingdom officials in the September 11th attacks, who have paid even modest attention to recent media coverage of the Kingdom's conduct on the international stage, have very real and legitimate concerns about their personal safety and security.  The declaration of Saudi Minister of State Mohamed Al Sheikh does nothing to alter these undeniable facts that must inform Plaintiffs' request that proper mechanisms be implemented to protect third party witnesses.

This issue can only be addressed on an individual witness basis, as each deposition or declaration is noticed.  Under the protocols Plaintiffs' have proposed, the Kingdom will receive ample notice of and opportunity to prepare for testimony of any third party witnesses.  Given that fair notice, the Kingdom's current complaints should be seen for what they are – an attempt to distract from the real issue (the legitimate safety concerns of the witnesses resulting from the Kingdom's documented intimidation of witnesses), borne principally of the Kingdom's sensitivities about the reputational effects of its own behavior.

This issue is most properly addressed in the context of the overall disputes concerning the deposition protocol at the hearing scheduled by this Court on March 23, 2020.  We have not, however, been able to reach agreement with the Kingdom, and therefore will appear before the Court this Wednesday.  ECF No. 6026.

---

[7] https://www.vanityfair.com/news/2019/07/how-saudi-arabia-makes-dissidents-disappear.

[8] https://www.cnn.com/2018/02/11/middleeast/saudi-ritz-carlton-reopens-intl/index.html

Respectfully submitted,

| | |
|---|---|
| COZEN O'CONNOR | MOTLEY RICE |
| /s/ Sean P. Carter, Esquire | /s/ Robert T. Haefele, Esquire |
| Sean P. Carter, Esquire | Robert T. Haefele, Esquire |
| 1650 Market Street, Suite 2800 | 28 Bridgeside Boulevard |
| Philadelphia, PA 19103 | Mt. Pleasant, SC 29464 |
| MDL 1570 Plaintiffs' Exec. Committee for Commercial Claims | MDL 1570 Plaintiffs' Exec. Committee for Personal Injury and Death Claims |

KREINDLER & KREINDLER

 /s/ Steven R. Pounian, Esquire
Steven R. Pounian, Esquire
Andrew J. Maloney, Esquire
750 Third Avenue, 32nd Floor
New York, NY 10017

MDL 1570 Plaintiffs' Exec. Committee
for Personal Injury and Death Claims

cc:  All Counsel via ECF