UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to*:
Ashton et al. v. al Qaeda Islamic Army, et al., 02-cv-6977 (GBD)(SN)

**Ashton Plaintiffs' Objections to Reports and Recommendations Regarding Non-Immediate Family Members (ECF Nos. 5387 and 5701)**

The *Ashton* Plaintiffs respectfully submit the following Fed.R.Civ.P. 72(b) objections, pursuant to 28 U.S.C. § 636(b)(1), to Magistrate Judge Netburn's Reports and Recommendations regarding solatium damages to certain non-immediate family members of victims killed on September 11, 2001 in the terrorist attacks. ECF Nos. 5387 and 5701.  For the following reasons, certain *Ashton* plaintiffs that Magistrate Judge Netburn recommended not receive solatium awards did, in fact, have the necessary "functional equivalent" to a biological relationship warranting a final judgment of damages.  Upon a *de novo* review, this Court should grant the plaintiffs discussed herein damages at the amounts set forth below.

1. **Legal Standard**

When a party files objections to a report and recommendation, a district court must make a *de novo* determination as to those portions of the report to which objections are made. *See* 28 U. S. C.§ 636(b)(l)(C); *Rivera v. Barnhart,* 423 F. Supp. 2d 271,273 (S.D.N.Y. 2006). The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). The court must "arrive at its own, independent conclusion" regarding those portions of the report to which objections were

1

made. *Nelson v. Smith,* 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 2005) (quoting *Hernandez v. Estelle,* 711 F.2d 619,620 (5th Cir. 1983)).

## 2. Governing Framework Applied to Non-Immediate Family Members

As a general matter, "only spouses, parents, siblings, and children are entitled to recover" solatium damages asserted in a Foreign Sovereign Immunities Act (FSIA) action. *Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379 (D.D.C. 2015); *see also Owens v. Republic of Sudan,* 864 F.3d 751, 807 (D.C. Cir. 2017) ("[N]ot every person who experiences emotional distress from a major terrorist attack – a universe that could be large indeed-can state a claim for [intentional infliction of emotional distress] absent some close relationship to a victim who was injured or killed.")  Courts, including in this multi-district litigation, have, however, recognized an exception to the "immediate family member" requirement and have awarded solatium damages to plaintiffs who the courts have found to be the "functional equivalent" of immediate family members of the deceased victims. *See* ECF No. 3795 (adopting ECF No. 3676 and establishing non-immediate family member framework); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 79 (D.D.C. 2010); *Estate of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 29 (D.D.C. 2009); *Knox v. Palestinian Authority,* 442 F. Supp. 2d 62 (S.D.N.Y. 2006); *Smith v. Islamic Emirate of Afghanistan,* 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003).

In this case, the Court has established several general factors that determine whether non-immediate family members are entitled to recover solatium damages arising out of the murder of their loved ones on September 11, 2001.

- "The first factor is long-term residence or co-habitation in the decedent's household." ECF No. 3676 at 7.

- "The second factor … [for] a non-immediate family member in the parent or child role is whether the non-immediate family member ever played a guardian or custodian-like role in the decedent's life (or, vice versa, whether the decedent played

such a role in the life of the family member." *Id.* at 7 – 8.  That is, "whether the stepparent emotionally, financially, and socially treated their stepchild as equivalent to a biological child." *Id.* at 8.  Legal guardianship is not "dispositive" to this analysis. *Id.*  Instead, important considerations are "the length of the alleged guardian- or custodian-like relationship and the number of years the functional equivalent to a child was a minor living in the claimant's home." *Id.*

- "The third factor" in the parent-child role analysis "is whether the biological family member was absent in the family life." *Id.*

When discussing specific classes of individual plaintiffs, the Court stated that as for aunts, uncles, nieces and nephews, such relatives were not "per se" or "categorically" barred from seeking solatium damages. *Id.* at 9.  While "overwhelming evidence that the family member in question … was adopted by the decedent (in the case of nephews or nieces)" was necessary, the Court was clear that the functional-equivalent determination did not "require a legal adoption as a per se requirement to recover solatium damages" and that "the legal relationship between the parties" was not "dispositive." *Id.*  Thus, the Court would "not require a legal custodianship relationship … as a sine qua non of demonstrating functional equivalence for these categories of plaintiffs," though "only in the rarest cases will such a plaintiff be able to demonstrate functional equivalence absent one." *Id.* at 10.  Such a showing could be made "where both biological parents were wholly absent from the decedent's life, such that the relevant individual fulfilled the entirety of the parental role," but the Court stated that it would not extend this to "more ambiguous cases." *Id.*

As for stepparents and stepchildren, the Court set forth certain critical dates that would weigh on the entitlement to solatium damages:

- "Stepparents … who became part of the family when the decedent was in early childhood (roughly until the age of eight) may be deemed fully functional equivalent to biological parents … and would be entitled to full solatium damages, and stepchildren who were in the same range when the decedent became part of their family would be deemed fully equivalent to biological children. Stepparents … who became part of the family when the decedent had

3

passed early childhood but was still living in the family home (ages nine and above) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent became part of the family would receive half damages as well. Stepparents ... who became part of the decedent's family when the decedent had nearly finished his secondary education would likely not be deemed functional equivalents of immediate family members and would not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family." *Id.* at 13.

- The Court also added a requirement that the step-relative and the victim must have "continuously cohabited ... for a significant period of time prior to the date the claimant (for stepchild claims) ... turned 18 and attained the age of majority. This period of time is presumptively at least two years." *Id.*

### 3. Application of Framework to Specific Cases

With that framework established and operative here, the following *Ashton* plaintiffs should be entitled to receive solatium damages in the amounts set forth below.

### A. *Plaintiff Julian Perez (Nephew of 9/11 Victim Marlyn Carmen Garcia)*
   **Presumptive Award: $8,500,000.00**
   **Requested Award: $8,500,000.00**

Julian Perez never knew his biological father and was largely abandoned by his biological mother. ECF No. 4719-2 at 16. From the time that Julian was born, Marlyn was more involved in his life than was his biological mother. *Id.* Marlyn would take Julian for overnight stays in her parents' home (his grandparents') from the time that he was an infant. *Id.* From the time he was seven years old, Julian was primarily living with Marlyn, who was responsible for preparing Julian's meals and for putting him to bed. *Id.* Marlyn took Julian to school, supervised his homework and made him dinner each day. *Id.* at 17. She took part-time jobs while still in school in order to purchase Julian clothes and toys, to buy him food and to take him "on adventures." *Id.* at 16. Not only was Marlyn the primary source of financial and domestic support for Julian, she also instilled in him his religious faith and a commitment to social justice. *Id.*

4

This was not merely a case of a special relationship – rather, Marlyn stepped into the role of parent that neither Julian's biological father nor mother could fulfill.  This is demonstrated by Marlyn's declaration of Julian as a dependent on her tax forms and the efforts that she went through to become Julian's legal parent. *Id.* at 17.  Julian's biological mother had no objection to the legal formalization of the relationship that Marlyn had with Julian, even if it would be the final step in eliminating any parental role that she might have had with her biological son. *Id.* Julian and his other family members recognized that Marlyn was, in essence, "both mother and father" to him. *Id.*

That Marlyn was, essentially, a parent to Julian was recognized by the September 11, 2001 Victims Compensation Fund, which awarded both a non-economic dependency award to Julian (typically limited to spouses and dependent children) and awarded him twenty-five percent of the economic damages award.  This fact should weigh strongly in favor of recognizing (just as the Victims Compensation Fund did), that Julian was, for all intents and purposes, a dependent child of Marlyn's and that he, like the other thousands of children who lost their parents on September 11, 2001, suffered the same emotional anguish and terror of those children whose primary parental figure was lost that day.

These unique and compelling circumstances are unambiguous – Marlyn was Julian's parent in all but name – and meet the Court's standard for recovery of solatium damages.

B. ***Plaintiff Mariano D'Alessandro (Nephew of 9/11 Victim Rocco Nino Gargano*)**
   **Presumptive Award: $8,500,000.00**
   **Requested Award: $8,500,000.00**

From the tender age of six years old, Rocco Gargano was the only father that Mariano D'Alessandro knew. *See* ECF 4719-2 at 7.  Mariano's father was incarcerated and that same year Rocco, Mariano's uncle, moved into the family home. *Id.*  Rocco immediately took on the role of father, treating Mariano as his own biological son.  Rocco provided for Mariano emotionally and

financially. *Id.* He was Mariano's champion at school, on the soccer field and at home. *Id.* Mariano had no other father from the time he was six years old and after Rocco was murdered on September 11, 2001, he lost a second father. *Id.*

Recognizing the strength of the relationship between Rocco and Mariano, the September 11th Victim Compensation Fund issued an award to Mariano, which is further proof of the financial, social and emotional dependency that Mariano had on Rocco. This was not merely a special uncle-nephew relationship but was, instead, the functional equivalent of a child-parent relationship. Though Rocco did not adopt Mariano formally, by cohabiting with him from his youth, taking on all of the roles of the absent biological parent and even wearing the title of "father" to Mariano, Rocco was, in essence, that rare case of an uncle functioning as a parent. Under the unique circumstances here, with a wholly absent biological father, continuous cohabitation from a tender age and the substantial dependence between the victim and nephew, Mariano D'Alessandro is entitled to a recovery for the solatium losses he suffered following his uncle's death.

C. ***Plaintiff Aaron Pagan (Nephew of 9/11 Victim Angela Rosario)***
   **Presumptive Award: $8,500,000.00**
   **Requested Award: $8,500,000.00**

From the time of his birth, Aaron Pagan cohabitated with, among others, his aunt (and godmother) Angela Rosario. ECF No. 4719-2 at 13. Aaron's biological father was absent from his life and that void was filled by Angela who was, essentially, a second parent to Aaron. *Id.* Angela provided financial support for the household and critical emotional support for Aaron. *Id.* She picked him up from school, played sports with him, supervised his homework and took him on vacations. *Id.* When her employer had child-friendly company events, Angela brought Aaron; she bought him clothing and gifts; she took him to the circus and to movies. Angela "stepped in and filled the role of a second parent for" Aaron. *Id.* Angela played that parental role for Aaron

from his birth in 1992 until Angela's death on September 11, 2001 and she did it with complete dedication, commitment, loyalty and love.  Because Angela was the functional equivalent of a parent to Aaron, cohabitating with him from his birth until her death, Aaron is entitled to a solatium damages award in this case.

### D. *Plaintiff Maxwell Sivin (Stepchild of 9/11 Victim Joel Miller)*
   **Presumptive Award: $8,500,000.00**
   **Requested Award: $4,250,000.00**

Maxwell Sivin's parents separated when he was around 13 years old and from the time that Maxwell was around 15 years old, his mother and Joel Miller married. ECF No. 5429-2 at 6. At nearly the same time, Maxwell's biological father died and from then on, Joel Miller was the only father that Maxwell had. *Id*.  While the family did not begin cohabitating immediately, Joel was emotionally and functionally Maxwell's father from the time he was 15 years old. *Id.*  Then, starting from when Maxwell was about 17 years old for the next five years, until September 11, 2001, Maxwell and Joel lived together. *Id.*  Joel Miller guided Maxwell Sivin through high school, college and law school. *Id.*  He modified his estate planning so that Maxwell and Maxwell's biological brother Justin would each share equally in any estate distribution along with his biological son. *Id.*  Joel was involved in every daily activity of Maxwell's life from the time that Maxwell first met him until Joel's death. *Id.*  Joel went to every track and field meet that Maxwell had; they vacationed together every year; and he celebrated all major milestones with Maxwell. *Id.* at 7.

The Magistrate Court previously found that the nature of the relationship that Joel Miller had with his stepson Justin Sivin, Maxwell's biological brother, warranted a solatium damages award of $4,250,000. ECF No. 5701 at 8.  That Justin was two years younger than Maxwell, and thus resided in the same household as Joel for the threshold two-year period before turning 18

7

years old set forth in the Court's framework for stepchildren plaintiffs, divides the two plaintiffs (Maxwell and Justin) in an arbitrary and irrational way. Maxwell's anguish and grief is not diminished because of the five years that he cohabitated with Joel only one of those was before he turned 18 years old. Nor should this distinguish Maxwell's solatium losses from Justin's, who cohabitated with Joel for the same total amount of time as Maxwell. Joel Miller came into Maxwell's life when he was around 13 years old, officially became his stepfather when Maxwell was 15 years old, was the only father Maxwell had following his biological father's heart attack, and was a constant and daily presence in Maxwell's life, including five years of cohabitation, until September 11, 2001. Maxwell, just like his biological brother Justin, should be awarded half of the presumptive solatium damages awarded to children of those victims murdered on September 11, 2001, which is $4,250,000.00.

### 4.  Prejudgment Interest

As in prior applications, the *Ashton* plaintiffs ask that this Court direct that prejudgment interest of 4.96% on any solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New York be assessed, as was done previously in the prior *Ashton* applications, as well as for other plaintiffs in this consolidated litigation.

### 5.  Conclusion

For the reasons set forth herein, under the Court's previously established framework and the facts in each of these cases, the *Ashton* plaintiffs respectfully object to the Reports and Recommendations as to the above plaintiffs ask that this Court grant an Order that will (1) award them solatium damages as described above and (2) direct that prejudgment interest of 4.96% on the solatium awards running from September 11, 2001 until the date of judgment be assessed.

Dated: New York, New York
March 9, 2020

Respectfully submitted,

KREINDLER & KREINDLER LLP

BY: /s/ Megan W. Benett

750 Third Avenue, 32nd Floor
New York, New York 10017
Tel: (212) 687-8181
mbenett@kreindler.com
COUNSEL FOR *ASHTON* PLAINTIFFS