# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to All Actions*

## DECLARATION OF CATHERINE MANNHERZ HUNT

I, Catherine M. Hunt, being duly sworn, declare and state as follows:

1. My full name is Catherine Mannherz Hunt. I am a former Special Agent of the Federal Bureau of Investigation ("FBI"). In 1996, I completed the 4 month Special Agent training at the FBI Academy in Quantico, Virginia. As a Special Agent I was assigned to the Foreign Counterintelligence program in the Los Angeles and San Francisco Divisions of the FBI working "country threat" matters. For approximately 5 years from 1996 through 2001, I successfully conducted investigations on foreign counterintelligence targets and participated in several espionage investigations that led to prosecutions.

2. I was assigned to the San Francisco FBI Joint Terrorism Taskforce (JTTF) in 2002 where I worked on multiple domestic and international terrorism investigations. I was appointed the Hate Crimes Coordinator on the JTTF managing and investigating federal hate crime violations for the division and expanding the FBI's official liaison capacity within various ethnic communities. Due to the increase in hate crimes after the terrorist attack on September 11, 2001, I was designated to fill a newly created position as the Point-of-Contact for the Arab, Muslim, and Sikh communities.

1

3. While assigned to the San Francisco Division's JTTF, I was asked by the FBI's International Operations Unit at FBI Headquarters to serve as the Acting Legal Attaché (LEGAT) at the U.S. Embassy in Cairo, Egypt. During 2002 and 2003, I served two tours at that Embassy where I was responsible for FBI/DOJ and related law enforcement affairs. As a member of the Embassy's Country Team, I attended meetings and regularly briefed and advised the Ambassador and Deputy Chief of Mission on sensitive criminal and intelligence matters.

4. As Acting LEGAT Cairo, I traveled to other countries in North East Africa to conduct investigations on terrorism, intelligence, and criminal cases. I personally investigated matters involving international terrorism, involuntary servitude, human trafficking, theft of antiquities, and international child custody disputes. I participated in U.S.-Egypt bilateral discussions on judicial and extradition procedures and established formal communication channels for the LEGAT Office. Upon my return to the San Francisco Division, I received a letter of commendation from then U.S. Ambassador C. David Welch for my work in Egypt.

5. In late 2004, I was directly appointed by FBI Director Robert Mueller to serve as the Assistant Legal Attaché at the newly formed U.S. Embassy in Baghdad, Iraq. To develop the capacity of the LEGAT Baghdad office, I initiated and cultivated relationships with Iraqi elements of the Coalition Provisional Authority (Iraq's transitional government), other U.S. Government agencies, the U.S. Military, and members of the Multi-National Force-Iraq. I regularly met personally with the Iraqi Interior Minister to solidify and enhance FBI and Iraqi law enforcement cooperation and intelligence exchanges.

6. I personally briefed Attorney General Gonzalez on FBI operations in Iraq and maintained regular communication with the U.S. Ambassador, the Deputy Chief of Mission, other U.S. agencies and Flag Officers of the Multi-National Force-Iraq. I established the FBI's

LEGAT office at the U.S. Embassy-Baghdad and supervised FBI Special Agents and support personnel assigned to that office.

7. During my 17 months in Iraq, I conducted investigations of kidnapped U.S. citizens and other foreign nationals in Iraq. I interviewed and interrogated numerous insurgents and foreign fighters with known or suspected membership in al Qaeda, Ansar al-Islam, and the Iraq insurgency. I received the FBI Campaign Support Medal for my successful work in a war zone.

8. I am personally familiar with and have employed a wide variety of techniques in counterterrorism, counterintelligence, and law enforcement investigations, including but not limited to: the execution of search warrants; Title III wiretap and FISA court-authorized interception on telephones and interiors of rooms and vehicles; undercover work; the use of confidential informants; surveillance; extraction of information from computers and cell phones including the analysis of phone records, banking records, money transfers, travel documents, internet and social media, books and periodicals utilized by targets; tracking targets and photographing and/or videotaping them and their associates; and forensic review of physical evidence, including but not limited to documents, bomb making material and weapons possession.

9. In 2006, I left the FBI to move to Florida to work as a consultant to private industry and defense contractors, providing investigative and intelligence training and other related advice. I also attended the University of South Florida where I received a master's degree in clinical social work to provide psychotherapy and counseling to military veterans with PTSD, first responders, and other victims of trauma.

10. I was retained in this matter as a Consultant by the law firm of Kreindler & Kreindler LLP. I have reviewed many documents concerning the 9/11 attacks, including the following:

- the Congressional Joint Inquiry Report;

- the 9/11 Commission Report and supporting documents;

- the 9/11 Review Commission Report of 2015;

- 2012 FBI Summary Report;

- the Opinion of this Court dated March 28, 2018 that denied the motion to dismiss brought by the Kingdom of Saudi Arabia ("KSA");

- discovery documents obtained during the course of the litigation by the Plaintiffs' Executive Committees ("PECs");

- the subpoena and "Touhy" letter served by the PECs on the FBI and correspondence between the PECs and the DOJ regarding the subpoena and letter; and

- other documents, including U.S. government documents released under FOIA or otherwise declassified, court records, open source documents, and public information databases.

11. Together with document review, I am conducting an investigation of the events that took place in Southern California regarding the 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar in the year 2000. I have interviewed numerous civilian witnesses, along with current and former law enforcement and intelligence personnel with knowledge relevant to the 9/11 investigation. I have made multiple trips to Southern California investigating the community surrounding the King Fahad Mosque in Culver City, California where the Kingdom of Saudi Arabia posted Fahad al-Thumairy as an accredited diplomat and representative of the Kingdom's Ministry of Islamic Affairs, and where al-Thumairy served as an Imam at the King Fahad Mosque. I investigated the nearby Mediterranean Gourmet Restaurant (since replaced by

4

another restaurant), where Saudi employee Omar al-Bayoumi met with the two hijackers on February 1, 2000. I canvassed apartment complexes in the vicinity of that mosque and restaurant. I also spent significant time in the neighborhoods where the hijackers lived in San Diego and visited various locations (such as the Islamic Center of San Diego and the Masjid Al-Rribat of San Diego) frequented by the hijackers, as well as other locations in Southern California.

12. Following the 9/11 attacks, as is now widely known, the FBI quickly learned that hijackers al-Hazmi and al-Mihdhar entered the United States in 2000, arriving in Los Angeles on January 15, 2000, staying there for approximately two weeks. They then moved to San Diego, where al-Mihdhar lived until mid-June 2000 and al-Hazmi until December 2000, when he was picked up by a third hijacker, Hani Hanjour, and taken to Arizona.

13. The public documents from the official government investigations of the 9/11 attacks contain practically no information concerning the two hijackers' activities during their first two weeks in the Los Angeles area. For example, the 9/11 Commission Report states that while the hijackers first arrived in Los Angeles on January 15, 2000, "[w]e do not pick up their trail until February 1, 2000." I made that two-week period a particular focus of my investigation. Reports indicate that the hijackers were unable to read or understand English and had no familiarity with the United States. Therefore, it would follow that advance preparations were made to provide assistance so that the hijackers could become safely established inside the United States and proceed with their plans.

14. Based on my investigation, as described herein, I have assembled a list of documents in the possession of the FBI that are relevant to the discovery ordered by this Court at pages 18-23 of its March 28, 2018 opinion and responsive to the plaintiffs' subpoena. Those

documents are addressed below, and a more detailed document list is attached as Appendix 1. To be clear, the document list attached as Appendix 1 is by no means intended to present an exhaustive list of all relevant records in the possession of the FBI that are responsive to plaintiffs' subpoena, but rather identifies records relating to my investigative findings discussed herein. I am confident that the FBI is in possession of additional relevant and responsive records beyond those I have been able to identify thus far.

15. Under FBI procedures, all investigation is documented in some form and placed into a file. Certain documents that provide summaries and/or outline the facts and progress of an investigation are routinely placed in a case file as well. These include:

- subject and witness interview forms known as FD-302s;
- summary, synopsis and case review documents, reports, and electronic communications ("ECs") providing the status of the investigation; and
- travel authorization forms and ECs, that describe the case status and justify travel for witness interviews and investigation.

16. The 2012 FBI Summary Report states that Saudi diplomat al-Thumairy was "the Imam at the King Fahad Mosque near Los Angeles when al-Hazmi and al-Mihdhar first arrived in the United States . . ." and that "Thumairy immediately assigned an individual to take care of them during their time in the Los Angeles area." The name of the individual assigned by al-Thumairy to take care of the hijackers during their time in the Los Angeles area is concealed in the redacted version of the 2012 FBI Summary Report. The FBI must have witness interview forms and documents concerning that individual.

17. During my investigation, I identified one individual who could be the person referenced in the 2012 FBI Summary Report who "Thumairy immediately assigned…to take care of [the hijackers]." His name is Mohamed Johar.

6

18. I located Mr. Johar and arranged an interview with him on August 9, 2018. Mr. Johar's attorney was present throughout the interview. Mr. Johar told me that he had been interviewed by the FBI on multiple occasions in 2007, 2010, and 2016. He told me that in 2007, the FBI flew him to Los Angeles to point out specific locations of interest, such as the restaurant where al-Hazmi and al-Mihdhar met with al-Bayoumi. During the interview Mr. Johar's attorney stated "surely you have access to the interviews" and "you can get this information from the FBI." Mr. Johar stated, "I'm not hiding . . . . I told the FBI." The FBI should have interview FD-302s, ECs, travel authorizations, and a subject case file concerning Mr. Johar.

19. During our interview, Mr. Johar told me that he was a frequent attendee at the King Fahad Mosque. He confirmed that in January 2000, he met al-Hazmi and al-Mihdhar and personally witnessed al-Thumairy have contact with al-Hazmi and al-Mihdhar at the King Fahad Mosque and that the four of them had a conversation. Mr. Johar said he saw al-Hazmi and al-Mihdhar attend the Mosque on multiple occasions.

20. Mr. Johar told me that he had been subpoenaed by a New York Grand Jury in late 2015 or early 2016 with a scheduled date to appear in February 2016. The Grand Jury subpoena involved the 9/11 related investigation of an employee of Saudi Arabia working at its Los Angeles Consulate named Smail Mana aka Ismail Mana. Mr. Johar explained that his mother was friends with Mr. Mana's wife through a relationship they formed at the King Fahad Mosque. Mr. Johar said that he knew that Mr. Mana worked at the Los Angeles Consulate of Saudi Arabia and that Mr. Mana regularly spoke at the Mosque. Mr. Johar's attorney said, "You can get the information from the prosecution of Smail Mana - those documents are public information - surely you must have them."

21.  I located and met briefly with Mr. Mana on September 1, 2018. He immediately referred me to his lawyer. I had a telephone conversation with Mr. Mana's lawyer on September 4, 2018, who confirmed that Mr. Mana had been served with a Grand Jury subpoena. This information corroborates the information provided by Mr. Johar's attorney and indicates that there must have been a FBI investigation regarding Mr. Mana. The service of Grand Jury subpoenas on Mr. Johar and Mr. Mana indicate that the investigation was not classified.

22.  The name "Ismail Mana" was raised by the 9/11 Commission during its October 2003 interview of al-Bayoumi regarding al-Bayoumi's support of Nawaf al-Hazmi and Khalid al-Mihdhar. My investigation determined that Mr. Mana worked at the Los Angeles Consulate of Saudi Arabia located at 2045 Sawtelle Boulevard in Los Angeles and that Mr. Mana also lectured at the King Fahad Mosque.

23.  The second paragraph on page 2 of the October 2012 FBI Summary Report explains that a lead was sent to JTTF Los Angeles in August 2012 seeking confirmation of two possible addresses for

> REDACTED individual who was known to have extremist views and was identified as having met with Omar al Bayoumi in private on the same day as Bayoumi's alleged "chance" first meeting with 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.

That paragraph also states that the FBI planned to interview REDACTED regarding his role "aiding Bayoumi in facilitating the hijacker's arrival and settlement in California, for which REDACTED has never provided adequate explanation." The name "Thumairy" is not redacted throughout the 2012 FBI Summary Report and Thumairy last visited the U.S. in May 2003 and therefore, had no current address in the Los Angeles Division at the time the lead was sent. I believe Smail Mana is the individual referenced in the paragraph and that the FBI has evidence that he met with al-Bayoumi at Saudi Arabia's Los Angeles Consulate on February 1, 2000, just

8

prior to the meeting of al-Bayoumi with the hijackers at the Mediterranean restaurant. The FBI undoubtedly has documents concerning his relevance to the 9/11 investigation. The FBI must have FD-302s, ECs, and a subject case file concerning Mr. Mana.

24. During my interview of Mr. Johar and his attorney, Mr. Johar also identified two other individuals as having contact with al-Hazmi and al-Mihdhar: Mohdar Abdullah and an acquaintance of Mr. Johar's named Akram Alzamari.

25. The 2012 FBI Summary Report states that Saudi government employee al-Bayoumi "assigned two individuals to care for them [the hijackers], one of whom was Mohdar Abdullah." The 9/11 Review Commission Report of 2015 states that Mohdar Abdullah was interviewed by the FBI not only "on several occasions prior to the 9/11 Commission's 2004 report" but again in 2007 and 2008, and also 2011. According to the 2012 FBI Summary Report, Mr. Abdullah was deported from the U.S. in 2004. Therefore, the 2007, 2008, and 2011 interviews likely occurred overseas. As a result, the FBI should have FD-302s and EC reporting documenting the interviews with Mr. Abdullah and travel authorization forms which summarize justification for travel to interview Mr. Abdullah. FBI documents show that case file 315N-SD-64663 was opened with Mohdar Abdullah as the subject. This case file number was later changed to 415F-SD-64663.

26. I located and met with Mr. Johar's acquaintance, Mr. Alzamari. He said that he had spoken to "whoever investigates these things," including "the FBI" and other government officials. He said that he had "told the FBI everything…it's all in there…I'm sure you have read it." During our conversation, he described the nature of the relationship between the King Fahad Mosque, the Saudi Consulate, and the Ministry of Islamic Affairs. Mr. Alzamari stated that he viewed himself as a close associate and friend of al-Thumairy. He refused to speak with me

9

about his interactions with Mohamed Johar, al-Hazmi and al-Mihdhar. He stated, "talking about them makes me feel bad." He would not answer questions about any connections between al-Thumairy, al-Hazmi, and al-Mihdhar. The FBI should have interview FD-302s and ECs regarding their interviews of Akram Alzamari and a subject case file on Akram Alzamari.

27. The 2012 FBI Summary Report states that Omar al-Bayoumi assigned a second individual (other than Mohdar Abdullah) to care for the hijackers. That individual is not named in the 2012 FBI Summary Report. The FBI must have witness interview FD-302s, ECs, and/or other documents concerning that second individual.

28. The 2012 FBI Summary Report states that the FBI travelled to London in June 2012 to obtain evidence seized in New Scotland Yard's 2001 searches of al-Bayoumi's residences and offices. The FBI should have the documents obtained in the search together with reports concerning the review and analysis of those documents performed by the FBI.

29. The FBI's PENTTBOM case was opened on September 11, 2001 under case number 265A-NY-280350. The number was later changed to 415A-NY-280350. I found that after the conclusion of the work of the 9/11 Commission in 2004, FBI headquarters closed case number 415A-NY-280350.

30. Although the case number 415A-NY-280350 was closed, according to the 9/11 Review Commission Report of 2015, work continued on other cases related to the 9/11 attacks. These investigations involve various subjects and specific areas of investigation directly relevant to the discovery matters currently at issue in the plaintiffs' cases.

31. According to the 9/11 Review Commission Report of 2015, the FBI opened the so-called PENTTBOM "subfile" case in 2007. The 2012 FBI Summary Report also references the subfile and states that the "subfile" was an investigation into Saudi government officials -

including Fahad al-Thumairy and Omar al-Bayoumi, and additional person(s) whose names are redacted - known to have provided "substantial assistance" to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar during their time in California.

32. Key documents regarding the FBI's investigation of al-Thumairy and al-Bayoumi should have been copied to the "subfile" investigation. Key documents regarding the FBI's investigation of Mohamed Johar, Smail Mana, Mohdar Abdullah, and Akram Alzamari would also have been copied to the FBI's PENTTBOM subfile.

33. The 2012 FBI Summary Report states that subjects of the subfile case investigation, who provided "substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar during their time in California . . . include Fahad al-Thumairy, Omar Ahmed al-Bayoumi, REDACTED NAME(S)." That report also states that "[t]here is evidence that REDACTED NAME(S) and tasked al-Thumairy and al-Bayoumi with assisting the hijackers." The FBI would likely have documents concerning the name(s) of redacted subject(s)—those individuals who tasked al-Thumairy—and the basis for investigating those subject(s). Those documents include the 2012 Report itself, without redactions.

34. My investigation has determined that, in addition to al-Thumairy, al-Bayoumi, and Smail Mana, there are at least six other individuals employed by the Saudi government who the FBI investigated in relation to the 9/11 attacks. All of those individuals worked with al-Thumairy and/or al-Bayoumi. The names of those persons are:

- Abdullah al-Jraithen
- Khalid al-Sowailem
- Musaed Ahmed al-Jarrah
- Adel Mohamed al-Sadhan
- Mutaeb Abdelaziz al-Sudairy
- Omar Abdi Mohamed

11

35.     FBI reports show that Abdullah al-Jraithen arrived in Los Angeles in December 1999. Al-Jraithen and Omar al-Bayoumi both checked into the Travelodge Motel on December 20, 1999. The Travelodge Motel is located one block from the King Fahad Mosque. Subsequent investigation showed that Abdullah al-Jraithen was an employee of the Saudi Ministry of Islamic Affairs and a teacher at the Imam Muhammad Ibn Saud Islamic University in Riyadh, Saudi Arabia. According to al-Bayoumi's toll records, there were numerous telephone calls between al-Bayoumi and officials of the Saudi government after his stay with al-Jraithen at the Travelodge. FBI reports show that the relevant information related to these phone calls is contained in FBI document 265A-NY-280350-SD serial 3332.

36.     That same FBI document contains information that al-Bayoumi made thirty calls to (202) 342-3700 from January 19 to March 24, 2000. Saudi government letterhead lists that phone number as belonging to the Ministry of Islamic Affairs office at the Saudi Embassy in Washington, D.C., headed by Khalid al-Sowailem. Prior to 9/11, al-Sowailem held a more senior position in the Ministry of Islamic Affairs' offices in the United States than that of Fahad al-Thumairy. The FBI document also shows al-Bayoumi called a second number, (202) 494-2777, used by al-Sowailem. The calls to these numbers, as well as to other numbers affiliated with the Saudi government (including Fahad al-Thumairy), took place from December 1999 – March 2000. This is the timeframe in which al-Bayoumi and others would have been making preparations for the arrival of al-Hazmi and al-Mihdhar in Los Angeles and then hosting and arranging assistance for them in San Diego.

37.     Another Saudi official whose name surfaces in 9/11 investigation documents is Musaed Ahmed al-Jarrah. In 1999-2000, al-Jarrah was serving as a Saudi Embassy official in Washington D.C., and was responsible for the placement of Ministry of Islamic Affairs

employees known as guides and propagators posted to the United States, including Fahad al-Thumairy. The FBI believed that al-Jarrah was "supporting" and "maintaining" al-Thumairy during the 9/11 investigation.

38. Given the fact that al-Jraithen, al-Sowailem, and al-Jarrah were Saudi officials holding positions of higher seniority than al-Thumairy within the Ministry of Islamic Affairs and/or Saudi diplomatic missions in the United States, and that they were actively investigated by the FBI, it is reasonable to conclude that one or more of them were subjects of the subfile investigation. Therefore, it is likely that the FBI is in possession of evidence that they were involved in working with al-Thumairy and al-Bayoumi to assist the hijackers. The FBI must have documentation of their investigation of al-Jraithen, al-Sowailem, and al-Jarrah in the PENTTBOM subfile as well as within the broader PENTTBOM files. The FBI may also have individual subject case files on these individuals.

39. The March 2015 report of the 9/11 Review Commission states that Omar al-Bayoumi "[a]ssisted al-Hazmi and al-Mihdhar as well as al-Sadhan and al-Sudairy during their respective times in San Diego." My investigation determined that Adel Mohamed al-Sadhan and Mutaeb Abdelaziz al-Sudairy were Saudi government employees of the Ministry of Islamic Affairs during this period. I learned that al-Sadhan and al-Sudairy were visiting scholars at the El Cajon Mosque in San Diego where al-Bayoumi served as an officer. I also learned that arrangements were made at the El Cajon Mosque for al-Sadhan and al-Sudairy to stay at the same five-room San Diego boarding house where hijackers al-Hazmi and al-Mihdhar lived. The FBI must have documentation of investigation conducted on al-Sadhan and al-Sudairy in the PENTTBOM subfile and the FBI would have opened individual subject case files regarding al-Sadhan and al-Sudairy.

13

40. Saudi government documents seized by the FBI in 2004 in a raid on the home of Omar Abdi Mohamed show that he was illegally working for Saudi Arabia in San Diego from 1995 to 2004 and was a "propagator" for Saudi Arabia's Ministry of Islamic Affairs in San Diego under the direct control of al-Sowailem and al-Thumairy. The Saudi government documents as well as documents filed by the U.S. Government in the criminal and immigration cases against Mohamed show that, for the period from 1998 to 2001, Mohamed was found to have been involved in money laundering for charities closely associated with al Qaeda. U.S. Government documents state that Mohamed was "specifically tasked by the Saudi Arabian government in intelligence gathering mission in his employment as a propagator for that government." Mohamed was a subject of investigations by the FBI and the 9/11 Commission. Court documents in Mohamed's immigration case state that the government decided not to pursue further prosecutions of Mohamed "for diplomatic reasons," presumably based on his work for Saudi Arabia. The majority of documents held by the FBI and the 9/11 Commission regarding Mohamed remain classified. As the investigation of Mohamed found that he was working under the supervision of al-Sowailem and al-Thumairy, the investigative materials in the possession of the FBI relating to Mohamed are likely to contain information concerning the nature and scope of al-Sowailem's and al-Thumairy's work for the Saudi government.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Executed on September 26, 2018

*Catherine M. Hunt*

Catherine M. Hunt

14

# APPENDIX 1

## **FBI Document List**

1. Unredacted copy of the 2012 FBI Summary Report

2. For the "subfile" case:

   a. FBI summary, synopsis and file review documents setting forth the status of each case;
   b. travel authorization forms which state the reasons for travel;
   c. witness interviews;
   d. documents containing the names of each subject, including al-Thumairy and al-Bayoumi, and the basis to proceed with an investigation of each subject; and
   e. documents concerning any contact between each subject, including al-Thumairy and al-Bayoumi and one or both of the two hijackers, *i.e.* al-Hazmi and al-Mihdhar.

3. For the cases opened for subjects al-Thumairy, al-Bayoumi, Mohdar Abdullah (315N-SD-64663), Mohamed Johar, Smail Mana aka Ismail Mana, and Akram Alzamari:

   a. FBI summary, synopsis and file review documents setting forth the status of each case;
   b. travel authorization forms which state the reasons for travel;
   c. witness interviews; and
   d. documents concerning any contact between the subject and al-Thumairy, al-Bayoumi and one or both of the two hijackers, *i.e.* al-Hazmi and al-Mihdhar.

4. For the PENTTBOM case, 265A-NY-280350 and 415A-NY-280350,

   a. Phone records of calls made by or to al-Bayoumi and al-Thumairy from December 1, 1999 through December 31, 2001; and
   b. 265A-NY-280350-SD serial 3332

5. For each of the eight Saudi government employees listed below, from the PENTTBOM case, 265A-NY-280350 and 415A-NY-280350, "subfile" case, and the cases opened for subjects al-Thumairy, al-Bayoumi, Mohdar Abdullah (315N-SD-64663), Mohamed Johar, Smail Mana, and Akram Alzamari:

   a. witness interviews of the employee;
   b. any witness interviews or summary, synopsis or file review documents mentioning the employee; and
   c. documents concerning any contact between the employee and al-Thumairy, al-Bayoumi or one or both of the two hijackers, *i.e.* al-Hazmi and al-Mihdhar.

      (1) Abdullah al-Jraithen

      (2) Khalid al-Sowailem
      (3) Musaed Ahmed al-Jarrah
      (4) Adel Mohamed al-Sadhan
      (5) Mutaeb Abdelaziz al-Sudairy
      (6) Smail Mana
      (7) Omar Abdi Mohamed
      (8) the person who "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."

6. For each of the five individuals listed below, from the PENTTBOM case, 265A-NY-280350 and 415A-NY-280350, "subfile" case, and the cases opened for subjects al-Thumairy, al-Bayoumi, Mohdar Abdullah (315N-SD-64663), Mohamed Johar, Smail Mana and Akram Alzamari:

   a. witness interviews of the individual;
   b. any witness interviews or summary, synopsis or file review documents mentioning the individual; and
   c. documents concerning any contact between any of the five individuals and al-Thumairy, al-Bayoumi or one or both of the two hijackers, *i.e.* al-Hazmi and al-Mihdhar.

       (1) Mohamed Johar
       (2) Akram Alzamari
       (3) the "individual" assigned by al-Thumairy "to take care of them [the hijackers] during their time in the Los Angeles area
       (4) the "individual" other than Mohdar Abdullah who was assigned by al-Bayoumi to "to care for them [the hijackers]"
       (5) the person who "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."

7. From any file, including but not limited to the PENTTBOM case, 265A-NY-280350 and 415A-NY-280350, "subfile" case, the cases opened for subject al-Thumairy, al-Bayoumi and Mohdar Abdullah (315N-SD-64663), al-Bayoumi files seized by New Scotland Yard, and reports and analysis of such files.