**SUBJECT TO FBI PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                         :

                                         :

In Re Terrorist Attacks on September 11, 2001    :      03 MDL 1570 (GBD)(SN)

                                         :

                                         :

-------------------------------------------------------------x

---

## DECLARATION OF BRIAN T. GILHOOLY
## FEDERAL BUREAU OF INVESTIGATION

---

      I, Brian T. Gilhooly, hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.   I am the Deputy Assistant Director, Operations Branch, Counterterrorism Division, Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"). I entered on duty with the FBI in 2002 and, prior to my present position, served in various positions at FBI Headquarters in Washington, D.C. and the FBI's San Francisco and San Diego field offices.

2.   The matters stated herein are based on information furnished to me in my official capacity by employees of the FBI, as well as on my background, training, and experience related to FBI policies and procedures and national security matters, my review and consideration of documents, and information available to me in my official capacity.

## PURPOSE OF THIS DECLARATION

3.   I submit this declaration in support of the FBI's response to Plaintiffs' second motion to compel dated January 15, 2020. In particular, this declaration addresses Plaintiffs' challenge to the method and scope of the FBI's searches for material responsive to the April 6, 2018

**SUBJECT TO FBI PROTECTIVE ORDER**

Touhy Request and subpoena (the "Touhy Request") and subsequent requests from Plaintiffs for documents and other materials.  I am also submitting a classified *in camera*, *ex parte* declaration regarding the FBI's searches in response to the Touhy Request, which provides additional information that cannot be included in an unclassified declaration.

4.     Through the exercise of my official duties, I have been advised of this civil action in which Plaintiffs, who are victims and families of victims of the terrorist attacks of September 11, 2001, or entities that sustained damage or losses as a result of the attacks, allege that Defendants provided material support to Osama bin Laden and to Al Qa'ida ("AQ"), a designated terrorist organization.  I have been advised that with regard to Defendant the Kingdom of Saudi Arabia (the "Kingdom" or "Saudi Arabia"), Plaintiffs allege that its agents and employees directly and knowingly assisted the hijackers and plotters who carried out the attacks.

5.     I am further aware that the Court authorized Plaintiffs to conduct limited and targeted jurisdictional discovery on the issue of whether and to what extent Saudi nationals Fahad al-Thumairy ("Thumairy") and Omar al-Bayoumi ("Bayoumi") and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Nawaf al Hazmi ("Hazmi"), Khalid al Mihdhar ("Mihdhar"), and other 9/11 hijackers.  I also am aware that Plaintiffs served the Touhy Request on the FBI.

6.     The Touhy Request sought a broad range of documents from or about FBI investigations relating to the September 11, 2001 terrorist attacks, at least two of which — the primary investigation into the attacks (the "PENTTBOM" investigation), and the "Subfile Investigation" focused on individuals who provided or may have provided substantial assistance to Hazmi and Mihdhar during their time in California prior to the attacks — are still

**SUBJECT TO FBI PROTECTIVE ORDER**

pending.  Of the ten items enumerated in the Touhy Request, four referenced specific

documents, and the FBI located, processed, and produced, with appropriate redactions, three

of those four documents.[1]  The remaining six items in the Touhy Request sought "[a]ny and

all" records in various categories.

## BACKGROUND ON THE PENTTBOM AND SUBFILE INVESTIGATIONS

7.    In response to the terrorist attacks on September 11, 2001, the President and the Attorney

General directed the FBI to conduct a nationwide investigation to identify and apprehend

individuals involved in the attacks and to prevent future acts of terrorism within the United

States.  That initial investigation, known as the PENTTBOM investigation, remains open.

8.    The publicly released report of the 9/11 Review Commission, dated March 2015,[2] notes

at page 101 the opening of a "subfile" within the PENTTBOM investigation in order to

"sharpen the focus on the lingering allegations that the circle of 9/11 conspirators may be

wider."  The 9/11 Review Commission report also refers at page 103 to the continuing work

of "the subfile team."   In the public declaration of Michael C. McGarrity previously submitted

in this case ("the Public McGarrity Declaration") (ECF No. 5142), then-Assistant Director

McGarrity used the term "Subfile Investigation" to refer to the subject matter of the FBI's

2012 Report, which was the subject of an assertion of the state secrets privilege in this case.

For purposes of this unclassified declaration, I will use the term "Subfile Investigaton" to refer

to the same matter.

---

[1] One of the specific documents requested was an FBI internal memorandum that described the status of the "subfile" investigation as of October 5, 2012 (the "2012 Report").  The FBI produced a redacted version of the 2012 Report, and some of the information withheld from that report is the subject of a separate motion to compel, which is currently pending before the Court.  *See* ECF Nos. 5127-28 (Plaintiffs' motion to compel) and 5140-44 (the FBI's opposition to the portion of the motion to compel pertaining to the 2012 Report).

[2] Found at https://www.fbi.gov/file-repository/final-9-11-review-commission-report-unclassified.pdf/view.

SUBJECT TO FBI PROTECTIVE ORDER

## BACKGROUND ON THE FBI'S SYSTEMS OF RECORDS

9.     As of September 11, 2001, the FBI's investigative case management system was known as the Automated Case Support System ("ACS").  Through ACS, FBI personnel could access the FBI's Central Records System ("CRS"), an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency, including the performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices and FBI Legal Attaché Offices ("Legats") worldwide.

10.   The PENTTBOM investigation was opened in ACS on or about September 11, 2001, and the New York Field Office was assigned as the "office of origin," meaning that it would be considered the lead field office for the investigation.  However, due to the extraordinary nature of the attacks and the broad directive to prevent future terrorist attacks, virtually every FBI field office in the United States and every overseas Legat was involved in the PENTTBOM investigation and maintained a hard copy PENTTBOM file relating to that office's PENTTBOM-related investigative activities.

11.   Reports of interviews and reports of other investigative work conducted at the various field offices and Legats would be uploaded into ACS by the offices that conducted the investigative activity; any documents that were uploaded became accessible to anyone in the FBI with access to ACS.  However, ACS system policy was to not upload documents originating outside the FBI, such as court records and business records (such as bank and phone records) obtained from third parties.  In addition, FBI field offices typically did not

SUBJECT TO FBI PROTECTIVE ORDER

upload paper documents originating with the FBI, such as handwritten interview notes and inventories and receipts regarding property seized during the execution of searches, into ACS.[3]  If the office that obtained or generated such documents needed to share them with another office, they were generally sent via the FBI (non-electronic) mail system or facsimile. Items obtained by the FBI offices that were considered potentially of evidentiary value generally were maintained at the field office that collected the item.[4]  Thus, unlike the typical FBI investigation, where the office of origin maintains all investigative file materials, many investigative file materials for the PENTTBOM case were, and still are, maintained in offices across the United States.

12.  The FBI replaced ACS with the FBI's current case management system, known as Sentinel, which became effective FBI-wide on July 1, 2012.  Sentinel uses a modern web-

---

[3]  As a general matter within the FBI, these types of materials are not considered part of the "main file" of an investigation, which consists of internal memoranda, reports of interviews, and other investigative reports.  Instead, these types of records are categorized and maintained as either:

- "1A" items, which are non-evidentiary items maintained with a case file that fit within a prescribed FBI "1A envelope."  Examples include interview notes, surveillance photos, phone and bank records (if not too bulky), and non-evidentiary media (*i.e.*, CDs, DVDs, or USB drives);

- "1B" items, which are physical evidence, including digital evidence, maintained in a prescribed evidence room, and which require the maintenance of a record of the chain of custody.  Examples include drugs, firearms and valuables;

- "1C" items, which are non-evidentiary items that are maintained with the case file but are too bulky to fit within a 1A envelope.  Examples include bank records, binders and portfolios; or

- "1D" items, which are electronic surveillance evidence ("ELSUR"), maintained in a prescribed ELSUR evidence room, and which require the maintenance of a record of the chain of custody.  Examples include recordings of consensual monitoring and recorded FBI interviews.

Although these records were not uploaded to ACS as individual, searchable documents, descriptions of the nature of these records (for example, "Toll records for (555) 555-5555") would be generally available and searchable. Because of this, any successful search for such records would be based upon the quality of the description in ACS of the 1A, 1B, 1C or 1D item.

[4]  However, during the preparation for the prosecution of Zacarias Moussaoui (roughly 2001–2006), and for the subsequent preparation for military commissions prosecutions (2007 to the present), many records and evidence items (1As, 1Bs, 1Cs and 1Ds) were sent from the 56 FBI field offices to the New York Field Office for use in the Moussaoui prosecution, or to the Counterterrorism Division for use in the military commissions prosecutions.

SUBJECT TO FBI PROTECTIVE ORDER

based application for entry, review, approval and search of case and intelligence information. Since July 1, 2012, FBI-generated electronic records have been created and stored electronically in case files via Sentinel.  In addition, after Sentinel became operational, digital scanners also became readily available throughout the FBI.  As a result, documents categorized as "1A" items are now routinely scanned and uploaded into Sentinel.  However, "1A" items that were put into the case file prior to the advent of Sentinel are generally available only in the field office case file, and have not been retroactively scanned and uploaded into Sentinel.

13.  I am advised that Plaintiffs and, in particular, a former FBI employee named Bassem Youssef, who has been retained by Plaintiffs and who has submitted declarations on behalf of Plaintiffs, have contended that all FBI records are stored electronically.  As described above, this is not accurate.  In response to the Touhy Request, the FBI has spent considerable time and effort searching for documents and things which are not stored electronically.  For example:

> *a.*  telephone toll records for ████████████████████████ were found in the paper files of the San Diego Field Office;
>
> *b.*  telephone toll records ████████ were found in paper files that originated in the Los Angeles Field Office, but which had to be retrieved from one of the FBI's main file warehouses located near Washington, D.C.;
>
> *c.*  copies of materials seized from ████████████████ ████████ were found through searches of paper files in the New York Field Office;
>
> *d.*  an unredacted copy of an FBI memorandum discussing calls from telephone

**SUBJECT TO FBI PROTECTIVE ORDER**



numbers which the Plaintiffs had obtained in redacted form through a

Freedom of Information Act ("FOIA") request, was found in a paper file that

originated at FBIHQ, which had to be retrieved from one of the FBI's main file

warehouses located near Washington, D.C.

e. court documents relating to 

were found in the paper files of the San Diego Field Office;

f. "1B" evidence items seized

were located through a manual search of the San Diego Field Office's

Evidence Control Room; and

g. motel registration records specifically requested by Plaintiffs were found in the

New York Field Office Evidence Control Room.

**DOCUMENTS REQUESTED IN THE SUBPOENA**

14. The first two requests in the Touhy Request read as follows:

   **a. Any and all records referring or relating to Omar al Bayoumi, Fahad al Thumairy, Mohdhar Abdullah, Omar Abdi Mohammed[5], Khalid Sowailem, the King Fahd Mosque, or the Western Somali Relief Agency.**

   **b. Any and all PENTTBOM records referring or relating to Omar al Bayoumi, Fahad al Thumairy, Mohdhar Abdullah, Omar Abdi Mohammed, Khalid Sowailem, the King Fahd Mosque, or the Western Somali Relief Agency.**

15. I am advised that Plaintiffs contend that the FBI should comply with these requests as

written. In other words, according to Plaintiffs, the FBI should identify every responsive

document that refers or relates to each named individual or entity and, if the FBI does not

---

[5] Footnote 1 of the subpoena provides additional identification information for Omar Abdi Mohammed.

## SUBJECT TO FBI PROTECTIVE ORDER

produce each document in full, it should provide a privilege log identifying the basis for withholding each responsive document.  I understand that the classified declaration of Assistant Director Jill Sanborn, Counterterrorism Division, addresses the state secrets privilege and other privileges that are implicated by Plaintiffs' requests ("Classified Sanborn Declaration").  Below, I address the burdensome nature of the requests.

16.   If the FBI were to attempt to comply with the requests as written, it would require the review of a massive volume of documents.  The number of records in Sentinel that refer to the individuals and entities listed in Request Numbers 1 and 2 is discussed in detail in my classified *in camera*, *ex parte* declaration.[6]  In light of the very large number of records referencing these names, the sensitivity of these records, the fact that many records are part of, or relate to, pending investigations, the extraordinary time and resources that would have been required to locate and review each of these records, and the burden that such an effort would have placed on the FBI's primary mission to prevent future terrorist attacks, the FBI determined that it could not respond to these requests as written.[7]  Instead, the FBI decided that it would identify a subset of "core records" that may be particularly relevant to the issue

---

[6] The FBI conducted many of the Sentinel searches described in my *in camera*, *ex parte* declaration through a search of words within a specific distance from each other, which is referred to as a "proximity" search.  Proximity searches can be run across the entire Sentinel system or can be limited to a search within a particular case file. Proximity searches can also be restricted by date.  However, proximity searches can often result in numerous "hits" for documents other than the documents being sought.  For example, to search for interview reports of a particular individual, a proximity search of that individual's name near the word "interview" will normally capture interview reports, but will also capture documents which make reference to the fact that that person was interviewed.  For recent documents created in Sentinel, search results can be filtered to look for "FD-302" interview forms, which is the form used for most interview reports.  For "legacy" documents created in ACS, the search results cannot be filtered in this manner.  Thus, a search for pre-Sentinel interview reports is often very inefficient and time-consuming.

[7] I am aware that in a March 28, 2018 Memorandum Decision and Order, at 28–31, Judge George B. Daniels rejected Plaintiffs' request to take jurisdictional discovery with respect to Omar Abdi Mohammed, whom Plaintiffs alleged established the Western Somali Relief Agency as a front for Al Qaeda.  For this reason, the FBI objected to the Touhy Request to the extent it sought documents regarding that individual and that entity, and did not conduct Sentinel searches for them.

**SUBJECT TO FBI PROTECTIVE ORDER**

of whether and to what extent Thumairy and Bayoumi and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers, and would then conduct a declassification and privilege review of those documents to determine what, if any, information could be provided.

17.  The initial set of core documents were identified by subject matter experts in the New York Field Office who currently or formerly were assigned to the Subfile Investigation, in conjunction with the Counterterrorism Division at FBIHQ, which oversees the Subfile Investigation, and attorneys from the FBI's Office of the General Counsel ("OGC") and the U.S. Attorney's Office for the Southern District of New York ("USAO/SDNY").  The documents included internal FBI communications concerning the initiation of the investigations on Bayoumi, Thumairy, and ⬛⬛⬛ other internal analytical reports, and interview reports (including reports of confidential human sources) relating to the activities of Bayoumi, Thumairy, ⬛⬛ [8]  In addition, included in the initial set of core documents were certain documents specifically identified in the Touhy Request, namely, the 2012 Report, the 2004 FBI-CIA Joint Intelligence Report,  and any portions of the classified November 2004 Office of Inspector General ("OIG") report ⬛⬛⬛

18.  I am advised that during the course of the FBI's identification, collection and processing of "core records" in response to the Touhy Request, Plaintiffs' counsel and the USAO/SDNY

---

[8] Plaintiffs state that the FBI has not produced a 302 of an interview of ⬛⬛ conducted i⬛⬛⬛ ⬛⬛⬛

**SUBJECT TO FBI PROTECTIVE ORDER**

have engaged in further discussions about other records or categories of records that Plaintiffs believed should have been included in the FBI's response to the Touhy Request. As a result of these ongoing discussions, the FBI agreed to treat certain additional documents or categories of documents as "core records," and performed additional searches to attempt to locate those materials. Specifically, as a result of a meet and confer call on October 9, 2018, the FBI searched for more interview reports and added reports located in those searches to the set of "core records." In addition, Plaintiffs' counsel identified specific additional documents and categories of documents in a letter dated January 2, 2019, an email dated October 11, 2019, and a letter dated November 26, 2019, and the FBI performed additional searches for certain items listed in those communications.[9]

19. In all, the FBI has produced approximately 4,000 pages of records in response to the Touhy Request, and located and processed in excess of 100 pages of additional "core records" that were withheld in full because they were subject to various privileges. The FBI has released the records in a series of ten productions, which have been referred to by the parties as "tranches." The first tranche was produced on or about November 19, 2018; the most recent production was the tenth tranche, which the FBI produced on or about January 10, 2020. In addition, on or about March 23, 2020, the FBI sent the parties ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ which Plaintiffs had specifically requested.[10]

---

[9] At Plaintiffs' request, the FBI also spent considerable time searching for a parking ticket allegedly issued in January 2000 at Los Angeles International Airport ("LAX"), even though it was not requested in the Touhy Request.

[10] As discussed, *infra*, the FBI has located additional core records. The FBI's ability to process these documents for release has been constrained by the COVID-19 public health emergency. Staff in the FBI offices essential to the review and preparation of records for production have been sent home, and because of the nature of the computer systems on which they work, these employees cannot perform their job functions remotely. Where indicated in this declaration that documents "are being processed" for release, it should be understood that the processing has been placed on hold until normal operations resume. In addition, when normal operations resume, the FBI will be removing a limited number of redactions from documents previously produced.

**SUBJECT TO FBI PROTECTIVE ORDER**

Included in the FBI's productions of responsive documents have been records — such as foreign government documents and grand jury materials[11] — that are rarely released.

20.   My classified *in camera, ex parte* declaration provides many details about the efforts the FBI has made to locate additional documents responsive to the first request in the Touhy Request, beyond the initial set of core records first identified by the FBI.  In unclassified terms, I can disclose the following:

21.   The FBI located and produced phone, email, and bank records ▓▓▓▓▓▓ that were found in a database containing scanned copies of certain items (including "1As") collected from field offices in preparation for the federal district court trial of Zacarias Moussaoui.[12]

22.   The FBI searched for additional financial records ▓▓▓▓▓▓▓▓

23.   The FBI produced toll records for ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓, the FBI conducted a Sentinel search of the terms "Mohdar", "Abdullah", and "bank" within 25 words of each other.  The FBI reviewed the records identified by this search, ▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25.   In response to Plaintiffs' request, the FBI searched for telephone toll records ▓▓▓▓▓

---

[11] The only core records that the FBI identified that were produced pursuant to grand jury subpoenas were bank, phone and financial records.

[12] Additional records not included in prior productions recently have been found in this database and are being processed for release. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**SUBJECT TO FBI PROTECTIVE ORDER**

26.  In an email dated October 11, 2019, Plaintiffs asked the FBI to produce a copy of a

videotape of a February 2000 party reportedly hosted by Bayoumi, which was attended by

Hazmi and Mihdhar.  This videotape is mentioned in the 9/11 Commission Report.[13]  The FBI

performed Sentinel searches and conducted physical searches to locate the videotape.  The

FBI has made additional inquiries with agents and other FBI employees who previously

worked on PENTTBOM and might be aware of the location of other copies of the videotape,

but thus far it has not been located.  However, still images taken from the party video have

been located and are being processed for release.

27.  In their October 11, 2019 email, Plaintiffs asked the FBI to provide all documents seized

during the execution of a search warrant ███████████████████████████

████████████████████████████████[14]  In response to that request, Sentinel

searches identified serials[15] in a San Diego Field Office file for the PENTTBOM investigation

which described the search in some detail and stated that the evidence was placed in the

Evidence Control Room in San Diego.  A San Diego Field Office employee then reviewed the

listing of "1B" evidence items in Sentinel to identify which "1B" items appeared to be

associated with the execution of the search warrant.  Several "1B" items appeared to be

pertinent, so the employee searched the Evidence Control Room in San Diego and confirmed

that they were present.  One of those items is described as ██████████████████

---

[13] Found at https://govinfo.library.unt.edu/911/report/911Report.pdf.
[14] ████████████████████████████████████████████████
[15] Documents entered into an FBI file are assigned serial numbers according to the order in which they were placed in the file, with the first document in the file being serial 1.  The FBI uses the term "serial" to refer to these serialized documents.

SUBJECT TO FBI PROTECTIVE ORDER

[REDACTED] [16] Because these items are considered original evidence, they must be handled in accordance with FBI policy, including maintaining the chain of custody. On or about February 6, 2020, those documents were shipped from the San Diego Field Office to an FBI Information Management Division facility in Winchester, Virginia, known as the Document Conversion Laboratory, which specializes in digitizing documentary evidence while maintaining the proper chain of custody. The FBI's OGC in Washington, D.C., received a digitized version of the documents from the Document Conversion Laboratory on or about March 11, 2020. Those documents will be reviewed and processed.

28.   In their October 11, 2019 email, Plaintiffs specifically requested that the FBI produce a photograph of Thumairy with the hijackers outside the King Fahd Mosque. Plaintiffs stated that the Mosque's director testified at a deposition that U.S. government agents showed such a photograph to Mosque personnel. A review of the transcript of this deposition shows that he testified that he was told by a King Fahd Mosque official, Tajuddin Shuaib, that within weeks of the 9/11 attacks, representatives from the FBI and CIA met with him and that the FBI had shown him such a photograph. [REDACTED]

[REDACTED]

29.   Plaintiffs also requested that the FBI produce any photographs of Bayoumi with the hijackers, although Plaintiffs did not provide any information [REDACTED]

---

[16] [REDACTED]

SUBJECT TO FBI PROTECTIVE ORDER

30.  In the sixth and seventh tranches, the FBI produced certain documents

The FBI determined that these may be relevant to the jurisdictional discovery and obtained approval                           to release these specific documents.

31.  As previously noted, Plaintiffs requested that the FBI re-review a document released through FOIA which describes telephone calls to entities of the Saudi Arabian government from phone numbers subscribed to or utilized by                      In response, the FBI found an unredacted copy of that document in a file retrieved from one of the FBI's main file warehouses located near Washington, D.C.  It is being processed for release.

32.  I am advised that on or about November 26, 2019, in connection with a meet and confer negotiation with the USAO/SDNY, Plaintiffs provided specific page references to the 9/11 Commission Report and the 9/11 Review Commission Report which identified by date certain interview reports of Mohdar and                            [17], which the FBI had not yet produced.

33.  Based on those specific page references, the FBI conducted further Sentinel searches and

---

[17]

**SUBJECT TO FBI PROTECTIVE ORDER**

identified most of the documents referenced in those public reports, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ which had not previously been released.  The FBI

produced ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ According to the 9/11 Commission Report

at page 514, there is a January 15, 2002 FBI interview of Mohdar, but Sentinel searches did

not locate any interview report for Mohdar corresponding to this date.  In addition, Plaintiffs

provided to the USAO/SDNY a redacted document, ▮▮▮▮▮▮, that had

previously been released through FOIA, and which Plaintiffs appear to believe ▮▮▮▮▮▮

▮▮▮▮▮▮ The FBI located the original version of this document, and it is ▮▮▮

▮▮▮▮▮▮

34.  In their October 11, 2019 email, Plaintiffs asked for interview reports ▮▮▮▮ In

response, the FBI conducted Sentinel searches and identified two interview reports which may

be relevant to the jurisdictional discovery.  Those interview reports are being processed for

release.

35.  In their October 11, 2019 email, Plaintiffs asked for interview reports ▮▮▮▮▮

▮▮▮▮ The FBI has identified a ▮▮▮ interview report, which is being processed for release.

The FBI also is reviewing a group of interview reports of ▮▮▮▮▮▮▮

▮▮▮▮▮▮ to determine whether they may be relevant to the jurisdictional

discovery, and will process those documents that are relevant to the jurisdictional inquiry.

36.  In their October 11, 2019 email, Plaintiffs asked for all lodging records obtained by the

FBI concerning numerous individuals, and also identified specific lodging records that they

were requesting.  The FBI conducted searches in Sentinel, as follows:

    *a.*  In response to Plaintiffs' request for ▮▮▮▮▮▮▮

**SUBJECT TO FBI PROTECTIVE ORDER**

████████████████████████████████████████

████████ through Sentinel searches, a "1B" item in the PENTTBOM file was

identified as fitting the description of the documents requested.  The FBI located

the "1B" item in the New York Field Office's Evidence Control Room and is

processing it for release.

*b.*   In response to Plaintiffs' request for ████████████████████████

████████████████████████████ through Sentinel

searches, the FBI identified a "1B" item in the PENTTBOM file as fitting the

description of the documents requested.  The FBI located the "1B" item in the

New York Field Office's Evidence Control Room and is processing it for release.

*c.*   In response to Plaintiffs' request for ████████████████████

████████████████████████ the FBI conducted the

Sentinel proximity searches listed below.  The FBI reviewed the records identified

by these searches and ████████████████████████

████████

    i.   Search limited to the PENTTBOM file:

       1.

       2.

       3.

       4.

    ii.   Search not limited to the PENTTBOM file:

       1.

       2.

SUBJECT TO FBI PROTECTIVE ORDER

3. ██████████████████████████████

d.   In response to Plaintiffs' request for ███████████████████

██████████████████████████████████████

█████████████████ through Sentinel searches, the FBI identified a "1B"

item in the PENTTBOM file as fitting the description of the documents requested.

The "1B" item was located in the New York Field Office's Evidence Control

Room and is being processed for release.

e.   In response to Plaintiffs' request for ███████████████████

███████████████████████████████████████████

█████████████████ the FBI conducted the Sentinel searches listed below.

The records identified through these searches were reviewed and █████████

██████████████████

   i.   ████████████████████████ [18]

   ii.  ███████████████████ (limited to the PENTTBOM file);

   iii. ██████████████████ (limited to the Subfile Investigation).

37.   In their October 11, 2019 email, Plaintiffs asked for documents concerning contacts of

Bayoumi, Mohdar, Hazmi and Mihdhar with aviation flight schools.   In response, the FBI

performed the following proximity searches, which resulted ██████████████████

████████████

   a. ████████████████████████████████

   b. ████████████████████████████████

   c. ████████████████████████████████

---

[18] A Sentinel search using "AND" will locate documents with those terms appearing anywhere in the document.

d.

38.  The FBI determined that review ⬛⬛⬛⬛⬛⬛⬛⬛ was not a reasonable

method of searching.  Therefore, the FBI conducted the following more focused searches and

reviewed the results:

a.

b.

c.

d.

39.  The next item in the subpoena asks for the following:

> c.      **Any and all communication records (including but not limited to
> phone, email and fax) and financial and banking records of Khalid al
> Mihdhar, Nawaf al Hazmi, and Anwar al Aulaqi (prior to and on September
> 11 2001).**

40.  On or about November 14, 2019, as part of the eighth tranche of documents, the FBI

produced phone, email and bank records ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛ The phone and bank records were obtained through grand

jury subpoenas.

41.

42.

SUBJECT TO FBI PROTECTIVE ORDER



43.  The next item in the subpoena asks for the following:

> d.      **Any and all records referring or relating to the work and investigation of the PENTTBOM subfile team, as referenced on pp. 101–103 of the 9/11 Review Commission Report.**

44.  As previously explained, the "Subfile Investigation" is a still pending and active investigation.  Because it is an ongoing investigation, the file contains a large volume of documents, many of which are classified.  The review and processing of the entire file would consume an exceptionally large amount of time of New York Field Office, Counterterrorism Division and FBI OGC personnel whose primary duty is investigative and operational; because of that, and because of the concern that release of documents could nterfere with the investigation and disclose sensitive sources, methods, techniques, and other privileged information, the FBI did not attempt to review or process for release the entire file.  However, the FBI has released numerous documents in response to more particularized requests from the Plaintiffs.

45.  The next request in the subpoena is as follows:

> e.    **The 2012 FBI Summary Report.**

46.  The FBI produced this document, with limited redactions, and it is the subject of a pending motion to compel.  It was initially produced as part of the fourth tranche at

**SUBJECT TO FBI PROTECTIVE ORDER**

FBI000361–64.  It was produced again in the fifth tranche at FBI001142–45, and the sixth

tranche included revised pages FBI001144–45.

47.  The next two requests in the subpoena are as follows:

> **f.**    **Any and all records referring or relating to any person(s) referenced in the 2012 FBI Summary Report as "subject" of the investigation described in that report.**

> **g.**    **Any and all records referring or relating to the person(s) "who tasked al-Thumairy and al-Bayoumi with assisting the hijackers," according to the 2012 FBI Summary Report.**

48.  On or about September 12, 2019, the FBI disclosed, pursuant to the FBI Protective Order

in place in this matter, a revised redacted copy of the 2012 Report, showing ███████████

the individual who fit the description of the person identified in items f and g of the subpoena.

In my classified *in camera*, *ex parte* declaration, I provide further details about this request.

49.  The next request in the subpoena is as follows:

> **h.    The Joint FBI-CIA Intelligence Report assessing the nature and extent of Saudi government support for terrorism, prepared and submitted in accordance with the Intelligence Authorization Act for FY 2004, Classified Annex S. 1025/S. Report 108-44.**

50.  A redacted copy of this report was provided in response to the subpoena.

51.  The next request in the subpoena is as follows:

> **i.    The September 1, 2005 letter from Robert Mueller and Porter Goss to Senator Pat Roberts, enclosing the Joint FBI-CIA Intelligence report assessing the nature and extent of Saudi government support for terrorism, prepared and submitted in accordance with the Intelligence Authorization Act for FY 2004, Classified Annex S. 1025/S. Report 108-44.**

52.  Plaintiffs attached a redacted copy of this letter to the Touhy Request, and asked for an

unredacted copy.  In response to this request, a search was conducted by the office within the

FBI's Information Management Division which maintains copies of the FBI Director's

correspondence, and current and former FBI employees involved in the drafting of the Joint

SUBJECT TO FBI PROTECTIVE ORDER

FBI-CIA Intelligence report and in the Office of Congressional Affairs were asked to search

for a copy of the letter.  However, the FBI could not locate an unredacted copy.

53.  The last request in the subpoena is as follows:

> **j.      The November 2004 U.S. Department of Justice, Office of Inspector
> General report titled "A Review of the FBI's Handling of Intelligence
> Information Related to the September 11 Attacks (November 2004), " a
> redacted copy of which is attached hereto as Exhibit E.**

54.  Plaintiffs later clarified that they were requesting the Top Secret version of this report,

and that the copy they attached to the subpoena is the public unclassified version of the report,

not a redacted version.  In response, the FBI produced, after applying appropriate redactions,

the table of contents and the pages of the report ████████████████████████

████████████████████

### FBI RESOURCES ADDRESSING THE TOUHY REQUESTS

55.  As was explained in the June 21, 2019, declaration of Duel Valentine, ECF No. 5191, the

FBI's search for and review of documents in response to the Touhy Request is being handled

by FBI personnel in the Counterterrorism Division at FBIHQ, the New York Field Office, and

the National Security and Cyber Law Branch and the Litigation Branch of the OGC, with

assistance from the USAO/SDNY and the FBI's Information Management Division (the

"Team").  The review is painstaking and time-consuming.  It requires a line-by-line review of

each document by the Team to determine whether information remains properly classified or

is subject to the law enforcement privilege or other privileges and, if so, whether specific

classified and privileged information can nonetheless be released in the public interest and the

exercise of discretion pursuant to section 3.1(d) of Executive Order 13526.  With respect to

internal memoranda, the review typically requires research by the Team into the original

source of information contained in the document in order to determine whether release is

SUBJECT TO FBI PROTECTIVE ORDER

permissible under law and policy, whether authority for release needs to be sought from another government agency or foreign government, and whether release might compromise sensitive sources and methods. In undertaking this review, the FBI must consider not only whether release of information could interfere with the Subfile Investigation or the PENTTBOM investigation, but whether it could interfere with other current and future investigations as well as its impact on the national security of the United States as per Executive Order 13526.

56.   All of the FBI personnel in the Counterterrorism Division, the New York Field Office, and the National Security and Cyber Law Branch of the OGC who are working on the response to the subpoena have ongoing, regularly assigned investigative and operational duties and responsibilities. Their primary duty is, and must be, investigative and operational, to address new and evolving threats to national security and the American people.

57.   Attached hereto as Attachment A is a listing of the documents produced by the FBI thus far, by bates stamp number.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____8____ day of April 2020.

Brian T. Gillhooly
Deputy Assistant Director, Counterterrorism Division
Federal Bureau of Investigation

**SUBJECT TO FBI PROTECTIVE ORDER**

## ATTACHMENT A

FBI Bates Stamp              Document

SUBJECT TO FBI PROTECTIVE ORDER



**SUBJECT TO FBI PROTECTIVE ORDER**



FBI000361-364          FBI 2012 Report

FBI 2014 Report

SUBJECT TO FBI PROTECTIVE ORDER

Joint FBI-CIA Report

July 2004 OIG Report

FBI001142-1145     FBI 2012 Report (revised)

**SUBJECT TO FBI PROTECTIVE ORDER**

