SUBJECT TO FBI PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

...............................................................x

*In re Terrorist Attacks on September 11, 2001*          03 MDL 1570 (GBD) (SN)

...............................................................x

**MEMORANDUM OF LAW OF NON-PARTY THE
FEDERAL BUREAU OF INVESTIGATION IN SUPPORT OF ITS MOTION FOR A
PROTECTIVE ORDER AND IN OPPOSITION TO PLAINTIFFS' MOTIONS TO
COMPEL PRODUCTION**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2709/2678/2769
*Attorney for Federal Bureau of Investigation*

SARAH S. NORMAND
JEANNETTE A. VARGAS
ANDREW E. KRAUSE
Assistant U.S. Attorneys
 *—Of Counsel—*

SUBJECT TO FBI PROTECTIVE ORDER

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ............................................................................................................3

STANDARD OF REVIEW ..............................................................................................5

ARGUMENT ...............................................................................................................6

I.  The Government's Assertions of the State Secrets Privilege
    Should Be Upheld ........................................................................................6

    A.  The Government Has Satisfied the Procedural and Substantive
        Requirements for Assertion of the State Secrets Privilege ........................6

    B.  The Attorney General Has Properly Asserted the State Secrets
        Privilege Over Information that Would Reveal Whether or Not
        Individuals Are Subjects ........................................................................8

    C.  The State Secrets Privilege Encompasses a List of Subfile
        Documents ............................................................................................10

    D.  The State Secrets Privilege Protects Information that Has Been
        Withheld From the Core Records ...........................................................10

        1.  Records ██████████ .........................................................10

        2.  Document 12 (the 2016 report)......................................................11

        3.  Documents 9, 10, and 11 (the Opening Electronic
            Communications)........................................................................12

        4.  Classification Markings ..............................................................13

II. The Information Subject to the Attorney General's Assertion of the State Secrets
    Privilege Is Also Protected by the National Security Act......................................14

III. The FBI Properly Withheld Information Protected from Disclosure by the Law
     Enforcement Privilege ...............................................................................15

IV. Documents 12, 13, and 15 Are Protected by the
    Deliberative Process Privilege ...................................................................17

**SUBJECT TO FBI PROTECTIVE ORDER**

V.      The Work Product Doctrine Protects Document 13 and Parts of
the 2014 Report .......................................................................................................18

VI.     The Core Records Approach Was Appropriate in Light of the Privilege,
Proportionality, and Undue Burden Concerns Identified by the FBI ...................18

VII.    The Court Should Enter an Order Prohibiting Questioning of Witnesses
Regarding any Government Affiliation .................................................................23

CONCLUSION ......................................................................................................................23

**SUBJECT TO FBI PROTECTIVE ORDER**

# TABLE OF AUTHORITIES

*CASES*                                                                              **PAGE**

*Agility Public Warehousing Co., K.S.C.P. v. U.S. Dep't of Def.*,
      246 F. Supp. 3d 34 (D.D.C. 2017) .................................................................... 19

*Arista Records LLC v. Lime Group LLC*,
      No. 06 Civ. 5936 (KMW), 2011 WL 781198 (S.D.N.Y. Mar. 4, 2011) .......................... 19

*Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*,
      No. 11 Civ. 6746 (RKE) (HBP), 2014 WL 2518959 (S.D.N.Y. June 4, 2014) ............... 17

*Bassiouni v. CIA*,
      392 F.3d 244 (7th Cir. 2004) .................................................................. 10, 11

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. DOJ*,
      697 F.3d 184 (2d Cir. 2012) .................................................................... 17

*Butler v. Suria*,
      No. 17 Civ. 3077 (KPF), 2018 WL 4278338 (S.D.N.Y. June 27, 2018) ...................... 19

*COMSAT Corp. v. Nat'l Sec. Found.*,
      190 F.3d 269 (4th Cir. 1999) .............................................................. 5, 20, 23

*Cusumano v. Microsoft Corp.*,
      162 F.3d 708 (1st Cir. 1998) .................................................................. 19

*Dart Indus. Co. v. Westwood Chem. Co.*,
      649 F.2d 646 (9th Cir. 1980) .................................................................. 19

*DiBacco v. U.S. Army*,
      795 F.3d 178 (D.C. Cir. 2015) .................................................................. 15

*Edwards v. U.S. Dep't of Justice*,
      43 F.3d 312 (7th Cir. 1994) .................................................................. 20

*Exxon Shipping Co. v. U.S. Dep't of Interior*,
      34 F.3d 774 (9th Cir. 1994) .................................................................. 19

*Fazaga v. FBI*,
      884 F. Supp. 2d 1022 (C.D. Cal. 2012),
      *aff'd in part, rev'd in part*, 916 F.3d 1202 (9th Cir. 2019) ................................. 9

*Fitzgibbon v. CIA*,
　911 F.2d 755 (D.C. Cir. 1990) ......................................................................... 12

*Floyd v. City of New York*,
　739 F. Supp. 2d 376 (S.D.N.Y. 2010) ............................................................. 17

*Halkin v. Helms*,
　690 F.2d 977 (D.C. Cir. 1982) ......................................................................... 14

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
　891 F.2d 414 (2d Cir. 1989) ...................................................................... 12, 13

*Ibrahim v. Dep't of Homeland Sec.*,
　No. C 06-00545 WHA, 2013 WL 4549941 (N.D. Cal. Aug. 23, 2013) ............. 8

*In re City of New York*,
　607 F.3d 923 (2d Cir. 2010) ...................................................................... 16, 17

*In re Sealed Case*,
　856 F.2d 268 (D.C. Cir. 1988) ......................................................................... 15

*In re Sept. 11 Litig.*,
　621 F. Supp. 2d 131 (S.D.N.Y. 2009) ............................................................. 19

*Kronisch v. United States*,
　No. 83 Civ. 2458 (KMW), 1994 WL 524992 (S.D.N.Y. Sept. 27, 1994),
　*aff'd*, 150 F.3d 112 (2d Cir. 1998) ................................................................. 15

*Landry v. F.D.I.C.*,
　204 F.3d 1125 (D.C. Cir. 2000) ....................................................................... 15

*Mohamed v. Jeppesen Dataplan, Inc.*,
　614 F.3d 1070 (9th Cir. 2010) ..................................................................... 8, 13

*Moore v. Armour Pharm. Co.*,
　927 F.2d 1194 (11th Cir. 1991) ....................................................................... 19

*N.Y. Times Co. v. FBI*,
　297 F. Supp. 3d 435 (S.D.N.Y. 2017) ............................................................... 9

*Poulsen v. Dep't of Def.*,
　373 F. Supp. 3d 1249 (N.D. Cal. 2019) ............................................................. 9

SUBJECT TO FBI PROTECTIVE ORDER

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*,
  No. 13 Civ. 5032 (ER), 2015 WL 1344479 (S.D.N.Y. Mar. 23, 2015)......................... 8, 9

*Scott v. Chipotle Mexican Grill, Inc.*,
  94 F. Supp. 3d 585 (S.D.N.Y. 2015)................................................................. 13

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)......................................................................... 12

*United States v. Reynolds*,
  345 U.S. 1 (1953)............................................................................... *passim*

*Wilson v. CIA*,
  586 F.3d 171 (2d Cir. 2009)........................................................................... 13

*Zuckerbraun v. Gen. Dynamics Corp.*,
  935 F.2d 544 (2d Cir. 1991)............................................................................ 8

### *STATUES*

50 U.S.C. § 3024(i)(1) ................................................................................... 14

### *RULES*

Fed. R. Civ. P. 26(b)(1)................................................................................. 20

Fed. R. Civ. P. 26(b)(3)(A)............................................................................. 18

### *OTHER AUTHORITIES*

Executive Order 13,526 ................................................................................... 4

SUBJECT TO FBI PROTECTIVE ORDER

## PRELIMINARY STATEMENT

The Department of Justice ("DOJ") and its component, the Federal Bureau of Investigation ("FBI") (collectively, the "Government"), respectfully submit this memorandum of law in support of the Government's motion for a protective order and in opposition to the motions of the Plaintiffs Executive Committees ("PECs") to compel production of broad categories of largely classified and privileged records relating to national security investigations.

The PECs' two motions to compel seek, *inter alia*, records related to various individuals that the PECs believe were the subjects of national security investigations, as well as all records related to the Subfile Investigation of Omar al Bayoumi ("Bayoumi") and Fahad Al Thumairy ("Thumairy"), records related to ███████████████ and all records from a specific case file for Mohdar Abdullah ("Mohdar"). These requests raise obvious concerns regarding burden, proportionality and overbreadth. But more fundamentally, the FBI could not respond fully to these requests without revealing privileged information. For certain of these requests, the FBI cannot even disclose the volume of responsive records, let alone the subjects or dates of such records, without revealing information that is privileged. DOJ is therefore constrained to deny those requests in a final agency decision.

Although the FBI could not respond to the requests as propounded, in recognition of the public importance of this litigation, the FBI nonetheless made extraordinary efforts to provide the plaintiffs with substantial information pertinent to the jurisdictional inquiry authorized by the Court. This approach is outlined in the final agency decision issued in response to the Touhy request. Declaration of Sarah S. Normand, dated April 13, 2020 ("Fourth Normand Decl."), Exh. S. The FBI agreed to search for and conduct privilege and declassification reviews of a subset of records of particular relevance to the jurisdictional inquiry, a process that has been called the "core

records" approach. Even this more limited undertaking has proven to be a difficult enterprise, as it took the better part of two years, during which time the FBI expended thousands of hours to locate and process the core records. To date, the FBI produced to the PECs in whole or in part approximately 4,000 pages of records, and withheld in full twenty-one records or categories of records. And the FBI continues to search for and process additional records. The FBI's core records approach struck a reasonable and appropriate balance between protecting privileged information regarding ongoing national security investigations and the PECs' interest in disclosure.

The FBI properly withheld privileged information from the core records. The Attorney General of the United States and the Acting Director of National Intelligence ("DNI"), after actual and personal consideration, have asserted the state secrets privilege to protect from disclosure the classified information sought by the PECs. The public declarations submitted by Attorney General William P. Barr ("Second Barr Decl."), Acting DNI Richard A. Grenell ("Grenell Decl."), and the Assistant Director of the FBI's Counterterrorism Division, Jill Sanborn ("Sanborn Decl.")—as well as the detailed classified declarations by AD Sanborn ("Classified Sanborn Decl."), Acting DNI Grenell ("Classified Grenell Decl."), and the CIA ("Classified CIA Decl.") lodged for the Court's *ex parte*, *in camera* review—establish that release of the classified information sought from the core records would risk significant harm to national security. This information is therefore protected from disclosure by the state secrets privilege, as well as other privileges. The limited amount of unclassified information that has been withheld by the FBI is also highly sensitive and protected by the law enforcement privilege and other privileges.

Accordingly, this Court should sustain DOJ's final Touhy decision; enter a protective order pursuant to Rule 26(c) upholding the Government's privilege assertions, protecting the FBI from being required to search for and process additional records except for those additional searches

SUBJECT TO FBI PROTECTIVE ORDER

that the FBI has already committed to perform, and prohibiting inquiry into matters protected by the state secrets privilege at deposition; and deny the PECs' motions to compel.

## BACKGROUND

The Touhy request and subpoena are not an ordinary discovery request. They seek "any and all records" regarding an ongoing national security investigation (which has been described as the "Subfile Investigation") and specific individuals or entities that either are subjects or the PECs believe may be subjects of investigation. *See* Declaration of Sarah S. Normand, dated June 21, 2019 ("First Normand Decl."), Exh. A, App. A. The Touhy request and subpoena also seek specific records that the PECs know to be classified, including classified portions of the October 2012 FBI report ("2012 report") that was the subject of the PECs' first motion to compel, a joint FBI-CIA intelligence report, and a DOJ Office of Inspector General ("OIG") report. *Id.* The FBI repeatedly asked the PECs to narrow their requests, but they declined to do so.[1]

In light of the PECs' refusal to narrow their extraordinarily broad requests, and in recognition of the unique importance of this case, the FBI decided to gather a set of "core records" that may be of particular relevance to the jurisdictional inquiry and review those core records to determine what, if any, information could be declassified and produced subject to the FBI Protective Order. The initial set of core records included interview reports, the 2012 report and other reports of an analytical nature, the FBI-CIA intelligence report, portions of the DOJ-OIG report ███████████████ and phone and bank records ██████████████████. ███ The FBI did not limit its core records review to the initial set of records gathered in the summer of 2018, however. While refusing to withdraw their broad requests, the PECs have, on a number of occasions, identified specific records or categories of records of particular interest.

---

[1] A detailed chronology of the Government's discussions with the PECs, the FBI's core records approach, and the FBI's productions of core records is provided in the Fourth Normand Declaration.

Between October 2018 and March 2020, in response to these specific requests, the FBI conducted multiple supplemental searches and identified additional documents for review and processing.[2] For example, the FBI conducted searches for specific items listed by the PECs in correspondence from January, October, and November 2019, including records that were identified for the first time in those communications. *See* Fourth Normand Decl. ¶¶ 25-27, 40-44; Gilhooly Decl. ¶ 18. These efforts have resulted in recent releases of additional items sought by the PECs, *see* Gilhooly Decl. ¶¶ 19 n.9, 33, while other records identified in the PECs' motion, such as ███████████████████████ Pl. Br. 20, have been located and will be processed, *see* Gilhooly Decl. ¶¶ 21 n.12, 27, 31, 33-36, 42.[3] In addition, the FBI has undertaken to determine whether all interview reports in the Subfile Investigation that contain substantive information concerning Bayoumi, Thumairy, ███████████ have been processed and produced, to the extent that can be done without disclosing privileged information. To the extent any such interview reports have not been processed, they will be. Sanborn Decl. ¶ 106 n.15.

The core records review was not a typical classification or privilege review. The FBI also considered whether exceptional circumstances exist such that information should be declassified and released in the public interest, pursuant to section 3.1(d) of Executive Order 13,526. And the FBI did declassify and release certain information in the core records, including the name of the third main subject of the Subfile Investigation. The FBI also took the unusual step of asking foreign governments to authorize the release of records and information subject to the FBI Protective Order. In addition, DOJ filed petitions in four district courts seeking disclosure of financial and banking records obtained via grand jury subpoena. At the PECs' request, DOJ also

---

[2] Detailed descriptions of the FBI's searches are provided in the classified and unclassified declarations of Brian T. Gilhooly, dated April 8, 2020 ("Classified Gilhooly Decl." and "Gilhooly Decl.," respectively).

[3] Processing of the core records identified in the most recent supplemental searches has been constrained by the COVID-19 pandemic and will be completed when normal FBI operations resume. Gilhooly Decl. ¶ 19 n.10.

sought unsealing ███████████████████████████████████████ filed under seal in the Southern District of California, and obtained archived trial records from another case in that district.

The FBI has now produced approximately 4,000 pages of core records subject to the FBI Protective Order. These include interview records ████████████████ evidentiary materials, voluminous telephone and bank records, and relevant portions of the joint FBI-CIA intelligence and DOJ-OIG reports. *See* Gilhooly Decl., Att. A. The PECs have relied upon many of these documents in their motion practice with Saudi Arabia. The FBI withheld from production certain information in the core records, including intelligence information belonging to other members of the Intelligence Community ("IC"). Grenell Decl. ¶ 7. The FBI also withheld twenty-one records (or, in one case, a group of "classified record(s)") in their entirety because they contain confidential human source ("CHS") reporting, foreign government information, sensitive sources or methods, or other classified and/or privileged information. Sanborn Decl., Exh. A (unclassified privilege log).

### STANDARD OF REVIEW

As set forth in the FBI's initial response to the PECs' first motion to compel, which is incorporated herein, this Court should review DOJ's final agency decision with respect to the PECs' Touhy request and subpoena under the "arbitrary and capricious" standard of review provided by the Administrative Procedure Act ("APA"). *See* ECF No. 5189 ("First FBI Br.") 11-12 (citing, *inter alia*, *COMSAT Corp. v. Nat'l Sec. Found.*, 190 F.3d 269, 277 (4th Cir. 1999)). However, DOJ's final decision, and in particular the assertions of privilege, proportionality and undue burden therein, should be upheld whether the Court applies the standards applicable to the APA or Rules 26 and 45 of the Federal Rules of Civil Procedure.

5

## ARGUMENT

### I.   The Government's Assertions of the State Secrets Privilege Should be Upheld

As described in the Government's detailed public and classified declarations, disclosure
of much of the information sought by the PECs—including, *inter alia*, records that would reveal
whether or not certain individuals are or were subjects of national security investigations; CHS
reporting; sensitive information received from foreign governments pursuant to agreements of
confidentiality; the documents initiating the investigations into Thumairy ████████ (Documents
10 and 11 on the FBI's privilege log); the classified portions of the document initiating the
investigation into Bayoumi (Document 9) and the 2016 report (Document 12); and the
classification markings throughout the core records—could reasonably be expected to cause
significant harm to national security. The Government's claim of state secrets privilege over
these records, and the other information over which the privilege has been asserted, should
therefore be upheld.

### A.   The Government Has Satisfied the Procedural and Substantive Requirements for Assertion of the State Secrets Privilege

The Government previously set forth the legal standards governing adjudication of the
state secrets privilege in its second response to the PECs' first motion to compel, and rather than
repeat that discussion, incorporates it herein.  *See* ECF No. 5140 ("Second FBI Br.") 10-12.

The Government has satisfied the procedural and substantive requirements for assertion
of the state secrets privilege. *See United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) (privilege
must be lodged by the head of the department which has control over the matter, after actual
personal consideration of the matter by that officer). A formal claim of privilege with respect to
the FBI's information has been asserted by the Attorney General based upon his personal
consideration of the matter. Second Barr Decl. ¶¶ 3-4. As to information within the core records

that belongs to other members of the IC, the Acting DNI has likewise made a formal claim of privilege upon personal consideration. Grenell Decl. ¶¶ 8-9, 15.

As with the motion to compel production of the 2012 report, the Attorney General has asserted the state secrets privilege over four overlapping categories of classified information: (i) subject information; (ii) reasons for investigation and results; (iii) sources and methods; and (iv) foreign government information and information sharing and cooperation with foreign partners. Second Barr Decl. ¶ 5. The Attorney General has determined, after actual and personal consideration, that disclosure of these categories of information reasonably could be expected to cause significant harm to the national security. Second Barr Decl. ¶¶ 7-10; *see also* Sanborn Decl. ¶¶ 30-40 (explaining potential harms to national security from release of information in four categories). The specific information that is subject to the Attorney General's assertion of the state secrets privilege, and the anticipated harms to national security that could result from disclosure, are described in detail in the Classified Sanborn Declaration. Second Barr Decl. ¶ 6.

Acting DNI Grenell has similarly asserted the state secrets privilege over "highly sensitive and classified" information concerning intelligence activities, sources and methods; foreign government information; and information concerning foreign activities and foreign relations of the United States. Grenell Decl. ¶¶ 15, 17. The Classified CIA Declaration and the Classified Grenell Declaration describe with particularity the information subject to Acting DNI Grenell's assertion of privilege, and the serious and potentially grave harms to national security that could result from disclosure.

The Government's classified and unclassified declarations amply establish "a reasonable danger" that disclosure of the information over which the privilege is asserted could reasonably be expected to be detrimental to national security. *Reynolds*, 345 U.S. at 9-10; *see also Mohamed*

**SUBJECT TO FBI PROTECTIVE ORDER**

*v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1086 (9th Cir. 2010); *Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2013 WL 4549941, at *4-*5 (N.D. Cal. Aug. 23, 2013). "[T]he court must accord the 'utmost deference' to the executive's determination" of the potential harms to national security. *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991) (citation omitted); *accord Restis v. Am. Coalition Against Nuclear Iran, Inc.*, No. 13 Civ. 5032 (ER), 2015 WL 1344479, at *3 (S.D.N.Y. Mar. 23, 2015). The Court accordingly should uphold the Attorney General's and the Acting DNI's assertions of the state secrets privilege.

### B. The Attorney General Has Properly Asserted the State Secrets Privilege Over Information that Would Reveal Whether or Not Individuals Are Subjects

The Attorney General's assertion of the state secrets privilege encompasses information that would tend to reveal whether or not an individual was the subject of a national security investigation. Second Barr Decl. ¶ 7. Whether or not a particular individual is or was the subject of a national security investigation is itself a classified fact that is protected from disclosure by the state secrets privilege. Sanborn Decl. ¶ 45. The FBI has therefore withheld records that indicate whether or not specific individuals are or were subjects of investigation. *Id.*

Because the FBI cannot acknowledge whether or not an individual is or was a subject, the FBI cannot respond fully to the PECs' requests for records related to the individuals or entities named in the motions to compel—███████████████ Prince Abdulaziz bin-Fahad ("Prince Abdulaziz"), Abdullah Ali Saleh al-Jraithen ("Jraithen"), Adel Mohamed al-Sadhan ("Sadhan"), Omar Abdi Mohamed ("Mohamed"), and Mutaeb Abdelaziz al-Sudairy ("Sudairy").[4] *Id.* ¶¶ 46-52. The volume of records the FBI possesses with respect to these individuals is itself information that is subject to the state secrets privilege. *Id.*; *see also Poulsen v. Dep't of Def.*,

---

[4] Although the Court allowed the PECs to brief separately issues related to the FBI's relevance objections regarding requests for records related to Sadhan, Sudairy, Jraithen, and Mohamed, the FBI explicitly preserved all arguments regarding privilege with respect to those requests. *See* First FBI Br. 19.

SUBJECT TO FBI PROTECTIVE ORDER

373 F. Supp. 3d 1249, 1266, 1273 (N.D. Cal. 2019) (DOJ could assert *Glomar* response to FOIA request to protect "the identity [of] any specific individuals or organizations who are subjects of national security investigations," as this is "classified information"); *N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435, 449 (S.D.N.Y. 2017); *Fazaga v. FBI*, 884 F. Supp. 2d 1022, 1044 (C.D. Cal. 2012), *aff'd in part, rev'd in part on other grounds*, 916 F.3d 1202 (9th Cir. 2019) (rehearing petition pending). The FBI could not reveal the volume of records in its possession regarding a particular individual without revealing the FBI's level of investigative interest in that person. Sanborn Decl. ¶¶ 48-49. If the FBI were to have no or few records pertaining to a particular person, it could be inferred that the FBI had limited knowledge regarding that person. *Id.* ¶ 48. In contrast, if the FBI were to reveal that it had large volumes of responsive documents, it could be inferred that the individual was the subject of a national security investigation. *Id.* ¶ 49.

For example, the PECs seek all "evidence" that they allege was gathered by the FBI regarding the specific tasks ▆▆▆▆▆▆ performed on behalf of 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. Pl. Br. 15. The FBI could not reveal the volume of such records in its possession without revealing whether or not ▆▆▆▆▆▆ subject of an investigation and the results of any such investigation, including precisely what the FBI knows or does not know with respect ▆▆▆▆▆▆ Sanborn Decl. ¶ 52.[5]

The PECs' motions to compel production of alleged "evidence ▆▆▆▆▆▆ and records regarding other individuals who have not been acknowledged as subjects, including Prince Abdulaziz, Jraithen, Sadhan, Mohamed, and Sudairy, should therefore be denied.

---

[5] The section of the 2012 report cited by the PECs, Pl. Br. 15, does not reference "evidence," but merely states that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Pl. Br. 15.

SUBJECT TO FBI PROTECTIVE ORDER

### C.   The State Secrets Privilege Encompasses a List of Subfile Documents

The PECs also seek a "comprehensive list of subfile documents." Pl. Br. 12. Any such list would be protected by the state secrets privilege, however. As AD Sanborn explains, disclosure of the number of responsive documents, as well as the types, dates, and descriptions of responsive documents, would tend to reveal such privileged facts as when and how much investigative activity took place and the FBI's respective focus on the different subjects. Sanborn Decl. ¶¶ 64-68. The Classified Sanborn Declaration provides additional details regarding the sensitivities associated with the production of such a listing. Accordingly, the PECs' motion to compel production of a comprehensive list of Subfile documents should be denied. *See, e.g.*, *Bassiouni v. CIA*, 392 F.3d 244, 245 (7th Cir. 2004) (CIA not required to create index of documents where volume, dates, and subject matters would reveal classified information, notwithstanding that some documents may not be classified).

### D.   The State Secrets Privilege Protects Information Withheld From the Core Records

1.   Records ▮▮▮▮▮▮▮▮▮▮

The PECs' motion to compel production of records and information ▮▮▮▮▮▮▮▮▮ including the "evidence" ▮▮▮▮▮▮ "tasked al-Thumairy and al-Bayoumi with assisting the hijackers" as referenced in the 2012 report, Pl. Br. 12-15, should be denied as these records are protected by the state secrets privilege. As noted in the declaration of former FBI Assistant Director Michael C. McGarrity, this statement in the 2012 report is more accurately characterized as an investigative theory than an objective statement of fact. Declaration of Michael C. McGarrity, dated September 12, 2019 (ECF No. 5142) ¶ 22. Regardless, the FBI searched for the "evidence" referenced, as well as other documents ▮▮▮▮▮▮▮▮ Sanborn

Decl. ¶ 99 n.14.[6] Those documents have been withheld as privileged. The FBI cannot further describe the nature of those documents in its public submissions without revealing privileged information, but the records and the harms to national security that would result from disclosure are described in the classified submissions. *Id*.

 2. Document 12 (the 2016 report)

Document 12 on the FBI's privilege log, an April 2016 analytic review that provides an update on the results of the Subfile Investigation, is protected in part by the state secrets privilege because it includes information regarding subjects of national security investigations, the results of investigations, sensitive sources and methods, including CHS reporting, and foreign government information. Sanborn Decl. ¶¶ 61-63.[7] AD Sanborn explains that release of the classified portions of Document 12 could reasonably be expected to cause harm to national security because they reveal "the information that the FBI gathered, the extent and limits of its capabilities when gathering information, how it analyzed that information at that time, and what the FBI deemed significant. In particular, disclosure of the results of its investigation would alert subjects and other individuals named in the document as to what the FBI knew or did not know about their activities." *Id.* ¶ 62. The Government's classified submissions address the contents of this document in more detail.

The PECs argue that this document "contains relevant evidence that in fairness must be made available to allow Plaintiffs to answer the FBI's Declaration and ensure that the record is accurate and complete." Pl. Br. 16. As the PECs do not know the contents of this document, this

---

[6] Contrary to the PECs' implications, Pl. Br. 13, the FBI's search for core records included records ▮▮▮▮▮▮▮▮. The FBI did not "reverse[] course" in September 2019; rather, the FBI determined that new searches were not warranted because records ▮▮▮▮▮▮▮▮ already fell within the scope of its existing searches.
[7] As addressed *infra* in Point III, although the Attorney General has not asserted the state secrets privilege over the unclassified portions of Document 12, they are protected by the law enforcement privilege.

SUBJECT TO FBI PROTECTIVE ORDER

assertion is sheer speculation. But in any event, the state secrets privilege is absolute; "even the most compelling necessity cannot overcome" a claim of state secrets privilege. *Reynolds*, 345 U.S. at 11. The PECs' citation to *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), a case which discusses implicit waivers of the attorney-client privilege, is inapposite because there is no implicit or subject-matter waiver of the state secrets privilege. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421 (2d Cir. 1989) (discussing official acknowledgment doctrine, and citing caselaw for the proposition that "prior disclosure of similar, as opposed to specific, information to that being sought does not waive the state secrets privilege"); *see also Fitzgibbon v. CIA,* 911 F.2d 755, 766 (D.C. Cir. 1990). Moreover, AD McGarrity's declaration neither referenced Document 12 nor revealed the privileged contents of the document.

### 3.  Documents 9, 10, and 11 (the Opening Electronic Communications)

The three electronic communications ("ECs") that reflect the initiation of investigations into Bayoumi, Thumairy, ██████ part of the Subfile Investigation (listed on the FBI's privilege log as Documents 9, 10 and 11) are also protected in whole or in part by the state secrets privilege. Sanborn Decl. ¶¶ 59-60. These documents set forth the predication for opening national security investigations. Revealing this information "would alert current and future subjects to those activities which are likely to arouse suspicion and result in the opening of an investigation, thus providing valuable insight to those intent on terrorism and other criminal activity on how to avoid detection." *Id.* ¶ 59. The state secrets privilege has been asserted over the entirety of the ECs ██████ Thumairy, and over the classified portions of the Bayoumi EC. *Id.* ¶ 60. Further descriptions of their contents, and the harms to national security that would result from disclosure, are provided in the classified submissions.

The PECs contend that these documents cannot be privileged in their entirety as "the FBI has already released information about the roles" of Thumairy, Bayoumi, ███████ Pl. Br. 17. In fact, the FBI has released very little information regarding its investigation ███████ Sanborn Decl. ¶ 99 n.14. But more fundamentally, the state secrets privilege is not waived by the release of general unclassified information regarding a particular subject; rather, the PECs must show that information that is as specific as and matches the information withheld from the documents has been the subject of an official public acknowledgment. *Hudson River Sloop*, 891 F.2d at 421; *see also Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009); *cf. Jeppesen*, 614 F.3d at 1090. The PECs have not met their burden of establishing official disclosure of the specific classified information in these documents.

The PECs also argue that the FBI should be compelled to release the dates of each of the opening ECs. Pl. Br. 17-18. Yet the date upon which a national security investigation is initiated is itself a classified fact over which the state secrets privilege has been asserted. Sanborn Decl. ¶ 60 n.11. Local Civil Rule 26.2 does not compel the disclosure of information in a privilege log that is itself privileged. *See Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 601 (S.D.N.Y. 2015) ("To require more information [on the privilege log] would be to put the defendant in the contradictory position of having to risk its privilege in order to preserve it.").[8]

    4.  <u>Classification Markings</u>

The Attorney General's assertion of the state secrets privilege also extends to all of the classification markings in the produced records. Second Barr Decl. ¶ 11; Sanborn Decl. ¶ 44. Although ordinarily classification markings indicating that a paragraph is unclassified or Secret

---

[8] Although the PECs argue that it is public knowledge that investigations of Bayoumi and Thumairy were opened "within a year of the 9/11 Attacks," and that an investigation ███████████████████ Pl. Br. 18, the opening ECs in question relate to the Subfile Investigation, which did not begin until 2007. And the cited document ███████████ but does not state that he was the subject of an FBI investigation ███████

are not themselves classified, in the unique circumstances presented by the documents at issue, selectively releasing portion markings as to some documents but not others would have revealed information that is subject to the state secrets privilege. Sanborn Decl. ¶ 44. Accordingly, here all portion markings and banner headings are subject to the privilege.

The classification markings are also irrelevant. The PECs hypothesize that the FBI improperly redacted these markings to hide that "much of the text in those documents was unclassified." Pl. Br. 24. This is not the case. Although information need not be formally classified to be protected by the state secrets privilege, *Halkin v. Helms*, 690 F.2d 977, 996 n.69 (D.C. Cir. 1982), AD Sanborn nonetheless has confirmed that all of the information over which the state secrets privilege has been asserted is properly classified, Sanborn Decl. ¶¶ 43-44,[9] and that the markings have not been withheld for an improper purpose, *id.* ¶ 44.

## II.    The Information Subject to the Attorney General's Assertion of the State Secrets Privilege Is Also Protected by the National Security Act

Section 102A(i)(1) of the National Security Act ( "Act"), as amended, provides that "[t]he [DNI] shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). AD Sanborn has invoked the statutory protections of the Act with respect to the information that is also subject to the Attorney General's assertion of the state secrets privilege. Sanborn Decl. ¶¶ 78-79; *see DiBacco v. U.S. Army*, 795 F.3d 178, 197-99 (D.C. Cir. 2015). Acting DNI Grenell has also invoked the protections of the Act with respect to

---

[9] In most cases, the information over which the state secrets privilege has been asserted was properly marked as classified at the time the document was prepared. Sanborn Decl. ¶ 43. There are a few instances, however, where a paragraph or document was not marked. *Id.* AD Sanborn, an Original Classification Authority, has explained why that may be the case, and confirmed that this information is currently and properly classified. *Id.* Moreover, the Classified Sanborn Declaration identifies each instance in which the state secrets privilege has been claimed over information that was previously unmarked or marked unclassified and that the redaction of classification markings was not done for an improper purpose, *id.* ¶ 44. Moreover, the Classified Sanborn Declaration identifies each instance in which the state secrets privilege has been claimed over information that was previously unmarked or marked unclassified.

information in the core records belonging to other members of the IC. Grenell Decl. ¶ 16.

Accordingly, the information over which the state secrets privilege is asserted is also protected

from disclosure by this absolute statutory privilege. *See Kronisch v. United States*, No. 83 Civ.

2458 (KMW), 1994 WL 524992, at *8 (S.D.N.Y. Sept. 27, 1994) (citing cases), *aff'd*, 150 F.3d

112, 120 n.3 (2d Cir. 1998).

### III.    The FBI Properly Withheld Information Protected from Disclosure By the Law Enforcement Privilege

The FBI has properly invoked the law enforcement privilege to protect information (both

classified and unclassified) within the core records. The legal standards governing the assertion

of the law enforcement privilege have been outlined extensively in the FBI's prior submissions,

and are incorporated herein. Second FBI Br. 19-23.

The FBI has submitted classified and unclassified declarations from Assistant Director

Sanborn, who based her assertion of the law enforcement privilege upon personal review of the

documents at issue. Sanborn Decl. ¶ 10; *see, e.g.*, *Landry v. F.D.I.C.*, 204 F.3d 1125, 1135-36

(D.C. Cir. 2000); *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). The declarations

identify the information over which the privilege is claimed, why that information falls within

the scope of the privilege, and the specific harms that would result from disclosure. Sanborn

Decl. ¶¶ 80-107. Specifically, in addition to the information encompassed by the Attorney

General's assertion of the state secrets privilege, the law enforcement privilege extends to

information redacted from the core records produced to the parties which would reveal "the

FBI's investigative interest in certain individuals, specific law enforcement methods and

techniques used in the FBI's national security investigations, specific information obtained, or

gaps in information, relating to the investigations, the FBI's opinions and conclusions about

certain witnesses and evidence gathered in the investigations, personal information regarding

**SUBJECT TO FBI PROTECTIVE ORDER**

third parties which if revealed would discourage cooperation, and information which would

indirectly tend to reveal confidential cooperation from a foreign government." Sanborn Decl.

¶ 81. These categories of law enforcement information fall well within the scope of the privilege.

*See, e.g.*, *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010).

The FBI has also asserted the law enforcement privilege with respect to the compilations

of all records related to the Subfile Investigation, Bayoumi, Thumairy, ███████ Mohdar.

Sanborn Decl. ¶¶ 96-102. Specifically, AD Sanborn explains that the universe of records, when

viewed collectively, "would provide a roadmap to subjects and other interested parties as to how

the FBI conducted that particular national security investigation." Sanborn Decl. ¶ 97. The record

compilation would reveal "what the FBI knows and does not know about the subjects of the

investigation, which witnesses the FBI did or did not interview, what types of leads the FBI

followed and which it did not, how the FBI analyzes evidence, and the conclusions the FBI

reached as a result of its investigation." *Id.* ¶ 98. Such information is properly protected by the

law enforcement privilege. The Court should therefore deny the PECs' motion to compel

production of the "entire subfile investigation ███████ Thumairy, Bayoumi, and their

Subagents," Pl. Br. 11, and the "complete case file" for Mohdar, Pl. Br. 19.

The FBI has also asserted the law enforcement privilege to protect a limited amount of

unclassified information in Document 9, the opening Bayoumi EC, consisting of background

information regarding Bayoumi that is publicly known. Sanborn Decl. ¶ 93. This information is

sensitive in the context of this document, as the selection of specific facts for inclusion reveals

the information upon which the FBI placed particular significance as a predicate for the opening

of a national security investigation. *Id.* The law enforcement privilege also protects unclassified

information in Document 12, the 2016 report, which consists of summaries and quotations of

16

interview reports or other documents that have been produced to the parties. *Id.* ¶ 94. This

information is sensitive when included in this document because the facts the FBI decided were

pertinent to include "reflect the focus and direction of the investigation as of that date, and the

significance the FBI placed on the particular witnesses and particular information discussed." *Id.*

There is a strong presumption against lifting the law enforcement privilege, which

requires, among other things, that a party demonstrate a "compelling need" for the information

that outweighs the public interest in nondisclosure. *In re City of New York*, 607 F.3d at 945. The

PECs cannot demonstrate a compelling need for the withheld information, particularly where it

exists in the public domain or summarizes other documents already in their possession.

Moreover, in light of the sensitivity of the information subject to the privilege, much of which is

classified, the public interest in nondisclosure outweighs any need the PECs may have for the

information. *Floyd v. City of New York*, 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010).

## IV.     Documents 12, 13, and 15 Are Protected by the Deliberative Process Privilege

In addition to the state secrets and law enforcement privileges, Documents 12, 13, and 15

are protected in full by the deliberative process privilege.[10] The deliberative process privilege

protects internal agency documents that are "(1) predecisional, *i.e.*, prepared in order to assist an

agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually . . . related to

the process by which policies are formulated." *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law

v. DOJ*, 697 F.3d 184, 194 (2d Cir. 2012) (citation and internal quotation marks omitted). These

documents were prepared as part of the consultative and deliberative process of determining the

---

[10] AD Sanborn is authorized to assert the deliberative process privilege on behalf of the FBI. Sanborn Decl. ¶ 3; *see also Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, No. 11 Civ. 6746 (RKE) (HBP), 2014 WL 2518959, at *4 (S.D.N.Y. June 4, 2014).

next steps in an investigation, prior to any final investigative or prosecutorial decision. Sanborn

Decl. ¶¶ 108-13. They are therefore both predecisional and deliberative.

## V.   The Work Product Doctrine Protects Document 13 and Parts of the 2014 Report

Document 13 on the FBI privilege log, and certain discrete information within a 2014

FBI report, constitutes work product protected from disclosure under Federal Rule of Civil

Procedure 26(b)(3). The information was "prepared in anticipation of litigation" by a "party or

its representative," namely, agents of the FBI working in consultation with federal prosecutors

regarding an investigation that could result in a criminal prosecution. Fed. R. Civ. P.

26(b)(3)(A); see Sanborn Decl. ¶¶ 110, 113. Document 13 is a briefing paper that was prepared

by FBI personnel regarding the status of and next steps in an investigation, which the agents

shared with prosecutors as part of the consultative process. Id. ¶ 110. And certain dated entries in

the 2014 report discuss the substance of case strategy meetings between FBI special agents and

prosecutors. Id. ¶ 113. The FBI therefore properly withheld this information as work product.

## VI.   The Core Records Approach Was Appropriate in Light of the Privilege, Proportionality, and Undue Burden Concerns Identified by the FBI

The PECs also challenge the FBI's core records approach as inconsistent with its

discovery obligations. Pl. Br. 9-11. As described in detail in the Fourth Normand Declaration and

the public and classified Gilhooly Declarations, the FBI's search for and processing of core

records was a difficult undertaking that took years and a substantial commitment of resources to

complete. Requiring the FBI—a non-party to the litigation—to respond fully to the

extraordinarily broad Touhy request would impose an undue and disproportionate burden,

particularly because of the large volume of classified and privileged material contained in the

potentially responsive records. See First FBI Br. 14-22; Agility Public Warehousing Co.,

K.S.C.P. v. U.S. Dep't of Defense, 246 F. Supp. 3d 34, 48 (D.D.C. 2017) (government entitled to

SUBJECT TO FBI PROTECTIVE ORDER

consider burden requested discovery would place on agency). Additionally, the FBI could not

respond to the request for its entire set of Subfile records, or the universe of documents related to

Bayoumi, Thumairy ████████ Mohdar, as the compilations of such records are themselves

privileged. *See supra* at 16. As the PECs have consistently refused to narrow their exceedingly

broad requests, the FBI's core records approach was an appropriate means of balancing the

unique burden and privilege concerns raised by the Touhy request.

It is well-established that under Rule 45(d)(1), "concern for the unwanted burden thrust

upon non-parties is a factor entitled to special weight." *Cusumano v. Microsoft Corp.*, 162 F.3d

708, 717 (1st Cir. 1998); *see e.g.*, *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649

(9th Cir. 1980); *Butler v. Suria*, No. 17 Civ. 3077 (KPF), 2018 WL 4278338, at *2 (S.D.N.Y.

June 27, 2018) (declining to enforce subpoena that sought "sensitive" documents from third

party, noting that a court may "take steps to relieve a non-party of the burden of compliance even

when such accommodations might not be provided to a party'" (citation and alteration omitted));

*Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 781198, at *2

(S.D.N.Y. Mar. 4, 2011). This is particularly true where the non-party is the United States

government, the subpoena seeks classified national security information and sensitive documents

pertaining to ongoing investigations, and compliance would impose substantial burdens on and

divert substantial resources of FBI operational personnel. *See, e.g.*, *Exxon Shipping Co. v. U.S.

Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994); *Moore v. Armour Pharm. Co.*, 927 F.2d

1194, 1197-98 (11th Cir. 1991); *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131,145 (S.D.N.Y. 2009).

The Touhy request indiscriminately seeks a broad swath of records from ongoing national

security investigations. Because of the unique nature of the FBI's PENTTBOM records, the

process of identifying and locating all records responsive to the request would be a difficult and

SUBJECT TO FBI PROTECTIVE ORDER

cumbersome process, requiring engagement with FBI field offices across the United States.[11] *See*

Gilhooly Decl. ¶¶ 10-13. The thousands of hours that have already been expended in searching

for and processing the more limited subset of core records illustrates this point. *See* First FBI Br.

19-20. Requiring the FBI to undertake this process for all Subfile records would present an

extreme burden on FBI officials with ongoing investigative and operational duties and

responsibilities. Gilhooly Decl. ¶¶ 55-56. Courts have afforded significant discretion to DOJ to

determine whether and to what degree it should divert resources from critical operations to

respond to civil discovery demands. *See, e.g., Edwards v. U.S. Dep't of Justice*, 43 F.3d 312, 317

(7th Cir. 1994); *COMSAT*, 190 F.3d at 278.

Such extraordinary burdens are especially unwarranted here. *See* Fed. R. Civ. P. 26(b)(1).

In the course of responding to the Touhy request, the FBI already has released thousands of

pages of material, including records—such as grand jury records and foreign government

information—that are rarely released. Gilhooly Decl. ¶ 19.[12] In selecting materials for inclusion

within the core records, the FBI prioritized evidentiary materials, as it was more likely such

documents could be released, over analytical materials, which more often raise privilege

concerns. Searches for all responsive records will yield a large volume of classified and

otherwise privileged materials.

These challenges are underscored by the PECs' ongoing demands for the production of

the FBI's "entire [S]ubfile [I]nvestigation" and the entire case file for Mohdar. *See* Pl. Br. 11-12,

19. The Subfile Investigation is a pending and active investigation; it contains a large volume of

---

[11] Contrary to the PECs' assertion, the FBI does not "concede[]" that "searching for and providing a list of all . . . responsive records is not burdensome," Pl. Br. 7 n.6; indeed, the searches for the records that have been produced to date have been very time consuming, and a search for *all* potentially responsive records in particular categories would be enormously burdensome.

[12] The PECs misread certain language in the petitions for disclosure of grand jury materials as demonstrating that the FBI included in the core records additional grand jury records that it then withheld from production. Pl. Br. 22. This is not the case. *See* Fourth Normand Decl. ¶¶ 31-32; Gilhooly Decl. ¶ 19 n.11.

documents, many of which are still classified, and "the review and processing of the entire file would consume an exceptionally large amount of time of New York Field Office, Counterterrorism Division and FBI OGC personnel whose primary duty is investigative and operational."[13] Gilhooly Decl. ¶ 44. Similarly, the PECs' demand for all records related to Mohdar "implicates a wide range of sensitive law enforcement information." Sanborn Decl. ¶ 99. Accordingly, the additional searches and processing of records sought by PECs is unduly burdensome in these circumstances.

The PECs criticize the core records approach as a "subjective" process that was deliberately designed to "exclude[] numerous documents of paramount relevance . . . from even being reviewed." Pl. Br. 1, 10-11. This attack on the FBI's good faith is unfounded. Many of the so-called "excluded" records identified by the PECs either do not exist, *see* Gilhooly Decl. ¶ 33 (explaining that there is no ▮▮▮▮▮▮▮▮▮▮▮▮; *id.* ¶ 17 n.8 (same for ▮▮▮▮▮▮▮▮▮▮▮; were not located after doing reasonable searches, *see, e.g., id.* ¶ 33 (electronic searches did not locate any FBI report of interview of Mohdar on January 15, 2002); were withheld as privileged, such as the records ▮▮▮▮▮▮▮▮▮▮ *see supra* at I.D.1; or were in fact produced to the PECs, Gilhooly Decl. Att. A (listing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ interview reports that the PECs claim were omitted from the production, ▮▮▮▮▮▮[14] And the FBI's good faith is demonstrated by the fact that many of the documents FBI subject matter experts independently

---

[13] As the FBI has explained previously, the suggestion that records from the Subfile Investigation could be processed more quickly, Pl. Br. 12, reflects a fundamental misunderstanding of the nature of the review being conducted by the FBI in this matter, *see* First FBI Br. 19-20, and of the difficulties of identifying and locating records that are not available in electronic form, *see* Gilhooly Decl. ¶¶ 10-12.

[14] That the FBI did not search for any ▮▮▮▮▮▮ analysis that it might have performed, Pl. Br. 20, is not evidence of bad faith, but merely reflects that the FBI's core record approach prioritized evidentiary material over analytics that were more likely to be privileged. Moreover, the PECs had no need for any analysis performed by the FBI, as the FBI produced the underlying document, and the PECs can retain an expert to perform such an analysis.

selected for inclusion in the set of core records were precisely the same records that the PECs later identified as priority items in their communications with the FBI. Fourth Normand Decl. ¶¶ 22, 55; Pl. Br. 6 (describing records produced in first and second tranches as "significant").[15]

The PECs wrongly argue that the fact that the FBI, after extensive searches, was not able to locate certain records is evidence of bad faith. Pl. Br. 1-2.[16] In fact, the complexity of searching for items from the PENTTBOM Investigation further demonstrates the FBI's good faith response to the subpoena, as well as the enormity of the burdens that would be imposed were the FBI required to search for and process all the requested records. Due to the extraordinary nature of the 9/11 attacks, virtually every FBI field office in the United States and every overseas FBI Legal Attaché Office was involved in the PENTTBOM investigation and maintained its own hard copy PENTTBOM investigative file. Gilhooly Decl. ¶ 10. While certain documents generated in these various locations were uploaded into the FBI's legacy central electronic recordkeeping repository, the general FBI practice with that legacy system was not to upload documents that originated outside the FBI (*i.e.*, court records and business records from third parties) or paper documents (*i.e.*, handwritten interview notes and inventories of seized property) generated within the FBI. *Id.* ¶ 11. Moreover, many items of potential evidentiary value were maintained at the FBI field office where they were collected; thus, unlike a typical FBI investigation, where a single field office will have all investigative file materials, many such materials for the PENTTBOM case were, and still are, located in offices across the country. *Id.* And while the FBI upgraded its central records management system in 2012, many records that

---

[15] Although the PECs claim that the FBI included documents of "marginal or no relevance" in subsequent tranches, Pl. Br. 10, they fail to mention that the FBI included these materials (and sought leave from a foreign government to produce those documents) in response to a specific request from the PECs for ████████████████████ ████████████████ *see* Fourth Normand Decl. ¶ 25.
[16] The Gilhooly Declaration and the Classified Gilhooly Declaration set forth the substantial efforts the FBI made to locate certain material specifically identified by the PECs, and demonstrate the reasonableness of those searches. *See, e.g.*, Gilhooly Decl. ¶¶ 24-26, 36-38, 41-42.

pre-dated the advent of that system were not retroactively added, and therefore are only available in the original field office case files. *Id.* ¶ 12. Nonetheless, the FBI has spent considerable time and effort searching for documents and things that are not stored electronically, coordinating those efforts with FBI personnel in various field offices and record storage facilities. *See id.* In light of this, any suggestion of bad faith is manifestly unfounded.

The FBI has reasonably balanced its interests related to its law enforcement and counterterrorism missions with the PECs' interests in discovery, and has expended substantial time and resources to search for and process responsive records. But the PECs' demands would require the FBI to locate and process a large volume of classified and otherwise privileged records from an ongoing investigation, much of which the FBI would not be able to produce to the PECs. The Court should not impose this undue and disproportionate burden on the FBI.

## VII.   The Court Should Enter an Order Prohibiting Questioning of Witnesses Regarding any Government Affiliation

The Attorney General and Acting DNI have formally asserted the state secrets privilege over any information that would tend to reveal a confidential source, whether in a document or elicited through questioning at a deposition. Second Barr Decl. ¶ 4; Grennel Decl. ¶ 15.

the United States formally moves for a protective order that would be generally applicable to all depositions, and which would prevent the PECs from questioning witnesses in a manner designed to reveal whether such individuals have a confidential, covert, or protected relationship with the United States.

### CONCLUSION

For the foregoing reasons, the Court should sustain DOJ's final Touhy decision, grant the FBI's motion for a protective order, and deny the PECs' motions to compel disclosure.

**SUBJECT TO FBI PROTECTIVE ORDER**

Dated:          April 13, 2020
                  New York, New York

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney for the
                            Southern District of New York

                  By:    */s/ Jeannette A. Vargas*
                            SARAH S. NORMAND
                            JEANNETTE A. VARGAS
                            ANDREW E. KRAUSE
                            Assistant United States Attorneys
                            86 Chambers Street, 3rd Floor
                            New York, New York 10007
                            Telephone: (212) 637-2709/2678/2769