UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.............................................................x

*In re Terrorist Attacks on September 11, 2001*

No. 03 MDL 1570 (GBD) (SN)

**Filed Under Seal**
**Subject to FBI Protective Order**

.............................................................x

## FOURTH DECLARATION OF SARAH S. NORMAND

SARAH S. NORMAND, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am an Assistant United States Attorney in the office of Geoffrey S. Berman, United States Attorney for the Southern District of New York, attorney for non-party the Federal Bureau of Investigation ("FBI"), a component of the United States Department of Justice ("DOJ") (collectively, the "Government").   Along with my colleagues Jeannette A. Vargas and Andrew E. Krause (individually and collectively, "Government counsel"), I have been assigned to represent the interests of the United States and its agencies and components, including the FBI, in this matter.

2.      I submit this declaration in support of the FBI's opposition to the motions to compel directed at the FBI, filed by the Plaintiffs' Executive Committees ("PECs") under seal on May 31, 2019, and January 15, 2020, respectively, and the FBI's cross-motion for a protective order.   I have previously submitted three declarations in this matter:   the Declaration of Sarah S. Normand dated June 21, 2019 ("First Normand Decl."), the Supplemental Declaration of Sarah S. Normand dated September 12, 2019 ("Second Normand Decl."), and the Declaration of Sarah S. Normand dated October 29, 2019 ("Third Normand Decl."), each of which attached certain exhibits.   All of the documents referred to in this declaration are either attached as exhibits hereto, attached as exhibits to the First or Second Normand Declarations, the

Declaration of Steven R. Pounian dated January 15, 2020 ("Pounian Decl."), or the Declaration of Sean P. Carter dated May 31, 2019 ("Carter Decl."), or available on the public docket at the identified ECF docket entry.

3.     The statements in this declaration are based on my personal knowledge and/or records and information obtained from the FBI or otherwise in the files of the DOJ.

**The *Touhy* Request and FBI's Core Records Approach**

4.     On April 10, 2018, the Plaintiffs Executive Committees ("PECs") served on the FBI a subpoena and a request pursuant to the Department of Justice's so-called "*Touhy*" regulations, 28 C.F.R. §§ 16.21-16.29, for production of ten categories of records (collectively, the "*Touhy* request").   *See* First Normand Decl., Exh. A.   Five of the categories seek "[a]ny and all records"—or, in one case, "any and all PENTTBOM records," referring to the FBI's investigation of the attacks of September 11, 2001—concerning seven individuals or entities[1] (categories (a) and (b)), the FBI's ongoing "subfile" investigation (category (d)), and any subjects of the subfile investigation identified in an October 2012 FBI report (categories (f) and (g)).   *Id.* at App. A.

5.     This Office provided an interim response to the *Touhy* request on May 2, 2018 ("interim *Touhy* response").   *See* First Normand Decl., Exh. B.   In the interim *Touhy* response, the Government objected to the *Touhy* request to the extent it seeks records beyond the limited scope of jurisdictional discovery as defined by the Court, namely, "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers."   *Id.* at 4-6; *see In*

---

[1] Specifically, categories (a) and (b) of the *Touhy* request seek all records concerning Omar al Bayoumi, Fahad al Thumairy, Mohdar Abdullah, Omar Abdi Mohamed, Khalid Sowailem, the King Fahd Mosque, and the Western Somali Relief Agency.   First Normand Decl., Exh. A, App. A at (a), (b).

*re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631, 651 (S.D.N.Y. 2018).   The Government also objected to the *Touhy* request on the grounds that it would impose an extraordinary, disproportionate, and undue burden on the FBI, both in its exceptionally broad scope and insofar as it seeks production of classified and privileged records as well as the entire investigatory file relating to the FBI's ongoing subfile investigation and subjects of that investigation.   *See* First Normand Decl., Exh. B, at 6-11.   In light of these and other objections, the Government asked the PECs to significantly narrow the scope and breadth of the request and subpoena.   *Id.* at 11-12.

6.   The PECs replied to the interim *Touhy* response by letter dated May 25, 2018. First Normand Decl., Exh. C.   The PECs declined to substantially narrow the *Touhy* request. They refused to narrow in any respect six of the ten categories of the *Touhy* request, and thus adhered to their broad request for "any and all records" concerning the FBI's entire subfile investigation and subjects of that investigation.   *Id.*, Exh. A (table) at 2-4.   And as to the other categories, the PECs' proposals did not materially narrow the scope of records sought in the *Touhy* request.   For example, the PECs proposed to exclude the Western Somali Relief Agency from category (a), but only if the FBI agreed to search for and produce "any and all records" regarding the subfile investigation (category (d)).   *Id.*, Exh. A at 1-2.

7.   In subsequent communications over the course of the summer of 2018, the PECs maintained their position that they would not substantially narrow the scope of the *Touhy* request, and indicated that they intended to file a motion to compel.   *See* Exhs. L, O, attached hereto.

8.   In light of the PECs' refusal to substantially narrow the *Touhy* request, and in an effort to determine what if any information about the subfile investigation could be produced, the

FBI, in coordination with Government counsel, determined to identify a group of "core records" that may be particularly relevant to the limited jurisdictional inquiry authorized by the Court. The FBI gathered the initial set of core records during the summer of 2018.

9.      This Office first identified the FBI's core records approach to the PECs during a telephone conversation between myself and PEC member Sean P. Carter on July 3, 2018.   Mr. Carter subsequently sent me an email on July 17, 2018, in which he asked for a letter describing the FBI's proposed approach.   *See* Exh. M, attached hereto.   Government counsel responded to Mr. Carter's email by letter dated July 30, 2018.   *See* Exh. N, attached hereto.   With regard to the core records approach, Government counsel explained that "the FBI is in the process of identifying a subset of documents that may be relevant to the allegations on which the Court has permitted limited jurisdictional discovery to proceed.   The FBI will then conduct a declassification and privilege review of those documents to determine what, if any, information can be provided."

10.      By letter dated August 8, 2018, the PECs acknowledged the Government's July 30, 2018 letter, and specifically the statements regarding FBI's core records approach, and requested to meet and confer.   *See* Exh. O, attached hereto.   A telephonic meet and confer call was held on August 17, 2018, during which the FBI's core records approach was discussed.

11.      On September 10, 2018, the PECs filed a letter with the Court seeking leave to file a motion to compel.   *See* ECF No. 4153.   The Government filed a response on September 13, 2018.   *See* First Normand Decl., Exh. D (ECF No. 4176).   The Government noted, at the outset, that the *Touhy* request is "not an ordinary demand for civil discovery.   Rather, the PECs seek a voluminous amount of material from the files of a federal law enforcement agency regarding active investigations," including "records and information they know to be classified."

The Government advised the Court that, "as this Office explained to the PECs in July and in the most recent meet-and-confer discussion on August 17, the FBI has identified a subset of records that may be relevant to the allegations on which the Court has permitted limited jurisdictional discovery."   The letter further stated that "[t]he FBI has conducted a preliminary review of these materials, and determined that they are all classified and/or were compiled in the course of an active law enforcement investigation.   The FBI is therefore in the process of conducting a thorough declassification and privilege review of this subset of records to determine what, if any, information can be produced in the litigation.   This review is currently underway."   The Government proposed to "provide a report to the PECs and the Court at the discovery conference scheduled for October 12, 2018."   By order dated September 21, 2018 (ECF No. 4189), the Court denied the PECs' request for leave to file a motion to compel in advance of the October 12, 2018 discovery conference, and ordered the Government to provide an oral report at that conference regarding the status of its declassification and privilege review.

12.     On September 26, 2018, the PECs sent Government counsel a letter and a declaration by Catherine Hunt dated September 26, 2018 (the "Hunt Declaration"), and asked for a meet and confer.   Carter Decl., Exh. 5.   In her declaration, Ms. Hunt speculates that certain individuals who were not named in the *Touhy* request, including Mohamed Johar, Smail Mana and Akram Alzamari, were subjects of either the Subfile Investigation or a separate national security investigation.   The Hunt Declaration also sets forth the nature of the Plaintiffs' interest in eight Saudi officials.   The appendix to the Hunt Declaration lists a number of documents Ms. Hunt believed to be in the FBI's possession, including documents from the alleged "cases opened for subjects" Johar, Mana, and Alzamari, as well as "documents containing the names of each subject" of the Subfile Investigation.

13.     Ms. Hunt referred in her declaration to unspecified "U.S. government documents released under FOIA [the Freedom of Information Act] or otherwise declassified."   Upon receipt of the Hunt Declaration, Government counsel requested that the PECs provide copies of any U.S. government documents released under FOIA or otherwise on which Ms. Hunt relied in preparing her declaration, to aid the FBI in identifying and reviewing relevant records.   The PECs did not provide or identify these records.

14.     The PECs and Government counsel met and conferred by telephone on October 9, 2018.   During that call, the PECs emphasized their interest in certain specific documents, including the October 2012 report identified in the *Touhy* request ("the 2012 report") and a purported parking ticket issued at the Los Angeles International Airport ("LAX"), and in documents pertaining to some of the individuals who were described in the body of the Hunt Declaration.   The PECs indicated that they intended to proceed with depositions of certain non-parties in the near future, and they were particularly interested in receiving interview reports for those individuals.

15.     During this call, counsel for the Government stated in sum and substance that the Hunt Declaration would be helpful to the FBI in understanding the individuals and documents that were of particular interest to the PECs.   Government counsel made no commitment to conduct searches for all documents pertaining to Bayoumi, Thumairy, the third main subject of the FBI's investigation referred to in the 2012 report, or any of the individuals identified in the Hunt Declaration.   Nor did Government counsel make any commitment to search for the categories of documents or information listed in the Appendix to the Hunt Declaration ("Hunt Appendix").   Government counsel who participated in the call do not recall the Hunt Appendix being mentioned during the call.

16.     On October 10, 2018, PEC member Steven R. Pounian sent a follow-up email to Government counsel in which he reiterated the PECs' request that the FBI process certain discrete categories of records.   Carter Decl., Exh. 6.   Mr. Pounian's October 10 email identified the following documents as of particular interest to the PECs:   the 2012 report and other summary documents from the subfile; the alleged parking ticket from LAX; interview reports for three individuals whom the PECs had indicated they were seeking to depose in the near future, and records concerning four Saudi government employees, two of whom were identified in the Hunt Declaration.   As of October 10, the FBI had already included the 2012 report and interview records █████████████████████████████ in the set of core records to be reviewed, and additional interview records ████████████████ were later added to the core records in response to the PECs' request.

17.     On October 11, 2018, the parties had another telephonic meet-and-confer call. At that time, Government counsel informed the PECs that the core records gathered to date included interview reports, but we were not in a position to reveal the names of the individuals whose interview reports had been collected as part of the core set of documents.   We represented that the FBI would conduct some supplemental searches for additional core records based on its clarified understanding from the meet-and-confer discussions between Government counsel and the PECs.   We did not state what the scope of those searches would include.

18.     This Court held a discovery conference on October 12, 2018.   *See* First Normand Decl., Exh. E.   Government counsel noted that the *Touhy* request was "extraordinary in its breadth and the types of documents that were requested, which include a wide number of classified and privileged materials pertaining to an ongoing FBI investigation."   *Id.* at 6. Counsel explained that the Government had provided an interim *Touhy* response "which noted a

number of objections as to breadth and classification and privilege and other objections," but that "despite the breadth and despite the objections, our office [the U.S. Attorney's Office] has worked very hard with the FBI to identify a subset of documents that we think may be relevant potentially to the matters on which the Court has authorized limited jurisdictional discovery to proceed."  *Id.* at 7.   "Once we had a group of documents identified, our office asked the FBI to conduct a declassification and privilege review of those records," which was ongoing.   *Id.* Government counsel noted that this was not a typical privilege review, but also a declassification review.  *Id.*

19.     Government counsel advised the Court that the core records included interview records, the 2012 report, portions of other classified reports the PECs had specifically requested in the Touhy request,[2] other records of a more analytical nature, and telephone and banking records.   *Id.* at 12, 15-16.   Government counsel further advised the Court that, based upon "more recent discussions" with the PECs, the FBI was "searching for some additional records," but that "it may not be a large volume."   *Id.* at 9-10.

20.     With regard to timing, Government counsel explained that productions would be made on a rolling basis subject to an appropriate protective order, that the first tranche of records would be ready for production by early or mid-November, and that there would be "at least a second and third tranche."   *Id.* at 8-9.   Government counsel explained that it was not possible to provide a firm deadline for the second tranche or for completion of the review, but that the Government understood the Court (at that time) hoped to complete jurisdictional discovery by early 2019, and with that in mind the Government was working to complete the process as

---

[2] Specifically, the *Touhy* request sought a joint FBI-CIA intelligence report and a Department of Justice Office of Inspector General ("OIG") report, both of which are classified.   First Normand Decl., Exh. A, App. A at (h), (j).

quickly as it could.   *Id*. at 9-10, 15.   Government counsel also emphasized the difficult and

time-consuming nature of the FBI's review, given the highly sensitive nature of the records the

PECs have requested.   *Id.* at 8, 15.

21.     At the October 12, 2018 status conference, the PECs indicated that they were

"hopeful about the process," and they thought it was "the best way under the circumstances to

proceed."   *Id.* at 15.   The PECs acknowledged that "[t]here is some uncertainty right now, but

we're willing to proceed with that uncertainty."   *Id.*

**The FBI's Production of Core Records**

22.     The FBI produced the first tranche of core records on November 19, 2018,[3] and

the second tranche on December 20, 2018.[4]   The first and second tranches of core records

consisted of interview reports, most of which had been gathered during the summer of 2018 and

some of which had been added to the group of core records following the meet and confer

discussions between Government counsel and the PECs in October 2018.

23.     To the extent information was redacted from the FBI's production, redaction

codes were applied to the records to indicate the ground(s) for each redaction.   *See* Second

Normand Decl., Exh. K at 2 (redaction code key).   The FBI also produced a privilege log to

accompany each tranche to the extent any documents were withheld from disclosure in full on

grounds of privilege or other protection, including classification.   *See*, *e.g.*, Pounian Decl., Exh.

17.   All of the FBI's productions were made subject to the FBI Protective Order (ECF No.

4255).

---

[3] The Pounian Declaration mistakenly states that the first tranche was produced on November 29, 2018.   Pounian Decl. ¶ 14.

[4] The Pounian Declaration mistakenly states that the second tranche was produced on August 30, 2019.   Pounian Decl. ¶ 25.

24.     In November 2018, the PECs requested the assistance of Government counsel in obtaining certain documents that had been admitted as evidence at the trial of Omar Abdi Mohamed in the Southern District of California.   In response, I contacted the U.S. Attorney's Office for the Southern District of California, which retrieved the trial records from archives. On November 27, 2018, I provided the PECs with copies of certain of those documents.   *See* Exh. P, attached hereto.

25.     On January 2, 2019, the PECs sent the Government a letter setting forth "a list of documents that [the PECs] wanted to make certain were included in the FBI's searches and produced."   *See* Exh. F.   The list included several specific documents or categories of documents, including the 2012 report, other subfile summary reports post-2012, the alleged LAX parking ticket, materials seized from Bayoumi by New Scotland Yard, a "Bayoumi videotape" of a February 2000 party at the apartment of the hijackers in San Diego, and interview reports and/or notes of interviews of several specific individuals.

26.     FBI's processing of core records was suspended during the lapse in Department of Justice appropriations from December 21, 2018, through January 25, 2019.   Thereafter, the FBI produced a third tranche of records on March 15, 2019.   The third tranche consisted largely of interview reports, including documents that had been added to the core records as a result of discussions with the PECs in October 2018 and the PECs' January 2, 2019 letter.

27.     In March and April 2019, the PECs and Government counsel engaged in a series of meet and confer discussions concerning the FBI's productions.   The PECs noted that the first two tranches of records had contained useful information, but they expressed concern about the third tranche.   Among other things, the PECs noted that the 2012 report had not yet been produced.   *See* Carter Decl., Exhs. 8-9; First Normand Decl., Exhs. G-H.   Government counsel

advised the PECs that the FBI continued to search for and process additional records in response to the *Touhy* request, including telephone and financial records as well as various specific records that the PECs had requested in their January 2, 2019 letter.   We further advised that the initial tranches consisted largely of interview records because, in processing the core records, the FBI had prioritized review of interview reports, as the Government understood from discussions with the PECs in October 2018 that they intended to proceed with depositions on an expedited basis.

28.     With regard to the 2012 report, Government counsel advised the PECs that one of the reasons that document remained under review was that the FBI was awaiting the position of a foreign government regarding release of certain information in the document.   The PECs requested that the FBI produce an interim version of the report, which the FBI agreed to do.

29.     During these meet and confer discussions, the PECs objected that the third tranche production included some records that had previously been released under FOIA. Government counsel responded that this did not have any bearing on the FBI's response to the Touhy request.   We noted that Government counsel had previously asked the PECs to provide copies of any relevant U.S. government documents released under FOIA or otherwise, to assist the FBI in identifying and reviewing the core records, but the PECs declined to do so, claiming that such information was privileged.   Government counsel reiterated their prior request that the PECs identify any documents previously released under FOIA or otherwise publicly available that they wished the FBI to consider as part of the core records review.

30.     On May 1, 2019, the FBI produced a fourth tranche of records.   The fourth tranche contained additional interview reports that had been requested by the PECs in their January 2, 2018 letter, ███████████████████████████████████████ and an

interim version of the 2012 report that lifted certain of the redactions in the version released under FOIA.

31.     At the PECs' request, this Court held a discovery conference on May 13, 2019. *See* Exh. I.   The Court directed the FBI to complete its processing and production of core records, other than telephone and financial records obtained via grand jury subpoena, by July 12, 2019.   *Id.* at 37.   With regard to records obtained via grand jury subpoena, Government counsel explained that the Department of Justice intended to file petitions in the jurisdictions where the grand jury subpoenas were issued to transfer venue to this Court pursuant to Fed. R. Crim. P. 6(e)(3)(G), so that this Court could consider whether to order disclosure pursuant to Fed. R. Crim. P. 6(e).   Exh. E at 16-19.   Counsel for the Government explained that the FBI was still in the process of determining which jurisdictions had issued grand jury subpoenas for the records in question, and that it may not ultimately be possible for the FBI to link all the records with particular subpoenas.   The Court proposed that, in the event the FBI could not match all records with a subpoena, the Court could issue a blanket Rule 6(e) disclosure order with respect to the remaining bank and phone records.

32.     During the summer of 2019, the Department of Justice filed petitions in four districts—the District of New Jersey, the Eastern District of Virginia, the Central District of California, and the Southern District of California—seeking the disclosure of certain grand jury materials and requesting that the petitions be transferred to this Court pursuant to Fed. R. Crim. P. 6(e)(3)(G).   Counsel for the Government in this case requested that the Criminal Division AUSAs who filed these disclosure petitions in the relevant jurisdictions, in addition to listing the specific grand jury records that the FBI had already located and included among the core records, include in the petition a "catch-all" provision referencing any additional records that had been

obtained by grand jury subpoena regarding Bayoumi, Thumairy, or the September 11 attacks.[5]

One of the intended purposes of this "catch-all" provision was to ensure that if any additional

records were located in the future, or if the FBI later determined that any of the bank or phone

records that the FBI had not linked with a specific grand jury subpoena had originated from that

district, the Government would not need to file a second transfer petition in that jurisdiction,

thereby further delaying any production to the PECs.

33.     On July 12, 2019, the FBI produced a fifth tranche of records.[6]  This completed

the FBI's production of core records that had been located as of that date, with the exception of

records obtained via grand jury subpoena and certain records obtained from a foreign

government which the FBI had requested but not yet received authorization to produce.[7]  The

fifth tranche included a revised version of the 2012 report, redacted versions of the joint FBI-

CIA intelligence report and portions of the DOJ-OIG report ▮▮▮▮▮▮▮▮ telephone and

financial records that the FBI had ascertained had not been obtained via grand jury subpoena,[8]

and additional interview reports and other documents that had been requested by the PECs.

34.     On August 30, 2019, the FBI produced a sixth tranche of records,[9] which

included certain of the foreign government records and information that the foreign government

had authorized the FBI to release to the PECs subject to the FBI Protective Order.   Specifically,

---

[5] With respect to the Central District of California, at the time the petition was filed, the Government had not matched any set of records with a subpoena issued from that district, but was still in the process of determining which records had originated from which district.   DOJ filed a petition in that district in an abundance of caution.

[6] The Pounian Declaration mistakenly states that the fifth tranche was produced on July 15, 2019.   Pounian Decl. ¶ 17.   Because of the size of the production, it was produced on a CD served by Federal Express on July 12, 2019.

[7] At the FBI's request, the Court extended the deadline to complete processing and production of the foreign government records to August 31, 2019 (ECF No. 4683), and again to October 16, 2019 (ECF No. 5066).

[8] The PECs later pointed out that some of the telephone records in this production were duplicates.

[9] The Pounian Declaration mistakenly states that the sixth tranche was produced on December 20, 2018.   Pounian Decl. ¶ 26.

the sixth tranche included records ████████████████████████████████████████████

as well as a version of the 2012 report that unredacted certain foreign government information

that had been authorized for release.   The sixth tranche also included telephone records the FBI

had ascertained were not obtained via grand jury subpoena.

35.     On September 12, 2019, the FBI produced a further version of the 2012 report,

which contained the declassified name of the third main subject.

36.     After the Rule 6(e) disclosure petitions referenced above in paragraph 32 were

transferred to this Court, the Court issued an order on October 7, 2019, authorizing disclosure of

the grand jury materials subject to the FBI Protective Order.   *See* ECF No. 5193.

37.     On October 16, 2019, the FBI produced a seventh tranche of records, consisting

of additional records ███████████████████████████████ which the foreign

government had authorized for release to the PECs subject to the FBI Protective Order.

38.     At the PECs' request, the Department of Justice agreed to file an application to

unseal ████████████████████████████████████ in the United States

District Court for the Southern District of California.   The district court granted the application

to unseal these materials on October 17, 2019.

39.     On November 15, 2019, the FBI produced an eighth tranche of records, consisting

of the telephone and financial records obtained via grand jury subpoena that were the subject of

the Court's October 7 order, as well as the unsealed █████████████████████

40.     During the summer and fall of 2019, the PECs and Government counsel conferred

regarding the FBI's productions and the PECs' requests for additional searches.   By letter dated

August 16, 2019, the PECs informed the Government that they believed there were additional

records of core relevance in the FBI's possession that had not been produced.   Pounian Decl.,

Exh. 3.   By letter dated September 4, 2019, counsel for the Government asked the PECs to

identify the records to which they were referring.   *See* Pounian Decl. Exh. 5 at 4.   On October

11, 2019, the PECs provided counsel for the Government with a list of records they believed

should have been included among the core records.   *See* Pounian Decl. Exh. 6.   Several of these

records had not previously been specifically requested by the PECs.   Included on the list were

requests for specific lodging records, records of contacts with flight schools, photos of Bayoumi

or Thumairy with Hazmi and Mihdhar, ████████████████████████████████████ and

interview reports for specific individuals.   *Id.*

41.     The Court held a discovery conference on November 15, 2019.   *See* Exh. R,

attached hereto.   Government counsel advised the Court and the PECs that the FBI continued to

process a handful of remaining records and continued to search for limited additional records that

the PECs had requested, but that the FBI's production of core records was substantially

complete.   *Id.* at 21.

42.     At the Court's direction (ECF No. 5297), the PECs sent Government counsel a

letter dated November 26, 2019, providing a list of issues that the PECs intended to raise in their

omnibus discovery motion.

43.     The PECs separately sent the Government an email on November 20, 2019,

inquiring about, *inter alia*, certain gaps in the phone and bank records produced in the eighth

tranche.   Pounian Decl., Exh. 19.   In response, the FBI agreed to continue to search for

additional responsive phone and bank records for ████████████████████████ *Id*.

44.     The PECs and Government counsel met and conferred by telephone on December

4, 2019.   During that call, the FBI agreed to conduct searches for a number of documents

identified for the first time in the October 11 and November 26 lists, as later set forth in the

Government's email of January 13, 2020.   *See* Pounian Decl., Exh. 18.   The Government also

agreed to search for additional interview reports for certain witnesses, and additional phone and

banking records.   *Id.*

45.     On December 11, 2019, the FBI produced a ninth tranche of documents, which

included additional grand jury materials that had been omitted from the eighth tranche and a few

additional interview reports that the FBI had located.

46.     During the meet and confer process, the PECs identified specific redactions that

they intended to challenge within tranches 1 through 8.   The FBI re-reviewed those redactions to

determine whether any further information could be released from those documents, and

ultimately determined to release limited additional information.   On January 10, 2020, the FBI

produced those reprocessed records as a tenth tranche of records.   The tenth tranche also

included additional interview reports that the FBI had agreed to search for during the December

4 meet and confer.   The FBI withheld in full additional documents from the tenth tranche.

47.     On January 14, 2020, the FBI produced a privilege log to accompany the tenth

tranche production.   *See* Pounian Decl., Exh. 17.   The privilege log includes an entry (Log No.

21) for "Classified Record(s)," with the notation, "Because the FBI cannot provide any

description of certain record(s) without thereby disclosing classified information, a classified

privilege log describing such record(s) will be provided separately to the Court."   At the Court's

direction (ECF No. 5959), the FBI provided a classified privilege log to the Court on February

21, 2020, for review *ex parte* and *in camera* (ECF No. 6001).

48.     On January 13, 2020, Government counsel sent an email to the PECs to update

them on the status of the FBI's searches for certain documents that the PECs had requested.   *See*

Pounian Decl., Exh. 18.   Government counsel advised that the FBI had located ████████████

███████████████████ as well as additional interview reports requested by the PECs, and would

process those materials.   Government counsel further advised that the FBI had located a version

of a document released under FOIA and submitted to the Court as "Exhibit 81" to a PEC motion,

and would process that document, with the exception of the first page, which was part of a

separate record.   Government counsel advised that the FBI was searching for the following

limited records or categories of records requested by the PECs in their October 11 and November

26 lists:   (a) any photographs of the hijackers with Bayoumi or Thumairy (if any), (b) the

Bayoumi party videotape, (c) certain additional telephone, banking and credit card records, (d)

certain lodging records, and (f) records of Mohdar's or Bayoumi's contacts with flight schools (if

any).   The Declaration of Brian T. Gilhooly, Deputy Assistant Director, Operations Branch,

Counterterrorism Division, dated April 8, 2020, provides information regarding the results of

these supplemental searches.

49.     On March 23, 2020, the FBI produced copies ████████████████ to the PECs and

relevant defense counsel.   The mailing sent to PEC firm Kreindler & Kreindler was returned as

undeliverable, apparently because of staffing reductions due to COVID-19.   However, Mr.

Pounian subsequently advised us that he had been able to view ████████████████ that was made

available by another PEC firm.

50.     On April 13, 2020, U.S. Attorney Geoffrey S. Berman issued a final response to

the Touhy request.   *See* Exh. S, attached hereto.

51.     As required by Rule 26(c)(1) of the Federal Rules of Civil Procedure, the FBI has,

in good faith, conferred with the PECs in an effort to resolve these disputes without court action.

**Response to Certain Purported Fact Statements in the PECs' Memorandum of Law**

52.     The PECs' memorandum of law contains several purported statements of fact that are not supported by competent evidence and are inaccurate.[10]

53.     The PECs state on page 4 of their memorandum of law that during the telephonic meet and confer call on August 17, 2018, DOJ "told the PECs for the first time that the FBI was working to locate and review so-called core documents."   This is incorrect.   Prior to the August 17, 2018 meet and confer, I discussed the core records approach during a telephone call with PEC member Sean Carter on July 3, 2018, which Mr. Carter acknowledged in his email of July 17, 2018, *see* Exh. M.   I also described the core records approach in a July 30, 2018 letter to the PECs, *see* Exh. N, which was acknowledged in the PECs' August 8, 2018 letter, *see* Exh. O.

54.     On page 5 of their memorandum of law, the PECs state that at the October 12, 2018 hearing, "the DOJ advised this Court that the FBI intended to produce the core documents relevant to the jurisdictional inquiry."   To the extent this statement is intended to suggest that Government counsel represented that the FBI would produce all of the core records it has gathered, or all records relevant to the jurisdictional inquiry, it is not accurate.   As the transcript reflects, Government counsel advised that the FBI was conducting a privilege and declassification review of "a subset of documents that we think may be relevant potentially to the matters on which the Court has authorized limited jurisdictional discovery to proceed," as well as "some additional records" that would be added to the core group as a result of "more recent discussions" with the PECs, which "may not be a large volume."   First Normand Decl., Exh. E at 7, 9.   Counsel represented that the FBI likely would be in a position to produce documents in

---

[10] The PECs' memorandum of law contains characterizations of various meet and confer discussions between the PECs and Government counsel.   The Government does not adopt those characterizations.

response to the *Touhy* request on a rolling basis and subject to an appropriate protective order, and that if records were withheld from any production on privilege or other grounds, the FBI would so indicate.   *Id.* at 8, 10-11.

55.     On page 5 of their memorandum of law, the PECs purport to explain which "recent discussions" I was referring to when I advised the Court, at the October 12, 2018 hearing, that "we are searching for some additional records."   The PECs speculate that "[t]he communications referenced by the DOJ included Plaintiffs' September 28, 2018 [sic] proffer through a Declaration of Catherine Hunt and its Appendix."[11]   In fact, as I have previously advised the PECs, *see* First Normand Decl., Exh. H at 2, my comments referred to the telephonic meet and confer session on October 9, 2018, which was summarized in Mr. Pounian's follow-up email of October 10, 2018, *see* Carter Decl., Exh. 6.   Mr. Pounian's October 10 email makes no mention of the Hunt Appendix.   As noted above, Government counsel made no commitment during the October 9 call to search for particular records, let alone the broad categories of records identified in the Hunt Appendix.   Government counsel who participated in the call have no recollection of the Hunt Appendix being mentioned during the call.

56.     The PECs state on page 6 of their memorandum of law that "the first two tranches in November and December 2018 . . . included . . . information that the FBI produced in direct response to the [sic] Catherine Hunt's Appendix list."[12]   That is not accurate.   The first and second tranches consisted of interview reports ▬▬▬▬▬▬▬▬▬   The FBI had collected

---

[11] The Hunt Declaration and Appendix were provided to Government counsel on September 26, 2018.   Carter Decl., Exh. 5.

[12] For this proposition, the PECs cite the Second Supplemental Declaration of Catherine Hunt, dated July 9, 2019. Pl. Br. 6. By letter dated July 15, 2019, the Government moved to strike this and other portions of the Second Supplemental Hunt Declaration.

interview reports pertaining ███████ individuals in the summer of 2018, well before the FBI received the Hunt Declaration on September 26, 2018.

57.     The PECs state on pages 6-7 of their memorandum of law that in an email dated August 2, 2019, Pounian Decl., Exh. 2, the Government "disclosed for the first time that its core records approach was not designed to search for all records relating to Bayoumi and Thumairy or other principals, but rather the 'FBI's approach has always been that it would undertake a declassification review with respect to a *subset* of 'core' records involving Bayoumi and Thumairy.'"   Government counsel never stated, in any letter, email or telephone conversation, that the FBI would search for "all records" regarding Bayoumi, Thumairy, or any other person or entity.   To the contrary, Government counsel advised the PECs on multiple occasions, well before August 2019—including in letters dated July 30 and September 13, 2018, and at the discovery conference on October 12, 2018—that the core records consisted of a "subset of records" that were potentially relevant to the limited jurisdictional inquiry before the Court.   *See* Exh. N (July 30, 2018 letter); First Normand Decl., Exh. D (Sept. 13, 2018 letter) at 2, Exh. E (Oct. 12, 2018 transcript) at 7; *see also* Pounian Decl., Exh. 2 (Aug. 2, 2019 email) at 2, Exh. 5 (Sept. 4, 2019 letter) at 4.

58.     On pages 12 and 13 of their memorandum of law, the PECs state that in May 2019, "the Department of Justice conceded there was 'no dispute' that the FBI was obligated to search for and produce its relevant documents ███████ This is incorrect.   As the portions of the transcript quoted in footnote 14 on page 13 of the PECs' memorandum make clear, I advised the Court at the May 13, 2019 discovery conference that as to two individuals, one of whom ███████ "those two individuals we understand are among those individuals as to whom the court has permitted discovery or at least there is no dispute as to that, and records concerning

those individuals were part of the FBI's search, so the FBI has searched for records concerning

those individuals."   First Normand Decl., Exh. I at 20.   No commitment was made, at the May

2019 conference or any other time, to produce documents ████████████████

**Exhibits to This Declaration**[13]

59.   Attached to this declaration are true and complete copies of the following

exhibits:

Exhibit L:   Letter from the PECs to the U.S. Attorney's Office, dated June 28, 2018;
Exhibit M:   Email from Sean Carter to Sarah S. Normand, dated July 17, 2018;
Exhibit N:   Letter from Sarah S. Normand to the PECs, dated July 30, 2018;
Exhibit O:   Letter from the PECs to the U.S. Attorney's Office, dated Aug. 8, 2018;
Exhibit P:   Letter from Sarah S. Normand to the PECs, dated Nov. 27, 2018 (w/o encl.);
Exhibit Q:   ████████████████████████████████████████████
Exhibit R:   Transcript of Discovery Conference on November 15, 2019;
Exhibit S:   Final *Touhy* Response from U.S. Attorney Geoffrey S. Berman, dated April 13, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            April 13, 2020

                         /s/ *Sarah S. Normand*
                        SARAH S. NORMAND
                        Assistant United States Attorney

---

[13] Exhibits A-I are attached to the First Normand Declaration, and Exhibits J and K are attached to the Second Normand Declaration.