**SUBJECT TO FBI PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                        :
                                          :

In Re Terrorist Attacks on September 11, 2001    :       03 MDL 1570 (GBD)(SN)
                                          :
                                          :
-------------------------------------------------------------x

---

**DECLARATION OF
JILL SANBORN, ASSISTANT DIRECTOR
FEDERAL BUREAU OF INVESTIGATION**

---

      I, Jill Sanborn, hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation

("FBI"), United States Department of Justice ("DOJ").  I am responsible for, among other things,

directing the conduct of FBI counterterrorism investigations.

2.      In my capacity as Assistant Director of the FBI's Counterterrorism Division, I have been

delegated original classification authority by the Attorney General of the United States.  *See*

Executive Order ("EO") 13,526, Section 1.3(c).  As a result, and pursuant to all applicable

Executive Orders, I am responsible for the protection of classified information, including the

sources, methods, and techniques used by the FBI in the collection of such information.  Thus, I

have been authorized, pursuant to the responsibilities and obligations as defined in Executive

Orders and through the delegation from the Attorney General, to execute declarations and

SUBJECT TO FBI PROTECTIVE ORDER

affidavits in order to protect such classified information.[1]

3.       In my capacity as Assistant Director, I also have been delegated authority by the Director of the FBI to assert the law enforcement privilege where, for example, disclosure of information could cause harm to an investigation or investigative interest of the FBI, could impair the effectiveness of an investigative technique, method, or procedure of the FBI, or could tend to reveal a confidential source of information.  As Assistant Director, I also am authorized to assert the work product privilege and the deliberative process privilege.

## I. PURPOSE OF THIS DECLARATION

4.       I submit this declaration in support of the Attorney General's assertion of the state secrets privilege and to support the FBI's assertion of other privileges in response to Plaintiffs' motion to compel the production of information responsive to a Touhy request and subpoena that Plaintiffs served upon the FBI in or about April 2018 (the "Touhy Request"), and the FBI's cross-motion for a protective order with respect to the Touhy Request.

5.       As set forth further below, it is my judgment that disclosure of the information subject to the Attorney General's assertion of the state secrets privilege described herein reasonably could be expected to cause significant harm to the national security of the United States.  I also will submit a classified *in camera, ex parte* declaration in support of the Attorney General's assertion of the state secrets privilege and in support of the FBI's assertion of other privileges.  In my classified declaration, I provide additional details about the information subject to Plaintiffs'

---

[1] Executive Order 13,526, Section 1.2(a)(1) states that TOP SECRET shall be applied to "information the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe."  Section 1.2(a)(2) states that SECRET shall be applied to "information the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." In this declaration, I use the term "significant" harm, which is the standard set out in the Department of Justice's internal policy regarding assertion of the state secrets privilege.  My understanding is that the "exceptionally grave" and "serious" standards in EO 13526, Section 1.2(a) meet the Department's "significant" harm standard.

**SUBJECT TO FBI PROTECTIVE ORDER**

motion and the FBI's cross-motion, and the reasons why its disclosure reasonably could be expected to cause significant harm to national security and the FBI's law enforcement mission.

6.     Through the exercise of my official duties, I have been advised of this civil action in which Plaintiffs, who are victims and families of victims of the terrorist attacks of September 11, 2001, or entities that sustained damage or losses as a result of the attacks, allege that Defendants provided material support to Osama bin Laden and to the Al Qa'ida ("AQ") terrorist organization.  I have been advised that with regard to Defendant the Kingdom of Saudi Arabia (the "Kingdom" or "Saudi Arabia"), Plaintiffs allege that its agents and employees directly and knowingly assisted the hijackers and plotters who carried out the 9/11 attacks.

7.     I am further aware that the Court authorized Plaintiffs to conduct limited and targeted jurisdictional discovery on the issue of whether and to what extent Saudi nationals Fahad al-Thumairy ("Thumairy") and Omar al-Bayoumi ("Bayoumi") and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Nawaf al-Hazmi ("Hazmi"), Khalid al-Mihdhar ("Mihdhar"), and other 9/11 hijackers.  Plaintiffs thereafter served the Touhy Request on the FBI seeking a wide range of documents relating to the FBI's ongoing investigations into the 9/11 attacks.

8.     I am aware that in response to the Touhy Request, as well as subsequent specific requests made by Plaintiffs, the FBI has produced approximately 4,000 pages of documents, some in redacted form, and has identified an additional twenty-one documents or groups of documents responsive to the Touhy Request which have been withheld in full. I also am aware that on January 15, 2020, Plaintiffs filed a motion to compel challenging the scope of the FBI's search and the redactions and withholding of those documents.

9.     As the official charged with directing and overseeing the FBI programs responsible for

**SUBJECT TO FBI PROTECTIVE ORDER**

conducting counterterrorism investigations, I have concluded that unauthorized disclosure of the information subject to the Attorney General's state secrets privilege assertion described herein reasonably could be expected to cause significant harm to the national security of the United States.

10.     The matters stated herein are based on my personal knowledge, my background, training, and experience related to national security matters, my review and consideration of documents and information available to me in my official capacity (including the Touhy Request, the twenty-one documents or groups of documents that have been withheld in full and that are listed on the FBI's privilege logs, and the challenged portions of the approximately 4,000 pages that were released to Plaintiffs in part and from which information was withheld on the grounds of privilege), my judgment as Assistant Director, and information furnished to me by employees of the FBI and DOJ.  I have reached my conclusions in accordance therewith.

11.     Specifically, this declaration addresses, to the extent feasible in an unclassified document, the significant harm to the national security interests and law enforcement interests of the United States that could reasonably be expected to result from the disclosure of the information that is the subject of Plaintiffs' motion to compel and the FBI's cross-motion to quash and for a protective order.

12.     In particular, the Attorney General's assertion of the state secrets privilege encompasses the following categories of information implicated by Plaintiffs' motion to compel:  (A) the identity of subjects of national security investigations; (B) reasons for the national security investigations and results of the investigations; (C) sensitive sources and methods used in national security investigations; and (D) foreign government information and information sharing and cooperation with foreign partners.  The FBI's assertion of the law enforcement

**SUBJECT TO FBI PROTECTIVE ORDER**

privilege and the protections of the National Security Act of 1947, as amended by the

Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024(i)(1) (the

"National Security Act"), also encompasses these categories of information.

## II. THE FBI'S ROLES AND RESPONSIBILITIES

13.     The FBI's mission is to protect and defend the United States against terrorist and foreign

intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide

leadership and criminal justice services to federal, state, municipal, and international agencies

and partners.  In order to defend the country from a range of national security and major criminal

threats, the FBI uses an intelligence-driven and threat-focused approach, combining its

investigative and intelligence operations to be more analytical and preventative, more aware of

emerging threats, and better able to stop them before they turn into crimes, including acts of

terrorism.

14.     The FBI's top priority is protecting the United States from terrorist attacks.  Working

closely with its partners, including our most trusted foreign partners who rely upon the FBI to

protect their confidential information and maintain the confidentiality of their cooperation,[2] the

FBI uses its investigative and intelligence capabilities to neutralize terrorist cells and operatives

in the United States, to help dismantle extremist networks worldwide, and to cut off financing

and other forms of support provided by terrorist sympathizers.  In carrying out the FBI's

paramount mission of securing the nation from terrorism, criminal prosecution is just one of

several means that the FBI uses to protect national security.

---

[2] At ¶¶ 39–40, *infra*, I explain the chilling effect on the FBI's ability to obtain intelligence from its trusted foreign partners if the FBI is unable to protect this confidential information and maintain the confidentiality of this cooperation.

SUBJECT TO FBI PROTECTIVE ORDER

### III.  BACKGROUND ON THE PENTTBOM AND SUBFILE INVESTIGATIONS

15.      In response to the terrorist attacks on September 11, 2001, the President and the Attorney

General directed the FBI to conduct a nationwide investigation to identify and apprehend

individuals involved in the attacks and to prevent future acts of terrorism within the United

States.  That initial investigation, known as the PENTTBOM investigation, remains open.

16.      The publicly released report of the 9/11 Review Commission dated March 2015[3] notes at

page 101 the opening of a "subfile" within the PENTTBOM investigation in order to "sharpen

the focus on the lingering allegations that the circle of 9/11 conspirators may be wider."  The

9/11 Review Commission report also refers at page 103 to the continuing work of "the subfile

team."  In the public declaration of Michael C. McGarrity previously submitted in this case ("the

Public McGarrity Declaration") (ECF No. 5142), then-Assistant Director McGarrity used the

term "Subfile Investigation" to refer to the subject matter of the FBI's 2012 Report, which was

the subject of the prior assertion of the state secrets privilege in this case.  For purposes of this

unclassified declaration, I will use the term "Subfile Investigation" to refer to the same matter.

17.      That Thumairy and Bayoumi are among the subjects of the open Subfile Investigation has

been previously disclosed.[4]  The identity of a third subject of the Subfile Investigation, ███████

████████████████████████████████████████████████████████████  is not known

publicly, but has been released to counsel for Plaintiffs, the Kingdom of Saudi Arabia, and

Dallah Avco in accordance with the FBI Protective Order entered in this matter.

---

[3] Found at https://www.fbi.gov/file-repository/final-9-11-review-commission-report-unclassified.pdf/view.
[4] The FBI's interest in Thumairy and Bayoumi was publicly disclosed in the Final Report of the National
Commission on Terrorist Attacks Upon the United States (the "9/11 Commission Report") published in 2004.  The
9/11 Review Commission report later identified Thumairy and Bayoumi as "key individuals."  Subsequently, in
response to a Freedom of Information Act request, the FBI released a redacted version of the 2012 Report which
states that Thumairy and Bayoumi are main subjects of the Subfile Investigation.

SUBJECT TO FBI PROTECTIVE ORDER

## IV.  PLAINTIFFS' TOUHY REQUEST AND THE FBI'S RESPONSE

18.    I understand that in April 2018, Plaintiffs served the FBI with the Touhy Request, which

seeks the following:

    *a.*  Any and all records referring or relating to Omar al Bayoumi, Fahad Al Thumairy,

Mohdar Abdullah ("Mohdar"), Omar Abdi Mohamed ("Mohamed"), Khalid

Sowailem ("Sowailem"), the King Fahd Mosque, or the Western Somali Relief

Agency;

    *b.*  Any and all PENTTBOM records referring or relating to Bayoumi, Thumairy,

Mohdar, Mohamed, Sowailem, the King Fahd Mosque, or the Western Somali Relief

Agency;

    *c.*  Any and all communication records (including but not limited to phone, email and

fax) and financial and banking records of Mihdhar, Hazmi, and Anwar al Aulaqi

(prior to and on September 11, 2001);

    *d.*  Any and all records referring or relating to the work and investigation of the

PENTTBOM subfile team, as referenced on pp. 101-103 of the 9/11 Review

Commission Report;

    *e.*  The 2012 FBI Summary Report (the "2012 Report");

    *f.*  Any and all records referring or relating to any person(s) referenced in the 2012

Report as "subjects" of the investigation described in that report;

    *g.*  Any and all records referring or relating to the person(s) "who tasked al-Thumairy

and al-Bayoumi with assisting the hijackers," according to the 2012 Report (*i.e.*, any

and all records referring or relating ▓▓▓▓▓ );

    *h.*  The joint FBI-CIA intelligence report assessing the nature and extent of Saudi

government support for terrorism ("Joint FBI-CIA Intelligence Report");

    *i.*    The September 1, 2005 letter from Robert Mueller and Porter Goss to Senator Pat

        Roberts, enclosing the Joint FBI-CIA Intelligence Report;

    *j.*    The November 2004 DOJ, Office of the Inspector General, report titled "A Review of

        the FBI's Handling of Intelligence Information Related to the September 11 Attacks

        (November 2004)" ("OIG Report").

19.    I am advised that on or about May 2, 2018, the U.S. Attorney's Office for the Southern

District of New York ("USAO/SDNY"), on behalf of the FBI, provided an interim response to

the Touhy Request and the subpoena, in which the government, *inter alia*, asked Plaintiffs to

substantially narrow the Touhy Request to records pertaining to the specific allegations as to

which the Court has permitted limited and targeted jurisdictional discovery, and set forth specific

objections to the subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure and

DOJ's Touhy regulations.

20.    As relevant here, the FBI objected to the Touhy Request because, *inter alia*, it called for

the disclosure of classified information, protected information concerning confidential sources or

investigatory records, and records or information where a statute or regulation, such as the

National Security Act, the Privacy Act, the Internal Revenue Code, the Bank Secrecy Act, or

Rule 6(e) of the Federal Rules of Criminal Procedure, forbids disclosure. The FBI also objected

to the Touhy Request to the extent it sought privileged documents or information.  The FBI

asked Plaintiffs to consider ways in which they could significantly narrow the scope and breadth

of the Touhy Request, explaining that the Touhy Request as currently framed would impose an

undue burden on the FBI and would require a long period of time to process.

21.    I am advised that in a letter dated May 25, 2018, Plaintiffs responded to the government's

**SUBJECT TO FBI PROTECTIVE ORDER**

May 2 letter. Plaintiffs refused to narrow the scope of subcategories (c), (d), (f), or (g), and as to subcategory (a), would only agree to drop their request for records relating to Western Somali Relief Agency and Mohdar Abdullah if the FBI otherwise agreed to provide all documents from the Subfile Investigation.

22.     I understand that, after further communications between the government and Plaintiffs, the USAO/SDNY, on behalf of the FBI, sent a letter to Plaintiffs on July 30, 2018, which explained that the FBI was in the process of identifying a subset of documents that may be relevant to the allegations on which the Court has permitted limited jurisdictional discovery, and would then conduct a declassification and privilege review of those documents to determine what, if any, information could be provided.

23.     The FBI proceeded to follow the "core records" approach outlined in its July 30 letter in responding to subcategories (a), (b), (d), (f) and (g) of the Touhy Request.  The details of how the FBI identified and searched for "core records" are set forth in detail in the Declaration of Brian T. Gilhooly, Deputy Assistant Director, Counterterrorism Division.  It is my understanding, however, that to identify the "core records" relevant to the issue of whether and to what extent Thumairy and Bayoumi and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers, the FBI consulted with subject matter experts in the FBI New York Office who currently or formerly were assigned to the Subfile Investigation, the Counterterrorism Division at FBI Headquarters (which oversees the Subfile Investigation), and attorneys from the FBI's Office of General Counsel and the USAO/SDNY.  Based on these consultations, the FBI searched for certain evidentiary and analytical materials regarding Thumairy, Bayoumi, █████████████

24.     Among the evidentiary materials included in the "core records" collection are FBI

**SUBJECT TO FBI PROTECTIVE ORDER**

interview reports, telephone and bank records, source reporting documents, and foreign

government information.  Analytical materials include internal FBI documentation referred to as

Electronic Communications ("ECs") and investigative summaries.  In addition to the "core

records" initially collected by the FBI, the FBI searched for and processed additional records that

were specifically identified by Plaintiffs during meet-and-confer discussions with the

USAO/SDNY, including additional FBI interview reports, and records that previously had been

under seal pursuant to orders of various United States district courts (records which were

unsealed at the request of the DOJ in connection with this litigation).  The FBI also included as

part of its "core records" collection three documents specifically identified in the Touhy

Request—the 2012 Report, the Joint FBI-CIA Intelligence Report, and any portions of the OIG

Report referencing Thumairy, Bayoumi ██████████

25.     Once these "core records" were identified and collected, the FBI then carefully reviewed

the materials to determine what could be declassified and released and what would still have to

be withheld on the basis of privilege.  As a result of this approach, the FBI released, in whole or

in part, approximately 4,000 pages of materials in response to the Touhy Request.  The FBI

redacted privileged material from those documents, and applied codes to the redactions

indicating the bases for the FBI's withholdings.  Moreover, the FBI prepared a privilege log

describing any "core record" that the FBI had withheld in full on the basis of privilege.  A true

and correct copy of that privilege log is attached as Exhibit A to this declaration (the "Public

Privilege Log").  In addition, because certain documents could not be described on a privilege

log without thereby revealing classified information, the FBI separately prepared a classified

privilege log that describes additional classified records that have been withheld in full.  A true

and correct copy of that classified privilege log (the "Classified Privilege Log") has been

**SUBJECT TO FBI PROTECTIVE ORDER**

provided *in camera ex parte* to the Court.  For the remainder of this declaration, I will refer to

the documents that have been released in whole or in part to Plaintiffs as responsive to the Touhy

Request, as well as the documents described on both the Public and Classified Privilege Logs,

collectively, as the "Core Records."

26.     The FBI has withheld from the Core Records, in whole or in part, information that is

subject to the state secrets privilege, the law enforcement privilege, the National Security Act,

the informant privilege, the deliberative process privilege, and the work product doctrine.

## V.  PLAINTIFFS' MOTIONS TO COMPEL THE PRODUCTION OF DOCUMENTS

27.     I am advised that on May 31, 2019, Plaintiffs filed a motion to compel the FBI to produce

any and all documents in its possession concerning four individuals—Abdullah Ali Saleh-

Jaithen, a/k/a Abdullah A.S. al-Jraithen ("Jraithen"); Sadhan; Sudairy; and Mohamed.  Even

though only one of those individuals (Mohamed) was named in the Touhy Request, I understand

that Plaintiffs argued that the FBI investigated the other three individuals as part of the Subfile

Investigation.  In addition, Plaintiffs sought an order compelling the FBI to disclose an

unredacted copy of the 2012 Report, including the name of the person or persons who, according

to the Report, "tasked" Thumairy and Bayoumi with assisting the hijackers.

28.     The FBI opposed the motion to compel in submissions filed on June 21, 2019 (addressing

the four individuals), and September 12, 2019 (addressing the 2012 Report).  As part of the

September 12, 2019 response, the FBI declassified ███████████ in the 2012 Report, and the

Attorney General asserted the state secrets privilege over the remaining withholdings in the

document.

29.     Plaintiffs filed a second motion to compel on January 15, 2020.  I understand that in the

second motion, Plaintiffs seek an order requiring the production of the following categories of

**SUBJECT TO FBI PROTECTIVE ORDER**

documents:  (i) the FBI's entire Subfile Investigation; (ii) any and all records referring or relating

██████ (iii) unspecified "evidence" regarding specific tasks that ██████████████

allegedly performed to aid Hazmi and Mihdhar; (iv) ██████ phone records; (v) documents

concerning Saudi Prince Abdulaziz bin Fahad ("Prince Abdulaziz"); (vi) the FBI's entire case

file on Mohdar; (vii) specific FBI witness statements for Mohdar and Abdussattar Shaikh; (viii)

the FBI's analysis of the ████████████████ (ix) subscriber information related to

certain phone records and analysis of telephonic activity; and (x) documents analyzing bank

records and money transfers.[5]  Plaintiffs also challenged the withholding of all documents listed

on the FBI's privilege logs, and certain information that had been withheld on the grounds of

privilege or privacy from the Core Records.

## VI.  INFORMATION SUBJECT TO THE STATE SECRETS PRIVILEGE AND THE HARM TO NATIONAL SECURITY FROM DISCLOSURE

30.     The Attorney General's assertion of the state secrets privilege covers certain national

security information within the following four general categories:

A.  **Subject Identification**:  The Attorney General's assertion of the state secrets

privilege encompasses information which would indicate that a particular individual or entity is

or was the subject of a national security investigation, unless the identity of the subject has been

made public or declassified under proper authority.  This category of information includes

information that could tend to confirm or deny whether a particular individual or entity is, was,

or was not the subject of a national security investigation.

---

[5]  The motion to compel also seeks the production of certain categories of records that the FBI has committed to search for as part of its "core records" approach but has not yet been able to locate.  Those records, and the details of the FBI's efforts to locate those records, are addressed in the Declaration of Brian T. Gilhooly, Deputy Assistant Director, Counterterrorism Division.

B. **Reasons for Investigation and Results**:  The Attorney General's assertion of the state secrets privilege encompasses information which would reveal the reasons a particular individual or entity is or was the subject of a national security investigation and information obtained as a result of that investigation.

C. **Sources and Methods**:  The Attorney General's assertion of the state secrets privilege encompasses information which would reveal sensitive sources and methods used in a national security investigation.

D. **Foreign Government Information and Information Sharing and Cooperation with Foreign Partners**:  The Attorney General's assertion of the state secrets privilege encompasses information received from a foreign government with the understanding that it, and/or the nature of the information sharing and cooperation between the FBI and foreign partners in a national security investigation, will remain confidential.

## A.  SUBJECT IDENTIFICATION

31.     The first category of information encompassed by the Attorney General's assertion of the state secrets privilege is information which would indicate that a particular individual or entity is or was the subject of a national security investigation, unless the identity of the subject has been made public or has been declassified under proper authority.  In unclassified terms, this category includes information that could tend to confirm or deny whether a particular individual or entity is, was, or was not the subject of an FBI national security investigation.  This type of information may include the name of an individual or entity, and reporting on an individual or entity which indicates they are or were the subject of an investigation.  Protection of this information is critical to the FBI's national security efforts, and disclosure reasonably could be expected to cause significant harm to the national security.

**SUBJECT TO FBI PROTECTIVE ORDER**

32.     Disclosure that particular individuals or entities are the subjects of open national security investigations obviously would alert the subjects to the fact of the FBI's current interest in them. Such knowledge would cause significant harm to FBI national security investigations, as subjects could reasonably be expected to destroy evidence, attempt to influence witnesses, or take steps to alter their conduct so as to avoid detection of their activities.  In these circumstances, disclosure of the fact that they are subjects could significantly hinder the FBI in gathering further intelligence on their activities or determining their whereabouts.  In addition, knowledge that they are under investigation might enable subjects to anticipate the activities of the FBI.  Such knowledge would also alert associates of the subjects to the fact that the FBI may be aware of their associations with the subjects, causing them to take similar steps to avoid scrutiny. Disclosure could also enable subjects to ascertain the identities of confidential human sources ("CHSs") or other sources of intelligence, putting those sources at risk.

33.     Similarly, even where an investigation has been closed, disclosing that an individual or entity formerly was the subject of a classified national security investigation reasonably could be expected to cause significant harm to national security.  Disclosure that an individual or entity has been, but is no longer, under investigation might induce that subject to evaluate previous conduct and interactions to determine what information the Government might have obtained about them.  To the extent that the former subject's terrorism-related intentions were not previously detected and the individual or entity later decided to undertake terrorist activity, their knowledge that they were no longer the subject of investigative interest might embolden that person or entity to operate or take action, confident that there is no threat of detection.  In addition, the fact that investigations are closed typically does not indicate that subjects have been "cleared" of wrongdoing.  The FBI frequently reopens closed cases based on new information.

## B. REASONS FOR INVESTIGATION AND RESULTS

34.     The second category of information encompassed by the Attorney General's assertion of

the state secrets privilege is information that could tend to reveal the predicate for an FBI

national security investigation regarding a particular person or entity, information obtained

during the course of such an investigation, and the status and results of the investigation.  This

would include information (if any) the FBI obtained from the U.S. Intelligence Community

related to the reasons for any investigation, and information regarding subjects of investigation

that could tend to reveal the predicate for, information obtained in, or results of a national

security investigation. Disclosure of such information reasonably could be expected to cause

significant harm to national security.

35.     In unclassified terms, disclosure of this information would reveal a range of sensitive

national security investigative information.  Obviously, disclosure of this information would

reveal what the FBI knows or does not know and what the FBI deems important to a national

security investigation.  Disclosure of such information would alert current and future subjects to

those activities which are likely to arouse suspicion and result in the opening of an investigation,

thus providing valuable insight to those intent on terrorism and other criminal activity on how to

avoid detection.  Disclosure of such information may also alert subjects and others of the sources

of that information, thus revealing sensitive sources and methods including the existence of CHS

reporting on that subject.

## C.  SOURCES AND METHODS

36.     The third category of information encompassed by the Attorney General's assertion of

the state secrets privilege is information which would reveal sensitive sources and methods used

in a national security investigation.  This category includes information that could tend to reveal

**SUBJECT TO FBI PROTECTIVE ORDER**

particular sources, methods or techniques, or classified policies and procedures, used by the FBI in national security investigations with respect to specific individuals and entities. This would include information related to court-ordered searches or surveillance, CHSs, and other investigative or operational sources and methods the FBI may use in a national security investigation regarding a particular person, the reasons such sources and methods were used, the status of the use of such sources and methods, and results derived from such sources and methods.

37.     The disclosure of information in this category reasonably could be expected to cause significant harm to national security. Protecting FBI sources and methods for investigating or countering potential national security threats is of the utmost significance because the FBI's top priorities are to protect the United States from terrorist attacks and foreign counterintelligence operations. The disclosure of sources and methods would assist adversaries by revealing how the FBI performs these vital tasks. It would allow adversaries to exploit this information to deploy countermeasures or escape detection, thereby interfering with the FBI's mission. Disclosure of sensitive sources and methods also would risk compromising the use of those sources and methods in the future, and potentially risk harm to specific individuals, including CHSs.

### D.  FOREIGN GOVERNMENT INFORMATION AND INFORMATION PERTAINING TO INFORMATION SHARING AND COOPERATION WITH FOREIGN PARTNERS

38.     The last category of information encompassed by the Attorney General's assertion of the state secrets privilege is information received from a foreign government with the understanding that it and/or the nature of the FBI's information sharing and cooperation with foreign partners in a national security investigation will remain confidential, or information reflecting assistance supplied to the United States by a foreign government.

**SUBJECT TO FBI PROTECTIVE ORDER**

39.     In unclassified terms, disclosure of classified information reflecting assistance supplied to the United States by foreign government counterparts in connection with national security investigations reasonably could be expected to cause significant harm to national security.  The FBI's ability to carry out its responsibilities to conduct national security investigations and collect foreign intelligence often depends on the cooperation of foreign government officials, foreign intelligence services, or foreign security services.  Through a series of international agreements, memoranda of understanding, Mutual Legal Assistance Treaties, letters rogatory, and other voluntary and compulsory agreements, as well as professional relationships between the U.S. Government and foreign governments, the FBI receives and retains law enforcement and intelligence information from participating countries which the FBI uses in the course of its investigations.

40.     Maintaining the confidentiality of foreign government information is critical to sustaining ongoing, productive cooperation with friendly foreign nations in the field of counterterrorism. The release of official government documents that reveal the nature of the confidential assistance provided to the FBI in connection with the PENTTBOM or Subfile investigations would compromise established confidentiality agreements, and thereby reasonably could be expected to strain relations between the United States and the foreign government(s).  That release also could have a chilling effect on the free flow of vital information to U.S. intelligence and law enforcement agencies.  In addition, disclosure of a country's cooperation with the FBI could reasonably be expected to cause significant harm to national security because it would enable terrorists to avoid or employ countermeasures in countries that share information with the United States.

**VII.  INFORMATION ENCOMPASSED BY THE STATE SECRETS PRIVILEGE**

SUBJECT TO FBI PROTECTIVE ORDER

41.      The Attorney General's assertion of the state secrets privilege applies to the 20 documents that the FBI has withheld in full and which are described on the Public Privilege Log, as well as the documents described on the Classified Privilege Log.  The Attorney General's assertion of the state secrets privilege encompasses requests for records where the response would reveal whether or not a particular individual was or was not the subject of an investigation.  Additionally, the Attorney General has asserted the state secrets privilege with respect to portions of the 2014 Report, the OIG Report, and the Joint CIA-FBI Report, as described further herein.  Finally, the Attorney General has asserted the state secrets privilege with respect to discrete pieces of information contained in ▇▇▇▇▇ witness interviews,[6] ▇ ECs, and the classification markings contained on all marked documents, as further described herein.[7]

42.      I first describe the withheld information that is subject to the Attorney General's state secrets privilege assertion, together with the significant harm to national security that reasonably would be expected to occur upon disclosure of the national security information, in further detail below.  I have organized the withholdings by the four categories of national security information subject to the Attorney General's privilege assertion.  Some of the information encompassed by the Attorney General's privilege assertion falls into two or more of these four categories.  To the extent certain information or documents cannot be discussed in unclassified terms, those

---

[6]  Specifically, the Attorney General has asserted the states secrets privilege with respect to discrete pieces of information contained in ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[7]  I am informed that the Plaintiffs have limited their challenges, as it pertains to information subject to the state secrets privilege, to these documents and portions of documents.  Accordingly, I have not considered and do not address any withholdings of additional information in the Core Records that also may also be subject to the state secrets privilege.

SUBJECT TO FBI PROTECTIVE ORDER

withholdings are discussed in detail in my classified *in camera ex parte* declaration.

43.     With respect to the Core Records produced in redacted form, all of the information

encompassed within the Attorney General's assertion of the state secrets privilege has been

determined to be properly classified at the SECRET or TOP SECRET level.  In most cases, the

classified information was marked correctly as classified at the time the document was created.[8]

In a small number of cases, however, the information in the document was marked originally as

"U" (for "unclassified") or did not include any classification markings at all.  This may have

been the result of error, such as the failure to appreciate the impact of disclosure of the

information on the national security, a misunderstanding about the policies regarding

classification of documents, a possible technical error in the system in which the record was

created by not requiring or including a banner or overall classification, or a combination of these

reasons.[9]  It also may be the case that information was properly unclassified at the time the

document was created, but as the result of changes in classification policy or as a result of

subsequent developments, which heightened the sensitivity of the information, the information

was properly classifiable when the Core Records were reviewed for and produced in this case.

In either case, all of the information in the redacted Core Records that is the subject of the

Attorney General's assertion of the state secrets privilege was reviewed by a member of the

Classification Unit in the FBI's Information Management Division who has been delegated the

authority to classify or declassify information under the authority of their Section Chief, who is

---

[8]  Documents that constitute foreign government information are not necessarily independently marked by the FBI. Pursuant to section 1.6(e) of EO 13,526, however, information provided by a foreign government retains, at minimum, the classification level marked by the country providing it or the classification agreed to by the two countries.

[9]  All FBI employees are authorized to derivatively classify documents they create by reference to, and in accordance with, the FBI's National Security Information Classification Guide ("NSICG"). Derivative classification is the classification of unmarked information, or a compilation of classified and/or unclassified information, based on classification guidance.  It is my experience that derivatively classifying information is not a precise science and that classification determinations by the author of the document are not always correct.

**SUBJECT TO FBI PROTECTIVE ORDER**

an Original Classification Authority.  Furthermore, I have reviewed the information and determined that its disclosure would reasonably be expected to cause significant harm to national security.

44.      The Attorney General's assertion of the state secrets privilege also includes the banner classification and portion markings themselves.  I recognize that in ordinary circumstances, markings indicating that paragraphs are unclassified or classified as SECRET would not themselves be classified.  Classification markings were withheld in the documents produced in this particular case because, in the unique circumstances presented by the documents at issue, selectively releasing portion markings as to some documents but not others would have revealed information that is subject to the state secrets privilege.  I can affirm that the classification markings have not been withheld to conceal improper classification markings.

## A.   SUBJECT INFORMATION

45.      As previously stated, disclosure by the FBI that a particular individual or entity is, was, or never has been, the subject of a national security investigation reasonably could be expected to cause significant harm to current and future investigations.   The FBI therefore cannot produce documents or information that would tend to reveal whether or not individuals whom the FBI has not acknowledged to be subjects of national security investigations are or were subjects. Whether or not a particular individual or entity is the subject of a national security investigation is itself a classified fact that is protected from disclosure by the state secrets privilege.

46.      In the particular context of the Subfile Investigation, where the identities of certain subjects have been disclosed, disclosure of whether other individuals are or are not subjects of the investigation would tend to reveal how much the FBI knows or does not know about the activities and associates of the known subjects.  Moreover, individuals who associated with the

20

SUBJECT TO FBI PROTECTIVE ORDER

known subjects may suspect, but not know, whether they are also subjects.  If any of those

individuals desire to commit terrorist acts, notification that there are no additional subjects would

suggest that they are not under investigation, and, therefore they can operate without detection.

Indeed, confirmation that an individual is not under investigation could provide an incentive to

terrorist organizations to utilize that individual to commit a terrorist act before his or her

associations are detected.  For these reasons, the FBI cannot reveal whether or not there are

additional subjects of the Subfile Investigation.

47.     Conversely, confirmation that there are additional subjects of the Subfile Investigation

would tend to reveal results of the investigation to the known subjects, *i.e.*, that the FBI is aware

of their potentially incriminating association with certain other individuals.  And with respect to

those individuals who may suspect that they are a subject of the Subfile Investigation, officially

confirming that there are other subjects could significantly harm the investigation, as it could

reasonably be expected to encourage them to destroy evidence, to be wary of potential

informants, and to take extra precautions that any nefarious activities not be subject to

government surveillance. The Attorney General's assertion of the state secrets privilege thus

extends to all FBI documents or portions of documents that would tend to reveal whether an

individual is the subject of a national security investigation, or whether or not there were any

additional subjects of the Subfile Investigation.

48.     In this context, the FBI cannot even reveal the volume of records in its possession with

respect to an individual or entity who has not been acknowledged to be a subject of a national

security investigation, as it would tend to reveal whether such person or entity was or was not the

subject of an FBI investigation.  Revealing the volume of records in the FBI's possession would

tend to suggest the FBI's level of investigative interest in an individual.  If the FBI were to have

no records, or only a handful of records, pertaining to a particular person or entity, it could then

be inferred that such an individual or entity was not a subject of investigative interest for the FBI,

and that the FBI therefore has limited knowledge or information regarding such an individual or

entity.

49.     In contrast, if the FBI were to reveal that it had large volumes of material regarding an

individual or entity, it could be inferred that such an individual or entity was the subject of a

national security investigation, and that the FBI has more extensive knowledge regarding such an

individual or entity.

50.     The FBI thus cannot reveal the volume of records in its possession that would be

responsive to the requests in subcategories (a) and (b) for all records, or all PENTTBOM

records, relating to Mohamed, Khalid Sowailem, the King Fahd Mosque, and the Western

Somali Relief Agency.  To my knowledge, the FBI has not publicly stated whether or not these

individuals or entities were or were not subjects of a national security investigation.  Revealing

the volume of responsive records pertaining to these individuals or entities would tend to reveal

whether or not they are or were the subjects of national security investigation.

51.     Indeed, in moving to compel the FBI to produce any and all records related to Jraithen,

Sadhan, or Sudairy, who are not named in the Touhy Request, Plaintiffs argued that such records

were responsive to the Touhy Request because each of these individuals must have been

investigated by the FBI as part of the Subfile Investigation.  I understand that Plaintiffs have

made a similar argument in their motion to compel records relating to Prince Abdulaziz, who

also was not named in the Touhy Request.  To my knowledge, it has not been officially

acknowledged whether or not any of these individuals is or was the subject of a national security

investigation.  The FBI thus cannot reveal the number of responsive records it possesses with

22

**SUBJECT TO FBI PROTECTIVE ORDER**

respect to these individuals without confirming or denying whether these individuals have been investigated by the FBI.

52.     To provide another example, in their motion to compel, Plaintiffs seek all of the "evidence" that was gathered in the course of the Subfile Investigation regarding the specific tasks ████████████ performed on behalf of Hazmi and Mihdhar.  But any response that would reveal the volume of records responsive to a request for all evidence the FBI gathered regarding particular individuals risks exposing the subjects of FBI investigations and the results of any such investigations.  To the best of my knowledge, the FBI has not acknowledged whether or not ███████ been the subject of the Subfile Investigation.  If the FBI were to respond that it had not obtained any such evidence, this could suggest either ██████ was not the subject of a national security investigation, or that the FBI had not been able to find any evidence of his activities.  Conversely, if the FBI were to respond by producing all the evidence it had collected, this would reveal the complete results of the FBI's investigation, and precisely what it knows or does not know with respect ██████ activities.   In either scenario, the FBI's response would reveal classified information regarding the subjects of and results of a national security investigation.

53.     Because the FBI cannot reveal the volume of documents in its possession regarding a particular individual or entity without thereby suggesting whether such an individual or entity was or was not the subject of an investigation, it could not provide a privilege log for all responsive documents without revealing information encompassed by the Attorney General's assertion of the state secrets privilege.  Moreover, beyond the volume of responsive records, a privilege log would necessarily reveal other information protected by the state secrets privilege. A disclosure of the type (for example, whether a document is a report of interview, a letter to an outside entity transmitting legal process for records, or a communication to a foreign

SUBJECT TO FBI PROTECTIVE ORDER

government), and dates of all the documents would tend to reveal how much and when investigative activity occurred, sensitive sources and methods used in any such investigation, and the general nature of the investigative activity taking place.

54.     For the same reason, the FBI cannot respond to subcategory (f) of the Touhy Request to the extent that it seeks records relating to individuals who have not been acknowledged to be subjects of national security investigations.  Specifically, subcategory (f) seeks any and all records relating to any individual that is referenced as a "subject" in the 2012 Report of the investigation described in that report.  The Touhy Request already seeks any and all records relating to the acknowledged subjects of the Subfile Investigation—Bayoumi, Thumairy, and █████████ subcategories (a), (b), and (g).  Thus, the only additional records that would be responsive to subcategory (f) would be those records that pertain to any unacknowledged subjects of the Subfile Investigation.  The question of whether other individuals are subjects of the Subfile Investigation is a classified fact encompassed within the Attorney General's assertion of the state secrets privilege.  The FBI cannot respond to this subcategory of the Touhy Request without confirming or denying whether or not any other individual or entity was also a subject of the Subfile Investigation.

55.     For the foregoing reasons, the Attorney General has asserted the state secrets privilege over all documents or information that would tend to reveal whether or not Jraithen, Sadhan, Sudairy █████ Prince Abdulaziz, Mohamed, Western Somali Relief Agency, Sowailem, or the King Fahd Mosque are or were the subjects of national security investigations, as well as any response to subcategory (f) of the Touhy request.

56.     The Attorney General's assertion of the state secrets privilege encompasses subject information contained within the Core Records.  My classified *ex parte in camera,* declaration

provides details concerning the subject information revealed in the documents at issue.  In this

public declaration, I am unable to provide those details.[10]

### B.  REASONS FOR INVESTIGATION AND RESULTS

57.     I describe below information which, if disclosed, would reveal the reasons for and results

of a national security investigation.

#### 1.     *AGENT NOTES*



58.     On pages

the FBI withheld agent notes from witness interview reports.  In

general, these notes reflect the opinions, conclusions, or investigative analysis of the agents in

connection with names or other information provided by witnesses.  They tend to reveal what the

FBI did or did not know about the named individuals and what importance the FBI placed on

following up on the witnesses' information.

#### 2.     *OPENING ECs ON BAYOUMI, THUMAIRY* <br> *(DOCUMENTS 9, 10, & 11 ON THE PUBLIC PRIVILEGE LOG)*

59.     The Attorney General's privilege assertion also includes the three ECs that reflect the

initiation of investigations by the FBI into Bayoumi, Thumairy,                    of the Subfile

Investigation.  Each of these documents details the predication for opening investigations into

Bayoumi, Thumairy,                    and reveal what the FBI knew or did not know at

the time the investigations were opened.  Disclosure of the opening ECs would alert current and

---

[10]  As the same information withheld from the 2012 Report has been withheld in the             the Attorney
General's privilege assertion encompasses such information in the             to the same extent as in the 2012
Report.  I hereby incorporate by reference the descriptions of the withheld material in the 2012 Report, as well as the
detailed explanation for the FBI's assertion of privilege with respect to such information, set forth in the Public
McGarrity Declaration.

SUBJECT TO FBI PROTECTIVE ORDER

future subjects to those activities which are likely to arouse suspicion and result in the opening of

an investigation, thus providing valuable insight to those intent on terrorism and other criminal

activity on how to avoid detection.  Disclosure of such information also may alert subjects and

others of the sources of that information, thus revealing sensitive sources and methods including

the existence of CHS reporting on that subject.  For these reasons, each of the opening ECs has

been withheld in full.

60.     The opening ECs on Thumairy ▮▮▮▮ (Documents 10 and 11, respectively, on the

Public Privilege Log), in their entirety, are encompassed within the Attorney General's assertion

of the state secrets privilege.  The opening EC on Bayoumi (Document 9 on the Public Privilege

Log) contains a number of unclassified paragraphs of background information about Bayoumi

that have been officially released in interview reports and other documents.  The unclassified

information is subject to the law enforcement privilege, as discussed, *infra*.  Only the classified

information in Document 9 is encompassed within the Attorney General's assertion of the

privilege.[11]

### 3.   *DOCUMENTS 12 AND 15 ON THE PUBLIC PRIVILEGE LOG*

61.     Documents 12 and 15 on the FBI Public Privilege Log, both of which are internal FBI

documents that provide an update or overview of the results of the Subfile Investigation, have

been withheld because their disclosure could reasonably be expected to cause significant harm to

the national security.  These documents discuss sensitive classified sources and methods,

including confidential human source reporting.  Document 12 also contains foreign government

---

[11] The dates on which the investigations of Bayoumi, Thumairy ▮▮▮▮ opened in connection with the Subfile Investigation are encompassed within the Attorney General's assertion of the privilege.  If the FBI were to release the dates the investigations were initiated, it may expose what the FBI knew at that time and was sufficient predicate for an investigation.  Further, release of the initiation dates could inform the subjects of what the FBI knew or did not know at the time it chose to initiate an investigation, or reveal other sources and methods, such as CHS reporting, see *infra*.

information and information regarding subjects of national security investigations.  The Attorney

General's assertion of the state secrets privilege encompasses Document 15 in its entirety, and

the classified portions of Document 12.  Like Document 9, Document 12 includes unclassified

paragraphs that discuss interview reports which have been officially released.  The unclassified

portions of Document 12 are subject to the law enforcement privilege, as discussed, *infra*.

62.     Documents 12 and 15 set forth in detail the results of the FBI's Subfile Investigation.

These documents provide a roadmap into how the FBI conducts sensitive national security

investigations.  They reveal the information that the FBI gathered, the extent and limits of its

capabilities when gathering information, how it analyzed that information at that time, and what

the FBI deemed significant.  In particular, disclosure of the results of its investigation would alert

subjects and other individuals named in the document as to what the FBI knew or did not know

about their activities.  This, in turn, could assist those individuals in taking countermeasures,

such as destroying evidence, attempting to influence witnesses, and avoiding detection of their

future activities.  Disclosure of this information could therefore be reasonably expected to be

harmful to the national security.

63.     Thus, Documents 12 and 15 are encompassed within the Attorney General's assertion of

the privilege because they reveal subjects of national security investigations, the results of those

investigations, sensitive sources and methods, and foreign government information.

### 4.  *LISTING OF ALL SUBFILE DOCUMENTS*

64.     The Attorney General's assertion of the state secrets privilege also extends to the

Plaintiffs' request for a listing, akin to a *Vaughn* index, of all documents related to the Subfile

Investigation.  The FBI could not provide a description of all records related to the Subfile

Investigation without revealing sensitive and classified information.  Such a comprehensive

**SUBJECT TO FBI PROTECTIVE ORDER**

listing would provide a roadmap to subjects and other interested parties as to how the FBI

conducted that particular national security investigation.  The listing of all records would tend to

reveal the extent of the investigation, the sources and methods used, the focus of the

investigation, and the results of the investigation.  For example, disclosure of the volume of

records would reveal the depth of the FBI's investigation, and revealing the dates of all

documents would reveal when particular investigative activity occurred.  Such a listing could

potentially reveal such information as what witnesses the FBI did or did not interview, what

types of leads the FBI followed and which it did not, and what types of sources the FBI did nor

did not utilize.  This roadmap would provide valuable insights, not just to the subjects of the

Subfile Investigation, but to potential subjects of other national security investigations who seek

to thwart the FBI's investigative efforts.

65.     For example, knowledge that the FBI interviewed a particular witness on a particular day,

together with knowledge that soon thereafter the FBI interviewed certain other witnesses, or

obtained records from certain locations, may indicate that the first witness disclosed the names of

the additional witnesses or the existence of those records, even if the content of that original

witness statement had been withheld on privilege grounds.  It also could reveal how the FBI

evaluated information from that original witness, what investigative steps the FBI deemed

appropriate in light of the information obtained from that witness, and the manner in which the

FBI pursued specific leads from the information it obtained.  Similarly, if the FBI were to

disclose that an interview withheld on the basis of the informant privilege took place on a

particular day, that information could shed light on the investigative reports that followed soon

thereafter, and potentially reveal identifying information about the CHS.[12]

66.     Perhaps even more importantly, a listing of all documents from a national security investigation would inevitably reveal the gaps in the information the FBI was able to obtain.  If terrorists were to learn what types of documents the FBI does not possess, what investigative steps the FBI did not take, or what connections the FBI has not made, they could exploit this information in the future to cause significant harm to the national security.  Exposing such gaps in the FBI's records also could indicate specific areas in which the FBI encountered difficulties in gathering information and signify potential limits to the FBI's capabilities.  This could reasonably be expected to cause significant harm to the national security because terrorist organizations and terrorists could modify their behavior to avoid detection of their activities and exploit the gaps in the FBI's abilities to collect intelligence and evidence.

67.     Indeed, even disclosure of the number, type (*e.g.*, whether a document is a report of an interview, a letter to an outside entity transmitting legal process for records, or a communication to a foreign government), and dates of all the documents in the Subfile would tend to reveal how much and when investigative activity has occurred and the general nature of the investigative activity taking place.  This is especially so as the parties can scrutinize this information in light of public releases of information, the FBI's release of certain documents relating to the Subfile Investigation in response to the Touhy Request and in response to FOIA requests, and Plaintiffs' independent investigation, and thereby draw conclusions about the nature of other, undisclosed documents from the Subfile Investigation.

---

[12]   Revealing the exact date of an interview of a CHS could, in some contexts, be source- identifying itself.  For example, if a CHS is suspected by his or her associates of being a CHS, and his or her associates question the CHS's whereabouts on a particular date, disclosure that an interview of a CHS took place on that date could be source-identifying.  Additionally, the date the CHS provided information to the FBI in close proximity to a particular conversation or event also could reveal the source's identity in narrowing the pool of individuals with knowledge of the conversation or event.  This is a primary reason why the FBI's privilege log did not disclose the exact dates of documents withheld in full as they relate to CHSs.

**SUBJECT TO FBI PROTECTIVE ORDER**

68.     In sum, disclosure of the reasons for and results of national security investigations could reasonably be expected to cause significant damage to the national security.

## C.  SOURCES AND METHODS

69.      I describe below, in unclassified terms, the information within the Core Records that, if disclosed, would reveal sensitive sources and methods used in national security investigations.

### 1.  *SOURCE REPORTING*

70.     The Attorney General has asserted the state secrets privilege over information that would tend to identify individuals who have served as CHSs for the FBI in national security investigations.  Numerous CHSs report to the FBI on a regular basis; they provide information under express assurances of confidentiality and are "informants" within the common meaning of the term.  Others are interviewed and/or provide information under implied assurances of confidentiality (*i.e.*, under circumstances from which assurances of confidentiality may be inferred).  In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the singular information they provided, will not be divulged outside the FBI.  The FBI has learned through experience that CHSs assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal.  The FBI also has learned that CHSs must be free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public.  It is only with the understanding of complete confidentiality that the aid of such CHSs can be enlisted, and only through this confidence that these CHSs can be persuaded to continue providing valuable assistance in the future.  Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

**SUBJECT TO FBI PROTECTIVE ORDER**

71.    The release of a CHS's identity would forever eliminate that source as a future means of obtaining information.  Moreover, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources providing information to the FBI.  This holds true even in situations where the CHS is deceased or where many years have passed since the events took place.  Revealing the identity of a CHS, even a deceased one, could lead to retribution against that person's family or associates, in the form of embarrassment, humiliation, and/or physical or mental harm.  Such a result would greatly impair one of the FBI's most important means of collecting information.

72.    Protecting a source's identity is not limited to protecting the source's name or biographical details from disclosure.  The substance of the source reporting can often itself be identifying.  For example, the information provided to the FBI by a source may be known only to a limited number of individuals.  The source reporting may reveal that the source was in a particular place at a particular time, or disclose the substance of specific conversations.  These details could tend to reveal the identity of the source.  For this reason, the FBI protects source reporting that is singular in nature and potentially source-identifying.

73.     In particular, the FBI has withheld in full Documents 1, 2, 3, and 5 on the Public Privilege Log because those documents contain sensitive CHS reporting related to matters of national security.  The FBI also has withheld source reporting and source-identifying information that appears in Core Records that have been released in part to Plaintiffs.

    2.    *METHODS AND TECHNIQUES USED IN NATIONAL SECURITY INVESTIGATIONS*

74.    The FBI also withheld certain information that would reveal sensitive information regarding methods and techniques used in national security investigations, including information that describes internal FBI policy requirements for counterterrorism investigations.  Disclosure

31

**SUBJECT TO FBI PROTECTIVE ORDER**

of these requirements would reveal a method or technique for national security investigations by revealing the specific types of information the FBI seeks to gather in these investigations and what information the FBI considers important to its overall counterterrorism mission.

75.     In sum, disclosure of these sensitive sources and methods could reasonably be expected to cause significant damage to the national security.  They are therefore included in the Attorney General's assertion of the state secrets privilege.

### D.   FOREIGN GOVERNMENT INFORMATION AND INFORMATION PERTAINING TO INFORMATION SHARING AND COOPERATION WITH FOREIGN PARTNERS

76.     Finally, the Attorney General has asserted the state secrets privilege over specific information within the set of Core Records where such information was received from a foreign government with the understanding that it and/or the nature of the FBI's information sharing and cooperation with foreign partners in a national security investigation will remain confidential, or such information reflects assistance supplied to the United States by a foreign government. Documents 4, 6, 7, 8, 16, 17, 18, 19 and 20 described on the Public Privilege Log, as well as certain information redacted from the Core Records (as described with particularity in my classified *ex parte in camera* declaration) have been withheld because they constitute foreign government information, or would reveal cooperation with foreign partners.

77.     In sum, disclosure of information received confidentially from a foreign government and documents reflecting information sharing and cooperation with foreign partners in a national security investigation could reasonably be expected to cause significant damage to the national security.

### VIII.   INFORMATION PROTECTED FROM DISCLOSURE BY THE NATIONAL SECURITY ACT

78.     In addition, the FBI asserts the protections of Section 102A(i)(1) of the National Security

Act, which provides that the Director of National Intelligence (the "DNI") "shall protect from unauthorized disclosure intelligence sources and methods." The FBI has been delegated authority by the DNI to assert the protections of the National Security Act.

79.     I am advised that as interpreted by courts, the phrase "intelligence sources and methods" in the National Security Act encompasses all four categories of information for which the Attorney General has asserted the state secrets privilege. I have concluded that the discussion herein concerning the reasons for the Attorney General's assertion of the state secrets privilege applies equally to the FBI's assertion of the protections of the National Security Act.[13]  The FBI therefore asserts the protection of the National Security Act over all information and documents for which the Attorney General has asserted the state secrets privilege.

## IX.  INFORMATION SUBJECT TO THE LAW ENFORCEMENT PRIVILEGE

80.     The information described above which is encompassed by the Attorney General's assertion of the state secrets privilege is, for the same reasons, encompassed by the FBI's assertion of the law enforcement privilege. As previously explained, the counterterrorism and other national security investigations undertaken by the FBI have a law enforcement purpose, and disclosure of information regarding the identity of subjects of those investigations, the reasons for and results of those investigations, the sources and methods used in those investigations, information regarding cooperation and information sharing with foreign partners, or information received confidentially from foreign partners, would seriously undermine those investigations and the ability of the FBI to effectively carry out other investigations which rely

---

[13]  As was the case with the FBI's 2012 Report, which was the subject of the prior motion to compel, although the Attorney General's assertion of the state secrets privilege does not encompass ▮▮▮▮▮▮▮▮▮▮ as the third main subject in the ▮▮▮▮▮▮▮▮▮▮ name is still shielded from public disclosure by the FBI Protective Order. As the release of that name is limited and non-public, the FBI asserts the protections of the National Security Act over any document which identifies ▮▮▮▮ the subject of a national security investigation, including but not limited to the relevant portions of the ▮▮▮▮ and Document 11 on the Public Privilege Log.

upon the confidentiality of such information, source and methods, and foreign partner information sharing and cooperation.

81.     In addition to the information encompassed by the Attorney General's assertion of the state secrets privilege, the Core Records contain unclassified information not encompassed by the Attorney General's privilege assertion which nevertheless should be protected under the law enforcement privilege.  In unclassified and unprivileged terms, this information includes information revealing the FBI's investigative interest in certain individuals, specific law enforcement methods and techniques used in the FBI's national security investigations, specific information obtained, or gaps in information, relating to the investigations, the FBI's opinions and conclusions about certain witnesses and evidence gathered in the investigations, personal information regarding third parties which if revealed would discourage cooperation, and information which would indirectly tend to reveal confidential cooperation from a foreign government.

82.     The FBI withheld on law enforcement privilege grounds portions of the reports of witness interviews that reflect that the witness had been asked questions regarding third parties where it has not been previously disclosed that such individual was of investigatory interest to the FBI.  Disclosure of the identity of individuals who were of investigatory interest to the FBI would result in many of the same harms as disclosing the identity of subjects of investigations, as discussed above.

83.     The FBI's assertion of the law enforcement privilege also extends to agents' assessments of witness physical demeanor and credibility. FBI agents are trained to take note of the interactions and reactions of individuals that they interview.  Based on the interviewee's physical reactions to the agents' questions, the agents may investigate certain statements more than

others.  Release of this type of information would disclose what FBI agents deemed to be important with respect to a particular interview, could alert a witness that the FBI had concerns regarding the witness's credibility, and could inform the witness or others of the mannerisms agents notice during interviews.

84.     The FBI withheld the opinions, conclusions, or investigative analysis of FBI agents in connection with names or other information provided by witnesses.  Such information tends to reveal what the FBI did or did not know about the named individuals and what importance the FBI placed on following up on the witness's information.

85.     The FBI has withheld references to specific information that the FBI had been lacking at a fixed point in time.  As discussed above, the revelation of gaps in the information available to the FBI could reveal vulnerabilities in its ability to gather evidence that could be exploited by criminals seeking to evade detection or prosecution.

86.     The FBI has asserted the law enforcement privilege over references to the utilization of specific law enforcement databases in specific situations and the results of searches in those databases. While the existence of the systems in question is public knowledge, the FBI's use of those systems to obtain information regarding specific individuals or facts is law enforcement sensitive, as it would reveal the importance the FBI placed in obtaining or verifying certain types of information and when the FBI employs particular methods in conducting its investigations. Moreover, the results of those searches reveal the extent of the FBI's knowledge, and perhaps gaps in its knowledge, regarding certain individuals.

87.     The FBI also has withheld references to the service of subpoenas for grand jury testimony or documents upon certain individuals on the grounds of law enforcement privilege and because such disclosure is prohibited by Federal Rule of Criminal Procedure 6(e).  Disclosure of such

information could tend to reveal the importance that the FBI placed on obtaining a particular witness's testimony.

88.     The FBI also has withheld markings identifying the basis for the classification of documents and the date upon which classification is set to expire, for reasons discussed in ¶ 44 of this declaration, and because disclosure of those markings would tend to indicate the nature of the investigation to which the document relates.

89.     The FBI withheld the discussion of strategies employed by FBI agents to elicit information from particular witnesses.  The disclosure of such information would indicate the specific types of tactics used by FBI agents, and allow individuals to take steps to guard against such tactics.  The disclosure of such information with respect to a particular witness also could lead that witness, or other witnesses, to be distrustful of the FBI in the future, inhibiting the FBI's ability to obtain further information or cooperation from that witness.

90.     The FBI withheld lead information in ECs, as disclosure would reveal the importance the FBI placed on certain information, and the steps taken, or not taken, to follow up on that information.

91.     The FBI also withheld administrative "accomplishment" information used to gather statistics for internal and external performance management, program management, and reporting.

92.      The FBI withheld agent notes from witness interview reports on law enforcement privilege grounds.  As with the agent notes for which the FBI asserted the state secrets privilege, these notes reflect the opinions, conclusions, or investigative analysis of the agents in connection with names or other information provided by witnesses.

93.     As noted previously, the Bayoumi opening EC (Document 9 on the Public Privilege Log)

**SUBJECT TO FBI PROTECTIVE ORDER**

contains a number of unclassified paragraphs of background information about Bayoumi that have been officially released in other documents.  The unclassified information in Document 9 is properly subject to the law enforcement privilege because of the context in which it appears.  Specifically, disclosure of the facts which the FBI decided were pertinent to the opening of an investigation on Bayoumi, would presumably reflect the FBI's most current information at that time, and would reveal the significance the FBI placed on certain witnesses and certain information.  It also would reveal that the stated information was relevant to the predication of the new investigation.

94.        The FBI also withheld all unclassified information in Document 12 on the grounds of the law enforcement privilege.  Document 12 contains quotations and summaries of information obtained from interview reports and other documents that have been released to the parties in this case subject to the FBI Protective Order.  This information is nonetheless encompassed within the law enforcement privilege when included in this analytical report discussing and analyzing the results of the FBI's investigation.  This is because disclosure of the facts, which the FBI, in April 2016, decided were pertinent to include in the document, reflect the focus and direction of the investigation as of that date, and the significance the FBI placed on the particular witnesses and particular information discussed.  Disclosing which interview statements are discussed or not discussed in Document 12 also may reveal gaps in the FBI's knowledge of events, by suggesting that the FBI either did not have certain information or did not appreciate the significance of information that it had obtained.

95.        The FBI has withheld certain personal information that was provided by witnesses during voluntary interviews.  The FBI depends upon the willingness of members of the public to speak candidly with agents.  Although the FBI cannot guarantee witnesses' complete confidentiality,

**SUBJECT TO FBI PROTECTIVE ORDER**

the FBI does make every attempt to safeguard personal information shared by members of the public so as not to erode public trust or discourage that individual or others from speaking with the FBI in the future.  In this case, the FBI has withheld a limited amount of information on this basis, including personal identifying information for certain third party witnesses (such as complete dates of birth, driver's license numbers, social security numbers, or phone numbers), personal information regarding members of various witnesses' families, and the identity of a third party minor.   The specific information withheld on this basis is described below:



- The FBI withheld [redacted] date of birth and driver's license number from [redacted]

- The FBI withheld another witness's date or birth, social security number, and phone numbers from [redacted]

- The FBI withheld from [redacted] a description provided by [redacted] of his extended family, [redacted]

- On pages [redacted] the FBI redacted from the witness statement provided [redacted] the name of the minor that [redacted] This discussion on those pages includes a number of personal details regarding [redacted]

- On [redacted] the FBI withheld information provided by [redacted] regarding his current job and his wife's current employment.

96.     Finally, the FBI has asserted the law enforcement privilege in response to requests for certain compilations of records.  Specifically, subcategory (d) of the Plaintiffs' *Touhy* request seeks all the records generated by or gathered as part of the Subfile Investigation.  Subcategories

**SUBJECT TO FBI PROTECTIVE ORDER**

(a), (b) and (f) of the Touhy Request also seek all records relating to two individuals—Bayoumi

and Thumairy—who are acknowledged subjects of the Subfile Investigation, as well as Mohdar,

whom FBI has acknowledged to have been of investigative interest.  Similarly, subcategories (f)

and (g) both seek any and all records related ███████ who has also been acknowledged (within

the confines of the FBI Protective Order) as a subject of the Subfile Investigation.  Plaintiffs'

motion to compel similarly seeks production of all documents related to the Subfile Investigation

of Bayoumi, Thumairy, ███████ and all documents from an investigative file related to

Mohdar.

97.      The FBI could not respond to these requests without revealing information that is

protected by the law enforcement privilege.  The universe of documents pertaining to an

investigation, when taken together, would reveal information regarding the investigation that is

qualitatively different than the information that would be disclosed when the documents are

considered individually.  In each case, the compilation of records would provide a roadmap to

subjects and other interested parties as to how the FBI conducted that particular national security

investigation.  The set of records related to an investigation reveals the extent of the

investigation, the sources and techniques used, the focus of the investigation, and the results of

the investigation.  For example, disclosure of the volume of records related to a particular

investigation or individual would reveal the depth of the FBI's investigation, and revealing the

dates of all documents would reveal when particular investigative activity occurred.  The FBI's

assertion of the law enforcement privilege therefore encompasses the compilation of all records

from the Subfile Investigation, as well as the compilations of records related to Bayoumi,

Thumairy, ███████ Mohdar.

98.      Taken together, for example, the documents in the Subfile would reveal the relative

**SUBJECT TO FBI PROTECTIVE ORDER**

emphasis the FBI places on particular sources and techniques when conducting a national

security investigation.  Disclosure of the Subfile Investigation's contents would reveal what the

FBI knows and does not know about the subjects of the investigation, which witnesses the FBI

did or did not interview, what types of leads the FBI followed and which it did not, how the FBI

analyzes evidence, and the conclusions the FBI reached as a result of its investigation.  This

roadmap would provide valuable insights, not just to the subjects of the Subfile Investigation, but

to potential subjects of other national security investigations who seek to thwart the FBI's

investigative efforts.

99.     Just as all records from the Subfile Investigation are protected by the law enforcement

privilege when taken together as a whole, so too are the records responsive to Plaintiffs' requests

for all records referring or relating to Bayoumi, Thumairy, ████ Mohdar.  Although

Bayoumi, Thumairy, ████ acknowledged subjects of the Subfile Investigation, and the

FBI has acknowledged Mohdar to have been the subject of investigative interest, and certain

information about them has been officially released in the 9/11 Commission Report and

elsewhere, a request for all of the FBI's records referring or relating to them (subcategory (a) of

the Touhy Request) or all records in the PENTTBOM file referring or relating to them

(subcategory (b) of the Touhy Request) implicates a wide range of sensitive law enforcement

information that has not been disclosed.  This includes, to the extent applicable to each, the

specific predicate for opening cases on them, the complete results and current status of the

investigation as to each of them, the sensitive law enforcement sources and techniques used in

the investigation of each of them, and the cooperation of and information received from foreign

government partners concerning those individuals.[14]

---

[14] Unlike Bayoumi and Thumairy, the FBI has not revealed any information regarding its investigation ███

40

**SUBJECT TO FBI PROTECTIVE ORDER**

100.     Additionally, documents that may not be sensitive standing alone, when taken together

with all other documents in an investigatory file, could disclose the direction of the investigation

in a manner that could interfere with that pending investigation, as well as indirectly expose the

use of sensitive techniques.  For example, knowledge that the FBI interviewed a particular

witness on a particular day, together with knowledge that soon thereafter the FBI interviewed

certain other witnesses, or obtained records from certain locations, may indicate that the first

witness disclosed the names of the additional witnesses or the existence of those records, even if

the content of that original witness statement had been withheld on privilege grounds.  It also

could reveal how the FBI evaluated information from that original witness, what investigative

steps the FBI deemed appropriate in light of the information obtained from that witness, and the

manner in which the FBI pursued specific leads from the information it obtained.  Similarly, if

the FBI were to disclose that an interview withheld on the basis of the informant privilege took

place on a particular day, that information could shed light on the investigative reports that

followed soon thereafter, and potentially reveal identifying information about the CHS.

101.     Perhaps even more importantly, a compilation of all documents from a particular

investigation or related to a particular subject would inevitably reveal the gaps in the information

the FBI was able to obtain.  If terrorists were to learn what information the FBI does not possess,

what investigative steps the FBI did not take, or what connections the FBI has not made, they

could exploit this information in the future to cause significant harm to the FBI's investigative

_____

beyond declassifying his name in the 2012 Report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, the
FBI was aware of Plaintiffs' interest in the statements in the 2012 ▮▮▮ Reports ▮▮▮ including the
statement referring to "evidence" that he had "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."  As
noted in the declaration of former AD McGarrity, this statement is more accurately characterized as an investigative
theory than an objective statement of fact.  Regardless, the FBI searched for and treated as "core records" the
documents relating to, and which may have been perceived as support for, this statement, as well as other documents
▮▮▮▮▮▮▮▮ Those documents have been withheld as privileged and the FBI cannot further describe the nature
of those documents in this unclassified declaration.  They are described in detail in my classified *in camera ex parte*
declaration.

SUBJECT TO FBI PROTECTIVE ORDER

efforts.  For example, if it were known that a particular individual's terrorism-related intentions had not been previously detected, that individual might later decide to undertake further terrorist activity, confident that the FBI was not monitoring his activities.  Exposing such gaps also could indicate specific areas in which the FBI encountered difficulties in gathering information and signify potential limits to the FBI's capabilities.  This could reasonably be expected to cause significant harm to the national security because terrorist organizations and terrorists could modify their behavior to avoid detection of their activities and exploit the gaps in the FBI's abilities to collect intelligence and evidence.

102.     For all these reasons, while certain documents or facts relating to the Subfile Investigation or to the investigations of particular subjects may be unprivileged when viewed separately, they would not be unprivileged if viewed together with all other documents from the investigative file.  Just as the separate pieces of a jigsaw puzzle, when put together, reveal an image that was not previously apparent, putting all of the documents in the Subfile Investigation together would reveal facts regarding the focuses, results, gaps, strategies, and subjects of a sensitive national security investigation.  The disclosure of the universe of documents—even if some documents are identified only on a privilege log—could reasonably be expected to cause significant harm to the national security.  Thus, the entire universe of documents from the Subfile Investigation, when taken as a whole, is categorically subject to the law enforcement privilege.

103.     Because the FBI is asserting a categorical privilege with respect to all documents within the Subfile Investigation when considered collectively, as well as the compilations of documents regarding Bayoumi, Thumairy, ███████ Mohdar, the assertion of privilege does not rest on whether particular documents, taken separately, would be subject to the law enforcement

privilege in whole or in part.  The FBI has therefore not prepared a privilege log with respect to these documents.  The privilege extends to the universe of documents as a whole, as opposed to the individual documents that make up the universe, which may or may not be privileged when considered in isolation.

104.    As is the case for the request for the entire Subfile Investigation, requiring the FBI to provide an accounting for all documents referring or relating to Bayoumi and Thumairy would itself reveal privileged information, even if the contents of those documents were not revealed.  For example, disclosing the number of documents the FBI has which refer or relate to Bayoumi, Thumairy, ███████████ tend to disclose the breadth of the investigation in absolute terms, as well as in comparison to one another, thus revealing the degree of the FBI's relative focus on each of the subjects.  The conclusions which could be drawn from such an accounting would be magnified if the FBI were required to disclose the date or type of each document (*e.g.*, whether it was an interview report, a letter transmitting legal process for records, a communication with a foreign government), particularly in light of the ability of the parties to compare such details in a privilege log with other information disclosed in response to the Touhy Request, in response to FOIA requests or in some other official disclosure, or based on the Plaintiffs' independent investigation.

105.    I am advised that Plaintiffs also contend that, because of the passage of time, no harm could result from disclosure of the contents of the Subfile Investigation.  I agree with Assistant Director McGarrity, as explained in his Public Declaration at paragraph 23, that the mere passage of time does not cause the FBI to cease its efforts to bring terrorists and terrorist organizations to justice, and that applies with particular force to the September 11 attacks, the deadliest in our nation's history.

**SUBJECT TO FBI PROTECTIVE ORDER**

106.    While the FBI recognized that it would not be possible to respond in full to the requests

for all records relating to the Subfile Investigation or to Bayoumi, Thumairy, ███ Mohdar

without revealing information that is protected by the law enforcement and state secrets

privileges, the FBI also understood the extraordinary nature of the lawsuits filed against the

Kingdom of Saudi Arabia and other defendants alleging their involvement in the terrorist attacks

of September 11, and sought to find a way to provide some response to these portions of the

Touhy Request even with the necessary constraints of the privilege considerations.  As Bayoumi,

Thumairy, ███ now acknowledged subjects of the Subfile Investigation, responding to

such a request in part does not raise the same privilege concerns regarding requests for records

pertaining to possible unacknowledged subjects.  Moreover, processing a limited subset of

documents pertaining to these individuals does not raise the same privilege concerns as

producing or even describing the entire universe of records in the FBI's possession relating to

those individuals or the Subfile Investigation.[15]

107.    By employing the "core records" approach in response to the Touhy Request—as

opposed to responding with an outright refusal to provide any records because of the overbreadth

of the request and the complex privilege issues—the FBI struck a balance between the need to

protect privileged information regarding an ongoing national security investigation and the

parties' interest in disclosure.  Included in the FBI's productions of responsive documents have

been records—such as FBI interview reports, foreign government documents, and grand jury

materials—that are rarely released to the public, and would not be available pursuant to the

---

[15] I have instructed the FBI personnel involved in the processing of documents in response to the Touhy Request to determine whether all interview reports in the Subfile Investigation that contain substantive information concerning Bayoumi, Thumairy, ███ have been processed and produced, to the extent that can be done without disclosing classified or law enforcement privileged information.  To the extent any such interview reports have not been processed, that processing will commence once normal operations resume following the COVID-19 public health emergency.

**SUBJECT TO FBI PROTECTIVE ORDER**

Freedom of Information Act.  Moreover, the FBI took the extraordinary step of declassifying

███████████ and his identification in the 2012 Report as the third main subject of the Subfile

Investigation, pursuant to its discretion under Section 3.1(d) of EO 13,526.

## XI.   INFORMATION SUBJECT TO THE DELIBERATIVE PROCESS AND WORK PRODUCT PRIVILEGES

108.    I understand that the deliberative process privilege extends to deliberative documents

created prior to a final agency decision, and that this privilege exists, among other reasons, to

protect the give-and-take of the consultative process within government agencies and to

encourage full and candid discussions among agency personnel in the course of agency decision-

making.  I further understand that the work product privilege extends to documents prepared in

anticipation of litigation, and includes (but is not limited to) documents reflecting mental

processes of an attorney.

109.     In addition to asserting the state secrets privilege and the law enforcement privilege with

respect to Documents 12, 13 and 15 on the Public Privilege Log, the FBI has also withheld

Document 13 in full on the grounds of deliberative process privilege and work product, and

Documents 12 and 15 in full on the grounds of the deliberative process privilege.

110.    Document 13 is a briefing paper prepared by the FBI as part of an investigation which the

FBI anticipated could potentially result in a criminal prosecution.   The FBI personnel involved

in the investigation consulted with federal prosecutors regarding the status and next steps in the

investigation, and the briefing document was provided to prosecutors as part of that consultative

process.  Accordingly, this document is protected by both the deliberative process and work

product privileges.

111.    Document 15 is an incomplete, working document that is protected by the deliberative

process privilege.  The document contains notations throughout, such as placeholders for

45

citations or internal comments, which further indicate that this document was a working document.  It was prepared to aid the FBI in determining its next investigative steps.  It also reflects the ongoing deliberations between agents and analysts in determining the significance of certain investigative facts.

112.     Document 12 also has also been withheld on the basis of the deliberative process privilege.  One of the purposes of this document was to facilitate discussions between the New York Field Office and SDNY prosecutors regarding the status and next steps in the investigation, which the FBI anticipated could potentially result in a criminal prosecution.

113.     In addition to the three documents withheld in full, the FBI also has withheld two of the dated entries in the 2014 Report on the basis of the deliberative process and work product privileges.[16]  The withheld entries describe the substance of case strategy meetings between FBI agents and AUSAs regarding potential next steps in a criminal investigation.  This information is both predecisional and deliberative, and prepared in anticipation of litigation.

## XII.  CONCLUSION

114.     Accordingly, based upon my personal consideration of the matter, I have concluded that disclosure of the national security information described herein as subject to the Attorney General's assertion of the state secrets privilege reasonably could be expected to cause significant harm to the national security.  I have also concluded that this information is protected from disclosure under the National Security Act and the law enforcement privilege and that disclosure of this information could reasonably be expected to cause significant harm to the FBI's ability to effectively carry out its law enforcement mission.  Finally, I have concluded that certain information described herein is appropriately subject to the deliberative process privilege

---

[16] The FBI marked those redactions as subject to the deliberative process privilege and other privileges, but did not note the work product privilege.  The FBI will produce a revised version noting the work product privilege.

**SUBJECT TO FBI PROTECTIVE ORDER**

and the work product privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of April 2020.

Jill Sanborn
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation
