```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     IN RE:  TERRORIST ATTACKS ON
3    SEPTEMBER 11, 2001.
                                           03 MD 1570 (GBD)(SN)
4
     ------------------------------x       Telephone Conference
5
                                           New York, N.Y.
6                                          May 21, 2020
                                           10:30 a.m.
7    Before:

8                         HON. SARAH NETBURN,

9                                          U.S. Magistrate Judge

10                            APPEARANCES

11   KREINDLER & KREINDLER LLP
           Attorneys for Plaintiffs' Executive Committee
12   BY:  STEVEN R. POUNIAN
           -and-
13   MOTLEY RICE LLC
     BY:  ROBERT T. HAEFELE
14         -and-
     ANDERSON KILL P.C.
15   BY:  JERRY S. GOLDMAN
           -and-
16   COZEN O'CONNOR P.C.
     BY:  SEAN P. CARTER
17
     KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
18         Attorneys for Defendant The Kingdom of Saudi Arabia
     BY:  MICHAEL K. KELLOGG
19         GREGORY G. RAPAWY
           ANDREW C. SHEN
20
     MOLO LAMKEN LLP
21         Attorneys for Defendant Dallah Avco
     BY:  ROBERT K. KRY
22
     BERNABEI & KABAT, PLLLC
23         Attorneys for Saudi individual and corporate defendants
     BY:  ALAN KABAT
24
     STEVEN T. COTTREAU
25         Attorney for Defendant Dubai Islamic Bank
```

1              (Case called)

2              THE COURT:  Good morning, everybody.  I think we are

3    ready to begin.

4              Thank you all for joining us.  Thank you for the

5    second go at this conference.  I know we have had a slow start

6    this morning and that was because we were making sure that we

7    had everything set up the way we wanted it to be set up.

8              If everything is working correctly, we should have all

9    of the lawyers who are subject to the various protective orders

10   on the Skype line with the ability to view the screen.  I think

11   we have one or two lawyers who are also on the Skype line but

12   who should not have the ability to view the screen because they

13   are not covered by the protective order.

14             And then we have many people connected in through the

15   telephone line who are listening on a listen-only basis who are

16   interested in the case either because they are family members

17   or the press or otherwise interested in this proceeding.  So I

18   think we are up and running.

19             I am going to call the case and get the appearances,

20   and then I want to go through the agenda for today.

21             This is In Re Terrorist Attacks on September 11, 2001.

22   The docket No. is 03 MD 1570.

23             I think I am going to do a roll call to make it

24   easiest for the court reporter.

25             Is Steve Pounian here?

```
 1                 MR. POUNIAN:  Yes, your Honor.

 2                 THE COURT:  I see Steve Pounian is on my screen, but

 3    he is listed as muted.  I don't see his video.

 4                 Now I see you.

 5                 MR. POUNIAN:  I'm muted.  Is it working now, your

 6    Honor?

 7                 THE COURT:  I can see you, but I can't hear you.

 8                 MR. POUNIAN:  Mr. Kellogg, you can hear me?

 9                 MR. KELLOGG:  Yes.

10                 THE COURT:  I'm told that everybody else can hear you

11    but me.  Do you want to mute yourself and unmute yourself to

12    see if makes a difference?

13                 MR. POUNIAN:  I'm back on mute again.  I'm on.

14                 THE COURT:  Can you speak now, Mr. Pounian?

15                 MR. POUNIAN:  Yes, your Honor.  I am here.  Can you

16    hear me?

17                 THE COURT:  I'm losing my patience with all of this,

18    as I'm sure everybody else is.

19                 MR. POUNIAN:  I'm here.  Can you hear me.

20                 THE COURT:  I'm being suggested that I do volume up.

21    I have a computer that was built just after they invented

22    computers, so I don't even know where volume would be on this

23    computer.

24                 I have my speakers at full volume.

25                 MR. POUNIAN:  I'll try again, your Honor.  Can you
```

 1    hear me?

 2              THE COURT:  I'm still not hearing you.

 3              Mr. Kellogg, do you want to speak just so I can see if

 4    I can hear you?

 5              MR. KELLOGG:  Yes, your Honor.  Can you hear me?

 6              THE COURT:  We know it's not a bias system then.

 7              Anybody want to go to Manhattan?

 8              I am going to take a quick recess.  I am going to turn

 9    my video off and see if I can get somebody from our IT system

10    on to see if I can manage this.  Give me a moment.

11              I think the age-old trick of shutting down the

12    computer and starting up the computer may have worked.

13              Let's begin again.  Mr. Pounian, can I hear you?

14              MR. POUNIAN:  Yes, your Honor.  I'm here.

15              THE COURT:  Wonderful.  I have never been so happy to

16    hear your voice.

17              We have the court reporter back on.  Steve Pounian is

18    here from Kreindler & Kreindler.

19              Is Robert Haefele here?

20              MR. HAEFELE:  I am here, your Honor, yes.

21              THE COURT:  And Jerry Goldman?  I saw Mr. Goldman

22    previously.  Mr. Goldman.

23              MR. GOLDMAN:  Yes, your Honor, I am here.  Good

24    morning.

25              THE COURT:  And Mr. Carter.

 1              MR. CARTER:  Yes, your Honor, I am here.

 2              THE COURT:  Anybody else on behalf of the Plaintiffs'

 3   Executive Committee?

 4              MR. POUNIAN:  No, your Honor.

 5              THE COURT:  On behalf of the Kingdom of Saudi Arabia,

 6   I see Michael Kellogg.

 7              MR. KELLOGG:  Yes, your Honor.

 8              THE COURT:  I see Andrew Shen.

 9              MR. SHEN:  Yes, your Honor.  Good morning.

10              THE COURT:  And Mr. Rapawy is with you as well.

11              MR. KELLOGG:  Yes, he is.

12              THE COURT:  Anybody else for the Kingdom?

13              MR. KELLOGG:  No, your Honor.

14              THE COURT:  Thank you.

15              Is Robert Kry here for Dallah Avco?

16              MR. KRY:  Good morning, your Honor.

17              THE COURT:  Good morning.

18              We should have Alan Kabat here for the individual

19   corporate defendants.

20              MR. KABAT:  Your Honor, Alan Kabat here.

21              THE COURT:  Anybody else on the Skype call whose

22   appearance I have not called out?

23              MR. COTTREAU:  Good morning, your Honor.  This is

24   Steve Cottreau for Dubai Islamic Bank.

25              THE COURT:  Thank you.

```
 1              Anybody else?
 2              Thank you all, again, for your patience.  It's now
 3    about 10:30.  My intention is to jump right in, pick up where
 4    we left off.  There has been some movement even in that area
 5    since we were last together.
 6              My plan is for us to go for an hour and then to take a
 7    short break so that everybody can stretch their legs, etc.  I
 8    don't know how long we will need to go today, but I figure at
 9    least at the hour mark we should take a break.  We should all
10    plan on breaking at 11:30 for a moment.  That will also help
11    the court reporter.
12              There is a court reporter on this call.  That person
13    does have video feed, which I hope will help him attribute
14    statements to the speaker.  But if you can also remember to
15    introduce yourself before you speak, that would help as well.
16              A reminder.  As I was starting to say previously, I
17    understand that documents are being presented at this
18    conference that are covered under various protective orders and
19    have been designated as confidential by the parties and by the
20    FBI.
21              I want to make sure that everybody is sensitive to
22    that issue.  We have people listening in on a listen-only
23    basis, both family members, interested members of the public,
24    and the press, and we want to make sure that nothing is
25    disclosed in the audio that would be protected.  So I am going
```

1    to ask that the parties be as circumspect as they can in

2    describing documents.

3         I have the two large binders that the Plaintiffs'

4    Executive Committee have sent to me, and I believe I also have

5    some documents that have been e-mailed to me, if you need me to

6    look at that, and also we will be publishing documents to the

7    screen.  If you can just be exceedingly careful about that

8    issue.

9         I believe that there are four large categories of

10   witnesses that we are going to talk about today.  Those are

11   individuals for whom the Kingdom has designated as subject to

12   diplomatic immunity and, therefore, not required to testify,

13   individuals that we are categorizing as former employees for

14   whom the Kingdom indicates does not have the capacity to force

15   to testify, and then high-ranking officials for whom the

16   Kingdom has asserted the apex privilege or privilege that

17   associates with senior members of government, as well as

18   corporations.  Lastly, there is a category related to

19   individuals that were excluded from document discovery from the

20   Kingdom based on motion practice and orders of the Court and

21   whether or not, notwithstanding those decisions, those

22   individuals should be required to testify.

23         I believe those are the four categories here today.

24   We started with what I think among the most complicated issues,

25   which is those individuals who are, arguably, subject to

1   diplomatic immunity.  When we tried this conference last week

2   we began with that, so I want to begin with that again.

3          The first question that we were discussing was whether

4   or not the Kingdom had satisfied its burden as a threshold

5   matter to establish that these 11 individuals were in fact

6   covered by diplomatic immunity.  There is the *Carrera v.*

7   *Carrera* case out of the D.C. Circuit that discusses that, and

8   there have been more recent cases in the district courts

9   talking about that initial requirement.

10          Since our conference last Thursday, the Kingdom has

11  submitted a letter indicating that these 11 people are listed

12  on various Department of State listings as having been

13  qualified for diplomatic or consular immunity, and the

14  plaintiffs have responded to that letter.

15          Why don't I begin there and ask that the Plaintiffs'

16  Executive Committee to start off with a discussion about

17  whether or not the Kingdom has met its burden.  And if you

18  believe that it has not, if you can tell me what case law you

19  think requires it to do more.

20          MR. POUNIAN:  As I said earlier, we do not dispute the

21  certification of the ambassador, Bandar, or the consul general,

22  Salloum.  But we do require certification from the Department

23  of State, which is what the case law has demanded in the past

24  with regard to these other individuals as to whom this witness

25  testimony immunity is claimed.

1          With regard to those individuals, typically, the

2    Department of State has issued a certificate that covers the

3    particular time period and covers the witness.  And the books

4    that have been submitted, which were submitted late, were not

5    included as part of the motion by Saudi Arabia, but in an

6    attempt to cure the defect in their motion, we don't think that

7    those are satisfactory substitutes for the certification that

8    would come directly from the Department of State.

9          And in this case, your Honor, there are particular

10   issues of which your Honor is aware regarding the certification

11   of employees at the consulate and the embassy.  For instance,

12   Thumairy himself was a diplomat, and the Kingdom has now

13   claimed he wasn't working at the consulate at all.  He was

14   working somewhere else.  We have questions regarding others who

15   the Kingdom has claimed are diplomats at the facilities.

16         THE COURT:  Thumairy is not one of the 11 that they

17   are citing the immunity.

18         MR. POUNIAN:  That is correct, your Honor, he is not.

19   He is not.  But we have questions about the others, some of the

20   others as to whom they do claim immunity.  As I said, your

21   Honor, we don't claim it as to the ambassador or the consul

22   general.  We see them clearly.

23         But we do not know whether there was any action taken

24   by the Department of State at any time after the events of 9/11

25   with regard to any other of these Saudi officials as to whom

1  they claimed immunity.  We do not have access to that

2  information, but the Kingdom does.  In this circumstance, they

3  should have come forward with the certification provided by the

4  Department of State, which is what is traditionally provided in

5  cases of this nature.

6      THE COURT:  In reading over the cases where this issue

7  comes up, in my reading of the case law it is not that clear on

8  how a sovereign would meet its burden.  Most of the cases that

9  I've read suggest that all that's required is that the

10 Department of State speaks to the issue, that there hasn't

11 been, in my read, a particularly rigorous analysis, and that's

12 so long as some official document has been presented from the

13 Department of State that that is adequate.

14     Do you read cases to require more?

15     MR. POUNIAN:  What I've seen in the prior case law,

16 your Honor, is an actual certification directed to the

17 particular official that deals with the circumstances of that

18 particular official.

19     THE COURT:  Which case are you citing to?

20     MR. POUNIAN:  I believe that's in the *Carrera* case,

21 and I can get your Honor additional cites from the Southern

22 District, but I believe a decision of Judge Sweet.  But I don't

23 have that at my fingertips right now, your Honor.

24     THE COURT:  Can I ask a question.  I didn't look at

25 this in the submission from the Kingdom.  Was Thumairy listed

1    on that list?

2         MR. POUNIAN:  He was not listed on that list, your

3    Honor, and there is others that are not listed on that list.

4    Mr. Muhanna is not listed on that list, even though he had

5    diplomatic status.  Sadhan and Sudairy had diplomatic status.

6    They are not listed on any list.

7         It just raises more questions to us about how this

8    process and actually who is on and who is off the list and the

9    standards that were kept and what the actual records are now,

10   what the State Department would say now, looking back from 2020

11   back to what actually was going on in 2000, 2001.  That's our

12   query.  It's something that they have the burden of proving in

13   the first instance.

14        THE COURT:  I'll address these questions to the

15   Kingdom, but let's move on.

16        Let's assume now that we have passed this threshold

17   question and we have individuals that you want to depose who

18   are qualified, meaning that their immunity is not being

19   challenged.  I want to talk about two different things, at

20   least.

21        The first is, I want to talk about your argument that

22   whatever protection these individuals would have is more akin

23   to a privilege that needs to be asserted on an individual

24   question basis rather than an absolute immunity from

25   participation and, secondly, on this issue of a functional

1    assessment, you've cited to cases where individuals were

2    engaged in criminal acts or fraudulent acts, suggesting that

3    there is something akin to a crime fraud exception, such that

4    any immunity would not protect somebody who is engaged in

5    conduct that was plainly inconsistent with the duties of the

6    consulate or the embassy, and I'd like to flesh out how that

7    would apply here and how you would envision exploring the scope

8    or parameters of such exemption.

9        MR. POUNIAN:  Yes, your Honor.  I think it is similar

10   to a privilege that would be asserted question by question at a

11   deposition, if it is recognized by your Honor.  And it goes

12   to -- and I think you have to look at the specific facts here

13   and what we are dealing with because the questions that we are

14   dealing with here have nothing to do with the functioning of

15   the consulate or the --

16       THE COURT:  We lost your video feed 30 seconds ago and

17   now we have lost your audio feed.

18       MR. CARTER:  Your Honor, I did just text Mr. Pounian.

19       Your Honor, while we are waiting for him to come back

20   on, can I briefly address the certification issue your Honor

21   raised?

22       THE COURT:  Yes.

23       MR. CARTER:  Very quickly, when there is litigation

24   involving interests of a foreign sovereign it is not uncommon,

25   your Honor, for the foreign state to need to engage with the

1   State Department to make some proffer in the context of the

2   litigation relative to a claimed immunity or interest of the

3   foreign state.

4           For instance, claims against foreign officials are

5   governed by the common law, not the Foreign Sovereign

6   Immunities Act.  And in that docket it is incumbent upon the

7   foreign state to submit a request to the State Department for

8   consideration of whether immunity should be extended and for

9   the State Department then to come forward with a submission on

10  that point.

11          The Kingdom began the litigation here by saying that

12  there was going to be broad cooperation with the discovery

13  proceedings that at least as to documents these diplomatic

14  immunities weren't going to be asserted.  And now they have

15  come forward and asserted that the witnesses themselves, who

16  can speak to these matters, should be immunized.

17          We think in that context it's particularly incumbent

18  upon the Kingdom to seek an appropriate certification from the

19  State Department.  Presently now, in the context of the

20  litigation to come forward, we don't know exactly how the State

21  Department would do that.  But given the fact that there were

22  determinations and there is public reporting about this, that

23  some people with whom the Kingdom had imbued diplomatic status

24  were not properly imbued with that status.  We do think that it

25  shouldn't be held to the stringent requirement of asking the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   State Department to weigh in.

2           THE COURT:  Can I ask a question, Mr. Carter.  I

3   assume you are not asking the State Department to decide today,

4   with whatever information it has now, whether or not it would

5   revoke the immunity that it granted, to the extent it granted

6   it in the late '90s.  I think that seems inappropriate.

7           It also seems unfair for the State Department to

8   undertake such an evaluation.  My reading of the case law is

9   that this is an administrative process.  And to the extent that

10  what is required of the Department of State is simply to check

11  its books and records to see whether or not person X was

12  presented and immunity was granted as to employees.

13          MR. CARTER:  Your Honor, I think the one qualification

14  of that would be that there is actual evidence that the

15  diplomatic credentials of certain of the Saudi representatives

16  were in fact revoked.  It may very well be a determination by

17  the State Department that they were, in effect, fraudulently

18  obtained in the first instance, which would negate their

19  legitimacy as a result of the subsequent determination, I

20  think.  At a minimum, that seems to be something the State

21  Department should have an opportunity to consider in relation

22  to a formal request.

23          THE COURT:  I don't think it's appropriate today, in

24  2020, to request that the Department of State go back and

25  evaluate immunity decisions it made 22 years ago.  It's one

1    thing if after the September 11 attacks, it, as part of its

2    investigation, determined that certain people's immunity, like

3    Thumairy's, were inappropriate and therefore revoked, and so

4    Thumairy would not qualify were the Kingdom to be asserting

5    immunity on his behalf.

6            But I think in 2020 the request is simply, as we look

7    back today, are those immunities intact?  If we looked back

8    today at Thumairy, the answer would be no.

9            With respect to the other folks, the question I don't

10   think is, now with all the information we have, are we going to

11   reevaluate that decision, but, rather, looking back 20 years

12   into the past, are those people still listed as having been

13   granted immunity without revocation?  And if that's the

14   question to present to the Department of State, then is it form

15   over substance to require some form of certification if what

16   was presented by the Kingdom is an unchallenged official record

17   of the State Department's books?

18           MR. CARTER:  Your Honor, I think we are not expecting

19   that the State Department will conduct a 2020 reassessment of

20   the appropriateness of the original diplomatic credentials.  We

21   are simply suggesting that the submission of a formal request

22   is appropriate so that we determine whether or not there were

23   officials, who, like Thumairy, had their credentials revoked

24   and for whom the Kingdom is now claiming this kind of immunity.

25           It may be that other of the individuals where the

1    Kingdom is asserting this immunity fell in a similar situation

2    as Thumairy and had their credentials revoked, and that's

3    really the issue.

4            THE COURT:  Other than knowing it happened with

5    Thumairy, do you have any reason to believe that it happened

6    with the other 11 people?

7            MR. CARTER:  Your Honor, a number of the individuals

8    in question are associated with the Kingdom's religious

9    apparatus in the United States.  The 9/11 Commission includes,

10   you know, a footnote indicating that there was a significant

11   debate about the presence of those folks in the United States

12   and that with regard to Thumairy the issue was resolved when

13   they decided to preclude him from reentering the United States

14   based on evidence that he may be connected to terrorism.

15           There is public reporting, as I said, your Honor, that

16   the United States removed 60 or 70 individuals associated with

17   the Kingdom's diplomatic and consular functions in the United

18   States in the wake of the September 11 attacks in what the

19   State Department said at the time was part of an effort to

20   protect the homeland.

21           So we don't know who those 60 or 70 people are.  But

22   we do have concern that it encompasses some of the people who

23   are the subject of the present application, and that's

24   essentially what we are getting at and urging that there should

25   be a requirement to make the formal request.

1          MR. KELLOGG:  May I respond?

2          The case law indicates that there is no particular

3     means by which someone asserting diplomatic immunity has to

4     prove diplomatic status.  In the *Broidy* case in the Second

5     Circuit, for example, all there was was an e-mail from the

6     State Department indicating that somebody had been granted

7     diplomatic service, and the reason they had to do that is

8     because the defendant in that case, the person who was

9     asserting immunity, had not been recognized by the State

10    Department.  He was a Moroccan official, part of the UN

11    delegation.  At the outset of the case he did not have

12    diplomatic immunity.  And one day before he was granted it or

13    one day after he was granted it, the State Department said,

14    yes, he has now been granted it, so he's entitled to diplomatic

15    immunity.

16          Here, in this case, we have at the outset plaintiffs'

17    own witness list, which I am going to ask Mr. Shen to pull up,

18    given to us on December 6 on last year which lists the various

19    witnesses they want by their positions, starting with the

20    embassy.  And you will see, at it comes up --

21          THE COURT:  I have this document in a hard copy in

22    front of me as well.

23          MR. KELLOGG:  On the first page it says:  Saudi

24    government witnesses, embassy of Saudi Arabia in Washington,

25    D.C.  And it lists the four individuals for whom, from the

1    embassy, we are claiming diplomatic immunity:  Ahmed al-Qattan,

2    who identifies as the chief of staff; Majed al-Ghesheyan, who

3    identifies as the head of Islamic Affairs; Mazyed Ibrahim

4    al-Mazyed, who identifies as cultural attache of U.S.; and

5    Prince Bandar Bin Sultan, who identifies as the ambassador.

6         And then it has a list from the consulate general.

7    And it lists the deputy consul, consul general, deputy consul

8    general, another deputy consul general, and Walid Bukhari, who

9    is a visa employee.

10        Each of those nine individuals for whom we are

11   claiming diplomatic immunity is also on the State Department's

12   formal list of persons getting either diplomatic or consular

13   immunity.  These are formal lists published by the department

14   of protocol at the State Department.

15        I'd actually like to pull up a prologue of each of

16   those for the Court to see.  It says:  The diplomatic lists

17   helps persons, with the exception of those identified by

18   asterisks, enjoy full immunity under provisions of the Vienna

19   Convention on diplomatic relations.

20        The same thing is for the consular list, where it

21   talks about complete and official listing of the foreign

22   consular offices in the United States, and recognized consular

23   officers.  All five of the individuals for whom we claim

24   diplomatic immunity at the L.A. consulate are listed there.

25   None of those, to our knowledge, have had their credentials

1   revoked or otherwise questioned in the intervening years.

2          Yes, there is no question that Saudi Arabia used to

3   send propagators to work at mosques around the United States

4   and other countries, and they gave them diplomatic credentials.

5   There is no question that the United States called them on that

6   and said, you can't do that, and revoked those diplomatic

7   credentials which is why, for example, Thumairy was denied

8   reentry into the United States because his diplomatic visa was

9   revoked.

10          But as to the nine individuals that I've just cited,

11   there has just been no question either that they were

12   legitimate diplomats at the time.  Mr. Pounian said, well, I

13   don't know if those were subsequently rejected.  Well, that's

14   not a basis for making an inquiry when we presented more than a

15   *prima facie* case that these individuals were protected.  So

16   that's nine of the 11.

17          The other two diplomats were ambassadors to other

18   locations:  Mr. al-Shahri and Mr. al-Sharif.  We actually think

19   that being an ambassador to another location gives you

20   immunity, even outside of the receiving state.  The Court need

21   not reach that issue because these two are both former

22   officials.  In fact, seven of the 11 diplomats that we are

23   claiming diplomatic immunity for are former employees and,

24   therefore, outside of our control, and we cannot compel them to

25   testify, in any event.

1           I just don't see, in the face of that showing, as your

2   Court noted, what sense it would make now to go to the State

3   Department and say, by the way, would you repeat for us what

4   you already put in your diplomatic and consular books and let

5   us know if anything happened subsequent at that time, when

6   there is no indication that anything did.  Frankly, we would

7   know if any of these --

8           THE COURT:  Can I ask an evidentiary question, which

9   is the same one I was asking to, I believe, Mr. Pounian, which

10  is, is Thumairy listed on that list?  If we asked today if

11  Thumairy had privileges, because we know that they were

12  revoked, would he appear today on that list?

13          MR. KELLOGG:  He was not, even at the time, on either

14  the diplomat list or the consular official list.  However, he

15  did have diplomatic credentials and those were subsequently

16  revoked.  Indeed, for all the propagators they were revoked.

17          THE COURT:  When you say credentials that means, for

18  instance, that they were traveling with the diplomatic

19  passport?

20          MR. KELLOGG:  With a diplomatic visa.  I am not sure

21  about the diplomatic passport, but they were on a diplomatic

22  visa.

23          THE COURT:  That's what you mean by credentials.

24          MR. KELLOGG:  Yes.  We are not claiming diplomatic

25  immunity as to any of those individuals.  Yes, there was a

1    legitimate back and forth with the State Department about

2    whether it was appropriate to give those folks diplomatic

3    credentials, and Saudi Arabia said, well, don't we do the same

4    for people you send to Saudi Arabia?

5           I'm sorry.  Mr. Rapawy tells me I am going into

6    confidential information.

7           But there was a legitimate discussion about whether it

8    was OK for propagators to have diplomatic credentials.  The

9    United States ultimately decided it was not, and those

10   credentials were revoked.  But none of that has anything to do

11   with the 11 diplomats we are talking about today.

12          THE COURT:  Thank you.

13          MR. POUNIAN:  Your Honor, I came back to find Mr.

14   Kellogg talking, so I guess I lost my opportunity there.

15          If I could just respond to one thing that he just said

16   about the 12 people, whatever.  We know that there were two

17   officials at the embassy who were secunded from Imam

18   University.  One of them is Mr. Ghesheyan.  The other one they

19   have agreed to produce for a deposition.

20          It is these types of questions, your Honor, that we

21   are dealing with in trying to understand because he is not a

22   typical, in a diplomatic quote/unquote role, someone coming in

23   from this educational institution and secunded into the

24   embassy.  That is one of the reasons why we have raised this

25   issue.

1          THE COURT:  I'm sorry.  You are referring to

2     Mr. Ghesheyan?

3          MR. POUNIAN:  Ghesheyan is the pronunciation, as I

4     understand it.

5          MR. CARTER:  Your Honor, can I piggyback on what

6     Mr. Pounian said just very briefly.

7          Mr. Kellogg suggested that the controversy concerning

8     diplomatic status was limited to the propagators who were

9     assigned to mosques throughout the United States.

10          Our understanding is that the controversy concerned

11     the Islamic Affairs' apparatus the Kingdom was operating in the

12     United States more broadly and not simply propagators who were

13     attached to particular mosques and, thus, why we are concerned

14     about people like Ghesheyan in particular.

15          MR. POUNIAN:  Your Honor, one other thing.  There was

16     an Islamic Affairs representative at the consulate also,

17     Mr. Awad, who had Mr. Mana working underneath him.

18          I was going to get in some of these facts in response

19     to your Honor's questions before about getting past this

20     particular threshold issue and getting into the facts regarding

21     how the privilege, which we don't really think there is one in

22     this case, given the circumstances and the facts here.  But how

23     the privilege could be asserted at the deposition, I think, is

24     a question-by-question privilege, and I'm happy to get back to

25     that, your Honor, if you'd like me to do so.

1          THE COURT:  Sure.  If I could just wrap up for a

2     moment because you threw in a few factual element which I

3     hadn't focused on which is, from your perspective, I understand

4     that there are at least two people you take no issue with,

5     Bandar and Salloum.  But you suggested that anyone who was

6     associated with the Islamic Affairs department, Ghesheyan and

7     al-Awad, that those people might be slightly different than

8     others?

9          MR. POUNIAN:  Yes, your Honor.  That's one area that

10    we have identified from our efforts, and we don't know the

11    entirety of the situation.  We are looking in from the outside

12    and trying to find out the facts, and they have the burden here

13    to come forward.  So they are always saying we have the burden,

14    but here they have the burden, and we are trying to hold them

15    to their burden because there are issues here that are not a

16    hundred percent clear to us.  It's not certain.

17         And with regard to these people and who Ghesheyan was

18    working under, they are producing that person.  But there are

19    others that we have these questions about, your Honor.

20         MR. KELLOGG:  Your Honor, I'd like to make two quick

21    points about that.

22         First of all, there was an Islamic Affairs department

23    at the embassy.  Mr. Ghesheyan was the head of that and

24    Mr. Awad was deputy consul in Los Angeles and represented him

25    in the Islamic Affairs department.

1          There is no indication whatsoever that either of those

2     individuals had their diplomatic credentials questioned,

3     revoked, or otherwise put in question at all.  And the mere

4     fact that they worked on Islamic Affairs is fully within the

5     scope of the Vienna Convention, which says cultural and other

6     outreaches in the receiving state are perfectly appropriate.

7          And I would also add that they are both retired.  They

8     are both former employees and, hence, outside the subpoenaed

9     jurisdiction of the Court unless they are willing to testify.

10    We asked both of them if they would be willing.  I know we

11    asked Mr. Ghesheyan and I believe we asked Mr. Awad, and they

12    both declined.

13         MR. POUNIAN:  Your Honor, what I have seen from their

14    papers, they have never asked Mr. Awad and in fact they have a

15    lot of questions about the circumstances of his departure from

16    Saudi Arabia because when we first received their letter on

17    February 3 of this year, they said Mr. Awad was still working

18    for Saudi Arabia.  He was a current employee.  And then the

19    very next day we get an e-mail, he just retired from Saudi

20    Arabia.  And this was after we had had his name as a witness

21    for over a year.

22         So it's obvious that he retired at some point after we

23    served our witness list, and Saudi Arabia never took any steps

24    to notify us or to give us any warning or any opportunity to

25    take his testimony.

1        And to say that he is a former employee, when he is

2   someone they are claiming is a high-level official, is

3   absolutely ludicrous.  And they have complete control over him

4   as a sovereign state.  They can produce Mr. Awad if they want

5   to.  It's just that they have decided they don't want to.  It's

6   their decision as to whether or not they want to produce

7   Mr. Awad.  And they are saying, no, we refuse to do so.

8        And in this circumstance, your Honor, the reason we

9   have to press these questions and press them forcefully is

10  because we believe we are entitled to an adverse inference in

11  this type of circumstance, when they have witnesses that they

12  have withheld from testimony that we have asked for.  They have

13  pulled the rug out from underneath us and now they are claiming

14  corporate type privileges to say that these people are

15  protected because they are part of a corporation when the

16  corporation is the Kingdom of Saudi Arabia.

17       It is not a corporation.  It's a sovereign entity and

18  it has control over Mr. Awad and can produce them.  He is a

19  loyal public servant of Saudi Arabia and he will appear if

20  directed by the king.  And we demand that he appear to testify

21  because there is very significant evidence that he has

22  regarding the facts of this case that have nothing to do with

23  diplomatic functions.  And this is a complete attempt to shield

24  the key facts of this case from coming out and being developed

25  before your Honor.

1        THE COURT:  I do want to talk about former employees,

2   but not right now.  I want to continue to focus on the

3   diplomatic immunities or privileges.

4        MR. POUNIAN:  Again, your Honor, I didn't raise the

5   former employee issue, but it is difficult to discuss any of

6   these people because some of them are former, some of them are

7   high level, some of them, etc.  And all the issues are

8   intertwined with many of them.  I am at your Honor's pleasure

9   in terms of how to proceed.

10       THE COURT:  What I wanted to talk about was, assuming

11  that the Kingdom has met its burden and established that the

12  immunity would attach, how do we proceed?  Your argument, as I

13  understand it, is that there is some sort of what I'm calling a

14  crime fraud exception, which would argue that if a diplomat was

15  engaged in conduct that was criminal, fraudulent, somehow

16  plainly outside of the scope of their consular or diplomatic

17  responsibilities that they would not be entitled to the

18  protections of the conventions, and there are cases to support

19  that.  You cited to cases involving the fraudulent issuance of

20  visas, for instance.

21       And so my question for you is, as a practical matter,

22  how would you propose that that exploration be carried out in

23  order to determine exactly the bounds of any exception to

24  immunity?

25       MR. POUNIAN:  Your Honor, the witness' deposition

1    would come forward.  We can call the witness and we would ask

2    questions, and I assume that at the appropriate time Mr.

3    Kellogg would object.  And then we would have to come to your

4    Honor if there were objections that we could not get resolved

5    among the parties.  But the facts are so complex and there are

6    so many different layers to it that I don't see any other way

7    to conduct it.

8              You speak, your Honor, of a crime of fraud exception.

9    I believe that a lot of these witnesses, whether or not they

10   were involved in the crime itself, they are eyewitnesses to

11   events and places and people and things in California, in the

12   year 2000 when a plot was hatched to provide assistance to the

13   hijackers when they first came over to the United States.

14             And whether or not they knew what they were seeing at

15   the time, whether they were part of the operation or not, if

16   they visited the mosque on their own or if they talked to

17   Thumairy about something, that was not part of their consular

18   function.  It was outside the function of the consulate.  This

19   is going to have to be decided on a question-by-question basis.

20             I can go through some of the witnesses and explain.

21   When you go through the details of facts involved, it's very

22   difficult, I think, for the Court to set a bright line test,

23   like Saudi Arabia wants to say, oh, they are completely immune

24   from testimony.  That's ridiculous under these circumstances

25   because of the nature of the facts and the nature of the

 1   personal knowledge that these people have from things that have

 2   nothing to do with the functioning of the consulate or the

 3   embassy.  They were there in California.  They knew.  They saw

 4   things that happened at the mosque.  They saw things that

 5   happened with Thumairy.  They knew what Bayoumi was doing.

 6   Those things are not related to the function of the consulate.

 7               THE COURT:  Do you know that to be true?  Because, for

 8   example, if one of these witnesses was speaking with Thumairy

 9   because he is a Saudi citizen and he came for services or part

10   of their cultural outreach in America, and you would like to

11   know about those conversations that they had.  Why is that

12   outside the scope of their diplomatic work?

13               MR. POUNIAN:  Your Honor, let me step back one second.

14               They have raised a lot of statements here that are

15   contrary.  At one point they say the mosque is private.  Now

16   they are saying when they go there it's part of their function.

17   What is it?  They are saying that the Bayoumi was not doing any

18   work for the Kingdom.  He was a student.  They are saying, on

19   the other hand, any conversation we had with Bayoumi is part of

20   the Kingdom.  Thumairy was on his own.

21               THE COURT:  Why would going to a private mosque mean

22   that was not part of your function?  If I was the ambassador to

23   France and I wanted to visit an American corporation that was

24   located in France and I went to visit as the ambassador to see

25   what this American corporation was doing, that would be part of

1    my diplomatic role of promoting American business in France.

2    Just because I was visiting a private corporation wouldn't take

3    me outside of that immunity.

4            MR. POUNIAN:  No.  But I don't think that the visits

5    here are of that nature, your Honor, where it's an official

6    visit of a diplomat to the mosque.  If I could just show your

7    Honor one example of an exhibit here.

8            MR. CARTER:  Your Honor, while Mr. Pounian is doing

9    that, can I briefly address the issue?

10           THE COURT:  Yes.

11           MR. CARTER:  I think part of this, your Honor, is that

12   with regard to engagements with Thumairy, the Kingdom itself

13   has, in the context of this argument, acknowledged that the

14   program of activity in which Thumairy was engaged was not a

15   proper part of any diplomatic function in the United States.

16   And to the extent that officials are dealing with Thumairy with

17   regard to the work that Thumairy was sent here to do, that was

18   not properly part of any diplomatic function of the Kingdom in

19   the United States, shouldn't have been here, in all actuality,

20   at all.

21           Then we have another layer indicating that the

22   engagements may have run to the actual provision of support for

23   the attack itself, and that's clearly another issue that's well

24   outside of any proper diplomatic or consular function and

25   something we would have to explore, and you can't do it unless

1   you ask the questions of the witness about what they were

2   talking to Thumairy about.

3          THE COURT:  Mr. Carter, where has the Kingdom

4   acknowledged that the work of propagators was not appropriate?

5          MR. CARTER:  I think Mr. Kellogg during this argument

6   indicated that the Kingdom had been imbuing the propagators

7   with diplomatic authority and that a controversy arose after

8   that and that the Kingdom effectively acknowledged that that

9   was not appropriate, that the propagation activity was not an

10  appropriate part of the diplomatic functions in the United

11  States.  And to the extent that the officials and the embassy

12  and consulate were directing that work and engaging, it's

13  simply outside the scope of the appropriate diplomatic

14  functions.

15         MR. KELLOGG:  May I respond to that, your Honor?

16         THE COURT:  Yes, Mr. Kellogg.

17         MR. KELLOGG:  What I acknowledged was that the

18  propagators, the U.S. said they shouldn't have had diplomatic

19  passports.  It doesn't mean that they weren't serving a

20  legitimate function in the United States or that consular

21  officials, in dealing with propagators were not pursuing their

22  consular functions which are very broadly defined in the Vienna

23  Convention on consular relations, and they include

24  interacting -- helping and assisting nationals, both

25  individuals and corporate bodies of the sending state,

1     protecting the interests of the state, the sending state,

2     performing other functions, engaging in cultural and other

3     outreach.

4            So the fact that embassy officials met with Bayoumi to

5     give him a passport is clearly a consular function.  The fact

6     that when a high-level official came, he would go to the King

7     Fahad Mosque and members of the consular staff would go with

8     him.  That's, again, a diplomatic or consular function.  I am

9     not suggesting that any of the consular officials or the

10    embassy officials themselves have engaged in any illegitimate

11    conduct.  They have not provided any indication of that.

12           In any event, the few cases which talk about the fraud

13    exception to diplomatic immunity are extremely limited.  There

14    is the *Swarna* case in the Second Circuit where they are talking

15    about a procedural immunity of a diplomat who had engaged in

16    human trafficking, involuntary servitude, forced labor, and

17    sexual abuse at a private residence, nothing like what is at

18    issue here.

19           In the visa fraud case, *Morocco v. United States*,

20    which was in the Southern District, Morocco was attempting to

21    intervene into an ongoing grand jury investigation where the

22    U.S. Government represented to the Court that it would not

23    inquire into any consular functions.  This was a fraudulent

24    scheme outside the embassy to bring workers in domestic

25    farmhands to the U.S. who would apply for visas falsely,

1    claiming that they had been hired to work at the consulate.

2    They are very different issues.

3        The Court in *Swarna* said, in deciding whether

4    something is a consular function, you do not look at

5    allegations that it's criminal or not.  You do not inquire into

6    that.  So we can talk further about the consular functions and

7    how broadly it is.

8        If you look at their witness list, and I cannot go

9    into it in detail because it's a confidential document, but we

10   do this in the addendum of our reply brief.  It indicates in

11   every case that they are talking about basic consular

12   functions, meeting with people are day-to-day activities.  And

13   they have no basis for assuming that anything is outside of

14   their consular functions, which would make it a total waste of

15   time to drag former consular officials in for a deposition

16   simply so that every question can be objected to about their

17   consular functions.

18       It seems that this circuit in the *Wilburn* case said in

19   that case that the vice consul was free to ignore a subpoena

20   for documents and testimony if she determined that they have

21   arranged to exercise the consular functions.

22       Here we have plaintiffs' own indication of what they

23   want to talk about these individuals about that makes it

24   absolutely clear that they want to talk about diplomatic and

25   consular functions.  They want to talk about protecting in the

1   receiving state interests of the sending state, helping and

2   assisting nationals of sending state, reporting to the

3   government of the sending state about conditions and

4   developments in the receiving state.

5          All of those phrases are right from the Vienna

6   Convention on diplomatic and consular relations.  They are very

7   broadly stated.

8          And, again, I can't go into any more details, but they

9   do say, with respect to these officials, they want to talk

10  about the work they did with Thumairy and Bayoumi or about

11  day-to-day activities at the L.A. consulate, all matters that

12  they cannot inquire into.

13         MR. POUNIAN:  Your Honor, may I respond to that,

14  please?

15         THE COURT:  Yes.

16         MR. POUNIAN:  Your Honor, the facts here don't involve

17  events -- for the most part, don't involve events that occurred

18  inside the consulate or inside the embassy, but they do involve

19  Saudi Arabia setting up shadow organizations illegally inside

20  the United States with Ministry of Islamic Affairs officials

21  established at mosques in the United States.  Particularly in

22  California, at the King Fahad Mosque, they established

23  Thumairy.  They established the Bayoumi at a mosque in San

24  Diego.  And they had the help and assistance -- through the

25  MoIA organization they were given diplomatic cover.  Thumairy

1    was given diplomatic cover.  Others visiting were given

2    diplomatic cover.  And this is a criminal activity of visa

3    fraud that established this and allowed this shadow

4    organization to take place.  And the shadow organization was

5    included extremists who were aligned with al-Qaeda who were

6    against the interests of the United States of America.

7              Mr. Kellogg can argue until he is blue in the face

8    that this is a diplomatic function, but it is no way a

9    diplomatic function for Saudi Arabia to set up these

10   organizations outside of the consulate and then come in and

11   claim immunity when the events of 9/11 happened.  It makes no

12   sense.

13             MR. CARTER:  Your Honor, if I can briefly, again,

14   piggyback on what Mr. Pounian said.  There is quite a material

15   and significant distinction between Mr. Kellogg's reference to

16   cultural outreach and engagement with citizens and the

17   operation of a government illegal column in the United States

18   and the direction of the people who are working within that

19   framework.

20             And what the United States deemed was appropriate was

21   the Kingdom's creation of this structure that was being

22   directed in the United States to engage in this activity.  And

23   the people working within it were both improperly imbued with

24   diplomatic credentials.  They were also in violation of the

25   Foreign Agent Registrations Act, which is illegal, and we have

1    specific charges to that effect here.

2           Those distinctions do drag this completely outside of

3    the context of sort of more mundane engagements of a consular

4    official.  It's the operation of an illegal structure that is

5    at issue.  And that's not a diplomatic function.

6           It's akin to the Russians running a propaganda

7    campaign in the United States.  The Foreign Agent Registration

8    Act itself was enacted because the Nazis were trying to run

9    propaganda campaigns in the United States.  And it's similar

10   considerations that led the United States to conclude that this

11   was an entirely inappropriate function.

12          MR. POUNIAN:  In the *Morocco* case that Mr. Kellogg

13   cited, the Court allowed the U.S. Government to investigate the

14   government of Morocco, question witnesses at the consulate

15   because it was conduct related to a visa fraud scheme that was

16   prohibited by the laws and regulations of the United States,

17   such that no consular function is implicated.

18          Now, the U.S. is allowed to collect the facts about

19   that case, just like we have to collect the facts here.  And

20   the fact that Saudi Arabia used the consulate and used the

21   embassy and they knowingly -- the consulate and the embassy

22   knowingly were involved in these efforts to establish the

23   shadow organization inside the United States and authorize

24   Thumairy.  And they also knew about Bayoumi.  And they have

25   information regarding an illegal scheme inside the United

1    States that is not a diplomatic function.  We are entitled to

2    discovery on that issue.  We are entitled to know their

3    knowledge on that particular issue.

4            Now, it's going to require, if your Honor rules that

5    they have some level of protection regarding their functions --

6    in the *Morocco* case, the U.S. made every effort to protect

7    functions.  I don't need to see what's in the diplomatic bag.

8    I am not going to ask about the discussion on some particular

9    issue that may affect that issue.  And if I do, Mr. Kellogg

10   will object.

11           But these basic facts have to be known and there is

12   clear evidence of a scheme that is going on, clear evidence

13   involving a scheme that involves not only Thumairy and Bayoumi,

14   but Prince Abdul-Aziz.  There is the role of the third man who

15   tasked Thumairy and Bayoumi and, as the Court will remember,

16   Judge Daniels allowed discovery in this case for the very

17   purpose, as he said.

18           Plaintiffs claim Thumairy and Bayoumi were directed by

19   someone within the Saudi embassy in Washington to help Hazmi

20   al-Mihdhar.  That is why we have to go to the embassy and ask

21   the questions about who was in the chain of command over these

22   people and what was the extent of their agency and what was the

23   extent of their authority to get the questions answered

24   because, otherwise, what is the point of the judge's decision

25   in this case in terms of what discovery we are granted.  It

1    goes to the heart of the scheme, the heart of the claim that

2    plaintiffs have made in this case as to what happened and what

3    the agency issues are.

4         It involves people and events at the mosque that the

5    Prince founded, that Saudi Arabia claims was privately done.

6    We question that.  That's what they claim and now they are

7    coming in and saying no, it's something different.

8         They installed Thumairy as the leader there.  Who did

9    that?  Why, how, when?  This is part of the entire scheme, the

10   entire plot that we were granted discovery on, and it's

11   intertwined with the consulate and the embassy, and they use

12   diplomatic immunity when they want to try to hide the facts of

13   what they are doing.

14        They gave Thumairy diplomatic immunity so that he

15   could get out of the country, which he did.  If it had been

16   anyone else, he would be in jail right now.  He got out.  It's

17   wrong for them now to be coming in to claim this immunity now

18   to try to shut down on a broad basis the way they are across

19   the board immunity.  It does not make sense, given the facts,

20   the complexity of the facts here, how they are intertwined, all

21   the different details that we have to know.

22        And the fact that they themselves, like the government

23   in Morocco, was involved in a scheme to bring all these

24   Ministry of Islamic Affairs officials in without proper

25   paperwork, to bring in others from MoIA, we know, in San Diego,

1      to bring in Bayoumi as a student when he wasn't a student.  All

2      of these issues are issues that they have knowledge of and that

3      they should have to testify on because they have nothing to do

4      with the consular and embassy function.

5              THE COURT:  Mr. Pounian, when we lost you, you were

6      attempting to post something to the screen.  I don't know if

7      there is something you still wanted to do.

8              MR. POUNIAN:  Yes, your Honor.  I was going to address

9      several of the witnesses.  If I could do that, your Honor, it's

10     probably a good time to do this.

11             MR. KELLOGG:  Your Honor, before he does that, may I

12     make three quick points?

13             THE COURT:  Sure.

14             MR. KELLOGG:  First, essentially, Mr. Pounian and

15     Mr. Carter are saying that the Ministry of Islamic Affairs is a

16     criminal organization, that there is something inherently

17     illegal, suspect, shadowy about the propagation of Islam,

18     which, frankly, it's the government religion in Saudi Arabia.

19     They are perfectly entitled to do that.  Lots of Christian

20     missionaries travel around the world and nobody says this is a

21     shadow organization.  There is nothing wrong with that

22     inherently.

23             Now, the visa issue, the U.S. called them on that and

24     changed the way that that's done.  But that doesn't mean that

25     this was an elaborate scheme to defraud the United States.  In

1    any event, the visa issue has nothing to do with the limited

2    narrow discovery Judge Daniels asked about whether anyone

3    charged Thumairy and Bayoumi to assist the hijackers.

4         On that, we have gone out of our way to provide a huge

5    production of diplomatic documents which are absolutely

6    inviolable and protected.  There is nothing in those documents

7    that supports the allegation that anybody at either the embassy

8    or the consulate directed Thumairy and Bayoumi to do anything.

9         Mr. Pounian, I don't know where he comes up with the

10   idea that Thumairy would be arrested if he were in the United

11   States.  He came back to the United States, wanted to reenter

12   and they said, well, no, your diplomatic visa has been revoked

13   and you go back.  There has never been any suggestion -- he was

14   cleared by the 9/11 Commission.  There has never been any

15   suggestion by the FBI or otherwise since that he is facing

16   criminal jeopardy in this matter.  And it's irresponsible for

17   Mr. Pounian to simply make assertions like that which have no

18   basis of fact.

19        THE COURT:  Mr. Carter and Mr. Pounian cannot speak at

20   the same time.  You have to decide who is going to go first.

21        MR. CARTER:  Your Honor, I have three quick sentences.

22        First, it's not the plaintiffs' lawyers saying the

23   Ministry of Islamic Affairs was a problematic enterprise.  The

24   United States made the determination to dismantle this

25   operation and State Department officials said it was done as

1    part of an effort to protect the homeland and that's something

2    that's in our complaint.

3              THE COURT:  Dismantle what operation?

4              MR. CARTER:  There were massive problems with the

5    Ministry of Islamic Affairs.  It has published entire white

6    papers noting that it removed thousands of people from the

7    payroll of the Ministry of Islamic Affairs and sent many others

8    for reprogramming as part of its counterterrorism effort.

9    That's their own position with regard to the issue.

10             With regard to the scope of discovery, your Honor, we

11   obviously think the Kingdom is framing this in absurdly narrow

12   terms.  There is a question here about the scope of agency, and

13   we need to explore that.

14             Just with regard to Thumairy and the 9/11 Commission

15   issue, your Honor, the public documents indicate that Thumairy

16   is a main subject of a counterterrorism and criminal

17   investigation that the DOJ has at least said remains active.

18             That's all, your Honor.

19             THE COURT:  Thank you.

20             Mr. Pounian.

21             MR. POUNIAN:  Thank you, your Honor.

22             Let me discuss Consul General Salloum, who they

23   describe as a former official.  We have no idea when he

24   retired, and there has been no indication that there was any

25   effort made in asking him to testify.

1          The Kingdom hasn't agreed to produce anyone from the

2   consulate except for Thumairy, who was assigned there, but

3   evidently the Kingdom now claims he didn't work there.  But

4   Salloum, if I could show your Honor, Thumairy was asked in

5   2004, who was his superior?  And Thumairy said he reported to

6   the consul general.  That was Thumairy's testimony before the

7   9/11 Commission.  Is that true?  Is that not true?  Did he

8   report to the consulate general?  I would like to ask

9   Mr. Salloum that question.  I don't think the answer to that

10  question involves any diplomatic function.  It's a matter of

11  yes or no, did he report to the consul general.  It's not a

12  diplomatic function.

13          Let me show your Honor one other exhibit here,

14  Mr. Salloum himself on January 31, 2000.

15          THE COURT:  Are you trying to show me documents?

16          MR. POUNIAN:  Yes, I am, your Honor.  I apologize.

17          THE COURT:  It's not popping up on my screen.

18          MR. POUNIAN:  That's completely my fault because I'm

19  so excited about this new tool -- I apologize, your Honor.

20          THE COURT:  That's OK.  Now I'm getting something.

21          MR. POUNIAN:  As I said before, in the 9/11 Commission

22  testimony, Thumairy testified that he reported to Salloum.

23          Can your Honor see the check?

24          THE COURT:  I see that it is a check.

25          MR. POUNIAN:  It's a personal check from Mr. Salloum

1    to the mosque, dated January 31, 2000, which is the day before.

2    Omar al-Bayoumi met in Los Angeles for the first time with the

3    hijackers.  We got this document from the King Fahad mosque

4    from a subpoena.  It's the only personal check of Mr. Salloum

5    that we found in the entire production, and it is dated the day

6    before Bayoumi's meeting with the hijackers.  I would like to

7    ask Mr. Salloum about his personal check to the mosque for

8    $12,000.  I don't believe that involves a consular function.

9            That check was accompanied by a letter, which is the

10   next exhibit.

11           THE COURT:  Mr. Pounian, what exhibit was the check,

12   just so I have it for my records?

13           MR. POUNIAN:  It's Exhibit 39, your Honor.

14           THE COURT:  Thank you.  To the extent you are looking

15   at exhibits, I have my binder.  You could tell me which exhibit

16   so I can look at my copy, too.

17           MR. POUNIAN:  Fine, your Honor.  I had highlighted

18   some of these to help.  We are not dealing with confidential

19   documents yet.

20           The next one is another public document we obtained

21   from the mosque that accompanied the check in which the consul

22   general told the mosque --

23           THE COURT:  I'm sorry.  What exhibit are you at now?

24           MR. POUNIAN:  This is Exhibit 40, your Honor.

25           THE COURT:  Yes, I'm with you.

1      MR. POUNIAN:  I am pleased to send you a check in the

2  amount of $12,000 to deliver the employees' accrued salaries

3  until the amount is received from the office of his Royal

4  Highness, Prince Abdul-Aziz Bin Fahd.

5      We have had a lot of discussion, your Honor, about

6  Prince.  This letter indicates to Mr. Salloum about the Prince.

7  I'd like to question him about this particular issue and his

8  explanation for what the check is for and the timing of the

9  check and why the check was sent.

10     Mr. Salloum appointed Smail Mana.  Smail Mana was a

11  consulate.  ████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ███████  I have it highlighted on the screen to direct your

14  Honor's attention to the portion of that document that's

15  relevant here.

16         THE COURT:  I have read that paragraph now.

17         MR. POUNIAN:  Thank you, your Honor.

18         There are two other items with regard --

19         THE COURT:  Do we know where Mana is?

20         MR. POUNIAN:  Yes, your Honor, we do.

21         THE COURT:  Is he going to be testifying?

22         MR. KELLOGG:  He is in California, your Honor, and is

23  scheduled to testify.

24         MR. POUNIAN:  He is subject to a subpoena in this

25  country.

```
 1              Your Honor, if I could then turn to the next document.
 2    Again, I cannot discuss this, but there are two different pages
 3    from this particular document I want to show to the Court.  And
 4    this is not part of the binder before your Honor.  It's
 5    something that was previously filed with the Court, and I would
 6    like to make it part of the motion.  ██████████████████
 7              THE COURT:  Could you tell me where it would located
 8    in our files.
 9              MR. POUNIAN:  Your Honor, I can give you the specific
10    exhibit number.  It was included in one of plaintiffs' motion
11    to compel production of documents.
12              THE COURT:  After this conference, if you could just
13    let us know after this conference where those exhibits are,
14    that would be helpful.
15              MR. POUNIAN:  We will, your Honor.
16              That's really the highlighted information that I
17    wanted to point your Honor's attention to.
18              THE COURT:  Can you increase the side of your screen.
19    I can't read that font.
20              MR. POUNIAN:  First is what the document is and then
21    there is one definition there, your Honor.
22              That's the information I wanted to present on that.
23              I wanted to address one other issue, your Honor, with
24    regard to Mr. Salloum, and that is, this is a public document
25    produced by the Department of State.
```

1          In October of 2000, while the hijackers were in

2    California, the Department of State had a meeting with

3    Mr. Salloum and raised questions that are directly relevant to

4    the issues here.  They then sent a follow-up letter, and this

5    is a copy of the follow-up letter of October 4, 2000.  This is

6    the first page of the letter.  It's Exhibit 3, your Honor.  And

7    this is page, state 38.  Then it's page state 39 has this at

8    the top:  The State Department is asking, Fahad al-Thumairy's

9    position is listed as the administrative officer.  Is this

10   accurate?  We understand that Mr. al-Thumairy is the head of

11   the mosque in Culver City.  If he is not employed by the

12   consulate, a notification of termination should be submitted.

13   This is in October of 2000.

14         Your Honor ordered the Kingdom to produce documents

15   regarding its response to this and nothing was produced.  They

16   said they couldn't find anything.  It's the same thing we have

17   heard over and over again.  They did a quote/unquote reasonable

18   search and came up empty.

19         We want to ask Mr. Salloum about this and we think

20   it's perfectly within our rights, as set forth in the *Morocco*

21   case.  This is the precise scheme that we were discussing about

22   the visa and what was he doing to cover it up.

23         And we also know, from the interview, if I scroll

24   down, that the State Department also asked Mr. Salloum, does

25   Thumairy have his own car?  Does Thumairy have a driver's

1    license?  Because a diplomat is not supposed to have their own

2    car without diplomatic plates and not supposed to have a

3    private driver's license because their activities are supposed

4    to be tracked.  They then sent to Mr. Salloum the information.

5    Thumairy did have his own car.  That's on page 39.  Then on the

6    next page they advised:  Well, Thumairy had a driver's license.

7          Why is this important?  Because we believe Thumairy

8    was traveling, making visits to various different people, going

9    to different places without worrying about being tracked and

10   that's why he wanted a driver's license and that's why he

11   wanted his own car.  He didn't want to be driving around in

12   diplomatic plates.

13         Again, the Court ordered discovery on this, and we got

14   nothing.  That was in the November 25, 2019 order.  We want to

15   know how Mr. Salloum responded to this particular inquiry.

16         Your Honor, I'm ready to move on to Mr. Awad, or would

17   your Honor like to take the break that you had mentioned at

18   11:30.

19         MR. KELLOGG:  Before we move on, can I make discrete

20   points about Mr. Al Salloum?

21         THE COURT:  Go ahead, Mr. Kellogg.

22         MR. KELLOGG:  Plaintiffs are going to be able to

23   depose Mr. Mana, Mr. Bayoumi, and Mr. Thumairy, who, of course,

24   will have the most direct knowledge about each of these things.

25         And as we found in this case, you can't necessarily

1    rely on FBI 302s.  They are not admissible for a reason and in

2    many cases the testimony has and will deviate significantly

3    from what an agent has jotted down during some of the

4    interviews.

5         Second, they deposed the two officials from the King

6    Fahad Mosque.  They asked him ad nauseam about the payments

7    from the embassy, from Prince Abdul-Aziz, so it's not like

8    that's the only source.  They also have all of the relevant

9    documents on that.

10        As for Mr. Salloum, he was the consul general.  He was

11   the head of the consulate at that time.  He clearly has

12   residual immunity for any testimony concerning his functions,

13   and they show you a letter that the State Department wrote to

14   him about a Saudi citizen, and, if anything, if there is a core

15   consular function, it would be responding to such a request

16   from the State Department.

17        There is just no way that they can ask him about that

18   without impinging upon his consular immunity.

19        MR. POUNIAN:  Your Honor, this was no ordinary Saudi

20   citizen.  This was Mr. Thumairy.  And it's directly relevant to

21   the case.  And this Court ordered the Kingdom to produce

22   documents about it, and they did not do so.  And Mr. Salloum

23   has the same information that this Court ordered the Kingdom to

24   produce.

25             And they suggest in their papers and they repeat here,

1   we can get all the information from Thumairy and Bayoumi and

2   Mr. Mana.  But that's not what this Court ordered in terms of

3   discovery.  We are supposed to get discovery regarding the

4   chain in command up and down, above and below Thumairy and

5   Bayoumi.  And Thumairy identified Mr. Salloum as his

6   supervisor.  Whether that's true or not, we are entitled to

7   inquire.  And Mr. Thumairy was out on his own, not associated

8   with the consulate.  He was under the consul's wing, so to

9   speak, under this scheme that they had, but he was out on his

10  own.  So we are entitled to ask consul general Salloum about

11  that.

12          We also know from the facts, their testimony before

13  the 9/11 Commission, that Thumairy repeatedly lied.  They were

14  not reliable witnesses about the facts.  If we are going to the

15  bottom of the agency issue, your Honor, we have to hear from

16  others, others to fill in the facts and to learn the entire web

17  of facts that surround this agency issue.

18          MR. CARTER:  Your Honor, if I could briefly add on.

19  Mr. Pounian made the very good point that Thumairy and Bayoumi

20  are known to have lied about the very issues at the heart of

21  the discovery proceedings here and how that necessitates that

22  we be given access to other knowledgeable witnesses.  That's

23  certainly true.

24          Mr. Kellogg just mentioned that there is an

25  expectation that witness testimony is going to depart

1    significantly from the content of the FBI 302s.  And that is

2    very significant from our perspective and it's the first I'm

3    hearing it, your Honor.

4           The statements made to the FBI, as your Honor is

5    aware, are subject to criminal penalties and have to be true.

6    And the FBI officials who record those are under both legal

7    obligations to record the interviews accurately, ethical

8    obligations to do so, and the suggestion that FBI agents are

9    cavalier in writing down what they have been told is simply

10   inconsistent with practice and law.

11          To the extent that the Kingdom has had engagements

12   with witnesses indicating that they are going to recant

13   statements made to the FBI and recorded in 302s, that, again,

14   just sort of indicates that access to witnesses who were

15   involved and have personal knowledge needs to be granted.

16          Mr. Kellogg also mentioned that with regard to the

17   Abdul-Aziz Bin Fahd payments, we have access to the documents.

18   Without getting into the full scope of the documents, your

19   Honor, the documents themselves raise the very pertinent

20   questions we need to explore through depositions.  They don't

21   provide any indication for the context, the purpose, or the

22   circumstances surrounding the matters that are indicated in

23   those documents and that's precisely what we need to get to.

24          And, again, with regard to this core immunity issue,

25   there is a couple of inconsistencies again.  We have made the

1   point that most of this concerns dealings with Thumairy with

2   regard to his role in a structure that was later deemed illegal

3   by the United States.

4           Even beyond that, they have taken this inconsistent

5   position that whatever the prince was doing should perhaps be

6   deemed private, but now the engagements of Salloum related to

7   that they are suddenly saying is a perfect consular function,

8   and they simply can't have it both ways.

9           That's all, your Honor.

10          MR. KELLOGG:  Quick points, your Honor.

11          First, this is not a surprise to Mr. Carter that we

12  recently had a deposition of a witness who pointed out

13  significant inaccuracies in the 302.  I'm not sure why he is

14  shocked at that because that's going to happen.  It's been my

15  experience, as a former AUSA, dealing with the FBI all the

16  time, people write down a lot of stuff that maybe their memory

17  differs than that of the witness.

18          I forgot my second point, so we can take a break.

19          THE COURT:  I think we should take a few-minute break.

20          I'm checking in with the court reporter.  He is going

21  to speak with my deputy while we are on a break to make sure we

22  have his time.

23          I'm a little bit worried that we have been going for

24  about an hour and a half, and we have only chipped away at some

25  of these issues here.  I think we need to, when we resume, sort

1    of prioritize our arguments.

2            I do think that the consular issues are the most

3    complicated, so my hope and expectation is that some of the

4    legal questions related to the other issues will be a little

5    bit more streamlined.

6            I do want to urge the plaintiffs' counsel to just --

7    we want to prioritize our presentation because I don't know

8    that we can spend quite as long on every single one of the 38

9    witnesses that are sort of in question here.

10           It is 11:50.  Why don't we take a five-minute break

11   and resume at 11:55.  Thank you.

12           (Recess)

13           THE COURT:  Mr. Pounian, do you want to continue.

14           MR. POUNIAN:  Yes, your Honor.

15           I would also like to address Mr. Awad.

16           I stated earlier, your Honor, we have some serious

17   questions about the circumstances under which he retired, given

18   the fact that on February 3 we were told he was still currently

19   working for Saudi Arabia and then on February 4, the next day,

20   we were told he is actually now retired.  And we can discuss

21   this when we deal with the quote/unquote former officials.

22   It's a fact issue that's involved there.  But we can raise

23   that.  He is one of the people that appears to have retired

24   after we identified him as a witness in the case, and certainly

25   the Kingdom knows that he's a witness in the case, has known

1    from the beginning that he's a witness in the case.

2         Your Honor, again, Mr. Awad, as with Mr. Salloum,

3    Thumairy told the 9/11 Commission in his testimony that Awad

4    was one of the two people he worked most closely with at the

5    consulate.  Awad was the representative of the Islamic Affairs

6    department at the consulate, and in that role he reported

7    directly to Mr. Jarrah at the embassy, Mr. Mana's supervisor.

8    And, again, I would point the Court to those documents I showed

9    the Court before █████████, the three documents that I

10   showed the Court before the break.  I won't go back to those

11   again.

12        Also, we know one other thing about Mr. Awad.  He not

13   only had a pretty continuing role at the mosque, which I don't

14   believe was related in any way to his consulate work, but he

15   was an eyewitness to certain events at the consulate which Mr.

16   Kellogg has referenced as a consulate function.

17        But I'd like to show your Honor an exhibit, if I may.

18        THE COURT:  Is this in my binder?

19        MR. POUNIAN:  It is, your Honor.  It is Exhibit 21.

20        THE COURT:  For the court reporter, if you can, to the

21   extent we are talking about names, if you can spell them the

22   first time, it would be very helpful.

23        MR. POUNIAN:  Of course.  Mr. Awad is A-w-a-d,

24   Mr. Jarrah is J-a-r-r-a-h, and Mr. Mana is M-a-n-a.

25        I wanted to direct your Honor's attention to the

1   second page of this document.  In fact, the second paragraph

2   there.

3          Your Honor, if I may, may I proceed?

4          THE COURT:  Yes.  I have read the highlighted version.

5          MR. POUNIAN:  The question here that is to be

6   presented to Mr. Awad is essentially regarding the fact of this

7   event itself.  There are two events listed here, and we want

8   him to confirm the one event that he was a witness, simply the

9   facts of the event.  It is a relevant issue in the case and I

10  believe it's an issue that may be of dispute and it seems to

11  be, based on reading the Kingdom's last briefs.

12         The question is not about the function that was

13  performed.  The question is about confirming the date, similar

14  to like getting a privilege log and just confirming that some

15  event occurred on a certain date.

16         THE COURT:  This issue is at the core of consular

17  duties.

18         MR. POUNIAN:  Your Honor, the issuance of a passport

19  is mentioned in the treaty.  This is probably one of the only

20  examples where the issue was mentioned.  But I am not asking

21  about the fact of anything about the passport itself.  I'm

22  asking about when Mr. Bayoumi went to the consulate, the date.

23  We asked for logs from the consulate to be produced.  There

24  were no logs produced for this date or the next date, for

25  January or February 2000.  We didn't get the logs from those

1    dates to show what the visits were.  We have this document and

2    we are expecting -- we don't want to have the testimony of

3    Mr. Bayoumi to explain the document.  This is information from

4    someone else, and we think that the person who witnessed the

5    event should testify.

6          MR. CARTER:  Your Honor, very briefly, and without

7    getting into the content of the documents, the emphasis of

8    questioning is going to be on events, transactions relevant to

9    the provision of a support network and in the involvement of

10   people in that.  Obviously, that's a central piece of what the

11   Court authorized discovery to explore.

12         And it certainly must be true that plaintiffs in cases

13   of this nature are entitled to explore those kinds of issues

14   because, otherwise, JASTA itself is simply a dead letter.

15   States can simply organize terrorist attacks using their

16   diplomatic and consular facilities and effectively immunize

17   themselves for activities that Congress has said they don't

18   have any immunity for.  That's all, your Honor.

19         MR. KELLOGG:  Your Honor, before we move on Mr. Awad,

20   can I make two points?

21         THE COURT:  Yes.

22         MR. KELLOGG:  First of all, when we first wrote back,

23   we had understood and Mr. al-Awad was still ambassador to

24   Chile.  Our cocounsel corrected that the very next day after we

25   filed the initial letter responding to their witness list.  And

1    we corrected it the next day.  That does not mean that Mr. Awad

2    retired during that 24-hour period.  We thought he was still

3    the ambassador to Chile.  In fact, he had retired.  If the

4    Court would like, I can go back and try to find out the exact

5    date on which he ceased to be the ambassador to Chile.  But I

6    hardly think it shows anything nefarious, as plaintiffs want to

7    suggest.

8          Second, as the Court pointed out, this document, if

9    anything, is in the core of an ordinary diplomatic function.

10   It's handling requests of this sort from your constituency,

11   from your citizens, and actually they can ask Mr. Bayoumi about

12   it, but they have a copy of Mr. Bayoumi's passport, which is

13   stamped on the day that it was issued.  I really don't

14   understand where we are going with this saying that deputy

15   consul has to testify about giving somebody a passport.

16         MR. CARTER:  Your Honor, if I may just respond to

17   that.  The Court, obviously, in authorizing discovery

18   understood that Bayoumi's visits to the consulates were

19   relevant to the agency question, the provision of a support

20   network.

21         And whether or not there may have been some cover

22   orchestrated in order to provide a plausible excuse for those

23   does not limit the ability to ask questions about whether there

24   were other purposes for those visits.  And we have made a *prima*

25   *facie* showing that there was, which is why discovery was

1    authorized.

2            THE COURT:  Understood.

3            MR. POUNIAN:  I also could say, your Honor, Mr.

4    Kellogg keeps saying Mr. Thumairy and Bayoumi were being dealt

5    with as quote/unquote citizens.  I think that they can't be

6    considered in this case as mere citizens visiting the consulate

7    or mere citizens being dealt with by people from Saudi Arabia.

8    They had a role.

9            I am not going to go over, again, the documents that I

10   showed to the Court that were the FBI documents, but there was

11   some role that the Kingdom is not disclosing that Mr. Bayoumi

12   was playing, and he was not a mere citizen making a visit, as

13   you or I would make a visit to an embassy.

14           If I could turn now to the embassy just briefly.  I am

15   trying to streamline this.  Part of the issue here, your Honor,

16   is we had a 10-page brief to deal with all these issues and we

17   thought, and I still believe that these issues were already

18   resolved by your Honor when we sent in our scope of information

19   for each witness.  Your Honor reviewed that, held that we would

20   get 25 witnesses.

21           And then, after the fact, we are coming in now and

22   kind of rearguing these one by one, which I don't think is

23   appropriate at this time.  I understand the convention issues.

24   We have to deal with those.  But in terms of the relevancy

25   issues, I don't think that we should be arguing those at this

1    point.

2            THE COURT:  To be clear, it has never been and will

3    not be my intention to determine who you think are the best

4    witnesses for you to depose on a relevancy or probative basis,

5    among witnesses that you are permitted to depose.  But the

6    Kingdom has raised objections, as we said at the outset, to

7    these categories.

8            And my intention is to rule on these issues and, you

9    know, at least in the first instance on a legal question,

10   whether or not these objections are appropriately asserted.

11   And it may be that I find that with respect to certain

12   individuals, I think you can get past objections for factual

13   reasons.

14           But this exercise is not because I want to know why

15   you think so and so is important.  This exercise is for you to

16   explain to me either why you think the objection is not well

17   taken in the first instance as a matter of law and, secondly,

18   as a factual matter whether or not somebody's either role does

19   not entitle them to privileges or protections or whether or not

20   there is a category of information that the Court could

21   identify to determine whether or not protection is appropriate

22   or not.

23           I will tell you that one of the ways that I am trying

24   to think about this particular legal question, which I do think

25   is very complicated, is, in part, like our own qualified

1    immunity doctrine, which I don't know if any of you have any

2    experience with, but qualified immunity of officials would

3    protect you from service of process.  But in many cases the

4    courts determine that this is a factual question to determine

5    whether or not you are subject to that protection.  And so a

6    defendant who asserts a qualified immunity defense at the

7    outset may be required to sit for a deposition in order to

8    assess factually whether or not that qualified immunity is in

9    fact appropriately asserted at all.

10            As I think about this immunity doctrine, I hope I'm

11   not sharing too much, because this is a work in progress for me

12   as well.  But it seems to me a lot like a qualified immunity

13   privilege where it may in fact be an absolute bar, but there

14   may be circumstances where you need to assess the facts to

15   determine whether or not the individual is in fact entitled to

16   that protection.  So that's why I'm talking about facts here.

17            MR. POUNIAN:  I understand, your Honor.  Thank you.

18            If I could move on to the embassy, at the embassy,

19   your Honor had authorized discovery as to Khaleid Sowailem, and

20   we proceeded with document discovery.  And he is someone we

21   would have deposed as a witness, but he evidently died at some

22   point during the past year.  We were never notified that there

23   was any urgency to take his deposition.  So now we have no

24   opportunity to preserve his testimony or what he knew about his

25   work with Thumairy.

1              As your Honor knows, the focus of discovery is, as
2     Judge Daniels said in the order, that Thumairy and Bayoumi were
3     directed by someone within the Saudi embassy to help Hazmi
4     al-Mihdhar.  And we believe that it's appropriate.
5              Another person we have identified is Ahmed Qattan.  He
6     was the embassy chief of staff, your Honor.  And all of these
7     documents are under seal, so I have to share them with the
8     Court and simply just go through them.
9              If I could just direct your Honor's attention to
10    Exhibits 15, 16, 17, 22, and 24.  Let me just go right to 24,
11    your Honor, and then we won't --
12             I just wanted to direct your Honor's attention to the
13    highlighted information here.  The date is at the top.
14             THE COURT:  I've read it.
15             MR. POUNIAN:  This document that I showed your Honor
16    before was, this is the first page of the document, Exhibit 21.
17             THE COURT:  Yes.
18             MR. POUNIAN:  This document, Exhibit 15, if I could,
19    your Honor.  It's difficult because I can't say anything.  But
20    I can show your Honor the document.
21             THE COURT:  OK.
22             MR. POUNIAN:  Thank you, your Honor.
23             In lieu of argument, your Honor, if I can just point
24    the Court's attention to the paragraph regarding Mr. Qattan in
25    our submission in terms of his particular role that we believe

1    is critical in terms of obtaining his testimony in this case.

2            THE COURT:  OK.

3            MR. POUNIAN:  Thank you, your Honor.

4            MR. KELLOGG:  Your Honor, do you want me to respond as

5    to Mr. al-Qattan or wait until Mr. Pounian has gone through

6    other witnesses?

7            THE COURT:  Why don't you respond now while it's

8    fresh.

9            MR. KELLOGG:  Well, you've looked at those three

10   documents.  It's hard to suggest that those -- I can't go into

11   details, but it's hard to suggest that those are not official

12   functions of the chief of staff of an embassy to be looking

13   into.

14           Mr. Qattan was the chief of staff at the embassy,

15   which is a very high-level position.  He is currently a

16   minister of state, another high-level position.  And there is

17   no ambiguity about the Vienna Convention immunity or residual

18   immunity that applies to former diplomats for their official

19   functions.

20           Mr. Pounian can say, we really want him, we really

21   think he's important.  None of that matters because all they

22   want to question him about is who he assigned to do what and

23   how he handled various inquiries about Saudi citizens and

24   allegations concerning issues relating to institutions funded

25   by Saudi Arabia.  I just don't see the point here.

1          MR. POUNIAN:  Your Honor, if I may, this deals

2     directly with the agency issue that is at the heart of

3     discovery.  It deals with the command regarding the individuals

4     as to whom this Court has allowed jurisdictional discovery.

5          And we don't have Mr. Sowailem.  We don't have anyone

6     at the embassy who is in a supervisory role over the people as

7     to whom the Court has authorized this particular focused

8     discovery to address the issues regarding the who, what, when,

9     why they are going out on these assignments to places they are

10     calling private.  And, as you said before, we have to deal with

11     it question by question.

12          But there are issues here that have to be faced.

13     There are issues here that have to be directed at the witness,

14     and I think we are entitled to do that.  And depending on the

15     witness' answers, it may take a different course.  But we are

16     entitled to do that and to inquire and to determine what the

17     agency facts are that are relevant to this case.

18          MR. CARTER:  Your Honor, if I could just address this

19     in a way that I think speaks to the qualified immunity analogy

20     your Honor raised.

21          There are sets of issues here that we think clearly

22     fall outside of the consular functions.  Those include the

23     engagements with regard to what we clearly think was an illegal

24     structure, government structure, involving Thumairy and other

25     religious officials of the Kingdom.

1            There are a set of relationships engagements dealing

2    with those illegal individuals in their work day to day as well

3    as contemporaneous to the circumstances surrounding the support

4    network.  And then there are a whole set of issues that the

5    Kingdom has claimed were private and unrelated to government

6    function.  There are these categories that fall clearly outside

7    of this with regard to each of these witnesses.  As Mr. Pounian

8    said, we need to have the opportunity to address the witnesses

9    with those questions.  And if there is some nuance along the

10   way, the Court can deal with the objections.

11            THE COURT:  Let's move on to another witness.

12            MR. POUNIAN:  Your Honor, those are the witnesses we

13   wanted to focus on on the diplomatic issue.

14            THE COURT:  Great.

15            MR. POUNIAN:  I just wanted to address one other

16   matter on this issue, and that's the case law that has been

17   cited by Saudi Arabia, particularly the Second Circuit case in

18   *Brzak*, which involved sex discrimination cases of UN employees

19   in a UN office.  It's the internal handling of that case which

20   was what the Court said was immune.  How that was handled

21   inside the office, how those claims were handled inside the

22   office, any illegal actions inside the office.  Those things

23   were immune.

24            But, interestingly, that case itself did not reach the

25   state law battery claims that were brought against the UN

1    officials and didn't decide those claims.  But that case has

2    absolutely no application to the facts here, which involve a

3    scheme outside the consulate involving a whole group of people

4    who were working under visas that were authorized by the

5    consulate.  So it's a completely different situation.

6         The facts here deal with an outside situation, like in

7    the *Morocco* case, where people are being brought in and working

8    outside of the consulate when they are being registered as

9    administrative assistants inside the consulate.

10        I think that the Saudi Arabia agrees now that these

11   actions outside the consulate are not subject to the treaty.

12   But they are saying, oh, the superiors who oversaw and

13   witnessed these same activities are somehow protected from

14   giving testimony, and that does not make sense.  To the extent

15   that they witnessed things, they should come forward and

16   testify, your Honor.

17        THE COURT:  Can I ask a point of clarification.  In

18   your application we have really focused on four individuals

19   here where you have identified documents.  I am not asking you

20   if you abandon your objection as to the other seven because I

21   know what the answer to that would be.

22        But with respect to those other individuals for whom

23   you have not presented evidence challenging their official

24   functions, is there a factual record for the Court to do so?

25        MR. POUNIAN:  Yes, there is, your Honor.  I'd have to

1    go back and look in the declarations.

2          Again, we didn't address all 50 individuals in our

3    declaration because it would have been a 300-page declaration.

4    We primarily presented regarding the witnesses as to whom we

5    had received discovery from the Kingdom on where we had

6    actually obtained some discovery, even though, as you know,

7    your Honor, we have complaints about the amount of discovery

8    and the quality of it, the fact that we didn't get any of the

9    day-to-day records for the key time period for the seven

10   witnesses as to whom the Court allowed discovery.

11         MR. CARTER:  Your Honor, may I briefly speak to that?

12         I think there is sort of a procedural backdrop to this

13   that's relatively important.  Your Honor will recall that we

14   served a witness list originally way back in February of 2019,

15   and then again in December, pursuant to your Honor's order, and

16   that included a proffer by plaintiffs of relevant areas where

17   each of the witnesses had knowledge.  So we did make that

18   proffer in the first instance.  The Kingdom did not in any

19   material sense respond to that proffer in its motion for a

20   protective order.  We think given the fact that we had already

21   made the proffer, it should have.

22         We nonetheless took the opportunity to supplement the

23   record in our opposition papers as to certain of the witnesses.

24   But what the Kingdom then did is include an addendum in its

25   reply brief poking what it viewed as holes in the information

1    we had provided for the subset in our opposition.

2          The original proffer in our witness list went largely

3    unchallenged, and we have never had an opportunity to respond

4    to the addendum and the reply, which we think, candidly, was

5    procedurally improper.  It should have been -- any challenge of

6    that nature should have been in the motion originally.  So

7    that's sort of just the procedural context in which this

8    arises, your Honor.

9          THE COURT:  I think I have the question whether I'm

10   considering whether witnesses may be relevant.  The summary

11   that I'm looking at from your witness list certainly makes

12   compelling arguments as to everybody that they may have

13   relevant information and information that you feel is critical

14   to developing your case.

15         My question is whether or not, as a legal proposition,

16   and being faithful to the letter of the conventions,

17   individuals who may plainly have relevant information are still

18   precluded from testifying because what they witnessed was

19   witnessed in the context of performing their consular duties.

20         MR. CARTER:  Yes, your Honor.  Part of what I was

21   alluding to, inartfully, was that the summaries of the areas of

22   knowledge indicate that the witnesses have personal knowledge

23   with regard to transactions and events that fall outside of the

24   protections of the convention.

25         For instance, if a witness was dealing with very

1    specifically with the appointment of Thumairy to his improper

2    role, or in supervising Thumairy in his illegal role, we think

3    that the summaries have established that there is an area of

4    questioning outside of the scope of the conventions.

5          If there is evidence in the summaries indicating that

6    people had very direct dealings, contemporaneous with the

7    provision of support to hijackers with Bayoumi, Thumairy, or

8    others, we also think that's an area that falls outside of any

9    potential protection where we would be entitled to conduct

10   questioning.  So in that respect we do think that the summaries

11   indicate areas where the conventions could not possibly apply.

12         MR. KELLOGG:  Your Honor, if I might respond to that.

13   The summaries actually make our case for us.  The areas of

14   inquiry that they want to go into deal with the day-to-day

15   official functions of officials at the embassy and the

16   consulate.

17         In our addendum what we were trying to show was to

18   emphasize that point, that the information they want deals with

19   official functions.  And we put in the addendum because

20   Mr. Pounian put a 39-declaration in their response, in their

21   opposition, that was essentially 39 pages of argument disguised

22   as a declaration.  And so we felt it necessary to respond to

23   those specific points and emphasize, again, that the testimony

24   they are hoping to elicit has to do with official functions.

25         With due respect, there is nothing qualified about the

1   Vienna Convention and immunity.  Where it applies it is

2   absolute and it cannot be overridden based on a showing of

3   need.  For former diplomats we have residual immunity against

4   testimony and against service of process with respect to acts

5   performed by such person in the exercise of his function as a

6   member of a mission.

7           THE COURT:  To be clear, Mr. Kellogg, sorry to

8   interrupt you, but I'm not using the word that the immunity is

9   qualified.  I'm saying that it is similar to the qualified

10  immunity doctrine, which also cannot be overridden by need.

11  But the qualified immunity doctrine does include, on occasion,

12  a factual assessment as to whether or not the conduct in the

13  lawsuit against the police officer would entitle the police

14  officer to immunity.  And if it would, then it is absolute.

15          But the question can be, in those contexts, whether or

16  not the underlying facts entitled that police officer, in my

17  hypothetical, to total immunity and that's the way I've been

18  thinking about the convention, not that it is an immunity which

19  is qualified, but rather that it is doctrinally similar, maybe.

20  Like I said, this is a thought in process, but that it may be

21  doctrinally similar to qualified immunity, which may say that

22  in certain instances some factual development is necessary to

23  see whether the absolute immunity applies.

24          MR. KELLOGG:  Understood, your Honor.

25          My point really is that the testimony they seek to

1   elicit has to do with official functions.  The only way that he

2   can propose to get around it is saying that there was criminal

3   activity which doesn't count for purposes of official

4   functions.

5        And, A, that's wrong under both the *Swarna* and the

6   *Brzak* cases because you don't look at whether it's criminal or

7   not and, B, in any event, it's utterly without factual

8   foundation.  There is nothing in here to suggest that any of

9   these diplomats, nothing other than plain speculation that any

10  of these diplomats were engaged in illegal activities designed

11  to support the hijackers.  And they have to make some sort of

12  showing if they are even to try to take them outside the scope

13  of the official functions, which they can't do and which, under

14  *Brzak* and *Swarna*, wouldn't help them in any event.

15        MR. POUNIAN:  Your Honor, if I can just address that

16  one issue.  In *Brzak* and *Swarna*, the issues there, it's really

17  defined in *Brzak*.  The reason was found in an official function

18  there.  It involves the management, the internal management of

19  the United Nations office, personnel management inside the

20  office, personnel management decisions.  That is why that was a

21  diplomatic function in that case.  It was UN employees working

22  inside an office and a supervisor, and they were trying to come

23  in and apply U.S. law to inside the mission itself.

24        This case is completely different.  As I said before,

25  and as Mr. Carter said before, it involves shadow organizations

1   outside of the consulate and the interactions of people in the

2   consulate with these organizations.  It is not internal to the

3   mission.  It is not internal to the diplomatic mission at all.

4   And it's completely distinguishable from those two cases and

5   the purpose of those cases.

6          There is no question here, as stated in the *Morocco*

7   case, you can't go and establish a visa fraud scheme and bring

8   people in from out of the country and set up a whole other

9   network of government officials working essentially illegally

10   in the United States and say that's a diplomatic function.

11   That's just not the case.

12          To the extent there were people in the consulate and

13   evidence they were involved, and Mr. Salloum was asked about

14   it.  He was directly asked about it in October 2000.  They

15   asked him the question.  The State Department came.  And he

16   lied to them about Thumairy's driver's license.  He said no.

17   He lied to them about his car.  No.

18          Why did he lie to them?  It establishes a serious

19   question of his credibility and perhaps his involvement when he

20   is sending a $12,000 check to the mosque the day before the

21   hijackers arrive.  These are questions we want to ask.  Mr.

22   Kellogg says they are all squeaky clean.  We have to ask the

23   questions to know.  We have to pursue the questions, where they

24   lead.

25          He is presenting his defense, they didn't do anything,

1   so they shouldn't be questioned.  We are obviously prosecuting

2   this case, and we are taking it where it leads.  And where it

3   leads from Thumairy and Bayoumi is right to the embassy and

4   right to the consulate.  That's why we are going there.  That's

5   why we need the testimony.  And if it's qualified, we will

6   start asking the questions and go through them and deal with

7   it.

8         But that's the only way it is going to work unless we

9   are going to say we will shut it all down and you couldn't do

10  something inside the consulate and not be questioned about it

11  because it doesn't make sense in this circumstance because

12  these actions were outside the consulate.

13        MR. KELLOGG:  First of all, your Honor, I strongly

14  object to the suggestion that Mr. al-Salloum lied to the United

15  States about the merits.  There is no evidence to support that.

16        Second, and more important, if you look at the Vienna

17  Convention on diplomatic relations, article 3, and the Vienna

18  Convention on consular relations, article 5, it's a long list

19  of functions that the consular and the embassy can perform.

20  They are not limited to internal housekeeping matters.

21        As you pointed out at the initiation of this

22  discussion, if a consular official goes out to visit their

23  mosque that's supported by Saudi Arabia, he is performing a

24  consular function.  And there is, A, no evidence to suggest

25  that any of the diplomatic officials that they want to question

1    were engaged in illegal activity and, B, under *Brzak* and

2    *Swarna*, it doesn't matter, in any event.  And particularly the

3    suggestion that some sort of illegal scheme of visa fraud

4    comparable to what was going on in Morocco is simply unfounded.

5    The U.S. never said that Saudi Arabia was engaged in criminal

6    activity in sending these people over with diplomatic

7    credentials.  It simply said.  No.  Propagators can't get the

8    diplomatic credentials.  We are yanking their visas.

9           That's nothing like what was at issue in the *Morocco*

10   case.  Even in the *Morocco* case, the Court said, I am not going

11   to intervene in a grand jury investigation into visa fraud.

12   The U.S. has assured me that they are not going to impinge upon

13   consulate functions.  If they do, Morocco can come back to me

14   and seek an injunction.

15         MR. CARTER:  Your Honor, the U.S. did indicate that

16   the activities of the propagators were illegal.  They

17   criminally charged Omar Abdi Mohamed, one of them, with, among

18   other things, violations of Foreign Agents Registration Act.

19   It is a true that there is a declaration by the U.S. that this

20   was in fact illegal.

21         And as Mr. Pounian pointed out, the questioning here

22   concerns the engagements of these officials with regard to this

23   unauthorized illegal structure.  They are limited with regard

24   to their diplomatic functions to proper and legal functions

25   within the scope of their diplomatic activities.  And this

1    entire structure was not part of that or not properly part of

2    that.

3          Likewise, engagements with people like Thumairy and

4    Bayoumi, where there is indicia that it was for purpose of

5    organizing a support a network for the hijackers is clearly not

6    part of immunity either.  Thanks, your Honor.

7          THE COURT:  I think we have exhausted the issue of

8    diplomatic and consular immunity.  I'd like to turn to the

9    issue of former employees, if we can turn to that next.

10         I want to begin with a practical question because I

11   think that that's worth starting with, which is, let's say I

12   conclude that person A qualifies as a former employee and I say

13   that the Kingdom should present that person as their witness,

14   and the Kingdom makes a good-faith effort to do so and that

15   witness says, I am just not showing up.

16         Where do we go from there?

17         MR. POUNIAN:  I think, your Honor, the Kingdom can

18   compel that witness to appear.  I think the Court could issue

19   letters rogatory and request the government of Saudi Arabia to

20   produce the witness for a deposition and compel the witness to

21   appear in that event.

22         I think it's a fiction to compare Saudi Arabia to a

23   corporation.  It tries to use cases involving corporations who

24   do not have control over former employees, whereas if the

25   sovereign -- and it does have control over its former employees

1    in the Saudi Arabia --

2         THE COURT:  Some of the things that you say to argue

3    that point feel to me like I would have to make a conclusion

4    about the nature of the government, whether or not the rule of

5    law exists, whether or not it has any democratic pillars.  I'm

6    not prepared and I certainly don't think there is a record in

7    this case to make that point.

8         I know on the other occasions you have pointed to

9    things in the news to support claims about what Saudi Arabia

10   can and cannot do.  I am not sure that that record is properly

11   before me.  And it seems to me for me to conclude that Saudi

12   Arabia, of course, can get any citizen into a deposition room

13   because of the nature of its government would require me to

14   make a finding that I don't think has been presented to me in

15   this case.

16        MR. CARTER:  Your Honor, if I can respond to that, I

17   don't think our argument about Saudi Arabia's capacity to make

18   witnesses available rests on the nature of the Saudi state.  It

19   rests on the nature of Saudi Arabia as a sovereign.  And

20   sovereigns, as a power inherent to being governments, have the

21   capacity to effectuate judicial assistance, including by making

22   witnesses available to testify in proceedings.  It's all the

23   more clear here where the Kingdom is a defendant in the case

24   and, thus, subject to U.S. discovery rules.  Saudi Arabia tries

25   to evade this inherent feature of sovereignty by arguing, one,

1    that it's not a signatory to treaties to provide judicial

2    assistance in this setting and, two, by a claim that there is

3    no provision for witnesses to testify in civil or criminal

4    matters, and we are not entirely sure what it means.

5         As to the treaty issue, that's wholly irrelevant, your

6    Honor.  The relevant point is that, as a sovereign, Saudi

7    Arabia would have the capacity to enter into a treaty of that

8    nature precisely because, as a government, it has the practical

9    ability to make witnesses available.  It chooses not to.

10        The treaties at the end of the day, your Honor, are

11   really procedural devices to effectuate a feature of

12   international relations and comity.  Normally, these kinds of

13   requests wouldn't be honored as a matter of comity.  And your

14   Honor will recall that the Kingdom has invoked principles of

15   comity and, on that basis, urged this Court to relieve it of an

16   obligation to search certain repositories where we believe

17   relevant documents are located.

18        We don't believe comity principles need to be resorted

19   to here because the Kingdom is a party to the proceedings and

20   subject to the discovery rules, but it is notable that the

21   Kingdom has invoked it and it's a two-way street.

22        As regards the issue of the Kingdom claiming that

23   there is no civil or criminal mechanism to facilitate witness

24   testimony, all the Court has is a claim by counsel on a

25   footnote, nothing from the government of the Kingdom indicating

1    that it uniquely lacks the capacity to do that.

2            We are not experts on Kingdom law, but if you look on

3    websites of firms functioning in Saudi Arabia, they clearly

4    indicate that there are legal proceedings in Saudi Arabia that

5    include witness testimony and a mechanism to join third-party

6    witnesses to appear in those proceedings.  They are Sharia

7    courts, perhaps, rather than civil courts, but there is a

8    capacity.

9            Because of all that, your Honor, we think that the

10   Court can clearly direct Saudi Arabia to make former employees

11   available.  We think the case is all the more clear, given the

12   continuing relationship between the government and the

13   witnesses in the form of pensions and the like, and we think

14   that that's the appropriate course.

15           If the Court thinks that a belt-and-suspenders

16   approach is appropriate to make the record abundantly clear, as

17   Mr. Pounian suggested, the Court could issue letters rogatory

18   to Saudi Arabia requesting that the government of the Kingdom

19   undertake efforts to facilitate the evidence-gathering

20   functions of this Court by making its witnesses available.  If

21   at that point it wants to claim that it's either unwilling or

22   unable to do so, we can assess the facts it offers in support

23   of that from a competent official and determine whether or not

24   it's appropriate for there to be an adverse inference.

25           MR. KELLOGG:  Your Honor, may I respond?

1          THE COURT:  Sure.

2          MR. KELLOGG:  32 of the witnesses on the plaintiffs'

3     list are not current employees.  Two of them are deceased and

4     two of them, as far as we can tell, were never employees and

5     cannot be served, in any event.  So that leaves 28 former

6     employees.

7          As this Court held in the *JSC Foreign Economic*

8     *Association* case, former employees who, quote, have made it

9     clear that they refuse to appear for any depositions cannot be

10    compelled to appear.  That's a general principle that applies

11    to witnesses in a case, whether they are former government

12    employees or whether they are former corporate employees.

13         Despite that, unless they were diplomates or

14    high-level officials, we flew to Saudi Arabia at the beginning

15    of this year, and we affirmatively encouraged former employees

16    to sit voluntarily for a deposition.

17         As the Court may recollect, we actually had a script

18    so we couldn't be accused of deviating from it both in English

19    and in Arabic and affirmatively urged people, we would like

20    them to testify because we think it would just show how empty

21    the plaintiffs' allegations are.  But only four former

22    employees voluntarily agreed to testify:  Bayoumi, Jarrah,

23    al-Ghudaian and al-Anqari, as well as al-Sowailem was in the

24    United States and therefore within the subpoena power of the

25    Court, is also available to testify.

1          It should not be surprising that most of the

2     individuals don't want to testify.  The events in question

3     happened 20 years ago.  These are civil servants who were in

4     the middle of their careers and have all retired by now.  Most

5     of them viewed themselves as having no relevant information or

6     desire to be involved in this case, and they are not alleged to

7     have specific involvement and the documents don't implicate

8     them.

9          None of them are within the subpoena jurisdiction of

10    the Court.  Therefore, they have to be subject to deposition by

11    notice under Rule 30(a).  But to be subject to deposition by

12    notice you have to be an officer, director, or managing agent

13    of a party, and numerous cases say that.

14         And the standard for being a managing agent is

15    flexible, but it is clear, where the party has no control,

16    deposition by notice is not proper.  As the court stated in the

17    *Hugo Boss* case, quote:  As a general matter, a corporation

18    cannot be required to produce a former officer or agent for

19    deposition since it does not have control over him.  Same

20    applies to a sovereign country.

21         So plaintiffs have the burden to prove that former

22    employees are nonetheless under our control, and they presented

23    absolutely no evidence of a continued control over any of these

24    former employees.

25         The allegations that they, quote, received government

1   benefits or may still be a government employee or may retain

2   consulting roles or are subject to the king's directions won't

3   suffice to meet their burden.

4        Compare the *Independent Product Corp.* case in the

5   Southern District of New York in which the Court said, well,

6   despite formal resignation, the witness retained a financial

7   interest in participating in the management of the plaintiff's

8   corporation and, therefore, subject to deposition by notice.

9   But there is nothing approaching that here.

10        And in the absence of any evidence of control,

11   plaintiff suggests that we may have caused or encouraged

12   employees to retire to avoid deposition.  There is absolutely

13   no basis for that allegation.  We were directly involved in the

14   process of reaching out to former employees and saw no evidence

15   of anyone retiring or being encouraged to retire to avoid

16   testimony.

17        Indeed, as I have pointed out, we went and

18   affirmatively urged them to participate, and that includes for

19   Mr. al-Jaithen, who applied for retirement at some point before

20   we even got the plaintiffs' witness list on February 20 of

21   2019.  He applied for retirement on February 5 of 2019.

22   Discovery was denied as to him on November 28.  He then

23   proceeded to retire in May of 2019, when the Court ruled that

24   he was outside the scope of jurisdictional retirement, and we

25   viewed that ruling as final.  Plaintiffs moved to vacate it in

August and the Court granted it, so we provided documents. But by that time he was already retired. And indeed we didn't even know about his retirement until the Court reconsidered and allowed discovery.

So there is no indication that anyone was encouraged to retire and there is simply no procedure under Saudi law to compel the testimony of a fact witness in a civil case. And indeed plaintiffs have not tried to invoke any such procedure.

It's not like Sweden, where the Court has issued letters rogatory for an individual there. Saudi Arabia is not a participant of any such covenant with the United States or other countries, and Saudi Arabia itself has no procedure available in a civil case to make witnesses testify against their will.

Essentially, what plaintiffs are suggesting is that the Court should order Saudi Arabia to issue a lawless directive to a private citizen to force them to testify against their will, and that's simply beyond the power of the Court and inappropriate for plaintiffs to request.

THE COURT: As to the point that I believe Mr. Carter made about if the Court could issue letters rogatory, that there is no mechanism for the Kingdom to recognize such letters?

MR. KELLOGG: That's correct, your Honor.

MR. CARTER: Your Honor, if I may respond to those.

1            First of all, as I said before, whether or not Saudi

2     Arabia is a signatory to a treaty to facilitate judicial

3     assistance is irrelevant.  There certainly is the capacity,

4     pretreaty capacity for states to provide judicial assistance to

5     one another as a matter of comity.  That's not dependent on the

6     existence of any treaty whatsoever.  This Court --

7            THE COURT:  I'm sorry to interrupt you.  As a matter

8     of comity Saudi Arabia may wish to produce information.  Maybe

9     it would respond to some request in another case for

10    information.

11           But here we are talking about private citizens.  I

12    don't think it's fair to suggest that Saudi Arabia's

13    unwillingness to accept a letters rogatory is the end of the

14    conversation because let's just say Mr. Kellogg said, yes, we

15    will accept service, we will do our best.

16           My question is, what would the Kingdom do with that?

17    Would they go to someone's house and seize them and force them

18    to testify?  That's my concern.  What, practically speaking,

19    does it mean to have the Kingdom participate?  If the president

20    of the United States asked you to sit for a deposition and you

21    said, thank you, Mr. President, but I'm not willing to do so, I

22    don't know what the president could do to you.

23           MR. CARTER:  Your Honor, the fact that these treaties

24    exist is a reflection that the states have the practical

25    ability to facilitate the collection of evidence from

1    knowledgeable persons and witnesses within their borders.

2    That's a function of statehood.  States broadly engage in this

3    activity.  We do not find remotely credible the Kingdom's claim

4    that it has no practical or legal capacity to do that.  We can

5    try to explore that.  I think we will have trouble getting a

6    Saudi lawyer to work for us.  But we are happy to explore that

7    issue further.

8             THE COURT:  If you want me to rule that it's not

9    credible that Saudi Arabia can't help, I can't just say that.

10            MR. CARTER:  Your Honor, again, we think this is a

11   feature of statehood.  And if Saudi Arabia wanted to, it could

12   come forward with a knowledgeable official testifying in an

13   affidavit to say that we have no ability to do this.

14            That's not what the Court received.  The Court

15   received a claim in a footnote, carefully worded, that there is

16   not a mechanism for witness testimony in civil or criminal

17   proceedings.  We think otherwise.  And one of the treaties we

18   indicated indicates an ability to facilitate assistance in

19   criminal matters, undercutting the argument.

20            As a consequence, your Honor, at base, it's notable

21   that all the cases the Kingdom is relying upon, your Honor,

22   arise in the corporate context.  All of those cases reflect the

23   recognition that the relationship between a corporate employer

24   and employee functionally terminates when the employee guess

25   the job, leaving the corporation with no legal or practical

1   ability to make that witness available once the relationship

2   has terminated.  The corporations don't possess any of the

3   powers of sovereign governments, and that removes this from

4   that circumstance.

5        Now, candidly, we think most of these people do

6   qualify as managing agent.  And I think as Mr. Pounian will

7   talk about, the paramount test in determining whether someone

8   is a managing agent after they leave the employ is whether or

9   not they can be expected to continue to have interests aligned

10  with the defendant rather than the adversarial party.

11  Certainly for the Kingdom's most senior members of the royal

12  family and people who held high-ranking official positions

13  throughout their careers, that's certainly the expectation in

14  the case.

15       Your Honor, again, we do believe that a formal request

16  would ferret out what the true nature of the claimed inability

17  is on the part of the Kingdom.

18       MR. POUNIAN:  Your Honor had a question about the

19  documents that we submitted about the letters procedure in

20  Saudi Arabia.  And they are between paragraphs 145 and 154 of

21  my declaration with the accompanying exhibits.

22       Exhibit 93 is a procedures manual for legal assistance

23  in Saudi Arabia, and they claim that this only applies in

24  criminal cases.  This is part of an initiative that Saudi

25  Arabia entered as part of being part of the G20 group.  And

1    they agreed to certain frameworks for mutual legal assistance

2    in Saudi Arabia.

3           And they claim that this only applies in criminal

4    cases, but I would argue that the aspects of this case that we

5    are seeking testimony do involve issues that relate to criminal

6    matters, and I don't know if it can be parsed in that way.  It

7    shows that the Kingdom had the ability to compel testimony in

8    the Kingdom on behalf of countries, including the United

9    States, and they have specific treaties with other gulf nations

10   that are also referenced here.

11          There is also a factual issue, your Honor, that I'd

12   like to raise that Mr. Kellogg brought up.

13          THE COURT:  Mr. Pounian, before we go on, my

14   understanding is that this document here is really something

15   for prosecutors to facilitate the prosecution of criminal

16   charges in the United States, for example, where they need the

17   assistance of the Kingdom for the purposes of prosecuting that

18   case.  Are you citing to this because it's proof that they

19   can't help?

20          MR. POUNIAN:  It's proof that they have a mechanism in

21   place, they have a committee in place to provide international

22   legal assistance, and there is no reason why they can't do it

23   in this case.  And they have a committee that receives the

24   requests and this procedure does discuss criminal cases.

25          But, you know, we are in a very unique situation here

1   involving a case against a foreign sovereign, and they are

2   fighting, evidently.  They were in a cooperation mode

3   supposedly at the beginning, and now they have turned into a

4   noncooperation mode.  Here we are.  And it's a very difficult

5   system to get any information about.  It's a closed system.

6          MR. CARTER:  Your Honor, if I can speak to that point

7   that Mr. Pounian just raised.

8          I think the treaty is particularly relevant here when

9   your Honor looks at footnote 5 of the Kingdom's opening brief,

10  addressing this issue when we raised it in the meet and confer.

11  It is our understanding that there is no procedure available

12  under Saudi Arabian law to compel any fact witness to appear

13  for testimony in any civil or criminal case in Saudi Arabia.

14         When we then produced a treaty that indicates a

15  capacity to do that, the Kingdom's response is, oh, well, that

16  only relates to criminal matters.  Well, the initial position

17  was, there is no mechanism in either civil or criminal and then

18  it shifted.

19         We have significant concerns about whether or not the

20  statements that have been made are carefully crafted and

21  whether or not there is, in fact, in reality, a capacity to do

22  this.  And we think that there is because there are proceedings

23  analogous to civil proceedings.  They may be in Sharia courts,

24  but they involve witnesses appearing.  They involve the

25  authority of courts to join third parties for witnesses so

1    their testimony can be taken.  That's why we think there should

2    be a formal request to ferret out some facts that are relevant

3    to the Court's authority.

4           MR. KELLOGG:  Your Honor, if I may, two points on

5    this?

6           THE COURT:  Sorry.  Before Mr. Kellogg continues, is

7    it the plaintiffs' perspective that I should say the plaintiffs

8    have raised doubt as to the ability of the Kingdom to compel

9    its citizens to come to a deposition and put the burden on the

10   Kingdom to establish that they cannot compel someone to come?

11   Is that what you're suggesting?

12          MR. CARTER:  Your Honor, if they have the practical

13   ability to make people appear and they are a party in the case,

14   then the Court has the authority under the discovery rules to

15   make those witnesses appear.

16          THE COURT:  Do they have the practical ability?  If

17   person A says, I'm sorry, I'm not interested in showing up, for

18   whatever reason, for good reasons, for bad reasons, I don't

19   know, but they say, I'm not showing up.  I don't know.  I don't

20   have a foundation for saying to the Kingdom, you can go to that

21   person's house and seize them and require them to sit for a

22   deposition.

23          MR. CARTER:  Your Honor, I guess there are two things.

24   One, we are suggesting that the request be made so that that

25   very question is answered in an official setting by a Kingdom

1    official knowledgeable about the procedures.  Your Honor would

2    be making a request.  These are witnesses who are relevant.  To

3    the extent the Kingdom has the ability, we would ask that the

4    Kingdom make them available for deposition.

5         In response, the Kingdom has three choices.  It can

6    make them available.  It can say, we decline to offer

7    assistance to the United States court in this matter, or it can

8    say, we do not have an ability to do so for the following

9    reasons.  And we'd have an ability to then check the legitimacy

10   of that excuse and we would actually have a record.  Your Honor

11   seems to be indicating that there is not a record.  And we look

12   at that and say, it's because the Kingdom hasn't come forward

13   with any affidavit explaining its position.

14        Your Honor, we can attempt -- as I said, I think we

15   will have difficulty finding -- certainly we are not going to

16   find a lawyer in Saudi Arabia willing to work for us in this

17   case based on experience, but we can try and find a lawyer with

18   expertise on Saudi Arabian law to submit an affidavit, and we

19   could do that on a parallel track.

20        THE COURT:  Mr. Kellogg, I cut you off.

21        MR. KELLOGG:  Thank you, your Honor.  Just a few

22   points.

23        First of all, footnote 5 of our opening brief is

24   absolutely correct when we say that there is no procedure

25   available under Saudi Arabian law to compel any fact witness to

1  appear for testimony in any civil or criminal case in Saudi

2  Arabia.  That is correct.

3      The mutual legal assistance, which applies only in

4  criminal investigations, will allow investigators from other

5  countries to come to Saudi Arabia in a criminal context to

6  interview a witness.  In fact, it cooperated with the 9/11

7  Commission in allowing interviews of certain people in Saudi

8  Arabia in conjunction with that criminal investigation.

9      But when plaintiffs cited that material, the mutual

10  legal assistance, they just cut the words short and said, it's

11  allowed, without leaving out the fact it's in a criminal

12  context and for a criminal purpose.  There is no mechanism for

13  us to force witnesses to appear.  Essentially, we have already

14  done what the Court would ask us to do in some sort of letters

15  rogatory.  We went personally to each of these people, if we

16  can meet with them in person or on the phone, and urged them to

17  participate, and they said that they would not do so.

18      Essentially, what Mr. Carter is saying is, well,

19  you're a totalitarian regime; just force them.  That is not

20  correct and the Court cannot direct Saudi Arabia to illegally

21  require witnesses who do not want to testify and have no

22  obligation to testify to appear for a deposition.

23      MR. CARTER:  Your Honor, just to clarify, I was not

24  suggesting that because Saudi Arabia is an authoritarian state

25  it should uniquely be required to do this.  The point we were

1    making is that this is a function of sovereignty that states

2    carry out all the time, enter into treaties about, and Saudi

3    Arabia is claiming a unique, truly unique in international law,

4    inability to do something that all states do all of the time.

5    And so we are simply requesting that a formal request be made

6    so that Saudi Arabia can state officially, make its claim

7    official with an appropriate affidavit if it's claiming

8    inability to do this.

9           With regard to the interviews, with all candor, your

10   Honor, if you look at the interview sheet and the

11   questionnaire, very early on the statement is made:  As a

12   former employee you are not required to sit for this

13   deposition.

14          Well, we candidly are not at all clear that that's

15   true, but it certainly colors the field if you tell people that

16   they don't have to do this.

17          So, again, for all of these reasons, we think that a

18   formal request would be appropriate, and we are happy to

19   simultaneously explore an affidavit of our own.

20          MR. KELLOGG:  Is he suggesting, your Honor, that I

21   should have lied to the witnesses and told them that they were

22   obliged?  After the statement that he quotes, I went on and

23   said:  But Saudi Arabia would find it beneficial if you agree

24   to participate because we believe your testimony will help to

25   rebut the allegations made by the plaintiffs in this case.  I

1    was not going to misrepresent the state of the law or their

2    obligations in my interviews with these witnesses.

3             THE COURT:  Mr. Carter, I'm sure you can chip away at

4    the script, as you have just begun to do, that Mr. Kellogg or

5    his agents read to individuals.  I keep falling back on the

6    practical aspects of this conundrum.

7             Again, as I understand it, your pitch to me is, Judge,

8    modern states do this all the time.  If you went to France,

9    they would help us with securing a witness deposition.  And so

10   the fact that the Kingdom hasn't signed on to these treaties

11   doesn't mean that it can't help.  It should be able to help.

12   It's a modern state.

13            Let's say the Kingdom says, yes, we are willing to

14   help.  We are willing to do the work we would have been

15   obligated to do under a treaty without the obligation.

16            What different that Mr. Kellogg did or his agents are

17   you suggesting would have been more appropriate?

18            MR. CARTER:  Your Honor, what I'm saying is that

19   states can do this because they have judicial systems that they

20   can leverage to require people to appear.  If this kind of

21   request were sent to the United States, the United States would

22   issue a subpoena to me and I would have no choice but to

23   appear.

24            In this case, the Kingdom is a defendant in the

25   litigation, subject to the Court's discovery rules.  And even

1   the corporate cases that they cite acknowledge that if the

2   defendant has a practical ability or some form of control to

3   make the witness appear, they are obligated to do so.

4          So we think if the Kingdom has a mechanism via its

5   judicial system to require the witnesses to appear, it is

6   subject to the discovery rules and obligated to exercise that

7   legal authority to make the witnesses appear.  Again, we think

8   a formal request would ferret that out, and we would also be

9   agreeable to seeking out an expert who can provide an affidavit

10  to say that they do have that level of control.

11         MR. POUNIAN:  Your Honor, if I could also just briefly

12  point out, there is an example of a request that was accepted

13  by Saudi Arabia from France in paragraph 151 of our declaration

14  in a criminal case.  And Saudi Arabia sent letters rogatory to

15  Turkey in the Jamal Khashoggi matter to get information from

16  Turkey.  So they themselves have used letters rogatory to get

17  information from other countries.  That's the one point I

18  wanted to make.

19         I also had a factual point to make, your Honor, if

20  it's time for that.  I don't want to rush.

21         THE COURT:  Go ahead.

22         MR. POUNIAN:  There is a question here that Mr.

23  Kellogg raised regarding the witnesses, and they say they

24  didn't do anything to discourage anyone and also no one was

25  fired because they were about to testify.

1          Your Honor, in February of 2019, this Court ordered us

2     to send a witness list to Saudi Arabia and the purpose of that

3     list was specifically to facilitate the meet-and-confer

4     process, and we sent the list to Saudi Arabia.  It included

5     many witnesses Saudi Arabia already knew about, including

6     Mr. Jaithen.  In our letter we specifically said, please tell

7     us whether you're unable or unwilling to produce any of these

8     witnesses.  We are interested in taking their testimony.

9          And then we find out, we get no response from the

10    Kingdom on that.  The only response they ever make is, we want

11    to limit you to five depositions or 10 depositions.

12         And then we find out that over the course of the last

13    year Mr. Jaithen left in May, after we sent out that letter,

14    with no notice from Saudi Arabia and nothing to us saying,

15    Mr. Jaithen is leaving, you have a window to take his

16    deposition, if you want, or we can raise it with the Court

17    because we don't think you should take it.  But the issue was

18    never raised.  We didn't have a chance to raise the issue.

19         The same thing with Mr. Awad.  I raised this before.

20    At some point, I think, close to February 3, 2020, he was still

21    working for the Kingdom because they listed him as a current

22    employee and, yet, now he's a former employee.  That's another

23    factual example that we know about.

24         What we are concerned about are all the examples we

25    don't know about.  And during the conversation before,

1    Mr. Kellogg seemed to be willing to give us information about

2    Mr. Awad, but we want to know information about all of the

3    witnesses.

4         If they are going to raise this technicality and say

5    they have no control over these people and, etc., then we want

6    to know when they left the employ and how, whether they are

7    working somewhere else now because it is possible, and the

8    Kingdom has a practice to secund people to other employers.

9    They are said they are not working for the Kingdom anymore.

10   They are working for the Muslim World League or they are

11   working for Imam University.  Very possible that many of these

12   witnesses are in that situation, and we would have absolutely

13   no way to know that.

14        The Kingdom knows.  The Kingdom has all the

15   information on that issue.  But they are saying, oh, no, it's

16   your burden to tell us.  It's your burden to crack open our

17   completely secret operation over here and get the details on

18   this.  And that's really improper and unfair and I think it's a

19   basic principle that the Kingdom should be coming forward and

20   giving us witness information.  They must give us contact

21   information for witnesses and they should let us know when and

22   how they left the employment of the Kingdom, if that is the

23   case.  And are they secunded now somewhere else, what's their

24   current job, and is the Kingdom paying them any money?  Because

25   the practice is, as you recall with Mr. Bayoumi, the Kingdom is

1    still paying people, but they are working for Dallah Avco or

2    whatever.  We want to know what the situation is.

3            Mr. Jaithen, as one example, is in early retirement.

4    It so happens -- and if I could point your Honor out to -- some

5    of the exhibits are under seal, so I cannot discuss them with

6    your Honor.  We identified Mr. Jaithen in October of 2018.  We

7    brought the motion before your Honor.  And the events after

8    that happened are set out in, I believe, paragraphs 72 to 74 of

9    my declaration.  That spells out what happened after

10   Mr. Jaithen was identified.

11           So the process of his termination, I would say, seems

12   to be a direct result of us naming him as a witness in the

13   case, and we think that's wrong and it's something that we need

14   to get to the bottom of because we believe that if we don't get

15   the testimony of these witnesses, we are entitled to an adverse

16   witness because not only are they saying they are not under

17   their control, but they have taken steps with regard to some

18   witnesses, and we are not sure how many yet, to deprive us of

19   the testimony of the witnesses, which is wrong, egregious, and

20   should not be countenanced by this Court, and that's the point

21   I wanted to make, your Honor.

22           THE COURT:  Is there any law to support that claim,

23   that the Kingdom should be required to come forward with

24   evidence?

25           MR. POUNIAN:  Come forward with evidence about

1    witnesses?

2              THE COURT:  About their nonemployer employee status.

3              MR. POUNIAN:  The federal rules, Rule 26, provides for

4    a certain exchange of information.  One is contact information

5    about a witness.  It doesn't specifically mention -- I think it

6    would include employment information in terms of whether that

7    person is employed or not.

8              In this instance we could serve interrogatories or

9    serve document requests.  The problem is, your Honor, we didn't

10   know about this until now.  We would have pursued this back

11   last year if they had responded to our attempts to meet and

12   confer with the witness list pursuant to the order of this

13   Court, but they never responded, never responded.

14             Not only did they not respond, but they were acting

15   behind the scenes.  Obviously, they had some kind of plan.

16   Whether Mr. Kellogg was part of it or not, he probably advised

17   them about the law and they proceeded according to plan.  And

18   that is not proper and there is a way, obviously, to get the

19   information.

20             It's very simple for this Court to order them to

21   produce the information.  It's a very simple matter, when and

22   how they left the employ.  Mr. Kellogg was ready to give the

23   information about Awad earlier, say he would, but there is more

24   than just Mr. Awad.  There is more than just Mr. Jaithen.  And

25   it's important.  It's a very important issue and these are

1    witnesses who they are now claiming are not under their

2    control.  We think the contrary is true.  It's not a good

3    situation, your Honor.

4          MR. KELLOGG:  Mr. Pounian just made a very serious

5    allegation, and I would like to respond to that before

6    Mr. Carter jumps in in support.

7          First of all, this is not a technicality that people

8    are retired and therefore outside of our control and,

9    therefore, not subject to noticed deposition.

10         Second, the allegation that I or any of us have

11   participated in encouraging people to retire in order to avoid

12   having to be subject to noticed deposition is absolutely false.

13   It has no basis in fact whatsoever, and it is irresponsible.

14         Let me deal specifically with the allegations.  In

15   November of 2018, Judge Netburn denied plaintiffs' motion for

16   document discovery as to al-Jaithen.  Al-Jaithen was out of the

17   case.

18         On February 5, 2019 -- I am going to ask Mr. Shen to

19   pull up the document which we provided -- there is a cover

20   letter that includes Mr. Jaithen's request to retire.  You will

21   see that the cover letter is dated February 5 of 2019.  The

22   next page shows the actual application to retire.  We don't

23   know actually when that was received.  It could have been well

24   before February 5.  But it indicates that he has completed his

25   work and plans to retire.  That was on February 5.  We got

1   their first witness list on February 20, 2019.

2           On May 5, Jaithen's retirement became effective.  This

3   was based on the Court's decision that there would be no

4   discovery as to him.  We didn't even know about that until

5   after the Court changed its mind in response to their motion

6   and the Court ordered to permit document discovery as to

7   Jaithen.  During the course of that process we learned that he

8   was retired.  A, there was no motivation to have him retire

9   since at the time he was not even subject to discovery and, B,

10  the chronology doesn't work because he moved to retire before

11  he was ever named as a witness.  That's their one example to

12  support their broadbush allegation that we have pushed

13  witnesses to retire, which is absolutely incorrect.

14          I know of no basis for them to now try to reopen

15  discovery and get interrogatories and documents as to when

16  everybody retired who are former employees, but I can say that

17  there is absolutely no basis for the serious allegations that

18  Mr. Pounian is making.

19          MR. POUNIAN:  Can I respond, your Honor?

20          THE COURT:  Let me just ask Mr. Kellogg.  How

21  burdensome would it be to submit an affidavit that just states

22  the dates of retirement and whether anybody is secunded through

23  a government placement?

24          MR. KELLOGG:  Your Honor, I note that Saudi Arabia is

25  now suffering severely from the coronavirus and has a 24/7

1    lockdown in place.  That may take time.  Plus, we are talking

2    numerous different agencies from which we will need to get the

3    retirement data.  I don't know.  I would have to find out and

4    could make a representation to the Court.

5          I do object to having to sort of defend our integrity

6    in response to allegations that have no basis whatsoever.  But

7    if the Court wants that information, we will get it.  It may

8    take some time.

9          THE COURT:  Thank you.

10         Mr. Pounian, you want to say something?

11         MR. POUNIAN:  Yes, your Honor.

12         We alerted the Kingdom to Mr. Jaithen in October of

13   2018.  They initially said they didn't even know who he was.

14   Then, as I've shown in the documents, 72 to 74, paragraphs in

15   my declaration, one of which is under seal, they then start the

16   early retirement process with Mr. Jaithen which Mr. Kellogg

17   showed you one document from that in February.

18         And then we served the witness list in February in

19   which we asked to meet and confer, as this Court directed us to

20   do, and the list was sent in that process and we got no

21   response.  Then he is retired in May.

22         Mr. Kellogg says he's out of the case based on the

23   Court's order in November.  That's document discovery about

24   Mr. Jaithen.  It's not our request to take his testimony as a

25   witness.  And the Kingdom knows a lot more about these people

1    than we do.  They knew the importance of Mr. Jaithen.  I don't

2    know whether Mr. Kellogg did, but someone in the Kingdom knew

3    about Mr. Jaithen and what his role was, and they did want him

4    out of the case.  There is no question about it.

5         We should not go through this process where they get

6    to decide and we hear unilaterally discussions from them, he is

7    not available, he's a former employee.  And then we find out,

8    given the time frame here, it's clear, there is a direct

9    relationship with our announcement of him as a witness and the

10   events that happened over the coming months after that, which

11   culminated in his early retirement in May.

12        It's not just Mr. Jaithen.  I pointed out Mr. Awad

13   also.  And that happened -- we don't know when it happened

14   exactly, your Honor, but it seems clear from the facts you can

15   infer that it happened some time around February of 2020.  It

16   may have happened in January.  But it happened at some point

17   close in time to when they prepared the list because they had

18   information that he was current and then, all of a sudden, he

19   wasn't current.  As I said, we don't know the facts and we

20   would have pursued the facts vigorously had we known this was

21   going to be an issue.

22        That's what I wanted to say, your Honor.

23        MR. CARTER:  Your Honor, I had intended to offer

24   something very brief, but Mr. Kellogg wanted to intervene.  I

25   was just going to point out that I think the timeline Mr.

1    Kellogg has offered is a bit skewed.  The relevant point is

2    when it became apparent that Jaithen was someone we were

3    interested in, which was before the retirement began.

4         Also relevant, your Honor, it is relatively standard

5    practice when a corporation is discussing retirement with a

6    witness who has relevant knowledge in an ongoing legal dispute

7    to take steps to arrange for the witness' testimony to be

8    preserved either before they retire or, as a condition of any

9    pension or other retirement benefits, to require that the

10   witness commit to be made available.  And it's quite clear that

11   as processes were likely developing here, there was a capacity

12   to secure, to alert us to the impending retirement so the

13   testimony could be preserved.

14        THE COURT:  Anything else we want to discuss with

15   respect to former employees?

16        MR. CARTER:  Your Honor, the only thing we had in

17   addition on this, with regard to the managing agent question,

18   very briefly, looking at the cases, it's clear that the

19   paramount consideration, as I mentioned before, is whether the

20   witness is going to continue to identify with the interests of

21   the defendant rather than the interests of the adversary.  And

22   the In Re Honda decision at 168 F.R.D. 535 addresses that

23   point, as do other of the decisions in the space.

24        Your Honor, I think that the point we have made in the

25   brief is that with senior members of the royal family who enjoy

1   all the benefits of being part of the central royal family with

2   high-ranking officials or people who are claimed to be, it's

3   certainly the case that they identify with the interests and

4   can be expected to be or should be made available and reach the

5   managing agent status.  That's all, your Honor.

6          THE COURT:  Can I just ask a point of clarification.

7   You've said this twice now, that the question is whether or not

8   the interests are with here the Kingdom rather than with the

9   adversary.  I am not sure if you're citing or thinking about

10  the *Scientology* case out of the D.C. Circuit when you say that.

11         I don't think the question is whether or not the

12  former employee's interests are aligned with the Kingdom or

13  aligned with the United States, or at least the plaintiffs,

14  but, rather, whether they are aligned with the Kingdom as its

15  former employer or adverse to it.

16         MR. CARTER:  Your Honor, another case in the space,

17  the *In Re Honda* that I mentioned, the paramount test is whether

18  the individual can be expected to identify with the

19  corporation's interests as opposed to an adversary's.  That's

20  what I was getting at.

21         MR. KELLOGG:  Your Honor, if I may respond to that.

22  The test is whether the former employer controls the employee.

23  That's quite clear.  That's the standard for a managing agent.

24  And there have been rare exceptions, like in the *Independent*

25  *Product Corp.* case in the Southern District of New York, which

1    I mentioned, where despite formal resignation, the witnesses

2    continued to have a financial interest, and they were

3    continuing to participate actively in the management of the

4    plaintiff corporation.  In that sense, there was continued

5    control.

6            I'm just saying, while your interests are aligned or

7    you think the same way, that has nothing to do with the

8    question before the Court.

9            THE COURT:  I think we have exhausted questions about

10   former officials.  What I'd like to do is take another

11   five-minute pause.  We have been going three hours now.  I hope

12   everybody is doing OK.  And then turn to what I hope are going

13   to be the briefest four areas of discussion, the high-ranking

14   officials question and the question about whether or not there

15   should be deposition discovery of individuals for whom the

16   Court has concluded the Kingdom does not need to produce

17   document discovery.

18           It is now 1:32.  Let's come back at 1:37.  Thank you.

19           (Recess)

20           THE COURT:  Let's move to the issue of high-ranking

21   officials.

22           MR. POUNIAN:  Mr. Carter is going to be arguing that.

23           THE COURT:  Mr. Carter.

24           MR. CARTER:  Yes, your Honor.

25           THE COURT:  The screen is yours.

1          MR. CARTER:  Thank you, your Honor.

2          I'll try to be as concise as possible.

3          When we look at the Kingdom's high-ranking official

4    objections, what we see, as a general matter, is that the

5    Kingdom is sort of resting entirely on selective citations to

6    fragmentary phrases from a handful of decisions and, on the

7    basis of that selective quotation, essentially arguing that

8    there is a bright line rule that broadly protects officials

9    from testifying, even where they have personal knowledge.

10         The Kingdom takes it a step further by urging that

11   this rule extends to former officials, that extends to current

12   officials relative to matters undertaken during their role as

13   nonsenior officials previously, and that it extends to people

14   who are not at the highest levels of the government.  And

15   that's simply not correct.

16         There is no real effort in the Kingdom's briefing to

17   engage the reasoning of the decisions, the policy

18   considerations undermining these, the specific facts that are

19   addressed in various cases.  And when you unpack those, it's

20   apparent that the objections that the Kingdom has offered

21   simply don't sustain scrutiny with regard to these particular

22   witnesses.

23         There is no bright line test here at all, your Honor.

24   Quite to the contrary, this is an incredibly limited doctrine

25   and that's because it is in derogation of the long-standing

1   rule that a litigant is entitled to every man's evidence or, to

2   update that a bit, to every person's evidence.  And because

3   it's in derogation of that rule it is applied limitedly and in

4   the circumspect manner to a very small class of people.

5          It is a balancing test, and I think the decision we

6   cited from *Byrd v. District of Columbia* in a footnote in our

7   brief, which is reported at 259 F.R.D. 1 is instructive on this

8   point.  It makes quite clear that the analysis begins with an

9   assessment of whether or not the individual is in fact high

10  ranking and at an apex level sufficient to invoke the doctrine.

11  Then there is a balancing test to determine if the potential

12  for harm outweighs the litigant's significant interest in

13  preparing for trial.

14         When we go through both the initial test as to high

15  ranking, there are significant defects in the Kingdom's

16  argument as to virtually all of these people.  And when we look

17  at the factors relevant to the balancing test, it's apparent

18  that it doesn't apply.

19         And before getting to whether or not these folks are

20  high ranking at all, the cases are quite clear, your Honor,

21  that if the individual official has personal knowledge of

22  matters that are the subject of an actionable claim, the

23  witness needs to testify, and we think that that effectively

24  ends this analysis in the case of these individuals.

25         We have included, both through our original witness

1   list as well as the supplemental facts, that clearly indicate

2   that these people have relevant knowledge.  That is

3   demonstrated in two ways.

4           First, by showing that they all had a position that

5   gave them unique visibility into structures, programs,

6   relationships and operations that are relevant to the agency

7   and other questions at issue here and, second, in virtually

8   every one of the cases, because there are documents that

9   include their names on them with regard to matters that are the

10  subject of discovery.  And I think Mr. Pounian will address

11  those a bit more directly.

12          Your Honor, with regard to this question of whether or

13  not these people even qualify, the Kingdom claims initially

14  that this extends broadly to former employees.  The Court, in

15  *Byrd* concluded otherwise.  Other courts have acknowledged a

16  potentially limited protection to former high-ranking

17  officials, but noted the fact that the testimony would not

18  interfere with their duties is a significant factor in the

19  balancing test.

20          And so here, with regard to the folks who are former

21  high-ranking officials, the fact that there could be no

22  interference with their official functions undercuts the claim

23  for protection from testifying as to the matters at issue.

24          With regard to individuals who are currently

25  high-ranking officials or former high-ranking officials but for

1  whom testimony is being sought as to other positions they

2  previously held, the immunity simply doesn't qualify because,

3  as I'll explain in a minute, one of the principal concerns here

4  is subjecting high-ranking officials to testimony about purely

5  discretionary decisions committed to their judgment that are

6  not potentially actionable, and that's not implicated when you

7  are not talking to them about their current high-ranking

8  official position.

9        Just to take a step back, your Honor, with regard to

10  this balancing test, as I said, the first consideration that

11  underpins most of these decisions is the notion that most

12  testimony that would be sought from the head of typically a

13  U.S. federal agency would concern purely discretionary matters

14  that simply aren't actionable and couldn't be relevant to the

15  proceeding, and that's largely because of the discretionary

16  function limitation in the Federal Tort Claims Act.  That's not

17  at issue here, your Honor.

18        In fact, one of the principal features of JASTA is

19  that it eliminated any kind of protection for allegedly

20  discretionary decisions, and so we don't pose the principal

21  risk that animates the decisions involving senior officials of

22  federal agencies.  And, in fact, the Court has authorized

23  discovery specifically to allow us to go up the chain to

24  determine what the scope of agency was and where directions

25  were coming from.

1          And so the principal consideration at issue in these

2    cases is simply not implicated here.  As we have said as well,

3    the concern that features prominently in the cases with U.S.

4    officials is that this will interfere with their ability to do

5    their jobs because of the scope of litigation against federal

6    agencies in U.S. courts.  That's obviously not a consideration,

7    given the limited circumstances in which Saudi Arabia could be

8    required to bring former officials or high-ranking officials to

9    testify.

10          Now, the Kingdom cites the decision in *Papandreou* to

11    suggest that this rule applies to foreign officials.  We think

12    *Papandreou* simply indicates that the Court should engage in the

13    same kind of analysis it does for cabinet-level U.S. officials

14    when dealing with someone holding a similar position in a

15    foreign government.  It doesn't announce any bright line rule.

16          And, again, with regard to the individual officials in

17    question here, we don't have potential that they are simply

18    being called to testify as to discretionary matters that

19    wouldn't be actionable anyway.  We don't have a significant

20    concern about interfering with their official functions and

21    precluding them from performing their duties, and they do in

22    fact have relevant knowledge and information, as indicated in

23    our proffers.  For all of those reasons, they are relevant

24    witnesses who we should have access to.

25          The Kingdom's claims that they don't have knowledge

1   rests principally on its preferred interpretation of evidence,

2   which, again, is not the point, as your Honor said.  The

3   preference here should be allowed for the plaintiffs to

4   determine who are the best witnesses to testify as to the

5   issues raised in the litigation.  If the Kingdom wants to claim

6   we are wasting our time by talking to people because it claims

7   they don't have knowledge, that's just us making a mistake.

8          With regard to all of these witnesses, your Honor, the

9   Kingdom had an obligation to come forward with specific facts

10  addressing each of the components of this analytical framework,

11  and it simply has not done that.

12         And what's notably missing from the entire briefing is

13  any declaration which actually denies that the people had

14  relevant interactions, for example, with Bayoumi and Thumairy.

15  And so when we look at the entire doctrine, it simply doesn't

16  operate here to place a limitation on these particular

17  witnesses.  Thank you, your Honor.

18         THE COURT:  Thank you.

19         MR. POUNIAN:  Your Honor, I'm ready to go through two

20  witnesses, if it's appropriate at this time, or Mr. Kellogg can

21  respond to Mr. Carter.  I think that they had the burden to

22  come forward and they haven't.  But I want to talk about Prince

23  Abdul-Aziz and I would like to talk about Minister Sheikh as

24  two of the high-level witnesses.

25         MR. KELLOGG:  Your Honor, if I could respond on the

108

1  legal issues first, I think that might bring the issues

2  appropriately to the Court.

3          First, as far as the threshold, I don't think there

4  really can be any dispute that the individuals for whom we have

5  invoked the doctrine qualify as high-level officials.  We have

6  invoked it very sparingly, only individuals with the rank of

7  minister or head of a diplomatic facility, like an ambassador,

8  a general consul, or head of a cultural mission.  There can't

9  be any genuine dispute that ministers and heads of diplomatic

10 facilities are specifically high ranking under the *Lederman* and

11 other cases -- *Lederman* being a Second Circuit case which is,

12 of course, binding on this Court.

13         And what *Lederman* said is that these high-ranking

14 government officials -- they extended this to the deputy mayor,

15 I would point out -- cannot be compelled to testify except in

16 exceptional circumstances.  Three different cases that we cite,

17 the *Moriah* case, *Lederman* and *Calvary Church*, all make clear

18 that this applies to both current and former high-ranking

19 officials.  That's a direct quote, doctrine applies to both

20 current and former high-ranking officials from the *Moriah* case

21 in this court.  It also applies to foreign government officials

22 as a matter of comity.  What the Court said in *Papandreou* is

23 "principles of comity dictate that we afford the same respect

24 to foreign officials as we do to our own."

25         And what *Lederman* made clear -- and, again, I would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  stress that's the binding precedent in this Court -- is that

2  the burden is on plaintiffs to demonstrate exceptional

3  circumstances justifying the deposition, such as identifying

4  unique firsthand knowledge held by these individuals or by

5  proving, quote, that the relevant information could not be

6  obtained elsewhere.

7          So that's the legal framework that should apply here,

8  and we can get into the facts.  But as Mr. Carter pointed out,

9  our position is that they presented no concrete allegations or

10 evidence that any of the 13 high-ranking officials has any

11 firsthand knowledge, let alone unique firsthand knowledge,

12 bearing on the narrow subject of jurisdictional discovery,

13 which is whether Thumairy or Bayoumi took action in 2000 at the

14 direction of more senior Saudi officials to provide assistance

15 to the hijackers.

16         THE COURT:  Can I interrupt you for a second.  I've

17 obviously read *Lederman*.  I understand that the law is that

18 high-ranking officials can be forced to testify if there are

19 "exceptional circumstances."  And in *Lederman* the finding was

20 or the language was, such as unique information, unique

21 knowledge.

22         My question to you is, the bounds of exceptional

23 circumstances.  Because it seems to me that there is at least a

24 colorable argument that if the plaintiffs are denied witnesses

25 from door 1 and they are denied witnesses from door 2, that

1    there may be exceptional circumstances that would militate in

2    favor of giving them witnesses through door 3.

3         MR. KELLOGG:  Let me respond to that, your Honor.  I

4    assume by door 1 and door 2 you are referring to both former

5    employee issue and diplomat official.  Eight of the 13 for whom

6    we claim high-level official are former employees and nine are

7    former heads of diplomatic or consular admissions.  Only two

8    are current employees who are not former diplomats.

9         One of those is the Imam of the Great Mosque of Mecca,

10   the holiest site in Islam, which is a cabinet-level position.

11   Their whole case with respect to him is that he allegedly

12   visited the United States on two or three occasions between

13   1998 and 2001 and allegedly encountered al-Sowailem and

14   al-Thumairy during those alleged visits.

15        I don't think that's the sort of satisfaction of the

16   burden that was put on the plaintiff in the *Lederman* case to

17   demonstrate exceptional circumstances, and the same applies to

18   the other Saleh al-Ash-Sheikh, the only other current employee

19   who is not a former diplomat.  He's a former minister of

20   Islamic Affairs and current minister of state.  I can't go into

21   the precise showing with respect to him, but I can refer the

22   Court to page 4 of the sealed addendum of our reply, which goes

23   through their allegations and explains why none of them

24   indicate unique knowledge or exceptional circumstances.

25        THE COURT:  Thank you.

1          MR. CARTER:  Your Honor, if I can briefly respond.

2          THE COURT:  Yes.

3          MR. CARTER:  Mr. Kellogg said that there is no

4    argument that these folks are entitled to the protection.  To

5    the extent that this has been extended to foreign officials,

6    it's solely through the In Re *Papandreou* line of authority

7    which indicates that it would extent only to cabinet-level

8    officials.  And there are folks here for whom it's being

9    invoked who are chief of staff to the ambassador, a deputy

10   consul, and a range of people who simply do not reach that sort

11   of cabinet-level position authority for which it should be

12   invoked.

13         As we said previously, the fact that people hold a

14   cabinet-level position now, or could be argued to hold it,

15   doesn't immunize them from testifying with regard to matters

16   undertaken by them in a position that was not cabinet level

17   because you are not implicating the subject matter concerns

18   associated with deposing someone who is at the head of an

19   agency, for instance, about discretionary matters.  There

20   clearly are defects in the claim with regard to a number of

21   these folks.

22         With regard to the question your Honor raised about

23   door No. 1, door No. 2, and door No. 3, that is correct, your

24   Honor, and that's a very significant reason why we need to be

25   afforded access to these witnesses in this particular case.

1          Most of the cases in this line of authority involve

2     circumstances in which the high-ranking official comes forward

3     with specific facts saying, I wasn't involved in any of this.

4     I don't have any personal knowledge, and you have access to all

5     of these people who actually engaged in the relevant

6     transactions who are subject to being deposed and can testify.

7          And that's not the case here, as your Honor has

8     pointed out.  The Kingdom has made a very elaborate effort to

9     preclude us from getting access to many of the witnesses.  And

10    the documentary record is full of holes and simply calls out

11    even more for testimony to explain some of these events and

12    transactions.

13         Again, Mr. Kellogg attacked our factual showing with

14    regard to these folks by citing a single example, Mr. Sudais or

15    Sheikh Sudais.  Without getting into the specifics, your Honor,

16    it is not insignificant in the event that people had

17    contemporaneous interactions with Fahad al-Thumairy relating to

18    his potential scope of work which indicate a likelihood that

19    there would have been conversations about what Thumairy was

20    doing in the United States, who he was taking directions from,

21    what his mission was, and what the scope of his agency was.

22    And there are very few people who are potentially available who

23    have the capacity to speak to those issues.

24         Sheikh Sudais, we believe, is a witness who should be

25    testifying.  Obviously, there was a similar effort to minimize

1    the significance of evidence relating to Prince Abdul-Aziz Bin

2    Fahd.  Mr. Pounian is going to address that, but all I would

3    say is that the Kingdom there and elsewhere is relying upon

4    argument about its preferred interpretation of the evidence

5    that's been offered, but nowhere in the record is there an

6    affidavit or a declaration in response to our proffer that

7    these folks have relevant facts and knowledge that says, I do

8    not know anything about this.  And that's more commonly what

9    happens when a high-ranking official is seeking to avoid the

10   traditional obligation to testify, and it simply has not

11   happened here.  In fact, the absence of anything of that nature

12   gives rise to an inference that the folks do actually know

13   something very specific.  Thanks, your Honor.

14          THE COURT:  Thank you.

15          MR. KELLOGG:  Your Honor, if I might, essentially,

16   Mr. Carter is suggesting that in order to not provide testimony

17   they have to provide testimony in the form of a declaration.

18   That is not what *Lederman* says.  It says that the burden is on

19   the plaintiffs to demonstrate exceptional circumstances, not

20   that we have to go to Mecca to talk to the Imam at the Great

21   Mosque and say, hey, here is a piece of paper that said you

22   don't know anything about the terrorist attacks in 2001.  It's

23   not what the case law indicates.

24          MR. CARTER:  Your Honor, in response to that I would

25   say, No. 1, *Lederman* is a very different context.  It obviously

1    did not involve foreign officials.  I think it was apparent on

2    the record there that the traditional considerations that come

3    into play under this doctrine were present.

4         You are dealing with claims about First Amendment

5    violations, and the testimony in that case that was being

6    sought clearly ran to this issue as sort of purely

7    discretionary determinations being made by the most senior

8    officials of the government of the City of New York.

9         Again, you have to take a step back here because the

10   policy considerations that animate this entire doctrine aren't

11   present here, which is why the decision in *Byrd* directs that

12   the balancing test apply.  And the balancing test includes the

13   consideration of all of these issues.

14        Again, we are not dealing with a situation where there

15   is an effort here to depose an official in the abstract about

16   purely discretionary decisions that couldn't form the basis of

17   a claim.  We are talking to them about matters that are

18   properly the subject of the claim under JASTA.

19        We are not implicating a situation in which we are

20   going to interfere with their ability to properly perform their

21   work.  Some of them are former officials who aren't going to be

22   interfered with at all.  And, as your Honor said, this is not a

23   situation in which the evidence is readily available from other

24   folks because of the limits the Kingdom itself has placed on

25   the availability of witnesses and documents in the litigation.

1          And, again, we made an affirmative proffer of the

2     relevant area of inquiry with regard to these folks in the

3     original witness list.  In response to that, in filing for a

4     protective order, the Kingdom did nothing to respond to our

5     actual witness list and the proffers we made there.

6          To the extent it could be seen to have addressed this

7     at all, there was limited argument, I believed, on pages 8 to

8     10 of this brief about three of these officials, not the other

9     10.  When it filed its reply brief it constrained its argument

10    solely to the folks for whom we supplemented the record in our

11    opposition, but there is still no response to at least six of

12    the folks.  Thank you, your Honor.

13          THE COURT:  Thank you.

14          Mr. Pounian, you said you wanted to focus on two

15    individuals in particular.

16          MR. POUNIAN:  I was going to focus on Prince

17    Abdul-Aziz and Minister Ash-Sheikh, if I could.

18          THE COURT:  Yes.

19          MR. POUNIAN:  The prince acted for the Kingdom in

20    founding the King Fahad Mosque, which was named after his

21    father, and had Thumairy installed there as the first Imam, the

22    first leader of the mosque.

23          If I could show your Honor this exhibit.  I showed

24    this before to your Honor.  This is a public exhibit from

25    Salloum to the mosque confirming that his royal highness,

1   Prince Abdul-Aziz, is paying salaries at the mosque.  Those

2   salaries included the salary of Mr. Thumairy, who was paid

3   money from the mosque.

4        We also know, your Honor, from our own investigation,

5   in documents not produced by the Kingdom, but the first

6   produced by our requests to the Department of Justice, that the

7   Kingdom assigned Thumairy in January 1998 to oversee all

8   propagators in California, and we asked for a production on

9   that issue.  And I would like to direct your Honor's attention

10  to this one document, which is under seal.  I have highlighted

11  it.

12        THE COURT:  I've read this.

13        MR. POUNIAN:  One thing I would like to address your

14  Honor's attention to is the caption, the header on this letter

15  where it has come from, but also the signature line on the

16  letter; in other words, how it is signed.  If I could just show

17  your Honor the original letter to provide some context of this.

18  If you see the address on the top.

19        THE COURT:  I'm sorry.  This document is in my

20  binders, so I know where I'm looking.

21        MR. POUNIAN:  Exhibit 50, your Honor.  I apologize.  I

22  get out of my talking mode and I've got to relearn it.  But

23  Exhibit 50, your Honor, yes.

24        The next page shows the actual document, the address

25  from which it's written.

1          As an aside, your Honor, this document was found in

2     the offices of the ministry in Saudi Arabia.  We don't think

3     there is any reason why this document should be under seal,

4     confidential.

5          If I could turn your Honor to the next document, which

6     is actually prior in sequence, Exhibit 49 to this document.

7          THE COURT:  Yes.

8          MR. POUNIAN:  And the highlighted language here.

9          THE COURT:  OK.

10         MR. POUNIAN:  Your Honor, the Court made a specific

11    order in its July 2019 order at page 36 to produce documents

12    regarding this particular document, and no documents were

13    produced by Saudi Arabia.  And the prince, they claim, is now a

14    former official, but he is part of the royal family that runs

15    Saudi Arabia.  He has loyalties to the throne and he is clearly

16    under the control of the government.  In fact, he was detained,

17    according to press reports, at some point within the last two

18    years.  And after he was released he had a photo op with the

19    current prince of Saudi Arabia.  And there is no question that

20    he can be directed to appear by the Kingdom.

21         Also, I just point out one other thing in terms of the

22    box A, box B, box C.  The prince's chief of staff, Assaf, is

23    also listed as a retired or former official who is not being

24    produced.

25         Any of the information that's being presented here

118

1  from the prince's office and ministry for Saudi Arabia during

2  this time 20 years ago, it would come from one of these two

3  individuals and the other individual is evidently not available

4  or they are not willing to make him available.  And the prince

5  says he is not available.  So he is part of the government,

6  your Honor, and we believe he should be made available.

7         Let me turn now to Minister Ash-Sheikh, if I could.

8  He is a current official.  He is no longer the head of the

9  Ministry of Islamic Affairs.  But he was the deputy minister

10  and the minister during the relevant time period here.  And he

11  was the head of the chain of command above Thumairy at the

12  ministry.

13         THE COURT:  Sorry to interrupt you.  This is Saleh Bin

14  Abdul-Aziz al-Ash-Sheikh?

15         MR. POUNIAN:  Al-Ash-Sheikh.  He is summarized in

16  paragraphs 56 through 61, your Honor, of my declaration.

17         Al-Ash-Sheikh had personal knowledge and

18  responsibility with regard to Thumairy.  And I'd like to point

19  your Honor to several exhibits.

20         First, Exhibit 15.  I am going to turn to the second

21  page of this document.

22         The first line has the addressee and then the

23  information sent below that's highlighted.  I had shown this to

24  your Honor earlier, also.

25         THE COURT:  This letter is from January of 2001, is

1    that correct?

2            MR. POUNIAN:  Your Honor, this is attached to another

3    document, which is the prior document.  And it is from 2001.  I

4    believe this letter was written in April of 2001.  And if you

5    read this letter it will maybe give you some context.  I don't

6    know the exact date that's on the second letter, but it's from

7    April 2001.

8            One more exhibit I would just like to show your Honor

9    is this.  First, if I could just point to the second page.

10           THE COURT:  What exhibit am I at now?

11           MR. POUNIAN:  This is Exhibit 48.  You can see that

12   the signatory on that exhibit.  If we go up to the part that's

13   highlighted, the date of the document is at the very top.  Part

14   of the relevance of the document is who it is addressed to.

15   There is an addressee there.  And in paragraph 61 of my

16   declaration the recipient of the letter is explained with

17   information on this particular subject.

18           THE COURT:  OK.

19           MR. POUNIAN:  Now, Minister Ash-Sheikh was responsible

20   for the policy of the Ministry of Islamic Affairs to place

21   propagators inside the United States under diplomatic cover.

22   At the time he was acting as minister, while Thumairy was

23   working for the ministry in the United States, al-Ash-Sheikh

24   also served -- he was not only the minister, but he served as

25   president of the Al-Haramain organization.

```
 1              I would like to show you Exhibit 47.  This is a
 2    document from 2016 that was prepared by Saudi Arabia in which
 3    they specified Al-Haramain as a terrorist financing operation
 4    that was a channel for the embassy bombings against the United
 5    States in 1998.  Exhibit 47, your Honor.  On the next page of
 6    that it identifies that Al-Haramain was notoriously tied to
 7    al-Qaeda and Osama Bin Laden.
 8              I just wanted to show one other set of documents, if I
 9    could, briefly.  That is Exhibit 44.  This is addressed to -- I
10    can't say it, but it states on the letter.  The date is on the
11    last line.
12              One other document, your Honor, one that's also under
13    seal ████████████ which is from -- if I can just show you the
14    second page first.  It's difficult to do this.  This is from
15    that recipient there on the final page on that date.
16              THE COURT:  I'm sorry.  Where am I looking, exhibit
17    what?
18              MR. POUNIAN:  ████████████ your Honor, and the
19    signature line.  I'm just pointing the Court out to, first,
20    with the date and the signature, just providing context for the
21    first page of that document.
22              If we go to the top page of the document, if we go to
23    ████████████, the part that is highlighted there from the prior
24    recipient that I pointed out.
25              Finally, with regard to the minister --
```

```
 1              THE COURT:  Sorry.  Can you say who it's addressed to,

 2    or is that confidential?

 3              MR. POUNIAN:  I can't.  I can't say who it was

 4    addressed to.  It is confidential.  In fact, I would have to

 5    explain it, your Honor, and then I would be -- I have not been

 6    able to reveal any of the people, what would normally be done

 7    with a privileged log in the sense.  If I'm free to do that, I

 8    would be happy.  It would make things much easier if I could

 9    just say a date, recipient, and signatory.  But we have not

10    done that.

11              Finally, with regard to Minister Ash-Sheikh, your

12    Honor, I think one key that he can testify to, the Kingdom's

13    ratification of Thumairy's conduct.  He still remains at the

14    ministry today, and he remained at the ministry for many years

15    while Ash-Sheikh remained as minister and after the documents

16    I've showed you with regard -- it's not something that he is

17    unable to discuss and directly address.  And the ratification

18    of the conduct is a subject, we believe -- is something that

19    only Minister Ash-Sheikh can speak to.  That's it on those two

20    witnesses, your Honor.

21              THE COURT:  Thank you.

22              MR. CARTER:  Your Honor, before turning to the

23    conclusion of that, just a quick second.

24              Because Mr. Pounian was talking about Prince

25    Abdul-Aziz Bin Fahad, I just wanted to note one thing again,
```

1    your Honor.  Again, with regard to the potential former

2    employee argument, Prince Abdul-Aziz Bin Fahad is not only a

3    member of the highest order of the royal family, but also

4    someone, as a consequence of that, who would receive financial

5    benefits from the state.  That's very apparent and fits within

6    the cases that treat him as a managing agent.

7           The other point is, the letter the Kingdom sent us on

8    February 3, 2020, indicates for many of the people that there

9    was a meeting and that they refused requests to sit for

10   deposition.  There is no such representation with regard to

11   Prince Abdul Aziz Bin Fahad or some of the others.  On that

12   basis we are not even sure that the former employee issue has

13   been raised.

14          THE COURT:  Thank you.

15          Mr. Kellogg.

16          MR. KELLOGG:  Yes, your Honor.

17          I'll start with Prince Abdulaziz Bin Fahad.  There is

18   no question in our mind that he is a former employee.  He is

19   retired.  In fact, a photo op with the prince is certainly no

20   indication otherwise, and the fact that he's a member of the

21   royal family is also no indication.  Otherwise, the royal

22   family is very, very large and not all of them are employed by

23   the Kingdom of Saudi Arabia.

24          It is simply not correct that we did not provide

25   documents regarding Prince Asad's private office and charitable

1    donations made out of that office.  I refer the Court to our

2    opposition to plaintiffs' motion to compel on that subject.

3    And certainly Mr. Thumairy is available and will be deposed,

4    and he can be asked about the charitable contributions he made.

5         The officials from the King Fahad Mosque were asked

6    repeatedly and at great length about the sources of the

7    financing for the mosque and where they came.  I don't think

8    any of those factors satisfy plaintiffs' obligation to show

9    exceptional circumstances, nor does it change the fact that he

10   is a former employee.

11        As for Saleh al-Ash-Sheikh, again, we walked through

12   this at pages 3 to 4 of our addendum.  He's current minister of

13   state.  That's a cabinet-level position.  And there is no

14   showing that he had relevant firsthand knowledge.  And the

15   documents on which they rely, and we go through them in our

16   sealed filing, are all irrelevant or they are after the fact or

17   both.  So I don't think in either instance have plaintiffs

18   satisfied their burden of showing unique knowledge that cannot

19   be gained elsewhere.

20        I would stress that the phrase from *Lederman* is not

21   just unique knowledge, but unique knowledge about the facts

22   relevant to the litigation which here is the alleged assignment

23   of Bayoumi and Thumairy to help the hijackers.

24        THE COURT:  Thank you.

25        MR. CARTER:  Your Honor, again, we disagree with the

1    Kingdom's interpretation of a lot of the documents.  We think

2    that the content of the documents proves itself the need for

3    testimony because there are significant gaps in understanding

4    why some of these events and transactions took place.

5         Again, when you are dealing with people who had

6    contemporaneous dealings with folks like Thumairy about the

7    nature of the Thumiary's work, that runs to the heart of the

8    agency question and there are very few people who have that.

9         If there are records, including the names of these

10   people indicating direct dealings on that front, they clearly

11   have unique and relevant information, and access to Thumairy is

12   not adequate because we have already established that he has a

13   history about lying about the very matters that are the subject

14   of this litigation.  Thank you, your Honor.

15        MR. KELLOGG:  Your Honor, one last very short point

16   raised by Mr. Carter's last remark.

17        The fact that Thumairy and al-Ash-Sheikh were at the

18   Ministry of Islamic Affairs after the events of 9/11 provides

19   no basis for saying, oh, they must have talked and Thumairy

20   must have talked about what he was doing and his assignments

21   there, etc.  There is just no basis for that in the documents.

22   Of course, they can ask Mr. Thumairy about that during his

23   deposition.

24        MR. POUNIAN:  Your Honor, there is a basis for that.

25   In Exhibit 48 it does indicate there was some personal

1    involvement and there is other aspects of actual personal

2    involvement of the minister with regard to Thumairy, and he was

3    aware of Thumairy.  There is no question about that and

4    Thumairy was assigned to this very special assignment in Los

5    Angeles.  The minister was aware.

6           And I just need to deal with one other issue Mr.

7    Kellogg raised before about the documents regarding Prince

8    Abdul-Aziz.  There were no documents produced specifically

9    regarding the exhibit, Exhibit 49, that I showed your Honor.

10   There were no documents produced regarding that except for one

11   or two things that did not explain any of the circumstances.

12   There were no communications whatsoever that were sent out --

13   that were exchanged with regard to these events.  There is only

14   certain people with knowledge, and those people should be

15   deposed and we should not have to rely on Thumairy for that

16   information because he is not the one who is in the chain of

17   command.  We need the people and we are entitled to the people

18   in the chain of command on that issue.

19           I believe there is an outstanding motion, your Honor,

20   on this particular issue where we have raised the issue of

21   where documents were searched for, and Saudi Arabia has only

22   searched in the quote/unquote private office of the prince but

23   hasn't searched the ministry offices of the prince.  And that

24   is still before the Court.

25           MR. CARTER:  Your Honor, if I can add one thing so Mr.

1   Kellogg can then respond in full.  We are constrained from

2   talking about the content of some of the documents.

3        But Mr. Kellogg did raise something that I think

4   underscores the point about discovery.  He suggested that there

5   was a defense that the Kingdom intended to raise about the

6   capacity in which the prince acted and the purpose.  He

7   referred to private and charity.  That is at the heart of the

8   very matter.  It is absolutely disputed.  And the Kingdom has

9   made clear that it intends to advance a defense to the

10  plaintiffs' claims on that basis.  And we are entitled to

11  conduct discovery concerning the Kingdom's defenses.  And so

12  the Kingdom has put this in issue by its own effort to

13  characterize the evidence and by its own claims about what

14  happened.  Thanks, your Honor.

15       THE COURT:  Thank you.

16       I want to just turn briefly to what I think is the

17  final issue, which is whether or not it's appropriate to order

18  deposition discovery, setting aside all of these other

19  objections that the defendant has raised, but whether or not

20  it's appropriate to order other deposition discovery of

21  individuals for whom I have denied document discovery or, I

22  should say, about whom I have denied document discovery.

23       Who would like to deal with that?

24       MR. POUNIAN:  I was ready to handle that, your Honor.

25  I think the two things are apples and oranges.  The document

1   discovery this Court denied as to Sadhan, Sudairy, and Batikhi

2   was involving their particular issues, but it does not address

3   their status as an eyewitness to events in southern California.

4           And it is clear that Sadhan and Sudairy, for instance,

5   have eyewitness information about what Bayoumi was doing in San

6   Diego and what Thumairy was doing in Los Angeles because they

7   were there and they were there at the precise time of the

8   events.  Your Honor has seen this exhibit before from the 2015

9   FBI report that was made public.  It describes Bayoumi as a

10  manager of the Kurdish Community Islamic Center.  That's the

11  mosque that Bayoumi managed San Diego, and he assisted the two

12  hijackers as well as al-Sadhan and al-Sudairi during their

13  respective times in San Diego.  Those two men know what Bayoumi

14  was doing and had information that is relevant regarding his

15  activities in San Diego at that time.

16          During the time they were in California they were

17  propagators working for the Ministry of Islamic Affairs and

18  they were under Thumairy's supervision.  So they would also

19  have knowledge about what Thumairy was doing at that time, and

20  it is the critical time.  It is 1999, and we also believe in

21  2000, and we also submitted evidence to your Honor that the two

22  men stayed at the very same rooming house as the hijackers, and

23  we believe that they were referred there by Mr. Bayoumi.

24          That would show the pattern of Mr. Bayoumi setting up

25  people at this rooming house in San Diego, including Sadhan,

1   Sudairy, Hazmi, Mihdhar and also his boss' nephew, Salmi, who

2   also ended up staying there in August 2000.

3       These two men from the Ministry of Islamic Affairs

4   traveled to California.  They were working for the Kingdom, we

5   believe, on diplomatic passports as part of this group of MoIA

6   representatives inside the United States, and they can testify

7   regarding Bayoumi and Thumairy.  They were eyewitnesses at the

8   moment in the time.  And there is no other witnesses available

9   in that particular situation that have been identified by the

10  Kingdom.

11      They didn't identify those two individuals.  We did.

12  We found this report.  We didn't know who Sadhan and Sudairy

13  were, and we reverse-engineered and figured it out after a

14  significant amount of investigation.  We had never known about

15  them had they not been mentioned in this document.  There is no

16  reason why we should not be able to take their testimony and

17  find out what they know.

18      I also have another issue to raise, your Honor.  The

19  same goes for Mr. Batikhi, who was in San Diego, who was a good

20  friend of Bayoumi's and who was the Imam at the mosque where

21  the hijackers first showed up in San Diego.  He was a Saudi

22  government employee, and he would know what Bayoumi was doing

23  in 1999, 2000, what his job was.  He may have information on

24  that.

25      Now, I also I want to discuss a different matter, your

1   Honor, this one issue that is not on the agenda, but perhaps

2   I'll stop.  But it's regarding one witness, Faisal Muhanna, who

3   the Kingdom claims that it cannot identify.  And I would like

4   to have the opportunity to address that.  I don't know whether

5   you want me to do that now or wait until after we dealt with

6   Sadhan, Sudairy, and Batikhi.

7        THE COURT:  Does he fall into the category -- I take

8   it the answer is no since they can't identify him -- of

9   somebody that they are objecting to depositions because it was

10   denied in --

11        MR. POUNIAN:  He does not fall in that category.

12        THE COURT:  Let's tie a bow around that category

13   before we move on.

14        MR. POUNIAN:  Thank you, your Honor.

15        THE COURT:  Mr. Kellogg.

16        MR. RAPAWY:  Your Honor, this is Gregory Rapawy.  I

17   was going to address --

18        MR. KELLOGG:  We are going to switch places, your

19   Honor.

20        MR. RAPAWY:  I'm sorry about that, your Honor.  Can

21   you hear me?

22        THE COURT:  Just for the court reporter's sake, this

23   is Gregory Rapawy now.

24        MR. RAPAWY:  We are socially distanced in a courtroom,

25   but one computer can apparently have sound on at the same time.

1    THE COURT:  Do you feel safe?  I want to make sure you

2    feel safe sitting where you are and conducting your

3    presentation.

4    MR. RAPAWY:  Yes.  I will proceed, your Honor.  Thank

5    you for the inquiry.

6    Regarding the previous rulings on al-Sadhan and

7    al-Sudairi, your Honor knows best what you were thinking when

8    you ruled.  But I have reviewed your opinions and it had been

9    my reading of them that you addressed the very same allegations

10   that we just heard with regard to why these individuals would

11   have relevant knowledge and rejected them, both initially and

12   then on reconsideration.

13   I don't really think there is much new to be addressed

14   with regard to these individuals.

15   THE COURT:  Can I ask you, though, to address the

16   question whether or not the ruling as to compelling the Kingdom

17   to search for documents on these individuals necessarily means

18   that these individuals themselves should not be presented and

19   subject to questioning.  I think there is a different burden.

20   MR. RAPAWY:  I understand, your Honor.  I do agree

21   that the legal standard is not identical, and I think what we

22   were dealing with here was the question of what the scope is of

23   jurisdictional discovery.  And we had interpreted your Honor's

24   previous rulings as being a ruling that these individuals were

25   beyond the scope of the limited jurisdictional discovery that

1   was ordered by Judge Daniels.  It doesn't mean that all the

2   considerations are the same.  But I think the argument that

3   these individuals have relevant knowledge are essentially the

4   same.  And so while you have not necessarily addressed the

5   question specifically, the current request should be rejected

6   for the same reasons.

7         And I think we would take the same view with regard to

8   Sharif Batikhi.  I was just handed the notes of your Honor's

9   previous ruling, but I think most of this material is under

10  seal, and I don't really need to refer your Honor to your own

11  order.  But it is summarized on page 7 of our sealed addendum.

12        With regard to Sharif Batikhi, I would says the case

13  is even a little bit stronger.  In the motion to vacate order,

14  plaintiffs' allegations concerning his involvement to anything

15  relevant were rejected as speculative and undercut by the

16  factual record.  And the claim that he was a friend of

17  al-Bayoumi, I am not sure what their basis is for saying that.

18  It may well be true, but I don't see that it necessarily brings

19  him within the scope of jurisdictional discovery here.

20        I did also want to briefly address the point.  There

21  are some other witnesses as to whom we have invoked or made the

22  argument that they are beyond the scope of discovery that I

23  think are differently situated.

24        If I could refer your Honor to the last page of

25  appendix A to our motion, the four individuals at the bottom of

1    that last page on the table --

2            THE COURT:  I'm sorry, Mr. Rapawy.  Does somebody have

3    their phone not muted?  I feel like we are getting more

4    background noise.  I want to make sure the court reporter can

5    hear Mr. Rapawy clearly.

6            Mr. Rapawy, if you could repeat the last few things of

7    what you just said and spell the names of any of these

8    individuals.

9            MR. RAPAWY:  I will try to go slower.

10           The individuals for whom we've cited as outside the

11   scope of jurisdictional discovery, that's Al Wahbi, Colonel

12   Ahmed, Major Khalid, and then Mr. Al Omari.

13           Those individuals were ruled to be outside the scope

14   of jurisdictional discovery for a slightly different reason.

15   Not because of the burden on Saudi Arabia from producing

16   documents or not specifically, but because the only knowledge

17   they were alleged to have related to post 9/11 investigative or

18   intelligence matters that they would have had knowledge of only

19   because of their official position in intelligence or

20   investigative agencies, including the Ministry of Interior, the

21   presidency of state security, and the presidency of general

22   intelligence.

23           The only reason that plaintiffs have tried to ask

24   those individuals or the only things that plaintiffs say they

25   intend to ask those individuals about are the post 9/11

1    investigative activities.

2          And so we would take the view that even if your Honor

3    were to decide differently with regard to someone like

4    al-Sadhan or al-Sudairi, those four individuals who I just

5    named, there is a separate reason for their being outside the

6    scope of jurisdictional discovery because taking their

7    depositions would implicate the same types of comity concerns

8    that we have invoked for opposing document discovery from the

9    files of the intelligence and investigative agencies.

10          MR. POUNIAN:  Your Honor, if I could be heard

11    regarding Sadhan, Sudairy, and Batikhi.

12          The Kingdom's defense in this case has been that

13    Thumairy was the Imam at the mosque.  He didn't supervise

14    anybody.  And no one supervised his work.  That's in their

15    interrogatory answers.

16          As to Bayoumi, they said he's a student not doing

17    work, and he's not getting any assignments and he's not

18    instructing anyone.

19          Now, these three propagators from the Ministry of

20    Islamic Affairs were there and had work interactions.  Your

21    Honor said no documents on the issues that we wanted to

22    advance, but they definitely have knowledge regarding these

23    defenses of the Kingdom, and I think they have knowledge of

24    other issues, too.  It's clearly discovery that should be

25    permitted because there is no one else who has knowledge in

1    that time frame, in that place.  They were there at the time.

2           Now, with regard to the witnesses, we named Colonel

3    Ahmed and Major Khaleid because they were at the testimony

4    given before the 9/11 Commission by Bayoumi and Thumairy.  And

5    it's possible we may find a U.S.-based witness to cover this

6    issue as to what they said at that testimony, but that's why we

7    asked for them.  And we wanted to have the right to take their

8    testimony to confirm simply the words that were said by

9    Thumairy and Bayoumi when they testified at the 9/11

10   Commission.  I just wanted to make that clear for the record,

11   your Honor.

12          MR. CARTER:  Your Honor, if I could add two points

13   related to what Mr. Pounian addressed just very quickly.

14          With regard to your Honor's prior rulings with Sadhan

15   and Sudairy, as Mr. Rapawy said, the Court obviously has a

16   better understanding of the thought process.  But we understood

17   the Court to be determining that the record did not support

18   imposition of an order requiring broad searches of ministries

19   for documents relating to the activities that Sadhan and

20   Sudairy were undertaking.

21          It is quite a different question, though, whether or

22   not they have relevant knowledge based on their observations

23   about what Bayoumi was doing in the time period, what the

24   nature of his role for the Saudi government may have been.

25          And individuals who had direct dealings with Bayoumi,

1    particularly in the context of him providing services on behalf

2    of the Ministry of Islamic Affairs, are uniquely situated to

3    indicate their observations, the nature of the conversations

4    they had with him about how it came to be that he was serving

5    these functions, who directed him to undertake these

6    activities, who had the authority to direct him to do things.

7          And the Court has authorized discovery with regard to

8    those very issues related to the agency question and indeed

9    directed discovery concerning the day-to-day activities of

10   these folks.  Very few documents were produced just indicating

11   that the opportunity to depose people who engaged with them on

12   these issues is all the more important.

13         With regard to the folks present at the interview, all

14   I would say is that the question of whether or not they may

15   have a privilege to assert is separate from the question of

16   whether or not they have knowledge relevant to the

17   jurisdictional inquiry.  And we understood the issue here to be

18   whether or not they have knowledge relevant to the

19   jurisdictional inquiry.  And for the reason Mr. Pounian said,

20   we do think they do.  Thank you.

21         MR. RAPAWY:  Your Honor, if I may, on that last point

22   I will say that the exact same argument that privilege should

23   be distinguished from the scope of jurisdictional discovery was

24   made when plaintiffs unsuccessfully sought document discovery

25   from the intelligence investigative agencies, pretty much in so

1    many words, as I recall.  And the Court nevertheless accepted

2    our position that the agencies should be considered outside the

3    scope.

4          With regard to the post 9/11 interviews, I will point

5    out that one of the very things that the Court specifically

6    denied discovery of was any transcripts or recordings that

7    might exist, hypothetically might exist that might be in Saudi

8    Arabia's possession concerning those interviews.

9          With regard to that issue I think it really is very

10   clear that the reason of the prior ruling applies here.

11         THE COURT:  I was beginning by saying thank you to

12   everybody.  I appreciate both the technological patience with

13   the Court and the excellent arguments and preparation.  I know

14   preparing for a conference of this magnitude is no small

15   undertaking.  And then to add in the complications of the

16   pandemic and moving to a virtual platform, everybody did an

17   excellent job, and so I'm enormously appreciative of your hard

18   work.

19         MR. HAEFELE:  I have one housekeeping issue after

20   Mr. Pounian is done.

21         THE COURT:  I'll leave my praise to the end.

22         Mr. Pounian, the floor is yours.

23         MR. POUNIAN:  I was basking in it, but I will go back

24   to the task at hand.

25         Faisal Muhanna is a witness who Saudi Arabia claims is

1   unable to identify.  But it's clear that they never searched

2   for him and they never searched the particular place where they

3   could find him, which I believe is the embassy in Washington,

4   and we believe that they must do so now.

5           According to the public information that we have,

6   Faisal Muhanna lived with Fahad Thumairy at the same address

7   near the mosque, near the King Fahad Mosque.

8           I would just like to show your Honor, if I could, a

9   confidential document ████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████, your Honor, particularly the last sentence

12  on that page, and then go over to the next page, at the very

13  top.

14          THE COURT:  These are notes from 2002, correct?

15          MR. POUNIAN:  This report is from 2002, but it

16  involves events -- hold on one second, your Honor.  If you see,

17  the interview is from 2002.  But if you look at the third

18  paragraph, your Honor, it gives the date of these particular

19  events.  I should have highlighted that, your Honor.

20          There are too many exhibits to go through, your Honor,

21  to do this quickly, but if I can just point your Honor to

22  paragraph 135 of the declaration.

23          THE COURT:  Can I stop you for one second.

24          Obviously, I'll ask the Kingdom's lawyers this

25  question.  But is it your understanding that they are saying,

 1    we don't think he's a person or are they saying, we don't know

 2    where he is?

 3         MR. POUNIAN:  The words they used were unable to

 4    identify and that's all we got from them and they said it's a

 5    very common name.  But we are asking them to search the embassy

 6    because we think that's the place to search to find him.  And I

 7    don't believe they had done that.  I don't believe they had

 8    done that.  We have gotten some wordsmithing, but I don't think

 9    they have searched the embassy, your Honor.

10         THE COURT:  Who from defendant's counsel would like to

11    respond to that?

12         MR. RAPAWY:  Concerning the document --

13         THE COURT:  Mr. Pounian, can you close out the screen.

14         MR. POUNIAN:  Sorry.  Yes, your Honor.

15         THE COURT:  That's OK.  Thank you.

16         Yes, Mr. Rapawy.

17         MR. RAPAWY:  I can't really discuss the contents of

18    the document because it is under seal, but I would refer your

19    Honor to page 8 of the sealed addendum to our reply, which is

20    where we address this issue, and I can also make this specific

21    representation.  We did ask the embassy if he were a former

22    employee and if they knew where he was, and they did not.  They

23    had no record of him as a former employee, and they do not know

24    where he is.  Regardless of whether he's a current or former

25    employee, we don't currently have the ability to locate the

1   individual who is in dispute, and we have made the inquiries

2   requested by plaintiffs.

3           MR. CARTER:  Your Honor, as a practical matter,

4   without getting into content, there is another person in that

5   document who presumably knows who he is.

6           THE COURT:  Mr. Rapawy, do you know how deeply you

7   have explored the request, including by asking that other

8   person?

9           MR. RAPAWY:  I don't know.  We have not asked the

10  other person.  He is, I think, a former employee.  For the

11  reasons given on page 8 of the sealed addendum, I am not sure

12  that the document actually shows that person has a close

13  relationship with Mr. Al Muhanna, but I think we could try to

14  reach out, if that is something that your Honor would like us

15  to do.

16          THE COURT:  I think if there is an obvious stone that

17  is left unturned, it would be useful.

18          MR. RAPAWY:  Understood, your Honor.

19          THE COURT:  Does that bring us to a conclusion here?

20          Mr. Haefele had a housekeeping matter.

21          MR. HAEFELE:  Thank you, your Honor.

22          When your Honor had initially noticed the hearing you

23  indicated you would address the lingering issues about

24  deposition protocol, and I think your Honor has addressed most

25  of those or all of those and in order.  But we had one question

1   and a few points of clarification concerning the deposition

2   protocol.

3          The question is whether the Court intends to enter a

4   second deposition protocol order for depositions concerning the

5   Kingdom's jurisdictional discovery, or are we relying on the

6   existing protocol as amended by the Court's recent order?

7   That's the one question.

8          The few points of clarification were --

9          THE COURT:  I'm sorry.  Before you move on, is your

10  question whether I am going to issue a new order or whether I

11  expect you to incorporate my rulings in an order?

12         MR. HAEFELE:  Either, your Honor.

13         THE COURT:  My expectation was that once we had

14  resolved all of the outstanding issues for how we were going to

15  move forward with depositions that the parties would put that

16  in a single document and present it to me to be executed.

17         MR. HAEFELE:  Thank you, your Honor.

18         The two points of clarification are specific to

19  paragraph 42 regarding the deposition title.  I'm referring to

20  paragraph 42 in what was the original proposed second order.

21         The first point of clarification is that although

22  plaintiffs have tried to be efficient in moving forward with

23  the depositions that have been done so far in the context of

24  the merits defendants, we wanted to call the Court's attention

25  to the fact that, as permitted in paragraph 41 of the proposed

1    protocol, the plaintiffs anticipate there being exceptions to

2    the seven-hour time limit or the 10-and-a-half-hour time limit

3    that exists in the protocol and that likely, for example, in

4    the cases of Bayoumi and Thumairy we would anticipate, giving

5    the breadth of information that would be covered, that we may

6    ask for more time in those cases.  But as the proposed order

7    indicates and allows and as the existing deposition protocol

8    order indicates, we would bring those to the Court's attention

9    only after we do meet and confer with the defendants.

10           Probably, the more important clarification, though, is

11   we wanted to make sure that we noted that -- your Honor had

12   indicated in this order and a previous order your observation

13   that, in the Court's experience, quality translators can

14   conduct deposition services in close to real time.

15           First, we wanted to emphasize that in the context of

16   the depositions conducted to date in the merits defendants'

17   cases, we have had a number of instances some bad experiences

18   with, I would say, less than preferred translators, but

19   eventually we had identified a translator that all the parties

20   agreed were particularly capable.

21           When we offered examples to your Honor in our February

22   21 letter, we made it a particular point to offer examples of

23   only that particular capable translator that the parties had

24   agreed on, and in each instance the depositions with those

25   translators took more than twice the time.

142

1      The reason that the depositions necessarily take

2   longer than what your Honor has experienced in your real-time

3   experience is because the real-time translation in these

4   depositions just isn't a viable option.

5      Defense counsel, in fact, has taken great pains to

6   make clear that to instruct the translators not to do real time

7   and to break the questions into pieces and break the answer

8   into pieces.  And then in one instance where the translator

9   actually slipped into doing real time, the court reporter

10  stopped the translator and told him, no.  You have to break it

11  into pieces, you can't do real time, because I can't get the

12  deposition transcribed that way.

13     The result is that in every instance the questions are

14  being asked and answered at least twice, once in each language,

15  and usually there are questions that end up happening about the

16  translation that result in the question being reasked and

17  reanswered twice again.

18     I suppose, related to that, there is probably some

19  subtle differences in the translations between the different

20  languages that you may experience in court, perhaps probably

21  Spanish, or something like that, and a translation of Arabic.

22  I am not sure what your experience is and I'm, quite frankly,

23  not really versed in the difference in the translations, but my

24  understanding is that there are.

25     With all of that said, your Honor, I think provided

1   that there is emphasis on the reasonableness of the extensions

2   being allowed where appropriate as the draft order recognizes,

3   we anticipate that we can in most instances comply with the

4   imposed limits.  We wanted to make sure it was on the record

5   that there were those differences between real-time

6   translations and what is happening in the depositions, should

7   the issue arise again in the litigation.

8           THE COURT:  Thank you.

9           I hope this is something that everybody can cooperate

10  with.  You are right that my experience is mostly with Spanish

11  in the court.  And our highly competent translators who do

12  court proceedings every day are able to do something close to

13  real time and that was my thinking, that you would have the

14  best translators that money could buy for your depositions.

15          If it is turning out that either because the

16  translation services aren't able to do real time or because

17  other people in the room, whether that's lawyers or the court

18  reporter, are requesting that questions and answers be

19  staggered and not real-time interpretation, yes.  It sounds to

20  me that it's going to have to be double because you're asking

21  two questions.  You're asking a question in English and then a

22  question in Arabic.

23          My hope is that folks will be reasonable here in the

24  grand scheme of things.  We are talking about three and a half

25  hours.

1           MR. HAEFELE:  Your Honor, I want to clarify.  I wasn't

2    suggesting that we disagree with the approach that the

3    defendants or the court reporter.  We think it was necessary to

4    break it down like that.  I didn't want to say it was a

5    one-sided thing.  I think everybody agreed that they needed to

6    be parsed like that for the transcript to read right.

7           THE COURT:  In that case, taking twice as long for a

8    seven-hour deposition is reasonable, just keeping in mind that

9    the parties should be doing their best to be efficient.

10          MR. HAEFELE:  Your Honor, I think that if you look at

11   the depositions that have been done, we have tried our best,

12   and I think we have gotten them done in a good amount of time

13   within the times prescribed already for most of the

14   depositions, but we expect that there may be some exceptions

15   here.

16          MR. SHEN:  Your Honor, I've attended most of the

17   depositions in the merits cases.  The one-and-a-half times time

18   limit has worked well in all of those depositions.  There

19   hasn't been a request to the Court to extend that timeline yet.

20   If there is a request here, we will certainly work with

21   plaintiffs, but we don't expect there to be an issue here, and

22   I think the Court's baseline rule of one-and-a-half times is

23   appropriate.

24          THE COURT:  Thank you.

25          Mr. Haefele, was there anything else?

145

1              MR. HAEFELE:  No.  Thank you, your Honor.

2              THE COURT:  Let me continue with my praise to all of

3      you.  I really do think this was an impressive hearing.  I

4      actually think, at the end of the day, it went quite well, even

5      though it took us a little while to get there.

6              I have a report from my deputy that we had 440

7      individual calls coming in on the line beyond the 12 lawyers

8      who are participating through Skype, so this was quite a

9      presentation.  I'm sure for the families and other members of

10     the public, this is a preferred way for us to proceed because

11     more people were able to call in than would have been able to

12     come into a courtroom in the Southern District of New York, so

13     I'm glad that they all had that opportunity.

14             All things being equal, I don't think I would continue

15     with this platform, but at least we now know that it works and

16     we are able, I think, to get serious work done.  I really do

17     appreciate everybody.  I know this was not an easy lift and

18     everybody was so incredibly well prepared and organized, and

19     I'm endlessly grateful for that.

20             As I say all the time, I know how important all of

21     these issues are.  I take them incredibly seriously.  To the

22     extent that it seems from your end that it takes us a long time

23     to get issues resolved and decisions out, it's not for lack of

24     thinking about them.  They are always high on our list of work

25     to do.  As you know, we have a single law clerk dedicated

1    exclusively to this case.  So he does nothing more than think

2    about the issues that you bring to the Court's attention.  So

3    we are doing our very best to keep working and moving forward.

4            We will aim to get a decision out on this motion and

5    other pending motions as quickly as we can.  I recognize where

6    things stand as far as public health issues.  I still do want

7    to move this case forward as best we can.  I know everybody

8    wants that.

9            And, hopefully, the parties in that interim can be

10   thinking about depositions that maybe are capable of being

11   conducted easily now with remote means.  For example, I know

12   every time a question of an easy deposition that should be

13   excluded from the limits comes up, the plaintiffs point to

14   deposing the university where Bayoumi was at school and asking

15   questions about transcripts.  Those seem like easy sort of

16   low-hanging fruits to get rid of, or other questions about

17   authentication of documents.  You all should be creative now.

18           I haven't set a deadline for these depositions because

19   I am being sensitive to the global pandemic, but that is also

20   high on my list of things to accomplish.  And I will be in

21   touch with you all about that issue as soon as we have some

22   better clarity.

23           I think that does it.  My last thank you will be to

24   Steven, our court reporter, for his herculean efforts in

25   conducting a four-and-a-half-hour remote proceeding, so thank

1    you, Steven, for your efforts, greatly appreciate it, as well

2    as to my staff.  I think every member of my staff was involved

3    in getting this up and running.  Thank you to them as well.

4          I think, with that, we are adjourned.  I wish

5    everybody health and safety, and I will be in touch by written

6    order in the coming days and weeks.

7          Thank you, everybody.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25