UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___ 8/27/2020

**03-MDL-01570 (GBD)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

On February 21, 2020, the Kingdom of Saudi Arabia ("Saudi Arabia" or the "Kingdom")

filed a motion under seal for a protective order regarding the depositions of current and former

Saudi officials. See ECF No. 6000. On March 10, 2020, the Plaintiffs' Executive Committees

("PECs" or "Plaintiffs") filed a motion under seal in opposition and a cross-motion to compel.

The Kingdom filed its reply under seal on March 17, 2020. The Court held oral argument on the

motions on May 21, 2020. The Court GRANTS in part and DENIES in part the Kingdom's

motion and GRANTS in part and DENIES in part Plaintiffs' cross-motion to compel.[1]

## BACKGROUND

This case is in jurisdictional discovery. Plaintiffs contend that the Court has jurisdiction

over Saudi Arabia under the Justice Against State Sponsors of Terrorism Act ("JASTA"). ECF

No. 3781, at 7. On March 28, 2018, the Honorable George B. Daniels found that Plaintiffs

articulated a "reasonable basis" for the Court to assume jurisdiction. ECF No. 3946,

Memorandum Decision and Order ("March 28 Order"), at 4. Accordingly, Plaintiffs were

permitted to conduct "limited and targeted jurisdictional discovery" regarding two individuals:

Fahad al Thumairy and Omar al Bayoumi. Id., at 23. On December 6, 2019, as the period of

---

[1] This Opinion and Order has been filed under seal in its entirety. The Court will issue a redacted version
following the resolution of Plaintiffs' Rule 72 objections to the Court's decision granting in part Saudi
Arabia's motion to seal. See ECF No. 4696.

document discovery came to a close, Plaintiffs filed a letter containing their preliminary deposition list with a statement of the scope of information that Plaintiffs intend to elicit from each witness. ECF No. 5337 ("Pls. Witness List"). On February 21, 2020, Saudi Arabia filed a motion for a protective order regarding 46 of the 53 individuals identified on Plaintiffs' list. This Opinion & Order addresses the Kingdom's motion and Plaintiffs' cross-motion to compel.

Saudi Arabia contends that at least 32 witnesses on Plaintiffs' Witness list are not current employees of Saudi Arabia because they are deceased (two individuals), were never employees of Saudi Arabia (one individual), or are no longer employed by Saudi Arabia (29 individuals); 11 are shielded from testifying under the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations; 13 are current or former high-ranking officials who have no unique, first-hand knowledge relating to Plaintiffs' allegations; and eight are beyond the scope of the limited jurisdictional discovery authorized by the Court in its prior orders. Saudi Arabia's February 21, 2020 motion ("KSA Br."), at 1. Of the 11 individuals Saudi Arabia contends are shielded by the Vienna Conventions, seven are also former employees. Id. Of the 13 individuals Saudi Arabia contends are shielded by the high-ranking official doctrine, eight are also former employees, and eight are also shielded by the Vienna Conventions. Id.

## FOUNDATIONAL RULES

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." Chettri v. Nepal Rastra Bank, 834 F.3d 50, 55 (2d Cir. 2016) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989)). Under the FSIA, a foreign state is immune from suit unless a specific statutorily defined exception applies. Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 251 (2d Cir. 2000). JASTA created a new exception to the FSIA. See 28

U.S.C. § 1605B. It applies when, in addition to injury, causation, and damages, a plaintiff can show (1) an act of international terrorism in the United States; and (2) a tortious act by a foreign state, or any official, employee, or agent of that state taken while acting within that person's office, employment, or agency. See March 28 Order, at 9.

Judge Daniels found a "reasonable basis" for the Court to assume jurisdiction under JASTA on the grounds that "Plaintiffs allege facts sufficient to show that they and their agents were following instructions from more senior officials in the Saudi Embassy." Id., at 22. Accordingly, "Plaintiffs shall be permitted to conduct limited and targeted jurisdictional discovery critical to answering . . . whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." Id., at 23.

The Federal Rules of Civil Procedure state that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed R. Civ. P. 26(b)(1). In a FSIA case, the Court of Appeals has made clear that jurisdictional discovery of a foreign state should be limited. See First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998); EM Ltd. v. Republic of Argentina, 695 F.3d 201, 209-10 (2d Cir. 2012); Arch Trading Corp. v. Republic of Ecuador, 839 F.3d 193, 206 (2d Cir. 2016). To protect a foreign state from the "expense, intrusiveness, and hassle of litigation," a court must be cautious in allowing jurisdictional discovery. Arch Trading Corp., 695 F.3d at 206. The Court must order discovery "circumspectly and only to verify allegations of specific facts crucial to an immunity determination." First City, 150 F.3d at 176.

Still, the Court must conduct a "delicate balancing" while managing discovery. Id. Plaintiffs have already established a reasonable basis for the Court to assume jurisdiction over

Saudi Arabia, lessening the concern that the Court will impose discovery obligations on a potentially immune defendant. Congress has expressed a strong interest in granting federal courts jurisdiction when a foreign state commits a tortious act in connection with an act of terrorism within the United States. See JASTA, § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 ("The purpose of this Act is to provide civil litigants with the broadest possible basis . . . to seek relief against . . . foreign countries . . . that have provided material support . . . to persons that engage in terrorist activities against the United States.") While these concerns do not negate the Court's obligation to conduct limited discovery, they emphasize that Plaintiffs must be given the discovery necessary to determine if JASTA applies. See Sociètè Nationale Industrielle Aèrospatiale v. U.S. Dist. Court, 482 U.S. 522, 544 n.28 (1987) (noting that, in any comity analysis, courts should consider whether an interest of the United States would be undermined).

## DISCUSSION

### I. Testimony of Former Employees

#### A. Legal Standard

Saudi Arabia argues that at least 32 of the 38 witnesses on Plaintiffs' Witness List are unavailable for deposition because they are not current employees of Saudi Arabia, and as such, Saudi Arabia has no control over them and cannot produce them for deposition without their voluntary consent. KSA Br., at 3. Foreign nationals residing outside the United States cannot be subpoenaed to testify under Federal Rule of Civil Procedure 45. See United States v. Korolkov, 870 F. Supp. 60, 65 (S.D.N.Y. 1994) (citing Fed. R. Crim. P. 17(e)(2); 28 U.S.C. § 1783; United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984)). Saudi Arabia is also not a signatory to the Hague Convention or any other convention that would allow the Court to request assistance in securing testimony of individuals residing in Saudi Arabia. KSA Br., at 1-2. Thus, the Court

addresses Plaintiffs' requests for Saudi Arabia to make individuals available as party witnesses under Federal Rule of Civil Procedure 30(a). See id.

Under Rule 30, "[o]nly a party to litigation may be compelled to give testimony pursuant to a notice of deposition." U.S. v. Afram Lines (USA), Ltd., 159 F.R.D. 408, 413 (S.D.N.Y. 1994). The Saudi government officials on Plaintiffs' Witness List are not parties to the litigation. They may, however, be subject to deposition by notice if they are considered to be the equivalent of employees of a party corporation. See generally McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D. 70, 79 (D.D.C. 1999) (finding "no reason to preclude" the application of a Rule 30(b)(6) notice to Iran despite its status as a foreign sovereign rather than a corporation.) Parties under Rule 30 may be noticed pursuant to Rule 30(b)(6), or Plaintiffs "may identify a specific officer, director, or managing agent to be deposed and notice that person under Rule 30(b)(1)." Afram Lines, 159 F.R.D. at 413; see also United States v. The Dorothy McAllister, 24 F.R.D. 316, 318 (S.D.N.Y. 1959) (examining the United States, as a party, through its managing agents).

"[A] corporate employee or agent who does not qualify as an officer, director, or managing agent" "is not subject to deposition by notice" under Rule 30. Id. The party seeking the deposition has the burden to "establish the status of the witness." Afram Lines, 159 F.R.D. at 413. But this burden is "modest," and any doubts are resolved in favor of the examining party. Dubai Islamic Bank v. Citibank, N.A., No. 99-CV-1930 (RMB) (THK), 2002 WL 1159699, at *4 (S.D.N.Y. 2002). The determination of a deponent's status as a "managing agent" is "determined as of the time of the deposition, not as of the time when the activities disputed in the litigation occurred." Rundquist v. Vapiano SE, 277 F.R.D. 205, 208 (D.D.C. 2011) (internal citations omitted). But "courts have made exceptions to this general rule, for example when a corporation terminates an officer in light of pending litigation." Id.

A "corporation cannot be required to produce a former officer or agent for deposition since it does not have control over him." Boss Mfg. Co. v. Hugo Boss AG, No. 97-CV-8495 (SHS) (MHD), 1999 WL 20828, at *2 (S.D.N.Y. Jan. 13, 1999). But "this rule is not woodenly applied. Rather, courts within and without this district have adopted a 'practical' approach that 'focuses not only on the formal connection between the witness and the party at the time of the deposition, but also on their functional relationships." Dubai Islamic Bank, 2009 WL 1159699, at *3. The deponent "need not have a formal association with the corporation to be deemed its managing agent . . . Likewise, the deponent need not be associated with the corporation at the time of his deposition." Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, 351 (N.D. Ohio 1999) (internal citations omitted). Summarizing this approach, the D.C. Circuit has observed:

> Courts have accorded managing agent status to individuals who no longer exercised authority over the actions in question (and even to individuals who no longer held any position of authority in a corporation), so long as those individuals retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests.

Founding Church of Scientology of Washington, D.C., Inc. v. Webster, 802 F.2d 1448, 1456 (D.C. Cir. 1986).

### B.  Application to Plaintiffs' Proposed Deponents

The parties do not dispute that Plaintiffs' proposed deponents would meet the "managing agent" test were the deponents still serving in the Saudi government. The Court will therefore assume, absent evidence or argument to the contrary, that all 32 witnesses at issue, if still employed, would be properly designated as an officer, director, or managing agent of the Kingdom. The only point of contention before the Court is whether the Kingdom retains control over these officials now that they are retired or no longer serving in their government posts. The question is therefore whether these former officials have maintained interests consonant with

rather than adverse to the Kingdom's interests. On the record before the Court, Plaintiffs have not sufficiently shown that all of the proposed deponents meet this threshold.

A court in this district has found former employees to be managing agents where "[i]t cannot be denied that [the former employees] stand ready to serve the plaintiffs," as one of the employees already did after his resignation. Independent Productions Corp. v. Loew's, Inc., 24 F.R.D. 19, 26 (S.D.N.Y. 1959). Another court in this district found that "[t]he continued employment of the former master as a chief mate indicates that his interests are still identified with the defendant corporation." Curry v. States Marine Corp. of Delaware, 16 F.R.D. 376, 377 (S.D.N.Y. 1954). Similarly, an employee who "retains a position with the plaintiff . . . such that he remains loyal to not only the corporation by which he is now employed but also to the other [related] plaintiff-corporations" was found to be a managing agent. Boston Diagnostics Development Corp. v. Kollsman Manufacturing Co., 123 F.R.D. 415, 415 (D. Mass. 1988).

The Kingdom has stated that 32 of Plaintiffs' proposed deponents are not current employees of Saudi Arabia. Absent evidence to the contrary, the Court cannot find that these individuals should be accorded managing agent status. There is no continued employment to suggest that these individuals maintain interests consonant with the Kingdom, and these individuals have not shown a willingness to "stand ready to serve" the Kingdom. On the contrary, the Kingdom contacted many of these individuals and requested their attendance at a deposition, and they declined the request. KSA Br., at 3-4; see also Afram Lines, 159 F.R.D. at 414-15 (finding that Afram did not have control over overseas port agents because "there has been no showing that they ever provided sworn testimony for Afram without being required to do so by subpoena or other formal process). Indeed, two of the proposed deponents, Prince Abdulaziz and Prince Bandar, were allegedly detained by the Kingdom. Declaration of Steven R.

Pounian, dated March 10, 2020 ("Pounian Decl.") ¶¶ 161-164. The Court is surely in no position to determine the allegiances of individuals whose freedom was put in jeopardy by their own government. The fact that an individual continues to receive government benefits, see Pls. Br., at 2, is insufficient.

Moreover, "the consequence of requiring depositions pursuant to notice" is that Saudi Arabia "could be sanctioned for failing to produce witnesses who are in fact beyond its control." Afram Lines, 159 F.R.D. at 414. Federal Rule 37(d) authorizes sanctions whenever "a party. . . after being served with proper notice, [fails] to appear for [their own] deposition." Fed R. Civ. P. 37(d)(1)(A)(1); see also Fu v. Consolidated Edison Co. of N.Y., Inc., 16-CV-4017 (RA) (HBP), 2018 WL 4373995, at *2 (S.D.N.Y. Sept. 13, 2018). Plaintiffs are, in effect, asking the Court to threaten a foreign sovereign with contempt sanctions if it does not comply with legal processes that it claims it does not ascribe to. See KSA Br., at 2 n.5; Pounian Decl. ¶¶ 145–154 (describing various frameworks and processes for criminal cases and regional conventions of which either the United States or Saudi Arabia is not a party). Because I find that none of the 32 witnesses qualifies on the present record as a managing agent, the Court will not direct the Kingdom, on pain of sanction, to produce individuals for deposition who have refused to do so voluntarily, except as qualified below.

## C. Exceptions

Courts have recognized an exception to the managing agent rule when "a corporation terminates an officer in light of pending litigation." Rundquist, 277 F.R.D. at 208. This exception promotes fundamental fairness when a witness unexpectedly is removed from the reach of a Rule 30 notice. Plaintiffs argue that certain witnesses were retired after Plaintiffs named them as

material witnesses in this case, and that the Kingdom failed to notify the Court or Plaintiffs in advance to allow their testimony to be preserved. Pls. Br., at 1.

### 1.  Abdullah Al Jaithen

Plaintiffs first identified Al Jaithen as a person of interest in their October 10, 2018 Supplemental Document Requests of the Kingdom. Pls. Ex. 51. Plaintiffs then named Al Jaithen as a witness for deposition in February 2019, at which time Plaintiffs asked Saudi Arabia to advise as to whether it claims to be unable or unwilling to produce any of its proposed witnesses for deposition. Pls. Ex. 53. A December 2018 internal MOIA note asks that Al Jaithen be terminated for having supported the Muslim Brotherhood, and a February 21, 2019 internal MOIA note states that Al Jaithen wished to retire at that time. Pls. Exs. 56, 57. Al Jaithen's "Early Retirement" was effective May 5, 2019. Pls. Ex. 58. At no time did the Kingdom advise Plaintiffs of the fact that Al Jaithen was leaving its employ or take any available measures to preserve Al Jaithen's testimony. Pounian Decl. ¶ 74.

While the Court initially denied Plaintiffs' request for document discovery as to Al Jaithen on November 29, 2018, see ECF No. 4261, that ruling has no bearing on Plaintiffs' February 2019 request to depose Al Jaithen, and the Kingdom's failure to advise Plaintiffs of Al Jaithen's retirement. The Kingdom's failure to notify Plaintiffs as to Al Jaithen's change in status supports Plaintiffs' argument that Al Jaithen's retirement may have related in part to the pending litigation, and as such, the Court will determine Al Jaithen's status as a "managing agent" as of the time when the activities disputed in the litigation occurred, not at the time of the deposition. See Rundquist, 277 F.R.D. at 208; see also E.I. DuPont de Nemours and Co. v. Kolon Indus., Inc., 268 F.R.D. 45, 51 (E.D. Va. 2010) ("The timing and circumstances of [defendant's] reassignment or termination of its employees render the true status of the proposed deponents

highly suspect."). The Court has found Al Jaithen to be "more senior than Thumairy at the Ministry of Islamic Affairs," and noted that he may be a "higher-ranking Saudi official" who gave instructions to assist the hijackers. January 3, 2020 Opinion & Order ("January 3 Order"), at 6. As any doubts regarding Al Jaithen's status are resolved in favor of the examining party, the Court orders that the Kingdom produce Al Jaithen for a deposition. Dubai Islamic Bank, 2002 WL 1159699, at *4.

### 2.  Abdullah Al Awad

Plaintiffs also seek to depose Abdullah Al Awad. See Pls. Witness List, at 2. Plaintiffs first listed Al Awad as a proposed deponent in February 2019. See Pls. Ex. 53. At that time, Plaintiffs requested that "the Kingdom advise us . . . whether it claims to be unable or unwilling to produce any of these individuals for deposition." Id. According to the Kingdom's July 20, 2020 letter to the Court, Al Awad served as Saudi Arabia's Ambassador to Chile until March 8, 2019. See ECF No. 6323. Accordingly, Al Awad was still employed by the Kingdom when Plaintiffs filed their initial witness list in February 2019. At that time, the Kingdom should have advised Plaintiffs that Al Awad's contract extension was to end one month later.

The Kingdom was also independently aware of Al Awad's potential relevance to this litigation. Judge Daniels's order denying Saudi Arabia's motion to dismiss referred to a February 1, 2000 meeting at the Consulate where Bayoumi told "at least one person he was traveling" to Los Angeles to pick up visitors, see March 28 Order, at 19 n.10, and the ███████████████████

██████████████████████████████████████████████

███████████████████████████ See ECF No. 6326. It would be unfair to deprive Plaintiffs of this relevant deposition because the Kingdom, contrary to its obligations, failed to advise Plaintiffs that Al Awad was retiring in 2019. The Court finds that Al Awad, as

the former Deputy Counsel, is a "managing agent" subject to deposition notice and must be produced.

### 3. Other Retired Officials

Plaintiffs additionally claim that Khalid Al Assaf, Abdulaziz Al Anqari, Mohamed Al Salmi, and Abdulaziz Al Ammar "may still be" Saudi government officials. Pounian Decl. ¶¶ 75, 91, 97. Of these individuals, Al Anqari has voluntarily agreed to testify. KSA Ex. 1, at 2. Al Salmi's three-year term, according to Plaintiffs' own evidence, ended on January 1, 2019. Pls. Ex. 66. Plaintiffs provide no evidence for their claims about Al Assaf and Al Ammar. Separately, Plaintiffs cite a March 23, 2019 Royal Decree issued by King Salman of Saudi Arabia dismissing Tawfiq Al Sudairy from his position as Deputy Minister of Islamic Affairs. Pounian Decl. ¶ 82.

On this record, principles of fairness do not support finding that these individuals should be deemed managing agents and that Saudi Arabia should be compelled to produce them for deposition. Plaintiffs have not demonstrated that the Kingdom knew that Plaintiffs would be seeking these individuals' depositions and failed to act to allow the Plaintiffs to preserve their testimony. To the extent the Plaintiffs believe, based on evidence, that these individuals are "still" employed by the Kingdom, Plaintiffs may seek affidavits from the Kingdom attesting to their current employment status. Absent evidence suggesting that the Kingdom retains control over these individuals, the Court GRANTS the Kingdom's request for a protective order.

## II. Testimony from Current and Former Diplomatic Officials

### A. The Vienna Conventions on Consular and Diplomatic Relations

The Vienna Convention on Diplomatic Relations of 1961 ("VCDR") and the Vienna Convention on Consular Relations of 1963 ("VCCR") are international treaties widely acknowledged as the authoritative statement of immunity applicable to relations among nations.

See United States v. Enger, 472 F. Supp. 490, 505 n.15 (D.N.J. 1978). The VCCR is the product

of the United Nations Conference on Consular Relations, which worked from a draft prepared by

the International Law Commission. Representatives from the governments of 92 countries,

including the United States, came together to draft the final document. See Mora v. New York,

524 F.3d 183, 189 (2d Cir. 2008) (citing Luke T. Lee, Vienna Convention on Consular Relations

15-18 (1966)). The VCCR was ratified by the United States in 1969. See id. Following a similar

process, the VCDR, codifying "longstanding principles of customary international law with

respect to diplomatic relations," was ratified by the United States in 1972. Broidy Capital Mgmt.

LLC v. Benomar, 944 F.3d 436, 441 (2d Cir. 2019) (citing 767 Third Ave. Assocs. v. Permanent

Mission of Republic of Zaire to United Nations, 988 F.2d 295, 300 (2d Cir. 1993)).

The drafters of the Conventions made clear that the purpose of the privileges and

immunities therein "is not to benefit individuals but to ensure the efficient performance of

functions by consular posts on behalf of their respective States." VCCR pmbl.; see also VCDR

pmbl. (diplomatic immunity is intended "not to benefit individuals but to ensure the efficient

performance of the functions of diplomatic missions as representing States.") The immunities

and privileges belong to the sending state, not individual diplomatic or consular officials. See,

e.g., Report of the Commission to the General Assembly, U.N. Doc. A/4425, in II Y.B. Int'l

Comm'n 143, 170 (1960) (immunity "in respect of acts performed by [consular officers] in the

exercise of their functions" is "an immunity which the sending State is recognized as

possessing"); Report of the Commission to the General Assembly, U.N. Doc. A/3859, in II Y.B.

Int'l L. Comm'n 78, 99 (1958) (immunity of diplomatic agents "may be waived by the sending

State alone"). The articles of the Conventions are considered inviolable. See generally Beard v.

Greene, 523 U.S. 371, 376 (1998) (noting, in a discussion of the VCCR, that "treaties are recognized by our Constitution as the supreme law of the land").

The consular functions covered by the VCCR include "protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law"; "furthering the development of . . . cultural . . . relations between the sending State and the receiving State"; "issuing passports and travel documents to nationals of the sending state"; "helping and assisting nationals, both individuals and bodies corporate, of the sending State"; and "performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State." VCCR art. 5(a), (b), (d), (e), and (m). Covered diplomatic functions include "[p]rotecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law"; [a]scertaining by all lawful means conditions and developments in the receiving State"; and "developing . . . cultural . . . relations." VCDR art. 3(1)(b), (d), and (e). The Court of Appeals has "cautioned against a narrow reading" of the VCCR's catchall provision. See Kingdom of Morocco v. United States, No. 19-MC-00396 (NSR), 2019 WL 6724436, at *8 (S.D.N.Y. Dec. 11, 2019) (citing Heaney v. Gov't of Spain, 445 F.2d 501, 505 (2d Cir. 1971)).

The privileges and immunities of the Vienna Conventions apply to testimony and documents regarding all "acts performed . . . in the exercise of [officials'] functions" at diplomatic or consular facilities, VCDR art. 39(2); VCCR art. 53(4). Under the VCDR, "[a] diplomatic agent is not obliged to give evidence as a witness." VCDR art. 31(2). A "diplomatic agent" is defined as "the head of the mission or a member of the diplomatic staff," i.e. those "having diplomatic rank." Id. arts. 1(d)-(e). "[W]ith respect to acts performed by such a person in

the exercise of his functions as a member of the mission, immunity shall continue to subsist" after a diplomatic agent's functions end. Id. art. 39(2). Similarly, under the VCCR, "[m]embers of a consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions." VCCR art. 44(3). "Members of the consular post" means "consular officers, consular employees, and members of the service staff." Id. art. 1(1)(g). "[W]ith respect to acts performed by a consular officer or a consular employee in the exercise of his functions, immunity from jurisdiction shall continue to subsist without limitation of time." Id. art. 53(4).

### B.  Procedural Requirements for the Invocation of the Vienna Conventions

For the Vienna Conventions to apply, a diplomat must be accredited as a diplomat. Ved P. Nanda et al., Litigation of International Disputes in U.S. Courts § 4:6 (2020). "The Department of State . . . interprets the VCDR to allow individual diplomats to assert immunity on their own behalves." United States v. Al Sharaf, 183 F. Supp. 3d 45, 51 (D.D.C. 2016). The D.C. Circuit has held that "[i]t is enough that [the diplomat] has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the Department's recognition has been communicated to the court." Carrera v. Carrera, 174 F.2d 496, 497 (D.C. Cir. 1949). "[R]ecognition by the executive branch—not to be second-guessed by the judiciary—is essential to establishing diplomatic status." United States v. Lumumba, 741 F.2d 12, 15 (2d Cir. 1984) (citing Restatement (Third) of Foreign Relations Law of the United States § 461 Commentary at 30 (Tent. Draft. No. 4, 1983)). "The courts are disposed to accept as conclusive of the fact of the diplomatic status of an individual claiming an exemption, the views thereon of the political department of their government." Carrera, 174 F.2d at 497 (internal citations omitted).

Saudi Arabia has provided the Court with archived versions of the State Department's Diplomatic List and List of Foreign Consular Offices, which contain names of members of diplomatic staff and recognized consular officials who are entitled to the immunities of the Vienna Conventions. ECF No. 6222; see, e.g., U.S. Dep't of State, Diplomatic List, Summer 2000, https://1997-2001.state.gov/about_state/contacts/diplist/2000/00summer_4.html#saudi (capitalization omitted). Those lists identify all the individuals as to whom the Kingdom has asserted testimonial immunity under the Conventions, except for two ambassadors to other jurisdictions, who are certainly entitled to immunity as well. Plaintiffs have not presented any evidence to the Court that the credentials of any of these listed officials have at any time been revoked. The Court therefore finds that the Kingdom has satisfied its burden of showing that the individuals as to whom immunity is being asserted are properly accredited.[2]

## C. Residual Immunity Under the Vienna Conventions

Plaintiffs argue that when a diplomat's functions end, they have no residual immunity; i.e., the privileges and immunities afforded by the treaties cease. Plaintiffs claim that the VCCR's residual immunity provision, Article 53(4), does not apply to Article 44's rules regarding witness testimony; rather, it applies only to "immunity from jurisdiction," under Article 43. Plaintiffs' March 10, 2020 opposition ("Pls. Br."), at 4. Similarly, Plaintiffs argue that the VCDR's residual immunity provision, Article 39(2), reaches only to diplomatic personnel insofar as they are the subject of a civil or criminal suit under Article 31(1); there is no such immunity regarding the obligation to give testimony as a witness under Article 31(2). Id.

---

[2] If Plaintiffs have evidence that the credentials of any of the individuals on these archived lists were subsequently revoked, they may present such information to the Department of State and relay any findings to the Court.

In interpreting a treaty, courts "begin[] with the text of the treaty and the context in which the written words are used." Mora, 524 F.3d at 194 (internal citations omitted). The term "immunity" is defined as the "freedom or exemption from a charge, duty, obligation, office, tax, imposition, penalty, or service esp. as granted by law to a person or class of persons." Webster's Third New International Dictionary 1130-31 (2002); see also Black's Law Dictionary 885 (4th ed. 1968) defining immunity as an "[e]xemption" from "performing duties which the law generally requires other citizens to perform"). These ordinary meanings of the term "immunity" encompass the exemption from giving testimony.

This meaning is also supported by the context in which the words are used. Article 45(1) of the VCCR refers to the "privileges and immunities" generally provided for in Articles 41, 43, and 44, indicating that the drafters considered all of these provisions to operate similarly. Also, Article 41 of the VCCR, discussing criminal immunities, states that officers "shall not be liable to arrest," the same language used in Article 44 ("liability to give evidence"). Courts in this district have interpreted the comparable VCDR provisions similarly. See Vulcan Iron Works, Inc. v. Polish American Machinery Corp., 472 F. Supp. 77, 79 (S.D.N.Y. 1979) ("Article 31 of the [VCDR] deals with the immunity of 'diplomatic agents'"); In re Application of Noboa, No. M19-111 (JSM), 1995 WL 581713, at *4 (S.D.N.Y. Oct. 4, 1995) (applying VCDR Art. 39(2)'s residual immunity provision to Art. 31(2)'s "immunity of a diplomat from giving testimony").

Plaintiffs further contend that procedurally, the former Saudi government officials on their list must appear at their depositions, and Saudi Arabia may then object to specific questions on privilege grounds. Pls. Br., at 3. Plaintiffs cite to a district court in Texas which found that "[a]lthough foreign diplomats are not obligated to testify, [the Vienna Conventions] do not provide a general exemption from giving testimony." Box v. Dallas Mexican Consulate General,

16

No. 3:08-CV-1010-O, 2013 WL 12353107, at *2 (N.D. Tex. 2013) (citing John Fellas et al.,

Transnational Litigation: A Practitioner's Guide §§ 13:91, 22:19). That court held that the

official may refuse to answer questions regarding his consular functions, but that the defendants

may not refuse to produce the official for deposition. Id. A court in this Circuit, however, found

that diplomatic agents' "failure to appear for depositions in response to the plaintiffs' subpoena

was excusable" under Article 31(2) of the VCDR. Vulcan Iron Works, 472 F. Supp. at 79-80.

This Court agrees with its sister district court. Witnesses therefore need not appear for their

deposition if their testimony would only cover material that the Court has found to be protected

by the Vienna Conventions.

### D.  Scope of the Residual Immunity Under the Vienna Conventions

Plaintiffs argue that even if there is residual immunity for witness testimony, Saudi

Arabia cannot block the testimony of its officials about activities that fall outside their legitimate

diplomatic functions. To frame its analysis, the Court turns to the related doctrine of

prosecutorial immunity. A "prosecutor enjoys absolute immunity . . . when he acts within the

scope of his prosecutorial duties." Imbler v. Pachtman, 424 U.S. 409, 420 (1976). "If a

prosecutor had only a qualified immunity . . . the threat of . . . suit[] would undermine

performance of his duties." Id. at 424. In this instance, "it has been thought in the end better to

leave unredressed the wrongs done by dishonest officers than to subject those who try to do their

duty to the constant dread of retaliation." Id. at 428 (internal citations omitted). Courts "examine

the nature of the functions with which a particular official . . . has been lawfully entrusted."

Forrester v. White, 484 U.S. 219, 224 (1988). For example, courts have found that "advising the

police in the investigative phase of a criminal case . . . [does not qualify] for absolute immunity."

Burns v. Reed, 500 U.S. 478, 493 (1991). Furthermore, where a prosecutor has "intertwined his

exercise of authorized prosecutorial discretion with other, unauthorized conduct . . . absolute immunity has been denied." Bernard v. County of Suffolk, 356 F.3d 495, 504 (2d Cir. 2004).

The Court of Appeals has similarly found that the Vienna Conventions' residual immunity is designed to ensure "the efficient performance of the functions of diplomatic missions," and is "limited to a narrow set of acts that are committed "in the exercise of [the diplomat's] functions *as a member of the mission*." Swarna v. Al-Awadi, 622 F.3d 123, 134 (2d Cir. 2010) (emphasis in original). There is no immunity for "actions that pertain to [the official's] household or personal life and that may provide, at best, 'an indirect' rather than a 'direct . . . benefit to' diplomatic functions." Id. at 134-35 (internal citations omitted). "[A]cts incidental and indispensable to diplomatic activities include . . . only such acts as are directly imputable to the state or inextricably tied to a diplomat's professional activities." Id. at 135. Consistent with the VCDR's text and drafting history, the United States, through the State Department, has limited the application of residual immunity to "official acts only." Id.

Courts apply a two-part test when determining whether an act was "performed in the exercise of consular functions." First, "the Court must determine that the actions of the consular officials implicated some consular function. Second, the acts for which the consular officials seek immunity must be performed in the exercise of the consular functions in question." Ford v. Clement, 834 F. Supp. 72, 75 (S.D.N.Y. 1993) (Sotomayor, DJ), aff'd 29 F.3d 621 (2d Cir. 1994) (internal citations and quotation marks omitted). In making these determinations, courts consider "(1) the subjective intent of the consular official, based on objective evidence, in performing the act; (2) whether the act furthered some function of the consulate; (3) whether the act is of a 'personal character;' (4) the seriousness of the act; and (5) the absence or presence of a malicious

motive in the performance of the particular act." United States v. Cole, 717 F. Supp. 309, 323 (E.D. Pa. 1989).

"In addition, the Court may consider whether the act is part of a prolonged course of criminal conduct." Id. (internal citations omitted). However, "[i]n conducting this analysis, we must not judge whether the underlying conduct actually occurred, or whether it was wrongful. Rather, our consideration is a functional one." Swarna, 622 F.3d at 137 (internal quotation marks and citations omitted). "[W]e . . . look [] to the objective acts . . . in question, not the type of injury alleged." Brzak v. United Nations, 597 F.3d 107, 113 & n.* * (2d Cir. 2010) (citing Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996)). The Court of Appeals explained that this objective test parallels that in the prosecutorial immunity context. See id.

The "precise task before the Court" is to "scrutinize the [] acts objectively and evaluate whether they fall within the [individual's] official functions subject to [their] residual immunity." Al Sharaf, 183 F. Supp. 3d at 53. The Court notes, at the outset, that there is "little case law as to what constitutes a consular function," and "there are no clear rules that define what actions constitute 'performing' the exercise of consular functions." Ford, 834 F. Supp. at 75-76. The Court also recognizes that Judge Daniels explicitly permitted discovery regarding whether Al Thumairy and Al Bayoumi were "following instructions from more senior officials in the Saudi Embassy." March 28 Order, at 22. While acts taken "in the regular course of implementing an official program or policy of the mission" are protected by the Conventions, Swarna, 607 F. Supp. 2d at 517, acts that implicate a consular function but were not "performed in the exercise of the consular function in question" do not receive the protections of the Conventions. Ford, 834 F. Supp. at 75. The Court will need to decide these issues on a topic-by-topic, witness-by-witness basis.

On the present record, there are only three witnesses about whom the Kingdom asserts immunity under the Vienna Conventions, but who are not protected by the former employee or high-ranking official doctrines: Ahmed Al Qattan, Abdullah Al Awad, and Sami Al Ibrahim.[3] KSA Br., Appx. A. While the Court will address only these witnesses, the Court's analysis should provide helpful guidance to the parties regarding any other potential deponents.

### 1. Sami Al Ibrahim

The Court can give only limited guidance regarding Sami Al Ibrahim based on the descriptions contained in Plaintiffs' Witness List. Posing high-level questions to Al Ibrahim about Al Bayoumi's status at the Consulate likely does not infringe on Al Ibrahim's consular duties. See Kingdom of Morocco, 2019 WL 6724436, at *8 ("inquirie[s] into high-level, general questions about a witness's position at the Consulate . . . do not strike this Court as an inquiry about the 'exercise of [] functions' that is protected by Article 44."). However, questions about Al Bayoumi's visits and phone calls to the Consulate, without information showing that these activities did not involve acts in the exercise of a consular function, are likely precluded by the Conventions. See Pls. Witness List, at 3. For witnesses such as Al Ibrahim where certain topics of questioning may fall outside the scope of the witness's residual immunity, the witnesses must appear for deposition and objections should be made on a question-by-question basis.

### 2. Ahmed Al Qattan

The Court can offer some more guidance concerning Al Qattan. To the extent that Al Qattan interacted with Al Jarrah in the performance of routine embassy duties, questions

---

[3] The Court is not including in this category any witness whom the Court does not find to fall under the high-ranking official doctrine, but whom the Kingdom has not yet asked to sit for deposition voluntarily. Should any of those individuals agree to be deposed, the parties should conduct the deposition in accordance with the Vienna Conventions guidance provided in this section and raise any disputed issues to the Court at that time.

regarding Al Jarrah's "day-to-day work" at the Embassy and his "role in overseeing the KFM," Pls. Witness List at 1, implicate the diplomatic function of "[r]epresenting the sending State in the receiving State." VCDR art. 3(1)(a). Questions concerning ██████████████████████ ████████████████████████████████████ and questions concerning ████████████████ ██████████████████████████████ implicate the diplomatic function of "[p]rotecting in the receiving State the interests of the sending State['s] . . . nationals." VCDR art. 3(1)(b). Questions concerning ██████████████████████████████████████ ██████████████████████ implicate the diplomatic function of "[p]romoting friendly relations between the sending State and the receiving State, and developing their . . . cultural . . . relations." VCDR art. 3(1)(e). This analysis does not preclude Plaintiffs, however, from inquiring as to whether these acts were performed in the exercise of the diplomatic functions in question. Immunity only attaches if they were so performed. The Court notes, as an example, that documents such as a personal check made out by Al Salloum to the King Fahad Mosque, Pls. Ex. 39, represent acts that may not have been performed in the exercise of a consular function even if a consular function was implicated.

Plaintiffs also indicate that ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Questions concerning ███████████████████████████████████████ ████████████████████████ to the extent they concern actions performed in the exercise of an official function, are impermissible under Brzak, where the Court of Appeals found that "allegations involve[ing] personnel management decisions fall[] within the ambit of

the defendants' professional responsibilities." Brzak, 597 F.3d at 113. By contrast, officials'

false claims that Al Thumairy did not have a car registered with the state of California, when he

in fact had one contrary to State Department regulations, see Pls. Ex. 3, at State0034-37, do not

implicate a diplomatic function. See Kingdom of Morocco, 2008 WL 6724436, at *8 (finding

that regarding "conduct . . . plainly prohibited by the laws and regulations of the United States . .

. there can be no consular function that is implicated.") (internal quotation marks omitted).

In Kingdom of Morocco, the complaint alleged that two co-conspirators "hired several

Filipino nationals to work as domestic workers and farmhands, but instructed them to apply for

U.S. visas by falsely representing that they had been hired to work at the Consulate." 2008 WL

6724436, at *1. Plaintiffs' exhibits show that ███████████████████ Al Thumairy,

who himself stated that he only spent 60 or 70% of his time working at the Consulate. ████

████████████████████████████████████████████████████████

████████████ Pls. Ex. 108, at 3. While the fact patterns in Kingdom of Morocco and the

present case are not identical, in both cases false representations were made regarding the facts

surrounding individuals' diplomatic status. See Pls. Ex. 3, at State0022 (granting Al Thumairy

entry into the United States as a "consular employee" working as an "administrative officer").

Saudi Arabia has argued that Morocco is distinguishable because "[t]he U.S. never said

that Saudi Arabia was engaged in criminal activity in sending these people over with diplomatic

credentials." May 21, 2020 Hr'g Tr. 71:6-8. The question before the Court, however, is not

whether the underlying conduct was wrongful. See Swarna, 622 F.3d at 137. The Court need not

reach any judgment about whether criminal activity occurred to note that the State Department

made clear to Saudi Arabia that it disapproved of false representations regarding its diplomatic

personnel. See Pls. Ex. 3, at State0039 (informing Saudi Arabia that "if [Thumairy] is not

employed by the Consulate, a Notification of Termination should be submitted); Pls. Ex. 14
(State Department press statement that individuals "not engaged in the conduct of administrative
or other duties within the Embassy" are "not entitled to diplomatic status"); ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████ An act that
"takes advantage of the privileges of that position does not suddenly make it a consular
function." Cole, 717 F. Supp. at 323. Plaintiffs may therefore ask questions about false
representations made regarding the accreditation of Saudi propagators, as long as those questions
do not concern officials' decision-making performed in the exercise of official functions.

### 3. Abdullah Al Awad

Plaintiffs seek to ask Al Awad about the date that Al Bayoumi went to the Los Angeles
Consulate in early 2000. May 21, 2020 Hr'g Tr. 53:21-22. ████████████████

██████████████████████████████████████████████

██████████████████████ Saudi Arabia contends that a meeting to renew a passport
would indisputably involve the consular function of "issuing passports . . . to nationals of the
sending State." KSA Addendum, at 3; VCCR art. 5(d). The Court agrees that questions
concerning the issuance of a passport, including the fact of whether it was issued, are protected
by the Conventions. But Plaintiffs do not intend to ask anything about the passport itself. Asking
Al Awad to simply confirm the date of this meeting, which Judge Daniels explicitly referenced

in his opinion authorizing jurisdictional discovery, does not implicate any consular function. See March 28 Order, at 19 n.10. Plaintiffs are therefore permitted to ask Al Awad to confirm the date of the meeting, and to ask whether there were any other non-consular purposes for the visit.

## III.   Depositions of Current or Former High-Ranking Government Officials

### A.  Legal Standard

Saudi Arabia argues that 13 of the individuals on Plaintiffs' deposition list are current or former Ministers or heads of diplomatic or consular missions, only two of whom currently serve in positions at the rank of a cabinet-level minister and whose testimony is not precluded by Vienna Convention Immunities. KSA Br., at 8. The Kingdom argues that there are no exceptional circumstances warranting the deposition of these current or former high-ranking officials under the high-ranking official doctrine first established in United States v. Morgan, where the Supreme Court ruled that the Secretary of Agriculture should not be compelled to testify to respect "the integrity of the administrative process." 313 U.S. 409, 422 (1941).

The Court of Appeals for the Second Circuit established the relevant standard in Lederman v. NYC Dep't of Parks & Recreation, where it observed that courts have long held "that a high-ranking government official should not—absent exceptional circumstances—be deposed or called to testify regarding the reasons for taking official action. 731 F.3d 199, 203 (2d Cir. 2013). "High-ranking officials," the court explained, "are generally shielded from depositions because they have greater duties and time constraints than other witnesses. If courts did not limit these depositions, such officials would spend an inordinate amount of time tending to pending litigation." Id. (internal quotation marks and citation omitted). Joining several other courts of appeals, the Circuit held that "to depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition – for example, that the

official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." Id. The Court also takes into account whether Plaintiffs "identify with particularity the information they need[]." Id.

"Whether an official is a high-ranking government officer . . . is determined on a case-by-case basis." McNamee v. Massachusetts, No. 12-40050-FDS, 2012 WL 1665873, at *2 (D. Mass. May 10, 2012) (internal quotation marks omitted). "The doctrine is certainly not limited to constitutional officers of the United States." Id. This designation has generally only been applied, however, to government officials who are at the "apex" of their organization. Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives, 161 F. Supp. 3d 199, 250 (S.D.N.Y. 2015); see Bogan v. City of Boston, 489 F.3d 417, 423 (1st Cir. 2007) (Boston mayor is a high-ranking government official); In re United States, 197 F.3d 310, 316 (8th Cir. 1999) (Attorney General and Deputy Attorney General are high-ranking government officials).

"This doctrine applies to both current and former high-ranking officials." Moriah v. Bank of China Ltd., 72 F. Supp. 3d 437, 440 (S.D.N.Y. 2014). "Subjecting former officials decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service"; therefore, to have meaning, "the protections must continue upon the official's departure from public service." United States v. Wal-Mart Stores, No. 01-CV-152 (JPM), 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002). But, "[a]lthough the doctrine applies to former officials, the fact that they are not current high-ranking officials is a factor when considering

whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties." Moriah, 72 F. Supp. 3d at 440.

The Court will also apply this doctrine to foreign ministers serving in ranks equivalent to high-level U.S. government officials. The D.C. Circuit, in a jurisdictional analysis under the Foreign Sovereign Immunities Act, found foreign ministers to be the equivalent of U.S. cabinet-level officials for the purposes of the high-ranking officials doctrine. In re Papandreou, 139 F.3d 247, 254 (D.C. Cir. 1998) ("Principles of comity dictate that we accord the same respect to foreign officials as we do to our own"). "Thus, absent some showing of need for oral testimony from the Ministers," the D.C. Circuit found that the "district court erred in authorizing their depositions." Id.

### B. Application to Plaintiffs' Proposed Deponents

#### 1. Current Officials

##### a. Sheikh Abdulrahman Al Sudais

Saudi Arabia claims that Al Sudais is a current Minister of State, the equivalent of a cabinet-level official. KSA Br., at 8; KSA Ex.1, at 6. Al Sudais is currently the imam of the Great Mosque of Mecca. Id. Plaintiffs seek to depose Al Sudais because he attended the Grand Opening of the King Fahad Mosque ("KFM") on the orders of the King and visited the United States in 2000 and 2001, hosted by Al Sowailem and sponsored by Prince Abdelaziz. Pls. Witness List, at 9. In 2001, he visited the KFM with Al Sowailem and met with Al Thumairy, and Al Thumairy submitted a request for funding to Al Sudais for the KFM's Imam, who was Al Thumairy himself. Id.

Plaintiffs have not demonstrated that Al Sudais "has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less

burdensome or intrusive means." Lederman, 731 F.3d at 203. Neither Al Sudais's visit to the
KFM nor Al Thumairy's request for funding for the KFM's Imam have any bearing on whether
Al Thumairy or Al Bayoumi "took actions in 2000, at the direction of more senior Saudi
officials, to provide assistance to" the 9/11 hijackers." ECF No. 3946, at 23. To the extent that Al
Thumairy's funding request is relevant at all, that information can be obtained through less
burdensome means. See, e.g., Raymond v. City of New York, No. 15-CV-6885 (LTS) (SLC),
2020 WL 1067482, at *6 (S.D.N.Y.) (finding depositions of former Police Commissioners to be
improper where the same information could be obtained by deposing lower level supervisors).

### b. Saleh Bin Abdulaziz Al Ash-Shaikh

Saudi Arabia claims that Al Ash-Shaikh is a current Minister of State, the equivalent of a
cabinet-level position. KSA Br., at 8; KSA Ex. 1, at 3. Al Ash-Shaikh was the Minister of
Islamic Affairs ("MOIA") during the relevant time period. Plaintiffs allege that he approved the
extension of Al Thumairy's assignment to the KFM and Al Thumairy's promotion in 2000, and
that he was responsible for implementing the pre-9/11 Saudi practice of obtaining diplomatic
status for MOIA's non-diplomatic religious officials inside the United States, including Al
Thumairy. Pls. Witness List, at 4. Plaintiffs allege that Al Ash-Shaikh has knowledge of the
elements within the MOIA and other Saudi government agencies that supported al Qaeda before
9/11, and he took an active role in the post 9/11 review of Al Thumairy's role in providing
support to the hijackers. Id. Finally, Plaintiffs also allege that Al Ash-Shaikh helped found the Al
Haramain Islamic Foundation. Id.

Plaintiffs' exhibits support their contention that Al Ash-Shaikh may have unique first-
hand knowledge. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ As Minister of Islamic Affairs, the head of the organization most

directly implicated in Plaintiffs' allegations, it is possible that only Al Ash-Shaikh "can speak to"

"the ratification of [Thumairy's] conduct." May 21, 2020 Hr'g Tr. 121:18-20. It is likely, as

such, that Al Ash-Shaikh "has unique first-hand knowledge related to the litigated claims or that

the necessary information cannot be obtained through other, less burdensome or intrusive

means." Lederman, 731 F.3d at 203. The Court accordingly finds that Al Ash-Shaikh is not

protected by the high-ranking officials privilege.

### c. Walid Bukhari and Saad Al Jabreen

Bukhari is a current Ambassador for Saudi Arabia, and Al Jabreen is a current Consul

General for Saudi Arabia. KSA Ex. 1, at 3. Plaintiffs identify Bukhari as a former visa employee

whom Al Thumairy worked with on a regular basis at the Consulate, and Al Jabreen as someone

whom Al Thumairy worked closely with at the Consulate and ███████████████████████

███████████ Pls. Witness List, at 3, 2. In Lederman, the Court found that Plaintiffs "did not

identify with particularity the information they needed, nor did they contend that [the high-

ranking officials] had first-hand knowledge about the litigated claims or that the relevant

information could not be obtained elsewhere." Lederman, 731 F.3d at 203. On the record before

the Court, Plaintiffs have not presented exceptional circumstances to justify the depositions of

Bukhari or Al Jabreen.

### d. Ahmed Bin Abdulaziz Al Qattan

Saudi Arabia claims that Al Qattan is currently a Minister of State. KSA Ex. 1, at 2. Plaintiffs claim that Al Qattan, as the former Embassy Chief of Staff, personally oversaw much of Al Jarrah's day-to-day work, and has personal knowledge of Al Jarrah's role regarding the KFM, Al Thumairy, and Al Muhanna. Pls. Witness List, at 3. Plaintiffs also claim that Al Qattan was the conduit inside the Embassy for communications with Prince Abdulaziz regarding directions and funding for the KFM and Al Thumairy. Id. Plaintiffs ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ These exhibits show that Al Qattan likely has unique first-hand knowledge regarding some of Al Jarrah and Al Thumairy's relevant pre-9/11 activities and any post-9/11 ratification of their conduct. This discovery is particularly relevant because Saudi Arabia's document discovery regarding Al Jarrah produced no documents from the year 2000. See Pls. Second Motion to Compel, Dated January 22, 2020, at 11. Where a court finds that the relevant government official "has unique first-hand knowledge related to the litigated claims, it need not make a separate finding that the necessary information cannot be obtained through other, less burdensome or intrusive means." New York v. United States Dep't of Commerce, 339 F. Supp. 3d 144, 152 (quoting Lederman, 731 F.3d at 202) (internal quotation marks omitted).

The Court finds that Al Qattan is not protected under the high-ranking official doctrine. Al Qattan's deposition, however, should be limited to topics about which the Court has found, above, that he does not retain residual immunity under the Vienna Conventions.

### 2. Former Officials

When applying the high-ranking official doctrine to former officials, the Court accords less weigh to whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties. See Moriah, 72 F. Supp. 3d at 440. The Court also finds the policy reasoning behind the doctrine, i.e. that participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service, see Wal-Mart Stores, 2002 WL 562301, at *3, to carry less weight in the context of foreign governments, where the Court has little insight into the processes and incentives behind entry into public service. Where, as here, there is also no likelihood of serial abusive litigation, the Court finds that first-hand knowledge related to the litigated claims to be sufficient, and Lederman's "exceptional circumstances" test to be met where the litigated claims are of high public interest and there are limited other opportunities for discovery.

The Court understands that with the exception of Ali Bin Abdulrahman Al Khalaf, the following witnesses have not informed the Kingdom whether they will voluntarily sit for a deposition.[4] Accordingly, the Court will assess whether the following witnesses properly fall under the high-ranking official doctrine, with the understanding that the Kingdom will ask any witnesses whom the Court finds to not be protected by that doctrine to voluntarily sit for a deposition. The Court will not assess whether Al Khalaf's testimony is barred under the high-

---

[4] While Al Awad has also not informed the Kingdom whether he will sit for deposition voluntarily, the Court orders that he be produced for deposition pursuant to the analysis above.

ranking official doctrine, because Al Khalaf has affirmatively refused to voluntarily testify, and the Court did not find, above, that Khalaf may be compelled to appear as a managing agent subject to deposition by notice. See KSA Ex. 1, at 5. For any witness below whom the Court finds is not protected by the high-ranking official doctrine but whose testimony may be protected by the Vienna Conventions, the Kingdom should request their deposition voluntarily and any questioning should proceed in accordance with the Vienna Conventions guidelines set out above.

### a. Prince Bandar Bin Sultan Bin Abdulaziz Al Saud

Plaintiffs argue that Prince Bandar, the former Saudi Ambassador, oversaw the work of Al Thumairy and Al Jarrah and has unique personal knowledge of the roles they were assigned by the Kingdom. Pls. Witness List, at 2; see



Plaintiffs also allege that Prince Bandar has direct personal knowledge about the decision of the Ministry of Foreign Affairs to provide diplomatic cover for propagators working in the United States. Pls. Witness at 2;

While Saudi Arabia persuasively argues that these documents do not suggest that Prince Bandar oversaw the work of Al Jarrah and Al Thumairy, KSA Addendum at 2-3, Plaintiffs' exhibits nonetheless indicate that Prince Bandar likely has first-hand knowledge, as the Ambassador at the time these events transpired, into the role that Al Thumairy was assigned by the Kingdom and the diplomatic cover provided to the propagators. Accordingly, Plaintiffs have

met their required burden under <u>Lederman</u> as applied by the Court to former officials to show "exceptional circumstances" justifying Prince Bandar's deposition.

### b.  Abdullah Al Awad

Plaintiffs allege that Al Awad, the former Deputy Consul in Los Angeles, was the representative of the Islamic Affairs department at the Consulate and reported to Al Jarrah. Pls. Witness List, at 2. Plaintiffs also allege that Al Awad is aware of Al Bayoumi's status at the Consulate and Al Bayoumi's visits and phone calls in January-February 2000. <u>Id.</u>;



Plaintiffs further allege that

Al Awad,                          and Deputy Counsel, likely has first-hand knowledge regarding Al Bayoumi's status and role, satisfying the <u>Lederman</u> test as applied by the Court to former officials. For the permissible contours of Al Awad's deposition under the Vienna Conventions, see the analysis at page 23, <u>supra</u>.

### c.  Mohammed Al Salloum

Al Salloum is the former Consul General in Los Angeles. Al Thumairy told that 9/11 Commission that he reported directly to Al Salloum. <u>See</u> Pls. Ex. 108, at 3. Al Salloum received and distributed the Kingdom's funding for the KFM and provided regular reports about the KFM to Prince Abdulaziz. Pls. Witness List, at 2; Pls. Exs. 39, 40 (showing that Al Salloum sent a

personal check to the KFM in the amount of $12,000 "to deliver the employees accrued salaries until the amount is received from the office" of Prince Abdulaziz, on the day that Al Bayoumi visited the Consulate and the day before Al Bayoumi first met with the hijackers); ███████████ ███████████████████████████████████████████████████████ Saudi Arabia contends that the Court has ruled the funding of the Mosque to be "irrelevant." KSA Addendum, at 3. But the Court only stated that "the evidence [regarding Prince Abdulaziz's involvement in the Mosque's funding] is too tangential to Plaintiffs' allegations to *warrant a broad search for documents*." July 22, 2019 Opinion & Order on Plaintiffs' Motion to Compel ("MTC Order"), at 22 (emphasis added). The Court did not find the evidence to be irrelevant entirely.

Plaintiffs also claim that Al Salloum personally met with the State Department in October 2000 to discuss Al Thumairy's status at the Consulate and Al Thumairy's violation of State Department rules barring him from driving a private vehicle without diplomatic license plates. Pls. Witness List, at 2; Pls. Ex. 3, at State038 and State039 (October 4, 2000 letter from the State Department to Al Salloum inquiring about Al Thumairy's position). Plaintiffs' concerns regarding the timing of Al Salloum's personal payment to the KFM, and Al Salloum's personal involvement with the State Department regarding Al Thumairy in 2000, suggest that Al Salloum has unique first-hand knowledge sufficient to satisfy the <u>Lederman</u> test as applied to former officials.

### d.  Prince Abdulaziz Bin Fahad Bin Abdulaziz

Prince Abdulaziz is a former Minister of State who was, according to Plaintiffs, integrally involved in the creation, funding, management, and operation of the KFM. Pls. Witness List, at 7. Plaintiffs also allege that ██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ The Court has found

that "Plaintiffs are entitled to records concerning Thumairy's employment and compensation *vis
a vis* the Saudi government." MTC Order, at 25. The Court has also granted Plaintiffs' motion to

compel the Kingdom to "produce documents from the government Offices of Prince Abdulaziz

regarding his assignments and compensation of Thumairy." May 27, 2020 Opinion & Order, at

6. Plaintiffs may obtain documents relevant to this issue from the Kingdom. But as Prince

Abdulaziz is a former official, the Court gives less weight to whether the information can be

obtained through less burdensome means. Plaintiffs have therefore satisfied their <u>Lederman</u>

burden by showing that Prince Abdulaziz likely has first-hand knowledge regarding the context

of this ████████████ to Thumairy.

### e. Mazyed Ibrahim Al Mazyed

Al Mazyed was the Cultural Attaché in the United States. Plaintiffs allege that at Prince

Bandar's request, Al Mazyed was assigned after 9/11 to respond to questions about Al

Bayoumi's role in the United States, and that Al Mazyed has knowledge on that subject. Pls.

Witness List, at 1; ██████████████████████████████████████

██████████████████████████ Plaintiffs further allege that Al Mazyed supervised

the Saudi Student's Clubs sponsored by the Saudi government that were regularly attended by Al

Thumairy and Al Bayoumi and were used by the Saudi government to monitor the activities of

its citizens in the United States. <u>Id.</u>; ██████████████████████████████

██████████████████████████████████ A cultural attaché is not

a cabinet-level official with similar rank to a Minister of State. Accordingly, the Court does not

find that the high-ranking official doctrine appropriately applies to Al Mazyed. In any event,

Plaintiffs' evidence suggests that Mazyed likely has first-hand knowledge regarding Bayoumi's role in the United States.

### f. Abdurrahman Bin Gurman Al Shahri and Mohammed Bin Faiz Al Sharif

Plaintiffs allege that Al Shahri and Al Sharif were members of the Royal Committee established after 9/11 to investigate and establish controls over the secondment of personnel from the MOIA to Embassies and Consulates following allegations of support provided by MOIA personnel for al Qaeda and other terror groups. Pls. Witness List, at 7-8. The Court has found the Royal Committee's 2003 meeting to be relevant to the jurisdictional inquiry because the Committee "involves Saudi Arabia's review and potential ratification of Thumairy's work." MTC Order, at 33. In light of the Court's prior findings, and the refusal of other members of the Royal Committee to sit for deposition, see KSA Ex. 1, at 6, the Court finds that Al Shahri and Al Sharif 's testimony is not precluded by the high-ranking official doctrine.

## IV. Depositions of Individuals Beyond the Scope of Jurisdictional Discovery

### A. Depositions of Individuals About Whom the Court Denied Document Discovery

#### a. Adel Al Sadhan, Mutaeb Al Sudairy, and Sharif Batikhi

Saudi Arabia contends that the depositions of Al Sadhan, Al Sudairy, and Batikhi are precluded by the Court's prior rulings denying document discovery. ECF No. 4261, at 2; January 3 Order, at 7-12. Regarding Al Sadhan and Al Sudairy, the Court found that "[g]iven the Court's obligation to conduct jurisdictional discovery narrowly . . . Plaintiffs' supplemental document requests regarding Sadhan and Sudairy are inappropriate." January 3 Order, at 10. Regarding Batikhi, the Court found that it would "not order broad, untailored discovery . . . in these circumstances." Id., at 12. In the Court's May 7, 2020 Opinion & Order ("May 7 Order") considering Plaintiffs' motion for reconsideration regarding their document discovery requests,

the Court again found that "Plaintiffs have not established that discovery regarding Sadhan and Sudairy is within the limits of this Court's jurisdictional inquiry," but noted that "this holding does not mean that Plaintiffs may not ask questions during its upcoming depositions of Saudi government officials regarding Sadhan and Sudairy." May 7 Order, at 6.

The fact that the Court found that Plaintiffs had not established that document discovery was warranted regarding these officials does not mean that the Court precluded their depositions. The depositions of other individuals regarding Al Sadhan and Al Sudairy, such as Prince Mohammed Bin Salman Bin Mohammed Al Saud, are also not precluded by this Court's prior rulings. Pls. Witness List, at 9. The standard of relevance for depositions would be impossibly high if only those about whom broad document discovery was warranted could be deposed. The Court therefore DENIES the Kingdom's motion regarding Al Sadhan, Al Sudairy, Batikhi, and Al Saud.

### b. Propagators in California from 1998-2001

Plaintiffs also seek to depose "[a]ny propagator employed by Saudi Arabia who worked inside the State of California from 1998-2001" regarding, broadly, their scope of employment, chain of command, day-to-day work, and oversight of Thumairy, Bayoumi, Muhanna, Sadhan, Sudairy, and Batikhi, as well as involvement "in the plot to provide substantial assistance to the 9/11 hijackers." Pls. Witness List, at 6. Saudi Arabia contends that these proposed depositions are precluded by the Court's opinions denying discovery relating to Thumairy's supervision of California propagators. KSA Br., at 10; MTC Order, at 24-25. The Court cannot assess Plaintiffs' request in the absence of any information regarding specific propagators whom Plaintiffs seek to depose, and the reasons Plaintiffs seek to depose those individuals. Plaintiffs are welcome to identify and present individual propagators to the Court for proposed depositions.

On the present record, the Court reaffirms its opinion that even if Al Thumairy may have supervised Saudi propagators working in California, that "does not mean that Thumairy directed that individual to aid the 9/11 hijackers," and denies Plaintiffs' request on those grounds. Id., at 24.

### B. Depositions of Individuals Regarding Post 9/11 Investigative Material

#### a. "Col. Ahmed" and "Major Khalid" (Mahabith)

Saudi Arabia argues that the depositions of "Col. Ahmed" and "Major Khalid" are precluded by the Court's prior rulings denying discovery of post-9/11 investigative material, including information about the 9/11 Commission interviews of Al Bayoumi and Al Thumairy. KSA Br., at 10. Plaintiffs argue that "Col. Ahmed" and "Major Khalid," who attended the 9/11 Commission Interviews of Al Bayoumi and Al Thumairy, respectively, must be deposed to confirm the statements Al Bayoumi and Al Thumairy made during their interviews. Pounian Decl. ¶ 143. Plaintiffs claim that the reports of the interviews contain statements that are contradicted by other documents or other witness statements, and the Kingdom has refused to produce the transcripts or recordings of the interviews to confirm the statements of Al Bayoumi and Al Thumairy. Id.

The Court previously denied Plaintiffs' requests for Saudi Arabia's "recordings, transcripts, transcriptions, and notes" regarding the 9/11 Commission interviews of Al Bayoumi and Thumairy, finding that Plaintiffs "have already obtained detailed memoranda from the 9/11 Commission," and the burden of production is high because "Plaintiffs seek access to a foreign sovereign's intelligence files." MTC Order, at 48-49. Those concerns apply equally here, if not more so, because Plaintiffs seek access to a foreign sovereign's intelligence officials themselves, whose identities are protected. The Court reiterates its finding that Plaintiffs have already

received detailed memoranda from the 9/11 Commission, and Plaintiffs can raise any contradictions to Al Bayoumi and Al Thumairy themselves.

### b. Osama Bin Saud Al Wahbi and Saad Bin Nansh Al Omari

Al Wahbi, of the Ministry of Interior, and Al Omari, of the Presidency of General Intelligence, were, according to Plaintiffs, members of the Royal Committee. To the extent that Plaintiffs obtain access to other members of the Royal Committee, such as Al Shahri and Al Sharif, the Court finds the burden of the depositions of Al Wahbi and Al Omari to outweigh their value under Federal Rule of Civil Procedure 26(b)(1) and international comity. But if Plaintiffs do not have access to any other Royal Committee members, the Court authorizes the depositions of Al Wahbi and Al Omari solely regarding the Royal Committee on the grounds that their testimony regarding that external body, and not the work of their own ministries, is equivalent to the production of documents held by, but not created by, a foreign sovereign's intelligence agency. See ECF No. 4015, at 20:1-8.

## V.   Depositions of "Unknown" Employees

### A. Alp Karli

Plaintiffs contend that Karli is a contract manager who implemented the PCA's decisions regarding Al Bayoumi's secondments, renewals, and pay scale. Pls. Witness List, at 8. Plaintiffs further contend that Karli was the only person identified by Saudi Arabia in its interrogatories as Al Bayoumi's supervisor. Id. Saudi Arabia contends that, based on a reasonable investigation, Karli was not an employee of Saudi Arabia, and that Saudi Arabia does not have contact information for Mr. Karli. KSA Ex. 1, at 5. The record suggests, however, that Saudi Arabia's conclusions represent its interpretation of the evidence, not the results of a properly conducted investigation.

The Kingdom is correct that Karli signed a document that claimed that he was a representative of Dallah Avco. Pls. Ex. 83, at DA090. But Dallah Avco's Chairman subsequently filed a letter claiming that this was inaccurate, and that Karli was in fact an employee of the Kingdom. Id., at DA092-093. The Kingdom contends that the employees on the contract for which Dallah Avco was the contractor at the time were paid by Dallah Avco, citing Plaintiffs' Exhibit 88, at 603, but that document is a PCA form stating that the pay scale is "per the instructions of Director General, PCA/AE." Saudi Arabia claims, without evidence, that the PCA "did not regard" these contract employees "as PCA employees." KSA Addendum, at 8. Accordingly, the Court orders the Kingdom to undertake additional steps to determine the identity of Karli's employer and inquire whether Karli will sit for deposition.

### B. Faisal Al Muhanna

Plaintiffs contend that Al Muhanna was an employee and friend of Al Thumairy, who has eyewitness knowledge of Al Thumairy's day to day activities for the Kingdom because he lived with Al Thumairy in three different locations in Los Angeles in 1999-2001. Pls. Witness List, at 1. Saudi Arabia claimed it had been unable to identify Al Muhanna and agreed to undertake additional efforts to locate him. KSA Ex. 1, at 2; May 21, 2020 Hr'g Tr. 139:10-16. The Kingdom subsequently located Al Muhanna, and he has agreed to appear for a deposition. ECF No. 6323.

### CONCLUSION

In summary, former employees who decline to be deposed voluntarily need not appear for a deposition, with the exceptions of Abdullah Al Jaithen and Abdullah Al Awad. The consular and diplomatic officials for whom Saudi Arabia asserts the protections of the Vienna Conventions retain residual immunity, but only as to activities that were conducted in

furtherance of the witnesses' official duties. Such witnesses may be asked questions about activities that were not undertaken in furtherance of their official duties, as described above, and objections may be lodged on a question by question basis where the Kingdom believes such activity is protected by the Conventions. The Court addresses the depositions of witnesses over whom the Kingdom asserts the high-ranking official doctrine on an official-by-official basis as outlined above. The Court similarly addresses the depositions of witnesses whom the Kingdom claims are beyond the scope of jurisdictional discovery on an official-by-official basis.

Within 14 days of this Order, the parties are directed to meet and confer and present joint or separate proposals to the Court regarding the sequencing and logistics of the depositions subject to this Order. See ECF No. 6204. The Court reiterates its expectation that the parties move forward immediately with non-party and document authentication depositions not subject to this Order. See id. Accordingly, the Court DENIES without prejudice Saudi Arabia's letter motion for a scheduling order. The Clerk of Court is respectfully directed to terminate the gavel at ECF No. 6398.

The Court GRANTS in part and DENIES in part Saudi Arabia's motion for a protective order, and GRANTS in part and DENIES in part Plaintiffs' cross-motion to compel. This Order is restricted to the following case participants: Plaintiffs' Executive Committees, Kingdom of Saudi Arabia, Dallah Avco Trans Arabia, and the Federal Bureau of Investigation.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:        August 27, 2020
              New York, New York

40