# EXHIBIT C



# SUPPLEMENTAL REPORT FROM THE SPECIAL MASTER

# UNITED STATES VICTIMS OF STATE SPONSORED TERRORISM FUND

# AUGUST 2017

KENNETH R. FEINBERG

SPECIAL MASTER

# SUPPLEMENTAL REPORT FROM THE SPECIAL MASTER

# UNITED STATES VICTIMS OF STATE SPONSORED TERRORISM FUND

# AUGUST 2017

**1.   INTRODUCTION**

The Justice for United States Victims of State Sponsored Terrorism Act, codified at 42 U.S.C. § 10609 (2015) (the "Act"), established the U.S. Victims of State Sponsored Terrorism Fund (the "Fund"). On May 17, 2016, the Attorney General appointed Kenneth R. Feinberg, Esq., as the Special Master to administer the Fund with the assistance of the Money Laundering and Asset Recovery Section ("MLARS"), Criminal Division, United States Department of Justice.

In January 2017, the Special Master provided to Congress a report providing an overview of the Fund's establishment and operations. The Report, which has also been made available on the Fund's website, included all available information which the Act required the Special Master to provide Congress within 30 days of authorizing initial payments, namely: (1) an explanation of the procedures for filing and processing of applications for compensation from the Fund, and (2) an analysis of the payments made to eligible claimants from the Fund and the amount of outstanding eligible claims.[1] *See* 42 U.S.C. § 10609(i). The Special Master is supplementing the January 2017 report following the distribution of the initial payments.

**2.   OVERVIEW OF THE FUND**

The Act established the Fund as well as funding for it, including an appropriation of $1.025 billion for the Fund in FY 2017. 42 U.S.C. § 10609(e)(5). In addition, the Act mandates that certain forfeiture proceeds, penalties, and fines be deposited into the Fund if "forfeited or paid to the United States after the date of [the Act's] enactment." *Id.* at § 10609(e)(2). These funds are to come from civil and criminal matters involving prohibited transactions with state sponsors of terrorism. *Id*. The Act further provides that the Fund will make its last obligations no later than January 2, 2026. 42 U.S.C. § 10609(e)(6). Thus, the Fund may continue to accumulate funds over its ten-year life.

The Act also set forth specific requirements which must be met in order to receive compensation from the Fund. Under 42 U.S.C. § 10609(c), an eligible claimant is statutorily limited to:

---

[1] http://www.usvsst.com/docs/USVSST%20Fund%20Congressional%20Report%201-9-17.pdf.

(1) a U.S. person, as defined in 42 U.S.C. § 10609(j)(8),[2] with a final judgment issued by a United States district court under state or federal law against a state sponsor of terrorism and arising from an act of international terrorism, for which the foreign state was found not immune under provisions of the Foreign Sovereign Immunities Act, codified at 28 U.S.C. § 1605A or § 1605(a)(7) (as such section was in effect on January 27, 2008);

(2) a U.S. person, as defined in in 42 U.S.C. § 10609(j)(8), who was taken and held hostage from the United States embassy in Tehran, Iran, from the period beginning November 4, 1979, and ending January 20, 1981, or the spouse and child of that U.S. person at that time, and who is also identified as a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia; or

(3) the personal representative of a deceased individual in either of those two categories.

Under the Act, payments from the Fund are determined using compensatory judgment amounts for judgment holders, and statutorily determined amounts for Iran hostages and their families.[3] The payments are distributed on a pro rata basis and calculated in accordance with statutory limitations, including consideration of compensation claimants have already received from sources other than this Fund. *See* 42 U.S.C. § 10609(d).

On May 17, 2016, the Attorney General appointed Kenneth R. Feinberg, Esq., as the Special Master to administer the Fund with the assistance of MLARS.

The Act required the Special Master to publish a notice in the Federal Register (the "Notice") of the eligibility requirements and application procedures within 60 days after his appointment, and exempted the Notice from the public notice and comment requirements of 5 U.S.C. § 553. *See* 42 U.S.C. § 10609(b). Although not required, in an effort to solicit public input and provide transparency, the Special Master posted draft procedures and frequently asked questions ("FAQs") on a website, and invited input from the public from June 17, 2016 through June 29, 2016. Moreover, on June 24, 2016 and June 29, 2016, the Special Master hosted telephonic town hall meeting conference calls to provide potential claimants, their lawyers, and the public with the opportunity to ask questions of the Special Master concerning the Act. During the town hall conference calls, which were open to anyone to participate, the Special Master discussed the draft eligibility requirements, application procedures, and FAQs. In

---

[2] The statute does not limit eligibility to U.S. citizens, nor does the Foreign Sovereign Immunities Act ("FSIA"). Certain foreign nationals such as non-U.S. citizens who serve as U.S. government employees or contractors can bring causes of action under the FSIA. The referenced subsection of Act provides: "The term 'United States person' means a natural person who has suffered an injury arising from the actions of a foreign state for which the foreign state has been determined not to be immune from the jurisdiction of the courts of the United States under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28 or is eligible to make a claim under subsection (c)(2)(B) or subsection (c)(2)(C)." *Id.* at § 10609 (j)(8).

[3] The Act prescribes the eligible claim amount as the sum total of $10,000 per day for each day that a U.S. person was taken and held hostage from the United States embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981. 42 U.S.C. § 10609(c)(2)(B). Based on that 444-day period, the eligible award amount is $4,440,000. For each spouse and each child of a former hostage, the eligible claim amount is set as $600,000. *Id.* at § 10609(c)(2)(C).

addition, the Special Master met personally with victims' advocates. After these efforts, and in accordance with the statutory deadline, the Notice and a required accompanying System of Records Notice ("SORN") were published in the Federal Register on July 14, 2016. *See* Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45535; and Privacy Act of 1974; Systems of Records, 81 Fed. Reg. 45539 (July 14, 2016).

The Fund began accepting applications on July 14, 2016, the Notice's publication date. Pursuant to the Act, existing judgment-holder claimants and Iran hostages and their spouses and children had 90 days after publication of the Notice, or until October 12, 2016, to file applications. 42 U.S.C. § 10609(c)(3)(A). Claimants who obtained judgments after July 14, 2016 have 90 days from the date they obtain the judgment to file. Detailed information regarding application procedures is provided in section 3(a) of this Report.

The Act required that the Special Master authorize initial payments on eligible claims within one year of enactment, *i.e.,* by December 19, 2016.[4] 42 U.S.C. § 10609(d)(2). To meet this statutory deadline, yet also include as many claimants as possible among those who receive initial payments, the Special Master accepted applications through December 1, 2016. Claimants who filed after December 1, 2016 did not receive initial payments, but, if eligible, may receive payments in future distributions over the term of the Fund.

From July 14, 2016 to December 1, 2016, the Fund received a total of 2,883 applications. The Special Master determined that 2,332 of them (81 percent) were eligible claims. The Special Master denied 539 applications (19 percent). Details regarding the eligible and denied claims are provided in section 4, *infra.* The Special Master could not issue decisions on 12 applications because the claimants failed to respond timely to the Notices of Deficiencies that were issued.

By December 12, 2016, the Special Master issued written eligibility decisions to all claimants and, if applicable, their attorneys. Eligible claimants were notified that they were authorized to receive an initial payment, including the amount of compensatory damages, and, if applicable, the amount of receipts from sources other than the Fund, to be used in the calculation of initial payments. Claimants whose applications were denied received notice of the reason for the denial. Claimants whose applications were denied had 30 days from receipt of this initial decision to request a hearing. 42 U.S.C. § 10609(b)(4). The Special Master or his designee conducted the hearing, and issued a final decision thereafter.

Payments from the Fund are generally pro rata, and thus are dependent on other claimants' awards. Moreover, payments are subject to significant additional limitations, as described more fully in section 3(d), *infra,* some of which also require calculations based on other claimants' information. Therefore, awards for all those eligible for initial payments had to be calculated together.

The details of the Fund's methodology are articulated in the *Fund Payment Calculation Explanation*, which was made available on the Fund's website in February 2017.[5] In general, the

---

[4] One year from enactment was December 18, 2016, a Sunday, hence the adjusted deadline of December 19, 2016. In any event, the Special Master authorized all initial payments by December 12, 2016.
[5] *See* http://www.usvsst.com/docs/PAYMENT_CALCULATION_EXPLANATION_Final.pdf.

3

Fund computed the "payment percentage," which is the amount of funds available to pay to all eligible claimants divided by the compensatory damages after accounting for the statutory limitations and compensation from sources other than this Fund. The Fund allocated $1,104,450,000 for the initial payments, which included the $1.025 billion dollars appropriated by the Act and additional funds received from certain qualifying cases. For the initial payments, the payment percentage was 13.66%.

Beginning on March 10, 2017, the Fund began issuing initial payments on a rolling basis. As explained *infra* the Fund paid $1,040,902,501.89 to eligible claimants.

The following sections provide the specific information required for reporting to Congress as set forth in the Act.

**3. PROCEDURES FOR FILING AND PROCESSING OF APPLICATIONS FOR COMPENSATION**

### a. Application Process

The claimant has the burden of establishing eligibility for payment by the Fund under the Act. Each claimant must submit his or her own application, and, if the claimant is the estate of a deceased individual, provide the requisite information for the Personal Representative of the decedent.

The Personal Representative for a deceased claimant is normally the individual appointed by a court of competent jurisdiction as the Personal Representative of the deceased claimant's will or estate, executor of the deceased claimant's will, or the Administrator of the deceased claimant's estate. Accordingly, the Personal Representative provides copies of relevant legal documents, such as court orders, letters testamentary, letters of administration, or similar documentation. Sufficient documentation must be submitted for those Personal Representatives appointed under foreign law.

Application forms are made available on the Fund's website at www.usvsst.com, and may be requested in writing or by phone to the claims administrator. Similarly, applications to the Fund may be submitted online, by email, by mail, or via toll-free facsimile. If claimants are represented by counsel, counsel may submit their applications.

Claimants with final judgments obtained before July 14, 2016, and Iran hostages and their spouses and children, must have filed their applications by October 12, 2016. Claimants with final judgments obtained on or after July 14, 2016, must file no later than 90 days after the date of obtaining a final judgment.

### b. Application Requirements

#### i. Iran Hostages and Their Spouses and Children

A claimant who sought to establish eligibility for payment because he or she was taken and held hostage from the United States embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981, must have submitted: (1) verification of the

date on which he or she was taken hostage from the United States embassy in Iran, (2) verification of the date on which he or she was released, and (3) verification that he or she is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia.

If a claimant sought to establish eligibility for payment as the spouse of an individual who was held hostage in Tehran, Iran, during the relevant period, the application must have included a copy of a marriage certificate showing the date of marriage and an affirmation that the marriage continued through January 20, 1981, as well as verification that the claimant is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia. Likewise, if a claimant sought to establish eligibility for payment as the child of an individual who was held hostage in Tehran, Iran, during the relevant period, the application must have included a copy of a birth certificate or adoption decree showing a date of birth or adoption prior to January 20, 1981, as well as verification that the claimant is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia.

###      ii.    Judgment Holders

A claimant seeking to establish eligibility for payment on the basis of a final judgment issued by a United States district court under state or federal law against a state sponsor of terrorism and arising from an act of international terrorism, for which the foreign state was found not immune under provisions of the FSIA, must submit, among other documents, a copy of the final judgment, as well as a list identifying any immediate family member(s) of the claimant who is/are also identified in the final judgment. Claimants with a final judgment against an instrumentality of a state sponsor of terrorism are eligible for compensation from the Fund; however, claimants with a final judgment solely against a terrorist group or organization, and not against a state sponsor of terrorism, are not.

The Act requires that all claimants identify compensation from any source other than the Fund that the claimant or the claimant's beneficiaries have received or are entitled or scheduled to receive as a result of the act of international terrorism that gave rise to the final judgment. The claimant must provide all relevant information and documentation in his or her application and update the Fund about any additional amounts received after filing the application.

###      iii.   Parties in Specified Litigation

The Act includes special provisions for judgment creditors in *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.), and Settling Judgment Creditors as identified in the order dated May 27, 2014, in the proceedings captioned *In Re 650 Fifth Avenue & Related Properties*, No. 08 Civ. 10934 (S.D.N.Y.). These claimants had three options with respect to filing a claim with the Fund:

> First, they could choose *not* to participate in the Fund. This would mean they do not file any application nor receive any compensation from the Fund.
>
> Second, they could elect to participate in the Fund. Like other judgment-holder claimants, they filed applications and if found eligible, received compensation from the

5

Fund on the same terms as other eligible claimants. To elect to participate, however, these particular claimants had additional requirements. They had to provide written notice in accordance with the Act to the Attorney General, the Special Master, and the Chief Judge of the United States District Court for the Southern District of New York. Moreover, electing to participate in the Fund assigned their interests in the above-referenced proceedings to the Fund.

Third, these claimants could file applications for conditional payment. They filed applications like other claimants, but the Special Master allocated and withheld payments to these eligible claimants pending rulings in the above-referenced proceedings. *See* 42 U.S.C. § 10609(e)(2)(B)(iv)(I). These amounts will be held in the Fund until those rulings.

A total of 29 claimants, all of whom are Settling Judgment Creditors in the *In Re 650 Fifth Avenue & Related Properties* proceedings, elected to participate in the Fund. By electing to participate in the Fund, these claimants irrevocably assigned to the Fund all rights, title, and interest to such person's claims to the assets at issue in such proceedings. 42 U.S.C. § 10609(e)(2)(B)(iii). On June 29, 2017, a verdict was reached in favor of plaintiffs in *In Re 650 Fifth Avenue. See Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 1:08-cv-10934-KBF, Doc. 1895. The Fund will pursue the interests in that matter of the 29 *In Re 650 Fifth Avenue* Settling Judgment Creditors who elected to participate in the Fund for the benefit of the Fund, recognizing the possibility of appeals and time necessary to dispose of the subject properties.

A total of 184 claimants filed applications for conditional payment, four (4) of which were denied as ineligible. Of those 180 eligible claimants who filed applications for conditional payment, 78 were *Peterson* judgment creditors and 102 were *In Re 650 Fifth Avenue* Settling Judgment Creditors.[6]

The Act provides that if a final judgment is entered in favor of plaintiffs in *Peterson* and funds are distributed, the payments allocated to claimants who applied for a conditional payment shall be considered void, and any funds previously allocated to such conditional payments shall be made available and distributed to all other eligible claimants. 42 U.S.C. § 10609(e)(2)(B)(iv)(II). A final judgment in favor of plaintiffs in *Peterson* was entered, appealed to the United States Court of Appeals for the Second Circuit, and ultimately affirmed by the United States Supreme Court on April 20, 2016. *See Bank Markazi aka Central Bank of Iran v. Peterson*, 578 U.S. __ (2016). Distributions to the judgment creditor plaintiffs in *Peterson* commenced on October 19, 2016. *Peterson v. Iran*, 10 Civ. 4518, Doc. 706. Accordingly, these conditional claimants did not receive award payments, nor were they included in the award calculations.

---

[6] Of these 102, 31 were individuals who had final judgments but had also received an award or an award determination under VCF1, as described in 42 U.S.C. § 10609(d)(3)(A)(ii)(III), and discussed in section (b)(iv), *infra*. Since they were not eligible to receive compensation from the Fund, they were not considered when calculating award amounts. Accordingly, conditional payment amounts were calculated for only 71 of the *In Re 650 Fifth Avenue* Settling Judgment Creditors.

Seventy-one (71) Settling Judgment Creditors in *In Re 650 Fifth Avenue* filed applications for conditional payment and were found eligible, and had not received an award or an award determination from the September 11th Victim Compensation Fund ("VCF1") awards or award determinations. Accordingly, the Special Master allocated but withheld the funds for their initial payment amounts, which totaled $61,868,069.53, pending rulings in that case. As noted above, on June 29, 2017, a verdict was reached in favor of plaintiffs in *In Re 650 Fifth Avenue*. Given the possibility of appeals, the Fund will maintain the $61,868,069.53 amount allocated and set aside until a final judgment is rendered. These amounts are not available to other eligible claimants at this time.

### iv.  Recipients of 9/11 VCF1 Awards or Award Determinations

The Act imposes limitations on compensation to claimants who received an award or an award determination from VCF1. Specifically, the Act provides:

> In the event that a United States person and the immediate family member of such person, has an eligible claim under this section and has received an award or an award determination under section 405 of the Air Transportation Safety and System Stabilization Act (49 U.S.C. 40101 note), the amount of compensation to which such person, or the immediate family member of such person, was determined to be entitled under section 405 of the Air Transportation Safety and System Stabilization Act (49 U.S.C. 40101 note) shall be considered controlling for the purposes of this section, notwithstanding any compensatory damages amounts such person, or immediate family member of such person, is deemed eligible for or entitled to pursuant to a final judgment described in subsection (c)(2)(A).

42 U.S.C. § 10609(d)(3)(A)(ii)(III).

A total of 136 eligible claimants who had final judgments also received an award or award determination in VCF1 and submitted applications for conditional payment to the Fund. Thirty-one (31) of these 136 claimants are also Settling Judgment Creditors in *In Re 650 Fifth Avenue* who filed applications for conditional payment. Although these claimants were determined eligible, because their VCF1 award or award determinations were considered controlling under the Act, they were not entitled to any compensation from the Fund; thus, no award amounts were calculated and allocated for these claimants.

### c.  Review and Adjudication

All applications to the Fund are reviewed by the Fund's claims administrator, as well as attorneys employed by the United States Department of Justice. If an application is deficient, Fund attorneys notify the claimant, or his or her attorney, and offer an opportunity to resolve the deficiency. Department of Justice attorneys make recommendations; however, all applications are reviewed and either determined eligible or denied by the Special Master.

Under 42 U.S.C. § 10609(b)(3), all decisions by the Special Master with regard to compensation from the Fund are final and not subject to administrative or judicial review. However, not later than 30 days after receipt of a written decision by the Special Master, a claimant whose application was denied in whole or in part may request a hearing before the

7

Special Master or his designee.  Not later than 90 days after a hearing, the Special Master must issue a written decision affirming or amending the original decision; the written decision is final and non-reviewable.

### d. Payment

The Act authorizes the Special Master to order payment from the Fund "for each eligible claim of a United States person to that person or, if that person is deceased, to the personal representative of the estate of that person." 42 U.S.C. § 10609(d).  With certain limitations, eligible funds will be paid on a pro rata basis out of available funds, based on the amounts outstanding and unpaid on eligible claims, until all such amounts have been paid in full or the Fund terminates in 2026.  In 42 U.S.C. § 10609(d)(3)(A)(ii), the Act places limitations on claim amounts for certain eligible claims:

> (I)  In the event that a United States person has an eligible claim for compensation from the Fund that exceeds $20,000,000, the Special Master shall treat that claim as if it were for $20,000,000.
>
> (II) In the event that a United States person and the immediate family members of such person have claims that, if aggregated, would exceed $35,000,000, the Special Master shall reduce such claims on a pro rata basis so that in the aggregate such claims do not exceed $35,000,000; and
>
> (III) In the event that a United States person, or his or her immediate family member, has an eligible claim for compensation from the Fund and has received an award or an award determination under section 405 of the Air Transportation Safety and System Stabilization Act, the amount of compensation to which such person or their immediate family member was determined to be entitled under section 405 of the Air Transportation Safety and System Stabilization Act shall be considered controlling, notwithstanding any compensatory damage amounts such person or immediate family member is deemed eligible for or entitled to pursuant to a final judgment [issued by a United States district court under state or federal law against a state sponsor of terrorism and arising from an act of international terrorism.][7]

Moreover, the Act also includes provisions for accounting for claimants' receipts of payments from sources other than the Fund (if any).  *Id.* at § 10609(b)(2)(B).  Claimants who have received 30% or more of their compensatory damages from sources other than the Fund may not receive payments from the Fund until other claimants have received thirty percent of their compensatory damages from the Fund.  Claimants who have received some, but less than 30%, of their compensatory damages from sources other than the Fund had their awards adjusted to account for the percentage other claimants will receive from the Fund.  42 U.S.C. § 10609(d)(3)(B).

---

[7] As explained above, because the eligible claimants who received an award or award determination from VCF1 were paid in full, there are no amounts outstanding and unpaid; thus, these claimants do not receive additional compensation from the Fund.

The sections of the Act above determined the methodology for the award calculations, mandating distribution on a pro rata basis to all eligible claimants after accounting for the statutory limitations and compensation from sources other than this Fund.

The Act also contains a special exclusion provision, which provides that no individual "who is criminally culpable for an act of international terrorism" may "receive any compensation . . . either directly or on behalf of a victim." 42 U.S.C. § 10609(h). The Special Master consulted with the Federal Bureau of Investigation ("FBI") to ensure that background checks were conducted on eligible claimants.[8] The Fund also conformed to additional requirements and restrictions before issuing the initial payments. For example, as stated in the SORN, Fund records were disseminated to "the Department of [the] Treasury to ensure that any recipients of federal payments who also owe delinquent federal debts have their payment offset or withheld or reduced to satisfy the debt." SORN, 81 Fed. Reg. at 45540.

### 4. ANALYSIS OF PAYMENTS MADE TO ELIGIBLE CLAIMANTS FROM THE FUND

#### a. Number of Applications for Compensation Submitted

From July 14, 2016 to December 1, 2016, the Fund received **2,883** applications for compensation. These applications were considered for authorization for an initial payment. The Fund continues to accept applications, which will be considered for future payments, if eligible.

#### b. Number of Applications Approved and Amount of Each Award

The Special Master approved **2,332** applications as eligible claims in the first round of payments. The amount of each award paid is provided in a separate addendum to protect claimants' privacy; thus, it does not include claimants' identifying information. *See, e.g.,* the Privacy Act Notice in the Fund's Application Form and the SORN.

Some eligible claimants did not and will not receive payments from the Fund.

- One (1) eligible claimant identified sources of compensation other than the Fund that fully satisfied the compensatory damages awarded by a United States District Court. Because the Fund does not provide compensation for pre-judgment or post-judgment or punitive damages, this eligible claim is considered paid in full. *See* 42 U.S.C. § 10609(j)(3).
- All of the 136 eligible claimants who received an award or award determination from VCF1 are considered paid in full, as explained in section 3(b)(iv), *supra*. (This includes 31 Settling Judgment Creditors in *In Re 650 Fifth Avenue* who filed applications for conditional payment.)
- Additionally, 78 judgment creditors in *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.), filed applications for conditional payment and were

---

[8] FBI background checks were conducted on the eligible claimants, such as the victim himself or herself, or the Personal Representative of deceased victims. FBI background checks were not conducted on the beneficiaries of a deceased claimant's estate (other than Personal Representatives) because they did not receive any compensation directly from the Fund or on behalf of the victim.

found eligible. As explained in section 3(b)(iii), *supra*, because a final judgment was entered in favor of plaintiffs and funds were distributed in that case following the Special Master's determination that the claims were eligible, the applications for conditional payment were thereafter considered void. *Id.* at § 10609(e)(2)(B)(iv)(II).

While the Special Master approved their applications as eligible, these 215 claims were not included when the Fund calculated the initial awards. Moreover, they will not receive payments in any future distributions from the Fund.

The Fund calculated awards in accordance with the Act for the remaining 2,117 eligible claimants. Of these, 2,024 received awards (the other eligible claimants did not receive awards for reasons explained above and in section d below). The amount of each award is provided in an addendum. Generally, the award amounts for these 2,024 claimants) ranged from approximately $1,300 to $2.7 million dollars. The chart below shows that most claimants, nearly 55%, had award amounts less than $500,000.



10

### c. Number of Applications Denied and Reasons for Denial

The Special Master denied **539** applications. Of these, nearly all — 532, or 99 percent — were denied because the claimants did not meet the statutory eligibility requirements; they did not hold a qualifying final judgment, or they were not qualifying hostages held in Iran from 1979 to 1981 or did not demonstrate that they were qualifying spouses or children of such a hostage. Six (6) applications were denied as duplicates. Finally, one (1) application was denied as untimely.

### d. Number of Applications Pending for Which Compensatory Damages Have Not Been Paid in Full

The Fund has eliminated certain applications from further consideration for compensation, and will not factor them into future calculations. As explained earlier, a total of 137 claimants have been paid in full, all from sources other than the Fund. Moreover, 78 *Peterson* judgment creditors who filed applications for conditional payment were originally found eligible, but those applications are considered void following the *Peterson* decision and payment distribution. Finally, one eligible applicant withdrew his or her claim after receiving notification of eligibility but before receiving payment. Therefore, there are now **2,116** claimants who have not been paid in full and may be eligible to receive payments when the Fund makes future distributions.

Of those, the vast majority—2,024 claimants—received initial payments. The amounts of these payments are detailed in an addendum to this Report. Those who did not receive payments to date include three (3) claimants who were approved and for whom award amounts were allocated, but they have not yet been able to submit the necessary documentation sufficient for the Special Master to release the payments. Thus, payments for these 3 claimants remain on hold. Additionally, as explained in section 3(b)(iii), *supra*, 71 Settling Judgment Creditors in *In Re 650 Fifth Avenue* who filed applications for conditional payment have been allocated initial payment amounts but have not been paid, pending rulings in that case. Finally, 18 claimants had already received more than 30% of their total compensatory judgments from other sources. They accordingly were precluded from receiving initial payment amounts, as explained in section 3(d), *supra*, but may receive payments in future distributions.

### e. Total Amount of Compensatory Damages From Eligible Claims That Have Been Paid and Remain Unpaid

To date, the Special Master has paid 2,024 eligible claims a total of **$1,040,902,501.89** in compensatory damages.

A total of **$9,792,404,331.16** in compensatory damages (or statutory award amounts for Iran hostages and their spouses and children) currently remains unpaid on the 2,116 eligible claims that may receive future distributions.

## 5. FUTURE DISTRIBUTIONS

The Act provides that "[o]n January 1 of the second calendar year that begins *after the date of initial payments* . . . if funds are available in the Fund, the Special Master shall authorize additional payments on a pro rata basis to those claimants with eligible claims . . . and shall authorize additional payments for eligible claims annually thereafter if funds are available in the Fund." *Id.* at § 10609(d)(4) (emphasis added).

As noted above, the Fund began distributing initial payments on March 10, 2017, on a rolling basis. The second calendar year after the March 10, 2017 initial payment date is 2019. Accordingly, the Special Master is statutorily required to authorize the second round of payments on January 1, 2019. Pursuant to the Act, subsequent distributions will be authorized annually thereafter, if funds are available, until the Fund terminates in 2026. *Id.* at § 10609(e)(6)(A).