UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON :                03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                       :

_____

**This Document Relates To:**
***Havlish, et al. v. bin Laden, et al*., Case No. 03-CV-09848**
***Ashton, et al. v. al Qaeda Islamic Army, et al*., Case No. 02-CV-06977**
***Burnett, Sr., et al., v. Islamic Republic of Iran*, Case No. 15-CV-9903**
***Burlingame, et al. v. bin Laden, et al., Case No. 02-CV-07230***
***Bauer, et al. v. al Qaeda Islamic Army, et al., Case No. 02-CV-07236***
***O'Neill, Sr., et al. v. Republic of Iraq, et al., Case No. 04-CV-1076***
----
***All other cases against the Islamic Republic of Iran***

**PLAINTIFFS' FED.R.CIV.P. 72 OBJECTIONS TO THE MAGISTRATE JUDGE'S
SEPTEMBER 30, 2020 OPINION & ORDER (ECF No. 6481) DENYING PLAINTIFFS'
MOTIONS FOR RECONSIDERATION AND / OR CLARIFICATION REGARDING
"COMMON BENEFIT FUND" DECISION (ECF No. 5180)**

MOTLEY RICE LLC

JODI WESTBROOK FLOWERS
DONALD A. MIGLIORI
ROBERT T. HAEFELE
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*For the Plaintiffs' Exec. Committee for
Wrongful Death And Personal Injury Plaintiffs*

KREINDLER & KREINDLER LLP

JAMES P. KREINDLER
ANDREW J. MALONEY
KREINDLER & KREINDLER LLP
750 Third Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: amaloney@kreindler.com
*For the Plaintiffs' Exec. Committee for
Wrongful Death And Personal Injury
Plaintiffs*

ANDERSON KILL P.C.
JERRY S. GOLDMAN
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York 10020
Tel.: 212-278-1000
Email: jgoldman@andersonkill.com
*For the Plaintiffs' Exec. Committee for
Wrongful Death And Personal Injury
Plaintiffs*

# TABLE OF CONTENTS

Page

1.  Background ...................................................................................................1

    A.  Case Management in the Consolidated MDL Since 2004 .............................2

    B.  The *Havlish* Plaintiffs' Default Proceedings ..................................................5

    C.  Congress Establishes the United States Victims of State Sponsored
        Terrorism Fund ...........................................................................................6

2.  Standard of Review.........................................................................................7

3.  Argument ......................................................................................................8

    A.  Awards from the Congressionally-Created USVSST Fund Are Outside the Scope
        of the MDL Court's Authority ......................................................................8

    B.  A CBF Cannot Be Created to Benefit Work Relating to Only a Single Defendant
        Out of Many in a Single, Consolidated MDL ...............................................12

    C.  Even if a Common Benefit Fund Is Established, No Allocation of Common
        Benefit Fees Can Occur Until the Litigation Has Come to a Conclusion, When the
        Relative Efforts and Contributions of All Attorneys Performing Common Benefit
        Work Can be Fairly Compared and Assessed ..............................................16

    D.  Any Claim to Recoveries From USVSST Fund in its First Round Has Been Waived 19

4.  Conclusion ..................................................................................................20

Responding Plaintiffs, composed primarily of the leadership of the Plaintiffs' Executive Committee for Personal Injury and Wrongful Death Claims ("PEC"), object pursuant to Fed. R. Civ. P. 72 to the September 30, 2020 and September 30, 2019 decisions by the Honorable Sarah Netburn, United States Magistrate Judge, ordering the establishment of a Common Benefit Fund ("CBF") solely for work done on the Iran default liability component of this multidistrict litigation. ECF Nos. 5180 and 6481.[1]

This Court should reject and set aside those decisions, which are contrary to law, the committee structure in this lawsuit, multidistrict litigation ("MDL") practice, and equitable principles. In the middle of this complex MDL, the Magistrate Judge ordered the creation of a CBF to allocate payment only to those attorneys who developed evidence and worked toward obtaining a liability judgment on default against one out of many defendants, to be financed by recoveries obtained from a government fund established and existing outside of the scope of this litigation, without crediting Responding Plaintiffs for *any* other common-benefit work performed in their more than seventeen years of litigation against numerous appearing defendants. The creation of such a CBF is unprecedented, unwarranted and unjustified and the decisions ordering its establishment should be set aside.

### 1. Background

In 2003, the Judicial Panel on Multidistrict Litigation ordered that all actions against defendants who allegedly promoted, financed, sponsored, or otherwise supported the terrorist attacks of September 11, 2001 be consolidated and transferred to the United States District Court for the Southern District of New York. *See In re Terrorist Attacks on September 11, 2001,* 295 F.

---

[1] *See* ECF No. 6481 at 1, fn. 1 (Magistrate Judge stating that "[t]he Court understands the 'Responding Plaintiffs' to be the Plaintiffs' Executive Committee for Wrongful Death and Personal Injury Plaintiffs and certain other the [sic] Plaintiffs listed in their motion. The Court further understands that the 'Responding Plaintiffs' in the initial motion represented all Plaintiffs with a claim against Iran who are not part of the *Havlish* action.").

Supp. 2d 1377 (J.P.M.L. 2003). The resulting MDL now involves claims by thousands of individual wrongful death and personal injury claimants, as well as commercial claimants seeking recovery of economic losses, against a range of defendants.  To date, notwithstanding that counsel responsible for prosecuting this litigation have expended significant resources, no court-ordered mechanism for compensating counsel for their time or expenses incurred in leading the MDL and working for the common benefit of all plaintiffs in this suit over the past seventeen years has been established or funded, let alone allocated.

**A.  Case Management in the Consolidated MDL Since 2004**

To assist in the management of this complex MDL, Judge Richard C. Casey, to whom the MDL was originally assigned, issued Case Management Order #3 on June 16, 2004. ECF No. 248 ("CMO3").  That order, among other things, organized counsel, established two Plaintiffs' Executive Committees (one for wrongful death and personal injury plaintiffs and the other for plaintiffs asserting commercial and property damage claims) ("PECs") and a single Plaintiffs' General Steering Committee ("General Committee."). *Id.*  For the benefit of all plaintiffs, the Court directed the PECs to "coordinate discovery and motion papers to the extent practicable to promote judicial economy, avoid duplicative effort, and limit the burden on parties responding to discovery." CMO3 at ¶3.  Further, the Court ordered the PECs to "conduct all pretrial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all plaintiffs." CMO3 at ¶10.  As to the Plaintiffs' General Committee, the Court directed that it would, "at the request of the Plaintiffs' Executive Committees, provide assistance as required in handling the liability pretrial proceedings." CMO3 at ¶10.  The PECs were also authorized to "coordinate the work of plaintiffs' counsel and perform such other functions as

2

necessary and appropriate to complete pretrial proceedings in the Consolidated Action and/or as may be authorized by the Court." CMO3 at ¶11g.

Certain members of the PECs, primarily the Responding Plaintiffs, have led the lawsuit and have been prosecuting the claims against the appearing defendants, and have prosecuted to various stages the claims against non-appearing defendants.[2]  Those same Responding Plaintiffs have also borne the vast majority of the significant expenses involved in prosecuting this action.[3]

The docket reflects the daunting scope of the work that those members of the PECs who are Responding Plaintiffs here have undertaken in fulfilling their leadership responsibilities. Among other things, the PECs have:

- Developed evidence against several non-sovereign and sovereign defendants, including the Kingdom of Saudi Arabia, the Islamic Republic of Iran ("Iran") and the Republic of Sudan, filed suit, served defendants and embarked on discovery against those defendants;
- Handled hundreds of dispositive motions, including opposing more than three dozen motions to dismiss by various individual, charity, banking, and sovereign defendants;
- Led discovery proceedings that this Court has described as labyrinthine and that involved the production of millions of pages of foreign language documents (all of which had to be translated, reviewed, and analyzed by counsel and subject matter experts);
- Brought multiple motions for sanctions for discovery abuse, leading to, among other things, imposition of sanctions against several defendants;
- Negotiated deposition protocols;
- Moved for judicial assistance in aid of discovery from foreign states, leading to discovery from or discovery proceedings in Germany, Spain, Bosnia, Belgium, Italy, Canada, Sweden and the International Criminal Tribunal for the former Yugoslavia ("ICTY");
- Briefed multiple complex Second and Seventh Circuit appeals and filed three separate petitions for writs of *certiorari* to the United States Supreme Courts (two of which resulted in requests for the views of the United States);

---

[2] Since CMO3 was enacted, Jerry Goldman, of the Anderson Kill firm, has taken over representation in the *O'Neill* cases.

[3] While CMO3 contemplated a funding scheme for expenses incurred by both PECs (*see* CMO3 at ¶¶ 15-17), that reimbursement mechanism has never been employed.

- Prosecuted related claims in forfeiture proceedings in federal court in Chicago seeking to attach frozen al Qaeda assets for the benefit of the 9/11 plaintiffs as a whole;
- Engaged in global investigative efforts to develop evidence in support of all claims;
- Conducted depositions both in the United States and in several foreign countries;
- Litigated several Freedom of Information Act requests and *Touhy* demands to the U.S. Government, including the Departments of Justice, State, and the Treasury;
- Conducted substantial third-party discovery;
- Briefed, argued, and won an initial motion to dismiss brought by the Kingdom of Saudi Arabia;
- Briefed, argued, and won several important discovery disputes against the Kingdom of Saudi Arabia and the U.S. Government;
- Moved for and litigated class certification issues.

*See* Declaration of PEC Co-Liaison Counsel Andrew J. Maloney III, Esq. ("Maloney Decl.").

In addition to the litigation-specific tasks listed above, the same members of the PECs have handled a range of essential case management initiatives and obligations, such as negotiating case management procedures and protocols with the defendants and preparing related submissions to the Court; preparing agendas for discovery and case management conferences; developing procedures to harmonize pleadings in the MDL; and integrating new plaintiffs and claims into the MDL. *See, generally*, Maloney Decl.   In addition, certain of the committee members worked diligently with Congress for more than seven years to enhance the legal rights and remedies available to the MDL plaintiffs, culminating in the enactment in 2016 of the Justice Against Sponsors of Terrorism Act ("JASTA"). *See id*.

All of those tasks have demanded not only substantial attorney and support time but also the investment of millions of dollars in out of pocket expenses – all for the benefit of all plaintiffs in this MDL.  The Court has not, to date, ordered any contributions toward these common efforts or expenses.

## B. The *Havlish* Plaintiffs' Default Proceedings

While *Havlish* counsel have not been involved in the common liability work detailed

above, they did move for and obtain a default judgment against non-appearing defendant Iran.

*See* 03-cv-9848 (S.D.N.Y.) (GBD), ECF No. 295.  This Court issued the liability default

judgment on December 22, 2011 following a half-day uncontested hearing.  *Havlish* counsel

moved for a default judgment separate from other counsel (despite the PECs' accumulation of

their own evidence concerning Iran)[4] while other members of the committees were focusing on

other necessary work to move the case forward.  This is the sort of division of labor that CMO3

contemplated to "promote the orderly and efficient conduct of this litigation, and [to] avoid

unnecessary duplication and unproductive effort." CMO3 at ¶ 12.   Indeed, *Havlish* counsel were

free to focus on the Iran default precisely because other committee members were fulfilling other

demanding obligations imposed on them under CMO3 and the Court's further orders, thus

freeing up *Havlish* counsel's time.

Though Responding Plaintiffs had their own evidence and proof to move for a judgment

against Iran without *Havlish* counsel's efforts, and had intended to do so when they determined

the timing was appropriate, once this Court granted a final judgment of liability against Iran, that

became the law of the case.  Given that, any further proceedings on the same liability questions

would have been redundant and an improvident expenditure of both MDL and judicial resources,

---

[4] Responding Plaintiffs opposed the timing of moving for that judgment as a strategic matter but had compiled the evidence necessary to do so themselves at an appropriate time. *See* ECF No. 3272 at 18-20 and supporting declarations.  The Responding Plaintiffs' activities included extensive and professional investigative efforts relating to Iranian support for Al-Qaeda and the 9/11 attacks, including locating and interviewing witnesses, obtaining documents, translating documents, gathering publicly available information, consulting with experts, and analyzing information. *See id*. Active members of the PECs also retained a former Israeli Military Intelligence officer expert on Iranian-sponsored terrorism and a group of counter-terrorism consultants retired from the CIA, the FBI, and other government intelligence agencies to develop evidence of Al-Qaeda's global infrastructure and the sources of support that allowed the terror organization to plan, coordinate, and conduct the 9/11 attacks, including Iran. *Id*. Further proof on this point will be presented should a final order establish a CBF.

and Responding Plaintiffs accordingly relied on the *Havlish* precedent when moving for their own judgments against Iran.

### C. Congress Establishes the United States Victims of State Sponsored Terrorism Fund

Four full years after *Havlish* counsel obtained a default judgment, Congress in December 2015 passed the Justice for United States Victims of State-Sponsored Terrorism ("USVSST") Act, which created a means for certain individuals holding final judgments against any formally-designated state sponsor of terrorism to obtain some compensation from financial fines and penalties assessed by the United States Government (the "USVSST Fund"). *See* 34 U.S.C. § 20144. As originally enacted, the USVSST Act treated all payments from the September 11th Victim Compensation Fund ("VCF") as a collateral source that, essentially, deprived any judgment-holder of an award from the USVSST Fund if he or she had directly received an award or award-determination from the VCF. *See* Pub.L. 114-113 , Div. O, Title IV, § 404, Dec. 18, 2015, 129 Stat. 3007. This had the effect of denying nearly all estates of September 11th victims as well as their spouses and dependents from participating in the USVSST Fund until legislation eliminating that disqualification was enacted on November 21, 2019. *See id*.[5] *Havlish* counsel did not have any role in the creation of the USVSST Fund nor in the Fund's 2019 expansion nor did they have any role in securing deposits into that Fund (though they do stand to recover awards for the clients and the attendant fees for themselves.) *See* ECF No. 6449 at 7.[6]

---

[5] Certain "immediate family members" who did not previously receive a VCF award or award-determination were eligible to participate in the USVSST Fund and received recoveries from it prior to the 2019 amendment. *See id.*

[6] While *Havlish* counsel previously suggested that "detailed written comments setting forth why" excluding certain September 11th family members led to the USVSST Fund Special Master "revers[ing]" himself, there is no evidence of any causation between the two and, indeed, the Responding Plaintiffs at the same time had in-person meetings with the Special Master and Department of Justice attorneys on these same points.

Thus, after Congress created the USVSST Fund (and expanded it) certain previously-excluded immediate family members of the victims killed in the September 11th terrorist attacks became eligible to participate in the Congressional compensation program, including both those family members represented by *Havlish* counsel and those represented by Responding Plaintiffs.

In 2016, *Havlish* counsel moved for creation of a Common Benefit Fund (seeking 8% of all USVSST Fund recoveries), *see* ECF No. 3235 *et seq.*, which was denied without prejudice, *see* ECF No. 3322, and then renewed that motion in 2019 (now seeking 12% of all USVSST Fund recoveries, without any explanation for that 50% increase), *see* ECF No. 4289 *et seq.*  The Magistrate Judge granted *Havlish* counsel's 2019 motion to create a CBF to allocate payments only to counsel "who worked for the common benefit of all plaintiffs *in pursuit of the claims against Iran*" (ECF No. 6481 at 10 (emphasis added)) even though the litigation  is a single, consolidated, and ongoing MDL; work done to establish Iran's liability constitutes only a small portion of the total work undertaken in this MDL; Iran has not settled any cases;  Responding Plaintiffs have expended substantial time and resources in the MDL for the common benefit of all plaintiffs; and no plaintiff's case is fully resolved.[7]

## 2.  Standard of Review

This Court should review the Magistrate Judge's decisions *de novo*.  The creation of a Common Benefit Fund to advantage solely counsel who worked on claims against Iran is a dispositive order and, as several Courts of Appeals have held, motions for attorney's fees should be subject to *de novo* review by a district court, with a magistrate court's decision regarding

---

[7] The Magistrate Judge denied without prejudice *Havlish* counsel's specific request for 12% of recoveries (which would be 80% of all attorneys' fees under the current statutory cap) and has not yet proposed a particular contribution figure or allocation amount. ECF No. 5180 at 12-13.  She also denied Responding Plaintiffs' motion for reconsideration and clarification of her original decision. ECF No. 6481.

attorneys' fees constituting only a recommendation. *See Baylor v. Mitchell Rubenstein & Associates, P.C.*, 857 F.3d 939, 946 (D.C. Cir. 2017); *Massey v. City of Ferndale*, 7 F.3d 506, 509-10 (9th Cir. 1993); *Estate of Conners by Meredith v. O'Connor*, 6 F.3d 656, 659 (6th Cir. 1993). The 2016 common benefit decision was issued as a report and recommendation subject to *de novo* review and there is no reason that the Magistrate Judge's decisions now should be treated any differently. ECF No. 3322.[8]

Whether reviewed under a *de novo* standard under Fed.R.Civ.P. 72(b) or a contrary to law / clearly erroneous standard under Fed.R.Civ.P. 72(a), the Magistrate Judge's ruling concerning a limited CBF for the benefit of only one group of counsel cannot be justified and must be set aside.

### 3.  Argument

#### A.  Awards from the Congressionally-Created USVSST Fund Are Outside the Scope of the MDL Court's Authority

Congress enacted the Multidistrict Litigation Act in 1968 to streamline and coordinate groups of cases with common questions of fact that justified centralizing pretrial proceedings before a single court in order to "promote the just and efficient conduct of such action." 28 U.S.C. § 1407(a).  A federal court's managerial authority over MDLs before it is the source of its power to create common benefit compensation schemes. *In re Showa Denko K.K.L.-Tryptophan Prods. Liab. Litig. II*, 953 F.2d 162, 165 (4th Cir. 1992).[9]  That is, the court's authority to

---

[8] The Magistrate Judge cited to *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113 (2d Cir. 2010) in support of her issuance of the decisions as Opinions and Orders, but that case only held that a district court's order establishing a common benefit fund was not entitled to interlocutory appeal to the Second Circuit, not that a magistrate judge had authority to issue an order (as opposed to a report and recommendation) regarding attorney's fees.

[9] Under the prevailing "American Rule," attorneys are not entitled to obtain fees for their work except pursuant to contract or statutory authorization. *Hall v. Cole*, 412 U.S. 1, 4 (1973); *Rodonich v. Senyshyn,* 52 F.3d 28, 32 (2d Cir. 1995).  An exception exists in the "common fund" cases, where an attorney's work creates, expands, or protects a common fund that is subject to the Court's jurisdiction that "makes possible an award that will operate to spread the costs proportionately among" members of the class that will benefit from the fund. *Mills v. Electric Auto-Lite Co.,*

manage the federal MDL establishes, as a corollary, the court's authority to "assure that [the]

attorneys [performing common benefit tasks] receive reasonable compensation for their work"

and establish a common benefit fund. *In re Zyprexa Liab. Litig.*, 467 F.Supp.2d 256, 265

(E.D.N.Y. 2006), quoting *In re Linderboard Antitrust Litig.*, 292 F.Supp.2d 644, 653 (E.D.Pa.

2003).

Generally speaking, the appropriate source for a common benefit fee fund is the

recoveries that MDL plaintiffs have obtained through the litigation that the federal transferee

court is overseeing. *See In re Zyprexa Prods. Liab. Litig.,* 594 F.3d at 130 (Kaplan, J.,

concurring) (finding that the "most equitable" source of common-benefit compensation in an

MDL is the "recoveries" plaintiffs received from the litigation); *cf. Local Union No. 38, Sheet*

---

396 U.S. 375, 394 (1970); *Hall,* 412 U.S. at 5; *Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 166-67 (1939); *Rodonich,* 52 F.3d at 31.  The "common benefit" concept derives from the common fund doctrine. *In re Diet Drugs*, 582 F.3d 525, 546 n. 44 (3d Cir. 2009).

The only "common benefit" that *Havlish* counsel assert they conferred was the entry of a default judgment against a defaulting defendant.  They have not – and cannot – credibly argue that they had any role in establishing the USVSST Fund or that they were involved in any way in obtaining the federal fines and penalties that constitute the USVSST Fund.  Rather, *Havlish* counsel simply established a legal precedent that other plaintiffs relied on as *res judicata,* just as regularly occurs in a common law system that relies on precedent.  As the Restatement (Third) of Restitution and Unjust Enrichment explains:

> [One] limiting function of the definition of "common fund" . . . is to guard against overextending the rationale of the claim. The nature of the legal system is such that the successful assertion of one person's claim may confer a demonstrable benefit on a range of others: persons similarly situated (in some respect at least), but whose relation to the transaction is increasingly remote. At one end of the spectrum are the core cases for "common fund," such as the claim between beneficiaries of the same trust; at the other is the claim asserted against an unrelated litigant, who stands to take advantage of a favorable precedent established in the claimant's case. The requirement of this section that there be an identifiable fund to which the beneficiaries are "entitled to share by reason of their common or parallel interests therein" establishes the minimum connection between the claimant, the fund, and the defendant, without which the benefits in question are either too generalized or too remote to justify a liability to pay for unrequested services.

*Restatement (Third) of Restitution and Unjust Enrichment* § 29, comment e. It follows that the mere creation of "favorable precedent" against Iran without creating "an identifiable fund to which the beneficiaries are 'entitled'" is "too generalized" and "too remote" to justify ordering payment of a common benefit fee.

*Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 90 (2d Cir. 2003) (awarding plaintiff's attorney fees at end of case pursuant to "'common benefit doctrine'" because the "litigation" conferred a benefit even though plaintiff's efforts did not result in monetary recovery).  Absent authority under 28 U.S.C. § 1407 or a voluntary agreement by counsel, courts cannot direct payment of attorney's fees that originate from a source outside of the federal litigation. *In re Genetically Modified Rice*, 764 F.3d 864, 874 (8th Cir. 2014), *cert. denied* 135 S.Ct. 1455 (2015).

Indeed, while "a district court needs to have broad discretion in coordinating and administering multidistrict litigation . . . . to minimize expense to all litigants and provide judicial efficiency … [t]he authority for consolidating cases on the order of the judicial panel on a multi-district litigation [] is merely procedural and *does not expand the jurisdiction of the district court to which the cases are transferred.*" *In re Showa Denko*, 953 F.2d at 165 (emphasis added).  In *Showa Denko*, in addressing an MDL common benefit order that compelled contributions from plaintiffs in state or federal litigation who were not before the MDL court and by claimants who had compromised their claims outside of court, the Fourth Circuit concluded: "[c]laimants who have not sued and plaintiffs in state and untransferred federal cases have not voluntarily entered the litigation before the district court nor have they been brought in by process. The district court simply has no power to extend the obligations of its order to them." *Id*. at 166.

Likewise, the Eighth Circuit held in *In re Genetically Modified Rice* that a district court "did not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries," noting that "Lead Counsel assert[ed] no independent basis for jurisdiction over these state-court actions." *In re Genetically Modified Rice Litig.*, 764 F.3d at 873.  Additionally, in the cases where certain

counsel would be receiving fees from both cases that were part of the MDL and from other, non-federal litigation sources, the appellate court rejected lead counsel's argument for assessments, regardless of whether plaintiffs' counsel benefitted from the lead counsel's work, stating that those other claims, venued in state courts:

> related or not, are not before the district court. The state-court plaintiffs at issue neither agreed to be part of the federal MDL nor participated in the MDL Settlement Agreement. *Even if the state plaintiffs' **attorneys** participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court **plaintiffs** and Bayer.*

> Lead Counsel also urge that the state-court plaintiffs' counsel benefited from the MDL leadership group's work, so equity requires that they contribute to the Fund. But equity is insufficient to overcome limitations on federal jurisdiction. *The district court correctly held that it lacked jurisdiction to order holdback from the state-court recoveries.*

*Id*. at 873-874 (italicized emphasis added, bolded emphasis in original).[10]

Where, as here, the source of payments that one party seeks to take originates outside of the MDL, does not come from the defendants, and is not a part of the federal litigation (but is, rather, a Congressional creation), the MDL court lacks authority to order that those recoveries be contributed as part of an MDL assessment.  Indeed, the legislation which established the USVSST Fund makes clear that determinations regarding the eligibility of particular claimants to the Fund and the amounts payable to eligible claimants are within the sole discretion of the Fund's Special Master and not subject to judicial review.  *See* 34 U.S.C. § 20144(b)(3).[11]

---

[10] The authority of a federal MDL court to attach fees on one category of claims outside of the federal litigation – claims entirely unfiled – is an open question in the Second Circuit. *See In re General Motors LLC Ignition Switch Litigation*, --- F.3d ---, 2020 WL 4586820, *8 (S.D.N.Y.) (Aug. 10, 2020) (noting that neither the Supreme Court nor the Second Circuit had addressed the authority of federal courts to impose assessments on unfiled claims but nevertheless concluding that district court could do so).

[11] Further evidence that awards from the Fund are outside the scope of this litigation and should not serve as a source for a CBF is the statutory cap imposed on recovery for legal fees and expenses, which supersedes any of the agreements clients may have with their attorneys in connection with the litigation. *See* 34 U.S.C. § 20144(f) (capping both attorney's fees and recoverable costs at 15% of award).

Accordingly, any redistribution of fees directly tied to the Special Master's separate decision-making process would be improper and the Magistrate Judge's order that Responding Plaintiffs contribute USVSST Fund recoveries to a CBF exceeded the court's authority, whether because beyond a court's subject matter jurisdiction or managerial authority over an MDL.

### B.  A CBF Cannot Be Created to Benefit Work Relating to Only a Single Defendant Out of Many in a Single, Consolidated MDL

Even if this court were to conclude that it has authority over recoveries received from the United States Government's USVSST Fund, the Magistrate Judge fundamentally misconstrued the reasoning underlying judicial authority to create a Common Benefit Fund and incorrectly ruled that work relating to a single defendant in this MDL warrants compensation to only those attorneys who were involved in that work.  Rather, if this Court concludes that the payments from the USVSST Fund constitute successful recoveries in this MDL over which it can exercise authority, then it is the MDL as a whole that is a success, triggering a duty to fairly compensate *all* counsel who did common benefit work in the MDL, not just those lawyers who worked on the claims against Iran.

When the Judicial Panel on Multidistrict Litigation consolidates a case, the transferee court is to appoint counsel who then, for the benefit of all plaintiffs, "develop proof of liability and anticipate defenses; gather the expertise necessary to prove causation and other elements of plaintiffs' cases; … manage discovery; coordinate the various filings; and communicate with counsel for plaintiffs, counsel for defendants, and the court." MANUAL FOR COMPLEX LITIGATION, FOURTH § 22.62 (2020).  The attorneys who assume and fulfill the obligations required of such leadership committees play a vital role in assisting and enabling courts' management of complex MDL litigation generally. *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 775 (9th Cir. 1977) (recognition that creation of lead counsel committee is to "insure the

orderly disposition of the actions with the economy of time, money and effort for the court, counsel and the parties"); *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d at 130 (Kaplan, J., concurring) ("[T]he efficient handling of [MDL] cases demands a similar approach to case management [to class actions]. District courts typically appoint lead counsel or a plaintiffs' steering committee to coordinate and conduct pretrial proceedings on behalf of all plaintiffs in order to avoid what otherwise might well become chaotic."); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972,* 549 F.2d 1006, 1012 (5th Cir. 1977) (district courts have the inherent authority "to bring management power to bear upon massive and complex litigation to prevent [the litigation] from monopolizing the services of the court to the exclusion of other litigants").

The common benefit doctrine is a corollary to a federal court's authority to establish the MDL management structure and that doctrine "rests on the perception that persons who obtain the benefit of *a lawsuit* without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Under this doctrine, the "committee members" leading the MDL are to be compensated "for their work on behalf of all plaintiffs involved in consolidated litigation." *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir.), citing *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1016. It is the common work performed in the MDL, not the work concerning one individual defendant, that provides the court with managerial authority to establish a Common Benefit Fund. *See In re General Motors LLC Ignition Switch Litigation*, --- F.Supp.3d --- (2020), 2020 WL 4586820, *3(defining "common benefit work" as "all work authorized by the court-appointed … [l]eadership … and performed for the benefit of all plaintiffs in Common Benefit Actions."); *In re City of New York*, 2011 WL 7145228, *14 (E.D.N.Y.) (Dec. 2, 2011) (treating liaison counsel's work coordinating

communications and proceedings as performed for the common benefit and warranting compensation).

It is therefore the work, effort, time and expense relating to *all* of the "activities performed and expenses incurred by counsel that relate to matters common to *all* claimants" that must be taken into consideration in establishing an CBF and that imbue a court with the authority to shift fees amongst various counsel by means of that CBF. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2006 WL 471782, at *4 (N.D. Cal. Feb. 28, 2006) (establishing process for common cost fund and submission of time and expenses for compensation) (emphasis added).[12]

The Magistrate Judge's approval of "a common benefit fund applicable *solely* to claims against Iran is appropriate" was unwarranted and unsupported by caselaw, MDL practice, and equitable principles. ECF No. 5180 at 7 (emphasis added).  In doing so, the Magistrate Judge failed to recognize that a court's authority in creating a CBF is premised on the need to compensate the *entire* leadership structure of a complex MDL to promote just and efficient litigation in the entire case – *not* to reward only one small group of attorneys. *In re Zyprexa Products Liab. Litigation*, 467 F.Supp.2d at 265 (court's authority to "appoint[] … lead and liaison counsel and appropriate management committees" is the predicate that leads to the "necessary corollary … to assure that these attorneys receive compensation for their work."). Because a court's power to create and allocate a Common Benefit Fund is derived from its

---

[12] The tasks that constitute a "common benefit" can be both litigation-specific and more generally case-management related.  So, for example, a liaison counsel can be compensated from a CBF for her role convening and conducting meetings with plaintiffs' counsel, circulating documents to counsel, providing status updates, participating in discussions with opposing counsel and coordinating payments for experts. *See In re City of New York*, 2011 WL 7145228, *14.

authority to manage the entire MDL, an order creating and allocating a CBF for work related to only one defendant is outside of the court's managerial authority.

The inequities of this piecemeal approach are stark in this case. Over the course of nearly two decades, the Responding Plaintiffs have devoted substantial time and money to common-benefit work in this MDL, as detailed above and as evident from the docket activity. The common-benefit doctrine exists to provide reasonable compensation to attorneys who voluntarily take on the costs and burdens of handling the common work of an MDL. It would be contrary to the entire common-benefit doctrine were only those attorneys whose limited efforts, in the context of a complex MDL, proved successful against a single (defaulting) defendant entitled to compensation. If this were the case, there would be no incentive for counsel to take on the more difficult, and riskier, common-benefit assignments. Indeed, lead counsel's task of assigning work assignments would become substantially more difficult with participating counsel insisting on doing only the easier, straightforward tasks with the highest likelihood of success. In this MDL, for example, the work of seeking justice for the victims of September 11th attacks from all those responsible has been prolonged, difficult, hard-fought, and expensive. By contrast, the work involved in obtaining a default judgment against Iran, a defendant that never appeared in this litigation, was relatively straightforward, relying heavily on pre-established facts and existing legal precedent out of the United States Court of Appeals for the District of Columbia and the 9/11 Commission Report, *see* 03-cv-9848 (S.D.N.Y.)(GBD), ECF No. 273 at 13 & Appendix A, and culminating in an uncontested prove-up hearing lasting less than one day.

It would be contrary to the entire common-benefit doctrine as well as an unprecedented decision without any legal support in common-benefit jurisprudence to create a CBF to benefit only those attorneys who pursued the easy route of a default judgment against a non-appearing

defendant in a complex case against dozens of parties, and excluding from the CBF those attorneys who have engaged in the long, hard, and expensive slog of pursuing relief against appearing sovereigns, charities, banks, and individuals.  This Court should set aside the decisions creating a Common Benefit Fund that did not take into consideration the work performed in the MDL as a whole, and instead established a CBF to grant fees only to those involved in a narrow, discrete part of the litigation.

### C.  Even if a Common Benefit Fund Is Established, No Allocation of Common Benefit Fees Can Occur Until the Litigation Has Come to a Conclusion, When the Relative Efforts and Contributions of All Attorneys Performing Common Benefit Work Can be Fairly Compared and Assessed

The Magistrate Judge's decision that a CBF limited to work relating to Iran can be allocated now is also flawed in that it relies on the erroneous presumption that allocation of CBF payments to counsel who worked on the Iran portion of the MDL would be proper while the rest of the MDL continues on its course.  Both equitable principles and MDL precedent preclude such an arrangement, as it is only at the end of a lawsuit (even if a CBF is created and even it is funded earlier), that all contributions to the MDL can be compared and assessed and CBF fees equitably apportioned among all of the attorneys performing the common-benefit work.

Ruling in favor of an interim attorney's fee award, the Magistrate Judge relied exclusively on the Duke Law Center for Judicial Studies, *Standards and Best Practices for Large and Mass-Tort MDLs* 71 (2014) ("Duke Report.") ECF No. 5180 at 7.  Citing the Duke Report, the Magistrate Judge observed that "although courts usually defer setting the common benefit fee until the MDL is resolved, that determination can be made earlier if individual cases begin to settle." ECF No. 5180 at 7.  In response to the PECs' reconsideration argument that this misconstrued the Duke Report section on timing of payments, the Magistrate Judge again relied on the Duke Report. *See* ECF No. 6481 at 6.  But the Duke Report does not support this

16

unprecedented mid-litigation *allocation* of a common benefit fund to counsel, and the rationale and justification underlying the common benefit doctrine militates against doing so.

The Duke Report sets forth a "best practice" for courts suggesting that a "transferee judge should determine an appropriate assessment to be made from the gross recovery in each case" as "individual cases in the MDL begin to settle." Duke Report at 80. But, contrary to the Magistrate Judge's analysis, the treatise does not support allocation of payments to counsel from that fund when the MDL is still ongoing (against, for example, other defendants.) *Id.* The Magistrate Court improperly conflated a court's authority to *assess* a contribution to begin to fund the CBF when individual cases become fully resolved (so as to make sure no cases escape contribution) with a court's authority to *allocate* payments to counsel based on their relative contributions to the overall MDL, which cannot be done until the MDL itself is fully concluded. *Id.* at 81 ("assessment" – not allocation – decision is mostly made "after there is a global settlement or judgment," but MDL court can impose an assessment "earlier … if individual cases begin to settle or are resolved through trial.")(emphasis added)[13]

The Duke Report simply does not provide support for the extraordinary remedy proposed by the Magistrate Judge – an interim fee allocation for common-benefit work as to a single defendant while litigation is ongoing and being led and financed by counsel who would both be expected to contribute to and largely be excluded from collecting the same common benefit fund. The Magistrate Judge's reliance on the treatise for the proposition that a Common Benefit Fund can be allocated mid-litigation (and to reward work only as to a single defendant) was misplaced

---

[13] Similarly, the treatise observes that courts generally "defer setting the precise percentage of settlement proceeds that will fund the CBF until the MDL is resolved or settled," because it is then that "the value of the common benefit work is known," though courts may direct an early funding – but not payment allocation – when a defendant makes an earlier partial payment. *Id.* at 68.

and contrary to well-established MDL law and practice. *See, e.g., In re Vioxx Prods. Liab. Litig.,* 760 F. Supp.2d 640, 653 (E.D.La. 2010) (Fallon, J.).[14]

To the extent that there is a basis to create a Common Benefit Fund, it must be established in a way that will compensate all counsel who have assumed and fulfilled the responsibilities that the Court imposed on the committees, who have shouldered the burden of prosecuting the claims for the plaintiffs as a whole and whose collective contribution cannot be accurately measured before the end of the MDL as a whole. *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740 (E.D. La. 2011) (Fallon, J.) (though court earlier established contribution amount for common benefit fund, only once MDL was settled did court issue allocation decisions regarding payments to the various attorneys who performed common benefit work in the MDL).

The equitable principles of unjust enrichment and *quantum meruit* that underpin the common benefit doctrine are squarely at issue in this MDL where the leadership members of the MDL who are Responding Plaintiffs have taken on the obligation to develop claims against a broad range of the sponsors and supporters of the terrorist attacks on behalf of all plaintiffs in the lawsuit, and have borne responsibility for the vast majority of all common benefit work. The relative contributions of the committee members for their roles in those tasks – the value of their time and related costs – that the Responding Plaintiffs have made in favor of the plaintiffs in this MDL, and which otherwise would have been borne solely by counsel for the plaintiffs

---

[14] Whether it is proper to create a CBF solely for purposes of interim cost reimbursements is a separate question and one that, unlike an interim attorney's fee allocation, has support in the history and practices of MDLs. *See* Duke Report at 69.

individually, cannot be calculated until the entire MDL is resolved.[15]  The Magistrate Judge's decisions to the contrary must be set aside.

### D.  Any Claim to Recoveries From USVSST Fund in its First Round Has Been Waived

On July 12, 2016, this Court denied *Havlish* counsel's initial motion for creation of a CBF as premature because no USVSST Fund payments had yet issued. *See* ECF No. 3309.  That same month, the USVSST Fund began making some payments, with the first round authorized and public notice concerning those payments posted by December 19, 2016. *See* USVSST Fund Important Dates, www.usvsst.com/important.php, last accessed October 30, 2020.  Those payments were distributed soon after the USVSST Fund issued them. *See* ECF No. 5361 at 17. *Havlish* counsel, however, did not renew its motion for creation of a CBF for nearly two more years, long after awards and fees from the first USVSST Fund round had been distributed.

When *Havlish* counsel renewed their motion for a CBF in December 2018, it asked only for payments from fees other attorneys received "*by virtue of USVSST Fund distributions … received in 2019 and continuing through all future years of the USVSST Fund.*" ECF Nos. 4289 at 2, 4290 at 2-3 (emphasis added).  By affirmatively seeking the fees only from 2019 and forward in the motion renewing their request for a CBF, *Havlish* counsel has waived any claim for fees from previously issued awards and any contribution from USVSST Fund fees must exclude fees received from the first round of payments.

---

[15] Further evidence of the inequity of the Magistrate Judges' approach is the fact that she appears to expect all Responding Plaintiffs to make the same contribution to a CBF, despite the fact that they have recovered different amounts for their clients (with some having not yet received any USVSST Fund distributions) and have varying fee agreements (such that proportional fee recoveries vary meaningfully amongst Responding Plaintiffs).  Any ultimate CBF would have to take those differences into account before assessing a contribution to be fair and equitable and the full scope of those differences cannot be determined until the end of the MDL

### 4. Conclusion

This Court should not authorize the creation of a Common Benefit Fund that: would be composed of recoveries from a government fund outside the scope of the MDL; would compensate work relating only to a single defaulting defendant at the expense of the PEC leadership that has conducted plaintiffs' case management responsibilities in the MDL and who continue to vigorously pursue claims against numerous other appearing defendants aggressively defending themselves; would make any allocations for attorney time prior to conclusion of the MDL as a whole; and would include fees that *Havlish* counsel previously waived. Doing so would be contrary to the statutory and common law authorizing the establishment and operation of MDL common benefit funds; the history and circumstances of this particular case, including the committee structure adopted at the outset of the litigation and nature and scope of the work that has been undertaken by committee members; and equitable principles.  The PEC respectfully requests that this Court set aside the 09/30/2019 and 09/30/2020 decisions (ECF Nos. 5180 and 6481) and deny the *Havlish* counsel's request for establishment of a Common Benefit Fund (ECF No. 4289 *et seq.*).

November 4, 2020                                    Respectfully submitted,


MOTLEY RICE LLC                          KREINDLER & KREINDLER LLP

By: /s/ Robert T. Haefele                    By: /s/ Andrew Maloney

   JODI WESTBROOK FLOWERS        JAMES P. KREINDLER
   DONALD A. MIGLIORI                ANDREW J. MALONEY
   ROBERT T. HAEFELE                 KREINDLER & KREINDLER LLP
   MOTLEY RICE LLC                   750 Third Avenue
   28 Bridgeside Boulevard           New York, New York 10017
   Mount Pleasant, SC 29465          Tel.: 212-687-8181
   Tel.: (843) 216-9184             Email: amaloney@kreindler.com

Email: rhaefele@motleyrice.com
*For the Plaintiffs' Exec. Committee for Wrongful Death And Personal Injury Plaintiffs*

*For the Plaintiffs' Exec. Committee for Wrongful Death And Personal Injury Plaintiffs*

ANDERSON KILL P.C.

By: /s/ Jerry S. Goldman
    JERRY S. GOLDMAN
    ANDERSON KILL P.C.
    1251 Avenue of the Americas
    New York, New York 10020
    Tel.: 212-278-1000
    Email: jgoldman@andersonkill.com
    *For the Plaintiffs' Exec. Committee for Wrongful Death And Personal Injury Plaintiffs*