# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CERTAIN 03 MDL 1570 PLAINTIFFS<br><br>Plaintiffs,<br><br>v.<br><br>THE REPUBLIC OF THE SUDAN<br><br>Defendant. | CIVIL ACTION NO.: 03 MDL 1570 (GBD) (SN)<br><br>**CONSOLIDATED AMENDED COMPLAINT AS TO THE REPUBLIC OF THE SUDAN**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED COMPLAINT AS TO THE REPUBLIC OF THE SUDAN

*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* Case No. 03 Civ. 9849
*Federal Insurance Co., et al. v. Al Qaida, et al.,* Case No. 03 Civ. 6978
*Continental Casualty Co., et al. v. Al Qaeda, et al.,* Case No. 04 Civ. 5970
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.,* Case No. 04 Civ. 1922
*Estate of John P. O'Neill, Sr., et al. v. Republic of the Sudan, et al.,* Case No. 18 Civ. 12114

## I.     INTRODUCTION

1.     This Consolidated Amended Complaint is filed on behalf of Plaintiffs with claims against the Republic of the Sudan, including members of the *O'Neill* putative class action with claims against the Republic of the Sudan (referred to collectively as "Plaintiffs").

2.     This Consolidated Amended Complaint does not displace the operative complaints in these actions, as contemplated in multi-district litigation proceedings.

3.     This Consolidated Amended Complaint relates solely to the Republic of the Sudan and does not apply to any other defendants in the September 11th MDL.

## II.     THE PARTIES

4.     Plaintiffs in these consolidated actions include the estates of thousands of individuals murdered in the terrorist attacks of September 11, 2001 (the "September 11th attacks"), several thousand family members of those victims, thousands of individuals who

themselves suffered physical injuries caused by the September 11th attacks, and commercial entities that incurred billions of dollars in losses due to physical injuries to property caused by the September 11th attacks.  In addition, the *O'Neill* class action complaint asserts claims on behalf of all members of a putative class.

5.      Plaintiffs have described their particular injuries and the nexus between those injuries and the September 11th attacks in the complaints through which they initiated their actions and the associated pleadings in those cases, which are incorporated herein by reference.[1]

6.      Defendant, the Republic of the Sudan ("Sudan"), is a foreign state within the meaning of 28 U.S.C. § 1603(a) and 28 U.S.C. §1391(f), and a Designated State Sponsor of Terrorism pursuant to the Export Administration Act of 1979, Arms Export Control Act of 1976, and Foreign Assistance Act of 1961.  Defendant Sudan maintains an Embassy within the United States at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

7.      Defendant Sudan was designated as a State Sponsor of Terrorism by the U.S. Department of State on August 12, 1993.

## III.    JURISDICTION

8.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1330, as the claims against Sudan fall within the exceptions to foreign sovereign immunity set forth at 28 U.S.C. §§ 1605(a)(5), 1605A, and 1605B of the Foreign Sovereign Immunities Act ("FSIA"), 28

---

[1] The incorporated complaints are the *Burnett* Third Amended Complaint, Case No. 02 Civ. 1616 (D.D.C.), ECF No. 29, and *Burnett's* Notice of Consolidation of Pleadings, 03 MDL 1570, ECF No. 1377; *Federal Insurance* First Amended Complaint with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order Number 2, Case No. 03 Civ. 6978, ECF No. 772; *Continental Casualty* Second Amended Complaint, Case No. 04 Civ. 5970, ECF No. 195; *O'Neill* Class Action Complaint, Case No. 04 Civ. 1922, ECF Nos. 1, 21-22, as amended by the *O'Neill* First Consolidated Complaint, Case No. 03 MDL 1570, ECF No. 1569; *O'Neill* Complaint, Case No. 18 Civ. 12114, ECF No. 1.

U.S.C. § 1602 *et seq*., as well as the exception to immunity formerly set forth at 28 U.S.C. § 1605(a)(7).

9.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## IV.    NATURE OF THE ACTION

10.     This is a suit for wrongful deaths, personal injuries, and property damage and economic loss caused by the September 11, 2001 terrorist attacks upon the United States.  The claims against Sudan are predicated on its sponsorship of, and intimate collaboration with, Osama bin Laden and al Qaeda in the years leading up to the September 11, 2001 terrorist attacks, through which Sudan provided material support for, aided and abetted, and conspired with al Qaeda in relation to those attacks, as well as Sudan's own related acts of international terrorism, involving violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq*.  *See e.g.* 18 U.S.C. §§ 2333(a), 2333(d), 2339A, 2339B, and 2339C.

## V.     FACTUAL BACKGROUND

11.     On September 11, 2001, nineteen members of al Qaeda hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens.

12.     Nearly three thousand innocent people were killed on September 11, 2001 as a result of the September 11th attacks, and thousands more were injured.  In addition, the attacks caused property and economic damage on a catastrophic scale.

13.     For al Qaeda and its collaborators and supporters, the September 11th attacks were the culmination of a more than decade long campaign to carry out spectacular terrorist attacks against the United States, set in motion with the formation of al Qaeda in 1989.

14.     The success of the September 11th attacks was made possible by Sudan's pervasive state sponsorship of al Qaeda beginning in 1989 and continuing through the September 11th attacks.

15.     As further detailed below, Sudan served as a critical incubator for al Qaeda from its nascent stages and through the September 11th attacks, deploying assets, resources, and expertise uniquely available to it as a state actor to nurture and sustain al Qaeda and provide it with the skills and resources necessary to fulfill its mission to conduct terrorist attacks against the United States.  This support was deployed under the direction of Sudan's most senior officials, using Sudan's intelligence, military, and diplomatic apparatuses, with knowledge of al Qaeda's intent to use resources provided to it to conduct terrorist attacks against the United States, and with the intent that al Qaeda would in fact use the support Sudan provided to achieve that objective.

16.     As further detailed below, Sudan's support for al Qaeda encompassed safe haven for al Qaeda and its senior leadership and members; training camps; intelligence services and training in intelligence practices and techniques; military equipment, training, and assistance; diplomatic cover for al Qaeda members and operations; passports and other identification and travel documents; preferred access to Sudan's banking, business, and agricultural sectors; relationship building with other terrorist organizations and terrorist states, including Iran; and access to other resources uniquely available to Sudan as a state actor.

17.     As further detailed below, al Qaeda itself was the product of the intimate collaboration between Sudan's senior leadership and Osama bin Laden, and would never have come into being as an international terrorist organization absent the support and resources provided by Sudan from al Qaeda's inception through September 11, 2001.  The support

4

provided by Sudan enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th attacks, and was essential to the success of those attacks.

## VI.     THE ORIGINS OF AL QAEDA

18.     Al Qaeda has its origins in the jihad against the Soviet occupation of Afghanistan, which served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage "jihad" against the Soviet Union.

19.     Osama bin Laden, a wealthy citizen of Saudi Arabia, traveled to Afghanistan in 1985 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen.  According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission Report"):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization.  This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states.  Donations flowed through charities and other non-governmental organizations (NGOs).  Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors."[2]

20.     At the conclusion of the Afghan jihad, bin Laden aspired to transform the network created for the military conflict in Afghanistan to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States.

> April 1988 brought victory for the Afghan jihad.  Moscow declared it would pull its military forces out of Afghanistan within the next nine months.  As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

---

[2] 9/11 Commission Report at p. 55.

> Bin Ladin and [Abdullah] Azzam agreed that the organization
> successfully created for Afghanistan should not be allowed to
> dissolve.  They established what they called a base or foundation
> (al Qaeda) as a potential general headquarters for future jihad.[3]

21.     When bin Laden and a handful of close associates reached their agreement to
establish al Qaeda in Peshawar, Pakistan in 1989, it was merely an aspirational idea, and a range
of prohibitive practical, financial, political, and logistical obstacles stood in the way of their
ambition to establish a global jihad organization.  Absent the intervention and support of the
government of Sudan, those formidable obstacles would have remained insurmountable, and al
Qaeda would never have come into being.

## VII.    AL QAEDA'S OBJECTIVES AND TACTICS

22.     In establishing al Qaeda in 1989, bin Laden sought to create a multi-national
Islamic army to challenge the perceived domination of the democratic West.[4]

23.     For bin Laden and his followers and supporters, the United States was the source
of all problems confronting the Muslim world, to be destroyed at all costs.  Accordingly, the
United States has been, since al Qaeda's inception, the primary target of bin Laden's
organization.

24.     The centerpiece of bin Laden's strategy to fight the United States involved staging
high profile terrorist attacks against America and its citizens.  Bin Laden firmly believed that
such attacks would serve to demonstrate that America was nothing more than a paper tiger, and
rally Muslims throughout the world to al Qaeda's cause.  Pursuant to this strategy, "[p]lans to
attack the United States were developed with unwavering single-mindedness throughout the
1990s."[5]

---

[3] *Id.* at p. 56.
[4] Indictment, *United States v. Usama Bin Laden, et al.*, Case No. 1:98-cr-1023 (S.D.N.Y.).
[5] 9/11 Commission Report at p. 48.

25.     As a complement to the efforts to attack the United States through terrorist strikes, al Qaeda has also sent its members to fight U.S. interests and military personnel in conflict regions throughout the world.  Since at least 1992, al Qaeda has been involved in fighting U.S. interests, through both traditional forms of combat and terrorist attacks, in Afghanistan, Algeria, Bosnia, Chechnya, Egypt, Indonesia, Iraq, Kashmir, Kenya, Kosovo, Malaysia, Pakistan, the Philippines, Somalia, Sudan, Syria, Tanzania, Turkey, and Yemen.

## VIII.   THE CRITICALITY OF AL QAEDA'S INFRASTRUCTURE TO THE 9/11 ATTACKS

26.     According to the 9/11 Commission, the "9/11 attack was a complex international operation, the product of years of planning."[6]  Indeed, plans for the attacks were carefully vetted through al Qaeda's most senior leadership over a period of several years; al Qaeda drew on knowledge and experience acquired over the course of its development and through work on earlier terrorist plots in conceiving, planning, and carrying out the 9/11 operation; al Qaeda employed sophisticated counterintelligence and operational techniques in planning and conducting the attacks; al Qaeda relied on cooperative relationships forged during its development, including a cooperative relationship with Sudan, in planning and carrying out the attacks; the individuals selected to participate in the attacks were chosen from an enormous pool of potential candidates, who were recruited, trained, and indoctrinated over a period of many years; and details of the plans were revised up until the last minute, through a sophisticated global communication network capable of evading the surveillance and intelligence operations of the United States and its allies.

27.     Based on the findings of its investigation concerning al Qaeda's development during the thirteen (13) years preceding the September 11th attacks, the evolution of al Qaeda's

---

[6] *Id.* at p. 365.

efforts to target the United States through plots involving the civil aviation system, and the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate, and mount the September 11th attacks, the 9/11 Commission reached the following conclusions regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require
>
> • time, space, and ability to perform competent planning and staff work;
>
> • a command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> • opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
>
> • a logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;
>
> • access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;
>
> • reliable communications between coordinators and operatives; and
>
> • opportunity to test the workability of the plan.[7]

28.     In light of those conclusions, the United States has affirmed that the imposition of civil liability on sponsors and supporters of terrorism pursuant to the ATA is an important component of the United States' national security strategy, which serves to deter the financing of terrorism and thereby deprive terrorist organizations of the resources needed to carry out

---

[7] *Id.* at pp. 365-366.

sophisticated terrorist attacks, like the September 11th attacks.  As Deputy Secretary of State,

Antony J. Blinken testified in an affidavit filed on behalf of the United States in proceedings

before a federal district court in the Southern District of New York:

> The ability of victims to recover under the ATA also advances
> U.S. national security interests.  The law reflects our nation's
> compelling interest in combatting and deterring terrorism at every
> level, including by eliminating sources of terrorist funding and
> holding sponsors of terrorism accountable for their actions.
> Imposing civil liability on those who commit or sponsor acts of
> terrorism is an important means of deterring and defeating terrorist
> activity.  Further, compensation of victims at the expense of those
> who have committed or supported terrorist acts contributes to U.S.
> efforts to disrupt the financing of terrorism and to impede the flow
> of funds or other support to terrorist activity.[8]

## IX.    SUDAN, HASSAN AL TURABI, AND THE NATIONAL ISLAMIC FRONT

29.    Sudan is a country in northeastern Africa, bordered by Egypt, Libya, Chad,

Ethiopia, and Eritrea and separated from Saudi Arabia by the Red Sea.

30.    Hassan al Turabi was a powerful Sudanese cleric, religious leader, politician, and

the de facto leader of Sudan from 1989 until 1999.  Turabi preached a radical, militaristic Islamic

fundamentalism and was the principal architect behind a movement to unify Shia and Sunni

jihadist terrorists organizations against the United States.

31.    Turabi founded the National Islamic Front ("NIF"), a Sudanese political party and

off-shoot of the Muslim Brotherhood, whose objectives were to institutionalize a militant version

of Islamic law in Sudan, with the ultimate goal of spreading an extremist Islamism across the

Muslim world.

32.    Under Turabi's leadership, the NIF started to gain political power in Sudan in the

early 1980's.

---

[8] Declaration of Antony J. Blinken, *Sokolow, et al. v. Palestine Liberation Organization, et al.*, Case No.
1:04-cv-397 (S.D.N.Y.).

33.     Turabi and the NIF realized that, to solidify power in Sudan and achieve their

goal of creating an Islamic state in Sudan, they would have to coopt the Sudanese military and

security services.

34.     On June 30, 1989, after successfully coopting Sudan's security and military

apparatuses, Turabi and the NIF staged a bloodless coup with the help of Omar al Bashir, a

brigadier general in the Sudanese army, and installed Bashir as the President of Sudan.[9]

35.     From the onset, the new Sudanese government established by Turabi and Bashir

considered the American government to be an enemy of their movement and Sudan.[10]

36.     At the time of the 1989 coup until 1999, Turabi and Bashir shared power over

Sudan.[11]

37.     In 1999, tensions developed between Turabi and Bashir as a result of an effort by

Turabi to implement changes that would have reduced Bashir's power.  Bashir prevailed in the

ensuing power struggle, and remained in power until 2019, when he was ousted in a coup.

38.     Bashir's ouster of Turabi in 2000 did not alter Sudan's longstanding collaboration

with al Qaeda.  To the contrary, Sudan continued to provide critical and extensive support to al

Qaeda through, and even after, September 11, 2001.  According to the State Department's annual

report on global terrorism for calendar year 2001, issued after the September 11th attacks in May

of 2002, Sudan "remained a designated state sponsor of terrorism.  A number of international

terrorist groups including al-Qaida, the Egyptian Islamic Jihad, Egyptian al-Gama'a al-

---

[9] *Sudan: Hassan Al-Turabi's Life and Politics, Episode One, Rise to Power*, Al Jazeera World, August 14, 2019.

[10] *Sudan: Hassan Al-Turabi's Life and Politics, Episode Two, Fall from Favour*, Al Jazeera World, August 14, 2019.

[11] In 1998, Turabi and Bashir renamed the NIF the National Congress Party, and thereafter exercised power under its banner.

Islamiyya, the Palestine Islamic Jihad, and HAMAS continued to use Sudan as a safe haven,

primarily for conducting logistics and other support activities."

## X.    SUDAN:  A STATE SPONSOR OF TERRORISM

39.    On August 13, 1993, the United States designated Sudan as a state sponsor of

terrorism and it continues to be so designated to this day.

40.    In 1997, four years after Sudan was designated as a state sponsor of terrorism,

then Senator John Ashcroft, during a Senate hearing titled "Sudan and Terrorism," summarized

why Sudan was designated as a state sponsor of terrorism and reviewed Sudan's unwavering

commitment to sponsoring terrorism even after it was designated:

> One of the most serious of these new national security threats is the
> rise of international terrorism.  We are holding this hearing today
> in the Subcommittee on African Affairs to address the menace of
> terrorism as sponsored by the Government of Sudan.  Since first
> being designated a State sponsor of terrorism in 1993, Sudan has
> risen quickly in the ranks of infamy to join Iran as the worst of
> State sponsors of terrorism.
>
> Sudan harbors elements of the most violent terrorist organizations
> in the world….
>
> In addition to harboring terrorist organizations, Sudan has given
> refuge to several of the most notorious terrorists, including Imad
> Moughniyeh and Osama Bin Laden….
>
> Sudan is not simply a favorite vacation spot for terrorists.  The
> Sudanese Government is an active supporter of these terrorist
> activities….  Two Sudanese diplomats at the United Nations in
> New York conspired to help Jihad terrorists gain access to the UN
> complex to bomb the building.[12]

41.    The State Department's annual report on terrorism, first prepared in 1985 and

known during the relevant period as *Patterns of Global Terrorism*, presented the following

---

[12] Opening Statement of John Ashcroft, *Sudan and Terrorism,* Hearing before the Subcommittee on
African Affairs of the Committee on Foreign Relations, United States Senate, One Hundred and Fifth
Congress, First Session, S. Hrg 105-223, May 15, 2007.

relevant findings concerning Sudan's state sponsorship of Osama bin Laden and al Qaeda in the

editions of the report issued between 1995 and 2001:

> • <u>1995</u> – Sudan continued to serve as a refuge, nexus, and training hub in 1995 for a number of international terrorist organizations, primarily of Middle Eastern origin.  The Sudanese Government, which is dominated by the National Islamic Front (NIF), also condoned many of the activities of Iran and the Khartoum-based Usama Bin Ladin, a private financier of terrorism.  Khartoum permitted the funneling of assistance to terrorist and radical Islamist groups operating in and transiting Sudan.

> \*\*\*

> Khartoum also permitted Usama Bin Ladin, a denaturalized Saudi citizen with mujahedin contacts, to use Sudan as a shelter for his radical Muslim followers and to finance and train militant groups.  Bin Ladin, who lives in Khartoum and owns numerous business enterprises in Sudan, has been linked to numerous terrorist organizations.  He directs funding and other logistic support through his companies to a number of extremist causes.

> • <u>1997</u> – Usama bin Muhammad bin Awad Bin Ladin is one of the most significant sponsors of Sunni Islamic terrorist groups.  The youngest son of Saudi construction magnate Muhammad Bin Ladin, Usama joined the Afghan resistance almost immediately after the Soviet invasion in December 1979.  He played a significant role in financing, recruiting, transporting, and training Arab nationals who volunteered to fight in Afghanistan.  During the war, Bin Ladin founded al-Qaida – the Base – to serve as an operational hub, predominantly for like-minded Sunni Islamic extremists.  The Saudi Government revoked his citizenship in 1994 and his family official disowned him.  He had to move to Sudan in 1991, but international pressure on that government forced him to move to Afghanistan in 1996.

> \*\*\*

> Since August 1996, Bin Ladin has been very vocal in expressing his approval of and intent to use terrorism.  He claimed responsibility for trying to bomb U.S. soldiers in Yemen in late 1992 and for attacks on them in Somalia in 1993, and reports suggest his organization aided the Egyptian al-Gama'at al-Islamiyya in its assassination attempt on Egyptian President Mubarak in Ethiopia in 1995.

• <u>1998</u> – Sudan continued to serve as a meeting place, safehaven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization.  The Sudanese Government also condoned many of Iran's objectionable activities, such as funding terrorist and radical Islamic groups operating and transiting Sudan.

\*\*\*

In August the United States accused Sudan of involvement in chemical weapons development.  On 20 August the United States conducted military strikes against the al-Shifa pharmaceutical plant in Khartoum, which was associated with Usama Bin Ladin's terrorist network and believed to be involved in the manufacture of chemical weapons, to prevent an anti-U.S. attack.

• <u>1999</u> – Sudan in 1999 continued to serve as a central hub for several international terrorist groups, including Usama Bin Ladin's al-Qaida organization.  The Sudanese Government also condoned Iran's assistance to terrorist and radical Islamist groups operating in and transiting through Sudan.

Khartoum served as a meeting place, safehaven, and training hub for members of the Lebanese Hizballah, Egyptian Gama'at al-Islamiyya, al-Jihad, the Palestinian Islamic Jihad, HAMAS, and Abu Nidal organization.  Sudan's support to these groups included the provision of travel documentation, safe passage, and refuge.  Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere.

• <u>2000</u> – Sudan, however, continued to be used as a safehaven by members of various groups, including associates of Usama Bin Ladin's al-Qaida organization, Egyptian al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS.  Most groups used Sudan primarily as a secure base for assisting compatriots elsewhere.

• <u>2001</u> – Sudan, however, remained a designated state sponsor of terrorism.  A number of international terrorist groups including al-Qaida, the Egyptian Islamic Jihad, Egyptian al-Gama'a al-Islamiyya, the Palestine Islamic Jihad, and HAMAS continued to use Sudan as a safehaven, primarily for conducting logistics and other support activities.

42.     In the May 1997 Senate Foreign Relations Committee hearing referenced above, terrorism expert Steven Emerson echoed former Senator Ashcroft and testified as follows:

> Sudan, arguably the largest terrorist camp in the word, has become a central player in supporting, sponsoring and enhancing terrorist groups....  Unless some type of brakes are forcibly applied to the spinning vortex of terrorism emanating from the Sudan, the attacks on our friends and on ourselves will only continue.[13]

43.     Unknown at the time to the committee members and the witnesses who testified at the May 17, 1997 hearing, Sudan and al Qaeda had already started planning the following attacks on the United States:  1) the simultaneous bombings of U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, a year later; 2) the attack on the U.S.S. Cole three years later in Aden, Yemen; and 3) the 9/11 attacks four years later.

## XI.    SUDAN OFFERS THE NEWLY BORN AL QAEDA THE SANCTUARY AND SUPPORT IT NEEDED TO GROW INTO A TERRORIST NETWORK WITH WORLDWIDE GLOBAL STRIKE CAPABILITIES

44.     As concluded by the CIA, while al Qaeda was conceived in the hills of Afghanistan-Pakistan border, it was transformed from a mere idea into a functioning and sophisticated terrorist organization in Sudan, as a result of the support, resources, training, and encouragement provided by the Sudanese government:  "While based in Sudan from 1992-1996, al-Qaida, was transformed from an only partially realized idea to an international organization ready to operate on its own."[14]

---

[13] Prepared Statement of Steven Emerson, *Sudan and Terrorism,* Hearing before the Subcommittee on African Affairs of the Committee on Foreign Relations, United States Senate, One Hundred and Fifth Congress, First Session, S. Hrg 105-223, May 15, 2007.
[14] CIA Report, *Al-Qaida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003.

45.     Before moving to Sudan in the early 1990's, al Qaeda was a poorly organized group operating out of a small and unstable base on the Afghanistan-Pakistan border, with no more than sixty (60) members scattered across thousands of miles of distance.[15]

46.     Following the withdrawal of Soviet forces from Afghanistan in 1989, the newly born al Qaeda found itself without a home.  The Arab fighters who had flocked to Afghanistan to wage jihad were no longer welcome in Afghanistan or Pakistan.

47.     Without a base from which to operate and house recruits and members, al Qaeda was destined to collapse before it ever became an organization in any meaningful sense.  It was spared from that certain fate by the intervention of the Sudanese government, whose newly installed leaders sent emissaries to Osama bin Laden with an offer for him to relocate his new group, al Qaeda, to Sudan.

48.     Bin Laden was particularly receptive to Sudan's overtures because of their shared ideological vision and because forging a relationship with the NIF and the new Sudanese leadership would provide bin Laden and al Qaeda with legitimacy among Islamists, something bin Laden recognized as critical to building a global jihad organization.  As Kenneth Katzman, a former analyst for the CIA and terrorism expert for the Congressional Research Service, stated:

> Osama Bin Laden is inspired by Turabi's expansive vision; he sees eye to eye with him.  Turabi has Islamic credentials Osama Bin Laden could never have.

49.     According to the trial testimony of Jamal Ahmed Mohamed al Fadl, a former Sudanese member of al Qaeda, Sudan's facilitation of al Qaeda's relocation to Sudan started

---

[15] Testimony of Evan F. Kohlmann, *Owens v. Republic of Sudan,* Case No. 01-cv-2244 (D.D.C.), October 28, 2010, at pp. 227-228.

with Sudan dispatching three Sudanese intelligence officers to Peshawar, Pakistan to meet with Osama bin Laden and other members of al Qaeda.[16]

50.     In response to Sudan's overtures, bin Laden dispatched four al Qaeda operatives from Pakistan to Sudan to meet with the NIF and Turabi to explore a partnership with Sudan. The purpose of the initial exploratory trip was to confirm that the NIF and al Qaeda shared ideological goals and to confirm that the Sudanese government would provide the safe haven, resources, and support to establish, build, and sustain al Qaeda.[17]

51.     The discussions confirmed that al Qaeda and the Sudanese leadership did in fact share a common ideology and Islamist vision, and that Sudan was committed to providing the state support needed to realize bin Laden's vision to establish a global terrorist organization.

52.     The arrangement between bin Laden and the Sudanese regime specifically contemplated that bin Laden would use the base in Sudan and support of the Sudanese government to build al Qaeda into a global terrorist organization dedicating to attacking the United States:

> Bin Laden agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building.  Turabi in return would let Bin Laden use Sudan as a base for worldwide business operations and for preparations for jihad.[18]

---

[16] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden*, Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 216-218.
[17] *Id.*
[18] 9/11 Commission Report at p. 57.  *See also* CIA Report, *Historical Background of the Islamic Army and Bin Ladin's Move from Afghanistan to Sudan*, November 26, 1996 (indicating that "Bin Ladin moved al Qaeda to Sudan at the behest of the National Islamic Front").

53.     Al Qaeda began its relocation from Afghanistan and Pakistan to Sudan in 1990, when bin Laden dispatched al Qaeda members to Sudan to rent and purchase residences for the relocation of the nascent organization, and farms to be used for jihad training.[19]

54.     While many of the Arab mujahideen who had fought in Afghanistan were not welcome back to their home countries at the conclusion of the Afghan conflict, as they were recognized to present a security threat due to their dedication to an extreme jihadist worldview, bin Laden was welcomed back to Saudi Arabia and celebrated as a hero for his role in organizing and supporting the fight in Afghanistan, which the Saudi regime had aggressively promoted as a righteous "jihad."  Thus, while other members of the embryonic al Qaeda organization began relocating to Sudan, bin Laden returned to Saudi Arabia.

55.     Meanwhile, at Sudan's invitation and with its express assistance, virtually every member of al Qaeda's newly formed *Shura Council*, the terrorist organization's governing body, relocated to Sudan, including Dr. Ayman al Zawahiri, al Qaeda's deputy commander, and Mohammed Atef, al Qaeda's military chief.[20]

56.     The base and support provided by the government of Sudan afforded the leadership of the newly formed al Qaeda the time, space, and resources needed to systematically build their terrorist organization.  The endorsement of Sudan's Islamist leaders provided al Qaeda with enhanced legitimacy and credibility among Islamists in its recruiting efforts, which were further bolstered by the safe haven and businesses al Qaeda established within Sudan with the assistance of Sudan's government, which allowed al Qaeda to offer prospective members

---

[19] 9/11 Commission Report at p. 57.  *See also* Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden*, Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 219-223, 242-244, 262-264.
[20] Testimony of L'Houssaine Kherchtou, *United States v. Khaled al Fawwaz*, Case No. 1:98-cr-1023 (S.D.N.Y), January 28, 2015, pp. 292-434 (identifying al Qaeda operatives who relocated to Sudan).

(many of whom had nowhere to go) housing in a safe environment and paying jobs while they trained for jihad.

57.     By virtue of this platform provided by the government of Sudan, al Qaeda's membership grew exponentially, from a mere sixty members in 1989 to two thousand members by the early 1990s.

58.     As confirmed by L'Houssaine Kerchtour, a sworn member of al Qaeda who became a U.S. informant, al Qaeda's leadership and base of operations had completed the move to Sudan by 1992, specifically to Sudan's capital of Khartoum.[21]

59.     The importance of Sudan as a safe haven cannot be overstated because Sudan, at the time of al Qaeda's inception, provided six essential functions for the growth and development of al Qaeda:

> • A welcoming government that provided travel documents when other governments would restrict travel or arrest Arab jihadists returning from Afghanistan;
>
> • Business opportunities so that recruits could be given paid jobs in order to care for themselves and their families;
>
> • Business opportunities that provided cover for the international movement of money, operatives and equipment;
>
> • A safe place free from the warring factions in Afghanistan so as to recruit members and their families;
>
> • Protection from foreign interference by the use of Sudan's security, intelligence, and military apparatus; and
>
> • A government sponsored center for al Qaeda to meet with other terrorist organizations permitting al Qaeda to acquire international contacts, influence and power in the terrorist underworld.

---

[21] Testimony of L'Houssaine Kherchtou, *United States v. Khaled al Fawwaz*, Case No. 1:98-cr-1023 (S.D.N.Y), January 28, 2015, at p. 386.

60.     On August 2, 1990, Iraq invaded Kuwait, and in response, Saudi Arabia permitted U.S. troops to be stationed in the Kingdom to repel the Iraqi invasion and protect Saudi Arabia itself.

61.     Bin Laden and many prominent Saudi clerics condemned the arrangement, viewing the presence of an "infidel" force on Muslim land to be a desecration of holy land and further evidence of a conspiracy theory long advanced by the Saudi regime and its religious institutions, that the West was engaged in a sophisticated plot to undermine the fabric of Muslim societies in order to occupy Muslim land.

62.     The presence of U.S. troops in Saudi Arabia also enraged Sudan's Islamist regime, including leaders Bashir and Turabi who both publically condemned the presence of U.S. troops in the region in terms mirroring bin Laden's Islamist and conspiratorial narrative.

63.     According to President Bashir:

> We are deeply against sending troops to our region because we know well these troops do not come to protect anyone, do not come to defend legitimacy. Instead they come to destroy Iraqi forces.  They seek to control the Arab oil fields and to insure that oil will continue to flow to their industries.[22]

64.     Turabi likewise ominously declared:  "We will not bow before anyone.  We refuse to be humiliated and we will defy America."[23]

65.     In April of 1991, shortly after the armistice was signed concluding the Gulf War, bin Laden relocated to Sudan, allowing him to oversee more directly the operations his followers had been establishing in Sudan since 1990.

---

[22] *Sudan: Hassan Al Turabi's Life and Politics, Episode Two, Fall from Favour*, Al Jazeera World, August 14, 2019.

[23] *Sudan: Hassan Al-Turabi's Life and Politics, Episode One, Rise to Power*, Al Jazeera World, August 14, 2019.

66.     When bin Laden arrived in Sudan in 1991, the Sudanese government deployed its intelligence services to provide personal security for bin Laden in coordination with bin Laden's own personal bodyguards and those responsible for training Bin Laden's personal bodyguards.[24]

67.     This security assistance was part of a far broader hand-in-glove collaboration between Sudan's intelligence services and al Qaeda, implemented at the outset of the partnership between Sudan and al Qaeda and continuing through September 11, 2001, pursuant to which al Qaeda enjoyed the full benefits and expertise of a sophisticated state intelligence apparatus.  As part of that collaboration, the Sudanese intelligence services began coordinating counter-intelligence activities in the early 1990's by vetting potential al Qaeda recruits.[25]

68.     Pursuant to bin Laden's direction, Jamal al Fadl personally worked with the Sudanese intelligence services to investigate and interrogate potential recruits, to ensure that they were not spies looking to gather information about al Qaeda and its plots on behalf of hostile governments.

69.     Pursuant to this counterintelligence collaboration, Sudan's intelligence services would identify and collect information on potential al Qaeda recruits, hold the potential recruits in custody so that al Qaeda could interview them and determine if they were an asset or a threat. To the extent a potential recruit were deemed a threat, al Qaeda and Sudanese intelligence would either jail or kill them.[26]

70.     Sudan further facilitated al Qaeda's recruitment program by granting citizenship to al Qaeda members, and by providing false passports and diplomatic papers for use by al

---

[24] Guilty Plea of Ali Mohamed, *United States v Ali Mohamed,* Case No. 1:98-cr-1023 (S.D.N.Y.), October 20, 2000.
[25] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 231-237.
[26] *Id.*

Qaeda.[27]  This assistance directly enabled al Qaeda's operations as well, by enabling al Qaeda members to travel in furtherance of al Qaeda's terrorist activities.

71.     When other countries became aware of the extent of Sudan's collaboration with al Qaeda and related terrorist organizations and implemented heightened monitoring of those traveling to and from Sudan as part of their counterterrorism efforts, the Sudanese government implemented procedures to frustrate those counterterrorism efforts, including by refraining to stamp the passports of al Qaeda members and escorting them past customs and immigration officials.[28]  This program further enabled al Qaeda members to travel internationally in furtherance of al Qaeda's recruitment and operational activities, including its planning and preparations to conduct terrorist attacks against the United States.

72.     Sudan's President Bashir also provided an official Sudanese government letter to al Qaeda operatives in Sudan, which permitted al Qaeda operatives to avoid and bypass security screening of their persons and possessions.[29]

73.     In addition to facilitating the recruitment and movement of al Qaeda terrorists, Sudan also assisted in the movement of weapons and other equipment for al Qaeda from Afghanistan to Sudan, by ferrying that weaponry and equipment on the Sudanese government run airline, Sudan Airways.[30]

74.     The Sudanese government also played an invaluable role in establishing cooperation agreements between al Qaeda and other terrorists and terrorist states, which were essential to al Qaeda's development into a sophisticated terrorist organization and its ability to carry out large-scale attacks.

---

[27] *Id.* at pp. 317-318.
[28] *Id.* at pp. 285-286.
[29] *Id.* at pp. 233-234, 238-239.
[30] *Id.* at pp. 272-274.

75.     In 1991, consistent with Turabi's vision to unite Shia and Sunni Islamists against their common enemy, the United States, the Sudanese government began facilitating meetings, discussions, and cooperation agreements among the NIF, al Qaeda, Iran, and the world's most notorious terrorists and terrorist organizations.[31]

76.     This unprecedented unification of Shia and Sunni Islamists resulted in a tripartite agreement among al Qaeda, Iran, and the NIF to "collaborate politically and militarily."  "The primary goal of the collaboration was to confront Israel and the United States."[32]

77.     The importance of the Sudanese government's role in connecting adverse terrorists groups together for the purpose of attacking the United States and the role that Sudan played is summarized by the testimony of terrorism expert and former U.S Treasury and FBI Counterterrorism analyst, Dr. Matthew Levitt:

> Q.  How did al-Qaeda come into contact with the Iranian government?
>
> A.  Al-Qaeda, Bin Laden, and many of his cohorts moved to Sudan in 1991.  Hassan al-Turabi, the head of the National Islamic Front, which ruled Sudan at the time, was keen not only on instituting Islamic sharia law in Sudan at home, but in making the Sudan a place from which worldwide Islamic revolution could flow.
>
> And to that effect Hassan al-Turabi hosted numerous meetings, some large summits with radical extremist groups, including one, for example, in April 1991.  Groups like HAMAS and Palestinian Islamic Jihad, Egyptian Islamic Jihad, al-Qaeda, Sudanese radicals, Iranians, Lebanese Hezbollah were all invited and attended.  So it was at these meetings where Iranian officials, Hezbollah officials, al-Qaeda officials and others first began to have some serious meetings.
>
> Q.  Were such meetings involving groups from such a wide spectrum unusual?

---

[31] CIA Report, *Terrorism: Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran and the NIF*, January 31, 1997.
[32] *Id.*

A.  They have been unusual until then.  Since, Iran has held similar meetings in Iran.  But at the time it was unusual for that many groups to get together in that type of a setting.  It's the type of thing, the type of benefit that comes really only with state sponsorship and the kind of safe haven that Sudan as a radical Islamist government at the time was able to provide. [33]

78.     As part of Sudan's plan to unify all violent, radical Islamic extremists (Shia and Sunni), Turabi and the Sudanese government conceived, organized, and hosted the first Popular Arab and Islamic Congress ("PAIC") from April 25-28, 1991, which brought together numerous extremists and violent extremist groups, including bin Laden and his al Qaeda operation.

79.     The following terrorists and terrorist organizations attended the April 1991 PAIC conference in Sudan:

| Location | Attendee | Organization |
| --- | --- | --- |
| Egypt | Ibrahim Shukri | Muslim Brotherhood |
| Egypt | Ayman al Zawahiri | Egyptian Islamic Jihad |
| Iran | Unknown | Iranian Embassy |
| Iraq | Saad al Tikriti | Government |
| Palestine | Mayif Hawatma | DFLP |
| Palestine | George Habash | PFLP |
| Palestine | Yassir Arafat | PLO |
| Palestine | Ibrahim Ghousha | Popular Struggle Front |
| Palestine | Fathi al-Shiqaqi | Palestine Islamic Jihad |
| Palestine | Jabbar Amar | Palestine Islamic Jihad |
| Palestine | Munir Said | HAMAS |
| Palestine | Khalid Mishaal | HAMAS |

---

[33] Testimony of Dr. Matthew Levitt, *Owens v. Republic of Sudan,* Case No. 1:01-cv-2244 (D.D.C.), October 26, 2010, at pp. 165-168.

| Palestine | Mounir Shafiq | unknown |
| Philippines | Muhammad Jamil Khalifa | Abu Sayyaf |
| Saudi Arabia | Osama bin Laden | Islamic Salvation Foundation |

80.    As a result of the 1991 PAIC conference, and the ongoing support and facilitation of the Sudanese government, al Qaeda forged cooperation relationships with other jihadist terrorist organizations.  These relationships were vital to al Qaeda, as the experience of its own members was largely limited to participation in a military conflict against the Soviets in the countryside of Afghanistan.  As a result, al Qaeda had little or no experience in the myriad skills needed to fund, support and carry out terrorists operations, much less to do so while evading the intelligence and counterterrorism programs of world superpowers like the United States.

81.    To overcome these challenges, Sudan brokered an agreement under which "experience from Hizballah and Iran should be transferred to new nations/extremists groups who lack this expertise.  This would allow Islamic Army [al Qaeda] members to gain the necessary expertise in terrorist operations."[34]

82.    The CIA summarized its principal findings concerning the agreements reached in 1991 and the resulting arrangement among Sudan, Iran, and al Qaeda in a January 31, 1997 report cited by the 9/11 Commission and titled *Terrorism: Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran and the NIF*, which was produced by the CIA in 2018 in response to a subpoena issued by Plaintiffs in these and related actions.  The report documents the following findings:

> • Shia and Sunni Islamists might effectively coordinate their activities and form a tripartite front against their common enemies, consisting of the NIF, Iran, and OBL's Islamic Army.

---

[34] CIA Report, *Terrorism: Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran and the NIF*, January 31, 1997.

• An agreement was eventually reached to collaborate politically and militarily.  The primary goal of this collaboration was to confront Israel and the United States, while the secondary goal was to undermine Arab regimes which supported Israel and the United States.

• Experience from Hizballah and Iran should be transferred to new nations and extremist groups who lack this expertise.  This would then allow Islamic Army members to gain the necessary experience in terrorist operations.

• After the agreement was reached, a delegation visited Tehran repeatedly to meet with Iranian officials; also met several representatives of Lebanese Hizballah.[35]

83.      At the time, Iran and its proxy Hezbollah were by far the most sophisticated terrorist actors in the world, with capacities and expertise al Qaeda could only imagine.

84.      After the cooperation arrangement was reached, it began to bear fruit immediately, when Iran and Hezbollah invited al Qaeda to send operatives to Lebanon and Iran for direct training in terrorist operations and techniques:

• Shortly after the Tripartite Agreement was reached [REDACTED] operatives traveled to southern Lebanon to receive training in explosives from Hizballah.

• Iran also began training individuals.[36]

85.      "In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security."[37]

86.      Ali Mohamed separately confirmed the collaborative relationship brokered and supported by Sudan between al Qaeda and Iran, testifying that while serving as an al Qaeda official in Sudan he was "aware of certain contacts between al Qaeda and al Jihad organization,

---

[35] *Id.*
[36] CIA Report, *Terrorism: Cooperation Among Usama Bin Ladin's Islamic Army, Iran, and the NIF,* January 31, 1997.
[37] 9/11 Commission Report at p. 61.

on one side, and Iran and Hezbollah on the other side.  I arranged security for a meeting in the Sudan between Mughaniyah, Hezbollah's chief, and Bin Laden."[38]

87.     The meeting between Osama Bin Laden and Imad Fayez Mughniyah, at that time the world's most notorious and sophisticated terrorist who oversaw Hezbollah's military, intelligence, and security apparatuses, and was responsible for the 1983 bombing of the United States Marine Corps barracks in Lebanon, was arranged by Sudanese intelligence, which also provided external building security for al Qaeda.[39]

88.     Linking Iran's Hezbollah terrorist organization with the newly formed al Qaeda made perfect sense from Sudan's perspective, given Sudan's plans to use al Qaeda as a terrorist proxy to attack the United States.  As one terrorism expert testified:  "The Sudanese intelligence service viewed al-Qaeda as a proxy, much the way that Iran views Hezbollah as a proxy.  The idea being is that by sharing resources, information, by assisting al-Qaeda, the Sudanese could use al-Qaeda to attack their mutual enemies."[40]

89.     Indeed, as Kenneth Katzman, a former CIA analyst and terrorist expert for the Congressional Research Service has observed, the Sudanese government viewed al Qaeda as a key component of Sudan's operational apparatus:

> They are allies.  They are close associates.  They are business partners.  Osama Bin Laden is Turabi's alter ego, his field commander, his operations chief.[41]

---

[38] Guilty Plea of Ali Mohamed, *United States v Ali Mohamed,* Case No. 1:98-cr-1023 (S.D.N.Y.), October 20, 2000, at p. 28.
[39] *Id.* at p. 27.
[40] Testimony of Evan F. Kohlmann, *Owens v. Republic of Sudan,* Case No. 1:01-cv-2244 (D.D.C.), October 28, 2010, at pp. 268-269.
[41] Tim Weiner, *U.S. Fury on 2 Continents: The Protagonist; Man With Mission Takes on the U.S. at Far Flung Sites*, New York Times, Aug. 21, 1998, at A1.

90.     Consistent with this symbiotic and intertwined relationship, Sudan's intelligence agency deployed al Qaeda operatives to assassinate political opposition leaders.  For example, Dr. Abdul Munim Khabir and Dr. Motrif al Sadeek, both Sudanese intelligence officers who assisted al Qaeda operatives to transit in and out of Sudan undetected, met with Jamal al Fadl and tasked al Qaeda to kill Saddiq al Mahdi, the Umma party opposition leader and former Sudanese Prime Minister.[42]

91.     As succinctly detailed by the 9/11 Commission Report, Osama bin Laden took full advantage of the sanctuary, support, resources, training, and encouragement provided by the Sudanese government to transform al Qaeda into a sophisticated, global terrorist organization:

> Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises.  In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast.  Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes.  One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from Western Europe to the Far East.  Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tucson, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus.
>
> Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities.  The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya.  He also made use of the already-established

---

[42] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 7, 2001, at pp. 358-376.

Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest.  (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)

Bin Ladin now had a vision of himself as head of an international jihad confederation.  In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances.  It was composed of his own al-Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent.  In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea.  Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia.  Bin Ladin maintained connections in the Bosnian conflict as well.   The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders.  Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.  It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir.  In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.

This pattern of expansion through building alliances extended to the United States.  A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn.  In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK.  Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson.  Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda

operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.[43]

## XII.   SUDAN AND AL QAEDA ATTACK U.S. INTERESTS IN SOMALIA

92.     Nearly as soon as Sudan welcomed al Qaeda to Sudan and began deploying its state resources to build al Qaeda's organizational and operational capabilities, Sudan and al Qaeda began joint preparations for attacking the United States.

93.     These joint efforts resulted in successful attacks on U.S. interests in Somalia and Yemen as early as 1993.

94.     In December of 1992, President George H. Bush dispatched 28,000 American troops to Somalia to support the United Nations' humanitarian mission to end the starvation of the Somali people.[44]

95.     Although the intervention by U.S. and U.N. peacekeeping forces is estimated to have saved millions of Somali lives, bin Laden viewed the U.S. operations in Somalia as a mere pretext for American preparations to occupy Muslim countries throughout the Islamic world.[45]

96.     In response to the deployment of U.S. troops to Somalia in late 1992, al Qaeda's leadership formulated a *fatwa* specifically demanding the eviction of U.S. forces from Somali land.[46]

97.     Consistent with their shared Islamist worldview, the Sudanese government also considered the presence of U.S. troops in Somalia as another example of U.S. aggression and interference in Muslim affairs.

---

[43] 9/11 Commission Report at pp. 57-58.
[44] *Significant Incidents of Political Violence Against Americans: 1993*, United States Department of State, Bureau of Diplomatic Security, Office of Intelligence and Threat Analysis, at p. 13.
[45] Statement J.T. Caruso, *Al-Qaeda International*, Hearing before the Subcommittee on International Operations and Terrorism, Committee on Foreign Relations, United States Senate, December 8, 2001.
[46] *Id.*

98.    True to his word, in December 1992, with Sudan's encouragement and assistance, bin Laden and his al Qaeda terrorist organization struck their first violent blow against the U.S. with the attempted bombing of U.S. military personnel staying in a hotel in Aden, Yemen, where U.S. troops often stayed *en route* to Somalia.  The attack was directed by a Yemeni member of al Qaeda's Shura Council, and carried out by al Qaeda members who had received training at one of the organization's camps in Sudan.

99.    U.S. intelligence was confident of Osama bin Laden's role in the attack.  As the Congressional Joint Inquiry into the Terrorist Attacks of September 11, 2001 noted:

> In December 1992, as U.S. military forces were deploying to Somalia as part of a United Nations operation to provide humanitarian assistance to a starving population, Islamic extremists attacked a hotel in Aden, Yemen housing U.S. service members supporting that operation.  *An Intelligence Community paper from April 1993 concluded that "[Bin Ladin's] group almost certainly played a role" in that attack.*[47]

100.    In furtherance of their joint program to attack the United States, al Qaeda and Sudan seized on the opportunity presented by the presence of U.S. troops in close proximity to Sudan and al Qaeda's newly formed base of operations in Sudan, and attacked U.S. troops and interests in Somalia.

101.    As confirmed by the CIA, al Qaeda, assisted and encouraged by Sudan, sent weapons, communication equipment, military trainers and terrorist fighters to Somalia to attack U.S. troops: "Islamic Army members were sent to Somalia, with the NIF's knowledge and

---

[47] Report of the Joint Inquiry of the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 (2002), at p. 194.

encouragement, in order to kill U.S. Troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission."[48]

102.    In early 1993, al Qaeda military chief Mohammed Atef, along with Saif al Adel, another senior al Qaeda official, began to provide military training to Somali militia members, in preparation for attacks on U.S. forces.[49]

103.    To support further attacks against American interests within Somalia, al Qaeda established a cell in Nairobi, through which al Qaeda sent weapons and trainers to the Somali warlords battling U.S. forces.[50]  "Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee."[51]  Mohammed Atef traveled to Somalia on several occasions during 1992 and 1993 for the purpose of organizing violence against U.S. troops then stationed in Somalia.  Following each visit, Atef reported directly to Osama bin Laden, at his base in Khartoum.[52]

104.    As described by one former member of al Qaeda, operatives would live in Sudan with their families and travel to and from Kenya, which was a transit point between Sudan and Somalia, using Sudan as a safe haven for the operatives and their families.[53]  They would travel openly with their Sudanese government supplied passports using commercial airlines, training Somali terrorists for a few months and returning to Sudan for a few weeks to spend time with their families.

---

[48] CIA Report, *Terrorism: Usama Bin Laden's Activities in Somalia and Sudanese NIF Support*, April 30, 1997.
[49] *Responsibility for the Terrorist Atrocities in the United States, 11 September 2001*, Government of the United Kingdom, Office of the Prime Minister (October 4, 2001).
[50] 9/11 Commission Report at p. 60.
[51] *Id.*
[52] *Responsibility for the Terrorist Atrocities in the United States, 11 September 2001*, Government of the United Kingdom, Office of the Prime Minister (October 4, 2001).
[53] Testimony of L'Houssaine Kherchtou, *United States v. Khaled al-Fawwaz*, Case No. 1:98-cr-1023 (S.D.N.Y.), January 28, 2015, at p. 387.

105.     In order to conceal the true terrorist purpose of their travels, al Qaeda operatives used identification cards supplied by Mercy International Relief Agency, an al Qaeda front nominally created to provide humanitarian aid to Somalia refugees, but that in actually was a clandestine al Qaeda organization used to move money and operatives to and from Sudan and Somalia by way of other African counties.[54]

106.     In 1993, al Qaeda trained Somali militia, with the assistance of al Qaeda operatives, began targeting and attacking U.S. and United Nation forces in Mogadishu.  These attacks were well organized and employed a variety of sophisticated techniques, including sniper attacks, hit and run attacks, vehicle ambushes, landmines, command-detonated bombings, as well as rocket propelled grenade and mortar attacks.[55]  On August 8, 1993, a command-detonated explosion killed four U.S. soldiers.  The sophistication of these attacks reflected al Qaeda's growing operational capabilities, resulting from the training and resources provided and arranged by the government of Sudan.

## XIII.   EFFORTS BY SUDAN AND AL QAEDA TO ATTACK AND DESTABILIZE THE EGYPTIAN GOVERNMENT

107.     While in Sudan, al Qaeda also partnered with the Sudanese regime in efforts to undermine the secular Egyptian government, in the hopes of promoting the establishment of an Islamic state in Egypt.  In furtherance of that objective, and in keeping with its policy of embracing terrorist organizations as partners, Sudan provided safe haven and support to several terrorist groups dedicated to the overthrow of the Egyptian regime, including the al Qaeda affiliated Al Gama'a al Islamiyya and Egyptian Islamic Jihad.[56]  Al Gama'a al Islamiyya is

---

[54] *Id.* at pp. 404-407.
[55] *Significant Incidents of Political Violence Against Americans: 1993*, U.S. Department of State, Bureau of Diplomatic Security, Office of Intelligence and Threat Analysis, at p. 13.
[56] U.S. Department of State, *Patterns of Global Terrorism* (1993-2001).

Egypt's largest militant group, and has been active since the late 1970s.  Over the years, the group has conducted armed attacks against Egyptian security and government officials, as well as other opponents of its extremists objectives.  In addition, al Gama'a al Islamiyya has conducted terrorist attacks against tourists in Egypt, including a November 1997 attack that killed 58 foreign tourists.[57]  In 1996, al Gama'a al Islamiyya's spiritual leader, Shaykh Umar Abd al Rahman, was sentenced to life in prison for his role in the 1993 World Trade Center bombing.  Senior members of the organization signed Osama bin Laden's 1998 *fatwa*, calling for attacks against the United States.  Although the organization's primary goal has long been to overthrow the Egyptian government and replace it with an Islamic state, al Gama'a al Islamiyya has collaborated extensively with al Qaeda in the jihad against America.

108.    Similarly, the Egyptian Islamic Jihad's primary goal is the overthrow of the Egyptian government and establishment of an Islamic state based on sharia.  Historically, the Egyptian Islamic Jihad specialized in armed attacks against high-level Egyptian government personnel, including cabinet ministers, and car bombings of U.S. and Egyptian facilities.  The organization was responsible for the 1991 assassination of Egyptian President Anwar Sadat, and also claimed responsibility for the attempted assassination of Interior Minister Hassan al Alfi in August of 1993 and Prime Minister Atef Sedky in November of 1993.  In 1995, Egyptian Islamic Jihad bombed the Egyptian embassy in Islamabad, Pakistan.  In 1998, authorities thwarted a planned attack against the U.S. embassy in Albania.[58]

109.    The Egyptian Islamic Jihad was founded by Ayman al Zawahiri, Osama bin Laden's closest advisor and since at least 1998 al Qaeda's second in command.  Zawahiri and bin Laden first met in Afghanistan during the conflict with the Soviet Union.  Zawahiri, who was

---

[57] U.S. Department of State, *Patterns of Global Terrorism* (2001).
[58] *Id.*

a trained physician, soon became bin Laden's personal doctor and chief spiritual advisor.  In 1992, Zawahiri reunited with bin Laden in Sudan. During the years that followed, the relationship between Zawahiri and bin Laden strengthened even further, and they steered their respective organizations towards the collaborative pursuit of common goals, most notably, waging jihad against America.  To facilitate that cooperation, al Qaeda formally integrated the Egyptian Islamic Jihad into its organizational structure by appointing senior Egyptian Islamic Jihad figures to positions within al Qaeda.  For instance, Zawahiri sat on al Qaeda's Majlis al Shura or consultation council, which was responsible for approving all significant, strategic and operational undertakings.[59]  In 1998, Egyptian Islamic Jihad publicly declared their common ambition to attack America, by jointly signing the 1998 *fatwa* under the banner.  Later that year, Zawahiri formally merged his organization into al-Qaeda.

110.    The Sudanese regime collaborated with Egyptian Islamic Jihad and al Qaeda in an effort to assassinate Egyptian president Hasni Mubarak.  In 1995, al Qaeda affiliated members of the Egyptian Islamic Jihad attacked President Mubarak's motorcade, during a visit to Addis Ababa, Ethiopia.  Subsequent investigations revealed that the attackers received direct support from the Sudanese Intelligence Services, including fake passports that allowed the attackers to transit from Sudan into Ethiopia, as well as logistical assistance. Following the failed assassination attempt, several of the attackers fled back to Sudan, where they received safe haven from the Sudanese regime.[60]   As a result of its role in sponsoring the attack and providing refuge to the involved terrorist, the United Nations Security Council issued Resolution 1044, formally sanctioning Sudan and demanding that Sudan:

---

[59] Indictment, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.); Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, pp. 189-211.
[60] U.S. Department of State, *Patterns of Global Terrorism* (1997).

> undertake immediate action to extradite to Ethiopia for prosecution the three suspects sheltering in the Sudan and wanted in connection with the assassination attempt on the basis of the 1964 Extradition Treaty between Ethiopia and the Sudan;
>
> Desist from engaging in activities of assisting, supporting and facilitating terrorist activities and from giving shelter and sanctuaries to terrorist elements and act in relations with its neighbors and with others and in full conformity with the Charter of the United Nations and the Charter of the Organization of African United.

111.    Sudan remained defiant in the face of the international community's condemnation of its actions, and refused to comply with the mandates of Resolution 1044. Sudan's refusal to comply with those mandates lead to two additional Security Council Resolutions, deploring Sudan's conduct and imposing sanctions on the Sudanese government.[61]

## XIV.   SUDAN PLANS AN ATTACK ON THE U.S. HOMELAND

112.    Striking U.S. troops in Somalia fell far short of Sudan's ambitious goals for carrying out attacks against the United States, which instead envisioned more devastating attacks within the U.S. homeland.  Consistent with that objective, Sudan mobilized its state resources to support a terrorist attack on the United Nations and other New York City buildings and infrastructure, in what was intended to be a follow up to the 1993 attack on the World Trade Center.

113.    This planned attack, which was later termed the Landmark Plot, was thwarted by U.S. counter-terrorism officials in June of 1993.

114.    In furtherance of the plot, the officials at the most senior levels of the Sudanese government instructed intelligence officers at the Sudanese embassy to provide support to the

---

[61] United Nations Security Council Resolutions 1054 (1996) and 1070 (1996).

terrorist cell enlisted to carry out the attack.  As confirmed by then Senator John Ashcroft in 1997:

> Two Sudanese diplomats at the United Nations in New York conspired to help Jihad terrorists gain access to the U.N. complex to bomb the building.  The plot to bomb the U.N. was just one in a series of plots to bomb numerous locations around New York, including the Lincoln and Holland Tunnels, the George Washington Bridge, and U.S. military installations.  Five of the original 12 defendants convicted in the series of terrorist plots were Sudanese nationals.[62]

115.    Following the U.S. investigations revealing the direct involvement of the Sudanese government and its senior leadership in the Landmark Plot, the United States designated Sudan as a State Sponsor of Terrorism.  As terrorism expert Lorenzo Vidino explained in testimony before the United States District Court for the Eastern District of Virginia:

> In '93 the incident which kind of triggered the designation by the State Department was of course Sudan's involvement in terrorist activities inside the United States.
>
> Q.  You're talking about the World Trade Center?
>
> A.  The World Trade Center in '93 and the follow-up operation.
>
> Q.  Would you tell the Court what that involvement was?
>
> A.  Well, especially in the follow-up operation after the World Trade Center attack, a cell made mostly of Sudanese nationals operating in the New York area, started planning a follow-up attack where the targets were the U.N., the Holland Tunnel and probably the FBI headquarters in New York.  This was supposed to be, as I said, a follow-up attack to the '93 attack which, in their view, was a botched attack.
>
> The Sudanese delegation at the United Nation –
>
> Q.  Are you talking about the embassy?  The U.N. embassy?

---

[62] Opening Statement of John Ashcroft, Hearing of Subcommittee on African Affairs, Committee on Foreign Relations, One Hundred and Fifth Congress, S. Hrg 105-223, May 15, 2007.

A.  The Sudanese embassy at the United Nation was directly involved in supporting this cell in carrying out its activities.

Q.  And how was that?

A.  Phone calls were intercepted by U.S. Intelligence between some of the operatives in which they talk about the fact that officials at the Sudanese embassy were going to provide them with diplomatic passports once the operation was carried out so that they could leave the country freely the night after the attack was to take place.

At the same time for the bombing of the U.N. headquarters, the truck loaded with explosives was supposed to come in, go into the garage of the U.N. using documents provided by the Sudanese delegation.  Pretty much the Sudanese delegation would write the letter and use plates.  Actually the plates that were supposed to be put on the truck were plates given by the Sudanese delegation.

So there were different indications that the Sudanese delegation there was closely supporting this attempt.  Two individuals that were actually directly linked to the plot were, U.S. intelligence indicated that they were actually members of Sudanese intelligence, but they were of course not identified as such at the United Nations, but were actually members of the Sudanese military intelligence.

When the U.N., the Sudanese ambassador to the U.N., who was apparently not aware that this plot was taking place, called Turabi to complain about this, Turabi pretty much told him to literally mind his own business.  So it was clear there was involvement of the highest-ranking members of the Sudanese government that had dispatched intelligence officers at the Sudanese embassy to provide support to the cell to carry out this attack in the United States.  So this attack was botched, was thwarted, but it was really the final straw that led to the designation of Sudan as a state sponsor of terrorism by the United States State Department.[63]

116.     In addition to its involvement in the Landmarks Plot, the U.S. Department of State

detailed a range of other terrorist activities in support of Sudan's designation as a State Sponsor

of Terrorism:

---

[63] Testimony of Lorenzo Vidino, *Rux v. Republic of Sudan*, Case No. 2:04-cv-0428, (E.D.Va.), March 13, 2017, at pp. 90-91.

In August [1993], the Secretary of State placed Sudan on the list of state sponsors of terrorism.  Despite several warnings to cease supporting radical extremists, the Sudanese Government continued to harbor international terrorist groups in Sudan.  Through the National Islamic Front (NIF), which dominates the Sudanese Government, Sudan maintained a disturbing relationship with a wide range of Islamic extremists.  The list includes the ANO, the Palestinian HAMAS, the PIJ, the Lebanese Hizballah, and Egypt's al Gama'at al-Islamiyya.

The Sudanese Government also opposed the presence of the United Nations coalition in Somalia and probably provided some aid to the Somali Islamic Union and the Somali National Alliance. Egypt, Tunisia, and Algeria have complained that Sudan supports antiregime insurgents in North Africa with safehaven, weapons, passports, funds, and training. Algeria withdrew its Ambassador from Khartoum in March.

Sudan's ties to Iran, the leading state sponsor of terrorism, continued to cause concern during the past year.  Sudan served as a convenient transit point, meeting site, and safehaven for Iranian-backed extremist groups.  The Iranian Ambassador in Khartoum Majid Kamal was involved in the 1979 takeover of the U.S. Embassy in Tehran and guided Iranian efforts in developing the Lebanese Hizballah group while he served as Iran's top diplomat in Lebanon during the early 1980s.  His presence illustrated the importance Iran places on Sudan.[64]

117.    After its designation as a State Sponsor of Terrorism on August 12, 1993, Sudan continued to assist al Qaeda in attacking U.S. troops in Somalia, leading to a notorious and deadly attack by al Qaeda's Somali fighters on U.S. forces on October 3 and 4, 1993, when al Qaeda-trained Somali militants attacked U.S. special forces involved in a targeted operation to apprehend General Mohammed Farah Hassan Aidid, an al Qaeda-supported warlord who controlled a militia force known as the Somali National Army.[65]

---

[64] U.S. Department of State, *Patterns of Global Terrorism* (1993).
[65] *Review of the Circumstances Surrounding the Ranger Raid on October 3 – 4, 1993 in Mogadishu, Somalia*, United States Senators Carl Levin and John Warner, September 29, 1995, at p. 23.

118.    On October 3, 1993, al Qaeda trained Somali fighters shot down two U.S. MH-60 helicopters with rocket-propelled grenades.  Some of the soldiers were able to evacuate back to the U.S. military's compound on the outskirts of Mogadishu, but others were trapped at the crash sites and cut off.  An urban battle ensued between al Qaeda-trained Somali militiamen and U.S. Special Forces, which lasted through the night.  Eighteen American soldiers died and 73 were wounded in the battle.[66]

119.    Despite the astounding causalities suffered by Somali forces in the battle, bin Laden proclaimed victory in the "Somali jihad" following the U.S. decision to withdraw troops from the region in 1994, and the attack featured prominently in al Qaeda's propaganda campaign over the years that followed.  In an interview with CNN, bin Laden explained that one of his proudest achievements during the time period al Qaeda was based in Sudan was al Qaeda's role in the killing of American soldiers during the battle of Mogadishu in 1993.[67]

120.    In his 1996 *fatwa* calling on Muslims to drive America out of Muslim lands, bin Laden openly celebrated the 1993 attack in Somalia, claiming that it caused the United States to "[leave] the area carrying disappointment, humiliation, defeat and your dead with you."[68]

121.    The 9/11 Commission has confirmed Sudan's and al Qaeda's role in the attacks, finding that:

> After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction.  In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans.  The perpetrators are reported to have belonged to a group from southern Yemen headed by a Yemeni member of Bin

---

[66] *Significant Incidents of Political Violence Against Americans: 1993*, United States Department of State, Bureau of Diplomatic Security, Office of Intelligence and Threat Analysis, at p. 13; Dr. Richard W. Stewart, *The United States Army in Somalia 1992-1994*, U.S. Army Center for Military History (2003).
[67] Peter L. Bergen, *Holy War, Inc.: Inside the Secret World of Osama bin Laden* (2001), at p. 81.
[68] 9/11 Commission Report at p. 48.

Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.

Al-Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly supervised by al-Qaeda's military leader.  Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al-Qaeda's military committee.  These trainers were later heard boasting that their assistance led to the October 1993 shoot down of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.[69]

## XV.   SUDAN AND AL QAEDA'S SYMBIOTIC BUSINESS RELATIONSHIPS

122.    As Sudan worked hand in glove with al Qaeda to attack the U.S. at home and

abroad, and to deploy its state resources to enhance al Qaeda's organizational and operational

capabilities (by providing training, safe haven, religious and ideological validation, intelligence

services and other support), it also dedicated its state resources to helping al Qaeda build a

financial infrastructure to build and sustain the organization.  The financial infrastructure created

with Sudan's support and assistance enabled al Qaeda grow its organization, raise funds for

terrorist operations, recruit and financially support members and al Qaeda leadership, train

terrorists, increase its influence among jihadist organizations, and develop the skills and

resources necessary for sophisticated terrorist operations.

123.    As part of this effort, Sudan afforded bin Laden and al Qaeda preferred access to

Sudan's economic, banking, agricultural, and business structures, and worked with al Qaeda to

build revenue streams to support al Qaeda's growth, development, and operations.  As described

by a 1996 State Department fact sheet:

---

[69] *Id.* at pp. 59-60.

Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi. . . . [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum.  Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

124.    A partial known list of businesses include:

**Wadi Al Aqiq (a/k/a "The Mother Company")**

- Import-Export Firm.

- First company to be established by al Qaeda in Sudan. Later became the mother company of all other al-Qaeda endeavors.

**Taba Investments**

- Money Exchange operation.

- Run by al Qaeda member Abu Hassan al Sudani.

- A Bank account of the company held in Cyprus Bank.

**Al Hijra Construction**

- Construction (infrastructure).

- Contracted by the Sudanese government to build roads and bridges in Sudan, including the construction of the Tahhadi Road (a/k/a "Al Tahdi al Uskri") linking Khartoum to the northern cities of Um Durman, Shindi, Atbarah and Dangala (700 kilometers), and Port Sudan Airport.

- Run by al Qaeda members: Dr. Sharif al Din Ali Mukhtar, Abu Hassan al Sudani, Abu Hamman al Saudi, Abu Rida al Suri and Abu Hajer.

- Al Hijra Construction bought explosives said to be used for construction purposes.

- Al Hijra worked with Sudanese military officials to transport and provide provisions to bin Laden's terrorist training camps in northern Sudan.[70]

### Al Themar al Mubaraka

- Farming of sesame, peanuts and corn.

- Run by al Qaeda members Abu Hassan el Masry and Dr. Mubarak al Doori.

- Location known as Damazine Farm; 2/3 of Damazine farm was used for farming purposes, the rest used as explosives training camp for al Qaeda members.

### Al Qudarat Transportation

- Transportation (Trucking) Company.

### Khartoum Tannery

- Cow hide trading company.

- Company was originally owned by the Sudanese government but was given to al Qaeda as reimbursement for the work done by Hijra Construction Company on the Thaddi Road, a project contracted by the Sudan government.

125.    These businesses formed jointly with the Sudanese government were a boon to al

Qaeda's recruitment and growth, and they provided jobs for the operatives who were moving

from Afghanistan, Pakistan, and elsewhere to Sudan.[71]

126.    The Sudanese government also provided al Qaeda with access to the international

banking system by co-founding with bin Laden the Al Shamal Islamic Bank.  Osama bin Laden

invested with senior members of the NIF in the Al Shamal Islamic Bank in Khartoum, and the

---

[70] Testimony of Lorenzo Vidino, *Rux v. Republic of Sudan*, Case No. 2:04-cv-0428, (E.D.Va.), March 13, 2017, at pp. 79-80.
[71] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 251-255.

bank's founders included the Northern State Government of Sudan, ruled at that time by Mutasin Abdel Rahim, the personal representative of Hassan al Turabi.

127.     In 1988, the provisional Board of Directors of Al Shamal Islamic Bank included Abdel Wahab Osman (Chairman of the Board and Sudanese Minister of Industry at that time, going on to be Sudanese Minister of Finance & National Economy from 1996 to 2000), the Sudanese Government of Northern State, and Izz El Din El Sayed (Speaker of the Sudanese People's Assembly from 1983 to 1985).

128.     Until at least October 2001, Al Shamal Islamic Bank's shareholders included the National Fund for Social Insurance, a Sudanese National entity listed as representative of the Workers Unions at the National Assembly Committee.

129.     The bank jointly founded by Sudan and al Qaeda was used directly to support al Qaeda operations.  In 1993, $250,000 was wired from the account of Wadi al-Aqiq, an al Qaeda front company, at Al Shamal Bank via Bank of New York to the associate's Bank of America account in Dallas, Texas, where it was used it to buy a plane in Tucson, Arizona, and then flown to Khartoum.[72]

130.     The plane was intended to transport American Stinger anti-aircraft missiles from Pakistan to Sudan.  However, because the aircraft's limited range did not allow the plane to fly the entire distance from Pakistan to Sudan without refueling, a plan to transport the missiles was abandoned because a stopover might involve a search of the plane in countries other than Sudan or Pakistan, whose governments had agreed to sanction the transport of the missiles.  Instead, the plane was used to transport al Qaeda operatives into Kenya to assist in the creation, training, and

---

[72] Testimony of Essam al Ridi, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 14, 2001, at pp. 613-614.

development of an al Qaeda cell in Kenya, which would eventually bomb the U.S. embassy in Kenya in 1998.[73]

131.    Sudan also provided material support to al Qaeda via the Faisal Islamic Bank of Sudan.  Turabi held a position on the board of directors of the Swiss-based parent of Faisal Islamic Bank, and maintained his office in the penthouse of the Faisal Islamic Bank building in Khartoum.

132.    Prominent members of the NIF forged other business relationships with al Qaeda as well.  Along with other senior members of the NIF, bin Laden founded Wadi al Aqiq, a holding company, and Taba Investments Ltd.

133.    According to the U.S. State Department, Taba Investments Ltd. secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products.  Al Qaeda used that platform to support the terror organization's operations.

134.    The portfolio of businesses created by bin Laden with the assistance of the Sudanese government, to support and sustain al Qaeda, also included Ladin International Company; Al Hijra Construction; Gum Arabic Company Limited, an enterprise jointly owned by bin Laden and the Sudanese government; Al Themar, an agricultural company which employed 4,000 employees working its Al Damazine farms; Blessed Fruits Company and Al Ikhlas, enterprises involved in the production of honey, fruits and vegetables as well genetic work on animals; Al Qudurat, a trucking company; Khartoum Tannery, a leather company; and Rowad Development and Investment Company, among others.  These companies generated revenue streams to support al Qaeda's phenomenal growth while in Sudan, and provided jobs for the

---

[73] Testimony of Essam al Ridi, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 14, 2001, pp. 563-570, 578-579.

influx of members recruited by al Qaeda, contributing to al Qaeda's transformation from a mere idea to a functioning international terrorist organization.

135.    Many of these businesses continued to operate to support al Qaeda even after bin Laden personally left Sudan.  According to a June 20, 2000 State Department cable, "Several Bin Ladin businesses … are run by al-Qa'ida lieutenants and still operate in Sudan….  Sudan maintains a financial stake in some of these companies and has tried to obscure Bin Ladin's commercial ties by changing the name of at least one of his companies."[74]

136.    These companies also provided cover to obscure al Qaeda's growing infrastructure and expanding terrorist operations from foreign intelligence services, enabling al Qaeda to grow and train its terrorist army without triggering foreign intelligence collection that would have resulted in interdiction efforts.  For instance, al Qaeda's front companies purchased farms throughout Sudan for the dual purpose of generating agricultural income and as a cover for the creation and operation of terrorist training camps.

137.    Al Qaeda operated six of these camps in Sudan, the main one being a 20 acre site near Soba, 10 kilometers south of Khartoum.

138.    Two thirds of the land at the farm was used for farming to generate income and jobs for al Qaeda, while the remainder of the property was used for terrorist training.[75]

139.    These camps were created and operated with the full knowledge and support of the Sudanese government, which provided security for the camps and would intercede on behalf of al Qaeda if the camps drew the attention of local Sudanese police.  For example, when the local police would respond to a neighbor's complaint about explosions that occurred while

---

[74] U.S. Department of State Diplomatic Cable, *Sudanese Involvement in Terrorism*, June 20, 2000.
[75] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 242-246.

testing bombs, al Qaeda would contact Sudanese intelligence which would warn the local police off.[76]

140.     The camps provided training not just for al Qaeda's operatives, but also for Sudan's Popular Defense Force ("PDF"), the para-military force responsible for terrorizing the non-Arab and Christian population in the south of Sudan.

141.     Sudan also helped al Qaeda establish a network of front charities to provide funding for al Qaeda and launder funds for bin Laden's organization.  This network included purported charities that Sudan worked with al Qaeda to establish to support al Qaeda's terrorist operations, and other ostensible charities aligned with al Qaeda that Sudan allowed to operate freely from within Sudan in support of al Qaeda.  This network provided a steady stream of reliable funding to support al Qaeda's massive budgetary needs through September 11, 2001.

142.     Islamic African Relief Agency (a/k/a "IARA"), a charity based in Khartoum with fundraising subsidiaries in many countries that operated within this network to support al Qaeda, was intimately tied to the NIF and government of Sudan.  Senior members of al Qaeda served as officers of IARA, and senior Sudan intelligence officers together with Bin Laden senior aides ran the IARA branch in Pakistan and Afghanistan in support of Bin Laden's activities.[77]  IARA's office in Dublin, Ireland was raided in 2001 and evidence was found demonstrating a financial link to Mustafa al Hawsawi, who was a major source of funds for the 9/11 hijackers during their stay in the United States in 2000 and 2001.  IARA further facilitated the NIF's financing of al Qaeda's attack on U.S. armed forces in Somalia.

---

[76] *Id.* at 223-224.
[77] U.S. Department of the Treasury's Executive Order 13224 designation of the Islamic African Relief Agency ("IARA"), October 13, 2004.

143.     On October 13, 2004, the U.S. government listed IARA as a Specially Designated Global Terrorist ("SDGT") entity, along with five senior officials, for providing "direct financial support" to bin Laden and al Qaeda.

144.     The Benevolence International Foundation ("BIF") was a Saudi-based charity that operated closely with al Qaeda during its formative years in Pakistan and Afghanistan.  Upon arriving in Sudan, al Qaeda and Sudan agreed to allow BIF to begin operating inside Sudan. Based from Sudan, BIF facilitated the movement of al Qaeda operatives around the world. Under cover of humanitarian aid programs, BIF supported the Sudan government's war of aggression against the non-Arab and Christian population in the southern regions of the country.

145.     On November 19, 2002, BIF was designated as a Specially Designated Global Terrorist ("SDGT") entity by the U.S. government for providing financial, material, and logistical support to al Qaeda and related organizations engaged in violent activities.

146.     The founder of BIF, Saudi national Adel Batterjee, was appointed the Chairman of Al Shamal Islamic Bank after Osama bin Laden left Sudan.  The U.S. government listed Batterjee as a Specially Designated Global Terrorist ("SDGT") on December 21, 2004, describing him "as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida."

147.     The Third World Relief Agency, another so-called charity founded by Sudanese intelligence officials, assisted al Qaeda in moving its personnel and weaponry internationally. TWRA's weapons trafficking to al Qaeda in Bosnia in particular was coordinated with Hasan al Turabi.[78]

---

[78] Interpol, Fusion Taskforce, *Financing of Terrorism and Charities*, July 2003, at pp. 20-21.

148.    The Muwafaq Foundation was a Saudi-founded organization supporting al Qaeda in Pakistan, Bosnia, and Sudan.  Its office in Sudan was staffed with Sudanese government employees on secondment from the NIF.  In 1994, the U.S. State Department called it a "de facto agent" of the government of Sudan.[79]

149.    The Al Dawa al Islamiya (a/k/a "Islamic Call") also played a pivotal role in helping al Qaeda establish itself in Sudan.  Senior officers of Islamic Call were also members of the NIF and opened bank accounts for al Qaeda and helped with the founding of al Qaeda mother company Wadi al Aqiq.

## XVI.   OTHER COORDINATED ACTIVITIES WITH AL QAEDA EVIDENCE SUDAN'S INTENT TO INFLICT MASS CASUALTIES ON THE U.S.

150.    Sudan's dedication to helping al Qaeda acquire the resources and capabilities required to conduct successful mass terrorist attacks against the United States is further evidenced by Sudan's direct and extensive effort to acquire weapons for al Qaeda's terrorist operations, including not only traditional terrorist tools like bombs and guns, but also weapons of mass destruction like chemical weapons and uranium as well.

151.    Jamal al Fadl testified that Sudanese intelligence and other government officials greatly aided al Qaeda's weapons acquisitions and trans-shipments.  Fadl described several arms shipments, including al Qaeda's smuggling of Kalashnikov rifles into Egypt with the use of camels.  Fadl also recalled a midnight shipment of four large crates of weapons and explosives to an Islamic group in Yemen, carried on an al Qaeda boat, accomplished with the aid of Abu Ali, a Sudanese intelligence officer, using Sudanese army facilities for logistics.[80]

---

[79] U.S. Department of State Diplomatic Cable, *Anatomy of an Islamist* NGO, September 1994.
[80] Testimony Jamal Ahmed al Fadl, *United States v. Usama Bin Laden*, Case No. 1:98-cr-1023 (S.D.N.Y.), February 6, 2001, at pp. 337-340.

152.     On at least two occasions between 1992 and 1995, al Qaeda transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to Yemen. Authorization for the transportation came directly from Sudan's President Omar al Bashir.

153.     In the early 1990's, Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of al Qaeda and Abdul Baset Hamza, a Lieutenant Colonel in the Sudanese army to discuss the joint manufacture of chemical weapons.[81]

154.     Fadl also met with Abdel al Mobruk, another Sudanese Lieutenant Colonel, for the purposes of securing uranium to make bombs.[82]

## XVII.  THE SEEDS OF THE 9/11 PLOT WERE PLANTED IN SUDAN

155.     Relying on the training, expertise, safe haven, resources and protection provided by the Sudanese government, al Qaeda began developing plots to carry out terrorist attacks by exploiting vulnerabilities in the civil aviation system in the early 1990's, and continuously worked to leverage the cumulative expertise and knowledge acquired from these efforts to carry out successful aviation attacks with unwavering dedication.  These continuous efforts led directly to the September 11th Attacks.

156.     Indeed, the September 11th Attacks were an adaptation of several earlier al Qaeda plots targeting the civil aviation system, dating to the early 1990s, which were developed using the resources and expertise provided by Sudan.

157.     Al Qaeda's efforts to use aircraft as weapons in a terrorist strike began in earnest no later than 1993, when bin Laden sent Ihab Mohammed Ali, a naturalized United States citizen who joined al Qaeda in 1990, to the United States to obtain pilot training, using funds both

---

[81] *Id.* at pp. 291-293.
[82] Testimony of Jamal Ahmed al Fadl, *United States v. Usama Bin Laden,* Case No. 1:98-cr-1023 (S.D.N.Y.), February 7, 2001, at pp. 358-361.

carried from and wired from Sudan to the United States.  Ali underwent training at the Airman Flight School in Norman, Oklahoma, the same flight school where al Qaeda would later send Zacarias Moussaoui to obtain pilot training for purposes of his role in attacking the American homeland and that several of the 9/11 hijackers visited and considered for their pilot training. [83]

158.    In 1994, al Qaeda sent Ihab Mohammad Ali to Los Angles for further flight training, again paid for and sponsored out of Sudan.[84]  When Ali returned to Sudan after completing his training, bin Laden asked him to assassinate Egyptian President Hosni Mubarak by crashing a plane into Mubarak's aircraft midair.  The plot became infeasible when the aircraft Ali was to use for the attack was damaged during training, but the knowledge acquired by al Qaeda in developing the plot directly enhanced its capacity to plan and carry out sophisticated terrorist attacks using planes as weapons.[85]

159.    At the same time, in 1993, al Qaeda sent L'Houssaine Kherchtou to Kenya to train as a terrorist pilot to work with another al Qaeda would-be pilot Ihab Ali (a/k/a Nawawi), who had already trained as a pilot in the United States.[86]

160.    Simultaneously, Khalid Sheikh Mohammed ("KSM"), the mastermind of the September 11th attacks, and his nephew Ramzi Yousef, were in the process of developing a plot to bomb twelve U.S. commercial airplanes over the Pacific Ocean as they flew from Asia to the United States, known as the "Bojinka" or "Manila Air" plot.  The plot was disrupted by the Philippine National Police in January 1995 when a chemical fire erupted in an apartment used by Yousef and Abdul Hakim Ali Hashim Murad to plan for the attacks.

---

[83] Testimony of Ihab Mohammad Ali, *United States v. Khaled al Fawwaz*, Case No. 1:98-cr-1023 (S.D.N.Y.), January 29, 2015, at pp. 637-639; 769-775.
[84] *Id.*
[85] *Id.*
[86] Testimony of L'Houssaine Kherchtou, *United States v. Khaled al Fawwaz*, Case No. 1:98-cr-1023 (S.D.N.Y.), January 28, 2015, at pp. 386-387, 393-394.

161.     The cell that hatched the Bojinka plot, which included KSM and Yousef, was associated with Abu Sayyef Group, an al Qaeda affiliate in the Philippines, and supported by al Qaeda through the Philippine branch of the International Islamic Relief Organization ("IIRO"), headed by bin Laden's brother-in-law Mohammed Jamal Khalifa, who, in turn, were all supported by al Qaeda from its base of operations in Sudan.

162.     In relation to the Bojinka plot, KSM and Yousef conducted extensive evaluations of civil aviation security protocol, to identify vulnerabilities that could be exploited for purposes of terrorist attacks.  The knowledge and expertise acquired in that context, using funding provided by al Qaeda through the IIRO, were vital to the planning and development of the 9/11 plot.

163.     KSM recognized that the organizational capacities and expertise al Qaeda had acquired as a result of its partnership with Sudan were both unique and essential to the successful planning and conduct of the sophisticated terrorist attack he was contemplating.  According to the 9/11 Commission, "KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide."[87]

164.     In 1995, Sudan, consistent with its objective of uniting terrorists and terrorist organizations to attack the United States, hosted the first meeting between KSM and al Qaeda.

165.     Knowing Sudan was a safehaven for terrorists, and knowing the al Qaeda operated with impunity in Sudan due to Sudan's official government support, KSM traveled to Sudan where he met with Mohammed Atef, al Qaeda's military chief.

---

[87] 9/11 Commission Report at p. 149.

166.     While the specifics of their discussions are unknown, it is certain that the discussion were productive, as Atef provided KSM with a means to contact him in the future for further discussions.[88]

167.     Prompted by his 1995 meeting with KSM, and because Sudan's provision of a safe haven allowed al Qaeda to operate with near impunity free from foreign intelligence interference due to the counter-intelligence services provided by the Sudanese government, al Qaeda's *shura council* had the time and opportunity to study and plan for future operations. In particular, Atef conducted a study of the aviation industry and the use of airplanes as a means of terror and "concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties.  The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling [KSM's] Bojinka concept."[89]

168.     In January 1996, KSM learned that the U.S. had indicted him for his role in planning the 1993 World Trade Center bombing and he escaped to Afghanistan.

169.     KSM had by then already established his bona fides with Atef during the 1995 meeting in Sudan, and Atef vouched for KSM and arranged a meeting between KSM and bin Laden in Tora Bora, Afghanistan.[90]

170.     At this meeting, KSM briefed bin Laden on the World Trade Center bombing, the *Bojinka* plot and other terrorist activities.  KSM also presented a proposal for an operation that would involve training pilots who would crash planes into buildings in the United States.  This proposal would become the 9/11 operation.[91]

---

[88] *Id.* at pp. 148-149.
[89] *Id.* at p. 153.
[90] *Id.* at p. 148.
[91] *Id.* at pp. 148-149.

171.    Al Qaeda's capacity to plan, implement and carry out that operation was deeply dependent on the resources, capabilities, expertise, and relationships acquired from and with the assistance of the government of Sudan, and but for Sudan's hand-in-glove partnership with al Qaeda, it would have been impossible for al Qaeda to plan, prepare, and successfully carry out those attacks.

172.    To begin with, al Qaeda would never have existed as a meaningful organization, absent the intervention of Sudan's leadership to provide it with a base and deploy its state resources to transform bin Laden's vague concept into a functioning and skilled terrorist organization.  If bin Laden can be thought of as al Qaeda's father, Sudan was its mother.

173.    Further, the successful planning and conduct of the 9/11 plot was a sophisticated undertaking, requiring implementation of counterintelligence measures to protect the plot from discovery by the world's most sophisticated intelligence services; implementation of compartmentalization and similar operational techniques; collaborative relationships with other terrorists and terrorist states to support the preparations for the attacks; a global infrastructure to move men and money; a pool of recruits large enough to identify qualified candidates to participate in the operation; reliable streams of funding to support the operation; knowledge concerning the security protocols and vulnerabilities of the civil aviation system, acquired through years of plots and experience; a global communications system to coordinate the operation and understanding of security protocols to evade communications intercepts by state intelligence services; and a range of other capabilities not easily acquired or commonly possessed by terrorist organizations.

174.    Al Qaeda possessed all of these capacities when KSM first approach al Qaeda with the operation precisely because the government of Sudan deployed its state resources to

provide them to al Qaeda, with the specific intent that they would be used to carry out attacks against their shared enemy, the United States.

175.   Indeed, and by way of example, al Qaeda relied on its collaborative relationship with Iran, which existed only because Sudan brokered and forged that relationship, to facilitate the travel of many of the 9/11 hijackers into and out of Afghanistan for training for the mission.

176.   In sum, the following excerpts detail the impact Sudan's state sponsored support had on growth and development of al Qaeda:

- While based in Sudan from 1992-1996, al Qaeda was transformed from an only partially realized idea into an international organization ready to operate on its own.  A major factor in this development was the education al Qaeda members received working with the NIF.  The NIF, which seized power in 1989, welcomed al Qaeda and other extremist groups during the 1990s because these groups shared Khartoum's (the capital of Sudan) interests in promoting pan-Islamic unity; toppling moderate Arab governments deemed hostile to Islamic movements; and, countering Western Influence in the Islamic World;

- Al Qaeda left Sudan with an independent ability to establish and operate training camps;

- While in Sudan, al Qaeda developed relations with every noteworthy Islamic extremist group;

- With the help of the NIF, al Qaeda solidified its formal structure; learned or enhanced key skills; and made the contacts necessary to become a self-sufficient international terrorist organization;

- Through meetings, training, and other activity, the NIF facilitated contacts in Sudan between al Qaeda members and nearly every noteworthy Islamic extremist group;

- Al Qaeda had established cooperative relationships by 1996 with at least 20 Sunni Islamic extremist groups in the Middle East, South Asia, Africa, and East Asia, as well as with elements of the Saudi opposition. This cooperation entailed generating funding, smuggling routes, training, and, in some cases, terrorist operations;

- Al Qaeda began running [terrorist] training camps at bin Laden's farms and other facilities in Sudan;

- Al Qaeda had established cooperative relationships by 1996 with at least 20 Sunni Islamic extremist groups in the Middle East, South Asia, Africa, and East Asia.  This operation entailed generating funding, smuggling routes, training, and, in some cases, terrorist operations; and

- Through meetings, training, and other activity, the NIF facilitated contacts in Sudan, some of which had been forged in Afghanistan, between al Qaeda members and nearly every noteworthy Islamic extremist group.[92]

177.   A year later, the CIA noted:

- Osama bin Laden came to the attention of the CIA as an emerging terrorist threat during his stay in Sudan from 1991 to 1996;

- During his five-year residence in Sudan, Osama bin Laden combined business with jihad under the umbrella of al Qaeda;

- In association with powerful members of the ruling Sudanese National Islamic Front, he embarked on several business ventures that most likely multiplied his fortune;

- His workforce in Sudan included militant Afghan war veterans who were wanted by the authorities in their own countries because of their subversive or terrorist activities;

- In May 1993, al Qaeda financed the travel of more than 300 Afghan war veterans to Sudan after the Pakistani government launched a crackdown against foreign Islamic extremists based in Pakistan;

- By January 1994, al Qaeda had begun financing at least three terrorist training camps in northern Sudan.  Among the trainers were Egyptian, Algerian, Tunisian, and Palestinian extremists; and

- While in Sudan, OBL and al Qaeda financed Islamic extremists who opposed secular and moderate Islamic governments and who despised the West.[93]

## XVIII. SUDAN CONTINUES TO PROVIDE AL QAEDA WITH SAFE HAVEN AND MATERIAL SUPPORT AFTER BIN LADEN RELOCATES TO AFGHANINSTAN IN 1996

178.   Sudan has sought to advance a false narrative that its collaboration with al Qaeda concluded in 1996, when bin Laden personally left Sudan for Afghanistan.  This is false.

179.   By 1996, the United States had ratcheted up the pressure campaign on Sudan to an intense level, as a result of the increasing awareness of Sudan's terrorist activities and the

---

[92] CIA Report, *Al-Qaida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003.
[93] CIA Report, *The Rise of UBL and Al-Qa'ida and the Intelligence Community Response,* March 19, 2004.

threat posed to U.S. national security by its relationship with bin Laden in particular.  Under the circumstances, Sudan and bin Laden realized that the very success of their terrorist experiment made it no longer viable for Sudan to continue to provide bin Laden with personal safehaven and protection in Sudan, and they agreed he would move to Afghanistan.  However, their shared dedication to work together to attack the United States remained unchanged.

180.     In May of 1996, bin Laden relocated to the mountainous region of Afghanistan.

181.     Notwithstanding his departure from Sudan, bin Laden and Turabi "continue[d] to be politically and ideologically close."  Bin Laden viewed Turabi "as a mentor and an ideological source of inspiration."[94]

182.     Having moved to a secure base in Afghanistan, on August 23, 1996, bin Laden issued his second fatwa declaring war on the United States.

183.     While bin Laden and some members of al Qaeda's leadership had moved out of Sudan, al Qaeda itself continued to maintain a robust presence in Sudan under the protection of the Sudanese government, and Sudan's support for al Qaeda's financial and terrorist training activities remained active and uninterrupted through and beyond September 11, 2001.

184.     For example, according to the State Department's 1999 Patterns of Global Terrorism report, Sudan "continued to serve as a central hub for several international terrorist groups, including Usama Bin Laden's al-Qaida organization."[95]

185.     The State Department's Patterns of Global Terrorism reports for calendar years 2000 and 2001 include a similar finding that al Qaeda and other terrorist organizations continued

---

[94] CRS Report for Congress, *Terrorism: Middle Eastern Groups and State Sponsors, 1998*, August 27, 1998, at p. 32.
[95] U.S. Department of State, *Patterns of Global Terrorism* (1999) (reporting that "Sudan continued to serve as a meeting place, safehaven, and training hub for members of Bin Ladin's al-Qaida").

to use Sudan as a "safehaven." Those terrorist organizations included Egyptian Islamic Jihad, Egyptian al Gama'a al Islamiyya, Palestine Islamic Jihad, and HAMAS.

186.    Moreover, al Qaeda operatives from Sudan continued to support the terrorist cells they opened in other parts of Africa while in Sudan. For example, beginning in 1993, al Qaeda dispatched its operatives from Sudan to Kenya to begin setting up the logistical network necessary to surveil, plan, and carry out the 1998 bombings of the U.S. Embassies in Kenya and Tanzania. In 1997, funding in U.S. dollars for the bombing plot was transferred from Sudan to al Qaeda operatives with the assistance of Sudanese authorities. Further, several of the principal operatives in al Qaeda's bombing plot travelled back and forth between Khartoum and Nairobi, the site of one of the attacks. In the aftermath of the Embassy attacks, Sudan's President Omar al Bashir defended Osama bin Laden. "I met him and I know that he is a believer in God and a believer in his cause."

187.    As detailed in a State Department diplomatic cable dated June 20, 2000, Sudan's provision of safe haven and support to terrorist organizations continued even after the December 1999 shake-up of the Sudanese government wherein President Bashir consolidated power and sidelined Turabi:

> **Current Status of Sudan's Support for Terrorism**
>
> We have observed no significant changes in Sudan's support for terrorism since the December 1999 political shakeup in which President Omar Al-Bashir consolidated power and sidelined National Islamic Front (NIF) leader Hassan Al-Turabi. Terrorists from a variety of Islamic extremist groups – such as Usama Bin Ladin's organization, Egyptian Islamic Jihad (EIJ), and Hamas – continue to use Sudan for safehaven, training, and, in some cases, as a platform to plan operations.
>
> **Usama Bin Ladin**
>
> Sudan's change in government appears to have had little effect on Bin Ladin operatives, who continue to operate freely from

57

Khartoum.  Several Bin Ladin businesses – including Atyaf Investments and the Khartoum Tannery – are run by Al-Qa'ida lieutenants and still operate in Sudan, although they are trying to keep a low profile.

– Sudan maintains a financial stake in some of these companies and has tried to obscure Bin Ladin's commercial ties by changing the name of at least one of his companies.

**Egyptian Groups**

The EIJ and Al-Gama'at Al-Islamiyya also receive safehaven and support in Sudan.  More than 20 EIJ and Gama'at members affiliated with Bin Ladin are operating in Sudan and meet on a regular basis to discuss common issues of concern.

– Senior Gama'at leader Rifa'i Taha Musa – who is alleged with Bin Ladin and last October called for an increase in anti-US attacks – traveled to Sudan in April to rally local Gama'at support for his plan to return the group to violent operations.

**Palestinian Groups**

Several Palestinian extremist groups – such as Hamas, the Palestine Islamic Jihad (PIJ) and the Abu Nidal Organization (ANO) – maintain a presence in Sudan and continue to conduct a wide range of activities, including fundraising, recruitment, ideological and paramilitary training, and other logistical support activities.

– Hamas – which has a few hundred supporters among the local Palestinian population – has an official representative in Khartoum, operates at least one small front company, and is associated with several NGOS there.

– Bashir has taken some steps – such as signing international conventions to combat terrorism – if only to attract more western European and moderate Arab businessmen and to gauge the residual strength of Turabi's supporters.  But he nonetheless has not taken action consistent with those conventions.[96]

188.    Several months later, the U.S.S. Cole was bombed by al Qaeda in the port of Sanaa, Yemen in October 2000.

---

[96] U.S. Department of State Diplomatic Cable, *Sudanese Involvement in Terrorism*, June 20, 2000.

189.    On July 25, 2007, the U.S. District Court in the Eastern District of Virginia held that Sudan was liable for the injuries suffered by plaintiffs in the U.S.S. Cole bombing.

190.    In particular, the Court concluded that a nascent al Qaeda transformed into a functioning and sophisticated terrorist organization, capable of carrying out large-scale, global attacks, as a direct result of the support and resources provided by the Sudanese government:

> Based on the expert testimony and documentary evidence, the Court FINDS as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole.  Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering."[97]

191.    The Court further found that the explosives used in the attack on the U.S.S. Cole originated in Sudan:

> [T]he Court FINDS as a fact that, that the explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan.  This finding is corroborated by the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the 1998 embassy bombings.  (Ex. 32, United States v. Bin Laden, Case No. 198CR1023, Trial Tr. Feb. 6, 2001).  Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

---

[97] *Rux v. Republic of Sudan*, 495 F. Supp. 2d, 541, 553 (E.D. Va. 2007).

***

The diplomatic passports and pouches utilized by Al Qaeda in furtherance of its terrorist activities were furnished by agents or officials of the Government of Sudan acting within the scope of their office, employment, or agency.  Based on this testimony and the evidence supporting it, the Court FINDS as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen." [98]

192.   Finally, the Court held the following:

Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safe houses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing.  *See* 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10]  The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11]  Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. *Rux*, 461 F.3d at 473.  Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed.Reg. 52523-01 (Oct. 8, 1993).[99]

---

[98] *Id.* at 553-554.
[99] *Id.* at 554-555.

## COUNT I

### CLAIMS UNDER SECTION 1605A(c) OF THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605A(c)

### ON BEHALF OF ALL PLAINTIFFS GRANTED A PRIVATE RIGHT OF ACTION UNDER 28 U.S.C. § 1605A[100]

193.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein at length.

194.    At all relevant times, defendant Sudan was and remains a foreign state designated as a state sponsor of terrorism as required by 28 U.S.C. § 1605A(a)(2)(A)(i) to maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a)(2)(A)(i).

195.    Plaintiffs herein initially brought suit against defendant Sudan pursuant to 28 U.S.C. § 1605(a)(7) and Pub.L. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)).

196.    Congress, in the National Defense Authorization Act for Fiscal Year 2008 (P.L. 110-181, § 1083), which was enacted January 29, 2008 (the "NDAA"), amended the Foreign Sovereign Immunities Act ("FSIA") by adding a new § 1605A to Chapter 97 of Title 28 of the U. S. Code.  The new Section 1605A unequivocally creates a federal private right of action against foreign state sponsors of terrorism.  Subsection (c) of § 1605A, provides:

> **(c) Private right of action.**–A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to–

---

[100] Section 1605A of the Foreign Sovereign Immunities Act grants a right of action to (1) nationals of the United States, (2) members of the armed forces, (3) employees of the U.S. government (including individuals performing a contract awarded by the U.S. Government) acting within the scope of employment, and legal representatives of persons described in (1), (2), or (3).

**(1)** a national of the United States,

**(2)** a member of the armed forces,

**(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

**(4)** the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

197.     Section 1605A applies to the pending actions of each of the Plaintiffs herein pursuant to Pub.L. 110-181, Div. A, Title X, § 1083(c), Jan. 28, 2008, 122 Stat. 342, which provides that:

**(1) In general.**–The amendments made by this section [enacting this section and amending 28 U.S.C.A. §§1605, 1607, 1610, and 42 U.S.C.A. § 10603c] shall apply to any claim arising under section 1605A of title 28, United States Code [this section].

* * *

**(3) Related actions.**–If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after–

(A) the date of the entry of judgment in the original action; or

(B) the date of the enactment of this Act [Jan. 28, 2008].

198.     As a result of the conduct of defendant Sudan and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Plaintiffs suffered damages as fully set forth in the paragraphs herein which are incorporated here by reference.

199.     The surviving personal injury and death victims were seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental and emotional pain and injury and they were rendered sick, sore, lame and disabled, and were otherwise injured or killed, or were confined to a hospital, bed, and/or home for a period of time. Those surviving personal injury victims and the estates of those killed are entitled to recover damages from defendant Sudan for their personal injuries and deaths sustained in and as a result of the September 11, 2001 terrorist attacks.

200.     Decedents killed in the September 11, 2001 terrorist attack are survived by family members entitled to recover damages from defendant Sudan for wrongful death. These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

201.     Certain of the *Federal Insurance* Plaintiffs made payments pursuant to worker's compensation insurance policies for personal injuries and deaths resulting from the September 11th attacks.  In addition, certain of the *Federal Insurance* Plaintiffs received assignments of several hundred wrongful death and personal injury claim for those who were killed or sustained injuries in the September 11, 2001 terrorist attacks, pursuant to applicable worker's compensation laws.

202.     The injuries and damages suffered by the Plaintiffs by virtue of personal injury and wrongful death, and the consequences resulting there from, were proximately caused by the intentional and reckless acts, omissions, and other tortious conduct of defendant Sudan as described herein.

203.     As a direct and proximate result of intentional and reckless acts, omissions, and other tortious conduct of defendant Sudan, the surviving personal injury plaintiffs suffered

serious and permanent personal injuries, severe mental and emotional anguish and suffering, impairment of their respective earning capacities, which impairment will continue indefinitely into the future, as well as financial losses and expenses.

204.    As a direct and proximate result of intentional and reckless acts, omissions, and other tortious conduct of defendant Sudan, the surviving personal injury plaintiffs were obligated to receive and undergo medical attention and care and to incur various expenses for the treatment of their injuries.

205.    As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support.

206.    As a direct and proximate result of the defendant Sudan's cowardly, barbaric, and outrageous acts of murder, the heirs of the Decedents will forever grieve their deaths.

207.    As a further result of intentional and reckless acts, omissions, and other tortious conduct of defendant Sudan, the Plaintiffs have been caused to expend various sums to administer the estates of Decedents and have incurred other expenses for which they are entitled to recover amounts of money.

208.    As a result of the defendant's murderous conduct, Plaintiffs suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

209.    Plaintiffs also bring this action for damages suffered by the Decedents and caused by the defendant's conduct. As a result of the intentional and negligent acts of defendant Sudan as described above, the Decedents endured pain, suffering, and trauma; were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful

bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their ultimate deaths.

210.    The actions of defendant Sudan, its agencies, instrumentalities, officials, employees and agents, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all the Plaintiffs. The defendant intended to carry out actions that would end the lives of the Decedents.

211.    As a result of their intentional, malicious, outrageous, willful, and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT II

### CLAIMS UNDER SECTION 1605A(d) OF THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605A(c)

### ON BEHALF OF ALL PLAINTIFFS GRANTED A PRIVATE RIGHT OF ACTION UNDER 28 U.S.C. § 1605A[101]

212.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein at length.

---

[101] Section 1605A of the Foreign Sovereign Immunities Act grants a right of action to (1) nationals of the United States, (2) members of the armed forces, (3) employees of the U.S. government (including individuals performing a contract awarded by the U.S. Government) acting within the scope of employment, and legal representatives of persons described in (1), (2), or (3).

213.     This suit was initially brought pursuant to 28 U.S.C. § 1605(a)(7) and Pub.L. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)).

214.     Congress in the National Defense Authorization Act for Fiscal Year 2008 (P.L. 110-181, §1083), which was enacted January 29, 2008 (the "NDAA") amended the FSIA by adding a new § 1605A to Chapter 97 of Title 28 of the U. S. Code. In addition to a private right of action, the new Section 1605A authorized recovery of additional damages against the foreign state sponsors of terrorism:

> **(d) Additional Damages.**–After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

215.     Section 1605A applies to this pending action pursuant to Pub.L. 110-181, Div. A, Title X, § 1083(c), Jan. 28, 2008, 122 Stat. 342, which provides that:

> **(1) In general.**–The amendments made by this section [enacting this section and amending 28 U.S.C.A. §§1605, 1607, 1610, and 42 U.S.C.A. § 10603c] shall apply to any claim arising under section 1605A of title 28, United States Code [this section].

> * * *

> **(3) Related actions.**–If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after–

>> (A) the date of the entry of judgment in the original action; or

>> (B) the date of the enactment of this Act [Jan. 28, 2008].

216.     As a result of the conduct of defendant Sudan and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Plaintiffs suffered damages as fully set forth in the paragraphs herein which are incorporated here by reference

217.     The injuries and damages suffered by the Plaintiffs by virtue of the September 11, 2001 terrorist attacks, and the consequences resulting therefrom, were proximately caused by the intentional and reckless acts, omissions, and other tortious conduct of defendant Sudan as described herein.

218.     As a direct and proximate result of the defendant's intentional, willful, and malicious acts of terrorism on September 11, 2001, Plaintiffs have sustained reasonably foreseeable property damage and economic losses.

219.     The *Federal Insurance* Plaintiffs, in accordance with their obligations under applicable policies of insurance, paid several billion dollars to their insureds in compensation for property or other forms of economic damage resulting from the September 11, 2001 terrorist attacks.  Pursuant to applicable worker's compensation laws, certain of the *Federal Insurance* Plaintiffs also received assignments for several hundred wrongful death and personal injury claims.

220.     Plaintiffs are entitled to damages under § 1605A(c) as described herein.

221.     By reason of the same acts on which the action under § 1605A(c) is based, Plaintiffs have been caused to compensate their insureds for reasonably foreseeable property and economic loss, third party liability and loss under life and property insurance policies.

222.     As a result of their intentional, malicious, outrageous, willful, and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT III

### AIDING AND ABETTING AND CONSPIRING WITH AL QAEDA TO COMMIT THE SEPTEMBER 11th ATTACKS UPON THE UNITED STATES IN VIOLATION OF 18 U.S.C. § 2333(d) (JASTA)

### ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS[102]

223.    Plaintiffs incorporate all previous allegations by reference.

224.    As set forth above, defendant Sudan knowingly provided material support, resources, and substantial assistance to, and conspired with, al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11, 2001.

225.    As set forth above, plaintiffs' claims against defendant Sudan relating to its tortious acts in support of al Qaeda fall within the exception to foreign sovereign immunity set forth at 28 U.S.C. § 1605B, and plaintiffs are thus authorized to assert causes of action against Sudan pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.

---

[102] The causes of action pursuant to the ATA, 18 U.S.C. § 2331 *et seq.*, are asserted on behalf of plaintiffs who are U.S. nationals; estates, heirs, and survivors of U.S. nationals; U.S. nationals who are members of a putative class represented by such plaintiffs; plaintiffs who are subrogated to the rights of U.S. nationals who incurred physical injuries to property and related losses as a result of the September 11th attacks; and plaintiffs who are assignees of U.S. nationals killed or injured in the September 11th attacks. The term "U.S. National Plaintiffs" in the context claims under JASTA or the ATA refers to all such parties.

226.     Through the tortious acts in support of al Qaeda described above, defendant Sudan aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(d).

227.     At the time of the September 11th attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

228.     As described herein, defendant Sudan knowingly provided substantial assistance to al Qaeda, for the express purpose of enabling al Qaeda to carry out terrorist attacks against the United States and its citizens.  The September 11th attacks were a foreseeable, and indeed intended, result of defendant Sudan's knowing provision of substantial assistance to al Qaeda.

229.     As described herein, defendant Sudan and al Qaeda agreed to work in concert with one another to carry out terrorist attacks against the United States and its citizens.  Sudan continuously provided material support and assistance to al Qaeda pursuant to that agreement, from al Qaeda's inception until after the September 11th attacks.  Within the framework of that agreement, Defendant Sudan conspired with other parties, including the Republic of Iran, to provide material support and assistance to al Qaeda.

230.     The funding and other material support defendant Sudan provided to al Qaeda and arranged for other parties to provide to al Qaeda, as described above, enabled al Qaeda to acquire the global strike capabilities employed on September 11, 2001, and was essential to al Qaeda's ability to carry out the attacks.

231.     During the decade preceding the September 11th attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided

to it to conduct large scale terrorist attacks in order to kill innocent civilians, destroy property on a mass scale, and cause catastrophic economic harm.

232.    The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendant Sudan.

233.    Plaintiffs and/or their insureds suffered injuries to their persons, property or businesses by reason of the September 11th attacks and defendant's tortious acts in support of al Qaeda.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with treble damages, punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

<u>COUNT IV</u>

**AIDING AND ABETTING AND CONSPIRING WITH AL QAEDA TO COMMIT THE SEPTEMBER 11th ATTACKS UPON THE UNITED STATES IN VIOLATION OF 18 U.S.C. § 2333(a)**

**ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS**

234.    Plaintiffs incorporate all previous allegations by reference.

235.    As enacted in 1992, the express civil cause of action established under 18 U.S.C. § 2333(a) authorized claims for aiding and abetting and conspiring to commit an act of international terrorism.

236.    Through the tortious acts in support of al Qaeda described above, defendant Sudan aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism

against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. §
2333(a).

237.     The relentless campaign by al Qaeda and its material supporters to carry out
terrorist attacks against the United States and its citizens, which culminated in the September 11th
attacks, involved continuous acts of violence and acts dangerous to human life, that violate the
criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332. See
18 U.S.C. § 2332b(a) (prohibiting conduct transcending national boundaries: killing or
attempting to kill persons within the United States; causing serious bodily injury or attempting to
cause serious bodily injury to persons within the United States; destroying or damaging any
structure, conveyance, or other real or personal property within the United States; or attempting
or conspiring to destroy any or damage any structure conveyance, or other real or personal
property within the United States).

238.     Plaintiffs and/or their insureds suffered injuries to their persons, property or
businesses by reason of acts committed by al Qaeda that involved the murder and attempted
murder of persons within the United States, and the mass destruction of real and personal
property within the United States, in violation of the criminal laws of the United States,
including the prohibitions set forth in 18 U.S.C. § 2332.

239.     Through the tortious acts in support of al Qaeda described above, defendant
Sudan aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism
against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. §§
2332(a), 2332(b), 2332(c), and 2333.

240.     Defendant Sudan knew at all times that it was providing material support for al
Qaeda's campaign to carry out acts of international terrorism against the United States and its

citizens, and was both aware and intended that the resources it provided would substantially assist al Qaeda in that objective.

241.    Defendant Sudan also agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this complaint, and committed overt acts in furtherance of the conspiracy.  At all relevant times, defendant Sudan knew of the conspiracy and of the roles of the al Qaeda elements it was supporting in furtherance of the conspiracy.

242.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to plaintiffs and/or their insureds, defendant Sudan is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or plaintiffs' insureds have sustained as a result of such injuries.

243.    By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructures, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens, in violation of 18 U.S.C. § 2332, defendant Sudan is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or plaintiffs' insureds have sustained by reason of the September 11th attacks.

244.    The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendant Sudan.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with treble damages, punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and

equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT V

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333

### ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS

245.    Plaintiffs incorporate all previous allegations by reference.

246.    The actions of defendant Sudan in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population ... to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

247.    The actions of defendant Sudan in providing funding and other forms of material support to al Qaeda and its agents, and in providing substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th attacks in violation of 18 U.S.C. § 2333, caused injuries to the persons, businesses, or property of plaintiffs and/or plaintiffs' insureds.

248.    By participating in the commission of violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B that have caused plaintiffs and/or their insureds to be injured in their persons, businesses, or property, defendant Sudan has engaged in acts of international terrorism and is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or plaintiffs' insureds have sustained as a result of such injuries.

249.     By virtue of its willful violations of 18 U.S.C. § 2339C, which proximately caused the injuries suffered by plaintiffs and/or their insureds, defendant Sudan committed acts of international terrorism and is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or plaintiffs' insureds have sustained as a result of such injuries.

250.     The actions of defendant Sudan in providing funding and other forms of material support to al Qaeda and its agents were dangerous to human life, by their nature and as evidenced by their consequences.

251.     The actions of defendant Sudan in providing funding and other forms of material support to al Qaeda and its agents either occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

252.     Accordingly, the actions of defendant Sudan in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333 and through incorporation of 18 U.S.C. §§ 2339A, 2339B, and 2339C.

253.     As set forth above, but for the assistance provided by defendant Sudan, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th attacks, which were a foreseeable and intended result of Sudan's material support and sponsorship of al Qaeda.

254.     For the reasons set forth above, defendant Sudan is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or plaintiffs' insureds have suffered to their persons, businesses or property as a result of the September 11th attacks.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with treble damages, punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

<u>COUNT VI</u>

**WRONGFUL DEATH**

**ON BEHALF OF ALL PLAINTIFFS BRINGING WRONGFUL DEATH CLAIMS**

255.    Plaintiffs incorporate all previous allegations by reference.

256.    Plaintiffs herein bring this action for the wrongful death proximately caused by defendant Sudan engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the mass murder committed by the terrorist attacks acts of September 11, 2001.

257.    Surviving family members or estates of those wrongfully killed and their assignees are entitled to recover damages from defendant Sudan for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths. Those responsible for these deaths must be held accountable for the losses incurred.

258.    The injuries and damages suffered by plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of defendant Sudan as described herein.

259.     As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

260.     As a direct and proximate result of defendant Sudan's acts of international terrorism, torture, conspiracy, and racketeering resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

261.     As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of defendant Sudan, plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT VII

### NEGLIGENCE

### ON BEHALF OF ALL PLAINTIFFS

262.     Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

263.     Defendant Sudan was under a general duty not to injure, murder, or cause to be injured or murdered, not to commit, sponsor, or otherwise materially support criminal or tortious acts, endanger lives, foster terror and/or engage in activity that would foreseeably lead to the personal injury and/or death of Plaintiffs.

264.     Defendant Sudan's actions as described in the preceding paragraphs, incorporated herein, breached the duty owed to Plaintiffs.

265.     Defendant Sudan's breach of its duty was a proximate cause of the deaths and injuries at issue and the continuing trauma, loss, and personal injuries inflicted on Plaintiffs.

266.     Defendant Sudan's actions were negligent and/or grossly negligent.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT VIII

### SURVIVAL

### ON BEHALF OF ALL PLAINTIFFS BRINGING WRONGFUL DEATH CLAIMS

267.     Plaintiffs incorporate all previous allegations by reference.

268.     As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of defendant Sudan as described herein, those killed on September 11, 2001, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and

assault.  Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, and intentionally inflicted physical pain.  Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

269.    As a result of defendant Sudan's criminal and tortious conduct, those killed suffered damages, including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial.  Plaintiffs herein seek and are entitled to survival damages for those tortured and killed on September 11, 2001.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT IX

## ALIEN TORT CLAIMS ACT[103]

## ON BEHALF OF ALL ALIEN NATIONAL PLAINTIFFS

270.　Plaintiffs incorporate all previous allegations by reference.

271.　The Alien Tort Claims Act, 28 U.S.C. § 1350, allows aliens to sue for torts committed in violation of the law of nations or a treaty of the United States.  Certain of the plaintiffs in this action are non-U.S. citizen aliens.

272.　As set forth above, defendant Sudan, individually, jointly, and severally, aided and abetted, sponsored, financed, promoted, fostered, materially supported, or otherwise conspired to proximately cause the death and injury of innocent persons namely the alien plaintiffs herein through and by reason of acts of international terrorism – the heinous attacks of September 11, 2001.  These terrorist acts constitute a clear violation of the law of nations, otherwise referred to as customary international law, which includes international legal norms prohibiting crimes against humanity, mass murder, genocide, torture, extrajudicial killing, air piracy, financing of terrorism, and terrorism.  These international legal norms can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions, and other documents:

(1) Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2) Allied Control Council Law No. 10 (Dec. 20, 1945);

---

[103] The causes of action pursuant to the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, are asserted on behalf of plaintiffs who are alien nationals; estates, heirs, and survivors of alien nationals who are not themselves U.S. nationals; alien nationals who are members of a putative class represented by such plaintiffs; subrogated to the rights of alien nationals who incurred injuries to property and related losses as a result of the September 11th attacks; and assignees of alien nationals killed or injured in the September 11th attacks.

(3) Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277;

(4) Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5) Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6) International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7) International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8) U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9) U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10) Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11) Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc.  8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13) The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14) The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15) The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

273.     As a result and proximate cause of defendant Sudan's activities set forth above in

violation of the law of nations, the alien plaintiffs suffered injury and damages as set forth

herein.

274.     As a result and proximate cause of defendant Sudan's sponsorship of terrorism in violation of the law of nations and customary principles of  international law, the plaintiffs suffered injury and damages as set forth herein.

275.     Pursuant to 28 U.S.C. § 1350, the plaintiffs herein who are alien nationals; estates, heirs, and survivors of alien nationals who are not themselves U.S. nationals; alien nationals who are members of a putative class represented by such plaintiffs; subrogated to the rights of alien nationals who incurred injuries to property and related losses as a result of the September 11th attacks; and assignees of alien nationals killed or injured in the September 11th attacks are entitled to recover damages they have sustained by reason of defendant Sudan's actions in furtherance of this crime against humanity.

**WHEREFORE**, each plaintiff who is an alien national; estate, heir, or survivor of an alien national who is not himself or herself a U.S. national; an alien national who is a member of a putative class represented by such plaintiffs; subrogated to the rights of an alien national who incurred injuries to property and related losses as a result of the September 11th attacks; or an assignees of an alien national killed or injured in the September 11th attacks, demands judgment against defendant Sudan, jointly and severally, and/or individually, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, costs, attorney's fees, and such other and further relief as the Court may deem appropriate under the circumstances.

# COUNT X

## ASSAULT AND BATTERY

### ON BEHALF OF ALL PLAINTIFFS BRINGING
### WRONGFL DEATH AND PERSONAL INJURY CLAIMS

276.     Plaintiffs incorporate all previous allegations by reference.

277.     As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of defendant Sudan as described herein, which culminated in the September 11th attacks, plaintiff decedents and/or personal injury plaintiffs were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily contact, from which they ultimately died or suffered serious permanent personal injury.

278.     By reason of all of the foregoing, plaintiffs were killed, seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental, and emotional pain and injury, and they were rendered sick, sore, lame and disabled, and were otherwise injured or killed, and/or were confined to a hospital, and/or to bed and home for a period of time by reason thereof, and/or required and received medical care and treatment, and/or incurred medical expenses and will continue to incur future expenses therefor, and were prevented from attending to the duties of their employment and prevented from pursuing the furthering their careers and lost salary and earnings and will lose future salary and earnings thereby.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this

Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XI

## CONSPIRACY

## ON BEHALF OF ALL PLAINTIFFS

279.    Plaintiffs incorporate all previous allegations by reference.

280.    As set forth above, defendant Sudan, unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate, cooperate and engage in unlawful and tortious acts pursuant to a common course of conduct, namely the promotion and sponsoring of international terrorism, resulting in the death and injury of plaintiffs and/or their insureds.

281.    As set forth above, defendant Sudan conspired with, encouraged, and furthered and agreed to provide material support, funding, sponsorship, aiding and abetting and/or other material resources to al Qaeda, Osama bin Laden, and the hijackers in furtherance of this conspiracy.

282.    As set forth above, defendant Sudan engaged in commonly motivated, organized, concerted and conspiratorial acts, efforts, transactions, material support, and activities designed, intended, and foreseeably to cause acts of international terrorism including the terrorist attack on the United States, its citizens and society on September 11, 2001.  Co-conspirators herein continue in their quest to attack the United States, resulting in the harm to plaintiffs, which was done pursuant to and furtherance of this concert of action, agreement, enterprise, civil and criminal conspiracy and common scheme.

283.    Defendant Sudan's concert of action, scheme, enterprise and conspiracy to support and promote Osama bin Laden, al Qaeda, the hijackers and international terrorism was a proximate cause of the September 11, 2001, terrorist attacks that killed and injured plaintiffs and/or plaintiffs' insureds.

284.    As a result of defendant Sudan's concert of action and conspiracy to further international terrorism, plaintiffs have suffered damages as will be shown at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XII

### AIDING AND ABETTING

### ON BEHALF OF ALL PLAINTIFFS

285.    Plaintiffs incorporate all previous allegations by reference.

286.    As set forth above, defendant Sudan knowingly and substantially assisted in the sponsorship of Osama bin Laden, al Qaeda, international terrorism and the September 11, 2001 terrorist attacks that killed and injured plaintiffs and/or their insureds.

287.    At the time of such aiding and abetting, defendant Sudan knew or should have known that its role was part of an overall and ongoing illegal, criminal, and/or tortious activity.

288.     As set forth above, defendant Sudan aided and abetted in concerted efforts, transactions, acts and activities designed to cause the attacks of September 11, 2001, on the United States, its citizens, foreign citizens, its liberties and freedoms.

289.     Defendant Sudan's aiding and abetting of international terrorism through material sponsorship of al Qaeda was a proximate cause of the September 11, 2001 terrorist attacks that killed and injured plaintiffs and/or plaintiffs' insureds.

290.     As a direct and proximate result of defendant Sudan's aiding and abetting activities, plaintiffs have suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## <u>COUNT XIII</u>

### NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON BEHALF OF ALL INDIVIDUAL PLAINTIFFS

### ON BEHALF OF ALL PLAINTIFFS

291.     Plaintiffs incorporate all previous allegations by reference.

292.     Defendant Sudan intended or knew or should have known, that its conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress, leaving the victims and their family members with severe and permanent physical, psychological and emotional injuries.

293.    Defendant Sudan intended, knew or should have known that the September 11, 2001, suicide hijackings and intended mass murder would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological, and emotional injuries and ongoing posttraumatic stress disorder on a horrific and massive scale.

294.    The actions of defendant Sudan were unconscionable, extreme, outrageous, intentional, malicious, willful, unconscionable, reckless, and/or negligent, and were done with an intentional, malicious, willful, grossly negligent, and/or negligent disregard for the rights and lives of those murdered, those injured, and the surviving loved ones.

295.    As a direct and proximate cause of defendant Sudan's negligent, grossly negligent, willful, malicious and/or intentional misconduct and reckless disregard for human life, plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical, and psychiatric disorders; ongoing emotional distress and anxiety; physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counselling and long-term care, particularly for all minor plaintiffs.

296.    The acts and conduct of defendant Sudan were undertaken in an intentional, grossly negligent and/or negligent manner intended to or reasonably foreseeable to result in the killing and injuring of innocent people. These criminal and tortious acts culminated in the murder and maiming of innocent people on September 11, 2001, and beyond, causing continuing, permanent emotional, mental and physical suffering to the families and heirs of the decedents.

297.     Defendant Sudan, by engaging in this intentional, unlawful, grossly negligent, and/or negligent conduct negligently and/or intentionally inflicted emotional distress upon the plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XIV

**LIABILITY PURSUANT TO RESTATEMENT (SECOND) OF TORTS § 317
AND RESTATEMENT (THIRD) OF AGENCY § 7.05:
SUPERVISING EMPLOYEES AND AGENTS**

### ON BEHALF OF ALL PLAINTIFFS

298.     Plaintiffs incorporate all previous allegations by reference.

299.     Defendant Sudan was reckless in their supervision of their agents or employees, including Hassan al Turabi, Omar al Bashir, Abdul Baset Hamza, Abdel al Mobruk, and others, in that defendant Sudan knew of these employees' and agents' propensity for the conduct that caused injury to plaintiffs or plaintiffs' insureds prior to the injuries' occurrence, and defendant Sudan failed to exercise due care in supervising their employees and agents.

300.     The ability of the above-referenced agents or employees to provide wide-ranging material support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and the resulting injuries to plaintiffs, were caused by reason of the reckless supervision by defendant Sudan of its agents or employees.

301.     Due to the reckless supervision on the part of defendant Sudan, plaintiffs and/or plaintiffs' insureds sustained injuries.

302.     The injuries sustained by plaintiffs and/or their insureds, as a result of the recklessness of defendant Sudan, were foreseeable and defendant Sudan knew or should have known of the risk of injury to the plaintiffs and/or plaintiffs' insureds.

303.     The torts committed by the above-referenced employees and agents of defendant Sudan were committed, among other places, on the premises of defendant Sudan or with the chattels of defendant Sudan, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operated by defendant Sudan using its money and resources.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XV

**LIABILITY PURSUANT TO RESTATEMENT (SECOND) OF TORTS § 317
AND RESTATEMENT (THIRD) OF AGENCY § 7.05:
HIRING, SELECTING, AND RETAINING EMPLOYEES AND AGENTS**

**ON BEHALF OF ALL PLAINTIFFS**

304.     Plaintiffs incorporate all previous allegations by reference.

305.     Defendant Sudan was reckless in hiring, selecting, and retaining as and for its employees and agents individuals, including Hassan al Turabi, Omar al Bashir, Abdul Baset

Hamza, Abdel al Mobruk, and others, in that defendant Sudan knew of these employees' and agents' propensity for the conduct that caused injury to plaintiffs and/or plaintiffs' insureds prior to the injuries' occurrence.

306.    Defendant Sudan hired, selected, and retained the above-referenced agents and employees and placed them in a situation where they could create an unreasonable risk of harm to others.

307.    The ability of the above-referenced agents and employees to provide wide-ranging material support to al Qaeda and the September 11th hijackers, referenced above, and the resulting injuries to plaintiffs, were caused by reason of the reckless hiring, selecting, and/or retention by defendant Sudan.

308.    The injuries sustained by plaintiffs and/or their insureds, as a result of the recklessness of defendant Sudan, were foreseeable and defendant Sudan knew or should have known of the risk of injury to the plaintiffs.

309.    The torts committed by the above-referenced employees and agents of defendant Sudan were committed, among other places, on the premises of defendant Sudan or with the chattels of defendant Sudan, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operated by defendant Sudan using its money and resources.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this

Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XVI

### 18 U.S.C. § 1962(a)-(d) – CIVIL RICO

### ON BEHALF OF ALL PLAINTIFFS

310.   Plaintiffs incorporate all previous allegations by reference.

311.   Defendant Sudan constitutes a "person" as such term is used in 18 U.S.C. § 1961(3).

312.   Defendant Sudan, as a principal, agent, and coconspirator, performed "racketeering activity" as defined in 18 U.S.C. § 1961(1) by knowingly providing material support to Osama bin Laden and al Qaeda prior to the September 11th attacks, as described above.

313.   Defendant Sudan, including the agents, officials, officers, and employees of defendant Sudan whose attributable conduct in support of al Qaeda is discussed above, and Osama bin Laden and al Qaeda, were associated in fact with a common purpose of spreading extremist Wahhabi doctrine and rule, including through acts of jihad, and constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce (the "RICO Enterprise").

314.   The RICO Enterprise constitutes an "enterprise" because all members thereof, including but not limited to defendant Sudan, had the same goal of spreading Wahhabi doctrine and rule, including through acts of jihad, and in fact worked together to achieve that goal.

315.   Defendant Sudan committed two or more of the aforesaid acts of racketeering activity within ten years of one another by continuously participating in the sponsorship of al

Qaeda, and thereby committed a "pattern" of racketeering activity as defined in 18 U.S.C. §
1961(5).

316.    Defendant Sudan, as a principal, agent of, and co-conspirator with Osama bin
Laden and al Qaeda, used and invested, both directly and indirectly, the income and the proceeds
of the pattern of racketeering activity, to establish the RICO Enterprise in violation of 18 U.S.C.
§ 1962(a).

317.    Defendant Sudan, as a principal, agent of, and co-conspirator with Osama bin
Laden and al Qaeda, maintained, directly and indirectly, an interest in and control of the RICO
Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

318.    Defendant Sudan, as a principal, agent of, and co-conspirator with Osama bin
Laden and al Qaeda, conducted and participated, directly and indirectly, in the conduct of the
affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C.
§ 1962(c).

319.    Defendant Sudan, as a person associated with the RICO Enterprise, which
engaged in acts of racketeering activity which affected interstate and foreign commerce, did
conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d).  It was part of
the conspiracy that defendant Sudan and co-conspirators devised, intended to devise, and
participated in a scheme to defraud and to obtain money and property by means of materially
false and fraudulent pretenses, representations, and promises, and material omissions.  It was a
further part of the conspiracy that defendant Sudan and others would and did misrepresent,
conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts
done, in furtherance of the conspiracy.

320.    Defendant Sudan violated 18 U.S.C. § 1962(a-d) by investing in, maintaining an interest in, conducting and participating, directly and indirectly, or by conspiring to do the same, in the RICO Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including but not limited to:

(a) 18 U.S.C. § 1341 (mail fraud);

(b) 18 U.S.C. § 1343 (wire fraud);

(c) 18 U.S.C. § 1503 (obstruction of justice);

(d) 18 U.S.C. § 1956 (money laundering);

(e) 18 U.S.C. § 2339A (material support to organizations engaged in violent activities); and

(f) 18 U.S.C. § 2339B (material support to designated foreign terrorist organizations).

321.    The damages suffered by plaintiffs and/or plaintiffs' insureds, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by defendant Sudan, acting individually and in concert with others.

322.    The loss of business and property by plaintiffs and/or their insureds included loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, personal property, support, funeral and burial expenses, prospective inheritance, and the other economic contributions that plaintiffs' decedents would have made to plaintiffs' households, as well as loss of money and physical destruction of real property ("losses").  Such losses were a direct and proximate result of the racketeering activities of defendant Sudan.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and

post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## COUNT XVII

### TRESPASS

### ON BEHALF OF ALL PLAINTIFFS ASSERTING CLAIMS FOR PROPERTY DAMAGE AND ECONOMIC INJURIES

323.    Plaintiffs incorporate all previous allegations by reference.

324.    The September 11th attacks constituted an intentional and unwanted trespass upon plaintiffs' real and personal property, and/or upon the real and personal property of plaintiffs' insureds, to which plaintiffs and/or their insureds did not consent.

325.    As a result of the intentional and unwanted trespass upon plaintiffs' real and personal property, and/or that of their insureds, plaintiffs incurred losses as described more fully in their operative complaints, which are incorporated herein by reference.  Those losses include, without limitation, the physical destruction of plaintiffs' real and personal property, or that of their insureds, and resulting economic losses.

326.    As set forth above, defendant Sudan knowingly provided material support and resources and substantial assistance to al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11, 2001.

327.    Through the tortious acts in support of al Qaeda described above, defendant Sudan aided and abetted and conspired with al Qaeda in the commitment of the intentional and unwanted trespass upon plaintiffs' real and personal property, and/or that of their insureds.

328.     The funding and other forms of material support defendant Sudan provided to al

Qaeda, as described above, enabled al Qaeda to gestate from a nascent ideology into a fully

realized terror organization with skills, resources, and global strike capabilities essential to its

mission to conduct terrorist attacks against the United States, and that were in fact used to carry

out the attacks on September 11, 2001.

329.     During the decade preceding the September 11th attacks, al Qaeda repeatedly

made clear, through both declarations and actions, its intent to use funds and resources provided

to it to conduct large scale terrorist attacks resulting in the mass destruction of property, in order

to kill innocent civilians and cause catastrophic economic harm.

330.     The September 11th attacks were a direct and foreseeable result of the material

support and sponsorship of al Qaeda by defendant Sudan.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan

jointly, severally, and/or individually, in an amount authorized by governing law to be

determined at trial, for compensatory damages, together with punitive damages, plus pre- and

post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this

Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever

again committing such heinous acts.

## <u>COUNT XVIII</u>

### VIOLATIONS OF INTERNATIONAL LAW

### ON BEHALF OF ALL PLAINTIFFS

331.     Plaintiffs incorporate all previous allegations by reference.

332.     Defendant Sudan is jointly and severally liable for plaintiffs' injuries under the

principles of international law.

333.    It is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law

334.    The terrorist attacks of September 11, 2001 involved the hijacking of four airplanes.  Aircraft hijacking is widely recognized as a violation of international law of the type that gives rise to liability against the hijackers and those who aided or abetted the aircraft hijacking.

335.    Through the tortious acts in support of al Qaeda described above, defendant Sudan aided and abetted, and conspired with, al Qaeda in the commission of a violation of international law, aircraft hijacking, because their conduct substantially assisted al Qaeda's commission of the September 11th attacks.

336.    In addition, and in the alternative, the tortious conduct of defendant Sudan aided and abetted the violation of the following additional conventions, agreements, U.N. declarations, resolutions, and principles of international law:

(1)  Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)  Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)  Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277;

(4)  Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5)  Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)  International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)  International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8)  U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9)  U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10)  Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11) Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13) The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14) The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15) The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

337. Plaintiffs and/or their insureds suffered injuries by reason of the above conduct for which defendant Sudan is jointly and severally responsible.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with treble damages, punitive damages, plus pre- and post-judgment interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims so triable.

Dated: November 20, 2020

Respectfully submitted,

*/s/ Sean P. Carter*
Sean P. Carter, Esq.
Stephen A. Cozen, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street
Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-2000
Fax: (215) 665-2013
scarter1@cozen.com
scozen@cozen.com
starbutton@cozen.com

Attorneys for *Federal Insurance* Plaintiffs,
Lead Counsel for the Property Damage
and Commercial Plaintiffs, and Plaintiffs' Executive
Committee for Commercial Claims

*/s/ Robert T. Haefele*
Robert T. Haefele, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq.
John Eubanks, Esq.
MOTLEY RICE LLC
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
rhaefele@motleyrice.com
jflowers@motleyrice.com
dmigliori@motleyrice.com
melsner@motleyrice.com
jeubanks@motleyrice.com

Attorneys for *Burnett* Plaintiffs,
Co-Lead Counsel for Personal Injury and Wrongful
Death, and Plaintiffs' Executive Committee for
Personal Injury and Wrongful Death

*/s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Bruce Strong, Esq.
Arthur R. Armstrong, Esq.
Samantha E. Smith, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Jgoldman@andersonkill.com
Bstrong@andersonkill.com
Aarmstrong@andersonkill.com
Ssmith@andersonkill.com

Attorneys for *O'Neill* Plaintiffs and the *O'Neill*
Class Action, and Plaintiffs' Executive Committee
for Personal Injury and Wrongful Death


*/s/ Edward M. Pinter*
Edward M. Pinter, Esq.
Catherine B. Altier, Esq.
FORD MARIN ESPOSITO WITMEYER
& GLESER, LLP
Wall Street Plaza, 16th Floor
New York, NY 10005
Tel: (212) 269-4900
Fax: (212) 344-4294
epinter@fordmarrin.com
caltier@fordmarrin.com

Attorneys for *Continental Casualty* Plaintiffs


Legal\49720354v1

98