# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS ON      :
SEPTEMBER 11, 2001             :      MDL 03-1570 (GBD)(SN)

**This Document Relates To:**

*Havlish, et al. v. bin Laden, et al.,* **Case No. 03-CV-09848**
*Ashton, et al. v. al Qaeda Islamic Army, et al.,* **Case No. 02-CV-06977**
*Burnett, Sr., et al., v. Islamic Republic of Iran,* **Case No. 15-CV-9903**
*Burlingame, et al. v. bin Laden, et al.,* **Case No. 02-CV-07230**
*Bauer, et al. v. al Qaeda Islamic Army, et al.,* **Case No. 02-CV-07236**
*O'Neill, Sr., et al. v. Republic of Iraq, et al.,* **Case No. 04-CV-1076**
----
*All Other Cases Against the Islamic Republic of Iran*


### *HAVLISH* PLAINTIFFS' RESPONSE IN OPPOSITION TO RESPONDENTS' RULE 72 OBJECTIONS TO MAGISTRATE JUDGE NETBURN'S SEPTEMBER 30, 2020 ORDER AND OPINION


January 25, 2020

Table of Contents

I.     SUMMARY OF THE ARGUMENT ................................................................................. 1

II.    FACTUAL BACKGROUND ......................................................................................... 5

   A.   The Development of the *Havlish* Work Product that Serves as the Basis for All MDL
Judgments Against Iran ................................................................................................. 5

   B.   Respondents' Beneficial Use of the *Havlish* Work Product ............................................. 11

III.   STANDARD OF REVIEW ......................................................................................... 12

IV.    ARGUMENT ........................................................................................................... 14

   A.   The Court's Subject Matter Jurisdiction Over Respondents' Claims  is the Basis for the
Court's Authority to Order Respondents to Contribute a Portion of their Recoveries from
VSSTF Awards to a Common Benefit Fund ......................................................................... 14

   B.   The Court Has Authority to Create a Common Benefit Fund to Compensate Only
Attorneys Whose Work Product Produces a Tangible Benefit for MDL Claimants ............... 17

   C.   Although the Court Has Authority to Order the Allocation of Common Benefit Fees to
Attorneys Whose Work Product Serves as the Basis for MDL Claimant Recoveries Before all
MDL Cases are Resolved, Respondents' Objection is Premature Because the Court Here Has
Not Ordered the Allocation of Any Common Benefit Fees ................................................... 22

   D.   *Havlish* Counsel Have Not and Cannot Waive the Court's Authority to Order
Respondents to Contribute to a Common Benefit Fund From Any or All Rounds of VSSTF
Recoveries ..................................................................................................................... 22

V.     CONCLUSION ......................................................................................................... 24

Plaintiffs in *Havlish v. Bin Laden, et al.*, case no. 03-cv-09848, respectfully ask the Court to deny Respondents' Rule 72 Objections to Magistrate Judge Netburn's September 30, 2020 Order and Opinion, ECF 6481 denying Respondents' motion for reconsideration of the Court's September 30, 2019 common benefit order.

## I.    SUMMARY OF THE ARGUMENT

On December 29, 2011, this Court entered an Order of Judgment in *Havlish* finding the Islamic Republic of Iran and several of its agencies and instrumentalities (collectively referred to as "Iran") liable for damages the *Havlish* Plaintiffs suffered as a result of the September 11, 2001 terrorist attacks.  ECF No. 2516.  Thereafter, *Havlish* counsel developed a damages paradigm, supported by expert testimony, that was incorporated into Magistrate Judge Maas's Report and Recommendation adopted by the Court on October 3, 2012.  ECF No. 2623.  The *Havlish* judgment and damages paradigm are the product of years of effort and *Havlish* counsels' investment of vast amounts of time, money and expertise.  The task of obtaining that judgment was complicated by the fact that *Havlish* counsel developed the evidence against Iran and presented its work product to the Court over the repeated "vigorous objections" of, and with no assistance from, the Plaintiffs' Executive Committees.

In the years since entry of the *Havlish* judgment, the Court has entered judgments totaling more than $82 billion against Iran in 25[1] other cases in this MDL.[2] Respondents in the present

---

[1] Plaintiffs in an additional 20 MDL cases have asserted claims against Iran. The Court has not yet entered judgment in those cases.

[2] *Havlish* attorneys are counsel in three additional MDL cases that include claims against Iran, *Hoglan, et al. v. Islamic Republic of Iran, et al.*, case no. 11-cv-07550, *Ray, et al. v The Islamic Republic of Iran, et al.*, case no. 19-cv-12, and *Ryan, et al. v The Islamic Republic of Iran, et al.*, case no. 20-cv-266. These cases are not included among the 25 Respondent actions.

matter are comprised of the Plaintiffs in those 25 cases, 21 of which were not filed until years after the Court entered the *Havlish* judgment.[3] Thousands of MDL claimants now have recovered a portion of their Iran judgments through awards from the U.S. Victims of State Sponsored Terrorism Fund (the "VSSTF").[4]  While Respondents acknowledge that they relied on and utilized the *Havlish* work product exclusively to obtain judgments in each of their cases, and further acknowledge that those judgments are the basis of their recoveries from the VSSTF, they oppose the *Havlish* Plaintiffs' request to create a common benefit fund that would compensate those attorneys who contributed to the work product upon which those judgments stand.

*Havlish* Plaintiffs filed their initial motion seeking the creation of a common benefit fund on March 19, 2016. ECF No. 3236.  The Court denied that motion without prejudice to renew, holding that the creation of the requested fund was premature because, at that point, the amount of effort Respondents would expend to collect on their judgments against Iran, and the sums, if any, they would actually recover, could not be determined.  ECF No. 3322 (adopting Magistrate Judge Maas's Report and Recommendation, ECF 3309).  In her Opinion and Order of September

---

[3] For example, Plaintiffs in the *Burnett v. The Islamic Republic of Iran*, case no. 15-cv-9903, who collectively comprise the largest Iran judgment holders, did not file a complaint against Iran until December 18, 2015, four years after the *Havlish* judgment. *Havlish* Plaintiffs provided the Court with a listing of Respondent cases and judgment dates and amounts at ECF No. 6448-1.

[4] The VSSTF was created and funded by an act of Congress, 34 U.S.C. §20144, "to provide compensation to a specific group of international terrorism victims harmed by state sponsored terrorism.  In general, the Fund is designed to award compensation to those victims of international state sponsored terrorism who (1) have secured final judgments in a United States district court against a state sponsor of terrorism, or (2) were held hostage at the United States Embassy in Tehran, Iran from 1979 to 1981 (and their spouses and children)." http://www.usvsst.com/faq.php.  The VSSTF was originally funded by Congress' designation of a portion of certain monies derived from U.S. Department of Justice prosecutions of entities that violated U.S. sanctions against Iran and other state sponsors of terrorism. The VSSTF is replenished, on a continuing basis, through "qualifying case deposits" from further prosecutions by the Justice Department until January 1, 2026.  http://www.usvsst.com/deposits.php.

30, 2019, Magistrate Judge Netburn granted in part the *Havlish* Plaintiffs' renewed motion for the creation of a common benefit fund, finding that the uncertainty that previously concerned the Court was removed when Responding Plaintiffs began to collect their judgments against Iran from the VSSTF with little effort other than the filing of an application form.  ECF No. 5180, Opinion & Order (referred to herein as the "Common Benefit Order").  Magistrate Judge Netburn subsequently denied Respondents' motion for reconsideration of the Common Benefit Order and "reaffirm[ed] that it is appropriate now to assess a common benefit fee to compensate those lawyers who worked for the common benefit of all plaintiffs in pursuit of the claims against Iran."  ECF No. 6481 (referred to herein as the "Reconsideration Order") at p. 10.

Respondents now assert four objections to the Reconsideration Order. The Court should deny each of those objections because Respondents have not and cannot demonstrate that any aspect of the Reconsideration Order is clearly erroneous or contrary to law. In their first objection, Respondents contend that the Court lacks jurisdiction over the corpus of the recovery, the VSSTF, and therefore cannot order Respondents to contribute a portion of their VSSTF awards to a common benefit fund. But Respondents do not provide any legal foundation for that objection as the cases on which they rely either fail to support or directly refute their position. *See, for example*, *In re Genetically Modified Rice Litigation*, 835 F.3d 822, 830 (8th Cir. 2016)(holding that the trial court's subject matter jurisdiction provides a basis for the court's authority to order plaintiffs in an MDL proceeding to contribute to a common benefit fund and that "***there is no separate requirement that the Court also have jurisdiction over the corpus of the settlement, as though this were a quasi-in rem proceeding***.")(emphasis added).

In their second objection, Respondents contend that a common benefit fund cannot be used to compensate only those attorneys whose work has enabled MDL claimants to recover

judgments against Iran. Instead, Respondents insist that any common benefit order must be designed to compensate members of the PEC for their work on cases that have not resolved. In an attempt to find some support for this position, Respondents conflate the concepts of "common work" and "common benefit." While Respondents' memorandum includes a lengthy list of common work the PEC has performed, that work has not yet produced, and may never produce, a tangible benefit to MDL claimants. The purpose of a common benefit fund is not to reward common work, but rather to reward work that produces a common benefit.  Since only the work done in furtherance of the Iran judgment has produced a common benefit, the Reconsideration Order correctly upholds and reaffirms the Common Benefit Order finding that it is appropriate to create a common benefit fund to compensate attorneys whose work produced that benefit. ECF 6481 at p. 10. That finding is neither clearly erroneous nor contrary to law, so Respondents' second objection must be denied.

Respondents' next objection states that the Court cannot make an allocation of common benefit fees at this point in the litigation. This objection should be rejected because it is premature, in that the Court has not yet ordered any allocation of common benefit fees, and it is wrong. Rather, Judge Netburn's Reconsideration Order requires the parties to submit information to the Court that will allow her to make rulings regarding the size, scope, and mechanism for administering a common benefit fund. Once those rulings are made, the Court's inherent managerial authority certainly provides the basis for an allocation of fees, especially under the unique factual circumstances presented here.

In their final objection, Respondents assert that *Havlish* counsel has waived a "claim" to recoveries from VSSTF first-round payments. This objection is deficient on its face because *Havlish* counsel does not have, and never had, a claim on any recoveries. Rather, a determination

regarding which recoveries should be subject to a common benefit assessment is for the Court to determine. *Havlish* counsel cannot waive the Court's authority to order Respondents to contribute a portion of payments received in the first round of VSSTF awards to a common benefit fund. Moreover, Respondents have not alleged and cannot establish the elements of waiver (the voluntary surrender of a known right), so the Court should overrule their final objection.

## II.  FACTUAL BACKGROUND

### A.  THE DEVELOPMENT OF THE *HAVLISH* WORK PRODUCT THAT SERVES AS THE BASIS FOR ALL MDL JUDGMENTS AGAINST IRAN

On December 9, 2003, the Judicial Panel on Mutidistrict Litigation transferred to this Court all lawsuits brought by plaintiffs seeking "to hold liable an array of defendants who allegedly promoted, financed, sponsored, or otherwise supported the acts of terrorists that led to the deaths and injuries arising from the September 11, 2001 attacks on the United States." ECF No. 1, Conditional MDL Transfer Order. In the early stages of this MDL, the Court entered Case Management Order No. 3 that, among other things, appointed members of the Plaintiffs' Executive Committee (the "PEC") and designated counsel in *Ashton, Burnett* and *Federal Insurance* as Committee Chairs. ECF No. 248. For purposes of the matter at issue here, CMO No. 3 contains two unique and important provisions. The first provides that any plaintiffs' attorney may, when necessary, present to the Court individual positions that are divergent from the positions of the PEC (CMO 3 at ¶13), and the second recognizes that independent investigations were being undertaken by various plaintiffs' counsel (CMO 3 at ¶20).

From the inception of the PEC, *Havlish* counsel made it clear that they were pursuing, and intended to pursue, claims against Iran that they believed to be important to their clients as

well as many other plaintiffs in the MDL.[5] At the same time, the other PEC members made it clear that they considered the development of such evidence to be of little consequence in the broader MDL.  As Magistrate Judge Netburn correctly observed in the Common Benefit Order, *Havlish* counsel's independent investigation was divergent from the position of the PEC but was not inconsistent with CMO No. 3.  ECF No. 5180 at p. 10.

Indeed, in 2010, one of the PEC's lead counsel advised the Court that the PEC "vigorously opposed" the *Havlish* Plaintiffs' presentation of evidence against Iran, referring to the *Havlish* effort as "the hair on the tail of the dog doing something that we think could kill the dog."  *See* ECF No. 4289-4, transcript of April 15, 2010 conference, at pp. 16-18.  Prior to the *Havlish* submission of evidence, counsel representing the PEC repeatedly stated their position that a judgment against Iran was not in *any* plaintiff's best interest.  *See Id.* at p. 17 (stating the PEC's position that a judgment against Iran would "disadvantage all of the plaintiffs" for reasons that have never been explained);  *See also* ECF No. 4289-5, transcript of July 13, 2011 conference, at p. 17 (stating the PEC's new position that a judgment against Iran could somehow derail an unexplained "well-thought-out strategy").

In the face of that resistance from the PEC, *Havlish* counsel conducted their investigation that ultimately led to the compilation of an irrefutable body of evidence establishing Iran's liability. Over a ten-year period, the *Havlish* legal team invested tens of thousands of hours of attorney time and underwrote nearly $2 million in costs and expenses in pursuit of evidence

---

[5] The *Havlish* action was filed in 2002 and did not name the myriad of Saudi and other defendants pursued by other PEC members. An initial investigation into the factual background of the events of 9/11 led *Havlish* counsel to believe that the sovereign state primarily responsible for providing direct and material support to the 9/11 hijackers was the Islamic Republic of Iran. For that reason, *Havlish* counsel made a commitment to their clients that they would vigorously pursue claims against Iran.

against Iran.  *See* ECF No. 2552, Ex. M.  Among other things, *Havlish* attorneys identified, located and interviewed or consulted with dozens of expert and fact witnesses, in the United States, Canada, Europe, and the Middle East.  Those witnesses included a number of defectors from the Iranian military, the Islamic Revolutionary Guards Corps, and Iran's Ministry of Information and Security, as well as other persons connected with terrorist organizations, counter-terrorism agencies and organizations, domestic federal and international law enforcement, the militaries of several countries, 9/11 Commissioners and Commission staff, and other individuals knowledgeable about terrorist operations, recruitment, financing, travel, planning, training, and/or communications, as well as the history, methodology, and purposes of state-sponsored terrorism.  During the course of the investigation, *Havlish* counsel conducted extensive research, including a review of innumerable books, treatises, and government reports in pursuit of evidence that would support a judgment that would satisfy the Court, withstand scrutiny and enable collection efforts in the U.S. and abroad.

The *Havlish* Plaintiffs made every effort to ensure that its case against Iran was both factually and procedurally solid.  In their original pleadings, the *Havlish* Plaintiffs asserted claims against Iran pursuant to §1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1602, *et seq.*, as well as a number of state and federal common law and statutory claims.  In August 2008, the *Havlish* Plaintiffs filed a motion for default judgment against Iran. *See* ECF No. 2124.  Around the same time, Congress repealed the FSIA's §1605(a)(7) and replaced it with §1605A, which created a federal private right of action against foreign state sponsors of terrorism.  The *Havlish* Plaintiffs thereupon filed a motion for leave to amend their Complaint in order to proceed under the new statutory scheme.  The *Havlish* motion set out the background and substance of the new law and the basis for its retroactive application.  ECF No.

2228.  This Court granted that motion on June 17, 2010.  ECF No. 2253.

Having ensured the proper procedural framework, the *Havlish* Plaintiffs proceeded to file its proof on liability in the form of three separate legal memoranda, a lengthy appendix, and eighty-five 85 exhibits.  ECF Nos. 2430-2434 and 2473.  Four of these 85 exhibits comprised, collectively, approximately thirty (30) hours of sworn videotaped testimony taken overseas by *Havlish* counsel, each containing scores of additional exhibits.  Due to the highly sensitive nature of some of the presented material, the Court granted the *Havlish* Plaintiffs' motion to file three of the witnesses' testimony, the accompanying exhibits, and several related affidavits, under seal, as well as the lengthy legal memorandum discussing that evidence.  ECF No. 2440.

Also constituting a substantial portion of the *Havlish* evidence were sworn affidavits, with exhibits, totaling approximately 1,000 pages, by ten experts in the fields of terrorism, intelligence, criminal investigation, and the structural aspects of the state, the government, and the agencies and instrumentalities of the Islamic Republic of Iran.  These ten experts included three senior staff members of the 9/11 Commission, three former CIA operatives or analysts, the most esteemed American expert on Iran's government and economics, France's preeminent terrorism prosecutor, the top terrorism and military intelligence investigative journalist in Israel, and the former top U.S. official of Interpol.  Another witness was an authoritative American investigative journalist and author, who worked hundreds of hours with *Havlish* counsel throughout the investigation, domestically and overseas; he submitted two affidavits, one of them sealed, pertaining to the *Havlish* investigation.  Most of these experts appended additional exhibits and attachments to their affidavits.  All of these experts were retained, vetted, and presented by *Havlish* counsel.

Further, *Havlish* counsel interviewed and consulted with scores of other experts,

witnesses, and current and former government officials in the U.S., Europe, and the Middle East. One *Havlish* attorney made fourteen (14) separate trips overseas during the investigation, some of them with the aforementioned American investigator; another *Havlish* attorney made four trips abroad in connection with the investigation and the testimony, as well as consulting with experts; other *Havlish* attorneys also traveled internationally and all of them, on innumerable occasions, travelled extensively within and across the United States.

Subsequent to the filing of the evidence, *Havlish* counsel requested an opportunity to present the evidence in open court, which this Court granted, despite the opposition of the PEC. At a hearing on July 13, 2011, the co-chairman of the PEC argued to this Court that such a hearing should not be afforded to the *Havlish* Plaintiffs because it would interfere with the PEC's "well-thought-out strategy" that was never explained to *Havlish* counsel (who were members of the PEC) or the Court. *See* ECF No. 3236-2, transcript of July 13, 2011 conference, at pp. 10-11. This Court nevertheless granted the *Havlish* Plaintiffs request for an evidentiary hearing over the objections of the PEC.

At the evidentiary hearing on December 15, 2011, the *Havlish* attorneys made an in-depth presentation of the public evidence, and some of the sealed evidence, in open court. Based upon that evidence, this Court adopted and entered fifty-three (53) pages of detailed Findings of Fact and Conclusions of Law proposed by the *Havlish* attorneys. ECF No. 2515. The Court entered a liability judgment against Iran in favor of the *Havlish* Plaintiffs on December 22, 2011. ECF No. 2514.

Shortly thereafter, the Court ordered a damages inquest, heard initially by Magistrate Judge Maas. The *Havlish* Plaintiffs submitted voluminous damages inquest briefing and evidence that included not only evidence from the *Havlish* Plaintiffs themselves, but also from

two experts.  The first was an expert in economic analysis of lost earnings; the other was retired

Rear Admiral Alberto Diaz, Jr., M.D., of the United States Navy who was, *inter alia*, Chief of

Staff for the Navy's Bureau of Medicine and Surgery.  Dr. Diaz attested to the overwhelming

physical, psychological, and neurophysiological aspects of the horrific deaths of the 9/11

victims.  In significant part, the expert testimony of Admiral Diaz underpinned the pain-and-

suffering awards of $2 million for each decedent that ultimately comprised a portion of the

*Havlish* judgment.  In his July 30, 2012, Report and Recommendation on Damages, Magistrate

Judge Frank Maas relied specifically upon Dr. Diaz' report regarding his "chilling account of the

horrific conditions" encountered by each of the 9/11 decedents and their "unimaginable pain and

suffering on September 11, 2001," as well as case law cited in the *Havlish* Plaintiffs' damages

inquest memorandum, recommending that this Court award $2 million in pain-and-suffering

damages to each decedent estate.  ECF No. 2618, p. 8.

This Court adopted Judge Maas' Report and Recommendation in its entirety. ECF No.

2623. In addition to the $2 million pain and suffering awards to decedent estates, the Court

awarded solatium damages to all of the qualified immediate family member plaintiffs, including

some functional equivalents of immediate family members, in the following amounts:

$12,500,000 for each spouse of a 9/11 decedent; $8,500,000 for each child; $8,500,000 for each

parent; and $4,250,000 for each sibling.  Each of those solatium award amounts represents an

enhancement from solatium awards in other terrorism cases, which the *Havlish* attorneys had

advocated in their damages briefing, and set the benchmark for Respondents' damage awards.

ECF No. 2552. This Court entered final judgment in *Havlish* on October 12, 2012.  ECF No.

2624.

### B.  RESPONDENTS' BENEFICIAL USE OF THE *HAVLISH* WORK PRODUCT

In the Common Benefit Order, Magistrate Judge Netburn correctly characterized

Respondents' use of the *Havlish* work product as follows:

> In sum, *Havlish* counsel performed a substantial amount of work that
> benefited all Plaintiffs and allowed them to receive compensation from the
> VSSTF. The Court views these circumstances as exceptional and unlikely to
> reoccur in this litigation.
>
> . . . Respondents almost exclusively relied on the *Havlish* evidence when
> they pursued their own default judgments years' later. *See, e.g.,* ECF No.
> 2970 (*Ashton*); ECF No. 3000 (*O'Neill*). Indeed, both the *Ashton* and
> *O'Neill* Plaintiffs requested that the Court use "the evidence . . . previously
> received and analyzed" in *Havlish*. ECF No. 2970, at 21; ECF No. 3000, at
> 2. Judge Daniels obliged, entering default judgments based on the
> "evidence submitted by [the *Havlish*] Plaintiffs." ECF Nos. 3021 & 3022.

ECF No. 5180 at pp. 10-11.

Respondents would not be eligible to receive VSSTF awards if they did not obtain the

judgment against Iran that was made possible through their use of the *Havlish* work product.  *See*

http://www.usvsst.com/faq.php, section 2 – Eligibility.  Incredibly, Respondents say they had

compiled their own evidence against Iran that they intended to use "at an appropriate time."

Objections at p. 5, f/n 4. But *Havlish* counsel were members of the PEC and the PEC leadership

never explained why they believed the *Havlish* liability presentation was not made "at an

appropriate time." To be sure, *Havlish* counsel were concerned, as the PEC should have been,

that a delay in obtaining a judgement might result in missed collection opportunities for

claimants in this MDL. This concern was heightened in 2010 when, as the PEC was telling this

Court that the PEC "vigorously opposed" the *Havlish* request to present evidence supporting

judgment against Iran, judgment holders in an unrelated case were undertaking proceedings in

this Court to collect $1.8 billion in Iranian assets. *See Peterson v. Islamic Republic of Iran*, 758

F.3d 185 (2014) (S.D.N.Y. case no. 10-04518).

In any event, Respondents never hinted that they had compiled any evidence at a time when they may have assisted *Havlish* counsel in their presentation of the liability case. Indeed, at the end of the hearing on April 15, 2010, the Court asked *Havlish* counsel to share and discuss their Amended Complaint with the PEC. Judge Daniels specifically observed that "they [the PEC] might have some helpful suggestions." *See* ECF 4289-4, Transcript of Conference held April 15, 2010, at pp. 19-20.

*Havlish* counsel did as the Court asked, provided the PEC with a copy of the Amended Complaint and discussed the allegations and the planned evidentiary presentation. However, when it subsequently became clear that the Court would allow the *Havlish* Plaintiffs to present the case against Iran, there were no suggestions from the PEC. The PEC never offered to help in any way. PEC leadership never sought a joint presentation of evidence on behalf of all 9/11 plaintiffs, choosing instead to stick by a confused stand-still strategy. While Respondents now contend that they had compiled their own evidence against Iran, they never shared that evidence with *Havlish* counsel.

## III.   STANDARD OF REVIEW

The Court should review Respondents' objections under a "clearly erroneous or contrary to law" standard. Respondents have submitted objections to Magistrate Judge Netburn's September 30, 2020 Reconsideration Order that addresses issues raised in connection with the *Havlish* Plaintiffs' motion to create a common benefit fund. While Respondents contend that the Court should treat the order as a Report and Recommendation and conduct a *de novo* review, the order does not fall within the excepted motions in 28 U.S.C. § 636(b)(1)(A), so it cannot be interpreted as a Report and Recommendation. Accordingly, Magistrate Judge Netburn correctly issued her

decision as an Opinion and Order. *See In re Zyprexa Prods. Liab. Litig.,* 594 F.3d 113, 117–18 (2d

Cir. 2010) (finding that an order establishing a three-percent set-aside for a common benefit fund

did not "give, or aid in giving, [any] substantive relief" sought in the lawsuit) (internal alterations

omitted).

     This Court recently stated the standard for review of Rule 72 objections to a Magistrate

Judge's order as follows:

> A district judge must modify or set aside only those parts of a magistrate
> judge's order related to nondispositive matters that are clearly erroneous or
> contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(l)(A); *Thomas v.
> Arn,* 474 U.S. 140, 149 (1985) (stating that "Congress provided for a
> 'clearly erroneous or contrary to law' standard of review of a magistrate's
> disposition of certain pretrial matters")." A district court is justified in
> finding a magistrate judge's ruling 'clearly erroneous' where, although
> there is evidence to support it, the reviewing court on the entire evidence
> is left with the definite and firm conviction that a mistake has been
> committed." *Highland Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173,
> 177 (S.D.N.Y. 2008) (citations omitted). "An order is contrary to law
> when it fails to apply or misapplies relevant statutes, case law or rules of
> procedure." *MacNamara v. City of New York,* 249 F.R.D. 70, 77
> (S.D.N.Y. 2008) (internal citations and quotations omitted).
>
> This is a highly deferential standard, and the objector thus carries a
> heavy burden. *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading Inc.,*
> No. 04 Civ. 6189, 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007);
> *see also Lugosch v. Cangel,* 443 F.Supp.2d 254, 276 (N.D.N.Y.2006)
> (noting that particular deference is due where "the magistrate judge has
> been deeply involved in discovery matters in the case for years").

ECF No. 6532.

     This same standard applies here.[6]

---

[6] Respondents chose to seek reconsideration of the Common Benefit Order of September 30,
2019 rather than file objections within 14 days of that order as required by Fed. R. Civ. P. 72(a).
Here they object to Magistrate Judge Netburn's ruling regarding their motion for reconsideration.
To prevail on a reconsideration motion, the movant must demonstrate "an intervening change of
controlling law, the availability of new evidence, or the need to correct a clear error or prevent
manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d

## IV.   ARGUMENT

### A.   THE COURT'S SUBJECT MATTER JURISDICTION OVER RESPONDENTS' CLAIMS  IS THE BASIS FOR THE COURT'S AUTHORITY TO ORDER RESPONDENTS TO CONTRIBUTE A PORTION OF THEIR RECOVERIES FROM VSSTF AWARDS TO A COMMON BENEFIT FUND

In their first objection, Respondents argue that this Court lacks authority to assess their

VSSTF recoveries in connection with a common benefit order.  In support of that position,

Respondents cite two cases, one that directly refutes their argument and another that plainly

offers no support for their objection. Both cases involve a similar fact pattern: A number of

plaintiffs brought suit against a defendant in a federal MDL court while other plaintiffs sued the

same defendant in state court. When the plaintiffs' executive committee asked the MDL court to

order common benefit assessments from the recoveries of state court plaintiffs, the court

determined that it lacked jurisdiction over the state court actions so it could not assess those

recoveries. Neither of those cases support Respondents' proposition that "courts cannot direct

payment of attorney fees that originate from a source outside of the federal litigation."

(Objections at p. 10.)

The first case on which Respondents rely is *In re Showa Denko K.K.L.-Tryptophan Prods.*

*Liab. Litig. II*, 953 F.2d 162 (4th Cir. 1992), where the court noted that the challenged common

benefit order attempted to reach not only plaintiffs in cases pending in the multi-district

---

99, 104 (2d Cir. 2013). The standard for granting a motion for reconsideration is strict. *Shrader v. CSX Transp., Inc*., 70 F.3d 255, 256-57 (2d Cir. 1995). Accordingly, reconsideration is generally denied unless "the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citing *Shrader*, 70 F.3d at 257). In her Opinion and Order, Magistrate Judge Netburn found that the points raised in Respondents' motion for reconsideration did not satisfy the standard for granting reconsideration. Therefore, the only question raised here by Respondents' objections is whether it was "clearly erroneous or contrary to law" for Magistrate Judge Netburn to find that Respondents motion for reconsideration failed to establish that aspects of Common Benefit Order were "clear error or manifestly unjust."

litigation, but also plaintiffs in federal cases not transferred to the multi-district litigation and plaintiffs in 683 pending state cases. *Id* at 164. The court also found it significant that Showa Denko, the party contesting the common benefit order, did not contest the district court's authority to establish the fund and require contributions by plaintiffs ***in actions before the court***. *Id.* Rather, the Fourth Circuit held that the trial court lacked jurisdiction over parties in actions in other courts and therefore could not compel them to comply with its common benefit order

> Claimants who have not sued and plaintiffs in state and untransferred federal cases have not voluntarily entered the litigation before the district court nor have they been brought in by process. The district court simply has no power to extend the obligations of its order to them.

*Id.* at 165.

The Eighth Circuit made a similar holding in the other case on which Respondents rely heavily, *In re Genetically Modified Rice Litigation*, 764 F.3d 864 (8th Cir. 2014)("*Genetically Modified Rice I*").  The appellate court affirmed the trial court's ruling that it lacked jurisdiction to compel parties in state court litigation to contribute to a federal MDL's common benefit fund even when a state court plaintiff's attorney also represented plaintiffs in the MDL court. *Id*. at 874.

The rulings in both cases are inapposite here because the Respondents all have claims pending in this Court, not state court. Respondents' contention that *Showa Denko* and *Genetically Modified Rice I* stand for the proposition that an MDL court must have jurisdiction over the source of recovery payments in order to include those payments in a common benefit assessment is simply wrong. Those courts declined to extend the reach of common benefit orders to state court litigation not because they lacked jurisdiction over the corpus of the recovery, but rather because they lacked jurisdiction over the parties and the subject matter of their state court

suits. That is not the case here, where this Court has personal jurisdiction over Respondents and subject matter jurisdiction over their claims

Moreover, in a subsequent ruling in *Genetically Modified Rice Litigation*, the Eighth Circuit directly refuted the notion that this Court lacks authority to assess Respondents' VSSTF recoveries. *In re Genetically Modified Rice Litigation*, 835 F.3d 822, 830 (8th Cir. 2016) ("*Genetically Modified Rice II*"). In that litigation, several thousand rice farmers and others involved in the rice business sued Bayer CropScience in state and federal court after Bayer's genetically modified rice tainted the U.S. rice supply. One of the claimants, Riceland, filed a cross-claim against Bayer in state court and a complaint in the MDL court asserting the same claim. Riceland agreed to settle the state court litigation and released all claims against Bayer. *Id.* at 826-827.  When the MDL leadership moved to assess 10% of the Riceland recovery as required under the common benefit order, Riceland argued that such an assessment was precluded by the ruling in *Genetically Modified Rice I*.  The Eight Circuit disagreed:

> *Rice I* does not control this case, because Riceland and Bayer were parties to multiple federal lawsuits before the district court at the time of settlement. Unlike the state-court-only plaintiffs in *Rice I*, Riceland pursued its claims against Bayer in both state and federal court. Applying the Common Benefit Order to the state-court-only plaintiffs in *Rice I* would have required the federal court to exercise authority over parties that never appeared in federal court. Riceland, by contrast, "voluntarily entered the litigation" and sought a federal forum by filing a federal complaint and asserting third-party claims in the consolidated federal proceedings. The district court therefore had jurisdiction to enter any orders regarding Riceland that are consistent with the authority of a transferee court in centralized multidistrict litigation.

*Id.* at 828.

The Eighth Circuit proceeded to explain that the trial court's authority to compel compliance with the common benefit order was based on its jurisdiction over Riceland and the

fact that the source of payment for Riceland's settlement was outside the court's jurisdiction was irrelevant:

> The district court found that the plaintiffs' leadership group here conferred a substantial benefit on Riceland. Riceland was before the district court as a plaintiff, cross-claimant, or third-party claimant in at least seven federal cases. The district court had subject-matter jurisdiction over these federal actions. This jurisdiction was a sufficient basis for the court to exercise its equitable and managerial authority to prevent Riceland from freeriding on the work of the leadership group.
>
> ***There is no separate requirement that the court also have jurisdiction over the corpus of the settlement, as though this were a quasi-in rem proceeding***.

*Id.* at 830 (emphasis added).

Like Riceland in *Genetically Modified Rice II*, Respondents here have voluntarily entered this litigation as parties to lawsuits in this MDL. This Court therefore has "jurisdiction to enter any orders regarding Respondents that are consistent with the authority of a transferee court in centralized multidistrict litigation," including a common benefit order. There is no separate requirement that the Court also have jurisdiction over the VSSTF in order to include Respondents' VSSTF awards in that common benefit order.  Therefore, the Court should deny Respondents' first objection.

**B.  THE COURT HAS AUTHORITY TO CREATE A COMMON BENEFIT FUND TO COMPENSATE ONLY ATTORNEYS WHOSE WORK PRODUCT PRODUCES A TANGIBLE BENEFIT FOR MDL CLAIMANTS**

In Respondents' second objection, they assert the legally unsupportable notion that "It is common work performed in the MDL … that provides the court with managerial authority to establish a common benefit fund" (Objections at p. 13), and common work "imbue(s) a court with the authority to shift fees among counsel by means of a common benefit fund." (Objections at p. 14.)  On that shaky foundation rests Respondents' conclusion that this Court's common

benefit order cannot direct the common benefit fund toward compensating only those attorneys whose work product produces an actual benefit for MDL claimants but instead must provide compensation for common work without regard to its contribution to a successful outcome. Respondents' position is demonstrably misguided, as MDL courts have broad discretion to tailor their common benefit fee decisions and routinely restrict common benefit fee distribution to attorneys who produce a tangible benefit for MDL claimants. *See, e.g., Genetically Modified Rice I, supra.* (affirming the award of common benefit fees to members of the plaintiffs' steering committee while denying fees to an attorney group based on the trial court's determination that their work did not produce a benefit for other plaintiffs).

Contrary to Respondents' premise, the Court's power to create a common benefit fund springs from two sources unrelated to the work of MDL attorneys. The first is the Court's unquestionable authority to manage and administer cases brought before it. The second is the Court's inherent equitable power which, for more than a century, courts have relied upon to create common funds where principles of fairness so require, even in the absence of an MDL or class setting. *See Trustees v. Greenough*, 105 U.S. 527 (1881); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939).

Given the irrefutable nature of these principles, Respondents cannot challenge this Court's authority to create a common benefit fund, but instead object that the contemplated fund is not specifically designed to compensate them at this time for work they have performed in connection with claims against defendants other than Iran.[7] Respondents include in their memorandum a

---

[7] Respondents here assert essentially the same objection the *Federal Insurance* Plaintiffs make in their Rule 72 objections. For that reason, *Havlish* Plaintiffs incorporate herein, and refer the Court to, arguments made in *Havlish* Plaintiffs Response in Opposition to the *Federal Insurance* Plaintiffs' Rule 72 Objections.

lengthy list of tasks the PEC has performed in pursuit of claims against those other defendants. Objections at pp. 3-4. But that work has not yet produced a recovery for any MDL plaintiff, so it cannot be the basis for a common benefit fee allocation. *See* Duke Law Center for Judicial Studies, *Standards and Best Practices for Large and Mass-Tort MDLs* (2014) at 68 ("The CBF's function is to compensate plaintiffs' counsel for their work based on their relative contributions to the *outcome* of the case.")(emphasis added).

Respondents' objection cannot be sustained because it is based on a misconception of the purpose for a common benefit fund, which is not simply to reward common work, but rather to compensate attorneys whose work has produced a common benefit. While the PEC's work against other defendants has not produced a benefit for the MDL claimants, all of the liability work, and a substantial part of the damages work, performed by *Havlish* counsel has benefited Respondents and Respondents' counsel. Under these circumstances, a failure to allocate fees to *Havlish* counsel would defy the long-established principles of equity and *quantum meruit* that serve as the bases for all common benefit orders.

Nevertheless, Respondents claim that a common benefit order that does not reward the PEC for their common work would be inconsistent with standard MDL practice as reflected in the case law. They cite cases that support the proposition that "committee members leading the MDL are to be compensated for their work on behalf of all plaintiffs involved in consolidated litigation." Objections at p. 13, citing *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir.), citing *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1016. But the courts in those cases were issuing common benefit rulings in settings where the work of the committee members had led to successful recoveries for MDL plaintiffs. In the present case, only the work of *Havlish* counsel has led to successful recoveries. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v.*

*Pelella*, 350 F.3d 73, 90 (2d Cir. 2003)(common benefit doctrine permits an award of attorney's fees where the plaintiff's *successful litigation* confers a substantial benefit on the members of an ascertainable class)(emphasis added).

Similarly, Respondents cite *In re City of New York*, 2011 WL 7145228, a case where common benefit fees were awarded to liaison counsel for case management tasks such as "convening and conducting meetings, with plaintiffs' counsel, circulating documents to counsel, providing status updates, participating in discussions with opposing counsel and coordinating payments for experts." Objections at p. 14, f/n 12. But here, liaison counsel never conducted meetings that furthered the claims against Iran, never circulated any documents that furthered claims against Iran, never provided status updates regarding the PEC's pursuit of claims against Iran, and never coordinated payments of experts that *Havlish* counsel retained to further claims against Iran. In connection with claims against Iran -- the only claims to reach a successful resolution benefitting all MDL claimants -- all of these tasks were performed by *Havlish* counsel and not by liaison counsel or the PEC. And yet, under Respondents' conception of an appropriate common benefit order, the work of liaison counsel would be rewarded and the work of *Havlish* counsel would not.

Respondents express concern that establishing a common benefit fund to compensate only attorneys whose efforts prove successful would create an incentive for attorneys to take on less difficult common benefit tasks and shy away from "more difficult and riskier" common benefit work. But that is not what happened here where *Havlish* counsel performed essential work in pursuit of a judgment that the PEC, for reasons one PEC leader described as "well-thought-out," declined to pursue.

Respondents insist that a common benefit order that rewards only *Havlish* counsel for

obtaining the Iran judgment and enabling Respondents' VSSTF recoveries is inequitable. In essence, Respondents propose an alternative common benefit plan under which a portion of attorney fees derived from VSSTF recoveries and other future recoveries, including fees related to awards to *Havlish* plaintiffs, would be placed in a fund that would be primarily distributed to Respondents' counsel. Thus, under Respondents' preferred common benefit order, *Havlish* counsel would be required not only to provide Respondents with the benefits of a judgment and damages paradigm, but also to pay their counsel for the privilege of delivering that benefit to them.

The inequity produced by the application of Respondents' concept of an appropriate common benefit fund order is made plain when considering the *Havlish* Plaintiffs' potential recovery in *In re: 650 Fifth Avenue and Related Properties*, S.D.N.Y. case number 08-cv-10934. In the *650 Fifth Avenue* litigation, which is not part of this MDL, the *Havlish* Plaintiffs and several groups of terrorism victims ranging from the 1983 Marine Barracks bombings victims to the 1996 Khobar Towers bombing victims, and a number of smaller groups, all of whom hold judgments against Iran, are attempting to collect their judgments from two entities as proxies for the Iranian government. The PEC and Respondents were not eligible to participate in that collection effort due to their self-imposed delay in finalizing their judgments, a delay they attempted to force upon the *Havlish* Plaintiffs by arguing to the Court that a *Havlish* judgment would be somehow damaging to all MDL claimants. If the PEC had won the argument on that issue, it is likely that the *Havlish* Plaintiffs would also have been precluded from the opportunity to participate in a potential *650 Fifth Avenue* recovery. In the event the *650 Fifth Avenue* litigation is successful, the *Havlish* Plaintiffs will have obtained a recovery *in spite of* efforts by the PEC to convince the Court to deny the *Havlish* request to proceed to judgment. Nevertheless, the broader common

benefit fund proposed by the PEC and *Federal* Plaintiffs would require the *Havlish* Plaintiffs to compensate the very members of the PEC who advocated against the *Havlish* Plaintiffs' interests (and, as it turns out, against the interests of Respondents themselves). Under these circumstances, Respondents' contention that equity and fairness demand this result is absurd.

C.  **ALTHOUGH THE COURT HAS AUTHORITY TO ORDER THE ALLOCATION OF COMMON BENEFIT FEES TO ATTORNEYS WHOSE WORK PRODUCT SERVES AS THE BASIS FOR MDL CLAIMANT RECOVERIES BEFORE ALL MDL CASES ARE RESOLVED, RESPONDENTS' OBJECTION IS PREMATURE BECAUSE THE COURT HERE HAS NOT ORDERED THE ALLOCATION OF ANY COMMON BENEFIT FEES**

Respondents third objection challenges the allocation of common benefit fees prior to the end of litigation against every defendant in the MDL, whenever that may occur. This objection should be rejected both because it is premature, as the Court has not yet ordered any allocation of common benefit fees, and it is wrong. Judge Netburn's Reconsideration Order requires the parties to submit information to the Court that will allow her to make rulings regarding the size, scope and mechanism for administering a common benefit fund. Once those rulings are made, the Court's inherent managerial authority certainly provides the basis for an allocation of fees, especially under the unique factual circumstances presented here. As Magistrate Judge Netburn correctly observed in the Reconsideration Order, "While many or even most MDLs may wait until the litigation is complete, most MDLs do not involve multiple defendants with cases proceeding on vastly different timelines." ECF No. 6481 at p. 4.

D.  ***HAVLISH* COUNSEL HAVE NOT AND CANNOT WAIVE THE COURT'S AUTHORITY TO ORDER RESPONDENTS TO CONTRIBUTE TO A COMMON BENEFIT FUND FROM ANY OR ALL ROUNDS OF VSSTF RECOVERIES**

In their final objection, Respondents assert that *Havlish* counsel has waived a "claim" to recoveries from VSSTF first round payments. This objection is deficient on its face because *Havlish* counsel does not have, and never had, a claim on any recoveries. Rather, a determination

regarding which recoveries should be subject to a common benefit assessment is for the Court to determine. *Havlish* counsel cannot waive the Court's authority to order Respondents to contribute a portion of payments received in the first round of VSSTF awards to a common benefit fund.

In any event, Respondents have not alleged and cannot establish the elements of waiver, the voluntary surrender of a known right. The *Havlish* Plaintiffs filed their original motion seeking the creation of a common benefit fund in March 2016, well before any Respondent received, or had even applied for, a VSSTF recovery. ECF No. 3236. In *Havlish* Plaintiffs' renewed motion, filed in December 2018, they asked the Court to order an assessment "of any amounts collected on Responding Plaintiffs [Iran] judgments by any means." ECF 4289 at p. 2. At that time, the *Havlish* Plaintiffs had no information about the number of Respondents who qualified and received VSSTF first round awards, if any. But because VSSTF first round payments had already been disbursed and distributed at that point, *Havlish* Plaintiffs presumed that any assessment of first round recoveries would be paid from upcoming VSSTF second round awards in 2019. Thus when *Havlish* counsel requested allocation and disbursement of "all sums placed into the common benefit fund by virtue of USVSST Fund distributions received by the Responding Plaintiffs in 2019," they were not, as Respondents contend, waiving a known right, but instead simply were recognizing the practicality of avoiding a "clawback" of a portion of first round VSSTF awards.

In the Reconsideration Order, Magistrate Judge Netburn properly rejected Respondents waiver claim, finding as follows:

> The Court did not find, and does not find here, that *Havlish* counsel waived any interest in USVSST Fund Round One payments. *Havlish* counsel filed their initial motion well before the Round One payments were distributed, and there is

no reason why Round Two and Three should be included but Round One excluded from a common benefit fee. The Court also does not find Responding Plaintiffs' argument that Round One funds may no longer be recoverable to have merit. Whether the specific monies received from the USVSST Fund have been consumed is irrelevant; as Responding Plaintiffs have themselves recently argued, "[t]hat some fees may have been disbursed is immaterial to the question of whether Respondents will comply with a final order directing payment into a common benefit fund." ECF No. 6475, at 5 n.6.

The Court should uphold Magistrate Judge Netburn's ruling and deny Respondents' objection.

## V.    **CONCLUSION**

For the reasons stated above and those set forth in *Havlish* Plaintiffs' Response in Opposition to the *Federal Insurance* Plaintiffs' Objections to the September 30, 2020 Opinion and Order, the Court should deny Respondents' objections.

Respectfully Submitted,

/s/ Stephen A. Corr
Stephen A. Corr (PA Bar No. 65266)
BEGLEY, CARLIN & MANDIO, LLP
680 Middletown Boulevard
Langhorne, PA  19047
(215) 750-0110

Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, PLLC
1211 Connecticut Avenue, N.W., Suite 420
Washington, DC  20036
(202) 467-4489

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, LLC   (*Lead Counsel*)
The Kress Building
301 19th Street North

Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
3905 Founders Road
Indianapolis, 46268
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

John A. Corr (PA Bar No. 52820)
LAW OFFICE OF JOHN A. CORR
301 Richard Way
Collegeville, PA 19426
(610) 482-4237

David C. Lee (TN Bar No. 015217)
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
   YEGELWEL, P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
EDWARD H. RUBENSTONE, LLC
812 N. Fairway Rd.
Glenside, PA 19038
(215) 887-9786

Donald J. Winder (UT Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000

25

P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

**Attorneys for the *Havlish* Plaintiffs**