IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

Case No. 1:03-md-01570-GBD-SN

*This document relates to:*

*Ashton, et al. v. Al Qaeda, et al.*, No. 02-cv-6977; *Federal Ins. Co., et al. v. Al Qaida, et al.*, No. 03-cv-6978; *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849; *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922; *Continental Casualty Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-5970; *O'Neill, et al. v. Republic of the Sudan, et al.*, No. 18-cv-12114; *Aronow, et al. v. Republic of Sudan*, No. 20-cv-07733; *Betru, et al. v. The Republic of Sudan*, No. 20-cv-10615; *Parker, et al. v. The Republic of the Sudan*, No. 20-cv-10657; and *Nolan, et al. v. The Republic of the Sudan*, No. 20-cv-10720.

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF
SUDAN'S CONSOLIDATED MOTION TO DISMISS THE AMENDED COMPLAINTS**

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

January 8, 2021

*Counsel for the Republic of the Sudan*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT .........................................................................................................2

I.   THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER THE FSIA........2

     A.   The Court Lacks Subject-Matter Jurisdiction Under The Terrorism-
          Related Exceptions To Sovereign Immunity (§ 1605A, § 1605B, And
          Now-Repealed § 1605(a)(7)) .............................................................3

          1.   The Amended Complaints Fail To Allege Jurisdictional Causation
               Under The Terrorism-Related Exceptions To Sovereign Immunity ..........6

               a.   Jurisdictional Causation Requires A Showing Of But-For
                    Causation ..................................................................7

               b.   Jurisdictional Causation Also Requires A Showing Of
                    Proximate (Or Direct) Causation ......................................8

               c.   The Amended Complaints Fail To Allege That Sudan's
                    Acts Caused Plaintiffs' Injuries Under Any Jurisdictional
                    Causation Standard .......................................................9

          2.   The Jurisdictional Limitation Period Under § 1605A(b) Has
               Expired ..................................................................18

          3.   The Amended Complaints Do Not Otherwise Satisfy The
               Jurisdictional Requirements Of The Terrorism-Related Exceptions.........21

          4.   Sudan Is Immune From Claims Of Family Members Of Victims
               Under Both § 1605A(a) And § 1605B(b) ..............................23

          5.   Sudan Is Immune From Claims Brought By Corporate Plaintiffs
               Under § 1605A(a), § 1605(a)(7), and § 1605B .......................25

     B.   The Court Lacks Subject-Matter Jurisdiction Under The Noncommercial-
          Tort Exception (§ 1605(a)(5))...........................................................27

II.  THE COURT LACKS PERSONAL JURISDICTION OVER SUDAN.........................27

III. THE AMENDED COMPLAINTS FAIL TO STATE A CLAIM AGAINST SUDAN ...28

     A.   The Amended Complaints Fail To State A Claim Against Sudan Under
          § 1605A(c) & (d) ..........................................................................28

     B.   The Amended Complaints Fail To State A Claim Against Sudan Under
          The Anti-Terrorism Act...................................................................29

1.    The Amended Complaints Fail To Allege That Sudan's Actions Proximately Caused Plaintiffs' Injuries ................................................. 29

2.    The Amended Complaints Otherwise Fail To Plead Primary Liability Against Sudan Under Section 2333(a) ..................................... 30

3.    Secondary-Liability Claims Are Not Available Against Sudan .............. 33

    a.    Secondary-Liability Claims Are Not Available Against Foreign Sovereigns .................................................................. 33

    b.    Plaintiffs' Secondary-Liability Claims Are Time Barred ............. 34

4.    The Amended Complaints Otherwise Fail to Plead Secondary Liability Against Sudan Under Section 2333(d)(2) ................................. 35

    a.    The Amended Complaints Fail To Satisfy The ATA's Threshold Secondary-Liability Requirements ............................ 35

    b.    The Amended Complaints Fail To Allege That Sudan Aided and Abetted Al Qaeda ...................................................... 35

    c.    The Amended Complaints Fail To Allege That Sudan Conspired With Al Qaeda ........................................................ 38

5.    Corporate Plaintiffs Lack Standing To Bring ATA Claims .................... 39

C.    The Amended Complaints Fail To State Claims Under State Law ..................... 40

D.    The Amended Complaints Fail To State Claims Under The Alien Tort Statute, Civil RICO, And International Law ........................................................ 44

IV.    THE AMENDED COMPLAINTS VITIATE THE ENTRIES OF DEFAULT IN *ASHTON*, *BURNETT*, AND *FEDERAL INSURANCE* .................................................. 44

CONCLUSION ..................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Agbor v. Presidency of the Republic of Eq. Guinea*,
  No. 18-cv-8611 (PAE) (RWL), 2019 U.S. Dist. LEXIS 108862 (S.D.N.Y.
  June 27, 2019) ................................................................................................ 47, 48

*Alli v. Steward-Bowden*,
  No. 11-cv-4952(PKC)(KNF), 2012 U.S. Dist. LEXIS 138603 (S.D.N.Y. Sept.
  25, 2012) ................................................................................................................ 46

*Allstate Ins. Co. v. Yadgarov*,
  No. 11-cv-6187 (PKC) (VMS), 2014 U.S. Dist. LEXIS 30068 (E.D.N.Y. Feb.
  10, 2014) ................................................................................................................ 44

*Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*,
  92 F.3d 57 (2d Cir. 1996) ...................................................................................... 46

*American Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974) ............................................................................................... 34

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ................................................................................................. 9

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ................................................................................................. 2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 3, 11, 27, 28

*Ashton v. Al Qaeda Islamic Army*,
  298 F. Supp. 3d 631 (S.D.N.Y. 2018) ......................................................... passim

*Ashton v. al Qaeda Islamic Army (In re Terrorist Attacks on Sept. 11, 2001)*,
  No. 03-md-1570 (GBD) (FM), 2015 U.S. Dist. LEXIS 173091 (S.D.N.Y. Dec.
  28, 2015) ................................................................................................................ 28

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) ............................................................................................... 39

*Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.*,
  No. 13-cv-3376 (JMF), 2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. May 5,
  2014) ...................................................................................................................... 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 3, 11, 27, 28

*Bettis v. Islamic Republic of Iran*,
    315 F.3d 325 (D.C. Cir. 2003) ...................................................................................40

*Bigio v. Coca-Cola Co.*,
    675 F.3d 163 (2d Cir. 2012) .....................................................................................42

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ....................................................................................32

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) ....................................................................................... 2, 3, 24

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) ............................................................................................7, 8

*Boyce v. E.A. Techs., Inc.*,
    No. 10-cv-9359, 2012 U.S. Dist. LEXIS 6259 (S.D.N.Y. Jan. 19, 2012) ...........45

*Breard v. Greene*,
    523 U.S. 371 (1998)..................................................................................................33

*Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks on Sept. 11, 2001)*,
    349 F. Supp. 2d 765 (S.D.N.Y. Jan. 18, 2005) .................................................42, 43

*Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks on Sept. 11, 2001)*,
    840 F. Supp. 2d 776 (S.D.N.Y. 2012) ...................................................... 16, 29, 44

*Burrage v. United States*,
    571 U.S. 204 (2014)...................................................................................................7

*Cain v. Twitter, Inc.*,
    No. 17-cv-2506, 2018 U.S. Dist. LEXIS 163457 (N.D. Cal. Sept. 24, 2018) .......38

*Carey v. Piphus*,
    435 U.S. 247 (1978)...................................................................................................8

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994).................................................................................................36

*Charvac v. M&T Project Managers of N.Y., Inc.*,
    No. 12-cv-05637, 2013 U.S. Dist. LEXIS 177920 (E.D.N.Y. 2013) ...................45

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
    710 F.3d 946 (9th Cir. 2013) ...................................................................................39

*Cicippio-Puleo v. Islamic Republic of Iran*,
   353 F.3d 1024 (D.C. Cir. 2004) ................................................................4

*City of Almaty v. Sater*,
   No. 19-cv-2645 (AJN), 2020 U.S. Dist. LEXIS 36510 (S.D.N.Y. Mar. 3,
   2020) .............................................................................................................44

*City of Rancho Palos Verdes v. Abrams*,
   544 U.S. 113 (2005) ......................................................................................41

*Cody v. Mello*,
   59 F.3d 13 (2d Cir. 1995) .............................................................................47

*Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*,
   140 S.Ct. 1009 (2020) ....................................................................................7

*Commercial Bank of Kuwait v. Rafidain Bank*,
   15 F.3d 238 (2d Cir. 1994) ...........................................................................47

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ...............................................................35, 38

*Di Ponzio v. Riordan*,
   679 N.E. 2d 616 (N.Y. 1997) .......................................................................43

*Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*,
   602 F.2d 478 (2d Cir. 1979) .........................................................................29

*Evseroff v. IRS*,
   190 F.R.D. 307 (E.D.N.Y. 1999) .................................................................46

*Fed. Ins. Co. v. al Qaida (In re Terrorist Attacks on Sept. 11, 2001)*,
   134 F. Supp. 3d 774 (S.D.N.Y. 2015) ..................................................22, 29

*First Fidelity Bank, N.A. v. Antigua & Barbuda*,
   877 F.2d 189 (2d Cir. 1989) .........................................................................47

*First Inv'rs Corp. v. Liberty Mut. Ins.*,
   152 F.3d 162 (2d Cir. 1998) .........................................................................25

*Freeman v. HSBC Holdings PLC*,
   465 F. Supp. 3d 220 (E.D.N.Y. 2020) .........................................................36

*Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*,
   582 F.3d 393 (2d Cir. 2009) .........................................................................27

*Gater Assets Ltd. v. AO Gazsnabtranzit*,
   413 F. Supp. 3d 304 (S.D.N.Y. 2019) .........................................................27

*Gill v. Arab Bank, PLC*,
    891 F. Supp. 2d 335 (E.D.N.Y. 2012) .................................................................31

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) .......................................................... 31, 38

*Global Gold Mining, LLC v. Ayvazian*,
    983 F. Supp. 2d 378 (S.D.N.Y. 2013) ................................................................48

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...............................................................30

*Green v. City of New York*,
    465 F.3d 65 (2d Cir. 2006) ......................................................................... 42, 43

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)...........................................................................................24

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................35, 37, 38

*Havlish v. Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*,
    No. 03-md-1570, 2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011) ................ 6, 7, 8

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ...............................................................................................9

*Holmes v. Secs. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)...........................................................................................9

*Honickman v. Blom Bank SAL*,
    432 F. Supp. 3d 253 (E.D.N.Y. 2020) ...............................................................35

*Int'l Controls Corp. v. Vesco*,
    556 F.2d 665 (2d Cir. 1977) .............................................................................44

*In re Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009) ............................................................. 19, 20

*Jeanty v. Newburgh Beacon Bus Corp.*,
    No. 17-cv-9175, 2018 U.S. Dist. LEXIS 197248 (S.D.N.Y. Nov. 19, 2018) ........................8

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995)...........................................................................................8

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) ...............................................................................44

*Kaplan v. Lebanese Canadian Bank, SAL,*
   405 F. Supp. 3d 525 (S.D.N.Y 2019) ......................................................... 30, 38

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
   376 F.3d 1123 (D.C. Cir. 2004) .........................................................................6

*Kirch v. Liberty Media Corp.,*
   449 F.3d 388 (2d Cir. 2006) ..........................................................................42

*Knowland v Great Socialist People's Libyan Arab Jamahiriya,*
   No. 08-cv-1309-RMC, 2010 U.S. Dist. LEXIS 146715 (D.D.C. Oct. 8, 2010) .............. 19, 20

*Leibovitch v. Islamic Republic of Iran,*
   697 F.3d 561 (7th Cir. 2012) ..........................................................................40

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006) ..........................................................................37

*Linde v. Arab Bank, PLC,*
   822 F.3d 314 (2d Cir. 2018) ...................................................................... 31, 37

*Linde v. Arab Bank, PLC,*
   882 F.3d 314 (2d Cir. 2018) ...........................................................32, 34, 35, 36

*Marquez-Almanzar v. INS,*
   418 F.3d 210 (2d Cir. 2005) ..........................................................................26

*Mastafa v. Australian Wheat Bd. Ltd.,*
   07-cv-7955, 2008 U.S. Dist. LEXIS 73305 (S.D.N.Y. Sept. 25, 2008) ................................37

*Meyers v. Epstein,*
   282 F. Supp. 2d 151 (S.D.N.Y. 2003) ...................................................................8

*Mohammad Hilmi Nassif & Partners v. Republic of Iraq,*
   2020 U.S. Dist. LEXIS 52643 (D.D.C. January 15, 2020) ................................................47

*Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.,*
   311 F.3d 488 (2d Cir. 2002) ..........................................................................12

*Mortimer Off Shore Servs. v. Fed. Republic of Germany,*
   615 F.3d 97 (2d Cir. 2010) ..............................................................................3

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,*
   414 U.S. 453 (1974)......................................................................................41

*Nationsbank of Florida v. Banco Exterior de Espana,*
   867 F. Supp. 167 (S.D.N.Y. 1994) .....................................................................47

*In re Navas-Acosta,*
    23 I. & N. Dec. 586 (BIA 2003) ...................................................................................26

*Newman v. Republic of Bulgaria,*
    No. 16-cv-9768 (JFK), 2017 U.S. Dist. LEXIS 66807 (S.D.N.Y. May 2, 2017) ............ 42, 43

*O'Neill v. Al Rajhi Bank,*
    714 F.3d 118 (2d Cir. 2013) .......................................................................17, 18, 29, 43

*O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on Sept. 11, 2001),*
    714 F.3d 109 (2d Cir. 2013) .................................................................................... passim

*O'Sullivan v. Deutsche Bank AG,*
    No. 17-cv-8709, 2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) .........................38

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017) ..........................................................................6, 7, 19, 41

*Paroline v. United States,*
    572 U.S. 434, 444-45 (2014) ................................................................................ 8, 12, 18

*Rimkus v. Islamic Republic of Iran,*
    750 F. Supp. 2d 163 (D.D.C. 2010) .................................................................................20

*River Light V, L.P. v. Lin & J Int'l, Inc.,*
    No. 13-cv-3669, 2014 U.S. Dist. LEXIS 86015 (S.D.N.Y. June 24, 2014) ) ........................10

*Robinson v. Gov't of Malaysia,*
    269 F.3d 133 (2d Cir. 2001) ............................................................................................21

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) ......................................................................................... 9, 29

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018) .....................................................................................................24

*Sarkis v. Ollie's Bargain Outlet,*
    560 F. App'x. 27 (2d Cir. 2014) .......................................................................................8

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993) .........................................................................................................2

*Scribner v. Summers,*
    84 F.3d 554 (2d Cir. 1996) ....................................................................................... 42, 43

*Sheldon v. Khanal,*
    No. 08-cv-3676 (KAM)(LB), 2009 U.S. Dist. LEXIS 91599 (E.D.N.Y. Sept.
    30, 2009) ......................................................................................................................45

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019) ................................................... 37

*Sikhs for Justice v. Nath*,
   893 F. Supp. 2d 598 (S.D.N.Y. 2012) .................................... 47

*Simon v. Republic of Iraq*,
   529 F.3d 1187 (D.C. Cir. 2008) ............................................. 20

*SPV OSUS, Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ................................................... 29

*Sturdza v. United Arab Emirates*,
   281 F.3d 1287 (D.C. Cir. 2002) ............................................. 33

*Stuto v. Fleishman*,
   164 F.3d 820 (2d Cir. 1999) ............................................ 42, 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................ 10

*In re Terrorist Attacks on Sept. 11, 2001*,
   740 F. Supp. 2d 494 (S.D.N.Y. 2010) ................................ 21, 43

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-md-1570 (GBD) (FM), 2016 U.S. Dist. LEXIS 31172 (S.D.N.Y. Mar.
   9, 2016) ................................................................................... 28

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-md-1570, 2016 U.S. Dist. LEXIS 149051 (S.D.N.Y. Oct. 24, 2016) ........................ 26

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
   552 F.3d 93 (2d Cir. 2008) ..................................................... 38

*United States v. Aleskerova*,
   300 F.3d 286 (2d Cir. 2002) ................................................... 38

*United States v. Kilkenny*,
   493 F.3d 122 (2d Cir. 2007) ................................................... 32

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ............................................................. 7, 8

*Velez v. City of New York*,
   730 F.3d 128 (2d Cir. 2013) ................................................... 43

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983) ................................................................. 2

*Virtual Countries, Inc. v. Republic of South Africa*,
    300 F.3d 230 (2d Cir. 2002) ............................................................. 3

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016) ............................................................. 30

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) ......................................................... 30, 31

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .................................................. 30, 32

**STATUTES AND RULES**

1 U.S.C. § 1 ....................................................................................... 33

8 U.S.C. § 1101(a)(22) .................................................................. 25, 39

Anti-Terrorism Act, 18 U.S. Code § 2331, *et seq.*

    18 U.S.C. § 2331 ...................................................................... 30, 32

    18 U.S.C. § 2332 ...................................................................... 31, 38

    18 U.S.C. § 2332i(b) ................................................................. 38, 40

    18 U.S.C. § 2333 ........................................................................ passim

    18 U.S.C. § 2333(a) ................................................................... passim

    18 U.S.C. § 2333(d) ................................................................... passim

    18 U.S.C. § 2339A ........................................................................ 32

    18 U.S.C. § 2339B ........................................................................ 32

    18 U.S.C. § 2339C ........................................................................ 32

22 U.S.C. § 611 .................................................................................. 22

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602, *et seq.*

    28 U.S.C. § 1330(a) ........................................................................ 2

    28 U.S.C. § 1330(b) ...................................................................... 27

    28 U.S.C. § 1604 ............................................................................ 2

    28 U.S.C. § 1605(a)(5) .......................................................... 3, 21, 26

28 U.S.C. § 1605(a)(7) (repealed 2008) ..................................................*passim*

28 U.S.C. § 1605A ..................................................................................*passim*

28 U.S.C. § 1605B ..................................................................................*passim*

28 U.S.C. § 1606 ................................................................................ 40, 41

28 U.S.C. § 1607 ...................................................................................... 40

28 U.S.C. § 1608 ...................................................................................... 25

28 U.S.C. § 1610 ...................................................................................... 24

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, 1241 ...................................................................... 4

Designations of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999) ...................................................................................... 11

Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998) ...................... 11

Justice Against Sponsors of Terrorism Act ...................................................... 5

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3 (Jan. 28, 2008) ............................................................ 4, 6, 7

U.S. State-Sponsors-of-Terrorism List, 85 Fed. Reg. 82565 (Dec. 18, 2020) ............................... 1

**RULES**

Fed. R. Civ. P. 4 ...................................................................................... 45

Fed. R. Civ. P. 5(a)(2) .............................................................................. 45

Fed. R. Civ. P. 12(b)(1) ........................................................................ 1, 18

Fed. R. Civ. P. 12(b)(6) ....................................................................... 20, 27

Fed. R. Civ. P. 55(a) ................................................................................ 46

Fed. R. Civ. P. 55(c) ................................................................................ 46

**LEGISLATIVE MATERIALS**

162 Cong. Rec. H6029 (2016) ................................................................... 41

H.R. Rep. No. 94-1487 (1976) .................................................................... 4

H.R. Rep. No. 103-702 (1994) .................................................................................24

H.R. Rep. No. 104-383 (1996) .................................................................................24

H.R. Rep. No. 105-48 (1997) ...................................................................................24

**OTHER AUTHORITIES**

Nat'l Comm'n on Terrorist Attacks Upon the United States,
    The 9/11 Commission Report (2004),
    http://govinfo.library.unt.edu/911/report/911Report.pdf ........................................... 2, 10, 12

Ingrid Wuerth, The Due Process and Other Constitutional Rights of Foreign
    Nations, 88 Fordham L. Rev. 633, 650, 673-679 (2019) ....................................................27

Restatement (Second) of Torts § 317 .......................................................................42

Restatement (Third) of Agency § 7.05 ......................................................................42

The new Transitional Government of the Republic of the Sudan respectfully moves this Court to dismiss the two operative amended complaints against it. *See* ECF Nos. 6537 ("*Ashton Compl.*") & 6539 ("CAC").

## PRELIMINARY STATEMENT

Sudan — which was recently removed from the U.S. State-Sponsors-of-Terrorism List (85 Fed. Reg. 82565 (Dec. 18, 2020)) — unequivocally condemns the 9/11 Attacks and expresses its deepest condolences to the victims and their families. As the Amended Complaints acknowledge, the terrorist organization Al Qaeda and its leader, Osama Bin Laden, committed those heinous attacks. Sudan categorically denies providing material support or resources for the attacks, or otherwise causing the attacks and, if necessary, will prove that the allegations against it are wholly unfounded. But such an evidentiary showing should be unnecessary: even accepting the Amended Complaints' allegations as true for purposes of this Motion, all claims against Sudan must be dismissed for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.

The fundamental jurisdictional flaw in the Amended Complaints is that they are devoid of factual allegations linking Sudan's purported conduct to the 9/11 Attacks. The Amended Complaints contain extensive allegations addressing the residency of Bin Laden in Sudan from April 1991 until May 1996 — when Sudan permanently expelled Bin Laden from the country — as well as the purported support the Sudanese Government allegedly provided to Bin Laden and Al Qaeda during that period. But the expulsion of Bin Laden from Sudan in May 1996 breaks any causal chain, and allegations from the 1990s are too attenuated in time from the 9/11 Attacks to support FSIA jurisdiction. *See Ashton v. Al Qaeda Islamic Army*, 298 F. Supp. 3d 631, 647 (S.D.N.Y. 2018).

Critically, the very source on which the Amended Complaints expressly rely for their allegations against Sudan — the 9/11 Commission Report — forecloses any plausible suggestion that Sudan's activities in the 1991-1996 period could have assisted Bin Laden and Al Qaeda in carrying out the 9/11 Attacks. The Report found, for example, that when Sudan expelled Bin Laden from Sudan, he "left with practically nothing" and was "significantly weakened," and that "it appears that the Sudanese government expropriated all his assets." *See* Nat'l Comm'n on Terrorist Attacks Upon the United States, The 9/11 Commission Report 63, 170 (2004), http://govinfo.library.unt.edu/911/report/911Report.pdf.

In an effort to overcome Bin Laden's undeniable expulsion from Sudan more than five years before the 9/11 Attacks, the Amended Complaints include allegations about Al Qaeda members purportedly remaining in Sudan after May 1996. But these allegations also fail to connect Sudan's purported conduct with the 9/11 Attacks.

## ARGUMENT

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER THE FSIA

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see* 28 U.S.C. §§ 1330(a), 1604. Under the FSIA, a foreign state, its political subdivisions, and its agencies and instrumentalities are presumptively immune from the subject-matter jurisdiction of U.S. courts, subject to specified exceptions to sovereign immunity. 28 U.S.C. §§ 1604-1607; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983)); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (stating the FSIA "starts from a premise of immunity and then creates exceptions to the general principle" (internal quotations omitted)).

As a "foreign state" under § 1603(a) of the FSIA (*Ashton* Compl. ¶ 2; CAC ¶ 6), Sudan is presumptively immune from the claims in these actions, unless one of the FSIA's exceptions to sovereign immunity applies. Where a foreign-state defendant challenges only the "legal sufficiency" of a complaint, as Sudan does here, dismissal is required if the complaint lacks factual allegations that "show (and not just arguably show)" that the elements of an exception to sovereign immunity are satisfied. *Helmerich*, 137 S. Ct. at 1324 (addressing standard for plaintiffs' showing when facts are stipulated). "Conclusory allegations" and "bald assertions" are insufficient to establish jurisdiction under the FSIA. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (citations omitted). Rather, factual allegations must rise "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (citation omitted). The "plausibility standard" under *Iqbal* "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d 97, 113 (2d Cir. 2010) ("'mere conclusory statements'" that "fail to show anything 'more than a sheer possibility'" fail to make "threshold showing necessary" to establish subject-matter jurisdiction under FSIA (quoting *Iqbal*, 556 U.S. at 678)).

The Amended Complaints fail to allege sufficient facts under any of these standards to establish an exception to immunity under 28 U.S.C. §§ 1605(a)(5), 1605(a)(7) (repealed 2008), 1605A, or 1605B. *See Ashton* Compl. ¶ 4; CAC ¶ 8.

### A.     The Court Lacks Subject-Matter Jurisdiction Under The Terrorism-Related Exceptions To Sovereign Immunity (§ 1605A, § 1605B, And Now-Repealed § 1605(a)(7))

As originally enacted in 1976, the FSIA did not contain any immunity exceptions related to international terrorism, and did not contain any private rights of action against any foreign states.

H.R. Rep. No. 94-1487, at 12 (1976) (explaining that the FSIA was "not intended to affect the substantive law of liability"). In 1996, Congress amended the FSIA to add a new terrorism exception to immunity under 28 U.S.C. § 1605(a)(7). *See* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, 1241. Courts held that § 1605(a)(7) did not provide for any private right of action against a foreign state and the FSIA was deemed a wholly jurisdictional statute. *See, e.g.*, *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).

On January 28, 2008, Congress amended the FSIA's terrorism exception, through § 1083 of the National Defense Authorization Act (the "2008 NDA"). *See* Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-41 (Jan. 28, 2008), codified at 28 U.S.C. § 1605A note. Sections 1083(a) & (b) of the 2008 NDAA repealed the former terrorism exception under the FSIA, § 1605(a)(7), and replaced it with a new terrorism exception under new § 1605A. Like § 1605(a)(7) before it, § 1605A(a) creates an exception to foreign sovereign immunity for cases in which:

> [M]oney damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). Section 1605A(a) adds that "[t]he court shall hear a claim under this section" if "the claimant or the victim" was, at the time of the act described in § 1605A(a)(1) occurred, a U.S. national, a member of the U.S. armed forces, or employed by the U.S. government. *Id.* § 1605A(a)(2)(A)(ii). Congress also included, for the first time, a private right of action against foreign states (*see* 28 U.S.C. § 1605A(c)), and, through the 2008 NDAA, provided plaintiffs who had § 1605(a)(7) actions or judgments pending in 2008 a time-limited opportunity to transition them to § 1605A actions (*see* 2008 NDAA § 1083(c), codified at FSIA § 1605A (note)).

In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), which created a new terrorism-related exception to foreign sovereign immunity under new § 1605B, entitled "Responsibility of foreign states for international terrorism against the United States." Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B). Section 1605B removes a foreign state's immunity for:

> [A]ny case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b). Section 1605B also lifts the bar on Anti-Terrorism Act ("ATA") claims by a U.S. national against a foreign state where the immunity exception is satisfied. *See id.* § 1605B(c).

With regard to § 1605A (and now-repealed § 1605(a)(7)), the Amended Complaints do not allege that any Sudanese official committed (or otherwise participated in) one of the enumerated predicate acts. Rather, the Amended Complaints try (but fail) to allege that Sudanese officials provided "material support or resources for such an act," i.e., for the 9/11 Attacks. Similarly, with regard to § 1605B, the Amended Complaints do not allege that Sudan or its officials perpetrated "an act of international terrorism in the United States." Instead, the Amended Complaints try (but fail) to allege that Sudan or its officials committed "tortious act[s]" that "caused" the 9/11 Attacks.

For the reasons below, none of the terrorism exceptions to immunity applies to the claims against Sudan.

### 1. The Amended Complaints Fail To Allege Jurisdictional Causation Under The Terrorism-Related Exceptions To Sovereign Immunity

Section 1605A (like § 1605(a)(7) before it) withdraws sovereign immunity in cases against foreign states involving "personal injury or death that was *caused by* an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources *for* such an act." 28 U.S.C. § 1605A(a)(1) (emphases added); § 1605(a)(7) (repealed 2008). Section 1605A (and § 1605(a)(7)) also require that the relevant conduct be "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." *Id.*

Section 1605B similarly withdraws sovereign immunity in cases against foreign states involving "physical injury . . . or death occurring in the United States and *caused by* an act of international terrorism in the United States; *and* a tortious act or acts *of* the foreign state, or *of* any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred." 28 U.S.C. § 1605B(b) (emphases added).

Causation is thus a jurisdictional requirement under § 1605A and § 1605B. *See Havlish v. Bin Laden*, No. 03-md-1570, 2011 U.S. Dist. LEXIS 155899, at *202 (S.D.N.Y. Dec. 22, 2011) (addressing § 1605A); *Ashton*, 298 F. Supp. 3d at 644-46 (addressing § 1605B); *see also Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (holding that jurisdictional causation under § 1605(a)(7) requires showing of proximate cause).

In *Havlish* and *Ashton*, this Court held that proximate cause may be established by a "reasonable connection between the material support provided and the ultimate act of terrorism." *Havlish*, 2011 U.S. Dist. LEXIS 155899, at *202 (citation omitted); *see also Ashton*, 298 F. Supp. 3d at 645 (citing *Owens*, 864 F.3d at 794) & n.8. Specifically, this Court required that: (1) "the

defendant's conduct 'must be a "substantial factor" in the sequence of events that led to the plaintiff's injury'" and (2) "the plaintiff's injury 'must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's actions.'" *Ashton*, 298 F. Supp. 3d at 646 (quoting *Owens*, 864 F.3d at 794).

### a.     Jurisdictional Causation Requires A Showing Of But-For Causation

After this Court's decisions in *Havlish* and *Ashton*, two recent Supreme Court decisions have made clear that statutory causation provisions, like those here, require a showing of *but-for* causation.

First, in *Comcast Corp. v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020), the Supreme Court required a showing of but-for causation even where the cause of action at issue did not expressly require that the injury be caused by defendant's actions. In so holding, the Court stressed that the "ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action." 140 S.Ct. at 1014-16 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013)). Second, in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020), the Court held that, as a matter of statutory interpretation, phrases like "because of" or "by reason of" *require* a showing of but-for causation. 140 S. Ct. at 1739.

Nothing in the language of § 1605A (or § 1605(a)(7)) or § 1605B indicates that the causation requirement — "caused by" — in these statutory provisions should deviate from the default requirement of but-for causation (*see* 28 U.S.C. §§ 1605A(a)(1), 1605(a)(7), and 1605B(b)). *Bostock*, 140 S. Ct. at 1745. Indeed, following this approach is consistent with numerous courts' interpretation of identical language in other statutes. *See, e.g., Burrage v. United*

*States*, 571 U.S. 204, 210 (2014) (equating "caused by" with "resulting from," which the Court held requires but-for causation); *Sarkis v. Ollie's Bargain Outlet*, 560 F. App'x. 27, 30 (2d Cir. 2014) (affirming finding that defendant employer's adverse action not "caused by" retaliation and therefore plaintiff failed to establish but-for causation under *Nassar*); *Jeanty v. Newburgh Beacon Bus Corp.*, No. 17-cv-9175, 2018 U.S. Dist. LEXIS 197248, at *25 (S.D.N.Y. Nov. 19, 2018) ("For an adverse retaliatory action to be *caused by* plaintiff's protected activity, the plaintiff must plausibly allege that the retaliation was a '*but-for' cause* of the employer's adverse action . . . ." (internal quotations omitted)); *Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003) ("Because the purpose of compensatory damages is to compensate the plaintiff for an injury *caused by* a defendant, one principle of causation is that the defendant's conduct be a '*but for' cause* of plaintiff's injuries." (citing *Carey v. Piphus*, 435 U.S. 247, 254-55 (1978))).

Plaintiffs therefore must show that their alleged injuries on September 11, 2001, would not have happened "but for" Sudan's purported acts. *Bostock*, 140 S. Ct. at 1739 ("[The but-for] form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause.").

### b. Jurisdictional Causation Also Requires A Showing Of Proximate (Or Direct) Causation

In addition to but-for causation, jurisdictional causation also demands a showing of proximate cause. *Havlish*, 2011 U.S. Dist. LEXIS 155899, at *202; *Ashton*, 298 F. Supp. 3d at 645; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536-38 (1995) (holding that "caused by" language requires proximate cause "as a limiting jurisdictional principle"). Proximate cause "refers to the basic requirement that . . . there must be some *direct relation* between the injury asserted and the injurious conduct alleged," and is "often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v.*

*United States*, 572 U.S. 434, 444-45 (2014) (emphasis added) (citations omitted); *see also Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (holding proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient" (quoting *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 271, 274 (1992))); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (stating that when analyzing proximate cause "the central question [a court] must ask is whether the alleged violation led *directly* to the plaintiff's injuries" (emphasis added)).

Courts have applied this direct-relationship standard in terrorism cases. In *Rothstein v. UBS AG*, the Second Circuit explained that a direct relationship between the defendant's conduct and the injury must exist to establish proximate cause. 708 F.3d 82, 91-92, 94 (2d Cir. 2013) (sustaining dismissal of ATA claims for failure to sufficiently allege facts showing proximate cause); *id.* at 91-92, 95 (holding "proximate cause" under § 2333(a) requires that "the alleged violation *led directly*" to plaintiffs' injury, which was "reasonably foreseeable or anticipated as a natural consequence" (emphasis added)); *id.* (stating "we can only assume [Congress] intended [the words 'by reason of'] to have the same meaning that courts had already given them" in the Sherman Act and the Clayton Act, and requiring that "defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause" (quoting *Holmes*, 503 U.S. at 268)).

### c.   The Amended Complaints Fail To Allege That Sudan's Acts Caused Plaintiffs' Injuries Under Any Jurisdictional Causation Standard

The Amended Complaints fail, by any standard, to allege facts sufficient to support a causal connection between the material support allegedly provided by Sudan and Plaintiffs' injuries in the 9/11 Attacks.

The Amended Complaints allege that Bin Laden resided in Sudan between April 1991 and May 1996, at which point he was expelled "after the United States pressured Sudan." *Ashton*

Compl. ¶¶ 15, 19, 69; CAC ¶¶ 65, 179. This allegation breaks any causal link — let alone any direct causal link — required between the material support allegedly provided to Bin Laden before Sudan expelled him in 1996 and the 9/11 Attacks more than five years later. *See Ashton*, 298 F. Supp. 3d at 646-47 (finding plaintiffs failed to allege that support provided to al Qaeda in the 1990s bore "any reasonable connection whatsoever to the 9/11 Attacks").

The 9/11 Commission Report (which Plaintiffs quote and cite selectively, *see* CAC ¶¶ 19-20, 24, 26-27, 52-53, 85, 91, 103, 120-21, 163; *Ashton* Compl. ¶ 97) confirms this break in the causal chain. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13-cv-3669, 2014 U.S. Dist. LEXIS 86015, at *7 (S.D.N.Y. June 24, 2014) ("[T]he court will deem the complaint to include 'any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are "integral" to the complaint.'" (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011))). In particular, the Report found: "Bin Ladin left Sudan — *significantly weakened*, despite his ambitions and organizational skills." 9/11 Comm'n Report 63 (emphasis added). "Not until 1998 did al Qaeda undertake a major terrorist operation of its own, in large part because Bin Ladin *lost his base in Sudan*." *Id.* at 62 (emphasis added). The Report concluded that:

> *Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda.* When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. *When Bin Ladin arrived in Afghanistan, he relied on the Taliban* until he was able to reinvigorate his fund-

–10–

> raising efforts by drawing on ties to wealthy Saudi individuals that
> he had established during the Afghan war in the 1980s.

*Id.* at 170 (emphases added).

The Amended Complaints acknowledge that, according to the State Department, only in August 1996 — *after* Sudan had expelled Bin Laden — did Bin Laden become "vocal in expressing his approval of and intent to use terrorism." CAC ¶ 41; *see also* CAC ¶ 182 (alleging that in August 1996, from Afghanistan, Bin Laden issued a public "fatwa" declaring war against the United States); *Ashton* Compl. ¶ 81 (alleging that "Bin Laden and al Qaeda issued a public Declaration of Jihad calling for attacks on the United States" in August 1996). Bin Laden's open expression of such terrorist aims after he left Sudan culminated in his designation as a terrorist for the first time in 1998, more than two years after he had left Sudan. *See* Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998). And the United States did not designate Al Qaeda as a foreign terrorist organization until over a year after that, on October 8, 1999. *See* Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999).

Although the Amended Complaints allege that Sudan provided support to al Qaeda after Bin Laden was expelled (*see* CAC ¶¶ 178-92; *Ashton* Compl. ¶¶ 19, 116-19), none of these allegations rises above conclusory assertions and thus fails to satisfy *Iqbal* and *Twombly*. For instance, the Amended Complaints offer the vague and conclusory allegation that, after his expulsion from Sudan, Bin Laden "viewed Turabi 'as a mentor and an ideological source of inspiration'" (CAC ¶ 181; *see also Ashton* Compl. ¶ 19), but both pleadings leave to the imagination how this type of "inspiration" might demonstrate that the 9/11 Attacks were "caused by" Sudan.

The Amended Complaints also allege that from May 1996 until September 11, 2001, Al Qaeda and other groups maintained a "presence" in Sudan and "continued to use Sudan as a

'safehaven.'"  *See, e.g.*, CAC ¶¶ 183-85.  But Plaintiffs do not (and cannot) allege that anyone purportedly "present" in Sudan during this period played any role in the 9/11 Attacks at all, or that Sudan provided any support whatsoever to those individuals that carried out the 9/11 Attacks.

The Amended Complaints incorporate by reference the State Department's Patterns of Global Terrorism Reports.  *See, e.g.*, CAC ¶¶ 184-85; *Ashton* Compl. ¶ 118.  These reports provide only "meager and conclusory" allegations of support provided by Sudan to terrorist organizations between 1997 and 2001.  *See Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 499 (2d Cir. 2002) (rejecting State Department Country Reports as "meager and conclusory submissions");  Brief for Petitioner-Appellant at 40-43, *Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488 (2d Cir. 2002) (identifying the reports dealt with in Second Circuit's opinion as State Department Country Reports).  Moreover, nothing in the Amended Complaints (or in these reports) establishes any "but for" connection, let alone any "direct relation," *Paroline*, 572 U.S. at 444, or "any definite and specific, articulable connection," *Ashton*, 298 F. Supp. 3d at 659, to the 9/11 Attacks.

The Amended Complaints allege that "[s]everal Bin Ladin businesses . . . are run by Al-Qa'ida lieutenants and still operate in Sudan, although they are trying keep a low profile."  CAC ¶ 187; *see also Ashton* Compl. ¶ 116.  Even if the Amended Complaints had alleged any direct relationship between Bin Ladin's purported business interests and Plaintiffs' injuries (which they do not), this allegation fails to bridge the temporal gap between Bin Laden's expulsion from Sudan in 1996 and the 9/11 Attacks.  The Amended Complaints also fail to allege facts showing that any purported support provided by Sudan to these businesses directly related to the 9/11 Attacks.  Moreover, the 9/11 Commission Report directly contradicts this allegation, stating that, after being expelled from Sudan:

> Bin Ladin was in his weakest position since his early days in the war
> against the Soviet Union. The Sudanese government had canceled
> the registration of the main business enterprises he had set up there
> and then put some of them up for public sale. According to a senior
> al Qaeda detainee, the government of Sudan seized everything Bin
> Ladin had possessed there.

9/11 Comm'n Rep. 65.

Finally, the Amended Complaints rely upon *default judgments* that held Sudan liable for materially supporting the 1998 bombings of the U.S. Embassies in Kenya and Tanzania and the 2000 attack on the U.S.S. *Cole*. CAC ¶¶ 186, 188-92; *Ashton* Compl. ¶¶ 82-96. In entering both of those default judgments the courts made uncontested findings that Sudan supported the attacks by facilitating the delivery of "weapons" and "explosives" to the terrorist who carried out the attacks in nearby countries. *See, e.g.*, *Ashton* Compl. ¶¶ 89, 91-92; CAC ¶ 191. (Those findings were uncontested only because Sudan's prior regime did not appear to defend itself. Sudan in fact disputes those findings and expresses its deepest sympathies for the victims of the Embassy bombings and the Cole attack, which it condemns without reservation.) And here there are no comparable allegations that Sudan provided such direct support for those who carried out the 9/11 Attack, which transpired on the other side of the world from Sudan. Even accepting the truth of the Amended Complaints' allegations for the purposes of this motion, they do not show that any support Sudan allegedly provided for those attacks *caused* (under any causation standard) Plaintiffs' injuries from the 9/11 Attacks. (Contrary to the allegation in the *Ashton* Amended Complaint (¶ 89), undersigned counsel has not been "on-again, off-again," and in fact has never withdrawn from any action in which it has appeared for Sudan. Indeed, Sudan and undersigned counsel took an E.D.Va. default judgment regarding the *Cole* attack all the way to the United States Supreme Court, where the default judgment was vacated.)

The remaining allegations against Sudan in the Amended Complaints concern Sudan's purported support for Bin Laden and Al Qaeda *before* Sudan expelled Bin Laden from the country in 1996. *See, e.g.*, CAC ¶¶ 18-127, 150-77; *Ashton* Compl. ¶¶ 12-18, 20-81. But this Court has already rejected allegations regarding purported conduct in the 1990s as not "bear[ing] any reasonable connection whatsoever to the 9/11 Attacks" because the allegations relate to purported "support of al Qaeda's activities far removed, both in time and place, from the 9/11 Attacks." *Ashton*, 298 F. Supp. 3d at 647. Indeed, this Court specifically found with respect to the Saudi Joint Commission for Relief in Bosnia and Herzegovina ("SHC"), a foreign state under the FSIA, that allegations that "from 1996 *through 1999*, SHC 'funneled hundreds of thousands of dollars to al Qaeda'" were too attenuated to "implicate the SHC's personal involvement, or that of any of its employees or agents, in any particular tortious act or acts that caused the 9/11 Attacks." *Ashton*, 298 F. Supp. 3d at 646-47 (holding that "*all* of the factual allegations as to SHC relate to its support of al Qaeda's activities far removed, both in time and place, from the 9/11 Attacks").

In any event, these pre-expulsion allegations fail to allege any facts that would support a plausible inference that Sudan's purported support to Bin Laden and Al Qaeda caused the 9/11 Attacks. For example, the only participant in the 9/11 Attacks that the Amended Complaints allege entered Sudan is Khalid Sheikh Mohammed ("KSM"), who is alleged to have met with an Al Qaeda member in Sudan in 1995. CAC ¶¶ 164-66. But allegations about a meeting as far back as 1995, for unknown purposes, and that did not involve any alleged conduct of Sudan, is insufficient to support any inference that Sudan caused the 9/11 Attacks. Besides, this Court has already rejected as insufficient far more detailed allegations involving KSM. *See Ashton*, 298 F. Supp. 3d at 647 (holding allegations that Saudi officials "cleans[ed]" the 9/11 hijackers passports and issued

a fraudulent passport to "9/11 mastermind Khalid Sheik Mohammed" not sufficient to establish jurisdiction).

The Amended Complaints allege that Sudan purportedly "sent emissaries" to Afghanistan in 1989 offering Bin Laden to relocate to Sudan (CAC ¶ 47; *see also Ashton* Compl. ¶ 13), provided a "platform" for Bin Laden and members of Al Qaeda to set up a "base of operations" (CAC ¶¶ 57-58; *Ashton* Compl. ¶ 15), and allowed Bin Laden to purchase farms for "jihad training" in Sudan (CAC ¶¶ 53, 70, 137-40); *see also Ashton* Compl. ¶ 56). But the Amended Complaints fail to allege any facts sufficient to support a plausible inference of even a "reasonable connection" — let alone the required direct and but-for causal relationships — between this purported support of Al Qaeda or Bin Laden in the early 1990s and the 9/11 Attacks in 2001. For example, the Amended Complaints do not allege any facts supporting a plausible inference that any purported training in Sudan was for the 9/11 Attacks or that any 9/11 Attacks participant trained at any purported camps in Sudan.

The Amended Complaints also allege that at some unspecified point before 1996, Sudanese intelligence "vett[ed] potential al Qaeda recruits." CAC ¶ 67. But, even if true, the Amended Complaints allege no facts supporting any plausible inference that any of these supposed "potential recruits" ever joined Al Qaeda, let alone played any role whatsoever in the 9/11 Attacks. The Amended Complaints allege that at some point in the early 1990s, Sudanese intelligence "warn[ed] the local police off" of noise complaints about explosions (CAC ¶ 139), but the Amended Complaints draw no factual connection between explosions on a Sudanese farm in the early 1990s and the airplane-hijacking 9/11 Attacks, nor do the Amended Complaints allege that any of the individuals involved in those explosions played any role in the 9/11 Attacks.

The Amended Complaints further allege that Sudan "grant[ed] citizenship" and provided "passports and diplomatic papers for use by al Qaeda" (CAC ¶ 70; *see also Ashton* Compl. ¶ 57), but do not (and cannot) allege that *anyone* with Sudanese citizenship, or using a Sudanese passport or diplomatic papers, played *any* role in the 9/11 Attacks. Nor do the Amended Complaints allege facts supporting any plausible inference that any of the purported weapons and equipment that Sudan allegedly permitted to "bypass security" during this period (CAC ¶¶ 72-73, 151-52) were used in the 9/11 Attacks, or that the ability to evade customs security screening in Sudan, in the early 1990s, otherwise somehow caused the 9/11 Attacks in the United States in 2001.

And the Amended Complaints discuss at length Al Qaeda's claims of involvement in attacks on U.S. troops in Somalia in 1993 (without alleging any involvement or knowledge of Sudan or its officials) (CAC ¶¶ 92-106), alleged efforts to destabilize the Egyptian government in the mid-1990s (CAC ¶¶ 107-11), and the failed 1993 "Landmark Plot" (CAC ¶¶ 112-121). But again the Amended Complaints fail to allege any facts supporting any plausible inference of a causal connection between Sudan's purported conduct and those events, let alone Plaintiffs' injuries on 9/11.

The Amended Complaints also allege that Bin Laden "formed symbiotic business relationships with wealthy NIF members," and that Bin Laden owned a company "jointly" with "the Sudanese government." CAC ¶¶ 123, 125; *see also id*. 124, 132-136; *Ashton* Compl. ¶¶ 31-37 (concerning SBG among others). But the Amended Complaints do not allege facts supporting a plausible inference that any of these individuals were officials, employees, or agents of Sudan, or that they acted within the scope of their authority when entering into these purported "business alliances," or that any alleged activity caused the 9/11 Attacks. *See, e.g.*, *Burnett v. Al Baraka Inv. & Dev. Corp.*, 840 F. Supp. 2d 776, 782 (S.D.N.Y. 2012), *aff'd* 714 F.3d 659, 676 (2d Cir. 2013)

(affirming dismissal and expressly rejecting argument that "support to Osama Bin Laden through government infrastructure contracts that [defendant] SBG had in the Sudan" in the late 1980s and early 1990s were "connected in any meaningful way, for the purpose of establishing personal jurisdiction, to the September 11, 2001 attacks"). The Amended Complaints likewise fail to allege facts supporting any plausible connection (let alone any causal link) between Sudanese banks, allegedly "co-found[ed]" by Bin Laden and NIF members (CAC ¶¶ 126-31; *Ashton* Compl. ¶¶ 23-30), and the 9/11 Attacks. In any event, such general allegations of banking activity do not support a showing of proximate causation. *See O'Neill v. Al Rajhi Bank*, 714 F.3d 118, 124 (2d Cir. 2013) ("*Terrorist Attacks VII*") ("We also are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda — as alleged by plaintiffs — proximately caused the September 11, 2001 attacks . . . .").

The Amended Complaints allege interactions in the early 1990s between Al Qaeda members and purported Sudanese officials. In one instance, an Al Qaeda member purportedly worked with an NIF official at some unspecified time "to obtain communications equipment for the Sudanese intelligence service." *Ashton* Compl. ¶ 60. The Amended Complaints also allege that "in the early 1990s" an Al Qaeda member "met with" two individuals who were purportedly in the Sudanese army to "discuss" chemical weapons and "securing uranium." CAC ¶¶ 153-54. But the Amended Complaints fail to allege facts supporting that in either instance the officials were acting on behalf of Sudan and within the scope of their authority, or that these purported activities somehow were related to the 9/11 Attacks that occurred years later. And the Amended Complaints fail to connect the 9/11 Attacks to any of the alleged meetings that Sudan, through al-Turabi, allegedly "facilitated" *nearly a decade earlier.* CAC ¶¶ 74-75, 83-88, 107, 143-46, 175; *Ashton* Compl. ¶¶ 40-46, 52-54.

Finally, the Amended Complaints allege that Sudan, at an unspecified time, "allowed" charities "aligned with al Qaeda" to "operate freely from within Sudan" (CAC ¶ 141) (at the same time that those charities were apparently also operating in numerous other countries, including, for example, Ireland (CAC ¶ 147 & n.2)). The only charity that the Amended Complaints tie to Sudan is the Third World Relief Agency (allegedly based in Sudan), which allegedly assisted in "weapons trafficking to al Qaeda *in Bosnia*." CAC ¶ 147 (emphasis added). Even if true, this allegation does not suggest that the purported weapons trafficking involved any Sudanese official acting in the scope of his authority and does not have any bearing whatsoever on the 9/11 Attacks or Plaintiffs' injuries. *See Terrorist Attacks VII*, 714 F.3d at 124 (holding that allegations that defendant "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda" are "insufficient for proximate causation purposes").

Thus the allegations against Sudan are so "far removed, both in time and place" (*Ashton*, 298 F. Supp. 3d at 646), as well as in fact, that "the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity" (*id.* (quoting *Paroline*, 572 U.S. at 445)). They are perforce insufficient to show the any required jurisdictional causation (whether but-for, direct, or reasonable connection), and the Amended Complaints must therefore be dismissed in their entirety under Rule 12(b)(1) as a matter of law.

## 2. The Jurisdictional Limitation Period Under § 1605A(b) Has Expired

No Plaintiff has brought a timely action against Sudan under § 1605A. The limitations provision in § 1605A(b) contains the same 10-year bar applicable to § 1605(a)(7) actions. Section 1605A(b) provides in pertinent part:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under § 1605(a)(7) (before the date of the enactment of [§ 1605A]) . . . not later than . . . 10 years after the date on which the cause of action arose.

Thus under § 1605A(b)'s 10-year limitations provision, § 1605A actions arising from the 9/11 Attacks would be timely if filed by September 11, 2011. Inexplicably, Plaintiffs here did not purport to file § 1605A actions until December 21, 2018, and various dates in September, November, and December 2020 — seven years or more after the limitations period had expired. *See O'Neill* Supp. Compl., 18-cv-12114, ECF No. 1; *Aronow* Compl., 20-cv-7733, ECF No. 1; *Ashton* Comp., ECF No. 6537; CAC, ECF No. 6539; *Betru* Compl., 20-cv-10615, ECF No. 1; *Parker* Compl., 20-cv-10657, ECF No. 1; *Nolan* Compl., 20-cv-10720, ECF No. 1.

Instead, Plaintiffs invoke the "related action" provision explicated in § 1083(c)(3) of the 2008 NDAA amendments to the FSIA (codified in § 1605A note). *See Ashton* Compl. ¶ 123; CAC ¶ 215. But § 1083(c)(3) does not apply to Plaintiffs' claims. Section 1083(c) (titled "Application to Pending Cases") was not intended to allow plaintiffs (like Plaintiffs here), who in 2008 still had years remaining under the 10-year statute of limitations to bring a § 1605A action, to circumvent that 10-year limitation period. Rather, § 1083(c) provided transition rules for "plaintiffs with pending cases" under § 1605(a)(7), allowing them a time-limited opportunity to bring their cases within § 1605A. In other words, "[n]otwithstanding the limitation period" that might otherwise have prevented a § 1605(a)(7) plaintiff from bringing a new action under § 1605A in 2008, § 1083(c) provided a means to "bridge the gap between the now-repealed § 1605(a)(7) and the new § 1605A." *Owens v. Republic of Sudan*, 864 F.3d 751, 765 (D.C. Cir. 2017), *vacated on other grounds, sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

As for § 1083(c)(3) specifically, this sub-section provided a mechanism for plaintiffs whose § 1605(a)(7) actions had already "reached a final judgment and were not before the courts at time of the enactment of the 2008 NDAA" from availing themselves of § 1605A. *In re Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 91 (D.D.C. 2009). Those plaintiffs had 60 days from the

entry of the judgment in their original action or from the date of the enactment of the NDAA (i.e., by March 28, 2008), whichever was later, to file a "related action" under § 1083(c)(3).  *See Knowland v Great Socialist People's Libyan Arab Jamahiriya*, No. 08-cv-1309-RMC, 2010 U.S. Dist. LEXIS 146715, at *9-10 (D.D.C. Oct. 8, 2010) ("'Related Actions' under § 1083(c)(3) contemplate past complaints submitted under § 1605(a)(7), by the same complainant, which have been finalized by judgment. . . . A 'related action' is, therefore, an action commenced by a party under § 1605A, who had previously pursued, through full judgment, an action under § 1605(a)(7) regarding the same act or incident."), *vacated sub nom. Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 n.3 (D.C. Cir. 2013) (appearing to acknowledge the merit of the *Knowland* defendants' § 1083(c)(3) interpretation and noting that they "inexplicably" neglected to defend this aspect of the holding on appeal); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 178 (D.D.C. 2010) (explaining § 1083(c)(3) actions "enable[] plaintiffs who achieved final judgments under the former terrorism exception, § 1605(a)(7), to pursue new federal causes of action under § 1605A" (quoting *In re Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 64 (D.D.C. 2009)).

Here, because none of Plaintiffs' pending actions under § 1605(a)(7) had reached judgment as of the date of the NDAA's enactment in 2008, Plaintiffs could not then — and cannot now — avail themselves of the "related action" provision in § 1083(c)(3). Of course, Plaintiffs still could have availed themselves of the 10-year limitation period under § 1605A(b) by filing a new action under § 1605A by September 11, 2011. But, again inexplicably, Plaintiffs failed to do that either.

Because the time bar in § 1605A (like § 1605(a)(7)) is jurisdictional, this Court lacks subject-matter jurisdiction over the Amended Complaints to the extent they are brought under § 1605A. *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1194, 1196 (D.C. Cir. 2008) (characterizing § 1605(f) as a "jurisdictional provision"), *rev'd on other grounds, sub nom.*

*Republic of Iraq v. Beaty*, 556 U.S. 848 (2009). But regardless of whether the limitation is jurisdictional, the Amended Complaints must still be dismissed as untimely under Rule 12(b)(6).

### 3. The Amended Complaints Do Not Otherwise Satisfy The Jurisdictional Requirements Of The Terrorism-Related Exceptions

The Amended Complaints do not allege that Sudan itself committed any of the predicate acts in § 1605A(a)(1) and § 1605(a)(7), but instead allege that jurisdiction is proper under those sections based on the alleged "provision of material support or resources" by Sudanese officials acting within the scope of their authority. As explained above, however, the Amended Complaints fail to allege any facts supporting any plausible inference that Sudan provided any material support for the 9/11 Attacks or that any such support caused the 9/11 Attacks.

Unlike § 1605A and § 1605(a)(7), § 1605B does not contain any reference to the "provision of material support or resources." Rather, § 1605B(b) withdraws sovereign immunity where physical injury or death in the United States were caused by an act of international terrorism in the United States *and* by "a tortious act or acts" of the foreign state or an official acting in the scope of his employment. 28 U.S.C. § 1605B(b). Jurisdiction under § 1605B(b) is purposefully limited, however, and expressly excludes omissions and "acts that constitute mere negligence" from the scope of available tortious acts. 28 U.S.C § 1605B(d).

The Second Circuit has instructed that courts must assess the elements of the underlying tort claim to determine whether a complaint pleads sufficient facts to establish the "tortious act" component of jurisdiction. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (2d Cir. 2001) (interpreting jurisdictional phrase "tortious act" in context of noncommercial-tort exception (§ 1605(a)(5)); *see also Swarna*, 622 F.3d at 144 (applying New York substantive law in § 1605(a)(5) action to determine if plaintiffs properly alleged a "tortious act"). The underlying torts alleged in this case require intentionality or, at a minimum, deliberate indifference. *See, e.g.*,

*In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("*Terrorist Attacks V*") (holding that material support claim under the ATA and § 2339B requires "know[ledge]" of or "deliberate[] indifferen[ce]" to the commission of "terrorist acts"). But, as explained *infra* Section III, the Amended Complaints fail to allege sufficient facts to support a plausible inference that Sudan had the requisite knowledge or intent.

Furthermore, all three terrorism-related exceptions require sufficient factual allegations that a Sudanese official, employee, or agent carried out the requisite "tortious acts" within the scope of his authority. No such allegations exist; only legal conclusions and vague and conclusory statements. *See, e.g.*, CAC ¶ 15 ("This support was deployed under the direction of Sudan's most senior officials . . . with knowledge of al Qaeda's intent to use resources provided to it to conduct terrorist attacks against the United States, and with the intent that al Qaeda would in fact use the support Sudan provided to achieve that objective."); CAC ¶ 17 ("al Qaeda itself was the product of the intimate collaboration between Sudan's senior leadership and Osama bin Laden"); CAC ¶ 52 (alleging an "arrangement between bin Laden and the Sudanese regime"); *Ashton* Compl. ¶ 3 ("The defendant Sudan by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted, and conspired with a variety of groups that use terror to pursue their goals."); CAC ¶¶ 49, 139, 142, 147, 151 (vague references to purported "intelligence officers" or "officials"); *Ashton* Compl. ¶ 13, 15, 39, 42, 60, 66, 73 (same).

And, where the Amended Complaints allege acts involving Turabi, those allegations lack any facts that he acted, at any point, as a Sudanese official, employee, or agent. *See Fed. Ins. Co. v. al Qaida*, 134 F. Supp. 3d 774, 785 (S.D.N.Y. 2015) (finding Plaintiffs failed to meet burden where they "allege[d] no facts and provide[d] no evidence to support that [purported official] was a Saudi official acting in any official capacity at the relevant time"). Vague allegations that Turabi

acted as a "de facto leader of Sudan" (CAC ¶ 30) will not do.  *See Ashton*, 298 F. Supp. 3d at 652-53 (finding allegations that individuals were "undeclared employees and agents of the Saudi government" were insufficient to establish jurisdiction over Saudi Arabia under § 1605B, because "there is no specific, non-conclusory allegation that at any relevant time period" the individuals "were acting as officials, employees, or even agents of Saudi Arabia").  Notably, the Amended Complaints allege Turabi ended that "de facto" role, whatever that might have been, years before the Attacks in 1999.  CAC ¶ 30.  Moreover, the allegations contradict the notion Turabi was a Sudanese official, employee, or agent by alleging he was religious leader and the head of a political party, with no official role in the Sudanese government, and board member of a Bahamian company.  *See* CAC ¶¶ 30-33 (describing Turabi as "a powerful Sudanese cleric, religious leader, [and] politician," who founded "the National Islamic Front ('NIF'), a Sudanese political party"); *Ashton* Compl. ¶ 3 (identifying Turabi as the "leader" of the NIF); *see also, e.g.*, 22 U.S.C. §§ 611(e) & (f) (distinguishing between "government of a foreign country" and "foreign political party"); *Ashton* Compl. ¶ 25.  Finally, Amended Complaints allege that Bashir, not Turabi, served as Sudan's President during the decade prior to the 9/11 Attacks, undercutting the allegation Turabi was the "de facto leader."  *See, e.g.*, CAC ¶ 34, *Ashton* Compl. ¶ 3.

### 4.    Sudan Is Immune From Claims Of Family Members Of Victims Under Both § 1605A(a) And § 1605B(b)

This Court lacks subject-matter jurisdiction over the claims of the relatives of the decedent victims of the September 11 attacks.  Section 1605A(a)(2)(A)(ii) withdraws a foreign state's immunity for certain claims if "the claimant or the victim" satisfies specified criteria (i.e., U.S. citizenship or employment by the U.S. Government).  28 U.S.C. §§ 1605A(a)(1), (a)(2)(A)(ii).  The natural meaning of § 1605A is that it withdraws immunity for claims of either (i) a "victim" who was injured and has the requisite U.S. nationality or employment; or (ii) a "claimant" acting

as the legal representative of a person who was killed or incapacitated (a "victim") if either the claimant has or the victim had the requisite U.S. nationality or employment. 28 U.S.C. § 1605A(c). Use of the term "claimant" is necessary in the statute because in the case of a killing or incapacitation, the "victim" will not be the one asserting the claim.

The Supreme Court in *Helmerich* underscored the importance of analyzing the provisions of the FSIA against the statute's purpose and legislative history. 137 S. Ct. at 1319-21; *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018) (interpreting other provisions of the FISA "consistent with the history and structure of the FSIA"). Here, the FSIA's legislative history confirms Sudan's interpretation that the Court lacks subject-matter jurisdiction over the claims of family-member plaintiffs.

An early version of § 1605(a)(7), the now-repealed predecessor to § 1605A, first used the term "claimant," and the House Report explained, consistent with Sudan's natural-reading interpretation: "[W]here the victim is not alive . . . the victim's legal representative or . . . a proper claimant in an action for wrongful death may bring suit." H.R. Rep. No. 103-702, at 5 (1994); *see also* H.R. Rep. No. 104-383, at 62 (1996) ("[A] lawsuit proceeding under [§ 1605(a)(7)] will be brought either by the victim, or on behalf of the victim's estate in the case of death or mental incapacity."); H.R. Rep. No. 105-48, at 2 (1997) (intending "American nationals who are victims of such acts or their *surviving claimants* [to] bring an action" (emphasis added)).

If "claimant" applies to anyone who brings a claim, then even "victims" are "claimants" and Congress's deliberate effort to separate these concepts would be redundant. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (interpreting statute to avoid a reading that renders some words redundant). In contrast, Sudan's interpretation of § 1605A(a) properly gives meaning to both "claimant" and "victim" as used in the statute. Moreover, Sudan's interpretation allows

§ 1605A(a) to be read in harmony with § 1605A(c).  *See, e.g., Rubin*, 138 S. Ct. at 823-25 (interpreting § 1610(g) of the FSIA in view of and consistent with other subsections in § 1610). That is, a foreign state's immunity would only be withdrawn for claims of persons who qualify to bring claims under the exclusive federal cause of action in § 1605A(c).  Accordingly, this court lacks subject-matter jurisdiction to hear family-member claims under § 1605A.

Section 1605B(b) similarly withdraws a foreign state's immunity for cases "in which money damages are sought against a foreign state for *physical injury* to person or property or death occurring in the United States." 28 U.S.C. § 1605B(b) (emphasis added).  While the FSIA does not define "physical injury," the Second Circuit has drawn a distinction between physical injury and emotional distress.  *First Inv'rs Corp. v. Liberty Mut. Ins.*, 152 F.3d 162, 166 (2d Cir. 1998) (explaining that policyholders "sought damages for emotional distress, even though they had sustained no physical injury").  None of the family-member Plaintiffs here has alleged any physical injury arising out of the 9/11 Attacks.  Accordingly, this Court lacks subject-matter jurisdiction to hear those family-member claims under § 1605B.

### 5.   Sudan Is Immune From Claims Brought By Corporate Plaintiffs Under § 1605A(a), § 1605(a)(7), and § 1605B

The Court similarly lacks subject-matter jurisdiction over the claims of the *Federal Insurance* and *Continental Casualty* Plaintiffs because § 1605A(a)(2)(A)(ii) and § 1605(a)(7)(B)(ii) do not withdraw a foreign state's immunity for actions brought by corporations.  Section 1605A(a)(2)(A)(ii) applies only to individuals; it authorizes actions by a claimant or victim who is a "national of the United States," a member of the armed forces, or a U.S. government employee or individual contractor. Section 1605A(h)(5) defines "national of the United States," by reference to § 101(a)(22) of the Immigration and Nationality Act ("INA"), which defines a U.S. national as "(A) a citizen of the United States, or (B) a person who . . . owes

permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22). Similarly, but even more limited, § 1605(a)(7)(B)(ii) applies only if the "claimant or the victim" was a "national of the United States," as defined in § 101(a)(22) of the INA. And § 1605B(c) — which lifts the jurisdictional bar on ATA claims against foreign states (18 U.S.C. § 2337(2)) in cases where the foreign state is not immune under § 1605B(b) — also limits the abrogation of immunity under § 1605B to claims brought by "nationals of the United States," as defined under the ATA. The ATA also applies the definition of that phrase under the INA. *See infra*, Section III.B.5.

Clearly, the insurance companies are not nationals of the United States. They are not "citizens" under the INA, nor are they persons "ow[ing] permanent allegiance to the United States." *See, e.g.*, *In re Navas-Acosta*, 23 I. & N. Dec. 586, 588 (BIA 2003) (concluding that U.S. nationality under the INA "may be acquired only through birth or naturalization"); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2016 U.S. Dist. LEXIS 149051, at *283 (S.D.N.Y. Oct. 24, 2016) (holding in FSIA context that the INA definition's "reference to individuals with a 'permanent allegiance' to the United States was 'a term of art that denotes a legal status for which individuals have never been able to qualify by demonstrating permanent allegiance" (quoting *Marquez-Almanzar v. INS*, 418 F.3d 210, 218 (2d Cir. 2005))). And the insurance companies have pled no facts to show their claims derive from those of "nationals of the United States." They offer only the conclusory assertion (in a footnote) that, "The causes of action pursuant to the ATA, [2]8 U.S.C. § 2331 et seq., are asserted on behalf of . . . plaintiffs who are subrogated to the rights of U.S. nationals who incurred physical injuries to property and related losses as a result of the September 11th attacks . . . ." CAC p. 68 n.103. Thus, this Court lacks subject-matter jurisdiction to hear the claims of the insurance company Plaintiffs under § 1605A(a).

**B.      The Court Lacks Subject-Matter Jurisdiction Under The Noncommercial-Tort Exception (§ 1605(a)(5))**

The Amended Complaints invoke (CAC ¶ 8, *Ashton* Compl. ¶ 4) the non-commercial tort exception to immunity that withdraws sovereign immunity in any case "in which money damages are sought against a foreign state for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5).  But, as the Second Circuit has held, "'the entire tort' must [have been] committed in the United States" for § 1605(a)(5) to apply.  *O'Neill v. Saudi Joint Relief Comm.*, 714 F.3d 109, 116-17 (2d Cir. 2013) (affirming dismissal where alleged support was provided outside of the United States).  Neither Amended Complaint alleges that Sudan or any of its agents, acting within the scope of their offices or employment, committed any tortious act in the United States that caused Plaintiffs injuries.  Thus, § 1605(a)(5) cannot establish subject-matter jurisdiction here.

## II.      THE COURT LACKS PERSONAL JURISDICTION OVER SUDAN

The Court lacks personal jurisdiction over Sudan because, as established above, no exception to sovereign immunity applies in this case. 28 U.S.C. § 1330(b); § 1608 (for personal jurisdiction, requiring applicable exception to sovereign immunity plus proper service of process). In addition, Sudan maintains that foreign states are persons entitled to a minimum-contacts analysis under the Due Process Clause, notwithstanding this Circuit's contrary authority.  *See Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 398-400 (2d Cir. 2009) (holding foreign sovereigns not "persons" for due process analysis, but recognizing that the Supreme Court has not yet ruled on this point); *but see Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F. Supp. 3d 304, 313 (S.D.N.Y. 2019) ("Commentators have questioned the rationale of both denying due process protections to foreign states as well as using a rule untethered to the text of

the Constitution to guide constitutional analysis." (citing Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633, 650, 673-679 (2019)))

## III.    THE AMENDED COMPLAINTS FAIL TO STATE A CLAIM AGAINST SUDAN

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also id.* ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."); *Twombly*, 550 U.S. at 555-56 (holding "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true" (citation omitted)).   The Court may consider only well-pled factual allegations (*see id.*), and must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" (*Iqbal*, 556 U.S. at 678 (citation omitted)).

The Amended Complaints fail to state claims under § 1605A(c) and (d) of the FSIA, 18 U.S.C. § 2333(a) (ATA primary liability), 18 U.S.C. § 2333(d) (ATA secondary liability), a variety of state-law theories, the Alien Tort Statute, the civil RICO statute, and international law.

### A.    The Amended Complaints Fail To State A Claim Against Sudan Under § 1605A(c) & (d)

Section 1605A(c) provides a private right of action for eligible plaintiffs bringing an action under § 1605A(a).  And § 1605A(d) provides for a right of action for "reasonably foreseeable property loss . . . by reason of the same acts on which the action under subsection (c) is based." An action may not be brought under § 1605A(d) if a cause of action under § 1605A(c) is not available.  *See Ashton v. al Qaeda Islamic Army*, No. 03-md-1570 (GBD) (FM), 2015 U.S. Dist. LEXIS 173091, at *494 (S.D.N.Y. Dec. 28, 2015), *recommendation adopted by In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (FM), 2016 U.S. Dist. LEXIS 31172 (S.D.N.Y.

Mar. 9, 2016).  Because the Amended Complaints fail to establish § 1605A(a)'s jurisdictional requirements (including as to jurisdictional causation), the Amended Complaints fail to state claims for relief under § 1605A(c) and (d).  *See* 28 U.S.C. § 1605A(c); *Ashton*, 2015 U.S. Dist. LEXIS 173091, at *494 ("Congress created two sections and made actions under section 1605A(d) derivative of those arising under section 1605A(c).").

To recover under § 1605A(c), a plaintiff must also allege that he is a (1) U.S. national, (2) a member of the armed forces, (3) an employee or contractor of the U.S. government, acting within the scope of his employment, or (4) the legal representative of any of these persons.  Thus, the Court must dismiss the § 1605A(c) claims of Plaintiffs who are foreign nationals without any of these required affiliations or who have failed to plead the requisite U.S. nationality or affiliation. *See, e.g.*, *Burnett* App'x to 3d Am. Compl., No. 02-cv-1616-JR (D.D.C.), ECF No. 26 (alleging place of residence for some Plaintiffs, but failing to allege nationality or citizenship for any Plaintiff); *Ashton* 6th Am. Compl. ¶ 1, 02-cv-6977, ECF No. 465 (stating generally that Plaintiffs include "U.S. citizens, residents, or foreign citizens" who will be appointed legal representatives of those killed in the attack, but failing to allege citizen or nationality for any Plaintiff); *Fed. Ins. Co.*, First Am. Compl. ¶¶ 1-41, ECF No. 111 (alleging Plaintiffs are U.S. and foreign corporations).

## B.  The Amended Complaints Fail To State A Claim Against Sudan Under The Anti-Terrorism Act

### 1.  The Amended Complaints Fail To Allege That Sudan's Actions Proximately Caused Plaintiffs' Injuries

Plaintiffs' primary-liability and secondary-liability claims under the ATA — which can only be asserted by U.S. nationals, *see* 18 U.S.C. § 2333(a) — both fail because the Amended Complaints, as established above, do not allege sufficient facts to support a plausible inference that satisfies the proximate-cause standard (i.e., but-for and direct causation) for either claim.  *See Terrorist Attacks VII*, 714 F.3d at 123 (holding Congress intended showing of proximate cause

under § 2333 based on Supreme Court's interpretation of the 'well-understood meaning' of the phrase 'by reason of' across multiple statutes") (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013)); *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (stating "the actions of the aider/abettor [purportedly, Sudan or its officials] proximately caused the harm on which the primary liability is predicated"); *see Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484-85 (2d Cir. 1979) (holding proximate cause required for aiding and abetting).

### 2. The Amended Complaints Otherwise Fail To Plead Primary Liability Against Sudan Under Section 2333(a)

Under § 2333(a), a claim must also allege that the defendant committed a predicate "act of international terrorism," and that the defendant "engage[d] in knowing misconduct," both of which the Amended Complaints fail to do. *Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13-cv-3376 (JMF), 2014 U.S. Dist. LEXIS 62053, at *7 (S.D.N.Y. May 5, 2014) (quotation omitted); *see Waldman v. PLO*, 835 F.3d 317, 335 (2d Cir. 2016) ("To prevail under the ATA, a plaintiff must prove three formal elements: unlawful *action*, the requisite *mental state*, and *causation*." (quotation omitted)); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 (2d Cir. 2014) (holding § 2333(a) "incorporates the knowledge requirement from [the alleged predicate act]."); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) ("[C]ourts have interpreted [§ 2333(a)] to include a requirement that there be some deliberate wrongdoing by the defendant, in light of the fact that the statute contains a punitive element (i.e. treble damages)."); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010) ("[T]he ATA requires allegations of intentional misconduct — in addition to other state-of-mind requirements incorporated in [the alleged predicate acts].").

Under the ATA definition of "international terrorism," 18 U.S.C. § 2331(1), Plaintiffs must allege facts sufficient to support a plausible inference that Sudan's conduct: (1) "involve[d] violent

acts or acts dangerous to human life" that (2) would constitute "a violation of the criminal laws of the United States or of any State" (*id.* § 2331(1)(A)), and that (3) "appear[ed] to be intended" "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination or kidnapping" (*id.* § 2331(1)(B)). Critically, "Plaintiffs must plausibly allege that [Sudan's] *own* actions 'also involve[d] violence or endanger[ed] human life.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532 (S.D.N.Y 2019) (alterations in original) (quoting *Linde v. Arab Bank, PLC*, 822 F.3d 314, 326 (2d Cir. 2018)).

The Amended Complaints fail to allege facts supporting a plausible inference that Sudan engaged in conduct that involved any violent or dangerous acts, let alone any violent or dangerous acts related to the 9/11 Attacks. The Amended Complaints also fail to allege facts to support a plausible inference that Sudan committed a "violation of the criminal laws of the United States or of any State" within the meaning of § 2331(1)(A). Such a showing requires facts plausibly satisfying the *mens rea* element of the relevant criminal statute. *See Weiss*, 768 F.3d at 207-08.

The Amended Complaints allege that Sudan violated a variety of criminal statutes (*see* CAC ¶¶ 235-52; *Ashton* Compl. ¶ 139), the vast majority of which sound in conspiracy or aiding and abetting. As discussed further below, the Amended Complaints do not allege facts sufficient to support a plausible inference that Sudan (or any Sudanese official) conspired with or aided and abetted Al Qaeda, let alone in connection with the 9/11 Attacks. The Amended Complaints similarly do not allege sufficient facts to support a plausible inference that Sudan violated any of the predicate offenses contained in the Anti-Terrorism Act.

Specifically, § 2332 applies only to harms or attempted harms to U.S. nationals "outside the United States." *See Gill v. Arab Bank, PLC* ("*Gill I*"), 891 F. Supp. 2d 335, 364 (E.D.N.Y.

2012) ("Section 2332 criminalizes the unlawful killing of — and other unlawful attacks on — American nationals while those nationals are outside of the United States; similarly criminalized are attempted killings of and conspiracies to kill American nationals abroad." (citing § 2332(a)-(c))); *see also Gill v. Arab Bank, PLC* ("*Gill III*"), 893 F. Supp. 2d 542, 554 (E.D.N.Y. 2012) (holding § 2332(b) applies to conspiracies against "a United States national *abroad*" (emphasis added)).

On September 11, 2001, both § 2339A and § 2339B proscribed the provision of material support or resources to terrorists or designated Foreign Terrorist Organizations "*within the United States.*" 18 U.S.C. §§ 2339A(a) & 2339B(a)(1) (2000) (emphasis added). The Amended Complaints fail to allege any facts supporting a plausible inference that Sudan (or Sudanese officials) engaged in any conduct from "*within the United States*" as part of the 9/11 Attacks.

Section 2339C is clearly inapplicable, as it was enacted on June 25, 2002 — *after* 9/11 Attacks. Pub. L. 107-197, 116 Stat. 724 (2002). *See, e.g.*, *United States v. Kilkenny*, 493 F.3d 122, 126 (2d Cir. 2007) (holding "criminal law is not to be applied retroactively").

The term "international terrorism" under § 2331(1)(B) further requires that the Amended Complaints allege facts supporting a plausible inference that the conduct of Sudan (or Sudanese officials) "appear[ed] to be intended" to (i) "intimidate or coerce a civilian population," (ii) "influence the policy of a government by intimidation or coercion," or (iii) "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B). This requirement "is a matter of external appearance rather than subjective intent" that "distinguish[es] terrorist acts from other violent crimes." *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685, 694 (7th Cir. 2008); *see also Wultz*, 755 F. Supp. 2d at 49 (holding plaintiffs

must plead "grounds from which an objective observer could conclude [the] defendant . . . intended to achieve any of the three results set forth under § 2331(1)(B)").

The allegations in the Amended Complaints of Sudan's purported provision of financial and other resources to Al Qaeda do not objectively "appear to [have been] intended" to coerce or intimidate any civilian population or government. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (holding that "the provision of material support to a terrorist organization does not invariably equate to an act of international terrorism" as defined by the ATA, and requiring allegations that the defendant manifested "the apparent intent to intimidate or influence").

Accordingly, Plaintiffs' primary-liability claims should be dismissed on this basis.

### 3.  Secondary-Liability Claims Are Not Available Against Sudan

#### a.  Secondary-Liability Claims Are Not Available Against Foreign Sovereigns

Plaintiffs' aiding-and-abetting and conspiracy claims under 28 U.S.C. § 1605B and 18 U.S.C. § 2333(d) (CAC ¶¶ 223-33; *Ashton* Compl. ¶¶ 136-38) necessarily fail because JASTA does not extend secondary liability to foreign sovereigns. JASTA authorizes ATA suits against foreign sovereigns only "in accordance with [18 U.S.C. §] 2333." 28 U.S.C. § 1605B(c). Section 2333 creates secondary liability only for a "*person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism.*" 18 U.S.C. § 2333(d)(2) (emphasis added). For the definition of "person," § 2333(d)(1) refers to 1 U.S.C. § 1, the Dictionary Act, under which "'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." The definition of "person" does not include sovereigns, foreign or otherwise. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1307 (D.C. Cir. 2002) (relying on the Dictionary Act to hold a foreign sovereign is not a "person" under 42 U.S.C. § 1985); *see also Breard v.*

*Greene*, 523 U.S. 371, 378 (1998) (per curiam) (holding "[A foreign sovereign] is not a 'person' as that term is used in [42 U.S.C.] § 1983"). Since a foreign sovereign is not a "person," Sudan cannot be liable under § 2333(d).

**b.    Plaintiffs' Secondary-Liability Claims Are Time Barred**

Only the five *O'Neill* Plaintiffs filed timely § 2333(d) claims against Sudan before the statute of limitations expired on January 2, 2019. *See* 18 U.S.C. § 2333 note; *O'Neill* Supp. Compl., 18-cv-12114, ECF No. 1 (filed Dec. 21, 2018). The remaining Plaintiffs inexplicably did not assert any § 2333(d) claims against Sudan until late 2020, over a year after the statute of limitations had expired. *See Aronow* Compl., 20-cv-7733, ECF No. 1 (Sept. 18, 2020); *Ashton* Comp., ECF No. 6537 (Nov. 19, 2020); CAC, ECF No. 6539 (Nov. 20, 2020); *Betru* Compl., 20-cv-10615, ECF No. 1 (Dec. 16, 2020); *Parker* Compl., 20-cv-10657, ECF No. 1 (Dec. 17, 2020); *Nolan* Compl., 20-cv-10720, ECF No. 1 (Dec. 18, 2020); *see also* Ltr. from Pls.' Exec. Comms. 3, June 18, 2020, ECF No. 6285 (admitting the filing of Plaintiffs' previous complaints preceded JASTA's enactment and required amendment in order to assert claims under the new statute); Ltr. from *Ashton* Pls. 2, June, 18, 2020, ECF No. 6286 (same). Even if the 2018 *O'Neill* class action complaint tolled the limitations period under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the tolling applied only for "all spouses, children, parents, or siblings of any individual who died" in the 9/11 Attacks and "all legal representatives . . . entitled to bring legal action on behalf of any individual who died as the result of the terrorist attacks on September 11, 2001 . . . ." *O'Neill* Supp. Compl. ¶ 11, 18-cv-12114, ECF No. 1. The claims of Plaintiffs that fall outside the class — e.g., Plaintiffs alleging personal injury and corporate Plaintiffs (*see, e.g.*, CAC ¶ 4) — are time-barred and must be dismissed.

#### 4.     The Amended Complaints Otherwise Fail to Plead Secondary Liability Against Sudan Under Section 2333(d)(2)

Even if it were available against foreign sovereigns at all, secondary liability under the ATA is limited to the narrow circumstances where: (1) a plaintiff's injuries arose from an act of international terrorism "committed, planned, or authorized" by an officially designated FTO, and (2) the defendant "aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed" the terrorist act. *Linde*, 882 F.3d at 320 (alteration in original) (quoting 18 U.S.C. § 2333(d)(2)).   But the Amended Complaints fail to allege facts sufficient to satisfy even the ATA's threshold requirements, let alone facts sufficient to support a plausible inference that Sudan knowingly aided and abetted or conspired with Al Qaeda.

##### a.     The Amended Complaints Fail To Satisfy The ATA's Threshold Secondary-Liability Requirements

The Amended Complaints fail to allege that Sudan provided assistance to the perpetrators of the 9/11 Attacks, i.e. members of Al Qaeda.   *See Crosby v. Twitter, Inc.*, 921 F.3d 617, 626-27 (6th Cir. 2019).   In *Crosby*, the Sixth Circuit affirmed dismissal of ATA claims because, "*even if* Defendants somehow supported ISIS, and *even if* the shooting were an act of international terrorism, Plaintiffs' ATA claim for secondary liability still fail[ed] because [the shooter] 'committed' the terrorist act," and the plaintiffs had not adequately alleged that the defendants had supported him.   *Id.* at 627.   Likewise, here, the Amended Complaints fail to allege that Sudan (or Sudanese officials) supported the actual perpetrators of the 9/11 Attacks.   Thus, Plaintiffs' secondary-liability claims fail under § 2333(d)(2).

##### b.     The Amended Complaints Fail To Allege That Sudan Aided and Abetted Al Qaeda

In the ATA context, aiding-and-abetting liability requires that (i) "'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he

provides the assistance,'" and (ii) "'the defendant must knowingly and substantially assist *the principal violation*.'" *Linde*, 882 F.3d at 329 (emphasis added) (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)).  The Amended Complaints do not allege facts supporting a plausible inference that Sudan meets either of these two required elements.

**Knowledge.**  Aiding-and-abetting liability "requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities."  *Id.* (quoting *Halberstam*, 705 F.2d at 477); *see also Honickman v. Blom Bank SAL*, 432 F. Supp. 3d 253, 263-64 (E.D.N.Y. 2020) (explaining that defendant "must have known it was assuming a role in [the FTO's] terrorist activities 'at the time that [it] provide[d] the assistance'" (second and third alterations in original) (quoting *Linde*, 882 F.3d at 329)).  The mere provision of services to an FTO — such as the purported "financial and logistical support" that Sudan allegedly provided to Al Qaeda (*Ashton* Compl. ¶ 103) — is not sufficient to satisfy this knowledge requirement.  *See Linde*, 882 F.3d at 329-30 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*."); *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 233 (E.D.N.Y. 2020) ("[A]t most, the Complaints allege that Defendants should have known that they were contributing to terrorism and chose to ignore the possible consequences.  That is in effect an allegation of recklessness, but JASTA requires more." (alteration marks omitted) (quoting *Brill v. Chevron Corp.*, No. 15-cv-4916, 2018 U.S. Dist. LEXIS 137579, at *17 (N.D. Cal. Aug. 14, 2018))).  The Amended Complaints do not allege any facts supporting a plausible inference that Sudan actually knew that, through whatever purported support it allegedly gave Al Qaeda, it was playing a "role" in Al Qaeda's planning and execution of the 9/11 Attacks.  Indeed, as alleged, Sudan expelled Bin Laden in 1996 (*Ashton* Compl. ¶ 69; CAC ¶¶ 65, 179) — *before* Al Qaeda's designation in 1999 as an FTO.

**Substantial Assistance.** The aiding-and-abetting claims also fail because the Amended Complaints do not allege facts supporting a plausible inference that Sudan knowingly provided *substantial assistance* to Al Qaeda to carry out the 9/11 Attacks. *See* 18 U.S.C. § 2333(d)(2) (providing "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance [to] . . . the person who committed such an act of international terrorism"); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (describing civil law aiding and abetting as "know[ing] that the other's conduct constitutes a breach of duty and giv[ing] substantial assistance or encouragement to the other" (citation omitted)); *Halberstam*, 705 F.2d at 477 (explaining that to succeed on a claim for civil aiding and abetting "the defendant must knowingly and substantially assist the principal violation").

The Amended Complaints do not allege a single fact supporting a plausible inference that Sudan provided assistance — financial or otherwise — linked to the "commission" of the 9/11 Attacks, much less that was a "substantial factor in causing" the attacks. *See Mastafa v. Australian Wheat Bd. Ltd.*, 07-cv-7955, 2008 U.S. Dist. LEXIS 73305, at *16-17 (S.D.N.Y. Sept. 25, 2008) (holding under common law aiding and abetting that assistance for the tortfeasor must be "a substantial factor in *causing* the resulting tort" (emphasis added) (citation omitted)); *id.* at *16 ("It is not enough that a defendant provide substantial assistance to a tortfeasor; the 'substantial assistance' must also 'advance the [tort's] *commission*.'" (emphasis added) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006))).

On their face, the Amended Complaints fail to satisfy at least four of the six *Halberstam* factors adopted by the Second Circuit in *Linde*. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) (considering "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4)

defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance"). Plaintiffs do not allege facts supporting a plausible inference that Sudan (or a Sudanese official) specifically encouraged the 9/11 Attacks (first factor); was "present" at the time of the 9/11 Attacks (third factor); "knowingly assumed a role" in the 9/11 Attacks (fifth factor); or provided a safe haven for Al Qaeda during the relevant time period (sixth factor). As alleged, Sudan expelled Bin Laden in May 1996 (*Ashton* Compl. ¶ 69; CAC ¶¶ 65, 179), over five years *before* the 9/11 Attacks. Such a length of time "does not admit an inference of aiding and abetting" the act of terrorism at issue here. *Siegel*, 933 F.3d at 225.

### c.   The Amended Complaints Fail To Allege That Sudan Conspired With Al Qaeda

The Amended Complaints fail to state a claim for conspiracy under the ATA because they do not allege that Sudan "'(1) *knew* about the aims and objectives of [Al Qaeda's alleged conspiracy to perpetrate the 9/11 Attacks],'" "'(2) *agreed* to the essence of these objectives, and (3) performed acts . . . *intended to* further these objectives.'" *Gill III*, 893 F. Supp. 2d at 554 (alterations and omissions in original) (emphases added) (quoting *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 114 (2d Cir. 2008)) (addressing conspiracy under § 2332(b)).

"To establish membership in a conspiracy, [plaintiffs] must prove that the defendant knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002). The Amended Complaints do not allege facts supporting a plausible inference that Sudan reached an *agreement* with any member or Al Qaeda (let alone Al Qaeda members who perpetrated the 9/11 Attacks) with the specific intent to participate in Al Qaeda's efforts to perpetrate the 9/11 Attacks. *See O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2019 U.S. Dist. LEXIS 53134, at *35-36 (S.D.N.Y. Mar. 28, 2019) (holding that plaintiffs must plausibly plead that defendants conspired

with an FTO "to commit an act of international terrorism"); *Kaplan*, 405 F. Supp. 3d at 534 (recounting "the *Halberstam* framework" for conspiracy as requiring an "agreement between two or more persons . . . to participate in an unlawful act, or a lawful act in an unlawful manner"); *Cain v. Twitter, Inc.*, No. 17-cv-2506, 2018 U.S. Dist. LEXIS 163457, at *8-9 (N.D. Cal. Sept. 24, 2018) (dismissing JASTA conspiracy claim because "[n]othing in the [complaint] establishes an agreement, express or otherwise, between Twitter and ISIS *to commit terrorist attacks*" (emphasis added)); *see also Crosby*, 921 F.3d at 626-27 & n.6 ("Courts now routinely dismiss ATA claims when the plaintiffs fail to allege a direct link between the defendants and the individual perpetrator."). The Amended Complaints also fail to allege any specific steps taken by Sudan in furtherance of any purported conspiracy. Therefore, the Amended Complaints fail to plead a claim of conspiracy under the ATA against Sudan.

### 5.    Corporate Plaintiffs Lack Standing To Bring ATA Claims

The *Federal Insurance* and *Continental Casualty* Plaintiffs fail to state a claim under the ATA because they do not allege facts sufficient to establish standing as corporations to bring such claims. Insurance companies cannot bring ATA claims in their own right. Section 2333 authorizes claims by a "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or estate, survivors, or heirs . . . ." 18 U.S.C. § 2333(a). For the definition of "national of the United States," § 2331(2) refers to the Immigration and Nationality Act, which defines it as "(A) a citizen of the United States, or (B) a person who . . . owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). Corporations cannot be "citizens" under the INA, nor are they persons "ow[ing] permanent allegiance to the United States." And the text of § 2333(a) confirms that it provides a remedy only for natural persons, referring to injuries to "*his or her* person, property or business," and "*his or her* estate, survivors or heirs" (emphases added).

The corporate Plaintiffs invoke a subrogation theory for their ATA claims (CAC p. 68 n.103), but the ATA does not provide for subrogation claims. Congress may limit or eliminate subrogation rights, even without a "clear statement," where the relevant statute evinces a congressional intent to do so. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 960 (9th Cir. 2013) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). Section 2333 permits claims only by natural persons, and unlike other terrorism statutes (*see, e.g.*, 28 U.S.C. § 1605A(d)), it contains no reference to insurers or indemnity claims.

### C.    The Amended Complaints Fail To State Claims Under State Law

Before Congress enacted § 1605A(c) and (d) in 2008, courts exercising subject-matter jurisdiction under § 1605(a)(7) applied substantive law (typically state law) by following the directive in § 1606 that foreign states: "shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 1606 ("Extent of Liability"); *see also, e.g.*, *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 338 (D.C. Cir. 2003) (Section 1606 "instructs federal judges to find the relevant [state] law" that applies to the cause of action.). Section 1606 is a gateway — or pass through — to a substantive source of liability law upon which claims against a foreign state may be based where the foreign state does not have immunity under § 1605 or § 1607.  *See, e.g.*, *Bettis*, 315 F.3d at 338 ("[W]e have no free-wheeling commission to construct common law as we see fit. . . . [W]e are bound to look to state law in an effort to fathom the 'like circumstances' to which 28 U.S.C. § 1606 refers.").

With the enactment of § 1605A(c), Congress closed the § 1606 gateway to other sources of substantive law in § 1605A cases. By its terms, § 1606 continues to apply only in cases brought "under section 1605 or 1607," not under § 1605A. This makes sense, because § 1605A(c) now contains the exclusive rules on the scope of a foreign state's liability in § 1605A(a) actions. The exclusive nature of the § 1605A(c) claim is consistent with Congress's stated intent in enacting

§ 1605A(c) — to create an express cause of action for plaintiffs with actions filed under § 1605A, and to eliminate the "pass-through approach [that] created a patch-work of inconsistent recovery for victims of terrorism and their families." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 567-69 (7th Cir. 2012) (quoting floor statements). Thus, the enactment of § 1605A created an exclusive federal private right of action against foreign states designated as state sponsors of terrorism, preempting state law claims.

When JASTA was enacted in 2016, Congress again did not amend § 1606 to explicitly require that its rules on the extent of liability apply to foreign states that lacked immunity under new § 1605B. This omission also makes sense, because the scope of the foreign state's waiver of immunity under § 1605B is contained in § 1605B(c). Section 1605B(c) waives the foreign state's immunity only to the extent that it lifts the jurisdictional bar under § 2337(2) that previously prohibited a claim against a foreign state under § 2333.

The unavailability of the § 1606 gateway for § 1605A or § 1605B claims, combined with the enactment of the private right of action in § 1605A(c) and the lifting of the bar on § 2333 actions against foreign states in § 1605B(c), inescapably signal that the federal claims are exclusive and that state-law claims are unavailable where the exceptions to immunity in § 1605A or § 1605B apply. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("As we have said in a different setting, '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" (quoting *Alexander v. Sandoval*, 552 U.S. 275, 290 (2001))); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies."); *but see Owens v. Republic of Sudan*, 864 F.3d 751, 808 (D.C.

Cir. 2017) (holding state-law claims are still available to those who may not bring the federal cause of action in § 1605A(c)). Plaintiffs thus may not assert claims under state tort law for actions asserted under the exceptions to sovereign immunity in either § 1605A(a) or § 1605B(b). Of course, if this Court dismisses Plaintiffs' § 1605A actions as time-barred, Plaintiffs may *only* invoke state tort law for their actions under § 1605(a)(7) or § 1605(a)(5).

In any event, the Amended Complaints fail to allege facts that support a plausible claim for relief against Sudan for any state-law tort. *See* CAC ¶¶ 255-69, 276-309, 323-30; *Ashton* Compl. ¶¶ 154, 156, 158-65. As an initial matter, all of Plaintiffs' state-law tort claims require a showing of at least proximate causation. *See, e.g.*, *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (aiding and abetting); *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (assault and battery); *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (trespass); *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (intentional infliction of emotional distress); *Newman v. Republic of Bulgaria*, No. 16-cv-9768 (JFK), 2017 U.S. Dist. LEXIS 66807, at *6-7 (S.D.N.Y. May 2, 2017) (negligence and negligent infliction of emotional distress); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 349 F. Supp. 2d 765, 829 (S.D.N.Y. Jan. 18, 2005) (quoting N.Y. Est. Powers & Trusts § 5-4.1 (McKinney 2002)) (wrongful death / survival); § 317 of the Restatement (Second) of Torts and § 7.05 of the Restatement (Third) of Agency (negligent supervision / hiring). As explained above, the Amended Complaints have failed to allege facts that plausibly show that Sudan's alleged actions proximately caused the 9/11 Attacks.

Plaintiffs' assault and battery, trespass, and intentional infliction of emotional distress claims also fail because the Amended Complaints fail to allege the requisite level of intent for such claims. *E.g.*, CAC ¶¶ 276-78; CAC ¶¶ 323-29; *Ashton* Compl. ¶¶ 130-32; *see also, e.g.*, *Green*, 465 F.3d at 86 (addressing intent element of assault and battery); *Scribner*, 84 F.3d at 557

(addressing intent element of trespass); *Burnett*, 349 F. Supp. 2d at 829-30 (S.D.N.Y. Jan. 18, 2005) (citing *Stuto*, 164 F.3d at 827 (2d Cir. 1999)) (enumerating elements of IIED claim).  In addition, the IIED claims of the family-member Plaintiffs and the corporate Plaintiffs fail under New York law because they do not allege that these Plaintiffs were present at the 9/11 Attacks. *See Lauver v. Cornelius*, 85 A.D.2d 866 (3d Dep't 1981) (dismissing parents' IIED claims because they were not present when children were being abused).  The corporate Plaintiffs' IIED claims also fail because corporations cannot suffer emotional distress.

Plaintiffs' aiding and abetting and conspiracy claims fail for many of the same reasons that their secondary-liability claims fail under the ATA.  *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (enumerating requirements under New York law); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy.").

Plaintiffs' negligence and negligent infliction of emotional distress ("NIED") claims are expressly excluded from § 1605B actions and, in any event, fail because the Amended Complaints do not allege facts that support a plausible inference that Sudan owed a duty of care to Plaintiffs, let alone breached that duty, *Di Ponzio v. Riordan*, 679 N.E. 2d 616, 618 (N.Y. 1997), or that, in the case of NIED claims, family-member Plaintiffs suffered "an unreasonable risk of serious bodily harm," *Newman*, 2017 U.S. Dist. LEXIS 66807 at *6-7.

Finally, the Amended Complaints fail to state a claim for negligent supervision and hiring because, critically, under New York law, a plaintiff may only establish claims for negligent supervision and hiring where the employee acted "*outside* the scope of her employment."  *Velez v. City of New York*, 730 F.3d 128, 136-37 (2d Cir. 2013) (emphasis added); *see also* Restatement (Second) of Torts § 317 cmt. *a*.

**D.    The Amended Complaints Fail To State Claims Under The Alien Tort Statute, Civil RICO, And International Law**

Plaintiffs' claim under the Alien Tort Statute (CAC ¶¶ 270-75; *Ashton* Compl. ¶¶ 166-72) is not even cognizable.  *See Terrorist Attacks VII*, 714 F.3d at 125 (affirming dismissal of ATS claims and holding that "no universal norm against 'terrorism' existed under customary international law (*i.e.*, the 'law of nations') as of September 11, 2001").

Similarly, this Court's prior decision in this multi-district litigation forecloses Plaintiffs' Civil RICO claims.  *Terrorist Attacks V*, 740 F. Supp. 2d at 515 (dismissing Civil RICO claims for failure to allege that "any injury arising from defendants' investment of the racketeering income" or to allege any factual basis "that any moving defendant took some part in directing the affairs of the al Qaeda enterprise" or "of a conscious agreement, among the defendants, to commit two predicate acts in furtherance of the common purpose of the RICO enterprise").

Finally, Plaintiffs' claim for "violations of international law" (CAC ¶¶ 331-337) also is not cognizable because "[t]he law of nations generally does not create private causes of action to remedy its violations  . . . ." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995).

**IV.    THE AMENDED COMPLAINTS VITIATE THE ENTRIES OF DEFAULT IN *ASHTON*, *BURNETT*, AND *FEDERAL INSURANCE***

The Court directed the parties to address the effects of the Amended Complaints on the entries of default against Sudan.  *See* Nov. 4, 2020 Order at 2, ECF No. 6521.  No Plaintiff has obtained a default *judgment* against Sudan.  And only Plaintiffs in the *Ashton*, *Burnett*, and (Plaintiffs assert) *Federal Insurance* cases have obtained *entries* of default against Sudan.  *See Ashton* Clerk's Cert. of Default, Dec. 22, 2011, ECF No. 2511; *Burnett* Clerk's Cert. of Default, Mar. 15, 2012, ECF No. 2575; Ltr. from Pls.' Exec. Comms. 1, June 18, 2020, ECF No. 6285.

The Amended Complaints filed on November 19 and 20, 2020 (ECF Nos. 6537, 6539), which add both new legal claims and new allegations, nullified Plaintiffs' prior complaints

regarding Sudan and automatically mooted any prior entries of default against Sudan in those cases. *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668-70 (2d Cir. 1977) (citing cases) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."); *see also City of Almaty v. Sater*, No. 19-cv-2645 (AJN), 2020 U.S. Dist. LEXIS 36510, at *2 (S.D.N.Y. Mar. 3, 2020) (concluding that "when Plaintiffs filed the First Amended Complaint, they rendered the entry of default against MeM and motion for default judgment moot"); *Allstate Ins. Co. v. Yadgarov*, No. 11-cv-6187 (PKC) (VMS), 2014 U.S. Dist. LEXIS 30068, at *21 & n.12 (E.D.N.Y. Feb. 10, 2014) ("[S]everal courts have found that once the original complaint is superseded, a clerk's entry of default on that pleading is mooted." (citing cases)), *adopted by* 2014 U.S. Dist. LEXIS 30067 (E.D.N.Y. Mar. 5, 2014); *Sheldon v. Khanal*, No. 08-cv-3676 (KAM)(LB), 2009 U.S. Dist. LEXIS 91599, at *1 n.1 (E.D.N.Y. Sept. 30, 2009) (stating that "the plaintiffs' filing of their Amended Complaint" mooted the prior entry of default), *aff'd in part, vacated in part on other grounds*, 396 F. App'x 737 (2d Cir. 2010).

Moreover, the entry of default in *Ashton* does not even apply to approximately half of the *Ashton* Plaintiffs. The *Ashton* Plaintiffs filed their Consolidated Master Complaint on March 6, 2003 (*see* 02-cv-6977, ECF No. 11), and their Affidavit of Service (*see* 02-cv-6977, ECF No. 358) indicates that they served Sudan with that complaint on April 29, 2003. From 2003 to 2005, they filed *six* amendments to the Consolidated Master Complaint — adding approximately 1252 new Plaintiffs. *See* No. 02-cv-6977, ECF Nos. 32, 38, & 111; No. 03-md-1570, ECF Nos. 27, 447, & 1463. Because the six amended complaints added new plaintiffs, Rule 5(a)(2) of the Federal Rules of Civil Procedure required that they be served on Sudan. *See, e.g.*, *Boyce v. E.A. Techs., Inc.*, No. 10-cv-9359, 2012 U.S. Dist. LEXIS 6259, at *7 n.5 (S.D.N.Y. Jan. 19, 2012) ("Because defendant was 'in default for failing to appear' and the amended complaint added additional plaintiffs,

–45–

thereby presenting 'new claim[s] for relief,' plaintiffs were obliged to serve defendant pursuant to Federal Rule of Civil Procedure 4."); *Charvac v. M&T Project Managers of N.Y., Inc.*, No. 12-cv-05637, 2013 U.S. Dist. LEXIS 177920, at \*2 (E.D.N.Y. 2013) (stating "plaintiffs are not entitled to default judgment based on a complaint in which they are not named").

Neither the *Ashton* nor the MDL 1570 docket contains any affidavits of service for the six amended complaints as to Sudan. And the Clerk's Certificate of Default in *Ashton*, dated December 22, 2011, references *only* the 2003 Consolidated Master Complaint, not any of the six amended complaints. *See* ECF No. 2511. Therefore, the six amended complaints did not become operative as to Sudan and the 1252 Plaintiffs added in those amended complaints do not hold any entry of default as to Sudan.

Further, no certificate of default against Sudan exists in either the *Federal Insurance* (03-cv-6978) or the MDL 1570 dockets. Without a signed clerk's certificate of default entered in the docket, no entry of default exists against Sudan in the *Federal Insurance* case. *See, e.g., Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir. 1996) ("[W]e note that the entry of a default judgment in this case is procedurally flawed by lack of compliance with the requirement of Rule 55(a) that the clerk enter a default, a step that affords the defaulted party an opportunity to move, pursuant to Rule 55(c), to vacate the default . . . ."); *Alli v. Steward-Bowden*, No. 11-cv-4952(PKC)(KNF), 2012 U.S. Dist. LEXIS 138603, at \*2, \*4 (S.D.N.Y. Sept. 25, 2012) ("[W]ithout a certificate of default, no basis exists for granting [Plaintiff's] motion for judgment by default . . . .") (internal quotations omitted); *Evseroff v. IRS*, 190 F.R.D. 307, 308 (E.D.N.Y. 1999) (denying motion for default as defective because no Clerk's certificate of default had been signed). (In December 2019, counsel for the *Federal Insurance* Plaintiffs provided counsel for Sudan with what appears to be a signed Clerk's Certificate of Default, dated September 9, 2005,

against Sudan and others; but that certificate inexplicably does not appear anywhere in the dockets.)

More fundamentally, no reason exists for this Court to proceed in default against Sudan. Sudan has appeared in this litigation and is fully committed to contesting the claims against it. *See* Ltr. from Sudan, June 21, 2020, ECF No. 6288; Status Conf. Tr. at 23:15-22, Aug. 5, 2020 ECF No. 6393. Sudan has filed a timely motion to dismiss the *O'Neill* supplemental complaint (ECF Nos. 5824 & 5825) and has engaged with Plaintiffs and the Court regarding the schedule for these consolidated proceedings. *See* Ltr. from Sudan, June 21, 2020, ECF No. 6288; Status Conf. Tr., Aug. 5, 2020, ECF No. 6393; *see also Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, 2020 U.S. Dist. LEXIS 52643, at \*46-47 (D.D.C. Jan. 15, 2020) (recommending setting aside an entry of default where foreign-state defendants appeared to contest claims and stating that "there is a strong presumption against the entry of default judgment against a foreign state that has appeared in the case and expressed a desire to contest the claims"), *adopted by* 2020 U.S. Dist. LEXIS 51538 (D.D.C. Mar. 25, 2020).

The Second Circuit "has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default." *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995) (collecting cases); *see also Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 612 (S.D.N.Y. 2012) (same). And default judgments against foreign sovereigns are particularly "disfavored." *First Fidelity Bank, N.A. v. Antigua & Barbuda*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside." (citing Restatement (Third) of Foreign Relations § 459 comment c ("Default judgments are disfavored, particularly in suits against foreign states.") & Reporters' Note 1)); *see also Nationsbank of Florida v. Banco Exterior de Espana*, 867 F. Supp. 167, 174 (S.D.N.Y. 1994)

(citing *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)) (declining to make an entry of default or enter a default judgment against Spanish instrumentality).

Not surprisingly, therefore, this Court routinely sets aside entries of default against foreign sovereigns that subsequently appear to defend themselves before default judgments have been entered, as is the case here with Sudan. *See, e.g.*, *Agbor v. Presidency of the Republic of Eq. Guinea*, No. 18-cv-8611 (PAE)(RWL), 2019 U.S. Dist. LEXIS 108862 (S.D.N.Y. June 27, 2019), *report and recommendation adopted in relevant part*, No. 18-cv-8611 (PAE), 2019 U.S. Dist. LEXIS 129502, at *7 (S.D.N.Y. Aug. 1, 2019) (denying motions for default judgments and vacating defaults entered against foreign sovereign defendants); *id.* at *33 ("Default judgment is an extreme sanction that is disfavored in the Second Circuit." (quoting *Global Gold Mining, LLC v. Ayvazian*, 983 F. Supp. 2d 378, 383 (S.D.N.Y. 2013))).

On August 21, 2019, a civilian-led transitional government was installed in Sudan and has since been actively pursuing Sudan's reintegration into the international community and its bilateral engagement with the United States. Sudan's bilateral engagement with the United States has resulted in a historic Bilateral Agreement executed on October 30, 2020 and the rescission of Sudan's designation as a State Sponsor of Terrorism. *See* 85 Fed. Reg. 82565 (Dec. 18, 2020), https://www.federalregister.gov/documents/2020/12/18/2020-27848/rescission-of-determination-regarding-sudan. Secretary of State Michael Pompeo described this historic development as marking "a fundamental change in our bilateral relationship toward greater collaboration and support for Sudan's historic democratic transition." *See* Michael R. Pompeo, Secretary of State, Sudan's State Sponsor of Terrorism Designation Rescinded, Press Statement (Dec. 14, 2020), https://www.state.gov/sudans-state-sponsor-of-terrorism-designation-rescinded/. Furthermore, on December 27, 2020, the President signed into law the Sudan Claims Resolution Act, which will

provide Sudan with immunity from all claims against it based on its prior designation as a State Sponsor of Terrorism (but which preserves pre-existing claims in this MDL proceeding).  Sudan Claims Resolution Act, Consol. Appropriations Act, 2021, Pub. L. 116-260 (2020).

The new Transitional Government of Sudan respects the U.S. judicial process and this Court and is fully committed to contesting the claims against it in these adversarial proceedings.

## CONCLUSION

For the foregoing reasons, Sudan respectfully requests that the Court dismiss with prejudice the Amended Complaints against Sudan in their entirety for lack of subject-matter and personal jurisdiction, as well as for failure to state a claim upon which relief can be granted. Sudan expressly preserves all of its rights, privileges, immunities and defenses, including its defenses on the merits and its right to move to strike the Amended Complaints' impermissible requests for punitive damages and a jury trial.

Dated:   January 8, 2021
       Washington, DC

Respectfully submitted,

**WHITE & CASE**

/s/ *Christopher M. Curran*
Christopher M. Curran
Nicole Erb
Claire A. DeLelle
Matthew S. Leddicotte (*pro hac vice*)
Nicolle Kownacki (*pro hac vice*)
Celia A. McLaughlin (admission application
    forthcoming)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:   + 1 202 626 3600
Facsimile:   + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
cdelelle@whitecase.com
mleddicotte@whitecase.com
nkownacki@whitecase.com
cmclaughlin@whitecase.com

*Counsel for the Republic of the Sudan*