UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

----------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:                               │
│ DATE FILED:    7/22/2019             │
└─────────────────────────────────────┘
```

**03-MDL-1570 (GBD)(SN)**

**<u>OPINION & ORDER</u>**

**SARAH NETBURN, United States Magistrate Judge:**

On November 30, 2018, the Plaintiffs' Executive Committees ("PECs" or "Plaintiffs")

filed a motion to compel the Kingdom of Saudi Arabia ("Saudi Arabia") to produce documents

and answer interrogatories. ECF No. 4264. The motion to compel is GRANTED in part and

DENIED in part.[1]

<b>BACKGROUND</b>

This case is in jurisdictional discovery. Plaintiffs contend that the Court has jurisdiction

over Saudi Arabia under the Justice Against State Sponsors of Terrorism Act ("JASTA"). ECF

No. 3781, at 7. On March 28, 2018, the Honorable George B. Daniels found that Plaintiffs

articulated a "reasonable basis" for the Court to assume jurisdiction. ECF No. 3946,

Memorandum Decision and Order ("March 28 Order"), at 4. Accordingly, Plaintiffs were

permitted to conduct "limited and targeted jurisdictional discovery" regarding two individuals:

Fahad al Thumairy and Omar al Bayoumi.[2] Id. at 23.

Judge Daniels emphasized several allegations in his March 28 Order. Regarding

---

[1] This Opinion & Order has been filed under seal in its entirety. The Court has directed the parties to
provide proposed redactions consistent with the FBI Protective Order and the Court's decision granting in
part Saudi Arabia's motion to seal. The Court will issue a redacted version on the public docket once that
process is complete.

[2] Outside of those referring to Thumairy and Bayoumi, Plaintiffs' allegations were insufficient to permit
jurisdiction under JASTA. Id. at 25, 27, 28, 31.

Thumairy, Plaintiffs alleged that Saudi Arabia's Ministry of Islamic Affairs ("MOIA") appointed Thumairy to be (1) the imam at the King Fahad Mosque in Los Angeles, California; and (2) an accredited Saudi diplomat at the Los Angeles Consulate. March 28 Order, at 19. Plaintiffs claimed that Thumairy, at the direction of an unnamed senior Saudi official, orchestrated the U.S.-based support network for two of the 9/11 hijackers. Id. These individuals were Nawaf al Hazmi and Khalid al Mihdhar. Id.

Regarding Bayoumi, Plaintiffs alleged that he was a long-standing employee of Saudi Arabia's Presidency of Civil Aviation ("PCA"). March 28 Order, at 20. Plaintiffs argued that Bayoumi moved to the United States in 1994 to study English at San Diego State University. Id. During his initial year in San Diego, Plaintiffs claimed that Bayoumi was granted a secondment by the Saudi government to work for Dallah Avco Trans Arabia Company ("Dallah Avco"). Id. Plaintiffs alleged that Saudi Arabia paid Bayoumi approximately $3,000 per month, despite his failure to perform any work or enroll in classes. Id.

On February 1, 2000, Plaintiffs alleged that Thumairy met with Bayoumi inside Thumairy's office at the Consulate. March 28 Order, at 19. Following the meeting, Bayoumi met with Hazmi and Mihdhar, two of the 9/11 hijackers. Id. at 20. Plaintiffs argued that Bayoumi provided material support to the hijackers as they settled in San Diego. This included: finding them an apartment, co-signing their lease, helping them open a bank account, and occasionally paying their rent. Id. Bayoumi also enlisted another individual, Mohdhar Mohammed Abdullah, to provide additional support. Id. at 21. At Bayoumi's instruction, Abdullah helped Hazmi and Mihdhar apply to flight schools, obtain multiple fake driver's licenses, and perform surveillance of the Los Angeles International Airport. Id. Plaintiffs also alleged that, around the same time that the hijackers arrived in the United States, Bayoumi received a sharp increase in the stipend

he received from Saudi Arabia and made dozens of telephone calls to various U.S.-based Saudi institutions, including the Los Angeles Consulate. Id. at 21–22. Based on these allegations, Plaintiffs alleged that Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official, with providing substantial assistance to the hijackers. Id. at 23. Accepting Plaintiffs' allegations as true, Judge Daniels concluded that limited jurisdictional discovery was warranted.

On May 24, 2018, this Court held a conference to determine the scope and procedures of that discovery. ECF No. 3968. The Court directed Saudi Arabia to search for documents and information in five repositories: (1) the Saudi Consulate in Los Angeles, California; (2) the Saudi Embassy in Washington, D.C. (the "Embassy"); (3) the Cultural Mission in Fairfax, Virginia; (4) the Ministry of Islamic Affairs; and (5) the Presidency of Civil Aviation, and its successor, the General Authority of Civil Aviation. ECF No. 4009. During the conference, Plaintiffs argued that Saudi Arabia should be required to search its intelligence agencies, the Presidency of State Security ("PSS") and the General Intelligence Directorate ("GID"). See ECF No. 4015, Transcript of May 24 Conference, at 23–25. The Court denied this request without prejudice, but directed Saudi Arabia to search for documents that the PSS had compiled from other agencies. Id. at 31. The Court also directed Saudi Arabia to look for relevant documents from January 1, 1998, through December 31, 2002. ECF No. 4009.

Saudi Arabia made an initial production on July 31, 2018, and a subsequent production on August 14, 2018. See Opposition to Motion to Compel ("Def's Br."), Filed Under Seal, at 1. Plaintiffs filed their motion to compel on November 30, 2018, see Motion to Compel (Pl's Br."), Filed Under Seal, and the Court heard oral argument on Plaintiff's motion on February 26, 2019. ECF No. 4398.

**LEGAL STANDARD**

A district court has broad discretion to determine the scope of discovery. <u>Frontera</u>

<u>Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic</u>, 582 F.3d 393, 401 (2d Cir.

2009). Thus, where jurisdictional facts are placed in dispute, a court "retains considerable

latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction."

<u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003) (quoting <u>Phoenix Consulting, Inc. v.</u>

<u>Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000)). In evaluating Plaintiffs' motion to

compel, the Court considers two principle factors: (1) the limited nature of jurisdictional

discovery under the Foreign Sovereign Immunities Act; and (2) the impact, if any, that JASTA

has on this regime.

**I.     Jurisdictional Discovery Under the FSIA**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, provides "the sole

basis for obtaining jurisdiction over a foreign state in federal court." <u>Chettri v. Nepal Rastra</u>

<u>Bank</u>, 834 F.3d 50, 55 (2d Cir. 2016) (quoting <u>Argentine Republic v. Amerada Hess Shipping</u>

<u>Corp.</u>, 488 U.S. 428, 439 (1989)). Under the FSIA, a foreign state is immune from suit unless a

specific statutorily defined exception applies. <u>Zappia Middle East Constr. Co. v. Emirate of Abu</u>

<u>Dhabi</u>, 215 F.3d 247, 251 (2d Cir. 2000). Absent such an exception, federal courts lack both

subject matter and personal jurisdiction over the foreign sovereign. <u>Cargill Int'l S.A. v. MIT</u>

<u>Pavel Dybenko</u>, 991 F.2d 1012, 1016 (2d Cir. 1993) (citations omitted).

The Court of Appeals has distinguished jurisdictional discovery from merits discovery

under the FSIA. <u>See</u> <u>EM Ltd. v. Republic of Argentina</u>, 695 F.3d 201, 209–10 (2d Cir. 2012),

<u>aff'd</u>, <u>Republic of Argentina v. NML Capital, LTD</u>, 573 U.S. 134 (2014) ("[I]t is important to

distinguish discovery requests made before a court conclusively has jurisdiction over a foreign

sovereign from those made after such jurisdiction has been ascertained."). Where jurisdiction exists, a federal court can exercise its judicial power over the foreign sovereign as it would over any other party. Id. at 209. For this reason, once a court determines that it has jurisdiction, its ability to compel discovery from a foreign state is assumed. Lantheus Medical Imaging, Inc. v. Zurich American Ins. Co., 841 F. Supp 2d. 769, 779 (S.D.N.Y. 2012); see also Restatement (Fourth) of the Foreign Relations Law of the United States (2018), § 462 (noting that, except upon request by the Attorney General, a foreign state is "generally subject to discovery in connection with a suit against it").

But broad discovery is not automatic. The FSIA seeks to "protect foreign sovereigns from the burdens of litigation, including the cost and aggravation of discovery." Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic, No. 10-CV-5256 (KMW), 2011 WL 4111504, at *3 (S.D.N.Y. Sept. 13, 2011). As a result, before the plaintiff has established jurisdiction, a district court "must be circumspect in allowing discovery." Arch Trading Corp. v. Republic of Ecuador, 839 F.3d 193, 206 (2d Cir. 2016) (quoting EM Ltd, 695 F.3d at 210). Were that not the case, the discovery obligations imposed on a foreign state would frustrate the FSIA's presumption of immunity. See Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela, 556 F. Supp. 2d 272, 282 (S.D.N.Y. 2008) (citing El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996)).

The FSIA therefore requires a "delicate balancing" in managing jurisdictional discovery. First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998). While the Court must permit the discovery necessary to determine whether immunity applies, it must also protect a sovereign's legitimate claim to immunity. Id. In maintaining this balance, the Court should exercise "special vigilance" to protect foreign states from the dangers of unnecessary

discovery. Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court, 482 U.S. 522, 546 (1987). Accordingly, even where jurisdictional discovery is warranted, it should be "ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." March 28 Order, at 7; First City, 150 F.3d at 176; Glencore Denrees Paris v. Dep't of Nat'l Store Branch 1, No. 99-CV-8607 (RJS), 2008 WL 4298609, at *6 (S.D.N.Y. Sept. 19, 2008).

## II.    The Impact of JASTA

JASTA — the Justice Against State Sponsors of Terrorism Act — created a new exception to the FSIA. See 28 U.S.C. § 1605B. This exception applies when, in addition to injury, causation, and damages, a plaintiff can show (1) an act of international terrorism in the United States; and (2) a tortious act by a foreign state, or any official, employee, or agent of that state taken while acting within that person's office, employment, or agency. In re Terrorist Attacks on September 11, 2001, 298 F. Supp. 3d 631, 642 (S.D.N.Y. 2018). Judge Daniels found a "reasonable basis" for the Court to assume jurisdiction under JASTA, and as a result, directed "targeted jurisdictional discovery" regarding Thumairy and Bayoumi. March 28 Order, at 22–23.

The Court of Appeals has made clear that jurisdictional discovery of a foreign state should be limited. See First City, 150 F.3d at 176; EM Ltd, 695 F.3d at 210; Arch Trading Corp, 839 F.3d at 207. At oral argument, however, Plaintiffs suggested that these cases are not controlling because they arose under the commercial exception to the FSIA. See ECF No. 4456, February 26 Oral Argument, at 69. As a general matter, the Court disagrees with Plaintiffs' contention. FSIA immunity is immunity not only from liability, but also from the costs and other disruptions attendant to defending a lawsuit. EM Ltd. v. Republic of Argentina, 473 F.3d 463, 486 (2d Cir. 2007). Thus, to protect a foreign state from the "expense, intrusiveness, and hassle

of litigation," a court must be circumspect in allowing jurisdictional discovery. Arch Trading Corp, 695 F.3d at 207. This concern — that is, protecting a potentially immune defendant from the costs of litigation — applies regardless of the alleged basis for jurisdiction. Jurisdictional discovery should therefore be limited even in cases arising under JASTA.[3]

Accordingly, the Court will order discovery "circumspectly and only to verify allegations of specific facts crucial to an immunity determination." First City, 150 F.3d at 176. In this case, the relevant facts include "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to . . . the 9/11 hijackers." See March 28 Order, at 23. Plaintiffs' discovery requests should shed light on this inquiry.

At the same time, however, the Court is mindful that it must conduct a "delicate balancing" while managing discovery. Plaintiffs have already established a reasonable basis for the Court to assume jurisdiction over Saudi Arabia. This lessens the concern, at least to an extent, that the Court will impose discovery obligations on a potentially immune defendant. Moreover, Congress has expressed a strong interest in granting federal courts jurisdiction when a foreign state commits a tortious act in connection with an act of terrorism within the United States. See JASTA, § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 ("The purpose of this Act is to provide civil litigants with *the broadest possible basis* . . . to seek relief against . . . foreign countries . . . that have provided material support . . . to persons that engage in terrorist activities against the United States.") (emphasis added). While these concerns do not negate the Court's

---

[3] Plaintiffs' reliance on Republic of Argentina v. NML Capital, LTD is also misplaced. In that case, Argentina waived jurisdictional immunity and therefore was "liable in the same manner and to the same extent as a private individual." 573 U.S. 134, 142 (2014) (quoting 28 U.S.C. § 1606). In contrast, Saudi Arabia vigorously contends that it is immune from suit under the FSIA. Unless and until the Court holds otherwise, the Court will hesitate to impose an undue burden of discovery on a party that is potentially immune from the Court's jurisdiction.

obligation to conduct limited discovery, they emphasize that Plaintiffs must be given the discovery necessary to determine if JASTA applies. See Société Nationale, 482 U.S. at 544 n.28 (noting that, in any comity analysis, courts should consider whether an interest of the United States would be undermined).

## DISCUSSION

### I.   Preliminary Issues

#### A.   Relevant Timeframe

In the May 24 Order, the Court directed Saudi Arabia to search for documents between January 1, 1998, and December 31, 2002.  ECF No. 4009. Imposing time constraints on Saudi Arabia's document production is consistent with the Court's obligation to be circumspect in allowing discovery. Indeed, other courts have adopted a similar procedure when managing a jurisdictional inquiry under the FSIA. See, e.g., Reiss v. Societe Centrale du Groupe Des Assurances Nationales, 185 F. Supp. 2d 335, 340 (S.D.N.Y. 2002) (permitting a three-year discovery window).

In certain instances, Plaintiffs contend that Saudi Arabia must produce documents outside of the relevant timeframe. Pl's Br., at 4. The Court will address these requests on a case-by-case basis. Where evidence suggests that Saudi Arabia possesses a specific group of relevant documents created before 1998 or after 2002, the Court may order additional searches. Absent such evidence, however, Plaintiffs' requests will be denied. To be clear, unless the Court states otherwise, Saudi Arabia must search for documents only between 1998 and 2002.

#### B.   Locations to be Searched

In the March 28 Order, Judge Daniels directed that jurisdictional discovery shall proceed "by focusing only on those allegations of specific facts described below relevant to the FSIA

immunity determination." March 28 Order, at 5. As a result, and as this Court noted in April 2018, Plaintiffs' discovery demands should be "tethered to one of [the] allegations that Judge Daniels relied upon." ECF No. 3975, Transcript of April 12 Hearing, at 21. Those allegations suggest five locations where responsive documents are likely to exist: (1) the Saudi Consulate in Los Angeles, California; (2) the Saudi Embassy in Washington, D.C.; (3) the Cultural Mission in Fairfax, Virginia; (4) the Ministry of Islamic Affairs; and (5) the Presidency of Civil Aviation, and its successor, the General Authority of Civil Aviation.

Plaintiffs contend that Saudi Arabia must search for documents in additional locations. See, e.g., Plaintiffs' Proposed Order ("Proposed Order"), ¶ 24 (seeking documents from the General Intelligence Presidency, the Ministry of the Interior, and the Ministry of Defense). As with Plaintiffs' request for documents outside of the relevant timeframe, the Court will address these concerns on a case-by-case basis. The burden or expense of a discovery demand cannot exceed its likely benefit. See Fed. R. Civ. P. 26(b)(1). This is particularly true where, as here, any undue burden would be imposed on a potentially immune sovereign defendant. For these reasons, Saudi Arabia must search additional locations only if the evidence suggests that a particular group of responsive documents may be located there. See Transcript of May 24 Conference, ECF No. 4015, at 17, 25.

The Court will apply a similar framework to Saudi Arabia's intelligence services. Given the allegations identified by Judge Daniels and the limited nature of jurisdictional discovery under the FSIA, broad searches of the GID or the PSS are inappropriate.[4] Further, even in merits

---

[4] The 9/11 Commission concluded that Bayoumi was an "unlikely candidate for clandestine involvement with Islamist extremists," and a joint report from the FBI and CIA found "no information to indicate that" Bayoumi was an "intelligence officer[] of the Saudi Government[.]" See March 28 Order, at 23. Judge Daniels concluded that these findings *did not* contradict Plaintiffs' allegations, which focused on whether Bayoumi was tasked by Thumairy, at the behest of a more senior Saudi official, with aiding the hijackers. Id. Saudi Arabia's intelligence agencies are otherwise unmentioned in Judge Daniels's decision.

discovery, international comity requires the Court to demonstrate due respect for "any sovereign interest expressed by a foreign state." Catalano v. BMW of North America, LLC, No. 15-CV-4889 (KBF), 2016 WL 3406125, at *6 (S.D.N.Y. June 16, 2016) (quoting First Am. Corp. v. Price Waterhouse LLP, 154 F.3d 16, 21 (2d Cir. 1998)). These considerations are particularly important "when it comes to a foreign sovereign's diplomatic and military affairs." Aurelius Capital Master, Ltd. v. Republic of Argentina, 589 F. App'x 16, 18 (2d Cir. Dec. 23, 2014). As a result, the Court will order Saudi Arabia to search its intelligence agencies only if, weighing the interests of comity, "actual . . . contemporaneous evidence" suggests responsive documents may exist. See Transcript of May 24 Conference, at 27; Freund v. Republic of France, 592 F. Supp. 2d 540, 563 (S.D.N.Y. 2008) ("[Plaintiffs'] requests raise serious comity concerns insofar as they would require the Court to order a foreign sovereign . . . to provide access to their sealed archives.").

Arguing for broader searches, Plaintiffs rely on Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989). In that case, the district court dismissed the plaintiff's claims under the act of state doctrine because her anticipated discovery would implicate "a foreign nation's national security and intelligence affairs."[5] Id. at 1422. The Ninth Circuit reversed, but not on grounds that support Plaintiffs' position. Notably, the court held that it had jurisdiction over the Republic of China ("ROC"). Id. at 1431–32. Liu therefore provides little guidance in managing discovery against Saudi Arabia, whose sovereign immunity may still apply. In any event, the court did not address whether the plaintiff's anticipated discovery was appropriate. Because the court determined that the ROC was liable under respondeat superior, it concluded that it "need not

---

[5] The act of state doctrine "bars U.S. courts from declaring invalid, and thus ineffective as a rule of decision, the official act of a foreign sovereign." Kashef v. BNP Paribas S.A., No. 18-1304, 2019 WL 2195619, at *4 (2d Cir. May 22, 2019) (citing W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 405 (1990)).

decide whether or to what extent further inquiries might be made of ROC officials." Id. at 1434. Accordingly, Plaintiffs' reliance on Liu is misplaced.

Likewise, Plaintiffs' appeal to JASTA is equally unavailing. Plaintiffs contend that Congress, despite knowledge that discovery of sensitive documents was likely to occur, passed JASTA without adding discovery restrictions. See Plaintiff's Reply Brief ("Pl's Reply Br."), Filed Under Seal, at 3; accord H.R. Rep. 94-1487, 1976 WL 14078, at *23 (1976) ("The [FSIA] does not attempt to deal with questions of discovery. Existing law appears to be adequate in this area."); NML Capital, 573 U.S. at 143 ("The [FSIA] says not a word on [the application of federal discovery rules.]"). Even if true, there is no indication that Congress meant for this type of discovery to occur *before* JASTA's jurisdictional requirements have been satisfied. To do so would put the cart before the horse, providing Plaintiffs the benefits of merits discovery before they have successfully stated a claim for relief. In any event, Saudi Arabia does not have blanket protection from discovery of its intelligence agencies. Rather, consistent with the March 28 Order, the Court merely seeks evidence that responsive documents may exist before encroaching Saudi Arabia's legitimate interests as a foreign sovereign potentially immune from the Court's jurisdiction.

### C.   Standard for a Motion to Compel

To prevail on their motion to compel, Plaintiffs "must cite to specific evidence to challenge [Saudi Arabia's] assertions that no additional responsive documents exist." Mason Tenders Dist. Council of Greater New York v. Phase Constr. Servs., Inc., 318 F.R.D. 28, 42 (S.D.N.Y. 2016). Where Plaintiffs provide mere speculation, their requests will be denied.

II.     **Document Requests Concerning Thumairy**

    A.     **Supervision of Thumairy by the Ministry of Islamic Affairs**

        1.     **Thumairy's Appointment to Oversee California Propagators**

Plaintiffs allege that MOIA directed Thumairy, among other things, to oversee Saudi propagators working in California.[6] In their moving papers, Plaintiffs seek documents regarding the nomination and decision to approve Thumairy for this position. Proposed Order, ¶ 1. Evidence produced by the Department of Justice ("DOJ") suggests that Saudi Arabia has failed to produce relevant documents.

On January 17, 1998, Khalid al-Sowailem sent a letter to a propagator in the United States. Declaration of Steven R. Pounian ("Pounian Decl."), Filed Under Seal, Exhibit 8, at 9. Sowailem, who worked at the Embassy, was a MOIA employee and the Director of the Da'wah Office in the United States. Id.; Def's Br., at 3–4. In the letter, Sowailem stated that the Director of Da'wah for Europe, America, and Australia had "approved the nomination of [Thumairy] to oversee propagators working in the state of California." Pounian Decl., Exhibit 8, at 9. Sowailem also directed the recipient to cooperate with Thumairy "in promoting propagation activities." Id. This document — which was not included in Saudi Arabia's initial production — suggests that Thumairy supervised propagators in California and that there was a process to select and name Thumairy to that role.

During a meet-and-confer, Saudi Arabia agreed to perform a targeted search for the January 1998 Letter. Def's Br., at 8. Subsequently, on March 21, 2019, Saudi Arabia produced a ██████████████████████████████████████████████████████. Plaintiffs' March 22 Letter, Filed Under Seal, at 3. ███████████████████████████████████████

---

[6] A "propagator" is an Islamic missionary or preacher. Def's Br., at 8.



█████████████████████████████████████████████████

████████████████████████████████████ Id., Exhibit 2, at 6903. The

███████████████████████████ does not provide any context or background for

Thumairy's nomination. Id. This indicates, at least to an extent, that ██████████████

████████████████████████████████████

The ████████████████, is the only document that Saudi Arabia produced

regarding Thumairy's nomination. As described above, however, ████████ indicate that

additional documents should exist. Accordingly, within 45 days of this Order, Saudi Arabia is

directed to search for and produce any documents regarding (1) Thumairy's nomination to

oversee the propagators in California; and (2) the approval of that nomination by the Director of

Da'wah for Europe, America, and Australia. █████████████████████████, any

responsive documents were likely created before the Court's cut-off period for discovery.

Therefore, Saudi Arabia must search for documents beginning in December 1995, when

Thumairy's initial nomination to work in the United States was approved. Pounian Decl., Exhibit

19, at 603.

### 2.    Responsibilities of MOIA Propagators

Plaintiffs seek documents concerning the duties and tasks "provided by [MOIA] to

Propagators and Guides employed by MOIA inside the United States." Proposed Order, ¶ 2. The

Court is reluctant to grant Plaintiffs' request. Judge Daniels authorized discovery into whether

Thumairy acted at the direction of more senior Saudi officials, not into whether Thumairy acted

within the scope of his employment as an imam. March 28 Order, at 21–23. As a result,

documents regarding the propagators' general responsibilities are unlikely to shed light on

Plaintiffs' limited inquiry.

Nevertheless, Saudi Arabia has agreed to search for documents "concerning the roles and duties at [Thumairy's] level." Def's Br., at 9. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce any documents showing the responsibility of individuals who held the same title and rank as Thumairy, including documents showing the reporting protocol for these individuals. See Pounian Decl., Exhibit 7-H, at 13. Saudi Arabia is not required to search for documents before January 1, 1998.

### 3.  Responsibilities and Supervision of Thumairy

More broadly, Plaintiffs contend that Saudi Arabia failed to produce "MOIA documents about Thumairy's roles, duties, and supervision." Pl's Br., at 6. To support their claim, Plaintiffs refer to documents produced by the DOJ in November 2018. Id. Plaintiffs' request is largely DENIED.

First, Plaintiffs cite the January 1998 letter from Sowailem to a Saudi propagator in the United States. Pl's Br., at 6. As discussed above, this document suggests that there was a formal process regarding Thumairy's appointment to oversee the California propagators. Pounian Decl., Exhibit 8, at 9. But the Court has already directed Saudi Arabia to search for documents related to Thumairy's nomination and approval. No further relief is warranted.

Second, Plaintiffs point to a group of documents seized in a 2004 FBI raid of a propagator's home. Pl's Br., at 6; Pl's Reply Br., at 5. These documents include: (1) an April 1996 letter from Sowailem that informs all U.S. propagators about a religious institute in the District of Columbia; (2) a November 1996 letter from Sowailem reminding U.S. propagators to obtain written authorization before taking leave and to provide a "photocopy of the entry stamp" upon return; (3) a March 1997 document from a San Diego propagator detailing his religious activities during the previous three months; (4) an undated certificate indicating that the same

propagator attended a conference in Saudi Arabia in the Fall of 1998; and (5) a February 2001 document from the same propagator describing his religious activities in either 1999 or 2000. Pounian Decl., Exhibit 8, at 11–12, 18–26, 30–32.

The DOJ's production shows that, across a five-year period, there were six instances of communication between Saudi Arabia and its propagators in the United States. Contrary to Plaintiffs' contention, this is not evidence of a "highly regulated system for directing and monitoring" the propagators. See Pl's Br., at 7. In any event, that documents were seized during a 2004 raid of a propagator's home does not mean that similar documents — 15 years later — will still be in *Saudi Arabia's* possession. For these reasons, the records produced by the DOJ do not justify additional searches regarding the Kingdom's supervision of Thumairy. See Proposed Order, ¶ 3.

Nevertheless, Plaintiffs have shown that Saudi Arabia may possess a specific subset of responsive documents. In ███████████████████████████████████ ███████████████████████████████████████ Plaintiffs' March 22 Letter, Exhibit 2, at 6903. The DOJ production indicates that at least one other California propagator submitted ████████████████. Pounian Decl., Exhibit 8, at 18–19, 30–31. In addition, before Thumairy's July 2000 promotion from "Guide" to "Propagator," Sowailem completed a "performance report" regarding Thumairy's work. Declaration of Gregory G. Rapawy ("Rapawy Decl."), Filed Under Seal, Exhibit 15, at 2691, 2695–97. Although the form is somewhat incomplete, Sowailem provided numerical ratings (all "excellent") for Thumairy's skills in "occupational performance," "personal traits," and "relationships with [others]." Id. at 2696. This evidence suggests that additional documents exist concerning Saudi Arabia's supervision of Thumairy. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and

produce (1) any ████████████ submitted by Thumairy to the Embassy or the Ministry of

Islamic Affairs; (2) the ████████ referenced in the ████████████████████

████████ (3) any documents that Sowailem used to prepare the "performance report;" and (4)

any other performance reviews of Thumairy's work.

### B.    Supervision of Thumairy by the Ministry of Foreign Affairs

#### 1.    Thumairy's Supervisors in MOFA

Plaintiffs seek documents concerning the "duties, responsibilities, and tasks" provided to

Thumairy by the Ministry of Foreign Affairs ("MOFA"). Proposed Order, ¶ 4. Plaintiffs focus on

three individuals who allegedly supervised Thumairy: Mohammed al-Salloum, the Consul

General in Los Angeles; Majid al-Ghesheyan, the Head of Islamic Affairs at the Embassy; and

Musaed al-Jarrah, Ghesheyan's deputy. Pl's Br., at 7–8. Because Plaintiffs merely speculate that

additional documents must exist, their request is DENIED.

Plaintiffs rely on a memorandum created by the 9/11 Commission detailing Thumairy's

interview with the Commission. Pl's Br., at 8. During the interview, Thumairy indicated that: (1)

he "reported to the Consul General;" and (2) of the individuals at the Embassy, he had "the most

contact with Dr. Majid." Pounian Decl., Exhibit 11, at 3–4. To be sure, these statements suggest

that Salloum, the Consul General at the Los Angeles Consulate, and Ghesheyan, the Head of

Islamic Affairs at the Embassy, supervised Thumairy's work. But Saudi Arabia has already

performed extensive searches of both the Consulate and the Embassy. Def's Br., at 10 n.10.

Without evidence that additional searches will locate more documents, the Court will not order

Saudi Arabia to duplicate its discovery efforts.[7]

---

[7] Plaintiffs also contend that Thumairy reported to Abdel Kareem Bin Baz, the Islamic Affairs Officer in
Los Angeles; Musaed al-Jarrah, the Deputy Head of Islamic Affairs; and Smail Mana, an employee of
MOFA's Islamic Affairs Bureau at the Consulate. Pl's Br., at 7 & 8 n.4. The Court has already ordered

**2.** ███████████████████████████████████

Saudi Arabia produced ████████████████████████████████████████
████████████████████████████████. Pounian Decl., Exhibit 15, at 1253. █
████████████████████████████████████████████████
████████████████████████████████████ <u>Id.</u> Plaintiffs seek
documents regarding ████████████████, including: (1) why ████████████████ was
requested; (2) why and how the issue was brought to the attention of ████████████; (3)
the nature of Thumairy's role; and (4) the ██████ mentioned ████████████████
Proposed Order, ¶ 5. This request is DENIED.

The ████████████ — which Saudi Arabia produced to Plaintiffs — does not
suggest that additional responsive documents exist. The ██████ does not say, for example, that
████████████████████████████████████, or that the Embassy
internally deliberated over ████████████. Plaintiff's conclusory assertion that more
documents must exist does not support a motion to compel. This is especially true given Saudi
Arabia's extensive search of the Embassy.

In addition, Plaintiffs are incorrect to assert that Saudi Arabia has failed to produce
responsive documents. <u>See</u> Pl's Br., at 8. Regarding Thumairy's role at the King Fahad Mosque
(the "Mosque"), ████████████████ indicated that ████████████████████████
████████████ Pounian Decl., Exhibit 15, at 1253. ████████████████████
████████████████████ <u>Id.</u> Regarding ████████████
████████████ stated that ████████████████████████
████████████ <u>Id.</u> Other documents confirm ████████████████. <u>See,</u>

---

discovery concerning Jarrah and Mana, ECF No. 4261, and Plaintiffs cite no evidence to support their
allegations regarding Bin Baz.

<u>e.g.</u>, Rapawy Decl., Exhibit 1, at 550 (extending Thumairy's "delegation period" as the "Imam of the mosque"); Exhibit 2, at 6667 (███████████████████████████████████ ████████████████████████); Exhibit 5, at 566 ██████████████████████████████ ████████████████████████████████████████); Exhibit 15, at 2692 (indicating that Thumairy "[f]ielded practice of the Da'wah" and supervised the "program" at the King Fahad Mosque).

Similarly, Saudi Arabia has produced documents regarding ████████████████████. Def's Br., at 10 n.11. The Mosque was administered by a private charity in California. Pounian Decl., Exhibit 12, at 97. However, ██████████████████████████████ ████████████████████████. Rapawy Decl., Exhibit 10, at 1213. ████ ██████████ ████████████████████████████████████████████████████ ████████████████████████████. Pounian Reply Decl., Exhibit 67, at 1274. ████████████████████████████████████████████ <u>Id.</u> ████ ██████████████████████████████████████████████ ████████████████████ Rapawy Decl., Exhibit 10, at 1213. Ultimately, ████ ██████████████████████████████ <u>Id.</u>, Exhibit 11, at 1223. ████ ████████████████████████████████████████████ ████████ <u>Id.</u> at 1224. Accordingly, the Court does not find any significant gaps in Saudi Arabia's production cornering ████████████████████.

3.    **The 2003 Extension of Thumairy's Term in Los Angeles**

In a letter dated May 21, 2003, the Undersecretary of Mosques, Da'wah, and Guidance indicated that Ambassador Bandar had requested an additional one-year extension of Thumairy's

contract. Pounian Decl., Exhibit 16, at 564. Based on this letter, Plaintiffs seek documents concerning "the 2003 extension of Thumairy's term in Los Angeles." Proposed Order, ¶ 6. This request is DENIED.

As part of its document production, Saudi Arabia produced  Rapawy Decl., Exhibit 13, at 1227.

Id.

Id. Accordingly, Saudi Arabia has already produced documents regarding the 2003 extension of Thumairy's term in Los Angeles.

### C.   The King Fahad Mosque

#### 1.   The Mosque's Supervision of Thumairy

As discussed above, the King Fahad Mosque was administered by the Islamic Foundation of Sheikh Ibn Taimmiyyah (the "Foundation"), a non-profit registered in California. Pounian Decl., Exhibit 12, at 97. In January 1997, pursuant to a 1995 agreement with Abdullah al-Turki, then-Minister of Islamic Affairs, the Foundation added seven Saudi officials to its Board of Directors. Id. at 98, 100. These officials included Salloum and Ghesheyan, individuals to whom Thumairy indicated that he reported. Id., Exhibit 11, at 3–4.

Based on this evidence, Plaintiffs seek documents concerning the "appointment and role" of Saudi officials at the Mosque. Pl's Br., at 9; Proposed Order, ¶ 7. This request is DENIED. Documents regarding the 1995 agreement to add Saudi officials to the Foundation's Board of Directors are unlikely to shed light on whether Thumairy was directed to assist the 9/11 hijackers. Further, according to documents produced by the Mosque, none of the Saudi officials

"acknowledged or accepted their appointments." Pounian Decl., Exhibit 12, at 100. Nor did the officials "attend[] any annual meetings" or attempt to "assume [their] responsibilities." Id. Thus, given that the Saudi officials were Board members in name only, Plaintiffs have no basis to seek documents regarding their alleged "role" in the Mosque's operations.

In any event, Saudi Arabia has produced documents regarding its relationship with the Mosque. It has produced, for example, documents concerning ███████████████████ ██████ See, e.g., Pounian Decl., Exhibit 26, at 1258 (███████████████████ ██████████████ at 1250 ████████████████████████████████ ████████████████████████████████; at 1623 █████████████ ███████████████████████████████ Rapawy Decl., Exhibit 24, at 1620 ████████████████████████████ Exhibit 25, at 1624 ██████████████████████████████████ Exhibit 28, at 1226 ███████████████████████████████ Similarly, Saudi Arabia has produced documents regarding ████████████████████████ ████████████████████████████.[8] Id., Exhibit 12, at 1230–31. Because Plaintiffs do not explain why additional documents might exist, their request for documents concerning Saudi Arabia's "establishment, funding, staffing, sponsorship, and support" of the Mosque is DENIED. See Proposed Order, ¶ 8.

Finally, Plaintiffs contend that Saudi Arabia must produce more documents regarding Thumairy's appointment and responsibilities at the Mosque. Pl's Br., at 9. Relying on Abdullah al-Turki's deposition, Plaintiffs argue that MOIA "received periodic reports from each Mosque where the Kingdom had assigned a propagator." Id. This argument mischaracterizes Dr. Turki's



---

[8] ████████████████████████████████████████████████

testimony. When asked if someone would have supervised Thumairy's work, Dr. Turki testified

that MOIA "*may ask* for an annual report" from a host organization, not that the Ministry always

did so. Pounian Decl., Exhibit 20, at 398 (emphasis added). Indeed, on cross examination, Dr.

Turki stated that "he [did not] recall" whether "there were any reports . . . generated pertaining to

[Thumairy] during his time in the United States." Rapawy Decl., Exhibit 26, at 410. Plaintiffs

have not shown that Saudi Arabia's production was insufficient. Their request at paragraph nine

of the Proposed Order is therefore DENIED.

### 2.    Depositions of the Foundation's Directors

In June 2019, the parties deposed Dr. Khalil al Khalil and Dr. Osman Kaldirim, two of

the Foundation's Directors. Both parties subsequently filed letters with the Court supplementing

the record for Plaintiffs' motion to compel. In their submission, Plaintiffs contend that the

deposition testimony warrants additional searches. The Court agrees, but only to a limited extent.

### a.    The Office of Prince Abdulaziz[9]

During his deposition, Khalil testified that he received a letter in 1999 from Khalid al-

Assaf, Prince Abdulaziz's chief of staff. Khalil dep., at 229, 404. The letter stated that the Prince

no longer had any interest in having a representative on the Foundation's Board of Directors. Id.

at 225. Based on this letter, Khalil told Kaldirim to remove the seven Saudi officials from the

Foundation's Board and "go back to the old board of trustees." Id. at 226. This process seems to

have taken some time: although the Foundation passed a corresponding resolution on August 17,

2001, the formal paperwork was not filed with the State of California until September 2002. Id.

at 379–380, 399–402; Pounian Decl., Exhibit 12, at 100.

---

[9] For further discussion regarding this Office, see infra, Part II.J.

Plaintiffs request that Saudi Arabia search the Office of Prince Abdulaziz for a copy of the 1999 letter. This request is GRANTED. Although the evidence generally suggests that Saudi officials did not play a role in the Foundation's day-to-day management, Khalil's testimony points to a specific document regarding its relationship with Saudi Arabia. This document may shed light on when and for what reason Saudi Arabia decided to withdraw its apparently nominal presence on the Foundation's Board of Directors. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce the 1999 letter. To the extent the Office of Prince Abdulaziz no longer exists, <u>see</u> Khalil dep., at 405, Saudi Arabia should make reasonable efforts to locate the document. Saudi Arabia may limit its search from January 1, 1999, until September 11, 2001.

In addition, Plaintiffs request that Saudi Arabia search the Office of Prince Abdulaziz for documents concerning payments to the Mosque. Proposed Order, ¶ 14. This request is DENIED. Although Plaintiffs contend that the Office helped fund the Mosque, the exhibits cited in Plaintiffs' brief do not support this position. <u>See, e.g.</u>, Pounian Decl., Exhibit 26, at 1250, 1258

████████████████████████████████████████████████████████████

████████ In any event, to the extent Prince Abdulaziz may have been involved in the Mosque's funding, that evidence is too tangential to Plaintiffs' allegations to warrant a broad search for documents.[10]

---

[10] <u>See, e.g.</u>, Plaintiffs' June 21 Letter, at KSM 448 (showing Prince Abdulaziz donated approximately $1 million in September 1993 to buy the land on which the Mosque was built); KFM 379–82 (containing a letter sent to Prince Abdulaziz and Ambassador Bandar in July 1995 regarding potential options to link the Foundation with Saudi Arabia). <u>See also</u> Pounian Decl., Exhibit 12, at 77, 79 (indicating that the Mosque received $30,000 from Prince Abdulaziz in 1999, but $0 in 2000).

**b.      Thumairy's Alleged Association with Extremists**

In August 2001, three individuals, one of whom was a MOIA employee, visited the King Fahad Mosque. Khalil dep., at 79, 296–298. The individuals were hosted by Thumairy. Id. at 83. Because Khalil was "curious" whether the MOIA employee was sent as an "overture," he called Abdul Aziz al-Ammar, a Deputy Minister in the MOIA. Ammar told Khalil that the individuals were "there by themselves" and had not been sent by MOIA or the Saudi government. Id. at 80, 301. Ammar also stated that the Mabahith (the Saudi equivalent to the FBI) was "looking for" the individuals. Id. at 80, 82. During his deposition, Khalil testified that, at the time, he "wasn't happy that [Thumairy] was hosting someone that the government was looking for" and that he was "concern[ed]" that the individuals were "extremists." Id. at 86. This evidence warrants additional searches of the Ministry of Islamic Affairs. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce any documents regarding the individuals who visited the Mosque and were hosted by Thumairy in August 2001.

Khalil also testified about a separate phone call to Ammar in October 2001. In this instance, Khalil told Ammar that the FBI had shown a Mosque employee a photograph of Thumairy with the 9/11 hijackers at the Mosque. Khalil dep., at 69, 77. Saudi Arabia has produced numerous documents regarding ███████████████████. See Rapawy Decl., Exhibit 5, at 566; Pounian Decl., Exhibit 25, at 606, 612, 605. To the extent Plaintiffs seek more records regarding this portion of Khalil's testimony, their request is DENIED.

**D.      Thumairy's Supervision of Saudi Arabia's Employees**

**1.      Thumairy's Supervision of Muhanna**

████████████████████████████████████████████████

███████████████████████████. Pounian Decl., Exhibit 15, at 1253. ███████████████



Based on this evidence, Plaintiffs seek documents regarding Thumairy's supervision of Muhanna. Proposed Order, ¶ 12. As indicated above, however, the Court has already ordered discovery regarding this individual. <u>See</u> ECF No. 4261. Because no further relief is warranted, Plaintiffs' request is DENIED.

### 2.    Thumairy's Supervision of California Propagators

More broadly, Plaintiffs seek documents regarding Thumairy's supervision of Saudi Arabian employees within California. Proposed Order, ¶ 10. Their request includes any documents that identify the "MOIA Propagators in the United States between January 1, 1995 and September 11, 2001." Proposed Order, ¶ 11. Given the limited nature of jurisdictional discovery, these requests are DENIED. The record indicates that Thumairy may have supervised Saudi propagators working in California. Pounian Decl., Exhibit 8, at 9. But that allegation, even if true, does not support Plaintiffs' requests — that Thumairy supervised a propagator's religious activities does not mean that Thumairy directed that individual to aid the 9/11 hijackers. <u>See</u> March 28 Order, at 30 (articulating a similar rationale). Moreover, Thumairy's "performance

report" in May 2000 cautions against further discovery. Rapawy Decl., Exhibit 15, at 2691. The report suggests that individuals in "executive positions," like Thumairy, do not usually "carry out any supervisory roles or make decisions." Id. at 2695. For these reasons, the Court will not compel Saudi Arabia to conduct additional searches.

E.      **The 1999 Propagator's Conference**

In a letter to a propagator named Omar Abdi Mohamed, the Saudi Embassy stated that a "gathering for propagators" would be held in Los Angeles from July 16, 1999, until July 26, 1999. Pounian Decl., Exhibit 23, at 275. The letter also asked Mohamed to provide the Embassy with his full name in English, as well as a round-tip travel itinerary from Mohamed's place of business to Los Angeles. Id.

Saudi Arabia agreed to search for documents regarding this event. Pounian Decl., Exhibit 3, ¶ 89. In response, Saudi Arabia produced



Id., Exhibit 24, at 1269.

Id. at 1269–70.

Id. at 1269.

Id. at 1268.

The evidence suggests that additional responsive documents exist. Thumairy was

and at a minimum, was appointed to oversee the Saudi propagators in California (even if he did not engage in any actual supervision). As a result, there is a strong likelihood that MOIA would have communicated with Thumairy regarding a ten-day "propagators conference"                                    Accordingly, within 45

days of this Order, Saudi Arabia is directed to search for and produce any documents concerning the 1999 propagators conference █████████████████

### F.     Saudi Arabia's Funding of the Mosque

Plaintiffs seek records concerning Saudi Arabia's payments to the King Fahad Mosque. Proposed Order, ¶ 14. As discussed above, however, Saudi Arabia has already produced numerous responsive documents. See, e.g., Pounian Decl., Exhibit 26, at 1250, 1258, 1623; Rapawy Decl., Exhibit 24, at 1620; Exhibit 25, at 1624; Exhibit 28, at 1226. Plaintiffs must cite specific evidence to challenge Saudi Arabia's assertion that no additional documents exist. These examples fail to support an inference that Saudi Arabia has not satisfied its obligations.

Plaintiffs emphasize certain third-party discovery obtained from the Mosque. These documents show that: (1) the Mosque issued 15 checks to Thumairy between February 1998 and July 2001, totaling approximately $41,000; (2) the Mosque made payments to a group of "volunteers" in January 2000, including a $700 payment to Thumairy; (3) Thumairy wrote a $3,000 check to the Mosque on December 20, 1999, ████████████████████████████ ███████████████████████████████████████████ and (4) Consul General Salloum wrote a $12,000 check to the Mosque on January 31, 2000, ██████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ████████████████. See Pl's Br., at 11–12. While potentially relevant to the Court's jurisdictional inquiry, this evidence does not suggest that Saudi Arabia has withheld (or failed to locate) additional documents regarding its payments to King Fahad Mosque. Accordingly, Plaintiffs' discovery demand is DENIED.

### G.    Thumairy's Pay Increases and Promotions

#### 1.    The Alleged Pay Increase in February 2000

Plaintiffs claim that Thumairy received "a substantial pay increase" in February 2000.

Pl's Br., at 12. The documents cited by Plaintiffs do not support this assertion. ███████████

███████████████████████████ Pounian Decl., Exhibit 30, at 1556. ████████

█████████████████████████████████████████

█████████████ Id., at 1555. █████████████████

████████████████████████████████████

███████ [11] Id. at 1555–56. Because Plaintiffs cannot show that Thumairy received a pay

increase in the first place, their request for related documents is DENIED.[12] See Proposed Order,

¶ 15.

#### 2.    The Alleged Bonus Payment in May 2000

Similarly, Plaintiffs claim that Thumairy received a "special financial bonus" in May

2000. Pl's Br., at 12. Plaintiffs rely on a letter dated May 2, 2000, from Sowailem to a U.S.

propagator. Pounian Decl., Exhibit 32, at 14. In the letter, Sowailem stated that a "financial

award" had been authorized for "all propagators belonging to the . . . Da'wah office in America."

Id. It is not clear that Thumairy would have received this award; among other things, Thumairy's

job title as of May 2000 was "Guide," not "Propagator." Pounian Decl., Exhibit 31, at 593.

Nevertheless, Saudi Arabia has agreed to conduct a targeted search for responsive documents.

---

[11] For clarity, the Court notes that █████████████████████████████ Pounian Decl., Exhibit 30, at 1555. Thumairy's net pay is calculated using the correct figure.

[12] ████████████████████████████████ Compare Pounian Decl., Exhibit 30, at 1556 with Rapawy Decl., Exhibit 14, at 1557. But this does not support a motion to compel. The documents show ████████████ Pounian Decl., Exhibit 30, at 1556.

Def's Br., at 15. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce a letter from Sowailem to Thumairy in May 2000 pertaining to any purported bonus that was paid to Thumairy.

If Saudi Arabia locates documents that suggest Thumairy received the May 2000 "financial award," it is further directed to search for documents that explain the reasons why the bonus was administered. Absent additional evidence tying Thumairy to the May 2000 bonus, Saudi Arabia is not required to search for documents regarding the bonus generally. A bonus sent to a group of Saudi employees that does not include Thumairy (or another individual alleged to have aided the 9/11 hijackers) is not relevant to this litigation.

### 3.   Thumairy's Promotion in July 2000

Plaintiffs seek documents that "explain the reasons why Thumairy received . . . [a] promotion in the year 2000." Proposed Order, ¶ 15. But Saudi Arabia has already produced these documents.

Thumairy became eligible for a promotion on February 11, 2000. Rapawy Decl., Exhibit 15, at 2692. On May 14, 2000, the Committee for Selection of Nominations reviewed the names of employees who had (1) completed at least four years of service; (2) met certain academic and performance requirements; and (3) were the "best and most worthy." Id. at 2693. As part of this process, the Committee recommended several promotions, including one for Thumairy. Id. The next day, the head of the Committee, Abdul Aziz Bin Abdullah al-Ammar, sent a letter to the Minister of Islamic Affairs attaching the minutes of the Committee's meeting. Id. at 2690. In response, on either June 17 or June 18, Muhammad al-Sumaih, "The Consultant," indicated that the Minister had "no objection" to most of the nominations, including Thumairy's. Id. On June 20, Ammar sent a letter to Saud Ibn Abdullah Ibn Taleb, the Deputy of the Ministry for

Administrative and Technical Affairs. Id. at 2691. The letter attached the Minister's approval of the Committee's recommendations, as well as the "performance reports" for each of the nominees. Id. Thumairy's report was completed by Sowailem. Id. at 2695–96. The report indicated that Thumairy was "excellent" in "occupational performance," "personal traits," and "personal relationships." Id. at 2696.

Noting the Minister's June 18 approval, Taleb subsequently approved Thumairy's nomination on July 20, 2000. Pounian Decl., Exhibit 31, at 593. Thumairy was promoted from a "Grade (8)" "Guide" to a "Grade (9)" "Propagator." Id. He also received a small pay increase. Id. These documents thoroughly outline Thumairy's promotion. Because Plaintiffs summarily conclude that additional documents must exist, see Pl's Br., at 12, their request for documents is DENIED.

### H.   Thumairy's Diplomatic Status, Passports, Visas, and Travel

####   1.   Documents



. Pounian Decl., Exhibit 35, at 6667–68. Plaintiffs seek four documents ▮▮▮▮▮▮▮▮ all of which Saudi Arabia has agreed to look for. Proposed Order, ¶ 17; Pounian Decl., Exhibit 7-H, at 13 (second-to-last bullet). Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce the documents ▮▮▮▮

####   2.   ▮▮▮▮▮▮▮▮

. Pounian Decl., Exhibit 33, at 1234.



. Id.

Pounian Decl., Exhibit 34, at 1236.

Pounian Decl., Exhibit 10, at 6679.

Id.

. Id.

Plaintiffs argue that Saudi Arabia must produce

Pl's Br., at 13. The Court agrees. Although

the document is relevant to Thumairy's agency with Saudi Arabia and his placement, at Saudi Arabia's direction, as a consular employee in Los Angeles. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce

as well as any supporting documents submitted therewith or relied upon.

### 3.    Travel Records

Saudi Arabia produced documents regarding Thumairy's travel from 1998 to 2002. These records show that Thumairy requested a 19-day leave of absence

in June 1998. Rapawy Decl., Exhibit 17, at 591. That request was subsequently approved. Id., Exhibit 18, at 2768.

Id., Exhibits 19 & 20, at 2802, 2783. In addition, Saudi Arabia produced documents showing



Pounian Decl., Exhibit 36, at 1535, 1720. The documents indicate that Thumairy ████ ████████████████████████████████████████████████ Id.

Plaintiffs seek records regarding the purpose and authorization for Thumairy's ████ ████████████████ Proposed Order, ¶ 19. Although Plaintiffs are correct that this information was not produced, the Court is not convinced that additional searches will yield responsive documents. Plaintiffs can inquire into ████████████████████ during Thumairy's deposition. Accordingly, Plaintiffs' request is DENIED.

Plaintiffs also seek records about an alleged trip to Denmark on September 11, 2001. Proposed Order, ¶ 19. There is some evidence that this trip occurred: an online Saudi newspaper shows that Thumairy was scheduled to deliver a lecture at a prison in Copenhagen on the relevant date. Pounian Decl., Exhibit 37. Plaintiffs are mistaken, however, that Saudi Arabia has not produced responsive documents. See Pl's Br., at 13. For example, Saudi Arabia's production shows that Thumairy was granted a 26-day leave of absence starting on August 28, 2001, and that he did not qualify for "free airfare." Rapawy Decl., Exhibits 21 & 22, at 584, 2765. Because Thumairy was not working during his travel to Denmark, there is no reason to think that Saudi Arabia will have additional documents regarding the trip.

Finally, Plaintiffs argue that, based on Thumairy's passport, he made at least 10 trips to Saudi Arabia between 1996 and 2003. Pl's Br., at 13. Plaintiffs seek documents regarding Thumairy's "work and business meetings" during these trips. Id. But Plaintiffs provide no evidence that Thumairy was traveling in his capacity as a Saudi employee, let alone that he was working and attending meetings. If anything, the records produced thus far show that ████████████ ████████████████████████████████ See, e.g., Rapawy Decl., Exhibits 17, 19, 20. Plaintiffs' document demand is therefore DENIED. See Proposed Order, ¶ 20.

### 4.      Thumairy's Special Passport

Saudi Arabia produced a color-copy of Thumairy's special passport, which was issued on April 4, 1996. Rapawy Decl., Exhibit 23, at 6882. Plaintiffs request that the Court order Thumairy to make his special passport available for inspection by Plaintiffs. Proposed Order, ¶ 22. That request is DENIED. Rule 34 expressly allows a responding party to "produce copies of documents" rather than "permitting inspection." Fed. R. Civ. P. 34(b)(2)(B). In addition, the numbering on the passport, clearly visible in the top left-hand corner, shows that no part of the passport was omitted. Rapawy Decl., Exhibit 23. On these facts, the Court will not require Saudi Arabia to produce Thumairy's special passport for inspection.

Plaintiffs also contend that Thumairy's passport shows that he did not have a U.S. visa at certain points between 1996 and 2000. Pl's Br., at 14. But this suggests that Thumairy's visa was expired during these periods, not that additional documents exist. Again, the numbering on Thumairy's special passport indicates that the entire document was produced. The Court cannot compel production of what does not exist. Accordingly, Plaintiffs' request is DENIED. See Proposed Order, ¶ 21.

### I.      Minutes from the 2003 Meeting

On June 2, 2003, following instructions from the Minister of Islamic Affairs, two MOIA employees, including the MOIA undersecretary, convened a meeting to study the "problems" of some of the propagators in the United States and Great Britain. Pounian Decl., Exhibit 40, at 556–57. Those problems included, among other things, communicating in good faith with "suspicious persons in the name of [the propagators'] official work." Id. at 557. The employees made a general recommendation, concluding that the "controls and rules" discussed by a September 2002 committee should be implemented. Id. at 557–58. Those rules analyzed how

MOIA delegates should interact with "Islamic associations . . . in Western countries" and were designed to ensure "the non-exploitation of delegates . . . by any suspicious entity." Id. at 558. The employees then provided specific recommendations for delegates in America and Britain. Id. at 558–60. Referencing Thumairy by name, the employees noted his recent "arrest and return to Saudi Arabia" and concluded that his deployment should be terminated because "his return to America is not possible now." Id at 558.

The 2003 minutes — and the "controls and rules" mentioned therein — describe Saudi Arabia's response to problems facing propagators in the United States, including their communication with "suspicious persons." Evidence suggests that ███████████████ ███████████ among other things, ███████████████████████████████ ███████████████████████████. Rapawy Decl., Exhibit 7, at 6861. ███ ███████████████████████████████████████████████ ███████████████████████ Id. Thus, because the 2003 meeting involves Saudi Arabia's review and potential ratification of Thumairy's work, it is relevant to the Court's jurisdictional inquiry. See Reiss, 185 F. Supp. 2d at 338 ("[A] party's ratification, that is, subsequent approval of an agent's performance, may support a finding of jurisdiction under the FSIA.").

Saudi Arabia must conduct three targeted searches. First, Saudi Arabia must search for and produce the April 15 letter referenced in the 2003 minutes. The letter contains "directives" from the Minister of Islamic Affairs and may be the genesis of the meeting. Second, Saudi Arabia must search for and produce the September 2002 minutes detailing the "controls and rules" to be implemented by MOIA. The June 2003 minutes indicate that these "controls" were created by MOIA, MOFA, the Ministry of the Interior, and the "Intelligence." Pounian Decl.,

Exhibit 40, at 557–58. In this regard, Plaintiffs have made a specific showing that a particular document may be located in an agency outside of the five repositories identified in the May 24 Order. Therefore, to the extent Saud Arabia cannot locate the 2002 minutes in MOIA, it should conduct additional searches for the 2002 minutes (and only the 2002 minutes) in the other agencies involved in the committee.

Third, Saudi Arabia must search for and produce (1) any documents that the employees relied on to recommend Thumairy's termination; and (2) any documents regarding Thumairy that were created in response to the 2003 minutes.[13] Saudi Arabia may limit its searches to those agencies identified in the May 24 Order, and it need only search from September 11, 2001, until December 31, 2003. See Proposed Order, ¶ 23 (requesting that date range). Although these documents are outside of the discovery period, the 2003 minutes provide sufficient evidence that responsive documents may exist.

### J.      Documents from the Office of Prince Abdulaziz

On July 12, 2019, the FBI produced its fifth tranche of documents to Plaintiffs and Saudi Arabia. Relying on this production, Plaintiffs contend that Saudi Arabia must search the Offices of Prince Abdulaziz for "responsive documents." See Plaintiffs' July 15, 2019 Letter, at 1. Broadly, Plaintiffs assert that Saudi Arabia must search for documents concerning (1) the identity of Thumairy's supervisors; and (2) any directives or tasks issued to Thumairy. Id. at 2. The Court agrees that a targeted search of the Office of Prince Abdulaziz is appropriate.

Plaintiffs emphasize a July 2003 FBI Report regarding  The report states that,

---

[13] The minutes state that the employees "previewed" "information" that was provided by the "Deputy Minister for Mosques, Da'awah, and Guidance." Pounian Decl., Exhibit 40, at 558. In addition, although unmentioned by the parties, the Court notes that Plaintiffs' Exhibits 16 and 63 may be examples of responsive documents.



Id., Exhibit 1,

Id.

Id.

Id.

According to Saudi Arabia, the

See Saudi Arabia's July 17, 2019 Letter, at 2. The ▮▮▮▮▮ do not provide a basis for additional searches, Saudi Arabia contends, because there is "no evidence" that they are "linked to the 9/11 attacks or to the hijackers." Id. at 3. Even if true, this argument is unpersuasive. Plaintiffs are entitled to records concerning Thumairy's employment and compensation *vis a vis* the Saudi government. Thus far, searches for those types of documents have been limited to the Embassy, the Consulate, and the MOIA, because those were the most likely locations to find responsive materials. Based on the July 2003 report, however, it is likely that Thumairy also received assignments and compensation from the Offices of Prince Abdulaziz. Although this Office is outside the five repositories identified in the May 24 Order, Plaintiffs have provided specific evidence to support their belief that responsive documents will be located.

Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce any documents from the Offices of Prince Abdulaziz regarding (1) the identity of Thumairy's supervisors, if any; and (2) any tasks or directives issued to Thumairy, including any instructions regarding ███████████████████████████████████████. Saudi Arabia may limit its search from 1998 until 2002.

## III.     Document Requests Concerning Bayoumi

### A.     Bayoumi's Duties and Responsibilities

Bayoumi, a long-serving employee of the PCA, was seconded to Dallah Avco in the summer of 1995. Rapawy Decl., Exhibit 29, at 1024. Saudi Arabia provided an interrogatory response stating that Bayoumi was seconded to "pursue his education in the United States and Britain." Pounian Decl., Exhibit 5, at 18. Bayoumi was not unique in this regard, as it appears Dallah Avco subsidized the education of various Saudis as part of a "routine and continuous" program. Rapawy Decl., Exhibit 39, at 708; see also Pounian Decl., Exhibit 50, at 515 n.18 (second-hand witness statement that Bayoumi was "one of many Saudis" on Dallah Avco's payroll who was not required to work). Other documents confirm that Bayoumi was a student while living in the United States. From 1995 through January 1998, Bayoumi earned a Master in International Business Administration. Although he registered for a second graduate degree and received various educational certificates, it is less clear that Bayoumi was actively taking classes after this point. That changes in August 2001, however, when Bayoumi traveled to the United Kingdom to become a full-time research student. See infra, pp. 38–40.

In their moving papers, Plaintiffs contend that Bayoumi's secondment to Dallah Avco was a "cover job" designed to conceal the true nature of his employment. Pl's Br., at 15. For this reason, Plaintiffs argue, Saudi Arabia should search its intelligence agencies, Ministry of

Defense, and Ministry of the Interior, for documents concerning Bayoumi's "actual duties and responsibilities." Proposed Order, ¶ 24. This argument is unavailing. Crucially, Plaintiffs fail to establish a connection between Bayoumi and agencies they propose to be searched. Plaintiffs rely heavily on the FBI's recent document production. To the extent that evidence has value, ████

████████████████████████████████████████████████████████████

████ [14] It does not, however, demonstrate a relationship (or suggest one might exist) between Bayoumi and the Ministry of Defense or the Saudi intelligence services. Accordingly, Plaintiffs' request is DENIED.

**B.      Bayoumi's Original Secondment**

In a letter to Saudi Arabia in May 1995, Dallah Avco stated that it was "in dire need for [Bayoumi's] services" as an accountant. Pounian Decl., Exhibit 43, at 1029. It therefore requested that Bayoumi be seconded to Dallah Avco for a one-year period. Id. Saudi Arabia approved this request the following month, stating that Bayoumi's secondment was intended to "strengthen the cooperation between the public sector and private sector." Rapawy Decl., Exhibit 29, at 1024. As discussed above, however, later documents indicate that Bayoumi was sent to the United States to "complete his higher education." Id., Exhibit 30, at 707. This latter explanation is supported by Saudi Arabia's interrogatory answer. Pounian Decl., Exhibit 5, at 18.

Given the disconnect between Saudi Arabia's document production and interrogatory response, additional searches are warranted. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce documents concerning Bayoumi's 1995 secondment

---

[14] See, e.g., Exhibit 17, ████ Exhibit 50, at 515 n.13, Exhibit 78, at 8 ████ ████ ); Exhibit 17, ████ Exhibit 71, at 229, 516 nn.24 & 26, 517 n.33; Exhibit 86, at 5, 23, 42 ████ ; Exhibit 17, ████ ; Exhibit 27, at 2; Exhibit 56, at 14 & Exhibit 81; ████

████ All exhibits are contained in the Pounian Declaration or the Pounian Reply Declaration.

to Dallah Avco, including the reasons for that secondment. To ensure all responsive documents are located, Saudi Arabia must look for documents beginning in 1995.

In addition, the document granting Bayoumi's secondment references a letter approving that decision from the "Deputy Minister of Defense and Civil Aviation and the General Inspector of Civil Aviation Affairs." Rapawy Decl., Exhibit 29, at 1024. Similar references are found in the renewals of Bayoumi's secondment. Id., at Exhibits 34–37, at 709–711, 813 (collectively, the "Approval Letters"). The Approval Letters suggest that a senior official associated with the Ministry of Defense provided at least nominal supervision of Bayoumi's employment. Although Saudi Arabia has produced at least one of these documents, see Pounian Decl., Exhibit 44, it should produce the rest as well. Because the Approval Letters are identified by date and letter number, this search will not impose an undue burden. Thus, to the extent these documents cannot be located in the PCA, Saudi Arabia must also perform a targeted search in the Ministry of Defense.

Contrary to Plaintiffs' contention, broader searches of the Ministry of Defense (or the Saudi intelligence services) are inappropriate. Saudi Arabia produced the Deputy Minister's Approval Letter from 1998. That document was located *in the PCA*, suggesting relevant materials form the Ministry of Defense will be found without searching that agency. Further, the 1998 letter does not suggest that additional documents exist. The letter is brief, simply acknowledging the request to renew Bayoumi's secondment and concluding that "[t]here is no objection." Pounian Decl., Exhibit 44, at 4350. The letter does not reference other materials or otherwise suggest broader discussions were ongoing regarding Bayoumi's employment. Under these circumstances — and given the respect owed to Saudi Arabia as a foreign sovereign in

jurisdictional discovery — the Court finds that the likely benefit of searching the Ministry of Defense is outweighed by its corresponding burden.

### C.   The First Four Renewals of Bayoumi's Secondment

At Dallah Avco's request, Saudi Arabia renewed Bayoumi's one-year secondment in 1996, 1997, and 1998. Rapawy Decl., Exhibits 34–36, at 709–711. In 1999, however, Dallah Avco stated that "it [did] not want to renew [Bayoumi's] secondment" for another year. Pounian Decl., Exhibit 45, at 1101. Mohamed Ahmed al-Salmi, an official in the PCA, responded that "HQ desires to second [Bayoumi] for one year only to complete the task for which the HQ agreed upon his secondment." Id., Exhibit 46, at 1104. Salmi "hope[d]" that Dallah Avco would renew Bayoumi's employment and instructed the company to "draft a letter and serve it on the HQ . . . with all due speed." Id. Dallah Avco subsequently changed course, submitting a brief letter requesting an extension of Bayoumi's secondment. Id., Exhibit 47, at 1110. That request was ultimately approved. Rapawy Decl., Exhibit 37, at 813.

Despite directly involving the PCA, none of the communications in 1999 was produced by Saudi Arabia. This suggests that Saudi Arabia's search for responsive documents was insufficient. Accordingly, within 45 days of this Order, Saudi Arabia is directed to search for and produce documents concerning the fourth renewal of Bayoumi's secondment to Dallah Avco. Because these communications were between Dallah Avco and the PCA, Saudi Arabia is not required to search the Ministry of Defense or the Saudi intelligence agencies.

### D.   The Fifth Renewal of Bayoumi's Secondment

The following year, on April 15, 2000, Salmi stated that Bayoumi had "resumed his work" in Saudi Arabia. Pounian Decl., Exhibit 48, at 4383. This statement was confirmed by the PCA's Director of Employment, who wrote on the same day that Bayoumi had "finished his

39

lending term" and "returned to his job." Rapawy Decl., Exhibit 38, at 704. Later, on May 11,

2000, Salmi requested a "study leave" for Bayoumi. See Pounian Decl., Exhibit 48, at 888.

Although this request appears to have been denied on May 16 by the Director of Personnel

Affairs, it was subsequently approved on May 23 by the President of Civil Aviation. Id. at 888,

1434; Rapawy Decl., Exhibit 39, at 872. Specifically, Bayoumi was permitted "a two-year

academic leave of absence without pay" so that he could "pursue graduate studies in the United

States." Id.

   Based on these documents, Saudi Arabia contends that "Bayoumi's secondment ended in

April 2000, after which he was given a two-year leave to pursue his studies further." Pounian

Decl., Exhibit 6, at 3. On May 30, 2000, however, Bayoumi's secondment to Dallah Avco was

renewed for a fifth time. Id., Exhibit 49, at 82. Bayoumi was given a new job title, and his

secondment was backdated to April 13, 2000. Id. This document was created by the PCA, but

was not included in Saudi Arabia's production. As a result, there is reason to believe that Saudi

Arabia's searches were insufficient. Accordingly, within 45 days of this Order, Saudi Arabia is

directed to search for and produce documents concerning the fifth renewal of Bayoumi's

secondment to Dallah Avco in May 2000. Saudi Arabia need not search any agencies outside of

those identified in the Court's May 24 Order.

   ### E.    Bayoumi's Pay Records

   Plaintiffs seek documents concerning Bayoumi's pay records, including those related to

an alleged increase in Bayoumi's stipend in April 2000. Proposed Order, ¶ 28. This request is

DENIED. In its interrogatory response, Saudi Arabia stated that it paid Dallah Avco a lump sum

pursuant to Dallah Avco's contract with the PCA. Pounian Decl., Exhibit 5, at 19. Saudi Arabia

further stated, however, that it did not determine or approve compensation of particular seconded

employees. Id. Thus, it was Dallah Avco, and not the PCA, who "paid [Bayoumi's] salary and made decisions concerning his compensation." Id.

The document production supports Saudi Arabia's position. Bayoumi's original secondment — as well as his first four renewals — indicate that "Dallah Avco . . . will be responsible for [Bayoumi's] wages and allowances." Rapawy Decl., Exhibit 29, at 1024; Exhibits 34–37, at 709–711, 813 (using similar language). Saudi Arabia also had a general policy that the salary of a seconded employee is "to be stopped from the date he leaves" and that the "seconding entity" may be required to "bear all or part of the [employee's] salary." Pounian Decl., Exhibit 48, at 937. Consistent with these documents, Dallah Avco's privilege log indicates that it possesses documents regarding Bayoumi's "monthly salary" from September 6, 1995, until May 12, 2002. Id., Exhibit 49, at 2. These documents were addressed from Dallah Avco to Bayoumi. Id. Thus, to the extent Bayoumi received a monthly salary or was given a raise in April 2000, the evidence suggests that Dallah Avco, not Saudi Arabia, will have responsive documents. In any event, Saudi Arabia has searched for payment records and produced what it has found. Rapawy Decl., Exhibits 42–44. Based on this evidence, the Court will not order Saudi Arabia to perform additional searches for documents concerning Bayoumi's compensation.

F.    **Bayoumi's Work at the PCA**

Plaintiffs seek documents concerning Bayoumi's work at the PCA between April and May 2000. Proposed Order, ¶ 29. In doing so, however, Plaintiffs make no attempt to challenge Saudi Arabia's assertion that no additional responsive documents exist. See Pl's Br., at 20; Def's Br., at 19. Accordingly, their request is DENIED.

### G.      Bayoumi's Work Computer

In their initial set of discovery demands, Plaintiffs sought documents concerning "any task, duty, assignment, job, act, or initiative" performed by Bayoumi at the direction of the Saudi government. ECF No. 4004-1, ¶ 29. As part of its response, Saudi Arabia produced electronic records from Bayoumi's work computer from 1998 until 2002. Def's Br., at 20. Plaintiffs demand that Bayoumi's computer be produced for inspection. Proposed Order, ¶ 30. This request is DENIED.

Rule 34 of the Federal Rules of Civil Procedure allows a party to "inspect, copy, test, or sample" another party's electronically stored information. Fed. R. Civ. P. 34(a)(1)(a). This provision, however, is "not meant to create a routine right of direct access to a party's electronic information system." Notes of Advisory Committee on 2006 Amendments. For this reason, a party can inspect an adversary's computer only under limited circumstances, such as when the litigant has "tampered with the computer or hidden relevant materials." Lifeng Chen v. New Trend Apparel, Inc., No. 11-CV-324 (GBD) (MHD), 2012 WL 4784855, at *1 (S.D.N.Y. Oct. 2, 2012) (collecting cases).

Here, Plaintiffs contend that Saudi Arabia has hidden relevant materials. Pl's Reply Br., at 9. They reason that, despite searching a "work" computer, Saudi Arabia produced "no evidence that Bayoumi received any instruction or did any work." Id. Plaintiffs' speculation, however, is not evidence that Saudi Arabia's production was incomplete. The Court will not permit Plaintiffs to inspect Bayoumi's laptop "merely because [they] want[] to search for additional documents." See Ameriwood Indus., Inc. v. Liberman, No. 06-CV-524 (DJS), 2006 WL 3825291, at *4 (E.D. Mo. Feb. 23, 2007) (citing McCurdy Group v. Am. Biomedical Grp., Inc., 9 F. App'x 822, 831 (10th Cir. 2001)). If Plaintiffs obtain evidence that suggests Saudi

Arabia failed to produce certain records — such as, for example, deposition testimony from Bayoumi regarding the use of his laptop — they may move at that time for any appropriate relief. See Piccone v. Town of Webster, No. 09-CV-6266 (MWP), 2010 WL 3516581, at *9 (W.D.N.Y. Sept. 3, 2010) (providing similar relief).

### H.    Bayoumi's Status as a Student

Saudi Arabia produced numerous documents regarding Bayoumi's education. Between August 1994 and May 1995, Bayoumi completed a "non-credit English program" and an "intensive course in English" at San Diego State University. Rapawy Decl., Exhibit 45, at 6794; Exhibit 46, at 6795. ███████████████████████████████████████ ███████████████████████████████████████ Id., Exhibit 47, at 6797. ███████████████████████████████████████████████████ ████████ Id., at 1837–39. ██████████████████████████████████ ████████ Id., Exhibit 49, at 908. He took classes throughout 1997, ultimately earning his Master's degree on December 9 of that year. Id.; Exhibit 48, at 905.

Although more disrupted, Bayoumi's studies continued after earning his graduate degree. In June 1998, he received "certifications of completion" from San Diego Community College for Small Business Management and Introduction to Computers. Id., Exhibit 57, at 739; Exhibit 59, at 741. Subsequently, in November 1998, Bayoumi was admitted to the Keller Graduate School of Management to pursue a Master of Business Administration. Pounian Decl., Exhibit 54, at 68. ███████████████████████████████████████████████████ Rapawy Decl., Exhibit 60, at 6647. Nevertheless, Bayoumi's transcript shows that he withdrew

from classes during the November 1998 session and that he received an "unsatisfactory" during the June 1999 session. Pounian Decl., Exhibit 54, at 68.[15]



Rapawy Decl., Exhibit 50, at 6660 ████████████ Exhibit 61, at 6661 ██████

████████████ Id. It is unclear whether Bayoumi actually registered for classes during this period. In October 2000, however, Bayoumi was offered a position as a full-time research student at Aston Business School in the United Kingdom. Id., Exhibit 56, at 6801. █████████ ████████████████████████████████████████████ he was eventually awarded a Master of Science by Aston University in May 2002. Id., Exhibit 62, at 6643; Exhibit 55, at 724.

It is clear, therefore, that Saudi Arabia has searched for and produced documents regarding Bayoumi's education. Plaintiffs' speculation that Saudi Arabia must possess "progress reports concerning [Bayoumi's] studies" and "substantive documents regarding his coursework" is unfounded. See Proposed Order, ¶ 31. Accordingly, Plaintiffs' request for additional documents is DENIED.

## I.     Other Payments to Bayoumi

### 1.     Payments from the Ministry of Finance

Plaintiffs seek documents located at the Ministry of Finance regarding any payments to Bayoumi. Proposed Order, ¶ 32. As evidence that these documents exist, Plaintiffs cite a December 2002 report from the United States legislative intelligence committees. Pl's Br., at 21.

---

[15] It seems that Bayoumi visited Washington, D.C., during this time period, perhaps explaining his transcript at Keller. Between May 1999 and March 2000, Bayoumi completed seven continuing education courses at the School of Business and Public Management at George Washington University. Pounian Decl., Exhibit 53, at 1841. These courses were each a few days long, see Rapawy Decl., Exhibits 52–54, and Bayoumi eventually earned a Master's Certificate in Project Management on March 3, 2000. Id., Exhibit 51, at 906.

The report states that the FBI located records indicating that Bayoumi, "at one point," received "$20,000 from the Saudi Ministry of Finance." Pounian Decl., Exhibit 56, at 423. Although second-hand, this evidence is sufficient to justify a targeted search for documents. Accordingly, Saudi Arabia is directed to search for and produce any payments to Bayoumi made by the Ministry of Finance, including the alleged $20,000 payment. Saudi Arabia must search for records only between 1998 and 2002.

### 2.    The Alleged $37,000 Payment

Plaintiffs claim that Bayoumi received $37,000 on January 15, 2000, the day the hijackers arrived in Los Angeles. Pl's Br., 21. To support their contention, Plaintiffs cite a list of "Follow-Up Questions" prepared by the 9/11 Commission. Pounian Decl., Exhibit 57. The relevant question provides:

> Does the record evidence of deposits into Bayoumi's San Diego bank accounts preclude the possibility that he received four wire transfers on or about 15 January 2000 (as were reported by Scotland Yard) in cash (in other words, has the FBI concluded that the $10k, $15k, $2k, and $10k transfers were never even made from Bayoumi's Bank of America in Saudi Arabia, or merely that no such transfers were received in Bayoumi's San Diego accounts)?

Id., at 5. Although poorly phrased, the question provides at least some evidence that Bayoumi received several wire transfers on the day the hijackers arrived in Los Angeles. Plaintiffs are entitled to discovery to verify this allegation. Accordingly, within 45 days of this Order, Saudi Arabia should search the PCA and the Ministry of Finance for documents regarding any wire transfers to Bayoumi on January 15, 2000.

### 3.    The Alleged $400,000 Donation

The December 2002 report also noted that Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." Pounian Decl., Exhibit 58, at 174. According to an FBI source,

Bayoumi delivered $400,000 to a Kurdish mosque in San Diego. Id. Plaintiffs admit, however, that Bayoumi received these funds from a Saudi businessman, not the Ministry of Finance or another component (or agent) of the Saudi government. Pl's Br., at 21; Pounian Decl., Exhibit 17, ███████████████████████████████████████████ ████████████████████████████ As a result, the Court has no basis to conclude that Saudi Arabia possesses relevant documents. That the donation ultimately went to a mosque where two Saudi propagators may have worked is insufficient to warrant a broad search for documents. See Pounian Decl., Exhibit 59, at 11. Accordingly, Plaintiffs' request at paragraph 34 of their Proposed Order is DENIED.

### J.    Bayoumi's Passports

Saudi Arabia produced documents regarding two of Bayoumi's passports. First, Saudi Arabia produced ████████████████████████████████████████████ Rapawy Decl., Exhibit 63, at 1833; Exhibit 64, at 6644. Those documents were collected from the Saudi Arabian Cultural Mission and the Saudi Embassy in Washington, D.C. Pounian Decl., Exhibit 7-H, at 8. Second, Saudi Arabia produced two copies of a passport issued on February 1, 2000, at the Los Angeles Consulate. Rapawy Decl., Exhibit 32, at 2332; Exhibit 65, at 1180. One version, containing only the photo page, was collected from Bayoumi; the other version, containing 18 non-sequential pages, was collected from the PSS. Pounian Decl. Exhibit 7-H, at 8; Exhibit 60, at 1180–88.

Saudi Arabia contends that it produced all responsive documents located in a reasonable search. Def's Br., at 22. Plaintiffs, however, point to specific evidence to challenge the adequacy of Saudi Arabia's searches; namely, that Bayoumi's February 2000 passport does not contain pages 4–5, 14–19, and 26–48. Pounian Decl., Exhibit 60, 1180–88. Accordingly, Saudi Arabia is

directed to search for and produce the complete passport issued to Bayoumi on February 1, 2000.

Saudi Arabia appears to have obtained the longer version of Bayoumi's passport from the PSS.

See Def's Br., at 22 (stating that the copy collected from Bayoumi contained only the

information page and the opposing page). If that is correct, Saudi Arabia's search should again

include that agency. This is (1) a targeted search (2) for a specific document (3) that is relevant

to Plaintiffs' claims and (4) that cannot be obtained through alternative means, i.e. through third-

party discovery. Accordingly, international comity does not demand a different outcome. See

Catalano, 2016 WL 3406125, at *6 (identifying factors that guide a comity analysis in the

discovery phase).

### K.    Bayoumi's Travel

Plaintiffs seek documents regarding Bayoumi's "travels, trip requests, and justification."

Proposed Order, ¶ 36. But Saudi Arabia has already searched for these types of documents. See

Pounian Decl., Exhibit 61, at 6461; Rapawy Decl., Exhibit 66, at 6464. Moreover, there is no

reason to think that Saudi Arabia's production was incomplete. Although Bayoumi seems to

have spent a limited amount of time in Washington, D.C., he was seconded at Dallah Avco at

this point, not working for the PCA. Accordingly, Plaintiffs' requests for more documents is

DENIED.

## IV.    Plaintiffs' Remaining Document Requests

### A.    The Hijackers' Passports

According to a U.S. government report, three of the 9/11 hijackers were carrying Saudi

passports "containing a possible extremist indicator present in the passports of many al Qaeda

and other terrorists." Pounian Decl., Exhibit 62, at 2. The 9/11 Commission similarly noted that

Bayoumi's passport contained a "cachet that intelligence investigators associate with possible

adherence to al Qaeda." Pounian Decl., Exhibit 50, at 516 n.19. Taken together, this evidence suggests that the hijackers' passports are relevant to the Court's jurisdictional inquiry: if, for example, the hijackers' passports have the same terrorist marker as Bayoumi's, then Saudi Arabia may have had prior knowledge of Bayoumi's alleged extremism. Moreover, given that the hijackers' passports are specific, easily-identifiable documents, there is no concern of imposing an undue burden on Saudi Arabia. For these reasons, within 45 days of this Order, Saudi Arabia is directed to search for and produce the passports of the 9/11 hijackers from Saudi Arabia. See Proposed Order, ¶ 37.

### B.    The 9/11 Commission Interviews

The 9/11 Commission interviewed Bayoumi and Thumairy in Saudi Arabia in October 2003 and February 2004. Pounian Decl., Exhibit 11. The Commission produced memoranda of the interviews, which indicate that officials from the PSS were present. Id. Based on this information, Plaintiffs seek Saudi Arabia's "recordings, transcripts, transcriptions, and notes," as well as any documents that Saudi Arabia used to prepare Bayoumi and Thumairy. Proposed Order, ¶ 38. International comity — and the Federal Rules of Civil Procedure — foreclose Plaintiffs' request at this time.

Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly. Bell v. Andy's Car Co., No. 05-CV-7182 (LTS) (RLE), 2008 WL 835641, at *1 (S.D.N.Y. Mar. 28, 2008) (citing Crawford-El v. Britton, 523 U.S. 574, 598 (1998)). In exercising this discretion, the Court must consider, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the value of Plaintiffs' proposed discovery is low because they have already obtained detailed memoranda from the 9/11 Commission. The memoranda outline Thumairy and Bayoumi's statements closely, including

their demeanor and overall reactions. See Pounian Decl., Exhibit 11. The burden, on the other

hand, remains quite high, as Plaintiffs seek access to a foreign sovereign's intelligence files. This

is particularly true given the Court's obligation to manage jurisdictional discovery circumspectly

and to exercise "special vigilance" in protecting Saudi Arabia from unnecessary expense. See

Société Nationale Industrielle, 482 U.S. at 546. Because this burden outweighs any potential

benefit, Plaintiffs' request is DENIED.

**C.     The Islamic Center of San Diego ("ICSD")**

Plaintiffs seek documents concerning the relationship between the ICSD, a San Diego

Mosque, and Thumairy, Bayoumi, Sowailem, and the hijackers. Pl's Br., at 23. To support their

request, Plaintiffs argue that the ICSD was the "center of the hijackers' support network." Id.

This claim, however, is based largely on speculation and guilt-by-association. See, e.g., Pounian

Decl., Exhibit 11, at 4 (statement from Bayoumi, contradicted elsewhere, that he saw the

hijackers at the ICSD when they first arrived in San Diego); Exhibit 17, ███████████████

██████████████████████████████████; id. ██████████████████

████████████████████████████████████████████████

████; id. ██████████████████████████████████████

██████████████████████████████ Plaintiffs also point to the report created by

the 9/11 Commission. ECF No. 3669-1 (the "9/11 Report"). The 9/11 Report noted that Hazmi

persuaded the administrator of the ICSD to let him use the administrator's bank account to

receive a $5,000 wire transfer from Dubai. Id. at 220. This hardly suggests that the ICSD was the

"hub" of the hijackers' support network; indeed, the 9/11 Report also notes that the members of the ICSD were "well-meaning" in their interactions with the hijackers. <u>Id.</u>

In any event, it is unclear why *Saudi Arabia* would possess responsive documents. As noted in the ICSD's response to Plaintiffs' subpoena, the ICSD has "never had a financial relationship with [Saudi Arabia]," and it has "never worked with [MOIA], the Saudi Embassy, the Saudi Consulate in Los Angeles, or the [PCA]." Pounian Decl., Exhibit 64, at 4. Plaintiffs contend that a Saudi employee was the ICSD's imam during the relevant period. Even if true, that does not show that Saudi Arabia would have documents regarding *Bayoumi or Thumairy's* relationship with the Mosque. Accordingly, Plaintiffs' request is DENIED.

**D.** ████████████





████████████████████████████████████████████████████ Id.

██

Plaintiffs' request for documents concerning ████████████████████████

██████████████████████ is overbroad. Proposed Order, ¶ 40. Nevertheless, given ██

██████████████████████████████████████

████, targeted discovery regarding their trip is appropriate. Accordingly, within 45 days of

this Order, Saudi Arabia is directed to search for and produce any documents concerning ████

██████████████████████████████████████

██████████████████ Saudi Arabia should search for documents between November

1999 and January 2000.

**E.     Sowailem's Phone Records**

Plaintiffs, relying on a redacted FBI report, contend that Bayoumi called Sowailem 30

times while the hijackers were in Los Angeles and San Diego. Pl's Br., at 24. Based on this

evidence, Plaintiffs seek documents showing Sowailem's phone records at the Embassy from

November 1999 through June 2000. Proposed Order, ¶ 41. This request is DENIED. Although

Bayoumi seems to be the subject of the report, it is somewhat difficult to determine who actually

called Sowailem's number.[16] In any event, Saudi Arabia has searched for Sowailem's telephone

---

[16] At the start of the "Telephone Numbers" section, the report provides: "[a] review of the following calls indicate a total 141 of call5 made by telephone numbers associated with [REDACTED] to entities of the Saudi Arabian overnment in the Washington, D.C. araa." Pounian Reply Decl., Exhibit 81, at 110 (mistakes in original). Similarly, under the section describing the calls to Sowailem's number, the report

records at the Embassy and found none. Def's Br., at 24. Absent evidence that these searches were insufficient, no further relief is warranted.

### F.      Videos or Photographs of Bayoumi, Thumairy, and the Hijackers

Bayoumi hosted a party in February 2000, which was attended by the hijackers and other members of the Muslim community. 9/11 Report, at 219. Hazmi and Mihdhar reportedly spent most of the party by themselves in a back room. Id.; ████ Pounian Decl., Exhibit 17, ████ ████████████████████████████████████████████████████. Although one witness recalled that the party was intended to welcome Hazmi and Mihdhar to the community, other evidence suggests that it was organized to honor a visiting sheikh. Id. at 516 n. 25.

At Bayoumi's request, another attendee videotaped the gathering with Bayoumi's video camera. 9/11 Comm'n Report, at 219. Plaintiffs contend that Saudi Arabia should search its intelligence agencies, the Ministry of Defense, the Ministry of Foreign Affairs, and the Ministry of the Interior for the videotape. Proposed Order, ¶ 42. It is unclear, however, why these agencies would have received a copy of the video. Plaintiffs argue that it is "likely" that Saudi Arabia possesses a copy, at least in part because the FBI managed to obtain one. Pl's Br., at 24. But this is mere speculation and does not support a broad search of agencies outside the scope of the March 28 Order. Accordingly, Plaintiffs' request is DENIED.

---

states: [t]his number was called 30 times from [REDACTED]. . . . In addition, this number was called 21 times from [REDACTED]." Id. at 115. A joint congressional report indicates these calls were from Bayoumi. Pounian Decl., Exhibit 56, 423–24.

V.     **Requests for Answers to Interrogatories**

A.     **Additional Repositories**

As part of their second interrogatory,[17] Plaintiffs request that Saudi Arabia identify "all Kingdom repositories where Thumairy and Bayoumi documents are located." Pl's Br., at 24; Pounian Decl., Exhibit 2, at 11. In a similar vein, Plaintiffs also request that Saudi Arabia provide "amended answers based on all of the information in its possession or available to it." Proposed Order, ¶ 45. Both requests are DENIED.

Saudi Arabia answered Plaintiffs' interrogatory by describing the places where documents were found as a result of Saudi Arabia's search. Def's Br., at 24. Given the scope of discovery authorized by the March 28 Order, that response was sufficient. To identify "all repositories" or answer based on "all . . . information in its possession," Saudi Arabia would have to search dozens of agencies, including its intelligence services. That type of unrestricted search — untethered to the allegations identified in the March 28 Order — is inconsistent with the limited jurisdictional discovery authorized by Judge Daniels and permitted under the FSIA. Of course, to the extent necessary, Saudi Arabia must amend its interrogatory answers based on the additional searches it performs to comply with this Order. See Fed. R. Civ. P. 26(e)(1). That compliance will include targeted searches of agencies outside of the original five identified by the Court. Contrary to Plaintiffs' contention, no more is required.

B.     **Identity of Saudi Arabia's Witnesses**

Finally, Plaintiffs contend that Saudi Arabia must "identify the names of each witness who provided the information upon which its interrogatory answers were based." Pl's Br., at 25. This request is DENIED.

---

[17] The briefing refers to Plaintiffs' Interrogatory No. 1. Pl's Br., at 24; Def's Br., at 24. Context, however, indicates that the parties dispute Saudi Arabia's answer to Interrogatory No 2.

Generally, a party is "free to ask for names of persons with knowledge of the facts." Seven Hanover Assocs., LLC v. Jones Lang LaSalle Americas, Inc., No. 04-CV-4143 (PAC) (MHD), 2005 WL 3358597, at *1 n.1 (S.D.N.Y. Dec. 7, 2005). Plaintiffs, however, seek the identities of those who actually participated in Saudi Arabia's case preparation. This type of information is protected by the work product doctrine. See Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199, 232–33 (E.D.N.Y. 2007) ("[I]nformation regarding individuals who assisted plaintiffs' counsel with the preparation of their interrogatory responses . . . is protected work product."); Tracy v. NVR, Inc., 250 F.R.D. 130, 132–33 (W.D.N.Y. 2008) (same, citing Strauss). Thus, while Plaintiffs may ask for the identities of persons with knowledge, they are not entitled to the "identification of who among such knowledgeable individuals have been interviewed." Seven Hanover Assocs., 2005 WL 3358597, at *1 n.1.

## CONCLUSION

Plaintiffs' motion to compel is GRANTED in part and DENIED in part. Saudi Arabia shall perform the required searches within 45 days of this Order.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 4266.

**SO ORDERED.**

DATED:   July 22, 2019
         New York, New York

SARAH NETBURN
United States Magistrate Judge