EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM) ECF Case |
|---|---|

*This document relates to All Actions*

### DECLARATION OF CATHERINE MANNHERZ HUNT

I, Catherine M. Hunt, being duly sworn, declare and state as follows:

1. I previously submitted a series of Declarations in this case and once again set forth my biographical and relevant background information. My full name is Catherine Mannherz Hunt. I am a former Special Agent of the Federal Bureau of Investigation ("FBI"). In 1996, I completed the 4-month Special Agent training at the FBI Academy in Quantico, Virginia. As a Special Agent I was assigned to the Foreign Counterintelligence program in the Los Angeles and San Francisco Divisions of the FBI working "country threat" matters. For approximately 5 years from 1996 through 2001, I successfully conducted investigations on foreign counterintelligence targets and participated in several espionage investigations that led to prosecutions.

2. I was assigned to the San Francisco FBI Joint Terrorism Taskforce (JTTF) in 2002 where I worked on multiple domestic and international terrorism investigations. I was appointed the Hate Crimes Coordinator on the JTTF managing and investigating federal hate crime violations for the division and expanding the FBI's official liaison capacity within various ethnic communities. Due to the increase in hate crimes after the terrorist attack on September

1

11, 2001, I was designated to fill a newly created position as the Point-of-Contact for the Arab, Muslim, and Sikh communities.

3. While assigned to the San Francisco Division's JTTF, I was asked by the FBI's International Operations Unit at FBI Headquarters to serve as the Acting Legal Attaché (LEGAT) at the U.S. Embassy in Cairo, Egypt. During 2002 and 2003, I served two tours at that Embassy where I was responsible for FBI/DOJ and related law enforcement affairs. As a member of the Embassy's Country Team, I attended meetings and regularly briefed and advised the Ambassador and Deputy Chief of Mission on sensitive criminal and intelligence matters.

4. As Acting LEGAT Cairo, I traveled to other countries in North East Africa to conduct investigations on terrorism, intelligence, and criminal cases. I personally investigated matters involving international terrorism, involuntary servitude, human trafficking, theft of antiquities, and international child custody disputes. I participated in U.S.-Egypt bilateral discussions on judicial and extradition procedures and established formal communications channels for the LEGAT Office. Upon my return to the San Francisco Division, I received a letter of commendation from then U.S. Ambassador C. David Welch for my work in Egypt.

5. In late 2004, I was directly appointed by FBI Director Robert Mueller to serve as the Assistant Legal Attaché at the newly formed U.S. Embassy in Baghdad, Iraq. To develop the capacity of the LEGAT Baghdad office, I initiated and cultivated relationships with Iraqi elements of the Coalition Provisional Authority (Iraq's transitional government), other U.S. Government agencies, the U.S. Military, and members of the Multi-National Force-Iraq. I regularly met personally with the Iraqi Interior Minister to solidify and enhance FBI and Iraqi law enforcement cooperation and intelligence exchanges.

6. I personally briefed Attorney General Gonzalez on FBI operations in Iraq and maintained regular communication with the U.S. Ambassador, the Deputy Chief of Mission, other U.S. agencies and Flag Officers of the Multi-National Force-Iraq. I established the FBI's LEGAT office at the U.S. Embassy-Baghdad and supervised FBI Special Agents and support personnel assigned to that office.

7. During my 17 months in Iraq, I conducted investigations of kidnapped U.S. citizens and other foreign nationals in Iraq. I interviewed and interrogated numerous insurgents and foreign fighters with known or suspected membership in al Qaeda, Ansar al-Islam, and the Iraq insurgency. I received the FBI Campaign Support Medal for my successful work in a war zone.

8. I am personally familiar with and have employed a wide variety of techniques in counterterrorism, counterintelligence, and law enforcement investigations, including but not limited to: the execution of search warrants; Title III wiretap and FISA court-authorized interception on telephones and interiors of rooms and vehicles; undercover work; the use of confidential informants; surveillance; extraction of information from computers and cell phones including the analysis of phone records, banking records, money transfers, travel documents, internet and social media, books and periodicals utilized by targets; tracking targets and photographing and/or videotaping them and their associates; and forensic review of physical evidence, including but not limited to documents, bomb making material and weapons possession.

9. In 2006, I left the FBI to move to Florida to work as a consultant to private industry and defense contractors, providing investigative and intelligence training and other related advice. I also attended the University of South Florida where I received a master's

degree in clinical social work to provide psychotherapy and counseling to military veterans with PTSD, first responders, and other victims of trauma.

10. I was retained in this matter as a Consultant by the law firm of Kreindler & Kreindler LLP. I have reviewed many documents concerning the 9/11 attacks, including the following:

- the Congressional Joint Inquiry Report;

- the 9/11 Commission Report and supporting documents;

- the 9/11 Review Commission Report of 2015;

- 2012 FBI Summary Report;

- the Opinion of this Court dated March 28, 2018 that denied the motion to dismiss brought by the Kingdom of Saudi Arabia ("KSA");

- discovery documents obtained during the course of the litigation by the Plaintiffs' Executive Committees ("PECs");

- the subpoena and "Touhy" letter served by the PECs on the FBI and correspondence between the PECs and the DOJ regarding the subpoena and letter; and

- other documents, including U.S. government documents released under FOIA or otherwise declassified, court records, open source documents, and public information databases.

11. Together with document review, I conducted an investigation of the events that took place in Southern California regarding the 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar in the year 2000. I interviewed numerous civilian witnesses, along with current and former law enforcement and intelligence personnel with knowledge relevant to the 9/11 investigation. I made multiple trips to Southern California investigating the community surrounding the King Fahad Mosque in Culver City, California where the Kingdom of Saudi Arabia posted Fahad al-Thumairy as an accredited diplomat and representative of the Kingdom's

Ministry of Islamic Affairs, and where al-Thumairy served as an Imam at the King Fahad Mosque. I investigated the nearby Mediterranean Gourmet Restaurant (since replaced by another restaurant), where Saudi employee Omar al-Bayoumi met with the two hijackers on February 1, 2000. I canvassed apartment complexes in the vicinity of that mosque and restaurant. I also spent significant time in the neighborhoods where the hijackers lived in San Diego and visited various locations (such as the Islamic Center of San Diego and the Masjid Al-Ribat of San Diego) frequented by the hijackers, as well as other locations in Southern California.

12.  Following the 9/11 attacks, as is now widely known, the FBI quickly learned that hijackers al-Hazmi and al-Mihdhar entered the United States in 2000, arriving in Los Angeles on January 15, 2000, staying there for approximately two weeks. They then moved to San Diego, where al-Mihdhar lived until mid-June 2000 and al-Hazmi until December 2000, when he was picked up by a third hijacker, Hani Hanjour, and taken to Arizona.

13.  The public documents from the official government investigations of the 9/11 attacks contain practically no information concerning the two hijackers' activities during their first two weeks in the Los Angeles area. For example, the 9/11 Commission Report states that while the hijackers first arrived in Los Angeles on January 15, 2000, "[w]e do not pick up their trail until February 1, 2000." I made that two-week period a particular focus of my investigation. Reports indicate that the hijackers were unable to read or understand English and had no familiarity with the United States. Therefore, it would follow that advance preparations were made to provide assistance so that the hijackers could become safely established inside the United States and proceed with their plans.

14. The 2012 FBI Summary Report states that Saudi diplomat al-Thumairy was "the Imam at the King Fahad Mosque near Los Angeles when al-Hazmi and al-Mihdhar first arrived in the United States . . ." and that "Thumairy immediately assigned an individual to take care of them during their time in the Los Angeles area." The name of the individual assigned by al-Thumairy to take care of the hijackers during their time in the Los Angeles area is concealed in the redacted version of the 2012 FBI Summary Report.

15. During my investigation, I identified Mohamed Johar as an individual who had contact with the hijackers during their time in Los Angeles. I located Johar in Cincinnati, Ohio on August 8, 2018 and met with Johar and his attorney at his attorney's office on the evening of August 9, 2018 for an interview.

**Summary of Interview with Mohamed Johar**

16. Johar told me that he was approached and interviewed by the FBI on multiple occasions in 2007, 2010, and 2016. In 2007, the FBI flew him from Ohio to Los Angeles to point out specific locations of interest, such as the restaurant where al-Hazmi and al-Mihdhar met with al-Bayoumi. During the interview Johar's attorney stated, "surely you have access to the interviews" and "you can get this information from the FBI." Johar stated, "I'm not hiding...I told the FBI."

17. During our interview, Johar said he was a frequent attendee at the King Fahad Mosque. He confirmed that in January 2000, he met al-Hazmi and al-Mihdhar and personally witnessed al-Thumairy have contact with al-Hazmi and al-Mihdhar at the King Fahad Mosque and that the four of them had a conversation. Johar said he saw al-Hazmi and al-Mihdhar attend the Mosque on multiple occasions. Johar assisted the hijackers with regard to their lodging during the first two weeks they were in Los Angeles. Johar admitted that he took the hijackers to

6

the Mediterranean restaurant which was located down the street and around the corner from his home, where the hijackers had their "chance meeting" with al-Bayoumi. Johar admitted that before the hijackers departed for San Diego, al-Hazmi asked Johar to store a piece of his luggage, a medium-size black bag, and that he would come back and retrieve it at a later date. Johar did store the bag at his home and al-Hazmi retrieved the bag from Johar during one of his subsequent visits from San Diego. Johar claimed that he never looked inside the bag while it was in his possession. Johar was in telephonic contact with the hijackers while they were in San Diego. Johar admitted that after moving to San Diego, al-Hazmi returned to Los Angeles and stayed the night with Johar at his sister's apartment which is in the same apartment complex as Johar and his parents' home.

18.     Johar said his last interview by the government took place at his attorney's office in Cincinnati, Ohio sometime in January 2016. Johar had been served with a grand jury subpoena and was due to appear in front of a grand jury in New York in February 2016. Johar said the meeting was attended by himself, his attorney, an FBI Agent, an NYPD Officer, a female who may have been an analyst, and an Assistant United States Attorney (AUSA). Sometime during the meeting, the AUSA told Johar's attorney that Johar did not need to appear before the grand jury and the government would be in contact if Johar was needed. The meeting ended and neither Johar nor his attorney heard anything further from the government regarding Johar's contact with the hijackers.

19.     During our interview, Johar identified two other individuals as having contact with al-Hazmi and al-Mihdhar: Mohdar Abdullah and an acquaintance of Johar's named Akram Alzamari. Johar stated that Akram Alzamari had a closer relationship with the hijackers than he did.

7

**Interview with Akram Alzamari**

20.     On August 15, 2018, Akram Alzamari was contacted at his home and, after confirming his identity, he was handed an envelope and told he was being served with a subpoena for his deposition. Alzamari asked how his information had been obtained, and he was told that an explanation would be provided if he would be willing to meet for an interview. Alzamari agreed to meet for an interview the following day.

21.     On August 16, 2018, Alzamari was interviewed at a food court in a mall. He started by questioning the legitimacy of the subpoena and flouted the fact that he was attending the meeting against his attorney's advice. His questions were addressed and, despite his skepticism regarding the subpoena, Alzamari pulled out a small pad and pen and agreed to talk, taking notes on all questions asked and names discussed throughout the entirety of the conversation that lasted well over an hour.

22.     Alzamari questioned how his name came up in the investigation. It was explained that Mohamed Johar was interviewed with his attorney and that Johar said he introduced al-Hazmi and al-Mihdhar to him. In fact, Johar stated that Alzamari had developed a closer relationship with the two hijackers than Johar. Alzamari made no verbal comment to this statement.

23.     Alzamari was asked directly about his relationship with Johar and the hijackers. Alzamari said he did not have a close relationship with Johar. They would see each other at the mosque at times and would attend dinners and other social events outside of the mosque, but such social interactions were infrequent.

8

24. Alzamari said he did not want to talk about his relationship with Johar, al-Hazmi, and al-Mihdhar unless he was compelled by the government or some legal authority. Alzamari stated he had already answered the same questions to the government or "whoever investigates these things," and, "You must have seen the write-ups of my interviews." Alzamari asked directly if I had read the reports and said, "if you read the reports then you should already know."

25. Alzamari confirmed that Johar introduced him to al-Hazmi and al-Mihdhar but took issue with Johar's statements that he provided "assistance" to the hijackers, saying this was not true. When asked to clarify his relationship with al-Hazmi and al-Mihdhar, Alzamari replied, "just read the report."

26. Alzamari stated he was no longer in contact with Johar for personal reasons and would not elaborate further. He said he was very uncomfortable discussing the topic of Johar and the hijackers because it made him "sad."

27. Alzamari was asked about his relationship with the Johar family and if they knew each other in Yemen. Johar became very suspicious and asked why questions were now being asked that the government never asked. Alzamari would not answer the question.

28. Alzamari was asked about the Saudi diplomat and Imam, Fahad al-Thumairy. Alzamari stated he and al-Thumairy had a good relationship and that they were friends. Al-Thumairy trusted Alzamari and felt comfortable sharing frustrations with his job. While Alzamari was working at Circuit City, al-Thumairy would send him mosque visitors who were hosted by the Kingdom of Saudi Arabia's (KSA) Los Angeles Consulate. Alzamari would provide these individuals with Toshiba computers and other electronics that were then paid for by the mosque.

29.     Alzamari said al-Thumairy wanted to introduce him to important and influential people at the Consulate and the mosque, but Alzamari declined saying, "this is not me."

30.     Alzamari said he did not understand why the U.S. government deported al-Thumairy and that the U.S. should have held onto al-Thumairy after 9/11 to "squeeze him for all he's got" and then deport him. He said he thought it was stupid of the U.S. to deport him.

31.     Alzamari said he was knowledgeable about the origins of the King Fahd Mosque and that he had attended the storefront mosque on Venice Boulevard before the King Fahad Mosque was constructed. Alzamari said he attended mosque regularly, often multiple times per day.

32.     Alzamari was asked about the connection between the KSA's Los Angeles Consulate and the King Fahad Mosque. Alzamari said the Saudi government, and more specifically Saudi Intelligence, was behind the construction, administration, and control of many mosques. The Saudi government funded the mosques and ran them through the Ministry of Islamic Affairs in the consulates. Alzamari could not recall the English translation for the organization who ran the mosques. Frustrated for not recalling the English words, Alzamari telephoned his wife and she texted "Ministry of Islamic Affairs." Alzamari said the Ministry of Islamic Affairs is responsible for coordinating Sheiks and Imams, providing for their personal care, and monitoring who attends mosque.

33.     Alzamari stated that the rule is that if the Saudis are not interested, they do not get involved with the building or running of a mosque. If they are interested, Saudi control of a mosque includes the assignment of the Imams and control over which programs, educational and otherwise, are financially supported in the mosque.

34. To clarify, it was asked whether or not al-Thumairy was placed as Imam at the King Fahd Mosque by the Saudi government and Alzamari responded, "there's no doubt." He stated that if any Imam held the position at the King Fahad Mosque, it was because the Saudis wanted him there. If al-Thumairy was Imam at the King Fahd Mosque, it was because the Saudi government, and more specifically the Ministry of Islamic Affairs, put him there.

35. Alzamari said that most of the official visitors to the mosque were sponsored by the Saudi government and were well taken care of. Other visitors who were important Muslims, for example important scholars, but not visiting at the behest of the Saudi government, were not looked after like the Saudi sponsored visitors. Alzamari said that 90% of the visitors were Saudi sponsored.

36. Alzamari stated that most Los Angeles Consulate personnel from Saudi Arabia attended the King Fahd Mosque as it was a requirement. These individuals were not religiously devout but attended mosque more as a cultural responsibility and to maintain their positions in the consulate.

37. Alzamari was asked about drivers for the KSA's Los Angeles Consulate and their relationship to the mosque. Alzamari said that the consulate drivers would have attended the mosque as a requirement for their employment at the consulate. Alzamari still refused to answer specific questions about al-Hazmi and al-Mihdhar but agreed to answer hypothetical questions. Alzamari was asked, "if the consulate wanted al-Hazmi and al-Mihdhar picked up at the airport, would they have sent someone from the mosque?" Alzamari answered, "Yes," and "No exceptions."

38. Alzamari stated the Saudi Los Angeles Consulate was happy with al-Thumairy until he was deported.

11

39. Alzamari reiterated that he showed up to the interview voluntarily against his attorney's advice. He said he used a CAIR attorney named Suzanne (LNU). Alzamari said he had more information but would not share it unless compelled by some authority.

40. Alzamari said he supports the lawsuit against Saudi Arabia and that he dislikes the Saudis because they are "responsible for a lot of problems for Muslims and non-Muslims," and that most non-Saudis feel this way.

41. Alzamari stated that the entire Islamic community carries the burden for what the hijackers did.

42. Alzamari said he was in Yemen visiting his mother when 9/11 occurred.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Executed on April 21, 2020

Catherine M. Hunt