UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED:___  3/4/2021             │
└─────────────────────────────────────┘
```

In re:

    **TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001**

-------------------------------------------------------------X

**03-MDL-01570 (GBD)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

    On January 15, 2020, the Plaintiffs' Executive Committees ("Plaintiffs" or the "PECs") filed under seal their second motion to compel the Federal Bureau of Investigation ("FBI"). On April 13, 2020, the FBI filed an opposition to Plaintiffs' motion to compel and a cross-motion for a protective order. ECF No. 6136 *et seq*. Plaintiffs filed their reply on July 10, 2020. ECF No. 6310 *et seq*.[1] The FBI filed a surreply on September 4, 2020. ECF No. 6433. On October 9, 2020, and October 13, 2020, Plaintiffs filed two letter motions "to supplement the record" on the Plaintiffs' motion to compel and the FBI's cross-motion for a protective order. ECF Nos. 6491, 6497; see also ECF Nos. 6506, 6509. The FBI filed responsive letters on October 15, 2020, and October 16, 2020. ECF Nos. 6501, 6505. Plaintiffs' motion is GRANTED in part and DENIED in part.[2]

---

[1] On July 21, 2020, the Court received a fax addressed to the Honorable George B. Daniels from Florida Bulldog and The New Yorker requesting the unsealing of these submissions. The Court recognizes the public's interest in access to these documents and will review any proposed redactions regarding these submissions consistent with the procedures outlined in the FBI Protective Order, see ECF No. 4255.

[2] The Court issued a version of this Opinion and Order under seal on February 1, 2021. ECF No. 6606. The Court modifies the Opinion and Order to correct a factual misstatement concerning the FBI's public disclosure of certain information. An unredacted version of this modified Opinion and Order has been filed under seal and a version with redactions has been filed on the public docket, pursuant to the FBI Protective Order.

**BACKGROUND**

On April 10, 2018, Plaintiffs served on the FBI a subpoena and a request pursuant to the Department of Justice's so-called "Touhy" regulations, 28 C.F.R. §§ 16.21-16.29, for production of ten categories of records. See First Declaration of Sarah S. Normand ("First Normand Decl."), dated June 21, 2019, Ex. A. Five of the categories seek "[a]ny and all records" or—in one case— "any and all PENTTBOM records" referring to the FBI's investigation of the attacks of September 11, 2001 concerning seven individuals or entities (categories (a) and (b)), the FBI's ongoing "subfile" investigation (category (d)), and any subjects of the subfile investigation identified in the 2012 FBI Summary Report (categories (f) and (g)). Id. at App. A.

The Government provided an interim response to the Touhy request on May 2, 2018. See First Normand Decl., Ex. B. In the interim Touhy response, the Government objected to the Touhy request to the extent it seeks records beyond the scope of jurisdictional discovery as defined by the Court, namely, "whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." Id., at 4-6; see also ECF No. 3946, Memorandum Decision and Order ("March 28 Order"), at 23. The Government also objected to the Touhy request on the grounds that it would impose an extraordinary, disproportionate, and undue burden on the FBI, both in its exceptionally broad scope and insofar as it seeks production of classified and privileged records as well as the entire investigatory file relating to the FBI's ongoing subfile investigation and subjects of that investigation. See First Normand Decl., Ex. B, at 6-11.

In light of these and other objections, the Government asked the PECs to significantly narrow the scopes of both the request and the subpoena. Id., at 11-12. The PECs replied to the interim Touhy response by letter dated May 25, 2018. First Normand Decl., Ex. C. While Plaintiffs offered to modify the request in a number of categories, they did not offer to further limit their request for "any and all" records concerning the FBI's Subfile Investigation and the subjects of that investigation. Id., Ex. A (table) at 2-4. By letter dated July 30, 2018, the Government explained its core records approach for the first time in writing in response to Plaintiffs' requests, stating that "the FBI is in the process of identifying a subset of documents that may be relevant to the allegations on which the Court has permitted jurisdictional discovery to proceed. The FBI will then conduct a declassification and privilege review of those documents to determine what, if any, information can be provided." Fourth Declaration of Sarah S. Normand, dated April 13, 2020 ("Fourth Normand Decl."), Ex. N.

On August 8, 2018, Plaintiffs responded to the Government's July 30, 2018 letter, acknowledging the Government's statements concerning the FBI's core records approach but expressing their frustration that the FBI had not yet produced any documents in response to the subpoena or substantiated the FBI's objections in the interim Touhy response. Fourth Normand Decl., Ex. O. In advance of a scheduled October 12, 2018 discovery conference, Plaintiffs sent another letter expressing their interest in details concerning the "criteria that were used to identify the 'core' set of records," and identifying a further list of documents contained within the FBI's files directly relevant to the jurisdictional inquiry authorized by the Court. Declaration of Sean P. Carter, dated July 10, 2020 ("Carter Decl."), Ex. 11.

At the October 12, 2018 conference, the Government stated that "despite the breadth [of the subpoena] and despite the objections, [the U.S. Attorney's Office] has worked very hard with

the FBI to identify a subset of documents that [it thought] may be relevant potentially to the matters on which the Court has authorized limited jurisdictional discovery to proceed." Fourth Normand Decl. ¶ 18. Plaintiffs advised the Court that they "are hopeful about the process," but "will not know until [they] get the documents and actually see them." Carter Decl. ¶ 20. The PECs and the Government continued to confer regarding the FBI's response, including but not limited to meet and confers held on October 9 and 11, 2018; January 2, 2019; and March 20, 2019. Id. ¶ 17. The FBI agreed to search for some additional records based on discussions with the PECs, and the FBI documents were produced to Plaintiffs on a rolling basis, beginning with the first tranche on November 19, 2018. Fourth Normand Decl. ¶¶ 19, 22.

On January 2, 2019, Plaintiffs sent the Government a letter setting forth "a list of documents that [the PECs] wanted to make certain were included in the FBI's searches and produced." See Second Declaration of Sarah S. Normand, dated Sept. 12, 2019 ("Second Normand Decl."), Ex. F. In March and April 2019, Plaintiffs and the Government engaged in a series of meet and confer discussions concerning the FBI's productions. Fourth Normand Decl. ¶ 27. On March 25, 2019, Plaintiffs sent a letter to the Government asking for clarification concerning the scope of the FBI's document searches. Carter Decl., Ex. 24. In an email dated July 16, 2019, Plaintiffs reiterated their request for clarification concerning the methodology and adequacy of the FBI's searches "to make sure that [Plaintiffs] have a clear understanding of the methodology the FBI employed in connection with its so-called core documents approach." Id., Ex. 14.

On August 2, 2019, the Government responded to Plaintiffs' July 16 Email, stating that Plaintiffs were mistaken "that the FBI treated as core all records in its possession relating to Bayoumi, Thumairy, ███████████ (or any other individual)." Id., Ex. 16 Rather, the

"FBI's approach has always been that it would undertake a declassification review with respect to a *subset* of 'core' records including Bayoumi and Thumairy." Id. (emphasis in original). According to the Government, "FBI personnel who were involved in the subfile investigation identified documents that were of central relevance to the jurisdictional inquiry based upon their personal knowledge of the case file and its contents, along with targeted electronic searches of Sentinel designed to locate certain witness statements and other specific records." Id. By letter dated August 16, 2019, Plaintiffs stated that the Government's explanation of the search methodology was at odds with its prior representation that "the FBI's search of the subfile would extend to all subfile documents relating to or referencing Bayoumi and/or Thumairy, and that all such documents would be reviewed as part of the 'core documents' approach." Id., Ex. 17.

The Government sent Plaintiffs a letter on September 4, 2019, advising that it "never stated or implied that the FBI's search would include 'all subfile documents relating to or referencing Bayoumi and/or Thumairy.' Given both the volume and the classified and privileged nature of the records, any such search would be unduly burdensome." Id., Ex. 18. The Government also stated that it could not provide a list of the search terms used in the FBI's electronic searches, or a list of all documents in the subfile, because doing so would reveal classified and privileged information. Id. Throughout this time, the FBI continued producing documents to Plaintiffs. Fourth Normand Decl., ¶¶ 30, 33-35, 37, 39. Indeed, the FBI's production is continuing. Pls. Br., at 8. The FBI has also agreed to conduct searches for documents that continue to be identified by Plaintiffs. Fourth Normand Decl., ¶ 44. On April 13, 2020, then-U.S. Attorney for the Southern District of New York Geoffrey S. Berman issued a final response to the Touhy request. Id., Ex. S. Before filing the present omnibus motion to compel, Plaintiffs filed an initial motion to compel the FBI, which the Court addressed

5

separately. ECF No. 6159, 6510. This decision addresses Plaintiffs' second motion to compel the FBI.

## STANDARD OF REVIEW

### I.     The Federal Rules Provide the Appropriate Standard of Review

The Court of Appeals for the Second Circuit has left undecided whether section 706 of the Administrative Procedure Act ("APA") or the Federal Rules of Civil Procedure provides the appropriate standard of review when a challenge to a non-party agency's subpoena response is brought by a motion to compel. See U.S. Envtl. Prot. Agency. v. General Elec. Co., 212 F.3d 689, 689-90 (2d Cir. 2004); accord In re S.E.C. ex rel. Glotzer, 374 F.3d 184, 190 (2d Cir. 2004). Courts in this Circuit have approached this problem in different ways. At least one court has applied the APA abuse of discretion standard. See In re Sept. 11 Litig., 621 F. Supp. 2d 131, 144-45 (S.D.N.Y. 2009). Another has concluded that the APA standard of review is inapplicable. See In re PE Corp. Securities Litigation, No. 03-CV-705 (TPS), 2005 WL 806719, at *6-7. (D. Conn. Apr. 8, 2005).

As discussed in the April 27, 2020 Opinion & Order, this Court gives special weight to the fact that the D.C. Circuit, which handles the largest number of federal agency subpoenas, has chosen to apply the Federal Rules. ECF 6159, at 6; see Watts v. S.E.C., 482 F.3d 501, 508 (D.C. Cir. 2007). Accordingly, absent instruction otherwise from the Court of Appeals for the Second Circuit, the Court will apply Federal Rules 26 and 45 in its analysis of Plaintiffs' motion to compel.

### II.    The Parties' Burdens Under the Federal Rules

Subpoenas "issued under Rule 45 of the Federal Rules of Civil Procedure are subject to Rule 26(b)(1)'s overriding relevance requirement." During v. City Univ. of N.Y., No. 05-CV-

6992 (RCC), 2006 WL 2192843, at *2 (S.D.N.Y. Aug. 1, 2006). Rule 26(b) requires district

courts in "[a]ll discovery" to consider a number of factors potentially relevant to the question of

undue burden, including: whether the discovery is "unreasonably cumulative or duplicative";

whether the discovery sought "can be obtained from some other source that is more convenient,

less burdensome, or less expensive"; whether "the party seeking discovery has had ample

opportunity to obtain the information by discovery in the action"; and whether "the proposed

discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(1)-(2).

"The party seeking discovery bears the initial burden of proving the discovery is

relevant." Citizens Union of City of N.Y. v. Attorney General of N.Y., 269 F. Supp. 3d 124, 139

(S.D.N.Y. Sept. 29, 2016). If the party issuing the subpoena establishes the relevance of the

materials sought, the burden then shifts to the movant to demonstrate an undue burden. See

Griffith v. United States, No. M8-85 (JFK), 2, at *2 (S.D.N.Y. Apr. 25, 2007). "Whether a

subpoena imposes an undue burden depends upon such factors as relevance, the need of the party

for the documents, the breadth of the documents, the time period covered by it, the particularity

with which the documents are described and the burden imposed." Night Hawk Ltd. v.

Briarpatch Ltd., No. 03-CV-1382 (RWS), 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003).

The trial court has broad discretion to determine whether a subpoena imposes an undue burden.

See Jones v. Hirschfeld, 219 F.R.D. 71, 74 (S.D.N.Y. 2003).

### III.   Rule 45's Undue Burden Standard as Applied to Requests to a Governmental Non-Party

The Rule 45 "undue burden" standard requires district courts supervising discovery to be

generally sensitive to costs imposed on non-parties. See, e.g., Cusumano v. Microsoft Corp., 162

F.3d 708, 717 (1st Cir. 1998) ("concern for the unwarranted burden thrust upon non-parties is a

factor entitled to special weight in evaluating the balance of competing needs" in Rule 45

inquiry); see also Fed. R. Civ. P. 45(d)(2)(B)(ii) (a court order to compel compliance "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"). Indeed, one scholar has opined that the more appropriate nomenclature is "nonparty" discovery, not "third-party" discovery, as "the word nonparty serves as a constant reminder of the reasons for the limitations that characterize 'third-party' discovery." Dart Indus. Co. v. Westwood Chem. Co., 649 F.2d 646, 649 (9th Cir. 1980) (citing Getman, R., "Federal 'Third-Party' Discovery in the Small Antitrust Case," 45 Brooklyn L. Rev. 311 (1979)). Discovery under Rules 26 and 45 must properly accommodate "the government's serious and legitimate concern that its employees not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." Exxon Shipping Co. v. U.S. Dep't of the Interior, 34 F.34 774, 778-79 (9th Cir. 1994).

Further, "[i]t is clear from the Department of Justice regulations governing the disclosure of confidential information, as well as the common law doctrine in Touhy and the litany of succeeding case law, that the United States may restrict the release of its information." Edwards v. U.S. Dep't of Justice, 43 F.3d 312, 317 (11th Cir. 1994). "[T]he decision about production rests with the agency, based on the factors provided in [the agency's] Touhy regulations. Even if the information [the party] seeks is relevant to the underlying litigation, it is not automatically entitled to the [documents] it has requested." Agility Public Warehousing Company K.S.C.P. v. United States Dep't of Defense, 246 F. Supp. 3d 34, 44 (D.D.C. 2017). During the AIDS epidemic, a court found that "plaintiffs' interest in [the requested information] simply cannot compare to the government's interest in maximizing the use of its limited resources in dealing with a national health crisis." Moore v. Armour Pharm. Co., 927 F.2d 1194, 1197-98 (11th Cir. 1991). To this end, "the court [may] take steps to relieve a nonparty of the burden of compliance

even when such accommodations might not be provided to a party." Wertheim Schroder & Co.

v. Avon Products, No. 91-CV-2287 (PKL), 1995 WL 6259, at *6 (S.D.N.Y. Jan. 9, 1995).

## DISCUSSION

**I.      Core Records Approach**

Plaintiffs argue that the FBI's core records methodology does not comply with its

discovery obligations under Rules 26 and 45. Memorandum of Law in Support of Plaintiffs'

Second Motion to Compel Directed to the FBI ("Pls. Br."), at 9. When responding to Rule 45

subpoenas, government agencies such as the FBI have to conduct reasonable searches for

responsive documents, unless the government proves that the effort to conduct the searches

would itself impose an undue burden. In the absence of an undue burden, the FBI has the duty to

search for all records relevant to each of a litigant's theories. See Linder v. Dep't of Defense, 133

F.3d 17, 24 (D.C. Cir. 1998) ("To the extent such information satisfies Rule 26's broad definition

of relevance, the district court may decline to order the agencies to search for that information

only if the agencies satisfy their heavy burden of proving oppressiveness or establish some other

recognized ground for modifying or quashing subpoenas for relevant information.").

The core records search method, Plaintiffs argue, does not "remotely" comply with the

FBI's obligations. Pls. Br., at 10. Plaintiffs argue that the core records approach is a subjective

procedure, designed to limit the FBI's search to a narrow subset of documents that the FBI

unilaterally deems relevant and responsive. Id. According to Plaintiffs, this subjective approach

denies the Court and Plaintiffs the opportunity to objectively determine if the FBI is conducting a

reasonable search. Id. Plaintiffs' expert states that the FBI typically uses a systematic search

method with defined search criteria to locate relevant documents. Declaration of Bassem

Youssef, dated July 10, 2020 ("Youssef Decl.") ¶ 16. The core records approach, Plaintiffs

allege, contravenes the FBI's regulations, published in the Federal Register, which mandate that the FBI's General Indices be searched to determine relevant files. Id. ¶¶ 18-19. The content of the FBI's production, Plaintiffs argue, underscores the impropriety of this approach: despite the FBI's claim that it has engaged in an effort to produce core records, the actual production includes numerous documents of marginal or no relevance to the jurisdictional inquiry, and documents of paramount relevance to that inquiry have not been produced, and in many cases have been excluded from the review process entirely. Id. Because the core records approach has not involved any systematic searches to identify the subfile records that specifically reference Al Bayoumi, Al Thumairy, Al Jarrah, and other principal subjects, it is impossible to know the full dimension of the relevant records the FBI excluded from its process entirely. Id., at 11.

The FBI argues that the core records approach was appropriate in light of specific privilege, proportionality, and undue burden concerns. The FBI's search for and processing of core records was a difficult undertaking that took years and a substantial commitment of resources to complete. See Memorandum of Law of Non-Party the Federal Bureau of Investigation in Support of its Motion for a Protective Order and in Opposition to Plaintiffs' Motions to Compel Production ("FBI Br."), at 18. Requiring the FBI, a non-party to this litigation, to respond fully to the extraordinarily broad Touhy request would impose an undue and disproportionate burden, particularly because of the large volume of classified and privileged material contained in the potentially responsive records. Id. Additionally, the FBI could not respond to the request for its entire set of Subfile records, or the universe of documents related to Al Bayoumi, Al Thumairy, Al Jarrah, or Mohdar Abdullah, as the compilations of such records are themselves privileged. Id., at 19. As Plaintiffs have consistently refused to narrow their

exceedingly broad requests, the FBI argues that the core records approach was an appropriate means of balancing the unique burden and privilege concerns raised by the Touhy request. Id.

More specifically, the volume of records in Sentinel that refer to the individuals and entities listed in Plaintiffs' Request Numbers 1 and 2 is discussed at length in Gilhooly's *in camera*, *ex parte* classified declaration. Gilhooly Decl. ¶ 16. In light of the very large number of records referencing these names, subject matter experts in the New York Field Office who currently or formerly were assigned to the Subfile Investigation, in conjunction with the Counterterrorism Division at FBIHQ, and attorneys from the FBI's Office of the General Counsel and the U.S. Attorney's Office for the Southern District of New York identified an initial set of core documents that may be particularly relevant to the jurisdictional inquiry. Id. ¶¶ 16-17. In all, the FBI has produced approximately 4,000 pages of records. Id. ¶ 19.

The FBI further argues that because of the unique nature of the FBI's PENTTBOM records, and the fact that virtually every FBI field office in the United States and every overseas FBI Legal Attaché Office was involved in the PENTTBOM investigation and maintained its own hard copy investigative file, the process of identifying and locating all records responsive to the request would be a difficult and cumbersome process, requiring engagement with FBI field offices across the United States. FBI Br., at 19-20; Gilhooly Decl. ¶ 10. While certain documents generated in these locations were uploaded into the FBI's legacy central electronic recordkeeping repository, the general system policy was not to upload documents that originated outside the FBI or paper documents generated within the FBI. FBI Br., at 22. Many items of potential evidentiary value were maintained at the FBI field office where they were collected and are still located in offices across the country. Id. Nonetheless, the FBI has spent considerable time and effort searching for documents and items that are not stored electronically, coordinating those

efforts with personnel in various field offices and record storage facilities. Id., at 23. Many of the documents FBI subject matter experts independently selected for inclusion in the set of core records were the same records that the PECs later identified as priority items. Id., at 21-22.

The thousands of hours that have already been expended in searching for and processing the more limited subset of core records illustrates the burden that a search of the entire Subfile would entail. Id., at 20. Requiring the FBI to undertake this process for all Subfile records would present an extreme burden on FBI officials with ongoing investigative and operational duties and responsibilities, a burden that is especially unwarranted here because the FBI has already released thousands of pages of materials that are rarely released, including grand jury records and information from foreign governments. Id. In selecting materials for inclusion within the core records, the FBI prioritized evidentiary materials, as it was more likely such documents could be released, over analytical materials, which more often raise privilege concerns. Id.

Additionally, because the Subfile Investigation—which the FBI contends is still pending and active—contains a large volume of classified documents, and because of the concern that the release of documents could interfere with the investigation and disclose sensitive sources, methods, techniques, and other privileged information, the FBI did not attempt to review or process for release the entire file. Gilhooly Decl. ¶ 44. Rather, the FBI has released numerous documents in response to more particularized requests from Plaintiffs, a process which requires a line-by-line review of each document to determine whether information remains properly classified or is subject to the law enforcement privilege or other privileges, and, if so, whether specific classified and privileged information can nonetheless be released in the public interest and the exercise of discretion pursuant to section 3.1(d) of Executive Order 13526. Id. ¶¶ 44, 55. In undertaking this review, the FBI considers whether release of information could interfere with

the Subfile Investigation or the PENTTBOM investigation, whether it could interfere with other current and future investigations, and the impact of releasing the information on the national security of the United States, as per Executive Order 13526. Id. ¶ 55.

Plaintiffs counter that numerous examples show how the FBI's irregular core records approach led to delays, chaos, and missing documents. Memorandum of Law in Further Support of Plaintiffs' Motions to Compel Directed to the FBI and In Opposition to FBI's Motion for Protective Order ("Pls. Reply"), at 6. Only now, two years after the subpoena was served, does the FBI seek to determine whether all interview reports in the Subfile Investigation concerning Al Bayoumi, Al Thumairy, Al Jarrah, ███████████ have been processed and produced. Id. The FBI "did not search" for analytic documents and has withheld certain Al Bayoumi documents "[b]ecause of the complications involved in reviewing ██████████████████" Id., at 11, 7 (citing Gilhooly Decl. ¶ 27 n.16). The FBI has produced potentially relevant information for hearings at the Guantanamo Bay Detention Camp that it has not yet produced for Plaintiffs. Id., at 8 (citing Pounian Decl. ¶¶ 5-7 & Ex. 1); but see Declaration of Michael H. Glasheen, dated Sept. 4, 2020, at ¶¶ 6-12, 13 (confirming that the FBI is reviewing these documents provided by prosecutors in the Office of Military Commissions and will process for release any of the documents that contain substantive information relevant to the jurisdictional inquiry).

Plaintiffs also identify a number of FBI documents of relevance to the jurisdictional inquiry that Plaintiffs know about because they were partially released under FOIA but that were not identified, reviewed, or produced under the core records approach. Declaration of J. Scott Tarbutton Decl., dated July 10, 2020, Ex. J. Furthermore, Plaintiffs' expert argues that some of the FBI's searches in response to the subpoena, such as a Sentinel search for documents ███

████████████████████████████████████████████████████

████████████████████████, may have been performed ineffectively. Youssef Decl.

¶ 38.

In addition, Plaintiffs' expert contends that neither FBI Assistant Director Sanborn nor

Deputy Assistant Director Gilhooly state that they have personally done any work on the 9/11

investigation or have first-hand knowledge of the Subfile Investigation, and the FBI has failed to

present a witness who actually worked on the 9/11 case and has personal knowledge from which

to opine on the adequacy of the searches and reviews conducted. Youssef Decl. ¶¶ 10, 11. No

proof is offered directly from the subject matter experts who worked on the subfile investigation

regarding how the core records were selected. Id. ¶ 12. The FBI does not reveal the number of

potentially relevant documents identified in a General Indices search, nor does the FBI explain

its lack of sufficient personnel and logistical capacity to review those documents for their

probative value. Id. ¶ 20. The FBI's inability to locate material evidence, such as the video taken

at the party that Al Bayoumi arranged for the hijackers in San Diego, indicates to Plaintiffs that

no active investigation is ongoing. Id. ¶ 42. The FBI does not comprehensively detail how many

warehouses store relevant 9/11 investigation documents or how they were searched, and the fact

that the FBI has not properly maintained its file does not provide an excuse for the FBI to resist

properly responding to Plaintiffs' subpoena. Id. ¶¶ 47, 49.

In their supplemental briefing, Plaintiffs also argue that "[t]he content and timing of the

FBI's Tranche 13 and 14 productions . . . provide further evidence that the FBI's core records

production was subjective, haphazard, and improperly overlooked key documents." Plaintiffs'

Letter Motion for Discovery to Supplement the Record and Expedite Document Production, at 2.

Specifically, Plaintiffs claim that tranches 13 and 14 included █████████ 302 reports

concerning interviews of witness ████████████████████████████████████████

███████████████ 302 reports of interviews of ████████████████ an associate of Al Bayoumi,

which contain numerous references ██████████████████ specifically referenced in the Court's

March 2018 ruling authorizing jurisdictional discovery. Id.

The FBI responds that the length of time that the core records process has taken is

predominantly a function of the breadth and burdensome nature of Plaintiffs' requests and the

sensitivity of the underlying information. Reply Memorandum of Law of Non-Party The Federal

Bureau of Investigation in Further Support of its Motion for a Protective Order ("FBI Surreply"),

at 15. The FBI's responsiveness to Plaintiffs' numerous supplemental requests to search for and

process specific documents does not demonstrate bad faith, but rather evidences the FBI's good

faith efforts to balance the Plaintiffs' interests in obtaining discovery and the FBI's interests in

protecting privileged information and preserving its resources. Id. The FBI contends that its

burden must be assessed in light of the records as they are maintained, not as Plaintiffs wish they

were maintained. Id., at 16. The FBI also argues that it is incorrect that searches for documents

can be done through use of search terms, or that there are internal procedures that mandate

electronic searches or dictate a methodology that must be used in identifying documents to be

processed in response to a request. Id.; see Declaration of Deborah Crum, dated September 4,

2020 ("Crum Decl.") ¶ 10. Plaintiffs' expert cites a wholly inapposite regulation designating

routine uses for the FBI's Central Records System under the Privacy Act. FBI Surreply, at 16-17.

The regulation says nothing about how the FBI should conduct searches generally. Id. Finally, in

response to the allegation that the belated production of key 302 reports demonstrates a need to

order a methodological search, the FBI states that (1) it has previously produced to the PECs in

its first tranche numerous other ████████ interview reports regarding the same events; and (2)

interview reports that amounted to little more than "unconfirmed rumor, speculation, or comments regarding Bayoumi's reputation in the community, ███████████████ ████████████████████████████████████████████████████ were not deemed to be of core relevance" and were produced accordingly. FBI's Response to Letter Motion for Discovery to Supplement the Record and Expedite Document Production, at 3.

In "the Touhy context, [government agencies are] certainly entitled to consider the risk to privileged information and the burden this would place on the agency" and whether the refusal to comply with the Touhy request "is reasonable in light of the breadth of the requests and the limited relevance or cumulative nature of the information sought . . ." Agility, 246 F. Supp. at 48. "The Court may not substitute its judgment for that of the agency about the agency's use of its own resources where [the agency] has considered the relevant factors and articulated a rational basis for its decision." Id. at 49. "When an agency is not a party to an action, its choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 278 (4th Cir. 1999). Where a third-party subpoena "sought a tremendous number of agency documents," courts have found that production "would measurably strain agency resources. . . ." Id. Still, "[a] reasonable inconvenience must be borne to further the goals of discovery." Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 407 (D.C. Cir. 1984).

"Whether searching 967 cubic feet of documents is reasonable must be determined according to the facts of the case." Id. at 407. "Whether compliance with a requested search would be unduly burdensome depends on the volume of material requested, the ease of searching for the requested documents in the form presented . . . and whether compliance threatens the normal operations of the responding agencies." Linder v. Calero-Portocarrero, 180 F.R.D.168,

175 (D.D.C. 1998). Additionally, "[t]he fact that these are very important cases with large sums of money at stake is relevant in determining the reasonableness of the subpoena." Northrop, 751 F.2d at 407 (internal citations omitted). Where, for example, an agency contends that a subpoena should be quashed, courts have recommended that "[p]erhaps a partial search could be attempted to determine how productive and how onerous a search of the complete file would be." Westinghouse Elec. Corp. v. City of Burlington, 351 F.2d 762, 767 (D.C. Cir. 1965).

Courts have awarded declarations detailing the FBI's searches a "presumption of good faith." Gizmodo Media Grp., LLC v. Fed. Bureau of Investigation, 366 F. Supp. 3d 585, 589 (S.D.N.Y. 2019). Indeed, "[c]ourts have repeatedly upheld index searches of CRS [the FBI's Central Records System] to be adequate when they are supported by detailed declarations explaining the underlying systems and the search procedures used." Id. at 560. Courts have found that the FBI conducted an adequate search where "the FBI searched CRS . . . using ACS [the FBI's Automated Case Support System], Sentinel, and the manual indices" and the FBI described how it conducted its search in supporting declarations. Id.

Some of declarations relied upon by courts in assessing the burden to the agency detail how long the processing of all requested documents would take. See Calero-Portocarrero, 180 F.R.D. at 175 (estimating that it could take 27 years of effort to process over 1,000,000 pages of records). Where government agencies have argued that a search of the entire file would not be productive because many of the responsive documents would be privileged, courts have either ordered a modification of the subpoena based on the facts and claims the court has already heard, or have directed the agency to conduct "partial searches, or samplings, of voluminous filed containing potentially privileged information." Northrop, 751 F.2d at 405, 407. If a sample is produced, a court must know what "percentage of the documents would be subject to the

privilege," and that the sample "contains a typical proportion of potentially privileged documents based on the universe it represents." Id. at 405-06.

Unlike Northrop, where the agency conceded that its files are organized "topically and geographically," here virtually every field office in the United States and every Legat overseas maintained a hard copy of the PENTTBOM file relating to that office's PENTTBOM-related investigative activities. Northrop, 751 F.2d at 405; Gilhooly Decl. ¶ 10. Ordering the FBI to search through every location would be unduly oppressive. Additionally, unlike the agency in Northrop, here the FBI has effectively already produced a sample of documents to Plaintiffs that suggests that a significant portion of the Subfile as a whole is likely to be privileged. The FBI has not, however, informed the Court of how many hours might be required to review and produce the entire Subfile, or explained in specific detail the criteria by which the FBI's subject matter experts identified the core records. See, e.g., Leopold v. Nat'l. Sec. Agency, 196 F. Supp. 3d 67, 75 (D.D.C. 2016) (while special counsel avers that it would likely take "several years and the diversion of resources" to conduct a complete search, he does not "break out the time and resources that would be required" to search only certain email files).

Despite these shortcomings in the FBI's declarations, the FBI's descriptions of the number of documents located in the Subfile and the dispersed locations in which these documents are stored sufficiently convince the Court that complying with the subpoena as written would be unduly burdensome and oppressive. The Court need not make a finding as to precisely what percentage of Subfile documents are likely to be privileged to determine, based on the FBI's current production, that the production of the entire Subfile would impose an extraordinary burden on the FBI's litigation and operational staffs. In light of the broad requests in Plaintiffs' subpoena, the Court recognizes the propriety of the core records approach.

Accordingly, the Court modifies the subpoena to require only additional searches for the specific document requests relevant to the jurisdictional inquiry as directed by the Court in this Order. See, e.g., Northrop, 751 F.2d at 407 (finding that courts may order a modification of the subpoena "based on the facts and claims the court has already heard"). Where the Court orders the FBI to conduct additional searches for specific documents or categories of documents, the Court recognizes that the FBI may be unable to ultimately produce all or any of the documents to Plaintiffs. Still, the Court expects the FBI, as it has already done on numerous occasions in response to Plaintiffs' additional document requests, to attempt to locate the documents directed by the Court and produce as many as possible to Plaintiffs.

## II.    Assertion of Privileges

### A.  State Secrets Privilege

The state secrets privilege is a "common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security." Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991). In United States v. Reynolds, the Supreme Court recognized the privilege and set forth standards governing its use. 345 U.S. 1, 7-11 (1953). The privilege may be invoked only by the government and may be asserted even when the government is not a party to the case. See, e.g., Fitzgerald v. Penthouse Int'l., Ltd., 776 F.2d 1236 (4th Cir. 1985). Once properly invoked, "the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege." Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984). "[T]he more plausible and substantial the government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and

scope of the claim." Id. at 59. But "the privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter." Id. at 57.

### 1.   Actual Personal Consideration by the Attorney General

To invoke the state secrets privilege, there must be (1) a "formal claim of privilege," (2) "lodged by the head of the department which has control over the matter," (3) "after actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8. "It is of the utmost importance . . . that the Government comply with the formal requisites for assertion of the claim." Kinoy v. Mitchell, 67 F.R.D. 1, 8 (S.D.N.Y. 1975). Because the Court must rely so heavily upon the judgment of the responsible executive officer . . . it must be clear that the judgment was properly exercised. At a minimum there must be an explicit representation to this effect." Id. at 9. Courts assessing whether this procedural requirement has been met have found that government officials who have not "reviewed the specific content of the material for which privilege is sought" are not competent to assert the privilege. Yang v. Reno, 157 F.R.D. 625, 634 (M.D. Penn. 1994).

Courts have found the "actual personal consideration" requirement to be met where, as here, the heads of department personally considered the nature of Plaintiffs' requests, see Declaration of William P. Barr, dated April 13, 2020 ("Second Barr Decl.") ¶ 6, Public Declaration of Richard A. Grenell, dated March 25, 2020 ("Grenell Decl.") ¶ 8, and considered the information provided in the classified declaration by the Assistant Director of the FBI's Counterterrorism Division and in the classified declaration of the CIA that details the dangers to national security if the information would be disclosed. See, e.g., Edmonds v. U.S. Dep't of Justice, 323 F. Supp. 2d 65, 75 (D.D.C. 2004) (classified declaration of the Deputy Director of

the FBI submitted for *in camera* review in support of Attorney General's formal invocation of

the state secrets privilege); In re United States, 872 F.2d 472, 474 (D.C. Cir. 1989) (classified

declaration of the assistant director of the FBI's Intelligence Division submitted for *in*

*camera* review in support of Attorney General's formal invocation of the state secrets privilege);

Halkin v. Helms, 598 F.2d 1, 5 (D.C. Cir. 1978) (privilege invoked by Secretary of Defense was

supported by *in camera* testimony of Deputy Director of the National Security Agency).

     Plaintiffs assert that the privilege is not properly invoked here where neither then-

Attorney General Barr nor former Acting Director of National Intelligence Grenell personally

saw and considered the text of the records at issue, and where the FBI failed to retrieve

documents for which the privilege is asserted. Pls. Reply, at 17. But the Government has only

asserted the privilege over specific documents and portions of documents identified in the

classified and unclassified declarations, see Sanborn Decl. ¶ 41; FBI Surreply, at 3 n.2, 7. The

only exception is the FBI's assertion of the privilege over a listing of all documents related to the

Subfile Investigation, which the Court discusses in more detail below. Id. ¶ 64.

     Courts have found the personal consideration requirement met where the head of

department states in an affidavit that he or she has "reviewed a representative sample of the

documents as well as affidavits of staff members who had received all of the documents."

Northrop, 751 F.2d at 400. "In a case such as this, the [Attorney General], once []he has properly

invoked the claim of privilege and adequately identified categories of privileged information,

cannot reasonably be expected personally to explain why each item of information arguably

responsive to a discovery request affects the national interest." Kasza v. Browner, 133 F.3d

1159, 1169 (9th Cir. 1998). "[E]xplaining through a competent official . . . how the claim of

privilege plays out in practice is consistent with Reynolds's insistence that the decision to object

be made at the highest level." Kasza, 133 F.3d at 1159. Accordingly, the Court finds the actual

personal consideration requirement to be met in this case.

### 2.  Scope of the State Secrets Privilege

Plaintiffs contend that the FBI's burden of proof on the state secrets privilege is "much

greater" in this case because twenty years have passed since the relevant events. Pls. Reply, at

12. In support of this proposition, Plaintiffs cite a number of cases that address qualified

privileges, but do not address the state secrets privilege. See, e.g., Kinoy, 67 F.R.D. at 10-11

(discussing the factors that courts should consider when assessing qualified privileges); Swanner

v. United States, 406 F.2d 716, 719 (5th Cir. 1969) (discussing a qualified privilege over

criminal investigative reports); Capitol Vending Co. v. Baker, 35 F.R.D. 510, 511 (D.D.C. Sept.

8, 1964) (discussing a qualified executive privilege over investigative documents). The state

secrets privilege, by contrast, is absolute, and does not have an expiration date or depend on the

existence of any investigation. See Ellsberg, 709 F.2d at 57; Fitzgibbon v. CIA, 911 F.2d 755,

763 (D.C. Cir. 1990) ("we reject [the] contention that the District Court was under an obligation

to consider the effect of the passage of time" upon information regarding intelligence sources

and methods).

Plaintiffs reiterate their argument, first made in their motion to compel the FBI's

production of the 2012 Summary Report, that the state secrets privilege does not apply to "fact

information collected by law enforcement involving the investigation of criminal activities inside

our borders." Pls. Reply, at 14. In doing so, Plaintiffs again mischaracterize the nature and

origins of the September 11 attacks. Because "the state secrets doctrine pertains generally to

*national security* concerns, the privilege has been viewed as both expansive and malleable."

Ellsberg, 709 F.2d at 57 (emphasis in original). As explained by the Court's October 21, 2020

Opinion & Order, see ECF No. 6510, the characterization of the 9/11 investigation as concerning solely domestic security issues is incorrect.

Intelligence activities conducted domestically have been found by courts to be no different for disclosure purposes than foreign intelligence activities conducted abroad. See CIA v. Sims, 471 U.S. 159, 169 (1985) (making clear that "all sources of intelligence information" are protected from disclosure); see also Fitzgibbon., 911 F.2d at 764-65 (holding that, after Sims, domestic intelligence sources are protected to the same extent as foreign sources); accord Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice, 160 F. Supp. 3d 226, 235-36 (D.D.C. 2016) (applying the Supreme Court's expansive view of what constitutes an "intelligence source" in Sims to the activities of the FBI); cf. Mohamed v. Jeppesen Dataplan, Inc., 614 F.3d 1070, 1086 (9th Cir. 2010) (citing Sims favorably in determining the scope of the state secrets privilege). Indeed, courts have already applied the state secrets privilege in contexts similar to the present case. See, e.g., Fazaga v. F.B.I., 884 F. Supp. 2d 1022, 1030 (C.D. Cal. 2012) (applying the state secrets privilege in a case involving FBI surveillance of members of the Muslim community in California), aff'd in part, rev'd in part on other grounds, 965 F.3d 1015 (9th Cir. 2020). The Court of Appeals has also found the state secrets privilege to apply to the disclosure of national security information in law enforcement investigations. See United States v. Abu-Jihaad, 630 F.3d 102, 141 (2d Cir. 2010) (applying the privilege in the prosecution of a former Navy officer convicted of communicating national defense information to unauthorized persons).

### 3.  Whether the Information at Issue is Privileged

After a court determines that the privilege has been properly invoked, it then "must make an independent determination whether the information is privileged." Jeppesen Dataplan, 614

F.3d at 1080 (internal citations omitted). The court must satisfy itself "that there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security." Zuckerbraun, 935. F.2d at 546-47. "The Executive bears the burden of satisfying a reviewing court that the Reynolds reasonable-danger standard is met." El-Masri v. United States, 479 F.3d 296, 305 (4th Cir. 2007). "Simply saying 'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1203 (9th Cir. 2007). Rather, the government must provide "[s]ufficient detail" to enable the court to conduct a meaningful examination. Id. But "it is recognized that the government need not demonstrate that injury to the national interest will inevitably result from disclosure." Ellsberg, 709 F.2d at 58 (internal quotations omitted). Although the privilege "is not to be lightly invoked," Reynolds, 345 U.S. at 7, the court must accord the "utmost deference" to the executive's determination of the impact of disclosure on military or diplomatic security. Zuckerbraun, 935 F.2d at 547 (internal citations omitted).

The Government asserts the state secrets privilege over four categories of information as described in the Government's public and classified declarations: (i) subject information, (ii) reasons for investigation and results, (iii) sources and methods, and (iv) foreign government information and information sharing and cooperation with foreign partners. Second Barr Decl. ¶ 5. These are typical categories of information over which the Government has previously applied the state secrets privilege. See, e.g., Ibrahim v. Dep't of Homeland Sec., No. 06-00545 (WHA), 2013 WL 4549941, at *4-5 (N.D. Cal. Aug. 23, 2013) (upholding state secrets privilege over information pertaining to subject identification, reasons for investigations and results, and sources and methods used in counterterrorism operations).

24

The Government seeks to protect "information which would indicate that a particular individual is or was the subject of a national security investigation . . . [which] includes information that could tend to confirm or deny whether a particular individual is, was, or was not the subject of a national security investigation;" "information which would reveal the reasons a particular individual is or was the subject of a national security investigation and information obtained as a result of that investigation;" "information which would reveal sensitive sources and methods used in a national security investigation;" and "information received from a foreign government with the understanding that it and the nature of the information sharing and cooperation between the FBI and foreign partners in a national security investigation will remain confidential." Second Barr Decl. ¶ 5. The former Acting Director of National Intelligence asserted the privilege over foreign government information; intelligence activities, sources, and methods; and information concerning foreign activities of the United States, including confidential sources. Grenell Decl. ¶ 15.

Plaintiffs contend that the Government's declarations do not present the essential specifics necessary for the Court to perform the independent review required at this step in the Reynolds analysis. Pls. Reply, at 18. The public Sanborn Declaration identifies the documents over which the state secrets privilege is being asserted, along with the reasoning, in general strokes, why such information must be protected. See Sanborn Decl. ¶¶ 41-77. The Classified Sanborn Declaration, which is over three times as long as the public declaration, details the specific documents as well as the redacted sections of previously released documents that are covered by the state secrets doctrine, and more specifically details the harms to national security that may result from their release. See Classified Sanborn Decl. ¶¶ 57-298. Unfortunately, the Court is precluded from explaining the matters covered by the privilege in more detail than can

be found in the public Sanborn declaration, because "[c]are in protecting state secrets is necessary not only during a court's review of the evidence, but in its subsequent treatment of the question in any holding." Black v. United States, 62 F.3d 1115, 1119 (8th Cir. 1995).

The Court can, however, assuage some of the concerns Plaintiffs raise in their motion papers. Plaintiffs claim that "none of the FBI declarations contain a shred of evidence that the government made any effort to 'narrowly tailor' its privilege claims and disentangle nonsensitive information to the maximum extent possible." Pls. Reply, at 20. Rather, Plaintiffs claim, "the FBI asserts privilege over entire documents rather than providing line-by-line redactions." Id. These concerns are largely unfounded. The FBI has produced approximately 4,000 documents to Plaintiffs, most of which, as far as the Court has seen, contain only line-by-line redactions, if any. Gilhooly Decl. ¶ 19. The Government has only asserted the privilege over the 20 entire documents identified in Public Privilege Log, as well as the documents described on the Classified Privilege Log. Sanborn Decl. ¶ 41. For all of these documents, the Government explained the reasons why the entire documents cannot be produced in its classified declarations. Where the Court sought additional explanation regarding the reasons for classifying either entire documents or line-by-line redactions in produced documents, the Court asked the Government to explain their process in camera. See ECF No. 6461. On the whole, the Government's large production, and limited number of withheld documents, undermines Plaintiffs' allegations.

Plaintiffs also claim, without evidence, that "factual information concerning the whereabouts and activities 20 years ago of known Saudi officials and their subagents cannot by its very nature of labeled as a 'state secret.'" Pls. Reply, at 20. As laid out in the public Sanborn declaration, the only information over which the Government has asserted the privilege is that which falls under the four identified categories. Sanborn Decl. ¶ 42. The Government is not

asserting the privilege over factual information untethered to the identified categories. Plaintiffs claim that the FBI attempts to "transform" that fact information into "subject information" to "assert a privilege that does not exist. Pls. Reply, at 20. Such a privilege does, in fact, exist. See Fazaga, 884 F. Supp. 2d at 1041 (privileged asserted over "subject identification," seeking to protect information "that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation"). Plaintiffs further claim that FBI reports containing a record of facts assembled from third-party sources are clearly discoverable, citing caselaw on hearsay exceptions under the rules of evidence, without considering whether such information may be properly privileged. Pls. Reply, at 23. The Court agrees with the FBI that these hearsay exception cases are irrelevant. See FBI Surreply, at 6-7. Moreover, and most fundamentally, the Court recognizes that the mere passage of time does not cause the FBI to cease its efforts to bring terrorists and terrorists organizations to justice, particularly with regards to the deadliest attack in our nation's history. Sanborn Decl. ¶ 105.

Plaintiffs' expert contends that "there is no basis offered to demonstrate that any subject information could be gleaned from the documents sought by the Plaintiffs, and even assuming that it could, no rationale is offered to assert state secrets over such information at this time." Youssef Decl. ¶ 56. The Government extensively provides the basis for its assessment in its classified declarations, and the FBI's public statements that "disclosure of whether other individuals are or are not subjects of the investigation would tend to reveal how much the FBI knows or does not know about the activities and associates of the known subjects," and that "confirmation that an individual is not under investigation could provide an incentive to terrorist organizations to utilize that individual to commit a terrorist act before his or her associations are

detected," provide adequate rationale to suggest that disclosure may cause damage to national security. Sanborn Decl. ¶ 46.

Plaintiffs further assert that given that facts can come from multiple sources, and that so much time has transpired, information can be provided with the source identification redacted. Pls. Reply, at 21. Plaintiffs contend that there is no indication that the FBI made the effort to limit its assertions to the bare minimum of information that would identify a purported confidential source in any instance. Id. The Government has explained at length in the Classified Sanborn Declaration, however, why the release of the specific information at issue here could tend to identify the human sources who provided that information. Simply redacting the source's identity, as Plaintiffs suggest, is not sufficient. See, e.g., Larson v. Dep't of State, 565 F.3d 857, 863-65 (D.C. Cir. 2009) (holding that information provided by CHS that could reveal the identity of intelligence source was properly withheld). The Court is satisfied by the Government's explanations and does not find that the FBI has redacted any more information than necessary to properly protect confidential sources.

Plaintiffs also claim that because the FBI asserts broad privileges for "foreign government information" but only notes in some cases that such information involved foreign governments "not the Kingdom of Saudi Arabia," the only possible conclusion is that where the foreign government is not specified as "not the Kingdom of Saudi Arabia," the information must have involved the Kingdom. Pls. Reply, at 22 (citing Pounian Reply Decl., Ex. 11, at ¶¶ 7-8, 14, 16-20). If privileges are being asserted for information received from Saudi Arabia, such information, Plaintiffs argue, should have been produced in response to Plaintiffs' discovery requests directed to the Kingdom. Id. The Classified Sanborn Declaration provides additional information regarding the origination of the foreign government information at issue. The Court

is satisfied by the information provided in the FBI and finds that there is no need for the FBI to provide any additional information on the origination of any documents to the parties.

In sum, the Court upholds the Government's claim of state secrets privilege regarding the classified information over which it is being asserted, as set forth generally in the Second Barr Declaration and described in detail in the Classified Sanborn Declaration.

## B.  Law Enforcement Privilege

The law enforcement privilege protects "information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel [or] the privacy of individuals involved in an investigation, and information that would otherwise . . . interfere[] with an investigation." In re City of New York, 607 F.3d 923, 944 (2d Cir. 2010) (internal quotation marks and citations omitted). The party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents in question. In re Sealed Case, 856 F.2d at 271-72. To meet this burden, "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." Id. at 271 (internal citations omitted).

The FBI has properly established the applicability of the law enforcement privilege. The D.C. Circuit Court of Appeals has found that officials other than the head of the department could assert the privilege, including lesser officials such as the head of the relevant office or division. See Landry v. F.D.I.C., 204 F.3d 1125, 1135-36 (D.C. Cir. 2000). The FBI has satisfied this criterion by submitting classified and unclassified declarations from Assistant Director

Sanborn, who oversees the FBI's counterterrorism division and bases her assertion of the privilege on her personal knowledge and review and consideration of the documents and information available to her in her official capacity. Sanborn Decl. ¶¶ 3, 10. The Sanborn declarations also identify with specificity the information for which the privilege is claimed, along with an explanation why it properly falls within the privilege's scope. Id. ¶¶ 80-107; Classified Sanborn Decl. ¶¶ 301-62.

Because the Court has found that the state secrets privilege properly applies to the classified information over which it is being asserted, the Court need only analyze whether the law enforcement privilege applies to the unclassified information contained in the Core Records over which the FBI asserts the privilege. The FBI has explained why this unclassified information falls within the privilege's scope. In unclassified and unprivileged terms, this information includes information revealing the FBI's investigative interest in certain individuals, specific law enforcement methods and techniques used in the FBI's national security investigations, specific information obtained, or gaps in information, relating to the investigations, the FBI's opinions and conclusions about certain witnesses and evidence gathered in the investigations, personal information regarding third parties which if revealed would discourage cooperation, and information which would indirectly tend to reveal confidential cooperation from a foreign government. Sanborn Decl. ¶ 81.

More specifically, the privilege is asserted over portions of the reports of witness interviews that would disclose the identity of individuals who were of investigatory interest to the FBI; agents' assessments of physical demeanor and credibility that would disclose what FBI agents deemed to be important with respect to a particular witness interview; the opinions, conclusions, or investigative analysis of FBI agents in connection with names or other

information provided by witnesses that would reveal what the FBI did or did not know about the named individuals; and references to specific information that the FBI had been lacking at a fixed point in time that would reveal vulnerabilities in the FBI's ability to gather evidence. Sanborn Decl. ¶¶ 82-85. The FBI also asserts the privilege over references to the utilization of specific law enforcement databases in specific situations and the results of searches in those databases; references to the service of the subpoenas for grand jury testimony or documents upon certain individuals; the discussion of strategies employed by FBI agents to elicit information from particular witnesses; lead information in electronic communications; and administrative accomplishment information used to gather statistics for internal and external performance management; and certain personal information that was provided by witnesses during voluntary interviews. Id. ¶¶ 86-87, 89-91, 95.[3]

These categories of information fall within the scope of the law enforcement privilege, specifically as the privilege is designed to "prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources . . .  and otherwise to prevent interference with an investigation." In re Dep't of Investigation of City of New York, 856 F.2d 481, 484 (2d Cir. 1988) (internal citations omitted). An investigation, however, "need not be ongoing for the law enforcement privilege to apply as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information" is revealed to the public. In re City of New York, 607 F.3d at 944 (internal quotations omitted). The disclosure of the information described in the Sanborn Declaration could reasonably be expected to interfere with both the Subfile Investigation and future investigations. Revealing the identity of individuals of

---

[3] The Court addresses separately the FBI's assertion of the law enforcement privilege over classification markings (Sanborn Decl. ¶ 88), the Al Bayoumi opening EC (Id. ¶ 93), all the unclassified information in Document 12 (Id. ¶ 94), and requests for certain compilations of records (Id. ¶¶ 96-104).

investigatory interest, what FBI agents deemed to be important in the investigation, what FBI agents did or did not know about certain individuals, and gaps in the FBI's ability to gather evidence can be reasonably expected to interfere with both the Subfile Investigation as well as future investigations. The same holds true for the FBI's techniques and procedures, including the use of certain databases, investigatory methods and strategies, as well as personal information provided by interviewees and administrative accomplishment information.

"Once a court has determined that the law enforcement privilege applies . . . there [is] a pretty strong presumption against lifting the privilege." In re City of New York, 607 F.3d at 945 (internal citations and quotation marks omitted). "To rebut that presumption, the party seeking disclosure must show (1) that the suit is non-frivolous and brought in good faith, (2) that the information sought is [not] available through other discovery or from other sources, and (3) that the information sought is importan[t] to the party's case." Id. (internal quotation marks omitted). With respect to the importance of the information sought, a "*compelling* need" for the information is required. Id. (emphasis in original). Rebutting the presumption, however, does not end the inquiry. "Rather, once the presumption has been overcome, a court must still balance [t]he public interest in nondisclosure . . . against the need of a particular litigant for access to the privileged information." Id. (internal citations and quotations omitted). Disclosure is therefore only required if the compelling need outweighs the public interest in nondisclosure. See id.

Judge Daniels found that "Plaintiffs shall be permitted to conduct limited and targeted jurisdictional discovery critical to answering . . . whether and to what extent Thumairy, Bayoumi, and their agents took actions in 2000, at the direction of more senior Saudi officials, to provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." March 28 Order, at 23. The information at issue here is not "critical" to answering that question.

Specifically, information about the FBI's assessment of evidence, information revealing the gaps in the FBI's knowledge, and information concerning the FBI's techniques and procedures are in no way "critical" to the limited jurisdictional inquiry in this litigation. The same certainly holds true for personal information and information gathered for performance management. The information over which the privilege is being asserted in this litigation is not the same as the quota data for which plaintiffs demonstrated a need in the civil rights action against the New York Police Department for its "stop and frisk" policy. Cf. Floyd v. City of New York, 739 F. Supp. 2d 376, 384 (S.D.N.Y. 2010) (finding that plaintiffs, who had been unable to prove their quota theory through other discovery, had a compelling need for quota information). In any event, even if the Court were to accept that Plaintiffs have a compelling need for disclosure, they have not established that the need outweighs the public interest in nondisclosure. The Court is satisfied, based on the submissions, that the public interest in nondisclosure is substantial. Therefore, the Court finds that there is no compelling need outweighing the public interest in nondisclosure.

### C.  Assertion of Other Privileges

The FBI has asserted the protections of the National Security Act over the same information over which the state secrets privilege has been asserted. See FBI Br., at 14-15. The FBI has also asserted the deliberative process privilege over Documents 12, 13, and 15, and the work product doctrine over Document 13 and parts of the 2014 Report. See id., at 17-18. Because the FBI has asserted these privileges only for information over which it has already asserted other privileges, and the Court is satisfied of these other privileges' applicability, the Court need not conduct an independent analysis of the application of the National Security Act, deliberative process privilege, or work product doctrine to the information at issue.

### III.    List of Subfile Documents

Plaintiffs request that the FBI produce its entire Subfile Investigation of Al Jarrah, Al Thumairy, Al Bayoumi, and their subagents, as well as a list of all Subfile documents responsive to the subpoena. Plaintiffs contend that there "can be no question" that the FBI Subfile materials are directly relevant and assert that the FBI has not provided a proper explanation for why its Subfile could not be produced. Pls. Br., at 12. Plaintiffs cite their expert's estimation that the Subfile contains about 5,000-6,000 pages, and that the FBI has routinely produced similar amounts of pages in other litigations. Id. Plaintiffs also request that the FBI produce a comprehensive list of Subfile documents in its possession that are responsive to the subpoena, analogous to the Vaughn index a government agency must provide in response to a routine FOIA request. Id.

The FBI asserts that any such list would be protected by the state secrets privilege. FBI Br., at 10. Disclosure of the number of responsive documents, as well as the types, dates, and descriptions of responsive documents, would tend to reveal such privileged facts as when and how much investigative activity took place and the FBI's focus on different subjects. Id. For example, disclosure of the volume of records would reveal when particular investigative activity occurred, potentially revealing information such as what witnesses the FBI did or did not interview, what types of leads the FBI followed and which it did not, and what types of sources the FBI did not did not utilize. Sanborn Decl. ¶ 64. This roadmap would provide valuable insights not just to the subjects of the Subfile Investigation but to potential subjects of other national security investigations. Id. ¶¶ 64-67.

Additionally, the FBI contends that it cannot produce all documents related to the Subfile Investigation, as well as the compilations of records related to Al Bayoumi, Al Thumairy, Al

Jarrah, or Mohdar Abdullah, without revealing information protected by the law enforcement privilege. The universe of documents pertaining to an investigation, when taken together, would reveal information regarding the investigation that is qualitatively different than the information that would be disclosed when the documents are considered individually. Sanborn Decl. ¶ 97. The set of records related to an investigation reveals the extent of the investigation, the sources and techniques used, the focus of the investigation, and the results of the investigation. Id. This roadmap would provide valuable insights not just to the subjects of the Subfile Investigation but to potential subjects of other national security investigations. Id. ¶ 98.

Regarding records referencing Al Jarrah, Al Thumairy, Al Bayoumi, and Abdullah specifically, their disclosure would implicate the specific predicate for opening cases on them, the complete results and current status of the investigation as to each of them, the sensitive law enforcement sources and techniques used in the investigation of each of them, and the cooperation of and information received from foreign government partners concerning those individuals. Id. ¶ 99. Additionally, a compilation of all documents from a particular investigation or related to a particular subject would inevitably reveal the gaps in the information the FBI was able to obtain, which terrorists could exploit in the future to cause significant harm to the FBI's investigative efforts. Id. ¶ 101. While certain documents or facts relating to the Subfile Investigation or to the investigations of particular subjects may be unprivileged when viewed separately, they would not be unprivileged if viewed together with all other documents from the investigative file. Id. ¶ 102. The FBI therefore asserts the law enforcement privilege over the entire universe of documents from the Subfile Investigation when taken as a whole. Id.

Plaintiffs respond that the FBI does not dispute that the Subfile directly targets the jurisdictional issues at stake, and that the FBI offers no good justification for its failure to

produce its entire Subfile except for vague, conclusory, and factually unsubstantiated claims that it would be too burdensome. Pls. Reply, at 5. Plaintiffs further contend that the number of documents in the file is immaterial to Plaintiffs' requests for the relevant evidence. Id., at 21. Plaintiffs claim that the FBI failed to assert the state secrets privilege as to documents that it did not even retrieve. Id., at 17. Plaintiffs further question why the date of documents in the Subfile qualifies as state secrets, citing to the fact that the FBI admits that its investigation of Al Jarrah was opened, along with new investigations of Al Bayoumi and Al Thumairy, after 2007. Id., at 21. Plaintiffs argue that this shows that the FBI asserts privileges to suit its own litigation purposes and will divulge previously "secret" information once its interests change. Id.

Plaintiffs are incorrect that the state secrets privilege must be asserted as to each document for the FBI to assert it over the universe of documents as a whole. Courts have upheld the assertion of the state secrets privilege over the general subject matter of a suit without the need for review of individual records where assertion of the privilege "did not relate to particular documents, but to all documents." Molerio v. FBI, 749 F.2d 815, 821 (D.C. Cir. 1984) (emphasis in original). Additionally, courts "will uphold a claim of privilege for information that standing alone may seem harmless, but that together with other information poses a reasonable danger of divulging too much to a 'sophisticated intelligence analyst.'" In re U.S., 872 F.2d 472, 475 (D.C. Cir. 1989) (quoting Halkin v. Helms, 598 F.2d 1, 10 (D.C. Cir. 1978)). "[I]f seemingly innocuous information is part of a classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other classified information." Kasza, 133 F.3d at 1166. Even if some dates or other information may be publicly known, revealing the full listing of all documents in the Subfile Investigation may pose a danger to the national security.

The government has also previously asserted privileges over file listings. In <u>Bassiouni</u>, the government similarly maintained that "providing a list of the documents that mention Bassiouni, and claiming document-by-document exemptions for those whose contents are classified, would reveal details about intelligence-gathering methods." <u>Bassiouni v. CIA</u>., 392 F.3d 244, 245 (7th Cir. 2004). The court found that it was "easy to appreciate the basis of this concern," reasoning that a "list of documents could show clusters of dates that reveal when the agency acquired the information." <u>Id.</u> This could reveal how the information came to the CIA's attention, and "in the intelligence business, 'how' often means 'from whom.'" <u>Id.</u> While some of the information requested may already be publicly available, "the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, method and operations." <u>Fitzgibbon</u>, 911 F.2d at 766. Accordingly, the Court declines to order the FBI to produce a list of Subfile documents. For the same reasons, the Court declines to order the FBI to produce all documents related to the Subfile Investigation.

## IV.    Specific Document Requests

### A.  Al Jarrah Documents

Plaintiffs contend that the FBI must produce the documents specifically demanded in Plaintiffs' subpoena about Saudi Embassy official Musaed Al Jarrah, referenced in the 2012 Summary Report as the person who "tasked [Al] Thumairy and [Al] Bayoumi with assisting the hijackers." Pls. Br., at 12. At the May 13, 2019 conference, Government counsel stated that records concerning Al Jarrah "were part of the FBI's search," and that the FBI has "searched for records concerning" Al Jarrah. Declaration of Steven R. Pounian, dated January 15, 2020 ("First Pounian Decl."), Ex. 8, at 20. But the FBI has not identified and released the documents that are central to the jurisdictional inquiry, including FBI 302 witness interview statements, phone, and

37

banking records. Pls. Br., at 13. Plaintiffs contend that the FBI would not have stated in the 2012 Summary Report that "there is evidence" that Al Jarrah tasked Al Bayoumi and Al Thumairy without a significant factual predicate. Id. (citing First Pounian Decl., Ex. 14, at 4). Plaintiffs argue that the FBI fails to present any evidence that it conducted a proper search for Al Jarrah evidence or a description of the method it used to locate Al Jarrah materials. Pls. Reply, at 8.

The FBI contends that these records are protected by the state secrets privilege. FBI Br., at 10. It also argues that the statement in the 2012 Summary Report that "there is evidence" that Al Jarrah tasked Al Thumairy and Al Bayoumi is more accurately described as an investigative theory than an objective statement of fact. Id. (citing Declaration of Michael C. McGarrity, dated Sept. 12, 2019, ¶ 22). The FBI nonetheless searched for the "evidence" referenced, as well as other documents relating to Al Jarrah. Id., at 11 n.6. Those records have been withheld as privileged, and the FBI describes the records and the harms to national security that would result from disclosure in its classified submissions. Id.; Sanborn Decl. ¶ 99 n.14.

The Court recognizes that in camera examination "is necessarily conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure." Vaughn v. Rosen, 484 F.2d 820, 825 (D.C. Cir. 1973). But "[i]n national security cases, some sacrifice to the ideals of the full adversary process are inevitable." Military Audit Project v. Casey, 656 F.2d 724, 751 (D.C. Cir. 1981). The Court is satisfied both that the FBI searched for documents referencing Al Jarrah, including the "evidence" referenced in the 2012 Summary Report, and that "there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security." Zuckerbraun, 935. F.2d at 546-47. Accordingly, the Court will not order the FBI to produce the additional documents Plaintiffs demand concerning Al Jarrah.

38

**B.** ▆▆▆▆ **Documents**

Plaintiffs argue that the FBI refused to identify and produce key evidence about ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ who held a private meeting with Al Bayoumi before Al Bayoumi's first meeting with the hijackers. Pls. Br., at 15 (citing First Pounian Decl., Ex. 12, ▆▆▆▆▆▆▆▆ While the FBI produced the 302 witness interview statements of ▆▆▆ and others who interacted with him, the FBI has not released evidence, as set forth in the 2012 Summary Report, of his "role aiding Bayoumi in facilitating the hijacker[s'] arrival and settlement in California." Id. (citing First Pounian Decl., Ex. 14, at 2). Phone records released by the FBI show ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, but the FBI has not produced any proof about the specific tasks undertaken ▆▆▆▆ for the hijackers in coordination with Al Bayoumi and Al Thumairy. Id. (citing First Pounian Decl., Exs. 15, 16).

The FBI responds that because it cannot acknowledge whether an individual is or was a subject of a national security investigation, the FBI cannot respond fully to Plaintiffs' requests for records relating to ▆▆▆. FBI Br., at 8. The FBI has not acknowledged whether ▆▆▆ has been the subject of the Subfile Investigation. Sanborn Decl. ¶ 52. The volume of records the FBI possesses with respect to ▆▆▆ is itself information that is subject to the state secrets privilege because the FBI could not reveal the volume of records in its possession without revealing whether or not ▆▆▆ was the subject of an investigation and the results of any such investigation, including precisely what the FBI knows or does not know with respect to ▆▆▆ activities. FBI Br., at 8-9. The FBI also clarifies that the 2012 Summary Report does not reference evidence in the FBI's possession, but merely states that the FBI intended to interview ▆▆▆ Id., at 9 n.5.

Plaintiffs respond that while the 2012 Summary Report may not reference evidence in the FBI's possession, the report refers directly to relevant fact information that the FBI collected about ███████ in the support plot but withheld from production. Pls. Reply, at 9. The FBI's submission also ignores the phone record evidence Plaintiffs assembled and the FBI interview statements showing ████████████████████ Id. Plaintiffs further contend that the information they seek about individuals whose names have been publicly linked to the alleged 9/11 support plot is discoverable fact information whether or not the FBI deemed those individuals as subjects. Id., at 20. Plaintiffs' expert contends that no basis is offered to demonstrate that any subject information could even be gleaned from the documents sought by Plaintiffs. Youssef Decl. ¶ 56. Likewise, Plaintiffs contend that any such subjects are well aware of the Government's past interest and investigation of this case, see Youssef Decl. ¶ 57, and if there was any risk that ████ would destroy evidence if documents are released to Plaintiffs, that risk has long come and gone. Pls. Reply, at 20-21.

The Government has often asserted the state secrets privilege over "subject identification," Ibrahim, 2013 WL 4549941, at *4, and courts have found that "[d]isclosure of those *not* under investigation by the FBI is . . . dangerous because individuals who desire to commit terrorist acts may then be motivated to do so upon discovering that they are not being monitored." Fazaga, 884 F. Supp. 2d at 1044 (emphasis in original). "Information about who is being investigated while the status of others [is] unconfirmed may be manipulated by individuals and terrorist groups to discover whether they or any of their members are being investigated." Id. Additionally, as stated above, the Government is not asserting the privilege over factual information untethered to the identified privilege categories. See *supra* at 25. The Court will therefore not order the FBI to reveal the volume of records on ████ in its possession.

As the Court previously found, however, the release of some relevant documents, alone, may not necessarily confirm or deny that an individual is the subject of a national security investigation. See ECF No. 6159, at 18 ("Relevant documents may be found . . . the production of which may have no bearing on whether or not the FBI has opened an investigation."). This is especially the case where, as here, the FBI has disclosed to Plaintiffs that ██████████

███████████████████████████████████████████████████

████████████████████   The FBI's concerns regarding the implications of whether many or no documents are produced does not mean that no relevant unprivileged documents can be produced at all. Accordingly, the Court orders the FBI to search for and produce any relevant unprivileged ████ documents.

### C.  April 2016 Report (Document 12)

Plaintiffs request that the FBI produce its April 2016 Review Report, a 16-page document the FBI identified as a core document on its privilege log that contains an "[a]nalytic review and assessment of [the] case." Pls. Br., at 16 (citing First Pounian Decl., Ex. 17, at ¶ 12). Plaintiffs contend that the Report is the last substantive document prepared by the FBI in the Subfile Investigation, and it undoubtedly addresses and updates the proof assembled by the FBI about the roles of Al Jarrah, Al Thumairy, Al Bayoumi, and other Saudi government officials. Id. It is not credible, Plaintiffs argue, for the FBI to contend that the entire Report is privileged, where the FBI has declassified and released most of the FBI's 2012 and 2014 Summary Reports about the involvement of the same Saudi government personnel in assisting the 9/11 hijackers. Id. Furthermore, Plaintiffs assert that the 2016 Report contains relevant evidence that in fairness must be made available to allow Plaintiffs to answer the McGarrity Declaration's claim that the 2012 Report's statements about Al Jarrah were merely an "investigative theory." Id.

The FBI contends that the 2016 Report is protected in part by the state secrets privilege because it includes information regarding subjects of national security investigations, the results of investigations, sensitive sources and methods, including confidential human source ("CHS") reporting, and foreign government information. FBI Br., at 11. This document provides a "roadmap" into how the FBI conducts sensitive national security investigations. Sanborn Decl. ¶ 62. Specifically, the FBI contends that disclosure of the results of the FBI's investigation would alert subjects and other individuals named in the document as to what the FBI knew or did not know about their activities. Id. This could assist those individuals in taking countermeasures, such as destroying evidence, attempting to influence witnesses, and avoiding detection of their future activities. Id. The FBI additionally asserts that Plaintiffs' contention that the 2016 Report contains evidence necessary to allow Plaintiffs to answer the McGarrity Declaration is sheer speculation. FBI Br., at 11-12.

The FBI also asserts the law enforcement privilege over the unclassified information in the document. The law enforcement privilege protects summaries and quotations of interview reports and other documents that have been produced to the parties in this case. Id., at 16-17. This information is nonetheless encompassed within the law enforcement privilege when included in this analytical report discussing and analyzing the results of the FBI's investigation. Sanborn Decl. ¶ 94. This is because disclosure of the facts that the FBI decided were pertinent to include reflects the focus and direction of the investigation as of that date, and the significance that the FBI placed on the particular witnesses and particular information discussed. Id. Disclosing which interview statements are discussed or not discussed may also reveal gaps in the FBI's knowledge of events by suggesting that the FBI either did not have certain information or did not appreciate the significance of information it had obtained. Id.

Plaintiffs respond that given the current status of the investigation, the age of the evidence, the importance of the information to Plaintiffs' case, the inability to obtain evidence from other sources, and the availability of a protective order, there is simply no justification for the FBI to assert the law enforcement privilege. Youssef Decl. ¶ 90. Plaintiffs cite United States v. Bilzerian for the proposition that the 2016 Report must be made available to allow Plaintiffs to answer the FBI's Declaration. But Bilzerian discussed implicit waiver of the attorney-client privilege only. 926 F.2d 1285, 1292 (2d Cir. 1991). Not only is Plaintiffs' assertion that this report relates in any way to the McGarrity Declaration sheer speculation, but "disclosure of a type of information *similar* to that presently sought will not vitiate the state secrets privilege." Nat'l. Lawyers Guild v. Att'y. Gen., 96 F.R.D. 390, 402 (S.D.N.Y. 1982) (emphasis in original).

In any event, the Court is satisfied "that there is a reasonable danger that disclosure of the particular facts" over which the FBI asserts the state secrets privilege in the Report "will jeopardize national security." Zuckerbraun, 935 F.2d at 546-47. While "prior disclosure of the specific information sought to be disclosed," such as summaries and quotations of interview reports, "waives the [state secrets] privilege," see id., Plaintiffs also have no "compelling need" under the law enforcement privilege for summaries and quotations of documents already released. In re City of New York, 607 F.3d at 945. Accordingly, the Court declines to order the FBI to produce both the classified and unclassified portions of the Report.

### D.  Opening Electronic Communications (Documents 9, 10, and 11)

Plaintiffs request that the FBI release its communications, partially identified on the FBI's privilege log without dates, regarding the initiation of formal investigations of Al Jarrah, Al Thumairy, and Al Bayoumi. The communications, Plaintiffs contend, necessarily review evidence about actions undertaken by the three Saudi government officials to assist the hijackers.

Pls. Br., at 17. As the FBI has already released information about the roles of each of these officials, there is no proper basis for the FBI to allege that the entire communications are privileged. Id. Plaintiffs also request that the FBI release the dates of each communication under Local Rule 26.2(a)(2)(A), noting that it is already public information that the FBI commenced investigations of Al Thumairy and Al Bayoumi within a year of the 9/11 attacks and a 9/11 Commission public document shows that an investigation involving Al Jarrah was conducted as of January 2004. Id., at 17-18 (citing First Pounian Decl., Ex. 10, at 1).

The FBI has asserted the state secrets privilege over the entirety of the opening electronic communications ("ECs") for Al Jarrah and Al Thumairy, and over the classified portions of the Al Bayoumi EC. Sanborn Decl. ¶ 60. Each of these documents details the predicate for opening investigations into Al Jarrah, Al Thumairy, and Al Bayoumi, respectively, and reveal what the FBI knew or did not know at the time the investigations were opened. Id. ¶ 59. Disclosure of the opening ECs would alert current and future subjects to those activities which are likely to arouse suspicion and result in the opening of an investigation, thus providing valuable insight to those intent on terrorism and other criminal activity on how to avoid detection. Id. Disclosure of such information may also alert subjects and others of the sources of that information, thus revealing sensitive sources and methods. Id. The FBI further contends that the PECs have not shown that information as specific as or matching the information withheld from the documents has been the subject of an official public acknowledgement, and as such, the state secrets privilege has not been waived by the release of general unclassified information regarding a particular subject. FBI Br., at 13.

The FBI additionally argues that the dates on which the investigations were opened are also encompassed within the assertion of the state secrets privilege because if the FBI were to

release the dates the investigations were initiated, it may expose what the FBI knew at that time and was sufficient predicate for an investigation. Sanborn Decl. ¶ 60 n.11. Local Rule 26.2 does not compel the disclosure of information in a privilege log that is itself privileged. FBI Br., at 13. The FBI further clarifies that the opening ECs in question relate to the Subfile Investigation, which did not begin until 2007, not an earlier investigation into Al Bayoumi and Al Thumairy, and that Plaintiffs' cited document does not state that Al Jarrah was the subject of an FBI investigation in 2004. Id., at n.8. Regarding the Al Bayoumi opening EC, the FBI contends that the law enforcement privilege protects a limited amount of unclassified information, consisting of background information regarding Al Bayoumi that is publicly known. Id., at 16. This information is sensitive in the context of this document because the selection of specific facts for inclusion reveals the information upon which the FBI placed particular significance as a predicate for opening a national security investigation. Id.; Sanborn Decl. ¶ 93.

Plaintiffs respond that the FBI's specific factual predicate to conduct an investigation is discoverable, pointing to the fact that the FBI does not address its documents with the fact information to open the FBI's PENTTBOM investigations of Al Thumairy and Al Bayoumi, who the FBI has confirmed were named as subjects shortly after the 9/11 attacks. Pls. Reply, at 25. Plaintiffs' expert contends that the FBI could redact the sources and methods with a line-by-line review and produce the information to Plaintiffs, as this litigation is the only case where the evidence concerning the Saudi government officials and their role in providing support to the 9/11 hijackers will ever be used. Youssef Decl. ¶ 85. The dangers to national security and interference to the Subfile and future investigations that may result if such information were released are further detailed in the Government's classified submissions.

Classified information that a party seeks to obtain is deemed to have been "officially disclosed only if it (1) [is] as specific as the information previously released, (2) match[es] the information previously disclosed, and (3) was made public through an official and documented disclosure." Wilson v. CIA, 586 F.3d 171, 186 (2d Cir. 2009) (internal citations and quotation marks omitted). Indeed, "anything short of such a[n official] disclosure necessarily preserves some increment of doubt regarding the reliability of the publicly available information." Id. at 195. Even if the redacted information seems innocuous in the context of what is already known by the public, "[minor] details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of jigsaw puzzle, each detail may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." ACLU v. Dep't of Justice, 681 F.3d 61, 71 (2d Cir. 2012) (internal citations and quotation marks omitted). Previous disclosures regarding the investigations into these individuals therefore do not require the disclosure of the information now at issue.

Additionally, Plaintiffs' expert's suggestion that this information should be produced to Plaintiffs regardless because this is the only case where the information will be used does not minimize the national security concerns arising from disclosure. Furthermore, the FBI is correct that the date of privileged documents need not be produced where "divulgence of such information would cause disclosure of the allegedly privileged information." Local Rule 26.2(a)(2). The public interest in the nondisclosure of the specific facts that prompted the FBI to open an investigation into Al Bayoumi outweighs any compelling need for the publicly known facts included in this document. See generally FBI Surreply, at 14. Accordingly, the Court finds these ECs to be appropriately protected by the state secrets and law enforcement privileges.

46

### E. Al Jarrah's Phone Records

In a November 25, 2019 email to Plaintiffs, the FBI stated that it "continues to search for additional relevant phone records" for Al Jarrah, and that "[i]f such additional records are located, they will be processed." First Pounian Decl., Ex. 19. By email on January 13, 2020, the FBI informed Plaintiffs that "as to phone records regarding the third main subject, the FBI will not be producing any additional documents." Id., Ex. 18. Plaintiffs contend that phone records were produced for Al Thumairy, Al Bayoumi, and others, and no reason is provided why they should not be produced for Al Jarrah. Pls. Br., at 18. The FBI does not specifically address Al Jarrah's phone records in its unclassified submission, stating only that records and information pertaining to Al Jarrah are protected by the state secrets privilege. FBI Br., at 10. The Court's analysis and conclusions regarding Al Jarrah records are described at pages 37-38, *supra*.

### F. Documents concerning Prince Abdulaziz's ███████████████



Pls. Br., at 18. Prince Abdulaziz held cabinet-level positions in the Saudi government, from which he directed the funding, construction, and operation of the King Fahad Mosque. Id. Plaintiffs contend that the FBI undoubtedly has obtained relevant ███████████████████████████████████████ in relation to Al Thumairy and the 9/11 support plot. Id., at 18-19. Plaintiffs argue that the FBI offers no explanation as to why ███████████████ ███████████████████████████████████████████ Pls. Reply, at 10.

The Government contends that because the FBI cannot acknowledge whether or not Prince Abdulaziz is or was a subject of a national security investigation, the FBI cannot respond fully to Plaintiffs' requests for records relating to Prince Abdulaziz. FBI Br., at 8. Even the volume of records the FBI possesses with respect to these individuals is itself information that is subject to the state secrets privilege. Id.; Sanborn Decl. ¶ 51. If the FBI were to have no records, or only a handful of records, pertaining to an individual person, it could then be inferred that such an individual was not a subject of investigative interest for the FBI, and that the FBI therefore has limited knowledge or information regarding such an individual; similarly, if the FBI were to reveal it had large volumes of material regarding an individual, it could be inferred that such an individual was the subject a national security investigation, and that the FBI has more extensive knowledge regarding such an individual. Id., at 48-49.

As the Court noted above, the Government has often asserted the state secrets privilege over "subject identification." Ibrahim, 2013 WL 4549941, at *4. The FBI has ██████████ ████████████████████████████████████████████████████████████████ Accordingly, any amount of ████████ disclosure or nondisclosure of information may suggest that Abdulaziz was or was not the subject of a national security investigation. The Court therefore declines to order the FBI to produce any ████████ documents concerning ████████ ████████████████

**G.  The FBI's Mohdar Abdullah Case File**

Plaintiffs argue that while the FBI ████████████████████████████████████ ████████████████, the FBI has refused to produce Mohdar Abdullah's complete case file, which allegedly contains the evidence about his contacts with Al Bayoumi and Al Thumairy and the details of the assistance he provided to the hijackers in 2000. Pls. Br., at 19. Judge Daniels

addressed in detail the special role undertaken by Mohdar Abdullah in the hijackers' support plot. March 28 Order, at 21. By virtue of his role, Plaintiffs allege that Abdullah's FBI case file necessarily encompasses key information related to the jurisdictional discovery in this case. Pls. Br., at 19.

The FBI asserts the law enforcement privilege with respect to the compilations of all records related to Abdullah, whom the FBI has acknowledged to have been of investigative interest. Sanborn Decl. ¶¶ 96, 97. A request for all records referring or relating to Abdullah implicates a wide range of sensitive law enforcement information, including, to the extent applicable, the specific predicate for opening the case, the sensitive law enforcement sources and techniques used, and the cooperation of and information received from foreign government partners. Id. ¶ 99. This privilege extends to the compilation of Abdullah documents, not the individual documents that make up the universe, which may or may not be privileged when considered in isolation. Id. ¶ 103. The FBI has asserted the state secrets privilege with respect to discrete pieces of information contained in ████████████████████████ Id. ¶ 41 n.6.

The FBI further contends that the additional searches and processing of Abdullah records sought by Plaintiffs is unduly burdensome in these circumstances, in light of the fact that the Subfile Investigation is still pending and active and contains a large volume of documents, many of which are still classified. FBI Br., at 20-21. The FBI further contends that ████████████ ███████████████████████████████████████████████ ██████████████████████████████ (electronic searches did not locate any FBI report of interview of Abdullah on January 15, 2002), and ██████████████ ██████████████████████████████████ Id., at 21. Additionally, some of ███████████████

49

 but the FBI's search for ███████

████████████████████████████████████████████

███████████████████████████ Gilhooly Decl. ¶ 24, 25. Plaintiffs

question whether this means the records were lost, see Youssef Decl. ¶ 41, and contend that

█████████████████████████████████████████████

█████████████████ should be found in his case file or its subfiles. Hunt Decl. ¶ 9.

The Court has reviewed the FBI's classified submissions detailing the reasons for

invoking the state secrets and law enforcement privileges as to discrete pieces of information in

the ████████████████ and is satisfied that disclosure of those facts will jeopardize

national security. The Court also finds that the public interest in nondisclosure outweighs

Plaintiffs' need for the complete Abdullah case file. Courts tend to favor nondisclosure where the

information "implicate[s] such vital concerns as terrorism," "risk[s] divulging any secret law

enforcement techniques or procedures," or "impair[s] the integrity of [] investigations or

weaken[s] any future law enforcement program." Floyd, 739 F. Supp. 2d at 384-85; see also

Creighton v. City of New York, No. 12-CV-7454 (PGG), 2015 WL 8492754, at *10 (S.D.N.Y.

Dec. 9, 2015) (nondisclosure favored where disclosure would "reveal information about the

nature of governmental operations or the manner in which those operations are conducted").

Here, these factors all support nondisclosure of the complete case file. However, in light

of the key role played by Abdullah in support of the hijackers as described in the March 28

Order, and the lesser burden involved in searching a specific case file for a specific subset of

records, the Court orders the FBI to search the Abdullah case file for subscriber information, toll

records, intelligence analyst charts, and other relevant documents, and to produce any relevant

unprivileged documents to Plaintiffs.

50

**H.  FBI 302 Witness Statements Involving Key Subagents of the Plot**

Plaintiffs contend that the FBI has refused to produce, without justification, the 302

interview statements of the following witnesses: (1) Mohdar Abdullah interviews dated

███████████████, January 15, 2002, ████████████████████████████████████

█████████ and (2) Abdussattar Shaikh, who had contacts with Al Bayoumi and interacted

with the hijackers and lived in Al Bayoumi's San Diego rooming house in 2000. Pls. Br., at 19-

20.

The FBI contends that Sentinel searches did not locate any interview report for Abdullah

corresponding to the January 15, 2002 date mentioned in the 9/11 Commission Report. Gilhooly

Decl. ¶ 33. Additionally, ██████████████████████████████████████████████████

█████████████████ Id. ████████████████████████████████████████████████

██████████████████ See Gilhooly Decl. Att. A ████████████████████████████

████████████████. The FBI also produced ████████████████████████████████

█████████████ See Gilhooly Decl. ¶ 33, Att. A ████████████████. The FBI has undertaken to

determine whether any other interview reports containing substantive information concerning

████████████████ that have not already been processed can be processed and produced. Sanborn

Decl. ¶ 106 n.15. The FBI has also identified and produced a series of interview reports of

██████ See ECF No. 6497, at 2.

Regarding the FBI's commitment to search for and process "all interview reports in the

Subfile Investigation that contain substantive information about Bayoumi, Thumairy, Jarrah, or

████████" see FBI Br., at 4, Plaintiffs question why the FBI did not already process these

documents in September 2018, when they were specifically identified in the "Appendix 1" list

prepared by Plaintiffs' investigator Catherine Hunt and provided to the Government. Pls. Reply,

at 6 (citing Second Pounian Decl., Ex. 10, at ¶ 5.b.). The Court's analysis of this issue is addressed by the Court's analysis of the core records approach in Section I, *supra*. Pursuant to the commitments made by the FBI in the Sanborn Declaration, the FBI is directed to search for and produce any of the requested interview reports that have not yet been located.

I.  **Analysis of Al Bayoumi's** ███████████████

The FBI produced Al Bayoumi's ████████████████████████████████
██████████████████████████████, but refused to produce the FBI's analysis of those ███████████████ Pls Br., at 20. Plaintiffs contend that there is no explanation for why Al Bayoumi, an ostensible student, accountant, and mosque official, ██████████████████. Id. The FBI's analysis of ████████████ is directly relevant to Al Bayoumi's motive and knowing involvement in the 9/11 plot and should be produced. Id.

The FBI responds that the fact that the FBI did not search for any ███████████ analysis merely reflects that the FBI's core records approach prioritized evidentiary material over analytics that were more likely to be privileged. FBI Br., at 21 n.14. Moreover, the FBI contends that Plaintiffs have no need for any analysis performed by the FBI, as the FBI produced the underlying document and Plaintiffs can retain an expert to perform such an analysis. Id. Plaintiffs respond that the FBI essentially admits that it simply decided on its own to ignore Plaintiffs' document requests, withholding the documents without even searching for them. Pls. Reply, at 11. The FBI's suggestion that Plaintiffs hire an expert, Plaintiffs' argue, is a non sequitur, as the ███████████████ undoubtedly contain factual information. Id. Plaintiffs contend that the FBI must first identify and review the documents, and only then may assert any privilege claims. Id.

Plaintiffs are mistaken that the FBI must review every document in the Subfile and assert privileges over each document individually. As discussed above, the FBI is not asserting

privilege over all of the Subfile materials that it is not producing to Plaintiffs, but rather is arguing that the search for such materials is burdensome in part because many are likely to be privileged. See Northrop, 751 F.2d at 406 (finding that issues of privilege bear on the question of burden); FBI Surreply, at 7. Regardless, Plaintiffs may be correct that Al Bayoumi's ███ ████████ of obvious relevance to the jurisdictional inquiry, contains additional factual information that can be produced. Accordingly, the Court directs the FBI to search for and produce any unprivileged portions of the ████████████.

**J. Phone Records and Analysis**

Plaintiffs contend that the FBI produced an incomplete and limited group of phone records. Pls. Br., at 20. Plaintiffs requested missing records for various individuals and subscriber information for their calls. First Pounian Decl., Ex. 6, at ¶ 2. On January 13, 2020, Plaintiffs were advised that "the FBI is continuing to search for additional phone records for ████████████████████████████████████" Id., Ex. 18. Plaintiffs ask the Court to order the FBI to produce all records on Plaintiffs' list, as well as documents identified by Plaintiffs containing the FBI's summaries and analysis of relevant phone calls. Pls. Br., at 20-21. At least one of the documents identified by Plaintiffs was previously released to a third party under FOIA but not produced in response to Plaintiffs' subpoena. First Pounian Decl., Ex. 20.

The FBI provides details about the efforts it has made to locate additional responsive documents to the first request in the Touhy request in its classified submissions. Gilhooly Decl. ¶ 20; Classified Gilhooly Decl. ¶¶ 33-34, 36, 56-57, 59-60, 68-69. The FBI notes that business records such as phone records obtained from third parties were not uploaded to ACS, the FBI's prior case management system, according to system policy. Id. ¶ 11. Still, the FBI produced toll records ████████████████████████████████████████████████

████████████████████████████████████ Id. ¶ 23. Additional phone toll records for ████████████████████████ were found in the paper files of the San Diego Field Office, and phone toll records for ██████████ were found in paper files that originated in the Los Angeles Field Office but which were retrieved from one of the FBI's main file warehouses located near Washington, D.C. Id. ¶ 13. The FBI found an unredacted copy of the document released through FOIA in a file retrieved from one of the FBI's main file warehouses located near Washington, D.C. and is processing that document for release. Id. ¶ 31. The FBI also produced phone records of ████████████████, which were obtained through grand jury subpoenas. Gilhooly Decl. ¶ 40. The FBI also conducted Sentinel searches for ██████████████████████████ ████████████████████████ Id. ¶ 41.

Plaintiffs nonetheless contend that the FBI has haphazardly produced an incomplete set of phone records for ████████████████████████████████████████, and no records at all for ████████████████████████████████ Pls. Reply, at 10; Hunt Decl. ¶¶ 5-7. Plaintiffs contend that a complete set of the phone records is critical to piece together the contacts and coordination among the Saudi officials and their subagents providing support to the hijackers. Id.; Hunt Decl. ¶¶ 12-18. The FBI has also not yet provided subscriber information revealing the numbers ████████████████████████ called, nor, Plaintiffs contend, has the FBI searched key databases with relevant phone information. Id.; Hunt Decl. ¶ 10-11. Plaintiffs note that they have been unable, despite extensive efforts to obtain this information from other sources. Id.; Tarbutton Decl. ¶¶ 3-6. By prioritizing the search of evidentiary materials over analytic documents, the FBI has not produced phone analysis records including the subscriber information that is currently missing from the production. Id. at 11.

In the related FOIA context, courts have found that agencies need not reveal "information regarding the actual databases or indices searched." <u>Citizens for Responsibility & Ethics in Washington v. Nat'l. Indian Gaming Comm'n</u>, 467 F. Supp. 2d 40, 50 (D.D.C. 2006). Contrary to Plaintiffs' contentions, the Court does not find that the FBI needs to reveal more about the nature of its searches than it has already done in the public and classified declarations. While the FBI has properly detailed the extent of its electronic and physical searches for relevant phone information, the Court nonetheless recognizes the importance of phone records to Plaintiffs' case. The Court therefore seeks to confirm that the FBI has properly searched for all the relevant phone numbers as provided by Plaintiffs in the Fifth Supplemental Hunt Declaration, and directs the FBI to search for any phone records listed in the Hunt Declaration that have not previously been searched for and to produce any unprivileged phone records or analysis to Plaintiffs.

### K.  Bank Records and Analysis

Plaintiffs argue that the FBI produced an incomplete and limited group of banking records. Pls. Br., at 21. Plaintiffs requested missing records for various individuals, and on January 13, 2020, the FBI advised that it was "continuing to search for additional bank or credit card records for ██████████████████████████████████████████ ██████████" First Pounian Decl., Ex. 18. The FBI has also produced only one analysis ██ ██ ██████████ banking records, but not the records themselves, and Plaintiffs request that the FBI produce other documents that analyze the funds received and spent by others allegedly involved in the plot. Pls. Br., at 21. Plaintiffs also contend that bank records and other information collected from third parties is factual information concerning activities 20 years ago that cannot by its very nature be labeled as a state secret. Pls. Reply, at 20.

The FBI notes that business records such as bank records obtained from third parties were not uploaded to ACS. Gilhooly Decl. ¶ 11. Nonetheless, the FBI contends that in addition to the bank records it produced in the eighth tranche, the FBI conducted Sentinel searches for █. Id. ¶ 42. ████████████████████████████████████████████████████████████████████████. Id. ███████████████████████████████████████████████████████████████████████████████████████ Id. The FBI discusses its search for bank records and analysis in more detail in the classified Gilhooly Declaration.

The Court is satisfied that the FBI has sufficiently searched for responsive records. Moreover, the Court does not agree with Plaintiffs that bank records collected from third parties cannot by their nature be labeled a state secret. As the Court articulated above, pursuant to the unclassified Sanborn declaration, the only information over which the Government has asserted the state secrets privilege is that which falls under the four identified privileged categories. Sanborn Decl. ¶ 42. The FBI has not asserted the privilege over factual information untethered to the identified categories. FBI Surreply, at 7. As such, bank records information may be protected under the state secrets privilege if their production would reveal the reasons for investigation and results, or sources and methods. The Court declines to order the FBI to conduct further searches.

**L.  Grand Jury Records**

Plaintiffs contend that the FBI is refusing to produce relevant material from grand jury subpoenas on the ground that the Government's Rule 6(e) petitions authorized only the disclosure of the bank, phone, and financial records identified within the subpoenaed records, not their wholesale disclosure. Pls. Br., at 21 (citing First Pounian Decl., Ex. 19, at 2). Plaintiffs

contend that it is clear that the FBI and the Southern District of California determined that it had records responsive to the <u>Touhy</u> request other than just bank, phone, and financial records, but none of those records was produced by the FBI. <u>Id.</u>, at 22 (citing First Pounian Decl., Ex. 23).

The FBI contends that Plaintiffs have misread the language in the petitions for disclosure of grand jury materials. FBI Br., at 20 n.12. Counsel for the Government requested that the Criminal Division AUSAs who filed the petitions for the disclosure of certain grand jury materials, in addition to listing the specific grand jury records that the FBI had already located and included among the core records, include a "catch-all" provision referencing any additional records obtained by grand jury subpoena regarding Al Bayoumi, Al Thumairy, or the September 11 attacks. Fourth Normand Decl. ¶ 32. One of the intended purposes of this "catch-all" provision was to ensure that if any additional records were located in the future, or if the FBI later determined that any of the bank or phone records that the FBI had not linked with a specific grand jury subpoena had originated from that district, the Government would not need to file a second transfer petition in that jurisdiction. <u>Id.</u> The only core records that the FBI identified that were produced pursuant to grand jury subpoenas, however, were bank, phone, and financial records. Gilhooly Decl. ¶ 19 n.11.

The FBI told Plaintiffs by email dated September 4, 2019, that the "FBI intends to produce the phone and bank records that are the subjects of these Rule 6(e) petitions when permitted to do so by a court order." First Pounian Decl., Ex. 5. The FBI also discussed only phone and banking records subject to the grand jury subpoenas at the Court's May 13, 2019 conference. <u>Id.</u>, Ex. 8, at 16. At that hearing, counsel for the Government explained that the FBI was still in the process of determining which jurisdictions had issued grand jury subpoenas for the records in question, and that it may not ultimately be possible for the FBI to link all the

records with particular subpoenas. Id. at 17. The Court proposed that it could issue a blanket

Rule 6(e) disclosure order in the event the FBI could not match all records with a subpoena. Id.

The Court does not find it to be "clear," as Plaintiffs argue, that the FBI had determined

that it had records responsive to the Touhy request and subpoena other than bank, phone, and

financial records. Plaintiffs themselves stated that the "grand jury materials at issue include

banking, phone, and financial records of individuals involved in the September 11th attacks."

September 20, 2019 Memorandum of Law of Plaintiffs' Executive Committees in Support of

Petitions Filed by the Government Seeking Disclosure of Grand Jury Materials. The Court found

that Plaintiffs' request "is structured to cover only material so needed," and that Plaintiffs "seek

disclosure of certain banking, phone, and financial records related to this litigation." ECF No.

5193, at 4. The FBI mentioned the Rule 6(e) petitions only with regards to phone and banking

records both at the May 13, 2019 conference and the September 14, 2019 email to Plaintiffs, and

the Court's recommendation that a blanket order be issued more broadly did not mean that other

types of responsive records had been located. Accordingly, the Court denies Plaintiffs' request.

## V.    Plaintiffs' Outstanding Requests

Plaintiffs contend that they have a number of outstanding requests for relevant materials

that the FBI has not yet produced despite locating or agreeing to continue to search for them.

Plaintiffs request that the Court order the FBI to produce the requested items if these issues are

not resolved by the time this motion is fully briefed. Pls. Br., at 22.

Specifically, Plaintiffs request the production of witness statements of ███████████

████████████████ which the FBI notified Plaintiffs in January 2020 it had located and was

processing. Pls. Br., at 22. The FBI conducted Sentinel searches and identified the █████

interview reports and has produced the reports. Gilhooly Decl. ¶ 33. The FBI also identified two

interview reports related to ████████ that may be relevant to the jurisdictional inquiry and is processing them for release. Id. ¶ 34. Plaintiffs do not revisit the issue in their Reply filings. On this record, there is nothing for the Court to order the FBI to produce that it is not already processing for release.

Plaintiffs next request the videotape of Al Bayoumi's party for the hijackers. The FBI has thus far not been able to locate the referenced tape after performing Sentinel and physical searches, as well as inquiring with agents and other FBI employees who previously worked on PENTTBOM and might be aware of the location of other copies of the tape. Gilhooly Decl. ¶ 26. However, still images taken from the party video have been located and are being processed for release. Id. Plaintiffs question why the FBI searched Sentinel for the videotape given statements made about the location of documents in storage rooms, and inquire as to what physical locations were searched for the videotape and photographs. Youssef Decl. ¶ 43. Plaintiffs' expert contends that it is difficult to imagine how still images would be found absent some record in the Sentinel system, and an FBI serial number would be prepared when the still images were copied from the video. Id. ¶ 42. The Court is satisfied, based on the FBI's public and classified submissions, that the FBI has conducted a thorough search for the tape.

Plaintiffs also request that the FBI produce  ████████████████ which the FBI told Plaintiffs in its January 13, 2020 letter it had located and was processing. Pls. Br., at 22 (citing First Pounian Decl., Ex. 18). On March 23, 2020, the FBI sent the parties ████████████ ████████████ Gilhoolly Decl. ¶ 19. Plaintiffs note that witness reports and news reporting suggest that the FBI has ████████████ that have not been produced. Second Pounian Decl. ¶ 8 (citing Exs. 2,3). The FBI states that it has located ████████████ and

will process it for release. Crum Decl. ¶ 9 n.2. The Court directs the FBI to expedite the

processing of the ██████████████.

Plaintiffs also request lodging records of the Saudi government officials, their subagents,

and the hijackers at key times and places in Southern California. Pls. Br., at 22. The FBI

identifies the Sentinel searches it conducted for these records, and states that documents are

being processed for release regarding ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Gilhooly Decl. ¶ 36a, b, d. The FBI

did not find any relevant records for ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Id. ¶ 36c, 36e. Plaintiffs' expert contends

that the FBI's searches for records ████████████████████████████████

████████████████████████ were improper because a ██████████████████████

████████████████████████████████████████████████

Youssef Decl. ¶ 38. While the other ████████████ were located in the FBI's "1B" files, records

about ██████████████████ would have more likely been "1A" files, such as FBI FD-302s. Id.

The Court does not find Plaintiffs' expert's analysis persuasive. The FBI located the ████

████████████████████████████████ after a Sentinel search, which revealed the

"1B" items. See Gilhooly Decl. ¶ 36b. The FBI similarly conducted Sentinel searches for

██████████████████████ which would have similarly produced any relevant "1A" or "1B" files

that existed. See id. ¶ 36c. The FBI does not contend that the Sentinel search for ██████████

████████████ was limited to "1A" or "1B" items only. Accordingly, the Court only directs the

FBI to produce any unprivileged records already located after a proper search. The Court does not order the FBI to conduct any additional or modified searches for relevant records.

Plaintiffs also request documents concerning the contacts of Al Bayoumi and Abdullah with aviation flight schools. Pls. Br., at 22. The FBI identifies the proximity searches it conducted, which resulted in hits on a large number of records, as well as a more focused search, ██████████████████████████████████████████████████████████ Gilhooly Decl. ¶¶ 37-38. Plaintiffs do not revisit the issue in their Reply filings other than noting that the documents remain missing. Tarbutton Decl., Ex. J, at ¶ 25. The Court finds that the FBI has undertaken an appropriate search and has identified no documents to compel.

Plaintiffs request additional documents seized from ████████████████████ ██████ Pls. Br., at 22. The FBI identified and searched for relevant documents in the Evidence Control Room in San Diego. Gilhooly Decl. ¶ 27. The documents were shipped to the FBI's Document Conversion Laboratory, which specializes in digitizing documentary evidence while maintaining the proper chain of custody, and the FBI began processing them for release. Id. The FBI produced ████████████████████████████ Second Pounian Decl. ¶ 3. Additionally, the FBI initially stated that it did not intend to review "1B" items found in ████████████████████████ because of the complications involved in reviewing them, see Gilhooly Decl. ¶ 27 n.16, but later agreed to process the ████████████ after conducting an appropriate review. Crum Decl. ¶ 7. Turning the materials over to Plaintiffs immediately without review raises issues regarding chain of custody, Gilhooly Decl. ¶ 27, and risks damaging the only ████████████ FBI Surreply, at 17. The Court directs the FBI to review the "1B" items and produce them as expeditiously as possible to Plaintiffs.

**VI.    Classification Markings**

Plaintiffs request that the Court direct the FBI to remove the redactions that conceal the unclassified header, footer, and portion classification markings on all of the documents released to Plaintiffs. Pls. Br., at 23. These markings are used to alert holders of documents to the presence of classified information and identify the exact information or portion that is classified. Id., at n.22. Plaintiffs contend that the markings themselves are not privileged or classified and are critical to evaluating the merit and weight of the arguments the FBI has offered in refusing to comply with the subpoena. Id. For example, the FBI's argument that a declassification review of the Subfile documents would be unduly burdensome hinges on the unsubstantiated claim that the responsive documents are highly sensitive and classified. Id., at 23-24. If the portion markings reveal that significant segments of the text were originally designated as unclassified, the FBI's claims that disclosure would present a substantial threat to national security fall apart. Id., at 24. Plaintiffs point to an example of a document that did not include any portion markings at all, suggesting it was designated unclassified when created in 2007, but was then classified 11 years later in conjunction with its production to Plaintiffs. Id. (citing First Pounian Decl., Ex. 23).

The FBI responds that the assertion of the state secrets privilege also extends to all of the classification markings in the produced records. FBI Br., at 13 (citing Second Barr Decl. ¶ 11). Although ordinarily classification markings indicating that a paragraph is unclassified or classified as SECRET are not themselves classified, in the unique circumstances presented by the documents at issue, selectively releasing portion markings as to some documents but not others would have revealed information that is subject to the state secrets privilege. Sanborn Decl. ¶ 44. Accordingly, the FBI asserts the privilege as to all portion markings and banner headings. The FBI also states that FBI Assistant Director Sanborn confirmed that all of the information over

which the state secrets privilege has been asserted is properly classified, and that the markings have not been withheld for an improper purpose. Id. ¶¶ 43-44. Sanborn explains that certain paragraphs or documents were not originally marked as the result of error, the failure to appreciate the impact of the disclosure of the information on national security, a misunderstanding about the policies regarding the classification of documents, or a technical error in the system, and confirms that this information is now properly classified. Id. ¶ 43.

Plaintiffs respond that no case has ever applied the state secrets privilege to the actual classification markings in the margins of any document, let alone to admittedly unclassified documents. Pls. Reply, at 25. Plaintiffs contend that there is a national security interest in releasing the markings to ensure that classification rules are followed. Id. Plaintiffs' expert contends that it is "impossible to imagine" the state secrets issue raised by the release of portion markings on their own. Youssef Decl. ¶ 65. If selectively releasing portion markings would reveal information that is subject to the state secrets privilege, as Sanborn contends, Plaintiffs suggest the FBI simply release all of its portion markings. Id.

Regarding Sanborn's discussion of the mistakes in original classification, Plaintiffs' expert points out that Sanborn fails to describe even a single discrete instance where one of the potential reasons for errors in original classification necessitated the classification of a previously unclassified document. Id. ¶ 61. He further points to the fact that the FBI sought to classify certain words in the 2012 Summary Report in 2019 despite the fact that those words were not classified when the document was publicly released in 2016, suggesting that the FBI has used different classification review standards at different times. Id. ¶ 70. If the system was so error-prone leading to mistaken classification decisions, Plaintiffs' expert asks, how many documents did the FBI find were over-classified in the 9/11 file? Id. ¶ 72.

The FBI rebuts Plaintiffs' expert's argument that by correcting erroneous classification markings the FBI has "reclassified" or "newly classified" information. FBI Surreply, at 10. The correction of erroneous classification markings is not a reclassification of information because whether information is classified or not is determined by an Original Classification Authority, not the FBI agent who applies derivative classification markings to a document he or she has drafted. Id., at n.6; Declaration of Maria J. Saylor, dated September 3, 2020, ¶¶ 7-8. An agent who erroneously marks classified information as unclassified does not thereby declassify the information, nor does the agent have the authority to do so. Id. (citing N.Y. Times v. CIA, 965 F.3d 109, 122 (2d Cir. 2020) ("Declassification cannot occur unless designated officials follow specified procedures" set forth in section 3.1 of Exec. Order 13,526)). Additionally, an FBI supervisor responsible for processing documents for potential release in civil discovery has attested that it is a common occurrence for information that is marked unclassified to later be found to contain classified information. Crum Decl. ¶ 11. The Court credits the FBI's experts over Plaintiffs' expert, whose description of classification and declassification procedures the FBI credibly contends runs contrary to the Executive Order and FBI policy. FBI Surreply, at 10.

Courts have found the withholding of classification markings to be justified in the FOIA context because "when placed in the context of substantive reporting or analysis they may reveal or highlight areas of particular intelligence interest, sensitive collection sources or methods, or foreign sensitivities." Larson v. Dep't of State, No. 1:02-CV-01937 (PLF), 2005 WL 3276303 at *10 (D.D.C. Aug. 10, 2005). "To avoid highlighting information that reveals such matters, as a general rule the Agency withholds all . . . markings indicating the classification levels of individual paragraphs." Id. The FBI has similarly substantiated the need to classify the markings in this case in the unclassified and classified Sanborn declarations. See Sanborn Decl. ¶ 44.

The Court notes that information need not be marked classified in order to be subject to the state secrets privilege. See FBI Surreply, at 11; Halkin v. Helms, 690 F.2d 977, 996 (D.C. Cir. 1982) (distinguishing policy judgment reflected in a state secrets assertion from a classification determination in the FOIA context). As in Larson, the FBI here has articulated the reasonable danger that damage to national security will result if the markings are released. The Government further elaborated on the reasons for the protection of the classification markings in this case in the October 10, 2020 *in camera* conference. See ECF No. 6461. The Court does not find that the FBI must release the classification markings to Plaintiffs.

## VII.   Tranche 15 Materials

Plaintiffs seek the FBI's production of "███████████████████████████ ██████████████████████████ referenced in a laboratory report produced in Tranche 15. The FBI has indicated these materials either do not relate to Al Bayoumi or were obtained by a foreign government. Accordingly, the FBI represents it is making efforts to determine whether it still has possession of these items and will follow up with the PECs on the fruits of that inquiry. At this time, the Court denies without prejudice the request to compel the production of these items.

## VIII.   Deadline to Produce Certain Agreed Upon Disclosures

By their letter motion to supplement the record, Plaintiffs also seek an order requiring the FBI to complete its processing of certain records by a specific date. The Court credits the FBI's assertion that the FBI is "diligently continuing to process the remaining documents and has been producing such documents on a rolling basis, as reflected in the fact that it made additional productions of documents on August 11, September 21, and October 9, 2020 . . ." and recognizes that COVID-19 has delayed records processing. FBI's Letter Response to Motion to Supplement

the Record and Expedite Document Production, at 4. The FBI should continue to work diligently to produce the agreed upon records and should, to the extent feasible, prioritize review of records relating to certain witnesses scheduled for deposition. The Court declines to set a deadline for the FBI to complete processing the specific records sought by Plaintiffs' supplemental letter motion.

## IX.      Questioning Witnesses Regarding any Government Affiliation

For the reasons set forth in the FBI's letter dated October 17, 2019, the Government moves for a protective order that would be generally applicable to all depositions which would prevent the PECs from questioning witnesses in a manner designed to reveal whether such individuals have a confidential covert or protected relationship with the United States. FBI Br., at 23; Fourth Normand Decl., Ex. Q. The U.S. Government has a "compelling interest" in ensuring that the identities of confidential informants and confidential human sources are protected. Sims, 471 U.S. at 175. In order to vindicate this interest, the United States consistently refuses to confirm or deny under the *Glomar* doctrine whether or not a particular individual is or is not a confidential informant or human source. See, e.g., Montgomery v. IRS, 330 F. Supp. 3d 161, 171 (D.D.C. 2018) ("[I]f the IRS does not consistently invoke *Glomar*, 'requesters will soon be able to determine when [it] is protecting records and when there are no records to protect' [, and a] savvy requester could then 'determine whether a confidential informant exists'").

Granting a protective order is appropriate to protect privileged information from disclosure, including information regarding confidential informants. See, e.g., Newell v. City of New York, No. 00-CV-8333 (LMM) (RLE), 2003 U.S. Dist. LEXIS 9893, at *1 (S.D.N.Y. June 12, 2003). Here, good cause exists for the entry of protective order in light of the Government's assertion of the state secrets privilege over information that would tend to reveal sensitive sources and methods in a national security investigation, including information that would tend

to reveal the potential existence of confidential human sources. <u>See</u> Second Barr Decl. ¶ 5; Grenell Decl. ¶ 15. Accordingly, the Court enters the FBI's requested protective order.

## X.     Appointment of a Special Master

Plaintiffs contend that as in prior cases involving complex secrecy issues, courts have appointed a special master under Fed. R. Civ. P. 53 to evaluate the government's document production and privilege claims. Pls. Reply, at 29. Rule 53 requires an "exceptional condition" to exist before a judge can appoint a master. <u>In re U.S. Dep't of Defense</u>, 848 F.2d 232, 235 (D.C. Cir. 1988). Courts have found the "exceptional condition" test met in a case involving a "FOIA claim with respect to which the judge has no access to impartial expert witnesses or other features of the adversary process in order to assist him in making his decision about disclosure," where 14,000 pages had to be reviewed. <u>Id.</u> at 236. In <u>Michael Cohen v. United States</u>, the court-appointed special master similarly reviewed thousands of pages of potentially privileged documents. <u>See, e.g.</u>, No. 18-mj-03161 (KMW), ECF No. 99 (Aug. 9, 2018).

Here, the number of documents or categories of documents for which privilege has been claimed is less than one hundred in total. <u>See</u> FBI Surreply, at 19. Numerous courts have decided privilege debates in cases such as this without resort to a special master. <u>See, e.g.</u>, <u>Northrop Corp. v. McDonnell Douglas Corp.</u>, 751 F.2d 395, (D.C. Cir. 1984). The Court also agrees with the FBI's concerns that Plaintiffs' suggestion that a special master could "test the FBI's claims by various means, including by requesting the FBI to conduct specific word searches," Pls. Reply, at 30, risks an overreaching intrusion of the Judiciary into the Executive Branch's determination that information is subject to privilege in the first instance. <u>See</u> FBI Surreply, at 19 n.10. Accordingly, the Court does not find a special master to be appropriate.

Plaintiffs further argue that the Court should direct the FBI to furnish the documents identified for *in camera* review. Pls. Reply, at 30. In <u>Reynolds</u>, the Supreme Court instructed that courts should not insist upon an examination of the evidence even by the judge alone in chambers if the court is satisfied that there is a reasonable danger that the compulsion of the evidence will risk the national security. 345 U.S. at 10. The Court has therefore insisted on *in camera* review only where necessary to determine the applicability of the asserted privileges.

## XI.    Plaintiffs' Motion for Reconsideration of the Court's April 27, 2020 Order

Plaintiffs move for reconsideration of a portion of the Court's April 27, 2020 Order denying a motion to compel the FBI to search for documents and records concerning Omar Abdi Mohamed a/k/a Omar al-Kateeb. As described in that Order, Mohamed worked for Saudi Arabia as a MOIA propagator in San Diego from 1995 through 2004. <u>See</u> ECF No. 6159, at 13. In denying Plaintiffs' request for discovery regarding Abdi Mohamed's work in California and his work relationships with Al Thumairy and Al Bayoumi, the Court noted that Plaintiffs had failed to allege any contact between Abdi Mohamed and Al Bayoumi that was plausibly related to Al Bayoumi's connection with the 9/11 hijackers. <u>Id.</u> at 15. Plaintiffs assert that newly produced evidence contained in ███████████████████████████████ ████████████████████████████████████████ Plaintiffs' Letter Motion for Discovery to Supplement the Record and for Partial Reconsideration of this Court's April 27, 2020 Order & Opinion, at 3. Taken in conjunction with other available information, Plaintiffs conclude that the totality of the evidence including this new proof "suggests that Abdi Mohamed was part of a cell directed by Thumairy and Bayoumi to assist the hijackers." <u>Id.</u> Plaintiffs move the Court to order "the FBI to conduct a targeted search for documents that mention Abdi Mohamed along with Bayoumi, Thumairy, Mohdar Abdullah, and the hijackers." Plaintiffs'

Letter Reply to Response to Motion for Discovery to Supplement the Record and for Partial Reconsideration of this Court's April 27, 2020 Order & Opinion, at 3.

The FBI responds that reconsideration motions may not be made by letter motion, and that, because the motion implicates issues beyond relevance and the scope of permitted jurisdictional discovery, the FBI must be afforded adequate time to fully present its arguments in a brief and present additional evidence. For instance, the FBI notes that it initially objected to the proposed discovery concerning Abdi Mohamed based on burden, overbreadth, and privilege and that the Court did not address these issues in its April 27, 2020 Order due to its finding that the proposed discovery fell outside the scope of the jurisdictional discovery authorized by the Court's March 28, 2018 Order.

The Court finds that the evidence cited by Plaintiffs tends to demonstrate that additional searches relating to Mohamed would be within the scope of jurisdictional discovery, but that it would be premature to rule on the motion for reconsideration without full briefing from the FBI on both questions of scope and burden, overbreadth, and privilege. Therefore, the Court orders the FBI to submit a letter response, of no more than five pages, to Plaintiffs' motion for reconsideration, by February 15, 2021.

## CONCLUSION

Pursuant to the analysis above, Plaintiffs' motion to compel the FBI and the FBI's cross-motion for a protective order are GRANTED in part and DENIED in part. The FBI is ordered to produce the required documents to Plaintiffs and the Court within 45 days of this Order and to submit additional briefing related to Plaintiffs' motion for reconsideration of the portion of the Court's April 27, 2020 Order by February 15, 2021. Plaintiffs may reply to the FBI's submission by letter of no more than five pages within seven days of the FBI's filling.

Plaintiffs' request for oral argument is DENIED as moot. The Clerk of Court is respectfully directed to terminate the gavels at ECF Nos. 6437 and 6491.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated:      February 1, 2021
            New York, New York