# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 04-cv-01922
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Estate of John P. O'Neill, Sr., et al. v. Republic of the Sudan, et al.*, Case No. 18-cv-12114
*Aronow, et al. v. Republic of Sudan*, Case No. 20-cv-07733
*Betru, et al. v. The Republic of Sudan*, Case No. 20-cv-10615
*Parker, et al. v. The Republic of the Sudan*, Case No. 20-cv-10657
*Nolan, et al. v. The Republic of the Sudan*, Case No. 20-cv-10720

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE REPUBLIC OF THE SUDAN'S MOTION TO DISMISS THE AMENDED COMPLAINTS

March 8, 2021

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. STANDARDS OF REVIEW ...................................................................................4

III. FACTUAL AND EVIDENTIARY BACKGROUND ..............................................5

    A. The Amended Complaints Plausibly Allege That Sudan Aided and Abetted, Conspired With, and Provided Material Support to Al Qaeda .............................................................5

IV. THE AMENDED COMPLAINTS PLEAD FSIA JURISDICTION ........................8

    A. Sudanese Officials and Agents Acting Within the Scope of Their Authority Provided Material Support To and Conspired With Al Qaeda ..................................................9

    B. Plaintiffs Plead Proximate Cause Under the FSIA..................................................13

        1. Plaintiffs Allege That Sudan's Material Support to Al Qaeda Was a Substantial Factor in the Sequence of Events That Led to the 9/11 Attacks, and That the Attacks are Attributable to Sudan as a Co-Conspirator ....................................................14

        2. Plaintiffs' Injuries Were a Reasonably Foreseeable and Natural Consequence of Sudan's Terrorist Actions .........................................................................................15

        3. Sudan's Fact-Bound Causation Arguments Have No Merit .................................17

    C. The Limitations Period Under § 1605A(b) Is Not Jurisdictional..............................23

    D. Solatium Plaintiffs and Property Damage Plaintiffs Have Standing to Assert Jurisdiction Under § 1605A and § 1605B .............................................................24

        1. Family Members and Property Damage Plaintiffs Have Standing Under § 1605A............24

        2. Section 1605A(d) Expressly Authorizes the Commercial Plaintiffs' Property Damage and Subrogation Claims.........................................................................................25

        3. JASTA's Waiver Of Sovereign Immunity Is Not Limited To U.S. Nationals....................26

V. PLAINTIFFS' § 1605A AND § 1605B CLAIMS ARE TIMELY ..............................27

    A. Plaintiffs' § 1605A Claims Are Timely Under the Related Action Provisions of § 1083(c)(3) .................................................................................................................27

        1. Plaintiffs' Actions are Timely Under § 1605A........................................................28

        2. Plaintiffs' Actions are Timely Under JASTA............................................................30

VI. THIS COURT HAS PERSONAL JURISDICTION OVER SUDAN ........................32

VII. THE AMENDED COMPLAINTS PLAUSIBLY PLEAD THE REQUIREMENTS OF THEIR SUBSTANTIVE LAW CLAIMS.....................................................................32

    A. Plaintiffs' Factual Allegations State a Claim Under § 1605A .....................................32

    B. Plaintiffs Plead Claims Under the ATA...........................................................................33

        1. The Amended Complaints Plead ATA Conspiracy Claims .......................................33

        2. The Amended Complaints Plead Valid ATA Aiding and Abetting Claims...................37

        3. Sudan's Argument That It Did Not Provide Material Support In Direct Support Of The 9/11 Attacks Is Irrelevant For ATA Secondary Liability.........................................40

        4. Sudan's Textual Arguments Against Imposing Secondary Liability Are Properly

i

Rejected ............................................................................................................................41

C.  Plaintiffs Allege ATA Primary Liability ........................................................................43

1. The Amended Complaints Allege That Sudan Engaged in an Act of International
Terrorism...........................................................................................................................44
2. The Amended Complaints Allege Sudan Committed Predicate Offenses...........................45
3. The Amended Complaints Also Allege Intent for Primary Liability ...................................45

D.  The Amended Complaints Plausibly Plead Causation For ATA Primary and Secondary
Liability ..............................................................................................................................46

E.  Plaintiffs' State Tort Law Claims Are Not Preempted .................................................47

F.  The Amended Complaints Set Forth All of the Elements of the Asserted State Law Tort
Claims.................................................................................................................................48

1. Alien Tort Claims Act .........................................................................................................49
2. Trespass..............................................................................................................................49
3. Civil RICO ..........................................................................................................................50

G.  The Subrogating Insurers Have Standing to Bring Substantive ATA Claims...........51

1. Subrogation Rights are Available under the ATA ..............................................................52
2. The Insurers Have Alleged Standing as Subrogees ...........................................................53
3. Sudan's Standing Argument is Contrary to the Text of the ATA .......................................54
4. U.S. Corporations are Citizens and Nationals of the U.S...................................................55
5. JASTA Confirmed the Rights of Corporations under the ATA ..........................................56
6. The ATA Must be Broadly Construed ................................................................................57

VIII. SUDAN IS NOT ENTITLED TO RELIEF FROM THE DEFAULTS ................................58

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AcryliCon USA, LLC v. Silikal GmbH,*
    985 F.3d 1350 (11th Cir. 2021) .................................................................................... 33

*Al Fayed v. C.I.A.,*
    229 F.3d 272 (D.C. Cir. 2000) ...................................................................................... 42

*American Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974) ...................................................................................................... 30

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
    869 P.2d 454 (Cal. 1994) .............................................................................................. 47

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................................ 5

*Ashton v. Al Qaeda Islamic Army,*
    298 F. Supp. 3d 631 (S.D.N.Y 2018) ........................................................................... 13

*Bartlett v. Societe Generale deBanque Au Liban Sal,*
    2020 U.S. Dist. LEXIS 229921 (E.D.N.Y. Nov. 25, 2020) .......................................... 47

*Belkin v. Islamic Republic of Iran,*
    2020 U.S. Dist. LEXIS 130286 (D.D.C. 2020) ........................................................... 58

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................................................... 15, 48, 49, 51

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,*
    811 F .Supp. 2d 53, 71 (D.D.C. 2011) .......................................................................... 26

*Crum v. Veterans of Foreign Wars,*
    502 F. Supp. 1377 (D. Del. 1980) ................................................................................ 55

*Dammarell v. Islamic Republic of Iran,*
    370 F. Supp. 2d 218 (D.D.C. 2005) ............................................................................. 58

*Doe v. Bin Laden,*
    580 F. Supp. 2d 93 (D.D.C. 2008) ............................................................................... 12

*Doe v. Bin Laden,*
    663 F.3d 64 (2d Cir. 2011) ...................................................................................... 8, 56

*In re Downstream Addicks & Barker (Tex.) Flood-Control Reservoirs,*
137 Fed. Cl. 712 (2018) ................................................................................................33

*Enron Oil Corp. v. Diakuhara,*
10 F.3d 90 (2d Cir. 1993) ........................................................................................ 58, 59

*Flanagan v. Islamic Rep. of Iran,*
190 F. Supp. 3d 138 (D.D.C. 2016) ....................................................................... 59, 60

*Flanagan v. Islamic Rep. of Iran,*
87 F. Supp. 3d 93 (D.D.C. 2005) ..............................................................13, 47, 59, 60

*Force v. Islamic Republic of Iran,*
464 F. Supp. 3d 323 (D.D.C. 2020) ...............................................................................18

*Freeman v. HSBC Holdings, PLC,*
2021 U.S. Dist. Lexis 3452 (E.D.N.Y. January 7, 2021) ......................................38, 39, 47

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,*
582 F.3d 393 (2d Cir. 2009) .........................................................................................32

*Halberstam v. Welch,*
705 F.2d 472 (D.C. Cir. 1983) ..............................................................................*passim*

*Havlish v. Bin Laden,*
2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011) ............................8, 13, 14, 21

*Hussein v. Dahabshiil Transfer Servs. Ltd.,*
705 F. App'x 40 (2d Cir. 2017) ................................................................................ 43, 44

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund,*
500 U.S. 72 (1991) .......................................................................................................42

*In re Islamic Republic of Iran Terrorism Litigation,*
659 F. Supp. 2d 31 (D.D.C. 2009) ......................................................................... 30, 58

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
513 U.S. 527 (1995) .....................................................................................................22

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
536 U.S. 88 (2002) .......................................................................................................56

*Kaplan v. Lebanese Canadian Bank,*
405 F. Supp. 3d 525 (S.D.N.Y. 2019) ....................................................................*passim*

*Kashi v. Gratsos,*
790 F.2d 1050 (2d Cir. 1986) .......................................................................................47

*Khaliq v. Republic of Sudan,*
  No. 1:04-cv-01536 .................................................................................................29

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
  376 F.3d 1123 (D.C.C. 2004) ........................................................................... 18, 22

*Knowland v. Great Socialist People's Libyan Arab Jamahiriya,*
  2010 WL 11424122 (D.D.C. Oct. 8, 2010) ...........................................................29

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya,*
  533 F.3d 837 (D.C. Cir. 2008) ...............................................................................26

*Leibovitch v. Islamic Republic of Iran,*
  697 F.3d 561 (7th Cir. 2012) .................................................................... 25, 26, 47

*Letelier v. Republic of Chile,*
  488 F. Supp. 665 (D.D.C. 1980) ..............................................................................8

*Liu v. Republic of China,*
  892 F.2d 1419 (9th Cir. 1989) .................................................................................8

*Locust Valley Water Dist. v. Dow Chem. Co.,*
  465 F. Supp. 3d 235 (E.D.N.Y. 2020) ...................................................................13

*Makarova v. United States,*
  201 F.3d 110 (2d Cir. 2000) .....................................................................................4

*Maryland v. Louisiana,*
  451 U.S. 725 (1981) ...............................................................................................48

*Mohamad v. Palestinian Auth.,*
  566 U.S. 449 (2012) .................................................................................. 52, 54, 55

*Montrell v. City of New York Dept. of Social Services,*
  436 U.S. 658 (1977) ...............................................................................................54

*Morrison v. Nat'l Austl. Bank Ltd.,*
  547 F.3d 167 (2d Cir. 2008) .....................................................................................4

*Musacchio v. United States,*
  136 S. Ct. 709 (2016) .............................................................................................24

*J.S. ex rel. N.S. v. Attica Cent. Sch.,*
  386 F.3d 107 (2d Cir. 2004) .....................................................................................4

*Nat. Res. Def. Council v. Johnson,*
  461 F.3d 164 (2d Cir. 2006) .....................................................................................4

*Navarra v. Marlborough Gallery, Inc.*,
   2013 WL 1234937 (S.D.N.Y. March 26, 2013) ..................................................... 31

*In re NovaGold Res. Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009) .................................................................. 5

*O'Sullivan v. Deutsche Bank, AG*,
   2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. March 28, 2019) ................................. 40

*Opati v. Rep. of Sudan*,
   140 S. Ct. 1601 (2020) ......................................................................................... 60

*Owens v. Republic of Sudan*,
   174 F. Supp. 3d 242 (D.D.C. 2016) .............................................................. 12, 24

*Owens v. Republic of Sudan*,
   412 F. Supp. 2d 99 (D.D.C. 2006) ........................................................... 15, 22, 39

*Owens v. Republic of Sudan*,
   826 F. Supp. 2d 128 (D.D.C. 2011) ..................................................................... 12

*Owens v. Republic of Sudan ("Owens IV")*,
   864 F.3d 751 (D.C. Cir. 2017) ....................................................................*passim*

*Palsgraf v. Long Island R. Co.*,
   248 N. Y. 339, 162 N. E. 99 (1928) ..................................................................... 22

*Pfizer, Inc. v. Gov't of India*,
   434 U.S. 308 (1978) ............................................................................................. 42

*Red Lion Broad. Co. v. F.C.C.*,
   395 U.S. 367 (1969) ............................................................................................. 56

*Rimkus v. Islamic Republic of Iran*,
   750 F. Supp. 2d 163 (D.D.C. 2010) ..................................................................... 29

*Roth v. Islamic Republic of Iran*,
   78 F. Supp. 3d 379 (D.D.C. 2015) ....................................................................... 24

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ............................................................................ 19, 47

*Rux v. Republic of Sudan*,
   495 F. Supp. 2d 541 (E.D. Va. 2007) .................................................................. 12

*Rux v. Republic of Sudan*,
   2005 U.S. Dist. LEXIS 36575 (E.D. Va. Aug. 26, 2005) ...................... 3, 11, 12, 18

*Scribner v. Summers*,
    84 F.3d 554 (2d Cir. 1996) ........................................................................................ 49, 50

*Simon v. Republic of Iraq*,
    529 F.3d 1187 (D.C. Cir. 2008) ................................................................................. 23, 24

*Slayton v. Am. Express Co.*,
    460 F.3d 215 (2d Cir. 2006) ............................................................................................31

*Solutia, Inc. v. FMC Corp.*,
    385 F. Supp. 2d 324 (S.D.N.Y. 2005)...............................................................................57

*Steamship Co. v. Tugman*,
    106 U.S. 118 (1882)...........................................................................................................55

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013)...............................................................................43

*In re Terrorist Attacks on Sept. 11, 2001*,
    740 F. Supp. 2d 494 (S.D.N.Y. 2010)..................................................................43, 44, 50

*In re Terrorist Attacks on Sept. 11, 2001*,
    2011 U.S. Dist. LEXIS 153138 (S.D.N.Y. Oct. 14, 2011) ................................................52

*In re: Terrorist Attacks on Sept. 11, 2001*,
    2015 WL 9468813 (S.D.N.Y. Dec. 28, 2015)....................................................................26

*In re Terrorist Attacks on September 11, 2001*,
    295 F. Supp. 2d 1377 (J.P.M.L. 2003) ..............................................................................30

*United States v. Texas*,
    507 U.S. 529 (1993)...........................................................................................................52

*United States v. Wong*,
    575 U.S. 402 (2015)...........................................................................................................24

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*,
    681 F.3d 103 (2d Cir. 2012) ...............................................................................................8

*Van Riper v. United States*,
    13 F.2d 961 (2d Cir. 1926) ...............................................................................................12

*Vedder Price P.C. v. US Capital Partners, LLC*,
    2017 WL 4180021 (S.D.N.Y. Sept. 20, 2017) ..................................................................59

*Wm. Passalacqua Builders, Inc. v. Resnick Developers, Inc.*,
    933 F.2d 131 (2d Cir. 1991) .............................................................................................57

*Wyatt v. Syrian Arab Republic*,
  736 F. Supp. 2d 106 (D.D.C. 2010) ................................................................................30

**Statutes**

1 U.S.C. § 1 ................................................................................................................42

8 U.S.C. § 1101 ..........................................................................................................54

18 U.S.C. § 1111 ........................................................................................................45

18 U.S.C. § 2331 ....................................................................................42, 45, 54, 55

18 U.S.C. § 2332 ................................................................................................43, 44

18 U.S.C. § 2333 ..........................................................................................41, 43, 54

18 U.S.C. § 2339 ..................................................................................7, 43, 44, 45

28 U.S.C. § 1350 ........................................................................................................49

28 U.S.C. § 1605 ..................................................................................................*passim*

34 U.S.C. § 20144 ......................................................................................................55

**Rules**

Fed. R. Civ. P. 12 ..........................................................................................4, 5, 32, 33

Fed. R. Civ. P. 15 ......................................................................................4, 28, 30, 31

## MEMORANDUM OF LAW IN OPPOSITION TO SUDAN'S MOTION TO DISMISS

### I.    INTRODUCTION

The well pleaded factual allegations and evidence presented in the Amended Complaints readily establish, for purposes of a motion to dismiss, that the Republic of the Sudan ("Sudan") knowingly conspired with, aided and abetted, and provided material support to al Qaeda, for more than a decade leading up to and continuously through the September 11th attacks, for the express purpose of providing al Qaeda with the resources and expertise needed to conduct sophisticated terrorist attacks against the United States.  Sudan, as a designated State Sponsor of Terrorism, provided critical support for al Qaeda that was initiated and orchestrated by its most senior leaders, and deployed through its intelligence, military, and other core government agencies.  Sudan's conspiracy to build al Qaeda's terrorism capabilities encompassed a critical collaboration with Iran and its terror proxy Hezbollah, to provide al Qaeda with terrorist capabilities and support needed to attack America.

The Amended Complaints' (and the original complaints) show that Sudan's material support for al Qaeda "caused" the September 11th attacks, pursuant to the applicable jurisdictional and substantive standards, in several ways.  Citing the findings of U.S. government reports, Plaintiffs allege that Sudan was a knowing, active, and principal member of al Qaeda's conspiracy to attack the United States, making the terrorist acts of the al Qaeda terrorists who planned and carried out the attacks themselves attributable to Sudan.  The undisputed factual allegations also show how Sudan's support was essential to the very creation and development of al Qaeda, such that al Qaeda simply would not have existed, much less possessed the capabilities necessary to carry out a sophisticated international terrorist attack, but for Sudan's state support.  The complaints further allege that Sudan provided particular resources and training to al Qaeda, including training in counterintelligence practices and the planning of terrorist operations, that were essential to the planning and execution of the September 11th attacks.  Finally, the complaints allege that the material support program Sudan arranged for Iran

to provide to al Qaeda, as part of their tripartite conspiracy to attack America, was directly used to facilitate the travel and training of several of the 9/11 hijackers, and that the safe haven and logistical base in Sudan was used for planning and operational aspects of the attacks.

Sudan does not raise any factual challenge to Plaintiffs' facts and evidence, and its motion principally rehashes a range of legal and factual distortions that numerous federal district and appellate courts previously rejected in finding Sudan liable for al Qaeda's 1998 African Embassy and 2000 U.S.S. Cole attacks. Those courts found that Sudanese officials initiated and maintained a massive state material support program for al Qaeda, and found jurisdiction and liability based on determinations that Sudan's support transformed al Qaeda into a sophisticated international terrorist organization and provided it with the capabilities needed to carry out complex international terrorist attacks, and based on Sudan's status as a co-conspirator of the al Qaeda terrorists. The reasoning and holdings of those decisions apply with full force here.

Without informing the Court of the degree to which the arguments it raises here have been directly rejected by numerous federal court decisions, Sudan's motion to dismiss resorts to quintessential straw man tactics –repeatedly distorting the record and legal standards, and then declaring victory based on purported refutations its own distortions, rather than the actual facts and legal standards at issue. This strategy is evident in the only two arguments Sudan offers with potential reach to all of the claims against it in this MDL – its flawed claims that the Amended Complaints fail to allege causation, or material support activities undertaken by a Sudanese official, employee or agent, acting within the scope of his office, employment, or agency.

Sudan's causation arguments rest on the theory that its material support must have been a direct or but-for cause of the 9/11 attacks, to satisfy the proximate cause standards in material support cases. Sudan's extensive arguments on this point both misstate the governing legal standards, and ignore factual allegations and evidence that are more than sufficient to satisfy Sudan's own erroneous

standards.[1]  Indeed, even if the "but for" causation standard did apply, which is not the case, Plaintiffs' factual allegations and evidence would be more than sufficient to satisfy it.  Sudan's fact-bound arguments relating to Osama bin Laden's personal departure from Sudan and claims of attenuation do not alter this conclusion, as they are irrelevant, at best raise factual disputes that cannot be resolved in its favor, and have been specifically rejected by other federal courts.[2]

Sudan's argument that the complaints fail to allege that the material support in issue was provided by an official, employee, or agent acting within the scope of his role for Sudan has likewise been directly rejected by courts addressing facts and evidence nearly identical to the record at issue here.  At base, this argument amounts to a request that this Court repudiate the Executive branch's designation of Sudan as a State Sponsor of Terrorism and the assessments supporting that designation. It also ignores the detailed factual allegations that Sudan's program of support for al Qaeda was implemented and maintained as a matter of Sudanese policy, encompassed forms of support that only a state actor could provide, and was implemented through numerous core ministries of the Sudanese government over a period of many years.

Sudan's additional procedural and technical arguments, directed at only a subset of the claims and/or claimants, fair no better.  Its plea that certain claims and theories presented in the Amended Complaints should be deemed untimely ignores that the immunity exceptions set forth in 28 U.S.C. § 1605A and 28 U.S.C. § 1605B are not subject to any statute of limitations, and that the additional

---

[1] *Infra* Section IV.B.3.a, note 9, for a list of the examples of Sudan's attempts to argue that its material support has to be directly linked to the perpetrators of the 9/11 attacks.

[2] *See generally Owens v. Republic of Sudan ("Owens IV"),* 864 F.3d 751 (D.C. Cir. 2017) (rejecting Sudan's but for causation argument, its claimant/victim argument, its argument regarding admissibility and reliance on official government reports, its argument that 28 U.S.C. § 1605A preempts state tort law claims, its broken chain of causation argument, its argument that the statute of limitations is jurisdictional; its argument that State Department reports are conclusory and inadmissible; and its argument that the 9/11 report statement that bin Laden's departure broke the chain of causation); *Rux v. Republic of Sudan,* No. 2:04-cv-428, 2005 U.S. Dist. LEXIS 36575, at *44-45 (E.D. Va. Aug. 26, 2005) ("*Rux I*") *aff'd in part, appeal dismissed in part; Rux v. Republic of Sudan,* 461 F.3d 461, 471-72 (4th Cir. 2006) ("*Rux II*") (both courts rejecting Sudan's causation and the within the scope argument that the material support provided was not provided by the government of Sudan).

substantive causes of action asserted in the Amended Complaints are timely because they are related actions under § 1083(c)(3) of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, § 1083 and/or because they relate back to the dates of the filing of the original complaints, pursuant to Fed. R. Civ. P. 15.  Sudan's standing arguments directed only to a subset of the Plaintiffs and claims ignore that the immunity exceptions set forth in § 1605B(b) and 28 U.S.C. § 1605(a)(5) do not include a U.S. national requirement, and that the additional damages provision of § 1605A(d) expressly authorizes claims "for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies." And even as to Plaintiffs' substantive claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), Sudan's arguments misconstrue the definition of the term U.S. national and its application to the claims here.  Further, the Amended Complaints sufficiently plead substantive causes of action under § 1605A, the ATA, conspiracy, aiding and abetting and state tort law.

Finally, the filing of the Amended Complaints did not vitiate the defaults entered against it, and Sudan has failed to attempt to, and could not, demonstrate an entitlement to relief from those defaults.

## II.   STANDARDS OF REVIEW

In deciding a Fed. R. Civ. P. 12(b)(1) motion to dismiss, the Court "'must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.'"  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (quoting *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006)).  The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue . . . ."  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings").

With respect to a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As in a motion to dismiss for lack of jurisdiction, the court must presume that the allegations in the complaint are true and give plaintiffs the benefit of every reasonable inference drawn therefrom. *Id. Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 284 (S.D.N.Y. 2009) (citing *Iqbal,* 556 U.S. at 664).

## III.   FACTUAL AND EVIDENTIARY BACKGROUND

### A.   The Amended Complaints Plausibly Allege That Sudan Aided and Abetted, Conspired With, and Provided Material Support to Al Qaeda

Very soon after Omar al Bashir and Hassan al Turabi jointly assumed power in 1989, the new leaders of Sudan dispatched intelligence emissaries to Afghanistan, to encourage Osama bin Laden to relocate his new "group" to Sudan. *See* Consolidated Amended Complaint ("CAC") ¶¶ 47, 49; Ashton Amended Complaint ("AAC") ¶ 13. At the time, al Qaeda was nothing more than a poorly organized group of no more than 60 jihadists, with no operational base. CAC ¶ 45. Its few members were no longer welcome in Afghanistan or Pakistan, and most faced arrest upon return to their home countries. CAC ¶¶ 46-47. In sum, al Qaeda was destined to collapse before it ever became an actual organization.

Sudan spared it from that fate. Bin Laden agreed to locate his group in Sudan based on assurances from Sudan's leadership that the Sudanese government would provide "the state support needed to realize [his] vision to establish a global terrorist organization." CAC ¶¶ 50-52. Virtually all of al Qaeda's leadership, including Ayman al Zawahiri and Mohammed Atef, moved to Sudan immediately, with bin Laden following in 1991. CAC ¶¶ 55, 66; AAC ¶¶ 15-16. From the outset, the shared goal of the agreement between Sudan and al Qaeda was to build al Qaeda's operational capabilities, to enable it to attack their shared enemy, the United States. CAC ¶ 52; AAC ¶ 20.

In the ensuing years, Sudan deployed its state resources to attend to every need required for al Qaeda to establish itself and develop into a fully functioning terrorist organization. CAC ¶ 44; AAC ¶ 18. Sudan provided a safe haven and safe operational base for al Qaeda leadership and members, affording it the time, space, and resources to systematically build the organization. CAC ¶¶ 16, 50, 56, 59; AAC ¶ 17. It facilitated al Qaeda's recruitment of new members, and assisted (and in several cases partnered along with Saudi patrons of al Qaeda) with bin Laden in establishing a network of businesses and banks, which were used to financially support members; fund terrorist operations; provide cover for movement of money, terrorist operations, operatives' travel, and the acquisition of equipment and weapons. CAC ¶¶ 122-149; AAC ¶¶ 17-50. Sudan's intelligence services partnered hand in glove with al Qaeda, providing security for its leadership, vetting recruits, killing perceived threats; protecting the organization from foreign counterterrorism efforts, and training al Qaeda in counterintelligence. CAC ¶¶ 66-69; AAC ¶¶ 13, 15, 39, 42. Sudan provided passports, false diplomatic credentials, and concealed al Qaeda members' travels from monitoring by foreign counterterrorism agencies. CAC ¶¶ 70-72; AAC ¶¶ 10, 57, 58. Sudan's military and intelligence services assisted al Qaeda with weapons procurement and shipments, and Sudan directly participated in and supported al Qaeda terrorist operations. CAC ¶¶ 73, 90, 92-106, 110; AAC ¶¶ 13, 42, 66.

Sudan also played a critical role in forging training and cooperation agreements on al Qaeda's behalf with more sophisticated terrorist states and organizations, arraignments that supercharged al Qaeda's terrorist development and operational capabilities. CAC ¶¶ 74, 75; AAC ¶¶ 51-53. Because al Qaeda had essentially no training or expertise in planning or conducting terrorist operations when it arrived in Sudan, these were essential to al Qaeda acquiring global strike capabilities. Most significant among these was the "Tripartite Agreement" Sudan brokered among itself, al Qaeda and Iran, pursuant to which they agreed to cooperate militarily against the U.S., and Iran and Hezbollah agreed to and did provide al Qaeda with training "to gain the necessary experience in terrorist operations."

CAC ¶¶ 76, 81-88; AAC ¶ 53.  This collaboration between Iran and al Qaeda remained active through 9/11, and as this Court already has held in imposing liability on Iran, was directly used to support the 9/11 operation.  AAC ¶ 54.

In summarizing the significance of Sudan's overall program of state support for al Qaeda, the CIA succinctly concluded that al Qaeda was "transformed from an only partially realized idea into an international organization ready to operate on its own.  CAC ¶ 44; AAC ¶ 18.  Al Qaeda leadership began studying, testing, and supporting plots using airplanes as implements of terror from their operational base in Sudan, and the mastermind of the 9/11 plot, Khalid Sheikh Mohammed, met in Sudan with Mohammed Atef in 1995 to discuss cooperation with al Qaeda.  CAC ¶¶ 165-167; AAC ¶ 97.  The facts indicate that KSM likely presented the so-called "planes operation" plot (which became 9/11) at that meeting, and it led to a direct meeting with bin Laden a year later, where KSM presented the idea directly to bin Laden.  CAC ¶¶ 169-170; AAC ¶ 97.

Although bin Laden was personally compelled to depart Sudan in 1996 as a result of *external* international pressure, Sudan's support for al Qaeda continued unabated through September 11, 2001.  As the State Department's terrorism reports for 1997-2001 confirm, al Qaeda continued to operate from and maintain a logistical base in Sudan, with the active support of the Sudanese government, throughout this period.  CAC ¶¶ 41, 184; AAC ¶¶ 116-18.

Given the nature,[3] scope, duration, and criticality of the material support Sudan provided to al Qaeda, it is not at all surprising that federal courts have uniformly found Sudan subject to jurisdiction and liability for sophisticated al Qaeda terrorist operations carried out after bin Laden's personal departure from Sudan, including the African Embassy and Cole attacks.  *Infra*, Sections IV.A and IV.B.

---

[3] Sudan's support for al Qaeda encompassed the precise types of assistance Congress targeted through § 1605A, § 1605B, and the ATA, to prevent acts of terrorism.  *See* 18 U.S.C. § 2339A(b) (defining material support).

## IV.    THE AMENDED COMPLAINTS PLEAD FSIA JURISDICTION

Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, a foreign state is not entitled to immunity from the jurisdiction of U.S. courts for claims that fall within any of the FSIA's enumerated exceptions to immunity.  Here, Plaintiffs' Amended Complaints allege all of the requisite elements of three of the terrorism-related exceptions set forth in sections 1605A,[4] 1605B, and 1605(a)(5)'s tort exception.[5]

**§ 1605A**.  To establish jurisdiction under § 1605A, a plaintiff must plead a) a claim for money damages for personal injury or death caused by an extrajudicial killing or the provision of material support or resources for an extrajudicial killing; b) that the extrajudicial killing or the provision of material support for that extrajudicial killing was engaged by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency; c) that the victim or claimant was a U.S. national, member of the armed forces or employed by the U.S. government, or a party claiming injuries within the additional damages provision of § 1605A(d); and d) that the foreign state was a State Sponsor of Terrorism at the time of the extrajudicial killing. 28 U.S.C. § 1605A; *see Havlish v. Bin Laden,* 2011 U.S. Dist. LEXIS 155899, at *186-190 (S.D.N.Y. Dec. 22, 2011) (reviewing elements for § 1605A FSIA state sponsor of terrorism exception).

---

[4] The original complaints invoked the immunity exception at 28 U.S.C. § 1605(a)(7), the predecessor to § 1605A, and the amended complaints invoke it as a back-up as well.  To the extent the original Plaintiffs were precluded from now invoking § 1605A, which is not the case, they would still be entitled to proceed under § 1605(a)(7) and the state law.

[5] The facts and principles presented in the context of sections 1605A and B also demonstrate jurisdiction under § 1605(a)(5).  As for §1605B, these are claims for money damages for personal injury, death, and property damage, based on tortious acts of Sudanese officials, also satisfying those common elements of § 1605(a)(5).  For the reasons discussed herein, Plaintiffs' allegations also satisfy § 1605(a)(5)'s causation and scope of office or employment elements. *Infra*, Sections IV.A and IV.B.  To the extent § 1605(a)(5) requires a tortious act in the U.S. in addition to the injury, the September 11th attacks and attributable acts of the al Qaeda terrorists who committed them satisfy it.  *Infra*, Section VII; *Doe v. Bin Laden,* 663 F.3d 64, 66-67 (2d Cir. 2011).  Finally, because Sudan's conduct involves material support program for terrorism in violation of U.S. and international law, as reflected by Sudan's designations as a terrorist state, its conduct may not be deemed a discretionary function.  *See, e.g., USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 113 (2d Cir. 2012) (defendant's conduct was not "discretionary" because it violated city ordinance); *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (exception is inapplicable because defendant had no discretion to violate law that prohibits murder); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("there is no discretion to commit, or to have one's officers or agents commit, an illegal act").  Thus, this Court also has jurisdiction under § 1605(a)(5).

**§ 1605B(b).**  The Justice Against Sponsors of Terrorism Act ("JASTA")'s immunity exception applies where the case is one in which "money damages are sought" for (1) "physical injury to person or property or death occurring in the United States"; (2) "caused by" an "act of international terrorism in the United States"; and (3) "caused by" a "tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment or agency."  28 U.S.C. § 1605B(b).

Many of these requirements are not in dispute.  Indeed, Sudan does not dispute that it was a designated State Sponsor of Terrorism at the time of the 9/11 attacks, or that the 9/11 attacks were both an extrajudicial killing under § 1605A, and act of international terrorism that caused personal injury, property damage and death in the United States under § 1605B.  Sudan also does not dispute that the acts described in the complaint are tortious, for purposes of § 1605B.

Instead, Sudan argues that the complaints fail to allege a) that an officer, employee or agent of Sudan provided material support within his or her office, employment, or agency; or b) that the material support detailed in the pleadings was reasonably connected to the 9/11 attacks.  Sudan further claims that Plaintiffs' invocation of § 1605A is untimely, and that certain (but certainly not all) Plaintiffs, including non-injured victims and corporate plaintiffs, lack jurisdictional standing under one or both of the exceptions.  As shown below, Sudan's arguments are meritless.

### A.    Sudanese Officials and Agents Acting Within the Scope of Their Authority Provided Material Support To and Conspired With Al Qaeda

As described above, the Amended Complaints set forth in detail how senior Sudanese officials initiated and sustained a comprehensive program of state support for al Qaeda, which spanned numerous core ministries of the Sudanese government and encompassed forms of support that only a state actor could provide, in furtherance of Sudan's official policy of using terrorism as a tool. Without even attempting to offer any evidence to raise a factual challenge to those allegations and the evidence supporting them, Sudan claims that the Amended Complaints lack any facts sufficient to

allege that an official, employee, or agent of Sudan provided material support or committed a tort in his role for Sudan.  In support, Sudan culls a handful of allegations that characterize the obvious import of the facts as a whole, and labels them as "conclusory," while ignoring the detailed allegations that sit behind them.  (ECF No. 6575 at 35).  This attempted sleight of hand does not withstand even a cursory review of the actual record.

Sudan's argument on this point ignores Plaintiffs' allegations relating to the Executive branch's designation of Sudan as a State Sponsor of Terrorism.  CAC ¶¶ 7, 39, 117; AAC ¶¶ 3, 58, 79.[6]  That designation first issued in 1993 and remained in place through September 11, 2001, and the State Department's annual terrorism reports for 1997-2001 all cite Sudan's continuing support for al Qaeda as a predicate for the annual re-certifications of Sudan's State Sponsor status.  In addition, on November 3, 1997, President Clinton issued Executive Order 13067, declaring "I, William J. Clinton, President of the United States of America find that *the policies and actions of the Government of Sudan, including continued support for international terrorism*…constitute[s] an unusual and extraordinary threat to the national security and foreign policy of the United States. (*emphasis added).*

The Executive branch's determinations that the *Sudanese government* sponsored al Qaeda as part of its official policies and activities is an essential lens through which the facts set forth in the Amended Complaints must be viewed.  Those formal determinations give rise to a clear inference, and make plausible Plaintiffs' allegations, that Sudanese officials, including Bashir and Turabi, employees, and agents were acting within the scope of their roles for the government and in furtherance of Sudan's government policy, in providing the material support to al Qaeda described in the complaints.

Even without these inferences that flow from the Executive branch's designations and declarations, the Amended Complaints contain exhaustive factual detail that Sudanese officials,

---

[6] On August 12, 1993, Secretary of State Warren Christopher made the following determination: "In accordance with section 6(j) of the Export Administration Act (50 U.S.C. App. 2405 (j)), I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism."

employees, and agents, acting within the scope of their roles for Sudan, provided material support to al Qaeda, including through the cooperation agreements senior Sudanese officials brokered with Iran and Hezbollah. Citing firsthand accounts of former NIF members, the Amended Complaints detail how the NIF, headed by Hussan al Turabi, installed Omar al Bashir, as the co-leader of Sudan's government, and that Turabi and Bashir jointly governed Sudan in the ensuing years. CAC ¶¶ 31-36; AAC ¶¶ 13-16. The complaints offer undisputed facts that Sudan's most senior leaders urged bin Laden to build a terrorist organization in Sudan, with the official aim of building its capacities to attack the U.S. The pleadings show how this program was then implemented through hand-in-glove cooperation between al Qaeda and Sudan's intelligence, military, customs and other agencies, all of which would have been impossible without the active participation of Sudan's most senior officials (along with the involved intelligence, military and other officials). They also detail forms of support that only a state actor and its officials could provide, including safe haven and training camps in Sudan, and al Qaeda's access to and use of government-owned infrastructure including army bases and Sudan's government-owned airline. The complaints also show al Bashir personally granted special financial privileges to al Qaeda run businesses. CAC ¶¶ 122-129; AAC ¶¶ 21-48, 65. These and other allegations describe an official, state-run material support program.

Consistent with this evidence, the precise "scope of office, employment, or agency" argument that Sudan proffers here was rejected in the *Rux* decisions. *Rux v. Republic of Sudan,* No. 2:04cv428, 2005 U.S. Dist. LEXIS 36575, at *44-45 (E.D. Va. Aug. 26, 2005) ("*Rux I*") *aff'd in part, appeal dismissed in part*, *Rux v. Republic of Sudan,* 461 F.3d 461 (4th Cir. 2006) ("*Rux II*"). *Rux I* found that providing diplomatic pouches, waiving of taxes and duties, allowing the formation of terrorist training camps, and establishing a bank with Osama bin Laden could reasonably be done within the scope of government duty, and that many of them can only be done with the assistance of the highest echelons of government. Accordingly, the court concluded that "[a]s a matter of law, the factual allegations in

the Complaint are sufficient to satisfy the 'within the scope' element of jurisdiction." *Rux I,* at \*44.

In affirming *Rux I,* the Fourth Circuit, after reviewing President al-Bashir's personal involvement in supporting al Qaeda, stated "other aspects of providing safe haven to Al-Qaeda also necessarily involved official governmental support. For example, as the district court recognized, permitting the use of diplomatic pouches, granting relief from taxes and duties, allowing the establishment and operation of terrorist training camps, and establishing financial joint ventures between Sudan and Al-Qaeda could only be carried out by government officials acting within the scope of their offices." *Rux II,* 461 F.3d at 472, n.5; *see also Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 139 (D.D.C. 2011) ("*Owens II*"); *Owens v. Republic of Sudan,* 174 F. Supp. 3d 242, 280 (D.D.C. 2016) ("*Owens III*"), *aff'd, Owens v. Republic of Sudan,* 864 F.3d 751 (D.C. Cir. 2017) ("*Owens IV*"); *Rux v. Republic of Sudan,* 495 F. Supp. 2d 541, 554 (E.D. Va. 2007) ("*Rux III*") (all finding or affirming that the Sudanese government provided material support to al Qaeda).

Plaintiffs' factual allegations that Sudan conspired with al Qaeda and Iran, further satisfy the "scope of office, employment, or agency' in an additional way. As Learned Hand explained long ago, "[w]hen men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do." *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926); *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 98-99 (D.D.C. 2008) (recognizing attribution through conspiracy); *see also* 162 Cong. Rec. S2845 (daily ed. May 17, 2016) (statement of Sen. Cornyn): JASTA's new FSIA exception "incorporates traditional principles of vicarious liability and attribution, including doctrines such as . . . secondary liability"). Here, the very purpose of Sudan's conspiracy with al Qaeda (which encompassed the tri-partite agreement Sudan brokered among itself, al Qaeda and Iran) was to attack America. Thus, the terrorist acts of Sudan's agent al Qaeda in conducting the 9/11 attacks, and of Iran in providing support for those attacks, were within the scope of their co-conspirator agencies and attributable to Sudan.

*Flanagan v. Islamic Rep. of Iran*, 87 F. Supp. 3d 93, 116-17 (D.D.C. 2005) (as co-conspirators with al

Qaeda, Iran and Sudan are jointly and severally liable for al Qaeda's terrorist attacks).

### B.     Plaintiffs Plead Proximate Cause Under the FSIA

Sudan suggests the wrong standard when it argues that the FSIA's terrorism exceptions should

be read to impose a "direct" and "but for" jurisdictional causation requirement.  As Sudan is forced

to acknowledge, this Court (and others) has rejected the standard Sudan advocates.  *Ashton v. Al Qaeda*

*Islamic Army,* 298 F. Supp. 3d 631, 644-646 (S.D.N.Y 2018); *Havlish*, 2011 U.S. Dist. LEXIS 155899 at

*202.  Instead, this Court has adopted the "traditional test for proximate causation that has been

applied elsewhere in the FSIA context: 'some reasonable connection between the act or omission of

the defendant and the damage which the plaintiff has suffered.'"  *Ashton,* 298 F. Supp. 3d at 645-646

(quoting *Owens IV*, 864 F.3d at 794).

Pursuant to this reasonable connection standard, a plaintiff need simply allege that the

defendant's actions were a substantial factor *in the sequence of events* that led to the plaintiff's injury, and

the plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence of the

defendant's actions.  *Ashton,* 298 F. Supp. 3d at 645-646 (*emphasis added); Owens IV*, 864 F.3d at 794.

A substantial factor need not directly cause the plaintiff's injuries.  Rather, "[t]he word 'substantial'

means that the act or omission 'had such an effect in producing the injury that reasonable people

would regard it as a cause of the injury.'"  *Locust Valley Water Dist. v. Dow Chem. Co.,* 465 F. Supp. 3d

235, 240 (E.D.N.Y. 2020) (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.,* 725 F.3d

65, 116 (2d Cir. 2013).

While Sudan nominally acknowledges the reasonable connection test, it does not meaningfully

argue that its material support was not a substantial factor in causing the sequence of events that led

to the 9/11 attacks, nor does it make any real effort to argue that the 9/11 attacks were not a

reasonably foreseeable or anticipated consequence of providing material support to al Qaeda.  Instead,

13

Sudan rests its arguments on its largely irrelevant and factually inaccurate claims that (1) Sudan's material support was not "directly" used to carry out the 9/11 attacks; (2) Osama bin Laden personally departed Sudan in 1996; and (3) Sudan's support for al Qaeda should be deemed too attenuated and disregarded for purposes of causation.[7]   Sudan's three fact-bound arguments are at odds with governing law and simply ignore the facts in favor of Sudan's own proposed (and not credible) narrative.  Further, to the extent that Sudan seeks to argue that the causal chain was broken by some development, it is claiming a supervening cause, which is an affirmative defense and not resolvable by way of a 12(b)(6) motion to dismiss.

> **1.      Plaintiffs Allege That Sudan's Material Support to Al Qaeda Was a Substantial Factor in the Sequence of Events That Led to the 9/11 Attacks, and That the Attacks are Attributable to Sudan as a Co-Conspirator**

Plaintiffs' factual allegations satisfy the jurisdictional proximate cause test in several independent and mutually reinforcing ways.  As discussed elsewhere, Plaintiffs' factual allegations establish that Sudan conspired with al Qaeda, Iran, and Hezbollah, for the express purpose of enabling al Qaeda to attack the United States.  *See Infra*, VII.B.  As such, the actions of the al Qaeda terrorists who planned and carried out the September 11th attacks are themselves attributable to Sudan. Likewise, the material support Sudan arranged for Iran and Hezbollah to provide to al Qaeda, which this Court already has found to be a substantial factor in the events leading to 9/11, *see, e.g., Havlish*, 2011 U.S. Dist. LEXIS 155899, at *125, 129-30, 133, 151, 188, 197-201, are attributable to Sudan as well.  There is no basis to dispute that those attributable acts, including the September 11th attacks themselves, were a substantial factor in the sequence of events leading to Plaintiffs' injuries.  That alone settles the matter.

---

[7] Incredibly, other than quoting Ashton, the legal terms "substantial factor," "reasonably foreseeable," and "natural consequence" appear nowhere else in Sudan's brief.

2.    **Plaintiffs' Injuries Were a Reasonably Foreseeable and Natural Consequence of Sudan's Terrorist Actions**

Plaintiffs' factual allegations also establish that their injuries were *reasonably foreseeable,* or anticipated as a natural consequence of Sudan's actions in supporting al Qaeda. *Ashton,* 298 F. Supp. 3d at 645-646.[8]Indeed, terrorist acts and the resulting deaths and physical injuries are precisely the reasonable and natural consequence of a state sponsor's provision of material support to a terrorist organization. *Owens IV,* 864 F.3d at 798; *Burnett v. Al Baraka Inv. & Dev. Corp.,* 349 F. Supp. 2d 765, 797 (S.D.N.Y. 2005) (quoting *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C 2003) ("Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given [the complaints'] allegations that, prior to September 11, al Qaeda and Osama bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens."); *accord Owens v. Republic of Sudan,* 412 F. Supp. 2d 99, 114-115 (D.D.C. 2006) ("*Owens I*") (in supporting al Qaeda, Sudan could foresee that al Qaeda would carry out terrorist attacks years later.).

In *Owens IV*, Sudan appealed a default judgment entered against it for claims arising from the 1998 African Embassy bombings, including by claiming that the district court should not have found that those attacks were a foreseeable result of its material support to al Qaeda, under the theory that Sudan did not know that Osama bin Laden was a terrorist.  864 F.3d at 797.  Sudan cited that bin Laden and al Qaeda had not been designated as such prior to relocating to Sudan.  *Id.*  The Court rejected the argument, finding that "Sudan ignores the broader context of its actions.  In the early 1990's the Sudanese government reached out to numerous terrorist groups. . . . That al Qaeda was included in this list of renowned terrorist organizations *supports an inference that its terrorist aims were*

---

[8] Sudan does not argue that the Amended Complaints fail to plead that the 9/11 attacks were a reasonably foreseeable result of its provision of material support to al Qaeda.  Instead, Sudan relies on its previously rejected argument urging a "but for" and "direct" connection standard.  As a result, Sudan has conceded the point.

*foreseeable – indeed, foreseen – at the time of Sudan's invitation.*" *Id.* (*emphasis added*).

The *Owens IV* court further reasoned that "as its relationship with al Qaeda deepened, Sudan undoubtedly became aware of al Qaeda's hostility to the United States and its intention to launch attacks against American interests." *Id.* at 798. Citing facts and evidence identical in substance to those presented in the Amended Complaints relating to al Qaeda's open hostility to the United States (CAC ¶¶ 112-121; AAC ¶¶ 70-78), the court concluded "Sudan's claimed ignorance of al-Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could *not help but foresee that al Qaeda would attack American interests wherever it could find them.*" *Id.* at 798 (*emphasis added*).

As in *Owens IV*, the Amended Complaints sufficiently plead that it was reasonably foreseeable that al Qaeda would attack the United States, and in fact show that Sudan shared al Qaeda's goal to attack American, and partnered with al Qaeda to make that goal a reality. The facts demonstrating this shared mission include but are not limited to: Sudanese officials' direct involvement in the thwarted Landmark's Plot on the U.S. homeland (CAC ¶¶ 112-115; AAC ¶¶ 77-78); Sudan's role in providing material support for al Qaeda fighters in Somalia (CAC ¶¶ 116-121; AAC ¶¶ 73-76); Sudan's tripartite agreement with al Qaeda and Iran to attack the U.S. (CAC ¶¶ 75-88; AAC ¶¶ 52-54); Sudan's designation as a state sponsor of terrorism by the U.S. State Department in 1993 (CAC ¶¶ 7, 117; AAC ¶ 79); Sudan's continued support for terrorism in general, and al Qaeda in particular, after its designation as a state sponsor in 1993 (CAC ¶¶ 40-42, 117-121, 178-192; AAC ¶¶ 82-84); President Clinton's 1997 Executive Order, and Sudan's continuing material support of al Qaeda after the 1998 embassy bombings and the 2000 U.S.S. Cole attack (CAC ¶¶ 38, 41, 43, 185-188; AAC ¶¶ 101-118).

In sum, Plaintiffs' facts and evidence show that terrorist attacks against the U.S. were not only a foreseeable and natural consequence of Sudan's collaboration with al Qaeda, but the intended and specific aim of that partnership.

### 3.    Sudan's Fact-Bound Causation Arguments Have No Merit

Exactly as it has unsuccessfully attempted to do in other cases, Sudan attempts to deflect the content and import of the actual record, based on three largely irrelevant and inaccurate fact-bound arguments: *First*, Sudan wrongly claims that jurisdictional causation requires a showing that material support it provided to al Qaeda was used directly by the actual perpetrators of 9/11, and incorrectly claims that Plaintiffs' pleadings fail to make such a showing. *Second*, Sudan argues that Osama bin Laden's personal departure from Sudan in 1996 somehow breaks the casual chain. *Third*, ignoring the facts and evidence showing that Sudan's material support for and conspiracy with al Qaeda remained ongoing through September 11, 2001, Sudan claims that the material support it provided to al Qaeda should be regarded as too attenuated in time and place from 9/11 to satisfy the modest jurisdictional causation standard, in the context of a motion to dismiss raising a purely legal challenge. As set forth below, none of these arguments have any factual or legal merit.

### a)    Sudan's Material Support Need Not Have Been Used by The Perpetrators of the 9/11 Attacks, But Was In Fact Used to Support the 9/11 Attacks

Ignoring the actual elements of the reasonable connection standard, Sudan attempts to interject its own different test, arguing that its conduct cannot be a "cause" of the 9/11 attacks within the meaning of the FSIA's exceptions, absent a very direct link between the material support it provided and the 9/11 attacks.[9]   As Sudan knows from its numerous failed attempts to avoid

---

[9] For example, Sudan argues that the Amended Complaints fail to allege that anyone Sudan harbored in the late 1990's "played any role in the 9/11 attacks" or provided any support to those who carried out the attacks. ECF No. 6567 at 23-25. It claims that the Amended complaints fail to allege any support to al Qaeda's "businesses [is] directly related to the 9/11 Attacks." ECF No. 6575 at 25. "No comparable allegations that Sudan provided such direct support for those who carried out the 9/11 attacks." *Id.* at 26. The "Amended Complaints fail to allege any facts to support…the required direct and but for causal relationship between the purported support of Al Qaeda or Bin Laden…and the 9/11 Attacks." *Id.* at 28. "Amended Complaints do no allege any facts…that any purported training in Sudan was for the 9/11 attacks or that any 9/11 Attack participants trained at any purported camps in Sudan." *Id.* Amended complaints fail to allege that Sudan's provision of security for explosive training that occurred in Sudan in early 1990's was for the 9/11 hijacking or the 9/11 hijackers. *Id.* Amended Complaint fails to allege that the fake passports provided by Sudan to al Qaeda "played any role in the 9/11 Attacks. *Id.* at 29. Plaintiffs' ATA claims fail for failing to plead "but for and direct causation." *Id.* at 42. "Amended Complaints fail to allege that Sudan…supported the actual perpetrators of the 9/11 Attacks." *Id.* at 48. "Amended Complaints do not allege any facts that Sudan knew its support…was playing a "role" in the "planning and

jurisdiction and liability based on this exact argument, its "direct" link theory has no merit. *Owens IV,* 864 F.3d at 798-799 (district court properly found Sudan's material support for al Qaeda was proximate cause of 1998 embassy bombing despite lack of any evidence that Sudan knew of or specifically supported bombings); *Rux I,* 2005 U.S. Dist. LEXIS 36575, at \*44-45 (no requirement at pleading stage to provide a direct link between support provided by Sudan and Cole attack).

In *Owens IV,* the court rejected Sudan's argument that § 1605A required that the material support it provided to al Qaeda must have been given and used to directly aid the specific terrorist act that injured the plaintiffs. 864 F.3d at 799. The court correctly held that "a state sponsor of terrorism …may not avoid liability for supporting known terrorist groups by professing ignorance of their specific plans for attacks." *Id.* at 799. Thus, the fact "that the evidence failed to show Sudan either *specifically intended or directly advanced* the 1998 embassy bombings is irrelevant to *proximate cause and jurisdictional causation.*" *Id.* at 799. (emphasis added); *see also Force v. Islamic Republic of Iran,* 464 F. Supp. 3d 323, 368 (D.D.C. 2020) (rejecting any requirement that the material support provided be directly linked to a particular terrorist attack). In *Force* the court concluded that financial and military aid that increases the operating capacity of a terrorist organization is a substantial factor in causing terrorist attacks by those terrorist organizations, and that deaths and injuries resulting from such attacks are reasonably foreseeable or a natural consequence of providing such support. *Id.* at 368.

Responding to Sudan's argument that general material support was insufficient to establish proximate cause, the *Owens* court referred back to its earlier decision in *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1128 (D.C.C. 2004), where the Court explained causation in the context of a hypothetical raised by a sovereign defendant:

> A terrorist organization is supported by two foreign states. One specifically instructs the organization to carry out an attack against a U.S. citizen. Can the state which only provides general support, but

---

execution of the 9/11 Attacks." *Id.* at 49. Amended complaints fail to allege "specific intent to participate in Al Qaeda's efforts to perpetrate the 9/11 Attacks. *Id.* at 53.

> was not involved with the act giving rise to the suit also be stripped of its immunity? Yes, we said. Because material support "is difficult to trace," requiring more than proximate cause "could absolve" a state from liability when its actions significantly and foreseeably contributed to the predicate act.

*Owens IV*, 864 F.3d at 799 (citations omitted).

Citing only one case involving substantive claims under the ATA, *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), Sudan implies that multiple "*Courts* have applied this direct relationship standard in terrorism cases." Yet, *Rothstein* does not stand for the proposition that Sudan cites it for (that courts in terrorism cases require "a direct causal link or participation in the attack that injured the plaintiff"). Rather, it merely found that the mere provision of financial services by a bank to Iran, without some evidence that the bank knew its financial services were being used by Iran to fund terrorism, was insufficient to establish traditional proximate cause, because even foreign sovereigns who are state sponsors of terrorism have legitimate need for and use banking services. *Id.* at 97.

### b)   Osama bin Laden's Departure Did Not Break the Casual Chain

Selectively citing the 9/11 Commission Report, Sudan argues that its alleged "expulsion" of Osama bin Laden in 1996 weakened bin Laden and breaks the causal chain. Here again, the arguments Sudan urges have been specifically rejected by the courts that found Sudan subject to jurisdiction and liability for the 1998 African Embassy attacks and 2000 U.S.S. Cole bombing, both of which occurred well after bin Laden personally departed Sudan. *Owens IV*, 864 F.3d at 795-796. In *Owens IV*, applying the substantial factor element of the reasonable connection test, the court noted that "Sudan argues that by expelling bin Laden in 1996 it broke the chain of causation leading to the 1998 embassy bombings." *Id.* at 795. Relying on some of the same government reports cited by the Amended Complaints here, the court stated "we do not believe Sudan broke the chain of proximate causation by completely disassociating itself from al Qaeda in or after 1996," concluding "as the district court inferred, it is far more likely that Sudan, despite having expelled bin Laden in 1996, continued to

harbor al-Qaeda terrorists until and after the bombings." *Id.* at 796.

Next, the court addressed Sudan's significantly weakened argument stating, "Sudan counters by selectively quoting the 9/11 Commission Report, stating 'Bin Ladin left Sudan…significantly weakened.'" *Id.* at 796-97.  Rejecting Sudan's "significantly weakened" argument, the court stated "bin Laden's expulsion did not undo the support Sudan provided in the previous years." *Id.* at 797.  Again, relying on many of the same facts alleged in the Amended Complaints (CAC ¶¶ 44-91, 122-149, 155-177; AAC ¶¶ 97-118), the court emphasized the criticality of Sudan's complete program of support in enabling al Qaeda to establish itself and grow, and in providing it with the operational capabilities necessary to carry out sophisticated attacks:  Sudan "allowed al Qaeda to extricate itself from a war-torn Afghanistan," enabled it to "organize its terrorist enterprise in a stable safe haven" and "sheltered the group from foreign intelligence," "put al Qaeda in contact with other, more experienced terrorist groups residing in Sudan" and "allowed al Qaeda to grow its membership." *Id.* at 797.  The court concluded that while "the expulsion of bin Laden may have marked a temporary setback for Al Qaeda, on balance, the organization benefited greatly from Sudan's aid during the 1990s.  Therefore, the district court's conclusion that Sudan's support was a 'substantial factor' in the chain of causation leading to the embassy bombings was far from clearly erroneous." *Id.* at 797.  This holding and the reasoning underlying it, in the more demanding context of a review of the sufficiency of the evidence to support a final default judgment, underscores the folly of Sudan's claims that bin Laden's departure somehow erases its pervasive program of support for al Qaeda.

Here, the Amended Complaints, predicated on much of the same evidence as in *Owens,* allege that Sudan's material support allowed al Qaeda to extricate itself from Afghanistan; set up operation in the safe haven of Sudan; grow and train its membership in all facets of terrorist operations, including counter-intelligence, covert operations, covert travel, bomb making, fundraising; collaborate covertly and insulated from foreign interference with Iran and its terrorist proxies; and connect with other

terrorists and terrorist organizations, all of which furnished al Qaeda with the resources to devise, plan and carry out the 9/11 attacks. Further, Sudan directly brokered the agreement for Iran to provide support for al Qaeda operations, which this Court already has determined to have involved material support directly causing the 9/11 Attacks. *See, e.g., Havlish,* 2011 U.S. Dist. LEXIS 155899, at *125, 129-30, 133, 151, 188, 197-201. Sudan's alleged expulsion of bin Laden did nothing to erase these massive contributions to al Qaeda's operational capabilities leading directly to 9/11.

### c) Sudan's Attenuation Arguments Are Legally and Factually Flawed

Sudan asks this Court to disregard literally hundreds of paragraphs of factual allegations in the Amended Complaints, detailing critical support Sudan provided to al Qaeda both before and after Osama bin Laden personally departed Sudan, arbitrarily claiming that those allegations are too remote in time and place to even be considered in conducting the jurisdictional causation analysis. ECF No. 6575 at 27-31. Here again Sudan ignores the actual legal standard, suggesting that its pervasive support for al Qaeda should be deemed irrelevant unless it directly supported the 9/11 attacks. Once again, the actual causation test merely requires that the material support alleged have been a substantial factor in the *sequence of events* that led to the terrorist attacks, not in the actual perpetration of any particular attack. *Ashton,* 298 F. Supp. 3d. at 645-646. Without even attempting to engage that standard and the content of the actual complaints, Sudan argues that this Court's statement in *Ashton* that allegations relating to the Saudi High Commission's support to al Qaeda in Bosnia in the 1990's were too attenuated in time and place to be a cause of the 9/11 attacks, should be applied as some sort of bright line rule to wipe out any allegations relating to Sudan's material support to al Qaeda before bin Laden's departure—an especially troubling approach given ample precedent rejecting the argument and holding Sudan accountable for the identical conduct.[10]

---

[10] While Plaintiffs respectfully disagree with the Court's determination that the allegations as to the SHC were insufficient, the nature and scope of the support SHC was alleged to have provided to al Qaeda is different from that which Sudan is

Sudan's suggestion that the cited language of *Ashton* should be read to require a temporal and spatial proximity requirement here is directly at odds with the Supreme Court's explicit admonition that the lower courts should not impose any such requirements in applying causation language in jurisdictional statutes. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995).  In *Grubart,* the Supreme Court considered jurisdictional causation under the under the Extension of Admiralty Jurisdiction Act, which provides that "the admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water…."  *Id.* (quoting 46 U.S.C.A. § 30101 (West)).  Rejecting spatial and proximity arguments concerning the "caused by" language in the statute, the Supreme Court stated "The Act uses the phrase 'caused by,' which more than one Court of Appeals has read as requiring what tort law has traditionally called 'proximate causation.'  This classic tort notion normally eliminates the bizarre, cf. *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), and its use *should obviate not only the complication but even the need for further temporal or spatial limitations.*"  *Id.* at 536. (emphasis added) (citations omitted).

The *Rux, Kilburn*, and *Owens* cases relied on *Grubart* in adopting the traditional proximate cause test for the identical "caused by" language of the FSIA's terrorism-related exceptions.  And consistent with *Grubart,* they too have rejected a requirement of a spatial or temporal proximity between the provision of material support and the ultimate terrorist act.  *Owens IV,* 864 F.3d at 796 ("provided the plaintiffs demonstrated proximate cause, the *temporal remoteness* between Sudan's material support and the embassy bombings *was irrelevant*") (emphasis added)*; Owens I,* 412 F. Supp. 2d at 114-15.[11]

_____

alleged to have provided.  Sudan ran a comprehensive program of state support for more than a decade, including safe haven, military and intelligence assistance, training in terrorism operations, issuance of false passports and diplomatic papers, and every other form of material support.  The differences in the nature, scope, and kind of support in issue further undermine Sudan's attempted reliance on the excerpted language from the Court's holding as to SHC.

[11] In *Owens I,* the court also rejected Sudan's attenuation theory under the scope of risk analysis set forth by *Restatement (Third) of Torts, Section 29 (Scope of Liability (Proximate Cause)).*  The court noted this scope of risk analysis focuses on whether there is an "intuitive relationship" between the act(s) alleged and the resulting harm—that is "whether the conduct was wrongful *because* that type of damage might result."  *Id.* at 115. (emphasis in original).  The court went on to state "does

Sudan's remoteness arguments also ignore that its program of material support for al Qaeda continued unabated after bin Laden's departure, and was very much active on 9/11. AAC ¶¶ 98-118. As the State Department's official terrorism reports cited in the Amended Complaints make clear, al Qaeda continued to maintain operations and a logistical base in Sudan after bin Laden's departure, and through 9/11. This operational and logistical base was actively supporting the al Qaeda organization and its terrorist operations throughout the period that 9/11 was being conceived, planned, and carried out. Sudan's remoteness argument is thus a fallacy to begin with. And Sudan has no way to distinguish the present claims from those presented in the African Embassy and Cole bombings cases, where its remoteness arguments were soundly rejected, particularly given that the 9/11 operation was itself already in motion when the Cole bombings occurred (with the attack itself occurring less than a year later and at a time when some of the hijackers were already in the United States).

Finally, as with other of its theories, Sudan's "remoteness" arguments ignore its status as a member of al Qaeda's conspiracy to attack America. As set forth elsewhere, Sudan, as co-conspirator with al Qaeda, is vicariously liable for al Qaeda's perpetration of the 9/11 attacks, without any independent need for Sudan to have directly participated in the 9/11 attacks.

## C.    The Limitations Period Under § 1605A(b) Is Not Jurisdictional

As an alternative basis for seeking to avoid jurisdiction under § 1605A, Sudan argues that the 10-year statute of limitations in § 1605A(b) is jurisdictional, citing exclusively to *dicta* in *Simon v. Republic of Iraq*, 529 F.3d 1187, 1193-94, 1196 (D.C. Cir. 2008), *rev'd on other grounds, sub nom. Republic of Iraq v. Beaty*, 556 U.S. 848 (2009). Inexplicably, Sudan fails to inform this Court that the D.C. Circuit

---

the 'scope of risk' associated with providing material support to terrorist groups include the risk that such support might facilitate a terrorist act by members of those groups at some future time? The obvious answer is yes; giving aid and comfort to those who engage in terrorist acts such as extrajudicial killing—here, al Qaeda and Hizbollah—is wrongful *precisely* because it makes it more likely that the beneficiaries of the aid will, *years later,* commit murders and cause injuries." *Id.* (first emphasis in original, second emphasis added).

addressed the question directly in *Owens*, and expressly held that the 10-year statute of limitations in §
1605A(b) is not jurisdictional.[12]  *Owens IV,* 864 F.3d at 801-804 ("The plain text alone is enough to
render the limitation period in § 1605A(b) nonjurisdictional."); *Roth v. Islamic Republic of Iran,* 78 F.
Supp. 3d 379, 397 (D.D.C. 2015) ("This Court has held that section 1605A's limitations provision is
not jurisdictional.").  These decisions flow from Supreme Court precedent that "most time bars are
nonjurisdictional," *United States v. Wong,* 575 U.S. 402, 410 (2015), and its instruction to courts that
limitation periods should treat a time bar as jurisdictional only if Congress clearly stated such.
*Musacchio v. United States,* 136 S. Ct. 709, 717 (2016).  Congress had no intention to make the limitation
jurisdictional and, as such, § 1605A(b)'s limitation time period is a statute of limitations applicable only
to the substantive cause of action.

### D.    Solatium Plaintiffs and Property Damage Plaintiffs Have Standing to Assert Jurisdiction Under § 1605A and § 1605B

Sudan's claims that solatium family members and the property damage Plaintiffs lack
jurisdictional standing under § 1605A and § 1605B(b) is contrary to the plain text of those provisions,
and once again rests on implausible theories that have been repeatedly rejected.

#### 1.    Family Members and Property Damage Plaintiffs Have Standing Under § 1605A

Without citing to any authority on point and failing to inform this Court that Sudan's
arguments have previously been rejected, Sudan argues that Congress limited the terrorism exceptions
in §1605A(a) and §1605B(b) to victims who died or suffered personal injuries but immunized Sudan
from claims by family members of those terrorism victims.  Sudan made the exact same argument in
*Owens IV,* 864 F.3d at 805-07, under § 1605A(a).  Indeed, while the argument in Sudan's appellate
brief is not entirely verbatim with what is argued here, entire paragraphs were lifted and copied into

---

[12] Sudan also failed to inform that its very same argument relying on *Simon* was explicitly rejected by the district court in
*Owens III,* 174 F. Supp. 3d at 267-268 ("*Simon* did not actually hold that § 1605(f)'s time bar was jurisdictional.").

Sudan's arguments in this matter.  Sudan Final Brief, USCA Case No. 14-5105, Doc. No. 1631291, at 42-43.  The *Owens* court concluded that "by its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant who is not the legal representative of a victim physically injured by a terrorist attack.  Who in particular may bring a claim against a foreign sovereign is a question of substantive law, wholly separate from the question of our jurisdiction." *Owens IV,* 864 F.3d at 807.

Section 1605A(a)(2) eliminates immunity if "the claimant or the victim" is a U.S. national, service member, or government employee.  28 U.S.C. § 1605A(a)(2).  Thus, on its face § 1605A(a)(2) permits claims by persons other than the victim.  As the Seventh Circuit has held, "[d]enying jurisdiction over family members' claims for American victims would require us [the court] to ignore the disjunctive structure of § 1605A(a)(2)(A)(ii)." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 569-70 (7th Cir. 2012).

### 2.    Section 1605A(d) Expressly Authorizes the Commercial Plaintiffs' Property Damage and Subrogation Claims

Equally meritless is Sudan's claim that the property damage Plaintiffs lack jurisdictional standing under § 1605A, in support of which Sudan conspicuously fails to cite the most relevant provision of the statute that plainly settles the issue in Plaintiffs' favor.  Sudan's argument on this point relies exclusively on the U.S. national language of § 1605A(a)(2)(A)(ii)(I), but the provision relevant to the property damage Plaintiffs' jurisdictional standing is § 1605A(d).  It provides:

(d) Additional Damages.—

After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

28 U.S.C. § 1605A(d).

As the courts have explained, and Sudan knows well, standing under § 1605(a)(d) is derivative of standing under § 1605A(c), and as a result it is unnecessary for the party filing suit under § 1605A(d) to establish standing separately. *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,* 811 F .Supp. 2d 53, 71 (D.D.C. 2011) ("Under the language of [§ 1605A], once a party with valid standing has brought an action under § 1605A(c), it is unnecessary for a party filing suit under § 1605A(d) to establish standing separately; standing under § 1605A(d) is derivative of that under § 1605A(c)."). Consistent with this fact and the plain text of § 1605A(d), courts have consistently held that corporate insurance companies may pursue property damage claims pursuant to § 1605A(d), regardless if they are U.S. national corporations, and regardless of the citizenship or nationality of the subrogating insurance carriers or victim of the terrorist attack. *Id.; La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya,* 533 F.3d 837, 844 (D.C. Cir. 2008); *Leibovitch,* 697 F.3d at 570; *see also In re: Terrorist Attacks on Sept. 11, 2001,* No. 03-MDL-1570 (GBD) (FM), 2015 WL 9468813, at *1-3 (S.D.N.Y. Dec. 28, 2015) (since policyholders suffered property damage from terrorist acts, insurance companies could recover).[13]

### 3. JASTA's Waiver Of Sovereign Immunity Is Not Limited To U.S. Nationals

Sudan also seeks to avoid jurisdiction under JASTA's immunity exception for certain of the claims, based on its plainly erroneous assertion that its availability is limited to U.S. nationals. In fact, JASTA's exception to sovereign immunity, which is set forth at § 1605B(b), does not include any requirement that the plaintiff asserting claims for injuries in the United States be a U.S. national. Indeed, that provision contains absolutely no reference to U.S. nationals or nationality at all. Ignoring that fact, Sudan misleadingly cites the U.S. national requirement of the separate provision at §

---

[13] Although irrelevant for purposes of § 1605A, the insurers have alleged that they are either themselves nationals of the United States, and/or are subrogees of nationals of the United States. Here, several of the insurance companies also are pursuing wrongful death and injury claims pursuant to workers' compensation assignments, and are entitled to proceed under § 1605A(c) for those claims.

1605B(c), which concerns the availability of the substantive causes of action under the ATA and has nothing to do with the immunity determination at all.

Once again, JASTA's immunity exception, JASTA § 3, enacted at § 1605B(b) provides that "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by— (1) an act of international terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred."

As the plain text cited above makes absolutely clear, the immunity exception set forth in section 1605B(b) does not include any requirement that the plaintiff be a U.S. national (or for that matter a natural person).  Instead, it provides a jurisdictional grant of general application for claims for personal injury, property damage, or death caused by an act of international terrorism in the United States, and based on some "tortious act" of a foreign state or one of its agents, employees, or officials. The tort claims that may flow through that exception to immunity include state common law and other tort claims by non-U.S. nationals injured on U.S. soil.[14]

## V.     PLAINTIFFS' § 1605A AND § 1605B CLAIMS ARE TIMELY

### A.     Plaintiffs' § 1605A Claims Are Timely Under the Related Action Provisions of § 1083(c)(3)

Contrary to Sudan's argument, the Amended Complaints state timely claims against Sudan under § 1605A.  The claims are the very same claims that these Plaintiffs commenced against Sudan in the 2002-2004 period under then § 1605(a)(7), and thus all the § 1605A claims relate back the

---

[14] Sudan's argument that JASTA's immunity exception is limited to U.S. nationals appears to be based on its wholly unsupportable claim that Congress (silently) preempted state common law and most federal claims in enacting JASTA, leaving terrorism victims with claims under the ATA as their sole possible remedy.  This theory is contrary to JASTA's purpose and text, and has absolutely no basis in law or fact.  *Infra*, Section VII.E.

original complaint for Rule 15 purposes.  Not only did the § 1605A claims "ar[i]se out of the conduct, transaction, or occurrence set out …in the original pleading," *see infra* section 2, but § 1605A(b) explicitly contemplates that if an action, was commenced under 1605(a)(7) no later than September 11, 2011, it can be "maintained" under § 1605A.  Since "the law that provides the applicable statute of limitations allows relation back," Rule15(c)(1)(A), Plaintiffs' claims are timely under both subsections of Rule 15.  The MDL Plaintiffs' actions were commenced before 2011 under § 1605(a)(7), and thus now that the § 1605A causes of action have been included in the amended pleadings, Sudan's time bar arguments are therefore irrelevant, and the Court should deny the motion to dismiss the § 1605A claims as time-barred on this ground alone.

### 1.   Plaintiffs' Actions are Timely Under § 1605A

Section 1605A(b) explicitly contemplates that if an action, was commenced under § 1605(a)(7) no later than September 11, 2011, it can be "maintained" under § 1605A(c).  The MDL Plaintiffs' actions were commenced before 2011 under § 1605(a)(7), and thus now that the § 1605A(c) causes of action have been included in amended pleadings, Sudan's time bar arguments are irrelevant.  Sudan's brief fails to discuss, at all, this basic default procedure for converting § 1605(a)(7) claims to § 1605A claims, and the Court should deny the motion to dismiss the § 1605A claims as time-barred on this ground alone.

Even were the Court to determine that amendment adding the § 1605A claims is for some reason inappropriate, all such claims could be made in a "Related Action" subject to the commencement periods set forth in § 1083(c)(3).  Such a "Related Action" by definition would be related to the MDL litigations and combined therewith for pre-trial and trial purposes.

Sudan's brief fails to address the basic default procedure contemplated by § 1605A for "maintain[ing]" an action under § 1605A that was originally brought under § 1605(a)(7).  Rather, Sudan's brief focuses exclusively on this second procedure for bringing new claims under § 1605A.

Sudan argues, at MOL 18-21, that were the MDL Plaintiffs to have brought – or now were they to bring – a "Related Action" alleging § 1605A claims, they would be time barred.  Sudan argues that "because none of Plaintiffs' pending actions under § 1605(a)(7) had reached judgment as of the date of the NDAA's enactment in 2008, Plaintiffs could not then – and cannot now – avail themselves of the 'related action' provision in sec. 1083(c)(3)."  MOL at 20.

Sudan supports this argument by citing two cases, *Knowland v. Great Socialist People's Libyan Arab Jamahiriya,* 2010 WL 11424122 (D.D.C. Oct. 8, 2010), and *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163 (D.D.C. 2010).  In both cases, judgments had been entered years before the enactment of the NDAA, so amendment was no longer available, and the incidents underlying the § 1605A claims had occurred more than ten years before such enactment.  Therefore, plaintiffs in those cases had to commence new actions within 60 days of the enactment of the NDAA, since otherwise they had no way to avoid a time-bar dismissal.

However, no judgments have been entered here, and thus the 60 day extension of § 1083(c)(3)(B) relied on by Sudan is simply not relevant.  Rather, Plaintiffs here have the safe harbor of § 1083(c)(3)(A), which would give them until 60 days after the entry of judgments on their § 1605(a)(7) claims, and their other state and Federal law claims, to commence a new action.

Sudan suggests, without any case support, that § 1083(c) "was not intended to allow plaintiffs (like Plaintiffs here) who in 2008 still had years remaining under the 10-year statute of limitations to bring a § 1605A action, to circumvent that 10-year limitation period."  MOL at 19.  This argument is analogous to the argument Sudan made in *Owens IV,* 864 F.3d at 800-01, that a plaintiff who failed to refile a § 1605(a)(7) case within the 60-day period provided under § 1083(c)(2), was ineligible to avail itself of the "Related Actions" provision.  In fact, that argument moved District Judge Bates in *Khaliq v. Republic of Sudan*, No. 1:04-cv-01536, Sept. 9, 2009, docket 32, and Oct. 10, 2009, docket 35, to deny amendment to allege § 1605A claims made after the § 1083(c)(2) deadline had passed.  The *Khaliq*

plaintiffs then commenced a "Related Action" under § 1083(c)(3), which Judge Bates allowed and combined into the *Owens* litigation. *See Owens* IV, 864 F.3d at 800.[15]

This litigation is the result of the consolidation and centralization of a set of actions which "present common, complex legal and factual questions concerning the efforts of plaintiffs to hold liable an array of defendants who allegedly promoted, financed, sponsored or otherwise supported the acts of terrorists that led to the deaths and injuries arising from the September 11, 2001 attacks on the United States." *In re Terrorist Attacks on September 11, 2001,* 295 F. Supp. 2d 1377 (J.P.M.L. 2003). To dismiss the amended complaints because of Sudan's contention that the original Plaintiffs were not the intended beneficiaries of the expansion of claims expressly permitted by § 1605A, only to have precisely the same claims re-presented in related actions that will necessarily be joined to the litigation centralized by the Judicial Panel, defines futility.

### 2.     Plaintiffs' Actions are Timely Under JASTA

Sudan argues that a subset of the Plaintiffs in the actions other than *O'Neill*, who claim that Sudan is liable for aiding-and-abetting and conspiracy under the ATA, are time-barred.[16]   Because those claims are amendments to the original actions, and "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading," Fed. Rule Civ. Proc. 15(c), the statute of limitations governing JASTA claims is irrelevant.

It is incontestable that the claims of the personal injury and property damage Plaintiffs arise out of precisely the same occurrence set forth in the original complaints. Sudan has been on notice from when it was first served with the initial pleading in these MDL cases that the personal injury and

---

[15] Judge Bates may well have been persuaded by the holdings of his fellow jurists in the DC District that a related action may be brought by an original plaintiff, *see In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 65 (D.D.C. 2009), and then presumptively consolidated with the original still pending action. *Wyatt v. Syrian Arab Republic*, 736 F. Supp. 2d 106 (D.D.C. 2010).

[16] Sudan concedes that the claims of family members of any individual who died in the 9/11 Attacks, and legal representatives entitled to bring actions on behalf of such decedents, are presently viable under the tolling rules in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). *See* MOL at 34.

property damage Plaintiffs were suing for the damages they suffered due to Sudan's alleged participation in and facilitation of al Qaeda's heinous acts. The only issue raised by the amendment to add JASTA claims is whether Sudan acts are also a basis for an ATA damage award.

The amended pleading more than meets the test for relating back. "[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.,* 460 F.3d 215, 228 (2d Cir. 2006); *Navarra v. Marlborough Gallery, Inc.*, No. 10 Civ. 7547(KMW)(RLE), 2013 WL 1234937 (S.D.N.Y. March 26, 2013) (adding a cause of action for tortious interference to an action alleging monopolization and Lanham Act violations, based on the same allegations of improper business activity, relates back to the filing of the original complaint). Here, the original complaints, served on Sudan in the early 2000's, included the very Plaintiffs who Sudan now argues are time barred. The "conduct" of Sudan which constitutes its aiding and abetting of al Qaeda, and its conspiracy with al Qaeda, is the "conduct" alleged in those original complaints. All that is changed is the basis of liability to these Plaintiffs for those acts, liability explicitly added by JASTA.

Were this Court to rule that the relation back doctrine is not applicable, then those subsets of Plaintiffs challenged by Sudan, who are not part of the class denominated in the *O'Neill* supplemental complaint, 18-cv-1214, can commence "related actions" under § 1605A and § 1083(c)(3). Their claims under JASTA arise out of the very acts that their § 1605(a)(7) and § 1605A claims arise under – the 9/11 Attacks. Nothing would be gained by making those Plaintiffs commence a new action under § 1605A and JASTA only to have it promptly consolidated with the present actions, and thus permitted under Rule 15(a)(2).

## VI.   THIS COURT HAS PERSONAL JURISDICTION OVER SUDAN

Sudan argues that his Court should decline personal jurisdiction over Sudan because the Amended Complaints fail to properly plead an FSIA immunity exception.  As set forth above, the Amended Complaints sufficiently plead both the § 1605A and § 1605B immunity exceptions.  An immunity exception and proper service are all that is required for personal jurisdiction over a foreign state.  Sudan concedes that it has been properly served and that proper service and an immunity exception are all that is required under current Second Circuit precedent.  *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393 (2d Cir. 2009).[17]

## VII.   THE AMENDED COMPLAINTS PLAUSIBLY PLEAD THE REQUIREMENTS OF THEIR SUBSTANTIVE LAW CLAIMS

### A.   Plaintiffs' Factual Allegations State a Claim Under § 1605A

Sudan acknowledges that, to the extent Plaintiffs' factual allegations satisfy the jurisdictional requirements of § 1605A, they also serve to state a substantive cause of action for material support under § 1605A(c). Sudan Br. at 28.  And to the extent individual Plaintiffs have asserted viable claims under § 1605A(c), the insurer Plaintiffs have stated claims under § 1605A(d).  Consistent with the analysis presented above, Plaintiffs have presented factual allegations (and evidence) plausibly pleading all elements of jurisdiction pursuant to § 1605A, and thus (by Sudan's own concession) have stated substantive claims under § 1605(a), (c), and (d) as well.

Given the expansive substantive remedy established under § 1605A for material support of terrorism, Plaintiffs respectfully submit that this Court need not wade through Sudan's labyrinthine (and flawed) arguments directed to Plaintiffs' additional causes of action at this time.  Fed. R. Civ. P. 12(i).  The material support cause of action under § 1605A is at least as expansive as Plaintiffs'

---

[17] Sudan argues that it is entitled to a due process minimum contacts analysis yet fails to argue why it does not have minimum contacts under the Due Process clause.  Sudan is not entitled to due process protections, but waived this argument in any case.

additional causes of action, and as a result, discovery proceedings as to Sudan in this MDL will be guided and defined by Plaintiffs' § 1605A material support claims in any case.  Pursuant to Rule 12(i), the court need only decide Rule 12(b)(1)-(7) motions "before trial," and can in fact elect to defer a ruling until trial in its discretion.  *Id.*  Consistent with Rule 12(i), the "method and timetable for deciding a Rule 12(b) motion is left to the sole discretion of the trial judge."  *In re Downstream Addicks & Barker (Tex.) Flood-Control Reservoirs,* 137 Fed. Cl. 712, 712 n.1 (2018) (discussing Fed. R. Civ. P. 12(i) and deferring ruling on government's motion to dismiss pursuant to parallel court of claim Rule 12(i)); *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) ("Rule 12(i) affords the district court discretion on how to proceed" with Rule 12 motions).  Thus, this Court has discretion on when to decide Sudan's additional Rule 12 arguments, and can defer decision until after discovery on the 1605A claims.

### B.      Plaintiffs Plead Claims Under the ATA

The Amended Complaint sufficiently plead all of the elements of secondary and primary liability under the ATA.  "The ATA establishes a cause of action for U.S. nationals who are the victims of international terrorism.  It provides, in pertinent part, that '[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States.'"  *Kaplan v. Lebanese Canadian Bank,* 405 F. Supp. 3d 525, 531 (S.D.N.Y. 2019) (citing 18 U.S.C § 2333(a)).  The ATA provides for two types of claims, secondary liability claims and primary liability claims.  *Id.* at 531, 533.

### 1.      The Amended Complaints Plead ATA Conspiracy Claims

JASTA amended the ATA to provide a cause of action against "secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others."  *Id.* at 533 (quoting *Linde v. Arab Bank*, 882 F.3d 314, 319-20 (2d Cir. 2018)).  ATA liability extends to "any

person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Id.* (quoting 18 U.S.C. § 2333(d)(2)). The "proper legal framework" for assessing conspiracy and civil aiding and abetting and liability under JASTA is set forth in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983). *Id.* at 533-34 (citing *Siegel v. HSBC N. Am. Holdings, Inc.,* 933 F.3d 217, 223 (2d Cir. 2019). Secondary liability claims under the ATA can be either in the form of civil conspiracy or aiding and abetting. *Id.* at 534-35.

To plead a conspiracy-based secondary liability claim under the ATA, the plaintiff must plead that the secondary actor and primary actor (i.e. the terrorist organization that carried out the terrorist attack) entered into an agreement to commit an act of international terrorism, and that the plaintiff was injured by an unlawful overt act performed by either by the secondary actor or the primary actor pursuant to this agreement. *Id.* at 534 (citing *Halberstam,* 705 F.2d at 477). "Under the *Halberstam* framework, the elements of a conspiracy include: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Id.* (citations omitted).

In this case, the Amended Complaints plausibly allege that Sudan and al Qaeda entered into an agreement to use terrorism to attack the United States (Elements One and Two) that al Qaeda, the primary actor, perpetrated the 9/11 attacks (Element Three) and that the 9/11 Attacks were perpetrated as part of Sudan and al Qaeda's scheme to attack the United States (Element Four).

### a)    Facts Establishing The Unlawful Agreement

The 9/11 Commission and the CIA concluded that Sudan entered into what the CIA termed a "*Tripartite Agreement Among Usama Bin laden, Iran and the NIF,*" and that pursuant to the agreement they would collaborate politically and militarily to confront the United States. Further, the CIA determined that pursuant to this agreement, Hezbollah's terrorist experience and knowledge would

be shared with Osama bin Laden's Islamic Army (*i.e.*, al Qaeda) so that al Qaeda would gain the necessary experience in terrorist operations.  CAC ¶¶ 82-89; AAC ¶ 53.  As confirmed by one terrorism expert's trial testimony, Sudan's motivation in joining this tripartite agreement was Sudan's desire to transform Osama bin Laden's Islamic Army into Sudan's own terrorist proxy similar to Iran's terrorist proxy, Hezbollah.  CAC ¶ 88; AAC ¶¶ 13-20, 52-53.  In furtherance of the agreement, Sudan provided prolonged widespread material support to al Qaeda.  *Supra*, Sections III.A and IV.A.

Sudan's initial designation as a foreign sponsor of terrorism in 1993, and President Clinton's 1997 Executive Order, establish that Sudan was an active supporter of terrorist activities and that these activities presented a grave national security threat.   All elements of the conspiratorial relationship are further reinforced by the myriad of examples of mutual cooperation, including provision of every type of material support listed in the material support statutes, from which the agreement can be inferred based on the nature and duration of the support provided.  *Halberstam,* 705 F.2d at 478 (the agreement can be inferred from indirect evidence, including the relationship between the actors and the actions, and the duration of the joint activity.).

Given the overwhelming examples of material support, many of which have no purpose other than unlawful ones, Sudan does not actually argue that the Amended Complaints fail to sufficiently plead that someone in Sudan conspired with al Qaeda while al Qaeda was based and operated in and from Sudan.  In reality, Sudan argues that the Amended Complaints fail to sufficiently plead that it was the Sudanese government that conspired with al Qaeda.  As previously discussed, the Amended Complaints plausibly plead that Sudan knowingly and intentionally, as a rogue nation, provided material support to and conspired with al Qaeda and not just rogue government officials or politicians as Sudan suggests.  *Supra*, Sections III.A and IV.A.

**b)**　　　**Facts Establishing the Overt Act Causing Injury**

The overt act causing the injury need only be perpetrated by one of the parties to the unlawful

agreement not both. *Kaplan*, 405 F. Supp. 3d at 533-34 (to prove conspiracy liability under ATA against a bank plaintiff must plead that their injuries were caused by an overt act by either the bank or the terrorist organization). This is so because the nature of civil conspiracy liability is that the secondary actor is liable for the acts of the primary actor based on the conspiratorial nature of the unlawful agreement. The parties do not dispute that the 9/11 attacks are an unlawful overt act perpetrated by al Qaeda.

    c)  **Facts Establishing The Overt Act Conducted In Furtherance of Common Scheme**

  The ultimate act of terrorism, in this case the 9/11 attacks, was conducted in furtherance of Sudan and al Qaeda's common scheme to attack the United States. Sudan conducted numerous overt acts in furtherance of the common scheme, including providing every form of material support listed in the material support statutes, brokering and participating directly in the transfer of Hezbollah's terrorism experience and knowledge to al Qaeda, assisting in security for terrorist training camps and security for clandestine meetings between al Qaeda leaders and Imad Mughniyah.

  Sudan argues the Amended Complaints must plead that Sudan conspired specifically as to the September 11th attacks and with the actual perpetrators of 9/11 attacks. This is simply not the law for conspiracy-based ATA secondary liability. Indeed, "once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy." *Halberstam*, 705 F.2d at 481. Civil conspiracy liability attaches even if the co-conspirator's participation was remote or not significant; it is the agreement to do wrongdoing that is the critical factor in the causal chain. *Id.* at 485.

### 2. The Amended Complaints Plead Valid ATA Aiding and Abetting Claims

Aiding and abetting liability has three elements under the *Halberstam* framework which are: "(1) 'the party whom the defendant aids must perform a wrongful act that causes an injury,' (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance,' and (3) 'the defendant must knowingly and substantially assist the principal violation.'" *Kaplan*, 405 F. Supp. 3d at 534 (citing *Halberstam*, 705 F.2d at 477).

#### a) Sudan Provided Aid To Al Qaeda The Primary Actor

Sudan does not contest that al Qaeda is the primary actor that perpetrated the 9/11 attacks. Rather, Sudan argues that it is not a secondary actor because it did not provide aid to al Qaeda. The Amended Complaints plausibly plead the Sudanese government materially supported al Qaeda. *Supra*, Sections III.A and III.B.

#### b) Sudan Was More Than Generally Aware It Was Playing A Role In Al Qaeda's Terrorist Activities

"To adequately plead the 'general awareness' element, a plaintiff must plausibly allege that the defendant was 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Kaplan*, 405 F. Supp. 3d at 534-35 (citing *Linde*, 882 F.3d at 329). General awareness "does not require proof of specific intent or knowledge of the particular attacks at issue" and only requires that the alleged aider and abettor is generally aware that it is playing a 'role' in a terrorist organization's violent or life-endangering activities. *Id.* at 535 (citations omitted).

Unlike the cases Sudan cites in support of its lack of awareness argument, this is not a case of a potentially innocent financial institution providing innocuous financial services to the customers who might be affiliated with terrorist organizations. Rather, this case involves a designated state sponsor providing material support to al Qaeda, a known terrorist organization based in Sudan for at many years. The nature of the material support provided self-proves general awareness because no

legitimate, lawful reasons exist for providing terrorist organizations with training (*e.g.*, counter-intelligence, communications, etc.), networking terrorists with other terrorists, providing security for terrorists meeting places, training camps and housing, assisting in covert travel by providing passports/failing to stamp passports and collaborating in attempts to secure chemical or biological weapons.

The Amended Complaints go further and allege that Sudan specifically intended to play a role in al Qaeda's terroristic activities because the support and collaboration was provided for the express purpose of attacking the United States.  These facts supporting Sudan's specific intent to attack the United States include:  a) Sudanese government officials' direct participation in and support for 1993 Landmarks plot, the 1998 African Embassy bombings, and the 2000 U.S.S. Cole attack; b) Sudan's designation as a state sponsor of terror in 1993; c) Sudan's continuation of its support to and harboring of al Qaeda and other terrorists after its designation in 1993, demonstrating Sudan's zealous commitment to supporting terrorists despite U.S. condemnation and harsh economic sanctions; d) United Nations Security Council's Resolutions 1054 and 1070 issued in 1996 sanctioning Sudan and demanding that it cease supporting terrorism; and e) President Clinton's 1997 declaration that Sudan's policy of supporting terrorism was a substantial threat to U.S. security.

c)  **Sudan's Knowing and Substantial Assistance to Al Qaeda**

Court's look at these six factors to determine knowing and substantial assistance:  (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.  *Kaplan*, 405 F. Supp. 3d at 532 (citations and quotations omitted).

Terrorism is so heinous that terrorism in of itself satisfies the nature of the act factor. *Freeman v. HSBC Holdings, PLC*, No. 18-CV-7359 (PKC) (CLP); 19-CV-2146 (PKC) (CLP), 2021 U.S. Dist.

Lexis 3452, at *34, 41 (E.D.N.Y. January 7, 2021) (providing financial assistance to a designated FTO satisfies the first factor). The second factor, the amount of assistance, is overwhelming in this case given that Sudan, nurtured and fostered al Qaeda by providing every type of material support listed in the material support statutes. *Supra*, Sections III.A and IV.B. The third factor, presence at the time of the tort, is given little weight in aiding and abetting claims in ATA material support cases because material support "can be expected to occur far earlier and away from where the [a]ttacks were committed." *Freeman*, 2021 U.S. Dist. Lexis 3452, at *41 (citations omitted); accord *Owens IV*, 864 F.3d at 796 ("provided plaintiffs demonstrated proximate cause, the temporal remoteness between Sudan's material support and the embassy bombings was irrelevant); *Owens I*, 412 F. Supp. 2d 114-15 (rejecting Sudan's temporal and spatial proximate cause argument because terrorist attacks occurring far later are precisely what a state sponsor of terrorism could expect by providing material support).

The fourth factor, relation to the tortfeasor, mitigates in favor of finding knowing and substantial assistance because the Amended Complaints plausibly allege that Sudan was al Qaeda's birthplace and home. Sudan provided a home not just in the sense of a location for al Qaeda to reside but also as a location where, free of foreign interference and with Sudan's active assistance, al Qaeda could train, learn, expand, and network with other terrorists and Iran. Perhaps most importantly, Sudan provided a unique type of safe haven that only nation states can provide, from which al Qaeda based its operations allowing the terror organization to covertly: a) begin its foray into terrorism unfettered by international interference; b) attract other terrorists and terrorist organizations expanding the size, competency, and geographical reach of its organization; c) grow its own financial and charitable networks in Sudan providing current and future funding; d) infiltrate other financial institutions and charities worldwide providing current and future funding; and e) perfect its planning of and training for future terrorist acts.

The fifth factor, Sudan's state of mind, supports aiding and abetting liability. As determined

by the U.S. government, terrorism expert testimony and by conclusions of other courts, Sudan actively encouraged and supported al Qaeda's transformation from a group of Afghan guerrilla fighters into a terrorist organization with aim of attacking the United States. The sixth factor, duration of the assistance, also supports aiding and abetting liability as the Amended Complaints provide specific examples of material support that occurred spanning more than a decade.

### 3. Sudan's Argument That It Did Not Provide Material Support In Direct Support Of The 9/11 Attacks Is Irrelevant For ATA Secondary Liability

Sudan argues that the predicate act, knowledge and intent elements of conspiracy and aiding and abetting liability requires a direct nexus between its conduct and the ultimate act of terrorism, the 9/11 attacks. Sudan's argument on this point is irrelevant because the focus of secondary conspiracy and aiding liability under the ATA is not on the connection between the material support and any particular terrorist act but on the conspiracy and aid provided by the secondary actor to the terrorist organization not to any particular terrorist attack.

For secondary liability aiding and abetting claims under the ATA "[t]o adequately plead the 'general awareness' element, a plaintiff must plausibly allege that the defendant was 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities . . . . [S]uch awareness does not require proof of specific intent or knowledge of the particular attacks at issue." *Kaplan,* 405 F. Supp. 3d at 534-35 (citations and quotations omitted); *O'Sullivan v. Deutsche Bank, AG,* No. 17-CV-8709-LTS-GWG, 2019 U.S. Dist. LEXIS 53134 *39 (S.D.N.Y. March 28, 2019) ("[A] defendant need not know of or intend to bring about the specific attacks at issue."). The lack of a knowledge or scienter requirement stems from the nature of aiding and abetting liability which "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." *Halberstam,* 705 F.2d at 478.

As previously discussed, the nature of the support Sudan provided and the United States' decision to declare Sudan a pariah foreign state imposing harsh trade and economic sanctions proves

more that the requisite general awareness.  *Supra*, Sections III.A and IV.A.  This general awareness is all that is required for aiding and abetting liability for the 9/11 attacks.

> ### 4. Sudan's Textual Arguments Against Imposing Secondary Liability Are Properly Rejected

Sudan make two arguments against imposing secondary liability by parsing out portions of the text of JASTA and the predicate criminal statutes.  A reading of the entire text of the statutes foreclose Sudan's arguments.

Sudan argues that it is immune from secondary liability because JASTA's amendment of the ATA did not open foreign sovereign to ATA secondary liability.  Sudan initiates its argument by misquoting JASTA, stating that is reads: "*JASTA authorizes ATA suits against foreign sovereigns only in accordance with [18 U.S.C.] §2333*."  MOL at 33 (emphasis added).  Sudan goes on to argue that § 2333(d) limits liability to a "person" referring to 1 U.S.C. § 1, the Dictionary Act, for the definition of person.  From that premise, Sudan argues that, since the Dictionary Act definition of a person does not include foreign states, JASTA did not intend that ATA liability attach to foreign states.

Sudan selectively quotes both JASTA and the Dictionary Act.  JASTA actually reads:

"(c) CLAIMS BY NATIONALS OF THE UNITED STATES.—Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

Thus, JASTA specifically authorized suits against a foreign state under the ATA and stripped away ATA § 2337(2)'s foreign state immunity for ATA claims.  To read 18 U.S.C. § 2333 as barring suits against foreign states would be completely inapposite to the plain text of JASTA.

Sudan also selectively quotes from the Dictionary Act omitting the key phrase "unless the context indicates otherwise," which undermines Sudan's entire argument.  The Dictionary Act actually reads:  "In determining the meaning of any Act of Congress, *unless the context indicates otherwise*— … 'person' as including 'corporations, companies, associations, firms, partnerships, societies, and joint

stock companies, as well as individuals.'" 1 U.S.C. § 1 (*emphasis supplied*). The context certainly indicates otherwise because the plain text of JASTA amended the ATA to permit ATA claims against foreign states and stripped foreign states immunity for ATA claims in § 2337(2).

Furthermore, the use of the term "person" in a statute includes a foreign sovereign when there is "affirmative evidence of such an inclusory intent." *Al Fayed v. C.I.A.*, 229 F.3d 272, 274 (D.C. Cir. 2000). Such evidence includes "the purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 83 (1991); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312-20 (1978) (foreign government is a "person" under the Sherman Anti-Trust Act based on Congressional intent that the word "person" have "broad . . . meaning" and that the Act have "expansive remedial purpose."). JASTA's purpose (as stated by Congress in the Act itself specifically stripping away ATA immunity for foreign states) (*see also* JASTA § 2 ("The purpose of this ACT is to provide civil litigants with the broadest possible basis . . . to seek relief against . . . foreign countries")), subject matter (it is FSIA exception and creates substantive ATA claims against foreign sovereigns), context (it was passed to allow secondary liability claims against foreign sovereigns) and legislative history (it was meant to apply to provide secondary liability claims against foreign sovereigns) confirm that Congress intended to subject Sudan to secondary liability claims.

Sudan argues that it cannot be liable for § 2339A and § 2339B violations because, on September 11, 2001, the statutes did not criminalize conduct outside of the United States. In so doing, Sudan ignores the definition of international terrorism in § 2331, which includes both acts that are violations of the criminal law of the United States, or "*would be* a criminal violation *if* committed within the jurisdiction of the United States." 18 U.S.C. § 2331(1)(a) (*emphasis added*). A predicate offense for purposes of a § 2331 claim therefore includes conduct outside the United States, even if the underlying statute is limited to acts within the United States. Plaintiffs have thus sufficiently alleged that

42

defendants violated § 2339A and § 2339B where the Amended Complaints describe conduct which would be a violation if committed in the United States.

### C.   Plaintiffs Allege ATA Primary Liability

"The ATA defines international terrorism as activities that (1) involve violent acts or acts dangerous to human life; (2) qualify as a violation of the criminal laws of the United States or of any State if committed within the United States; (3) appear to be intended to intimidate or coerce a civilian population, to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (4) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." *Kaplan*, 405 F. Supp. 3d at 531-32 (citing 18 U.S.C. § 2331(a) (internal quotations omitted)).

The ATA primary liability theories in the Amended Complaints rest on Sudan's own targeting of the United States and on its pervasive support of al Qaeda's targeting of the United States that constitute violations of federal and state law, or that would if committed in the United States, including the material support provisions of 18 U.S.C. §§ 2339A and 2339B. Specifically, the Amended Complaints allege that Sudan committed acts of international terrorism by violating the material support statutes, 18 U.S.C. §§ 2339A and 2339B; 18 U.S.C. § 2332d. These statutes serve as the predicates through which conspiracy-based civil liability under § 2333 attaches. In *Hussein v. Dahabshiil Transfer Servs. Ltd.,* the court explained that the cause of action set forth in § 2333(a) is an action for intentional torts requiring the plaintiffs to establish that the defendants "provided material support knowing that the 'recipient of the material support . . . is an organization that engages in terrorist acts'" or, at a minimum, there must be a showing that the defendants were "deliberately indifferent to whether or not the organization [engages in terrorist acts]." 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017), *aff'd sub nom*; *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 705 F. App'x 40 (2d Cir. 2017). *See also Strauss v. Credit Lyonnais, S.A.,* 925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013); *In re Terrorist Attacks on Sept. 11, 2001,*

740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("*Terrorist Attacks V*").

The criminal material support provisions of the Act—Sections 2339A and 2339B— themselves explicitly provide for liability for conspiring to provide aid to foreign terrorists. Section 2339A imposes liability on "[w]ho[m]ever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources . . . or *attempts or conspires to do such an act . . . .*" 18 U.S.C. § 2339A(a) (emphasis added); *see also* 18 U.S.C. § 2339B (similarly imposing liability on "[w]ho[m]ever knowingly provides material support or resources to a [F]oreign [T]errorist [O]rganization, *or attempts or conspires to do so*"); 18 U.S.C. § 2339B (emphasis added); *Hussein*, 230 F. Supp. 3d at 175.

As discussed *Supra*, Section VII.B.1.a, the Amended Complaints establish the existence of a tripartite agreement between Sudan and Iran and al Qaeda which satisfies the civil conspiracy test set forth in *Halberstam*. This conspiracy alone holds Sudan liable as a primary actor under 18 U.S.C. § 2332(b) (conspiring to murder U.S. nationals), and 18 U.S.C. § 2339A-C (each creating liability for a conspiracy to provide material support)). Having shown the existence of a conspiracy, and acts of homicide and material support in furtherance of that conspiracy committed by al Qaeda and Sudan, the Amended Complaints can establish primary liability on each claim. *See Hussein*, 230 F. Supp. 3d 175 (recognizing that one who conspires to violate § 2339A-C "is a primary violator of Section 2333(a)" and thus a claim for conspiracy to provide material support gives rise to a civil claim).

1.    **The Amended Complaints Allege That Sudan Engaged in an Act of International Terrorism**

An act of terrorism is not limited to obviously violent or dangerous conduct. Plaintiffs have alleged that Sudan, itself a state sponsor of terrorism, knowingly harbored and supported multiple terrorist organizations with the specific intent that that terrorist organization conduct terrorist attacks against the United States and against U.S. interests and targets in other nations. A state sponsor harboring of a terrorist organization must necessarily be an act "dangerous to human life," otherwise

the United States government would not have had any cause to designate Sudan as such and declare that Sudan's support for terrorism was a threat to national security.

### 2. The Amended Complaints Allege Sudan Committed Predicate Offenses

With respect to the predicate offenses of §§ 2339A, 2339B, and 2339C, the Amended Complaints state causes of action under each. Section 2339A criminalizes the provision of material support, including financial services and currency, that is "used in preparation for, or in carrying out," various terrorism-related crimes, including: "the unlawful killing of a human being with malice aforethought," 18 U.S.C. §§ 1111(a); the use "without lawful authority" of a "weapon of mass destruction . . . against any person or property within the United States," *id.* § 2332a(a)(2); an act of terrorism (including killing and assault with bodily injury) transcending national boundaries that results in death or property destruction, *id.* § 2332b(a); and bombing a place of public use, government facilities, or public transportation systems with the intent to kill or destroy property, *id.* § 2332f.

Plaintiffs have alleged that Sudan provided such material support, and that the support was used "in preparation for, or in carrying out" a variety of acts that violate these criminal statutes, including the killing and injury of thousands of persons in the United States. Plaintiffs also adequately allege that defendants' conduct violated § 2339B, which prohibits persons from "knowingly provid[ing] material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). Plaintiffs allege in detail Sudan knowingly provided such support to al Qaeda.

### 3. The Amended Complaints Also Allege Intent for Primary Liability

Sudan argues that the Amended Complaints have not alleged any actions that objectively appear to be intended to coerce or intimidate any civilian population or government within the meaning of § 2331(1)(A). In so doing, Sudan ignores its status as a designated sponsor of terrorism and the subsequent UN declarations and sanctions. The United States and the United Nations designated and sanctioned Sudan precisely because Sudan's harboring of and material support to a

multitude of terrorists and terrorist organizations created the objective external appearance (at least to the counter terrorism experts and diplomats in the U.S. government and the United Nations) that Sudan shared the terroristic goals of intimidating and coercing civilian populations and of influencing the policy of a governments by intimidation and coercion.

As previously discussed, Sudan provided material support to al Qaeda because it shared al Qaeda's intent to attack the United States. This shared specific intent more than plausibly pleads an external appearance that Sudan shared al Qaeda's terroristic goals.

**D.**  **The Amended Complaints Plausibly Plead Causation For ATA Primary and Secondary Liability**

Again, ignoring relevant decisions including decisions by this Court, Sudan argues that "but for" causation is required for ATA primary liability and completely fails to address causation for ATA secondary liability. Like jurisdictional causation, ATA primary liability causation is premised on the substantial factor/reasonably foreseeable traditional test for proximate cause. Sudan does not even argue these elements in either the jurisdictional section or the failure to state a claim section of its memorandum of law. Instead, Sudan cites to cases that do not involve a state sponsor of terrorism providing material support directly to a terrorist organization and asks this Court to adopt a different standard, one that would require plaintiffs to plead and eventually prove that the material support provided by a state sponsor was actually used by the terrorist organization that it supports to carry out the ultimate act of terrorism. That is not the correct standard, nor should it be given the fungible nature of material support, the difficulty in tracing material support to any particular attack, the horrific nature of terrorism, and the threat posed by a foreign state's support of terrorism, particularly one like Sudan who zealously continued to support terrorism even after being designated by the United States and sanctioned by the United Nations.

This Court has adopted the proximate cause elements of substantial factor and reasonably foreseeability as the causal standards for substantive ATA claims, holding "a person is not liable to all

those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Kaplan*, 405 F. Supp. 3d at 531 (citing *Rothstein*, 708 F.3d at 91 (emphasis and citation omitted). In so doing, this Court explicitly rejected "but for" causation "[c]ontrary to defendant's assertion . . . Plaintiffs are not required to establish "but for" causation in addition to proximate causation. *Id.* at 532 n.3 (citing *Hussein*, 230 F. Supp. 3d at 171 n.3.). As set forth above, the Amended Complaint more than sufficiently plead that Sudan's violations of the ATA material support statutes were both a substantial factor in bringing about the sequence of events that caused the 9/11 attacks and that the 9/11 attacks was a reasonably foreseeable consequence of Sudan's material support. *Supra*, Sections IV.B.1 and IV.B.2.

For secondary conspiracy liability, Sudan, as the secondary actor, is vicariously liable for al Qaeda's perpetration of the 9/11 attacks. *Flanagan*, 97 F. Supp. 3d at 116-17; *Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994). For secondary aiding and abetting liability, causation is established by a showing that Sudan aided and abetted al Qaeda generally without any requirement that Sudan directly aided and abetted the 9/11 attacks. *Freeman*, 2021 U.S. Dist. Lexis 3452 at *34 (pervasive provision of financial services to a known FTO assists the principle violation of multiple terrorist attacks); *Bartlett v. Societe Generale deBanque Au Liban Sal*, 2020 U.S. Dist. LEXIS 229921 at *8 (E.D.N.Y. Nov. 25, 2020) (same).

### E.    Plaintiffs' State Tort Law Claims Are Not Preempted

Again recycling arguments that it has already lost, Sudan maintains that the enactment of § 1605A and § 1605B should be interpreted as preempting state tort law claims against foreign sovereigns. This argument, which Sudan has coined as the "closing the gateway," has been rejected by the Courts that have addressed it. *Owens IV*, 864 F.3d at 809 (Congress did not intend to foreclose access to state tort law); *Leibovitch*, 697 F.3d at 567-69 ("[A]lthough 1605A created a new cause of

action it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity.").

JASTA's enactment made this all the more clear.  It was enacted to "provide civil litigants with the broadest possible basis . . . to seek relief against persons, entities, and foreign countries."  JASTA, § 2(b).  That declared purpose stands at fundamental odds with Sudan's implausible claim that Congress, through that very act, eliminated significant rights of terrorism victims (without saying so much as a word).  Further, JASTA's immunity exception applies broadly to "tortious acts" of foreign states, *see id.* § 3(b), and the only limitation Congress placed on its reach is a rule of construction indicating that foreign states shall not be subject to jurisdiction "on the basis of an omission or tortious act or acts that constitute mere negligence."  *Id.* § 3(d).  The inclusion of that provision would make no sense if Sudan's preemption theory were correct, as Congress already would have eliminated any such tort claims.

When Congress created these new remedies to bolster the rights of terrorism victims, it did not eliminate existing rights.  To find otherwise would distort the plain reading of the statutes and to ignore Congressional intent, and run afoul of the fundamental precept that it is presumed that Congress does not intend to supplant state law.  *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981).

### F.   The Amended Complaints Set Forth All of the Elements of the Asserted State Law Tort Claims

New York law does not recognize an independent cause of action for conspiracy and/or aiding and abetting, but does recognize such secondary liability if the plaintiffs plead that the primary actor (al Qaeda) committed the underlying tort and the secondary actor (Sudan) conspired with and aided and abetted the primary actor.  *Burnett*, 349 F.2d at 825-30.  In *Burnett,* Judge Casey conducted an analysis of New York conspiracy and aiding and abetting law and determined that if the 9/11 Plaintiffs could establish the requisite knowledge and intent under New York law for conspiracy and/or aiding and abetting, then the 9/11 Plaintiffs necessarily set forth proper claims for secondary liability for

their ATCA, Wrongful Death and Survival, IIED, and Trespass Claims. *Id.*

Here, the Amended Complaints more than sufficiently plead all of the elements of conspiracy and aiding and abetting under New York law against Sudan. The elements of conspiracy and aiding and abetting liability under New York law are the same as those elements for ATA conspiracy and aiding and abetting: an agreement to participate in a common plan or design to commit a tortious act, tortious conduct by both the primary and secondary actors and commission of a tortious act by either the primary or secondary actor that, in pursuit of the common plan, causes injury. *Burnett,* 349 F. Supp. 2d at 797-98. Here, the Amended Complaints set forth plausible facts establishing Sudan's liability for both conspiracy and aiding and abetting. *Supra*, Sections VII.B and VII.C and VII.D.

### 1.  Alien Tort Claims Act

The Alien Tort Claim Act ("ATCA"), 28 U.S.C. § 1350, is a jurisdictional statute that confers federal question jurisdiction over any civil action by an alien for a tort committed in violation of the law of nations. Conspiracy to commit and aiding and abetting aircraft hijacking is a violation of international law that provides a basis for a concerted action claim of material support by alien-plaintiffs injured as a result of 9/11. *Burnett,* 349 F. Supp. 2d at 825. The Amended Complaints plausibly allege that Sudan conspired with and aided and abetted al Qaeda, and that the conspiracy and aid was a substantial factor in causing the sequence of events that led to the 9/11 attacks and that the 9/11 attacks were a reasonably foreseeable consequence of the conspiracy and aid. *Supra*, Sections VII.C and VII.D. Therefore, the alien victims of 9/11 have properly pled claims for a violation of international law for the hijacking of the airplanes that were used as weapons of mass destruction.

### 2.  Trespass

The Amended Complaints set forth all of the elements of primary and secondary liability against Sudan for trespass. As to primary liability, Plaintiffs agree with Sudan that *Scribner v. Summers,* 84 F.3d 554 (2d Cir. 1996), accurately sets forth the elements of trespass under New York law.

Trespass is the intentional invasion of another's property and "[t]o be liable, the trespasser 'need not intend or expect the damaging consequences of his intrusion[;]' rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'" *Scribner,* 84 F.3d at 557 (quotation omitted). Thus, to be liable in trespass the defendant need not intend to invade another's property or any particular property but need only have (i) "intend[ed] the *act* which amounts to or produces the unlawful invasion," and (ii) "had good reason *to know or expect*" that the act would result in the intrusion. *Id.* at 558 (emphasis in the original).

Thus, the elements of trespass are an intended act which produces an unlawful invasion that the actor has reason to know or expect would result from the intended act. The Amended Complaints allege that Sudan's intended act of providing material support to a terrorist organization with the specific intent that the terrorist organization attack the United States "produced" the 9/11 attacks (*i.e.,* was a factual cause). The Amended Complaints more than factually plead that Sudan could expect by materially supporting a terrorist organization who intended to attack the United States that the terrorist organization would do so and that property would be unlawfully damaged or destroyed as a result. Sudan not only could expect it, the Amended Complaints plead facts showing that Sudan intended an unlawful invasion of property. Examples of the evidence showing that Sudan at least expected and actually intended unlawful invasions of property include providing security for terrorist training camps that were experimenting and practicing with explosives, Sudan's own direct role in the Landmarks plot and the African embassy bombing, which were terrorist acts aimed at buildings in order to inflict mass casualties, and Sudan's own role in transitioning to al Qaeda Hezbollah's expertise in large scale bombing. Thus, Plaintiffs have properly pled a primary trespass claim against Sudan as well as its conspiracy and aiding abetting claims.

### 3.    Civil RICO

Sudan dismissively states the decision in *Terrorist Attacks V,* 740 F. Supp. 2d at 515, forecloses

Plaintiffs' civil RICO claims with no analysis between what was pled as to those defendants and what is pled against Sudan. Contrary to Sudan's one sentence argument, the Amended Complaints do plead all of the elements for a valid RICO claim.

To establish RICO, a complaint must plausibly allege the following seven elements: (1) *that the defendant* (Sudan); (2) *committed two or more acts* (*e.g.*, provided security, provided false passports, transported weapons, established joint businesses, jointly opened a bank, provided land for terror training camps, hosted and participated in numerous terrorist meetings and conferences, aided in the 1993 Landmarks plot, the 1998 Embassy bombing and the 2000 attack on the U.S.S. Cole, etc.); (3) *constituting a pattern* (these acts all occurred within a 10-year period); (4) *of racketeering activity* (these acts involved violations of a multitude of predicate criminal statutes including those criminalizing the provision of material support to terrorists and murder; (5) *directly or indirectly invests in, maintains an interest in, or participates in* (Sudanese officials provided direct support for the Landmarks plot, the Embassy bombing and the attack on the U.S.S. Cole, as well as its intelligence officers directly instructing al Qaeda members to carry out at least one assassination and joined attempts to secure chemical and nuclear weapons and jointly invested in a numerous businesses; (6) *an enterprise* (Sudan hosted, associated and materially supported al Qaeda for shared common purpose of conducting terrorist activities; (7) *the activities of which affect interstate or foreign commerce.* (their terrorist activities obviously affect interstate and foreign commerce). *Burnett,* 349 F. Supp. 2d at 826-27 (italicized words are list of elements for civil RICO).[18]

### G. The Subrogating Insurers Have Standing to Bring Substantive ATA Claims

Without citation to any supporting authority, Sudan argues that the remedies of the ATA are limited to natural persons and that corporate plaintiffs and subrogating insurers lack standing to bring

---

[18] Sudan has not even argued which, if any, of the elements of a civil RICO claim are not plausibly pled in the Amended Complaints, making it impossible for the PECs to provide a coherent and proper response.

ATA claims.  Sudan's attack on subrogation rights is incompatible with basic and longstanding principles of American law.  Its natural person argument ignores the plain text of the ATA extending ATA remedies to persons and entities who suffer injuries to business and property, fails to recognize that JASTA expressly confirmed Congress's intent to extend ATA remedies to all U.S. citizens, including corporate entities, and is fundamentally at odds with the ATA's broad remedial and counterterrorism purposes.

### 1.      Subrogation Rights are Available under the ATA

Sudan's suggestion that Plaintiffs cannot proceed on a subrogation theory is wrong on its face. In its October 14, 2011 Report and Recommendation (ECF No. 2479), this Court already considered the issue and permitted the subrogation claims to proceed, stating that "[t]o the extent that the Plaintiffs seek to recover amounts paid to their insureds, they unquestionably are subrogated to their insureds' ATA claims."  *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2011 U.S. Dist. LEXIS 153138, at *6 (S.D.N.Y. Oct. 14, 2011), *report and recommendation adopted*, No. 03 CIV. 6978, 2011 U.S. Dist. LEXIS 144936 (S.D.N.Y. Dec. 16, 2011).

Sudan's request that this Court infer that Congress eradicated doctrines of subrogation under the ATA by silence is contrary to controlling precedent.  "'Congress is understood to legislate against a background of common-law . . . principles.'"  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 457 (2012) (quotation omitted).  "Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotations omitted).  "In such cases, Congress does not write upon a clean slate."  *Id.*  Accordingly, if Congress intends, by passing a statute, to "abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law."  *Id.* (citations omitted).

Here, it is beyond dispute that the ATA contains no language addressing longstanding

doctrines of subrogation, much less language that "speaks directly" to the issue.  The absence of any such language forecloses Sudan's suggestion that this Court should infer Congress's intent to abrogate subrogation rights under the ATA.  Sudan's attempt to construct an argument based on the distinct structure of claims under the entirely separate State Sponsor of Terrorism statute, meanwhile, is not remotely credible.  Section 1605A is a distinct statute, enacted years after the ATA for entirely different purposes, and tailored to address a range of unique and distinct policy and legal considerations.  It provides no insight as to Congress's intent in enacting the ATA years earlier or JASTA years later, and certainly no basis to eliminate doctrines of subrogation under the ATA.

### 2.     The Insurers Have Alleged Standing as Subrogees

Sudan makes the additional argument that the *Federal* and *Continental* Plaintiffs lack standing because they failed to properly plead that they are U.S. nationals.  While Sudan misapprehends the U.S. national requirement, *infra*, Section VII.G.3, its claim that the insurance Plaintiffs have not alleged it is wrong in any case.  The CAC at page 2, n.1, specifically incorporates by reference the following previous filed complaints *Federal Insurance First Amended Complaint* ("FAC")*, Case No. 03-Civ. 6878, ECF No. 772 and *Continental Casualty Second Amended Complaint,* Case No. 04-Civ 5970, ECF 195. Those complaints described the citizenship of the insurer Plaintiffs themselves, and the *Federal* Plaintiffs' FAC included schedules identifying the thousands of insureds to whom those insurers had paid compensation for 9/11 losses, giving rise to their subrogation rights.  For many of those insurers, these schedules identified not only property damage losses, but also workers' compensation beneficiaries who were killed and injured in the attacks, many of whom assigned their claims to the insurers to pursue against Sudan in full, pursuant to the workers' compensation statutes.  The specific U.S. national allegation in footnote 103 of the CAC was predicated on these detailed underlying facts, which were expressly incorporated into the CAC.  Thus, Sudan's claim that the insurers have offered only a "conclusory assertion (in a footnote)" on this point is plainly wrong.  Plaintiffs' allegation is

well supported by factual submissions incorporated into the CAC, and they have thus satisfied the requirement to allege U.S. national standing for their ATA claims.

### 3.    Sudan's Standing Argument is Contrary to the Text of the ATA

The ATA incorporates by reference the textual definition of "national of the United States" from 8 U.S.C. § 1101(a)(22), which provides that a national of the United States includes:  "citizen[s] of the United States, and . . . persons who, though not citizens of the United States, owe permanent allegiance to the United States."  The ATA then provides that, for purposes of the ATA, a "person" includes any "individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 2331(3) (emphasis supplied).  Thus, the plain text of the ATA provides that a national of the United States includes any "individual or entity capable of holding a legal or beneficial interest in property" that is a "citizen" of the United States.  These definitions foreclose Sudan's argument that the civil remedies of the ATA are limited to individuals or "natural persons," phrases that appears nowhere in the definitions or text.  *Mohamad*, 566 U.S. at 455 ("Congress . . . established a cause of action for U.S. nationals injured 'by reason of an act of international terrorism' and defined 'person' as it appears in the statute to include 'any individual or *entity* capable of holding a legal beneficial interest in property.'") (citing 18 U.S.C. §§ 2333(a), 2331(3) (emphasis in the original)).  *See also Montrell v. City of New York Dept. of Social Services,* 436 U.S. 658, 687 (1977) ("[B]y 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.").

18 U.S.C. § 2333(a)'s express remedy for losses to "property, or business" further proves that Congress conferred ATA standing on corporations, because business and property interests are most commonly held through some corporate or similar form.  Congress was keenly aware of these realities and the policies underlying them when it enacted the ATA, and its express endorsement of a remedy for injuries to "business or property" establishes that the ATA's remedies are not limited to natural

persons.  Congress made its intent on this point doubly clear by defining person in terms of an individual or entity's capacity to hold a legal or beneficial interest in property.  18 U.S.C. § 2331.

Moreover, where Congress intends for the remedies of a counter-terrorism statute to be limited to natural persons and individuals, it uses precise terms to do so.  For example, in enacting the Justice for Victims of State Sponsored Terrorism Act, which established a fund to provide limited compensation for terrorist judgments against designated State Sponsors of Terrorism, Congress limited eligibility to participate in the fund to "United States person[s]," 34 U.S.C. § 20144(C)(1)(A), and then defined that term to include only "a natural person who has suffered injury arising from the actions" of a designated State Sponsor of Terrorism.  In stark contrast, the ATA contains no such limitation of its remedies to "natural person[s]."  *See also Mohamad*, 566 U.S. at 455 (contrasting ATA's use and definition of the term "persons" with TVPA's use of "individuals").

### 4.     U.S. Corporations are Citizens and Nationals of the U.S.

Sudan's argument that corporations are not United States citizen for purposes of the ATA is contrary to longstanding authority recognizing in a range of contexts that corporations organized under the laws of the United States and its states are both citizens and nationals of the United States. Indeed, it is axiomatic that corporations are citizens when determining subject matter jurisdiction. *See* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . . .").  And, federally chartered corporations are generally considered citizens of the United States, though not of any particular state. *Crum v. Veterans of Foreign Wars*, 502 F. Supp. 1377, 1379 (D. Del. 1980) (citing *Bankers Trust Co. v. Tex. & Pacific Ry. Co.*, 241 U.S. 295, 309 (1916)) (other citations omitted).  A "corporation of a foreign State is, for purposes of jurisdiction in the courts of the United States, to be deemed, constructively, a citizen or subject of such State." *Steamship Co. v. Tugman*, 106 U.S. 118, 121 (1882); Restatement (Third) of Foreign Relations Law of the United States

§ 213 (1986) ("For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized"); *see also JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002) (holding that a corporation organized under the laws of the British Virgin Islands was a "citizen or subject" of a foreign state for purposes of alienage diversity jurisdiction under Section 1332(a)(2)).   In keeping with these principles, corporations organized under U.S. laws are citizens of the United States, and thus fall squarely in the ATA's textual definition of the term "national of the United States."

### 5.      JASTA Confirmed the Rights of Corporations under the ATA

The plain language of JASTA and Congress's statements concerning the purposes of JASTA eliminate any doubt as to the purpose of the ATA and the intention of Congress to extend its protections to corporations.  Specifically, Congress declared in JASTA that it was amending the ATA to provide "*persons and entities* injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims" against those responsible for their injuries.  *Id.* at § 2(a)(7) (emphasis added).  There could be no clearer declaration of Congress's intent that the ATA's remedies extend beyond natural persons and include corporate entities.  As the Supreme Court has held, "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."  *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 380-81 (1969). This Court's rulings prior to JASTA's enactment, authorizing insurer plaintiffs in earlier filed actions to proceed under the ATA and entering judgments in their favor under that statute, further foreclose Sudan's arguments.  As stated by the Second Circuit in *Doe v. Bin Laden,* "'Congress is presumed to be aware of a judicial interpretation of a statut[ory section]' and partial amendment of a statute without touching the previously interpreted section 'constitutes an implicit adoption of [the prior] interpretation,' absent a clear indication to the contrary."  663 F.3d 64, 69 (2d Cir. 2011) (quoting *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007)).  Here, this Court (and the Second

Circuit) authorized claims by insurers to proceed under the ATA on numerous occasions and in a range of settings, prior to JASTA's enactment.

### 6.      The ATA Must be Broadly Construed

Sudan's arguments that the remedies of the ATA should be construed to be unavailable to corporations and subrogating insurers are in profound conflict with the remedial goals and basic objectives of the ATA.  In conflict with these principles, Sudan's proposed reading of the ATA would fundamentally undermine the most basic goals and purposes of the ATA.  By suggesting that the remedies of the ATA should be deemed unavailable to corporations, businesses, and insurers, Sudan necessarily asks this Court to immunize terrorist organizations and their sponsors from liability under the ATA for broad categories of injury their terrorist conduct is specifically designed to cause.  In fact, under Sudan's theory, al Qaeda would be immune from liability under the ATA for the destruction of the World Trade Center complex.

Restricting ATA remedies to natural persons would also broadly prevent U.S. citizens who are natural persons from recovering for injuries to their business and property interests, and effectively eviscerate the express remedy the ATA creates for such injuries.  As the Second Circuit has observed, U.S. laws encourage individuals to use corporate structures in their business affairs, in order to promote business development and economic vitality, while protecting the personal assets of the individual.  *See Wm. Passalacqua Builders, Inc. v. Resnick Developers, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) ("[T]he policy behind the presumption of corporate independence and limited shareholder liability [is the] encouragement of business development.").  Where individuals avail themselves of corporate and similar structures, the individual shareholders generally cannot pursue direct claims against tortfeasors and must cede such authority to the entity.  *See Solutia, Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005).  Given these realities, Sudan's arguments would, if endorsed, broadly foreclose individual U.S. citizens from recovering under the ATA for injuries to their business and property,

thereby effectively eliminating the ATA's express remedy for such losses.

## VIII.   SUDAN IS NOT ENTITLED TO RELIEF FROM THE DEFAULTS

Finally, the Court should decline to vacate the existing certificates of default against Sudan, and should enforce them.  Sudan has not moved to vacate the defaults, but instead has claimed that the Amended Complaints automatically nullified the defaults.  In fact, Courts that have considered the issue in the specific context of a post-default amendment updating the legal basis for claims against a State Sponsor of Terrorism, have held that such an amendment does not result in the assertion of a "new claim," since the cause of action is essentially the same.  *Belkin v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 130286, *7 (D.D.C. 2020) (post-default amendment is "essentially the same" claim for relief and does not vacate default); *Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218, 224 (D.D.C. 2005) (post-default amendment reflecting a change in the source of the law is "essentially the same" action and does not vacate default); *see In Re Islamic Republic of Iran*, 659 F. Supp. 2d 31, 106 (D.D.C. 2009) ("[T]hese new claims are nonetheless actions for personal injury or death, which sound in tort, and which are based on the same underlying terrorist act or incident as the failed state law claims that were originally advanced under § 1605(a)(7). . . . While the source of law applicable to these terrorism actions sounding in tort under the FSIA has changed, nothing else has.").  Those courts found that plaintiffs need not serve such amended complaints on the defaulted defendant, and allowed the claims to proceed to default judgment proceedings on the basis of the amended pleading.  That approach would not be possible if, as Sudan claims, the amendments automatically vacated the defaults.

Even if Sudan had moved, it could not have met its burden.  In determining whether to vacate the defaults, the single question is whether Sudan has demonstrated the necessary "good cause" to set aside the defaults.  In addressing that question, the Court is to balance three criteria: (1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious defense; and (3) whether, and to what extent, vacating the default will cause the non-defaulting party prejudice.  *Enron*

*Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993); *Vedder Price P.C. v. US Capital Partners, LLC*, No. 16-CV-6787 (JPO), 2017 WL 4180021, at *2 (S.D.N.Y. Sept. 20, 2017).  Here, each of the considerations have previously been weighed and balanced against Sudan.

In *Flanagan v. Islamic Rep. of Iran*, 190 F. Supp. 3d 138, 156 (D.D.C. 2016), the court weighed each of the considerations against Sudan and rejected Sudan's request to set aside non-final default judgments.[19]  Soundly rejecting Sudan's request, the court marches through the factors, noting the willfulness of Sudan's defaults (at 156), the prejudice to the plaintiffs (at 159-60), and the lack of merits of its defenses (at 160-83).  The same considerations, balancing, and outcome applies here.

Notably, in *Flanagan*, on the issue of Sudan's willfulness, the court observed there, as was so here, "Sudan was absent from this action for an exorbitant period of time.  Coupled with Sudan's history of litigating, and abandoning, other FSIA actions against it, the record paints a decidedly different picture.  As a result, the Court conclude[d] that Sudan's default . . . constituted a 'deliberate decision to default.'"  *Id.*  The *Flanagan* opinion unpacks this rational in several more paragraphs.

The court in *Flanagan* also soundly addressed the prejudice to plaintiffs.  "[A]ssessing prejudice, courts consider the possible, tangible harms that may flow from a party's delayed appearance in the case, including the 'loss of evidence, increased difficulties of discovery, and an enhanced opportunity for fraud or collusion.'" 190 F. Supp. 3d at 159 (quotations and citations omitted).  Although the Court observes that "delay in and of itself does not constitute prejudice," it found "more than delay apparent in this case." *Id.*  In *Flanagan*, where Sudan's delay was much shorter than the decade long delay in MDL 1570, the court observed that, as the moving party, Sudan has the burden to show that vacating the defaults will pose no prejudice.  There, as here, Sudan could not deny the prejudice resulted where, during the multi-year delay, "critical witnesses have died or been killed, numerous personnel at all levels of the government have left their positions, and undoubtedly governmental records have been destroyed." *Id.*

---

[19] Because the judgments were not final, the court applied the Rule 55 "good cause" standard applied to default.

Indeed, the court took judicial notice that at least one critical individual has died: Hassan al Turabi, the head of the National Islamic Front who offered Osama bin Laden and al Qaeda refuge in Sudan, was alive in 2010, years after Plaintiffs filed this lawsuit, but passed away on March 5, 2016. *Id.* at 160.

The *Flanagan* court's analysis of the evidence and finding that it supports causation as to general support for al Qaeda rebuts any real claim that Sudan could demonstrate a meritorious defense. Coupled with the findings regarding willfulness in ignoring U.S. litigation and the resultant prejudice to Plaintiffs, there is no basis to vacate the decades old certificates of default here.[20]

In another case regarding Sudan's role in supporting al Qaeda, this time as to its 1998 attacks on the U.S. embassies in Africa, the Supreme Court issued an opinion in *Opati v. Rep. of Sudan*, 140 S. Ct. 1601, 1606 (2020). The Court acknowledged and left undisturbed the Circuit Court opinion to the extent that it offered detailed factual findings explaining that Sudan had knowingly served as a safe haven near the two United States embassies and allowed al Qaeda to plan and train for the attacks. The Court also found that Sudan had provided hundreds of Sudanese passports to al Qaeda, allowed al Qaeda operatives to travel over the Sudan-Kenya border without restriction, and permitted the passage of weapons and money to supply al Qaeda's cell in Kenya. *Id.* at 1606. The Court in *Opati* remanded the matter after finding that punitive damages were "available under the federal cause of action in § 1605A(c) [and plaintiffs could] . . . seek and win punitive damages for past conduct." *Id.* at 1607.

Because Sudan never moved to vacate the defaults, they remain in place; but even if Sudan had moved, as in the *Flanagan* and *Opati* cases, this Court should have rejected any notion of vacating the Plaintiffs' defaults. Accordingly, the cases in which defaults were entered should proceed immediately to a default judgment hearing, at least as to the claims asserted in the earlier complaints in those cases.

---

[20] Sudan's complaints about the identification of Plaintiffs in *Ashton* ignore that CMO #2 expressly authorized the practice. CMO 2 at ¶ 12. Its complaint that the default in *Federal* was not docketed on the ECF is likewise invalid. The early proceedings in this case were conducted during the advent of ECF, and the fact that the clerk did not docket the default on ECF at that time does not void its existence.

Dated:  March 8, 2021                        Respectfully submitted,

Stephen A. Cozen, Esq.
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel:  (215) 665-2000

Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Tel:  (843) 216-9000

James P. Kreindler, Esq.
Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER, LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel:  (212) 687-8181

Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 278-1000

Noel J. Nudelman, Esq.
HEIDEMAN, NUDELMAN & KALIK, P.C.
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel:  (202) 463-1818

Dorothea M. Capone, Esq.
BAUMEISTER & SAMUELS, P.C.
One Exchange Plaza
15th Floor
New York, NY 10006
Tel:  (212) 363-1200

Jeanne Marie O'Grady, Esq.
SPEISER, KRAUSE, NOLAN & GRANITO
140 East 45th Street
New York, NY 10017
Tel:  (212) 661-0011

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Republic of the Sudan's Motion to Dismiss the Amended Complaints, was filed electronically this 8th day of March 2021.  Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which all parties may access.

_____

J. Scott Tarbutton, Esq.

LEGAL\51282674\1

63