IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 1:03-md-01570-GBD-SN |
| *This document relates to:* | ORAL ARGUMENT REQUESTED |
| *Ashton, et al. v. Al Qaeda, et al.*, No. 02-cv-6977; *Federal Ins. Co., et al. v. Al Qaida, et al.*, No. 03-cv-6978; *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849; *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922; *Continental Casualty Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-5970; *O'Neill, et al. v. Republic of the Sudan, et al.*, No. 18-cv-12114; *Aronow, et al. v. Republic of Sudan*, No. 20-cv-07733; *Betru, et al. v. The Republic of Sudan*, No. 20-cv-10615; *Parker, et al. v. The Republic of the Sudan*, No. 20-cv-10657; and *Nolan, et al. v. The Republic of the Sudan*, No. 20-cv-10720. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>SUDAN'S CONSOLIDATED MOTION TO DISMISS THE AMENDED COMPLAINTS</u>**

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

April 7, 2021

*Counsel for the Republic of the Sudan*

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I.    THE OPPOSITION CANNOT OVERCOME SUDAN'S PRESUMPTIVE
      SOVEREIGN IMMUNITY UNDER THE FSIA..................................................1

      A.    The Opposition Cannot Show Jurisdictional Causation .........................1

      B.    The Opposition Cannot Show That Any Sudanese Official, Employee, Or
            Agent Committed Any Tortious Act Within The Scope Of His Authority ..........11

      C.    The Opposition Cannot Overcome Sudan's Immunity From Claims Of
            Family Members Of Victims Under Both § 1605A(a) And § 1605B(b).............13

      D.    The Opposition Cannot Overcome Sudan's Immunity From Claims
            Brought By Corporate Plaintiffs Under § 1605A(a), § 1605(a)(7), And
            § 1605B ...........................................................................................14

      E.    The Opposition Cannot Establish Subject-Matter Jurisdiction Under The
            Noncommercial-Tort Exception (§ 1605(a)(5))......................................16

II.   THE OPPOSITION CANNOT SHOW PERSONAL JURISDICTION OVER
      SUDAN ......................................................................................................16

III.  THE OPPOSITION CANNOT OVERCOME THE TIME BARS PRECLUDING
      PLAINTIFFS' CLAIMS ...............................................................................16

      A.    Plaintiffs Failed To Bring Timely § 1605A Actions ............................16

      B.    All But The *O'Neill* Plaintiffs Failed To Bring Timely JASTA Actions .............21

IV.   THE OPPOSITION CANNOT OVERCOME THE AMENDED COMPLAINTS'
      FAILURE TO STATE A CLAIM ...................................................................22

V.    THE OPPOSITION CANNOT CURE THE DEFECTIVE ENTRIES OF DEFAULT
      IN *ASHTON*, *BURNETT*, AND *FEDERAL INSURANCE* ................................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Al Fayed v. C.I.A.*,
   229 F.3d 272 (D.C. Cir. 2000) ........................................................................23

*American Pipe & Construction Co. v. Utah*,
   414 U.S. 538 (1974) ........................................................................................22

*Ashton v. Al Qaeda Islamic Army*,
   298 F. Supp. 3d 631 (S.D.N.Y 2018) .......................................................... *passim*

*Ashton v. al Qaeda Islamic Army (In re Terrorist Attacks on Sept. 11, 2001)*,
   No. 03-md-1570, 2015 U.S. Dist. LEXIS 173091 (S.D.N.Y. Dec. 28, 2015) ................. 14-15

*Belkin v. Islamic Republic of Iran*,
   667 F. Supp. 2d 8 (D.D.C. 2009) ....................................................................24

*Benavidez v. Piramides Mayas, Inc.*,
   No. 09-cv-5076, 2013 U.S. Dist. LEXIS 55586 (S.D.N.Y. Apr. 16, 2013) ...........................25

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017) ......................................................................................4

*Cal. Pub. Employees Ret. Sys. v. ANZ Sec. Inc.*,
   137 S. Ct. 2042 (2017) ....................................................................................22

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab
   Jamahiriya*, 811 F. Supp. 2d 53 (D.D.C. 2011) .............................................15

*Charlot v. Ecolab Inc.*,
   97 F. Supp. 3d 40 (E.D.N.Y. 2014) ...............................................................21

*City of New York v. Minetta*,
   262 F.3d 169 (2d Cir. 2001) ...........................................................................14

*Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*,
   140 S. Ct. 1009 (2020) ....................................................................................23

*Dammarell v. Islamic Republic of Iran*,
   370 F. Supp. 2d 218 (D.D.C. 2005) ...............................................................24

*De Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2008) ................................................................................2

*Doe v. Bin Laden*,
   663 F.3d 64 (2d Cir. 2011) .............................................................................16

*Flanagan v. Islamic Rep. of Iran*,
190 F. Supp. 3d 138 (D.D.C. 2016) ................................................................25

*Gill v. Arab Bank, PLC*,
891 F. Supp. 2d 335 (E.D.N.Y. 2012) ...............................................................5

*Gutierrez v. Waterman S.S. Corp.*,
373 U.S. 206 (1963) ..........................................................................................6

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ..........................................................................8

*Havlish v. Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*,
No. 03-md-1570, 2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011) .............. 4, 7-8, 9

*Hernandez v. Smith*,
793 F. App'x 261 (5th Cir. 2019) ................................................................20, 21

*Holmes v. Secs. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ..........................................................................................5

*In re Islamic Republic of Iran Terrorism Litigation*,
659 F. Supp. 2d 31 (D.D.C. 2009) ..................................................................24

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995) ..........................................................................................6

*Knowland v Great Socialist People's Libyan Arab Jamahiriya*,
No. 08-cv-1309, 2010 U.S. Dist. LEXIS 146715 (D.D.C. Oct. 8, 2010) ...............................19

*La Reunion Aerienne v. Socialist People's Libyan Jamahiriya*,
533 F.3d 837 (D.C. Cir. 2008) ........................................................................15

*Leibovitch v. Islamic Republic of Iran*,
697 F.3d 561 (7th Cir. 2012) ...........................................................................15

*Lelchook v. Commerzbank AG*,
No. 10-cv-5795, 2011 U.S. Dist. LEXIS 106305 (S.D.N.Y. Aug. 1, 2011) ...........................23

*Levy v. U.S. GAO*,
175 F.3d 254 (2d Cir. 1999) .............................................................................21

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) .............................................................................23

*Lotes Co., Ltd. v. Hon Hai Precision Industry Co., Ltd.*,
753 F.3d 395 (2d Cir. 2014) ................................................................... 4, 10-11

*O'Neill v. Saudi Joint Relief Comm.,*
    714 F.3d 109 (2d Cir. 2013)................................................................................16

*Owens v. Republic of Sudan,*
    826 F. Supp. 2d 128 (D.D.C. 2011) ....................................................................10

*Owens v. Republic of Sudan,*
    174 F. Supp. 3d 242 (D.D.C. 2016) ....................................................................10

*Owens v. Republic of Sudan* ("*Owens IV*"),
    864 F.3d 751 (D.C. Cir. 2017) ......................................................................10, 13

*P & V Enters. v. U.S. Army Corps of Eng'rs,*
    516 F.3d 1021 (D.C. Cir. 2008) ..........................................................................21

*Penguin Grp. (USA) Inc. v. Am Buddha,*
    609 F.3d 30 (2d Cir. 2010)..................................................................................16

*Presbyterian Church of Sudan v. Talisman Energy,*
    No. 01-cv-9882, 2003 U.S. Dist. LEXIS 3981 (S.D.N.Y. Mar. 19, 2003) ............11

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013)..................................................................................23

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018)..........................................................................................13

*Rux v. Republic of Sudan,*
    No. 04-cv-428, 2005 U.S. Dist. LEXIS 36575 (E.D. Va. Aug. 26, 2005)........10, 12

*Rux v. Republic of Sudan,*
    461 F.3d 461 (4th Cir. 2006) ..........................................................................10, 12

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis United*
    *States LLP*, 806 F.3d 71 (2d Cir. 2015) .................................................................5

*Simon v. Republic of Iraq,*
    529 F.3d 1187 (D.C. Cir. 2008) ..................................................................... 17-18

*In re Terrorist Attacks on Sept. 11, 2001,*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010)....................................................................5

*In re Terrorist Attacks on Sept. 11, 2001,*
    740 F. Supp. 2d 494 (S.D.N.Y. 2010)...................................................................24

*United States v. Quintieri,*
    306 F.3d 1217 (2d Cir. 2002)................................................................................2

*United States v. Wong*,
    575 U.S. 402 (2015).................................................................................................22

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983)...................................................................................................4

*Weiss v. Nat'l Westminster Bank PLC*,
    No. 19-863(L), 2021 U.S. App. LEXIS 9979 (2d Cir. Apr. 7, 2021)......................23

*Yates v. United States*,
    574 U.S. 528 (2015).................................................................................................19

**STATUTES**

28 U.S.C. § 2401(a) ....................................................................................................21

Anti-Terrorism Act, 18 U.S. Code § 2331, et seq.

    18 U.S.C. § 2331..............................................................................................23

    18 U.S.C. § 2333..............................................................................................15

    18 U.S.C. § 2333(a)...........................................................................................5

    18 U.S.C. § 2333(d)..................................................................................... 21-23

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602, et seq.

    28 U.S.C. § 1330(b).........................................................................................16

    28 U.S.C. § 1605(a)................................................................................. *passim*

    28 U.S.C. § 1605A .................................................................................. *passim*

    28 U.S.C. § 1605B .................................................................................. *passim*

    28 U.S.C. § 1606........................................................................................ 23-24

    28 U.S.C. § 1608.............................................................................................16

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181,
    122 Stat. 3 (Jan. 28, 2008) ........................................................................ 16-20

**RULES**

Fed. R. Civ. P. 12(i) ....................................................................................................22

Fed. R. Civ. P. 15(c) ............................................................................................. 20-22

**OTHER AUTHORITIES**

Nat'l Comm'n on Terrorist Attacks Upon the United States, The 9/11 Commission
Report (2004), http://govinfo.library.unt.edu/911/report/911Report.pdf .......................... 3, 4-5

The Opposition states that "Plaintiffs respectfully disagree with" this Court's 2018 holding in *Ashton* that the allegations against the Saudi High Commission ("SHC") were insufficient to support subject-matter jurisdiction under the FSIA.  Opp. 21 n.10.  But that holding in *Ashton* is not only consistent with controlling law, it is also the law of the case in this action, establishing that allegations of generalized support for al Qaeda, including during its formative stages in the 1990s, are insufficient to show jurisdictional causation.  As this Court put it, such allegations are "far removed, both in time and place, from the 9/11 Attacks."  *Ashton*, 298 F. Supp. 3d at 647.  This Court's decision in *Ashton* controls here; indeed, the allegations against Sudan are even more remote from the 9/11 Attacks than the allegations against the SHC were.

The Opposition grasps for support in default judgments holding Sudan liable for embassy bombings in East Africa (*Owens*) or the bombing of the U.S.S. *Cole* in Yemen (*Rux*).  But those default judgments were based on uncontested allegations that Sudan provided the perpetrators of the attacks with material support that was proximate in time and place to the attacks.  Those allegations stand in sharp contrast to the allegations here, which largely portray Sudan as providing support years before and half a world away from the 9/11 Attacks.  The Opposition, in short, cannot escape this Court's holding in *Ashton* that allegations of support attenuated temporally and geographically from the 9/11 Attacks cannot support FSIA jurisdiction.  The Amended Complaints must be dismissed.

## ARGUMENT

I.   **THE OPPOSITION CANNOT OVERCOME SUDAN'S PRESUMPTIVE SOVEREIGN IMMUNITY UNDER THE FSIA**

A.   **The Opposition Cannot Show Jurisdictional Causation**

The Opposition tries (at 21 & n.10) to avoid this Court's prior decision in *Ashton*, but it cannot.  In *Ashton*, this Court held that allegations of generalized support provided by the SHC

(another sovereign defendant in this multidistrict litigation) to al Qaeda were insufficient to establish subject-matter jurisdiction under the FSIA.  298 F. Supp. 3d at 647 (granting SHC's motion to dismiss for lack of subject-matter jurisdiction under JASTA).  This Court's decision in *Ashton* is controlling and applies with even greater force to the even more attenuated and conclusory allegations against Sudan.  *See, e.g.*, *De Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2008) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case . . . .'" (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002))).

Contrary to the Opposition's assertion (at 17), Sudan challenges only the legal sufficiency of the allegations set forth in the Amended Complaints (*see* Mem. 3).  This Court's reasoning and conclusion that the allegations against the SHC were insufficient to show jurisdictional causation under the FSIA apply to the allegations against Sudan here:

> Plaintiffs fail to plead any specific, non-conclusory allegations that the SHC, or any of its employees or agents operating within the scope of their employment or agency, knowingly or with deliberate indifference provided material support directly to al Qaeda to aid in planning or facilitating the 9/11 Attacks.  Nor do they plausibly allege that any of the SHC's conduct during the 1990s bears any reasonable connection whatsoever to the 9/11 Attacks.  Indeed, *all* of the factual allegations as to SHC relate to its support of al Qaeda's activities far removed, both in time and place, from the 9/11 Attacks.

*Ashton*, 298 F. Supp. 3d at 647.  If anything, the allegations against Sudan here are even more remote and conclusory than the allegations against the SHC that this Court already found wanting.

For example, in *Ashton*, Plaintiffs alleged that the SHC served "as an operational hub for al Qaeda activities, both prior to and after" the 9/11 Attacks, referencing "[m]aterials discovered during a raid on the SHC's offices one month after" the 9/11 Attacks, including photographs of World Trade Center towers.  Pls.' Opp. to KSA and SHC Renewed Mot. to Dismiss 62 (ECF No. 3782) ("PEC's KSA and SHC Opp.").  This Court held that those allegations were insufficient.

298 F. Supp. 3d at 646-47.  The Opposition (at 23) echoes those conclusory allegations, stating vaguely (without any factual support and in contradiction to the 9/11 Commission Report (which the Amended Complaints incorporate by reference)) that al Qaeda maintained an "operational and logistical base" in Sudan "throughout the period that 9/11 was being conceived, planned, and carried out."

This Court in *Ashton* held that allegations that "the SHC's direct involvement in the portfolio of plots al Qaeda was developing to attack the American homeland" during this time period were also insufficient.  298 F. Supp. 3d at 646 (alteration omitted) (quoting KSA and SHC Consol. Am. Compl. at ¶ 94 (ECF No. 3463) ("KSA and SHC CAC")).  Here, the Opposition (at 21) does not even attempt to tie Sudan's conduct to the 9/11 Attacks, instead disclaiming any need to allege that Sudan's conduct was a "substantial factor" in "the actual perpetration of any particular attack."  Plaintiffs also alleged in *Ashton* that the SHC played a "key role in financing and facilitating al Qaeda's targeting of the United States," and that it provided "'cover' jobs for numerous al Qaeda members" and weapons to al Qaeda affiliates.  PEC's KSA and SHC Opp. 63. This Court held that these allegations were likewise insufficient.  298 F. Supp. 3d at 646.  Yet the Amended Complaints here similarly allege without factual support or temporal specificity that Sudan "support[ed] al Qaeda's financial and terrorist training activities" (CAC ¶ 183), that Bin Laden (not Sudan) created businesses in Sudan that "generated revenue streams to support al Qaeda's growth" and "provided jobs" for al Qaeda recruits (CAC ¶ 134), and that Sudan attempted to "acquire weapons" for al Qaeda (CAC ¶ 150).  Further, in *Ashton*, the Court held that allegations against the SHC relating to the provision of support to al Qaeda factions to fight U.S. personnel in Somalia in 1993 were insufficient, but the Amended Complaints nevertheless recycle those

allegations here against Sudan. *Compare Ashton*, 298 F. Supp. 3d at 646-47, *with* CAC ¶¶ 92-106. Plaintiffs do not merely "respectfully disagree" with *Ashton*; they defy its holding.

The Opposition also fails (at 19-21) to overcome the break in the causal chain that occurred when Sudan expelled Bin Laden from the country in 1996. *See Ashton* Compl. ¶¶ 19, 69; CAC ¶¶ 65, 179. The unsupported assertion (at 14) that this argument is an affirmative defense that should not be resolved now is fundamentally incorrect. Causation is a jurisdictional requirement that must be decided "as near to the outset of the case as is reasonably possible." *See Helmerich*, 137 S. Ct. at 1317 (quoting *Verlinden*, 461 U.S. at 493-94). *See also Lotes Co., Ltd. v. Hon Hai Precision Industry Co., Ltd.*, 753 F.3d 395, 412 (2d Cir. 2014) (explaining that courts assessing proximate cause consider "whether there was a superseding or intervening cause" (internal quotation marks omitted)).

The Opposition (at 7) tries to minimize Sudan's 1996 expulsion of Bin Laden as being merely a "personal departure." But this Court in *Havlish* has already found that "bin Laden *and* al Qaeda were forced to leave Sudan" in 1996 and that Iran "assisted al Qaeda in *moving their operation and members*" out of Sudan and "to Afghanistan, Iran, Pakistan, Yemen, and Lebanon." 2011 U.S. Dist. LEXIS 155899, at *179 (emphases added). The 9/11 Commission Report underscores the profound effect of this expulsion, finding that Bin Laden "left Sudan significantly weakened" "with practically nothing," that apparently "the Sudanese government expropriated all of his assets," and that al Qaeda was unable to "undertake a major terrorist operation of its own, in large part because Bin Ladin lost his base in Sudan." Mem. 10 (quoting 9/11 Comm'n Report 62-63, 170). The Opposition fails to identify any "specific, non-conclusory allegations" that would contradict the 9/11 Commission Report's findings or plausibly show that the 9/11 Attacks in the

United States in 2001 were "reasonably foreseeable" after this break in the causal chain.  *See* Opp. 15-16, 19-20.

Instead, the Opposition (at 19) accuses Sudan of "selectively citing" the 9/11 Commission Report, but Sudan merely identifies the glaring contradictions between certain allegations in the Amended Complaints and the findings in the 9/11 Commission Report.  And Sudan most assuredly did *not* concede the point (at 15 n.8) that the 9/11 Attacks were somehow reasonably foreseeable; Sudan asserted repeatedly that Plaintiffs' allegations fail to establish proximate cause "under any standard."  *See* Mem. 6-7, 9-18.

In addition, the Opposition (at 21-23) fails to close the gaps in causation by making the extraordinary assertion that proximity in time and place are irrelevant to the Court's proximate causation analysis.  Courts assessing proximate cause — including this Court in these proceedings — routinely look to whether a defendant's alleged conduct is too remote in time, place, or other relation from the asserted injury to establish a causal link.  *See Ashton*, 298 F. Supp. 3d at 647 ("Indeed, *all* of the factual allegations as to SHC relate to its support of al Qaeda's activities *far removed, both in time and place*, from the 9/11 Attacks." (emphases added)); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 486-87 (S.D.N.Y. 2010) (holding "alleged acts of rendering support to al Qaeda during its formative years" are "too remote and attenuated" to establish jurisdiction); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis United States LLP*, 806 F.3d 71, 86-87 (2d Cir. 2015) (proximate cause "mandates 'some direct relation'" between alleged conduct and injury "that is not 'too remote'" (quoting *Holmes*, 503 U.S. at 268)); *Gill v. Arab Bank, PLC*, 891 F. Supp. 2d 335, 368 (E.D.N.Y. 2012) ("Temporal and factual issues will often be crucial, in particular cases, in proximate cause inquiries pursuant to section 2333(a).").

The Opposition (at 22) misconstrues the Supreme Court's decision in *Grubart*, which held that factors like temporal and spatial proximity are already included in the proximate-causation standard and, therefore, need not be specified separately.  513 U.S. at 536-37.  *Grubart* expressly affirmed that "familiar proximate causation" is consistent with the Supreme Court's "nonremote" causation requirement that the injury occur "at a time and place not remote from the wrongful act." *Id.* (citing *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 210 (1963)).

Plaintiffs themselves have argued in this MDL that the "timing and amount" of alleged support for terrorism is "relevant to determine proximate cause" under the FSIA, and that the "timing, location, and amount" of alleged funding from Saudi Arabia was "highly significant" in establishing that the purported funding "was a proximate cause of the 9/11 attacks."  *Ashton* Opp. to KSA and SHC Renewed Mot. to Dismiss 22, 38 (ECF No. 3781) ("*Ashton* KSA and SHC Opp.").  Applying those principles, this Court has held that allegations against Saudi Arabia — that were much closer in time, place, and fact to the 9/11 Attacks than any of the allegations against Sudan here — were insufficient to show jurisdictional causation.  *Ashton*, 298 F. Supp. 3d at 647, 651-55.  Such allegations included, for example, that Saudi Arabia "cleansed" the passports of the 9/11 Attack "mastermind" and 15 of the 9/11 hijackers themselves (*Ashton* KSA and SHC Opp. 24-25); funded a "dry run" of the 9/11 Attacks (*id.* at 25-27); laundered money for al Qaeda that directly funded the 9/11 Attacks (*id.* at 17); shared leadership with an al Qaeda front (*id.* at 30-32); and funded training camps in Afghanistan where the 9/11 hijackers allegedly received their training (*id.* at 36, 38) and where the 9/11 Attacks allegedly "were conceived and coordinated" (PEC's KSA and SHC Opp. 62).  These allegations are of the same "nature, scope, and kind" as Plaintiffs' allegations that Sudan provided "safe haven, military and intelligence assistance, training in terrorism operations, issuance of false passports and diplomatic papers, and every other

form of material support" (Opp. at 21 n.10), but none of the allegations against Sudan even approaches the level of proximity in time, place, or fact to the 9/11 Attacks as those against Saudi Arabia.  And yet this Court held that those allegations against Saudi Arabia were "inadequate to withstand scrutiny under Rule 12."  *Ashton*, 298 F. Supp. 3d at 648.

Nevertheless, the Opposition maintains (at 21) that Sudan's alleged provision of unspecified "critical support" to al Qaeda "before and after" Bin Laden's expulsion was "a substantial factor in the sequence of events" leading to Plaintiffs' injuries, and focuses (at 23) on vague allegations that, after 1996, "al Qaeda continued to maintain operations and a logistical base in Sudan."  But *Ashton* establishes the insufficiency of such conclusory allegations.  298 F. Supp. 3d at 647.  And notably the Opposition fails to identify any "specific, non-conclusory allegations" of pre- or post-1996 conduct by Sudan that approaches the temporal, geographical, or factual proximity of allegations that this Court *has* held to be reasonably connected to the 9/11 Attacks.

For example, in *Havlish*, this Court held that allegations that Iran had "provided direct support to al Qaeda specifically for the attacks" were sufficient to establish FSIA jurisdictional causation.  2011 U.S. Dist. LEXIS 155899, at *198-99.  The Court found that Iran had facilitated travel of the 9/11 hijackers themselves to training camps in Afghanistan in the year before 9/11, and then coordinated the hijackers' travel to the United States to carry out the attacks.  *Id.* at *125-32, *182; *see also id*. at *172 (finding "Iranian travel facilitation enabled eight (8) to fourteen (14) muscle hijackers to acquire needed Saudi passports and U.S. visas thus ensuring their continued training in Afghanistan and access to the United States"); *id*. at *133 (finding Iranian agents "escort[ed]" 9/11 hijackers on flights into and out of Iran).  The Court further found that Iran developed plans involving "use of passenger airliners as bombs to attack U.S. cities," "specifically targeted" the World Trade Center and the Pentagon, purchased a flight simulator that was likely

used to train the hijackers, and sent "coded messages" that it had activated those plans in the weeks before the attacks.  *Id*. at \*137, \*142-44, \*149-50, \*175.

In stark contrast, the Opposition relies (at 12, 14) on conclusory allegations relating to a purported "tripartite agreement" and "conspiracy" between al Qaeda, Iran, and the NIF in 1991. But the Amended Complaints do not allege facts supporting a plausible inference that Sudan entered into any conspiratorial agreement with al Qaeda — let alone that it conspired with al Qaeda to commit the 9/11 Attacks.  *See Halberstam*, 705 F.2d at 477 ("The element of agreement is a key distinguishing factor for a civil conspiracy action."); *see also* Mem. 38-39 (citing cases).

The CIA Report that is the source of the allegation of this purported "tripartite agreement" does not even state that *Sudan* was a party to *any* agreement (illicit or otherwise).  *See* CAC ¶¶ 75 & n.31, 76 & n.32, 81 & n.34, 82 & n.35 (incorporating CIA Report by reference).  At most, the "NIF" — an alleged "political party" (CAC ¶ 31) — purportedly entered into an agreement with Bin Laden and Iran in 1991 — *ten years before the 9/11 Attacks*.  CAC ¶¶ 75, 76, 82; *see also Ashton* Compl. ¶ 53 (quoting from CIA Report).  Putting aside that the NIF — and not Sudan — is alleged to be a party to this purported agreement, the temporal remoteness of this allegation renders it wholly insufficient under *Ashton*.  298 F. Supp. 3d at 659 (finding allegations concerning acts taken in the 1980s and 1990s in Europe, Africa, the Middle East, and the Far East "too temporally and geographically remote from the 9/11 Attacks").

Indeed, the Amended Complaints allege that the purported "agreement" involved Iran, Hezbollah, and al Qaeda, but they fail to allege that Sudan or any Sudanese government official was a party to the purported agreement.  *See, e.g.*, CAC ¶ 82 (alleging al Qaeda delegation "visited Tehran repeatedly to meet with Iranian officials" with no alleged involvement by Sudan or Sudanese officials); ¶ 84 (alleging purported agreement "began to bear fruit immediately, when

Iran and Hizbollah invited al Qaeda to send operatives to Lebanon and Iran for direct training," with no alleged involvement by Sudan); ¶ 86 (alleging that Ali Mohamed (an individual with no alleged connection with the Sudanese government) "was 'aware of certain contacts between al Qaeda . . . and Iran and Hezbollah,'" and that Mr. Mohamed (not Sudan or any alleged Sudanese government official) arranged for a meeting between "Hezbollah's chief, and Bin Laden.").

The Opposition (incredibly) goes on to assert (at 14) that Iran's support to al Qaeda, as detailed in *Havlish*, is somehow "attributable to Sudan" because of this purported agreement and conspiracy. But *Havlish* leaves Sudan out of the Iran-al Qaeda partnership altogether, finding instead that "the al Qaeda-Iran alliance was responsible for all of the most significant terrorist attacks against U.S. national interests from the 1990s up to and including the attacks of September 11." *Havlish*, 2011 U.S. Dist. LEXIS 155899, at *173. Indeed, *Havlish* repeatedly describes the conspiracy as involving only Iran, Hezbollah, and al Qaeda, with no mention of any Sudanese involvement whatsoever. *See, e.g., id.* at *110-11 (describing "informal agreement" following discussions "between al Qaeda and Iranian operatives"); *id.* at *112 (finding "representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism" which led "to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda"). In short, that alone does *not* settle the matter (*contra* Opp. 14).

Next, the Opposition (at 15-23) relies heavily on decisions in the *Owens* and *Rux* cases to attempt to show jurisdictional causation against Sudan. The *Owens* and *Rux* cases of course are not controlling in this MDL and involved default judgments obtained against Sudan in uncontested proceedings arising out of, respectively, the U.S. Embassy bombings in Kenya and Tanzania and the U.S.S. *Cole* attack in Yemen. Moreover, *Owens* and *Rux* also involved factual allegations that were more closely tied to those terrorist attacks than any allegation against Sudan in respect of the

9/11 Attacks in this case.  Indeed, the courts in those cases emphasized repeatedly the geographic proximity between Sudan and the locations of the attacks.

For example, the D.C. Circuit in *Owens* emphasized the geographic proximity of Kenya and Tanzania to Sudan, finding that Sudan "facilitated" al Qaeda's "movement throughout the region," which "allowed al Qaeda to . . . establish the cells in Kenya and Tanzania, which ultimately launched the 1998 bombings."  *Owens*, 864 F.3d at 797.  The district court in *Owens* also stressed Sudan's location next to Kenya and Tanzania in holding that, "[c]ritically, Sudan provided safe haven in a country near the two U.S. embassies" and the "vast majority" of planning and preparation for the Nairobi cell "was done by al-Qaeda operatives transiting back and forth between Nairobi from Khartoum."  *See Owens*, 174 F. Supp. 3d at 277-78; *Owens*, 826 F. Supp. 2d at 139.  The district court in *Owens* also found that Sudanese agents "facilitated the transport of al Qaeda operatives and funds from Sudan to the Nairobi cell."  *Owens*, 826 F. Supp. 2d at 145-46; *see also Owens*, 864 F.3d at 795 (Sudanese agents facilitated transportation of "large undeclared sums of money to Kenya").

Similarly, the *Rux* courts relied on allegations of Sudan's support for the "actual perpetrators" of the *Cole* bombing and for the transport of "explosive devices" from Sudan to Yemen, finding the allegations there went "well beyond" "curt allegations."  *See Rux*, 2005 U.S. Dist. LEXIS 36575, at *39; *id*. at *29 ("Defendant continued to render support and shelter of . . . Yemeni militant terrorists who planned the attack on the USS Cole."); *Rux*, 461 F.3d at 474 ("Plaintiffs then detail specific allegations that Sudan allowed . . . an Al-Qaeda operative to ship explosives from Sudan to Yemen, the site of the bombing.").

Lastly, ignoring Supreme Court and Second Circuit authority establishing that directness and "but for" causation are encompassed in proximate causation (*see* Mem. at 7-9 (citing cases);

*see also Lotes*, 753 F.3d at 411-12)), the Opposition (at 13-14) insists that those concepts are irrelevant to the proximate-causation analysis under § 1605A and § 1605B. Ultimately, however, this issue should be academic, as the Opposition accepts the articulation of proximate causation in *Ashton*, and the allegations of the Amended Complaint demonstrably fail to satisfy the proximate-causation standard applied in *Ashton*.

### B.  The Opposition Cannot Show That Any Sudanese Official, Employee, Or Agent Committed Any Tortious Act Within The Scope Of His Authority

The Opposition (at 11) asserts that the Amended Complaints "offer undisputed facts" about conduct by "Sudan's most senior leaders," but does not allege who these "leaders" are, what specific actions they took, how their acts are purportedly connected to the 9/11 Attacks, and where in the Amended Complaints one might find answers to these questions. Grasping, the Opposition (at 10) argues that Sudan's (now repealed) designation as a state sponsor of terrorism in 1993 and the "inferences that flow" from that designation somehow suffice to show that Sudanese government officials acting within the scope of their employment provided material support to al Qaeda. But the designation by itself cannot establish jurisdiction under the FSIA. *See Presbyterian Church of Sudan v. Talisman Energy*, No. 01-cv-9882, 2003 U.S. Dist. LEXIS 3981, at *4 n.1 (S.D.N.Y. Mar. 19, 2003) ("The notion that a state sponsor of terrorism might be entitled to immunity under the FSIA is clearly contemplated by the terms of the statute." (citing 28 U.S.C. § 1605(a)(7)(B)(i), (ii))). And the 1997 Executive Order (Opp. 10) does not even mention al Qaeda or address any specific conduct by Sudan.

Critically, the Opposition does not identify any specific, non-conclusory allegation that Turabi was a Sudanese official, employee, or agent. *See* Mem. 22-23 (citing *Ashton*, 298 F. Supp. 3d at 652-53). Instead, the Opposition repeats the conclusory allegation that Turabi "jointly governed Sudan in the ensuing years." Opp. 11 (citing CAC ¶¶ 31-36; *Ashton* Compl. ¶¶ 13-16).

Yet neither Amended Complaint alleges that Turabi held any official Sudanese governmental post. *See* CAC ¶¶ 31-36; *Ashton* Compl. ¶¶ 13-16.   In any event, as explained above, any alleged material support provided by Turabi is too attenuated temporally and geographically to establish jurisdictional causation.  *See Ashton*, 298 F. Supp. 3d at 659.

Analogizing to *Rux* does not help the Opposition either, as the allegations here do not rise to the level of specificity in *Rux*.  *See* Opp. 11-12 (asserting that *Rux* "found that providing diplomatic pouches, waiving of taxes and duties, allowing the formation of terrorist training camps, and establishing a bank with Osama Bin Laden could reasonably be done within the scope" of government employment) (citing *Rux*, 2005 U.S. Dist. LEXIS 36575, at *44-45; *Rux*, 461 F.3d at 472, n.5).

Other than citing *Rux* (CAC ¶ 191), neither Amended Complaint includes any allegation involving "diplomatic pouches."  Nor does either Amended Complaint include any allegation that any Sudanese official "waiv[ed] taxes or duties" for al Qaeda, other than a passing reference to *Owens* (*Ashton* Compl. ¶ 86).

The Amended Complaints also fail to allege that any Sudanese official acting within the scope of his authority "allow[ed] the formation of terrorist training camps."  *See, e.g.*, CAC ¶ 139 (making conclusory allegation that "camps were created and operated with the full knowledge and support of the Sudanese government").  The *Ashton* Complaint alleges (at ¶ 13) that an unidentified "member of the Sudanese Intelligence service bought five farms in Sudan for the use of al Qaeda as training camps."   But the CAC contradicts this allegation, alleging instead that "bin Laden dispatched al Qaeda members" — not Sudanese Intelligence service members — "to Sudan to rent and purchase residences for the relocation of the nascent organization, and farms to be used for jihad training."  CAC ¶ 53 (citations omitted).  Moreover, the *Ashton* Complaint's allegation is

undermined by the testimony of al Qaeda operative Jamal al Fadl — which both Amended Complaints incorporate by reference (*see, e.g.*, CAC ¶¶ 53 n.19, 67 n.25, 68, 69 n.26, 70 n.27, 71 n.28, 72 n.29, 73 n.30, 90 n.42, 109 n.59, 125 n.71, 138 n.75, 151 n.80, 153 n.81, 154 n.82; *Ashton* Compl. ¶¶ 28, 92) — who testified that *he* bought or rented the farms at issue.  Test. of Jamal al Fadl at 219:12-13, 220:16-20 (Feb. 6, 2021), *United States v. Hage*, No. 98-cr-1023 (S.D.N.Y. Sept. 21, 1998).  Further, the Amended Complaints fail to allege that any purported Intelligence officer purchased the farm within the scope of his authority.  *See Ashton* Compl. ¶ 13.

Finally, the Amended Complaints fail to allege that the Sudanese government or any Sudanese government official "establish[ed] a bank" with Bin Laden, alleging instead that Bin Laden in 1988 "invested with senior members of the NIF" in a Khartoum bank (CAC ¶ 126) that was founded in 1983 (*Ashton* Compl. ¶ 23), many years before Bin Laden allegedly even arrived in Sudan.  In short, the Opposition fails to rehabilitate the Amended Complaints' conclusory allegations that are insufficient to establish that any Sudanese official, employee, or agent acting within the scope of his employment provided material support to al Qaeda.  *See* Mem. 16-18.

### C.     The Opposition Cannot Overcome Sudan's Immunity From Claims Of Family Members Of Victims Under Both § 1605A(a) And § 1605B(b)

The Opposition (at 24-25) relies almost entirely on the D.C. Circuit's decision in *Owens* in arguing that this Court has jurisdiction over family-member claims under § 1605A(a).  But the D.C. Circuit interpreted the relevant statutory terms in isolation, ignoring the text, context, and purpose of § 1605A(a)(2)(A)(ii).  *Owens*, 864 F.3d at 807.  Since the D.C. Circuit's decision in *Owens*, the Supreme Court has reaffirmed the importance of reading the FSIA's statutory terms "consistent with the history and structure of the FSIA." *Rubin*, 138 S. Ct. at 825.  When considered within its context and purpose (*see* Mem. 23-25), § 1605A(a)(2)(A)(ii) limits jurisdiction to actions

brought by the individuals killed or injured in the 9/11 Attacks, or their personal representatives, and does not extend to family members bringing solatium claims in their own right.

The Opposition does not oppose Sudan's argument that there is no textual basis in § 1605B(b) to support an exercise of jurisdiction over family-member claims, and therefore the Opposition concedes the point. *City of New York v. Minetta*, 262 F.3d 169, 181 (2d Cir. 2001) (holding party waived argument where it failed to respond to opposing party's argument).

### D.    The Opposition Cannot Overcome Sudan's Immunity From Claims Brought By Corporate Plaintiffs Under § 1605A(a), § 1605(a)(7), And § 1605B

The Opposition relies (at 25) on § 1605A(d)'s "Additional Damages" provision as the basis from which corporate-insurer plaintiffs may abrogate Sudan's sovereign immunity under § 1605A(a).  But this approach improperly conflates claims (under § 1605A(d)), on the one hand, and jurisdictional immunity (under § 1605A), on the other.  Section 1605A(a)(2)(A)(ii) authorizes actions by *only* a claimant or victim who is a "national of the United States," a member of the armed forces, or a U.S. government employee or individual contractor.  And, therefore, only those claimants or victims within those categories may abrogate Sudan's immunity under § 1605A(a) and bring "additional damages" claims for property loss under § 1605A(d).

To read § 1605A(d) as allowing entirely separate entities, not contemplated by § 1605A(a)(2)(A)(ii), to bring *additional* damages claims would vitiate the express jurisdictional limitations imposed by § 1605(a)(2)(A)(ii).  Thus, the corporate-insurer plaintiffs, none of which is a "national of the United States," lack standing to invoke § 1605A(a) as a basis for subject-matter jurisdiction over their damages claims under § 1605A(d).  *See* Mem. 26.

The cases cited in the Opposition (at 26) are unavailing, and none binds this Court.  Three decisions were uncontested default judgments.  *See* Opp. 26 (citing *Terrorist Attacks*, 2015 U.S.

Dist. LEXIS 173091; *Lloyd's*, 811 F. Supp. 2d 53).  And *Leibovitch*, 697 F.3d at 571, does not discuss corporate-insurer plaintiffs or reference § 1605A(d).

The final case, *La Reunion Aerienne*, 533 F.3d 837, predates the 2008 amendments to the FSIA, and the D.C. Circuit makes no mention of Plaintiffs' theory here that § 1605A(d) entitles them to rely on § 1605A(a) to abrogate Sudan's immunity.  Rather, the D.C. Circuit concluded corporate plaintiffs could bring claims under § 1605(a)(7) under a subrogation theory.  But even if subrogation could permit corporate plaintiffs to invoke § 1605A(a) (or § 1605(a)(7)) immunity, which Plaintiffs do not assert, Plaintiffs' conclusory statement in a footnote that "the insurers have alleged that they are either themselves nationals of the United States, and/or are subrogees of nationals of the United States" (Opp. 26 n.13) does not suffice to show their claims derive from those of "nationals of the United States."

The Opposition (at 26-27) also misinterprets the scope of § 1605B's abrogation of immunity by reading § 1605B(b) in a vacuum.  Section 1605B(b) incorporates the requirements for valid ATA claims, including that they may be brought only by U.S. nationals, by identifying ATA claims as the exclusive causes of action available under § 1605B.  In other words, § 1605B lifts the jurisdictional bar on causes of action against foreign states only for the ATA claims contemplated by § 1605B(c).  Claims "in accordance with section 2333" are the only causes of action that § 1605B authorizes.  And because only "nationals of the United States," as defined by the Immigration and Nationality Act, may bring ATA claims, immunity of foreign states may be abrogated only for claims by those plaintiffs — not for corporate plaintiffs' claims.  Accordingly, Sudan remains immune from the § 1605B claims of the insurance-company plaintiffs.

### E. The Opposition Cannot Establish Subject-Matter Jurisdiction Under The Noncommercial-Tort Exception (§ 1605(a)(5))

The Opposition contends that the 9/11 Attacks "and attributable acts of the al Qaeda terrorists who committed them" satisfy the exception's "entire tort" rule, relying on case law that fails to contemplate that rule at all. Opp. 8 n.5 (citing *Doe v. Bin Laden*, 663 F.3d at 66-67). The Opposition disregards that the Second Circuit has since held that "allegedly contributing financial and other resources to support Osama Bin Laden and al Qaeda" from outside the United States does not satisfy the exception's requirement that the entire tort take place in the United States, even where the "injuries and damage" allegedly resulting from such assistance did occur within the United States. *O'Neill*, 714 F.3d at 116-117.

## II. THE OPPOSITION CANNOT SHOW PERSONAL JURISDICTION OVER SUDAN

As discussed above, no exception to sovereign immunity applies in this case. *See* 28 U.S.C. §§ 1330(b), 1608. And Sudan has not waived (Opp. 32 n.17), but rather expressly preserved (Mem. 27-28), its argument that Plaintiffs must demonstrate that Sudan possessed "minimum contacts" with the forum. *See Penguin Grp. (USA) Inc. v. Am Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (requiring that "plaintiff must make a prima facie showing that jurisdiction exists" (citations omitted)).

## III. THE OPPOSITION CANNOT OVERCOME THE TIME BARS PRECLUDING PLAINTIFFS' CLAIMS

### A. Plaintiffs Failed To Bring Timely § 1605A Actions

The Opposition (at 28) conspicuously deemphasizes the Amended Complaints' reliance upon § 1083(c)(3) of the 2008 NDAA in favor of a new interpretation of § 1605A(b). But the Opposition (at 28) misinterprets § 1605A(b) by asserting that "if an action was commenced under

1605(a)(7) no later than September 11, 2011, it can be 'maintained' under § 1605A(c)."  Read in

its proper context, § 1605A(b) authorizes no such thing.

Section 1605A(b) governs when "an action" may be brought or maintained "under this

section," referring to § 1605A.  As explained in *Simon*, 529 F.3d at 1191-92, actions that were

pending under § 1605(a)(7) at the time of § 1605A's enactment "obviously cannot be said to have

been 'filed under' the new provision."  Therefore, *Simon* continued, "the plaintiff in a case pending

under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by § 1605A;

in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new

provision."  *Id.* at 1192.

*Simon* then explained that there were two ways plaintiffs with "pending cases" could

invoke new § 1605A: (1) by refiling his suit within 60 days if he met the requirements of NDAA

§ 1083(c)(2), or (2) by filing a new action under § 1083(c)(3), which authorized a "plaintiff who

had 'timely commenced' a 'related action' under § 1605(a)(7) to bring 'any other action arising

out of the same act or incident,' provided 'the [new] action is commenced' within 60 days" of the

later of the date of entry of judgment in the original action or March 28, 2008.  *Id.* at 1192.

The "Claim Heard" subsections in § 1605A(a) incorporate the § 1083(c) mechanics and

provide helpful context for interpreting § 1605A(b).  The "Claim Heard" provision sets the rules

under which a court "shall hear a claim" under § 1605A.  Claims shall be heard if (1) the foreign

state was designated as a state sponsor of terrorism during the times specified relative to when the

claim was filed "under this section" (§ 1605A(a)(2)(A)(i)(I)), or (2) the case is "an action refiled

under this section by reason of § 1083(c)(2)(A)" or "filed under this section by reason of section

1083(c)(3)," and the foreign state was a designated state sponsor of terrorism when the "original

action" was filed (i.e., the action underlying a refiled action by reason of § 1083(c)(2)) or the

"related action under section 1605(a)(7)" was filed (i.e., the newly filed action under § 1083(c)(3)) (§ 1605A(a)(2)(A)(i)(II)).  *See also Simon*, 529 F.3d at 1192.

In other words, the only claims that shall be heard "under this section" are those filed directly under § 1605A; those in previously pending actions under § 1605(a)(7) that were refiled under § 1605A pursuant to § 1083(c)(2); and those in new actions brought under § 1605A pursuant to § 1083(c)(3) that had related § 1605(a)(7) actions.

Turning to the language of § 1605A(b), the limitations provision refers to the time in which "an action may be brought or maintained under this section."   Read in light of § 1605A(a)(2(A)(i)(I) and (II), "an action" must refer to the three types of actions that can be brought or maintained under § 1605A, i.e., actions directly brought under that section, refiled actions pursuant to § 1083(c)(2), or new actions brought by reason of § 1083(c)(3).  Section 1605A(b) addresses these distinct actions in two separate clauses.

The first clause concerns "an action" that "may be brought or maintained under this section [§ 1605A] . . ." not later than 10 years after the date on which the cause of action arose.  This clause covers an action that is "brought" directly under § 1605A.  The reference to "an action" that is "maintained" under § 1605A necessarily refers to an original § 1605(a)(7) action that was refiled pursuant to § 1083(c)(2) because the original action was not "brought" under § 1605A.  The second clause concerns "an action" that is timely if "a related action was commenced under section 1605(a)(7)" within the 10-year limitations period.  This second clause is necessary because in the case of a new action that was brought under § 1605A by reason of § 1083(c)(3), the timeliness must be measured from the commencement of the related § 1605(a)(7) action; otherwise, the new action would be time-barred in its own right, absent this relation-back rule.

The Opposition fails to engage in any of this rigorous analysis of § 1605A(b)'s text or context, and instead, submits an interpretation of § 1605A(b) that would allow plaintiffs with timely filed § 1605(a)(7) actions to bring or maintain a § 1605A action whenever they wished. But such interpretation would render the entire deadline scheme under § 1083(c) superfluous. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (refusing to read statute in a way "that would render superfluous an entire provision passed in proximity as part of the same Act").

None of Plaintiffs "brought or maintained" any action under § 1605A within the 10-year limitation period. When § 1605A was enacted in 2008, Plaintiffs already had pending § 1605(a)(7) actions. Plaintiffs could have brought an action directly under § 1605A by September 11, 2011, but inexplicably, they did not. Plaintiffs also could have brought or maintained their pending § 1605(a)(7) actions under § 1605A either (1) by refiling their actions within 60 days if they met the requirements of § 1083(c)(2), or (2) by filing a new action pursuant to the requirements of § 1083(c)(3). Plaintiffs did neither.

The Amended Complaints now rely belatedly upon § 1083(c)(3). *See* Mem. 19 (citing *Ashton* Compl. ¶ 123; CAC ¶ 215). But as Sudan explained (Mem. 19-20), under § 1083(c)(3)(B), Plaintiffs had until March 28, 2008 to bring a new action under § 1605A related to their pending § 1605(a)(7) actions. Plaintiffs missed that deadline.

Further, contrary to the Opposition's assertion (at 28-29), § 1083(c)(3)(A) does not apply to Plaintiffs' § 1605(a)(7) actions. Section 1083(c)(3)(A) provides that plaintiffs who had timely § 1605(a)(7) actions could bring a related action under § 1605A not later than 60 days *after* the entry of judgment in their § 1605(a)(7) actions. Section 1083(c)(3)(A) applied only to § 1605(a)(7) actions that had *already* reached final judgments as of the date of the NDAA amendments to the FSIA, as the courts in *In re Iran Terrorism Litigation* and *Knowland* held. Mem. 19-20. Plaintiffs

–19–

who did not have final judgments as of January 2008 had to rely on § 1083(c)(3)(B) and avail themselves of § 1605A by March 28, 2008.

Under Plaintiffs' interpretation, § 1083(c)(3)(A) would authorize plaintiffs with § 1605(a)(7) actions that had not yet reached final judgment to avoid any statutory time bar and bring a § 1605A action any time they wished up until 60 days after the date of any future entry of a judgment in their § 1605(a)(7) actions, whenever that may be. But § 1083(c)(3)(A)'s text is not so expansive or arbitrary; it does not provide that such plaintiffs may bring a § 1605A action whenever they like *before* a judgment is entered in the § 1605(a)(7) action. If that were the case, § 1083(c)(3)(B) and its 60-day deadline would be meaningless because any § 1605(a)(7) plaintiff could ignore that deadline and file a new § 1605A action any time he pleased years later. Moreover, § 1083(c)(3)(A) speaks only of the authority to bring a § 1605A action *after* the entry of judgment in the § 1605(a)(7) action and not *before*, thus indicating Congress was focused on judgments already entered and not judgments yet to be entered at an unspecified time in the future.

The Opposition's invocation (at 28) of the relation-back doctrine under Rule 15(c) does not save Plaintiffs' untimely § 1605A claims. By its terms, Rule 15(c) governs relation back only when plaintiffs seek to add new claims, defenses, or parties arising from the conduct in the original complaint. Rule 15(c) does not apply here, where Plaintiffs seek to bring new actions under a new jurisdictional predicate, having missed the statutory deadline to do so. *See, e.g.*, *Hernandez v. Smith*, 793 F. App'x 261, 265-66 (5th Cir. 2019) (holding Rule 15(c) does not allow plaintiffs "to go back in time" to cure jurisdictional defects). If Rule 15(c) applied to Plaintiffs' pending § 1605(a)(7) actions when Congress amended the FSIA in January 2008, the elaborate deadline mechanisms for "Pending Cases" under § 1083(c) would be unnecessary.

Finally, though the Opposition disputes the jurisdictional nature of § 1605A(b) (at 23-24), resolution of this dispute question is unnecessary here.   Sudan nevertheless maintains that, notwithstanding the D.C. Circuit's decision in *Owens*, "the 'text, context, and relevant historical treatment'" of § 1605A(b) all confirm § 1605A(b)'s jurisdictional nature:   § 1605A(b)'s plain language gives the court power to hear an "action" — not merely claims — brought "under this section," meaning § 1605A titled "Terrorism exception to the jurisdictional immunity of a foreign state," if filed within the limitations period.   *See, e.g.*, *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (holding 28 U.S.C. § 2401(a) — containing deadline to bring "action" against the United States — was jurisdictional).

### B.        All But The *O'Neill* Plaintiffs Failed To Bring Timely JASTA Actions

Nothing in Rule 15(c) allows Plaintiffs to relate new § 1605B actions back to the jurisdictional predicate of their § 1605(a)(7) actions for the purposes of asserting untimely § 2333(d) claims.   Opp. 30-31.   Subject-matter jurisdiction over § 2333(d) claims did not exist under the § 1605(a)(7) actions, and Plaintiffs therefore cannot relate back to those actions. *See, e.g.*, *Hernandez*, 793 F. App'x at 265-66 (holding relation back did not apply where jurisdiction did not exist over original action).

But even if some of Plaintiffs' § 1605B actions could relate back to their § 1605(a)(7) actions, many thousands of new Plaintiffs bringing claims against Sudan for the first time would not benefit from relation back under Rule 15(c)(1)(C)(ii). *See Charlot v. Ecolab Inc.*, 97 F. Supp. 3d 40, 82-84 (E.D.N.Y. 2014) (holding Rule 15(c)(1)(C)(ii) applies to amendment adding new plaintiffs).   Under Rule 15(c)(1)(C)(ii), such Plaintiffs have not (and cannot) show that Sudan knew or should have known that their new claims would have been brought against it, but for a mistake by these Plaintiffs. *See id.* at 86-87 (refusing to allow claims of new plaintiffs to relate back to complaint of original plaintiffs); *see also Levy v. U.S. GAO*, 175 F.3d 254 (2d Cir. 1999)

(affirming denial of request to add new plaintiffs where request was not due to mistake as required under Rule 15(c)(1)(C)(ii)).

Plaintiffs also cannot relate their untimely § 1605B actions back to the *O'Neill* putative class action by invoking *American Pipe*. Sudan did not concede application of *American Pipe* (Opp. 30 n.16), but only hypothesized that "*if*" *American Pipe* applied, it would apply "*only*" to Plaintiffs who fall within the putative *O'Neill* class (Mem. 34). Indeed, *American Pipe* does not apply to toll jurisdictional provisions. *See Cal. Pub. Employees Ret. Sys. v. ANZ Sec. Inc.*, 137 S. Ct. 2042, 2051 (2017) (stating *American Pipe* is "grounded in traditional equitable powers of the judiciary"); *United States v. Wong*, 575 U.S. 402, 408-09 (2015) (stating equitable tolling is forbidden for jurisdictional provisions). Section 1605B exists for a singular purpose — to allow, under certain circumstances, the exercise of subject-matter jurisdiction under the FSIA over an ATA claim against a foreign state under § 2333(d). Because the new jurisdictional predicate in § 1605B is inextricably intertwined with the ATA claim it provides, equitable tolling principles do not apply.

In any event, the purported *O'Neill* class includes only "spouses, children, parents, or siblings" (Mem. 34 (quoting *O'Neill* Supp. Compl. ¶ 11, 18-cv-12114, ECF No. 1)), not the claims of "family members" generally (Opp. 30. n.16). Thus, claims of family members who fall outside this definition — such as grandparents, cousins, and step-parents — and corporate Plaintiffs and Plaintiffs alleging personal injury would not be tolled and are time-barred.

## IV. THE OPPOSITION CANNOT OVERCOME THE AMENDED COMPLAINTS' FAILURE TO STATE A CLAIM

The Opposition suggests (at 32) that, under Rule 12(i), this Court should focus on "the expansive substantive remedy established under § 1605A for material support" and defer consideration of the numerous pleading deficiencies Sudan identifies with respect to "Plaintiffs'

additional causes of action."  But the Opposition disregards (and fails to rebut) Sudan's numerous grounds favoring swift dismissal of the Amended Complaints.

In particular, the Court can dispose of Plaintiffs' untimely § 1605A and § 1605B actions on purely legal grounds (as discussed above).  And the Court can dispose of all of Plaintiffs' ATA claims because (as explained above) the Amended Complaints fail to allege facts supporting a plausible inference that Sudan's conduct was the proximate cause of the 9/11 Attacks (indisputably considering "but for" and directness elements).  *See Comcast*, 140 S. Ct. at 1014; *Rothstein*, 708 F.3d at 95.  The Court also can readily dispose of Plaintiffs' ATA secondary-liability claims, because (among other reasons) § 2333(d), by its terms, excludes foreign states.  *See* § 2333(d)(1) (expressly incorporating Dictionary Act definition of "person," which does not include foreign states and cannot overcome the "longstanding interpretative presumption that 'person' does not include the sovereign" (*Fayed*, 229 F.3d at 274 (quotation omitted))).  Similarly, the ATA's express incorporation of the INA definition of "person" into the ATA's definition of "national of the United States" is unambiguous that corporate plaintiffs lack standing to bring ATA claims. *See* 18 U.S.C. § 2331(2); *see also Lelchook v. Commerzbank AG*, No. 10-cv-5795, 2011 U.S. Dist. LEXIS 106305, at *5 (S.D.N.Y. Aug. 1, 2011) ("Standing under the ATA is conferred by 18 U.S.C. § 2333(a). . . . From the plain meaning of the text, it is apparent that . . . suit may be brought by the injured national, or his estate, survivors, or heirs.").  The Court also can readily dispose of Plaintiffs' primary-liability claims under the ATA, because (among other things) the Amended Complaints do not even purport to allege that Sudan acted as a principal perpetrating the 9/11 Attacks or that Sudan's own actions "also involve violence or endanger human life," as required under *Linde*, 882 F.3d at 319, 316; *see also Weiss v. Nat'l Westminster Bank*, No. 19-863(L), 2021 U.S. App. LEXIS 9979, at *29-31 (2d Cir. Apr. 7, 2021).  The exclusion of § 1605A and § 1605B

from § 1606 establishes that § 1605A(c) and § 1605B(c) provide the exclusive causes of action under their respective sections, and that § 1606 no longer operates as a gateway to state-law (or any other) claims.  *See* Mem. 40-43.  Finally, the Second Circuit's decision in *Terrorist Attacks VII*, 714 F.3d at 125, and this Court's prior decision in this case, *Terrorist Attacks V*, 740 F. Supp. 2d at 515, foreclose Plaintiffs' ATS and RICO claims.

## V.   THE OPPOSITION CANNOT CURE THE DEFECTIVE ENTRIES OF DEFAULT IN *ASHTON*, *BURNETT*, AND *FEDERAL INSURANCE*

The Opposition (at 58-60) ignores the case law cited by Sudan (*see* Mem. 44-46) establishing that the Amended Complaints (with new allegations, claims, and plaintiffs) vitiate and render moot any entries of default against Sudan connected with prior complaints.  And the cases cited in the Opposition (at 58) are inapposite, as each concerns the conversion of cases from § 1605(a)(7) to § 1605A (*see In re Iran Terrorism Litig.*, 659 F. Supp. 2d at 104; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 12, 18-19, 20 (D.D.C. 2009)) or the clarification of "existing claims" (*see Dammarell*, 370 F. Supp. 2d at 224).

Here, the Opposition cannot escape that the Amended Complaints added allegations, new Plaintiffs (in the thousands), and new substantive claims previously unavailable to them (e.g., claims for secondary liability under JASTA).  Indeed, Plaintiffs conceded that their Amended Complaints raise new claims and legal bases for jurisdiction not previously asserted in Plaintiffs' prior complaints (or that "did not even exist" when those prior complaints were filed).  Pls.' Ltr. to Ct. at 2 (ECF No. 6493) ("In particular, the updated Complaints were aimed at including legal remedies established *subsequent to the filing* of the original complaints, including in particular JASTA," and "the *most prominent* intervening occurrences necessitating Plaintiffs' supplementation are the several intervening changes in law regarding suits against foreign sovereigns." (emphases added)).  The prior entries of default thus are of no legal consequence and

Sudan is entitled to respond to these Amended Complaints. *Benavidez v. Piramides Mayas, Inc.*, No. 09-cv-5076, 2013 U.S. Dist. LEXIS 55586, at *17-19 (S.D.N.Y. Apr. 16, 2013); Mem. 44-46.

Finally, the Opposition is incorrect in its reliance (at 59-60) on *Flanagan* and *Opati*, in which the courts declined to set aside default *judgments*. Here, Plaintiffs have never sought — let alone obtained — any default judgments against Sudan. *See Flanagan*, 190 F. Supp. 3d at 160 (confirming there is "no risk of prejudice" to setting aside an entry of default where "plaintiffs had not yet expended any significant efforts to satisfy their burden of proof for default judgment").

## CONCLUSION

For the foregoing reasons, Sudan respectfully requests that the Court dismiss with prejudice the Amended Complaints against Sudan in their entirety for lack of subject-matter and personal jurisdiction, as well as for failure to state a claim upon which relief can be granted.

Dated:   April 7, 2021
         Washington, DC

Respectfully submitted,

## WHITE & CASE

/s/ *Christopher M. Curran*
Christopher M. Curran
Nicole Erb
Claire A. DeLelle
Matthew S. Leddicotte (*pro hac vice*)
Nicolle Kownacki (*pro hac vice*)
Celia A. McLaughlin (admission application
    forthcoming)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:    + 1 202 626 3600
Facsimile:    + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
cdelelle@whitecase.com
mleddicotte@whitecase.com
nkownacki@whitecase.com
cmclaughlin@whitecase.com

*Counsel for the Republic of the Sudan*