# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| **Plaintiffs' Executive Committee for Personal Injury and Death Claims** | **Plaintiffs' Executive Committee for Commercial Claims** |
|---|---|
| Ronald L. Motley, (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Stephen A. Cozen, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

May 27, 2021

<u>Via ECF</u>
The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

      Plaintiffs submit this opposition to the Kingdom of Saudi Arabia's letter-motion for a protective order seeking to limit questioning of Musaed al-Jarrah at his upcoming deposition to only his interactions or direct communications with Omar al-Bayoumi, Fahad al-Thumairy, Nawaf al-Hazmi or Khalid al-Mihdhar and to whether Jarrah instructed anyone to assist hijackers Hazmi or Mihdhar. ECF No. 6817.

      The Kingdom's proposal would limit Plaintiffs' deposition to ultimate questions and deny necessary discovery of the circumstances of Bayoumi's and Thumairy's employment and the persons directing them – central areas of the jurisdictional discovery the Court authorized. If Jarrah provided support for the 9/11 plot or conspired with others in connection with the terrorist attacks, the evidence of that conduct – whether circumstantial or direct – may not be shielded by the doctrine of diplomatic immunity. It simply cannot be the case that supporting a plot leading to the murder of 3,000 citizens of the country in which a person purported to hold diplomatic privileges is a core diplomatic function. The Kingdom's efforts to limit Plaintiffs' questioning of Jarrah is an end-run around the grant of discovery and should be denied.

    **1. Musaed al-Jarrah**

      Judge Daniels, in granting jurisdictional discovery, explained that establishing that Thumairy and Bayoumi "were following instructions from more senior officials in the Saudi Embassy and, as such, their actions can be attributed to Saudi Arabia" would be one method of "satisfying JASTA's FSIA exception." ECF No. 3946 at 22. The Court then granted discovery

on this precise method of establishing jurisdiction over the Kingdom: which "more senior Saudi officials" directed al-Thumairy and al-Bayoumi to "provide assistance to Hazmi, Mihdhar, and other 9/11 hijackers." *Id.*

Discovery has revealed that Jarrah was the third main subject of the FBI subfile investigation and that "[t]here is evidence that Jarrah … tasked al-Thumairy and al-Bayoumi with assisting the hijackers." ECF No. 6292-1. Jarrah is a former employee of the Kingdom who was at one point employed by the Ministry of Education and then was sent to work for the Kingdom's Islamic Affairs Department out of the Saudi Embassy in Washington, D.C.

Plaintiffs provided the Kingdom a preliminary list on Feb. 20, 2019 that identified Jarrah as a person they would depose. Plaintiffs also named Jarrah as a deposition witness in a Dec. 6, 2019 letter to the Court. Exh. A. In response, while the Kingdom raised Vienna Convention objections to other proposed witnesses, as to Jarrah it stated that he "is a former employee of Saudi Arabia but has *voluntarily agreed to sit for a deposition*." Exh. B (emphasis added).

The Court thereafter set a deadline for the Kingdom to move for any protective order as to the witnesses Plaintiffs identified. ECF No. 5998. When the Kingdom moved for a protective order on February 21, 2020, it set forth precisely which, if any, privileges it would seek to invoke to block the testimony of the witnesses Plaintiffs had identified. Exh. C. It moved for a protective order with respect to 46 of 53 of those witnesses. *See* 2020-02-21 Kingdom Motion for Protective Order at 1. Of those 46, the Kingdom identified 11 witnesses it claimed were unavailable under the Vienna Conventions. *Id.* Jarrah was expressly *not* one of the witnesses as to whom the Kingdom sought a protective order. Exh. C. Rather, just as the Kingdom had advised Plaintiffs previously, it stated that Jarrah had "consent[ed]" to be deposed. *See* 2020-02-21 Kingdom Motion for Protective Order at 4 fn 9.

On April 30, 2021, Plaintiffs advised the Kingdom that they intended to take Jarrah's deposition starting on June 17. Exh. D. The Kingdom responded on May 3, 2021 that Jarrah was available. *Id.* The Kingdom did not suggest that the scope of questioning would be limited. *Id.* Plaintiffs then formally noticed Jarrah's deposition on May 14, 2021 to take place over June 17 and 18, 2021. Exh. E.

Only a month before Jarrah's deposition – more than two years after Plaintiffs notified the Kingdom that they intended to depose Jarrah; more than a year after the Court's deadline for filing for a protective order; and more than a year after the Kingdom moved for protective orders for other witnesses under the Vienna Conventions on Consular and Diplomatic Relations while expressly *not* moving for any protection for Jarrah's testimony – the Kingdom for the first time alleged that Jarrah was entitled to immunity.

The Kingdom's egregiously late application for a protective order seeks to limit Jarrah's testimony to the narrowest possible scope, belatedly asking this Court on the eve of the deposition to restrict Plaintiffs from asking any questions other than ultimate ones about direct communications or interactions among Jarrah, Thumairy, Bayoumi, and the hijackers, or any other direct instructions to assist the hijackers. Indulging this untimely and improper request would wrongly deny Plaintiffs access to important evidence establishing the key links in the 9/11 conspiracy and would expand the Vienna Conventions beyond core diplomatic functions to protect criminal conduct.

## 2. The Kingdom of Saudi Arabia Expressly Waived any Objection Under the Vienna Conventions

As of February 2019, the Kingdom knew that Plaintiffs intended to depose Jarrah. The Court set a deadline of February 28, 2020 for the Kingdom to move for any protective orders as to the witnesses identified by Plaintiffs. In its February 2020 motion, the Kingdom expressly asserted Vienna Convention privileges as to certain witnesses, but not Jarrah. And up until May 13, 2021, the Kingdom expressly stated that Jarrah was *not* "unavailable" under the Vienna Conventions and that his testimony as a "former employee" would be provided voluntarily.

In response to Plaintiffs' allegations and proof, Saudi Arabia agreed to produce Jarrah for the same reasons that it agreed to produce Thumairy, who also held a diplomatic title from 1996-2003, without restriction. It was obvious that the diplomatic function privilege did not restrict questioning about Jarrah's interactions and work relevant to aspects of the 9/11 plot.[1]

Saudi Arabia has waived any potential privilege. The Kingdom expressly set forth those individuals whom it claimed fell within the diplomatic or consular privileges. Jarrah was not one. To the contrary. The Kingdom stated he was appearing as a former employee and was doing so voluntarily. In addition to not claiming the privilege for Jarrah when it did so for all other witnesses, the Kingdom expressly proffered him as a non-Vienna Convention witness. Plaintiffs reasonably relied on those representations over the course of depositions and deposition preparation for the witness. The Kingdom cannot now be allowed to belatedly revivify a privilege to gain strategic advantage over the 9/11 Families. Moreover, the Court set a deadline with which the Kingdom has not complied. This Court should deny its motion for a protective order on those bases, alone.

## 3. Plaintiffs Must be Allowed to Ask Questions Beyond the Kingdom's Proposed Limits

Just as criminal cases often rely on circumstantial evidence – the phone calls that establish the contact between co-conspirators, the surveillance photograph that puts a suspect within the vicinity of the crime – so does this case. The hijackers did not arrive in California publicly advertising their plot or their needs, nor would it be reasonable to expect discovery to demonstrate such brazen criminality. Rather, proof of the scope of the conspiracy supporting the 9/11 Attacks must be established by some circumstantial evidence. Restricting Plaintiffs from asking questions about the various aspects of the plot beyond the direct interactions solely among Jarrah, Thumairy, Bayoumi and the hijackers (or those who were also directly tasked with helping them) would deny the 9/11 Families key information establishing the conspiracy.[2]

---

[1] The Kingdom relies on a short April 21, 2021 U.S. Department of State memo which stated that "official records … *indicate* that … Jarrah was notified to the Department as assuming his duties as an administrative and technical staff member for the Embassy … ." ECF No. 6817-1 at 4. This is insufficient to establish that even outside of his role in the 9/11 plot Jarrah performed diplomatic functions such that his testimony can be limited. *Broidy Capital Mgt. LLC v. Benomar*, 944 F.3d 436, 444 (2d Cir. 2019). If it were, then Thumairy, holding a diplomatic title, would similarly be cloaked in the Kingdom's diplomatic privilege.

[2] Further, the evidence makes clear that the activities of Thumairy and other "propagators" were being conducted in violation of U.S. law, and were not part of any legitimate diplomatic function in the U,S. The Kingdom cannot shield Jarrah from testifying as to matters related to the propagators.

As the Second Circuit has repeatedly explained, membership in a conspiracy "may be proven entirely by circumstantial evidence." *U.S. v. Miranda-Ortiz,* 926 F.2d 172, 176 (2d Cir.1991). Indeed, participation in a single transaction may be sufficient to sustain a charge of knowing participation in an existing conspiracy. *Id; U.S, v. Murray,* 618 F.2d 892, 903 (2d Cir.1980) (defendant's single purchase of narcotics in 1975, together with evidence that he had previously done business with key coconspirator sufficed to permit conviction of conspiracy spanning 1972 to 1978). And the evidence need not show that a co-conspirator knew all members of the conspiracy or all the details of its operation. *See U.S. v. Feola,* 420 U.S. 671, 692 (1975); *Blumenthal v. U.S.,* 332 U.S. 539, 557 (1947); *U.S. v. Nusraty,* 867 F.2d 759, 763 (2d Cir.1989); *U.S. v. Martino,* 759 F.2d 998, 1003 (2d Cir.1985).

Under the Vienna Convention for Diplomatic Relations, "immunity … subsist[s]" only in connection with suits concerning "acts performed … in the exercise of [the official's] functions as a member of the mission." VCDR Art. 39(2). Providing material support for a plot leading to the murder of 3,000 citizens of the receiving state cannot be considered a legitimate diplomatic function. *See* VCDR Art. 41(3) (physical diplomatic facilities "must not be used in any manner incompatible with … general international law … ."). Any diplomatic immunity must be "limited to a narrow set of acts that are committed 'in the exercise of [the diplomat's] functions as a member of the mission." *Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (former diplomat had no residual immunity from suit brought by household employee). Criminal conduct is expressly *not* a core diplomatic function. *Kingdom of Morocco v. U.S.*, 2019 WL 6724436 (S.D.N.Y. Dec. 11, 2019) (submitting fraudulent visa applications "plainly 'prohibited by the laws and regulations' of the United States" and thus outside the privilege).

The Kingdom's efforts to bar Plaintiffs from questioning Jarrah about the various conduct, acts, and history that could, whether directly or circumstantially, demonstrate his role in the 9/11 plot would effectively immunize from scrutiny or prosecution any criminal acts committed in the receiving state. Moreover, it would effectively thwart the very jurisdictional discovery that the District Court previously granted. This Court should not countenance this outrageous, unwarranted and unsupported expansion of diplomatic privileges.

Respectfully submitted,

| | |
|---|---|
| COZEN O'CONNOR | MOTLEY RICE |
| */s/ Sean P. Carter* | */s/ Robert T. Haefele* |
| Sean P. Carter, Esquire | Robert T. Haefele, Esquire |
| 1650 Market Street, Suite 2800 | 28 Bridgeside Boulevard |
| Philadelphia, PA 19103 | Mt. Pleasant, SC 29464 |
| MDL 1570 Plaintiffs' Exec. Committee for Commercial Claims | MDL 1570 Plaintiffs' Exec. Committee for Personal Injury and Death Claims |

KREINDLER & KREINDLER

 /s/ Megan W. Benett
Steven R. Pounian, Esquire
Andrew J. Maloney, Esquire
Megan W. Benett, Esquire
485 Lexington Avenue, 28th Fl.
New York, NY 10017

MDL 1570 Plaintiffs' Exec. Committee
for Personal Injury and Death Claims