## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) <br><br> ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 17-cv-07914
*Abbate, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-08617

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS FROM DEFENDANT AL RAJHI BANK</u>

July 30, 2021

## <u>TABLE OF CONTENTS</u>

**Page**

I.     PROCEDURAL BACKGROUND ................................................................. 1

II.    LEGAL ARGUMENT .............................................................................. 4

    A.    The Standards for a Motion to Compel ................................................. 4

    B.    ARB Fundamentally Misconstrues the Scope of Discovery Mandated By the Second Circuit ................................................................. 5

    C.    The Remand Order Authorizes Jurisdictional Discovery on the Totality of Plaintiffs' Allegations Bearing on ARB's Intent ...................................... 7

    D.    The 10 Areas Of Inquiry are All Relevant to Whether ARB Undertook Tortious Acts Aimed at the United States and Conspired with and/or Aided and Abetted Al Qaeda ................................................................. 9

    E.    ARB Has Failed to Meet Its Burden as the Party Resisting Discovery ............... 15

        1.    There is No Support for ARB's Objections that the Requested Discovery is Irrelevant and Beyond the Scope of the Jurisdictional Mandate ................................................................. 16

        2.    It is Immaterial that Jurisdictional Discovery May Overlap with Merits Discovery ................................................................. 19

    F.    Plaintiffs' Discovery Requests Impose a Reasonable Time Frame for Jurisdictional Discovery ................................................................. 20

        1.    The Ten-Year Period Between January 1, 1992 and December 31, 2002 is a Reasonable and Relevant Time Frame for Pre-9/11 Conduct ................................................................. 20

        2.    Investigative Materials Generated after December 31, 2002 are Relevant ................................................................. 22

        3.    ARB Has Not Met its Burden of Showing that Foreign Law Cannot Shield Itself from Discovery by Asserting Privileged Purportedly Held by Saudi Regulators ...................................... 24

        4.    ARB Has Failed to Meet its Burden of Establishing Undue Burden ........ 25

III.    CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Wehinger*,
  2019 U.S. Dist. LEXIS 215367 (C.D. Cal. Mar. 20, 2019).....................................................20

*Calder v. Jones*,
  465 U.S. 783 (1984)......................................................................................................7, 20

*Charles Schwab Corp v. Bank of America Corp.*,
  883 F.3d 68 (2d Cir. 2018).............................................................................................7, 20

*Diamond Servs. Mgmt. Co., LLC v. C&C Jewelry Mfg., Inc.*,
  2021 U.S. Dist. LEXIS 112190 (N.D. Ill. June 15, 2021).......................................................20

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983).............................................................................................19

*Harris v. Bronx Parent House Network, Inc.*,
  2020 U.S. Dist. LEXIS 26566 (S.D.N.Y. Feb. 14, 2020).......................................................25

*Kaplan v. Lebanese Canadian Bank SAL*,
  2021 U.S. App. LEXIS 17105, 999 F.3d 842 (2d Cir. 2021) .........................................*passim*

*Licci v. Lebanese Canadian Bank*,
  732 F.3d 161 (2d Cir. 2013)....................................................................................................7

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018).............................................................................................18, 19

*In re Lloyds Banking Grp, PLC*,
  2021 U.S. Dist. Lexis 134046 (S.D.N.Y. July 19, 2021)......................................................25

*Strauss v. Credit Lyonnais*,
  242 F.R.D. 199 (S.D.N.Y. 2007) .........................................................................................24

*In re Terrorist Attacks on September 11, 2001*,
  538 F.3d 71 (2d Cir. 2008)...................................................................................................17

*In re Terrorist Attacks on September 11, 2001*,
  714 F.3d 659 (2d Cir. 2013).............................................................................1, 14, 17, 22

*In re Terrorist Attacks of September 11, 2001*,
  2018 U.S. Dist. LEXIS 147908 (S.D.N.Y. Aug. 29, 2018)..................................................4, 16

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
    779 F. App'x 66 (2d Cir. 2019) ................................................................ *passim*

*Waldman v. Palestine Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016)............................................................................18, 19

**Other Authorities**

FED. R. CIV. P. 12(b)(6) ........................................................................................2

FED. R. CIV. P. 26........................................................................................4, 20

FED. R. CIV. P. 37............................................................................................1

Pursuant to Federal Rule of Civil Procedure 37, and in accordance with this Court's July 21, 2021 Order (ECF No. 6976), Plaintiffs submit this memorandum of law in support of their motion to compel defendant Al Rajhi Bank ("ARB") to search for and produce records responsive to Plaintiffs' First Set of Consolidated Jurisdictional Requests for Production of Documents dated May 11, 2021 ("Plaintiffs' Requests"). This motion is necessary because ARB has resisted even basic compliance with the discovery ordered by the Second Circuit.

## I.   PROCEDURAL BACKGROUND

On October 15, 2019, the Second Circuit reversed the district court's dismissal of Plaintiffs' claims against ARB for lack of personal jurisdiction and remanded the case for jurisdictional discovery. *See Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019) ("Remand Order"). Referencing the full scope of Plaintiffs' allegations against ARB in their First Amended Complaint ("FAC"), the Second Circuit held that Plaintiffs' allegations indicating ARB's intent to further terrorism against the United States differentiated Plaintiffs' claims from other terrorism cases against banks, where jurisdiction was found to be lacking. Specifically, the Second Circuit held that, when read as a whole, the multitude of connections between ARB and prominent al Qaeda partners, and particular allegations regarding ARB's knowledge, give rise to an inference that ARB had the requisite intent to advance al Qaeda's terrorist pursuits against the United States.

The Second Circuit's mandate authorizes discovery as to the allegations set forth in the FAC, to develop evidence as to four areas of inquiry: "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda." 779 F. App'x at 69 (citing *In re Terrorist Attacks on September 11, 2001,* 714 F.3d 659 (2d Cir. 2013)) ("*Terrorist*

1

*Attacks VII*").  By authorizing jurisdictional discovery on the degree, scope, means, and intent of the support ARB provided to al Qaeda, the Second Circuit framed the jurisdictional inquiry as intertwined with the merits of Plaintiffs' claims under the Anti-Terrorism Act ("ATA").

Notwithstanding the Remand Order for jurisdictional discovery, ARB resisted being subject to discovery at all, urging this Court to bypass the discovery mandated by the Second Circuit and consider an alternative motion to dismiss under F.R.C.P. 12(b)(6).  ECF No. 5384. This Court denied ARB's motion and directed the parties to proceed to "limited personal jurisdiction discovery" consistent with the "specific boundaries" delineated by the Second Circuit.  *See* March 26, 2021 Order (ECF No. 6681).

On May 11, 2021, Plaintiffs served ARB with Plaintiffs' requests, attached to the accompanying Declaration of J. Scott Tarbutton ("Tarbutton Declaration") as Exhibit A. Although the Second Circuit's Remand Order authorizes Plaintiffs to conduct discovery as to the full portfolio of relationships and activities addressed in the FAC and bearing on ARB's intent, Plaintiffs focused their requests on a narrower set of issues that they anticipate will be sufficient to establish ARB's intent to advance al Qaeda's targeting of the United States and status as an abettor and co-conspirator of al Qaeda.  Generally, Plaintiffs' 58 requests are divided into ten main areas of inquiry:

1.  Request Nos. 1-8, and 35 seek records relating to ARB's relationships and role in advancing al Qaeda's terrorist agenda with three notorious al Qaeda entities, the International Islamic Relief Organization ("IIRO"), Al Haramain Islamic Foundation, and Muwafaq Foundation (a/k/a Blessed Relief Foundation) (the "Da'wah Organization Requests").  As reflected by the assessments of U.S. officials cited in the FAC, each of those entities was deeply intertwined with core al Qaeda during the relevant time period.  Importantly, ARB principals simultaneously served in leadership positions of the Da'wah Organizations at a time when those al Qaeda charity fronts were publicly implicated in terrorist activities.

2.  Request Nos. 9-22, and 33-34 seek records relating to ARB's material support to certain specifically named persons, including members and financiers of al Qaeda,

9/11 hijackers, and persons who provided support to the hijackers in the U.S., such as Omar Bayoumi and Fahad al Thumairy (the "Al Qaeda Operative Requests").

3.  Request Nos. 23-25 seek records relating to ARB's own financial transactions directed to supporting terrorism in the United States, including contributions to al Qaeda related entities in the United States (the "U.S. Financial Requests").

4.  Request Nos. 26-32 seek records relating to the events, relationships, and transactions described in the July 26, 2007 Wall Street Journal article, *Terror Financing: US Tracks Saudi Bank Favored by Extremists*, which quotes various U.S. intelligence reports on ARB and describes specific actions taken by ARB and its principals to advance terrorist causes and circumvent counter-terrorism measures (the "Terror Financing Article Requests").

5.  Request Nos. 36-38 seek records relating to ARB's relationship with and role in facilitating al Qaeda support activities of al Qaeda's most notorious patrons and financial facilitators (the "Golden Chain Requests")

6.  Request Nos. 39-41 seek records relating to the role of ARB and its principals in themselves establishing, funding, and promoting a network in the U.S. to surreptitiously channel support to al Qaeda and other terrorist causes (the "SAAR Network Requests").

7.  Request Nos. 42-44 seek records relating to Saleh al Hussayen, a ARB Shariah Board member who checked into the same hotel as several of the 9/11 hijackers the night before the attacks, and whose activities the Second Circuit already had held were an appropriate subject for jurisdictional discovery (the "Saleh al Hussayen Requests").

8.  Request Nos. 45-54 seek records relating to terror financing and sponsorship investigations directed at ARB and conducted by ARB, Saudi Arabia, the United States, or other relevant parties, several of which are identified very specifically in the FAC (the "Terrorism Finance Investigation Requests").

9.  Request No. 55 seeks records relating to Suleiman al Rajhi's departure from ARB, which the circumstances indicate was significantly driven by his role in using the bank to support and foster terrorism (the "Suleiman al Rajhi Departure Requests").

10. Request Nos. 56-58 seek records relating to ARB's anti-money laundering/anti-terrorism financing protocols and practices, or lack thereof (the "ARB Financial Controls Requests").

For the Court's convenience, a relevance chart listing each of Plaintiffs' requests and the allegations of the FAC pertaining to each is attached to the Tarbutton Declaration as Exhibit B.

On June 10, 2021, ARB served its Responses and Objections to Plaintiffs' Requests. *See* Exhibit C to the Tarbutton Declaration. ARB's "responses" consist of 162 pages of objections,

through which ARB declared that it would not conduct any searches for documents responsive to 47 out of the 58 requests.  For the remaining 11 requests, ARB indicated that it intended to conduct limited searches, unilaterally narrowing the subject matter of the documents it agreed to search for and the time frame (and interposing a range of ambiguous additional limitations).[1]

On June 29, 2021, the parties met and conferred concerning ARB's objections.  The June 29 discussion confirmed that the parties have significant disagreements regarding the scope and areas of discovery authorized in the Remand Order.  By Order dated July 21, 2021 (ECF No. 6976), the Court authorized Plaintiffs to proceed with the present motion to compel.

## II.   LEGAL ARGUMENT

### A.   The Standards for a Motion to Compel

Under Rule 26(b)(1*)*, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "Information within this scope of discovery need not be admissible in evidence to be discoverable." *In re Terrorist Attacks of September 11, 2001*, 2018 U.S. Dist. LEXIS 147908, *266 (S.D.N.Y. Aug. 29, 2018) (citing FED. R. CIV. P. 26(b)(1)).  "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Id.* (citing *Condit v. Dunne,* 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).  "Thus, the Rule 26(b)(1*)* standard presents a 'relatively low threshold' for a party to show that the material sought is relevant to any claim or defense in the litigation." *Id.* (internal citations omitted).  "When a party objects to discovery requests, 'the objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded  the federal discovery rules, each [request] is not

---

[1] These include ARB's statements that its searches will be limited to what ARB itself believes to be a "reasonable and proportionate search" of undefined "relevant repositories and custodians," and that its resulting production will be limited in "conjunction with and subject to applicable laws and regulations as well as to the circulars, instructions, guidance, and directives of the relevant regulatory authorities."  *See e.g.*, Exh. C at pp. 60-61.

relevant.'"  *Id.* at 266-67 (internal citations omitted).  "General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information."  *Id.* at 267 (internal citations omitted).

**B.      ARB Fundamentally Misconstrues the Scope of Discovery Mandated by the Second Circuit**

ARB's objections to Plaintiffs' requests reflect its fundamental resistance to, and calculated effort to avoid, the precise discovery that was mandated by the Second Circuit, and that is most relevant to assessing ARB's intent to foster al Qaeda's terrorism directed at the United States.  ARB's objections are nothing more than a reverse-engineered artifice, designed to insulate damaging evidence that would establish ARB's intent to foster al Qaeda's targeting of the United States from discovery.  Although voluminous (162 pages), ARB's objections and its consequent refusal to search for relevant documents are primarily founded on two erroneous and improper claims.

First, ARB claims that *"the only jurisdictional discovery authorized by the Second Circuit concerns the allegations of the First Amended Complaint of Bank support directly to al Qaeda purportedly by 'providing financial services to known extremist operatives.'"  See* Exh. B, p. 3 (emphasis added).  To the contrary, the Second Circuit did not limit jurisdictional discovery to "direct support" to al Qaeda via banking service to "known extremist operatives" as ARB argues (and whatever that means).  Rather, the Second Circuit authorized discovery as to all matters bearing on ARB's intent to foster al Qaeda's terrorism against the United States. Pursuant to the plain language and import of the Second Circuit's Remand Order as to ARB, and its other controlling decisions, that discovery necessarily encompasses the full context of ARB's supportive dealings with other co-conspirators and aiders and abettors of al Qaeda, the knowledge of ARB and its principals that the bank was participating in al Qaeda's terrorism

5

through those relationships, and activities conducted with that knowledge indicating an intent to advance al Qaeda's mission.  Indeed, the Second Circuit expressly noted that the gravamen of Plaintiffs' FAC was that "Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives.  They further allege Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States."  Remand Order, 779 F. App'x at 68.  The Second Circuit then authorized discovery on the allegations of the FAC to develop evidence concerning: "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda." *Id.* at 69.

Second, ARB aims to avoid producing damaging and relevant discovery by suggesting, in conflict with the Remand Order, this Court's earlier decisions in this MDL, and basic logic, that the timeframe for discovery should be limited to the period between October 8, 1999 and September 11, 2001.  Exh. C at p. 18.  This attempt to artificially constrict discovery to a 23-month period is plainly designed to deprive Plaintiffs of discovery as to the full context of ARB's central role in advancing al Qaeda's interests before 9/11, and the evidence showing that it did so with a specific awareness of the terrorist nature of the relevant entities and persons with which it was partnering.  And by attempting to cut off discovery on the date of the 9/11 attacks, ARB transparently seeks to shield from discovery the myriad post-9/11 investigations of ARB's pre-9/11 terrorist activities, most of which did not commence until 2003.  The evidence ARB's proposed temporal limitations aim to exclude from discovery is directly relevant to the

assessment of ARB's intent to foster al Qaeda's terrorism directed at the United States, and

Plaintiffs are thus entitled to conduct discovery as to those matters.

As set forth below, the 58 requests seek information as to ten main areas of inquiry that

bear directly on the who, what, where, when, why, and how issues specifically identified by the

Second Circuit as appropriate and necessary areas of discovery.  Therefore, ARB's objections

based on relevancy and scope should be rejected and the Court should order ARB to conduct full

and complete searches for the records and ESI requested by Plaintiffs.

### C.   The Remand Order Authorizes Jurisdictional Discovery on the Totality of Plaintiffs' Allegations Bearing on ARB's Intent

Plaintiffs' theories of jurisdiction as to ARB, which were the focus of the proceedings

before the Second Circuit in the appeal, rest on:  a) the effects test set forth in *Calder v. Jones*,

465 U.S. 783 (1984); and b) the common scheme test for conspiracy and aiding and abetting

endorsed in *Charles Schwab Corp v. Bank of America Corp.,* 883 F.3d 68 (2d Cir. 2018).  Under

the effects test, the exercise of personal jurisdiction is "constitutionally permissible if the

defendant aimed its conduct at the forum" even if defendant's conduct took place entirely outside

of the forum.  *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 173 (2d Cir. 2013) (citing

*Calder,* 465 U.S. at 789).  Under the common scheme test, the primary actor's tortious conduct

in the forum (here, the 9/11 attacks carried out by al Qaeda) is attributable to the co-conspirator

or the aider/abettor for personal jurisdictional purposes.  *See Schwab,* 883 F.3d at 87-88

(conspiracy liability).

In the appeal before the Second Circuit, Plaintiffs argued that ARB's intent to foster al

Qaeda terrorism directed at the United States, and status as a co-conspirator and aider and abettor

of al Qaeda, was borne out by the FAC's allegations showing "an usually close, substantial

nexus between ARB and al-Qaeda."  Case No. 18-1201-cv(L), ECF No. 127 at p. 18.  That

showing flows from a collective reading of the allegations that "ARB provided extensive financial support and services to al-Qaeda, its operatives, and the affiliated organizations," and those establishing that "ARB fully knew of its role in supporting al-Qaeda's anti-U.S. agenda." *Id.* Plaintiffs argued that the totality of ARB's myriad connections and supportive dealings with organizations and persons closely intertwined with al Qaeda, coupled with the specific allegations that ARB and its principals were specifically aware of ARB's role in the scheme to advance al Qaeda's terrorist agenda, differentiated the present case from those in which jurisdiction had been found lacking.

The Second Circuit plainly agreed. Its Remand Order authorized jurisdictional discovery based on the totality of the relationships and facts alleged in the FAC, which it correctly understood to bear directly on ARB's intent. Initially, the Remand Order states:

> In brief, Plaintiffs-Appellants principally allege that Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services to known extremist operatives. They further allege Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States.

*See* Remand Order, 779 F. App'x at 68.

Having thus framed the key claims and theories before it, the Second Circuit then held that "[c]onstruing all reasonable inferences in favor of" Plaintiffs, "the support alleged here" and allegations indicating ARB's "specific intent" to foster al Qaeda's targeting of the United States, differentiated the present case from those in which the allegations were found inadequate to establish jurisdiction. Remand Order, 779 F. App'x at 69. On that basis, the Second Circuit directed discovery to determine "what support" ARB provided and how ARB "was involved *in the process*" of providing that support. *Id.* (emphasis supplied).

Consistent with the Remand Order, Plaintiffs are entitled to explore the factual allegations that ARB and its principals provided extensive financial and operational support to al

8

Qaeda and its core support entities, with the knowledge and intent of advancing its terrorist objectives.  Plaintiffs' requests focus on those precise issues with great specificity; the requests properly and necessarily focus on the relationships and transactions that entwined ARB and al Qaeda and inform the required assessments of the support it provided and its intent.  And as shown below, all 58 requests and all 10 areas of inquiry seek records that are relevant to the issue of personal jurisdiction over ARB, because the information sought is probative as to whether ARB undertook tortious actions aimed at the United States (establishing personal jurisdiction under the effects test) or whether ARB entered into a conspiracy and/or aided and abetted al Qaeda (establishing personal jurisdiction under the common scheme test).

**D.    The 10 Areas of Inquiry are All Relevant to Whether ARB Undertook Tortious Acts Aimed at the United States and Conspired with and/or Aided and Abetted Al Qaeda**

1.    <u>The Da'wah Organization Requests (Request Nos. 1-8, 35)</u>

The Da'wah organization requests seek discovery concerning ARB's relationship with three notorious al Qaeda charity fronts, the IIRO, Al Haramain, and Muwafaq Foundation.[2]  As reflected by Plaintiffs' allegations, each of these entities was deeply intertwined with core al Qaeda on the one hand, and with ARB on the other, under circumstances indicating that ARB and its principals were acutely aware of their roles in fostering al Qaeda's terrorism against the United States.[3]  For example, Plaintiffs' allegations document U.S. government assessments that

---

[2] The FAC includes allegations concerning ARB's intertwined dealings with more than a dozen al Qaeda proxies and fronts, under circumstances indicating that ARB also was specifically aware of their terrorist nature and acted to advance their terrorist goals.  While the Second Circuit's Remand Order plainly authorized discovery as to all of those relationships, Plaintiffs limited their initial requests to the IIRO, Al Haramain, and Muwafaq to expedite the discovery process and because Plaintiffs assessed that fulsome discovery as to those relationships would be sufficient (with the other discovery Plaintiffs are seeking) to establish ARB's intent.  But fulsome discovery as to those relationships is essential to provide the context needed to show ARB's intent, particularly given the additional relevant relationships and transactions Plaintiffs have omitted from their requests in order to expedite discovery.

[3] Given these allegations, ARB's support for and partnerships with these organizations does in fact involve "direct support" for al Qaeda through financial and other services for "known extremists," and thus falls within ARB's own (erroneous) formulation of discovery.

Osama bin Laden used the entire IIRO to advance al Qaeda's terrorist agenda, FAC ¶ 176; and

U.S. designations of IIRO branches and a senior IIRO official in Saudi Arabia described as the

"million dollar man" based on his role in bankrolling al Qaeda and related terrorist groups.  *See*

Exh. A to FAC at ¶ 59.  The FAC further alleges ARB's extensive partnership with IIRO in

support of al Qaeda's terrorist agenda, through both the facilitation of IIRO's financial activities

and ARB's own contributions, and various facts confirming ARB's specific awareness of IIRO's

integration with al Qaeda, including through the direct involvement of ARB principals in senior

positions with IIRO itself.  FAC ¶¶ 175-182.

Plaintiffs' allegations as to Al Haramain similarly reflect the same type of intertwined

relationships and dealings that are of central import to the assessment of ARB's intent to foster al

Qaeda's terrorism.  Citing excerpts from U.S. intelligence reports, Plaintiffs allege that ARB

"maintained at least twenty-four (24) accounts and handled unusual transactions for the Al

Haramain Islamic Foundation, 'a charity that Treasury officials say has acted as a front for al

Qaeda in 13 countries.'"  FAC ¶ 158.  The FAC details al Haramain's pervasive ties to al Qaeda

and direct involvement in al Qaeda plots and attacks, resulting in the designations of all of Al

Haramain's global offices by the United States, *see* Exh. A to FAC at ¶¶ 129-154, and the U.S.

government's assessment that [w]hen viewed as a single entity, [al Haramain] is one of the

principal Islamic NGOs providing support for the al Qaida network and promoting militant

Islamic doctrine worldwide."  Exh. A to FAC at ¶ 140.  And Plaintiffs expressly allege that ARB

and its principals were expressly aware of Al Haramain's terrorist nature and role, FAC ¶ 174, as

indicated by ARB's handling of "unusual transactions" for ARB, FAC ¶ 158, and a range of

other factors.[4]

---

[4] Plaintiffs ongoing investigation has revealed that a senior ARB official named Abdullah al Misfer, who worked for one of ARB's principals, simultaneously served as an official of Al Haramain.  The evidence suggests that Misfer

ARB has refused to even search for any responsive records as to these critical relationships and dealings.  This refusal is at odds with the plain language of Remand Order, which expressly recognized that "Plaintiffs-Appellants principally allege that Al Rajhi Bank provided financial services and donations to charities that it knew financially supported al Qaeda" and that "Al Rajhi Bank's provision of financial services was done with the specific intent to further al Qaeda's terrorism against the United States." Remand Order, 779 F. App'x  at 68.  Thus, by mandating personal jurisdictional discovery, the Second Circuit necessarily authorized discovery into ARB's relationship with the very charitable organizations that the Amended Complaint alleges ARB partnered with to support al Qaeda, with the knowledge that those charities were fronts for, or working as proxies for, al Qaeda. Thus, this Court should require ARB to search for and provide the requested information.

### 2.   The Al Qaeda Operative Requests (Request Nos. 9-22, 33, 34)

The al Qaeda operative requests seek information regarding ARB's provision of banking services to certain specifically named persons and SDGTs, including Osama bin Laden, al Qaeda financiers, the 9/11 hijackers, and Omar Bayoumi and Fahad al Thumairy, who both provided direct support to the 9/11 hijackers.  In its responses, ARB refused to search for records relating to any of the operatives or SDGTs identified in Plaintiffs' requests except for three persons – Abdulaziz Mohamad al Omari, Mamdouh Mahmud Salim, and Abd al Hamid Sulaiman al Mujil – and further limited its agreement to search for only those records from October 8, 1999 until

---

was responsible for collections and transfers of donations to the special account opened by Al Haramain at ARB.  Telephone records produced by AT&T in response to a subpoena indicate that Omar al Bayoumi, who provided direct support to the 9/11 hijackers, placed several calls to ARB numbers associated with Misfer and Abdullah al Rajhi in January of 2001.  *See* Exhibits D and E to Tarbutton Declaration.  In addition to his role in supporting the 9/11 hijackers, Bayoumi and was implicated in efforts to help Al Haramain take control of a U.S. mosque.  *See* Part Four of the 2002 Report of the Congressional Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 (the "28 Pages"), Exhibit F to the Tarbutton Declaration, at pp. 435-36.

September 11, 2001.  ARB refused to search for records for the other named operatives on the grounds that the FAC does not specifically allege that those other named persons had accounts at ARB, a nonsensical argument given that ARB is uniquely situated to determine who had accounts at ARB.  ARB's argument on this point also ignores the FAC's specific allegation, citing U.S. intelligence reports, that al Qaeda directed its operatives to use the bank, FAC ¶ 162, as well as the many circumstances in which this Court has (appropriately) authorized discovery based on facts learned by Plaintiffs through discovery or through their independent investigations.  Particularly given the specific allegation that al Qaeda directed its operatives to use ARB, the FAC's failure to specifically allege that a particular al Qaeda operative had a specific account at ARB does not foreclose discovery on the issue, especially as to senior al Qaeda members and individuals directly involved in the 9/11 attacks.

### 3.   The U.S. Financial Requests (Request Nos. 23-25)

Request Nos. 23-25 seek ARB's financial dealings in the United States, and specifically what funds ARB transferred into the United States to al Qaeda support entities.  Production of the requested documents goes directly to the heart of the jurisdictional inquiry as to what extent ARB's own funding activities in support of al Qaeda were aimed at the United States.

### 4.   The Terror Financing Article Requests (Request Nos. 26-32)

The FAC extensively references an article published by the Wall Street Journal ("WSJ") in 2007 describing U.S. investigations of ARB and assessments of its terrorist activities, including a 2003 CIA report concerning ARB's connections with terrorism and terrorist financing.  FAC ¶¶ 156-163.  Request Nos. 26-32 ask for documents relating to the transactions and events described in several intelligence reports authored by the CIA and other U.S. agencies, which form the basis of the WSJ article.  Indeed, the activities detailed in the article encompass remarkable steps undertaken by ARB's principals to facilitate the bank's terrorist activities,

12

including measures undertaken after 9/11 to circumvent new counter-terrorism measures and protect their own assets from seizure.  Those issues go to the heart of the state of mind of the bank and its principals, as confirmed by the U.S. government's consideration of potential sanctions and covert interference with the bank's activities.

### 5.   The Golden Chain Requests (Request Nos. 36-38)

The FAC alleges that the Golden Chain document is a list of wealthy donors to Osama bin Laden and al Qaeda, FAC ¶ 131, and further alleges that Suleiman al Rajhi and the other individual listed on the Golden Chain not only supplied money to al Qaeda, but also considered their support as an investment in al Qaeda's terrorist activities, demanding the financial support be used to launch significant attacks.  FAC ¶¶ 132, 136-137.  Plaintiffs also allege that Suleiman al Rajhi had close connections to these other primary benefactors and facilitators of al Qaeda, including in certain cases through joint service on the IIRO Executive Council, giving rise (in combination with Plaintiffs' other allegations) to a plain inference that he was aware of their roles and intent to advance al Qaeda's terrorism and made ARB available to facilitate their support.  FAC ¶¶ 180-181. The financial support ARB delivered to al Qaeda from these patrons is directly relevant to the jurisdictional inquiry.

### 6.   The SAAR Network Requests (Request Nos. 39-41)

The FAC alleges an in depth relationship between ARB, the Al Rajhi family members that controlled ARB, and the SAAR Network, a U.S.-based network of purported charities that was dissolved in the wake of 9/11 because of its connection to terrorism and terrorist financing. FAC ¶¶ 185-186.  ARB's principals established, funded, and directed the SAAR Network to covertly channel support to al Qaeda and associated terrorist entities.  The SAAR Network records are probative as to ARB's aim to assist terrorism in the United States.

13

7.   The Saleh al Hussayen Requests (Request Nos. 42-44)

Saleh al Hussayen is a deceased ARB official who traveled to the United States and stayed in the same hotel as the Virginia based hijackers on the night before September 11, 2001. The Second Circuit previously authorized discovery as to Saleh al Hussayen, *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 678 (2d Cir. 2013) ("*O'Neill*"), but he died before that discovery could be obtained.  The Second Circuit emphasized Hussayen's travel and proximity to the September 11th attackers in connection with "Al-Hussayen's involvement with Al Rajhi Bank"— specifically, his "channel[ing of] contributions to purported charities that supported al Qaeda through his position as a member of the Sharia Board at Al Rajhi Bank."  *O'Neill,* 714 F.3d at 679 & n.14.  Hussayen's travel to meet the hijackers "cast his *activities at Al Rajhi Bank* and his alleged indirect funding of al-Qaeda [through his work on ARB's Sharia Board] in a different light."  *Id.* at 679 (emphasis added).  In particular, those meetings "raise[d] a plausible inference that [Al-Hussayen] may have intended his alleged indirect support of al-Qaeda to cause injury in the United States." *Id.*

Plaintiffs' entitlement to the discovery they seek from ARB as to Hussayen follows directly from the Second Circuit's conclusion that discovery was warranted as to Hussayen, based on his role as an agent of ARB.  And the fact that the Second Circuit found that Hussayen's activities at ARB in support of al Qaeda through the charities warranted discovery as the support for al Qaeda through those charities, makes all the more clear Plaintiffs' entitlement to discovery from ARB as to its role in fostering al Qaeda with those same charities.[5]

---

[5] Indeed, the Second Circuit's ruling that Hussayen's *indirect* support of al Qaeda could support and warranted discovery as to personal jurisdiction forecloses the formulation of discovery ARB now advances.

8. <u>The Terrorism Finance Investigation Requests (Request Nos. 45-54)</u>

Plaintiffs' requests seek information concerning terror finance investigations conducted by ARB, Saudi Arabia, and the United States after the September 11, 2001 attacks. The FAC details the U.S. government's post-9/11 attempts to investigate ARB's connections with al Qaeda. FAC ¶¶ 169-171. Post-9/11 investigation records concerning ARB's ties to terrorist organizations and proxies is directly relevant to any material support provided by ARB to al Qaeda and necessarily would have explored its intent to advance al Qaeda's terrorism.

9. <u>The Suleiman al Rajhi Departure Request (Request No. 55)</u>

The FAC alleges that Suleiman al Rajhi, ARB's Chairman, Managing Director, and largest shareholder, was forced to leave his leadership position at ARB and relinquish his control over the bank in light of compelling evidence that he deployed the bank's resources to support al Qaeda in the years leading up to the 9/11 attacks. FAC ¶ 168. The discovery Plaintiffs seek as to Suleiman al Rajhi's departure from ARB is thus highly relevant to ARB's intent, as well as the support it provided to al Qaeda and ARB's role in the process of providing that support.

10. <u>The ARB Financial Controls Requests (Request Nos. 56-58)</u>

ARB's financial control records are relevant to several critical issues. To the extent that Plaintiffs can show that banking transactions were facilitated by ARB in violation of ARB's own financial controls, or that ARB deviated from proper practices to allow illicit transactions to proceed, an inference arises that ARB facilitated those transaction with a nefarious intent. However, without ARB's documents concerning ARB's financial controls, it is impossible for Plaintiffs to assess those issues.

**E.    ARB Has Failed To Meet Its Burden As The Party Resisting Discovery**

Plaintiffs have satisfied their initial burden of establishing that the discovery that they are seeking is relevant to issues of personal jurisdiction over ARB in general, and the issues as to

which the Second Circuit directed discovery to proceed in particular.  Thus, the burden now shifts to ARB, as the party resisting discovery, to prove that discovery should not be had because the requested discovery is irrelevant, unduly burdensome or is subject to a privilege.  *In re Terrorist Attacks of September 11, 2001,* 2018 U.S. Dist. LEXIS 147908 at *266.

> 1.  <u>There is No Support for ARB's Objections that the Requested Discovery is Irrelevant and Beyond the Scope of the Jurisdictional Mandate</u>

ARB's primary relevancy objection, advanced as grounds for resisting virtually every one of Plaintiffs' requests, is based on its theory that "the only jurisdictional discovery authorized by the Second Circuit . . . is support directly to al Qaeda purportedly by 'providing financial services to known extremist operatives.'"  *See* <u>Exhibit B</u>, *passim*. This formulation is at direct odds with the plain language and context of the Remand Order, which rejected nearly identical arguments by ARB in the appeal, as well as other controlling decisions of the Second Circuit.

The Second Circuit's Remand Order contains no language limiting its rationale or the discovery it authorized pursuant to that reasoning to allegations of direct support to known extremists.  Instead, the Second Circuit expressly noted the gravamen of Plaintiffs' allegations, *supra* at p. 5, and authorized discovery as to any and all matters alleged in the FAC and relating to "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda."  779 F. App'x at 69.  The Second Circuit's specific reference in authorizing discovery to Plaintiffs' allegations that ARB provided "financial services and donations to charities that it knew financially supported al Qaeda," *id.*, and express endorsement of discovery to determine "how these defendants were involved in the *process* of providing support to al

Qaeda," *id.* (emphasis supplied), plainly foreclose ARB's absurd formulation of the scope of discovery.

To the extent ARB seeks to sustain its scope objection based on the Second Circuit's decisions declining to exercise jurisdiction over banking defendants in other ATA cases, on the basis of very different allegations, it plainly misapprehends those rulings and their application here.  At the outset, the Second Circuit has not held that direct support to the responsible terrorist organization is required or the only means to establish personal jurisdiction in an ATA case.  To the contrary, the Second Circuit's decisions at most indicate that claims based on indirect support and involving allegations that suggest no more than general awareness of the recipient's potential ties to terrorism establish only foreseeability of harm, and are insufficient to establish the intent required under a purposeful direction theory.  *In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71, 75 (2d Cir. 2008) ("*Terrorist Attacks III*").  In contrast, more robust allegations, such as those here showing expansive cooperative dealings with a range of notorious al Qaeda entities and facts indicating a specific knowledge by the bank and its principals of their role in advancing al Qaeda's terrorist activities, are sufficient to give rise to an inference of an intent to direct terrorist activities at the United States.  *See O'Neill,* 714 F.3d at 679 ("These additional allegations not only suggest the possibility that he may have provided direct aid to members of al-Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al-Qaeda to cause injury in the United States"); *id.* (his relationship to hijackers "cast his activities at Al Rajhi Bank and his alleged indirect funding of al-Qaeda in a different light").  And they are sufficient as well to establish a bank's status as a co-conspirator and aider and abettor of the terrorist organization, even if an intermediary is involved.

17

The Second Circuit recognized these very principles in finding the claims against ARB to be distinguishable from cases in which jurisdiction was found lacking, and its decisions in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), and *Kaplan v. Lebanese Canadian Bank SAL,* 2021 U.S. App. LEXIS 17105, 999 F.3d 842 (2d Cir. 2021), make them all the more clear.  In *Linde,* the Second Circuit explained the standards governing aiding and abetting liability under the ATA, pursuant to JASTA's amendments, and recognized that allegations satisfying the aiding and abetting standard (including through indirect support and financial services) can give rise to an inference of the defendant bank's own "intent to further [the organization's] terrorist activities."  *Linde,* 882 F.3d at 330.  And where that aiding and abetting involves an anti-American terrorist organization like al Qaeda, the nexus to U.S. harm is apparent.  *Waldman v. Palestine Liberation Organization,* 835 F.3d 317, 339-40 (2d Cir. 2016) (intentional support to organization "known to be targeting the United States" would establish link to U.S. harm).

The Second Circuit's decision in *Kaplan*, in turn, addresses the standards that must be applied in construing allegations of terrorist support in an ATA case and assessing a defendant bank's mental state, and expressly confirms that a defendant bank may aid and abet a terrorist organization, with an intent to foster that organization's terrorist agenda, through an intermediary.  *See Kaplan,* 2021 U.S. App. LEXIS 17105.  *Kaplan* instructs that the district court is required "to consider all of the complaint's allegations, rather than considering each in isolation, and to accept as true all permissible inferences that could be drawn from the complaint as a whole."  2021 U.S. App. LEXIS 17105 at *58.  The Second Circuit expressly recognized that "'[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind.'"

18

*Id.* at *36 ((quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)).  *Kaplan* further recognized that a bank may aid and abet a terrorist organization and assume a role in its terrorist activities by supporting known intermediaries.  *Id.* at *31-32.  These principles make clear that any assessment of ARB's mental state and intent to foster al Qaeda's targeting of the United States, and status as an aider and abettor and co-conspirator of al Qaeda, require that Plaintiffs be afforded discovery as to the full context, duration, and scope of ARB's support for al Qaeda, including its partnerships with known al Qaeda collaborators.

In sum, *Kaplan, Linde,* and *Waldman* confirm that a court must examine the totality of both the direct and indirect relationships and connections between a bank or a terrorist organization when assessing whether a bank had the requisite intent to support, conspire with or aid and abet a terrorist organization for the purpose of ATA liability.  Likewise, a court must examine the totality of the direct and indirect connections and relationships to determine if a bank supported, conspired with and/or aided and abetted a terrorist organization for the purpose of determining if said support, agreement and/or aid was provided with the intent to cause harm in the United States.  Therefore, despite ARB's objections to the contrary, discovery concerning indirect support is relevant to the whether this Court has personal jurisdiction over ARB.[6]

2.  <u>It is Immaterial that Jurisdictional Discovery May Overlap with Merits Discovery</u>

To the extent ARB predicates its scope objections on the view that this Court's reference to "limited jurisdictional discovery" means discovery that is limited in artificial respects that

---

[6] Beyond the fact that ARB's extraordinarily narrow formulation of the scope of discovery is manifestly incorrect, its application of its own test is incoherent and indicative of its attempt to reverse engineer the process.  For example, ARB has agreed to conduct limited searches for accounts held by Abd al Hamid Sulaiman al Mujil, presumably under the theory that Mujil has been designated and is therefore a "known extremist."  At the same time, however, ARB is refusing to conduct searches as to Al Haramain and IIRO, even though both have also been designated.  And even as to Mujil, ARB is refusing to search the IIRO accounts over which he had authority and through which he and others at IIRO channeled support to al Qaeda.

would deprive Plaintiffs of access to evidence necessary to assess ARB's mental state and intent, and status as an al Qaeda aider and abettor and co-conspirator, it is wrong.[7]   The Second Circuit authorized discovery as to Plaintiffs' theories of jurisdiction, arising under both *Calder* and *Schwab*.  Pursuant to F.R.C.P. 26, Plaintiffs are entitled to discovery as to matters relevant to those inquiries, and cannot be deprived of access to the very evidence that is required to make a showing as to ARB's intent and role as an aider and abettor and co-conspirator.  In cases where the jurisdictional inquiry is intertwined with the merits, as here, the scope of the matters relevant to jurisdiction may very well parallel those governing the merits of Plaintiffs' claims.  *See Diamond Servs. Mgmt. Co., LLC v. C&C Jewelry Mfg., Inc.*, 2021 U.S. Dist. LEXIS 112190, *8 (N.D. Ill. June 15, 2021) (ruling plaintiffs are entitled to jurisdictional discovery even were it "is significantly intertwined with merits discovery"); *Baker v. Wehinger*, 2019 U.S. Dist. LEXIS 215367, *24 (C.D. Cal. Mar. 20, 2019) (recognizing jurisdictional and merits discovery may overlap and compelling production of requests that constitute jurisdictional discovery and also reveal facts relevant to merits).

### F.   Plaintiffs' Discovery Requests Impose a Reasonable Time Frame for Jurisdictional Discovery

#### 1.   The Ten-Year Period Between January 1, 1992 and December 31, 2002 is a Reasonable and Relevant Time Frame for Pre-9/11 Conduct

Unless otherwise required by the context of the discovery request, Plaintiffs' discovery requests set the relevant time period for each request as January 1, 1998 through December 31, 2004.  This presumptive time period is more narrow than the timeframe previously set by the Court for discovery as to personal jurisdiction and merits discovery defendants.  In those contexts, this Court held that 1992 through 2004 is the appropriate presumptive timeframe for

---

[7] Plaintiffs note that the Remand Order refers to "jurisdictional discovery," and does not include the word "limited."

discovery.  In serving their discovery on ARB, Plaintiffs voluntarily set a more narrow time frame for most of the requests,[8] despite being entitled to discovery for a much more expansive time period, to expedite the discovery process.

ARB, however, resists even this time period.  Instead, for the 11 out of 58 requests that it agreed to conduct searches for responsive documents, ARB has limited or plans to limit its searches for documents from October 8, 1999 (the date the United States designated al Qaeda as a Foreign Terrorist Organization ("FTO")) to September 11, 2001 (the date on which Plaintiffs' alleged injuries occurred).  Such a narrow window is not supported by the Remand Order, is in direct conflict with prior decisions in this case, and plainly is designed to insulate damaging and relevant evidence from discovery altogether.

By order dated December 21, 2007, Judge Daniels determined that discovery in and after 1992 is relevant to the claims that defendants aided and abetted al Qaeda:

> Given the nature of the claims and defenses, the appropriate temporal scope of discovery should reasonably begin in 1992. 1992 is the year prior to the 1993 attacks against the United States, and the year when it is alleged that Osama bin Laden and other senior al Qaeda leadership issued a formal fatwah, specifically calling for jihad against the United States and other Western allies.

*See* ECF No. 2059.

Judge Daniels explicitly recognized that by 1993 it was evident that Osama bin Laden and his al Qaeda organization posed a threat to U.S. interests given al Qaeda's public fatwahs and its role in the U.S. Embassy bombings in Africa when he determined that the relevant starting point for discovery is 1992.  Judge Daniels' ruling recognized that supporters within al

---

[8] Plaintiffs have indicated alternate relevant time periods for certain specific requests, tailored to the particular facts and circumstances covered by those requests.  For instance, Plaintiffs' requests related to Muwafaq encompass earlier periods because Muwafaq merged into al Qaeda by 2001, and ARB's relationship with Muwafaq is particularly relevant to ARB's commitment to support al Qaeda from the inception of the organization.  This early commitment and the duration of its following support are directly relevant to ARB's intent.  In each case, there is a very particular rationale for the alternate period indicated.

Qaeda's circle would have been aware of its designs and objectives early on, and well before the general public was placed on notice.

Without explanation or justification, ARB's seizes on al Qaeda's FTO designation date of October 8, 1999 as the earliest date for relevancy.  Plaintiffs assume that ARB selected this date hoping to advance an argument that it could have not known of al Qaeda's terroristic goals and activities until the United States designated al Qaeda as an FTO.  Any such argument is meritless because by definition U.S. designations are retrospective – not predictive.  Every entity placed on the FTO list is designated for its past conduct, and witting supporters of terrorism invariably know about their roles in terrorist activity before such designations occur.  *Kaplan*, 2021 U.S. App. LEXIS 17105 *56.  Thus, both post- and pre-FTO designation transactions in support of an FTO are relevant, as this Court's prior rulings and entire approach to discovery in this MDL make clear.

Moreover, ARB's time period arguments are foreclosed by the Second Circuit's rulings remanding other personal jurisdiction defendants for discovery.  In particular, the Second Circuit in 2013 held that Plaintiffs' allegations that Abdullah Omar Naseef and Abdullah al Obaid fostered al Qaeda's targeting of the United States in their roles heading the Muslim World League were sufficient to establish Plaintiffs' entitlement to jurisdictional discovery.  *O'Neill*, 714 F.3d at 678-679.  Critically, Naseef headed the MWL from 1983 to 1993, and Obaid headed the organization from 1995 to 2000.  Given these rulings, it is especially clear that there is no merit to ARB's claim that the relevant timeframe for personal jurisdiction is limited to the period subsequent to al Qaeda's designation.

        2.    <u>Investigative Materials Generated after December 31, 2002 are Relevant</u>

For all records relating to investigations into ARB's ties to terrorism financing, Plaintiffs' requests seek documents generated between January 1, 1998 and December 31, 2004.  ARB

argues that the permissible window for relevancy as to the requested terror financing investigation is between September 11, 2001 and December 31, 2002.  ARB's proposed December 31, 2002 cut-off date is illogical[9] given the extensive allegations in the FAC establishing that investigations into ARB were principally conducted after December 2002.  For example, in the FAC, Plaintiffs refer to several reports and investigations conducted by the United States regarding the relationship between al Qaeda and ARB principals, which necessarily took place after the attacks themselves.  *See, e.g.,* FAC ¶¶ 165-175.  Plaintiffs are entitled to discovery to explore the allegations relating to, among other things, discussions and meetings between U.S. officials and officials from ARB and/or the Saudi government in 2003 and 2004, concerning problematic ARB accounts and transactions.  Discovery on these issues bears on the nature of ARB's support to al Qaeda, and its intent to further terrorism in the United States and is clearly within the scope of the Remand Order.

The Second Circuit's decision in *Kaplan* further highlights the disconnect between ARB's proposed temporal limitation and the applicable framework governing ATA liability.  Whereas *Kaplan* established that an examination of the full scope of the allegations is necessary to evaluate a claim for aiding and abetting under JASTA, ARB seeks to provide the Court with a small snapshot that would distort the Court's ability to assess the relationships and conduct giving rise to jurisdiction.  In addition, by recognizing that the provision of indirect support through an intermediary may support the imposition of aiding and abetting liability – and that support to a known operative is neither necessary or determinative – *Kaplan* undermines ARB's argument that the date that the United States designated al Qaeda as an FTO provides a

---

[9] Its proposed commencement date is illogical as well, given the likelihood of earlier investigations prompted by the bombings of the U.S. Embassies in Africa, in which several of ARB's partners were implicated, and other al Qaeda attacks.

reasonable boundary for discovery.  *Kaplan* also counsels against ARB's efforts to look to the attacks as the outer boundary for discovery, on the basis that the appropriate analysis under the ATA focuses on whether the defendant provided support to the foreign terrorist organization, without regard to the nexus between the support and the attack.

ARB's insistence on a December 2002 cut off, despite the extensive allegations in the FAC that investigations into ARB continued well past 2002, raises legitimate concerns that ARB is intentionally seeking to avoid producing the precise documents that will support the exercise of jurisdiction.  ARB provides no basis for why December 2002 should be the cut-off date and Plaintiffs respectfully request that ARB be compelled to produce responsive documents to their Terrorism Finance Investigation Requests (Request Nos. 45-54) for the time period from January 1, 1998 through December 31, 2004.

### 3.   ARB Has Not Met its Burden of Showing that Foreign Law Cannot Shield Itself from Discovery by Asserting Privileged Purportedly Held by Saudi Regulators

ARB objects to nearly all of Plaintiffs' discovery requests "to the extent that compliance would violate or cause another to violate any laws or regulations of any applicable jurisdiction, including any applicable rules, regulations, directives, circulars, instructions, or guidance promulgated by any relevant regulatory authorities."  Through the meet and confer process, ARB indicated that this objection principally concerned the position of Saudi regulators, and that ARB was not in a position to advise the extent to which Saudi law may prevent the production any particular document.  ARB has not moved for a protective order nor filed an affidavit delineating any foreign law that conflicts with its discovery obligations despite it being well settled that a party relying on foreign law as the basis for resisting discovery faces the burden "of demonstrating that such law *actually bars* the production or testimony at issue. . . ."  *Strauss v. Credit Lyonnais,* 242 F.R.D. 199, 207 (S.D.N.Y. 2007) (emphasis in original) (internal citations

omitted).  A party resisting discovery based on foreign banking laws must show that the foreign

laws actually bars the production of the requested information because "the Second Circuit has

clearly said that bank secrecy laws are not a bar to discovery orders." *In re Lloyds Banking Grp,*

*PLC,* 2021 U.S. Dist. Lexis 134046, *18 (S.D.N.Y. July 19, 2021) (internal citations omitted)).

The preferable method for raising foreign banking laws as a valid objection to the production of

documents is to support such an objection with sworn testimony or affidavits that set how and

why the production of documents would violate foreign law.  *Id.*

ARB's vague objections without citation to any specific Saudi law are insufficient to

satisfy its burden of proving an actual conflict of laws, the prerequisite for this Court to even

consider a comity analysis.

### 4.   ARB Has Failed To Meet its Burden of Establishing Undue Burden

ARB's boilerplate objections that include unsubstantiated claims of undue burden,

overbreadth, and lack of relevancy, accompanied by a lack of document production or

interrogatory responses, "are a paradigm of discovery abuse." *Harris v. Bronx Parent House*

*Network, Inc.,* 2020 U.S. Dist. LEXIS 26566, *5 (S.D.N.Y. Feb. 14, 2020) (internal citations

omitted).  To defeat a motion to compel, the resisting party producing documents must assert

more than conclusory reasons why the request is improper and must make a "specific showing

that the request would be overly burdensome." *Id.* at *12.

ARB has failed to make the specific showing as to each request required for it to meet its

burden of establishing undue burden.  Therefore, the Court should ignore ARB's conclusory

assertions and order ARB to search for and produce the requested documents.

## III.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

motion to compel directed to Defendant ARB.

Dated: July 30, 2021                         Respectfully submitted,

/s/  Sean P. Carter
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-2000

Attorneys for *Lloyd's Syndicate 2*
and *Muenchener* Plaintiffs


James L. Bernard, Esq.
Patrick N. Petrocelli, Esq.
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Attorneys for *Arrowood* Plaintiffs


Christopher R. LoPalo, Esq.
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, NY  11747
(212) 397-1000

Attorneys for *Augilar*, *Abarca*, *Abedhajajreh*,
*Addesso*, *Aiken*, *Hodges*, and *Abbate* Plaintiffs


Robert C. Sheps, Esq.
SHEPS LAW GROUP, P.C.
25 High Street
Huntington, NY 11743
(631) 249-5600
Attorneys for *Charter Oak* Plaintiffs

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the Memorandum of Law in Support of Plaintiffs'

Motion to Compel the Production of Documents From Defendant Al Rajhi Bank, was

electronically filed this 30th day of July.  Notice of this filing will be served upon all parties in 03

MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF")

system, which the following parties may access.

Matthew S. Leddicotte, Esq.
Reuben J. Sequeira, Esq.
White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005-3807
mleddicotte@whitecase.com
rsequeira@whitecase.com

J. Scott Tarbutton, Esq.

LEGAL\53567872\1

27