# *Honickman v. Blom Bank Sal*

United States Court of Appeals for the Second Circuit

December 10, 2020, Argued; July 29, 2021, Decided

Docket No. 20-575

**Reporter**

2021 U.S. App. LEXIS 22480 *

MICHAL HONICKMAN, INDIVIDUALLY AND FOR THE ESTATE OF HOWARD GOLDSTEIN, EUGENE GOLDSTEIN, LORRAINE GOLDSTEIN, RICHARD GOLDSTEIN, BARBARA GOLDSTEIN INGARDIA, MICHAEL GOLDSTEIN, CHANA FREEDMAN, DAVID GOLDSTEIN, MOSES STRAUSS, PHILIP STRAUSS, BLUMA STRAUSS, AHRON STRAUSS, ROISIE ENGELMAN, JOSEPH STRAUSS, TZVI WEISS, LEIB WEISS, INDIVIDUALLY AND FOR THE ESTATE OF MALKA WEISS, YITZCHAK WEISS, YERUCHAIM WEISS, ESTHER DEUTSCH, MATANYA NATHANSEN, INDIVIDUALLY AND FOR THE ESTATE OF TEHILLA NATHANSEN, CHANA NATHANSEN, INDIVIDUALLY AND FOR THE ESTATE OF TEHILLA NATHANSEN, YEHUDIT NATHANSEN, S.N., A MINOR, HEZEKIAL TOPOROWITCH, PEARL B. TOPOROWITCH, YEHUDA TOPOROWITCH, DAVID TOPOROWITCH, SHAINA CHAVA NADEL, BLUMY ROM, RIVKA POLLACK, RACHEL POTOLSKI, OVADIA TOPOROWITCH, TEHILLA GREINIMAN, YISRAEL TOPOROWITCH, YITZCHAK TOPOROWITCH, HARRY LEONARD BEER, INDIVIDUALLY AND AS THE EXECUTOR OF THE ESTATE OF ALAN BEER AND ANNA BEER, PHYLLIS MAISEL, ESTELLE CAROLL, SARRI ANNE SINGER, JUDITH SINGER, ERIC M. SINGER, ROBERT SINGER, JULIE AVERBACH, INDIVIDUALLY AND FOR THE ESTATE OF STEVEN AVERBACH, TAMIR AVERBACH, DEVIR AVERBACH, SEAN AVERBACH, ADAM AVERBACH, MAIDA AVERBACH, INDIVIDUALLY AND FOR THE ESTATE OF DAVID AVERBACH, MICHAEL AVERBACH, EILEEN SAPADIN, DANIEL ROZENSTEIN, JULIA ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN, ESTHER ROZENSTEIN, JACOB STEINMETZ, INDIVIDUALLY AND FOR THE ESTATE OF AMICHAI STEINMETZ, DEBORAH STEINMETZ, INDIVIDUALLY AND FOR THE ESTATE OF AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT MAYERSON, NETANEL STEINMETZ, ANN COULTER, FOR THE ESTATE OF ROBERT L. COULTER, SR., DIANNE COULTER MILLER, INDIVIDUALLY AND FOR THE ESTATE OF JANIS RUTH COULTER, ROBERT L. COULTER, JR., INDIVIDUALLY AND FOR THE ESTATE OF JANIS RUTH COULTER, LARRY CARTER, INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF DIANE LESLIE CARTER, SHAUN CHOFFEL, RICHARD BLUTSTEIN, INDIVIDUALLY AND FOR THE ESTATE OF BENJAMIN BLUTSTEIN, KATHERINE BAKER, INDIVIDUALLY AND FOR THE ESTATE OF BENJAMIN BLUSTEIN, REBEKAH BLUTSTEIN, NEVENKA GRITZ, INDIVIDUALLY AND FOR THE ESTATE OF DAVID GRITZ AND NORMAN GRITZ, JACQUELINE CHAMBERS, INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF ESTHER BABLAR, LEVANA COHEN, INDIVIDUALLY AS THE ADMINISTRATOR OF THE ESTATE OF ESTHER BABLAR, ELI COHEN, SARAH ELYAKIM, JOSEPH COHEN, GRETA GELLER, AS THE ADMINISTRATOR OF THE ESTATE OF HANNAH ROGEN, ILANA DORFMAN, AS

THE ADMINISTRATOR OF THE ESTATE OF HANNAH ROGEN, REPHAEL KITSIS, AS THE ADMINISTRATOR OF THE ESTATE OF HANNAH ROGEN, TOVA GUTTMAN, AS THE ADMINISTRATOR OF THE ESTATE OF HANNAH ROGEN, TEMINA SPETNER, JASON KIRSCHENBAUM, ISABELLE KIRSCHENBAUM, INDIVIDUALLY AND FOR THE ESTATE OF MARTIN KIRSCHENBAUM, JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT, DAVID KIRSCHENBAUM, DANIELLE TEITELBAUM, NETANEL MILLER, CHAYA MILLER, AHARON MILLER, SHANI MILLER, ADIYA MILLER, ALTEA STEINHERZ, JONATHAN STEINHERZ, TEMIMA STEINHERZ, JOSEPH GINZBERG, PETER STEINHERZ, LAUREL STEINHERZ, GILA ALUF, YITZHAK ZAHAVY, JULIE ZAHAVY, TZVEE ZAHAVY, BERNICE ZAHAVY, Plaintiffs-Appellants, v. BLOM BANK SAL, Defendant-Appellee.†

**Prior History:** Plaintiffs-Appellants sued BLOM Bank SAL ("BLOM Bank") for aiding and abetting Hamas, designated as a foreign terrorist organization by the United States, in carrying out attacks in which Plaintiffs-Appellants and their relatives were injured or killed. They allege BLOM Bank aided and abetted Hamas's attacks in violation of the *Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), by providing financial services to customers affiliated with Hamas. The district court granted BLOM Bank's motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)* ("Rule *12(b)(6)*"), concluding that Plaintiffs-Appellants did not plausibly allege BLOM Bank aided and abetted Hamas's attacks. Plaintiffs-Appellants argue that the district court misapplied the standard for JASTA aiding-and-abetting liability, and that their complaint suffices to survive a *Rule 12(b)(6)* [*1] dismissal. Although we agree that the court did not

apply the proper standard, Plaintiffs-Appellants' complaint nonetheless fails to state a claim. Accordingly, we AFFIRM the judgment of the district court.

**Counsel:** MICHAEL J. RADINE (Gary M. Osen, Ari Ungar, Aaron A. Schlanger, Dina Gielchinsky, on the brief), Osen LLC, Hackensack, NJ, for Plaintiffs-Appellants.

LINDA C. GOLDSTEIN (Michael H. McGinley, Ryan [*2] M. Moore, Selby P. Brown, Dechert LLP, Philadelphia, PA, on the brief), Dechert LLP, New York, NY, for Defendant-Appellee.

**Judges:** Before: POOLER, WESLEY, CARNEY, Circuit Judges.

**Opinion by:** WESLEY

## Opinion

WESLEY, *Circuit Judge*:

Plaintiffs-Appellants and their family members (collectively, "Plaintiffs")[1] were injured or killed in attacks carried out by Hamas, which the United States has designated as a foreign terrorist organization. They sued BLOM Bank SAL ("BLOM Bank") for aiding and abetting Hamas's attacks by providing financial services to customers affiliated with Hamas, in violation of the Anti-Terrorism Act ("ATA"), *18 U.S.C. § 2333*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), *id. § 2333(d)(2)*. The United States District Court for the Eastern District of New York (Matsumoto, *J.*) granted BLOM Bank's motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*, concluding that Plaintiffs failed to plausibly allege BLOM Bank aided and abetted Hamas's attacks in violation of JASTA. Plaintiffs argue on appeal that

---

† The Clerk of the Court is directed to amend the official caption as set forth above.

---

[1] As alleged, Plaintiffs brought this action on behalf of themselves and as representatives of the estates of their family members who died in the attacks.

the district court erred in dismissing their complaint because it applied the wrong standard for JASTA aiding-and-abetting liability. Although we agree that the court did not apply the proper standard, we affirm its judgment because Plaintiffs' complaint fails to state a claim **[*3]** under the correct standard.

## BACKGROUND

The United States government has designated Hamas[2] as a foreign terrorist organization ("FTO") since 1997.[3] Between December 1, 2001 and August 19, 2003, Hamas carried out a series of attacks, including shootings and bombings, in Israel and the Palestinian territories in which Plaintiffs were injured or killed. BLOM Bank is a Lebanese bank that operates internationally. Plaintiffs sued BLOM Bank for damages under the ATA for allegedly aiding and abetting Hamas's attacks by providing financial services to three customers affiliated with Hamas: the Sanabil Association for Relief and Development ("Sanabil"), Subul al-Khair, and the Union of Good (collectively, the "Three Customers").

## I. Plaintiffs' Complaint

As alleged, Hamas operates a "civilian infrastructure" called the "*da'wa*," which translates in Arabic to "the call to the believers to shelter beneath the faith" and provides "social welfare activities." J.A. 141, 141 n.6. One of the founders

of Hamas explained in an interview in 1998 that "[s]ocial work is carried out in support of [Hamas's aim to liberate Palestine from Israeli occupation], and it is considered to be part of the [Hamas] movement's **[*4]** strategy." *Id.* at 141. In the early 1990s, Hamas pursued a "three-pronged strategy" to strengthen its influence: (1) improving its military capacity, (2) "intensify[ing] its efforts to systematically gain control" of institutions important to the Palestinian public, and (3) "accelerat[ing] the development of its world-wide fundraising network." *Id.* at 143.

## A. The Three Customers: Sanabil, Subul al-Khair, and Union of Good

Hamas established Sanabil in 1994 "with the unofficial goal of competing with H[i]zbollah's [(a designated terrorist organization's)] social welfare infrastructure." *Id.* at 152. Sanabil was Hamas's "*da'wa* headquarters in Lebanon until late 2003." *Id.* at 154. It distributed funds it received from Hamas's fundraising network to Palestinian refugee camps in Lebanon "to build [Hamas's] support within that community." *Id.* at 154. Its board members were well-known leaders of Hamas in Lebanon. In August 2003, a Lebanese newspaper reported that pursuant to an order by a Hamas political leader, Sanabil had opened offices in all of the Palestinian refugee camps in Lebanon. "Sanabil regularly distributed small sums in cash from its accounts to hundreds (if not thousands) of individual **[*5]** dependents in the Palestinian refugee camps under the categories of 'Orphan Sponsorships,' 'Student Sponsorships,' 'Needy Sponsorships' and 'Family Sponsorships.'" *Id.* at 159. As a Lebanese publication reported in 2004, Sanabil "sponsored 1,200 Palestinian families and spent around $800,000 on orphans and $55,000 on needy patients." *Id.*

On August 22, 2003, the U.S. Department of the Treasury designated Sanabil as a Specially

---

[2] "'Hamas' is an acronym for the Arabic phrase 'Harakat al-Muqawama al-Islamiya,' sometimes translated as the 'Islamic Resistance Movement.' . . . In accordance with common usage, we refer to it here as 'Hamas.'" *Linde v. Arab Bank, PLC, 706 F.3d 92, 97 n.6 (2d Cir. 2013)* (internal citation omitted).

[3] The U.S. Secretary of State "is authorized to designate an organization as a foreign terrorist organization" if it "engages in terrorist activity" or "retains the capability and intent to engage in terrorist activity" and "the terrorist activity . . . threatens the security of United States nationals or the national security of the United States." *8 U.S.C. § 1189(a)(1)*.

Designated Global Terrorist ("SDGT"),[4] finding that it is "part of a web of charities raising funds on behalf of [Hamas] and using humanitarian[] purposes as a cover for acts that support [Hamas]." *Id.* at 147. The Treasury Department explained in a press release:

> [Hamas] recruits permanent members from the religious and the poor by extending charity to them from organizations such as Sanabil. . . . After starting by providing basic necessities the charity eventually began asking poor families within the camps to fill out application forms, particularly those who had worked with the Islamic Movement . . . and [Hamas].

*Id.* at 155. Sanabil was also "identified . . . as an unindicted co-conspirator" in the U.S. government's 2004 prosecution of the Holy Land Foundation **[*6]** ("HLF"), a charity designated as an SDGT, which transferred money to Sanabil. *Id.* at 159.

Subul al-Khair was founded in 1998 in Beirut, Lebanon, and "functioned much like Sanabil, but was more focused on [Hamas] supporters in the Beirut area." *Id.* at 161. It "regularly distributed small sums in cash from its accounts to individual[s] under the categories of 'Orphan Sponsorships' and 'Student Sponsorships.'" *Id.* Subul al-Khair was not designated as an SDGT; however, it was listed as an unindicted co-conspirator in HLF's criminal trial.

Union of Good was founded in 2000 "as the umbrella organization for [Hamas's] global fundraising activity." *Id.* at 162. It "originally began as a limited 101-day fundraising drive for emergency aid at the outset of what was later called

the Second Intifada."[5] *Id.* Because of its success, Union of Good became a permanent institution and "raise[d] tens of millions of dollars for [Hamas]." *Id.* The U.S. Department of the Treasury designated Union of Good as an SDGT in November 2008.[6] *Id.* at 163. The Treasury Department's press release noted:

> Union of Good acts as a broker for [Hamas] by facilitating financial transfers between a web of charitable organizations--including **[*7]** several organizations previously designated . . . for providing support to [Hamas]--and [Hamas]-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen [Hamas's] political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support [Hamas] members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of [Hamas]. . . . In addition to providing cover for [Hamas] financial transfers, some of the funds transferred by the Union of Good have compensated [Hamas] terrorists by providing payments to the families of suicide bombers."

*Id.* at 163. The chairman of Union of Good, Sheikh Yusuf al-Qaradawi, gave interviews in 2002 and later years commending Hamas's suicide attacks and martyrdom operations.

## B. BLOM Bank's Financial Services to the Three Customers

Each of the Three Customers held accounts at

---

[4] The "SDGT designation is distinct from the State Department's FTO designation." *Weiss v. Nat'l Westminster Bank PLC, 768 F.3d 202, 209 n.7 (2d Cir. 2014)*. The Treasury Department is authorized to designate groups and individuals who "pose a significant risk of committing[] acts of terrorism" or "are determined . . . to assist in, sponsor, or provide financial, material, or technological support for . . . acts of terrorism" as SDGTs under Executive Order 13224. *See* Exec. Order No. 13224, 3 C.F.R. § 13224 (2001).

[5] The "Second Intifada" was "a period [in the early 2000s] of intensified violence by Palestinian terrorist groups in the aftermath of failed peace negotiations between Israel and the Palestinian Authority." *See Linde v. Arab Bank, PLC, 882 F.3d 314, 319 (2d Cir. 2018)*.

[6] Israel also "designated" Union of Good in 2002 "in an order of the Minister of Defense of the State of Israel, based on its being 'part of the Hamas organization or supporting it and strengthening its infrastructure.'" J.A. 162. The complaint does not specify what designation Israel gave Union of Good.

BLOM Bank. Sanabil held its account at BLOM Bank "[d]uring the relevant period (1999-2003)." *Id.* at 156. Three organizations in Hamas's fundraising network transferred money to Sanabil's account at BLOM Bank. Specifically:

(1) HLF, a charity **[*8]** based in the U.S., "transferred over $2 million . . . through BLOM [Bank's] correspondent bank accounts in New York to Sanabil's bank account(s) at BLOM [Bank] in Lebanon." *Id.* The last payment from HLF to Sanabil was on September 7, 2001. The U.S. Department of the Treasury designated HLF as an SDGT on December 4, 2001; the complaint does not allege BLOM Bank processed any payments from HLF to Sanabil after HLF's designation.

(2) KindHearts, a charity based in the U.S. which "succeeded to HLF's fundraising for [Hamas] after HLF was designated," "sent an additional $250,000 to Sanabil's accounts between July 2002 and July 2003." *Id.* at 158. BLOM Bank processed these transfers to Sanabil's account. The complaint does not allege KindHearts was designated as an SDGT.

(3) The Al-Aqsa Foundation ("Al-Aqsa"), a charity based in Germany, "transferred at least $50,000 into Sanabil's accounts at . . . BLOM [Bank] between April — May 2003." *Id.* at 158-59 (emphasis omitted). Al-Aqsa was designated as an SDGT on May 29, 2003; BLOM Bank processed one transfer from Al-Aqsa to Sanabil the day after Al-Aqsa's designation. The complaint does not allege BLOM Bank processed any later transfers from Al-Aqsa **[*9]** to Sanabil.

In an invoice attached as an exhibit to the complaint, the stated purpose of the payment from Al-Aqsa to Sanabil's account at BLOM Bank was "help concerning orphan children." *Id.* at 177-78.

Subul al-Khair also maintained an account at BLOM Bank and BLOM Bank "deposited multiple transfers sent by HLF to Subul al-Khair." *Id.* at 161. "HLF sent Subul al-Khair over $500,000 between 1999 and 2001," but the complaint does not specify whether BLOM Bank processed that entire amount or some portion of it. *Id.* The complaint does not provide dates or further information regarding the financial services BLOM Bank provided for Subul al-Khair.

Union of Good held an account with BLOM Bank. The complaint does not identify any dates for this account; nor does it note the transactions, if any, BLOM Bank processed for Union of Good.

## II. Applicable Law

The ATA authorizes U.S. nationals "injured in his or her person, property, or business by reason of an act of international terrorism" to sue for treble damages as well as attorney's fees and costs.[7] *18 U.S.C. § 2333(a)*. "[I]nternational terrorism" encompasses "activities that—(A) involve violent acts or acts dangerous to human life that . . . would be a criminal violation **[*10]** if committed within the jurisdiction of the United States or of any State," "(B) appear to be intended—to (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," and "(C) occur primarily outside the territorial jurisdiction of the United States." *Id. § 2331(1)(A)- (C)*.

The ATA did not expressly permit relief against parties who aided the primary perpetrator of the act of international terrorism. JASTA, Pub. L. No. 114-222, 130 Stat. 852 (2016), amended the ATA to create a cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism."[8]

---

[7] Before the enactment of JASTA in 2016, the ATA did not specify which parties could be sued. See *18 U.S.C. § 2333(a)*.

[8] The term "person" includes corporations. *See 18 U.S.C. §*

2021 U.S. App. LEXIS 22480, *10

*18 U.S.C. § 2333(d)(2)*. JASTA applies to "any civil action . . . pending on, or commenced on or after, the date of [its] enactment . . . and . . . arising out of an injury to a person, property, or business on or after September 11, 2001." 130 Stat. at 855. Congress was clear that its purpose in enacting JASTA was to:

[P]rovide civil litigants with the *broadest possible basis*, consistent with the Constitution of the United States, to seek relief against **[*11]** persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.

*Id.* at 853 (emphases added). Congress also specifically endorsed the reasoning of the D.C. Circuit in *Halberstam v. Welch, 705 F.2d 472, 227 U.S. App. D.C. 167 (D.C. Cir. 1983)* in conducting the aiding-and-abetting analysis. *Id.* at 852. "*Halberstam* . . . provides the proper legal framework for how [aiding and abetting] liability [under the ATA] should function." *Id.* (emphasis added).

Under *Halberstam*, there are three elements for aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury" (the "aiding party who causes injury" element); "(2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element); "(3) the defendant must *knowingly and substantially assist* the principal violation" (the "substantial assistance" element). *705 F.2d at 477* (emphases added).

### III. The District Court's Decision

The district court granted BLOM Bank's motion to

dismiss for **[*12]** failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)* ("*Rule 12(b)(6)*"), concluding that Plaintiffs' complaint did not plausibly allege that BLOM Bank aided and abetted Hamas's attacks. *See Honickman for Est. of Goldstein v. BLOM Bank SAL, 432 F. Supp. 3d 253, 271 (E.D.N.Y. 2020)*. In the court's view, Plaintiffs failed to allege the latter two elements of JASTA aiding-and-abetting liability: "(1) that [BLOM Bank] was generally aware of its role as part of an overall illegal or tortious activity at the time that it provided the assistance, and (2) that [BLOM Bank] knowingly and substantially assisted the principal violation." *Id. at 263* (alterations in original, internal quotation marks, and citation omitted).

As to general awareness, the court first found "Plaintiffs' complaint does not plausibly allege that BLOM [Bank] was generally aware of any connection between the Three Customers and Hamas." *Id. at 265*. It then concluded that "even if Plaintiffs' allegations plausibly alleged that BLOM [Bank] knew the Three Customers were related to Hamas, '[e]vidence that [BLOM Bank] knowingly provided banking services to [Hamas], without more, is insufficient to satisfy JASTA's scienter requirement.' . . . Plaintiffs have not plausibly alleged that BLOM [Bank] knew that by providing financial services to the Three Customers, it **[*13]** was playing a role in Hamas's violent activities." *Id. at 265-66* (second alteration in original) (citation omitted). Regarding substantial assistance, the court analyzed the six factors identified in *Halberstam*, discussed below, and ruled that "[t]he complaint fails to establish that BLOM[] [Bank's] provision of financial services to the Three Customers amounted to providing 'substantial assistance' to Hamas." *Id. at 268*.

Plaintiffs argue on appeal that: (1) the district court applied the wrong legal standard in evaluating the sufficiency of their complaint; and (2) their complaint plausibly alleges that BLOM Bank was generally aware of its role in Hamas's illegal activities and that BLOM Bank knowingly

provided substantial assistance to Hamas.

## DISCUSSION

"We review *de novo* a district court's dismissal of a complaint under *Rule 12(b)(6)*, accepting all of the complaint's [non-conclusory] factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." *Giunta v. Dingman, 893 F.3d 73, 78-79 (2d Cir. 2018)*. It is well established that:

[t]o survive a [*Rule 12(b)(6)*] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff **[*14]** pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (internal quotation marks and citations omitted).

## I. The Standard for JASTA Aiding-and-Abetting Liability

### The "Aiding Party Who Causes Injury" Element

The first element, that "the party whom the defendant aids must perform a wrongful act that causes an injury," *Halberstam, 705 F.2d at 477*, is straightforward. It is satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act. BLOM Bank argues that

Plaintiffs' complaint falls short because "the only parties whom BLOM [Bank] allegedly 'aided' are the [Three] Customers," and "JASTA limits aiding-and-abetting liability to those circumstances in which a defendant actually 'aided and abetted . . . the person who committed' the relevant 'act of international terrorism.'" **[*15]** Appellee's Br. at 63 (emphasis omitted) (quoting *18 U.S.C. § 2333(d)(2)*). We recently rejected the same contention in *Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842 (2d Cir. 2021)*, holding that "[t]he language and purpose of JASTA are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal" who committed the wrongful act "even where [the defendant's] relevant substantial assistance was given to an intermediary" of the principal. *Id. at 856*.

## B. The "General Awareness" Element

The second ("general awareness") and third ("substantial assistance") elements form the crux of most JASTA aiding-and-abetting cases. The "general awareness" element requires the defendant to be "generally aware" of its role in "an *overall illegal or tortious activity* at the time that [it] provides the assistance." *See Halberstam, 705 F.2d at 477* (emphasis added). The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable. See id. at 477, 488*.

*Halberstam* establishes this foreseeability principle. There, the D.C. Circuit held that Linda Hamilton was civilly liable for aiding and abetting the murder of Michael **[*16]** Halberstam during a burglary of his home by Bernard Welch, Hamilton's partner, even though she was unaware of Welch's plan to burglarize or kill Halberstam. *See id. at 474, 488*. Over the five years Hamilton and Welch lived together, Welch acquired significant wealth by

selling stolen goods that he obtained through burglaries. *Id. at 475*. Although Hamilton was never present during Welch's burglaries and claimed she was unaware that they were occurring, she performed the "secretarial work" for Welch's illegal enterprise, such as typing transmittal letters for sales of the stolen goods and keeping inventories of the stolen goods that were sold. *Id.*

The court concluded that the "sudden influx of great wealth" Hamilton and Welch experienced, "the filtering of all transactions through Hamilton *except* payouts for [the] goods" sold, and "Hamilton's collusive and unsubstantiated treatment of income and deductions on her tax forms . . . combine[d] to make the district court's inference that [Hamilton] knew [Welch] was engaged in illegal activities acceptable, to say the least." *Id. at 486*. Indeed, given the facts, "it [would] def[y] credulity that Hamilton did not know that something illegal was afoot." *Id.*

Hamilton's "general [*17] awareness of her role in [Welch's] continuing criminal enterprise," *id. at 488*, sufficed to establish her liability for aiding and abetting Halberstam's murder because the murder was a *foreseeable consequence* of Welch's illegal activity. As the court explained:

> [U]nder an aiding-abetting theory, [the murder] was a *natural and foreseeable consequence* of the activity Hamilton helped Welch to undertake. It was *not necessary that Hamilton knew specifically that Welch was committing burglaries*. Rather, when she assisted him, *it was enough that she knew he was involved in some type of personal property crime at night*—whether as a fence, burglar, or armed robber made no difference—*because violence and killing is a foreseeable risk in any of these enterprises*.

*Id.* (emphases added).[9] Foreseeability is thus central

to the *Halberstam* framework, and as a result, to JASTA aiding-and-abetting liability.[10]

The district court, however, rejected the foreseeability principle, holding that "it is not enough for Plaintiffs to plausibl[y] allege that BLOM [Bank] was generally aware of [its] role in terrorist activities, from which terrorist attacks were a natural and foreseeable [*18] consequence." *Honickman, 432 F. Supp. 3d at 264* (first and third alterations in original) (emphasis, internal quotation marks, and citation omitted). The court's conclusion contravenes both *Halberstam* and *Linde v. Arab Bank, PLC, 882 F.3d 314 (2d Cir. 2018)*, one of the first cases in which we interpreted aiding-and-abetting liability under JASTA.[11]

*Linde* was brought *before* JASTA was enacted. The plaintiffs alleged that a defendant bank was liable as a principal under the ATA for committing an act of terrorism by "knowingly providing" material support to an FTO in the form of "financial services." *Linde, 882 F.3d at 318*. At trial, the district court instructed the jury that the "provision of material support to [an FTO in violation of a distinct statute, *18 U.S.C. § 2339B*] . . . necessarily proved the bank's commission of an act of international terrorism" under the ATA. *Id. at 325*.

---

at night looking for soft drinks in the kitchen. *See Halberstam, 705 F.2d at 482*. Two of them failed to extinguish the torches they used to light their way to the attic, causing the church to catch on fire. *See id.* The defendant, one of the teenagers, did not know about the torches, did not enter the attic, and was not near the church when it caught on fire. *See id.* Still, he was found liable for damages caused by the fire because as part of the attempt to reach the church attic, "the need for adequate lighting could reasonably be anticipated," making the use of torches and subsequent fire foreseeable. *See id. at 483* (citation omitted).

[10] *Halberstam* did not specifically attach foreseeability to the general awareness or substantial assistance elements; it used foreseeability broadly for establishing the extent of liability under an aiding-and-abetting theory. *See 705 F.2d at 482-83*. As a result, it is more important that courts do not skip foreseeability altogether rather than apply it at a precise stage of the JASTA aiding-and-abetting analysis.

[11] We acknowledge that the district court's decision came before our opinion in *Kaplan* clarified the import of our earlier JASTA aiding-and-abetting precedents which may have generated some ambiguity as to the proper standard.

---

[9] The *Halberstam* court extracted the foreseeability principle from *American Family Mutual Insurance Co. v. Grim, 201 Kan. 340, 440 P.2d 621 (1968)*, in which a group of teenagers broke into a church

2021 U.S. App. LEXIS 22480, *18

We held that this instruction was erroneous because providing material support to an FTO does not qualify under the definition of "an act of international terrorism." *Id. at 326*. However, the plaintiffs argued on appeal that the availability of aiding-and-abetting liability under JASTA, enacted between the time of trial and the appeal,[12] made the error in the jury instruction harmless. *Id. at 328*. *Linde* rejected their argument, determining that:

> aiding and **[*19]** abetting an act of international terrorism *requires more than the provision of material support to a designated terrorist organization*. Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities. *Halberstam[], 705 F.2d at 477*. Such awareness may not require proof of the specific intent demanded for criminal aiding and abetting culpability . . . . Nor does awareness require proof that Arab Bank [(the defendant)] knew of the specific attacks at issue when it provided financial services for Hamas. What the jury did have to find was that, in providing such services, the bank was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities. *Halberstam[], 705 F.2d at 477*. *This is different from the mens rea required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities. See Holder v. Humanitarian Law Project, 561 U.S. 1, 16-17, 130 S. Ct. 2705, 177 L. Ed. 2d 355 . . . (2010)*.

*Linde, 882 F.3d at 329-30* (some emphases omitted and others added) (footnotes and internal citation omitted).

_____

[12] We agreed that the plaintiffs were entitled to invoke JASTA on appeal because the act applies retroactively. *See Linde, 882 F.3d at 328*.

Here, the district court misread this passage from *Linde* to conclude that applying **[*20]** the *Halberstam* foreseeability standard to the "general awareness" element *Linde* by "replac[ing] the scienter for aiding-and-abetting liability with the lower scienter required for [criminal] material support." *Honickman, 432 F. Supp. 3d at 264*. The court erred in equating the foreseeability standard and the scienter required for criminal material support; the two are distinct. In doing so, the court also implicitly perceived *Linde* as requiring *more* than the *Halberstam* standard for general awareness, which we rejected in *Kaplan*.

"[N]othing in *Linde* repudiates the *Halberstam* standard that a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Kaplan, 999 F.3d at 860*. Nor could it, of course, given Congress's unambiguous assignment of *Halberstam* as the appropriate legal framework for JASTA aiding-and-abetting liability. *Linde's* holding that aiding-and-abetting "requires more than the provision of material support to a terrorist organization," *882 F.3d at 329*, means only that allegations that a defendant "knowingly provid[ed] material support to an FTO, *without more*, does not *as a matter* **[*21]** *of law* satisfy the general awareness element." *Kaplan, 999 F.3d at 860* (emphasis added). That language "does not establish that [a defendant's provision of] material support to an FTO is *never* sufficient for [JASTA] aiding-and-abetting liability." *Id.* (emphasis added). Instead, "[w]hether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry" depending on allegations that a defendant "was generally aware . . . that it was playing a role in unlawful activities from which [terrorist] attacks were *foreseeable*." *Id. at 860-61* (emphasis added).

On the other hand, we reject Plaintiffs' attempt to equate the *Halberstam* foreseeability standard with the "fungibility" theory in *Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S. Ct. 2705, 177 L.*

*Ed. 2d 355 (2010)*. *Linde* recognized that general awareness "is different from the *mens rea* required to establish material support in violation of *18 U.S.C. § 2339B*, which requires only knowledge of the organization's connection to terrorism . . . . *See Holder[,] 561 U.S. [at] 16-17*." *Linde, 882 F.3d at 329-30*. In *Holder*, a criminal material support case under *§ 2339B*, the plaintiffs[13] knowingly provided material support to FTOs but claimed they were "seek[ing] to facilitate only the lawful, nonviolent purposes of those groups." *561 U.S. at 7-8*. The Supreme Court determined that for the purpose of *§ 2339B*, it did not [*22] matter that the "[m]aterial support [was] meant to promote peaceable, lawful conduct" because "[m]oney is fungible" and "there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Id. at 30-31* (internal quotation marks and citations omitted).

Plaintiffs urge us to adopt *Holder*'s "fungibility" rationale in assessing the sufficiency of their complaint. They contend that *Linde* merely recognized that the *mens rea* for aiding and abetting is "different" from criminal material support, not that it is "higher." Appellants' Br. at 44. However, *Linde* determined that the facts in *Holder*--adequate for criminal material support--fall short for the general awareness element of JASTA aiding and abetting. *882 F.3d at 329-30*. Indeed, *Linde* could not have been clearer: aiding and abetting "requires more than the provision of material support to a designated terrorist organization," *882 F.3d at 329*. Plaintiffs' fungibility argument would displace the aiding-and-abetting standard with the standard for criminal material support by making "knowingly providing material [*23] support to an FTO, without more" sufficient "as a matter of law" for the general awareness element. *See Kaplan, 999*

*F.3d at 860*. Not only would this erase *Linde*'s distinction between general awareness and criminal material support, but it would also evade *Halberstam*'s foreseeability standard.[14]

Accordingly, the relevant inquiry for the general awareness element is: did Plaintiffs "plausibly allege[] the [Three] Customers were so closely intertwined with [Hamas's] violent terrorist activities that one can reasonably infer that [BLOM Bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [Hamas's] attacks were foreseeable[?]"[15] *Kaplan, 999 F.3d at 860-61*.

## C. The "Substantial Assistance" Element

The last element for aiding-and-abetting liability requires that the defendant "knowingly and substantially assist[ed] the principal violation." *Halberstam, 705 F.2d at 477*. As the analysis in *Halberstam* reveals, the "principal violation" must be foreseeable from the illegal activity that the defendant assisted; knowing and substantial assistance to the actual injury-causing act--here, Hamas's attacks--is unnecessary. *See id. at 488*.

The district court appeared to impose [*24] a higher standard on the "*knowing*" prong of

---

[13] The plaintiffs were U.S. organizations and citizens who challenged the constitutionality of the criminal material support statute (*18 U.S.C. § 2339B*) and sought an injunction to prohibit its enforcement. *See Holder, 561 U.S. at 10-11*.

---

[14] Plaintiffs rely on *Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685 (7th Cir. 2008)*, a pre-JASTA case in which the Seventh Circuit held that the causation element of primary liability under the ATA, *18 U.S.C. § 2333(a)*, is satisfied when the defendant knowingly donated money to a terrorist organization because "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." *549 F.3d at 698*. *Boim* is inapposite. It was decided before Congress assigned *Halberstam* as the appropriate framework for JASTA aiding-and-abetting liability claims and therefore lacks the requisite analysis. Moreover, any persuasive value it might have is insufficient to overcome the binding effects of *Linde* and *Kaplan* on us.

[15] Contrary to BLOM Bank's argument, the Three Customers do not themselves need to be "engaged in . . . violent or terrorist acts." *See* Appellee's Br. at 32-34.

"knowingly and substantially" assisted than required, concluding that "Plaintiffs' complaint fails plausibly to allege that any assistance BLOM [Bank] provided--even if substantial--would have been knowing." *Honickman, 432 F. Supp. 3d at 268*. The "knowledge component" is satisfied "[i]f the defendant knowingly--and not innocently or inadvertently--gave assistance."[16] *Kaplan, 999 F.3d at 864*. For instance, *Halberstam* held that "the district court . . . justifiably inferred that Hamilton assisted Welch with knowledge that he had engaged in illegal acquisition of goods." *705 F.2d at 488*. It did not require Hamilton to "know" anything more about Welch's unlawful activities than what she knew for the general awareness element.

How much aid qualifies as substantial assistance? *Halberstam* identified six factors:

> (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Linde, 882 F.3d at 329* (citing *Halberstam, 705 F.2d at 484-85*). No factor is dispositive; the weight accorded to each is determined on a case-by-case basis. *See Halberstam, 705 F.2d at 483*; *see also Kaplan, 999 F.3d at 856*.

The [*25] district court misunderstood the first factor, "the nature of the act encouraged," to be a question of whether Plaintiffs plausibly alleged "that BLOM [Bank] knowingly encouraged Hamas'[s] violent activities, such as those which caused Plaintiffs' injuries." *Honickman, 432 F. Supp. 3d at 268*. However, the "nature of the act involved dictates what aid might matter."[17] *See Halberstam, 705 F.2d at 484* (emphasis omitted). As a result, the factor requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the Three Customers) would be important to the nature of the injury-causing act (Hamas's terrorist attacks).

For the second factor, the "amount of assistance," the district court held "Plaintiffs make no non-conclusory assertions that any of the funds processed by the Three Customers actually went to Hamas, or that BLOM [Bank], at the time it provided banking services to the Three Customers, was aware or intended that Hamas would receive the corresponding funds." *Honickman, 432 F. Supp. 3d at 268*. However, Plaintiffs did not need to allege the funds "actually went to Hamas." Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice. [*26] *See Kaplan, 999 F.3d at 866*. In other words, if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided. *See Halberstam, 705 F.2d at 488*.

Lastly, the fourth factor, the "defendant's relation to the principal," is useful for determining the defendant's capacity to assist. *See id. at 484*. The district court erroneously construed this Court's finding in *Siegel v. HSBC N. Am. Holdings, Inc., 933 F.3d 217 (2d Cir. 2019)*, that "the plaintiffs d[id] not plead any non-conclusory allegations that [the defendant-bank] had any relationship with [the FTO]" to mean that Plaintiffs must plead a direct relationship between BLOM Bank and Hamas. *Id. at 225*; *see Honickman, 432 F. Supp. 3d at 269*. In

---

[16] BLOM Bank argues in its post-argument letter brief that under *Kaplan*, "where a complaint alleges that the assistance was indirect, it must allege (among other things) that the defendant had 'actual knowledge' of the intermediary's connection to the FTO." Appellees' Letter Br. at 14. *Kaplan* did not so hold; instead, it asserted "the actual knowledge component of the *Halberstam* standard requires that the defendant 'know[ ]' that it is providing 'assistance,' . . . whether directly to the FTO or indirectly through an intermediary." *999 F.3d at 863-64* (alteration in original) (citation omitted).

[17] For example, verbal encouragement of "physical acts of violence" may be important to a principal's commission of battery. *See Halberstam, 705 F.2d at 484*.

*Siegel*, the defendant-bank's "relation to the principal" was several steps removed: it allegedly had a commercial relationship with *another bank* that was linked to *various terrorist organizations* including the FTO that caused the plaintiffs' injuries. *See 933 F.3d at 220-21*. Although the relationship between the defendant and the FTO should not be so attenuated as in *Siegel*, a direct relationship between the defendant and the FTO is not required to satisfy this factor.

## II. The Sufficiency of Plaintiffs' Complaint

For Plaintiffs' JASTA **[*27]** aiding-and-abetting claim to be viable, the complaint must plausibly allege all three elements of the *Halberstam* standard for aiding-and-abetting liability.

The first element, that the party whom the defendant aided performed the injury-causing act, merits little attention. Plaintiffs plausibly allege that the party whom BLOM Bank aided (indirectly), Hamas, committed attacks causing Plaintiffs' injuries. For the second element, general awareness, the complaint must plausibly allege: (1) as a threshold requirement, that BLOM Bank was aware of the Three Customers' connections with Hamas before the relevant attacks; and (2) the Three Customers were so closely intertwined with Hamas's violent terrorist activities that one can reasonably infer BLOM Bank was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to the Three Customers. *See Kaplan, 999 F.3d at 860*. For the final element of substantial assistance, the complaint must contain sufficient factual allegations relating to the six factors identified above.

We conclude that Plaintiffs' aiding-and-abetting claim fails because the allegations do not support an inference that BLOM **[*28]** Bank was aware of the Three Customers' ties with Hamas prior to the relevant attacks, thereby undermining the second element of general awareness. In assessing this element, the district court found that the complaint's references to media articles and publications on the Three Customers' connection to Hamas were insufficient because "Plaintiffs fail[ed] plausibly to allege that BLOM [Bank] . . . actually knew or should have known of any of the cited sources." *Honickman, 432 F. Supp. 3d at 265*. However, as we explained in *Kaplan*, Plaintiffs did not need to allege that BLOM Bank knew or should have known of the public sources at the pleading stage. *See 999 F.3d at 865*. Such a requirement at this juncture would be too exacting.

Nevertheless, the public sources cited in the complaint do not plausibly support an inference that BLOM Bank had the requisite general awareness at the time that it provided banking services to the Three Customers. *See Halberstam, 705 F.2d at 477* ("[T]he defendant must be generally aware of [its] role . . . *at the time that [it] provides the assistance*.") (emphasis added). One of the news articles on Sanabil referenced in the complaint was dated August 27, 2004, more than a year after the last relevant attack, and reported only that Sanabil **[*29]** sponsored Palestinian families and spent money on orphans. The Lebanese press's coverage of Sanabil's center in Sidon closing due to "its links to [Hamas]" is undated. J.A. 159. The complaint lacks any allegations that at the time of the interviews in which al-Qaradawi--who chaired Union of Good--praised martyrdom and criticized the United States' designation of Hamas, it was public knowledge that al-Qaradawi chaired Union of Good.[18] Indeed, the Treasury Department's press release, announcing the designation of Sanabil and similar organizations as SDGTs only after the final attack at issue, describes these organizations as

---

[18] Plaintiffs argue that "the publicly available evidence [in the complaint] was largely available before or during the relevant period or discussed facts that were previously knowable." Appellants' Br. at 39, n.11. However, "publicly available" evidence is not the same as public sources such as media articles. The latter, depending on their substance, plausibly suggest a defendant's knowledge which can be confirmed during discovery, whereas the former requires the implausible inference that the defendant was aware of those facts even before the news media.

using "humanitarian[] . . . purposes *as a cover* for acts that support [Hamas]," which the Treasury Department unveiled only after developing "credible evidence" in an investigation. J.A. 147 (emphasis added). That organizations like the Three Customers maintained a "cover" in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood these organizations' true nature and activities from the public record at the time.

The limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*. See *999 F.3d at 864*. The **[\*30]** *Kaplan* complaint alleged Hizbollah made public statements identifying the defendant-bank's customers as "integral parts of Hizbollah" prior to the relevant attacks which were "specific as to the status of the speaker," "the circumstances in which the statements were made," and "the other specific media in which they were made," including Hizbollah's own websites. *Id.*

Plaintiffs' remaining allegations also fail to suggest BLOM Bank was aware of the connections between the Three Customers and Hamas.[19] The complaint alleges certain leaders of Hamas were board members of the Three Customers but does not aver that this was public knowledge during the relevant period. Sanabil and Subul al-Khair were identified as unindicted co-conspirators in HLF's criminal trial and/or prosecution, but HLF was not indicted until 2004, after the relevant period. Sanabil and Union of Good were not designated as SDGTs until after the last relevant attack, and BLOM Bank did not transfer any funds from non-

customer charities after they were designated as SDGTs except for one transfer from Al-Aqsa to Sanabil the day after Al-Aqsa's designation. We agree with the district court that this single post-designation transfer, **[\*31]** standing alone, is insufficient to suggest BLOM Bank was aware of Sanabil's links to Hamas.[20]

Because we conclude Plaintiffs failed to plausibly allege BLOM Bank was aware the Three Customers were related to Hamas, we do not need to consider whether they plausibly alleged the Three Customers were closely intertwined with Hamas's violent terrorist activities.[21] Nor do we need to address whether the complaint satisfies the substantial assistance element. The complaint's failure to support a reasonable inference that BLOM Bank knew of the Three Customers' links to Hamas sounds the death knell of Plaintiffs' JASTA aiding-and-abetting liability action.

**CONCLUSION**

We **AFFIRM** the judgment of the district court.

---

**End of Document**

---

[19] Plaintiffs referenced in their briefs and at oral argument a 2001 FBI report identifying Sanabil as a "known front[]" for Hamas. *See* Appellants' Br. at 32; Appellants' Letter Br. at 11. Their complaint contained no reference to this FBI report. Similarly, Plaintiffs characterized BLOM Bank's transactions for the Three Customers as "untraceable" for the first time in their post-argument letter brief. *See, e.g.*, Appellants' Letter Br. at 8. "[A] *Rule 12(b)(6)* motion tests the adequacy of the complaint . . . not the briefs." *Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 91 (2d Cir. 2000)*, *abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*, (internal citation omitted).

[20] The allegation that Israel designated Al-Aqsa as a terrorist organization in 1998, without specifying whether and where this was made public, is also unavailing. Moreover, even if the complaint plausibly alleged it was public knowledge that Al-Aqsa, HLF, and KindHearts were linked with Hamas, those entities were not BLOM Bank's customers. Without any further allegations, a defendant-bank's transfers of funds from *non-customers* associated with an FTO to the defendant's customers does not compel an inference that the defendant knew of its *customers'* connections to that FTO.

[21] However, we note that there is a meaningful difference between the alleged functions of the Three Customers and those of the customers in *Kaplan*. In *Kaplan*, the plaintiffs' theory was that the defendant-bank's customers provided subsidies to the families of Hizbollah suicide bombers--*i.e.*, veterans' funds for terrorists--and the defendant-bank "permitted the laundering of money . . . in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks." *999 F.3d at 858, 865*. By contrast, Plaintiffs' theory rests on the *da'wa*, Hamas's social welfare program, and the Three Customers were alleged only to have supported orphans in Palestinian refugee camps.