UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) <br><br> ECF Case |

## DECLARATION OF PROFESSOR JIMMY GURULÉ

I, Professor Jimmy Gurulé, being duly sworn, declare and state as follows:

1. My expertise is described more completely in paragraphs 2 thru 8 below and in my *curriculum vitae*, which is attached hereto as Exhibit A. In summary, I am a former Under Secretary (Enforcement) of the U.S. Department of Treasury, where I was the Treasury Department official responsible for overseeing the Office of Foreign Asset Control (OFAC), the federal agency responsible for administering and enforcing the United States' economic sanctions policies and programs. Presently I am a full professor of law at Notre Dame Law School, where I have taught courses in Criminal Law, White Collar Crime, International Criminal Law, and the Law of Terrorism. As a law professor since 1989, I have taught courses, conducted research, published scholarly articles and books, and lectured domestically and internationally on the subjects of anti-money laundering and countering the financing of terrorism.

2. In my capacity as Under Secretary for Enforcement, U.S. Department of the Treasury, from 2001-2003, I had oversight responsibility for several major federal law enforcement agencies, including: the U.S. Secret Service; U.S. Customs Service; Bureau of Alcohol, Tobacco and Firearms; Executive Office of Asset Forfeiture; Financial Crimes Enforcement Network (FinCEN); and OFAC. The U.S. Customs Service (now part of the Department of Homeland Security and known as Immigration and Customs Enforcement)

conducts complex money laundering investigations. FinCEN is the federal agency responsible for enforcing the Bank Secrecy Act (31 U.S.C. § 5311 et seq.), and OFAC administers and enforces the United States' economic sanctions policies and programs, including those imposed under Executive Order No. 13224 ("E.O. 13224"), blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism.

3. While Under Secretary of the Treasury, I played a central role in developing and implementing the U.S. government's anti-terrorist financing strategy. Among other things, I was responsible for drafting the 2001 and 2002 National Money Laundering Strategy (NMLS). The NMLS is intended to prioritize, focus, and coordinate the U.S. Government's resources to combat money laundering and terrorist financing. Several federal agencies, bureaus and offices are involved in developing and implementing the NMLS, including: the U.S. Department of the Treasury; U.S. Department of Justice; U.S. Department of State; Federal Bureau of Investigation; Drug Enforcement Administration; Federal Deposit Insurance Corporation; Federal Reserve Board; FinCEN; OFAC; Internal Revenue Service; Office of the Comptroller of the Currency; Office of Thrift Supervision; Immigration and Custom Enforcement; U.S. Postal Inspection Service; U.S. Secret Service; Office of National Drug Control Policy; U.S. Securities and Exchange Commission; and the Treasury Department Executive Office of Asset Forfeiture.

4. As a component of my role in developing and implementing the U.S. Government's anti-terrorist financing strategy, I had responsibility as Under Secretary for coordinating America's anti-terrorist financing programs, to include the E.O. 13224 designation program, with the complementary programs of our international partners, to include the designation and sanctions programs administered by the United Nations Security Council Committee established pursuant to Resolution 1267 (the UN 1267 Committee). Among other

duties, the UN 1267 Committee oversees the implementation by UN Member States of the three sanctions measures (assets freeze, travel ban and arms embargo) imposed by the Security Council on individuals and entities associated with the al Qaeda terrorist organization.

5.      While Under Secretary, I also supervised the promulgation of the Treasury Department regulations implementing the anti-money laundering and counter-terrorist financing provisions of the USA PATRIOT Act (P.L. 107-56, 115 Stat. 272 (2001)).

6.      As an expert in anti-money laundering and countering terrorist financing, I have given lectures at conferences, universities, international bankers associations, and other venues located domestically and abroad, including: Milan, Rome, and Naples, Italy; London, England; Vienna, Austria; Brussels, Belgium; Madrid and Barcelona, Spain; Davos, Switzerland (World Economic Fortin); Luxembourg, Luxembourg; Mumbai, New Delhi, Pune, and Calcutta, India; Asuncion, Paraguay; Tirana, Albania; New York City, New York (International Organization of Securities Commissioners and Institute of International Bankers); Miami, Florida (Florida International Bankers Association); and Las Vegas, Nevada (Association of Certified Anti-Money Laundering Specialists).

7.      I am the author and co-author of numerous books, law review articles, and other publications on money laundering and terrorist financing, including: NATIONAL SECURITY LAW AND THE CONSTITUTION (Wolters Kluwer 2d ed., 2020) (co-author); NATIONAL SECURITY LAW: PRINCIPLES AND POLICY (Wolters Kluwer 2d ed., 2019) (co-author); COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Juris Publ. 4th ed., 2019) (co-author); HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018 (co-editor); PRINCIPLES OF COUNTERTERRORISM LAW (West Publ. 2011) (co-author with Prof. Geoffrey Corn);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar 2008); INTERNATIONAL CRIMINAL LAW: CASES AND MATERIALS (Carolina Academic Press 4th ed., 2012) (co-author); THE LAW OF ASSET FORFEITURE (LexisNexis 2d ed., 2004) (co-author); HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Banking Publ. Ltd. 2005); *Criminalizing Material Support to Domestic Terrorist Organizations*, 47 N.D. J. Leg. 8 (2021); *The Failure to Prosecute ISIS's Foreign Financiers under the Material Support Statute*, THE HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018) (co-author); *Utilizing Secondary Sanctions to Curtail the Financing of the Islamic State,* GEORGETOWN JOURNAL OF INT'L AFFAIRS (2017); *The Need to Refocus the Government's Post-9/11 Counter-Terrorist Financing Strategy*, 50 Valparaiso L. Rev. 493 (2016); *Holding Banks Liable Under the Anti-Terrorism Act for Providing Financial Services to Terrorists: An Ineffective Legal Remedy in Need of Reform*, 41 N.D. J. Leg. 184 (2015); *The Demise of the UN Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 CASE W.RES. J. INTL L. 10 (2009); *Does "Proceeds" Really Mean "Net Profits"?: The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009); *Who Is Winning the War on Terrorist Financing?*, THE FINANCIAL REGULATOR 25 (2005); *The Global Efforts to Stop Terrorist Financing*; ELECT. 1., U.S. Dept. of State (Aug. 2003); and *The Money Laundering Control Act of 1986*: *Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity*, 32 AM. CRIM. L. REV. 823 (1996).

4

8.      By virtue of my experience serving as Under Secretary and academic work, as described more fully above, I am intimately familiar with the international anti-money laundering and counterterrorism standards and best practices for financial institutions.

9.      I have been asked by the plaintiffs to review the declaration submitted by Al Rajhi Bank official Naif al Dahmashi, and to comment on whether the record-keeping system described in that declaration, and related description of the efforts that allegedly would be necessary to locate and produce bank documents responsive to plaintiffs' document requests, are consistent with international banking standards and best practices, and relevant anti-money laundering and counterterrorism financing standards and best practices.

10.     Initially, the al Dahmashi declaration fails to set forth a number of basic facts that would be necessary to fully evaluate whether ARB is maintaining its records in accordance with governing standards and best practices.  For example, al Dahmashi's declaration does not clearly describe the particular categories of documents that are encompassed by the archiving system described in the declaration; whether any categories of responsive documents are archived or maintained differently; when records responsive to plaintiffs' document requests were sent to the archive; how ARB records were maintained before they were sent for archiving and whether the manner in which they are archived differs from the manner in which they were maintained prior to archiving; whether documents relating to any inquiries concerning potential terrorism financing or similar activity were maintained in some segregated or indexed manner that would make them readily retrievable, in addition to other relevant issues.

11.     Despite the foregoing limitations resulting from the lack of information in the al Dahmashi declaration, the description of the archiving system and steps that would be necessary to locate bank records responsive to plaintiffs' document requests raises significant questions as

to whether ARB's system for maintaining its records is consistent with international standards and best practices, including standards and best practices to prevent money laundering and terrorist financing.

12. On this point, the Recommendations of the Financial Action Task Force (FATF) are instructive and insightful. *See* Financial Action Task Force, *International Standards on Combating Money Laundering & the Financing of Terrorism and Proliferation* (FATF Recommendations), available at https://www.fatf-gafi.org/media/fatf/documents/recommendations/pdfs/FATF%20Recommendations%202012.pdf.

13. According to its own description:

The Financial Action Task Force (FATF) is an inter-governmental body established in 1989 by the Ministers of its Member jurisdictions. The mandate of the FATF is to set standards and to promote effective implementation of legal, regulatory and operational measures for combating money laundering, terrorist financing and the financing of proliferation, and other related threats to the integrity of the international financial system. In collaboration with other international stakeholders, the FATF also works to identify national-level vulnerabilities with the aim of protecting the international financial system from misuse. The FATF Recommendations set out a comprehensive and consistent framework of measures which countries should implement in order to combat money laundering and terrorist financing, as well as the financing of proliferation of weapons of mass destruction. Countries have diverse legal, administrative and operational frameworks and different financial systems, and so cannot all take identical measures to counter these threats. The FATF Recommendations, therefore, set an international standard, which countries should implement through measures adapted to their particular circumstances. The FATF Recommendations set out the essential measures that countries should have in place to:

• identify the risks, and develop policies and domestic coordination;

• pursue money laundering, terrorist financing and the financing of proliferation;

• apply preventive measures for the financial sector and other designated sectors;

• establish powers and responsibilities for the competent authorities (e.g., investigative, law enforcement and supervisory authorities) and other institutional measures;

⬥ enhance the transparency and availability of beneficial ownership information of legal persons and arrangements; and

⬥ facilitate international cooperation.

FATF Recommendations at p. 7.

14. Essential to its central mission to establish international standards to effectively counter money laundering and terrorist financing, the FATF's Recommendations include minimum standards for the maintenance of records by financial institutions. These standards are designed, among other goals, to ensure that financial institutions are able to effectively investigate potential money laundering or terrorist financing activities, and respond to document and information requests from government or regulatory bodies investigating possible money laundering or terrorist financing activities. *See* FATF Recommendation 11.

15. To these ends, FATF Recommendation – provides as follows:

> Financial institutions should be required to maintain, for at least five years, all necessary records on transactions, both domestic and international, *to enable them to comply swiftly with information requests from the competent authorities.* Such records must be sufficient to permit reconstruction of individual transactions (including the amounts and types of currency involved, if any) so as to provide, if necessary, evidence for prosecution of criminal activity. Financial institutions should be required to keep all records obtained through CDD measures (e.g. copies or records of official identification documents like passports, identity cards, driving licenses or similar documents), account files and business correspondence, including the results of any analysis undertaken (e.g. inquiries to establish the background and purpose of complex, unusual large transactions), for at least five years after the business relationship is ended, or after the date of the occasional transaction. Financial institutions should be required by law to maintain records on transactions and information obtained through the CDD measures. The CDD information and the transaction records should be available to domestic competent authorities upon appropriate authority.

FATF Recommendation 11 (emphasis added).

16. As indicated above, and of likely relevance here, the international standards established by the FATF set particular guidelines for maintenance of so-called Customer Due Diligence. The FATF standards require financial institutions to undertake customer due

7

diligence (CDD) measures when: "(i) establishing business relations; (ii) carrying out occasional transactions: (i) above the applicable designated threshold (USD/EUR 15,000); or (ii) that are wire transfers in the circumstances covered by the Interpretive Note to Recommendation 16; (iii) there is a suspicion of money laundering or terrorist financing; or (iv) the financial institution has doubts about the veracity or adequacy of previously obtained customer identification data." FATF Recommendation 10.

17. Also, of likely relevance here, the FATF Recommendations also set standards for customer relationships and transactions involving Politically Exposed Persons (PEP). A PEP is defined as follows:

> Foreign PEPs are individuals who are or have been entrusted with prominent public functions by a foreign country, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials.
>
> Domestic PEPs are individuals who are or have been entrusted domestically with prominent public functions, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials.
>
> Persons who are or have been entrusted with a prominent function by an international organization refers to members of senior management, i.e. directors, deputy directors and members of the board or equivalent functions.

FATF Recommendations at p. 126.

18. Financial institutions should be required, in relation to foreign politically exposed persons (PEPs) (whether as customer or beneficial owner), in addition to performing normal customer due diligence measures, to:

> (a) have appropriate risk-management systems to determine whether the customer or the beneficial owner is a politically exposed person;
>
> (b) obtain senior management approval for establishing (or continuing, for existing customers) such business relationships;

8

> (c) take reasonable measures to establish the source of wealth and source of funds; and
>
> (d) conduct enhanced ongoing monitoring of the business relationship.
>
> Financial institutions should be required to take reasonable measures to determine whether a customer or beneficial owner is a domestic PEP or a person who is or has been entrusted with a prominent function by an international organization. In cases of a higher risk business relationship with such persons, financial institutions should be required to apply the measures referred to in paragraphs (b), (c) and (d).
>
> The requirements for all types of PEP should also apply to family members or close associates of such PEPs.

FATF Recommendation 12.

19. As reflected by the above, international standards and best practices contemplate that financial institutions should maintain their records in a manner that will "enable them to comply swiftly with information requests from the competent authorities … [and] to permit reconstruction of individual transactions (including the amounts and types of currency involved, if any) so as to provide, if necessary, evidence for prosecution of criminal activity." These standards also contemplate that financial institutions will create and maintain records relating to required CDD (including analysis of unusual or suspect transactions) and accounts relating to PEPs.[1]

20. Again, because of the limitations resulting from the lack of information contained in the al Dahmashi declaration, it is not possible to fully evaluate the extent to which ARB's record maintenance procedures and other processes deviate from international standards and best practices. However, at least based on the information provided, it does not seem that ARB's record-keeping systems comport with international standards requiring financial institutions "to

---

[1] Although I refer in this Declaration to the language of the current FATF Recommendations, the 2003 edition of the Recommendations includes requirements nearly identical to the provisions referenced here.

comply swiftly with information requests from the competent authorities … [and] to permit reconstruction of individual transactions (including the amounts and types of currency involved, if any) so as to provide, if necessary, evidence for prosecution of criminal activity." Further, given the nature of the accounts at issue here, which include accounts reportedly linked to government officials and that were the subject of international and governmental inquiries and investigations, it seems reasonable to expect that ARB would previously have segregated relevant records, and that its records pertaining to such accounts would include CDD and PEP documents. The declaration makes no mention of such records, where they would be stored, or what efforts would be necessary to locate them.

21. The FATF standards and best practices are consistent with the requirements of Bank Secrecy Act (BSA), 31 U.S.C. §§ 5312 et seq., for recordkeeping. The BSA also requires financial institutions to comply swiftly with information requests related to money laundering and terrorist financing. Specifically, under 31 U.S.C. § 5318(k)(2), a "covered financial institution" is required to respond to a request by an appropriate Federal banking agency for information related to anti-money laundering compliance within 120 hours of receiving such request. Clearly, if Al Rajhi Bank was doing business in the United States, it would not be able to comply with the 120-hour rule.

22. In my opinion, a sophisticated, global financial institution maintaining and archiving its records in accordance with international standards and best practices should be able to readily compile account, transaction, CDD, and PEP records for designated accounts. Moreover, Al Rajhi Bank's apparent inability to access client bank records in a timely manner is a fundamental breach of international standards and best practices to prevent money laundering and the financing of terrorism.

23. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of September, 2021.

_____
Professor Jimmy Gurulé

# Exhibit A

**JIMMY GURULÉ**
Notre Dame Law School
Notre Dame, IN 46556
(574) 631-5917
Gurule.1@nd.edu

**EDUCATION:**

S.J. Quinney College of Law, University of Utah, J.D. (1980)
University of Utah, B.A. English (1974)

**EXPERIENCE:**

**PROFESSOR OF LAW, NOTRE DAME LAW SCHOOL (1989 to present)** Teaching courses in Criminal Law, International Criminal Law, National Security Law, Death Penalty, and the Wrongful Conviction Externship.

Served as Associate Dean from 1998-99.

Concurrent Professor, Department of Political Science
Institute for Latino Studies, Fellow

**UNDER SECRETARY (ENFORCEMENT), U.S. DEPARTMENT OF THE TREASURY (2001-2003)** - Nominated by President George W. Bush and unanimously confirmed by the United States Senate.

Served as the top Treasury Department law enforcement official, provided oversight, policy guidance to and coordinated the activities of the United States Customs Service, United States Secret Service, Bureau of Alcohol, Tobacco and Firearms (BATF), Financial Crimes Enforcement Network (FinCEN), Federal Law Enforcement Training Center (FLETC), Office of Foreign Assets Control (OFAC), and Executive Office of Asset Forfeiture.

The Treasury enforcement bureaus comprised over 10,000 employees with a proposed fiscal year 2003 budget of over $5 billion.

Played a pivotal role in developing and implementing the Treasury Department=s global strategy to combat terrorist financing, meeting regularly with foreign finance and justice ministers, and overseeing Treasury=s participation in the Financial Action Task Force (FATF). Responsible for developing the 2001 and 2002 National Money Laundering Strategy and supervising publication of the regulations implementing the anti-money laundering provisions of the USA PATRIOT Act.

Responsible for coordinating the security plan for the 2002 Salt Lake City Winter Olympics and establishing the U.S. Customs-led terrorist financing task force "Operation Green Quest."

1

As Under Secretary (Enforcement), featured in *Newsweek* (Oct. 29, 2001), *U.S. News & World Report* (Dec. 31, 2001), *The Washington Diplomat* (March 2003), *Bank Systems & Technology* (May 2002) *Luxembourg Business* (Sept. 2002), and *Notre Dame Magazine* (Autumn 2002).

**ASSISTANT ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE (1990-1992)** -
Nominated by former President George H.W. Bush and unanimously confirmed by the United States Senate.

Provided oversight, policy guidance to and coordinated the activities of the Bureau of Justice Assistance (BJA), Bureau of Justice Statistics (BJS), National Institute of Justice (NIJ), Office of Juvenile Justice and Delinquency Prevention (OJJDP), and Office of Victims of Crime (OVC).

Responsible for administering an office with a combined fiscal year budget of over three-quarters of a billion dollars. Also, testified before various congressional committees on a wide range of criminal justice issues.

**ASSISTANT UNITED STATES ATTORNEY, U.S. ATTORNEY'S OFFICE, CENTRAL DISTRICT OF CALIFORNIA (1985-1989)** -
Served as the Deputy Chief of the Major Narcotics Section and prosecuted high-profile international narcotics, organized crime, money laundering, and tax fraud cases, and conducted complex grand jury investigations. Supervised the three-year investigation and prosecution of defendants responsible for the kidnapping and murder of a DEA Special Agent in Mexico.

**DEPUTY COUNTY ATTORNEY, SALT LAKE COUNTY ATTORNEY=S OFFICE (1982-1985)** -
Served as Chief of Major Drug Section, prosecuting major felony cases.

**TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION (1980-1982)** -
Hired through the DOJ Honors Program. Prosecuted major narcotics cases and investigated money laundering cases.

**EXPERT WITNESS** - Served as an expert witness or consultant in over 15 high profile money laundering and terrorist financing cases.

**ADVISED FOREIGN GOVERNMENTS**: Armenia (2018) (investigating and prosecuting public corruption), Bahrain (2012) (investigating and prosecuting torture), Belize (2011) (Prosecutorial Reform Index) and Armenia (2010) (Detention Procedure Assessment Tool).

**ADVISED THE WORLD BANK AND U.N. OFFICE ON DRUGS & CRIME**: Stolen Asset Recovery Initiative (2010).

**Advisory Board Member, Chicago-Kent College of Law, Center for National Security and Human Rights Law** (2019-present).

**FULBRIGHT SCHOLAR** - Universidad Diego Portales, Facultad de Derecho, Santiago, Chile (2011)

**BOOKS:**

ADVANCED INTRODUCTION TO COUNTER-TERRORISM LAW (Elgar Publ., manuscript due March 2021);

NATIONAL SECURITY LAW AND THE CONSTITUTION (Wolters Kluwer, 2d ed., forthcoming 2020) (co-author);

NATIONAL SECURITY LAW: PRINCIPLES AND POLICY (Wolters Kluwer, 2d ed. 2019) (co-author);

COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Juris Publ., 4th ed. 2019);

HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018) (co-editor);

CRIMINAL AND FORENSIC EVIDENCE: CASES, MATERIALS, PROBLEMS (LexisNexis 4th ed., 2014) (co-author);

INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (Carolina Academic Press 4th ed., 2012) (co-author);

PRINCIPLES OF COUNTER-TERRORISM LAW (Thomson-West 2011) (co-author);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008);

INTERNATIONAL CRIMINAL LAW DOCUMENTS SUPPLEMENT (Carolina Academic Press 4th ed., 2012) (co-author);

HUMAN RIGHTS MODULE ON CRIMES AGAINST HUMANITY, GENOCIDE, OTHER CRIMES AGAINST HUMANITY, AND WAR CRIMES (Carolina Academic Press 2d ed. 2007) (co-author); and

THE LAW OF ASSET FORFEITURE (LexisNexis) (2d ed., 2004) (co-author).

**LAW ARTICLES:**

*The Failure to Prosecute ISIS's Foreign Financiers under the Material Support Statute*, THE HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW. (Palgrave McMillan 2018) (co-author);

*Utilizing Secondary Sanctions to Curtail the Financing of the Islamic State*, GEORGETOWN JOURNAL OF INTERNATIONAL AFFAIRS (2017);

*The Need to Refocus the Government's Post-9/11 Counter-Terrorist Financing Strategy Directed at Al Qaeda to Target the Funding of ISIS*, 50 Valparaiso L. R. 493 (2016) (symposium article);

*Holding Banks Liable Under the Anti-Terrorism Act for Providing Financial Services to Terrorists: An Ineffective Legal Remedy in Need of Reform,* 41 N.D. J. Leg. 184 (2015);

*The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 Case W. Res. J. Int'l L. 19 (2009) (symposium article);

*Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute,* 7 Ave Maria L. Rev. 339 (2009);

*Unfunding Terror,* 17 THE TRANSNATIONAL LAWYER 113 (2004) (ABordering on Terror@ Symposium B McGeorge School of Law);

*U.S. Opposition to the 1998 Rome Statute Establishing an International Criminal Court: Is the Court's Jurisdiction Truly Complementary to National Criminal Jurisdictions?,* 35 Cornell Int'l Law Journal 1 (2002);

*The International Criminal Court: Complementarity with National Criminal Jurisdiction*, 33 AMICUS CURIAE, Journal of the Society for Advanced Legal Studies (2001);

*The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances B A Ten Year Perspective: Is International Cooperation Merely Illusory?,* 22 Fordham Int'l Law Journal 74 (1998);

*The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?* 32 Am. Crim. L. Rev. 823 (1996);

*The Ancient Roots of Modern Forfeiture,* 21 NOTRE DAME JOUR. OF LEG. 155 (1995); and

*Terrorism, Territorial Sovereignty, and the Forcible Apprehension of International Criminals Abroad,* 17 Hastings Int'l and Comp. L. Rev. 457 (1994).

**MISCELLANEOUS PUBLICATIONS**:

*The American People Must See the Mueller Report with Few Redactions,* The Hill Opinion (April 17, 2019);

*Deploying U.S. Armed Forces in Niger Is Unlawful,* CNN Opinion (Oct. 24, 2017);

*Could Trump Have Obstructed Justice?,* CNN Opinion (May 11, 2017);

*Supreme Court Strikes Blow Against Terror,* CNN Opinion (April 21, 2016);

Drafted Amicus Brief in *Bank Markazi v. Peterson,* No. 14-770 (U.S.S.C. 2016);

*Prosecuting the Financiers of Terror,* in HOMELAND SECURITY HANDBOOK, 99-120 (David Kamien, ed., McGraw-Hill 2d ed., 2012);

*Are Some Banks Too Big to Fail?,* CNN Opinion (Aug. 16, 2012);

*FISA and the Battle between National Security and Privacy,* available at http://jurist.pitt.edu/forum/2012/02/jimmy-gurule-fisa.php.

PROSECUTORIAL REFORM INDEX FOR BELIZE, American Bar Association Rule of Law Initiative (March 2011);

HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING, *Evaluating the Progress in the Global War on Terrorist Financing,* 221-231(Central Banking Publ. Ltd.) (2005);

*Who Is Winning The War on Terror Financing?,* 10 FINANCIAL REGULATOR 25 (2005);

THE RIGHT TO A FAIR TRIAL, *The Right to a Fair Trial in the United States* (Council of Europe Publ.) (1999) (Report presented at UniDem Seminar in Brno by European Commission for Democracy).

**CONGRESSIONAL TESTIMONY:**

**Testified before the following Congressional committees on terrorist financing issues**:

House Judiciary Committee, Subcommittee on the Constitution and Civil Justice (7/14/16);

5

House Committee on Financial Services, Task Force to Investigate Terrorism Financing (6/23/16);
House Financial Services Committee (11/13/14);
Senate Judiciary Committee (11/20/02);
House Committee on Ways and Means (6/26/02);
Senate Appropriations Subcommittee on Treasury and General Government (4/17-18/02);
House Appropriations Subcommittee on Treasury, Postal Service and General Government (3/06/02, 2/27-28/02);
Senate Select Committee on Intelligence (2/04/02);
House Committee on Financial Services (10/03/01);
Senate Committee on Banking, Housing, and Urban Affairs (9/26/01);
House Permanent Select Committee on Intelligence (9/18/01); and
Senate Committee on Finance (5/16/01).

Testified before the U.S. Commission on Security and Cooperation in Europe (5/8/02).

**LECTURES:**

Mexico City (2019); Sao Paolo, Brazil (2017); Toronto, Canada (2017); Tilburg, The Netherlands (2015); ABA Business Law Section Annual Meeting Chicago, Illinois (2015); London, England (ND London Global Gateway 2019, 2015); Kuala Lumpur, Malaysia (2014); Manchester, England (2014); Seoul, South Korea (2014 and 2013); Geneva, Switzerland (2013); Belize City, Belize (2011); Tirana, Albania (2008); London, England (Chatham House) (2008); Mumbai, New Delhi, Calcutta, and Puna, India (2006), Milan, Rome and Naples, Italy (2005) (Guardia de Finanza, National Anti-Mafia Agency, Carabinieri, Banca Intesa, Italian Bankers Association, CEISS B Military Center for Strategic Studies); Catholic University, Research Center on TransCrime, Milan, Italy (2005); Economic Forum Series, U.S. Embassy, Brussels, Belgium(2005); Amerika Haus, Vienna, Austria (2004, 2005); Austrian Defense Academy, Vienna, Austria (2005); Asuncion, Paraguay (Catholic University School of Law, Comandancia de la Policia Nacional, SEPRELAD, Senators of Finance Committee) (2005); Raiffeisenlandesbank, Linz, Austria (2004); The Hague, Conference for Iraqi Judges (2004); International Organization of Securities Commissions (IOSCO), New York City (2004); World Economic Forum, Davos, Switzerland (2003); Euroforum, Madrid, Spain (2003); Conference on Money Laundering and Financial Crimes, Central Banking Publications Ltd., Windsor, England (2003); Institute of International Bankers, New York City (2003); Florida International Bankers Association, Miami, Florida (2003); Heritage Foundation (2002); McGeorge School of Law (2003); S.J. Quinney School of Law, University of Utah (2003); Columbus School of Law, Catholic University, Washington, D.C. (2002); Notre Dame Law School (2002); Florida State University School of Law (2000); University of London, Center for Advanced International Studies (1999); University of Mendoza School of Law, Mendoza, Argentina (1999); University of Kentucky Law School (1997); and Harvard Law School (1993).

Addressed a nationwide meeting of high-ranking Russian federal prosecutors at a conference on money laundering sponsored by the U.S. Embassy in Moscow, Russia (1997).

Participated in a conference on money laundering held in Yerevan, Armenia, sponsored by the ABA Central and East Europe Law Initiative (CEELI) (1998).

Addressed the United Nations Security Council 1267 and 1373 Sanctions Committee on freezing terrorist assets (Feb. and Sept. 2002)

Delivered the law school commencement address at the S.J. Quinney School of Law, University of Utah (2002)