UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
|---|---|
| | ECF Case |

## DECLARATION OF ERIC ROBINSON, JD/PMP

I, ERIC ROBINSON, JD/PMP, being duly sworn, declare and state as follows:

1. I respectfully submit this declaration in response to the three (3) declarations ("Declarations") filed by Defendant Al Rajhi Bank ("Defendant") at MDL Docket Entry Nos. 7087-7089, in response to Plaintiffs' Motion to Compel the Production of Documents filed in the above referenced matter of *In re Terrorist Attacks on September 11, 2001*, Case No. 1:03-md-01570-GBD-SN (S.D.N.Y.).

2. In 1987, I obtained my B.S. from the University of Miami. In 1995, I obtained my J.D. from the University of Miami School of Law. I have been employed by KLDiscovery ("KLD") since February 2008 and currently serve as its Director of Advisory Services & Strategic Client Solutions. I have over 25 years of accumulated legal, eDiscovery, and project management experience. I have been regularly engaged as an ESI liaison and eDiscovery advisor and have also been retained to provide expert testimony and affidavits regarding all facets of the discovery process, including but not limited to ESI review and production.

3. I was retained on behalf of all Plaintiffs pursuing claims against the Defendant, for the purpose of reviewing and responding to the Defendant's declarations and associated burden assertions. Included in this review is an assessment of the Defendant's purported costs, processes, and protocols to comply with Plaintiffs' document requests. My review and assessment is based upon my experience, knowledge of and familiarity with generally accepted industry standards, as

well as an evaluation of the information provided by the Defendant by way of the statement and declarations noted in paragraph 4 below.

    4.    In connection with this Declaration, I have reviewed the following Declarations submitted by Defendant (incorporated by reference):

    a. Statement of Naif Al Dahmashi (employee of Defendant) dated 01 September 2021 (MDL Docket Entry No. 7087);

    b. Declaration of John J. Queirolo, Jr. (retained consultant) dated 01 September 2021 (MDL Docket Entry No. 7088); and

    c. Declaration of Cathy Fetgatter (retained consultant) dated 01 September 2021 (MDL Docket Entry No. 7089).

    5.    I have additionally reviewed Plaintiffs' First Set of Consolidated Jurisdictional Requests for Production of Documents Directed to Al Rajhi Bank, dated 11 May 2021 (incorporated by reference).

    6.    In an effort to establish a common foundation for purposes of my analysis (despite not having access to, or direct knowledge of, the Archive Center, the hard copy documents maintained therein, and/or the Defendant's indexing systems), I am relying upon the following representations made by the Defendant:

    a. Defendant's assumptions of approximately 2,500 pages per box[1]; and 15,000 – 20,000 pages per gigabyte (GB)[2] are in alignment with generally accepted industry standards.

    b. Defendant implemented the O'Neill indexing system in approximately 2010. According to the Defendant, the O'Neill index is at the box level and does not

---

[1] Statement of Naif Al Dahmashi, paragraph 15.
[2] Declaration of John J. Queirolo, Jr., paragraph 6.

      include an index of the contents of the boxes.[3]

  c. Defendant previously scanned a significant quantity of archived files and those images are maintained in Defendant's FileNet system. However, scans created prior to 2015 do not have searchable text (i.e., optical character recognition ("OCR") technology was not used to create searchable text).[4]

  d. Defendant states that the following information[5] is required to locate specific boxes of documents using the O'Neill index:

     i. Transaction Documents from Branches requires (A) the transaction date; and (B) the Branch number.

     ii. Other documents from the Head Office, Regional Offices and Branches require (A) the date the documents were received by the Archive Center, "or any date range specified on the boxes or courier slips by the sending department;" and (B) either the office number or department from which the documents were sent for archiving. Alternatively, for Branch documents, the identification of the document category.

  e. Defendant also indicates that boxes cannot be located leveraging document dates.[6]

  f. Regardless of any noted limitations, leveraging the O'Neill index, Mr. Al Dahmashi was able to identify 114,420 potentially relevant boxes for the requested period of 1999 through 2001[7] from a reported total archive of

---

[3] Statement of Naif Al Dahmashi, paragraphs 7 and 8.
[4] Statement of Naif Al Dahmashi, paragraph 12.
[5] Statement of Naif Al Dahmashi, paragraph 9.
[6] Id.
[7] Statement of Naif Al Dahmashi, paragraph 15.

approximately 2.25 million boxes.[8]

g. Defendant also states that within the universe of the 114,420 identified boxes, there is a subset of 13,049 boxes that "do not contain transaction documents that be selected by combination of transaction date and branch."[9] However, Defendant does not indicate how these boxes were identified as potentially relevant.

h. Using the agreed upon assumption of 2,500 pages per box, Mr. Al Dahmashi correctly estimates the potentially relevant universe at approximately 286,000,000 pages.[10] Based on the assumption of 15,000 to 20,000 pages per GB, the estimate volume of the images would be approximately 14,300 GB to 19,000 GB.[11]

i. Defendant further states that of the 286,000,000 pages identified through the O'Neill index, approximately 66,000,000 may have already been scanned into the FileNet system.[12]

7. As an initial matter, I have reviewed Plaintiffs' document requests and the search parameters contained therein and believe that the requests seeking relevant account and transactional records are targeted in scope and do not represent what would be considered as "complex" searches based on generally accepted industry standards.

8. Defendant's Declarations, however, assert that there would be significant expense in complying with the discovery requests. Notwithstanding that Plaintiffs should not be prejudiced

---

[8] Statement of Naif Al Dahmashi, paragraph 6.
[9] Statement of Naif Al Dahmashi, paragraph 15.
[10] Id.
[11] Statement of John J. Queirolo, Jr., paragraph 6.
[12] Statement of Naif Al Dahmashi, paragraph 17.

based on how the Defendant has elected to store and maintain its data, in reviewing their approach to compliance with the discovery requests, it appears that the declarants have outlined the most arduous and manual approach, thereby exacerbating the ultimate cost of the undertaking.

9. Indeed, the protocol and processes described by the Defendant neglect to consider or incorporate alternative approaches that could significantly reduce the level of effort and resultant costs of compliance with the Plaintiffs' discovery requests. Following are several alternatives which may result in significant efficiencies being achieved.

10. With respect to the initial inventory and identification processes, the Defendant has provided very little insight into "how" they approached the inventory and identification process. That said, one viable alternative to more accurately identify potentially relevant boxes of records, would be to deploy a team to each archive location (4 in total) to perform a high-level "eyes on" inspection of the boxes. While there would be a cost associated with this effort, if this process were to reduce the potentially relevant universe by 10%, it would reduce the overall page count by approximately 27,500,000 pages. Additionally, assuming some level of consistent filing, this team would build efficiencies and be able to expedite the inventory and identification process as they familiarized with the document types.

11. Additionally, given the assertion by the Defendant that approximately 66,000,000 pages of the identified 286,000,000 pages may have already been scanned into the FileNet system, this would reduce the box count by approximately 26,400 boxes.

12. Mr. Al Dahmashi's declaration provides an estimate of SAR 0.085 (approximately $0.023 (USD)) per page for the scanning and OCR of the files.[13] However, the Defendant provides no evidence that they have negotiated or sought out more advantageous pricing given the

---

[13] Statement of Naif Al Dahmashi, paragraph 18.

significant volume.  In conducting independent research, I have received unofficial quotes of $0.0011 to $0.0016 (USD) per page for scanning and providing OCR of the entire 286,000,000 pages (this does not account for the approximately 66,000,000 pages that have already been scanned into FileNet and would only require OCR).  This equates to roughly a 30% reduction in the scanning and OCR costs.

13.     Notwithstanding the potential reduction in the number of boxes required to be scanned, the Defendant's proposed protocol for the analysis and review of the documents contemplates an absolute "worst case" scenario and fails to consider the application of industry standard search and analytics tools to narrow the data set requiring human review, to include the use of predictive coding.

14.     For instance, Ms. Fetgatter's Declaration at p. 2 n.1, makes a broad assumption that OCR text generated from the scanned images will be unreliable and thereby minimize or eliminate the value of leveraging searching and other analytics tools, to include predictive coding.  While it is accurate that the efficacy of search tools and analytics algorithms is largely dependent upon the availability of "readable" text, neither Ms. Fetgatter nor any of the other declarants have provided evidence that the Defendant has attempted to validate, through sampling or testing, that the process of generating text would largely fail to provide "usable" text for a significant portion of the data set.

15.     Similarly, Ms. Fetgatter's assertion of a review pace of 40 – 50 documents per hour[14] fails to take into consideration the level of review required in this scenario.  Specifically, Plaintiffs' requests are focused on very tailored terms and date parameters, which would significantly expedite the review.  Plaintiffs are seeking documents related to specific individuals,

---

[14] Declaration of Cathy Fetgatter, paragraph 7.

entities, and/or account numbers within specified time frames that do not require in-depth or detailed review.

16.     Accordingly, the Defendant's assertion that they would need to perform a manual review of the entire universe of documents, ignores the likelihood that some significant percentage of the document universe will have usable OCR text to enable the use of the readily available search and analytics tools which would dramatically reduce the universe of documents requiring human review.

17.     Experience would also dictate that leveraging well-crafted targeted search parameters would significantly reduce and limit the volume of documents ultimately subjected to human review.

18.     Additionally, it is important to note that while Mr. Al Dahmashi's statement indicates that the 13,049 boxes of non-transactional documents are a subset of the 114,420 identified boxes, the declarations of both Mr. Queirolo and Ms. Fetgatter *add* these to the total universe of calculated images and documents when deriving their cost assumptions, effectively double-charging for the 13,049 boxes in their loading, hosting, and review calculations, thereby incorrectly inflating the estimated costs.[15]

19.     As a practical matter, engagements such as this should be addressed with a phased approach wherein each subsequent phase is informed by the preceding phases.  My professional recommendation in this instance would be to more closely evaluate the usefulness and completeness of the O'Neill index and FileNet system.  I would suggest incorporating a human, hands/eyes-on component to validate, at least initially, that the indices are actually identifying potentially relevant boxes of documents.  The Defendant has offered no evidence to indicate this

---

[15] Declaration of Cathy Fetgatter, paragraphs 7 – 9; Declaration of John J. Queirolo, Jr., paragraphs 5 – 10.

has been attempted.

20.     It is also suggested that the Defendant seek competitive quotes for the scanning and OCR components.

21.     Once the process has moved to the analysis and review component, the Defendant's eDiscovery provider can validate the efficacy of the available OCR and work with the Defendant to craft a reasonable, efficient, and defensible review strategy.  This strategy should incorporate available technology to enhance and expedite the process while minimizing the volume of human review.

22.     Finally, as a practical matter and based on industry best practices, the Defendant has failed to consider alternative technology solutions specifically designed to accommodate large volumes of data, where the scanned and OCR'd documents may be indexed and searched.  Such technologies would create efficiencies and provide the opportunity to significantly reduce and manage the ultimate review population.  These solutions are generally significantly less expensive on both the initial ingestion and hosting costs, as compared to eDiscovery review platforms.  It would be relatively straightforward to apply Plaintiffs' keyword and account number searches in such a solution.

23.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of October 2021, in Mechanicsville, Virginia.

*EricMRobinson*
_____
ERIC ROBINSON, JD/PMP