

**EMILY KIRSCH**
150 E. 58TH STREET 22ND FLOOR
NEW YORK, NY 10155
O (212) 832-0170
M (917) 744-2888
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

November 12, 2021

**VIA ECF**
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:   *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

We represent the firm Kreindler & Kreindler, LLP ("Kreindler & Kreindler") in connection with the November 1-2, 2021 hearing regarding John Fawcett's breach of the protective orders in this matter (the "Hearing").  We write in opposition to the Kingdom of Saudi Arabia's (the "Kingdom") letter motion dated November 9, 2021 ("Nov. 9 Motion") requesting that Kreindler & Kreindler submit declarations listing attendees at all depositions who are not already listed as appearing, and providing records of each such person's agreement to be bound by the protective orders.  *ECF 7322*.  Perhaps now recognizing that neither the documentary nor the testimonial evidence adduced at the Hearing supports its accusations against the Kreindler & Kreindler lawyers as complicit in Fawcett's breach, the Kingdom is pivoting to other unsupported allegations in its relentless – and highly improper – effort to get at its adversaries' work-product.

The Kingdom's Nov. 9 Motion asserts that Ms. Benett's testimony at the Hearing "provides substantial reason to believe that Kreindler & Kreindler has violated the deposition protocol in this case and, potentially, the MDL and FBI Protective Orders, by permitting individuals not authorized by the deposition protocol and not identified on the deposition record to attend the confidential depositions in this case." *Nov. 9 Motion at p.1*.  More specifically, the Nov. 9 Motion alleges that Ms. Benett's testimony provides a basis to speculate that one particular consultant with information about Musaed Al Jarrah's child pornography (the "Consultant") was in a conference room listening to Mr. Jarrah's deposition, and that the Consultant may not have signed a protective order. But Ms. Benett's testimony does no such thing. To the contrary, her testimony establishes that (i) she could not have knowledge of who may or may not have been in the conference room during the Jarrah deposition because she was in a room by herself, elsewhere, taking the deposition, and (ii) Ms. Benett could confirm under oath with 100% certainty that the firm had processes in place to ensure that any consultant with access to confidential information – depositions included – reviewed and agreed to the protective orders in this case. For this reason alone, the Nov. 9 Motion must be denied.

But the Nov. 9 Motion is further troubling in several respects.

KIRSCH & NIEHAUS

*First,* As explained more fully below, the Nov. 9 Motion knowingly misstates Ms. Benett's testimony by taking snippets out of context and stringing them together in decontextualized argument that amounts to an obvious attempt to mislead this Court. In fact, the Court itself has *already stated on the record* what the established facts of Ms. Benett's testimony are in this regard. The Kingdom's motion not only disregards what the Court has said on the matter, it is founded on a supposition diametrically opposed to the facts as articulated by the Court.

*Second,* this is not the first time that the Kingdom's counsel has misled the Court in one of its motions by deliberately withholding critical facts and context and instead arguing innuendo and speculation that it knows to be contrary to the established facts.

*Third*, the Nov. 9 Motion represents yet another attempt to disingenuously "raise issues" about Kreindler & Kreindler's handling of confidential information without regard for the truth. If the Kingdom cared about the truth of this incident, its counsel would have questioned either Mr. Fawcett or Mr. Pounian – both of whom were shown to potentially have relevant knowledge – about the Consultant's absence or presence at the deposition. But the Kingdom has shown its objectives to be otherwise. They seek "relief" that does not protect confidential information, but rather is carefully targeted to gain access to protected work product and information about how lead plaintiffs' counsel is building its case. In particular, the Kingdom seeks to learn the identities of Kriendler & Kreindler's and the PECs' consultants, whose names constitute privileged information that is closely held because of, *inter alia*, the risk of threats and intimidation.[1] The Court's processes must not be abused in this way. The Nov. 9 Motion should be recognized for the fishing expedition it is, and be denied.

> **A. The Kingdom Has Grossly Misrepresented Ms. Benett's Testimony to This Court in Direct Contradiction of What the Court Has Already Stated Regarding Ms. Benett's Testimony, and What a Fair Reading of the Transcript Makes Clear.**

Contrary to the Kingdom's claims, Ms. Benett's testimony neither: (1) suggests that deposition protocol was breached, nor (2) suggests that any protective orders were not followed. The Court itself aptly summarized Ms. Benett's testimony on the record at the Hearing on November 2:

> **The COURT:** I think Ms. Benett has …testified that [the Consultant] spoke with her or communicated with her somehow during the deposition in order to provide this information [about child pornography on Mr. Jarrah's computer]. **But she doesn't know whether he was actually listening to the deposition, and it would be the practice of the firm that he would**

---

[1] The risk here is not theoretical. A potential witness in this case, Jamal Khashoggi, was murdered by Saudi Arabia at its Consulate in Istanbul, Turkey, after the Kingdom learned that Plaintiffs privately reached out to Mr. Khashoggi, a former official of the Saudi Embassy in Washington, to obtain relevant information. *ECF 6003-2 at ¶¶ 9-16.*

**KIRSCH & NIEHAUS**

> **have signed the MDL order, but he did not make an appearance at the deposition. I think those are the facts we have established.**

*Benett 331:9-16 (emphasis added).*[2] Undeterred by these established facts, the Kingdom's motion brazenly insists otherwise.

### 1. Ms. Benett's Testimony Establishes That She Was Completely Unaware Of What the Consultant Was Doing During the Jarrah Deposition.

As the Court noted, Ms. Benett's testimony conclusively established that she was in a room by herself taking the deposition and has no knowledge of anyone else's whereabouts during that deposition, including the Consultant. Although Ms. Benett had previously testified that the "deposition was by Zoom. I was in a room by myself," *(Benett 310:19-20),* Mr. Shen returned to this topic and badgered Ms. Benett with several more repetitive questions about whether the Consultant attended the deposition. The relevant testimony is reproduced in its entirety below, including the entirety of Ms. Benett's answers explaining that she did not know and could not have known whether the Consultant attended the deposition. As an aid to the Court, we have underlined the words that the Kingdom quoted in its motion, and bolded the words that the Kingdom omitted. *See Nov. 9 Motion at p.3.*

> Q:   Was this FBI agent actually attending this deposition?
> …
> A:   So, there was, in the office next – I was taking the Zoom deposition in a room in our office by myself. In that wing, there were people who were walking, not in the office, not in the Zoom room, not where the deposition was happening. He was one person who was there during that time, generally in the office. There were a number of other people, it was a weekday. Certainly, nobody was in the Zoom room with me.
> Q:   So, you were in a separate Zoom room. People were in another room listening to the deposition, correct?
> A:   What I am saying is that when I spoke with him, he was not watching a deposition. He was – there is a corridor, there are workstations. I stepped out. I had not met him before. I don't think I met him before. He told me information.
> Q:   **But you don't know if he was watching the deposition in the other room because you are taking a deposition by yourself?**
> **A:   Right.**
> Q:   You don't know whether he is in the other room watching or not, is that your testimony? Let me ask you this: Do you know whether he attended that deposition?
> A:   <u>I wouldn't be surprised if he did</u>. **I was in a room taking the deposition by myself. How could I know where he was at the very time I am in that room?** I don't have any

---

[2]   Citations in the form "*Name, page:line*" are to the transcript of the Hearing, and identify the witness testifying.

3

reason – I guess I <u>don't have any reason to think that he didn't</u>, **but I can't tell you that I was in there with him during the deposition because I was taking the deposition in a room by myself.**

*Benett 328:6-329:15.* This is the testimony upon which the Kingdom relies in telling this Court that the Court's own summary of established facts was wrong, and instead constitutes "substantial grounds to believe that Kreindler & Kreindler has violated paragraph 31 of the deposition protocol." *Nov. 9 Motion at p.1.* We not only disagree with the Kingdom's overreach, but find the tactic troubling.

> **2. Ms. Benett's Testimony Conclusively Established That Kreindler & Kreindler Ensured That Individuals Were Shown and Agreed to the Protective Orders Prior to Receiving Any Protected Materials – Including Depositions.**

The Kingdom also asserts that "[w]hen counsel for Saudi Arabia asked whether Ms. Benett knew whether the agent had reviewed and agreed to abide by the protective orders in this case, she was unable to testify definitively that he had done so." *Nov. 9 Motion at p.3.* Without belaboring the point, and as the Court has already noted at the Hearing, Ms. Benett's testimony was crystal clear that the firm has practices and procedures in place to ensure that anyone who had access to confidential information was first presented with the protective orders for review and agreement, and it maintains a chart of everyone who has signed, together with a file of all the signatures. Ms. Benett was 100% confident under oath that if the Consultant was privy to confidential information, such as being present in a room with a feed of the deposition, he signed the protective order. *Benett 330:10-13; 331:7-8 ("if he was in the room, he signed the protective order").* Below is the relevant portion of Ms. Benett's testimony.

> Q: Sitting here today, you don't know whether he signed the FBI protective order, correct?
> A: I have recently looked at them. It is true I cannot remember. I have looked recently at the entire file of everybody who has signed the protective orders. I believe he has, but I cannot say with absolute certainty without looking at that file, sitting here on the stand right now.
> Q: And you don't know sitting here today whether he agreed to abide by the MDL protective orders, correct?
> A: If he had access to any MDL protected information, he absolutely would have had to review and agree to the MDL protective order.
> Q: That's not my question. The question is, do you know sitting here today?
> A: So, just to be clear, your question is, irrespective of whether he looked at protected material, did he review the protective order?
> Q: Do you know whether he looked at and agreed to abide by the MDL protective order?
> A: If he was given MDL protected materials, yes.
> Q: But you don't know that, correct?
> A: I mean –

4

KIRSCH & NIEHAUS

> Q: I am asking if you know if he looked at and agreed to abide by it. Do you know if he did that?
> A: If he was given MDL protective materials, he looked at it and agreed to abide by it because that was our practice.
> Q: But you don't know one way or another whether he did?
> A: **I know with 100% certainty that if he looked at MDL protected materials, he reviewed and agreed to abide by the MDL protective order because that is what our practice was.**

*Benett 331:21-332:25.* We honestly do not understand how the Kingdom could so mischaracterize this testimony as providing "substantial reason to believe that Kreindler & Kreindler has violated … potentially, the MDL and FBI Protective Orders." *Nov. 9 Motion at p. 1.* The Kingdom had nothing to quote – even out of context – and merely stated "[w]hen counsel for Saudi Arabia asked whether Ms. Benett knew whether the agent had reviewed and agreed to abide by the protective orders in this case, she was unable to testify definitively that she has done so." *Nov. 9 Motion at p.3.* Ms. Benett decisively testified that Kreindler & Kreindler's practices require obtaining agreement to abide by protective orders – as the Court observed in just so many words at the Hearing.[3] Again, this disingenuous overreach is troubling.

### B. This is Not the First Time the Kingdom Has Misled the Court with Incomplete Facts and Improper Innuendo

Regrettably, the tactics in this Nov. 9 Motion echo prior filings by the Kingdom. Mr. Kellogg's July 23, 2021 letter motion and accompanying declaration, for example, also deliberately misled the Court with respect to a July 5 email from reporter Michael Isikoff to Michael Kellogg. *ECF 6981*. By omitting key facts, Mr. Kellogg created the false impression that Jim Kreindler was having substantive discussions with Mr. Isikoff about confidential depositions, and as such was somehow responsible for Mr. Fawcett's breach of the protective order. *Id.*

The facts, however, as the Court will recall from the Hearing, are that: Mr. Kreindler taped a *Conspiracyland* podcast with Mr. Isikoff on July 1. *KK Ex. Tab 9*. On July 5, Mr. Isikoff reached out to Mr. Kellogg seeking comment on statements Mr. Kreindler made on the already-recorded podcast. *ECF 6981-4 Exh. D*. The podcast "dropped" on July 10, 2021, and has been publicly available and accessible on the Yahoo! News Website ever since. *See, e.g., ECF 6981-3, Exh. C*. The podcast did not disclose any information about the Jarrah deposition. *Id.*

---

[3] Nor can Ms. Benett be blamed for not passing Mr. Shen's memory test about who had definitively signed the protective orders. The purpose of this Hearing was for the Court to inquire further into Mr. Fawcett's breach of the protective orders for which Ms. Benett was well prepared to testify. Mr. Shen's probing into the inner workings of Kreindler & Kreindler, who was present in the office and precisely what they were doing on that day and what Kreindler & Kreindler's internal records show, was an improper attempt to access his adversary's work product and was well beyond the scope of the Hearing.

**KIRSCH & NIEHAUS**

On July 23, Mr. Kellogg filed a sworn declaration with this Court concerning the leak of the Jarrah transcript, and attached a copy of the July 5 email sent to him by Mr. Isikoff. *ECF 6981- 4, Exh D3*. Mr. Kellogg's declaration ***did not*** inform the Court that Mr. Isikoff sought comment from Mr. Kellogg on Mr. Kreindler's public podcast quote, which had been widely available for two weeks. Mr. Kellogg swore only that: "**Mr. Isikoff has contacted me in the past to request comment on a story he was working on, but I never have given him comment about this case. A true and correct copy of a July 5, 2021 email from me is attached as Exhibit A.**" *Id.*

But in his accompanying unsworn letter to the Court, Mr. Kellogg described the July 5 email and then *immediately* discussed the Jarrah article, as though the July 5 email was a request to comment on private statements Mr. Kreindler gave to Mr. Isikoff in connection with the Jarrah article rather than the public statements that aired on the podcast. Mr. Kellogg then further falsely implied that Mr. Kreindler was having private discussions with Mr. Isikoff by cagily stating that we "have not found any other published *article* containing the quotations that Isikoff attributed to [Jim Kreindler] in his July 5 email" – but, of course, the statement by Mr. Kreindler was from a published *podcast*. *ECF 6981 at p. 3*.[4] Mr. Kellogg withheld from the Court the fact that the podcast was the source of the quotation. He then used the July 5 email referencing the podcast quotation as the "reason to believe that [Isikoff] had substantive discussions with [Jim Kreindler] concerning the depositions at the time he was preparing the July 15 article". Just as there is zero basis today to draw the inferences from Ms. Benett's testimony that the Kingdom asks this Court to draw, there was zero basis then for Mr. Kellogg to imply that Mr. Kreindler had any private discussions with Mr. Isikoff, as the extensive discovery and the testimony at the Hearing have completely borne out. Counsel for the Kingdom knew as early as July 23 that there was no basis to assume that Jim Kreindler was speaking privately to Mr. Isikoff about Jarrah, but they fostered the misconception for months.[5]

### C. With Demonstrated Disregard for the Facts, The Kingdom's Motion Is Designed Solely to Seek Access to The Names of Kreindler & Kreindler's Consultants.

In addition, if the Kingdom actually cared whether the Consultant attended the Jarrah deposition (as opposed to caring about what the Consultant's name is), its counsel would have asked either

---

[4] Nor can Mr. Kellogg claim to have been unaware of the *Conspiracyland* podcast. Not only has the Kingdom demonstrated it scrupulously follows Mr. Kreindler's public appearances, but, remarkably, Mr. Kellogg himself cited to and attached a Yahoo! News page in that very filing ***that references and links to the podcast itself.*** *ECF 6981, at footnote 3, ECF 6981-3, Exh. C.*

[5] This misleading filing was hardly harmless. This Court relied at least twice on Mr. Kellogg's demonstrably false representations and inuendo in its orders. *See ECF 7011 at p.2; ECF 7134, 4 of 24* (both citing Mr. Kellogg's letter and declaration and noting that "circumstantial evidence" existed that Jim Kreindler was the source of the leak because, *in addition to* his appearance on the podcast, the July 5 email suggests that Jim Kreindler discussed depositions with Mr. Isikoff privately).

**KIRSCH & NIEHAUS**

Mr. Fawcett or Mr. Pounian, both of whom were shown to possibly have relevant knowledge, and both of whom testified after Ms. Benett. When Ms. Benett testified that "there were people who were attending who were in a conference room" *Benett 310:20-21; Nov. 9 Motion at 2,* she also testified just three lines down that "I believe John [Fawcett] was there." *Benett 310:24-25.* Yet when Mr. Fawcett took the stand at the Hearing about two hours later, not a single question was asked about his attendance at the Jarrah deposition or whether the Consultant was present. Moreover, during Ms. Benett's cross-examination, Mr. Shen displayed the appearance sheet for the Jarrah deposition on the monitors and focused on the Kreindler & Kreindler attorneys present. *Benett, 329:18-22; KSAX 0032.* One such attorney was Steven Pounian, who took the stand directly after Ms. Benett. The Kingdom did not ask Mr. Pounian a single question about the attendance at the Jarrah deposition or whether the Consultant was present.[6]

What the Kingdom cares about is obtaining names or other information about Kreindler & Kreindler's and the PECs' consultants, experts, or sources, who are helping to build the case against the Kingdom. If there is any doubt that the Kingdom's true goal is to obtain details of this protected work product, one need look no further than the Kingdom's questioning at the Hearing itself. In questioning Ms. Benett, Mr. Shen inquired:

> Q:   Ms. Benett, the reason you know about the event that you asked Mr. Jarrah at his deposition is because an investigator who works at the who is a former FBI agent told you about that event, correct?
> [Objection as to Work Product and caution to Kingdom counsel from the Court]
…
> Q:   You said you heard rumors. Who had you heard rumors from?
> [Objection. Mr. Shen asks a new question without a ruling, knowing it was improper].
> *Benett 319:4 - 320:16.*
…
> Q:   When did this former FBI agent work for the Kreindler firm?

---

[6] The Kingdom employed this approach throughout the hearing, asking witnesses without a basis of knowledge to answer questions they were not competent to answer and then choosing not to pose the questions to the witnesses who could answer. *See, e.g., KSAX 0012* (purported text messages between Mr. Fawcett and a third party, presented only to Mr. Kreindler), *Kreindler 42:12 – 44:23; KSAX 0018* (purported transcript of Mr. Kreindler's Dartmouth speech, presented only to Ms. Benett), *Benett 316:2 – 318:5; KSAX 0023* (letter from Mr. Fawcett's attorney to Kellogg Hansen discussing Mr. Fawcett's storage systems, presented only to Mr. Hartney), *Hartney. 154:20 – 155:9; KSAX 0038* (purported webpage for Conspiracyland presented only to Mr. Maloney, who had never listened to the podcast or seen the webpage), *Maloney. 205:22 – 206:9; KSAX 068* (purported screenshot of a dropbox account of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 150:19 – 152:12; KSAX 0079* (purported article by Michael Isikoff describing an interview with Mr. Kreindler, presented only to Mr. Maloney), *Maloney 203:13 – 205:21; KSAX 0150* (purported "Signal" messages of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 232:20-234:2.*

KIRSCH & NIEHAUS

[Objection as to who is retained and how the firm works with consultants is protected work product. Court instructs a rephrasing of the question to be more narrow].

*Benett 325:19-326:11.* Mr. Hansen similarly sought to obtain the names of consultants working for the Kreindler firm when questioning Mr. Fawcett:

> Q: So who confirmed it [the fact that Jarrah had child pornography on his computer]? Did someone confirm it for you?
> A: … I didn't get more confirmation that from the source that told me about it.
> Q: Who's the source?
> [Objection by counsel for Kreindler & Kreindler, sustained by the Court.]

*Fawcett 469:17-21.* Multiple times, in the face of consistent rulings and warnings from the Court, counsel for the Kingdom attempted to delve into its adversary's work product, and to obtain information regarding consultants who, at potential risk to themselves, are assisting in this litigation. This motion is a thinly-veiled attempt to achieve the same goal.

### D. The Kingdom's Legal Citations are Equally Misleading and in Fact Further Reveal Their Improper Motives

The Kingdom's legal citations are equally as misleading as its factual citations. It is not in dispute that a federal district court has inherent authority to issue sanctions for violation of its orders upon a finding established by clear and convincing, competent evidence that a violation has occurred. In the *Exxon Mobil* case cited by the Kingdom, the district court judge imposed sanctions, after having established by clear and convincing competent evidence that a witness failed to answer more than 100 questions at a deposition by reading a pre-prepared non-responsive statement into the record as his answer. *Doe I v. Exxon Mobil Corp.,* No. 1:01-CV-1357-RCL, 2021 WL 1840649, at *5 (D.D.C. May 7, 2021). It is also not in dispute that a federal district court has the authority to issue orders in furtherance of enforcing existing orders. *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 344 (S.D.N.Y. 2012). However, if the Kingdom were to establish by clear and convincing competent evidence that the protective orders were violated – which they obviously have not done and cannot do – they would be entitled to seek relief fashioned to protect their confidential information. The relief the Kingdom seeks tellingly has nothing to do with protection of their information. They seek a list of names of consultants whose names Kreindler & Kreindler, in order to protect against witness intimidation, has not disclosed.

For all of the reasons stated above, the Kingdom's Nov. 9 motion should be denied in its entirety.

Respectfully Submitted,

_____*/s/ Emily Kirsch*_____
Emily Bab Kirsch

8