# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' JOINT MOTION TO EXCLUDE EXPERT TESTIMONY OF
# JONATHAN WINER AND BRIAN MICHAEL JENKINS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ......................................................................................................................1

ARGUMENT .............................................................................................................................3

I.      An Expert Must Have Requisite Qualifications for Each Subject on which He Opines .....3

        A.      Winer's Experience Does Not Provide the Requisite Specialized Knowledge for the
                Multitude of Subjects on which He Opines. ..............................................................4

        B.      Jenkins Is Concededly Unqualified to Offer Certain of His Opinions. .....................9

II.     An Expert Must Not Proffer Irrelevant and Unhelpful Testimony...................................10

        A.      Winer Opines on Irrelevant and Unhelpful Topics and Usurps the Jury's Role. ....10

        B.      Jenkins Offers Incomplete, Inaccurate, and Irrelevant History that Is Unhelpful. ..13

III.    An Expert Must Not Speculate as to Motive and Mental State .........................................14

        A.      Winer Impermissibly Opines on Defendants' and Others' States of Mind. ............15

        B.      Jenkins Offers Impermissible Speculation as to Motive and Mental State. ............17

IV.     An Expert's Testimony Must Have Sufficient Factual Basis ............................................18

        A.      Winer's Opinions Frequently Lack Factual Basis.  ..................................................19

        B.      Jenkins Frequently Lacked Identifiable Bases for His Opinions. ............................24

V.      Experts Must Reliably Apply Their Stated Methodology for Their Testimony to Be
        Reliable ............................................................................................................................26

        A.      Winer Does Not Reliably Apply His Purported Methodology in This Case. ...........27

        B.      Jenkins Does Not Reliably Apply His Purported Methodology in this Case. .........33

VI.     Experts May Not Serve as Mere Conduits of Hearsay Without Applying Analysis to
        Their Sources ...................................................................................................................35

        A.      Winer's Affirmative Report Is a Compendium of Impermissible Hearsay. ............36

        B.      Jenkins Regurgitated the Most Prominent of His Limited Sources Without Analysis
                to Establish Facts Not Requiring Expertise. ...........................................................39

CONCLUSION........................................................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
  185 F. Supp. 3d 401 (S.D.N.Y.2016) ....................................................................................19

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ....................................................................................... *passim*

*Arista Records LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009) .....................................................................................4

*Capstone Logistics Holdings, Inc. v. Navarrete*,
  No. 17-Civ.-4819 (GBD)(BCM), 2020 WL 3429775 (S.D.N.Y. June 23,
  2020) (Daniels, J.), *aff'd in part and remanded on other grounds,* 838 F.
  App'x 588 (2d Cir. 2020) .......................................................................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................................................... *passim*

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
  No. 14-cv-8486 (VM)(SN), 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017) .............................19

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014) ......................................................................................26

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ..............................................................................15, 17

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...........................................................................................................19, 29

*In re Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-CV-5810, 15-CV-1626, 2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) .....................26

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 523 (E.D.N.Y. 2012) ..........................................................................7, 10, 12

*Estate of Jaquez v. City of N.Y.*,
  104 F. Supp. 3d 414 (S.D.N.Y. 2015), *aff'd*, 706 F. App'x 709 (2d Cir. 2017) ......................4

*Kewazinga Corp. v. Microsoft Corp.*,
  No. 1:18-CV-4500-GHW, 2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021) ..........................15, 16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...................................................................................................................3

*Langbord v. U.S. Dep't of Treasury*,
    832 F.3d 170 (3d Cir. 2016)..................................................................................36

*Linde v. Arab Bank, PLC*,
    920 F. Supp. 2d 282 (E.D.N.Y. 2011) ............................................................15, 16

*Linde v. Arab Bank, PLC*,
    922 F. Supp. 2d 316 (E.D.N.Y. 2013) ....................................................10, 11, 16

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008).............................................................................19

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)................................................................15, 33, 36

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    982 F.3d 113 (2d Cir. 2020)...........................................................18, 19, 35

*In re Mirena IUS Prod. Liab. Litig.*,
    387 F.Supp.3d 323 (S.D.N.Y 2019), *aff'd* 982 F.3d 113 (2d Cir. 2020) .............................26

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005)...............................................................................4

*Pan Am. World Airways, Inc. v. Port Auth. of N.Y. & N.J.*,
    995 F.2d 5 (2d Cir. 1993).................................................................................4

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016)..............................................................................26

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)..............................................................18

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) (*In re Rezulin I*)...................................... *passim*

*Riegel v. Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006)........................................................................18, 35

*Ruggiero v. Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005)..............................................................................19

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................ *passim*

*In re Sept. 11 Litig.*,
    621 F. Supp. 2d 131 (S.D.N.Y. 2009)..............................................................40

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,*
    467 F.3d 107 (2d Cir. 2006)............................................................................4

*Stelman v. United States,*
    14-CV-05363(SN) 2016 WL 5315196 (S.D.N.Y. Sept. 21, 2016)............................4

*Strauss v. Credit Lyonnais, S.A.,*
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..............................................................39

*U.S. v. Arnaout,*
    282 F. Supp. 2d 838 (N.D. Ill. 2003) ..............................................................32

*U.S. v. Arnaout,*
    N.D. Ill. Case No. 02-CR-892........................................................................29, 32

*United States v. Arnaout,*
    431 F.3d 994 (7th Cir. 2005) .........................................................................32

*United States v. Articles of Banned Hazardous Substances Consisting of an*
*Undetermined No. of Cans of Rainbow Foam Paint,*
    34 F.3d 91 (2d Cir. 1994)..............................................................................10

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991).........................................................................10

*United States v. Kantengwa,*
    781 F.3d 545 (1st Cir. 2015) .........................................................................33, 36

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008)..........................................................25, 35, 36, 39

*United States v. Rahman,*
    189 F.3d 88 (2d Cir. 1999).............................................................................11, 15

*United States v. Rubi-Gonzalez,*
    311 Fed. Appx. 483 (2d Cir. 2009) .................................................................36, 39

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006)...........................................................................10, 12

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir. 2004).............................................................................4

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)...........................................................................18

*Veleron Holding, B.V. v. Morgan Stanley,*
    117 F. Supp. 3d 404 (S.D.N.Y. 2015)..............................................................4

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)................................................................................................3, 10

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004)....................................................................................................3

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017)................................................................................................26

**Federal Rules of Evidence**

FRE 403 .................................................................................................................................1, 10

FRE 404 ......................................................................................................................................1

FRE 702 ...........................................................................................................................*passim*

FRE 703 .....................................................................................................................................35

## INTRODUCTION

This litigation has been pending for nearly two decades. Fact discovery has spanned more than ten years, during which time approximately two million pages of documents were gathered from all corners of the globe and numerous depositions of fact witnesses were held all around the world. The tragedy of the terrorist attacks of September 11 remains, but Plaintiffs' exhaustive efforts to find facts linking them to these Defendants[1] have failed. Now, in an attempt to find some way around the absence of factual evidence, Plaintiffs seek to roll out a group of ideological professional "terrorism experts" to try to launder improper expert opinion as fact. This is precisely what *Daubert* was designed to prevent.

Defendants, pursuant to the Court's September 29, 2021 Order (Dkt. 7160), bring this "bellwether" motion under Rule 702 and *Daubert* to strike the reports and proffered testimony of Plaintiffs' experts Jonathan Winer, Esq. ("Winer") and Brian Michael Jenkins ("Jenkins").[2] As detailed in this memorandum, despite their narrow credentials, Winer and Jenkins, collectively, offer up wide-ranging, result-oriented opinions without sufficient factual bases or application of a proper methodology, among other improprieties. It is the Court's role as gatekeeper of the evidence to prevent this case from becoming a forum for ideological ruminations about the fears and uncertainties of the last forty years of international history.

In his affirmative and rebuttal expert reports, which combined are over two hundred pages, Winer, a career macro-level financial policy advisor and practicing attorney, offers a smorgasbord

---

[1] "Defendants" means Dubai Islamic Bank, World Assembly of Muslim Youth and World Assembly of Muslim Youth International (collectively, "WAMY"), International Islamic Relief Organization ("IIRO"), Muslim World League ("MWL"), Dr. Abdullah Omar Naseef, Dr. Abdullah bin Saleh Al Obaid, Dr. Abdullah Abdelmohsen Al Turki, Dr. Adnan Basha, and Yassin Kadi.

[2] In light of the Court's Order requesting "bellwether <u>Daubert</u> motions," the Defendants do not raise evidentiary challenges, including but not limited to FRE 403 and 404, but reserve the right to raise such challenges to the expert testimony of Winer and Jenkins at a later date should the Court not strike their reports.

of opinions despite not having the requisite qualifications and having been previously struck by a court in an analogous case for trying to do the same thing. Lacking the requisite knowledge and experience, Winer instead cites prominently to his inside-the-beltway exposure as expertise, no matter how tangential to the issues upon which he opines. Winer proffers views on issues plainly not appropriate for expert testimony and fails to provide facts to back up his off-the-cuff, political punditry masquerading as expertise. He fails to reliably apply what limited methodology he articulates, as he cherry-picks facts from the relatively small number of documents furnished to him by Plaintiffs' counsel and ignores contrary evidence.

Winer particularly sought to opine on, and critique, the financial record-keeping and controls of the Charity Defendants,[3] even though he has no training or experience on such subjects and did not bother to examine more than a handful of the financial records of these charities before issuing his affirmative report. An advocate, not an expert, Winer contorts the *lack* of any direct evidence linking the Charity Defendants to Al Qaeda as evidence of their support of Al Qaeda, relying instead on the disturbing claim that he knows Middle Easterners are "duplicitous," saying one thing in front of Western audiences but believing something else entirely. He also purports to opine on U.S. Department of Treasury and U.N. designation processes for which he lacks relevant expertise and that are in any event not germane to the case. Through his reports, Winer serves as an impermissible conduit to irrelevant and unreliable hearsay materials from witnesses and documents, some of which Plaintiffs have tried, but failed, to authenticate and instead through their experts seek to introduce through the back door.

Jenkins's report suffers from similar failures and should be excluded. Jenkins, a RAND Corporation advisor, purports to examine the 9/11 operation from Al Qaeda's point of view. Yet

---

[3] "Charity Defendants" refers to MWL, IIRO, and WAMY.

he cites effectively nothing as the basis of his conclusions and when he does cite something, he usually just makes himself a conduit for the hearsay of the *9/11 Commission Report*. Jenkins also unreliably applies his avowed historical methodology, speculates impermissibly about others' motives and thinking, and opines on irrelevant topics.

For these reasons, and as articulated in greater detail below, Defendants respectfully request that the Court strike the reports and exclude the proffered testimony of Winer and Jenkins in this litigation.

## ARGUMENT

Trial courts have the role of "gatekeep[er]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,"[4] and Plaintiffs have the burden to establish that their experts' testimony is admissible.[5] As detailed below, they cannot do so for either Winer or Jenkins. Given that these two experts' reports combined run nearly 240 pages[6] and egregiously fail to comply with Rule 702 and *Daubert*, it is not possible to catalog within forty pages each instance of impermissible testimony. Accordingly, in addition to the many examples identified herein, Defendants provide a table (attached at Exhibit D) that links each area of challenge to the improper portions of these experts' reports.

## I.     An Expert Must Have Requisite Qualifications for Each Subject on which He Opines

Only a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify."[7] Courts "must ensure that an expert will be proffering opinions on issues

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–49 (1999).

[5] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

[6] Winer submitted an affirmative report, titled Expert Report of Jonathan M. Winer, attached at Exhibit A, and a rebuttal report, titled Rebuttal Report of Jonathan M. Winer, attached at Exhibit B. Jenkins submitted an affirmative report, titled The Road to 9/11:  The September 11 Terrorist Attack on the World Trade Center, attached at Exhibit C.

[7] FRE 702.

3

or subject matter that are within his area of expertise."[8] To do so, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."[9] Expertise and qualifications in one field do not necessarily extend to others.[10] Further, where experience is the asserted basis for expertise, an expert must show how it "led to his conclusion or provided a basis for his opinion."[11] Thus, "courts do not simply take the word of people with experience"[12] that their experience adequately supports their opinions.

## A. **Winer's Experience Does Not Provide the Requisite Specialized Knowledge for the Multitude of Subjects on which He Opines.**

Winer repeatedly offers opinions far exceeding his narrow field of expertise.[13] Winer, a lawyer with prior experience as a mid-level State Department official, submitted over two hundred pages of reports as Plaintiffs' proffered omnibus expert. While Plaintiffs seek to have Winer offer expert opinions on every topic category identified by the Court,[14] his experience and qualifications are not relevant to the issues on which he opines. No court has ever deemed Winer qualified to deliver expert testimony similar to that which Plaintiffs proffer in this case, and this Court should

---

[8] *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009).

[9] *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

[10] *Nimely v. City of N.Y.*, 414 F.3d 381, 399 & n.13 (2d Cir. 2005) ("emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields") (reversing admission of expert testimony as violating Rule 702); *see also Pan Am. World Airways, Inc. v. Port Auth. of N.Y. & N.J.*, 995 F.2d 5, 7, 10 (2d Cir. 1993) (affirming refusal to qualify expert with some knowledge in area and prior expert experience); *Estate of Jaquez v. City of N.Y.*, 104 F. Supp. 3d 414, 429–31 (S.D.N.Y. 2015) (emergency room doctor who treated gunshot wounds and "consulted with an unidentified forensic pathologist" not qualified to opine on gunshot victim's position when shot), *aff'd*, 706 F. App'x 709 (2d Cir. 2017).

[11] *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006); *see also Stelman v. United States*, 14-CV-05363(SN) 2016 WL 5315196, at *10 (S.D.N.Y. Sept. 21, 2016) ("An expert relying on personal experience 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" (quoting FRE 702 Advisory Comm. Notes, 2000 Amendments)) (Netburn, M.J.).

[12] *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015).

[13] *See* Ex. D.

[14] "[B]roadly speaking, it appears to me that the experts fall into a handful of categories" including, (1) "geopolitical or historical experts", (2) "financing, international money laundering rules, accounting, banking practices, etc.", and (3) "planning and organizing or funding for the 9/11 attacks." Sept. 29, 2021 Conf. Tr. at 7:23-8:10, attached at Exhibit E.

not do so here.

As a macro-level policy analyst,[15] Winer's expertise is in "financial regulation including the regulation of financial institutions in the United States and around the world to combat money laundering and terrorist finance."[16] As a legislative staffer, a mid-level official with the State Department in the 1990s, and a private consultant for the government, much of Winer's work since the mid-1980s has focused on policy issues concerning appropriate controls in financial systems to track and prevent financial crimes including money laundering, corruption, and "terrorist finance."[17] Additionally, from September 2013 to January 2017, Winer occupied the niche State Department roles of Special Envoy for Libya and Special Advisor for the resettlement of an Iranian dissident group.[18] None of this qualifies him on the panoply of topics on which he opines.

Winer admits that he is not an expert on Islamic religious doctrine nor on all Islamic terms and concepts.[19] He claims to be able to "discuss" the Wahhabism and "Salafism" movements but admits that he is not an expert in religion and has not spent his professional life studying Islam or as a religious scholar.[20] Winer has never been posted to Saudi Arabia ("the KSA").[21] He is not an expert on the KSA or any other relevant regions or their histories and geopolitics. Nor has Winer ever given testimony or published any article on the following: Al Qaeda, Islamic charities, or any alleged connections between them; charities in general, alleged abuse of charities to fund terrorism,

---

[15] Winer Dep. Tr. at 83:4–87:25, 89–95:21, 99:7–100:1, 102:5–104:1, 295:9–297:7 (discussing career analyzing financial regulatory and banking systems on nation-wide scales and developing policies and procedural controls for financial regulatory systems to better track and prevent improper financial activity including money laundering, terrorism financing, and corruption). A compilation of the excerpted portions of Winer's deposition transcript is attached at Exhibit F.

[16] Ex. A, App. 1A at 136.

[17] *Id.*; *see also* Ex. A, App. 1B at 141–42.

[18] Ex. A, App. 1A at 136–37, 1B at 140–41.

[19] Ex. F at 74:4–78:5.

[20] *Id.* at 76:25–77:3, 177:21–178:8.

[21] *Id.* at 79:5–7.

or Gulf charities in particular; the geopolitics of the KSA; Islam, Wahhabism, Salafism, or Jihad.[22] He has no training in the applicable accounting standards and only limited knowledge of banking and financial standards in the KSA.[23] Nor is Winer a certified fraud examiner, a forensic accountant, a CPA, or an auditor.[24] He is manifestly unqualified to opine on the Charity Defendants' compliance with the accounting and auditing standards and requirements in place in the KSA, Pakistan, and other foreign countries between 1992 and 2002. He has never interviewed any Al Qaeda member and has no field experience pre-9/11 in Afghanistan, Chechnya, or Bosnia.[25] He has never authored any peer-reviewed article on terrorist financing or Al Qaeda.[26] Outside of blog posts, his writings and testimony on terrorist financing focus on policy and regulatory changes to counter terrorist financing.[27] He is not an expert on Al Qaeda, its history, its ideology, or its sources of funding, including specifically from any of the Charity Defendants.

Troublingly, Winer's "experience" and knowledge concerning Al Qaeda and the alleged role of the Charity Defendants in supporting Al Qaeda comes not from work he did but from alleged passing conversations and communications with other government officials who (he suggests) would know enough to opine on these issues.[28] Winer improperly devotes large sections of his affirmative report to these hearsay "statements from the most senior U.S. government officials working day-to-day on terrorist finance issues in the period before, during, and/or after the 9/11 attacks."[29]

---

[22] Ex. A, App. 1B at 143–51.

[23] Ex. F at 294:16–295:8, 296:9–297:13.

[24] *Id.* at 57:13–18, 277:10–17. In a prior case in which he assessed terrorist finance vulnerabilities, a forensic accounting firm reconstructed the financial record for him. *Id*. at 73:5–19; *see also id*. at 71:9–19.

[25] *Id*. at 64:18–24.

[26] *Id*. at 107:25–109:12; Ex. A App. 1B at 143–51.

[27] *See, e.g.*, Ex. A, App. 1B at 146–49.

[28] *See, e.g.*, Ex. F at 59:3–60:7, 89:9–90:12, 127:3–9.

[29] *See, e.g.*, Ex. A at 37, ¶ 6.7.11; *see also id.* at 21–37, ¶¶ 6–6.7.12; 53–54, ¶¶ 8.5–8.5.5; 88, ¶ 12.7.1.

While he claims to have been qualified as an expert witness on terrorism finance, this is not accurate. It is true that Winer was among many experts listed by plaintiffs in the terrorism case of *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012). However, Judge Weinstein found that Winer was qualified to testify as an expert only on very narrowly circumscribed matters relating to U.S. banking terminology, standards and practices, but that he was "not qualified under *Daubert* and Rule 702 to opine as to Hamas's agenda or relationship with terrorist organizations" or "its interaction with charitable organizations."[30] This Court should similarly find that Winer is not qualified to opine on Al Qaeda's alleged connections to charities here.

Winer is also unqualified to opine on the Office of Foreign Assets Control's ("OFAC") Executive Order ("EO") 13224 designation process. He never worked at OFAC or directed its designation process; he has never even worked at the Treasury Department. But in opining on the OFAC designation process, Winer repeatedly relies on his personal experience in government, claiming he "was involved in understanding thoroughly the process that the United States government uses for designations" and "was part of interagency discussions about designating particular entities under various executive orders."[31] Yet Winer admitted that *none* of the experiences and discussions he describes having in government involved an OFAC designation under EO 13224—the very basis for the designation process about which he seeks to testify.[32]

Winer's first stint in the U.S. State Department ended in 1999, before EO 13224 even

---

[30] *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d at 536.

[31] *See* Ex. F at 533:7–16; *see also* Ex. A at 130, ¶ 16.2.2 ("I have personally been involved in discussions at the National Security Council in which one or more components of the U.S. government have opposed the designation of persons or entities who engaged in acts defined as terrorism" due to law enforcement or intelligence considerations.); *id.* at 131, ¶ 16.2.3.2 ("I have personally participated in discussions . . . in which foreign policy considerations were major factors in deciding whether to designate a person or an entity under a U.S. sanctions program."); *id.* ¶ 16.3 ("[T]he U.S. often refrains from designating people and entities under EO 13224 for a variety of…reasons…as I have seen through my own direct participation in discussions at the National Security Council.").

[32] Ex. F at 532:10–24 ("Q. And did any of those interagency discussions … involve designations or de-designations under executive order 13224? A. No.").

existed, and none of Winer's designation-related discussions in that period even concerned terrorist activity.[33] Instead, his daily focus was "international organized crime and financial crime," and non-13224 terrorism sanctions came up only in "comparison" to organized crime sanctions.[34] Winer's second State Department stint began in 2013, and he had discussions in his niche roles as "Special Advisor" for resettling an Iranian dissident group and "Special Envoy for Libya" but none of those discussions concerned EO 13224, either.[35] Finally, in private practice Winer represented just two clients seeking *de-designation* under EO 13224.[36] Winer admitted that he has never "performed any systematic review" of de-designations.[37] His unrelated, outsider experiences constitute neither expertise nor sufficient factual basis for Winer's extensive opinions on the EO 13224 process.[38]

Winer also opines on the mechanics of the United Nation's Security Council's ("UNSC") Resolution 1267 listing and delisting processes, as well as the purpose of imposing and removing those sanctions, including the "main reason why the designations are removed."[39] But Winer concedes he has no personal experience with the imposition or removal of sanctions under Resolution 1267—another mechanism that postdated the bulk of his time in government.[40] Asked

---

[33] *Id*. at 498:20–500:14, 528:14–529:3; Ex. A App. 1B at 141.

[34] Ex. A, App. 1A at 136; Ex. F at 102:11-18; 499:25–500:12; 531:3–14.

[35] Ex. A, App. 1A at 136–37; Ex. F at 532:20–24.

[36] Ex. F at 529:4–7; Ex. A App. 1B at 141.

[37] Ex. F at 540:14–16.

[38] Asked to explain why he asserts that other sanctions processes that he *did* discuss in government are "the same" or "similar" to OFAC's EO 13224 process, *id.* at 531:15–19, 534:8–15, Winer again cites his discussions "with people who were more directly involved in it on a regular basis than [he] was in terms of particular candidates or entities. It's something I've been immersed in going back to the 1990s", *id.* at 534:16–21, 535:3–19, but none of the discussions in which he grounded his opinions concerned a designation under EO 13224, *id.* at 532:20-24 (and those in the 1990s predated that order). Further, he admitted that the sanctions processes' "details may be different…depending on the circumstances and the particular program," *id.* at 536:4–9, and with respect to the varying details of the EO 13224 process, he deferred to those who were actually "there first-hand at the time." *Id.* At 536:11–537:6.

[39] Ex. A at 134–35, ¶¶ 18–18.4; Ex. F at 542:8–23.

[40] Winer admitted that "[t]hey took place following [his] departure" from the State Department and that he only has "some sense of the process" by which the UNSC lists and delists. Ex. F at 541:1–17 and 541:23–542:7.

to provide "all the bases" for his knowledge about the Resolution 1267 listing and delisting processes, Winer vaguely described "conversations" he had with unnamed U.S. officials while in government concerning "the desirability" and feasibility of seeking multilateral sanctions against "*crime* entities," authority that did not exist at that time.[41] Winer's personal experiences are "simply inadequate to support" his opinions on OFAC designations under EO 13224 or UNSC designations under Resolution 1267.[42]

### B. Jenkins Is Concededly Unqualified to Offer Certain of His Opinions.

Jenkins has no expertise in religion, and resoundingly disclaimed any expertise in religion, Islam, or the history of Islam,[43] yet his report is peppered with opinions on these matters. He opines, for instance, on the ethical implications of particular religious beliefs, the Quranic concept of jihad, jihad in the history of Islam, and the goals of Salafism.[44] While conceding that he is "not a theologian," and testifying that he could provide only "a personal view" that Al Qaeda "distorted" Islam, he still opines on Al Qaeda's "radical interpretation" of the Islamic concept of jihad.[45] Similarly, he testifies that he "suspect[ed]" Al Qaeda "like[d] the Wahhabi ideology as part of [its] ideology," but notes his lack of qualifications in this space, saying that explaining his own opinion would "take me down a path of theological discussions and I'm going to run through the end of my rope there very quickly."[46] Because Jenkins is admittedly unqualified, the Court should exclude

---

[41] *Id.* at 572:5–573:20 (emphasis added); *id.* at 573:15–18 ("And that was a factor in the decision—probably—it's hard to remember precisely, but [lack of authority] was a factor in our decision not to move forward at that time [with sanctions]."). Moreover, some of these conversations took place in the 1990s, before Resolution 1267, and Winer's memory of the specifics admittedly "is much less precise." *Id.* at 574:1–6.

[42] *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

[43] Jenkins Dep. Tr. At 286:5–25. A compilation of the excerpted portions of Jenkins's deposition transcript is attached at Exhibit G.

[44] Ex. C at 6, 9–10, 16–18.

[45] Ex. G at 97:9–99:3; Ex. C at 18.

[46] Ex. G 48:10–20, 268:2–21. (Jenkins also protested that this exceeded his report, but his "Al Qaeda's worldview" section linked Wahhabism to Salafism, and Salafism to jihadism, in introducing Al Qaeda's jihadism. Ex. C at 17–18).

his proffered testimony on Islam.[47]

## II.     An Expert Must Not Proffer Irrelevant and Unhelpful Testimony

Expert witnesses may testify only if their "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[48] That "helpfulness" inquiry "goes primarily to relevance": "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[49] Courts must therefore ensure that expert testimony "is relevant to the task at hand."[50] As part of determining "whether expert testimony will be helpful to the fact-finder, the Court must determine whether the testimony usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."[51] The "well-established rule" in the Second Circuit is that "experts are not permitted to present testimony in the form of legal conclusions,"[52] and therefore, "an expert's testimony on issues of law is inadmissible."[53] Courts "exclude expert testimony that provides legal opinions, legal conclusions, or interprets legal terms,"[54] even implicitly.[55]

### A.   <u>Winer Opines on Irrelevant and Unhelpful Topics and Usurps the Jury's Role</u>.

Winer's reports are replete with irrelevant and unhelpful testimony, and he packs them with

---

[47] *See* Ex. D.

[48] FRE 702(a).

[49] *Daubert*, 509 U.S. at 591 (internal citations and quotation marks omitted); *see also Gill*, 893 F. Supp. 2d at 541 (concluding that irrelevant expert testimony violated FRE 702 and 403).

[50] *In re Vivendi*, 838 F.3d at 253 (internal quotation marks omitted).

[51] *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (alterations omitted) (Netburn, M.J.); *see United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (explaining that expert testimony offering legal conclusions trespasses on trial judge's exclusive territory).

[52] *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994).

[53] *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

[54] *Scott*, 315 F.R.D. at 48–49 (excluding legal opinion); *see also Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322 (E.D.N.Y. 2013) ("*Linde II*") ("Mr. Gurulé's report is replete with inadmissible legal opinions or explanations of the law.").

[55] *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (*In re Rezulin I*); *id.* at 547 (excluding legal opinion).

improper legal conclusions that usurp the jury's function rather than assisting it.[56]

For instance, his extensive quotation from a 1996 State Department cable about purported royal stipends in the KSA, their $2 billion annual budget, and Saudi princes living in arrears is irrelevant to this case.[57] He attempts to justify these quotations with the attenuated explanation that Saudi Royal corruption and familial finances somehow provided an environment for charities to keep inaccurate and incomplete accounting records.[58] This conclusion does not follow and the alleged Royal profligacy is not "relevant to the issues before the jury."[59]

Winer also offers irrelevant and unhelpful opinions on designation processes under EO 13224 and Resolution 1267. Two types of designations are of note: (i) certain Defendants or their branches or employees were designated by OFAC and/or the UNSC after 9/11; and (ii) Plaintiffs may allege that some non-designated Defendants assisted or were otherwise connected to persons who were designated after 9/11. But no designations, let alone post-9/11 designations, are disputed in this case, and the fact of such post-9/11 designations is irrelevant to Plaintiffs' causes of action.[60]

Nor will Winer's protracted survey of the processes resulting in *post*-9/11 designations "make it more or less likely" that the Defendants are liable for their *pre*-9/11 conduct.[61] Designations are the product of highly discretionary, *ex parte* administrative assessments, "not decisions about whether the U.S. government can prove" guilt, and for that reason, Winer admitted,

---

[56] *See* Ex. D.

[57] Ex. A at 65, ¶¶ 9.13–9.13.4.

[58] *Id.* at 66, ¶ 9.14.

[59] *United States v. Rahman*, 189 F.3d 88, 137–38 (2d Cir. 1999) (in case concerning plots against Egyptian president and United States, excluding expert testimony on Egypt's human rights record, as well as defendant's religious beliefs and political understandings, as irrelevant and distracting).

[60] *Cf. Linde II*, 922 F. Supp. 2d at 332 (precluding expert testimony on "the methods, significance, and processes regarding official terrorism designations" in part because no one disputed Hamas was designated, and such testimony "does not make it more or less likely that the [defendant was liable], nor would … help the jury decide that question of fact").

[61] *Id.*; *see also In re Rezulin I.*, 309 F. Supp. 2d at 544 (expert opinions on whether defendants behaved unethically "would not assist the fact-finder in determining any factual dispute in [a] case" in which "principal issues" were whether defendants breached legal duties and caused injury).

they "are not subject to the same rules that would be applicable to a criminal, or even a civil, case."[62] Precisely because designations are "subject to a standard of proof that is lower than the preponderance of the evidence standard that plaintiffs must meet," the court in *Gill* recognized that such testimony has "limited bearing on issues such as [defendant's] conduct or mental state."[63] Rather than "assist[ing] the jurors to understand the evidence or determine a factual issue" before them, Winer's designation-processes testimony will only confuse the jury about the evidence and issues.[64] It is for the jury to weigh the underlying evidence to determine liability, not to defer to the untested, *ex parte*, and non-transparent determinations of the U.S. government or U.N. Moreover, the fact that certain parties (or their branches) and non-parties were designated *after* 9/11 "simply is not relevant"[65] to assessing Defendants' conduct and mental states *before* 9/11 and *before* the public designation of some persons or entities with which Defendants may have previously interacted.[66] They are designed only to try to get inadmissible and prejudicial post hoc information before the jury.

In addition to these irrelevant topics, Winer offers broad and unsupported legal conclusions that, rather than helping the fact-finder, would usurp its role of applying the law to the facts. One instructive example warrants mention. In Section 3.11 of his affirmative report, Winer opines that "IIRO, MWL, and WAMY each provided significant material support to [A]l Qaeda without which it would not have achieved its global capabilities."[67] Because Plaintiffs do not have facts sufficient

---

[62] Ex. A at 127, ¶ 15.6 (evidentiary standard for designation "is not the same standard required by a court for a criminal conviction, or the same standard for even a civil case"); *id.* at 134–35, ¶¶ 18–18.4 (describing UN designation processes); *see also id.* at ¶ 18.1 (noting that UNSC designates on members' proposals).

[63] 893 F. Supp. 2d at 535–36 (allowing designation testimony, but directing proponent to address its "probative force, if any").

[64] *Stewart*, 433 F.3d at 312 & n.10.

[65] *In re Rezulin I*, 309 F. Supp. 2d at 544.

[66] The unhelpfulness of this testimony is only exacerbated by the controversy and evidentiary redactions plaguing the OFAC designation process, which Winer admitted "was not as complete" in "the frantic first weeks and months after" 9/11 when some of the designations related to Defendants occurred. Ex. F at 536:13–14; Ex. B at 39, ¶ 3.6.3.

[67] Ex. A at 9, ¶ 3.11.

to support a finding of liability, they offer up Winer's convenient opinion that certain elements of their baseless claims are met. In this way, Winer demonstrates precisely why judges—not advocates posing as experts—apply the law in the courtroom.[68] This and Winer's other unhelpful testimony and impermissible legal conclusions should be excluded.[69]

**B.** **Jenkins Offers Incomplete, Inaccurate, and Irrelevant History that Is Unhelpful.**

Although this case concerns the events of 9/11, Jenkins offers a protracted discussion that long predates Al Qaeda, covers actors around the globe with no connection whatsoever to Al Qaeda, and details a wide assortment of events with absolutely no relation to 9/11. In his report, he reaches back to 1968—when Bin Laden was a school boy—to detail the beginnings of commercial airline hijackings by secular Palestinian terrorists, the Japanese Red Army, and even Sikh extremists.[70] He focuses on  terror groups like the Popular Front for the Liberation of Palestine, and iconic terrorist targets like Big Ben and the Eiffel Tower, sites in Syria and Timbuktu, and the Bamiyan Buddhas in Afghanistan, none of which is connected to Al Qaeda or the 9/11 attacks.[71] Jenkins's discussion of this irrelevant history should be excluded.[72]

---

[68] *See Scott*, 315 F.R.D. at 48–49 ("Mr. Crandall's testimony reads more like lawyer's argument…these are arguments to be made by counsel. And the Court or the jury will ultimately determine whether they hold true. Thus, those portions of Mr. Crandall's testimony that purport to analyze the relevance of plaintiffs' evidence are struck, and Mr. Crandall is precluded from testifying about what conclusions should be drawn from the evidence he has gathered."); *see also Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-Civ.-4819 (GBD)(BCM), 2020 WL 3429775, at *10 (S.D.N.Y. June 23, 2020) (striking improper expert testimony for stating legal conclusion that a party did not infringe on copyrighted material) (Daniels, J.), *aff'd in part and remanded on other grounds*, 838 F. App'x 588 (2d Cir. 2020).

[69] *See* Ex. D, which catalogs other such examples. In one such instance, Winer even offers an incorrect legal interpretation. *See* Ex. A at 10–11, ¶ 3.13 (stating that OFAC sanctions under EO 13224 "apply economic sanctions to terrorists and those supporting terrorists" and that these "sanctions are only applied to those who have already engaged in terrorism or material support to terrorists," which is contradicted by another Plaintiffs' expert, Jimmy Gurulé, who testified under oath that one can be designated without evidence of committing or intending to support terrorism (*see* Gurulé Dep. Tr. At 84:8–86:6, attached at Exhibit H)).

[70] Ex. C at 7–9.

[71] *Id.* at 9–10, 12.

[72] In fact, Jenkins dedicates a significant portion of his report to discussing upwards of 10 terrorist plots in which, as he admitted, Al Qaeda was not even involved. *See id.* at 7–11, 12, 13–14; Ex. G at 94:5–6, 232:17–233:3 ("Bojinka was not an Al Qaeda operation" and "reported financing" only evidence of involvement); *id.* at 214:16–215:15 (all plots described on pages 7 to 11, other than 9/11, did not involve al Qaeda).

Jenkins also details the 1993 World Trade Center bombing and Bojinka plot (a Philippines-based scheme to bomb commercial jets over the Pacific in the mid-1990s), despite his own concession that neither was an Al Qaeda plot,[73] and despite the undisputed fact that Khalid Shaikh Mohammad ("KSM") had not even met with Bin Laden, let alone begun working with Al Qaeda, until after both operations.[74] Jenkins further admitted that: (1) the local plotters of the 1993 bombing were neither members of nor affiliated with Al Qaeda; and (2) he did not know of any evidence that Ramzi Yousef, the common participant in the 1993 bombing and the 1994-95 Bojinka plot, ever met Bin Laden, had any financial transactions with Al Qaeda, or was a member of Al Qaeda.[75] Jenkins also admitted that the only connection between Al Qaeda and the Bojinka plot was the "reported financing, and with the operative word being reported."[76] As he explained, he read about that (where he could not remember), did not confirm it, did not make a judgment on it, and does not know if it is true.[77] These and other such proffered opinions are not helpful to the jury and should be excluded.[78]

## III.   An Expert Must Not Speculate as to Motive and Mental State

"As a general rule, inferences about the intent or motive of parties or others lie outside of the bounds of expert testimony."[79] Experts "may not testify on the intent, motives or states of mind of corporations, regulatory agencies and others if the expert has no basis in any relevant body of

---

[73] Ex. C at 11–12, 13–15; Ex. G at 233:10–234:14 ("fair inference" that Al Qaeda did not support the 1993 World Trade Center bombing); *id.* at 94:5–6 (Bojinka "was not an Al Qaeda operation").

[74] Ex. C at 11, 16, 23; Ex. G at 76:3–8.

[75] Ex. G at 233:10–234:14; 93:20–94:17; 79:23–85:17; *see also* Ex. C at 15.

[76] Ex. G at 232:17–233:3.

[77] *Id.* at 228:22–229:19. *See infra*, Part V.B. at 33-36, for a discussion of Jenkins's failure to apply a reliable methodology.

[78] Exhibit D catalogs other such examples.

[79] *Scott*, 315 F.R.D. at 46–47.

knowledge or expertise,"[80] because Rule 702 requires that expert testimony be grounded in "knowledge," not "subjective belief or unsupported speculation."[81] Intent is a question that "juries must answer . . . with the lay tools [of] examination of testimony and documents, and assessment of credibility."[82] Thus, speculative "opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person" are improper.[83] Experts are "not competent to testify to [another's] intentions or beliefs" and parties may not tell the jury about someone's "thoughts" or "intentions through the mouths" of experts.[84]

### A.   Winer Impermissibly Opines on Defendants' and Others' States of Mind.

Winer repeatedly violates the prohibition against proffering state of mind evidence.[85] In his affirmative report, an entire section – entitled "*[t]he work of the charities to support militancy, warfare, and terrorism, was intended to be covert, not overt, so that formal records did not show such support*" – explicitly discusses the Charity Defendants' purported intent, not even identifying individuals, just attributing intent to entire entities.[86] There, Winer posits, based on the bigoted trope he peddles earlier in his affirmative report that Middle Easterners tend to be "duplicitous" and hide their true intent; and that "no one should expect that any charities involved in supporting al Qaeda accurately documented that activity."[87] In Winer's worldview, because the Islamic charities hail from the Middle East, they intended to support Al Qaeda surreptitiously,

---

[80] *Id.* (excluding restaurant analyst's expert testimony regarding motivation behind restaurant chain's business model as improper "without dispositive support").

[81] *Daubert*, 509 U.S. at 590.

[82] *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-CV-4500-GHW, 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021); *see Scott*, 315 F.R.D. at 46–47.

[83] *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) ("*Linde I*"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 195 (S.D.N.Y. 2009) (excluding expert testimony on this ground).

[84] *Rahman*, 189 F.3d at 136; *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion of testimony, noting that experts speculated as to motives and intent).

[85] *See* Ex. D.

[86] Ex. A at 61, ¶ 9.7 (emphasis in the original).

[87] *Id.* at 67, ¶ 9.16.

duplicitously engaging in "a double game" by not documenting their activities, "*intend*[ing] to provide deniability."[88] Elsewhere, Winer postulates that the charities' intent to operate covertly explains the absence of evidence of their wrongdoing.[89] In other words, Winer perversely concludes that the absence of evidence that the Charity Defendants intended to support Al Qaeda is itself evidence of their pro-Al Qaeda work. He appoints himself an authority and ignores the documentary evidence from those defendants based on his assumption that they are duplicitous and their records and testifying officials are all untrustworthy. This race-baiting narrative is beyond the pale and excludable under the rules.

Winer purports to know not only what "duplicitous" Middle Easterners subjectively think, but Westerners too. He speculates, without a shred of factual support, that the 9/11 Commission had evidence that WAMY, MWL and IIRO were sources of 9/11 funding but, motivated by foreign policy considerations, did not name them.[90] As Winer opines, the 9/11 Commission did so as "a matter of intention . . . in the context of the overall U.S.-Saudi relationship."[91] When pressed at his deposition, however, he concedes that "[n]o one at the 9/11 Commission stated that [intention] to me".[92] Winer would have the fact-finder rely on his unfounded biases and conjectures rather than on the existence – or, more properly, the absence – of evidence.[93]

---

[88] *Id.* at 59–60, ¶¶ 9.5–.6.1 (emphasis in original); 67, ¶ 9.16.

[89] *Id.* at 61, ¶ 9.7.

[90] Ex. A at 23, ¶ 6.5; Ex. F at 406:8–409:12; *see also id.* at 143:25–144:3.

[91] Ex. F at 409:2–6.

[92] *Id.* at 406:8–409:12; Ex. A at 37, ¶ 6.7.12.

[93] Ex. F at 408:10–409:6; Ex. A at 23, ¶ 6.5; *see Scott*, 315 F.R.D. at 46–47 (expert may not assign motivation or intent to party's actions); *see also Kewazinga*, 2021 WL 4066597, at *16 (expert opining what party thought based on public and internal statements excluded); *Linde II*, 922 F. Supp. 2d at 327 (excluding testimony concerning whether Israeli government or individual Palestinians would have permitted behavior supportive of terrorism); *Linde I*, 920 F. Supp. 2d at 285 (excluding expert testimony attempting to "paint a picture for the jury regarding . . . intent . . . and motivations").

**B.  <u>Jenkins Offers Impermissible Speculation as to Motive and Mental State</u>.**

Aiming to write his report "from al Qaeda's point of view" and seeking to answer, among other questions, "[h]ow did its leaders view the world? What were they trying to do?" Jenkins opines on groups' and individuals' mindsets and motives.[94] For example, Jenkins asserts that Al Qaeda's "strategists believed in divine intervention"; "Bin Laden believed that if the United States could be driven out of the Middle East, the jihad would triumph"; and KSM was "[n]ot an especially pious man… more interested in the what, where, and how than in why."[95] Much of his testimony concerning "motivations, intent, state of mind, or purposes" is unflinchingly religious in nature.[96] But as outlined above, Jenkins is not an expert in religion. When asked, Jenkins claims to draw these insights into Al Qaeda's perspective from criminal complaints, trial transcripts, detainees' statements, and generally what Al Qaeda members have said, written, or done "as evidence of how they viewed things and how they did things and intentions."[97] But he admitted that such sources cannot reflect every individual's viewpoint.[98] He also conceded their limitations, saying, "I don't have an x-ray vision and I don't know this is what bin Ladin was thinking, this is always indirect evidence as to what he says and what Al Qaeda did."[99] And Jenkins usually did not cite support of any kind when making claims about Al Qaeda figures' perspective, and admitted that at times he relied on his own "surmise."[100] These and other such opinions should be

---

[94] Ex. C at 2, 17.

[95] *Id.* at 16; *see* Ex. G at 78:15–79:4 (describing KSM's "tremendous ego" and offering "surmise" as to hubris to discredit particular statement).

[96] Ex. C at 9–10 ("Showing off their talent was important to the operational planners of terrorist attacks while demonstrating their devotion and prowess was extremely important to al Qaeda's operatives"); *id.* at 17 ("Islamists or Salafists—those committed to a restoration of the original or purer form of Islam that prevailed at the time of the Prophet—… increasingly began to think of themselves as a jihadist vanguard."); *see In re Fosamax*, 645 F. Supp. 2d at 195; *see also supra* at Part I.B. at 9-10 (explaining Jenkins is unqualified to testify on religion).

[97] Ex. G at 126:13–129:3.

[98] *Id.* at 127:22–23.

[99] *Id.* at 48:11–15.

[100] *See supra* n.96, *infra* n.107.

17

excluded.[101]

## IV.    An Expert's Testimony Must Have Sufficient Factual Basis

Expert testimony must bear "the indicia of reliability,"[102] meaning they are "based on sufficient facts or data"; "the product of reliable principles and methods"; and the expert must have "reliably applied the principles and methods to the facts of the case."[103] The Court, as part of its required "hard look . . . to ensure [the] reliability" of proposed expert testimony, "should undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[104] "To warrant admissibility," it "is critical that an expert's analysis be reliable at every step."[105] If it is not, whether "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."[106] Expert testimony "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence support that conclusion."[107]

Indeed, the Supreme Court made clear that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. [Instead, a] court may conclude that there is simply too

---

[101] Exhibit D catalogs other such examples.

[102] *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (stating that the court's discretion in assessing reliability "is not unfettered: It does not permit the district court to perform the gatekeeping function inadequately").

[103] FRE 702(b) - (d).

[104] *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (emphasis in original; internal quotation marks omitted).

[105] *Amorgianos*, 303 F.3d at 267.

[106] *Id.* at 266.

[107] *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 126–27 (2d Cir. 2006) (affirming exclusion of testimony "based on sheer surmise and conjecture" as "insufficiently substantiated to be admissible," noting expert "essentially provided no explanation as to how he had reached his conclusion" (internal quotation marks omitted)); *see R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269–70 (S.D.N.Y. 2010) (recommending exclusion of expert testimony, noting experts' failure to describe underlying premises "with the level of specificity necessary to allow defendants' counsel and the jury to test their conclusions"); *see id.* at 250 (adopting magistrate judge's analysis).

great an analytical gap between the data and the opinion proffered."[108] Opinions "that are without factual basis and are based on speculation or conjecture are … inappropriate," as are "conclusory opinions."[109] Absence of textual support for expert opinions is fatal where an expert also fails to "utilize[] reliable scientific methods to reach [his] conclusion."[110] And this Court has excluded expert testimony where the expert failed to take into account evidence revealed during discovery that, had it been considered, would have changed the expert report.[111]

### A. **Winer's Opinions Frequently Lack Factual Basis**.

Many of Winer's opinions are devoid of a factual basis and do not meet Rule 702(b)'s criteria for admissibility. As shown below, throughout his deposition he admitted not receiving documents produced during discovery.[112] Yet, Winer opines that Islamic charities such as MWL, IIRO and WAMY funded "every aspect of Al Qaeda terrorist activities" through indoctrination in mosques and madrassas "to kill non-believers."[113] Winer concludes with misleading statements that these organizations recruit terrorists through religious propagation.[114] In short, Islam is the fatal problem. But Winer could not support these opinions with any facts showing that WAMY, MWL, or IIRO provided material support to Al Qaeda and caused the terrorist attacks of September

---

[108] *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 426 (S.D.N.Y.2016); *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (in light of *Joiner* and *Amorgianos*, explaining that objections to expert testimony go to the jury only once the Court has found that expert's conclusions based on sufficient "data, a methodology, or studies" to survive Rule 702).

[109] *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311–12 (2d Cir. 2008) (internal citation omitted) (agreeing with district court that expert assertions lacking "evidentiary citation" or elaboration could not create material issue of fact); *see also Scott*, 315 F.R.D. at 50 (excluding expert testimony "generally offered without benefit of citation to research, studies or other generally accepted support for expert testimony," saying expert had "no basis on which to render these conclusions").

[110] *In re Mirena*, 982 F.3d at 124.

[111] *ECD Inv'r Grp. v. Credit Suisse Int'l*, No. 14-cv-8486 (VM)(SN), 2017 WL 3841872, at *14 (S.D.N.Y. Sept. 1, 2017) (Netburn, M.J.).

[112] The materials Winer relied upon in forming his opinions in his affirmative report are collected in his Reliance Chart for his affirmative report, attached hereto as Exhibit I.

[113] Ex. A at 7–8, ¶¶ 3.4-3.5; 37–38, ¶¶ 7.1–7.1.1.

[114] *Id.*

11, 2001.

Winer claims that WAMY, MWL and IIRO were among those charities named by the 9/11 Commission as creating and playing a "central role" in Al Qaeda's "global infrastructure,"[115] and cites to pages 170-71 of the *9/11 Commission Report* in support of this claim.[116] However, neither the *9/11 Commission Report* nor the source cited by the Commission name WAMY, MWL or IIRO as charities having anything to do with Al Qaeda.[117] The paragraph Winer relies upon in fact reads:

> Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities – particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[118]

When pressed, Winer could only speculate that the words "such as" referred to WAMY, MWL, or IIRO, based on his claimed knowledge of what the Commission really "meant."[119] That speculation has no factual basis. Winer also ignores the 2003 congressional testimony of OFAC's then-director Richard Newcomb that Treasury had no basis for concluding that WAMY was engaged in supporting terrorism.[120]

Winer also opines, without citation to any fact, that the funds and support from the charities assisted Al Qaeda by "facilitating the transport of fighters and terrorists to combat zones."[121] When

---

[115] *Id.* at 142–47, ¶¶ 5.1; 5.3.4; 6.3; 6.3.3, 6.5.

[116] Ex. F 143:20-145:2.

[117] *9/11 Commission Report* at 170, n.118 to chapter 5, excerpts attached at Exhibit J.

[118] *Id.* at 170–71; Ex. A at 65, ¶ 4.17.4.

[119] Ex. F at 143:3–145:19; 408:9–409:22; *see also* Ex. A at 23, ¶ 6.5.

[120] *See* Ex. F at 212:21–213:25 (transcript of video of Newcomb's Congressional testimony). Winer also admitted he knew, but apparently ignored, that WAMY USA still exists as a charity in Virginia to the present day. *Id.* at 217:15–20, 218:11–17.

[121] Ex. A at 37-38, ¶¶ 7.1, 7.1.3.

asked for the factual basis for his opinion, Winer admitted "I'm not sure at this moment about WAMY in particular, on facilitating the transport of fighters and terrorists."[122] Similarly, at Section 9.4 of his affirmative report, Winer repeats the speculation without any facts that Gulf State-based charities provided funding for madrassas, which allegedly preached a radical form of Islam. The only source he provides is footnote 86, where he refers to the subject matter taught at certain madrassas with no mention of WAMY, MWL, or IIRO. During his deposition, Winer admitted that he did not know of any Al Qaeda members who attended WAMY-funded madrassas and he could not state which madrassas incubated which fighters—he simply claims to "know."[123]

Winer opines that, in sum, based upon his purported review of the financial record, the Charity Defendants provided financial and "significant material support to Al-Qaeda without which it would not have achieved its global capabilities."[124] Winer's stated factual basis for this opinion perversely includes the fact that the Charity Defendants' "publicly disclosed financial records" do *not* contain any evidence of financial support for Al Qaeda.[125] Further support is his xenophobic claim that Middle Easterners are duplicitous by nature, citing his "decades of work on Middle East issues."[126]

Winer's opinion that the Charity Defendants provided financial support to Al-Qaeda and that they lacked adequate financial controls rests in large part upon his "review" of pleadings and documents and the Charity Defendants' responses to discovery requests which he labels "improbably thin."[127] In other words, the absence of evidence from decades ago is evidence. Winer

---

[122] Ex. F at 189:5–18; *see also id.* at 190:2–8. Furthermore, at Ex. A at 45, ¶ 7.4.8, Winer claims that the charities had "twin roles: their relief efforts in Bosnia intermingled with the war effort against the Serbs." Again, Winer provides no citations to evidence or any facts concerning how the genocide of Bosniak Muslims led to the 9/11 terrorist attacks.
[123] Ex. F at 219:2–11, 219:18–24.
[124] *See* Ex. A at 9–10, ¶¶ 3.11–3.11.3; *see also id.* at 10 ¶ 3.12; 55, ¶ 9.1; 59–60, ¶ 9.5; 62, ¶ 9.7.2; 117–18, ¶ 12.20.
[125] *Id.* at 62, ¶ 9.7.2.
[126] *Id.* at 59–60, ¶ 9.5.
[127] *Id.* at 117–18, ¶ 12.20.

makes these and other[128] sweeping accusations in his affirmative report despite conceding that he reviewed no financial records pertaining to WAMY or MWL, and only three audits pertaining to IIRO.[129]

Winer also improperly seeks to impute the designation of an independent organization, the Rabita Trust, to the MWL, without any factual basis. After parroting hearsay documents without any analysis, Winer offers the unsupported conclusion that "[g]iven the Rabita Trust's status as a subsidiary of MWL", its actions "are also to be attributed to MWL."[130] Yet Winer cites nothing whatsoever to support the factual claim that Rabita Trust was a subsidiary of MWL. Not even the Treasury Department's documents, which Winer cites in connection with the designation, make that assertion.[131] This is no surprise. Documents produced in discovery—but not among the cherry-picked documents fed to Winer by Plaintiffs' counsel—make clear that the Rabita Trust was not a subsidiary of MWL.[132]

Winer's rebuttal report suffers from similar methodological deficiencies, reaching conclusions without any factual bases. There, he states that the audits of WAMY's Pakistan office provide "the clearest documentation of the lack of controls on the uses of funds by WAMY, in an area of exceptionally high risk of abuse for terrorist finance, and lists categories of spending ('stipends,' 'student welfare') which are consistent with the reports of diversions from charities for support of terrorism in that region in that period."[133] Winer acknowledges that WAMY's objective includes providing students with educational funds, but still speculates without any

---

[128] Winer asserts, for instance, "audits of entities they funded or assisted show false recordkeeping." *Id.* at 10, ¶ 3.12 n.4.

[129] *See* Ex. F at 40:16-43:2; 501:18-502:13.

[130] Ex. A at 115, ¶ 12.18.1.

[131] *See id.* at 115, ¶ 12.17.1, n.229; in fact, the Treasury Department document states that "Rabita Trust is a Pakistani non-governmental organization."

[132] *See* IIRO 111692-99, attached at Exhibit L.

[133] Ex. B at 5, ¶ 2.7.

supporting facts that the student welfare category is a "red flag" for the kind of slush fund category that could enable a charity operating in a conflict area to provide support for terrorism, simply because it supports young men in a foreign conflict area.[134]

Winer acknowledges that he had no facts to support his opinion that alleged weaknesses in charity controls caused a person to engage in fighting, become a terrorist, and participate in the 9/11 attack: "There is no proof of that because by their very nature, this funding took place…without the controls that would have enabled anyone to reconstruct the support that led to al-Qaeda."[135] This "absence of evidence" argument is offered by a trained advocate, posing as an expert, contending that WAMY (and others) have the burden of proving their innocence in the absence of evidence of any wrongdoing.

In addition, Winer renders an inadmissible opinion about the Canadian Revenue Agency's ("CRA") report on WAMY Canada[136] without any factual basis. First, Winer opines that the CRA report found that WAMY Canada had a massive deficiency,[137] even though the CRA report never used that term and Winer admitted that he was neither a certified public accountant nor a forensic auditor.[138] Second, Winer erroneously states that the CRA report "assessed" that "[a] Canadian audit of WAMY's Canadian branch provides a clear example of … links to terrorism", including Al Qaeda.[139] When challenged during his deposition about the accuracy of this statement, Winer's response was "I would have to look at the rest of the report. There is a difference between the word

---

[134] Ex. F at 319:24–320:15, 320:21–24; *see also* Ex. B at 14-15, ¶¶ 2.17.4-2.17.5.

[135] Ex. F at 326:19–327:8.

[136] The CRA Report, which was marked as Exhibit 925 to the Winer deposition, is attached at Exhibit M.

[137] Ex. A. at 68, ¶ 10.3.1; *see* Ex. M at 4-25.

[138] Ex. F at 277:11–17 ("No, I am not an auditor I am an attorney…I am not a certified public accountant.")

[139] Ex. A at 68, ¶ 10.3 ("The WAMY branch was stripped of its charitable status by Canada after a Canada Revenue Agency investigation found that the charity had failed to comply with basic bookkeeping and accounting requirements for the charity, and was inextricably linked to its Saudi parent, which Canada assessed to have provided support to al Qaeda.").

assessed and which has been alleged, and I think we have to look at the whole report…."[140] Winer agreed that the CRA report referred to allegations made by the lawyers who hired him in this case.[141] He also admitted that the CRA report is neither a law enforcement report nor an intelligence report, and that the CRA revoked only WAMY Canada's not-for-profit status and donation deductibility in connection with the Income Tax Act, not its registration or continued operation, and did not freeze WAMY Canada's assets.[142]

These, and other such opinions,[143] do not meet Rule 702(b)'s requirement that an expert's opinion must be "based on sufficient facts or data." They should be excluded.

### B. Jenkins Frequently Lacked Identifiable Bases for His Opinions.

Jenkins's report suffers from the same deficiency. A purported historian not basing his opinions on field experience, Jenkins's 36-page report has a mere 33 citations.[144] He concedes that, where there is no citation, there is no way to discern from the report the support for his opinions.[145] With respect to one uncited section, Jenkins stated that there was no reason that he did not provide citations, and admitted that he "should have listed every single citation."[146]

Endeavoring to fix the errors of his report, Jenkins suggested that the missing citations in his report would usually be of the *9/11 Commission Report*, but stated "[y]ou would have to figure

---

[140] Ex. F. at 274:4-276:8. The CRA report listed news reports that "WAMY Canada's parent organization located in Saudi Arabia has been alleged to support terrorism." Ex. M at 12-15. Contrary to his opinion, there was no such finding or assessment. *See also* Ex. F at 265:17-266:15 where Mr. Winer admitted that CRA did not investigate WAMY Saudi Arabia let alone issue an assessment or finding.

[141] Ex. F at 276:3–277:5.

[142] *Id.* at 263:15-265:16

[143] *See* Ex. D.

[144] Thirty pages (or 80% of the report) contain either a single citation or none at all.

[145] *See* Ex. G at 158:5–13("Q. Looking at your report itself on pages 16 to 17, there is no way for me to tell where you got any one of those points or what authority you used or where in that authority to find any of these points, is that right? A. No, I would have to go back and footnote every—certainly every paragraph"); *see id.* at 165:17–21 ("[Q.] Is there any way for me looking at [page 28 of] the report to be able to tell where you got the information in the pilot selection section of your report? A. There isn't a footnote here.").

[146] *Id.* at 158:15–20.

that out on a case-by-case basis."[147] Repeatedly at his deposition, he could not identify his sources, testifying on one occasion, "I think you can take a reasonable guess that it's the 9/11 Report, *probably supplemented* by some other published works".[148] Of one of his report's statements, Jenkins testified, "it is one of those things that quite frankly is inside my head."[149] Of an uncited account of Bin Laden's "far enemy" theory, on which Jenkins admitted (without citation) that scholars disagree, Jenkins stated that it "is not an invention of Brian Jenkins ... what I cannot give you right now is tell you this specific document or this specific document."[150]

Jenkins also claimed that he did not provide citations when making "obvious statements of fact that are known to the audience."[151] But if his points are indeed obvious, Jenkins's testimony is excludable as unnecessary and unhelpful to the trier of fact.[152] Moreover, Jenkins admitted that in some cases he had "obviously over-assumed the readers' knowledge."[153] In differentiating propositions requiring citations from "obvious" references, Jenkins offered one example where he provided a citation for an "obscure" reference in his report, noting that, after 9/11, Bin Laden "used the term 'Hubal' in speaking about America," which Jenkins claimed "recalled the actions of the Prophet when he conquered Mecca in the 7th century," destroying an idol called Hubal.[154] From this, Jenkins opines that "Bin Laden may also have seen a unique propaganda opportunity in toppling the Twin Towers... [as it] would emulate the Prophet's toppling and smashing of the idols in Mecca."[155] But the citation he offers does not describe the incident or connection giving rise to

---

[147] *Id.* at 174:12–19.
[148] *Id.* at 157:19–158:4 (emphasis added).
[149] *Id.* at 163:7–22.
[150] *Id.* at 269:18–21, 271:15–18.
[151] *Id.* at 164:14–25, 168:16–169:2, 175:4–9.
[152] *See United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own.").
[153] Ex. G at 168:24–25.
[154] Ex. C at 25.
[155] *Id.*

this opinion.[156] It seems the real basis "relate[d] back to" "discussions" with his unnamed other "colleagues" and "other analysts."[157] These and other such opinions should be excluded.[158]

## V.     Experts Must Reliably Apply Their Stated Methodology for Their Testimony to Be Reliable

To be reliable, it is fundamental under Rule 702(c) and (d) that expert testimony be "the product of reliable principles and methods reliably applied."[159] Opinions that assume a conclusion and "reverse-engineer[ ] a theory" to fit that conclusion are inadmissible.[160] Moreover, "'an expert may not 'pick and choose' from the scientific landscape and present the Court with what he believes the final picture looks like.'"[161] The Second Circuit has affirmed the exclusion of expert testimony as unreliable "[i]n light of the analytical gap between [the expert's] stated methodology and the manner in which he assessed" the facts.[162] An expert must provide "a sufficiently reliable application of his stated methodology."[163]

---

[156] Ex. G at 160:6–7; Ex. C at 25 & n.29 (citing webpage containing Bin Laden's speech and simply identifying Hubal as a pre-Islam idol). In fact, with that inaccurate citation, Jenkins distorts the facts of Islamic history and egregiously connects it with the 9/11 terrorist attacks. Prophet Muhammed and his companions were expelled from their homes after systematic oppression and torture and returned to Mecca years later to reunite with their families, without shedding any blood, ultimately forgiving their oppressors. *See generally*, https://www.worldhistory.org/Prophet_Muhammad/. Bin Laden, on the other hand, killed 3,000 innocent civilians.

[157] Ex. G at 160:7–10.

[158] *See* Ex. D.

[159] *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 664 (2d Cir. 2016) (affirming exclusion of testimony where expert "did not reliably apply" his purported methodology by failing to make the evaluation his methodology required).

[160] *In re Mirena IUS Prod. Liab. Litig.*,387 F.Supp.3d 323, 348 (S.D.N.Y 2019), *aff'd* 982 F.3d 113 (2d Cir. 2020); *see also In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810, 15-CV-1626, 2017 WL 6729295, at *8 (S.D.N.Y. Dec. 28, 2017); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) ("[M]ethodology ... aimed at achieving one result ... is unreliable, and ... must be excluded."); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796–800 (3d Cir. 2017) (affirming exclusion of "conclusion-driven" analysis).

[161] *In re Rezulin I*, 309 F. Supp. 2d at 563(quoting *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 596 (9th Cir. 1996)) (typographic error corrected). In *Rezulin I*, an expert failed to consider two studies that addressed the "very subject" upon which he offered his opinion that "reached drastically different conclusions," notwithstanding that he testified at his own deposition that "[a]ll evidence should be taken into account." The court found the omission "especially glaring" and the opinion properly excluded.

[162] *In re Pfizer*, 819 F.3d at 665 (internal quotation marks omitted).

[163] *Id.* at 663–65 (internal quotation marks omitted); *see also In re Mirena*, 982 F.3d at 123–24 (affirming exclusion of testimony where experts did not apply their methodologies reliably); *Amorgianos*, 303 F.3d at 258–69 (same).

Winer and Jenkins fail to meet these standards. While "good grounds" for a conclusion may allow admission despite "minor" methodological flaws, that is not the case here.[164]

### A.  **Winer Does Not Reliably Apply His Purported Methodology in This Case.**

Nowhere in the over two hundred pages of Winer's reports does he articulate a methodology. At his deposition, he testified that his methodology is "essentially an all-source approach in which you take as many sources as you can and then weigh the sources and bring them together to form your analytic findings on a topic."[165] In undertaking this purported "all-source" approach, Winer claims to rely upon "primary sources" and "first-hand information" as well as "government reports, both from the United States and sometimes from other governments."[166]

Throughout his reports, however, Winer fails to apply his purported methodology to the facts of this case. Instead of reviewing and weighing "all" the sources as he claims he did, Winer did not consider evidence pertinent to the opinions he offers. He concedes he relied upon Plaintiffs' counsel to identify the relevant documents for his consideration[167] and rendered opinions based on that limited selection without regard for the existence of other documents (also in Plaintiffs' possession) that necessarily should have factored into his analysis and that might militate against his conclusions.[168] For example, the Charity Defendants produced hundreds of thousands of pages of financial records, including but not limited to audits, financial statements and operational reports. Before issuing his affirmative report, however, *Winer only reviewed three IIRO audits and*

---

[164] *Amorgianos*, 303 F.3d at 268–69 (internal quotation marks omitted).

[165] Ex. F at 119:5–8.

[166] *Id.* at 118:12–21.

[167] *See* Ex. F at 27:18–25, 28:21–29:8, 30:4–16, 44:11–20, 47:11–14, 122:6–11, 123:5–14, and 561:10–13.

[168] In his affirmative report, for example, Winer cites to an MWL letter produced in this litigation forwarding a donation to IIRO for "Assisting the Muslim Mujahideen in Chechnya" as evidence of IIRO's alleged support to al Qaeda, but fails to even consider the response letter, also produced in this litigation, which reflects that the "money was spent for non-military means" that included the "purchase of medications or foodstuffs" for refugees. When confronted with this at the deposition, Winer admitted that this "clears up" the issue. *See* Ex. A at 91–92, ¶ 12.8.3; Ex. F at 516:2–518:21 and Ex. 946 to the Winer deposition, attached at Exhibit N.

*no other financial records of IIRO or any audits or financial records of WAMY or MWL.*[169] Yet Winer conceded that seeing "every bit of audit material" was an important aspect of his methodology, [170] and that even though he "asked for them,"[171] he was not provided with all of the audits, so he issued his conclusions based on the documents he had reviewed "within the time available."[172] Thus, when pressed for specifics, Winer's responses demonstrate that his approach in this case was far from the stated "all source" approach he claims he applied in reaching his conclusions. He was spoon-fed documents from Plaintiffs that might support Plaintiffs' case and did not review or ignored any that failed to support or contradict their case.

Nonetheless, Winer makes several sweeping conclusions relating to MWL, IIRO and WAMY, including that (i) it was "standard practice for charities which provided support to [A]l Qaeda to list the support as expenses for legitimate activities" to avoid detection;[173] and that (ii) the "financial improprieties and irregularities … reflect conditions within IIRO that made it possible" to support Al Qaeda and other terrorist groups.[174] Given that Winer admitted to reviewing a negligible subset of financial documents produced by only one of the three Charity Defendants, despite his own emphasis on the importance of seeing "every bit of audit material," Winer could not have applied his articulated methodology to form any reliable "analytic finding" about the alleged "standard practice" of MWL, IIRO and WAMY or their alleged intentions[175] to conceal support for terrorism. Instead, Winer offered an unreliable conclusion based on speculation about

---

[169] Ex. A at 67, ¶ 10.1; Ex. F at 501:18–502:13.

[170] Ex. F at 41:17–19; *see also id.* at 501:13–503:14 (responding to a question concerning whether he reviewed various other IIRO audits which were produced in the course of this litigation, Winer repeated the importance of "see[ing] any and all audits undertaken by IIRO branches for the period relevant to the litigation").

[171] *See id.* at 41:23; *see also id.* at 30:4–16; 47:17–21; 122:12–123:4; 164:11–14; 281:4–19; 286:21–287:8.

[172] *See id.* at 43:2; *see also id.* at 30:1–3; 42:21–43:2; 43:24–44:2; 44:11–20; 123:5–14; 131:7–10; 136:9–12.

[173] Ex. A at 55–67, ¶ 9 et seq.

[174] *Id*. at 77, ¶ 10.9.7.

[175] This is also improper expert witness testimony as to state of mind, intent or motive. *See supra* at Part II.

the practices and intentions of the Charity Defendants of which he demonstrated no knowledge or experience. And with respect to the three IIRO audits he did review, even though none of them reflect support to any terrorist organization,[176] Winer leaps to the wholly unsubstantiated conclusion that IIRO's purported "financial irregularities" in three audits demonstrate a link to support for terrorism. This is the exact kind of opinion evidence that the Supreme Court stated "is connected to existing data only by the *ipse dixit* of the expert,"[177] which should be excluded.[178]

Winer's opinion that WAMY provided material support to Al Qaeda and had deficient financial practices and controls, without having reviewed *any* of the voluminous documents and financial records WAMY produced,[179] is another example of the unreliable application of his claimed methodology to the facts. As discussed above, Winer provides no citation to facts, and testified to no experience, that would lead him to such a conclusion.[180] Abandoning his role as an independent expert, Winer rendered an opinion even though he knew he had not received all of the financial records he asked for.[181]

After he received the comprehensive report from WAMY's forensic accounting expert, Jonathan Marks, Winer again requested that Plaintiffs provide him with WAMY financial records.[182] While Winer received some audits and asked for more, the number of audits and financial records that he received and reviewed, by his own admission, did not correspond to the

---

[176] Ex. A at 74–77, ¶¶ 10.9–10.9.7(providing his layperson's views of the import of the "improprieties and irregularities" but failing to identify a single transaction reflecting evidence of support to a terrorist organization); *see also id.* at 120, ¶ 13.5.3 conceding that the "audit itself did not show support for terrorism".

[177] *Gen. Elec. Co.*, 522 U.S. at 146.

[178] These opinions also fail because they lack sufficient facts and data required by Rule 702(b), as discussed *supra* at 19–25.

[179] *See* Ex. A at 10, ¶ 3.12 n.4; *see also* Ex. F at 41:3-42:5; Ex. I at 6, 26.

[180] In discussing the need for secrecy, Winer relies on the government's evidentiary proffer in *U.S. v. Arnaout*, which, as discussed below, was rejected by the district court and which ended with no terrorism charges. Ex. A at 55, ¶¶ 9.3–9.3.2.

[181] *Id.* at 10, ¶ 3.12 n.4; Ex. F at 284:4–287:16.

[182] Ex. F at 281:4–282:12, 283:21–285:19.

number of financial documents reviewed by WAMY's proffered forensic accountant.[183] Again, contrary to his claimed methodology, although he knew he had not reviewed all of the available financial records, Winer doubles down in his rebuttal report, stating that WAMY's financial records showed "deficiencies in controls" which, according to Winer, was in itself evidence of material support to Al-Qaeda.[184] Just as improperly, Winer opines that WAMY employees had not been diligent in their document productions based solely on the arguments of Plaintiffs' lawyers during a discovery dispute, despite the fact that these arguments not only had been refuted by WAMY's counsel, but ultimately rejected by this Court, which found, *inter alia*, that "it would be a manifest injustice to ignore WAMY's extensive discovery efforts."[185]

Elsewhere, Winer similarly abandons his stated methodology in disregarding employment and other relevant records produced by the Charity Defendants. In his affirmative report, Winer frequently cites to various bad acts by individuals whom he claims were employees of MWL or IIRO, as a basis for his conclusion that the organization provided material support to Al Qaeda.[186] Here, again, Winer's opinions are not the product of a reliable methodology, as he fails to consider employment records,[187] among other records produced in this litigation, in forming his opinions, including documents produced by MWL and IIRO that speak to the nature, extent and timing of the employment of these individuals. For example, Winer links IIRO to the Bojinka plot in Manila based solely on the fact that Mohammad Jamal Khalifa worked for the IIRO-Philippines's branch

---

[183] *Id.* at 281:1-282:12; *see also* Jonathan Marks's Reliance Chart attached at Exhibit O; Ex. F at 284:1-285:19; 286:21-287:16; 287:21-288:10.

[184] *See* Ex. B at 2-21, ¶¶ 2.2–2.28; *compare id.* at 3, ¶¶ 2.3.1–2.3.10 *and* Winer Rebuttal Reliance Chart, attached at Exhibit P, *with* Marks Reliance Materials, Ex. O.

[185] Opinion & Order of the Honorable Sarah Netburn, filed January 15, 2019, Doc. No. 4350 at 5, 6; *see* Ex. B at 28-29, ¶¶ 2.34–2.37; Ex. F at; 327:24-334:9; WAMY's Memorandum of Law in Support of Reconsideration of Section IV of the Court's Motion to Compel Ruling, Doc. No. 4165 at 3 n2.

[186] *See, e.g.,* Ex. A at 29, ¶ 6.6; 68, ¶ 10.3; 71, ¶¶ 10.5.1-10.5.2; 86–87, ¶¶ 12.6.6–12.6.10.

[187] Ex. F at 465:17–20.

office, but Winer admitted that he never considered Khalifa's letter of resignation, ending his tenure with IIRO in September 1993, before the planning of the Bojinka plot.[188] Furthermore, when asked for any other factual bases for IIRO's alleged support for the Bojinka plot, Winer could offer none, instead conceding that he ignored evidence tying the plot to a *completely different* charity.[189] In another example, Winer ignores employment records in favor of information the accuracy of which he admittedly cannot confirm, citing Emerson, who identifies Abu Nasir as an IIRO employee, but concededly without knowing Emerson's source and without attempting to review any of the employment records produced by IIRO.[190] These and other documents indicate that certain individuals, whom Winer credits in claiming a basis for a connection to Al Qaeda, either never worked for IIRO or MWL or had long since left these organizations when they committed these alleged acts, which in any event are wholly unrelated to 9/11.[191]

Furthermore, Winer falls drastically short of the requirements of Rule 702(d) when he opines that the WAMY subsidiary charity Lajnat Al-Birr[192] Al-Islamiah (LBI) and a separate United States charity, Benevolence International Foundation, Inc. (BIF) established by Adel Batterjee, were "intertwined;" even though Winer neither considered, cited, nor discussed the primary source documents showing that in fact they had no relationship.[193] In fact, documents reflect that Batterjee at one time was the executive director of LBI but was removed from or left

---

[188] Ex. A at 28, ¶ 6.6.8; at 98, 12.9.11; 100, ¶ 12.9.17; Ex. F at 425:8–17; *see also* Ex. J (*9/11 Commission Report*) at 147 ("In 1994, KSM accompanied Yousef to the Philippines, and the two of them began planning…[the] 'Bojinka' plot.").

[189] Ex. F at 427:6–429:22 and 431:19–433:23.

[190] Ex. A at 86, ¶ 12.6.6 & n.152.; Ex. F at 465:1–8 and 17–20, and 467:4–11 (when asked about Emerson's source that Abu Nasir was an IIRO employee, Winer stated that he looked for it but "didn't find it."). The fact that Winer provides a caveat to clarify that he does not know the source of the information upon which he bases his opinion (*see* Ex. A at 86, n.154) underscores the deficiency in his application of his purported methodology.

[191] *See e.g.,* Ex. F at 460:23-462:16; 472:22-474:11; and Winer Deposition Exhibit 941 at 13, 16, excerpt attached at Exhibit K.

[192] "Al-Birr" in Arabic means "benevolence."

[193] Ex. A at 26, ¶ 6.6.6.2; 41, ¶ 7.3.4.3; 47, ¶ 7.7.3.1 and n.66; 104, ¶¶ 12.12.1-12.12.2; 105, ¶ 12.12.5; and 106-108, ¶¶ 12.12.9-12.12.11; Ex. B at 32, ¶ 2.38.9; and 32-33, ¶¶ 2.38.11-2.38.12.1.

this position in early 1993, after which he formed BIF.[194] Winer also opines that his conflated BIF/LBI was a "central vehicle" for funding terrorists yet fails to consider, cite or discuss the abundant evidence showing that BIF did not support terrorists.[195] Winer relies upon a rejected evidentiary proffer and a press release in *U.S. v. Enaam Arnaout*, N.D. Ill. Case No. 02-CR-892, but ignores other filings in the case showing that BIF had no affiliation with LBI.[196] Winer also fails to consider findings by both the district judge and the Seventh Circuit that the government had not shown that BIF provided support to terrorists.[197] He also considered—but completely ignored—similar findings in the 9/11 Commission's Monograph on Terrorist Financing.[198]

---

[194] *See* Ex. F at 225:19–230:3; *see also* Winer Deposition Exhibit 914 (attached at Exhibit Q) at 7–8. For example, a 1993 letter from WAMY to Batterjee protested his decision to form another organization with a similar name and logo to LBI's, expressing concern that this would cause confusion "despite the absence of any relationship between [the two organizations] from an organizational and administrative aspect." *See* Winer Deposition Exhibit 915 (attached at Exhibit R) at 2; *see also* Ex. F at 230:4–25. Neither had Winer considered a 1993 letter to Prince Abdulaziz, which discussed the danger of confusion with BIF and referred to Batterjee as a "former executive," who "*no longer has any administrative connections with [LBI], but has also resigned from the Board of Supervisors.*" Winer Deposition Exhibit 916 (attached at Exhibit S); Ex. F. at 231:4–232:4.

[195] Ex. A at 26, ¶ 6.6.6.2; 41, ¶ 7.3.4.3; 47, ¶ 7.7.3.1 and n.66; 104, ¶¶ 12.12.1-12.12.2; and 106–08, ¶¶ 12.12.9–12.12.11.

[196] The Government's *Santiago* proffer was rejected by U.S. District Court Judge Conlon, who found that the proffered statements were not admissible under the co-conspirator exception. *See United States v. Arnaout*, Memorandum Opinion and Order filed February 3, 2003, Doc. No. 168 at Winer Deposition Exhibit 919 (attached at Exhibit T); *see* Ex. A at 41, ¶ 7.3.4.3 and nn.48, 49; 47, ¶ 7.7.3.1 and nn.66, 69; 105–06, ¶ 12.12.5 and n.205; 106–07 ¶ 12.12.9 and n.207; 107–08, ¶ 12.12.10 and n.208; *see also* Ex. F. at 246:23–24, 247:1–23; Winer Deposition Exhibit 920, attached at Exhibit U at 111.

[197] *See* Ex. F at 248:4–11, 249:2–250:3; Winer Deposition Exhibit 922 (attached at Exhibit V), *U.S. v. Arnaout*, 282 F. Supp. 2d 838 (N.D. Ill. 2003); Ex. F at 251:11–25, 252:1–5; Winer Deposition Exhibit 923 (attached at Exhibit W), *United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005). In her Order finding that the government had not shown that the enhancement under U.S.S.G. §3A1.4 applied, Judge Conlon found that: "(n)or does the record reflect that (Arnaout) attempted, participated in, or conspired to commit any act of terrorism." *Arnaout,* 282 F. Supp. 2d at 843. The Court also found that "(t)he government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon and walkie-talkies to be used to promote a federal crime of terrorism." *Id.* at 845.

[198] Ex. F at 255:3–256:8. Commenting on the *Arnaout* prosecution, the Monograph concluded that "(d)espite these troubling links, the investigation of BIF revealed little compelling evidence that BIF actually provided financial support of al-Qaeda, at least after al-Qaeda was designated … in 1999. Indeed, despite unprecedented access to the U.S. and foreign records of these organizations, one of the most experienced and best terrorist prosecutors resolved the investigation of BIF without a conviction for support of terrorism…." *See* Winer Deposition Exhibit 909 (attached at Exhibit X) at 111.

Hiding behind purported time constraints, Winer forms flawed opinions based on cherry-picked evidence, selected by Plaintiffs' attorneys, even though the documents he received were a mere subset of the relevant documents, as his asserted methodology requires. Where, as here, an expert ignores readily available evidence that is "vital to his opinion," exclusion of the expert's testimony is warranted.[199] Winer, acting as an advocate instead of an objective expert, and tainted by his bigoted suppositions, makes analytic leaps by providing opinions that are connected to facts "only by the *ipse dixit*" articulated in his reports. Such opinions should therefore be excluded.[200]

**B. Jenkins Does Not Reliably Apply His Purported Methodology in this Case.**

Jenkins, whose degree is in history, did not identify a methodology in his report, but at deposition claimed to follow "[a] historical methodology, including looking at historical comparisons."[201] Jenkins could not identify a single source explaining "the rules for an historian"; instead, he described the features of "sound research" in this area: "to try to assemble the documents, the relevant materials, to try as much as possible to utilize primary sources, to make judgments that are supported by citable materials so that the reader can track where you're coming from and what you relied on."[202] Jenkins also agreed that in evaluating a terrorism analyst's work "you would want something that is fair based upon facts as they are available" and would assess "whether the evidence you present supports your conclusions."[203] But Jenkins fails to accomplish the "historian's task[, which] is to choose reliable sources, to read them reliably, and to put them together in ways that provide reliable narratives about the past."[204] As discussed already, Jenkins

---

[199] *In re Rezulin I*, 309 F. Supp. 2d at 563.

[200] *See* Ex. D.

[201] Ex. G at 145:11–18.

[202] *Id.* at 147:18–148:9.

[203] *Id.* at 15:12–17, 106:21–107:13.

[204] *Marvel Characters,* 726 F.3d at 135 (internal quotation marks omitted) (affirming exclusion of historical expert testimony); *see also United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (describing a historical expert's

rarely cited *any* support for his opinions, instead letting the reader "figure that out on a case-by-case basis"[205]—far from providing "citable materials so that the reader can track" what he relied on. Given space constraints, two striking examples of Jenkins's routine practice are provided here.[206]

First, to make the point that "[t]errorists seek symbolic targets," Jenkins lists the targets of various terrorist plots without providing citations.[207] Asked which of these plots involved Al Qaeda, Jenkins pointed to a plot against the CIA headquarters that "was part of Bojinka."[208] However, at his deposition, Jenkins could only reiterate his report's unsourced statement that Bojinka "was *reportedly* financed in part by bin Ladin," though he admitted that he could not name a citation for that idea and had no "independent confirmations" of it or even an opinion on whether it was true.[209] Thus, Jenkins's only basis for testifying that Al Qaeda participated in the Bojinka plot is a report from an unremembered source that he did not investigate and does not necessarily believe.[210] This is far from "a reliable [historical] narrative," and the Court should reject it.

Second, Jenkins describes Ramzi Yousef as "an international recruiter for the nascent al Qaeda group," again without citation.[211] At his deposition, Jenkins first "backed away from" this statement as inaccurate, admitting that it should be changed to "groups coalescing around Al

---

"role of surveying a daunting amount of historical sources, evaluating their reliability, and providing a basis for a reliable narrative" (internal quotation marks and alteration omitted)).

[205] Ex. G at 174:12–19.

[206] Exhibit D catalogs other such examples.

[207] Ex. C at 12.

[208] Ex. G at 231:13–18.

[209] Ex. C at 11 (emphasis added); Ex. G at 226:11–22 and 232:18–233:3 ("As I said, the reported financing, and with the operative word being reported, and the answer beyond that, not that I know of or that I have included in this report."); *id.* at 229:9–14 ("[T]he 'reportedly' means…that there is a report indicating that, but I don't have other independent confirmations of that report, so I am citing it as a reportedly, but not making a personal judgment on it.").

[210] Indeed, far from being an al Qaeda-financed operation, Jenkins himself admitted that Bojinka "was not an Al Qaeda operation." Ex. G at 94:5–6.

[211] Ex. C at 11.

Qaeda."[212] Jenkins could not recall the basis for it and requested time to locate his source, but his "quick Google search" turned up a source that he admittedly did not use and did not include in his reliance materials, ultimately stating, "[y]ou know, I didn't make it up."[213] Nor did Jenkins know of any evidence that Yousef met Bin Laden, transacted with Al Qaeda, or was even a member of Al Qaeda.[214] Jenkins never performed the work of a historian—citing, evaluating, and weighing sources—yet still renders this opinion about Yousef being a recruiter for Al Qaeda.

Flouting his stated methodology, Jenkins produced a report littered with premises and conclusions that lack any identifiable bases, even after a deposition. There is simply no way to evaluate a historical report that fails to identify the sources relied upon—much less one that excludes the consideration and weighing of competing sources and conclusions.[215] Because he fails to "utilize reliable scientific methods to reach [his] conclusion," the absence of support for that opinion is fatal to its admissibility.[216]

## VI.  Experts May Not Serve as Mere Conduits of Hearsay Without Applying Analysis to Their Sources

While "experts can testify to opinions based on inadmissible evidence, including hearsay,"[217] they may not "simply transmit that hearsay to the jury."[218] Instead, "the expert must form his own opinions by applying his extensive experience and a reliable methodology to the

---

[212] Ex. G at 218:21–219:2; *see also Riegel*, 451 F.3d at 126–27 (affirming exclusion of expert testimony where expert could not explain his conclusion and retreated from it at his deposition).

[213] Ex. G at 219:10–19, 220:8–17 ("I would check back, I think part of it comes out of … the 9/11 Report … There was some other documents and, again, I would want to double-check on this, that were the result of the investigation of the 1993 World Trade Center bombing… [T]hat phrase international recruiter comes from somewhere, it is not a phrase that I invented in my head. So there is a source for that, there is a concrete source for that…. I would have to double-check some things."); *id.* at 221:9–222:17, 224:16.

[214] *Id.* at 77:7–85:17; *see* also Ex. J (*9/11 Commission Report)* at 59 (describing Yousef as a "rootless" operative not necessarily belonging to any organization).

[215] *Amorgianos*, 303 F.3d at 267, 268–69 (internal quotation marks omitted).

[216] *In re Mirena*, 982 F.3d at 124.

[217] *See* FRE 703.

[218] *Mejia*, 545 F.3d at 197.

inadmissible materials."[219] He may not "establish[] the facts" in the case by summarizing factual material that "require[s] no specialized knowledge" and that the jury could understand independently if introduced into evidence.[220] An expert should "explain how he ha[s] pieced together bits of information from different sources and reached a studied conclusion," rather than "merely repeating information he had read or heard."[221] Historical experts, too, should not function "simply as a conduit for hearsay," parroting straightforward hearsay accounts, but instead "bring their expertise to bear," for example by "helpfully synthesiz[ing] dense or voluminous historical texts."[222] "The appropriate way to adduce factual details of specific past events" is to introduce admissible evidence, not hire a purported historian to regurgitate hearsay to a jury.[223]

## A. __Winer's Affirmative Report Is a Compendium of Impermissible Hearsay.__

Winer frequently relies on hearsay evidence while offering no analysis or opinion of his own that is based on a reliable methodology. Section 6 of Winer's affirmative report is particularly egregious. He quotes extensively from documents and statements of others without applying any expertise or analysis whatsoever, merely repeating or summarizing information he has heard or read. Winer begins with his thesis: "[t]here is broad consensus, backed by extensive documentation, that Islamic charities played a central role in providing the funding and other support for al Qaeda that made it possible for this terrorist group to carry out the 9/11 attacks."[224]

---

[219] *Id.* at 197 (citations and quotations omitted); *see also United States v. Rubi-Gonzalez*, 311 Fed. Appx. 483, 487 (2d Cir. 2009).

[220] *Mejia*, 545 F.3d at 194–96 (holding that expert "went beyond those issues on which his 'expert' testimony would have been helpful" where he recited "highly specific facts" and, "especially disturbing[ly]," "essentially summarized the results of [FBI] investigation," none of which required expertise to understand).

[221] *Id.*

[222] *Marvel*, 726 F.3d at 135–36; *see Langford v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (expert should "synthesize[] disparate and voluminous historical sources and provide[] the jury his opinion"); *Kantengwa*, 781 F.3d at 562 (approving historic expert testimony "based in part on the *consistency* of" multiple accounts, not merely "select" hearsay statements "themselves," noting consistency with historical record fits "generally accepted historical methodology").

[223] *Marvel*, 726 F.3d at 136.

[224] Ex. A at 21, ¶ 6.1.

Over the next sixteen pages he regurgitates hearsay evidence adding conclusory or speculative "comments" that simply agree with what he has quoted and offer no indicia of a methodology of any kind. Page after page, Winer quotes from documents,[225] recounts conversations with unidentified government officials,[226] or provides excerpts from statements made in the wake of 9/11 by "senior U.S. government officials." [227] About 75% of Section 6 of Winer's affirmative report is nothing more than quotes from documents and excerpts from statements of others.[228]

A few examples demonstrate the ways in which Winer seeks to launder impermissible hearsay.[229] In Section 6.2, Winer quotes extensively from a December 2003 report of the UNSC and adds nothing more than a layperson's observation that the UN Report (i) "named IIRO as an important example of the use by Al Qaeda of the charities, and stated that it 'works in close association with the MWL'" and (ii) stated that IIRO was engaged in "legitimate humanitarian activities but was also 'used, *knowingly or unknowingly*, to assist in financing al Qaeda.'"[230] No specialized knowledge is needed to read the document.

In Section 6.4 Winer states that "[d]uring [his] tenure as Deputy Assistant Secretary of State for International Law Enforcement, and in the days after 9/11, [he] spoke with U.S. government officials who were concerned about, and frustrated by their inability to correct, the involvement of Islamic charities in providing support to al Qaeda. Without exception, [Winer claims,] these officials expressed views consistent with the assessments quoted above from the conclusions of the 9/11 Commission."[231] Winer fails to identify the government officials with

---

[225] *See e.g.*, *id.* at 21–30, ¶¶ 6.2–6.6.11.7.

[226] *See, e.g., id.* at 23, ¶ 6.4.

[227] *See, e.g.,* 31–32, ¶¶ 6.7–6.7.1.8; 33, ¶¶ 6.7.3–6.7.3.3; 34–35, ¶¶ 6.7.5–6.7.5.2; 35–37, ¶¶ 6.7.7–6.7.10.2.

[228] *Id.* at 21–37, ¶¶ 6.1–6.7.12.

[229] As reflected in Exhibit D, there are many sections of Winer's reports that suffer from the same deficiency, and they should be excluded as well.

[230] Ex. A at 22, ¶ 6.2.3 (emphasis added).

[231] Ex. A at 23, ¶ 6.4.

whom he spoke, the statements they offered, or on what basis he analyzed those statements to reach a reasoned opinion concerning whether those statements were consistent with other evidence upon which he seeks to rely. Instead, he impermissibly tries to backdoor "the views" of those unnamed officials in the guise of expert testimony.

In Section 6.6, Winer identifies "a report on Islamic charities operating in Bosnia that was produced by the CIA in 1996 ("1996 CIA Report")",[232] which he claims "summarizes source information regarding the relationship between these charities and terrorist groups, and provide an analytic framework for understanding them." While quoting extensively from the "1996 CIA Report", Winer occasionally interjects his "comments" that either (i) summarize what was written, (ii) offer the mere *ipse dixit* that the "CIA analysis" was "accurate" or "accurately reflected" factual claims that Winer asserts without any factual basis, or (iii) speculate about "the best understanding of the U.S. intelligence community" or about what the CIA knew and when.[233]

Then, in Section 6.7, Winer quotes several pages of "excerpts of statements from senior U.S. government officials about the role the charities played in financing al-Qaeda and its terrorist activities." Winer offers nothing more than a layperson's summary of the testimony and speculation about what was in the minds of others. For example, in Section 6.7.6, Winer "take[s] note" of a statement by Richard Clarke, former U.S. counterterrorism czar at the National Security Council, that "terrorist groups hide how they finance their operations through various forms of money laundering activities, and that IIRO [allegedly] used these techniques . . ." and then offers

---

[232] Defendants dispute the authenticity of the 1996 CIA Report, which Plaintiffs attempted unsuccessfully to obtain through a FOIA request, and, at the appropriate time, will raise an evidentiary challenge to the introduction of this document into evidence.

[233] *See, e.g.*, Ex. A at 24 ¶ 6.6.2 (declaring that "[t]he CIA analysis accurately describes the Islamic charities continuum of activities"); *id.* at 24–25, ¶ 6.6.3 (speculating that "[t]he CIA analysis reflected the best understanding of the U.S. intelligence community in 1996 . . ."); *id.* at 25, ¶ 6.6.4. (commenting that "[t]his analysis accurately reflected the lack of controls the charities had chosen to put into place to track the actual uses of the funds in the field prior to the 9/11 attacks"); and *id.* at 31, ¶ 6.6.11.7 (speculating about what "links" "were evident" to the CIA "as early as 1996.").

the impermissible speculation that Clarke "would not implicate IIRO in terrorist activities in sworn public testimony without a sound factual basis to do so."[234] There are proper ways to introduce factual evidence; the short cut of parroting hearsay is not one of them.

The conclusion is ineluctable: Section 6 of Winer's affirmative report relies heavily on hearsay evidence and applies no expertise whatsoever. The Second Circuit has repeatedly excluded the type of testimony that Winer presents here. In *Mejia*, the court excluded expert testimony based on inadmissible hearsay where the expert "did not explain how he had pieced together bits of information from different sources and reached a studied conclusion," and thus he "did not analyze his source materials so much as repeat their contents."[235] In *Strauss*, the Eastern District excluded the portions of the expert's report that were "nothing more than a recitation of secondary evidence, not all of which is admissible," reasoning that the "tactic of simply 'repeating hearsay evidence without applying any expertise whatsoever' has been rejected by the Second Circuit, and therefore must be rejected here."[236] These and other such opinions should be rejected here.[237]

**B. Jenkins Regurgitated the Most Prominent of His Limited Sources Without Analysis to Establish Facts Not Requiring Expertise.**

Jenkins and his claimed historical project also fail these standards. Where support for his opinions is identifiable, it appears that he generally repackages the *9/11 Commission Report*—hearsay Judge Hellerstein, in related litigation, has deemed largely inadmissible but perhaps an

---

[234] *Id.* at 35, ¶ 6.7.6 and n.36 wherein Winer again speculates that "Clarke *may have* been referring to evidence known to him . . ." (emphasis added); *see also id.* at 32–33, ¶ 6.7.2 (claiming that Under Secretary Levey's testimony "reflected the formal position of the entire U.S. government at the time. Based on all the information known to me, Levey's testimony accurately describes the role that Saudi charities played in the funding of terrorist activity, including that of al Qaeda resulting the 9/11 attacks on the United States."); *id.* at 37, ¶ 6.7.11 (speculating that the statements he quotes at length in his report "reflect the considered view of senior echelons of the U.S. government during this period that the charities were central to incubating al Qaeda and its ability to strike the United States in the 9/11 attack.").

[235] *Mejia*, 545 F.3d at 192; *see also Rubi-Gonzalez*, 311 Fed. Appx. at 487.

[236] *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 446 (E.D.N.Y. 2013) (*quoting Mejia*, 545 F.3d at 197).

[237] Other similarly flawed portions of his report are identified at Exhibit D.

acceptable basis for a limited, stipulated set of facts—without assessing its reliability or meaningfully synthesizing it with other sources.[238] Jenkins admitted, "you would have to say the primary source for this is the 9/11 Commission Report."[239] It figures prominently among the limited citations in his report. He even "incorporate[d]" the Commission's discussion of thirteen topics in three different chapters rather than "repeating it *ad nauseum* [*sic*] here."[240] Indeed, when asked to explain or identify the bases for many of his citationless statements, on multiple occasions, Jenkins simply identified the 9/11 Report.[241] Yet he acknowledges that the *9/11 Commission Report* was based on information available at the time,[242] and further disclaimed doing anything to assure himself of its continued accuracy.[243] The Federal Rules require more of experts than this. The jury needs no expert to understand the facts contained in the *9/11 Commission Report*, and if it does, Jenkins has shown neither why nor how he is up to the task, as he did nothing more than recite the *9/11 Commission Report's* contents without applying expertise based on either methodology or experience. These and other such opinions should be excluded.[244]

## CONCLUSION

For the reasons above, the Court should strike the reports and exclude the proffered testimony of Plaintiffs' experts Winer and Jenkins.

---

[238] *See In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 155–57 (S.D.N.Y. 2009).

[239] Ex. G at 174:21–23; *id.* at 70:4 ("I use it extensively …").

[240] Ex. C at 25–26 (specifically, "the issues of the participants' backgrounds, recruitment, selection, training, deployment, travels in relation to the plot, arrivals in the U.S., flight training in the U.S., coordination with one another in the U.S., selection of flights, preparations in the days immediately before 9/11, navigation of airport security on 9/11, and actions aboard the planes").

[241] *See, e.g.*, Ex. G at 160:17–161:3; *id.* at 178:10–16; *id.* at 179:2–8.

[242] *Id.* at 70:11–18, 133:24–25, 140:17–141:10; Ex. C at 1 n.1.

[243] Ex. G at 133:15–19 (in answer to this question, saying "Not, not really").

[244] *See* Ex. D.

November 15, 2021                  Respectfully submitted,

/s/ *Waleed Nassar*
Eric L. Lewis
Waleed Nassar (admitted *pro hac vice*)
Aisha E. R. Bembry (admitted *pro hac vice*)
Sumayya Khatib (admitted *pro hac vice*)
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue, NW Suite 1000
Washington, DC 20005
Telephone: (202) 833-8900
Fax: (202) 466-5738
Email: eric.lewis@lbkmlaw.com
Email: waleed.nassar@lbkmlaw.com
Email: aisha.bembry@lbkmlaw.com
Email: sumayya.khatib@lbkmlaw.com
*Counsel for Defendants Muslim World League,*
*International Islamic Relief Organization, Dr. Abdullah bin*
*Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah*
*Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Omar T. Mohammedi*
Omar T. Mohammedi
Frederick Goetz, *of counsel* (admitted *pro hac vice*)
The Law Firm of Omar T. Mohammedi, LLC
233 Broadway, Suite 820
New York, NY 10279
Telephone: (212) 725-3846
Fax: (212) 202-7621
Email: omohammedi@otmlaw.com
Email: fgoetz@goetzeckland.com
*Counsel for Defendants World Assembly of Muslim Youth*
*and World Assembly of Muslim Youth International*

41

/s/ *Steven T. Cottreau*
Steven T. Cottreau
C. Kevin Marshall (admitted *pro hac vice*)
Gabrielle E. Pritsker
Audrey Beck (admitted *pro hac vice*)
Jones Day
51 Louisiana Ave, NW
Washington, D.C. 20001
Telephone: (202) 879-3939
Email: scottreau@jonesday.com
Email: ckmarshall@jonesday.com
Email: gpritsker@jonesday.com
Email: abeck@jonesday.com
*Counsel for Dubai Islamic Bank*

/s/ *Juan P. Morillo*
Juan P. Morillo (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP
777 Sixth St NW
Washington, DC 20001
Telephone: (202) 538-8174
Email: juanmorillo@quinnemanuel.com
*Counsel for Dubai Islamic Bank*

/s/ *Alan Kabat*
Alan Kabat
Bernabei & Kabat PLLC
1400 16th St. NW #500
Washington, DC 20036-2223
Telephone: 202-745-1942
Email: Kabat@BernabeiPLLC.com
*Counsel for Dr. Abdullah bin Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Peter C. Salerno*
Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
221 Schultz Hill Road
Pine Plains, NY 12567
Telephone: (518) 771-3050
Email: peter.salerno.law@gmail.com
Email: amyrothsteinlaw@gmail.com
*Counsel for Defendant Yassin Kadi*