EXHIBIT A



EXHIBIT
896
J. Winer
7/13/2021
Debra A. Dibble, RDR, CRR, CRC

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS   )                     03-MDL-1570 (GBD) (SN)

ON SEPTEMBER 11, 2001         )

                                              )

---

## EXPERT REPORT OF JONATHAN M. WINER

---

**CONTENTS**

| Section Number | Section Contents | Page Number |
|---|---|---|
| 1 | Introduction | 3 |
| 2 | Background In Terrorist Finance and Related Work | 3 |
| 3 | Executive Summary | 7 |
| 4 | Al Qaeda and its Funding Needs Pre 9/11 | 12 |
| 5 | Saudi Arabia as Source of Funds Al Qaeda/Terrorism to 9/11 | 18 |
| 6 | Charities as Source of Funds for Al/Qaeda/Terrorism to 9/11 | 21 |
| 7 | Charities Impact to Build Al Qaeda Global Strike Capabilities | 38 |
| 8 | Role of Training Camps in Building Al Qaeda Capabilities | 49 |
| 9 | Why Charity Records Would Not Show Al Qaeda Support | 55 |
| 10 | Implications of Financial and Accounting Irregularities | 67 |
| 11 | Al Qaeda's Use of Charities for Aligned Terrorist Groups | 77 |
| 12 | Role of IIRO, MWL, WAMY in Material Support of al Qaeda | 82 |
| 13 | No separation of Purposes of Funds Used in Material Support | 118 |
| 14 | Purpose of the 13224 Executive Order Designation Program | 122 |
| 15 | Evidence US Needs to Designate Person or Entity Under 13224 | 125 |
| 16 | Implications Non-Designation of Person or Entity Under 13224 | 128 |
| 17 | Implications Withdrawal of Designation Under 13224 | 132 |
| 18 | Implications of Non-Designation, Withdrawal for UN programs | 134 |

APPENDICES

| Appendix 1A | Experience and Qualifications | 136 |
|---|---|---|
| Appendix 1B | CV Jonathan M. Winer | 140 |
| Appendix 2 | Materials Reviewed for This Report | 153 |

1. *Introduction*

1.1.    I have been asked by the law firm of Motley Rice to render my expert opinion on questions relating to the involvement of charities in international terrorist finance in the period leading up to the 9/11 attacks. I have also been asked to address certain matters pertaining to sanctions under U.S. law and under processes involving the United Nations. The narrative below is submitted to assist the Court as it considers the issues raised in this case.  I have highlighted each section by topic, to make my Export Report more easily followed.  I am being compensated at an hourly rate of $800 for my study and testimony in this case.

1.2.    *Material Reviewed for This Expert Report.* To prepare my Expert Report, I have reviewed the Consolidated Amended Complaint,  and four other 9/11 cases that have been consolidated with this case: *Federal Insurance Co., et al. v. al Qaida, et al., Case No. 03 Civ. 6978; Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., Case No. 03 Civ. 9849;  Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No. 02 Civ. 6977;*  and *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al., Case No. 04 Civ. 1922.* I have also reviewed the Plaintiffs' Averment of Facts and Evidence in Support of their Claims Against the Kingdom of Saudi Arabia, and the Saudi High Commission for the Relief of Bosnia & Herzegovina, some of the material pleadings, and thousands of pages of factual material produced in discovery, provided in exhibits in depositions, and/or included as attachments to court filings. I have reread material I have previously written regarding terrorist finance, including my Congressional testimony on terrorist finance, the Report of the 9/11 Commission and hearings, appendices and staff reports cited in my Expert Report, as well as refreshed my knowledge on this topic through review of documents issued by governments and official bodies, such as the U.S. Department of State ("State"), the U.S. Department of the Treasury ("Treasury"), the White House, the U.S. Congress, the United Nations ("UN"), and INTERPOL.  I have read testimony and books written by other experts in terrorist finance, including a number with whom I have had professional relationships and/or contacts over the years regarding terrorist finance and money laundering policy and enforcement issues. A more complete list of materials used in this report is attached at Appendix 2.

2. *My Background in Terrorist Finance*

2.1.    *Initial Work on Cross-Border Financial Crime and Terrorist Issues, U.S. Senate, 1985-1994.* As set forth in my CV, I worked as counsel for Senator John F. Kerry in the U.S. Senate from 1985 until 1994, when I became Deputy Assistant Secretary of State for International Law Enforcement. During the years I worked with Senator Kerry, we focused on cross-border threats to U.S. security in a series of investigations, beginning in 1985 with information we received that turned out to relate to what later became known as the Iran-Contra affair. During this period, Senator Kerry became the chairman of the Senate Subcommittee on Terrorism, Narcotics, and International Operations, in which I assisted him in investigations (and exposure of) the middle eastern bank, BCCI, the Bank of Credit and

Commerce International, which was involved in serious corruption, fraud, narcotics money laundering, and the handling of terrorist funds.[1] Over the course of these investigations, we found that as of the mid-1980's, there was no international system to protect against money laundering, terrorist finance, fraud or any other form of cross-border crime. Accordingly, we sought to build one. We developed ideas and principles that beginning in 1989 became incorporated into the Financial Action Task Force ("FATF") and its money laundering and counter-terrorist finance standards, which are now global norms.

2.2.     *Service as Deputy Assistant Secretary of State for International Law Enforcement, 1994-1999.* During this period, I was the senior U.S. diplomat focused on cross-border financial crime within the State Department. My primary work was to build international capabilities to combat financial crime threats, including terrorist finance. I came to work most closely during this period with the White House's counter-terrorism and transborder threats official, Richard A. Clarke. During this period, Clarke headed what was known as the "Transnational Threats" ("TNT") office at the NSC, which coordinated and directed U.S. intelligence, law enforcement, military, and financial regulatory agencies as well as the State Department, as a means to build an integrated U.S. (and global) response to transnational threats, including terrorism. Towards the end of this period, Clarke became increasingly focused on the threat posed to the United States by Osama Bin Ladin ("bin Ladin"), who the U.S. indicted for the first time in 1998 for terrorist activity aimed at killing Americans. By necessity, my work in this role required extensive analysis and understanding of terrorist financing modalities.

2.2.1.  At the center of my work were efforts to get all countries to put into place effective measures to criminalize money laundering and other forms of cross-border crime, including terrorist finance. At the time, there were many countries that had still failed to do this, including essentially all of the countries of the Middle East.

2.2.2.  By 1996, I became concerned about the risk of a major terrorist event threatening the United States, and the United States homeland in particular. While I was in my position at the State Department, I was consulted about the threat by Senator John Kerry, as he was writing a book about international crime published in 1997. After we talked about the growing terrorist threat to the U.S. homeland, he wrote: "It will take only one mega-terrorist event in any of the great cities of the world to change the world in a single day."[2]

2.2.3.  During 1998 and 1999, as part of a process directed by the National Security Council, President Clinton asked us to warn countries that they would face the risk of no longer having open access to the United States if

---

[1] "The BCCI Affair, A Report to the Committee on Foreign Relations United States Senate by Senator John Kerry and Senator Hank Brown," December 1992 102nd Congress 2d Session Senate Print 102-140. https://www.hsdl.org/?view&did=449738
[2] John F. Kerry, The New War, Simon and Shuster (1997), p. 111.

they failed to take steps to criminalize money laundering and related activities like terrorist finance.  I visited such countries in the Mediterranean and Middle East as Cyprus, Israel, Lebanon, and Syria to warn them about our concern and to require them to take action to combat the use of their financial systems by criminals and terrorists. Other U.S. officials with whom I worked closely in developing and implementing U.S. policies addressing these threats  travelled to Saudi Arabia and other Gulf states who were members of a regional body, the Gulf Cooperation Council, to issue similar warnings.

2.2.4.   By the time I left the U.S. government in late 1999, we had made substantial progress in securing commitments and action from some countries, including Cyprus, Israel, and Lebanon, while others, such as Syria and the Gulf States, had taken no action. I was not personally involved in the visits to the Gulf States; however, I knew people who were. I learned from them that they remained deeply concerned that no progress was being made in those countries to address the risks, and that they were increasingly frustrated by the failure of the Gulf States to take any action against a terrorist finance threat that they knew was serious and that was imperiling U.S. national security.

2.2.5.   *Post-9/11 Work Pertaining to Terrorist Finance and Financial Crime.*
After I left the U.S. government, I continued to provide advice and expertise to governments and to international institutions. This included providing assistance regarding money laundering, illicit finance, and terrorist finance and sponsorship to the U.S. intelligence community, Treasury, Justice, the NSC, the U.S. House of Representatives, the U.S. Senate, the IMF, World Bank, and the UN, as well as to the governments of Russia and Indonesia in connection with the development of their domestic money laundering laws and regulations.  After the September 11, 2001 terrorist attacks ("September 11 attacks"), the Senate Committee on Banking, Housing and Urban Affairs asked me to testify in connection with Congress' response to the September 11 attacks.  My testimony on terrorist finance was given to the Senate on September 26, 2001, and became part of the record relied upon by the Congress in connection with its consideration of the USA-PATRIOT Act ("Patriot Act").  Title III of the Patriot Act incorporated a broad panoply of provisions to combat financial crime and terrorist finance and support whose adoption I had advocated during my time in the Clinton Administration.  Since the September 11 attacks, I have been asked by both the U.S. Senate and the U.S. House of Representatives to testify on terrorist finance and support issues, as well as by numerous organizations and publications, including academic journals, to provide my expertise on terrorist finance and support and transnational criminal issues. I list my Congressional testimony, publications and lectures, together with my CV, as Appendix 1B to my Expert Report.

2.2.6.  *Other Work that Provides Background for My Expertise.* From late 1999 through mid-2008, I practiced law at Alston & Bird L.L.P. During that period, I provided both domestic and non-US clients legal and advisory services on money laundering and terrorist finance enforcement and regulation in the United States and globally. I rendered advice to financial institutions regarding their obligations to counter money laundering and terrorist finance, both statutory and regulatory, as well as to assist clients in adopting global best practices for compliance. I was also asked to handle matters pertaining to the application of UN and U.S. sanctions regarding terrorist funds, administered in the U.S. by the Office of Foreign Assets Control ("OFAC") of the Treasury. I also provided informal assistance to the UK liquidator of BCCI in connection with the liquidator's ongoing efforts to secure compensation for BCCI's depositors. From time to time, I provided informal advice to the UN, IMF, OECD, and World Bank on terrorist finance and other topics involving transnational financial crime.

2.2.6.1.  From mid-2008 until mid-2013, I provided consulting services at the international consulting and strategic communications firm of APCO Worldwide. During this period, I continued to work on legal and regulatory issues pertaining to money laundering and terrorist finance for foreign and domestic clients of that firm.

2.2.6.2.  From September 2013-January 2017, I served in the U.S. Department of State's Bureau for Near Eastern Affairs, which is responsible for managing and implementing the foreign policy of the United States in relation to the Middle East, specifically, the countries of Algeria, Bahrain, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Libya, Morocco, Oman, Qatar, Saudi Arabia, Syria, Tunisia, the United Arab Emirates, and Yemen. During that time I served as the Senior Coordinator for the Resettlement of the former anti-Iranian government terrorist group, the Mujahedin-e Khalq and as the Special Envoy for Libya. In these capacities, I participated in every aspect of counter-terrorism policy discussion concerning the Middle East in daily meetings at the Bureau. I also participated in senior interagency meetings on counter-terrorism issues chaired by the National Security Council and provided advice to the Secretary of State and the White House as relevant on terrorism issues pertaining to Iran, Iraq, and North Africa.

2.2.6.3.  Since my departure from the U.S. government I have returned to private legal practice and consulting, while also undertaking academic and public policy work at the Middle East Institute, as

reflected in my profile there.[3] My current legal and consulting practices include ongoing work on law enforcement and financial regulatory issues, sanctions, and matters pertaining to the Middle East.

    2.2.6.4.    Further information on my background and experience is provided as Appendix 1A to my Expert Report.

3. *Executive Summary*

3.1.    All of my opinions offered herein are expressed to a reasonable degree of certainty.

3.2.    Al Qaeda, founded by a Saudi, bin Ladin, in 1988, spent about $30 million a year in direct expenditures to run its operations. In addition to these funds, it relied on spending by Islamic charities many times that amount per year to indoctrinate, recruit, train, house, transport, equip, and arm Islamic fighters and terrorists, and to operate al Qaeda and affiliated and associated terrorist groups. This support enabled al Qaeda to develop the ability to carry out terrorism on a global basis by the time it carried out the 9/11 attacks.

3.3.    Saudi Arabia was the most significant souce of funding for al Qaeda in the years leading up to 9/11, and the epicenter for terrorist finance globally.

3.4.    Islamic charities, most of which were founded by Saudi Arabians and/or headquartered in Saudi Arabia, played the most important role in providing the resources al Qaeda needed.  Those charities included the International Islamic Relief Organization ("IIRO,") the Muslim World League ("MWL"), and the World Assembly of Muslim Youth ("WAMY"), among others.

3.5.    The funds and support from the charities assisted al Qaeda and its affiliates in essentially every aspect of their terrorist activities. These included indoctrinating fighters and terrorists, by providing materials in mosques and madrassas that taught Muslims it was proper to kill non-believers (that is, Christians, Jews, those not believing in God, such as the Soviets, and Muslims they viewed as apostates for having different views of Islam); helping to recruit jihadists and terrorists, through the propagation process and by facilitating their transport to and support in combat zones; buying weapons for jihadists and terrorists; providing storage facilities for weapons for jihadists and terrorists; providing training camps for jihadists and terrorists where they were taught how to use weapons and make bombs; disseminating terrorist training manuals to jihadists and terrorists; providing food, housing and medical care to jihadists and terrorists; providing cover to people engaged in terrorism, such as by providing fake work papers to jihadists and terrorists; providing office space for al Qaeda and its agents to do

---

[3] My public profile is available on the Middle East Institute website at https://www.mei.edu/experts/jonathan-m-winer and on my law firm's website, https://www.winerlegal.com

business as they engaged in such activities as weapons purchases; and raising funds for and transmitting funds to al Qaeda and to those working with it. Such funding and related support in turn enabled al Qaeda to make direct expenditures as needed to build its global capacity to attack the United States.

3.6.     Al Qaeda used the infrastructure it was able to develop with the support of the charities, such as its training camps and curriculum, to train Muslims to become terrrorists and to succeed in carrying out terrorist attacks. The training included weapons training, training in land mines, bomb making, how to carry out guerilla warfare, how to kill unarmed people and how to carry out chemical weapons attacks. The infrastructure provided by or made possible by the charities also enabled al Qaeda to recruit and select candidates for major terrorist operations against Western targets such as the United States and to provide them the specific training they needed to carry out such attacks. These skills and others developed and taught at the training camps provided the foundation for the planning and operational activities necessary for al Qaeda to succeed in striking the United States.

3.7.     The charities that helped Al Qaeda were engaged in two principal types of activities. The first of these was religious propagation activities of an extreme form of Islam, Wahhabism, which included the dissemination and teaching of texts justifying armed conflict, violent jihad, and the killing of non-believers. The second type of activities were relief efforts aimed at Muslims in need, especially in conflict zones. The propagation activities of the charities were essential for indoctrinating and recruiting Muslims to become jihadists and terrorists. The relief activities of charities aligned with al Qaeda and other extremist organizations facilitated the recruitment of terrorists, provided space for their training and operations, and provided a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being relief workers. Funds from the relief agencies were also used to help al Qaeda and other terrorist groups by purchasing weapons and other things the terrorists needed, or were given to al Qaeda and affiliated groups for their own direct spending.

3.8.     I know of no charity that has among its lawful, public, authorized uses providing funds and other support support for acts of violence. Record-keeping by any charity involved in support for such acts of violence or for any form of serious crime necessarily seeks to hide the evidence of such support. Documenting terrorist activities in the books of a charity is counter to the interests of both the charities supporting terrorist groups and to the interests of the terrorist groups themselves. Doing so would increase the risk that the donor as well as the recipient will be indicted, arrested, subject to civil liability to their victims, sanctioned, and/or put out of business. It was standard practice for charities that provided support to al Qaeda to hide what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities.

3.9.    Information available on charities that provided material support to al Qaeda and other terrorist groups prior to 9/11 show a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to make accurately reconstructing how they actually spent their funds impossible. Few audits of such charities for the period prior to 9/11 are available. The few limited audits that have emerged show recurrent patterns of gross abuse, as one would expect of charities whose personnel intentionally were expending charitable funds for prohibited purposes, such as buying weapons and providing direct support to terrorist groups.

3.10.   Al Qaeda systematically used its relationships with Islamic charities to channel resources to aligned terrorist organizations and causes as well as to its own organization. These enabled these aligned terrorist groups, as well as al Qaeda itself, to plan and carry out terrorist attacks throughout the world. The charities advanced al Qaeda's terrorist mission through building up an infrastructure in which local terrorist groups involved with local extremist causes could indoctrinate and recruit Muslim men to carry out jihad against non-Muslims and/or secular governments and forces. These other terrorist groups then provided logistical support, documentation, and other help, including fundraising, to al Qaeda to promote al Qaeda's terrorist activities as well as their own extremist activities. The terrorist activities engaged in by both al Qaeda and its affiliated terrorist groups included terrorist activities in conflict zones and elsewhere, such as Europe and the United States, as well as violent resistance to non-Muslim forces in areas of civil conflict. The charities' support to al Qaeda affiliates included, for example, providing training camps and guesthouses in various areas, including Afghanistan, Pakistan, the Sudan, Somalia and Kenya, for the use of al Qaeda and for these affiliates. The support that al Qaeda was able to provide other terrorist groups as a result of the support it received from these charities included purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons, all of which it did for its own members, and for associated terrorist organizations in various countries throughout the world.

3.11.   The three major Saudi international charities, IIRO, MWL, and WAMY, each provided significant material support to al Qaeda without which it would not have achieved its global capabilities. Prior to the 9/11 attacks, such support included:

    3.11.1.  *IIRO* supported terrorist finance activities through its field offices in many countries throughout the world. IIRO provided funding for terrorist infrastructure, provided jobs and safe haven to al Qaeda and al Qaeda operatives, and funded and built local support for affiliated terrorist groups. Two of IIRO's branches and the head of one of its major Saudi Arabian offices were specifically designated for terrorist sanctions by the US and UN.  That other offices of IIRO were not designated should not be interpreted to mean that no other IIRO office was similarly

implicated. To the contrary, U.S. government assessments indicate the bin Laden used  IIRO as a whole to support al Qaeda's activities.

3.11.2. *MWL* provided funding to al Qaeda and bin Ladin and incubated others who provided such funding. As stated by a former member of al Qaeda who knew bin Ladin well, MWL incubated and housed other charities and their key personnel as they supported terrorism, by providing funding to them that they were able to use to build the capacity of al Qaeda and associated organizations to carry out jihad locally and globally, including against the United States. As described by the al Qaeda insider, MWL was the "mother" of the other charities helping al Qaeda.

3.11.3. *WAMY* provided funds to al Qaeda and to associated Islamic terrorist organizations and separatist movements. It channeled donated funds to al Qaeda and these organizations and movements; provided them financial and logistical support; helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones; provided weapons to al Qaeda, as well as Islamic soldiers and terrorists involved in affiliated or associated activities and causes; recruited young Muslims to join terrorist and separatist organizations and causes, including to become martyrs for Islam; served as a distribution channel for transmitting information and documents to and from al Qaeda and within and among Islamic terrorist organizations and associated separatist movements; disseminated hate speech against Christians and Jews designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against "infidels;" and urged young Muslims to take up arms against secular, non-Islamist societies. The Saudi charity LBI, then merged into WAMY and became a formal part of WAMY.

3.12. It is not possible to determine an exact dollar amount of the material support given by IIRO, WAMY and MWL for terrorism. The charities did not accurately report support they provided for terrorism. The limited information provided about the bookkeeping maintained by one of these three charities, IIRO, includes evidence of fraudulent and dishonest records.[4] In any case, the offices, activities, and funds of the charities could be and were used simultaneously for both humanitarian and terrorist purposes. While some of the humanitarian assistance provided by these charities was unrelated to providing support for jihad and terrorism, overall, the two types of activities - humanitarian and terrorist - were inextricably intermingled in the international operations of these charities in the days, months, and years that preceded the 9/11 attacks.

3.13. The purpose of the U.S. program under Executive Order 13224 to designate and apply economic sanctions to terrorists and those supporting terrorists is to stop them from continuing to carry out and support terrorism and terrorist activity.

---

[4] I have seen no audits pertaining to WAMY or MWL. However, audits of entities they funded or assisted show false recordkeeping.

These sanctions are only applied to those who have already engaged in terrorism or material support to terrorists, but they are not applied to everyone who has done those things. Their purpose is primarily preventative, to stop them from continuing to threaten U.S. national security and the security of other countries. The U.S. applies this sanctions authority in a tailored fashion to achieve these objectives, in coordination with other tools it uses to achieve this result.

3.14.   When designating someone for terrorist sanctions, the U.S. government puts together a package of material, consisting of two major types of information. The first type included classified or U.S.-government sensitive information, generated by U.S. intelligence, law enforcement and other U.S. government source. The second type included unclassified information obtained from public records, newspaper publications, and other non-U.S.-governmental information. This package typically includes extensive information that the candidate for designation has engaged in terrorism or materially supported terrorism, and poses the threat of continuing to do so. Typically, a designation package includes raw intelligence or law enforcement information that cannot be used in court for various reasons, including the need to protect the sources of the information and the method by which was acquired.

3.15.   The United States does not designate all of the people and entities about whom it has collected information showing them to have engaged in the material support of terrorism. Some of the people and entities the U.S. could sanction for past conduct may no longer pose a terrorist threat. Others who still pose potential current or future terrorist risk may be cooperating with the U.S., making sanctions counterproductive while such cooperation is taking place. In still other cases, designating a particular person or entity would risk imperiling the cooperation of third-parties the U.S. needs to help it counter al Qaeda and other terrorist groups, again making such sanctions counterproductive. There may also be a decision not to sanction someone because the U.S. assesses that there are more effective ways of securing compliance, such as through high-level diplomatic talks with a foreign country to get it to take immediate action against the threat. Rather than issue a sanction against a state-sponsored charity which has engaged in terrorist support, for example, the U.S. may instead decide to tell the foreign country which sponsors that charity to take effective action to end the charity's material support for terrorism, or face serious consequences. When successful, this approach mitigates terrorist risk, while avoiding the risk of a damaging public dispute between the two countries. All of this is a normal part of the sanctions process, and helps explain why a pesron or entity who has engaged in significant material support of terrorism has not been sanctioned.

3.16.   It is common for the U.S. to remove people and entities from its sanctions lists, once the objective of imposing the sanction on them has been achieved. When a person or entity no longer poses a significant terrorist threat, the U.S. government takes action to remove that person or entity from the sanctions list. The removal of the person or entity's name from the list does not mean the original listing was

wrong, or that the person or entity has been exonerated for past bad acts. It merely means that the person or entity no longer constitutes a terrorist threat in the present or future, due to such reasons as the person or entity ending terrorist ties, abandoning support for terrorism, going out of business, and/or putting sufficient controls in place to ensure that they cannot support terrorism in the future.

3.17.  The UN terrorist sanctions programs work similarly to the U.S. sanctions under EO 13224. People and entities are sanctioned by the UN at the request of one or more members of the UN Security Council (such as the U.S.) due to the sanctioned person or entity posing a continuing terrorist threat. When circumstances have changed and there is no longer an undue risk the person or entity will continue to support terrorism, they are delisted. Delisting does not mean the original sanctions were wrong, or that the person or entity has been found innocent. It means the delisted person or entity is assessed to no longer pose a terrorist threat due to changed circumstances, such as the delisted person or entity haven taken sufficient steps to end its past terrorist ties.

## Detailed Findings and the Basis for Those Findings

4.  *What were al Qaeda's Financial Needs in the Years Leading Up to 9/11?*

4.1.  Al Qaeda was founded by bin Ladin in 1988,[5] who combined strands of extreme political Islam from ideas which began in Egypt and in Saudi Arabia with his skills as a fundraiser to build a global network of terrorist groups. Al Qaeda initially provided support for Arab and Afghan fighters against the Soviet Union in Afghanistan. Al Qaeda's activities were then expanded at bin Ladin's direction to undertake armed conflict and terrorism globally against those not living in accordance with bin Ladin's interpretation of the strict requirements of 7th Century Islamic or sharia law.[6] This broadened goal created the need for Al Qaeda to expand its funding requirements.

4.2.  In 1988, Egypt and Saudi Arabia were the central geographic locations of Islamic political and cultural identity. People and ideas from each of these countries

---

[5] There is no universal agreement on spelling and capitalization in English on Arabic names. I have tried generally to adopt the spelling used in the 9/11 Commission report. I also generally retain, when possible, whatever was the original spelling used in the source material which can differ from that used in the 9/11 Commission report, and other documents. Thus, within my Expert Report, bin Ladin may be spelled as "bin Ladin," "Bin Ladin," and "bin Laden," as well as other variants as reflected in any original document I am citing. Similarly, "Osama" may be spelled as "Usama," or "Usamah," and al Qaeda as "al Qaeda," "Al Qaeda," "al-Qaeda," "al Qaida," "al-Qaida." and "al-Qa'ida," and any other variants, depending on the source document. For other Arabic names, I have generally used whichever spelling is used in the original source document. Gulf State- originated Islamic charities typically have multiple spellings in English. I have not sought to standardize them, but adopt the spelling from the source document. I have taken the same approach to the multiple spellings used for terrorist groups.

[6] An account of Al Qaeda's founding based on documents seized by the U.S. government from the Islamic charity Benevolence International Foundation is provided in the Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout,* NDIL, Case No 02 CS 892, 7 January 2003, with the documents in turn contained in a four-volume appendix to the proffer.

contributed elements that baked together over time led to the creation and development of al Qaeda.[7] Al Qaeda doctrine identified the United States as the primary impediment to the goal of a worldwide Islamic government and accordingly, al Qaeda targeted U.S. interests and citizens for its attacks. In bin Ladin's 1998 fatwa, he called upon Muslims everywhere to kill Americans.

4.2.1. Al Qaeda was different from most terrorist organizations in that it not only financed and carried out its own operations, but also financed and supported other Islamic terrorist organizations throughout the world. To do this took a great deal of money, requiring bin Ladin to leverage funds and other support from many people, including state-sponsored Islamic charities.

4.2.2. The September 11 attacks were orchestrated, financed, and carried out by al Qaeda operatives.[8] Prior to the 9/11 attacks, al Qaeda was directly responsible for numerous other attacks around the world and played a supporting role in attacks carried out by other Islamic terrorist organizations. Attacks for which Al Qaeda was directly responsible included the 1998 bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania which killed over 300 people and wounded 5,000,[9] and the October 2000 attack on the U.S.S. Cole which killed 17

---

[7] A deeply researched history of the development of Islamic extremism from Egypt and from Saudi Arabia is provided by Pulitzer Prize winner author Lawrence Wright in The Looming Tower: Al Qaeda and the Road to 9/11. In summary, his book finds Al Qaeda's origins in three people. The first, who called for Islamic jihad against the west and against secular states in Muslim countries, was Egyptian Sayyid Qutb, executed by Egypt in 1966 for participation in a conspiracy to overthrow the Egyptian government and assassinate its political leaders. Notably, Qutb called for a return to 7th Century Islamic values and norms, based on those in place during the life of Mohammed. The second was Ayman al-Zawahiri, also an Egyptian, who came to participate in plots to overthrow the Egyptian government under Anwar Sadat, to kill the main leaders of the country, capture army, radio, TV and telephone headquarters, and bring about a public uprising and an Islamic revolution in Egypt. After being imprisoned and tortured in Egyptian prison, an even more radical Zawahiri left Egypt for Saudi Arabia in 1985, and then moved to Peshawar, Pakistan, where bin Ladin and Zawahiri met and formed an alliance, initially relating to helping the Afghan resistance against the Soviets. As Wright wrote: "Each man filled a need in the other. Zawahiri wanted money and contacts, which Bin Ladin had in abundance. Bin Ladin, an idealist given to causes, sought direction; Zawahiri, a seasoned propagandist, supplied it." The Looming Tower, Vintage Books, (2006, 2011), p. 144. As of February 1, 2020, Zawahiri remains the central figure in al-Qaeda, a role he has held since bin Ladin's death on May 2, 2011. See, e.g., https://www.counterextremism.com/extremists/ayman-al-zawahiri An additional important founder of Al Qaeda was Shaykh Abdullah Azzam, a Palestinian who became director of the Saudi-financed charity the Muslim World League in Peshawar, coordinating the activities of Islamic relief agencies, including providing direct support to the Afghan-Arab mujahideen in Afghanistan. See, e.g., "The Life and Death of Abdullah Azzam," Jed Lea-Henry, Middle East Policy Council, undated, https://mepc.org/journal/life-and-death-abdullah-azzam
[8] The 9/11 Commission Report, July 22, 2004, Chapters 2, 4, 7, and 8. https://govinfo.library.unt.edu/911/report/911Report.pdf
[9] Indictment, U.S. v. Bin Ladin, SDNY, S(9) 98 Cr. 1023 (LBS), available at: https://www.nonproliferation.org/wp-content/uploads/2016/05/us_indictment_against_bin_laden.pdf. https://www.asser.nl/upload/documents/DomCLIC/Docs/NLP/US/US_v_Usama_bin_Laden_et_al_Indictment_1998.pdf

U.S. sailors.[10]

4.3.    Some start-up funds for al Qaeda came from bin Ladin's personal fortune, but this fortune largely was consumed by business failures in Sudan. Al Qaeda's primary sources of funds came from personal donations and support from Islamic charities, including Saudi Arabian charities, especially those operating in conflict zones, such as Afghanistan, Bosnia,[11] and Chechnya. In such areas, support flowed to Muslims and Islamic militants engaged in conflict with non-Muslims. The global propagation activities of these charities were also essential for the indoctrination and recruitment of such fighters. These propagation activities included the dissemination of extremely intolerant and anti-western Wahhabist ideas which included strong hostility to Christians, Jews, and to non-Islamicist or secular governments.

4.4.    The United States indicted bin Laden in 1998, three years prior to his financing and masterminding the 9/11 terrorist attacks.  That indictment describes the global ambition of his global terrorist network, and the types of capabilities he and al Qaeda needed to build this network:

4.4.1.    Bin Laden created al Qaeda or "The Base" in 1988, with its headquarters in Afghanistan and Peshawar, Pakistan, to fight the Afghan war against Soviet occupation. By 1991, he relocated al Qaeda's headquarters and himself in Sudan, where both remained until approximately 1996, as it built offices and operations in a number of countries. These included Bosnia, Croatia, Kosovo and Albania in the Balkans; Central Asian countries from the former Soviet Union with substantial Muslim populations, such as Kazakhstan, Tajikistan, Turkmenistan, and Uzbekistan; European portions of the former Soviet Union with Muslim populations such as Chechnya and the Republic of Georgia; Southeast Asian countries with Muslim populations, such as Indonesia, Malaysia, the Philippines, and Thailand; African countries with Muslim populations such as Djibouti, Egypt, Eritrea, Kenya, Somalia, Sudan, Tanzania and Tunisia; and areas in western Europe and North America that included aggrieved or potentially aggrieved Muslim populations.[12]

---

[10] "Al Qaeda Associates Charged In Attack On USS Cole, Attempted Attack On Another U.S. Naval Vessel," U.S. Department of Justice Press Release, May 15, 2003, https://www.justice.gov/archive/opa/pr/2003/May/03_crm_298.htm

[11] For the purposes of my Expert Report, I use the term "Bosnia" in discussing events relating to the country of Bosnia and Herzegovina, except when an entity or document uses the full name, in which case I retain the longer version.

[12] Indictment, *US v. Bin Ladin*, id. The geographic scope of al Qaeda is specifically articulated in the 1998 indictment: "Al Qaeda functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, and at times, the Islamic Group . . . and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan and the Kashmiri region of India and the Chechnyan region of Russia.

4.4.2.  Al Qaeda's interpretation of Islamic law was based on the premise that the only legitimate laws on earth are those set forth by Mohammed during his lifetime in the 7th century. The interpretation derived from a puritan Islamic reform movement called Salafism that was itself an offshoot of Saudi Wahhabism, an ultraconservative 18th century sect of Islam that during the 20th century became the state-sponsored religion of Saudi Arabia under the House of Saud.

4.5.  To accomplish its goals, al Qaeda needed to recruit Islamic fighters; indoctrinate them in its extreme ideology and religious views; and train them in warfare, including irregular warfare and terrorism, drawing the fighters from the broader Muslim communities in which they were based. These requirements included much of what would be required by a non-terrorist military business: hiring recruiters to find personnel for the organization; the creation of "content" for recruiting and indoctrinating the people being recruited; the dissemination of that content through communications designed to attract potential recruits; the purchase and rental of real estate for training camps and safe houses; food and housing for trainees and fighters; salaries for al Qaeda's core infrastructure in each country as well as any funds needed for trainees and fighters; military equipment, such as firearms and explosives; warehouses to store such equipment; communications equipment such as portable and satellites phones and storage space for the electronics; office space for administration of the organization at its headquarters and other major nodes; personnel to undertake logistics and travel; funding and facilitating the travel of those working for the organization to where they were needed; purchasing and maintaining a fleet of vehicles to provide transportation for al Qaeda leadership and for terrorist operations in particular locations such as Afghanistan, Kenya, Somalia, and Sudan; analysis and planning; legal and banking support; payments to other service providers, such as those making and/or obtaining counterfeit passports; currency for a range of immediate needs; and financial agents and couriers to handle the currency and its movements.[13]

4.6.  Initially, al Qaeda began its operations in Afghanistan, supported in substantial part by Saudi-based charities. IIRO, for example, funded six terrorist training camps there. As al Qaeda expanded into other countries, its need for funds also expanded. The 9/11 Commission staff found that in the years leading to the 9/11 terrorist attacks, al Qaeda raised about $30 million per year for direct expenditures by al Qaeda that was generated from Islamic charities and from the use of well-placed financial facilitators who gathered money from both witting

Al Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Canada and the United States." ¶5.

[13] Throughout the indictment in *US v. Bin Ladin*, id., the U.S. government identified these requirements for Al Qaeda at some length as they applied in Afghanistan, Kenya, Pakistan, Somalia, Sudan, Tanzania, the United Kingdom, and the United States, among other locations. See, e.g., ¶¶5, 9, 11, and 12. Al Qaeda also established terrorist infrastructure in additional areas, such as Southeast Asia, Chechnya, and the Balkans.

and unwitting donors, primarily in the Gulf region.[14] The 9/11 Commission staff finding was consistent with what was publicly known in general terms at the time of 9/11, and with the information that has been generated since the 9/11 attacks.[15] However, as discussed in Section 4.9 of my Expert Report, the $30 million estimate does not include important categories of ongoing, non-cash support that al Qaeda obtained from Islamic charities, in addition to the direct financial support that the charities provided al Qaeda received at particular times.

4.7.    Al Qaeda's development of world-wide capacities arose from bin Ladin's assessment that Islamic jihad should go beyond the borders of individual nation-states to capture all areas in which any Muslims lived. In the words of the 9/11 Commission:

4.7.1.    "Bin Ladin understood better than most of the volunteers the extent to which continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'"

4.7.2.    "Mosques, schools, and boardinghouses served as recruiting stations in many parts of the world, including the United States. Some were set up by Islamic extremists or their financial backers."[16]

4.8.    Over the years prior to 9/11, al Qaeda grew into the largest and most dangerous international terrorist organization by applying the funds and other support it received from charities and other funders to go global during bin Ladin's time in Afghanistan, Sudan, and then again during this second period in Afghanistan. As the 9/11 Commission staff found, once bin Ladin returned to Afghanistan, the largest single al Qaeda expense was its support for the Taliban in Afghanistan, which the staff estimated to itself account for spending of about $20 million per year (out of the $30 million annual total). As stated in the staff report, bin Ladin also used money to train operatives in camps in Afghanistan, create terrorist networks and alliances, and support the jihadists and their families. "Finally, a

---

[14] National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission,  available at
https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf
[15] For example, U.S. counter-terrorism czar Richard A. Clarke has stated that prior to 9/11, he and his staff at the U.S. National Security Council had concluded that al-Qaeda had developed "a vast, global fundraising machine," which "involved both legitimate businesses and criminal enterprises. But it was clear that the most important source of Al Qaeda's money was its continuous fundraising efforts through Islamic charities and nongovernmental organizations." Against All Enemies (2004), p. 192.
[16] The 9/11 Commission Report, July 22, 2004, https://govinfo.library.unt.edu/911/report/911Report.pdf, p. 55

relatively small amount of money was used to finance operations, including the approximately $400,000–500,000 spent on the September 11 attacks themselves."[17]

4.9.    The full requirements of al Qaeda went well beyond the $30 million in annual direct support. To achieve its global capabilities and to build the infrastructure that it ultimately used to strike the United States in 9/11, al Qaeda required very large expenditures over a twenty year period. Many of these expenditures did not involve direct funding to al Qaeda, but they were necessary as a foundation for its activities. To meet these requirements, al Qaeda relied on:

4.9.1.   funds that al Qaeda raised itself from wealthy Gulf State Arabs;

4.9.2.   resources from Islamic charities acting as fronts for al Qaeda and aligned terrorist groups to promote Islamic jihad and terrorism;

4.9.3.   resources from Islamic charities that provided support to al Qaeda and aligned groups as well as actual humanitarian relief activities in conflict zones, such as IIRO, MWL and WAMY;

4.9.4.   help from Islamic charities to embed itself in areas favorable to the recruitment of terrorists, such as areas of violent conflict and political instability or locations where Muslim populations had local grievances or other vulnerabilities that made Muslims potentially recruitable for terrorism;

4.9.5.   facilitation of travel to areas for recruitment, fund-raising, and operations;

4.9.6.   activities that built support within indigenous populations, such as building and operating orphanages or health care clinics; and

4.9.7.   securing ideological support from these and other Islamic charities through such activities as propagation through schools and mosques in Muslim areas, which built the ideological basis to indoctrinate and recruit Muslims to become terrorists.

4.10.   Collectively, this support provided the means for al Qaeda to indoctrinate, recruit, train, equip, arm, transport, and house Islamic fighters and terrorists, and to facilitate the operations of al Qaeda and affiliated and associated terrorist groups.

---

[17] 9/11 Commission Monograph on Terrorist Financing, Id., p. 4.

5. *Was Saudi Arabia a Significant Source for Funding of al Qaeda in the Years Leading up to 9/11?*

5.1.   Saudi Arabian charities and Saudi nationals played a central role in helping al Qaeda create its global infrastructure, uniting disparate Muslim groups in different parts of the world into a common extremist cause.

5.2.   Numerous U.S. officials and former U.S. officials, from both the Clinton and the Bush Administrations concluded that Saudi Arabia was, in the words of former U.S. Treasury Counsel David Aufhauser in 2002 testimony before Congress, the "epicenter" for global terrorist finance. Below I provide representative examples:

5.2.1.   "Senator Kyl: Let me start with you, Mr. Aufhauser. Just very specific questions. Are the Saudis part of the general terrorist threat against the United States? Mr. Aufhauser. People within Saudi Arabia are, yes. Senator Kyl. Is there still a significant al Qaeda terrorist threat here in the United States? Mr. Aufhauser. Yes. . . . Senator Kyl. With regard to the trail of money I should have asked you, Mr. Aufhauser, specifically about the trail of money and whether it leads in some cases to Saudi Arabia. Mr. Aufhauser. In many cases it is the epicenter. Senator Kyl. Does that trail of money also show money going to al Qaeda? Mr. Aufhauser. Yes. Senator Kyl. Is the money from Saudi Arabia a significant source of funding for terrorism generally? Mr. Aufhauser. Yes. Principally al Qaeda but many other recipients as well." Testimony, Department of the Treasury General Counsel David Aufhauser, June 28, 2003.[18]

5.2.2.   "As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahhabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike. We are concerned that this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States. Through the support for madrassas, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism. Such Saudi financing is contributing significantly to the radicalization of millions of Muslims in places ranging from Pakistan to Indonesia to Nigeria to the United States. Foreign funding of extremist madrassas in Pakistan alone, for example, is estimated in the tens of millions, much of it historically from Saudi Arabia." Lee Wolosky, former Counter-Terrorism Senior

---

[18] Testimony of David Aufhauser, Senate Committee on the Judiciary, June 26, 2003, https://www.govinfo.gov/content/pkg/CHRG-108shrg91326/html/CHRG-108shrg91326.htm

Director at the National Security Council, Clinton Administration, June 15, 2004.[19]

5.2.3. "The Saudis have, at a minimum, a clear pattern of looking the other way when funds are known to support extremist purposes. One Saudi official was quoted in the press as saying that a Saudi organization created to crack down on charities funding terrorism does little because it doesn't want to discover top people giving to charities.'' Matthew Levitt, a former FBI counterterrorism analyst and later, the Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Department of the Treasury, July 22, 2004.[20]

5.2.4. "The challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we have faced. Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda. Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq. . . Saudi Arabia-based and funded organizations remain a key source for the promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda." Stuart Levey, Under Secretary of the Treasury, Office of Terrorism and Financial Intelligence, July 13, 2005.[21]

5.3. The 9/11 Commission made a number of conclusions about the role that Saudi Arabia played in funding al Qaeda's ability to attack the United States on 9/11, as set forth in its final report, issued July 22, 2004, based on extensive investigation, and reflecting the consensus of its bipartisan members.[22]  I provide excerpts below:

5.3.1. "Saudi Arabia has been a problematic ally in combating Islamic extremists. At the level of high policy, Saudi Arabia's leaders cooperated with American diplomatic initiatives aimed at the Taliban or Pakistan before 9/11. At the same time, Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities. It was the society that produced 15 of the 19 hijackers." (p. 371)

5.3.2. "The Kingdom is one of the world's most religious conservative societies, and its identity is closely bound to its religious links, especially its

---

[19] Testimony of Lee Wolosky "Concerning the Second Report of an Independent Task Force on Terrorist Financing Sponsored by the Council on Foreign Relations," U.S. Senate Committee on Governmental Affairs, June 15, 2004, https://www.govinfo.gov/content/pkg/CHRG-108shrg95189/html/CHRG-108shrg95189.htm

[20] Testimony, Matthew A. Levitt, Senate Committee on Banking, Housing and Urban Affairs, August 1, 2002, https://www.govinfo.gov/content/pkg/CHRG-107shrg89957/html/CHRG-107shrg89957.htm

[21] Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, July 13, 2005, https://www.treasury.gov/press-center/press-releases/Pages/js2629.aspx

[22] The 9/11 Commission Report, July 22, 2004, https://govinfo.library.unt.edu/911/report/911Report.pdf

position as the guardian of Islam's two holiest sites. Charitable giving, or *zakat,* is one of the five pillars of Islam. It is broader and more pervasive than Western ideas of charity – functioning also as form of income tax, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. Funding charitable works is an integral function of the governments in the Islamic world. It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax. Closely tied to the zakat is the dedication of the government to propagating the Islamic faith, particular the Wahhabi sect that flourishes in Saudi Arabia." (p. 372)[23]

5.3.3.   "While Saudi domestic charities are regulated by the Ministry of Labor and Social Welfare, charities and international relief agencies, such as the World Assembly of Muslim Youth (WAMY), are currently regulated by the Ministry of Islamic Affairs. This ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world, including in mosques and schools. Often these schools provide the only education available; even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools. Some Wahhabi-funded organizations have been exploited by extremists to further their goal of violent jihad against non-Muslims. [24] One such organization has been the al Haramain Islamic Foundation; the assets of some branch offices have been frozen by the U.S. and Saudi governments." (p. 372)[25]

---

[23] Propagating Islam is an obligation of the government under the Saudi Basic Law of Governance, Saudi Arabia, Basic Law of Governance, Article 23. Also see Articles 1, 9, 10, 13, and 34. https://www.saudiembassy.net/basic-law-governance

[24] I understand the word "exploited" in this context to mean "the action of making use of and benefiting from resources." As discussed further in my Expert Report, while the Islamic charities that provided support to extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities.

[25] Al Haramain Islamic Foundation and fourteen of its branches were ultimately designated as terrorist support organizations by the US and by the UN before the entire organization was reported by Saudi Arabia in 2004 as being dissolved. See Resource Center, Protecting Charities, profile of Al Haramain, U.S. Department of the Treasury, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx  "The Al-Haramain branches in Bosnia and Herzegovina, Somalia, Indonesia, Kenya, Tanzania, Pakistan, Afghanistan, Albania, Bangladesh, Ethiopia, the Netherlands, and the Union of the Comoros  have provided financial, material and/or technological support to the Al-Qaida network, including Jemaah Islamiyah, Al-Itihaad al-Islamiya / AIAI, the Egyptian Islamic Jihad and Lashkar-e-Tayyiba. These terrorist organizations received funding from Al-Haramain and used Al-Haramain as a front for fundraising and operational activities," UN Security Council  UNSCR 1267 Sanctions Committee website, updated 18 January 2018, [citations omitted] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramain-islamic-foundation-%28bosnia-and.  See also  "Saudis Are Shutting Down A Charity Tied to Terrorists," New York Times, June 3, 2004, https://www.nytimes.com/2004/06/03/world/saudis-are-shutting-down-a-charity-tied-to-terrorists.html

5.3.4.    Consistent with the above statements, the 9/11 Commission noted a
"**likelihood that charities with significant Saudi government
sponsorship diverted funds to al Qaeda.**" [emphasis added] (p. 171).

6.    *What Role Did Purported Charities Play in Providing Funding or Other Support for
al Qaeda and the 9/11 Attacks on the United States?*

6.1.    There is broad consensus, backed by extensive documentation, that Islamic
charities played a central role in providing the funding and other support for al
Qaeda that made it possible for this terrorist group to carry out the 9/11 attacks.

6.2.    This consensus is reflected in a December 2003 report of the UN Security Council
which describes their role as follows:

6.2.1.    "From its inception Al-Qaida has relied heavily on charities and donations
from its sympathizers to finance its activities. Charities provide Al-Qaida
with a very useful international channel for soliciting, collecting,
transferring and distributing the funds it needs for indoctrination,
recruitment, training, and logistical and operational support. These funds
are often merged with and hidden among funds used for other legitimate
humanitarian of social programmes. Al-Qaida supporters and financiers
have also established front charity networks whose main purpose is to
raise and deliver funds to Al-Qaeda. The roots of these charity networks
stem from the anti-Soviet jihad in Afghanistan during the late 1980s.
During that time, Al-Qaida could draw on the support of a number of
State-assisted charities and other deep-pocket donors that supported the
anti-Soviet cause."

6.2.2.    "Today, Al-Qaida continues to rely heavily on those charities to facilitate
and mask the collection and movement of its funds. Activities range from
collection boxes at mosques and Islamic centers to direct fund-raising and
solicitations, the merging of funds for both legitimate relief purposes and
terrorism, the misuse or embezzlement of legitimate charitable funds, and
the creation of front charities to channel funds from community
collections or deep-pocket supporters. Al-Qaida has also benefited from,
and relies heavily on, the activities of legitimate charities that support the
propagation and teaching of more radical forms of Muslim
fundamentalism."[26]

---

[26] UN Security Council Letter dated 1 December 2003 from the Chairman of the Security Council
Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and
associated individuals and entities addressed to the President of the Security Council, enclosing Second
report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions
1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban, and individuals and entities
associated with them ("Second Report,"), S/2003/1070, ¶¶34-35, https://documents-dds-
ny.un.org/doc/UNDOC/GEN/N03/600/46/PDF/N0360046.pdf?OpenElement

6.2.3. The UN Report then named IIRO as an important example of the use by al Qaeda of the charities, and stated that it "works in close association with the MWL" The UN Report stated that IIRO was engaged in legitimate humanitarian activities but was also "used, knowingly or unknowingly, to assist in financing al Qaeda."[27]

6.3. The 9/11 Commission reached a number of conclusions about the role that the Saudi charities played in funding al Qaeda's ability to attack the United States on 9/11, as set forth in its final report, issued July 22, 2004, based on extensive investigation, and reflecting the consensus of its bipartisan members:

6.3.1. "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudia Arabia and the Persian Gulf States. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the majahideen, or 'holy warriors.'" p. 55

6.3.2. "Al-Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. Some individual donors surely knew, and others did not, the ultimate destination of their donations. . . . These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause." p. 170

6.3.3. "Al Qaeda also collected money from employees of corrupt charities. . . . It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large international charities – particular those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda." p. 170

6.3.4. "In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, Al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the

---

[27] Second Report, id, ¶¶40-41

guise of working for a humanitarian operation." pp. 170-171.

6.4.    During my tenure as Deputy Assistant Secretary of State for International Law Enforcement, and in the days after 9/11, I spoke with U.S. government officials who were concerned about, and frustrated by their inability to correct, the involvement of Islamic charities in providing support to al Qaeda. Without exception, these officials expressed views consistent with the assessments quoted above from the conclusions of the 9/11 Commission. The 9/11 Commission's findings about the charities are also consistent with other information developed by various federal government agencies both before the 9/11 attacks and afterwards, about the role of the charities in supporting al Qaeda, as detailed further in this Section 6 of my Expert Report, and in subsequent Sections.

6.5.    I assess these conclusions of the 9/11 Commisson to be correct, so far as they go. But the 9/11 Commission did not identify *all* of the charities or charity officials that funnelled money and other support to al Qaeda. Instead, it identified a few examples of the charities' involvement in supporting al Qaeda, using the phrase "such as," rather than providing assessments about each charity about which it had evidence. This lack of completeness becomes evident when one reviews other documents, including documents pre-dating the 9/11 Commission's work, from the U.S. government and from other governments, which provide further detail about the type and scope of assistance provided to al Qaeda by charities whose specific activities in support of al Qaeda the 9/11 Commission did not fully address.

6.6.    *Role of Charities as US Government Understood Before the 9/11 Attacks.* While I served at the State Department in the late 1990's, I became aware of concerns among the specialists tracking bin Ladin and al Qaeda that some Saudi-supported Islamic charities were providing financial support for al Qaeda. As is typical when policymakers have an interest in an important topic, the Central Intelligence Agency produced analytic work regarding that topic in the form of a report. I have reviewed a report on Islamic charities operating in Bosnia that was produced by the CIA in 1996 ("1996 CIA Report"). This 14-page report is typical of the type of reports the CIA prepared in response to interest in a topic from high-level U.S. government officials.[28] It summarizes source information regarding the relationship between these charities and terrorist groups, and provides an analytic framework for understanding them. It focuses principally on the activities of

---

[28] "Central Intelligence Agency Report on NGOs With Terror Links," 1996, "1996 CIA Report," handwritten notation, Jan '98, no further date specified, Exhibit 95, Index of Evidence Supporting Plaintiffs' Averment of Facts in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina available, text available online as Exhibit J Case 1:03-md-01570-GBD-SN   Document 3826-6   Filed 12/01/17  Page 37 of 99, https://www.docketbird.com/court-documents/In-Re-Terrorist-Attacks-On-September-11-2001/Exhibit-EX1JT4B1/nysd-1:2003-md-01570-03826-006 and except for first paragraph at https://en.wikisource.org/w/index.php?title=CIA_Report_on_NGOs_With_Terror_Links&action=edit. The report is also referenced in the UNSC Second Report, id, at p. 15, as a "recently published report by the United States Central Intelligence Agency."

Islamic charities in the former Yugoslavia, discussing their broader international activities in other countries, such as the Philippines, as a backdrop to its analysis of such charities in their operations in the Balkans. Its analysis is consistent with later statements by current and former senior U.S. government officials about how these Islamic charities provided support for terrorism. Below I provide excerpts from that report, followed by my comments on them.

6.6.1.   1996 CIA Report: *"Approximately one third of these Islamic NGOS [out of the 50 such Islamic charities operating globally] support terrorist groups or employ individuals who are suspected of having terrorist connections. . . . Individuals connected to some of these NGOs have plotted to kidnap or kill U.S. personnel."* <u>Comment</u>: In the 23 years that have passed since the CIA produced this report, this assessment has held up well. A number of the charities identified in the Report, discussed below, and/or those associated with them, provided support to al Qaeda.

6.6.2.   1996 CIA Report: "*International Islamic charities have established a presence in nearly every country around the world that has a substantial Muslim population. For both traditional and more activist Muslims, aiding Muslims in distress is a religious duty. Islamic activists dominate the leadership of the largest charities. . . . The main objectives of these organizations include proselytizing, helping the needy, and defending Muslim communities from enemies. Where Muslims are engaged in armed conflict, some Islamic organizations provided military aid as part of a "humanitarian" package.* <u>Comment</u>: The CIA analysis accurately describes the Islamic charities continuum of activities. These began with helping Muslims in distress by providing health care, food, or other support, but also included the propagation of ultraconservative Islamic religious values, and then added actual support of armed fighting (jihad) against those in conflict with Muslims. This activity in turn incorporated support for groups engaged in terrorism, including al Qaeda, facilitating their ability to carry out terrorist attacks.

6.6.3.   1996 CIA Report: *"The main Islamic charities maintain headquarters and raise money in a few regional centers, the most important being in the Arabian peninsula and Sudan. Smaller organizations – important because of their support to extremist groups – often have headquarters in European offices in North America. Private donors retain a major influence on each group's policies."* <u>Comment</u>: The CIA analysis reflected the best understanding of the U.S. intelligence community in 1996, but understated the inter-connectedness of the main international Islamic charities, which shared funders, activities, and personnel in a complex web of relationships that in turn connected to al Qaeda. The reference to the "Arabian penisula" included other countries, such as Kuwait and the United Arab Emirates, but in particular meant Saudi Arabia. The reference to Sudan is also notable, as bin Ladin maintained

his headquarters there from 1991-1996 (the time when the report was written), when bin Laden left Sudan under international pressure.[29]

6.6.4.   1996 CIA Report: *"Governments in the Islamic world generally support the major charities' religious activities and help finance them, but are unable to monitor the groups or control how they use their money."* <u>Comment</u>: This analysis accurately reflected the lack of controls the charities had chosen to put into place to track the actual uses of the funds in the field prior to the 9/11 attacks.

6.6.5.   1996 CIA Report: *"All of the major and most of the minor Islamic charities are significant players in the former Yugoslavia, particularly in aiding Bosnian Muslims. Their contributions represent a significant proportion of humanitarian aid in Bosnia. According to the US Embassy in Riyadh, Saudi nationals alone gave $150 million through Islamic NGOs for aid to Bosnia in 1994. . . . The NGO's charitable activities include delivery of food, clothing and medicine; support to orphanages, schools, hospitals, and refugee camps; and housing construction, infrastructure support and agricultural projects. – Many of these organizations also support foreign Muhahedin fighters in Bosnia. . . . A growing body of reporting indicates that some of these charities are being used to aid Islamic extremist groups that engage in terrorism. We have information that nearly one-third of the Islamic NGOs in the Balkans have facilitated the activities of Islamic groups that engage in terrorism, including the Egyptian Al-Gama'at Al-Islamiyya, Palestinian Hamas, Algerian groups, and Lebanese Hizballah."* <u>Comment:</u> These excerpts provide a concrete example of the continuum of activities by the Islamic charities in conflict-zones. The charities undertake humanitarian work; they support Muslim fighters in ongoing conflict against non-Muslim groups; and they simultaneously support a range of Islamic extremist groups who operate in the same area, provide fighters for the conflicts, and carry out acts of terrorism. The charity work was itself problematic, because the legal activities the charities engaged in were accompanied by propagation of extremist ideology, thus creating a foundation for indoctrination and recruitment. The genuine relief efforts made it possible to build public support for the extremist activities which accompanied them. They attracted funds from donors that were also use to build terrorist capacities. They also provided a cover for moving people and supplies, especially into areas of conflict, which became training grounds for al Qaeda. The

---

[29] A separate short intelligence report written by the State Department in 1996 provided this assessment, characterizing bin Ladin as a radical terrorist financier who supported a small army of trained fighters, and who was being deported from Sudan by Sudanese authorities to alleviate international pressure and avert further UN sanctions for Khartoum's support for terrorism. The article states that, as of 1996, Egypt and Saudi Arabia, as well as the U.S., were applying "pressure" to get him out of Sudan.  Terrorism/Usama Bin Ladin: Who's Chasing Whom?," declassified intelligence assessment, U.S. Department of State, August 19, 1996, https://www.judicialwatch.org/wp-content/uploads/2014/08/State-Appeal-1996-Bin-Laden-Correspond.pdf

reference to Al-Gama'at Al-Islamiyya is important and telling. Al-Zawahiri had been one of its leaders prior to his joining bin Ladin and forming al Qaeda in 1988. Zawahiri ultimately announced the formal merger of al Qaeda with the Egyptian group in 2006.[30]

6.6.6.  1996 CIA Report: *"Efforts by governments to counter terrorist groups' use of NGOs are complicated by domestic and international political concerns, legal constraints, and the size and flexibility of the international extremist network. Domestic Islamic organizations – and sometimes foreign governments – have accused host governments of attacking legitimate Islamic institutions and intentionally hampering relief efforts. . . Four approaches have been used."*

6.6.6.1.  *"Closed NGO Offices. Several countries – including Italy, Austria, Albania, Croatia, Macedonia, Pakistan, and Saudi Arabia – have closed  the offices of NGOs whose members supported opposition groups, otherwise attacked the government, or conducted certain illegal activities such as arms smuggling. In each case, some employees of the targetted offices escaped and joined other NGOs, usually in neighboring countries, where they continued their activities. In some cases, the offices reopened later at new addresses."*

6.6.6.2.  <u>Comment</u>: This excerpt addresses the movement among Islamic charities of personnel from charities that are found to be involved in illegal or extremist activities, to ones that have not yet been found to be involved in such activities, and then continuing the original activities at the next charities, or reopening the closed charities at a different address or even under different names. This pattern, already evident to the CIA in 1996, continued in Islamic charities through 9/11, and beyond. For example, as set forth in Section 7.7.3.1 of my Expert Report, LBI, a charity used directly to support al Qaeda and to provide arms to fighters in Afghanistan, was rolled up and incorporated into the Saudi-state sponsored WAMY in 1996, while an offshoot, Benevolence International Foundation, was established and headquartered in the United States as a cover for continued support to al Qaeda.

6.6.6.3.  *"Control Finances. Saudi Arabia, Kuwait, and the United Arab Emirates have taken steps in the past two years to control the flow of money to extremists. They have passed laws mandating that major donations go only to government approved charities or a central collecting agency, and they have removed street*

---

[30] "Al-Zawahiri: Egyptian militant group joins Al Qaeda, Group linked to Luxor tourist slaughter, Sadat assassination," CNN, August 5, 2006, https://www.cnn.com/2006/WORLD/meast/08/05/zawahiri.tape/index.html,

*corner charity boxes placed by some NGOs. – Central collecting agencies have increased their resources and power, but we have no evidence that these efforts have proved effective in curbing the activities of NGOs. Most measures are one-time-only acts with little follow-up, and oversight of field operations has not increased."*

6.6.6.4.  <u>Comment:</u> This excerpt makes the point that three Gulf States, including Saudi Arabia, had taken actions to create the public impression that they were curtailing the use of the charities to fund Islamic extremisms, likely in respose to concerns expressed by the United States, but the actions were minimally implemented, not reinforced, and had no impact on what was actually taking place in the operations of the charities outside their home sponsoring country.  More generally, the fact that such actions were necessary underscores the nature of the underlying terrorist financing and support problem.

6.6.6.5.  *"Arrest Individual Members. Some countries have continued to allow suspect NGOs to operate while arresting individual members for terrorism or other illegal acts. This tactic, when applied consistently, appears to be the most successful in halting illegal activities within NGOs. For example, police in the Philippines have been investigating people and organizations, including NGOs, involved in plots against Western airliners, Ambassadors, the Pope, and Phillippines officials since January 1995. These investigations have led to periodic arrests and appear to have prevented some NGOs, including the International Islamic Relief Organization, from continuing to be used as cover for illicit activities."*

6.6.6.6.  <u>Comment:</u>  This excerpt from the 1996 CIA Report describes the "Bojinka Plot," which was a precursor to the 9/11 attacks. In the Bojinka plot, al Qaeda operatives in the Philippines planned to assassinate Pope John Paul II, to blow up 11 airliners in flight from Asia to the U.S., shutting down air travel around the world, and to crash a plane into the headquarters of the CIA in Fairfax County, Virginia. The plot was disrupted by Filipino police in 1995. Notably, the 1996 CIA Report finds that one of Saudi Arabia's largest charities, IIRO, was being used by the plotters to provide cover for their activities. This provides a second example, on a different continent, of (1) the use of Saudi based Islamic charities, (2) in support of terrorism, involving (3) al Qaeda and bin Ladin; and (4) evidence of planning for further attacks on Americans.

6.6.7.   The excerpts above are taken from the first four pages of the 1996 CIA Report. The remaining ten pages list and summarize terrorist and extremist ties involving 16 Islamic charities operating in Bosnia, describing their use for terrorist activities or support and their links to other Islamic NGOs.[31] The charities listed for having connections to Islamic extremists included (1) Al-Haramayn Islamic Foundation (Saudi origin); (2) Human Appeal International (linked to Hamas); (3) Human Concern International (independent, UK origin); (4) Human Relief International (Muslim Brotherhood/Egypt origin); (5) International Humanitarian Relief Organization (Turkish/Iranian origin); the (6) International Islamic Relief Organization (Saudi origin); (7) the Islamic Relief Agency (Sudan controlled); (8) Kuwaiti Joint Relief Committee (Kuwait origin); (9) Lajnat Al-Birr al-Islamiyyya, also known as the Islamic Charity Committee (Saudi origin); (10) Makhtab al-Khidamat (MAK) (which was controlled by bin Ladin and was an al Qaeda predecessor; this entity was in turn funded by the Saudi Arabia Red Crescent and by the Saudi-state sponsored Muslim World League); (11) Muwafaq Foundation (funded by private Saudi sources, including Saudi Banker Khalid bin Mahfouz); (12) Qatar Charitable Society (Qatar); (13) Red Crescent, Iran (Iranian origin); (14) Saudi High Commission (Saudi origin); (15) Third World Relief Agency (Sudan origin); (16) Islamic World Committee of Commission (Muslim Brotherhood, Kuwait origin).

6.6.8.   The brief profiles of these Islamic charities show an array of alleged involvement by these groups and/or persons associated with them in extremist/terrorist activities, including (1) fundraising for other terrorist groups, like Hamas; (2) suspected weapons smuggling to Bosnia; (3) suspected involvement in the bombing of the Egyptian Embassy in Islamabad; (4) discussing plans for anti-Jewish bombings in Croatia; (5) discussing plans to assassinate a former Algerian Prime Minister and PLO chief Yasir Arafat as well as bombings in Croatia; (6) personnel linked to bin Ladin (his brother-in-law), said to be involved in the Bojinka plot to kill the Pope and blow-up U.S. airlines; (7) funding militant training camps in Afghanistan; (8) providing weapons to the Bosnian military during the Yugoslavian civil war; (9) kidnapping six westerners in Kashmir; (10) undertaking weapons smuggling in France; (11) planning terrorist attacks in Europe; (12) involvement in the 1993 World Trade Center bombing; (13) providing cover for Iranian intelligence services; (14) carrying out a suicide car bombing of a Croatian police facility; (15) providing support to terrorist groups seeking to rebuild a network in Italy; and (16) supporting Arab Mujahadin in Bosnia.

6.6.9.   Comment: In this 14-page paper, the CIA briefly summarizes extensive violent extremist and terrorist activity linked to these Islamic charities, which include terrorist plotting that anticipated the 9/11 attacks, and links

---

[31] The 1996 CIA Report refers to them as 15 charities; by my count, the number is 16.

to those who had previously attacked the World Trade Center in New York. Although the report primarily focuses on Bosnia, it nevertheless documented the intimate relationship of these Islamic charities to terrorist groups and activities in many countries, including Europe, the Middle East and North Africa, North America, Southeast Asia, South Asia, and Southwest Asia. Notably, the Saudi-origin charities above were linked to a number of the most violent activities specified above, including the military support to Islamic fighters in Afghanistan and the Balkans; the 1993 World Trade Center bombing; the Bojinka plot and the Kashmir kidnappings. Many of these charities were linked to bin Ladin and to the two organizations that were precursors for al Qaeda: Makhtab al-Khidamat, bin Ladin's initial vehicle for charity and terrorism; and to Al-Gama-at Al-Islamiyya, which was the ideological training ground in Egypt for bin Ladin's partner, physician, and successor, al-Zawahiri.

6.6.10.  The brief profile in the 1996 CIA Report of IIRO is of particular interest, as by 1996 the CIA was aware of IIRO's involvement with bin Ladin amd terrorist activities, as specified in the excerpts from the 1996 CIA Report below:

6.6.10.1.  *"Headquarters in Jiddah, Saudi Arabia. The IIRO is affiliated with the Muslim World League (MWL) a major international organization largely financed by the Government of Saudi Arabia. Last year, the head of the MWL, who is appointed by King Fahd, was also chairman of the Board of Trustees of the IIRO. According to the IIRO literature, the IIRO has offices in over 90 countries."*

6.6.10.2.  *"Extremist Connections: Hamas, Algerians, Al-Gama'at al-Islamiyya. Ramzi Ahmed Yousef, who is awaiting trial in New York for his suspected involvement in the World Trade Center bombing. Usama Bin Ladin, a wealthy Saudi-born businessman currently residing in Sudan who supports various Islamic extremist groups."*

6.6.10.3.  *"Support for Extremist/Terrorist Activity: ... The former head of the IIRO office in the Philippines, Mohammad Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin. . . The IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source."*

6.6.10.4.  *"Links to other NGOs:  "Coordination Council, HRA, Third World Relief Agency,  Qatar Charitable Society, KJRC, Saudi High Commission."*

6.6.10.5.   <u>Comment:</u> The brief profile of IIRO in the 1996 CIA Report
shows the CIA as of that time to have concluded that IIRO was
an (1) Islamic charity, operating all over the world; (2)
providing support of terrorism in the Philippines and Islamic
militant training in Afghanistan, involving (3) al Qaeda and bin
Ladin, and (4) planning for further attacks on Americans. Over
the past 24 years, there has been documentary, evidentiary, and
analytical confirmation of each of these 1996 assessments.

6.6.11.   The brief profile of Makhtab al-Khidamat ("MAK" or "MK") in the 1996
CIA Report is also important, as it states MAK's connection to bin Ladin
and to other Saudi-supported Islamic charities such as IIRO and MWL.

6.6.11.1.   *"AKA: Human Services Organizations (HSO), Al-Kifah"*

6.6.11.2.   *"Offices: Zagreb and Sarajevo. Headquarters in Peshawar,
Pakistan."*

6.6.11.3.   *"Extremist Connections: Algerian groups, Afghan veterans,
Ramzi Yousef, Usama bin Ladin, and possibly Hizballah, and
Al-Gama'at Al-Islamiyya."*

6.6.11.4.   *"Support to Extremist/Terrorist Activity: According to a
foreign government service, the former director of the Zagreb
office of HSO and his deputy were both senior members of
Algerian extremist groups; French police arrested the deputy
for weapons smuggling in France in July 1994, according to a
French law enforcement official. Another foreign government
service reported that an Algerian national affiliated with HSO
and a senior commander of the Mujahedin, also Algerian, were
preparing for an unspecified terrorist attack in Europe if
Shayka Umar Abd Al-Rahman, then on trial in New York for
complicity in the 1993 World Trade Center bombing, were
convicted. The Shaykh was convicted in October 1995 of
conspiracy to commit terrorist acts in the United States. He
was sentenced to life in prison without parole on 17 January
1996. . . . The press has reported that some employees of
MAK's New York branch were involved in the World Trade
Center bombing. The Peshawar office funds at least nine
training camps in Afghanistan, according to clandestine
sources.*

6.6.11.5.   *"Links to other NGOs; TWRA, IIRO. MAK is suspected of
having links to the Muslim World League."*

6.6.11.6.   MAK was an early component of and predecessor of al Qaeda.
Its personnel were linked to the 1993 World Trade Center

bombing that was a precursor to 9/11. It was later designated and subjected to sanctions by the U.S. Treasury Department as a Special Designated Global Terrorist organization. As stated by the U.S. Treasury, MAK (which it refers to as "MK") "is considered to be the pre-cursor organization to al Qaida and the basis for its infrastructure. . . . MK has helped funnel fighters and money to the Afghan resistance in Peshawar, Pakistan, and had established recruitment centers worldwide to fight the Soviets. After Azzam was killed in 1989, UBL and Sheikh Umar Abd al-Rahman (a.k.a. "The Blind Sheikh") continued to use MK to recruit fighters for the Soviet-Afghan conflict. Sheikh Umar Abd al-Rahman was implicated in the 1993 World Trade Center bombing and has been convicted for unrelated crimes pertaining to planning terrorist attacks in the New York area. MK is known to have provided funds and other support to several charities, including the Al Haramain Foundation (AHF) and the Global Relief Foundation."[32]

6.6.11.7.   <u>Comment</u>: The links between MAK, a terrorist support organization and precursor of al Qaeda, which masquaraded as a charity, and other charities which were on their face engaged in charitable activities but also incubated terrorism, were evident to the CIA as early as 1996, including links to two major Saudi charities, IIRO and MWL.

6.7.   *Role of Charities as U.S. Understood it After 9/11 Attacks.*  After the 9/11 attacks, the U.S. and other governments made it a priority to understand and to take action against the charities who were involved in providing support to al Qaeda. Raids carried out on charities produced further documentation of the use of their facilities for terrorism and terrorist planning. The additional documentation also provided evidence of record keeping practices that made it impossible to track how the charities spent their funds, and thereby provided a cover for fraud, theft, and in cases like IIRO, direct terrorist finance and other terrorist support. Below I provide excerpts of statements from senior U.S. government officials about the role the charities played in financing al-Qaeda and its terrorist activities.

6.7.1.   Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, July 13, 2005: "Terrorist groups have long exploited charities for several key reasons, including the following:

6.7.1.1.   "The "legitimate" activities of these charities, such as the operation of schools, religious institutions, and hospitals, can –

---

[32] U.S. Department of the Treasury, "Key Issues: Protecting Charitable Organizations," https://www.treasury.gov/resource-center/terrorist-illicit-finance/Terrorist-Finance-Tracking/Pages/charities_execorder_13224-i.aspx

if abused – create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate terrorist ideologies."

6.7.1.2.    "Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists."

6.7.1.3.    "To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them."

6.7.1.4.    "Charitable funds are meant to move in one direction only, accordingly, large purported charitable transfers can move without a correspondent return of value and without arousing suspicion."

6.7.1.5.    "International charities naturally focus their relief efforts on areas of conflict, also prime locations for terrorist networks. Such charities provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas."

6.7.1.6.    "Wealthy Saudi financiers have funded terrorist organizations and causes that support that support terrorism and the ideology that fuels the terrorists' agenda. Even today [July 13, 2005], we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq."

6.7.1.7.    "Saudi Arabia-based and funded organizations remain a key source for the promotion of ideologies used by terrorists and violence extermists around the world to justify their hate-filled agenda."

6.7.1.8.    "Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League  (MWL) continue to cause us concern."[33]

6.7.2.    The interagency process within the U.S. government requires such formal statements by a senior Treasury Department official to be vetted

---

[33] Excerpts, testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban Affairs, July 13, 2005, https://www.treasury.gov/press-center/press-releases/Pages/js2629.aspx.  The U.S. government continued to express concern about the role of IIRO, MWL, and WAMY as late as December 30, 2009. "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance," Cable, U.S. Department of State, December 30, 2009, https://wikileaks.org/plusd/cables/09STATE131801_a.html

throughout the U.S. government, including U.S. intelligence and law enforcement agencies, as well as the State Department and White House. Accordingly, Under Secretary Levey's testimony reflected the formal position of the entire U.S. government at the time. Based on all the information known to me, Levey's testimony accurately describes the role that Saudi charities played in the funding of terrorist activity, including that of al Qaeda resulting in the 9/11 attacks on the United States.

6.7.3.  Testimony of Assistant Secretary of State for Economic and Business Affairs E. Anthony Wayne before the Senate Committee on Banking, Housing and Urban Affairs "Money Laundering and Terrorist Financing in the Middle East and South Asia," July 13, 2005:

6.7.3.1.  "Saudi Arabia's new banking regulations place strict controls on accounts held by charities. Saudi Arabia has also ordered an end to the collection of donations at mosques and instructed retail establishments to remove charity collection boxes from their premises. These steps have been extremely challenging for the Saudi government, but they have been ordered because it understands that terrorists are more likely to use funds collected anonymously and without an audit trail than those that move through regular banking channels. We believe that Saudi actions have, in fact, significantly reduced the flow of cash from Saudi Arabia to al Qaida and other terrorist groups in the region."

6.7.3.2.  "On the issue of greater religious tolerance, the Saudi Government, on its own initiative, recently completed a comprehensive revision of textbooks to 'remove objectionable langauge,' and these new textbooks are now being used in Saudi schools."

6.7.3.3.  "Additionally, appropriate regulatory oversight of organizations headquartered in the Kingdom such as the World Muslim League [sic, meaning Muslim World League], the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY) is absolutely necessary."[34]

6.7.4.  Assistant Secretary of State Wayne's testimony makes three points that are relevant to provision of resources to al Qaeda by Saudi-based charities. The first is that the charities were a source of anonymous cash that left minimal audit trails, and thereby moved more easily to terrorists. Once

---

[34] Excerpts, testimony by Assistant Secretary of State for Economic and Business Affairs E. Anthony Wayne Before the Senate Committee on Banking, Housing and Urban Affairs, "Money Laundering and Terrorist Financing in the Middle East and South Asia," Washington DC, July 13, 2005, https://www.banking.senate.gov/imo/media/doc/ACFAA.pdf

measures were taken after the 2003 Riyadh bombings to restrict Saudi-based charities from raising funds through cash, these measures reduced the flow of that cash from Saudi Arabia to al Qaida. The second is that as of July 13, 2005, Saudi Arabia had still yet to take sufficient action to regulate and control the activities of MWL, IIRO, and WAMY to ensure that they were not engaging in terrorist finance and support. The third is the State Department still viewed Saudi based charities, especially MWL, IIRO, and WAMY, to be at risk of facilitating terrorist finance even as late as July 13, 2005, nearly four years after the 9/11 attacks.

6.7.4.1.   The Wayne testimony also provides an implicit proof of the lack of Saudi Arabia's failure to take meaningful action against the charities prior to 9/11, even when they had announced they had done so.

6.7.4.2.   The Wayne testimony describes a Saudi order to end the collection of donations at mosques and cash-based charity collection boxes.

6.7.4.3.   These are exactly the actons that Saudi Arabia had already promised to undertake prior to the writing of the 1996 CIA Report of nearly a decade earlier, as referenced in Setion 6.6.6.3 of my Expert Report.

6.7.4.4.   The State Department testimony of July 13, 2005, describing them as recent actions, suggests that the charities access to cash continued long after 1996, and indeed, for years after the 9/11 attacks on the United States.

6.7.5.   Testimony of Richard A. Clarke, former U.S. counterterrorism czar at the National Security Council, Before the United States Senate, Banking Committee, 22 October 2003:

6.7.5.1.   "Terrorist groups use a variety of means to move funds, including charities, private companies, offshore accounts, U.S. accounts, real estate transactions, blank checks and bulk cash couriers."

6.7.5.2.   "In the United States, this pattern was allegedly practiced by the International Islamic Relief Organization (IIRO). IRO's [sic] Virginia branch would reportedly draw funds on Saudi Arabian accounts. These funds were allegedly channeled through front companies operating as chemical manufacturers, real estate developers, book publishers and social groups. In the form of investment proceeds, funds would reportedly return

to IIRO, which would in turn send the money back to Saudi Arabia."[35]

6.7.6.   I take note of Clarke's statement that terrorist groups hide how they finance their operations through various forms of money laundering activities, and that IIRO used these techniques to obtain funds from Saudi Arabia, sending them to banking accounts in the United States, and then sending funds back to Saudi Arabia after they had been laundered through fronts. As the most senior U.S. official focused on al Qaeda on a day-to-day basis in the days leading up to the 9/11 attacks, Clarke was positioned to have had knowledge of the underlying facts. Clarke would not implicate IIRO in terrorist activities in sworn public testimony without a sound factual basis to do so. [36]

6.7.7.   Testimony, Lee Wolosky, former Director for Transnational Threats on the National Security Council under Presidents Clinton and George W. Bush. September 29, 2004:

6.7.7.1.   As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahhabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike. In my view, this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States. Through support for madrassas, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism.[37]

6.7.8.   Testimony, Dennis M. Lormel, Chief, Financial Crimes Section, FBI, Before the House Committee on Financial Services, Subcommittee on

---

[35] Excerpt, statement (Testimony) Richard A. Clarke, former U.S. counterterrorism czar under Presidents Bill Clinton and George W. Bush, October 22, 2003, https://www.investigativeproject.org/documents/testimony/54.pdf

[36] Clarke may have been referring to evidence known to him concerning the constellation of charities based at an address in Herndon, Virginia, that was under federal investigation at the time. *See, e.g.*, "A Sprawling Probe Of Terror Funding Centers in Virginia U.S. Tries to Tie Maze of Firms, Charities Based in Herndon Into a Global Network,: Wall Street Journal, June 21, 2004, https://www.wsj.com/articles/SB10877805858974258 and "U.S. Links Islamic Charities, Terrorist Funding," Washington Post, August 20, 2003, https://www.washingtonpost.com/archive/politics/2003/08/20/us-links-islamic-charities-terrorist-funding/ac8ca368-0e67-4ad0-b7f4-1d7e02898f0d/

[37] Testimony of Lee S. Wolosky, Esq., Of Counsel, Boies, Schiller & Flexner LLP, U.S. Senate Committee on Banking, Housing, and Urban Affairs, September 29, 2004, https://www.investigativeproject.org/documents/testimony/309.pdf

Oversight and Investigations, February 12, 2002, "Financing Patterns Associated with al Qaeda and Global Terrorist Networks":

6.7.8.1.  "Saudi Arabia has been one of the most significant funding mechanisms for terrorist organizations, especially al Qaeda."[38]

6.7.9.  Testimony, R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury, July 31, 2003:

6.7.9.1.  "The threat of terrorist support networks and financing is real. . . . There is much we know about how radical Islamic terrorist networks are established and still thrive. Wealthy individuals and influential individuals and families based in the Middle East have provided seed money and support to build a transnational support infrastructure that terrorists have used for their purposes. This network, fueled by deep-pocket donors and often controlled by terrorist organizations, their supporters, and those willing to look the other way, includes or implicates banks, businesses, NGOs, charities, social service organizations, schools, mosques, madrassas, and affiliated terrorist training camps and safe houses throughout the world."[39]

6.7.10.  Testimony of David D. Aufhauser, General Counsel, Department of the Treasury Before the Senate Judiciary Committee Subcommittee on Terrorism, Technology and Homeland Security, June 26, 2003:

6.7.10.1.  "Investigation and analysis by intelligence and enforcement agencies have clearly revealed that terrorist organizations utilize charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations (NGOs) are commingled and then sometimes diverted or siphoned to groups or organizations that support terrorism. Fundraising may involve community solicitation in the United States, Canada, Europe, and the Middle East or solicitations directly to wealthy donors. Though these charities may be offering humanitarian services here or abroad, funds raised by these various charities are sometimes diverted to terrorist

---

[38] Testimony of Dennis M. Lormel, Chief, Financial Crimes Section, FBI, Financing Patterns Associated with Al Qaeda and Global Terrorist Networks," House Committee on Financial Services, Subcommittee on Oversight and Investigations, February 12, 2002, https://www.investigativeproject.org/documents/testimony/235.pdf
[39] Testimony of R. Richard Newcomb, Director Office of Foreign Assets Control, U.S. Department of the Treasury, July 31, 2003, Hearing, Committee on Governmental Affairs, United States Senate, Exhibit 100, Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, http://www.iwar.org.uk/cyberterror/resources/terror-financing/073103newcomb.htm

causes. This scheme is particularly troubling because of the perverse use of funds donated in good will to fuel terrorist acts."

6.7.10.2.   This was the same hearing in which Mr. Aufhauser, in oral testimony, stated that Saudi Arabia was the "epicenter" of charitable funding for al Qaeda, as set forth in Section 5.2.1 of my Expert Report.

6.7.11.   These statements from the most senior U.S. government officials working day-to-day on terrorist finance issues in the period before, during, and/or after the 9/11 attacks are mutually consistent. They reflect the considered view of senior echelons of the U.S. government during this period that the charities were central to incubating al Qaeda and its ability to strike the United States in the 9/11 attacks.

6.7.12.   I first testified about the role of the charities before Congress in a hearing conducted by the Senate Committee on Banking on September 26, 2001, just over two weeks after the 9/11 attack on the United States. At that time, I testified that a number of Islamic charities had provided funds to terrorists or failed to prevent their funds from being diverted to terrorist use.[40] In 2020, I continue to assess my prior testimony as accurate. Based on all of the information that I have reviewed over the 18 and a half years since the 9/11 attacks took place, it remains my opinion that the Saudi-based Islamic charities played a central role in providing funds and other support to al Qaeda, making the 9/11 attacks on the United States possible.

7.   *How Did the Money and Other Resources Provided by Purported Charities Enhance Al-Qaeda's Global Strike Capabilities and Enable it to Carry out 9/11?*

7.1.   The funds and support from the charities assisted al Qaeda in essentially every aspect of its terrorist activities. These included:

7.1.1.   Indoctrinating fighters and terrorists, by providing "educational" and "religious" materials in mosques and madrassas that taught Muslims it was proper to kill non-believers (that is, Christians, Jews,  those not believing in God, such as the Soviets, and apostates or "kafirs," who believe in different forms of Islam, and are viewed by Islamic extremists to be infidels as well);

7.1.2.   Helping to recruit the fighters and terrorists, through the propagation process;

---

[40] "September 11, 2001: Attack on America, Hearing on the Administration's "National Money Laundering Strategy for 2001," September 26, 2001, Hearing on the Administration's "National Money Laundering Strategy for 2001," testimony of Jonathan M. Winer, https://avalon.law.yale.edu/sept11/winer_001.asp

7.1.3.   Facilitating the transport of fighters and terrorists to combat zones;

7.1.4.   Buying weapons for Islamic jihadists and terrorists;

7.1.5.   Providing storage facilities for weapons for Islamic jihadists and terrorists;

7.1.6.   Providing training camps for Islamic jihadists and terrorists where they were taught how to use weapons and make bombs, such as improvised explosives devices;

7.1.7.   Disseminating terrorist training manuals to Islamic fighters and terrorists;

7.1.8.   Providing food, housing and medical care to Islamic fighters and terrorists;

7.1.9.   Providing cover to people engaged in terrorism, such as by providing fake work papers to Islamic fighters and terrorists, stating that they worked for the charities when those providing the papers knew they were actually undertaking jihad and terrorism.

7.1.10.  Providing office space for al Qaeda and its agents to do business as they enaged in such activities as weapons purchases.

7.1.11.  Raising funds for and transmitting funds to al Qaeda and to those working with it. Such funding in turn enabled al Qaeda to make direct expenditures as needed to build its global capacity to attack the United States, including the comparatively small amounts needed for the logistics to carry out the 9/11 attacks.

7.2.   There were several phases in the development of al Qaeda and its ability to strike the United States. For the purposes of understanding how the charities were central to al Qaeda's development of its global strike capacities, I separate them and label them based on where bin Ladin was living.

7.2.1.   The first phase was bin Ladin's *First Afghanistan period, 1979-1989*, during which al Qaeda was formed and was able to take advantage of funds from Saudi state-sponsored and other charities aimed at helping the Afghan-Arab fighters to force the Soviet Union out of Afghanistan. Prior to al Qaeda's formation, bin Ladin worked with MAK, known locally in Peshawar, Pakistan as the "Afghan Services Bureau," which used funds from the charities to recruit, train, and arm Afghan and Arab fighters in Afghanistan to engage in combat against Soviet forces there. The funds from the charities enabled MAK as al Qaeda's precursor, and towards the end of this period, al Qaeda itself, to develop systems for logistics, false documents, finance, and transporation, for use across borders. This

became fundamental to al Qaeda's longer-term growth and capacity to strike globally.[41]

7.2.2.   The second phase was bin Ladin's *Sudan period, 1990/1991-1996*. During this period, bin Ladin resided in Sudan and was able to build much greater capacity for his al Qaeda organization due to two factors. First, Sudan's government was open to the use of Islamic charities for financing Muslim resistance against non-Islamist governments, including through terrorism. Second, during this time, the Bosnian war broke out, fueling a new round of investment in fighters, weapons, and armed resistance by charities that included funding for these purposes to their goals in addition to the advertised and more traditional "relief" effort. The funds that flowed into Bosnia from Saudi Arabia's major charities, as well as others, were subject to minimal monitoring, and were readily diverted to whatever al Qaeda wanted to use them for. Moreover, the recruitment, training, and operational support for an Islamic army made up of irregular forces provided a substantial training opportunity for al Qaeda to gain practical knowledge and experience that it was then able to use for other miltiary actions, including terrorist attacks against the west. During this time, the First Chechen War erupted in Dagestan, Russia, again pitting Muslims against non-Muslims, and providing another location where charitable relief activities and terrorist military activities comingled, providing another boost to al Qaeda.

7.2.3.   The third phase was bin Ladin and al Qaeda's *2nd Afghanistan period, from about 1996 through September 11, 2001*. During this period, bin Ladin personally and al Qaeda as an organization received protection from the Taliban. Islamic charities continued to provide funding and support for al Qaeda, especially (but not limited to) in areas of ongoing Muslim vs. non-Muslim war, such as Bosnia and Chechnya, but also in areas where Islamic extremist groups sought to challenge existing governance, such as the Philippines. This funding in turn incubated al Qaeda's ability to strike globally, including its ability to attack the United States, which it first did in the Kenya and Tanzania bombings in 1998, and then on 9/11.

7.2.4.   In summary, during each of these three periods, which spanned more than two decades in total, al Qaeda relied on help from Islamic charities to build its global strike capabilities, ultimately enabling it to carry out 9/11.

7.3.   During al Qaeda's *First Afghanistan period (1979-circa 1989),* which functionally came to an end with the departure from Afghanistan of the Soviets, Saudi religious charities, and wealthy private Saudi businessmen systematically funded the Afghan resistance against the Soviets.

---

[41] 9/11 Commission Report, id, pp. 55-56.

7.3.1.   As summarized by scholars J. Millard Burr and Robert O. Collins in "Alms for Jihad," during this period: "[T]he distinction between supporting jihad to promote the revival of Islam, and later, sustaining terrorism, became hopelessly blurred. . . . In time, the distinction between freedom fighter and terrorist was difficult to establish."[42]

7.3.2.   During the First Afghanistan period, the Saudi charities provided support for the insurgency against the Soviet Union through providing funding and logistical support to Afghan-Arab fighters to organize and mobilize across the border from Pakistan, where the charities were largely based, into Afghanistan. During the decade of the Afghan war, some 35,000 Muslim radicals from 43 Islamic countries in the Middle East, North and East Africa, Central Asia and the Far East were recruited by religious madrassas to serve with the Afghan Mujahideen. Tens of thousands more foreign Muslim radicals also came to study in hundreds of new madrassas, largely supported by Saudi charities, located in Pakistan, especially along the Afghan border. The propagation of extreme ultraconservative Wahhabism, recruitment of fighters, and training for fighting all came together in this process, bringing young men together from a range of Arab countries to study, train, and fight for their religion.[43]

7.3.3.   In practice, the boundaries between humanitarian aid, military support, and da'wa (missionary activity) were comprehensively blurred by the Saudis during the Soviet-Afghan conflict.[44]

7.3.4.   Several Saudi charities played major roles in backing the Afghan-Arab Mujaheddin which enabled the early development of al Qaeda. These included the Saudi Arabia Red Crescent Society, IIRO, MWL and LBI, which was later incorporated into WAMY. Each of these also supported MAK, which the CIA identified in its 1996 Report as linked to people involved in the first World Trade Center attack of 1993 and to other terrorist activities, and which the U.S. Treasury Department later sanctioned as a Specially Designated Global Terrorist organization.[45]

7.3.4.1.   MAK's principal function during the First Afghanistan period was to provide support to the mujahideen in Afghanistan. On the physical level, this support included housing, food, training, weapons, funds, transport, and logistical support for the fighters as they engaged in attacks on Soviet forces. MAK also engaged

---

[42] Alms for Jihad, J. Millard Burr and Robert O. Collins, Cambridge University Press (2006), p. 23
[43] Taliban, Ahmed Rashid, Yale University Press, https://yalebooks.yale.edu/book/9780300163681/taliban, p. 130.
[44] "The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 12. https://repository.library.georgetown.edu/bitstream/handle/10822/1051628/CIRSOccasionalPaper20JonathanBenthall2018.pdf?sequence=1&isAllowed=y
[45] Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout*, NDIL, Case No 02 CS 892, 7 January 2003.

in ideological work, propagating political Islam to new recruits to indoctrinate them in violent Salafi jihadism.[46]

7.3.4.2.  An additional function of the MAK was to handle the documents for all the newcomers to the war, so that families could be notified if a soldier died in battle. This evolved to enable MAK to use the documents of dead soldiers to falsify travel documents for cross-border travel.[47]

7.3.4.3.  To generate the funds and other resources necessary to provide support to the mujahideen, the MAK relied on help from charities engaged in local relief activities for the Afghan-Arab mujahideen. These included LBI, whose leaders then established Benevolence International Foundation, Inc. ("BIF"), as an offshoot Islamic charity incorporated in the U.S. to provide a cover for its ongoing support for terrorism and to facilitate broader generation of funds,[48] while the LBI parent itself merged into WAMY. Additional support for MAK was generated by IIRO, which was itself structurally under the umbrella of MWL. IIRO offices in Peshawar, Pakistan housed the offices for Al-Qaida during this period.[49] IIRO also provided cover for Al-Qaeda fighters and other personnel through providing them ID cards that falsely stated that the persons working for al Qaeda were working for IIRO.[50] As set forth in Section 6.6.10 of my Expert Report, the CIA learned from an informant that IIRO also provided funding for six terrorist training camps in Afghanistan.

7.4.   During bin Laden's *Sudan period (1990/1991-1996)*, Saudi Islamic charities played a continuing part in building al Qaeda's global strike capabilities in an environment in which extreme Islamist views were being promoted by the government of Sudan under an Islamic political party, the National Islamic Front ("NIF"), which had seized power in a military coup in 1989. Throughout this period, the NIF promoted an aggressive Islamist agenda with the goal of creating

---

[46] Statement, Kim Cragin, The RAND Corporation, "Understanding Terrorist Ideology," Before the Select Committee on Intelligence, United States Senate, June 12, 2007, https://www.rand.org/content/dam/rand/pubs/testimonies/2007/RAND_CT283.pdf

[47] FBI 302 of Gamal Ahmed Mohamed Al-Fedel, 11/10/96, SNY101-0024, Exhibit 139 Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[48] Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," U.S. v. Aranout, NDIL, Case No 02 CS 892, 7 January 2003. In my Expert Report, I use the term "BIF" and "Benevolence" interchangeably, using the acronym "BIF" when the acronym has been used in the underlying material, and the using the word "Benevolence" in my analysis of its activities.

[49] Government Evidentiary Proffer, Id., and FBI 302 of Al-Fedel, "Co-operating Witness Interview," FBI New York Office, June 2, 2004, Exhibit 140, Affirmation of Sean Carter, id.

[50] Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *U.S. v. Fazul Abdullah Mohammed,* et al., Case No. 01-1535-cr(L), US Second Circuit Court of Appeals, filed June 14, 2007.

an Islamic state in Sudan and establishing the country as the capital of the militant Islamist world. During that time, the NIF developed close ties with radical Islamist groups and terrorist organizations, including Osama bin Laden and the origins of his al Qaeda organization, after inviting bin Ladin into the country and promising him its total support.

7.4.1.  During this period, Sudan functioned as a safe-haven for a range of Islamists. When bin Ladin moved to Sudan in the spring of 1991, he intended to use Sudan as a base to build an Islamic Army, which he would then use to force the United States out of the Islamic world, so that all Muslims would live under Islamic law. Bin Ladin told associates that he would do this using economic as well as military power.[51]

7.4.2.  During this period, Sudan harbored and provided sanctuary to terrorists and their operational and logistical supply network, including bin Ladin and al Qaeda. Both bin Ladin and al Qaeda received the support and protection of the Sudanese intelligence and military from foreign intelligence services and rival militants. Sudan provided bin Laden and al Qaeda hundreds of Sudanese passports. The Sudanese intelligence service allowed al Qaeda to travel over the Sudan-Kenya border without restriction, permitting the passage of weapons and money to supply the Nairobi terrorist cell. Sudan's support of al Qaeda was official Sudanese government policy.[52]

7.4.3.  In accord with its strong Islamist orientation after 1989, and its majority Muslim population, Sudan came to house a number of Islamic banks. These included the Faisal Islamic Bank, which was protected by the Sudanese Islamist government  which exempted it from taxes on assets, profits, wages and pensions. On arriving in Sudan, bin Ladin then inested $50 million in the Al Shamal Islamic Bank, whose board of directors included a Saudi prince (Mohammed al-Faisal).[53]  These and other banks were then in turn used for the deposits of funds from charities, and to move funds for al Qaeda for a variety of purposes. These included military and logistical support to militants, including arms purchases, as well as to enable the charities to provide social and welfare services.[54]

---

[51] FBI 302 of Gamal Ahmed Mohamed Al-Fedel, 11/10/96, SNY101-0024, Exhibit 139 Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[52] Memorandum Opinion, Findings of Fact, *Owens v. Sudan*, Civil Action No. 01-2244 (JDB), https://www.govinfo.gov/content/pkg/USCOURTS-dcd-1_08-cv-01380/pdf/USCOURTS-dcd-1_08-cv-01380-0.pdf

[53] Alms for Jihad, J. Millard Burr and Robert O. Collins, Cambridge University Press, Chapter Five, pp. 82-85.  Prince Mohammed al-Faisal was a son of Saudi King Faisal and a grandson of Saudi Arabia's founder, Abdul Aziz.

[54] See FBI 302, Al-Fedel, id, Alms for Jihad, id., Chapter Five, pp. 86-87.

7.4.4.  The role played by the charities and the banks in Sudan during this period was summarized by the federal court in its formal Finding of Facts in the case of *Owens v. Sudan*, as follows [citations omitted]:

7.4.4.1.  Al Qaeda also opened and operated a number of purported charities to provide income for jihad, launder such funds and otherwise operate as a front for terrorist operations.

7.4.4.2.  Most of the charities had offices in Khartoum and were active across West and Central Africa, including in Somalia and Kenya. As fronts for al Qaeda activity, these charities served as depots for al Qaeda communications and records and as safe meeting houses for operatives. For example, al Qaeda used the office of Mercy International in Nairobi, Kenya to hide documents, plan operations, and house members of al Qaeda. Al Qaeda members used Mercy International ID cards to pose as relief workers. Another charity in Nairobi, Help Africa People, did not engage in any relief work and was utilized similarly as a cover organization for al Qaeda members.

7.4.4.3.  Bin Laden and al Qaeda also invested in Sudanese banks. This access to the formal banking system was useful for "laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan." Bin Laden invested $50 million in the Sudan's Al Shamal Islamic Bank, and these funds were used to finance al Qaeda operations.[55] Al Shamal Islamic Bank was known for financing terrorist operations, and bin Laden remained a leading investor of the bank long after he left Sudan.[56]

7.4.5.  As al Qaeda insider Jamel Ahmed Mohammed al Fadl told the FBI in 1996 after he had become an informant on al Qaeda for the U.S. government, by 1992, all of the "basic rules . . . were in place," when bin Ladin issued a *fatwah* or religiously-based ruling declaring that all foreign forces must be fought, including all American forces in the Gulf region, because they were "the head of the snake." Al Fadl told the FBI that bin Ladin first spoke of this explicit intention during this period in Sudan.[57]

---

[55] "State Department Issues Factsheet on Bin Ladin (Sponsor of Islamic extremist activities described) August 14, 1996, Bates stamp 20548.005; see also "Profile of Alleged Saudi Terrorist Supporter," Cairo Rose Al-Yusuf in Arabic on 17 May 1996, report by Hamdi Rizq, Nabil Sharaf-al-Din, and Tariq Hasan on Usamah Bin-Ladin, provided in English on 21 May 1993, U.S. FBIS NC1905113593
[56] Memorandum Opinion, Findings of Fact, *Owens v. Sudan,* Civil Action No. 01-2244 (JDB), U.S. District Court for the District of Columbia, pp. 22-23, available at
https://www.govinfo.gov/content/pkg/USCOURTS-dcd-1_08-cv-01380/pdf/USCOURTS-dcd-1_08-cv-01380-0.pdf
[57] FBI 302 of Gamal Ahmed Mohamed Al-Fedel [spelling as in original], 11/10/96, SNY101-0024, Exhibit 139 Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in

7.4.5.1.  In the case of *Owens v. Sudan*, the DC Circuit court found that "Al Fadl was particularly well-suited to address the relationship between al Qaeda and the government of Sudan in the 1990s because he served then as a principal liaison between the terrorist group and Sudanese intelligence. He had also been instrumental in facilitating al Qaeda's relocation from Afghanistan to Sudan in 1991 and had assisted the group in acquiring properties there. Although al Fadl did not testify at the evidentiary hearing, his prior testimony provided much of the factual basis for the expert witnesses' opinions."[58]

7.4.6.  Both in the Owens case and previously in his work as an informant for the FBI prior to the 9/11 attacks, al Fadl described the involvement of Islamic charities as interwoven into al Qaeda. For example, in 1996, he identified the head of IIRO in Peshawar as a "good friend" of bin Ladin who "would contribute funds or contacts" to specific al Qaeda operations.[59] In videotaped interviews with U.S. federal law enforcement officials, al Fadl described how IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers, so that they could get visas to travel "to England, or if you want to go to anywhere in the world."[60]

7.4.7.  A major element of the support bin Ladin received from charities during his Sudan period was their deep involvement in supporting Muslims in Bosnia during the sectarian conflicts that took place in the former Yugoslavia. These conflicts became activated for Muslims in the Balkans in 1992, after Bosnia's Muslim leader, Alija Izetbegovic, proclaimed Bosnia-Herzegovina to be an independent republic. In response, Bosnia Serbs undertook a policy of ethnic cleansing to expel the Bosnian Muslims, known as "Bosniaks," from territory in which there was a majority presence of Bosnian Serbs, killing hundreds of thousands of Bosnian Muslims in the process. Islamic mobilization for this ugly war

---

Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, pp. 12-13. In its Findings of Fact in the case of *Owens v. Sudan*, the court summarized Al-Fadl's history and knowledge as follows: "One of the members of al Qaeda who played an important role in the move [to Sudan] was Jamal al-Fadl, who later worked directly with the Sudanese intelligence service under the approval of Bin Laden. Al-Fadl was Sudanese, and he served as an intermediary between al Qaeda and the Sudanese intelligence service. Id. at 244-45. Al-Fadl later defected to the United States and became an official source for the Federal Bureau of Investigation and the U.S. Justice Department."

[58] *James Owens, et al., Appellees v. Republic Of Sudan, Ministry Of External Affairs And Ministry Of The Interior Of The Republic Of The Sudan*, Appellants, No. 14-5105, United States Court of Appeals, District of Columbia Circuit, July 28, 2017  https://caselaw.findlaw.com/us-dc-circuit/1869227.html

[59] FBI 302 of Mohamed Al-Fedel, 11/10956, id, p. 7

[60] Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *U.S. v. Fazul Abdullah Mohammed*, et al., Case No. 01-1535-cr(L), US Second Circuit Court of Appeals, filed June 14, 2007, p. SA-897.

helped al Qaeda to build its global capacities further, as the conflict generated massive charitable contributions throughout the Muslim world to support their coreligionists, and minimal-to-no oversight about what happened to those funds on the ground. As a result, major Islamic charities including IIRO, MWL, WAMY, and Al Haramain, among others, funnelled hundreds of millions of dollars worth of aid to Bosnian Muslims, to provide relief, which included support for armed activities by fighters in Bosnia such as the purchase of weapons. By one estimate, two-thirds of the Saudi funds went directly to Izetbegovic's Bosniak government; one-third, however, went to the Islamic charities operating in Bosnia, which provided a wide range of services including lethal aid as well as humanitarian relief.[61]

7.4.8.  During the war, around 3,000 Islamic foreign volunteers, among them many Wahhabis, went to Bosnia to help the Muslim Bosnians in their fight. The volunteers were incorporated into a unit called El Mudzahid, part of the 7th Brigade based in the central Bosnian towns of Tuzla, Zenica and Maglaj.[62] In order to fight, they needed support. That support was provided in substantial part by the Islamic charities, especially those from Saudi Arabia. Thus the charities had twin roles: their relief efforts in Bosnia intermingled with the war effort against the Serbs. The relief efforts by the charities included building madrassas, funding programs to care for war orphans, and supporting reconstruction of Islamic infrastructure, such as rebuilding mosques. These activities also helped with indoctrinating local populations and building support within the local population for the presence of non-indigenous forces. The military support by the charities during the 1992-1995 was also substantial, though providing a precise break-down of which funds went to which purpose is not possible, due to the dual use of the charities simultaneously for both purposes.

7.5.  During bin Ladin's *Second Afghanistan period*, which covered the period 1996-2001, charitable funding remained essential to enable al Qaeda to consolidate its core in safety, and to engage in terrorist activities on a global basis. Bin Ladin moved back to Afghanistan in 1996 after the United States and other countries pressed Sudan to force bin Ladin out following an assassination attempt on then Egyptian-president Hosni Mubark that was linked to al Qaeda. Accordingly, he returned to Afghanistan, where he remained until the September 11, 2001 attacks.

7.6.  To remain safely in Afghanistan, bin Ladin invested in his hosts, the Taliban, who had themselves adopted the values, mores, laws and regulations ("Shari'a" or

---

[61] Alms for Jihad, J. Millard Burr and Robert O. Collins, Cambridge University Press, Chapter Six, pp. 102-113.

[62] "Salafist/Wahhabite Financial Support to Educational, Social And Religious Institutions," European Parliament, EXPO/B/AFET /FWC/2009-01/Lot4/22 June/ 2013, p. 12
https://www.europarl.europa.eu/RegData/etudes/etudes/join/2013/457136/EXPO-AFET_ET(2013)457136_EN.pdf

Islamic law) they believed to have been adopted in 7th Century Arabia by Mohammed and the first four "rightly-guided" caliphs who ruled the Islamic world in the first 30 years after Mohammed's death. The CIA told the 9/11 Commission that during this period al Qaeda was paying the Taliban $10 million to $20 million in return for safe haven.[63]

7.7.    Financial support from outsiders, especially the support it received from Islamic charities, remained essential to al Qaeda's activities, as during this period the organization "spent funds as quickly as it received them." In the words of the 9/11 Commission:

7.7.1.    "Actual terrorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, training camps, airfields, arms, and the development of training manuals. . . . Bin Laden also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided start-up funds to new groups of money for specific terrorist operations."[64]

7.7.2.    Money is, of course, fungible, except in cases where contributions and expenditures are meticuously tracked, which was not the case with regards to al Qaeda's receipt of funds from charities or al Qaeda's expenditures to carry out the 9/11 attacks. As I stated in testimony before the U.S. Senate on July 31, 2003: "it cost a lot of money to create al-Qaeda. It was a constant fundraising operation." [65]Al Qaeda's terrorist attacks on the United States would not have been possible without the vast fundraising and terrorist spending that had preceded them over the course of some two decades of al Qaeda's development from the seeds of Afghanistan-specific Islamic resistance into a global terrorist organization and parent of and/or partner with other such organizations at a regional level.

7.7.3.    Throughout this final period leading up to the 9/11 attacks, Saudi-based funding supported Islamic charities throughout the world which constructed Islamic centers, mosques, schools, operated health care facilities, distributed food, and provided housing to Muslims in need.  A number of the most visible charities, including each of Saudi Arabia's major international charities, IIRO, MWL, and WAMY, at the same time supported terrorist organizations, including al Qaeda, in areas where they had common goals, such as Afghanistan and Bosnia, or where their

---

[63] 9/11 Commission Report, id, p. 171, footnote 127, Notes to Chapter 5, p. 498.
[64] 9/11 Commission, id., p. 171.
[65] "Terrorism Financing: Origination, Organization, And Prevention, Senate Committee on Governmental Affairs, July 31, 2003, pp. 28-29 and in written testimony beginning at p. 118, https://www.govinfo.gov/content/pkg/CHRG-108shrg89039/html/CHRG-108shrg89039.htm

personnel had special interests, such as IIRO's provision of support to terrorist groups in Indonesia and the Philippines. For example:

7.7.3.1.  *Benevolence International* was an Islamic charity founded in 1987 and alleged in a federal indictment in Chicago to have supported al Qaeda for more than a decade, as the successor to the Saudi charity LBI, which then merged into WAMY.[66] The U.S.-based Benevolence charity spent a reported $3.4 million on relief operations in 2000-2001 alone.  The initial president and secretary of the organization was Adel Batterjee, a Saudi who federal investigators assess was the person referred to in the "Golden Chain" memorandum found at the raid by Benevolence International's headquarters in Sarajevo specifying al Qaeda's principal financial benefactors.[67] Benevolence International also had interlocking directors and senior officers with MWL.[68] Benevolence was identified by al Qaeda member al Fadl, who had direct contact with bin Ladin prior to becoming a U.S. federal informant prior to the 9/11 attacks, as one of three charities, together with the Muslim World League and a Qatari charity, that were the primary sources for funding al Qaida and for al Qaida's fundraising activities.[69]

7.7.3.2.  *IIRO.*  Established in 1978, IIRO had (and still has) branches throughout the world.  Its official activities, as specified on its website, include building mosques, financing and administering schools, and sponsoring orphans.  Its financing and support of terrorism included: (a) employment of Mahmoud Jaballah at its offices in Canada, who was arrested in 1999 (and again in 2001) for belonging to Al Jihad; (b) financial support through its office in Zamoanga City in the Philippines for secessionist Islamic terrorists in the southern region of the country, through Mohammad Jamal Khalifa, bin Ladin's brother-in-law; with

---

[66]According to the Chicago indictment of Benevolence, in 1987, LBI was founded by Adel Batterjee in Saudi Arabia and Peshawar, Pakistan, with one of its purposes to provide support for the mujahideen fighting in Afghanistan. In the early 1990s, LBI was renamed Benevolence International Foundation, referred to in Arabic as "Al Birr al Dawalia," and incorporated in the United States to increase donations and reduce scrutiny by authorities. BIF received status as a tax-exempt charitable organization in March 1993. About the same time, Arnaout assumed formal management of BIF, which proceeded to open various offices, including in Pakistan, Bosnia-Herzegovina and Azerbaijan, and then used the funds raised by the charity to support violence and terrorist groups, including al Qaeda.  "Benevolence Director Indicted For Racketeering Conspiracy; Providing Material Support To Al Qaeda and Other Violent Groups," U.S. Department of Justice Press Release, October 9, 2002, https://www.justice.gov/archive/usao/iln/chicago/2002/pr1009_01.pdf

[67] *See, e.g.,* "Investigators work to crack terrorism's second tier," The Bradenton Herald, November 3, 2002.

[68] *See, e.g.,* "U.S. probes founder of Waterloo agency," The Record, Kitchener-Waterloo, Ontario, June 15, 2002.

[69]"Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout,* NDIL, Case No 02 CS 892, 7 January 2003, p. 25.

similar support for other terrorists in Indonesia; (c) involvement in planned attacks on U.S. consulates in India in Madras and Calcutta through the offices of IIRO Asia;  (d) involvement in supporting the terrorists who carried out the 1998 embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya; (e) funding terrorist training camps in Afghanistan, among other terrorist support activities. I discuss these and other examples of the IIRO's material support of terrorism in greater detail in Section 12 of my Expert Report.

7.7.3.3.   *Muwafaq or Blessed Relief.*  Muwafaq was a Saudi charity that forwarded millions of dollars to al Qaeda for terrorist training and resistance in Afghanistan, Bosnia, and Chechnya, as well as to Hamas. After its terrorist finance activities were exposed in 1996 and reported in an FBI affidavit, it was shut down.[70]

7.7.3.4.   *Rabita Trust*.  Based in Pakistan, the Rabita Trust was founded by the secretary general of MWL and funded by wealthy Saudis. It initially had the mission of repatriating and rehabilitating Pakistanis stranded in Bangladesh and India after the partitions. It was designated as a terrorist financier by the U.S on October 12, 2001 and by the UN on October 17, 2001 on the basis that it had provided both logistical and financial support to al Qaida. Its head, Wael Julaidan, was designated as a terrorist and subject to sanctioned on September 6th, 2002 by both Saudi Arabia and by the United States.

7.7.3.5.   *Wafa Humanitarian Organization.*  This Saudi-funded charity was based in Afghanistan and listed as a specially designated global terrorist organization by the United States on December 20, 2001. WAFA was a militant supporter of the Taliban. Documents found in WAFA's offices in Afghanistan revealed that the charity was intimately involved in assassination plots against U.S. citizens as well as the distribution of "how to" manuals on chemical and biological warfare. U.S. officials have described WAFA as a key component of bin Laden's

---

[70] See e.g., "Saudi businessman denies terrorist ties," Chicago Tribune, October 14, 2001, https://www.chicagotribune.com/news/ct-xpm-2001-10-14-0110140158-story.html and testimony of Matthew A. Levitt,  "The Role Of Charities And Ngo's In The Financing Of Terrorist Activities," Senate Subcommittee on International Trade and Finance, Senate Committee on Banking, Housing and Urban Affairs, August 1, 2002, https://www.govinfo.gov/content/pkg/CHRG-107shrg89957/html/CHRG-107shrg89957.htm; "A Nation Challenged: The Money; Saudi Denies U.S. Charge That He Gave Bin Laden Aid," New York Times, October 15, 2001, https://www.nytimes.com/2001/10/15/world/a-nation-challenged-the-money-saudi-denies-us-charge-that-he-gave-bin-laden-aid.html

organization. It was involved in efforts to develop a nuclear program for al Qaeda.[71]

7.7.3.6.   *Muslim World League.*  MWL has long been one of Saudi Arabia's principal international charities. MWL personnel worked for and with al Qaeda in Bosnia and Kenya, as well as in the Afghanistan/Pakistan region, and acted as the "mother" for other charitable support of bin Ladin and al Qaeda, as set forth in greater detail in Section 12 of my Expert Report.[72]

7.7.3.7.   *World Assembly of Muslim Youth (WAMY).* Another of Saudi Arabia's largest international charities, WAMY distributed articles containing calls to jihad against Christians and Jews, funded groups engaged in jihad, and shared offices and bank accounts with other charities involved in terrorist funding, as set forth in greater detail in Section 12 of my Expert Report.

7.7.4.   I address with greater specificity information about the specific roles that individual charities played in providing material support to al Qaeda prior to the September 11 attacks, and immediately afterwards, in later sections of my Expert Report.

8.   *How Did al Qaeda's Infrastructure, Such as its Training Camps, Enhance Its Global Strike Capabilities and Enable it to Carry out 9/11?*

8.1.   From the First Afghanistan period of 1979-1989 to the day of the 9/11 attacks, Al Qaeda built its operational capabilities through training camps first developed by MAK and other service providers to the Afghan Arabs fighting the Soviets in Afghanistan, and taken over by Al Qaeda from the time of its creation in 1988. These capabilities required the development of training camps where the recruits would be taught how to succeed in operations on behalf of al Qaeda, both through conventional guerrila warfare and through terrorist strikes.

8.2.   Throughout the 1990's, Al-Qaeda and associated terrorist groups controlled dozens of training camps in Afghanistan, which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya,

---

[71] "Protecting Charitable Organizations," entry for Wafa Humanitarian Organization, U.S. Department of the Treasury website,  https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-p.aspx;  UN Sanctions Committee, designation narrative for Wafa Humanitarian Organization,
https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/wafa-humanitarian-organization ; see also "Investigating Patterns of Terrorist Financing," Testimony of Steven Emerson Before the House Committee on Financial Services Subcommittee on Oversight and Investigations, February 12, 2002.
[72] *See, e.g.*, "Washington Knows Bin Laden's Funders," Intelligence Online, May 9, 2003.

Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia.[73]

8.2.1.    These training camps provided tactical and operational training to thousands of Islamic militants during this period. U.S. military analysts identified some 16 major Afghanistan-based terrorist training camps attended by one or more of the persons formally designated as "Enemy Combatants" by the United States and held at Guantanamo for their roles in carrying out or supporting military activities by Al Qaeda, as well as some 27 additional terrorist training camps in Afghanistan and in other countries such as Pakistan, the Philippines and Tajikistan.[74]

8.2.2.    The al Qaeda training camps were an integral part of the terrorist organization. All 19 of the 9/11 hijackers, as well as the operatives in the Cole attacks and the African Embassy bombing attended Afghan training camps. U.S. intelligence estimates put the total number of fighters who underwent instruction in bin Ladin–supported camps in Afghanistan from 1996 through 9/11 at 10,000 to 20,000.[75]

8.2.3.    Al Qaeda and associated terrorist groups were not the only ones using the terrorist training camps in Afghanistan. The camps were also used by Pakistani insurgent groups seeking to gain control over Kashmir, and by the Taliban for its own purposes within Afghanistan. With personnel, funds, and management all to some extent fungible, the training camps provided a common infrastructure for disparate groups training fighters and terrorists for different purposes.

8.2.4.    Training at the camps included:

8.2.4.1.    Weapons familiarization and training

8.2.4.2.    Land mines

8.2.4.3.    Tactics

8.2.4.4.    Topography

---

[73] 9/11 Commission Report, id, p. 64 and Interview of Ali Ahmad Ali Hamad, March 4, 2008, Exhibit 225, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[74] CTC Report: An Assessment of 516 Combatant Status Review Tribunal (CSRT) Unclassified Summaries, 25 July 2006, Combatting Terrorism Center, West Point Military Academy, pp. 16-17, https://upload.wikimedia.org/wikipedia/commons/5/5f/An_Assessment_of_516_Combatant_Status_Review_Tribunal_%28CSRT%29_Unclassified_Summaries.pdf

[75] 9/11 Commission Report, id, p. 67.

8.2.4.5.   Field movements

8.2.4.6.   Basic explosives

8.2.4.7.   Guerilla warfare and mountain tactics

8.2.4.8.   Marksmanship

8.2.4.9.   Small team tactics

8.2.4.10.  Ambush

8.2.4.11.  Camouflage

8.2.4.12.  Rendezvous Techniques

8.2.4.13.  Covert Communication[76]

8.2.5.  The curriculum actually taught to the terrorists-in-training at the Al Qaeda training camps was consistent with the topics specified in a training manual called "the Al-Qaeda handbook," that was found an seized by British investigators in Manchester, England during a search of the home of a fugitive charged in an al Qaeda terrorism conspiracy. These topics included:

8.2.5.1.   Buying, transporting and using weapons

8.2.5.2.   Making, using and transporting explosives

8.2.5.3.   Communications and transportation for the individual, his group and for particular terrorist operations

8.2.5.4.   Basic safety precautions for the group outside of the battlefield, and how to maintain safety for the group to which a soldier belonged in a conflict environment

8.2.5.5.   Developing and carrying out security planning

8.2.5.6.   Undertaking tactical operations

---

[76] CTC Report: An Assessment of 516 Combatant Status Review Tribunal (CSRT) Unclassified Summaries, 25 July 2006, Combatting Terrorism Center, West Point Military Academy, pp. 15-17, https://upload.wikimedia.org/wikipedia/commons/5/5f/An_Assessment_of_516_Combatant_Status_Revie w_Tribunal_%28CSRT%29_Unclassified_Summaries.pdf

       8.2.5.7.   Covet methods for obtaining information (espionage); secret writing, ciphers and codes

       8.2.5.8.   How to carry out kidnappings and assassinations using rifles and guns

       8.2.5.9.   How to carry out assassinations using explosives

       8.2.5.10.  How to carry out assassinations using poisons

       8.2.5.11.  Interrogations and investigations

       8.2.5.12.  How to act while in prisons and detention centers[77]

  8.2.6.  Specific courses taught in some al Qaeda training camps in Afghanistan included:

       8.2.6.1.   AK-47 training

       8.2.6.2.   Training in explosives compounds

       8.2.6.3.   Explosives training

       8.2.6.4.   Training on explosives, poisons, and electronics

       8.2.6.5.   Clock bomb training

       8.2.6.6.   Chemical warfare training, including practicing techniques for using chemicals to kill dogs in order to then perform such techniques on human beings[78]

8.3.    Interviews of al Qaeda fighters held as enemy combatants at Guantanemo found that the jihadists had generally gone through a training camp system that had consistent features. These included mosques or study groups for recruitment; safe houses for meetings; guest houses for visitors or newly arrived would-be jihadists; and then the training camps where the recruits were transformed into fighters and terrorists. Under this system, potential jihadists from outside the Afghanistan-

---

[77] See "Military Studies in the Jihad Against the Tyrants: The Al-Qaeda Training Manual," US Air Force Counterproliferation Center, Maxwell Air Force Base, Alabama, edited by Jerrold M. Post (2004). https://www.airuniversity.af.edu/Portals/10/CSDS/Books/alqaedatrainingmanual2.pdf  The exact provenance of the Manual prior to its discovery is not known. The language of the Manual makes its general origin, Al Qaeda, clear, and its specifics track with individual accounts of life in the training camps, such as that provided by Ali Admad Ali Hamad, Declaration Of Ali Ahmad Ali Hamad, In re Terrorist Attacks on September 11, 2001, Exhibit 224 to Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, 03 MDL 1570 (GBD) ECF Case
[78] "Army of Darkness: The jihadist training system in Pakistan and Afghanistan, 1996-2001," Sean M. Maloney (2015), https://doi.org/10.101080/09592318,2015.1006409, citing materials at https://www.pbs.org/wgbh/pages/frontline/shows/trail/inside/testimony.html

Pakistan region would be recruited in their home country from a religious or educational setting; be provided passage to Pakistan to received further religious training or filtering, then be moved to a safe house in Pakistan, and from there, move to the "guest house" in Afghanistan. From there, the recruit would go to a training camp for formal training.[79]

8.4.    During bin Ladin's Sudan period, Al Qaeda established terrorist training camps in Sudan similar to those first established in Afghanistan. These included terrorist training camps in which al Qaeda experimented with chemical and biological warfare.[80]

8.5.    The 9/11 Commission found that the terrorist training camps provided the foundation for Al Qaeda's global terrorist strike capabilities and for the attacks on the United States. Among its findings were:

8.5.1.    "Many of the operatives in the African Embassy and Cole attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers. There was a mutually reinforcing relationship between the camps and terrorist operations: the camps provided operatives for terrorist attacks, and successful attacks boosted camp recruitment and attendance."

8.5.2.    "The training at al Qaeda and associated camps was multifaceted in nature. A worldwide jihad needed terrorists who could bomb embassies or hijack airliners, but it also needed foot soldiers for the Taliban in its war against the Northern Alliance, and guerrillas who could shoot down Russian helicopters in Chechnya or ambush Indian units in Kashmir. Thus, most recruits received training that was primarily geared toward conventional warfare. Terrorist training was provided mostly to the best and most ardent recruits."

8.5.3.    "The quality of the training provided at al Qaeda and other jihadist camps was apparently quite good. There was coordination with regard to curriculum, and great emphasis on ideological and religious indoctrination. Instruction underscored that the United States and Israel were evil, and that the rulers of Arab countries were illegitimate. The camps created a climate in which trainees and other personnel were free to think creatively about ways to commit mass murder."

8.5.4.    "According to a senior al Qaeda associate, various ideas were floated by mujahidin in Afghanistan: taking over a launcher and forcing Russian scientists to fire a nuclear missile at the United States; mounting mustard gas or cyanide attacks against Jewish areas in Iran; dispensing poison gas

---

[79] "Army of Darkness: The jihadist training system in Pakistan and Afghanistan, 1996-2001," Sean M. Maloney (2015), https://doi.org/10.101080/09592318,2015.1006409.

[80] *U.S. v. Bin Ladin*, et. al, SDNY98-CR-1023, Trial Testimony of Jamal al-Fadl, pp. 291-293, February 6, 2001

into the air conditioning system of a targeted building; and, last but not least, hijacking an aircraft and crashing it into an airport terminal or nearby city."

8.5.5. "Trainees in the camps did not focus solely on causing the deaths of enemies. Bin Ladin portrayed "martyrdom" in the service of jihad as a highly desirable fate, and many recruits were eager to go on suicide missions."[81]

8.6. Funding for the training camps came from a number of sources, such as IIRO.

8.7. As the 9/11 Commission found: "donors were primarily in the Gulf countries, especially Saudi Arabia. Some individual donors knew of the ultimate destination of their donations, and others did not; they were approached by facilitators, fund-raisers, and employees of corrupted charities, particularly during the Islamic holy month of Ramadan. The financial facilitators also appeared to rely heavily on imams at mosques, who diverted zakat donations to the facilitators and encouraged support of radical Islamic causes. Al Qaeda fund-raising was largely cyclical, with the bulk of the money coming in during the Islamic holy month of Ramadan."[82]

8.8. By all accounts, building up, operating, and maintaining dozens of training camps in Afghanistan cost a great deal of money.  The funding was used to train Islamic fighters to participate in combat in Bosnia; to force the Soviets out of Afghanistan and to try to do this in Chechna; and to train Islamic fighters in how to commit terrorist acts against civilians. In practice the training and support for Islamic jihadists fighting Soviet and Serb soldiers and training and support for terrorists seeking to kill unarmed civilians for political purposes were inextricably intermixed. The Islamic training camps were funded by the same sources who funded the relief efforts aimed at helping Muslims in these and other areas of conflict. As hundreds of millions of dollars went into the Islamic resistance movements, these funds helped build al Qaeda's infrastructure, of which al Qaeda's dozens of training camps were a central component.

8.9. Al Qaeda's training camps provided what the 9/11 Commission called the "[o]pportunity and space to recruit, train, and select operatives with the needed skills and dedicating, providing the time and structure required to scoalize them into the terrorist cause, judge their trustworthiness, and hone their skills," as well as "a logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go."[83] In my opinion, the training camps funded in part by Saudi charities such as IIRO were an essential foundation for al Qaeda's ability to build global strike capabilities and to enable it to carry out the 9/11 attacks.

---

[81] "Overview of the Enemy," Staff Statement No. 15, 9/11 Commission, June 16, 2004, pp. 9-10, https://www.washingtonpost.com/wp-srv/nation/shoulders/CommissionStatement15.pdf
[82] 9/11 Commission Report, id, pp. 19-21.
[83] 9/11 Commission Report, id, p. 366.

9. *Would You Expect the Internal Records of Charities That Were Involved in Supporting al Qaeda to Document Their Support for al Qaeda? If not, why not?*

9.1.   Based on the information I have reviewed, I conclude it was standard practice for charities which provided support to al Qaeda to list the support as expenses for legitimate activities, as part of helping both themselves and al Qaeda avoid detection by anyone who might seek to stop them from facilitating or carrying out terrorist activities.

9.2.   There are multiple reasons why no one should reasonably expect internal records of charities that were involved in supporting al Qaeda to maintain formal documentation of their support for its terrorist activities. I provide the principal reasons below.

9.3.   *Bin Ladin did not want any of its funders disclosed, but wanted them kept secret. Exposing them threatened to expose al Qaeda's terrorist network and terrorist activities.* Maintaining secrecy was essential to al Qaeda's survival, and bin Ladin sought to have its funders adhere to this principle. Bin Ladin understood that exposure of what al Qaeda was doing with the charities threatened not only the funders of al Qaeda, but al Qaeda itself.

   9.3.1.   To counter the risk of exposure, al Qaeda made it a practice to work with charities funding it to hide the sources of its funding, and doing so was important to bin Ladin personally. For example, after a failed attempt by al Qaeda operatives to assassinate President Hosni Mubarak of Egypt while on travel to Addis Ababa in Ethiopia in 1995, bin Ladin complained to an al Qaeda member that Qatar Charitable Society funds had been used in that operation and that he was concerned that al Qaeda's abilities to use charities to fund operations might be compromised as a result.[84]

   9.3.2.   The al Qaeda member understood from conversations with bin Ladin and others in al Qaeda that the charities would receive funds that could be withdrawn in cash. A portion of the cash would be used for legitimate relief purposes and another portion of the cash would be used for al Qaeda operations. The money for al Qaeda operations would then be listed through fraudulent documentation in the charities' books as expenses for building mosques or schools or feeding the poor or the needy.[85]

9.4.   *The ideology promulgated by major Islamic charities was in alignment with that of al Qaeda prior to 9/11.* Gulf State-based Islamic charities engaged in propagation activities provided funding for mosques and madrassas, which in turn preached a radical and extreme form of Islam, consistent with the state religion of

---

[84] Government's Evidentiary Proffer Supporting The Admissibility Of Coconspirator Statements, *U.S. v. Aranaout*, No. 02 Cr 892, United States District Court Northern District Of Illinois, Eastern Division, footnote 14
[85] Government's Evidentiary Proffer, id, ¶6.

the dominant Gulf State, Saudi Arabia. In preaching militant Islam, they were reflecting the extremist religious ideology supported by their funders. A charity could report payment for salaries, books, mosques, madrassas, and related expenditures without these seeming to be support for terrorism, although in fact, these expenditures were relied on by al Qaeda to recruit terrorists. Such ideological expenditures would have been recorded as expenditures for propagation, not for violence or terrorism. The ideas promulgated by the charities engaged in the propagation were aligned with those of al Qaeda, and thus indoctrinated and helped to recruit fighters and terrorist for al Qaeda.

9.4.1.   "Propagation" is a translation commonly used in English of the Arabic term "da'wa," which I understand means "call" in Arabic and refers to efforts to propagate or strengthen the Islamic faith around the world.

9.4.2.   Many Islamic charities consider da'wa to be an important part of their missions. These included major Saudi charities like MWL and WAMY, which prior to 9/11 propagated ultra-conservative Wahhabi teachings regarding Islam.

9.4.3.   When ones look at the actual material that was being propagated, it becomes easy to understand how the propagation of these doctrines, ideas, and language, incubated terrorism. The available literature provides many examples.[86]

---

[86] *See, e.g.,* Husain Haqqani, "Islam's Medieval Outposts," Foreign Policy, November/December 2002, pp. 58–64, http://www.ceip.org/files/publications/Haqqani112002FP.asp; "Pakistan: Madrasas, Extremism and the Military," International Crisis Group, Report 36/Asia/29 July 2002, https://www.files.ethz.ch/isn/28349/036_pakistan_madrasas__extremism_and_the_military_amended.pdf "Foreign Affairs; In Pakistan, It's Jihad 101," Thomas L. Friedman, New York Times, Nov. 13, 2001 https://www.nytimes.com/2001/11/13/opinion/foreign-affairs-in-pakistan-it-s-jihad-101.html; Rick Bragg, "Nurturing Young Islamic Hearts and Hatreds," New York Times, October 13, 2001, https://www.nytimes.com/2001/10/14/world/a-nation-challenged-schools-shaping-young-islamic-hearts-and-hatreds.html. Samples of the hate-speech curriculum of the madrassas can be found at "Religious Textbooks, two excerpts of education textbooks used by Middle School Students in Saudi Arabia," PBS Frontline, https://www.pbs.org/wgbh/pages/frontline/shows/saudi/etc/textbooks.html

[86] I have read several compelling accounts of how the madrassas taught jihad. For example, Husain Haqqani, writing in Foreign Policy, described how he was taught as a young Pakistani to memorize Koranic verses in Karachi. He was taught that communists were evil because they denied the existence of God, and that the West was also immoral because Westerners drank alcohol and engaged in sex outside of marriage, and Western women did not cover themselves. Haqqani visited a Pakistani madrassa just after the 9/11 attacks, and found a much more virulent strain of teaching, where children were being taught that they must "fight the unbelievers and that includes those who carry Muslim names but have adopted the ways of unbelievers." At the school, the children were told that the 9/11 attacks were brought about by a conspiracy by Jews against the Taliban, and that Taliban head Mullah Omar and bin Ladin were great Muslims "for challenging the might of the unbelievers." Haqqani wrote that some six million Muslims study in madrassas around the world, and twice that number attend small Koranic schools attached to village mosques. He wrote that while the overwhelming majority of these madrasas did not teach violence, others did, and essentially all taught a rejection of modernity, emphasizing conformity and a medieval mind set. "Islam's Medieval Outposts, Husain Haqqani, November 10, 2009, https://foreignpolicy.com/11/10/islams-medieval-outposts/ Other useful accounts are provided in "School by the Book," Newsweek, March 10, 2002, http://www.newsweek.com/school-book-141839, which describes schools in Karachi which teach the

9.4.4.    I note the testimony of former Ambassador to the United States Dr. Dore Gold before the U.S. Senate Committee on Governmental Affairs on July 31, 2003 in a Senate hearing in which I also testified.

9.4.4.1.    In that testimony, Ambassador Gold quoted an Egyptian news editor as stating that "Wahhabism leads, as we have seen, to the birth of extremist, closed, and fanatical streams, that accuse others of heresy, abolish them and destroy them. The extremist religious groups have moved from the state of Takfir [condemning other Muslims as unbelievers] to the stage of 'annihilation and destruction,' in according with the strategy of Al-Qa'ida – which Saudi authorities must admit is a local Saudi organization that drew other organizations into it, and not the other way around. All the organizations emerged from under the robe of Wahhabism."

9.4.4.2.    Ambassador Gold also provided a then-recent example of the types of hate speech Saudi religious leaders propagated. He quoted from a book written by Saudi Sheikh Hamed bin Uqla al-Shuaibi, written November 16, 2001, stating that the Sheikh hoped Allah would bring further destruction upon the United States.

9.4.4.3.    I have recently reviewed a public English-language webpage, still available online in 2020, recounting Sheikh Hamed's life and dedicated to his memory, which states that he was one of the first scholars in the Arabian Peninsula to issue a public fatwa calling upon the Muslims to support the Taliban. The webpage states that Sheikh Hamed's support for the Taliban continued after the 9/11 attacks, when he called on Muslims to engage in fighting against the United States in Afghanistan, as stated expressly in the still-current website in his honor. "[W]hilst

---

concept of jihad or "holy war" as a "special subject to prepare students to fight for the cause of Islam," and "compulsory for all Muslims." The teacher in Karachi interviewed for the article gave his "blessing" to the militant group Jaish-e-Muhammed which soon thereafter kidnapped and murdered Wall Street Journal correspondent Daniel Pearl. Harvard terrorism scholar Jessica Stern published an article in Current History in November 2001, summarizing testimony she gave on September 20, 2001 before the House Government Reform Committee on Terrorism, based on research she did in visiting madrassas. In the article, she describes how the madrassas facilitate the ability of training young men to become terrorists, through teachers assuring their students that "killing civilians is allowed." As Stern states: "A former member of al Qaeda explained how a charismatic teacher taught him not to fear killing non-combatants. If the innocent victim is a 'good person,' his teacher said, 'he goes to paradise.' If he's a bad person, 'he goes to hell.' She reports that the schools function as orphanages. "Families that cannot afford to feed their children send them to madrassahs, where they are not only educated but also closed and fed. In the most extreme of these schools…children are taught about hate…they are susceptible to their teacher's message that the best way to fulfill their religious duty is to fight on behalf of the Taliban or to join so-called jihadi groups. The children are also taught that Osama bin Laden is a hero." "Preparing for a War on Terrorism." Jessica Stern, Current History, November 2001, Volume: 100, Issue 649 pp. 355.357, http://www.currenthistory.com/Article.php?ID=255

many in the Muslim World were siding with America and grieving for it, he issued fatwa clarifying the Truth and called upon the Muslim Ummah to come to the support of the Taliban and the Foreign Mujahideen in Afghanistan. Many of his students answered the call and went to Afghanistan, of which some were martyred." The webpage makes clear that the Sheikh had been employed throughout his life as a scholar in a Saudi-state supported religious institute.[87]

9.4.4.4. The case of Sheikh Hamed's call to Muslims to fight unbelievers and to support the Taliban against the United States after 9/11 by being ready to kill themselves in the process, provides a perfect example of the continuum between religious propagation and support for terrorism. The funds that went to Sheikh Hamed throughout his life as a teacher of Islamic extremism had the direct result of supporting a man who after the 9/11 attacks still called on young Muslim men to become religious warriors and martyrs by fighting the United States.

9.4.4.5. In his testimony, Ambassador Gold described the history of the major Saudi charities as follows: "Saudi Arabia erected a number of large global charities in the 1960s and 1970s whose original purpose may have been to spread Wahhabi Islam, but which became penetrated by prominent individuals from al-Qaeda's global jihadi network." He said that the three most prominent of these were IIRO, MWL, and WAMY, and also named al-Haramain.[88]

9.4.4.6. One would not reasonably expect that files of the charities engaged in propagation would include specific entries that state that the funds being expended were for the purpose of having religious teachers teach young men to become religious warriors, carry out jihad, and carry-out suicide attacks against Americans and others. Yet in practice, this is exactly what statements by Sheikh Hamed and others with similar views supported by these Saudi charities, did.

9.4.4.7. Major Saudi charities involved in the type of extremist Islamic religious propagation activities I have described in my Expert Report expended substantial funds for propagation, or da'wa, promoting the strain of Islamic thought that called for holy war against infidels as a religious duty. Though those involved in

---

[87] Biography of Hamood Ibn Uqla Ash-Shu'aybi, https://muwahhidmedia.wordpress.com/2013/07/24/biography-of-hamood-ibn-uqla-ash-shuaybi/
[88] Testimony, Dr. Dore Gold, former Israeli Ambassador to the United States, Senate Committee on Government Affairs, July 31, 2003, https://www.congress.gov/congressional-report/109th-congress/senate-report/368/1

publishing or disseminating the examples below may not characterize these statements as "support for al Qaeda," the thinking in them is fully consistent with al Qaeda's ideology:

9.4.4.7.1.   "Be dissociated from the infidels, hate them for their religion, leave them, never rely on them for support, do not admire them, and always oppose them in every way according to Islamic law." (Printed by Saudi Government Ministry of Cultural Affairs, prior to 2004)[89]

9.4.4.7.2.   "To be true Muslims, we must prepare and be ready for jihad in Allah's way. It is the duty of the citizen and the government. The military education is glued to faith and its meaning, and the duty to follow it." (Printed by Saudi Government Ministry of Education, prior to Dec 2004)[90]

9.4.4.7.3.   "Jihad is the key to Muslims' success and felicity, especially when their sacred shrines are under the Zionist occupation in Palestine, when millions of Muslims are suffering suppression, oppression, injustices, torture and even facing death and extermination campaigns in Burma, Philippines, Patani, USSR, Cambodia, Vietnam, Cyprus, Afghanistan, etc. This responsibility becomes even more binding and pressing when we consider the malicious campaigns being waged against Islam and Muslims by Zionism, Communism, Free Masonry, Qadianism, Bahaism and Christian Missionaries." (Speech, 1980, head of Muslim World League)[91]

9.5.   *The intent to avoid direct conflict with the West through duplicity, or engaging in a double game.* Over my decades of work on Middle East issues, I have found it common for people and institutions there to send different messages to different audiences as a means of seeking to avoid direct confrontation with powerful western countries, especially the United States. During the 1980's, the U.S. and the Islamic world were united in wanting to see the Soviet Union out of Afghanistan. This unity for that limited purpose broke apart in other conflicts between Muslims and non-Muslims in other areas, such as Israel/Palestine, or

---

[89] "Saudi Publications on Hate Ideology Invade American Mosques," Freedom House, December 2004, https://freedomhouse.org/sites/default/files/inline_images/Saudi%20Publications%20on%20Hate%20Ideology%20Invade%20American%20Mosques.pdf
[90] Freedom House, id.
[91] Muhammad Ali Harakan, "Duty of Implementing the Resolutions," Journal of the Muslim World League, No. 6 (1980), pp. 48–49, cited in https://www.belfercenter.org/sites/default/files/legacy/files/The_Rise_of_Muslim_Foreign_Fighters.pdf .

Bosnia, and diverged in the Afghanistan/Pakistan region as soon as the Soviets departed. In any case, the use of a charity to facilitate militant activity would have been seen from the outset as problematic by the west, as well as in conflict with universal international standards that go back to the founding of the Red Cross, and which were formally adopted by the Red Cross, Red Crescent, and other humanitarian groups in 1979. [92] The seven fundamental standards include the requirement of neutrality – that a relief organization such as the Red Cross and Red Crescent may not take sides in hostilities or engage at any time in controversies of a political, racial, religious or ideological nature. Thus, any Islamic charity providing support for military efforts would need to keep that support hidden because such support would be in conflict with the universal international norms considered essential to the work of all charities.[93]

9.6.   *Avoiding legal liability.* A charity acknowledging that it helped fund activities that killed people would have the risk of having its leadership criminally indicted and having the organization itself sanctioned or found liable for injuring the victims. No charity would ever want to put itself in the position of acknowledging that it had intentionally funded such activities, even in cases, such as those involving the Islamic charities operating in war zones where they were directly assisting Islamic fighters with logistics and documentation, as well as facilitating the provision of weapons to those fighters.

9.6.1.   Most simply, decisions by a charity and its leadership not to document what it was doing, even when it was legally required to do so, were *intended* to provide deniability and could be used to avoid the risk of legal liability for having provided funds to terrorists. To use the popular catch-phrase used in the world of computer software design, the charities' failure to document support for terrorism was *not a bug, but a feature* of how they operated. The charities operated with minimal record-keeping regarding their activities in the field for many reasons. But one important one was that their heads could rely on the lack of records to "prove" they had done nothing wrong, and thereby try to avoid having anyone hold them legally or otherwise accountable.

---

[92] See "Proclamation of the Fundamental Principles of the Red Cross," Commentary, at website of International Committee of the Red Cross, stating that "The Fundamental Principles are the result of a century of experience. Proclaimed in Vienna in 1965, they bond together the National Red Cross and Red Crescent Societies, the International Committee of the Red Cross and the International Federation of Red Cross and Red Crescent Societies, and guarantee the continuity of the Movement and its humanitarian work." https://www.icrc.org/en/doc/resources/documents/misc/fundamental-principles-commentary-010179.htm.  .

[93] The principle of neutrality is of fundamental importance because the Geneva Accords give relief workers absolute protection on the battlefield. If any of them are helping one side to a conflict, the entire principle of protection is put at risk, endangering all of the other relief workers. In practice, the Islamic charities violated this bedrock principle in Afghanistan, Bosnia, Chechyna, Indonesia, the Philippines, Sudan, and a number of other places in the days leading up to 9/11. See additional commentary on the principle of neutrality on the website of the International Committee of the Red Cross at https://www.icrc.org/en/doc/resources/documents/misc/fundamental-principles-commentary-010179.htm

9.7.  *The work of the charities to support militancy, warfare, and terrorism, was intended to be covert, not overt, so that formal records did not show such support.* Islamic charities were used as cover while they were providing support for military activities, indoctrination, recruitment, and terrorist planning in areas where al Qaeda was operating. They did this undercover because their support was *covert*, not overt. There was more than one reason for having the support not be documented. These included but were not limited to preserving their ability to deny that they were engaged in this activity and thereby avoid direct confrontation with the west and legal liability, as stated above. Another reason is that it is normal when a military force is being gathered in preparation for a conflict for it to keep its activities secret, in order to gain an advantage over its enemy. Prior to 9/11, extreme Islamists supporting al Qaeda saw endless enemies, from non-Islamic forces in places like Bosnia, to the very existence of secular and western governments operating in areas where Muslims lived. Terrorist groups operate in secrecy to avoid detection; charities supporting them necessarily do so, too, with regards to their support of the terrorist groups. When a charity is secretly supporting terrorism, it is to its advantage not to create records that document that it is so doing. The available record is replete of examples of this phenomenon.

9.7.1.  Al Haramain was a large Saudi based charity office with offices throughout the world that was systematically providing support for and acting on behalf of terrorist groups, including al Qaida, using charitable relief services as a cover. Its documents never disclosed this. The U.S. government was initially able to determine its actual activities initially through slowly gathering information on its activities from local informants.

9.7.1.1.  Informants told the U.S. and other friendly authorities that the Kenyan branch of al Haramain was involved in plotting terrorist attacks against Americans. An employee of the charity, for example, warned that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate at the Embassy, and specified the source of funds for the attack as coming from a wealthy senior official of the charity. The U.S developed further intelligence that the charity's leaders in Nairobi decided to alter their previous plans to bomb the U.S. Embassy in Nairobi, and instead would seek to assassinate U.S. citizens. In this period, an official at al Haramain communicated to others that he had obtained five hand grenades and seven "bazookas" from a source in Somalia. The U.S. eventually learned that these weapons were to be used in a possible assassination attempt against a U.S. official, and that a former director of the charity in Tanzania was responsible for making preparations for the advance party that planned the August 7, 1998, bombings of the U.S. Embassies in Dar Es

Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.[94]

9.7.1.2.   Comment: Al Haramain advertised itself as a private charity doing good work by promoting Islamic teaching throughout the world. Its funding generally came from grants from other countries, individual Muslim benefactors, and special campaigns, which targeted Muslim-owned business entities around the world as sources of donations.[95] But in reality, this "charity" funded terrorism in many countries, including terrorist plots that killed Americans; its record-keeping and disclosures to donors documented none of that activity. If it had ever admitted its actual activities supporting terrorism to its donors, it would have faced immediate closure. Instead, the U.S. and other countries had to put together information on the support the organization provided to terrorist groups bit by bit. Some of its branches were closed in early 2002, more were closed over the course of the following two years. But al Haramain was able to continue its activities in some locations until as late as 2008, when the U.S. finally sanctioned it on a global basis, including within those sanctions its headquarters in Saudi Arabia, which caused it to finally close globally.[96]

9.7.2.   The conduct of other charities that provided support to terrorism, such as IIRO, WAMY, and MWL, discussed in Section 12 of my Report, show a similar pattern. Support for al Qaeda, other terrorist groups, or even for more routine armament of Islamic fighters in zones of conflict, was not something any of them stated in any publicly disclosed financial records. These activities were covert, not overt. Any public evidence of such support was denied, as such disclosure posed an immediate threat to the support, to the individuals at the charity who were carrying it out, and to the continued existence of the charity itself.

9.8.   *Avoiding documentation was a precaution for anyone helping al Qaeda, including the charities, to prevent opponents from seeing what they were doing.* Acts of

---

[94] "Protecting Islamic Charities," entry on al Haramain Kenya and Tanzania branches, U.S. Department of the Treasury Resource Center,  https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx   Other entries for al Haramain's terrorist support in other countries contain further examples of its support for al Qaeda and terrorism.

[95] "Protecting Islamic Charities," entry for al Haramain Islamic Foundation, id.

[96] Between 2002-2004, the United States designated thirteen branch offices of al Haramain operating in Afghanistan, Albania, Bangladesh, Bosnia & Herzegovina, Comoros Islands, Ethiopia, Indonesia, Kenya, Netherlands, Pakistan, Somalia, Tanzania, and the United States. Despite these efforts, the leadership of the organization attempted to reconstitute the operations of the organization, and parts of the organization continued to operate. In 2008, the U.S. Government designated the entirety of the al Haramain organization for terrorist sanctions, including its headquarters in Saudi Arabia. Resource Center, Protecting Charities, U.S. Department of the Treasury, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx

terror are planned in secret, and only revealed once the bomb has exploded in a target, such as a U.S. Embassy, or after a plane has been hijacked and crashed into a building, such as the World Trade Center. Such acts of terror require surprise. The less documentation, the less risk. It is standard for clandestine organizations, such as terrorist groups, to conceal what they are doing to prevent their enemies from learning about their terrorism prematurely. This principle, which is rather obvious, extends to those helping them. Documentation creates the risk of exposing the terrorist's plans to the terrorist targets. To reduce the risk of detection, avoiding documentation of terrorist finance is the rule.

9.8.1.  More generally, when the secret was breached, and charities were found to have engaged in terrorist support, their heads and operatives were liable to being indicted, or at minimum, forced to leave the country where they were operating. Forced departures were in fact a recurrent threat to al Qaeda, as reflected in the closure of the offices of al Haramain, Muwafaq, Benevolence International globally, and the closure of some offices of IIRO, for their support for bin Ladin, al Qaeda and terrorism. Once information on its support for terrorism was established, a charity could no longer help the terrorists carry out terrorist activity. For the protection of the charities and the terrorists both, the fewer documents that might reveal this, the better. The longer any such evidence was concealed, the longer the charity could stay in operation.

9.9.   *Maintaining flexibility in spending to meet contingencies.* Al Qaeda used its financial support systems to create slush funds that could be spent on whatever the organization happened to need at a particular time. In relying on charities, al Qaeda could obtain financial support that it could use for multiple purposes, so long as the charities themselves did not have to provide very precise documentation about what they were doing. As a result, the lack of documentation served the interests of both the charities assisting al Qaeda, and the terrorist organization itself.

9.10.  *Continuum from legitimate to illegitimate activities.*  Prior to the 9/11 attacks, there was a continuum in areas of conflict from legitimate, important, and moral charitable relief activities to the activation of terrorists. In such areas, rather than having a bright line between taking care of the physical and spiritual needs of Muslims, on the one hand, and supporting violent jihad against non-Muslims, on the other hand, there was a continuum of activities that made it difficult to tell where one began and the other left off.

9.10.1. In a conflict zone, a charity may take care of orphans whose parents have been killed in the conflict by non-Muslims, such as the Soviets in Afghanistan, the Serbs in Bosnia, or the Russians in Chechnya. First, the orphans' physical needs must be taken care of, then their spiritual needs, and also their education. The Islamic charitable organizations raised funds from ordinary middle-class Muslims as well as from wealthy ones, to carry out all of these activities in such conflict areas. But the charities activities

did not always stop with assisting the injured in recovery and education. They continued with propagation activities of Islamic religious organizations that taught the ideology of jihad to some of these orphans and to assisting those orphans (or others) to fight jihad against those who were perceived as responsible for their victimization, including with logistics, travel, false documents, and the provision of arms.

9.10.2. Similarly, in a conflict zone there is the need to provide housing and food to refugees and others who need them. Charities of all kinds are needed to do this. But in the case of conflict zones where al Qaeda and other terrorist groups took root, the mechanisms for housing, food, and other relief services also provided environments where the terrorist groups could gather intelligence as well as recruits. They thereby served to incubate what became terrorist support networks in these conflict zones. Thus, in Bosnia and Chechnya, for example, IIRO and the Third World Relief Agency first established themselves as providers of Islamic relief. They then extended services to terrorists such as visas and fake ID cards.[97]

9.11. *Lack of meaningful regulatory requirements to force better accounting.* In the United States, a charity must maintain adequate documentation of its expenditures or risk its charitable status, being forced to close, or even worse outcomes, such as potential indictment for charity fraud. Due to the deductibility of contributions to charities, donors as well as charities need to be able to document their contributions. By contrast, in the Gulf States, in particular, Saudi Arabia, prior to 9/11 there was no active regulation of religious charities. The lack of such requirements meant that in practice little transparency was required for either the donors or the recipients of the donations to charities.

9.12. *Tradition of personal charity.* Making charitable contributions or zakat is an obligation of every Muslim. Islamic charitable giving is simultaneously a social, religious, cultural, and political obligation, and there are no precise borders between these spheres. Those running Islamic charities clearly had a great deal of latitude prior to the 9/11 attacks in what to do with the billions of dollars in funds they received annually from Muslims meeting their *zakat* obligation.

9.12.1. The very notion of engaging in oversight of Islamic charities would imply a lack of trust in those operating the charities, and been unseemly. The opposition of the head of one of Saudi Arabia's most important international charities, IIRO, to such oversight was reflected in an interview by British scholar Jonathan Benthall with the co-founder of IIRO, Farid Yasin Qurashi in 1995. As Benthall writes: "on the issue of transparency and accountability, which I raised with him, he was

---

[97] <u>Jihad in Saudi Arabia</u>, Thomas Hegghammer, Cambridge University Press (2010) p. 49

adamant. Charitable giving was a Saudi tradition, he explained, and how contributions were spent was no one's business except the donors."[98]

9.12.2.   In practice, as demonstrated by the broad record of abuse of the large, international Islamic charities from Saudi Arabia (and in some cases, based in other Middle East states, such as the Emirates, Qatar, and Egypt, or by charities originating in the Middle East but headquartered in the United States or UK), meant that oversight in practice was minimal, leaving them open to use for violence and terrorism as well as for their publicly stated purposes. The principal perpetrators of this conduct constituted only a fraction of the thousands of Islamic charities that undertake charity work around the world, but the phenomenon was nevertheless substantial: altogether there are roughly 40 international Islamic charities that have been designated by the U.S. Treasury Department for sanctions related to their support for terrorism.[99]

9.13.   *Corruption*. Oil-rich Middle Eastern family-ruled states, particularly Saudi Arabia, had long had a reputation for being susceptible to corruption.[100] In Saudi Arabia, prior to the 9/11 attacks, the corruption was pervasive, discouraging close monitoring of who was paying what to whom. As an example, I provide excerpts from a 1996 State Department cable published by Wikileaks:

9.13.1.   "Saudi princes and princesses, of whom there are thousands, are known for the stories of their fabulous wealth--and tendency to squander it."

9.13.2.   "The most common mechanism for distributing the nation's wealth to the royal family is the formal, budgeted system of monthly stipends for all members of the Al Saud, managed by the Ministry of finance's "office of decisions and rules."  The stipends range from $270,000 per month on the high end to $800 per month for the lowliest member of

---

[98] "The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 16.

[99] "Protecting Charities," U.S. Department of the Treasury website, last updated July 17, 2008, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx

[100] *See, e.g.,* "In gilded Saudi royal circles, corruption has long been a way of life," Los Angeles Times, November 8, 2017. "The Fall of the House of Saud," Atlantic, May 2003, https://www.theatlantic.com/magazine/archive/2003/05/the-fall-of-the-house-of-saud/304215/. See also interview on PBS Frontline of former Saudi Ambassador to the United States Prince Bandar bin Sultan: "The way I answer the corruption charges is this. In the last 30 years, we have made- we have implemented a development program that was approximately- close to $400 billion worth. You could not have done all of that for less than, let's say, $350 billion. Now, if you tell me that building this whole country and spending $350 billion out of $400 billion, that we had misused or got corrupted with $50 billion, I'll tell you, "Yes." But I'll take that any time. But more important, who are you to tell me this? I mean, I see every time all the scandals here, or in England, or in Europe. What I'm trying to tell you is, so what? We did not invent corruption. This happened since- since Adam and Eve. I mean, Adam and Eve were in heaven and they had hanky-panky and they had to go down to earth. So I mean this is- this is human nature. But we are not as bad as you think!" PBS Frontline, Interview, Prince Bandar, late September 2001, https://www.pbs.org/wgbh/pages/frontline/blackmoney/etc/script.html

the most remote branch of the family.  Bonus payments are available for marriage and palace building.  The embassy estimates that the stipends system puts an annual drain of about $2 billion on the $40 billion government budget."

9.13.3.    "Aside from the stipends system, a handful of the senior most princes enrich themselves by controlling several billion dollars in annual expenditures in 'off-budget' programs.  With no Ministry of finance [sic] oversight or controls, these programs are widely viewed as sources of royal rakeoffs."

9.13.4.    "Other ways some princes obtain money include borrowing from the banks, and not paying them back."[101]

9.14.    In such an environment, where there is "no Ministry of Finance oversight or controls" for "off-budget programs," charities have incentives not to keep accurate and complete accounting records. Rather, in practice, charities funded through support by the government, by members of a royal family and/or by other powerful and influential people, have incentives to maintain flexibility on the reporting of both donations and expenditures, domestic and foreign, as a means of preserving necessary accommodations to whomever might be demanding whatever, including support to foreign fighters and terrorists.

9.15.    What took place in Saudi Arabia, the country whose charities were at the "epicenter" of the terrorist finance problem, illustrates this point. In December 2002, Saudi Arabia announced it had created a new High Commission for Oversight of Charities to help Saudi charities reform their operations and improving their transparency. In making that announcement, Adel al-Jubeir, a Saudi Arabian official who later became the country's Ambassador to the United States and then the country's Foreign Minister, stated that all Saudi charities had been audited.[102]  Yet more than seventeen years later, the results of any comprehensive, charity-wide audits that may have been conducted of its charities by the Saudi government have never been made publicly available.[103]  Six years after the 2002 announcement of the High Commission, Saudi Arabia reported to the world's premiere anti-money laundering authority, the FATF, in 2008, that the High Commission announced by Al-Jubeir in 2002 had yet to be implemented.[104]

---

[101] "Saudi Royal Wealth: Where Do They Get All That Money?," U.S. Department of State Cable, Embassy Riyadh, November 30, 1996, Wikileaks, https://wikileaks.org/plusd/cables/96RIYADH4784_a.html .

[102] Al-Jubeir served as Saudi Arabia's Ambassador to the United States from 2007-2015 and as its Minister of Foreign Affairs from 2015-2018. Since December 27, 2018, his title has been Saudi Minister of State for Foreign Affairs.

[103] "Saudi Arabia – Terrorist Financing Issues," Congressional Research Service, September 14, 2007, CRS-18, https://fas.org/sgp/crs/terror/RL32499.pdf

[104] "Mutual Evaluation, Anti-Money Laundering and Combating the Financing of Terrorism, Saudi Arabia," ¶778 FATF, June 25, 2010,  https://www.fatf-gafi.org/media/fatf/documents/reports/mer/MER%20KSA%20full.pdf

I have not found information documenting that the High Commission ever became operational in practice as a means to monitor Saudi charities.

    9.15.1.   Saudi Arabia's decision to create a "High Commission" to carry out oversight of the Saudi international charities after the 9/11 attacks reflected the reality that prior to 9/11, there had essentially been no such oversight of these charities. In the absence of that oversight, there does not appear to have been any mechanism created by the regulators of the charities to have ensured that their records were accurate.

9.16.    In summary, no one should expect that any charities involved in supporting al Qaeda accurately documented that activity. The lack of controls and accounting integrity became means to facilitate flexibility for the uses of the funds, without tracking mechanisms, during a period in which these charities were propagating ultra-conservative Wahhabi ideology and the funding of Islamic jihadists in areas of conflict. In that culture, these Islamic charities mixed charitable relief with deniable facilitation of jihad by Muslim fighters engaged in armed conflict with non-Muslims, which in practice blended into supporting terrorist activities as well.

10. *What Significance Do You Attach to the Financial Improprieties and Irregularities Reflected in Audits and Financial Documents of Charities Like IIRO?*

10.1.    Documents and depositions taken in this matter show that when some audits were undertaken of some of the Islamic charities, the audits found financial improprieties and irregularities. For the reasons set forth in Section 9 of my Expert Report, I would expect such audits to find expenditures whose actual use cannot be traced, in addition to instances in which funds were provided for unauthorized uses. The three audits of IIRO branches I have reviewed (one of which included only a few pages out of the entire audit) found exactly these types of issues.

10.2.    The charitable sector world-wide has long been subject to abuse, with such abuse especially serious when the charities are not subject to adequate oversight. Extensive oversight, regulation, and public disclosure requirements are needed to counter the risk of misconduct involving charities.[105] The lack of controls of Islamic charities headquartered in the Gulf States prior to 9/11, especially Saudi Arabia, left these charities especially vulnerable to multiple forms of abuse, as reflected in the evidence of financial improprieties and irregularities found in audits I have reviewed of covering some of these charities. This principle is

---

[105] A 2006 Harvard study estimated US charity fraud to involve some $40 billion in losses per year, "An Investigation of Fraud in Nonprofit Organizations: Occurrences and Deterrents," Hauser Center, Harvard University, https://cpl.hks.harvard.edu/files/cpl/files/workingpaper_35.pdf   A 2017 forensic and analytic study in the UK estimated annual losses of £2.3 billion in losses at charities due to fraud in 2016. https://www.crowe.com/uk/croweuk/-/media/Crowe/Firms/Europe/uk/CroweUK/PDF-publications/Annual-Fraud-Indicator-report-2017.ashx?la=en-GB&hash=46DD55B92DABDB33CABD62A76FB0B1EE2E1791D1

illustrated by several cases in which such later audits found serious financial irregularities in Islamic charities linked to terrorism, in which those serious irregularities made it impossible to trace how the charity was actually expending its funds.

10.3. *A Canadian audit of WAMY's Canadian branch provides a clear example of financial improprieties and irregularities, as well as links to terrorism.* The WAMY branch was stripped of its charitable status by Canada after a Canada Revenue Agency investigation found that the charity had failed to comply with basic bookkeeping and accounting requirements for the charity, and was inextricably linked to its Saudi parent, which Canada assessed to have provided support to al Qaeda.

   10.3.1. In an audit that concluded in 2011, Canada's Revenue Agency ("CRA") audited WAMY's books and records for the period from January 1, 2000 to December 31, 2003. It found massive deficiencies. These included:

      10.3.1.1. Failure to maintain a general ledger or similar record of receipts and expenditures;

      10.3.1.2. Inability to provide any cancelled cheques for its fiscal year ending December 31, 2001;

      10.3.1.3. A number of missing cancelled cheques for its fiscal year ending December 31, 2002;

      10.3.1.4. Failure to maintain a minute book or hold board meetings in accord with its corporate by-laws;

      10.3.1.5. Inaccurate and improperly accounted receipts;

      10.3.1.6. No copies of a number of official donation receipts for the fiscal year ending December 31, 2002;

      10.3.1.7. Failure to maintain bank deposit slips for any of the fiscal years under audit.

   10.3.2. CRA found that WAMY's failure to maintain these "essential books and records" prevented CRA from verifying who received donations, the nature and purpose of WAMY's actual business dealings, and who exercised ultimate control over the arrangements and transactions.

   10.3.3. CRA further found that it had obtained pamphlets and literature from WAMY indicating that the charity "may be pursuing objectives that are in fact quite different from those for which it was incorporated," were "broad and vague, and could therefore be used to promote ends that are not exclusively charitable." Accordingly, CRA found that it was "unable to

conclude with any degree of certainty that WAMY has limited itself to the pursuit of charitable purposes and activities."

10.3.4. Finally, CRA found that WAMY's Canada charity was indistinguishable from the headquarters of WAMY in Saudi Arabia, had little or no independent function, and had transferred funds for "non-charitable purposes which included money transfers to non-qualified donees."

10.3.5. CRA stated that under Canadian law, purposes which offend public policy are not charitable, and that Canada's public policy was to deprive terrorist organizations of access to funds rather than to give them the tax advantages of operating as a charity. It then assessed that WAMY and its affiliates had extensive "adverse reporting" of ties to terrorists.

10.3.6. The "adverse reporting" on WAMY cited by Canada included:

10.3.6.1. WAMY funding a student group in India banned by the Indian government for anti-government activities, and whose leader was identified in public reports as an important figure in the global jihadist movement and arrested in connection with the July 2006 terrorist bombings in Mumbai, as well as links to another terrorist group, Laskhar-e-Tayyiba, listed as a terrorist entity by Canada.

10.3.6.2. Allegations made by the Jamestown Foundation in October 2005 that WAMY was funding Islamic militants in the Nigerian state of Yobe through several other organizations, including MWL and IIRO.

10.3.6.3. A 2002 Arab News report that WAMY had increased its allocation to the Palestinian intifada (uprising against Israel) to $2.7 million per month in addition to $70 million also provided by WAMY to the intifada.

10.3.6.4. A report in "Guide to Wahhabi Organizations in North America," written by Jamaluddin B. Hoffman describing WAMY as the sister organization to MWL, which he describes as "the ideological headquarters for Islamic extremists worldwide" working through branch offices and affiliate organizations many of which had direct links to al Qaeda and other terrorist groups.

10.3.6.5. Close ties to the closed Islamic charity, Benevolence International Fund, found to be a front for systematic finance of terrorism, including funding Benevolence and sharing a Canadian bank account with Benevolence's Canadian office. CRA noted that the head of Benevolence had pled guilty to providing financial assistance to individuals engaged in violence overseas, and that he and others had "agreed to conceal from donors, potential donors and federal and state governments that a material portion of the

donations received by BIF based on BIF's misleading representations was being used to support fighters overseas." CRA added that such support included boots for fighters in Chechnya and boots, tents, uniforms, and an ambulance intended to be used by Islamic fighters in Bosnia.

10.3.6.6. CRA concluded that these and other reported links to groups involved in supporting terrorism made the continued operation of WAMY in Canada contrary to public policy.

10.3.7. CRA also found that literature distributed by WAMY and other material produced by WAMY's Saudi Arabian counterpart, appeared "to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change. CRA provided examples:

10.3.7.1. The MWL pamphlet, "A Dialogue on the Internet," distributed by WAMY (Canada) stating that "Christians living with Muslims in the east . . . have always enjoyed the tolerance and good treatment of Islam … [u]nfortunately Western Christians preferred and still prefer to be the enemies of Islam and Muslims."

10.3.7.2. A WAMY publication stating that "Jews are humanity's enemies; they foment immorality in this world; the Jews are deceitful, they say something but mean the exact opposite."

10.3.7.3. A 1991 WAMY publication stating that Muslims should "[t]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and Al-Quds [Jerusalem] when they go back to Islam and make jihad for the sake of Allah."[106]

10.3.8. Based on this and related information found in the audit that showed that the account had found that the charity's books and records had grave financial improprieties and irregularities; that as a result Canada could not adequately determine what it was actually spending its funds on; that the charity had extensive ties to terrorist groups; that some of the charity's messaging included hate speech; and that the charity had violated three core requirements of Canadian charity laws, Canada ordered WAMY's Canada charity to be closed. Before doing so, it offered WAMY's head, Ayman al-Taher, the opportunity to contest its factual and legal findings. Neither al-Taher, nor anyone else representing WAMY responded, and

---

[106] Notice of Audit of the World Assembly of Muslim Youth to its President, Ayman Al-Taher, Canada Revenue Agency, BN: 871966040RRR0001, File #3008146, August 23, 2001, to provide opportunity for response, Exhibit 181, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

Canada's decision to close WAMY's Canada office and to revoke its
license as a charity in Canada became final as of September 23, 2011.[107]

10.4.    Canada's audit of WAMY illustrates how financial improprieties and
irregularities in a charity that included inadequate books and records create a
situation where it becomes impossible to determine how funds were actually used,
even when other evidence shows that the charity is linked to terrorist groups,
makes payments to other charities found to have directly funded terrorism; and
disseminates hate speech consistent with ideological support of terrorism.
Inadequate and fraudulent books and records are typical of charities that are
hiding bad conduct. For charities linked to terrorism, bad books and records
become the means of hiding terrorist support.

10.5.    *An audit of the Third World Relief Agency ("TWRA"), headquartered in Vienna,
Austria, found similar patterns of financial irregularities and links to terrorism.*
The prosecutor for the International Court of Criminal Justice ("ICCJ") for the
Former Yugoslavia investigated allegations of the Bosnian army for violations of
applicable international arms embargoes in place during the Yugoslav war. This
investigation led to a 2002 review of TWRA's activities through an audit of
banking statements and other documents that had been seized from TWRA's
offices in Vienna in 1996 following a mutual legal assistance request from
Germany prosecutors. Thus audit in turn produced an Expert Report that
documented gross irregularities in TWRA's records.[108]

10.5.1.    The ICCJ prosecutor determined that wire transfers from the bank
involved showed that Saudi prince Salman (today the King of Saudi
Arabia) had made contributions of over $120 million to TWRA in the
period 1992-1995 and that more than $7 million of TWRA's funds had in
turn gone to a close associate of bin Ladin, Wael Julaidan.

10.5.2.    Julaidan was characterized by the ICCJ Prosecutor as being on the
"Golden Chain List" as a recipient of contributions to Al-Qaeda; a former
secretary of the Muslim World League and the Rabita Trust in Pakistan,
and "a partner and aid [sic] to bin Ladin," whose assets had been frozen by
the United States.

---

[107] Notice of Intention to Revoke the World Assembly of Muslim Youth, Notice to Ayman Al-Taher,
President, Canada Revenue Agency, BN: 871966040RRR0001, File #3008146, January 05, 2012, Exhibit
191, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in
Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for
Relief of Bosnia & Herzegovina.
[108]"Expert Report Concerning the Area – Financial Investigations – relating to the judicial assistance
request, ref. no. INV/10289/T09-PH (245), dated 8/27/2002 of the "Office of the Prosecutor (OTP) of the
International Court of Criminal Justice for the former Yugoslavia relating to the "Third World Relief
Agency" TWRA), Vienna/Austria, MR/GER049960, Exhibit 231 Affirmation of Sean Carter Transmitting
Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the
Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, hereafter
"ICCJ Expert Report."

10.5.3. The ICCJ Expert Report of the banking records also showed more than $4.5 million in transfers by TWRA to the Sudanese founder of TWRA, Elfatih Hassanein. Hassanein, described in a separate press account as "the chief broker of black-market weapons deals by Bosnia's Muslim-led government and the agent of money and influence in Bosnia for Islamic movements and governments around the world," and alleged to be involved in concluding hundreds of millions of dollars in arms deals for Muslims fighting in the Yugoslavian war.[109]

10.5.4.  The ICCJ Expert Report showed that descriptions for the purpose of the bank transactions were given with such words as "wool," "oil," "goods," and "wheat," with literally millions of dollars of transactions characterized as "satellite phones."[110]

10.5.5.  I assess that these characterizations of the transactions by the charity were false. I conclude that these references were to cover arms sales or other improper activities that constituted support for armed conflict rather than legitimate charitable activities. In one case, for example, a text accompanying a banking transaction for $3.5 million characterized the transactions as being for "wheat to Albania for Bosnian refugees." But a fax corresponding to this transaction was found to concern "pieces of military equipment." The ICCJ prosecutor also found that the fax instructed "the delivery of cesium 137." The purpose for the use of the Cesium 137 is not stated. However, Cesium 137 is a radioactive isotope of special concern to specialists in terrorism. Cesium 137 has long been seen as the prime candidate for use in a radioactive, or "dirty" terrorist bomb, that would be designed by a terrorist group to inflict maximum fear in addition to biological damage on its targets. It was explicitly discussed as a candidate for such use by Islamic terrorists during the war

---

[109] "In the documents and in the bank accounts of the Third World Relief Agency, Austrian investigators have tracked $350 million they say flowed from Muslim governments and radical Islamic movements to Bosnia. At least half was used to purchase weapons illegally and smuggle them to the Bosnian government army, according to Western intelligence estimates." The Washington Post article also explicitly ties TWRA and Hassanein to providing terrorist finance support to al Qaeda and bin Ladin:  "[M]ilitants in the terrorist underworld are also believed to have used the relief agency to get money to the Bosnian government, including the wealthy Saudi Arabian emigre Osama Binladen [sic], a suspected sponsor of militant Islamic groups around the Middle East. Binladen [sic], a resident of Sudan until last year, is reportedly now in Afghanistan, where he has issued statements calling for attacks on U.S. forces in the Persian Gulf. Investigators say the agency also had ties to Sheik Omar Abdel Rahman, a radical Egyptian cleric who was convicted of planning several terrorist bombings in New York and is linked to the group that carried out the World Trade Center bombing in February 1993. Intelligence agencies say they have tapes of telephone calls by Rahman to the agency's office, during which he discussed its commitment to sell the sheik's videotapes and sermons in mosques around Europe." "Bosnia's Muslims Dodged Embargo," Washington Post, September 22, 1996, https://www.washingtonpost.com/wp-srv/inatl/longterm/bosvote/front.htm
[110] ICCJ Report, pp. 25-27.

in Chechnya, who reportedly obtained Cesium 137, and threatened to use it in Moscow.[111]

10.5.6.    The ICCJ Expert Report also found numerous banking transactions that contained no meaningful information on who they went to, or what they were actually used for. For example, there were 23 payments by check amounting to $11.8 million made to a recipient or sender (not clear which) listed only as "Holder," some of which had no further explanation, and others of which merely stated "Support for Bosnian refugees."[112]

10.5.7.    The experts who conducted the ICCJ Expert Report concluded that TWRA's charitable humanitarian aid mission had provided a cover for its actual financial support to Bosnian politicians; that the support was made possible by "massive financial support" from the "Arabian regime," of which the support provided by Saudi Prince Salman, at the time, Saudi Arabia's defense minister, was a prime example. The ICCJ Expert Report found that "[t]o what extent the donors could assume a pure humanitarian use of the financial means is thus at least questionable," and went on to state that "there are heavy doubts as to whether the financial means of the TWRA were exclusively used for humanitarian aid," referring to the proposition that the aid did not include military support as "dubious."

10.5.8.    The ICCJ Expert Report concludes: "Based on the presented information from the available documents regarding weapons deliveries and weapons dealings, it is suspected that the political leadership of Bosnia was aware of them and did not see nor make a difference between humanitarian and military aid. . . . A correspondent use of the humanitarian aid organization TWRA as a cover for these kinds of dealings and deliveries [that is, of military aid] is thus regarded as probable."

10.5.9.    The ICCJ Expert Report further concludes: "The financial investigations on the TWRA undertaken so far expose a far-reaching network of individuals, organizations and companies, which indicates intensive and frequent contacts in the entire Islamic world." The ICCJ Expert Report further found that these included millions of dollars in payments to Julaidan, who it characterized as being the subject of "unconfirmed information . . . as a donations collector of AL QAEDA, and partner and aid to BIN LADEN." The ICCJ Expert Report made further note that "TWRA apparently made use of a worldwide network of bank accounts," extending to Austria, Belgium, Malaysia, Croatia and Turkey, suggesting

---

[111] ICCJ Report, p. 28. For terrorist interest in and uses of Cesium 137 see "The Potential for Radiological Terrorism by al-Qaeda and the Islamic State," The Washington Institute, August 10, 2016, https://www.washingtoninstitute.org/policy-analysis/view/the-potential-for-radiological-terrorism-by-al-qaeda-and-the-islamic-state; see also "Seize the Cesium," New York Times, Aug. 1, 2007, https://www.nytimes.com/2007/08/01/opinion/01zimmerman.html
[112] ICCJ Expert Report, p. 38

"an internationally acting organizational structure, which enables [it] to be very flexible and financially active worldwide."[113]

    10.5.10. Another Saudi-based Islamic charity, WAMY, wired funds to TWRA during this period. The ICCJ Expert Report found that a transfer was made from WAMY's account in Jeddah, Saudi Arabia to TWRA on March 25, 1992 in the amount of ATS 399,067.15 (about $34,254). No posting text was entered.

10.6.    The ICCJ Expert Report was based on bank and financial records seized from TWRA in Austria. The records show improprieties and irregularities throughout the records. Often, those records did not properly identify senders, receivers, and purposes of transactions. In some cases, those identified included obviously fraudulent entries. This was most easily seen in the transaction characterized as "wheat" which was likely a cover for military purchases referred to in a fax transmitted at the same time. The fraud is also evident in the literally incredible characterizations of millions in spending on "satellite phones" and the stereotypical nature of the entries regarding the purposes of transactions. In my experience involving many other cases of money laundering over many years, these kind of entries are a standard, typical form of fraud that are routinely used to launder funds to hide their actual origin, destination, and/or actual uses, through banks.[114]

10.7.    The significance that I attach to the financial improprieties and irregularities reflected in this audit of TWRA is that TWRA systematically hid its provision of arms to the Bosnians, in violation of international weapons embargoes then in effect, and that TWRA at the same time supported Al Qaeda and bin Ladin through Julaidan, bin Ladin's associate, and a major terrorist financier for al Qaeda.

10.8.    In 2002, Saudi Arabia joined the United States in jointly designating Julaidan for economic sanctions as a bin Ladin associate and supporter of al Qaeda. At the time of the Joint Designation, the U.S. Department of the Treasury stated that Julaidan had been acknowledged by both bin Ladin and by a top al Qaeda lieutenant of bin Ladin as a known associate of their operations, and that Julaidan had been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.[115]

10.9.    *IIRO audits, covering a few of its foreign branches, also found serious financial improprieties and irregularities.* Separately, a number of investigations have shown IIRO tied to terrorist groups and terrorist support. IIRO was founded in 1975 as the humanitarian relief subsidiary of MWL, and endorsed shortly thereafter by the Saudi Royal Family, with a broad remit to help victims of wars

---

[113] ICCJ Report, pp. 61.63
[114] The ICCJ Report references suspected money laundering/launders on p. 16 and 30.
[115] "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," U.S. Department of the Treasury Press Release, 9/6/2002 https://www.treasury.gov/press-center/press-releases/Pages/po3397.aspx

and natural disasters. Prior to 9/11, IIRO did not publish detailed financial accounts of its activities.[116] Information from audits of three IIRO offices that were later released to lawyers for the plaintiffs in this matter reveal extensive evidence of bad practices by its personnel in handling and reporting their uses of funds.

10.9.1.  In IIRO's Pakistan Branch Office, for example, in late 2000, an IIRO audit discovered that the IIRO's local office manager and its financial officer had been involved in wholesale "cheating, forgery, and misuse of the IIRO's funds." The audit found that the local financial officer had incinerated the financial documents needed to determine what had happened. More than $3 million was determined to be unaccounted for, in which expenditures were not recorded and for which no vouchers or supporting documentation was available, or where the auditors concluded the funds had been misused or misappropriated. Prior to 2003, the IIRO's Pakistan branch had transferred funds to Afghanistan in cash.[117]

10.9.2.  In the review to determine whether books and records were properly kept for that branch from 1996 through February 22, 2001, the auditor of the Pakistan branch of IIRO found that the IIRO staff "failed to discharge the basic function of preparing and maintaining proper books of account and underlying accounting record which is an essential requirement of any organization. . . This has not only facilitated financial mismanagement[,] it created opportunities for misuse[,] misappropriations of funds and fraud. We are, however, unable to determine whether the non-maintenance of books of account was done deliberately or was only due to inability or carelessness, for which the management is also equally responsible."[118]

10.9.2.1.  The IIRO Pakistan Branch office was the very office identified in the 1996 CIA Report that had been used by the IIRO to fund six al Qaeda training camps.

10.9.2.2.  In 2001, a complaint filed by the then-director of the IIRO Pakistan Branch Office, stated that the audit of the branch's files had found "tremendous financial embezzlement; roughly millions according to the local currency." The head of its accounting department had forged amounts, provided management with wrong accounts, put pressure on subordinates to change financial statements and to forge

---

[116] The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 10.

[117] Deposition of Adnan Basha, February 21, 2019, pp. 212, 250. Basha is the long-time Secretary General of the IIRO.

[118] International Islamic Relief Organisation Pakistan Branch, Verification of Receipts and Payments for the Period 1 January 1996 to 22 February 2001, Ford Rhodes Sidat Hyder & Co., Chartered Accountants, a Member of Ernst & Young International, Basha Exhibit 150, Basha Deposition, id.

accounts. A Pakistani court found that the documents the manager had created were forged, irrelevant, and "not real."[119]

10.9.3.   In a separate incident, in about the same period, The Secretary General of the IIRO, Adnan Basha, found in the course of an audit that the office of the IIRO in the Eastern Province of Saudi Arabia, which was at the time headed by a member of the Saudi Royal Family, Prince Turki bin Fad bin Jalalwi, was initiating funds transfers from its accounts to offices outside Saudi Arabia to a number of other countries, including Baltistan (part of Pakistan), Egypt, Ethiopia, Indonesia, Jordan, Lebanon, Palestine, the Philippines, Sudan, and Thailand, without the knowledge or permission of the IIRO's main office. When he learned of this, Secretary General Basha asked Prince Turki to stop authorizing and facilitating such transfers, as it violated the IIRO's financial regulations. Prince Turki refused to cease sending funds overseas, despite the audit having found him to have violated applicable regulations. The violations included the office making payments without supporting documentation or vouchers and the use of cash for projects without expense vouchers or receipts. Following his continuing refusal to abide by IIRO regulations, he was eventually forced to resign.[120]

10.9.4.   An Internal Auditor's report on the IIRO office in Jordan for 1999-2000 found a number of irregularities and anomalies. These included duplications in reports on distribution of funds to orphans, deviations from policies and financial guidelines, and the absence of oversight of projects and programs by the organization's office in Jordan.[121]

10.9.5.   An audit of the IIRO's Indonesia branch in 2004 found its accounting system to be deficient: the office failed to use daily ledgers or an accounting system that was compatible with that used by the IIRO's financial department or other IIRO local and foreign offices. It found internal controls to be weak, and that the auditor could not match the declared debit balances of IIRO-Indonesia, and found various other discrepancies in the amounts of funds reported from the documentation, and transactions that could be explained, including more than $383,000 in deposits from IIRO's office in the Eastern Province of Saudi Arabia, which was not supposed to be providing any such funds.[122]

10.9.6.   The involvement of multiple IIRO offices in support of al Qaeda is well-established and reflected in the designations in 2006 of some IIRO

---

[119] IIRO 31006-3107 and 31160-31166.
[120] Deposition of Adnan Basha, February 21, 2019, pp. 265-278
[121] IIRO 287449-287561.
[122] Audit-IIRO Indonesia, IIRO 36875, IIRO 36869-36871, IIRO 36823, IIRO 34989-35007.

offices (IIRO Indonesia and Philippines) for sanctions by the United States and by the United Nations, among others.[123]

10.9.7.  I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere. It also included support to bin Ladin and his associates, as I will discuss in further detail in Sections 12 and 13 of my Expert Report.

11. *Did al Qaeda Use Its Relationships with Purported Charities To Channel Resources to Aligned Terrorist Organizations and Causes? If so, how did those activities advance al Qaeda's terrorist mission?*

11.1.  Al Qaeda systematically used its relationships with Islamic charities to channel resources to aligned terrorist organizations and causes, as well as to its own organization, enabling them to plan and carry out terrorist attacks in a range of locations beyond the United States, including Algeria, Bosnia, Chechnya, Egypt, Eritrea, India, Indonesia, Iraq, Israel, Kenya, Libya, Malaysia, Morocco, Oman, Pakistan, the Philippines, Somalia, Sudan, Tanzania, and Tunisia.[124] Breaking this down geographically into regions, Al Qaeda's fund-raising network enabled it to form relationships in South Asia; the Caucasus and Central Asia; North and East Africa; the Middle East; and Southeast Asia.[125]

11.2.  The charities advanced al Qaeda's terrorist mission through building up an infrastructure in which local groups involved with local causes could indoctrinate and recruit Muslim men to carry out violent jihad against non-Muslims and/or secular governments and forces. They then provided logistical support, documentation, and other help to al Qaeda to promote al Qaeda's terrorist activities as well as their own extremist activities, which included both violent

---

[123] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury Press Release, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx; UN listing, https://www.mfsa.mt/wp-content/uploads/2019/04/Annex-III-Al-Qaida-Sanctions-List.pdf.  The IIRO was delisted by both the United States and the UN in 2014. I discuss the implications of listing and of delisting by both the United States and the UN in Sections 17-19 of my Expert Report.
[124] 9/11 Commission Report, id., pp. 57-58.
[125] Beyond al-Qaeda: The Global Jihadist Movement," RAND, 2006, https://www.rand.org/content/dam/rand/pubs/monographs/2006/RAND_MG429.pdf

resistance to non-Muslim forces in areas of civil conflict, and terrorist activities in both conflict zones and elsewhere, such as Europe and the United States.

11.3. In general, the support that went from charities to al Qaeda enabled al Qaeda to build up a common infrastructure that it could use to recruit and train its own members, and in turn to provide the services other terrorist groups needed to recruit and train their members. These included, for example, providing training camps and guesthouses in various areas, including Afghanistan, Pakistan, the Sudan, and Kenya, for the use of al Qaeda and for affiliated groups. The support that al Qaeda was able to provide other groups also included purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons, all of which it did for its own members, and for associated terrorist organizations in various countries throughout the world.[126]

11.4. There are numerous examples of this phenomenon, which can most easily be seen by looking at how al Qaeda and the charities interacted with other groups in particular countries. Much of the information set forth in these country-by-country reviews, except as otherwise specified, is provided in an official online website maintained by the U.S. Department of the Treasury in its "Resource Center" with the title "Protecting Charitable Organizations."[127]

11.5. **In Bosnia**, for example, supporting local Bosnian groups:

11.5.1. Benevolence International Foundation (BIF-USA), incorporated in the State of Illinois in 1992, was a U.S., tax-exempt, not-for-profit organization whose stated purpose was to conduct humanitarian relief projects throughout the world. BIF-USA's financial accounts were blocked pending investigation in December 2001, and the charity was fully designated by the United States on November 19, 2002, and in the United Nations on November 21, 2002. The three closely linked but separately incorporated entities of BIF-USA, Benevolence International Fund (BIF-Canada), Bosanska Idealna Futura (BIF-Bosnia), and their branch offices were all designated simultaneously. BIF operated around the world in Bosnia, Chechnya, Pakistan, China, Ingushetia, Russia, and other nations. Enaam Arnaout, BIF's Chief Executive Officer and a member of the Board of Directors, was convicted in the United States for operating BIF as a racketeering enterprise. In a March 2002 search of BIF's offices, Bosnian law enforcement authorities discovered a host of evidence linking Arnaout to bin Laden and al Qaida. Various documents also established that Arnaout worked with others—including members of

---

[126] *U.S. v. Usama Bin Laden*,, SDNY, S(9) 98 Cr. 1023 (LBS) (1998), ¶12, Overt Acts, https://www.nonproliferation.org/wp-content/uploads/2016/05/us_indictment_against_bin_laden.pdf
[127] "Resource Center: Protecting Charitable Organizations," U.S. Department of the Treasury, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx

al Qaida—to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida.[128]

11.6.  **In Chechnya,** for example, supporting local Chechen groups:

11.6.1.  In the mid-1990's, the Benevolence International Foundation opened an office in Chechnya. In 1998, Al-Qaeda military commander Saif al-Islam served as the Benevolence International Foundation officer in Chechnya. The organization's office in Baku kept close contact with the Al-Qaeda cell in Kenya that bombed the U.S. embassy in Nairobi in August 1998. Until its November 2002 U.S. Treasury designation as a terrorism financier, the foundation lent material support to Chechen mujahedeen in the form of cash and military equipment.[129]

11.7.  **In Kenya**, for example, supporting terrorism directed against the United States:

11.7.1.  The Kenyan government ordered five charities closed for their apparent involvement in the bombings of the U.S. Embassy in Nairobi and the U.S. Embassy in Dar es Salaam in 1998. The five charities ordered closed were: Al Haramain, Mercy Relief International, Help Africa People, IIRO, and the Ibrahim bin Abdul Aziz Al Ibrahim Foundation. In essence, Kenyan authorities had concluded that all of these charities were assisting al Qaeda, with allegations including their involvement in smuggling material for making the bombs that blew up the Embassies in purported relief shipments.[130]

11.7.2.  These charities had different relationships to al Qaeda:

11.7.2.1.  IIRO provided actual humanitarian relief services in a number of countries, while also providing support to al Qaeda.

11.7.2.2.  Others charities were little more than alter-egos of al Qaeda. For example, Help Africa People was founded by Wadih el Hage, the personal secretary of bin Ladin. Help Africa People was an important part of the Kenya terrorist operation because it provided the opportunity for al Qaeda members to receive documentation and identification papers from the NGO. Help Africa People also provided al Qaeda members with legitimacy

---

[128] Resource Center, id.

[129] "How Chechnya Became a Breeding Ground for Terror," id. "Various documents also established that Arnaout worked with others -- including members of al Qaida -- to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida," "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," U.S. Department of the Treasury Press Release, 11/19/2002, https://www.treasury.gov/press-center/press-releases/Pages/po3632.aspx

[130] The charities appealed the closures, and the closures were stayed by Kenya following popular protests.

and the appearance of providing services to needy people, such as facilitating a malaria treatment program in Kenya.

11.7.2.3. Mercy International Relief Agency was another al Qaeda-created charity and operated by al Qaeda members.[131]

11.8. **In the Philippines,** for example, supporting the Abu Sayyaf terrorist separatist movement:

11.8.1. On August 3, 2006, the U.S. Department of the Treasury designated the Philippine (and Indonesian) branch offices of IIRO for facilitating fundraising for al Qaida and affiliated terrorist groups. The Treasury found that the IIRO-PHL was a source of funding for the al Qaida-affiliated Abu Sayyaf Group ("ASG") and served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding went to legitimate projects and the rest was directed to terrorist operations. The Philippine branches of IIRO were founded sometime in the late 1980's or early 1990's by bin Ladin's brother-in-law, Muhammad Jamal Khalifa, who Treasury identified as a senior al Qaida member.[132]

11.8.1.1. ASG has carried out three decades of terrorist attacks in the Philippines in an effort to carve out a separate Islamic state in that country. The attacks have included bombings, assassinations, kidnappings, torture, and beheadings.[133]

11.8.1.2. The initial funds provided by IIRO to help al Qaeda channel resources to its aligned Philippine group were used to expand ASG and buy weapons. IIRO's charitable work included building schools and mosques to facilitate good relations for ASG with the local population. An estimated 10-30 percent of IIRO funds actually went towards humanitarian projects. The rest went to terrorist organizations, in particular, ASG, and helped ASG expand and gain support from the local

---

[131] "Anatomy of a Terrorist Attack: An in-Depth Investigation Into the 1998 Bombings of the U.S. Embassies in Kenya and Tanzania," Ridgeway Center, University of Pittsburgh, 2005-17, p. 56, https://www.files.ethz.ch/isn/26356/05_anatomy_terr_attack.pdf
[132] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury Press Release, August 3, 2006 https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx
[133] A compendia of Abu Sayyaf's terrorist activity to 2007 is available from the GMA Network, at "Abu Sayyaf kidnappings, bombings and other attacks," August 23, 2007 https://www.gmanetwork.com/news/news/content/154797/abu-sayyaf-kidnappings-bombings-and-other-attacks/story/

populations, giving the ASG an advantage over the Armed
Forces of the Philippines.[134]

11.9.   **In Sudan,** for example:

11.9.1.   In the 1990's, the Sudanese government has used its territory to provide
safe haven, training bases, and staging areas to numerous terrorist
organizations, including al Qaeda, Egyptian Islamic Jihad (EIJ),
Hezbollah, Hamas, Palestinian Islamic Jihad (PIJ), Abu Nidal, and
Gama'at al Islamiyya. Operatives not only moved freely in and out of
Sudan, but also established offices, businesses, and logistical bases for
operations. Training camps were opened in the east of the country, which
sent fighters from Lebanon, Afghanistan, and Algeria across the border
into neighboring Eritrea and Ethiopia.[135]

11.9.2.   From Sudan, Al Qaeda was able to build its network to reach many more
countries and to attract people involved with local Islamist groups in
countries such as Afghanistan, Algeria, Bosnia, Chechnya, Kashmir,
Sudan and Tajikistan for refresher training in Sudan and financial support
to enable them then to return to fight in ongoing conflicts or to launch
Islamist groups at home.[136]

11.10.   These are representative examples only of a much wider universe of relationships
between al Qaeda and affiliated terrorist groups, and of how charities facilitated
the building of those relationships. But the general pattern is clear. Al Qaeda
relied on willing charities which supported Islamic extremism and *jihad* to
generate funds for conflict zones, in areas where separatist Muslims were carrying
out terrorist attacks as part of efforts to weaken secular governments and to create
independent Islamic states. These funds were in turn used to facilitate al Qaeda's
ability to help local groups, with local causes, achieve local goals, consistent with
the broader goals of al Qaeda. The funds were used to promote extremist Islamic
ideology to indoctrinate local populations; to recruit potential Islamic fighters so
that they would join terrorist groups; and in particular locations as needed, to
provide logistical support and arms to the groups in their local area, from initial
training and in some cases including in the final operations. The financial support
al Qaeda received from the charities leveraged al Qaeda from being a terrorist
group originating in and operating in just one main area (Afghanistan) to one with
dozens of affiliates in many disparate regions and with global reach including the
ability to launch attacks on the United States.

---

[134] "Abu Sayyaf Crime, Ideology, Autonomy Movement? The Complex Evolution Of A Militant Islamist
Group in The Philippines," Small Wars Journal, 2012, https://smallwarsjournal.com/jrnl/art/abu-sayyaf-
crime-ideology-autonomy-movement-the-complex-evolution-of-a-militant-islamist-gr
[135] "Terrorism in the Horn of Africa," US Institute of Peace, January 2004, section on Sudan, p. 13
https://www.usip.org/sites/default/files/sr113.pdf
[136]   Inside Al Qaeda Global Network Of Terror, Rohan Gunaratna, Berkley Books (2003), p. 47.

12. *What was the Specific Role that Charities Such as IIRO, WAMY, and MWL Played in Providing Material Support to al Qaeda if any before September 11th and its Immediate Aftermath?*

12.1.  IIRO, WAMY, and MWL are three of the largest Saudi based charities. In this section of my Expert Report, I summarize the specific role that each of them played in providing material support to al Qaeda prior to the 9/11 attacks, and in its immediate aftermath.

**IIRO**

12.2.  The International Islamic Relief Organization (IIRO) was established in Saudi Arabia in 1978 "in response to the increasing need to alleviate the suffering of human beings worldwide." The website it maintained at the time of the 9/11 attacks stated that its headquarters was in Jeddah, Saudi Arabia, and that it maintained more than 100 offices around the world in more than 120 countries, aimed at providing assistance to victims of natural disasters and wars.[137] According to the IIRO website, the major part of IIRO's financing came "from generous people in Saudi Arabia" making "voluntary contributions given for either earmarked or unspecified projects." The IIRO website stated that IIRO accepted unconditional contributions in cash or kind. It specified that the organization had raised and spent $418 million over the eight-year period between 1987 and 1995. (No update for the following six years was provided by the IIRO.)[138] According to British scholar Jonathan Benthall, during this period IIRO was the world's largest Islamic charity. He described it as carrying out "extensive fundraising and promotional capacity" and constituting "a substantial instance of the Saudi kingdom's use of humanitarian aid combined with political and religious objectives."[139] The characterization of the IIRO by U.S. officials responsible for overseeing and investigating enemy combatants who fought on behalf of al-Qaeda while working for IIRO in Afghanistan, Bosnia, or elsewhere, is more blunt: "The International Islamic Relief Organization, also known as the World Islamic Relief Organization, is the largest Islamic charity organization in Saudi Arabia. International investigations have disclosed the organization has connections to terrorist financing activities and its field offices throughout the world have supported terrorist activity."[140]

---

[137] IIRO Website from November 11, 2001, home page
https://webarchive.loc.gov/legacy/20011121101405/http://www.arab.net/iiro/
[138] IIRO Website from November 11, 2001, webpage on finances
https://webarchive.loc.gov/legacy/20011006014319/http://www.arab.net/iiro/finance.html
[139] "The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar, Center for International and Regional Studies (2018), p. 2,
https://repository.library.georgetown.edu/bitstream/handle/10822/1051628/CIRSOccasionalPaper20Jonatha
nBenthall2018.pdf?sequence=1&isAllowed=y
[140]Unclassified Summary of Evidence for Administrative Review Board in the Case of Al Sawah, Tariq Mahmoud Ahmed, 16 January 2008, p. 2, Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba, Exhibit 175, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the

12.3.    According to the U.S. government, "IIRO is an Islamic NGO with ties to extremist activities."[141] Unlike some of the other charities which provided support to al Qaeda and its affiliated network, IIRO undertook substantial humanitarian work in many countries. IIRO also provided extensive material support to al Qaeda and aligned terrorist organizations prior to 9/11 and immediately afterwards in a number of regions. As described in the Second Report by the UN Monitoring Group established to monitor and report on sanctions against al Qaeda, the Taliban and those associated with them:

12.3.1.    "Most of [IIRO's] activities, and the activities of its associated charities, relate to religious, education, social and humanitarian programs. But IIRO, and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing Al-Qaida…. Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing of the American Embassies in Dar es Salaam and Nairobi. A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaeda training camps in Afghanistan prior to 11 September 2001. After that date, Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan…. Allegations have surfaced in India and the Philippines that local IIRO officers and employees were directly implicated in Al-Qaida-related terrorist activities, including planned attacks against the American Consulates in Madras and Calcutta. The IIRO office in Zamboanga City, the Philippines, reportedly served during the early 1990's as the coordinating center for secessionist Islamic activities, and as late as 1996 channeled money to the Abu Sayyaf group, another designated entity."[142]

12.4.    As reflected in this summary from the UNSC terrorist sanctions Monitoring Committee, IIRO's material support of al Qaeda included concrete, specific activities involving IIRO and al Qaeda in Afghanistan, Bosnia, Chechnya, Indonesia, Kenya, and the Philippines. As discussed further in this section of my Expert Report, two of IIRO's branches, in Indonesia and the Philippines, were designated for sanctions by the U.S. Department of the Treasury on August 3

---

Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[141] Unclassified Summary of Evidence for Administrative Review Board in the Case of Ameur, Mammar, 25 July 2005, Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at US Naval Base Guantanamo Bay, Cuba. PEC-KSA002737..

[142] UN Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, enclosing Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban, and individuals and entities associated with them ("Second Report,"), S/2003/1070, ¶¶40-43, https://documents-dds-ny.un.org/doc/UNDOC/GEN/N03/600/46/PDF/N0360046.pdf?OpenElement

2006 and by the UN in the same period.[143] (These entities were delisted by the UN in 2014[144] and by the US on August 16, 2016.[145])

12.5.  Below, I will summarize the substance about what I have learned about IIRO's support for terrorism in each of the specified countries, and then will provide my conclusions about the implications of this support globally.

12.6.  **In Afghanistan:**

12.6.1.  IIRO was long highly active in Afghanistan, operating from offices in Pakistan. From 1982 onward, the organization helped Afghans fleeing Afghanistan after the invasion of the Red Army. These included the mujahidin who fought Soviet occupying troops. During the First Afghan War, IIRO's relief programs in Afghanistan and Pakistan were supported by the General Donation Committee for Afghanistan led by Saudi Prince Salman. By the early 1990's, IIRO's Peshawar office was supplemented by a base in Jalalabad in eastern Afghanistan, where it established a camp to accommodate some of the hundreds of thousands of displaced Afghan refugees. During this period, IIRO participated in a body called the Council for Islamic Coordination formed by the Saudi and Kuwaiti Red Crescent societies, the Muslim World League, and a Sudan relief agency. One of the rotating presidents of the council was Abdullah Azzam, one of al Qaeda's founders.[146] Azzam is typically characterized as the founding father of terrorist jihad, a mentor to the founders of HAMAS, as well as bin Ladin and al Qaeda's current leader, al-Zawahiri.[147]

12.6.2.  IIRO operations in Peshawar to support the Afghanistan refugees, including the mujahidin, were directed by Talaat Fouad Abdul Qasim, a terrorist who had belonged to Egyptian Islamic Jihad (Jama'at al-

---

[143] Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network, August 3, 2006 https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx

[144] "Security Council Al-Qaida Sanctions Committee Deletes Two Entries from Its List," January 6, 2014, https://www.un.org/press/en/2014/sc11243.doc.htm  As discussed in detail in Section 19 of my Expert Report, the delisting of a person or an organization means that the respective body has determined the person or entity no longer constitutes a terrorist threat as a result of changed capabilities, intentions, and/or conditions. It has no implications regarding the delisted person or entities past, and does not constitute any form of exoneration. As discussed further in my Expert Report, the lack of designation of other components of the IIRO similarly does not mean that the US, UN, or any relevant government has found them to be innocent of wrongdoing. Any statement that delisting constitutes exoneration for past bad conduct is untrue.

[145] "Kingpin Act Designations; Counter Terrorism Designations Removals," U.S. Department of the Treasury, OFAC, August 16, 2016,  https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160816.aspx

[146] "The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 11. https://repository.library.georgetown.edu/bitstream/handle/10822/1051628/CIRSOccasionalPaper20JonathanBenthall2018.pdf?sequence=1&isAllowed=y

[147] See, e.g., "The 9/11 Attacks' Spiritual Father,' Bruce Riedel, Brookings Institute, September 11, 2011, https://www.brookings.edu/opinions/the-911-attacks-spiritual-father/

Islamiyya), was sentenced to death by Egypt, captured by the U.S. in Croatia, turned over to the Egyptian government, and executed in Cairo in 1998.[148]

12.6.3.  The then-head of IIRO told the Washington Post shortly after 9/11 that IIRO had been deeply involved in Afghanistan, and had provided assistance to the Taliban. As the Washington Post stated, "[i]n Afghanistan, the Saudi government and its charities initially provided key financial and political support to the Taliban, who have been strongly influenced by the Wahhabi strain of Islam, a strict brand of fundamentalism that developed in the Saudi kingdom. The IIRO alone has given more than $60 million to the Taliban and people under its control, according to its secretary general, Adnan Basha."[149]

12.6.4.  As found by a British scholar of the Middle East, Jonathan Benthall, who in general is sympathetic to the Islamic charities and supports their relief work, IIRO "was one of many Islamic charities working on the Pakistan-Afghan border, combining an ideological  mission (aimed specially at Afghan refugees), paramilitary support for the Afghan combatants, and humanitarian aid, including the installation of hospitals and supply of medicines and medical equipment.[150]

12.6.5.  As set forth in the 1996 CIA Report on al Qaeda terrorist groups active in Bosnia, IIRO was funding six terrorist training camps in Afghanistan.[151]

---

[148] Alms for Jihad, id., https://archive.org/stream/alms_for_jihad-final/alms_for_jihad-final_djvu.txt
[149] "Muslim Charities Under Scrutiny," Washington Post, September 29, 2001, https://www.washingtonpost.com/archive/politics/2001/09/29/muslim-charities-under-scrutiny/a72826c9-5789-4d31-844a-c0452c89e43f/
[150] "The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 12. https://repository.library.georgetown.edu/bitstream/handle/10822/1051628/CIRSOccasionalPaper20JonathanBenthall2018.pdf?sequence=1&isAllowed=y
"The Rise and Decline of Saudi Overseas Humanitarian Charities," Jonathan Benthall, Georgetown University Qatar Center for International and Regional Studies (2018) p. 12. https://repository.library.georgetown.edu/bitstream/handle/10822/1051628/CIRSOccasionalPaper20JonathanBenthall2018.pdf?sequence=1&isAllowed=y
[151] 1996 CIA Report, id, section on IIRO.

12.6.6.  An IIRO employee, Sayed Abu Nasir, received terrorist training in Afghanistan[152] and was then implicated in terrorist plots to bomb American consulates in Madras and Calcutta in India.[153]

12.6.7.  Nasir reportedly stated his superiors at IIRO told him that 40 to 50 percent of IIRO's charitable funds were being diverted at the time to finance terrorist training camps in Afghanistan and Kashmir.[154]

12.6.8.  Muamar Jaballah is an Egyptian Islamist who has been held in Canada since 1995, when he applied for and was not granted political asylum. He was accused by Egyptian authorities of involvement in the 1981 assassination of President Anwar El-Sadat and acquitted, and accused on terrorism-related charges a second time in Egypt in 1987 and again acquitted. Jaballah then went to Pakistan where he worked for the IIRO for a period of three years.[155]

12.6.9.  According to the Canadian government, Jaballah was a member of a terrorist organization, the Egyptian Islamic Jihad, which had a history of violent activities in Egypt, sought to overthrow the government there, and

---

[152] Testimony of Matthew A. Levitt, "The Role Of Charities and NGOs In The Financing Of Terrorist Activities, Hearing, Senate Subcommittee On International Trade and Finance of the Committee On Banking, Housing, and Urban Affairs, United States Senate, August 1, 2002, https://www.govinfo.gov/content/pkg/CHRG-107shrg89957/html/CHRG-107shrg89957.htm  I give considerable weight to statements of fact by Levitt before Congress, given his experience as a former counterterrorism intelligence analyst at the FBI in the period before he provided this testimony. He later became the Deputy Assistant Secretary of the Treasury responsible for analyzing counterterrorism intelligence during the Bush Administration.

[153] "Pakistan Denies Role in Plotting Bombings in India," an article describing Nasir's possible involvement in the plot on the U.S. embassies, and the possibility that it was linked to al Qaeda and bin Ladin, Jan. 22, 1999 https://www.nytimes.com/1999/01/22/world/pakistan-denies-role-in-plotting-bombings-in-india.html

[154] Alms for Jihad, id., https://archive.org/stream/alms_for_jihad-final/alms_for_jihad-final_djvu.txt, citing Senate testimony from terrorist expert Steven Emerson.  According to Emerson, Nasir was originally employed by the IIRO in Thailand and then transferred from Thailand to Lahore, Pakistan in 1994. Emerson states that Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir himself was eventually instructed by Shaykh Al-Gamdin to undergo military training at one of the camps, where he met bin Ladin. I find this information plausible, but I do not know the sources of Emerson's information; the electronically-maintained cites provided in his testimony for the New York Times do not cover the Nasir-Al-Gamdin relationship. It may be that this information was provided in an earlier or different edition of the newspaper from that maintained electronically. I note that the online article has a different title from that specified in the Emerson references, and the text may have been different as well. Testimony of Steven Emerson with Jonathan Levin Before the United States Senate Committee on Governmental Affairs "Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror," July 31, 2003, Exhibit 180, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[155] "Militant sought from Canada," Al Ahram weekly, 13-19 May 1999, https://web.archive.org/web/20080907052552/http://weekly.ahram.org.eg/1999/429/eg13.htm

engaged in terrorist activities abroad. The Canadian government assessed that he engaged in terrorism, in Egypt, relayed communications between cells of the Egyptian Islamic Jihad, including those engaged on August 7, 1998 in the bombing of United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. The Canadian government believed that telephone numbers associated with Jaballah in Canada were linked to Islamic extremists, in this country and abroad, and that Jaballah followed "a travel pattern consistent with the profile of an Islamic Mujahedin extremist - one who left Egypt to fight in Afghanistan, trained in Yemen, and may have fought in Chechnya." In the 1990's Yemen and Azerbaijan were known havens and training bases for Islamic terrorists. Moreover, it is believed that he spent a period of time in Afghanistan.[156]

12.6.10. A Yemeni, Samir al-Hasan, a detained enemy combatant at Guantanamo, served as a bodyguard for bin Ladin in Afghanistan in the period before, during, and after the 9/11 attacks. Guantanamo records stated that al-Hasan received basic and advanced militant training at the al-Qaida al-Faruq Training Camp, and was identified as an al-Qaida guesthouse staff member. His name and aliases were found on al-Qaida affiliated documents and he acknowledged he was recruited by a known al-Qaida member, Marwan Jawan, who also facilitated his travel to Afghanistan. Al-Hassan also fought U.S. and allied forces in Afghanistan in the battle at Tora-Bora. Al-Hasan's cover story for his time with al-Qaeda was that he was in Afghanistan as a relief worker for the Islamic Relief Organization and that he received the position from the head of the Islamic Relief Organization.[157]

12.6.11. I conclude that IIRO's provision of relief services to displaced Afghans as Saudi Arabia's premiere charitable relief agency, and which it announced publicly that it was doing, also enabled it to provide support to Arab Afghan mujahidin, and as represented by the examples of Nasir, Jaballah, and al-Hasan, including being provided jobs by IIRO. IIRO's direct involvement in the provision of support to the Islamic fighters was noted by a clandestine source for the CIA by 1996, and the information this source conveyed was  reflected in the 1996 CIA Report's specific information that IIRO was funding six terrorist training camps, which were used to provide skills in such areas as the use of weapons and bomb making by al Qaeda and/or its affiliates.

---

[156]  In the Matter Of Mahmoud Jaballah, 2006 FC 1230 (CanLII), Federal Court of Canada, https://www.legislationline.org/download/id/3050/file/Jaballah%20Re%202006%20FC%201230.pdf

[157] Department of Defense, Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba, To: Al Hasan, Samir N; Subject: Unclassified Summary Of Evidence For Administrative, Review Board In The Case Of Al Hasan, Samir N, 13 October 2006, Exhibit 169, Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

12.7.    **In Bosnia:**

12.7.1.    IIRO was highly active as part of deep Saudi Arabian involvement in the Yugoslavian war there that took place from early 2002 to December 2005. I restate here the findings of the 1996 CIA Report cited earlier in my Expert Report: "[a]ll of the major and most of the minor Islamic charities are significant players in the former Yugoslavia, particularly in aiding Bosnian Muslims. Their contributions represent a significant proportion of humanitarian aid in Bosnia." The CIA found that the NGOs' charitable activities included delivery of food, clothing, and medicine; support to orphanages, schools, hospitals, and refugee camps; and housing construction, infrastructure support, and agricultural projects. The CIA found that "[m]any of these organizations also support foreign mujahedin fighters in Bosnia. Coordination councils based in Zagreb and Sarajevo, coordinate the activities of the most important organizations. These councils may function like a similar one established in Peshawar, Pakistan, which organizes arms shipments and aid to military training camps, and provides humanitarian aid to refugees, according to a clandestine source."[158]

12.7.2.    The trail of IIRO activities in support of Islamic militants, fighting, and al Qaeda in Bosnia includes:

12.7.2.1.    A handwritten account on IIRO stationery, found as a result of a raid in Bosnia, from the late 1980's of a meeting attended by the secretary-general of MWL and bin Laden representatives, indicating IIRO's readiness to have its offices used in support of militant actions.[159]

12.7.2.2.    The IIRO office in Bosnia were managed in part by a man, Abdel Aziz, linked by Serb authorities to two other international Muslim organizations suspected of aiding armed fundamentalist militant groups: Al-Rabita Al-Alami Al-Islamiyya (the Muslim World League) and the Sanabil Relief Agency. When official Serbs investigated the last of these (Sanabil), investigators reportedly discovered 17 terrorist training manuals in its Belgrade offices. According to the Serb news sources cited by terrorism expert Steven Emerson in Senate testimony "Zaher's top lieutenant at IIRO, Jamal Al-Jibouri, Serb officials believed Jibouri was responsible for general oversight of a massive logistics operation to provide Muslim militants in the Balkans with weapons and ammunition. Emerson further testified that one Serbian website, www.truthinmedia.org, stated in 2001 that Serb troops

---

[158] 1996 CIA Report, id.,

[159] Glenn Simpson, "List of Early al-Qaeda Donors Points to Saudi Elite," Wall Street Journal, March 18, 2003. https://www.wsj.com/articles/SB104794563734573400

had found an IIRO identification card on the body of a killed Arab-Afghan guerilla in Bosnia.[160] Terrorism expert Evan Kohlmann cites a review by a Bosnia government agency as stating that Zaher was also an eyewitness and possible accessory to the 1994 murder of British aid worker Paul Goodall.[161]

12.7.2.3.   A case providing practical evidence of IIRO's use by al Qaeda in Bosnia is that of Al Qaeda bombmaker Tariq Mahmoud Ahmed al Sawah. Al Sawah is an Egyptian who later obtained dual Bosnian citizenship, and who was detained as an enemy combatant by the United States in Guantanamo, as an admitted member of al-Qaida.

12.7.2.4.   Al Sawah's area of expertise as a terrorist was developing specialized improvised explosive devises ("IEDs") for use against US military forces and civilians. These IEDs included the limpet mine (a type of mine which uses magnets to attach to a ship) to sink US naval vessels, and fabrication of the prototype for the shoe-bomb that al Qaeda developed and sought to use in a failed attack on a civilian transatlantic flight to the U.S. from Europe. Prior to detention, al Sawah admitted teaching explosives at the al-Qaida advanced training camp at Tarnak Farm, aka (Abu Ubaydah Camp), where bin Ladin personally praised him for his "good work." Al Sawah was associated with numerous explosives experts including some who remain at large. He associated with the planners and perpetrators of international terrorist attacks and other senior al-Qaida members, and may have had advanced knowledge of the 9/11 attacks on the U.S. He participated in hostilities against US and Coalition forces, and is a veteran extremist combatant.

12.7.2.5.   According to al Sawah, he previously had joined and served in the Bosnian Third Army from 1993-1997, whose members were predominantly were Arab mujahidin fighters. While in Bosnia, they trained in how to use rifles, handguns, rocket propelled grenades, and basic explosives such as grenades and mines. He stated that during the period he was a fighter in Bosnia, Khalid Sheikh Mohammed, the mastermind of the 9/11

---

[160] Testimony of Steven Emerson with Jonathan Levin Before the United States Senate Committee on Governmental Affairs "Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror" July 31, 2003, id.  The website remains online as of early 2020, but states that it is no longer maintained.
[161] Affirmation of Evan Kohlmann, id., ¶¶44-49

attack on the United States, was providing money and arms for al Sawah's fighting unit.

12.7.2.6.   During the time al Sawah was working as a fighter and developing his bomb-making expertise in Bosnia, al Sawah also worked as a relief worker for IIRO.[162]

12.7.2.7.   Former U.S. mujahidin fighter Randall Todd Royer, who fought as a Bosnian jihadist, has stated that it was "well known that [IIRO] helped get 'people' into Bosnia. He stated that another mujahidin fighter in Zenica had openly discussed his efforts to use IIRO to obtain identity cards for other jihadis.[163]

12.7.3.   The above information provides some of the specific data points which illustrate and document the range of activities in which IIRO was engaged during the Bosnian war. These data points illustrate the role IIRO played in providing material support to al Qaeda from 1993-1997: it helped to provide jobs to Muslims engaged in the Yugoslavian civil war; it provided salaries to a bomb maker as he training the process of learning how to become an improvised explosives expert to sink U.S. vessels and make shoe-bombs to take down passenger aircraft; it funded fighter and terrorist training camps; it provided documentation and/or jobs for terrorists; and its senior leaders in Bosnia were engaged in arranging for obtaining weapons in bulk for the fighters. Separately, as set forth in the 1996 CIA Report, it worked closely with other Islamic charities and NGOs who supported the Islamic fighters in Bosnia, some of whom themselves were actively engaged in planning terrorist attacks, including those directed at the United States. Taken together, these data points outline major elements of how IIRO helped al Qaeda become a central participant, in the Bosnian wars, and helped to facilitate its planning for violence, including against the United States, far beyond the Balkans.

## 12.8.   **In Chechnya:**

12.8.1.   The Chechen resistance movement originated in the immediate aftermath of the fall of the Soviet Union, when other parts of the Soviet Union with substantial Muslim populations became separate from Russia. In its early post-Soviet years, the Chechen resistance movement was largely secular and nationalist resistance movement with the goal of separating from or

---

[162] Department of Defense, Office for the Administrative Review of Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba, Unclassified Summary of Evidence in the case of Tariq Mahmoud Ahmed al Sawah, 16 January 2008, Exhibit 175, Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.
[163] Affirmation of Evan F. Kohlmann, In re Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) ECF Case, ¶39, Exhibit 164, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

achieving autonomy with Russia. Some Muslim identification helped rally support, but its secular orientation was clear. Over the course of the 1990's, however, Chechnya experienced an Islamic revival, and by 1994, when its local government faced an invasion from Russia, it moved towards political Islam to rally support at home and from Muslim communities elsewhere. As Indian defense analyst Vinod Anand has described in a pre-9/11 article published in 2000 entitled "Export of Holy Terror to Chechnya," during the 1990's, religious militant groups and organizations based in Pakistan and areas of Afghanistan controlled by the Taliban provided support to Islamic fighters for wars against non-Muslim forced that included the war in Chechnya.  Anand said the most important of these organizations included al-Qaida.[164]  In the process, by 1995, Chechen resistance leaders and their troops began to switch allegiance from their historical adherence to the Sufi branch of Islam to Wahhabism and the celebration of what another academic writer has described as "death, suicide and mass murder as weapons against the infidel."[165] This took place amid a flood of money into Chechnya from the Gulf States, and Gulf State Islamic charities, such as IIRO.

12.8.2.   Gordon M. Hahn, currently a Senior Researcher at the Center for Terrorism and Intelligence Studies (CETIS) in California, states there were some three hundred Afghan Arabs fighting in Chechnya against the Russians by 1995, joined by mujahidin from Bosnia and Azerbaijan. He describes the IIRO's involvement in these activities in Chechnya as follows: "At the time, Saudi government-sponsored Islamic charities such as the International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), the Chicago-based Benevolence International Foundation (BIF), and other Saudi front organizations were active in Chechnya and elsewhere in Russia raising funds for the Chechen resistance and spreading Wahhabist ideas by setting up Islamic education institutions in Russia and providing opportunities for Russian citizens to study Islam abroad."[166]

12.8.3.   One concrete example of the support that IIRO provided for Chechen fighters in this period is provided in a letter from the Muslim World League Secretariat General to IIRO General Supervisor in Jeddah, dated in both the Islamic and western calendars as Dhul Hijja 1415H and 2/5/1995. The caption on the letter is "Assisting the Muslim Mujahideen in Chechnya." The content states that the Muslim World League would appreciate IIRO forwarding a check for 450 Riyals for a donation made on behalf of Sister Badr Taj from America "for the Muslim Chechen Mujahideen through Sheikh Muhammad Bin Abdullah al-Sabeel." While

---

[164] "Export of holy terror to Chechnya from Pakistan and Afghanistan," Vinod Anand, Strategic Analysis, 24:3, 539-551, https://www.tandfonline.com/doi/abs/10.1080/09700160008455231
[165] See, e.g., "The Chechen Resistance and Radiological Terrorism," Jeffrey Bates, The Nuclear Threat Initiative, April 1, 2004, https://www.nti.org/analysis/articles/chechen-resistance-radiological-terror/
[166] Russia's Islamic Threat, Gordon M. Hahn, Yale University Press, p. 36.

small in value (perhaps $120 at the exchange rate in place in 1995), the donation is explicitly for helping Islamic fighters in Chechnya and funneled through IIRO to them.[167]

12.8.4.  Another concrete example is the case of Al Qaeda bombmaker Tariq Mahmoud Ahmed al Sawah, who as I have described in Section 12.7 of my Expert Report was provided a job by IIRO in Bosnia while he was developing his skills as a maker of improvised explosive devices and fighting with the local Bosnian Muslims. Al Sawah, an Egyptian, became an al Qaeda insider who bin Ladin relied on for his bomb-making schools. In addition to his work with al Qaeda in Bosnia in the mid-1990's and in Afghanistan at the end of the Balkan wars, other witnesses said that he also fought as a mujahedin in Chechnya. The timing of the Chechen and Bosnian conflicts suggests that his Chechnya fighting likely came within the period that he was in Bosnia and had IIRO affiliation.[168]

## 12.9.  **In Indonesia and the Philippines:**

12.9.1.  IIRO was highly active in both Indonesia and the Philippines in the lead up to the 9/11 attacks. During the 1990's, its offices in these two countries were headed by bin Ladin's brother-in-law Mohammed Jammal Khalifa, who used his status as head of IIRO in these two countries to simultaneously carry out humanitarian work, propagation of the Islamic religion through supporting mosques and schools, and building a terrorist network. IIRO credits itself with funding 575 mosques in Indonesia alone.[169]

12.9.2.  On August 3, 2006, the U.S. Department of the Treasury sanctioned IIRO's branch in Indonesia as a specially designated global terrorist organization. On that date, the Treasury stated that "[t]he IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated Islamic foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed

---

[167] Muslim World League, Secretariat General, Makkah al-Mukarramah, Financial Department Number 20/16165 Date: 2 Dhul Hijja 1415H (2/5/1995) Attachments: Check, Subject: Assisting the Muslim Mujahideen in Chechnya, Exhibit 27, Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.
[168] Department of Defense, Office for the Administrative Review of Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba, Unclassified Summary of Evidence in the case of Tariq Mahmoud Ahmed al Sawah, 16 January 2008, Exhibit 175, pp. 12-13, Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.
[169] "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," Zachary Abuza, National Bureau of Asian Research, Volume 14, Number 5, December 1, 2003, p. 25 https://www.nbr.org/publication/funding-terrorism-in-southeast-asia-the-financial-network-of-al-qaeda-and-jemaah-islamiyah/

the establishment of training facilities for use by al Qaida associates."[170] The reference to "JI" was to Jemaah Islamiyah ("JI"), a Southeast Asian militant extremist terrorist group, subject to US and UN sanctions, which seeks to establish an Islamic state in Southeast Asia, and which bombed two sites frequented by western tourists in Bali on October 12, 2002, killed more than 200 people.[171] Because of their association with the al-Qaida network, including JI and ASG, the United Nations also included IIRO Indonesia and Philippines branches on the UN 1267 Committee list of individuals/entities subject to sanctions pursuant to UNSC Resolution 1267 in 2006.[172]

12.9.3.   In the public release announcing the U.S. decision, the Undersecretary of the Treasury, Stuart Levey, stated "[i]t is particularly shameful when groups that hold themselves out as charitable or religious organizations defraud their donors and divert funds in support of violent terrorist groups. We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."[173]

12.9.4.   The announcement provided additional information about why IIRO's Philippine branch was sanctioned. In essence, that IIRO office had received funds from the Executive Director of another office of IIRO, in the Eastern Province of the Kingdom of Saudi Arabia, Abd Al Hamid

---

[170] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," Treasury Press Release, August 3, 2006. https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx. The Treasury sanctioned the IIRO offices in Indonesia on the same date.

[171] *See, e.g.*, "The 12 October 2002 Bali bombing plot," BBC, 11 October 2012, summarizing the attacks and what took place afterwards, ten years after the bombings took place. https://www.bbc.com/news/world-asia-19881138

[172] UN Security Council Committee established pursuant to Resolution 1267 (1999) concerning Al-Qaida and the Taliban and Associated Individuals and Entities for International Islamic Relief Organization Indonesia and Philippines, November 9, 2006, https://www.scribd.com/document/36687023/The-Al-Qaida-and-Taliban-Sanctions-Committee-1267

[173] Treasury press release, August 3, 2006, id. As reflected in a June 16, 2006 State Department cable, after years of discussion between the U.S. government and the Saudi government, the U.S. decided to sanction the Indonesian and Philippine branches of IIRO due to their involvement in terrorist activity. Before doing so, the U.S. government sent a senior official from the Department of Homeland Security, Fran Townsend, to Saudi Arabi to advise Saudi Arabia ahead of the designation that the U.S. had been concerned about IIRO's involvement in terrorism for a long time, and would now finally take action. As stated in the cable, Townsend would advise Saudi Arabia that "the United States is also aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity. We have been concerned about IIRO for many years now and have shared our concerns and information with the Government of Saudi Arabia on a regular basis." The U.S accordingly asked Saudi Arabia to join it in designating the Indonesian and Philippines branches of IIRO for their support of terrorism, and to take action to sanction or otherwise stop the involvement of IIRO's branch in the Eastern Province of Saudi Arabia at the same time. "Terrorism Finance: International Islamic Relief Organization (IIRO)," U.S. Department Of State, Cable, 2006 June 16, 06STATE99426, https://search.wikileaks.org/plusd/cables/06STATE99426_a.html  Rather than sanctioning the entities when the U.S. government did so, Saudi Arabia announced that it would investigate and freeze the funds of Al-Mujil as the Executive Director of the IIRO Eastern Province branch office. https://www.saudiembassy.net/press-release/saudi-ambassador-remarks-us-designation-iiro-branches

Sulaiman Al-Mujil, who had been called the "million dollar man" for supporting Islamic militant groups. Treasury stated that Al-Mujil provided donor funds directly to al Qaida and had become a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI) in Southeast Asia. As stated in the public release, both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia that were themselves sanctioned by the U.S. and designated pursuant to the authorities of E.O. 13224. These terrorist groups were (and remain) also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or bin Ladin.[174]

12.9.5.   Treasury found that in 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support terrorist groups including JI. The Treasury further found that Al-Mujil was present in Afghanistan in the late 1990's and personally knew bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of bin Ladin's organization in Arab countries. In the 1990's, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad. Finally, Treasury found that the Indonesian and Philippines branches of IIRO received support from the IIRO office in the Eastern Province of Saudi Arabia, controlled by Al-Mujil, who had repeatedly authorized payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).[175]

12.9.6.   IIRO's support for Al Qaeda in Southeast Asia was very significant. There had long been militant Islamic fighters operating in terrorist groups seeking to establish separate fundamentalist Islamic states in such countries as Indonesia, Malaysia and the Philippines, and in a more localized way, in Burma and Thailand. Fighters from most of these local Southeast Asian terrorist groups made their way to train and/or fight with the mujahidin in Afghanistan. Many of them wound up among those training in the approximately 40 terrorist training camps bin Ladin established in Afghanistan, with links to al Qaeda, that were as described by Zachary Abuza, a specialist in Southeast Asian terrorism, "personal, rarely structured, and amorphous," in which there were times they raised their own funds, and times they came to bin Ladin and received his help.[176]

12.9.7.   In Tentacles of Terror: Al Qaeda's Southeast Asian Network, Abuza describes how bin Ladin used IIRO to build terrorist groups in the

---

[174] Treasury Press Release, August 3, 2006, id.

[175] Treasury Press Release, August 3, 2006, id.

[176] "Tentacles of terror, Al Qaeda's Southeast Asian network," Institute of Southeast Asian Studies December 2002, Zachary Abuza, Vol. 24, No. 3 (December 2002), pp. 427-465, https://www.jstor.org/stable/25798610?seq=1

Philippines and Indonesia. His description provides the best account I have read of the role that IIRO played in providing material support to al Qaeda before the September 11 attacks, and so I quote it at some length, together with other writings by Abuza, which I identify separately in footnotes:

12.9.7.1. "Bin Laden already had some ties with the Philippines. In 1988, he dispatched his brother-in-law Mohammed Jammal Khalifa to the Philippines to recruit fighters for the war in Afghanistan. Khalifa was already engaged in radical Muslim politics and was a very senior member of the Muslim Brotherhood in his native Lebanon."[177]

12.9.7.2. "Bin Laden clearly saw the potential [for an Islamic state] in the Philippines and he was alarmed at the Moro National Liberation Front's (MNLF's) ongoing peace negotiations with the Philippine government. In his eyes, the MNLF was selling out and abandoning the goal of establishing an Islamic state. Khalifa travelled throughout the Moro region to recruit and facilitate the jihadi's travels to Pakistan. He left the Philippines in either 1989 or 1990, but he returned in 1991 to establish a permanent Al Qaeda network."[178]

12.9.7.3. "At the time [Khalifa] was officially the regional director for the Saudi-based charity, the Islamic International Relief Organization (IIRO), responsible not just for projects in the Philippines but also in Indonesia, Thailand, and Taiwan. Later, the IIRO decided to have separate directors for each of the countries, and Khalifa became the IIRO head for the Philippines."[179]

12.9.7.4. "Khalifa set out to establish a thorough network [of terrorists]. According to interviews with Philippine intelligence officials, Khalifa developed his network very slowly and carefully. In their eyes, he did a meticulous professional job."[180]

12.9.7.5. "Khalifa established several other charities and Islamic organizations in the Philippines . . . ostensibly for charity and religious work, but which channeled money to extremist groups. He established Al Maktum University in Zamboanga using funds from the IIRO. He also established a branch office of the IIRO in Zamboanga. According to the IIRO's head office in Saudi Arabia, the organization's activities in the

---

[177] Tentacles of terror," id.
[178] Tentacles of terror," id.
[179] Tentacles of terror," id.
[180] Tentacles of terror," id.

Philippines include an orphanage and dispensary in Cotabato City, pharmacies in Zamboanga (including a floating dispensary that served remote coastal communities in western Mindanao), providing food and clothing to internally displaced people who had fled war zones, and funding schools and scholarships. The IIRO asserted that its activities were undertaken with at least official approval, if not in cooperation with the [Philippine] government. However, all of these projects, although legitimate charitable work, were located in MILF zones or in urban population centers where the MILF was trying to make inroads as it began to focus on a political strategy that would move toward an East Timor-like referendum process for Mindanao."[181]

12.9.7.6.   "Established in the Philippines, Khalifa began to provide covert assistance to the MILF [Moro Islamic Liberation Front, a terrorist group] in two ways – financially, and through training. In addition, he provided overt assistance by funding development projects to zones under MILF control, or to areas that constituted core constituencies of MILF supporters."[182]

12.9.7.7.   As set forth by Abuza, the training initially took place in camps in Afghanistan, and al Qaeda then began to move Middle Eastern trainers into the camps of the Philippine separatist organization, the MILF, in the Philippines. Their growing presence in turn led to increased violence by the MILF, including suicide attacks, bomb attacks, assassination attempts, and the like. "There is ample evidence that during the 1990's the MILF received funding and training from Al Qaeda operatives. For the most part, this money came through the Al Qaeda network established by Jamal Mohammed Khalifa, in particular, the IIRO."[183]

12.9.7.8.   Abuza has provided further information, in a separate article, about how IIRO under Khalifa's direction built support for al Qaeda and affiliated local terrorist groups. "According to Philippine National Security Advisor Roilo Golez, Khalifa 'built up the good will of the community through charity and then turned segments of the population into agents.' A Philippine intelligence report noted that 'the IIRO which claims to be a relief institution, is being utilized by foreign

[181] "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," Zachary Abuza, National Bureau of Asian Research, Volume 14, Number 5, December 1, 2003, p. 26 https://www.nbr.org/publication/funding-terrorism-in-southeast-asia-the-financial-network-of-al-qaeda-and-jemaah-islamiyah/
[182] "Tentacles of terror," id.
[183] "Tentacles of terror," id.

extremists as a pipeline through which funding for the local extremists' is provided. An Abu Sayyaf defector acknowledged that 'The IIRO was behind the construction of mosques, school buildings and other livelihood projects' but only 'in areas penetrated, highly influenced and controlled by the Abu Sayyaf.' For example, in Tawi, the director of the IIRO branch office was Abdul Asmad, who was the Abu Sayyaf's intelligence chief until his death in June 1994. The defector said the IIRO was used by bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf and MILF: 'Only 10 to 30 percent of the foreign funding goes to the legitimate relief and livelihood projects and the rest go to terrorist operations.'" [citations omitted][184]

12.9.8. Other accounts of Khalifa's activities confirm this narrative and assessment of the use of IIRO to provide material support to terrorism in Southeast Asia. For example, soon after 9/11, Newsweek summarized his approach to using IIRO as a base for building his terrorist network in Southeast Asia as follows: "From 1986 to 1994, when he headed the Philippine office of the International Islamic Relief Organization, a Saudi-based charity, Khalifa is believed to have swindled thousands of dollars from the IIRO budget, or channeled funds through its bank accounts to groups like the Abu Sayyaf. 'Muslim militants work through legitimate organizations," says Gen. Alfredo Filler, former intelligence chief for the Philippine military. "The assistance is not intended for insurgents, but it can be skimmed off.'[185] What I find especially notable about this summary is the lengthy period that Khalifa headed the Philippine office of IIRO – eight years, dating from before Al Qaeda was founded, until the time that it had begun systematically to build the network that made the 9/11 attacks possible. This account takes at face value the idea that Khalifa swindled funds from IIRO throughout that lengthy period, *without anyone at IIRO noticing*. But five years later, the U.S. government concluded that his key funder, Al-Mujil, *was* aware of what he was doing, and knowingly supported Khalifa's use of IIRO in Southeast Asia to build a terrorist network. To again quote then Under Secretary of the Treasury Stuart Levey: "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell

---

[184] "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," Zachary Abuza, National Bureau of Asian Research, Volume 14, Number 5, December 1, 2003, p. 27 https://www.nbr.org/publication/funding-terrorism-in-southeast-asia-the-financial-network-of-al-qaeda-and-jemaah-islamiyah/
[185] "Taking from the Poor," Newsweek, October 21, 2001, https://www.newsweek.com/taking-poor-154043

of regular financial donors in the Middle East who support extremist causes."[186]

12.9.9.   IIRO support to MILF was accompanied by its support to an even more violent group, Abu Sayyaf, whose leader fought in Afghanistan, trained in Peshawar, and became a friend of bin Ladin. When this terrorist, Ustadz Abdurajak Kanjalani, returned to his native Philippines, he committed to waging jihad there until he created an Islamic state based on Saudi Wahhabist interpretations of Islam. He then received substantial funding from bin Ladin brother-in-law Khalifa from IIRO, which enabled him to build Abu Sayyaf to the point where it was able to indoctrinate, recruit, and train Islamic militants to become terrorists and to carry out terrorist bombings, kidnappings, robberies, and murders. The infrastructure for this was built out from the IIRO funds. Abuza quotes a defector from Abu Sayyaf as telling Filipino authorities that "[t]he IIRO was behind the construction of Mosques, school buildings, and other livelihood projects" but only "in areas penetrated, highly influenced and controlled by the Abu Sayyaf." According to the defector, "Only 10 to 30% of the foreign funding goes to the legitimate relief and livelihood projects and the rest go to terrorist operations."[187]

12.9.10.   Kanjalani also formed a relationship with bin Ladin and with Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing, and the man who was to then to plan the Bojinka plot from the Philippines which al Qaeda intended would blow up a dozen planes at once as they flew to the United States.[188]

12.9.11.   <u>Comment</u>: If Philippine authorities had not been alerted to the Bojinka plot due to a fire breaking out in the apartment building where the terrorists were working with explosives, the planned 12 airplane coordinated terrorist bombings could have resulted in as many or more deaths than resulted from the four passenger plane assault of 9/11, depending on the timing of the bombs and the location of the planes when the explosions took place. In my opinion, the Bojinka plot would not have been possible without the building of the relationships between al Qaeda and its operatives in the Philippines supported by IIRO.

12.9.12.   IIRO remained open in the Philippines for a long time after Filipino authorities had determined that it was providing material support to terrorism. The reasons for this were political. As stated by Abuza: "one senior intelligence official complained, 'we could not touch the IIRO.' It took the Philippine government almost six years to shut the IIRO office

---

[186] Treasury Press Release, August 3, 2006
[187] <u>Militant Islam in Southeast Asia: Crucible of Terror</u>, Zachary Abuza, Lynne Rienner (2003), p. 93.
[188] "Echoes of early design to use chemicals to blow up airliners," International Herald Tribune, maintained by New York Times, August 11, 2006, https://www.nytimes.com/2006/08/11/world/asia/11iht-web.0811manila.2447764.html

in the Philippines. . . Why was the IIRO allowed to remain open so long? The simple answer was that there was intense diplomatic pressure from Saudi Arabia on the Philippines. The IIRO is politically well-connected, and its supporters include the Saudi royal family and the top echelon of society. One of the board members of the IIRO office in the Philippines was the Saudi ambassador. The Saudis' most important source of leverage in this was the visas and jobs for several hundred thousand Filipino guest workers."[189]

12.9.13.   The above information summarizes major elements of the comprehensive use of IIRO's offices in Indonesia and the Philippines to help al Qaeda construct its Southeast Asian network. In these countries, IIRO's specific role was to provide cover to what bin Ladin's brother-in-law, Khalifa, was doing to build up both al Qaeda and affiliated terrorist groups, including the MILF, Abu Sayyaf, and Jemaah Islamiyah. As head of IIRO's operations in Southeast Asia, and then in the Philippines only, Khalifa used his authority at IIRO to use IIRO resources to fund and support indoctrination, recruitment, training, and for terrorist logistics, operations, and even the purchase of weapons and material to carry out terrorism.

12.9.14.   The material I have summarized covers IIRO activities supporting al Qaeda in a few selected, but important, countries among the circa 80 countries in which it was operating prior to 9/11. The role that it played in these countries was fundamental in helping al Qaeda to build its infrastructure to commit terrorist activities itself, and to build its relationships with other terrorist groups whose ideology was in alignment with al Qaeda and committed to carrying out terrorist attacks on the same types of targets that al Qaeda was targeting. The infrastructure included funding terrorist and jihadist training camps in Afghanistan, training facilities and activities in the Balkans and Southeast Asia, and indoctrinating, training, and providing operational support and funding for al Qaeda and aligned terrorist groups in these locations.

12.9.15.   In countries like Chechnya, the propagation efforts of Saudi charities combined with the relief activities of IIRO had the impact of channeling cultures that had been largely secular into embracing extreme Wahhabi notions of carrying out holy war and holy terror against non-believers. In Southeast Asia, IIRO's director was actually bin Ladin's brother-in-law, an integral part of al Qaeda, and building al Qaeda capabilities and the capabilities of aligned terrorist groups through systematic, direct funding,

---

[189] "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah," Zachary Abuza, National Bureau of Asian Research, Volume 14, Number 5, December 1, 2003, p. 28
https://www.nbr.org/publication/funding-terrorism-in-southeast-asia-the-financial-network-of-al-qaeda-and-jemaah-islamiyah/

from an ideologically-aligned part of IIRO in Saudi Arabia based in the Eastern Province of Saudi Arabia.

12.9.16.   Taken together, IIRO's activities in these diverse locations had the impact of helping Al Qaeda transform itself from a local support organization for mujahidin fighting the Soviets in Afghanistan, to a global terrorist organization and a terrorist brand, sitting above local terrorist organizations, that was able to indoctrinate them further, recruit more fighters to their cause, support them locally, and turn their assets into its own, while building its own global strike capabilities. IIRO's support was not incidental to al Qaeda's development, but fundamental, occurring in many different parts of the world, and it had significant consequences in enhancing al Qaeda's capabilities.

12.9.17.   In Southeast Asia, where IIRO support was especially central to the development of al Qaeda's regional capacity, the al Qaeda personnel incubated by IIRO support conceived of the Bojinka plot that was a precursor to the 9/11 attacks, and intended to inflict mass casualties on Americans. When the Bojinka plot failed, the people and ideas behind it who were not arrested, such as Khalid Sheikh Mohammed, continued to plan terrorist attacks until they developed the 9/11 terrorist operation against the United States. Thus, IIRO activities in Southeast Asia alone, for which its Indonesian and Philippines offices were placed on U.S. and global sanctions, provided al Qaeda with essential ingredients that it ultimately took advantage of to carry out the 9/11 attacks that killed 3000 Americans.[190]

## World Association of Muslim Youth (WAMY)

12.10.   *The World Assembly of Muslim Youth (WAMY),* founded in 1972, is a Saudi-based non-profit chaired by the Saudi Minister of Islamic Affairs. Prior to 9/11, WAMY's stated goals were to recruit and educate Muslims, specifically the young, to build schools and mosques, initiate social welfare projects, and provide disaster relief. At the time, WAMY had offices in about 55 other countries and affiliations some 500 other Muslim youth and student organizations on five continents.[191] These numbers remain largely unchanged to this day. WAMY's current website states that the organizations goals are to protect the identity of Muslim youth and help them with their problems; educate and train them to become active and positive citizens; to introduce non-Muslims to Islam "in its purest form as a comprehensive system and way of life," to establish dialogue between the Muslim world and other societies, and to provide assistance to others through training and cooperation.[192]

---

[190] "Portrait of 9/11 'Jackal' Emerges as He Awaits Trial," New York Times, Nov. 14, 2009 https://www.nytimes.com/2009/11/15/us/15ksm.html
[191] Alms for Jihad, id., p. 33
[192] Website, World Assembly of Muslim Youth, "About Us,"   http://www.wamy.co.za/about.html

12.10.1. In practice, amid these lofty ideals, WAMY also provided support to al Qaeda prior to the 9/11 attacks, through three major mechanisms. These included: (1) its educational activities, which included publications that justified war against those who did not share Wahhabist beliefs; (2) funding al Qaeda and other terrorist groups and (3) engaging in providing jobs to al Qaeda personnel, disseminating documents providing military training to terrorists, and other miscellaneous support to Al Qaida, as described further below.

12.10.2. This support for al Qaeda emerged in the course of WAMY's engagement with Islamic refugee groups. This was reflected, for example, in the Eighth World Assembly of Muslim Youth (WAMY) held in Amman, Jordan, in October 1998. At that conference, Crown Prince Hassan bin Talal urged Muslim youth to create an international zakat fund to be used in support of refugees, since three-quarters of all the world's refugees were then to be found in Muslim countries.[193] Prior to 9/11, in the process of carrying out these stated goals, WAMY undertook a wide range of activities which included bringing together other Islamic charities in annual international conferences. These conferences became a meeting place for "young militant Islamists [who used them as] an inspirational opportunity to meet other angry young Muslims, define objectives, and devise whatever means necessary to achieve them."[194]

12.10.3. According to the U.S. government, "WAMY supports terrorist ideals and causes." The U.S. government has characterized WAMY as a "Tier One" terrorist support organization. "WAMY is listed as a Tier 1 NGO. Tier 1 NGOs are defined as having demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests."[195] The U.S. government has further stated that "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Laden and al Qaida operations." [196] The U.S. government has also stated that "[a]ccording to top WAMY officials, both the United States and Israel must be destroyed."[197]

12.10.4. WAMY's focus on supporting Muslim refugees in areas of conflict facilitated the merger of its role of its charitable activities, and its provision-in-practice of material support to Al Qaeda prior to September 11 and its immediate afterwards. I provide examples of each of these

---

[193] Alms for Jihad, id., p. 12
[194] Alms for Jihad, id., p. 33-34
[195] Unclassified Summary of Evidence for Combatant Status Review Tribunal, Hamed, Adel Hassan, 19 November 2004, PEC-KSA002746
[196] Unclassified Summary of Evidence for Administrative Review Board in the Case of Ameur, Mammar, 25 July 2005, Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at US Naval Base Guantanamo Bay, Cuba.
[197] Summary of Administrative Review Board Proceedings for ISN 940, undated, FED-PEC 141772.

types of support: first, ideological; second, financial, and third, miscellaneous logistical and administrative help, especially in areas of Muslim conflict with secular forces.

12.10.5.  WAMY's focus on supporting Muslim refugees in areas of conflict facilitated the merger of that role, and its provision-in-practice of material support to Al Qaeda prior to September 11 and its immediate afterwards.

12.10.6.  I provide examples of each of these types of support: first, ideological; second, financial, and third, miscellaneous logistical and administrative help, especially in areas of Muslim conflict with secular forces.

12.11.  *Ideological Support of al Qaeda by WAMY*. Consistent with its stated goal of educating and training Muslim youth, WAMY had a publishing arm that it used to publish and disseminate pamphlets, books, and other materials on Islam to Muslims throughout the world. These materials included calls for jihad against non-Muslim groups.

12.11.1.  The following examples were provided by Senior Customs Agent David C. Kane in an affidavit filed with the U.S. federal court in the case of *U.S. v. Biheiri* in Virginia dated September 11, 2003:

12.11.1.1.  "Ask the kuffaar [infidels]: who repelled their tyrants? And ask the mushrikeen [literally polytheists]: who terrified their supporters? Ask the world: who shook its monarchs? * * * Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!" From the book published and disseminated by WAMY, Islamic Camps: Objectives, Program Outlines and Preparatory Steps. In his affidavit, Kane stated that these materials were identified in the book as intended for Muslim youth, aged 14-18.

12.11.1.2.  "[T]he seed of the Gulf-war was planted by a Jew; the Jews are enemies of the faithful, God and the angels; The Jews are humanity's enemies; they foment immorality in this world; The Jews are deceitful, they say something but mean the exact opposite; Who was behind the biological crisis which became like brain washing? A Jew; Who was behind the disintegration of family life and values? A Jew; The one that stirred-up hate and turned the individuals against their Muslim governments in the Arab peninsula - a Jew; Who

promoted Atheism and made the countries thrive on Muslims' blood? The Jews; Every tragedy that inflicts the Muslims is caused by the Jews." <u>A Handy Encyclopedia of Contemporary Religions and Sects</u>, published by WAMY.[198]

12.11.2.  The following examples were provided by terrorism expert Steven Emerson in 2003 testimony before the 9/11 Commission: [199]

12.11.2.1.  Islam "is a religion of Jihad," and Jihad "was an answer for the Jews, the liars*." *<u>Islamic Views</u>, an Arabic language book written by WAMY and printed by the Saudi Government's Armed Forces Printing Press.

12.11.2.2.   "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngers will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." <u>Islamic Views</u>, id.

12.11.2.3.  "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews and the Christians, those who do not believe in Mohammed. You should say they are infidels." <u>Islamic Views</u>, id.

12.11.3.  The following example was provided by Canada's Revenue Service following an investigation of WAMY in Canada that led to the revocation of its license as a charity there:

12.11.3.1.  "Muslims in the east. . . have always enjoyed the tolerance and good treatment of Islam . . . [u]nfortunately, Western Christians preferred and still prefer to be the enemies of Islam and Muslims." The MWL pamphlet, <u>A Dialogue on the Internet</u>, distributed by WAMY (Canada).[200]

12.11.4.  This and similar material written, published, and/or disseminated by WAMY prior to the 9/11 attacks, provided religious and ideological justification for jihad and Islamic martyrdom, two concepts that were among the foundations for justifying Al Qaeda's program of suicide bombings and terrorist attacks.

---

[198] Affidavit, David C. Kane, Senior Special Agent, Bureau of Immigration and Customs Enforcement, U.S. Department of Homeland Security, September 11, 2003, *U.S. v. Biheiri*, Case No. 03-365-A, Eastern District of Virginia,
[199]Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States July 9, 2003 https://govinfo.library.unt.edu/911/hearings/hearing3/witness_emerson.htm
[200] Audit of the World Assembly of Muslim Youth, Canada Revenue Agency, id., p, 18.

12.12.   *Terrorist Finance*. For the reasons set forth in Section 9 of my Expert Report, I would not expect to see documents expressly stating that WAMY provided financial and other support to al Qaeda and bin Ladin. However, there are a number of data points that provide a basis for concluding that WAMY did indeed provide support for Islamic jihad, terrorism, and al Qaeda. WAMY's fund-raising activities for al Qaeda and affiliated groups has been reported in a number of different regions since at least the early 1990's. Some of these activities were carried out through other charities, such as Benevolence (BIF), which WAMY funded or with which it had an affiliation, and whose officers simultaneously shared positions with WAMY and with the charities that they were heading which they used directly to provide material support to bin Ladin.

12.12.1.   One of the three major charities that bin Ladin and al Qaeda relied on, LBI, was funded by WAMY, eventually actually merged into WAMY and became part of WAMY, and both organizations were headed by the same person, Adel Batterjee, later designated by the U.S. Treasury and the UN Security Council for sanctions due to his central role in raising funds for al Qaeda and bin Ladin.

12.12.2.   Al Fadl, the al Qaeda operative who worked directly with bin Ladin, told the U.S. government that bin Ladin stated al Qaeda principally relied on three charities: Benevolence (BIF); Muslim World League (discussed in further detail below) and the Qatar Charitable Society. BIF's precursor, LBI, was merged into WAMY on May 28, 1996, having previously been viewed by WAMY to be functioning as a subsidiary of WAMY providing relief services in the field, especially in areas of conflict such as Afghanistan/Pakistan and Bosnia.[201]

12.12.3.   The original founder of Benevolence, Adel Batterjee, identified himself to the New York Times as the global chairman of WAMY. In that capacity, he told the New York Times ""If a relief worker decides that he wants to join the fighting forces, we would not stop him. . . . But he can no longer officially represent our organization."[202]

12.12.4.   Dr. Abdul Wahab Noorwali, who served as Assistant Secretary General of WAMY from about 1996 to 2004 after having volunteered for the organization for about the previous decade, was a board member of LBI in Jeddah from 1993-1995. He confirmed that during the 1990s, it was WAMY's practice to fund operations and activities for Batterjee and LBI in Pakistan and Afghanistan. He stated that WAMY was not involved in LBI's fundraising or daily operations, but did financially support projects completed by LBI under WAMY's auspices "until the relationship between LBI and WAMY ended," which took place with

---

[201] Administrative Resolution No 37 Dated 10/01/1417 AH (28 May 1996), World Assembly of Muslim Youth/Lajnat al Birr al Islamiyaa, Exhibit 267, Noorwali deposition, WAMYSA0276804
[202] "Muslims From Afar Joining 'Holy War' in Bosnia," New York Times, Dec. 5, 1992
https://www.nytimes.com/1992/12/05/world/muslims-from-afar-joining-holy-war-in-bosnia.html

the merger of the two organizations on May 28, 1996. He further stated that WAMY's Pakistan offices took over all of LBI's humanitarian projects, which he described as involving social welfare, orphanages, health care, and various forms of education programs.[203] According to Noorwali, Batterjee had "some financial, administrative, and report delivering with Adel Batterjee," as "WAMY is very strict with regards to reporting." He stated that Batterjee had "often disregarded these procedures and was not very clear with the operations he conducted." According to Noorwali, "[t]here was lack of clarity with what he was doing and a lack of reporting to confirm operations," which resulted in ambiguity in receivables and expenditures." Noorwali's statement portrayed Batterjee as, in essence, a rogue operator who was asked to resign in 1993. Noorwali further stated that neither WAMY nor LBI ever sent funds to al Qaeda, and that he was aware of no misuse of funds or diversion of any money for any purpose other than planned charitable activities. He also stated that Benevolence ("BIF") was an entirely separate organization from LBI, and WAMY opposed his naming the successor organization BIF with a name similar to LBI and sent him a letter expressing that opposition, and demanded that he cease and desist doing so.[204]

12.12.5.  <u>Comment:</u>  I find Noorwali's Declaration to contain internal contradictions, as well as characterizations of events that is in important areas inconsistent with other information I have reviewed. In essence, his Declaration states that WAMY funded LBI, that Batterjee's operations of LBI were non transparent and the documentation on funds coming in and funds going out could not be relied on and that WAMY fired him as a result in 1993, the year after Batterjee told the New York Times he was the global chairman of WAMY. Even if Noorwali's account of Batterjee's departure from WAMY were to be accurate and complete, Batterjee's terrorist finance activities began many years before his departure from WAMY. As stated clearly in the U.S. Department of the Treasury terrorist sanctions listing of Batterjee, it began during the period he was working with and for WAMY: "In the late 1980s, Batterjee founded the precursor to BIF, LBI, in Saudi Arabia and Pakistan.  LBI provided financial and operational support to mujahedeen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.  LBI was affiliated with Makhtab Al-Khidamat (MK), which was co-founded and

---

[203] Declaration of Dr. Abdul Wahab Noorwali  (hereafter "Noorwali Declaration") in support of Defendant World Assembly of Muslim Youth, Exhibit 254, Noorwali Deposition, LVF 07-23-19, In re Terrorist Attacks on September 11, 2001, ¶¶28-33.
[204] Noorwali Declaration, ¶¶34-42.

financed by UBL and is the precursor organization of al Qaida.   LBI later joined al Qaida upon the dissolution of MK."[205]

12.12.6. In his Declaration, Noorwali states that "No money or funds were sent by WAMY or LBI to al Qaeda," that to his knowledge, WAMY never allowed support of al Qaeda, never was involved in any activity for the benefit of al Qaeda, never "shared or intended to share its office with BIF or any other entity," would never have allowed LBI to continue to work on projects if they were engaged in al Qaeda-related activities, and never allowed anyone to disguise an al Qaeda member as a WAMY employee.[206]

12.12.7. Noorwali does not state how he knows that neither WAMY nor LBI ever sent money or funds to al Qaeda. I have not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds they provided to Batterjee as he was engaged in terrorist finance activities for al Qaeda. To the contrary, the evidence that exists suggests that WAMY did not track what Batterjee did with funds provided by these charities. Noorwali himself states that Batterjee's management of LBI prior to his departure in 1993 had not been transparent, and one could not track  sources or funds or expenditures. Accordingly, I read Noorwali's statement merely to mean that neither WAMY nor LBI maintains records showing that they funded al Qaeda and that they cannot track their funding of Batterjee's activities to show whether he used the funds provided to him while he was a senior officer of WAMY to support al Qaeda or not.

12.12.8. Of course, no one should expect any charity to maintain records that its funds are being used by al Qaeda, for weapons, explosives, or other criminal or terrorist purposes. The traces of any such spending, when they are visible at all, are fragmentary, such as occasional references to the prices of weapons in a fax as shown at the TWRA office, or the testimony of informants such as al Fadl about the involvement of Benevolence and WAMY as "the mother" in providing material support to al Qaeda.

12.12.9. Noorwali's account is inconsistent with the facts set forth in the US indictment of the leader of the U.S. operations of Benevolence ("BIF"). In that indictment, the  U.S. found that in 1987, LBI was founded by Adel Batterjee in Saudi Arabia and Peshawar, Pakistan, with one of its purposes to provide support for the mujahedeen fighting in Afghanistan. In the early 1990s, LBI was renamed Benevolence International Foundation, referred to in Arabic as "Al Birr al Dawalia," and

---

[205] "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx
[206] Noorwali Declaration, ¶¶47-52.

incorporated in the United States to increase donations and reduce scrutiny by authorities. BIF received status as a tax-exempt charitable organization in March 1993. About the same time, Arnaout assumed formal management of BIF, which proceeded to open various offices, including in Pakistan, Bosnia-Herzegovina and Azerbaijan. In the mid to late 1980s, the indictment alleges that Arnaout, using various aliases, worked with LBI and another organization, [M]ekhtab al [K]hidemat (the "Services Office"), to provide assistance to fighters in Afghanistan. The "Services Office" was operated principally by Sheik Abdallah Azzam and Usama bin Laden to provide logistical support for the mujahedeen in Afghanistan, including financial assistance for military training and assistance with obtaining travel and identity documents and immigration status in Pakistan. Arnaout also allegedly provided assistance to members of Hezb e Islami and its leader Gulbuddin Hekmatyar, as well as mujahedeen under the command of bin Laden, who, along with others in about August 1988, formed an organization in Afghanistan known as al Qaeda (the "Base") to provide logistical and financial support to mujahedeen in various areas of the world outside Afghanistan. Bin Laden and al Qaeda relied on various organizations, including charities, to transfer money and provide cover for traveling al Qaeda members and associates, according to the indictment. In the same late 1980's time frame, Arnaout allegedly served as director of communications in the "al Masada" mujahedeen camp in Jaji, Afghanistan, under the direction of bin Laden, distributing resources, including weapons. In 1991, Arnaout, while employed by LBI, allegedly worked with others, including al Qaeda members, to purchase rockets and assorted rifles in large quantities and distribute them to various mujahedeen camps, including some operated by al Qaeda."[207]  Based on all of the information I have reviewed, I find this account persuasive. To the extent that Noorwali's version of events differs from the Justice Department's assessment, I conclude the Justice Department's assessments to be accurate.

12.12.10. On December 21, 2004, the U.S. Department of the Treasury designated Batterjee as a specially designated global terrorist for providing financial and material support to al Qaida and bin Ladin. At the time, Under Secretary of the Treasury Stuart Levey stated that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida.   A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator." In making the designation, Treasury stated that "[i]n the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-

---

[207] "Benevolence Director Indicted For Racketeering Conspiracy; Providing Material Support To Al Qaeda And Other Violent Groups," U.S. Department of Justice Press Release,  October 9, 2002, https://www.justice.gov/archive/usao/iln/chicago/2002/pr1009_01.pdf

Islamiah (LBI), in Saudi Arabia and Pakistan.   LBI provided financial and operational support to mujahedeen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.   LBI was affiliated with Makhtab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.   LBI later joined al Qaida upon the dissolution of MK."[208]

12.12.11. Batterjee's joint role as chairman of WAMY and founder of one of al Qaeda's central vehicles for funding terrorism, LBI/Benevolence, illustrates the inter-relationship of these charities, which were Janus-faced: one face provided humanitarian services, the other face supported jihad and terrorism.

12.12.12. In North America, in the course of its audit of WAMY's Canadian office, the Canada Revenue Agency found that WAMY was closely associated to BIF-Canada, and provided funding for BIF's activities in the United States. In its audit, the Canada Revenue Agency found that WAMY's president in Canada, Mohamed Khatib, simultaneously served as the Secretary of BIF-Canada. BIF-Canada and WAMY used the same residential mailing address in contacts with the Canada Revenue Agency. BIF-Canada and WAMY shared a Canadian bank account, which functioned as a joint account. WAMY provided funds to BIF-USA, and BIF-USA and BIF-Canada shared a common director, Ennam Aranout, who pled guilty to racketeering charges in the U.S. and admitted BIF had provided financial assistance to individuals engaged in violent activities overseas.[209]

12.12.13. In Europe and Bosnia, an audit of TWRA, the Islamic charity found at the center of funding the purchase of weapons for Islamic fighters in Bosnia, showed its receipt of 399,067.15 Austrian schillings on March 25, 2002, from WAMY in Jeddah, worth about $34,254 at the time.[210] This timing corresponded exactly to preparations for the outbreak of hostilities in early April 2002, when the Serbs and Bosnian Muslims entered into open warfare, with substantial killings on both sides.[211]

---

[208] "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," id.

[209] Notice of Audit of the World Assembly of Muslim Youth to its President, Ayman Al-Taher, Canada Revenue Agency, BN: 871966040RRR0001, File #3008146, August 23, 2001, to provide opportunity for response, Exhibit 181, pp. 12-13, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[210] ICCJ Expert Report, id.

[211] "Bosnia Asking U.N. For Peace Forces," New York Times, March 28, 1992, https://www.nytimes.com/1992/03/28/world/bosnia-asking-un-for-peace-forces.html   The war is commonly

12.12.14. The head of TWRA, Fatih el Hassanein, served at the same time as the director of the WAMY Austria and Eastern Europe at the very time the Bosnian conflict began, 1992, and the period in which he and TWRA were engaged in the provision of arms. The WAMY document showing Hassanein's role as the WAMY director for the very region where the Bosnian conflict was taking place contains the notation: "paying amounts of money to associations for specific projects." The WAMY document does not identify the nature of the projects in which WAMY provided funds to Hassanein or the amounts involved.[212] The absence of documentation about exactly what Hassanein was doing as head of WAMY with oversight over Bosnia at that time illustrates the difficulty of separating Hassanein's role as head of TWRA, when he was central to massive provisions of arms to Islamic jihadis in Bosnia, his simultaneous work on behalf of bin Ladin and Al Qaeda, and his simultaneous work for WAMY.[213] Like Batterjee's simultaneous roles as chairman of WAMY, founder of LBI and Benevolence, and terrorist financier for al Qaeda, Hassanein's multiple roles were inextricably intertwined, with his charitable roles providing a cover to arms smuggling activities to Bosnian jihadists.

12.12.15. The flexibility of having people engaged in Islamic militant activities in Bosnia at the same time that they were engaged in charitable activities is illustrated by a public quote in the same period from Batterjee when he identified himself to the New York Times in 1992 as the global

---

[212] Chart, internal WAMY report referencing the "Eastern Europe Office - Austria" identifying Mr. Fateh Ali Hussein as the "Director of the Office of WAMY office in Austria and Eastern Europe," referencing "Paying amounts of money to associations for specific projects," and dated 2/30/1992 [sic]. Other dates in the same chart are mostly for the Islamic years 1413-1415, which correspond to the period 1992-1994 and to the Bosnian conflict ECF Nos. 3912-36, 3963-9 provided by WAMY of communications, Exhibit 36, Case 1:03-md-01570-GBD-SN Document 3912-36 Filed 02/28/18

[213] Hassanein was simultaneously the head of TWRA and a facilitator for Qaeda, while he was also the head of WAMY's Vienna office, whose geographic responsibility included Bosnia, as described in an extensive 1996 article in The Washington Post. "Hassanein, who studied medicine in Yugoslavia and set up the Third World Relief Agency in 1987, apparently turned it into the chief broker of black-market weapons deals by Bosnia's Muslim-led government and the agent of money and influence in Bosnia for Islamic movements and governments around the world. A Western banker in Austria referred to Hassanein as the "bagman" of Bosnian President Alija Izetbegovic. "If the Bosnian government said we need flour, he ran after flour. If they said we need weapons, he ran after weapons." . . . "[M]ilitants in the terrorist underworld are also believed to have used the relief agency [Hassanein's TWRA] to get money to the Bosnian government, including the wealthy Saudi Arabian emigre Osama Binladen, a suspected sponsor of militant Islamic groups around the Middle East. Binladen, a resident of Sudan until last year, is reportedly now in Afghanistan, where he has issued statements calling for attacks on U.S. forces in the Persian Gulf.". . . "[M]oney began to pour into the Third World Relief Agency. In one month alone, July 1992, $20 million entered its account at the First Austrian Bank. In October of that year, one Saudi Arabian government official strolled into the bank's staid headquarters in downtown Vienna with two suitcases filled with cash. He deposited $5 million. From 1992 to 1995, $350 million passed through the agency's hands, bank officials said." "Bosnia's Muslims Dodged Embargo," Washington Post, September 22, 1996, https://www.washingtonpost.com/wp-srv/inatl/longterm/bosvote/front.htm

chairman of WAMY. In that capacity, he told the New York Times, "If a relief worker decides that he wants to join the fighting forces, we would not stop him. . . But he can no longer officially represent our organization."[214]

12.12.16. <u>Comment</u>: Batterjee did not tell the New York Times that a relief worker who engages in military activities in Bosnia could no longer be supported, or work for, or otherwise be unofficially involved with the charity. Instead, his clear message is that nothing would change other than that a person engaged in jihad could no longer "officially" be involved in WAMY.

12.13. *Acts of Facilitation and Other Material Support.* Beyond its ideological support for Islamic extremism, including justification for martyrdom, the basis for suicide bombings and other attacks, such as the 9/11 suicide hijackings, and the direct financing of al Qaeda described above, WAMY's operations in various countries provided facilitation and other forms of material support to al Qaeda. Examples include:

12.13.1. *Messenger Services.* WAMY's Peshawar office was raided in November, 2002 in a joint FBI-Pakistan intelligence operation. A WAMY employee was subsequently questioned for hand-delivering a recorded message from bin Laden to local media. In that tape, bin Laden praised various terrorist attacks.[215]

12.13.2. *Training of Fighters.* According to a pre-9/11 news report in Pakistan translated by the U.S. Foreign Broadcast Information Service (FBIS, now renamed the Open Source Center), cited by Steven Emerson in his testimony before the 9/11 Commission, WAMY was involved in both religious and jihadi training for its member organizations in Pakistan. At the time, the only affiliate it had in Pakistan was a Pakistani youth organization, Jamiat Taleba Arabia. The newspaper stated that the latter group was involved in the Afghan conflict on behalf of the mujahidin "from the very beginning," and also undertook jihad in Kashmir from 1990 through 1993.[216]

12.13.3. *Provision of Arms.* As described in the previous subsection of my Expert Report, WAMY's director for Bosnia, Fatih Hassanein, engaged in the massive provision of weapons to Islamic jihadists in Bosnia in the 1992 period while also head of WAMY's offices in Austria. Hassanein was not the only person at WAMY purchasing weapons and providing other

---

[214] "Muslims From Afar Joining 'Holy War' in Bosnia," New York Times, Dec. 5, 1992 https://www.nytimes.com/1992/12/05/world/muslims-from-afar-joining-holy-war-in-bosnia.html
[215] "Pakistan Questions Sudan Man About Tape," Associated Press, December 8, 2002, https://www.theintelligencer.com/news/article/Pakistan-Questions-Sudan-Man-About-Tape-10572462.php
[216] Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States July 9, 2003 https://govinfo.library.unt.edu/911/hearings/hearing3/witness_emerson.htm

support for violent jihad. The same activity took place in other locations where WAMY was operating, with WAMY support. WAMY was active in Chechnya during the Chechen War. While that war was taking place, WAMY's then-Secretary General, an Islamic religious scholar named Dr. Maneh al Jahari, wrote that "the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees. The question that must be asked is: What do the Chechen Muslims need from us today? 1. They need money to buy arms and ammunition. 2. They need food, clothing, medicine, and tents; 3. They need propagators and propagation materials for awareness. They are Sunnis who have been alienated from Islam for nearly 70 years and have stuck to it in difficult circumstances, almost like the circumstances of the Inquisition.. . Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory."[217]

12.13.4.  Shortly after the 9/11 attacks on the United States, Noorwali, as the Assistant Secretary General of WAMY, gave an interview to a Saudi newspaper, the Saudi Gazette, in which he tried to distinguish between "terrorism" and "self-defense." He stated: "Palestinians defending their home and families against the Israeli occupier are not terrorists. There are some extreme attitudes toward Islam in the world that are presented by western media to give a wrong conception of Islamic Jihad. The word jumps to the world's mind with every single bombing, though most of the time those responsible are not Muslims. The world must know that what terrorist groups are doing is far from the right Islamic path."[218]

12.13.5.  Comment: The statements by senior WAMY officials reflect the worldview of WAMY before 9/11 and in its immediate aftermath. In 2000, the then-Secretary General of WAMY expressly described the elements of what the Islamic charities, including WAMY, were providing Islamic fighters in Chechnya and elsewhere during that period: First, funding for weapons to fight with; second humanitarian relief; and third, ideological propagation to adopt the Wahhabist form of Islam. In 2001, WAMY's Assistant Secretary General stated, in substance, that violent resistance by Muslims was proper and lawful so long as it is in self-defense against an "occupier." When coupled with

---

[217] "The Chechen Tragedy: The Reality And The Required Role," Dr. Manei bin Hammad Al Juhani, translated from the Arabic, link listed as http://www.suhuf.net.sa/2000jaz/jan/15/fe1.htm, but this no longer is a working link. Provided to me as PDF document from this matter, FED-PEC 233836-233843 (English and Arabic).
[218] "WAMY team in Afghanistan risks life to deliver aid," Saudi Gazette, November 20, 2001, Exhibit 258, Noorwali Deposition, FED-PEC0235725-29,

the idea that all non-Islamic secular governments in areas where Muslims live are "occupiers," the line between "terrorism" and "self-defense" disappears. I assess that this merger of "self-defense" into "terrorism" is what happened with WAMY's operations in the field, as it acted as the "mother" of organizations such as IIRO and Benevolence and others who provided ongoing direct support to al Qaeda.

12.14.   *In summary*, these facts, coupled with additional information set forth in the documentation that I have reviewed, provide examples of how WAMY funded al Qaeda and associated Islamic terrorist organizations and separatist movements; channeled donated funds to al Qaeda and these organizations and movements; provided them financial and logistical support; helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones; provided weapons to al Qaeda, as well as Islamic soldiers and terrorists involved in affiliated or associated activities and causes; recruited young Muslims to join terrorist and separatist organizations and causes, including to become martyrs for Islam; served as a distribution channel for transmitting  information and documents to and from al Qaeda and within and among Islamic terrorist organizations and associated separatist movements; disseminated hate speech against Christians and Jews designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against "infidels;" and urged young Muslims to take up arms against secular, non-Islamist societies.

12.15.   *The Muslim World League ("MWL")* was established in 1962 by then-prince (later king) Faisal bin `Abd al-`Aziz to secure the legitimacy of the Saudi regime by globalizing Wahhabism. At its founding, it described its mission as "performing God's duty in spreading Islam (dawat al-Islam), explaining its principles and teachings, refuting interpretations which disfigure it, fighting conspiracies that seek to sow sedition among Muslims and undermine their unity and brotherhood, and taking into consideration Islamic issues so that the interests and hopes of Muslims may be achieved and their problems resolved." This mission has remained largely unchanged to this day, although MWL's current website adds that it will undertake these missions through "all means that are not at variance with the Sharia (Islamic law)," while "rejecting all acts of violence and promoting dialogue with the people of other cultures."[219]

12.15.1.   In its early decades, MWL's core purpose was to counter the Arab nationalism promulgated by Egyptian president Nasser, and thereby avoid challenges to the legitimacy of Saudi Arabia as a family-based dynasty. It therefore aligned itself with political Islam externally, just as it aligned with the Wahhabi religious leadership in Saudi Arabia internally. The result was that MWL became a mechanism broadly to support political Islam in other countries, which from about 1979

---

[219] "About MWL." Muslim World League Website, https://en.themwl.org/about-mwl

onward, with the outbreak of the First Afghan War, included support for the mujahedin, jihad and terrorism.[220]

12.15.2.   The relationship between MWL and al Qaeda appears to have been formed in the earliest days of al Qaeda's existence, through its involvement with both of al Qaeda's founding fathers: Osama bin Ladin, and Abdullah Azzam.

12.16.   *The MWL/Azzam Relationship.* Azzam was a leading figure in the Jordanian branch of the pan-Islamist Muslim Brotherhood, and one of bin Ladin's university professors in Saudi Arabia, obtained a teaching position in Islamabad, Pakistan, funded by MWL in December 1981. Azzam continued as a teacher there until he moved to Peshawar in 1986 to run MWL's office there. Throughout that time (1981-1986), he depended on his salary from MWL to make his living.[221]

12.16.1.   Azzam was a foundational figure for terrorist jihad generally and for al Qaeda specifically. One could properly think of him as the godfather of pan-Islamic foreign fighters. In the words of Thomas Hegghammer: "Azzam is known in the Islamist community as the spiritual father of the Arab Afghans, and the contemporary historical evidence supports this reputation. He arrived in Pakistan in 1981, produced recruitment literature from 1982 onward, gave talks about Afghanistan in the Arab world from 1983 onward, and established the foreign fighter logistics office known as the Services Bureau in Peshawar in late 1984. The significance of these initiatives is evidenced by the fact that most of the fighters who went to Peshawar before 1986 seem to have been inspired by Azzam's writings or helped by the Services Bureau, or both."[222]

12.16.2.   A more literary evocation of his Azzam's role in creating al Qaeda (while he was being paid a salary by MWL) is provided by New Yorker writer Lawrence Wright in his book on bin Ladin and al Qaeda, The Looming Tower:  "Azzam combined piety and learning with a serene and blood intransigence. His slogan was "Jihad and the rifle alone; no negotiations, no conferences, no dialogues." As Wright writes: "In the skillful hands of Sheikh Abdullah Azzam, the legend of

---

[220]  "Holy Wars, The Rise of Islamic Fundamentalism," Dilip Hiro, November 5, 2013, Routledge (2013), https://www.routledge.com/Holy-Wars-Routledge-Revivals-The-Rise-of-Islamic-Fundamentalism-1st/Hiro/p/book/9780203381014

[221]  "The Rise of Muslim Foreign Fighters, Islam and the Globalization of Jihad," Thomas Hegghammer, International Security, Vol. 35, No. 3 (Winter 2010/11), pp. 86-87, Harvard University, https://www.belfercenter.org/sites/default/files/legacy/files/The_Rise_of_Muslim_Foreign_Fighters.pdf

222 Hegghammer, id.

the Afghan holy warriors would be packaged and sold all over the world."[223]

12.16.3.  In this period, Azzam met frequently with bin Ladin in Saudi Arabia, stayed in bin Ladin's apartment, and held recruiting sessions there. In September 1984, the two men met, decided to join forces, and agreed to set up the Services Bureau, MAK.[224] As set forth in Section 7.2 and Section 7.3 of my Expert Report, MAK was the operational precursor to al-Qaeda that initially created the fundraising, recruitment, logistics, and arms networks that benefited Al-Qaeda during the 1990s. In a proffer of its evidence in the case involving the head of the U.S. charity Benevolence ("BIF"), the U.S. Department of Justice described this work as providing travel documents, funds, and other logistical support to the mujahidin fighting in Afghanistan, through IIRO, which in turn was under the umbrella of MWL.[225]

12.16.4.  Thus what became al Qaeda in substantial part originated in the partnership of bin Ladin and Azzam while Azzam was a salaried employee of MWL. According to Hegghammer, Azzam's obituary described him as an "MWL education adviser" at the time of his assassination by a roadside bomb in Peshawar in 1989.[226]

12.17.  *MWL's Relationship to al Qaeda.* The initial foundation MWL provided bin Ladin and Azzam provides the backdrop for MWL's continuing role in the development of MAK, and then of al Qaeda. MWL's office in Peshawar, Pakistan, where MAK began, was first headed by Azzam, and then by Wa'el Julaidan. Azzam's successor at the offices of MWL in Peshawar, which was also the offices of MWL's service affiliate, IIRO.[227] Julaidan was sanctioned by the U.S. Department of the Treasury on September 2002 as a specially designated global terrorist a year for having "been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network." In the designation, Treasury noted Julaidan's close direct ties to bin Ladin, as stated by bin Ladin himself, his ties to other key leaders of al Qaeda, and his service as a member of the Board of Trustees of the Rabita Trust and its Director

---

[223] The Looming Tower: Al-Qaeda and the Road to 9/11, Lawrence Wright, Vintage Books, 2006, 2011, pp. 110-111
[224] Wright, id., pp. 117-119.
[225] "Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," U.S. v. Aranout, NDIL, Case No 02 CS 892, 7 January 2003, p. 19.
[226] Hegghammer, id., p. 87
[227] Testimony of Steven Emerson with Jonathan Levin Before the United States Senate Committee on Governmental Affairs "Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror." July 31, 2003,  https://www.govinfo.gov/content/pkg/CHRG-108shrg89039/html/CHRG-108shrg89039.htm

General, which Treasury found to have provided both logistical and financial support to al Qaeda.[228]

    12.17.1.    The Rabita Trust, a subsidiary of MWL, was among the first entities sanctioned by the U.S. as a specially designated global terrorist in the immediate aftermath of the 9/11 attacks on October 6, 2001. The U.S. government found that Rabita Trust had "close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida."[229] In making its designation of the Rabita Trust on October 17, 2001, the UN Security Council found that the Rabita Trust had helped in the financing, planning, facilitating, preparing or perpetrating terrorist acts by al Qaida and bin Ladin.[230]

    12.17.2.    A commonly used Arabic name for the Muslim World League is "Rabitat al-Alam al-Islami," with the Arabic word "Rabita" or "Rabitat" meaning "link" or "association," or "league."[231]  The Rabita Trust's very name highlights its relationship as an off-shoot of MWL.

12.18.   *In summary:* MWL first funded Azzam as the head of MAK, continued to fund him while he was also the head of MAK's offices in Peshawar, and continued to fund the development of MAK through the Rabita Trust, which the U.S. and the UN Security Council both found to provide direct financial and other support to bin Ladin and Al Qaeda.

    12.18.1.    Given the Rabita Trust's status as a subsidiary of MWL, I can only conclude that the actions attributed by the U.S. government and the UN Security Council of the Rabita Trust's direct support to al Qaeda and bin Ladin are also to be attributed to MWL. I note that the U.S. government stated that Julaidan had "been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network," yet only specified his role in relationship to the Rabita Trust. I conclude that his roles also included being head of MWL's and IIRO's offices in Peshawar, and that these are likely the other, unspecified, NGOs that the U.S. Treasury was referring to in its press release.

---

[228] "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," September 6, 2002,  U.S. Department of the Treasury Press Release,
https://www.treasury.gov/press-center/press-releases/Pages/po3397.aspx

[229] U.S. Department of the Treasury Resource Center, Key Issues, Protecting Charitable Organizations, entry for Rabita Trust,  https://www.treasury.gov/resource-center/terrorist-illicit-finance/Terrorist-Finance-Tracking/Pages/charities_execorder_13224-p.aspx

[230] UN Sanctions 1267 Committee Summary for Rabita Trust, narrative of reasons for imposition of sanctions, October 17, 2001,
https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/rabita-trust

[231] *See, e.g.,* Oxford Islamic Studies Online http://www.oxfordislamicstudies.com/article/opr/t125/e1959 and "Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout*, NDIL, Case No 02 CS 892, 7 January 2003, p. 19

12.18.2.   Taking these relationships together, as well as additional information I have reviewed regarding MWL and the activities of its subsidiaries, which included IIRO, WAMY, Rabita Trust, and Benevolence, I conclude that MWL provided a wide range of support to al Qaeda and bin Ladin prior to the 9/11 attacks, by providing a grand tent to incubate and house key personnel of these entities in key periods of the development of their support for terrorism, and by providing funding to them that they were able to use to build the capacity of al Qaeda and associated organizations to carry out jihad locally and globally, including against the United States.

12.19.  The persistence of the U.S. government's continuing concern about these charities involvement in these activities even after the 9/11 attacks is notable, and persisted for many years after 9/11.

12.19.1. A State Department cable entitled "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance," from December 30, 2009 shows that the U.S. government was still pressing Saudi Arabia to take action against those three charities at that time. The cable further stated that at the time, these charities were still providing material support to terrorists.

12.19.2. As stated in the State Department December 30, 2009 cable "for action" by the U.S. Embassy in Riyadh and other U.S. Embassies in the Gulf States and in Pakistan: "Saudi Arabia has enacted important reforms to criminalize terrorist financing and restrict the overseas flow of funds from Saudi-based charities.  **However, these restrictions fail to include multilateral organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY.) Intelligence suggests that these groups continue to send money overseas and, at times, fund extremism overseas**. [emphasis added]  In 2002, the Saudi government promised to set up a Charities Committee that would address this issue, but has yet to do so. The establishment of such a mechanism, however, is secondary to the primary U.S. goal of obtaining Saudi acknowledgement of the scope of this problem and a commitment to take decisive action."[232]

12.19.3. Finally, I note the 1993 conversations reported by former Al-Qaida operative Jamal Ahmed al Fadl with bin Ladin, in which bin Ladin identified three Muslim charities as the primary sources of al Qaida's

---

[232] "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance," U.S. Department of State Cable to Embassy Riyadh, December 30, 2009, https://wikileaks.org/plusd/cables/09STATE131801_a.html  I do not have information that this cable to have been authenticated by the Department of State; however, based on its formatting, numbering, and detail, which are consistent with the cables I have reviewed during my tenure at the Department, I assess that it is an authentic document, however the means by which it was obtained by Wikileaks.

financial and fundraising activity. They were named by al Fadl as the Muslim World League, Benevolence International Foundation, and the Qatar Charitable Society.[233] In a debrief to U.S. investigators, al Fadl explained that bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers. In the debrief, al Fadl explained that Julaidan's underlying organization was "Ribeta al-Aram al-Islamyi," based out of Mecca in Saudi Arabia, that was "like a mother." In response, the U.S. agent interviewing al Fadl said, "like a mother NGO?" Al Fadl said, "yes." The U.S. agent then said "the mother of all NGOs," and al Fadl repeated, "yes."[234] This "mother NGO" refers to MWL; indeed, the Arabic translation for Muslim World League is routinely given as "Rabitat al-Alam al-Islami," in transliterated English from the Arabic. Julaidan was a major terrorist financier for al Qaeda, as set forth elsewhere in my Expert Report. Taking all of these facts together, I consider al-Fadl's testimony that Julaidan was working for MWL at the time he was providing an array of material support to al Qaeda to be a smoking gun of MWL's own material support for al Qaeda and bin Ladin.

12.20.  The above narrative summarizes a vast amount of information about these organizations, but that information remains extremely incomplete. I have reviewed discovery requests made by the plaintiffs in this case, and have noted the documentary responses from IIRO, MWL, and WAMY. As set forth in the pleadings and documents that I have reviewed, the responses from these charities to the discovery requests are improbably thin. They cannot possibly represent all the actual documentation regarding financial transactions among these three entities and entities and people who have been designated for sanctions by the United States, the UN Security Council and others due to their support of al Qaeda and terrorism. I conclude it very likely that there is, or was, additional documentation which could provide further information on the extent to which these organizations provided assistance to jihadists in zones of conflict, and to the organizations and persons who have been sanctioned for providing help to al Qaeda and bin Ladin. Even in the absence of that information, the record, incomplete as it is, provides sufficient data points to enable me to assess that these three charities provided substantial material support to advance al Qaeda's terrorist mission. Such support included at various times and various locations creating and disseminating propaganda to indoctrinate and recruit; funding charities and organizations engaged in building terrorist networks, and included some direct operational support to recruit, train, equip and arm, fighters and

---

[233] Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout,* NDIL, Case No 02 CS 892, 7 January 2003, p. 25.
[234] Interview of al-Fadl, Exhibit 141, PEC-KSA002135-2143,  01-1535-cr(L)

terrorists, by giving them such assistance as office space or cover as humanitarian workers.

12.21. Although IIRO's offices in Indonesia and the Philippines were later sanctioned by the U.S. and the UN Security Council, neither IIRO as a whole, nor MWL nor WAMY, has been designated for U.S. sanctions due to their having provided support to al Qaeda and bin Ladin, despite the evidence of their involvement in doing so. There are many reasons why the U.S. government does not designate individuals and organizations for sanctions even when it has sufficient evidence to do so, as terrorist sanctions are used in a discretionary fashion to advance overall U.S. national security and UN global security interests. As I discuss in greater detail in Section 16 of my Expert Report, there can be overriding political and security factors that cause the U.S. not to designate persons and entities despite their support of terrorism. In the case of MWL, the reason not to do so should be obvious: the organization had been created by then Saudi Crown Prince Faisal, who soon thereafter became Saudi Arabia's King. It has been supported by the Saudi Royal Family ever since. The United States needed the Saudi government to help counter the monster it had created through the use of its charities to fund Islamic militancy and pan-Islamic Wahhabism. To maintain its relationship to combat future terrorist attacks, the U.S. has been faced with very difficult choices to make in who to sanction and who not to sanction. In my opinion, the U.S. sanctioned the "lesser" Islamic charities that were less central to the Saudi regime's efforts to maintain its religious legitimacy through the propagation of Saudi-style Islam throughout the world, such as Benevolence and the Rabita Trust, and continued in dialog with the Saudi government in an effort to "fix" others, such as the IIRO (other than its Indonesian and Philippines branches which were ultimately designated), WAMY, and MWL, so that they would no longer be a threat.

13. *Is it Possible to Determine Whether the Material Support Given by the IIRO, WAMY, and MWL was for Humanitarian Purposes or for Terrorism Purposes?*

13.1. IIRO, WAMY, and MWL each engaged in both humanitarian and terrorist support activities prior to the 9/11 attacks. With rare exceptions, it is not possible to estimate the amounts or percentages of each type of these activities.  First, the charities themselves did not provide sufficient, and sufficiently accurate, documentation on what they were doing to enable one to make such a break-down by amount or by percentage. Second, in practice, support for these two seemingly-different types of activities substantially overlapped.

13.2. These charities undertook propagation activities in support of Wahhabi religious doctrine and to provide relief services in areas of conflict and/or humanitarian need, including but not limited to Afghanistan, Algeria, Bosnia, Chechnya, Indonesia, Israel/Palestine, Kashmir, Pakistan, the Philippines, Somalia, Sudan, Tunisia, and elsewhere. In the course of undertaking these two types of activities, these charities also were knowingly and intentionally providing support to "self-defense" or armed resistance in conflict on the ground with forces representing

the governments of those or neighboring countries

13.3.     As stated throughout my Expert Report, the Wahhabist ideology propagated by
these charities, including its intolerance for Christians and Jews, its promotion of
Jihad, including martyrdom, and its call to redeem territory for the Islamic world,
provided the ideas that led to the indoctrination of those who came to fight fo al
Qaeda and associated groups. The humanitarian support and relief activities,
including activities at orphanages and schools directed at young Muslims, merged
with recruitment activities to produce Islamic fighters for battle with non-Islamic
forces controlled by "infidels," especially in areas of active warfare such as
Afghanistan, Bosnia, Chechyna, Israel/Palestine, and Kashmir, but also in other
areas such as Southeast Asia, West Africa, the Maghreb, and East Africa, where
pan-Islamic fundamentalism was seeking to establish Islamic rule as an
alternative to secularist control.

13.4.     The recruitment activities in turn merged with support activities, such as the
provision of office space, fake identification as workers for the charities,
facilitation of travel, and sponsorship of others who were directly engaged in
acquiring weapons for use by Islamic fighters. In Afghanistan, it included the
actual acquisition of real estate to be used for the training of Islamic fighters that
also became training grounds for terrorists in such areas as how to use weapons
and make bombs. These activities in turn helped al Qaeda build its global
network, recruit and train terrorists, and deploy them on a global basis, including
against the United States and to carry out the 9/11 terrorist attacks.

13.5.     Audits of branches of IIRO, discussed also in Section 10.9 of my Expert Report,
provide context for why it is impossible to determine the precise amounts
provided by these entities that were used to provide material support to al Qaeda.

13.5.1.  The audit of the IIRO Pakistan Branch Office from January 1, 1996
through February 22, 2001 found the apparent diversion of millions of
dollars of funds by that branch, and the wholesale fabrication of invoice,
receipts and entire projects to conceal that activity. The audit found
"tremendous financial embezzlement; roughly a million according to the
local currency."[235] One related finding is of particular importance: an
internal memo from an IIRO Financial Supervisor to the Secretary General
of IIRO, Adnan Basha, dated April 21, 2001, states that "certain invoices
are forged with names of unreal companies. The team went to the address
of these companies and shops and confirmed that they are unreal."[236]

13.5.2.  The 1996 CIA Report referred to this IIRO branch office as the means by
which the the IIRO funded six al Qaeda training camps. There is no
reference in the audit to IIRO funding training camps, or to any other uses
of the funds for military activity, violence, and/or terrorism. I would not

---

[235] IIRO 26468-26490
[236] IIRO 31006-31007

expect to find such a reference. I conclude that the information in the 1996 CIA Report that such funding did take place was reliable and accurate, as the CIA routinely has to vet and assess sources, and would not have included the information in the report if it had concerns about the reliability of the source.[237] The financial irregularities reflected in the audit of the IIRO Pakistan branch are consistent with this conclusion.

13.5.3. I have also been provided information on an audit of IIRO Indonesia covering the 2003/2004 timeframe, well after the 9/11 attacks. That audit found that the accounting system used by IIRO Indonesia was deficient and that accounting records could not be matched. Among the findings were that there was no ledger that met the need for an effective accounting system and that the auditors could not match debit balances because the main office for the charity did not have a current account.[238] The audit itself did not show support for terrorism, which is not surprising given that no documentary trail was maintained for the actual use of the funds, but that the U.S. government's findings make clear that such activities did take place at that branch of IIRO. [239]

13.5.4. I have been provided a few pages excerpted from an audit of IIRO Jordan. These few pages, as set forth in Section 10.9.4 of my Expert Report, also showed irregularities and anomalies, which included duplicate payments, deviations from polices and financial guidelines, and no oversight in practice over what the charity was doing in Jordan.

13.5.5. When audits find deficient accounting systems and fabricated records and missing documentation and oversight at a charity such as the IIRO in three branch offices, they suggest that other audits would find similar deficiencies, making the financial records that do exist at best untrustworthy and unreliable, and demanding upon the level of deficiency, worthless as proofs that the charity was doing what it claims it has been doing.

13.6.   Even the most comprehensive review of the documents that exist today would not make it possible to precisely allocate the use of IIRO, WAMY and MWL assets prior to the 9/11 attacks between humanitarian support, on the one hand, and material support for terrorism, on the other. In conflict zones where Islamic

---

[237] IIRO 31160-31166
[238] Audit, IIRO Indonesia, IIRO 34989-35007.
[239] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of Treasury Press Release, August 3, 2006
https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx   The support provided by the IIRO to terrorist groups in the Philippines during the period of time IIRO's offices there were controlled by bin Ladin's brother-in-law, Mohammed Khalifa, was clearly considerable, and an audit to be proper would need to address the entire range of activities involving diversions that have been described to date. See for example "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiya," Zachary Abuza, Contemporary Southeast Asia Vol. 25, No. 2 (August 2003), pp. 169-199.

fighters were at war with secular forces, and where so much of the aid was
provided, there was no bright line to separate these activities in practice. Nor have
I seen evidence that prior to the 9/11 attacks anyone supporting these charities
sought to create or enforce a line to distinguish between humanitarian work,
military activity against armed forces, and terrorism directed against civilians.

13.7. The limited audits that I have been provided are indicative of the broad problem:
the charities did not maintain controls that would have prevented their use by
actors on the ground to support terrorism. In the face of extensive evidence that
the controls were inadequate, and requests by U.S. officials to address the use of
the charities to facilitate extremism and terrorism, the leaders of the charities did
not take meaningful efforts to put such controls in place and thereby begin to
address the use of the charities to support al Qaeda and aligned terrorist groups.[240]

13.8. Based on the information I have reviewed, I conclude that comprehensive and
accurate audits of all the offices of each of these charities (if they were to exist)
would uncover additional discrepancies between the claimed uses of funds and
proofs that these uses of funds were the actual activities carried out in practice.
However, I would not expect documents maintained by the charities to document
use for activities labeled as "terrorism." Every UN member states has signed on to
one or more of the UN anti-terrorism conventions.[241] Any charity, even one
charity knowingly funding the provision of weapons, would avoid putting on
paper statements that it was using charitable funds to purchase weapons.  Instead,
what you would expect to find is documentation of lax auditing.

13.9. The Saudi government has told the U.S. government that comprehensive audits of
its international charities were undertaken in a comprehensive fashion, but I have
substantial uncertainty whether such statements were accurate as based on the
information I have reviewed, no such comprehensive audits (with the very limited
exceptions cited in my Expert Report) have been provided to outsiders.

13.10. For all of these reasons, it is not possible to determine the exact amount of the
material support given by IIRO, WAMY and MWL for terrorism, or to compare it
to the amount these charities carried out in humitarian activities. It is clear that
these charities carried out extensive humanitarian activities, although some of

---

[240] Even information that funds were spent for humanitarian purposes could be misleading if the
expenditures related to propagation activities, such as the building or maintenance of mosques or
madrassas, given the ideological content of those institutions prior to 9/11.

[241] "As a result of the attention focused on countering terrorism since the events of 11 September 2001 and
the adoption of Security Council resolution 1373 (2001), which calls on States to become parties to these
international instruments, the rate of adherence has increased: some two-thirds of UN Member States have
either ratified or acceded to at least 10 of the 19 instruments, and there is no longer any country that has
neither signed nor become a party to at least one of them." UN Counter-Terrorism Committee, International
Instruments, https://www.un.org/sc/ctc/resources/international-legal-instruments/. As of 2020, there are 194
UN member states. Of these, 189 are currently parties to the UN International Convention for the
Suppression of the Financing of Terrorism.  UN, Status, International Convention for the Suppression of
the Financing of Terrorism, https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-
11&chapter=18&lang=en

these humanitarian activities had a dual purpose in propagating an ideology aligned with that of al Qaida, and in helping al Qaida recruit potential terrorists. It is also clear that these three charities provided extensive support for Islamic jihad and terrorism prior to 9/11. In some cases, the two types of activities – humanitarian on the one hand, and military or terrorist on the other, were entirely separate. In other cases, the two activities were inextricably intermingled, as I have stated in my examination of their roles in Afghanistan, Bosnia, and Chechnya, in particular, and as took place in the activities in South East Asia during the period IIRO was controlled by bin Ladin's brother-in-law. In still other cases, such as the activities of IIRO in Africa in connection with the bombing of the U.S. Embassies in Nairobi and Dar es Salaam, the interrelationship of legimate charitable activity and support for terrorist operations by these three charities remains murky, due to inadequate investigation.[242]

13.11.   *To conclude:* the difficulty in separating the two types of activities, the one, humanitarian, and the other, military and/or terrorist, in the period prior to 9/11, is inherent in the way the charities operated, and one of the reasons for the continuing concerns expressed by the U.S. government to Saudi Arabia, as the sponsor of these three charities, about what Saudi charities were doing, both before the 9/11 attacks, and after. Saudi oversight of these charities was minimal, and the record is clear that efforts to document what the charities were actually doing on the ground were, at best, inadequate. But no one should doubt that in practice, these and other Islamic charities, as a result of actions by some of their most senior personnel, played a foundational role in providing al Qaeda with ideological, financial, and operational capabilities that it needed to grow from its origins in Afghanistan to become a global terrorist organization with global terrorist capabilities.

14.   *What is the Purpose of the EO 13224 Designation Program?*

14.1.   One of the Federal government's first responses to the terrorist attacks of September 11, 2001 was President Bush's signing of Executive Order 13224 entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism." ("EO 13224"). As its title suggests, the Executive Order's general aim has been to cut off resources to terrorists and terrorist organizations through asset blocking. EO 13224 prohibits transactions with individuals and organizations deemed by the Executive Branch to be associated with terrorism and blocks any assets controlled by or in the possession of such entities and those who support them.[243]

---

[242] "Muslim Charities Under Scrutiny," Washington Post, September 29, 2001, https://www.washingtonpost.com/archive/politics/2001/09/29/muslim-charities-under-scrutiny/a72826c9-5789-4d31-844a-c0452c89e43f/
[243] "Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," Federal Register, Vol. 66, No. 186 Tuesday, September 25, 2001, https://www.treasury.gov/resource-center/sanctions/Documents/13224.pdf

14.2. A Fact Sheet issued by the White House when EO 13224 was issued provides useful insight into its purposes, and its scope, as illustrated in the excerpts I provide below:

14.2.1. "The President has directed the first strike on the global terror network today by issuing an Executive Order to starve terrorists of their support funds.  The Order expands the Treasury Department's power to target the support structure of terrorist organizations, freeze the U.S. assets and block the U.S. transactions of terrorists and those that support them, and increases our ability to block U.S. assets of, and deny access to U.S. markets to, foreign banks who refuse to cooperate with U.S. authorities to identify and freeze terrorist assets abroad."

14.2.2. The White House press release further states that EO 13224 would target all individuals and institutions linked to global terrorism; allow the Treasury to freeze U.S. assets and block U.S. transactions of any person or institution associated with terrorists or terrorist organizations; name specific individuals and organizations whose assets and transactions are to be blocked, and identify "charitable organizations that secretly funnel money to al-Qaeda." It also stated that it would provide "donors information about charitable groups who fund terrorist organizations," and stated the President's intent to punish those financial institutions at home and abroad **that continue to provide resources and/or services to terrorist organizations.**"[emphasis added]

14.2.3. Just eleven terrorist organizations were listed in the original order, including organizations that make up the al-Qaeda network, together with a dozen terrorist leaders, including bin Ladin and his chief lieutenants, three charitable organizations, and one corporate front organization. EO 13224 authorized the Secretary of State and the Secretary of the Treasury to make additional terrorist designations in the future.[244]

14.3. The initial listings were a small subset of the persons and entities who would eventually be added to those sanctioned under EO 13224. After the initial designations in September 2001, Treasury continued at various times to designate additional persons and entities for their facilitation of terrorism. As of June 16, 2004, for example, the United States had designated 375 individuals and entities as "specially designated global terrorists" or "SDGTs" under EO 13224. More than 270 of these entities are associated with either al Qaida or the Taliban.[245] As of December 31, 2018, a total of 1,411 individuals and entities had been designated and remained listed as "Specially Designated Global Terrorists" or

---

[244] "Fact Sheet on Terrorist Financing Executive Order," White House, September 24, 2001, https://georgewbush-whitehouse.archives.gov/news/releases/2001/09/20010924-2.html
[245] "Testimony of R. Richard Newcomb, Director Office of Foreign Assets Control U.S. Department of the Treasury Before the House Financial Services Subcommittee on Oversight and Investigations," June 16, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1729.aspx

"SDGTs" for having met one or more of the criteria for designation set forth in E.O. 13224 and were therefore blocked.[246] From time to time, based on the need to have the sanctions meet their goal of deterring terrorism, Treasury also dropped people and entities from the list, "delisting" them, after keeping them on the list was no longer needed to achieve the anti-terrorism goal.

14.4.   The adding and dropping of names over time has been a normal and natural aspect of the administration of EO 13224, which is a form of list-based sanctions, or smart sanctions, which have allowed the U.S. government to more precisely target persons and groups who pose a threat to national security, foreign policy, and economy of the United States. In cases of list-based sanctions such as EO 13224, OFAC prohibits transactions between U.S. persons and particular individuals and entities, including charities, on an "as-needed" basis, to counter the risks to the United States posed by these individuals and entities for past, or ongoing and future involvement in terrorism or terrorist support.

14.5.   From the 1990's onwards, the U.S. government has generally preferred to use list-based sanctions, rather than to sanction entire countries, for three principal reasons:

14.5.1.   First, smart sanctions are able to target bad actors without the substantial collateral damage that sanctions imposed on an entire country have on the targeted nation's population.

14.5.2.   Second, list-based sanctions are very effective in specifically deterring terrorists and terrorist supporters from being able to use their funds to support terrorism across borders. In practice, they have had substantial impact in shutting down the ability of listed people and entities to undertake financial transactions throughout the world, especially through financial institutions that have contacts with the United States and the EU. Few foreign financial institutions want to take the risk of being sanctioned in turn by the United States for having continued to do business with anyone sanctioned for terrorism.

14.5.3.   Third, list-based sanctions on a limited number of persons and entities not only deter the sanctioned persons and entities from providing support to terrorism, but also have a broader impact of deterring those who are not sanctioned, but know themselves to be at risk of being sanctioned. People and entities who have not been sanctioned but who have engaged in behaviors that justify their being sanctioned may cease engaging in material support of terrorism in order to avoid losing their right to do business and to travel.

---

[246] 2018 Terrorist Assets Report, U.S. Department of the Treasury Twenty-seventh Annual Report to the Congress on Assets in the United States Relating to Terrorist Countries and Organizations Engaged in International Terrorism, https://www.hsdl.org/?abstract&did=825946

14.6.   Consistent with this list-based approach, the numbers of people and entities who have been designated for sanctions under EO 13224 have changed over time. The U.S. government expends a tremendous amount of time and care in deciding how best to leverage these sanctions to achieve its national security and counter-terrorism goals. There are times that naming a person or entity on a sanctions list is the only possible policy choice. But there are also times that not sanctioning a person or entity for past bad conduct, including actions that may constitute terrorism under U.S. and foreign laws, may be the most effective way of stopping terrorism. The U.S. government applies sanctions to particular persons and entities, or not, based on what it deems most likely to meet this overarching policy goal, weighing all relevant factors.

14.7.   In summary, the purpose of the EO 13224 designation program is to counter terrorism through the use of U.S. economic sanctions powers. It is a powerful, national security authority that gives the President discretion, in consultation with others in the U.S. government, to leverage the U.S.'s central role in the world economy to take whatever actions they deem necesssary and proper, including economic sanctions against particular people and entities, to counter the risk of terrorists being able to take advantage of economic resources to attack the United States and other countries.

15. *What Kind of Evidence Does the US Need In Order to Designate a Person or Entity Under that Program?*

15.1.   When the United States prepares to designate a person or an entity under EO 13224, it undertakes an extensive interagency process to accumulate information about the relationship of that person or entity to the terrorist threat. It seeks to meet a number of standards simultaneously. These include, among other requirements, discussed below, finding information to show that the person or entity has a relationship to the terrorist threat; that sanctioning the person or entity will help the U.S. counter the terrorist threat; that the U.S. government will be in a position to provide sufficient documentation to a U.S. court in unclassified form to meet any challenge by the sanctioned person or entity to the designation; and that the overall information in both classified and unclassified forms is sufficiently robust to justify the impact that the sanction would have on an innocent party.

15.2.   As these agencies are consulted, the evidence that is developed is likely to include a mixture of raw intelligence from the intelligence community, finished analytic intelligence from those sources;[247] confidential government sources from other parts of the government such as from the State Department, of the type of material included in diplomatic cables, and law enforcement information collected by one or more of the U.S. law enforcement agencies (they include the FBI, the Drug Enforcement Administration, U.S. Customs and Border Protection, the Secret

---

[247] Raw intelligence could include a transcript of an interview with a member of Al Qaeda such as al Fadl. Finished analytic intelligence could consist of material such as the 1996 CIA Report.

Service, the State Department's Diplomatic Security Service, the Coast Guard, and the Bureau of Alcohol, Firearms, and Tobacco, as well as the Departments of Justice and Homeland Security). Open source information is collected as well, from a range of sources including online media available in English and other languages, and information broadcast on radio or television or cable in English or other languages. Passport or travel information from U.S. government or foreign government databases may also be included; banking information if available; and information from any relevant court records.

15.3.   In undertaking this process, the Treasury Department as the lead agency for putting together packages for sanctions candidates consults with the Central Intelligence Agency and other parts of the U.S. intelligence community to assess what information it has in U.S intelligence about a person or entity's relationship to the terrorist threat; it does the same with the FBI and other components of the Department of Justice and the Department of Homeland Security (or its precursors). The State Department is consulted to assess the impact that sanctioning a person or entity would have on U.S. foreign relations, which includes the need to continue to work with other contries and to obain their cooperation in combatting terrorism. The State Department in turn consults internally with its Embassies in countries that could have an interest in the candidate for sanctions, to obtain the views of the Ambassador as to whether sanctioning a person or entity would have an overall positive, neutral, or negative impact on obtaining cooperation from the foreign country against terrorism. The Defense Department is consulted, and may be asked to assess the impact of sanctioning a person on its relationships with the military in a foreign country that could be affected by the sanctions. The Energy Department may be consulted if the foreign country's energy relationships with the United States might be impacted by a particular sanction; the Commerce Department might also have views.

15.4.   All of these materials are then put together in a package, which typically will include information that is subject to various levels of classification, depending on its source and nature, as well as unclassified information. Some important classified information that is on topic may be excluded from a package, if the information is so secret and compartmented that includng it and disseminating it within those involved in the sanctions process would be incompatible with its classification. In such cases, the President or other very senior officials might be told about this additional informaton, which would not be available to those without the requisite clearance and need to know.

15.5.   At the end of this process, the package, remaining in a classified form, is shared with the cabinet officials, or designated officials below the cabinet officials, who will meet to discuss the package. Typically this is in done in phases, first, at a level several stages below the heads of the departments (Secretaries), then at the Deputy Secretary level, and finally at the Secretary level in a meeting typically convened by the National Security Advisor to the President, and when appropriate by the President.

15.6.    The evidence has to be sufficient to demonstrate that sanctioning this person or entity could help reduce the risk to national security from al Qaeda or another terrorist group with whom the person or entity has had a relationship. This is not the same standard required by a court for a criminal conviction, or the same standard for even a civil case. It is a standard in which the President and the Secretary of the Treasury, guided by information and positions taken during the course of the inter-agency process, have great discretion, due to the sanctions being applied under a national security authority. These are decisions in which the goal is to use sanctions against foreign persons to protect U.S. national security. They are not decisions about whether the U.S. government can prove beyond a reasonable doubt that the person or entity has violated U.S. laws and should be indicted. Because they are national security decisions, not criminal law decisions, designations are not subject to the same rules that would be applicable to a criminal, or even a civil, case.[248]

15.6.1.   One reason the U.S. government tries to supplement the classified information it puts together in each package with unclassified "open source" information is to ensure that if a sanctioned person seeks to have a sanctions determination overturned by a U.S. court, the government will be able to provide sufficient unclassified information to the court to win its case against any such challenge.

15.6.2.   An example of the kind of evidence the U.S. uses to designate a person or entity under the program is the package of materials provided to the then-acting Director of OFAC for the designation for sanctions under EO 13224 of Abd al Hamid Sukaman al- Mujil and the IIRO's Philippines and Indonesia branches. The declassified version of that package shows that the U.S. compiled and relied on 112 documents. Most of these remain classified. Based on the reasons specified for their continuining classification, I understand them to involve intelligence, law enforcement, or other confidential internal U.S. government documents. Eighteen of the documents were unclassified. These consist of the types of materials I have described in this section, such as newspaper articles, material translated by the U.S. Foreign Broadcast Information Service (now called the Open Source Center), information from websites, documents from court filings, and unclassified portions of government documents.[249]

---

[248] Courts reviewing these designations apply the "highly deferential standard" of the Administrative Procedure Act, meaning that a court may set aside Treasury's action "only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' *Zevallos v. Obama*, CV 13-0390 (RC), 2014 WL 197864 (D.D.C. Jan. 17, 2014) (quoting 5 U.S.C. § 706(2)(A)) https://caselaw.findlaw.com/us-dc-circuit/1707548.html

[249] Memorandum for Barbara Hammerle, Acting Director, Office of Foreign Assets Control, from Matthew Levitt, Deputy Assistant Secretary, Office of Intelligence & Analysis, Additional Designations Pursuant to E.O. 13224, Dr. Abd Al Hamid Sulaman al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches, undated, Exhibit 144, Affirmation of Sean Carter Transmitting Evidence in

15.6.3. In my experience, it is typical that much or most of the material compiled by the U.S. as it considers whether to designate a person or entity in a sanctions program consists of or includes classified material.

15.7. In summary, the types of evidence include classified intelligence and law enforcement information, supplemented by unclassified sources such as newspapers and broadcast media, websites, and court filings. The evidence in the package has to be sufficient for the U.S. government to conclude that the imposition of sanctions is both justified on the basis of the relationship of the candidate for sanctions, and will help achieve the goal of EO 13224 – to counter the risk of terrorism and terrorist support.

16. *Does the Fact that the US Has Refrained from Designating a Person or Entity Pursuant to EO 13224 Provide a Basis to Conclude that the Entity in Question Did Not Provide Support to Terrorism? Are There Reasons the US May Refrain From Designating a Person or Entity Even Though the US Has Convincing Evidence that the Person or Entity is Engaged in Supporting Terrorism?*

16.1. No one should conclude that a person or entity who has not been designatd under EO 13224 therefore has been in any sense "cleared" as not involved in providing material support for terrorism. There are multiple reasons for not designating even when the evidence to justify designating the person or entity for material support of terrorism under EO 13224 is clear. The national security rationale for designating people and entities under EO 13224 means all factors have to be weighed. Interagency process involving foreign policy, intelligence, military, economic and law enforcement considerations, as well as national security. The U.S. has information on many people and entities about whom it has such information without designating them.

16.2. The many reasons for a person or entity who has engaged in such support not to be designated include among others:

16.2.1. *Cases in which designating a person or entity may be legally justified on the basis of their material support of a terrorist group, but not found to advance the U.S. government's overall objective of reducing the risk of terrorism.* This can be true, for example, when a person has provided such support, but the political and foreign policy costs of designating the person would impair cooperation from a foreign country that is needed by the United States.

16.2.1.1. In the case of Saudi-sponsored charities, for example, the United States sought to obtain Saudi cooperation to undertake joint designations of some charities, which it obtained, while entering into discussions with Saudi Arabia to secure reforms to other charities that had been directly supported by the Saudi

Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

128

Arabian government and the Saudi Royal Family. This approach is reflected in joint designations involving the United States and Saudi Arabia for al-Haramain in 2004,[250] and the continuing discussions between the U.S. and Saudi Arabia on how to reform charities that had not been designated, such as the IIRO, MWL, and WAMY.

16.2.1.2. These discussions are reflected, for example, in a June 16, 2006 State Department cable discussing an upcoming trip of then U.S. Homeland Security Advisor Fran Townsend to Saudi Arabia. As stated in the cable, Ms. Townsend was seeking to obtain "concrete Saudi cooperation by July 18 in addressing USG concerns about IIRO-EP [that is, the IIRO's office in the Eastern Province of Saudi Arabia], including law enforcement action, shutting down the branch, or co-sponsorship for the UN listing, emphasizing the importance of cooperation, but stressing the need for unilateral U.S. action if concrete Saudi cooperation does not result in definitive action against IIRO-EP."[251]

16.2.1.3. Soon thereafter, the U.S. unilaterally designated the head of IIRO-EP for sanctions, without the participation or agreement of Saudi Arabia, as well as the Philippine and Indonesian branches of IIRO.[252]

16.2.1.4. IIRO-EP itself was not designated, despite the information that the U.S. government had developed about its involvement in material support of al Qaeda. Instead, the head of the branch of this charity was designated. The U.S. has not publicly explained the reason it chose not to designate IIRO-EP. Based on my reading of the record available to me, I conclude that the reason was based on both political and policy considerations: the United States needed Saudi Arabia to take further steps to curtail the use of charities in Saudi Arabia to provide material support to terrorism; concluded that designating IIRO-EP itself would be counterproductive to achieving that goal; and designated its head both to stop him personally from engaging in further terrorist finance activities and to send a message to Saudi Arabia that there would be the risk of further designations

---

[250] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," January 22, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1108.aspx

[251] State Department Cable 06STATE99426 June 16, 2006, regarding visit of Townsend to Saudi Arabia, Exhibit 115, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina.

[252] "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx

unless that government took sufficient steps to address the threat.

16.2.2. *Cases in which a designation would put at risk sensitive intelligence.or law enforcement information or activities.* I have personally been involved in discussions at the National Security Council in which one or more components of the U.S. government have opposed the designation of persons or entities who engaged in acts defined as terrorism under U.S. and under international law, due to the concern that a designation could have a negative impact on ongoing law enforcement or intelligence matters.

16.2.2.1.  An example of this type of concern would include when, a U.S. intelligence agency was obtaining important cooperation from someone who had in the past provided material support for terrorism. If the U.S. government concluded that the value of continuing to obtain that cooperation outweighed the value of sanctioning the person, the person would not be designated. Although the designation would be justified and proper under EO 13224 due to the person's prior bad acts, it would not advance the overall policy goal of EO 13224 to combat terrorism, and therefore, the person would not be designated.

16.2.2.2.  Another example would be a case in which U.S. law enforcement agencies were currently working with persons who had provided material support to terrorism in the past, but were now involved in cooperating on an active law enforcement investigation. Again, a designation would be justified and proper under EO 13224, but the person would not be designated for these other reasons.

16.2.3. *Cases in which foreign policy considerations would provide an overriding reason not to designate a person or an entity under EO 13224.* As I have described, the process of agreeing to sanction a person or entity under EO 13224 involves many components of the U.S. government, including the State Department. A decision to designate a prominent foreign person or entity often raises very difficult and sensitive foreign policy questions. The State Department in particular will be aware of a host of ongoing areas of cooperation between the  U.S. and a foreign country which could be impacted by such a designation. There are times when the State Department, or other components of the U.S. government with active interests in the foreign country, such as the Department of Treasury or Department of Commerce, will express concern about the designation of a person or entity based in that country due to such considerations.

16.2.3.1. I do not know whether foreign policy considerations affected particular decisions not to sanction particular charities sponsored by the Saudi Royal Family and/or Saudi government. I do know that the State Department and its Embassy in Riyadh would be consulted throughout the consideration of any proposal to sanction such a charity, and would weigh in with assessments of the possible consequences of such a designation, which could have negative consequences for countering terrorism if it impacted bilateral cooperation on those issues, as well as any positive ones for shutting down future actions by that charity.

16.2.3.2. I have personally participated in discussions within the State Department and interagency in which foreign policy considerations were major factors in deciding whether to designate a person or an entity under a U.S. sanctions program, and in which persons or entities were not sanctioned although the evidence was absolutely clear that they had engaged in an act defined as terrorism under U.S. law.

16.2.4. *Cases in which a person or entity has engaged in material support of terrorism in the past, but has changed their behavior, or gone out of business.* As the purpose of sanctions under EO 13224 is to counter the risk of terrorism by drying up funding for al Qaeda and other terrorist groups, there may be times when an entity has demonstrably engaged in funding terrorism, but designating that entity for sanctions would not advane this overriding goal, as it is no longer in business or has changed its behavior.

16.2.4.1. For example, there is substantial information about the use of the Saudi-based Muwafaq Foundation for supporting al Qaeda. However, the organization was largely out of business by the time of the 9/11 attacks. Accordingly, the U.S. government did not designate the charity.[253]

16.3. In summary, the U.S. often refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries in combatting terrorism, as I have seen through my own direct participation in discussions at the National Security Council regarding people and entities who engaged in substantial acts of terrorism as defined under both U.S. and international law who have never been designated, due to other considerations.

---

[253] "More Assets Frozen in Terrorism Fight" Washington Post, October 14, 2001, https://www.washingtonpost.com/archive/politics/2001/10/14/more-assets-frozen-in-terrorism-fight/9f3f8ea7-33b8-4ec3-8cb0-40667eb3ac8c/

17. *Does the Fact that the US has Withdrawn the EO 13224 Designation of a Person or Entity Amount to Exoneration? If not, why not?*

17.1.   The withdrawal of a designation of a person or entity under EO 13224 is a normal and natural part of the sanctions program, and has happened many times over the years, as it has with other U.S. sanctions programs. Sanctions are not intended to last forever, but only so long as the U.S. government considers them necessary to carry out the purpose of the sanctions. A withdrawal should never be considered an exoneration unless the U.S. government has publicly stated that the original listing was undertaken in error.

17.2.   I have personal experience, both as a private sector attorney and as a senior government official, with the delisting of people and entities who were listed for sanctions for proper reasons by the U.S. government and who were later delisted. Below I provide an example of each experience, which illustrates why the withdrawal of a designation does not amount to exoneration, but rather, to changed circumstances and needs.

17.3.   During the Bush Administration, in the mid-2000's, as a private sector attorney, I helped secure the delisting of entities sanctioned under Balkan sanctions programs, which like EO 13224 allow for delisting when a sanction is no longer needed because circumstances have changed, and the listing no longer serves the goal of the sanctions program. The delisting was of entities known as Srbska Sume, that owned timber forests in Republika Srbska, the Serbian enclave in Bosnia, whose timber had been harvested to fund ongoing support of war criminals. The government in Republika Srbska changed; controls were put into place in the forests; the forests were no longer being harvested to fund war criminals; and the sanctions were accordingly withdrawn from Srbska Sume, as I had requested on behalf of a private American client who sought to invest in manufacturing in that region.

17.4.   During the Obama Aadministration, prior to my taking on the position of Special Coordinator for MEK Resettlement, the U.S. government withdrew the designation of the Mujahedin-e Khalq ("MEK"), an Iranian dissident group that had previously be designated  for terrorism, which had been applied to them due to their having carried out bombings against the Iranian clerical regime and before that, against the Shah of Iran in the 1970's, 80's and 90's. After being designated for sanctions as a terrorist group in 1996, the MEK renounced terrorism and engaged in no terrorist acts following that renunciation. Getting them out of Iraq was made difficult, however, due to the fact that they had previously been designated as terrorists by the United States, and only delisted from sanctions in 2012.

17.5.   When the sanctions under EO 13224 and their designations as terrorists were withdrawn from the group, the State Department issued a statement to make clear that the group had indeed been engaged in terrorism in the past, and that the delisting was not an exoneration, which I quote here:

17.5.1. "The Secretary of State has decided, consistent with the law, to revoke the designation of the Mujahedin-e Khalq (MEK) and its aliases as a Foreign Terrorist Organization (FTO) under the Immigration and Nationality Act and to delist the MEK as a Specially Designated Global Terrorist under Executive Order 13224. These actions are effective today. Property and interests in property in the United States or within the possession or control of U.S. persons will no longer be blocked, and U.S. entities may engage in transactions with the MEK without obtaining a license. . . . With today's actions, the Department does not overlook or forget the MEK's past acts of terrorism, including its involvement in the killing of U.S. citizens in Iran in the 1970s and an attack on U.S. soil in 1992. The Department also has serious concerns about the MEK as an organization, particularly with regard to allegations of abuse committed against its own members. The Secretary's decision today took into account the MEK's public renunciation of violence, the absence of confirmed acts of terrorism by the MEK for more than a decade, and their cooperation in the peaceful closure of Camp Ashraf, their historic paramilitary base. The United States has consistently maintained a humanitarian interest in seeking the safe, secure, and humane resolution of the situation at Camp Ashraf, as well as in supporting the United Nations-led efforts to relocate eligible former Ashraf residents outside of Iraq."[254]

17.5.2. The delisting of the MEK was undertaken for foreign policy reasons, not because the MEK were exonerated for its past terrorist conduct. The foreign policy reasons included the U.S. seeking to defuse the dangerous source of tension the MEK created between the Government of Iraq and the Government of Iran by eliminating the sanctions, which had become an insurmountable barrier to their resettlement, while the organization had demonstrated through more than a decade of good behavior that it no longer presented a terrorist threat. The group's past behaviour was not expunged; the sanctions had resulted in the intended result of providing a strong incentive to the group to cease engaging in attacks on Iran, and as a result, they stopped being a terrorist threat.

17.6. The cases I have cited are representative of the kinds of reasons that the U.S. government engages in delistings. When it is no longer necessary for the U.S. government to sanction a person or entity under EO 13224 or any other sanctions program, it lists the sanctions or delists the person or entity. The change of status does not imply any reconsideration of whether the sanctions were proper at the outset, let alone an exoneration. The delisting merely reflects changes in current conditions, making the sanctions of that person or entity no longer needed to fulfill the U.S. national security objectives that led to the original listing.
.

---

[254]"Delisting of the Mujahedin-e Khalq," U.S. Department of State Press Release, September 19, 2012, https://2009-2017.state.gov/r/pa/prs/ps/2012/09/198443.htm

18. *Does the Fact that the UN has Withdrawn its Sanctions Designations of a Person or Entity for Terrorist Finance Amount to Exoneration? If not, why not?*

18.1.   UN sanctions programs are based on decisions made by the UN Security Council. One or more members of the Security Council propose listing a person or entity for sanctions, based on the findings made by that member state. If there is consensus among the Permanent Five members of the UN Security Council (China, France, Russia, the United Kingdom and the United States) to proceed with the listing, and the other 10 non-permanent, rotating members of the 15-country UN Security Council concur, the person or entity is sanctioned. A similar process applies to delisting.

18.2.   As with the U.S. sanctions under EO 13224, the UN sanctions, undertaken under UN Resolution 1267, have had the particular purpose of countering the threat to global security presented by al Qaeda, the Taliban, and associated terrorist groups. The UN sanctions have required all UN member states to impose a travel ban and an assets freeze on anyone who had engaged in "acts or activities indicating that an individual, group, undertaking or entity is associated with ISIL (Da'esh) and Al-Qaida," were defined as including: "[p]articipating in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of; [s]upplying, selling or transferring arms and related materiel to; [r]ecruiting for; or otherwise supporting acts or activities of, ISIL (Da'esh), Al-Qaida or any cell, affiliate, splinter group or derivative thereof."[255]

18.3.   The UN Security Council, through the UN Sanctions Committee, regularly adds names to this list upon the application of a member state, and deletes names from this list upon a similar request by the original listing state that sought the listing, by unanimous consent, and undertakes a set of additional procedures in cases in which consent is not unanimous. In addition to members of the UN Security Council being able to seek the delisting of names, the UN has created a special process by which persons and entities on the UN list may themselves ask for delisting, through a procedure involving an ombudsperson, who first reviews the information that caused the person or entity to become listed for terrorist support, and then assesses the information brought to the attention of the ombudsperson as to whether the totality of the current circumstances justify a delisting. The ombudsperson then makes recommendations to the Security Council, which adopted if there is consensus and are referred for further consideration, with an eventual vote by majority to delist or not, should there not be consensus.[256]  As

---

[255]"Security Council Committee pursuant to resolutions 1267 (1999) 1989 (2011) and 2253 (2015) concerning ISIL (Da'esh) Al-Qaida and associated individuals groups undertakings and entities," https://www.un.org/securitycouncil/sanctions/1267#sanction_measures  The provisions I have quoted were updated in 2015 to incorporate the Islamic State. In substance, they have remained the same since they were put into place in their current form after the 9/11 attacks on the U.S.

[256]"Procedure for requests for delisting submitted to the Office of the Ombudsperson," UN Security Council, pursuant to UN Security Council Resolution 2368 (2017) https://www.un.org/securitycouncil/ombudsperson/procedure

the UN Security Council states, it is important for the UN to ensure that sanctions be applied to those that pose a current risk of providing material support to terrorism, and that those who no longer pose such a threat be released from sanctions. Relevant current guidance from the Security Council to the Sanctions Committee implementing the regime includes:

18.3.1. [The UN Security Council] [d]irects the Committee to continue to ensure that fair and clear procedures exist for placing individuals, groups, undertakings and entities on the ISIL (Da'esh) & Al-Qaida Sanctions List and for removing them as well. . .

18.3.2. [The UN Security Council] [r]eiterates that the measures referred to in paragraph 1 of this resolution are preventative in nature and are not reliant upon criminal standards set out under national law.[257]

18.4. Like the U.S. sanctions program, the UN Security Council sanctions are imposed to counter the threat of an entity engaging in terrorism or material support of terrorism, with a focus on *prevention of future bad acts* rather than *punishment for past bad acts*. When the threat is no longer present, a person or entity can be removed from the list. Removal consitutes a finding that the person or entity is no longer a threat. It does not consitute a finding that the person or entity did not present a terrorist or terrorist support threat in the past.

Jonathan M. Winer

Executed this 10th day of March, 2020.

---

[257] UN Security Council Resolution 2368 (2017), Adopted by the Security Council at its 8007th meeting, on 20 July 2017,  https://www.undocs.org/S/RES/2368(2017)

**APPENDICES**

**Appendix 1A – Experience and Qualifications**

*Experience and Qualifications of Jonathan Winer*

Currently I practice law in Washington, D.C. where I specialize in financial regulation, including the regulation of financial institutions in the United States and around the world to combat money laundering and terrorist finance, as well as in other areas of national security law. I am also a non-resident scholar at the Middle East Institute. I also provide international consulting services on matters within my expertise, which include areas of international law, sanctions, trade, transborder criminal activity, counterterrorism, corruption, information security and data protection, and related issues.

I was Deputy U.S. Assistant Secretary of State for International Law Enforcement from 1994 through 1999.  In that position, I served as the principal policy-maker focused on a daily basis on international organized crime and financial crime for State, including money laundering and the systems used for terrorist finance.  I handled oversight of U.S. law enforcement relations with many nations.  At the request of the National Security Council ("NSC") of the White House or the Vice President's office, I chaired numerous interagency working groups on trans-border law enforcement and crime issues, as well as bilateral and multilateral groups working on these issues with foreign counterparts. My work included developing responses by the government of the United States to criminal conspiracies directed at our government or our people from overseas; tracking such criminal activity; obtaining evidence regarding it; obtaining cooperation from other countries on trans-border criminal activity; and initiating and overseeing overt and covert operations to control and combat trans-border criminal activity emanating from overseas. In this position, I represented our government in negotiations taking place in more than 40 countries on six continents, carried out direct bilateral negotiations and discussions with representatives of some 80 countries in the U.S. and overseas and multilateral negotiations with representatives of more than 100 countries. That work included development and oversight of U.S. anti-money laundering policy internationally, including U.S. policy regarding the FATF, based in Paris, the world's premiere anti-money laundering body, which at the time was undertaking ongoing assessments of the money laundering regulation of its member countries. These included the Gulf Cooperation Council ("GCC"), whose members include Saudi Arabia.

I returned to the State Department in September 2013, and served in the Bureau of Near Eastern Affairs as the Special Advisor for the Resettlement of the Mujahedin-e Khalq ("MEK") and Special Envoy for Libya until January 2017. In those roles, I served as the White House and Secretary of State's senior official to resettle an Iranian political group that had previously been designated by the United States for terrorist sanctions, and which had since been delisted for no longer posing a terrorist threat, out of Iraq and into Albania, thereby ending an ongoing source of instability and risk between Iraq and Iran. I also was the lead U.S. diplomat for efforts to end a civil war in Libya through a

negotiated settlement which was achieved in December 2015, and continued in that role seeking to maintain that peace until my departure from the State Department at the beginning of the Trump Administration. In these two roles, I worked directly with senior officials of many countries, including Albania, Algeria, Canada, China, Egypt, the EU, France, Germany, Italy, Jordan, Libya, Morocco, Qatar, Romania, Russia, Saudi Arabia, Sudan, Tunisia, the United Arab Emirates, among others. During that time, I worked directly with the U.S. Department of Defense and AFRICOM, as well as with the CIA and other U.S. intelligence agencies, to address terrorism issues involving the Islamic State and U.S. sanctions programs and designations. I also participated in White House meetings of the Deputies Committee (involving the Deputy Secretaries of cabinet agencies), at the Principals Committee (involving the Secretaries of cabinet agencies), and at the National Security Council, in meetings chaired by the National Security Advisor or the President. These meetings included discussions of how to respond to terrorist threats in the Middle East, including how we would address the terrorist threat through a mixture of diplomatic, military, and sanctions options.

*Experience in U.S. Foreign Policy Sanctions, and Terrorist Finance Process*

During my six-year service as Deputy Assistant Secretary of State, I met daily with other senior policy makers at State to discuss foreign policy issues involving the response of the U.S. government to foreign governments, officials, businesses, and persons involved in planning or carrying out criminal activity directed at the United States and/or its people, including issues relating to terrorism. I also worked on a daily basis with counterparts at the NSC, the U.S. Department of Justice ("Justice"), Treasury, the U.S. Department of Commerce ("Commerce"), Department of Defense ("Defense"), the Central Intelligence Agency ("CIA") and other components of the U.S. intelligence community. The work included daily contact with senior officials from the major U.S. federal law enforcement agencies, which at the time included the Federal Bureau of Investigation ("FBI"), DEA, Customs, Secret Service, the Bureau of Alcohol, Tobacco and Firearms ("ATF"), the Coast Guard, and the Immigration and Naturalization Service ("INS"). During this period, I was an active participant in many interagency agencies involving these and other U.S. agencies, and led numerous interagency missions at home and overseas dealing with responding to international criminal activity, including financial elements of transborder terrorist activity (terrorist finance). This work included leading or participating in delegations involving the United States and the UN, EU, Council of Europe, FATF, Organization of American States ("OAS"), Group of Seven ("G-7") and Group of Eight ("G-8") and many other modalities. I had ongoing contact with the Office of Foreign Assets Control ("OFAC"), responsible for administering sanctions, and with the White House as well as the agencies specified above, over questions about when and how to use targeted sanctions against individuals and entities, including discussions over designating particular targets.

During my three-and-a-half year service in the State Department's Bureau of Near Eastern Affairs, I met daily with other senior policy makers at State to discuss foreign policy issues involving the Middle East and terrorism, as both of my portfolios involved having to develop appropriate policies and diplomatic activities to address issues involving terrorists or former terrorists.

In the case of the MEK, I had to address the problem of resettling people the U.S. had previously found to have engaged in terrorism, once they renounced terrorism, in order to protect them from the immediate and ongoing risk of being subject to terrorist attacks themselves by agents of the government of Iran. To do this, I had to work closely with senior officials from such other U.S. government agencies as Justice, Defense, CIA, FBI, and the Department of Homeland Security ("DHS"), as well as with the State Department and the White House.

During this period, Libya faced many terrorist threats. These included the occupation of the central coastal region of Libya by the Islamic State, which the U.S. responded to with airstrikes against the Islamic State in Libya, undertaken with the permission of Libyan authorities that I brokered. They also included attacks on civilian airports by militia leaders seeking to gain military advantage over other militias or security forces. In the course of considering the appropriate U.S. response to these threats, I met frequently with other senior policy makers at the State Department and throughout the U.S. government to discuss the use of sanctions to combat the risk of terrorism and civil war in Libya. I again participated in sanctions designation processes, which were typically managed by senior officials at the National Security Council of the White House.

*Earlier Experience*

I first became involved in international money laundering matters in 1980, while I was working as an associate while still in law school for the U.S. Attorney in Denver, Colorado on a bank fraud case involving the use of offshore banks in the Caribbean to launder funds and defraud U.S. banks and investors. At that time, I received training from senior investigators from the FBI and the Office of the Comptroller of the Currency ("OCC"), responsible for regulating U.S. banks. In 1980 and 1981, while working as a journalist writing about legal affairs, I first developed expertise in the application of U.S. sanctions laws arising out of the Iranian hostage crisis and the use by the United States of the International Emergency Economic Powers Act ("IEEPA") to freeze Iranian assets prior to the resolution of the crisis in 1981 with the Algiers Accords. From 1985 through 1994, I worked in the U.S. Senate as counsel to Senator John F. Kerry. During that time, I handled financial regulatory, criminal justice and foreign policy issues in connection with hearings and legislative matters before the Senate Committees on Foreign Relations, Judiciary, and Banking. I drafted legislation to strengthen U.S. law against international money laundering and financial crime. I also directed and/or staffed a series of investigations into international money laundering and serious transnational criminal activity affecting the United States and Americans. These international investigations included matters pertaining to the Iran/Contra Affair, the drug trafficking of Panamanian dictator Manuel Noriega, and the corrupt activities of the Bank of Credit and Commerce International ("BCCI") in Asia, Africa, Latin America, North America, Europe and the Middle East. This work substantially focused on the intersection of foreign policy and law enforcement. For example, I drafted a substantial portion of a report on this topic, published in 1988 by the Senate Committee on Foreign Relations, with the title "Drugs, Law Enforcement and Foreign Policy." The Senate report analyzed cases in which U.S. foreign policy interests were preventing the U.S. government from protecting U.S. citizens from injury by foreign drug traffickers, arms traffickers, criminals, and terrorists.

Later, I drafted the preponderance of the U.S. Senate report on BCCI, "The BCCI Affair," issued by Senators Kerry and Brown, which reported on how BCCI was used, among other purposes, to facilitate terrorist finance.

*Non-Government Experience*

Over the past twenty years, I have been involved in sanctions and terrorist finance issues from a number of perspectives and roles.

One role has been as a lawyer. I have provided counselling to financial institutions; persons and entities seeking to assess and address their risk of being designated for sanctions; persons and entities who have been sanctioned and are seeking to be delisted and international organizations dealing with sanctions issues, such as the IMF, World Bank, and UN, among others.

A second role has been as a policy analyst. I have written on sanctions and on money laundering and on terrorist finance issues for many publications, as set forth in my CV. I was also retained as an expert on financial crime by a U.S. government agency from 2000-2008 to assess the vulnerabilities of countries throughout the world to money laundering, terrorist finance, and corruption. During this time, the countries I studied and provided assessments on for financial crime and terrorist finance risk included every country in the Middle East.

A third role has been as a teacher. For many years, I taught analysts at the CIA's Kent School, covering a number of topics, especially those relating to corruption and financial crime, as well as lecturing on those topics, terrorist finance, sanctions and many other foreign policy and regulatory issues at academic institutions, again as set forth in my CV.

A fourth role has been as a public commentator. After the 9/11 attacks, I was a consultant for ABC News on terrorist finance issues. Over the past twenty years, I have been frequently quoted on terrorism and sanctions issues by U.S. and international media.

A fifth role has been as a consultant on sanctions, anti-money laundering, and counter-terrorist finance issues to domestic and foreign clients, as well as with government agencies, domestic and foreign, and international organizations such as the United Nations and World Bank.

A sixth role has been as an expert witness on terrorist finance issues, as set forth in my CV.

**Appendix 1B  CV – Jonathan M Winer**

**Positions**

*Principle, Law Offices of Jonathan M. Winer, January 2017-present*

Represent and counsel domestic and multinational clients on cross-border compliance and enforcement issues relating to national security law, international financial regulatory issues, trade and e-commerce, foreign corrupt practices, public policy and legislative matters, including matters relating to extradition, mutual legal assistance, money laundering and counterterrorism (AML-CFT), sanctions (OFAC), inward investment (CFIUS), cybersecurity, cross-border taxation, and data protection compliance.

Private practice of law and international consulting, focusing on the Middle East, former Soviet Republics, and cross border issues relating to the U.S. and the European Union.

*Non-Resident Scholar, Middle East Institute, May 1, 2017-present*

Research, writing, and speaking on political, economic and security issues relating to Libya, North Africa, and the Middle East at the Middle East Institute in Washington, D.C.

*Senior Counsellor, APCO Worldwide, August 1, 2017-present*

Provide strategic advice to international clients of global communications firm on matters relating to national security law, financial regulatory issues, foreign corrupt practices, sanctions, foreign investment/trade, and public policy.

*Special Envoy for Libya, Senior Coordinator for Libya, Senior Advisor for MEK Resettlement, Bureau of Near Eastern Affairs, US Department of State, September 2013-January 2017*

Served as Secretary of State Kerry's and the State Department's Special Envoy for Libya. Played a central role in shaping and implementing US policies regarding Libya, working with U.S. officials, other governments, Libyan officials, representatives of the private sector, NGOs, and others interested in Libya and its future. Served as the Senior Advisor for MEK Resettlement, responsible for securing the resettlement of more than 3000 members of an Iranian dissident group of Iraq, which concluded with the successful resettlement of all of them out of Iraq as of September 12, 2016.

Awarded the Secretary's Distinguished Service Award, the highest award issuable by the Secretary of State, "*for extraordinary service to the U.S. government in solving one of the most intractable issues in U.S. foreign policy, thereby avoiding the massacre of over 3,000 members of the Mujahedin-e Khalq and averting a crisis between Iran and Iraq,*" and for "*leading U.S. policy in Libya, tenaciously and brilliantly moving Libya from a*

*major foreign policy embarrassment to a fragile but democratic, internationally recognized government.*"  November 2016.

*Senior Vice President./Senior Director/Head of Government Affairs Group, APCO Worldwide, June 2008-September 2013*

Strategic advice to corporate, non-governmental and governmental clients and international organizations in U.S.,  Pacific Rim, Central Europe, Israel and Eurasia regarding cross-border regulatory, legal and policy issues, primarily involving financial services regulation, foreign investment and trade, corruption and corrupt practices, information security and data protection, money laundering, asset recovery, sanctions, and cross-border law enforcement assistance. Expert witness services on money laundering and terrorist finance. Public sector work included assisting World Bank Stolen Assets Recovery Initiative, UN (ODC) Anti-Corruption Initiatives (Vienna), Global Forum on Corruption (Doha), OECD Working Group on Mining Transportation (Paris).

*Partner 2004-2008; Counsel 1999-2003, Alston & Bird, LLP,  November 1999-May 2008*

Represented domestic and multinational clients on compliance and enforcement issues relating to international financial regulatory issues, privacy, data protection and information security, foreign corrupt practices, cross-border trade, foreign investment (CFIUS), public policy and legislative matters. Provided counseling regarding AML-CFT compliance, terrorist finance, international criminal enforcement, and sanctions issues. Written and lectured extensively on cross-border financial regulation, national security law and intelligence issues, cross-border legal issues relating to data protection and cyber-security, corruption. Provided expert witness services on cross-border financial crime, narcotics, and corruption issues. Investigations and compliance work relating to complex matters involving corruption, money laundering, and sanctions in multiple jurisdictions. Undertook initiatives for World Bank and UN International Peace Institute on corruption and money laundering. Provided open source analysis of money laundering, corruption, and sanctions vulnerabilities and capacities of 80+ countries over an eight-year period as contractor for US government.

*Deputy Assistant U.S. Secretary of State for International Law Enforcement, 1994-1999*

Senior person at the U.S. Department of State responsible on a day-to-day basis for formulating and overseeing U.S. policy and programs to deal with money laundering, high-tech crime, intellectual property theft, corruption, small arms trafficking, trafficking in women, alien smuggling and other cross-border crime. Led interagency U.S. negotiations with P-8, EU, OAS, and managed bilateral modalities on law enforcement and financial regulatory issues with China, Russia, Thailand, Mexico, Hungary, Nigeria, Ukraine, and various countries in Central America, the Caribbean, and Southern Africa. Developed President Clinton's Transnational Organized Crime strategy, 1998. Conceptualized and negotiated Inter American Treaty on Illicit Arms (1997) and scope and framework of UN Transnational Organized Crime Convention (2000). Created and negotiated frameworks for international law enforcement academies for Southeast Asia

(ILEA-Bangkok) and Southern Africa (ILEA-Gaborone). Created and served as Executive Secretary for 1st Global Forum Against Corruption (1999).
Awarded Distinguished Honor Award, U.S. Department of State, November 1999, which stated that "*he created the capacity of the Department and the U.S. government to deal with international crime and criminal justice as important foreign policy functions*," and that "*the scope and significance of his achievements are virtually unprecedented for any single official*."

*Counsel and Senior Legislative Assistant, U.S. Senator John F. Kerry (D-Mass.), 1985-1994*

Responsible for policy development and legislation for U.S. Senator in the areas of banking and financial services, foreign relations, law enforcement. Conducted numerous Congressional investigations of international money laundering, drug trafficking, corruption, and fraud, including investigations of Iran/Contra affairs (1986-1988); drug trafficking and money laundering in the Caribbean and Central America, including the Bahamas, Haiti, and Panama (1988-1989); undertook key elements Senate investigation into the global activities of the Bank of Credit and Commerce International (BCCI), 1990-1992; primary authorship of the Senate's final report on BCCI.  Investigations included extensive inquiries into activities of U.S. intelligence and law enforcement agencies in the period 1986-1994.

*Counsel, Lieutenant Governor of Massachusetts, 1983-1984*

Provided legal advice, policy development, and speech-writing for Massachusetts Lieutenant Governor on law enforcement and federal-state relations issues. Staffed Governor's Anti-Crime Council; redrafted portions of Massachusetts general criminal laws; developed Massachusetts high-crime crime legislation and draft state Racketeering Influenced and Corrupt Organizations (RICO) law.

*Associate, Hale and Dorr L.L.P., Boston, Mass, 1981-1983*

Handled civil and criminal litigation in state and federal courts.

*Reporter, National Law Journal, New York, NY 1978-1981*

Staff reporter, covering national and international legal affairs, including sanctions issues (IEEPA) pertaining to Iranian assets litigation.

**Education and Citizenship**

J.D. New York University School of Law, 1981

B.A. Yale University, 1976  cum laude

United States. Born Boston, Massachusetts, June 21, 1954

**Expert Witness Services**

Qualified and served as an expert witness by defense in a U.S. defamation action on behalf of a U.S-based investigative journalism organization.

Qualified and served as an expert witness by defense on terrorism finance in UK defamation action on behalf of a major U.S. news publication.

Qualified and served as an expert witness by plaintiffs on money laundering, shell corporations, and uses of Liechtenstein trusts in Arizona civil action involving allegations of fraud.

Retained and testified as expert witness by plaintiffs on Bank Secrecy Act issues in arbitration involving US firm and a Brazilian company.

Retained and testified as expert witness by Colombian asylum seeker in connection with an asylum case on Colombia rule of law and national security issues.

Qualified and served as an expert witness on terrorism finance by plaintiffs in NY action against a Middle Eastern bank accused of facilitation of terrorist payments.

Qualified and currently serving as an expert witness by plaintiffs on the obligations of banks under domestic and international law and regulations to develop and implement effective anti-money laundering policies and procedures in connection with a plaintiff's action against an international bank alleged to have breached such duties, in a pending case in Canada.

**Publications and Testimony**

2020

"Libya: Will Berlin peace plan take on the immovable object and his irresistible force?," Middle East Institute, January 21, 2020

2019

"Origins of the Libyan Conflict and Options for Its Resolution," Libya chapter of book "Escaping the Conflict Trap: Toward Ending Civil Wars in the Middle East Paperback," published by Middle East Institute, August 2, 2019

2018

"Libya: Maintaining a stable instability in 2018," Middle East Institute, December 17, 2018

"Palermo talks need to spur Libyan actions," Middle East Institute, November 5, 2018

"The UN's "Plan B" for Libya needs a security solution, too," Middle East Institute, October 29, 2018

"A turbulent trial for Tripoli," Middle East Institute, September 17, 2018

"Putin's Proposed Deal With Trump: An Offer America Can Only Refuse," The Daily Beast, July 19. 2018

"Libya's future is bigger than any one leader," Middle East Institute, April 25, 2018

"Egypt continues efforts to unite Libyan military," Middle East Institute, March 19. 2018

"Devin Nunes is investigating me. Here's the truth," Washington Post, February 8, 2018.

"Libya to receive UN aid," Middle East Institute, January 22, 2018

"Libya: Reawakening the spirit of change," Middle East Institute, January 7, 2018

2017

"Libya Talks Continue," Middle East Institute, October 10, 2017

"French FM in Libya to Push for Peace," Middle East Institute, September 5, 2017

"Outsiders' Bets on Libya Torpedo Peace," Cipher Brief, August 31, 2017

"Libya Weighing Choices between Rescues and Standoffs," August 14, 2017

"Libya Still Seeking Grand Bargains, But Facing Range of Spoilers," Middle East Institute, August 4, 2017

"Foreign Powers Should Push for Peace in Libya," Middle East Institute, May 23, 2017

"Russia to Hold Navy Drill off Libyan Coast," Middle East Institute, May 22, 2017

"Libya Talks Progress," Middle East Institute, May 8, 2017

2016

Congressional Testimony, "US Policy in Libya," *Senate Foreign Relations Committee*, June 15, 2016

Congressional Testimony, "US Policy in Libya," *House Foreign Affairs Committee,* November 30, 2016

2015

Op-Ed, "Time for Libyans to Seize the Moment," *Libya Herald*, August 6, 2015

2012

Congressional Testimony, "The Case of George Wright and Beyond*," U.S. Commission on Security and Cooperation in Europe (Helsinki Commission)* July 11, 2012

2011

"Youth Unemployment in North Africa and Middle East Driving Political Change," *SitRep*, February 28, 2011

"Two Scenarios for Change in Egypt," February 3, 2011; "Ozymandias in Egypt," both in *Counterterrorism Blog*, January 31, 2011

2010

"Mexican Money Laundering: A Study in Cross-Border Currency Flows, a Permeable Financial Services Sector," Center for Strategic and International Studies, October 2010

"Illicit Finance in China," a study for Centra Technology, September 2010

"Testing a Dangerous Yemen," Counterterrorism Blog, January 1, 2010

2009

"An Initial International Cooperation Agenda on High Consequence Events for the Obama Administration," *PACER National Center of Excellence on Homeland Security,* Johns Hopkins SAIS.

"Jakarta bombings highlight importance of splinter group analysis," Counterterrorism Blog, July 17, 2009

"Bipartisan Experts Tell Congress to Let Guantanamo Detainees Come to US," Counterterrorism Blog, July 13, 2009

"U.S. Public Health System Needs To Accelerate Attention to Bioterror Threat," *Counterterrorism Blog*, February 1, 2009

2008

"Countering Terrorist Finance: A Work, Mostly in Progress," article in *The Annals of the American Academy of Political and Social Science*, July 2008, in volume "Terrorism: What the Next President Will Face."

"Diplomatic Expulsions Highlight Need for US to Re-Engage with Latin America," September 14, 2008, "EU High Court Invalidates Sanctions Against Al Qaeda," "The Urgent Need for a Broader Counterinsurgency Approach in the FATA," September 2, 2008,  "Islamic D-8 Summit Agenda in Malaysia Promotes Trade, Energy Revenue Sharing," July 7, 2008, "Details on Colombia Hostage Operation Right Out of Spy Thriller," July 2, 2008; "Colombia Rescues Ingrid Betancourt and Three US Hostages," July 2, 2008, "Boumediene v. Bush, Another View -- Judicial Oversight of Terrorist Detainment Essential to Freedom," June 16, 2008; "EU Agrees to Join US Iran Sanctions, Iran Gets Funds Out of Town," June 10, 2008; "In Southeast Asia, a Counterterrorism Strategy That's Working," June 9, 2008; "FARC's terrorist diplomacy reaches Germany," May 24, 2008; "INTERPOL Finds FARC Computers Material Authentic and Extensive," May 15, 2008; "Docs Suggest Chavez, FARC Agreed to Blame Paramilitaries for FARC's Murders," May 12, 2008; "More on the FARC-Chavez Connection," May 12, 2008; "Colombian Newspaper Reports INTERPOL Found No Tampering with FARC Computers," May 7, 2008; "UK Court Invalidates Terrorist Asset Freezing Regime as Unconstitutional," April 24, 2008; "FARC's Efforts to Assassinate Uribe Described in Seized Computers," April 23, 2008; "Indonesia Bans Jemaah Islamiyah After Malaysia Arrests Leaders On Way to Syria," April 21, 2008; "Ecuador Publishes FARC Commander's "Brotherly Greetings," April 11, 2008; "New information on FARC Support For Ecuador Presidential Campaign," April 10, 2008; "FARC Uranium May Be Depleted, But It's Still Nuclear Material," March 28, 2008; "Colombia Announces Find of 66 Pounds of Uranium It Says Linked to FARC," March 26, 2008, "The FARC's Terrorist Diplomacy," March 18, 2008, "FARC allegations multiply, require vetting," March 10, 2008; "Provocative material in FARC computers needs broad disclosure and analysis," March 7, 2008, "U.S. reportedly skeptical about the dirty bomb allegation," March 5, 2008, "Growing International Free-For-All, As Charges Mount On Chavez Laundering and Terrorist Ties," March 4, 2008, "Al-Qadi Ruling Threatens EU and Ultimately UN Terrorist Sanctions Process," January 16, 2008 (all in *Counter-Terrorism Blog*).

2007

"Proposed Internet Gambling Regulation Would Require New Policies and Procedures for the U.S. Payments System," with Kathryn Marks*, Electronic Banking and Commerce Report*,  Vol 12, Issue 9.

"Bhutto Murder Fits Pattern of Lashkar I Jhangvi Terrorism, With Nasty Implications," December 28, 2007; "Benazir Bhutto's Assassination -- a Lethal Assault on Democracy," December 27, 2007; "In Stunning Move, UN and US Delist Nasreddin and His Companies from Sanctions," November 16, 2007, "Canada's FinTrac Public Info Limited by Canadian Law," November 4, 2007, "Did Syria Have Visible WMD Program Prior to US Invasion of Iraq?," October 28, 2007, "Treasury Sanctions On Iran Will Have

Commercial Impact For Foreign Banks," October 25, 2007, "Economic Sanctions and Iranian Containment," August 29, 2007 "Paradoxical Policies For Pakistan and Iran," August 6, 2007; "The Threat of "Homegrowns," June 3, 2007; "Battle of the Brands," May 20, 2007; "An Unusual Apparent Win-Win on North Korea," March 19, 2007, "Is U.S. Supporting Brotherhood Activities in Syria?," March 11, 2007, "Treasury's Message About Iran: "Be Afraid,"" March 9, 2007, "Bangladesh Stalled on Enacting Terrorist Finance Law," February 25, 2007, "Treasury Hits Iran With Another Proliferation Freeze," February 16, 2007, "The Pakistan Taliban," February 14, 2007; "Writing Now on Wall for Handling of Iranian Assets," February 13, 2007, "EU Undertakes Major Assault on PKK, Backed By US," February 11, 2007; "Regulators Provide Current Stats on Results of BSA Reporting," February 9, 2007, "Treasury Seeks $ to Hire New Specialists on Rogue States," February 6, 2007, "EU Privacy Czar Claims Right to Prohibit US Access to EU Financial Records," February 1, 2007, "Is Treasury Bank Freeze Real or Phony Issue Stalling NK Talks?," January 29, 2007; "Treasury To Take Away Kim Jong Il's iPods and Cognac," January 26, 2007; "CIA, Military Reveal Acquisition of Domestic Bank Records," January 14, 2007, "The "Material Support" Test for Terrorism," January 11, 2007; "$14 billion Iranian Bank Sepah Hit by US Sanctions," January 9, 2007; "Treasury Uses Sanctions Authority to Name More Syrian Proliferators," January 8, 2007, "Beach Bank Case Highlights Laundering Risk of Phone Cards," January 3, 2007 (all in *Counter-Terrorism Blog*).

2006

Testimony, House Committee on International Relations, Subcommittee on Oversight, "Offshore Banking, Corruption and the War on Terrorism," March 29, 2006.

Advisory, "FinCEN Issues Clarification of Securities and Futures Industries Due Diligence Obligations Under § 312 of the USA PATRIOT Act," Alston & Bird, June 20, 2006. "Federal Financial Institutions Examination Council Releases 2006 Releases to the Bank Secrecy Act," *Electronic Banking Law and Commerce Report* (West Legalworks), September 2006 (Kathryn Marks, coauthor).

"EU Strikes Down Terrorist Finance Designation of Iranian Opposition," December 12, 2006; "UK Banks Bowing to Risk of Action from US on Iran," December 4, 2006; "European Privacy Czars Seek to Stop Terror Finance Monitoring," November 29, 2006; "Australia Finds US Pressure on Iran Having an Impact," November 26, 2006; "Clarifying the Status of Arab Bank in the U.S.," November 17, 2006; "Isolating Iranian Banking Activities," November 14, 2006; "Counter Insurgency and Counter Terrorism in Europe," October 15, 2006 (all in *Counter-Terrorism Blog*).

2005

"Cops Across Borders: The Evolution of Trans-Atlantic Law Enforcement and Judicial Cooperation," in *Transatlantic Homeland Security* (Routledge Publishing)

"Tracking Conflict Commodities and Financing," in *Profiting From Peace – Managing the Resource Dimensions of Civil War,"* (Rienner Publishing)

"Cleaning Up the UN," Washington Times (March 4, 2005)

"The President's Faith-Based Policy Towards Russia," (Stuart B. Eizenstat, co-author)," published in *NY Times online* (Khodorkovsky on Trial)

"Confronting International Terrorism -- Networking Individual Governments to Combat a Global Threat," *The Atlantic Council* (March 2005)

"New FinCEN Regulations Require Insurance Companies to Implement Anti-Money Laundering Programs and File Suspicious Activity Reports," with Kathryn Marks, *Electronic Banking Law and Commerce Report*, December 2005

2004

Testimony, *Senate Committee on Finance*, "U.S. Govt Efforts on Terrorist Finance," May 19, 2004

Articles, "Towards a Unified Tracking System for Conflict Commodities and Financing," Economic Agendas in Civil Wars (*UN International Peace Academy*, article version of 2005 book chapter)

"Yemen's Enduring Challenges," *Jamestown Monitor*, April 8, 2004

2003

Testimony, "Terrorist Finance," *U.S. Senate Committee on Government Operations* (July 31, 2003

"The Finance of Illicit Resource Extraction," in *Natural Resources and Violent Conflic*t (World Bank Publishing)

"Old Rules, New Threats: Building Global Jurisdiction, Systems*," Council on Foreign Relations/American Society of International Law* (March 2003)

"Illicit Transactions and Nigerian Oil," CSIS Nigeria Working Group (May 2003)

"The Growing Role of International Institutions in Counterterrorism and Law Enforcement," *Council on Foreign Relations*, November 5, 2003

2002

Testimony, "Terrorist Finance," *Senate Judiciary Committee* (November 20, 2002)

"Finance of Illicit Conflict," *World Bank (online)* (December 2002)

"Globalization, Terrorist Finance, and Global Conflict," in the *Financing of Terrorism, Special Issue on Criminal and Regulatory Law Reform of the European Journal of Law Reform*, Geneva (Volume 4, Issue 2)

"International and Domestic Efforts to Combat Terrorist Finance Since 9/11," S*urvival, International Institute for Strategic Studies,* (Vol. 44 Number 3 Autumn 2002), coauthored with Dr. Trifin J. Roule).

"Review of International Money Laundering," *Strategic Survey,* London, (Spring 2002) (coauthored with Dr. Trifin J. Roule)

"Illicit Finance and Global Conflict*," Programme for International Co-operation and Conflict Resolution, Fafo Institute for Applied Social Science,* Oslo, Norway, Report 380, (March 25, 2002)

"How to clean up dirty money," *Financial Times* (March 22, 2002)

"Canadian Privacy Law," chapter in "GigaLaw Guide to Internet Law," Random House, September 2002

"EU Privacy Czars Consider Enforcement Test Cases," *E-Commerce Law Report*, Vol 4, No. 8, pg. 2, (June, 2002).

2001

Testimony, "International Terrorist Finance," *Senate Committee on Banking, Housing and Urban Affairs*, (September 26, 2001) in connection with hearings on USA-Patriot Act following September 11 terrorist attacks.

"The Role of Economic Sanctions in Combating International Terrorism (And Its Place in The Trans-Atlantic Alliance),"*American Institute for Contemporary German Studies,* Johns Hopkins University (November, 2001).

"Characteristics and Features of Russian Organized Crime," commissioned by the *National Intelligence Center of the Central Intelligence Agency* (March, 2001).

"Russian Crime and Corruption In an Era of Globalization: Implications for the U.S." (May 2001), commissioned by *the Congressional Research Service*, in "Russia's Uncertain Economic Future," published by *Congress' Joint Economic Committee* (December 2001), written with Dr. Phil Williams.

"The EU Data Protection Directive: Implications for the U.S. Privacy Debate," March 8, 2001, *House Subcommittee on Commerce, Trade, and Consumer Protection*

"U.S. Approach to the Regulation of E-Commerce - Consensus or Collision with the EU," with JL Douglas, *Business Law International*, 2001 – HeinOnline.

2000

Testimony, Russian money laundering and financial crime issues, including Bank of New York/Benex case, House Committee on Banking and Financial Services, (March 9, 2000)

"The Coming Wave of Transparency Reform: A Tidal Shift," originally prepared as an address to Jesus College, Cambridge University on September 13, 1999, and published as an article in the *Journal of Financial Crime*, Institute of Advanced Legal Studies, Henry Stewart Publications (Spring 2000).

"Regulating the Free Flow of Information: a Privacy Czar as the Ultimate Big Brother*," John Marshall Journal of Computer and Information Law,* VOL. XIX • Fall 2000.

1998

Testimony, Money Laundering, *House Committee on Banking and Financial Services,* (June 11, 1998).

"Replacing Safe Havens with a Safe System," 12 *Amicus Curiae* 2.

1997

Testimony, Migrant Trafficking, *House Judiciary Subcommittee on Immigration and Claims*, (April 21, 1997). Testimony, "Mexico: Measures to Combat Money Laundering, *House Banking and Financial Services Committee* (May 15, 1997).

"Alien Smuggling: Elements of the Problem," *Transnational Organized Crime*, 3.1, Frank Cass Publishers. McDonald, W-F. (Ed.) (1997).

"International Crime in the New Geopolitics: A Core Threat to Democracy," *in Crime and Law Enforcement in the Global Village*. Highland Heights, KY, and Cincinnati, OH: Academy of Criminal Justice Sciences and Anderson Publishing. ISBN 0-87084-196-3;

"Crime and Cooperation," *in European Integration and American Interests*, J Gedmin, edit, AEI Press

"Problems and Strategies to Attack Narcotics, Crime and Corruption in the Caribbean," Paper, *Georgetown University Conference on the Caribbean*.

1996

Testimony, Nigerian Crime, *House International Relations Committee, (*September 11, 1996).

Testimony, Money Laundering and Mexico, *House Banking and Financial Services Committee*, (September 5, 1996).

Testimony, "The Threat to U.S. Trade and Finance From Drug Trafficking and International Organized Crime," *Senate Caucus on International Narcotics Control of the Subcommittee on Trade of the Senate Finance Committee* (July 30, 1996).

1992

BCCI Affair, Report to the Senate from Senator John Kerry and Senator Hank Brown, principal investigator and drafter (December, 1992).

"How Banking Reform Ended in 1991," *Durrell Journal of Money and Banking* (March 1992).

1991

"Will U.S. Regulators Rethink Role of Foreign Banks in Wake of BCCI Scandal?" *Durrell Journal of Money and Banking* (November 1991).

## Lectures and Presentations

Lecturer on foreign policy and national security issues *at Kent Center for Intelligence Analysis, Central Intelligence Agenc*y 2002-2013.

Lectured on foreign relations, national security, and national security law issues and on international financial regulation and enforcement, sanctions, money laundering, financial crime, information and computer security, data protection and privacy, payments systems and the regulation of payments systems, inward investment and trade, sanctions, corruption, terrorism, terrorist finance, transnational organized crime, extradition and mutual legal assistance, and intelligence issues: U.S.-China, US-Mexico, and U.S.-EU transborder investment and trade, and related topics at American Academy of Arts and Science (MA); American Banker (DC); American Bar Association International Section (New York); American Bar Association Committee on Law and National Security US-UK (London); American Conference Institute  (New York); American Institute for Contemporary German Studies (DC); Asian Institute of International Studies (Asia-ISIS) (Singapore); Atlantic Council (Washington DC and Vienna, Austria); Argentine National School of Intelligence (Buenos Aires); Banking Institute (Charlotte, North Carolina); Bilateral US-Arab Chamber of Commerce (DC); Boston University (MA); Brookings Institute (DC);  Bureau for National Affairs (BNA) (DC); Cambridge University, Jesus College (Cambridge UK); Canadian Institute of International Affairs (Toronto); Canadian Center for International Peace and Security (Ottawa);  Carnegie Endowment (DC); Center for American Progress (DC); Central Intelligence Agency Kent School (Virginia); Center for Peace and Security Studies (CPSS); Center for Strategic and International Studies (CSIS)(DC); Cosmos Club (DC);

Council on Foreign Relations (NY) and (DC); Cybersecurity Industry Alliance (DC); European Council on Foreign Relations (Berlin); Georgetown University (DC);  George Washington University Homeland Security Institute (Washington DC); Harvard University Kennedy School of Government (Cambridge, MA); Global Forum Against Corruption (Doha); International Islamic Finance Forum (Geneva); International Monetary Fund (IMF) (DC); Jane's Defense Seminars (DC);  Johns Hopkins University (DC); Middle East Institute (DC); NACHA (Washington DC); Nanjing Business Forum (Nanjing); National Defense University (DC); NATO (DC); New York University (NY); Offshore Alert Forum (Miami); Organization for Cooperation and Development (Paris); PACER National Center of Excellence on Homeland Security (DC);  Princeton University (Princeton, NJ); Ripon Society (Rome, Italy); School of Advanced International Studies (SAIS) (DC); Strategic Research Institute (SRI) (DC);  The Tahrir Institute for Middle East Policy (DC); Task Force on Financial Integrity & Economy Development (Washington DC); Thomson Financial (NY); Tufts University (MA); University Center for International Studies (University of Pittsburgh); University of London, School of Advanced International Legal Studies (London); (DC); United Nations (IPA) (NY) (Oslo, Norway and Bellagio, Italy); United Nations UNODC (Vienna Austria); US Institute of Peace (DC); Washington College of Law (American University); US Special Forces Training Academy (Virginia Beach); Wilton Park, UK (UK Foreign Office); World Bank (DC).

**Other**

Outside Director, Global Witness Foundation (US), 2003-2013
Member, Council on Foreign Relations Task Force on Terrorist Finance, 2002-2004
Steering Committee, CSIS Transnational Threats Initiative, 2002-2013 and 2017-present
Member, Atlantic Council Experts Group on Terrorism, 2005-2006
Contributing Expert, Counter-Terrorism Blog, 2006-2011
Commissioner, Council on Foreign Relations Andes 2020 Commission, 2003-2004
On-air Expert, Terrorist Finance, ABC World News, September-December 2001
Senior Advisor, Kerry-Edwards Presidential Campaign and Kerry Presidential Debate Team (2004)
Obama for President Foreign Policy Task Force Member (Latin America) (2007-2008)
US Institute of Peace Financial Sanctions Study Group on North Korea (2009)
OSI Burma Sanctions Study Group (2009)
Financial Services Volunteer Corps (2004-2008)

**Appendix 2 – Material Consulted**

In connection with the preparation of this report, attached hereto is a list of reliance materials that I consulted and considered in forming my opinions.