EXHIBIT F

This Transcript Contains Confidential Material

```
  1                UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF NEW YORK

  2

  3    IN RE: TERRORIST ATTACKS    )   03-MDL-1570 (GBD)(SN)

       ON SEPTEMBER 11, 2001       )

  4                                 )

  5

  6

  7

                             —  —  —

  8

                     Tuesday, July 13, 2021

  9                        —  —  —

 10              THIS TRANSCRIPT CONTAINS

                  CONFIDENTIAL MATERIAL

 11                        —  —  —

 12

 13     Remote video-recorded deposition of JONATHAN M.

       WINER, held at the location of the witness,

 14    commencing at 10:04 a.m., on the above date, before

       Debra A. Dibble, Certified Court Reporter,

 15    Registered Diplomate Reporter, Certified Realtime

       Captioner, Certified Realtime Reporter and Notary

 16    Public.

 17

                             —  —  —

 18

 19

 20

 21

 22

 23

                   GOLKOW LITIGATION SERVICES

 24          877.370.DEPS | fax 917.591.5672

                     deps@golkow.com

 25
```

```
 1        A.     135 pages is correct.

 2        Q.     And is that correct that your rebuttal

 3   was 66 pages?

 4        A.     Yes.

 5        Q.     Do you agree with me that this is a

 6   massive case, correct?

 7        A.     Yes.

 8        Q.     With massive documents; correct?

 9        A.     Yes.

10        Q.     Massive documents produced?

11        A.     Yes.

12        Q.     This is for the finder to evaluate claims

13   and defense in this case.  Do you agree with me?

14        A.     Yes.

15        Q.     Did you choose which document to review

16   and which document not to review?

17        A.     Yes.

18        Q.     Did the lawyers select documents for you

19   to review?

20        A.     Yes and no.

21        Q.     What do you mean by yes and no?

22        A.     I was given an initial group of

23   documents.  After going through those documents, I

24   asked for more documents.  And that took place a

25   couple of times.
```

This Transcript Contains Confidential Material

```
1      Q.    And that's from the time, I assume, that

2   you start reviewing the documents to the time that

3   you issued your final report; correct?

4           MR. HAEFELE:  Objection to form.

5      A.    Yes.

6      Q.    (BY MR. MOHAMMEDI)  Were any documents in

7   Arabic?

8      A.    There are no documents in Arabic that I

9   have read.  I don't read Arabic.

10     Q.    Were there any documents translate -- I'm

11  sorry.

12     A.    There were documents in Arabic that were

13  translated into English in which I had both English

14  and Arabic language next to it.  I am not able to

15  determine whether the English was authentic to the

16  Arabic, but they were still represented.

17     Q.    Which documents did plaintiff give you to

18  review?

19          MR. HAEFELE:  Objection.

20     A.    Please repeat --

21     Q.    (BY MR. MOHAMMEDI)  What documents did

22  plaintiffs' lawyers give to you review?

23     A.    The documents listed in my reliance

24  report.

25     Q.    So it is fair to assume that all the
```

```
 1   document that your reliance materials are the ones

 2   that plaintiff gave you to review?

 3             MR. HAEFELE:  Objection to form,

 4        foundation.

 5        A.    It's my understanding that the materials

 6   in the reliance report were the materials that were

 7   provided to me, that's correct, plus additional

 8   materials that I found.

 9        Q.    (BY MR. MOHAMMEDI)  And that includes the

10   materials that were produced in this litigation; is

11   that correct?

12        A.    It does include some materials produced

13   in this litigation, yes.

14        Q.    And do you know how many materials were

15   produced in this litigation?

16        A.    I do not.

17        Q.    So you have no idea how many documents

18   were produced in this litigation?

19        A.    It's not something that I have an opinion

20   on it.

21        Q.    Okay.

22        A.    I can make no representations of fact as

23   to how many documents have been produced in the

24   litigation.

25        Q.    Did you ask for that?
```

 1      A.     I asked for -- to receive as much as

 2   possible given the amount of time that there was for

 3   me to prepare my report.

 4      Q.     So you specifically asked to be given --

 5   that plaintiffs' lawyers will give you as many

 6   documents as possible to review to render your

 7   opinion?

 8                 MR. HAEFELE:  Objection to form,

 9        misstates testimony.

10      A.     What I have stated in this deposition and

11   am happy to restate is that I was given a lot of

12   material initially.  After spending some extensive

13   number of hours on that material, I requested

14   additional material of various kinds.  I did that on

15   more than one occasion.  I don't remember how many

16   occasions.

17                 In addition, I asked for some academic

18   materials that I needed to get quickly, that I

19   understood the firm might have, which they were able

20   to provide me.  An example of that might be a report

21   by Mr. Benthall or Mr. Hegghammer.  Merely as

22   examples.  I don't recollect precisely which reports

23   those were, because once I had them, how I acquired

24   them was not particularly important.  Their

25   authenticity and accuracy, of course, was, but in an

1    citations.  And in addition, they listed the

2    material they provided me.

3         Q.    Okay.  Just as a follow-up question, you

4    are not aware that -- how many pages the Assembly of

5    Muslim Youth produced in this case, correct?

6         A.    I do not know the number of pages that

7    any entity produced in this case.

8         Q.    Let me tell you how many pages Mr. -- I'm

9    sorry, what the Assembly of Muslim Youth has

10   produced.  It's 1.264621 pages.

11              And that's WAMY Saudi Arabia.

12              And WAMY International produced 15,202

13   pages of documents in this case.

14              Have you seen any of these?

15              MR. HAEFELE:  Objection, form,

16        foundation, misleading.

17        A.    I've seen some of them.  I've seen some

18   audits.  I have requested every bit of audit

19   material.

20        Q.    (BY MR. MOHAMMEDI)  But audits were not

21   listed in the affirmative report, were they?

22        A.    They were not.  I was not provided those

23   at the time.  I asked for them, and I got them

24   later.  And when I reviewed them, I then provided my

25   analysis.  But I wanted them from the beginning.  I

This Transcript Contains Confidential Material

```
 1   wanted an audit and I did request them.
 2       Q.   Is it fair to say that you did not review
 3   the audit before you produced your affirmative
 4   report; correct?
 5       A.   My report itself says I did not.
 6       Q.   Okay.  And are you aware that Muslim
 7   World League produced over 700,000 pages of
 8   documents?
 9           MR. HAEFELE:  Objection to form.
10       A.   I have stated and now repeat that I am
11   not aware of the amount of documents produced by
12   anyone involved in the case in terms of the numbers.
13       Q.   (BY MR. MOHAMMEDI)  And it's fair to say
14   that your affirmative report did not really rely
15   mostly on the documents produced in this case;
16   correct?
17           MR. HAEFELE:  Objection to form.
18       A.   I can't respond to that question with a
19   yes or a no.
20       Q.   (BY MR. MOHAMMEDI)  No, you can.
21       A.   It relied on the material that I've
22   listed.  I looked at every audit that I was able to
23   get my hands on and the financial records associated
24   with them.  And I went through depositions of the
25   officers of the defendants, for example, and sought
```

```
 1    to consider as much information as I could within

 2    the time available.

 3        Q.    Yeah.  It is fair to say it's over

 4    2 million pages of documents between -- let's say

 5    World Assembly Muslim Youth and Muslim World League,

 6    we will call it WAMY and MWL.  So you have not

 7    reviewed the over 2 million pages of documents that

 8    were produced by WAMY and Muslim World League;

 9    correct?

10            MR. HAEFELE:  Objection to form.

11        A.    It is correct that I have not reviewed

12    2 million documents from anyone at any time in my

13    life.

14        Q.    (BY MR. MOHAMMEDI)  I will direct you to

15    page 6 and page 26 of your reliance material.

16            If -- there is the highlighted version

17    there.  If you see Exhibits 267, which was actually

18    an exhibit to a deposition of WAMY, and there was a

19    document there, says, WAMYSA0276804.  Do you see

20    that?

21        A.    Yes.

22        Q.    That's one of your reliance material;

23    correct?

24        A.    It's material that was available to me,

25    which I considered.  I considered as much as I could
```

of the material that was provided within the time that I had.

Q. But my question is, is this the one that you relied on?

A. You would have to show me the document, sir.

Q. No, I don't need to show you the document.

A. Well, then I can't tell you to what extent I considered it.

Q. I am relying on the reliance material that you produced and you said that those are the documents you relied on when you produced your report; correct?

MR. HAEFELE: Objection, badgering.

A. Those are the documents that were made available to me by the law firm and which I did my best to consider. I considered as much as I possibly could within the time allotted, within the time that I had to get the report done.

Q. (BY MR. MOHAMMEDI) Is this reliance material accurate?

A. The material that was available to me, it's accurate, yes.

Did I go through as much of it as I

This Transcript Contains Confidential Material

```
1        Q.    (BY MR. MOHAMMEDI)  Did they submit
2   reliance material, did they?
3              John Marks would submit his reliance
4   material.  Did you --
5              MR. HAEFELE:  Object to the form.
6        Q.    (BY MR. MOHAMMEDI)  Did you review the
7   reliance materials that John Marks submitted in his
8   report?
9              MR. HAEFELE:  Objection to form,
10       foundation.
11       A.    I reviewed all the audit material that
12  was made available to me, and my conclusions about
13  that audit material were provided in my rebuttal
14  report.
15       Q.    (BY MR. MOHAMMEDI)  And is that fair to
16  say, based on his statement in his report?
17       A.    I looked at the statements in his report.
18  I looked at the audit material.  I asked if there
19  was any additional audit material, and I expressed
20  my concern that there was a lot of material that was
21  still missing.
22       Q.    Okay.  Which questions relating to the
23  involvement of charities in international terrorism
24  finance in the period leading up to 9/11 attacks
25  were you asked to opine on?
```

This Transcript Contains Confidential Material

```
 1              So is it fair, you have not been a

 2    faculty of any academic institution.  Is that fair

 3    to say?

 4         A.    I have not been a resident faculty member

 5    of any institution.  I am a nonresident scholar at

 6    this time and have been since 2017 at the Middle

 7    East Institute.

 8         Q.    Are you a social scientist?

 9         A.    I am an attorney.  I did study some

10    social science in law school.

11         Q.    But you are not a social scientist?

12         A.    I am not a Ph.D.

13         Q.    Are you a certified public accountant?

14         A.    No.

15         Q.    Are you a forensic accountant?

16         A.    No.

17         Q.    Are you certified fraud examiner?

18         A.    No.

19         Q.    Are you or have you been a member of the

20    law enforcement?

21         A.    Have I been a member of law enforcement?

22         Q.    Law enforcement.

23         A.    I worked as a prosecutor at the beginning

24    of my career.

25         Q.    But that's the -- that's the experience
```

This Transcript Contains Confidential Material

1   that related to law enforcement that you are talking

2   about, right?

3       A.    No, that's incorrect.

4       Q.    Okay.  Go ahead.

5       A.    For six years I was the lead person at

6   the United States Department of State, addressing

7   international law enforcement issues.  In that

8   period I worked with U.S. law enforcement on a daily

9   basis.

10      Q.    Were you yourself a member of law

11  enforcement?

12            MR. HAEFELE:  Objection to form.

13      A.    Did I have the power to prosecute?  I did

14  not.  Did I have the power to arrest?  I did not.  I

15  was not a prosecutor or a police officer.  Except

16  early on when I did a -- when I did a money

17  laundering prosecution.

18      Q.    (BY MR. MOHAMMEDI)  Have you ever worked

19  as an intelligence service analyst or agent?

20      A.    I have worked under contract for a U.S.

21  government analytic agency for many, many years,

22  providing both intelligence and analysis to that

23  agency, as disclosed in my CV.

24      Q.    You testified that you are an expert in

25  history of al-Qaeda; correct?

This Transcript Contains Confidential Material

```
 1      A.    I would have to look at precisely what

 2   their CV said.

 3      Q.    Are you an expert in history of al-Qaeda?

 4      A.    What is that?  Omar, I didn't hear you.

 5      Q.    Al-Qaeda.  Are you an expert on history

 6   of al-Qaeda?

 7      A.    In certain context, yes.  I know enough

 8   about its activities Afghanistan, Bosnia, Chechnya,

 9   Sudan, Southeast Asia, and elsewhere to have

10   familiarity with its activities.

11      Q.    How do you know that?

12      A.    I have some expertise in the area.  I am

13   not an Arabic reader, so there are things that are

14   in Arabic, I'm sure, that would allow me to know

15   more.

16      Q.    How do you -- how did you gain that

17   expertise?

18      A.    When the United States government first

19   became concerned about al-Qaeda in the 1990s, I was

20   meeting regularly with Richard Clarke at the NSC who

21   is the United States government's counterterrorism

22   czar at the time.  And I was dealing with the

23   interrelated issue of international crime, and in

24   particular international financial crime.  And the

25   two are inexorably intermingled, and the
```

This Transcript Contains Confidential Material

```
 1   United States was seeking that period of time, both
 2   to understand these phenomena and to begin to build
 3   capacity to combat them.  And I had regular contact
 4   with Mr. Clarke and was working for him and with
 5   him, such as with Michael Sheehan, for example, and
 6   Rand Beers on these issues in the late 1990s and
 7   became aware of his concern.
 8       Q.    Okay.  And is it fair to say those were
 9   within the policy scope?
10             MR. HAEFELE:  Objection, form.
11       A.    I'm not sure I understand the question.
12       Q.    (BY MR. MOHAMMEDI)  Were you dealing with
13   this matter from a policy perspective?
14       A.    Yes, but I also was trying to -- it was
15   my job also to communicate to other countries about
16   what we needed them to do and what capacities we
17   needed.  I did not do that, however, regarding
18   al-Qaeda myself.  I was aware that others were, but
19   I was not.
20       Q.    You were not.  Okay.  Have you ever
21   studied terrorism in an academic setting?
22       A.    I couldn't understand the question.
23       Q.    Have you ever studied terrorism in any
24   academic setting?
25       A.    I have been asked to write about
```

This Transcript Contains Confidential Material

```
 1              MR. HAEFELE:  Let him answer the

 2        question.

 3              MR. MOHAMMEDI:  We take a five-minute

 4        break.

 5              MR. HAEFELE:  We'll take a break.

 6        That's fine.  Omar, listen to what I'm saying.

 7        Listen to what I'm -- Omar, just listen to

 8        what I'm saying.  I don't want to fight with

 9        you.

10              MR. MOHAMMEDI:  Let me conduct my

11        deposition, Robert.

12              THE VIDEOGRAPHER:  We're going to go

13        off the record at 11:09 a.m.

14              (Recess taken, 11:09 a.m. to

15              11:22 a.m. EDT)

16              THE VIDEOGRAPHER:  We are back on

17         record at 11:22 a.m.

18        Q.   (BY MR. MOHAMMEDI)  Mr. Winer, have you

19   ever interviewed members of al-Qaeda?

20        A.   No.

21        Q.   Do you have a field experience -- when

22   I'm saying field experience -- before 9/11 including

23   Afghanistan, Chechnya, Bosnia?

24        A.   Not in those countries, no.

25        Q.   Are you an expert on terrorism -- or
```

1          I am an expert in financial crime and in

2    the question of when inadequate disclosure creates

3    opportunities for the abuse of charities.  And I've

4    been a proponent for many years of stronger

5    reporting standards for charities, because of that

6    concern, and testified before Congress some

7    substantial number of years ago, I think in the 00s,

8    on that issue.

9         Q.    And do you do your own financial analysis

10   of this reporting or do you use accountant or

11   forensic accountant for that purpose?

12        A.    It depends on the context in the case.  I

13   have been involved in a matter in which the

14   attorneys involved in the matter retained an

15   accounting firm to do the forensic accounting work,

16   which we then assessed as -- in connection with an

17   OFAC matter.  And part of providing the terms of

18   reference for the accounting firm, what we needed,

19   what we needed to analyze and understand.

20          So for that purpose, I was an expert in

21   order to assess what the U.S. government would

22   require to provide certainty, enough certainty that

23   there was no risk of terrorist findings to enable a

24   person or entity to be delisted.  When I was

25   investigating BCCI in the 1980s, I spent extensive

This Transcript Contains Confidential Material

```
 1        A.    I don't know.  It would --

 2        Q.    But there was definitely before --

 3        A.    Somewhere between the period of 1989 and

 4   1994.

 5        Q.    '94.  Okay.

 6              And you said that you relied on the

 7   forensic accountant and -- to run your expertise as

 8   far as assessment; correct?

 9                   MR. HAEFELE:  Objection to form.

10        A.    An attorney group that I was part of

11   worked -- chose to retain a forensic accountant firm

12   to assist us in reconstructing a record that would

13   enable us to assess terrorist finance vulnerability

14   and what additional practices would need to be put

15   into place to correct those vulnerabilities in that

16   particular case.

17        Q.    (BY MR. MOHAMMEDI)  Was the case about

18   terrorism finance?

19        A.    Yes.

20        Q.    Okay.  And what type of terrorist finance

21   are you talking about?

22        A.    I'm sorry, I don't understand the

23   question.

24        Q.    It was a Middle Eastern finance or was

25   it --
```

```
 1        A.      Yes.

 2        Q.      -- related to where?

 3        A.      Yes.

 4        Q.      Are you an expert on Islam?

 5        A.      I am not an expert on the doc --

 6   religious doctrine of any kind, except to the extent

 7   that it involves the political impact of different

 8   types of interpretations of religion when a religion

 9   is politicized into a political movement, where I

10   have expertise.

11              So when you have a combination of foreign

12   policy, security, and religion, that's an area that

13   I have devoted some extensive work on over a long

14   period of time.

15              And that is an area of expertise, yes.

16   In the Middle East bureau, where I was from 2013 to

17   2017, we were constantly dealing with -- within the

18   bureau and I was personally -- the competing agendas

19   of political Islam and various strands and strains

20   of political Islam, including that in the Islamic

21   state and al-Qaeda and other groups like Ansar

22   al-Sharia.  And that competing with -- Arab

23   nationalism competing with states that would be

24   modern unitarian states, competing with warlord and

25   different types of rule in which pan-Islamic rule
```

This Transcript Contains Confidential Material

```
 1   was one of the strains, political strains that had

 2   all kinds of consequences for terrorism and

 3   terrorist risk, and having to understand the various

 4   strands of those was critically important to my

 5   work.

 6              In that period in particular, while I was

 7   involved.

 8       Q.   (BY MR. MOHAMMEDI)  But you are not an

 9   expert on Islamic terms of concept from a religious

10   standpoint, are you?

11              MR. HAEFELE:  Objection, form.  Asked

12        and answered.

13       A.   I am not really -- I'm not willing to

14   adopt your question as an answer.  I'm happy to say

15   again what my expertise is.

16       Q.   (BY MR. MOHAMMEDI)  Are you a religious

17   expert?  "Yes" or "no."

18              MR. HAEFELE:  Objection to form.

19       Q.   (BY MR. MOHAMMEDI)  Are you a religious

20   expert?

21              MR. HAEFELE:  Still objection to

22        form.  It's the same question and he's

23        answered.

24       A.   I developed expertise in the political --

25       Q.   (BY MR. MOHAMMEDI)  I just say, are you a
```

This Transcript Contains Confidential Material

```
 1   religious expert?  I mean, it's -- you already

 2   explained that.  I'm just asking you are you a

 3   religious expert?

 4               MR. HAEFELE:  Omar, you keep asking

 5        and repeating the same answer he gave.

 6               MR. MOHAMMEDI:  He already answer a

 7        question that was not really what I was

 8        asking.  I'm just asking if you are a

 9        religious expert.

10   A.    I can answer it this way:  My father was

11   a medical researcher in cardiovascular disease and

12   learned some fundamental principles in connection

13   with the angiotensin system.  He was an expert in

14   that area.  He was also a doctor.  He was not an

15   expert in glioblastoma.  So if you're asking

16   somebody are you an expert in medicine, well, yes,

17   my father was a medical expert, a medical expert

18   with certain areas of expertise.

19               I have certain areas of expertise.  Am I

20   a religious expert who spent my life on Islam,

21   Christianity, Judaism, Buddhism, Bahaism, Sufism,

22   the difference between Sunni and Shia, I have not

23   spent my lifetime on it, although I could give you

24   the basics of the Sunni/Shia split if it was of help

25   to you.  I could discuss when Wahhabism originated
```

This Transcript Contains Confidential Material

```
 1    and when the modern Salafi movement originated, and

 2    the fact that some people think its antecedents go

 3    back earlier and foundations for it earlier.  I can

 4    talk about the relationship between Egypt and

 5    Saudi Arabia in competing for religious dominance.

 6    But does that make me an expert in religion?  No.

 7              MR. GOETZ:  Objection, nonresponsive,

 8         move to strike.

 9         Q.    (BY MR. MOHAMMEDI)  Do you hold yourself

10    as a religious expert in this case?

11              MR. HAEFELE:  Objection to form.

12              MR. MOHAMMEDI:  Just answer this

13         "yes" or "no."

14              MR. HAEFELE:  Objection, you can't

15         demand a "yes" or "no" answer.

16              MR. MOHAMMEDI:  Robert, you can stop

17         interjecting.

18              THE WITNESS:  I believe I've answered

19         the question.

20         Q.    (BY MR. MOHAMMEDI)  Are you an expert on

21    religion in this case?

22              MR. HAEFELE:  Objection to form,

23         asked and answered multiple times.

24         A.    I am expert on the political aspects of

25    Islam and how it played out in the region in the
```

This Transcript Contains Confidential Material

```
 1   1980s, 1990s, and 00s.

 2        Q.    Are you an expert in Islamic terms and

 3   concepts?

 4        A.    I know about a few of them.  Not all of

 5   them.

 6        Q.    Are you an expert --

 7              Knowing is not an expert.  Do you agree

 8   with me?

 9              MR. HAEFELE:  Objection to form,

10       argumentative.

11        A.    I think it's really up to others to

12   determine the scope of my expertise.  I felt

13   comfortable and continue to feel comfortable

14   answering questions that were posed to me in my

15   expert report.

16        Q.    (BY MR. MOHAMMEDI)  Okay.  Then we go to

17   the next point.

18              (Reporter clarification.)

19        Q.    (BY MR. MOHAMMEDI)  Are you an expert on

20   the Kingdom of Saudi Arabia history?

21        A.    I know a fair amount about the Kingdom of

22   Saudi Arabia.  I dealt with issues relating to it

23   every day in my last work, the state departments.  I

24   was not personally responsible for that

25   relationship, but I was in meetings each morning
```

This Transcript Contains Confidential Material

```
 1     when I was in Washington to discuss the ins and outs

 2     of that relationship.

 3              And I'm familiar with the modern history

 4     of Saudi Arabia.

 5          Q.    Have you ever been posted in

 6     Saudi Arabia?

 7          A.    No.

 8          Q.    Have you ever been posted anywhere in the

 9     Middle East pre-9/11 as U.S. representative?

10          A.    I'm sorry, please repeat the question.

11          Q.    Have you ever been posted anywhere in the

12     Middle East pre-9-11 as a U.S. representative?

13          A.    I've undertaken missions in a variety of

14     places in the Middle East.  I have been posted in

15     Washington.  I've always been -- I've lived in

16     Washington since 1985.

17          Q.    If we go to you -- as Exhibit 2, your CV

18     and the experience and qualifications.

19                    MR. HAEFELE:  Just for the record,

20          it's not Exhibit 2.

21                    MR. MOHAMMEDI:  I'm sorry, I'm sorry.

22          Which exhibit, that CV and qualification.

23                    MR. HAEFELE:  896.

24                    Wait, do you want his CV or his

25          expert report?
```

This Transcript Contains Confidential Material

```
 1    the time?

 2        A.    I was in law school.  I was not -- did

 3    not have a law degree at that time.

 4        Q.    And what did you do?

 5               MR. HAEFELE:  Objection to form.

 6        A.    I worked with the -- John Sharkey

 7    comptroller of the currency and Tom Reardon of the

 8    FBI in preparing materials for a trial involving

 9    money laundering activity and fraud in the

10    Caribbean.  It was a cross-border crime, which

11    introduced me to a number of concepts in money

12    laundering and fraud.  That's how I began my

13    involvement in the skill.

14        Q.    (BY MR. MOHAMMEDI)  And you worked with

15    Financial Action Task Force; correct?

16        A.    Yes.

17        Q.    Which is the Financial Action Task Force?

18        A.    What is it?  Is that the question?

19        Q.    Yes.

20        A.    The Financial Action Task Force was

21    created in the meeting of the G7, I believe in 1989,

22    in response in part to legislation that I worked on

23    with Senator Kerry requiring the United States to

24    negotiate what were then called Kerry agreements so

25    that U.S. anti-money laundering laws, which were
```

This Transcript Contains Confidential Material

1    still quite basic, would be adopted in other

2    countries to avoid regulatory enforcement

3    arbitration.

4           And the Bush administration did not want

5    to negotiate bilateral agreements in that area, and

6    what evolved was instead the Financial Action Task

7    Force by a decision of the G7 in 1989.

8       Q.    And at the time of its creation, did

9    financial task force have any policies to combat

10   terrorism financing in particular?

11      A.    No.

12      Q.    And the role was mostly related to policy

13   matters; correct?

14      A.    No.

15      Q.    What is relate -- what was it related to?

16      A.    It was a mechanism to develop

17   international money laundering standards, which

18   countries would then put into place to provide a

19   foundation to combat money laundering and all forms

20   of financial crime, essentially because money

21   laundering involves disguising the actual uses of

22   funds.  So it applies to a very great range of

23   felonies, of serious crimes.  And the idea was to

24   have it -- initially it was to combat drug

25   trafficking only, but by 1996 it became modified

This Transcript Contains Confidential Material

```
 1    to -- a system to combat all forms of serious crime.
 2        Q.    Okay.  And as a deputy assistant
 3    secretary of state for international law in 1984, on
 4    September 11, 1996 you testified before the House
 5    International Relations Committee; correct?
 6        A.    I don't recollect the date.
 7                MR. MOHAMMEDI:  Can you bring up
 8        Exhibit 6, which is 902, I believe.  Right?
 9                (Winer Deposition Exhibit 902, Cheap
10                Flights to Nigeria, was marked for
11                identification.)
12                TRIAL TECHNICIAN:  That might take a
13        second.  That didn't come through --
14                MR. MOHAMMEDI:  Can we go off record
15        until you figure this out?
16                THE VIDEOGRAPHER:  Going off the
17        record.  11:50 a.m.
18                (Recess taken, 11:50 a.m. to
19                11:51 a.m. EDT)
20                THE VIDEOGRAPHER:  Back on the
21        record.  The time is 11:51 a.m.
22        Q.    (BY MR. MOHAMMEDI)  So in page 1 of that
23    document, which is highlighted for you, in
24    paragraph 3, is you -- you refer to your bureau's
25    responsibility was to protect American citizens and
```

This Transcript Contains Confidential Material

```
 1   American businessmen from threats posed by

 2   international narcotics trafficking and crime;

 3   correct?

 4              MR. HAEFELE:  Omar, can you tell us

 5        what we're looking at?

 6              MR. MOHAMMEDI:  I just mentioned it.

 7              MR. HAEFELE:  I know, but can you

 8        tell us --

 9              MR. MOHAMMEDI:  It's here.

10              MR. HAEFELE:  What is the document?

11        I know you're highlighting something from a

12        document; I don't know what the document is.

13              MR. MOHAMMEDI:  I understand.  At

14        paragraph 3, the highlighted version of

15        paragraph 3.

16              MR. HAEFELE:  Of what -- what is the

17        document you're highlighting?

18              MR. MOHAMMEDI:  Okay, the document I

19        mention is a Congressional testimony in 1996.

20              MR. HAEFELE:  Thank you.  I must have

21         missed that.  I apologize.

22        Q.   (BY MR. MOHAMMEDI)  Do you read that,

23   Mr. Winer?

24        A.   Yes.  Would you like me to read it?

25        Q.   I just read it to you.  You agree with
```

```
 1   that; right?

 2        A.    Yes.

 3        Q.    And your responsibility was for policy;

 4   correct?

 5        A.    That was part of my responsibility, yes.

 6        Q.    And there was nothing referencing to

 7   terrorism or terrorism financing, was there?

 8        A.    That's correct.

 9              MR. HAEFELE:  Objection to the form.

10        A.    But let me simply --

11              MR. MOHAMMEDI:  I don't have any

12         question pending.

13              MR. HAEFELE:  Let him finish the

14         answer, Omar.

15        A.    At my bureau, given our responsibility,

16   policy, and programs, the programs part got very

17   operational.  So it's a mistake and inaccurate to

18   state that it's limited to policy only.

19        Q.    (BY MR. MOHAMMEDI)  But it's a relate --

20   it's not related to anything about terrorism;

21   correct?

22        A.    That's correct.

23              MR. HAEFELE:  Objection to form.

24        A.    That statement is not related to anything

25   about terrorism.  The hearing was on Nigerian crime.
```

This Transcript Contains Confidential Material

```
 1   kind.  Money laundering of every kind.

 2              And fraud and money laundering including

 3   terrorism.  As mentioned, I first encountered the

 4   terrorism problem in my work for the subcommittee on

 5   Terrorism, Narcotics, and International Operations,

 6   organizations, I believe the subcommittee was

 7   called, in the years I was working for then-Senator

 8   John Kerry.

 9              That expertise was the foundation for my

10   understanding on terrorist finance.  They also

11   worked closely with Richard Clarke, who was the lead

12   person in the U.S. government during the Clinton

13   administration for dealing with terrorism, and

14   chatted with him about it in the course of my work,

15   which was directly adjacent and intersected with the

16   work that was being undertaken on terrorism.  My

17   involvement was limited to an understanding that we

18   needed to take on terrorist finance at the same time

19   and that we had a growing problem associated with

20   terrorist finance.  This emerged fairly rather late

21   in my time at the Department of State, '98, '99,

22   with particular focus after the terrorist bombings

23   of our embassies, which got everybody's attention at

24   the State Department and caused people to broaden

25   and deepen their focus on these issues.
```

This Transcript Contains Confidential Material

 1          During this period of time, Mr. Clarke

 2   was quite frustrated with the response of the U.S.

 3   government to what he perceived as a tremendous

 4   threat.  I was one of the people in the functional

 5   bureaus who he could talk with about the nature of

 6   the threat without getting push-back.

 7          The regional bureaus very often would

 8   push back when you were asking countries to do more.

 9   And the Middle East bureau, in this period of time,

10   would push back sometimes.

11          And so I got exposed to it in that

12   period.  When I went to Alston & Bird, after 9/11, I

13   was reached out to by the United States Senate, by

14   ABC News, by academic institutions, and participated

15   in a number of seminars, conferences, and so on, on

16   terrorism finance; and used that period of time to

17   deepen my knowledge and research into the

18   phenomenon.  I also was retained by the

19   United States government from a period of about 2000

20   to a period of about 2008 to provide regular reports

21   on countries relating to money laundering, terrorist

22   finance, corruption, these countries'

23   vulnerabilities, and these companies' capacities to

24   deal with them.

25          And so my study continued while I was

This Transcript Contains Confidential Material

```
1   under contract to the United States government

2   throughout that period.

3       Q.   (BY MR. MOHAMMEDI)  And that was from

4   1999-2008; correct?

5       A.   No, I believe it was 2000 to 2008, not

6   1999.

7       Q.   2000.  Because I think it says 1999.

8       A.   I was at Alston & Bird from 19 -- the end

9   of 1999 to 2008, but my work in this territory did

10  not take place in 1999.  I was there only two months

11  in 1999, and that work began later.

12      Q.   And, Mr. Winer, what percentage of your

13  time would you estimate that was spent in counseling

14  regarding terrorism finance for that period of time,

15  which is from 2000-2008?

16      A.   Could you please repeat the question.

17      Q.   What percentage of your time would you

18  estimate was spent on counseling regarding terrorism

19  finance from 2000, 2008?

20      A.   It's difficult for me to put a percentage

21  on something I've never put a percentage on.  I can

22  tell you that I had a contract with the

23  United States government, a series of contracts,

24  which --

25      Q.   How many?  I'm sorry.  How many
```

This Transcript Contains Confidential Material

1    contracts?

2        A.    I can't tell you how many.  I can tell

3    you how many years.  They began in 2000 and

4    continued through 2008.  In which I was providing

5    work regularly to the United States government

6    throughout that period of time on this set of

7    issues.

8        Q.    And when you say, when you talk about

9    2000, 2008, and you talk about your -- the contract,

10   are those the clients that you were advising during

11   that time?

12       A.    I had private sector clients I provided

13   advice to in connection with OFAC, and I had the

14   government as a client providing analytic --

15   academic or analytic work on country studies,

16   principally, though it was not only country studies,

17   of vulnerability to money laundering, vulnerability

18   to terrorist finance.  Their capacities to combat

19   these phenomena.  And what measures of performance

20   might look like if they built greater capacity.

21       Q.    And did you represent any charity itself

22   in this -- during that time period?

23       A.    Yes, as I've mentioned, I did.

24       Q.    And was there --

25       A.    As I've stated, I have, yes.

This Transcript Contains Confidential Material

```
 1        Q.    And those are foreign charities or U.S.
 2   charities?
 3        A.    Both.
 4        Q.    And the foreign charities, which area
 5   of --
 6        A.    Middle East --
 7        Q.    -- the world that you were representing?
 8        A.    Middle East.
 9        Q.    Middle East mostly?
10        A.    I can't -- you asked -- I talk about two
11   cases involving OFAC.  There's a third case which
12   did not involve that, which involved a U.S. domestic
13   charity which had other issues associated with
14   financial documentation of its activities and
15   investigated enforcement matters where I was
16   providing advice.
17        Q.    Did you represent any other government
18   other than the U.S. government?
19        A.    Let me think of what I did when.  Yes,
20   while I was at Alston & Bird, if that's the period
21   we're talking about, I represented the government of
22   Indonesia for a period.
23        Q.    Indonesia.  Any other government?
24        A.    Later, I represented the government of
25   Malaysia.
```

This Transcript Contains Confidential Material

```
1        Q.    If you can just list them for me, I'd
2   really appreciate that, if you have the list.
3        A.    I represented the governments of
4   Indonesia.  I don't know the exact year.  I
5   represented the government of Malaysia in roughly
6   2009 or '10.
7              But again, I don't have these accurate.
8   Indonesia would have been roughly 2005 or '6, but I
9   don't recollect.
10       Q.    Were any of those governments you
11  represent before 9/11?
12       A.    No.
13       Q.    It was after 9/11?
14       A.    Yes.  And in Indonesia --
15             Let me wait until you ask a question.
16       Q.    What type of representation you had for
17  Indonesia and Malaysia in your practice?
18       A.    Generally both -- both countries wanted
19  to understand the U.S. government's major issues
20  with them and to think about how to enhance their
21  relationship with the United States.  In connection
22  with Indonesia, we provided legal advice on certain
23  matters.  And beyond that, I really can't get into
24  that.  Though separately I can say that I provided
25  an analysis or critique of Indonesia's anti-money
```

This Transcript Contains Confidential Material

```
 1    laundering and antiterrorist laws and made

 2    recommendations on them.  But that wasn't -- that

 3    was a separate engagement that I did pro bono in

 4    addition to the formal engagement.

 5         Q.    Mr. Winer, every time you respond, you

 6    say money laundering and terrorism finance.  Is it

 7    that every time you dealt with money laundering you

 8    dealt with the terrorism finances as well?

 9         A.    I can't say every time, but after 9/11,

10    in the work that I did for the U.S. government, it

11    was, if not always, it was almost always.

12              As I said a few minutes ago, there were a

13    few reports that I did for the United States

14    government which were outside of the country

15    analysis framework.  The 100-plus reports that I

16    did -- and it might have been 120, I don't remember

17    the exact number.  It tended to be about 20 a year,

18    to the best of my memory -- were generally country

19    reports, but they also asked me to look at things

20    like global financial risk from derivatives, the

21    money laundering and crime risk of internet

22    gambling.  So occasionally there would be specialist

23    topics.  But the country reports always included,

24    the best of my memory, a charity finance department.

25         Q.    And were you responsible to get with
```

This Transcript Contains Confidential Material

```
 1        Q.    So you're saying because it was not
 2   relevant, even though it's banking standard,
 3   terrorism finance was not relevant?
 4        A.    Not to this particular case.  It was
 5   about a Ponzi scheme and there was no terrorist
 6   finance involved.
 7        Q.    Okay.  In -- yeah.
 8              In exhibit, I think 896.  Page 151, 152.
 9              You referred that you teach terrorism
10   finance to CIA analyst at Kent School from
11   2002-2013; correct?
12        A.    I don't think I said 2013.  If that's --
13   if it says it anywhere, that's not -- I don't think
14   that's -- actually, let me think about that.  Yes, I
15   did.  I taught all the way until I went back to...
16              That's correct.  Yep.
17        Q.    How many courses on terrorism finance did
18   you teach to CIA analysts?
19        A.    I don't remember.
20        Q.    What was the duration of -- I mean, how
21   many times a -- I would say what was the frequency
22   of those lectures?
23              MR. HAEFELE:  Objection to the form.
24        A.    There were typically four a year, and
25   they covered corruption, money laundering, terrorist
```

This Transcript Contains Confidential Material

1    finance, that range of topics.

2        Q.    (BY MR. MOHAMMEDI)  Did you have any

3    syllabus?

4        A.    I did proposals to them and prepared

5    presentations and that type of thing.

6        Q.    So there was no syllabus for your

7    lectures?

8        A.    I don't understand the word syllabus in

9    this connection.

10       Q.    I teach in law school and whenever I

11   teach -- I go to teach, I'll have syllabus for the

12   duration of time during I teach, and people who

13   teach in the -- I mean, obviously everyone who

14   teach, they have syllabus, if it's a recognized

15   and -- a teaching position?

16              MR. HAEFELE:  Objection to the form.

17       A.    I didn't have a syllabus.

18       Q.    (BY MR. MOHAMMEDI)  You didn't have a

19   syllabus.  Okay.

20              Those courses that you were teaching,

21   were they in any way related to 9/11?

22              MR. HAEFELE:  Object to the form.

23       A.    Yes.

24       Q.    (BY MR. MOHAMMEDI)  Can you give me

25   examples?

This Transcript Contains Confidential Material

```
 1        A.    Sure.  I focused on Pakistan as a case
 2   study of the ways in which corruption played out in
 3   having very, very poor controls on the movement of
 4   money, and the terrorist problem, winding up being a
 5   destabilizing factor in India -- or in Pakistan over
 6   many, many years.  That's the main thing that I
 7   remember about it.  The evolution of Pakistani
 8   politics, including the impact of 9/11, which
 9   included the odd moment when money moved in, a
10   substantial amounts of payments moved in after there
11   was a crackdown, moved into the formal banking
12   system.  I remember that fact, for example, as being
13   part of the discussion.
14             And the need to understand integrity in
15   systems versus corruption in systems, in the banking
16   system, in the oversight banking mechanisms
17   generally.  That's my memory.
18        Q.    I see.  If we can go to Exhibit 8.
19                  (Winer Deposition Exhibit 904,
20                  Jonathan M. Winer resume, was marked
21                  for identification.)
22        Q.    (BY MR. MOHAMMEDI)  This is an exhibit of
23   your resumé submitted to 2012 court filing in Gill
24   versus Arab Bank.
25             Is that correct?
```

This Transcript Contains Confidential Material

```
 1        A.     Mm-hmm.

 2        Q.     And you were hired as an expert in that

 3   case as well; correct?

 4        A.     Sure.  Mm-hmm.

 5        Q.     On page 1, which you have, in the third

 6   sentence of the first paragraph, your 2000 resumé,

 7   you are talking about your experience as deputy U.S.

 8   assistant secretary of state law enforcement;

 9   correct?

10        A.     Yes.

11        Q.     You stated you serve as a principal

12   policy-maker, as a principal policy-maker focused on

13   a daily basis on international organized crime and

14   financial crimes for the State Department, including

15   money laundering, the systems used for terrorist

16   finance, and mutual legal assistance and

17   international cooperation against transnational

18   threats such as crimes and terrorism; correct?

19        A.     That's correct.

20        Q.     In this resumé that you submitted in 2019

21   at page 36 -- 136, sorry.  896 -- Exhibit 896,

22   page 136.  You kept the same wording; right?  Except

23   you changed the last phrase to handled oversight of

24   U.S. law enforcement relation with many nations;

25   correct?
```

This Transcript Contains Confidential Material

```
 1        A.    Yes.

 2        Q.    How did the same experience come from

 3   hours of the policy maker focusing on mutual legal

 4   assistance and international cooperation to I

 5   handled oversight of law enforcement relations?

 6        A.    Both are true.

 7        Q.    But one was -- resumé was submitted in

 8   different cases, two different thing -- two

 9   different variation; correct?

10        A.    Yes.

11              MR. HAEFELE:  Objection to form.

12        Q.    (BY MR. MOHAMMEDI)  Why -- why are there

13   two different variations of your resumé?

14        A.    Well, probably because I thought of the

15   fact in connection with this that I was also doing

16   oversight of U.S. law enforcement relations.  Is

17   this one from the Canada case?  Where is this one

18   from?  Is this my current one?

19        Q.    This is not Canada case.  This is the

20   Gill versus Arab Bank.

21        A.    This one -- which one?  I have a few --

22        Q.    The 2012 I showed you was the Gill versus

23   Arab Bank.

24        A.    Yeah.  So I've also handled oversight of

25   U.S. law enforcement relations with many nations.
```

1    It's a fact.  It's true.

2       Q.    So this -- you said -- just before you

3    said, you said just because you were dealing with

4    this issue here, that's why you added that.  Is that

5    correct?  That was your testimony right before I

6    asked you a question.

7       A.    No, I said I added it because it's also

8    true.  I don't recollect, to be honest, why I added

9    it.  I probably just wanted it.  But it's accurate.

10   I can go into detail if you'd like detail.

11      Q.    I'm just asking questions specifically

12   about that.  I'm not asking for detail.  Thank you.

13         In your 2019 resume which you submitted

14   in this case, the heading reads:  Experience in U.S.

15   Foreign Policy Sanctions and Terrorist Finance

16   Process; correct?

17      A.    Yes.

18      Q.    And that's page 137.

19         In your 2012 resumé you wrote, during my

20   six-year service as -- and let's go to page 2 of

21   that exhibit.

22      A.    Uh-huh.

23      Q.    Exhibit 8, page 904.

24         I'm sorry, Exhibit 904 -- Exhibit 904,

25   which is -- which we just have now, at page 2.

This Transcript Contains Confidential Material

```
 1    the NSC to get the whole U.S. government going to

 2    deal with the international financial crimes bureau

 3    in that period.

 4         Q.    Okay.  In your 2019 resumé and the

 5    earlier experience, which is page 138 of

 6    Exhibit 196, you wrote about the Senate report drug

 7    law enforcement and foreign policy:  The Senate

 8    report analyzed cases in which U.S. foreign policy

 9    interests were preventing the U.S. government from

10    protecting U.S. citizens from injury for -- by

11    foreign drug traffickers, arms traffickers,

12    criminals, and terrorists.

13              Right?

14         A.    Yes.

15         Q.    Is that correct?

16              That sentence does not appear in your

17    2012 resumé that was submitted in the Gill versus

18    Arab Bank; correct?

19         A.    I don't know.

20         Q.    It does not.  Okay.

21              Have you ever written a book?

22         A.    I've written chapters of books.

23         Q.    You have not written a book?

24         A.    Chapters only.

25         Q.    Prior to 9/11, did you publish any
```

This Transcript Contains Confidential Material

```
 1   article or peer-reviewed journal on the subject of
 2   terrorism finance?
 3        A.    No.
 4        Q.    Prior to 9/11, did you publish any
 5   peer-reviewed books on the subject of terrorism
 6   finance, or chapters of the books, for that matter?
 7        A.    No.
 8        Q.    Have you ever authored any peer-reviewed
 9   article on al-Qaeda?
10        A.    I'd have to go back and look at the
11   articles that I wrote that were published in various
12   academic places to determine how much it was about
13   al-Qaeda.  So I can't answer the question offhand.
14        Q.    As you sit here, can you remember any --
15   anything --
16        A.    I was -- my writing, after 9/11, focused
17   very broadly on what was needed to combat terrorist
18   finance.  Those were works that I was commissioned
19   to do.  The writing I did was the work that was
20   commissioned.
21        Q.    Okay.  Have you ever authored any
22   peer-reviewed article on Islamic terrorism?
23        A.    Certainly, the writing that I've produced
24   includes that topic.  I'd have to go back and read
25   all of the articles to be able to answer the
```

This Transcript Contains Confidential Material

1   question at this point.

2        Q.    Have you ever authored any peer-reviewed

3   article on al-Qaeda finance and terrorism finance of

4   facts of 9/11?

5        A.    I'd have to go back again to the survival

6   article that I wrote to the international -- it's

7   the one that was published in the aftermath, but I

8   wrote a bunch of things in that period of time which

9   covered all these issues.  But I have not gone back

10  lately to look at them.  So I'd have to go back and

11  look at them to be able to answer your question as

12  formulated.

13       Q.    Okay.

14       A.    I wrote a lot about those topics.  What I

15  put into those particular chapters of those books, I

16  don't recollect.  It tended to be largely focused on

17  what was needed institutionally to address the gaps

18  in regimes that were in place to combat terrorist

19  finance.  That was the major thing that I tended to

20  write about.  How much of that went into the

21  individual case of al-Qaeda, I just don't recollect.

22       Q.    Okay.  Have you ever been accused of

23  committing perjury?

24       A.    In court?

25       Q.    In general.

This Transcript Contains Confidential Material

```
 1         A.    When I'm asked a question, as an expert,
 2    I draw on my own personal experience in the field,
 3    and the -- whatever period of time that I worked on
 4    an issue directly when I was in the government, I
 5    draw on my experience as a practitioner, as a
 6    lawyer, in which I -- when I've been exposed to
 7    clients with issues in that area, and my study of
 8    the law and my past study of facts.  I draw upon, as
 9    well, analysis and academic work that I've
10    undertaken in the past and the research I did in
11    connection with that.
12              I look at primary source information when
13    it's available.  So Jamal al-Fadl, for example,
14    Mr. Ahmad, would both be examples of first-hand
15    information.  There's also -- can be first-hand
16    information in newspaper reports when you have
17    contemporaneous interviews or quotes from
18    individuals, and I will use that as well.
19              I rely on government reports, both from
20    the United States and sometimes from other
21    governments.  I rely on UN reports and other
22    official reports, because based on my experience,
23    those are typically based on a tremendous amount of
24    work, which often is documented; it's not always
25    explicitly documented.
```

This Transcript Contains Confidential Material

```
1              So what I try to do -- and this is --
2    this was how I went about my work for the U.S.
3    government from 2000 to 2008, when I was doing the
4    analytic work I discussed with you.  It's
5    essentially an all-source approach in which you take
6    as many sources as you can and then weigh the
7    sources and bring them together to form your
8    analytic findings on a topic.  And so it's really I
9    try and take advantage of the work that's been done
10   by others, as much first-hand information as I can
11   get my hands on, and analyze and assess it and bring
12   human reason to bear upon it.
13        Q.   (BY MR. MOHAMMEDI)  Do you apply any
14   scientific and social science methodology?
15        A.   I think I have just described the
16   methodology that I apply.  And I'm not sure
17   precisely what type of information you're looking
18   for.  Is it statistical information?
19        Q.   You are the expert here.  I guess you
20   will explain to me how you -- how you reach your
21   opinion by applying scientific and social science
22   methodology.
23              MR. HAEFELE:  Objection to form.
24        A.   As I've just described, I take primary
25   source material, which is capable of being read, and
```

This Transcript Contains Confidential Material

1              What I did was I looked at, in light of

2      my own experience and knowledge, which included the

3      academic analytic work that I did for the U.S.

4      government, as well as my own tenure working for the

5      Senate and my two tenures at the State Department,

6      and the work that I've done on behalf of clients, I

7      looked at the materials provided to me by the

8      attorneys in this case, supplemented it with

9      additional research into the secondary literature of

10     some scholars, who I cite in my reliance material,

11     and that's how I came to my formulations.

12             When there was first-hand information

13     that I thought was particularly relevant, I looked

14     at it.  And when I didn't have it, I asked for more

15     of it.  A particular case of that is there were

16     representations about the extent of audits.  I

17     wanted every audit that I could get my hands on.

18     The more, the better, because that's primary source

19     information that's very important to me.

20         Q.    So let's make it clear on the record that

21     the audit you're referring to are not in your

22     affirmative report.  Right?

23         A.    Yes.

24         Q.    Let's also --

25         A.    Excuse me, the audits for WAMY were not

This Transcript Contains Confidential Material

1   in my affirmative report.  There were some IIRO

2   audits.  I asked for them and I wanted them.  I got

3   more audits from my rebuttal report and then

4   analyzed those.

5        Q.    And let's make it clear that the reliance

6   materials that you have, the documents produced in

7   this -- the documents produced in this case were

8   given to you by plaintiffs' attorneys; correct?

9        A.    Most of them were, or many of them were.

10  I supplemented as best I could with additional

11  research when I felt that additional research that I

12  was able to get in the limited amount of time that I

13  had between the time of my retention and the time

14  that my report was due, I would supplement.

15       Q.    In your prior testimony, you stated those

16  are the documents that you relied on in rendering

17  your opinion in your affirmative report, correct?

18       A.    Yes.

19       Q.    The index.  Okay.  If an allegation

20  appears in a government document in your

21  methodology, do you accept the fact -- accept it as

22  a fact or do you do anything to attempt to

23  corroborate or dispel fact assertions?

24            MR. HAEFELE:  Objection to form.

25       A.    That's a very broad category, government

This Transcript Contains Confidential Material

```
 1   be from a mild concern to a moderate concern to a

 2   serious concern.

 3           In the last half of the 1990s, terrorism

 4   associated with areas of Muslim and non-Muslim

 5   conflict and the growth of al-Qaeda were both things

 6   that were becoming of increased concern to the

 7   United States government as a matter of national

 8   security and a particular concern for Richard

 9   Clarke, who was my mentor in this period of time.

10   Q.   I get to -- I don't think you have

11   provided the standard of concern that I'm asking

12   you, but that's fine.  We can move on.

13           MR. HAEFELE:  Let me just object one

14      more time to the cutting off the witness

15      before he answers his questions.

16   A.   As I've tried to express, the term

17   concern can mean many things, but typically,

18   typically its meaning in this kind of a context,

19   when the U.S. government official says something is

20   of concern, or continuing concern, it's a -- it

21   involves a communication to another government.

22   There was not an internal communication within the

23   government to démarche the other government about

24   its concern.  And in connection with the three

25   defendants in this case, the United States
```

This Transcript Contains Confidential Material

```
 1        A.     Sorry I --

 2        Q.     (BY MR. MOHAMMEDI)  Do you corroborate

 3   the proffer, if -- the information in the proffer

 4   with other information that you have to be able to

 5   reach an opinion?

 6               MR. HAEFELE:  Objection to form.

 7        A.     I looked at as much information as I

 8   could within the period of time allotted to me to

 9   try to incorporate and understand a wide range of

10   materials, which included the proffer but was not

11   limited to the proffer.  So for example, with monies

12   relating to the Aranda case, there's separate

13   documents from the United States government, such as

14   terrorist designations.  There's separate

15   information from the UN, such as terrorist

16   designations.  You look at everything you can to try

17   and figure out what's going on.

18        Q.     (BY MR. MOHAMMEDI)  Okay.  What about

19   Christopher Hedges' 1992 New York Times article.

20   It's not a primary source?

21        A.     It's not -- it's a newspaper article

22   that's contemporaneous.  And it's contemporaneous on

23   certain things.  Then I think it can be relied on as

24   a primary source for certain things.  In other

25   aspects, it's a secondary source.
```

This Transcript Contains Confidential Material

```
 1      A.    I don't recollect.

 2      Q.    Okay.  So -- strike that.

 3            How many times did you -- how much time

 4   did you spend reviewing the Harmony database?

 5      A.    Not a lot.  As I said, the legend on it

 6   cautioned me on.  I tested the legend by looking at

 7   a couple of things to see if it was going to be of

 8   any value.  Found it wasn't any value for that

 9   purpose and didn't spend more time on it.  I had a

10   very limited amount of time between December and

11   when I turned the report in, and didn't spend much

12   time on it.

13      Q.    So it is your testimony you didn't find

14   any evidentiary value in those documents, that's why

15   you stopped looking at them?

16      A.    That's correct, I did not.

17      Q.    Does the CRA have any agency -- in your

18   report, you went through the details.  And I'm not

19   going to go through the details now, but I just

20   wanted to for the purposes of your methodology, did

21   you consider the adverse reporting in that case part

22   of -- as a primary source?

23      A.    I don't understand what you --

24      Q.    Okay.  So just to be very quick, the

25   Canadian report, the CRA report, listed adverse
```

1   funded by these large Gulf charities and had

2   employees who would siphon the money to al-Qaeda.

3        Q.   (BY MR. MOHAMMEDI)  So it says

4   al-Haramain.  It doesn't say WAMY, it doesn't say

5   Muslim World League, correct?

6             MR. HAEFELE:  Objection to form and

7         objection to the interruption.

8        A.   It says, smaller charities in various

9   parts of the globe were funded by these large Gulf

10  charities.  The al-Haramain reference is a reference

11  to an entity which Saudi Arabia joined and

12  sanctioned, and it is a "such as."  Such as means

13  it's not the only one.  Now, there were a limited

14  number of large international charities in

15  Saudi Arabia.  And the one the United States

16  government referred to repeatedly as a particular

17  concern in public testimony and in private

18  communications to the Saudi Arabian government were

19  IIRO, the Muslim World League, and WAMY.

20       Q.   (BY MR. MOHAMMEDI)  So here, if you --

21  Mr. Winer, what does it say on those pages that

22  WAMY, Muslim World League, and IIRO played any role

23  in helping create al-Qaeda's global infrastructure.

24  What does it say here?

25       A.   I believe it says, the statement, large

This Transcript Contains Confidential Material

1   international charities such as, which set up, were

2   supporting, smaller charities, is a reference to

3   those three entities.

4       Q.    But my question is very specific.  Has it

5   said those names that they form helping create

6   al-Qaeda global infrastructure.  Based on your

7   statement in 5.1:  Central role in helping al-Qaeda

8   creates its global infrastructure, uniting disparate

9   Muslim groups, in different parts of the world into

10  a common extremist cause.  I'm just asking, does --

11  is it true that WAMY, Muslim World League, and IIRO

12  were not named in this; correct?

13              MR. HAEFELE:  Objection to form.

14      Q.    (BY MR. MOHAMMEDI)  That is 9/11

15  Commission report; correct?

16              MR. HAEFELE:  The report is reticent

17       on the names of who the other large

18       international charities were.

19      Q.    (BY MR. MOHAMMEDI)  You're -- but,

20  Mr. Winer, you're the one who wanted to refer me to

21  page 170, 171 to support your opinions; right?

22  Correct?

23      A.    Yes, I'm asking to you understand this in

24  connection with many statements made by U.S.

25  government officials in other forums about these

This Transcript Contains Confidential Material

```
 1   entities, and you put two and two together and it

 2   makes four.

 3           Now, if you look on page 171 --

 4      Q.   These are your assumptions; correct?

 5      A.   I beg your pardon?

 6      Q.   These are your assumptions; correct?

 7      A.   This is my understanding.  Page 171,

 8   please.  The end of the first paragraph, the first

 9   full paragraph:  This conclusion does not exclude

10   the likelihood that charities with significant Saudi

11   government sponsorship -- charities -- diverted

12   funds to al-Qaeda.  Charities is more than one.

13   It's not just al-Haramain.

14      Q.   First of all, it does not say WAMY,

15   Muslim World League, and IIRO, correct?

16              MR. HAEFELE:  Objection.

17       Argumentative.

18      A.   It is reticent on the identity of those

19   charities.

20      Q.   (BY MR. MOHAMMEDI)  And that's based on

21   your assumption, correct?

22              MR. HAEFELE:  Objection.

23      A.   Based on the other statements made by

24   U.S. government officials in a number of other

25   contexts.  That is what I believe, correct.
```

This Transcript Contains Confidential Material

```
 1        A.    No, I didn't say WAMY audits.
 2        Q.    Okay.  So my question, which other
 3   organization you reviewed documents showing --
 4   because in your footnote, you state that you have
 5   seen no audits pertaining to WAMY or Muslim World
 6   League.  But audit of entities they funded or
 7   assisted show false recording.
 8        A.    I have sought to answer your question
 9   accurately each time you've asked it.  Let me try
10   again.
11             At the time I wrote the first report, I
12   asked for but did not receive audits pertaining to
13   WAMY or Muslim World League.  I wanted them, I
14   didn't get them.  I got them and discussed them in
15   the rebuttal -- my rebuttal report.  I did see
16   audits of entities they funded or assisted which
17   showed false recordkeeping.
18        Q.    And which organizations are those?
19        A.    The Third World Relief Association is
20   one.  And the IIRO is another.
21        Q.    So how come we don't have that in the
22   reliance material, the document of WAMY showing the
23   false recording in the Third World Relief
24   organization?
25        A.    I believe they are in the reliance
```

This Transcript Contains Confidential Material

```
 1       Q.    Is that correct?

 2       A.    That's my understanding of when they say:

 3  Who was behind the biological crisis which became

 4  like brainwashing?  A Jew.  And it goes on from

 5  there, and they talk about why are you so miserly

 6  with your blood.

 7       Q.    Okay.  So to you that is --

 8       A.    Teach our children to love taking revenge

 9  on the Jews and the oppressors.

10       Q.    Do you agree that there are hatred

11  statements made all over the world?

12             MR. HAEFELE:  Objection.

13       A.    I'm not in a position to discuss -- to

14  opine on hatred statements all over the world.  This

15  is calling for revenge on the Jews.

16       Q.    (BY MR. MOHAMMEDI)  And you are saying

17  that WAMY text specifically said that we are

18  justifying the killing of nonbelievers?

19       A.    Yes.

20       Q.    Okay.  We'll move on.

21             I'm just going to ask you another

22  question.  You are not a religious expert, are you?

23       A.    We've discussed this issue earlier.

24  You've asked me this question.  I understand a

25  religion in a political context when religion is
```

This Transcript Contains Confidential Material

```
 1   used for political purposes as part of my

 2   understanding of relationships among states, as part

 3   of my understanding of terrorism.  We had national

 4   and global security issues.  And so in that context,

 5   yes.  In the context of various religious doctrines,

 6   intrareligious discussions of text, there are people

 7   who spend their lifetimes as religious scholars, and

 8   that has not been my work.

 9        Q.    And you're referring -- is it fair that

10   you are referring to a document that's expressed

11   religious views of an organization, and you are

12   making the -- you are reaching the conclusion that

13   was calling for justifying the killing of

14   nonbelievers; correct?

15             MR. HAEFELE:  Objection to form.

16        A.    Yes.

17        Q.    (BY MR. MOHAMMEDI)  You understand the

18   meaning of jihad?

19        A.    It has multiple meanings.

20        Q.    Okay.  Do you understand the meaning of

21   Salafis?

22        A.    I believe so.

23        Q.    You do?  And are you testifying as an

24   expert here to discuss jihad and Salafis?

25        A.    Only in the context of the political
```

This Transcript Contains Confidential Material

 1    and I have very specific questions related to some
 2    of the section you mentioned where I would really
 3    like to you answer, but I'm going to go one by one.
 4    There are only two.
 5              7.1.3 at page 38.  In addition to there
 6    being no citation, you also said:  Facilitating the
 7    transport of fighters and terrorist to combat zones.
 8        A.    Yes.
 9        Q.    I'd like you to give me the facts.
10        A.    Sure.
11              MR. HAEFELE:  Objection to form.
12        Q.    (BY MR. MOHAMMEDI)  Can you offer the
13    facts as they relate to WAMY now or anything in your
14    report?
15              MR. HAEFELE:  Objection to form.
16        A.    I'm not sure at this moment about WAMY in
17    particular, on facilitating the transport of
18    fighters and terrorists.
19        Q.    (BY MR. MOHAMMEDI)  My question is very
20    specific to WAMY, Mr. Winer.
21        A.    Yes.  In paragraph 7, I trust --
22        Q.    Yeah, 7.1 --
23        A.    -- the entire paragraph of paragraph 7.1
24    refers to the charities collectively.  It does not
25    refer to particular charities.  The information on

```
 1    particular charities is specified by name.
 2        Q.    Okay.  But there is no -- as you sit here
 3    and in your report, you don't refer to WAMY;
 4    correct?
 5        A.    I don't recollect referring to WAMY of
 6    facilitating transport of fighters.  I would have to
 7    go back and look as to which charities were involved
 8    in that.
 9        Q.    Okay.  And then 7.1.4.  You state:
10    Buying weapons for Islamic jihadists and terrorists?
11        A.    Yes.
12        Q.    What facts do you have that WAMY did
13    this?  Do you have any fact that WAMY did this?
14        A.    Yes.  WAMY's -- the co-head of WAMY
15    Vienna, and the -- federal relief agency was
16    involved in these activities, both by public
17    accounts and by some of the materials that were
18    looked at in the audit.
19            And he was in both roles, according to a
20    primary source document that I reviewed as well as
21    two statements that he made.
22        Q.    You're referring to the Bosnian war;
23    correct?
24        A.    Yes.
25                MR. HAEFELE:  Objection to the form.
```

This Transcript Contains Confidential Material

```
 1        we've achieved our goal by teeing issues up.

 2        There are --

 3             SEN. ARLEN SPECTER:  I'm not asking

 4        you about internal deliberations, I'm asking

 5        you -- and let me be -- let me be specific

 6        with some organizations which have been

 7        discussed with you by staff prior to your

 8        coming here.  Were there recommendations as to

 9        the National Commercial Bank of Saudi Arabia

10        for economic sanctions which were rejected?

11             RICHARD NEWCOMB:  No,

12        Senator Specter, there was not.

13             SEN. ARLEN SPECTER:  Were there

14        recommendations for sanctions against the

15        World Assembly of Muslim Youth?

16             RICHARD NEWCOMB:  There, as in

17        others, these are issues that we looked at and

18        examined very carefully.  There was no

19        recommendation out of our office on either of

20        those.

21             SEN. ARLEN SPECTER:  Well, what

22        conclusions did you come to on the World

23        Assembly of Muslim Youth?

24             RICHARD NEWCOMB:  That, along with

25        the whole variety of charitable organizations
```

This Transcript Contains Confidential Material

```
 1        operating head offices in Saudi or

 2        organizations that we're looking at, as well

 3        as the whole range of several hundred or so

 4        possible organizations that may be funding

 5        terrorist activities, rising to the level of a

 6        recommendation is a complicated policy

 7        practice --

 8              SEN. ARLEN SPECTER:  Well, I'm not

 9        concerned about several hundred others.  I'd

10        like to know what about the World Assembly of

11        Muslim Youth.  Were they funding terrorist

12        organizations subject to economic sanctions

13        without any action being taken?

14              RICHARD NEWCOMB:  I can't conclude

15        that in this hearing today.  It is an

16        organization that we --

17              SEN. ARLEN SPECTER:  You say you

18        can't conclude it --

19              RICHARD NEWCOMB:  Cannot.  Cannot.

20              SEN. ARLEN SPECTER:  -- at this

21        hearing today?

22              RICHARD NEWCOMB:  Well, we did not

23        conclude that in our deliberations, so I can't

24        say that that was a recommendation of our

25        office.
```

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 913, WAMY
 2                     International, Inc. 2021 Annual
 3                     Report, was marked for
 4                     identification.)
 5                    MR. HAEFELE:  What is Exhibit 18?  Do
 6          you mean --
 7                    MR. MOHAMMEDI:  Yeah, it is WAMY
 8          registration of 2021.  And this is a
 9          registration for WAMY International with the
10          Commonwealth of Virginia State Corporation
11          Commission.
12                    MR. HAEFELE:  Just so we're clear,
13          it's Exhibit 913.
14                    MR. MOHAMMEDI:  Exhibit 913, correct.
15      Q.   (BY MR. MOHAMMEDI)  You didn't consider
16  this in your material when you were rendering your
17  opinion, correct?
18      A.    This document is dated January 23, 2021,
19  so I did not consider it in my report that was
20  written some months before.
21      Q.   (BY MR. MOHAMMEDI)  Mr. Winer, if I
22  represent to you that all the registration of WAMY
23  International from that time until 2020 was
24  submitted and were produced to plaintiff counsel,
25  would you agree with me?
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Object to the form.

 2        A.    Would I agree with you on what, sir?

 3        Q.    (BY MR. MOHAMMEDI)  We have produced the

 4   documents, the registration documents, for every

 5   year including -- every year up to 2020, I believe,

 6   to you -- to the lawyers who hired you in this

 7   production --

 8        A.    Yes.

 9        Q.    -- of this case production.

10        A.    What's the question, please?

11        Q.    The question -- so you said this was

12   2021, and you did not review.  And the question, are

13   you aware that WAMY produced all registrations of

14   WAMY prior to 2021?

15        A.    I was not aware of that production, but I

16   did understand WAMY was still out there, as I said

17   to you a minute ago.

18        Q.    We can take that down.

19                    MR. MOHAMMEDI:  Can we take a

20         five-minutes break?

21                    THE VIDEOGRAPHER:  Going off the

22         record.  4:11 p.m.

23                    (Recess taken, 4:10 p.m. to

24                    4:18 p.m. EDT)

25                    THE VIDEOGRAPHER:  Back on record at
```

This Transcript Contains Confidential Material

```
1        4:18 p.m.

2        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, are you

3    aware of any person who attended madrassas, as you

4    mentioned from WAMY, WAMY madrassas, that became a

5    member of al-Qaeda?

6        A.    I don't know who attended WAMY madrassas

7    and who did not.

8        Q.    But you are not aware of anyone who was

9    at the madrassas that became a member of al-Qaeda?

10       A.    I do not know what madrassas incubated

11   which fighters and which terrorists, period.

12       Q.    Okay.  So the question you are not aware

13   of anyone who attended madrassas, it doesn't matter

14   which type of madrassas, that became a member of

15   al-Qaeda.

16       A.    I know that there are people who became

17   members of al-Qaeda who attended madrassas.

18       Q.    What about WAMY?

19       A.    I don't know which madrassas they

20   attended, whether they were related to WAMY or any

21   other organization that sponsored a madrassas.

22       Q.    So as you sit here, you don't "know"

23   know; correct?

24       A.    That's correct.

25       Q.    Let's go to your report, Section 12,
```

This Transcript Contains Confidential Material

```
 1   at together.  And that's how I understand the
 2   situation.
 3       Q.   (BY MR. MOHAMMEDI)  Isn't it a fact that
 4   because you are making a statement that BIF and LBI
 5   are intertwined and you mentioned that many times,
 6   interchangeable, based on a proffer; right?
 7   That's --
 8       A.   No.
 9       Q.   Okay.  So let me ask you a question.
10   Another question.
11            It's not based on a proffer you say;
12   correct?
13       A.   It's based on all the information
14   available to me.
15       Q.   Okay.  Okay.  So let's go through some of
16   the documents to show you.
17            If you put in Exhibit 26, which is --
18   just remind me where we are.
19            TRIAL TECHNICIAN:  914, I have.
20            (Winer Deposition Exhibit 914,
21            Minutes of the Seventh Meeting of the
22            Benevolence Committee's Supervisory
23            Council, was marked for
24            identification.)
25       Q.   (BY MR. MOHAMMEDI)  This is an Arabic
```

This Transcript Contains Confidential Material

1   document, translated in English, which is -- which

2   is document that have been produced in this case.

3   Minutes of the Seventh Annual Meeting of LBI

4   Supervisory Council on July 8, 1993.

5           If you go to the -- I know you don't

6   speak Arabic, Mr. Winer, but there is an English

7   translation.  Can you go down to the English

8   translation?  Or go up.  I'm not sure where.  It's

9   either first.

10          Are we there?

11      A.   Yes.

12      Q.   No, not to you, Mr. Winer, I'm talking to

13  the tech.

14          TRIAL TECHNICIAN:  Is it not showing

15      on your screen?

16          MR. MOHAMMEDI:  It's not, no.

17          Oh, it's there.

18      Q.   (BY MR. MOHAMMEDI)  This meeting refers

19  to the council approval of Dr. Hassan Bahifz Allah

20  wanting to replace Adel Batterjee after being

21  dismissed for an extension of six months beginning

22  on August 1, 1993.  Do you see that?

23      A.   No.

24      Q.   Okay.  So can you go to the section --

25  that's it.

This Transcript Contains Confidential Material

```
 1              Okay.  Are you ready?  Let me know when
 2   you're ready.
 3        A.    I've read the material that you've
 4   provided me, in front of me in yellow.
 5        Q.    Yes, the yellow pages.
 6              It is fair to say Batterjee's dismissal
 7   was in February 1993 if it was an extension of six
 8   months for the person who replaced him starting
 9   August 1993; correct?
10        A.    I don't see those dates here.
11              TRIAL TECHNICIAN:  Mr. Mohammedi, if
12        you could just direct me to what section.
13              MR. MOHAMMEDI:  Yeah, I'm going to.
14              Go to page 9.
15              This one here.
16              THE WITNESS:  So is executive
17        director the title Batterjee had rather than
18        chair?
19        Q.    (BY MR. MOHAMMEDI)  Correct.
20        A.    Then I'm corrected, it's executive
21   director rather than chair.  I accept that
22   correction, if that's what the records show.
23        Q.    And then also, that Mr. Batterjee was
24   dismissed, was gone in February 1993.
25        A.    Sir, where does it say that, please?
```

This Transcript Contains Confidential Material

```
 1        Q.    It says extending the one date of
 2   Dr. Hassan Bahifz Allah, and that's No. 1 of the
 3   second No. 1.
 4        A.    I see that.
 5        Q.    Okay.  And the documents before talks --
 6   I mean, the same document talks about his -- the
 7   issue with the -- with the -- with Adel Batterjee,
 8   but here the extension of this extended the mandate
 9   of Hassan Bahifz Allah for an additional six months
10   that was following the dismissal of Mr. Batterjee.
11        A.    Where does it say that --
12        Q.    So we're going to show you -- if you
13   go -- if you go to page 7.
14              Make it a little bigger.
15        A.    It says:  The executive director briefly
16   spoke in his report of the latest updates regarding
17   the handover from the former director.  I don't see
18   the word "dismissal."  I see "handover."  And then I
19   see a reference to tension and a promise was made to
20   quickly and directly intervene to ease such tension.
21              What is the date of the document, sir,
22   please?
23        Q.    It's a meeting discussing the new
24   executive director that was an extension after six
25   months, which means Batterjee was not the executive
```

This Transcript Contains Confidential Material

1    director starting February 1993; correct?

2              MR. HAEFELE:  Objection, form.

3        A.   It does -- it actually doesn't say that.

4    It refers to a handover from the former director.

5    And refers to an attempt to ease the tension, which

6    suggests there are still actions to be taken.  So I

7    can't assess from this when he was dismissed.

8        Q.   (BY MR. MOHAMMEDI)  But you can assess

9    that he was not with LBI as of February 1993,

10   correct?

11             MR. HAEFELE:  Objection, form.

12       A.   No, I cannot.

13       Q.   (BY MR. MOHAMMEDI)  You cannot?

14       A.   I can't tell what date he left, based on

15   this.

16       Q.   If you --

17       A.   If I may continue.  It looks to me from

18   this document that at some point in this period, a

19   new executive director took over from the old

20   executive director.  It doesn't say that the old

21   executive director was dismissed.  It does say that

22   there was tension and action going -- needed -- that

23   needed to take place to ease the tension.

24             So the dates -- the basic idea that he

25   was leaving the position seems to me the most

This Transcript Contains Confidential Material

```
1    plausible interpretation of this.  The statement

2    that he's dismissed does not -- is not set forth in

3    this document.

4         Q.   Okay.  I think we -- you know, I guess we

5    will go through the documents.

6              If we can have Exhibits 23.

7                   (Winer Deposition Exhibit 915,

8                    2-23-1993 letter to Adel Batterjee,

9                    was marked for identification.)

10        Q.   (BY MR. MOHAMMEDI)  Which is dated

11   February 23, 1993.

12             That is the English version, which is

13   FED-PEC0114419, the Arabic document.

14             And then there is a translation.

15             If you can just make that bigger.

16             Can you read it for -- I mean, you can

17   read it to yourself if you want to.

18        A.   Yes, this is consistent with Mr. Noor

19   Wali's deposition.

20        Q.   And you do not have any reason to dispute

21   this accurate -- the accuracy of this document,

22   right?

23        A.   No, I do not.  I believe this is likely

24   to be accurate.  I have no reason not to think it

25   accurate.
```

This Transcript Contains Confidential Material

```
 1        Q.    Okay.  I'm also going to include to have

 2   an exhibit, which is 25, ours.  Where are we?  Which

 3   number are we at?

 4                    (Winer Deposition Exhibit 916,

 5                    5-11-1993 letter to Salman bin

 6                    Abdulaziz, was marked for

 7                    identification.)

 8        Q.    (BY MR. MOHAMMEDI)  This is a letter from

 9   Dr. Al-Juhani, who was the head of Muslim -- the

10   World Assembly of Muslim Youth.

11        A.    Yes.

12        Q.    Have you seen this document before?  You

13   can show the English version of it.

14        A.    Yes.  Thank you.

15        Q.    And it's dated May 11, 1993; correct?

16        A.    Yes, that's the date of it, if you'll

17   give me a minute, please.

18        Q.    Have you seen this document before?

19        A.    I need to read it to remember whether

20   I've seen it before or not.

21        Q.    Sure.  Just the highlighted sections.

22        A.    Yeah, I've not read this document before.

23        Q.    Do you have any reason to question the --

24   this document?

25        A.    No.
```

This Transcript Contains Confidential Material

```
 1          Q.     It's a primary source; correct?

 2          A.     Yes.

 3          Q.     And it's dated May 11, 1993; correct?

 4          A.     Yes.

 5                 MR. MOHAMMEDI:  Can we get

 6      Exhibit 27?

 7                     (Winer Deposition Exhibit 917,

 8                     6-14-1996 Minutes of Islamic

 9                     Benevolence Committee dissolution and

10                     merging with World Assembly of Muslim

11                     Youth, was marked for

12                     identification.)

13          Q.    (BY MR. MOHAMMEDI)  As of May 28, 1996,

14     LBI merged with WAMY; correct?

15          A.     Yes.  I am familiar with this.

16          Q.     You are familiar with this one, right?

17                 MR. HAEFELE:  Omar, just so we're

18      keeping consistent with the markings here,

19      this is already Noor Wali Exhibit 267, I

20      think.

21                 MR. MOHAMMEDI:  Okay, yeah.  That's

22      fine.  Yes.  Thank you, Robert.

23          A.     I do not remember whether I saw this

24     document or not.  I think I did, but I'm not

25     positive, but I'm certainly familiar with the action
```

This Transcript Contains Confidential Material

```
 1          Q.    (BY MR. MOHAMMEDI)  Let me see.  50 --
 2    that's right.
 3          A.    Which paragraph?
 4          Q.    You are referring to U.S. versus Arnaout.
 5    When you're making statement, you're referring to
 6    the proffer; correct?  The prosecution documents.
 7          A.    I'm still lost as to what you're
 8    referring to.  What page?
 9          Q.    Let me direct you.  U.S. versus Arnaout.
10    This is the page 32.
11                If you go to page 32, and it is 2.38.10.
12                And when you making the statement, your
13    referring to the government evidentiary proffer
14    supporting the admissibility of co-conspirator
15    statement; correct?  And that's per footnote No.
16    45?
17          A.    I'm sorry, I'm still lost, sir, as to
18    what you're --
19          Q.    If you go to your rebuttal page 32.
20          A.    Yes.
21          Q.    And go to 2.38.10.  And then when you're
22    referring to --
23          A.    Yes.  Yes.  Footnote 45 refers to the
24    government evidentiary proffer.  That is correct.
25          Q.    You were referring to that.
```

This Transcript Contains Confidential Material

```
 1              Have you considered any other documents
 2   in the filing in that case?
 3        A.    I've considered whatever documents are in
 4   my reliance materials.  At this moment, I don't
 5   remember what I considered and did not over the
 6   course of all of this work.  I can't tell you every
 7   document is there.  I can say that I also considered
 8   the statements about Batterjee made by the U.S.
 9   government before, during, and after this matter,
10   and about what he did.  And what Arnaout did.  And
11   that's in my rebuttal statement laid out in a fairly
12   systematic fashion.
13        Q.    Okay.  If you go to Exhibit 35.  And now
14   it's sentencing memo.  We have it in front of us --
15   I meant, sorry, exhibit -- what is the exhibit we're
16   at right now?  920.
17              If you scroll down to page 4, this is --
18   this is a memo filed by Arnaout's lawyer in the
19   case.  Arnaout's lawyer in the case.  And if you go
20   to page 4, it says that Mr. Arnaout's organization,
21   BIF-USA, no affiliation to LBI.
22              Do you see that?
23        A.    Yes.
24        Q.    Let's go to the next exhibit we have for
25   you, Exhibit 36.
```

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 921, USA v.

 2                    Arnaout Plea Agreement, was marked

 3                    for identification.)

 4         Q.    (BY MR. MOHAMMEDI)  If you go to page 2

 5    to 4 in that, it's a plea agreement.

 6               The question, do you know that burden of

 7    proof for sentencing enhancement under United States

 8    sentencing guidelines is preponderance of evidence?

 9    It's not beyond reasonable doubt?

10         A.    I haven't thought about the issue of what

11    the standard is for enhancements.

12         Q.    So government claim BIF are now subject

13    to terrorism enhancement under the guidelines.

14               Even with all the evidence at the

15    government's disposal with respect to BIF and

16    Arnaout, what the Court found government could not

17    meet the burden.

18         A.    I'm sorry, where are you reading from,

19    sir?

20         Q.    This is not --

21               Can you hold on a second, please?

22               Yeah.  Yes, can we put the Exhibit 37 --

23    sorry about that.

24                    (Winer Deposition Exhibit 922, U.S.

25                    v. Arnaout 282 F.Supp.2d 838 (2003),
```

This Transcript Contains Confidential Material

```
 1                  was marked for identification.)

 2       Q.    (BY MR. MOHAMMEDI)  Sir, the government

 3  claim BIF are now subject to terrorism enhancement

 4  under the guidelines.  But the Court, if you go

 5  to -- let's see, what page do we have.  This

 6  highlight I'm trying to find out.  838.

 7                  If you go down when you see the

 8  highlighted section.

 9                  So the application here, it says, if you

10  see that:  Arnaout does not stand convicted of a

11  terrorism offense, and goes on.  Do you want to read

12  that for us, Mr. Winer?

13       A.    I read it.

14       Q.    You read it?  Do you agree with that?

15                  MR. HAEFELE:  Objection to form.

16       A.    The terrorist charges were dropped as

17  part of the plea agreement.  That's accurate.

18       Q.    (BY MR. MOHAMMEDI)  And is it because the

19  government could not meet its burden; correct?

20                  MR. HAEFELE:  Objection to the form.

21       A.    My understanding of the case as laid out

22  in my report and my rebuttal report, is that the

23  judge's decision on the admissibility of statements

24  by co-conspirators impaired the government's case,

25  and thus the government was not going to be able to
```

This Transcript Contains Confidential Material

```
 1    put into the record what it wanted to be able to put

 2    into the record, and therefore it agreed to the plea

 3    agreement, as did the defendant.

 4        Q.   (BY MR. MOHAMMEDI)  Can you go to page 6

 5    of the document?

 6             Can you read this to us?

 7        A.   Yes, I'm aware of this.  I've read this

 8    at some point.

 9        Q.   And do you agree with that statement?

10        A.   I agree with the statement based on --

11             MR. HAEFELE:  Objection to form --

12        A.   -- the information --

13             I agree with the statement based on the

14    consequences of the decision that was made to

15    eliminate the particular evidence that the

16    government was going to be relying on.

17        Q.   (BY MR. MOHAMMEDI)  Do you believe in the

18    judge's decisions?

19        A.   The judge's decisions are a legal fact.

20        Q.   They are legal facts, right?  And they

21    are better than proffer, aren't they?  They are

22    something you should be relying on rather than the

23    proffer; correct?

24        A.   Yes, but you have to distinguish between

25    a criminal case and a civil case, which are not the
```

This Transcript Contains Confidential Material

1  same thing.  And not every judicial ruling is a

2  ruling that's going to be correct.  Judges, in fact,

3  get overruled from time to time.  That's part of the

4  process.  In this particular case, no one appealed.

5  Neither the defendant nor the government appealed.

6  The government complained afterwards and reaffirmed

7  its belief that the defendants had committed more

8  serious offenses, but that's neither here nor there.

9  The decision is a fact, and it's legally accurate.

10  This was the decision that was reached.

11       Q.    And you said there were no more --

12             If you can just put Exhibit 38, which is

13  a Seventh Circuit decision, which is the document

14  affirming the district court ruling.

15                  (Winer Deposition Exhibit 923, U.S.

16                  v. Arnaout 431 F.3d 994 (2005), was

17                  marked for identification.)

18       A.    So was there appeal here?

19       Q.    (BY MR. MOHAMMEDI)  Look at the -- look

20  at the exhibit where it says --

21       A.    The United States did in fact appeal.  I

22  had forgotten.  Thank you for correcting me.

23       Q.    Thank you.

24             So you were not aware of this, correct?

25       A.    I had forgotten --

This Transcript Contains Confidential Material

```
 1        Q.    Of this decision, the Seventh Circuit
 2   decision?
 3        A.    I was aware of it.  I had forgotten.  It
 4   says that:  The District Court did not commit clear
 5   error in refusing to apply the --
 6        Q.    Let's go to Section 3A1.4.
 7              And there are highlights, if you go down.
 8              Can you go down, just for us to see?
 9              TRIAL TECHNICIAN:  What page is it
10      on?
11              MR. MOHAMMEDI:  Let me see.  It's
12         highlighted.  So you will find it.
13              Page 8.
14        Q.    (BY MR. MOHAMMEDI)  And the Court found
15   that:  The district court did not [sic] find that
16   the record did not establish by a preponderance of
17   the evidence that Arnaout attempted, participated
18   in, or conspired to commit any act of terrorism.
19   The district court also found that the government
20   had not established that the Bosnian and Chechen
21   recipients of BIF aid were engaged in a federal
22   crime of terrorism, or that Arnaout intended the
23   donated boots, uniforms, blankets, tents, x-ray
24   machine, ambulances, nylon or walkie-talkies to be
25   used to promote a federal crime of terrorism.
```

This Transcript Contains Confidential Material

```
 1   don't recollect on the enhancement.
 2        Q.    Okay.
 3             Now, if we go back to the terrorism
 4   finance staff monograph, I think we entered that as
 5   Exhibit 12, I believe.  Sorry, exhibit -- what's
 6   that exhibit you enter, the monograph?  909.
 7             And if you go to page 11, which is PDF
 8   page 114.  I'm sorry, page 111, PDF page 114.
 9             And it says:  Despite these troubling
10   links, the investigation of BIF revealed little
11   compelling evidence that BIF actually provided
12   financial support of al-Qaeda, at least after
13   al-Qaeda was designated a foreign terrorist
14   organization in 1999.  Indeed, despite unprecedented
15   access to the U.S. and foreign records of these
16   organizations, one of the most experienced and best
17   terrorist prosecutors has not been able to resolve
18   the investigation of BIF without conviction for
19   support of terrorism, although the OFAC action --
20   not -- shut down BIF, that victory came at the
21   considerable cost of negative public opinion in the
22   Muslim and Arab communities, who contend that the
23   government's destruction of these charities reflects
24   bias and injustice with no measurable gain to
25   national security.
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Objection to form.

 2                    Is there a question?

 3          Q.    (BY MR. MOHAMMEDI)  Do you -- have you

 4     considered this?

 5                    MR. HAEFELE:  Objection to form.

 6          A.    Yes, I read the terrorist financing staff

 7     monograph.  And these cases, complex financial crime

 8     cases from all counts.

 9          Q.    (BY MR. MOHAMMEDI)  Did you --

10          A.    Please allow me to respond.

11                    Complex financial crime cases, I've seen

12     repeatedly, run into problems even when it was clear

13     to me, in connection with such cases, that there was

14     serious criminal activity.  I've seen this

15     repeatedly.  They are hard cases to make, because

16     the actions that relate to complex international

17     crime cases, which include terrorist finance cases,

18     can take place over a long time.  They can involve

19     people who aren't available for testimony in the

20     United States.  The source is going to be a

21     mixture -- can involve intelligence sources which

22     can't be readily converted into physical evidence.

23     So they are hard case to make.

24                    In this case, there is a reference here

25     to at least after al-Qaeda was designated a foreign
```

This Transcript Contains Confidential Material

```
1          suspect it has.  I don't know.
2                    MR. MOHAMMEDI:  The CRA report.
3                    MR. HAEFELE:  Pardon me?
4                    MR. MOHAMMEDI:  The Canadian Revenue
5          Agency report.
6                    MR. HAEFELE:  Oh, CRA report.  I'm
7          sorry.
8                    MR. MOHAMMEDI:  Right.
9                    MR. HAEFELE:  I suspect it has been.
10         I don't recall.
11                   MR. MOHAMMEDI:  Why don't you put it
12         in now, since we're not.
13                   MR. HAEFELE:  That's fine.  Let's put
14         it in as a new one.  925.
15                   (Winer Deposition Exhibit 925, Letter
16                   to Ayman Al-Taher, Subj: Notice of
17                   Intention to Revoke the World
18                   Assembly of Muslim Youth,
19                   FED-PEC0218170-218203, was marked for
20                   identification.)
21         Q.   (BY MR. MOHAMMEDI)  I assume, Mr. Winer,
22    that you've seen this one, since you refer to it
23    many times in your report?
24         A.    Your assumption is correct.
25         Q.    You'd agree with me this is not an
```

1    intelligence report; right?

2        A.    It is not an intelligence report; that is

3    correct.

4        Q.    It is not a law enforcement report;

5    correct?

6        A.    It's a report of the Canada Revenue

7    Agency, notice of intention to revoke the WAMY

8    registration in connection with the Income Tax Act.

9        Q.    What type of registration that WAMY

10   Canada was -- CRA was trying to invoke WAMY Canada?

11       A.    I believe it was its registration for

12   charter.

13       Q.    It's fair to say its not-for-profit

14   status; correct?

15       A.    Yes.

16       Q.    So not revoking registration of WAMY

17   Canada altogether, just not-for-profit status;

18   correct?

19       A.    I'd have to look at it again to address

20   that issue.

21       Q.    Okay.  I guarantee that's what happened.

22       A.    I accept your representation on that.

23       Q.    What do you understand the consequences

24   of revoking WAMY Canada's status of charity for

25   Canadian tax purposes?

This Transcript Contains Confidential Material

```
 1        A.    Contributions to it wouldn't be counted
 2   as deductible.
 3        Q.    I'm sorry, I didn't hear that.
 4              Can you repeat that?  I'm sorry, I
 5   couldn't hear it.
 6        A.    I would think contributions to it would
 7   not be tax deductible.  I don't know what the impact
 8   would be on its operation -- operating ability.  I'd
 9   have to look at that issue.  I haven't considered
10   that issue.  Whether it could have --
11        Q.    Whether --
12        A.    Or not it could have any remaining
13   capacity to operate in Canada after that.
14        Q.    Are you aware if the Canadian government
15   froze the assets of WAMY Canada?
16        A.    I have no reason to believe that it did.
17        Q.    And you agree that the subject of all of
18   the review by CRA was WAMY Canada branch, not WAMY
19   Saudi Arabia; correct?
20        A.    That's correct.
21        Q.    It is fair to say that what -- CRA did
22   not investigate WAMY Saudi Arabia; correct?
23        A.    It investigated the matters that were
24   within its jurisdiction, which would go to the
25   activities of the entities based in Canada and the
```

This Transcript Contains Confidential Material

 1    transactions that it was involved in.  It certainly

 2    would not have gone to conduct an investigation in a

 3    foreign country.  That would tend to be outside the

 4    ability of most revenue services, and I presume of

 5    Canada's.

 6         Q.    Right.  And it did differentiate between

 7    WAMY and WAMY Canada, and I think what it says is,

 8    mostly in the exhibit that we have here, it says

 9    page 5 of 22, which is page 8 PDF, specifically

10    states WAMY and WAMY Saudi Arabia; correct?

11         A.    It does make references to WAMY

12    Saudi Arabia here.

13         Q.    And do you believe WAMY means WAMY

14    Canada?

15         A.    Yes.

16         Q.    Okay.  Can we get Exhibit 41?  It is a

17    declaration by Khatib.

18                    (Winer Deposition Exhibit 926,

19                    Declaration of Mohammed Al Khatib,

20                    was marked for identification.)

21         Q.    (BY MR. MOHAMMEDI)  Have you seen this --

22    have you seen this declaration before?

23         A.    Yes, I have seen it.

24         Q.    And you considered in your report by --

25    you went through it and you considered it in your

This Transcript Contains Confidential Material

```
 1        Q.    Do you have an idea where the money came

 2   from?

 3        A.    Not from this record.

 4        Q.    In your Section 10.3-10.4.  Page 68-71.

 5              We can take this down.

 6                    MR. HAEFELE:  What page?

 7                    MR. MOHAMMEDI:  Page 68.

 8                    MR. HAEFELE:  Of the initial report?

 9                    MR. MOHAMMEDI:  Of the initial

10     report, yes.  The affirmative report.

11        Q.    (BY MR. MOHAMMEDI)  In that page 68, you

12   say, Section 10.3, you say that CRA assessed that

13   WAMY Canada, Saudi parent, provided support to

14   al-Qaeda.

15              Do you see that?

16        A.    I'm not clear as to which paragraph

17   you're pointing to, I'm sorry.

18        Q.    And in Section 10.3, page 68.

19        A.    It says that the WAMY branch was stripped

20   of its charitable status by Canada after a Canada

21   revenue agency investigation found that the charity

22   had failed to comply with basic bookkeeping and

23   accounting requirements for the charity and was

24   inextricably linked to its Saudi parents, which

25   Canada assessed to have provided support to
```

1    al-Qaeda.

2        Q.    Where is it in the CRA report that this

3    finding was made?

4        A.    I would have to go back to the CRA report

5    to tell you.

6              I can't tell you out of my memory where

7    it said that.  I believe that summarizes what they

8    found.

9        Q.    So if you go to page --

10       A.    In paragraph 10.3.4, I quote what CRA

11   found.

12       Q.    Okay.  So if you go to -- let me just

13   look at it.

14             Page 1 of the CRA report at exhibit --

15   page 1.  The CRA report.  That's where we entered.

16   I can't remember the exhibit number now.

17             TRIAL TECHNICIAN:  Was it the last

18      exhibit entered?

19             MR. MOHAMMEDI:  925.

20       Q.    (BY MR. MOHAMMEDI)  So in page 1 of the

21   report, WAMY Canada parent organization located in

22   Saudi has been alleged to support terrorist.

23             Does it say that?  It says that, correct?

24       A.    Yes.

25       Q.    Okay.  So your statement -- do you -- is

This Transcript Contains Confidential Material

```
 1    it fair to say your statement on CRA report on WAMY

 2    is not correct?

 3         A.    I would have to take a look at the rest

 4    of the report.  There is a difference between the

 5    word assessed and which has been alleged, and I

 6    think we have to look at the whole report in order

 7    to fully address that issue, and not just this

 8    paragraph.

 9         Q.    Okay.  Do you agree -- do you know that

10    in Exhibit 45, if you go to exhibit that were just

11    entered now.  Right.

12               At page 4, can you read that, which is

13    highlighted?  That's what off of the -- that's the

14    information, the content of the CRA report.

15               Can you read that?

16               It says United States District Court For

17    the District of Columbia lawsuit filed by victims

18    families of 9/11.

19               Do you see that?

20         A.    Yes.

21         Q.    Are you aware the CRA considered an

22    allegation made by the lawyers who hired you?

23                    MR. HAEFELE:  Objection to form.

24         A.    They considered everything that they

25    listed, which was --
```

This Transcript Contains Confidential Material

1     Q.    (BY MR. MOHAMMEDI)  The lawyers that

2   hired you, those allegations, correct?  They're

3   still allegations.

4               MR. HAEFELE:  Objection to form.

5     A.    That's correct.

6     Q.    (BY MR. MOHAMMEDI)  In 10.3.1, page 68,

7   again, you say that CRA audit found massive

8   deficiencies.  Do you see that?

9     A.    Yes.

10    Q.    Are you an auditor?

11    A.    No, I am not an auditor, I'm an attorney.

12    Q.    Are you a CPA?

13              MR. HAEFELE:  Objection, asked and

14     answered.

15    A.    You asked me this question earlier.  I

16  previously have responded to that question to tell

17  you that I am not a certified public accountant.

18    Q.    (BY MR. MOHAMMEDI)  So what qualification

19  do you have to render this opinion?

20              MR. HAEFELE:  Objection.

21    A.    I have laid out my qualifications

22  previously in this deposition.  I'm going to respond

23  to your current question at some length since the

24  question is a very broad question.

25              I first began dealing with bank

This Transcript Contains Confidential Material

1    want to make sure that I answer your question.

2         Q.    I'm withdrawing the question.  We'll move

3    on.

4              In preparing your affirmative report,

5    we -- you already stated that you did not review

6    WAMY audits; correct?

7         A.    I asked for but did not receive --

8         Q.    And you asked from who, the plaintiff

9    attorneys?

10        A.    Yes.

11        Q.    And, I mean, you -- so you asked for it

12   but you never received it; correct?

13        A.    That is correct.  I received it after

14   asking again, after the audit reports -- after the

15   expert reports for the defense were provided, I

16   asked for them again and got more.  There were still

17   many, many, many missing reports, but I did receive

18   some reports as set forth in my supplemental

19   statement.

20        Q.    Okay.  How many of the approximate 825

21   projects report listed in Mark's appendix did you

22   review in preparing for your rebuttal?

23        A.    I reviewed the materials that I listed in

24   my reliance report.  I reviewed all the audits and

25   material that were characterized as audits that I

This Transcript Contains Confidential Material

1    could find and was provided.  If there were more, I

2    would have -- been provided more, I would have read

3    more.  It's information that I consider to be of

4    great use when there's audits.

5              The audits that were provided me and I

6    asked for more did not correspond to the number

7    described in one of your expert's reports, and I

8    highlighted the difference between the number that

9    was described and what was made available to me.  I

10   don't know whether there were additional audit

11   reports available or not.  I am aware of the

12   representations regarding the report.

13        Q.   Do you know how many financial documents

14   have been produced in this case?

15        A.   I do not know, first, how you described

16   it, what the word financial means in this case.

17        Q.   Have you reviewed the receipts, WAMY

18   receipts produced in this case?

19              MR. HAEFELE:  Objection to form.

20        A.   You'd have to show me receipts in a

21   particular area.  I reviewed some receipts.  They

22   were purported to be audit material that's described

23   in one of your expert reports.  I went in the

24   reports and looked at all of the references to

25   material in the expert report on the auditing

This Transcript Contains Confidential Material

1    issues, and went through those receipts.

2        Q.    (BY MR. MOHAMMEDI)  Have you reviewed

3    financial reports?

4        A.    I beg your pardon?

5        Q.    Have you reviewed financial reports?

6        A.    I don't know what -- how you're defining

7    financial reports in this regard.  Are you talking

8    about --

9        Q.    Do you know -- yeah, do you know that

10   WAMY issues every year a financial report?

11       A.    Yeah, for the -- globally?  I did read

12   those.

13       Q.    You read those ones?

14       A.    Yes.

15       Q.    And have you read project report?

16             MR. HAEFELE:  Objection to form.

17       A.    I described the project report --

18   material that was provided in connection with the

19   audits that were provided to me, and that's what I

20   focused on.

21       Q.    (BY MR. MOHAMMEDI)  And is it fair to say

22   there was limited to the audit that's WAMY expert

23   referred to; correct?

24       A.    Yes, those are the only --

25             MR. HAEFELE:  Objection to form.

This Transcript Contains Confidential Material

```
 1      A.    Those are the only audits that I was

 2  aware of.  I requested as much audit information as

 3  was available.

 4      Q.    (BY MR. MOHAMMEDI)  Did you have the

 5  appendix of reliance materials produced by Baker

 6  Tilly?

 7              MR. HAEFELE:  Objection to form.

 8      A.    I don't recollect.

 9      Q.    (BY MR. MOHAMMEDI)  Can you say -- as you

10  sit here, that you have reviewed all documents in

11  response -- in making your rebuttal that Baker Tilly

12  relied on in producing the report?

13              MR. HAEFELE:  Objection to form,

14       foundation.  You haven't produced those, Omar.

15      Q.    (BY MR. MOHAMMEDI)  They were produced.

16              MR. HAEFELE:  They were not produced.

17              MR. MOHAMMEDI:  Okay.  So it -- we

18       agree to disagree; they were produced.

19      Q.    (BY MR. MOHAMMEDI)  Can you answer the

20  question?

21      A.    I asked for all of the material that was

22  relied upon.  I reviewed -- material that I

23  reviewed, I described in my reliance materials and

24  as I stated in my supplemental report, there was a

25  discrepancy between the number of audits that the
```

This Transcript Contains Confidential Material

```
 1   expert from Baker Tilly referred to and the number
 2   that I was able to review.
 3           I described with specificity in my
 4   rebuttal report the audits that I was able to review
 5   and what was in back of it.  In some cases, those
 6   were not actual audits.  In some cases they were
 7   financial -- unaudited financial statements.  In
 8   other cases they were just backup materials or
 9   materials about materials, which is to say they were
10   materials that were in the general vicinity of some
11   payments that were -- that may have been made but
12   did not contain sufficient information to enable me
13   to evaluate it, but they were most certainly not
14   audits, although they were the material referred to
15   in the Baker Tilly report.
16   Q.    So --
17   A.    So I was left unable to replicate that
18   which the Baker Tilly report referred to based on
19   the reference pages set forth in that report.
20   Q.    Is it fair to say you did not ask the
21   lawyers and the lawyers -- plaintiffs' lawyers did
22   not send you the document, financial document of
23   WAMY for you to render your opinion in your report,
24   affirmative report, as well as rebuttal; correct?
25                MR. HAEFELE:  Objection to form,
```

This Transcript Contains Confidential Material

```
 1        foundation.  You have not produced all of

 2        those documents.

 3               MR. MOHAMMEDI:  Okay, we agree to

 4        disagree.

 5   A.    It is --

 6               MR. MOHAMMEDI:  Just state your

 7        objection.

 8   A.    May I respond to your question?

 9               MR. MOHAMMEDI:  State your objection,

10      you don't need to make statements.

11               MR. HAEFELE:  You're misleading the

12        witness.

13               MR. MOHAMMEDI:  It's not misleading.

14               MR. HAEFELE:  It is.

15               MR. MOHAMMEDI:  You're wrong.

16      Robert, you're wrong.

17               MR. HAEFELE:  Well, you say I'm

18        wrong.  I say I'm right.  But go ahead.  I'm

19        not stopping you from asking the questions.

20   Q.    (BY MR. MOHAMMEDI)  Go ahead.

21   A.    In my -- before my initial report, I

22   asked for all audit material.  As reflected in that

23   report, I received audit material for IIRO.  I did

24   not receive audits for WAMY.  I did not receive

25   audits from World Muslim League.  I did receive the
```

This Transcript Contains Confidential Material

```
 1    annual financial reports which I found to be of a
 2    very general nature and not something that I found
 3    to be particularly useful.
 4              And I did review that in connection with
 5    my original report.  After reading the rebuttal --
 6    the reports from the defendants, the expert reports,
 7    I became aware of additional material and asked for
 8    that additional material.  And when I asked for that
 9    additional material, I reviewed that material and
10    provided my assessment to that material, which
11    included the fact that some of the reports that were
12    characterized as audits were not audits, some of
13    them were not verified audits.  They contained a
14    variety of other deficiencies in their limitations.
15    I noted the number of jurisdictions in which there
16    were no --
17        Q.    Mr. Winer, I've heard it three or four
18    times.
19        A.    This is what I did.  It is not consistent
20    with the question that you asked me, which is --
21        Q.    The question -- the question I'm asking
22    you is specific.  The question I'm asking you, and
23    I'm not going to go much more on this, because I --
24    it is clear that you have not reviewed the financial
25    documents produced by WAMY except for the ones that
```

 1    the WAMY expert referred to.  Correct?

 2                 MR. HAEFELE:  Objection to form.

 3         A.    No, that's not correct.  I reviewed the

 4    annual reports of WAMY.

 5         Q.    (BY MR. MOHAMMEDI)  Okay.

 6         A.    I did not see other audits.

 7         Q.    Okay.

 8         A.    So if there are other audits, I would be

 9    happy to review them.  I would be pleased to review

10    additional audits.

11         Q.    It's fair to say that you, for you,

12    financial records are only audits; correct?

13         A.    That's incorrect and it's a misstatement

14    of what I just testified to.

15         Q.    Okay.  All right.  Let's move on to -- in

16    Section 2.4.1, at page 1 of your rebuttal, you state

17    that:  WAMY audit did not meet the international

18    standard; correct?  Do you remember that?

19    International accounting standard.

20         A.    Yes.

21         Q.    Does a not-for-profit organization have

22    the obligation to fulfill the international

23    accounting standard?

24         A.    It's a question of how much one is going

25    to rely on an audit and whether the audit is

This Transcript Contains Confidential Material

```
 1   relevant to interpreting a financial report.  In

 2   fact, essential.  Particularly in a field where

 3   there is assistance being provided in a conflict

 4   zone, for example.

 5             So it's of great relevance and

 6   importance.  The fact that an audit report -- an

 7   audit has not been undertaken, its significance is

 8   going to be different in different circumstances.

 9   In the circumstances of this case, it's very

10   important.

11        Q.    Is a not-for-profit organization

12   obligated to issue a report?

13        A.    It depends on the laws of the country in

14   which it's operating, and the laws of the country in

15   which it's charted, what's it required to do.

16        Q.    And are you an expert on financial

17   aspects of income in Saudi Arabia?  On the standard?

18        A.    It depends what question you're asking.

19   I am very familiar with the lack of controls in

20   accounting, auditing -- please let me answer your

21   question -- and money laundering controls that were

22   in place at the time that I did my investigations of

23   BCCI in the senate.  I was also familiar with the

24   lack of accountability in the Kingdom of Saudi

25   Arabia as of the time I left the Department of State
```

This Transcript Contains Confidential Material

1    in the late 1990s.

2            I've had recent experience in connection

3    with certain matters associated with Saudi Arabia

4    which lead me to believe that the standards have

5    changed substantially over the last 20 years, but I

6    did have representations made in the amount of

7    standards back then, and they were not standards the

8    United States government was happy about.

9        Q.    (BY MR. MOHAMMEDI)  Are you an expert in

10   countries implementing the international standards

11   in their own countries?  Are you an expert in the

12   field?

13       A.    That's what I was retained to provide

14   analysis and assistance on to the United States

15   government from 2000 through 2008 in the area of

16   money laundering, terrorist finance, and corruption,

17   vulnerability; both vulnerability, the systems to

18   combat it, the nature of the threat, and how we

19   might evaluate the effectiveness of the system

20   against the threat.

21           So where I was asked to look at that set

22   of issues in an integrated fashion for, as mentioned

23   in one of my statements, for a very large number of

24   countries around the world, including essentially

25   every country, if not every country in the Middle

This Transcript Contains Confidential Material

1    East.

2         Q.    So as you sit here, you are telling me

3    that you are an expert in maintaining of the

4    standard -- international banking standard in the

5    countries that you are referring to?

6         A.    In relationship to financial crime, yes.

7         Q.    What about the standard --

8         A.    The --

9         Q.    I'm talking about the financial standard,

10   not the crimes.  I'm talking the standard of

11   implementation of banking standard in countries.

12        A.    In the late 1990s, when I was in the

13   United States government, we became very focused on

14   the fact that there were essentially no controls on

15   movements of funds in most if not all -- actually

16   all at that point of the Middle Eastern states.

17   Whether they were Christian states, Muslim states,

18   or Jewish states, it was a problem across the board.

19   It was particularly a problem in countries that

20   didn't have annual taxes, that didn't have an income

21   tax.

22              And so one of the things that the

23   treasury department, the justice department, the

24   State Department focused on, in response to

25   direction from the White House, was how we start

This Transcript Contains Confidential Material

1  ratcheting up to these standards.  And that was part

2  of the work that was undertaken by the Financial

3  Action Task Force in the late 1990s.

4          After I left the government, I was asked

5  to continue to evaluate the situation in a large

6  number of countries, including all the countries in

7  the Middle East in this territory.

8      Q.    And you were saying this including the

9  Saudis and the accounting standard as implemented

10  from the international standards; correct?

11      A.    It would -- no, it would be too much to

12  say the accounting standard, because I did not cover

13  the details of accounting standards.  I looked at

14  the overall regulatory and enforcement system, which

15  looked at financial transparency and accountability,

16  and what the controls were in place in the banking

17  system at that time.  And that in turn looked at the

18  practices of businesses and sort of the general

19  level of oversight, which was poor.

20      Q.    And is it fair to say you did make the

21  similar statement during the TD Bank case when you

22  said that you were an expert in implementation of

23  the accounting standard in Canada and you were

24  excluded; correct?

25      A.    That's not correct.

This Transcript Contains Confidential Material

 1          The auditor is not saying that.  You are

 2   saying that.

 3               MR. HAEFELE:  Objection to form.

 4       Watch your tone, please.

 5       A.    Is that a question, sir?

 6       Q.    (BY MR. MOHAMMEDI)  The question, do you

 7   have any evidence that food, tents, clothes went to

 8   al-Qaeda instead of the needy?

 9       A.    This report does not allow one to know

10   what the material -- what the goods went to or even

11   if the goods that went there were as represented in

12   the report.

13       Q.    And what is in your report is an

14   assumption; correct?

15       A.    I couldn't understand your last --

16       Q.    What's in your report is assumption.

17               You're assuming.  You don't have evidence

18   to show.

19       A.    I disagree with your characterization of

20   my report and of the testimony I've given.

21       Q.    Okay.  In your rebuttal Section 2.17.5,

22   page 14, from 1998 to 1994, Pakistan audit.  You're

23   referring to that.

24               You went on and explained the categories

25   are student welfare.  That is a red flag; right?

This Transcript Contains Confidential Material

1    For supporting terrorists.  Is that correct?

2        A.    It's a red flag for the kind of slush

3    fund category that would enable a charity operating

4    in an area of conflict to provide support for a

5    terrorist group because it's providing support for

6    young men in an area of conflict that is foreign to

7    them.  In other words, you had foreign fighters in

8    this period of time in Pakistan and Afghanistan,

9    foreign meaning they're not Pakistani and they're

10   not Afghani, and there's money being provided for

11   them for student welfare.  So it's a slush fund.

12   And there are no controls.  There's a complete lack

13   of controls.  There's no evidence of any controls on

14   the actual uses.  And that's what I'm -- my

15   statement is essentially saying.

16       Q.    Do you know which is the objective of

17   WAMY?

18             Do you know the name itself, what it

19   means?  The World Assembly of Muslin Youth?

20             MR. HAEFELE:  Object to form.

21       Q.    (BY MR. MOHAMMEDI)  Do you know the

22   objective of providing student with funds to educate

23   them?

24       A.    Yes, I'm -- but what -- it's more

25   difficult for me to know what's being done when the

This Transcript Contains Confidential Material

```
 1      A.    I -- sir, I don't agree with that

 2   characterization.

 3            MR. HAEFELE:  Neither do I.

 4      Q.    (BY MR. MOHAMMEDI)  So do you -- again,

 5   do you have any facts showing that any money from

 6   student welfare went to support al-Qaeda?

 7      A.    Because the controls were so weak.

 8   There's no information that is available to show

 9   precisely what the funds were actually spent for in

10   the field.  That's the problem when you have lack of

11   controls.  And the 9/11 Commission talked about this

12   and other experts have talked about this.  If you

13   don't have controls on the expenditure of cash in

14   the field, or even the provision of goods, and it is

15   going to people who are training to be fighters, to

16   militants, and they cross over into terrorism and

17   it's going to people at terrorist training camps,

18   that's providing material support.

19            Now, when you don't have the controls in

20   place, it's going to be very difficult for anyone to

21   reconstruct exactly when it happened and with whom.

22   But there are data points, and the data points I go

23   into in my report.  This part of my report is about

24   the material weaknesses in the controls.  And so

25   what you're asking me is, do you have proof that the
```

```
 1   material weaknesses in the controls caused this
 2   person to engage in training, who then became a
 3   terrorist and participated in the 9/11 attack.  And
 4   the answer is, there is no proof of that because by
 5   their very nature, this funding took place, the
 6   support took place without the controls that would
 7   have enabled anyone to reconstruct the support that
 8   led to al-Qaeda.
 9              So instead, one has to rely on a lack of
10   controls and the material deficiencies in the
11   controls, the presence in the location, the nature
12   of the people who were being served, the fact that
13   they're foreign fighters rather than domestic or
14   local -- they're foreigners rather than domestic or
15   local people, and a variety of other factors as I've
16   illustrated in the report.
17              Moreover, the report goes into facts such
18   as the provision of travel documents and
19   facilitation and so on.  One would then have to get
20   quite granular, and you've not asked me about those
21   granular issues.
22        Q.    I did ask you to answer them, but let's
23   move on.
24              Now, rebut -- in your rebuttal 2.34-2.35,
25   page 28-29, you stated at Section 2.34, I understand
```

This Transcript Contains Confidential Material

1    that WAMY's counsel in a premotion meet-and-confer

2    represented that WAMY's overseas branch officers

3    were recalcitrant and many of the offices did not

4    properly maintain office records and did not submit

5    required financial, administrative, operations, and

6    activity reports to WAMY headquarters.  And you said

7    as documented in a Plaintiffs' Reply Memo of Law,

8    whose substance on that issue did not refute.

9              In Section 2.35, you quote plaintiffs'

10   counsel legal brief arguing that statement by WAMY

11   counsel allegedly considered judicial admission; is

12   that correct?

13        A.    This language speaks for itself, I

14   believe.

15        Q.    Are counsel legal argument evidentiary

16   basis for you to render an opinion?

17              MR. HAEFELE:  Objection to form.

18        A.    I see these letters as providing

19   contemporaneous records of communication that took

20   place in relationship to this case.  If there are

21   other contemporaneous records regarding these

22   communications that are different from this, I would

23   be pleased to review them and add them to my report.

24        Q.    (BY MR. MOHAMMEDI)  Did you ask

25   plaintiffs' counsel if there was any finding to

This Transcript Contains Confidential Material

```
 1    rebut their claim?

 2                MR. HAEFELE:  Objection to form.

 3         A.    I understand that this was the material

 4    that was available on this issue.

 5         Q.    (BY MR. MOHAMMEDI)  And you --

 6         A.    It's all in quotes.

 7         Q.    Okay.  My question, did you ask

 8    plaintiffs' counsel if there was any filing to rebut

 9    their claims?

10                MR. HAEFELE:  Objection to form.

11         A.    I wanted to know whether this was

12    complete on these issues, and I understood that this

13    was complete off of this issue.

14         Q.    (BY MR. MOHAMMEDI)  Are you aware that

15    WAMY moved for and was granted reconsideration based

16    specifically on plaintiffs' argument, raised only on

17    reply motion not raised in their moving papers, that

18    WAMY's counsel supposedly stated that office

19    branches failed to provide reports to headquarters

20    and that WAMY's compliance with discovery

21    obligations relied upon those uncooperative

22    branches?

23                MR. HAEFELE:  Objection --

24         Q.    (BY MR. MOHAMMEDI)  Are you aware that

25    WAMY moved for motion for reconsideration and was
```

This Transcript Contains Confidential Material

```
1   granted?

2                    MR. HAEFELE:  Objection to form.

3                    This is --

4        A.    I don't know what WAMY's counsel

5   plaintiffs -- pardon me, for the defendants, did

6   following this set of communications.  If there's

7   information that's relevant, I'm happy to review it.

8        Q.    (BY MR. MOHAMMEDI)  Let's put Exhibit 59.

9   Motion for reconsideration.

10                    (Winer Deposition Exhibit 935,

11                    Defendants World Assembly of Muslim

12                    Youth Saudi Arabia and World Assembly

13                    of Muslim Youth International

14                    Memorandum of Law in Support of

15                    Motion for Reconsideration of Section

16                    IV of The Court's Motion to Compel

17                    Ruling, was marked for

18                    identification.)

19       Q.    (BY MR. MOHAMMEDI)  If you go to page 3

20  and footnote 2 of the motion, it says -- so if you

21  go to:  These allegations could not be farther from

22  the truth.  PEC's statements mischaracterize the

23  meet-and-confer between WAMY and PEC and blindly

24  assume that branch offices were solely responsible

25  for collecting documents, without any oversight and
```

1    control by WAMY's counsel.

2              And the footnote states, the only chapter

3    that has ignored counsel's instructions and

4    directives is the Canada chapter.

5              And I can't read -- if you can make that

6    smaller, I can just --

7              It says -- yes, thank you.

8              So there is a footnote there that says

9    about only WAMY Canada, but that was not by the

10   other chapters.  Do you see that?

11             MR. HAEFELE:  Objection to form.

12        Q.   (BY MR. MOHAMMEDI)  And use it for a

13   motion for reconsideration and it was granted.  Do

14   you know that?

15        A.   No.

16        Q.   Okay.  Let me direct you to Exhibit 60 of

17   the court order.

18             (Winer Deposition Exhibit 936, In Re:

19             Terrorist Attacks on September 11,

20             2001 Opinion and Order, was marked

21             for identification.)

22        Q.   (BY MR. MOHAMMEDI)  If you go -- this is

23   a court order.  In this -- related to this issue

24   that you raised in your report.

25             MR. HAEFELE:  Objection, apples and

1          oranges.  Geez.  Omar, this is --

2                  MR. MOHAMMEDI:  No problem.

3                  MR. HAEFELE:  This is way beyond the

4          scope --

5                  MR. MOHAMMEDI:  Not speaking

6          objection.  You get to stop.  You need to let

7          me --

8                  MR. HAEFELE:  Objection --

9                  MR. MOHAMMEDI:  No speaking

10         objection.

11                 MR. HAEFELE:  Objection, scope,

12         vague, confusing --

13                 MR. MOHAMMEDI:  No, stop.  The

14         witness has -- has said in his report, I refer

15         to your letter and your motion, and ignored

16         the court order as well as a motion for --

17                 MR. HAEFELE:  But you're mixing

18         apples and oranges here.

19                 MR. MOHAMMEDI:  I am not.  Please,

20         Robert, stop.  You need to let me finish.

21         Okay?

22                 MR. HAEFELE:  Please finish.

23                 MR. MOHAMMEDI:  Thank you.

24                 Can you make it smaller, please?

25                 MR. HAEFELE:  But really small.  Like

This Transcript Contains Confidential Material

```
 1        off-the-screen small.

 2                 MR. MOHAMMEDI:  Thank you.

 3        Q.    (BY MR. MOHAMMEDI)  Eleven of the bank

 4   branches identified by the PECs are not actually

 5   offices; rather work was conducted in these

 6   countries from branch offices in other locations.

 7                 Other branch offices were not formed

 8   until at least 2000, which suggests the number of

 9   responsive documents will be limited.  For the

10   remaining offices, WAMY has produced tens of

11   thousand of pages for each office, including

12   hundreds of financial documents.

13                 As a result, WAMY has addressed the PEC's

14   concern regarding the 22 specific WAMY overseas

15   branch and the four WAMY branch offices in the

16   Kingdom.  And it refers to the ECF filing.  That was

17   an order for a motion for reconsideration in which

18   we make the statement that was not plaintiffs --

19   that was statement from plaintiff was not correct,

20   and the judge order and grant to WAMY the motion for

21   consideration that WAMY fulfilled its obligation to

22   search and produce the financial document.  Correct?

23                 MR. HAEFELE:  Objection to the form

24        of the question.

25        A.    In order to be able to respond to this
```

This Transcript Contains Confidential Material

1    document, I would need to be able to see more than

2    just the material which you've highlighted in

3    yellow.

4         Q.    (BY MR. MOHAMMEDI)  Have you considered

5    this material before you rendered your opinion?

6         A.    I had not seen this material.

7         Q.    Okay.

8         A.    And I can't evaluate it.

9         Q.    Okay.

10              MR. MOHAMMEDI:  How many times we

11         have from seven hours and 30 minutes?

12              THE VIDEOGRAPHER:  We have ten

13         minutes left.

14              MR. MOHAMMEDI:  Can we take the ten

15         minutes to just regroup and come back?  Just

16         take five minutes to see if we have any

17         further questions from our side.

18              MR. HAEFELE:  What was that last

19         number of that last exhibit?

20              THE REPORTER:  The last exhibit was

21         936.  I marked it.

22              THE VIDEOGRAPHER:  We're going to go

23         off the record.  7:42 p.m.

24              (Recess taken, 7:42 p.m. to

25              7:50 p.m. EDT)

This Transcript Contains Confidential Material

```
 1                        CERTIFICATE
 2          I, DEBRA A. DIBBLE, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 3  Court Reporter and Notary Public, do hereby certify
    that prior to the commencement of the examination,
 4  JONATHAN M. WINER was duly sworn by me to testify to
    the truth, the whole truth and nothing but the
 5  truth.
 6          I DO FURTHER CERTIFY that the foregoing is a
    verbatim transcript of the testimony as taken
 7  stenographically by and before me at the time, place
    and on the date hereinbefore set forth, to the best
 8  of my ability.
 9          I DO FURTHER CERTIFY that pursuant to FRCP
    Rule 30, signature of the witness was not requested
10  by the witness or other party before the conclusion
    of the deposition.
11

            I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of
    any of the parties to this action, and that I am
13  neither a relative nor employee of such attorney or
    counsel, and that I am not financially interested in
14  the
    action.
15
16
17
18          [signature]
19  _____

    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 8-3-2021
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD) (SN)
      ON SEPTEMBER 11, 2001       )
 4                                 )
 5
 6
 7

                          —— —— ——
 8
                   Wednesday, July 14, 2021
 9                        —— —— ——
10            THIS TRANSCRIPT CONTAINS
              CONFIDENTIAL MATERIAL
11                        —— —— ——
12
13      Remote video-recorded deposition of JONATHAN M.
      WINER, VOLUME II, held at the location of the
14    witness, commencing at 9:36 a.m., on the above date,
      before Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                          —— —— ——
18
19
20
21
22
23
                  GOLKOW LITIGATION SERVICES
24           877.370.DEPS | fax 917.591.5672
                     deps@golkow.com
25
```

```
 1   9/11 monograph.  You're familiar with those two

 2   documents, sir?

 3       A.   Yes.

 4            MR. HAEFELE:  Are -- okay.  Never

 5        mind.  Never mind.  I was going to ask if we

 6        could take down what was there, but you did

 7        already.

 8       Q.   (BY MR. LEWIS)  You state on page 23 at

 9   Section 6.5, that you assess -- I assess these

10   conclusions of the 9/11 Commission to be correct so

11   far as they go.  And then, later in the same

12   paragraph, you talk about a lack of completeness

13   which becomes evident when one reviews other

14   documents, including documents pre-dating the 9/11

15   Commission's work from the U.S. government and from

16   other governments which provide further detail about

17   the type and scope of assistance provided to

18   al-Qaeda.

19            Do you see that at 6.5?

20       A.   Yes.

21       Q.   What materials are you referring to that

22   the -- strike that.

23            Are you suggesting that the 9/11

24   Commission did a less-than-competent job, sir?

25            MR. HAEFELE:  Objection.
```

```
 1        A.     No, that's a misreading of that

 2   statement.  You misunderstood it.

 3        Q.     (BY MR. LEWIS)  I just asked you the

 4   question.  Okay.  You said that they've -- that

 5   they -- that there was a lack of completeness to the

 6   report.  Was that because of a -- of -- what is your

 7   explanation as to why they lacked completeness in

 8   their report?

 9               MR. HAEFELE:  Objection to the form.

10        Misstates the evidence.

11        A.     As I testified yesterday, and I'll

12   respond to your question with an explanation again

13   of exactly what I'm meaning in this paragraph.  The

14   9/11 commission did not make findings in all areas

15   of information it had and was available to it.

16               In some cases it makes references to

17   things generically than things specifically.  This

18   should not be surprising.  And it should not be

19   surprising because of the diplomatic sensitivities

20   between the United States and Saudi Arabia, and in

21   particular, the ongoing work that took place

22   throughout the 'OOs, by the United States government

23   to try to get controls on it.  And the Saudi Arabian

24   government to put greater controls on WAMY, the

25   Muslim World League, and the IIRO; which there is an
```

This Transcript Contains Confidential Material

```
1    extensive record of evidence by the United States to

2    do that and an expression of that concern that goes

3    on for many years after 9/11.

4              If you read carefully what the 9/11

5    Commission said, I'm not talking about the lack of

6    completeness of their work, I'm talking about the

7    lack of completeness of their identifications of all

8    the charities they're concerned about.

9              If you read the paragraph carefully, the

10   second sentence makes this clear.  The 9/11

11   Commission did not identify all of the charities or

12   charity officials that funneled money and other

13   support to al-Qaeda.  Instead, it identified a few

14   examples of the charities involved in supporting

15   al-Qaeda using the phrase "such as," which referred

16   to al Haram, rather than providing assessments about

17   each charity, about which it had evidence.

18             And so the rest of my -- the rest of my

19   sentence refers to the decision made by the 9/11

20   Commission not to provide the specifics it found on

21   WAMY, on IIRO, on Muslim World League.  There are no

22   chapters of that report, that commission report,

23   whether the terrorist finance monograph by the

24   staff, which laid out all of the information the

25   government had on those charities, and explained why
```

This Transcript Contains Confidential Material

1    the government had ongoing concerns about it.

2              This is not a mistake.  It's not an

3    innocent gap.  It's a matter of intention, in my

4    opinion.  And the intention relates to trying to

5    manage this threat in the context of the overall

6    U.S.-Saudi relationship.

7         Q.   (BY MR. LEWIS)  Who on the 9/11

8    Commission told you that that was the intent of the

9    9/11 Commission?

10        A.   That's my reading of all of the

11   information available to me.  No one at the 9/11

12   Commission stated that to me.

13        Q.   So you -- that's pure speculation on your

14   part; correct?

15             MR. HAEFELE:  Objection to form.

16        A.   No, it's not speculation on my part.

17   That's what I believe this means.  I don't know of

18   any other large international charities operating

19   out of Saudi Arabia that are the three major

20   multinational charities about which the

21   United States government has expressed concerns,

22   many, many times over many, many years.

23        Q.   (BY MR. LEWIS)  The 9/11 --

24        A.   Their absence from being identified in

25   this context when al-Haramain was, for me is

This Transcript Contains Confidential Material

1          My question for you, Mr. Winer, is do you

2    know when Mohammed Jamal Khalifa left IIRO?

3          A.   Yes, it was before -- I believe it was

4    before the Bojinka plot took place.  That's my

5    memory, but I always like to confirm my memory with

6    documents, because I'm not always precise as to

7    dates.

8          Q.   I'll show you a document.  I represent to

9    you it was September 1993, but if you'd like to see

10   Defendant's Exhibit 2017, you're still going to need

11   to -- need the conversion of the Hijiri year into

12   the Gregorian year, but hopefully you'll accept my

13   representation from my handy Hiidra/Gregorian

14   converter.

15          Okay?  Have you seen this document

16   before, sir?

17          A.   No.

18          Q.   Okay.  I can represent to you, sir, that

19   it is a letter of resignation -- of -- it is a

20   confirmation of a letter of resignation from

21   Mr. Mohammed Jamal Khalifa dated an illegible date

22   in the fourth month of the Hijiri year, 1414, which

23   correlates to September of 1993.  That is before the

24   Bojinka plot began; correct?

25               MR. HAEFELE:  Objection to form.

```
 1    Khalifa.  You can accept my representation or not.

 2    Does that sound consistent with your understanding?

 3                MR. HAEFELE:  Objection to the form.

 4        A.   It's possible that that's, you know, all

 5    correct.  I don't have those dates in front of me.

 6        Q.   (BY MR. LEWIS)  Ramzi Yousef came in the

 7    summer of 1994 and left in approximately September

 8    of 1994 as well, which is after Mohammed Jamal

 9    Khalifa.

10                My question for you is whether accepting

11    my representation for what it's worth, do you have

12    any evidence of any support by the International

13    Islamic Relief Organization of Khalid Sheikh

14    Mohammed in or around 1994 -- strike that.

15                At any time.

16                MR. HAEFELE:  Objection to the form.

17        A.   The relationship between Mohammed Jamal

18    Khalifa, KSM, Khalid Sheikh Mohammed, Bin Laden, and

19    Ramzi, were complicated.  Who is imitating whom, who

20    is working with whom, who is funding whom, and when,

21    all require a lot of focus and precision to be able

22    to talk through.  I'm not prepared to go into those

23    relationships in-depth at this time in the absence

24    of having documents in front of me because I was not

25    asked precisely this question.
```

```
 1              What I can say in order to answer your

 2    question is that al-Qaeda worked with an

 3    infrastructure that was built in part by Mohammed

 4    Sheikh Khalifa in his activities in the Philippines

 5    and Indonesia.  The capabilities he built were in

 6    turn part of what made it possible for Ramzi Yousef

 7    to then go ahead with the Bojinka plot.  The Bojinka

 8    plot in turn provided a template for the 9/11

 9    attacks.

10              Looking at the ways in which the capacity

11    to launch that strike was created is a big task, and

12    it is very much part of the framing necessary to

13    understand what happened.  I've just articulated a

14    portion of it, but it's incomplete.  To be able to

15    articulate a better portion of it, I would have to

16    work through the Bojinka plot in great detail, look

17    at the activities that were undertaken by Mohammed

18    Jamal Khalifa in Indonesia with one terrorist group,

19    in the Philippines with another terrorist group, the

20    capacities he built there, and then look at the

21    degree to which Ramzi Yousef then relied on it, took

22    advantage of it.

23              Just being able to go there was in part

24    because al-Qaeda had formed these relationships

25    there during the time that Mohammed Jamal Khalifa
```

This Transcript Contains Confidential Material

```
1    was undertaking work for IIRO, thus accounting for

2    IIRO's later designation by the United States and

3    the UN.

4              There's more to say on this, but I

5    don't -- I'm trying to respond to your question.

6        Q.   (BY MR. LEWIS)  Well, I'm -- that was --

7    I understand your theory, but my question for you

8    is, do you have any evidence that IIRO provided any

9    support, financial or otherwise, to Ramzi Yousef or

10   Khalid Sheikh Mohammed in connection with the

11   Bojinka plot?

12             MR. HAEFELE:  Objection to form,

13       asked and answered.

14       A.   It depends on --

15             MR. LEWIS:  It was not asked and

16       answered.

17       A.   Do you want me to respond or not?

18       Q.   (BY MR. LEWIS)  My question is do you

19   have any evidence that IIRO provided financial or

20   other support in connection with the Bojinka plot to

21   Yousef or Mohammed?

22       A.   I believe I've answered that question.

23             MR. HAEFELE:  Same objection.

24       Q.   (BY MR. LEWIS)  Well, we'll just have to

25   leave it there and the Court can decide.
```

 1    considered him reliable, and you said yes.  So can

 2    we move on?

 3                    MR. HAEFELE:  Objection.  Misstates

 4          the evidence.

 5          Q.    (BY MR. LEWIS)  You are aware that Abuza

 6    has written that a charity that Mohammed Jamal

 7    Khalifa set up separate from IIRO, called IRIC, was

 8    the primary funding mechanism for the Bojinka plot.

 9    Have you read that in Zachary Abuza's writing?

10          A.    I would have to look at the paragraph

11    that you've cited.

12          Q.    Okay, let's do that.  Document G in the

13    queue should be Exhibit 940.

14                    (Winer Deposition Exhibit 940,

15                    Project MUSE, Funding Terrorism in

16                    Southeast Asia: The Financial Network

17                    of Al Qaeda and Jemaah Islamiya, was

18                    marked for identification.)

19          Q.    (BY MR. LEWIS)  This is a document that

20    you cite in your report; correct?

21          A.    Yes.

22          Q.    I'm going to direct your attention to the

23    bottom -- the last paragraph that begins "perhaps."

24    Which you don't cite in your report, and I'll read

25    it.

This Transcript Contains Confidential Material

```
 1              Perhaps the most important charity
 2     established by Khalifa was the little known
 3     international Relations and Information Center
 4     (IRIC), in parentheses, which engaged in numerous
 5     activities for the most part philanthropic:
 6     Livelihood projects, job training, paren,
 7     (carpentry, fish farming, farming), closed parens,
 8     orphanages, Islamic schools and other social work.
 9     The IRIC was also the primary funding mechanism for
10     Khalid Sheik Mohammed, Ramzi Yousef, and Wali Khan
11     Amin Shah's attempt to blow up American jetliners in
12     early 1995 in what was known as Oplan Bojinka.
13              Do you see that?
14        A.    No.  I don't see it.  It's not up.  I
15     couldn't find it in the documents either.
16              TRIAL TECHNICIAN:  Could you direct
17         to what page you were referencing?
18        Q.    (BY MR. LEWIS)  Yes, the bottom of
19     page 175.
20        A.    Which exhibit, please?
21        Q.    It's the exhibit that's on the screen,
22     which is 940.
23              MR. HAEFELE:  940.
24        A.    Well, the exhibit on the screen only has
25     a cover page, that I can see.  And if you'd allow me
```

1   to look at it in the GolkowRemote, it's what

2   document, again, please?

3        Q.    (BY MR. LEWIS)  940 is the document.

4   It's a document that you cite in your report

5   multiple times -- and I'm referring you to the

6   bottom of page 175 to a portion that you did not

7   cite.

8             Do you want to review the whole document,

9   Mr. Winer?

10       A.    No.

11            TRIAL TECHNICIAN:  It is page 8 of

12        the document, Mr. Winer, that's in the

13        GolkowRemote.

14       A.    Yes, I see the language that you're

15   pointing me to.

16       Q.    (BY MR. LEWIS)  Okay.  Do you have any

17   knowledge of Mohammed Jamal Khalifa setting up

18   separate charities including the IRIC?

19       A.    Only what's reported here by Mr. Abuza.

20       Q.    Do you think it's relevant to your

21   opinions that a different entity funded the Bojinka

22   plot or not?

23       A.    Might be relevant.  I'd have to look at

24   the relationship of that entity to the other

25   entities, the source of funding for that entity, and

This Transcript Contains Confidential Material

```
 1                 THE VIDEOGRAPHER:  Going off the
 2       record at 12:52 p.m.
 3                 (Recess taken, 12:52 p.m. to
 4                 1:32 p.m. EDT)
 5                 THE VIDEOGRAPHER:  Back on the record
 6       at 1:32 p.m.
 7       Q.   (BY MR. LEWIS)  Okay.  Mr. Winer, I hope
 8   you're revived, and we can finish up.
 9       A.   Let's go forward.
10       Q.   Good.  When we broke, we were talking
11   about a gentleman named Mahmoud Jaballah.
12       A.   Yes.  I have refreshed my recollection on
13   that case.
14       Q.   Did you look into it during the break?
15       A.   Yes, I reread the Canada court opinion
16   that's referenced in my testimony -- in my expert
17   report.
18       Q.   Which one, the 2001 or the 1991?
19       A.   The one that's referenced in my report,
20   which I believe to be -- actually, a 2006 case, but
21   maybe that's not the one referenced.  In any case, I
22   remember it now.
23       Q.   Good.  You state at 7.7.3.2 that
24   Mr. Jaballah was employed by IIRO in Canada when he
25   was arrested in 1999 and again in 2001 for belonging
```

This Transcript Contains Confidential Material

```
 1    to Al Jihad.

 2              Having reviewed the materials, do you

 3    wish to amend?

 4         A.    Yes.

 5         Q.    Okay.  He was never employed by IIRO in

 6    Canada, was he?

 7         A.    He was employed by IIRO in Pakistan.

 8         Q.    From 1991 until 1994; correct?

 9         A.    In Peshawar, that's correct.

10         Q.    I think it was -- not in Peshawar, but he

11    was employed at a school teaching biology; right?

12         A.    That's correct.

13         Q.    And when he was arrested in 1999, he was

14    a janitor at a Jewish community center in Toronto;

15    correct?

16         A.    I don't recollect what he was doing in

17    Canada.

18         Q.    Would you like to see documentation of

19    his employment -- relating to his employment at a

20    Jewish community center in Canada or will you simply

21    take my word for it?

22         A.    Let's go to the documentation, just so we

23    can review it together.

24         Q.    This is from the 1999 decision which is

25    cited by the UN report.  It is document L, Exhibit
```

This Transcript Contains Confidential Material

```
1        Q.    And the basis for your saying that he was

2   an -- by the way, you are aware that we've produced

3   extensive employment records in this case, and there

4   is no Syed Abu Nasir in the employment records.  Are

5   you aware of that?

6              MR. HAEFELE:  Objection.

7        A.    I am not aware of what employment records

8   have been produced or whether all IIRO employees use

9   their real names at all times or whether there are

10  pseudonyms that are sometimes used when they go into

11  terrorist activity.  I do know sometimes terrorists

12  do use a pseudonym for terrorist activity; that is

13  not uncommon.

14       Q.    (BY MR. LEWIS)  I'm asking --

15       A.    I understand your representation.

16       Q.    -- the question.  I'm not asking you

17  about terrorist names.  I'm asking have you reviewed

18  any employment records produced by IIRO in this

19  case?

20       A.    No.

21       Q.    Okay.  Mr. Nasir, it says he received

22  terrorist training in Afghanistan and was then

23  implicated in terrorist plots to bomb American

24  consulates in Madras and Calcutta.

25              Let's talk about the Madras and Calcutta
```

This Transcript Contains Confidential Material

```
 1    plots, and you cite at footnote 153, a New York

 2    Times article, "Pakistan Denies Role in Plotting

 3    Bombings in India."  And you state, quite

 4    forthrightly, that the article itself, when you

 5    refer to it, doesn't say anything about Syed Abu

 6    Nasir; correct?

 7         A.    There are two footnotes.  There is a

 8    footnote relating to him, and then there is a

 9    separate footnote relating to the terrorist plots to

10    bomb the American consulates.  I would have to go

11    back to each of them to determine what they covered.

12         Q.    Okay.  Your -- but you've reviewed the

13    New York Times article that you cite at footnote

14    153, and you agree that at least the version that

15    the New York Times maintains doesn't mention a Syed

16    Abu Nasir; correct?

17         A.    I have not reviewed it in the last few

18    days.  I'd have to go look at it.

19         Q.    Well, you say:  I find this information

20    plausible, but I do not know the sources of

21    Emerson's information; the electronically maintained

22    cites provided in his testimony from the New York

23    Times do not cover the Nasir-Al-Gamdin --

24         A.    Now I know what you're talking about,

25    sure.  Right, I went and looked for it.
```

```
 1      Q.    And you didn't find it, did you?

 2      A.    No.

 3      Q.    I didn't either.

 4            And then you quote Senate testimony from

 5   Steven Emerson.  And Emerson says that Nasir started

 6   with IIRO in Thailand and then was sent to Lahore in

 7   1994.  And you say, again, quite forthrightly:  I do

 8   not know the sources of Emerson's information.

 9      A.    That's right.  When I looked at it, I

10   wanted to see what the basis was, and didn't find

11   it.

12      Q.    Do you know Steven Emerson?

13      A.    Yes.  I don't know him well, but I know

14   who he is.

15      Q.    Are you aware, sir, that there was no

16   IIRO office in Lahore, Pakistan in 1994 or any other

17   time?

18            MR. HAEFELE:  Objection to form.

19      A.    I don't know whether there was or was

20   not.

21      Q.    (BY MR. LEWIS)  Do you have any

22   information about whether IIRO was sponsoring any

23   training that this Mr. Nasir may have received?

24      A.    I provided the basis for the information

25   that I have in this footnote.
```

This Transcript Contains Confidential Material

```
 1      A.    If by that you mean were subject to the
 2   scrutiny of a criminal trial, it was not -- they
 3   have not been part of a criminal trial, so far as I
 4   know.
 5      Q.    And it was reviewed by three military
 6   officers at a proceeding where the defendant had no
 7   lawyer; correct?
 8      A.    I'm not positive about whether he had a
 9   lawyer or not there, but I'm -- certainly whether or
10   not he had a lawyer, this is a finding that they
11   made.
12      Q.    And the findings that were made have
13   often been found to be not accurate because they
14   were -- it was taken from all kinds of sources.  You
15   know that about Guantanamo, don't you, Mr. Winer?
16      A.    I think --
17            MR. HAEFELE:  Objection to form.
18      A.    I think you have summarized Guantanamo
19   Bay in an incomplete way, and I'm not prepared to
20   make statements about Guantanamo across the board.
21   I think you have to look at it case by case.
22      Q.    (BY MR. LEWIS)  You refer to al-Hasan
23   having a cover story for his time with al-Qaeda that
24   he was in Afghanistan as a relief worker for the
25   Islamic Relief Organization and he received the
```

1    position from the head of the Islamic Relief

2    Organization.

3            Now, are you aware, sir, that Samir

4    al-Hasan was never an employee of IIRO?

5            MR. HAEFELE:  Objection to form.

6        A.    I can't assess that.

7        Q.    (BY MR. LEWIS)  Well, you call it a cover

8    story.  Do you think that a -- someone makes up a

9    cover story that they had a job for IIRO, that that

10   implicates IIRO somehow?

11           MR. HAEFELE:  Objection to form,

12       foundation.

13       A.    It depends how the documentation was that

14   was related to it.

15       Q.    (BY MR. LEWIS)  Well, do you have any

16   other information to suggest that he was an employee

17   of IIRO?

18       A.    I have the information that was in the

19   Defense, and that's it.

20       Q.    And the Department of Defense dossier

21   doesn't say that he was; it just says that he said

22   he was; correct?

23       A.    It says exactly what the sentence shows.

24   It says that his name and aliases were found in

25   al-Qaeda affiliated documents.  He was recruited by

This Transcript Contains Confidential Material

```
 1    a known al-Qaeda member who facilitated his travel

 2    to Afghanistan.  He fought U.S. and allied forces,

 3    and his cover story was he was in Afghanistan as a

 4    relief worker for the Islamic Relief Organization,

 5    that he received the position.  It's not clear what

 6    the relationship of the cover story is to what his

 7    relationship to the organization was.

 8         Q.    You have no evidence to suggest that he

 9    had any relationship with the organization, do you?

10         A.    I can't interpret the statement beyond

11    what's in the Guantanamo materials.

12         Q.    Okay.  Let's move on, then, to Bosnia.

13               And I'd like to refer you to 12.7.2.2.

14    And on page 88 of your statement.

15               I'm sorry, 12.7.2.  And you say:  The

16    trail of IIRO activities in support of Islamic

17    militants, fighting, and al-Qaeda in Bosnia,

18    includes.

19               And then your first entry is:  A

20    handwritten document found as a result of a raid in

21    Bosnia from the late 1980s, of a meeting attended by

22    Secretary General of MWL and bin Laden

23    representatives, and that meeting took place in

24    Afghanistan; correct?

25         A.    I don't recollect where the meeting took
```

```
 1   now a lieutenant colonel.

 2       A.    Yeah, I've not seen this article before,

 3   as I said to you, so I did not realize that he is

 4   the person you say that he is.  We can go back and

 5   look at it and absorb that, but I want more time to

 6   evaluate this, particularly given that the FBI agent

 7   that's being relied on here for certain propositions

 8   is also being said in the same article to have made

 9   untrue allegations.  Which leaves me uncertain as to

10   the whole.

11       Q.    I don't think it says untrue, but I don't

12   need to debate --

13       A.    As untrue, but Soufan added an untrue

14   allegation of his own.

15       Q.    Okay.  It may be inaccurate, but it's not

16   suggesting that it was knowingly false, is it?

17       A.    The article says it's untrue.

18       Q.    Okay.  Let's go to OFAC designations.

19   And I just want to understand your experience,

20   Mr. Winer.  When you were in government in the '90s,

21   did you have any experience -- you had no

22   experience, of course, with EO 13224 because it was

23   not in effect; correct?

24       A.    Correct.

25       Q.    And did you have experience with
```

This Transcript Contains Confidential Material

```
 1    terrorist designations in the '90s?

 2         A.     That depends what you mean by experience

 3    with terrorist designations.

 4                I was in discussions about the use of

 5    IEEPA, the International Emergency Economic Powers

 6    Act, the basis for all UN sanctions, for U.S.

 7    sanctions in particular, pretty much other than the

 8    Trading With the Enemy Act used for Cuba sanctions

 9    at the time, and how they would apply to groups for

10    particular types of behavior.  And in this regard,

11    there was discussion of use of it against terrorist

12    organizations and then we were in turn looking at

13    the use of it for terrorist organizations for using

14    it for serious criminal organizations.

15                So I was involved in a number of

16    discussions, moderated typically by the White House,

17    with the participation of officials from the

18    departments of treasury, justice, and state,

19    regarding the designation process.

20                And what we would have to go through in

21    order to do further -- do new category of

22    designations for organized crime.  And that in turn

23    was to be modeled after the work that had been done

24    on the terrorist activities.

25                So I had to look at the kinds of things
```

This Transcript Contains Confidential Material

```
 1    that were being used in relationship to the

 2    terrorists in order to make recommendations for

 3    organized crime figures that we might designate.

 4    There was discussion of particular candidates for

 5    designation on the organized crime side that I

 6    participated in, the creation of prototype packages,

 7    and the action did not move forward.

 8         Q.    So is it your testimony that you never

 9    participated in designation -- the process that

10    resulted in the designation of a terrorist; is that

11    right?

12         A.    That's correct.

13         Q.    And then you returned to government in

14    2013 and 2016, and you had responsibility with

15    respect to MAK and then later with respect to Libya;

16    correct?

17         A.    Correct.

18         Q.    Did you participate in any designation

19    processes with respect to terrorism in the period of

20    2013 to 2016?

21         A.    Yes.

22         Q.    Did they involve Libya or the MAK or did

23    they involve other entities?

24         A.    They involved entities in the Middle

25    East, which extended beyond Libya.  That's really
```

1  all I'm free to say.

2      Q.    Did they extend to Iran?

3      A.    I was not involved in terrorist

4  designations relating to Iran.

5      Q.    Were you involved in terrorist

6  designations in relation to Saudi Arabia?

7      A.    No.

8      Q.    I presume you did not participate in the

9  designation process with respect to the two IIRO

10  offices in Indonesia or the Philippines; correct?

11      A.    I was not in the U.S. government at the

12  time those took place and did not participate.

13      Q.    I'd like to move on to the audit process.

14  You said yesterday that you wanted to see as many

15  audits as possible in preparing your report.  Do you

16  recall that testimony, sir?

17      A.    Yes.

18      Q.    And plaintiffs -- you referred to three

19  audits in your -- in your report; is that correct?

20      A.    I would have to go back to the report to

21  know precisely how many I referred to.

22            If you can take me to the paragraph, that

23  would be helpful.

24      Q.    I believe you discussed a Pakistan audit;

25  correct?

1      A.     Are we talking about my first report or

2    my second report?

3      Q.     That's what we're talking about, your

4    first report, yes.

5      A.     You'd have to take me to the section at

6    this point.

7      Q.     Okay.  In 10.1 on page 67:  The three

8    audits of IIRO branches I have reviewed (one of

9    which included only a few pages out of the entire

10   audit) found exactly these types of issues.

11           Does that refresh your recollection, sir,

12   that in your initial report --

13     A.     Yes.

14     Q.     -- you looked at three audits?

15           Are you aware, sir, that IIRO produced,

16   prior to the preparation of your report, indeed

17   before you -- I believe you were even retained, more

18   than a dozen other audits?

19           MR. HAEFELE:  Objection to the form,

20        foundation.

21     A.     I don't know what was produced when.  I

22   only know what I asked for and what I reviewed.

23     Q.     (BY MR. LEWIS)  Did you get an audit from

24   Chad?

25     A.     I don't believe so.

1    Q.    Did you get an audit from Nigeria?

2    A.    I don't believe so.

3    Q.    Did you get an audit from Sudan?

4    A.    I don't believe so.

5    Q.    Did you get an audit from Ethiopia?

6    A.    I don't think so.

7    Q.    Did you get an audit from Azerbaijan?

8    A.    I don't believe so.

9    Q.    Would those have been useful to you in

10   preparing your report?

11            MR. HAEFELE:  Objection to the form.

12   A.    I would like to see any and all audits

13   undertaken by IIRO branches for the period relevant

14   to the litigation.

15   Q.    (BY MR. LEWIS)  Okay.  You discuss

16   financial and accounting deficiencies at Islamic

17   charities.  You are aware, are you not, that

18   financial and accounting deficiencies are endemic in

19   charities, not just Islamic charities but charities

20   all over the world; correct?

21   A.    It is a problem in various types of

22   charities, not all charities everywhere, but I've

23   been retained in connection with some, as I

24   testified earlier, domestic and some foreign.

25   Q.    Let's take a look at your note 105.  On

This Transcript Contains Confidential Material

1    time.

2            I'd like to direct your attention to

3    page 91 of your report, in Section 12.8.3.  And you

4    say:  One concrete example of the support that IIRO

5    provided for Chechen fighters in this period is

6    provided in a letter from the Muslim World League

7    Secretariat General to IIRO General Supervisor in

8    Jeddah, dated in both the Islamic and western

9    calenders as Dhul Hijja -- pardon my

10   pronunciation -- 1415 Hijiri, and 2-5-1995.

11           Now, I would like to show you what is in

12   the queue as document W, which I will the ask the

13   reporter to mark as 946, and I'd ask you to look at

14   the -- it's two letters.  I'd like to ask you to

15   look at the second letter, please.  And ask you a

16   simple question, which is:  Is that the letter that

17   you are referring to as a concrete example of the

18   support that IIRO provided for Chechen fighters?

19                   (Winer Deposition Exhibit 946,

20                   5-30-1995 letter to Mr. Fawzi Rushdi

21                   al-Athama, was marked for

22                   identification.)

23       Q.    (BY MR. LEWIS)  No, I'm sorry, page 1.

24   I'm sorry.

25           Could you -- I'm sorry, Brian, could you

```
 1    move to page 2, please?

 2              Is page 2 the letter that you are

 3    referring to --

 4       A.    Yes.

 5       Q.    Okay.  I'm going to ask you, then,

 6    whether you are aware of the IIRO's responsive

 7    letter, which is page 1 of the document?

 8              And I will direct your attention to the

 9    second paragraph.

10       A.    This says the money was spent for

11    non-military means, which is good.

12       Q.    Good.  Were you aware of that?

13       A.    No, I had only seen the other page.  I

14    had not seen this page.  The other page -- if we can

15    go back to the other page, please.  Says it's for

16    the aid of the Chechen mujahideen.  Mujahideen means

17    fighter.  That's what it says.

18       Q.    And I'm --

19       A.    That's what is says, and that's the

20    document that I reviewed on how to deliver monetary

21    aid to them.

22              This page 1, which we are now in, which

23    we should now go back to, it's a very small amount

24    of money in any case, as I said in my statement,

25    says that the check was deposited for the purchase
```

1    of medications or foodstuffs for the benefit of

2    Chechen refugees and the organization of

3    jihad-supporting activities and only provides relief

4    for the refugee women and children.

5            I can't account for the difference

6    between two letters.  Let's go back to the other

7    page, please.

8            Thank you.  That's very helpful.

9            What is the date on -- the respective

10   dates of the two letters, please?  The first is

11   something that refers to April 12th, 1995.  The

12   second corresponds to May 30th, 1995.

13           So assuming this is the same amount,

14   which it appears to be, it looks to me like the

15   letter two -- and I'm trying to make sure that I've

16   got this right.

17           The Muslim World League from -- this from

18   World League to IIRO says:  Here it is for the muj;

19   and the IIRO writes back and says it was provided

20   to -- for medications or foodstuffs for refugees.

21   So that clears up that issue.

22       Q.    Good.  I'd like to move on to another

23   issue that pertains to your work at APCO.

24           Are you still at -- you still have a

25   relationship with APCO; is that correct?

1    includes transnational crime and terrorist finance,

2    foreign policy on U.S. relationships, geopolitical

3    security issues, and subsets within those broader

4    fields; is that correct?

5                 MR. HAEFELE:  Objection to from.

6        A.    Yes, including regulation enforcement

7    issues associated with financial institutions and

8    charities operating cross border.  Essentially if

9    it's things that cross borders and involves

10   regulation or enforcement, national security, law

11   enforcement issues, that's what I've spent my career

12   on over the last 35 years.  I think that's about

13   right.  35 years, yeah.

14       Q.    (BY MS. PRITSKER)  Thank you.  Discussing

15   executive order 13224, can you please list each

16   instance in which you were involved in the

17   designation or de-designation process under

18   executive order 13224?

19       A.    That order, I don't believe -- I can't

20   remember the year that order first was made, but I

21   was not involved in the designation process.  I was

22   involved in some delisting matters on behalf of

23   private sector clients, but I can't be more specific

24   with those because they're client confidential.

25                 In the -- my most recent iteration in

This Transcript Contains Confidential Material

```
 1    government, I was involved in discussions of various

 2    designations under other executive orders but not

 3    that one.

 4         Q.    How many delisting matters were you

 5    involved in in seeking delisting under executive

 6    order 13224?

 7         A.    Two.

 8         Q.    Is there a basis for not providing

 9    additional information regarding those two delisting

10    applications pursuant to executive order 13224 based

11    on privilege?

12         A.    Yes.

13         Q.    Was your representation in those two

14    instances known to the U.S. government?

15         A.    In what -- probably, but I'm not certain.

16               I'm not certain.

17         Q.    How is it privileged if it's possible

18    that the U.S. government knew about your

19    representation of those two parties in seeking

20    delisting under executive order 13224?

21         A.    I'm not in a position to disclose any

22    information relating to those investigations.  It

23    would be a breach of my obligations as an attorney

24    and I'm not going to do it.

25         Q.    What obligations as an attorney?
```

This Transcript Contains Confidential Material

```
 1        A.     To maintain client confidences.  And as I
 2   said, I'm not sure whether the U.S. government was
 3   aware of my particular engagements or not, but in
 4   any case, I am not in a position to disclose them
 5   and I will not.
 6        Q.     Mr. Winer, were those two clients that
 7   you represented in connection with seeking a
 8   delisting under executive order 13224 foreign
 9   clients?
10        A.     One case was a foreign client.  The other
11   was a domestic client.
12        Q.     For the foreign client, did you register
13   under the Foreign Agent Registration Act known as
14   FARA?
15        A.     No.
16        Q.     And you have no experience in the process
17   for designation or de-designation under executive
18   order 13224 during your time in the U.S. government;
19   is that right?
20        A.     No, that's not correct.
21        Q.     Under what instances were you involved in
22   the designation or de-designation of a party under
23   executive order 13224 during your time in the U.S.
24   government?
25        A.     I was not directly involved relating to
```

This Transcript Contains Confidential Material

```
 1    individual entities, but that does not mean I had no
 2    experience.
 3         Q.   Mr. Winer, what was your experience in
 4    the process for designation and de-designation under
 5    executive order 13224 during your service in the
 6    U.S. government?
 7         A.   As I previously testified, I had many,
 8    many, many interagency discussions of how one would
 9    approach designations in the area of organized
10    crime.  I had discussions with how we were doing it
11    in connection with the terrorist designations.  For
12    comparison, I became familiar with what the U.S.
13    government did to go through the designation
14    process.
15              More recently, in the period 2013 to
16    2017, I participated in discussions of designations
17    of individuals and entities, some of whom were
18    actually designated under other executive orders,
19    which is the same process.
20         Q.   Mr. Winer, in your participation in the
21    interagency's discussions of how one would approach
22    designations in the area of organized crime and also
23    in the context of terrorist organizations, that was
24    during your time in the State Department that ended
25    in 1999; is that right?
```

This Transcript Contains Confidential Material

```
 1      A.    No.

 2      Q.    When were these interagency discussions

 3   in which you discussed the approach of designations

 4   for --

 5      A.    In both --

 6      Q.    Mr. Winer, I ask that you please wait

 7   until I finish my question.  I will work on not

 8   interrupting you if you please don't interrupt me as

 9   well.  Thank you.

10            When did you have interagency discussions

11   related to the designation process related to

12   organized crime and terrorism?  When did those

13   interagency process meetings that you've discussed

14   multiple times occur?

15      A.    They occurred in 1998, 1999, that period,

16   roughly.  Might have been 1997 as well, but I can't

17   recall it.

18            I also took part in 2000 -- roughly 2014,

19   '15, '16.

20      Q.    And did any of those interagency

21   discussions in approximately 1997 through 1999 and

22   approximately 2014 to 2016 involve designations or

23   de-designations under executive order 13224?

24      A.    No.

25      Q.    And you've only represented two clients
```

1    with respect to seeking a delisting pursuant to

2    executive order 13224; is that right?

3                MR. HAEFELE:  Object as to the form.

4         A.    I've described my private practice

5    experience in this territory.  Now that I understand

6    where the -- what you're doing with your questions,

7    I would like to add my area of expertise.  I was

8    involved in both periods in understanding thoroughly

9    the process that the United States government does

10   for designations.

11               Had to understand that in order to be

12   proposing, as I did, potential candidates for

13   designation in both periods, and in both periods I

14   was part of interagency discussions about

15   designating particular entities under various

16   executive orders.

17        Q.    (BY MS. PRITSKER)  Thank you, Mr. Winer.

18   I'm going to object to your response as

19   nonresponsive and move to strike that.  I do ask

20   that you listen to my questions and answer them

21   exactly as I've asked them.

22               You have only represented two clients

23   with respect to seeking a delisting from OFAC

24   pursuant to executive order 13224; is that right?

25                    MR. HAEFELE:  Objection to form.

This Transcript Contains Confidential Material

```
 1      A.      That's what I recollect.

 2      Q.      (BY MS. PRITSKER)  And when were those --

 3    when did you represent those two clients who were

 4    seeking a delisting from OFAC pursuant to executive

 5    order 13224?

 6      A.      During my legal practice at Alston &

 7    Bird.

 8      Q.      Mr. Winer, you suggested that the process

 9    for designation and de-designation is similar under

10    all sanctions programs; is that right?

11      A.      Yes.

12      Q.      How do you know that it is a similar

13    process for designation and de-designation under all

14    of the different sanctions programs that OFAC

15    administers?

16      A.      Because of the experience I've had in

17    discussing the designation process over many years

18    with people who were more directly involved in it on

19    a regular basis than I was in terms of the

20    particular candidates and entities.  It's something

21    that I've been immersed in going back to the 1990s.

22      Q.      Can you name all the persons with whom

23    you had these discussions that led to your knowledge

24    of the designation and de-designation process that

25    OFAC administers?
```

1    A.   Can I name all of them?  Is that your

2  question?

3    Q.   Yes, to the best of your recollection.

4    A.   No, I can't name all of them.

5    Q.   Can you name any persons with whom you

6  had discussions regarding the OFAC's process for

7  designations and de-designations?

8    A.   Sure.  Dan Glaser, at the department of

9  the treasury.  Jodi Myers at the department of the

10  treasury.  Dan pre -- let me think of what his last

11  name is.  He was the head sanctions guy at treasury.

12  Dan -- his last name is not coming to me right now.

13  Something like Freedman, but that's not quite right.

14  And he was in charge of sanction programs.  Howie

15  Wachtel, who worked on sanction programs at State in

16  the Obama administration.  Dick Clarke at the NSC.

17       That would be a partial group.  That

18  would be a partial group because I was in a lot of

19  interagency meetings discussing these issues.

20    Q.   Is there anyone else that you can recall

21  sitting here today that you had discussions

22  regarding OFAC's designation and de-designation

23  process with?

24    A.   Not at the moment.

25    Q.   Was the process for designation and

This Transcript Contains Confidential Material

1    de-designation ever different across any of the

2    sanctions programs to your knowledge?

3        A.    Well, there's more than one process, so

4    the general approach is the same.  The details may

5    be different -- be different, depending on the

6    circumstances and the particular program.  OFAC is

7    constantly varying what it allows by license, what

8    it doesn't allow.  And so to say it's always the

9    same in every instance is not quite right, but the

10   basic process is the same.

11             There was a period of time, Juan Zarate

12   is another person I've discussed this with in the

13   past.  There was a period of time right after 9/11

14   where the process was not as complete as it became

15   very soon thereafter, which Mr. Zarate wrote about

16   in his book.

17       Q.    Which book did Juan Zarate talk about how

18   the process was not -- was not complete after 9/11?

19       A.    I think he said in -- the book was

20   Treasury's War.

21             This is for a short period of time in the

22   immediate aftermath of the attack.

23       Q.    Did you find Juan Zarate to be credible

24   on that point in the immediate aftermath of 9/11

25   that the OFAC designation process was not as

This Transcript Contains Confidential Material

1    complete?

2        A.    I find Juan Zarate generally to be

3    credible.  You'd have to look at exactly what he

4    wrote to get exactly right what his views were on

5    the process.  He was there first-hand at the time.

6    I was not.

7        Q.    Mr. Winer, do you believe that the

8    withdrawal of designation under executive order

9    13224 should never be considered an exoneration

10   unless the U.S. government has publicly stated that

11   the original listing was undertaken in error?

12            MR. HAEFELE:  Objection to form.

13       A.    The way in which your question is phrased

14   makes it difficult for me to answer.  It certainly

15   is not an exoneration.  It is a reflection of a

16   national security decision made by the United States

17   government that the listing is no longer necessary

18   to protect the national security of the

19   United States.  In my report I provide a detailed

20   explanation for this issue with regard to the

21   Mujahedin-e Khalq.

22       Q.    (BY MS. PRITSKER)  It's possible that

23   OFAC can delist a party in light of facts that now

24   show the designation was not warranted in the first

25   instance; is that right?

This Transcript Contains Confidential Material

```
 1   U.S. government entity had made a statement

 2   regarding the reason for the delisting.  It might be

 3   something that was done in coordination with other

 4   countries, as a result of other countries making a

 5   delisting decision at the same time, to act in

 6   accord without any of them making a statement as to

 7   why.

 8             There are a variety of possibilities, so

 9   your question, which is a very generic question,

10   was -- and was making a very broad blanket

11   statement, is not one that I can respond to with a

12   simple "yes" or "no."  It depends on a variety of

13   things, in addition to what OFAC might say.

14        Q.   Mr. Winer, have you ever performed any

15   systematic review of OFAC's de-designations?

16        A.   I have not.

17        Q.   Do you know what percentage of OFAC

18   de-designations are based on factual error?

19        A.   I'm not aware of such a study.  No, I do

20   not.

21        Q.   Do you have any opinions about the UN

22   Security Council's sanctions program for purposes of

23   this case?

24        A.   I've laid them out in the course of my

25   opinion.
```

This Transcript Contains Confidential Material

```
 1        Q.    What are those opinions related to the UN

 2   Security Council's sanctions program?

 3              MR. HAEFELE:  Objection to form.

 4        A.    If you look at my report from page 134 to

 5   136, I think it's basically two pages, it lays out

 6   the basic -- my basic views on the process of

 7   designation and de-designation.

 8              I've worked with the UN at different

 9   times in connection with these types of processes,

10   most recently in connection with my work in Libya,

11   where it has no desig -- no actual designation by

12   the UN but is monitoring compliance with UN Security

13   Council resolutions.  And I have some sense of the

14   process, which is a process that involves people

15   from multiple countries evaluating evidence and then

16   making recommendations for how the UN should respond

17   in response to evidence.

18        Q.    (BY MS. PRITSKER)  Mr. Winer, I'm going

19   to object to some of your answer as nonresponsive to

20   my question.  I did just ask what your opinions

21   related to the UN Security Council sanctions program

22   was, not what the basis of those opinions were.

23              Since we went into that, do you

24   personally have any experience with the UN sanctions

25   undertaken pursuant to UN resolution 1267?
```

This Transcript Contains Confidential Material

1      A.      I was not involved in those.  They took

2  place following my departure.

3      Q.      And do you have any experience with the

4  UN's withdrawal of sanctions?

5      A.      Again, I was not involved with them

6  directly.  But I have knowledge of them; I do not

7  have experience with them.

8      Q.      For any given removal of sanctions, if

9  the UN does not identify its reason, it's not

10  possible to know the true reason for the UN's

11  removal of sanctions; is that right?

12      A.      It may be right in some cases; it may not

13  be right in other cases.

14      Q.      Is it possible that the UN removes

15  sanctions in light of facts that now show that the

16  original designation was not warranted in the first

17  instance?

18      A.      It may be possible in some cases, but

19  it's not necessarily going to be the reason.  The

20  main reason why the designations are removed is

21  because they're no longer found to be necessary for

22  the purpose for the designations are made, rather

23  than a finding of error.

24      Q.      Mr. Winer, in your affirmative report you

25  state that Maktab Al-Khidamat, a/k/a MAK, was an

This Transcript Contains Confidential Material

```
 1        Q.    (BY MS. PRITSKER)  I'm going to restate

 2   my question.  Mr. Winer, can you please describe the

 3   methodology that you applied in this case?

 4        A.    Yes.

 5              MR. HAEFELE:  Objection, asked and

 6         answered.

 7        A.    I was asked a series of questions.  I was

 8   just going through the questions that I was asked.

 9   Because my methodology began with the questions.  In

10   order to answer the questions, I looked at as much

11   of the material that was made available to me as I

12   could relating to this case.  I looked at primary

13   source documents.  I looked at books about this

14   matter.  I looked at academic articles.  I looked at

15   statements by the United Nations.  I looked at

16   statements by treasury officials.  I looked at my

17   own prior testimony.  I looked at the testimony of

18   other people, including many people that I knew.

19              And in looking at all of that, I

20   systematically worked to build out what the answers

21   to those questions would be, based on the record

22   available to me, which included those types of

23   documents and sources as well as my own experience

24   in the United States government during this period

25   of time, in which I was having regular contact with
```

This Transcript Contains Confidential Material

1    that response.  I'm happy to supplement that

2    response if you would like.

3        Q.    I'd like to go back briefly to your

4    discussion of your knowledge of the UN sanctions

5    process.  Can you describe for me what are all the

6    bases for your knowledge of the listing and

7    delisting process under UN sanctions pursuant to UN

8    resolution 1267?

9        A.    Sure.

10           In conjunction with my work back in the

11   '90s, and in conjunction with my work more recently

12   when I went back to the State Department, I had

13   conversations with the people who were the

14   respective heads of the sanctions programs that were

15   relevant at the relevant time, Rick Newcomb, back --

16   principally back in the '90s, and more recently Dan

17   Fried, which was the name that I couldn't recollect,

18   and he's somebody that I've known for decades and

19   know very well, who is the head of the sanctions

20   office at the State Department more recently, as

21   well as Howie Wachtel, who worked for him at that

22   office.

23           And in the course of those conversations

24   and other conversations, we would talk about the

25   desirability of having the UN and other countries

This Transcript Contains Confidential Material

```
 1   join the United States in sanctions as opposed to

 2   unilateral sanctions.  So we would discuss the need

 3   to have sufficiency of information so that we could

 4   secure those kinds of outcomes as I've testified

 5   earlier today, in connection with putting together

 6   financial packages for crime entities.  We

 7   discussed -- also discussed in a portion of that the

 8   fact that at that time there would have been no

 9   basis, most likely, for multilateral designations in

10   that category, because the authority would not have

11   been present in the other countries to follow us in

12   that.

13           So in the course of that, we discussed

14   how we would have to think about that in such places

15   as the UN.  And that was a factor in the decision --

16   probably -- it's hard to remember precisely, but

17   that was a factor in our decision not to move

18   forward at that time.  It was done in a later

19   administration, adding that category in.  So that's

20   the basis for my knowledge.

21      Q.   And your knowledge of the UN sanctions

22   process is based on your discussions with US

23   officials, sometime during the time frame between

24   2013 and 2016; is that right?

25               MR. HAEFELE:  Objection to form.
```

This Transcript Contains Confidential Material

1      A.    No, I also had such discussions about how

2   we would multilateralize what we were doing in the

3   late '90s, with the UN, but my memory of the

4   discussion in the 1990s in that context about the UN

5   is much less precise.  It's a long time ago, and I

6   don't recollect the specifics.

7            MS. PRITSKER:  Why don't we take another

8   five-minute break and I'll collect my thoughts and

9   see if I have any other questions for you.  Thank

10  you.

11            THE VIDEOGRAPHER:  We're going to go

12       off the record at 5:13.

13            (Recess taken, 5:13 p.m. to

14            5:24 p.m. EDT)

15            THE VIDEOGRAPHER:  We are back on the

16       record at 5:24 p.m.

17      Q.    (BY MS. PRITSKER)  Mr. Winer, have you

18  ever argued to the U.S. Treasury Department on

19  behalf of a client that the decision to list your

20  client was made based on wrong information?

21      A.    No.

22            MS. PRITSKER:  Thank you.  I have no

23       further questions at this time.  I'm going to

24       reserve the remainder of my time.  Thank you

25       so much, Mr. Winer.

This Transcript Contains Confidential Material

```
 1                        CERTIFICATE
 2          I, DEBRA A. DIBBLE, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 3  Court Reporter and Notary Public, do hereby certify
    that prior to the commencement of the examination,
 4  JONATHAN M. WINER, was duly sworn by me to testify
    to the truth, the whole truth and nothing but the
 5  truth.
 6          I DO FURTHER CERTIFY that the foregoing is a
    verbatim transcript of the testimony as taken
 7  stenographically by and before me at the time, place
    and on the date hereinbefore set forth, to the best
 8  of my ability.
 9          I DO FURTHER CERTIFY that pursuant to FRCP
    Rule 30, signature of the witness was not requested
10  by the witness or other party before the conclusion
    of the deposition.
11
            I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of
    any of the parties to this action, and that I am
13  neither a relative nor employee of such attorney or
    counsel, and that I am not financially interested in
14  the
    action.
15
16
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 8-5-2021
23
24
25
```



November 15, 2021

**<u>VIA EMAIL ONLY</u>**

Aisha E. Bembry, Esquire                        Alan R. Kabat, Esquire
Lewis Baach Kaufmann Middlemiss PLLC            Bernabei & Kabat, PLLC
1101 New York Avenue, Suite 1000                1400 16th Street, N.W., Suite 500
Washington, DC 20005                            Washington, DC 20036

    Re:  ***In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570 (S.D.N.Y.)***

Dear Counsel:

Please be advised that we have not received confidential designations for the below mentioned depositions.  Therefore, the deposition transcripts listed below are considered not confidential.

- John Barron – April 29, 2021
- Jonathan Benthall – July 20, 2021
- Khalid Blankinship – June 22, 2021
- Jacob Vahid Brown – May 25, 2021
- Chas Freeman – April 6, 2021
- Sherman Jackson – June 2, 2021
- Oliver Roy – April 20, 2021
- Mark Sageman – July 1 and 2, 2021
- John Sidel – April 27, 2021
- Jonathan Winer – July 13 and 14, 2021
- Jonathan Marks – July 22, 2021

Sincerely,

*Kristie Martello*

Kristie Martello
Supervisor of Case Management

KM/ko
cc:  MDL-1570 Counsel