EXHIBIT U



EXHIBIT
920
J. Winer
7/13/2021
Debra A. Dibble, RDR, CRR, CRC

**18 01 1287**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 CR 892 |
| | ) | |
| v. | ) | Judge Suzanne B. Conlon |
| | ) | |
| ENAAM M. ARNAOUT, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Enaam M. Arnaout, by his attorneys, submits this Memorandum to address factors relevant to this Court's sentencing determination which were not relevant to, or adequately addressed by, the objections to the PSR's Guidelines calculation included Defendant's Position Paper as to Sentencing Factors. While Mr. Arnaout in no way seeks to minimize the severity of his offense, he asks the Court to sentence him based on the offense to which he pled guilty, and not based on the overwhelmingly prejudicial allegations made by the government which are both untrue and unproven. Mr. Arnaout also asks that the Court consider his rather tragic, and certainly unique, personal background, his achievements in building BIF-USA into a large and internationally respected Muslim charity, and the extraordinary good works that BIF-USA accomplished over the past decade. While those factors certainly do not excuse Mr. Arnaout's offense, they help place it in its proper context and will help the Court to understand that Mr. Arnaout's conduct was motivated not by a desire to finance terrorists but by a desire to help people in some of the most war-ravaged areas of the world.

I.    **Mr. Arnaout's Personal Background.**

As is reflected in the PSR (ll. 528-573) and Mr. Arnaout's letter to the Court, which will be separately transmitted to the Court by the probation officer, Mr. Arnaout was born in Syria in 1962 and

PEC-WAMY042195
KADI0031200

**18 01 1288**

was the eighth of ten children born to his parents. He was orphaned, as Muslim's use that term, when his father died in 1971. Mr. Arnaout came of age at a time when Hafez Assad's military dictatorship, backed by the Soviet Union, ruled Syria with an iron fist and quashed all dissent. In 1975, when Mr. Arnaout was 13, his older brother joined, and ultimately became a leader of, a dissident group which protested the new constitution imposed by Assad's Baath party. Over the next five years, Mr. Arnaout's family was repeatedly targeted by the government in retaliation for Bassam Arnaout's actions, and his other older brothers were repeatedly imprisoned and harassed. When Bassam Arnaout was killed in 1980 during a traffic stop, there was widespread unrest in the Arnaouts' hometown, and widespread protests of the government's murder of a prominent opposition leader. Shortly after Bassam's killing, another of Mr. Arnaout's brothers and one of his sisters were killed in their home as their mother watched. Mr. Arnaout, then 18, arrived home to find his sister's body literally torn into two pieces by machine gun fire. With the help of a local government official, the remainder of Mr. Arnaout's family escaped from Syria and became refugees looking for a new life in a different country.

After stops in Jordan and the United Arab Emirates, where he was unable to find affordable education or lucrative employment, Mr. Arnaout, with the financial support of his family, moved to Pakistan to obtain higher education. While in Pakistan, Mr. Arnaout met and married an American nurse and eventually moved with her to the United States.

When Mr. Arnaout was studying in Peshawar, Pakistan, near the Afghan border, many Muslim men from various countries were congregating to assist the Afghans in repelling the Soviet invasion of Afghanistan. The role of the United States government and the CIA in supporting these so-called *mujahideen* fighters has been well-documented. Many non-governmental organizations, both Muslim

PEC-WAMY042156

KADI0031201

and otherwise, were active in this region as well and assisted in supporting the many people dislocated by the conflict, as well as the growing influx of people looking to join the fight against the Soviets. It was in this context that Mr. Arnaout was befriended by Osama bin Laden, then simply a member of a wealthy Saudi family whose company was engaged in numerous building projects intended to help build infrastructure to help the *mujahideen* and, later, by Gulbuddin Hekmatyar, a leader of one of the Afghan factions. While Mr. Arnaout never actually fought the Soviets, he, like virtually everyone else in the area at the time, became involved in efforts to assist the *mujahideen* and, due to his keen intellect and engaging personality, came to be a respected member of the Peshawar community.

Mr. Arnaout does not deny many of the allegations made about him during this time period; they simply are irrelevant to the charge at issue. Mr. Arnaout, like virtually every visitor to the region, was photographed carrying a gun, did help supply the *mujahideen*, and did provide logistical support to fighters. He did not join *al Qaeda*, was not present for its founding, and has never in his life joined any organization which was in any way Anti-American. He perceived the fight against the Soviets to be an extension of his brother's fight against the Soviet-backed Syrian dictator, and as an orphan and political refugee himself, he felt drawn to help those in need.

**II.      The Origins of BIF-USA.**

While in Pakistan, Mr. Arnaout worked for *Lajnat Al-Birr Al-Islamiah* ("LBI"), a charity run by a wealthy Saudi named Adel Batterjee. After he got married and moved permanently to the United States, Mr. Arnaout had trouble obtaining employment, as he could not yet speak English. He learned that Batterjee had incorporated a not-for-profit entity called Benevolence International Foundation, Inc. ("BIF-USA") in the United States in 1992, but had not conducted any business through that entity. Mr. Arnaout convinced Mr. Batterjee to let him run BIF-USA as a Muslim charity, and, with $50,000 of

3

PEC-WAMY042157

KADI0031202

seed money provided by Mr. Batterjee, began the operations of BIF-USA in May 1993.  What the

government sees a continuing, decades-long international conspiracy was, in reality, a simple business

transaction in which a mentor gave his protege an opportunity to make a living in a new country.

Mr. Arnaout assumed full control of BIF-USA and at all times ran that organization as an

independent business with no affiliations to LBI or any of the other organizations run by Mr. Batterjee.

Mr. Arnaout did have occasional contacts with Mr. Batterjee, and on a couple of occasions met

individuals associated with LBI or other charitable organizations.  If, as the government apparently

believes, certain of those individuals were providing non-humanitarian support to terrorists, they did not

do so with BIF-USA's knowledge or support, and they did so while operating outside the jurisdiction

of the United States.

 After starting BIF-USA with literally nothing almost exactly a decade ago, Mr. Arnaout

oversaw a significant growth in the size, scope, and sophistication of BIF-USA's business.  At the time

the government shut it down, BIF-USA received $3-4 million per year in revenue, had distributed over

$20 million of aid in its eight years in existence, and had offices or programs in many areas of Eastern

Europe and Central Asia, Pakistan, Canada, and the United States.  The government seized voluminous

documentation of BIF-USA's well-established, and completely legitimate, charitable programs in many

areas of the world.  It seized no document regarding any BIF-USA program or office–legitimate or

otherwise–in either the Sudan or Yemen, yet it alleges that BIF-USA and Mr. Arnaout are somehow

tied to alleged operations in those countries.  While it is unfortunately true that BIF-USA, in its early

newsletters, sought to "puff" its own significance by taking credit for the programs of LBI and other

charities, BIF-USA provided no support to the Sudan or Yemen, and no document will evidence any

fund transfer, shipment, program, or any other fact to the contrary.

4

### III.   BIF-USA's Humanitarian Programs.

For almost a decade, BIF-USA administered essential humanitarian aid to individuals in the neediest areas of the world.  BIF-USA carried out its mission by raising funds to assist orphans and to provide emergency food distribution, health care, education and training in these needy areas.  Dr. Stephen Brown, an American physician who was associated with BIF-USA for three years, made several trips to Bosnia and Chechnya, and was prepared to testify on behalf of Mr. Arnaout at trial, has submitted a letter to the Court in which he details his extensive dealings with Mr. Arnaout and BIF-USA's humanitarian programs.  Dr. Brown states:

> One is at something of a loss in attempting to describe the desperation of conditions facing the Bosnian and Chechnian populations during the wars.  The Bosnians and Chechnians were the victims of wrenching atrocities and large portions of the populations were suffering.  Yet Enaam was enthusiastic in addressing situations that were almost hopeless in their absurdity.

*See* Tab 3 to Letter from Haugh to Hendrickson, June 9, 2003.[1]  Similar letters from two other American physicians accompany Dr. Brown's letter and express similar sentiments as to the value of BIF-USA's work and the passion shown by Mr. Arnaout to the cause of alleviating human suffering.

We detail below some of the outstanding humanitarian work discussed in various letters submitted to the Court:

---

[1] Because Mr. Arnaout's counsel received an incredible number of letters written on Mr. Arnaout's behalf, counsel has selected a representative sampling of those letters and transmitted them to the probation officer with a cover letter summarizing the various categories of letters attached. In accordance with standard procedures, counsel anticipates that the probation officer will forward copies of that submission to the Court and the government attorneys.

PEC-WAMY042159

KADI0031204

## ORPHAN SPONSORSHIP PROGRAM

The care of orphans[2] has remained the heart of BIF-USA's work since its inception. In many of the countries where BIF-USA operated, as many as 30% of the children were orphaned. By 2001, the number of orphans sponsored through BIF's orphan sponsorship program passed the 2000 mark. This did not include the hundreds of orphaned children that were cared for at one of several orphanages that BIF-USA supported. BIF-USA had an active sponsorship program in Afghanistan, Azerbaijan, Bosnia, Chechnya, China, Georgia, Pakistan and Tajikistan. *See id.*, Tab 18 (listing of some of the orphans that received support through BIF in those respective countries).

Almost every country in which BIF-USA operated had suffered the devastation of war. For many of these orphans, BIF-USA's monthly donation provided the basic needs for the child. Orphan money was also used for food, clothing, shoes, school supplies and other things that children and families needed. *See id.*, Tabs 6 and 7 (letters from Bosnian orphans and their parents which talk about the personal benefits to them of the sponsorship program and the severe hardship and loss incurred as a result of BIF-USA being shut down).

## BOSNIA

In his letter to the Court, Saffet Catovic, who worked for the mission of Bosnia and Herzegovina to the United Nations in New York from January of 1993 until 2001, describes the horrors of genocide that were perpetrated upon the Muslims in Bosnia in the mid-1990s. He writes that while the full extent of the humanitarian tragedy will only be known to God, conservative estimates put the number of dead or missing at 250,000, the number of displaced persons over 2 million and the number of women raped in excess of 25,000. *See id.*, Tab 2.

---

[2] Muslims define an orphan as a child whose father has died.

PEC-WAMY042160

KADI0031205

Mr. Catovic, who was impressed by BIF-USA's work in Bosnia while he was working for the UN, later became employed by BIF-USA in 2001. *Id.* He, as well as other former employees of BIF-USA have submitted moving letters describing the extraordinary efforts Mr. Arnaout and BIF-USA made to alleviate suffering in Bosnia through a number of programs. *See id.*, Tabs 2, 5. In addition, a selection of letters received from the beneficiaries of BIF-USA's work have written to the Court to express how meaningful BIF-USA's humanitarian efforts were to their families. *See id.*, Tabs 2, 5, 7-10. The following programs are discussed or referenced in those letters:

**Benevolence Educational Center Sarajevo**

Located in Dobrinja, a suburb of Sarajevo, the Benevolence Education Center Sarajevo ("BECS") provided basic computer and language courses and public access to the Internet. Over 800 students took classes at the center each year. BIF-USA charged nominal tuition solely to insure that the students were serious about their studies. BECS attracted a wide range of students, including government workers, doctors, judges, policemen, state representatives, disabled and retired individuals, orphans, and media personnel. The center provided one of the only opportunities for Bosnian Muslims to gain the skills required for employment.

**Ilijas Sewing Center**

Ilijas is a refugee city hosting more than 5,000 refugees, mostly women and children, who fled the city of Srebrenica, the site of some of the worst atrocities in the war. In August 2000, BIF-USA opened a sewing center in Ilijas. The center provides women free basic education regarding sewing and tailoring, which is a highly marketable skill that the women can use to support themselves and their families through work in one of the many garment factories and tailor shops in Bosnia.

PEC-WAMY042161

KADI0031206

**Zenica Dental Clinic**

In the city of Zenica, BIF-USA ran a dental clinic for children in the local schools. The clinic opened in 1987, but became a refugee center during the war. After the war, normal operations resumed, and in 1996 BIF-USA offered to support the clinic for five years. In 2001, BIF-USA renewed its pledge of support for another five years. The dental clinic treated children from the seven kindergartens in Zenica, as well as local orphans and other poor children. In one year over a thousand children were treated at the clinic. The clinic provided basic dental services, as well as simple operations and extractions. In addition, BIF sponsored seminars and classes on oral hygiene for both children and adults.

## CHECHNYA

BIF-USA began working in Chechnya because of massive suffering inflicted on the Chechen people by the war over Chechen independence from Russia. BIF-USA sent medical supplies and equipment, doctors, and winter clothing. At one time, BIF-USA operated a sewing factory and a farm in Chechnya, conducted three seasonal projects in Chechnya, and distributed food and clothing to refugees. In late 1996, after the Russians had withdrawn from Chechnya, BIF-USA was able to establish a physical office in Chechnya, in a suburb of Grozny called Tashkala, an began to sponsor some of the tens of thousands of children who were orphans as a result of the war. Even when BIF-USA's office in Chechnya was closed because of the war, it continued to help Chechens by sending relief aid to the many Chechen refugees living in Ingushetia in refugee camps.

BIF-USA provided medical assistance to Chechen refugees living in Ingushetia through a mobile ambulatory service, a clinic in the Aki Kurt refugee camp and its two dental clinics. In addition, BIF-USA built showers and toilets in the refugee camps in order to address the deplorable sanitary

8

PEC-WAMY042162

KADI0031207

**18 01 1295**

conditions and decrease the risk of disease. Finally, BIF opened an orphanage in Nazran and a school in the Aki-Yurt camp to help the children continue their education. *See id.*, Tabs 3, 15.

## OTHER COUNTRIES

**Women's Hospital**

The Charity Women's Hospital in Mahachkala, Daghestan was established in 1993. In 1998, BIF-USA agreed to assume responsibility for operation of the hospital because of the desperate need for free medical services in Daghestan. Daghestan suffers because of military attacks, earthquakes, and other difficult circumstances, and because approximately 70% of the population lives in poverty.

Medical services offered include inpatient and outpatient gynecological and obstetric care, medical testing of various types of treatment of diseases, and administration of medication. In addition to medical services, the hospital provides courses in general and mine first aid, which is necessary in light of the high fatality rates among victims of frequent earthquakes and the widespread use of mines and explosives. *See id.*, Tab 14. (Declaration of Medical Director Aishat Magomzdoya and letters from patients).

**Tuberculosis Hospital**

Tuberculosis, one of the most dangerous but most easy treated diseases, is a serious problem in Tajikistan. In 1998, in an effort to confront and ameliorate this crisis, BIF-USA took over operation of a TB hospital that had fallen into disrepair as a result of a lack of funding. BIF-USA initially repaired the facility then paid for the staff and supplies necessary to treat patients with TB.

Through the support of donors, BIF-USA was been able to markedly improve the TB situation in Tajikistan. In two years, approximately 300 children fully recuperated in the hospital. During this time, there were only two fatalities, both in cases in which the child entered the hospital at a very late

9

PEC-WAMY042163

KADI0031208

stage of the disease.   Since BIF-USA assumed responsibility for running the TB hospital, the hospital's

TB mortality rate dropped to the lowest point in ten years.   Shortly before the United States

government shut down BIF-USA, the government of Tajikistan asked BIF-USA to explore the

potential to open a TB hospital for adults, particularly for the parents of infected children.   At the time

BIF-USA was shut down, there were approximately fifty patients in the hospital, all under the age of

thirteen.   Their fates are unknown.   *See id.*, Tab 16.   (Declaration of Dr. Rakhimov).

**Gharm Orphanages**

In the city of Gharm in the Karategin valley of central Tajikistan, the Dawlat family opened their

home to over 185 orphaned and homeless children from the city and surrounding villages.   The family

has established orphanages in the city of Gharm, the village of Yaldamich, and the village of Hilmony.

The orphanages provided food, clothing, and housing for the orphans.   In order to provide aid to the

children living in the orphanages, BIF-USA sent regular shipments of flour, oil, rice, vegetables and

other needed food supplies.

**Benevolence International Computer Center ("BICC")**

The only facility of its kind in the Azeri capital of Baku, the BICC provided vital computer and

language courses for the local population.   The curriculum included various PC software classes,

English classes, and Arabic classes.   The center also provided Internet access for the local community.

The BICC benefitted numerous members of the Baku community.   Many students are from low income

families, refugees from the war with Armenia, and orphans.   Many of these students were able to obtain

jobs and benefit the community as a result of their training at BICC.   In addition, government officials

and members of other relief organizations also attended classes at the center.

PEC-WAMY042164

KADI0031209

**Sumgait Orphanage**

Starting in 1995, BIF-USA ran an orphanage in the industrial town of Sumgait, approximately 30 kilometers southwest of Baku. The residents of the orphanage include over 500 children. BIF-USA supplies daily meals for the children, provides clothing and education, and supports the staff of 100 employees and teacher. BIF-USA also distributed blankets, bed sheets, shoes, jackets, and toys for the orphans for years. *See id*, Tab 17. (Declaration of Mohammed Abdalla Mohammed Ali)

**IV.    Mr. Arnaout's Offense.**

Mr. Arnaout sincerely regrets his unfortunate decision to conceal from donors the fact that he provided items such as boots, blankets, and uniforms to the Bosnian army and to Chechen fighters and the Chechen justice ministry. He was motivated not by a desire to propagate fighting or violence but to alleviate suffering, aid those fighting for causes in which he and BIF-USA deeply believed, and to foster relations with the entities which granted BIF-USA access to war-torn areas and protected BIF-USA's representatives working in those areas. As Dr. Brown indicated, "[m]uch of the difficulty in our work was in gaining physical access to the areas" in which BIF was seeking to provide relief. *Id.*, Tab 3. Similarly, Commander Tiric, in the affidavit attached as Ex. F to Defendant's Position Paper, makes clear that humanitarian organizations had to maintain relationships with the army in order to gain access to the field.

Mr. Arnaout was tireless in accomplishing BIF-USA's mission. In the words of one co-worker, Nafees Shams:

> Enaam had endured many hardships and sometimes life-threatening circumstances to help the poor and victimized. His endless traveling and tireless dedication spanning over a decade for his organization–which was his life–was a constant inspiration to the entire staff of BIF in Chicago as well as the overseas offices.

PEC-WAMY042165

KADI0031210

**18 01 1298**

*Id.*, Tab 4. Solange Waithe, the executive director of BIF-USA's Canada office, wrote:

> [Mr. Arnaout's] purpose in life was to serve humanity. Over the last decade he has touched countless lives in forgotten nations and assisted the survival of their widows, orphans, disabled, and youth giving them a chance in life.

She proceeds to note that Mr. Arnaout acted as a goodwill ambassador for the United States to the nations in which he worked by "showing them the kindness and benevolence of Americans." *Id.*, Tab 4

## V.      Conclusion

For the foregoing reasons, Mr. Arnaout respectfully requests that the Court impose a sentence based on the conduct to which he has acknowledged guilt and which considers the motivation for his conduct, the context in which that conduct occurred, and the fact that the extraordinary amount of humanitarian relief provided by BIF-USA dwarfed the small but material amount of aid provided pursuant to Mr. Arnaout's fraud.

Date:   June 9, 2003                            Respectfully Submitted,

                                                ENAAM M. ARNAOUT


                                                By: _____
                                                    One of His Attorneys

Joseph J. Duffy
William P. Ziegelmueller
Todd J. Haugh
Stetler & Duffy, Ltd.
140 S. Dearborn Street, Suite 400
Chicago, IL 60603
312-338-0200 -phone
312-338-0070-fax

PEC-WAMY042166

KADI0031211