EXHIBIT V

KeyCite Yellow Flag - Negative Treatment
Distinguished by Haouari v. U.S., S.D.N.Y., May 2, 2006

282 F.Supp.2d 838
United States District Court,
N.D. Illinois,
Eastern Division.

UNITED STATES of America, Plaintiff,
v.
Enaam M. ARNAOUT, Defendant.

No. 02 CR 892.
|
July 17, 2003.

**Synopsis**
Following defendant's plea of guilty to racketeering fraud conspiracy, on basis of undisclosed use of funds raised for humanitarian purposes to provide aid to militia organizations, defendant objected to presentence investigation report (PSI). The District Court, Conlon, J., held that: (1) value of single-use chemical hand warmers would not be added to loss calculations; (2) one half of government's suggested value for military equipment donated to the Bosnian army would be added to loss calculations; and (3) terrorism enhancement would not be applied at sentencing.

Objection sustained.

See also 236 F.Supp.2d 916.

West Headnotes (7)

[1]  **Sentencing and Punishment** — Value of loss or benefit

Single-use chemical hand warmers, sent by defendant's charitable organization to a Chechen known to have provided equipment to fighters, were not shown to be intended for military use and therefore their value would not be added to loss calculations, at sentencing for racketeering fraud conspiracy based on undisclosed provision of aid to militia organizations, even though other funds were diverted to purchase military equipment; reliable evidence suggested that the recipient of the hand-warmers coordinated humanitarian efforts for refugees. 18 U.S.C.A. § 1962(d).

[2]  **Sentencing and Punishment** — Value of loss or benefit

Humanitarian organization's donation of military equipment to the Bosnian army occurred during defendant's leadership of organization and perpetrated a fraud on donors, such that value of the equipment would be added to loss calculations, at sentencing for racketeering fraud conspiracy based on undisclosed provision of aid to militia organizations, even if organization's funds were not used to purchase the equipment; defendant consistently represented to donors and government authorities that organization supported only humanitarian causes. 18 U.S.C.A. § 1962(d).

[3]  **Sentencing and Punishment** — Value of loss or benefit

One half of government's suggested value for military equipment donated by humanitarian organization to the Bosnian army would be added to loss calculations, at sentencing for racketeering fraud conspiracy based on undisclosed provision of aid to militia organizations, where there was a dearth of evidence about the purchase, source, age, value or condition of the items. 18 U.S.C.A. § 1962(d).

[4]  **Sentencing and Punishment** — Terrorism

Terrorism enhancement would not be applied at sentencing, for racketeering fraud conspiracy based on undisclosed provision of aid to militia organizations, of defendant who was head of an alleged humanitarian organization; defendant was not convicted of a terrorism offense and there was no evidence that he attempted, participated in, or conspired to commit any

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  1

EXHIBIT
922
J. Winer
7/13/2021
Debra A. Dibble, RDR, CRR, CRC

act of terrorism. 18 U.S.C.A. § 1962(d); U.S.S.G. § 3A1.4, 18 U.S.C.A.

[5] **Sentencing and Punishment** Terrorism

Terrorism enhancement, on basis of obstruction of justice, would not be applied at sentencing, for racketeering fraud conspiracy based on undisclosed provision of aid to military organizations, of defendant who was head of an alleged humanitarian organization, even though defendant made two perjurious statements; false statements obstructed investigation of aid to military forces in Bosnia and Chechnya but did not obstruct any investigation for providing support to terrorists or terrorist organizations or any other federal crime of terrorism. 18 U.S.C.A. § 1962(d); U.S.S.G. § 3A1.4, 18 U.S.C.A.

6 Cases that cite this headnote

[6] **Constitutional Law** Sentencing guidelines
**Sentencing and Punishment** Nature of amendment or revision

Even if terrorism enhancement, on basis of obstruction of justice, was warranted at sentencing, for racketeering fraud conspiracy, of defendant who made false statements denying that humanitarian organization provided undisclosed aid to military organizations, application would violate Ex Post Facto Clause; relevant Sentencing Guidelines' Application Note severely increased level of punishment for obstruction offenses that aided or promoted federal crimes of terrorism, and was not adopted until after defendant's perjurious declarations. U.S.C.A. Const. Art. 1, § 9, cl. 3; 18 U.S.C.A. § 1962(d); U.S.S.G. § 3A1.4, 18 U.S.C.A.

1 Cases that cite this headnote

[7] **Sentencing and Punishment** Nature of amendment or revision

Ordinarily, the Sentencing Guidelines in effect at the time of sentencing should be applied, but when a guideline or application note is amended after the date of the underlying offense, the amendment is not applied retroactively if substantive changes would result in increased punishment.

**Attorneys and Law Firms**

*840 Patrick J. Fitzgerald, John C. Kocoras, Deborah L. Steiner, U.S. Attorney's Office, Chicago, IL, for Plaintiff.

Joseph J. Duffy, William P. Ziegelmueller Stetler & Duffy, Ltd., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.

On the morning trial was to begin, Enaam Arnaout entered a guilty plea to a charge of racketeering fraud conspiracy committed in his operation of a charity, Benevolence International Foundation ("BIF"). The agreed facts submitted in a written plea agreement and the government's evidentiary proffer during the plea hearing specified the fraud consisted of Arnaout's undisclosed use of a portion of BIF's funds, raised for humanitarian purposes only, to provide aid to militia in Bosnia and Chechnya. The government agreed to dismiss other charges against Arnaout relating to money laundering and providing support to terrorist groups.

During the initial sentencing hearing on June 16, 2003, all claimed factual errors in the presentence investigation report ("PSI") and all but two issues pertaining to application of the sentencing guidelines were resolved. The court invited counsel to submit additional evidence and citations of authority on two remaining guideline issues: calculation of loss and application of the terrorism enhancement. These issues are now ripe for decision.

**I. Loss calculations**

**Hand and foot warmers.** It is undisputed that Arnaout is accountable for $196,653 in losses due to improper diversion of BIF humanitarian funds to purchase Chechen military boots, uniforms and an ambulance; and Bosnian

boots, blankets and tents.[1] At the June 16th hearing, the court overruled Arnaout's objections to including Chechen shoes ($34,500), an x-ray machine ($6,755), cash ($3,225) and another ambulance for Bosnian fighters ($7,500). This brought the total loss to $248,633.

The government contends $75,377 should be added for single-use chemical hand and foot warmers intended for Chechen fighters. The government argues non-humanitarian use can be inferred by the nature of the warmers and the fact they were shipped to Essa Abzoutov, who previously received BIF boots and an x-ray machine for Chechen fighters. A former BIF associate opined that Abzoutov was deeply committed to Chechnya's ***841** struggle for independence against Russia. The court does not find this opinion has any probative value. No doubt, anyone familiar with Russo–Chechen history could reasonably conclude that Abzoutov's views are shared by a vast majority of Chechens.

At the hearing, Arnaout argued the warmers were intended for Chechen refugees subjected to harsh winter conditions and that humanitarian aid was routinely shipped through Abzoutov because he was the Turkey-based representative of the Chechen provisional government. Arnaout's contention about Abzoutov is consistent with the former BIF associate cited by the government; the government's witness also described Abzoutov as responsible for coordinating refugee relief. GX 3, ¶ 1.

The government now offers two Russian news reports indicating Abzoutov was removed from his provisional government post in October 2000, two months before the warmers were shipped to him. GX A, B. Arnaout counters with a Russian news report dated December 19, 1999, which refers to Abzoutov as the Chechen representative to Turkey. DXB. The court finds news reports about Abzoutov's official status in December 1999 and October 2000 lack significant probative value in determining whether BIF intended the warmers for humanitarian or military use when they were shipped to Turkey in December 2000.

Far more significant and reliable is the affidavit of Marie Bennigsen Broxup, a British-based historian and editor specializing in the North Caucuses. DX A. Broxup traveled frequently to Chechnya from 1992 to 1999 on behalf of various governmental and non-governmental organizations. Her last visit to Chechnya was in July 1999, on behalf of the United States Marine Corps, to interview Chechen commanders about military tactics. Broxup attests that Isa Abzotov [*sic* ] was

> .... the appropriate channel through which charitable organisations as well as individuals, could send donations to relieve the humanitarian catastrophe brought about by the [Russo–Chechen] war. Because of the danger of operating in Chechnya, many [non-governmental organizations] unable to distribute aid directly, worked in collaboration with the Chechen representatives.

> In his official capacity, Isa Abzotov [*sic* ] collected funds and medical equipment that served to establish a rehabilitation centre for handicapped children....

> **Isa Abzotov [*sic* ] presently lives in Istanbul. Although he is no longer the official representative of his government, he continues to be active in the humanitarian field, trying to alleviate the suffering of the numerous Chechen refugees who arrive in Turkey.**

DX A [Emphasis added]. Given the Broxup affidavit, the court finds it is unreasonable to infer BIF intended the warmers for military use simply because they were shipped through Abzoutov. Whether or not he was an official of the Chechen government at the time of shipment, reliable evidence suggests Abzoutov coordinated—and still coordinates—humanitarian efforts for Chechen refugees.

Nor does the court find that the eight-hour usefulness of the warmers constitutes a sufficient basis *alone* to infer they were intended for military use The affidavit of Farrukh Younus, the BIF employee who actually located the California supplier and ordered the warmers, explains the circumstances and reasons BIF decided to buy these warmers for Chechen refugees in Ingushetia in late 2000. DX C. According to Younus, Chechen refugees were suffering from frostbite not alleviated by gloves and shoes; the chemical warmers were a comparatively inexpensive short-term solution ***842** to sub-zero refugee suffering. There can be no serious dispute that BIF provided significant humanitarian aid to Chechen refugees, widows and orphans during 1999–2001. *See, e.g.,* DX C (attached photographs); character reference letters and photographs submitted through the Probation Office on June 10, 2003.

**[1]** Based on the record, the court cannot conclude by a preponderance of the evidence that the warmers were intended for military use. Therefore, these items shall not

be added to the loss calculations. Arnaout's objection to the presence report on this issue is sustained.

**Storage items provided to the Bosnian army.** The presence report and the government include $133,982 for military uniforms, boots, nylon and walkie-talkies that a Saudi-based charity, *Lajnat Al Birr Al Islamia* ("LBI"), left in a Bosnian storage facility. Arnaout formally gained control over the storage facility in December 1993, when LBI founder Adel Batterjee—who was also chairman of the Saudi-based Benovolence International Foundation—authorized Arnaout to take control of BIF offices in the United States and Croatia. DX E. U.S.-based BIF was incorporated in Illinois in March 1992. GX F. There is no evidence that the stored items were purchased by BIF or Arnaout. Indeed, there is no direct evidence at all concerning the source, value, age or condition of these items. The absence of documents about the stored items in either BIF's Bosnian or Chicago offices suggests these materials were purchased by LBI/Batterjee.[2] It is beyond dispute that the stored items were turned over to the Bosnian army sometime between the end of 1992 and June 1994. GX 6.

The government predicates Arnaout's responsibility for these donations to the Bosnian army on his involvement in Bosnia in 1992, and his association with Batterjee and LBI before he became Executive Director of the American-based BIF. The government points out that BIF's own records reflect that the organization—and Arnaout—were engaged in humanitarian work in Bosnia as early as May 1992. GX C, D, E. Arnaout acknowledges that he managed BIF's Chicago and Bosnian offices before Batterjee actually appointed him to be BIF's Executive Director. Def. Supp. Br. at 10. However, he argues that because there is no evidence BIF funds were used to purchase the stored items abandoned by LBI, their donation to the Bosnian army could not have perpetrated a fraud on BIF donors.

 [2]    Arnaout ignores the fact that he consistently represented to donors and government authorities that BIF supported only humanitarian causes. Whether BIF directly purchased or merely inherited the stored items, a preponderance of the evidence establishes that the undisclosed donation of this BIF property to the Bosnian army was during Arnaout's "watch" and perpetrated a fraud on BIF donors.

 [3]    Arnaout asserts that the government's $133,982 estimate overstates the actual value of these items and is speculative. There is a dearth of evidence about the purchase, source, age, value or condition of these items. Although Arnaout claims these items were only of nominal value, their donation resulted in a letter of gratitude from the Bosnian army. GX 6. However, it is problematic to place a reasonable value on these items in war-torn Bosnia in 1992–1994. Accordingly, the court adopts Arnaout's alternative suggestion that the stored items be valued at ***843** $66,991, one-half of the government's estimate. Def. Supp. Br. at 14.

**Conclusion.** For the foregoing reasons, Arnaout's objections to the loss calculations for Chechen hand and foot warmers and storage items donated to the Bosnian army are sustained in part. The loss attributed to the fraud totals $315,624 [$248,633 + $66,991] and results in the addition of 12 levels to the sentencing guideline calculations.[3]

## II. Terrorism enhancement

**Application of § 3A1.4.** Arnaout does not stand convicted of a terrorism offense. Nor does the record reflect that he attempted, participated in, or conspired to commit any act of terrorism. In its written plea agreement, the government agreed to dismiss sensational and highly publicized charges of providing material support to terrorists and terrorist organizations. Nevertheless, the presentence report applies the terrorism enhancement, § 3A1.4 of the sentencing guidelines. The terrorism guideline provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase [the offense level] by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category ... shall be Category VI.

U.S.S.G. § 3A1.4 [Emphasis in original]. Application of the terrorism guideline would not only require imposition of the statutory maximum sentence (20 years), but it would also place Arnaout in the highest criminal history category even though he has no prior arrests or convictions. Based on his actual criminal history, Arnaout falls in Category I.[4]

The terrorism enhancement in its present form is a relatively new guideline, promulgated by the United Sentencing Commission as an emergency amendment in November 1996. Sentencing Guidelines, Appendix C, Amendment 539.

The amendment responded to a congressional directive that the existing international terrorism guideline be defined more broadly to include **only** federal crimes of terrorism. Antiterrorism and Effective Death Penalty Act of 1996 § 730, Pub.L. 104–132, 110 Stat. 1303.

As reflected in Application Note 1 of § 3A1.4, federal crimes of terrorism are defined and identified by statute. Specifically, 18 U.S.C. § 2332(b)(g)(5) defines a federal crime of terrorism as an offense "calculated to influence or affect conduct of government by intimidation or coercion, or to retaliate against government conduct." In addition, the offense must be a violation of one of a list of specified offenses: destruction of aircraft or aircraft facilities; violence at international airports; arson within special maritime and territorial jurisdiction; biological weapons; chemical weapons; congressional, cabinet, and Supreme Court assassination and kidnaping; nuclear materials; plastic explosives; arson and bombing of Government property risking or causing death; arson and bombing of property used in interstate commerce; killing or attempted killing during an attack on a Federal facility with a dangerous weapon; conspiracy to murder, kidnap, or maim persons abroad; protection of computers; killing or attempted **\*844** killing of officers and employees of the United States; murder or manslaughter of foreign officials, official guests or internationally protected persons; hostage taking; destruction of communication lines, stations, or systems; injury to buildings or property within the special maritime and territorial jurisdiction of the United States; destruction of an energy facility; Presidential and Presidential staff assassination and kidnaping; wrecking trains; terrorist attacks and other acts of violence against mass transportation systems; destruction of national defense materials, premises, or utilities; violence against maritime navigation and fixed platforms; homicides and other violence against United States nationals occurring outside the United States; use of weapons of mass destruction; acts of terrorism transcending national boundaries; bombing of public places and facilities; harboring terrorists; providing material support to terrorists or terrorist organizations; financing of terrorism; torture; sabotage of nuclear facilities or fuel; aircraft piracy; assault on a flight crew with a dangerous weapon; explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft; homicide or attempted homicide on aircraft; and destruction of interstate gas or hazardous liquid pipeline facility.

In sum, Congress has specifically and exhaustively identified criminal offenses that constitute federal crimes of terrorism. Those specifications control application of § 3A1.4. Further, Congress clearly intended the revised terrorism guideline to be "applicable only to those specifically listed federal crimes of terrorism, **upon conviction of those crimes** with the necessary motivational element to be established at the sentencing phase of the prosecution." Conference Report on S.735, 142 Cong. Rec. H. 3305–01, § 730, Directions to Sentencing Commission [Emphasis added].

Arnaout stands convicted of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d). Arnaout's offense is not included in the exhaustive list of federal offenses defined by Congress as terrorism crimes. The enabling legislation and § 3A1.4 plainly preclude application of the terrorism enhancement to the racketeering fraud conspiracy offense of conviction. Nonetheless, the government argues that the crime of conviction need not be enumerated in 18 U.S.C. § 2332b(g)(5) because the Sentencing Commission's use of the phrase "a felony that involved, or was intended to promote, a federal crime of terrorism" in § 3A1.4 should be read to expand application beyond the congressional directive that the enhancement shall apply only to federal crimes of terrorism. The government relies on a decision of another Circuit to support its interpretation. *United States v. Graham,* 275 F.3d 490, 517 (6th Cir.2001). In *Graham,* the terrorism enhancement was applied to a conviction for conspiracy to possess machine guns, threaten to assault and murder federal officers and employees, to forcibly assault, resist, oppose, impede, intimidate and interfere with federal officers when they were engaged in their official duties, and to maliciously damage and destroy and attempt to damage and destroy by means of an explosive a building, or other real or personal property used in interstate commerce. *Id.* at 515. Even though conspiracy offenses under 18 U.S.C. § 371 are not included in the statutory list of federal crimes of terrorism, some of Graham's predicate offenses and offense behavior are virtually identical to listed crimes of terrorism. *Id. at* 515–16. A majority of a divided appellate panel agreed with the district court's conclusion that the nature of Graham's conspiracy conviction was sufficiently analogous to the terrorist acts listed in § 2332b(g)(5). In the specific context of the *Graham* case, the majority **\*845** concluded that the objects of the offense of conviction—conspiracy—constituted federal crimes of

terrorism, and the terrorism enhancement could be applied on that basis. *Id.* at 518–19. A vigorous dissent found application of the terrorism enhancement unsupportable on the record and under the clear terms of § 2332b(g)(5) and its legislative history. *Id.* at 528–37.

**[4]** The divided *Graham* opinion is neither binding authority on this court nor factually analogous to this case. Even if this court followed the majority's questionable redrafting of § 2332b(g)(5), the racketeering fraud conspiracy offense of conviction is not predicated on any terrorist conduct enumerated in that statute. The government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon and walkie-talkies to be used to promote a federal crime of terrorism.

Moreover, it should be noted that the phrase "involved or was intended to promote" in § 3A1.4 was carried over *verbatim* from the original international terrorism guideline. The phrase is repeated in the revised guideline without any explanation or comment in the application notes—or even acknowledgment that the enhancement was to apply only to federal crimes of terrorism. Indeed, all the Sentencing Commission did to comply with the congressional mandate was to change the phrase "international terrorism" to "federal crime of terrorism." Even if it is inferred that the Sentencing Commission intended to expand application of the terrorism enhancement to conduct beyond the offense of conviction, the Sentencing Commission lacks authority to preempt the specific directives of Congress. *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997). Finally, in 2002, the Sentencing Commission obviated any ambiguity about § 3A1.4's use of the phrase in issue by striking Application Note 1 containing the "involved, or was intended to promote" language and inserted in its place the following:

> '*Federal Crime of Terrorism*' *Defined.*—For purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

Accordingly, the court concludes that § 3A1.4 does not apply to a racketeering offense because it is not a federal crime of terrorism as defined by § 2332b(g)(5).

**Obstruction of Justice**

Alternatively, the government invokes Application Note 2 as a basis for applying § 3A1.4 because Arnaout's relevant conduct includes obstruction of justice. At the June 16th sentencing hearing, the court determined that a two-level enhancement under § 3C1.1 for attempted obstruction of justice applied, based on two declarations under penalty of perjury Arnaout signed and filed in *Benevolence International Foundation, Inc., v. John Ashcroft, et al.,* 02 C 0763 (Judge Alesia). GX 15, Declaration of Enaam Arnaout executed March 22, 2002; GX 16, Corrected Declaration of Enaam Arnaout executed April 1, 2002. The two declarations are identical in all material respects. Arnaout's declarations were submitted in support of BIF's motion for a preliminary injunction seeking release of BIF assets frozen by the government several months earlier under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–06. This legislation empowers the Department of the Treasury to take such action against persons or groups who plan, authorize, aid or engage in hostilities or attacks *against the United States.*

**\*846** **[5]** In his declarations, Arnaout attested that BIF uses its funds only to assist the poor and needy; donations to BIF are used solely for charitable, humanitarian purposes; and BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. GX 15, 16 at ¶¶ 5, 6, 7. The court found these attestations were false, based on Arnaout's admissions during his guilty plea and substantial documentary evidence that establish BIF used a portion of its funds to aid military operations in Chechnya and Bosnia. The court found these false statements were willfully made and material to this case because at the time Arnaout knew that BIF's Bosnian operations were under investigation. GX 20, 21. The use of BIF humanitarian funds to aid military forces in Bosnia and Chechnya are at the heart of the racketeering conspiracy. The court did *not* find that Arnaout obstructed an investigation of BIF for providing material support to terrorists or terrorist organizations or any other federal crime of terrorism, or that he intended to promote a federal crime of terrorism.

Application Note 2 was adopted by the Sentencing Commission on November 1, 2002, and provides in relevant part:

*Harboring, Concealing, and Obstruction Offenses.*—For purposes of this guideline, an offense that involved ... (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism.

**[6]** It must first be observed that Application Note 2 explicitly refers to **offenses**, not relevant conduct. Arnaout does not stand convicted of an obstruction of justice **offense**, much less for aiding or promoting a federal crime of terrorism. His sentencing guideline calculations include a two-level punishment enhancement for relevant conduct that consists of submitting two declarations containing false statements material to the investigation of the offense of conviction in this case. *See* § 3C1.1(A) [obstruction of justice enhancement applies if defendant willfully attempted to obstruct or impede the administration of justice during the investigation of the **instant offense of conviction**]. The offense of conviction is clearly not a federal crime of terrorism.

Moreover, Application Note 2 was not adopted until November 1, 2002. Arnaout's declarations were executed on March 22, 2002 and April 1, 2002, seven months earlier. GX 15, 16. Application Note 2 severely increases the level of punishment for obstruction offenses that aid or promote federal crimes of terrorism. Obstruction offenses were not previously mentioned in § 3A1.4, and are not included in the statutory list of federal crimes of terrorism. Thus, even if § 3A1.4 applied to relevant obstructive conduct that was neither the offense of conviction nor a federal crime of terrorism, *ex post facto* concerns would be implicated.

**[7]** In adopting the Sentencing Reform Act, Congress apparently did not believe the *ex post facto* clause of the Constitution would apply to amended sentencing guidelines. S.Rep. No. 225, 98th Cong., 1st Sess. 77–78 (1983). However, the reality is different.

> While the [Sentencing] Commission concurs in the policy expressed by Congress, courts to date generally have held that the *ex post facto* clause does apply to sentencing guideline amendments that subject the defendant to increased punishment.

U.S.S.G. § 1B1.11, *Commentary, Background.* [November 1, 2002]. Ordinarily, the sentencing guidelines in effect at the time of sentencing should be applied. U.S.S.G. § 1B1.11; **\*847** *United States v. Hartz,* 296 F.3d 595, 598 (7th Cir.2002); *United States v. Fones,* 51 F.3d 663, 669 (7th Cir.1995). However, when a guideline or application note is amended after the date of the underlying offense, the amendment is not applied retroactively if substantive changes would result in increased punishment. *See, e.g., United States v. Bailey,* 227 F.3d 792, 801 n. 1 (7th Cir.2000) ["Generally to avoid Ex Post Facto Clause violations, we apply the sentencing guidelines in effect at the time of the commission of the offense ... However, we consider an amendment made to the commentary to a guideline if the amendment is to clarify, rather than to substantively change the Guidelines"]; *United States v. Nichols,* 169 F.3d 1255, 1270 n. 3 (10th Cir.1999) [district court correctly refused to apply § 3A1.4 in Oklahoma bombing case because guideline amended after time of offense to include domestic terrorism; retroactive application implicates *ex post facto* clause]. *See also United States v. Wells,* 163 F.3d 889, 899 (4th Cir.1998) [same].

**Conclusion**. For the foregoing reasons, the court will not apply the terrorism enhancement. Arnaout's objection to the 12 level increase in his guideline calculations and the five category increase in his criminal history are sustained. The government's other theories for application of § 3A1.4 are moot.

### III. Guideline Calculations

| | |
|---|---|
| **Base offense level** | 6 |
| **Loss** | 12 |
| **50+ victims** | 4 |
| **Acting for charity** | 2 |

| | |
|---|---|
| **Fraud outside U.S.** | 2 |
| **Role in offense** | 4 |
| **Obstruction of justice** | 2 |
| **Adjusted Offense Level (Subtotal)** | 32 |
| **Acceptance of responsibility** | -2 |
| **Total Offense Level** | 30 |
| **Criminal History Category** | I |
| **Sentencing Guideline Range** | 97 to 121 months |

**IV. Remaining Issues**

The government's alternative motion for an upward departure, and Arnaout's motions for downward departure and to strike portions of the presentence report, will be considered in the context of counsels' respective arguments in aggravation and mitigation at the sentencing hearing on August 18, 2003.

**All Citations**

282 F.Supp.2d 838

## Footnotes

1. Arnaout candidly admitted responsibility for the Bosnian blankets and tents. These items, valued at $27,000, were not included in the presentence report's loss calculations.
2. This inference is reasonable because the proof of BIF's undisputed aid to military beneficiaries is otherwise documented by BIF's own records.
3. The court notes that adopting the government's full $133,982 estimate would not change this result.
4. A prisoner's criminal history category has a direct effect on the designation of the facility by the Bureau of Prisons and the conditions of his incarceration.