# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |

This document relates to: *All Actions*

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE AND/OR LIMIT PROPOSED TESTIMONY OF DEFENDANTS' PROPOSED EXPERTS, JONATHAN BENTHALL, CHARLES W. FREEMAN, JONATHAN MARKS, AND JOHN SIDEL

---

Jodi Westbrook Flowers
Robert T. Haefele
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
For the Plaintiffs' Exec. Committees

James Kreindler
Andrew J. Maloney, III
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Fl
New York, NY 10017
Tel: (212) 973-3438
Email: amaloney@kreindler.com

November 15, 2021

Sean P. Carter
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
For the Plaintiffs' Exec. Committees

**Table of Contents**

I.   LEGAL STANDARD GOVERNING EXPERT TESTIMONY ............................................. 1

II.  CLAIMED AREAS OF EXPERTISE OF PROFFERRED EXPERTS ................................. 5

  A.  Jonathan Benthall (proffered by MWL/IIRO and Kadi). ...................................... 5

  B.  Amb. Charles W. Freeman (proffered by WAMY). ............................................ 6

  C.  Jonathan Marks (proffered by WAMY). ............................................................ 7

  D.  John Sidel (proffered by MWL/IIRO and related charity officials)........................ 8

III. BENTHALL, FREEMAN, MARKS AND SIDEL ARE NOT QUALIFIED......................... 9

  A.  Benthall's testimony in areas in which he is unqualified should be excluded. ...................... 10

  B.  Freeman is wholly unqualified to testify as an expert. ........................................ 12

  C.  Marks is not qualified to offer opinions regarding terror financing..................... 15

  D.  Sidel is not qualified to testify on Saudi charities, MWL/IIRO, or terrorist financing......... 16

  E.  Sidel is not qualified to opine on the operational needs and methods of terror organizations, the Bojinka Plot, or al-Qaeda's presence in the Philippines and Indonesia........................... 17

IV. EXPERTS BENTHALL, FREEMAN, MARKS, AND SIDEL OFFER IRRELEVANT AND/OR UNFAIRLY PREJUDICIAL OPINIONS............................................................... 21

  A.  Benthall offers irrelevant and unfairly prejudicial opinions ................................... 21

    1.  Benthall's Narrative Testimony About the History, Development, and Role of IslamicCharity is Irrelevant and Prejudicial. ................................................. 23

    2.  Benthall's Generalized Testimony About the Practical Considerations of Islamic Charities and the Role of Political and Cultural Issues in the Operation of Islamic Charities Is Irrelevant and Unfairly Prejudicial................................................. 24

    3.  Benthall's Testimony Regarding a Post-9/11 Backlash Against Islamic Charities Generally and Generalized Testimony About Other Charities Is Irrelevant and Unfairly Prejudicial............................................................................. 26

  B.  Freeman's testimony is conclusory, irrelevant, and prejudicial ........................... 28

  C.  Marks' irrelevant and unfairly prejudicial opinions should be excluded.............. 29

    1.  Marks may not offer speculative or unfairly prejudicial opinions ................... 31

    2.  Marks is unqualified to offer an opinion about refugee & orphan support programs, and those opinions are irrelevant, unfairly prejudicial....................... 36

  D.  Sidel offers irrelevant opinions that should be excluded. ................................... 36

    1.  The probative value of Sidel's report is far outweighed by the danger of unfair prejudice and confusion of the issues. ........................................... 39

V.   EXPERTS BENTHALL, FREEMAN, AND MARKS OFFER OPINIONS PREMISED ON UNRELIABLE METHODOLOGY ................................................................................ 40

A.   Benthall's opinions do not comply with acceptable methodology. ..................................... 40

B.   Freeman's methodology is unsound .................................................................................. 40

C.   Marks has not demonstrated that his opinions are based on sufficient facts or a reliable accounting methodology. ................................................................................................. 43

VI.  EXPERTS BENTHALL, MARKS AND SIDEL PROFFER IMPROPER STATE OF MIND TESTIMONY ............................................................................................................... 45

A.   Benthall offers improper state of mind evidence and an unqualified legal opinion regarding when an organization may be bound ....................................................................... 45

B.   Marks proffers improper state of mind testimony ........................................................... 48

C.   Sidel offers improper state of mind testimony ................................................................ 49

<u>**Table of Authorities**</u>

# Cases

*American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226 (S.D.N.Y., Sept. 30, 2003) .............................. 3

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002).................................................2, 4

*Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989)........................................................ 25

*Bourjaily v. United States*, 483 U.S. 171 (1987) ...................................................................................... 1

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997)................................ 47

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ..................................................passim

*Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420 (E.D. N.Y. 2011) .............................................. 4

*E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451 (S.D.N.Y. 2004)................................................ 3

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235 (S.D.N.Y. 1999) ............................ 3

*General Electric Co.* v. *Joiner*, 522 U.S. 136 (1997) ..............................................................................3, 5, 41

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010).............................................................................. 25

*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021)..................................................................... 47

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992).......................................................................................... 47

*In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019) .................................. 28

*In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001)................................................ 47

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004).....................................................3, 25, 47

*In re Silicone Gel Breast Impl. Prods. Liab. Litig.*, 318 F. Supp. 2d 879 (C.D. Cal. 2004).................................... 4

*Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012)................................................................................... 12

*Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021)........................................................... 47

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)....................................................................1, 2, 4, 5

*Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011) (*Linde I*)......................................4, 25, 43, 47

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) (*Linde II*)..........................................passim

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .......................................... 28

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied,* 434 U.S. 861 (1977)) ........................... 47

*Nimely v. New York City*, 414 F.3d 381 (2d Cir. 2005) ............................................................................. 2

*Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422 (W.D.N.Y. 2001) ........................................................ 28

*Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999)..................................................................... 3

*Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682 (8th Cir. 1981)........................................................ 47

*Sweet v. Electronic Data Systems, Inc.*, 1996 WL 204471 (S.D.N.Y. Apr. 26, 1996) .................................... 28

*Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) ........................................................... 28

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985)...................................................................... 47

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991).......................................................................... 25

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995)...........................................................................3, 29

*United States v. Locascio*, 6 F.3d 924, 936-37 (2d Cir. 1993)................................................................... 25

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)............................................................................... 25

*United States v. Mendlowitz*, 2019 U.S. Dist. LEXIS 220130 (S.D.N.Y. Dec. 20, 2019) .............................. 25

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)..........................................................................3, 25, 47

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)................................................................................ 47

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008)............................................................................. 2

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ........................................................................... 1

*Zaremba v. Gen. Motors Corp.*, 360 F.3d 355 (2d Cir. 2004) .................................................................. 1

## Rules

Fed. R. Evid. 104(a) .................................................................................................. 14

Fed. R. Evid. 401 .............................................................................................passim

Fed. R. Evid. 402 .................................................................................................1, 2

Fed. R. Evid. 403 .............................................................................................passim

Fed. R. Evid. 702 .............................................................................................passim

## Key to Exhibit Citations

Exhibits cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele, filed with the Memorandum

| | |
|---|---|
| Ex. 1, Benthall Report (MWL/IIRO) | Expert Report of Jonathan Benthall on behalf of Muslim World League, the International Islamic Relief Organization and Drs. Naseef, Al-Obaid, Al-Turki and Basha, dated August 3, 2020. |
| Ex. 2, Benthall Report (Kadi) | Expert Report of Jonathan Benthall on behalf of Yassin Abdullah Kadi, dated February 1, 2021. |
| Ex. 3, Freeman Report | Expert Report of Charles W. Freeman, Jr. on behalf of the World Assembly of Muslim Youth, dated August 5, 2020. |
| Ex. 4, Marks Report | Expert Report of Jonathan T. Marks on behalf of World Assembly of Muslim Youth, dated August 7, 2020. |
| Ex. 5, Sidel Report | Expert Report of John T. Sidel on behalf of Muslim World League, the International Islamic Relief Organization and Drs. Naseef, Al-Obaid, Al-Turki and Basha, dated July 29, 2020. |
| Ex. 6, Expert Report of Jonathan Winer | Expert Report of Jonathan M. Winer on behalf the plaintiffs, dated March, 10, 2020. |
| Ex. 7, Benthall Dep. | Excerpted Pages from the Deposition of Jonathan Benthall, taken on July 20, 2021. |
| Ex. 8, Freeman Dep. | Excerpted Pages from the Deposition of Charles W. Freeman, Jr., taken on April 6, 2021. |
| Ex. 9, Freeman Dep. Exhibit 559 | Freeman Deposition Exhibit 559, including the Comment Posted to "Sic Semper Tyrannis" blog by "Tidewater" on May 18, 2020 at 02:01 AM, on pages 5-6. |
| Ex. 10, Marks Dep. | Excerpted Pages from the Deposition of Jonathan T. Marks, taken on July 22, 2021. |
| Ex. 11, Sidel Dep. | Excerpted Pages from the Deposition of John T. Sidel, taken on April 27, 2021. |
| Ex. 12, WAMYSA 2296 | A document bearing Bates stamp markings WAMYSA 2296, produced by the World Assembly of Muslim Youth. |
| Ex. 13, WAMYSA 082520-21 | A document bearing Bates stamp markings WAMYSA 082520-21, produced by the World Assembly of Muslim Youth. |

| Ex. 14, WAMYSA 044850-51 | A document bearing Bates stamp markings WAMYSA 044850-51, produced by the World Assembly of Muslim Youth. |
|---|---|
| Ex. 15, Basha Dep. Exhibit 159 | Adnan Basha Deposition Exhibit 159, "Treasury Designates Director, Branches of Charity Bankrolling Al-Qaida" (FED-PEC0202110 to -112) |
| Ex. 16, Wohaibi Dep. | Excerpted Pages from the Deposition of Saleh al Wohaibi, Ph.D., individually and as a 30(b)(6) designee for WAMY, taken on October 23, 2019. |

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in support of their Motion to Exclude and/or Limit testimony of the following four putative expert witnesses offered by Defendants:[1] Jonathan Benthall, Charles W. Freeman, Jonathan Marks, and John Sidel. As set out in more detail below, these putative experts' reports violate Fed. R. Evid. 402 and 702. Pursuant to these standards, they offer a variety of irrelevant, prejudicial, and/or otherwise improper opinions that are not directed to any asserted claims. Furthermore, the experts lack qualifications to opine on multiple subject matters addressed in their opinion, and their opinions are based on unreliable methodology that is not acceptable in the relevant expert community. Because they have not based their opinions on sufficient facts or data that are the product of reliable principles applied to the facts of this case, their testimony should be excluded.

## I.   LEGAL STANDARD GOVERNING EXPERT TESTIMONY

The admissibility and limitation of proffered expert testimony are controlled by the standards set by Rules 702, 401, and 403 of the Federal Rules of Evidence and by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). A party introducing expert testimony has the burden to establish factors bearing on the admissibility of the expert's opinion by a preponderance of the evidence.[2]

Rule 702 provides that "a witness … may testify in the form of an opinion or otherwise" if: (a) The witness "is qualified as an expert by knowledge, skill, experience, training, or education;" (b) The witness's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (c) the testimony is based upon sufficient facts

---

[1] The experts referenced here are offered by defendants the World Assembly of Muslim Youth's ("WAMY"), the Muslim World League ("MWL"), the International Islamic Relief Organization ("IIRO"), the charity-related officials (Drs. Naseef, Turki, Obaid, and Basha, hereinafter included in the references to MWL/IIRO), and Yassin Kadi.

[2] Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments; *see Bourjaily v. United States*, 483 U.S. 171 (1987); *United States v. Williams*, 506 F.3d 151, 160-61 (2d Cir. 2007); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357-58 (2d Cir. 2004).

or data; (d) the testimony is the product of reliable principles and methods, and (e) the witness has applied the principles and methods reliably to the facts of the case.[3]

Rule 702 assigns to the district court the role of ensuring that the testimony of each qualified expert "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Court's gatekeeping function thus requires a two-part inquiry: whether the testimony is relevant to the task at hand and whether it has a reliable basis.[4]

**Threshold Question of Qualification.** Even before addressing the relevance and reliability issues, the Court must first address whether the expert is qualified – that is, whether the witness has specialized knowledge helpful to the jury to understand evidence or determine a fact in issue. The "relevance and reliability inquiries, as well as the question … of whether expert testimony will 'assist the trier of fact,' are separate from the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. New York City*, 414 F.3d 381, 400 n.11 (2d Cir. 2005) *citing* Fed. R. Evid. 702. Importantly, even where "a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *See Nimely*, 414 F.3d at 399 n.13.

**Relevance**. In fulfilling its gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant. *Amorgianos*, 303 F.3d at 265. Under FRE 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Under FRE 702, expert testimony must likewise "help the trier of fact to understand

---

[3] Fed. R. Evid. 702; *see also United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008).
[4] *See Daubert*, 509 U.S. at 591; *Kumho Tire*, 526 U.S. 137; Fed. R. Evid. 401, 402, and 702; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("the trial court should … [analyze] whether proffered expert testimony is relevant" and '[n]ext, … whether [it] has sufficiently reliable foundation….") (internal quotation marks omitted).

the evidence or to determine a fact in issue." Fed. R. Evid. 702. Even where an expert's methodology rests on sound principles and results in potentially reliable conclusions or opinions, if that testimony is unhelpful to a jury (and thus irrelevant), it cannot be admitted. *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful"). Proffered expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. The trial court has broad discretion in making this determination. *General Electric Co.* v. *Joiner*, 522 U.S. 136, 142 (1997).

Expert testimony must also meet the requirements of Rule 403 to be admissible under Rule 702. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial if it "involves some adverse effect…beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quote omitted). The Advisory Committee's notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee Note. Under Rule 403, trial courts are accorded "'wide latitude' in excluding evidence that possesses an undue risk of prejudice or confusion of the issues, or is found to be marginally relevant to the issues in the case." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296 (2d Cir. 1999) (internal quote omitted).

It is improper for an expert to testify about topics that bear no relevance to the actual claims at issue.[5] This includes expert testimony as to a party's intent, motive, or state of mind.[6]

---

[5] *See, e.g., American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226, at *2 (S.D.N.Y., Sept. 30, 2003) (precluding expert who attempted to connect unrelated facts, finding the expert's testimony irrelevant); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 464 (S.D.N.Y. 2004); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 241-42 (S.D.N.Y. 1999).
[6] *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (improper to "tell the jury the defendant's intentions through the mouths of witnesses other than [itself].”); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)

**Reliability**. In assessing the reliability of testimony, the district court should be guided by "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). The test for reliability is "flexible," *Kumho Tire*, 526 U.S. at 141, and a trial judge may (but need not) consider these non-exclusive factors identified in *Daubert*: (a) whether a theory or technique can be and has been tested; (b) whether it has been subjected to peer review and publication; (c) whether it has a high known or potential rate of error; and (d) whether it is generally accepted in the relevant scientific community. *Id.* at 149-50 (citing *Daubert*, 509 U.S. at 592-94).[7] A district court should consider the *Daubert* factors "where they are reasonable measures of the reliability of expert testimony," *id.* at 152; the list of factors "neither necessarily nor exclusively applies to all experts or in every case," *id.* at 141. Notably, the trial judge has "the same kind of latitude in deciding how to test an expert's reliability … as [the judge has when deciding] whether that expert's relevant testimony is reliable." *Id.* at 152.

Although the Supreme Court has instructed district courts to focus "on principles and methodology" the expert employed, and "not on the conclusions that they generate" (*see Daubert*, 509

---

(defendant's expert's opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, do not contain relevant expert evidence); *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) (*Linde I*) (same); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 328 (E.D.N.Y. 2013) (*Linde II*) (ruling on limits to Benthall's testimony, stating "an opinion as to the state of mind of an organization is inadmissible. *See Linde I*, 920 F. Supp. 2d at 285-87.").

[7] Other factors that courts have found relevant in the analysis include:

> (1) whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered.

*Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D. N.Y. 2011) (citing *In re Silicone Gel Breast Impl. Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing Fed. R. Evid. 702 Advisory Committee's Notes)).

U.S. at 595), it has also recognized that "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. Accordingly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

In *Kumho Tire*, the Supreme Court clarified that the trial judge's gatekeeping obligation applies not only to testimony based on "scientific" knowledge, as in *Daubert*, but also to testimony based on "technical" or "other specialized" knowledge. 526 U.S. at 141. Often "expert testimony will not rely on anything like a scientific method …." Fed. R. Evid. 702 Advisory Committee Note. The reliability determination in such a case should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

## II.    CLAIMED AREAS OF EXPERTISE OF PROFFERED EXPERTS

### A.    Jonathan Benthall (proffered by MWL/IIRO and Kadi).

For the opinions Benthall offers,[8] he testified that his expertise is in "Islamic charities; [including] in particular … more practical aspects relating to questions like counterterrorism and the like."[9] Benthall has a degree in English and is trained as an anthropologist.  *See, infra*, at 10 n.37. Although Benthall suggests his expertise includes aspects of money laundering and terror financing related to Islamic charities, Benthall himself admits he has no formal training, background, or experience regarding money laundering or investigating money laundering, and identified no such training, background, or experience regarding terrorist financing.[10] His purported expertise stems from his professed long-term "interest" in money laundering and terrorist financing regarding charities,[11]

---

[8] Benthalls' opinions are summarized in Ex 1, Benthall Report (MWL/IIRO) 1-4 and Ex. 2, Benthall Report (Kadi) 1-3.
[9] Ex. 7, Benthall Dep. 69:8-23.
[10] Ex. 7, Benthall Dep. 69:24 to 70:8; *see also* Ex. 7, Benthall Dep. 24:10-25 (Benthall's formal, post-secondary education includes a degree in English language and literature  from King's College in Cambridge).
[11] Ex. 7, Benthall Dep. 70:1-23.

which, by itself, would not satisfy *Daubert*. He admits he has no familiarity with the methodology the U.S. Treasury Department's Office of Foreign Assets Control uses,[12] nor any knowledge of what any government regulators do to investigate money laundering or terrorist financing.[13] He admits his only familiarity with the Financial Action Task Force ("FATF") concerned the publicity surrounding their investigations in the early 2000s and through FATF's dialogue with the Charity and Security Network.[14]

## B.    Amb. Charles W. Freeman (proffered by WAMY).

In his report, Freeman states he was asked to "provide expert testimony concerning the history, politics, and culture of Saudi Arabia, including Wahhabism; world conflicts and their relationship to 9/11; the relationship between the Kingdom of Saudi Arabia and WAMY,[15] as well as the relationship between the Kingdom, Osama bin Laden, and al Qaeda."[16] When asked in his deposition if he intended to "offer opinions in any other areas other than what [he was] asked to opine on by WAMY," Freeman responded, "not really.[17] He was not asked to opine about "connections between WAMY officials and individuals associated with any terrorist entity, including Al Qaeda,"[18]

---

[12] Ex. 7, Benthall Dep. 188:11-25.

[13] Ex. 7, Benthall Dep. 181:19-24.

[14] Ex. 7, Benthall Dep. 182:13-25 (When questioned on how far his familiarly with FATF extended, he said, "I must say I'm a little bit rusty about this because until I was asked to provide expertise on this case…I've been more concerned with other things." *See* Ex. 7, Benthall Dep. 182:25 -186:4; Benthall cites the Charity and Security Network as a group he has had contact with which hosts a website with "extremely valuable…information…to do with things like material support and laundering and counterterrorist finance." *See* Ex. 7, Benthall Dep. 179:14-24).

[15] Freeman should be barred from offering testimony about "the relationship between the Kingdom of Saudi Arabia and WAMY." The Court issued an Order (ECF No. 4588, June 14, 2019) directing WAMY to produce a Rule 30(b)(6) witness for testimony about, inter alia, "the relationship between WAMY and the Kingdom of Saudi Arabia" and all "financial support provided to WAMY by officials of the Saudi government and members of the Saudi Royal family." On June 21, 2019, WAMY designated Saleh al Wohaibi as its Rule 30(b)(6) witness to testify about WAMY's relationship with the Kingdom and the Royal family. When deposed, Dr. Wohaibi was unable to testify on those specific matters but confirmed that WAMY had made not inquiry to determine the extent of funding it received from the Royal family during the 1992-2002 timeframe, a clear violation of the Court's Order. Ex. 16, Wohaibi Dep. 95:5-19. Accordingly, testimony from Freeman about the relationship between the Kingdom and WAMY should be precluded.

[16] Ex. 3, Freeman Report 1.

[17] Ex. 8, Freeman Dep. 240: 20-24.

[18] Ex. 8, Freeman Dep. 242: 4 – 8.

about the functions, regulations, or internal structure of WAMY,[19] or about any Islamic charity other than WAMY.[20] Importantly, although his disclosed report did not expressly state any opinion about whether any Saudi-sponsored charity has given material support to al Qaeda, Freeman testified in his deposition that he had offered opinions on that point; when asked where that opinion was included in his report, he was unable to point to such an opinion, but responded that "it is throughout the report,"[21] and followed the response with five additional unresponsive paragraphs, before concluding by acknowledging "I did not personally engage … with Saudi charities in Saudi Arabia as Ambassador."[22]

### C.      Jonathan Marks (proffered by WAMY).

WAMY retained Marks as a rebuttal expert on accounting issues and then guided him to an opinion. Marks purports to have reviewed "tens of thousands of primary source documents and other information produced in connection with this matter"[23] to reach his opinion that he found no evidence to "support a finding of financial mismanagement or misconduct indicative of terrorist financing on behalf of WAMY."[24] However as described herein, the foundation for Marks' opinions rest on an incomplete handful of documents WAMY pointed him to and, in at least one key instance, the importance and meaning Marks ascribes to a document is wildly out of sync with what appears on the face of the document.[25]  Further, he relied almost entirely on the unexamined work of others, rather than an analysis of his own.

---

[19] Ex. 8, Freeman Dep. 242: 9 – 13.

[20] Ex. 8, Freeman Dep. 242:14-16.

[21] Ex. 8, Freeman Dep. 245:7-19.

[22] Ex. 8, Freeman Dep. 245:20 to 246:24.

[23] Ex. 4, Marks Report 6; *see also* Ex. 10, Marks Dep. 77:14 to 82:2 (Marks concedes he billed only fourteen hours for review of documents and did not personally review tens of thousands of documents but relied on his team's verbal summaries).

[24] Ex. 4, Marks Report 6.

[25] See *infra*, at 31-36, "Marks May Not Offer Speculative or Unfairly Prejudicial Opinions."

Marks' testimony seeks to rebut the following opinions of Plaintiffs' experts:[26]

(1) WAMY knowingly provided financial support to known terrorist organizations, including Al Qaeda;

(2) During the Relevant Period, the charitable sector was vulnerable to exploitation by terrorists due to lax regulatory requirements;

(3) Financial irregularities were inherent "features" of WAMY and "consistent with typical terrorist financing models";

(4) WAMY showed a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to prevent the detection of their provision of material support to Al Qaeda and other terrorist groups preceding 9/11;

(5) The "organizational and financial structures of WAMY are evidence that their material support of Al Qaeda" … "was conducted with the awareness and knowledge of senior officials who headed these organizations";

(6) WAMY knowingly laundered money through their charitable projects, using portions for relief purposes and diverting other portions to Al Qaeda; and

(7) WAMY knowingly provided material support to Al Qaeda by "hid[ing] what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities."

Marks offers the following opinions in rebuttal:

(1) WAMY's financial audit observations do not indicate participation in or support of terrorist activities;[27]

(2) WAMY Canada did not make a payment to the orphan program of BIF USA;[28]

(3) WAMY does not have a lack of or systematic recordkeeping issues;[29]

(4) WAMY's sources and use of funds were sufficiently supported and were not indicative of participating in or supporting terrorist activities;[30] and

(5) WAMY did not lack controls.[31]

**D.    John Sidel (proffered by MWL/IIRO and related charity officials).**

The thrust of Sidel's report is that "organizations like the MILF, the Abu Sayyaf group, and the Jemaah Islamiyah network have intersected with the multi-stranded circuitries of transnational Islamic outreach and Islamist activism, and with the clandestine activities of Al Qa'ida, they have done

---

[26] Ex. 4, Marks Report 5.
[27] Ex. 4, Marks Report 7.
[28] Ex. 4, Marks Report 21.
[29] Ex. 4, Marks Report 29.
[30] Ex. 4, Marks Report 30.
[31] Ex. 4, Marks Report 34.

so episodically, opportunistically, and as a function of – and compensation for – the weakness of their positions on the local/national level."[32]

Sidel relies on long outdated experience for his opinions about the Philippines and Indonesia. Using a tautology to support his expertise, Sidel says he is qualified to offer this opinion because he is "an acknowledged expert on the Philippines and Indonesia, with special expertise on the role of Islam in the politics and societies of these two countries, particularly in contexts of violent conflict."[33] He says that "these past three decades of sustained empirical research, immersion in scholarship, and teaching and supervision of post-graduate students have provided me with a strong basis of expert knowledge and understanding of the politics and societies of the Philippines and Indonesia, especially in terms of the intersection of Islam, politics, and violent conflict in the two countries."[34] But further questioning made clear that he did not spend extended periods of time in those countries after his initial fieldwork in the Philippines in the late 1980s into the early/mid 1990s, but only engaged in "brief visits."[35] Notably, Sidel was not in the Philippines or Indonesia when the IIRO offices were designated.

## III.   BENTHALL, FREEMAN, MARKS AND SIDEL ARE NOT QUALIFIED

---

[32] Ex. 5, Sidel Report ¶ 5. His affirmative opinions were about: (a) The historical and political context within which violent conflict emerged and evolved in the southern Philippines since the 1970s; (b) The role of the Moro Islamic Liberation Front (MILF) in the conflict in the southern Philippines; (c) The role of the Abu Sayyaf group in the conflict in the southern Philippines; (d) The historical and political context within which religious violence emerged in Indonesia over the late 1990s and early 2000s and the role of the Jemaah Islamiyah in such violence; (e) The nature and significance of the role of Southeast Asia within the global jihad waged by Al Qa'ida. (Ex. 5, Sidel Report ¶ 1.) Rebuttal opinions he offered addressed following issues: events in the Philippines and Indonesia; (b) The Bojinka Plot; (c) The identification of Southeast Asia as "a major center for operations" for Al Qa'ida; (d) The evidence regarding alliances between Al Qa'ida and the Abu Sayyaf group, the Moro Islamic Liberation Front (MILF), and the Jemaah Islamiyah (JI) network; (e) The activities, affiliations, and impact of Mohamed Jamal Khalifa in the context of the southern Philippines; (f) The determinations of the Office of Foreign Assets Control (OFAC) with regard to the Moro Islamic Liberation Front (MILF); and (g) The activities, affiliations, and impact of Kompak in the context of violent religious conflict in Indonesia. (Ex. 5, Sidel Report ¶ 2.)
[33] Ex. 5, Sidel Report ¶ 18.
[34] Ex. 5, Sidel Report ¶ 27.
[35] Ex. 11, Sidel Dep. 23:12-23 ("The last time I was in the Philippines before 2012 was in early 2001. So I missed a whole decade in the Philippines between 2001 and 2012."); *see also* 23:24-24:1-7 (when asked how frequently he was in the Philippines between the mid-1990s and 2001, he said "probably I was there every year for a matter of weeks."); 24:8-18 (stating that he lived in Indonesia in 1997, 1998, but visa restrictions caused him to exit the country and go back to the Philippines to visit, which he describes as "brief visits once a year").

A.      **Benthall's testimony in areas in which he is unqualified should be excluded.**

Benthall, whose opinions relate primarily to the cultural and historical context in which Islamic charities operate, has no expertise to opine on the following issues: material support, terrorist financing, money laundering, al-Qaeda or its history or how it is funded or financed, whether Islamic charities funded al-Qaeda and operational and financial irregularities of MWL/IIRO or Kadi's organizations. Benthall's formal education is limited to an undergraduate degree in English language and literature.[36] He is an anthropologist by training and an independent social researcher who has written on Islamic charities, aid, charity, and development in the Islamic world.[37] Neither his training nor experience afford him expertise in the areas identified above, in which he has shown a lack of expertise. Accordingly, the Court should exclude his testimony in these areas.

Almost nothing in Benthall's reports addresses material support, terrorist financing, or money laundering.[38] Because Benthall himself has acknowledged that he has little relevant expertise in these areas to aid the trier of fact,[39] the Court should exclude such testimony from Benthall.

Benthall acknowledged he is also not an expert on al-Qaeda, including its history or its funding or financing.[40] Perhaps most telling, Benthall acknowledged he did not know if Islamic charities funded al-Qaeda.[41] Accordingly, the Court should exclude his testimony in those areas, too.

---

[36] Ex. 7, Benthall Dep. 24:10 to 25:20

[37] Following his formal schooling, over a period of five years, Benthall held a series of jobs as a programmed learning executive, a data processing engineer, an investment analyst, followed by a position at the Lectures Programme Organizer and Secretary at the Institute of Contemporary Arts in London. He has also spent twenty-six years as the Director of the Royal Anthropological Institute of Great Britain and Ireland. *See* Benthall's Report of MWL/IIRO, Exhibit A: Curriculum Vitae; *see also* Ex. 7, Benthall Dep. 24:10 to 48:12 (for Benthall's confirmation regarding his formal education, a narrative of the skills required/acquired in his brief employment for various companies, and his hiring by the Royal Anthropological Institute).

[38] Ex. 1, Benthall Report (MWL/IIRO) contains only three scant references to "material support" (at 1, 20 (twice)), four to terror financing (at 3, 20 n. 49, 21 (twice), and no references at all to money laundering. Ex. 2, Benthall Report (Kadi) contains no reference to "material support", six to terror financing (at 3, 25 n.51, 37, 38, 39), and two to money laundering (at pp. 38-39, both referencing the expertise of plaintiffs' expert Victor Comras).

[39] *See supra* at 5-6 §II.A.

[40] Ex. 7, Benthall Dep. 155:19 to 156:9 (When asked, "Do you know how al-Qaeda was funded and financed?" Benthall responded, "No, I don't. Do you?").

[41] Ex. 7, Benthall Dep. 156:10-12.

Benthall also identified no expertise to aid a fact finder on the issues of operational or financial irregularities of MWL/IIRO or Kadi's organizations. In *Linde II*, the Eastern District of New York (Judge Gerson) disqualified Benthall from testifying on, among other things, "financial irregularities," finding that he possessed "no expertise whatsoever" on the subject. *Linde II*, 922 F. Supp. 2d at 327. Benthall has attained no new expertise in this regard, remains unqualified to analyze or opine on the reasons IIRO and Muwafaq experienced operational or financial irregularities, and the Court should therefore exclude testimony in that regard.

Benthall's lack of expertise about operational or financial irregularities resonates in the generality of his opinions on the point.[42] For IIRO, Benthall expresses a generalized belief that "[a]ny organization with as many operating sections, and working in as many different countries, as IIRO in 2001-2002 did, would have run the risk of administrative disarray and consequent leakage of resources."[43] For Kadi, Benthall knows perhaps even less on the issue. He admits he is not an expert on Kadi's businesses, shell companies, or the establishment of shell companies,[44] and that he had never investigated any of Kadi's commercial businesses in Sudan or elsewhere.[45] Although he agreed that one of Kadi's alleged charitable organizations, the Muwafaq Foundation,[46] operated in Sudan

---

[42] To the extent that Benthall suggests that his generalized view that IIRO's and the Muwafaq Foundation's theoretical inability to control finances and operations was due to the scope of their operations—discussed further in this paragraph—is premised on his "experience of the practical management challenges faced by diversified international NGOs," (Ex. 2, Benthall Report (Kadi) 27), Benthall's work in finance is limited to a brief engagement as an Investment Analyst with Henderson Administration Limited approximately fifty years ago; during which he received an "admittedly basic" training on financial matters, including investment analysis and reading balance sheets (Ex. 7, Benthall Dep. 29:13-30:1; 35:6-24). Similarly, although Benthall identified no specific basis for his opinion about IIRO's inability to control its operations and financing during the relevant period, his opinion appears to be derived from his observations related to operational issues experienced by two other completely unrelated organizations—Oxfam and Doctors Without Borders. (Ex. 1, Benthall Report (MWL/IIRO) 18.)

[43] Ex. 1, Benthall Report (MWL/IIRO) 19.

[44] Ex. 7, Benthall Dep. 133:22 to 135:21

[45] Ex. 7, Benthall Dep. 133:4-22; 136:16-20; *see also* 157:20-175:21 (In connection with his report for Kadi, Benthall did not interview anyone from the charities, interview or speak with any government officials, have discussions with representatives of religious institutions, speak to anyone who received charity from Muwafaq or Kadi, make personal observations, or consult any surveys).

[46] In the U.S. Office of Foreign Assets Control's 2004 decision about Kadi's designation as a Specially Designated Global Terrorist (SDGT), OFAC emphasized Kadi's leadership in the Muwafaq Foundation and noted that the entity was first active in Sudan, then in Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, Albania, Austria, and Germany.

from 1992 to 1996 and that Osama Bin Laden was in Sudan during this period (and while Sudan was listed as a state sponsor of terrorism beginning in 1993), he could not recall if Kadi was present in Sudan at the time.[47] About the Muwafaq Foundation, Benthall offered essentially the same generalized apologetics as he offered for IIRO, saying that, "any organization working with as many offices, and in as many different countries, as the Muwafaq Foundation did in the early and mid-1990s would have had difficulty maintaining control of its finances and operations."[48]  But the only Muwafaq financial reports Benthall considered were reports from the Pakistan office that he reviewed only because they appeared in one of plaintiffs' expert's report.[49] He made no inquiry into whether Kadi's businesses in Sudan employed al-Qaeda operatives, attributing his inability to make this inquiry to the brief period of time in which he drafted his report.[50]

B.      **Freeman is wholly unqualified to testify as an expert.**

Setting aside that serval areas of Freeman's testimony concern issues that are largely irrelevant to the claims against WAMY, the only defendant on whose behalf he proposes to offer testimony, nothing in Freeman's testimony qualifies him as an expert to testify on the issues addressed in his report. Freeman had a lengthy career in the U.S. Foreign Service, but he spent only 31 months of his career—from January 1990 to August 1992[51]—in his post as the U.S. Ambassador to Saudi Arabia. In fact, most of his foreign service career concentrated on China and other Asian states.[52] Before his post as U.S. Ambassador to Saudi Arabia, Freeman had no other foreign service posting in Saudi Arabia

---

While Muwafaq reportedly terminated operations in 1996 or 1997, the OFAC Memorandum states that Muwafaq "continued to operate until mid-2001 under the umbrella of Makhtab al-Khidamat … considered to be the precursor to al-Qaida," before Makhtab al-Khidamat dissolved and was absorbed into Osama Bin Laden's organization, and that "Muwafaq … joined [al-Qaida]." Kadi's has also noted that Muwafaq continued to be registered in Holland and Belgium. *Kadi v. Geithner*, 42 F. Supp. 3d 1, 13 (D.D.C. 2012).

[47] Ex. 7, Benthall Dep. 114:5-20; 118:10 to 119:2; 131:25-132:13

[48] Ex. 2, Benthall Report (Kadi) 27

[49] Ex. 7, Benthall Dep. 176:18 to 178:19 (acknowledging that he reviewed financial records from the Muwafaq Pakistan office only because they were referenced in the report of plaintiffs' expert, Victor Comras).

[50] Ex. 7, Benthall Dep. 133:23-134:7

[51] https://history.state.gov/departmenthistory/people/freeman-charles-w;  *see also* Ex. 8, Freeman  Dep. 15:13-16.

[52] Ex. 8, Freeman Dep. 50:22 to 51:21.

and no training regarding Saudi Arabia, other than training for the post itself.[53] During his time in the U.S. Foreign Service, Freeman's only interaction with any Saudi charity was limited to a single instance when he had limited contact with "World Muslim League" (sic).[54] Moreover, Freeman admits that he has never visited a WAMY office or spoken to any WAMY officials,[55] did not "personally engage … with Saudi charities in Saudi Arabia,"[56] has no knowledge of the accounting systems or methodology that WAMY has used, and has no personal knowledge of how WAMY identified projects to be funded or activities to be undertaken.[57]

Freeman freely admits that he is not an expert in a number of the areas of expertise relevant to these proceedings. He is no expert in terror financing,[58] Saudi Charities,[59] or WAMY itself.[60] Freeman states repeatedly that his expertise is based on his "professional experience" and "not on documents,"[61] but he lacks any necessary experience and training in any field that would permit him to offer reliable testimony related to Saudi charities accused of financing terrorism, and WAMY in particular. *See* Fed. R. Evid. 104(a); Fed. R. Evid. 702.

Although he bases his expertise on his experience, Freeman admits throughout his deposition that numerous circumstances bearing on the area of his alleged expertise occurred well after his mission in Saudi Arabia had terminated in 1992 and after his last government position ended in 1994. For example, Freeman has had no interactions with any Saudi charities between 1994 and writing his report, and has no familiarity with any of the charities' ongoing issues, finance, or inner workings from

---

[53] Ex. 8, Freeman Dep. 43:19-23.
[54] Ex. 8, Freeman Dep. 53:12-17.
[55] Ex. 8, Freeman Dep. 318:16-23.
[56] Ex. 8, Freeman Dep. 246:21-24.
[57] Ex. 8, Freeman Dep. 320:3 to 321:6.
[58] Ex. 8, Freeman Dep. 353:11-13.
[59] Ex. 8, Freeman Dep. 353:19-21.
[60] Ex. 8, Freeman Dep. 353:22-24.
[61] Ex. 8, Freeman Dep. 353:19-24.

that time period.[62] He testified that, after he left his last government post in 1994, his sources had no obligation to speak to him and stopped providing him information in the way they had done so during the 2½ year period that he was an Ambassador.[63] Additionally, Freeman has never written or published peer-reviewed literature on Saudi Arabia, Islam, counter-terrorism, material support, Saudi charities, WAMY, or any other areas on which he seeks to opine.[64]

Freeman insisted throughout his deposition that he relied on personal experience in forming his opinions and did not rely on documents.[65] Despite his insistence, even if Freeman argued that his expertise and testimony *were* based on his review of the relevant materials, this would not be enough to overcome his dearth of expertise in the areas on which he proffers opinions. Freeman did not review, was not given, and did not ask for any documents internal to WAMY, or for any WAMY documents related to internal controls, or information about WAMY's finances.[66] The only WAMY-specific financial documents he reviewed were WAMY auditing procedures provided to WAMY's counsel by Plaintiffs' counsel.[67] Additionally, Freeman has no knowledge of the accounting systems or methodology that WAMY has used, no personal knowledge of how WAMY identified projects to be funded or activities to be undertaken.[68] Freeman has never visited a WAMY office or spoken to any WAMY officials.[69] The only documents related to *this litigation* that Freeman reviewed for his deposition are a "dozen" documents that include "A couple of intelligence reports; a telegram that … [plaintiffs' counsel] placed in evidence; the 9/11 report, which I reread; a couple of reports on the Saudi financial system."[70]

---

[62] Ex. 8, Freeman Dep. 339:17 to 340:5.
[63] Ex. 8, Freeman Dep. 338:18 to 339:16.
[64] Ex. 8, Freeman Dep. 61:3 to 62:21.
[65] Ex. 8, Freeman Dep. 35:8-9; 259:11-12; 301:18-19; 354:10-14.
[66] Ex. 8, Freeman Dep. 298:17 to 299:1.
[67] Ex. 8, Freeman Dep. 300:8-14.
[68] Ex. 8, Freeman Dep. 320:3 to 321:6.
[69] Ex. 8, Freeman Dep. 318:16-23.
[70] Ex. 8, Freeman Dep. 289: 10-16.

In short, WAMY has not established Freeman's expertise in the subjects on which he seeks to opine. Freeman's short-lived stint as U.S. Ambassador to Saudi Arabia, his lack of scholarly work on the subjects he seeks to opine, and his lack of documentary review (which can only be described as minimal, at best) are disqualifying. Further, Freeman has acknowledged that he is not an expert on foundational issues in this case, namely terrorist financing, Saudi Charities, or WAMY itself. Freeman is wholly unqualified to proffer the opinions in his testimony and is not "qualified as an expert by knowledge, skill, experience, training, or education" as required by Federal Rule of Evidence 702.

## C.    Marks is not qualified to offer opinions regarding terror financing

Marks is Certified Public Accountant, ("CPA"), Certified in Financial Forensics ("CFF"), a Certified Information Technology Professional ("CITP"), a Chartered Global Management Accountant ("CGMA"), and a Certified Fraud Examiner ("CFE") Partner and Practice Leader of the Forensic Investigations, Compliance, and Integrity Services group at Baker Tilly.[71] However, he has no experience working in counterterrorism in any governmental capacity, has no expertise pertaining to the history of al-Qaeda, is not an expert on any other designated terrorist organization, has no professional background studying the funding of al-Qaeda, and has never previously worked on any matter involving possible funding of al-Qaeda.[72] Further, he admitted at his deposition that whether refugee and orphan support programs have been used to disguise and conceal funding for terrorism is not a subject within his area of expertise.[73] To support his conclusion that WAMY's practices are "not in-line with [an] organization that supported al Qaeda,"[74] Marks was asked in his deposition to name any organization that supported al Qaeda. Rather than being able to identify any al Qaeda supporter, thereby demonstrating some knowledge of the field, Marks instead retreated to a rote

---

[71] Ex. 4, Marks Report 1.
[72] Ex. 10, Marks Dep. 41:19 to 42:17.
[73] Ex. 10, Marks Dep. 161:12-24.
[74] Ex. 4, Marks Report 10; *see* Ex. 10, Marks Dep. 162:1 to 163:12.

defense of the party who had retained him and responded, "Not WAMY,"[75] suggesting he had no experience in the area to be able to name any others.

Marks has no professional training or experience in investigating terrorist financing or material support. When questioned about his prior professional experience in any terrorism-related matter, Marks first said he had experience in terrorism financing through "anti-money laundering-type fraud investigations … that were done on a global basis," but he could not identify the subject of those investigations.[76] On questioning, however, Marks acknowledged that the investigation he described was not related to any particular terrorist organization[77] and no terror financing allegations had been raised.[78] Tellingly, Marks ultimately admitted, "I have never been involved in an investigation that has led to anything related to terrorist financing."[79] Moreover, Marks could identify no training regarding hallmarks of terrorism financing, nor any other education or experience to qualify him to opine on whether or not WAMY provided material support to al-Qaeda or Osama Bin Laden leading up to the September 11, 2001 attacks, a core issue before the fact-finder.

**D.      Sidel is not qualified to testify on Saudi charities, MWL/IIRO, or terrorist financing**

Sidel agreed that his expertise is limited to Southeast Asia and political conditions and violence in the Philippines and Indonesia.[80] He states plainly that he is not an expert on al-Qaeda or its history,[81]

---

[75] Ex. 10, Marks Dep. 163:8-12.

[76] Ex. 10, Marks Dep 36:7-20.

[77] Ex. 10, Marks Dep. 38:12-17.

[78] Ex. 10, Marks Dep. 37:9 to 40:12; *see also* 35:11-37:8 (Marks testified this work involved analyzing "financial information and other information, looking at various flows of funds and other communications to determine whether there was money laundering and if the money laundering led to some type of illegal acts, such as terrorist financing").

[79] Ex. 10, Marks Dep. 41:9-18.

[80] Ex. 11, Sidel Dep. 33:15-21. Sidel's experience in this area ran through the 1980's and into the early to mid-1990's when he conducted field research "focused on local political, corruption, criminality, conflict, and violence in the Philippines." Ex. 11, Sidel Dep. 18:24 to 19:15.

[81] Ex. 11, Sidel Dep. 33:22-24; 116:14-15. Despite these clear disavowals of expertise, he qualifies his familiarity with al-Qaeda, saying he's "very well versed in the secondary literature" but "in terms of [his] own expertise or [his] own empirical research or analysis or interest, no" he's not an expert. Ex. 11, Sidel Dep. 34:15-22.

terrorist financing,[82] the role of charitable organizations in facilitating the funding of terrorism,[83] the operational requirements for sophisticated terrorist attacks,[84] or al-Qaeda's global strategy.[85]

**E.      Sidel is not qualified to opine on the operational needs and methods of terror organizations, the Bojinka Plot, or al-Qaeda's presence in the Philippines and Indonesia**

On issues such as the operational needs and methods of terror organizations, the Bojinka plot, and al-Qaeda's presence in the Philippines and Indonesia, Sidel lacks even the basic familiarity of the 9/11 Commission Report. Sidel did not read or review the 9/11 Commission Report "in connection with the writing of [his] expert report"[86] and has never read it in full.[87] Sidel avoided answering whether he agrees with the 9/11 Commission's statement that bin Laden provided equipment and training, and assistance to the MILF and Abu Sayyaf group by questioning whether the reports are substantiated and not "recycled and repeated."[88] Had he read the 9/11 Commission Report, perhaps he could offer an opinion or his expertise, but since he did not, the Court should preclude him from offering expert opinions on the findings of the 9/11 Commission Report.

Sidel purports to opine as an expert on the Bojinka plot,[89] yet admits repeatedly that he does not possess specific critical knowledge of events surrounding that plot. For example, when asked if he has "a view as to whether or not al-Qaeda had a hand in the Bojinka plot or not," Sidel states "I really don't know."[90]   Initially, he cites only Maria Ressa to support his opinions about the Bojinka

---

[82] Ex. 11, Sidel Dep. 34:1-3.

[83] Ex. 11, Sidel Dep. 34:4-8.

[84] Ex. 11, Sidel Dep. 34:9-12.

[85] Ex. 11, Sidel Dep. 34:13-15.

[86] Ex. 11, Sidel Dep. 35:8-13.

[87] Ex. 11, Sidel Dep. 35:14-17.

[88] Ex. 11, Sidel Dep. 58:17 to 59:24.

[89] Plaintiffs' expert Jonathan Winer describes the "Bojinka Plot" as a "precursor to the 9.11 attacks" where "al Qaeda operatives in the Philippines planned to assassinate Pope John Paul II, to blow up 11 airliners in flight from Asia to the U.S., shutting down air travel around the world, and to crash a plane into the headquarters of the CIA in Fairfax County, Virginia. The plot was disrupted by Filipino police in 1995." *See* Ex. 6, Expert Report of Jonathan Winer, § 6.6.6.6).

[90] Ex. 11, Sidel Dep. 116:1-10.

plot, describing her account as "the lengthiest available written account of that episode"[91] and "a credible account of what she knows and what is generally known about that from the outside."[92] However, only after asked about Ressa's assessments implicating the IIRO, al Qaeda, and Abu Sayyaf, Sidel contradicts his earlier testimony, saying that he is "not a big believer in [Ressa's] earlier reportage and her account. I don't see her as having the genuine local expertise and/or, really, at that time, the critical kind of questioning approach that some other similar seasoned investigative reporters in the Philippines had that she did not have as a matter of course."[93] Maria Ressa recently received the Nobel Peace Prize for her efforts to "safeguard freedom of expression."[94]

Sidel was asked if he recalls that Maria Ressa's book, *Seeds of Terror*, details that Osama bin Laden's brother-in-law and IIRO officer Mohammed Jamal Khalifa provided money to Abu Sayyaf founder Abdujarak Janjalani to conduct a bombing of a church in Jolo. Sidel responded that "this phase of [Maria Ressa's] career and this piece of work is overly sensationalist and credulous with regard to available sources."[95] Sidel then immediately backtracked in his deposition and stated "[b]ut I do not have any specific information of what was going on in Basilan in December of 1991."[96]

Further, regarding allegations that Mohammed Jamal Khalifa met with Janjalani, Wali Khan Amin Shah (a bin Laden associate), and Ramzi Youssef a month later to deliver $6,000 for two terror operations, Sidel again concedes he has no specific information that the allegation is untrue.[97]

Much of Sidel's claimed expertise is undermined by his inability to answer basic and fundamental questions on the very topics he claims expertise. For example, he agrees that Ramzi

---

[91] Ex. 11, Sidel Dep. 91:22 to 92:6.
[92] Ex. 11, Sidel Dep. 92:9-12.
[93] Ex. 11, Sidel Dep. 91:11-21.
[94] *The Nobel Peace Prize 2021,* The Norwegian Nobel Committee (October 8, 2021), https://www.nobelprize.org/prizes/peace/2021/press-release/
[95] Ex. 11, Sidel Dep. 94:3-15.
[96] Ex. 11, Sidel Dep. 96:8-14.
[97] Ex. 11, Sidel Dep. 96:15 to 97:7.

Yousef was a "man crucially involved in the WTC bombing" and that he was "implicated" in the Bojinka plot,[98] but he claims to not know whether Ramzi Yousef had a relationship with the leader of Abu Sayyaf, Abdujarak Janjalani.[99] Further, Sidel does not recall whether Abu Sayyaf created an urban guerilla squad, despite Ressa's representation that Mohamad Jamal Khalifa again met with Abu Sayyaf to encourage them to do so.[100] Sidel has no knowledge of the possibility that Ramzi Yousef was in Basilan in 1991 with Janjalani,[101] and has no information about whether Yousef had provided training to members of Abu Sayyaf.[102]

Regarding al Qaeda-related involvement in the Bojinka plot, Sidel testified that he remembered only "that there were names other than Ramzi Yousef and Khalid Sheikh Mohamed, that there were a few individuals whose backgrounds and affiliations were not something [he] knew a great deal about."[103] Importantly, he was confused by the name Wali Khan Amin Shah, AKA Usama Asmurai, an associate of Osama bin Laden and "advance man" for al Qaeda, and had difficulty recollecting his name.[104] After the examining attorney used the 9/11 Commission Report to refresh Sidel's memory about who Wali Khan Amin Shah was, Sidel confessed "I'm clearly thinking of somebody else."[105] Sidel then said that what he recalls about the individuals associated with Bojinka is that there were a "few obscure individuals," but that he had done "no investigation into [Wali Khan Amin Shah's] background" and had not done his "homework on who [Shah] was."[106] Sidel later says that he has a "very, very dim recollection of [Wali Khan Amin Shah's] name,"[107] disregarding that he knew nothing

---

[98] Ex. 11, Sidel Dep. 104:13-20.
[99] Ex. 11, Sidel Dep. 105:24 to 106:6.
[100] Ex. 11, Sidel Dep. 97:19 to 98:6.
[101] Ex. 11, Sidel Dep. 107:24 to 108:4.
[102] Ex. 11, Sidel Dep. 107:13-16.
[103] Ex. 11, Sidel Dep. 110:13 to 111:1.
[104] Ex. 11, Sidel Dep. 108:8 to 110:12.
[105] Ex. 11, Sidel Dep. 109:23 to 110:12.
[106] Ex. 11, Sidel Dep. 110:13 to 111:10.
[107] Ex. 11, Sidel Dep. 113:4-10.

about Wali Khan Amin Shah but still opined that Shah and others were "independent" and "not reliant on a broader support network."[108]

When reminded that he testified earlier that he was not an expert on "operational aspects of terrorist attacks" and thus could not opine on what kind of support is necessary to carry out a plot to assassinate the President of the United States or the Pope on foreign soil, Sidel stated "I'm not sure what kind of expertise that would be. You'd have – I assume you would have to be involved in that kind of activity or in counterterrorism, counterintelligence, counter—you know, work for the Secret Service, perhaps. So it doesn't sound like expertise that I – I can claim."[109] When asked if he agrees that "al-Qaeda was pursuing a pattern of expansion through building alliances" in the 1990s, Sidel responds "I'm not qualified to really comment on it, I don't think."[110]

As an example of Sidel's lack of expertise in the relevant fields, he references a "six year" gap between the passing of the Bojinka plot (in 1994-95) and the September 11, 2001 attacks that "remains to be explained," attempting to weaken plaintiffs' experts' widely accepted opinion and the common sense reality that Bojinka was a precursor to the September 11, 2001 attacks.[111] Though he discusses the "six year" gap in two separate paragraphs in his report, Sidel acknowledged in his deposition that he believes the operation was proposed to Osama bin Laden in "1998 or '99," already undermining his own thesis.[112] However, Sidel was also confronted with information that Khalid Sheikh Muhammad presented the plan for the September 11, 2001 attacks in 1996.[113] When asked – directly – if the timeframe between foiling the Bojinka plot and the proposal of the September 11, 2001 attacks was not in fact six years, but closer to one year Sidel replied "[f]rom the sound of it, yes."[114]

---

[108] Ex. 11, Sidel Dep. 128:7-22.
[109] Ex. 11, Sidel Dep. 133:11 to 134:4.
[110] Ex. 11, Sidel Dep. 64:5-16.
[111] Ex. 5, Sidel Report ¶ 108.
[112] Ex. 11, Sidel Dep. 150:8-15.
[113] Ex. 11, Sidel Dep. 151:4 to 152:8.
[114] Ex. 11, Sidel Dep. 154:20 to 155:3.

Sidel baselessly states that "Mohamed Jamal Khalifa's period of work for the IIRO in the Philippines came to an end in late 1993 without any discernible achievements in terms of his presumed goals of advancing some kind of global jihad focused on the United States. As for Khalifa's reported involvement in the Bojinka plot of 1994-95, he was no longer employed by the IIRO by this time."[115] Sidel conceded in his deposition that his only support for this is a letter shown to him by defense counsel indicating that Khalifa had resigned in 1993.[116] Without investigating the point further he accepted the lawyers' interpretation.

Sidel has no prior knowledge of key individuals and events that took place in the areas and time where he claims expertise. Sidel's knowledge of the Bojinka plot was gleaned from his review of Maria Ressa's book, *Seeds of Terror*, which is his **only** supporting document for his opinions on the plot, despite his perplexing and unfounded criticisms of Ressa. Sidel did not do the most basic research to prepare his report and for his deposition, had he done so he would have known that the time frame between the disruption of the Bojinka plot and when the September 11, 2001 attacks were proposed was closer to one year rather than six, and that the fact that the two events took place six years apart does not, alone, support his thesis that one could not be a precursor to the other. Sidel is not qualified to opine on the Bojinka plot, the operational needs and methods of terror organizations, or al Qaeda's presence in the Philippines and Indonesia, and his testimony should be excluded.

## IV. EXPERTS BENTHALL, FREEMAN, MARKS, AND SIDEL OFFER IRRELEVANT AND/OR UNFAIRLY PREJUDICIAL OPINIONS

### A. Benthall offers irrelevant and unfairly prejudicial opinions

Benthall's reports for IIRO and Kadi are replete with irrelevant and unfairly prejudicial opinions that, at best, will tend to confuse or mislead the factfinder. In his report for IIRO/MWL, Benthall

---

[115] Ex. 5, Sidel Report ¶ 15, 34.
[116] Ex. 11, Sidel Dep. 135:22 to 136:16.

affirmatively intends to opine on the following:[117] (1) The role of charitable giving in Islam; (2) The history and development of the alternative humanitarian movement of Islamic charitable giving; (3) The backlash against Islamic charities after 9/11; (4) The inevitable interconnection between politics and charitable giving common to all Non-Governmental Organizations (NGOs); (5) Why Islamic NGOs provide aid to Muslim communities across the world that are in need; (6) Cultural norms and historical transparency issues surrounding Islamic NGOs; and (7) Practical considerations for the disbursement of aid on the ground.

In fact, Benthall acknowledged his report was not written to address the issue of whether IIRO/MWL provided support to al-Qaeda before 2001.[118]

Benthall's report for Yassin Kadi is similar in scope, consisting, affirmatively, of opinions about: (1) The role of charitable giving in Islam, and its history and development; (2) The importance of understanding cultural norms in assessing transactions engaged in by charities and individuals associated with them; (3) Characteristics of historical charity regulation and personal relationships in the Arab world prior to 9/11; and (4) Why Islamic charities provide aid to Muslim communities in countries plagued by poverty, lack of education, wars and disasters.

The foregoing issues are irrelevant to the instant litigation, and cannot be grasped from the air. Thus, the opinions Benthall would offer are not intended to assist in the resolution of a factual dispute. Instead, Benthall characterized his report as providing "background information, which … [he] thought could be of use to the Court if this [case] went to trial."[119] Indeed, no party suggests that charitable conduct has not been beneficial nor that all of a bad actor's conduct must be bad acts related to the plaintiffs' injuries. Such testimony would tend to confuse a factfinder into wrongly balancing

---

[117] Benthall also offers rebuttal opinions on the following: (1) Fraud risk in domestic and international charities and its implications; (2) Purported duplicity in Middle Easterners and their institutions; and (3) The organizational structures of MWL and IIRO as purported evidence of organizational awareness of material support of al Qaeda.

[118] Ex. 7, Benthall Dep. 275:2-12.

[119] Ex. 7, Benthall Dep. 275:10-12.

the good works of charities against the bad conduct, such as supporting al Qaeda and its terrorist agenda. Indeed, there is no relevance to balancing any beneficial conduct. Fed. R. Evid. 401, 403.

1. **Benthall's Narrative Testimony About the History, Development, and Role of Islamic Charity is Irrelevant and Prejudicial.**

The history and development of Islamic charitable giving and the role of charitable giving in Islam is irrelevant as these facts are not in dispute. A considerable stretch of Benthall's reports cover these topics. His reports belabor the common knowledge surrounding the *raison d'etre* and functioning of charities the world over. Review of Benthall's opinions on these topics in his IIRO/MWL report, largely repeated in his report for Kadi, emphasize this point.[120]

This case is not about the history of Islamic charities or Islamic charities in general, but rather about the wrongful actions of the named defendants. Mr. Benthall clearly aims to confuse the fact finder through testimony about positive attributes of largely unidentified "Islamic charities" not at issue in this litigation to distract from the relevant, wrongful conduct of the actual defendants. Given the complexity of this MDL and the anticipated complexity of a trial, Benthall's extraneous testimony on the history and development of Islamic charitable giving, which will tend to unfairly prejudice, confuse, mislead, waste time, and cause undue delay, should be excluded.[121]

---

[120] *See, e.g.,* Ex. 1, ¶ 1 ("The tradition of Islamic charity, while exhibiting culturally specific historical concepts, has much in common with Judaism and Christianity, and hence with the secular Western traditions of charity, philanthropy and humanitarianism that developed historically from religious origins."); ¶ 2 ("Deeply rooted in Islamic teaching are the concepts of *zakat* and *sadaqa. Zakat* means obligatory almsgiving, associated in the Qur'an with the themes of purity and productivity and especially with prayer. *Sadaqa,* closely associated with *zakat,* has connotations of moral rectitude, and denotes voluntary giving over and above one's obligation."); ¶ 3 ("Islamic charities working at an international level began to be founded in the 1970s. They represent a confluence of two historical movements: the general rise and diversification of NGOs, and the Islamic resurgence.); ¶ 4 ("By the end of the twentieth century, there were few countries without a presence of Islamic charities, either raising funds or disbursing them, or both. Islamic charities everywhere tend to be marked by a commitment to assisting orphans and displaced persons, and by reference to religious tradition."); ¶ 13. ("A distinguishing feature of Islamic charities, as of Christian charities, is the view that programmes of economic development and relief aid should allow for a spiritual or moral as well as a material dimension, conceiving their recipients as whole persons rather than merely statistical units."); ¶ 15 ("During the 1990s, Gulf-based charities were less professionalized and specialized than their non-Muslim counterparts.").

[121] Fed. R. Evid. 401, 403; *see supra,* at 3, about excluding evidence having "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee Note.

    **2.**    **Benthall's Generalized Testimony About the Practical Considerations of Islamic Charities and the Role of Political and Cultural Issues in the Operation of Islamic Charities Is Irrelevant and Unfairly Prejudicial.**

The bulk of Benthall's IIRO/MWL report concerns the practical considerations of Islamic charities generally and the role of political and cultural forces on these organizations. For example, Benthall asserts: (1) it is difficult to find reliable historical evidence of the activities of Gulf-based charities up to the first decade of the twenty-first century; (2) disbursement of aid is inherently political; (3) deprivation and political unrest in large swathes of the Muslim world result in much of Islamic NGO aid being sent to these areas; (4) the charity culture of the Gulf does not require a public accounting because Gulf society is marked by a culture of privacy and discretion; and (5) disbursement of aid on the ground is generally by cash, even for large transactions.[122]

To offer these opinions, Benthall canvases IIRO and Muwafaq items about services they offered. He summarizes charitable programs IIRO offered in 1995, according to a fundraising video it produced.[123] He also notes that, according to IIRO, during the 1990s, it collaborated or held discussions with the U.N. Environmental Program, the World Conference on Religion and Peace, Doctors without Borders, and the U.N. Commission on the Status of Women.[124] He references his own work as support for his opinion that IIRO "led the way among Gulf-based charities in undertaking initiatives aimed at strengthening its links with the international aid mainstream."[125] He supports his opinion by referring to a "culturally sensitive" conference on refugees helmed by IIRO.[126] Though the conference touches on a sad aspect of the international refugee problem, that IIRO hosted a women-and-children-centered conference in 1994 does not explain why the facts of this case must

---

[122] Ex. 1, Benthall Report (MWL/IIRO), *see* ¶¶ 6, 11-12, 14, 16.
[123] Ex. 1, Benthall Report (MWL/IIRO) 15.
[124] Ex. 1, Benthall Report (MWL/IIRO) 16.
[125] Ex. 1, Benthall Report (MWL/IIRO) 15.
[126] Ex. 1, Benthall Report (MWL/IIRO) 16.

be considered within the context of political or cultural considerations. He conducts a similar analysis for Muwafaq, discussing several programs referenced in Kadi's document production. He summarizes, "In short, the Muwafaq Foundation cooperated at various points with some of the leading United Nations agencies: UNHCR, WHO, WFP, and Unicef."[127]

None of this opinion is relevant. Instead, as with the previous opinion about the history, development, and role of Islamic charity, this opinion will tend to confuse and mislead a factfinder into wrongly considering, for example: (1) history of beneficent conduct of IIRO and other Gulf-based charities, (2) beneficent reasons for IIRO and other charities disbursing aid, (3) or that IIRO and other charities should be excused from accountable transparency because unaccountable secrecy was how they normally did business. Such extraneous testimony that will tend to unfairly prejudice, confuse, mislead, waste time, and cause undue delay, should be excluded. Fed. R. Evid. 401, 403.[128] In addition, most of Benthall's testimony on these issues is predicated on his interpretation of documents and fact witness testimony to be offered in evidence and the evaluation of which is the province of the factfinder.[129]

---

[127] Ex. 2, Benthall Report (Kadi) 24.

[128] Expert testimony about other charities not at issue is not relevant. Expert testimony about the intentions or state of mind of IIRO or any other charity is improper *See Linde II*, 922 F. Supp. 2d at 326 (excluding expert testimony on charitable organizations not at issue in the litigation as irrelevant and potentially prejudicial); *see also Linde I*, 920 F. Supp. 2d at 285 (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 547 ("Insofar as many of the expert reports submitted by the defendant express opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, they do not contain relevant expert evidence. 'Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'"); *Rahman*, 189 F.3d at 136 (affirming trial court's exclusion of expert testimony that "constituted an effort to tell the jury the defendant's intentions through the mouths of witnesses other than himself"). In addition, the Supreme Court found that contributions to charities for benevolent purposes can be used to bolster their terrorist activities. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010).

[129] *See United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"); *see Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)(expert testimony is not proper if it concerns "matters which a jury is capable of understanding and deciding without the expert's help"); *United States v. Locascio*, 6 F.3d 924, 936-37 (2d Cir. 1993) (same); *United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991)(expert testimony should be limited to situations where the subject matter is beyond the knowledge of the average juror); *United States v. Mendlowitz*, 2019 U.S. Dist. LEXIS 220130, at *10 (S.D.N.Y. Dec. 20, 2019)(a party proffering expert testimony has the burden to demonstrate that such testimony is based on the witness's specialized knowledge).

The foregoing statements and opinions do not provide any commentary on the evidence in this case. Nor do they address any factual issue or contextualize the defendants' actions within the practical, cultural, or political considerations on which Benthall opines generally. Whether there were charitable aspects to the operation of MWL/IIRO or Muwafaq is not at issue or part of the parties' dispute.[130] Whether IIRO participated in conferences considering the unique needs and humanitarian aid requirements of female and minor refugees is not at issue. In this respect, Benthall's testimony is irrelevant. To the extent Benthall's generalized opinions about Gulf charities have any probative value, it is substantially outweighed by the risk of unfair prejudice and confusion because the jury may conflate Benthall's opinions about the practical, cultural, and political considerations of Gulf charities generally with the defendants' actions and draw unwarranted conclusions about the latter.

**3.    Benthall's Testimony Regarding a Post-9/11 Backlash Against Islamic Charities Generally and Generalized Testimony About Other Charities Is Irrelevant and Unfairly Prejudicial.**

With regard to what Benthall subjectively perceives to have been a post-9/11 backlash against Islamic charities, his opinion and testimony is that:

> In recent years, disproportionate attention has been given to Islamic charities as alleged threats to security. With certain exceptions, the blame attached to the Islamic sector for the funding of violent extremism has been exaggerated. Abuse of the privileged status of charities is unfortunately recurrent across the whole charity sector, and can be particularly hard to prevent because they depend on trust. Such abuse may be for personal enrichment or for the pursuit of goals other than those for which a specific charity was set up. A distinction should be drawn between abuse by individual officeholders and systemic intent, at the apex of a charity's organization, to embezzle or divert assets.[131]

In addition to his generalized testimony regarding the perceived unfair treatment of Islamic charities, Benthall spends several paragraphs discussing "administrative turbulence" within and misconduct by the leadership of various Western charities, including Oxfam, Save the Children,

---

[130] These also are not matters as to which expert testimony is necessary.  If appropriate at all, IIRO and MWL representatives with more complete knowledge of those organizations can testify on these issues.
[131] Ex. 1, Benthall Report (MWL/IIRO) ¶ 8.

Unicef, Doctors Without Borders, the United Way of America, and the American Parkinson Disease Association.[132] He does so in an attempt to compare the issues experienced by these charities to the claims against MWL/IIRO in this suit. First, there is no probative value to testimony about alleged misconduct within a few other charities (cherry-picked from the vast universe of charities operating in the world) unrelated to the Plaintiffs' claims and unrelated to the defendant.  Moreover, to the extent such testimony has any probative value (and it does not), that value is substantially outweighed by the risk of unfair prejudice and confusion because the issues described in the context of Western charities primarily involve disorder during periods of expansion and scandals ignited by embezzlement.[133] The embezzlement perpetrated in these other cases, according to Benthall, was by leaders seeking to fund lavish lifestyles or otherwise directly, monetarily benefit.[134] The situations he describes are vastly dissimilar to those at issue here, where foreign-based charity defendants are accused of supplying systematic material support to terrorists and terrorist organizations over the course of years. Comparing these allegations to those of organizational growing pains and fraud for personal gain conflates vastly disparate issues and risks jury confusion.

Benthall also compares Western and Islamic humanitarian organizations generally as a subterfuge for highlighting a perceived discrimination that is unfairly prejudicial because the purpose of such testimony is to suggest wrongly that the plaintiffs' claims here are the result of bigotry against defendants. This is yet another example of defendants' attempts wrongly to re-cast this case as a religious war against Islam; which it is not. For example, he offers, "Prejudice against Arabs and Muslims has become more acceptable in Western countries than many other forms of prejudice[.]"[135] Benthall may not testify as to an animus of the plaintiffs in filing claims against the defendants,

---

[132] Ex. 1, Benthall Report (MWL/IIRO) 18.
[133] Ex. 1, Benthall Report (MWL/IIRO) 18.
[134] Ex. 1, Benthall Report (MWL/IIRO) 18.
[135] Ex. 1, Benthall Report (MWL/IIRO) 4, ¶ 18.

particularly premised on his own subjective beliefs.[136] Discrimination against Islamic charities is not at issue here and is, therefore, irrelevant for the factfinder's determination regarding whether IIRO/MWL's conduct creates liability.[137]

### B.   Freeman's testimony is conclusory, irrelevant, and prejudicial

Freeman's conclusory and unsupported opinions regarding the *ulama* and the Royal family, as well as the portions of his report discussing that "support for al Qaeda by WAMY or its leaders would be a betrayal of the organization's very *raison d'être*" must be excluded as this Court has plainly stated conclusory expert testimony is impermissible.[138] In addition the excluding Freeman's testimony about WAMY's relationship with the Kingdom for the reasons addressed *supra*, at 6 n.15, it should be excluded also because trial courts in the Second Circuit have held that "[c]onclusory allegations of an expert absent a statement of the facts upon which they are based, are as insignificant as the conclusory allegations of a party, his attorney, or any other witness."[139]

Opinions offered by Freeman would also be unfairly prejudicial as Freeman's career as a diplomat would "suggest decision on an improper basis" such as "an emotional one" as precluded under Rule 403. Stated plainly, Freeman lacks any expertise in terrorist funding, material support networks, accounting systems, Saudi charities, or WAMY itself. Moreover, his title as a former ambassador would likely instill in a jury an improper and unfounded basis for expertise. Although Freeman does not have the requisite expertise on the subjects he seeks to opine, a jury could

---

[136] *Daubert*, 509 U.S. at 590 ("A trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is simply based on "subjective belief or unsupported speculation.")

[137] In addition to being irrelevant and unfairly prejudicial, nothing in Benthall's background qualifies him to testify regarding racial or religious discrimination. Moreover, mere speculation like this must be excluded. *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 240 n.16 (S.D.N.Y. 2019), *motion to certify appeal granted, reconsideration denied*, 427 F. Supp. 3d 374 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (admission of "speculative or conjectural" expert testimony is an abuse of discretion).

[138] *See Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) (stating "…opinions that are "conclusory" must be excluded) (citing *Major League Baseball Props.*, 542 F.3d at 311 (rejecting expert's conclusory statement where it was not accompanied by "any evidentiary citation" or any elaboration of the expert's reasoning)).

[139] *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001)(quoting *Sweet v. Electronic Data Systems, Inc.*, 1996 WL 204471, at *6 (S.D.N.Y. Apr. 26, 1996).

reasonably be confused, to the plaintiffs' prejudice, simply by virtue of his use of his title, that he has expertise that he does not have.[140] Diplomacy is not at issue in this case and to allow a diplomat to testify as an expert would no doubt create unfair prejudice as it would "suggest decision on an improper basis." Freeman's testimony would confuse the issues and mislead the factfinder into believing that Freeman's title grants him a higher rank of authoritative testimony. This is unfairly prejudicial as it has the "adverse effect…beyond tending to prove the fact or issue that justified its admission into evidence."[141]

### C.    Marks' irrelevant and unfairly prejudicial opinions should be excluded.

Marks cites to documents identifying charitable work done by WAMY to support his conclusion that WAMY did not participate in or support terrorist activities.[142] But the question of whether WAMY ever conducted any charity work is an irrelevant red herring to whether it ever engaged in material support toward terrorism. Plaintiffs have never claimed WAMY was not engaged in charity. Marks' proffered testimony about any alleged charitable work, unrelated to the allegation of material support, should be prohibited as in contravention of Rules 401 and 403 of the Federal Rules of Evidence.[143]

In addition, Marks partially attributed WAMY's implementation of a new accounting and financial policy, introduced and effective on January 1, 2000, to its gradual awareness of issues in their internal controls.[144] However, he was unaware the al Qaeda embassy bombings in Kenya and Tanzania occurred approximately a year and half earlier, unaware there was an increased focus on the role of

---

[140] Freeman admits that his foreign service experience was from postings related to East Asia, China, Taiwan, Bangkok, or India. Ex. 8, Freeman Dep. 50:22 – 51:3. Freeman also freely admits that he is not an expert in Saudi charities or WAMY. Ex. 8, Freeman Dep. 353:19-24.

[141] *See Gelzer*, 50 F.3d at 1139.

[142] Ex. 4, Marks Report 30-34.

[143] *See supra* at 25-27 and n. 128 (discussing exclusion of Benthall's testimony about "good" charitable work)

[144] Ex. 10, Marks Dep. 272:1 to 273:21.

charities in potentially supporting al Qaeda following those events, and unaware the U.S. Government was particularly concerned with Saudi charities during this period.[145]

Marks stakes his opinion on the unfounded notion that WAMY began centralizing its IT systems in 1997, a notion unsupported by the history of discovery here. Considering a 1997 WAMY document about IT issues and suggesting centralization of IT systems, Marks opined that the document suggested controls inconsistent with the financing of al Qaeda. He apparently did not consider whether the use of computers is incompatible with al Qaeda. When queried on this topic, unaware that files about al Qaeda's establishment and development were found on a charity's computer,[146] he said, "I can't answer that."[147]

In his report, Marks makes the unsupported assertion, "Over the course of centralizing recordkeeping, WAMY gradually became aware of issues in their internal controls and made a conscientious effort to improve any control issues."[148] He testified the basis of this conclusion was his review of audit reports and opinions, financial information, and "other information that highlighted certain areas."[149] He said, "So in my opinion,…over the period,…with project-based accounting, issuing policies and procedures,…guidelines for recognizing revenue and the like, that's an awareness."[150] When asked for the basis for attributing this realization to centralization of recordkeeping, Marks said, "[Counsel for Plaintiffs] have better insight into the documentation."[151]

Marks was also unable to identify any document reflecting WAMY's implementation of any new financial or auditing controls during the period from 1997 to 2000.[152] But elsewhere, Marks

---

[145] Ex. 10, Marks Dep. 274:17 to 276:8.
[146] Ex. 10, Marks Dep. 164:23 to 165:6.
[147] Ex. 10, Marks Dep. 164:7-21.
[148] Ex. 4, Marks Report 17.
[149] Ex. 10, Marks Dep. 265:1-9.
[150] Ex. 10, Marks Dep. 265:10-16.
[151] Ex. 10, Marks Dep. 265:22 to 266:2.
[152] Ex. 10, Marks Dep. 127:4-21 (Marks states, "I don't think new controls need to repose in a document, sir").

opines that a 1997 two-page letter from WAMY headquarters to the supervisor of a single WAMY branch office,[153] outlining IT issues and suggesting centralization of IT systems, contained controls inconsistent with the financing of al Qaeda.[154] When asked whether, in his view, the use of computers by a humanitarian organization is incompatible or inconsistent with support of al-Qaeda, Marks responded, "I can't answer that."[155] He was unaware that files regarding al Qaeda's establishment and development were discovered within a charity's computer files.[156]

1.      **Marks may not offer speculative or unfairly prejudicial opinions
        The Two-Page Letter**.

The Court should exclude Mark's speculative testimony premised solely on the 1997 two-page letter described in the preceding paragraph. In his report and testimony, Marks repeatedly refers to a two-page letter from the Office of WAMY Assistant Secretary General to a supervisor of one of its branch offices, wildly speculating repeatedly that the letter, with no other evidence, represents an organization-wide overhaul to WAMY's organizational accounting systems.[157]

Attaching significant importance to it, Marks makes at least four unattributed references to the same 1997 two-page WAMY document about IT issues.[158] Marks' is not only markedly vague in offering support for each of these points, on the last point he is misleadingly so by offering that he had "reviewed documents" – suggesting that there were multiple sources supporting the point. In his entire report he references only a single document touching on his assertion that "[i]ncreased

---

[153] The letter is Ex. 13, which was introduced as Exhibit 964 to Marks' deposition (WAMYSA082520-2521).

[154] Ex. 4, Marks Report 10.

[155] Ex. 10, Marks Dep. 164:7-21.

[156] Ex. 10, Marks Dep. 164:23 to 165:6

[157] Ex. 13, Exhibit 964 to Marks' Deposition (WAMYSA082520-2521).

[158] The four unattributed references include: (1) "The Opposing Experts simply ignore the fact that as early as 1997, WAMY began the process of implementing a more robust, centralized organizational accounting systems and IT control system" (Ex. 4, Marks Report 9); (2) "By beginning to institute more strict and centralized controls in 1997, WAMY became a more transparent and better recordkeeping organization that is not in-line with organizations that supported al Qaeda" (Ex. 4, Marks Report 10); (3) "In 1997, WAMY improved its IT functionality around accounting" (Ex. 4, Marks Report 16); and (4) "We have reviewed documents regarding WAMY's IT and accounting system being centralized as early as 1997, and due to this shift, it would not be uncommon for the centralization and consolidation of these systems to result in the minor loss of some less significant documents" (Ex. 4, Marks Report 29).

accounting controls began as early as 1997 when the WAMY Secretary General declared that WAMY would be centralizing IT systems."[159] For the reasons set for below, the Court should exclude his baseless opinions.

An objective assessment of that single two-page letter reveals that it is not at all what Marks says that it is. Marks claims the document is an organization-wide directive from WAMY's Secretary General to implement a robust, centralized accounting systems and IT control system. In fact, it is just a two-page letter from WAMY's Office of the Assistant Secretary General to the head of a single WAMY branch office in Abha, Saudi Arabia.[160] When pressed on the fact that the letter does not at all refer to an organization-wide directive from WAMY's Secretary General, Marks responds, "We had conversations about this with my team. I don't recall exactly what we were talking about" and then—without any support—conjectures: "I think customarily, when it is done this way, it's considered to be a directive."[161] But the letter's closing asks the recipient to "please provide us with your suggestions on this project, noting it will be discussed in the coordination meeting."[162] When asked whether that closing request suggested that the letter was not intended as a directive, Marks dodged the question and replied—again without support—that "[W]ell, my understanding is, with regards to this particular document, when a directive is issued like this, when it comes to internal control, there's always an opportunity to reply back."[163] Marks does not cite any reply to the letter or any other contemporaneous documents addressing the same issue. His understanding of the weight and parameters of the document appear confined to conjecture informed, perhaps, by discussion with his team (and the

---

[159] Ex. 4, Marks Report 17 (Marks referencing Ex. 13, Marks Dep. Ex. 964 (WAMYSA082521)).

[160] Ex. 4, Marks Report 17; *see* Ex. 13, Marks Dep. Ex. 964 (WAMYSA082520-2521).

[161] Ex. 10, Marks Dep. 259:15-23; *see also* 263:4-18 (After a period off the record, Marks returned and testified his team in the region explained because the letter came from the office of the Assistant Secretary general, it acted like a directive. He understood the Assistant Secretary General for planning at WAMY had the authority to issue a directive on behalf of the Secretary General.).

[162] Ex. 13, Marks Dep. Ex. 964 (WAMYSA082520-2521).

[163] Ex. 10, Marks Dep. 263:19-264:13.

record suggests they had little additional information), as opposed to data derived from primary sources or documents in production.[164]

After being pressed repeatedly if he had *any* evidence that WAMY actually undertook the organization-wide centralization of accounting and IT control systems, the only item Marks relied on for his assertion was this single letter that did not, in fact, evidence that the centralization ever happened. Marks said he understood "the implementation of the IT system, that project in itself, was the impetus behind this[.]"[165] When pressed for proof the implementation occurred, Marks referred to internal correspondence from the head office reprimanding managers and employees for not following procedures and "minutes for meetings … with accountants from the Saudi regional offices" showing "changing accounting protocols in the Eastern Provinces to rectify issues that were identified."[166] In one instance, Marks notes "WAMY updated and centralized its accounting systems in the late 1990s and early 2000s, which is supported by internal correspondence."[167] Though the comment suggests additional documentation evidences that WAMY implemented the organization-wide centralization, the footnote again cites only the same two-page letter.[168] Pressed further for evidence of implementation, Marks finally says, "The basis for this is my opinion, based on the evidence that I have reviewed in this engagement."[169] In short, the sole basis for the assertion is his own opinion supported solely by the single two-page letter to a single branch office that does not remotely say what Marks claims it does. This is insufficient and unreliable under *Daubert*.

---

[164] Ex. 10, Marks Dep. 258:8 to 259:23

[165] Ex. 10, Marks Dep. 266:3-14.

[166] Ex. 10, Marks Dep. 266:15 to 267:7.

[167] Ex. 4, Marks Report 18.

[168] *See* Ex. 4, Marks Report 18, n. 49 (In this footnote, Marks lists both production Bates numbers for this correspondence (Ex. 13) separately and backwards: WAMYSA082521 & WAMYSA082520. So cited, at a glance it wrongly appears to reference multiple pieces of correspondence.)

[169] Ex. 10, Marks Dep. 268:14-24.

Marks was also unaware of numerous declarations WAMY submitted describing the search for relevant documents as exclusively limited to finding hard copy documents in warehouses and file rooms with no mention of any electronic searches.[170] When queried on whether such a search would be expected if a centralization of recordkeeping occurred, Marks countered, "Just because somebody implements an IT system doesn't mean that it's completely and totally functional" and "[N]ot every IT system has all those skills and capabilities. So I don't think you can make that leap of faith."[171] He also points to WAMY's centralization of recordkeeping and consolidation of systems as a reason why WAMY likely lost "some less significant paper documents."[172] There is no documentary support for this apologist assertion on document destruction, and in fact WAMY's own representations contradict it. It is pure speculation that borders on fabrication. Even though his team claims to have reviewed "tens of thousands of primary source documents," Marks was unable to cite any documentary evidence of the implementation or quality of the alleged centralization of, or improvements to, WAMY's IT systems.[173]

Marks, referring again to the 1997 letter about implementation of centralized controls, opines:

> WAMY strived to achieve for [sic] best practices when it demanded
> that its local offices report and be accountable for spending, which is
> not typical for an organization "hiding" something. This structure and
> behavior are indicative of a control-based group, and not a group ran
> [sic] without control of its branches.[174]

This conclusion was included in Marks' report without citation. At his deposition, Marks was asked if there were any documents from 1997 to 2000, other than the 1997 IT memo from Dr. Shayji, reflecting implementation of new financial controls. He responded that he saw project-based

---

[170] Ex. 10, Marks Dep. 269:2-16.

[171] Ex. 10, Marks Dep. 270:14-22.

[172] Ex. 4, Marks Report 29.

[173] *See* Ex. 4, Marks Report 6 for his statement regarding the number of documents reviewed by his team.

[174] Ex. 4, Marks Report 10.

financing.[175] Next, he testified reporting to WAMY Saudi Arabia was demanded and indicated control.[176] Under further questioning, he finally admitted there was no document setting forth the implementation of new controls and opined this did not need to exist for controls to be in place.[177] On multiple occasions, he mentions WAMY's funding of projects on a project-by-project basis as a form of control but does not assert this was a corrective measure or newly implemented control.[178] Moreover, the extrapolation of entity-wide behavior based on comments particular to unique situations discussed in a handful of documents is not methodologically sound and will be unfairly prejudicial. Marks' testimony about the type and implementation of controls by WAMY to combat issues it discovered is baseless speculation, unsupported by the record, that should be excluded.

In support of his opinion that WAMY does not have systematic recordkeeping issues, Marks states, "WAMY's Assistant Secretary General stated that due to a 2008 flood in Jeddah, Saudi Arabia, many financial records stored in the basement were apparently lost."[179] He admits he has no credible basis for this claim and the declaration he referenced by Dr. Noorwali did not refer to financial records at all.[180] Questioned about whether the implementation of centralized recordkeeping would not have resulted in digitizing key financial records, Marks stated, "I don't know. I wasn't there."[181] Any

---

[175] Ex. 10, Marks Dep. 166:7-14; Ex. 4, Marks Report 10 (in support of his conclusion that project-based funding was an effective control, Marks cites Ex. 14, WAMYSA044850 to -851, which includes a relief contract and sets out the agreement of support and amount for each part, but also requires the recipient party to support expenditure with period reports.); *see also* Ex. 4, Marks Report 33 (citing Ex. 12, WAMYSA2296 to explain that WAMY sent $37,500 to the office as a pre-authorized bi-annual budget but instructed the regional office not to use the funds until a report was sent).

[176] Ex. 10, Marks Dep. 167:3-20 (Marks is unable to cite documentary evidence but references "the actions of the overall organizations, with regards to their reporting in to WAMY Saudi Arabia").

[177] Ex. 10, Marks Dep. 168:5 to 169:24.

[178] *See* Ex.4, Marks Report, p. 12; Ex. 10, Marks Dep. 168:13 to 169:4.

[179] Ex. 4, Marks Report 29; *see* Ex. 10, Marks Dep. 193:13-18 (Marks admits, "I don't know what was destroyed in that flood").

[180] *See* Ex. 10, Marks Dep 195:18 to 199:24 (Marks admits the Noorwali Declaration he referenced does not refer to financial records. He also admits he has no credible basis for the affirmative assertion in his report that many financial records stored in the basement at the Jeddah warehouse were lost).

[181] Ex. 10, Marks Dep. 126:17 to 127:2.

testimony Marks might offer to support his opinion that WAMY does not have systematic recordkeeping issues is based purely speculative.

Because the record does not support Marks' repeated speculative references to implementation of a centralized IT system, [182] those opinions and related testimony should be barred.

### 2. Marks is unqualified to offer an opinion about refugee & orphan support programs, and those opinions are irrelevant, unfairly prejudicial.

Marks admits he was not tasked to determine whether refugee and orphan support programs have been used to disguise and conceal funding for terrorism, and that he is not qualified to do so. [183] Yet he intends to opine on his findings with regard to a payment made to such program to contradict an official Canadian Government audit report and Plaintiffs experts. [184] For reasons more fully set forth below, Marks' is unqualified to offer testimony on this topic. Moreover, he improperly references Plaintiffs' expert opinions on this point as "unsupported conspiracy theories," [185] an attempt to interject baseless, unfair hyperbole, suggesting the experts who with Marks engage in fantastical thinking. In fact, those same conclusions were rendered by a government authority. [186]

### D. Sidel offers irrelevant opinions that should be excluded.

Sidel claims expertise related to his knowledge of "Southeast Asia and political conditions and

---

[182] Ex. 10, Marks Dep. 127:4 to 133:14 (A lengthy discussion occurred regarding evidence a centralization of recordkeeping and implementation of new controls occurred; Marks failed to cite any additional documentation).

[183] Ex. 10, Marks Dep. 161:3-24.

[184] Ex. 4, Marks Report 26.

[185] Ex. 4, Marks Report 26; see also the oxfordlearnerdictionaries.com definition of "conspiracy theory" as "the belief that a secret but powerful organization is responsible for an event."

[186] The Canada Review Agency ("CRA"), the Canadian agency that administers provincial and territorial tax programs, promoting compliance with Canada's tax laws, and ensuring the administration and enforcement of those laws, investigated WAMY's Canadian branch office and discovered areas of serious non-compliance. The investigation uncovered documents and information linking the WAMY Canadian branch office and its Saudi headquarters to terrorism, including evidence that the branch office shared common officers, office space, contact information, and bank accounts with a Specially Designated Global Terrorist ("SDGT") Benevolence International Fund-Canada ("BIF-Canada"). In addition, the Canadian WAMY branch office was funding the SDGT entity Benevolence International Foundation in the United States. On those findings, the CRA revoked WAMY's designation as a tax exempt registered charitable organization. See https:// https://www.canadiancharitylaw.ca/uploads/World_Assembly_of_Muslim_Youth.pdf

violence in the Philippines and Indonesia."[187] But when asked if he had "come across information pertaining to" the MWL/IIRO in the Philippines and Indonesia, Sidel responded "[v]ery minimally."[188] Sidel states in his report that:

> …instead of focusing on a narrow set of actors engaged in various forms of violence in the name of Islam, my research and analysis has emphasized the importance of contextualization. Here I have been concerned to situate those actors engaged in violence in the name of Islam within the discrete political and sociological contexts in which they are embedded, both in terms of the contested field of religious authority (i.e. who speaks in the name of the faith) and in terms of conditions and trends in the field of politics and power relations (i.e. how Muslims – and Islam –are represented in terms of state power and policy-making)."[189]

Before agreeing to testify as an expert for MWL/IIRO, Sidel had almost no awareness of MWL/IIRO involvement in Southeast Asia. Though he is aware that MWL was involved in the 1987 "Jeddah Accord" between the Moro National Liberation Front and the Philippines government,[190] he has "no other awareness" of the MWL's involvement in the Philippines "whatsoever as such, in terms of politics or otherwise the Philippines."[191] He testified that his familiarity with the MWL's engagements in the Philippines relating to MNLF and the MILF is limited to paragraph 3 of his Report,[192] but that section does not mention the MWL directly.[193] In fact, before MWL/IIRO retained him, Sidel had come across no information about IIRO's alleged support for Jemaah Islamiyah,[194] nor had he heard anything about IIRO's alleged funding of the MILF.[195]

Before he was retained for this case, Sidel did not even know that the U.S. Government had designated IIRO offices in Indonesia and the Philippines for providing material support to al Qaeda

---

[187] Ex. 11, Sidel Dep. 33:15-21.
[188] Ex. 11, Sidel Dep. 27:1-6.
[189] Ex. 5, Sidel Report ¶ 31.
[190] Ex. 11, Sidel Dep. 27:13 to 28:5.
[191] Ex. 11, Sidel Dep. 28:6-17.
[192] Ex. 11, Sidel Dep. 29:3-14.
[193] Ex. 5, Sidel Report ¶ 3.
[194] Ex. 11, Sidel Dep. 30:4-9.
[195] Ex. 11, Sidel Dep. 30:10-17.

and its affiliates Abu Sayyaf and Jemaah Islamiyah.[196] Sidel testified he first learned of the U.S. terrorism designations while preparing for this case.[197] He was aware of allegations about "direct forms of support and encouragement" and claims that Abu Sayyaf, Jemaah Islamiyah, and the MILF, had been receiving financial support from al-Qaeda, but never conducted any independent research concerning those allegations before or while serving as an expert in this litigation.[198]

Despite Sidel's earlier fieldwork and research in the Philippines and Indonesia, and after he was hired by MWL/IIRO, Sidel never sought out or conducted any interview with members of the Moro Islamic Liberation Front, Abu Sayyaf Group, or Jemaah Islamiyah,[199] to ask about allegations that those groups received financial or logistical support from the MWL/IIRO or people acting on their behalf, or about their ties to al Qaeda.  Nor did Sidel conduct any research or review public accounts of interviews with members of terror organizations such as Noor Umog.[200]

Sidel spends dozens of pages discussing the "historical and political context within which violent conflict emerged and evolved in the southern Philippines since the 1970s" and the roles of Abu Sayyaf and the MILF in said conflict. Sidel does not directly discuss facts at issue in this case in these sections, but characterizes them as "contextualization."[201] Throughout this extensive "contextualization" Sidel does not engage with the facts alleged in this case, and cites materials produced in this litigation *only once*.[202] Notably, nowhere in the summary section of his "affirmative

---

[196] When asked when he was first aware of the designation, Sidel stated "If I was aware of those facts prior to this case it was, you know, very subliminal, nothing that stayed with me." Ex. 11, Sidel Dep. 31:4-9. For the designations themselves, see Ex. 15, Exhibit 159, introduced at the Deposition of Adnan Basha.

[197] Ex. 11, Sidel Dep. 31:10-17 (stating "So when this was drawn to my attention in the course of … preparations for this case … it might as well have been my first time. It's the first time I read the actual press release, for example").

[198] Ex. 11, Sidel Dep. 32:11-23; 33:9-14.

[199] Ex. 11, Sidel Dep 19:21-24 and 20:1-2 (MILF); 20:3-24 and 21:1-8 (Abu Sayyaf); 21:9-17; 38:1-14 (Jemaah Islamiyah). He met with a senior MILF representative, Hadj Murad, over a "lavish buffet breakfast" at "a fancy hotel in Manila" between 2013-2016, but failed to ask him anything about MILF's activities before 9/11. *See* Ex. 11, Sidel Dep. 38:15-25; 39:1-24; 40:1-6

[200] Ex. 11, Sidel Dep 20:17-24; 21:1-8.

[201] *See* Ex. 5, Sidel Report ¶ 31 (stating "my research and analysis has emphasized the importance of contextualization").

[202] Ex. 5, Sidel Report 32 n. 48.

opinions," or the "qualifications" section of Sidel's report does he mention MWL/IIRO, Saudi charities, relief organizations, Saudi Arabia. In fact, the MWL is mentioned a mere *four times* throughout the entirety of the report. Aside from being mentioned in Sidel's summary of his rebuttal opinions, he does not discuss the IIRO until paragraph 88 of his 128-paragraph report.

The foregoing clearly indicates that, before his engagement in this litigation, Sidel had no relevant background in terrorism issues relevant to this case and possessed only limited knowledge tangentially related to the claims and defenses here. Sidel's generalized testimony about the Philippines and Indonesia does not address facts that would make it more or less likely that MWL/IIRO provided support to al Qaeda leading up to the September 11, 2001 attacks and is offered under the guise of "contextualization." The proposed testimony is irrelevant and misleading (and without sound methodological support).

### 1. The probative value of Sidel's report is far outweighed by the danger of unfair prejudice and confusion of the issues.

Rule 403 of the Federal Rules of Evidence instructs that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The probative value of Sidel's affirmative opinions are undoubtedly outweighed by the danger of unfair prejudice and confusion of the issues.

As stated above, Sidel spends dozens of pages discussing irrelevant topics under the guise of "contextualization," but his actual goal is to confuse. Sidel gives lengthy histories of the MILF, Abu Sayyaf, MNLF, and Jemaah Islamiyah, but mentions al Qaeda only *three* times in the affirmative opinions section of his report, and only after ten pages of historical background not related to any issue in this case. To the extent that Sidel's testimony regarding Abu Sayyaf, the MILF, MNLF, and Jemaah Islamiyah is probative, it is far outweighed by the danger of unfair prejudice and jury confusion. The import of these groups is via their *affiliates* and overlap – Ramzi Yousef and Mohamad

39

Jamal Khalifa. Sidel's testimony would only confuse the jury by claiming that, because at certain times these groups were engaged in localized issues, they could not have aided the larger effort – global jihad – undertaken by al Qaeda.

## V. EXPERTS BENTHALL, FREEMAN, AND MARKS OFFER OPINIONS PREMISED ON UNRELIABLE METHODOLOGY

### A. Benthall's opinions do not comply with acceptable methodology.

Although Benthall describes in his reports (Ex. 1, Benthall Report (MWL/IIRO) at 7-9; Ex. 2, Benthall Report (Kadi) at 8-10) a methodology he purports to have applied in reaching his opinions, Benthall admits in his deposition that he did not comply with his own methodology.  For example, by his own admission, Benthall consulted only three of ten types of material he identified in his methodology.[203] Questioned on his methodology, he denied it was related to a specific report and said "it's a kind of perspective of the process of doing research[.]"[204] Even if Benthall's analysis about the operations and financial transactions of MWL/IIRO and Kadi's interests proceeded according to methodologically acceptable means, which they did not, Benthall is not qualified to perform such an analysis.

### B. Freeman's methodology is unsound

Freeman identified no methodology at all beyond the quintessential disallowed "*ipse dixit*" opinion (or "he said it himself"). Freeman testified that his "methodology" consists of first writing his report, and then searching for corroborating information to support his own opinions.  Although Freeman offers a four-document "reading list" attached to his report and cites "corroborative material" in footnotes, he repeatedly insisted, both in his report and throughout his deposition, that

---

[203] *Compare* Ex. 1, Benthall Report (MWL/IIRO) 7-9 and Ex. 1, Benthall Report (Kadi) 8-10 *with* Ex. 7, Benthall Dep. 157:20 to 175:21 (In connection with his report for Kadi, Benthall did not interview anyone from the charities, interview or speak with any government officials, have discussions with representatives of religious institutions, speak to anyone who received charity from Muwafaq or Kadi, make personal observations, or consult any surveys).

[204] Ex. 7, Benthall Dep. 158:4-8.

his opinions are premised on his own experience and not on any documents.[205] Freeman dismisses any need to address any alternative views by claiming, incredulously, that he did not come across *any* materials that refuted his own views.[206] Freeman's tendency to confirm his biases and inability to seek out opinions that contradict his own are not reliable principles or methods and fall far short of compliance with *Daubert* because his opinions are connected to existing data "only by the *ipse dixit* of the expert." *See Joiner*, 522 U.S. at 146.

Even the "corroborative material" Freeman cites underscore his staggering lack of any reliable methodology, and underscore the degree to which he went out of his way to hunt for materials to corroborate his own views, and then characterized the materials in a way that intentionally sought to mislead the plaintiffs, the Court, and ultimately the jury. For example, in support of a key opinion in his report, Freeman quotes at length, without proper attribution, from a comment posted anonymously to an internet blog.[207] To obscure the manifest unreliability of the source, Freeman assures (with no other support) that he "attest[s] to its accuracy,"[208] and attributes it to "a former U.S. intelligence officer who wishes to remain anonymous."[209]

These representations are, in fact, entirely false.  In fact, Freeman pulled the cited text from an anonymous comment posted on an internet blog,[210] which he failed to cite as his source. He did not cite the website address of the blog comments from which he lifted the text.  He did not explain the source was an anonymously posted comment under a pseudonym ("Tidewater"), pulled from a blog run under another pseudonym ("*Sic Semper Tyrannis*").[211] Instead, he tried to confer unwarranted

---

[205] *Compare* Ex. 3, Freeman Report Ex. B. *with* Ex. 3, Freeman Report 1; Ex. 8, Freeman Dep. 35:8-9; 259:11-12; 301:18-19; 354:10-14.

[206] Ex. 8, Freeman Dep. 409:14-21.

[207] Ex. 3, Freeman Report 4 n.7; 12-13, endnote i.

[208] Ex. 3, Freeman Report 4 n.7.

[209] Ex. 3, Freeman Report 4 n.7

[210] Ex. 9, Freeman Dep. Exhibit 559, at 5-6 (Comment Posted to "*Sic Semper Tyrannis*" blog by "Tidewater" on May 18, 2020 at 02:01 AM).

[211] Ex. 8, Freeman Dep. 392:12-23.

authority on the source—about whom he knew nothing—by sourcing the text to "a former U.S. intelligence officer who wishes to remain anonymous."[212] Until questioned about it directly, Freeman sought to continue the ruse.[213] Only after Freeman was questioned directly about the ruse did he admit that he lifted the page-long passage verbatim from a blog comment and that he had no personal knowledge of the actual source.[214] He tried to defend the ploy by arguing that he simply lifted the text because it "coincides with my own personal knowledge."[215] But on questioning about the content of the text, it became clear that Freeman did not even know whether the statements in the text were accurate.[216] Conveniently, though, Freeman copied "Tidewater's" entire comment verbatim, without attribution, except that he omitted a single sentence that alludes to "Tidewater" subscribing to long-debunked conspiracy theories that the September 11, 2001 attacks were controlled demolitions.[217]

Nothing about Freeman's methodology—writing the report based on *ipse dixit* beliefs "corroborated" afterward by materials that Freeman curates to support his unsubstantiated opinions—is recognized as a reliable methodology under Rule 702 or the related case law. Indeed, nearly any far-flung theory could be corroborated premised on Freeman's "methodology" of searching the internet for information that coincides with his own opinions.[218]

Lastly, Freeman's opinions, which are outside his expertise, are conclusory and unsupported by facts or evidence, premised solely on his *ipse dixit*. One example of Freeman's conclusory opinions is his discussion that "support of al Qaeda is anathema to WAMY's reason for being" because it would "place WAMY leadership at odds with the Saudi state."[219] He says "official retribution would have

---

[212] Ex. 3, Freeman Report 4, n.7.
[213] Ex. 8, Freeman Dep. 384:16-19.
[214] Ex. 8, Freeman Dep. 392:16-23; 411:24 to 413:2.
[215] Ex. 8, Freeman Dep. 396:24 to 397:1.
[216] Ex. 8, Freeman Dep. 497:2 to 500:1 (Freeman showing lack of knowledge of information in "Tidewater" Comment)
[217] Ex. 8, Freeman Dep. 396:12 to 398:24.
[218] *See, e.g.,* https://birdsarentreal.com/blogs/news/birds-arent-real-newsweek (suggesting that an expert opinion that birds are robot drones could be supported by citation to an internet blog cite that coincides with that opinion).
[219] Ex. 3, Freeman Report 11-12.

been both immediate and harsh" for supporting al Qaeda.[220] Apparently he wants the reader to believe that, because Saudi Arabia has laws against support of terrorism, no one would deign to break the law. Similarly, he offers conclusory opinions that Saudi Wahhabism is not "compatible"[221] with al Qaeda, that the Saudi *ulema*, which speaks for Saudi Wahhabism, has been "unequivocal in its condemnation of al Qaeda its ideology, and its practices, which it considers perversions of Islamic principles."[222] These opinions, all outside any expertise Freeman may have, are nonetheless unsupported conclusory statements, improper state of mind evidence, and fundamentally inconsistent with authoritative documentation such as the 9/11 Commission Report. *See also Linde II*, 922 F. Supp. 2d at 328 (limiting Benthall's testimony, stating "an opinion as to the state of mind of an organization is inadmissible") (citing *Linde I*, 920 F. Supp. 2d at 285-87).

### C. Marks has not demonstrated that his opinions are based on sufficient facts or a reliable accounting methodology.

Marks did not proceed in his examination applying any cognizable methodology or adhering to any of the customary steps he admitted would have been appropriate to such an undertaking. His report does not contain a section recounting what, if any, methodology he applied in researching and drafting this report.[223] He states only that "experts who are CPAs, accountants, and auditors approach their analyses using tested and accepted methods and approaches[.]"[224] But nowhere, either in his report or throughout his deposition, does not explain what these methods and approaches might be, or if – or how – he applied them.  This violation of the rules and requirements for experts is itself disqualifying.

---

[220] Ex. 3, Freeman Report 12.
[221] Ex. 3, Freeman Report 5.
[222] Ex. 3, Freeman Report 7.
[223] *See* Ex. 10, Marks Dep. 97:14-18.
[224] Ex. 4, Marks Report 6.

To the extent Marks may suggest step he took were part of a reasonable methodology for a financial investigation of WAMY (though Marks never sets out any methodology), he conceded he did not follow it. For example, Marks agreed that, before undertaking a review of an organizations' financial and accounting controls, forensic investigators customarily obtain an understanding of the organization, including its operations and physical structure.[225] Marks' testimony reveals he did not do that. Marks could not testify to whether WAMY USA was an operational office during the period 1992 to 2002.[226] He was unable to recall if WAMY USA provided actual financial audits.[227] Similarly, he was not sure if he saw audits or audited financial statements for WAMY's offices in Sudan, the Philippines, Yemen, Kenya, Nigeria, Russia, or Kosovo.[228] He never determined how many physical offices comprised WAMY nor the total number of offices WAMY operated in Saudi Arabia and abroad for the period from 1992 to 2002, although in his deposition he approximated the number to be between thirty and forty.[229] He was unaware of whether his team at Baker Tilly catalogued WAMY offices and years for which they could identify (or could not) audits or audited financial statements.[230] Marks could not testify as to which offices were operational during this period nor name offices or periods for which Baker Tilly did not receive audits or audited financial statements.[231] Marks stated he was not engaged to perform a forensic audit of WAMY or its branch offices and Baker Tilly did not engage in an effort to reconstruct the distributions, expenses, and payments reflected in the audits.[232] In addition, to write his report, Marks relied on a team of other individuals which, in turn, relied on a small number of so-called "audits," some of which were not identified and others that when identified

---

[225] Ex. 10, Marks Dep. 186:17 to 187:6.
[226] Ex. 10, Marks Dep. 189:17-20.
[227] Ex. 10, Marks Dep. 190:1-3.
[228] Ex. 10, Marks Dep. 190:10 to 192:18. These are all known hot-spots for al Qaeda activity.
[229] Ex. 10, Marks Dep. 187:8-20.
[230] Ex. 10, Marks Dep. 188:7-16.
[231] Ex. 10, Marks Dep. 188:17 to 189-8.
[232] Ex. 10, Marks Dep. 103:1 to 104:14

were not actually audits, and dismissed qualifying language in the documents based on unconfirmed assumptions about the auditors conclusions.[233] Further, Marks had not developed or maintained a formal list of "red flags" identified during the review of documents he performed, or done by others at his direction, despite being asked to identify potential red flags.[234] On methodological shortcomings alone, Marks fails the *Daubert* standards.

## VI.   EXPERTS BENTHALL, MARKS AND SIDEL PROFFER IMPROPER STATE OF MIND TESTIMONY

### A.   Benthall offers improper state of mind evidence and an unqualified legal opinion regarding when an organization may be bound

During his deposition, Benthall was asked about Dr. Basha's testimony regarding Prince Turki bin Jalawi sending money overseas directly from the IIRO Eastern Province office in violation of IIRO's procedures.[235] In response to questions about whether or not Dr. Basha bore fault for failing to stop this behavior after its initial discovery, Benthall said, "I wouldn't defend Dr. Basha as being the most brilliant administrator … he was doing his best … [a]nd … there may have been other people … who had strings to pull and make it difficult for him."[236] Benthall later admitted, "[N]othing like that came from Dr. Basha. I have to admit that it's more speculation than concrete evidence."[237] He also confirmed that when he spoke to Dr. Basha in 2015 or 2016, he never raised the allegations about IIRO's involvement in terrorist activity.[238] Benthall's conclusions about why Dr. Basha failed to stop the overseas transfer of funds from IIRO's Eastern Province office have no bases.

---

[233] Ex. 10, Marks Dep. 51:6 to 52:18 (regarding audits and financial documents reviewed); 183:6 (regarding Marks inability to identify the fifty-four documents he claimed were "audit reports" he reviewed); 54:2-10 (regarding the number of Baker Tilly employees involved in the WAMY rebuttal report project); 93:17-95:23 (regarding semantic representations within Marks' Report about who actually performed the work to prepare the report); 103:10 to 104:15 (regarding a lack of due diligence conducted related to audit work done by others).

[234] Ex. 10, Marks Dep. 105:14-20 (Marks did testify the list of WAMY potential red flags, had he developed one, would be small.); *see also* 311:6-7 (In subsequent redirect by WAMY's counsel, Marks clarified his earlier statement regarding identifying a small list of potential red flags for WAMY, saying, after further review, they were not red flags).

[235] Ex. 7, Benthall Dep. 238:5 to 239:3.

[236] Ex. 7, Benthall Dep. 239:5-13.

[237] Ex. 7, Benthall Dep. 241:18 to 242:7.

[238] Ex. 7, Benthall Dep. 240:15-25.

In addition, he seeks to offer a rebuttal opinion about Evan Kohlmann's assessment of how the organizational and financial structures of MWL and IIRO provide evidence that wrongdoing would have been conducted with the knowledge of organizational leadership; however, Benthall's testimony on these issues is grounded in nothing more than his own guesswork.[239] Even worse, Benthall never attempted to analyze the operations of MWL/IIRO. When asked about this topic at deposition, he admitted he never tried to determine what, if any, investigation the IIRO undertook in response to accusations of potential involvement in al-Qaeda activities after the East African Embassy Bombings.[240] Based on this admission, Benthall cannot testify regarding the systematic practices at the apex of MWL/IIRO with regard to financing terrorism.

Benthall opines, "There is no reason to suppose that the leaders of the IIRO or MWL had anything to do with the leaders of Al-Qa'ida, or shared its ideology, goals or tactics." He claims, "[t]he administration and financial control of large international charities with many overseas branches present practical problems of all NGOs – Western and Islamic."[241] In adopting this position, Benthall seeks to offer the jury guidance about the legal distinction between illegal behavior by individual officeholders that is not attributed to an organization and when illegal behavior is imputed to an organization. But such testimony by Benthall about legal distinctions is improper. He is neither the judge nor an attorney and is unqualified to instruct a jury on such legal distinction despite his belief that one does not "need to be a lawyer to reach an informed judgment on such matters."[242] To the extent he offers a legal opinion on whether the actions of MWL/IIRO's leadership bind the organization, he is not qualified to do so and his testimony is improper because it invades the province

---

[239] *See* Ex. 1, Benthall Report (MWL/IIRO) 4 ¶ 19 for Benthall's rebuttal to Evan Kohlmann's assessment. The main thrust of his rebuttal opinion is Benthall's assessment of Kohlmann's qualifications.

[240] Ex. 7, Benthall Dep. 245:24 to 246:13.

[241] Ex. 1, Benthall Report (MWL/IIRO) 2 ¶ 9.

[242] Ex. 7, Benthall Dep. 222:16 to 223-19

of the Court would serve to confuse the jury on a legal issue.[243] To the extent Benthall proffers testimony regarding state of mind, intent, or motive, his testimony is also inappropriate because it would improperly instruct the jury on the intent of the organization and be unfairly prejudicial.[244] Benthall's prior attempt to proffer state of mind evidence in *Linde v. Arab Bank* was excluded.[245] Moreover, at least as to the merits defendants, the state of mind standard Benthall seeks to introduce is incorrect.[246]

Benthall also improperly injects speculative motive and state of mind testimony as to Yassin Kadi. As evidence that Muwafaq and Kadi were willing to extend charity to Christians, Benthall cites a letter of gratitude from the Minister of Social Affairs of the short-lived geopolitical entity known as the Croatian Republic of Herzeg-Bosnia which includes a New Testament reference.[247] Similarly, to support Kadi's motives, Benthall cites to a letter by the Sudanese Red Crescent Society, Malakal, stating that Muwafaq provides services without religious or racial discrimination, and to Kadi's own statement to OFAC asserting his strong commitment to promoting education in society, and among women in particular. Deposition testimony on this subject includes Benthall's belief that "if Mr. Kadi

---

[243] The Second Circuit has noted that it is "in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (citing *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985); *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510-12 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)). The *Hygh* Court also concluded that though an expert may be "uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing a jury." 961 F.2d at 364; *see In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (excluding expert's opinion regarding whether recusal was appropriate based upon application of statute because it constituted legal conclusion); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213-14 (D.C. Cir. 1997) (affirming exclusion of expert who opined that the defendant violated the ADA, because it constituted an impermissible legal conclusion).

[244] Such expert opinions amount to an attempt to "tell the jury the defendant's intentions through the mouths of witnesses other than [itself]. *Linde I*, 920 F. Supp. 2d at 285 (quoting *Rahman*, 189 F.3d at 136). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Linde I*, 920 F. Supp. 2d at 285 (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 547).

[245] *Linde II*, 922 F. Supp. 2d at 328; *see* Ex. 7, Benthall Dep. 88:14-89:24; 206:18-207:6 (At deposition, Benthall was unable to recall which parts of his testimony were excluded until shown the opinion regarding his disqualification).

[246] *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 859-60, 863-64 (2d Cir. 2021) (a defendant's mere awareness it was playing a role in terrorism satisfies the element required for an Anti-Terrorism Act Aiding and Abetting Claim); *see also Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021) (A defendant's general awareness can be reasonably inferred from the defendant being "closely intertwined" with the Foreign Terrorist Organization ("FTO") and its violent activities).

[247] Ex. 2, Benthall Report (Kadi) 34-35.

had shown any inclinations towards jihadist ideology, it would have seeped out in the course of these proceedings…. [H]e supported a women's college … and training for women…. [If any tendency towards] … jihadist extreme violentism [sic] ideology were there, it would have seeped out…." This assertion intends to serve as a testament to Kadi's good character and is groundless, improper state of mind testimony.

### B.     Marks proffers improper state of mind testimony

Related to testimony concerning WAMY's relationship with and management of one of its former officials, Specially Designated Global Terrorist designee, Adel Batterjee, Marks offers improper state of mind testimony that the Court should disallow. A section of Marks' report is devoted to a narrative recounting of the relationship between WAMY and Adel Batterjee according to the perspectives of WAMY and one of its longtime officials, Dr. Noorwali.[248] This is the backdrop for his blanket statements regarding the rationale for Batterjee's dismissal:

> These active actions by WAMY highlight its proactive approach to control and show that WAMY was active in its management and removal of anyone it considered to be a bad actor. An organization that was actively financing terrorism would not proactively remove an individual and bring to light any deception.[249]

These wide-ranging statements conflating Batterjee's dismissal with WAMY's active removal of *anyone* considered to be a bad actor, regarding what any organization *would* do, and imputing an intention to the organization is both improper speculation and an attempt to offer state of mind testimony with regard to WAMY.[250] Marks' testimony on WAMY's engagement in charitable works, as more fully set forth above, is presented by Marks not for its relevancy or in support of his relevant opinions, but as

[248] *See* Ex. 4, Marks Report 11-14 (The narrative provided by Marks is heavily reliant on Dr. Noorwali, referencing two Declarations and his deposition in addition to sections of a 181-page English language document produced by WAMY [WAMYSA018575-18755] entitled "World Assembly of Muslim Youth Pakistan Office – Islamabad: Brief Information about WAMY/LBI office activities during 1992 to 2002").

[249] Ex. 4, Marks Report 12-13.

[250] Adel Batterjee is the founder of Benevolence International Foundation ("BIF"). The United States Treasury Department designated both as Specially Designated Global Terrorists. See https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx for Batterjee's December 21, 2004 designation. See https://www.treasury.gov/press-center/press-releases/Pages/po3632.aspx for the November 19, 2002 designation of BIF.

evidence of WAMY's character as an organization.[251] This is improper state of mind testimony and should be barred.

### C.     Sidel offers improper state of mind testimony

Throughout his report, Sidel impermissibly infers the state of mind of the actors and organizations at the time. He suggests that the focus of Jemaah Islamiyah and Abu Sayyaf were, at all relevant times, "localized," and that there was no interest in southeast Asia for a "global jihad."[252] Examples include:

- "But the years that followed Khalifa's departure from the Philippines saw the Abu Sayyaf group focusing on localized criminal activities, rather than anything more recognizably 'global' or 'jihadi' in orientation or impact."[253]

- "On the ground, the MNLF's infrastructure was rooted in local political, familial, and business networks at odds with the Marcos government and its local allies in the southern Philippines, rather than in networks of religious schools and scholars. In considerable measure, the conflict in the southern Philippines has concerned Muslims but not Islam per se."[254]

- "Reportedly founded by an Islamic activist from Basilan after years of studying in the Middle East and a stint along the Afghanistan-Pakistan border with the mujahidin, this highly localized group is said to have originated as a religious group Al Harakat al-Islamiyya (the Islamic movement)."[255]

- "Thus the Jemaah Islamiyah network only briefly and belatedly turned to the grandiose cause of 'global jihad' after the failure of its bid for relevance – and its brief and failed experiment with local jihad – during the period of heightened Islamist influence and inter-religious violence in Indonesia in 1999-2001."[256]

---

[251] Ex. 4, Marks Report 10 ("A review of the primary source documents shows that WAMY supported other charitable organizations and initiatives that were in line with the goals enumerated in WAMY's charter, which includes humanitarian support for refugees and orphans" and "supporting refugees and orphans affected by war does not equate to terrorism, and is in line with WAMY's stated charitable goals").

[252] See Ex. 5, Sidel Report ¶ 116, stating "But the years that followed Khalifa's departure from the Philippines saw the Abu Sayyaf group focusing on localized criminal activities, rather than anything more recognizably 'global' or 'jihadi' in orientation or impact."; see also Ex. 5, Sidel Report 23, stating "activists associated with the remnants of the *Jemaah Islamiyah* network have been involved with a series of terrorist attacks in both Indonesia and the Philippines focused largely on local targets." Cf. infra, at 17-19 and n.89 (discussing the global implications of the Bojinka plot).

[253] Ex. 5, Sidel Report ¶ 116.

[254] Ex. 5, Sidel Report ¶ 48.

[255] Ex. 5, Sidel Report ¶ 60.

[256] Ex. 5, Sidel Report ¶ 82.

- "In short, the determinants of violence in the name of Islam in both the southern Philippines and Indonesia were local in origin, reflecting political opportunities and constraints in these local and national contexts rather than participation in a broader struggle for 'global *jihad*'."[257]

Sidel also impermissibly opined on the state of mind of organizations and individuals in his deposition, where he stated:

- Jemaah Islamiyah, prior to 9/11, was focused on local causes and conditions and not part of any broader global jihadism,[258] and

- Regarding Abu Sayyaf founder, Abdujarak Janjalani, Sidel states without citing to specific evidence that Janjalani's participation in the Afghan jihad was "more limited than they would subsequently like to let on."[259]

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court bar, exclude, or otherwise limit the expert opinions offered by Jonathan Benthall, Charles W. Freeman, Jonathan Marks, and John Sidel, together with such further relief as the Court may deem appropriate.

Dated: November 15, 2021                    Respectfully submitted,

MOTLEY RICE LLC                             COZEN O'CONNOR

By: /s/ Robert T. Haefele                   By: /s/ Sean P. Carter
JODI WESTBROOK FLOWERS                       SEAN P. CARTER
DONALD MIGLIORI                              SCOTT TARBUTTON
ROBERT T. HAEFELE                            COZEN O'CONNOR
MOTLEY RICE LLC                              One Liberty Place
28 Bridgeside Boulevard                      1650 Market Street, Suite 2800
Mount Pleasant, SC 29465                     Philadelphia, Pennsylvania 19103
Tel.: (843) 216-9184                         Tel.: (215) 665-2105
Email: rhaefele@motleyrice.com               Email: scarter@cozen.com
For the Plaintiffs' Exec. Committees         For the Plaintiffs' Exec. Committees

KREINDLER & KREINDLER LLP

By: /s/ Andrew J. Maloney
JAMES P. KREINDLER

---

[257] Ex. 5, Sidel Report ¶ 83.
[258] Ex. 11, Sidel Dep. 45:10-19 (stating "Yes, I think so" when asked if saying Abu Sayyaf and Jemaah Islamiyah were focused on local causes and conditions and not part of any broader global jihadism prior to 9/11 is a fair characterization.).
[259] Ex. 11, Sidel Dep. 78:22 to 79:8.

ANDREW J. MALONEY, III
KREINDLER & KREINDLER LLP
750 Third Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: amaloney@kreindler.com
For the Plaintiffs' Exec. Committees

**Certificate of Service**

I hereby certify that, on November 15, 2021, I caused an electronic copy of Memorandum of Law in

Support of Plaintiffs' Daubert Motion to Exclude and/or Limit Proposed Testimony of Defendants

Proposed Experts, Jonathan Benthall, Charles W. Freeman, Jonathan Marks, and John Sidel and all

accompanying papers to be served electronically by the Court's Electronic Case Filing (ECF)

System.  Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the

Southern District of New York's Electronic Case Filing ("ECF") system.

/s/

Robert T. Haefele