LB289111

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    In re Terrorist Attacks on              03 MD 1570 (GBD)(SN)
      September 11, 2001
 4                                            Hearing
      ------------------------------x
 5                                            New York, N.Y.
                                              November 2, 2021
 6                                            9:00 a.m.

 7    Before:

 8                          HON. SARAH NETBURN,

 9                                            U.S. Magistrate Judge

10                          APPEARANCES

11    LANKLER SIFFERT & WOHL LLP
           Attorneys for Nonparty Fawcett
12    BY:  MICHAEL GERBER
           HELEN GREDD
13         GABRIELLE FRIEDMAN

14    KIRSCH & NIEHAUS PLLC
           Attorneys for Kreindler & Kreindler and all witnesses
15    BY:  EMILY KIRSCH
           LISA FREY
16         -and-
      KREINDLER & KREINDLER LLP
17    BY:  MEGAN WOLFE BENETT
           -and-
18    EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
      BY:  HAL R. LIEBERMAN
19
      KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
20         Attorneys for Defendant Kingdom of Saudi Arabia
      BY:  MICHAEL KELLOGG
21         MARK C. HANSEN
           GREGORY G. RAPAWY
22         ANDREW C. SHEN
           CHRISTOPHER YOUNG
23

24

25
```

LB289111

```
1          (Hearing resumed)

2          THE COURT:  Good morning, everybody.

3          A few quick housekeeping matters.  Because we switched

4    the start time to 9, the phone call-in line is not available

5    until 9:30.  The press is here and listening both, I think,

6    some in the room, as well as in the press media room of the

7    courthouse.  We have an overflow room in courtroom 15A.

8    Obviously, this courtroom is open to the courtroom.  We are

9    doing the best we can to give full access as much as possible,

10   but we won't have the AT&T line available to the public until

11   9:30.

12         On that point, around 9:30 I am going to ask the

13   lawyers to literally give a 60-second break.  Ms. Slusher is

14   going to patch in the AT&T line while I will hear it over the

15   speakers that it's happening.  We just need 60 seconds to do

16   that.  So around 9:30, I will ask you to take a quick moment to

17   patch us in.

18         I think that's the end of the housekeeping.  You can

19   begin.

20         Mr. Maloney, I will remind that you already took an

21   oath to tell the truth.  You remain under that oath.

22         THE WITNESS:  Yes, your Honor.

23         THE COURT:  Mr. Shen, you may begin.

24         (Continued on next page)

25
```

LB289111                    Maloney - Cross

1    ANDREW J. MALONEY III, resumed.

2    CROSS-EXAMINATION (Cont'd)

3    BY MR. SHEN:

4    Q.  Good morning, Mr. Maloney.

5    A.  Good morning.

6    Q.  Yesterday when we had paused for the day you had testified

7    about the e-mail searches that you had conducted and that you

8    had directed Mr. Hartney to conduct, correct?

9    A.  Yes.

10   Q.  Now, you testified that you did not search any personal

11   e-mails, you didn't search any texts, you didn't search any

12   personal devices, correct?

13   A.  Correct.  I don't think your firm did either.

14   Q.  If you could just answer the question.

15          THE COURT:  Mr. Maloney, please answer the question.

16   A.  I did not.

17   Q.  You did not tell Mr. Hartney to search any of that

18   information, correct?

19   A.  I did not.

20          MR. SHEN:  Can we show Exhibit 150 on the screen,

21   please.

22   Q.  Sir, Exhibit 150 is a text message chain that Mr. Fawcett's

23   counsel has produced to us this week.  This is a text message

24   chain with Mr. Isikoff and it shows numerous communications

25   between Mr. Fawcett and Mr. Isikoff.

LB289111                        Maloney - Cross

1            If you could, please, turn to the second page, and you
2    will see that on July 24th of 2021, Mr. Fawcett writes to
3    Mr. Isikoff and says, "FYI, there is a witch-hunt for the
4    source of your Jarrah story."
5            Do you see that?
6    A.  Yes.
7    Q.  If you had actually searched personal devices and asked for
8    messages, it would have been clear as day that Mr. Fawcett was
9    the source of the leak, correct?
10   A.  No.
11           MS. KIRSCH:  Objection.  First of all, that's a
12   hypothetical.  Second of all, I don't know why Mr. Maloney is
13   being asked about a document that he has never seen.
14           THE COURT:  I think it's in connection with the nature
15   of the investigation that was conducted.
16           You can continue.
17   Q.  So your testimony is, no, it would not have been clear as
18   day?
19   A.  No.  It's clear there is communication here.  It doesn't
20   indicate in this text that Mr. Fawcett sent Mr. Isikoff the
21   Jarrah transcript.  It doesn't state that here.
22   Q.  Sir, your testimony is that it would not have been
23   reasonable to conduct any of those searches, that was your
24   testimony, right?
25   A.  That is my testimony for the third time.

LB289111                         Maloney - Cross

1    Q.  And you're standing by that testimony?

2    A.  I am.

3    Q.  Let's look at Exhibit 56.F, please.

4            56.F is the declaration that you submitted in this

5    case.

6    A.  That's Mr. Hartney's.

7    Q.  We discussed the e-mail searches that you directed Mr.

8    Hartney to conduct.  Exhibit 1 of his declaration sets out the

9    e-mails that were located in that search, correct?

10   A.  I don't know how to scroll on the computer here.

11   Q.  It's in the binder next to you as well.  Just take 30 or 45

12   seconds just to scroll through those e-mails.

13           THE WITNESS:  Is there a way for me to control it on

14   the screen?

15           THE COURT:  No.

16           THE WITNESS:  Sorry.

17   A.  Remind of the exhibit number, Mr. Shen.

18   Q.  56.F.  We are looking at Exhibit 1 of 56.F.

19   A.  OK.

20   Q.  Mr. Hartney showed you these e-mails after the search,

21   correct?

22   A.  Yeah.  The e-mails that we are looking right here in this

23   exhibit are from Jim Kreindler or to Jim Kreindler -- between

24   Mr. Kreindler and Mr. Isikoff.

25   Q.  And there are some other e-mails in here as well, including

LB289111                       Maloney - Cross

1    an e-mail from Mr. Fawcett to Mr. Isikoff, if you continue

2    scrolling through.

3            We will take you through some of those e-mails.

4            If you could look, please, at the bottom, there is a

5    page number, look at page 6.

6    A.  6 of 27.  Yes.

7    Q.  You see this is an e-mail from Mr. Kreindler to

8    Mr. Isikoff?

9    A.  Yes.

10   Q.  You see that he sent it from his personal device, his

11   iPhone?

12   A.  Yes.

13   Q.  And you see that this is a communication about the podcast

14   that Mr. Kreindler is going to appear on.  Do you see that on

15   July 1?

16   A.  Yes.

17   Q.  Now, sir, this is the earliest communication that we have

18   between Mr. Kreindler and Mr. Isikoff.

19           It certainly stands to reason that there were earlier

20   communications between the two of them, correct?

21   A.  I don't know that.

22   Q.  That's not something that you deduced during your

23   investigation?

24   A.  Well, I asked Mr. Kreindler about this e-mail, and he told

25   me that there was a program that he and Ali Soufan were on

LB289111                    Maloney – Cross

1   called Conspiracyland.  And I asked him if there was any
2   discussion about Jarrah's deposition, and he said no.
3   Q.  That's not the question, sir.
4   A.  Well, you asked me a question about my state of mind.  So I
5   am telling you my state of mind based on what I see here.
6   Q.  Looking at this e-mail, did you deduce that there must have
7   been earlier communications between Mr. Kreindler and
8   Mr. Isikoff?
9   A.  I didn't deduce one way or the other.  But I asked Mr.
10  Kreindler about this e-mail.
11  Q.  Did you ask him if there were earlier communications?
12  A.  I asked Mr. Kreindler if he ever discussed the Jarrah
13  deposition.  That was the nature.
14  Q.  That's not the question.
15  A.  Repeat your question.
16  Q.  Did you ask if there were earlier communications?
17  A.  I didn't.
18  Q.  Please look at page 27, please.
19          Do you see that this is a communication between Mr.
20  Kreindler and Mr. Isikoff where Mr. Isikoff is asking about the
21  status of a motion to lift the states secrets privilege and
22  the, quote, gag order?
23  A.  I see that.
24  Q.  And so, at this point in time, you knew that Mr. Kreindler
25  and Mr. Isikoff were discussing that issue, correct?

LB289111                    Maloney - Cross

1    A.  Yes.  I learned this sometime in late July when I got these

2    e-mails that he had asked about that.

3    Q.  If you could, please, let's look at page 13.

4          Mr. Hartney showed you this e-mail, which is an e-mail

5    from Mr. Fawcett to Mr. Isikoff, July 12, 2021.  Do you see

6    that?

7    A.  Yes.

8    Q.  And it attaches a priv log, but there is nothing at all in

9    the body of the e-mail.  Do you see that?

10   A.  Yes.  I think I saw the attachment at some point.

11   Q.  And you testified that within a few days of Mr. Hartney

12   conducting the search that found Mr. Kreindler's e-mails to Mr.

13   Isikoff you saw this e-mail, correct?

14   A.  Yes.

15   Q.  Now, this e-mail, where there is nothing in the body of the

16   e-mail, certainly indicates that there must have been other

17   communications between Mr. Fawcett and Mr. Isikoff?

18   A.  Why are you assuming that?

19   Q.  There is nothing in the body.  He is just sending a priv

20   log out of nowhere?

21         Mr. Maloney, you think that unsolicited Mr. Fawcett

22   just out of nowhere sent a privilege log to Mr. Isikoff?

23   A.  I don't know one way or the other.  I am just telling you.

24   Q.  Did you ask him?

25   A.  Yes, I did ask him.

LB289111                         Maloney - Cross

1    Q.  What did he say?

2    A.  He said Mr. Isikoff wanted to confirm the existence of the

3    2016 FBI summary, and he gave him the privilege log that had it

4    listed right there.

5    Q.  Did you ask him whether there were other communications?

6    A.  I asked him if he talked to Mr. Isikoff about the Jarrah

7    deposition.

8    Q.  Not the question.  Did you ask him if there were earlier

9    communications?

10   A.  I probably did because I wanted to know the context, as you

11   just indicated, of why he sent him a privilege log, so yes.

12   Q.  You're testifying under oath.  Did you or did you not ask

13   him about earlier communications?

14   A.  I must have asked him why did you send this, and he must

15   have told me he asked for it.  Obviously, there was a prior

16   communication about that, either with Mr. Fawcett and

17   Mr. Isikoff, or maybe Steve Pounian or Megan Benett or Jim

18   Kreindler or a client.  There is a lot of possibilities here.

19   You're making an assumption that he got the request directly

20   from Mr. Isikoff.

21   Q.  Now, sir, you knew that Mr. Kreindler, and we saw the

22   e-mail on page 27, the date of that e-mail is July 13, 2021,

23   Mr. Kreindler and Mr. Isikoff are discussing lifting the states

24   secrets privilege.

25            On July 12, 2021, Mr. Fawcett sends a privilege log

LB289111                    Maloney - Cross

1   listing the documents that are subject to the states secrets

2   privilege.  Do you see that?

3   A.  Yes.

4   Q.  Now, it's certainly the case that Mr. Fawcett was doing

5   that at Mr. Kreindler's direction, right?

6          MS. KIRSCH:  Objection.  That mischaracterizes prior

7   testimony.  It's assuming a fact that's not in the record and

8   it's kind of badgering the witness.  It's misleading.

9   A.  I actually answered that question.

10         THE COURT:  Please let me respond to your lawyer's

11  objections first.

12         I don't think it assumes facts because I think it was

13  an open question.  I think a hypothetical is OK.  But I will

14  ask Mr. Shen to ask the question more directly, please.

15  Q.  Sir, at the time that you looked at this e-mail, did you

16  deduce that Mr. Fawcett was instructed by Mr. Kreindler to send

17  this privilege log to Mr. Isikoff?

18         MS. KIRSCH:  Asked and answered.

19         THE COURT:  Overruled.

20  A.  I asked Mr. Fawcett why he sent the privilege log, and he

21  told me that Mr. Isikoff was looking for corroboration for

22  existence of the 2016 report.  I didn't cross-examine him and

23  say, Did Jim Kreindler ask you to do that, or did Mr. Isikoff

24  ask for that from you directly?  I didn't ask that part.  But I

25  did ask, Did you discuss anything about the Jarrah deposition?

LB289111                    Maloney – Cross

1    And he said no.

2    Q.  Just to be clear, you never asked Mr. Fawcett if Mr.

3    Kreindler asked him to do that?

4    A.  I may have.  I don't recall.  But the import of the

5    conversation was that there was a request by Mr. Isikoff for

6    corroboration of the existence of the 2016 report.  And he

7    provided the document, and as you see, there is no

8    communication other than a transmission of the document here.

9    And after I questioned Mr. Fawcett, I was satisfied that there

10   was no reason to believe that they discussed the Jarrah

11   deposition, or forwarded it.  In fact, these e-mails and

12   these -- these e-mails in front of me seem to confirm that

13   there was no communication about the Jarrah deposition.

14   Q.  Sir, at the time, you were not able to connect the dots in

15   your own head that Mr. Kreindler had directed Mr. Fawcett to

16   provide this to Mr. Isikoff?

17   A.  I didn't make that assumption.

18   Q.  So at this point, we are talking shortly after July 22

19   where Mr. Hartney has provided you with all of these e-mails,

20   you knew that multiple members at your firm were in discussions

21   with Mr. Isikoff, correct?

22   A.  Well, there's, I think, three e-mails from and to Jim

23   Kreindler, one about the gag order, which we covered --

24   Q.  Just answer my question, please.

25   A.  I am trying to answer your question, Mr. Shen.  When you

LB289111                    Maloney - Cross

1    say multiple, I am saying there are three from Jim Kreindler

2    and one from John Fawcett.  I am being exact and precise rather

3    than the sweeping generalizations you make.

4              THE COURT:  Sir, you're not helping yourself.  Please

5    just answer the questions.

6    Q.  Sir, at this point in time, you knew multiple members of

7    your firm had been in contact with Mr. Isikoff?

8    A.  I knew that Mr. Kreindler had and Mr. Fawcett.

9    Q.  And Ms. Hunt, too, because she appeared on the podcast,

10   right?

11   A.  I did not know that.

12   Q.  It did not come up in your investigation?

13   A.  No.

14   Q.  So you knew that Mr. Kreindler and Mr. Fawcett had also

15   attended the Jarrah deposition and knew exactly what transpired

16   at that deposition, right?

17   A.  Yes.

18   Q.  You also knew that they had access to that deposition?

19   A.  Yes.

20   Q.  You also knew that they attended the Thumairy and Bayoumi

21   deposition?

22   A.  Yes.

23   Q.  You also knew they had access to that deposition, right?

24   A.  Yes.

25   Q.  And you knew that Mr. Isikoff had written about what

1    happened at the Bayoumi and Thumairy depositions?

2    A.  I don't recall.

3    Q.  We went over this yesterday.

4    A.  I didn't read the entire article.  You directed me to the

5    portions you wanted me to.  Everybody knew that Mr. Bayoumi and

6    Thumairy were being deposed.  There was nothing that stood out

7    about that.

8    Q.  So on July 15, you didn't read the entire article written

9    by Mr. Isikoff, is that your testimony?

10   A.  No, that's not my testimony.

11            THE COURT:  Mr. Shen, may I remind you to speak a

12   little more slowly so the court reporter can get it.

13            MR. SHEN:  Yes, your Honor.

14   Q.  You also knew that Mr. Kreindler had been communicating

15   with Mr. Isikoff through his personal device, correct?

16   A.  I didn't know that until recently when we downloaded

17   everybody's cell phone.

18   Q.  But you knew that because he was e-mailing from his iPhone?

19   A.  I think I saw the e-mails.  The text messages I don't think

20   I had.

21   Q.  I am not asking about the text messages.  I am asking about

22   the e-mails.  It said they were sent from his iPhone.

23   A.  But that's using the Kreindler server.  That's how we found

24   his e-mails.  When you send an e-mail from your phone, it's as

25   if you're sitting at your desk so I saw them.

LB289111                      Maloney - Cross

1    Q.  But on your phone you also have your personal e-mail,

2    right?

3    A.  Yeah.  I have a Gmail account.

4    Q.  That you can access on your personal phone?

5    A.  Yes.

6    Q.  If someone sends an e-mail message to you on your Kreindler

7    account, you can forward that from your Gmail account, right?

8    A.  I would have to forward it from my Kreindler account to my

9    Gmail account.

10   Q.  You're sure about that?

11   A.  No, but that's what my understanding is.

12   Q.  But the fact of the matter is you never asked for Mr.

13   Kreindler's personal phone, right?

14   A.  Fourth time, I did not.

15   Q.  Or anybody else's?

16   A.  Fifth time, I did not.

17   Q.  Sir, if anyone at the Kreindler firm had leaked the

18   transcript, the prime suspects must have been Mr. Kreindler and

19   Mr. Fawcett, right?

20   A.  Not correct.

21   Q.  They were the ones who had communications with Mr. Isikoff?

22   A.  That's right.  None of those communications showed any

23   evidence that there was a discussion about the Jarrah

24   deposition or the forwarding of the transcript.

25   Q.  Now, at this time, did you attempt to screen Mr. Kreindler

1    and Mr. Fawcett off from the investigation?

2    A.   I don't know that I screened anybody off, but I conducted

3    the investigation --

4    Q.   So the answer is no, correct?

5    A.   When you say "screen," please define it.

6    Q.   You were updating them on the investigation?

7    A.   Yes.  But they weren't part of the investigation, so I gave

8    them the results as they were unfolding.

9    Q.   They were the subject, or they should have been the

10   subject, right?

11   A.   I made everybody who had access to that deposition

12   transcript the subject of the IT investigation we were

13   conducting, including myself.

14   Q.   At this point, was anyone at the Kreindler firm instructed

15   to retain all relevant documents pertaining to this leak?

16   A.   I don't recall, but I knew that if they used the Kreindler

17   server, even if they deleted it, we could find it.

18   Q.   That's not the question.  The question is, did you send out

19   a retention notice?

20   A.   I don't believe I did that in July.

21   Q.   Was any retention notice ever sent out about personal

22   devices?

23   A.   At some point there was.

24   Q.   When?

25   A.   I think it was much later.

LB289111                    Maloney – Cross

1    Q.   It was after your counsel had made an appearance?

2    A.   I believe so.  I don't recall the date.

3               THE COURT:  Mr. Shen, can we take a 60-second break?

4               MR. SHEN:  Yes.

5               (Pause)

6               THE COURT:  All right, Mr. Shen.  You can continue.

7    BY MR. SHEN:

8    Q.   Mr. Maloney, take a look at 56B, which is your sworn

9    declaration submitted in this case.  And paragraph 5, please.

10              Now, paragraph 5 says that, "The rough and final

11   Jarrah transcripts are saved in a directory within a network

12   share drive along with materials relating to the lawsuit."

13              Do you see that?

14   A.   Yes.

15   Q.   Now, that share drive is on Kreindler's internal network

16   server, is that right?

17   A.   Correct.

18   Q.   And it's called Case Media, is that right?

19   A.   Yes.

20   Q.   Then you state in your declaration that "only individuals

21   with the Kreindler log-in credentials can access that

22   directory."

23              Do you see that?

24   A.   Yes.

25   Q.   And that would be everybody who works at the Kreindler

LB289111                    Maloney - Cross

1    firm, correct?

2    A.  As a technical matter, yes, that is correct.

3    Q.  So anybody who works at the Kreindler firm simply enters in

4    their Windows log-in and has access to that directory?

5    A.  Not exactly.

6    Q.  When do they enter in their log-in?

7    A.  When you log on to your computer, you're logged into the

8    system.  But you would have to know where to go to find

9    materials for the 9/11 case.  And everybody at the firm was

10   told you can't have access, you're not permitted, unless you

11   sign a protective order and have a reason to do so.

12   Q.  That's what you're claiming now is the firm's policy.  But

13   as a technological matter, anyone at the firm can just simply

14   get through, right?

15          MS. KIRSCH:  I am just going to object to the first

16   preamble of the question where Mr. Shen is trying to put some

17   twisted testimony in the record.  It's not appropriate.

18          THE COURT:  This is cross-examination.  The question

19   is fine.

20   A.  I think as a technical matter, you may be correct.  As a

21   practical matter, it's not correct.

22   Q.  Now, sir, the Kreindler firm has no ability whatsoever to

23   track who actually accessed any of the confidential and

24   protected information for the 9/11 case, right?

25   A.  From the Kreindler server for a Kreindler employee?

LB289111                          Maloney - Cross

1    Q.  That's right.  For the Case Media.

2    A.  No, we don't have the ability to track.  So, for example,

3    if I went into Case Media and looked at it, no one would know

4    that I looked at the document.

5    Q.  And you would have no idea if any member who wasn't part of

6    your team looked at that document, right?

7    A.  That's true.

8    Q.  Even if they didn't sign the protective orders, you would

9    have no way of knowing, right?

10   A.  I suppose technically that's true.  As a practical matter,

11   that did not happen.

12   Q.  Before this whole leak issue came out and you had outside

13   counsel come in, had you made any efforts as a technological

14   matter to limit access to confidential protected information to

15   only individuals who had actually signed the protective order

16   and were working on the case?

17   A.  Well, as a practical matter, no.  As a technical matter,

18   anybody who was working on the case signed the protective

19   order, nobody who wasn't working on the case sought to gain

20   access to it.  I don't understand why you --

21   Q.  You don't know that, do you?

22   A.  I do know that.  I do know that.

23          It's true that I don't know if other people accessed

24   it and then lied about it, but I could tell you nobody else at

25   the firm accessed it.

LB289111                        Maloney – Cross

1    Q.  When you click into that server, is there a warning that

2    comes up that says, don't access this unless you have looked at

3    the FBI protective order or the MDL protective order?

4              MS. KIRSCH:  I am going to object once again.

5              First of all, Mr. Shen is arguing and yelling at the

6    witness.  Second of all, we all understand that Mr. Fawcett had

7    complete access.  This is a little bit of a sideshow, and I

8    think it's taking up a lot of time.  Mr. Fawcett had access to

9    the system irrespective of whether Mr. Maloney is correct or

10   not.

11             MR. SHEN:  Ms. Kirsch is not here to testify.

12             MS. KIRSCH:  We have now spent 20 minutes arguing with

13   Mr. Maloney about something that is not relevant to the issues

14   of this hearing, which is Mr. Fawcett's breach.

15             THE COURT:  I disagree because what is relevant is the

16   thoroughness of the investigation, which includes whether or

17   not the systems that were in place by the firm at the outset

18   were sufficient to protect this material.  So I disagree with

19   your position that this is not relevant.

20             As to both questioner and answerer, we need to tone

21   down the temperature because we don't need to have a screaming

22   match.  It's also not helpful to the court reporter.  So

23   everybody is here to cooperate, and we need to bring down the

24   temperature a little bit.

25             Please continue.

LB289111                      Maloney - Cross

1          MR. SHEN:  Yes, your Honor.

2    BY MR. SHEN:

3    Q.  Can I have an answer to that question?

4    A.  I don't recall the question, but we could have had Fort

5    Knox and Mr. Fawcett was given keys, as the rest of us were.

6    Q.  The question is, when somebody logs into the Case Media

7    server, is there a warning screen that comes up that says you

8    can only access this if you signed the protective orders or

9    agreed to abide by them?

10   A.  There is no warning screen that says that.

11   Q.  So the record is clear, after the leak issues come up and

12   after you have retained outside counsel, you have now put in

13   place a system that restricts access, is that right?

14   A.  I believe that's either underway or was done.

15   Q.  Now, sir, in paragraph 5, you tell the court, in the last

16   sentence, "Only the following individuals at Kreindler log-in

17   were provided access to the Jarrah transcript."

18         Do you see that?

19   A.  Where are you?

20   Q.  Last sentence.

21   A.  Yes.

22   Q.  And, sir, as you just testified, in fact, everybody at

23   Kreindler had access to those transcripts?

24   A.  They were not provided access.  As a technical matter, we

25   have covered, yes, they could probably get in there if they

LB289111                         Maloney - Cross

1    knew how to do it and where to find it.  They were instructed

2    not to do that, and during the investigation we confirmed that

3    nobody had access.

4    Q.  You don't know that?

5    A.  They could have all lied to me, Mr. Shen.  It's true.

6    Q.  You have no ability to track them so you don't know who had

7    access?

8    A.  I don't have the ability to corroborate whether they told

9    the truth or not about accessing the 9/11 files.

10   Q.  And, Mr. Maloney, you carefully crafted the language in

11   your declaration so that you wouldn't disclose to the court

12   that everyone at the Kreindler firm had access?

13   A.  That's not correct.

14   Q.  Why didn't you tell the court everyone had access?

15   A.  We gave the court what the court asked for.  I knew who had

16   access to the Jarrah transcript.  Those people were

17   investigated; they were all subjects of the investigation,

18   including myself.  And I had the IT guy in charge, who had the

19   technical, logical know-how to do it, conduct the

20   investigation.

21   Q.  You think the court didn't want to know that everyone had

22   access to the transcript, is that your testimony?

23   A.  I think the court asked us who had access to the Jarrah

24   transcript, and we told the court who had access to the Jarrah

25   transcript.

LB289111                        Maloney - Cross

1   Q.  So sitting here today, you still believe that that

2   statement in your declaration was truthful?

3   A.  Nobody else at the firm had accessed the transcript, to my

4   knowledge.

5   Q.  OK.  Paragraph 6.  You say, "Shortly after conferring with

6   Mr. Hartney, I asked each of the individuals listed above if

7   they had sent any portion of the Jarrah transcript to Isikoff

8   or anyone working on his behalf."

9                Do you see that?

10  A.  Yes.

11  Q.  Now, did you sit down in the room with those individuals

12  and ask them?

13  A.  I think we covered this yesterday, but I will go over it

14  again if you would like.  Some of them I did speak to

15  face-to-face and others were on the phone and probably e-mails.

16  This was during the summer.  We hadn't fully staffed back up

17  after the pandemic, so a lot of people were in and out of the

18  office.  So some of them were in person and some of them were

19  probably over the phone.

20  Q.  You said some were over the e-mail?

21  A.  I don't recall.

22  Q.  Did you use a script?

23  A.  No.

24  Q.  Did you take notes?

25  A.  No.

LB289111                      Maloney – Cross

1   Q.  Now, your testimony is that you actually specifically sat

2   down with Mr. Fawcett, looked him in the eye, and he told you

3   that he didn't send the transcript to Mr. Isikoff, is that

4   right?

5   A.  I don't think I sat down, but I was in his office and I

6   asked him.

7   Q.  And he lied to you, is that your testimony?

8   A.  We covered this yesterday.

9   Q.  He lied to you?

10  A.  He did not tell me the truth.

11  Q.  Sir, you're aware that Mr. Fawcett submitted a declaration

12  on September 27?

13  A.  Yes.

14  Q.  And you're aware that Ms. Benett and Mr. Pounian actually

15  drafted the language of that declaration, right?

16          MS. KIRSCH:  Objection.

17          MR. SHEN:  I am asking if he is aware.

18          MS. KIRSCH:  I object because that's an incorrect

19  statement of facts, and I don't even know where he gets it

20  from.  And it's wrong, as the evidence will show.

21          THE COURT:  Why don't you ask if he knew who drafted

22  it.

23  BY MR. SHEN:

24  Q.  Do you know who drafted it?

25  A.  No.

LB289111                     Maloney - Cross

1   Q.  Do you know who modified the language of the declaration?

2   A.  Well, it's my understanding Mr. Fawcett drafted his own

3   declaration and Ms. Benett also finished it so it could be

4   submitted to the court.

5   Q.  Do you know whether or not there were drafts traded back

6   and forth where Ms. Benett and Mr. Pounian were, quote,

7   polishing off the declaration?

8   A.  I do not know.  I was not involved in that.

9   Q.  Let's look at Exhibit 120, please.

10         Now, Exhibit 120 is an e-mail from -- a Mr. Pounian

11   e-mail chain between Mr. Pounian, Mr. Fawcett, and Ms. Benett,

12   and it attaches at 121 the actual declaration with redlines.

13   Do you see that?

14         MS. KIRSCH:  Objection.  There is no foundation that

15   the witness ever saw or knows anything about this document.

16         MR. SHEN:  I haven't asked the question.

17         THE COURT:  I don't think that's a basis of an

18   objection.  He can ask questions about the document.

19   A.  Yeah.  Mr. Shen, what is your question?  Do I see it on the

20   paper?  Yes, I see it.

21   Q.  So you see that Mr. Fawcett is sending redlines to his

22   declaration that he submitted on September 27 to Mr. Pounian,

23   and that's at 7:34 p.m.?

24   A.  I don't see anything about redlines.  I am reading what is

25   on the screen here.  There is no reference to a redline.

LB289111                    Maloney - Cross

1   Q.  Do you see that there is an attachment?

2   A.  Yes.

3   Q.  If you go to 121, sir, I will represent to you that this is

4   the attachment that was produced out of the Kreindler &

5   Kreindler system.

6           MS. KIRSCH:  I don't want to interrupt Mr. Shen's

7   questioning so I will just put a standing objection that this

8   witness was not involved in any of this correspondence, as

9   these documents show.  The witnesses who were involved are

10  here; they can testify as to this whole process.  And I think

11  that this is inappropriate.  There is more than just the

12  documents that Mr. Shen is showing Mr. Maloney, and if he is

13  using that to establish a fact, that's not proper.  So I will

14  make my standing objection.

15          THE COURT:  It is noted.  It is overruled.  You will

16  have an opportunity to redirect the witness.

17  BY MR. SHEN:

18  Q.  Mr. Maloney, looking at Exhibit 121, you actually see the

19  redlines in that document, right?

20  A.  I think the document speaks for itself.  There are

21  redlines.

22  Q.  In paragraph 3, there is a redline where Mr. Fawcett takes

23  out the sentence, "Until today, I had told Kreindler &

24  Kreindler that I did not know how Michael Isikoff had obtained

25  the transcript."

LB289111                    Maloney – Cross

1    A.   How am I supposed to know who deleted that?

2    Q.   Because it's Mr. Fawcett's redline that he sent back.

3    A.   I don't know that.

4    Q.   Let me make sure I understand your testimony, sir.

5              Looking at this e-mail chain that Mr. Fawcett is

6    sending back to Mr. Pounian with his redlines and saying how

7    about this, you cannot deduce that these are Mr. Fawcett's

8    actual redlines?

9    A.   Mr. Shen, seriously, you have prepared dozens, if not

10   hundreds of declarations and affidavits, and I am sure there

11   has been back and forth between you and the declarant.

12   Q.   Would you answer the question, please?

13   A.   I can't answer that question.  I told you I can't answer

14   that question.  I was not involved in it.

15             THE COURT:  Mr. Maloney does not understand what

16   happened with this declaration, and he can't answer any

17   questions about who was involved in its drafting or editing.

18   Q.   Sir, were you aware that Mr. Fawcett was willing to submit

19   a declaration admitting to his breach of the protective order,

20   but he wasn't willing to say that he had told the Kreindler

21   firm that he did not know how Michael Isikoff got the

22   transcript?  Did you know that?

23   A.   I knew the first part.  I didn't know the second part.  I

24   knew that he was willing to issue a declaration saying that he

25   was the one who transmitted the transcript.

LB289111                    Maloney - Cross

1    Q.  You didn't know the second part?

2    A.  The second part, where he deleted this line in the

3    declaration, which I have never seen, I did not know.

4    Q.  Sir, the truth is, you never asked Mr. Fawcett whether he

5    sent the transcript to Mr. Isikoff, right?

6    A.  That is not correct.

7            MS. KIRSCH:  Objection.  Asked and answered.

8    Q.  You never asked Mr. Kreindler either?

9    A.  I answered that question five times between yesterday and

10   today.

11           THE COURT:  Mr. Shen, move on, please.

12   Q.  Sir, go back to your declaration, Exhibit 56F.  We are

13   looking at paragraph 6.

14           Paragraph 6 of the declaration --

15   A.  Hold on.  56F?

16   Q.  Yes.

17           This describes the cloud-based server?

18   A.  This is Mr. Hartney's declaration?

19   Q.  Mr. Hartney's declaration.  It describes the cloud-based

20   server?

21   A.  Yes.

22   Q.  Mr. Hartney says, "On July 29, 2021, I reviewed the user

23   history of that cloud-based server," right?

24   A.  What paragraph?

25   Q.  Paragraph 6.

LB289111                     Maloney - Cross

1   A.  Yes.

2   Q.  And that was the first time that Mr. Hartney reviewed the

3   cloud-based server, right?

4   A.  I don't know, but I asked him to do that.  I asked him to

5   look at the cloud-based server so we can determine if any of

6   our consultants accessed the Jarrah transcript.

7   Q.  Let's just establish a timeline here.  If we can look at

8   Exhibit 93.

9           It's going to be on your screen, Mr. Maloney.

10          93 is July 29, an e-mail from you to Mr. Hartney?

11  A.  Yes.

12  Q.  At the bottom you asked him to look at the file share

13  server, right?

14  A.  Yes.

15  Q.  And who had access?

16  A.  Yes.

17  Q.  So, this is a July 29th e-mail.  That's the first time you

18  asked Mr. Hartney to look at this?

19  A.  I don't know if this is the first time.  I didn't have the

20  answers at this point in time, so I asked him to prioritize

21  this with some urgency.  It may be that I asked him prior to

22  this and this was a reminder.  You can see here, on the very

23  first line, I was asking him to make this a high priority.

24  Q.  But certainly, as of July 29, you didn't have answers as to

25  who had access to the cloud-based server?

LB289111                        Maloney - Cross

1    A.  I did not have a full understanding at that point.

2    Q.  But you are aware that Saudi Arabia filed a letter with the

3    court -- I will represent to you it's on July 23 -- in which

4    Saudi Arabia asked for certain discovery relating to the leak?

5    A.  I don't remember the date, but I remember them doing that,

6    yes.

7    Q.  If you can look at Exhibit 43, please.  This is PEC's

8    letter to the court responding to Saudi Arabia's letter.

9           Just before we put it on the screen, I think we

10   confirmed that this is a public document.

11          MR. RAPAWY:  We discussed this with the PECs when we

12   were talking about redactions, and they did not request any

13   redactions to this document.

14          THE COURT:  Thank you.

15          MR. SHEN:  Let's display the document, please.

16   BY MR. SHEN:

17   Q.  Sir, this is a letter that the PECs put in.  If you go to

18   the last page, you will see your signature block?

19   A.  Yes.

20   Q.  You certainly reviewed this document before it went in

21   under you signature block?

22   A.  Yes.

23   Q.  If we cull out the language before Saudi Arabia filed its

24   motion, it says, "Plaintiffs advised Saudi Arabia that each of

25   the lead PEC firms had already conducted internal

LB289111                    Maloney – Cross

1   investigations into the handling of the Jarrah transcript and

2   communications with Mr. Isikoff and that as a result of those

3   investigations, the lead PEC firms was confident that it was

4   not the source of the leak to Mr. Isikoff."

5        Do you see that language?

6   A.  Yes.

7   Q.  Now, you didn't tell the court that the Kreindler firm had

8   multiple contacts with Mr. Isikoff, right?

9   A.  No.  The question was if we had discovered that the

10  transcript had been sent from Kreindler to Mr. Isikoff.  That

11  was the focus -- the initial focus of the investigation was on

12  just that.

13  Q.  Did you make the decision not to disclose those multiple

14  contacts to the court?

15  A.  The status -- the question for the investigation was

16  whether or not anybody at Kreindler sent him the transcript,

17  sent Mr. Isikoff the transcript, not whether or not anybody had

18  ever spoken to Mr. Isikoff.

19  Q.  I am just asking who made the decision not to disclose that

20  report?

21  A.  I don't know.  It was not directly relevant.

22  Q.  You didn't tell the court that, in the course of your

23  investigation, no personal devices, no personal e-mails were

24  searched, correct?

25  A.  No.  Again, first of all, I didn't do that, as we have

LB289111                    Maloney – Cross

1     already discussed.  And no, it wasn't directly relevant.

2     Q.  You didn't tell the court that every single person at the

3     Kreindler firm had access to the transcript, and you had no

4     idea who actually looked at it or accessed it, right?

5     A.  Well, we didn't tell the court a lot of things that were

6     not directly relevant to the question, which was who sent the

7     transcript to Mr. Isikoff.

8     Q.  You don't think that's relevant to the question of what the

9     already conducted internal investigation is?

10    A.  No.  What was most relevant in the first week or two was to

11    determine whether or not the Jarrah transcript, which had very

12    limited access at our firm, had been e-mailed to anybody --

13    initially just to Mr. Isikoff, and then had a subsequent search

14    on any movement of that transcript.

15    Q.  Now, at this point in time, July 27, you had done no

16    investigation at all on the cloud-based server either, which

17    held the Jarrah transcript?

18    A.  I can't tell you, as I indicated a few minutes ago, if Mr.

19    Hartney had already been doing that.  But I can tell you, as of

20    the e-mail we just covered, I did not know the answers to that

21    search.

22    Q.  So, at the time that you wrote this letter, when you told

23    the court that you had already conducted your investigation,

24    you actually didn't know who had access at all to the

25    cloud-based server and the Jarrah transcript on the server?

LB289111                    Maloney - Cross

1    A.  That's not correct.

2    Q.  You don't know who accessed it?

3    A.  We do.

4    Q.  You just told me on July 27 that you didn't have the

5    answers?

6    A.  You put it in the present tense.  I am telling you right

7    after that e-mail, I did look at the cloud-based platform and

8    nobody accessed the Jarrah transcript.

9    Q.  That was on July 29, right?

10   A.  Let me back up for a second.  The cloud-based platform is

11   for consultants that had signed protective order.  They were

12   authorized to see it.  And I wanted to know if anybody actually

13   accessed it.  I got that answer, and the answer was negative.

14   Q.  The question I am asking you, Mr. Maloney, is at the time

15   that the Kreindler firm submitted this letter to the court, it

16   didn't know the results of the investigation on the cloud-based

17   server, right?

18   A.  I did not personally know the results.

19   Q.  And all you had done is ask Mr. Hartney to do the two

20   e-mail searches that we have already discussed, right, at this

21   time?

22   A.  Yeah.  Right.

23   Q.  Now, you're aware that on July 29, other members of the

24   PEC, the Cozen O'Connor firm and the Motley Rice firm, they

25   voluntarily submitted full declarations, those declarations

LB289111                       Maloney - Cross

1    came from anyone who had access to the transcript, and from

2    their IT director describing the search that was conducted?

3    A.  Yes.  Two of those plaintiffs' firms of many had accessed

4    the transcript.  I don't remember the date, but you say July

5    29.

6    Q.  Who at the Kreindler firm decided at that point in time

7    that it wasn't a good idea to submit declarations to the court?

8    A.  I don't know if it was any one person.  We generally do

9    things by consensus and the consensus was we would wait to see

10   what the court asked us to do.

11   Q.  So it was a consensus decision among all of the lawyers at

12   the Kreindler firm?

13   A.  Correct.  I think we had a meet-and-confer with your firm.

14   There was some disagreement.  And we decided to wait until we

15   got instructions from the court.

16   Q.  Now, as of July 29, when the other PEC firms had submitted

17   full and forthcoming declarations, were any declarations

18   drafted for Mr. Fawcett as to that date?

19   A.  I don't recall.

20   Q.  Were any declarations drafted for Mr. Kreindler?

21   A.  Not by me, so I don't know.

22   Q.  When is the first time that the Kreindler firm drafted a

23   declaration for Mr. Fawcett?

24   A.  I don't know because I wasn't involved in that.  But I know

25   that there was one that was done on September 27.

LB289111                    Maloney - Cross

1   Q.  But you don't know when the first draft was presented to

2   him?

3   A.  I do not.

4   Q.  Do you know if a draft was presented to him that said, I,

5   Mr. Fawcett, did not send the transcript to Mr. Isikoff, and I

6   have no idea who did?

7   A.  Mr. Shen, I don't know how many times I can tell you.  I

8   was not involved in drafting Mr. Fawcett's declaration at any

9   time.

10  Q.  So, after this letter to the court on July 27, where you

11  say that the investigation is done and you're confident that

12  the Kreindler firm isn't the source of the leak, you weren't

13  involved after that?

14  A.  No, I stayed involved.  We had additional search terms.  We

15  continued to do more searches.

16  Q.  You were involved in the search, but you weren't involved

17  in the preparation of the declarations?

18  A.  I was involved in the preparation of my own declaration,

19  and I thought maybe we might need one from John Hartney at some

20  point, so I started to think about that.  But that was it.  I

21  did not prepare declarations for anybody else.

22  Q.  Let's look at Exhibit 49, please.

23          Exhibit 49 is the August 30, 2021 order from the

24  court.

25          Now, just to put this in context, the Kreindler firm

LB289111                    Maloney - Cross

1    had submitted declarations to the court on August 16, and the

2    court ordered the Kreindler firm to submit additional

3    information in declarations, correct?

4    A.  Yes.

5    Q.  And the court orders the four attorneys at Kreindler --

6    yourself, Mr. Pounian, Ms. Benett and Mr. Kreindler -- to

7    identify all communications with Michael Isikoff, or anyone

8    acting on his behalf, whether oral or written.  Do you see

9    that?

10   A.  Yes.

11   Q.  Now, at that point in time, did you ask anybody, we need

12   all of your text messages, we need all of your personal

13   e-mails, the court's order said all communications?

14   A.  We may have.  I don't remember at this point if we

15   collected the cell phone data, but we did ask everybody if they

16   had any communications.

17   Q.  Did you collect it or not?

18   A.  On August 30?  Sometime in September we did.

19   Q.  After August 30, before the September 27 declarations that

20   went in, did you collect it, or was it after Ms. Kirsch got

21   involved?

22   A.  I know after Ms. Kirsch got involved, they were collected.

23   Before that, I think everybody was asked to determine whether

24   or not there was any messages, cell phone or personal or

25   anything to Mr. Isikoff.

LB289111                    Maloney – Cross

1    Q.  Did you go through and look at the call logs from the firm?

2    A.  No.  It wouldn't have shown me anything.

3    Q.  Did you ask anyone for them?

4    A.  No.

5    Q.  Did you ask to see, well, let's see how many calls Mr.

6    Kreindler had with Mr. Isikoff?

7    A.  No.

8    Q.  You are aware that that information is available, right?

9    A.  On the firm's -- sure, any time you make a phone call,

10   there is a recording of it.  It has been the subject of our

11   9/11 case.

12   Q.  It was produced to us this week by your counsel.  But you

13   never looked at it as part of your investigation?

14   A.  No.

15   Q.  You never looked at in preparation for preparing

16   declarations that the court ordered after you had submitted the

17   initial declarations?

18   A.  Each of us were instructed to go back and determine whether

19   or not any of us, anybody at the firm, had any communications

20   with Mr. Isikoff.

21   Q.  Let's look at the second page of the court's order.

22           The court orders the declaration from the head of the

23   firm's information technical group.  And it says that that

24   declaration should demonstrate that a forensic analysis was

25   done to identify who accessed the deposition transcripts and

LB289111                    Maloney – Cross

1     determine the dates of any access.

2              Do you see that?

3     A.  Yes.

4     Q.  Now, you knew at the time that that was impossible to do

5     from the Case Media server, right?

6     A.  No, I don't agree with that.  He did a forensic analysis to

7     determine if anybody transmitted the Jarrah transcript to

8     anybody outside the firm.

9     Q.  That's not the question.

10    A.  It's part of the question, it is.

11    Q.  The court's order says do a forensic analysis to determine

12    who accessed the transcript; not who sent the transcript, who

13    accessed the transcript.  You see that, right?

14    A.  I see that.

15    Q.  You knew at the time that that was impossible to do, based

16    on the technology you were using?

17    A.  Well, from Case Media, we have already covered you can't

18    tell the date that somebody looked at a document, but you can

19    tell if it was sent.

20    Q.  You can't tell who accessed it, right?

21    A.  True.

22    Q.  So this is a problem for the Kreindler firm, right?

23    A.  I don't know that I would call it a problem.  The law firm

24    that's working on the 9/11 case is permitted to have access to

25    the documents.  Nobody at the firm outside of the terror team

LB289111                    Maloney – Cross

1    had permission to access the documents, and to my knowledge, no

2    one ever did, nor would they know how to find it.

3    Q.  Sir, did anyone who submitted declarations on September

4    27th tell the court that it was impossible to do the forensic

5    analysis that the court required?

6    A.  There was a forensic analysis done.  If your quibble is it

7    wasn't good enough, we can debate that.

8    Q.  It's not a quibble.  I am asking you if anyone told the

9    court that you could not do an analysis to determine who

10   accessed the deposition transcripts?

11   A.  No.  We told the court we did a forensic analysis of who,

12   if anyone, sent the transcript outside the firm.

13   Q.  Who made the decision on the Kreindler side not to tell the

14   court that they couldn't do the analysis that the court ordered

15   on August 30?

16   A.  I don't recall there was ever a decision made about that

17   one way or the other.  We wanted to answer the court as fully

18   as we could who, if anyone, sent that transcript to anyone.

19   Q.  It was a consensus decision among the partners?

20   A.  Probably.  But I don't recall that specific conversation

21   taking place.  We wanted to inform the court everything we knew

22   about whether or not that transcript came from our firm,

23   Kreindler & Kreindler, to Mr. Isikoff or Yahoo! News.  And then

24   we did a subsequent search to determine if it was ever e-mailed

25   anywhere to anybody.

LB289111                    Maloney - Cross

1    Q.  After this August 30 order, do you know when the first time
2    that Mr. Fawcett was presented with the declaration?
3    A.  I don't know.  All I know is it was on September 27, he was
4    asked to sign a declaration.  My understanding is he couldn't
5    sign the declaration because he admitted on that day that he is
6    the person who transmitted the transcript.
7    Q.  Did you learn at some point in time that Mr. Fawcett was
8    represented by counsel Liz Crotty?
9    A.  I don't know that to ever be the case.
10   Q.  Sitting here today that's the first time you have heard
11   that?
12   A.  You're telling me he was represented by Ms. Crotty?
13   Q.  I am asking, is this the first time that you have heard
14   that?
15   A.  I am hearing it from you that he is represented by Ms.
16   Crotty.  That's the first time I heard that.  I don't know that
17   he was ever represented.  Are you representing that he was
18   represented by Ms. Crotty or not?
19   Q.  All I know is that there were communications with Ms.
20   Crotty that were marked as attorney-client privilege.
21   A.  Do you know who Ms. Crotty is?
22   Q.  I know who Mr. Crotty is.
23   A.  You know she worked at our firm on this case and that she
24   has remained friends with all of us at the firm?  Do you know
25   she was running for assistant district attorney?

LB289111                    Maloney - Cross

1          THE COURT:  Mr. Maloney, you are not asking the
2     questions.
3          THE WITNESS:  He is asking me if I know, and I said I
4     don't know.
5     Q.  Let me ask a new question.  Did you know that Mr. Fawcett
6     was consulting with Ms. Crotty around the issues of the leak of
7     the transcript?
8     A.  I have no knowledge of that.
9     Q.  This is the first time you have heard that?
10    A.  Yes.
11    Q.  Sir, your testimony is that on September 27, you learned
12    for the first time that Mr. Fawcett was the source of the leak?
13    A.  Yes.
14    Q.  Who told you?
15    A.  I assume I can testify to hearsay, but --
16    Q.  I am just asking who told you.
17    A.  Megan Benett.
18    Q.  Was that in a phone call or over an e-mail?
19    A.  Phone call.
20    Q.  What was your reaction?
21    A.  Stunned, sad, angry.
22    Q.  Did you call Mr. Fawcett?
23    A.  No.
24    Q.  Did you talk to him about the leak ever?
25    A.  No, I have never spoken to him since that day, even a few

LB289111                    Maloney – Cross

1    days leading up to that.

2    Q.  At that point he was persona non grata?

3    A.  You want me to characterize why I didn't call him?  I knew

4    that there was now a separation between us.  No, I wouldn't say

5    persona non grata.  He made a very bad mistake.  I haven't

6    spoken to him since then.

7    Q.  So after you learned that Mr. Fawcett had leaked the

8    transcript, did you do an investigation to determine whether

9    anyone at the Kreindler firm knew about the leak?

10   A.  I had done that investigation already, and I again asked

11   everybody afterwards if -- and they all said this is the first

12   time they were aware of it on the 27th.  So the answer is yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9112                        Maloney - Cross

```
 1   Q.  All right.  What you're saying is that you asked everybody

 2   afterwards whether they were aware of it?

 3   A.  Yes.

 4   Q.  All right.

 5   A.  I had already asked that multiple times in the two months

 6   prior as well, but yes.  When now -- when the revelation now

 7   came out on the 27th, we had a conversation, and everybody was

 8   just as shocked as I was.

 9   Q.  Did you ask for emails?

10   A.  Emails of what?

11   Q.  Did you do any email searches?

12   A.  For what?

13   Q.  To determine whether anyone had knowledge of the leak.

14   A.  We covered that.  For two months --

15   Q.  After September 27 did you do any additional email

16   searches?

17   A.  No.

18   Q.  All right.  After September 27 did you ask at that point

19   for any personal devices or personal emails?

20   A.  No, Mr. Shen.  There's a good reason for that.  I did not.

21   Q.  After that point, September 27, you knew that Mr. Fawcett

22   had leaked the transcript from his personal computer.  Did the

23   firm demand that he return that personal computer?

24   A.  Yes.

25   Q.  When?
```

LB2H9112                    Maloney - Cross

1   A.  I think that he was sent a letter, if I recall -- actually,

2   the Court asked for the computer, and we sent a letter to him

3   to make sure that the computer was either delivered to us or to

4   the Court because we --

5   Q.  But it was only after the Court issued an order, correct?

6   A.  I think it was within a couple of days of that.  I don't

7   remember the date, but it was literally the same week, I think.

8   Q.  It was after the Court issued the order?

9   A.  Probably, but I don't remember.  I know that -- I know that

10  once we'd found out what he had done that we knew that we

11  should no longer speak to him, and we had to, you know, make

12  sure that he no longer had access to our server and system.

13  You got to -- you got to understand, the first two days we're

14  trying to figure out what had just happened.  The Court's order

15  came in about the laptop, and we advised Mr. Fawcett he needed

16  to turn over the laptop.  And we wanted to make it as

17  expeditious as possible, either have him deliver it right to

18  the court or give it to us, and we'd deliver it to the court.

19  Q.  Did you at that point, after September 27, search through

20  in phone logs at the firm?

21  A.  No.

22          MR. SHEN:  I have no further questions.  Thank you,

23  Mr. Maloney.

24          THE COURT:  Ms. Kirsch, are you ready, or do you need

25  a minute?

LB2H9112                        Maloney – Redirect

1          MS. KIRSCH:  I would like a minute, your Honor.

2          THE COURT:  Let's take a quick recess, two or three

3    minutes, please.

4          (Recess)

5          MS. KIRSCH:  Thank you, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. KIRSCH:

8    Q.  Good morning, Mr. Maloney.

9    A.  Good morning.

10   Q.  When did you join the Kreindler firm?

11   A.  June of 1994.

12   Q.  Have you been working there ever since?

13   A.  Yes.

14   Q.  When did you first meet Jim Kreindler?

15   A.  Probably spring of 1994.

16   Q.  What about Ms. Benett?  When did you first meet Ms. Benett?

17   A.  I don't remember the year.  When she was interviewing with

18   the firm and started working with the firm, that was the first

19   time we met.  I don't remember the year she started.  Been

20   there so long, time compresses.  I really don't remember the

21   year.

22   Q.  That's OK.

23          Does 2006 sound about right?

24   A.  Yeah.

25   Q.  What about Mr. Pounian?  When did you first meet

LB2H9112                       Maloney - Redirect

1    Mr. Pounian?

2    A.  Spring of 1994.

3    Q.  '94.

4            What about John Fawcett?  When did you first meet John

5    Fawcett?

6    A.  I think either late 2001 or early 2002.  It was after 9/11.

7    Obviously, he came in to start working on the case.  So

8    certainly by early 2002, maybe even earlier, but after 9/11.

9    Q.  You've been working continuously with each of those people

10   since the time that you first met each one of them?

11   A.  Yes.

12   Q.  Can you describe a little bit about what the working

13   relationship is with that group, that you have with that group.

14   A.  Well, Mr. Fawcett, it was primarily on 9/11.  There were

15   some other matters or some other terrorism cases or some other

16   non-9/11 matters that I worked with him on as well, but it was

17   primarily 9/11.

18           Do you want me to describe the day to day over the

19   last 20 years?  I'm not sure.  I can come back to that.

20           But with Ms. Benett, it was more, and Mr. Pounian, it

21   was more ad hoc.  Mr. Pounian, probably not for many years.

22   There was a time where he was a partner, then of counsel, and

23   then came back.  So I didn't have a lot of work with

24   Mr. Pounian directly until probably 2015, as it relates to

25   9/11.

LB2H9112                          Maloney – Redirect

1              And with Ms. Benett, you know, I worked with her on a

2     variety of matters at the firm, including the terror case.  So

3     there was -- it was definitely more varied with Ms. Benett.

4     She has a general practice; I also have a general practice.

5     Q.  Focusing, then, on the 9/11 case, can you just describe how

6     often you all communicate, what the collaborative working

7     process is like.  Just give us a little sense of how that

8     works.

9     A.  So I would probably focus the time frame from, say, 2016

10    when JASTA was passed to current, because that's been a much

11    more intense time period, and that's the part that focused on

12    the case against the Kingdom of Saudi Arabia.  From that point

13    on, from 2016 to today, it's been a regular interaction, almost

14    on a daily basis.

15    Q.  And has any of the individuals that I've just mentioned,

16    have any of them ever lied to you before?

17    A.  No, not to my knowledge.

18    Q.  Do you have any reason to suspect that any of those

19    individuals have ever lied to you before?

20    A.  Nope.  You come to know people after 20 years of working

21    with them, or 15 years.  You have a good relationship.  And,

22    you know, their integrity is something that would certainly be

23    supported by all the work they've done and all the interactions

24    I've had, and I had no reason to think that anybody would lie

25    to me at the firm.

LB2H9112                    Maloney - Redirect

1   Q.  So has Mr. Kreindler -- let's just be specific --

2   Mr. Kreindler ever lied to you in all of the years you've known

3   him?

4   A.  No, certainly not that I'm aware.

5   Q.  Have you ever been aware that Ms. Benett has lied to you in

6   all the years you've known her?

7   A.  Never.

8   Q.  Have you ever been aware that Mr. Pounian had lied to you

9   in all of the years that you've known him?

10  A.  No.

11  Q.  Prior to this one incident about the leak, had you ever

12  been aware that Mr. Fawcett had lied to you?

13  A.  Never.

14  Q.  How many partners are there, roughly, at the Kreindler

15  firm?

16  A.  Somewhere around ten.  It's approximately eight to ten, I

17  think.  I can sit here and count them, if you'd like.

18  Q.  Is it a reasonably close partnership?

19  A.  Yes.  We have one partner in Boston.  The rest are in

20  New York.  There was a time we had two partners in Los Angeles,

21  but they're no longer part of the firm.  Everybody else is in

22  New York.

23  Q.  So if we go back, can you just recall when you first heard

24  about the leak that led to Mr. Isikoff's article?

25  A.  When I read the article on July 15.

LB2H9112                        Maloney - Redirect

1    Q.  Do you remember how you learned of it?

2    A.  We get forwarded news articles having to do with the 9/11

3    litigation by our PR group that essentially tracks stuff, and I

4    think the Isikoff article was sent to all of us.  I know that I

5    got it.  Pretty sure that's the source I got it from.  And I

6    don't think it was the only article that was attached, but I

7    don't recall for sure, but I opened it and read it that day.

8    Q.  What was your reaction?

9    A.  I was very surprised, particularly the last sentence where

10   Mr. Isikoff says he had a copy of the redacted transcript.  And

11   I knew immediately for him to have that, somebody had to leak

12   it and that that was a violation of the protective order.  So I

13   recognized immediately that was a serious issue.

14   Q.  If we could use the smaller binder that's up there, it has

15   a cover sheet that says "Kreindler & Kreindler."

16   A.  I only have the massive --

17          THE COURT:  I have the Kingdom's binder.

18   A.  -- binder from Mr. Shen.

19          MS. FREY:  Your Honor, may I approach?

20   Q.  OK.  Mr. Maloney, can you take a look at tab 1, please.

21   A.  Got it.

22   Q.  Can you identify this document?

23   A.  Appears to be a text message from me to John Fawcett, Megan

24   Benett, Steve Pounian.  I can't tell if there's other names on

25   there, but those names appear in the chat participants.

LB2H9112                         Maloney - Redirect

1          MS. KIRSCH:  I'd like to move this document into

2    evidence.

3          THE COURT:  Accepted.  It's accepted.

4          MS. KIRSCH:  Oh, thanks.

5          (Kreindler Exhibit 1 received in evidence)

6    BY MS. KIRSCH:

7    Q.  Mr. Maloney, what is the text that you're sending around to

8    the group?

9    A.  So this is on July 15.  The time, I think, is UTC time, so

10   it's sometime in the afternoon on July 15.  After I'd read the

11   Isikoff article, I texted the group because not everybody was

12   in the office, and I said, can we have a call this afternoon to

13   discuss the Yahoo! -- or discuss Yahoo!  That's the article

14   that Mr. Isikoff wrote that came out that day.

15   Q.  Do you recall whether that call took place?

16   A.  I believe it did.

17   Q.  What was discussed on that call?

18   A.  Whether anybody knew anything about how Mr. Isikoff had got

19   the transcript, whether anybody at Kreindler had sent the

20   transcript to him or told Mr. Isikoff about the Jarrah

21   deposition, the substance of the Jarrah deposition.

22   Q.  What was the takeaway from the call?

23   A.  That no one had.  No one had sent him the transcript and no

24   one knew how he got it.

25   Q.  Was it right after this call that you undertook to lead up

1   an investigation?

2   A.   Yes.

3   Q.   And why did you lead an investigation if everyone said that

4   they did not leak it?

5   A.   It's the old Ronald Reagan phrase, "trust but verify."  I

6   trusted everybody in the office and on that call, but I wanted

7   to verify.  I assumed at some point we might be asked whether

8   or not we had done anything to confirm it.  So the following

9   day, I asked our head of IT, John Hartney, to begin a search of

10  all the emails of people that had access to the transcript.

11  Q.   Before that discussion with Mr. Hartney, did you have a

12  face-to-face conversation with any of the members of the terror

13  team about this issue?

14  A.   Yeah.  I believe I spoke face-to-face with Mr. Fawcett that

15  same day, July 15.  If it wasn't July 15, it would have been

16  July 16.  But he was in the office that day and I was in the

17  office that day.  I went into the place where he sits and asked

18  him directly about whether or not he had sent this transcript

19  to Mr. Isikoff or if he knew anything about it, and he told me

20  he did not.

21  Q.   Did you speak with anyone else personally on that first

22  day?

23  A.   On that phone call.  It was the same day.

24  Q.   OK.

25  A.   That phone call also included Mr. Fawcett, but it also

LB2H9112                    Maloney - Redirect

1    included Ms. Benett, Mr. Pounian.  I thought Jim Kreindler was

2    also on the call, but I don't see his name here.  So I can't --

3    I can't verify that, but I'm pretty sure Jim got on a call with

4    us.

5    Q.  Can you take a look at tab 2, please.

6    A.  Yep.

7    Q.  Can you identify this document?

8    A.  It's an email chain.  So the first email is -- it looks

9    like it's from me at the bottom there, July 21, to Mr. Hartney:

10   "Any questions?"

11          And then this is in relation to the search he was

12   performing.  He sent me an email back later that day saying

13   that he performed a search on Lisa, that's Lisa Ranieri, she's

14   a secretary, I think Ms. Benett's secretary; Deb, Debby Pagan

15   who's a paralegal on the 9/11 case; Jim Kreindler; John

16   Fawcett; Steve Pounian; and my, which here denotes me.

17          And said:  I got a good number of results.  Do you

18   plan coming into the office so we can go over it or discuss it

19   on the phone?  I did not see any emails going out of anyone

20   email box with that particular transcript.  I tried calling

21   Mr. Hartney.  I must not have been in the office that day, and

22   he said he would call me back.

23          MS. KIRSCH:  I'd like to offer this into evidence,

24   please.

25          THE COURT:  It's accepted.

LB2H9112                    Maloney - Redirect

1              (Kreindler Exhibit 2 received in evidence)

2              THE COURT:  I think there's no objection to the

3     admission of any of the exhibits, is that correct?

4              MS. KIRSCH:  We would have objection to some of the

5     documents that previously were not moved into evidence, I

6     believe.

7              THE COURT:  My understanding is that the parties were

8     submitting these exhibits and that they were being admitted.

9              MS. KIRSCH:  No, your Honor.  That was one of the

10    reasons that the Kreindler firm had asked for an exchange of

11    exhibits ahead of time, so that we could look at them and see

12    whether we did, in fact, have objections.  We do have objection

13    to a number of the documents in the binder.  We would not

14    stipulate to admit that entire binder into evidence, absolutely

15    not.

16             THE COURT:  All right.  Well, I think on a

17    going-forward basis, then, you need to raise any objections.

18    And to the extent there are objections to be raised for

19    documents that were presented during the course of prior

20    examinations, then we'll have to deal with those objections

21    after the fact during the post-hearing briefing.

22             MS. KIRSCH:  Your Honor, there were many documents

23    that were just thrown up on the screen with no foundation laid

24    of any sort.  I don't -- if it was aiding in the testimony,

25    there was no motion to get them into evidence, I would have

LB2H9112                    Maloney - Redirect

1      raised the objection on a step-by-step basis.  Are we supposed

2      to be briefing all of that?  I had no idea that there was an

3      idea that they would be trying to move them into evidence.

4            THE COURT:  What's the foundation objection generally?

5      Aren't the majority of these documents documents that your firm

6      produced in the course of discovery?

7            MS. KIRSCH:  Well, I will have objections to

8      questioning Mr. Maloney about a document that he's actually

9      never seen before, even if that document may have come.  If

10     they want to get it in through one of the witnesses that can

11     lay a foundation and talk intelligently about it, that would be

12     a different matter.

13           THE COURT:  All right.  I'm not quite sure that

14     foundational objections are going to be well placed given that

15     the volume of the documents are either documents submitted in

16     court, either issued by the court or submitted to the court or

17     documents that were produced by the Kreindler firm as part of

18     the investigation here, but I guess maybe we'll address this at

19     a recess at some point.  So why don't you proceed.

20     BY MS. KIRSCH:

21     Q.  Mr. Maloney, looking at document No. 2, do you recall

22     whether you did have a conversation with Mr. Hartney after this

23     original exchange?

24     A.  I don't recall, but I most likely did.

25     Q.  Do you have a recollection of having a conversation to go

LB2H9112                    Maloney - Redirect

1    over this good number of results that Mr. Hartney's search

2    turned back?

3    A.   Yeah.

4    Q.   Do you have any recollection of what that discussion --

5    A.   Yeah.

6    Q.   -- sum and substance?

7    A.   Yeah, the results, at least at this point in time, were

8    not -- they weren't indicative of the Jarrah transcript or the

9    Jarrah deposition.  And then probably sometime that same week,

10   as I see this is July 21, I think by July -- between July 22

11   and 29th, I'd learn about the three emails that we covered on

12   cross-examination between Jim and Mr. Isikoff and the one from

13   John Fawcett forwarding the privilege log.

14   Q.   Can you take a look tab No. 3, please.

15   A.   Yep.

16   Q.   Can you identify that document?

17   A.   It's an email from me on July 21 to Jim Kreindler, Steve

18   Pounian, Megan Benett, and the subject line is "Jarrah."

19            MS. KIRSCH:  I'd move this into evidence.

20            THE COURT:  Any objection?

21            MR. SHEN:  No objection.

22            THE COURT:  Accepted.

23            (Kreindler Exhibit 3 received in evidence)

24   BY MS. KIRSCH:

25   Q.   Mr. Maloney, can you just sort of explain to me what the

LB2H9112                    Maloney - Redirect

1    purpose of this email to your partners is?

2    A.  Yeah.  This is me informing my partners that I had asked

3    John Hartney to search the outgoing email boxes of the

4    Kreindler 9/11 team from the date we received the transcript on

5    June 28 to see if anybody had sent the transcript to anyone

6    outside the firm, and I asked them to look specifically at Jim,

7    myself -- your Honor, I'm known as Duke -- Steve, as in

8    Pounian, John Fawcett, Megan Benett, Julia Sienski, Deb Pagan,

9    Lisa Ranieri, and Izabela.

10   Q.  Would you take a look at tab 4, please.

11           Do you recognize this document or recognize what it

12   is?

13   A.  Yeah.  I mean, I've only seen it recently.  It appears to

14   be a text message from -- let me see who it's from.  Yeah, it's

15   a text message from me to John Hartney on July 22.

16           MS. KIRSCH:  OK.  I move this into evidence, please.

17           THE COURT:  Any objection?

18           MR. SHEN:  No objection.

19           THE COURT:  It's accepted.

20           (Kreindler Exhibit 4 received in evidence)

21   BY MS. KIRSCH:

22   Q.  Can you explain to me, please, what's going on in this text

23   message.

24   A.  Yeah.  It's me telling John Hartney that Saudis made a

25   motion requesting information.  They made a motion to the

LB2H9112                    Maloney - Redirect

1    Court.  Prior to that, there had been, I think, a letter to us

2    or a meet-and-confer concerning the Jarrah leak, and I told --

3    I was updating Mr. Hartney about the fact that they'd made a

4    motion.  And I was trying to convey to him this is, obviously,

5    very important, and it should be top of your to-do list.

6    Finish the second search of Mr. Isikoff as soon as possible.

7    Let me know the results by tomorrow.

8              The second search, I think, was broader than the first

9    one, and I believe I asked him to determine whether or not the

10   Jarrah transcript had been emailed to anyone.  The first search

11   he had done was a little bit more narrow.  It was on searching

12   whether or not anybody had sent it to Mr. Isikoff or Yahoo!

13   News.  I had added some more.  I had him do another search,

14   another sweep, and this time to determine if there was an email

15   to anybody outside of the Kreindler firm.

16   Q.  And was that normal in the course of this investigation

17   that you would go back to Mr. Hartney for additional searches,

18   terms, changing the breadth?

19   A.  Yeah, I did it several times over the next several weeks.

20   Q.  Can you take a look tab No. 5, please.

21   A.  Yes.

22   Q.  Can you identify this document?

23   A.  It looks like -- this looks like a text from John Hartney.

24   Is it from him?  Yeah, it's from John Hartney.  It's unclear to

25   me if this is a text to me.  I don't see my number, so I don't

LB2H9112                    Maloney - Redirect

1   know if he's sending this to me or not.  I assume he was, but

2   it appears to be a text from John Hartney on July 22.

3           MS. KIRSCH:  I'll move this into evidence.

4           THE COURT:  Any objection?

5           MR. SHEN:  No objection.

6           THE COURT:  Admitted.

7           (Kreindler Exhibit 5 received in evidence)

8           THE WITNESS:  And this is when Mr. Hartney is telling

9   me he did find an email communication with Jim and Mr. Isikoff

10  discussing the gag order.

11  BY MS. KIRSCH:

12  Q.  What was your reaction to that information?

13  A.  I think I followed up with Mr. Hartney, and I said, was

14  there anything there regarding the Jarrah deposition?  And he

15  told me no, and I asked to see all the emails, I don't know,

16  the same day or within a day or two so I could review them

17  myself.

18  Q.  Why don't you take a look at tab No. 8, please.

19  A.  OK.

20  Q.  Do you recognize this?

21  A.  Yeah.  Looks like an email chain.  This is John Hartney

22  sending me on July 22 -- he forwarded me the email.  This is

23  the next day from that text we just covered, exactly what I was

24  recalling.  That he sent me copies of the emails between

25  Mr. Kreindler and Mr. Isikoff.

LB2H9112                         Maloney - Redirect

1          MS. KIRSCH:  I'll move this tab 8 into evidence.

2          MR. SHEN:  No objection.

3          THE COURT:  Thank you.  It's accepted.

4          (Kreindler Exhibit 8 received in evidence)

5    BY MS. KIRSCH:

6    Q.  Mr. Maloney, what was your reaction, if any, when you saw

7    this email as part of your investigation?

8    A.  Well, my initial reaction was, OK, he didn't mention Jarrah

9    at all in the email communication and there's no attachment, so

10   he didn't forward the transcript.  I still had some questions,

11   and so I asked Mr. Kreindler about it.

12   Q.  What was the sum and substance of this discussion with

13   Mr. Kreindler?

14   A.  I said, Did you speak to Mr. Isikoff about the Jarrah

15   deposition?  And he said no.

16   Q.  Can you take a look tab No. 9.  Can you identify this

17   document for me.

18   A.  It looks like a Zoom invite email chain forwarded to me

19   from John Hartney.  This would be yet another one of the emails

20   that Mr. Hartney found between Jim Kreindler and Mike Isikoff,

21   and this one is an invitation to a Zoom -- I guess a podcast or

22   a Zoom meeting with Jim and Ali Soufan.

23         MS. KIRSCH:  I'll move this document into evidence.

24         MR. SHEN:  No objection.

25         THE COURT:  Accepted.

LB2H9112                        Maloney – Redirect

1          (Kreindler Exhibit 9 received in evidence)

2          THE WITNESS:  I should point out, I was asked about if

3   I knew about this on cross-examination.  There's no indication

4   that I saw here about Catherine Hunt's involvement, so I

5   learned about that from Mr. Shen during cross.

6   BY MS. KIRSCH:

7   Q.  At the top here, when you write back to Mr. Hartney:

8   "Thank you.  Is that all there is?"

9          What are you asking Mr. Hartney about?

10  A.  He was sending emails to me, I guess one at a time, and I

11  wanted to make sure I had them all.

12  Q.  We're going to skip ahead.  I asked you after the previous

13  exhibit about your discussion with Mr. Kreindler.  I just want

14  to make sure, did you discuss this email with Mr. Kreindler as

15  well in that conversation?

16  A.  I believe I did.  I never listened to this podcast or Zoom

17  conference.  It's entitled -- I think this is the

18  *Conspiracyland* thing.  And I asked him generally what it was

19  about, and I specifically asked him, did you discuss the

20  substance of the Jarrah deposition?  And he told me no.

21  Q.  What did Mr. Kreindler say to you, to the best your

22  recollection?

23  A.  He did not discuss the substance of the Jarrah deposition.

24  Q.  All right.  Can you take a look tab 18.  Can you identify

25  this document, please.

LB2H9112                    Maloney - Redirect

1   A.   Yeah, it's an email.  The bottom portion is an email from

2   John Hartney to me on July 29.  So this is -- and I forwarded

3   it eventually to -- same day I forwarded it to Jim Kreindler,

4   Jim Pounian, Megan Benett, John Fawcett, Steve Pagan.  It

5   concerns the Jarrah transcript.

6          Again, as indicated earlier, I had Mr. Hartney perform

7   multiple searches of our server, and I wanted to make sure that

8   we covered all the bases.  If you look at some of those prior

9   emails, there was an email address for Mr. Isikoff at a

10  Verizon.net, I think, and I asked Mr. Hartney to make sure he

11  used the word "Isikoff" to make sure that that would be

12  captured no matter what the email address was, and obviously

13  use the word "Jarrah" in the search.

14         So there was some back and forth.  I wanted to make

15  sure Mr. Hartney, when he was repeating searches and expanding

16  the scope of the search, he was using the right search terms.

17  And I actually forwarded Mr. Hartney the Golkow email that

18  contained all the Jarrah transcripts.  That's the rough draft,

19  I believe, the final draft, both redacted and unredacted

20  versions.  Because sometimes a PDF has a code number associated

21  with it.  It doesn't say "Jarrah" in the email byline.  Email

22  from Golkow would say "Jarrah," but the PDF attached has serial

23  numbers sometimes, and I wanted to make sure he had that so he

24  could also plug that in as a search term so that in case

25  someone had emailed the Jarrah transcript and didn't use the

LB2H9112                        Maloney – Redirect

1    word "Jarrah," he would find that, too.  And that's what he's

2    indicating here in this email to me on July 29, that he'd

3    looked at that, and there was a serial number attached.

4                MS. KIRSCH:  I'd like to move that into evidence,

5    please.

6                MR. SHEN:  No objection.

7                THE COURT:  Accepted.

8                (Kreindler Exhibit 18 received in evidence)

9                MS. FREY:  Give the number.

10               THE COURT:  I think it's tab 18.

11               MS. KIRSCH:  Tab 18.

12               THE WITNESS:  Yeah, it's tab 18.

13               MS. KIRSCH:  Sorry, sorry.

14               THE WITNESS:  And just to complete what's on this

15   document, he's telling -- Mr. Hartney's telling me the search

16   results for all the people listed there as to who sent the

17   Jarrah transcript anywhere, not just to Mr. Isikoff, but to

18   anywhere.  And you can see there the very first one he caught

19   is the email that I sent to John Hartney which I just told you

20   about.  The paralegal, Deb Pagan, sent it to one of our

21   cocounsel who's authorized, has access, at the Baumeister

22   Samuels firm.  You can see their email extension there.  I

23   think they're on the cc.

24               And John Fawcett sent it to one of our consultants.

25   The name is redacted.  And then the rest was not sent to -- I

LB2H9112                    Maloney - Redirect

 1   guess Megan Benett's secretary sent it to Megan.  She already
 2   had it, in any event.
 3   Q.  Mr. Maloney, did you have a conversation with that
 4   consultant who was the recipient of the transcript?
 5   A.  I did.
 6   Q.  What was the sum and substance of that conversation?
 7   A.  I asked him, first, did he receive the transcript.  He said
 8   yes.  And how did he get it?  He got it from John Fawcett.  I
 9   said, did you -- what did you do with that transcript?  He
10   said, I don't -- I didn't even read it yet.  I said, Did you
11   send it anywhere?  He said no.  I said, You know, it's
12   protected material.  You can't send it anywhere.  Did you send
13   it to Mike Isikoff or speak to anybody at Yahoo! News?  And he
14   said no, and he said he knew that it was protected and that he
15   couldn't share it with anybody who was not authorized and that
16   Mr. Fawcett had actually reminded him of that.  So I told the
17   consultant, you may be asked to submit an affidavit on that.
18   He said, no problem.
19   Q.  Was that consultant aware at the time that there had been a
20   leak, to your knowledge?
21   A.  I think I told him in that communication I had with him,
22   conversation, yeah.  I don't know if he was aware of it before,
23   but he was aware during the phone call because I told him.
24   Q.  Did you ask the consultant whether he knew anything at all
25   about how that transcript may have been leaked?

LB2H9112                        Maloney - Redirect

1    A.  I did.

2    Q.  What did the consultant say to you?

3    A.  He said he had no idea, and he said, It wasn't me.  I

4    didn't send it anywhere.  I don't know how he got it.

5    Q.  Take a look tab 34.  Can you identify this document for us.

6    A.  It's a series of emails, an email chain between Mr. Hartney

7    and myself.  So --

8              MS. KIRSCH:  That's OK.  I'd like to just move tab 34

9    into evidence.

10             MR. SHEN:  No objection.

11             THE COURT:  It's accepted.

12             (Kreindler Exhibit 34 received in evidence)

13   BY MS. KIRSCH:

14   Q.  Can you tell us what's going on in this email exchange,

15   Mr. Maloney.

16   A.  Yeah.  I started out on August 30 -- at that point we knew

17   we had to get a declaration from Mr. Hartney as the head of our

18   IT, and so I drafted -- I think I drafted a declaration for

19   Mr. Hartney, and I think I wanted him to take a look at it and

20   make sure it was accurate and ask questions.  As a result of

21   that, Mr. Hartney, you know, wanted to make sure he crossed the

22   Ts and dotted the I's, and he wanted to redo the searches.

23   This would have been probably the fifth search or maybe sixth

24   search at this point in time on August 30.

25             But we were given at that point new email addresses

LB2H9112                    Maloney - Redirect

1    from the court for Mr. Isikoff.  One was a Yahoo!/Inc.com, and

2    the other one was an oath.com.  I made sure that Hartney had

3    those, so we had a total of three email addresses for Isikoff.

4    But I also made sure that Mr. Hartney searched just the word

5    "Isikoff" because it would come up in regard -- if Isikoff was

6    in the email address.  It wouldn't matter what the extension

7    was, so he would find that.

8             And I also told him we needed to expand the date

9    range, because prior to the Court's order, I had him look at

10   the time frame from when we received the deposition transcript

11   to the time the Isikoff article -- I think that was June 28

12   when we received it, if I'm not mistaken, and the article came

13   out on July 15.  So I asked him initially to search for email

14   traffic and communications with Mr. Isikoff about the Jarrah

15   transcript in that time period.

16            The Kingdom insisted that the scope and duration be

17   expanded.  I didn't quite understand the rationale for going

18   back to June 1 when the deposition hadn't even taken place

19   then.  But when the Court ordered that, we complied, and this

20   is what I asked Mr. Hartney to do, to expand the scope and

21   duration of the time frame to look at email traffic in and out,

22   so starting with June 1 to August 1.

23   Q.  Mr. Maloney, earlier on cross-examination there was some

24   conversation about whether you searched people's personal

25   devices.  Do you remember that?

LB2H9112                        Maloney - Redirect

1    A.   Yeah, I remember that.

2    Q.   In your opinion, was it reasonable not to require a

3    forensic search of people's personal devices?

4    A.   Yeah.  I think not only was it reasonable, I think it would

5    have been insulting to the staff to say I want all your cell

6    phones and laptops.  I also noticed that none of the other

7    declarations that had been filed, including the Kingdom's,

8    included searches of personal laptops and cell phones, which --

9    and none of the other plaintiffs firms and nobody else that was

10   putting in declarations.  So I didn't consider that to be a

11   reasonable request.  It wasn't something that even entered my

12   mind at the time.

13   Q.   So you just made mention to -- you reviewed the

14   declarations that were filed by the Cozen O'Connor firm, is

15   that right?

16   A.   I did.

17   Q.   Did I understand you to say that they didn't include any

18   searches of personal devices in their searches?

19   A.   My memory is that they had performed an IT search similar

20   to the one that Mr. Hartney did at our firm to look at who had

21   access to the transcript and if it was ever sent anywhere.  I

22   don't recall any declaration, whether it was Cozen O'Connor,

23   Motley Rice, the Kellog Hansen firm, there were a number of

24   firms, Anderson Kill -- there were a lot of firms that were at

25   that Jarrah deposition that had access to the transcript, and I

LB2H9112                    Maloney - Redirect

1    did look at a number of declarations as they came in at various

2    times.  I don't recall any of them saying that they looked at

3    personal cell phones and personal laptops.

4    Q.  So other than searching the firm's servers and interviewing

5    each one of the individuals who was known to handle the

6    transcript, you didn't feel that anybody rose to the level of

7    being a suspect that you needed to image or forensically image

8    their personal devices, is that right?

9    A.  Yeah.  The information I found did not create any

10   additional cause for concern or increased suspicion.  Even the

11   emails to Mr. Isikoff seemed benign to me.  We had

12   communications with a number of journalists.  Keep in mind, the

13   summer of 2021 was the lead-up to the 20th anniversary, and

14   there was a lot of media attention and focus and interest on

15   the case and on the families.  And families were being

16   interviewed.  The firm was being contacted.  So the Isikoff --

17   the fact that there were three emails between Mr. Isikoff and

18   Mr. Kreindler and one from John Fawcett was probably -- that's

19   one or -- one of the three or four out of probably 30 or 40

20   during that same time period with other journalists.  So that

21   did not stand out to me.  It would have certainly raised a red

22   flag if there was something about Jarrah in those emails, but

23   there was not.

24        So it was just the opposite.  To me it allayed any

25   suspicion when I saw that email traffic.  I knew, however, that

LB2H9112                    Maloney – Redirect

1    Mr. Shen and Mr. Kellogg would seize upon any communication

2    with Mr. Isikoff as something sinister.  That's not the case.

3    Q.  Take a look at tab 35, if you would.  Can you identify this

4    document for me.

5    A.  It's an email chain.  I think it's between me and

6    Mr. Hartney in August, August 30 and 31, of this year.

7              MS. KIRSCH:  I'd like to move this into evidence.

8              MR. SHEN:  No objection.

9              THE COURT:  It's accepted.  35.

10             THE WITNESS:  35.

11             THE COURT:  35.

12             (Kreindler Exhibit 35 received in evidence)

13   BY MS. KIRSCH:

14   Q.  If you look at the top couple of emails, can you just

15   explain to me what's going on in this exchange about searching

16   for the word "Isikoff"?

17   A.  Yeah.

18   Q.  What are you discussing here?

19   A.  Yeah.  Mr. Hartney is a very intelligent guy.  He's a very

20   IT guy, but he's a little bit of a Nervous Nellie.  Now that he

21   was being asked to swear out a declaration, he wanted to make

22   sure he had everything right and crossed his Ts and dotted his

23   I's.  And when I told him about the new email addresses, he

24   said, Well, I didn't have those email addresses before when he

25   did his prior searches.  I said, OK.  Well, that's all right.

LB2H9112                          Maloney – Redirect

1   Do it now.

2           Secondly, I said, Wouldn't your initial search have

3   discovered those despite not having the email full address

4   because it contained the word "Isikoff"?  And he responded,

5   Yes, you're right, it would have caught those.  In fact, when

6   he did another search, there was nothing additional.

7   Q.  So let's look at tab 36, if we could.

8   A.  OK.

9   Q.  Do you recognize this document?

10  A.  Yes.  This is Mr. Hartney forwarding to me the email that

11  he discovered between John Fawcett and Mr. Isikoff that was

12  July 12.

13          MS. KIRSCH:  I'd like to move this into evidence.

14          MR. SHEN:  No objection.

15          THE COURT:  It's accepted.

16          (Kreindler Exhibit 36 received in evidence)

17  BY MS. KIRSCH:

18  Q.  What's going on in this discussion with Mr. Fawcett?

19  A.  So after Mr. Hartney found this email, I contacted

20  Mr. Fawcett, and I think I had a conversation before this.  I

21  can see that the date of the email at the top is September 1,

22  but I'm fairly certain I actually spoke to Mr. Fawcett about

23  why he was in communication with Mr. Isikoff, did he discuss

24  Jarrah.  Again, the same questions again, but I said why did

25  you send him this privilege log?  Was this privilege log ever

LB2H9112                        Maloney - Redirect

1    filed on the public docket?  Because the copy I had, at least

2    the one that was easily accessible to me, didn't have the

3    ECF filing at the top.  But it was not marked confidential, and

4    that's what Mr. Fawcett confirmed for me, but I looked myself

5    to confirm it.

6    Q.  Let's take a look at tab 41.

7    A.  OK.  Another series of emails between myself and

8    Mr. Hartney.  And as you can see, the dates are -- this chain

9    started on July 29, but there's an intervening one, and then it

10   ends at the top of the page at September 2.

11              MS. KIRSCH:  I'd like to move this into evidence.

12              MR. SHEN:  No objection.

13              THE COURT:  It's accepted.

14              (Kreindler Exhibit 41 received in evidence)

15              MS. KIRSCH:  OK.

16              THE WITNESS:  And this one, I don't know if you want

17   me to tell you, explain what I'm seeing here.

18   BY MS. KIRSCH:

19   Q.  Sure.

20   A.  This is with regards to the cloud-based server which is

21   available to a certain number of authorized consultants to be

22   able to look at materials that we post there for them with --

23   it's password protected, and we can tell who, if anyone, looks

24   at any particular document and when they did that.  I think I

25   asked -- we covered this a little bit on cross-examination, and

LB2H9112                      Maloney - Redirect

1    I didn't have all the answers, at least I wasn't understanding

2    it correctly on July 29.  And this is -- I got answers soon

3    after July 29.

4           But, again, on September 2 when Mr. Hartney was told

5    he needed to do a declaration, I wanted to make sure I

6    understood and he understood what searches had been performed,

7    and he showed me that there were only these five deposition

8    transcripts that were actually viewed by anybody.  And as you

9    can see, it's Muhanna, Mersal, Freeman, Mana, and Olivier.

10   Nobody looked at Jarrah.

11   Q.  Thank you.  Let's look at tab 43.

12          Can you identify this document.

13   A.  This is an email from John Fawcett.  I'm trying to

14   understand.  He sent from the Kreindler server a message, I

15   think, to the consultant that you can't email these around to

16   people that haven't signed the protective order, and the

17   attachment at the top indicates it was the Qattan transcript,

18   the Jarrah deposition transcript.  And I asked John about this,

19   and this was, in fact, the same consultant we've been talking

20   about that was authorized to receive the transcript who I

21   followed up with myself personally.

22          MS. KIRSCH:  I'd like to move this into evidence.

23          MR. SHEN:  No objection.

24          THE COURT:  Accepted.

25          (Kreindler Exhibit 43 received in evidence)

LB2H9112                    Maloney - Redirect

1    BY MS. KIRSCH:

2    Q.  Mr. Maloney, when you saw Mr. Fawcett's email to the

3    consultant, does this reinforce your understanding that

4    Mr. Fawcett understands the obligations under the protective

5    orders?

6    A.  Yes.  He was reminding the consultant that he couldn't

7    share this.  That these were protected documents, and they

8    couldn't be shared.  In fact, the consultant told me

9    Mr. Fawcett had reminded him of that when he sent them.  And I

10   should also point out Mr. Fawcett told me he sent it to this

11   consultant on the first day or second day, either July 15 or

12   16.

13          THE COURT:  Can I just ask a clarifying question,

14   Mr. Maloney?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  I'm confused.  So there's a July 6 email

17   from Fawcett.

18          THE WITNESS:  Yes.

19          THE COURT:  From his Kreindler email address.

20          THE WITNESS:  Correct.

21          THE COURT:  And he writes, "You can't email these

22   around to people that haven't signed the protective order."

23          THE WITNESS:  Yes.

24          THE COURT:  How do we know to whom that July 6 email

25   is being sent?  I see there's something redacted above.

LB2H9112                    Maloney - Redirect

1              THE WITNESS:  Yes, it's redacted, your Honor.

2              THE COURT:  Is that --

3              THE WITNESS:  That's the consultant number one.

4              THE COURT:  There's another -- I'm confused.  Maybe

5      you can't answer it because it's confusing to you, too.

6              It appears that there's the July 6 email from Fawcett.

7      It's not clear to whom he's sending it.  Then there's an email,

8      I'm assuming it's from redacted to you, on September 1.

9              THE WITNESS:  Yeah.  I believe --

10             THE COURT:  And that something's being sent from the

11     ProtonMail.

12             THE WITNESS:  Yeah.

13             THE COURT:  I'm confused who's sending what.  I see

14     there's three possible emails, one on July 6, one on

15     September 1, one on September 2.

16             THE WITNESS:  My best recollection is that the

17     consultant emailed me on his ProtonMail server the original

18     email he got from John Fawcett, which is what you see at the

19     bottom.  I asked the consultant to forward me John's email, and

20     he did.  That's what this is.

21             THE COURT:  I see.  Thank you.

22     BY MS. KIRSCH:

23     Q.  Mr. Maloney, there was a discussion, I think, yesterday

24     that the consultant actually signed his declaration on -- as

25     early as September 2, even though others were not asked to sign

LB2H9112                    Maloney - Redirect

1   their declarations until the end of September.  Do you know why

2   it was that the consultant was asked to sign a declaration that

3   early?

4   A.  That was by me.  I wanted to find out -- I knew that he had

5   received a copy of the transcript, whereas others had not, and

6   I wanted to make sure we nailed down all the facts on how he

7   got it, when he got it, what he did with it.  And as soon as I

8   had that communication with him, I said, You know, we're going

9   to need you to do a declaration.  He goes, No problem.  I may

10  be traveling soon.  Let's get it now.  He got it right away.

11  Q.  As a general matter, Mr. Maloney, how often would you say

12  you communicate with Mr. Fawcett?

13  A.  On a near daily basis.  In fact, in the summer of 2021,

14  probably almost every day.  Maybe not weekends, but sometimes

15  on weekends, too.

16  Q.  To what extent were you aware of Mr. Fawcett's physical

17  whereabouts as a general matter?

18  A.  Well, obviously, if we were both in the office, I would see

19  him in the office.  But, again, not everybody was going to the

20  office every day during the pandemic in the summer, so there

21  were times where we were working out of our homes.  But

22  Mr. Fawcett was clearly working from home.  He said he was

23  working from home.  He was available from home, and he had a

24  computer there that he would have access to the Kreindler

25  server as if he was sitting at his desk, just like the rest of

LB2H9112                    Maloney - Redirect

1    us.  There were times where he was on Zoom where I could see

2    the background in his apartment.  Growing some tomato plants or

3    something like that.

4    Q.  Did you communicate with Mr. Fawcett about the protective

5    orders?

6    A.  Multiple times, yeah.  I mean, all the time, all the time

7    because anytime we would get a new production, say, from the

8    FBI, we knew that they would have to be protected.  And there

9    were times we'd have to ask the Justice Department whether or

10   not we could use a particular document at a deposition.  There

11   was constant conversations about what was protected, what's

12   not, what's confidential.  There's, obviously, a separate order

13   that governs the Kingdom's documents different than the MDL

14   order, and they're actually completed a little differently, but

15   we treated them pretty much the same.  None of those documents

16   should ever be available through the public domain.  You can't

17   file them on the docket unless they're under seal or redacted.

18   We can't even share them with our own clients.

19   Q.  In the 20 years you worked with Mr. Fawcett, did you ever

20   get any indication that Mr. Fawcett did not understand his

21   obligations under the protective orders?

22   A.  He understood them.  And for 20 years we didn't have any

23   issue or problems with Mr. Fawcett with any confidential

24   documents.

25   Q.  Mr. Fawcett never indicated in any way that he did not

LB2H9112                        Maloney – Redirect

1  intend to honor his obligations under the protective orders?

2  A.  Never said that.  In fact, the office where he and Steve

3  worked and stored documents, we called it the 9/11 war room,

4  that was locked every night.  We had hard copies.  Nowadays we

5  of a new office, and there are very few hard copies.  But up

6  until earlier this year, we were in the office building next

7  door.  The office where the documents were kept, any hard

8  copies, the files, locked, and only Mr. Pounian, I think

9  Mr. Fawcett, and the mailroom guy.  I didn't even have a key to

10  that office.  They were locked every night.  When anyone was

11  not there, the room was locked.

12  Q.  In fact, Mr. Pounian and Mr. Fawcett shared an office

13  space, is that right?

14  A.  Yeah.

15  Q.  Did you ever order or direct Mr. Fawcett to send the Jarrah

16  transcript to Mr. Isikoff?

17  A.  Never.  Did not.

18  Q.  Were you aware before September 27 that Mr. Fawcett had

19  sent the Jarrah transcript to Mr. Isikoff?

20  A.  I was not aware until midday on the 27th of September.

21  Q.  Did you ever approve or condone of Mr. Fawcett sending the

22  Jarrah transcript to Mr. Isikoff?

23  A.  No.

24  Q.  Did you ever have any reason to suspect that Mr. Fawcett

25  sent the Jarrah transcript to Mr. Isikoff?

LB2H9112                    Maloney - Recross

1    A.  I had no reason to suspect it.  And when I did the internal

2    investigation, I was able to corroborate, in my mind, that

3    nobody at Kreindler had sent the Jarrah transcript to Yahoo!

4    News or Isikoff.

5              MS. KIRSCH:  I have no further questions.

6              THE COURT:  Thank you.

7              MR. SHEN:  Your Honor, just five minutes.

8              THE COURT:  Sure.

9              THE WITNESS:  Mr. Shen, I need the book back --

10             MR. SHEN:  We can do it without it.

11             THE WITNESS:  -- the big one?

12   RECROSS EXAMINATION

13   BY MR. SHEN:

14   Q.  Now, Mr. Maloney, counsel for the Kreindler firm asked you

15   some questions about sending the Jarrah transcripts to

16   consultant A?

17   A.  Yes.  And we've called him consultant one, but I'm not

18   going to quibble, yes.

19   Q.  Sure.  Let's look at Exhibit 97, please.

20   A.  In the Kreindler book?

21   Q.  No, it will be on your screen.

22   A.  Oh.

23   Q.  Exhibit 97, as it's coming up, this is an email chain from

24   Mr. Hartney to yourself, and he's telling you that he's been

25   looking for the email that Mr. Fawcett sent to the consultant

LB2H9112                        Maloney - Recross

1  with the transcript?

2  A.  Yeah.

3  Q.  And he can't find it, correct?

4  A.  Yeah.  I can explain that, yeah.

5        THE COURT:  Mr. Shen, do you want to move this?  Given

6  Ms. Kirsch's position, do you want to move this into evidence?

7        MR. SHEN:  Well, your Honor, I think it's most

8  efficient if we address all these issues after the hearing.

9        THE COURT:  I was going to ask that the parties meet

10  and confer about that, but I wonder if on a going-forward

11  basis -- Ms. Kirsch, I don't know what your position is going

12  to be.  Do you want to do this on every document going forward?

13        MS. KIRSCH:  I think it's more efficient to move this

14  into evidence as we go.  We can meet and confer on the other

15  ones.  Again, that was something that would have been the most

16  efficient had we done it in advance of the trial, but I think

17  it's probably easier to make sure that we just move them in as

18  we go.

19        THE COURT:  Any objection as to this document?

20        MS. KIRSCH:  None.

21        THE COURT:  It's accepted.

22        (KSA Exhibit 97 received in evidence)

23  BY MR. SHEN:

24  Q.  Mr. Hartney's telling you on August 31 that he can't find

25  that email, correct?

LB2H9112                    Maloney - Recross

1  A.  He did.  But we had a conversation about this.  Turns out

2  that was incorrect.

3  Q.  Let's take a look at Exhibit 98.  Can we just get rid of

4  the call out, please.

5       At the bottom of the email, September 1, you were

6  asking Mr. Fawcett to send you a copy of the transcript, right,

7  or send a copy of the email that he sent to consultant one?

8  A.  Yes.

9  Q.  And he writes back and says, If Mr. Hartney can't find it,

10 how am I supposed to find it?  And this whole process is

11 creeping me out.  Do you see that?

12 A.  Yes.

13 Q.  This was actually on September 1, the day after the Court

14 issues its August 30 order requiring additional declarations,

15 right?

16 A.  Yeah, that's the date.

17 Q.  So you're telling Mr. Fawcett, well, it's really important

18 that we know the answer, and we need to get this actual email,

19 right?

20 A.  Yes.

21 Q.  All right.  Let's go to Exhibit --

22       THE COURT:  Sorry, Mr. Shen.  I want to try and

23 minimize the work on the back end.

24       Any objections to admitting this document?

25       MS. KIRSCH:  No, no objection.

LB2H9112                        Maloney – Recross

1           THE COURT:  OK.  It's accepted.

2           (KSA Exhibit 98 received in evidence)

3   BY MR. SHEN:

4   Q.  Let's look at Exhibit 99.  This has already been admitted

5   into evidence.  Ms. Kirsch showed you this document.  In fact,

6   what happens here is you have to go to the consultant to ask

7   the consultant to send you the email that Mr. Fawcett had sent

8   to him, correct?

9   A.  Well, ultimately, I need to explain.  I can't answer that

10  with a yes or no.  May I?

11  Q.  Sure.

12  A.  OK.  So, yes, I asked the consultant to send the email.  It

13  turns out there was a miscommunication between Mr. Hartney and

14  I in terms of who the consultant was.  I gave him the name of

15  the consultant.  I didn't know the consultant's email address

16  at the time.  He actually found -- prior to that he had already

17  found Mr. Fawcett's email to that consultant, but it was under

18  a different email address.  There's -- it's not encrypted, but

19  it was something that I didn't recognize.  So I asked

20  Mr. Hartney a few times, Did you find the email to so-and-so by

21  name?  And he said, No, I didn't find that.  I can't find that.

22  And I was puzzled by that because Mr. Fawcett had told me from

23  the very beginning he, in fact, sent the Jarrah transcript to

24  that consultant.

25          So I said, well, let's look at this another way.  Let

LB2H9112                    Maloney - Recross

1   me contact the consultant and find out if that email exists,

2   and that's what you see here, the consultant sending me the

3   email that he got from John Fawcett.  Then I showed that to

4   Mr. Hartney, and he says, Oh, I've had that all along.  This is

5   the same consultant I told you about back in July.  He just

6   hadn't -- he didn't put the connection together between the

7   name of the consultant and the email address that popped up in

8   his initial search.

9            So, really, it was a miscommunication in terms of

10   myself and Mr. Hartney on what he had found.  He had found that

11   from the very beginning.  So it turned out when I got this, it

12   just confirmed what I just told you.

13   Q.  Thank you.

14            Mr. Maloney, did you ask Mr. Fawcett why he was

15   creeped out when you were asking him to search for things?

16   A.  No, I didn't talk to him about it.

17            MR. SHEN:  All right.  No further questions.  Thank

18   you.

19            THE COURT:  All right.  Thank you, Mr. Maloney.  You

20   are done.  You can stay in the courtroom now.

21            THE WITNESS:  Thank you.

22            (Witness excused)

23            MR. SHEN:  Your Honor, Saudi Arabia calls Megan

24   Benett.

25   MEGAN WOLFE BENETT,

LB2H9112                          Benett - Cross

1          called as a witness by the Defendant,

2          having been duly sworn, testified as follows:

3    CROSS-EXAMINATION

4    BY MR. SHEN:

5    Q.  Good morning, Ms. Benett.  You took the Jarrah deposition

6    on June 17 and 18, correct?

7    A.  I did.

8          THE COURT:  Ms. Benett, sorry.  Can I ask you to sit

9    closer to the microphone so everyone can hear you.

10   Q.  And that's one of the depositions you took in the case.

11   Mr. Pounian took most of them?

12   A.  That's right.  Between June and January -- sorry, January

13   and June, Steve Pounian led probably 30-some depositions.  I

14   was lead on Jarrah, and I also took the Zeinab Affifi

15   deposition, and I defended a couple of the other depositions

16   that the Kingdom had noticed.

17   Q.  Now, Mr. Fawcett also attended the Jarrah deposition,

18   correct?

19   A.  So that deposition was by Zoom.  I was in a room by myself

20   in the office.  There were people who were attending who were

21   in a conference room, but given the nature of the documents and

22   sort of the many things you have to manage when conducting a

23   deposition by Zoom, my focus was primarily on getting to my

24   questions, getting the testimony that I was seeking.  I believe

25   John was there.  I may have seen him in and out, but he

LB2H9112                        Benett - Cross

1    certainly wasn't in the room with me.

2    Q.  But you know he attended the deposition, and he heard what

3    happened during the deposition, correct?

4    A.  I saw his name on the transcript.  I don't know how much --

5    I'm assuming he attended the entire deposition, but I was not

6    with him for that.

7    Q.  Mr. Fawcett manages all the discovery material in this

8    case, correct?

9    A.  So he, up until September 27, had access to all of the

10   discovery material.  A lot of people relied on him.  I, for

11   example, know where the materials are and did not necessarily

12   need to rely on him, although I would sometimes ask him to help

13   direct me to information.  We have a paralegal on the case who

14   does some of the document management.  We had another paralegal

15   who we brought in for the depositions who was helping to manage

16   things like deposition exhibits.  Getting ready for the

17   deposition was an enormous process because we had to go through

18   and prepare all of those -- the documents we thought we might

19   use as exhibits during the deposition, and we had several

20   people who were involved in that.

21   Q.  And Mr. Fawcett was one of them, correct?

22   A.  So I don't -- he may have been involved in pulling things.

23   I mean, there was a whole team that was working together.  He

24   was not -- I don't think he was lead on putting together the

25   deposition exhibit files.

LB2H9112                    Benett - Cross

1    Q.  Mr. Fawcett worked as an investigator and researcher on all

2    aspects of the 9/11 case for the Kreindler firm, correct?

3    A.  That's a correct statement.

4    Q.  Did Mr. Fawcett assist you in preparing for the Jarrah

5    deposition?

6    A.  So my preparation for Musaed Al Jarrah was I worked a lot

7    with Steve on that.  I worked a lot with Julia in our office on

8    the exhibits.  John was certainly involved.  So he was one of

9    the team.  Duke was probably involved also.

10   Q.  Ms. Benett, if you could just focus on answering my

11   question.

12            The question was did Mr. Fawcett assist you, and I

13   believe the answer was yes, correct?

14   A.  He was one of the people who assisted me, yes.

15   Q.  Did he see a copy of your deposition outline before the

16   deposition?

17   A.  I don't recall.

18   Q.  He certainly assisted in identifying and preparing

19   exhibits, correct?

20   A.  He would respond to my requests is your -- I guess what do

21   you mean by "assisted"?

22   Q.  Did he know which exhibits you were going to use at the

23   deposition?

24   A.  To be honest, I didn't know until partway through all the

25   exhibits I would be using.  It was an on-the-go process with

LB2H9112                    Benett - Cross

1    some of them.

2    Q.  Certainly, you had assembled a collection of exhibits you

3    may use.  Was he aware of what you might use?

4    A.  Well, you're asking me a question about his state of mind.

5    I don't think I can answer that.

6    Q.  I'm asking for your knowledge.  Did he assist in putting

7    together that collection of exhibits?

8    A.  He helped me out in preparing for the deposition.  I feel

9    like your question is did he know what my exhibits were going

10   into the deposition, and I don't know the answer to that.

11   Q.  Now, Mr. Fawcett knew what topics you were going to explore

12   at that deposition, correct?

13   A.  I feel like these are questions better for Mr. Fawcett, and

14   I don't -- I assume he did.

15   Q.  I want to be very careful here not to compound the

16   Kreindler firm's violation of the protective order by airing

17   confidential information at this hearing, so I'll ask you to

18   answer these questions without disclosing the specific content

19   of what occurred at the deposition.

20   A.  So, Andy, I'm going to answer the questions, and I'm going

21   to let my lawyer object to your grandstanding.

22          THE COURT:  Ms. Benett, please, your lawyer can stand

23   up and object as necessary.  I'm not sure that was

24   grandstanding.  He's just simply trying to make sure that

25   everybody is being sensitive to this subject matter, as we

LB2H9112                        Benett – Cross

1    discussed before this hearing began.

2                So, Ms. Kirsch, I'll hear you.

3                MS. KIRSCH:  I was just going to refer back to your

4    Honor's ruling, which was fairly narrow, but I would also -- I

5    would say that Ms. Benett should be able to answer -- we're

6    here in an open courtroom.  She should be able to answer the

7    question fully.  I think she is mindful, but you could give

8    again, of the instruction with respect to not revealing the

9    actual content, but that everything else is a topic that's

10   appropriate for the courtroom.

11               THE COURT:  Ms. Benett, I assume you're familiar with

12   the order I issued yesterday.  We're not going to discuss the

13   content of the deposition that happened other than the basis

14   that Mr. Fawcett relied on as his explanation for why he

15   disclosed the transcript.

16               Do you understand the scope of my ruling?

17               THE WITNESS:  I think so.  So my takeaway from the

18   order was that we're not going to discuss the actual exchange

19   during the deposition.

20               THE COURT:  That's correct.

21               THE WITNESS:  But that to the extent information

22   elicited during the deposition formed the basis of John

23   Fawcett's explanation for why he did what he did, that -- I

24   mean, I just -- is that not the --

25               THE COURT:  We're going to talk about the fact that

LB2H9112                    Benett - Cross

1   Mr. Fawcett said that allegations that Jarrah had child

2   pornography on his computer is why he felt compelled to

3   disclose it.  So that is what we're going to talk about, but

4   we're not going to talk about anything about questions that

5   were asked, what was elicited during the deposition, what was

6   introduced as an exhibit.  That is all off limits.

7              THE WITNESS:  OK.  Understood.

8   BY MR. SHEN:

9   Q.  Now, Ms. Benett, during the deposition you asked Mr. Jarrah

10  about the event that the judge just referenced, correct?

11  A.  About the possession of child pornography?

12  Q.  Yes, ma'am.

13  A.  Yes.

14  Q.  And that issue was not publicly disclosed prior to the

15  deposition.  That wasn't public information, correct?

16  A.  I don't know the answer to that.

17  Q.  Well, this is an event that Mr. Fawcett cites as a

18  rationale for violating the protective order and leaking the

19  transcript to Michael Isikoff, correct?

20  A.  OK.

21  Q.  You understand that, right?

22  A.  Yes, I saw the declaration.

23  Q.  Now, the Kreindler firm has retained a number of FBI agents

24  to assist in this case.  That's correct, right?

25  A.  There have -- yes, we have several former FBI agents who

LB2H9112                        Benett - Cross

 1    have -- who are working with the families in this case.

 2    Q.  And let's listen to what Jim Kreindler has to say about

 3    these former FBI agents.

 4              MS. KIRSCH:  What are we doing now?

 5              MR. SHEN:  It's on your screen.

 6              MS. KIRSCH:  Is this a question for Ms. Benett?  Is

 7    this something that I should be reviewing before I get to --

 8              THE COURT:  I assume there's going to be a question.

 9    That's what we're doing here.  If you want to review, do we

10    have a transcript that Ms. Kirsch can review before we air the

11    video?

12              MR. SHEN:  Is it Exhibit 18, reference 31:14.  These

13    are all public statements made by Mr. Kreindler.

14              MS. KIRSCH:  OK.  What's the reference?

15              MR. SHEN:  34:14.

16              MS. KIRSCH:  And what is this a transcript of,

17    Mr. Shen?

18              MR. SHEN:  This is a transcript of Mr. Kreindler's

19    public statements at Dartmouth University.

20              MS. KIRSCH:  I'm sorry.  Public statements when and

21    where?

22              MR. SHEN:  At Dartmouth University.

23              MS. KIRSCH:  I'll just take a moment and read it,

24    please, your Honor.

25              THE COURT:  Mr. Shen, you're going 34:14 to?

1       MR. SHEN:  To 52.  I'm sorry.  It starts at 31:14.

2    I'm sorry if I misspoke.

3            THE COURT:  Ms. Kirsch, did you hear that?

4            MS. KIRSCH:  I did.

5            MR. SHEN:  31:14 to 31:52.  Apologies.

6            MS. KIRSCH:  OK.  So this is from the 2019 speech at

7    Dartmouth, is that right?

8            MR. SHEN:  It's the same speech that we played

9    yesterday.

10           MS. KIRSCH:  Which was in 2019?

11           MR. SHEN:  I don't know offhand.  Yes.

12           THE COURT:  I don't think there's a dispute.

13           MR. SHEN:  2019.

14           THE COURT:  2019.

15           MS. KIRSCH:  OK.  That's fine.  No problem playing

16   Mr. Kreindler's speech.

17           MR. SHEN:  It will be on the screen in front of you.

18           (Audio played)

19   BY MR. SHEN:

20   Q.  Now, Ms. Benett, is Mr. Kreindler being truthful here that

21   FBI agents have told him and the other attorneys at the firm

22   what they know concerning their 9/11 investigation?

23   A.  I can't speak to what anybody has told Jim.  I mean, I

24   don't -- the agents that I've -- the folks who come on to work

25   with the families that I've spoken with, I guess I wouldn't --

LB2H9112                        Benett - Cross

1    I don't know if I would characterize my conversations with them

2    that way, but my role and my relationship with them is

3    different than Jim's, but I can't say -- I certainly couldn't

4    opine as to whether Jim is being truthful or not about that

5    statement.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9112                         Benett – Cross

1    LB289113                         Benett – Cross

2    BY MR. SHEN:

3    Q.  Let me ask you a more specific question.

4         Ms. Benett, the reason you know about the event that

5    you asked Mr. Jarrah at his deposition is because an

6    investigator who works at the firm who is a former FBI agent

7    told you about that event, correct?

8         MS. KIRSCH:  I want to say here, your Honor, that the

9    document information that related to this breach were

10   compelled, produced, and we produced them, and under the law,

11   your Honor gave us an order that does not waive any work

12   product.  This is not of the same nature, and so I want to

13   caution the witness to answer as best she can, but this is

14   getting close to the area of work product, and we do have a

15   concern about airing that in a public court.

16        THE COURT:  OK.  Thank you.  And I did issue the order

17   that you just referenced.

18        Mr. Shen, if you could just be careful.

19        THE WITNESS:  Can the court reporter repeat the

20   question?

21        (Record read)

22   A.  I don't think that's a correct statement.

23   Q.  Ms. Benett, when did you learn about that event that you

24   asked Mr. Jarrah about?

25   A.  I had heard rumors about it from sort of the periphery of

LB2H9112                        Benett - Cross

1    our work, not through anybody working with us or working with

2    the families, maybe a year or a year and a half.  I guess what

3    I would call sort of some chatter.

4    Q.  You said a year or a year and a half ago before the

5    deposition?

6    A.  I will confess that COVID has sort of -- it was certainly

7    before the deposition, but I don't remember if it was --

8    probably a year and a half before I think was the first time

9    that I had heard rumors of that.

10   Q.  That would have been at the beginning of 2020, roughly?

11   A.  I really am uncomfortable with the date.

12   Q.  We are just talking general time frames.  Roughly,

13   beginning of 2020?

14   A.  I don't know.

15   Q.  You said you had heard rumors.  Who had you heard rumors

16   from?

17            MS. KIRSCH:  So that's the same objection.  Maybe you

18   can describe generally the nature of the people from whom you

19   heard this, to the extent you can, but don't reveal any work

20   product.

21   Q.  Let me ask a new question.  Had you heard those, quote,

22   rumors from FBI agents who were working at the Kreindler firm?

23   That's a yes or no answer.

24   A.  Not from agents who were working at the Kreindler firm, no.

25   Q.  From agents who were working elsewhere?

LB2H9112                           Benett - Cross

1    A.  So, I did at one point hear that from a former FBI agent

2    who does not work at the Kreindler firm, but had come on board

3    to help with the families at one point, but that is not the

4    first place that I had heard this.

5    Q.  Where is the first place you heard it?

6    A.  It was in the course of our investigation, there were a

7    couple of people who came in the office and it was from them

8    that I had heard this.

9             THE COURT:  You don't need to give names, but I think

10   you can describe generally if these were staff people, if these

11   were people you had hired as consultants.

12            THE WITNESS:  They were outside people who had come

13   and asked and volunteered for a meeting with us.

14   Q.  Did they have documents about this event?  That's just a

15   yes or no question.

16            MS. KIRSCH:  It really isn't.  This case is all about

17   the investigation that the Kreindler firm has been doing in

18   order to build its case.  The absolute purpose that this

19   hearing ought not to serve is to allow the Kingdom to start

20   walking around into the work product processes and how they

21   conduct their investigation.

22            MR. SHEN:  That's not what we are intending to do,

23   your Honor.  This line of questioning goes directly to Mr.

24   Fawcett's stated basis for the leak, and when he found out

25   about that leak and when the firm knew about this information,

LB2H9112                    Benett - Cross

1    when the firm knew about it, is directly relevant to that.

2         MS. KIRSCH:  I would disagree that.  Perhaps there is

3    some relevance when Mr. Fawcett learned that information.

4    Those are questions that could be directed to Mr. Fawcett.  But

5    the Kreindler firm's work product, the people that they work

6    with in order to build their factual investigation, that is

7    just not appropriate for the adversary's counsel to put counsel

8    up on the stand and ask those questions.  That is very

9    irregular and it's inappropriate.

10        THE COURT:  What I do think is relevant is when the

11   firm had the information and who knew it at the time.  So I am

12   not going to require Ms. Benett to answer questions about who

13   provided that information or describe those people, but I do

14   think it is relevant, for the purpose of today's hearing, to

15   know when it was provided and whether or not there was a

16   document that might be on the firm's server that corroborates

17   the allegation.  So I do think that those two facts are

18   relevant for the purposes of the hearing.

19        MS. KIRSCH:  This is just me being not that smart.

20   What is the relevance of a document being on the server that

21   corroborates, and I think you mean the allegation against

22   Mr. Jarrah?

23        THE COURT:  Yes.  You're asking me?

24        MS. KIRSCH:  I was.  But I shouldn't, your Honor.  I

25   apologize.

LB2H9112                          Benett - Cross

1         THE WITNESS:  Given the colloquy, maybe I can

2    volunteer a response and see if that fits within the scope of

3    what the Court is --

4         THE COURT:  Sure.

5         THE WITNESS:  So, sometime shortly before the -- not

6    shortly, but sometime -- there were so many depositions that we

7    were managing and leading, especially up until the end of June.

8    At some point there was a former FBI agent who had been

9    involved and supervised the search of Musaed Al Jarrah's

10   computer, during which time his two agents recovered multiple

11   sexual images of minors that they believed had been saved on

12   the computer, and that they believed constituted knowing

13   possession of child pornography, that they then sent to the

14   National Center for Missing and Exploited Children because of,

15   apparently, a preexisting relationship between the Bureau and

16   the National Center when that sort of imagery is recovered

17   during the course of an investigation.  And I was told that

18   those agents had approached Mr. Jarrah in public with copies of

19   the images that they told him they had taken from his computer.

20        THE COURT:  I think the line of questioning is when

21   did you learn this information.  So I think you had said it was

22   about a year and a half before.  So these agents told you this

23   information about a year and a half ago?

24        THE WITNESS:  I'm sorry.  To be clear, the chatter,

25   the rumor, was maybe a year and a half ago, and that was not

LB2H9112                    Benett - Cross

1    from an FBI agent.  Then subsequently and shortly before the

2    deposition is when I learned this information that came from an

3    FBI special agent who had supervised the investigation into

4    Jarrah and specifically supervised the two agents who had

5    obtained the child pornography from his hard drive.

6              THE COURT:  Mr. Shen.

7    BY MR. SHEN:

8    Q.  You said that you had spoken directly to this agent?

9    A.  I have definitely spoken with this agent, yes.

10   Q.  That was before the Jarrah deposition, about these images?

11   A.  So, that actually may have been the day of the deposition.

12   It was -- I'm not sure if it was before or -- it was a two-day

13   deposition.  I don't know if it was before or maybe it was

14   during day one or day two.

15   Q.  But you had spoken to this agent before the deposition, is

16   that right?

17   A.  I don't know that that's right.

18   Q.  I am just asking for the best of your recollection.

19   A.  Then I will say I don't remember.  I don't think so.

20   Q.  And this agent, was he retained by the Kreindler firm, he

21   or she?

22   A.  The agent has done some work for the 9/11 families.  I

23   don't think this piece was connected to the work that agent had

24   done, but --

25              THE COURT:  When you say worked for the 9/11 families,

1    does that mean that the firm is paying him?

2           THE WITNESS:  Yes, of course.  Has worked with us on

3    behalf of the 9/11 families.  And I guess I should add, I am

4    saying that because he was interested in working with the

5    families; he had asked to work with the families.

6    Q.  When did this agent work for the Kreindler firm?

7    A.  I would have to, you know -- I am actually not -- I am

8    going to ask for the court's direction here because I do

9    feel -- I understand the importance with respect to Jarrah and

10   these images, but I'm not sure how much of this is within or

11   beyond, if it gets into work product about our investigation.

12          THE COURT:  I have already said that you can answer

13   questions related to when you or anyone else at the firm

14   learned this information.  And I think that's the nature of the

15   questions that Mr. Shen is asking.

16          THE WITNESS:  Could I hear the question back from the

17   court reporter?

18   BY MR. SHEN:

19   Q.  The question is, when did this former FBI agent work for

20   the Kreindler firm?

21          MS. KIRSCH:  With all due respect, I don't think

22   that's the same question.

23          MR. SHEN:  If it was before or after the deposition,

24   was he an employee to the Kreindler firm?

25          MS. KIRSCH:  I'm sorry.  I thought we just clarified

1    that what is relevant is when the Kreindler firm learned the

2    information, and when Ms. Benett learned the information, and

3    then perhaps if there is documentation.  But who is retained,

4    how they work with consultants, how they do their research, how

5    they pay them, when they paid them, that is work product, it is

6    not appropriate.

7              THE COURT:  Let's narrow in on when the firm received

8    the information.  To the extent there needs to be questions

9    about the nature of the firm's relationship at the time that it

10   learned this information, we can address that later.  But let's

11   focus now on when the firm learned the information.

12   BY MR. SHEN:

13   Q.  Ms. Benett, you said that a year to a year and a half prior

14   to the deposition you had heard rumors.  When had you first

15   heard more concrete evidence of the events that you asked

16   Mr. Jarrah about?

17   A.  So it was either shortly before or in the course of the

18   Jarrah deposition.

19   Q.  Were you shown documents?

20   A.  I was not.

21   Q.  Was anyone at the Kreindler firm shown documents?

22   A.  I wasn't shown documents.  I don't know if anybody else

23   was.

24   Q.  Was Mr. Fawcett, to your knowledge, aware of these rumors a

25   year or a year and a half ago before the deposition?

1  A.  I don't know.

2  Q.  Did you have discussions with him about it?

3  A.  Certainly, in the context of the Jarrah deposition, when I

4  had the information about the photographs, I do remember it was

5  in the middle of that deposition when the images themselves

6  were described to me.  I do think John Fawcett was around for

7  that.

8  Q.  So --

9  A.  I don't know.  He may have known before.  I just don't

10  know.

11  Q.  My question pertains to what you actually know.

12          Is it your testimony that the first time the images

13  were described to you were actually in the course of the

14  deposition?

15  A.  Yes.  So I had -- there was some sort of general suspicion

16  that this was a thing prior, a year and a half before that or

17  so.  Then there was more specific information that I learned.

18  I can't say that John Fawcett, when he did or didn't learn it.

19  But I learned in the course of the deposition, I was -- the

20  nature of the actual depictions of the child pornography taken

21  from Jarrah's computer were described to me.

22  Q.  So the FBI agent was actually in the Kreindler offices at

23  the time?

24  A.  I had got a message that described to me what those images

25  looked like.

LB2H9112                         Benett - Cross

1    Q.  Did the FBI agent know that you were in the process of

2    taking a deposition?

3              MS. KIRSCH:  And why is that relevant, your Honor?  I

4    am going to object to that.

5              THE COURT:  Sustained.

6    Q.  Was this FBI agent actually attending this deposition?

7              MS. KIRSCH:  I am going to object to that as well.

8              MR. SHEN:  What is the objection?  If we have somebody

9    who has not entered an appearance on the sheet listening in on

10   a confidential deposition.

11             THE COURT:  I think that that is relevant.  I will

12   allow it.

13             MS. KIRSCH:  OK.

14   A.  So there was, in the office next -- I was taking the Zoom

15   deposition in a room in our office by myself.  In that wing,

16   there were people who were walking, not in the office, not in

17   the Zoom room, not where the deposition was happening.  He was

18   one person who was there during that time, generally in the

19   office.  There were a number of other people, it was a weekday.

20   Certainly, nobody was in the Zoom room with me.

21   Q.  So you were in a separate Zoom room.  People were in

22   another room listening to the deposition, correct?

23   A.  What I am saying is that when I spoke with him, he was not

24   watching a deposition.  He was -- there is a corridor, there

25   are workstations.  I stepped out.  I had not met him before.  I

LB2H9112                     Benett - Cross

1    don't think I met him before.  He told me information.

2    Q.  But you don't know if he was watching the deposition in the

3    other room because you're taking a deposition by yourself?

4    A.  Right.

5    Q.  You don't know whether he is in the other room watching or

6    not, is that your testimony?

7         Let me ask you this.  Do you know whether he attended

8    that deposition and watched that deposition?

9    A.  I wouldn't be surprised if he did.  I was in a room taking

10   the deposition by myself.  How could I know where he was at the

11   very time that I am in that room?  I don't have any reason -- I

12   guess I don't have any reason to think that he didn't, but I

13   can't tell you that I was in there with him during the

14   deposition because I was taking the deposition in a room by

15   myself.

16   Q.  Does this person appear on the appearance sheet?

17   A.  I don't know.

18        MR. SHEN:  Let's put up the appearance sheet, please.

19   Exhibit 32.

20   Q.  We are on page 2.  That lists the attorneys from the

21   Kreindler firm.  Do you see that?

22   A.  Yes.

23        MR. SHEN:  Keep scrolling.  Keep going.  Keep going,

24   please.

25   Q.  There is also present.  Is this individual listed here?

LB2H9112                         Benett - Cross

1    A.  I do not see his name there.

2    Q.  Was it the practice of the Kreindler firm to have people

3    who did not actually make an appearance at these confidential

4    depositions to listen in on the depositions?

5    A.  Was it the practice to have them listen in on depositions?

6    Q.  Yes, ma'am.

7    A.  So, I mean, I don't think it was a practice to do that.  I

8    don't see his name there.

9    Q.  Did this person sign the FBI protective order?

10   A.  We have a chart of everybody who signed the protective

11   order, and we confirm before we give documents to them that

12   they have signed it.  If he sat in the deposition, he would

13   have had to sign it as well.

14   Q.  Not he would have had to.  Did he sign it, do you know?

15   A.  Andy, how can I know that?

16   Q.  You didn't check?

17   A.  Until today, you're telling me that he was sitting in the

18   deposition.

19   Q.  First of all, I didn't know he was sitting in the

20   deposition.  You testified --

21       MS. KIRSCH:  May I object for a moment?  There is a

22   confusion here.  Ms. Benett testified she was in a room by

23   herself.  Mr. Shen keeps asking questions about whether this

24   individual was in the deposition.  We haven't established that

25   he was or he wasn't.  Ms. Benett doesn't know.  I don't

LB2H9112                          Benett - Cross

 1   understand why we are continuing this.  She doesn't know if he

 2   was there.

 3            MR. SHEN:  She testified it would not be surprising if

 4   this individual was watching the deposition at the offices.

 5   A.  My point is, if he was, he would have signed the protective

 6   order.  You're saying, how could I not know if he signed the

 7   protective order?  Andy, I don't know if he was in the room.

 8   If he was in the room, he signed the protective order.

 9            THE COURT:  All right.  I think Ms. Benett has

10   indicated, I believe she has testified that he spoke with her

11   or communicated with her somehow during the deposition in order

12   to provide this information.  But she doesn't know whether he

13   was actually listening to the deposition, and it would be the

14   practice of the firm that he would have signed the MDL order,

15   but he did not make an appearance at the deposition.  I think

16   those are the facts we have established.

17   BY MR. SHEN:

18   Q.  Let me just make sure I understand.

19   A.  Can I just to Judge Netburn's --

20            THE COURT:  No.

21   Q.  Sitting here today, you don't know whether he signed the

22   FBI protective order, correct?

23   A.  I have recently looked at them.  It is true I cannot

24   remember.  I have looked recently at the entire file of

25   everybody who has signed the FBI protective orders.  I believe

LB2H9112                    Benett - Cross

1    he has, but I can't say with absolute certainty, without

2    looking at that file, sitting here on the stand right now.

3    Q.  And you don't know sitting here today whether he agreed to

4    abide by the MDL protective orders, correct?

5    A.  If he had access to any MDL protected information, he

6    absolutely would have had to review and agree to the MDL

7    protective order.

8    Q.  That's not my question.  The question is, do you know

9    sitting here today?

10   A.  So, just to be clear, your question is, irrespective of

11   whether he looked at protected material, did he review the

12   protective order?

13   Q.  Do you know whether he looked at and agreed to abide by the

14   MDL protective order?

15   A.  If he was given MDL protected materials, yes.

16   Q.  But you don't know that, correct?

17   A.  I mean --

18   Q.  I am asking if you know if he looked at and agreed to abide

19   by it.  Do you know if he did that?

20   A.  If he was given MDL protected materials, he looked at it

21   and agreed to abide by it because that was our practice.

22   Q.  But you don't know one way or another whether he did?

23   A.  I know with 100 percent certainty that if he looked at MDL

24   protected materials, he reviewed and agreed to abide by the MDL

25   protected material because that is what our practice was.

LB2H9112                    Benett - Cross

1    Q.  Ms. Benett, did you discuss the content of the deposition,

2    the Al Jarrah deposition, with this individual during the

3    course of the deposition?

4    A.  I did not.

5    Q.  You didn't discuss any portion where you were asking

6    Mr. Jarrah about the content of images found on his computer?

7            MS. KIRSCH:  Objection.  I don't think there has been

8    any testimony that Ms. Benett asked about the content.  Ms.

9    Benett said she was told about the content.

10           THE COURT:  Well, we know that she asked Al Jarrah

11   about the content.

12           MS. KIRSCH:  I am talking about the agent at the time.

13   The question said, did you -- you can read it back.  I believe

14   the question was, Ms. Benett, when you were asking the agent

15   for information, did you reveal the content of the Jarrah

16   deposition?  It was a misstatement of the testimony that we had

17   so far, and I object to it.

18           MR. SHEN:  Ms. Benett testified shortly before the

19   deposition, or at the deposition, she discussed the specific

20   issue with the FBI agent, and the FBI agent described to her

21   the specific images on the computer.  That's her testimony.

22           MS. KIRSCH:  And my objection is Ms. Benett should be

23   giving the testimony, not Mr. Shen.  It would be a lot easier,

24   particularly since I don't have realtime here.

25           THE COURT:  Well, I believe that Ms. Benett has

LB2H9112                    Benett - Cross

1   testified that either just before the deposition or during the

2   deposition this individual provided her with this information.

3   And Mr. Shen's question was, did you discuss with this

4   individual the content of the Al Jarrah deposition?

5           MS. KIRSCH:  Which was answered.

6   A.  I was approached and was told about the descriptions of the

7   images in the middle of the deposition.  It was not a response

8   to a question from me.

9   Q.  That wasn't my question.  Did you discuss the content of

10  the Al Jarrah deposition with this individual during the course

11  of the deposition?

12  A.  I did not.

13  Q.  Did you discuss the content of the deposition with him

14  after the deposition?

15  A.  We certainly discussed the child pornography.  We

16  discussed -- I had questions about how they got the computer,

17  the basis of the search, sending the images to the National

18  Center for Missing and Exploited Children.  So we had certainly

19  spoken about the sexual images of minors on Jarrah's computer

20  after the deposition.

21  Q.  That wasn't the question, Ms. Benett.  Did you discuss what

22  Mr. Jarrah testified to with this individual after the

23  deposition?

24  A.  It's a little hard to parse out because all of my

25  conversations with him have been about the child pornography.

LB2H9112                    Benett - Cross

1  Q.  So you may or you may not, you just don't know sitting here

2  today, is that your answer?

3  A.  We certainly have had follow-up conversations about the

4  child pornography on Jarrah's computer, and what the steps

5  were, ordinary practice were, etc., that may well have

6  implicated some of the testimony.  I don't want to say no, but

7  I know that my conversations have been primarily focused on

8  what he knew and what he was volunteering.

9  Q.  At the time, was he an employee or retained by the

10  Kreindler firm?

11  A.  I don't know if he -- I don't know if he was right then.

12  I'm not sure.

13  Q.  Now I am going to switch to a different topic, Ms. Benett.

14          You're aware that after the leak to Mr. Isikoff, the

15  Kingdom of Saudi Arabia filed a request with the court to see

16  certain discovery pertaining to that leak, correct?

17  A.  Yes, I am aware of that.

18  Q.  And you're aware that the PECs responded to that letter,

19  correct?

20  A.  Yes.

21  Q.  And you have been in the courtroom while we discussed the

22  response with other witnesses.

23          My question for you is, did you do any investigation

24  of the leak prior to the initial response on July 29?

25  A.  Me, personally?

LB2H9112                    Benett - Cross

1    Q.  You, personally.

2    A.  I was out of town.  I was on the West Coast at that time.

3    I was on the phone calls, internal phone calls, and PEC's phone

4    calls, but my role in the investigation wasn't really

5    until -- I helped with the declarations initially, obviously,

6    but then not until September.

7    Q.  So, in submitting the July 29 letter to the court, the

8    Kreindler firm relied upon the investigation that was done by

9    Mr. Hartney and by Mr. Maloney, is that correct?

10   A.  I think that's fair to say.

11   Q.  Now, as of that July 29 letter, had anyone asked Mr.

12   Fawcett to submit a declaration to the court?

13   A.  No.  We, in fact, as you know, the Kreindler team itself

14   didn't submit declarations at that time.  We thought that it

15   was frankly not -- we were waiting for the court to provide

16   guidance.  We did not think it was appropriate for opposing

17   counsel, for the Kingdom to be directing the process.  We were

18   concerned that it would inevitably turn into an opportunity to

19   dig through our files and to get into our work product.  We did

20   not prepare declarations for anyone, and we wanted to wait for

21   the court to issue an order to guide the process.

22   Q.  When is the first time that the Kreindler firm prepared a

23   declaration for Mr. Fawcett?

24   A.  So probably it would be when I became involved or more

25   involved.  There was the August 30 order that wanted the

LB2H9112                        Benett - Cross

1    supplemental declarations.  So certainly at that point I would

2    have been putting them in place.

3    Q.  Let me pause there.  So prior to August 30, no one had gone

4    to Mr. Fawcett and asked him to submit a declaration and

5    presented him with a draft declaration, to your knowledge?

6    A.  I hadn't.

7    Q.  After August 30, when is the first time that someone went

8    to Mr. Fawcett and presented him with a draft declaration?

9    A.  So from August 30 up until September, the court had issued

10   an order.  So there is the Yahoo! News motion to intervene that

11   stayed the August 30 date.  I had started declarations as of

12   the August 30 order and then things were on hold.  And then I

13   went back to it, with the court's Thursday, September 23 order.

14          So I don't know exactly when within that time frame I

15   would have started, but I certainly -- I think right around

16   August 30 I had conversations with everybody about the fact

17   that we would be preparing declarations.

18   Q.  Did you have conversations with Mr. Fawcett on August 30?

19   A.  I believe so.  My recollection is that what I did was to

20   talk to everybody who would be filing declarations

21   individually.

22   Q.  Did you ask him at the time whether he had sent the

23   transcript to Mr. Isikoff?

24   A.  I went through what the questions were that we would have

25   to be responding to, and that I was asking if -- I said,

LB2H9112                    Benett - Cross

1   essentially, based on our prior investigation, here is the

2   question that I am going to put in there and here is the

3   answer, is that correct?

4   Q.  And he said it was correct that he had not leaked the

5   transcript to Mr. Isikoff?

6   A.  So, I don't know that he said that expressly.  I know that

7   by the time I presented him with the declaration that was what

8   it said and he had it.

9   Q.  You don't recall him around that time actually telling you

10  he had not sent the transcript to Mr. Isikoff?

11  A.  I don't recall that.

12  Q.  So, do you actually recall when the first time you

13  presented a declaration to Mr. Fawcett?

14  A.  I don't recall if this was the first time.  I recall the

15  sequence of September 24th to the 27th -- sorry, 23rd.  I think

16  the order on Yahoo! News was Thursday, September 23rd, that

17  then said the August 30 declarations had to be submitted by

18  Monday, September 27.  So either that night or maybe the next

19  morning I sent an e-mail to everybody, we are going to have to

20  provide the declarations, here is what we worked on, here is

21  everybody's draft.  You have the e-mail.  You know what it

22  says.  It has to be 100 percent accurate under penalties of

23  perjury.  Give me any edits, I will call you to discuss.  Some

24  of them had to be wet signatures because they were nonlawyers.

25          I was home because I had a teenager who tested

LB2H9112                    Benett - Cross

1    positive for COVID and I had an unvaccinated younger kid who

2    had to quarantine for 14 days, so I couldn't go to the office.

3    Anyway, the Thursday or Friday communication was, we have to

4    make sure we can get this all done over the weekend and submit

5    it on Monday.

6    Q.  Just so I understand the sequence of events, the court

7    issues an order denying Yahoo! News' motion to limit the scope

8    of the declarations.  After that order comes out, you prepare

9    the declarations, and it's between that date and the 27th when

10   you first approach Mr. Fawcett and show him the draft

11   declaration?

12   A.  I don't think that's entirely correct because I had started

13   declarations prior to the September 23rd order.

14   Q.  All I am trying to figure out is when you first showed Mr.

15   Fawcett the declaration.

16   A.  No.  I just said that I had started the declarations.  I

17   don't know that that is the same time that I showed Fawcett his

18   declaration.

19   Q.  Fair enough.  The first time you showed Mr. Fawcett a

20   declaration was after the court denied Yahoo! News' motion?

21   A.  I can't recall.  I know by that time everybody had what I

22   thought would be a final declaration in hand.  So from August

23   30 on, I knew we would be preparing these declarations.  I

24   talked to everybody.  I worked on the declarations.  I don't

25   know if I had all of them drafted before the 23rd, but I

LB2H9112                         Benett - Cross

1    certainly didn't start on the 23rd.  I don't recall if I gave

2    John Fawcett a draft of his before the 23rd or not.  Certainly,

3    by September 24th, I would have sent it to him.

4    Q.  But prior to September 23rd, you don't recall sitting here

5    today actually presenting a draft to Mr. Fawcett and Mr.

6    Fawcett saying that he would sign a declaration saying that he

7    had not sent the transcript to Mr. Isikoff?

8    A.  That's correct.  I do not recall that conversation.

9    Obviously, everybody knew before that, because of the August 30

10   order, we would be doing declarations.  I spoke to everybody

11   about their declarations.  I had no reason to believe prior to

12   that that John Fawcett was not going to sign his declaration.

13   He gave me no indication that he had any concern about the

14   declaration I was preparing for him.

15   Q.  After you showed him the declaration that you prepared,

16   which actually said that he did not send the transcript to

17   Mr. Isikoff, did he tell you that he would sign that

18   declaration?

19   A.  So, on September 27th, I had called John a couple of times

20   over the weekend because I had most of the signed declarations

21   back already.  I did not yet have his.  Like I said, I had a

22   seven-year-old in remote school, a quarantined teenager.  I did

23   not want to wait for Monday morning.  So my recollection is

24   that I contacted John over the weekend to try to get the signed

25   declaration.  I know I did not hear from him about that.

LB2H9112                         Benett - Cross

1   Q.  He just never responded to your calls?

2   A.  I don't remember if it was a text or a call or if it was

3   more than one call.  I feel like I called him twice and got his

4   voice mail.  He has a voice mail and when it picks up, it

5   sounds like he is there on the phone.  It says, Hey, it's John,

6   and then you start talking and it's a voice mail.  I know that

7   I got that voice mail at least once, maybe twice.  I left

8   messages.  I know the message was, let me know if you have any

9   concerns or changes.  I just need to get this done before

10  Monday.

11          On Monday morning --

12  Q.  This is the 27th?

13  A.  The 27th.  I had prepared a cover letter to cover all the

14  declarations.  I had wanted to at the time address some of what

15  I had felt were unfair suggestions that the Kreindler firm was

16  behind the leak.  I had for two and a half months been

17  confident that we had nothing to do with it.  I was putting all

18  the documents together.  I was working with my secretary who I

19  think was remote that day as well.  And I got a call around 10

20  or 10:30 in the morning from John Fawcett who said to me, I

21  can't sign my declaration.

22  Q.  Now, before he called you at 10:30 in the morning saying he

23  can't sign the declaration, had he ever told you before that

24  that he would sign the declaration?

25  A.  I don't know if he used those words.  I certainly had no

LB2H9112                         Benett - Cross

1   reason to -- he never gave me any indication that he wouldn't.

2   From August 30 on, we knew that we had to submit a declaration,

3   including one from him.  He knew that I was preparing them.  I

4   had spoken to him about preparing them.  He never did anything

5   to suggest to me that he would do anything other than sign and

6   return it.  I think I even made sure he had a printer at home

7   because he would have to do a wet signature.  I even made sure

8   he had a printer at home so that he could print it and scan it

9   and send it back to me.

10  Q.  OK.  So you just don't remember whether he told you

11  beforehand that he explicitly told you that he would not sign

12  the declaration?

13  A.  I can tell you --

14  Q.  You have an impression, but you don't remember

15  specifically?

16  A.  He never told me he would not sign the declaration until

17  10:15 on Monday, September 27th.  Up until then, he may not

18  have said, yes, I will sign it.  I feel like we probably had a

19  conversation where he said no problem.  I don't know what he

20  was thinking that weekend.  I don't know what he was thinking

21  for the last two months.  I don't know what was going through

22  his mind.  But every indication, leading up to 10:15 on Monday

23  September 27th, was that I was getting a signed declaration

24  from John Fawcett that said, not only I didn't leak it, but I

25  have no idea who leaked it.  Because we didn't know until that

LB2H9112                          Benett - Cross

1   Monday that it had come from John Fawcett.

2   Q.  Did he tell you how he sent it to John Isikoff?

3   A.  He did eventually, yes.

4   Q.  Did he tell you on the 27th?

5   A.  He did not.

6   Q.  Did you ask him?

7   A.  The 27th --

8   Q.  If you can answer my question.  Did you ask him?

9   A.  Let me think about it for a moment.  Because the 27th was a

10  very wild day, trying to go back and make sure that we hadn't

11  missed something, completely reversing our position with the

12  court, to which we now knew we had to that day, and as quickly

13  as possible, bring to her attention that the breach had come

14  from John Fawcett.  I was busy changing everybody's declaration

15  because I could no longer have anybody say that we didn't know

16  who sent the declaration.  I was worried we might have missed

17  something so I was talking to other folks about the search that

18  we had done.  I was --

19  Q.  Can you just focus on my question, please?  Did you ask him

20  how he sent it?

21  A.  I don't think I asked him that day, but given everything

22  else that was going on, I don't recall.  I feel like if I had

23  asked him that day, it would have been in what I submitted that

24  day.

25  Q.  So sitting here today, you don't recall doing that?

LB2H9112                    Benett – Cross

1    A.  I don't recall if it was that day.  I know that on

2    September 30, I had a long conversation with him about how he

3    did it.

4    Q.  Did you ask him whether he had disclosed to Mr. Isikoff

5    other information, including what happened at the Bayoumi and

6    Thumairy deposition?

7    A.  He told me on the 27th that he had never done anything like

8    that before.

9    Q.  Did you ask him about the specific reference in

10   Mr. Isikoff's article about the Bayoumi and Thumairy deposition

11   and what occurred?

12   A.  I did not.

13   Q.  Did you ask at that point whether he had conferred with

14   counsel?

15   A.  I don't think I did.

16   Q.  Did you learn that he had conferred with Liz Crotty at some

17   point about this issue?

18   A.  The first time I learned that he had spoken to Liz Crotty

19   over the course of that summer was when I looked at the call

20   logs.

21   Q.  When did you look at the call logs?

22   A.  Whenever they were produced in the context of this.

23   Q.  So sometime this week was the first time?

24   A.  Well, I mean, I guess it would have been last week.

25   Q.  This week?

LB2H9112                    Benett - Cross

1    A.  Today is Tuesday.

2    Q.  You're right.  I think it was last week.

3           So on the 27th you did not know that Mr. Fawcett had

4    not disclosed to you that he had been conferring with legal

5    counsel?

6    A.  I did not.  I'm assuming from the privilege log and your

7    description.  I shouldn't say confer with counsel.  I didn't

8    know that he had a call with Liz Crotty.

9    Q.  When is the last time you spoke with Liz Crotty?

10   A.  There is a weekend in October, I was out in Oregon where my

11   family is, and I got a call from Liz, who I am friendly with,

12   and I had not spoken with her since the primary election.  She

13   called me.  I wished her my condolences on the loss.  We

14   happened to know several other people who were candidates for

15   the DA's election so we had a conversation about that.  Then

16   she asked me -- she told me that John had reached out to her,

17   and she asked me if I thought she had a conflict of interest in

18   representing him.  I said, I really can't talk to you about

19   that.  I suggested she call Emily, and I don't know if she did.

20   Q.  You said that was in October that you ran into her?

21   A.  I didn't run into her.  It was a phone call, and it would

22   have been whatever that fall holiday weekend.

23   Q.  Say that again.

24   A.  It would have been that fall holiday weekend.

25   Q.  In early October?

LB2H9112                    Benett - Cross

1    A.  Whatever the three-day weekend is in October.

2    Q.  She told you at that point in time that Mr. Fawcett had

3    reached out to her about legal advice?

4    A.  So, as soon as she said John's name, I told her I couldn't

5    talk with her about it.  She said all she wanted to know if I

6    thought she had a conflict of interest.  I said, I can't talk

7    to you about that.  I don't know if she called Emily.  I don't

8    know if she spoke with anybody else.

9    Q.  Let's look at 56J.  This is Mr. Fawcett's declaration.

10            Now, Ms. Benett, you and Mr. Pounian actually drafted

11   this declaration, correct?

12   A.  I formated this.  September 27, John had the declaration

13   that I had drafted.

14   Q.  Can you say that again?

15   A.  September 27, that morning, John had the declaration I had

16   drafted.  After he called me, obviously, we could not submit

17   what I had drafted for him.  He sent me a document that he

18   wrote, as far as I know.  I certainly wasn't involved in

19   writing it.

20   Q.  I don't need the chronology now.  I am just asking you, did

21   you draft his declaration in front of you?

22   A.  I formated it.  I did not write the words.

23   Q.  Did Mr. Pounian write the words?

24   A.  I don't know.

25   Q.  Let's take a look at Exhibit 108, please.

LB2H9112                    Benett - Cross

1          Exhibit 108 is an e-mail.  I will represent to you
2   that the metadata says that it's from Mr. Kreindler to yourself
3   and Ms. Benett on September 27, 2021, at 12:20.
4          MS. KIRSCH:  I am sorry.  You may have misspoke.
5   Mr. Shen may have misspoke.  What does the metadata say?
6          MR. SHEN:  It's from Mr. Fawcett.  I'm sorry if I
7   misspoke.  It's from Mr. Fawcett.
8          MS. KIRSCH:  I will just state for the record I don't
9   know what the metadata says.  We have produced another version
10  of this document that has the "from" line.  I don't know why
11  that came up the way it did.
12         THE COURT:  OK.
13         MR. SHEN:  We are going to move this into evidence.
14         THE COURT:  Any objection?
15         MS. KIRSCH:  I don't have an objection.  There is
16  another copy of this that is a complete document.
17         THE COURT:  Accepted.
18         (KSA Exhibit 108 received in evidence)
19  Q.  This is an e-mail to you and Mr. Pounian.  108A is the
20  attachment that is referenced at that declaration.
21         Is this the declaration that Mr. Fawcett had drafted
22  and sent to you and Mr. Pounian?
23  A.  I don't see 108A.
24         THE COURT:  Can you put up A.
25         There we go.

LB2H9112                         Benett - Cross

1   Q.  Do you recognize this as the declaration that Mr. Fawcett

2   drafted himself and sent to you?

3   A.  Yes, that looks like it.

4   Q.  If we focus on the first paragraph there, he says that he

5   had sent a redacted portion of the transcript to Mr. Isikoff.

6   Do you see that?

7   A.  Yes.

8   Q.  And he says that the redacted portions relate to the

9   sections of the deposition which were taken subject to the FBI

10  protective order.  Do you see that?

11  A.  Yes.

12  Q.  So he says that he sent essentially the entire transcript,

13  except for portions which were redacted for the FBI protective

14  order, correct?

15  A.  I don't know.

16  Q.  I am just asking what the language says.

17  A.  The language says the redacted portions related to the

18  sections of the deposition which were taken subject to the FBI

19  protective order, and irrelevant to the issue at hand, evidence

20  of Jarrah's use of child pornography.

21  Q.  Ms. Benett, there is nothing in this -- if we can look at

22  the entire screen -- there is nothing in this draft declaration

23  that he sent you stating his personal motivations, his family

24  motivations, for the leak, correct?

25  A.  No, I don't see any of that there.

LB2H9112                    Benett - Cross

1    Q.  Let's look at Exhibit 109.  This is an e-mail from Mr.

2    Pounian to yourself, September 27, 1:41 p.m.

3              109A is the attachment, which we will show on the

4    screen in a minute.

5              MR. SHEN:  We are going to move this into evidence as

6    well.

7              THE COURT:  Any objection?

8              MS. KIRSCH:  No objection.

9              THE COURT:  Admitted.

10             (KSA Exhibit 109 received in evidence)

11   Q.  If we focus on 109A, did Mr. Pounian completely rewrite the

12   declaration?

13   A.  I don't know.

14   Q.  Do you know if he starts from scratch and wrote on a new

15   Word document what is appearing on 109?

16   A.  I don't even know if Steve wrote this.  All I know is that

17   he sent it to me.

18   Q.  You didn't ask him?

19   A.  I talked to John after I got the final draft.

20   Q.  My question is, did you ask Steve Pounian if he wrote this?

21   A.  No.

22   Q.  Now, you received the declaration that Mr. Fawcett had sent

23   you earlier in the day, correct?

24   A.  Yes.

25   Q.  And you read it, correct?

LB2H9112                          Benett - Cross

1    A.   Yes.

2    Q.   Then you read this declaration that Mr. Pounian had sent

3    you, correct?

4    A.   Yes.

5    Q.   Did it appear to you at that point that Mr. Pounian had

6    drafted the entire declaration from scratch?

7    A.   I don't know.  I don't know if Steve drafted it.  I don't

8    know if John worked on it.  I don't know if John talked to

9    other people and then redrafted it.  I just don't know how this

10   all unfolded.  I don't think it looks like Steve completely

11   redrafted it.

12   Q.   Let's look at the draft that Mr. Pounian sent to you and to

13   nobody else.

14        He writes here in the first paragraph that the

15   redacted portions of the deposition I sent to Michael Isikoff

16   were limited to Jarrah's possession of child pornography.

17        Do you see that?

18   A.   Yes.

19   Q.   That's not what Mr. Fawcett said in his declaration that he

20   drafted, right?

21   A.   I guess then that, since we obviously didn't know what had

22   gone to Isikoff, maybe that was something -- I think that we

23   had believed that it was from the article.

24        Anyway, what was the question?

25   Q.   The question is, Mr. Pounian had changed the language in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    the declaration and he now says that the transcript that was

2    sent was limited to those images, correct?

3    A.  I just don't know that Steve did this.  You can ask him.

4    Q.  You didn't ask him why that language is so dramatically

5    different than the version Mr. Fawcett sent over?

6    A.  I did not.

7    Q.  And Mr. Pounian's version that he sent you at the bottom

8    talks about a personal interest because Mr. Musaed Al Jarrah,

9    it says that he was a diplomat in Morocco.

10            Do you see that?

11   A.  Yes.

12   Q.  And that personal interest doesn't appear in Mr. Fawcett's

13   declaration that he drafted, correct?

14   A.  It doesn't.  I mean, I knew that John was --

15   Q.  If you could just answer the question, Ms. Benett.

16            Did you know that Mr. Pounian had inserted and drafted

17   that language?

18   A.  I don't know that Steve did that.

19   Q.  We can look at Exhibit 110, please.

20            This is an e-mail chain between yourself and Mr.

21   Pounian, 1:47 p.m.  You are responding to the prior draft that

22   Mr. Pounian has sent you.  110A is the actual exhibit.

23            MR. SHEN:  I am going to move this into evidence.

24            THE COURT:  Any objection?

25            MS. KIRSCH:  No objection.

LB2H9112                        Benett - Cross

1          THE COURT:  It's accepted.

2          (KSA Exhibit 110 received in evidence)

3   Q.  You actually write back to Mr. Pounian and say "it's good,"

4   right?

5   A.  It was totally consistent with what I knew John's concerns

6   had been about Jarrah.

7   Q.  I am just asking you what the document says.  You write

8   back to him and says "it's good," right?

9   A.  I thought it was a good reflection of what I knew John's

10  concerns had been, yes.

11  Q.  And then you say, "I have also made some edits to the

12  declaration.  See the attached."  Right?

13  A.  Yes.

14  Q.  If we look at the attachment, you have elaborated on Mr.

15  Fawcett's personal interest in why he leaked the transcript.

16  That's your language that you inserted there, right?

17  A.  Well, I have to see it first.

18          Oh, you know what --

19  Q.  Is that your language that you inserted?

20  A.  Andy, I typed the words.  It's not really my language

21  because I knew from my conversations with John that his concern

22  with Jarrah being in Morocco was based in part on his

23  background in global humanitarian work.

24  Q.  I am not asking if it's true or not.  I am just asking if

25  you drafted the language.

LB2H9112                        Benett - Cross

1    A.  You asked me if it was my words.  I did type them, but I do

2    believe that I took that based on what I had learned from John.

3    Q.  Now, we know Mr. Fawcett's declaration that he sent over

4    had nothing about his personal interests.  And then you and Mr.

5    Pounian are exchanging drafts where you try to justify his

6    leak, correct?

7    A.  So, over the course of September 27, there were many

8    conversations with John.  The first was the one that I

9    described where I learned --

10   Q.  If you could just answer my question, Ms. Benett.  Were you

11   trying to justify Mr. Fawcett's leak to Isikoff by drafting the

12   language in his declaration stating that he had a personal

13   interest?

14   A.  First of all, there is no justification for the leak.

15   There was no effort to justify this.  It was an explanation.  I

16   couldn't understand why he would have done it.  And this to me,

17   when I had further conversations with John that day, it in no

18   way excuses what he did, but it provided context to me to

19   understand what he believed he had to do.

20   Q.  That may be the case, but you are actually inserting that

21   purported context in a declaration that is going to be

22   submitted to the court, right?

23   A.  I was working with John and trying to get it finalized for

24   the court on Monday, September 27.

25   Q.  Let's look at Exhibit 112, please.

LB2H9112                    Benett - Cross

1           Exhibit 112 is an e-mail from you to Justin Green at

2     the Kreindler firm.  It's dated September 27 at 2:15.  It

3     attaches a draft of the Jarrah declaration.

4           Who is Mr. Green?

5     A.  Justin is sitting there to your left.

6     Q.  Who is he?

7     A.  He is a partner at my law firm.

8     Q.  Is he a managing partner?

9     A.  Well, he would like to think so.

10    Q.  Was he consulted on this leak issue?

11    A.  As soon as I found out -- sorry, Noah.  As soon as I found

12    out about the leak, I called Justin and I alerted the partners.

13    Q.  Did you tell Mr. Green that you and Mr. Pounian were

14    drafting the language of Mr. Fawcett's declaration that would

15    be submitted to the court?

16    A.  I disagree with that because I wouldn't say that we were

17    drafting the language.

18    Q.  Hold on.  You told us that you didn't know if Mr. Pounian

19    drafted the language, right?  That's what your testimony was?

20    A.  Could you read back the other question?  The question you

21    asked, Andy, that I am trying to answer is, did I tell Justin

22    that Steve and I were drafting this language.

23    Q.  That's a yes or no question.  Did you tell him that?

24    A.  No.

25    Q.  Did you tell Mr. Green that you had drafted the portion of

LB2H9112                          Benett - Cross

1   the language attempting to justify the breach of the protective

2   order?

3              MS. KIRSCH:  Objection.  We already had testimony that

4   she says there is no justification.  Mr. Shen is trying to put

5   words back in her mouth again.  It's inappropriate.

6              THE COURT:  Mr. Shen, can you rephrase the question,

7   please?

8   Q.  Did you tell Mr. Green that you had drafted the portion of

9   the declaration that attempts to explain why Mr. Fawcett had a

10  personal interest in the leak?

11  A.  I told Justin what I learned that day about John's

12  motivations.  I told Justin --

13  Q.  That's not the question.  Did you tell him you drafted that

14  portion of the declaration?

15  A.  I don't really agree with the characterization.  But since

16  the answer is I don't know, or I don't recall, I will just go

17  with I don't recall.

18  Q.  Did Mr. Green provide you edits to the declaration?

19  A.  No.

20  Q.  Did he provide any commentary?

21  A.  I mean, honestly, I am -- obviously, I did send it to

22  Justin.  I think I sent it to him so the partnership knew what

23  was going to be submitted.

24  Q.  You don't recall if Mr. Green gave you any comments?

25  A.  I can't imagine we would get into that.

LB2H9112                        Benett - Cross

1    Q.  Did he sign off on the fact that it was OK to submit this

2    declaration to the court?

3    A.  I don't think I asked for permission.

4    Q.  Exhibit 118, please.

5            Exhibit 118 is an e-mail between you, Mr. Fawcett, and

6    Mr. Pounian.  Mr. Pounian is sending back a draft of the

7    declaration at 6:53 p.m.  The attachment is at 118A.

8            Do you see that?

9    A.  I don't see the attachment.

10   Q.  Now, do you recall that after you and Mr. Pounian had gone

11   through and drafted portions or revised portions of the

12   declaration, you then sent that draft back to Mr. Fawcett?

13   A.  Yes.  Obviously, what John sent me initially I had to

14   format in any event.  Certainly, we would have sent it to him.

15   We had to get back his signature.

16           MR. SHEN:  I am going to move this document in

17   evidence.

18           MS. KIRSCH:  No objection.

19           THE COURT:  Accepted.

20           (KSA Exhibit 118 received in evidence)

21           MR. SHEN:  Can we look at Exhibit 121.

22           I'm sorry.  Exhibit 120, please.

23   Q.  Exhibit 120, at 7:34 p.m. Mr. Fawcett sends an e-mail back

24   to you -- back to Mr. Pounian and attaches a declaration with a

25   few redlines.  I notice that you're not on the top e-mail here.

1          Did you receive a copy of the edits that Mr. Fawcett

2    had made to the declaration?

3          If we can look at 121, that's the attachment.

4    A.   I don't recall, but this looks like the final version so I

5    must have.

6          MR. SHEN:  I am going to move these two exhibits into

7    evidence.

8          THE COURT:  Any objection?

9          MS. KIRSCH:  122 and 122A?

10         MR. SHEN:  It's 120 and 121.

11         MS. KIRSCH:  No objection.

12         THE COURT:  It's admitted.

13         (KSA Exhibits 120 and 121 received in evidence)

14   Q.   Focusing on the actual redlines that Mr. Fawcett sent back,

15   he takes out language that says, "Until today, I told Kreindler

16   & Kreindler that I did not know how Mr. Isikoff had obtained

17   the transcript."

18         Do you see that?

19   A.   Yes.

20   Q.   Did you ever ask him why he took out that language?

21   A.   I don't know if I talked to him again.  I told him we

22   needed the computer, but I am not sure that I even spoke with

23   him again.  What time was that e-mail?

24   Q.   This was at 7:34 p.m.

25   A.   I probably didn't even speak with him again.

LB2H9112                    Benett - Cross

1    Q.  Is it curious to you that Mr. Fawcett didn't want to tell
2    the court that, I had told Kreindler & Kreindler that I did not
3    know how Michael Isikoff had obtained the transcript?
4    A.  I don't know if he took that out.  I know that I asked
5    Steve and Duke to confirm that he had been -- that Fawcett had
6    been asked directly and that that was an accurate statement.
7    And we believed that was an accurate statement.  I guess
8    Fawcett took it out.  I don't know why.
9    Q.  You're not aware of anybody asking Mr. Fawcett why he took
10   out that language?
11   A.  I don't think I did.  I don't know if anybody else did.
12   Q.  You didn't talk to Mr. Pounian about this edit?
13   A.  I don't know if we talked about that edit.  We definitely
14   talked about Steve -- I know back in -- I had a conversation
15   with Steve who was working closely with John.  I had a
16   conversation with Steve in July, and I was on the West Coast,
17   about asking John directly.  He told me he asked John if he had
18   released the transcript.  John told him, no.  So when this came
19   out, I may have said to Steve, am I remembering this correctly?
20   Didn't John tell us directly that he didn't provide the
21   transcript and he didn't know how Mr. Isikoff had gotten the
22   transcript?  My recollection is that Steve had confirmed what I
23   understood Fawcett to have said before, so I don't know why he
24   would have taken that out.
25   Q.  You don't know if Mr. Pounian asked Mr. Fawcett?

LB2H9112                    Benett - Cross

1   A.  I don't know.  I don't recall if we talked about whether

2   Steve was talking about that with John.  I imagine they had

3   talked about that, but I don't recall.

4   Q.  If we can just scroll down to paragraph 4.  You see that

5   there is language that says, "I had a personal interest."

6           Do you see that?

7   A.  Yes.

8   Q.  That's the language that we looked at in the prior exhibits

9   that you and Mr. Pounian had drafted, correct?

10  A.  What we looked at in the prior Fawcett draft, yes.

11  Q.  That's the language that was ultimately submitted to the

12  court, correct?

13  A.  It looks like it.

14  Q.  Now, let's look at Exhibit 58, please.  This is your

15  September 30, 2021 letter to the court.

16          You drafted this letter, correct?

17  A.  Yes.  This is the September 30 letter, yes.

18          MR. SHEN:  We are going to move this document into

19  evidence as well.

20          MS. KIRSCH:  No objection.

21          THE COURT:  Admitted.

22          (KSA Exhibit 58 received in evidence)

23  Q.  This letter actually attaches another declaration from Mr.

24  Fawcett, correct?

25  A.  I believe so.

LB2H9112                    Benett - Cross

1   Q.  Did you and Mr. Pounian draft the second declaration that

2   Mr. Fawcett had prepared?

3   A.  My recollection of the September 30th one is that I was on

4   the phone with John Fawcett who walked me through what he had

5   done.  I don't have the declaration in front of me, if you're

6   going to ask me questions about it.  My recollection is that I

7   was in the office that day.  I was on the phone, I believe I

8   was on the phone with John Fawcett.  He walked me through what

9   he had done.  I typed up that supplemental declaration and sent

10  it to him to look at.

11  Q.  You were the one who actually drafted the declaration, you

12  drafted the language in the declaration, correct?

13  A.  I disagree with that.  I literally on the phone had it on

14  speaker so I could type what he was telling me.  Yes, I typed

15  it, but I didn't know anything about how he had done this.  He

16  gave me the language.  He told me what he did.  I had questions

17  and I asked him things like -- I didn't even know about

18  ProtonMail before September 30.  It was a long call to try to

19  understand what he did.  And, yes, I typed it.

20  Q.  Did you or anyone else at the Kreindler firm purport to

21  give Mr. Fawcett any legal advice with respect to his September

22  27 declaration or his September 30 declaration?

23  A.  No.

24  Q.  Did you suggest to him at any point in time that he should

25  retain counsel in connection with those two declarations, not

LB2H9112                    Benett - Cross

1    later, but just in connection with those two?

2    A.  I don't recall doing so.  My answer is no.

3    Q.  Did you explain to Mr. Fawcett at the time that his

4    interest and the firm's interest may not be aligned?

5    A.  There was a conversation where he was apologizing and

6    deeply upset.  I did not have that sort of formal conversation

7    with him.  It wasn't until the court's October 4 order that I

8    said to him, you should get your own lawyer.

9    Q.  You had no discussions with him at all about any potential

10   conflicts of the firm's interest versus his interest, correct?

11   A.  I guess the reason I bring up the conversation where he was

12   upset and apologizing, in response to your question, is that it

13   felt to me like a real understanding on everybody's part that

14   not only was this a really big deal, but that this now

15   potentially irrevocably would change the relationship we had

16   with an individual who had been working on the case with the

17   firm for the families for the last 20 years.  And that to me,

18   to me that conversation was about how our paths were branching

19   differently.

20   Q.  My question to you was just, did you explain that there was

21   a conflict of interest and that he may be hurting his own

22   interest in supporting the firm's interest in submitting these

23   declarations?

24   A.  We did not have a conversation about that.

25   Q.  Did you discuss with him the court's prior actions in

LB2H9112                    Benett - Cross

1    connection with the firm's breaches of the protective orders?

2    A.  Are you referring to the October 17 -- I'm sorry, the 2017?

3    Q.  I am referring to any time that someone has brought to the

4    court's attention an alleged breach of the protective order by

5    the Kreindler firm, did you discuss with Mr. Fawcett what the

6    court did in connection with those?

7    A.  To be clear, I want to make sure I am not missing something

8    the court might have done.  My understanding is there was one

9    finding of a breach in this case.

10   Q.  I am just asking if you discussed that with Mr. Fawcett?

11   A.  What the court had done in 2017?

12   Q.  Let's start there.  Did you discuss that with Mr. Fawcett?

13   A.  I did not.

14   Q.  Did you discuss with Mr. Fawcett that the Department of

15   Justice had made the assertion that Mr. Kreindler had violated

16   the protective order in connection with his speech at Dartmouth

17   and what the court's reaction to that was?

18   A.  Did I discuss that with John Fawcett between September 27

19   and September 30?  No, I did not.

20   Q.  Mr. Fawcett agreed to submit a declaration on the 27th,

21   where he admitted to being the source of the leak and to

22   violating the protective order.  Why did he agree to submit a

23   second declaration?

24        MS. KIRSCH:  Objection.  That calls for speculation.

25   Q.  Let me ask a new question.  Did you urge Mr. Fawcett to

LB2H9112                    Benett - Cross

1   submit a second declaration?

2   A.  I just want to go back to, you said that he had agreed to

3   submit a declaration.  On September 27, I did say to him that

4   he had to decide what to do.  It was clear that there were

5   serious -- there were going to be serious ramifications about

6   this after our first conversation.  I didn't know whether he

7   would give us a declaration or not.  I actually for some period

8   that morning was figuring out what and how to tell the court

9   what had happened without being able to give a declaration from

10  Fawcett.

11          So, in the course of that September 27, one of those

12  September 27 conversations, I think that probably there was a

13  part of the conversation with John that was, if you sign a

14  declaration, there is going to be fallout.  I didn't want -- I

15  couldn't tell him not to sign the declaration, but I also

16  needed to make sure that he understood the seriousness,

17  obviously the seriousness of what he had done already, but the

18  seriousness of what was going to happen next.

19  Q.  What did you tell him the fallout would be?

20  A.  I think I said, this is a really big deal, and if you sign

21  the declaration, you have to accept the court is going to do

22  something.

23  Q.  Do you know why he agreed to sign the second declaration?

24  A.  So, the first declaration he gave me sua sponte.  The

25  second declaration, in our September 27 letter, we told the

LB2H9112                          Benett - Cross

1  court -- it was a crazy day.  We couldn't do everything we

2  wanted to do by the end of September 27.  In the letter we said

3  that we would provide the court with an update shortly about

4  the next steps.  I don't think there was an order -- maybe

5  there was -- from the court at that point to describe how he

6  had done it.  One of the things that we had to do was to

7  reconstruct what had happened in leaking that transcript and

8  why we hadn't captured it during our search.  Because we felt

9  confident up until September 27, given our firm's practices,

10  given what we were able to determine from our systems, given

11  the statements that everybody who had worked with us for

12  anywhere from five to 20 years and had never done anything like

13  this before, until 10 a.m. on September 27 we believed it was

14  not from us.  And it came from Fawcett, and we needed to figure

15  out how he could have done that without us ever having known.

16  Q.  Ms. Benett, did you make any promises to Mr. Fawcett if he

17  submitted the declaration?

18  A.  No.

19  Q.  Did you tell him that you would pay for his lawyer?

20  A.  No.

21  Q.  Is the firm in fact paying for his lawyer?

22  A.  I don't know.

23  Q.  Did you tell him that you would write to the court and

24  stick up for him for all the great work he did in the 9/11

25  case?

LB2H9112                        Benett - Cross

1    A.  I didn't say that to him.  There is no question about his

2    responsibility and the seriousness of his breach here.  It was

3    hard to also at the same time not feel like he needed -- who he

4    was needed to be explained in some way, and the work he had

5    done in the case for 20 years, and the fact that he had never

6    done anything like this before.  I definitely didn't say we are

7    going to write and we are going to stick up for you to the

8    court.  There was a letter that we wrote, and I don't remember

9    if it was the September 27 letter or the later letter, but it

10   did feel incumbent to me to recognize, not to minimize his

11   violation of the protective order, but to recognize the

12   substantial work that he had done for our clients, for the 9/11

13   family members, from 2002 until 2021.  And that was important

14   for us to say because he --

15                    (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LB2H9114                    Benett - Redirect

1    Q.  And so, Ms. Benett, you stuck up for Mr. Fawcett in the

2    letter you submitted to the Court on September 30, right?

3    A.  We felt like we needed to say who he was.

4    Q.  Right.  And you're sticking up for him again here as you're

5    testifying, correct?

6    A.  He breached a protective order.  He's the subject of -- one

7    of the subjects of the Court's investigation.  I mean, not sure

8    what you mean by -- I will say, he's been a tireless advocate

9    for the family members.  He was on phone calls every single

10   week with them.  He did so much work in building this case and

11   developing the evidence against the Kingdom of Saudi Arabia, it

12   would not be fair for his entire life to be reduced to this

13   mistake no matter how egregious it is.

14   Q.  And you were here yesterday when Mr. Kreindler gave his

15   emotional testimony about Mr. Fawcett and he stuck up for him

16   then as well, correct?

17   A.  I was -- I was here, and I did listen to Mr. Kreindler.

18            MR. SHEN:  I have no further questions.  Thank you.

19   REDIRECT EXAMINATION

20   BY MS. KIRSCH:

21   Q.  Good afternoon, Ms. Benett.

22            Sorry.  I just need one minute, your Honor.

23            THE COURT:  That's fine.

24   Q.  Can you take the Kreindler book and put that in front of

25   you, Ms. Benett.  We'll do some of this in reverse

LB2H9114                        Benett – Redirect

1    chronological order, but we'll just stick with what we were

2    just talking about.

3              Can you turn to tab 52.  Can you tell me, can you

4    identify this document?

5    A.   Yeah.  It's an email chain that starts from me.  It goes to

6    several people at the Kreindler firm.  And then above that is

7    an email from Steve Pounian to me.

8              MS. KIRSCH:  I'd like to move this into evidence.

9              THE COURT:  Any objection?

10             MR. SHEN:  No objection.

11             THE COURT:  Admitted.

12             MS. KIRSCH:  OK.  That's tab 51.

13             THE COURT:  I think that was tab 52.

14             THE WITNESS:  Yeah, I'm sorry.  I was on 52.

15             THE COURT:  I think you had asked us to turn to 52.

16             (Kreindler Exhibit 52 received in evidence)

17             MS. KIRSCH:  Oh, sorry.

18   BY MS. KIRSCH:

19   Q.   OK.  Can you explain to me --

20             THE COURT:  Ms. Kirsch, sorry, just so we are clear,

21   were you asking all of us to look at 52 or 51?

22             MS. KIRSCH:  51.

23             THE COURT:  I think we all were looking at 52.

24             MS. KIRSCH:  I'm sorry, 51.

25             THE COURT:  That's OK.  Are you at 51 now?

LB2H9114                    Benett – Redirect

1          Mr. Shen, any objection to admitting 51?

2          MR. SHEN:  No objection.

3          THE COURT:  OK.  It's admitted as well.

4          (Kreindler Exhibit 51 received in evidence)

5    BY MS. KIRSCH:

6    Q.  Ms. Benett, can you tell me what's going on in this email

7    which is midday on Friday, September 24?

8    A.  Yeah.  So this was after the September 23 order directing

9    that our declarations be filed by Monday, and I was circulating

10   to everybody who had been told they would need to do -- sign a

11   declaration.  The language of the Court's order shows what the

12   declarations would contain and making sure everybody would be

13   available to review, finalize review, sign, and get back to me.

14   Q.  At this point was it primarily your responsibility to

15   prepare these declarations to be filed in response to the

16   Court's order?

17   A.  Yes.

18   Q.  Did you take any steps at this time to satisfy yourself

19   that the declarations that would be submitted by all of these

20   individuals were complete and accurate?

21   A.  Yes.

22   Q.  Can you describe what you did.

23   A.  Sure.  So I had spoken to everybody individually previously

24   to describe generally what the content of the declarations

25   would have to say -- state.  I -- especially for the

LB2H9114                          Benett - Redirect

1   nonlawyers, I discussed what it meant to sign under penalty of

2   perjury.  I had told them that I'd try to get them -- that I

3   would -- I asked them questions to make sure that I knew the

4   correct answers to the Court's direction.  And then with John

5   Hartney, I had a longer conversation with Hartney because his

6   was going to have to focus on the Kreindler systems and stuff

7   that I wasn't necessarily as familiar with.

8   Q.  Why did you have a longer conversation with Mr. Hartney?

9   A.  Because I wanted to make sure that I could -- that he and I

10  could work on his declaration to accurately describe the firm's

11  practices and also the tech side, and it felt -- so in my

12  communications with John, that was just more efficient and

13  effective to do in person.

14  Q.  Then let's take a look at tab 52, please.  Can you identify

15  that document?

16  A.  Yeah.  That's a response from Steve Pounian to me to the

17  email at tab 51.

18          MS. KIRSCH:  I'd move that into evidence.

19          THE COURT:  I think we just did that because we had a

20  mix-up.

21          MS. KIRSCH:  You're right.  You're right.  You're

22  right.  I apologize.

23          THE COURT:  That's all right.

24  BY MS. KIRSCH:

25  Q.  Can you explain here what -- Mr. Pounian is offering to

LB2H9114                        Benett - Redirect

1   help you with these declarations, is that correct?

2   A.  Yes.

3   Q.  Did you have any reaction to -- it's the second to last

4   sentence, he says:  I'm also concerned about sharing what's

5   redacted name with KSA since he is living abroad.  Are we

6   planning to file his declaration with the Court only *ex parte*?

7           Can you explain what your reaction to that statement

8   from Mr. Pounian was?

9   A.  Well, I understood what his -- I understood his concern

10  both from the work product perspective but also from just the

11  witness safety perspective.  I mean, that's what I understood

12  that to be addressing.  Is that what your question is?

13  Q.  Yes.

14  A.  OK.  So, yes, we were -- that consultant was living in a

15  place where we had concerns about his safety if we were to

16  reveal his name to anybody but the court -- or at least reveal

17  his name to the defendants.

18  Q.  Can you expound a little bit on what the work product

19  concern was.  You said there were two types of concerns.

20  A.  Right.  So the work product was both producing his name and

21  his identity and the -- you know, the fact of his -- where he

22  was also, to the extent that that could bear on work that he

23  was doing in connection with the case and thereby reveal work

24  product.

25  Q.  Is it fair to say that the Kreindler firm has taken the

LB2H9114                        Benett - Redirect

1    lead in the factual investigation portion of the case against

2    KSA?

3    A.   That is definitely fair to say.  It was our investigators

4    who had developed most of the facts in interviews and located

5    the witnesses that were not those folks that the Kingdom

6    produced.  For example, the plaintiffs' witnesses were

7    individuals that our investigators were able to track down,

8    talk to, and have agreed to come and testify, for example.

9    Q.   And is that part of the reason that the Kreindler firm was

10   focused on answering the Court's questions but not voluntarily

11   revealing more information than it absolutely needed to for the

12   KSA?

13   A.   We had -- we had genuine concerns because we, even as we

14   speak, have people who are working on the case, and we were --

15   wanted to take every precaution possible to protect our active

16   work product.  We had -- you know, we had concerns.  I don't

17   want to sound histrionic, but the Jamal Khashoggi incident was

18   something that made us worried.  He had approached one of our

19   team members and expressed an interest in working with

20   Kreindler and the 9/11 family members.  And that day, as I

21   understand it, he spoke with Mohammad bin Salman's brother, who

22   was the ambassador in D.C. at the time, and was thereafter

23   obviously murdered.  I don't know if that would have had

24   anything to do with his agreeing to be a witness in our case,

25   but it was certainly something that we were mindful of, whether

LB2H9114                    Benett - Redirect

1    it was a question of physical safety of our investigators or

2    our witnesses or whether it was just a question of making them

3    no longer as willing to meet with us and speak with us.

4    Q.  Is it fair to say that in the beginning of this process,

5    when some of the other plaintiffs firms came forward

6    voluntarily with declarations, that the Kreindler firm felt it

7    was in a slightly different position in that regard?

8    A.  Yes, that is fair to say.  We were -- we knew that the

9    other firms had a different approach.  We felt like it wasn't

10   appropriate.  We also -- we felt confident at the time that

11   there was -- that this hadn't come from our firm, and we wanted

12   to be led by the Court and not by the Kingdom on what we had to

13   provide, and we also wanted to limit our responses to what was

14   asked for.  We trusted that if there was more information that

15   the Court needed, we would have a subsequent order.

16   Q.  So it's fair to say also that the Kreindler firm has an

17   enormous amount of highly sensitive, highly confidential

18   information of its own that it's handling on a day-to-day

19   basis, is that right?

20   A.  That's correct.

21   Q.  We've talked a little bit at this hearing about the

22   document management system, and so forth.  Can you explain the

23   steps that the firm takes and why it is that you're comfortable

24   that the confidential information that's being handled is, in

25   fact, safe?

LB2H9114                    Benett - Redirect

1    A.   Yeah.  So I'll talk first specifically about the management

2    of information in the 9/11 case.  The system that people have

3    heard about over the course of the hearing is called Case

4    Media.  The firm has in all -- almost, if not all, of our other

5    cases migrated over the course of the lifetime of this case to

6    it through at least two new software document management

7    systems.  We did not migrate the 9/11 case onto those new

8    systems for a variety of reasons.  One being that it is -- it

9    is old enough and big enough and we are familiar enough with

10   the way that those documents are managed within Case Media that

11   it would have been fairly disruptive to do so, especially

12   because our newest system was being built out, being trained on

13   it literally in the months leading up to and during the

14   deposition.  But even the one that we had before that postdated

15   the development of our document management system on Case

16   Media.

17        Case Media is, I would say, more or less required for

18   all other purposes.  So I don't know if there are even any

19   other active cases that have documents that are managed on Case

20   Media.  The only individuals who are told how -- again, this is

21   not -- this is not to suggest that as a technical matter, but

22   as a realistic matter, the only people who are directed to the

23   location where the 9/11 materials are maintained are people who

24   were working on the case and who have signed the FBI -- read

25   and signed the FBI protective order and reviewed the MDL

LB2H9114                     Benett - Redirect

1    protective order, and we keep a log of those people.  My

2    secretary maintains a file with the names of those people.

3    Q.  Thank you.

4           In that Case Media system, there are documents that go

5    to and from and are about some of these consultants and sources

6    that the Kreindler firm works with that are treated with the

7    highest sensitivity, is that correct?

8    A.  That's correct, yes.

9    Q.  So fair to say that this highly sensitive information of

10   yours is given the same protection as the highly sensitive

11   information or -- yeah, the highly sensitive information that

12   you're receiving from the KSA?

13   A.  Yeah, and from the FBI.

14   Q.  And from the FBI.  OK.

15          So if we go back to tab 52, what did you respond to

16   Mr. Pounian when he offered to give you some help with these

17   declarations over the weekend?

18   A.  I don't -- I don't remember if I wrote back to that email.

19   Q.  As a general matter, did you accept his offer?

20   A.  I think -- yes, I did.  I did send him, I think, what I

21   believed were sort of the close to final drafts.

22   Q.  Did you take steps at this point to reaffirm that whatever

23   was going to go into this filing to the Court on the 27th would

24   be accurate and complete?

25   A.  Yes.  So I spent a lot of that weekend with Hartney making

LB2H9114                    Benett - Redirect

1   sure -- since I was -- since I sort of jumped in on this, I

2   knew that Duke had gotten all the emails, but they were not

3   saved in a single place that was easy for me to access.  So I

4   worked with Hartney to make sure -- and in their native format.

5   I didn't want them coming like a forward from September 24 a

6   September 23 email.  I wanted the actual original native format

7   emails.  I worked with John to put them all in a folder.  I

8   looked through all of them.  I compared them to what I had seen

9   before.  If there was anything -- I think there was at one

10  point I thought that there was an original email that hadn't

11  come up during the search.  There was like a reply, reply,

12  original, and I had only the reply and the reply.  I was on the

13  phone with John to make sure that I hadn't missed that.

14          So, yes, I was working with John Hartney over the

15  course of the weekend to make sure that all of the

16  communications that were going to go into the exhibit that

17  would be an exhibit to his declaration that would be in

18  response to the Court's direction to produce all communications

19  with Isikoff were in a single place.

20  Q.  So let's look at tab 53.

21          So this appears to be an email from Mr. Maloney to you

22  forwarding a bunch of these emails that had been found in the

23  earlier search, is that right?

24  A.  Yes.

25          MS. KIRSCH:  I'd move this into evidence.

LB2H9114                    Benett - Redirect

1          MR. SHEN:  No objection.

2          THE COURT:  Accepted.

3          (Kreindler Exhibit 53 received in evidence)

4    BY MS. KIRSCH:

5    Q.  So can you explain to me what's happening here.

6    A.  So this is probably in response to me saying to Duke, you

7    know, I need all the emails.  And then I think after this is

8    when I decided I wanted to go back to Hartney and get the

9    native ones directly from the system, not just the forwards to

10   me.

11   Q.  So let's look at tab 54.  Can you identify this document?

12   A.  Yes.  So this is -- this is, again, Duke forwarding other

13   emails to me that Hartney had found during the course of his

14   investigation.

15          MS. KIRSCH:  I'd move this into evidence.

16          MR. SHEN:  No objection.

17          THE COURT:  It's accepted.

18          (Kreindler Exhibit 54 received in evidence)

19          MS. KIRSCH:  OK.

20   Q.  Also, tab 55, another one of these emails on September 24,

21   can you identify this?

22   A.  Yeah.  That is another forward from Duke to me of an email

23   that Hartney had filed during his July -- during his original

24   search.

25   Q.  OK.

LB2H9114                    Benett - Redirect

1    A.   During one of his searches.

2    Q.   And tab 56 -- I move, sorry, move 55 into evidence.

3            MR. SHEN:  No objection.

4            THE COURT:  It's accepted.

5            MS. KIRSCH:  Thanks.

6            (Kreindler Exhibit 55 received in evidence)

7            THE WITNESS:  56, I had asked you to just send me any

8    correspondence you had with John about the systems and

9    generally.

10           MS. KIRSCH:  OK.  I move 56 into evidence.

11           THE COURT:  Any objection?  It's accepted.

12           (Kreindler Exhibit 56 received in evidence)

13   BY MS. KIRSCH:

14   Q.   OK.  Let's look at tab 57.  Can you explain this?

15   A.   This is, again, Duke sending to me -- and I was on the

16   original email, but just to have it top of my inbox -- several

17   of the emails that were produced in the course of the

18   investigation.

19           MS. KIRSCH:  I'd move 57 into evidence.

20           MR. SHEN:  No objection.

21           THE COURT:  It's accepted.

22           (Kreindler Exhibit 57 received in evidence)

23   BY MS. KIRSCH:

24   Q.   Let's look at tab 58.  Can you identify this document?

25   A.   Yeah.  Yes.  This is a cover email from me to Hartney with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB2H9114                          Benett - Redirect

1    the draft of his declaration -- sorry, about a draft, yeah.  So

2    I think initially he was just checking in, and then I sent him

3    the draft, and then I sent him a different version.

4                MS. KIRSCH:  I'd move 58 into evidence.

5                MR. SHEN:  No objection.

6                THE COURT:  It's accepted.

7                (Kreindler Exhibit 58 received in evidence)

8    BY MS. KIRSCH:

9    Q.  Let's look at tab 61.  Do you recognize this document,

10   Ms. Benett?

11   A.  I do.  This is an email exchange between Steve Pounian and

12   myself on changes to his declaration, and I can --

13               MS. KIRSCH:  I'll move 61 into evidence.

14               THE COURT:  Any objection?

15               MR. SHEN:  No objection.

16               (Kreindler Exhibit 61 received in evidence)

17   BY MS. KIRSCH:

18   Q.  Let's look at it for a moment.  Mr. Pounian says to you:

19   "Can't everyone say I have no idea how Michael Isikoff got the

20   transcript?"  And then you respond up top.

21               Can you explain to us what's going on with your -- the

22   first sentence of your response?

23   A.  Sure.  Well, first of all, we couldn't, of course, say that

24   because as of then it was our understanding that nobody would

25   have known -- that nobody did know how Mr. Isikoff got the

LB2H9114                    Benett - Redirect

1    transcript.  I wasn't sure about adding that because I had

2    genuinely felt like we were being punished for having

3    previously provided what the Court had ordered and that we were

4    being scolded for not doing more, and I will confess that I

5    felt frustrated by that.  But it did seem to me, on balance, it

6    was worth adding, since we believed that to be true on

7    Saturday, September 25.

8    Q.  If you look at the third paragraph, you write:  "I left JF

9    a voice mail earlier to ask him the same things you emailed

10   about."

11          Are those the voice mails or one of the possibly two

12   voice mails you left for Mr. Fawcett over that weekend that you

13   testified about recently?

14   A.  Yes.

15   Q.  Do you recall again whether you heard back from Mr. Fawcett

16   over that weekend?

17   A.  I didn't -- I did not hear back from Fawcett over the

18   weekend.

19   Q.  Then you say:  "We also need to find out from JPK how many

20   times he talked to Isikoff, if he can recall when, and what

21   they discussed."

22          Do you see that?

23   A.  Yes.

24   Q.  And you were here in the room when Mr. Maloney testified

25   that he had previously had discussions about that with

LB2H9114                         Benett - Redirect

1    Mr. Kreindler, correct?

2    A.  Yes.

3    Q.  And so why is it that you're saying here we also need to

4    find out from JPK those things?

5    A.  I just wanted to be sure before filing this declaration

6    that we -- I wanted to be totally comfortable with what we were

7    filing, and I wanted to be -- I wanted to make sure everybody

8    had reviewed it repeatedly.  We were -- although, as is evident

9    in the email, though perhaps irritated, I also took it very

10   seriously, and I did not want to miss, for example, an Isikoff

11   call or email that might have been out there.

12   Q.  Then let's look at tab 62.  Can you identify this document

13   for us?

14   A.  Yes.  This is a series of emails about the draft

15   declarations and then the draft declarations behind it.

16           MS. KIRSCH:  I'd move this into evidence.

17           MR. SHEN:  No objection.

18           THE COURT:  It's accepted.

19           (Kreindler Exhibit 62 received in evidence)

20   BY MS. KIRSCH:

21   Q.  Now, it says here again on Saturday, up at the top, "Let's

22   talk to Fawcett and Jim tomorrow if possible."

23           Do you see that?

24   A.  Yes.

25   Q.  So that suggests that you still haven't made contact with

LB2H9114                          Benett – Redirect

1   them about the open issues, is that right?

2   A.  Correct.

3   Q.  Then let's just turn the page to -- the first declaration

4   draft attached is yours, and I'm going to just draw your

5   attention to paragraph 4.  Is that the sentence that

6   Mr. Pounian suggested got added in?

7   A.  Yes.

8   Q.  So here in the draft declarations that everyone's prepared

9   to sign on Saturday is that -- that paragraph 4 appears in your

10  declaration and it appears in this draft declaration of

11  Mr. Fawcett?

12  A.  Yes.

13          MR. SHEN:  Sorry, Ms. Kirsch, which exhibit are you

14  in?

15          MS. KIRSCH:  62.

16          THE COURT:  62.  I think there was a new 62 I

17  received.

18          MS. FREY:  Your Honor, can I explain something to

19  Mr. Shen just a second that has to do with just the

20  attachments?

21          MS. KIRSCH:  Is this the attachments?

22          MS. FREY:  I gave the attachments to someone

23  yesterday.  You don't have it in your book at all?  Do you need

24  another copy?

25          (Counsel confer)

1          MR. SHEN:  I'm sorry.

2          THE COURT:  That's OK.  I received a new Exhibit 62.

3     It was put in my binder.

4          MS. KIRSCH:  Yes, your Honor.  We had given them one

5     as well, but the binder that they're looking at now isn't the

6     one that the new exhibit went into.  So we're looking to see if

7     we can get another set.

8          MS. FREY:  I can get it now.

9          MR. SHEN:  Ms. Kirsch may proceed.

10         THE COURT:  OK.

11    BY MS. KIRSCH:

12    Q.  All right.  So if you look at the next declaration --

13         THE COURT:  Sorry.  I don't think we actually admitted

14    the document.  I take it, no objection?

15         MR. SHEN:  No objection.

16         THE COURT:  OK.  So it's admitted.

17         Go ahead.

18         (Kreindler Exhibit 62 received in evidence)

19         MS. KIRSCH:  Thank you.

20    BY MS. KIRSCH:

21    Q.  Starting at the Bates No. KK1436 is Mr. Fawcett's

22    declaration, and you've put in his draft declaration that same

23    paragraph 4?

24    A.  Yes.

25    Q.  And is that because that was what you believed to be the

LB2H9114                    Benett – Redirect

1    truth at the time?

2    A.  That is correct.

3    Q.  Let's look at tab 63.  Do you recognize that document?

4    A.  Yes.

5    Q.  Can you tell me what it is.

6    A.  Yep.  This is an exchange over that weekend before our

7    September 27 filing.  I'd been on the phone a bunch with

8    Hartney to make sure -- I think I had a list of all the emails,

9    but I wanted to make sure I had each of them in the original

10   format for purposes of the exhibits.

11              MS. KIRSCH:  I'll move this into evidence, tab 63.

12              MR. SHEN:  No objection.

13              THE COURT:  It's admitted.

14              (Kreindler Exhibit 63 received in evidence)

15   BY MS. KIRSCH:

16   Q.  Tab 64, can you look at that and tell me what this document

17   is, Ms. Benett.

18   A.  This is -- so this is the email that I'd asked Hartney for

19   in the -- previously at tab 63, and I didn't want it as -- I

20   think he sent me a PDF of the attachment, and I just wanted it

21   in email with that document attached to the email.

22              MS. KIRSCH:  OK.  I'll move tab 64 into evidence.

23              MR. SHEN:  No objection.

24              THE COURT:  It's admitted.

25              (Kreindler Exhibit 64 received in evidence)

LB2H9114                    Benett - Redirect

1    BY MS. KIRSCH:

2    Q.  Tab 65, Ms. Benett, what's going on here?  This is

3    Sunday --

4    A.  Right.

5    Q.  -- September 26?

6    A.  So this was -- I had thought that this was the email that I

7    thought had been missing from the folder that I was compiling

8    for the exhibit.  And it was an exchange with either Isikoff or

9    Isikoff's producer and Jim, and I had just been -- this is

10   where I had been worried that there was something that had been

11   left out because I had the response but not the original email,

12   but I then had it.

13              MS. KIRSCH:  I'd move tab 65 into evidence.

14              MR. SHEN:  No objection.

15              THE COURT:  It's accepted.

16              (Kreindler Exhibit 65 received in evidence)

17   BY MS. KIRSCH:

18   Q.  So, Ms. Benett, fair to say over the weekend you were

19   reviewing with a fresh eye all of the work that had previously

20   been done in the investigation in order to get the filing on

21   the Monday as accurate as possible, is that right?

22   A.  Yes, yeah.

23   Q.  Is that something that commonly happens at the firm, that

24   more than one of the partners might go back over something and

25   look at it to make sure it is 100 percent accurate?

LB2H9114                    Benett - Redirect

1   A.  Yeah, just -- yes, yes, especially -- certainly with the

2   judicial filing and certainly in this case, but as an ordinary

3   practice, yes, I would have somebody take a fresh set of eyes

4   at something like this.

5   Q.  So let's look at tab 66.  Can you tell me what this

6   document is, please.

7   A.  Right.  So this is me -- I had believed that all of the

8   deleted folders had also been checked, but I wanted to confirm

9   that the search encompassed incoming, outgoing, as well delete

10  folders.

11          MS. KIRSCH:  I'll move tab 66 into evidence.

12          MR. SHEN:  No objection.

13          THE COURT:  Accepted.

14          (Kreindler Exhibit 66 received in evidence)

15  BY MS. KIRSCH:

16  Q.  Ms. Benett, when you redid all of these steps of the search

17  or went over everything with your fresh eyes, did anything

18  occur to you had been missed in the search that Mr. Maloney had

19  presided over?

20  A.  I didn't find anything new.

21  Q.  So let's look at tab 68.  It's now 8:23 a.m. on Monday,

22  September 27.  Can you identify this document, please.

23  A.  My tab 68 is a 9:07 email.

24  Q.  And when you look -- well, I'll move tab 67 into evidence.

25          THE COURT:  Oh you're at 67 or 68?

LB2H9114                        Benett - Redirect

1           MS. KIRSCH:  I'm sorry.  Did I do that again?  67.

2           THE COURT:  67, yes, I see it.

3           MS. KIRSCH:  I apologize.

4           THE COURT:  Yes, this is again a new 67, so it's

5      possible that the Kingdom doesn't have a copy of it.

6           MS. FREY:  I have given it to both counsel.

7           THE COURT:  OK.  Good.  Any objection, counselor?

8           MR. SHEN:  Can you just --

9           THE COURT:  67.

10          MR. SHEN:  What's the date of that email, please?

11          THE COURT:  Monday, September 27, at 8:23 is the top

12     email.

13          MR. SHEN:  No objection.

14          THE COURT:  Accepted.

15          (Kreindler Exhibit 67 received in evidence)

16          THE WITNESS:  This is an email exchange between me and

17     Steve with, I think, just Jim's draft declaration.

18     BY MS. KIRSCH:

19     Q.  OK.

20     A.  I think I had talked to Jim to go over it with him one last

21     time before filing.

22     Q.  Do you remember what the conversation with Mr. Kreindler

23     was about the privilege log?

24     A.  I asked him, because there was the one email from -- the

25     one email from Fawcett to Isikoff that had that privilege log,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB2H9114                    Benett - Redirect

1   I asked Jim.  He didn't know what I was talking about with
2   respect to that email.
3   Q.  Mr. Kreindler was not aware -- Mr. Kreindler told you that
4   he was not aware that Fawcett had sent the privilege log back
5   in July, is that true?
6   A.  That's right.  That's right.
7   Q.  OK.
8   A.  And I still had not heard back from John Fawcett at this
9   point.
10  Q.  Right.  Let's look at tab 69.  Can you identify this
11  document for me.
12  A.  This is the covering email and the declaration for Julia
13  Sienski from our office.
14          MS. KIRSCH:  OK.  I'd move tab 69 into evidence.
15          MR. SHEN:  No objection.
16          THE COURT:  It's admitted.
17          (Kreindler Exhibit 69 received in evidence)
18  BY MS. KIRSCH:
19  Q.  Ms. Benett, who is Julia Sienski?
20  A.  She is -- she has the role of client liaison.  She also
21  functions also as a paralegal on this case.  So she is first
22  point of contact for many of the family members, and she also
23  manages a lot of the documents in the case.
24  Q.  Is this an example of the steps that you took when you were
25  working with the various declarants to get their declarations

LB2H9114                    Benett - Redirect

1   ready for filing?

2   A.  Yes, and I know that I work with Julia a lot, and she's

3   perfect.  I know that I spoke with her in person about this

4   also, but I just want to -- I did not -- she's super-busy, and

5   I did not want to -- in addition to the conversation, I wanted

6   to make sure she saw in her email, not just on the declaration,

7   that she has signing under penalty of perjury.  It has to be

8   accurate, and that we can make any changes that she wanted.

9   Q.  Let's turn to tab 73.

10          All right.  Can you identify this document,

11  Ms. Benett?

12  A.  This looks like the statement that John Fawcett sent to me

13  on Monday, September 27.

14          MS. KIRSCH:  I'll move this into evidence.

15          MR. SHEN:  No objection.

16          THE COURT:  Admitted.

17          (Kreindler Exhibit 73 received in evidence)

18  BY MS. KIRSCH:

19  Q.  So can you again just recall for us what led up to the

20  receipt of this document on the morning of September 27 or the

21  afternoon, I guess, to the best of your recollection?

22  A.  Right.  So this is 0the timestamp is 12:23, so I am fairly

23  confident that the time that I got the call from Jim was

24  between -- sorry, from John Fawcett was between 10:00 and 10:30

25  in the morning.  My first conversation with John was, I

LB2H9114                    Benett - Redirect

1    believe, relatively brief.  It was the -- I mean, he just said,

2    Megan, I can't sign my declaration, and I was, I think,

3    probably silent for some time and said, OK.  I'm going to need

4    to think about this.  Let's talk in a little bit is more or

5    less how the first call unfolded.

6            I called Justin Green to let him know for the

7    partnership about this.  I called Steve Pounian to let him know

8    about this.  There were -- I don't know if I talked before this

9    email.  I don't know -- I was on the phone a lot.  I don't know

10   if it was with more than those two people, but there was a --

11   there were a series of phone calls trying to figure out how

12   this happened.  There was some conversation, should we ask the

13   Court for more time so we can do more of an investigation?

14   There was a decision that we needed to get this in to the Court

15   immediately that day.  I think some of the other partners in

16   our office were looped in on some of those calls, and this

17   email came -- the whole day was sort of like that.  This email

18   came partway through that process.

19   Q.  So if we look at the attachment, it's that single-spaced

20   declaration that we looked at earlier, and this email, of

21   course, comes from Mr. Fawcett.  Is this document something

22   that Mr. Fawcett wrote?

23   A.  I believe so.  It sounds like it, and it's certainly what

24   he sent me.

25   Q.  You did not write this?

LB2H9114                    Benett - Redirect

1    A.  No, I didn't write it.

2    Q.  And this just came in from Mr. Fawcett?

3    A.  Yeah.

4    Q.  Did you understand this to be his first crack at what he

5    would put in a declaration?

6    A.  Yes.  I mean, he sent it to me unsigned.  I had not -- I

7    don't think -- I mean, I know I had not asked him to send me a

8    declaration.  I don't think I necessarily even knew that he was

9    even drafting one before I got this.

10   Q.  So let me direct your attention to the fourth paragraph of

11   this declaration.

12   A.  Yeah.

13   Q.  He writes -- so Mr. Fawcett writes:  "No one at Kreindler &

14   Kreindler instructed me to send the transcripts to Michael

15   Isikoff.  Nor did anyone at Kreindler & Kreindler have any

16   knowledge of my sending it to Mr. Isikoff."

17        Ms. Benett, you didn't tell Mr. Fawcett to write those

18   words, did you?

19   A.  No.

20   Q.  "Nor did any consultant or anyone else have any knowledge

21   of my sending the transcript to Mr. Isikoff."

22        Those are Mr. Fawcett's words, correct, Ms. Benett?

23   A.  Yes, they are.

24   Q.  And you didn't tell him to write those words, did you?

25   A.  No.

LB2H9114                    Benett - Redirect

Q.  "Until today, no one aside from myself and Michael Isikoff
was aware that I sent the Jarrah transcript to him."

        Do you see that?

A.  I do.

Q.  To the best of your recollection, much of those -- much of
that language shows up in his final declaration, isn't that
true?

A.  Yes.

Q.  He goes on to say:  "I sent the transcripts to Mr. Isikoff
via a non-Kreindler email address."

        You didn't tell him to write that, Ms. Benett?

A.  No, I didn't even know he had a non-Kreindler email
address.

Q.  He writes:  "I did so to prevent the partners and staff of
Kreindler & Kreindler from knowing about my intended action and
to prevent them from stopping me should they wish to do so."

        Did you write that, Ms. Benett, or did Mr. Fawcett?

A.  That was Mr. Fawcett.

Q.  Much of that language shows up in the final declaration,
isn't that true?

A.  Yes.

Q.  Or it might be the September 30 declaration.

A.  One or the other, yeah.

Q.  Mr. Shen asked you some questions about the fact that he
doesn't expound on his motives here in this first draft.  Do

LB2H9114                        Benett - Redirect

1   you feel that he should have?

2   A.   I -- I think, ultimately, it was important -- I mean, it

3   was important for me to understand why he would do something

4   this grave.  I thought it was important for him to provide that

5   information to the Court.  I knew that he was deeply troubled

6   by the Jarrah child pornography images.  I did not have any

7   sense that he was so upset about it that he was behind the leak

8   to Isikoff, but once I had the information about his -- you

9   know, his -- not just his sense of righteousness about the

10  child pornography itself but also his, what seemed to me,

11  genuine and heartfelt concerns about the fact that Jarrah was

12  in Morocco, that he believed it was a place where children were

13  routinely trafficked for sexual purposes, and I knew a little

14  bit more about his personal background, it did seem to me that

15  that was really important context.

16  Q.   Did Mr. Fawcett tell you during one of those conversations

17  on September 27 how strongly he felt about the crime of child

18  pornography?

19  A.   He did, and I should add also -- he did, and he was very

20  scared to put anything in his declaration about his own

21  children, and he did not -- we had a conversation about -- I

22  understood that that was part of what influenced his decision

23  here.  He didn't -- he was worried about his kids.  He was

24  worried about whether -- he was worried about their -- them

25  being part of this, him discussing them, their safety, but he

LB2H9114                    Benett - Redirect

1   was clearly -- his reaction was very much informed by his

2   strong feelings about somebody that he believed was not only

3   trafficking in sexual images of minors but was deliberately

4   living in a place where he would have easy access to minor

5   children for sexual purposes.

6   Q.  Can you explain that last bit a little more clearly that --

7   I take it Mr. Fawcett told you that he was concerned that

8   Mr. Jarrah was specifically living where he could continue to

9   consume or traffic child pornography?

10  A.  John Fawcett -- my understanding from my conversations with

11  John Fawcett was that he believed that Jarrah was intentionally

12  in Morocco in order -- I don't know if he thought this was the

13  only reason, but at least in part -- in order to not only

14  traffic in the disturbing imaginary but to also have ready

15  access to minors, children, for sexual acts.

16  Q.  There were some questions, Ms. Benett, about whether -- in

17  any of those conversations with Mr. Fawcett about whether you

18  advised him to get a lawyer or not.  Do you remember that

19  conversation on cross?

20  A.  Yes.

21  Q.  You don't represent Mr. Fawcett, of course, correct?

22  A.  Correct.

23  Q.  Did Mr. Fawcett ever come to you for legal advice?

24  A.  Not that I recall.

25  Q.  Did Mr. Fawcett come to you and ask for legal advice on

LB2H9114                         Benett - Redirect

1    this matter?

2    A.  No.

3    Q.  Did Mr. Fawcett ever ask you if you thought he needed

4    representation?

5    A.  No.

6    Q.  Prior to the October 4 order, were you focused on whether

7    there was a conflict of interest between the firm and

8    Mr. Fawcett?

9    A.  I was not.  I was not at all thinking about that.  I was

10   focused on sort of dealing with what we would have to look at

11   in light of Fawcett being the source of the leak, figuring

12   out -- getting him off the system, closing his access to any

13   materials, trying to sort of move him -- get back our work

14   product that he had, find some orderly transition to proceeding

15   in the case without his involvement.  But until the October 4

16   order with the language about potential referral for criminal

17   investigation, I -- I recognized that there was exposure for

18   violating the protective orders.  I did not -- I had not been

19   viewing it as something where his interests would diverge from

20   the firm's prior to that.

21   Q.  Fair to say on the 27th of September, your primary goal was

22   to get the facts in front of the Court as a first step?

23   A.  Yes, yes.

24   Q.  And also beginning on the 27th of September, you made sure

25   to take steps that Mr. Fawcett's access to the Kreindler

LB2H9114                         Benett - Redirect

1  servers was shut down, is that correct?

2  A.  Yes.

3  Q.  Did you make clear to Mr. Fawcett in those early days that

4  he was not to be working on the case until you had an

5  opportunity to sort out the next steps?

6  A.  Yes.

7          MS. KIRSCH:  Your Honor, could I take a moment just to

8  go over my notes to make sure everything's done?  I can do it

9  right here while people are waiting, or I could take five

10  minutes.  Whatever's easiest.

11          THE COURT:  If you think you're going to be wrapping

12  up, then let's take a couple of minutes.

13          MS. KIRSCH:  I'm sure I have a couple more questions,

14  but I will be wrapping up quickly.

15          THE COURT:  OK.  Let's just take a two-minute pause.

16          (Recess)

17  BY MS. KIRSCH:

18  Q.  Just a few more minutes.

19          Ms. Benett, I did just want to follow up on one

20  question on September 27 when we were talking about just

21  getting Mr. Fawcett's declaration done.  Your primary

22  obligation, of course, was to the Court at that time, is that

23  right?

24  A.  Yes.

25  Q.  Can you look at -- and I'm sorry to do this switch.

LB2H9114                        Benett - Redirect

1    There's a document that's in the Kingdom's binder, which is

2    that great big one, marked --

3              THE COURT:  It's right here.

4    Q.  -- tab 115.

5              THE COURT:  So this is KSA 115.  Got it.

6    Q.  Do you recall this email exchange with Mr. Hartney?

7    A.  I do.

8    Q.  This is happening on Monday, September 27, am right?

9    A.  Yes.

10   Q.  Can you tell me what's going on in this email exchange and

11   what conversations may have ensued.

12   A.  Sure.  So I had talked with John Hartney initially before

13   starting to work on his declaration about the systems and the

14   search and the systems management, and I was -- I wanted to

15   make sure, obviously, that his declaration was accurate.  I

16   understood that the Case Media system where the documents,

17   including the Jarrah deposition, were saved did not have

18   restricted access, meaning that it was available theoretical to

19   anybody at the firm.

20             He and I went back and forth because he didn't -- not

21   only did I not want to include language that suggested that

22   there was restricted access, but he also flagged I can't say

23   that there was restricted access.  Because of the nature of our

24   document management system in every other case versus the 9/11

25   case, the reality is that in order for somebody to know how to

LB2H9114                    Benett - Redirect

get to the 9/11 documents, including Jarrah, they would have to
come to the 9/11 team, to me or to one of the other attorneys.
We would then get them read in on the protective orders and
direct them as to how to access the materials saved in that
drive.

So we went through a number of different words that we
thought about using. I was concerned that saying "permission"
sounded too much like technical permissions, but at the same
time, I think in -- I coordinated it eventually with Hartney
and with Duke, and we used the language "able to access"
because it was true that you, as a firm policy, would not have
been -- and I didn't want to use "permissions" because I felt
like that sounded technical, but you would not have been
permitted to go to these files and to look at these materials
without reviewing and agreeing to be bound by the terms of the
protective orders. So John and I talked about that. I think
the email -- you see my email at 10:40 was trying to figure
out -- was trying to explain to him that it was -- that I
didn't want it to say it was restricted use, and then I just
felt like it was better to -- I mean, we talked that through.

I think "also need to discuss something with you, can
I call you in five" was both about working on that language,
but then also advising him about the -- about the leak and
about needing to get Fawcett off the systems.
Q. Understood.

LB2H9114                          Benett - Redirect

1              So let's just talk generally for one more minute.

2      Since you began to work -- when did you first meet John

3      Fawcett?

4      A.  I started at the Kreindler firm in October of 2006, so I

5      would have met him around then.

6      Q.  Can you describe how closely you worked with Mr. Fawcett

7      since then and through today, or through September 27.

8      A.  I've worked -- most of my work with him has been on the

9      9/11 case, which I joined that effort in 2016 to 2017.  So it's

10     not -- that's not the only -- I do have other matters that John

11     isn't involved with, but in terms of my work on the 9/11 case,

12     I would work with him on a daily or near daily basis.

13     Q.  How often do you communicate -- did you communicate with

14     Mr. Fawcett?

15     A.  Every day if we were both in the office; otherwise,

16     sometimes by phone.  I would say, if we weren't in the office,

17     maybe on a weekly basis.

18     Q.  To what extent were you aware of Mr. Fawcett's physical

19     whereabouts?

20     A.  I mean, if he was in the office, I knew he was there, but

21     otherwise I wouldn't know where he was if he wasn't in the

22     office.

23     Q.  To what extent were you aware of Mr. Fawcett's activities

24     for the firm either at the goal level or the task level?

25     A.  So, I mean, at the top level, he was a member of the team

LB2H9114                    Benett - Redirect

1    of lawyers who were working on the 9/11 case.  I mean he was a

2    member of the team that includes the lawyers who were working

3    on the 9/11 case, and we were all -- are all unified in our

4    effort to get the information that we believe will establish

5    the role of Saudi officials in the 9/11 attacks.

6            On a daily basis he was sort of a liaison with some of

7    our -- with a consultant or with investigators.  He did a lot

8    of review of the material, the discovery that was produced.  He

9    did independent investigation, for example, that might lead an

10   inquiry of ours in a new direction that was not necessarily

11   revealed in Kingdom materials or FBI materials.  He did a lot

12   of FOIA requests that started to develop some of our leads in

13   the case.

14   Q.  Did you ever communicate with Mr. Fawcett about the

15   protective orders in this case?

16   A.  Yes.

17   Q.  Can you describe those communications.

18   A.  So, I mean, I put them in kind of two categories:  One,

19   there were conversations of, yes, I know we are frustrated by

20   the protective orders and we have to abide by them, and there

21   was -- until September 27 I didn't believe that anybody was

22   knowingly going to violate the protective orders, but there

23   were several conversations about the fact that protective

24   orders were in place; they were orders of the court; we had to

25   comply with them.

1          There was a sort of parallel conversation that

2     revolved around efforts to be relieved from the protective

3     orders.  There were several motions in 2019, maybe 2018, but

4     2018, '19, into 2020 about what the families or the plaintiffs

5     felt like was an over-designation by the Kingdom of Saudi

6     Arabia of its materials.  There was -- I don't know if there

7     were any, certainly not many, I'm not sure any, documents that

8     the Kingdom produced that weren't produced subject to the MDL

9     protective order.  We felt like that was an over-designation.

10    We felt like the process that Judge Casey had in place was

11    being -- that the Kingdom was using it to its own strategic

12    advantage, and we did not think it was consistent with the

13    letter of the original Casey order, ECF 1900.

14         So there was some motion practice on that that we did

15    not prevail on, but certainly it came up in the context of the

16    protective orders are what they are.  You have to abide by

17    them.  They came up also in connection with the FBI protective

18    order.  We had -- we agreed voluntarily to sign the protective

19    order because otherwise we wouldn't have had access to any of

20    the FBI materials.

21         At the same time, as materials were produced, we had

22    serious questions about the need, any legitimate need, to

23    maintain those materials under the protective order.  We had

24    talked, sort of caucused amongst ourselves and with other firms

25    on the Plaintiffs' Executive Committee, about ultimately moving

LB2H9114                    Benett - Redirect

1    to lift the FBI protective order.  There was not unanimity

2    among the Plaintiffs' Executive Committee firms to do so.  It

3    was certainly something that we talked about a lot internally,

4    and along with the conversation that unless and until this

5    protective order is lifted, either by the Department of Justice

6    or after motions practice, we must live with it.

7    Q.  Ms. Benett, there's been some suggestion that because

8    Mr. Kreindler has publicly said that he does not believe these

9    protective orders should be in place, do you think that that

10   created an environment in the Kreindler firm that made people

11   feel as though they need not respect the protective orders?

12   A.  I would say that, if anything, those public statements

13   are -- reinforce internally that we might not -- we might be

14   frustrated by the protective orders, it may restrict us from

15   what we can say to our clients or what we could say publicly,

16   and we have to abide by the public orders.  They are in place.

17   The Court has not lifted them.  If we don't like it, we live

18   with it.  If the time is right or if the Department of Justice

19   decides otherwise, we will proceed differently, but we are

20   bound by those protective orders.  And Jim's -- to my mind,

21   Jim's public comments about them, although not the language

22   that I would use, reflect an understanding that we are bound by

23   them.

24   Q.  Mr. Fawcett never gave you any indication that he would not

25   respect the protective orders, did he?

LB2H9114                    Benett - Redirect

1   A.  Never.

2   Q.  Ms. Benett, did you ever order or direct Mr. Fawcett to

3   send a copy of the Jarrah transcript to Mr. Isikoff?

4   A.  Never.

5   Q.  Were you aware at any time prior to September 27 that it

6   was Mr. Fawcett who sent a copy of the Jarrah transcript to

7   Mr. Isikoff?

8   A.  I was not aware of that until the morning of September 27.

9   Q.  And when you found out for the first time that Mr. Fawcett

10  was the source of the leak of the Jarrah transcript to

11  Mr. Isikoff, what was the first thing that you did?

12  A.  I just don't remember if it was -- well --

13  Q.  The most important thing that you did.  That was a bad

14  question.

15  A.  I changed all of our declarations.  I pulled John's

16  declaration, and I removed from all of our declarations that we

17  didn't know who the source of the Isikoff leak was.

18  Q.  So you did not in any way ratify Mr. Fawcett's sending of

19  the Jarrah transcript to Mr. Isikoff?

20  A.  No.

21          MS. KIRSCH:  I have no further questions.

22          THE COURT:  Thank you.

23          MR. SHEN:  No questions, your Honor.

24          THE COURT:  Ms. Benett, you're done.  You can go back

25  to counsel's table.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB2H9114                        Benett - Redirect

1              (Witness excused)

2              THE COURT:  We're going to finish today, so we're

3       going to take a half-hour brunch -- brunch, half-hour lunch.

4       Be back here at 2 o'clock.

5              If I can also just ask -- sorry.  I do want to deal

6       with this exhibit issue.  I don't know if there is a list from

7       the Kingdom side about the exhibits that were discussed

8       yesterday, if we can reach some agreement so we can just move

9       everything in at the end of the hearing, but I'll ask while

10      you're eating sandwiches to think about that, too.

11             Thank you.  See you in a half an hour.

12             (Lunch recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Shen.

2          MR. SHEN:  Saudi Arabia calls Steven Pounian.

3          THE COURT:  Good afternoon, Mr. Pounian.

4   STEVEN POUNIAN,

5        called as a witness by the Kingdom,

6        having been duly sworn, testified as follows:

7          THE DEPUTY CLERK:  State your full name for the

8   record.

9          THE WITNESS:  Steven R. Pounian, P-O-U-N-I-A-N.

10          THE COURT:  Mr. Pounian, one, you have to keep your

11  mask on, I'm afraid.  Two, make sure you speak directly into

12  the microphone.  And three, during the questioning by the

13  Kingdom, they are going to put exhibits on the computer in

14  front of you, but this is their binder.

15          Mr. Shen, you may begin.

16  CROSS-EXAMINATION

17  BY MR. SHEN:

18  Q.  Good afternoon, Mr. Pounian.

19  A.  Good afternoon.

20  Q.  If you would look at Exhibit 43 in the binder in front of

21  you.  It also will appear on your screen.

22          Sir, Exhibit 43 is a letter that the Plaintiffs'

23  Executive Committee submitted to the court on July 27 in

24  response to a request by the Kingdom for certain discovery

25  pertaining to the leak to Michael Isikoff.  Do you see that?

LB289115                              Pounian - Cross

1    A.  I do.

2    Q.  There is a statement in the letter which says, "Each of the

3    lead PEC firms has already conducted internal investigations."

4              MR. SHEN:  Can we highlight that language for Mr.

5    Pounian.

6              It's at the top of the second page.

7    Q.  Sir, this letter was submitted under your signature,

8    correct?

9    A.  It was.

10   Q.  Now, the investigation that is being referred to in this

11   paragraph, was that conducted by Mr. Maloney?

12   A.  The firm had conducted an investigation, and I had

13   personally also conducted an investigation.

14   Q.  You had individually, in your personal capacity, conducted

15   an investigation as well?

16   A.  I did, yes.

17   Q.  What personal investigation did you conduct?

18   A.  Well, I wanted to check to make certain that the -- I

19   wanted to know exactly what had happened and how the transcript

20   had been handled by the law firm.

21   Q.  What investigation did you personally do independent of

22   what Mr. Maloney did?

23   A.  I don't know if it was independent.  It was probably

24   concurrent with what he was doing.  I got the information from

25   Mr. Hartney, the IT person, and I may have also contacted Julia

LB289115                        Pounian - Cross

1    Sienski at the firm to sort of determine where the transcript

2    had gone.  I was very concerned about nailing down exactly what

3    had happened with the transcript.

4    Q.  Now, Mr. Hartney had done the search of the firm's e-mail

5    records, is that correct?

6    A.  He had done the search, yes.

7    Q.  He provided the search results to Mr. Maloney and to

8    yourself?

9    A.  I don't recall him providing the results to myself.  I was

10   focused on the transcript and if the transcript had left the

11   law firm and to track that.

12   Q.  Did you ask Mr. Hartney to do an e-mail search?

13   A.  Well, to the extent that we were tracking the transcript, I

14   guess that would be included in an e-mail search -- an e-mail

15   search would be included in that.

16   Q.  The question is, did you ask Mr. Hartney to conduct a

17   search of the e-mail system?

18   A.  I don't remember specifically asking him that, no.

19   Q.  You said that you spoke to Ms. Sienski and the focus of

20   that was to determine where the transcript was saved and who

21   had received it?

22   A.  I honestly don't remember if I spoke to Ms. Sienski, but I

23   do know that I wanted to determine if the transcript had left

24   the law firm in any way, shape or form.  And that's what I

25   tried to do.

1   Q.  Is it fair to say, Mr. Pounian, that in making this

2   representation in this letter, that you were relying upon the

3   investigation that Mr. Maloney and Mr. Hartney had conducted?

4   A.  And the things that were represented that I understood from

5   my conversations with the people at the law firm about that.

6   Q.  Did you ask Mr. Fawcett specifically whether he had sent

7   the transcript to Mr. Isikoff?

8   A.  I asked Mr. Fawcett if he knew anything about how

9   Mr. Isikoff got the transcript.

10  Q.  When did you ask him that?

11  A.  I think about a week after the article.

12  Q.  So before this letter went into the court?

13  A.  It was before this letter.

14  Q.  He told you to your face he knew nothing about it?

15  A.  That is correct.

16  Q.  That was a lie, correct?

17  A.  That is correct.

18  Q.  How many times did Mr. Fawcett lie to your face about

19  sending the transcript to Mr. Isikoff?

20  A.  It was one time we had that conversation.  At the same

21  time, I was looking at where the transcript had gone.

22  Q.  And that was it, just that one time?

23  A.  It was at one time because I was trying to -- I had found

24  out he had sent the transcript to a consultant, and that's what

25  I was really tracking down.  I had found out that the

LB289115                    Pounian - Cross

1  transcript left the office and went to a consultant.

2  Q.  My question to you is, how many times did Mr. Fawcett tell

3  you that he did not send the transcript to Mr. Isikoff?

4  A.  It was once.

5  Q.  If you could turn, please, to Exhibit 108 in your binder.

6         Now, Mr. Pounian, you were involved in drafting the

7  September 27 declaration that Mr. Fawcett submitted to the

8  court, correct?

9  A.  He drafted the declaration and sent me and Megan a draft.

10 Q.  But the final declaration that was submitted, you were the

11 one who drafted it, correct?

12 A.  I put it into the system and sent it back and forth with

13 Mr. Fawcett to finalize it for the court.

14 Q.  So, Exhibit 108, this is an e-mail.  The top part is

15 apparently cut off, but it's from Mr. Fawcett to yourself and

16 to Ms. Benett.  108A contains the declaration that Mr. Fawcett

17 drafted and sent you, is that correct?

18        MR. SHEN:  If we can show 108A, please.

19 A.  Yes, that's it.

20 Q.  This is the language that Mr. Fawcett drafted, correct?

21 A.  That is correct.

22 Q.  If you could turn, please, to 109.

23        THE COURT:  Can I ask one clarifying question, back to

24 108?  This e-mail doesn't have the "from" header, and I am just

25 wondering if we know the "from" e-mail.  There is an indication

LB289115                        Pounian - Cross

1    that it is not a Kreindler e-mail.

2            MR. SHEN:  I believe that this e-mail was produced at

3    another location with a from --

4            MS. KIRSCH:  If it's helpful, the same e-mail is

5    Exhibit 73 in our book.

6            THE COURT:  That just says John Fawcett.

7            In any event, sorry to interrupt.

8    BY MR. SHEN:

9    Q.  Now, if we could look at Exhibit 109, please.

10           This is an e-mail, September 27, at 1:41 p.m., from

11   yourself to Ms. Benett, attaching a declaration 1.docx.

12           Do you see that?

13   A.  I see the header.

14   Q.  Let's look at the exhibit.  It's at 109A.

15           This contains a new version of Mr. Fawcett's

16   declaration.

17           Did you prepare this version that's attached at 109A?

18   A.  Yes, I prepared it, based on Mr. Fawcett's original draft.

19   Q.  So Mr. Fawcett sent you the draft that we looked at in the

20   prior exhibit, and then you created this new document and sent

21   it to Ms. Benett, is that right?

22   A.  That is correct.

23           MR. SHEN:  I have no further questions.

24           MS. KIRSCH:  If I could just have a moment.

25           THE COURT:  Sure.

LB289115                        Pounian - Redirect

1  REDIRECT EXAMINATION

2  BY MS. KIRSCH:

3  Q.  Good afternoon, Mr. Pounian.

4  A.  Good afternoon.

5  Q.  Just to finish up on the topic that we were just

6  discussing, can you just tell us in your own words how your

7  draft of the declaration for Mr. Fawcett came to be.  Just the

8  events of September 27, if you could just walk us through what

9  you recall happening on that day.

10 A.  Sure.  We were preparing to finalize the papers for the

11 court, and we had prepared drafts of everyone's declaration.

12 And I know that Megan was trying to get ahold of John to get a

13 signature on his declaration.  And that morning Megan called me

14 and told me that she finally did get ahold of John, and that he

15 had told her that he had leaked the transcript to Mr. Isikoff.

16         After that, we had conversations, and we decided that

17 we needed to prepare the filings and get a declaration from

18 John to present the facts to the court, and we proceeded to do

19 that.  John sent a draft, and we worked with him on the draft

20 and filed it along with the papers.  And we had to obviously,

21 of course, change all the declarations that we had prepared for

22 ourselves because we now knew how the leak had occurred, and we

23 then edited all of our declarations and filed them with the

24 court that evening.

25 Q.  Mr. Pounian, how long have you known Mr. Fawcett?

1    A.  We have worked together for four years at the firm, and I

2    have known him since 2002, 2003.

3    Q.  As you have been working on this case, how often did you

4    communicate with Mr. Fawcett?

5    A.  We communicated typically over the past three years almost

6    every day.  He was handling the facts in the case, and we would

7    be in touch constantly all the time.

8    Q.  To what extent were you aware of his physical whereabouts

9    on a day-to-day basis?

10    A.  Well, we shared an office at the law firm when I was

11    working at the firm, when I was physically there.  So I saw him

12    whenever I was in the office.  And I would communicate with him

13    practically every day.  So I was aware of where he was and what

14    he was doing.

15    Q.  So to what extent were you aware of Mr. Fawcett's

16    activities for the firm at the goal level, at the task level,

17    would you say?

18    A.  Well, I would talk to John about what his assignments were

19    on the case and what he was supposed to be doing on the case.

20    I did that regularly.  It was a nonstop kind of back-and-forth

21    activity between the two of us.  I knew what he was doing.  I

22    knew what his assignments were on the case.

23    Q.  Do you consider Mr. Fawcett to be a professional?

24    A.  Definitely.  He is a long-standing researcher,

25    investigator.  He was someone that we trusted as a

1    professional.  He was someone who was a colleague and a peer to

2    all of us at the firm.

3    Q.  Did you communicate with Mr. Fawcett about the protective

4    orders in this case?

5    A.  Yes, of course.  We worked with the protective orders

6    almost constantly on the case, and we were always

7    drafting -- every time we submitted something to the court,

8    every time we had any kind of hearing with the court, we were

9    working with the protective orders to make certain that we were

10   not revealing any protected information.

11   Q.  There was some testimony that you were not privy to about

12   Mr. Kreindler and his media presence and his public statements

13   that he dislikes the protective orders in this case.  Did you

14   ever find that Mr. Kreindler's public statements about the

15   protective orders suggested within the office that they need

16   not be adhered to?

17   A.  Never, no.  The orders were a source of frustration in that

18   we couldn't share certain information with our clients, but we

19   adhered to them strictly and it was something we obeyed all the

20   time.  There was no question about it.

21   Q.  Did Mr. Fawcett ever indicate to you in any way his

22   awareness of his obligations under the protective orders?

23   A.  Yes.

24   Q.  How did he do that?

25   A.  Well, as I said before, it was a matter, we were working

1  together on various projects and were always discussing the

2  protective orders and how they applied to certain documents we

3  were filing, or certain communications we were having.  It was

4  just a given in everything that we were doing.

5  Q.  So did Mr. Fawcett ever give you any reason to suspect that

6  he would not be honoring his obligations under the protective

7  orders?

8  A.  Never.

9  Q.  Are you aware of any complaints about Mr. Fawcett, by the

10  clients or by others, in all the years that you have worked

11  with him?

12  A.  I never heard any complaints about Mr. Fawcett, never.

13  Q.  Have you ever heard anyone accuse Mr. Fawcett of behaving

14  in an unprofessional manner?

15  A.  Never.

16  Q.  Is it your view that Mr. Fawcett is irresponsible or

17  unprofessional in any way?

18  A.  I have never known him to be that way, and this was the

19  first time I had ever known him to do anything that was

20  out-of-bounds, and it was a shock when it happened.

21  Q.  Did you order or direct Mr. Fawcett to share the transcript

22  of Mr. Jarrah's deposition with Mr. Isikoff?

23  A.  No.

24  Q.  Were you aware at any time prior to September 27 that it

25  was Mr. Fawcett who shared the Jarrah transcript with

LB289115                     Pounian - Redirect

1    Mr. Isikoff?

2    A.  No.

3    Q.  As we discussed, you never had any reason to suspect that

4    it was Mr. Fawcett who shared the Jarrah transcript with

5    Mr. Isikoff, is that correct?

6    A.  I didn't have any reason to suspect that he did that.

7              MS. KIRSCH:  I have no further questions.

8              THE COURT:  Thank you.

9              MR. SHEN:  No questions.

10             THE COURT:  You win the award for the shortest

11   witness.

12             Thank you, sir.

13             (Witness excused)

14             THE COURT:  Counsel.

15             MR. HANSEN:  Your Honor, we call Mr. Fawcett.

16             MS. KIRSCH:  Your Honor, I know your Honor has

17   indicated we should finish today, which we wholeheartedly agree

18   with.  I don't know if there is some way to apportion time to

19   ensure that if there is any need for the Kreindler firm to have

20   an opportunity to question Mr. Fawcett as well.  I don't know

21   how your Honor wants to proceed.

22             THE COURT:  Fair and good question.  Let's go about an

23   hour and see where we are, but I will make sure you have an

24   opportunity.

25             (Continued on next page)

LB289115                    Fawcett – Cross

1    JOHN FAWCETT,

2          called as a witness by the Kingdom,

3          having been duly sworn, testified as follows:

4               THE DEPUTY CLERK:  Would you please state your full

5    name for the record.

6               THE WITNESS:  John Fawcett.

7               THE COURT:  Mr. Fawcett, you can be seated.  We are

8    going to ask you to keep your mask on.  I am afraid that's our

9    court requirement for COVID protocols.

10              I am also going to ask you to hand me that binder, and

11   I am going to give you this big binder.  Those are the Kingdom

12   exhibits.  They will likely show you exhibits on the monitor.

13   You will also be able to see those in the binder.

14              Just move close to the microphone so everyone can hear

15   you clearly, especially the court reporter.

16   CROSS-EXAMINATION

17   BY MR. HANSEN:

18   Q.  Good afternoon, Mr. Fawcett.

19   A.  Good afternoon.

20   Q.  If you would speak up, I would appreciate it.

21              Mr. Fawcett, you are here today represented by

22   counsel?

23   A.  Yes, I am.

24   Q.  That's these folks sitting here to the left?

25   A.  Yes.

LB289115                    Fawcett - Cross

1    Q.  Are they counsel paid for by Kreindler & Kreindler?

2    A.  I believe so, yes.

3    Q.  Mr. Fawcett, you have worked for Kreindler & Kreindler for

4    almost 20 years?

5    A.  Yes.

6    Q.  You have worked directly under the supervision of James

7    Kreindler, correct?

8    A.  Amongst others, yes.

9    Q.  And pretty much the total source of your income over those

10   close to 20 years has come from Kreindler & Kreindler?

11   A.  80 to 90 percent.

12   Q.  Your work at Kreindler & Kreindler includes managing all

13   discovery material in the 9/11 case, right?

14   A.  Yes, in part.

15   Q.  I'm sorry?

16   A.  In part, yes.

17   Q.  But you do that?

18   A.  Yes, I do.

19   Q.  You did it through September 27th of this year?

20   A.  Yes, I did.

21   Q.  Would it also be fair to say dealing with the press on the

22   9/11 case is also part of your job at Kreindler & Kreindler?

23   A.  Yes, on occasion.

24   Q.  When you do that, do you bill for your time?

25   A.  Sometimes.

LB289115                    Fawcett - Cross

1    Q.   When do you not do it?

2    A.   When I'm doing it, it's kind of more background research

3    than work.

4    Q.   But when you are briefing reporters on a subject that Mr.

5    Kreindler is also talking to reporters about, is that part of

6    your duties for which you seek compensation and bill?

7    A.   I am not sure if I billed directly for that.  I don't

8    recall in my time records putting that.

9    Q.   You record your hours every day when you're working on the

10   case?

11   A.   Yes, I do.

12   Q.   Do you include within those hours time spent dealing with

13   press matters?

14   A.   Not very often.

15   Q.   Would you say, Mr. Fawcett, that you have a certain amount

16   of loyalty for Mr. Kreindler as a result of your long work

17   together?

18   A.   Yes.

19   Q.   So, I am going to ask you some questions about your state

20   of mind at the time that you provided these sworn declarations

21   to the court on September 27 and September 30.

22           Were you aware at the time you provided those

23   declarations that what you were claiming in your declarations

24   could subject you to criminal prosecution?

25   A.   Not now I wasn't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB289115                         Fawcett - Cross

1    Q.  Had anyone at Kreindler & Kreindler, before you submitted

2    those declarations, ever said to you, in words or substance,

3    John, you're basically admitting to a crime here, you ought to

4    seek counsel?

5    A.  No, I don't think so.

6    Q.  Were you aware when you gave those declarations that

7    deliberately violating a court order could be a crime?

8    A.  No, I didn't realize that at the time.

9    Q.  When you submitted those sworn declarations, were you aware

10   that destroying evidence that might be needed in a proceeding

11   could subject you to obstruction of justice charges, also a

12   crime?

13   A.  No, I hadn't considered that.

14   Q.  When you submitted your declarations, were you aware that

15   submitting false declarations could subject you to perjury

16   charges?

17   A.  Yes, I did.

18   Q.  Are you aware sitting here today that any false testimony

19   you give today could likewise subject you to perjury charges?

20   A.  Yes, I am aware.

21   Q.  If you had known the full extent of the criminal

22   consequences of submitting your sworn declarations, Mr.

23   Fawcett, would you have submitted those declarations on

24   September 27 and September 30?

25   A.  I don't know, really.

1    Q.  Let's talk for a minute about the protective orders.

2            You're aware that there are two such orders in this

3    case?

4    A.  That's right.

5    Q.  The MDL protective order and the FBI protective order?

6    A.  Correct.

7    Q.  Before you did any work under those orders, you studied

8    them and understood them?

9    A.  I wouldn't say I studied them.  I had read them.

10   Q.  You're hesitating.

11   A.  Well, studied implies a lot of understanding.

12   Q.  I will start with the MDL order.  That was issued in 2006

13   by Judge Casey, correct?

14   A.  I believe so, yes.

15   Q.  Did you read that order?

16   A.  Yes, I did.

17   Q.  You're hesitating.

18   A.  Well, I don't remember the exact point, but I would have

19   read it at the time, yes.

20   Q.  When you read it, do you remember that you understood every

21   piece of it?

22   A.  No, I didn't.

23   Q.  Let's go to the FBI protective order.

24           Are you familiar with that order?

25   A.  Yes, I am.

LB289115                        Fawcett - Cross

1  Q.  Is that yes, ma'am?

2  A.  Yes, I am.

3  Q.  Were you aware that's an order that was entered by this

4  court in 2018?

5  A.  Yes.

6  Q.  Did you read every line of that?

7  A.  Yes, I would have at the time.

8  Q.  Did you understand every line of that order?

9  A.  No, I didn't.

10  Q.  Why are you giving me that answer?

11  A.  Because things were pointed out to me after my

12  declarations.

13          MR. GERBER:  Your Honor, I think we are getting close

14  to some privileged communications, if you could instruct the

15  witness.

16          THE COURT:  To the extent you are answering based on

17  discussions you have had with your lawyer, you shouldn't answer

18  those questions.  To the extent, when you read the protective

19  order, that you had questions or didn't understand it, you can

20  answer that question.

21          THE WITNESS:  OK.

22  BY MR. HANSEN:

23  Q.  Putting aside anything your lawyer told you, Mr. Fawcett,

24  what was it about the protective order that you didn't

25  understand?

1  A.  I'm a little confused as to whether I should answer this or

2  not.

3           MR. GERBER:  Your Honor --

4           THE COURT:  Sir, when you read the protective order,

5  did you understand what it meant?

6           THE WITNESS:  I did at the time, but things were

7  pointed out later that I realized I didn't understand it.  I

8  thought I understood at the time, but in hindsight there were

9  some aspects that I did not understand.

10          MR. HANSEN:  Let me try a different way, your Honor.

11 Q.  You're not a lawyer, are you, Mr. Fawcett?

12 A.  No, I'm not.

13 Q.  You were working with a number of lawyers at Kreindler &

14 Kreindler, were you not?

15 A.  Yes, I was.

16 Q.  Did any of the lawyers at Kreindler & Kreindler explain to

17 you the various provisions of the FBI protective order so you

18 could be sure you understood it?

19 A.  We would have discussed both protective orders

20 occasionally.  I don't remember going through it line by line.

21 Q.  No one ever gave you a full briefing of every provision of

22 the FBI protective order?

23 A.  No, I don't think so.

24 Q.  From your understanding, and I don't want to get what your

25 able counsel has told you, what does the FBI protective order

LB289115                              Fawcett - Cross

1   provide in terms of a deposition transcript that has not been

2   reviewed by the FBI?

3          MR. GERBER:  Objection.  If we could just get clarity.

4   Is he asking the witness for his understanding in an earlier

5   period or his understanding now?  I think the timing is going

6   to matter here, your Honor.

7          MR. HANSEN:  Let me back up.

8   Q.  Before you hired current counsel, at the time you submitted

9   your declarations, tell us what you understood the FBI

10  protective order provided in terms of a deposition transcript

11  in this case that had not yet been fully reviewed by the FBI.

12  A.  What comes to mind is that the material -- the portions of

13  the transcript based on the FBI protected material was FBI

14  protected.  That's the way I was viewing it.

15  Q.  Did you ever actually read the order?

16  A.  Yes, I have read the order.

17  Q.  Let's look at it together for a minute.

18         MR. HANSEN:  Let's get up on the screen the order in

19  this case.  This is Exhibit 15, which I don't believe we have

20  to offer it into evidence because it's a court filing.  If

21  counsel disagrees, we can have that dispute now.

22         MR. GERBER:  No objection.

23         THE COURT:  Thank you.

24         This is KSA 15.

25         MR. HANSEN:  Let's highlight paragraph 10, please.

LB289115                         Fawcett - Cross

1    BY MR. HANSEN:

2    Q.  You see here it says, "Pending review of the deposition

3    transcript by the FBI, any deposition transcripts containing

4    such questions and testimony shall be automatically subject, in

5    their entirety, to the same protections and precautions as the

6    protected information.  Upon receipt of the deposition

7    transcript, a copy shall be served on the FBI by the PECs.  The

8    FBI will have 30 days to review and designate the portions of

9    the transcript that contain protected information."

10           Had you read that language, Mr. Fawcett?

11   A.  I read it, but this is the piece that I didn't appreciate

12   until later.

13   Q.  You were handling all the depositions in this case as part

14   of your job supervising the discovery material for Kreindler &

15   Kreindler, correct?

16   A.  I'm not sure I understand what you mean.

17   Q.  No one at Kreindler & Kreindler informed you that you

18   needed to treat all these deposition transcripts as fully

19   confidential under the FBI order until such time as this had

20   been complied with, right?

21   A.  I believe we did protect them.

22   Q.  The Al Jarrah testimony?

23   A.  With that exception.

24   Q.  How can you say that when you didn't even know what the

25   rule provided?

LB289115                    Fawcett - Cross

1    A.  We just generally protected all material.  It was not

2    readily available.

3    Q.  You didn't even understand the order, did you?

4    A.  This clause I did not, I admit.

5    Q.  I am going to ask you just a few questions about the

6    protective order violation found by this court in 2017.

7              Were you aware that --

8              MR. GERBER:  Objection, your Honor.  We understand, of

9    course, that the court has found a waiver of the Fifth

10   Amendment with regard to the subject matter of the

11   declarations.  This goes far beyond that, literally years back.

12   We respectfully submit that is not covered by the finding of

13   waiver by the court, and we would advise our client not to

14   answer questions regarding that other subject matter based on

15   his Fifth Amendment privilege against self-incrimination.

16             THE COURT:  Are you permitting your client to answer

17   questions about his knowledge of those events in the court's

18   findings or in its entirety?

19             MR. GERBER:  Fair enough.  To the extent that the

20   question is about the court's findings, yes, fair, he can get

21   into that.  I do want to make clear our position, to the extent

22   he is going to be asked questions regarding his own conduct.

23             THE COURT:  His involvement.  Then he asserts the

24   Fifth.

25             MR. GERBER:  Yes, your Honor.

LB289115                        Fawcett - Cross

1          THE COURT:  So, counsel and sir, if you want to ask

2     questions about what Mr. Fawcett knew about those allegations,

3     the court record, etc., those are questions that you may

4     answer.  To the extent you intend to ask questions of Mr.

5     Fawcett about his involvement in those allegations, where the

6     court found breach or where the FBI made an allegation of

7     breach, your lawyer is advising you to take the Fifth Amendment

8     and decline to answer those questions.

9          Do you understand that?

10          THE WITNESS:  No, I don't entirely.

11          MR. HANSEN:  Can I just ask the questions?  I think

12     the questions will sort this out.

13          THE COURT:  You can proceed, and counsel and I will

14     both watch carefully.

15     BY MR. HANSEN:

16     Q.  I am going to ask about your state of mind, Mr. Fawcett.

17          Were you aware in 2017 that this court entered a

18     finding of a protective order violation by Kreindler &

19     Kreindler?

20     A.  Yes.

21     Q.  Who did you understand the court to have found to have

22     violated the protective order?

23     A.  I don't really recall.

24     Q.  Do you know whether it was you or Mr. Kreindler himself?

25     A.  I believe they found Jim responsible.

LB289115                    Fawcett - Cross

1  Q.  Both you and Mr. Kreindler had talked to Caleb Hanan,
2  correct?
3          MR. GERBER:  Objection, your Honor.
4          THE COURT:  I think the witness is going to take the
5  Fifth to that question.
6  Q.  Are you going to follow your counsel's advice and invoke
7  your Fifth Amendment privilege against self-incrimination and
8  refuse to answer my last question?
9  A.  I would like to assert my Fifth Amendment privilege.
10         MR. HANSEN:  I couldn't hear the answer, your Honor.
11         THE COURT:  He said yes.
12 Q.  All right, Mr. Fawcett.  As a result of your
13 awareness -- actually, let me back up.
14         Were you aware that the court in 2017 also issued an
15 instruction to counsel to be exceedingly discreet in dealing
16 with protected material in the future?
17 A.  I don't remember sitting here today the order.
18 Q.  Were you aware in 2017 that the court had issued no
19 particular sanction against the violator of the protective
20 order?
21 A.  I don't remember exactly.
22 Q.  Were you present in the courtroom during the hearing on
23 that particular violation?
24 A.  No.
25 Q.  Did you read the transcript of that hearing?

LB289115                          Fawcett - Cross

1    A.  I may have read it at the time.  I don't recall it right
2    now.
3    Q.  You think you likely did?
4    A.  Yeah, I likely did.
5    Q.  So you would have seen that the court gave a warning,
6    called it a first warning, that violations would be dealt with
7    differently in the future, correct?
8    A.  I don't remember it at the moment, no.
9    Q.  So let's move forward in time to 2021.
10         You are aware, are you not, Mr. Fawcett, that your
11   boss, Mr. Kreindler, gave an interview to Michael Isikoff for
12   his podcast on July 1, 2021, correct?
13   A.  I don't recall the date, but in that time frame, yes.
14   Q.  I will represent to you that we have evidence in the record
15   of that, just to anchor you in time.
16         Mr. Kreindler was speaking to the reporter,
17   Mr. Isikoff, at that time with your knowledge, correct?
18   A.  Right.
19   Q.  And you were likewise speaking to the same reporter,
20   Mr. Isikoff, in the same time period, correct?
21   A.  Right.
22   Q.  In fact, you had a number of telephone calls and text
23   messages with Mr. Isikoff in the days immediately after July 1,
24   did you not?
25   A.  Yes, I believe so.

LB289115                    Fawcett – Cross

1  Q.  In fact, let's go to another exhibit, if we could.  This is

2  Exhibit 134.

3          MR. HANSEN:  I am going to offer them into evidence.

4  They were records produced by Mr. Fawcett in response to a

5  court order.

6          We offer them.

7          MR. GERBER:  No objection, your Honor.

8          THE COURT:  KSA 134 is admitted.

9          (KSA Exhibit 134 received in evidence)

10  Q.  So, these are your phone records for your personal cell

11  phone, Mr. Fawcett?

12  A.  Yes.

13  Q.  If you look at the top of the page, we will highlight it,

14  we have four entries for a number 202-258-2535.

15          You recognize that to be Michael Isikoff's telephone

16  number, don't you?

17  A.  Yes, I do.

18  Q.  One of the calls is for 22 minutes?

19  A.  Yes.

20  Q.  And you were talking to Mr. Isikoff about the 9/11 cases,

21  correct?

22  A.  Yes, I was.

23  Q.  And you were talking to Mr. Isikoff about leaking the Al

24  Jarrah deposition transcript to Mr. Isikoff, weren't you?

25  A.  We were talking about the Jarrah deposition.

LB289115                     Fawcett - Cross

1    Q.  Did you tell him in those calls, in words or substance,

2    that you were going to give him the Al Jarrah deposition

3    testimony?

4    A.  I'm not entirely sure if it was in that conversation we

5    would have been discussing the deposition.

6    Q.  Mr. Fawcett, jumping a little ahead in time, just for

7    purposes of the next few questions, you are aware that the

8    court ordered you on August 30 to both provide a declaration

9    and to provide any and all communications you had with

10   Mr. Isikoff, correct?

11   A.  Yes.

12   Q.  Isn't it true, sir, that none of these calls I am showing

13   you to you were ever disclosed to the court until we got a

14   court order to provide further discovery?

15   A.  I guess I don't understand.

16   Q.  OK.  These calls were not disclosed in your September 27

17   declaration, were they?

18   A.  No, I don't think so.

19   Q.  These calls were not disclosed in your September 30

20   declaration, were they?

21   A.  No, I don't believe so.

22   Q.  In addition to calls, you also had a number of texts with

23   Mr. Isikoff, did you not?

24   A.  If I could maybe correct that, I believe the declarations

25   did include discussion of the calls, or reference to calls.

LB289115                    Fawcett - Cross

1    Q.  I'm sorry.  You believe there was reference?

2    A.  Yes, I believe so.

3    Q.  You think there was one in your September 27 declaration?

4    A.  I'm not sure which one it is, or both of them.

5    Q.  Well, you could take a look at both of them.

6              I will represent to you there is some references to

7    phone calls in your September 30 declaration.  So let's go to

8    that.  That's Exhibit 59.

9              You're familiar with this declaration?

10   A.  Yes, I am.

11   Q.  You say in here, in paragraph 3, you privately communicated

12   with Michael Isikoff several times, correct?

13   A.  Yes.

14   Q.  Let's go further on down.  Go to the next page, please.

15   There is a reference to your first call.  Let's see where we

16   can find that.

17             MR. HANSEN:  It's a little further down.

18             Can we keep going, please?

19   Q.  There is a reference in paragraph 8 to a second phone call?

20   A.  Yes.

21   Q.  Let's go back to paragraph 3.  I didn't see it.

22             There are three calls.

23             MR. HANSEN:  Paragraph 3, please, Geoff.

24   Q.  Paragraph 3.  You believe the first time was in early July,

25   correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB289115                              Fawcett - Cross

1   A.  Correct.

2   Q.  Now, let's go to paragraph 8.

3           You had a second call with him about the timing?

4   A.  Right.

5   Q.  When was that?

6   A.  This would have been after the first call but prior to the

7   publication.

8   Q.  It's not July 3, is it?

9   A.  No.  My understanding is the first call would be July 3.

10  Q.  How about the third call you reference here?

11          MR. HANSEN:  Take that down and go to the third call

12  in paragraph 10.

13  Q.  The third call, when was that?

14  A.  Well, before the publication.

15  Q.  That's not these calls we were just looking at, was it?

16  A.  No.  I believe July 3rd is the first call.

17  Q.  So you didn't disclose at least some of these calls, and

18  there were others, were there not, that you didn't disclose?

19  A.  I don't believe so.

20  Q.  Let's look at your records then.

21          MR. HANSEN:  If we can put up Exhibit 138.

22          We offer 138.

23          THE COURT:  Any objection, counselor?

24          MR. GERBER:  No, your Honor.

25          THE COURT:  We will admit KSA 138.

LB289115                          Fawcett - Cross

1          (KSA Exhibit 138 received in evidence)

2     Q.  These are your records.  If you look at the top of the

3     page, there is one to Mr. Isikoff on July 12; there is a second

4     one on July 12; there is a third one on July 12; and then there

5     are two more entries for August 2nd.

6          So is it fair to say, Mr. Fawcett, that you did not

7     disclose to the court all of the contacts you had with

8     Mr. Isikoff by phone in either of your declarations?

9     A.  No.  I think those are the calls.

10    Q.  Your declaration talks about three calls, and we have just

11    shown you about ten.  All of them weren't disclosed, were they?

12    A.  Well, for instance, the way I kind of read this, there are

13    two calls on June 12, one is a call coming in and one is a call

14    going out.  I consider those one call.  Either he is calling me

15    or I'm calling him, and the other person is not answering and

16    so they return the call five minutes later.  That's one call.

17    Q.  The record will be what the record is.

18         Do you believe you disclosed all of your calls with

19    Mr. Isikoff in your sworn declaration?

20    A.  I believe so.

21    Q.  Even though you only referenced three calls?

22    A.  The July 3rd calls are essentially one call.

23    Q.  I see.

24         How about texts, were you aware that you were supposed

25    to tell the court about text messages as well?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB289115                       Fawcett - Cross

1  A.  I don't recall.

2  Q.  Did you read the court's August 30 order about what you

3  were required to disclose?

4  A.  I'm sure I did.

5  Q.  The court ordered you to disclose all communications with

6  Mr. Isikoff, correct?

7  A.  I don't have it in front of me.  I don't know.

8  Q.  Do you consider text messages communications?

9  A.  Yes, I would.

10  Q.  You had multiple text messages with Mr. Isikoff, didn't

11  you?

12  A.  I don't recall how many I had.

13  Q.  Let's look at, for example, Exhibit 82.  These are signal

14  messages between you and Mr. Isikoff.

15          MR. HANSEN:  I am offering this also, by the way,

16  Exhibit 82.

17          THE COURT:  Any objection?

18          MR. GERBER:  No, your Honor.

19          THE COURT:  KSA 82 is admitted.

20          (KSA Exhibit 82 received in evidence)

21  Q.  So, you also communicated with Mr. Isikoff by the signal

22  channel, correct?

23  A.  Yes, because the phone was not working, something is not

24  working.

25  Q.  Were you aware that you had these communications with

LB289115                    Fawcett – Cross

1    Mr. Isikoff at the time that you submitted your sworn

2    declarations on September 27 and September 30?

3    A.  I'm not sure I really looked through my signal messages.

4    Q.  Why would you not look if you were trying to be accurate

5    for the court?

6    A.  I don't know.  I don't have an answer to that.  I was just

7    talking about the phone calls relating to the transcript.

8    Q.  Actually, these are very significant texts, aren't they,

9    because they help us date when somebody provided the transcript

10   to Mr. Isikoff.

11          Let's go down to the bottom of this signal call chain,

12   the very last entry.  This is on the 5th of July.  This is four

13   days after Mr. Kreindler does his podcast, correct?

14   A.  Correct.

15   Q.  And you have been speaking with him by phone during this

16   period, correct?

17   A.  Yes, I have.

18   Q.  And Mr. Isikoff asks you, "Did Thumairy also invoke Vienna

19   Convention?"

20          Do you see that?

21   A.  Yes.

22   Q.  So we know from this text message that by July 5,

23   Mr. Isikoff has the Al Jarrah transcript, because Al Jarrah in

24   that transcript, which Mr. Isikoff then publishes about, had

25   invoked the Vienna Convention, correct?

LB289115                              Fawcett - Cross

1    A.   I don't know that for sure.

2    Q.   Well, do you know any other reason why Mr. Isikoff would

3    know about Al Jarrah invoking the Vienna Convention?

4    A.   If we had discussed it on the 3rd, yes.

5    Q.   So in addition to sending the transcript, you also

6    disclosed the contents of depositions orally to Mr. Isikoff in

7    your calls, is that what you're telling us?

8    A.   I remember talking about certain aspects of the deposition.

9    Q.   Let's look at what Mr. Isikoff wrote after you talked to

10   him and apparently provided him with the transcript.

11           MR. HANSEN:   Exhibit 40, please.

12   Q.   This is his story, dated July 15.

13           MR. HANSEN:   We offer Exhibit 40.

14           MR. GERBER:   No objection.

15           THE COURT:   KSA 40 is admitted.

16           (KSA Exhibit 40 received in evidence)

17           MR. HANSEN:   Let's go to page 4, please.  If we could

18   highlight the penultimate paragraph.

19   Q.   Here, Mr. Isikoff writes that there was a reference to an

20   instruction not to answer on the grounds of Vienna Convention.

21   He is talking about the Al Jarrah deposition, correct?

22   A.   Correct.

23   Q.   And you had provided him with that information, correct?

24   A.   It's in the transcript.

25   Q.   And he is asking you about it as early as July 5.  So can

LB289115                         Fawcett - Cross

1  we conclude that you probably gave him the transcript by July

2  5?

3  A.  I don't have any disagreement with that.  I did give him

4  the transcript.  I don't remember the exact date, but July 5

5  sounds about right.

6  Q.  Let's go to July 15.  This is the article that alerts

7  everyone that someone has violated the protective order by

8  giving a transcript to Mr. Isikoff.

9       Were you aware of Mr. Isikoff's article on July 15?

10  A.  Yes, I was.

11  Q.  I just want to be very clear about these questions.

12       Did anyone from Kreindler & Kreindler, on July 15 or

13  at any time prior to September 27, ask you directly, in words

14  or substance, John Fawcett, did you disclose the Al Jarrah

15  testimony to Michael Isikoff?

16  A.  I don't recall directly, but in substance, yes, they would

17  have asked in substance.

18  Q.  Why are you hesitating?  Did Jim Kreindler ever come to you

19  and say, John Fawcett, did you disclose the transcript to

20  Michael Isikoff?

21  A.  Not in those exact words, no.

22  Q.  Did you lie to Jim Kreindler?

23  A.  I misled him.

24  Q.  How about Andrew Maloney, did Andrew Maloney ever come to

25  you and ask you, in words or substance, Mr. Fawcett, did you

LB289115                        Fawcett − Cross

1    disclose the transcript to Michael Isikoff?

2    A.  I don't remember him specifically saying that.

3    Q.  At any point?

4    A.  I don't remember that, no.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9116                         Fawcett - Cross

1    Q.  How about Megan Benett?  Did Megan Benett at any point come

2    to you, in words or substance:  John Fawcett, did you give the

3    Al Jarrah transcript to Michael Isikoff?

4    A.  When you say "in substance," it implies there's other --

5    it's not direct, in other words, asking me directly, did you do

6    that?  I don't remember them saying that, but in substance.

7    Q.  When did she do that, whatever it was that was -- you're

8    referring to?

9    A.  Well, I would say it's -- it was much more -- at that

10   period of time, it was much more Maloney's role.

11   Q.  Let's back up.  I want to make sure we're very clear about

12   that.  With Mr. Kreindler you say you misled?

13   A.  Yes.

14   Q.  When did this happen?

15   A.  I think between the time the investigation began and

16   September 27.

17   Q.  How did you mislead him?

18   A.  By not -- by not openly telling them that I was the source

19   of the leak.

20   Q.  OK.  Let's distinguish a couple of things.

21          You didn't tell them you were the source of the leak,

22   correct?

23   A.  Correct.

24   Q.  Did he ask you if you were the source of the leak?

25   A.  Not directly, but I knew the investigation was ongoing.

LB2H9116                              Fawcett - Cross

1   Q.  But my question is does he come to you and say, ask you the

2   question, did you disclose this transcript?

3   A.  I don't remember that, no.

4   Q.  Did Megan Benett come to you and say, did you disclose this

5   transcript?

6   A.  No, I don't recall that.

7   Q.  Did Andrew Maloney come to you and say, did you disclose

8   the transcript?

9   A.  I don't recall that.

10  Q.  Did Steven Pounian come to you and say, did you disclose

11  the transcript?

12  A.  No, I don't recall that.

13  Q.  And by the way, you put in your own declaration that you

14  destroyed evidence, correct?

15  A.  Yes, I did.

16  Q.  And you knew at the time you destroyed this evidence that

17  this court proceeding, this MDL proceeding, was in progress,

18  correct?

19  A.  What do you mean the "proceeding"?  The investigation?

20  Q.  The case.

21  A.  The case was in progress.

22          THE COURT:  He's referring to --

23  A.  The 9/11 case?

24          THE COURT:  Yes, he's referring to the 9/11 case.

25  A.  The 9/11 case, certainly.

LB2H9116                         Fawcett - Cross

1    Q.  You knew if there was any disclosure of a protective order

2    violation, the court would have an investigation?

3    A.  I wasn't -- I wasn't thinking about an investigation, no.

4    Q.  It was obvious, wasn't it?

5    A.  Well, it was not to me.

6    Q.  Let's talk about your destruction for a minute.  When did

7    you destroy the email that communicated the transcript to

8    Mr. Isikoff?

9    A.  If I recall correctly, it was set on auto-destruct.

10   Q.  When did you make that setting on your computer?

11   A.  When I would have sent it to him.

12   Q.  As early as the initial sending of the transcript, you set

13   the auto-destruct to destroy the email?

14   A.  Yes.

15   Q.  You're pretty sure of that?

16   A.  Yes.

17   Q.  How about the thumb drive on which you downloaded the

18   transcript --

19   A.  Right.

20   Q.  -- from the Kreindler system?  You destroyed that, too, did

21   not you?

22   A.  Yes, I did.

23   Q.  When did you destroy that?

24   A.  I don't recall when it was destroyed.  I had a group of

25   thumb drives.  I had four or five thumb drives.  I destroyed

LB2H9116                          Fawcett - Cross

1    them all at once.

2    Q.  Well, this is pretty consequential, isn't it?  It might

3    matter quite a lot when you destroyed it.  Can you do your best

4    to tell us when you destroyed this information.

5    A.  I really -- I thought about this, and I don't remember

6    destroying it in the sense of destroying the transcript.  I was

7    getting rid of the four or five thumb drives on my desk at

8    home.

9    Q.  So there's no connection between your destruction of the

10   thumb drive of this evidence and your being discovered?

11   A.  No.  I had a lot of thumb drive that were all -- every time

12   I was using them, they were coming up with error messages, so I

13   just --

14   Q.  So it's possible that you destroyed this thumb drive after,

15   say, July 21, 2021?

16   A.  I don't really remember when it was.  It was sometime in

17   the summer.

18   Q.  Is it possible you destroyed that thumb drive after the

19   Court issued its first orders in this matter about

20   investigations?

21   A.  I don't remember which date that is.

22   Q.  So you have no idea?  It could have been anytime in the

23   summer?

24   A.  I think it's anytime in the summer.  It -- when it

25   started -- sorry.

LB2H9116                      Fawcett - Cross

1    Q.  All the way to Labor Day?

2    A.  Yeah, I suppose that's correct.

3    Q.  How did you destroy the thumb drive?

4    A.  First I tried -- I had four or five of them.  I tried to

5    open them.  I was going -- fed up with them because they

6    weren't working, and I like to have one to take back and forth

7    to the office.

8    Q.  Did you break it in two?  Did you throw it in the trash?

9    A.  No, I threw it in the trash.

10   Q.  And I should have asked you this before, but when I was

11   asking about your being interrogated by Kreindler, they asked

12   you to sign a declaration, did they not, saying that you had

13   lied to them, and you refused to do it?

14   A.  No, I don't recall.

15   Q.  Let's look at a document that's already in evidence, which

16   is Exhibit -- sorry, here.  I'll get it right for you.  121, I

17   believe.  Yeah.

18          Do you recall being sent a draft in an email for you

19   by either Mr. Pounian or Ms. Benett that you then edited to

20   take out the words "until today I had told/Kreindler &

21   Kreindler that I did not know how Michael Isikoff had obtained

22   the transcript"?

23          MR. GERBER:  Objection.  This is an attachment.  Can

24   he see the cover email to this document?

25          THE COURT:  Sure.  Mr. Hansen, can you just show the

LB2H9116                    Fawcett - Cross

1   email that this draft is attached to --

2            MR. HANSEN:  Yep.

3            THE COURT:  -- or direct the witness.  He can just

4   look at the hard copy.  Here we go.

5   BY MR. HANSEN:

6   Q.  There you go.  That's the cover.  Let me know when you're

7   ready to answer questions.

8   A.  OK.

9   Q.  OK.  Can we go back to the text.

10           Is that edit -- I don't have to read it again.  Is the

11  edit I just referenced an edit you made to this document?

12  A.  Let me see the whole page.

13  Q.  Sure.

14           THE COURT:  It's in that binder at Exhibit 121 if you

15  want to look at a piece of paper.

16           THE WITNESS:  I can see it.

17  Q.  You can tell me you don't know.  You can tell me yes.  You

18  can tell me no.

19  A.  I'm sorry.  What is the question?

20  Q.  Well, I'll repeat it.

21           I'm asking if you, John Fawcett, made the edit to this

22  document that's indicated in the redline in the second and

23  third lines of paragraph 3?

24  A.  The edit meaning the -- the deletion with the red line?

25  Q.  Yes.

LB2H9116                    Fawcett - Cross

1    A.  I'm not sure.  If it's -- if this is an email from me, then

2    I would have made it.  If this is an email coming back, then --

3    Q.  But do you recall being presented with a declaration that

4    said you'd lied to Kreindler & Kreindler and you crossing that

5    out because you hadn't done that?

6    A.  No, I don't -- I'm -- not quite understood that.

7    Q.  Did you tell anyone at Kreindler & Kreindler that the text

8    of this particular document was inaccurate in lines 2 and 3 of

9    Exhibit 121?

10              MR. GERBER:  Lines 2 and 3?

11              MR. HANSEN:  Lines 2 and 3 of paragraph 3,

12   Exhibit 121.

13   A.  I mean, I was very clear with them that I -- that the first

14   time they had heard about it was the day I signed this

15   declaration.

16   Q.  I'm not asking you about that.

17              Do you have any knowledge of why this was struck out

18   in this draft?

19   A.  I think because it -- maybe it doesn't just -- just doesn't

20   flow well.  It's --

21   Q.  Bad grammar?

22   A.  Yeah, I think it's --

23   Q.  Oh, please.

24              Mr. Fawcett, I'll move on to a different subject,

25   July 21.  You were aware on July 21 that the defendant

1  Saudi Arabia had told the Plaintiffs' Executive Committee it

2  was going to ask the Court for a court-ordered investigation of

3  this protective order violation, correct?

4  A.  I don't recall.

5  Q.  Well, the very next morning, according to records produced

6  in this case, you had a long phone call with Jim Kreindler,

7  didn't you?

8  A.  I'll take -- I'll take your word.  I don't know.

9  Q.  Well, let's show you the document, the reference.

10  A.  All right.

11         MR. HANSEN:  If we could put up on the screen

12  Exhibit 135, Exhibit 135.  These are your phone records, and I

13  will offer Exhibit 135 if it's not already in evidence.

14         MR. GERBER:  No objection.

15         THE COURT:  All right.  KSA 135 is admitted.

16         (KSA Exhibit 135 received in evidence)

17  BY MR. HANSEN:

18  Q.  If we go to the entry of 9:17 a.m., you see that on pretty

19  much first thing in the morning on the 22nd -- and I will

20  represent to you that lawyers for Saudi Arabia had sent an

21  email the day before to the Plaintiffs' Executive Committee

22  saying they were going to ask for an investigation.  On the

23  22nd, you have a 46-minute call with Jim Kreindler, correct?

24  A.  Yes.

25  Q.  In that call you talked about the fact that you had

LB2H9116                        Fawcett - Cross

1    provided the Al Jarrah transcript to Michael Isikoff, correct?

2    A.  No.

3    Q.  You strategized with Mr. Kreindler as to how you were going

4    to deal with this problem, didn't you?

5    A.  No, that's not correct.

6    Q.  You talked about what you would need to do to protect

7    yourself, correct?

8    A.  No, that's not correct.

9    Q.  What did you talk about in this 46-minute call?

10   A.  I -- I don't know.  That might have been a conference call

11   with others.  There may have been -- I talked with Jim often.

12   Forty-six minutes is a long call.  That tends to tell me it's

13   a -- it's more than one person.  But I never discussed the

14   Jarrah transcript or my leaking of the Jarrah transcript with

15   anyone.

16   Q.  How many times in July did you have a 46-minute call with

17   Jim Kreindler one on one?

18   A.  I don't know.  That's why that tends to tell me that it's,

19   you know -- we often had conference calls amongst the --

20   amongst all the people working on the case.

21   Q.  Do you remember anything about what was said by you or him

22   in that call?

23   A.  I don't remember, no.

24   Q.  Anything of the subject?

25   A.  Aside from it would not have been relating to the leak to

LB2H9116                          Fawcett - Cross

1   the Jarrah transcript.

2   Q.  What, if anything, in this call gave you concern about your

3   own criminal exposure?

4   A.  I -- I don't recall anything from that call.

5   Q.  Do you know a woman named Liz Crotty?

6   A.  Yes, I do.

7   Q.  Ms. Crotty is a criminal defense lawyer?

8   A.  Yes, she is.

9   Q.  Is she a personal friend of yours?

10  A.  Yes, she is.

11  Q.  You called Ms. Crotty, according to these records, almost

12  immediately after hanging up with Mr. Kreindler.  You see that

13  right above the Kreindler call?

14  A.  Yes.

15  Q.  Why did you call Ms. Crotty?

16  A.  She's my attorney, or she was my attorney.

17  Q.  Getting legal advice from her?

18  A.  I don't recall what I was doing on that, but I may very

19  well have been.

20  Q.  Were you paying her from your own pocket for this work?

21  A.  I didn't.  I had retained her years ago.

22  Q.  Who paid her fees?

23  A.  She didn't charge me any fees.  Aside from the day I

24  retained her, she charged me one dollar.

25  Q.  I recognize that your counsel's not going to want to get

LB2H9116                    Fawcett - Cross

1   you into privileged information, but I'll represent that you've

2   asserted privilege over your communications with Ms. Crotty.

3   But can you tell me at least the subject matter of this

4   communication?

5          MR. GERBER:  Your Honor, I would just ask the Court to

6   listen very carefully just to avoid any privilege waiver here.

7          MR. HANSEN:  I believe the subject of the

8   communications is not privileged.

9          MR. GERBER:  Your Honor, I agree that he can even

10  speak at a very high level to the subject matter.  I just want

11  to be careful the witness makes sure he understands what he can

12  and cannot get into in responding to that question.

13         THE COURT:  Do you hear your lawyer, sir?

14         THE WITNESS:  Sorry.  I was trying to remember what we

15  were talking about.

16         THE COURT:  Your lawyer said you can answer the

17  question only insofar as you can talk about the general subject

18  matter, what you were speaking with Ms. Crotty about.

19         THE WITNESS:  OK.

20         THE COURT:  Can you answer that question?

21         THE WITNESS:  I'm not -- I don't remember this call.

22  At one point in July I had made her aware that I wanted to talk

23  to her on an attorney-client basis.  I don't believe this was

24  actually -- I don't believe it was this call.

25  BY MR. HANSEN:

LB2H9116                    Fawcett - Cross

1   Q.  So somehow help me with the subject matter.  Was the

2   subject matter having to do with the 9/11 case?

3   A.  I don't -- actually, I don't think so.  However, I believe

4   there's an email from me to Ms. Crotty which we produced.

5           MR. GERBER:  Your Honor, again, to be clear, as the

6   Court said, we have asserted privilege with regard to those

7   communications.

8           THE WITNESS:  Right.

9           MR. GERBER:  I would ask the Court to direct my client

10  not to speak about the substance of his communications, whether

11  on the call or an email with Ms. Crotty.

12          THE COURT:  OK.  But, again, he can answer the

13  question about the general subject matter?

14          MR. GERBER:  Yes, your Honor.  Yes, your Honor.

15          THE COURT:  OK.  Sir.

16          THE WITNESS:  I do remember a call with Liz in the

17  summer in which we talked about her having run for District

18  Attorney, and she was telling me about how she felt about it

19  afterwards and having lost, and I remember that being quite a

20  long conversation.  And that's what I think --

21  BY MR. HANSEN:

22  Q.  Well, that's not privileged.

23  A.  -- this call was.

24  Q.  That would have nothing to do with attorney-client

25  privilege if she's talking about her race for District

LB2H9116                    Fawcett - Cross

1    Attorney.  I'm asking you -- look, I don't want to waste a ton
2    of everybody's time, Mr. Fawcett.  You know what I'm asking.
3    If you don't want to answer it, I guess we'll just have to
4    leave --
5             MR. GERBER:  Objection.
6    Q.  Here's the question.  No, seriously, here's the question:
7    What was the subject matter of your call with Ms. Crotty
8    immediately after hanging up with Mr. Kreindler?
9    A.  I do believe that this call was about her having run for
10   office, and we're just catching up because I had been following
11   that.
12   Q.  And yet you've asserted privilege over this call?
13   A.  Well, that's -- I remember there was a long call in which
14   that's what we talked about.
15   Q.  I'm going to ask you again.  You've asserted in good faith
16   attorney-client privilege over a call which the only thing you
17   discussed with Liz Crotty was her race for District Attorney
18   and how things were going with --
19   A.  That's why I remember why it took 22 minutes, because we
20   were talking quite a bit about her running for office.
21   Q.  Are you going to stand by that answer, Mr. Fawcett?
22   A.  Yes.
23   Q.  Recognizing the penalties of perjury are sitting here on
24   your shoulders today?
25   A.  Yes.

LB2H9116                          Fawcett - Cross

1    Q.  Recognizing that your attorney's asserted privilege over

2    this communication?

3    A.  Well, yes.

4    Q.  So were you calling Mr. Kreindler almost immediately after

5    hanging up with Mr. -- with Ms. Crotty at 10:19 a.m. in order

6    to fill him in on the personal doings of Ms. Crotty and her

7    family?

8    A.  No.

9    Q.  You have a four-minute call with him.  What are you talking

10   to Mr. Kreindler about immediately after you hang up with

11   Ms. Crotty?

12   A.  I'm not sure which one you're talking about.

13   Q.  I'm sorry.  Let's see if we can highlight it.  It's two up

14   above the 12:56 -- no, it's actually right here.  You see the

15   sequence, 9:17 Kreindler, 10:41 Crotty, 12:56 Kreindler, five

16   minutes, immediately after hanging up with Ms. Crotty.

17   A.  Well, it's about two hours after.

18   Q.  It's your very next telephone call?

19   A.  Yes, that's true.

20   Q.  What are you talking to Mr. Kreindler about?

21   A.  I don't know.

22   Q.  About Ms. Crotty's family doings?

23   A.  No.

24   Q.  OK.  Let's talk about August 30.  Court issued an order on

25   August 30.  Did you receive that order on August 30?

LB2H9116                        Fawcett - Cross

1    A.  Yes, I believe so.

2    Q.  Did you read it?

3    A.  Yes, I'm sure I did.

4    Q.  Did you realize you would have to submit a declaration, a

5    sworn declaration?

6    A.  Yes, I did.

7    Q.  Did you realize you were going to have to turn over all of

8    your communications with Mr. Isikoff, telephone, text, emails?

9    A.  If that's what the order said.  I don't remember exactly

10   what the order said.

11   Q.  But you realized you were going to have to do that,

12   correct?

13   A.  If that's what the order said, yes.

14   Q.  You didn't do it, did you?

15   A.  I did.  I turned over -- at least my declaration I

16   described the call.

17   Q.  You want to take a look at your declaration and find me a

18   text message?

19   A.  No.

20   Q.  Want to take the time?  We can take ten minutes here in

21   court.  You can look through all five pages, but you're not

22   going to find a single text message, are you, Mr. Fawcett?

23   A.  No.

24   Q.  You held that information back from the court, correct?

25   A.  Not deliberately.  I just -- it didn't occur to me that it

LB2H9116                          Fawcett - Cross

1    was --

2    Q.  Pretty important to have a text message where the

3    reporter's asking you about invoking the Vienna Convention,

4    which is clearly evidence of a disclosure, isn't it?

5    A.  I don't know.  I didn't -- frankly, I just didn't recall.

6    Q.  Well, after August 30, when was the first time that anyone

7    from Kreindler & Kreindler asked you directly, John Fawcett,

8    you will need to give a declaration denying your complicity in

9    the leak of the transcript to Mr. Isikoff?

10   A.  Repeat the question.

11   Q.  Sure.  After the Court issued its order on August 30, when

12   was the first time that anyone from Kreindler told you that you

13   would have to issue -- sign a sworn declaration saying you

14   hadn't leaked the transcript?

15   A.  Almost immediately.  If not the same day, the day after.

16   Q.  Who asked you?

17   A.  It would have been either Duke and/or Megan.  Those were

18   the two that were involved.

19   Q.  What did Duke and/or Megan say to you at this time?

20   A.  I think they just said everybody that's had access to this

21   transcript's going to have to issue a declaration.

22   Q.  Did you say you'd be willing to do so?

23   A.  I don't think I responded.

24   Q.  You did not respond?

25   A.  I think I avoided it.

LB2H9116                          Fawcett - Cross

1   Q.  OK.  Going from August 30 to September 27, tell us the

2   first time that anyone from Kreindler & Kreindler forced the

3   issue, in other words, said, John Fawcett, you're going to have

4   to sign your declaration right now?

5   A.  Well, the order had been stayed, and once that had run out,

6   then the order was live again.  That's when they reached out,

7   which would have been two or three days before I signed my

8   declaration.

9   Q.  So just let me make sure I'm understanding your answer.

10          The Court ordered that its prior order be enforced on

11  September 23.  You signed your first declaration on

12  September 27.  Are you telling us that it wasn't until two or

13  three days before September 27 that anyone from Kreindler &

14  Kreindler actually said you have to sign a declaration now?

15  A.  I think the same day the order came out, the 23rd, they

16  would have -- I believe that would have been Megan who sent --

17  Q.  And did you say, did you lie to your colleagues and say,

18  oh, sure, I'll give you a declaration saying I didn't do

19  anything?

20  A.  No.

21  Q.  Did you say anything?

22  A.  No.

23  Q.  So I'm really puzzled.  The leak's on July 15.  Kreindler &

24  Kreindler says they're going to do an investigation starting

25  July 15.  In the two months following July 15, not a single

LB2H9116                          Fawcett - Cross

1   person from Kreindler & Kreindler ever insisted that you give a

2   sworn declaration about whether you knew anything about the

3   leak?

4   A.  I don't think there was any call for a declaration from me

5   until later.  There was an investigation.

6   Q.  Sir, can you answer my question?

7   A.  Yeah.

8   Q.  I'm not asking whether there was a call for it.  Can you

9   answer my question?

10  A.  Yes.

11  Q.  Do you understand my question?

12  A.  Well, if you can please repeat it.

13  Q.  In the two-month-plus period from July 15 until

14  September 23, according to what you've just told us, no one

15  from Kreindler & Kreindler insisted that you give a sworn

16  declaration?

17  A.  I think that's correct, yes.

18  Q.  All right.  So now I just want to finish up on your

19  declarations.  Your declarations are false, aren't they,

20  Mr. Fawcett?

21  A.  They were not false at the time.  There are some things in

22  there now that I realize are incorrect.

23  Q.  False, right?  False?

24          MR. GERBER:  Your Honor, is there a question?

25  Q.  Your declarations are false, not just not well worded.  You

LB2H9116                      Fawcett - Cross

1    gave false testimony, didn't you, Mr. Fawcett?

2    A.  Not at the time.

3    Q.  It's either true or it's false.  Is it false or is it true,

4    your testimony?

5    A.  At the time I gave those, I thought they were true, and now

6    realize some of it is not true.

7    Q.  Well, let's actually unpack some of that.  We're going to

8    talk, first, about your September 27 declaration.

9            You actually prepared a draft of the declaration for

10   yourself, which is Exhibit, if I can get it in front of me,

11   108A.  So let's put that one up.

12           Do you recognize this document?

13   A.  Yes, I do.

14   Q.  You drafted this, didn't you?

15   A.  I did.

16   Q.  On your own computer?

17   A.  Yes, I did.

18   Q.  In your own words?

19   A.  Yes.

20   Q.  Did you think it was accurate when you wrote it?

21   A.  Yes.

22   Q.  You weren't trying to lie to anybody when you wrote this

23   declaration, were you?

24   A.  No, I wasn't.

25   Q.  So what you say in this declaration that you wrote, without

LB2H9116                     Fawcett - Cross

1    any help from Kreindler & Kreindler, is, and I'm going to the

2    first paragraph:

3            "I sent a redacted version of the transcript of the

4    deposition of Musaed Al Jarrah to Michael Isikoff in early

5    July 2021.  The redacted portions related to the sections of

6    the deposition which were taken subject to the FBI protective

7    order and irrelevant to the issue at hand."

8            So what you're saying there is the reactions were

9    redactions were done by the court reporter and had been taken

10   out of the transcript, correct?

11   A.  Yeah, that's right.

12   Q.  So what you're telling us in your declaration here is that

13   you've sent the whole transcript to Mr. Isikoff, correct?

14   A.  With the -- with the FBI material redacted, yes.

15   Q.  That was done by the court reporter for those questions and

16   answers, right?

17   A.  Yes, that's right.

18   Q.  But you didn't send portions of the 610-page transcript,

19   did you?

20   A.  Was a portion, yes.  It was all of it except for the

21   material subject to the FBI.

22   Q.  It was the entire transcript with blackouts on some of the

23   pages, correct?

24   A.  Yeah, it was quite a lot of blackouts because --

25   Q.  But there were pages.  The entire transcript was sent by

LB2H9116                         Fawcett - Cross

1    you to Mr. Isikoff, correct?

2    A.  Right, without the FBI-protected material.

3    Q.  So now I want to look -- the first thing I want to focus on

4    is whether your declaration is true or false.  If you go to

5    62A, which I believe was part of your direct testimony, it was

6    admitted by the Court.  We go to paragraph 2, you say:  "I sent

7    a redacted version of the transcript to Michael Isikoff.  The

8    redacted portions of the deposition I sent to Michael Isikoff

9    were focused on Musaed Al Jarrah's testimony about his

10   possession of" something.

11          Is that a true statement?

12   A.  Actually, that sentence doesn't really make any sense.

13   Q.  It's your declaration.

14   A.  I realize.

15   Q.  You signed it.

16   A.  I realize.

17   Q.  Did you read it?

18   A.  Yes.

19   Q.  Not hard to read, is it?

20   A.  It's a sentence that makes no sense.  It's tough to read it

21   now.

22   Q.  Ms. Benett and Mr. Pounian wrote it, didn't they?

23   A.  They took my declaration, my draft, and edited it, yes,

24   into this.

25   Q.  These aren't your words, they're their words, aren't they?

LB2H9116                     Fawcett - Cross

1    A.  It looks to me like that sentence makes no sense.  It's

2    like something that was cut out of here.

3    Q.  Makes plenty of sense, plenty of sense.  This sentence

4    discloses to the court that you didn't send the whole

5    transcript, all 610 pages, you sent only the 30 pages that had

6    to do with the child issue, right?

7    A.  No, no, the sentence makes no sense, the redacted portions.

8    Q.  The portions of the deposition I spent to Michael Isikoff

9    were focused on, so that suggests to the reader that you sent

10   only portions of the transcript, and they were portions that

11   were focused on a particular issue, isn't that right?

12   A.  No, it doesn't make any sense.  The redacted portions are

13   not Musaed Al Jarrah's testimony about child pornography.

14   Q.  How many of the 610 pages --

15   A.  Redacted portions were the FBI material.  That's why this

16   sentence doesn't make any sense.

17   Q.  It makes plenty of sense, and what you're saying here is

18   trying to minimize what you did.  And that's Mr. Pounian and

19   Ms. Benett are trying to do, aren't they?

20   A.  No, I think in the pace of doing this, I've got a very poor

21   sentence in my --

22   Q.  There were 610 pages in the deposition transcript, correct?

23   A.  I don't recall the number.

24   Q.  Can you give me a ballpark figure?

25   A.  It would be something like that, yes.

LB2H9116                          Fawcett - Cross

1    Q.  The number of pages that dealt with the photo issue, by our

2    count, it was roughly about 30.  Does that sound right to you?

3    A.  No, that -- that portion of the deposition needs to be read

4    in conjunction with other portions.

5    Q.  That part of the deposition has nothing to do with how many

6    times a witness invoked "I don't know," does it?

7    A.  I don't know.

8    Q.  Mr. Fawcett, please, if the only issue you were concerned

9    about was the images on someone's computer, you could and would

10   have sent the pages from the deposition that dealt specifically

11   with that issue, couldn't you?

12            THE WITNESS:  Your Honor, to -- to answer that

13   correctly, I need to talk about other --

14   Q.  I'm not asking for your attorney advice.  I'm asking could

15   you --

16            THE COURT:  Out of other portions of the deposition?

17            THE WITNESS:  Yes, I would need to relate it to the

18   issue of child pornography to other portions of the deposition.

19            THE COURT:  I think I know what the witness is

20   referring to, but do you want to have a sidebar?

21            MR. HANSEN:  I think I can make the question

22   completely innocuous.

23   BY MR. HANSEN:

24   Q.  There were questions on the record at the deposition about

25   images on the witness' computer, correct?

LB2H9116                          Fawcett - Cross

1    A.  Yes.

2    Q.  Those questions consumed no more than 30 pages of the

3    transcript, correct?

4    A.  No, they related to previous portions of the transcript as

5    well.

6    Q.  I'm just asking you weren't the portions about that subject

7    about 30 pages?

8              MR. GERBER:  Objection.  Asked and answered.

9              MR. HANSEN:  He hasn't answered it yet.

10             MR. GERBER:  Yes, he has.

11             THE COURT:  You can answer the question.

12   A.  They related to other portions of the transcript as well.

13   Q.  I'm not asking you -- so let's just be clear.  We're

14   talking about you sitting here having admitted to criminal

15   conduct and facing another possible perjury charge.  Are you

16   telling this Court you had to send every one of these 610 pages

17   because every one of those 610 pages dealt with the images on

18   Mr. Al Jarrah's computer?

19   A.  No.

20   Q.  But you sent all 610 pages, didn't you?

21   A.  Yes, I sent the complete transcript without the FBI

22   material.

23   Q.  So let's look at some other things that are false here.

24             Next sentence down, paragraph 2:  "I did not send any

25   FBI protected portions of the deposition to Michael Isikoff."

LB2H9116                        Fawcett - Cross

1     That too was false, wasn't it?

2     A.  I now realize that's correct, that's now false.

3     Q.  Did you think that maybe before you sent a sworn statement

4     to a court in a matter as serious as this, you'd go check the

5     protective order to see whether you were right?

6     A.  In hindsight, yes, I should have done that.

7     Q.  How about all these nice lawyers at Kreindler & Kreindler?

8     How many different lawyers were you talking to during this

9     time?

10    A.  During which time?

11    Q.  Sorry?

12    A.  I'm sorry, during which time?  What are we talking about?

13    Q.  The time you're working on this sworn statement of yours.

14    A.  Just Megan and Steve.

15    Q.  They're experienced lawyers?

16    A.  Yes.

17    Q.  Do you think maybe they understood the protective order?

18    A.  I don't know what --

19    Q.  Did either Megan Benett or Steve Pounian say to you, John

20    Fawcett, you can't say this in your deposition -- in your

21    declaration because it's not true.  This transcript was all

22    covered by the FBI protective order?

23    A.  I don't -- I don't recall that, no.

24    Q.  They didn't warn you one bit, did they?

25    A.  Well, I think they were -- they were -- I shouldn't say

LB2H9116                        Fawcett - Cross

1    what they were thinking.  I don't really know what they were

2    thinking.

3    Q.  They didn't understand the protective order either, is that

4    what you're trying to tell me?

5    A.  No, that's not what I'm saying.

6    Q.  It's either one of two things:  Either they're clueless

7    about the protective order, in which case they shouldn't be

8    practicing in this court, or they knew about the protective

9    order, and they deliberately let you put in false testimony,

10   isn't that true?

11            MR. GERBER:  Objection, your Honor.

12            THE COURT:  What's the objection?

13            MR. GERBER:  Your Honor, several things:  One, the

14   question's incredibly confusing.  Second, he's asking him to

15   speak about the state of mind or knowledge of third parties.  I

16   don't see how he could possibly answer this question.

17            THE COURT:  All right.  I'll sustain the objection.

18            MR. HANSEN:  All right.  Let me rephrase it, because I

19   think it's an important question, and it's a clear question.

20   Q.  It's one of two things, isn't it, Mr. Fawcett:  Either

21   these lawyers themselves didn't understand the protective order

22   or they understood it and knew what you were writing was wrong

23   and let you do it anyways, isn't that true?

24   A.  I don't know.

25   Q.  Let's go to another falsehood in your statement.

LB2H9116                     Fawcett - Cross

1   Paragraphs 3, you write:  Until today, no one other than

2   Michael Isikoff and I knew that the redacted transcript -- knew

3   that I sent the transcript.

4              Hadn't you told your criminal defense attorney, Liz

5   Crotty, that you'd sent this transcript long before you filed

6   this?

7              MR. GERBER:  Objection, your Honor.  This is getting

8   into privileged information.

9              MR. HANSEN:  I don't think you can commit perjury

10  under the shield of privilege.  He's put in a sworn statement.

11  He's opened the door to that.

12             MR. GERBER:  Your Honor, the factual question --

13  counsel is asking the witness to describe what information he

14  provided to Ms. Crotty.  That's privileged.

15             THE COURT:  I think your witness' -- your client's

16  testimony to date has been that he did not discuss any of this

17  with Ms. Crotty.  I know you've asserted his Fifth Amendment

18  privilege on his behalf, but he has testified so far under oath

19  that he did not discuss with Ms. Crotty anything beyond her

20  election campaign.

21             MR. GERBER:  Your Honor, he was asked about a single

22  phone call, and he gave that testimony about that phone call.

23  I think it's not disputed that there were other communications

24  with Ms. Crotty.  I don't think that's -- the question here is

25  not being limited to that particular phone call.  He's being

LB2H9116                    Fawcett - Cross

1   asked more generally if he spoke with counsel, if he told

2   counsel particular information.  It would just --

3          THE COURT:  I think he can answer the question, did

4   you tell anyone other than Michael Isikoff that you had sent

5   the transcript to Michael Isikoff, and if so, who?

6          MR. GERBER:  Yes, your Honor.

7          THE COURT:  OK.

8   BY MR. HANSEN:

9   Q.  Did you hear that question, Mr. Fawcett?

10  A.  No, I didn't quite understand.

11  Q.  Did you tell anyone other than Michael Isikoff -- did you

12  communicate to any human being prior to filing this sworn

13  statement that you had sent the redacted transcript to Michael

14  Isikoff, attorneys included?

15  A.  Not prior to that date.

16  Q.  Not prior to September 27?

17  A.  Not prior to, that's what I remember.

18  Q.  OK.  Let's wrap up here.

19          In the declaration that you wrote, you said nothing

20  about your supposed personal interest in the Al Jarrah

21  material, right?

22  A.  I'm not sure what you mean.

23  Q.  Well, you give a long -- or your friends at Kreindler &

24  Kreindler give a long story in the declaration about why you

25  thought you had to violate the protective order and smear

LB2H9116                         Fawcett - Cross

1    Mr. Al Jarrah's reputation.  Remember that?

2    A.  I don't think anybody asked me to smear Mr. Al Jarrah.

3    Q.  That's what you did, isn't it?

4    A.  No, that's not what I did.

5    Q.  OK.  Well, let's look at your version of your statement.

6    It's at 108A.  We'll put it up.

7         Do you see any reference in there to your supposed

8    personal interest in taking this action?

9    A.  I'm not sure what you mean by "personal interest."

10   Q.  I'm not sure either.  Let's go to what Mr. Pounian and

11   Ms. Benett wrote for you in Exhibit 62A, fourth paragraph, very

12   end.  62A, you write:  "I had a personal interest because."  Is

13   that your wording?

14   A.  Yes.

15   Q.  So you said to me a minute ago you didn't know what

16   "personal interest" meant, and yet you used this very phrase in

17   this declaration, right?

18   A.  Yes.

19   Q.  And that wasn't in your version of your declaration, was

20   it?

21   A.  No, it wasn't.

22   Q.  That was added by Mr. Pounian or Ms. Benett, correct?

23   A.  I believe we talked about it on the phone.

24   Q.  But it was written in there by Mr. Pounian or Ms. Benett,

25   correct?

LB2H9116                          Fawcett - Cross

1   A.  They put -- they forwarded this draft to me after -- after

2   maybe two phone calls, two long phone calls.

3   Q.  And you signed it just like you signed other things that

4   you now realize were incorrect, right?

5               MR. GERBER:  Objection to the form, your Honor.  I

6   want to be clear.  I want to make sure the witness understands

7   the question.  I think the form is confusing.  I would ask the

8   counsel to rephrase.

9               THE COURT:  Sustained.

10              Can you rephrase the question?

11              MR. HANSEN:  Of course, your Honor.

12  Q.  You signed what Mr. Pounian and Ms. Benett wrote for you,

13  correct?

14  A.  No, I signed what I believed to be a correct declaration at

15  the time.

16  Q.  Well, actually, you've already told us you didn't.  Earlier

17  in your testimony, you told us that you signed things you now

18  look at and say were either wrong or you don't even understand.

19  A.  At the time I signed them, I felt that was my declaration.

20  Q.  And this was written, prepared on a Kreindler & Kreindler

21  computer system, correct, the one you signed?

22  A.  I don't recall if they -- I believe they sent me a Word

23  file, and I think I converted it into a PDF possibly on my

24  computer.  I'm not quite sure.

25  Q.  Don't remember, is that right?

LB2H9116                     Fawcett - Cross

1    A.   Yeah.

2    Q.   And you say, at least in the version that they prepared,

3    these things about your motivation.  Let's go through that, and

4    then we'll be done.

5         The information about this child issue was 20-year-old

6    information, wasn't it?

7    A.   I'm not sure what we're talking about.

8    Q.   The information about what was found on the witness'

9    computer was 20 years old, wasn't it?

10   A.   It was about 15 years old.  The way I understand, it was

11   found on the computer about 2004, 2005, something like.

12   Q.   Well, 2004 is 17 years ago, right?

13   A.   Yes.

14   Q.   And you knew about that information long before the

15   Al Jarrah testimony, correct, because you helped Ms. Benett

16   prepare for it and had that questioning prepared?

17   A.   Correct.

18   Q.   So when did you first learn about this?

19        MR. GERBER:  Objection, just to clarify what the

20   "this" is.

21   Q.   I'm sorry.  The information that you claimed to be so

22   concerning to you, when did you first learn about it in

23   reference to the deposition itself?

24   A.   Maybe six to eight months prior to the deposition.

25   Q.   And you talked to Ms. Benett about it during the eight

LB2H9116                    Fawcett – Cross

1    months preceding the deposition, correct?

2    A.  Mostly in the few weeks before the deposition.

3    Q.  But how about before the week?  Did she also know this

4    information was out there?

5    A.  I don't recall when I first told Megan.

6    Q.  But certainly was before the deposition itself, wasn't it?

7    A.  Yes, it was.

8    Q.  And in those six or eight months when you have this

9    information you claim caused you so much concern, you took no

10   action to warn anybody, did you?

11   A.  It was unconfirmed.  It was rumor.  I didn't -- I didn't

12   know it.  I had been told it.

13   Q.  You took no action, correct?

14   A.  I tried to confirm it.

15   Q.  Did you take any action?

16   A.  Yeah, that's action.

17   Q.  So who confirmed it?  Did someone confirm it for you?

18   A.  I didn't get -- I didn't get more confirmation than from

19   the source that had told me about it.

20   Q.  Who's the source?

21          MS. KIRSCH:  Objection, your Honor.

22          THE COURT:  Sustained.

23   Q.  So you're telling us it was just an idle rumor before the

24   deposition?

25   A.  I wouldn't call it an idle rumor.  It was --

LB2H9116                      Fawcett - Cross

1    Q.  Was it enough to concern you?

2    A.  Absolutely.

3    Q.  So why didn't you take action before the deposition?

4    A.  I had nothing to back it up.

5    Q.  So this 20-year-old, 17-year-old information was

6    information that the United States government had, correct?

7    A.  Yes, that's correct.

8    Q.  So you, John Fawcett, are not a law enforcement officer,

9    are you?

10   A.  No, I'm not.

11   Q.  You don't have the power of the United States government,

12   do you?

13   A.  No, I don't.

14   Q.  The United States government has full power to protect

15   anybody who's in danger through its own offices, doesn't it?

16   A.  I don't -- I don't understand what you mean.

17   Q.  Well, if the government thinks there's a threat or concern,

18   the government can take action, can't it?

19   A.  Presumably, yes.

20   Q.  Did you ask our government to take any action after the

21   Al Jarrah deposition?

22   A.  No, I didn't.

23   Q.  The country you claim you were worried about is a U.S.

24   ally, correct?

25   A.  We're talking about Saudi Arabia?

LB2H9116                    Fawcett - Cross

1    Q.   How about Morocco?

2    A.   About Morocco?   Yeah, I suppose.

3    Q.   They have an embassy in this country?

4    A.   Yes, they do.

5    Q.   So when did you first go to the Moroccan embassy to

6    register your complaint?

7    A.   I didn't.

8    Q.   The country of Morocco has law enforcement, too, doesn't

9    it?

10   A.   I'm sure it does.

11   Q.   They cooperate with our law enforcement authorities, don't

12   they?

13   A.   I presume they do.

14   Q.   When did you first go to Moroccan law enforcement

15   authorities to register your concerns?

16   A.   I didn't.

17   Q.   No, what you did instead was this, Mr. Fawcett.  You took

18   doubly protected confidential information, leaked it to a

19   reporter as part of Jim Kreindler's press campaign to pressure

20   the government of Saudi Arabia and smear witnesses who wouldn't

21   confirm his libelous story.  That's what you did, isn't it,

22   Mr. Fawcett?

23              MR. GERBER:  Objection, your Honor.

24              THE COURT:  Hold on.

25              MS. KIRSCH:  This is not television.  Objection.

1          THE COURT:  All right.  Let's rephrase the question,

2     please, sir.

3     Q.  What you did, instead of all the things we just went

4     through, Mr. Fawcett, is you leaked the entire 610-page

5     transcript to a U.S.-language reporter for publication,

6     correct?

7     A.  I didn't expect him to public -- to make the transcript

8     public, no.

9     Q.  So what assurances did you have that he wouldn't?

10    A.  We talked about what I thought was important in the

11    transcript, which was the child pornography.

12    Q.  Did you --

13    A.  And he agreed with me that was an important topic, and he

14    wanted to write about the child pornography and the FBI's use

15    of that child pornography.

16    Q.  Wait, wait, wait, wait.  Did you make a deal with

17    Mr. Isikoff that he would only publish part of this transcript

18    you gave him?

19    A.  He told me that's what he was going to do his story on.  I

20    trusted him.  I know he's a legitimate, valid journalist.  And

21    that's what he did.

22    Q.  So we see various emails and messages from you to

23    Mr. Isikoff after the publication.  When did you complain to

24    Mr. Isikoff that he breached your agreement?

25    A.  He didn't breach my agreement.

LB2H9116                          Fawcett - Cross

1    Q.  What you did, Mr. Fawcett, was smear a witness who had

2    refused to confirm your law firm's story in this case, and you

3    were doing it as a message to other witnesses that if they did

4    the same thing, they'd be smeared, too.  Isn't that what you

5    were doing?

6             MS. KIRSCH:  Your Honor, I'm going to object to the

7    question, but I'd also just like to note for the record that

8    it's actually Mr. Hansen who's talked extensively about the

9    content of the --

10            MR. HANSEN:  Oh, that's not true.  You've been -- all

11   over the map, Ms. Kirsch.

12            MS. KIRSCH:  I'm sorry.

13            MR. HANSEN:  I'm not going to listen to that.

14            THE COURT:  Hold on, Mr. Hansen.

15            MS. KIRSCH:  The understanding was, I think your

16   Honor's order was, that we could talk about the issue of child

17   pornography; that we shouldn't be discussing exactly what is or

18   is not in the Jarrah transcript.  This is about the third time

19   now that there's been a discussion by Mr. Hansen about what may

20   be or may not be in the Jarrah transcript.  So it's the Kingdom

21   that's actually not following your Honor's order, and I think

22   that it seems like it's waived.  That we could talk about the

23   content if we wanted to.

24            MR. HANSEN:  Completely false.  I haven't said a thing

25   about it other than it's images on the guy's computer, and

LB2H9116                         Fawcett - Cross

1    they've gone far beyond.  Ms. Benett this morning went in

2    graphic details.  I'm just asking him if what he did was smear

3    a witness who'd been uncooperative, and I didn't say a word

4    about --

5         THE COURT:  I don't think Mr. Hansen has crossed the

6    line as to my prior order, and this is, obviously, the subject

7    of the article, which is what brings us all to this court here

8    today.  So I don't --

9         MS. KIRSCH:  Your Honor --

10        THE COURT:  I don't think -- nor do I think that he is

11   past the bounds of what's relevance.  I'm not sure what you

12   mean by you want to open it up and start talking about the

13   deposition.

14        MS. KIRSCH:  Well, your Honor, I would say this:  That

15   question was just packed with information that what Mr. Fawcett

16   did amount to smearing a witness because the allegations that

17   the witness denied that he had those images on his computer.

18   So if we're going to talk about the witnesses' denial, that's

19   the content of the deposition as opposed to that which is

20   relevant for Mr. Fawcett's motivation.

21        MR. HANSEN:  Convoluted beyond belief.

22        MS. KIRSCH:  I don't think so, your Honor.  I think

23   it's quite clear.

24        MR. HANSEN:  I'm asking what he is doing.  He's free

25   to deny it.  What he was doing was smearing a witness, whether

1    true or not.

2              THE COURT:  I think Mr. Hansen is free to ask about

3    the witness' motivation, which he has put in the record by

4    saying that he had a motive when he released the transcript,

5    and I think Mr. Hansen is free to ask what that motive was.

6              MS. KIRSCH:  I understand, your Honor, but if we are

7    precluded from discussing what Mr. Jarrah may have said in

8    response to the questions --

9              MR. HANSEN:  Doesn't matter whether it's true or not.

10   It's still a smear.

11             MS. KIRSCH:  -- I don't think Mr. Hansen should be

12   permitted to acknowledge or to say that there was a denial.  We

13   need to be able to discuss both sides of that, and the order --

14             MR. HANSEN:  I'm --

15             THE COURT REPORTER:  I'm sorry, Judge.  I cannot do

16   this.

17             MS. KIRSCH:  That's because Mr. Hansen's not letting

18   me finish.

19             MR. HANSEN:  Well, she's not --

20             THE COURT:  I will give everybody an opportunity to be

21   heard in my court.

22             Ms. Kirsch.

23             MS. KIRSCH:  Thank you.

24             There has been -- there have been representations in

25   the questions by Mr. Hansen about what Mr. Jarrah did or did

LB2H9116                         Fawcett - Cross

1    not say in answer to the questions about the child pornography

2    on his computer.  Therefore, I would say that that's not in

3    compliance with your Honor's order and that we should be able

4    to respond to that because we don't think that's an accurate

5    representation, and there's more to the story than that.

6           So we were ordered not to talk about the content of

7    the transcript, and we kept to that.  We hardly even talked

8    about child pornography at all, but we certainly didn't talk

9    about what was said on the transcript or what was not said on

10   the transcript.  Mr. Hansen is making -- is having that

11   discussion.

12          THE COURT:  Mr. Hansen.

13          MR. HANSEN:  My turn?

14          THE COURT:  Yes.

15          MR. HANSEN:  I haven't said one word about what she

16   says that I said.  I asked him about his motivation.  I did not

17   ask about what Mr. Jarrah said or didn't say.  I asked him if

18   contrary to what his motivation in his sworn statement was, he

19   was really just trying to smear the witness, and that's a fair

20   question, as your Honor has ruled.  And I think Ms. Kirsch

21   ought to actually abide by the rulings instead of making

22   20-minute objections at every legitimate question here.

23          Go ahead.  Look at me that way.  That's fine.

24          THE COURT:  Go ahead, Ms. Kirsch.

25          MS. KIRSCH:  I'm just waiting for a ruling.

LB2H9116                    Fawcett - Cross

1          THE COURT:  Go ahead.  Oh, a ruling.

2          Yes, I think that whether it's true or not that the

3   witness had this on his computer, whether he saw these images

4   or not is not the purpose of today's hearing, and so we're not

5   going to have collateral litigation about what the witness has

6   said or didn't say in response to deposition questions.

7          What Mr. Fawcett has put squarely in the court's --

8   the center of this court hearing is his own motivations, which

9   he has indicated were because of his concerns about the

10  children in Morocco, and I think Mr. Hansen is fair game to ask

11  questions about whether he had other motives than the motives

12  of protecting the children.  So I think this line of

13  questioning is reasonable, so I'll allow it.

14         Go ahead, Mr. Hansen.

15         MR. HANSEN:  Ms. Kirsch is still standing, so I want

16  to make sure she gets a chance to talk all she wants.

17         THE COURT:  Mr. Hansen, focus on the witness, please.

18  BY MR. HANSEN:

19  Q.  Can you answer the question, Mr. Fawcett?  I'm done if

20  there's an answer to that question.

21  A.  Could you repeat the question?

22         THE COURT:  Madam Court Reporter, do you think you

23  could find it?

24         MR. HANSEN:  It's probably so far back, your Honor,

25  I'll spare our poor, tired court reporter and just ask it

1   again.

2   Q.  Mr. Fawcett, wasn't your real motivation in releasing the

3   entire Al Jarrah transcript to Mr. Isikoff to smear a witness

4   who had been uncooperative with you?

5   A.  No, that's not correct.

6               MR. HANSEN:  If I could have five minutes, your Honor,

7   I think I may be done.

8               THE COURT:  OK.  Take a quick five-minute recess, and

9   then, Mr. Gerber, you'll be next, so if you also want to use

10  this opportunity to prepare any redirect.

11              MR. GERBER:  Thank you, your Honor.

12              (Recess)

13              THE COURT:  Mr. Hansen.

14              MR. HANSEN:  Your Honor, we've concluded our

15  examination.

16              THE COURT:  OK.  Thank you.

17              THE WITNESS:  Your Honor, may I correct an answer?

18              THE COURT:  Sure.

19              THE WITNESS:  While I was sitting here, I recalled

20  something.

21              THE COURT:  Mr. Hansen, would you like to stand up?

22  He'd like to correct an answer.

23              MR. HANSEN:  I'm sorry, your Honor, because I have a

24  cold, I can't hear.

25              THE COURT:  Mr. Fawcett would like to correct an

1   answer that he gave you previously.

2          MR. HANSEN:  Actually, he can do that with his own

3   counsel.  I don't think you get to correct answers after

4   they've been given.  I think his cross-examination's done.  His

5   own counsel can elicit from him what he wants to tell us.

6          THE COURT:  OK.  Fair enough.

7          All right.  Mr. Gerber -- oh, you're going to go

8   first?

9          MR. GERBER:  Your Honor, in light of our position

10  regarding the Fifth Amendment and our standing objection to the

11  direct examination of the witness regarding -- or

12  cross-examination of the witness regarding the declarations, we

13  are not going to redirect the witness.

14         THE COURT:  OK.  Do you want to deal with the issue he

15  just raised, or you want Ms. --

16         MR. GERBER:  Yes, your Honor, I do think however the

17  Court wants to do it, to the extent the witness wants to

18  correct the record, he should have opportunity to do so.  Your

19  Honor, we don't want to waive our Fifth Amendment position, as

20  the Court understands, I'm sure.

21         THE COURT:  I do understand.

22         All right.  Why don't I give the witness an

23  opportunity to say what he wants to say.

24         And, Mr. Hansen, you'll have an opportunity to ask any

25  follow-up questions at the end.  Is that satisfactory to you?

LB2H9116                          Fawcett – Cross

1          MR. HANSEN:  Yes, your Honor.  Thank you.

2          THE COURT:  OK.  Mr. Fawcett, what would you like to

3     correct?

4          THE WITNESS:  Thank you.

5          During the break there, I recalled the conversation

6     with Liz Crotty in July.  I remember calling her after the

7     Court's order had come out, so I was calling her about this

8     Court's order.  And I remember telling her on the phone:  I'd

9     like to come see you, Liz, about an issue.  And she said:

10    Well, I'm not going to be here.  I'm leaving.  I'll be back in

11    a couple of weeks.

12         And then we -- I didn't tell her why I wanted to talk

13    to her on the phone, and then the rest of the conversation was

14    about her campaign.  So it was correct that I had originally

15    called her about attorney-client -- attorney-client relations

16    because I saw the court order.  Had nothing to do with the call

17    to Jim Kreindler.

18         THE COURT:  It had nothing to do with?

19         THE WITNESS:  The call to Jim Kreindler that I had

20    just done previously.  It was because the order had come out

21    the day before, and I was --

22         THE COURT:  OK.  Thank you.

23         MR. HANSEN:  I'm sorry, your Honor.  Should I -- can I

24    follow-up?

25              (Continued on next page)

LB789117                        Fawcett - Cross

1          THE COURT:  Sure.

2    BY MR. HANSEN:

3    Q.  So this has nothing to do with your call on the 22nd to Ms.

4    Crotty, some subsequent call?

5    A.  No.  That's the call I'm talking about.

6    Q.  The subject matter of your call on the 22nd is you want to

7    come get legal advice because of the position you're in because

8    of leaking the transcript?

9    A.  Correct.

10   Q.  And you are making that call after 44 minutes with Mr.

11   Kreindler, where you talked about the leak issue?

12         MR. GERBER:  Your Honor, the way that counsel is

13   characterizing the witness's testimony I think is not accurate,

14   and I think it's actually quite important.  Because counsel

15   described it as the witness saying he had told Ms. Crotty the

16   substance regarding the leak.  I actually don't think that's

17   what the witness --

18         MR. HANSEN:  He can't testify.  The witness just

19   testified.

20         THE COURT:  I think the witness did testify that he

21   wanted to speak with her about possible defense issues or

22   retention, but I think the witness did not testify that he told

23   her that he had leaked the transcript.

24         MR. HANSEN:  The question I asked was, was the subject

25   matter of your conversation about the leak issue?  Not about

LB789117                    Fawcett - Redirect

1    whether he leaked, but that was the subject matter for his

2    wanting to see her.  And he said yes.  And I think that's fair

3    testimony.

4              THE COURT:  Are you done?

5    BY MR. HANSEN:

6    Q.  Your concern about this issue was prompted by your 44

7    minutes with Jim Kreindler immediately before calling Liz

8    Crotty, correct?

9    A.  No, that's not correct.

10             MR. HANSEN:  No further questions.

11             THE COURT:  Thank you.

12             Ms. Kirsch, your witness.

13   REDIRECT EXAMINATION

14   BY MS. KIRSCH:

15   Q.  Good afternoon, Mr. Fawcett.  I am Emily Kirsch.  I am

16   counsel for Kreindler & Kreindler.  I am just going to ask you

17   a few questions, if that's all right with you.

18             Before I ask the very few questions that I have, could

19   you tell us a little bit just about your professional

20   background so we understand what it is that you do and who you

21   are?

22             MR. HANSEN:  I object.  This has nothing to do with

23   the cross-examination, nothing to do with his direct

24   examination.  This is redirect examination on a new subject.

25   We have been here a long time.  We don't want a human interest

LB789117                        Fawcett - Redirect

1    story.

2               THE COURT:  She said she is going to be quick.  I will

3    allow her to ask background questions about Mr. Fawcett's

4    professional experience.

5    BY MS. KIRSCH:

6    Q.  Mr. Fawcett, would you tell us a little bit about your

7    professional background?  And the second part of that question

8    will be, even in your declaration, you mention that you have

9    worked for the 9/11 families for a long time.  So if you could

10   tell us a little bit about your professional background prior

11   to working for the 9/11 families and then describe your work

12   for the 9/11 families.  Just briefly so we have some grounding.

13   A.  I worked approximately ten years in oil exploration in the

14   Middle East, in Turkey.  I worked for a humanitarian aid

15   organization in Iraq, and in former Yugoslavia, and some other

16   countries, including Pakistan, Afghanistan.  Then I worked more

17   in the human rights field, particularly focused on financing

18   and dictators.  That was prior to coming to Kreindler.

19   Q.  The work that you do with the 9/11 families, or that you

20   have done for the past 20 years, can you describe that

21   generally, please?

22   A.  I consider myself largely a researcher.  I don't think I am

23   an investigator.  I look at documents.  So I'm part of the

24   whole analysis of the discovery material gathered.  In

25   addition, I spent a lot of time engaging with the families and

LB789117                    Fawcett - Redirect

1    essentially educating them about the progress of the case.

2    Q.  So, Mr. Fawcett, have you ever heard Mr. Kreindler talk

3    about the protective orders in this case, particularly the fact

4    that he doesn't like them?

5    A.  Yes.

6    Q.  Did Mr. Kreindler ever suggest to you any way, either

7    directly or tacitly or indirectly, that the orders should not

8    be followed because he doesn't like them?

9    A.  No.

10   Q.  Can you describe what sense you got from Mr. Kreindler

11   about the importance of the protective orders and following

12   them?

13   A.  We had to follow them.  Everyone in the case had to follow

14   him.  It wasn't just Jim, it was the Kreindler firm.  At the

15   same time, I know that they didn't like having to hide

16   material, withhold material from their clients.  That was a

17   very, very difficult thing for them to do, for all of us to do.

18   Q.  Did anybody at the Kreindler firm, Mr. Kreindler or anyone

19   else, ever suggest that there would ever be a time when it

20   would be OK to violate the protective orders?

21   A.  No.

22   Q.  Did you ever have any reason to believe that Mr. Kreindler

23   would not object to your sending the Jarrah transcript to

24   Mr. Isikoff?

25   A.  I'm not quite sure.

LB789117                    Fawcett - Redirect

1    Q.   Let me give you a better question.  Let me start at the

2    beginning.

3              Did Mr. Kreindler suggest to you that you should send

4    the Jarrah transcript to Mr. Isikoff?

5    A.   No, he did not.

6    Q.   Did Mr. Kreindler ever suggest to you in some sort of

7    indirect or tacit way that you should send the Jarrah

8    transcript to Mr. Isikoff?

9    A.   No.  No, never.

10   Q.   Did Mr. Kreindler give you any reason to believe that he

11   would condone your sending the Jarrah transcript to

12   Mr. Isikoff?

13   A.   No.

14   Q.   Did you ever believe that Mr. Kreindler might condone your

15   sending of the Jarrah transcript to Mr. Isikoff?

16   A.   No.

17   Q.   Did you ever believe that any of the Kreindler & Kreindler

18   lawyers would condone your sending of the Jarrah transcript to

19   Mr. Isikoff?

20   A.   No.  It would be the opposite.  They would tell me not to

21   do it.  That was my opinion.

22   Q.   Is that the reason you took steps to hide it from them,

23   because you knew they would tell you not to?

24   A.   Yes, that's right.

25   Q.   There was some discussion about exactly what the words were

LB789117                              Fawcett - Redirect

1    when the Kreindler & Kreindler lawyers, either Mr. Maloney, Mr.

2    Pounian or others, asked you about this leak.

3              Is it fair to say, Mr. Fawcett, that you think you

4    misled them with respect to what you knew about who sent the

5    Jarrah transcript to Mr. Isikoff?

6              MR. HANSEN:  Your Honor, I have been letting Ms.

7    Kirsch go on with her leading questions for two days.  Really,

8    there ought to be an end.  She should ask nonleading questions.

9    It's her witness.  She is just replowing the same ground they

10   plowed in the original declarations.  If she is going to do

11   something, it should be proper examination with direct

12   questions.  This is not cross-examination.  She hasn't asked a

13   nonleading question yet.

14             THE COURT:  I don't believe that Mr. Fawcett is her

15   witness.  He is represented by Mr. Gerber.  And we are here at

16   a bench trial, essentially.  So I will allow Ms. Kirsch to

17   continue with that line of questioning.

18   BY MS. KIRSCH:

19   Q.  I am not sure if we got an answer to my last question.

20   A.  Can you repeat the question?

21   Q.  Sure.  Did you mislead the Kreindler lawyers with respect

22   to what you might have known about who leaked the Jarrah

23   transcript?

24   A.  I don't know if that's the right word.  I certainly

25   prevaricated and dissembled and avoided letting them know.

LB789117                         Fawcett - Redirect

1   Q.  Mr. Fawcett, Mr. Hansen had asked you a series of questions

2   about, if you had known about Mr. Jarrah's child pornography

3   for so long, why did you not take action sooner?

4        My question is, at any time before the Jarrah

5   deposition, did you have confirmation that Mr. Jarrah was in

6   fact consuming and possibly trafficking child pornography?

7   A.  No.

8   Q.  So it was at the deposition, just to be very clear, that

9   you received the confirmation that Mr. Jarrah was consuming and

10  possibly trafficking in child pornography?

11       MR. HANSEN:  We have been over this issue multiple

12  times.  Can we have her stop this?

13       THE COURT:  I think that line of questioning is

14  improper based on my prior ruling.  We are not asking whether

15  it was true or not what was said during the deposition.  We

16  know that Mr. Fawcett has indicated that that was his

17  motivation.  We know that the topic is out.  We are not going

18  to talk about confirmations at depositions or answers that were

19  given.

20  BY MS. KIRSCH:

21  Q.  Just the last question, Mr. Fawcett.  You knew that your

22  acts and words had the effect of misleading the Kreindler

23  lawyers with respect to your leaking of the Jarrah transcript,

24  isn't that true?

25  A.  I'm not sure which acts and words you're referring to.

LB789117                    Fawcett - Redirect

1    Q.  Whatever acts and words there were that related to the

2    topic.

3    A.  I'm not quite sure how to answer that one.

4    Q.  I am just asking whether you were aware that you were

5    misleading the Kreindler lawyers by your words, whether they

6    were dissembling or prevaricating, or any of the other words

7    that you used?

8            MR. HANSEN:  Objection.  Asked and answered.  It's

9    putting words in the witness's mouth when he won't give the

10   answer she wants.

11           THE COURT:  You can answer it.

12   A.  I was not being honest with them.

13           MS. KIRSCH:  Thank you very much, Mr. Fawcett.

14           MR. HANSEN:  No further questions.

15           THE COURT:  Mr. Fawcett, I have just a couple of

16   questions to clarify for my mind.

17           One question I have is, in your initial declaration

18   that you submitted to, I believe Mr. Pounian and Ms. Benett,

19   you indicated that you had sent the transcript via a

20   non-Kreindler e-mail address.  What did you mean by that?

21           THE WITNESS:  That's the ProtonMail.

22           THE COURT:  Did they ask you what that e-mail address

23   was or what e-mail you used at that time?

24           THE WITNESS:  Sorry?

25           THE COURT:  Did either Ms. Benett or Mr. Pounian ask

LB789117

```
 1    you, when you told them that you sent it via a non-Kreindler
 2    e-mail address, did they ask you what that e-mail address was?
 3              THE WITNESS:  Yeah, I believe they did.
 4              THE COURT:  And did you explain to them what that
 5    e-mail address was?
 6              THE WITNESS:  I think we put it into either the first
 7    or second declaration.
 8              THE COURT:  I don't believe it's in the first
 9    declaration.  That's why I am asking.
10              THE WITNESS:  Maybe it was in the second then.
11              THE COURT:  Then I have a question that I hate to ask,
12    but since it's been made an issue.  Can you tell me the age of
13    your children?
14              THE WITNESS:  21.
15              THE COURT:  You have just one child?
16              THE WITNESS:  They are twins.
17              THE COURT:  Thank you.  Anything further?
18              Mr. Fawcett, thank you very much.  You are excused.
19              MR. RAPAWY:  Your Honor, very briefly.
20              Your Honor, you asked us to meet and confer previously
21    on the subject of the previous exhibits, which I don't think
22    has been resolved yet.
23              THE COURT:  Is Mr. Fawcett done?
24              Mr. Fawcett, you are excused.
25              (Witness excused)
```

LB789117

1          THE COURT:  I did ask about the exhibit issue.  Was

2     that you, Mr. Rapawy?

3          MR. RAPAWY:  We have agreed to meet and confer and

4     exchange a list and get something to the court in the next

5     couple of days.  At least based on my understanding of our

6     conversations, I think we should be able to resolve the issue

7     of the exhibits that went in before we started formally moving

8     for admission.  If that's not the case, we can come back to the

9     court.

10          THE COURT:  The court reporters, who are trying to do

11     their best job, have indicated that there is some confusion in

12     the record.  I actually think it's a confusion that we all

13     could solve, but each lawyer said things like, turn to exhibit

14     tab 12, and you both have exhibit tab 12.  I think we all know

15     what you're referring to.  The court reporters are concerned

16     because they are good at their job, and they don't want to

17     submit a transcript that is unclear.  But I am not sure we need

18     to burden them to try and match up what we were just calling

19     tab 7, and we know whether it's a Kreindler tab 7 or a KSA tab

20     7, and have them sort of redo the transcript.  I think they

21     would like to get you a transcript.  I think you have all

22     ordered it on an expedited basis.  I don't know whether you

23     want to hold up the transcript creation in order to resolve

24     this issue and have the court reporters go back into the record

25     to correct or whether we can live with a transcript that may be

1   more clear to us in the reading than it might be to the public.

2            MS. KIRSCH:  For what it's worth, I think one process

3   could be, if they wanted to give us a rough transcript, we

4   could use that as a basis to both meet and confer on the

5   documents, and we could clean it up ourselves and make the

6   edits, if that's helpful.  So we could give proper numbers or

7   tabs or do a better job of identifying the exhibits.  We could

8   work off the rough so that we can do our meet-and-confer about

9   the documents that were offered.

10           THE COURT:  I think that's fine.  So long as the court

11   reporter doesn't feel like she has to go into the rough now and

12   try and recreate.  We don't want her to have to do that.

13           MS. KIRSCH:  We could take the rough and then we could

14   just provide the edits for better marking the exhibits.  We can

15   do that for them.

16           THE COURT:  OK.

17           Next question.  Post-hearing briefing.  I don't know

18   if you all want to meet and confer and discuss an appropriate

19   schedule.  I don't know if you have thought about it already.

20   I think everybody's goal is to get proposed findings of fact

21   and conclusions of law to the court as quickly as possible.

22   It's my practice that when it's fresh it's best.  I don't know

23   if you have thought about a proposed schedule.  If you would

24   like to discuss that and get back to me later this week on a

25   proposal, I am happy to hear from you then, but I am happy to

LB789117

1    hear from you now.

2           MS. KIRSCH:  Does your Honor contemplate just

3    simultaneous one brief from each side?

4           THE COURT:  To be candid, I haven't contemplated so

5    much, only that it will happen.  There is an argument that

6    having it be simultaneous makes sense.  I suppose there is an

7    argument for having one side go first.  I would like to try to

8    avoid having multiple rounds of briefings.  I am happy to give

9    you all time to speak.

10          Mr. Kellogg, do you have a perspective?

11          MR. KELLOGG:  Yes.  Our thought was simultaneous

12   submissions in three weeks.

13          THE COURT:  Ms. Kirsch, how does that sound?

14          MS. KIRSCH:  That sounds fine.

15          THE COURT:  That means everybody gets it in before

16   Thanksgiving.

17          MR. HAEFELE:  Robert Haefele on behalf of the PEC.  I

18   anticipate being as actively involved in the findings of fact

19   as we have been over the past few days, which means very

20   little.  But I think the PEC would like to see findings of fact

21   before it's finalized.

22          THE COURT:  Why don't we do the following.  Why don't

23   we set the deadline for filing on Wednesday, the 24th of

24   November, which is the Wednesday before Thanksgiving.  So

25   everybody can work really hard and then eat a lot of turkey.

LB789117

1    And I will ask that the parties coordinate with the PEC to at

2    least give them 48 hours to do a quick review to make sure

3    there are no issues.  I don't anticipate there being issues.

4              MR. HAEFELE:  I don't either, your Honor, but that

5    will be perfect for us.

6              THE COURT:  So coordinate with the PEC, please.  But

7    given the way the testimony has gone in, I don't anticipate

8    there being real issues here.

9              MR. KELLOGG:  Your Honor, we would strongly object to

10   giving our submissions to the PEC before the filing with the

11   court.

12             THE COURT:  Could you provide anything?  I don't even

13   know what would be in there that would actually be PEC's work

14   product.

15             MR. KELLOGG:  He can review them after each side

16   files.  If they have concerns, they can submit them to the

17   court.  It would be fundamentally unfair for us to have to

18   share our pleadings with them before we file.

19             MR. HAEFELE:  I don't understand what the objection

20   would be.  If there is some problem with the findings of fact

21   that are proposed that may be binding on this litigation, I

22   think the Plaintiffs' Executive Committee should have an

23   opportunity to make sure.  Given how the testimony has gone in,

24   I don't anticipate there being any issue.

25             THE COURT:  Why don't we do the following.  Sorry to

494

LB789117

1    cut you off, sir.  I do think it's a fair point, because if

2    their strategy is revealed, then the other side can counter it

3    in their filings.  But what if we did something like the

4    following.  That the parties exchange their final documents on

5    the 24th, and file them with the court sometime, maybe December

6    1st.  So they are final copies, but if there are any redactions

7    that need to be raised, we can deal with it in that way.  I

8    think that might protect everybody's interests.  So the

9    exchange of the final documents Wednesday before Thanksgiving,

10   but I won't see them, which means everyone's Thanksgiving is

11   protected, and then we will file it with the court with any

12   redactions.

13            MR. KELLOGG:  Can we file them under seal with the

14   court and then they can review them and propose redactions to

15   the court?

16            THE COURT:  I think that's fine.  I think that's

17   materially the same concept.

18            MR. GERBER:  If I may?

19            THE COURT:  Yes.

20            MR. GERBER:  Mr. Fawcett obviously is not a party, but

21   we would like the opportunity to respond to the proposed

22   findings of fact and conclusions before the court issues its

23   final findings and conclusions.  I am just not sure what the

24   court is envisioning in terms of our role in the briefing.

25            THE COURT:  Let me take it under advisement and think

LB789117

1    about it and see what makes the most sense.

2              MR. GERBER:  Just to be clear, the stakes for our

3    client are incredibly high, and before the court issues its

4    ruling, we would just like an opportunity in some way to have

5    input here, to be heard.

6              THE COURT:  Why don't you think you could do that with

7    everybody else's filings?

8              MR. GERBER:  I am sorry, your Honor.

9              Your Honor, I am envisioning in some form advocating

10   for our client.

11             THE COURT:  I am wondering why that can't happen on

12   the 24th.

13             MR. GERBER:  It certainly can.  We are not a party.  I

14   think the court referred to the parties' submissions.  I don't

15   know if you were envisioning a simultaneous submission from us

16   as well.

17             THE COURT:  If you want to be heard, I think that

18   would be the time to be heard.

19             Anything further from anyone?

20             MS. KIRSCH:  No, your Honor.

21             THE COURT:  All right.  Well, on a personal matter, I

22   hope everybody is doing OK in COVID times.  I know I see all of

23   you often, and we haven't seen you in a long time.  I am sorry

24   for the reason that we are here, but I hope everybody is safe

25   and their family is safe.  And I hope everybody felt like the

LB789117

1    court did a good job with respect to our COVID protocols.  I

2    know we have been really careful and we are trying to be sort

3    of a leader in the federal system on this, so I hope everyone

4    felt like they were well taken care of.

5             With that, we are done.

6             MS. KIRSCH:  Just to clarify, we are going to do one

7    set of briefs simultaneously, filing under seal on November 24,

8    and allowing the PECs to have a look for any redactions by

9    December 1st.  And that's all the briefing that we are doing.

10            THE COURT:  Correct.

11            MS. KIRSCH:  OK.

12            THE COURT:  Thank you, everybody.  We are adjourned.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                           Page

3     ANDREW J. MALONEY III

4    Cross By Mr. Shen  . . . . . . . . . . . . 232

5    Redirect By Ms. Kirsch . . . . . . . . . . 273

6    Recross By Mr. Shen  . . . . . . . . . . . 305

7    MEGAN WOLFE BENETT

8    Cross By Mr. Shen  . . . . . . . . . . . . 310

9    Redirect By Ms. Kirsch . . . . . . . . . . 366

10    STEVEN POUNIAN

11   Cross By Mr. Shen  . . . . . . . . . . . . 404

12   Redirect By Ms. Kirsch . . . . . . . . . . 410

13    JOHN FAWCETT

14   Cross By Mr. Hansen  . . . . . . . . . . . 415

15   Redirect By Ms. Kirsch . . . . . . . . . . 482

16                    KREINDLER EXHIBITS

17   Exhibit No.                            Received

18    1   . . . . . . . . . . . . . . . . . . . 278

19    2   . . . . . . . . . . . . . . . . . . . 281

20    3   . . . . . . . . . . . . . . . . . . . 283

21    4   . . . . . . . . . . . . . . . . . . . 284

22    5   . . . . . . . . . . . . . . . . . . . 286

23    8   . . . . . . . . . . . . . . . . . . . 287

24    9   . . . . . . . . . . . . . . . . . . . 288

25    18  . . . . . . . . . . . . . . . . . . . 290
```

1    34 . . . . . . . . . . . . . . . . . . . 292
2    35 . . . . . . . . . . . . . . . . . . . 296
3    36 . . . . . . . . . . . . . . . . . . . 297
4    41 . . . . . . . . . . . . . . . . . . . 298
5    43 . . . . . . . . . . . . . . . . . . . 299
6    52 . . . . . . . . . . . . . . . . . . . 367
7    51 . . . . . . . . . . . . . . . . . . . 368
8    53 . . . . . . . . . . . . . . . . . . . 376
9    54 . . . . . . . . . . . . . . . . . . . 376
10   55 . . . . . . . . . . . . . . . . . . . 377
11   56 . . . . . . . . . . . . . . . . . . . 377
12   57 . . . . . . . . . . . . . . . . . . . 377
13   58 . . . . . . . . . . . . . . . . . . . 378
14   61 . . . . . . . . . . . . . . . . . . . 378
15   62 . . . . . . . . . . . . . . . . . . . 380
16   62 . . . . . . . . . . . . . . . . . . . 382
17   63 . . . . . . . . . . . . . . . . . . . 383
18   64 . . . . . . . . . . . . . . . . . . . 383
19   65 . . . . . . . . . . . . . . . . . . . 384
20   66 . . . . . . . . . . . . . . . . . . . 385
21   67 . . . . . . . . . . . . . . . . . . . 386
22   69 . . . . . . . . . . . . . . . . . . . 387
23   73 . . . . . . . . . . . . . . . . . . . 388
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                              KSA EXHIBITS

2     Exhibit No.                                    Received

3     97    . . . . . . . . . . . . . . . . . 306

4     98    . . . . . . . . . . . . . . . . . 308

5     108   . . . . . . . . . . . . . . . . . 347

6     109   . . . . . . . . . . . . . . . . . 349

7     110   . . . . . . . . . . . . . . . . . 352

8     118   . . . . . . . . . . . . . . . . . 356

9     120 and 121  . . . . . . . . . . . . . 357

10    58    . . . . . . . . . . . . . . . . . 359

11    134   . . . . . . . . . . . . . . . . . 428

12    138   . . . . . . . . . . . . . . . . . 432

13    82    . . . . . . . . . . . . . . . . . 433

14    40    . . . . . . . . . . . . . . . . . 435

15    135   . . . . . . . . . . . . . . . . . 445

16

17

18

19

20

21

22

23

24

25
```