**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001**

**03-MDL-1570 (GBD) (SN)**

**EXPERT REPORT OF JONATHAN BENTHALL**
**ON BEHALF OF YASSIN ABDULLAH KADI**

| Table of Contents | Page No. |
|---|---|
| I. SCOPE OF THIS EXPERT OPINION | 1 |
| II. SUMMARY OF AFFIRMATIVE EXPERT OPINION | 1 – 3 |
| III. QUALIFICATIONS | 3 – 7 |
| IV. METHODOLOGY | 8 – 10 |
| V. EXPERT AFFIRMATIVE OPINION | |
| 1. The role of charitable giving in Islam and its history and development | 10 – 15 |
| 2. Activities and character of the Muwafaq Foundation | 15 - 24 |
| 3. The importance of understanding cultural and historical norms in assessing transactions engaged in by charities and individuals associated with them | 25 – 28 |
| 4. Characteristics of historical charity regulation and personal relationships in the Arab world prior to 9/11 | 28 – 32 |
| 5. Why Islamic charities provided aid to Muslim communities in countries plagued by poverty, lack of education, wars and disasters | 32 – 37 |
| 6. The regrettable result of the overreaction against Islamic charities | 37 – 38 |
| VI. EXPERT REBUTTAL OPINION | 38 – 49 |
| EXHIBIT A | |
| EXHIBIT B | |

I

## I.   SCOPE OF THIS EXPERT OPINION

I have been asked by counsel for Yassin Abdullah Kadi to offer an expert opinion on the following:

1.   The role of charitable giving in Islam, and its history and development;

2.   The importance of understanding cultural norms in assessing transactions engaged in by charities and individuals associated with them;

3.   Characteristics of historical charity regulation and personal relationships in the Arab world prior to 9/11;

4.   Why Islamic charities provide aid to Muslim communities in countries plagued by poverty, lack of education, wars and disasters;

5.   The flaws in the report written by Victor Comras, offered by Plaintiffs as an expert report, insofar as it pertains to Mr Kadi.

## II.   SUMMARY OF AFFIRMATIVE EXPERT OPINION

1.   In broad terms, the tradition of Islamic charity has much in common with Judaism and Christianity, and hence with the secular Western traditions of charity, philanthropy and humanitarianism that developed historically from religious origins. It was marked however by certain specific concepts rooted in Islamic teaching: most importantly, *zakat* and *sadaqa*. Islamic charities of a modern kind began to grow since about 1980, and  in general have a "family resemblance".

2.   The Muwafaq Foundation ("Muwafaq" or "The Foundation"), registered in Jersey in 1992, was one of these Islamic charities, working in numerous countries in the fields of clothing and food distribution, social welfare, health, education and training, food production etc. These countries included former Yugoslavia during a period of extreme

1

violence and devastation, especially as a result of the Bosnian war of 1992 to 1995; Sudan with the problem of providing for displaced persons; and Pakistan, where the Foundation's priority was flood relief.

3. In my opinion, disproportionate attention has been given to Islamic charities as alleged threats to security. It is probably true that a few Islamic charities, and other charities, were made use of as conduits to fund or support paramilitary activities before 2001. But it must be remembered that during the Soviet–Afghan war of the 1980s an example was set by the United States government in mixing humanitarian, diplomatic and military aid to the *mujahideen* in Afghanistan; and that during this period the charity regulation regime in the USA was relatively relaxed.

4. Working in 1980s Afghanistan is not evidence of support for terrorism. I am not aware of any solidly grounded evidence to support the proposition that Mr Kadi or the Muwafaq Foundation had anything to do with the leaders of Al-Qa`ida or shared its ideology, goals or tactics.

5. I am not aware of any solidly grounded evidence of improper diversion of funds by Mr Kadi or the Muwafaq Foundation. In any case, allowance should be made for the fact that the Foundation operated in numerous countries, including war zones and areas afflicted by floods. Communications and banking technologies were less developed than today, so that maintaining full control of the Foundation's finances and operations would have been very difficult.

6. Account should also be taken of the characteristics of financial transactions in the Arab world prior to 9/11, including the field of charities, such as the tradition of privacy and discretion (especially with regard to charitable giving), and standards of charity regulation that were at that time less formal than in Western jurisdictions.

7. It is normal in the Gulf Arab states for individuals to rely in their financial commitments on friends and kinsfolk whom they trust – and this was characteristic of Mr Kadi's approach to charity. This norm has been described by social scientists as "clientelism".

8. Like most other Islamic charities, the Muwafaq Foundation concentrated on relieving poverty, lack of education, and distress caused by wars and disasters, in Muslim communities. However, I am not aware of evidence to suggest that the Foundation had any objection against also assisting non-Muslims; nor that Mr Kadi had any leanings towards proselytism or "political Islam" – let alone any sympathy towards Al-Qa'ida.

9. The fact that Mr Kadi was a major supporter of a pioneering women's college in Jeddah, founded  in 1999, the Dar Al Hekma College, indicates that his ideological leanings were progressive.

10. In my opinion, an overreaction against Islamic charities by the US justice system and the US Treasury has been sustained by some experts on counterterrorism and terrorist financing, whose methodology is often defective. They tend to rely on the attribution of guilt by association, and *petitio principii*[1], and their academic credentials are sometimes questionable.

## III.    QUALIFICATIONS

I have studied Islamic charities continuously for 25 years and published extensively about them. Born in Kolkata, India, in 1941, I graduated from the University of Cambridge in English Language and Literature in 1962. I was appointed Lecture Programme Organizer at the Institute of Contemporary Arts, London, in 1970, and  its Secretary from 1971 to 1973, and in 1974 I was appointed Director of the Royal Anthropological Institute of Great Britain and Ireland (RAI). In 1982 I was elected a Member of the Association of Social Anthropologists of the Commonwealth. In 2000 I resigned from the Royal Anthropological Institute to concentrate on my own research. In 1994 I was appointed an Honorary Research Fellow, Department of

---

[1] *I.e.* "begging the question".

Anthropology, University College London (until 2003, thereafter an Honorary Research Associate until currently). From 2009 till currently, I have been an Associate Fellow at the Humanitarian and Conflict Response Institute. Between 2008 and 2010, I was a member of the Advisory Committee of the Religions and Development Research Programme at the University of Birmingham. From 2019 until currently, I have been a member of the Editorial Board, *Journal of Muslim Philanthropy and Civil Society*, Indiana University.

In 1993 I was awarded the Anthropology in Media (AIME) Award by the American Anthropological Association as Founder Editor of *Anthropology Today* since 1985. In 2001, I was awarded the Patron's Medal of the RAI, and in 2015, I was appointed Director Emeritus.

I have also carried out voluntary work of a practical rather than an academic nature. Between 1981 and 1996, I served on a number of committees of Save the Children (UK), including six years of membership of the Overseas Committee, which was responsible for its international programme including disaster relief and development aid. Between 1997 and 2003, I was Chair of INTRAC (International NGO Training and Research Centre), Oxford (Board Member, 1996–2006), which is a not-for-profit company set up as a "support NGO", that is, supplying services to international Non-Governmental Organizations in the fields of training, consultancy, project planning, monitoring and evaluation of programmes, etc. Between 1997 and 2004, I was a Trustee of another successful British charity, the Alliance of Religion and Conservation, which was founded in 1995 by HRH Prince Philip, Duke of Edinburgh, to initiate environmental projects in collaboration with religious organizations and with intergovernmental organizations such as the UN Development Programme.

In 1993, I published *Disasters, Relief and the Media*, probably the first book-length study of the relations between international aid agencies and the communications media (new edition, 2010). In 1996, I was awarded a six-months sabbatical by the RAI, and I began a research project initially focused on the question of why some 30 National Societies of the International Red Cross and Red Crescent Movement use the red crescent rather than the red cross as their emblem. This led to field visits to Jordan, the Palestinian Territories, Oman and Algeria, and the research project quickly extended to cover the wider field of Islamic charities. After publishing

4

three peer-reviewed articles on the subject, I joined forces with Dr Jérôme Bellion-Jourdan, a French political scientist, to publish a co-authored book, *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003 (new paperback edition, 2009). Since then I have published many articles on Islamic charities, some of which were collected in *Islamic Charities and Islamic Humanism in Troubled Times* (2016). I also co-edited (with Robert Lacey) *Gulf Charities and Islamic Philanthropy in the 'Age of Terror' and Beyond* (2014), based on the Gulf Charities Workshop, which he and I co-directed in July 2012 at the University of Cambridge in the context of the Gulf Research Meeting 2012.

Some publications – in addition to those republished in the 2016 collection – are:

"Islamic Relief Worldwide", "Médecins Sans Frontières (MSF), "Oxfam" and "Relief" (in *The Palgrave Dictionary of Transnational History*, 2009);

"Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011);

"'Cultural proximity' and the conjuncture of Islam with modern humanitarianism" (in *Sacred Aid: Faith and Humanitarianism*, ed. Michael Barnett and Janice Stein, 2012);

"Charity" (in *A Companion to Moral Anthropology*, ed. Didier Fassin, 2012);

"Charity" (in *The Oxford Encyclopedia of Islam and Politics*, Oxford University Press, 2014);

"Religion and humanitarianism" (in *The Routledge Companion to Humanitarian Action*, ed. Roger MacGinty and Jenny H. Peterson, 2015);

"Charity: modern period" (in the *Encyclopedia of Islam, Third Edition* (Brill, 2016, online);

"Experto crede: A legal and political conundrum" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017);

"Charity" (in the *Cambridge Encyclopedia of Anthropology* online, 2017), also in French translation "Charité";

"Humanitarianism as ideology and practice" (in *The Wiley-Blackwell Encyclopedia of Anthropology*, 2018);

5

"The Rise and Decline of Saudi Overseas Humanitarian Charities", Occasional Paper no. 20, Center for International and Regional Studies, Georgetown University – Qatar, 2018;

"Charitable activities of the Muslim Brotherhood" (in *Journal of Muslim Philanthropy and Civil Society*, 2019, vol. 2 no. 2);

"The Care of Orphans in the Islamic Tradition, Vulnerable Children, and Child Sponsorship Programs", (in *Journal of Muslim Philanthropy and Civil Society*, 2019, vol. 3 no. 1);

"A note on humanitarian terminology". Allegra lab online: project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/

"Orphan programmes today and tomorrow", *The Forum: The Journal of the British Muslim charity sector*, issue 3, Winter/Spring 2021.

Between 2005 and 2013, I was engaged as an adviser to the Swiss Federal Department of Foreign Affairs (FDFA) Bern (Human Security Division) on a project entitled the Montreux Initiative (later renamed the Islamic Charities Project). This was conceived as an exercise in mediation or conflict resolution, whose objective was to remove obstacles from Islamic charities in so far as they were unjustified. The argument was that the long tradition of Islamic charitable giving was having difficulty expressing itself amid a growing climate of mistrust between Islam and the "West", and there was a need for confidence building between, on the one hand, Islamic charities determined to comply with internationally accepted codes of practice – including the need for transparency and non-discrimination – and, on the other hand, Western governments and regulatory authorities. I was commissioned by the FDFA to write a Feasibility Study in January 2005 and shortly thereafter appointed a member of the "core group", which included representatives of the FDFA and a number of experts with knowledge of humanitarian institutions, both Muslim and non-Muslim. At the end of 2005, some seventeen Islamic charities – from Europe but also from the Gulf and other Middle Eastern countries – met in Istanbul to further the project. It was agreed that discussions would proceed discreetly with no media involvement. For a short period, the project was co-sponsored by the UK Foreign and Commonwealth Office (as it was then known).

Part of the plan was to offer "capacity building" services to Muslim charities that had been hitherto managed on informal lines, *i.e.* helping them to improve their performance and public profile through modern procedures of administration and accounting. Recommendations were also made with regard to desirable improvements in governmental policies.

I was also a member of a delegation sponsored by the Swiss Government to Washington, D.C., in February 2011, and took part with other members of the delegation in meetings with staff members of the Senate Judiciary Committee, the State Department, the US Treasury's Office of Foreign Assets Control, the National Security Council, and other government officials.[2]

I have been invited to speak in many academic and humanitarian forums and also at the Charity Commission, Foreign and Commonwealth Office, and Home Office, London; Centre National d'Éducation et de Formation (French police academy); Ditchley Foundation, England; National Defense University, Fort McNair, Washington, D.C., etc.

I am a fluent writer and reader of French, and have studied Standard Arabic to an intermediate standard.

A complete list of my publications can be found in my CV, which is attached as Exhibit A to this report, along with a complete list of documents (or translations thereof) considered in the preparation of this report attached as Exhibit B. During the previous four years I have not testified as an expert at trial or by deposition, although I have previously provided an expert report in this matter on behalf of Muslim World League, the International Islamic Relief Organization and Drs. Naseef, Al-Obaid, Al-Turki and Basha. I am being compensated for my time in this matter at a rate of $400 an hour.

---

[2] The Montreux Initiative failed to achieve all its goals, owing mainly to political turbulence, but it made an appreciable indirect impact. The focus on "capacity building" was no longer necessary in 2010, since numerous "support NGOs" had by then become committed to this type of work. The recommendations with regard to compliance and governmental policies remain highly relevant. *See* Jonathan Benthall, "The Islamic Charities Project (Formerly Montreux Initiative)", in *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester University Press, 2016).

# IV.   METHODOLOGY

The research methodology that I have adopted has been as comprehensive as possible, enhanced by adherence to the principles of ethnography, which is a method of inquiry that I have learnt through exposure to the discipline of social anthropology. I make a distinction as far as possible between sources of factual information and how the information gained is presented and interpreted.

When I published *Disasters, Research and the Media* in 1993, there was as yet little academic research on international aid agencies of any kind. When I co-authored *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003, there was little published on Islamic charities. Indeed, there was little published on Faith Based Organizations of all confessions. Though research on all these topics is now expanding rapidly, there is still little academic research on charities based in the Gulf. Consequently, I have pursued my enquiries by drawing on diverse sources of information wherever I have been able to locate them.

The sources used may be roughly classified as follows. First, primary sources are to be sought wherever possible. These include: interviews with all relevant interlocutors such as charity workers and trustees, both remunerated and unpaid, both active and retired; government officials, both central and local, including representatives of regulatory authorities; representatives of religious institutions; recipients of charity and welfare support (this is an important source of information, though for various reasons it is the hardest to get access to); government publications and websites; personal observations, especially through "participant observation"; written material such as letters, reports, business records, in-house memoranda, photographs, websites, and promotional and fundraising material; and court documents.

Next, secondary sources include open-source academic articles and books, especially those that have been subjected to rigorous peer review; newspaper articles and websites (to be checked with special caution); interviews with other researchers, and with journalists and diplomats; intelligence reports when made available; other government reports; and statistical surveys, including mass public opinion surveys.

8

Presentation and interpretation of factual information are important aspects of social research. My methodology is influenced by three principles of ethnography, as a research method distinctive of social-cultural anthropology.

First, an emphasis on studying the behaviour of individuals and groups, and giving due consideration to the viewpoints of all interest groups and stakeholders. It should not be assumed that the most prestigious or the most vociferous parties to a controversy are the only ones who deserve a serious hearing.

A second principle is that of "decentring", that is to say unsettling prior assumptions. This has an analogy with the principle observed in Western law courts that judges and jury members are enjoined to put aside, as far as possible, all preconceptions. In the present context, I have ventured in my publications to "decentre" the assumption that charity and philanthropy are monopolies of the Christian and post-Christian West. This assumption has been extensively called into question recently by other scholars.[3] Whereas all major charitable traditions have important features in common, there are also significant differences. A body of social science research has developed over the last 25 years on Islamic charities, as part of the wider field of charities (both faith-based and secular) which should be taken into account by those who claim expertise in this field.

Third, researchers in the anthropological tradition are especially committed to examining their own biases and prejudices, with a view to adjusting for them as far as possible, just as they should make allowance for biases in the publications of others. Not only is everyone encumbered with prejudices as a result of their personal background – especially with regard to members of other ethnic groups and religions – but those who express professional opinions on matters of public concern tend to develop a personal investment in their opinions that can too easily harden into bias and prejudice.

---

[3] *E.g.* Amy Singer, 2008, *Charity in Islamic Societies* (Cambridge U.P.); Michael Barnett and Janice Stein (eds) 2012, *Sacred Aid: Faith and Humanitarianism* (Oxford U.P,); project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/.

This third principle is related to an additional principle, which should be common to all branches of inquiry in social science (not merely anthropology). This is the principle that all interpretations are essentially provisional and dependent on factual evidence, and that one should modify one's conclusions, in the event that new evidence arises to challenge them. Thus, my methodology takes care to weigh the relative opinions of the speakers with the balance of alternative evidence, and not to over-rely on one particular source. In addition, I also take care to constantly re-evaluate my conclusions, in light of new evidence.

Over my 25 years as an expert on Islamic NGOs, my work has been peer reviewed and widely disseminated. As far as I am aware, my broad conclusions on the subject of Islamic charities have never been challenged by other researchers in academic publications.

I also have expertise in fundamental principles of scholarship as applied to the social sciences, such as the requirement for assertions to be backed up by evidence, and the requirement to avoid logical fallacies, which include *petitio principii* and the presumption that the qualities of one person or entity are inherently qualities of another.

## V.   EXPERT AFFIRMATIVE OPINION

### 1.   The Role of Charitable Giving in Islam, and its History and Development

In broad terms, the tradition of Islamic charity has much in common with Judaism and Christianity, and hence with the secular Western traditions of charity, philanthropy and humanitarianism that developed historically from religious origins. The three Abrahamic religions all share the principle that wealth belongs to God, to whom human beings should be answerable as stewards of creation. The familiar English words that we use to describe aspects of altruism and voluntary giving are all loaded with cultural connotations: for instance, "charity" appears in many English translations of the Christian Gospels as a synonym for spiritual love,

10

and both "charity" and "humanitarian" have sharply defined meanings in Western law as well as everyday colloquial usages.[4]

Similarly, in the Islamic tradition there are culturally specific historical concepts. The most prominent form of voluntary charity in the history of Islam was the *waqf* or religious endowment (plural *awqāf*), roughly equivalent to the European charitable trust, and traceable back to the life of the Prophet Muhammad. It has been estimated that at the end of the eighteenth century between one-half and two-thirds of the lands of the huge Ottoman Empire were held in *waqf* structures,[5] and the institution spread over almost the whole of the Muslim world.[6] As a formal legal institution it is now much less prominent, but it survives as such in some countries such as Saudi Arabia and Oman, while as a concept grounded in the early history of Islam it has been adapted by some present-day Islamic NGOs as a vehicle for fund-raising.[7]

Even more deeply rooted in Islamic teaching, since they have a major place in the Qur'an, are the concepts of *zakat* and *sadaqa*. *Zakat* means obligatory almsgiving, associated in the Qur'an with the themes of purity and productivity and especially with prayer. It has been described as "financial worship". In the eyes of devout Muslims, prayer is rendered invalid if the *zakat* obligation is ignored. The Qur'an specifies eight categories of authorized beneficiaries, beginning with "the poor". These are (to borrow the most usual descriptions): the poor; the destitute; those employed to administer the *zakat*; those who might be converted to Islam, or assist in the cause; slaves; debtors; those committed to the "way of God"; and travellers in need.

---

[4] For a brief discussion of these words see Jonathan Benthall, 2019, "A note on humanitarian terminology". Allegra lab online: project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/

[5] Amy Singer, 2008, *Charity in Islamic Societies* (Cambridge U.P.), p.186.

[6] Jonathan Benthall and Jérôme Bellion-Jourdan, 2003, *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B. Tauris), pp.29–34; Monzer Kahf, 2014, "Waqf", in *The Oxford Encyclopedia of Islam and Politics,* ed. Emad El-Din Shahin (Oxford U.P.), pp.536–539.

[7] Jonathan Benthall, 2007, "Islamic Charities, Faith Based Organizations and the International Aid System", in *Understanding Islamic Charities*, ed. Jon B. Alterman and Karin von Hippel (CSIS Press), reprinted as Chapter 1 in *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester U.P., 2016), p.29.

In principle, Muslims should give one fortieth of their assets each year (2.5%), after deduction for the value of their home and their means of livelihood (such as working tools). Zakat is conceived as the opposite of usurious interest or *riba*, which is seen as essentially corrupting. *Sadaqa*, closely associated with *zakat*, has connotations of moral rectitude, and denotes voluntary giving over and above one's obligation.[8]

Giving is specially encouraged, and earns special merit, during the holy month of Ramadan. Alms given discreetly are better than those that are publicized. According to a well-known *hadith* (statement or action attributed to the Prophet Muhammad), those most favoured by God in the after-life include "a person who practises charity so secretly that his left hand does not know what his right hand has given"[9] This principle is also present in traditional Christian and Jewish teaching,[10] but is specially strong in Islam.

Those whose wealth is below a fixed threshold are exempt from almsgiving. Wealthy people are under a special obligation to be generous. The eleventh century Islamic scholar and religious judge, Al-Mawardi, taught that every Muslim can seek a solid morality, according to the different conditions of life, those of the poor, middle and rich: the rich must give to be purified of their possession, which otherwise enslave them.[11] This view would command wide assent today among Muslims, especially those of a socially conservative tendency.

---

[8] Jonathan Benthall, 2003, "Financial Worship", in Jonathan Benthall and Jérôme Bellion-Jourdan, *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B.Tauris), pp.7–28; Amy Singer, *Charity in Islamic Societies* (Cambridge U.P.), pp.38–57, 67–68.

[9] Sahih Al-Bukhari, vol. 2 book 24 no. 504 "Obligatory Charity Tax (Zakat)" https://sunnah.com/bukhari/24

[10] Cf. Matthew 6.3; and Maimonides, the twelfth-century Jewish philosopher, who outlined eight levels of charity, each higher than the next. The highest was helping a fellow Jew to be independent of charity. The second highest was giving without knowing who the recipient is, and without the recipient knowing who the donor is. "Charity (Tzedakah): Eight Levels of Charitable Giving" Jewish Virtual Library. https://www.jewishvirtuallibrary.org/eight-levels-of-charitable-giving

[11] Summarized by Jonathan Benthall (following Mohammed Arkoun), 2003, "Financial Worship", in Jonathan Benthall and Jérôme Bellion-Jourdan, *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B.Tauris), p.15–16.

There is no Muslim society in which the practice of *zakat* and *sadaqa* functions entirely smoothly, as enjoined in the Qur'an, to guarantee social harmony. A wide range of actual arrangements is found in different Muslim-majority countries. In Sudan and Pakistan *zakat* has become *de facto* part of the taxation system; in Morocco and Oman the *zakat* obligation is left for individuals to fulfil informally by giving to people in need identified through personal networks. In Jordan, the state controls *zakat* committees while also allowing them a measure of decentralized autonomy.[12] Traditionally, *zakat* was most widely seen as a vehicle for distribution only to Muslims and only to neighbours. There has been a trend towards relaxing these restrictions that is associated with the growth of modern Islamic NGOs, though the older view is still commonly held.[13]

All schools and movements in Sunni Islam[14] agree on the importance of *sadaqa and zakat*, the third of the five "pillars of Islam", although at times in Islamic history *zakat* became a mere vehicle for extracting taxes. It is reasonable to speak of "Islamic charity", since there is so much in common with the Christian tradition, and the more neutral, non-cultural-specific term "good works" is not widely used. Islamic scholars have devoted much attention to the rules governing who is eligible to receive *zakat*, and how owners of different kinds of wealth (such as mineral rights) should calculate their *zakat* obligation. There is no exact equivalent in the Christian tradition. However, it is not so different from the institution of tithing which still survives in some Christian denominations such as the Mormons, and which like *zakat* had its historical roots in ancient Jewish tradition and probably in the Middle Eastern practice of donating the first fruits of agricultural crops to those in need.

---

[12] Jonathan Benthall, 2003, "Financial Worship", in Jonathan Benthall and Jérôme Bellion-Jourdan, *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B.Tauris), p.13.

[13] Jonathan Benthall, 2016, *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester U.P.), pp.14–16.

[14] Shia Muslims are required to pay, in addition to zakat, an additional tithe (*khums*) to a religious leader of their choice.

The traditional centre of Islamic charity was the *waqf* (see above). In the nineteenth century, much *waqf* property in Muslim-majority countries was nationalized, and today the responsibilities of Ministries of Awqaf are often limited to the administration of mosques and Islamic schools.

Islamic charities working at an international level began to be founded in the 1970s.[15] They represent a confluence of two historical movements: the general rise and diversification of NGOs, and the Islamic resurgence.

A worldwide Islamic resurgence began in the 1970s, for which many explanations have been put forward. It may be seen as an intensification of a movement dating back much earlier: a growing awareness of Islamic values in response to Western and secular trends, and to the colonization of Muslim-majority countries. Islam came to be seen as an alternative way of life that challenged dominant social systems, offering an opportunity to regain esteem and dignity. This resurgence took many different forms.

One of the outcomes of the Islamic resurgence, relatively unpublicized in Western countries, was that Islamic charities of a modern kind were founded, including international humanitarian agencies. Though drawing on the Islamic traditions of charitable giving summarized above, they had much in common with Western agencies, especially Christian ones.

One type of Islamic charity may be categorized as "Islamist", that is to say, embodying an ideology that holds that all areas of life should be regulated by reference to Islam or at least one interpretation of it. Some Islamist charities in the Middle East were associated with opposition movements and found a role in providing effective welfare and relief services in national contexts, such as Egypt and the Palestinian Territories, where the state proved unable or unwilling to provide them. By contrast, in Saudi Arabia, a complex interplay of ideological and

---

[15] The Aga Khan Foundation, set up in 1967 under Swiss law, has been strongly supported by the Ismaili (Shia) community and is a sophisticated global aid agency.

political forces resulted in a uniquely intertwined relationship between the Islamic establishment and the government, reflected to some extent in other Gulf States.[16]

During the last two decades of the twentieth century, when the British Islamic charities were still relatively small, Islamic charities based in the Gulf, especially in Saudi Arabia and Kuwait, but also in Sudan, grew rapidly and were active in many conflict and disaster zones. Many Western charities had been launched or expanded during wars or shortly afterwards. The same was true of Islamic charities, which developed with particular vigour in the context of wars and civil unrest in the Middle East, the Horn of Africa, and Central Asia. They were particularly active during the Soviet–Afghan war of the 1980s and the civil war in former Yugoslavia during the 1990s.

Islamic charities in general have a "family resemblance" in that they tend to give special emphasis to helping orphans, widows and refugees, as well as to projects linked to the Islamic calendar, such as the holy month of Ramadan; and to use religious symbolism in their fundraising and campaigning. For instance, the Muwafaq Foundation used the image of the crescent,[17] like many other Islamic charities. Some Islamic charities, including the Muwafaq Foundation, have also sponsored mosques and religious education. On the other hand, they are also frequently active with programmes such as providing food supplies and medical facilities that are barely distinguishable from those administered by non-Muslim NGOs.

## 2.    Activities and character of the Muwafaq Foundation

The Muwafaq Foundation was one of the Islamic charities that grew during the last quarter of the twentieth century. It was first registered in Jersey in 1992 [18].

---

[16] Stéphane Lacroix, 2010, *Les islamistes saoudiens: Une insurrection manquée* (Presses Universitaires de France), pp.317–8; Mehran Kamrava, 2018, *Inside the Arab State* (Hurst), p.171.

[17] See the Activity Reports from Zenica, Bosnia, 1995–1996. KADI0077711 and KADI0077763.

[18] KADI0002964 – KADI0002969

**Former Yugoslavia**

In March 1995 Muwafaq's branch in Zagreb, Croatia, reported that it had support offices in Germany and Austria, and area offices in "Sudan, Pakistan, Russia, Kenya, Ethiopia, Somalia, Croatia (Zagreb, Split), Albania, Turkey and Bosnia & Herzegovina (Sarajevo, Zenica, Konjic, Mostar)".[19]  The report states: "MUWAFAQ FOUNDATION cherishes active links with other international organizations, particularly with UNHCR, and in cooperation with them MUWAFAQ has undertaken and successfully implemented several fruitful projects".[20] The same report indicates the diversity of the programmes on which it had embarked in 1995 in former Yugoslavia alone:

> "Humanitarian program" – distribution of clothing and food, including the slaughtering of sheep.
>
> "Program of social care" – for "children, women, elderly, sick and handicapped people, orphans and widows", including clinics, orphanages, circumcision for boys.
>
> "Educational program" including nine schools, provision of religious literature, computer training centres, scholarships for Bosnian students to study abroad – including 13 girls selected to study in Jordan.
>
> "Training program" including computer skills, sewing and knitting, carpentry and metalwork.
>
> "Training courses in foreign languages" including Arabic, English, German and Turkish, with award of certificates for successful students.
>
> "Local program of food production" including restoration of basic infrastructure, with the aim of promoting local self-sufficiency through ownership of animal farms, fish farms and agricultural farms.
>
> "Bosnian cultural program", sponsoring "Bosnian cultural activity" and "extension of support to Bosnian official programs in the field of education", also with the intention to "actively participate in the process

---

[19] KADI0002515 "Muwafaq Foundation Balkan Office: Results and Achievements", Zagreb, March 1995, p.2 (KADI0002513–2529).

[20] *Ibid*, p.1, KADI00002514.

of restoration and reconstruction of 1000 religious and cultural objects in
Bosnia and Herzegovina".

"Miscellaneous services" such as sports clubs, purchase of trucks for
purposes of relief aid.[21]

The Zagreb branch was in the process of completing a network of eleven sub-offices in former

Yugoslavia, with corresponding offices in Siegen (Germany), Vienna, and Tirana.[22]

The Bosnian war of 1992–1995 was extremely violent and destructive of lives and infrastructure.

The Bosnian Muslims were widely regarded, not only by their fellow-Muslims, as victims of

aggression, mass murder and "ethnic cleansing". On 22 June 2005, the United States Senate

passed "A resolution expressing the sense of the Senate: as follows: "That (1) the thousands of

innocent people murdered at Srebrenica in Bosnia and Herzegovina in July 1995, along with all

individuals who were victimized during the conflict and genocide in Bosnia and Herzegovina

from 1992 to 1995, should be remembered and honored; (2) the Serbian policies of aggression

and ethnic cleansing meet the terms defining genocide …."[23] A major factor that brought the war

to an end was the decision of the United States government to conduct air strikes with NATO

against the Serbs if they continued to threaten the Bosnian safe areas or refused to negotiate a

settlement. The massacre by Bosnian Serbs of over 7,000 Bosnian Muslims in Srebrenica in July

1995 was a turning point that helped persuade the Clinton administration to use diplomatic and

military means to end the war[24].

There can be no doubt about the scale of humanitarian needs in former Yugoslavia to which the

Muwafaq Foundation and many other aid agencies and charities set out to respond. Having

---

[21] Summarized from *Ibid*, pp.2–8, KADI0002515–2521.

[22] *Ibid*, pp. 10 and 12, KADI0002523 and 2525.

[23] 109th Congress (2005–2006), S.RES.134
https://www.congress.gov/bill/109th-congress/senate-resolution/134

[24] Ivo H.Daalder, 1998, "Decision to intervene" How the war in Bosnia ended", December 1st,
Brookings
https://www.brookings.edu/articles/decision-to-intervene-how-the-war-in-bosnia-ended/

visited many Islamic charities over the last 25 years and studied their records, I can affirm that the snapshot of its activities provided by the report of the Zagreb area office, March 1995, is typical of Islamic charities that were working in many regions of the world at that time.

Further evidence is available of projects planned and/or executed by the Foundation in war-torn former Yugoslavia:

> Project for "Maternal training care", Dobrinja-Sarajevo, for the benefit of 103 Bosnian war widows and their children, with 7 teachers of sewing, housekeeping, first aid etc. Funding of DM 92,900[25] for 6 months to be shared with Unicef and UNHCR. No date.[26]

> Project for "Language and computer training centre", Zagreb, Croatia, for the benefit of 140 Bosnian students, with 4 instructors – also, indirectly, the families of the students and employees. Improvement of the "psychological condition of Bosnian youth" is included as an objective. Financial sharing, 8 months: Muwafaq Foundation DM 26,456, UNHCR 42,600. Dated January 6, 1994.[27]

> Project for "Single parent children and orphan care", Dobrinja-Sarajevo, for the benefit of 264 children and 23 employees. Funding, 1 year: Muwafaq Foundation in cooperation with Unicef and UNHCR, DM 299,147. Dated February 15, 1994.[28]

> Project for "Medical care center", Bistrik–Sarajevo, for the benefit of the municipality. Funding, 1 year: DM 85,203 Muwafaq Foundation, Unicef to supply medicines and baby food. Dated March 1, 1994.[29]

---

[25] The conversion rate of the German mark to the US dollar was approximately $1 = DM 1.70. The "convertible mark" was established in 1995 in Bosnia–Herzegovina, pegged to the German mark at par until Germany adopted the Euro in 2002. https://www.investopedia.com/terms/b/bosnia-herzegovina-convertible-mark-bam.asp

[26] KADI0077858–77865.

[27] KADI0077877–77887.

[28] KADI0077900–77905.

[29] KADI0077906–77907.

Project for five schools, Sarajevo. Sarajevo, for the benefit of 3,500 pupils and 200 teachers, and indirectly their families. Budget: DM443,250. Dated 20 February, 1994.[30]

Project for training young refugees in the Zenica refugee camp, Bosnia-Herzegovina, to learn sewing and tailoring. 6 months, DM 37,700 to be funded by the Muwafaq Foundation (includes DM 15,000 for sewing machines). This proposal by a fashion designer seems to have been accepted by the Foundation, as some of the pages bear its seal. Dated 29 April, 1994.[31]

Project for "Women skills training centre" in Zenica. Sewing and tailoring, English language. Beneficiaries: 20 Bosnian women, and staff. Funding 6 months, UNHCR DM 29, 845; Muwafaq Foundation DM 23,952. Dated May 1, 1994.[32]

Project for poultry production  eggs and chickens. 1 year, DM 260,148. Dated 25 April 1994.[33]

The needs assessment for the poultry production project reads as follows (English spelling has been corrected):

Sarajevo, the Capital of Bosnia and Hercegovina counts around 250,000 inhabitants. During 2 years of the war, Sarajevo has sustained everyday shelling by Serbian aggressor and it has been surrounded from all sides therefore the only access to this city has been done from the air. Humanitarian support in food and cloth has been supplied also by airplanes but it has not been enough to settle the needs of people from Sarajevo. Therefore the present situation in Sarajevo is very difficult. First of all people are hungry and exhausted.

Nearly all the houses and flats have been destroyed. Industry is hardly damaged, too. People spent all food supplies they had. They lost their weight approximately 25 kilogrammes per a person. Except they are hungry, their clothing is very bad, too. They do not have enough money,

---

[30] KADI0077919.

[31] KADI007920–7926.

[32] KADI0077396–0077943.

[33] KADI0077920–77926.

> or they do not have at all the money to buy come necessary food and
> clothing.
>
> … The best solution is to enable Sarajevo to produce food itself.[34]

The programmes outlined above exhibit a practical approach to meeting basic needs experienced
by a traumatized and impoverished population.

An Activity Report submitted by the Zenica sub-office of the Muwafaq Foundation for January
1995 to June 1996 gives evidence of projects realized in central Bosnia under the following
headings:

1. "Social care programs (provision and distribution of humanitarian aid)
2. Educational programs
3. Program of scholarships for university students
4. Food production
5. Press and publication project
6. Program for organizing the iftars during the month of Ramadan."

The largest of these projects in terms of quantity was for the distribution of 248.5 tons of
humanitarian aid (mainly food and clothes), estimated cost DM 1,585,032, approximately
US$932,000 (at the conversion rate given in fn.25) .[35]

The Annual Report of the same Zenica sub-office for the year 1995 gives some further detail,
with an overlap of the dates covered.[36]

---

[34] KADI0077928.

[35] "Muwafaq Foundation, Activity Report for period between January 1995 – June 1996." Signed
by Head of office Enes Ibrahimagi, KADI0077711–77714.

[36] "Muwafaq Foundation, Annual Report about activities of Muwafaq Foundation Sub-Office
Zenica during year 1995." KADI0077763–77766. Both these reports of the Zenica sub-office
refer to the distribution of food and clothes to "families of shaheedes" and "invalids of war".
Though the Arabic word *shahīd* is often translated as "martyr" and can in other contexts refer to
terrorists, in the present context there is no reason to assume that the phrase means anything
other than the families of Bosnian Muslims who had been killed in the civil war in former
Yugoslavia. At the time of this activity report, a coalition led by the United States was working
together to defend the Bosnian Muslims.

**Albania**

An agreement dated February 2nd, 1994 between the Muwafaq Foundation and the Albanian Islamic Society provides for the Foundation to build at its own cost five Islamic centres and ten small mosques, and to bear costs of staffing, equipment, and printing of books and pamphlets.[37] A letter from the "Albanët cultur&sport club", Tirana, a youth club, dated January 7, 1997, expresses warm gratitude to Mr Kadi. as Chairman of the Muwafaq Foundation, for its support, and requests further funding of US$79,860 for one year's continued activities beginning on September 1st, 1997, with an itemized budget.[38]

**Pakistan**

A snapshot is provided by the accounts of the Muwafaq Foundation, Pakistan, for the year ended December 31, 1992.[39] This was the Foundation's regional office, which had commenced its activities in July 1991. It declared that its source of income was mainly "donation which is [*sic*] collected from philanthropists mainly from Saudi Arabia and also from various other countries and the Middle East".

Expressed in US dollars, declared expenditure for 1992 may be analysed as follows in descending order of size:

|  | US$ |
|---|---|
| Flood relief project | 84,474 |
| (A state of emergency was declared following torrential rains in September 1992)[40] | |

---

[37] KADI0039850–39852.

[38] KADI0093761–93777.

[39] KADI0002979–2985.

[40] UN Department of Humanitarian Affairs, situation report "Pakistan Floods Sept 1992" posted September 15, 1992. https://reliefweb.int/report/pakistan/pakistan-floods-sep-1992-un-dha-situation-reports-1-8

| | |
|---|---|
| Aftar Saaim Project | 42,968 |
| (Ritual breaking of the fast during the month of Ramadan) | |
| Regional office | 41,998 |
| Financial assistance to Department of Research and Study | |
| (presumably one of Pakistan's many research centres) | 35,408 |
| High Institute of Islamic Training | 17,539 |
| | |
| Other expenditures less exchange gain | 37,797 |
| | ------- |
| | |
| TOTAL | US$260,184 |

A sum of US$361,187 from donations remained unspent at the end of the year. This is particularly understandable in that the Foundation had only recently begun its work in Pakistan.

From this document the regional office of the Muwafaq Foundation appears to me to be typical of Islamic charities operating during the 1990s – in this case, with a focus on assisting the victims of floods rather than (as in the case of former Yugoslavia) of war and civil strife.

Audited accounts for the calendar year 1994[41] with 1993 comparatives, show expansion and diversification of the activities of the Muwafaq Foundation, Pakistan, on the same lines as 1992.

Similarly, the 1995 accounts show that the Pakistan office has set up an office and a project in Jalalabad, Afghanistan, for purposes of rehabilitation and relief aid (para. 1.2, p.7 of 17), including a Mother and Child clinic (para. 1.5, p.7 of 17) and a project for "rehabilitation of Afghan women" (para.9.1, p.14 of 17).[42] By 1996, there are six projects recorded in Afghanistan (para. 1.5, p.6 of 12).[43]

---

[41] KADI0003676–3693.

[42] "Muwafaq Foundation – Pakistan: Accounts for the Year Ended 31 December 1995". KADI0007358–7374.

[43] Muwafaq Foundation – Pakistan: Accounts for the Year Ended 31 December 1996". KADI0007375–7386.

22

Another document, dated August 28, 1996, testifies to the effective cooperation built up by Muwafaq Foundation, Pakistan, with the Peshawar sub-office of the UN High Commissioner for Refugees (UNHCR), with respect to health and education services provided for Afghan refugees.[44]

**Sudan**

The Muwafaq Foundation's serious engagement with governments is evidenced by the agreement, signed and sealed on April 24, 1993, between its Khartoum office and the Commissioner General for Voluntary Agencies, Ministry of Interior, Government of Sudan. This sets out the ways in which the Foundation, as an International NGO (INGO) is expected to work in partnership with the Sudanese government at all levels and with other voluntary agencies, in order to achieve the goal of "the building and strengthening of local and national capacity".[45]

Testimony to cooperation with international organizations is a contract for services between the Muwafaq Foundation's office in Khartoum, Sudan, and the World Health Organization (WHO), Regional Branch for the Eastern Mediterranean, Alexandria, signed by the parties on October 27,1993 and November 11, 1993.[46] In it Muwafaq agrees that it will provide services over six months to reduce the risks of Sexually Transmitted Diseases including AIDS infections among "youth in displaced camps". This was to be achieved by means of a KABP (Knowledge, Attitudes, Beliefs and Practices) survey; training of 100 peer leaders; education on HIV prevention for displaced youth; IEC (Information, Education and Communication) materials; and the distribution of condoms to "high risk groups". (Though this agreement is expressed as a commercial contract, the total consideration provided for is only US$5,500, in exchange for a substantial commitment of work and materials, so that it may be assumed that the Foundation must have decided to fund a large part of this budget from its own charitable resources.)

---

[44] KADI0228015 Letter from Ghassem Pardanash to Mr Muszuin dated 28 August 1996.

[45] KADI0086484–0086499.

[46] KADI0089033–89034.

A letter dated November 15, 1994,[47] from the Resident Coordinator of the United Nations System's Operational Activities for Development, Khartoum, invites Dr Sulaf Eldin Mohamed Salih, of the Moafaq [*sic*] Charity Foundation, Khartoum, to take part in the preparations for a Country Strategy Note for Sudan in the sub-group concerned with employment creation.

The World Food Program (WFP)'s Deputy Country Director, Khartoum, entered into a Letter of Understanding with the Director of Muwafag [*sic*]/ Khartoum[48] on June 19/20, 1996, providing for "Food relief assistance to malnourished children in Mayo Farms and Jebel Awlia displaced camps in Khartoum State".[49] The agreement was approved by the Khartoum State Relief Committee. WFP's responsibility was to provide 11.66 metric tons of food commodities (sorghum, pulses and vegetable oil) to meet the needs of malnourished children for three months, with specified rations. The Muwafaq Foundation would distribute the premix and monitor the operation following WFP standards (set out in an Annex), and would bear the management, transportation and handling costs.

Again in Sudan, a Basic Agreement was signed between the United Nations Children's Fund (Unicef) and Muwafaq Foundation on August 8 1996 and October 24, 1996.[50]

**Summary**

In short, the Muwafaq Foundation cooperated at various points with some of the leading United Nations agencies: UNHCR, WHO, WFP. and Unicef.

---

[47] KADI0086484–86499.

[48] The Arabic letter *qaf* is often transliterated in English in some parts of the Arab world as "g" rather than "q", in line with local pronunciation.

[49] KADI0089356–0089359.

[50] KADI0087219–0087221

24

3. __The importance of understanding cultural and historical norms in assessing__
   __transactions engaged in by charities and individuals associated with them__

I consider that in recent years, disproportionate attention has been given to Islamic charities as alleged threats to security. In particular, the United States' processes of blacklisting certain charities and promoters of charity as "specially designated terrorists" has been criticized as draconian.[51] One account of the immediate reaction in US government circles after the attacks of September 11, 2001 suggests that the decision to embark on freezing assets – as early as September 24 – was taken with undue haste. The chief counsel to the Treasury Department is quoted as having said to a journalist "It was almost comical. … We just listed out as many of the usual suspects as we could and said, Let's go freeze some of their assets".[52]

There is no doubt that, owing to a refusal to recognize the special responsibilities of charities, lax management, or criminal intent – or a combination of these reasons – a few Islamic charities, as well as other charities, were made use of as conduits to fund or support paramilitary activities before 2001. This may be partially attributable to the fact that during the Soviet–Afghan war of the 1980s, a strong precedent was set by the United States government in mixing humanitarian, diplomatic and military aid to the *mujahideen* in Afghanistan – even to the extent of setting up ostensibly charitable entities which were in fact state-funded vehicles for anti-Soviet propaganda. A number of US non-profit organizations with tax-exempt status (501(c)(3) organizations), such as American Friends of Afghanistan, were formed to channel US government funds through USAID and the National Endowment for Democracy (NED),[53] to engage in such activities as

---

[51] See for instance ~American Civil Liberties Union", 2009, *Blocking Faith, Freezing Charity: Muslim Charitable Giving in the "War on Terrorism Financing*", New York: ACLU.

[52] Ron Suskind, *The Price of Loyalty: George W. Bush, the White House, and the Education of Paul O'Neill*, p.193, 2004. New York: Simon and Schuster.

[53] National Endowment for Democracy, Annual Report, 1989, p.15. https://www.ned.org/wp-content/uploads/annualreports/1989-ned-annual-report.pdf; National Endowment for Democracy, Annual Report, 1990, p.19. https://www.ned.org/wp- content/uploads/annualreports/1990-ned-annual-report.pdf

publishing a magazine, *Afghan Jehad*,[54] arranging for injured *mujahideen* to be flown to the United States for medical treatment, training journalists to comment favourably on the *mujahideen*, and publishing leaflets for religious scholars. It was reported by an independent commentator in 1990 that the activities of some seventy advocacy NGOs worldwide had created an atmosphere of unconditional sympathy for the "freedom fighters", as they were then called by the US government, in which "anyone criticizing the rebels for their human rights violations or the alliance's lack of legitimacy is automatically seen as an apologist for the Soviet and Afghan armies".[55] Meanwhile the Soviets objected that the US administration was supporting international terrorism.[56] As noted above, the charity regulation regime in the US was relatively relaxed during the 1980s. I suggest that it encouraged certain Muslim and Arab activists to treat the structures of institutional charity in the same way,[57] whereas in the course of the 1990s

---

"Afghanistan Relief Committee," *Militarist Monitor*, updated December 31, 1990, https://militarist-monitor.org/afghanistan_relief_committee/ Accessed December 27, 2020.

See also United States District Court, District of Massachusetts, USA v. Muhamed Mubayyid and Emadeddin Z. Muntasser, Defendants' Motion to Dismiss and Incorporated Memorandum, October 5, 2006, https://groups.google.com/g/alt.lawyers/c/GtYFk96SEsk?pli=1   Accessed 27 December 2020;

and United States Court of Appeals, First Circuit, USA v. Mubayyid and Muntasser, and USA v. Al-Monla, decided September 1, 2011, https://casetext.com/case/us-v-mubayyid-5   Accessed 27 December 2020.

[54] *Afghan Jehad*, vol. 1 no. 4, 1988. Accessed at http://catalog.acku.edu.af/cgi-bin/koha/opac-detail.pl?biblionumber=15422&query_desc=kw%2Cwrdl%3A%20%22Afghan%20Jehad%22

[55] Helga Baitenmann, 1990. "NGOs, and the Afghan war: The politicisation of humanitarian aid." *Third World Quarterly* 12:1, 62–85, p.78.

[56] Antonio Donini, 2004. "Principles, politics, and pragmatism in the international response to the Afghan crisis" (in *Nation-Building Unraveled? Aid, Peace and Justice in Afghanistan*, ed. A. Donini et al., Bloomfield: Kumarian Press, 117–142, p.121. See Benthall, "Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011), pp.116–117.

[57] Benthall, "Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011), p.117. See also Erica Caple James, 2019, "Policing Philanthropy and Criminalizing Charity in the 'War on Terror'" in *Governing Gifts: Faith, Charity, and the Security State,* ed. Erica Caple James (School for Advanced Research Press), 141–160, p.153.

United States foreign policy changed towards anathematizing the former Afghan "freedom fighters" as terrorists.

Working in 1980s Afghanistan is not evidence of support for terrorism. Numerous NGOs were present and active in the region during that time – both Western and Islamic – due to the widespread humanitarian crisis. The war came to an end at the end of that decade, and Saudi aid to Afghan *mujahideen* came to an end shortly after the fall of President Mohammad Najibullah in 1992. In his report Mr Comras appears to rely principally on US Treasury Department accusations for his assertion that Mr Kadi and the Muwafaq Foundation had a connection with the leaders of Al-Qa'ida and/or shared its ideology, goals or tactics[58]. However, neither unexplained transactions, nor accounting records that fall short of current Western standards, should be assumed to indicate systemic wrongdoing, or an intent to divert funds to terrorist organizations such as Al-Qa'ida.

It appears from the documents analysed above that the Muwafaq Foundation operated in numerous countries, and carried out a wide variety of humanitarian services: emergency relief aid in conflict zones, flood relief, health and medicine, training and education, etc. Electronic banking was not fully developed at this time, and emails and cellphones were only beginning to be used. Communications were particularly challenging in war zones. I am aware of no solidly grounded evidence of improper diversion of funds; but even if such evidence were forthcoming, I would submit that any organization working with as many offices, and in as many different countries, as the Muwafaq Foundation did in the early and mid-1990s would have had difficulty in maintaining full control of its finances and operations. I base this opinion on my experience of the practical management challenges faced by diversified international NGOs.

Furthermore, Mr Kadi appears to have been intent on keeping Muwafaq separate from political activities. A letter signed by him as Chairman of the Board of Directors, Muwafaq Foundation, dated May 5, 1994, is addressed to Dr Salaf Al-Din Al-Saleh, General Director of the Muwafaq Foundation, Sudan, and copied to the Executive Director. This letter directs that all

---

[58] Comras Report *e.g.* p.19, fn.62; p.29 fn.108; p.31 fn.121; p.41 fn.173, 175; pp.47, 48 fn.202–206.

administrators, employees and workers of the Foundation shall come from all categories of the people of the country, and that this charitable work is "for all the needy of any group regardless of their affiliation". The letter continues:

> First: Commitment to complete neutrality based on scientific principles represented in the employee's competence, work abilities and trustworthiness. These specifications are the ones that would make an employee eligible for any job in the Foundation, and there is no doubt that they are available in the community as a whole and are not limited to a specific group of it. Thus, we would like to ensure that that there is no focus on a particular group and that workers are diversified to represent society as a whole.
>
> Second: Ensure that the Foundation's work is free of any political activities. Moreover, ensure that the provision of aid is limited to civilians only, who are the poor, the destitute and those in need. While not interfering in existing conflicts or that may arise in the future between groups of the community, this is not an area of the Foundation's activities.
>
> We ask you to continuously review to ensure that the Foundation follows this approach, which it has adhered to since its inception.[59]

We may note that the content of this letter applies the principle of non-discrimination both to the selection of employees and to the selection of beneficiaries, with a specific exclusion of aid to combatants.

## 4.   Characteristics of historical charity regulation and personal relationships in the Arab world prior to 9/11

Gulf charities have been criticized for a lack of transparency. It is necessary to take account of a cultural difference between the "charity culture" of the Gulf and that of countries such as the USA and the UK, where the publication of detailed auditors' reports is now compulsory for organizations that wish to take advantage of the prestige of charitable status and of the tax concessions granted by governments.

---

[59] KADI0089084, English translation with Arabic original.

One reason is the emphasis traditionally placed on modesty and anonymity in giving *zakat* and *sadaqa* (see above). But the Gulf States have been marked by a more general culture of privacy and discretion. When questioned by myself in 1995 about the lack of detailed annual accounts published by IIRO, the Secretary General, Dr Farid Qurashi, replied that in Saudi Arabia the duty of accountability was held to be only to the donors of charity – not to the public at large.[60] In the 1990s, Saudi-based charities only published very general statements about the sources and disbursement of funds. This is at odds with current practice in the USA and Western Europe, but looking back only a decade or two earlier than the 1990s in Britain, at least, some charities had been managed very informally – with little documentation apart from stubs in a chequebook.

The standards of charity regulation that we now take for granted in Western Europe and the USA are in fact of fairly recent historical origin. In Britain, Charity Commissioners were appointed by the government in 1853, but it was only in 1960[61] that charities were required to keep proper books of account and keep these records for at least seven years. No auditing or independent review was then required. Not until 1993 did a new Charities Act require registered British charities to lodge financial accounts with the Charity Commission and to submit to independent examination.[62] Whereas Islamic charities in the United Kingdom have complied with these requirements, it is understandable that in the 1990s the charities based in the Gulf and other Muslim-majority countries were managed in a more informal way.

Even today, and more so during the 1990s, Gulf-based charities have been less professionalized than their non-Muslim counterparts. It is widely recognized that as Western NGOs have become more professionalized and managed by bureaucracies, they are at risk of losing something of the spirit of altruism and volunteering that inspires charities at their best. The relative informality of Islamic charities' practices of financial reporting and monitoring in the 1990s was not

---

[60] Interview in London January 18, 1995. See IIRO *Newsletter,* 1.5, April 21, 1995, "London visit of IIRO delegates", p.6. Dr Qurashi (1949–2003) was Secretary General between 1985 and 1996.

[61] The Charities (Statement of Account) Regulations 1960 (SI 1960 No. 2425).

[62] Carolyn J. Cordery and Rachel F. Baskerville, 2007, "Charity financial reporting regulation: a comparative study of the UK and New Zealand", *Accounting History*, 12: 1, 7–27, pp.12–14.

necessarily correlated with any lack of authentic commitment to helping poor and disadvantaged people. Indeed, impartial observers have given special appreciation to the sincerity shown by fieldworkers employed by Islamic charities, and their strong solidarity with affected communities.[63] This attitude is consistent with the Qur'anic teaching that poor people have a right to *zakat* and should always be treated with respect.

In the context of international aid organizations, it must be remembered that the sophistication of the international banking system is not well adapted to conflict zones. This system historically depended on the establishing of relationships of trust between institutions and individuals in different countries and jurisdictions – relationships which are disrupted by military conflict.

Moreover, in the 1990s, the technologies of the Internet and cell phones were in their infancy. A dominant feature of Mr Kadi's commitments, both commercial and humanitarian, was his reliance on friends and relatives whom he trusted. Whereas the phenomenon of "clientelism" has been observed by social scientists in many other regions – from the Mediterranean to Latin America[64] – it is particularly marked in the Gulf Arab states. "Clientelism refers to relationships of patronage between people in the higher rungs of the socioeconomic ladder who use their status to facilitate access to goods and services by those below them."[65] "Although patron-client relationships are by definition invested with a certain quotient of affectivity, clientelism differs from mere instrumental friendship in the conditional character of the personal loyalties involved. This is largely a reflection of the discrepancies in status, power, and influence which serve both to segregate and to unite patrons and clients. The asymmetry inherent in the relationship is neatly expressed in Eric Wolf's phrase, "lopsided friendship."[66]

---

[63] Daniel Maxwell and Nisar Majid, 2016, *Famine in Somalia: Competing narratives, collective failures* (Oxford U.P.), p.196.

[64] Otherwise referred to as "patronage" or "patron–client relations". See William W. Stein, "Patronage", in David Levinson and Melvin Ember, Eds, *Encyclopedia of Cultural Anthropology* (New York: Henry Holt and Company), vol. 3, pp.905–907.

[65] Mehran Kamrava, 2018, *Inside the Arab State* (London: Hurst), p.157.

[66] Rene Lemarchand and Keith Legg, 1972, "Political clientism and development: a preliminary analysis", *Comparative Politics*, 4: 2 (January 1972), 149–178, p.152.

30

Steffen Hertog writes as follows of patron–client relationships within Saudi elites – including the royal family, bureaucrats and businessmen: "All these relationships tend to be quite long-term; perceptions of obligation and honor are strong. Kinship often plays a role in constructing these relationships, but not a determinant one."[67]

Analysis of Mr Kadi's business and charitable relationships suggests that he occupied an intermediate position in the Saudi hierarchy.  He has stated that he was invited several times to King Abdullah's palace, and met other members of the royal family.[68] He was helped in his business career by Khalid bin Mahfouz, who was a controlling shareholder in the National Commercial Bank,[69] and had (according to Mr Kadi) "a very, very strong relation with the king at that time".[70] Khalid bin Mahfouz contributed the initial donation to launch the Muwafaq Foundation, and his son, Abdulrahman bin Mahfouz was an original member of the Foundation's Council.[71]

Also of higher status than Mr Kadi, as well as having seniority in his family, was his uncle Dr Muhammad Omar Zubair, president of Abdulaziz University, Jeddah, which was founded in 1967 as a private university, became a public university in 1974, and towards the end of the twentieth century was gradually developing so that today it is recognized as the premier

---

[67] Steffen Hertog, 2010, *Princes, Brokers, and Bureaucrats: Oil and the State in Saudi Arabia* (Ithaca: Cornell University Press), p.22.

[68] Kadi Deposition, p.40, p.34.

[69] Comras Report, p.15.

[70] Kadi Deposition, p.117.

[71] KADI0002964

university in the Arab world.[72] Dr Zubair is remembered today as a pioneer in the revival of Islamic economics.[73]

Mr Kadi's relationship to Wael Julaidan, originally based on friendship between their respective families, was one of patron to client. Julaidan was well known as an effective organizer, and evidently Mr Kadi trusted him and rewarded him from time to time with gifts and loans.[74]

## 5. Why Islamic charities provide aid to Muslim communities in countries plagued by poverty, lack of education, wars and disasters

Like many other Islamic charities, the Muwafaq Foundation concentrated its efforts on bringing relief and development aid to Muslim communities. International Islamic charities have typically justified this concentration of effort by drawing attention to the high levels of deprivation and political unrest in large swathes of the Muslim world.[75]

As the Danish scholar Marie Juul Petersen has written of what she identifies as the "Islamic aid culture":

> the Islamic aid culture turned on notions of brotherhood and Islamic solidarity, binding Muslims together in a global community, the *umma*. In this perspective, all Muslims are part of the same religious brotherhood, and as such, closely connected, mutually interdependent, and obliged to help one another. One of the first disasters to attract the attention of Muslim aid

---

[72] https://www.timeshighereducation.com/student/best-universities/best-universities-arab-world

[73] Munawar Iqbal, 2017, "Development of Islamic economics and finance and the role of international conferences", *Journal of King Abdulaziz University: Islamic Economics,* King Abdulaziz University, Islamic Economics Institute, vol. 30(SI), pages 3-14, April. https://ideas.repec.org/a/abd/kauiea/v30y2017i4no1p3-14.html

[74] Kadi Deposition, p.31, p.33.

[75] Bruno De Cordier, "The 'humanitarian frontline', development and relief, and religion: What context, which threats and which opportunities?", *Third World Quarterly* 30: 4, 2009, 663–84, p.670.

organizations was the famine in the Horn of Africa in the beginning of the 1980s. For many people, Islamic solidarity was a major reason for engaging in this disaster – a wish to translate the theoretical and much talked-about Islamic solidarity into a practical Islamic aid, by demonstrating compassion with the starving Muslims … In concrete terms, this meant that Muslim charities would focus their aid on Muslim countries and populations, rarely aiming to bring help to non-Muslims.

Second, the aid provided was based on a conception of suffering as simultaneously material and spiritual: poverty was not only about hunger, diseases, and lack of education; it was also about religious ignorance and humiliation. This meant that aid was not only about building wells, distributing medicine, or teaching children to read and write: it was also about preaching, teaching children to memorize the Qur'an, and building mosques. As such, mission, or *da'wa*, was also an integrated part of aid provision in Muslim charities. This aspect of aid provision was further strengthened by the perception among many Muslim charities at the time that Western aid organizations worked either covertly or overtly as missionaries, attempting to attract converts to Christianity or secularism through their provision of aid (which some of them undoubtedly did).[76]

A first point to make is that there is no legislation in most Western jurisdictions – including the United States and the United Kingdom – that prohibits the founders of charities from providing benefits only for co-religionists. There are many Christian and Jewish charities that restrict their beneficiaries to Christian and Jewish people respectively.

It is clear from the evidence that the Muwafaq Foundation had an Islamic character. For instance, it contributed resources to the traditional breaking of the Ramadan fast in Pakistan, and to a programme sponsoring circumcision for boys in Bosnia (a traditional adolescent "rite of passage" with religious content), and to religious education and sometimes the building of mosques.

In the Islamic NGO context, mixing the disbursement of material aid with programmes that have a religious character does not evidence nefarious intent. A distinguishing feature of Islamic charities, in common with many Christian charities, is that programmes of economic development and relief aid should allow for a spiritual or moral as well as a material dimension,

---

[76] Lacey and Benthall, Eds, *Gulf Charities and Arab Philanthropy…*, p. 29.

conceiving their recipients as whole persons rather than merely statistical units. This is true even of charities such as the British-based Islamic Relief Worldwide, which have opted out of explicitly religious activities. The distribution of food to poor families in the *iftar* meal breaking the Ramadan fast is both a way to help them materially and also the celebration of an important religious tradition.

There is some evidence that Islamic charities may cater more effectively than secular or Christian charities to the needs of Muslim beneficiaries (just as Christian charities may work with special effectiveness to assist Christian beneficiaries, *e.g.* in Latin America and in parts of Africa). While the advantages of this "cultural proximity" are by no means automatic, a strong body of opinion among aid workers accepts the importance of cultural sensitivity.[77] Similarly in Britain today, an Islamic charity (the National Zakat Foundation) supplies shelters to cater for the specific needs of single Muslim women in distress.[78]

Evidence that the Muwafaq Foundation was capable of contributing a "value added" to aid programmes because of its privileged access to Muslim and Arab recipients of aid – *i.e.* "cultural proximity" – is provided by the record of its cooperation with WHO in Sudan. In the case of WHO, it was called on specially to assist with the highly sensitive problem of mitigating the risk of Sexually Transmitted Diseases including AIDS among displaced young people (p.23 above).

I have seen no evidence, however, that the Muwafaq Foundation and its founder Mr Kadi had any objection to extending their charitable services to non-Muslims – specifically Christians in the religiously mixed communities of Sudan and former Yugoslavia. On the contrary, a testimonial in English dated April 7th, 1995 expresses gratitude to the Muwafaq Foundation "for the goods that you had done". This is signed and sealed by the Minister for Social Affairs of the Croatian Republic of Herzeg-Bosnia, an unrecognized proto-state that lasted between 1991 and

---

[77] For a summary of the debate about "cultural proximity", see Benthall, *Islamic Charities*…., 2016, pp.51–52, 55–56.

[78] Benthall, *Islamic Charities*…., 2016, p.15.

1996. The testimonial includes a text from the New Testament: "He scattered abroad and gave to the poor, his justice endures for ever" (2 Corinthians 9.9).[79]

Further evidence is a document dated October 23, 1998 by the Sudanese Red Crescent Society, Malakal, which states that the Muwafaq Foundation "is cooperative and provides its services without religious or racial discrimination".[80] This is significant because all Red Cross and Red Crescent National Societies, as members of the International Movement of the Red Cross and the Red Crescent, are committed to the principle of non-discrimination on religious grounds.

Mr Kadi's statement to OFAC, dated December 19th, 2002, includes the following:

> (133) Personally, I am strongly committed to promoting education in society in general and among women in particular, to enable women to exercise leadership roles in the family and society. Accordingly in 1996 I founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia. This ultimately led to the founding of a pioneering women's college in Jeddah named Dar Al Hekma College in 1999. Dar Al Hekma College is now one of the first private colleges for women in the Kingdom, offering university level degrees. It is also unique as it educates women in an English language setting.

> (134) As well as leading the planning committee of the college, I am chairman of its academic committee. I decided to base the curriculum on the American higher education model. Thus, under my initiative and direction the college sought professional assistance and expertise from the United States. This led us to identifying and later contracting with the Texas International Education Consortium ("TIEC"), which is based in Austin, Texas. TIEC is a consortium of 32 public universities in the State of Texas formed for the purpose of developing, co-ordinating and implementing international education projects and academic programs.

> (135) The collaboration between TIEC and the college has been most successful in preparing the complete academic program and administrative and organisational structure for the college. At the completion of the TIEC project, I recruited several American administrators and faculty members and have supported their

---

[79] KADI00092190.

[80] KADI00092196.

involvement ever since the establishment of the college. The college now employs internationally qualified faculty members representing ten different nationalities, including American and many others who are American trained, including the Saudi Dean and Vice Deans who have earned their doctorates in the United States.

(136) The college was inaugurated by HRH Crown Prince Abdullah of Saudi Arabia in September 1999 after 4 years of planning. The college has won support from the Saudi Royal family, business people, local and foreign dignitaries, all of whom have commended its work. The college has been visited by Ambassadors and their wives including the US Ambassador to Saudi Arabia and by his wife and the wife of the UK Ambassador. I also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn [sic] Carter, during their visit to Saudi Arabia in the year 2000. They were very pleased with their visit to the college. President Carter gave a speech expressing his pride to be given the opportunity to visit the college; he said the college reflected the advances made by Saudi society and stressed the importance of private education adding that education was a source of freedom. Rosalyn Carter remarked that she had been very impressed by the achievements of Saudi women and that she had met many women during her visit to the college who had asked her to speak of the positive impression she had gained.

(137) I have supported the college, not only ideologically by supporting the aims of the college, but also financially, by providing finance myself and raising funds for the college from others. Since 1996 I have personally contributed substantial sums to the college and have raised very substantial donations and scholarship funds from others. I am also a very active member of the Board of Trustees of the college and attend the college meetings and other functions one or more times per week throughout the year.

(138) Soon after the tragic events of September 11th, I called a meeting with the American staff and faculty to express personally my regrets, sympathy and support for them; to offer them help in contacting their families back in the USA; and to reassure them that they would be protected and secure while working at the college and living in Saudi Arabia. I also sought to assure them of the solidarity of myself and of my fellow Board members against the vile acts of September 11th.[81]

---

[81] Statement to OFAC, KADI0002265–2267.

The visit by Former President Jimmy Carter and his wife on February 3, 2000 was recorded in the next day's issue of *Arab News*.[82] Mr Kadi appears with them in the group photograph, identified as "secretary-general of the board of trustees", as does the US Ambassador Wyche Fowler.

A "Catalog" published by the College in 2001–2002 is also available[83]. Mr Kadi is listed as a Member of the Board of Trustees (p.6). Notably, the curriculum includes disciplines such as Accounting and Business Information Systems – clearly designed to enable alumnae of the College to embark on careers in the national economy and in public life, rather than be confined to domestic roles.

According to Mr Kadi, some years before the actual foundation of the women's college in Saudi Arabia, in around 1992 Chafiq Ayadi "assisted me to establish an advanced teachers' college in Zagreb for helping women refugees to become teachers".[84]

### 6.   The regrettable result of the overreaction against Islamic charities

The US justice system and the US Treasury have relied on a number of experts on counter-terrorism and terrorist financing with special reference to Muslim individuals and entities. Without questioning their motivations, it is reasonable to question their methodologies.

Police and intelligence agents – responsible for keeping our populations safe from terrorism – rightly make extensive use of the technique of building up and analysing webs of association between individuals and between organizations. They are not responsible for proving their assertions to a neutral fact finder, and they are excused for erring on the side of caution when identifying an individual or an entity as terrorist. But for those responsible for arriving at judicial

---

[82] KADI0158736. *Arab News*, XXV: 68, February 4, 2000.

[83] KADI0158750 – KADI0158829.

[84] Statement to OFAC, para. 70, KADI0002236.

or administrative decisions, and those giving them expert advice, there is a material risk that they attribute guilt by association, and indulge in *petitio principii*.

Serious social scientists insist on well-grounded evidence, on contextualization, on making allowance for cultural differences, and on trying to understand the viewpoints and intentions of all relevant parties rather than only selected individuals. Normal standards for assessing academic credibility do not always appear to be maintained in the process of accreditation of experts. These standards include peer review, both at the stage of acceptance of books and articles for publication, and at the stage of reception when books and articles are reviewed and commented on by other scholars. Counterterrorism experts – whether official or self-described – frequently lack experience of the realities of disaster relief and poverty alleviation projects, and of the management of non-profit institutions, whose international programmes in conflict zones are always exposed to enhanced risks. They frequently ignore the growing research literature on contemporary Islam and on Faith Based Organizations, of which Islamic charities are a subset. Within the specific field of study of terrorism and terrorist financing, they frequently exaggerate the strength of evidence for the arguments they are advancing and ignore or discount the countervailing evidence. The basic principle of fairness, which dictates that those accused of serious misconduct should have a right to be heard, is often ignored.[85]

## VI.    EXPERT REBUTTAL OPINION

### 1. Background and qualifications

Mr Comras appears to have expertise on issues relating to money laundering and terrorism financing. Nothing in his résumé, however, or in the Library of Congress interview cited therein, suggests that he has expertise on issues relating to philanthropy, relief, and development aid – especially in the context of the Middle East – which are essential aspects of the present case.

---

[85] Jonathan Benthall, "Experto crede: A legal and political conundrum" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017, pp.160–183.

### 2.  Methodology

Mr Comras mentions that he relies inter alia on "social science research". But there is no evidence in his report of grounding in any of the social sciences such as sociology, political science or cultural anthropology. More specifically, he evinces no expertise either with regard to the history and cultures of the Middle East, or with regard to the study of charitable and humanitarian endeavours at different times and places, especially those inspired by Islamic traditions.

In consequence, his methodology is skewed towards one particular interpretative lens, that of terrorism financing and the prevention of money-laundering. Though important, these approaches need to be balanced by the other considerations mentioned above.

His report also fails to recognize the specific practical difficulties experienced by nonprofit organizations in supplying charitable and humanitarian services in conflict zones, where the normal services of banks, wire transfers, safe-deposit facilities etc. are often lacking or limited. These difficulties were specially salient during a period before the use of mobile phones and the Internet.

Mr Comras's report may be particularly faulted on several counts:

1.  The fallacy of *petitio principii* or "begging the question": for example, to presume a sinister explanation of an act by X in the course of advancing arguments to demonstrate that very conclusion.

2.  The attribution of guilt by association without probative evidence.

3.  Lack of historical contextualization.

4.  Blanket statements with inadequate support.

5.  Misleading quotation.

6.  One-sided presentation of documentary evidence.

7.  Equivocal and vague language.

As evidence of the lack of scruple evinced in Mr Comras's report, indicating a defective methodology, examples are given hereunder. The examples are not intended to be exhaustive.

**Pp.6–8.** With regard to the relevance of "red flags" for the evaluation of charities, as described by Mr Comras, they take no account of the practical difficulties that faced charities working in conflict zones twenty to thirty years ago. Although Mr Comras concedes that red flags are "indicators that are meant to alert government regulators and financial institutions" (Comras Report, p.7), he proceeds to treat them as retrospectively probative of guilt.

The effect is to create an impression by smearing, rather than by presenting solidly grounded evidence of culpable behaviour.

**Pp.9 to 14.** The report does not mention that until 1992 support of the Afghan mujahideen through military, diplomatic and humanitarian means was given by many Western governments, including the United States. No culpability should be ascribed to any individual or entity solely on the grounds that they took part in this broadly based project to displace the Soviet army and Soviet influence from Afghanistan. This passage suffers from an unbalanced historical perspective. (See above pp.25 - 27).

**P.13.** The 9/11 Commission Report published in 2004 contains these words: "In addition, entire charities, such as the al Wafa organization, **may have** wittingly participated in funneling money to al Qaeda." (p.170, emphasis added)

Mr Comras quotes this sentence as follows (p.13): "In addition, entire charities ...wittingly participated in funneling money to al Qaeda".

Omission of the words "may have" through ellipsis turns the sentence into a statement of fact rather than, as intended, a speculation. This is a serious misquotation.

**P.14.** Mr Comras writes: "Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau."

No support is given for the allegation. Moreover, the word "associated" is equivocal. The extent of association could range from a single chance encounter to a close and enduring relationship, rendering the statement so vague as to be meaningless.

**P.14 n.38.** Mr Comras states, "Sources told the FBI that they saw Yasin Kadi more than once at bin Laden/al Qaeda guesthouses in Peshawar and at the Dawa Organization guesthouse in Khartoum. Kadi 2944".

The document he cites to support this assertion fails to do so. In fact, KADI0002944 (2944–45) is a portion of a statement by Mr Kadi in which, among other things, he describes all of his encounters with Osama bin Laden, the last of which was in 1993. Nowhere in the entire document[86] is there a mention of guesthouses.

**P.14 last sentence**. Mr Comras writes: "To avoid red flags, Kadi tried to mask many of these questionable dealings as business or humanitarian related transactions, using bearer checks, shell companies, and circuitous routings."

"To avoid red flags" is a *petitio principii*. The statement is also an empty exercise in mind-reading.

**P.16 para. 3**. Mr Comras writes: "Together, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda."

No evidence is provided to indicate that Mr Kadi had any interest in propagating a "radical Islamic theology" (see also reference to "radical Islamic ideology", **p. 53** last line but 1). Indeed, the fact that he was a major supporter of a university for women in Saudi Arabia (see above at pp. 35 - 37) indicates on the contrary that he held progressive views.

**P.22 para. 3**. Mr Comras writes: "The IIRO was established ostensibly to provide humanitarian assistance to refugees from the Afghan war. However, this 'humanitarian' facade became a cover

---

[86] KADI0002928–2958.

for the charities channeling covert military and financial assistance to various Arab-Afghan militant groups fighting both in Afghanistan and Bosnia, including al Qaeda."

"'Humanitarian' façade" is another *petitio principii*.

**P.25 Block text (2 paragraphs).**

Mr Comras's use of the interviews given by Jamal Al-Fadl is a one-sided presentation of material in the record. Mr Al-Fadl is the former Al-Qa'ida member who became an informant for the FBI. (See Comras Report, p. 24). On May 24, 2007, Mr Kadi's attorney in Switzerland, Maître Marc Bonnant, wrote a letter to the Office of the Federal Investigating Magistrates in Geneva, denying and rebutting all the allegations advanced against Mr Kadi by Mr Al-Fadl in four interviews conducted in 2004.[87]

In particular, Maître Bonnant presented Mr Kadi's view, which contradicts Al-Fadl:

1. Para. a (1) of his letter: Mr Kadi has never been a member of the Dosari tribe in Saudi Arabia.
2. Para. a (2): He has never used the alias "Abu Khalid".
3. Para. a (4): He "never went to a guesthouse owned by Mr Oussama ben Laden, be it in Khartoum or elsewhere".
4. Para. a (5): He denies all allegations of support for "militant Islamic doctrine promoting violence", for Osama bin Laden, Al Qa'ida or any affiliate entity, anywhere in the world.

Through Maître Bonnant, Mr Yassin Kadi suggested that Mr Al-Fadl might have confused him with Dr Mansour Al-Kadi, who was known to be a supporter of the charity Al Haramain Foundation, whereas Mr Yassin Kadi has never supported it in any way or had any connection with it.

---

[87] KADI0007223–7229.

This hypothesis is corroborated by the fact that Mr Al-Fadl, as reported in his November 3rd 2004 interview, referred to Mr (Yassin) Kadi as the director of Al Haramain Foundation, and in the same interview stated that he had never heard of Dr Mansour Al-Kadi.[88] The fact that Mr Al-Fadl referred to Mr Yassin Kadi with the title "Doctor" suggested to Maître Bonnant that this was indeed a case of mistaken identity, as Mr Yassin Kadi had no doctorate. Moreover, Maître Bonnant states that "on several occasions Mr Jamal Al Fadl has incorrectly identified persons on the pictures which have been submitted to him – including Mr Yassin Abdullah Kadi" (pp.3–4 of his letter).

Mr Comras makes no reference to the Bonnant letter. That letter raises the strong possibility that Mr Yassin Kadi is the victim of a confusion of identity. It is well known that Dr Mansour Al-Qadi, a Saudi academic, was a senior office holder in the large international charity Al Haramain Foundation. Mr Yassin Kadi has stated that he never had any connection with the Al Haramain Foundation or supported it in any way. Mr Yassin Kadi did support a smaller charity with a similar name, Al Haramain Wa Al-Masjed Al-Aqsa Charity [the two Holy Sanctuaries and the Al-Aqsa Mosque Charity] which was registered in Saudi Arabia and had a branch in Sarajevo. Mr Yassin Kadi has stated that it was headed by a relative, Mr Mahmoud Taibah, who asked him to support this endeavour.[89] Mr Yassin Kadi has also stated "The charity was authorised to perform the following: Al-Walidein-Gazzaz primary school for children who had lost their father or both parents and the financing and supervising of Dar Al Walidein (a home for up to 320

---

[88] KADI0028428 (FBI Letterhead Memorandum (LHM) dated 26 April 2005, beginning at KADI0028380). This same page of the LHM (p.49), which is a response to questions posed by the Swiss investigators, shows that the Swiss investigators, at least, knew that Mansour "used to work for … Al-Haramain Islamic Foundation [AHIF]", and that Mansour was "most likely … not related to Yassin Al-Kadi".

[89] Kadi Deposition, p.193–194 and Errata Sheet (for spelling of "Taibah"). The Arabic words "Al Haramain", "the Two Sanctuaries", as the dual form of *haram*, refers to the two most sacred sites in Islam, the cities of Mecca and Medina in Saudi Arabia. It is a name chosen for numerous entities such as schools, but also currently for at least one travel company and a large perfume manufacturer.

children and single mothers who had lost their husbands/fathers as a result of the war in Sarajevo)."[90]

More scrupulous examination by Mr Comras of the documentation would have, or should have, caused him to provide a more balanced picture of the Al-Fadl statements.[91]

**p.25 fn.89**. Mr Comras mischaracterizes on two counts the 9/11 Commission interview with Patrick Fitzgerald. Mr Comras writes:

> "U.S. Attorney Patrick Fitzgerald subsequently told the 9/11 Commission, 'Fadl was an invaluable source of information; the mystery was over, and it was clear that bin Laden was running a major terrorist organization. Fadl's information later played a very important role in the investigation and prosecution of the 1998 Embassy Bombings conspirators.' He also stated that he has complete confidence in Fadl's honesty, and that Fadl accurately remembered everything in which he participated. See 911 Commission Interview of Patrick J. Fitzgerald, Jan. 28, 2004, p. 2."

What the memorandum of the interview with Mr Fitzgerald actually states is as follows:

> "He [Fitzgerald] also stated that he has complete confidence in Fadl's honesty, and **believes that** Fadl accurately remembered everything in which he participated. Fadl's recollection may not have been as good when he tried to recount what other people had told him about events in which he had not participated, plus he was not good at identifying photographs." (Emphasis added.)

First, Mr Comras has omitted the key word "believes" – which, when reinserted, draws attention to the subjective and unverifiable character of Mr Fitzgerald's stated opinion, as properly reported by members of the 9/11 Commission staff.

---

[90] OFAC statement para. 90 (KADI0002244).

[91] Citing the typed record of a "Co-operating Witness Interview" with Mr Al-Fadl conducted by the FBI on January 31, 2004, Mr Comras writes: "The source [Jamal Al-Fadl] was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida [apparently "circa 1989"] which was used to purchase weapons in Jalalabad, Afghanistan". (Comras Report, p.25, fn.92). On its face this statement is of dubious reliability considering, among other things, its double-hearsay character.

Second, Mr Comras has omitted the second sentence wherein Mr Fitzgerald is reported as casting doubt on:

(a) Mr Al-Fadl's recollection of other persons' accounts to him "about events in which he had not participated", and

(b) Mr Al-Fadl's ability to identify photographs. Taken together with the statement of Maître Bonnant that "on several occasions Mr Jamal Al Fadl has incorrectly identified persons on the pictures which have been submitted to him – including Mr Yassin Abdullah Kadi" (see above), this reported opinion of Mr Fitzgerald's casts further doubt on the accuracy of Mr Al-Fadl's statements.

Mr Comras's fairmindedness is made questionable by these omissions.

**P.33.** Symptomatic of the lack of care evinced in this report is the discrepancy between the figure of $300,000 stated on this page and the estimate of "between $926,000 and $1.28 million" stated on **p.50**, end of para. 2.

**P.38.** Mr Comras writes: "One of the companies through which this trade [in Sudanese agricultural products] was conducted was Rowad Development & Investment, which was registered in Khartoum on Dec. 19, 1992. That Registration shows that shareholders in Rowad included the Wadi al-Aqiq Corporation owned by Osama bin Laden. Bin Laden's signature was included on the registration document. Kadi was also a shareholder via his wholly owned Loxhall Corporation."

It is true that Mr Kadi was a minority shareholder in Rowad through his Loxhall Limited company, and that the Muwafaq Foundation was also a minority shareholder. This does not demonstrate a relationship with an Osama bin Laden company except that of co-shareholders. Mr Kadi stated in his deposition that he did not know at the time that Wadi al Aqiq was a shareholder in Rowad, did not in the early 1990s know what it was, did not know it was an Osama bin Laden company, and did not know what Osama bin Laden was doing in Sudan (Kadi Deposition, pp.87–88). He also stated that he did not sign the shareholder list on behalf of either

45

of the entities related to him (pp.141–42), and that he was not present at the meeting where the shareholder list was signed (p. 148 line 1). A fairminded report by Mr Comras might have made some mention of these mitigating facts.

Mr Comras's observation on the Rowad registration document goes beyond the facts to insinuate that there was a business relationship between Mr Kadi and Osama bin Laden, which Mr Kadi has denied, and for which there appears to be no support.

**P.38 n.159**.Mr Comras misrepresents the document KADI0052707 as incorporating Loxhall Limited in Sudan. In fact it is the registration certificate for a branch. Loxhall Limited was registered in the Isle of Man on July 17, 1990, and was an investment company. Although Mr Comras characterizes Loxhall Limited as "appear[ing] to be a shell company" (Comras Report at p.38 fn.159), it is not clear what he means by that. Loxhall Limited owned a minority shareholding in Rowad, as Mr Comras himself states (*Ibid*), as well as real estate in London,[92] shares in a chemical company in Pakistan,[93] and an investment portfolio.[94]

P.**40 last para**. Mr Comras refers to the investigation of Mr Kadi by the Swiss Police. But he omits to mention that on December 17, 2007 the Ministère Public de la Confédération (Swiss Federal Public Prosecutor's Office) wrote to Mr Kadi's Swiss attorney, Maître Bonnant, that it was abandoning the proceedings against Mr Kadi, and that the charges of supporting a criminal

---

[92] See letter from Stepien Lake Gilbert & Paling, Solicitors, dated April 16, 1997, referring to the sale for Loxhall Limited of 42 Trinity Court, a residential apartment in London WC1. KADI0162113

[93] See letter from Himont Chemicals (Pvt.) Limited, Lahore, Pakistan, to the Exchange Control Department, State Bank of Pakistan, Lahore, copied to Mr Kadi, referring to their receipt of US$236,680 from Loxhall Ltd (Isle of Man) against their subscription for equity in the company. KADI0172757.

Also a share certificate for 724,700 shares in Himont Chemicals (Pvt.) Limited, owned by Loxhall Ltd, Isle of Man, signed by Mr Intesar A. Siddiqui, Chief Executive (undated). KADI0172759.

[94] Investment report for Loxhall by A.G.I. Asset Management (Allianz Global Investors) dated January 23, 1997, showing capital of approximately US$1.28 million. KADI0171913.

organization had been dropped. Furthermore, all his [Swiss] accounts which had been frozen would be unblocked.[95] This is another example of a one-sided presentation of the documentary record.

**P.45 lines 7–8**. Mr Comras writes: "A nexus quickly developed between a number of these charities and terrorist organizations". If indeed this nexus existed, it is not demonstrated that the Muwafaq Foundation was part of such a nexus. This is an example of an unsupported assumption and alleging guilt by association. Mr Comras's Report is in fact permeated by the error of ascribing guilt by association.[96]

**P.52** Mr Comras quotes from the European Court of Justice's Judgment dated September 3, 2008 (paras.369–372), implying that it was confined to Mr Kadi's denial of due process with regard to his designation[97]. But it is clear from the judgment of the same court, *i.e.* the Grand Chamber of the European Court of Justice, dated July 18, 2013[98], that the court rejected, on a substantive basis, the evidentiary arguments advanced against Mr Kadi:

> **(para.153, p.35)** "It is however clear that no information or evidence has been produced to substantiate the allegations of the Muwafaq Foundation's involvement in international terrorism in the form of links with Makhtab al-Khidamat/Al Kifah and Al-Qaeda. In such circumstances, the indications of the role and duties of Mr Kadi in relation to that foundation are not such as to justify the adoption, at European level, of restrictive measures against him." ………

---

[95] Ref. KADI 0018537, English translation KADI0018536.

[96] Other examples of the error of ascribing guilt by association are found in Mr Comras's Report at: p.15 (association with Khalid bin Mahfouz); p.17 fn 53 (association with investment company which was investigated and was a subsidiary with a bank which did business with subsequently designated entities); p.31 fn 124 and p.32 (did business with individuals subsequently designated); p.39 (Yassin Kadi's Solano Limited bought sesame from a company which a few years previously handled Al Qa'ida's trade in sesame); p.38-39 (used a bank in which Osama Bin Laden was allegedly a part-owner and customer); p.44 (The Muwafaq Foundation reportedly supported a Bosnian fighters' group, one member of which was later arrested on terrorism charges). I by no means accept that Mr Comras has established the guilt of all the people and entities that Mr Kadi is alleged to have associated with.

[97] KADI0023373 - KADI0023438.

[98] KADI0025952 – KADI0025991.

**(para.163, p.38)** "It follows, from the analysis set out at paragraph 141 and paragraphs 151 to 162 of the judgment, that none of the allegations presented against Mr Kadi in the summary provided by the Sanctions Committee are such as to justify the adoption, at European Union level, of restrictive measures against him, either because the statement of reasons is insufficient, or because information or evidence which might substantiate the reason concerned, in the face of detailed rebuttals submitted by the party concerned, is lacking."

Mr Comras refers to the September 3, 2008 Judgment on procedural grounds by the European Court of Justice as its "critical ruling". Although he does refer to the later Judgment of the same court (dated 18 July 2013) in his page 51, fn.224, and it is listed in his "List of Reliance Materials", he seems to have overlooked the passage in the 2013 Judgment represented by the paragraphs cited above, nos. 153 and 163, or he would not have written that "the rulings did not detract from findings by the U.S. Treasury, The European Union, or the United Nations that Yasin Kadi had engaged in channeling funds to Osama bin Laden" **(p.52)**

This is a further instance of Mr Comras's slanted presentation of documentary evidence.

**P.53 last line.** Mr Comras alleges that Mr Kadi "and his circle of friends, colleagues and business associates, including Wael Hamza Julaidan, knowingly helped promote the radical Islamic ideology and resources that sustained them". This allegation against Mr Kadi is unsupported.

### 3. Conclusion

In sum, it is my opinion that Mr Comras lacks the grounding and experience to evaluate Mr Kadi's charitable activities and the context in which they occurred prior to 9/11. His methodology appears to be at variance with basic principles of social science and is seriously lacking in fairmindedness.

_February 1st, 2021_

Date

_Jonathan Benthall_

Jonathan Benthall

I certify under penalty of perjury under the laws of the United States of America that the foregoing report is my honest opinion, that all factual matters therein are true and correct to the best of my knowledge and belief, and that if called to testify, I would testify under oath consistently with the foregoing.

Executed on _1st_ February 2021

_February 1st, 2021_

Date

_Jonathan Benthall_

Jonathan Benthall

49

**EXHIBIT A**

**C.V. OF JONATHAN BENTHALL**

**Jonathan Benthall**

Honorary Research Fellow, Department of Anthropology, University College London

**Curriculum vitae updated January 2021**

12 September 1941    born in Kolkata. British subject.

1954-59                    Eton College (King's Scholar)
1959-62                    King's College Cambridge (Minor Scholarship in Classics). M.A.,
English Tripos (classed 2.1 in all parts). College Studentship in English (not taken up).
1964-69                    worked in industry and finance as programmed learning executive
(International Teaching Machines Ltd), data processing systems engineer (IBM United Kingdom
Ltd) and investment analyst (Henderson Administration Ltd)
1970-73                    Lectures Programme Organizer and Secretary (1971-73), Institute
of Contemporary Arts, London. Was responsible also for some exhibitions; for the 1972
mixed-media programme `The Body as a Medium of Expression'; and for the March 1973
French Programme to mark Britain's entry into the European Community (with British
Government funding and in cooperation with the French Institute and French Embassy Cultural
Section in London).


1974-2000             Director, Royal Anthropological Institute of Great Britain and Ireland.
Founding Editor of *RAIN* (RAI News) 1974-84, and of *Anthropology Today* 1985-2000.
Organized numerous conferences for the Institute, including Christianity and 'Primitive'
Religions (1976), Spirit Possession and Ecstatic Religion (1977), The Refugee Experience
(1980), Societies in Acute Crisis (1981), Christianity in Africa (1982), Religions in Conflict
(1984), The Protection of Children (1985), The Debt to 'Other' Musics (1990), The Ethnography
of Children (1992), etc.; directed the first International Festival of Ethnographic Film in 1985,
funded by Unesco, and chaired the Festival Committee for subsequent film festivals held in
Manchester and Canterbury on 1990, 1992 and 1994.
Awarded 6 months' sabbatical leave by the Institute, January to June 1996; spent carrying out
research on Islamic organized charity in the Middle East, with special reference to Jordan and
Palestine, with a research grant from the Nuffield Foundation.
Appointed Director Emeritus, 2015.

Since resigning from the Institute in 2000, has focussed on the comparative study of charity and
the voluntary sector, with special reference to the Arab-Islamic world. More recently he has
extended this interest to wider topics relating to Islam –  notably the environmental movement,
human rights, religious toleration and non-violence – ,  to 'faith and development' more generally,
and to mutations of religion and quasi-religious movements in secularizing societies.


**PUBLICATIONS – BOOKS AND OCCASIONAL PAPERS**
1972   *Science and Technology in Art Today* (London: Thames & Hudson, and New York:
Praeger).
1976   *The Body Electric: Patterns of Western Industrial Culture* (London: Thames & Hudson).

1993   *Disasters, Relief and the Media* (London: I.B. Tauris). Reprinted with new Introduction 2010, Wantage: Sean Kingston Publishing.

2003   *The Charitable Crescent: Politics of Aid in the Muslim World* (co-authored with Jérôme Bellion-Jourdan, London: I.B. Tauris). Reprinted in paperback with new Preface, 2009.

2008   *Returning to Religion: Why a Secular Age is Haunted by Faith* (London: I.B. Tauris).

2016  *Islamic Charities and Islamic Humanism in Troubled Times*  (Manchester: Manchester University Press).

2018 *The rise and decline of Saudi overseas humanitarian charities* (Doha: Center for International and Regional Studies, Occasional Paper no. 20, Georgetown University – Qatar)

## PUBLICATIONS - EDITED BOOKS

1970-74 Series editor for short Fontana/Collins series on technology and society, including Raymond Williams's book on Television and David Dickson's on alternative technology.

1972 (edited) *Ecology, the Shaping Enquiry* (London: Longman - published by Viking, New York, as *Ecology in Theory and Practice*).
1973 (edited) *The Limits of Human Nature* (London: Allen Lane, and New York: Dutton)
1975 (co-edited with T. Polhemus) *The Body as a Medium of Expression* (London: Allen Lane, and New York: Dutton)
2002. *The Best of 'Anthropology Today'* - Anthology of *RAIN/Anthropology Today* (1974-2000), with editorial introduction and linking matter. Preface by Professor Marshall Sahlins of the University of Chicago (London: Routledge).
2014. *Gulf Charities and Islamic philanthropy in the 'Age of Terror' and Beyond*. Co-edited with Robert Lacey, as a result of the Gulf Charities Workshop which we co-directed in July 2012 at the University of Cambridge in the context of the Gulf Research Meeting 2012. Includes an Editors' Introduction and my own chapter, 'The Islamic Charities Project (formerly Montreux Initiative)'.

## PUBLICATIONS - ARTICLES

**Articles and papers since 1990 include**:
1990. Elargir le contexte de l'anthropologie: comment a commencé *Anthropology Today*, in festschrift *Pour Jean Malaurie* (Paris: Plon).
1991. Invisible Wounds: Corporal Punishment in British Schools as a Form of Ritual. *Child Abuse and Neglect* 15: 377-388.
1991. 'Inside information on "the market"', *Anthropology Today*, 7.4, August, pp.1–2. *Possibly the first publication of the phrase 'market fundamentalism', later popularized by George Soros:  See Wikipedia entry:* https://en.wikipedia.org/wiki/Market_fundamentalism
1992. A late developer? The ethnography of children and child-focused research. *Anthropology Today* 8:2, April.
1992. Acceptable face for a place of pilgrimage (review article on museums). *Times Higher Education Supplement* 9 October.
1992. A study in survivalry [on indigenist organizations]. *Anthropology Today*. 8:6, December.
1993. Charisma in cashmere (review of the `Millennium' TV series). *New Statesman and Society*, 8 January.

1993. Rights to ethnobiology *Anthropology Today*. 9:3, June.

1993. Ethnic alleys and avenues [on ethnicity, with John Knight]. *Anthropology Today* 9:5, October.

1993. Preserving the stains of genocide [on the Auschwitz memorial museum]. *Times Higher Education Supplement* 15 October.

1995. Foreword `From Self-Applause through Self-Criticism to Self-Confidence' to Akbar S. Ahmed and Cris N. Shore (Editors), *The Future of Anthropology: Its Relevance to the Contemporary World* (London: Athlone Press).

1995. Missionaries and human rights. *Anthropology Today* 11:1. February.

1996. The religious provenances of anthropologists. *Anthropology Today* 12:4. August.

1996. Entry on Mass Media in *Encyclopedia of Cultural Anthropology* (Macmillan and HRAF) - also served as member of the Editorial Advisory Board.

1996. Enlarging the context of anthropology: the case of *Anthropology Today* [adapted version of 1990 French article] in *Popularizing Anthropology*, ed. J. MacClancy and C. McDonaugh (London: Routledge).

1997. Repercussions from the Église Saint-Bernard [on Undocumented migrants]. *Anthropology Today*. 13:4. August

1997. The Qur'an's call to alms. *Times Higher Education Supplement* 3 Jan. Reprinted in *ISIM Newsletter*.

1997. The Red Cross and Red Crescent Movement and Islamic Societies, with Special Reference to Jordan. *British Journal of Middle Eastern Studies*, 24(2), 157-177.

1999. Two takes on the Abraham story. *Anthropology Today*. 15:1, February.

1999. Financial Worship: the Quranic Injunction to Almsgiving. *Journal of the Royal Anthropological Institute* 5:1, March, 27-42.

1999. The critique of Intellectual Property. *Anthropology Today*. 15:6. December.

1999. 'Our Genius for the Equivocal' / 'Notre génie de l'équivoque'. Article in special issue of *Diogenes / Diogène* (UNESCO journal), no. 188, vol. 47: 4, on anthropology as a science, ed. Georges Guille-Escuret. Published in English and French.

2000. Middle East scenarios. *Anthropology Today*. 16:1. February.

2000. Civil society's need for de-deconstruction. *Anthropology Today*. 16:2. April.

2000. 'Loei 1993 - Karnataka 1998' [poem] in *Anthropology and Humanism* 25.1, 2000.

2000. 'Interpretando el movimiento islámico actual: el caso de la élite educativa de jóvenes británicos pakistaníes' in C. Lisón Tolosana (ed.), *Antropología: horizaontes interpretativos* (Granada: Universidad de Granada).

2001. Indigenism and Intellectual Property Rights. *Anthropology News*, April.

2001. 'Mâtea te urofa – with great friendship': a salutation to Sir Raymond Firth on his 100th birthday. 17:2. April.

2001. Comment: Speculations on Islamic financial alternatives, *Anthropology Today* 17.3, June, 29.

2001. Guest editorial: `Time to look "The Gift" in the mouth' [on academic research on charity] *Anthropology Today* 17:4, August, 1-2.

2001. Obituary, Julian Pitt-Rivers, *The Independent*, 25 August.

2001. Comment on article by Richard T. Antoun, 'Civil society, tribal process and change in Jordan: an anthropological view', *International Journal of Middle Eastern Studies*, 33.4, Nov., 668-70.

2002. 'Organized charity in the Arab-Islamic world: a view from the NGOs'. In *Interpreting Islam*, ed. H. Donnan (London: Sage Publications).

2002. 'Firstfruits in the Quran'. In *Sacrifice in Religious Experience*, ed. A. Baumgarten (Leiden: Brill).

2002. Guest editorial: 'Imagined civilizations?' [on Samuel P. Huntington] *Anthropology Today*, 18.6, December, 1-2.

2003. Chapter on 'Humanitarianism and Islam' in *Monitoring Trends in Humanitarian Action: Humanitarian Action After September 11*[th], ed. J. Macrae and A. Harmer. London: Overseas Development Institute Humanitarian Policy Group. (Also a shorter briefing paper on the same subject.)

2003. Commentary in *American Anthropologist*, June issue, on Mahmood Mamdani's article 'Good Muslim, Bad Muslim: A Political Perspective on Culture and Terrorism', September 2002.

2003. 'When is a call for alms a call to arms?', *Times Higher Education Supplement*, 5 September, 20-1.

2003. 'The raising of the Red Crescent'. *New Humanist*, 118.4, November.

2003. 'The greening of Islam?' [Islam and environmentalism]. *Anthropology Today*, 19.6, December.

2004. Reprint of the ODI briefing paper referred to above, *in International Development and Assistance: Where Politics Meets Economy*, ed. A. Bolesta (Warsaw: Leon Kotminski Academy of Entrepreneurship and Management)

2004. 'Naturally divine: are 'universal' values a religious legacy?' *Daily Star* (Beirut), 29 May.

2004. 'Waiting for a Muslim Gandhi? Islam and non-violence', *Daily Star* (Beirut), 21 August. (Reprinted in *Islam and Muslim Societies* (New Delhi), 1.1, 201-3).

2004. 'Religious NGOs in the ascendant: the Muslim case', *Nouveaux Mondes* no. 14 (special issue 'Les ONG au coeur de la mondialisation', Geneva: CRES).

2005. 'Confessional cousins and the rest: the structure of Islamic toleration'. *Anthropology Today*, 21.1, February.

2005. ' "Universal" values in action – with their faith legacies', *Islam and Muslim Societies* (New Delhi), 1.1, 1-8.

2006. 'L'humanitarisme islamique', *Cultures et Conflits*, no. 60.

2006. Introduction, Summary of discussions and Conclusion to *Religion, Politics, Conflict and Humanitarian Action : Faith-Based Organisations as Political, Humanitarian or Religious Actors*, ed. S. R. Simkhada and D. Warner, Geneva: Graduate School of International Studies.

2006. 'Islamic aid in a north Malian enclave', *Anthropology Today*, August 2006, 22.4.

2006. 'Arch[aeology]. and anth[ropology]. as religioid movements', *Anthropology Today*, October 2006, 22.5.

2007. 'Animal liberation and rights', *Anthropology Today*, April, 23:2.

2007. Poem, 'Abrasion and ecstasy', *Anthropology and Humanism*, 32:1, 91-2.

2007. Obituary, Brownlee J. Kirkpatrick, *Anthropology Today*, August, 23:4.

2007. 'Les ambiguïtés du jihad dans la pratique des ONG musulmanes' in edited collection *Les ONG confessionnelles*, ed. B. Duriez, K. Rousselet and F. Mabille, Paris: L'Harmattan, based on conference held in Paris by the Association de Sciences Sociales de Religion, February 2004.

2007. 'Oxford social anthropology since 1970: from schismogenesis to a new testament' from

conference volume celebrating the centenary of social anthropology in Oxford, *A History of Oxford Anthropology*, ed. P. Rivière, Oxford: Berghahn.

2007. 'Islamic charities, faith-based organizations and the international aid system', in J. Alterman and K. van Hippel, eds., *Understanding Islamic Charities*, Washington, DC: Center for Strategic and International Studies.

2007. 'The overreaction against Islamic charities', *ISIM Bulletin*, no. 20, Leiden: Institute for the Study of Islam in the Modern World.

2008. 'Islamic charities in southern Mali' *in Islam et sociétés au sud du Sahara*, 1, new series, Paris: Les Indes savantes.

2008. 'Have Islamic charities a privileged relationship in majority Muslim societies? The case of post-tsunami reconstruction in Aceh', published 26 June in the free online *Journal of Humanitarian Assistance* (Tufts University), www.jha.ac

2008. 'The Palestinian zakat committees 1993–2007 and their contested interpretations', Occasional Paper, Geneva, Graduate School of International and Development Studies, Program for the Study of International Organization(s).

Also                available                free                online: https://www.files.ethz.ch/isn/94618/Graduate_Institute_HEI_2008_en.pdf
            in English and in Arabic translation.

2008. 'The disaster–media–relief nexus', guest editorial, *Anthropology Today*, August 24.4.

2009. Entries on 'Relief', 'International Red Cross and Red Crescent Movement', 'Oxfam'. 'Médecins Sans Frontières' and 'Islamic Relief', for *Dictionary of Transnational History*, Palgrave Macmillan.

2009. 'Beyond belief', lead review (of five books on religion), *Times Literary Supplement*, 11 December.

2010. 'Powers of writing', review of Jack Goody's *Renaissances: The One or the Many*, *Times Literary Supplement*, 14 May.

2010. 'Distress of nations', lead review article (on engaging with Islam), *Times Literary Supplement*, 13 August.

2010. 'Mainstreaming religion: FBOs ride the wave', *ontrac*, newsletter of INTRAC, Oxford, no. 46, October.

2011. 'Holy neurons', review of David Lewis-Williams's *Conceiving God: The Cognitive Origin and Evolution of Religion*, *Times Literary Supplement*, 21 January.

2011. 'Islamic humanitarianism in adversarial context', in *Forces of Compassion, Humanitarianism Between Ethics and Politics*, edited by Erica Bornstein and Peter Redfield. Santa Fe: SAR Press.

2011. 'Clash theory', lead review of books by Olivier Roy and Eliza Griswold, *Times Literary Supplement*, 1 April.

2011. 'Building trust with a research – intervention – research cycle', *AnthroNews* no. 3, UCL Department of Anthropology Newsletter.

2011. 'An unholy tangle: Boim versus the Holy Land Foundation' *UCLA Journal of Islamic and Near Eastern Law*, vol. 10, 2010-11.

2011. 'Moving targets, review of Emmanuel Terray, *Combats avec Méduse*, *Times Literary Supplement*, 14 October.

2011. 'Asset strippers', review of three books on religion, *Times Literary Supplement*, 9 December.

2012. 'Islam and the West', review of seven books on Islam and Islamophobia, *Times Literary*

*Supplement*, 18 January.

2012. Two short poems in French, *French Literary Review*, 17, April, 16-17.

2012. 'Désastres–médias–aide humanitaire : la stabilité du système', concluding article in *Réfugiés, sinistrés, sans papiers : politique de l'exception*, ed. Michael Agier, Paris : Editions Téraèdre, collection of papers from conference 'Terrains d'Asile', Paris, Ecole des Hautes Etudes en Sciences Sociales, 19 September 2008.

2012. 'Diapraxis rules OK', guest editorial on mediation, *Anthropology Today*, 28.1, February, 1-2.

2012. '"Cultural proximity" and the conjuncture of Islam with modern humanitarianism', in *Sacred Aid: Faith and Humanitarianism*, Oxford University Press, ed. Michael Barnett and Janice Stein, based on two workshops held in Geneva in 2009 and 2010.

2012. 'Splits at the seams', review of Tariq Ramadan, *The Arab Awakening: Islam and the new Middle East*, *Times Literary Supplement*, 12 October.

2012. 'A bigger splash', review of Timothy Radcliffe, *Take the Plunge: Living baptism and confirmation*, *Times Literary Supplement*, 2 November.

2012. 'Charity', in *A Companion to Moral Anthropology*, ed. Didier Fassin, Wiley-Blackwell.

2012. 'Charity plus', guest editorial on recent publications on humanitarianism, *Anthropology Today*, 28.6, December, 1-2.

2013. 'Against chaos', review of books on religion by Emile Perreau-Saussine and Roger Trigg, *Times Literary Supplement*, 31 May.

2013. 'Faith and seminal reason', review of Andrew M. Sharp, *Orthodox Christians and Islam in the Post-Modern Age*, *Times Literary Supplement*, 5 July.

2013. 'Foregrounding the Muslim periphery', guest editorial on Akbar Ahmed's *The Thistle and the Drone*, *Anthropology Today*, 29.4, August.

2014. 'Abraham's children', review of Mona Siddiqui, *Christians, Muslims, and Jesus*, *Times Literary Supplement*, 31 January.

2014. 'Scientology's winning streak', guest editorial, *Anthropology Today*, 30.1, February.

2014. 'Critical realist', review of David Martin, *The Education of David Martin*, *Times Literary Supplement*, 21 February.

2014. 'Charity' and 'Yusuf Al-Qaradawi', *Oxford Encyclopedia of Islam and Politics*, Oxford University Press.

2014. 'Always with us', review of *Pauperland* by Jeremy Seabrook, *Times Literary Supplement*, 4 April.

2014. 'After Trondheim', review of two books on Malthus, *Times Literary Supplement,* 13 June.

2014. 'Social work, poverty, inequality and social safety nets: voluntary welfare organizations' in *Modern Islamic Thinking and Activism: Dynamics in the West and in the Middle East*, ed. E. Toguslu and J. Leman, Leuven: Leuven University Press.

2014. CA Comment on Michael Jindra, 'The dilemma of equality and diversity', *Current Anthropology*, 55.3, June.

2014. 'Times of violence', lead review of Michael Cook, *Ancient Religions, Modern Politics*, and Akeel Bilgrami, *Secularism, Identity, and Enchantment*, *Times Literary Supplement*, 12 September.

2014. 'Poplars in the marsh', review of David Martin, *Religion and Power*, and Karen Armstrong, *Fields of Blood*, *Times Literary Supplement*, 12 December.

2015. 'L'action caritative des monarchies du Golfe: entre obligation islamique et financement du radicalisme', *Moyen-Orient*, January–March, no. 25.

6

2015. 'Building a reform movement: could Muslims emulate nineteenth century Judaism', e-International Relations online magazine, posted 16 March 2015, http://www.e-ir.info/2015/03/16/building-a-reform-movement-could-muslims-emulate-nineteenth-century-judaism/

2015. 'Religion and humanitarianism', in *The Routledge Companion to Humanitarian Action*, ed. Roger MacGinty and Jenny H. Peterson, Routledge.

2015. 'William Fagg the seer', guest editorial, *Anthropology Today*, 31.3, June.

2015. 'Social insecurity', review of Luke Bretherton, *Resurrecting Democracy: Faith, citizenshop and the politics of a common life*, *Times Literary Supplement*, 26 June.

2015. 'Survivors', review of Timothy Larsen, *The Slain God: Anthropologists and the Christian faith*, *Times Literary Supplement*, 7 August.

2015. 'This life only', review of Roger Trigg, *Religious Diversity: Philosophical and political dimensions*, and James R. Lewis and J. A Petersen, *Controversial New Religions*, *Times Literary Supplement*, 11 September.

2015. 'Crossroads', review of Maurizio Albahari, *Crimes of Peace: Mediterranean migration at the world's deadliest border,* and Michel Agier (ed.) with Clara Lecadet, *Un monde de camps*, *Times Literary Supplement*, 2 October.

2015. 'Drops and buckets', review of Philippe Buc, *Holy War, Martyrdom, and Terror: Christianity, violence and the West*, and Jonathan Sacks, *Not in God's Name: Confronting religious violence*, *Times Literary Supplement*, 18 & 25 December.

2016. 'Charity, modern period', in *Encyclopedia of Islam, Third Edition*, Brill (online).

2016. 'Yehudi Menuhin und Deutschland', in *Yehudi Menuhin: Musiker, Mythos, Mensch* Festschrift for the Menuhin Centenary, Konzerthaus, Berlin.

2016. 'The word of dog', review of Donovan O. Schaefer, *Religious Affects: Animality, evolution, and power*, *Times Literary Supplement*, 17 June.

2016. 'The Order of Malta and humanitarian aid: in memory of John de Salis (1947–2014), Activity Report 2016, Sovereign Military Hospitaller Order of St John of Jerusalem of Rhodes and of Malta, pp.42–45.

2016. Interview: 'Anthropology, anti-racism and schools in the 1970s', conducted by David Mills. *Teaching Anthropology* vol. 6, published 13 November. https://www.teachinganthropology.org/ojs/index.php/teach_anth/article/view/442/551

2016. 'Losing our religion', review of Elizabeth Shakman Hurd, *Beyond Religious Freedom: The new global politics of religion*, *Times Literary Supplement*, 14 December.

2017. 'Church and state', review of David L. Gosling, *Frontier of Fear: Confronting the Taliban on Pakistan's border*, *Times Literary Supplement*, 4 March.

2017. 'Experto crede: A legal and political conundrum' in *If Truth be Told: The politics of public ethnography*, ed. Didier Fassin. Durham: Duke University Press.

2017. 'Technological art and *Studio International*'s eclectic vanguardism', *Interdisciplinary Science Reviews*, special issue on 'The experimental generation', edited by Bronać Ferran and Elizabeth Fisher, 42: 1-2, pp.79–92.

2017. 'Blanc ou noir', review of two books by Didier Fassin on prisons and punishment, *Times Literary Supplement*, 4 October.

2017. 'Just the ordinary God', review of Grace Davie, *Religion in Britain: A persistent paradox, Times Literary Supplement*, 12 December.

**2017**. 'Charity' in free online *Cambridge Encyclopedia of Anthropology*. www.anthroencyclopedia.com/entry/charity French translation

'Charité'. www.anthroencyclopedia.com/entry/charite

2018. 'Humanitarianism as ideology and practice', in *The International Encyclopedia of Anthropology*, ed. Hilary Callan, Wiley-Blackwell.

**2018**. 'Mary Douglas and the diversity of purity frameworks', *Anthropology Today*, April, 34.2, 27–28.

**2018**. 'Deep magic', review of Justin Welby, *Reimagining Britain* and Stephen Spencer (ed.) *Theology Reforming Society, Times Literary Supplement*, 5 June.

**2018**. 'Godfather of like', review of Cynthia L. Haven, *Evolution of Desire* (biography of René Girard), *Times Literary Supplement*,11 September.

**2018**. 'Brothers and arms', review of two books on political Islam, *Times Literary Supplement*, 19 September.

**2018**. Obituary of Michael Day (with Bernard Wood), *Anthropology Today*, October, 34.5, 24.

**2018.** 'Charitable activities of the Muslim Brotherhood', *Journal of Muslim Philanthropy and Civil Society*, 2.2.

2019. 'In God's name', review of books on religion and violence, by Richard A. Burridge & Jonathan Sacks (eds) and Ziya Meral, *Times Literary Supplement, 7 May.*

*2019. 'The care of orphans in the Islamic tradition, vulnerable children, and child sponsorship programs', Journal of Muslim Philanthropy and Civil Society, 3.1.*

*2019. 'A note on humanitarian terminology', Allegra Lab online: project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/*

2019. 'Cross purposes', Review of Olivier Roy, *Is Europe Christian?*, *Times Literary Supplement, 8 October.*

*2019. Comment, 'Glynn Flood', Anthropology Today, 35.5, October, 24.*

*2019**. 'The grace of Julian Pitt-Rivers: over and above the predictable' (review of two posthumous works by Julian Pitt-Rivers), JRAI, 25.3, 609–11.*

*2020. 'Tolerance and the godly: Approaching religious divides', review of five books on Islam and politics, Times Literary Supplement, 6 March.*

*2020. 'Comment: Anthropology and Climate Change: Reply to Eriksen.' Anthropology Today, 36.2, April.*

*2021. 'Orphan programmes today and tomorrow', The Forum: The Journal of the British Muslim charity sector, issue 3, Winter/Spring 2021.*

*Forthcoming, in press.* 'Friend, foe, or in-between? Humanitarian action and the Soviet–Afghan war', in *Non-State War Economies*, ed. Didier Fassin, Clémence Piault and Nicola di Cosimo. Lexington Books.

Book reviews for *New Statesman and Society* and *The Independent* newspaper on Clifford Geertz, Adam Kuper, Nigel Barley, Derek Freeman, biography of Tom Harrisson; and book reviews for *Journal of the Royal Anthropological Institute, Journal of Anthropological Research*, *Theoretical Anthropology, The Tablet, International Affairs.*

**VIDEO INTERVIEW**
Conducted by Professor Alan Macfarlane, December 2005, in his 'Anthropological Ancestors' series of interviews, accessible online in Cambridge University Dspace:
 https://www.dspace.cam.ac.uk/handle/1810/113828

**RECENT TEACHING, LECTURING AND SEMINARS**

Lectures at Observatoire du Religieux, Institut des Etudes Politiques, University of Aix-en-Provence, November 2005 and February 2006.

Seminar, Department of Anthropology, University College London, 14 November 2005: 'The secular sanctity of Médecins Sans Frontières'.

Presentations on Islamic charities at the Foreign and Commonwealth Office and the Charity Commission, London, 2007; Centre National d'Education et de Formation (French national police academy), 2007; Home Office, London, 2009.

Presentation at conference on Islamic NGOs, University of Utrecht, June 2007.

Keynote address on 'humanitarianism and the media', ALNAP Biannual Meeting, Madrid. March 2008.

Discussion paper on Palestinian zakat committees, Henry L. Stimson Center and Oxfam America workshop, on 'New humanitarian actors and donors', Washington, DC, May 2008.

Paper on 'cultural proximity' presented at conference on 'Religion, Secularism, and Humanitarianism: Exploring Differences, Boundaries, and Connections', Geneva, 10-11 October 2009

Opening presentation on 'Civil society in the contemporary Muslim world' at conference organized by the Dutch government sponsored Islam Research Programme, on 'Studying Islam in the public sphere: a critical reflection on knowledge production', Leiden, 3-4 November 2009.

Keynote presentation at a seminar 'Who are the humanitarians now?', Humanitarian and Conflict Response Institute, University of Manchester, 25 November 2009.

Presentation for the Charity and Security Network, Washington, DC, on research on West Bank zakat committees, 14 January 2010.

Plenary presentation, 'Mainstreaming religion: Faith Based Organizations ride the wave', at the closing conference of the DFID-funded Religions and Development research programme, University of Birmingham, 22 July 2010.

Presentation at the Swiss Federal Department of Foreign Affairs, Political Division IV (Human Security) Annual Conference, Bern, 14 October 2010, 'When religions and world views meet'.

'Reviewers meet reviewed' seminar at the British Museum, Anthropology Library, devoted to *The Charitable Crescent*, with Dr Jon Mitchell, who had reviewed it in the *Journal of the Royal Anthropological Institute*, 9 December 2010.

Seminar paper on Islamic charities, UCL Medical Anthropology Seminar series, November 2011.

Participation in seminar organized by Professor Charles Taylor on Religion and Secularization, Institute of Human Sciences, Vienna, 14-15 June 2012.

Presentation in a panel on 'The future of religion', Israeli Presidential Seminar, Jerusalem, 21 June 2012.

Co-director with Robert Lacey, Gulf Charities Workshop, University of Cambridge (Gulf Research Meeting), 11-14 July 2012.

Keynote address, 'Pure aid: Challenging humanitarianism' in workshop 'Salvage and salvation: religion, disaster relief and reconstruction in Asia', Institute for Asian Studies, University of Singapore, 22 November 2012.

Paper, 'Two models of toleration in Islam, concentric and accommodative: a dilemma for Muhammadiyah's philanthropy?', in International Conference on Muhammadiyah, University of Malang, Indonesia, 30 November 2012.

Lecture, 'Political aspects of faith-based humanitarian aid in different religious contexts', New York University, Abu Dhabi Campus, New York, 21 February 2013.

Presentation, 'Between the confessional field and the international aid system: official and private aid from the Gulf countries', for lecture series, 'No longer (only) the "white man's burden": the emerging donors in international aid', Conflict Research Group, University of Ghent, Belgium, 21 March 2013.

Keynote address, 'Islamic charities in Africa and the international aid system', in symposium, 'Islamic NGOs and development aid in Africa', Center for African Studies, University of Florida, Gainesville, USA, 12 April 2013.

Lecture, 'Yehudi Menuhin: violinist and visionary', 9th annual Nilsson Lecture in Contemporary Drama and Literature, Fine Arts Library, University of Texas, Austin, 28 February 2014.

Presentation, 'A revival of Gulf-based charities: opportunities and obstacles', University of Chicago conference, 'Crisis of humanitarianism', 26 April 2014.

Presentation, 'Puripetal force versus social entropy at the intersect between Islam and humanitarianism', conference at Jesus College, Cambridge, on Purity and Impurity, 20–21 May 2014.

Presentation, 'From the disaster–media–relief system to the finance–security assemblage, via Islamic charities', Institute of Advanced Study, Princeton, workshop on 'Public ethnography', 27–28 May 2014.

Participant, Doha Round Table on 'Formal and Non-Formal Economies in Afghanistan and Pakistan: The View from the Gulf', CIDOB Policy Research Project co-hosted with Qatar University Gulf Studies Program, 21 October 2014.

Presentation, workshop on 'Faith, Empire and European cultures of humanitarianism since 1945', Humboldt University, Berlin, 13 March 2015.

Participant, Ditchley Foundation conference on 'Global ambitions and local grievances: Understanding political Islam', and Rapporteur for the group meetings on 'The Islamic response to violent extremism, 19–21 March 2015.

Keynote address, 'The shipwreck of our humanity: A turning-point for Europe', for the conference 'Zukunft der Migration', organized by Forum 2000 and the German Association of the Order of Malta, Munich, 16 September 2015.

Presentation, 'The uses of extremism', for conference 'Building Peace through Coalitions', ARCENT/NESA, National Defense University, Fort McNair, Washington, DC, 6 April 2016.

Presentation, 'A repercussion from the Reagan Doctrine: The spooking of Islamic charity', in workshop 'Non-state war economies', Institute for Advanced Study, Princeton, 2–4 June 2016.

Presentation, 'Humanitarianism as ideology and practice: the contribution of social anthropology', in conference on "Compassion, social engagement, and discontent: Believing and the politics of belonging in Europe today", University of Leiden Centre for the Study of Religion, 10–11 November 2016.

Presentation on the Montreux Initiative, in workshop "Bridging transatlantic voices: Understanding Muslim humanitarian and development organizations in and around conflict zones', organized in Brussels by the British Council, Institute for Strategic Dialogue, and Georgia State University, 1–2 December 2016.

Presentation, 'Towards a level playing-field for Islamic charities', in conference sponsored by the Cordoba Foundation of Geneva and Eid Charity (Qatar) on 'International humanitarian action: between the East and the West', Doha, 26–27 March 2017.

Presentations on Saudi charities and humanitarian diplomacy in symposia on 'Middle Powers in the Middle East', Georgetown University in Qatar, Center for International and Regional Studies, Doha, 16–17 January and 20–21 August 2017.

Presentation on 'Orphans in Islamic teaching, and the care of vulnerable children' in Symposium on Muslim Philanthropy and Civil Society, Indiana University, 2–3 October 2018.

Presentation on 'The choking of Islamic aid flows since the 1980s Soviet–Afghan war', workshop on 'Muslim humanitarianism', Graduate Institute, Geneva, 15-16 May 2019.

Presentation, 'Remembering the Zagreb Minifesto', International Gustav Metzger Symposium, Zurich University of the Arts, 11 October 2019.

'Reviewers Meet Reviewed', leading an RAI online Zoom seminar to discuss Mikkel Bille's book *Being Bedouin Around Petra: Life at a World Heritage Site in the Twenty-First* Century, following review in JRAI.

## OTHER ACTIVITIES
Advisory Editor for anthropology, *New Dictionary of National Biography* (Oxford University Press), 2001-2003. Contributed articles on M.N. Srinivas, Marian Smith and Julian Pitt-Rivers, and advised on the commissioning and editing of articles on anthropologists who died during  the 20th century and more recently.

Jury member, Habilitation de Diriger des Recherches, political science department, University  of Aix-en-Provence, France, December 2004 (Professor Raphaël Liogier).

Invited to speak at meetings on Islam and humanitarianism at Médecins Sans Frontières offices  in London, Brussels and Amsterdam, 2004. Contributed a commissioned paper to MSF's Strategy Review, summer 2005.

Feasibility study for Swiss Federal Department of Foreign Affairs, Bern (Human Security Division), on 'Towards cooperation in removing obstacles for Islamic charities', January – February 2005. Independent adviser to the same Department for an initiative to implement the recommendations (the 'Montreux Initiative'), subsequently renamed the Islamic Charities Project, administered till 2012 by the Graduate Institute for International and Development Studies, Geneva, now by the Center for Security Studies, ETH Zurich, 2005-2013. Assisted with the Zakat Research Project in the Palestinian Territories, including field visits to the West Bank in 2009 and 2011, 2009-2013; took part in a delegation of the Islamic Charities Project to Washington, DC, March 2011.

Member of Dissertation Committee, University of Bergen, Norway, for doctoral thesis by Lars Gunnar Lundblad on Palestinian zakat committees, April 2011.

Member of the Midterm Review Committee, Major Collaborative Research Initiative, 'Religious Diversity and Its Limits: Moving Beyond Tolerance and Accommodation', Canadian SSHRC, September–November 2013.

Editorial Board, *Journal of Muslim Philanthropy and Civil Society*, 2019–current.

## PROFESSIONAL MEMBERSHIP
1982 Elected Member of the Association of Social Anthropologists.
1994-2003 Honorary Research Fellow, University College London, Department of Anthropology.
2003–current    Honorary Research Associate, University College London, Department of Anthropology.

2009-current   Associate Fellow, Humanitarian and Conflict Response Institute, University of Manchester
2008-2010      Advisory Committee, Religions and Development research programme, University of Birmingham.
2004-2012      Publications Committee, Royal Anthropological Institute
2019–current. *Editorial Board, Journal of Muslim Philanthropy and Civil Society*

**HONOURS AND AWARDS**
1973**.** Chevalier de l'Ordre des Arts et des Lettres (France).
1993. Anthropology in Media Award (AIME Award), American Anthropological Association.
2001. Patron's Medal, Royal Anthropological Institute, for 'distinguished service to anthropology and to the Institute'.

**VOLUNTARY WORK FOR U.K. CHARITIES**
Save the Children (UK): Member of UK Advisory Committee (1981- 87), Overseas Committee (1985-86), Council (1987-90), Assembly (1990-1998), Overseas Advisory Committee (1990-96).

Trustee (1997-2004), Alliance of Religions and Conservation.

Chair (1997-2003, Board member 1996-2006) of INTRAC (International NGO Training and Research Centre), Oxford.

**LANGUAGES**
Fluent speaker, reader and writer of French.
Reading knowledge of Standard Arabic. Elementary colloquial Arabic. Graded 'B+ Intermediate' for Middlebury, Vermont, Summer course in Arabic, June-August 2000.

Elementary Spanish.

**ADDRESS**
Downingbury Farmhouse, Pembury, Tunbridge Wells, Kent TN2 4AD.
Tel. +44 (0)1892 822815 or 822941.
Mobile: +44 (0)7787 510635.
Email: jonathanbenthall@hotmail.com

**EXHIBIT B**

**DOCUMENTS CONSIDERED BY EXPERT**

# DOCUMENTS CONSIDERED BY EXPERT

| |
|---|
| 109th Congress (2005–2006), S.RES.134 https://www.congress.gov/bill/109th-congress/senate-resolution/134 |
| 9/11 Commission Report (2004) |
| ACLU, *Blocking Faith, Freezing Charity: Chilling Muslim charitable giving in the 'war on terrorism financing* (New York: American Civil Liberties Union 2009). |
| "Afghanistan Relief Committee," *Militarist Monitor*, updated December 31, 1990. https://militarist-monitor.org/afghanistan_relief_committee/ Accessed December 27, 2020. |
| Afghan Jehad, vol. 1 no. 4, 1988. http://catalog.acku.edu.af/cgi-bin/koha/opac-detail.pl?biblionumber=15422&query_desc=kw%2Cwrdl%3A%20%22Afghan%20Jehad%22 |
| A.G.I Asset Management (Allianz Global Investors), "*Investment report for Loxhall*" (23 January 1997) |
| Al-Bukhari, Sahih, "*Obligatory Charity Tax (Zakat)*" (Volume 2, Book 24, No.504) https://sunnah.com/bukhari/24 |
| Baitenmann, Helga. "*NGOs, and the Afghan war: The Politicisation of Humanitarian Aid.*" (Third World Quarterly, January 1990) 12:1, 62-85 |
| Belew, Wendell, "*The impact of US laws, regulations, and policies on Gulf Charities*", in Robert Lacey and Jonathan Benthall, Editors, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond* , (Berlin: Gerlach Press, 2014) . |
| Bellion-Jourdan, J. *Islamic relief organizations: between 'Islamism' and 'humanitarianism'* (ISIM Newsletter, 2000) |
| Benthall, Jonathan and Bellion-Jourdan, Jérôme., *The Charitable Crescent: Politics of aid in the Muslim world* (London and New York: I. B. Tauris 2003, new paperback edition 2009). |
| Benthall Jonathan, 2019, "A note on humanitarian terminology". Allegra lab online: *Project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/* |
| Benthall, Jonathan. "*Islamic humanitarianism in adversarial context*" in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, (Erica Bornstein and Peter Redfield, 2011) |
| Benthall, Jonathan, "*The care of orphans in the Islamic tradition, vulnerable children, and child sponsorship programs*" (Journal of Muslim Philanthropy and Civil Society, 2019) |
| Benthall, Jonathan. "*The Islamic Charities Project (Formerly Montreux Initiative)*", in *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester University Press, 2016), pp.14–16 |
| Benthall, Jonathan. "*The Rise and Decline of Saudi Overseas Humanitarian Charities*", (Occasional Paper no. 20, Center for International and Regional Studies, Georgetown University – Qatar, 2018) |
| Benthall, Jonathan. 2012, '*Cultural Proximity and the Conjuncture of Islam with Modern Humanitarianism*", in Michael Barnett and Janice Stein (eds), *Sacred Aid: Faith and Humanitarianism* (Oxford University Press.) |
| Benthall, Jonathan. *The Red Cross and Red Crescent Movement and Islamic Societies, with Special Reference to Jordan* (*British Journal of Middle Eastern Studies*), 24(2), 157-177. |
| Benthall, Jonathan. "*Islamic charities, Faith-Based Organizations, and the international aid system,*" in Jon Alterman and Karin von Hippel, eds, *Understanding Islamic Charities* (Washington: CSIS Press). *Republished in Islamic Charities and Islamic Humanism in Troubled Times* (Manchester: Manchester University Press 2016) *as Chapter 1*.2007. |

Benthall, Jonathan. "*Have Islamic agencies a privileged access in majority Muslim areas? The case of post-tsunami reconstruction in Aceh [Indonesia]"*, (Online Journal of Humanitarian Assistance, 26 June 2008).

Benthall, Jonathan., *"Experto crede: A legal and political conundrum*" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, (2017)

Benthall, Jonathan., *"Financial Worship*", in Jonathan Benthall and Jérôme Bellion-Jourdan, *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B.Tauris) (2003)

Benthall, Jonathan., "*Disasters, Research and the Media" (1993)*

Bloom, Mia and Lokmanoglu, Ayse, "*From pawns to knights: The changing role of women's agency in terrorism*", (Studies in Conflict and Terrorism, 30 April , 2020)

Bokhari, Yusra, Nasim Chowdhury and Robert Lacey, *"A good day to bury a bad charity: The rise and fall of the Al-Haramain Islamic Foundation"*, in Robert Lacey and Jonathan Benthall, eds, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond*, (Berlin: Gerlach Press, 2014)

Bonner, Michael, Mine Ener, and Amy Singer.  *"Poverty and Charity in Middle Eastern Contexts"*. (Albany NY: State University of New York Press, 2003)

Burr, J. Millard and Robert O. Collins. "*Alms for Jihad: Charity and terrorism in the Islamic world"* (New York: Cambridge University Press,2006).

Callimachi, Rukmini., *"The ISIS Files"* by Aymenn Jawad al-Tamimi and Mara Revkin, (New York Times, 4 April 2018)

Caple James, Erica.  *"Policing Philanthropy and Criminalizing Charity in the 'War on Terror"* in *Governing Gifts: Faith, Charity, and the Security State,* ed. Erica Caple James (School for Advanced Research Press, 2019), 141–160

Daalder, Ivo H. 1998, "*Decision to intervene" How the war in Bosnia ended",* December 1st, Brookings
https://www.brookings.edu/articles/decision-to-intervene-how-the-war-in-bosnia-ended/

Jewish Virtual Library. *"Charity (Tzedakah): Eight Levels of Charitable Giving"*
https://www.jewishvirtuallibrary.org/eight-levels-of-charitable-giving

Cordery, Carolyn J. and Baskerville, Rachel F., 2007, "Charity financial reporting regulation: a comparative study of the UK and New Zealand", (Accounting History, 2007)

De Cordier, Bruno.*"The 'humanitarian frontline', development and relief, and religion: What context, which threats and which opportunities?" (Third World Quarterly* 30(4),2009)

De Goede, Marieke, "*Speculative Security: The politics of pursuing terrorist monies"* (Minneapolis: University of Minnesota Press, 2012).

Kadi Deposition

Vinita Deshmukh, Vinita, "*Banks cannot insist on ID proof to cash bearer cheque",* 22 March 2017
See: Banks cannot insist on ID proof to cash bearer cheque (moneylife.in)

Donini, Antonio. "Principles, politics, and pragmatism in the international response to the Afghan crisis" in *Nation-Building Unraveled? Aid, Peace and Justice in Afghanistan*, ed. A. Donini et al. ( Bloomfield: Kumarian Press,2004)

 European Parliamentary Research Service, *"An Overview of Shell Companies in the European Union (2018)*
https://www.europarl.europa.eu/cmsdata/155724/EPRS_STUD_627129_Shell%20companies%20in%20the%20EU.pdf

Fernando Jason, Bosnia – Herzegovina Convertible Mark (BAM) (December 2020)
https://www.investopedia.com/terms/b/bosnia-herzegovina-convertible-mark-bam.asp

FitzGibbon, Francis. "*Low-Hanging Fruit*." (London Review of Books, 22 January 2015).

Hamdan, Amani, "Women and education in Saudi Arabia: Challenges and achievements", (International Education Journal, 2005)https://files.eric.ed.gov/fulltext/EJ854954.pdf

Hegghammer, T., *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979.* 2010.

Hegghammer, Thomas., "*The Caravan: Abdallah Azzam and the Rise of Global Jihad". (*2020)

Hegghammer, Thomas.  "*Jihad in Saudi Arabia: Violence and Pan-Islamisn since 1979.*" (Cambridge: Cambridge University Press, 2010)

Hegghammer, Thomas.  "Violent Islamism in Saudi Arabia, 1979–2006: The Power and Perils of Pan-Islamic Nationalism", doctoral dissertation, Institut d'Études Politiques de Paris (2007) https://hegghammer.files.wordpress.com/2019/07/hegghammer-thesis-violent-islamism-in-saudi-arabia.pdf

Hertog, Steffen.  "*Princes, Brokers, and Bureaucrats: Oil and the State in Saudi Arabia"* (Ithaca: Cornell University Press, 2010)

International Islamic Relief Organisation Newsletter, "London visit of IIRO delegates" (21 April 1995)

Interview in London. IIRO *Newsletter,* 15, April 21, 1995, "London visit of IIRO delegates", p.6. Dr Qurashi (1949–2003) was Secretary General between 1985 and 1996

Interview of Patrick J. Fitzgerald, Memorandum of Record, (28 January 2004)  (Comras relied upon document)

Juul Petersen, Marie.*"For Humanity or for the Ummah? Ideologies of humanitarian aid among transnational Islamic Aid NGOs*" in Michele Acuto (ed.), *Negotiating Relief. The Dialectics of Humanitarian Space.* (London: Hurst & Co, 2012)

Juul Petersen, Marie,  "*Sacralized or secularized aid? Positioning Gulf-based Muslim charities*", in Robert Lacey and Jonathan Benthall, eds, *Gulf Charities and Islamic Philanthropy in the "Age of Terror" and Beyond* (Berlin: Gerlach Press, 2014), 25–52.

KADI0002964 – KADI0002969

KADI0003676 – KADI0003693

KADI0039850 – KADI0039852

KADI0093761 – KADI0093777

KADI0005088 – KADI0005126

KADI0007858

KADI0001708 – KADI00010

KADI0001741

KADI0001743

KADI0002198

KADI0002513 – KADI0002529

KADI0002514

KADI0002515 – KADI0002521

KADI0002523

KADI0002525

KADI0002979

KADI0002979 – KADI0002985

KADI0004269

KADI0007107

KADI0007223 – KADI0007229

KADI0007375 – KADI0007386

KADI0002910 – KADI0002912

| |
|---|
| KADI0092190 |
| KADI0092196 |
| KADI0092197 |
| KADI0010129 |
| KADI0013269 |
| KADI0013494 – KADI0013498 |
| KADI0018536 |
| KADI0018537 |
| KADI0023373 – KADI0023438 |
| KADI0025952 – KADI0025991 |
| KADI005088 – KADI005126 |
| KADI0068337 |
| KADI0077711 – KADI0077714 |
| KADI0077763 – KADI0077766 |
| KADI0077858 – KADI0077865 |
| KADI0077877– KADI0077887 |
| KADI0077900 – KADI0077905 |
| KADI0077906 – KADI0077907 |
| KADI0077919 |
| KADI0077920 – KADI0077926 |
| KADI0077927 |
| KADI0077936 |
| KADI0086484 |
| KADI0086484 – KADI0086499 |
| KADI0087219 – KADI0087221 |
| KADI0089356 – KADI0089359 |
| KADI0089033 – KADI0089034 |
| KADI0089084 |
| KADI0089843 |
| KADI0135576 – KADI0135582 |
| KADI0158736 |
| KADI0158750 – KADI0158829 |
| KADI0162113 |
| KADI0172759 |
| KADI0172757 |
| KADI0228015 |
| KADI0255497 |
| KADI0257746 |
| KADI0265483 |
| KADI0007358 – KADI0007374 |
| Kadi Deposition Exhibit No.21 |
| Kadi Deposition Exhibit No.22 |
| Kadi Deposition Exhibit No.23 |
| Kadi Deposition Exhibit No.24 |
| Kadi Deposition Exhibit No.25 |

| |
|---|
| Kadi Deposition Exhibit No.26 |
| Kadi Deposition Exhibit No.27 |
| Kadi Deposition Exhibit No.28 |
| Kadi Deposition Exhibit No.29 |
| Kadi Deposition Exhibit No.30 |
| Kadi Deposition Exhibit No.31 |
| Kamrava, Mehran. "*Inside the Arab State*" (Hurst 2018). |
| Kimmel, Michael S. *"Globalization and its Mal(e)contents: The gendered moral and political economy of terrorism",* (International Sociology,  September 2003), 603–620, p.615–16 |
| Lacey, Robert and Benthall, Jonathan. *"Gulf Charities and Islamic Philanthropy in the 'Age of Terror' and Beyond"* (Berlin: Gerlach Press 2014) |
| Lacroix, Stéphane.  "*Les islamistes saoudiens: Une insurrection manqué*" (Presses Universitaires de France, 2010), pp.317–318 |
| Lemarchand, Rene and Legg, Keith."*Political clientism and development: a preliminary analysis*", (Comparative Politics,  January 1972), 149–178, p.152. |
| Letter from Dorothy K. Robinson to John P. Kilroy in re: Matthew Levitt's publication. November 9, 2006. |
| Levitt, Matthew. *Hamas: Politics, Charity, and Terrorism in the Service of Jihad.* (New Haven: Yale University Press, 2006) |
| Li, Darryl. *"The Universal Enemy: Jihad, Empire, and the Challenge of Solidarity" (*2020) |
| Low, Lucinda A. "Dealing with allegations of corruption in international arbitration", AJIL Unbound, (Cambridge UniversityPress, 14 October 2019)https://www.cambridge.org/core/journals/american-journal-of-international-law/article/dealing-with-allegations-of-corruption-in-international-arbitration/AB6C9F4B525875AAF3EDDA2542C9A570 |
| Mackay, Sandra. "*The Saudis: Inside the Desert Kingdom*" (London: Harrap, 1987), p.176 |
| Maxwell, Daniel and Majid, Nisar, "*Famine in Somalia: Competing narratives, collective failures*" (Oxford University Press, 2016), p.196*.* |
| Monzer Kahf.  *"Waqf",* in *The Oxford Encyclopedia of Islam and Politics,* ed. Emad El-Din Shahin (Oxford University Press, 2014), pp.536–539. |
| Morton Bech et al. *"Payments are a-changin', but cash still rules", March 2018, Annex "Payments data for CPMI jurisdictions: Table A",* p.80.  https://www.bis.org/publ/qtrpdf/r_qt1803g.pdf |
| Munawar Iqbal, 2017, "Development of Islamic economics and finance and the role of international conferences", *Journal of King Abdulaziz University: Islamic Economics*, *King Abdulaziz University, Islamic Economics Institute*, vol. 30(SI), pages 3-14, April. https://ideas.repec.org/a/abd/kauiea/v30y2017i4no1p3-14.html |
| National Commission on Terrorist Attacks – Monograph on Terrorist Financing (Winer Relied Upon Document) |
| National Commission on Terrorist Attacks upon the United States, Staff Monograph, *Monograph on Terrorist Financing (2004)*. http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf |
| National Endowment for Democracy, Annual Report, 1989, p.15. https://www.ned.org/wp-content/uploads/annualreports/1989-ned-annual-report.pdf |
| National Endowment for Democracy, Annual Report, 1990, p.19. https://www.ned.org/wp-content/uploads/annualreports/1990-ned-annual-report.pdf |

Palmer, Victoria, 2011, *"Analysing 'cultural proximity': Islamic Relief Worldwide and Rohingya refugees in Bangladesh",* (Development in Practice, 2011) 96–108.

Plaintiffs' Document Request to Kadi No.92

"Profile: Mansour al-Kadi, History Commons",
http://www.historycommons.org/entity.jsp?entity=mansour_al_kadi_1

Revkin, Mara, *"ISIS' Social Contract: What the Islamic State Offers Civilians",* (Foreign Affairs, 10 January 2016)

Roy, Sara. *"Review of Matthew Levitt's Hamas: Politics, Charity, and Terrorism in the Service of Jihad".* (Middle East Policy,2007) 14.2: 162–66.

Singer, Amy. "*Charity in Islamic Societies"* (Cambridge University Press, 2008)

Stein, William W. "*Patronage*", in David Levinson and Melvin Ember, Eds, *Encyclopedia of Cultural Anthropology* (New York: Henry Holt and Company), vol. 3, pp.905–907.

Suskind, Ron. *The Price of Loyalty: George W. Bush, the White House, and the Education of Paul O'Neill*, (New York: Simon and Schuster, 2004).

Times Higher Education "*Best universities in the Arab World*" December 15, 2020
https://www.timeshighereducation.com/student/best-universities/best-universities-arab-world

The Charities (Statement of Account) Regulations 1960 (SI 1960 No. 2425).

*The OFAC List: Due process challenges in designation and delisting*. July 2014. Lawyers' Committee for Civil Rights of the San Francisco Bay Area. https://lccrsf.org/wp-content/uploads/The-OFAC-List-2014-FINAL.pdf

UN Department of Humanitarian Affairs, situation report "Pakistan Floods Sept 1992" posted 15 September, 1992. https://reliefweb.int/report/pakistan/pakistan-floods-sep-1992-un-dha-situation-reports-1-8

United Nations Security Council Report of the Ombudsperson, Annex 2 (31 January 2013)

United States Court of Appeals, First Circuit, USA v. Mubayyid and Muntasser, and USA v. Al-Monla, decided September 1, 2011, https://casetext.com/case/us-v-mubayyid-5   Accessed 27 December 2020.

United States District Court, District of Massachusetts, USA v. Muhamed Mubayyid and Emadeddin Z. Muntasser, Defendants' Motion to Dismiss and Incorporated Memorandum,  5 October 2006, https://groups.google.com/g/alt.lawyers/c/GtYFk96SEsk?pli=1    Accessed 27 December 2020

von Hippel, Karin. "*Aid Effectiveness: Improving relations with Islamic charities"* In J. B. Alterman and K. Von Hippel (eds.), *Understanding Islamic Charities*. (Washington DC: Center for Strategic and International Studies, 2007)

Washington Institute. 2012. "Counterterrorism Experts Defend Levitt from Unfair Attack in 'Harper's.'" September 10. http://www.washingtoninstitute.org/press-room/view/levitt-colleagues-object-to-harpers-article.