# EXPERT REPORT OF

## JONATHAN T. MARKS, CPA, CFF, CITP, CGMA, CFE
## PARTNER, BAKER TILLY US, LLP

### AUGUST 7, 2020

Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE
Partner
Baker Tilly US, LLP
1650 Market Street, Suite 4500
Philadelphia, PA 19103
jonathan.marks@bakertilly.com
(267) 261-4947

## TABLE OF CONTENTS

I.      Overview ................................................................................................................ 1
        A.   Retention and Scope .................................................................................. 1
        B.   Qualifications ............................................................................................ 1
        C.   Documents Considered .............................................................................. 2
        D.   Qualifying Language ................................................................................. 2
II.     Background .......................................................................................................... 4
        A.   INTRODUCTION ...................................................................................... 4
        B.   The ALLEGATIONS ................................................................................. 4
III.    Analysis ............................................................................................................... 6
        A.   WAMY's Financial Audit Observations Do Not Indicate Participation In or Support
             of Terrorist Activities ................................................................................ 7
             1.   Pakistan ........................................................................................... 11
             2.   Saudi Eastern Province ................................................................... 15
             3.   Other Saudi Regional Offices ......................................................... 16
        B.   WAMY Canada .......................................................................................... 18
        C.   THE CANADA REVENUE AGENCY ...................................................... 20
             1.   WAMY Canada did not make a payment to the orphan program of BIF USA. 21
        D.   WAMY Does Not Have a Lack of or Systematic Recordkeeping Issues ................ 29
        E.   WAMY's Sources and Use of Funds Were Sufficiently Supported and Were Not
             Indicative of Participating Inn or Supporting Terrorist Activities ........................... 30
        F.   WAMY Did Not Lack Controls ................................................................. 34
IV.     Conclusion ........................................................................................................... 36
Appendix A: Curriculum Vitae ...................................................................................... 39
Appendix B: Documents Considered .............................................................................. 43

# I.   OVERVIEW

## A.   RETENTION AND SCOPE

The Law Firm of Omar T. Mohammedi, LLC ("Counsel"), on behalf of its client, the World Assembly of Muslim Youth headquartered in Saudi Arabia ("WAMY") and the World Assembly of Muslim Youth USA ("WAMY USA"), engaged Baker Tilly US, LLP ("Baker Tilly", "we", or "us") to provide litigation support services and identified Jonathan T. Marks ("I", "me", or, "my") to serve as the rebuttal financial expert in the matter; *Terrorist Attacks On September 11, 2001, Case: 1:03-MD-01570-GBD-SN, United States District Court Southern District Of New York.*

My review involves an analysis of primary source documents, including financial documentation from WAMY and its chapters and uses of WAMY's funding for the period 1992 through 2002 to rebut claims raised in the Plaintiffs' experts' reports concerning WAMY's alleged involvement in terrorism financing.

## B.   QUALIFICATIONS

This expert report ("Report") is based upon my professional knowledge, education, training, and experience on similar investigatory engagements. I am the Partner and Practice Leader of the Forensic Investigations, Compliance, and Integrity Services group at Baker Tilly. I am a Certified Public Accountant, ("CPA"), Certified in Financial Forensics ("CFF"), a Certified Information Technology Professional ("CITP"), a Chartered Global Management Accountant ("CGMA"), and a Certified Fraud Examiner ("CFE"). I currently serve on the American Institute of Certified Public Accountants' ("AICPA") Fraud Task Force, which guides CPAs who specialize in fraud and forensic investigations. I am also a Board Fellow at the National Association of Corporate Directors and a published author appearing in the Journal of Forensic and Investigative

Accounting, Volume 11: Issue 3, July–December 2019.[1]  I was an adjunct professor at Rider University, where I taught auditing.  I was also a guest lecturer at Lehigh University, where I taught forensic accounting.

Attached, as **Exhibit A**, is my current curriculum vitae and information, which identifies my education, employment history, publications over the last ten years, and my expert testimony over the last four years.

## C.   DOCUMENTS CONSIDERED

I, and others under my direct supervision, have performed the analyses with the information made available through discovery. The information that I considered in my review includes (1) audit reports, (2) bank statements, (3) bank reports, (4) receipts, (5), financial reports,  (6), project reports,  (6) operational reports, and  (7) communications  regarding  operations  and  financial documents. See **Exhibit B**. The documents and information that I considered and relied on are consistent with the types of documents and information that accountants and practitioners in my field typically consider and rely on in performing analyses such as those that I was asked to perform in this matter.

## D.   QUALIFYING LANGUAGE

This Report and the accompanying exhibits are intended solely for use in connection with this litigation and may contain confidential information.  Any unauthorized use or distribution of this Report or its attachments is strictly prohibited. I specifically reserve the right to supplement or update this Report on learning additional information that may impact the findings or opinions stated herein, and reserve the right to respond to any additional information obtained through discovery or issues raised by experts retained by Plaintiffs. In addition, I reserve the right to prepare

---

[1] *See* **Exhibit A**, the Curriculum Vitae of Jonathan T. Marks.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

additional exhibits, charts, graphs, tables, demonstratives, and diagrams to summarize or support the opinions and analyses set forth in this Report.

## II.      BACKGROUND

### A.      INTRODUCTION

WAMY is a charitable organization founded in 1972 which maintained global satellite offices during the period 1992 through 2002 ("Relevant Period"). WAMY defines itself as "an independent organization and Islamic forum that supports the work of Muslim organizations and needy communities" all over the world. This Report is prepared to rebut the expert reports of Evan Francois Kohlmann ("Kohlmann"), Dr. Matthew Levitt ("Levitt"), and Jonathan M. Winer ("Winer") (together referred to herein as the "Opposing Experts"). The Opposing Experts are not auditors, accountants, financial experts, certified fraud examiners, or CPAs.

### B.      THE ALLEGATIONS

In connection with the matter, the Plaintiffs have accused WAMY of knowingly providing material support to Usama Bin Laden ("Bin Laden") and his organization, Al-Qaeda.

Specifically, the Opposing Experts have argued the following:

1.      WAMY knowingly provided financial support to known terrorist organizations, including Al Qaeda.

2.      During the Relevant Period, the charitable sector was vulnerable to exploitation by terrorists due to lax regulatory requirements.

3.      Financial irregularities were inherent "features" of WAMY and "consistent with typical terrorist financing models".

4.      WAMY showed a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to prevent the detection of their provision of material support to Al Qaeda and other terrorist groups prior to 9/11.

5.      The "organizational and financial structures of WAMY are evidence that their material support of Al Qaeda" … "was conducted with the awareness and knowledge of senior officials who headed these organizations."

6.      WAMY knowingly laundered money through their charitable projects, using portions for relief purposes and diverting other portions to Al Qaeda.

7.      WAMY knowingly provided material support to Al Qaeda by "hid[ing] what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities."

### III.     ANALYSIS

Based upon my review and analysis of the tens of thousands of primary source documents and other information produced in connection with this matter, I have not uncovered evidence to support a finding of financial mismanagement or misconduct indicative of terrorist financing activities on behalf of WAMY. The Opposing Experts describe WAMY as a terrorist-financing organization; however, their accusations point to no specific examples where WAMY knowingly financed terrorist activities, let alone the activities of UBL and Al Qaeda.  Instead, they rely generally upon a theory that, since non-profit organizations can sometimes be used to finance terrorist activity (with or without their knowledge), therefore WAMY must have been used by UBL and Al Qaeda.  Opposing Experts have no clear methodology or financial analysis with respect to their allegations against WAMY.  They have failed to base their opinions or reach conclusions on specific facts, circumstances, and documentary proof.  I have reached the opposite conclusions based upon my review and financial analysis in my capacity as a financial expert, trained CPA, and CFE. The accounting and audit methodology presented by the Opposing Experts—to the extent one exists—is not based on first-hand professional experience. None of the Opposing Experts are auditors, accountants, financial experts, certified fraud examiners, or CPAs. Yet, they purport to opine on issues that call for that expertise.  Moreover, experts who are CPAs, accountants, and auditors approach their analyses using tested and accepted methods and approaches, which the Opposing Experts have not applied.  Instead, they have just speculated without any analysis. Therefore, their combined methodologies are not based on relevant qualifications. Furthermore, the Opposing Experts do not base their conclusion on primary source financial documentation, which is central to our analysis. More problematic, the Plaintiffs' experts' conclusions are nothing more than speculation.

My analysis finds that WAMY experienced very few internal control weaknesses, which, when discovered, were addressed with more robust control environments, and did not and do not rise to the level of culpable conduct described by Opposing Experts. Based on the documentation I reviewed, I found WAMY's overall accounting control environment and efforts in correcting control deficiencies to be in line with a well-operated organization, considering the challenges faced by a not-for-profit organization operating in various developing countries where resources are scarce and financial regulations are not anywhere near the sophistication of the U.S. financial and accounting system requirements. I do not concur with the conclusions reached in the Opposing Expert reports.

The bases for my opinions are set forth below.

**A.     WAMY'S FINANCIAL AUDIT OBSERVATIONS DO NOT INDICATE PARTICIPATION IN OR SUPPORT OF TERRORIST ACTIVITIES**

The Opposing Experts stated that terrorist organizations rely on terrorist sympathizers "in specific foreign branch offices of large, international charities particularly those with lax external oversight and ineffective internal controls," for fundraising purposes.[2] WAMY did not experience lax oversight or ineffective internal controls. Specifically, by addressing limited instances of non-compliant reporting and recordkeeping with proactive internal control actions, WAMY has shown that it does not have lax external oversight and that it addresses internal control issues as they arise. What I found were increased external oversight and increased controls.

I, and others under my direct supervision, reviewed 57 audit reports / audited financial statements from WAMY and its international offices, in both English and Arabic.  I will tackle these head-on. Based on my review of the audit reports, I uncovered anodyne financial audit

---

[2] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) (SN) ECF Case, Expert Report of Evan Francois Kohlmann.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

observations relating to support surrounding the use of WAMY's funds and controls. The nature of the financial audit observations found in my review does not provide any indication that WAMY intentionally sponsored projects and individuals connected with terrorist activities.

The Opposing Experts simply ignore the fact that as early as 1997, WAMY began the process of implementing a more robust, centralized organizational accounting system and IT control system. This process introduced more strict and centralized controls of its national and foreign offices.[3] An organization seeking to hide illegal contributions to terrorist organizations does not heavily invest in top-flight accounting firms, and costly IT controls.

Implementing central controls is in line with practices of a large international not-for-profit organization and the Financial Action Task Force's ("FATF") *Best Practices Paper On Combatting The Abuse Of Nonprofit Organizations.*[4] Kohlmann's Report states that WAMY's financial irregularities and atypical accounting practices reflect "typical terrorist financing modes and methodologies." I reviewed the controls put in place by WAMY; the institution of centralized controls is not reflective of "typical terrorist financing modes and methodologies,"[5] but of a global organization that is improving its overall risk profile.[6] None of the Opposing Experts are auditors, accountants, financial experts, certified fraud examiners or CPAs; therefore, Kohlmann's use of the term "atypical" or "irregular" would be misleading as he does not have the prerequisite background or experience to understand not only what atypical or irregular would be, but what typical or regular would be.

---

[3] WAMYSA082520

[4] Financial Action Task Force, *Best Practices Paper On Combating The Abuse Of Non-Profit Organizations (Recommendations 8),* June 2015, Date Accessed: July 13, 2020; (https://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf).

[5] Kohlmann Report at , page 4 and 7

[6] Guidance for a Risk-Based Approach, The Bank Sector, Issued: October 2014, pg. 4 (http://www.fatf-gafi.org/media/fatf/documents/reports/Risk-Based-Approach-Banking-Sector.pdf)

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

According to Winer, Bin Laden and other Islamist leaders issued a fatwa[7] calling upon Muslims around the world to kill Americans in 1998.[8]  Levitt claims that, by 1999, Al Qaeda had the capacity to conduct major terrorist attacks as it built a worldwide network in about 60 countries.[9] Levitt further claims that Bin Laden allegedly used the resources of international Islamic nongovernmental organizations ("NGO") to finance terrorist activities.[10] According to the Opposing Experts, "Terrorist abuse of such NGOs [took] place at the local branch office rather than at the organizations' headquarters."[11] Winer opines that organizations that supported Al Qaeda showed a recurrent pattern of deficient controls.[12]

Levitt does not show how the NGOs provided this financial support to finance the 9/11 attacks. His contention is vague and conclusory and does not speak to WAMY's operations. Winer states that he has "not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds"; Winer uses this as the basis for his argument that, due to no audits being performed, the funds must have been used to support al-Qaeda and other terrorist activities.[13] As we have found in our review, WAMY performed numerous audits in Saudi Arabia and across its international offices, all of which do not highlight any concerns that money was being laundered to support al Qaeda. Furthermore, Winer is not a qualified CPA or forensic

---

[7] A fatwa is a legal opinion or decree handed down by an Islamic religious leader. *See* Definition of *fatwa*, Merriam-Webster, Date Accessed: July 24, 2020 (https://www.merriam-webster.com/dictionary/fatwa).

[8] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 9

[9] Expert Report of Dr. Matthew Levitt, page 10

[10] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 19

[11] Islamic Terrorists: Using Nongovernmental Organization Extensively (FED-PEC0290360-85)

[12] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 9, paragraph 3.9

[13] Winer report,  section 12.12.7 onwards, page 106

accountant, and he has not reviewed the wealth of financial information available to make such broad claims. A review of the primary source documents shows that WAMY supported other charitable organizations and initiatives that were in line with the goals enumerated in WAMY's charter, which includes humanitarian support for refugees and orphans affected by war. Based on our review of the project reports and receipts, WAMY provided financial support for refugee initiatives, which included humanitarian support in the form of clothing, food, and shelter. We reviewed project reports that include, for example, support for Kosovo refugees in Albania (1999),[14] Palestinian refugees in Lebanon (2002),[15] and Chechen refugees in Georgia (2000).[16] When providing funds for refugees, WAMY required the recipients to follow up with reports to ensure the charitable use of funds.[17] Supporting refugees and orphans affected by wars does not equate to terrorism, and is in line with WAMY's stated charitable goals. In addition, the control aspect of requiring reports continues with the transparent nature of its funding.

By beginning to institute more strict and centralized controls in 1997, WAMY became a more transparent and better recordkeeping organization that is not in-line with organizations that supported Al Qaeda. WAMY strived to achieve for best practices when it demanded that its local offices report and be accountable for spending, which is not typical for an organization "hiding" something. This structure and behavior are indicative of a control-based group, and not a group ran without control of its local branches.

---

[14] WAMYSA524838-WAMYSA524842

[15] WAMYSA525267-WAMYSA525272

[16] WAMYSA044850 - WAMYSA044851

[17] Ibid. The document includes the relief contract and sets out the agreement of support and amounts for each part, also requires the recipient party (in Georgia) to support expenditure with periodic reports.

As demonstrated below, this Report tackles head-on the few audit statements that presented any accounting issues which reveal no so-called "recurrent pattern of deficient control."

### 1. Pakistan

Lajnat al-Birr al-Islamiah ("LBI") was founded by Adel Batterjee[18] ("Batterjee") and registered in Pakistan on October 22, 1989,[19] with the main purpose of providing health services and urgent relief assistance to the poor in Northern Pakistan. LBI was established under the auspices of WAMY.[20]

LBI performed humanitarian works inside Afghanistan during its first two years of operations.[21] Initially, Batterjee kept satisfactory records of LBI's activities.[22] As WAMY's Assistant Secretary General explained, WAMY's policy was not to send funds unless they are allocated for specific projects and activities. Before the start of any project, a needs-assessment was performed, and the development of a budget followed this exercise. WAMY Saudi Arabia would follow up on every project, and if project reports were not received, WAMY would send someone from Jeddah to get the financial records and support[23]. We have found these declarations from Noorwali to be consistent with the supporting primary documents reviewed, and the project reports contained sufficient evidence for these processes, as we discuss in section C of our analysis. WAMY required the following items:

1. Needs Assessments

---

[18] PEC-WAMY040214, pg. 19/50

[19] WAMYSA018655 (BT: see WAMYSA057751, WAMYSA031896) (showing Pakistan registration March 12, 1991)

[20] Dr. Abdul Wahab Noorwali's Deposition Transcript, July 24, 2019, at 228.

[21] WAMYSA031308; WAMY028427; WAMYSA031293–8 and WAMYSA031301; and WAMYSA031289–92, and WAMYSA031302–4 (specific projects and their funding)

[22] April 2, 2018 Noorwali Declaration, at 8, 10; see also WAMYSA031289–92, and WAMYSA031302–4.

[23] Noorwali Declaration, at 17-24.

      2.   Project Reports

      3.   Operational Reports

      4.   Transactional Statements

WAMY would only send funds allocated for a specific project and would require reporting and audits on this funding to track the use of this funding.[24] The funding for WAMY's projects was thus done on a project by project basis. This is a version of control because it does not allow for a buildup of excess funds.   The funding of LBI on a project by project basis exhibits control over the funding of these projects.

However, by 1992, the relationship between WAMY and Batterjee was deteriorating due to Batterjee's progressive lack of reporting. This lack of reporting led to Batterjee's dismissal in early 1993.[25]

WAMY then became aware that Batterjee was using BIF, a separate charity unrelated to WAMY, to make donors feel as if they were donating to LBI when they were donating to BIF.[26] In response, WAMY immediately sent Batterjee a letter asking him to cease and desist.[27] On May 11, 1993, WAMY's Secretary General, Dr. al-Johani, informed then-Prince Salman bin Abdul Aziz about Batterjee's dismissal from LBI and about the deception.[28]   These active actions by WAMY highlight its proactive approach to control and show that WAMY was active in its management and removal of anyone it considered to be a bad actor. An organization that was

---

[24] April 2, 2018 Noorwali Decl. ¶ 15.

[25] April 2, 2018 Noorwali Decl. at Paragraphs 34-39.

[26] WAMYSA034247-248.

[27] FED-PEC0114419

[28] WAMYSA061345

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

actively financing terrorism would not proactively remove an individual and bring to light to any deception.

In July 1995, WAMY decided to dissolve LBI and take it over as a WAMY field office. "This was done in order to cut ties with Adel Batterjee clearly and to ensure that his activities with BIF were not attributed to or affiliated with WAMY."[29] As WAMY's Assistant Secretary General Dr. Noorwali stated, "the relationship with Adel Batterjee was cut, ended, and he used to carry out his activities in Benevolence International Foundation, of which we do not know any details. And our offices in the field, whether in Pakistan or other regions, did not deal with Benevolence International Foundation."[30] On May 28, 1996, that decision took effect, and LBI was dissolved and taken over by WAMY. LBI's name was merged into WAMY after the dissolution of all assets of LBI Pakistan.

Meanwhile, as Dr. Bahafzallah took over as LBI chairman in early 1993 after Batterjee's dismissal, he submitted LBI to annual external auditing by the Pakistani firm of Sidat Hyder Qamar Maqbook & Co., a representative of Arthur Anderson.[31] There was no mention of BIF anywhere in the LBI audit reports. Moreover, from all the audits carried out through 1997, when the organization was still named LBI,[32] it was clear that LBI had its main assets in Pakistan and Afghanistan. None of these assets were shared or transferred to any other organization, contrary to the speculative and unfounded statements in the Plaintiffs' experts' reports[33] when they lump

---

[29] Noorwali declaration II, at 13. See also WAMYSA065181–5.

[30] Noorwali deposition, July 24, 2019, at 267.

[31] WAMYSA018660–83.

[32] WAMYSA018648–83.

[33] E.g. Winer Report section 12.12.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

BIF and LBI together without any factual basis as one organization and claim BIF was a continuation of LBI.[34]  Our analysis of this matter is further detailed below.

WAMY funded specific charitable projects for LBI and WAMY Pakistan, and further required them to have audits performed to assure that LBI and WAMY Pakistan complied with WAMY's charitable initiatives in Pakistan from 1992 to 2002[35]. WAMY Pakistan conducted charitable projects in both Pakistan and bordering Afghanistan. While the Pakistani projects were audited and received a fair opinion, meaning that the financial statements are free from material misstatements and faithfully represent the financial performance and position of the entity, the audit reports contained a "disclaimer"[36] for relief projects in Afghanistan. In this case, a disclaimer was issued since the auditors were unable to verify the use of funds in neighboring Afghanistan, likely due to regional instability. However, there was nothing in the audit reports that showed any wrongdoing.  Based on my experience as a CPA and my review of the primary source documents, I conclude that these uses of a disclaimer were not out of place or a sign of terrorist funding. Regional instability and dangerous conditions in the area can lead to the use of a disclaimer.  An audit report containing a "disclaimer" does not equate to guilt.  Afghanistan was essentially an active war zone at the time, which necessitated the need for charitable assistance for those affected. Nevertheless, the auditors mention that assurance based on the close involvement of a regional director was common for the time.

---

[34] See also the report on LBI at WAMYSA065181–5.

[35] WAMYSA018575  & WAMYSA9690 to WAMYSA9738

[36] A disclaimer of opinion are normally a result of significant scope restrictions and when an auditor assesses that other types of opinions may not be warranted. *See*: The CPA Journal, Using Disclaimer in Audit Reports Discerning Between Shades of Opinion, Written By: Robert R. Davis, April 2004 Issue, Date Accessed: July 15, 2020 (http://archives.cpajournal.com/2004/404/essentials/p26.htm).

The dissolution of LBI followed proper procedures.[37] The Saudi Ministry of Islamic Affairs oversaw the dissolution by inspecting all assets and accountings of LBI. Based on principles of dissolutions, LBI, under the auspices of WAMY, provided financial documentation of its funds to the Ministry during the process of dissolution.[38] The funds were segregated until all assets were accounted for.[39] When the dissolution process was completed, the funds that had been put in to the Ministry were returned to WAMY after the merger of LBI into WAMY. Based on our financial expertise, LBI followed the right process of dissolution which shows the organization had no connection with any other organization except WAMY, and certainly was not financially connected to BIF. Batterjee was heading BIF which had its own activities, funding and operations and was established in different countries, including the US. LBI had no operations in the US. We have not seen any connection between WAMY and BIF based on our analysis.

### 2. *Saudi Eastern Province*

The regional WAMY offices of Dammam, Ahsa, and Khobor are subject to combined audits under the umbrella of the Saudi Eastern Province chapter of WAMY. Of the fourteen (14) audits performed for the Saudi Eastern Province during the Relevant Period, thirteen (13) received an "unqualified" opinion,[40] and only one, for the year ending December 31, 1999, highlighted control issues.[41]   As a CPA and auditor, the issues are not a concern because of the proactive approach taken by WAMY.

---

[37] WAMYSA032007–13; WAMYSA032014–20;

[38]. WAMYSA057787-WAMYSA057788, and WAMYSA029901-02.

[39] WAMYSA065183–5.

[40] An unqualified opinion is where an auditor has determined that financial statements are presented fairly, in all material respects, and in accordance with the applicable generally accepted accounting principles.

[41] WAMYSA1070344-70599

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

The auditors also set out practical guidelines to improve accounting performance. The guidelines advocated for a centralized accounting system that would save costs, time, and journal entries between the offices. As discussed below, WAMY promptly acted to set up protocols to adopt the measures recommended by the auditors, including, without limitation, the installation of a unified accounting system in all eastern provinces, the hiring of accountants in all offices, and staff training. In 1997, WAMY improved its IT functionality around accounting, and in 1999 they continued these accounting control improvements with more technology, hiring, and training. From an accounting standpoint, these proactive actions are further examples of an organization improving transparency and reporting.

The issues highlighted in the audits of the Saudi Eastern Province and WAMY Pakistan were exceptions to the other audit opinions found among its global and regional affiliate offices, which found the financial statements to be true and fair. The audit reports reviewed with exceptions represent 1.75% of the total global, and regional affiliated offices audits reviewed.[42]

### 3. *Other Saudi Regional Offices*

The following are two instances of accounting exceptions noted in the financial statements:

a. The 1994 audit of the Dammam office found that the fixed assets had been incorrectly included as expenses.[43]

b. The Riyadh office 1999 audit report found an issue with the accounting of fixed assets.[44]

---

[42] Bangladesh - WAMYSA066752 - WAMYSA066802, Baku - WAMYSA066717 - WAMYSA066751, Indonesia - WAMYSA066972 - WAMYSA067030, Somalia - WAMYSA067482 - WAMYSA067515,Sri Lanka - WAMYSA067542 - WAMYSA067657, Australia and South Pacific - WAMYSA066224-WAMYSA066240, South Africa- WAMYSA066424-WAMYSA066441, Pakistan - BUR-PEC-077860
[43] WAMYSA1070344-599 (pg. 157-163)
[44] WAMYSA1080588- 745

Neither of these issues would be indicative of an attempt to hide illicit activity. The financial audit observations describe the human errors that are common even in the most sophisticated companies in the U.S.  In a study of account errors common in non-profit organizations, *Accounting Errors in Non-profit Organizations. Accounting Horizons, presented by Jeffrey Burks, the Thomas and Therese Grojean Family Associate Professor of Accountancy and the Deloitte Faculty Fellow a professor at Notre Dame*, the presenters state, "[p]ublic charities report errors at a rate that is 60 percent higher than that of publicly traded corporations, and almost twice as high as that of similar-sized corporations. The errors are commonly errors of omission (i.e., failing to recognize items)." The errors in WAMY's accounting/bookkeeping records are common among charities, and WAMY's auditors advised and worked with WAMY to adjust the financial statements for the aforementioned issues.  My observations of the actions taken by WAMY to improve its problems is an act of control.

Increased accounting controls began as early as 1997 when the WAMY Secretary General declared that WAMY would be centralizing its IT systems.[45] Over the course of centralizing recordkeeping, WAMY gradually became aware of issues in their internal controls and made a conscientious effort to improve any control issues. The following actions were taken:

a.  A new accounting and financial policy was introduced and implemented with immediate effect on January 1st, 2000.[46] This set out guidance on how to recognize revenue, how to treat expenditures, and how funds are to be prioritized and allocated between projects.  The accounting department in the main office was tasked with increased responsibility, and their role was extended to the following:

---

[45] WAMYSA082521

[46] WAMYSA1070344-70599

    i.   Follow up the application of the accounting system in all offices with supervision and review of financial restrictions in each office,

    ii.   Prepare the final annual accounts of the symposium in the eastern region, and

    iii.   Support the planning of budgets of new offices

b.   Internal correspondence from the WAMY head office was identified, which reprimanded managers for any employees not following employment procedures.[47]

c.   Minutes from a meeting held with the accountants from the Saudi regional offices on June 18, 2000, provide evidence of changing accounting protocols in the eastern provinces to rectify the issues. This included the installation of a unified accounting system in all eastern provinces, the hiring of accountants in all offices, and staff training.[48]

I have noted that WAMY updated and centralized its accounting systems in the late 1990s and early 2000s, which is supported by internal correspondence.[49] Moreover, WAMY requires international offices to report on the allocation of installments of funding, following proof of activities on a bi-annually or quarterly basis.[50] These proactive efforts to enhance WAMY's internal controls and financial operations demonstrate the organization's efforts to enhance its control environment.

## B.    WAMY CANADA

I reviewed documents that highlighted the issues experienced by the Canadian office during the implementation of the new control and budgetary process: Mohammed Khatib

---

[47] WAMYSA528986-WAMYSA529175 pg 21

[48] WAMYSA1070344- 70599

[49] WAMYSA082521 &  WAMYSA082520

[50] WAMY SA 2179- 2180 &  WAMY SA 2100- 2102

("Khatib"), the director of WAMY Canada from 1997 through March 2001. In 1999, Khatib requested $12,000 for budgetary expenditures from WAMY,[51] but he only received a response for $3,000[52] of the requested amount. Additionally, by February 2001, WAMY Canada had not received any funds for the first quarter of 2001.[53] By March 2001, WAMY had demanded Khatib's resignation.[54] These actions were taken by WAMY because Khatib did not furnish detailed plans and reports of activities required to release the funds requested.

In a speech, "Identifying Terrorist Financing Red Flags and Emerging Trends" presented at ACAMS 9th Annual International Anti-Money Laundering Conference by Dennis M. Lormel, a terrorism expert and a former FBI agent responsible for having established an investigative organization within the FBI that identified the funding stream that supported the 9/11 attacks, Mr. Lormel highlighted the following;[55]

- The best chance to prevent terrorists from succeeding is to disrupt their ability to raise, move and access money

- Terrorists must have effective financial infrastructures

- Terrorists require financial support to achieve their goals

- Lack of government transparency

The defunding of WAMY Canada under Khatib was a direct response by WAMY to control funding and the actions of a director who was not operating in a controlled, transparent

---

[51] WAMY SA 2427- 29

[52] WAMY SA2579- 83 &  WAMYSA9807

[53] April 2, 2018 Declaration of Dr. Abdullah, ¶ 28.

[54] March 29, 2018 Declaration of Al-Khatib, ¶¶ 40, 43.

[55] ACAMS 9th Annual International Anti-Money Laundering Conference, Mandalay Bay, Las Vegas, Identifying Terrorist Financing Red Flags and Emerging Trends, September 20, 2010, Dennis M. Lormel, Founder and President, DML Associates.

manner.  WAMY took immediate action to correct the actions of one individual who was not being transparent.  WAMY promoted transparency, and when Khatib did not follow the control structure,[56] WAMY disrupted his ability to raise, move, and access money.  These actions are in line with Lormel's comments on what steps should be taken to prevent terrorists from succeeding, and they are not actions of a problematic organization or one ignoring misconduct.

## C.    THE CANADA REVENUE AGENCY

The Opposing Experts focus on the findings of the Canada Revenue Agency but reach the wrong conclusion. The Canada Revenue Agency ("CRA")[57] audited WAMY Canada and made an administrative decision regarding its taxable status. Along the way, the CRA points to WAMY Canada's connections to Benevolence International Foundation in Canada ("BIF Canada") and Benevolence International Foundation in the USA ("BIF USA") – neither of which were terrorist organizations or designated by any authority during the time period in question (January – June 2001).  Plaintiffs' experts focus on the fact that WAMY Canada and BIF Canada shared a common director, al- Khatib, a common address which was Khatib's home address, and a common bank account created by Khatib.

According to the CRA, BIF Canada and WAMY Canada shared an account at the Bank of Montreal with account number 8086-611.  The account was opened in October 2000 under the name "World Assembly of Muslim Youth." In January 2001, the name was changed by Khatib to "World Assembly of Muslim Youth o/a BIF," and then closed in June 2001.  In June 2001, the address on the account was the same as BIF Canada and Khatib's home address, in June of 2001 the address was the same as the last known address of BIF Canada. The 1998 address on

---

[56] WAMYSA067658

WAMY's application for charitable registration is the same as the address BIF used in its filings with the CRA. In Khatib's sworn declaration, he states that the Bank of Montreal account was a BIF account and that no WAMY funds were co-mingled with BIF funds.[58]  WAMY Canada and BIF Canada were two separate entities. Although they shared the Bank of Montreal bank account through Khatib, BIF Canada was not funded by WAMY Canada or by WAMY in Saudi Arabia. According to Khatib, the account was created this way to allow BIF Canada donors to take advantage of the tax-deductible status of WAMY Canada, while BIF Canada was waiting for approval of the request for charity status. He also stated that WAMY was not aware of his dealings with BIF because he did not disclose this relationship with anyone at WAMY.  As mentioned in Abdullah's testimony provided during his deposition, WAMY discontinued funding of WAMY Canada because Khatib failed to report the activities of the organization and terminated Khatib upon learning that he was volunteering or working for more than one charity without disclosing those relationships. The control actions of WAMY towards WAMY Canada are not in line with an organization supporting terrorist activities.

1. *WAMY Canada did not make a payment to the orphan program of BIF USA.*

The CRA audit report includes references that funds moved from WAMY Canada to BIF USA. The documents I reviewed only disclosed the movement of funds between BIF Canada to BIF USA. The audit reports I reviewed did not reveal, as Winer claims, "recurrent patterns of gross abuse, as one would expect of charities whose personnel intentionally were expending charitable funds for prohibited purposes, such as buying weapons and providing direct support to terrorist groups." Winer Report at 3.9. There were no supporting documents to show

---

[58] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

that funds were used to purchase weapons or support terror.  Khatib was in control of the account, not WAMY.

Opposing Expert Winer stated:

> "Canada's audit of WAMY illustrates how financial improprieties and irregularities in a charity that included inadequate books and records create a situation where it becomes impossible to determine how funds were actually used, even when other evidence shows that the charity is linked to terrorist groups, makes payments to other charities found to have directly funded terrorism; and disseminates hate speech consistent with ideological support of terrorism. Inadequate and fraudulent books and records are typical of charities that are hiding bad conduct. For charities linked to terrorism, bad books and records become the means of hiding terrorist support activities."

These statements are not correct with regards to WAMY Canada. Our first-hand review of the documentation shows clear evidence of the fund movement and to whom the funds are going to. There is no lack of transparency on behalf of WAMY Canada with this fund movement. Neither WAMY nor WAMY Canada funded BIF USA.  My review of the documents shows that the BIF USA money was sent out by Khatib to a charity organization, not a terrorist organization.  This is based on the evidence provided by WAMY Canada and the Canadian Government, not a third-hand comment.

The payment amount of $50,246 related to the orphan program was reflected in WAMY Canada's 2001 T3010 Registered Charity Information Return, WAMY Canada's unaudited financial statements, the WAMY Canada bank statements, and the CRA 2001 audit report.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## SECTION H. GIFTS TO QUALIFIED DONEES

The terms **qualified donee, specified gift,** and **associated charity** are explained in the guide.

H1 Did the charity make gifts to qualified donees? _____ 500 ☒ Yes    ☐ No

If *no*, go to section I.

If *yes*, provide the information outlined below. Please enter the total amount the charity gave each donee during the fiscal period, and list donees in order of the amount they received from largest to smallest.

| Name of donee | Check if donee is an associated charity | Location | BN/Registration number of donee if a charity | Amount of Gift | |
|---|---|---|---|---|---|
| | | | | Gifts (do not include specified gifts) ($) | Specified gifts ($) |
| ISLAMIC COMMUNITY CENTRE | ☐ | TORONTO ON | | 48,209 | |
| ORPHAN PROGRAM | ☐ | USA | | 50,246 | |
| AL HIJRA SCHOOL | ☐ | WINDSOR ONTARIO | | 66,721 | |
| DAR AL IMAN SCHOOL | ☐ | ST. LAURANT QC | | 21,891 | |
| IQRA ISLAMIC SCHOOL | ☐ | SURRY BC | | 13,970 | |
| REGINA HUDA SCHOOL | ☐ | REGINA SA | | 6,982 | |
| | ☐ | | | | |
| | | | Totals: 501 | 208,019 | 502 |

Total amounts given to qualified donees (add lines 501 and 502) _____  503 $    208,019

---

CANADA REVENUE AGENCY - AUDIT REPORT                                    PROTECTED B

CLIENT: WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY)

- 2001   -$50,246 to the **Benevolence International Fund** Orphan Program.
          -$4.000 to the **Muslim Student Association**.

EXPENSE

| | | |
|---|---|---|
| Cost of Goods Sold | | |
| Net Purchase | 0.00 | 0.00 |
| Total Cost of Goods Sold | 0.00 | 0.00 |
| | | |
| Payroll Expenses | | |
| Total Payroll Expense | 0.00 | 0.00 |
| | | |
| General & Administrative Expenses | | |
| Support to Charitable Organizations | 91,051.43 | 91,051.43 |
| Camp | 7,224.01 | 7,224.01 |
| Festival | 920.00 | 920.00 |
| Support -Al Hijra School | 66,721.26 | 66,721.26 |
| Designated Donation-Orphange Proj | 73,811.89 | 73,811.89 |
| Lisence & Registration | 30.00 | 30.00 |
| Interest & Bank Charges | 77.74 | 77.74 |
| Office Supplies | 252.96 | 252.96 |
| Gas | 0.00 | 0.00 |
| Food | 0.00 | 0.00 |
| Storage | 0.00 | 0.00 |
| Moving | 0.00 | 0.00 |
| Parking | 0.00 | 0.00 |
| Total General & Admin. Expenses | 240,089.29 | 240,089.29 |
| | | |
| TOTAL EXPENSE | 240,089.29 | 240,089.29 |
| | | |
| NET INCOME | -37,178.31 | -37,178.31 |

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

**EXPENSES**

| | |
|---|---:|
| Programme expenses | 165,917 |
| Designated donations | 73,812 |
| Office and general | 360 |
| Amortization | 510 |
| | 240,599 |

| | |
|---|---:|
| **EXPENDITURES IN EXCESS OVER REVENUES** | (37,688) |
| Net assets, beginning of year | 47,112 |
| **Net assets, end of year** | $ (9,424) |

**WORLD ASSEMBLY OF MUSLIM YOUTH**
STATEMENT OF OPERATIONS AND NET ASSETS

| FOR THE YEAR ENDED DECEMBER 31, | 2001 |
|---|---:|
| **REVENUES** | |
| Donations (Note 2) | $ 130,472 |
| Designated donations | 72,281 |
| Other Income | 158 |
| | 202,911 |
| **EXPENSES** | |
| Programme expenses | 189,483 |
| Designated donations | 50,246 |
| Office and general | 360 |
| Amortization | 510 |
| | 240,599 |

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## Transaction details

| Date | Description | Amounts debited from your account ($) | Amounts credited to your account ($) | Balance ($) |
|---|---|---|---|---|
| | **CAD FirstBank Business Investment Account® # 0430 8086-611** | | | |
| | Account type: NPO | | *$ 230 Deposit from [handwritten]* | |
| Mar 6 | **Opening balance** | | | 8,100.71 |
| Mar 6 | Credit, BR.0309, ABM DEPOSIT ADJUSTMENT, 9562244 | | 3,087.00 | 11,187.71 |
| Mar 6 | Sundry Item, BR.0309, IB | 4,969.00 | | 6,218.71 |
| Mar 14 | Error Correction, USD NOTES, AT1.526    HC $0.00, 420.00 | 640.92 | | 5,577.79 |
| Mar 14 | US $ Cash Sale, AT1.526    HC  $0.00, 420.00 | | 640.92 | 6,218.71 |
| Mar 14 | US $ Cheque Sale, AT1.5297    HC  $2.75, 420.00 | | 639.72 | 6,858.43 |
| Mar 14 | ABM Deposit, 985 DUNDAS ST. | | 4,825.00 | 11,683.43 |
| Mar 20 | ABM Deposit, 985 DUNDAS ST. | | 12,255.00 | 23,938.43 |
| Mar 20 | ABM Deposit, 985 DUNDAS ST. | | 1,017.00 | 24,955.43 |
| Mar 20 | US $ Wire Payment, USD PO   2987 | | 50,293.13 | 75,248.56 |
| Mar 26 | Deposit | | | |

By reviewing the primary source documents, it is simple to establish the fact that WAMY stopped funding WAMY Canada before this $50,293.13 payment was made from a source other than WAMY and to BIF--not WAMY. In March 2001, WAMY did not provide any funds to Al Khatib for WAMY Canada's operations because he was not reporting operations back to WAMY USA on behalf of WAMY Canada. Neither WAMY nor WAMY USA knew Khatib was a director of BIF Canada until after he was forced to resign as WAMY Canada's Director.  In his sworn declaration, Khatib stated that the funds were paid by BIF and not WAMY Canada.[59] This corroborates Abdullah's deposition that none of the money going to Khatib in March 2001 came from WAMY, which contradicts the CRA Audit Report. But

---

[59] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

Opposing Experts ignore all of this primary source material in favor of their unsupported conspiracy theories.

In the T20 2011 CRA charity audit report, the CRA states that the documentation does not allow the CRA to "determine the nature and intended purpose of WAMY's business dealings, what relationships have been developed, and who, effectively, exercises ultimate control over the arrangements or transactions."  The CRA is stating that it cannot determine these facts, which fails to support the CRA's and Winer's accusations of WAMY Canada's involvement with terrorist financing activities.

The CRA suggests that WAMY Canada's finances were obtained through WAMY, which is incorrect. There is no financial evidence showing that WAMY Canada funded BIF projects.  The CRA also states that WAMY Canada made a payment in 2001 from a dual account with BIF Canada to BIF USA. This is incorrect as WAMY Canada and BIF Canada were two separate entities,[60] and although they shared the Bank of Montreal bank account, BIF Canada performed its funding activities. WAMY Canada did not fund BIF Canada. While perhaps the work of an amateur office administrator, the creation of the Bank of Montreal account for BIF Canada does not mean, in and of itself, that WAMY funds were used by BIF Canada. Recall too that BIF Canada and BIF USA were not added to the terrorism watch list until November 2002.[61] At the time of the March 2001 wire payment, banks in Canada and the USA were required to maintain a program to stop the movement of money to agencies listed on the terrorist watch

---

[60] Letter dated June 16, 2004 from Dr. Khalid Bin Abdel Mohsen Al-Mehesan to Mr. Muhammed Bin Ali Al-Kotobi, with the subject Re: A proposal for Canada's Bureau
[61] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/benevolence-international-foundation / https://www.treasury.gov/press-center/press-releases/Pages/po3632.aspx

and/or sanctions list. However, the payment was not stopped because BIF Canada was not listed as a terrorist organization at the time of the payment.

WAMY did not become aware of WAMY Canada's audit findings until the CRA report had been released in August 2011.[62] Once aware of the CRA audit findings, WAMY offered to help WAMY Canada find an attorney in Canada so that they could file an appeal.[63] WAMY Canada responded by explaining that they were independent of WAMY USA and WAMY[64] and were required to follow separate regulations. Therefore, they were not allowed to have WAMY find an attorney for them in Canada.  WAMY's Secretary General, Dr. al Wohaibi, detailed WAMY Canada's lack of responsiveness and instructed WAMY Canada to cease and desist from causing further harm to WAMY.[65]

Opposing Expert Winer (3.8) stated:  Winer (3.8)_stated

> "I know of no charity that has among its lawful, public, authorized uses providing funds and other support for acts of violence. Recordkeeping by any charity involved in support for such acts of violence or for any form of serious crime necessarily seeks to hide the evidence of such support. Documenting terrorist activities in the books of a charity is counter to the interests of both the charities supporting terrorist groups and to the interests of the terrorist groups themselves. Doing so would increase the risk that the donor as well as the recipient will be indicted, arrested, subject to civil liability to their victims, sanctioned, and/or put out of business. It was standard practice for charities that provided support to al Qaeda to hide what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities."

---

[62] Letter dated April 9, 2012 from The Law Firm of Omar T. Mohammedi, LLC to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: In re Terrorist Attacks of September 11, 2001, 03 MDL 1570

[63] Letter dated April 9, 2012 from The Law Firm of Omar T. Mohammedi, LLC to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: In re Terrorist Attacks of September 11, 2001, 03 MDL 1570"

[64] Letter dated August 14, 2012 from Nasser (Irfan) Syed, Esq. of Goetz & Eckland P.A. to Sean P. Carter , Esq. of Cozen O'Connor with the subject "In Re: Terrorist Attacks on September 11, 2001, 03 MD 1570 (GBD) (FM)"

[65] Letter dated May 9, 2012 from Dr. Saleh Al Wohaibi, WAMY Secretary General, to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: World Assembly of Muslim Youth Canada"

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

In my review, I did not find falsified expenses presented as legitimate expenses. What I found, using the above as an example, was transparency as to these types of items. This transparency by WAMY Canada refutes the unfounded statement made above.  In my first-hand review of the CRA report, I found:

1)  The "thousands of dollars" sent to BIF USA was done before they were on the UN list. The funds were accepted by a rogue individual who was removed from their position at WAMY Canada (and the funds themselves were not provided by WAMY). In addition, there is no evidence that BIF contributed to 9/11.

2)  The facts show that the control of WAMY Canada by WAMY put an end to subversive actions by Khatib. These actions were not an act of WAMY forcing "its own objectives" in Canada, but a charity using its monetary oversight to control bad actors.

The Opposing Experts attempt to make a finding of links to terrorism based upon a regulatory agency's findings concerning taxable status:

> It is important to note that the three Saudi charities examined below are not the only ones that have raised concerns of intelligence, law enforcement, and policy officials. Consider, for example, the Canada Revenue Agency's (CRA) decision to revoke the charity registration of the World Assembly of Muslim Youth (WAMY) in Canada. The CRA found that WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda. CRA found that the WAMY office in Saudi Arabia "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada." The CRA report went on to lists examples of "adverse reporting on WAMY and its affiliates," linking the groups to terrorist organizations.[96]

The above is a broad-brush personal summary based on second-hand information that does not rely on fact.   Our first-hand review of the primary source of information show that the audit by

the CRA came to the following conclusion "We are unable to conclude with any degree of

certainty that payments made to qualified donees from WAMY's Bank of Montreal account were

carried out as part of the activities of WAMY."   As a CPA, I cannot come to a conclusion that

WAMY paid "thousands of dollars" to BIF when the audit is not able to come to that

conclusion.[66]

## D.      WAMY DOES NOT HAVE A LACK OF OR SYSTEMATIC RECORDKEEPING ISSUES

The complaints and other experts repeatedly mention that WAMY financials are

incomplete, and bank statements are missing from WAMY's records.  Based on my review, the

records following 1992 substantially exist, and I have not identified any systemic issues related

to missing documents following 1992, or systematic patterns of missing documents.  We have

reviewed documents regarding WAMY's IT and accounting systems being centralized as early

as 1997, and due to this shift, it would not be uncommon for the centralization and consolidation

of these systems to result in the minor loss of some less significant paper documents.

Furthermore, it is not uncommon for large decentralized organizations to periodically misplace,

inadvertently discard or destroy files and records, which are over seven (7) years old.  The

infrequent loss or discarding of documents is not indicative of an organization engaged in

criminal activity. Lastly, WAMY's Assistant Secretary General stated that due to a 2008 flood in

Jeddah, Saudi Arabia, many financial records stored in the basement were apparently lost.[67]

---

[66] https://www.canadiancharitylaw.ca/uploads/World_Assembly_of_Muslim_Youth.pdf
[67] 4.3.19 Declaration of Dr. Abdul Wahab Noorwali at ¶ 25 ("in 2008 there was a massive flood in Jeddah. Unfortunately, WAMY's office was in the path of the flood. I know that WAMY lost many records in this flood. I do not know exactly which records were lost").

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

E.   **WAMY's Sources and Use of Funds Were Sufficiently Supported and Were Not Indicative of Participating Inn or Supporting Terrorist Activities**

The FATF states that materials to stage-specific attacks include, but are not limited to, vehicles, improvised bomb-making components, maps, and surveillance material.[68] The Opposing Experts mention that donors may donate funds under the impression they are donating money for humanitarian purposes, but funds are instead diverted to fund terrorist activities.[69] Opposing Experts stated that it was standard practice for charities that provided support to terrorist organizations to hide what they were doing by listing military and terrorist support activities as expenses for legitimate activities.  Based on my review of tens of thousands of documents produced in this case, I found that WAMY did not have expenses related to the aforementioned items, but rather, WAMY had activities and projects reported and sufficiently supported. These projects were implemented across various countries and included sufficient evidence to support that the funds were not used in terrorist financing. Examples include photo evidence of the project or event, receipts, multiple phases of construction reports, student records, and follow up reports for spending, and other supporting evidence.

While WAMY has been accused by non-accountants of using charitable activities as a cover-up for terrorist-supporting activities, my analysis determined that 98.8% of the projects reviewed have been supported with a detailed plan and documentation as evidence of their operations and use of funds. Examples of such projects include:

---

[68] Financial Action Task Force, *Best Practices Paper On Combating The Abuse Of Non-Profit Organizations (Recommendations 8)*, June 2015, Date Accessed: July 13, 2020; (https://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf).

[69] Expert Report of Dr. Matthew Levitt, Dated March 9, 2020.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

- Plans for various projects such as promotion of women, professional skills, Islamic education, and inclusion of all Muslims worldwide[70]
- Audit report for Project relating to rehabilitation of stranded Pakistanis, 1992
- Report following a visit to Niger for a water project with Unicef[71]
- Project report from a mosque built in Kashmir[72]
- Report on projects for supporting refugees in Kosovo, 2000[73]
- Project report and transfer of funds for a Mosque project in Mali, 1998[74]
- Project summary of the Third Annual Camp in WAMY Canada for Muslim women to Shadow Lake, 1999[75]
- Project report and transfer of funds for a Mosque project in Indonesia, 1998[76]
- Report on completed projects in the Egypt office during 2002[77]
- Report for a Well and Reservoir project, Kashmir in 2001[78]
- Eid clothing project for orphans in Sudan in 1998[79]

Furthermore, regional offices were required to produce annual reports on the operations, events held, employee information, and initiatives conducted on behalf of WAMY in the respective countries during the year.[80]

Only 1.2% of the reviewed WAMY funded projects did not include sufficient supporting documentation.  In most projects reviewed outside of Western Europe, the United States, and Canada, project funds were sent to the personal account of a regional representative or director where bank accounts were not available. For example, in 1998, $6,134 was sent for social

---

[70] WAMYSA0819355-504

[71] WAMYSA018778-857

[72] WAMYSA523729-33

[73] WAMYSA524851-57

[74] WAMYSA043733-53

[75] WAMYSA041981-WAMYSA041982

[76] WAMYSA044943 - WAMYSA044946

[77] WAMYSA525586-WAMYSA525619

[78] WAMYSA040392 - WAMYSA040402

[79] WAMYSA042658 - WAMYSA042660

[80] Thailand - WAMYSA706710-WAMYSA706779, Malawi - WAMYSA1204564-WAMYSA1204579, Egypt - WAMYSA178403-WAMYSA1784425, US and Canada - WAMYSA061037 - WAMYSA061117, Eastern Europe - WAMYSA063241 - WAMYSA063246, Latin America - WAMYSA065390 - WAMYSA065409

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

welfare programs in Russia. The funds were sent to the director's personal bank with the WAMY

Russia address included in the recipient's details.[81]  Further, in 1997, 32,062 Saudi Riyals were

sent directly to the Chad country director for distribution to orphans.[82]  In Kurdistan during 1998,

$86,107 were sent to build Mosques and schools, and the funds were sent through a

representative in Turkey who was charged with distributing the funds accordingly.[83] WAMY

instructed all the projects mentioned above to produce a report upon completion of the initiative,

as per the organization's ordinary course of business.  Based on the low rate of unsupported

funding and the required reports for WAMY funded projects, I did not find evidence of any

patterns of funding terrorism, neither hidden nor apparent.

The overwhelming weight of the documents supports a robust reporting system. In my

opinion as a CPA, I agree with part of the Expert's quote found below, that you would expect

audits to find expenditures that may not be traced to the final user (e.g. an invoice to a plumber

without the auditor checking to see that the plumber purchased supplies from a legitimate

source), but what I did not find is the unauthorized use of funds, and Winer does not cite to any.

> "I would expect such audits to find expenditures whose
> actual use cannot be traced, in addition to instances in
> which funds were provided for unauthorized uses."[84]

It is clear WAMY placed great trust in the integrity and professionalism of its regional

representatives, and many were volunteers hired through word of mouth. As such, this could

invariably lead to someone less than able to perform the role to a satisfactory standard in the

position of regional or country director.

---

[81] WAMYSA042251 - WAMYSA042255

[82] WAMYSA526517-526

[83] WAMYSA043845-48

[84] United States District Court for the Southern District of New York, In Re: Terrorist Attacks on September 11, 2001, 03-MDL-1570 (GBD) (SN), Expert Report of Jonathan M. Winer, paragraph 10.1

This led to instances for projects occurring in the late 1990s/early 2000s, where WAMY determined that it would cease or restrict funding to offices or specific projects. In the WAMY Western Europe office, $37,500 was sent to the office as per the pre-authorized bi-annual budget. As a report with supporting documents and invoices of expenditures had not yet been received, WAMY instructed the regional office to consider the funds as a pledge and not use them until a report was sent.[85]

Other offices where issues were highlighted include WAMY Pakistan[86] and WAMY Canada[87] , as these offices failed to provide supporting documentation to WAMY for expenses or projects. These actions of control are further examples of WAMY's efforts to control spending and administer internal controls to mitigate risks of improper or overspending of funds, which is in line with a well-operated organization.[88]

 I did not observe any financial document indicating material support of terrorist activity, let alone the 9/11 attacks, and the amounts of the expenditures reviewed were not indicative of material support of terrorism or support to Al-Qaida. My view runs contrary to the following Opposing Expert's point, but my opinion is the first-hand one after reviewing the financial statements. Opposing Experts do not claim to have reviewed ANY first-hand source material.

> "Based on the information I have reviewed, I conclude it was standard practice for charities which provided support to AQ to list the support as expenses for legitimate activities, as part of helping both themselves and AQ avoid detection by anyone who might seek to stop them from facilitating or carrying out terrorist activities."

---

[85] WAMY SA 2296

[86] WAMYSA525470-78

[87] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

[88] WAMY SA 2296  and WAMYSA525470-78

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

I do note the late submission of financial records for tax purposes for WAMY USA for the period 2001 through 2002. However, the lateness of these submissions does not support a claim of terrorist activity.

As mentioned herein in this Report, WAMY had controls in place to attempt to monitor its worldwide chapters. Controls included but were not limited to local audits of financial statements, budgetary controls, and centralized controls.

## F.    WAMY DID NOT LACK CONTROLS

In his expert report, Winer states "[t]he lack of controls of Islamic charities headquartered in the Gulf States before 9/11, especially Saudi Arabia, left these charities especially vulnerable to multiple forms of abuse, as reflected in the evidence of financial improprieties and irregularities found in audits I have reviewed of covering some of these charities." Levitt states, "[t]he charitable sector remains vulnerable to terrorist financing. One reason for this, according to FATF, is that charities are subjected to lesser regulatory requirements than other entities, such as financial institutions or private companies."[89] While these work as generalities, neither Winer nor Levitt supports their conclusion with reference to primary source materials. As mentioned herein, in my review of primary source documentation, there were multiple examples of WAMY's internal control process, self-regulation, and a centralized IT accounting system. Another example of control and review is that WAMY, before commencing a relation with other charitable organizations, would request the organization's plans and objectives to see if they are in line with their objectives.[90] Finally, I came across various documents that present internal controls and the fact that these controls were revamped

---

[89] WAMY SA 2167- 74, WAMY SA 2253- 56, WAMY SA 2179- 80, and WAMYSA528986-9175
[90] WAMYSA065359 - WAMYSA065367

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

with the objective of being more effective at preventing the misuse of funds is further evidence of WAMY's control. In certain jurisdictions, the regulations may be less stringent, but it was evident WAMY tried to keep control of the financing of its worldwide operations.

## IV.        CONCLUSION

Based on my professional knowledge, education, training, experience, and the evidence I have reviewed to date, contrary to the accusations in the complaints and from Opposing Experts, I conclude, within a reasonable degree of professional certainty, that there is insufficient evidence to support misconduct, criminal behavior, or terrorist financing activities on behalf of WAMY during the period 1992 through 2002.

During my review, I did ***not*** find any evidence that:

- WAMY knowingly supported the militant and terrorist activities of Al Qaeda.
- WAMY, including WAMY Canada, funded and co-mingled funds with BIF.
- WAMY allegedly raised and laundered funds.
- Audits that mention terrorist financing or the support of terrorists.

Opposing experts have made most of their accusations and assumptions with an extremely wide brush, not based on any accounting analysis or methodology, as they have no expertise. They are not auditors, accountants, financial experts, certified fraud examiners, or CPAs. Instead, their unfounded statements push for the claim that all Islamic charities based in Middle Eastern countries must have been a part of the conspiracy that led to the tragedy of 9/11.

We have not found this to be the case for WAMY based on our first-hand review of the vast primary source documentation. Furthermore, it should be mentioned that charitable giving in the Middle East, especially in the Arabian Gulf, is worth billions of dollars. This is both due to obligatory religious charity (zakat inclusive of 2.5% of earnings), as well as the voluntary charity to the poor, widowed, and orphaned. Charities play an essential role in the Middle East of facilitating the transaction: from those inclined to give to the people and causes which need it

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

most.[91] Charitable giving is not a terrorist activity just because the charities happen to be Muslim organizations or Saudi-based organizations.  No accounting or financial principles differentiate between religious organizations or non-religious organizations.  Unfortunately, the opposing non-financial and accounting experts appear to be making that distinction.

WAMY observed the following, which are **contrary** to the accusations in the complaints and from Opposing Experts:

- Transparency

- Proactive Improvements and Controls

- Increased spend on Audit

- Increased IT controls

- Amplified Reporting

- Robust requirements for  Audits and Reports

- Accountability from senior leadership in WAMY

- Enforced mechanisms of control that were used proactively

- WAMY defunded areas that did not follow control and accounting policies

- Examples of funding for good causes

- Use of top audit firms

- Leadership and control over rogue individuals

- Accounting practices of a well-run corporation

---

[91] https://www.arabnews.com/node/1024711/business-economy

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

Accordingly, WAMY cannot be condemned based upon broad, general, and even biased assumptions about Muslim and Saudi-based charitable organizations. My experience as a financial forensics expert, auditor, fraud examiner, and accountant teaches me to stick to the facts presented in primary sources and documents.  The materials I reviewed in this matter show that WAMY operated as a standard, large, and global charity.

**************

My opinions expressed herein are presented to a reasonable degree of professional certainty.  The procedures performed were limited to those described herein based on the documents provided to date and other information obtained.  Information obtained subsequent to the date of this Report may affect my analyses, and this effect may be material.  If requested, I will update my analyses.

My procedures were performed solely in respect of the above-referenced matter.  Any opinions included herein are dependent on the specific facts and circumstances in the present dispute and cannot be applied to other situations or disputes.  This Report is not to be reproduced, distributed, disclosed, or used for any other purpose.

Respectfully submitted,

_____
Jonathan  T.  Marks,  CPA,  CFF,  CITP,
CGMA, CFE
Partner, Baker Tilly US, LLP
jonathan.marks@bakertilly.com
(267) 261-4947

**DATED:**     August 7, 2020

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## APPENDIX A: CURRICULUM VITAE

# Jonathan T. Marks, CPA/CFF, CITP, CGMA, CFE, and NACD Board Fellow

Jonathan T. Marks is a partner and leads the firm's global fraud and forensic investigation, compliance and integrity practice



**Baker Tilly US LLP
Partner**
1650 Market Street
Philadelphia, PA 19103
United States

**T +1 (215) 557 2025**
jonathan.marks@bakertilly.com
bakertilly.com

**Education**
Bachelor of Science in
Accounting -
Bloomsburg University

Jonathan has more than 30 years of experience working closely with his clients, their board, senior management, and law firms on global and cross-border fraud and misconduct investigations, including bribery, corruption, compliance, and other matters.

Jonathan specializes in internal and regulatory investigations; governance matters; risk assessment, design and implementation of compliance programs; global fraud risk management programs; and compliance coordination and monitoring services for the private, public, not-for-profit sectors. He assists his clients in mitigating potential issues by conducting root-cause analysis, developing remedial procedures, and designing or enhancing governance and compliance systems along with internal controls, policies and procedures, and customized training.

He has led high-profile financial, accounting, compliance, and regulatory investigations around the world relating to allegations of accounting irregularities, improper financial disclosures, fraud, non-compliance, bribery, corruption, kickbacks, cyber incidents, and whistleblower matters. Jonathan has provided expert testimony on accounting, damages/lost profits, financial, and internal control issues in commercial litigation matters.  He has appeared before the United States Securities and Exchange Commission (SEC), Financial Industry Regulation Authority (FINRA), and the United States Department of Justice (DOJ) to present his findings. Jonathan has also led global compliance initiatives, fraud risk or vulnerability assessments, internal audits, third-party risk management initiatives, and due diligence teams.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

Jonathan is a well-regarded author and speaker, who has gained international recognition for developing thought leadership that has enhanced the profession, including the development of the Fraud Pentagon. He regularly presents on an array of fraud, ethics, and forensic accounting topics. Jonathan has previously held leadership positions at a national accounting and global disputes and investigations professional services firm. He has educated and advised some of the world's largest companies on these and a variety of other highly complex issues.

**Selected experience**

– I was engaged by a former CEO of a publicly-traded medical device company to assist in interpreting technical accounting matters, working with the accounting expert, and developing a strategy for trial.

– Engaged by counsel to assist in analyzing documents and information allegedly related to Ponzi and money laundering schemes.

– Worked with counsel to resolve disputes related to technical accounting matters, purchase price disputes, earn-out provisions, representation and warranty claims and other

– Conducted financial and compliance due diligence on transactions and several times assisted in the negotiation of revised terms.

– Prepared the financial statements and drafted the footnotes for several complex mergers and acquisitions, including a reverse merger that passed SEC review.

– Consult with counsel regularly on GAAP issues.

– Worked directly with the US Attorney, FBI, IRS-CID and US Customs on a highly-publicized investigation involving a myriad of fraud schemes, concealment strategies and conversion tactics that involved several individuals and both private and publicly held companies

– Provided forensic accounting support to counsel to two senior executives (chief executive officer and chief financial officer) that were subjects of an SEC investigation related to revenue recognition issues

– Led the investigation of allegations that the chief executive officer, chief financial officer, and controller of large professional services firm knowingly departed from generally accepted accounting principles (GAAP) and SEC guidance when recording revenue; presented findings and conclusions to the national office of the auditing firm, which concurred with the assessment on the application of GAAP, resulting in others within the same space restating their financial statements

– Engaged by the audit committee of a Fortune 50 company to perform a root cause analysis and provide an assessment to the full board on the results of a massive internal investigation related to alleged revenue recognition issues brought forward by a whistleblower; the initial investigation was conducted by a highly reputable law firm which was assisted by a Big four accounting firm; Jonathan assisted in drafting the report, which provided recommendations on improving governance, risk, compliance, and internal controls

– Developed a road map, synthesized vast amounts of data with more than 15 organizations, and prepared an analysis to assist counsel in defense of an alleged stock manipulator;

analysis and findings were presented to the US Attorney, FBI, SEC and FINRA, who accepted and commented on quality and thoroughness of the work product

– Led a 10A investigation that involved several complex issues, including alleged illegal acts related to the valuation of inventory, inventory reserves. Non-GAAP financial information, and the overall completeness and accuracy of the books and records; worked closely with outside counsel and the external auditor, including their national practice leaders and forensic group

– Led several extensive global FCPA investigations and compliance exercises, working with management, outside counsel and in some instances the external auditor

– Conducted numerous fraud and FCPA risk assessments for many companies in many different industries, including a Fortune Five company; assisted with the development of the compliance program and the development or enhancement of internal controls, policies and procedures, and training

– Engaged  by the president, general counsel, and chief compliance officer of a Forbes Top 50 manufacturer and distributor to conduct a pre-monitor review focusing on assessing its governance, risk management, and compliance program. I then served as the compliance coordinator and liaison between the company and the DOJ's monitor and assisted the company with its remediation and training efforts. Led an internal audit team of more than 25 professionals in conducting on-site reviews of more than 360 distributors nationwide, the results of which helped enhance the control environment and compliance program

– I led a special audit committee investigation for a Forbes Top 100 company that spanned many countries and involved performing root cause analysis related to alleged $400 million fraud-related to channel stuffing by a large pharmaceutical concern. The investigation uncovered deficiencies in the overall governance framework, and legal, compliance, and internal audit functions. After the investigation, I assisted with the remediation of the legal, compliance, and internal audit functions. He also led a team to evaluate and enhance the design of internal controls and the merger/acquisition due diligence process.

– Helped lead an investigation related to millions of leaked documents that detail financial and attorney-client information for hundreds of thousands off-shore entities; provided guidance on possible bribery, money laundering and tax avoidance schemes.

– Retained by outside counsel to investigate allegations from a whistleblower that the general counsel and the controller were engaged in several schemes to defraud a large hospital group; the investigation uncovered an enormous fraud and many internal controls deficiencies, including weaknesses in governance, the risk assessment process and internal audit plan.

**Industry and civic involvement**

– AICPA Fraud Task Force – Leading the revamp of the anti-fraud initiative

– American Bar Association (ABA) – Previously served on the Professional Services Liability Committee Member

– American Institute of Certified Public Accountants (AICPA) – Member

– Association of Certified Fraud Examiners (ACFE) – Member and Frequent Speaker

- Center for Audit Quality – Former Member of the Anti-fraud Collaboration Initiative
- FBI National Citizens Academy Class No. 23 – Philadelphia Chapter Board Member and Audit Committee Chairperson
- Financial Executives International (FEI) – Former Research Committee Member
- Former adjunct professor at Rider University – Taught auditing
- Guest lecturer at Lehigh University – Fraud and forensics
- InfraGard – Member
- Institute for Fraud Prevention (IFP) – Intellectual Board Member (Now run by the ACFE)
- International Association of Independent Corporate Monitors - Member
- National Association of Corporate Directors (NACD) – Board Fellow
- New York State Society of CPA's – Former Member of the SEC Committee
- Pennsylvania Institute of Certified Public Accountants (PICPA) - Member
- Society of Corporate Compliance and Ethics (SCCE) - Member

**Community involvement**

- Cancer Support Community of Philadelphia, Gilda's Club – Chairperson of the Board
- Cancer Support Community – National Board Member and CEO Liaison
- Zeta Psi, Pi Kappa Chapter – President of the Alumni Association

**Recent Testimony and Expert Reports**

***Trial***

*Civil Action-Law No. 2014-02799, Wireless Acquisitions Group LLC v 915 Associates LLC and William Goldstein – February 2018*

*Damages (Video Testimony)*

***Settled before Deposition and Trial***

*Court of Common Please Case No. 160 10232, A. Jordan Rushie v. Jamie Ware, Fishtown Neighbors Association, Neil Brecher and Darren Smith – August 2018*
*Defamation of Character and Damages – Lost Profits*

**Publications**

I maintain a blog called *Board and Fraud.* It contains many of my writings across different topics. *(*https://boardandfraud.com/)