**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

In re:

    **TERRORIST ATTACKS ON**
    **SEPTEMBER 11, 2001**

------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED:     11/22/2021       │
└─────────────────────────────────┘
```

**03-MD-1570 (GBD)(SN)**

**ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

This document relates to:

> Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al., No. 16-cv-07853
> Addesso, et al. v. Kingdom of Saudi Arabia, et al., No. 16-cv-09937
> Aguilar, et al. v. Kingdom of Saudi Arabia, et al., No. 16-cv-09663
> Hodges, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-00117
> Aiken, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-00450
> Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al., No. 17-cv-02651
> Abarca, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-03887
> Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-03908
> Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-06123
> Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-07914
> Abbate, et al. v. Kingdom of Saudi Arabia, et al., No. 17-cv-08617

The Plaintiffs' Executive Committees ("PECs") move to compel production from Al Rajhi Bank ("ARB"). ECF No. 6996. The Court of Appeals ordered the jurisdictional discovery sought by this motion in Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank, 779 F. App'x 66 (2d Cir. 2019) (the "Remand Order"). The parties, though, disagree on what discovery that decision ordered. Attempting to entirely resolve this wide-ranging dispute in a single order will likely result in an inefficient and burdensome discovery process. Therefore, the Court resolves several of the parties' key disagreements. Based on that, it directs the parties to meet and confer to determine if they can agree on a reasonable course of discovery.

## BACKGROUND

This Court has previously detailed the proceedings against ARB. ECF Nos. 3947 and 6681. It therefore discusses only the facts necessary to resolve this dispute.

On June 27, 2018, the PECs' claims against ARB were dismissed for lack of personal jurisdiction. ECF No. 4033. That dismissal was then reversed, and the case was remanded for jurisdictional discovery. On May 11, 2021, the PECs served ARB with 58 discovery requests divided into ten categories. ECF Nos. 6996-1 at 13.

ARB replied with a set of objections to these requests on June 10, 2021. ECF No. 6996-1 at 7. Of the 58 requests, ARB indicated it would not conduct any searches for 47 of them. Id. at 8. It also limited what it would search for on the other 11. Id. The parties met and conferred about this on June 29, 2021, but after that meeting, reported that they had "fundamental disagreements" on the appropriate scope of discovery. ECF No. 6966 at 2. Accordingly, the PECs filed this motion on July 30, 2021. ECF No. 6996. It was fully briefed on October 1, 2021. ECF No. 7164. On October 7, though, ARB supplemented their opposition with a motion for oral argument to address several items raised in the PECs' reply. ECF No. 7244.

## DISCUSSION

The parties dispute almost every aspect of discovery from the relevance of each request to the burdens imposed by answering them. Resolving these issues completely would require the Court to micromanage discovery. While it will do so if needed, a one-time top-down resolution is less likely to produce an effective discovery program than one negotiated by the parties.

With that in mind, the Court will address the parties' disputes over the general and temporal scope of jurisdictional discovery authorized by the Remand Order. It will then apply that ruling to the PECs' 58 requests.

ARB has also stated that the PECs' requests could impose tens of millions of dollars in discovery costs. It further suggests that Saudi Arabian law may block the production of otherwise relevant materials. These issues may limit what discovery is available to the PECs, but they cannot be a blanket shield against disclosure of relevant material. Negotiating this balance between cost and legal barriers versus entitlement to relevant material is best attempted in the first instance by the parties.

I.      **The Remand Order Authorizes Discovery Into Support Provided to Both Alleged Al Qaeda Operatives and Supporting Charitable Organizations**

Generally, Federal Rule of Civil Procedure 26(b)(1) permits discovery into "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "Relevance in this context 'is an extremely broad concept.'" Hamilton Sundstrand Corp. v. Aircraft Propeller Serv., No. 19-cv-6472 (RA)(OTW), 2020 WL 8838031, at *1 (S.D.N.Y. June 22, 2020) (quoting Trilegiant Corp. v. Sitel Corp., 272 F.R.D. 360, 363 (S.D.N.Y. 2010)).

Courts have recognized, though, that jurisdictional "discovery must . . . be 'limited to the essentials necessary to determining the preliminary question of jurisdiction.'" In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 230 F. Supp. 2d 392, 400 (S.D.N.Y. 2002) (quoting Fed. Ins. Co. v. Richard I. Rubin & Co., 12 F.3d 1270, 1285 n.11 (3d Cir. 1993)). Thus, "[p]laintiffs may not conduct a fishing expedition, but must 'target[] information pertinent to the well established factors involved in a jurisdictional inquiry.'" In re Ski Train Fire, 230 F. Supp. 2d at 400 (quoting Rose v. Cont'l AG, No. 99-cv-3794 (JCW), 2001 WL 236738, at *4 (E.D.Pa. Mar. 2, 2001)) (internal citation omitted) (alteration in original); see also Astor Chocolate Corp. v. Elite Gold Ltd., No. 18-cv-11913 (PAE), 2020 WL 2130680, at *9 n.6 (S.D.N.Y. May 5, 2020) (directing "that requests for production be tightly focused" because "the purpose of the present

round of discovery is solely to test jurisdiction"), Carl v. Edwards, No. 16-cv-3863

(ADS)(AKT), 2017 WL 4271443, at *9 (E.D.N.Y. Sept. 25, 2017) (describing discovery as

occurring in the "limited jurisdictional context").

"The party seeking discovery bears the burden to demonstrate relevance, after a showing

of which 'it is up to the responding party to justify curtailing discovery.'" Precision Med. Grp.,

LLC v. Blue Matter, LLC, No. 20-cv-2974 (PGG)(SLC), 2020 WL 7352509, at *1 (S.D.N.Y.

Dec. 15, 2020) (quoting Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 284 F.R.D. 132,

135 (S.D.N.Y. 2012)). Additionally, "[e]ven if the documents sought are relevant, a court must

limit discovery if the request is, inter alia, 'unreasonably cumulative or duplicative,' or 'can be

obtained from some other source that is more convenient, less burdensome, or less expensive.'"

Precision Med. Grp., LLC, 2020 WL 7352509, at *1 (quoting Fed. R. Civ. P. 26(b)(2)(C)).

Here, the proper scope of discovery is assessed based on what was authorized in the

Remand Order. This summarized the PECs' position as "alleg[ing] that Al Rajhi Bank provided

financial services and donations to charities that it knew financially supported al Qaeda and

provided financial services to known extremist operatives . . . with the *specific intent* to further al

Qaeda's terrorism against the United States." Underwriting Members of Lloyd's Syndicate 2,

779 F. App'x at 68 (emphasis added).

The allegations of specific intent are crucial because "'[p]roviding indirect funding to an

organization that was openly hostile to the United States does not constitute . . . intentional

conduct' that is 'expressly aimed . . . at residents of the United States.'" Id. (quoting In re

Terrorist Attacks on September 11, 2001, 538 F.3d 71, 95 (2d Cir. 2008)) (alterations in

original). Thus, it is "[t]he inclusion of allegations related to Al Rajhi Bank's specific intent to

further terrorism in the United States . . . [that] distinguishes the present case from those in which

[the Court of Appeals has] not granted personal jurisdiction and warrants jurisdictional discovery." Underwriting Members of Lloyd's Syndicate 2, 779 F. App'x at 68–69.

Accordingly, the Court of Appeals authorized discovery into four areas: "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda." Id. at 69 (citing In re Terrorist Attacks on September 11, 2001, 714 F.3d 659, 678–79 (2d Cir. 2013) ("Terrorist Attacks I")).

ARB argues that this means that "the Second Circuit authorized jurisdictional discovery only with respect to the allegations in the [PECs' complaint] that the Bank provided direct support to al Qaeda purportedly by 'providing financial services to known extremist operatives.'" ECF No. 7086 at 9 (quoting Underwriting Members of Lloyd's Syndicate 2, 779 F. App'x at 68–69). In support, it notes that the Court of Appeals' has found that a court may not exercise personal jurisdiction over someone simply because they provided resources to an organization that they know is hostile to the United States. Terrorist Attacks I, 714 F.3d at 674.

This reads the Remand Order too narrowly. While the directness of support provided to terrorists is a factor in assessing personal jurisdiction, it is not the only factor. The Court of Appeals' personal jurisdiction decision on Saleh Al-Hussayen in Terrorist Attacks I, is instructive. Al-Hussayen was alleged to have aided al Qaeda indirectly through his work with ARB and related charities and also to have potentially aided the September 11 hijackers directly. 714 F.3d at 669. Thus, jurisdictional discovery was warranted for Al-Hussayen because "[t]hese additional allegations not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have intended his

alleged indirect support of al Qaeda to cause injury in the United States." Id. at 679. It was not, as ARB argues, that indirect support was meaningless to the personal jurisdiction calculation, but rather that jurisdiction is assessed based on a combination of direct and indirect support alongside specific intent to target the United States.

The Remand Order follows this guidance. It identifies two alleged acts by ARB: indirect support through "financial services and donations to charities that it knew financially supported al Qaeda" and direct support through "financial services to known extremist operatives." 779 F. App'x at 68. It then directs jurisdictional discovery into "the support alleged here" by the PECs. Id. at 69. Since the PECs alleged, and the Remand Order references, both direct and indirect support, the plain reading is that discovery is warranted into whether ARB provided financial support to *both* charities *and* known extremist operatives with the specific intent that this support be used to aid in terrorist acts in the United States. This, in turn, is to be investigated through discovery into the four areas identified by the Court of Appeals.

**II.    January 1, 1998 Is the Proper Start for Discovery While the Proper End Date Varies by the Nature of the Information Sought**

Beyond scope, the parties also dispute the appropriate discovery time period. The PECs proffer January 1, 1998 to December 31, 2004, as the general discovery period. For a subset of requests, they set the beginning of discovery at January 1, 1992. ECF No. 6996-1 at 24. ARB proposes October 8, 1999, the date the U.S. designated al Qaeda as a foreign terrorist organization, as the start date, and December 31, 2002, as the end date.

January 1, 1998, is the proper start date for all discovery. For the limited purpose of determining jurisdiction, discovery into conduct in or around 1992, nearly a decade before the September 11 Attacks is disproportionate to the needs of the case. Acts by ARB from 1992 to 1998, without evidence of support after 1998, are unlikely to support the exercise of jurisdiction.

6

See, e.g., Siegel v. HSBC Holdings, PLC, No. 17-cv-6593 (DLC), 2018 WL 501610, at \*4
(S.D.N.Y. Jan. 19, 2018) (finding that the necessary contacts for personal jurisdiction were not
present where a bank ceased providing services 10 months before the attack at issue).
Conversely, if the PECs can show sufficient jurisdictional contacts from 1998 onward, then
expanding discovery to 1992 will be unnecessarily cumulative. It will also unduly burden ARB
by forcing it to try to locate documents that may be close to three decades old.

　　　ARB's proposed start date cuts off discovery too soon. It is true that in several cases cited
by ARB contacts with terrorists that ceased months before the attack were insufficient to support
liability for terrorism. See, e.g., Averbach v. Cairo Amman Bank, No. 19-cv-0004, 2020 WL
486860 (GHW)(KHP), at \*13 (S.D.N.Y. Jan. 21, 2020). Yet "[t]here is no bright line rule
capable of helping a court fix the appropriate look-back period for every case." In re Terrorist
Attacks on Sept. 11, 2001, 440 F. Supp. 2d 281, 285 (S.D.N.Y. 2006). Given the complexity of
the September 11 Attacks and the time it took to plan and finance them, 1998 is a reasonable
point to start the investigation of ARB's alleged support.

　　　The appropriate end date varies by the nature of the information sought. The PECs argue
that December 31, 2004, is appropriate because they need to secure investigative materials
exploring ARB's prior conduct. This is sensible where a request seeks information on
investigations of prior ARB conduct. Thus, for example, an investigative report on ARB
connections to the September 11 attackers would be proper even if that report was made in
November 2003.

　　　Conversely, requests about ARB's conduct after 2002 are unlikely to speak to its support
for the execution of the September 11, 2001 Attacks. See, e.g., Sokolow v. Palestine Liberation
Org., 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014) (finding that "post-attack financial support

to the families of terrorists" was not sufficient to show a violation of the Antiterrorism Act of 1992 ("ATA")), Shatsky v. Palestine Liberation Org., No. 02-cv-2280 (RJL), 2017 WL 2666111, at *10 (D.D.C. June 20, 2017), vacated and remanded on other grounds, 955 F.3d 1016 (D.C. Cir. 2020) ("[A]fter-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused [a terrorist attack]"), Owens v. BNP Paribas S.A., 235 F. Supp. 3d 85, 98 (D.D.C. 2017), aff'd, 897 F.3d 266 (D.C. Cir. 2018) (finding it problematic, for the purposes of finding an ATA violation that most of the alleged conduct supporting a terror attack occurred "at least four years after" the attack).

Accordingly, where the PECs seek information about investigations into ARB's conduct, the end of the discovery period is December 31, 2004. This applies to Requests 8, 44, 47–54, and 58. For all other requests, the end date is December 31, 2002.

## III.   The PECs' Fifty-Eight Discovery Requests

Having addressed the scope of discovery the Court applies that ruling to the PECs' 58 discovery requests.

### A.  The Da'Wah Organization Requests (Nos. 1–8, 35)

The Da'Wah Organization Requests seek information on three charities, International Islamic Relief Organization ("IIRO"), the Al Haramain Islamic Relief Organization ("AHIF"), and Muwafaq Foundation (a/k/a "Blessed Relief Foundation"), and their employees. The PECs allege that ARB provided financial services for these organizations and that various ARB personnel also held leadership roles in them. They further allege that these organizations were al Qaeda fronts and that ARB and its senior personnel were aware of this. The Court addresses the nine Da'Wah Organization Requests based on this theory.

- **Requests Nos. 1–3**: these are granted. Each seeks information about accounts ARB held for the three da'wah organizations including deposits and withdrawals from associated

accounts. ARB's provision of financial support to these entities and how that support was provided goes to the core of this jurisdictional discovery.

- **Request No. 4**: this request is granted. It seeks information about ARB's contributions to the da'wah organizations as well as the contributions of Suleiman al Rajhi and others. Allegations that ARB and its high-ranking executives supported al Qaeda through charitable fronts like the da'wah organizations go directly to the inquiry ordered by the Court of Appeals.

- **Request No 5**: this request is granted. It seeks information on whether high-ranking ARB personnel simultaneously held positions in the da'wah organizations. They allege that these employees were aware of the da'wah organizations' role in supporting al Qaeda and that these ties are evidence of ARB's intent to help al Qaeda strike at the United States. ECF No. 6996-1 at 14. Shared personnel relationships between ARB and the da'wah organizations could provide evidence to support this theory.

- **Request No 6**: this is overbroad. It seeks all communications between the ARB Principals (all senior ARB personnel, including seven named parties) and the Da'Wah organizations from 1992 until 2004. The request for over a decade of communications from no less (and likely more) than seven named parties without any restrictive principle is disproportionate to the needs of this dispute and likely to reveal vast amounts of superfluous information.

- **Request No. 7**: this request is unnecessarily cumulative. The Court has said that Request No. 4, which seeks information on ARB's support for the da'wah organizations. This request, which seeks additional information on fundraising events for the da'wah organizations, is unnecessarily cumulative of that.

- **Request No. 8:** this request is granted to the extent described here. It seeks information about what notification ARB received that da'wah organizations and individuals were engaged in terrorism, armed conflict, or other criminal activities. This request is granted only for notification about da'wah organizations' involvement in any "terrorist activity or event, or in providing any form of material support to any terrorist organization or person" and in "supporting any armed conflict or militant activity." ECF No. 6996-4 at 4. The request for information on "criminal or corrupt activities" is overbroad since it could involve a large amount of material that is either immaterial if the criminal act is not connected to terrorism or duplicative of other requests if it is.

- **Request No. 35:** this request is denied. It seeks documents related to communications between ARB and AHIF officials concerning Bosnian fundraising between April 1992 and December 31, 1995. This request is too far removed both temporally and geographically from the September 11 Attacks. The transaction at issue, assuming evidence of it exists, would have been in a foreign country seven years before the September 11 Attacks. There is no suggestion that AHIF activities in Bosnia were connected to terrorist attacks in the United States in any form nor is there any basis to make that inference.

### B.  The al Qaeda Operative Requests (Nos. 9–22, 33, 34)

The al Qaeda Operative Requests are granted. Each involves transactions with people or entities alleged to be al Qaeda operatives. ARB has agreed to conduct searches for documents for three individuals (Abdulaziz Mohamed al Omari, Mamdouh Mahmud Salim, and Abd al Hamid Sulaiman al Mujil). It objects to the other requests because the PECs' complaint does not provide a basis to infer that this discovery is proper. In support, it argues that while the PECs allege that

al Qaeda directed its operatives to use ARB, this allegation "stops far short of alleging that al Qaeda operatives had accounts at Al Rajhi Bank." ECF No. 7086 at 15.

The complaint though, provides an adequate basis to infer that al Qaeda operatives may have maintained accounts at ARB. It alleges numerous instances of support by ARB for al Qaeda including obtaining travel documents for al Qaeda couriers, Plaintiffs' First Amended Complaint, Underwriting Members of Lloyd's Syndicate 2, No. 16-cv-07853, ECF No. 56, at ¶ 166 ("Complaint"), moving money for al Qaeda, Complaint at ¶167, and otherwise supporting al Qaeda and front organizations associated with the group. Complaint at ¶¶171–72. Moreover, as ARB tacitly acknowledges through their consent to search for certain records, the complaint explicitly alleges that several al Qaeda operatives had accounts at ARB or received funds through the institution. See, e.g., Complaint at ¶ 163. The allegation that ARB provided substantial support to al Qaeda and that some of their operatives had ARB accounts is a more than adequate basis to infer that other al Qaeda operatives might have maintained accounts there too.

This, in turn, is germane to what support was provided to al Qaeda, when it was provided and how it was provided. It may also provide circumstantial evidence of whether funds were earmarked for a particular attack. All of this is related to the inquiry directed by the Court of Appeals.

### C.  The U.S. Financial Requests (Nos. 23–25)

The U.S. Financial Requests are overbroad, and duplicative of other, more targeted requests. Each asks for communications related to transfers of money to beneficiaries in the United States, mosques, Islamic centers, or charitable institutions operating in California, or beneficiaries managed or otherwise overseen by Abdul Rahman al Rajhi. ECF No. 6996-4 at 9–10. The PECs state that these requests are necessary to discern "ARB's financial dealings in the

United States in general and specifically what funds ARB transferred into the United States to al Qaeda support entities." Id.

This is too generic a statement to support discovery into virtually every transaction ARB had in the United States from 1998 to 2002 regardless of whether the transacting parties were even associated with al Qaeda. Moreover, the pertinent information sought in these requests is covered by more targeted inquiries like the al Qaeda Operative Requests, rendering these requests cumulative.

### D.  The Terror Financing Article Request (Nos. 26–32)

The Terror Financing Article Requests are granted only to the extent described here. They seek "all documents" related to transactions discussed in the July 26, 2007, Wall Street Journal article *Terror Finance: U.S. Tracks Saudi Bank Favored by Extremists* ("*Terror Finance*"). Much of the material sought, however, is either duplicative or otherwise extraneous.

- **Request No. 26:** this request is unduly burdensome and cumulative. It seeks "all documents" relating to the events described in *Terror Finance*. The article covers the entire history of ARB including its founding in the 1940s. Taken literally, this would cover a huge amount of material. *Terror Finance* also includes discussion of ARB's interactions with IIRO, AHIF, and other alleged terrorists and fronts, which are already covered by other requests the Court has granted.

- **Request No. 27:** this request is unnecessarily duplicative. It seeks "all documents" relating to communications between ARB personnel "concerning contributions to da'wah or charitable organizations" from September 11, 2001 to December 31, 2004. ECF No. 6996-4 at 10. The PECs' Da'Wah Organization Request has already been granted.

Requesting all materials related to generic charitable interactions is unnecessarily cumulative of that.

- **Request Nos. 28**: this request is granted. It seeks information about an allegation in *Terror Finance* that, one year after the September 11 Attacks, Suleiman al Rajhi directed ARB personnel to investigate how to make charitable contributions that would avoid Saudi Arabian government scrutiny. Evidence that ARB resources were used to investigate ways to evade government scrutiny could provide circumstantial evidence of an intent to support terrorist attacks.

- **Request No. 29:** this request, which seeks all transfers of funds in 2002 by Suleiman al Rajhi to offshore accounts, is denied. Information about how Suleiman al Rajhi transferred funds that do not necessarily connect to ARB goes beyond the discovery into ARB's alleged intent to support terrorist attacks in the United States, particularly since it seeks information about transfers that occurred *after* the September 11 Attacks with no apparent connection to al Qaeda or its fronts.

- **Request Nos. 30–31:** these are denied. They seek information about a series of alleged transfers by Suleiman al Rajhi or Saleh al Rajhi to Germany in 1998. The Complaint does not suggest that the transfers had any connection to al Qaeda, much less to specific attacks inside the United States. Complaint at ¶ 161. This is insufficient to justify discovery into transactions six years before the September 11 Attacks to entities that have no apparent connection to the United States.

- **Request No. 32:** this request is denied. It seeks all documents related to the delivery of funds to Indonesia by couriers, with a specific focus on funds delivered to the alleged al Qaeda affiliate Kompak. This runs far afield of the appropriate inquiry. Information on

the delivery of *any* couriered funds to Indonesia is substantially overbroad and would include documents with no bearing on the PECs' claims. Even information relating to deliveries to Kompak is extraneous. The PECs' complaint states only that Kompak is an "Indonesian insurgent group" and "al Qaeda affiliate." Complaint at ¶ 165. It contains no allegations about how Kompak and al Qaeda are affiliated or any allegation that Kompak was associated with any activity even tangentially related to or targeted at the United States.

### E.  The Golden Chain Requests (Nos. 36–38)

The Golden Chain Requests, which concerns individuals on the "Golden Chain" documents, are denied. These materials have a troubled history in this litigation and judges overseeing this case have consistently declined to rely on it.

As described by Judge Richard Casey in 2005, "[t]he 'Golden Chain' is a group of documents that was discovered by Bosnian authorities searching the offices of charity Defendant [Benevolence International Foundation] in March 2002." In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 817 (S.D.N.Y. 2005). At the time, Judge Casey described it as "a document with serious foundational flaws." He noted that there was "no indication of who wrote the list, when it was written, or for what purpose . . ." Id. Summing up, he call it "only a list of names found in a charity's office," id. at 818, that could "not demonstrate that [a defendant] purposefully directed [their] activities at the United States" for the purposes of assessing personal jurisdiction. Id.

Five years later, Judge Daniels was no kinder in his assessment. He first reiterated Judge Casey's findings on the Golden Chain document's evidentiary value. In re Terrorist Attacks on Sept. 11, 2001, 718 F. Supp. 2d 456, 482 (S.D.N.Y. 2010). Then, he again stated that, for personal jurisdiction purposes, "inclusion on the Golden Chain list, does not demonstrate that [a

defendant] himself expressly aimed tortious conduct at the United States which resulted in, or relates to, the injuries sustained by plaintiffs." Id. at 483.

The lesson from more than a decade of caselaw is that presence on the Golden Chain list does not, without more, suggest that a party directed action against the United States. This is central to this inquiry: not just whether an entity provided support to al Qaeda or groups known to aid it, but whether it did so with the specific intent to further terrorism in the United States. Judges have repeatedly found that the Golden Chain documents cannot speak to this question even for claims against people actually on the list. If the list cannot show intent for those on it, then it is of no account that ARB processed transactions from that same group.

Moreover, at least two of the people listed as part of the Golden Chain requests (Osama Bin Laden and Wa'el Hamza Jelaidan), ECF No. 6996-3 at 47, are already included as part of the al Qaeda Operative Requests, ECF No. 6996-4 at 5–6, rendering those requests duplicative. Accordingly, Requests 36, 37 and 38 are not within the scope of this jurisdictional inquiry.

## F. The SAAR Network Requests (Nos. 39–41)

The PECs' three SAAR Network Requests are denied. Each seeks information about ARB's relationships to 57 organizations plus their officers, affiliates, employees and representatives, as well as 21 further individuals. These entities are alleged to be part of the "SAAR Network," a network of front charities organized to funnel resources to al Qaeda. ECF No. 6996-4 at 12–13. The Complaint alleges that the SAAR Network was established "with overlapping officers and directors set up to launder money to al Qaeda and international terrorism." Complaint at ¶ 185. It also alleges that these entities were raided as part of an anti-terrorism investigation in 2002. Id. at ¶ 186.

There are several problems with these requests. The first is that the complaint does not actually allege ties between ARB and the SAAR Network. The Complaint alleges that Suleiman

al Rajhi created and funded the various SAAR Network entities, id. at ¶¶ 185–86, but does not allege any direct connection between ARB and the SAAR Network. See also, ECF No. 6996-4 at 13 (describing connections between the SAAR Network and other foundations, but not ARB). Moreover, numerous purported SAAR Network entities were already dismissed from this case in 2010 after Judge Daniels found that the factual allegations against them were insufficient. In re Terrorists Attacks on Sept. 11, 2001, 740 F. Supp. 2d 494, 523 (S.D.N.Y. 2010), aff'd sub nom. Terrorist Attacks I, 714 F.3d 118. The lack of a reasonable connection between ARB and the SAAR Network, combined with the weak allegations against the SAAR Network itself, suggest that the discovery sought would have limited value.

It would also be unnecessarily cumulative. Both the IIRO and Suleiman al Rajhi are defined as SAAR Network charities or individuals. ECF No. 6996-3 at 13. The Court has granted several discovery requests related to both of these parties, rendering further discovery cumulative.

Finally, in light of the cumulative nature of this discovery and its marginal importance, this request is unduly burdensome. Seven years of discovery on 57 corporate entities and all their associated employees and agents, along with separate discovery into 21 people is likely to impose a substantial burden that cannot be justified given the inessentiality of the SAAR Network materials and the cumulative nature of the discovery sought.

### G.  The Saleh al Hussayen Requests (Nos. 42–44)

The three requests on Saleh al Hussayen are granted. Each deals with some facet of the relationship between ARB and al Hussayen. The PECs have alleged that al Hussayen was a member of ARB's Shariah Board and stayed in the same hotel as several of the September 11 hijackers the night before the attack.

As noted, this is not al Hussayen's first appearance in this case. In 2013, the Court of Appeals found that jurisdictional discovery was warranted against him given allegations of both direct and indirect aid to al Qaeda. Terrorist Attacks I, 714 F.3d at 679. Specifically, allegations about al Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, as well as his decision to switch hotels to *stay in the same hotel as at least three of the hijackers*, cast his activities at Al Rajhi Bank and his alleged indirect funding of al Qaeda in a different light." Id. (emphasis in original). This same conduct merits discovery into al Hussayen's relationship to ARB and his activities as part of that relationship.

ARB's objects that the PECs' have not adequately pleaded facts to establish al Hussayen's role at ARB, that he was acting as an agent of ARB, or that if he was an agent, that his actions can provide jurisdiction over ARB. ECF No. 7086 at 19. This puts the cart before the horse. Jurisdictional discovery has been ordered to determine if ARB supported al Qaeda and what manner of support was provided. It would make little sense to require the PECs to show facts sufficient for jurisdiction in order to obtain jurisdictional discovery. Accordingly, the three Saleh al Hussayen requests are granted.

### H.  The Terrorism Finance Investigation Requests (Nos. 45–54)

The Terrorist Finance Investigation Requests are granted to the extent described here. ARB has indicated that it will search for documents responsive to Requests Number 47 through 54, subject to objections on the time period. ECF No. 7086 at 20. Any objections to that time period are to be addressed based on Section II of this Order.

The two remaining requests, 45 and 46, are overbroad and cumulative. Request number 45 asks for "all documents relating to any investigation or audit relating to any potential criminal or terrorist activity, following the attacks of September 11, 2001" which references any ARB personnel or transaction. ECF No. 6996-4 at 15. Requiring the disclosure of all documents

17

related to any criminal or terrorist investigation regardless of its connection to al Qaeda or the September 11 Attacks exceeds the scope of discovery permitted by the Court of Appeals. It is also unnecessarily cumulative given that Requests 47, 48, 51, and 52 all seek information on investigations, audits, and other reviews by ARB and other entities into the use of ARB accounts linked to terrorism. Similarly, Request Number 46 requires documents relating to "all ARB accounts that were seized, frozen, closed, monitored, or in any way restricted following the attacks of September 11, 2001." Id. This is overbroad given the wide array of reasons that an account could be subject to monitoring or restriction, many of which may have nothing to do with al Qaeda. If restrictions on accounts are germane to an investigation of al Qaeda or the September 11 Attacks, such information is likely to be surfaced in the material on audits and investigations disclosed as part of Requests 47, 48, 51, and 52.

## I.   The Suleiman al Rajhi Departure Request (No. 55)

The Suleiman al Rajhi Departure Request is granted. The PECs request "all documents discussing the reasons for Suleiman al Rajhi's departure from, and relinquishment of control over, ARB." ECF No. 6996-4 at 18. ARB notes that allegations against Suleiman al Rajhi were dismissed as part of Terrorist Attacks I, 714 F.3d at 675. That dismissal, though, was based on a failure to allege that Suleiman al Rajhi's purported conduct was directed at the United States. Id. at 676.

The complaint here, in contrast, specifically references conduct by Suleiman al Rajhi in its allegations of ARB's specific intent. See, e.g., Complaint at ¶ 192 ("[A] broad spectrum of evidence demonstrates that Suleiman al Rajhi was …an active architect and manager of al Qaeda's global financial and logistical support network, who, along with others, actively deployed Al Rajhi Bank's resources to advance al Qaeda's continuous efforts to attack the United States.") Accordingly, Underwriting Members of Lloyd's Syndicate 2 noted that "the

support alleged here, in conjunction with *this specific intent*, we believe is 'more direct and one

step closer to al Qaeda' when compared to the support we have previously found inadequate."

779 F. App'x at 69 (citing <u>Terrorist Attacks I</u>, 714 F.3d at 678) (emphasis added).

Thus, whatever the inadequacy of prior pleadings against Suleiman al Rajhi, the present

complaint sufficiently alleges that some aspect of the specific intent to further terrorism stems

from his conduct. The PECs are entitled to investigate the degree to which his departure from

ARB is connected to allegations that he sought to use ARB resources to support terrorist attacks

against the United States.

### J.   The ARB Financial Controls Requests (Nos. 56–58)

All of the ARB Financial Controls Requests are granted. Requests 56 and 57 seek

materials relating to ARB's policies on anti-money laundering, combatting terrorist financing,

"Know Your Customer" practices, and similar controls aimed at preventing terrorists from

accessing ARB financial services. ECF No. 6996-4 at 19. Request 58 asks for audits,

investigations, or remedial actions undertaken by ARB, the United States, or Saudi Arabia

related to these policies after the September 11 Attacks. <u>Id.</u> The PECs request these materials on

the theory that if ARB executed banking transactions in violations of any of its policies that

would suggest that there was a "nefarious intention" associated with that transaction. <u>Id.</u>

Understanding how ARB may have processed payments for al Qaeda goes to the root of

this jurisdictional inquiry. This, in turn, requires understanding what policies and practices ARB

had in place to govern its processing. Investigations into ARB's anti-terrorism policies in the

wake of the September 11 Attacks are equally important to this question.

### IV.   Issues of Saudi Arabian Law Are Not Ripe for Resolution

The issue of whether Saudi Arabian law would bar the discovery sought by the PECs is

not ripe for resolution. The PECs argue that ARB's objections to discovery based on Saudi

Arabian law are too vague to bar discovery. Since ARB has failed to object properly, they further argue that these objections are waived. ECF No. 6996-1 at 29. ARB responds that, given the unclear nature of what they must produce, objections based on Saudi Arabian law are not yet ripe and should be made only after determining what discovery is relevant. ECF No. 7086 at 28.

"When a lawsuit requires discovery of materials located in a foreign nation . . . foreign legal systems and foreign interests are implicated." Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 551–52 (1987). This triggers a two-step process. First, a court must determine if there is actually a conflict between the discovery sought and foreign law. The burden is on the party resisting discovery to "provide the Court with information of sufficient particularity and specificity" to determine if this conflict exists. Laydon v. Mizuho Bank, Ltd., 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (quoting Alfadda v. Fenn, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)) (internal quotations omitted).

If a true conflict exists, courts in this Circuit must perform a seven-factor comity analysis to determine if that discovery is proper: (1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located; (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery. See, e.g., Wultz v. Bank of China Ltd., 910 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2012) (identifying these seven factors).

These factors show that the Saudi law question is not ripe for resolution. ARB has not even established a conflict between the discovery sought and the Saudi law preventing its production. Nor have the parties had the chance to consider or brief the Court on the importance of the material sought or the hardship of producing it given the narrowed scope of discovery ordered by the Court in this Order. In short, the record is not sufficiently developed for the Court to rule on the question of the application of Saudi Arabian law.

**V.    ARB's Arguments About Undue Burden Merit Further Efforts to Meet and Confer**

The final issue is whether the PECs' requests subject ARB to an undue burden. Federal Rule of Civil Procedure 26(c) permits ARB to seek protection from unduly burdensome discovery. ARB suggests the PECs' requests will impose astronomical discovery costs. According to the declarations submitted by ARB, it holds roughly 2.25 million boxes of documents in a warehouse in Riyadh, Saudi Arabia. ECF No. 7087 at ¶ 6. The contents of these boxes are not indexed, id. at ¶ 8, and files from before 2015 are not digitally searchable. Id. at ¶ 14. For a period from 1999 to 2001 (i.e., around half of the discovery period), there are at least 114,420 boxes of potentially responsive documents. Id. at ¶ 15.

ARB claims that the total cost of reviewing these 114,420 boxes would range from $92,106,300 to $250,381,500, with costs for a subset of 13,049 boxes ranging from $10,553,370 to $28,571,346. ECF No. 7088 at ¶ 10. The PECs' discovery experts contest these claims and suggest that ARB may have inflated these costs. For example, they suggest that ARB overestimates the costs for scanning files by as much as 30 percent. ECF No. 7164-3 at ¶ 12. They also suggest that ARB's discovery team has estimated costs based only on a "worst case" scenario that fails to use discovery best practices. Id. at ¶ 13.

Even crediting these arguments would yield substantial discovery costs. Taking ARB's lowest estimate and assuming it overstated all costs (not merely scanning costs) by 50 percent

21

would yield costs of $46,053,150 to review all 114,420 boxes. Applying the same calculus to the subset of 13,049 boxes yields $5,276,685.

Moreover, this estimate is just for 1999 to 2001. The Court has already found that the discovery period begins in 1998 and ends in either 2002 or 2004 depending on the inquiry. Thus, this Order has already added at least two additional years to the period for which, after reducing ARB's estimate by 50 percent, discovery costs run anywhere from $5 to $42 million. At the same time, this Order has denied numerous discovery requests which ought to narrow both the scope and cost of the discovery.

Two conclusions follow. First, even recognizing the stakes of this litigation, ordering what could amount to tens of millions of dollars in discovery costs for the threshold question of jurisdiction imposes an undue burden and is disproportional to the limited need to assess jurisdiction. Second, despite these costs, it cannot be a blanket objection to discovery that ARB's files are too difficult to review. The PECs are entitled to some reasonable discovery beyond what ARB has offered.

Courts have resorted to numerous options to break such an impasse. For example, they may order a sampling of documents to determine if options like cost shifting are appropriate. See, e.g., Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 317–24 (S.D.N.Y. 2003) (discussing how to use document sampling to inform a cost-shifting analysis). While the Court is prepared to implement such solutions here too, such a resolution is more likely to be workable and satisfactory to the parties if they can negotiate it themselves.

Accordingly, the parties are directed to meet and confer to determine if they can agree on an acceptable program of discovery based on the parameters of this Order. The parties shall file a joint status letter with the Court by December 10, 2021. That letter shall state whether the parties

have been able to reach an agreement, and if not, what disputes require further resolution by the Court.

Given this direction to meet and confer further, ARB's motion for oral argument at ECF No. 7244 is denied as premature.

## CONCLUSION

The parties are ordered to meet and confer based on the discovery guidance in this Order. The parties shall file a joint status letter with the Court by December 10, 2021. That letter shall state whether the parties have been able to agree on an acceptable discovery program and if not, what disputes require further resolution by the court. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 6996 and 7244.

**SO ORDERED.**

DATED:       New York, New York
             November 22, 2021

_____
SARAH NETBURN
United States Magistrate Judge