FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                  )

IN RE:  TERRORIST ATTACKS ON     )     Civil Action No. 03 MDL 1570 (GBD) (SN)

SEPTEMBER 11, 2001              )     ECF Case

——————————————————————— )

This document relates to:  *All Actions*


## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE KINGDOM OF SAUDI ARABIA RELATING TO
## KREINDLER & KREINDLER LLP'S VIOLATION
## OF THE COURT'S PROTECTIVE ORDERS


Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ viii

I.     INTRODUCTION ................................................................................... 1

II.    PROPOSED FINDINGS OF FACT ....................................................... 4

    A.    The MDL and FBI Protective Orders Govern the Use of
        Confidential Information in This Litigation ............................................. 4

    B.    Kreindler & Kreindler's Attorneys and Professionals Neither
        Understand nor Follow the MDL and FBI Protective Orders.................... 7

    C.    Kreindler & Kreindler Stores Confidential and Protected Material
        in Locations with Minimal or Nonexistent Safeguards ........................... 8

        1.    Kreindler & Kreindler's internal Case Media server had no
            ability to limit or track access to confidential material ................ 9

        2.    Kreindler & Kreindler's cloud-based ShareFile server does
            limit and track access to confidential material........................... 10

        3.    Kreindler & Kreindler's email server contains confidential
            material ......................................................................... 11

        4.    Kreindler & Kreindler employees save confidential
            material on their personal devices and email accounts ............... 11

        5.    Fawcett saved confidential material on Dropbox ...................... 11

    D.    Kreindler's Litigation Strategy Includes Frequent Press
        Appearances in Which He Disparages and Violates the Protective
        Orders........................................................................................... 12

        1.    Kreindler and others express disgust and hate for the
            Court's protective orders..................................................... 12

        2.    Kreindler, working with Fawcett, violated the MDL
            Protective Order in 2017 by disclosing confidential
            information to the press ...................................................... 13

        3.    Kreindler disclosed confidential information in a 2019
            speech at Dartmouth College and received a second
            warning from the Court....................................................... 15

        4.      Kreindler disclosed confidential information in a 2021
episode of the podcast *Conspiracyland* with Isikoff..................................15

E.      Fawcett Is or Was an Integral Member of the Kreindler & Kreindler
Team with Unfettered Access to Protected Materials and Duties
That Include Press Contacts...................................................................................16

F.      Kreindler & Kreindler Took Al Jarrah's Deposition with the
Concealed Assistance of a Former FBI Agent.........................................................18

G.     Kreindler Discussed the Confidential Al Jarrah Deposition with
Isikoff, and Fawcett Sent Isikoff the Transcript .....................................................20

        1.      Kreindler and Isikoff discussed the deposition, and
Kreindler discussed Isikoff's information requests with
Fawcett......................................................................................20

        2.      Fawcett discussed the deposition with Isikoff and sent
him the transcript .....................................................................21

        3.      Fawcett destroyed or concealed evidence of his actions ...........................21

        4.      Both Kreindler and Fawcett continued to communicate
with Isikoff................................................................................23

H.      Isikoff's Article Disclosed the Protective Order Violation, and
Kreindler & Kreindler Purported To Investigate.....................................................23

        1.      Maloney began the investigation already confident that
Kreindler & Kreindler was not the source of the leak ...............................24

        2.      No one asked Fawcett directly whether he sent Isikoff
the transcript.............................................................................25

        3.      Maloney did not investigate Kreindler & Kreindler's
contacts with Isikoff...................................................................26

        4.      Maloney did not investigate most of the locations in which
Kreindler & Kreindler stored the transcript or other
confidential materials.................................................................26

        5.      Maloney did not follow up on the two email searches that
he did instruct Hartney to conduct............................................28

        6.      Maloney did not discover Fawcett's communications with
Isikoff because he did not search personal devices or emails...................29

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

7.      Maloney did not require Fawcett or anyone else to sign a
        sworn declaration ................................................................30

I.      Saudi Arabia's Inquiry About the Violation Triggered Calls
        Between Kreindler and Fawcett – and Fawcett and Personal
        Defense Counsel .......................................................................31

        1.      Fawcett's communications with Kreindler and Crotty
                strongly suggest discussions about the protective order
                violation ................................................................31

        2.      Kreindler and Fawcett denied discussing the violation, and
                Fawcett falsely denied seeking legal advice from Crotty ........................32

        3.      Pounian's later declaration contradicts Kreindler's and
                Fawcett's testimony ................................................................33

J.      Kreindler & Kreindler Made False Representations in July and
        August To Avoid or Delay Investigation of the Violation ...................................34

        1.      Pounian's July 23 email and Kreindler & Kreindler's July
                27 letter made false representations to Saudi Arabia and
                to the Court ................................................................34

        2.      Kreindler & Kreindler declined to file any voluntary
                declarations ................................................................36

        3.      The Court's August 16 Order directed Kreindler & Kreindler
                to submit declarations concerning the leak ..................................36

        4.      Kreindler & Kreindler's August 16 declarations made false
                and misleading statements to the Court ......................................37

K.      Kreindler & Kreindler Failed To Comply with the Court's August
        30 Order and Made False and Misleading Statements............................................39

        1.      Hartney conducted limited additional email searches and
                failed to produce the results as described in his declaration.....................40

        2.      Benett and Pounian prepare false and misleading
                declarations ................................................................40

        3.      Kreindler & Kreindler admitted that its prior representations
                to the Court were false and drafted a declaration for Fawcett ...................44

        4.      Fawcett's declaration contained new false statements and
                did not identify or produce communications as directed by
                the Court................................................................49

5.      Kreindler & Kreindler submitted additional false, misleading, and noncompliant declarations with its September 27, 2021 letter ................................................................................. 52

        a.      Kreindler's declaration ................................................. 52

        b.      Maloney's declaration .................................................. 54

        c.      Benett's declaration .................................................... 55

        d.      Pounian's declaration .................................................. 55

        e.      Hartney's declaration .................................................. 55

6.      Kreindler & Kreindler's September 27, 2021 letter to the Court made additional false statements .................................... 57

L.   Kreindler & Kreindler Prepared and Filed a Supplemental Fawcett Declaration and Letter Making More False and Misleading Statements ........................................................................ 58

   1.      Fawcett's September 30, 2021 declaration made false statements ................................................................... 58

   2.      Kreindler & Kreindler's September 30, 2021 letter made false and misleading statements ................................. 59

M.   Kreindler & Kreindler Failed To Inform Fawcett of Serious Conflicts of Interest Before Causing Him To Incriminate Himself ..................... 62

N.   Post-Hearing Discovery Shows That Kreindler & Kreindler Violated Court Orders and Made False and Misleading Statements To Conceal the Violation ..................................................... 63

III.   PROPOSED CONCLUSIONS OF LAW ....................................... 66

A.   Kreindler & Kreindler Willfully Violated the Protective Orders Through Fawcett's and Kreindler's Acts and Omissions ..................... 66

   1.      Fawcett willfully violated the MDL Protective Order and willfully or recklessly violated the FBI Protective Order ..................... 66

   2.      Fawcett purposefully destroyed or concealed evidence of the violations .................................................................. 68

   3.      Kreindler recklessly or with gross negligence caused or failed to prevent Fawcett's violation of the MDL and FBI Protective Orders ................................................. 69

4.   Kreindler recklessly created a culture of disdain and disrespect for the Court's orders within his firm .......................................70

5.   Kreindler recklessly failed to supervise Fawcett despite giving him unlimited access to confidential information and press contacts ....................................................................71

6.   Kreindler was grossly negligent in failing to ensure that MDL Protected Information was kept secure ............................................72

7.   Kreindler personally violated the protective order by disclosing confidential information to Isikoff............................................74

8.   Kreindler & Kreindler is responsible for Fawcett's and Kreindler's conduct...........................................................................75

    a.   Fawcett acted within the scope of his agency or employment with the firm and for its perceived benefit ............................................................................75

    b.   Kreindler acted and failed to act within the scope of his agency for the firm and for its perceived benefit ....................76

B.   Through Its Attorneys, Kreindler & Kreindler Made False and Misleading Statements in the July 23 Email, the July 27 Letter, and the August 16 Declarations ............................................................77

1.   As of the July 23, July 27, and August 16 statements, Kreindler knew or should have known that Fawcett had violated the protective orders.................................................................78

2.   As of the July 23, July 27, and August 16 statements, Maloney, Benett, and Pounian knew or should have known that Maloney's investigation was unreasonable and incomplete .......................................................................79

    a.   Maloney did not conduct a reasonable investigation and knew it was not complete..........................................79

    b.   Benett and Pounian knew or should have known that they could not reasonably rely on Maloney's investigation....................................................................81

3.   Kreindler & Kreindler is responsible for its attorneys' misrepresentations............................................................................81

C.      Kreindler & Kreindler Violated the August 30 Order and Made
        Misrepresentations to the Court in the September 27 and
        September 30 Letters and the Declarations ............................................82

        1.      Kreindler's declaration violated the Court's order and made
                false statements and misleading omissions................................82

        2.      Maloney's declaration violated the Court's order and made
                false statements and misleading omissions................................83

        3.      Benett's and Pounian's declarations violated the Court's
                order and made false and misleading statements.......................84

        4.      Hartney's declaration violated the Court's order and made
                false and misleading statements................................................85

        5.      Fawcett's September 27 declaration violated the Court's
                order and made false statements ...............................................85

        6.      Fawcett's September 30 declaration violated the Court's
                order and made false and misleading statements.......................86

        7.      Benett also made false and misleading statements in the
                September 27 and September 30 letters.....................................87

        8.      Kreindler & Kreindler is responsible for its attorneys' and
                Fawcett's conduct .....................................................................87

D.      The Court Has Authority To Impose Sanctions Under Rule 37
        and the Court's Inherent Powers.............................................................88

        1.      Rule 37 authorizes severe sanctions for willful and
                bad-faith misconduct.................................................................88

        2.      The Court has inherent power to sanction bad-faith
                misconduct .................................................................................89

E.      The Court Should Impose Appropriate Remedies To Enforce
        Its Orders and Ensure Future Respect for Its Authority ........................90

        1.      The Court should remove all Kreindler & Kreindler
                attorneys from the Plaintiffs' Executive Committee for
                Personal Injury Claims and terminate their access to
                confidential information in the MDL..........................................90

        2.      The Court should certify to Judge Daniels the facts that
                show civil and criminal contempt ..............................................95

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

3.   The Court should consider disciplinary and criminal referrals ................... 96

4.   The Court should award attorneys' fees ..................................................... 98

5.   The Court should draw an adverse inference from destruction of evidence ............................................................................. 98

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

# TABLE OF CONTENTS

Page

CASES

*ADA Cases*, *In re*, 2018 WL 6620603 (M.D. Fla. Nov. 13, 2018), *report and recommendation adopted*, 2019 WL 12261700 (M.D. Fla. Jan. 29, 2019) ................ 70-71

*Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prods., Inc.*, 2020 WL 7342724 (S.D.N.Y. Dec. 11, 2020) ................................. 90

*Blue v. United States Dep't of Army*, 914 F.2d 525 (4th Cir. 1990) ............................ 70

*Carolco Pictures Inc. v. Sirota*, 700 F. Supp. 169 (S.D.N.Y. 1988) ........................... 75

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ..................................................... 89, 90

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47 (S.D.N.Y. 2020) ................................................................................. 68

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979) ................................................................... 70

*City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) ................................................................................. 88, 89, 90

*Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991) .......................... 88

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) ...................... 90

*Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36 (2d Cir. 2003) ...................... 66

*Dvorkin v. New York-Presbyterian Hosp.*, 2011 WL 280801 (S.D.N.Y. Jan. 19, 2011) ................................................................................. 70

*Enmon v. Prospect Cap. Corp.*, 675 F.3d 138 (2d Cir. 2012) .................................... 76

*Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2021 WL 1172265 (S.D.N.Y. Mar. 29, 2021) ............................................................... 89

*Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ........................... 68

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ................................ 77

*Grant Heilman Photography, Inc. v. Pearson Educ., Inc.*, 2018 WL 2414984 (E.D. Pa. May 29, 2018) ............................................................. 94

*Hutto v. Finney*, 437 U.S. 678 (1978) .................................................................... 90

*Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015) ...................................................................................88

*Jimenez v. City of New York*, 162 F. Supp. 3d 173 (S.D.N.Y. 2015), *aff'd in part, vacated in part*, 666 F. App'x 39 (2d Cir. 2016) ...............................................77

*Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1479018 (S.D.N.Y. Mar. 26, 2020) ...................................79

*Karsch v. Blink Health Ltd.*, 2019 WL 2708125 (S.D.N.Y. June 20, 2019) ...............................89

*Koch v. Greenberg*, 2011 WL 13260757 (S.D.N.Y. Aug. 16, 2011), *report and recommendation adopted*, 2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012) ...............................72

*Levine, In re*, 27 F.3d 594 (D.C. Cir. 1994)...............................................69

*Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021)...................................................3

*Litton Sys., Inc. v. AT&T Co.*, 91 F.R.D. 574 (S.D.N.Y. 1981)......................................80

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178 (S.D.N.Y. 2003), *adhered to on recon.*, 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004)...............................70

*Nguyen, In re*, 447 B.R. 268 (B.A.P. 9th Cir. 2011)...............................70, 71

*Nieves v. City of New York*, 208 F.R.D. 531 (S.D.N.Y. 2002) ...................................89

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)......................................90

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645 (2d Cir. 2004)...............................................67, 74

*Parmalat Sec. Litig., In re*:

472 F. Supp. 2d 582 (S.D.N.Y.), *aff'd*, 240 F. App'x 916 (2d Cir. 2007) .......................67

640 F. Supp. 2d 243 (S.D.N.Y. 2009)...............................................75

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371 (2d Cir. 1981) ...............................70

*Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794 (8th Cir. 2005)..................93, 94

*Resnik v. Coulson*, 2019 WL 1434051 (E.D.N.Y. Mar. 30, 2019) ...............................68

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ...................................88

*Rojas v. United States*, 55 F.3d 61 (2d Cir. 1995) ...............................66, 69

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, 924 F. Supp. 2d 505 (S.D.N.Y. 2013) ....................................................................................................89

*Schiller v. City of New York*, 2007 WL 1623108 (S.D.N.Y. June 5, 2007) ......................88, 89, 90

*Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379 (N.D. Ill. May 14, 2019) ...................................................................................................................94

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100 (S.D.N.Y. 2018) ......................................................................................77, 82

*United States v. Cutler*, 58 F.3d 825 (2d Cir. 1995) ..............................................66, 69

*United States v. Lynch*, 162 F.3d 732 (2d Cir. 1998) .............................................66, 67

*United States v. Mastropieri*, 685 F.2d 776 (2d Cir. 1982) .........................................67

*United States v. Parness*, 503 F.2d 430 (2d Cir. 1974) ..............................................78

*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67 (2d Cir. 1988) ..........................88

*Yeremis v. Amerit Fleet Sols.*, 2021 WL 1565693 (S.D.N.Y. Apr. 21, 2021) ..............77

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. V .............................................................................................13, 97

18 U.S.C. § 1512(c) ...............................................................................................68, 98

18 U.S.C. § 1621 ...........................................................................................................98

18 U.S.C. § 1622 ...........................................................................................................98

18 U.S.C. § 1623 ...........................................................................................................98

28 U.S.C. § 636(e)(6)(B) .............................................................................................96

28 U.S.C. § 636(e)(6)(B)(i) ..........................................................................................95

28 U.S.C. § 636(e)(6)(B)(ii) .........................................................................................95

28 U.S.C. § 1927 ...........................................................................................................76

Fed. R. Civ. P.:

    Rule 11 ..............................................................................................................70, 77

    Rule 37 ..............................................................................................................88, 95

Rule 37(b) ......................................................................................................3, 88, 89, 98

Rule 37(b)(2)(A) .....................................................................................................88, 90

Rule 37(b)(2)(C) .....................................................................................................88, 98

Rule 37(e) ...............................................................................................................89, 90

Rule 37(e)(1) .................................................................................................................89

Rule 37(e)(2) .................................................................................................................98

N.Y. R. Prof'l Conduct .................................................................................................96

Rule 3.3(a)(1) ................................................................................................................97

Rule 3.3(a)(3) ................................................................................................................97

Rule 3.4(a)(1) ................................................................................................................96

Rule 3.4(a)(3) ................................................................................................................97

Rule 3.4(a)(4)-(5) ..........................................................................................................97

Rule 3.4(c) ....................................................................................................................96

Rule 4.3 .........................................................................................................................97

Rule 5.1(a) .....................................................................................................................97

Rule 5.1(b)(2) ................................................................................................................97

Rule 5.1(d)(2) ................................................................................................................97

Rule 5.3(a) .....................................................................................................................96

Rule 5.3(b) .....................................................................................................................96


OTHER MATERIALS

Restatement (Second) of Agency (1958) .......................................................................75

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

## I.       INTRODUCTION

On November 1 and 2, 2021, this Court held an evidentiary hearing concerning a breach

of its protective orders by Kreindler & Kreindler, LLP ("Kreindler & Kreindler").  At the close

of the hearing, and by later order, ECF No. 7317, the Court directed the parties to submit

proposed findings of fact and conclusions of law by November 24, 2021.  This submission sets

forth the findings of fact and conclusions of law proposed by Defendant Kingdom of Saudi

Arabia ("Saudi Arabia").

After months of false denials, Kreindler & Kreindler no longer disputes that it violated

the Court's orders by sending a confidential deposition transcript to Yahoo! News reporter

Michael Isikoff ("Isikoff") and destroyed evidence of that violation.  But the evidence at the

hearing showed more.  James Kreindler ("Kreindler"), the leader and supervisor of his firm's

9/11 litigation team, created through his words and actions a culture of pervasive disregard and

disrespect for the Court's orders, which the firm's staff member John Fawcett ("Fawcett") acted

upon – more than once – in releasing protected material to reporters.  Kreindler personally

executed a press strategy in which he publicly expressed "disgust" and "hate" for those orders

and just as publicly violated them himself.  He knew little and cared less about what the Court's

orders required.  He set that example, and his team followed him.

Long before Fawcett's September 27, 2021 confession to the Court, Kreindler knew of or

willfully blinded himself to Fawcett's execution of the press strategy through covert leaks of

confidential information.  Fawcett had violated the protective order in the past; had unfettered,

unsupervised access to confidential material; and had, with Kreindler's knowledge, shared other

documents with Isikoff just days before the leak became public.  Fawcett also contacted and had

a privileged conversation with a personal criminal defense attorney the day after Saudi Arabia

told Kreindler & Kreindler it would seek a Court-ordered investigation, and on the same morning

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

as an unusually long call with Kreindler on which both men implausibly denied discussing the Isikoff leak – and as to which Fawcett prevaricated on the stand. At a minimum, Kreindler and his colleagues disregarded red flags pointing to Fawcett as Isikoff's source.

Kreindler & Kreindler then purported to "investigate" the leak through its partner Andrew Maloney ("Maloney"), who made no real investigation at all and instead sought only to support the conclusion that no one at Kreindler & Kreindler was Isikoff's source. Kreindler & Kreindler then falsely told the Court and Saudi Arabia that its investigation was complete and had determined its innocence. Its attorneys said the same thing in sworn declarations after the Court issued its first investigative order on August 12, 2021. They prepared to do so again even after the Court issued a second order on August 30, with partner Megan Benett ("Benett") and counsel Steven Pounian ("Pounian") drafting false and misleading testimony to conceal their firm's inability to complete the forensic investigation the Court had directed.

The cover-up continued until the last minute, when Fawcett refused to sign his declaration. Benett and Pounian then took a new declaration Fawcett wrote himself – which echoed Kreindler's public disparagement of the Court's orders – and rewrote it, adding false statements distancing Fawcett from their firm, minimizing the severity of his violations, and attempting to justify his actions with a concocted story about Fawcett's "personal interest" in human rights and protecting children. Kreindler, Maloney, Benett, and Pounian wrote and filed more false and misleading declarations and letters seeking to justify their conduct, to conceal their violations of the Court's orders, and to shift the blame from themselves by attacking Saudi Arabia and Musaed Al Jarrah ("Al Jarrah"). Kreindler & Kreindler's pattern of abuses continued even past the hearing, as shown by a new declaration they filed publicly just days ago, but that the Court immediately sealed for its gratuitous and irrelevant attacks on Al Jarrah.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

Severe sanctions for this conduct are warranted.  Exercising its authority under Federal Rule of Civil Procedure 37(b) and its inherent powers, the Court should remove Kreindler & Kreindler's attorneys from their seats on the Plaintiffs' Executive Committee for Personal Injury Claims and terminate their access to confidential information in this litigation.  Despite repeated warnings, they have shown through their words and conduct that they cannot be trusted to safeguard the confidential information in this case.  No lesser remedy will stop them from continuing to violate the Court's orders and then seeking to conceal those violations.  The Court should also certify to Judge Daniels the facts that show contempt of Court orders, should consider disciplinary and criminal referrals for the conduct that its investigation has revealed, and should award the attorneys' fees that the Federal Rules mandate for violations of a discovery order.

In making findings and drawing conclusions, the Court should consider the declarations it admitted as direct testimony, *see* ECF No. 7167, at 2, the testimony at the hearing (collectively, "Tr."), the exhibits admitted on the record at the hearing, the additional exhibits admitted by post-hearing order of the Court, ECF No. 7369, and other matters of record in the case or subject to judicial notice.  It should weigh whether that evidentiary record shows clear and convincing proof of wrongdoing, *see*, *e.g.*, *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 281 (2d Cir. 2021), and should find that requirement amply met.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

## II.     PROPOSED FINDINGS OF FACT

### A.     The MDL and FBI Protective Orders Govern the Use of Confidential Information in This Litigation

1.      On October 3, 2006, the Honorable Richard Conway Casey entered as ECF No. 1900 an order ("the MDL Protective Order") to govern the production and use of confidential information in this litigation.  *See* KSAX-0002.  The MDL Protective Order provides that:

a.      "Protected Material" includes "all Disclosure or Discovery Material, or portions thereof, as well as copies, summaries or abstracts thereof, which have been designated by the Designating Party as Confidential."  KSAX-0002, at 7.

b.      A "Receiving Party may use Protected Material . . . only for prosecuting, defending, or attempting to settle this litigation."  KSAX-0002, at 11.

c.      "Protected Material may be disclosed only to the categories of persons and under the conditions described in th[e] Order."  KSAX-0002, at 11.  Those categories are set out in Paragraph H.3.  Members of the press are not included.  *Id.* at 11-12.

d.      "Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order."  KSAX-0002, at 11.

e.      Depositions marked as containing "Confidential Information or Material" "shall be treated in accordance with the provisions of th[e] Order."  KSAX-0002, at 11.

f.      It is "the responsibility of counsel giving access to Confidential Information or Material produced by [a] Producing Party to create and retain records indicating that the person receiving Confidential Information or Material agreed to be bound by the terms and restrictions of this Order."  KSAX-0002, at 12-13.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

2.      On November 14, 2018, this Court entered as ECF No. 4255 an order ("the FBI

Protective Order") to govern the production of confidential information by the Federal Bureau

of Investigation ("FBI") and the use of such information in this litigation.  *See* KSAX-0015.

The FBI Protective Order provides that:

      a.      "[A]ll Protected Information produced pursuant to th[e] Order shall be

used solely for the purposes of this action and for no other purpose whatsoever, and shall

not be published to the general public in any form, or otherwise disclosed, disseminated,

or transmitted to any person, entity, or organization, except in accordance with the terms

of this Order."  KSAX-0015, at 2.

      b.      "[A]ny document or record designated as Protected Information may be

disclosed only to . . . Qualified Persons."  KSAX-0015, at 2.  Paragraph 6 of the Order

defines Qualified Persons.  Members of the press are not included.  *Id.* at 2-3.

      c.      "[A]ny deposition transcripts" containing "deposition questions intended

to elicit testimony regarding Protected Information" "shall be automatically subject, in

their entirety, to the same protections and precautions as the Protected Information"

"[p]ending review of the deposition transcript by the FBI."  KSAX-0015, at 5.  "Upon

receipt of [a] deposition transcript, a copy shall be served on the FBI by the PECs,"

and "[t]he FBI will have thirty (30) days to review and designate the portions of the

deposition transcript that contain Protected Information."  *Id.*

      d.      "A copy of [the FBI Protective] Order shall be delivered to each Qualified

Person to whom a disclosure of Protected Information is made, at or before the time of

disclosure, by the attorney making the disclosure."  KSAX-0015, at 4.  "Prior to receiving

access to Protected Information, each such Qualified Person shall agree to be bound by

the terms of th[e] order," and "[t]he provisions of th[e] Order shall be binding upon each such person to whom disclosure is made."  *Id.* at 4-5.

      e.      Kreindler & Kreindler, among other firms, requested that this Court enter the FBI Protective Order in its current form.  *See* KSAX-0014, at 4 (letter requesting that the Court "overrule Dallah Avco's objection to the proposed protective order, and promptly enter the protective order in the form submitted jointly by the United States and PECs"; signed by Maloney of Kreindler & Kreindler); *see also* KSAX-0015, at 1 ("[T]he Court enters th[e] Privacy Act Order and Protective Order, upon the joint request of the Plaintiffs and the Federal Bureau of Investigation . . . .").

3.      Kreindler & Kreindler has never filed any motion with the Court to lift or modify either the FBI Protective Order or the MDL Protective Order.  Tr. 32:14-18.

4.      On August 2, 2021, the FBI filed a letter with the Court calling the attention of counsel to the 30-day review provision governing transcripts of depositions containing FBI Protected Information.  ECF No. 6999, at 1.

5.      In addition to the MDL Protective Order and the FBI Protective Order, the Plaintiffs' Executive Committees (the "PECs") and Saudi Arabia also largely agreed to, and the Court after resolving certain disputes approved, a deposition protocol to govern depositions in jurisdictional discovery against Saudi Arabia.  *See* ECF Nos. 6002-1, 6204.  Under that protocol, "depositions may be attended (either in person or remotely) only by the witness, counsel for the witness, attorneys of record in the MDL Proceeding and their staff, court reporters, videographers, translators, and the Parties' in-house counsel," and "[a]ll persons in attendance (either in person or remotely) must be noted on the deposition record."  ECF No. 6002-1, ¶ 31; *see also* ECF No.

6204, at 2 (further authorizing "Saudi Arabia's and Dallah Avco's party representatives [to] attend depositions").

### B. Kreindler & Kreindler's Attorneys and Professionals Neither Understand nor Follow the MDL and FBI Protective Orders

6. Kreindler testified that he "did not recall the 30-day window" provided by the FBI Protective Order for the FBI to review deposition transcripts containing FBI-designated confidential information, and that, while he had read the FBI Protective Order "when [he] signed it," he has not read it "recently." Tr. 17:13-18:25 (testifying that he had forgotten "the 30-day window" provision in the FBI Protective Order, but if "that's the case, then, yes, both [protective orders] were" breached when the Al Jarrah transcript was leaked to Michael Isikoff).

7. Fawcett was the Kreindler & Kreindler professional responsible for managing the entire document collection for this litigation. Tr. 40:5-9. In his testimony, Fawcett admitted that he did not "underst[an]d every piece of" the MDL Protective Order or "every line of" the FBI Protective Order, that "things were pointed out to [him] after [his] declarations" that demonstrated that he did not understand the FBI Protective Order, and that none of the Kreindler & Kreindler lawyers "ever gave [him] a full briefing of every provision of the FBI protective order." Tr. 419:12-424:4.

8. Kreindler has admitted that he discussed with the press what occurred at the confidential depositions taken in this case. He told the press, for instance, that: "we've exposed all kinds of lies"; "[o]ne witness will contradict another"; "[e]ach person wants to minimize their own role and point fingers at others"; "you have lots and lots of people inculpating every Saudi official"; and there has been a "smoking gun or guns." KSAX-0039, at 11. On cross-examination, Kreindler testified that these statements disclose "what [the witnesses] did say" at their depositions. Tr. 108:22-24 ("Q. It's not an opinion, it's what the witnesses supposedly

said, isn't it?  A.  Not supposedly, what they did say.").  At the same time, Kreindler has claimed that his public statements do not discuss the "contents" of any of the confidential depositions and do not violate the protective orders.  Tr. 63:10-24, 108:7-110:21.

9.      Kreindler & Kreindler, as a firm, has made similar claims regarding Kreindler's statements in filings with the Court.  *See* KSAX-0058 (Kreindler & Kreindler's September 30, 2021 submission to the Court stating that "Jim Kreindler's comments on Conspiracyland did not disclose any content from the Jarrah depositions").

### C.   Kreindler & Kreindler Stores Confidential and Protected Material in Locations with Minimal or Nonexistent Safeguards

10.     Kreindler testified that he did not know how Kreindler & Kreindler maintained confidential documents in the 9/11 litigation.  He stated "only people who had signed the protective order" could access such documents, Tr. 72:21-25; as set forth below, that was incorrect.  When pressed, Kreindler testified that he "can't answer how the computer works" and had "no idea" whether access was restricted by policy or technology.  Tr. 73:1-10.

11.     John Hartney ("Hartney") testified as a witness familiar with Kreindler & Kreindler's information technology systems.  He testified that his department does not maintain a list of the individuals who had signed the MDL and FBI Protective Orders and does not know who has agreed to abide by those orders.  Tr. 136:5-10.

12.     Kreindler & Kreindler attorneys and employees saved MDL Protected Material and FBI Protected Information in at least five electronic locations, including:  (1) an internal proprietary server called "Case Media," Tr. 140:11-17; (2) a cloud-based storage system called "ShareFile"; (3) on the Kreindler & Kreindler email server; (4) on the home computers, devices, and personal email accounts of Kreindler & Kreindler attorneys and employees; and (5) on other cloud-based platforms that were managed by Fawcett, including Dropbox.  Tr. 136:22-137:9;

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

KSAX-0067, KSAX-0068 (showing Fawcett's maintenance of a Dropbox account containing confidential case materials).

> **1.    Kreindler & Kreindler's internal Case Media server had no ability to limit or track access to confidential material**

13.     "Case Media" is Kreindler & Kreindler's internal server where it saves 9/11 litigation materials, including confidential documents and deposition transcripts.  Until at least September 27, 2021, "anybody who worked at the Kreindler firm had access to Case Media where the protected information relating to the 9/11 case was saved," regardless of whether they worked on the 9/11 litigation or whether they had agreed to abide by the two protective orders in this case.  Tr. 138:18-139:24 (Hartney) (all lawyers and staff at Kreindler & Kreindler had access to this material "[s]o long as you had a Kreindler login"); Tr. 245:10-247:25 (Maloney).

14.     In addition, Kreindler & Kreindler "has no ability to track who actually accessed any of the confidential and protected material saved in Case Media," Tr. 139:25-140:17; and when accessing Case Media, a Kreindler & Kreindler attorney or employee would not receive any warning or notification that individuals who have not agreed to abide by the protective orders cannot access protected and confidential files, Tr. 249:6-10.

15.     Hartney agreed that systems that limit access to confidential material are "routinely available and used by law firms to keep protected information actually protected."  Tr. 178:20-23.  According to declarations submitted by information technology professionals from the other lead Plaintiffs' firms, each of those firms already had such systems in place to protect access to the confidential information produced in this case.  *See* ECF No. 6991, at 11, 12, ¶¶ 1, 5, 7 (declaration of Cozen O'Connor's "Director of User Support"; noting that the firm limited access to the databases where the confidential Al Jarrah transcript was saved); ECF No. 6992, at 22, 23, ¶¶ 1, 4 (declaration of Motley Rice's "Compliance and Security Specialist"; referencing

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

the "secure location where Motley Rice protects the transcripts"); ECF No. 7013-5, at 1, 2, ¶¶ 1, 6 (declaration of Anderson Kill's "director of the IT department"; noting that the confidential Al Jarrah transcript was saved on "a secure, shared folder on [the firm's] electronic file system that the IT department created primarily for downloading confidential deposition materials" from this case, and further noting that only five individuals at the firm had access to those documents).

16.     Hartney told Benett and the other attorneys at Kreindler & Kreindler that "everybody at the Kreindler firm had access to the Case Media where the Jarrah transcript was saved."  Tr. 142:15-19 (Hartney); *see also* Tr. 245:8-247:11 (Maloney testimony regarding Case Media); Tr. 405:17-406:3 (Pounian testimony that he got information from Hartney about how the confidential Al Jarrah transcript was handled by the Kreindler firm); KSAX-0115.

17.     At or around the time that Kreindler & Kreindler revealed that it was the source of the Al Jarrah transcript leak on September 27, 2021, Kreindler & Kreindler moved the confidential and protected information produced in this case onto another internal proprietary server that restricts who can access those materials.  That new system now tracks "who actually accessed proprietary material."  Tr. 178:7-19.

### 2.     Kreindler & Kreindler's cloud-based ShareFile server does limit and track access to confidential material

18.     Kreindler & Kreindler also saves confidential and protected documents, including the Al Jarrah transcript, on a cloud-based system called "ShareFile."  Tr. 147:21-22.  Kreindler & Kreindler "consultants, experts, and others could access this cloud-based system if they were provided login access."  Tr. 148:4-7.

19.     Unlike the Case Media server, the ShareFile server keeps a record of who accessed the confidential material stored on ShareFile.  Tr. 149:7-20.  This is the "only system" at the Kreindler firm that "tracks access to . . . documents."  Tr. 149:11-20.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

20.     The ShareFile system was used to provide access to confidential and protected documents to "[c]onsultants, experts, or others outside of Kreindler's system."  KSAX-0056F, ¶ 6.  Fawcett, however, had access directly to Case Media.  Tr. 138:18-139:2, 248:6-10.

### 3.     Kreindler & Kreindler's email server contains confidential material

21.     Kreindler & Kreindler also saves confidential and protected materials that are emailed to and from individuals who have a Kreindler & Kreindler email address on Kreindler & Kreindler's email server.  Tr. 155:14-17.

### 4.     Kreindler & Kreindler employees save confidential material on their personal devices and email accounts

22.     Fawcett and other Kreindler & Kreindler employees saved confidential case materials on home computers and personal devices of Kreindler & Kreindler employees.  KSAX-0059.  When directed to produce Fawcett's personal laptop to the Court, Kreindler & Kreindler stated that "Fawcett owns his laptop and that he has sole custody, control and possession of it and thus Kreindler & Kreindler cannot produce it nor compel him to do so."  ECF No. 7168.  Hartney testified that he had no knowledge that employees saved confidential materials on their personal devices and was never asked to investigate the issue.  Tr. 136:22-140:17.

### 5.     Fawcett saved confidential material on Dropbox

23.     Fawcett also saved confidential and protected information in folders on the separate cloud-based system Dropbox.  *See* KSAX-0067; KSAX-0068.  Hartney "kn[e]w" that Fawcett "had [a] Dropbox" account, Tr. 151:24, but did not know that Fawcett was "saving protected material" on the account, Tr. 151:9-12; *see also* Tr. 151:22-152:2 (same).

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

> **D.**    **Kreindler's Litigation Strategy Includes Frequent Press Appearances in Which He Disparages and Violates the Protective Orders**

24.    Kreindler supervises all the Kreindler & Kreindler professionals who work on the 9/11 litigation.  Tr. 22:3-9.  He sets an example for them; they follow his lead.  Tr. 22:10-15.

> **1.**    **Kreindler and others express disgust and hate for the Court's protective orders**

25.    For years, Kreindler has regularly made statements to the press about this litigation in order to put "pressure" on Saudi Arabia.  *See* Tr. 24:3-25:5; *see also* Tr. 25:21-24 (Kreindler testifying that he speaks to the press about this litigation because he believes that it is "helpful" to Plaintiffs' case).  Other attorneys at Kreindler & Kreindler, including Maloney, frequently speak to the press as well.  Tr. 208:20-209:5.

26.    Kreindler's reason for speaking to the press is that he believes doing so will be "helpful to the case" and resolution of this litigation would result in a significant sum of money "[f]or all of the lawyers" for Plaintiffs.  Tr. 23:24-24:2, 25:21-24.

27.    Kreindler & Kreindler's press strategy involves frequent complaints that the protective orders are "gag orders" and disparaging them as "disgusting."  Tr. 28:24-29:25.

28.    Kreindler has publicly referred to the protective orders as "disgusting protective orders imposed upon us by the Department of Justice with the blessing of the court," Tr. 29:8-13; has publicly called them "hated" and said that he is "angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on," Tr. 29:14-21; and has publicly declared that the protective orders amount to "a damn gag order imposed on us by the Saudis, our Department of Justice, and the court," Tr. 29:22-25.

29.    Kreindler testified that his "hat[red] and disgust[ ]" for the protective orders is not merely a press strategy, but a "heartfelt belief."  Tr. 28:24-29:7.  Maloney likewise testified that "every lawyer" for Plaintiffs "hate[s]" the protective orders and resents having to "live with them."

Tr. 30:15-31:4; *see* Tr. 210:11-14 (Maloney testifying that "every lawyer on the plaintiffs' side" hates the protective orders).

30.     As part of his press strategy, Kreindler frequently tells the press "outright" that there is "important evidence of Saudi government involvement with al Qaeda that I am not permitted to share with our clients, the family members, the press or the public."  Tr. 31:10-17. In making such statements, and purporting to summarize the content of confidential evidence, Kreindler knows that Defendants cannot rebut his statements without publicly disclosing the confidential evidence in the case and that the press cannot fact-check his assertions.

### 2.     Kreindler, working with Fawcett, violated the MDL Protective Order in 2017 by disclosing confidential information to the press

31.     In early 2017, Kreindler gave an interview to reporter Caleb Hannan ("Hannan") of *Politico* magazine, who then wrote an article.  *See* KSAX-0011; Tr. 37:10-13.  That article, titled "One Man's Quest to Prove Saudi Arabia Bankrolled 9/11," described a confidential document produced in this litigation by Defendant World Assembly of Muslim Youth ("WAMY"). *See* KSAX-0011, at 8 (describing "a note from Khaleid Sowailem written on official letterhead" with "Sowailem's phone number at the Saudi Embassy").

32.     At a May 8, 2017 hearing addressing this breach, Kreindler told the Court that Fawcett had interacted with Hannan and was the person who disclosed contents of the confidential WAMY document to Hannan.  *See* KSAX-0010, at 3-5; *see also* Tr. 38:3-8 (Kreindler testifying that the only people from Kreindler & Kreindler who spoke with Hannan were himself and Fawcett, and that Hannan must have received the information on the confidential document from either him or Fawcett).  When asked about this incident at the hearing, Fawcett invoked his Fifth Amendment privilege against self-incrimination.  Tr. 426:1-9.

33.     Although Kreindler attributed the breach to Fawcett, the Court concluded that Kreindler also had "breach[ed]" the MDL Protective Order by disclosing that confidential information to Hannan.  KSAX-0010, at 9; *see id.* at 12 ("As I stated earlier, Mr. Kreindler, by describing to the journalist that having received these confidential documents from WAMY and then having identified this particular piece of information you were able to connect the dots. I do believe that that was information that was confidential and you were not entitled to disclose the source of your information.").

34.     The Court admonished Kreindler that "[i]t is really unfair to the parties who will be turning over a lot of confidential and personal information to have those documents portrayed in a light that has a particular viewpoint."  KSAX-0010, at 9.  The Court gave Kreindler a "first warning" to be "exceedingly discreet" if in the future he "sp[oke] to the press."  *Id.* at 9-10.

35.     Kreindler has consistently resisted the Court's finding that he breached the MDL Protective Order in 2017 and denied that he has done so.  *See* KSAX-0010, at 12 (Kreindler insisting to the Court that "[a]ll you're talking about is the phone number on the letterhead, which is public information"); Tr. 34:17-20 (Kreindler testifying that he "personally did not" violate the MDL Protective Order in 2017).

36.     After the Court's finding of a breach and warning of the MDL Protective Order, Kreindler did not admonish Fawcett, did not restrict or monitor Fawcett's access to confidential documents in this litigation, and did not instruct Fawcett to stop talking to the press.  Tr. 38:9-24, 40:19-21.  According to Kreindler's testimony at the hearing, he simply "spoke" to Fawcett "about what happened."  Tr. 38:12-13.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

> ### 3. Kreindler disclosed confidential information in a 2019 speech at Dartmouth College and received a second warning from the Court

37.     In 2019, Kreindler gave a speech at Dartmouth College in which he called the FBI Protective Order "disgusting" and publicly disclosed what the FBI then considered confidential information from a 2012 FBI summary report.  KSAX-0018 (transcript).

38.     The Department of Justice ("DOJ") informed the Court that it viewed Kreindler's statements as a violation of the FBI Protective Order.  Ltr. from Sarah Normand to Hon. Sarah Netburn (Nov. 8, 2019) (filed under seal); Tr. 47:10-50:4, 209:6-13.  The Court again admonished "everybody . . . at counsels' table" to "pay[ ] attention" and "operat[e] . . . with heightened sensitivity."  ECF No. 5334, at 35:15-36:8.

> ### 4. Kreindler disclosed confidential information in a 2021 episode of the podcast *Conspiracyland* with Isikoff

39.     On July 1, 2021, Kreindler recorded an episode of the podcast *Conspiracyland*, hosted by Isikoff.  Tr. 63:25-64:2; KSAX-0056F, at 6, 10-11.  Catherine Hunt ("Hunt"), a consultant for Kreindler & Kreindler, also appeared on the same episode.  *See* KSAX-0039; *see also* KSAX-0032, at 6 (identifying Hunt's affiliation).

40.     Describing the depositions taken during jurisdictional discovery against Saudi Arabia, Kreindler stated on that episode that "we've exposed all kinds of lies"; that "one witness will contradict another"; that "[e]ach person wants to minimize their own role and point fingers at others"; that "you have lots and lots of people inculpating every Saudi official"; and that there has been a "smoking gun or guns."  KSAX-0039, at 11.  Kreindler also made inflammatory statements that Congress might "declare war" if he "could tell [Isikoff] everything [he] knew about the Saudi role" in the 9/11 attacks, and complained about the "damn gag order imposed on us by the Saudis, our Department of Justice and the court."  *Id.* at 6.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

41.     The accuracy of Kreindler's characterizations is not before the Court.  However, those characterizations purport to summarize confidential material just as the Court warned Kreindler in 2017 was improper:  "portray[ing]" documents that contain "a lot of confidential . . . information . . . in a light that has a particular viewpoint."  KSAX-0010, at 9:6-20; *see also supra* ¶ 8 (quoting Kreindler's testimony that he disclosed "what [the witnesses] did say").

**E.     Fawcett Is or Was an Integral Member of the Kreindler & Kreindler Team with Unfettered Access to Protected Materials and Duties That Include Press Contacts**

42.     Fawcett has been working with Kreindler & Kreindler on the 9/11 litigation for "almost 20 years"; he works "directly under the supervision of James Kreindler" and others at the firm.  Tr. 20:23-21:10, 416:3-8.  Fawcett has worked as an investigator and researcher on all aspects of the litigation for Kreindler & Kreindler.  Tr. 312:1-3.  Pounian described him as "a colleague and a peer to all of us at the firm."  Tr. 412:1-2.

43.     During the 20-year period that Fawcett has worked on the 9/11 litigation, "80 to 90 percent" of his income has come from Kreindler & Kreindler.  Tr. 416:9-11.  He is personally loyal to Kreindler.  Tr. 417:15-18.

44.     For Kreindler & Kreindler, Fawcett was "at the heart of the documents" in this litigation.  Tr. 38:25-39:3.  He was the Kreindler & Kreindler professional responsible for managing the entire 9/11 litigation document collection.  Tr. 40:5-9, 416:12-20; *see* Tr. 38:25-39:3 (Fawcett had full access to all 9/11 litigation documents).  Kreindler relied exclusively on Fawcett to locate and send him documents.  Tr. 73:20-74-19.

45.     Fawcett had an office at the Kreindler firm and a Kreindler office telephone number.  Tr. 148:22-149:6.  Although consultants and experts to Kreindler & Kreindler had access to only a cloud-based system where certain confidential and protected documents were saved, Fawcett was provided full access to the Kreindler firm's internal proprietary server,

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

which is the same access provided to Kreindler & Kreindler attorneys, employees, and staff. Tr. 38:25-39:3; KSAX-0056F, ¶ 5.  Fawcett was assigned a Kreindler firm email account, although consultants were not.  Tr. 149:3-4; KSAX-0056F, at 13 (July 12, 2021 email from Fawcett to Isikoff); KSAX-0097; KSAX-0098.  From an information technology perspective, Fawcett was not treated "any differently from any other employee at the firm."  Tr. 148:14-18.

46.     Fawcett also, as part of his work for Kreindler & Kreindler, kept confidential, protected information on at least one cloud-based platform (Dropbox) without the knowledge of Kreindler & Kreindler's information technology department. *Supra* ¶¶ 12, 23; KSAX-0068 (showing that as of October 15, 2021, Fawcett's name appeared on a Dropbox account containing confidential, protected documents that Plaintiffs had used as exhibits to their November 2018 motion to compel).

47.     Fawcett spoke to reporters as part of his duties for Kreindler & Kreindler and has billed time for these activities.  Tr. 40:22-24, 416:21-23, 417:4-14.  He met with reporters at Kreindler & Kreindler's offices.  *See* Tr. 41:15-18; KSAX-0012 (directing Laura Sullivan of NPR News to Kreindler & Kreindler's New York office).

48.     Kreindler and other Kreindler & Kreindler attorneys directed Fawcett to speak with the press and provide reporters with documents and information.  Tr. 41:12-16; *see* Tr. 42:24-43:17 (Kreindler testifying that he put Fawcett in contact with Laura Sullivan of NPR News in June 2021), 44:6-9 (Kreindler testifying that Fawcett met with Sullivan at his direction).

49.     Kreindler & Kreindler's standard practice was to have one of the attorneys act as the "face of the firm" and "speak to the press about the 9/11 case," and then to "enlist Mr. Fawcett to provide . . . documents" to the press as follow-up.  Tr. 208:11-209:5; *see also* Tr. 42:5-44:23, 65:5-66:21; KSAX-0012, at 4.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

50.     Kreindler & Kreindler attorneys testified that, when Fawcett would provide documents to the press, he first would get approval from an attorney.  Tr. 208:23-209:5 (Maloney); *see* Tr. 42:6-11 (Kreindler:  "[Fawcett] provides material when I or one of my partners would ask him to provide material that is public.").  Kreindler & Kreindler attorneys further testified that the only exception was the confidential Al Jarrah transcript, which they claim Fawcett gave Isikoff without their permission or knowledge.  Tr. 129:19-130:2 (Kreindler), 304:15-23 (Maloney), 402:2-8 (Benett), 413:21-414:2 (Pounian).

51.     The record shows at least two reasons to question that account:  (a) if Kreindler's denial of personal involvement in the 2017 protective order violation was truthful, *supra* ¶¶ 32-33, then Fawcett provided Hannan a confidential document without advance authorization from Kreindler; (b) in his June-September 2021 text message chain between Fawcett and journalist Laura Sullivan of NPR News, Fawcett told Sullivan:  "Megan says no problem for those two documents," KSAX-0012, at 4, suggesting that Fawcett had already disclosed or described "those two" documents to Sullivan, then checked with Benett afterwards to determine whether it was a "problem" for Sullivan to use those documents in a story.

### F.     Kreindler & Kreindler Took Al Jarrah's Deposition with the Concealed Assistance of a Former FBI Agent

52.     On June 17-18, 2021, Benett took the deposition of Musaed Al Jarrah. Tr. 310:5-7.  Fawcett assisted Benett with preparations for that deposition.  Tr. 312:4-14, 313:6-10.  Fawcett knew that the entire Al Jarrah deposition transcript was marked confidential. Tr. 61:19-62:9 (Kreindler testifying about a call with Fawcett).

53.     Attending that deposition from Kreindler & Kreindler were Steven Pounian, Andrew Maloney, John Fawcett, Debra Pagan, and Julia Sienski.  Also attending, and listed as a "Consultant" for Kreindler & Kreindler, was Catherine Hunt.  KSAX-0032.

54.     Benett testified that she was alone in a "Zoom room" in the Kreindler & Kreindler office when she took the deposition.  Tr. 328:14-20; *see* Tr. 310:17-311:1.  She further testified that "[t]here were people who were attending who were in a conference room," also in a Kreindler & Kreindler office.  Tr. 310:20-21.

55.     The contents of the deposition remain under seal.  According to the allegations that have been made public, during the deposition, one topic of discussion concerned certain images allegedly found by U.S. law enforcement on Al Jarrah's computer 17 years earlier, which Benett and Fawcett alleged constituted "child pornography."  Tr. 315:9-13, 468:5-13.  That topic is not relevant to any claim or defense at issue in jurisdictional discovery.

56.     Fawcett testified that he learned from an unidentified source about these purported images on Al Jarrah's computer six to eight months before Al Jarrah's deposition.  Tr. 468:5-469:22.  He testified that the information he received from the unidentified source was "[a]bsolutely" enough to concern him.  Tr. 470:1-2.  Before the deposition, however, Fawcett took no action relating to these purported images.  Tr. 470:5-471:16.

57.     Benett testified she "was approached" in the Kreindler & Kreindler office during a break in the deposition "and was told about the descriptions of the images."  Tr. 334:6-7; *see* Tr. 328:21-329:1 (testifying that she "stepped out" of the room where she was taking the deposition and was "told" the "information").  She described the person who shared the information as an "FBI special agent who had supervised the investigation into Jarrah and specifically supervised the two agents who had obtained [images] from his hard drive."  Tr. 324:1-5.  Benett testified that she did not know whether this agent attended the deposition, but did not "have any reason to think that he didn't."  Tr. 329:2-15; *see* Tr. 329:7-9 (testifying that she "wouldn't be surprised" if the agent attended the deposition from the conference room).  The FBI special agent did not

appear on the appearance sheet for the Al Jarrah deposition.  Tr. 329:16-330:1.  Post-hearing

discovery later revealed that the agent, whose name is Brian Weidner ("Weidner"), did, in fact,

attend the testimony.  *Infra* ¶¶ 224-225.

### G. Kreindler Discussed the Confidential Al Jarrah Deposition with Isikoff, and Fawcett Sent Isikoff the Transcript

#### 1. Kreindler and Isikoff discussed the deposition, and Kreindler discussed Isikoff's information requests with Fawcett

58.    Kreindler has known and spoken with Isikoff of Yahoo! News about the 9/11

litigation for "[a] long time."  Tr. 50:15-19.  Kreindler described Isikoff as one of "maybe a

dozen reporters who have followed the 9/11 Saudi involvement story."  Tr. 50:16-18.  In March

2021, Kreindler gave Isikoff an interview for a story about the 9/11 litigation.  KSAX-0079.

59.    During the two weeks after the Al Jarrah deposition, Kreindler had at least three

phone calls with Isikoff:  an 18-minute call on June 21, a 10-minute call on June 25, and a

7-minute call on June 28.  KSAX-0142; *see* K&K Ex. 102, at 9 (July 5, 2021 email from Isikoff

identifying Isikoff's cellphone number).

60.    Kreindler's 7-minute call with Isikoff on June 28, 2021, took place at 11:36 am.

KSAX-0142.  During that call, Isikoff asked Kreindler about the confidential Al Jarrah deposition.

Tr. 60:19-61:8.  Shortly after that call, Kreindler had two 1-minute phone calls with Fawcett:

the first at 12:22 pm and the second at 12:23 pm.  KSAX-0134, at 1-2.

61.    Kreindler testified that, during those calls, he discussed with Fawcett whether any

portions of the confidential Al Jarrah deposition transcript could be shared with Isikoff, and that

Fawcett told him the entire transcript was confidential.  Tr. 61:19-62:9.

62.    On July 1, 2021, as set forth above, Kreindler recorded an episode of the podcast

*Conspiracyland*, hosted by Isikoff, where he discussed the Al Jarrah deposition and other

confidential depositions.  Tr. 63:25-64:2; KSAX-0056F, at 6, 10-11; *supra* ¶¶ 39-40.

63.     On July 2, 2021, the day after Kreindler recorded the podcast episode, Kreindler

had an 18-minute phone call at 10:10 am with Fawcett.  KSAX-0134, at 1.

### 2. Fawcett discussed the deposition with Isikoff and sent him the transcript

64.     On July 3, 2021, Fawcett exchanged more than 10 phone calls and Signal

messages with Isikoff.  *See* KSAX-0082 (identifying three Signal messages and seven Signal

calls on July 3, 2021); KSAX-0134, at 1 (identifying four calls on July 3, 2021); *see also* Tr.

427:22-25.  Fawcett testified that, during those calls, he and Isikoff discussed the confidential

Al Jarrah deposition.  Tr. 428:1-25, 435:5-8.

65.     On or before July 5, 2021, Fawcett sent the confidential Al Jarrah deposition

transcript to Isikoff.  That afternoon, Isikoff and Fawcett exchanged a number of communications,

and Isikoff asked Fawcett in a Signal message:  "Did thumairy also invoke Vienna convention?"

– thus indicating that he knew what had transpired at the Al Jarrah deposition.  KSAX-0082,

at 3; Tr. 435:19-436:5.

66.     Kreindler & Kreindler has "admitted," and Kreindler confirmed at the hearing,

that Fawcett sent the Al Jarrah transcript to Isikoff and that, through Fawcett's actions,

"violations of two court orders were committed by Kreindler & Kreindler."  Tr. 19:1-20:11;

*see also* ECF No. 7147, at 1 (admitting that "our prior statements to the Court" that "Kreindler

was not the source of the Jarrah deposition obtained by Michael Isikoff" were "wrong").

### 3. Fawcett destroyed or concealed evidence of his actions

67.     According to a declaration that Fawcett signed and Kreindler & Kreindler filed

with the Court, Fawcett took several steps to send the transcript to Isikoff and to conceal his

actions.  Fawcett first "saved" the transcript "onto a thumb drive," from Kreindler & Kreindler's

internal server.  KSAX-0059, ¶ 7.  Because Kreindler & Kreindler did not track who accessed

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

confidential material on this server, it could not detect that Fawcett had accessed the transcript or had saved the transcript onto an external device. *Supra* ¶ 14.

68.     Fawcett then "took the thumb drive home" and "used a personal email account [he] established on ProtonMail to send the transcript." KSAX-0059, ¶ 7. "ProtonMail is an end-to-end encrypted email service." *Id.* Fawcett "set up" a "self-destructing messages option on [his] ProtonMail account," and the email leaking the transcript to Isikoff no longer exists. *Id.*

69.     Later, "[o]nce Isikoff published his article" on July 15, 2021, Fawcett "deleted everything from the thumb drive that contained the Jarrah transcript and then threw the thumb drive out in [his] household garbage." KSAX-0059, ¶ 10.

70.     At the November 1-2 hearing, Fawcett changed his story, testifying that he "had four or five thumb drives" that he "threw . . . in the trash" "all at once," because, "every time [he] was using them, they were coming up with error messages" and he was "fed up with them." Tr. 440:17-442:9. He further testified that his throwing away the thumb drives had no connection to concealing his status as the leaker. Tr. 441:2-13.

71.     Fawcett testified that he could have thrown out the thumb drive anytime during the summer, all the way up to Labor Day (September 6, 2021). Tr. 441:14-442:2. More than a month and a half before Labor Day, on July 21, 2021, Saudi Arabia advised Kreindler & Kreindler that it would request targeted discovery into the leak of the confidential Al Jarrah transcript. *See* ECF No. 6981 (under seal). Weeks before Labor Day, on August 12 and 30, 2021, the Court issued two investigative orders related to the leak. *See* ECF Nos. 7011, 7082.

72.     Fawcett admitted that he knew when he destroyed evidence that "this court proceeding, this MDL proceeding, was in progress." Tr. 439:16-25. From his changing testimony and vagueness about the date on which he deleted information from and discarded the

thumb drive, it can be inferred with reasonable certainty that he acted after realizing that the drive contained evidence that could be used against him and against Kreindler & Kreindler.

### 4. Both Kreindler and Fawcett continued to communicate with Isikoff

73. On July 10, 2021, the *Conspiracyland* episode aired. *See* KSAX-0039, at 1. That same day, Kreindler emailed Isikoff about an article that Isikoff had published. KSAX-0056F, at 12. Kreindler called the article "[g]reat" and thanked Isikoff. *Id.*

74. Both Kreindler and Fawcett continued to communicate with Isikoff about the case in the following days. *See* Tr. 65:5-67:10; KSAX-0056F, at 13-27. On July 12, 2021, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that had been withheld by DOJ on state secrets grounds, with nothing in the body of the email. KSAX-0056F, at 13-23. On July 13, 2021, Kreindler and Isikoff exchanged multiple emails regarding Plaintiffs' "request to DOJ to lift the state secrets privilege and gag order." *Id.* at 24-27.

75. Kreindler testified that he knew that Fawcett sent Isikoff the privilege log and that Fawcett "[p]robably" did so at his direction. Tr. 66:3-66:21. Benett testified, however, that on September 27, 2021, Kreindler had told her that he was "not aware that Fawcett had sent the privilege log back in July." Tr. 386:15-387:6; K&K Ex. 67, at 1.

### H. Isikoff's Article Disclosed the Protective Order Violation, and Kreindler & Kreindler Purported To Investigate

76. On July 15, 2021, Yahoo! News published under Isikoff's byline an article titled "FBI Tried to Flip Saudi Official in 9/11 Investigation." KSAX-0040. The article stated that a "copy" of the confidential Al Jarrah deposition transcript, with "some redactions for law-enforcement sensitive material," had been "obtained exclusively by Yahoo News." *Id.* at 1.

77. The article disclosed details of the confidential deposition transcript, including verbatim quotes of questions and answers. *See* KSAX-0040. It purported to give an exact count

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

of the number of times that Al Jarrah used the words "I don't remember." *Id.* at 4. It correctly identified the number of pages in the deposition transcript (more than 600). *Id.* at 2.

### 1.   Maloney began the investigation already confident that Kreindler & Kreindler was not the source of the leak

78.   In their September 27, 2021 declarations, Kreindler, Maloney, Benett, and Pounian each stated that, upon learning of the July 15, 2021 article stating that Isikoff had obtained a copy of the Al Jarrah deposition transcript, they immediately discussed the issue internally. KSAX-0056A; KSAX-0056B; ECF No. 7147-3; ECF No. 7147-4.

79.   At the hearing, witnesses gave contradictory testimony about these discussions. Kreindler testified that, when the Isikoff article was published on July 15, 2021, he "read the article when [he] was at home," then "came to the office" and "spoke to" Fawcett and Maloney about the leak. Tr. 76:17-77:2. Maloney testified that Kreindler "was not" in the office that day and that he did not have an in-person conversation with Kreindler on July 15. Tr. 214:1-24.

80.   Kreindler's declaration further stated that, "[a]fter that call, I asked . . . Maloney . . . to conduct an internal investigation to determine whether anyone at Kreindler was responsible for providing the information to Isikoff." KSAX-0056A, ¶ 5. At the hearing, Kreindler denied that he had asked Maloney to conduct an investigation. He instead testified that Maloney "volunteered to head up the – you're calling it an investigation – to go through the system and make sure that no one at the firm had anything to do with it." Tr. 76:17-78:1. Maloney's testimony corroborates that Kreindler did not ask him to conduct an investigation and that he did so on his own "initiative." Tr. 212:25-213:2.

81.   Before the purported investigation, Kreindler and Maloney had already concluded that no one from Kreindler & Kreindler had leaked the transcript. Kreindler testified that no one on his team was a "suspect" and that Kreindler & Kreindler was investigating "[n]o one." Tr.

24

70:18-71:16; *see also* Tr. 98:3-8 ("[I]t never would be possible, in my mind, for [Fawcett] to have something to do with it."). Maloney similarly testified that, before he conducted any investigation, he was "confident that Kreindler wasn't the source of the leak." Tr. 212:3-5.

82. Because he did not consider either a possible source of the violation, Maloney did not screen Kreindler or Fawcett from the investigation. Tr. 243:25-244:8.

83. Maloney did not instruct Kreindler, Fawcett, or anyone else at Kreindler & Kreindler to retain relevant documents about the protective order violation. Tr. 244:14-245:2.

### 2. No one asked Fawcett directly whether he sent Isikoff the transcript

84. Maloney's purported investigation was superficial. No one systematically interviewed all individuals who had access to the Al Jarrah transcript to determine whether Kreindler & Kreindler was the source of the leak. Kreindler testified that he never asked Fawcett "in words or substance" whether he "provide[d] the Al Jarrah transcript to Mr. Isikoff" and that he never "direct[ed] anyone else to ask Mr. Fawcett that question." Tr. 78:22-79:3.

85. Maloney testified that he did ask Fawcett whether he leaked the transcript to Isikoff and that Fawcett had lied to him by saying that he did not. Tr. 216:24-217:6. Pounian likewise testified that he asked "Fawcett specifically whether he had sent the transcript to Mr. Isikoff" and that Fawcett had lied and said that he "knew nothing about it." Tr. 407:6-17. Fawcett's testimony contradicted both statements. He stated that none of the attorneys at Kreindler & Kreindler, including Maloney and Pounian, ever asked if he "disclose[d] the transcript" to Isikoff. Tr. 436:24-437:4, 438:24-439:12.

86. Fawcett's testimony is corroborated by edits he made to a draft of his September 27, 2021 declaration prepared by Benett and Pounian. Fawcett removed language stating that he had told the attorneys at Kreindler & Kreindler that he did not leak the transcript. *See*

KSAX-0121.  At that time, Fawcett was trying to help Kreindler & Kreindler avoid responsibility for his actions and would have no reason to remove that language if it had been true.

### 3.     Maloney did not investigate Kreindler & Kreindler's contacts with Isikoff

87.     Maloney testified that he knew Kreindler spoke to Isikoff "from time to time." Tr. 203:6-12.  Yet Maloney did not ask Kreindler whether he had been in contact with Isikoff until Hartney uncovered emails from Kreindler to Isikoff.  Tr. 204:12-205:6.

88.     Maloney also testified that he never interviewed Hunt in the course of his investigation, and in fact did not even discover that Hunt had appeared on the same July 10, 2021 podcast with Isikoff on which Kreindler also appeared.  Tr. 205:18-206:16.  Maloney could have found this information easily by listening to the podcast, *see* KSAX-0039, or by searching for publicly available documents on the web, *see* KSAX-0038.

### 4.     Maloney did not investigate most of the locations in which Kreindler & Kreindler stored the transcript or other confidential materials

89.     As set forth above, confidential and protected case materials, including the Al Jarrah transcript, were saved in at least five locations by Kreindler & Kreindler's attorneys and employees.  *Supra* ¶¶ 12-23.  Maloney made no attempt to determine whether the transcript had been accessed from most of those locations.

90.     Any Kreindler & Kreindler attorney or employee with a firm login had access to Kreindler & Kreindler's Case Media server, and Kreindler & Kreindler does not track who had accessed any of the confidential and protected materials stored on that server.  *Supra* ¶¶ 13-14. Accordingly, anyone with a firm login was a potential source for the Isikoff article.  Maloney did not account for this possibility and made no attempt to interview everyone with a firm login.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

Tr. 173:21-174:4 (Maloney testifying that the only investigation involving Case Media that was done was to determine whether the Al Jarrah transcript was saved on Case Media).

91.    Kreindler & Kreindler's consultants and experts had access to the Al Jarrah transcript via the ShareFile cloud-based system. *Supra* ¶¶ 18-20.  At Maloney's direction, Hartney reviewed access to the transcript on that system on July 29, 2021.  That review occurred only after Kreindler & Kreindler had already informed the Court and Saudi Arabia that its investigation was complete.  Tr. 149:21-150:3, 172:14-24.

92.    Kreindler & Kreindler's attorneys and employees saved confidential materials on their personal laptops and devices. *Supra* ¶ 22.  Maloney never investigated whether anyone had saved the Al Jarrah transcript on any personal laptop or other device, nor whether anyone had communicated with Isikoff or provided any information to him through any personal device, text, or personal email.  Tr. 157:15-158:17 (Hartney), 222:9-223:2 (Maloney).  Maloney testified that such searches would not have been "reasonable" and were not "something that even entered my mind at the time."  Tr. 294:2-12.  Kreindler & Kreindler also did not search its phone logs for relevant communications.  Tr. 157:23-158:17.

93.    Fawcett saved confidential and protected materials on Dropbox, an external cloud-based platform. *Supra* ¶ 23.  There is no evidence that Maloney investigated whether the Al Jarrah transcript or any other confidential protected materials were saved on Dropbox, or whether anyone had accessed such material.  His declaration, KSAX-0056B, does not mention Dropbox as any part of his investigation.  Hartney testified that he did not conduct "any investigation of Dropbox."  Tr. 150:8-151:12; 153:6-154:3; 154:16-19.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

### 5.   Maloney did not follow up on the two email searches that he did instruct Hartney to conduct

94.     The only purported investigation that Maloney conducted in the week following the leak was to run two searches of their email system:  (a) a search of the Kreindler & Kreindler email system for outgoing messages from eight individuals that contained the Al Jarrah transcript; and (b) a "search for any emails to Mike Isikoff in the last month."  Tr. 220:9-222:7, 223:7-20; KSAX-0100; KSAX-0084.

95.     Hartney's email search revealed that Kreindler and Isikoff (or those working for Isikoff) exchanged at least nine emails between June 28, 2021, and July 13, 2021.  KSAX-0056F, at 6-12, 24-27; Tr. 234:18-235:5, 237:3-14.  These emails discussed Kreindler's appearance on Isikoff's podcast on July 1, a July 1 letter from members of Congress to the Attorney General and the FBI Director, a July 10 article that Isikoff had written concerning the 9/11 litigation, and a potential motion by Plaintiffs "to lift the state secrets privilege and gag order."  KSAX-0056F, at 6-12, 24-27.

96.     The earliest email on June 28, 2021, from Isikoff's producer on the *Conspiracyland* podcast to Kreindler provides call-in information for the July 1, 2021 podcast recording.  *See* KSAX-0056F, at 6.  From reading the email, it is apparent that there must have been earlier communications between Kreindler and Isikoff, as the producer would not otherwise have merely sent Kreindler a Zoom link with no explanation.  Maloney did not look for those earlier communications.  Tr. 161:22-162:1; *see* Tr. 235:4-236:17 (Maloney testifying that he never asked Kreindler if there were earlier communications with Isikoff).

97.     Each email Kreindler sent to Isikoff had a signature stating "Sent from my iPhone."  KSAX-0056F, at 6, 7, 11, 12, 25, 27.  The signatures make it apparent that Kreindler

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

used his personal device to communicate with Isikoff.  Maloney did not search Kreindler's personal devices or personal email.  Tr. 162:2-7, 222:19-223:2, 225:13-17, 242:14-243:16.

98.    Hartney's email search also revealed that Fawcett had emailed Isikoff on July 12, 2021.  KSAX-0056F, at 13.  The email attaches the FBI privilege log, but there is no content in the body of the email.  From reading the email, it is apparent either that there were other communications between Fawcett and Isikoff providing context for the privilege log or that someone else (such as Kreindler) in communication with Isikoff directed Fawcett to send the log.  Maloney did not search for such earlier communications.  Tr. 162:12-163:6 (Hartney).

99.    Even after discovering that Kreindler and Fawcett had been communicating directly with Isikoff in the days and weeks preceding Isikoff's July 15 article, and despite the fact that Kreindler had appeared on Isikoff's podcast where he discussed the Al Jarrah deposition and other confidential depositions, Maloney testified that he still did not believe that either Kreindler or Fawcett was a "suspect[ ]" in the leak.  Tr. 241:6-243:24.

### 6.    Maloney did not discover Fawcett's communications with Isikoff because he did not search personal devices or emails

100.    Despite knowing that Kreindler and Fawcett had communicated with Isikoff, neither Maloney nor Hartney made any effort to search Fawcett's personal devices, text messages, or personal emails.  Tr. 157:18-22 (Hartney), 222:9-223:2 (Maloney).  Such a search, if conducted, would have found numerous Signal calls and messages between Fawcett and Isikoff between July 3 and July 5, 2021.  In one of those messages, Isikoff asks Fawcett: "Did thumairy also invoke Vienna convention?"  KSAX-0082, at 3.  A search of Fawcett's personal devices also would have revealed a July 24, 2021 Signal message from Fawcett to Isikoff stating that "there's a witch hunt for the source of your Jarrah story."  KSAX-0150, at 2; *see also* Tr. 232:22-234:2.

101.    From reading the July 5 message about Fahad Al Thumairy, the July 24 message about "a witch hunt for the source of [the] Jarrah story," or both, it is immediately apparent that Fawcett was communicating with Isikoff about the confidential depositions.  Had Maloney found those texts, he would or should have known that – at a minimum – further investigation was required before Kreindler & Kreindler could make any representations to the Court or Saudi Arabia that it was not the source of the protective order violation.

102.    When confronted with the July 24 message at the hearing, Maloney responded that "[i]t doesn't indicate in this text that Mr. Fawcett sent Mr. Isikoff the Jarrah transcript," Tr. 233:19-21; and reaffirmed his position that "it would not have been reasonable to conduct any of those searches," Tr. 233:22-25.  Maloney's dismissive reaction to evidence that a reasonable investigator would have considered a glaring red flag confirms that he never meant to look for evidence that Kreindler & Kreindler might be responsible for the protective order violation.

### 7.    Maloney did not require Fawcett or anyone else to sign a sworn declaration

103.    No one from Kreindler & Kreindler presented Fawcett with a draft declaration and asked him to sign it until September 23, 2021, at the earliest.  Tr. 104:22-105:3 (Kreindler testifying that he did not know when Fawcett was asked to provide a sworn declaration and that he never talked to him about a sworn declaration), 340:4-14 (Benett testifying that she did not recall before September 23, 2021, "actually presenting a draft to Mr. Fawcett and Mr. Fawcett saying that he would sign a declaration saying that he had not sent the transcript to Mr. Isikoff").

104.    As Fawcett confirmed, "[i]n the two-month-plus period from July 15 until September 23 . . . no one from Kreindler & Kreindler insisted that [he] give a sworn declaration." Tr. 455:13-17.  Had Kreindler & Kreindler required Fawcett to sign a declaration at an earlier

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

point, Fawcett would have admitted to his breach at that time, as he ultimately did when he was forced to submit a declaration on September 27.

> **I.**     **Saudi Arabia's Inquiry About the Violation Triggered Calls Between Kreindler and Fawcett – and Fawcett and Personal Defense Counsel**

> **1.**     **Fawcett's communications with Kreindler and Crotty strongly suggest discussions about the protective order violation**

105.     On July 21, 2021, at 9:14 pm, lawyers for Saudi Arabia emailed the PECs, counsel for the other Defendants, and counsel for the FBI informing them that Saudi Arabia intended to file a motion requesting that the Court order targeted discovery to determine who leaked the confidential Al Jarrah deposition transcript.  KSAX-0042, at 3-4.  Kreindler received the email.  *Id.* at 3.

106.     The next morning, July 22, 2021, Fawcett had back-to-back communications with Kreindler and Elizabeth ("Liz") Crotty.  Crotty, a former associate for Kreindler & Kreindler, is now a criminal defense lawyer.  Tr. 84:20-24, 447:5-8.  She acted as Fawcett's personal attorney. Tr. 447:15-16.  The communications went as follows:  (a) at 8:18 am, Fawcett sent a text message to Crotty regarding legal advice, KSAX-0151, at 1; (b) at 9:17 am, Fawcett had a 46-minute phone call with Kreindler, KSAX-0135, at 3; (c) at 10:41 am, Fawcett had a 22-minute phone call with Crotty, *id.*; (d) at 12:07 pm, Fawcett sent an email to Crotty regarding legal advice, KSAX-0151, at 1; and (e) at 12:56 pm, Fawcett had a 5-minute phone call with Kreindler, KSAX-0135, at 3.

107.     Fawcett's phone records during this period do not show regular communications on his personal cell phone with either Crotty or Kreindler.  The July 22 call with Crotty is the only one shown in his July 2021 phone record.  *See* KSAX-0135.  The July 22 calls with Kreindler are two of the four such calls shown in that record.  The other two calls are a 1-minute call on July 21, 2021, at 1:54 pm, and a 4-minute call on July 23, 2021, at 10:19 am.  *See id.* at 3.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

**2.      Kreindler and Fawcett denied discussing the violation, and Fawcett falsely denied seeking legal advice from Crotty**

108.    Kreindler testified that he did not discuss the leak with Fawcett on the morning of July 22, 2021.  Tr. 84:3-12; *see* Tr. 85:24-86:12.  He further testified that he and Fawcett "absolutely" did not discuss any need for Fawcett to consult criminal defense counsel and that he has "no idea why John [Fawcett] called Liz Crotty."  Tr. 84:17-85:6.

109.    Fawcett testified that he did not recall what he discussed with Kreindler during their calls on July 22, 2021.  Tr. 445:18-447:1, 451:13-23.  He claimed, however, that the calls did not relate to the leak.  Tr. 445:18-447:1.  Indeed, Fawcett maintained that he "never discussed the Jarrah transcript or my leaking of the Jarrah transcript with anyone."  Tr. 446:9-15.  Kreindler's and Fawcett's assertions are not credible.

110.    Before the evidentiary hearing, Fawcett asserted attorney-client privilege over his oral and written communications with Crotty in the July-October 2021 period, including Fawcett's 22-minute call with Crotty on July 22, 2021.  *See* Tr. 447:25-449:15; KSAX-0151.  During the hearing, he told two conflicting stories about the call.  Both are false.

111.    At the hearing, Fawcett first testified that the July 22, 2021 call was about Crotty "having run for District Attorney."  Tr. 449-16:20.  He claimed to have a specific recollection of that discussion.  *See* Tr. 450:15-20 (Fawcett:  "That's why I remember why it took 22 minutes, because we were talking quite a bit about her running for office.").  On further cross-examination, he stood by that answer five more times.  Tr. 450:21-451:3.

112.    After a break in the hearing, and after cross-examination was concluded, Fawcett requested permission from the Court to "correct an answer," claiming that he had "recalled something."  Tr. 478:17-20.  He then changed his testimony to state that he "recalled the conversation with Liz Crotty in July"; that he "remember[ed] calling her after the Court's order

32

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

had come out, so [he] was calling her about this Court's order"; that he told her that he'd "like to come see you, Liz, about an issue"; that he "didn't tell her why [he] wanted to talk to her on the phone, and then the rest of the conversation was about her campaign"; and that the call "[h]ad nothing to do with the call to Jim Kreindler." Tr. 480:5-17.

113.   This Court issued no order in July related to the violation of the protective orders.

114.   Kreindler's and Fawcett's claimed lack of memory concerning their two calls on July 22, Fawcett's repeated and then-abandoned insistence that his call with Crotty did not relate to the leak to Isikoff, and Fawcett's retreat after a recess to the (clearly untrue) fallback position that the call related to a Court order that had just "come out" combine to suggest that the two witnesses were attempting to conceal the actual contents of Kreindler's calls with Fawcett. The only apparent motive to conceal those contents would be that Kreindler discussed information with Fawcett during those calls that would contradict Kreindler's and Fawcett's position that Kreindler did not know of Fawcett's actions in July 2021.

### 3.   Pounian's later declaration contradicts Kreindler's and Fawcett's testimony

115.   On November 17, 2021, after the evidentiary hearing, Kreindler & Kreindler submitted a declaration from Pounian attaching heavily redacted cell phone records purporting to show that Pounian also participated in the two phone calls the morning of July 22, 2021, and a declaration from Pounian concerning what was discussed on that call. *See* ECF No. 7359-1. According to Pounian, one matter discussed on the call "was that [Pounian] would coordinate with the PECs concerning our response to the email received the evening before from Saudi Arabia's counsel." ECF No. 7359-1, ¶ 4. That email concerned Saudi Arabia's intent to move for discovery about the protective order violation. *Supra* ¶ 105.

116.    Because Pounian has not been subject to cross-examination, his declaration is hearsay to the extent Kreindler & Kreindler seeks to rely on it, but may be considered as an admission by a party-opponent to the extent it states matters against the interest of Kreindler & Kreindler.  To the extent the Court considers it, Pounian's declaration provides further reason not to credit either Kreindler's or Fawcett's account of the call.  Kreindler testified that he did not discuss the leak at all with Fawcett on the morning of July 22, 2021.  Tr. 84:3-12; *see* Tr. 85:24-86:12.  Fawcett testified not only that he did not discuss "my leaking of the Jarrah transcript" with anyone, but also that he did not discuss "the Jarrah transcript" itself.  Tr. 446:13-15; *see also* Tr. 446:25-447:1 (stating again that the call "would not have been relating to the leak [of] the Jarrah transcript").  It is implausible that the participants in the call discussed Kreindler & Kreindler's response to Saudi Arabia's email about the violation, but that – as Kreindler and Fawcett twice testified – they did not discuss the violation itself.

**J.      Kreindler & Kreindler Made False Representations in July and August To Avoid or Delay Investigation of the Violation**

**1.      Pounian's July 23 email and Kreindler & Kreindler's July 27 letter made false representations to Saudi Arabia and to the Court**

117.    On July 23, 2021, Pounian responded to the July 21, 2021 email from counsel for Saudi Arabia.  KSAX-0042, at 2.  That email represented that Kreindler & Kreindler "ha[d] . . . completed [its] own . . . internal review[] of the handling of the Jarrah deposition transcript and contacts with Michael Isikoff" and had "determined that the transcript was not released through our firm[] or others working with our firm[]."  *Id.*

118.    On July 27, 2021, Kreindler & Kreindler joined a letter from the PECs to the Court representing that, "[b]efore Saudi Arabia filed its motion, Plaintiffs advised Saudi Arabia that each of the lead PEC firms," including Kreindler & Kreindler, "had already conducted

internal investigations into the handling of the Jarrah transcript and communications with

Mr. Isikoff, and that as a result of those investigations, each of the lead PEC firms was confident

that it was not the source of the leak to Mr. Isikoff."  KSAX-0043, at 2.

119.    Pounian signed the letter on behalf of Kreindler & Kreindler, and Maloney's

and Benett's names are included in the Kreindler & Kreindler signature block.  *See* KSAX-0043,

at 3.  Kreindler's name was omitted from the Kreindler & Kreindler signature block, which is

unusual.  *See id.*; *cf.* KSAX-0051, at 2 (September 9, 2021 letter to Judge Netburn in support

of Oath Inc.'s motion to intervene; signed by Kreindler).

120.    Kreindler & Kreindler's statement that it "was confident that it was not the source

of the leak to Mr. Isikoff," in context, constituted an assurance to the Court that Kreindler &

Kreindler was not in fact the source of the leak to Isikoff.  That assurance was false.

121.    The statements that Kreindler & Kreindler had "completed" or had "already

conducted" a "review" or an "internal investigation," whether taken as of July 23 or as of July

27, were also false.  At that time, Kreindler & Kreindler had conducted two searches of its email

server, with no follow-up.  *Supra* ¶¶ 94-99.  It had not investigated access to the transcript

through Case Media, ShareFile, or Dropbox.  *Supra* ¶¶ 89-93.  It had not searched personal

devices, text messages, email addresses, or phone logs.  *Supra* ¶¶ 100-102.  No one had asked

Fawcett to sign a declaration.  *Supra* ¶¶ 103-104.  If Fawcett's testimony is credited, *supra*

¶¶ 85-86, no one had even asked him if he had sent Isikoff the transcript.

122.    Under cross-examination, Hartney agreed that "by July 27 [he] could not have

concluded that no one at the Kreindler firm was the source of the leak."  Tr. 174:25-185:3.

123.    Kreindler & Kreindler's July 27 letter did not disclose to the Court other facts of

which at least Maloney was then aware, including that Kreindler and Fawcett had communicated

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

multiple times with Isikoff immediately before the July 15 article revealing the leak, *supra*

¶¶ 58-66, 73-75, and that Kreindler & Kreindler had no ability to track who at the firm had

access to the Al Jarrah transcript, *supra* ¶ 90.

### 2.   Kreindler & Kreindler declined to file any voluntary declarations

124.    On July 29, 2021, two firms on the PECs – Cozen O'Connor and Motley Rice –

voluntarily filed declarations with the Court.  ECF Nos. 6991, 6992.  Cozen O'Connor submitted

five declarations:  two from lawyers; two from paralegals; and one from the firm's "Director of

User Support," who described the firm's investigation into the leak of the confidential Al Jarrah

deposition transcript.  ECF No. 6991.  Motley Rice submitted seven declarations:  four from

lawyers; two from paralegals; and one from the firm's "Compliance and Security Specialist,"

who – like Cozen O'Conner's "Director of User Support" – described the firm's investigation

into the leak.  ECF No. 6992.  The Cozen O'Connor and Motley Rice voluntary submissions

included declarations from everyone who had accessed the Al Jarrah transcript.

125.    Kreindler & Kreindler chose not to file any declarations voluntarily, as a

"consensus decision among all of the lawyers at the Kreindler firm."  Tr. 261:23-262:15.

### 3.   The Court's August 16 Order directed Kreindler & Kreindler to submit declarations concerning the leak

126.    On August 12, 2021, the Court issued an order directing Kreindler & Kreindler

"to follow the lead of Cozen O'Conner and Mot[le]y Rice and to file declarations, under penalty

of perjury," by no later than August 16, 2021, "as to whether anyone with the firm or anyone

acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by

the Protective Order and the FBI Protective Order."  ECF No. 7011, at 2.

127.    The Court's order noted "[c]ircumstantial evidence" that Kreindler & Kreindler

"may be responsible for the leak," pointing to Kreindler's known connection to Isikoff.  ECF

No. 7011, at 2.  The Court informed Kreindler & Kreindler that, "[a]t a minimum," it "expected declarations" from Kreindler, Pounian, Maloney, and Benett.  *Id.*

128.    On August 13, 2021, Anderson Kill – another firm on the PECs – voluntarily submitted declarations from three attorneys, one paralegal, and the firm's IT director.  ECF No. 7013.  Like the Cozen O'Connor and Motley Rice submissions, Anderson Kill included declarations from everyone who had accessed the Al Jarrah transcript and described the firm's forensic investigation into the leak.  *Id.*

### 4.    Kreindler & Kreindler's August 16 declarations made false and misleading statements to the Court

129.    On August 16, 2021, Kreindler & Kreindler filed declarations from only the four attorneys that the Court named in its August 12, 2021 Order.  ECF No. 7016; *see* ECF No. 7134, at 5 (noting that Kreindler & Kreindler's August 16, 2021 submission did not include declarations from support staff or the firm's IT director).

130.    Far from following the lead of the other PEC firms, these declarations consist of boilerplate denials that each of the declarants had shared the Al Jarrah transcript with Isikoff and identical denials that, "to my knowledge, no one with the firm or anyone acting on its direction shared the Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order."  ECF No. 7016, at 3 (Benett Decl. ¶ 9).  None of the attorneys withdrew or corrected the statement in the PECs' July 27, 2021 letter to the Court that Kreindler & Kreindler completed its investigation by July 23, 2021.  *Supra* ¶ 118.

131.    Benett also named herself, Kreindler, Pounian, Maloney, and "a paralegal" as the only individuals at the firm who received the email from the court reporter with the final copy of the confidential Al Jarrah transcript.  ECF No. 7016, at 3 (Benett Decl. ¶ 5).  When she made that

statement, Benett knew that others in the firm had been forwarded the transcript or had otherwise received the transcript.  K&K Ex. 18.

132.    Benett also stated in her declaration that Kreindler & Kreindler had "conducted a review of the handling of the Jarrah deposition transcript after its receipt by the firm" and that her representation was "[b]ased on that review."  ECF No. 7016, at 3 (Benett Decl. ¶¶ 8-9). Benett made that representation on behalf of the firm even though she was not the one who conducted the investigation – Maloney had.

133.    Since the time of the July 27 letter, Hartney had checked the ShareFile download information and had determined that no one had downloaded the Al Jarrah transcript from that source.  KSAX-0056F, ¶ 6.  However, neither Maloney nor anyone else had taken any of the other omitted investigatory steps set forth above, *supra* ¶ 121, such as following up on the communications with Isikoff identified through Hartney's search of the email server; investigating access to the transcript through Case Media or Dropbox; searching personal devices, text messages, email addresses, or phone logs; asking Fawcett to sign a declaration; or, if Fawcett's testimony is credited, asking him directly if he had sent Isikoff the transcript.

134.    Like the July 27 letter, the August 16 declarations do not disclose that Kreindler & Kreindler had no ability to track who accessed the Al Jarrah transcript or that multiple individuals at Kreindler & Kreindler had communicated with Isikoff in the days and weeks before his July 15 article, including about the Al Jarrah transcript.  Nor do these declarations disclose the nature or the scope of the limited investigation that Kreindler & Kreindler (through Maloney) had conducted.

135.    The circumstances surrounding the August 16 declarations, including the boilerplate nature of the declarations, the information left out of the declarations, and a

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

comparison to the declarations that had already been submitted by Saudi Arabia and the other members of the Plaintiffs' Executive Committees, support a compelling inference that the Kreindler & Kreindler attorneys deliberately decided to provide as little information to the Court as they plausibly could, hoping that the Court would not follow up.

### K.   Kreindler & Kreindler Failed To Comply with the Court's August 30 Order and Made False and Misleading Statements

136.   On August 30, 2021, the Court ordered Kreindler & Kreindler to provide supplemental declarations.  KSAX-0049.  Among other things, the Court directed:

a.   Kreindler, Pounian, Maloney, and Benett to "identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021," and "state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation," KSAX-0049, at 1;

b.   all persons identified by the four attorneys also to provide declarations that, among other things, would "identify and describe all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021," KSAX-0049, at 2;

c.   "[a]ny written communication" during that time period between the four lawyers and any other declarant on the one hand, and Isikoff on the other, to "be provided to the Court," KSAX-0049, at 1-2; and

d.   Kreindler & Kreindler's IT director to provide a declaration "demonstrat[ing] that a forensic analysis was done to identify who accessed the deposition transcripts [and] determine the dates of any access," KSAX-0049, at 2.

As set forth below, Kreindler & Kreindler failed to do each of these things.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

### 1. Hartney conducted limited additional email searches and failed to produce the results as described in his declaration

137.    Hartney testified that, following the August 30, 2021 Order, he ran additional searches of Kreindler & Kreindler's email server, as directed by Maloney and Benett.  Tr. 188:10-191:9.  The record is not clear as to what additional searches Hartney ran.  Hartney's September 27 declaration states that he conducted a search of the email server for "outgoing, incoming, saved, or deleted messages . . . containing the names Jarrah or Isikoff or the name that Golkow [the court reporter] had given to the Jarrah transcripts when they were originally provided to Kreindler" and that the "only emails returned as a result of the searches I conducted are attached . . . as Exhibit 1."  KSAX-0056F, ¶¶ 9-10.  It is evident, however, that Exhibit 1 does not contain all "emails returned as a result of the searches" and that this statement is false.  Tr. 163:25-171:24.  Hartney could not explain this discrepancy, other than to testify that Benett drafted his declaration and assembled the exhibits to the declaration.  *Id.*

138.    Hartney and Maloney testified, however, that, even after the August 30 Order, no search or investigation was done of any personal devices, phone logs, text messages, or personal emails.  Tr. 157:15-158:17 (Hartney), 264:11-265:14 (Maloney).  Nor did Hartney then investigate or take any action concerning the Dropbox folder that Fawcett used to store confidential and protected material.  Tr. 150:8-14, 152:3-12.

### 2. Benett and Pounian prepare false and misleading declarations

139.    In the days after the August 30 Order, Kreindler & Kreindler began preparing some of the declarations required by that Order.  For instance, a declaration signed by Consultant 1, who received a copy of the Al Jarrah deposition by email, was signed on September 2, 2021.  KSAX-0062B, at 2; Tr. 104:4-11.

140.     No one from Kreindler & Kreindler presented Fawcett with a draft declaration

and asked him to sign it until September 23, 2021, at the earliest.  Tr. 104:22-105:3 (Kreindler

testifying that he does not know when Fawcett was asked to provide a sworn declaration and that

he never talked to him about a sworn declaration), 340:4-14 (Benett testifying that prior to

September 23, 2021, she does not recall "actually presenting a draft to Mr. Fawcett and Mr.

Fawcett saying that he would sign a declaration saying that he had not sent the transcript to Mr.

Isikoff"), 454:9-455:17 (Fawcett).  Fawcett agreed that "[i]n the two-month-plus period from

July 15 until September 23 . . . no one from Kreindler & Kreindler insisted that [he] give a sworn

declaration."  Tr. 455:13-17.

141.     Benett and Pounian took the primary role in drafting the declarations required by

the August 30 Order.  K&K Ex. 51 (September 24, 2021 email from Benett stating that "I am

preparing all declarations [relating to the leak] and will circulate asap"); K&K Ex. 52

(September 24, 2021 email from Pounian offering to help with declarations); K&K Ex. 62

(September 25, 2021 email exchange between Pounian and Benett exchanging draft declarations

for Kreindler & Kreindler individuals); Tr. 368:6-17, 369:25-370:2.  While they were preparing

the declarations, Benett told Pounian that she was "sticking to" the approach of "'only

answer[ing] what [the Court] asked for' because I'm so irritated by this."  K&K Ex. 61.

142.     Two requirements in the Court's order called for Kreindler & Kreindler to

disclose information that Benett and Pounian did not want to reveal.  Those were:  (1) Hartney's

declaration, which under the August 30 Order had to "demonstrate that a forensic analysis was

done to identify who accessed the deposition transcripts [and] determine the dates of any

access"; and (2) the requirement that the declarations "state every person that they know had

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

access to the deposition transcripts who has not already supplied a declaration in this investigation." KSAX-0049, at 1-2.

143.    As set forth above, Pounian and Benett knew that anyone at Kreindler & Kreindler was able to access the Al Jarrah transcript, regardless of whether they worked on the 9/11 litigation or agreed to abide by the protective orders. *Supra* ¶ 16.  Kreindler & Kreindler also had no ability to track who had accessed, downloaded, or printed any of the confidential and protected material saved on Case Media, *supra* ¶ 14, and accordingly "there would never be any evidence that anybody downloaded or printed the transcript," Tr. 145:14-146:18.  Accordingly, it was impossible for Kreindler & Kreindler to "demonstrate that a forensic analysis was done to identify who accessed the deposition transcripts [and] determine the dates of any access." KSAX-0049, at 2

144.    Benett and Pounian did not disclose to the Court that Kreindler & Kreindler was unable to perform the forensic analysis that the Court had directed.  Instead, they drafted language in Hartney's declaration to avoid that disclosure and to mislead the Court.

145.    In addition, because any individual with a Kreindler & Kreindler employee login and password had access to the deposition transcripts, compliance with the Court's order required the Kreindler & Kreindler attorney-declarants to identify every such individual as a "person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation," KSAX-0049, at 1; and would have required every such individual to submit a declaration of their own, *see id.* at 2.

146.    Benett and Pounian did not disclose to the Court in their declarations, or in the other declarations they prepared, that every individual with a Kreindler & Kreindler employee login and password had access to the transcripts.  Nor did they prepare declarations for every

42

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

such individual.  Instead, they drafted language in Hartney's declaration to avoid that disclosure and mislead the Court.

147.    On September 24, 2021, Pounian commented on language in the draft Hartney declaration, stating that "I will keep thinking about this sentence . . . .  The only Kreindler personnel told how to access the Jarrah transcript were Jim Kreindler, Steven R. Pounian, Andrew J. Maloney, Megan Wolfe Benett, John Fawcett, Debra Pagan, Julia Sienski and Lisa Ranieri."  KSAX-0101.  Benett responded that same day:  "We could also say 'allowed to access,'" to which Pounian replied:  "That's better."  *Id.*

148.    On September 27, 2021, Benett emailed Hartney a draft of his declaration. KSAX-0115.  The draft contained a statement that the "share drive is for use only by Kreindler attorneys and staff involved in this litigation."  Hartney responded that "I don't think it is truthful because it was saved in the casemedia share and not the terror share (which is restricted) and everyone at Kreindler has access to everything in casemedia."  *Id.*  On cross-examination, Hartney admitted that, nonetheless, "Benett insist[ed] on not including that language in the declaration [and that] [s]he d[id]n't want to tell the court that everyone has access to everything." Tr. 196:3-19; *see* Tr. 142:8-143:13.

149.    Hartney further admitted that, despite the August 30 Order's directive "to provide a declaration from the head of the law firm's information technology group that should demonstrate that a forensic analysis was done to identify who accessed the deposition transcripts and determine the dates of that access," he was "never asked to do one" and that "we don't keep any tracking of that information."  Tr. 175:4-21.

150.    In the end, Hartney's September 27 declaration states that "I was told that the following had been able to access the Jarrah transcripts [on the internal Case Media Server]:

Kreindler attorneys Jim Kreindler, Steven R. Pounian, Andrew J. Maloney, Megan Wolfe Benett, and Gavin Simpson; Kreindler staff members Debra Pagan, Julia Sienski and Lisa Ranieri; and Kreindler consultant John Fawcett.  I did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed by anyone else."  KSAX-0056F, ¶ 5.  For all the reasons set forth above, these statements are false and misleading.

151.    Moreover, each of the Kreindler, Maloney, Benett, and Pounian declarations submitted contains the following identical false language:  "*state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.  None.*"  KSAX-0056A-B, ECF No. 7147-3, ECF No. 7147-4 (boldface added).  At least for Maloney, Benett, and Pounian, those statements are knowingly false.  As Hartney testified, "before [he] signed [his] declaration [on September 27], [he] told Ms. Benett and the other attorneys that everybody at the Kreindler firm had access to the Case Media where the Jarrah transcript was saved."  Tr. 142:15-19.

152.    Maloney acknowledged that it was "[p]robably" a "consensus decision among the partners" not "to tell the court that [Kreindler & Kreindler] couldn't do the [forensic] analysis that the court ordered on August 30."  Tr. 266:11-267:25.

### 3.    Kreindler & Kreindler admitted that its prior representations to the Court were false and drafted a declaration for Fawcett

153.    On September 27, 2021, Kreindler & Kreindler submitted a letter to the Court admitting that its "prior statements to the Court" that it "was not the source of the Jarrah deposition obtained by Michael Isikoff" were "wrong."  ECF No. 7147.  Kreindler & Kreindler attached to this letter a declaration signed by Fawcett stating that he had leaked the transcript to Isikoff.  KSAX-0056J.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

154.    Benett testified that she had merely "format[t]ed" the Fawcett declaration before it was submitted to the Court and "did not write the words."  Tr. 346:9-22.  She also testified that she "d[id]n't know" whether "Pounian wr[o]te the words."  Tr. 346:23-24.  That testimony is false.  Fawcett explained that Benett and Pounian redrafted the September 27, 2021 declaration that he signed and submitted to the Court.  *See* Tr. 458:22-24 ("They took my declaration, my draft, and edited it, yes, into this.").

155.    The documentary evidence corroborates Fawcett's version of events.  On September 27, 2021, at 12:20 pm, Fawcett emailed Pounian and Benett a draft declaration that he personally wrote.  *See* Tr. 456:7-24; KSAX-0108 (email); KSAX-0108A (draft declaration).

156.    In that draft declaration, Fawcett stated that he "sent a redacted version of the transcript of the deposition of Musaed al Jarrah to Michael Isikoff in early July, 2021" and that "[t]he redacted portions related to the sections of the deposition which were taken subject to the FBI protective order and irrelevant to the issue at hand."  KSAX-0108A.

157.    Fawcett further wrote that "[t]he protective order should not be used to cover up evidence of a crime that is not being adjudicated"; that, "[i]f the Saudi Government, the FBI, and the Federal Court of the Southern District of New York continue to protect Musaed al Jarrah rather than prosecute him, then the public at least must be forewarned in order to have some chance to protect themselves"; that "[t]he only venue for such warning is the media"; and that he "could not allow Musaed al Jarrah's criminal acts to remain secret, when I had the opportunity to do something about it."  KSAX-0108A.

158.    The draft declaration prepared by Fawcett does not mention any personal interest that motivated his actions.  It does not state that he sent only portions of the transcript to Isikoff.  It does not deny that he sent FBI Protected Information to Isikoff.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

159.    On September 27, 2021, at 1:41 pm, Pounian emailed Benett, attaching a completely rewritten draft of Fawcett's declaration.  *See* Tr. 409:9-22; KSAX-0109 (email); KSAX-0109A (revised draft declaration).  Pounian testified that he drafted this revised version of the declaration.  Tr. 409:9-22.  Benett implausibly claimed that she did not know whether Pounian had redrafted the declaration and, despite the fact that the revised version is completely different from the version Fawcett had previously sent, that she never asked Pounian whether he had redrafted it.  Tr. 346:10-24, 349:11-21.

160.    In the revised draft declaration, Pounian wrote that "[t]he redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of [certain images]" and that Fawcett "did not send any other portions of the deposition to Michael Isikoff." KSAX-0109A.

161.    Pounian also wrote in the revised draft that Fawcett "had a personal interest" motivating his disclosure of the confidential Al Jarrah deposition transcript, because, among other reasons, "Musaed al Jarrah worked for Saudi Arabia as a diplomat in Morocco for many years."  KSAX-0109A.

162.    On September 27, 2021, at 1:47 pm, Benett wrote back to Pounian, attaching a second revised draft of Fawcett's declaration.  *See* KSAX-0110 (email); KSAX-0110A (second revised draft declaration).

163.    Benett stated in her email that Pounian's revised draft of the declaration was "good," but that she "added one bit towards the end."  KSAX-0110.  In the attachment, Benett added to the reasons why Fawcett "had a personal interest" in leaking the Al Jarrah transcript: because "from [Fawcett's] background in global humanitarian work [he] kn[e]w that Morocco is a country with a history of child sex trafficking."  KSAX-0110A; *see* Tr. 352:14-353:2.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

164.    Fawcett's phone records show no phone calls with Benett and Pounian during the time period that they jointly wrote and edited this language attempting to justify Fawcett's breach of the protective order.  *See* KSAX-0136, at 2.  There is also no record evidence that they received any written communications from Fawcett.  The record shows that they wrote this language on their own, without input from Fawcett.

165.    From the nature of the edits and the circumstances surrounding them, and from Benett's false and self-exculpatory testimony in which she denied writing the language or knowing who wrote it, the Court can infer that Benett and Pounian had two motives for adding their own language to the declaration:  (a) by causing Fawcett to testify to a pretextual "personal interest" in releasing the Al Jarrah transcript to Isikoff, the attorneys sought to distance his motives from those of Kreindler & Kreindler and create a basis for Kreindler & Kreindler to argue that the firm was not responsible for Fawcett's actions; and (b) by inserting the unfounded statement that Al Jarrah's residence in Morocco was somehow linked to its "dreadful history of child trafficking," the attorneys sought to make Fawcett appear more sympathetic and Al Jarrah less sympathetic, and to further Kreindler & Kreindler's overall strategy of creating negative press coverage for Saudi Arabia and its employees.

166.    Benett's other testimony at the hearing further confirms those motives, particularly the second one.  During her testimony, Benett went out of her way to further disparage and lodge unfounded and speculative accusations against Al Jarrah, including describing conversations with Fawcett in which she attributed to him statements that Al Jarrah "was deliberately living in a place where he would have easy access to minor children for sexual purposes."  Tr. 392:16-393:15.  There is no record evidence that Fawcett believed any such thing – even the declaration Benett drafted for him does not go so far – and Benett's statements are not

credible.  The Weidner declaration, publicly filed by Kreindler & Kreindler on November 22,

2021, made additional, similar attempts to insert into the record irrelevant material that

disparages Al Jarrah.  *Infra* ¶ 229.

167.    On September 27, 2021, at 2:15 pm, Benett emailed Justin Green, a Kreindler

partner apparently involved in the management of the firm, a clean version of the third revised

draft of Fawcett's declaration.  *See* KSAX-0112 (email); KSAX-0112A (third revised draft

declaration).  Tr. 354:1-7.  She testified that her reason for sending the draft to Green was so that

"the partnership knew what was going to be submitted."  Tr. 355:22-23.

168.    On September 27, 2021, at 6:53 pm and 7:06 pm, Pounian emailed Fawcett

further revised drafts of the declaration.  Benett was copied on the emails.  *See* KSAX-0118

(email); KSAX-0118A (attachment); KSAX-0120 (email).

169.    On September 27, 2021, at 7:34 pm, Fawcett emailed Pounian back the draft

declaration with redlined edits.  *See* Tr. 443:21-444:2 (Fawcett:  "[I]f this is an email from me,

then I would have made [the edits]"); KSAX-0120 (email); KSAX-0121 (attachment).

170.    In his redlines, Fawcett changed language stating that "[t]he redacted portions of

the deposition I sent to Michael Isikoff were **limited to** Musaed al Jarrah's testimony about his

possession of" certain images to state that "[t]he redacted portions of the deposition I sent to

Michael Isikoff were **focused on** Musaed al Jarrah's testimony about his possession of [certain

images]."  KSAX-0121, ¶ 2 (boldface added).

171.    In his redlines, Fawcett deleted:  "Until today, I had told Kreindler & Kreindler

that I did not know how Michael Isikoff had obtained the transcript."  KSAX-0121, ¶ 3.  Thus,

although Fawcett was willing to admit to breaching the protective orders in this case, he was not

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

willing to state in his declaration that he had told anyone at Kreindler & Kreindler that he did not

know how Isikoff had obtained the transcript.

> **4.   Fawcett's declaration contained new false statements and did not identify or produce communications as directed by the Court**

172.   The final version of Fawcett's September 27, 2021 declaration that Pounian and

Benett drafted and that Benett (signing for Kreindler & Kreindler) filed with the Court is

incomplete and contains numerous false or misleading statements.

173.   The declaration stated that "[t]he redacted portions of the deposition [Fawcett]

sent to Michael Isikoff were focused on Musaed al Jarrah's testimony about his possession of

[certain images]."  KSAX-0056J, ¶ 2; KSAX-0062A, ¶ 2.  That statement, which Pounian had

introduced into the declaration and which Benett submitted to the Court as Fawcett's testimony,

is false:  Fawcett testified that he "sent the complete transcript without the FBI material."  Tr.

461:13-22.  Thus, Fawcett did not send "portions" of the transcript, and what he sent was not

"focused on" one particular issue.

174.   Benett and Pounian knew that the "portions" language was false, because they

had seen the initial unedited declaration in which Fawcett told the truth.  *Supra* ¶¶ 155-158.

Benett and Pounian were also familiar with Isikoff's article.  ECF No. 7147-3, ¶ 3; ECF No.

7147-4, ¶ 3.  Thus, they knew that Isikoff described receiving "more than 600 pages of

transcripts" and described parts of the confidential Al Jarrah deposition that had nothing to do

with the alleged images.  KSAX-0040, at 2.

175.   Fawcett also knew that he sent Isikoff "the complete transcript without the FBI

material," Tr. 461:13-22; knew what he wrote in the first draft of his declaration, Tr. 456:7-24;

and knew that the statement in the declaration is false.  His testimony that the statement "makes

no sense" and is "tough to read," Tr. 458:3-459:21, is not credible.

176.     The declaration stated that Fawcett "did not send any FBI protected portions of the deposition to Michael Isikoff."  KSAX-0056J, ¶ 2; KSAX-0062A, ¶ 2.  That statement, which did not appear in Fawcett's initial draft, is false.  As Fawcett admitted at the hearing, *see* Tr. 461:24-462:2, the entire transcript was subject to the FBI Protective Order because the FBI had not had the opportunity to review it for any redactions.  *See* KSAX-0015, at 5.

177.     Benett and Pounian knew that Fawcett's denial was false because they had recently seen the letter from the FBI specifically calling the attention of counsel to Paragraph 10 of the FBI Protective Order, which created the 30-day review period.  *See* ECF No. 6999.  It is reasonable to infer that they believed Fawcett, as a non-lawyer, would be able to claim confusion on this issue, and explicitly or implicitly advised him to do so.

178.     The declaration stated that, "[u]ntil today, no one other than Michael Isikoff and [Fawcett] knew that [Fawcett] sent the redacted transcript to Michael Isikoff."  KSAX-0056J, ¶ 3; KSAX-0062A, ¶ 3.  There is strong circumstantial evidence that statement is also false. Before September 27, 2021, Fawcett had made two phone calls and sent three texts and two emails to Crotty.  *See* KSAX-0135, at 3; KSAX-0136, at 2-3; KSAX-0151, at 1.  It is not plausible that Fawcett had not told Crotty of his statement by this point.  In addition, the sequence of calls and contacts on July 22, 2021, provides evidence that Kreindler knew of Fawcett's actions.  *Supra* ¶¶ 105-107.

179.     The declaration stated that Fawcett acted "to protect the public and children" and "had a personal interest because Musaed al Jarrah worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, my own children are from that country, and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking."  KSAX-0056J, ¶ 4; KSAX-0062A, ¶ 4.  Pounian and Benett

wrote that statement as part of their effort to distance Fawcett from Kreindler & Kreindler and to make his breach of the protective orders appear more sympathetic.  It is pretextual and does not represent Fawcett's genuine motives or words.

180.   At the evidentiary hearing, Fawcett testified that he did not understand what "personal interest" meant. Tr. 466:5-9.  Fawcett's "children" who are referenced in the sentence are 21 years old. Tr. 489:11-16.  As Fawcett acknowledged, the information that supposedly motivated his conduct concerned events 17 years earlier.  He had known of that information for at least half a year before the deposition, yet took no action. *Supra* ¶ 56.  Finally, although the portion of the deposition relevant to allegations concerning child pornography spans only 30 pages, Fawcett sent the entire 600-plus-page transcript to Isikoff.  He had no explanation for this conduct when confronted with this at the hearing. Tr. 459:22-461:22.  Based on these facts, it is not credible that Fawcett's motivation was to protect any member of the public, in Morocco or otherwise.  Instead, Fawcett leaked the transcript to further Kreindler & Kreindler's strategy of generating favorable press coverage for Plaintiffs' attorneys and unfavorable press coverage for Saudi Arabia, and of using that press coverage to pressure Saudi Arabia.

181.   Finally, the declaration failed to "identify and describe all communications . . . , whether oral or written," that Fawcett had with Isikoff between June 1, 2021, and August 1, 2021. KSAX-0049, at 2.  The September 27 declaration states that Fawcett emailed the confidential Al Jarrah transcript to Isikoff "in early July," KSAX-0056J, ¶ 2; KSAX-0062A, ¶ 2, but does not provide the email (which had been destroyed, *supra* ¶ 68) or any further details about the email.  Fawcett had many more communications with Isikoff between June 1 and August 1.  *See* KSAX-0056F, at 13-23 (July 12, 2021 email and attachment); KSAX-0082 (identifying four Signal messages and eight Signal calls between July 3, 2021, and July 5, 2021);

KSAX-0134, at 1 (identifying four calls on July 3, 2021); KSAX-0150 (identifying two Signal messages and three Signal calls between July 12, 2021, and July 24, 2021); *see also* Tr. 427:22-25.  None of these communications was produced.

> **5.     Kreindler & Kreindler submitted additional false, misleading, and noncompliant declarations with its September 27, 2021 letter**

182.     With its September 27, 2021 letter to the Court, Kreindler & Kreindler submitted a number of additional declarations, also drafted by Benett and Pounian.  These declarations contain numerous false and misleading statements.

> **a.     Kreindler's declaration**

183.     The declaration that Kreindler signed and submitted to the Court on September 27, 2021, states that "I never discussed the content of the Jarrah deposition with Isikoff or anyone acting on his behalf."  KSAX-0056A, at 3, ¶ 6.  As set forth above, Kreindler told Isikoff in response to a question about what happened at the Al Jarrah, Al Thumairy, and Al Bayoumi depositions that we "exposed all kinds of lies," that "[o]ne witness will contradict another," that "[e]ach person wants to minimize their own role and point fingers at others," and that the testimony revealed "a smoking gun or guns."  *Supra* ¶ 40 (discussing KSAX-0039).  All of these statements purport to discuss and summarize the content of the Al Jarrah deposition as well as other confidential depositions.  *Supra* ¶ 41.

184.     In response to the Court's direction to "identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021," and its instruction that "[a]ny written communication must be provided to the Court," KSAX-0049, at 1, the Kreindler declaration states:  "I recall having two phone calls with Isikoff," KSAX-0056A, at 3, ¶ 6. The Kreindler & Kreindler phone records produced after Kreindler & Kreindler retained counsel reveal at least three calls between Isikoff's and

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

Kreindler's numbers.  Tr. 54:17-25 (Kreindler & Kreindler stipulating that the phone records show three calls).  Kreindler did not check any phone records before submitting this sworn statement to the Court.  Tr. 51:1-52:16.  Kreindler further testified that he exchanged text messages with Isikoff during the relevant period.  Tr. 55:2-56:12.  The declaration does not identify or attach any such text messages, nor are any attached to the Hartney declaration.[1]

185.    Kreindler acknowledged that, before submitting his sworn declaration, he did not "conduct a search or have anyone [else] conduct a search of [his] text messages."  Tr. 55:2-56:12.  Under questioning from the Court, Kreindler testified that he prepared the declaration based "[s]olely on [his] recollection."  Tr. 52:18-25.

186.    The declaration states:  "*state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation*.  **None.**"  KSAX-0056A, at 4, ¶ 6 (boldface added).  That statement is false because everyone at the Kreindler firm had access to the Al Jarrah deposition.  When confronted with this fact, Kreindler testified that he "didn't do anything" to inform himself about "who actually did have access before [he] gave this sworn statement to the court."  Tr. 114:8-115:19.

187.    Finally, the declaration states that "[f]or the first time today I learned the information set forth in the declaration of John Fawcett."  KSAX-0056A, ¶ 7.  For the reasons set forth above, Kreindler knew about, or was willfully blind to, Fawcett's leak of the Al Jarrah transcript to Isikoff, by no later than July 22, 2021.  *Supra* ¶¶ 105-116.

---

[1] After the hearing, counsel for Saudi Arabia raised this issue with counsel for Kreindler & Kreindler.  Counsel for Kreindler & Kreindler responded:  "[W]e have complied with our discovery obligations; we located and produced to you all responsive materials."

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

### b. Maloney's declaration

188.    Paragraph 5 of the Maloney declaration states that "[t]he rough and final Jarrah transcripts are saved in a directory within a network share drive along with material relating to this lawsuit. . . . No one who has not signed th[e] protective orders is permitted to review protected materials.  Only the following individuals with Kreindler login credentials were provided access to the Jarrah transcripts:  Jim Kreindler, Steven R. Pounian, [Maloney], Megan Wolfe Benett, Gavin Simpson, John Fawcett, Debra Pagan, Julia Sienski, and Lisa Ranieri." KSAX-0056B, ¶ 5.  It further provides:  "*state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation*.  **None.**" *Id.* at 4, ¶ 9 (boldface added).  As set forth above, those statements are knowingly false. Maloney knew when he made them that anyone with a Kreindler login could access the transcripts.  *Supra* ¶ 16.  Even Benett admitted at the hearing that the word "permitted" is misleading in this context because it suggested a technical constraint.  Tr. 396:10-397:24.

189.    Benett also testified that she "coordinated" the language in Hartney's declaration with both Hartney and Maloney.  Tr. 396:10-397:24.  Thus, Maloney knew that Hartney had specifically objected to the language in his declaration as inaccurate and that Benett had told Hartney to sign it anyway.

190.    Maloney's declaration also omits the information that Maloney's investigation was not yet complete when the PECs submitted their July 27, 2021 letter to the Court and misleadingly suggests that it was complete by that time.  Paragraphs 3 through 8 set out a series of events with dates in apparent chronological order from June 17, 2021, to July 16, 2021. KSAX-0056B, ¶¶ 3-8.  Paragraph 7 describes the search of ShareFile (the cloud-based system), but does not give its date.  *Id.* ¶ 7.  Hartney did not perform that search until July 29.  *Supra* ¶ 91. The declaration thus gives the impression that the searches Maloney directed Hartney to perform

were complete much earlier than they actually were. *Supra* ¶¶ 76-104 (providing the timeline of Kreindler & Kreindler's purported investigation).

### c.     Benett's declaration

191.    Paragraph 5 of the Benett declaration provides: "*state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.* **None.**" ECF No. 7147-3, at 2, ¶ 5 (boldface added). As detailed above, this statement is knowingly false. *Supra* ¶¶ 16, 148.

### d.     Pounian's declaration

192.    Paragraph 4 of the Pounian declaration provides: "*state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.* **None.**" ECF No. 7147-4, at 2, ¶ 4 (boldface added). As detailed above, this statement is knowingly false. *Supra* ¶¶ 16, 147.

### e.     Hartney's declaration

193.    Paragraph 5 of the Hartney declaration states that the directory where the 9/11 litigation materials were saved was "for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett." KSAX-0056F, ¶ 5.

194.    As set forth above, Hartney knew that the phrase "for use only by" was not true, because anyone with Kreindler & Kreindler login credentials could access the transcripts. Tr. 138:3-139:23, 140:18-25 (Hartney's testimony regarding Case Media). He told Benett so. KSAX-0115; Tr. 195:10-196:19 (Hartney). Benett told him to sign the declaration anyway, and he did. Tr. 142:15-143:13 (Hartney).

195.    Paragraph 5 of the Hartney declaration states that Hartney was "told that [certain] people had been able to access the Jarrah transcripts." KSAX-0056F, ¶ 5. That is literally true because Benett told him that – or at least told him to say it. Tr. 141:9-142:14 (Hartney). But it is

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

misleading because it concealed the truth that those people were not the only people who were able to access the transcripts, and Hartney knew that.  Tr. 138:3-139:23, 140:18-25 (Hartney's testimony regarding Case Media); KSAX-0115.

196.    Paragraph 5 of the Hartney declaration states that Hartney "did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed" by anyone other than certain named individuals.  KSAX-0056F, ¶ 5.  This statement is misleading.  As Hartney admitted during his testimony upon questioning from the Court, there would never be any evidence of downloading or printing, because Kreindler & Kreindler could not track those activities.  Tr. 143:18-146:18 (Hartney).  The Hartney declaration did not disclose that information, despite the directive in the Court's August 30 Order to "demonstrate that a forensic analysis was done to identify who accessed the deposition transcripts" and "determine the dates of any access."  KSAX-0049, at 2.

197.    Paragraphs 9-10 of the Hartney declaration described conducting certain searches for documents, including all emails from June 1 to August 1, 2021, "containing the names 'Jarrah' or 'Isikoff,'" and stated that "[t]he only emails returned as a result of the searches I conducted" were "attached . . . as Exhibit 1" to his declaration.  KSAX-0056F, ¶¶ 9-10.  This statement is false.  As Hartney admitted during his testimony, many other emails contained the name "Jarrah" but were not attached.  Tr. 163:25-166:10; *see, e.g.*, KSAX-0031 (June 10, 2021 email from counsel for Saudi Arabia to the PECs containing the word "Jarrah").  Hartney's only explanation for this false statement was that Benett drafted the declaration and pulled the attachments to his declaration.  *Supra* ¶ 137.

198.    Paragraph 10 of the Hartney declaration further states that "[n]one of th[e] emails had any portion of the Jarrah deposition transcripts attached to them."  KSAX-0056F, ¶ 10.  If

Maloney's testimony is credited, this statement also is false:  On July 6, 2021, Fawcett emailed Consultant 1 a copy of the confidential Al Jarrah transcript.  KSAX-0099.  When questioned about whether Hartney located this email during his search, Maloney testified that Hartney had done so.  Tr. 308:4-309:12.

### 6. Kreindler & Kreindler's September 27, 2021 letter to the Court made additional false statements

199.    On September 27, 2021, Kreindler & Kreindler submitted a letter to the Court admitting that it was the source of the leak of the confidential Al Jarrah transcript.  ECF No. 7147.  Benett signed the letter.  *Id.* at 2.

200.    That letter claimed that the firm's August 16 declarations were based on "a complete review of our computer storage and email systems and questioning of all individuals with access to the [Al Jarrah] transcript."  ECF No. 7147, at 1.  That statement is false.  The firm's review by that point was not "complete."  For example, no forensic review of the Case Media server had been performed, or could be performed, to determine who had accessed the transcript.  *Supra* ¶¶ 143, 149.  In addition, everyone at Kreindler & Kreindler had access to the confidential Al Jarrah transcript, but not everyone at Kreindler & Kreindler was questioned.  *Supra* ¶ 81.  Even Fawcett – who is "at the heart of the documents" in this litigation, Tr. 38:25-39:3 – was never directly asked whether he had sent the transcript to Isikoff.  *Supra* ¶¶ 85-86.

201.    Kreindler & Kreindler also sought to distance itself from Fawcett by misleadingly characterizing him as a "consultant."  ECF No. 7147, at 1.  In reality, Fawcett "was a colleague and a peer to all of us at the firm" and "at the heart of the documents" in the case.  *Supra* ¶ 42.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

**L.      Kreindler & Kreindler Prepared and Filed a Supplemental Fawcett Declaration and Letter Making More False and Misleading Statements**

202.    On September 29, 2021, Saudi Arabia filed a letter with the Court noting that Fawcett's September 27, 2021 declaration was false and incomplete, because it failed to identify and describe all of Fawcett's communications with Isikoff and falsely stated that only small portions of the confidential Al Jarrah transcript were sent to Isikoff.  ECF No. 7157 (under seal).

**1.      Fawcett's September 30, 2021 declaration made false statements**

203.    On September 30, 2021, Kreindler & Kreindler filed another letter with the Court, under Benett's signature, which attaches a supplemental declaration from Fawcett.  KSAX-0058 (letter); KSAX-0059 (Fawcett supplemental declaration).  Kreindler & Kreindler attorneys, principally Benett, wrote this supplemental declaration as well.  Tr. 360:1-19 (Benett).

204.    That September 30, 2021 supplemental declaration stated that Fawcett had "privately communicated with Michael Isikoff several times between June 1 and August 1 of this year."  KSAX-0059, ¶ 3.  That declaration discloses only three phone calls with Isikoff between June 1, 2021, and August 1, 2021, as well as general details of the email by which Fawcett sent Isikoff the confidential Al Jarrah deposition transcript.  *See* KSAX-0059.

205.    Fawcett had many more communications with Isikoff during that period, which he did not disclose.  *See* KSAX-0082 (four Signal messages and eight Signal calls between July 3 and 5, 2021); KSAX-0134, at 1 (four calls on July 3, 2021); KSAX-0150 (two Signal messages and three Signal calls between July 12 and 24, 2021); *see also* Tr. 427:22-25.

206.    Kreindler & Kreindler knew that the August 30 Order required the production of all written communications between Fawcett and Isikoff, yet it prepared and submitted a declaration without searching for messages or ensuring that such messages were produced.  None

of these messages was disclosed until Saudi Arabia served discovery requests on Fawcett in

advance of the evidentiary hearing and the Court ordered Fawcett – by then represented by new,

independent counsel – to produce them.  KSAX-0150 (Signal messages and calls between

Fawcett and Isikoff between July 12, 2021, and September 29, 2021); KSAX-0082 (Signal

messages and calls between Fawcett and Isikoff from July 3-5, 2021).

207.    At no time until after retaining outside counsel did Kreindler & Kreindler

investigate to determine whether key statements in Fawcett's declarations – such as the

conversations he had with Isikoff and his deletion of emails transmitting the transcript to Isikoff

– were correct.  *See* Tr. 177:21-178:6, 178:24-180:19 (Hartney testifying that he was not asked to

look at the firm's phone records for Fawcett's communications with Isikoff or anyone else, was

not asked to obtain Fawcett's laptop or other devices, and did not attempt to obtain any of

Fawcett's ProtonMail messages or determine whether those messages were deleted).

208.    The supplemental declaration also repeats the statement that Fawcett "sent the

Jarrah transcripts to Isikoff because [he] wanted someone to do something to stop Jarrah."

KSAX-0059, ¶ 6.  As set forth above, this claimed personal motive was invented by Benett and

Pounian and does not plausibly reflect Fawcett's actual motives.  *Supra* ¶¶ 179-180.

### 2. Kreindler & Kreindler's September 30, 2021 letter made false and misleading statements

209.    Kreindler & Kreindler's September 30, 2021 letter, signed by Benett, stated that

Kreindler & Kreindler "preserved and reported to the Court its communications as requested."

KSAX-0058, at 1.  That statement was false and misleading.  Kreindler & Kreindler never sent a

retention notice to preserve relevant documents.  *Supra* ¶ 83.  Because it never searched any

personal devices, personal emails, text messages, or phone records, Kreindler & Kreindler had

no basis to state that such communications had been preserved or reported.

210.    The letter stated that Kreindler & Kreindler "was not aware of what our consultant had done until the day our papers were due."  KSAX-0058, at 1.  That statement was false or misleading.  As set forth above, Kreindler knew about or was willfully blind to the leak by no later than July 22, 2021.  *Supra* ¶¶ 105-116.

211.    The letter stated that Kreindler & Kreindler "did not discuss the confidential content of the deposition of Mussaed al Jarrah with Michael Isikoff or anyone else who had not signed the protective order."  KSAX-0058, at 1.  That statement was false and misleading.  As set forth above, Kreindler appeared on Isikoff's podcast and discussed what occurred at that and other confidential depositions.  *Supra* ¶ 40 (discussing KSAX-0039).  Also, Benett's testimony revealed that she had discussed the contents of the deposition with Weidner.  *Supra* ¶ 57.  Although Kreindler & Kreindler has produced documentation that Weidner had signed an acknowledgment for the FBI Protective Order, it has produced no record that he ever "signed" or otherwise agreed in writing to abide by the MDL Protective Order.  *Infra* ¶ 225.

212.    The letter stated that Kreindler & Kreindler "did not approve of or encourage the breach, tacitly or otherwise."  KSAX-0058, at 1.  That statement was false.  Kreindler frequently expressed his disdain for the protective orders in the case.  *Supra* ¶¶ 27-29.  Maloney testified that "every lawyer" for Plaintiffs "hate[s]" the protective orders and resents having to "live with them."  Tr. 30:15-31:4.  Kreindler, himself, has a history of prior violations of the protective orders.  *Supra* ¶¶ 31-41.  Benett and Pounian drafted the language in Fawcett's declaration attempting to justify Fawcett's breach.  *Supra* ¶ 154.  Kreindler & Kreindler's actions before and after the breach – going back to its failure to discipline Fawcett in the wake of the 2017 breach of the MDL Protective Order – show that it encouraged his conduct.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

213. The letter stated that, "upon learning of the breach," Kreindler & Kreindler "immediately acted to remove the consultant from access to confidential materials." KSAX-0058, at 1. That statement was false or misleading. As set forth above, Fawcett still had his personal laptop, on which he had saved confidential material, and Kreindler & Kreindler did not (and later claimed it could not) require him to surrender the laptop. *Supra* ¶ 22.

214. The letter stated that "Kreindler questioned each person with access to the transcript of Musaed al Jarrah and prepared declarations in accordance with our understanding of each person's knowledge." KSAX-0058, at 1. That statement was false. Hartney had told Benett and the other Kreindler & Kreindler lawyers that everyone at Kreindler & Kreindler had access to everything on the Case Media server, including the Al Jarrah transcript. *Supra* ¶ 16. It is undisputed that Kreindler & Kreindler did not question every employee or staff member at the firm. Benett had also prepared the declarations submitted to the Court on September 27 to conceal that everyone at Kreindler & Kreindler had access to the Al Jarrah deposition transcript.

215. The letter stated that "Fawcett . . . drafted the declaration submitted to the Court." KSAX-0058, at 2. This statement was false. As set forth above, Pounian and Benett drafted that declaration, including the language purporting to justify the reasons for the leak. *Supra* ¶ 154.

216. The letter stated that, "[a]fter learning the truth from Mr. Fawcett, Kreindler had its director of information technology and lawyers review their investigation to see what if anything we had missed and needed to report to the Court." KSAX-0058, at 2. That statement was false. Hartney testified that after September 27, 2021, he conducted no further investigation at all into the leak, including who ordered the leak or knew about it. Tr. 176:1-177:5. Maloney similarly testified that after September 27 he did no "additional email searches" and did not "ask at that point for any personal devices or personal emails." Tr. 271:15-20.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

217.    The letter stated that "Jim Kreindler's comments on Conspiracyland did not disclose any content form the Jarrah deposition."  KSAX-0058, at 2.  That statement not only was false, but also shows either a complete misunderstanding or a willful misreading of the protective orders and of the Court's prior admonishments to counsel.  *Supra* ¶¶ 40-41.

218.    Finally, the letter stated that "[w]e must note to the Court that until now, John Fawcett has worked on the litigation for nearly 20 years without blemish."  KSAX-0058, at 3. This statement was false.  As set forth above, Kreindler and Fawcett had previously violated the MDL Protective Order by disclosing confidential information to a reporter for *Politico* in 2017. *Supra* ¶¶ 32-33.  The present breach of the Court's protective orders is at least the second such breach in which Fawcett has been directly involved.

**M.    Kreindler & Kreindler Failed To Inform Fawcett of Serious Conflicts
         of Interest Before Causing Him To Incriminate Himself**

219.    No Kreindler & Kreindler attorney informed Fawcett that he should seek counsel before preparing and submitting either of his two declarations.  No Kreindler & Kreindler attorney disclosed or discussed with Fawcett that the firm's interests were no longer aligned with his own.  Tr. 360:20-361:2, 361:20-24, 418:1-5.

220.    Fawcett testified that at the time he prepared his declaration he did not realize that he could be subject to criminal liability for the actions he was describing.  Given that he had personal criminal defense counsel at the time, *supra* ¶ 106, the credibility of that testimony is questionable.  Regardless, Benett testified that she did not know that Fawcett had conferred with Crotty at the time she prepared his declaration.  Tr. 344:16-345:8; *see also* Tr. 268:7-269:10 (similar testimony from Maloney).

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

221.   The Court has since ruled that, by voluntarily submitting his declarations, Fawcett waived his right against self-incrimination.  *See* ECF Nos. 7338 (transcript of October 28, 2021 ruling by Judge Netburn), 7340 (transcript of October 29, 2021 ruling by Judge Daniels).

222.   Benett testified that she did not make any promises to Fawcett if he signed the declaration, and claimed that she did not know whether Kreindler & Kreindler is paying for his representation.  Tr. 364:16-22.  That testimony is not credible.  Fawcett confirmed that Kreindler & Kreindler is paying for his representation.  Tr. 415:21-416:2.

### N.   Post-Hearing Discovery Shows That Kreindler & Kreindler Violated Court Orders and Made False and Misleading Statements To Conceal the Violation

223.   On November 19, 2021, after post-hearing motion practice, the Court ordered Kreindler & Kreindler to "file a declaration from the FBI Agent referenced in Ms. Benett's testimony" that would "state whether the FBI Agent attended the Al Jarrah deposition," "state if the FBI Agent signed materials agreeing to be bound by the protective orders," and "provide any materials demonstrating [that] they agreed to be so bound."  ECF No. 7369, at 3.

224.   On November 22, 2021, Kreindler & Kreindler filed with the Court a declaration from former FBI agent Weidner.  ECF No. 7384-1.  That declaration states that, "[i]n connection with my work for the 9/11 Families over the past year, I was requested traveled [sic] to New York City on or about June 18, 2021," which was the second day of the Al Jarrah deposition.  *Id.* ¶ 4.  It further states that, "[w]hile at the Kreindler & Kreindler offices that day, at certain points I entered a conference room where I saw portions of the Jarrah deposition, which Megan Benett, an attorney at Kreindler & Kreindler, was taking."  *Id.*  Weidner, as a consultant, was not authorized to attend the Al Jarrah deposition under the deposition protocol.  *Supra* ¶ 5.  Kreindler & Kreindler also did not note his appearance on the deposition record, as required by that protocol.  *Supra* ¶ 57.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

225.     Weidner's declaration did not attach any "records" required by Paragraph H.5 of the MDL Protective Order showing that Weidner "agreed to be bound by the terms and restrictions of th[e] Order." KSAX-0002, at 12-13.  Further, the declaration nowhere states that he ever "agreed" to abide by the MDL Protective Order.  Rather, it states that he "reviewed and understood both" orders; that he "signed the acknowledgment page for the FBI protective order"; but that "[t]he MDL protective order had no acknowledgment page."  ECF No. 7384-1, ¶ 3.  Later, it states that he "understood [his] obligations under the MDL and FBI protective orders" and "ha[s] abided by them since reviewing them and signing the FBI acknowledgment page over a year ago." *Id.* ¶ 12.  It is clear from what Weidner does and does not say that Kreindler & Kreindler never asked him to agree in writing to be bound by the terms and restrictions of the MDL Protective Order; that he never did so; and that Kreindler & Kreindler never made any written record of his agreement as required by Paragraph H.5.

226.     In light of Weidner's declaration, Benett's testimony that she did not know whether he had attended the deposition, Tr. 329:2-15, is not credible.  Weidner states that during the course of the Al Jarrah deposition on June 18, 2021, he walked to the office where Benett "was conducting the deposition by herself" and that, when she "stepped out of that office, I approached her to share information regarding Jarrah's meeting with two FBI SAs concerning child pornography."  ECF No. 7384-1, ¶ 5.  It is not plausible that Kreindler & Kreindler requested that Weidner travel to its offices in New York on the second day of the Al Jarrah deposition, *id.* ¶ 4; that he discussed the very subject matter of that deposition with Benett during the course of the deposition; and yet that Benett did not know whether Weidner attended.

227.     Benett also testified that she "kn[e]w with 100 percent certainty that if [Weidner] looked at MDL protected materials, he reviewed and agreed to abide by the MDL protected

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

material [sic] because that is what our practice was." Tr. 332:23-25.  That testimony was false.

As set forth above, *supra* ¶ 225, Kreindler & Kreindler has failed to produce any evidence of

Weidner ever agreeing to the MDL Protective Order, and certainly no written record as the

order's plain terms require.

228.    Weidner's declaration also showed that Kreindler & Kreindler made false and

misleading statements in its post-hearing letter relying on Benett's testimony, which argued:

> Ms. Benett's testimony was crystal clear that the firm has practices and
> procedures in place to ensure that anyone who had access to confidential
> information was first presented with the protective orders for review and
> agreement, and it maintains a chart of everyone who has signed, together with a
> file of all the signatures.  Ms. Benett was 100% confident under oath that if the
> Consultant was privy to confidential information, such as being present in a room
> with a feed of the deposition, he signed the protective order.

ECF No. 7330, at 4.  That argument was in response to a letter from Saudi Arabia that sought

production of "records showing that each such individual agreed to be bound by the protective

orders before receiving confidential information, as required under *Paragraph H.5 of the MDL

Protective Order* and Paragraph 8 of the FBI Protective Order."  ECF No. 7322, at 3 (emphasis

added).  When Kreindler & Kreindler relied on Benett's false testimony, described that

testimony as "crystal clear," and took umbrage that anyone might question that testimony, it did

not have in its files the records required by Paragraph H.5, but sought once more to conceal that

deficiency from the Court and from Saudi Arabia.

229.    The Weidner declaration further shows Kreindler & Kreindler's undeterred intent

to turn the protective order violation to its advantage as a weapon against Al Jarrah and Saudi

Arabia.  It is apparent from the face of the declaration that it was drafted by Kreindler &

Kreindler for Weidner to sign:  it uses the exact same formatting as the other declarations

submitted to the Court by Kreindler & Kreindler.  *Compare* ECF No. 7384-1 *with* KSAX-

0056A, B, F, J.  The declaration spends several paragraphs discussing material that the Court has

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

described as "gratuitous and irrelevant information about nonparty Musaed Al Jarrah's

interactions with the FBI" and as "potentially embarrassing and entirely irrelevant."  ECF No.

7381, at 1, 2-3 n.1.  After Kreindler & Kreindler publicly filed that declaration, the Court ordered

on its own motion that the declaration be sealed.  *Id.*  That Kreindler & Kreindler publicly filed a

declaration containing these details in connection with an inquiry into whether it violated the

deposition protocol only serves to exacerbate the damage to Al Jarrah caused by the initial leak

of his deposition transcript, demonstrates Kreindler & Kreindler's deliberate efforts to harm and

embarrass him, and shows that – despite the firm's statements that it views Fawcett's leak of the

Al Jarrah transcript as a serious matter – it embraces everything Fawcett has done on its behalf

and would act no differently if faced with the choice again today.

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   Kreindler & Kreindler Willfully Violated the Protective Orders Through Fawcett's and Kreindler's Acts and Omissions

#### 1.   Fawcett willfully violated the MDL Protective Order and willfully or recklessly violated the FBI Protective Order

230.    A court may conclude that a willful violation of its order has occurred when it

finds " 'specific intent to consciously disregard an order of the court,' " *United States v. Lynch*,

162 F.3d 732, 735 (2d Cir. 1998) (quoting *United States v. Cutler*, 58 F.3d 825, 837 (2d Cir.

1995)), or where the violator " 'knows or should reasonably be aware' he or she is in the wrong,"

*Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36, 38 (2d Cir. 2003) (quoting

*Lynch*, 162 F.3d at 735); *see also Rojas v. United States*, 55 F.3d 61, 63 (2d Cir. 1995) (per

curiam) (explaining that willfulness generally requires "proof of a volitional act done by one who

knows or should reasonably be aware that his conduct is wrongful") (citation omitted).

231.    The MDL and FBI Protective Orders prohibit sending confidential information to

a reporter for dissemination to the public.  *Supra* ¶¶ 1-2.  As so applied, the orders are "clear and

unambiguous." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citation omitted) (standard for contempt finding).

232.    Fawcett, a staff researcher for Kreindler & Kreindler with full access to the confidential information produced to Kreindler & Kreindler by Saudi Arabia and the FBI, was required to comply with both the MDL Protective Order and the FBI Protective Order, and had agreed to abide by those orders. *Supra* ¶¶ 7, 44.

233.    When Fawcett sent the transcript of Al Jarrah's deposition to Isikoff, Fawcett knew it was subject to the MDL Protective Order. *Supra* ¶ 52. Fawcett's actual knowledge that he was violating the Court's order when he sent the transcript to Isikoff is confirmed by his contemporaneous efforts to conceal his actions. *Supra* ¶¶ 67-72; *see*, *e.g.*, *United States v. Mastropieri*, 685 F.2d 776, 790 (2d Cir. 1982) (expressing "no doubt that an attempt to suppress material records permits an inference of consciousness of guilt and therefore of guilt itself"); *In re Parmalat Sec. Litig.*, 472 F. Supp. 2d 582, 585 (S.D.N.Y.) (treating "destruction of evidence" as "evidence of consciousness of guilt"), *aff'd*, 240 F. App'x 916 (2d Cir. 2007).

234.    Fawcett's actions were willful because he acted with specific intent to disregard the MDL Protective Order.

235.    Fawcett's claim to have acted out of moral indignation at Al Jarrah's alleged actions, even if credited (which it should not be, *supra* ¶¶ 179-180), is legally irrelevant to the willfulness of his actions. *See*, *e.g.*, *Lynch*, 162 F.3d at 735-36 (explaining that "bad intent" is not required for willfulness and that refusal to find willfulness where a defendant's violation was motivated by sincere religious beliefs was "[n]o doubt[] . . . error").

236.    When Fawcett sent it to Isikoff, the entire transcript of Al Jarrah's deposition was also subject to the FBI Protective Order because the FBI had not yet had 30 days to review

proposed redactions to the transcript.  FBI Protective Order ¶ 10; *see* ECF No. 6999 (filed under

seal).  The FBI Protective Order is clear and unambiguous in providing the FBI at least 30 days

to review the transcript of any deposition where FBI Protected Information is used.

237.     Fawcett's statement that he sent "portions" of the transcript that were "focused"

on Al Jarrah's alleged possession of child pornography, even if credited (which it should not be,

*supra* ¶¶ 173-175), is legally irrelevant because the transcript was protected in its entirety.

238.     Even if Fawcett did not have actual knowledge that he was violating the FBI

Protective Order when sending the transcript to Isikoff, he at least recklessly disregarded his

obligations under that order by sending the transcript without reading the order, including the

clear and unambiguous terms of Paragraph 10, and by failing to ask a Kreindler & Kreindler

attorney whether it would violate the FBI Protective Order to send the transcript to Isikoff.

### 2.     Fawcett purposefully destroyed or concealed evidence of the violations

239.     It is unlawful to deliberately destroy or conceal evidence one knows is relevant to

a pending or contemplated judicial proceeding.  Corrupt destruction or concealment of evidence

is a felony.  *See*, *e.g.*, 18 U.S.C. § 1512(c).

240.     In a civil case, there is a " 'longstanding common law duty' " to " 'preserve

evidence [that] arises when [a] party has notice that the evidence is relevant to litigation or when

a party should have known that the evidence may be relevant to future litigation.' "  *Charlestown

Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) (quoting *Fujitsu

Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), and *Resnik v. Coulson*, 2019

WL 1434051, at *7 (E.D.N.Y. Mar. 30, 2019)).

241.     Fawcett had a duty to preserve evidence of his violation of the Court's orders.

That duty arose the moment he sent the transcript to Isikoff because he knew there was an

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

ongoing proceeding before this Court and he knew or should have known that evidence of his

willful violation of this Court's orders was relevant to this proceeding.  *Supra* ¶ 72.

242.    Because Fawcett had a duty to preserve evidence at the moment he sent the

transcript to Isikoff, he violated that duty by sending the transcript to Isikoff using a self-

destructing messages option on ProtonMail set to delete his email after 7 days.  *Supra* ¶ 68.

243.    Alternatively, Fawcett had a duty to preserve evidence no later than July 21, 2021,

when he knew Saudi Arabia intended to raise the matter with the Court and he knew evidence of

his acts was relevant to this proceeding, *supra* ¶¶ 105, 115; or no later than August 12, 2021,

when this Court issued its first order directing Kreindler & Kreindler to produce declarations.

*See* ECF No. 7011; *see also* ECF No. 7165, at 1 ("[O]nce th[e] Court commenced its inquiry,

there was a duty to preserve all potentially relevant information.").

244.    Regardless of whether Fawcett's duty to preserve evidence arose as of the time he

sent the transcript to Isikoff; as of July 21-24, 2021; or as of August 12, 2021, he violated that

duty by deleting the sent copy of the transcript from the thumb drive he used and by throwing the

thumb drive out in his household garbage at an unspecified date that he could say only was

"before Labor Day."  *Supra* ¶ 71.  Based on his shifting and inconsistent testimony on this issue,

*supra* ¶¶ 68-70, the Court should conclude that Fawcett destroyed the thumb drive for the

purpose of preventing the evidence on it from being available to the Court and Saudi Arabia.

> **3.     Kreindler recklessly or with gross negligence caused or failed
> to prevent Fawcett's violation of the MDL and FBI Protective
> Orders**

245.    When considering the conduct of a lawyer, a court may " 'infer[ ]' " that the

lawyer's violation of a court order was willful when that lawyer's " 'conduct discloses a reckless

disregard for his professional duty.' "  *Rojas*, 55 F.3d at 63 (quoting *In re Levine*, 27 F.3d 594,

596 (D.C. Cir. 1994) (per curiam)); *see also Cutler*, 58 F.3d at 837 (following *Rojas* and

explaining:  "We hold attorneys to a higher standard of conduct than we do lay persons.");

*Dvorkin v. New York-Presbyterian Hosp.*, 2011 WL 280801, at *3 (S.D.N.Y. Jan. 19, 2011)

(inferring willfulness where attorney "never made any diligent effort to ensure" his client's

court-ordered "attendance" at a settlement conference).

246.    Short of willfulness and recklessness, a court may also impose "the full range of

sanctions" available where it finds "gross professional negligence[,] . . . that is, where counsel

clearly should have understood his duty to the court."  *Cine Forty-Second St. Theatre Corp. v.

Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) (upholding district court's

authority to preclude proof of damages at trial for plaintiff's "hopelessly belated compliance"

with a discovery order); *see Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 387 (2d

Cir. 1981) ("[G]rossly negligent failure to obey a discovery order may justify severe disciplinary

measures."); *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l

Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (same), *adhered to on recon.*, 2004 WL 1943099

(S.D.N.Y. Aug. 27, 2004).

### 4.    Kreindler recklessly created a culture of disdain and disrespect for the Court's orders within his firm

247.    As the partner supervising the 9/11 litigation for his firm, Kreindler had a

professional duty to supervise other attorneys and non-attorney professionals.  *See Blue v. United

States Dep't of Army*, 914 F.2d 525, 546 (4th Cir. 1990) (affirming Rule 11 sanctions against

"experienced senior partner in charge of [a] case" for failing to "ensure the case was adequately

staffed so that the factual bases of his clients' claims were investigated"); *In re Nguyen*, 447 B.R.

268, 280 (B.A.P. 9th Cir. 2011) (en banc) (affirming sanctions against bankruptcy attorney for

failure to "take a sufficiently active role in working with his clients," and for "a cavalier attitude

toward the accuracy of bankruptcy schedules" that "set the tone for the office"); *In re ADA*

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

*Cases*, 2018 WL 6620603, at *5-6 (M.D. Fla. Nov. 13, 2018) (admonishing and subjecting to

oversight two "supervising attorney[s]" for failure to "ensur[e] that the attorneys [they]

supervised complied with the Federal Rules of Civil Procedure, the Local Rules, and the Court's

orders"), *report and recommendation adopted*, 2019 WL 12261700 (M.D. Fla. Jan. 29, 2019).

248.    By publicly expressing "disgust" and "hat[red]" for the Court's orders, *supra*

¶¶ 28-29, Kreindler created an obvious and known risk that attorneys and employees of his firm

would view the orders as illegitimate and violate them.  He exacerbated that risk through the

example he set for those working under his supervision, including his own past violations of the

order, *supra* ¶¶ 31-41, and his own demonstrated lack of familiarity with the protective orders

even at a hearing to enforce them, *supra* ¶ 6.  Through his words and conduct, Kreindler "set the

tone for [his] office." *Nguyen*, 447 B.R. at 280.  He gave no meaningful caution, guidance, or

instruction to the attorneys or professionals he supervised to ensure that they followed the

Court's orders.

### 5.    Kreindler recklessly failed to supervise Fawcett despite giving him unlimited access to confidential information and press contacts

249.    Kreindler's general duty to supervise attorneys and professionals also included a

specific duty to supervise Fawcett.  Because Kreindler (a) knew that Fawcett had unlimited

access to all confidential documents in the MDL, *supra* ¶ 44; (b) knew or should have known

that Fawcett could access any of that information without anyone being able to trace or verify

what he had done, *supra* ¶ 16; (c) knew that Fawcett spoke with members of the press, met with

them at the Kreindler & Kreindler offices, and gave them documents, *supra* ¶¶ 47-51; and

(d) knew that Fawcett had violated the MDL Protective Order in the past, *supra* ¶¶ 32-33, his

duty to supervise required him to take reasonable protective measures to ensure that Fawcett did

not again violate the MDL Protective Order.

71

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

250.    Kreindler's failure to take any remedial measures in response to Fawcett's role in violating the protective order in 2017 – for example, Kreindler did not fire Fawcett, impose any discipline on him, limit his access to confidential information, or tell him to stop speaking to the press, *supra* ¶ 36 – constituted reckless disregard of Kreindler's supervisory responsibilities that caused or contributed to the violation of the Court's orders.  Knowing what he knew, it was reckless for Kreindler to leave Fawcett in a position where Fawcett dealt with reporters unsupervised and used his own personal judgment about what communications with them would disclose confidential information.  Alternatively, Kreindler's failure to take remedial measures was at least grossly negligent.

251.    If the Court credits Kreindler's testimony that he did not know who could access confidential materials or how access to confidential materials could be tracked because he was unfamiliar with the operation of Kreindler & Kreindler's systems, *supra* ¶ 10, that lack of familiarity itself – even after a Court-ordered investigation that focused on that issue – also showed grossly negligent disregard for his supervisory responsibilities.

### 6.    Kreindler was grossly negligent in failing to ensure that MDL Protected Information was kept secure

252.    As the attorney supervising the 9/11 litigation, Kreindler was responsible for ensuring that his firm took reasonable measures to "store[ ] and maintain[ ]" "Protected Material . . . in a secure manner that ensures that access is limited to the persons authorized under th[e] Order."  MDL Protective Order ¶ H.2.  *See Koch v. Greenberg*, 2011 WL 13260757, at *10 (S.D.N.Y. Aug. 16, 2011) (imposing sanctions for protective order violation in part because "counsel likely had few, if any, procedures in place to try to ensure that such unauthorized disclosures did not occur"), *report and recommendation adopted*, 2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012).

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

253.    Kreindler failed to ensure that his firm took such measures, as shown by (a) his own testimony that he was unfamiliar with the operation of his firm's computer systems, *supra* ¶ 10; (b) Hartney's and others' testimony that anyone with a firm login had access to confidential and protected information such as the Al Jarrah transcript, *supra* ¶ 13; (c) Hartney's and others' testimony that Kreindler & Kreindler had no ability to track and record access to these documents, *supra* ¶ 14; (d) Hartney's testimony that Kreindler & Kreindler knew of technical means to limit and track access to documents, but did not employ such means in the 9/11 litigation, *supra* ¶ 15; and (e) the post-hearing evidence that Kreindler, or an attorney working under his supervision, permitted Weidner to attend the Al Jarrah deposition without notifying other parties and without creating or maintaining documentation that Weidner had agreed to abide by the MDL Protective Order, *supra* ¶¶ 224-225.

254.    Kreindler & Kreindler has previously argued that its lack of security measures did not affect the Isikoff transcript violation. *See* KSAX-0058. This argument is incorrect and irrelevant because (a) if Fawcett acted without authorization and wanted to avoid detection, better security measures would likely have deterred him from sending the transcript, *see* KSAX-0058, at 2 (September 30, 2021 letter from Kreindler & Kreindler to the Court stating that adequate security measures "may help deter and serve as a check"); (b) the ability to limit and track access to documents would also have enabled Kreindler & Kreindler to narrow the class of suspects for the violation, investigate thoroughly (had it desired to do so), and avoid making false statements to the Court that Kreindler & Kreindler was not responsible for the violation; and (c) regardless of whether it caused other violations of the Court's orders, the failure to maintain confidential documents securely itself violated Kreindler's and his firm's duties.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

### 7. Kreindler personally violated the protective order by disclosing confidential information to Isikoff

255.    Although the core of the Court's current inquiry is the disclosure of the Al Jarrah transcript to Isikoff, Kreindler's statements to Isikoff on the *Conspiracyland* podcast, which also violated the MDL Protective Order, are relevant to that core inquiry.  Kreindler's statements are the best evidence of what Kreindler really told his colleagues and subordinates about whether the Court's orders deserve respect and should be obeyed.  *Supra* ¶ 248.  Kreindler's statements, and Kreindler & Kreindler's continued insistence that it complied with the MDL and FBI Protective Orders, should also inform the Court's determination about what remedies are required to ensure future compliance.

256.    Telling a reporter about the general contents or purported contents of specific confidential depositions is disclosing a "summar[y]" of those depositions that violates the order. *Supra* ¶¶ 40-41,183.  As so applied, the order is "clear and unambiguous."  *Paramedics*, 369 F.3d at 655.  If there had been any doubt about the clarity of the order, that doubt should have been resolved by the Court's 2017 warning to Kreindler personally, and its 2019 warning to "everybody . . . at counsels' table" including Kreindler, concerning his earlier statements to the press.  *Supra* ¶¶ 36, 38.

257.    Isikoff's questions to Kreindler sought, and Kreindler's answers to those questions gave, summaries (or purported summaries) of the depositions of Omar Al Bayoumi, Fahad Al Thumairy, and Musaed Al Jarrah.  *Supra* ¶¶ 40-41,183.  Kreindler knew he was not permitted to answer those questions but answered them anyway.  His testimony that he believed he was complying with the order is inconsistent, is not credible, and shows willful defiance of the Court's orders.  *Supra* ¶ 8.  Alternatively, even if credited, his testimony shows a reckless or grossly negligent misconstruction of the Court's orders after repeated warnings.

### 8. Kreindler & Kreindler is responsible for Fawcett's and Kreindler's conduct

258.    Fawcett and Kreindler were acting on behalf of Kreindler & Kreindler at the time of their violations of the Court's orders.  Thus, Kreindler & Kreindler also willfully violated the Court's orders.  Because Fawcett and Kreindler acted willfully, recklessly, or at least with gross negligence, Kreindler & Kreindler also acted with those culpable mental states.

### a. Fawcett acted within the scope of his agency or employment with the firm and for its perceived benefit

259.    It is undisputed that Kreindler & Kreindler is responsible for the actions of Fawcett in breaching the protective orders.  *See* Tr. 19:1-4 (Kreindler's admission "that these violation of two court orders were committed by Kreindler & Kreindler").  Kreindler's testimony on that point is binding in itself as an admission that Fawcett was acting on behalf of Kreindler & Kreindler at the time of his actions, and as a later ratification of Fawcett's actions.

260.    Those admissions not only are binding but also were correct.  "[U]nder general principles of agency law, a principal is liable for the torts of his agent committed within the scope of his agency."  *Carolco Pictures Inc. v. Sirota*, 700 F. Supp. 169, 172 (S.D.N.Y. 1988); *see also In re Parmalat Sec. Litig.*, 640 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2009) (discussing Restatement (Second) of Agency (1958)).  Fawcett acted on behalf of Kreindler & Kreindler under these general principles.

261.    Based on the testimony at the hearing, Kreindler & Kreindler made Fawcett responsible for maintaining and storing documents, including confidential documents, to which the firm gave him unfettered and unmonitored access, *supra* ¶ 44; and authorized him to speak to reporters and provide them with information about the case, including documents, *supra* ¶¶ 47-51.  Sending the Al Jarrah transcript to Isikoff was thus within the scope of his duties.  In addition, contrary to the false statement in his filed declaration that he wanted to protect the

75

public, Fawcett's motive for sending the transcript to Isikoff was to further Kreindler &

Kreindler's press strategy and to harass Al Jarrah and Saudi Arabia.  *Supra* ¶¶ 179-180.

262.    Fawcett's motives, reflected in his original, unedited declaration, were consistent

with Kreindler's public statements disparaging the Court's orders.  *Supra* ¶¶ 155-158.  Fawcett's

motive to harass Al Jarrah and Saudi Arabia was also consistent with Kreindler & Kreindler's

and its attorneys' other actions, including Benett's unfounded and irrelevant redirect testimony,

*supra* ¶ 166, and Kreindler & Kreindler's post-hearing submission of a declaration containing

material that the Court sealed after finding it gratuitous and irrelevant, *supra* ¶ 229.

> **b.      Kreindler acted and failed to act within the scope of his
> agency for the firm and for its perceived benefit**

263.    Kreindler & Kreindler is also responsible for Kreindler's actions and failures to

act concerning the violations of the Court's protective orders.  Law firms are accountable for the

actions of their partners, especially named partners with broad authority to act for the firm.  *See*,

*e.g.*, *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 148 (2d Cir. 2012) (noting general

availability of sanctions against law firms under inherent power, and affirming sanctions under

28 U.S.C. § 1927 against firm based on conduct of "founding, named partner" whose "actions

were indistinguishable from those of [his] . . . firm").

264.    So far as the 9/11 litigation is concerned, Kreindler's "actions were

indistinguishable," *Enmon*, 675 F.3d at 148, from those of Kreindler & Kreindler.  Kreindler's

firm gave him full authority to act on its behalf, including with regard to his public appearances.

*Supra* ¶ 24; *see* Tr. 24:11-14 (counsel for Kreindler & Kreindler:  "[W]e can stipulate Mr.

Kreindler talks to the press about the case. . . . He is the face of the case.").

265.    Kreindler's acts and failures to act were consistent with Kreindler & Kreindler's

objectives and strategies of using confidential information to create good press coverage and

using press coverage to exert pressure on Saudi Arabia.  *Supra* ¶ 25.  Kreindler's personal

interests were also aligned with those of his firm, because a successful recovery in the case –

which Kreindler intended to promote through his press strategy – would have created financial

benefits for the firm as well as for him personally.  *Supra* ¶ 26.

### B.    Through Its Attorneys, Kreindler & Kreindler Made False and Misleading Statements in the July 23 Email, the July 27 Letter, and the August 16 Declarations

266.    In July and August 2021, Kreindler & Kreindler and its individual attorneys made

false and misleading statements to the Court and to counsel for Saudi Arabia.  *Supra* ¶¶ 117-123,

129-152.  At the time the attorneys made the statements cited above, they knew that those

statements were false; recklessly disregarded facts showing that those statements were false; or

made those statements with gross negligence as to whether they were true or false.  *Id.*

267.    "Knowledge" in this context, as in other areas of the law, includes willful

blindness:  deliberately avoiding learning facts that would create knowledge.  *See generally*

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (general standard for willful

blindness); *see Jimenez v. City of New York*, 162 F. Supp. 3d 173, 182-83 (S.D.N.Y. 2015)

(imposing sanctions on counsel who prepared and filed a false affidavit with "willful blindness to

the obvious and fatal flaws in [the witness's] story"), *aff'd in relevant part, vacated in part*, 666

F. App'x 39 (2d Cir. 2016); *Yeremis v. Amerit Fleet Sols.*, 2021 WL 1565693, at *13-14

(S.D.N.Y. Apr. 21, 2021) (imposing Rule 11 sanctions on attorney who, "[a]t best, . . . chose to

remain willfully blind" to deficiencies in his motion).

268.    In addition to the duty specifically imposed by the Court's August 12 Order, each

of the Kreindler & Kreindler attorneys also had a general duty of candor to the Court.  *See Syntel*

*Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 118 (S.D.N.Y. 2018)

("[A]ttorneys owe an ethical duty of candor in all of their dealings with the Court.").

      1.      **As of the July 23, July 27, and August 16 statements, Kreindler knew or should have known that Fawcett had violated the protective orders**

269.    When his subordinates made representations to counsel in the July 23 email and to the Court in the July 27 letter, and when he submitted to the Court his own August 16 declaration, Kreindler knew or should have known that Fawcett was the source of the leak.

270.    As set forth above, even before July 2021, Kreindler knew facts about Fawcett's interactions with the press and past violation of the MDL Protective Order that showed an obvious risk that Fawcett would leak confidential information, *supra* ¶ 32; in early July, even before Isikoff published the article that revealed he had the transcript, Kreindler knew Fawcett was in contact with Isikoff, *supra* ¶¶ 74-75; and on July 22, Kreindler had two phone calls with Fawcett, interspersed with contacts between Fawcett and a criminal defense lawyer, *supra* ¶¶ 106-107  The Court should infer that, as of that morning, Kreindler either actually knew that Fawcett had sent the transcript to Isikoff or was willfully blind by deliberately avoiding actual knowledge of Fawcett's conduct.

271.    Fawcett's untruthful testimony about the July 22 calls, *supra* ¶¶ 109-116, even after repeated perjury cautions in open court, is strong evidence that something occurred the morning of July 22 about which he had reason to lie to the Court.  *See United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974) (treating "false testimony [that] tended not only to conceal [the witness's] own participation in the transfer of the funds but furthered [a] cover-up initiated by her husband" as "circumstantial evidence of guilty consciousness [with] . . . independent probative force").  The Court may reasonably infer that Fawcett was attempting to conceal either (a) that Fawcett disclosed his role in the violation, which is why he also contemporaneously sought legal advice, or (b) that the call participants avoided discussing who was responsible for the violation because Kreindler suspected that Fawcett was responsible but did not want to know.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

272.     If, on July 22, Kreindler did not actually know and had not deliberately avoided learning that Fawcett sent the transcript to Isikoff, he had at least passed up multiple opportunities to find out.  Those opportunities included (a) an in-person conversation that Kreindler testifies occurred on July 15, *supra* ¶ 78; (b) Maloney's investigation, *supra* ¶¶ 81-104, during which Kreindler could have given Maloney the information he had about Fawcett and asked Maloney to press Fawcett for answers; or (c) the lengthy phone call the morning of July 22, *supra* ¶ 106, after it became clear that Saudi Arabia would raise the issue with the Court.

273.     Accordingly, at the time of his firm's July 23 email, his firm's July 27 letter, and his own August 16 declaration, Kreindler knew of, was willfully blind to, recklessly disregarded, or was grossly negligent as to the falsity of the statements that Kreindler & Kreindler was not the source of the protective order violation.  He nevertheless failed to prevent his colleagues from making the false statements, made his own false statements, and failed to correct – until Fawcett's confession months later after multiple court orders – the statements once made.

> **2.     As of the July 23, July 27, and August 16 statements, Maloney, Benett, and Pounian knew or should have known that Maloney's investigation was unreasonable and incomplete**
>
> **a.     Maloney did not conduct a reasonable investigation and knew it was not complete**

274.     Assuming that Maloney did not know of the breach at the time it occurred, he investigated it on behalf of Kreindler & Kreindler and made representations to the Court that he did so.  In investigating on his firm's behalf, Maloney had "duties of candor and diligence" that he was not free to "cavalierly disregard."  *Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1479018, at *8 (S.D.N.Y. Mar. 26, 2020) (Daniels, J.) (affirming sanctions for misrepresentations that might have "beg[u]n as innocent errors" after counsel failed to take "timely and meaningful steps to consider the alleged errors," but instead "persistently

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

insisted" they were not at fault); *Litton Sys., Inc. v. AT&T Co.*, 91 F.R.D. 574, 575 (S.D.N.Y.

1981) (imposing sanctions in part based on "the gross negligence of . . . counsel in making . . .

representations without checking [a] file" that "was readily available to them," as well as on

failure to correct the negligent representations once more information was available).

275.     Maloney did not perform an objectively or subjectively reasonable investigation

before concluding – and informing the Court of his conclusion – that no one at Kreindler &

Kreindler was the source of the leak.  The deficiency of his investigation is shown by (a) his

assumption, from the start, that no one at Kreindler & Kreindler could have sent the transcript to

Isikoff, *supra* ¶ 81; and by his failures to (b) conduct reasonable interviews, including of Fawcett,

*supra* ¶¶ 84-86, 98-99; (c) investigate Kreindler & Kreindler's contacts with Isikoff, *supra* ¶¶ 87-

88; (d) search locations in which the transcript was saved, *supra* ¶¶ 89-93; (e) follow up on the

limited searches he did direct, *supra* ¶¶ 94-99; (f) search personal devices or emails, even after

learning of communications with Isikoff, *supra* ¶¶ 100-102; or (g) require sworn declarations,

*supra* ¶¶ 103-104.  Even on Maloney's own terms, his investigation was not complete by July 29

because he did not have the results of Hartney's search of the cloud-based server.  *Supra* ¶ 91.

276.     Knowing what he knew, Maloney knew that the statements in Pounian's July 23

email, in the July 27 letter (where Maloney's name appeared in the signature block), and in

Benett's August 16 declaration that an investigation had been conducted and was complete were

false and misleading.  *Supra* ¶¶ 121-123.  He also knew that Kreindler & Kreindler lacked a

reasonable basis for its repeated representations that it was not the source of the protective order

violation, including his own representation in his August 16 declaration.  He nevertheless put his

name on the false statements in the July 27 letter and the August 16 declaration, failed to prevent

his colleagues from making the false statements, and failed to correct the false statements once

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

made.  That Benett signed the declaration describing the "review," *supra* ¶ 132 – rather than Maloney, who conducted that review – further supports the conclusion that Maloney knew at the time that his investigation would not withstand scrutiny and wanted to distance himself from it.

277.    Alternatively, if Maloney did not know the statements were false, he recklessly disregarded an obvious risk that they were false or was grossly negligent as to their falsity.

> **b.      Benett and Pounian knew or should have known that they could not reasonably rely on Maloney's investigation**

278.    In light of Benett's reliance on Maloney's investigation, Tr. 336:7-10, there are two possibilities.  If she was familiar at the time of the July 27 letter and her August 16 declaration with what Maloney had and had not done in the course of his investigation, her July 27 and August 16 statements were knowingly, recklessly, or negligently false for the same reasons that Maloney's own statements were.  *Supra* ¶¶ 276-277.  If she was not familiar with what Maloney had and had not done, it was negligent for her to rely on it, and especially to invoke it as the basis for her sworn statement in the August 16 declaration.

279.    The same applies to Pounian, who made the initial statement in the July 23 email that Kreindler & Kreindler's representation was complete, and who also relied on Maloney's investigation.  To the extent Pounian testified that he conducted an investigation of his own, his testimony failed to establish any significant additional basis for reliance.  Tr. 405:17-407:5.

> **3.      Kreindler & Kreindler is responsible for its attorneys' misrepresentations**

280.    Kreindler & Kreindler is responsible for its attorneys' false and misleading statements to the Court.  As set forth above, Kreindler & Kreindler gave Kreindler personally full authority to act on its behalf in this litigation, and his actions are indistinguishable from its own.  *Supra* ¶ 264.  Through Kreindler's actions, Kreindler & Kreindler further authorized

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

(a) Maloney to conduct an investigation on its behalf and make representations about that investigation and the firm's knowledge to the Court, including in the July 27 letter and his August 16 declaration; and (b) Benett and Pounian to make representations about Maloney's investigation and the firm's knowledge to opposing counsel and the Court, including the July 23 email, the July 27 letter, and the August 16 declarations.  The firm is responsible for what they did and failed to do.

### C. Kreindler & Kreindler Violated the August 30 Order and Made Misrepresentations to the Court in the September 27 and September 30 Letters and the Declarations

281.    After the Court issued its August 30, 2021 Order, Kreindler & Kreindler had a duty to comply with that order and make full and candid disclosures of all required information. Their "ethical duty of candor in all of their dealings with the Court," *Syntel Sterling*, 328 F.R.D. at 118, also remained in force.  In their responses on behalf of Kreindler & Kreindler, its attorneys and Fawcett each willfully violated the August 30 Order's clear and unambiguous directives, and made knowingly false and misleading statements in their responses.

### 1. Kreindler's declaration violated the Court's order and made false statements and misleading omissions

282.    Kreindler's September 27, 2021 statement that he learned of Fawcett's violation of the protective orders "[f]or the first time today," KSAX-0056A, ¶ 7, was false because he already knew of or was willfully blind to Fawcett's conduct.  *Supra* ¶¶ 105-116.  His denials of having discussed the contents of the Al Jarrah deposition with Isikoff were also false and showed a willful misconstruction of the Court's order.  *Supra* ¶¶ 183, 217.

283.    It is not a mitigating factor, as Kreindler & Kreindler has suggested, ECF No. 7330, at 5, that the podcast statements were already known to the Court when Kreindler submitted his declaration.  Kreindler's continued insistence that his statements did not discuss

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

the contents of the deposition – even after hearing them played in open court – shows that his representations are unreliable.  For example, the Court cannot trust his statements that he did not discuss the contents of the deposition on his unrecorded calls with Isikoff.  *See* KSAX-0056A, ¶ 6.  If he had, he would deny doing so because he still insists that summarizing and characterizing witness testimony does not constitute discussing the contents of depositions.

284.    Kreindler, as the partner supervising the 9/11 litigation team, knew or should have known that there were many Kreindler & Kreindler employees and consultants who had access to the Al Jarrah deposition transcript but who had not submitted declarations.  *Supra* ¶¶ 214, 249.  Accordingly, his statement that he knew of no such individuals was knowingly false, reckless as to his professional duties, or at a minimum grossly negligent.

285.    Kreindler's mere reliance on his personal recollection of his calls with Isikoff, *supra* ¶ 185, and failure to search his phone records or his personal devices, were reckless or grossly negligent.  Even today he has not come into full compliance with the Court's order by amending his declaration to "identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021."  KSAX-0049, at 1.

### 2.    Maloney's declaration violated the Court's order and made false statements and misleading omissions

286.    Maloney undertook in his declaration to comply with the Court's directive that "[a]t least one" attorney "describe, in detail, the firm's internal investigation . . . undertaken in response to the breach of the Protective Orders."  KSAX-0049, at 1.  He was therefore expressly required to disclose material "detail[s]" about his investigation.

287.    Maloney's declaration nevertheless misleadingly suggested that his investigation was complete by the time of the July 27 letter to the Court, *supra* ¶ 190; falsely and misleadingly stated that "[o]nly the following individuals with Kreindler login credentials were provided

access to the Jarrah transcripts," *supra* ¶¶ 188-189; and misleadingly stated that "[n]o one who has not signed th[e] protective orders is permitted to review protected materials," implying with the word "permission" that a technical limitation on access existed, *supra* ¶ 188.

288.    Further, Maloney's statement also falsely responded "[n]one" to the Court's order to "state every person that [he] kn[e]w had access to the deposition transcripts who ha[d] not already supplied a declaration in this investigation."  *Supra* ¶ 188.  Even if Maloney's phrases "permitted to review" and "provided access" were not themselves false or misleading, the Court's order used the unambiguous phrase "had access."

### 3.    Benett's and Pounian's declarations violated the Court's order and made false and misleading statements

289.    Benett and Pounian, like Maloney, knew from Hartney that everyone with a Kreindler employee login had access to the transcript.  *Supra* ¶ 16.  In light of that knowledge, they, like Maloney, submitted knowingly false testimony to the Court when they responded "[n]one" to the Court's directive to "state every person that they kn[e]w had access to the deposition transcripts who ha[d] not already supplied a declaration in this investigation."

290.    Benett's and Pounian's personal intent to deceive the Court about the access issue is further established by (a) Hartney's contemporaneous communication to Benett that the statement she wanted him to make was not "truthful," *supra* ¶ 148; (b) Hartney's admission at the hearing that Benett told him she did not want the Court to have the information it requested, *supra* ¶ 148; and (c) Benett's and Pounian's email exchange days before the filing concerning the access language in Hartney's declaration and their deliberate alteration of that language, *see* KSAX-0101 – indicating that they were fully aware of this issue, had time to consider what they would say, and knowingly gave false testimony.  *Supra* ¶¶ 147-148.

### 4. Hartney's declaration violated the Court's order and made false and misleading statements

291.    Hartney made knowingly false or misleading statements in his declaration regarding access to the 9/11 litigation materials, *supra* ¶¶ 150, 193-198; and the lack of evidence that the transcript was downloaded or printed from the Case Media server, *supra* ¶ 196.  He also knowingly failed to disclose Kreindler & Kreindler's inability to perform the forensic analysis directed by the Court.  *Supra* ¶ 149.  Hartney's personal culpability should, however, be mitigated because he disclosed the truth to Benett and testified candidly at the hearing.

292.    Hartney's declaration also included a knowingly or recklessly false description of the search that produced the documents he attached, omitting many documents that resulted from his search.  *Supra* ¶ 197.  It is unclear whether Hartney himself was responsible for this error in light of his testimony that Benett prepared his declaration and exhibits.  *Id*.

293.    Benett knew that Hartney's declaration contained statements he did not consider "truthful," but prepared it, caused him to sign it, and filed it anyway.  She also knew, as did the other Kreindler & Kreindler attorneys, that the declaration concealed the truth about Kreindler & Kreindler's inability to perform the searches directed by the Court.  *Supra* ¶ 148.  If Hartney's culpability is mitigated because he told Benett the truth and followed her guidance, she has no such excuse.  Nor does Pounian.

### 5. Fawcett's September 27 declaration violated the Court's order and made false statements

294.    Fawcett made knowingly false statements in his first declaration, including: (a) that he sent only "portions" of the transcript to Isikoff, *supra* ¶¶ 173-174; (b) that those "portions" were "focused" on the child pornography issue, *id*; and (c) that he acted out of a "personal interest" in sending the transcript to Isikoff, *supra* ¶¶ 179-180.  He also made

an at least recklessly false statement that the materials he sent were not FBI protected.

*Supra* ¶¶ 176-177.

295.    Fawcett also failed to comply with the August 30 Order's clear and unambiguous requirement that he identify, describe, and produce communications with Isikoff.  He left out responsive (and material) calls and messages to Isikoff that he could have found by searching his later-produced personal phone records or his personal devices.  *Supra* ¶ 181.

296.    Benett and Pounian inserted into Fawcett's declaration statements that they knew to be false and that served Kreindler & Kreindler's interests, including pretextual language about Fawcett's "personal interest" that he testified at the hearing he did not understand.  *Supra* ¶¶ 179-180.  Benett also gave knowingly false testimony about her role in preparing the declaration, protesting that she had merely "format[t]ed" it.  *Supra* ¶ 154.  Neither she nor Pounian has at any time disclosed the truth about the false testimony they created and presented to the Court.

### 6.    Fawcett's September 30 declaration violated the Court's order and made false and misleading statements

297.    Fawcett's second declaration repeated his false testimony about his supposed personal motive for the protective order violation, *supra* ¶ 203; and purported to, but did not, cure his lack of compliance with the Court's directive concerning his communications with Isikoff, *supra* ¶¶ 204-207.  Because that declaration was Fawcett's second chance to comply with the August 30 Order, and because Saudi Arabia had by then already pointed out his failure to identify and produce messages, *supra* ¶ 202, his continued failure to comply was willful.

298.    Benett wrote the second declaration for Fawcett, like the first, and is responsible for the false statements in it.  *Supra* ¶ 203.  To the extent she may defend her conduct on September 27 by arguing that she acted under time pressure, the three-day interval gave Benett time to consider whether to correct the false statements she had caused Fawcett to make.  She did

not do so, and did not testify truthfully about her conduct at the hearing.  Benett had also seen

Saudi Arabia's letter pointing out Fawcett's failure to identify and produce responsive

communications, ECF No. 7157, but nevertheless wrote and submitted a declaration for him that

failed to cure his lack of compliance with the Court's order.

### 7.  Benett also made false and misleading statements in the September 27 and September 30 letters

299.  Benett also signed the September 27 and September 30, 2021 letters to the Court,

which contained a number of statements that she knew or should have known to be false or

misleading.  *Supra* ¶¶ 199-201 (describing false statements in the September 27 letter); *supra*

¶¶ 209-218 (describing false statements in the September 30 letter).

### 8.  Kreindler & Kreindler is responsible for its attorneys' and Fawcett's conduct

300.  Kreindler & Kreindler is also responsible for its attorneys' false and misleading

statements to the Court.  As set forth above, Kreindler & Kreindler gave Kreindler personally

full authority to act on its behalf in this litigation, and his actions are indistinguishable from its

own.  *Supra* ¶ 264.  In addition, through Kreindler, Kreindler & Kreindler further authorized its

partners Maloney and Benett and its counsel Pounian to prepare and submit its response to the

August 30 Order, and is responsible for their actions.  Further, based on Benett's unrebutted

testimony that she told "the partnership" of her actions through Green, *supra* ¶ 167, it appears

that other partners outside the 9/11 litigation team were aware of her actions on behalf of the

firm.  There is no suggestion in the record that Kreindler & Kreindler's management withdrew or

limited Benett's authority to act for Kreindler & Kreindler at that time.

### D. The Court Has Authority To Impose Sanctions Under Rule 37 and the Court's Inherent Powers

#### 1. Rule 37 authorizes severe sanctions for willful and bad-faith misconduct

301. Rule 37(b) of the Federal Rules of Civil Procedure authorizes this Court to impose various sanctions for a "fail[ure] to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2)(A).  The Court may hold "[b]oth parties and counsel . . . personally liable for expenses, 'including attorney's fees,' caused by the failure to comply."  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980) (quoting Fed. R. Civ. P. 37(b)(2)(C)).

302. A protective order restricting the use of confidential information provided in discovery, such as the MDL Protective Order and the FBI Protective Order, is "an order to provide or permit discovery" within the meaning of Rule 37(b).  *See City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730, at *7 (S.D.N.Y. Mar. 5, 2018) (imposing Rule 37 sanctions for protective order violation); *Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581, at *5 (S.D.N.Y. Oct. 20, 2015) (same); *Schiller v. City of New York*, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007) (same).

303. Rule 37(b) sanctions are properly used to "ensure that a party will not benefit from its own failure to comply" with a court order, "to obtain compliance with the particular order issued," and "to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault."  *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988).  "Severe sanctions" are "justified . . . when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable."  *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991).  The court's discretion in selecting a sanction should be guided by factors including:  "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser

sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant

party had been warned of the consequences of his noncompliance." *Nieves v. City of New York*,

208 F.R.D. 531, 535 (S.D.N.Y. 2002).

304.    Rule 37(e) of the Federal Rules of Civil Procedure further authorizes this Court to

impose sanctions "[i]f electronically stored information that should have been preserved in the

anticipation or conduct of litigation is lost because a party fail[s] to take reasonable steps to

preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P.

37(e)(1).  Like the Court's authority under Rule 37(b), its authority under Rule 37(e) may be

used to impose sanctions on lawyers and law firms as well as parties.  *See Fashion Exch. LLC v.*

*Hybrid Promotions, LLC*, 2021 WL 1172265, at *5 (S.D.N.Y. Mar. 29, 2021) (observing that

"courts in this district have sanctioned attorneys under" Rule 37(e)(1)); *Karsch v. Blink Health*

*Ltd.*, 2019 WL 2708125, at *1 (S.D.N.Y. June 20, 2019) (imposing such sanctions).

### 2.    The Court has inherent power to sanction bad-faith misconduct

305.    This Court can impose sanctions for litigation misconduct by attorneys and law

firms before it under its inherent powers.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46

(1991) (discussing the scope of a court's inherent powers).  Inherent-power sanctions can be

imposed for "willful disobedience of a court order," *id.* at 45 (citation omitted), including a

protective order.  *See City of Almaty*, 2018 WL 1229730, at *6 n.1; *Schiller*, 2007 WL 1623108,

at *3.  Inherent-power sanctions are also appropriate for "the making of false and misleading

statements to the Court."  *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, 924 F.

Supp. 2d 505, 507 (S.D.N.Y. 2013).

306.    Where "bad-faith conduct in the course of litigation . . . c[an] be adequately

sanctioned under the [Federal] Rules, [a] court ordinarily should rely on the Rules rather than the

inherent power."  *Chambers*, 501 U.S. at 50.  But the existence of "a statute or rule which

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

provides a mechanism for imposing sanctions of a particular variety for a specific type of abuse

does not limit a court's inherent power to fashion sanctions." *DLC Mgmt. Corp. v. Town of*

*Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998).  In an appropriate case, courts can impose

sanctions for conduct under a specific rule and also invoke its inherent powers as an alternative

legal basis for the same sanctions.  *See City of Almaty*, 2018 WL 1229730, at *6 n.1; *Schiller*,

2007 WL 1623108, at *3.  That approach is appropriate here to ensure that the Court invokes

authority of sufficient breadth to answer the wide-ranging misconduct before it.

307.    Sanctions under the Court's inherent powers require a finding of bad faith.  Bad

faith is action for an improper purpose such as (a) harassment or (b) delay, *see Oliveri v.*

*Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986); (c) "'hampering enforcement of a court order,'"

*Chambers*, 501 U.S. at 46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)); or

(d) perpetrating a "fraud" on the court, *see Beverly Hills Teddy Bear Co. v. Best Brands*

*Consumer Prods., Inc.*, 2020 WL 7342724, at *16-17 (S.D.N.Y. Dec. 11, 2020).[2]

> **E.    The Court Should Impose Appropriate Remedies To Enforce Its**
> **Orders and Ensure Future Respect for Its Authority**

> **1.    The Court should remove all Kreindler & Kreindler attorneys**
> **from the Plaintiffs' Executive Committee for Personal Injury**
> **Claims and terminate their access to confidential information**
> **in the MDL**

308.    The Court should remove all Kreindler & Kreindler attorneys from the Plaintiffs'

Executive Committee for Personal Injury Claims, as a "just order[ ]" under Rule 37(b)(2)(A) and

in the exercise of its inherent powers.  No lesser remedy against Kreindler & Kreindler will

adequately redress its misconduct, ensure that it respects the Court's orders in the future, or send

---

[2] The Court also can and should further confirm the conclusion that Fawcett and
Kreindler & Kreindler acted in bad faith by drawing an adverse inference under Rule 37(e)
based on Fawcett's purposeful destruction of evidence.  *See infra* ¶ 326.

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

an appropriate message to the bar and the public concerning the seriousness of the wrongdoing revealed by the Court's investigation and at the evidentiary hearing.

309.    This is not a case of innocent or merely negligent error.  Kreindler's pattern not only of publicly disparaging, but also of publicly violating, the protective orders in this case conveyed to everyone in his firm that the orders deserved neither respect nor compliance.  His testimony on the stand repeated that message again:  at a hearing where he faced potential sanctions, he reaffirmed his public scorn for the orders as a "heartfelt belief," bellowed defenses of his indefensible statements, and still had not bothered to familiarize himself with the orders' provisions.  Whether Kreindler told Fawcett to send the transcript to Isikoff, conveyed that message with a wink and a nod, or merely let his public statements about the orders speak for themselves, the record leaves no doubt that Fawcett believed – correctly – that he was carrying out the wishes of his long-time supervisor and patron.

310.    Kreindler & Kreindler's response to Fawcett's acts underscores the need for a firm response.  Even if Kreindler did not know about the violation when it occurred, his testimony that he never suspected Fawcett could have committed the violation is not credible.  Nor was Maloney's similar testimony.  The circumstantial evidence that Kreindler & Kreindler was the likely source of the leak was apparent to Saudi Arabia, the Court, and any reasonable observer.  A responsible law firm in this position would have immediately conducted a credible investigation with the goal either of clearing its name or, if one of its employees proved responsible, of taking prompt remedial action.  Maloney, a former prosecutor, knows how to conduct a credible investigation.  His failure to conduct one here speaks for itself.

311.    Kreindler & Kreindler's conduct became even worse after the Court issued not one, but two investigative orders.  Kreindler, Maloney, Benett, and Pounian collectively and

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

individually displayed an inexcusable combination of disregard for the Court's orders and willingness to mislead or outright lie to cover up their violations.  Even before they allegedly learned of Fawcett's violation, the Kreindler & Kreindler attorneys were prepared to submit false and misleading testimony to conceal their firm's lack of basic information safeguards and inability to perform the forensic searches the Court had directed.  After it became clear they could no longer deny the violations, they prepared false and misleading testimony to distance Fawcett from their firm – and then gave their own false testimony about doing so in open court.

312.    At no time has Kreindler & Kreindler or any of its attorneys made any credible showing of remorse or willingness to change.  At the evidentiary hearing, after time to reflect, each indignantly defended his or her own conduct.  Benett even did her best to exacerbate the breach of the protective orders through redirect testimony in which she repeated, amplified, and extended Fawcett's allegations about Al Jarrah.  *Supra* ¶ 166.  Later, when the Court directed further discovery about the then-unnamed FBI agent who attended the Al Jarrah deposition, Kreindler & Kreindler took that as an opportunity to file a declaration in which the agent expressed negative opinions about Al Jarrah so openly "gratuitous and irrelevant," ECF No. 7381, at 1, that the Court sealed the declaration on its own motion.  *Supra* ¶ 229.

313.    Any law firm must do better than this.  That is doubly true for a firm that holds a leadership role in major, complex litigation such as a seat on the Plaintiffs' Executive Committees.  The Court relies on candor and cooperation from PEC members to manage the case.  Those members' positions and statements affect the rights not only of the firms' own clients, but also those of other parties – other Plaintiffs, and Defendants such as Saudi Arabia as well.  The next time that Kreindler, Maloney, Benett, or Pounian make a representation to the

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

Court, will the Court remain able to put its confidence in that representation?  The answer cannot be yes.  And because it is not, they can no longer properly serve in those roles.

314.    Lesser sanctions, such as monetary sanctions, are also insufficient to deter future misconduct by Kreindler & Kreindler and its attorneys.  Any recovery in this case would generate financial benefits for Kreindler & Kreindler, and Kreindler personally, that would far exceed any compensatory award of attorneys' fees.  Kreindler believes his strategy of disclosing, or purporting to disclose, confidential information to generate favorable press coverage is an effective means of generating pressure on Saudi Arabia.  He will not stop doing it voluntarily.  Nor will his colleagues who share his beliefs and his incentives.  The Court should therefore prevent them from continuing by removing the leadership roles that give them credibility and by cutting off their access to confidential information.

315.    The Eighth Circuit approved a similar remedy in *Plaintiffs' Baycol Steering Committee v. Bayer Corp.*, 419 F.3d 794 (8th Cir. 2005).  In that case, an attorney who was a member of a plaintiffs' steering committee committed the relatively minor violation of "allowing a motion to be filed without [required] signatures." *Id.* at 807.  He then "fail[ed] to correct the problem in a timely manner, . . . exhibited poor judgment and a profound lack of the appropriate forthrightness and candor necessary from a member of" the committee, and "deliberately tried to cover-up his actions and mislead the Court and the parties" about the signature issue.  *Id.*  He also, like Kreindler & Kreindler here, "failed to exercise due care regarding the handling of confidential documents."  *Id.*  Taking all of this into account, the district court found that the attorney was "not qualified to perform the duties of a [committee] member with the zeal and integrity this Court requires," and the Eighth Circuit found this determination to be "well within [the district court's] discretion."  *Id.*

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

316.    Likewise, in *Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379 (N.D. Ill.

May 14, 2019), lead counsel in a class action improperly used confidential data to solicit opt-out

clients, creating an ethical conflict with his duties as class counsel by reducing the value of the

class's claims.  The Northern District of Illinois replaced the attorney as lead counsel, ordered

him to "destroy certain confidential data," apparently to ensure he did not misuse it further, and

ultimately reduced his fee allocation.  *Id.* at *12, *17.

317.    A remedy similar to those in *Baycol* and *Snyder* is appropriate here.  The

Kreindler & Kreindler attorneys currently serving in such roles should be removed.  Benett's and

Pounian's pending requests for appointment should be denied.  As an immediate consequence,

Kreindler & Kreindler attorneys and consultants or experts working at their direction will cease

to be Qualified Persons under the FBI Protective Order.  Kreindler & Kreindler and its attorneys

should also be denied access to MDL Protected Information because they have shown they

cannot be trusted to comply with the MDL Protective Order.  The Court should order that

Kreindler & Kreindler and Kreindler, Maloney, Benett, Pounian, and Fawcett personally shall no

longer receive any MDL Protected Information in this matter and may not retain any information

previously produced.  *See Snyder*, 2019 WL 2103379, at *11-12; *Grant Heilman Photography,*

*Inc. v. Pearson Educ., Inc.*, 2018 WL 2414984, at *4 (E.D. Pa. May 29, 2018) (requiring

destruction of confidential information as remedy for protective order violation).

318.    The Court can implement these measures without causing prejudice to Kreindler

& Kreindler's clients, who are not at fault, or to other MDL Plaintiffs.  It should direct Kreindler

& Kreindler to destroy or surrender to *other* members of the Plaintiffs' Executive Committees all

material subject to the FBI Protective Order or the MDL Protective Order and to certify

compliance to the Court.  The other PEC members – Motley Rice, Cozen O'Connor, and

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

Anderson Kill – are sophisticated firms equally well able to perform the work that Kreindler &
Kreindler has undertaken to date.  Similarly, outside experts and consultants (other than Fawcett)
should be permitted to sign new agreements with other PEC member firms and work under their
supervision in the future.  The recent extension of expert discovery will provide time for an
orderly transition of responsibilities.

319.     The Court should require certifications of full compliance with the above
directives from Kreindler & Kreindler through its current managing partner; by Kreindler,
Maloney, Benett, Pounian, and Fawcett; by Kreindler & Kreindler's outside counsel; and by
Fawcett's personal counsel.  Outside and personal counsel should be directed to conduct a
reasonable investigation to ensure Kreindler & Kreindler and Fawcett have fully complied with
the Court's orders and to describe such investigation in detail in their certifications.

### 2.     The Court should certify to Judge Daniels the facts that show civil and criminal contempt

320.     The facts before the Court show willful violations of its orders by Kreindler &
Kreindler through its attorneys and Fawcett, and by the attorneys and Fawcett personally, that
constitute contempt of court.  The facts also show aggravating circumstances including
destruction of evidence and knowingly false statements to the Court.  Fawcett, in particular, is
not subject to Rule 37 or inherent-power sanctions because he is neither a party nor an attorney.
He should not be allowed to escape with no consequences for his actions.  Accordingly, the
Court should consider whether contempt sanctions are an appropriate remedy here.

321.     Because the contempt was committed outside the Court's presence and may
warrant either civil or criminal remedies, a finding of contempt must be made by Judge Daniels
under 28 U.S.C. § 636(e)(6)(B)(i) or (ii).  The Court should certify the facts to Judge Daniels

under § 636(e)(6)(B), so that he may determine whether punishment of the contempt is warranted and which parties should face civil or criminal penalties.

### 3.    The Court should consider disciplinary and criminal referrals

322.    The Court should also consider the following bases for disciplinary or criminal referrals.  Although Saudi Arabia and Al Jarrah have been injured by the conduct set forth above and believe that conduct was done with a highly culpable mental state, counsel are mindful that Saudi Arabia and Al Jarrah do not have standing to seek disciplinary or criminal action as a remedy for their injuries.  The decision to refer is in the Court's sole discretion and involves prudential considerations beyond the mere likelihood of a violation.

323.    The facts before the Court would support referrals of Kreindler & Kreindler and its attorneys to the Committee on Grievances for investigation concerning the following potential violations of the New York Rules of Professional Conduct:

a.    whether Fawcett's willful violations of the protective orders would have violated Rule 3.4(c) (disregard of a tribunal's ruling) if engaged in by a lawyer;

b.    whether Fawcett's purposeful destruction of evidence would have violated Rule 3.4(a)(1) (knowing suppression of evidence) if engaged in by a lawyer;

c.    whether Kreindler & Kreindler, and Kreindler personally, violated Rule 5.3(a) by failing to supervise Fawcett reasonably;

d.    whether Kreindler is responsible under Rule 5.3(b) for Fawcett's actions as though they were his own, because he knew or should have known of Fawcett's actions at a time when their consequences could have been mitigated by disclosure to the Court, but failed to take such action;

e.    whether Kreindler's personal statements to Isikoff also disregarded this Court's rulings and so violated Rule 3.4(c);

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

   f.  whether Kreindler, Maloney, Benett, and Pounian violated Rule 3.3(a)(1) by making false statements of fact to a tribunal in the July 27 letter and the August 16 and September 27 declarations;

   g.  whether Benett and Pounian violated Rule 3.3(a)(3) and Rule 3.4(a)(4)-(5) by knowingly creating, using, and presenting to the Court false evidence in the form of the Hartney and Fawcett declarations;

   h.  whether Kreindler, Maloney, Benett, and Pounian violated Rule 3.4(a)(3) by knowingly concealing material facts they had a duty to disclose in the July 27 letter and the August 16 and September 27 declarations;

   i.  whether Benett and Pounian violated Rule 4.3 by communicating with Fawcett on September 27 and 30, believing him to be an unrepresented person, and gave him legal advice by editing and filing his declarations without disclosing that their interests and the interests of their clients no longer aligned with his own, thus causing him to incriminate himself and to waive his Fifth Amendment rights;

   j.  whether Kreindler & Kreindler, and Kreindler personally, violated Rule 5.1(a) and Rule 5.1(b)(2) by failing to make reasonable efforts to ensure that the firm's 9/11 litigation team complied with the Rules of Professional Conduct; and

   k.  whether Kreindler personally is responsible under Rule 5.1(d)(2) for the actions of Maloney, Benett, and Pounian as though they were his own, because he had supervisory authority over them and failed to exercise it reasonably.

324. In addition to the potential certification of a criminal contempt set forth above, the facts before the Court would warrant a criminal referral for investigation concerning whether Kreindler & Kreindler, any of its attorneys, or Fawcett committed the offenses of perjury, in

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

violation of 18 U.S.C. § 1621; subornation of perjury under 18 U.S.C. § 1622; use of a false

declaration under 18 U.S.C. § 1623; and destruction or concealment of a record or other object to

impair its availability for use in an official proceeding under 18 U.S.C. § 1512(c).

### 4.      The Court should award attorneys' fees

325.      Rule 37(b) of the Federal Rules of Civil Procedure provides that this Court "must

order the disobedient party, the attorney advising that party, or both to pay the reasonable

expenses, including attorney's fees, caused by the failure" to obey a discovery order, "unless the

failure was substantially justified or other circumstances make an award of expenses unjust."

Fed. R. Civ. P. 37(b)(2)(C).  As set forth above, a monetary remedy is not sufficient to serve the

purposes of sanctions here.  Nevertheless, it cannot be said that Kreindler & Kreindler's conduct

was substantially justified or that an award of expenses would be unjust.  Accordingly, Kreindler

& Kreindler and its attorneys should be directed jointly and severally to pay Saudi Arabia's

reasonable attorneys' fees and expenses for bringing its motion to enforce the protective orders

and all related proceedings, up to and including the present briefing.  Alternatively, the Court

should issue such an order pursuant to its inherent powers.

### 5.      The Court should draw an adverse inference from destruction of evidence

326.      The Court should also impose sanctions under Rule 37(e)(2) against Kreindler &

Kreindler, for Fawcett's purposeful destruction of evidence in anticipation that the Court would

order it produced and for Kreindler & Kreindler's attorneys' failure to take steps to preserve

evidence in Fawcett's possession at a time when it could have been preserved.  Although the

record without a Rule 37(e)(2) inference amply supports findings that Fawcett and Kreindler &

Kreindler acted willfully and in bad faith, the Court can and should confirm those findings with

an additional inference of willfulness and bad faith based on Fawcett's acts.

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

Dated:  November 24, 2021             Respectfully submitted,

                                    /s/ *Michael K. Kellogg*

Michael K. Kellogg

Mark C. Hansen

Gregory G. Rapawy

Andrew C. Shen

KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.

Sumner Square

1615 M Street, N.W., Suite 400

Washington, D.C. 20036-3209

(202) 326-7900

(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*