## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                        )     No. 03 MDL 1570 (GBD/SN)
                        )
In re Terrorist Attacks on September 11, 2001 )    ECF Case
                        )
                        )    **ORAL ARGUMENT REQUESTED**
                        )
                        )
                        )
                        )
---------------------------------------------------- x

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DUBAI ISLAMIC BANK'S
## MOTION FOR SUMMARY JUDGMENT
## AND RENEWED MOTION FOR DISMISSAL
## <u>(LIMITED TO PERSONAL JURISDICTION)</u>

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**...............................................................................................................  1

**BACKGROUND** ................................................................................................................  3

      A.    Dubai Islamic Bank ......................................................................................  3

      B.    This Litigation And The Initial Ruling On Personal Jurisdiction In 2010 ...........  3

      C.    Discovery Developed No Support For Plaintiffs' Allegations ............................  5

      D.    Plaintiffs' Admissions Indicate The Absence Of Support For Personal
          Jurisdiction ..................................................................................................  8

**ARGUMENT** ....................................................................................................................  10

I.     The Undisputed Facts Demonstrate That This Court Lacks Specific Jurisdiction
      As A Constitutional Matter Because DIB Did Not *Purposefully Direct* Its Foreign
      Conduct At The United States ...........................................................................  12

      A.    Discovery Provided No Support For Plaintiffs' Purposeful-Direction
          Allegations On Which The Court Relied At The Pleadings Stage ......................  12

      B.    Discovery Has Further Shown No Other Basis To Find That DIB
          Purposefully Directed Its Conduct At The United States ..................................  19

II.    This Court Lacks Specific Jurisdiction Over DIB As A Constitutional Matter
      Because DIB Has No US-Linked Conduct *Related To* Plaintiffs' Claims .....................  23

III.   Exercising Specific Jurisdiction Over DIB Would Be *Unreasonable* As A
      Constitutional Matter ......................................................................................  24

IV.   This Court Lacks Specific Jurisdiction As A *Statutory* Matter .......................................  24

**CONCLUSION** .................................................................................................................  25

**TABLE OF EXHIBITS**

| Exhibit 1 | Decl. of Mohamed Saeed Al Sharif, with Decl. Exs. A & B |
|---|---|
| Exhibit 2 | Certified English translation of Arabic text in Decl. Ex. A to Ex. 1 |
| Exhibit 3 | Certified English translation of Arabic text in Decl. Ex. B to Ex. 1 |
| Exhibit 4 | Decl. of Haroun Dharsey |
| Exhibit 5 | Dep. Tr. of Dr. Hussein Hamid Hassan (excerpts) |
| Exhibit 6 | Dep. Tr. of Judge Alan Fine (excerpts) |
| Exhibit 7 | Dep. Exs. 271 (excerpts), 272, & 276 to Ex. 6 |
| Exhibit 8 | Decl. of Abdulrahman Mohamed Al Ansari, with Decl. Exs. A, B, & C |
| Exhibit 9 | Certified English translation of Arabic text in Decl. Ex. A to Ex. 8 |
| Exhibit 10 | Certified English translation of Arabic text in Decl. Ex. B to Ex. 8 |
| Exhibit 11 | Certified English translation of Arabic text in Decl. Ex. C to Ex. 8 |
| Exhibit 12a | Decl. of Amr Abou El Maaty, with Decl. Ex. A (part 1) |
| Exhibit 12b | Decl. Ex. A (part 2) to Ex. 12a |
| Exhibit 13 | Certified English translation of Arabic text in Decl. Ex. A to Exs. 12a and 12b |
| Exhibit 14a | Decl. of Bader Ibrahim Abdullah Al Maazmi |
| Exhibit 14b | Decl. Ex. A to Ex. 14a |
| Exhibit 14c | Decl. Ex. B to Ex. 14a |
| Exhibit 14d | Decl. Ex. C to Ex. 14a |
| Exhibit 15 | Certified English translation of Arabic text in Decl. Ex. A to Ex. 14a |
| Exhibit 16 | Certified English translation of Decl. Ex. B to Ex. 14a |
| Exhibit 17 | Certified English translation of Decl. Ex. C to Ex. 14a |

| Exhibit 18 | Certified English translation of Fayez Rashid Ahmed Hassan Al-Qadi's account statements |
|---|---|
| Exhibit 19 | Pls.' Resps. & Objs. to Def. Dubai Islamic Bank's First Set of Reqs. for Admis. (Mar. 23, 2020) |
| Exhibit 20 | Pls.' Suppl. Resps. to Def. Dubai Islamic Bank's Second Set of Reqs. for Admis. (May 27, 2021) (excerpts) |
| Exhibit 21 | Pls.' Resps. & Objs. to Def. Dubai Islamic Bank's Third Set of Reqs. for Admis. (Aug. 5, 2021) (excerpts) |

# TABLE OF AUTHORITIES

**Page**

CASES

*Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*,
  2021 WL 3604517 (S.D.N.Y. Aug. 13, 2021)........................................................25

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  137 S. Ct. 1773 (2017)............................................................................................24

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)................................................................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)................................................................................11, 12

*Chrysler Cap. Corp. v. Century Power Corp.*,
  778 F. Supp. 1260 (S.D.N.Y. 1991).......................................................................25

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013)................................................................................11, 25

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021)..........................................................................10, 11, 23, 24

*In re Terrorist Attacks on Sept. 11, 2001*,
  295 F. Supp. 3d 416 (S.D.N.Y. 2018)...............................................................15, 22

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008)................................................................................21, 22

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)............................................................................ *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
  718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010)................................................... *passim*

*Katz v. Goodyear Tire & Rubber Co.*,
  737 F.2d 238 (2d Cir. 1984)...................................................................................25

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999)................................................................................................10

*Walden v. Fiore*,
    571 U.S. 277 (2014)............................................................................................ *passim*

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)...........................................................................22, 25

**STATUTES**

N.Y. CPLR 302....................................................................................................25

**RULES**

Fed. R. Civ. P. 4.............................................................................................10, 25

Fed. R. Civ. P. 12……..................................................................................11

Fed. R. Civ. P. 56............................................................................................11

CONFIDENTIAL & PRIVILEGED DRAFT

## INTRODUCTION

Consistent with this Court's scheduling order (MDL ECF 7160), Defendant Dubai Islamic Bank ("DIB" or "the Bank") seeks summary judgment under Federal Rule of Civil Procedure 56 (or, alternatively, dismissal on a renewed Rule 12 motion) on the ground that this Court lacks personal jurisdiction over DIB in these cases.

DIB is a leading Middle East financial institution and one of the largest banks in the United Arab Emirates ("UAE").  But DIB has no presence in the United States and had no presence there on September 11, 2001 ("9/11").  Nevertheless, this Court denied DIB's motion to dismiss for lack of personal jurisdiction based upon the allegations in Plaintiffs' complaints.  The Court inferred from those allegations that DIB had purposefully directed its activities at the United States and that Plaintiffs' injuries from 9/11 were related to those activities.  The Court emphasized Plaintiffs' allegations that DIB intentionally provided improper banking services "directly to Osama bin Laden and al Qaeda" and was "directly involved in helping to fund" 9/11.  718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010) (ECF 2252).  In particular, the Court inferred from the allegations that (i) DIB had a relationship with Osama bin Laden and laundered money for him, despite government warnings; and (ii) bin Laden's Chief Financial Officer had a DIB account that he used to transfer funds to 9/11 hijackers in the United States.

After eleven years of discovery, those allegations have been proven false.  Bin Laden had *no* relationship with DIB, and neither his CFO nor anyone else used *any* DIB account to transfer funds to any hijacker in the United States.  Indeed, after a 1999 press report suggested a relationship between DIB and bin Laden, DIB immediately investigated and could find no relationship with bin Laden.  As part of that effort, DIB immediately instructed its attorneys in the US and its counsel immediately contacted the US State Department to seek additional information to investigate, and to offer DIB's full and immediate cooperation.  In response, however, the US

government never provided any names or account numbers, or otherwise requested any additional cooperation from DIB.

In short, no facts support either the conduct or specific intent required for personal jurisdiction. During extensive discovery, including the searching of DIB's database of its hundreds of thousands of customers, the parties identified ten accountholders at DIB dating back to 1992 who might have had links or potential links to al Qaeda. But, those ten customers did not use their DIB accounts to fund the 9/11 attacks or other terrorist attacks, and DIB never knew at the time that those customers had any actual or alleged al Qaeda connections. In responses to requests for admission served after the close of document and deposition discovery, Plaintiffs admitted the key points showing a lack of personal jurisdiction over DIB:

- No funding. Plaintiffs "admit that they are not in possession of evidence" that any of the accountholders used DIB accounts to fund "the 9/11 operation" or even for "funding Al Qaeda" more generally. *See* Ex. 20, Nos. 1–20.

- No knowledge. Plaintiffs admit that after discovery they have "insufficient" information to "admit or deny that there is no evidence that DIB had any knowledge or awareness, prior to the September 11 Attacks, of any involvement in Al Qaeda by its customer[s]" or that any DIB accounts were used "by Al Qaeda" or "for Al Qaeda's purposes." *See* Ex. 21, Nos. 1–20.

- No Designation. Plaintiffs "do not contend that, prior to September 11, 2001," any of DIB's accountholders "was designated by that name as the subject of sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council." *See* Ex. 19.

DIB never sought to promote terrorism, DIB never sought to assist an attack in the United States, and no DIB customer accounts had any connection to the 9/11 attacks. As a result, the requisite conduct and intent for personal jurisdiction is lacking.

The 9/11 attacks were tragic, and the victims deserve justice. After nearly two decades, however, the facts make plain that DIB had nothing to do with 9/11, and Plaintiffs have failed to carry their burden to establish personal jurisdiction over it. Accordingly, DIB should be dismissed.

## BACKGROUND

### A.    Dubai Islamic Bank

DIB is a publicly traded banking company organized under UAE law and was 30% owned by the Dubai government after 1998.  Ex. 1 ¶12, 17.  Founded in 1975, it is one of the oldest continuously functioning Islamic banks in the world.  Ex. 5.  Islamic banks offer traditional banking services but use methods that comply with Islamic principles, such as the prohibition on paying or receiving interest and the values of fairness and transparency in business dealings.  *Id.*

DIB's headquarters and principal place of business have always been in Dubai, UAE.  Ex. 1 ¶12.  The corporate entity DIB has always conducted all its business from Dubai or its other Middle Eastern offices.  *Id.* ¶13.  DIB has never been qualified to do business in the United States or sought such qualification.  *Id.* ¶14.  It has never had offices or affiliates in the United States; it has never provided services in the United States; and, apart from holding correspondent banking accounts, neither DIB nor any of its subsidiaries and affiliates have conducted any banking business there.  *Id.* ¶14–16.  During the years 1999 to 2001, DIB had over 200,000 different customers and over 300,000 customer accounts, completing seven to ten million transactions per year.  Ex. 4 ¶10–12.

### B.    This Litigation And The Initial Ruling On Personal Jurisdiction In 2010

In 2003, the Judicial Panel on Multidistrict Litigation consolidated in this district lawsuits regarding the 9/11 attacks.  ECF 1.[1]  Six active cases remain against DIB.  Plaintiffs claim that DIB is liable under federal and common-law theories, because it allegedly provided financial services to al Qaeda in connection with the 9/11 attacks.  In 2005, DIB moved to dismiss for lack of personal jurisdiction, among other grounds.  ECF 954-2 (DIB Br.).

---

[1] ECF citations are of the MDL docket unless otherwise indicated.

In 2010, and before discovery, the Court determined that Plaintiffs' allegations sufficed for a *prima facie* showing of specific jurisdiction. 718 F. Supp. 2d 456, 489–90 (S.D.N.Y. 2010) ("*9/11 IV*") (ECF 2252), *rev'd in part on other grounds*, 714 F.3d 659 (2d Cir. 2013) ("*9/11 VII*"). Taking the complaint allegations as true, the Court concluded that DIB "allegedly purposely directed its activity at the United States and its residents" and thus had "the requisite minimal contacts for specific jurisdiction"; that "plaintiffs' claimed injuries are related to DIB's alleged tortious conduct"; and that exercising jurisdiction was reasonable, especially in light of DIB's alleged purposeful direction. *Id.* at 489–90. In reaching its conclusion, the Court surveyed four sets of allegations:

> **[1.]** Plaintiffs allege that, in 1999, the United States government announced that DIB was laundering money for Osama bin Laden. United States intelligence officials had allegedly obtained evidence that Osama bin Laden had a financial relationship with DIB, which was believed to have been arranged with the approval of the officials who control the bank. Plaintiffs further allege that, in 1999, United States officials visited the United Arab Emirates to put a halt to such a relationship by demanding the government end its purported lax supervision of the bank. **[2.]** DIB allegedly continued to knowingly provide financial and other forms of material aid to Osama bin Laden and al Qaeda, while disregarding the warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks through anti-terrorist and money laundering safeguards, and "know your customer" regulations.
>
> **[3.]** Plaintiffs claim that, in addition to bin Laden being allowed to funnel money through the bank, al Qaeda operatives used their bank accounts at DIB to send money to suspect charities. **[4.]** Plaintiffs further allege that DIB itself provided direct financial services and support for the attacks against the United States on 9/11. Specifically, plaintiffs allege that the bank account of Osama bin Laden's Chief Financial Officer[, Mustafa Ahmed al-Hisawi,] was the source of thousands of dollars of money transfers from DIB to two of the hijackers. The sole purpose of those fund transfers was allegedly to pay for the hijacker's training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks.

*Id*. at 488–89 (numbering added); *see* ECF 1064 at 4 (Pls.' Opp., identifying bin Laden's CFO as Hisawi). The Court particularly relied on the first, second, and fourth sets of allegations. *See* 718 F. Supp. 2d at 488–89 & n.13; *cf. id.* at 492–93.

### C.     Discovery Developed No Support For Plaintiffs' Allegations

Following the Court's 2010 motion to dismiss ruling, more than a decade of discovery ensued.  The now-developed factual record reveals that each of the *four sets* of allegations relied upon by the Court (detailed above) found *no factual support* after discovery:

**1.  *There have been no DIB accounts or transfers for bin Laden.***  The only basis for suspecting there may have been accounts for bin Laden was a July 1999 New York Times newspaper story.  DIB thoroughly and immediately investigated that claim at the time.  Ex. 1 ¶18–23; Ex. 6.  As part of the investigation, DIB—through its then-US counsel Alan Fine—contacted the US government to seek information and offer its cooperation.  Ex. 1 ¶19; Ex. 6.  After discovering no links with bin Laden, DIB then sought a retraction of the story.  Ex. 6; Ex. 1 ¶22–26.

Indeed, there is also no evidence that US officials, on account of a "financial relationship" between DIB and bin Laden, visited the UAE in 1999 to urge the government to end "lax supervision" of DIB.  *9/11 IV*, 718 F. Supp. 2d at 488–89.  A then-employee of the UAE Central Bank (now of DIB), which regulates UAE banks, who in his role should have learned of any such US or UAE concerns, has explained that he is "not aware of any meetings between the US government and the UAE Central Bank or other parts of the UAE government concerning terrorist financing concerns at DIB."  Ex. 1 ¶4–5, 9–10.  He also, while working there, "was never aware of any concerns of any alleged involvement by DIB in terrorist financing or money laundering."  *Id.* ¶11.  And in discovery, DIB searched its records for evidence of any US-UAE meeting in or around July 1999 concerning bin Laden, but none of the resulting documents indicates any such meeting about DIB.  Plaintiffs produced no admissible evidence to the contrary.

**2.  *DIB never continued any relationship with bin Laden and acted diligently.***  Whether before or after the July 1999 newspaper article, DIB never had an account or conducted

transactions for bin Laden. Ex. 1 ¶¶22–23, 40; Ex. 6. At all times, the Bank acted diligently. Before 9/11, the UAE Central Bank never cited or sanctioned DIB due to terrorist-financing or money-laundering concerns. Ex. 1 ¶30. DIB always used its best efforts to comply with the Central Bank's rules and directions. Ex. 12a ¶29; Ex. 14a ¶¶13, 18–19. And there is no evidence DIB's practices were inconsistent with applicable law or industry standards. *See* Ex. 12a ¶¶9–26. In particular, "[a]n account could not be opened for any person who was on the UAE Central Bank's Black List, other sanctions list distributed to DIB's branches, or DIB's own internal black list." *Id.* ¶19; *see id.* ¶26. Then, as now, DIB "would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity." *Id.* ¶28; *see* Ex. 1 ¶36; Ex. 8 ¶22; Ex.14a ¶32.

Indeed, the uncontroverted evidence shows that the Dubai government and UAE Central Bank "closely supervised" DIB in 1998 and 1999, after discovery of a $200 million fraud against DIB—a fraud that was unrelated to al Qaeda or terrorism. Ex. 6; Ex. 1 ¶¶17, 19. In response, the Dubai government increased its ownership share of DIB, approved the hiring of an investigator to investigate the fraud, and installed "completely" new management. Ex. 1 ¶17; Ex. 8 ¶25; Ex. 6. In further response, the Central Bank audited DIB daily for months, and DIB hired outside auditors to diagnose how to prevent future frauds. Ex. 6. DIB sued the fraudster, a Mali-based man external to DIB, and the US government investigated and indicted him for other crimes. *Id.*

Moreover, there is no evidence that DIB ever sought to promote terrorism. Senior DIB employees, including four whose employment began prior to 9/11, have explained that they have never been aware of any facts (i) suggesting that DIB intended to aid a terrorist attack, (ii) indicating that the Bank supported al Qaeda; or (iii) that "DIB ever knowingly provided

financial services to a customer with links to al Qaeda."[2]  The late 23-year chairman of the DIB board that reviews bank products for consistency with Islamic law also confirmed that no one ever told him DIB "wanted to promote terrorism" or "should help terrorists."  Ex. 5; *see also id.* (stating that 9/11 was "[t]he most criminal act").

**3.  _No DIB accounts were used to funnel money to "suspect charities" to promote terrorism._**  This Court mentioned charity-related allegations at the pleadings stage, though its reliance, if any, seemed limited.  *9/11 IV*, 718 F. Supp. 2d at 489.  In any event, discovery has offered no support for the suggestion that DIB accounts were used to promote terrorism (much less an attack in the United States) via charities, or that DIB knew at the time of any link between its customers (including the single customer that was a charity) and al Qaeda.  In fact, as explained below, Plaintiffs have admitted they lack any evidence that *any* DIB accounts identified in discovery funded 9/11 or al Qaeda.  Ex. 20, Nos. 1–20; *see infra* at 14–15.

**4.  _DIB never provided financial services or other support for the attacks against the United States on 9/11_.**  As this Court noted at the motion to dismiss stage, plaintiffs alleged that "bin Laden's Chief Financial Officer [Mustafa Ahmed al-Hisawi] was the source of thousands of dollars of money transfers from DIB to two of the hijackers" to "pay for the hijacker's training, including flight lessons, and other expenses."  718 F. Supp. 2d at 489.  Discovery again put the lie to this allegation: ***Hisawi never even had an account*** at DIB.  *E.g.*, Ex. 4 ¶14.

Further, Plaintiffs engaged in extensive discovery beyond the allegations that formed the basis of this Court's 2010 decision.  DIB responded to broad discovery requests and additionally conducted searches of its electronic account database for 629 names of potential accountholders.

---

[2] Ex. 8 ¶ 9, 21 (Sr. V.P. of General Banking Ops., 39-year DIB employee); Ex. 12a ¶ 27, 32 (Ass't V.P. and Head of Branches Support, 22-year DIB employee); Ex. 1 ¶ 32–33, 35 (Chief of Int'l Business and Real Estate Investments, 22-year DIB employee); Ex. 10a ¶ 30–31 (Manager of Legal Dept's Central Bank and Gov. Bodies Report Unit, 20-year DIB employee); Ex. 4 ¶ 7 (Head of I.T., 16-year DIB employee).

Discovery yielded ten DIB accountholders of potential interest. *See* Ex. 19 (listing accountholders). Two of these ten were apparently involved in 9/11: Ali Abdul Aziz Ali, a facilitator of the 9/11 plot; and Fayez Rashid Ahmed Hassan al-Qadi, a muscle hijacker. But their accounts had no connection to 9/11. But account statements confirm that Aziz Ali ***never withdrew any funds*** from his DIB account during the period when he was facilitating the hijackers' preparations—his first withdrawal was on the day before 9/11, after his assistance to the hijackers was complete. *See* Ex. 15 at 3457t–3458t; Ex. 20, No. 1. And al-Qadi ***ceased using*** his DIB account the year before 9/11 and there is no evidence it was used to promote the 9/11 attacks. *See, e.g.*, Ex. 18. In any event, there is no evidence that DIB knew at the time that these customers had any connection to al Qaeda or terrorism. Ex. 20, Nos. 1–20.

### D.   Plaintiffs' Admissions Indicate The Absence Of Support For Personal Jurisdiction

Document discovery was devastating to Plaintiffs' allegations and theory of the case: it showed no support of the allegations regarding bin Laden and his CFO. Indeed, following document discovery, Plaintiffs initiated ***only one deposition*** in their cases against DIB—that of Miami attorney (now Florida state court judge) Alan Fine. Judge Fine helped investigate the 1999 press article and contacted the US government to offer DIB's cooperation.[3] Ex. 6. After fact discovery closed, Plaintiffs themselves conceded the state of the record as to all ten accountholders (including Aziz Ali and al-Qadi) as follows:

***No Use of Funds from DIB Accounts for 9/11.*** As to hijacker al-Qadi, Plaintiffs "admit that they are not in possession of evidence tracing the use of specific funds from [his] account at DIB to particular operational expenditures he incurred in carrying out the 9/11 operation." Ex. 20,

---

[3] The Parties also deposed Dr. Hussein Hamid Hassan, but DIB initiated that deposition in 2017 to preserve his testimony in the face of health challenges. *See* ECF 3524.

No. 2.  As to facilitator Aziz Ali, Plaintiffs went even further, "admit[ting] that they are not in possession of evidence that money was withdrawn from [his] DIB account to support the 9/11 hijackers or other 9/11 plot principles [sic] in carrying out the 9/11 operation nor evidence that Ali withdrew funds prior to the 9/11 attacks in support of his own activities," only withdrawing funds the day before 9/11 for his private use.  *Id.*, No. 1.  And as to the remaining eight accountholders, "[P]laintiffs admit that they are not in possession of evidence tracing the use of specific funds from [their account(s)] at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation."  *Id.*, Nos. 3–10.

*No Use of Funds from DIB Accounts for Al Qaeda.*  Beyond 9/11 in particular, Plaintiffs also "admit that they are not in possession of evidence tracing the use of specific funds from [the ten accountholders' account(s)] at DIB to funding Al Qaeda through specific transactions."  *Id.*, Nos. 12–20; *see id.*, No. 11 (as to facilitator Aziz Ali, phrasing alternatively as lacking "evidence tracing the specific use of [his] account at DIB to for [sic] funding Al Qaeda through specific transactions," his fund withdrawals on September 10, 2001 notwithstanding).

*No DIB Awareness of Any Connections Between Accounts or Accountholders and Al Qaeda.*  Plaintiffs further admitted that "the information known or available to Plaintiffs is insufficient to enable Plaintiffs to admit or deny that there is no evidence that DIB had any knowledge or awareness, prior to the September 11 Attacks, of any use of [the ten accountholders' DIB account(s)] by Al Qaeda of [sic] for Al Qaeda's purposes."  Ex. 21, Nos. 11–20.  Similarly, "the information known or available to Plaintiffs is insufficient to enable Plaintiffs to admit or deny that there is no evidence that DIB had any knowledge or awareness, prior to the September 11 Attacks, of any involvement in Al Qaeda by [the accountholders]."  *Id.*, Nos. 1–10.

***No Designations of DIB Accountholders Before 9/11.*** "Plaintiffs admit that Plaintiffs do not contend that, prior to September 11, 2001, DIB's [ten accountholders were] designated by that name as the subject of sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council." Ex. 19, Nos. 1–10.

## ARGUMENT

On a now developed and closed factual record, this Court should recognize the utter failure of Plaintiffs' jurisdictional allegations and dismiss DIB for lack of personal jurisdiction.

The requirements for personal jurisdiction are a "bedrock[]" and "a matter of individual liberty." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999) (quotation marks omitted). Both a statutory basis and compliance with due process are necessary. *9/11 IV*, 718 F. Supp. 2d at 468–69; *see* FRCP 4(k). Due process makes a court's power over a defendant depend on "the nature and extent of the defendant's relationship to the forum," the touchstone being "treating defendants fairly." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021) (quotation marks omitted).

To satisfy that constitutional standard, the defendant's relationship with the forum (the "minimum contacts" inquiry) must meet one of two benchmarks. First, the defendant could be "essentially at home" there, by virtue of incorporation or principal place of business, and thus subject to general jurisdiction there. *Id.* at 1024 (quotation marks omitted). Second, for specific jurisdiction, which depends on whether a plaintiff's claims "arise out of or relate to the defendant's contacts with the forum," the Constitution requires that a foreign defendant's own, "suit-related conduct … create a substantial connection with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The defendant's contacts with the forum must be its "own choice," and not "random, isolated, or fortuitous." *Ford*, 141 S. Ct. at 1025 (quotation marks omitted). Where all this is so, the defendant "has clear notice of its exposure … to suits." *Id.* at 1027.

Under either jurisdictional basis, the constitutional requirements are keyed to "predictab[ility]"—rather than "surprising" defendants, they allow defendants to "structure [their] primary conduct to lessen or avoid exposure" to litigation in a forum. *Id.* at 1025, 1030 (quotation marks omitted). And it is the plaintiff's burden to establish, for each claim, that a defendant's relationship with the United States meets the constitutional threshold. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018).

Here, at the pleadings stage, Plaintiffs did not assert general jurisdiction over DIB, and any belated attempt would fail. 718 F. Supp. 2d at 478 & n.11; *see supra* at 3. As to specific jurisdiction, when this Court addressed DIB's motion to dismiss eleven years ago, Plaintiffs had to make only a *prima facie* showing, via mere allegations, because no discovery had occurred. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013).

But now, with discovery concluded, Plaintiffs' "showing must be factually supported." *Id.* DIB accordingly brings this "Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction." *Id.* at 85 (quotation marks omitted); *see* FRCP 56(a). Those material, undisputed facts resoundingly foreclose any conclusion that DIB directed its activities at the United States such that this Court may "fairly" assert authority over DIB. *Ford*, 141 S. Ct. at 1029. Plaintiffs have failed, on four distinct grounds discussed below, to carry their burden of establishing personal jurisdiction.[4]

---

[4] The undisputed facts show the absence of jurisdiction and thus summary judgment is appropriate, but the Court could in the alternative dismiss claims against DIB on a renewed motion to dismiss under FRCP 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). Plaintiffs' "showing must be factually supported" in either posture. *Id.* DIB maintains its request for an evidentiary hearing under either alternative in the event that the Court believes one is necessary. *See infra* at 25.

I.  **The Undisputed Facts Demonstrate That This Court Lacks Specific Jurisdiction As A Constitutional Matter Because DIB Did Not *Purposefully Direct* Its Foreign Conduct At The United States**

Specific personal jurisdiction fails, first, because there is no evidence that DIB purposefully directed its conduct at the United States.  Each allegation on which this Court relied has failed to find support, and the evidence actually shows the lack of purposeful direction.

In this MDL, the Second Circuit has explained that the defendant must have "purposefully directed [its] activities" at forum residents or, "[p]ut another way, … took intentional, and allegedly tortious, actions … expressly aimed at the forum."  *9/11 VII*, 714 F.3d at 674 (quotation marks omitted); *see Schwab*, 883 F.3d at 87 (explaining that this theory of jurisdiction "is typically invoked" in cases concerning exclusively foreign conduct with in-forum effects).  The "fair warning requirement is satisfied" by such intentional conduct, provided the plaintiff's injuries are sufficiently related to it.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (quotation marks omitted); *see id.* at 474 ("foreseeability of" defendant's causing harm in forum insufficient).  Thus, purposeful direction requires Plaintiffs to show allegedly *tortious conduct*, sufficiently *related* to the injuries at issue, and done *intentionally*.  *See* Order, ECF 7378, at 4, 6 ("specific intent to target the United States" is "crucial" to express aiming).  That Plaintiffs cannot do, on the undisputed facts.

A.  **Discovery Provided No Support For Plaintiffs' Purposeful-Direction Allegations On Which The Court Relied At The Pleadings Stage**

In the opinion denying DIB's motion to dismiss, this Court concluded that, if conduct were "*intended* to *directly* aid in the commission of a terrorist act, with *knowledge* that the brunt of the injuries will be felt in the United States," it would satisfy the purposeful-direction standard.  *9/11 IV*, 718 F. Supp. 2d at 480 (emphases added).  And in finding that Plaintiffs' allegations met that threshold, the Court "inferred, from the allegations pled," that DIB was *not* "a *passive* conduit

through which monies were *indirectly* channeled to and from al Qaeda." *Id.* at 489 (emphases added).  There were two key parts to that conclusion.

*First*, some of the allegations (Items 1 & 4, *supra* at 4) indicated to the Court that DIB's financial services "allowed for ***direct*** *funding of terrorist attacks*"—DIB allegedly "provide[d] banking and other financial services *directly* to Osama bin Laden and al Qaeda," and so "became *directly* involved in helping to fund the execution of the terrorist attacks of 9/11, carrying out financial services and transactions to aid the hijackers in preparing for those attacks." *Id.* (emphases added); *see id.* at 488 ("direct sponsorship of al Qaeda").  On this basis, this Court distinguished DIB from the 37 other defendants it did dismiss for lack of personal jurisdiction, noting that DIB's "alleged wrongdoing … has a direct relationship to" 9/11. *Id.* at 488 n.13.

*Second*, the Court inferred from some of the allegations (Item 2, *supra* at 4) that, far from being passive, DIB "***intentionally***" did the same "*in aid of al Qaeda's plan*" to attack the United States, because DIB continued to perform those services for bin Laden and al Qaeda even after it allegedly knew of the US government's concern, and even though those services violated "accepted international banking standards adopted to prevent the illicit movement of funds to terrorists." *Id.* at 489 (emphases added).

On the undisputed facts, not one of Plaintiffs' allegations that led the Court to reach those direct-support and specific-intent conclusions is true.

1. ***DIB Did Not Provide Banking Services To Osama bin Laden or his CFO And DIB Was Not Involved In The 9/11 Attacks***

The Court previously relied on Plaintiffs' allegations that DIB laundered money directly for bin Laden, who purportedly had a financial relationship with DIB.  But he did not: Plaintiffs have identified no evidence bin Laden had any relationship with DIB.  The Bank repeatedly searched its records for transfers and accounts in bin Laden's name (including spelling variations)

and found none.  Ex. 1 ¶¶22–23, 40; Ex. 6.  In short, there is no evidence that bin Laden was "allowed to funnel money through the bank."  *9/11 IV*, 718 F. Supp. 2d at 489.

This Court also previously relied on the allegation that bin Laden's CFO (Hisawi) made transfers from his DIB account to two hijackers—"transactions" that Plaintiffs told the Court "violat[ed] … international standards adopted to prevent money laundering."  ECF 1064 at 4. Indeed, it was on this basis that Plaintiffs said, in opposing DIB's motion to dismiss, that "DIB was directly involved in financing the September 11 attacks."  *Id.*  But Hisawi too never banked with DIB, and there is no evidence that he did.  DIB has searched its records for accounts in Hisawi's name—using seventeen variations that Plaintiffs provided—and found no accounts for him.  Ex. 4 ¶14.

Likewise, as to every person identified in discovery who was or may have been involved in al Qaeda and *did* have an account at DIB, Plaintiffs admit that they have no evidence of any transactions connecting funds from any of those accounts to either 9/11 in particular or al Qaeda in general.  Ex. 20, Nos. 1–20.  While 9/11 facilitator Aziz Ali was supporting the hijackers, he never transferred or withdrew any funds from his DIB account.  Ex. 15 at 3457t–3458t (account statements); Ex. 20, No. 1.  And hijacker al-Qadi stopped using his low-value DIB bank account over a year before 9/11.  Ex. 18 (account statements).  There is no evidence that these two customers used their DIB accounts to fund al Qaeda, let alone the 9/11 attacks.  Discovery also has dispensed with the vague allegation that "al Qaeda operatives used their bank accounts at DIB to send money to suspect charities."  *9/11 IV*, 718 F. Supp. 2d at 489; *see also 9/11 VII*, 714 F.3d at 676.  Only one charity (defendant IIRO) was among DIB's ten accountholders, and Plaintiffs have admitted there is no evidence that its account (or those of the other ten accountholders) funded 9/11 or al Qaeda.  Ex. 20, Nos. 8, 18.

The "random, fortuitous, or attenuated contacts [a defendant] makes by interacting with other persons affiliated with the [forum]"—such as a "relationship with a … third party"—are not enough for jurisdiction. *Walden*, 571 U.S. at 286 (quotation marks omitted). That an accountholder became a terrorist who attacked the United States is just so. Such a third person's "unilateral activity" is a categorically insufficient link for purposeful direction. *Id.* at 285–86, 291; *9/11 VII*, 714 F.3d at 676 ("[W]e decline to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could" result in jurisdiction under the circumstances (quoting *In re Terrorist Attacks*, 538 F.3d 71, 96 (2d Cir. 2008) ("*9/11 III*"), *abrogated in part on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010) ellipsis omitted). As this Court has recognized since *Walden*, the key issue is DIB's "own conduct" and whether it amounts to purposeful direction or express aiming. *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 426–27 (S.D.N.Y. 2018), *rev'd on other grounds sub nom. Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019). And here there is not even evidence of such indirect support—no DIB accountholders used their accounts to fund 9/11 or al Qaeda. Even before *Walden*, it was critical to this Court that, unlike the defendants it dismissed for lack of personal jurisdiction, "DIB *itself* provided *direct* financial services and support" for 9/11—so Plaintiffs alleged. *9/11 IV*, 718 F. Supp. 2d at 489. A decade later, the evidence shows that Plaintiffs' allegations were completely untrue.

### 2. *DIB Had No Specific Intent To Assist Al Qaeda's Attack On The United States*

The foundational allegation for this Court's *prima facie* finding of DIB's purported intention to assist an attack on the United States. In support, Plaintiffs alleged that US officials visited the UAE in 1999 (in or before July) to halt DIB's alleged "financial relationship" with bin Laden and end lax supervision of DIB, yet DIB defied these "warnings" by continuing to intentionally assist al Qaeda's 9/11 plot. *9/11 IV*, 718 F. Supp. 2d at 488–89. Not only is there

no evidence of a financial relationship with bin Laden, as shown above, but there is also no evidence of any intent by DIB to assist any act of terrorism.  On the contrary, the evidence manifests the Bank's revulsion for terrorist financing and eagerness to cooperate with both the US and its own governments.

*First*, all of the witnesses who work at or with the bank have explained that DIB never supported terrorism.  Senior DIB employees whose employment predates 9/11 all have explained that no information suggests that DIB "knowingly provided financial services to a customer with links to al Qaeda," and all believe DIB then and now would terminate any such relationship it learned of, and notify the authorities. Ex. 8 ¶21–22; Ex. 14a ¶27–28; Ex. 1 ¶35–36; Ex. 12a ¶31–32.  The witnesses have also explained that DIB never intended to aid a terrorist attack and never supported al Qaeda.  Ex. 8 ¶9, 21; Ex. 14a ¶27, 32; Ex. 1 ¶32–33, 35; Ex. 12a ¶30–31; Ex. 4 ¶7; *see also* Ex. 4.

*Second*, there is no support for the allegation that US officials visited the UAE to discuss "lax supervision" of DIB.  The individual who, to August 1999, was the UAE Central Bank official "responsible for overseeing all examiners who inspected banks"—who thus "should have been alerted about any US or UAE government concerns about money laundering or terrorist financing at banks operating in the UAE"—has declared that he is "not aware of *any* meetings between the US government and the UAE Central Bank or other parts of the UAE government concerning terrorist financing concerns at DIB." Ex. 1 ¶4–5, 9–10 (emphasis added).  Nor, while at the Central Bank, was he *ever* "aware of any concerns of any alleged involvement by DIB in terrorist financing or money laundering."  *Id.* ¶11.

*Third*, the Dubai government and UAE Central Bank were actually "closely supervis[ing]" DIB in 1998 and 1999, after a fraud against it came to light.  *Id.* ¶17, 19; Ex. 6.  There was a period

Case 1:03-md-01570-GBD-SN   Document 7420   Filed 12/03/21   Page 23 of 32

in which DIB "had been, in effect, intervened in, and the government was calling the shots."  Ex. 6.  The Dubai government increased its ownership share in DIB to 30% and installed "completely" new management "to oversee DIB's operations."  Ex. 1 ¶17; Ex. 8 ¶25.  The Central Bank audited DIB daily for months, and DIB employed outside auditors to diagnose what needed to be changed to prevent future frauds.  Ex. 6.  Neither from the Central Bank's daily oversight nor otherwise did DIB receive any sanction or citation related to money laundering or terrorism financing.  Ex. 1 ¶30; *cf.* Ex. 6 (the fraud against the Bank did not have "anything to do whatsoever with terrorism").

*Fourth*, when the report about US officials' purported concerns regarding DIB appeared in a July 1999 newspaper story, DIB "took them seriously and conducted an investigation to ensure that the bank was not assisting Osama bin Laden in any way."  Ex. 1 ¶19–23.  The Bank swiftly searched its records for bin Laden accounts and found no evidence of any relationship with him. *Id.* ¶22–23; Ex. 6.  The DIB executive (who was a former UAE Central Bank official) who came to oversee the Bank's investigation of the article's allegations explained that "[h]ad DIB found any evidence of its involvement with Osama bin Laden or any other terrorists during its investigation, DIB would have reported these terrorist financing issues to the UAE government and worked to close or freeze any accounts tied to terrorists."  Ex. 1 ¶18, 29.

DIB did not stop there: Within days of the story's release, DIB's counsel Alan Fine (now Judge Fine) was tasked with "try[ing] to find out if there were any facts to support the allegations that had been made in the newspaper, and to get information that would assist the bank in continuing its investigation internally into those allegations"; Mr. Fine quickly contacted the US State Department to "extend the offer of cooperation" by DIB.  Ex. 6; Ex. 1 ¶19.  (At a State Department press briefing the day the newspaper story appeared, a press officer had fielded some questions about it.)  Mr. Fine informed a public-affairs official "that we took the allegations

- 17 -

seriously, that we wanted to know what they were talking about," and that "[w]e wanted to know if they had any information that could help identify any facts related to the allegations"—because DIB "had conducted a search for anything in Osama bin Laden's name," "came up with nothing," and "had no idea where this was coming from."  Ex. 6.

Mr. Fine was directed to "the person who would have the most knowledge regarding any facts that could possibly substantiate the allegations," the counterterrorism expert for Middle East at the US State Department.  *Id.* He told that official that DIB had investigated whether bin Laden "had an account at the bank or was the sender or recipient of any wire transfer," and that DIB "wanted to work with the government of the United States to get this information, and if there was information to be gotten, to deal with it appropriately."  *Id.* But the official did not offer "any name," "account number," "date," nor "any information about when the transactions that might have been under investigation occurred," and never thereafter contacted DIB, despite Mr. Fine's request to "please call" with any information.  *Id.*; *see id.* ("Q. And at any time during your engagement for Dubai Islamic Bank, did anyone at the U.S. government ever call you with any concerns about any accounts at Dubai Islamic Bank related to Osama bin Laden or terrorism generally? A. No.").  Following its exhaustive investigation, DIB ultimately sought a retraction from the newspaper.  *Id.*; Ex. 1 ¶24–26.

***Fifth***, there is no evidence that DIB was "refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks through anti-terrorist and money laundering safeguards, and 'know your customer' regulations."  *9/11 IV*, 718 F. Supp. 2d at 489.  The only specific examples of DIB's alleged impropriety that Plaintiffs offered this Court were laundering money for bin Laden and transferring funds between Hisawi's purported DIB account and 9/11 hijackers (*see* ECF 1064 at 2, 4), neither of which occurred, as explained above.

In any event, in the years before 9/11, DIB actually used its best efforts to comply with the instructions of its regulator, the UAE Central Bank. Ex. 12a ¶29. DIB's internal audit programs prior to 9/11 incorporated Central Bank standards, and its auditors reviewed DIB branches and departments to ensure that they followed Central Bank circulars—including the seminal Anti-Money Laundering Circular 24/2000. *Id.* ¶6–13. As part of implementing that circular, which issued in late 2000, DIB in early 2001 appointed an Anti-Money-Laundering Compliance Officer, who developed policies and procedures, prepared reports, provided training, and communicated with the Central Bank. Ex. 14a ¶5–10.

Further, one of DIB's internal auditors in the 1999–2001 period testified that, as part of DIB's account-opening procedures, employees checked potential accountholders' names against the Central Bank's black list, DIB's own black list and list of existing customers, and any other sanctions lists distributed to DIB's branches (including any from the US Treasury Department's Office of Foreign Assets Control ("OFAC")). Ex. 12a ¶18. "An account could not be opened for any person" on a black list. *Id.* ¶19. Far from ignoring US government "warnings," in 1999 DIB distributed two OFAC lists to every section of the Bank "where accounts could be opened or transactions could be conducted to ensure that DIB did not conduct any business with any party named"—which included al Qaeda. Ex. 8 ¶15. "DIB's branches kept copies of [those] Lists to refer to them when opening accounts to ensure no accounts were opened for any individuals on the list," and DIB required employees to check those lists "when opening accounts and conducting transactions." *Id.* ¶20; *see id.* ¶15.

## B.     Discovery Has Further Shown No Other Basis To Find That DIB Purposefully Directed Its Conduct At The United States

Just as Plaintiffs' allegations undergirding this Court's 2010 ruling fall flat in light of the developed record in 2021, so too does that record do away with any other argument for purposeful

direction.   Plaintiffs' admissions as to the ten accountholders identified in discovery are dispositive.

As to all ten accountholders, including 9/11 facilitator Aziz Ali and hijacker al-Qadi, Plaintiffs admitted that before 9/11 not one "was designated by that name as the subject of sanctions administered by" either OFAC or the United Nations.  Ex. 19, Nos. 1–10.  After 9/11, some accountholders were designated or otherwise came to the attention of the Central Bank, which began asking UAE banks to search for and freeze accounts in the names of suspected terrorists.  Ex. 14a ¶13.  DIB informed the Central Bank of the results of its searches and used its best, good-faith efforts to comply with the Central Bank's instructions.  *Id.* ¶18–19.  But that none of DIB's accountholders appeared on such lists before 9/11, while DIB provided them "only financial services … that were available to all customers in the ordinary course of business," means that the key pre-9/11 way by which a bank might have learned of suspected terrorists lurking among its customers was not available to DIB.  Ex. 4 ¶16.

Plaintiffs further acknowledged, as to all ten accountholders, that "the information known or available to Plaintiffs *is insufficient* to enable Plaintiffs to admit or *deny* that there is *no* evidence that DIB had any knowledge or awareness, prior to the September 11 Attacks," either "of any involvement in Al Qaeda by [an accountholder]," or "of any use of [an account] by Al Qaeda of [sic] for Al Qaeda's purposes."   Ex. 21, Nos. 1–20 (emphases added).   Translating this artful response, Plaintiffs admit that DIB did not know that any customer was connected to al Qaeda or the 9/11 attacks.  On top of that, as explained above, Plaintiffs admitted that they have no evidence that any funds in the ten accountholders' accounts were *actually* used to fund either the 9/11 attacks or al Qaeda.

On the full factual record, DIB cannot have purposefully directed its conduct at the United States.  Specific jurisdiction "must be based on *intentional* conduct *by the defendant*."  *Walden*, 571 U.S. at 286 (emphases added).  In this MDL, the Second Circuit has found jurisdiction lacking where plaintiffs "rel[ied] on a causal chain to argue a concerted action theory of liability" in which defendant officials allegedly supported charities "knowing that their money would be diverted to al Qaeda, which then used the money to finance" 9/11.  *9/11 III*, 538 F.3d at 94.  The court noted that the plaintiffs did not allege that the defendants "directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them."  *Id.* (citing *Calder v. Jones*, 465 U.S. 783 (1984), as "affirming that court could exercise personal jurisdiction over *primary participants* in an alleged wrongdoing *intentionally directed* at a California resident" (quotation marks omitted)).  Thereafter, the Second Circuit relied on that decision in concluding that, "even if" a defendant knowingly "donated money to various purported al Qaeda fronts," there was no jurisdiction.  *9/11 VII*, 714 F.3d at 676.  This Court then similarly found it insufficient that, allegedly, "*third parties* used [defendant National Commercial Bank] to transfer money to al Qaeda," where NCB was not alleged to have itself funded al Qaeda but allegedly was a preferred option for al Qaeda and knowingly provided services to its front charities.  *In re Terrorist Attacks*, 295 F. Supp. 3d at 427.

The Second Circuit has further held that it would be insufficient for purposeful direction if defendants "*did* foresee" that the *intended* and *known* ultimate recipients of their financial contributions to intermediary organizations—which they *knew* had already declared war on the United States—"*would* attack targets" there.  *9/11 III*, 538 F.3d at 94–95 (emphases added); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337–38 (2d Cir. 2016) (after *Walden*, holding that perpetrating foreign terrorist attacks was not express aiming at United States, because

American casualties were "random and fortuitous," even if defendants knew Americans might be killed and they "continuously" were).

Moreover, the Second Circuit has held that it was "not enough" for purposeful direction that several banks allegedly knowingly, intentionally maintained accounts for al Qaeda-associated individuals and fronts, which accounts were used for al Qaeda's operations. *9/11 VII*, 714 F.3d at 676, 668 (applying *9/11 III*, 538 F.3d at 95–96); *see Waldman*, 835 F.3d at 339–40 & n.13 (directly, knowingly supporting US-designated terrorists is not necessarily enough, standing alone, for express aiming at United States); ECF 7378, at 4, 6 ("specific intent to target the United States" is "crucial" to express aiming, whether defendant directly or indirectly supported terrorists). The court "decline[d] to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could" result in jurisdiction in such circumstances. *9/11 VII*, 714 F.3d at 676 (quotation and alteration omitted). On this ground, the Second Circuit affirmed the dismissal of eight financial institutions—including banks in which bin Laden himself allegedly held shares and invested millions and which he allegedly used for terrorism. *Id.* at 668, 676; *see 9/11 IV*, 718 F. Supp. 2d at 486–87.

It is thus no surprise that nearly every bank defendant has been dismissed from this MDL. And the case against DIB may be the weakest of all—nothing like the other circumstances deemed insufficient for jurisdiction in this MDL is even present here. The bare allegations on which this Court provisionally relied are discredited. The so-called money laundering and transfers did not happen. DIB's *own* conduct—providing normal banking services to a handful of non-watchlisted customers in the UAE (among its over 200,000 customers)—provides ***no*** basis to believe DIB intentionally assisted 9/11 or al Qaeda. Ex. 4 ¶10–12. Indeed, Plaintiffs' concede they have no evidence to show that DIB knew at the time of any connection between its customers and al Qaeda.

The undisputed facts now compel the conclusion that DIB did not purposefully direct or expressly aim its activities at the United States.

## II.     This Court Lacks Specific Jurisdiction Over DIB As A Constitutional Matter Because DIB Has No US-Linked Conduct *Related To* Plaintiffs' Claims

Specific personal jurisdiction also fails because the record shows no US-linked conduct by DIB related to Plaintiffs' claims.  Even if a defendant's conduct forms a "substantial connection with the forum," it only suffices for specific jurisdiction if "suit-related."  *Walden*, 571 U.S. at 284.  While there need not be "a strict causal relationship," there must be a "connection," and this nexus requirement "incorporates real limits."  *Ford*, 141 S. Ct. at 1026; *cf. 9/11 VII*, 714 F.3d at 676 (affirming dismissal of party whose alleged support for bin Laden in early 1990s was not "connected in any meaningful way" to 9/11); *9/11 IV*, 718 F. Supp. 2d at 482 (allegations of *directly* supporting al Qaeda "until at least the late 1990s" lack inference of "temporal, geographical or causal connection, or proximity to" 9/11).

Plaintiffs' injuries from the 9/11 attacks simply do not arise from or relate to DIB's activities, which themselves are insufficient for the requisite substantial connection to the United States.  On the undisputed facts, the only connection between DIB and Plaintiffs' injuries is that some people who participated or may have participated in the 9/11 plot had accounts with DIB.  But Plaintiffs themselves admit they lack evidence that any of those accounts funded either the 9/11 attacks specifically or al Qaeda more generally.  Ex. 20, Nos. 1–20.  And Plaintiffs lack evidence that DIB was aware of any such uses of the accounts, or of their owners' involvement (if any) in al Qaeda.  Ex. 21, Nos. 1–20.  That record reveals only ***un***relatedness, and puts DIB in the same position as a business that unwittingly sold goods or provided other services to a 9/11 hijacker—hardly the required "strong relationship" among DIB, the United States, and Plaintiffs' claims.  *Ford*, 141 S. Ct. at 1028.

**III.    Exercising Specific Jurisdiction Over DIB Would Be *Unreasonable*
As A Constitutional Matter**

The exercise of personal jurisdiction over DIB also would not be "reasonable" and would "offend traditional notions of fair play and substantial justice." *Ford*, 141 S. Ct. at 1024 (quotation marks omitted).  That standard implicates several potential interests, "[b]ut the primary concern is the burden on the defendant." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (quotation marks omitted); *Walden*, 571 U.S. at 284.  Jurisdiction is reasonable where it is "predictable," operating so as to give defendants "fair warning" that allows them to avoid forum contacts that could yield foreign litigation.  *Ford*, 141 S. Ct. at 1025, 1028 n.4, 1030 (quotation marks omitted).

This Court, in assessing the reasonableness of jurisdiction over DIB at the pleadings stage, drew upon its purposeful-direction finding.  *9/11 IV*, 718 F. Supp. 2d at 490.  As the undisputed facts have disproven the allegations supporting that finding, jurisdiction also would not be reasonable here.  It is inconsistent with the doctrine's "underlying values" to assert jurisdiction over DIB without "the essential foundation of specific jurisdiction": "a strong relationship among the defendant, the forum, and the litigation." *Ford*, 141 S. Ct. at 1025 & n.2, 1028.

**IV.    This Court Lacks Specific Jurisdiction As A *Statutory* Matter**

Finally, personal jurisdiction over DIB also lacks any statutory foundation. *Waldman*, 835 F.3d at 327; FRCP 4(k).  The only remaining statutory possibility that Plaintiffs asserted at the pleadings stage is New York's long-arm statute, CPLR 302(a)(2).  That provision authorizes personal jurisdiction where the defendant or its agent committed a tortious act in New York, and the "cause of action aris[es] from … the act."  DIB itself of course committed no tort in New York (or anywhere else in the United States). Nor is there evidence that any al Qaeda member was DIB's agent or that DIB in any way agreed with al Qaeda to attack the United States—let alone requested,

directed, or benefited from al Qaeda's acts in New York. *See Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267–69 (S.D.N.Y. 1991) (applying CPLR 302(a)(2)). The undisputed facts rule out jurisdiction under the long-arm statute for much the same reasons they rule out jurisdiction under the Constitution, as discussed above. Indeed, the absence of jurisdiction under the latter demands the absence of jurisdiction under the former, as courts have recognized that the CPLR allows jurisdiction in "narrower" circumstances than the Constitution. *Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*, 2021 WL 3604517, at *3 (S.D.N.Y. Aug. 13, 2021).

## CONCLUSION

The Court should grant DIB's motion for summary judgment and renewed dismissal because the undisputed facts demonstrate the absence of jurisdiction over it. *See also supra* at 11 n.4. If, however, the Court deems any material fact disputed, DIB requests that, as the finder of jurisdictional facts, it hold an evidentiary hearing. *See Dorchester*, 722 F.3d at 85–87; *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 242 n.2 (2d Cir. 1984) ("The question of jurisdiction need not be submitted to a jury."). Consistent with this Court's order, DIB also reserves its right to seek summary judgment on other grounds should this motion be denied. *See* ECF 7160; ECF 7096 at 3.

Dated: December 3, 2021                    Respectfully submitted,


By: ___/s/ Steven T. Cottreau_____
    Steven T. Cottreau
    C. Kevin Marshall (admitted *pro hac vice*)
    Gabrielle E. Pritsker
    Audrey Beck (admitted *pro hac vice*)
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    Telephone: (202) 879-3939
    Email: scottreau@jonesday.com
    Email: ckmarshall@jonesday.com
    Email: gpritsker@jonesday.com
    Email: abeck@jonesday.com

    Juan P. Morillo (admitted *pro hac vice*)
    QUINN EMANUEL URQUHART & SULLIVAN LLP
    777 Sixth St., N.W.
    Washington, D.C. 20001
    Telephone: (202) 538-8174
    Email: juanmorillo@quinnemanuel.com

    *Counsel for Defendant Dubai Islamic Bank*