**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

This document relates to:  *All Consolidated Amended Complaint (ECF No. 3463) Cases*

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO FED. R. CIV. P. 54(b) AND THE COURT'S INHERENT POWERS TO REVISE THIS COURT'S MARCH 28, 2018 ORDER (ECF NO. 3946)

December 7, 2021

## TABLE OF CONTENTS

**Page**

Background ............................................................................................................. 3

I.   The Revised Legal Framework Applicable To ATA Aiding And Abetting Claims. ............... 5

II.  *Kaplan* And *Honickman* Indicate That Plaintiffs Adequately Pled Their Aiding And Abetting
     Claims Against The Kingdom .............................................................................. 11

     A.   The Kingdom's Indirect Support Provided Via the Purported Charitable
          Organizations Intertwined with al Qaeda .................................................. 13

     B.   The Kingdom's Indirect Support Provided Via Individuals Assisting al Qaeda ......... 18

     C.   Applicability to Primary Liability Claims .................................................. 21

III. Conclusion ...................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*Chen Gang v. Zhao Zhizhen,*
    799 Fed. Appx. 16 (2d Cir. 2000) ....................................................................5

*Credit Chequers Info. Servs. v. CBA, Inc.,*
    1999 U.S. Dist. LEXIS 6084 (S.D.N.Y. Apr. 29, 1999) ...................................5

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .............................................................. *passim*

*Honickman v. BLOM Bank SAL,*
    6 F.4th 487 (2d Cir. 2021) ..................................................................... *passim*

*Kaplan v. Lebanese Canadian Bank,*
    999 F.3d 842 (2d Cir. 2021) ................................................................... *passim*

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.,*
    729 F.3d 99 (2d Cir. 2013) ...................................................................................2

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) .............................................................................7, 9

*Lindsay v. Lockwood,*
    625 N.Y.S. 2d 393 (Monroe County, NY 1994) ................................................5

*Noble v. Weinstein,*
    335 F. Supp. 3d 504 (S.D.N.Y. 2018) ................................................................5

*Scollo v Nunez,*
    847 N.Y.S. 2d 899 (Queens County, NY 2007) ................................................5

*SEC v. Amerindo Inv. Advisors, Inc.,*
    2014 U.S. Dist. LEXIS 15696 (S.D.N.Y. Feb. 3, 2014) ....................................2

*Siegel v. HSBC North America Holdings, Inc.,*
    933 F. 3d 217 (2d Cir. 2019) ..............................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..........................................................................................10

*United States v. Jerry,*
    487 F.2d 600 (3d Cir. 1973) ...............................................................................2

*United States v. LoRusso,*
    695 F.2d 45 (2d Cir. 1982) .................................................................................2

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
     956 F.2d 1245 (2d Cir. 1992)................................................................2

**Statutes and Rules**

18 U.S.C. § 2333(a) ............................................................................3

18 U.S.C. § 2333(d)(2) .....................................................................3, 8

28 U.S.C. 1605B(b)(2)........................................................................16

Fed. R. Civ. P. 54(b) .......................................................................1, 2

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130
     Stat. 852 (Sept. 28, 2016)............................................................ *passim*

Pursuant to Fed. R. Civ. P. 54(b) and this Court's inherent powers, Plaintiffs who have asserted claims against the Kingdom of Saudi Arabia ("Kingdom") through the Plaintiffs' Executive Committees' Consolidated Amended Complaint at ECF No. 3463 ("CAC"),[1] move this Court to give effect to the recent decisions of *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021) ("*Kaplan*"), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) ("*Honickman*").  In particular, those decisions require that this Court enter orders superseding and revising its Order of March 28, 2018 at ECF No. 3946, insofar as that Order rejected Plaintiffs' arguments that this Court possesses jurisdiction over Plaintiffs' statutory and common law secondary and primary liability claims against the Kingdom.  Plaintiffs' claims are predicated on the Kingdom's aiding and abetting and provision of material support to al Qaeda, thereby fostering al Qaeda's terrorism including its attacks in the United States on September 11, 2001 (the "September 11th attacks").

*Kaplan* and *Honickman* set forth various principles regarding the operation and intent of the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016), which as previously canvassed clearly extended the exception to foreign sovereign immunity to circumstances where a claim of aiding and abetting a terrorist attack in the United States is adequately pled against the foreign sovereign.  The decisions specifically address claims, such as Plaintiffs' Anti-Terrorism Act ("ATA") and state and federal common law claims in this case, that a defendant has aided and abetted the terrorist activities of a designated Foreign Terrorist Organization ("FTO"), such as al Qaeda.  In each of the critical respects described below, the *Kaplan* and *Honickman* principles support this motion.

---

[1] *See* Attachment A.

Pursuant to Rule 54(b), non-final judgments "may be revised at any time before the entry of a [final judgment.]" Fed. R. Civ. P. 54(b). And, "so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir. 1982) (quoting *United States v. Jerry,* 487 F.2d 600, 605 (3d Cir. 1973)). Such reconsideration is especially appropriate where, as here, there is "an intervening change of controlling law … or [a] need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.,* 729 F.3d 99, 108 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992)). In such circumstances, reconsideration promotes the interests of justice and efficiency by "avoiding a second, unnecessary battle in the Court of Appeals." *SEC v. Amerindo Inv. Advisors, Inc.*, 2014 U.S. Dist. LEXIS 15696, *9 (S.D.N.Y. Feb. 3, 2014).[2]

As this Court previously found, the Kingdom raised no competent or relevant factual challenge to Plaintiffs' CAC. ECF No. 3946 at 22-23. Accordingly, the factual allegations of Plaintiffs' CAC must be accepted as true and may themselves serve to establish jurisdiction. *Id.* at 4, 23. Based on the uncontested factual allegations contained in the CAC, *Kaplan* and *Honickman* establish that Plaintiffs have adequately pled their claim against the Kingdom, establishing this Court's jurisdiction over Plaintiffs' claims and requiring entry of an order both denying the Kingdom's motion to dismiss for lack of jurisdiction and directing that the case proceed on the merits.

---

[2] The procedural posture of this litigation is especially suited to this motion, given the Court's modification of the schedule for expert discovery in light of President Biden's September 3, 2021 Executive Order directing the declassification of relevant investigation records. *See* E.O. 14040, *Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of September 11, 2001*, 86 FR 50439 (Sept. 3, 2021). Resolving this motion will in no way delay proceedings as to the Kingdom and will instead promote efficiency, including by expediting resolution of the jurisdictional question and clarifying the standards for further proceedings.

## BACKGROUND

The Court's March 28, 2018 Order sets forth background information relevant to this motion.  Of particular relevance, JASTA confirmed that victims of acts of international terrorism may seek damages under 18 U.S.C. § 2333(a) against those who aided and abetted such attacks, as well as those more directly contributing to them.  *See* ECF No. 3946 at 3, 8 n.6; 18 U.S.C. § 2333(d)(2); JASTA § 4(a).  Those claims are to be governed by "the legal framework" established by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  JASTA § 2(a)(5).  Plaintiffs seek damages against the Kingdom under Section 2333, as well as under state and federal common law.  JASTA also established that foreign sovereigns are not immune from such claims for damages "caused by – an act of international terrorism in the United States" and "a tortious act or acts of the foreign state, or of any official, employee or agent while acting within the scope of his or her office of employment, or agency … ."  JASTA § 3(a); ECF No. 3946 at 9.

Congress's acts in JASTA to amend the ATA and expand jurisdiction over foreign sovereigns facing such ATA and other terrorism-related claims were part of its design:

> to provide civil litigants with the broadest possible basis … to seek relief against persons, entities, and foreign countries, wherever acting …, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b).

In the March 28, 2018 Order, this Court held that it lacked jurisdiction over Plaintiffs' claims against the Kingdom, with the potential exception of claims related to the actions of Fahad al Thumairy, Omar al Bayoumi, and the other Kingdom officials and subagents who worked with them to provide an essential support network for the first arriving September 11th hijackers in the United States.  The Court declined to find jurisdiction based on several additional claims and theories proffered by Plaintiffs, reasoning that Plaintiffs' claims that the Kingdom

aided and abetted al Qaeda through charity intermediaries required a showing that those charities were agents of the Kingdom, ECF No. 3946 at 31-36, and based on its assessment that Plaintiffs were required to show in each case that the material support alleged had "caused the 9/11 Attacks." *Id.* at 31 (referring to the "tortious acts of the charity organizations"); *see also id.* at 28 (allegations related to Muhammad Jaber Fakihi fail to show that "the funds were in any way used to help plan or facilitate the 9/11 Attacks"); 26 ("Plaintiffs do not allege or come forward with evidence showing that any of their actions provided material assistance to the 9/11 hijackers or otherwise caused the 9/11 Attacks" with regard to allegations against Mohammed al Qudhaeein and Hamdan al Shalawi); 25 ("there is no allegation or evidence that the funds transferred to [Osama] Basnan and his wife were used to aid the hijackers or otherwise help facilitate the 9/11 Attacks"). In assessing the adequacy of the many acts of support alleged, the Court looked at Plaintiffs' allegations of particular instances of support separately. *Id.* at 19-24 (Bayoumi and Thumairy); 24-25 (Osama Basnan); 31-37 (charities).

On June 9, 2021, the Second Circuit issued *Kaplan*. In that decision, the court reversed the District Court's conclusions that plaintiffs had failed to adequately allege that the defendant had aided and abetted Hizbollah's terrorism by providing banking services to five individual intermediaries who allegedly facilitated Hizbollah's actions. In doing so, the court established several new legal principles and otherwise clarified the scope and operation of a Section 2333 aiding and abetting claim established in JASTA. On July 29, 2021, the Second Circuit issued *Honickman*. That decision also construed JASTA and further refined the principles set forth in *Kaplan* as applied to a claim based on banking services provided to alleged associates of an FTO (the court ultimately found that no basis had been alleged to establish that the defendant had reason to know of a connection between its customers and the FTO).

4

In this case, Plaintiffs' initial pleadings and filings laid out arguments that apply and satisfy the aiding and abetting principles subsequently announced in *Kaplan* and *Honickman*, and thus set forth facts that adequately allege such a claim.[3]  *See infra* pp. 11-21.  Those decisions thus establish that Plaintiffs are entitled to an order denying the Kingdom's motion to dismiss for lack of jurisdiction, and authorizing Plaintiffs' suits to proceed on the merits.

**I.      The Revised Legal Framework Applicable To ATA Aiding And Abetting Claims.**

As the Second Circuit explained, Congress "had instructed" that "the aiding-and-abetting framework established in *Halberstam v. Welch*, 705 F.2d 472 … should govern analysis of JASTA claims."  *Kaplan*, 999 F.3d at 851.  Under that framework, the elements of an ATA aiding and abetting claim[4] are:

> 1.  "that the party whom the defendant aided must have performed a wrongful act that caused an injury;"
>
> 2.  "that defendant must have been 'generally aware of his role as part of an overall illegal or tortious activity at the time he provide[d] the assistance;'" and

---

[3] Given the procedural posture and ongoing discovery related to the activities of Omar al Bayoumi, Fahad al Thumairy, and the many Kingdom officials and subagents who worked directly in conjunction with them to establish a support network for the first arriving hijackers in Southern California, Plaintiffs do not address those particular theories and supporting allegations and extensive evidence, new and old, in the context of the present motion.  However, *Kaplan* and *Honickman* do significantly alter and affect the analytical framework for evaluating those theories, and make clear that the Kingdom's principal arguments in opposition to them have no merit. Plaintiffs anticipate filing a separate motion at an appropriate time, addressing the significance of *Kaplan* and *Honickman* to those theories and the very fruitful discovery and intervening government disclosures related to them. And as that motion and other filings will show, the record developed in discovery and through those government disclosures overwhelmingly satisfies the requirements of that new framework.

[4] The CAC Plaintiffs have asserted common law aiding and abetting claims as well.  Plaintiffs reserve all arguments concerning the choice of law analysis and substantive source of law for those claims, but note for purposes of the present motion that New York law and federal common law are both potential sources of substantive law for Plaintiffs' common law aiding and abetting claims.  In either case, *Halberstam* provides the relevant framework for evaluating Plaintiffs' common law aiding and abetting and conspiracy claims as well.  *See Lindsay v. Lockwood*, 625 N.Y.S. 2d 393 (Monroe County, NY 1994) (citing *Halberstam* as instructive on elements of conspiracy and aiding and abetting liability under New York law); *Scollo v Nunez*, 847 N.Y.S. 2d 899 (Queens County, NY 2007) (same); *Chen Gang v. Zhao Zhizhen*, 799 Fed. Appx. 16 (2d Cir. 2000) (applying *Halberstam* [see comment: under federal law]); *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018) (citing *Halberstam* elements as instructive on secondary civil liability for aiding and abetting, assuming such cause of action exists under Section 1595 (Victims of Trafficking Victims Protection Act)); *Credit Chequers Info. Servs. v. CBA, Inc.*, 1999 U.S. Dist. LEXIS 6084, *42 (S.D.N.Y. Apr. 29, 1999) (citing *Halberstam* elements for aiding and abetting cause of action under federal law).  Accordingly, the principles announced in *Kaplan* and *Honickman* apply to the analysis of Plaintiffs' common law aiding and abetting claims as well.

3.   "'the defendant must [have] knowingly and substantially assist[ed] the principal violation.'"

*Id*. at 863 (quoting *Halberstam*, 705 F.2d at 477).

In considering whether the plaintiffs' allegations satisfied these elements, the Second Circuit in both *Kaplan* and *Honickman* addressed a series of issues of first impression in the course of rejecting various limiting arguments advanced by the defendant bank or adopted by the District Court in finding the plaintiffs' allegations to be deficient.  In doing so, the Second Circuit set forth a new framework governing what constitutes an adequately pled Section 2333 aiding and abetting claim.

1.   <u>Indirect Assistance</u>.  *Kaplan* held that, with respect to the provision of assistance, "a JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly."  *Id*. at 866.  An argument to the contrary, the Court explained, would "disregard[] Congress's instruction that JASTA is to be read broadly and to reach persons who aid and abet international terrorism 'directly or indirectly.'"  *Id.* at 855 (quoting JASTA § 2(b)).  JASTA "meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary."  *Id.* at 856; *infra* p. 10 (holistic approach to assessing allegations requires reasonable inference that FTO received funds from intermediary); *see also Honickman*, 6 F.4th at 495-96.

2.   <u>Support to the FTO, Not to the Particular Attack</u>.  *Kaplan* also confirmed that the appropriate analysis under the ATA focuses on whether the defendant provided support, directly or indirectly, to the foreign terrorist organization, rather than on the nexus between the support and the attack.  That is so because the FTO's terrorist attacks generally and wherever undertaken

6

are the natural and foreseeable consequence of support provided to the FTO, *see Kaplan*, 999

F.3d at 860, and because the FTO itself, not just the individual members carrying out the attack,

"causes" the injury for purposes of the first *Halberstam* element of an ATA claim.  *Id.* at 863;

*see Honickman*, 6 F.4th at 499 (liability requires only the foreseeability of terrorist harm that

arises from assisting a terrorist organization, not any connection to "the actual injury-causing

act").

     Several holdings in the decisions establish this principle.  In addressing the provision of

indirect support, the Second Circuit identified the relevant "principal" that ultimately received

the support as the FTO itself, Hizbollah (not individual attackers).  *Kaplan*, 999 F.3d at 855-56.

Likewise, in rejecting the defendant's argument that the recipients of the alleged financial

assistance must have "themselves committed actions of international terrorism," *id.* at 856, the

court required focus instead on whether "the defendant's acts aided and abetted the principal,"

Hizbollah.  *Id.*; *see id.* at 862 (explaining that, in *Siegel v. HSBC North America Holdings, Inc.*,

933 F. 3d 217 (2d Cir. 2019), the relevant inquiry was whether financial support was knowingly

provided "to [al Qaeda] or to any other terrorist organizations."); *Honickman*, 6 F.4th at 491-92

(Hamas generally the relevant principal).  Similarly, in addressing the "general awareness"

element, the court focused on whether the totality of the circumstances sustained a reasonable

inference that the support provided through an intermediary had been received by *the FTO* itself,

and whether the defendant was generally aware of playing a role in *the FTO*'s terrorist activities.

*Kaplan,* 999 F.3d at 863-64.  No further connection to particular terrorist activities, much less to

the attack giving rise to the claim for damages, was required.  *See id*. at 860-61 (rocket attacks

were "foreseeable" result of support to Hizbollah).  Indeed, *Kaplan* construed *Linde v. Arab

Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), as requiring only a showing that "the defendant have

been 'aware' that it was playing a role in terrorism" and, specifically, that "in providing such [financial] services" to the FTO (there, Hamas), the defendant "bank was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." *Id.* at 860-61.

The Second Circuit's treatment of the "knowing and substantial assistance" element makes this point even more directly. *Id.* at 865-66. "[K]nowing and substantial assistance for the actual injury causing act … is unnecessary." *Honickman*, 6 F.4th at 499. *Kaplan* expressly rejected any argument that plaintiffs must show that the defendant "knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks." *Kaplan*, 999 F.3d at 866. Instead, the issue "concerns whether [the defendant] aided and abetted *Hizbollah* by knowingly providing assistance – whether directly to *Hizbollah* or indirectly – and whether that assistance was substantial." *Id*. at 866 (emphasis added).

3. <u>Intent and Knowledge</u>. The Second Circuit also confirmed that a plaintiff need not establish "that the defendant had a specific intent," especially in relation to fostering the particular attack at issue. *Id.* at 863; *id.* at 865 (rejecting the District Court's requirement that the plaintiffs show that the defendant "intentionally supported Hizbollah in perpetrating the rocket attacks."). Indeed, "intent is not itself a *Halberstam* element." *Id.* at 860.

As to knowledge with respect to the provision of substantial assistance, the test requires only that "the defendant know[] that it is providing 'assistance,' 18 U.S.C. § 2333(d)(2)— whether directly to the FTO or indirectly through an intermediary … ." *Id.* at 863-64. "The 'knowledge component' is satisfied" as long as the assistance was not provided "'innocently or inadvertently,'" and requires no greater showing than is required "for the general awareness element." *Honickman*, 6 F.4th at 499-500. Thus, if "the defendant knowingly … gave assistance, directly or indirectly, and if that assistance was substantial, then aiding and abetting is

sufficiently established if the defendant was 'generally aware' that it was playing a role in international terrorism." *Kaplan*, 999 F.3d at 864; *id.* at 866 ("substantial" support element satisfied by the defendant bank's depositing "large sums" of third parties' funds in a bank account controlled by an intermediary closely associated with Hizbollah).

4. <u>General Awareness of Playing a Role in International Terrorism</u>.  The Second Circuit also rejected imposing state of mind and other requirements that the defendant in *Kaplan*, relying on *Linde*, had argued were associated with *Halberstam*'s "general awareness" element.

*Kaplan* established, instead, that this element contained no *mens rea* or other requirement beyond needing to show "that the defendant ha[d] been 'aware' that it was playing a role in terrorism."  *Id.* at 859-60, 863-64.  In particular, an inference of such general awareness was often appropriate when the allegations established the defendant's provision of material support to a terrorist organization.  *Id.* at 865-66.  Indeed, *Kaplan* held that general awareness in that case was satisfied by plausible allegations of the defendant's knowledge of (i) "Hizbollah's terrorist activities" and (ii) the "affiliation with Hizbollah" of the five individual intermediaries who received the indirect support in the form of banking services.  *Id.* at 865; *see id.* at 860-61 (provision of services to customers "closely intertwined with Hizbollah's violent terrorist activities" provides basis to infer the requisite "general awareness").  Two contextual factors were especially important:  "the context [of] Hizbollah's policy and practice of engaging in terrorist raids" and the various public statements and other allegations linking the recipients of aid to Hizbollah and thus to its activities.  *Id.* at 865-66.

*Honickman* provided further guidance regarding a crucial consideration for determining a defendant's "general awareness":  whether recipients of the assistance were alleged to be "closely intertwined" with the FTO and its violent activities.  *Honickman*, 6 F.4th at 499; *see*

*Kaplan*, 999 F.3d at 860-61.  If so, that relationship alone supported a reasonable inference that the defendant "was generally aware of its role in unlawful activities from which the attacks were foreseeable … ."  *Honickman*, 6 F.4th at 501.  In particular, the "general awareness" element is satisfied, for example, by "allegations that permit a reasonable inference that the defendant recognized that the money it transferred would be received by the FTO" – and the allegations do not even have to establish that "the FTO actually received the funds."  *Id.* at 500.

  5. <u>The "Lodestar" and "Holistic" Interpretive Principles</u>.  *Kaplan* mandates two governing interpretive principles.  First, the lodestar for construing JASTA is "Congress's instruction that JASTA is to be read broadly and to reach persons who aid and abet international terrorism 'directly or indirectly.'"  *Id.* at 855.  Second, allegations of support for terrorism "must be evaluated in the context of the enterprise they aided," *id.* at 865 (quoting *Halberstam*, 705 F.2d at 488), and evaluated holistically.  For such claims, the district court is required "to consider all of the complaint's allegations, rather than considering each in isolation, and to accept as true all permissible inferences that could be drawn from the complaint as a whole."  *Kaplan*, 999 F.3d at 865; *id.* at 854 ("[t]he proper question is whether there is a permissible relevant inference from '*all* of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007)) (emphasis in *Tellabs*).  That requirement led the Second Circuit to reject, in several respects, the District Court's conclusions drawn from focusing on particular allegations considered in isolation.  *See Kaplan,* 999 F.3d at 856, 864-66.

10

II.   ***Kaplan*** **And** ***Honickman*** **Indicate That Plaintiffs Adequately Pled Their Aiding And Abetting Claims Against The Kingdom.**

The legal framework established in these decisions applies directly here.  Those decisions establish and confirm the adequacy of Plaintiffs' allegations related to both secondary and primary liability claims that the Kingdom provided material support to al Qaeda and is liable for the resulting damage.  And, for this reason, and because Congress designed JASTA's exception to sovereign immunity to ensure that all such claims (and specifically, Plaintiffs' claims) would be able to proceed in U.S. courts, this Court has jurisdiction over them.

The principles set out in Section I establish the adequacy of Plaintiffs' claims against the Kingdom and are inconsistent with arguments or prior conclusions of this Court that those allegations are deficient.  Those principles establish that Plaintiffs' aiding and abetting allegations are sufficient because the allegations clearly establish that:  (i) the Kingdom indirectly assisted al Qaeda, which undertook the 9/11 attacks; (ii)(a) in providing financing, staffing, directing, and provision of other support to the purported charitable organizations, which were known by the Kingdom to be "closely intertwined" with and supporting al Qaeda and its violent activities, Kingdom officials, employees, and agents were "generally aware" of their role in al Qaeda's violent activities; (ii)(b) likewise, in directly or indirectly assisting various individuals in the United States and abroad known by the Kingdom to be "closely intertwined" with al Qaeda and its violent activities, Kingdom officials, employees, and agents were "generally aware" of their role in al Qaeda's illegal activities; and (iii) the Kingdom knowingly – *i.e.*, not inadvertently or innocently – provided support to al Qaeda in these and other respects that was substantial.[5]  *See Kaplan*, 999 F.3d at 856 (*Halberstam* elements for an

---

[5] Plaintiffs' pleadings and allegations – Plaintiffs' Consolidated Amended Complaint (Mar. 17, 2017) (ECF No. 3463) ("CAC"), and Plaintiffs' Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina (ECF No. 3463-1) ("Aver.") –

aiding and abetting claim); *id.* at 865-66 (finding even less extensive allegations sufficient to state claim). That is, the allegations establish each of the *Halberstam* elements for purposes of Plaintiffs' secondary liability claims against the Kingdom with respect, separately, to assistance provided via the charities and via individuals.[6] As described below, they also establish that the Kingdom provided material support to al Qaeda in a manner that support Plaintiffs' primary liability claims. Under *Kaplan* and *Honickman* the allegations cannot be found deficient based on arguments or conclusions that the charities and supported individuals were not or did not act as agents or alter-egos of the Kingdom, that al Qaeda did not directly receive the Kingdom's support, that the support provided to al Qaeda was insufficiently related to the September 11th attacks themselves, or that the Kingdom did not intend to facilitate the attacks. As described further below, the March 28, 2018 Order rested on these now-impermissible rationales, and was otherwise inconsistent with each of the Second Circuit principles described above. *See* ECF No. 3946 at 16-37; *see infra* pp. 14-17, 19, 20.

---

and subsequent related and supplemental filings – CAC Plaintiffs' Opposition to the Renewed Motion to Dismiss of the Kingdom of Saudi Arabia (ECF No. 3782) ("Opp'n.") and supporting subject matter expert affidavits – more than adequately satisfy the aiding and abetting principles and pleading standards set forth in *Kaplan*. *See, e.g.*, Opp'n. at pp. 35-56 (Saudi government employees and agents – Fahad al Thumairy, Omar al Bayoumi, Osama Basnan, Muhammed Jaber Fakihi, Saleh al Hussayen, Mohammed al Qudhaeein, and Hamdan al Shalawi – aided and abetted the 9/11 operation by providing substantial material support and resources to the September 11th hijackers and plotters, both from within the U.S. and abroad); pp. 56-71 (the Kingdom's indirect support for al Qaeda, through charity intermediaries, constitutes a tortious act satisfying JASTA's immunity exception); pp. 57-60 (under the direction and supervision of the Ministry of Islamic Affairs, the Kingdom provided massive funding and other important resources to a number of its charities that were intimately intertwined with the al Qaeda terrorist organization and its activities); pp. 60-63 (the Kingdom was specifically aware that the massive funding it was directing to these al Qaeda charity fronts was fueling al Qaeda's global operational and strike capabilities in the years leading to the September 11th attacks, thereby aiding and abetting al Qaeda's targeting of the United States); and pp. 63-65 (senior Saudi government officials and employees appointed by the Kingdom to head the charities were responsible for directing and facilitating the charities' sponsorship of al Qaeda and affiliated terrorist organizations).

[6] These conclusions also apply to establish the adequacy of the allegations against the Saudi High Commission for Relief for Bosnia and Herzegovina, which Plaintiffs will address in a separate motion.

### A. The Kingdom's Indirect Support Provided Via the Purported Charitable Organizations Intertwined with al Qaeda.

Applying each Second Circuit principle to assess Plaintiffs' allegations regarding the Kingdom's support to al Qaeda provided via the purported charitable organizations illustrates and buttresses these conclusions.

<u>First</u>, the Kingdom's indirect assistance to al Qaeda, provided to and through the charities by the Kingdom and inuring to the benefit of al Qaeda, can form the basis for aiding and abetting liability and primary liability claims. *See supra* p. 6 (first principle). That is so even assuming that the charities (or supported individuals) simply acted as intermediaries, rather than functioned as agents, alter-egos, or components of the Kingdom or as front groups operating as part of al Qaeda itself.[7] Plaintiffs alleged very significant support provided by the Kingdom to the charities, in the form of tens of millions of dollars, activities of key officials and other personnel, direction and management, and other support.[8] Plaintiffs also alleged very close ties between al Qaeda's activities and the charities, including intertwined personnel, financing, and operations, plainly supporting a reasonably inference that the Kingdom knew of this relationship and thus was generally aware of its support for al Qaeda's violent activities.[9] The same is true for allegations related to the support provided to individuals who were equally "closely intertwined"

---

[7] *Kaplan*'s "holistic" interpretive principle, *see supra* p. 10, also supports the reasonable inference that the charities operated as arms of the Kingdom and/or as part of al Qaeda, and separately that the Kingdom's support to and through the charities directly benefitted al Qaeda.

[8] *See, e.g.*, CAC ¶¶ 30, 31, 33, 105-33; Aver. ¶¶ 115, 116, 118, 121-29, 333-41, 371-74, 440-42, 477-79, 519-22, 543-45, 559-60, 575-77; Opp'n at pp. 57-58; Affirmation of Evan Francois Kohlmann (Nov. 9, 2017) (ECF No. 3738-9) ("Kohlmann II"), at ¶¶ 19-166 (testifying in detail the myriad ways in which the Kingdom exercised complete control over the charities and provided massive funding and other support to the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Al Haramain Islamic Foundation ("Al Haramain"), World Assembly of Muslim Youth ("WAMY"), Saudi Red Crescent ("SRC"), Saudi High Commission ("SHC"), and Saudi Joint Relief Committee ("SJRC")); Affirmation of Evan Francois Kohlmann (Feb. 3, 2015) (ECF No. 2927-9) ("Kohlmann I") (same).

[9] *See, e.g.*, CAC ¶¶ 30-33, 60-104, 134-54; Aver. ¶¶ 17-21, 39-48, 126-29, 286-580; Opp'n. at pp. 58-60; Kohlmann II ¶¶ 167-232.

13

with al Qaeda's activities.[10]  *See infra* pp. 18-21.  Indeed, Plaintiffs' allegations went further than necessary, and alleged at length the charities' use of their resources to provide financial, personnel, operational, and management support to al Qaeda, specifically including support for its terrorist operations.  *See supra* n. 5.  The March 28, 2018 Order did not recognize the significance and adequacy of these allegations.  *See* ECF No. 3946 at 31-37.

Second, under *Kaplan* and *Honickman,* it suffices for the allegations to establish that the Kingdom indirectly provided support to al Qaeda itself.  They need not establish a link to the particular attacks giving rise to Plaintiffs' claims.  *See supra* pp. 6-8 (second principle).  Through the allegations just canvassed, *see supra* p. 13, Plaintiffs clearly satisfied this requirement.  The March 28, 2018 Order imposed a more demanding standard often focused on whether a nexus existed between the alleged support and particular attacks, and did not recognize the adequacy of the allegations in this respect.  *See* ECF No. 3946 at 16-18, 31, 37.

Third, Plaintiffs' allegations establish the requisite degree of knowledge on the Kingdom's part, as required by *Kaplan* and *Honickman* (and under those decisions, the allegations need not establish intent).  *See supra* pp. 8-9 (third principle).  Plaintiffs set forth allegations of al Qaeda's long, intimately close relationship with the Kingdom and its officials and of the Kingdom's detailed knowledge of the intertwined nature of the charitable organizations and al Qaeda, including those organizations' support for al Qaeda.[11]  Indeed, Plaintiffs allege that Kingdom officials and employees held director, officer, and operational

---

[10] *See, e.g.*, CAC ¶¶ 116, 121-22, 125, 126, 131, 155-59, 165-66, 171, 198, 204-06, 214-31, 242, 247, 249, 251-54, 268, 272-74, 288, 291, 303-04; Aver. ¶¶ 82, 116, 149-50, 153-59, 163-64, 181, 183-85, 193, 200-01, 254-55, 304, 312, 334-38, 372-74, 440-41, 477-78, 520-22, 544-545, 560, 576; Opp'n. at pp. 43 (Thumairy), 44-45 (Bayoumi), 63-65; Affidavit of Michael T. Rochford (Nov. 7, 2017) (ECF No. 3783-6) at ¶¶ 26-29, 31-36, 38-42 (Bayoumi); ¶¶ 99-101 (Basnan); Affidavit of David Mitchell (Nov. 7, 2017) (ECF No. 3783-7) at ¶ 20 (Thumairy); ¶¶ 71-82 (Bayoumi); ¶¶ 90-92 (Basnan).  *See also* CAC ¶¶ 33, 140-54, 263 (direct involvement by Saudi government imams with the Ministry of Islamic Affairs in recruitment and fundraising activities for al Qaeda, including recruitment of certain of the 9/11 hijackers).
[11] *See, e.g.*, CAC ¶¶ 134-54; Aver. ¶¶ 581-87; Opp'n. at pp. 58-60; Kohlmann II ¶¶ 167-232.

14

employee positions within the charitable organizations, including in components and affiliates of the organizations jointly staffed by al Qaeda operatives and most directly supporting al Qaeda's terrorism.[12]  And they allege that, in any event, the head offices of the charities best known and overseen by the Kingdom in turn knew of and approved of the activities of the affiliates located elsewhere.[13]  Plaintiffs also allege that the Kingdom was repeatedly informed that the charitable organizations were assisting al Qaeda.[14]  The Kingdom plainly knew that it was providing support to entities and individuals "closely intertwined" with al Qaeda (as well as to al Qaeda itself), rendering the support something other than inadvertent or innocent, and that suffices to establish the requisite knowledge for both the "general awareness" element and for the claim as a whole.  *See Honickman*, 6 F.4th at 494.  The March 28, 2018 Order failed to accord appropriate significance to these allegations.  *See* ECF No. 3946 at 31-37.

Fourth, for the reasons noted above, these allegations also establish that the Kingdom was "generally aware" that its support provided to the charities was "playing a role in [al Qaeda's] terrorism."  *Kaplan*, 999 F.3d at 864; *see supra* pp. 9-10 (fourth principle).  Indeed, the Kingdom's deep familiarity with al Qaeda and its operations, and its detailed knowledge of the operations of the charitable organizations, *see supra* pp. 11, n.5, 13-15 (illustrative allegations), make any other conclusion implausible.  This is especially so because those allegations set forth

---

[12] *See, e.g.*, CAC ¶¶ 116, 121-22, 125, 126, 131; Aver. ¶¶ 82-83, 116, 304, 312, 334-38, 372-74, 440-41, 477-78, 520-22, 544-545, 560, 576; Opp'n. at pp. 63-65; Kohlmann II ¶¶ 30, 33, 42, 43, 86-88, 98, 130, 153, 160; Kohlmann I ¶¶ 28-29, 59-62, 72-75, 93-98, 111-12, 116, 118, 120, 124-28.

[13] *See, e.g.*, Kohlmann II ¶¶ 51-54 (MWL); 68, 77-82 (IIRO); 95, 110-27 (Al Haramain); 141-46 (WAMY); Kohlmann I ¶¶ 39-54 (Al Haramain); ¶¶ 65-68 (MWL); ¶¶ 81-90 (IIRO); ¶¶ 104-09 (WAMY).

[14] *See* Aver. ¶ 585 ("the international community repeatedly cautioned Saudi Arabia about the imminent threat posed by the activities of its da'awa organizations during the years preceding the September 11th Attacks"); *id.* ("In 1999 and 2000, senior delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism."); ¶ 584 ("Indeed, from the early 1990's through September 11, 2001, the involvement of the Saudi da'awa organizations in terrorist plots and operations was the subject of intense media scrutiny and reporting."); *see also* CAC ¶ 32 (the charities "were repeatedly implicated in terrorist activities and the sponsorship of al Qaeda during the years preceding the September 11th attacks, and officials throughout the Saudi government were thus aware that those government components were actively supporting al Qaeda.").

the context of the Kingdom's position in the region, its relationship with al Qaeda, its officials

operating within the charitable organizations (and working with al Qaeda members), and the

various instances where it was told of the charitable organizations' support for al Qaeda. *See id.*

The March 28, 2018 Order did not reflect the significance of these allegations of "general

awareness." *See* ECF No. 3946 at pp. 31-37.

Fifth, a holistic assessment of all of Plaintiffs' allegations is required and buttresses each

of the conclusions above. *See supra* p. 10 (fifth *Kaplan* principle).  The extensive allegations of

al Qaeda's notoriety, its close relationship with the Kingdom, the overlap within the charities of

Kingdom officials and employees and al Qaeda members, and the extensive support provided by

the charitable organizations and their subsidiaries to al Qaeda all color and inform any

assessment of the adequacy and weight of any particular allegation – and of the reasonableness

of drawing inferences from them in plaintiffs' favor. *See Kaplan*, 999 F.3d at 864-65.  Those

allegations also need to be viewed in light of allegations concerning the myriad individual

Kingdom officials who also supported al Qaeda in their official roles in essential ways, directly

or through the many supported individuals who were closely intertwined with al Qaeda,[15] as well

as the extensive allegations connecting the key actors in the terrorist attack to the Kingdom's

Ministry of Islamic Affairs ("MOIA") and documenting the MOIA's advancement of al Qaeda's

agenda and activities and its extensive role in promoting jihadist causes more broadly.[16]  Instead,

the March 28, 2018 Order scrutinized the complaint's particular allegations in isolation and, in

assessing claims of both primary and secondary liability, did not draw reasonable inferences

---

[15] This approach is further reinforced by section 1605B's command that jurisdiction may be predicated upon a foreign state's "tortious act or *acts,"* 28 U.S.C. 1605B(b)(2) (emphasis supplied), language that plainly requires a holistic assessment of all tortious acts alleged.

[16] *See* CAC ¶¶ 33, 140-54, 263 (direct involvement by Saudi government imams with the Ministry of Islamic Affairs in recruitment and fundraising activities for al Qaeda, including recruitment of certain of the 9/11 hijackers); Aver. ¶¶ 115-29 (describing the Ministry of Islamic Affairs' deployment of thousands of Wahhabi clerics throughout the world to support Islamic extremist movements like al Qaeda).

arising from the cumulative effect of the many allegations showing the Kingdom's longstanding knowledge of and varied types of support for al Qaeda. *See* ECF No. 3946 at 18-31 ("The Individuals"), 31-37 ("The Charities").

Plaintiffs' allegations were, in these respects, much stronger than those found sufficient to state a claim in *Kaplan*. In *Kaplan*, the alleged support at issue was a bank's provision of funds transfer services to five individuals. *Kaplan*, 999 F.3d at 849-50. Here, the Kingdom is alleged to have provided at least a significant portion of the charities' budgets of tens of millions of dollars, contributed the charities' personnel and directors, and provided other support. *See supra* p. 13. In *Kaplan*, the bank was alleged to have known of the intermediary individuals' ties to Hizbollah through media reports. *Kaplan*, 999 F.3d at 850. Here, the Kingdom was put on notice of the charities' ties to al Qaeda not only through media reports, but by U.S. and other government officials, its own officials embedded in the charitable organizations, the Kingdom's other intimate dealings with the charities, as well as by its detailed and long-standing familiarity with al Qaeda itself. *See supra* pp. 14-16. In addition, the extensive support allegedly provided by the intermediary charities to al Qaeda was far more extensive, and far more directly tied to al Qaeda's terrorist activities, than was the alleged support to Hizbollah provided by the five intermediary individuals in *Kaplan*. In both cases, the true nature of the designated foreign terrorist organization and its activities (Hizbollah in *Kaplan*, al Qaeda here) were widely known, although the Kingdom's alleged dealings with and familiarity with al Qaeda were far more extensive than the bank's knowledge of or dealings with Hizbollah in *Kaplan*. *See supra* pp. 11, n.5, 13-16. A holistic assessment of all the allegations led the Second Circuit in *Kaplan* to conclude that plaintiffs had adequately alleged an ATA aiding and abetting claim, and that result should be even plainer for the stronger allegations against the Kingdom made here. Likewise,

these allegations of the Kingdom's extensive knowledge of the closely intertwined nature of the charities and supported individuals to al Qaeda distinguish this case in this respect from *Honickman*, where the claims failed because no allegations suggested that the defendant even knew of the intermediaries link to the terrorist organization.

### B.   The Kingdom's Indirect Support Provided Via Individuals Assisting al Qaeda.

*Kaplan*'s and *Honickman*'s legal framework also applies to allegations that the Kingdom provided support to individuals who were working closely with al Qaeda and who in some cases were even closely, often formally, associated with the Kingdom.  Each of the points made in Section II.A with respect to allegations of the Kingdom's support for al Qaeda via the charities applies equally to allegations of support provided to various individuals and to al Qaeda through them, and the *Kaplan* and *Honickman* framework has three additional, significant implications for assessing those allegations related to support that Kingdom officials, agents, and employees provided to al Qaeda via particular individuals.

First, *Kaplan*'s "holistic" interpretive principle requires that allegations related to each individual's actions be assessed within the context of the extensive and longstanding relationship alleged to exist between the Kingdom and al Qaeda, the pattern of the Kingdom's support for jihadi activities through both charitable organizations and the Ministry of Islamic Affairs, and the number of Kingdom officials, employees, and agents having extensive contacts with and providing assistance to members of al Qaeda.  This applies both to the individuals alleged to have been assisting the September 11th attacks as well as the individuals associated with the Kingdom and acting within or with the charities.

Indeed, an astounding number of persons closely affiliated with the Kingdom are alleged to have overseen, fostered, or otherwise facilitated al Qaeda's terrorist operations, consistent

with and in furtherance of the radical agenda and activities of the Ministry of Islamic Affairs

itself.[17]  In a number of instances, those contacts were with members of al Qaeda planning or

supporting the September 11th attacks.[18]  These allegations must be considered as a whole,

together, rather than in isolation.  *See Kaplan*, 999 F.3d at 854, 865.  Considering the full sweep

of these allegations in this way makes clear the scope of the Kingdom's support for and

knowledge of al Qaeda's activities.  The March 28, 2018 Order did not take account of, or draw

the appropriate inferences in light of, this broader context.  *See* ECF No. 3946 at 19-24

---

[17] *See, e.g.*, CAC ¶ 33 (the Ministry of Islamic Affairs and components of the Kingdom's Wahhabi proselytizing apparatus broadly used the resources under their control to fund and materially support al Qaeda), ¶ 64 (MWL Secretary General Abdullah Omar Naseef met with Osama bin Laden and other founding members of al Qaeda and agreed that MWL offices would be used by al Qaeda as a platform for jihad), ¶¶ 65-69 (Saudi government officials installed founding al Qaeda members into senior leadership posts of the charities, including Wa'el Jelaidan, Mohammed Jamal Khalifa, Adel Batterjee, and Aqeel al Aqeel), ¶ 90 (IIRO officials used fraudulent orphan distribution lists to conceal funding to al Qaeda), ¶ 91 (IIRO and Al Haramain employees involved in planning and execution of the 1998 U.S. Embassy bombings), ¶¶ 140-54 (describing broad collaboration between officials and employees of the Kingdom's Ministry of Islamic Affairs and al Qaeda, including recruitment and fundraising).  *See also* Aver. ¶¶ 115-29 (describing the Ministry of Islamic Affairs' deployment of thousands of Wahhabi clerics throughout the world to support Islamic extremist movements like al Qaeda), ¶¶ 294-95 (Saudi Grand Mufti Sheikh Abdel Aziz bin Baz encouraging support for al Qaeda's jihad), ¶¶ 345-60 (MWL Secretary General Abdullah Omar Naseef authorizing Osama bin Laden and al Qaeda to launch attacks from MWL offices, and inserting al Qaeda members into key charity leadership positions within the MWL and IIRO), ¶ 361 (MWL Secretary General Ahmad Muhammad Ali), ¶¶ 375-76 (Wa'el Hamza Jelaidan), ¶¶ 380-96 (Mohammed Jamal Khalifa), ¶¶ 403-06 (senior IIRO official Abd al Hamid Sulaiman al Mujil "used his position to bankroll the al Qaida network"), ¶¶ 454-55, 459 (WAMY Secretary General Maneh al Johani encouraging Muslims to donate money to buy "arms and ammunition" for the cause of jihad), ¶ 490 (Al Haramain Chairman Aqeel Abdulaziz al Aqeel oversaw Al Haramain's "financial and material support to the al Qaida network"); *see also* CAC ¶¶ 33, 140-54, 263 (direct involvement by Saudi government imams with the Ministry of Islamic Affairs in recruitment and fundraising activities for al Qaeda, including recruitment of certain of the 9/11 hijackers).  *See also* Affirmation of John Lehman (ECF No. 3783-2) at ¶ 7 ("The links between Saudi Arabia's Wahhabi clerics and al Qaeda did not exist solely at the ideological level, but rather also involved collaboration on financial and logistical fronts.  Saudi clerics, paid by the government of the Kingdom and preaching at state funded mosques, issued fatwas that provided religious justification for al Qaeda's terrorist actions.")

[18] *See, e.g.*, CAC ¶¶ 34, 36, 155-64, 165-264 (detailing the substantial assistance provided to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar in the United States by Thumairy, Bayoumi, and Osama Basnan), ¶¶ 265-66, 267-80 (additional assistance by Mohammed al Qudhaeein and Hamdan al Shalawi), ¶¶ 281-87 (Saleh al Hussayen and the 9/11 hijackers), ¶¶ 288-301 (Muhammed Jaber Fakihi), ¶¶ 302-06 (Omar Abdi Mohamed); Aver. ¶¶ 131-251 (describing the assistance provided to the 9/11 hijackers by Thumairy, Bayoumi, Basnan, and Hussayen), ¶¶ 252-63 (Fakihi's relationship with the al Qaeda "Hamburg cell" hijackers); 2012 FBI "Summary Report" (ECF No. 3463-4) (confirming that Thumairy and Bayoumi provided "substantial assistance" to 9/11 hijackers Hazmi and Mihdhar).  *See also* Affirmation of Daniel Robert "Bob" Graham (ECF No. 3783-8) at ¶ 18 ("Saudi government employees Fahad al-Thumairy and Omar al-Bayoumi served as the nucleus of the support network that received Al-Hazmi and al-Mihdhar upon their arrival in the United States, and provided substantial assistance to al-Hazmi and al-Mihdhar that was essential to their successful assimilation into the United States and their preparations for the attacks.").

(Thumairy/Bayoumi), 24-25 (Basnan), 25-27 (Qudhaeein/Shalawi), 27 (Hussayen), 27-28 (Fakihi), 28-31 (Mohamed).

Second, even for claims based on theories of the Kingdom's support for al Qaeda undertaken by its officials, employees, and agents, *Kaplan* establishes that the allegations need focus only on support provided to al Qaeda, not support for the attacks. *See Kaplan*, 999 F.3d at 860-61; *supra* pp. 6-8. For both officials, employees, and agents operating with or within the charities and those more directly assisting al Qaeda, *Kaplan* and *Honickman* foreclose faulting Plaintiffs' allegations on the grounds that the support allegedly provided to al Qaeda lacked an adequate nexus to the attacks themselves. Again, the March 28, 2018 Order was inconsistent with this approach.

Third, *Kaplan* and *Honickman* indicate that the allegations related to these individuals must be evaluated based on an aiding and abetting theory, in addition to considering whether those individuals directly supported al Qaeda while acting within the scope of their office, employment, or agency. For example, the allegations related to the extensive involvement of Saudi government imams in fundraising and in recruiting jihadists for al Qaeda (including several of the hijackers), often from government funded mosques and platforms, support at least a reasonable inference that the support the Kingdom provided to them in turn facilitated al Qaeda's activities, in circumstances where Kingdom officials were generally aware of the role the Kingdom's resources played in assisting al Qaeda.[19] The same is true with respect to the

---

[19] Indeed, Plaintiffs' allegations detailing the Ministry of Islamic Affairs' close ideological alignment with al Qaeda and myriad supportive dealings and relationships with bin Laden's organization, and the Kingdom's robust support for the Ministry's radical agenda, readily support a far stronger inference. *See* CAC ¶¶ 33, 140-54, 263 (direct involvement by Saudi government imams with the Ministry of Islamic Affairs in recruitment and fundraising activities for al Qaeda, including recruitment of certain of the 9/11 hijackers); Aver. ¶¶ 115-29 (describing the Ministry of Islamic Affairs' deployment of thousands of Wahhabi clerics throughout the world to support Islamic extremist movements like al Qaeda).

allegations concerning individuals like Muhammed Jaber Fakihi.[20]  That result would apply without regard to whether those imams, Fakihi, or the other officials were acting within the scope of their office, employment, or agency (although those roles would independently provide the basis for liability).

### C.    Applicability to Primary Liability Claims.

Although *Kaplan* directly addressed the standards applicable to an ATA aiding and abetting claim, several of the principles noted above also apply to ATA primary liability claims. In particular, several of those principles eliminate particular bases for objecting to the adequacy of Plaintiffs' allegations supporting an ATA primary liability claim against the Kingdom, or otherwise support a finding that those allegations were sufficient.

As noted, most relevant is *Kaplan*'s holding that both "direct" and "indirect" support are relevant to assessing an ATA claim.  *See supra* p. 6.  *Kaplan*'s reasoning addressed when a defendant provides "substantial assistance" to a terrorist organization that first passes through an intermediary aligned with the organization.  That reasoning applies generally to the provision of material support to a terrorist organization, and applies equally to a claim of primary liability as to one for aiding and abetting.  Likewise, *Kaplan*'s and *Honickman*'s focus on provision of material support to a terrorist organization, rather than specifically in support of a particular attack also applies to ATA primary liability claims – because in both cases it is the recipient organization that causes the harm.  *See supra* pp. 6-8.  And, the need for a holistic assessment of all allegations together, with reasonable inferences drawn from the context those allegations provide, *see supra* p. 10, also applies to primary liability claims.

---

[20] *See* CAC ¶¶ 36, 265-66, 288-301 (Fakihi's relationship with the al Qaeda "Hamburg cell" hijackers); Aver. ¶¶ 252-63.

### III.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that *Kaplan* and *Honickman*
establish that Plaintiffs' allegations provide this Court with jurisdiction over Plaintiffs' claims
and request entry of an order denying the Kingdom's motion to dismiss for lack of jurisdiction.

Dated: December 7, 2021                    Respectfully submitted,

                                           COZEN O'CONNOR

                                           By:    /s/  Sean P. Carter
                                           Sean P. Carter
                                           Stephen A. Cozen
                                           J. Scott Tarbutton
                                           Cozen O'Connor
                                           One Liberty Place
                                           1650 Market Street, Suite 2800
                                           Philadelphia, PA 19103
                                           Tel: (215) 665-2000
                                           scarter1@cozen.com
                                           scozen@cozen.com
                                           starbutton@cozen.com

                                           *On behalf of the CAC Plaintiffs*

                                           MOTLEY RICE LLC

                                           By:   /s/  Robert T. Haefele
                                           Robert T. Haefele
                                           Jodi Westbrook Flowers
                                           Donald A. Migliori
                                           Motley Rice LLC
                                           28 Bridgeside Boulevard
                                           Mount Pleasant, SC 29465
                                           Tel: (843) 216-9184
                                           rhaefele@motleyrice.com
                                           jflowers@motleyrice.com
                                           dmigliori@motleyrice.com

                                           *On behalf of the CAC Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the Plaintiffs' Memorandum of Law in Support of

Motion Pursuant to Fed. R. Civ. P. 54(b) and the Court's Inherent Powers to Revise This Court's

March 28, 2018 Order (ECF No. 3946), was electronically filed this 7th day of December 2021.

Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern

District of New York's Electronic Case Filing ("ECF") system.

_____

J. Scott Tarbutton, Esq.

LEGAL\55228719\1

23

## ATTACHMENT A

Plaintiffs who have asserted claims against the Kingdom of Saudi Arabia through the Consolidated Amended Complaint ("CAC") at ECF No. 3463:

1. *Federal Insurance Co. et al. v. Al Qaida, et al.*, 03-cv-06978 (GBD)(SN) (Sept. 10, 2003)
2. *Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.,* No. 03-cv-08591 (Oct. 30, 2003)
3. *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp.*, 03-cv-09849 (GBD)(SN) (Dec. 11, 2003)
4. *Estate of John P. O'Neill, Sr. et al. v. Kingdom of Saudi Arabia, et al.*, 04-cv-01922 (GBD)(SN) (Mar. 10, 2004)
5. *Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-05970 (GBD)(SN) (Sept. 1, 2004)
6. *Cantor Fitzgerald Assocs. et al. v. Akida Inv. Co., Ltd., et al.*, 04-cv-07065 (GBD)(SN) (Sept. 2, 2004)
7. *Pacific Employers Insurance. Co., et al. v. Kingdom of Saudi Arabia, et al.*, 04-cv-07216 (GBD)(SN) (Sept. 10, 2004)
8. *Euro Brokers Inc., et al. v. Al Baraka Inv. and Dev. Corp., et al.*, 04-cv-07279 (GBD)(SN) (Sept. 10, 2004)
9. *Beazley Furlong Ltd. v. Kingdom of Saudi Arabia*, 16-cv-07456 (GDB)(SN) (May 4, 2017)
10. *Bowrosen, et al. v. The Kingdom of Saudi Arabia*, 16-cv-08070 (GBD)(SN) (Oct. 14, 2016)
11. *McCarthy, et al. v. The Kingdom of Saudi Arabia*, 16-cv-08884 (GBD)(SN) (Nov. 15, 2016)
12. *Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, 16-cv-09663 (GBD)(SN) (Dec. 14, 2016)
13. *Addesso, et al. v. Kingdom of Saudi Arabia et al.*, 16-cv-09937 (GBD)(SN) (Dec. 23, 2016)
14. *Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-00117 (GBD)(SN) (Jan. 6, 2017)
15. *Desimone v. Kingdom of Saudi Arabia*, 17-cv-00348 (GBD)(SN) (Jan. 18, 2017)
16. *Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-00450 (GBD)(SN) (Jan. 20, 2017)
17. *The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-02129 (GBD)(SN) (Mar. 23, 2017)
18. *The Charter Oak Fire Insurance Co, et al. v. Al Rajhi Bank, et al.*, 17-cv-02651 (GBD)(SN) (May 19, 2017)
19. *General Reinsurance. Corp., et al. v. Kingdom of Saudi Arabia*, 17-cv-03810 (GBD)(SN) (May 19, 2017)
20. *Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-03887 (GBD)(SN) (May 23, 2017)
21. *Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-03908 (GBD)(SN) (May 23, 2017)
22. *Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-04201 (GBD)(SN) (Jun. 5, 2017)
23. *Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-05174 (GBD)(SN) (Jul. 10, 2017)
24. *Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-05471 (GBD)(SN) (Jul. 19, 2017)
25. *Abedhajajreh v. Kingdom of Saudi Arabia, et al.*, 17-cv-06123 (GBD)(SN) (Aug. 14, 2017)
26. *Allianz Versicherungs-Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia*, 17-cv-06519 (GBD)(SN) (Aug. 25, 2017)
27. *Fraser, et al. v. Al Qaeda Islamic Army, et al.*, 17-cv-07317 (GBD)(SN) (Sept. 26, 2017)
28. *Muenchener Rueckversicherungs Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.*, 17-cv-07914 (GBD)(SN) (Oct. 19, 2017)

29. *Abbate v. Kingdom of Saudi Arabia, et al.*, 17-cv-08617 (GBD)(SN) (Nov. 7, 2017)
30. *Behette, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-00538 (GBD)(SN) (Jan. 22, 2018)
31. *Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-00947 (GBD)(SN) (Feb. 2, 2018)
32. *Dillaber, et al. v. Islamic Republic of Iran, et al.*, 18-cv-03162 (GBD)(SN) (Apr. 11, 2018)
33. *Leftt, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-03353 (GBD)(SN) (Apr. 17, 2018)
34. *Global Aerospace, Inc., et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-05373 (GBD)(SN) (Jun. 14, 2018)
35. *IF P&C Ins. Limited (Publ) v. Kingdom of Saudi Arabia, et al.*, 18-cv-05383 (GBD)(SN) (Jun. 14, 2018)
36. *Acker, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-06922 (GBD)(SN) (Aug. 1, 2018)
37. *Ascher, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-07509 (GBD)(SN) (Aug. 17, 2018)
38. *Alarcon, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-10779 (GBD)(SN) (Nov. 19, 2018)
39. *Napolitano, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-10820 (GBD)(SN) (Nov. 19, 2018)
40. *Adams, et al. v. Kingdom of Saudi Arabia*, 18-cv-11493 (GBD)(SN) (Dec. 10, 2018)
41. *Actisdano, et al. v. Kingdom of Saudi Arabia*, 18-cv-11504 (GBD)(SN) (Dec. 10, 2018)
42. *Anderson, et al. v. Kingdom of Saudi Arabia*, 18-cv-11509 (GBD)(SN) (Dec. 10, 2018)
43. *Abraham, et al. v. Kingdom of Saudi Arabia*, 18-cv-11515 (GBD)(SN) (Dec. 10, 2018)
44. *Arias, et al. v. Kingdom of Saudi Arabia*, 18-cv-11582 (GBD)(SN) (Dec. 11, 2018)
45. *Agri, et al. v. Kingdom of Saudi Arabia*, 18-cv-11619 (GBD)(SN) (Dec. 12, 2018)
46. *Barrera, et al. v. Kingdom of Saudi Arabia*, 18-cv-11624 (GBD)(SN) (Dec. 12, 2018)
47. *Casilla, et al. v. Kingdom of Saudi Arabia*, 18-cv-11645 (GBD)(SN) (Dec. 13, 2018)
48. *Ando, et al. v. Kingdom of Saudi Arabia*, 18-cv-11664 (GBD)(SN) (Dec. 13, 2018)
49. *Abdul-Matin, et al. v. Kingdom of Saudi Arabia*, 18-cv-11685 (GBD)(SN) (Dec. 13, 2018)
50. *Kane, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-11717 (GBD)(SN) (Dec. 14, 2018)
51. *Karibian, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-11727 (GBD)(SN) (Dec. 14, 2018)
52. *Towle, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-11745 (GBD)(SN) (Dec. 14, 2018)
53. *Escowitz v. Kingdom of Saudi Arabia*, 18-cv-11713 (GBD)(SN) (Dec. 14, 2018)
54. *Elliott, et al. v. Kingdom of Saudi Arabia*, 18-cv-11768 (GBD)(SN) (Dec. 15, 2018)
55. *Correale, et al. v. Kingdom of Saudi Arabia*, 18-cv-11769 (GBD)(SN) (Dec. 15, 2018)
56. *Bouattoura, et al. v. Kingdom of Saudi Arabia*, 18-cv-11772 (GBD)(SN) (Dec. 15, 2018)
57. *Lynch, et al. v. Kingdom of Saudi Arabia*, 18-cv-11773 (GBD)(SN) (Dec. 15, 2018)
58. *Guinta, et al. v. Kingdom of Saudi Arabia*, 18-cv-11774 (GBD)(SN) (Dec. 15, 2018)
59. *Jordan, et al. v. Kingdom of Saudi Arabia*, 18-cv-11776 (GBD)(SN) (Dec. 16, 2018)
60. *Munoz, et al. v. Kingdom of Saudi Arabia*, 18-cv-11781 (GBD)(SN) (Dec. 16, 2018)
61. *Allen, et al. v. Kingdom of Saudi Arabia*, 18-cv-11795 (GBD)(SN) (Dec. 17, 2018)
62. *Thatcher, et al. v. Kingdom of Saudi Arabia*, 18-cv-11814 (GBD)(SN) (Dec. 17, 2018)
63. *Abad, et al. v. Kingdom of Saudi Arabia*, 18-cv-11831 (GBD)(SN) (Dec. 17, 2018)
64. *Mawra, et al. v. Kingdom of Saudi Arabia*, 18-cv-11839 (GBD)(SN) (Dec. 17, 2018)
65. *Alesi, et al. v. Kingdom of Saudi Arabia*, 18-cv-11867 (GBD)(SN) (Dec. 17, 2018)
66. *Sansevero, et al. v. Kingdom of Saudi Arabia*, 18-cv-11872 (GBD)(SN) (Dec. 17, 2018)
67. *Balestrieri, et al. v. Kingdom of Saudi Arabia*, 18-cv-11874 (GBD)(SN) (Dec. 17, 2018)
68. *Abel, et al. v. Kingdom of Saudi Arabia*, 18-cv-11880 (GBD)(SN) (Dec. 17, 2018)
69. *Bonomo, et al. v. Kingdom of Saudi Arabia*, 18-cv-11885 (GBD)(SN) (Dec. 18, 2018)

70. *Bobbitt, et al. v. Kingdom of Saudi Arabia*, 18-cv-11886 (GBD)(SN) (Dec. 18, 2018)
71. *Cintron-Lugos, et al. v. Kingdom of Saudi Arabia*, 18-cv-11888 (GBD)(SN) (Dec. 18, 2018)
72. *Bursztyn, et al. v. Kingdom of Saudi Arabia*, 18-cv-11891 (GBD)(SN) (Dec. 18, 2018)
73. *Chiu, et al. v. Kingdom of Saudi Arabia*, 18-cv-11893 (GBD)(SN) (Dec. 18, 2018)
74. *Gitter, et al. v. Kingdom of Saudi Arabia*, 18-cv-11899 (GBD)(SN) (Dec. 18, 2018)
75. *DeConto, et al. v. Kingdom of Saudi Arabia*, 18-cv-11904 (GBD)(SN) (Dec. 18, 2018)
76. *Balarezo, et al. v. Kingdom of Saudi Arabia*, 18-cv-11911 (GBD)(SN) (Dec. 18, 2018)
77. *Kenney-Remini, et al. v. Kingdom of Saudi Arabia*, 18-cv-11921 (GBD)(SN) (Dec. 18, 2018)
78. *Lang, et al. v. Kingdom of Saudi Arabia*, 18-cv-11926 (GBD)(SN) (Dec. 18, 2018)
79. *Gordenstein, et al. v. Kingdom of Saudi Arabia*, 18-cv-11941 (GBD)(SN) (Dec. 18, 2018)
80. *Cumberbatch, et al. v. Kingdom of Saudi Arabia*, 18-cv-11942 (GBD)(SN) (Dec. 18, 2018)
81. *Dougherty, et al. v. Kingdom of Saudi Arabia*, 18-cv-11944 (GBD)(SN) (Dec. 18, 2018)
82. *Harris, et al. v. Kingdom of Saudi Arabia*, 18-cv-11946 (GBD)(SN) (Dec. 18, 2018)
83. *Pugh, et al. v. Kingdom of Saudi Arabia*, 18-cv-11949 (GBD)(SN) (Dec. 18, 2018)
84. *Garger, et al. v. Kingdom of Saudi Arabia*, 18-cv-11950 (GBD)(SN) (Dec. 18, 2018)
85. *Thatcher, et al. v. Kingdom of Saudi Arabia*, 18-cv-11951 (GBD)(SN) (Dec. 18, 2018)
86. *Bush, et al. v. Kingdom of Saudi Arabia*, 18-cv-11964 (GBD)(SN) (Dec. 18, 2018)
87. *Mercer, et al. v. Kingdom of Saudi Arabia*, 18-cv-11965 (GBD)(SN) (Dec. 18, 2018)
88. *Murray, et al. v. Kingdom of Saudi Arabia*, 18-cv-11966 (GBD)(SN) (Dec. 19, 2018)
89. *Perez, et al. v. Kingdom of Saudi Arabia*, 18-cv-11967 (GBD)(SN) (Dec. 19, 2018)
90. *Richards, et al. v. Kingdom of Saudi Arabia*, 18-cv-11969 (GBD)(SN) (Dec. 19, 2018)
91. *Rooney, et al. v. Kingdom of Saudi Arabia*, 18-cv-11970 (GBD)(SN) (Dec. 19, 2018)
92. *Spence, et al. v. Kingdom of Saudi Arabia*, 18-cv-11971 (GBD)(SN) (Dec. 19, 2018)
93. *Fontanes, et al. v. Kingdom of Saudi Arabia*, 18-cv-11983 (GBD)(SN) (Dec. 19, 2018)
94. *Mazur, et al. v. Kingdom of Saudi Arabia*, 18-cv-11992 (GBD)(SN) (Dec. 19, 2018)
95. *Abbanato, et al. v. Kingdom of Saudi Arabia*, 18-cv-11996 (GBD)(SN) (Dec. 19, 2018)
96. *Baucom, et al. v. Kingdom of Saudi Arabia*, 18-cv-12009 (GBD)(SN) (Dec. 19, 2018)
97. *Moreno, et al. v. Kingdom of Saudi Arabia*, 18-cv-12010 (GBD)(SN) (Dec. 19, 2018)
98. *Pagano, et al. v. Kingdom of Saudi Arabia*, 18-cv-12015 (GBD)(SN) (Dec. 19, 2018)
99. *Acosta, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12039 (GBD)(SN) (Dec. 20, 2018)
100. *Ortega, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12071 (GBD)(SN) (Dec. 20, 2018)
101. *Hogue, et al. v. Kingdom of Saudi Arabia*, 18-cv-12052 (GBD)(SN) (Dec. 20, 2018)
102. *Shtivelman, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12067 (GBD)(SN) (Dec. 20, 2018)
103. *Bursztyn, et al. v. Kingdom of Saudi Arabia*, 18-cv-12026 (GBD)(SN) (Dec. 20, 2018)
104. *Aepelbacher, et al. v. Kingdom of Saudi Arabia*, 18-cv-12030 (GBD)(SN) (Dec. 20, 2018)
105. *Cruz, et al. v. Kingdom of Saudi Arabia*, 18-cv-12034 (GBD)(SN) (Dec. 20, 2018)
106. *Amaniera, et al. v. Kingdom of Saudi Arabia*, 18-cv-12043 (GBD)(SN) (Dec. 20, 2018)
107. *Siguencia, et al. v. Kingdom of Saudi Arabia*, 18-cv-12044 (GBD)(SN) (Dec. 20, 2018)
108. *Abdulla, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12060 (GBD)(SN) (Dec. 20, 2018)
109. *Hartford Fire Ins. Co., et al. v. Kingdom of Saudi Arabia*, 18-cv-12085 (GBD)(SN) (Dec. 20, 2018)
110. *Perez-Zapata, et al. v. Kingdom of Saudi Arabia*, 18-cv-12100 (GBD)(SN) (Dec. 21, 2018)

111. *Swiss Reinsurance America Corp., et al. v. Kingdom of Saudi Arabia*, 18-cv-12109 (GBD)(SN) (Dec. 21, 2018)
112. *Adam, et al. v. Kingdom of Saudi Arabia*, 18-cv-12118 (GBD)(SN) (Dec. 21, 2018)
113. *Agostinacchio, et al. v. Kingdom of Saudi Arabia*, 18-cv-12141 (GBD)(SN) (Dec. 22, 2018)
114. *Deckelmann, et al. v. Kingdom of Saudi Arabia*, 18-cv-12143 (GBD)(SN) (Dec. 23, 2018)
115. *Crossfield, et al. v. Kingdom of Saudi Arabia* 18-cv-12224 (GBD)(SN) (Dec. 26, 2018)
116. *Wurttembergische Versicherung AG v. Kingdom of Saudi Arabia*, 18-cv-12257 (GBD)(SN) (Dec. 27, 2018)
117. *Aamoth, et al. v. Kingdom of Saudi Arabia*, 18-cv-12270 (GBD)(SN) (Dec. 27, 2018)
118. *Deuel, et al. v. Kingdom of Saudi Arabia*, 18-cv-12272 (GBD)(SN) (Dec. 27, 2018)
119. *Kincaid, et al. v. Kingdom of Saudi Arabia*, 18-cv-12273 (GBD)(SN) (Dec. 27, 2018)
120. *Ortiz, et al. v. Kingdom of Saudi Arabia*, 18-cv-12274 (GBD)(SN) (Dec. 27, 2018)
121. *Stackpole, et al. v. Kingdom of Saudi Arabia*, 18-cv-12275 (GBD)(SN) (Dec. 27, 2018)
122. *Abdus-Sabur, et al. v. Kingdom of Saudi Arabia*, 18-cv-12280 (GBD)(SN) (Dec. 28, 2018)
123. *Jacobs, et al. v. Kingdom of Saudi Arabia*, 18-cv-12286 (GBD)(SN) (Dec. 28, 2018)
124. *Berry, et al. v. Kingdom of Saudi Arabia*, 18-cv-12294 (GBD)(SN) (Dec. 28, 2018)
125. *Coppola, et al. v. Kingdom of Saudi Arabia*, 18-cv-12298 (GBD)(SN) (Dec. 28, 2018)
126. *Ervin, et al. v. Kingdom of Saudi Arabia*, 18-cv-12301 (GBD)(SN) (Dec. 28, 2018)
127. *Gularte, et al. v. Kingdom of Saudi Arabia*, 18-cv-12305 (GBD)(SN) (Dec. 28, 2018)
128. *Abreu, et al. v. Kingdom of Saudi Arabia*, 18-cv-12318 (GBD)(SN) (Dec. 28, 2018)
129. *Parks, et al. v. Kingdom of Saudi Arabia*, 18-cv-12322 (GBD)(SN) (Dec. 28, 2018)
130. *Keaton, et al. v. Kingdom of Saudi Arabia*, 18-cv-12326 (GBD)(SN) (Dec. 29, 2018)
131. *Mann, et al. v. Kingdom of Saudi Arabia*, 18-cv-12328 (GBD)(SN) (Dec. 29, 2018)
132. *Moy, et al. v. Kingdom of Saudi Arabia*, 18-cv-12334 (GBD)(SN) (Dec. 29, 2018)
133. *Quinones, et al. v. Kingdom of Saudi Arabia*, 18-cv-12335 (GBD)(SN) (Dec. 29, 2018)
134. *Sorrentino, et al. v. Kingdom of Saudi Arabia*, 18-cv-12336 (GBD)(SN) (Dec. 29, 2018)
135. *Johnston, et al. v. Kingdom of Saudi Arabia*, 18-cv-12346 (GBD)(SN) (Dec. 29, 2018)
136. *Rodriguez, et al. v. Kingdom of Saudi Arabia*, 18-cv-12348 (GBD)(SN) (Dec. 30, 2018)
137. *Moore, et al. v. Kingdom of Saudi Arabia*, 18-cv-12349 (GBD)(SN) (Dec. 30, 2018)
138. *Labozzetta, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12362 (GBD)(SN) (Dec. 31, 2018)
139. *Chairnoff, et al. v. Kingdom of Saudi Arabia*, 18-cv-12367 (GBD)(SN) (Dec. 31, 2018)
140. *Abiuso, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12374 (GBD)(SN) (Dec. 31, 2018)
141. *Zelmanowitz, et al. v. Kingdom of Saudi Arabia*, 18-cv-12381 (GBD)(SN) (Dec. 31, 2018)
142. *Knight, et al. v. Kingdom of Saudi Arabia*, 18-cv-12399 (GBD)(SN) (Dec. 31, 2018)
143. *Agro, et al. v. Kingdom of Saudi Arabia*, 18-cv-12402 (GBD)(SN) (Dec. 31, 2018)
144. *Anaya, et al. v. Kingdom of Saudi Arabia*, 18-cv-12339 (GBD)(SN) (Dec. 29, 2018)
145. *Nelson, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12375 (GBD)(SN) (Dec. 31, 2018)
146. *DiGiovanni, et al. v. Kingdom of Saudi Arabia, et al.*, 18-cv-12376 (GBD)(SN) (Dec. 31, 2018)
147. *Kwartowitz v. Kingdom of Saudi Arabia*, 18-cv-12378 (GBD)(SN) (Dec. 31, 2018)
148. *Ashourvaveh, et al. v. Kingdom of Saudi Arabia, et al.*, 19-cv-00039 (GBD)(SN) (Jan. 2, 2019)
149. *Barnes, et al. v. Kingdom of Saudi Arabia*, 19-cv-00003 (GBD)(SN) (Jan. 1, 2019)
150. *Watts, et al. v. Kingdom of Saudi Arabia*, 19-cv-00025 (GBD)(SN) (Jan. 2, 2019)

151. *Odland v. Kingdom of Saudi Arabia*, 19-cv-00026 (GBD)(SN) (Jan. 2, 2019)
152. *Ahmed, et al. v. Kingdom of Saudi Arabia*, 19-cv-00028 (GBD)(SN) (Jan. 2, 2019)
153. *Collazo, et al. v. Kingdom of Saudi Arabia, et al.*, 19-cv-00030 (GBD)(SN) (Jan. 2, 2019)
154. *Adedapo, et al. v. Kingdom of Saudi Arabia*, 19-cv-00040 (GBD)(SN) (Jan. 2, 2019)
155. *O'Connor v. Kingdom of Saudi Arabia*, 19-cv-00045 (GBD)(SN) (Jan. 2, 2019)
156. *Boyle, et al. v. Kingdom of Saudi Arabia*, 19-cv-00048 (GBD)(SN) (Jan. 2, 2019)
157. *Abarca, et al. v. Kingdom of Saudi Arabia*, 19-cv-00050 (GBD)(SN) (Jan. 2, 2019)

LEGAL\54423180\1

5