UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to*:
All Actions

# MOTION OF THE *ASHTON* PLAINTIFFS TO COMPEL SAUDI ARABIA TO PRODUCE DOCUMENTS CONCERNING THREE KINGDOM OFFICIALS, AND TO REVISE THIS COURT'S MARCH 2018 ORDER TO CONFORM WITH RECENT SECOND CIRCUIT AIDING-ABETTING TERROR CASES

KREINDLER & KREINDLER LLP
Steven R. Pounian, Esq.
James P. Kreindler, Esq.
Andrew J. Maloney, III, Esq.
Megan W Benett, Esq.
James Gavin Simpson, Esq.
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com

Attorneys for *Ashton* Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.  PLAINTIFFS ARE ENTITLED TO IMMEDIATE DOCUMENT DISCOVERY
    OF THE KINGDOM CONCERNING THREE SAUDI OFFICIALS WHO
    WORKED WITH BAYOUMI AND THUMAIRY TO SUPPORT AL QAEDA
    AND THE 9/11 PLOT ..............................................................................................3

   A. Plaintiffs are entitled to documents concerning the work, assignments, supervision,
      travel, and financial activities of Kingdom officials Sadhan and Sudairy, who
      operated inside the U.S. as the "advance intelligence team" for the 9/11 hijackers.......5

   B. Plaintiffs are entitled to documents about the work, assignments, supervision,
      travel, and financial activities of Omar Abdi Mohamed, identified as a terror extremist
      and al Qaeda member who worked in San Diego for the Kingdom with Thumairy,
      Bayoumi, and Sowailem and laundered money for al Qaeda ........................................10

II. THIS COURT SHOULD REVISE ITS MARCH 2018 ORDER TO CONFORM
    WITH RECENT SECOND CIRCUIT AIDING-ABETTING TERROR CASES ........14

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................................. passim
*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) ................................................. passim
*In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018) ........ passim
*Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021) ........................................ passim
*Rubik's Brand Ltd. v. Flambeau, Inc.*, 329 F.R.D. 55 (S.D.N.Y. 2019) ...................................... 3, 4
*Tatintsian v. Vorotyntsev*, 2021 WL 780139 (S.D.N.Y. Jan. 27, 2021) .......................................... 4
*United States v Mohamed*, 203 F. App'x. 879 (9th Cir. 2006) ..................................................... 11
*Venite v. St. Luke's/Roosevelt Hosp.*, 2002 WL 1461493 (S.D.N.Y. July 3, 2002) ........................ 3

Statutes

18 U.S.C. § 951 ............................................................................................................................. 12
18 U.S.C. § 2333 ....................................................................................................................... 2, 14
28 U.S.C. §§1602 ............................................................................................................................ 2
Pub. L. No. 114-222, 130 Stat. 852 ................................................................................................ 2

Rules

Fed. R. Civ. P. 16(b)(4) .................................................................................................................. 3
Fed. R. Civ. P. 54(b) ...................................................................................................................... 2

Other

Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of
   September 11, 2001, Exec. Order No. 14040, 86 Fed. Reg. 50439 (Sept. 3, 2021). .......... passim

I.  The *Ashton* Plaintiffs move this Court for an order to compel the Kingdom of Saudi Arabia to produce documents concerning the work, assignments, supervision, travel, and financial activities of three Kingdom officials —Adel al Sadhan, Mutaeb al Sudairy, and Omar Abdi Mohamed — from January 1, 1998 to September 11, 2001.  Pursuant to President Biden's September 3, 2021 Executive Order 14040,[1] the FBI is undertaking a further declassification review and has recently produced documents (which Plaintiffs sought from the beginning of discovery) confirming key details about how Sadhan, Sudairy and Abdi Mohamed worked with Fahad al Thumairy and Omar al Bayoumi to support al Qaeda and advance the 9/11 plot.  The requested discovery is directly relevant to the "limited jurisdictional discovery" previously granted by this Court in its Order of March 28, 2018, *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018)(ECF No. 3946), as well as the aiding-abetting principles established in the two recent Second Circuit cases which prompted the CAC Plaintiffs to file their pending motion: *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).

While the Court has previously stated that document discovery was over and has denied Plaintiffs' prior requests for discovery concerning the three Kingdom officials,[2] the recent FBI production provides good cause to reopen discovery to allow for this discrete document production and satisfies the discovery criteria previously defined by this Court.  The Kingdom should be ordered to produce the documents at issue no later than March 1, 2022, so that Plaintiffs' experts can consider them for the reports due on April 1, 2022.

---

[1] Declassification Reviews of Certain Documents Concerning the Terrorist Attacks of September 11, 2001, Exec. Order No. 14040, 86 Fed. Reg. 50439 (Sept. 3, 2021).
[2] The relevant prior Orders of this Court are addressed below.  *See*, n. 17, 18, *infra.*

1

II.      The *Ashton* Plaintiffs join in the CAC Plaintiffs' motion, ECF Nos. 7431, 7432, and move this Court, pursuant to Fed. R. Civ. P. 54(b) and this Court's inherent powers, to revise its March 2018 Order, based on the Second Circuit's rulings in *Kaplan* and *Honickman*. Like the CAC complaint, the *Ashton* complaint seeks damages from the Kingdom of Saudi Arabia under the Justice Against Sponsors of Terrorism Act (JASTA)[3] for causing the 9/11 Attacks by aiding and abetting al Qaeda. Congress expressly enacted JASTA to: (1) amend the Anti-Terrorism Act (ATA),[4] to allow the 9/11 Families along with other terror victims to bring aiding-abetting claims against sponsors of terrorism; and (2) amend the Foreign Sovereign Immunities Act,[5] to confirm that such claims could be brought against Saudi Arabia and other foreign states.

*Kaplan* and *Honickman* have now declared the legal principles governing JASTA aiding-abetting liability under the "proper legal framework" specified by Congress for such claims: the District of Columbia Circuit's decision in *Halberstam v. Welch*.[6] The *Ashton* Plaintiffs adopt the CAC Plaintiffs' arguments regarding the Second Circuit decisions and urge this Court to revisit its March 2018 Order to give effect to *Kaplan* and *Honickman* — and the clear intent of Congress in JASTA. This Court should declare that jurisdiction over the Kingdom has been established, and order merits discovery against the Kingdom to proceed, or allow Plaintiffs to pursue further jurisdictional discovery concerning the Kingdom's role in aiding-abetting al Qaeda and the 9/11 hijackers, including indirectly through various organizations and individuals.

---

[3] Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016).
[4] 18 U.S.C. § 2333, et seq.
[5] 28 U.S.C. §§1602, et seq.
[6] 705 F.2d 472 (D.C. Cir. 1983). Congress submitted its own finding with the JASTA statute to define the framework for the aiding-abetting cause of action:
> The decision of the United States Court of Appeals for the District of Columbia in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

I. **PLAINTIFFS ARE ENTITLED TO IMMEDIATE DOCUMENT DISCOVERY OF THE KINGDOM CONCERNING THREE SAUDI OFFICIALS WHO WORKED WITH BAYOUMI AND THUMAIRY TO SUPPORT AL QAEDA AND THE 9/11 PLOT**

At the conference on January 13, 2020, this Court stated, as to the Kingdom, "I view formal paper discovery to now be over" but adding the caveat that the Court would permit "follow-up" requests, citing the possibility of newly disclosed information from the FBI or depositions. ECF No. 5777 at 43.[7] This motion constitutes precisely the type of "follow-up" request foreseen by the Court: it is based on new information obtained from the FBI's most recent production and bears directly on the propriety of discovery previously sought regarding Sadhan, Sudairy, and Abdi Mohamed.

The legal standard for allowing additional document discovery is "good cause." *See* Fed. R. Civ. P. 16(b)(4) (where court enters a discovery schedule, it "can be modified with the court's consent upon a showing of good cause."). Courts in the Southern District customarily apply a six-part test to determine whether good cause has been established to permit additional discovery after a deadline:

> (1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence.

*Rubik's Brand Ltd. v. Flambeau, Inc.,* 329 F.R.D. 55, 58 (S.D.N.Y. 2019); *see also Venite v. St. Luke's/Roosevelt Hosp.,* 2002 WL 1461493 (S.D.N.Y. July 3, 2002).

---

[7] This Court stated:
> Let me make one last point, which is that I view formal paper discovery to now be over. We've had some litigation on this particular topic. I view now formal paper discovery to be over. I know that plaintiffs are waiting on motions for the FBI. Obviously, those need to be ruled on, and we'll get to those as soon as I can. I'm also not including in that statement the possibility and, I assume, the likelihood that during a deposition someone would indicate a particular document or category of documents that was not reasonably sought or maybe was sought and not found but now the deposition makes clear that it does exist, and so follow-up in the sort of ordinary course that everybody is familiar with.

3

Of these factors "the primary consideration in determining good cause is whether the moving party can demonstrate diligence." *Rubik's Brand*, 329 F.R.D. at 58.  Another key factor is whether the motion is based on new factual grounds and could not have been brought earlier. *Tatintsian v. Vorotyntsev,* 2021 WL 780139, at *5 (S.D.N.Y. Jan. 27, 2021).  As addressed below, these central factors are established here: the history of each request shows that Plaintiffs have vigorously sought the relevant discovery in previous discovery requests; moved to compel production; previously demanded that the FBI produce the information early in discovery; and, had no other means to obtain the FBI information until it was disclosed on November 2, 2021, pursuant to Exec. Order 14040.[8]

Moreover, the hearing in this case is not imminent; to the contrary, the ongoing FBI production allows a window of several months for the Kingdom to produce the documents before the Plaintiffs' expert witness reports are due.  Nor can the Kingdom properly claim unfair prejudice or surprise.  Plaintiffs have repeatedly sought the documents at issue, since early in this case.  Had the FBI information been divulged earlier, the Kingdom in turn would have been ordered to produce the documents at issue months, if not years ago.  Instead, the Kingdom has successfully evaded the discovery until now.

There is another strong factor supporting the requested production: the aiding-abetting framework set forth in the recent Second Circuit decisions in *Kaplan* and *Honickman.*  Under that framework, "liability for aiding-abetting often turns on how much encouragement or assistance is substantial enough," and the nature of the inquiry ordinarily requires a court to make inferences from indirect evidence. *Halberstam,* 705 F.2d at 476, 478.  To properly present

---

[8] Plaintiffs have been hampered by the fact that the documents publicly released by the FBI on November 2 still contain numerous redactions for privacy and grand jury restrictions.  Plaintiffs are waiting for the unredacted versions of the documents to be released by the FBI in this litigation subject to the FBI Protective Order. The government has not yet committed to a date by which that will happen.

their case, Plaintiffs are entitled to obtain the documentary evidence held by the Kingdom on the roles and duties of these three officials.

A. **Plaintiffs are entitled to documents concerning the work, assignments, supervision, travel, and financial activities of Kingdom officials Sadhan and Sudairy who operated inside the U.S. as the "advance intelligence team" for the 9/11 hijackers**

The new evidence released by the FBI describes Saudi Ministry of Islamic Affairs (MOIA) Propagators and diplomats Adel al Sadhan and Mutaeb al Sudairy as an "advance intelligence team" who travelled to California to meet with Thumairy, Bayoumi, Anwar Aulaqi, and others as part of the "network of individuals connected to the facilitation of two 9/11 hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar." EO14040-000583.[9] The two men first visited the U.S. in December 1998 and returned to live in the U.S. from 1999 through 2001. This Court should order the Kingdom to produce documents about the work, assignments, supervision, travel, and financial activities of Sadhan and Sudairy, to include the planning and coordination of their travel inside the U.S., from January 1, 1998 up to and including September 11, 2001.

The FBI's investigation documents show that before September 11, 2001, a group of Saudi Embassy and Consulate officials, including Thumairy, had ties to extremists and terror organizations. EO14040-000564.[10] Sadhan and Sudairy, both of whom the Kingdom appointed as diplomats and Officers at its Embassy in Washington, D.C. from June 1999 to April 2001,[11]

---

[9] References herein to EO14040 are to the bates numbers assigned to the documents as produced by the FBI pursuant to Exec. Order 14040. The referenced FBI documents are attached as Exhibit 1 to the First Declaration of Steven Pounian, which accompanies this motion. A Second Pounian Declaration also accompanies this motion to include the Under Seal Appendix referenced herein and under seal exhibits.
[10] Similar statements about Thumairy's roles are set forth in other newly released FBI documents, including EO14040-000708.
[11] Sadhan and Sudairy were registered by Saudi Arabia with the U.S. Department of State to work at the Saudi Embassy in Washington, D.C. from June 14, 1999 through April 2, 2001. Ex. 2. The Kingdom violated U.S. law by not employing Sadhan and Sudairy full time at its Embassy and instead assigning the two men to reside at various locations in the U.S. outside the Washington, D.C. area, including (but not limited to) California (where they

5

were clearly members of this group. The documents describe MOIA/Embassy diplomats Sadhan and Sudairy as part of the support network for the 9/11 hijackers collaborating with Thumairy, Bayoumi, and other Saudi Embassy officials. According to the FBI, the two men were "assessed to be part of a network of individuals connected to the facilitation of two 9/11 hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar." EO14040-000583. The FBI stated:

> Based on their activity patterns in 1999 and 2000, al-Sadhan and al-Sudairy possibly served in the capacity of an advance intelligence team involved in laying the groundwork for 9/11 hijackers al-Hazmi and al-Mihdhar, before their arrival in Southern California in early 2000. There is no indication al-Sadhan and Al-Sudairy had direct contact with the hijackers, however similar associations, communications, and logistics mirror those of the hijackers upon their arrival.

EO14040-000583. A 2010 FBI report concluded that the purpose of Sadhan's December 1998 visit to the U.S. "was to begin preparations for Al-Thumairy's subsequent assistance to Al-Hazmi and Al-Mihdhar." EO14040-000591. According to the FBI, Sadhan and Sudairy "may have served as an advance team who helped to arrange people to assist Al-Hazmi and Al-Mihdhar during their time in southern California." *Id.*[12]

The FBI documents reveal that on his first trip from Saudi Arabia to the U.S. in December 1998, Sadhan listed Thumairy's phone number in Los Angeles as his contact on his I-94 immigration form. *Id.*[13] The FBI documents also show that Sadhan and Sudairy made *two*

---

interacted with Bayoumi and Thumairy) and Missouri (where Sudairy lived with an al Qaeda operative). *See* Denza, *Diplomatic Law* 15 (4th ed. 2016) (since the mid-1980s, U.S. State Department rules have required that individuals accredited by foreign states as Embassy officials live in the Washington, D.C. area and work essentially full time at the Embassy).

[12] The most recent public release of FBI documents contained a new, completely unredacted version of the Executive Summary of the December 2004 FBI-CIA Joint Assessment. The material produced to date confirms that the Saudi MOIA provided financial and logistical support to terrorists (as demonstrated by the proof about Sadhan, Sudairy, and Thumairy). Newly revealed facts in the Summary further show that "Saudi-funded clerics" were part of a group of "Saudi funded intelligence officers and cooptees" engaged in collecting information inside the U.S. The body of the FBI-CIA Joint Assessment has not yet been released. According to the FBI, the remainder of the Joint Assessment "is the subject of an ongoing declassification review by other U.S. government agencies and departments consistent with Executive Order 14040 and will be posted publicly at the conclusion of that review." EO14040-000488.

[13] *See* Under Seal Appendix at ¶ 1.

separate trips to Southern California to meet with Thumairy and Bayoumi in 1998-1999. They visited not only for Ramadan 1419 in December 1998-January 1999, but also "for approximately six weeks in the summer of 1999" during "approximately June 1999 to August 1999." EO 14040-597. The report contains FBI investigative findings indicating that on this second visit Bayoumi "provided [them] a place to live and looked after them…." and "may have provided them with a cell phone." *Id.*[14]

As the FBI found, MOIA officials Sadhan and Sudairy comprised an instrumental "advance team" for al Qaeda to lay the groundwork for Hazmi and Mihdhar to settle in California. In March and April 1999, several months after Sadhan and Sudairy returned from their first visit to California, the two hijackers filed visa applications to visit the U.S., listing Los Angeles, California as their destination. Ex. 3 (relevant page from the "9/11 Timeline" assembled by FBI investigators). Al Qaeda's decision to send Hazmi and Mihdhar to California was made only after Kingdom officials Sadhan and Sudairy had confirmed the arrangements on the ground.

The FBI investigation concluded that the timing of a series of phone calls between Bayoumi and Sudairy in January and February 2000 was "significant" because the "calls coincide with significant logistic support of the hijackers." EO14040-000593, 000598; Ex. 4, Operation Encore 2016 Report at 14.[15] Bayoumi made these calls to Sudairy (who was at the time a Saudi diplomat living in Virginia) "while the hijackers were in San Diego with Al-Bayoumi". EO14040-000593. It is reasonable to infer that Bayoumi was reporting to Sudairy on

---

[14] *See* Under Seal Appendix at ¶ 2.
[15] A redacted version of the Operation Encore 2016 Report was released publicly by the FBI on September 11, 2021. For the purposes of this litigation, the FBI provided a further version, in which several of the redactions were lifted, on September 15, 2021, under the FBI Protective Order. *See* Under Seal Appendix at ¶ 3.

7

the arrival of the two hijackers and the arrangements that he, Thumairy, and others had made for them in Southern California, up to such point where "the hijackers' affairs were in order." *Id*.

In addition, the FBI documents demonstrate a key, direct tie between Sudairy and the al Qaeda terrorists who brought about the 9/11 Attacks: an FBI report states that

> [w]hile in Missouri, Al Sudairy lived with Ziyad Khaleel for about four months in 2000. Khaleel was a known communications equipment procurement officer for [Usama Bin Laden] and provided satellite phones used in the 1998 US Embassy bombings in Africa.

EO14040-000632.[16]

The new evidence adds precisely what this Court has said was lacking in its assessment of Plaintiffs' repeated efforts to compel document discovery about Sadhan and Sudairy from the Kingdom and the FBI over the past three years, beginning in October 2018. The Court denied the discovery after balancing the Kingdom's claim to immunity from discovery against the then-available factual record.[17] Plaintiffs also requested documents regarding Sadhan and Sudairy from the FBI and moved to compel the FBI to produce those documents at the first available opportunity, in May 2019. The FBI successfully opposed the motion, claiming, *inter alia*, that

---

[16] *See* Under Seal Appendix at ¶ 4.

[17] On November 29, 2018, this Court entered an order that summarily denied document discovery concerning Sadhan and Sudairy, stating that it would provide the reasons for its order in a subsequent decision. ECF No. 4261 at 2. In an Order on January 3, 2020 (ECF No. 5431 (sealed), ECF No. 6580 (public and redacted)), this Court adopted Saudi Arabia's arguments that "Plaintiffs fail…to provide concrete allegations that either official [Sadhan or Sudairy] assisted the hijackers." ECF No. 5431/6580 at 8; *see* KSA 9/12/2019 letter at 1 (claiming that Plaintiffs did not present any "concrete allegations" that Sadhan and Sudairy were part of the support network for the 9/11 hijackers). In its May 7, 2020 Order denying Plaintiffs' motion for reconsideration (ECF No 6195 (sealed), ECF No. 6583 (public and redacted)), this Court found the evidence at the time insufficient to show that "Sadhan and Sudairy took part in the alleged plot to assist the hijackers" (*id.* at 6) and reiterated the burden on Plaintiffs to articulate specific facts about Sadhan and Sudairy "relevant to the FSIA immunity determination" to allow the Court to balance the need for discovery to substantiate exceptions to sovereign foreign immunity against the Kingdom's claim to immunity from discovery. *Id*. After Plaintiffs filed objections, Judge Daniels endorsed this Court's findings. ECF No. 6614 at 3 ("Plaintiffs failed to provide concrete allegations that either Al Sadhan or Al Sudairy assisted the 9/11 hijackers."). The newly disclosed FBI documents address the very concern the Court identified, providing concrete allegations that Sadhan and Sudairy aided the hijackers and facilitated the 9/11 plot.

8

the FBI should not be ordered to produce documents that the Kingdom itself was not required to produce.  ECF No. 6582 at 3.[18]

The production mandated by Exec. Order 14040, however, has now revealed that the FBI did hold relevant documents regarding the roles of Sadhan and Sudairy and the ties of the two men to Bayoumi, Thumairy, and the 9/11 plot.  If the FBI had produced those documents in May 2019 as demanded by Plaintiffs, the information about Sadhan and Sudairy would have been disclosed; the Kingdom would have been ordered at that time to produce its documents about the work, assignments, supervision, travel, and financial activities of the two men inside the U.S. during the key time period; and the Plaintiffs would have been able to use the relevant documents at the depositions of Sadhan and Sudairy.

The new FBI production shows that this Court's prior rulings did not apprehend the key preparatory role that Sadhan and Sudairy played in the 9/11 support plot.  According to the FBI documents, Sadhan and Sudairy travelled to California "laying the groundwork for 9/11 hijackers al-Hazmi and al-Mihdhar," EO14040-000583, by meeting the persons (including Thumairy, Bayoumi, Anwar Aulaqi, and Abdusattar Sheikh) who would later help the hijackers and staking out the locations where the hijackers would visit and live.  The activities of Sadhan and Sudairy, working in tandem with other Kingdom officials to provide a support network for the 9/11 hijackers, fit precisely into the framework for aiding-abetting claims defined in *Kaplan* and *Honickman*.

Plaintiffs have demonstrated good cause to reopen discovery to obtain documents from the Kingdom about Sadhan and Sudairy.  The factual record now available brings discovery

---

[18] In an April 2020 Order, this Court agreed with the FBI and denied the motion, again concluding that "Plaintiffs had not made a specific allegation, supported by the factual record, that Sadhan and Sudairy were involved in assisting the hijackers." *Id*. at 12.

9

regarding Sadhan and Sudairy squarely within this Court's purview for the jurisdictional inquiry. The documents are directly relevant to the nature and extent of the support that Kingdom officials Sadhan and Sudairy provided to the 9/11 hijackers, as well as the involvement and work/agency relationships the two men had with other Kingdom officials, including Thumairy, Bayoumi, Embassy official Khalid al Sowailem, and others. The document discovery is also relevant to the credibility of the Kingdom's witnesses.

**B. Plaintiffs are entitled to documents about the work, assignments, supervision, travel, and financial activities of Omar Abdi Mohamed, identified as a terror extremist and al Qaeda member who worked in San Diego for the Kingdom with Thumairy, Bayoumi, and Sowailem and laundered money for al Qaeda**

The FBI production provides good cause for this Court to order the Kingdom to produce documents concerning MOIA Propagator Omar Abdi Mohamed (a/k/a Omar al Khatib). The FBI production shows that Thumairy, together with other Saudi Embassy and Consulate officials, funded extremists and terror organizations prior to 9/11, and that the FBI had information that "UBL [Usama Bin Laden] money" was "distributed" by Thumairy. EO14040-000564; EO14040-000693. The FBI described Abdi Mohamed as a radical extremist who "was also a member of AL-QAEDA." EO14040-000345. FBI documents previously produced in this litigation show that Abdi Mohamed reported directly to Thumairy,[19] and the new FBI production provides specific details about how Thumairy supervised Abdi Mohamed, citing an occasion when Thumairy "became angry" at Abdi Mohamed for having a second job "in addition to being

---

[19] In November 2018, the Department of Justice produced documents to the Plaintiffs from Abdi Mohamed's immigration fraud case showing that Abdi Mohamed received a January 1998 letter from Embassy diplomat and MOIA official Khalid al Sowailem instructing him to report to Thumairy, who had been appointed to oversee all MOIA Propagators in California. Plaintiffs' Nov. 30, 2018 Motion to Compel, Pounian Dec'l, Ex. 8 at DOJ000009. Despite Plaintiffs' specific requests in their original motions, Saudi Arabia failed to produce its copy of this document in its production. Saudi Arabia also failed to produce any documents about its assignment of Thumairy to supervise California propagators until after the DOJ had provided its documents, and Plaintiffs filed a Motion to Compel. *See* ECF No. 4456 at 12 (February 2019 hearing of Plaintiffs' Motion to Compel).

paid by the Saudi government." EO14040-000676.[20] The documents show that Abdi Mohamed had a close relationship with Bayoumi: the two men had lunch "on numerous occasions." EO14040-000654.[21] In addition, the FBI documents show that Abdi Mohamed was not only supervised by Thumairy, but also reported to Thumairy's supervisor Khalid al Sowailem at the Saudi Embassy, and that Sowailem traveled to San Diego and met with Abdi Mohamed. EO14040-000722.

The new FBI production confirms that in an interview with a U.S. immigration officer, Abdi Mohamed "lied about receiving approximately $350,000 from Global Relief Foundation," which the Treasury Department cited for its support to terrorism and al Qaeda. EO14040-000693. Plaintiffs previously showed that between December 1998 and May 2001 Abdi Mohamed assisted al Qaeda by laundering over $350,000 for the terror group from the Global Relief and al Haramain organizations via a California charity.[22]

The FBI documents show that Saudi Arabia's hiring of a known extremist and member of al Qaeda did not occur by accident: rather, the FBI found that to obtain his MOIA position Abdi Mohamed "had to have been trained in a Saudi-supported madrassa and recommended by an

---

[20] *See* Under Seal Appendix at ¶ 5. Plaintiffs also obtained documents from the FBI during discovery which confirmed that Mohamed was paid his salary and bonuses directly by the Saudi Embassy. Ex. 5.
[21] *See* Under Seal Appendix at ¶ 6.
[22] *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 654 (this Court cites Plaintiffs' allegations and proof that Abdi Mohamed "established a charity organization in San Diego called the Western Somali Relief Agency ("WSRA") to serve as a fundraising front for al Qaeda" and that "[b]etween December 1998 and May 2001, the WSRA issued 65 checks totaling nearly $400,000 to Dahab Shil, a money transfer agency whose office in Pakistan was controlled by 9/11 mastermind Khalid Sheikh Mohammed.").
The Ninth Circuit, in affirming Abdi Mohamed's sentence for immigration fraud, reviewed the "mysterious" and "unusual" facts concerning Abdi Mohamed's activities inside the U.S., finding that:
> [Abdi] Mohamed had received money from organizations that would later be designated Specially Designated Global Terrorists and that this money's destination was unknown, that he had undisclosed employment with the government of Saudi Arabia, and that he had extensive foreign travel despite no apparent income to support it. The existence of these circumstances was proven by a preponderance of the evidence, and the district court's sentence was premised on the notion that these mysterious circumstances in Mohamed's background were so unusual as to differentiate his case from a normal case of immigration fraud.

*United States v Mohamed*, 203 F. App'x. 879, 880 (9th Cir. 2006).

11

influential Islamic scholar." EO14040-000675.  In this context, the FBI's reference to an "influential Islamic scholar" necessarily means that a senior MOIA religious official nominated Abdi Mohamed for his MOIA job.[23]

The FBI documents indicate that this Court's denial of discovery about Abdi Mohamed was based on an incomplete factual record and was mistaken.  In his March 2018 Order, Judge Daniels found that there was no proof that Abdi Mohamed had provided funding to al Qaeda within the scope of his employment.[24]  The FBI documents, however, show that a group of Saudi government officials — including Abdi Mohamed's supervisor, Thumairy — routinely arranged funding to extremists and terror groups.  Further, the documents show that Thumairy and others within the Saudi government directed Abdi Mohamed's money laundering activities for al Qaeda.  This cannot be regarded as coincidental, when considering the evidence as a whole.[25]  Nor can the close relationship between Abdi Mohamed and another Saudi government official in San Diego, Bayoumi, be explained away as a coincidence.  Rather it is evidence that raises a reasonable inference of Saudi support for al Qaeda, reaffirming the FBI's assessment that a group of Saudi government officials were assigned to support extremists and terror organizations inside the U.S.

---

[23] The requested document discovery of the Kingdom will confirm this fact.  The Kingdom was responsible for a violation of U.S. law by employing Abdi Mohamed to work under cover in San Diego without giving prior notice to the Attorney General.  18 U.S.C. § 951 (criminal statute mandating that a non-diplomat agent of a foreign government working inside the U.S. must provide prior notification to the Attorney General). The Department of Justice told the U.S. Immigration Court in San Diego, California that the U.S. decided not to prosecute Abdi Mohamed for this crime for "[d]ue to concerns of diplomatic reasons."  Catherine Hunt May 30, 2019 Dec'l, Ex. 24 at 4 (April 2004 brief filed by the U.S. government in Abdi Mohamed's immigration proceeding).
[24] *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 654-55 (citing shortfalls in the Plaintiffs' demonstration of a reasonable basis for jurisdictional discovery regarding Abdi Mohamed).
[25] *Kaplan* stressed that the facts should be viewed as a whole and that acts that may appear to be neutral standing alone must be evaluated in the overall context.  999 F.3d at 865, *citing Halberstam*, 705 F.2d at 488.

Moreover, the record now shows conclusively that Thumairy was appointed to supervise Abdi Mohamed.[26] At the time of this Court's ruling in March 2018, Plaintiffs had available only a U.S. Customs report, which this Court described as including only a "conclusory statement that Thumairy supervised Mohamed's missionary activities—assuming that Thumairy is even the individual referenced in that report…"[27] Given the facts now learned from the FBI documents about Thumairy's role in collecting and distributing funds for extremism and terror, Thumairy's supervisory role over Abdi Mohamed is directly relevant to Abdi Mohamed's money-laundering activities for al Qaeda and his direct connection with Thumairy.

This Court specifically limited discovery to "the nature and scope of the agency" of Thumairy and Bayoumi for the Kingdom.[28] The discovery requested here – seeking to learn the facts about the Kingdom's employment of a known extremist and member of al Qaeda (Abdi Mohamed) assigned by Kingdom officials to work under Thumairy in California and launder substantial funds for al Qaeda – is clearly relevant to determining the scope of Thumairy's role for the Saudi government inside the U.S. Moreover, the newly-revealed information about Abdi Mohamed's close relationship with Bayoumi makes information about Abdi Mohamed directly relevant to determining the nature and scope of Bayoumi's work for the Kingdom, as well as shedding light on the nature of the Bayoumi - Thumairy work relationship.[29]

The FBI documents make it clear that this Court should now order the Kingdom to produce documents concerning the work, assignments, supervision, travel, and financial

---

[26] *See* n. 10-11, *supra*.
[27] *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 655.
[28] *Id*. at 651.
[29] As detailed in pending motions brought by the CAC Plaintiffs, this Court's decision to limit claims against the Kingdom for Mohamed's money laundering was also incorrect in light of the Second Circuit's recent decisions in *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021) and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). *See* ECF No. 7431, 7432.

13

activities of Abdi Mohamed inside the U.S. and his communications with other Saudi government officials, including Sowailem, Thumairy, and Bayoumi.

## II. THIS COURT SHOULD REVISE ITS MARCH 2018 ORDER TO CONFORM WITH RECENT SECOND CIRCUIT AIDING-ABETTING TERROR CASES

All Plaintiffs, whether through the CAC or *Ashton* Complaints, presented similar aiding-abetting claims under JASTA and ATA against the Kingdom. The First Cause of Action in the *Ashton* Plaintiffs' Complaint states their aiding-abetting claim that "[p]ursuant to 18 U.S.C. § 2333(a), (d), Saudi Arabia aided and abetted al Qaeda through numerous acts detailed herein by knowingly providing it with substantial assistance to prepare and carry out an act or acts of international terrorism." *Ashton* Complaint at ¶ 55.

As in the CAC Complaint, *Ashton* presented detailed allegations showing how Saudi Arabia knowingly provided substantial assistance to al Qaeda through a variety of different schemes. The Kingdom funded al Qaeda directly, as well as indirectly through various means, including through Mosques and Islamic Centers in the United States and around the world,[30] and through organizations that ostensibly operated as charities.[31] Those Mosques included locations where the 9/11 hijackers were recruited and provided safe haven.[32] Money sent by the Kingdom through various organizations provided the primary source of funding to establish and operate the terrorist training camps and safe houses in Afghanistan where the 9/11 hijackers were indoctrinated, lived, and trained.[33] The Kingdom provided key logistical support to al Qaeda through various means, including transportation, money laundering, identification, and

---

[30] *See id.* at ¶ 39, 45-51.
[31] *See id.* at ¶¶ 39-42, 45-51.
[32] *See id.* at ¶ 39. For example, two Saudi MOIA officials in Germany provided $1.8 million to fund al Qaeda directly as well as through a Mosque in Berlin and the Al Haramain Islamic Foundation, which was identified as an al Qaeda sponsor. *Id.* at 39. m.
[33] *See id.* at ¶¶ 40-42, 45-51.

14

equipment.[34]  The Kingdom's Ministry of Islamic Affairs promoted an extremist agenda around the world and Saudi Arabia actively supported al Qaeda through a network of officials in the U.S. and around the world.[35]  Numerous Kingdom officials were themselves active al Qaeda operatives or sympathizers and provided support to the terrorist group.[36]  These included Saudi government officials who were directly involved in various aspects of the 9/11 plot by providing support to the 9/11 hijackers.[37]

In its March 2018 Order, this Court did not apply the correct legal framework for assessing Plaintiffs' aiding-abetting claims under JASTA.  Under the recent *Kaplan* and *Honickman* decisions, this Court, upon reconsideration, should apply the *Halberstam* elements of analysis to the Plaintiffs' aiding-abetting claims against the Kingdom.

While this Court's March 2018 Order did mention in a footnote that JASTA had amended the ATA to specifically authorize aiding-abetting claims, 298 F.Supp.3d at 642 n. 6, the Court did not review Plaintiffs' aiding-abetting claims as set forth in *Halberstam*.  In fact, while both the Ashton and CAC Plaintiffs had addressed *Halberstam* at length in their oppositions to Saudi Arabia's Motion to Dismiss,[38] the Court's March 2018 Order omitted any reference to *Halberstam*.

The Second Circuit decisions in *Kaplan* and *Honickman* hold that assessments of JASTA aiding-and-abetting liability must follow "Congress's unambiguous assignment of *Halberstam* as the appropriate legal framework."  *Honickman*, 6 F.4th at 498. Under *Halberstam*, the three elements for aiding-and-abetting liability are: "(1) the party whom the defendant aids must

---

[34] *See id.* at ¶ 43.
[35] *See id.* at ¶¶ 11, 12, 39, 43, 44.
[36] *See id.* at ¶¶ 39, 44.
[37] *See id.*
[38] See ECF No. 3781 at 19, 25, 66 (*Ashton* Brief); and ECF No. 3782 at 27, 28, 30, 50, 52, 81 (CAC Brief).  Saudi Arabia did not even mention *Halberstam* in its motion, ECF No. 3668, and cited the case only once in its reply. ECF No. 3851 at 24.

15

perform a wrongful act that causes an injury" (the "aiding party who causes injury" element); "(2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element); and "(3) the defendant must *knowingly and substantially assist* the principal violation" (the "substantial assistance" element). *Honickman*, 6 F.4th at 494, citing *Halberstam,* 705 F.2d at 477 (emphasis added).

The Court's appraisal of the first *Halberstam* element for al Qaeda in this case should be just as "straightforward" as was the Second Circuit's appraisal concerning attacks by other foreign terrorist organizations. *Honickman*, 6 F.4th at 495. Applying the established standard here, a JASTA claim should be allowed in respect of the Kingdom's actions that aided and abetted al Qaeda "even where [the defendant's] relevant substantial assistance was given to an intermediary," or intermediaries, of the al Qaeda hijackers who were the "principal[s]" committing the wrongful acts. *Kaplan*, 999 F.3d at 856.

The second of the *Halberstam* elements ("general awareness") requires the defendant to be "generally aware" of its role in "an overall illegal or tortious activity at the time that [it] provides the assistance." *Halberstam*, 705 F.2d at 477. The defendant need not be generally aware of its role in the *specific act* that caused the plaintiffs' injuries; rather, it must be generally aware of its role in an *overall illegal activity*, *e.g*. harbouring or offering logistical assistance to al Qaeda terrorists, from which the terrorist acts that caused the plaintiff's injuries were *foreseeable*. *See Halberstam,* 705 F.2d at 477, 488.

Finally, under the third of the *Halberstam* elements for aiding-and-abetting liability ("substantial assistance"), this Court should have identified sufficient grounds to find that Saudi Arabia "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at

16

477.  Assistance to the actual injury-causing act is unnecessary to meet this standard. *Honickman*, 6 F.4th at 499. Plaintiffs' allegations should have been assessed as to whether the Kingdom "knowingly—and not innocently or inadvertently—gave assistance." *Kaplan*, 999 F.3d at 864. The proper test does not require more than "general awareness." *Honickman*, 6 F.4th at 500, *citing Halberstam*, 705 F.2d at 488.

In sum, upon a proper application of the *Halberstam* elements, there is jurisdiction under JASTA based on Plaintiffs' claims that the Kingdom knowingly provided substantial financial and logistical assistance to al Qaeda and its affiliates and was sufficiently aware that it was playing a role in al Qaeda's acts of terrorism.  *Kaplan*, 999 F.3d at 856, citing *Halberstam*, 705 F.2d at 477.

If the facts underlying jurisdiction must be proven before the Court, there is ample reasonable basis for this Court to order jurisdictional discovery to proceed forthwith on Plaintiffs' aiding-abetting claims. *See In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d at 641 (addressing FSIA cases concerning jurisdictional discovery).  Such discovery was previously outlined in the *Ashton* Plaintiffs' Opposition to the Kingdom's Motion to Dismiss.  *See* ECF No. 3780-1.

Dated:  December 17, 2021

    KREINDLER & KREINDLER LLP

    /s/ Steven R. Pounian
    Steven R. Pounian, Esq.
    James P. Kreindler, Esq.
    Andrew J. Maloney, III, Esq.
    Megan W Benett, Esq.
    James Gavin Simpson, Esq.
    485 Lexington Avenue
    New York, New York 10017
    Tel.: 212-687-8181
    Email: spounian@kreindler.com
    Attorneys for *Ashton* Plaintiffs