# EXHIBIT B

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

May 27, 2011

The Honorable George B. Daniels
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 630
New York, NY 10007

     Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD)

Dear Judge Daniels:

    The undersigned Co-Chairs of the Plaintiffs' Executive Committees submit this letter to request the Court's assistance in protecting the rights of the September 11th Plaintiffs as against the al Qaeda terrorist organization.

    Although the proceedings in this litigation have understandably focused primarily on the claims asserted against parties who have formally appeared to defend the claims asserted against them, the September 11th Plaintiffs also brought claims against numerous entities and individuals who elected not to appear, including the al Qaeda terrorist organization itself. Through a series of orders issued between April 7, 2006 and May 12, 2006, Judge Casey entered default judgments as to liability against al Qaeda in virtually all of the cases comprising this MDL. Copies of those Orders are enclosed as Exhibit "A" for the Court's convenience.

    In order to fully protect the September 11th Plaintiffs' rights against al Qaeda, and ensure that the September 11th Plaintiffs do not suffer harm as a result of execution proceedings initiated by other parties against al Qaeda, the September 11th Plaintiffs urgently need to have at least certain of their default judgments against al Qaeda reduced to a monetary sum.

The Honorable George B. Daniels
May 27, 2011
Page 2

---

After conferring extensively concerning this issue, the Plaintiffs' Executive Committees believe there is an efficient course available to protect the September 11th Plaintiffs' interests against al Qaeda, which will not require significant investment of the Court's time and resources. Specifically, certain of the plaintiffs in the *Federal Insurance* matter (the *Federal Insurance* Plaintiffs) filed a Motion for Assessment of Damages against Defaulted Defendants on February 13, 2007. That motion requested that the Court assess damages against nearly three hundred defaulted defendants pursuant to the Anti-Terrorism Act, on the basis of detailed affidavit testimony submitted by the *Federal Insurance* Plaintiffs' designated representatives and officers. For the Court's convenience, a copy of the primary brief submitted by the *Federal Insurance* Plaintiffs, including the affidavits submitted as exhibits thereto, is attached hereto as Exhibit "B." The *Federal Insurance* Plaintiffs' reply brief is attached hereto as Exhibit "C."

At this time, the undersigned co-chairs of the Plaintiffs' Executive Committees respectfully request that the Court take up consideration of the *Federal Insurance* Plaintiffs' Motion for Assessment of Damages, *but only insofar as it relates to the al Qaeda terrorist organization itself.* While many of the claims asserted in this litigation have been fiercely contested, Plaintiffs respectfully submit that no party would disagree that the September 11th Plaintiffs are entitled to a judgment against al Qaeda. Any monetary judgment entered against al Qaeda in favor of the *Federal Insurance* Plaintiffs will be used to advance and protect the interests of all plaintiffs in the MDL.

Accordingly, the Plaintiffs' Executive Committees respectfully request that the Court resolve the *Federal Insurance* Plaintiffs' Motion for Assessment of Damages to the extent it relates to the al Qaeda terrorist organization itself, as soon as practicable.

The Honorable George B. Daniels
May 27, 2011
Page 3

_____

The Plaintiffs' Executive Committees thank Your Honor for the Court's consideration of this matter, and would welcome the opportunity to address the Court concerning this application at a brief hearing.

Respectfully submitted,

COZEN O'CONNOR

By: _____
Elliott R. Feldman, Esquire
Co-Chair Plaintiffs' Executive
Committee for Commercial Claims

COZEN O'CONNOR

By: _____
Sean P. Carter, Esquire
Co-Chair Plaintiffs' Executive
Committee for Commercial Claims

KREINDLER & KREINDLER

By: _____
James P. Kreindler, Esquire
Co-Chair Plaintiffs' Executive
Committee for Wrongful Death
and Personal Injury Claims

MOTLEY, RICE, LLC

By: _____
Ronald Motley, Esquire
Co-Chair Plaintiffs' Executive
Committee for Wrongful Death
and Personal Injury Claims

cc:   All MDL Counsel of Record
      The Honorable Frank Maas

PHILADELPHIA\6042204\1 117430.000

# <u>EXHIBIT A</u>

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to: Federal Insurance Co. v. al Qaida*, 03-CV-6978 (RCC)

*This document is filed on behalf of those Plaintiffs in the above-referenced case seeking un-liquidated damages for workers' compensation losses as they relate to personal injuries and deaths suffered by victims of the September 11, 2001 Attack. Those Plaintiffs are identified in Exhibit A attached hereto.*

### DEFAULT JUDGMENT

This action having been commenced on September 10, 2003 by the filing of the Summons and Complaint, the First Amended Complaint and Summons were filed on March 10, 2004, defendants listed in Exhibit B were served with a copy of the First Amended Complaint and Summons in the manner described, proofs of such service thereof were filed on the dates identified in Exhibit B, the defendants not having answered the First Amended Complaint, and the time for answering the First Amended Complaint having expired, it is

ORDERED, ADJUDGED AND DECREED:  That the Plaintiffs identified in Exhibit A seeking un-liquidated damages for workers' compensation losses, have judgment against the defendants listed in Exhibit B, and shall be entitled to a hearing before this Court to establish the appropriate value of the Plaintiffs' un-liquidated damages.

New York, New York

APR 1 7 2006

_____
U.S.D.J.

This document was entered on the docket on

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-7-06

Exhibit A

Exhibit B

Exhibit C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-7-06

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:  Federal Insurance Co. v. al Qaida, 03-CV-6978 (RCC)*

*This document is filed on behalf of those Plaintiffs in the above-referenced case seeking liquidated damages for property, business interruption, and other economic losses as a result of the September 11, 2001 Attack.  Those Plaintiffs are identified in Exhibit A attached hereto.*

## DEFAULT JUDGMENT

This action having been commenced on September 10, 2003 by the filing of the

Summons and Complaint, the First Amended Complaint and Summons were filed on March 10,

2004, defendants listed in Exhibit B were served with a copy of the First Amended Complaint

and Summons in the manner described, proofs of such service thereof were filed on the dates

identified in Exhibit B, the defendants not having answered the First Amended Complaint, and

the time for answering the First Amended Complaint having expired, it is

ORDERED, ADJUDGED AND DECREED:  That the Plaintiffs identified in Exhibit A

*as seeking liquidated damages for property, business interruption, and other economic losses as a result of the September 11, 2001 Attack* ~~have judgment against the defendants listed in Exhibit B, in the liquidated amount of~~ *Pre-~~$4,992,570,314.39, multiplied by three for treble damages under the Anti-Terrorism Act~~ have judgment against the defendants listed in Exhibit B in an amount* ~~("ATA"), 18 U.S.C. § 2333 et seq., equaling $14,977,710,943.17, with interest at 9% from~~ *to be determined at a hearing.* ~~September 11, 2001 amounting to $5,458,452,355.25, plus costs and disbursements of this action~~

~~in the amount of $30,575.51, amounting in all to $20,436,193,873.93.~~

Dated: New York, New York
~~September ___, 2005~~
April 7, 2006

Richard Conway Casey

U.S.D.J.

This document was entered on the docket on

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-7-06

CASEY, J

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK



RECEIVED
APR 6 - 2006
Ch...
RICHARD C... ... CASEY
U.S...

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) <br> ECF Case |

*This document relates to: Burnett, et al., v. Al Baraka Investment & Dev. Corp., 1:03 CV 9849*

*This document is filed on behalf of those plaintiffs in the above-referenced case seeking un-liquidated damages for losses as they relate to personal injuries and deaths suffered by victims of the September 11, 2001 Attack. Those Plaintiffs are identified in Exhibit A attached hereto.*

## DEFAULT JUDGMENT

This action having been commenced on August 15, 2002 in the United States District Court for the District of Columbia by the filing of the Summons and Complaint; the Amended Complaint was filed on August 30, 2002, the Second Amended Complaint was filed on September 10, 2002, and the Third Amended Complaint filed on November 22, 2002; the case was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the Southern District of New York on January 2, 2004; each of the defendants listed in Exhibit B were served via publication pursuant to an order dated June 30, 2003 by Judge James Robertson of the United States District Court for the District of Columbia, and by order of this Court dated September 16, 2004 permitting service via publication, and proofs of such service thereof were filed on the dates identified in Exhibit B, the defendants not having answered the complaint, and the time for answering the complaint having expired, it is

ORDERED, ADJUDGED AND DECREED: That the Plaintiffs identified in Exhibit A as seeking un-liquidated damages for losses, have judgment against the defendants listed in Exhibit B, and shall be entitled to a hearing before this Court to establish the aggregate value of the Plaintiffs' un-liquidated damages.

Dated: New York, New York
       April 7, 2006

_____
                          U.S.D.J.

This document was entered on the docket on

Apr. 17, 2006



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:  Euro Brokers Inc. et al., v. Al Baraka Investment & Development Corp., et al., 1:04 CV 7279*

*This document is filed on behalf of those plaintiffs in the above-referenced case seeking damages for losses suffered by plaintiffs as a result of the September 11, 2001 Attack.  Those Plaintiffs are identified in Exhibit A attached hereto.*

### DEFAULT JUDGMENT

This action having been commenced on September 10, 2004 by the filing of the

Summons and Complaint; defendants listed in Exhibit B were served with a copy of the

complaint and summons in the manner described, proofs of such service thereof were filed on the

dates identified in Exhibit B, the defendants not having answered the complaint, and the time for

answering the complaint having expired, it is

ORDERED, ADJUDGED AND DECREED:  That the Plaintiffs identified in Exhibit A

as seeking damages for losses, have judgment against the defendants listed in Exhibit B, and

shall be entitled to a hearing before this Court to establish the aggregate value of the Plaintiffs'

damages.

Dated: New York, New York
       May 12, 2006

_____
                                       U.S.D.J.

This document was entered on the docket on

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-12-06

1 of 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-12-06

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:  World Trade Center Properties LLC, et al., v. Al Baraka Investment &
Development Corp., et al., 1:05 CV 7280*

*This document is filed on behalf of those plaintiffs in the above-referenced case seeking damages
for losses suffered by plaintiffs as a result of the September 11, 2001 Attack.  Those Plaintiffs are
identified in Exhibit A attached hereto.*

## DEFAULT JUDGMENT

        This action having been commenced on September 10, 2004 by the filing of the

Summons and Complaint; defendants listed in Exhibit B were served with a copy of the

complaint and summons in the manner described, proofs of such service thereof were filed on the

dates identified in Exhibit B, the defendants not having answered the complaint, and the time for

answering the complaint having expired, it is

        ORDERED, ADJUDGED AND DECREED:  That the Plaintiffs identified in Exhibit A

as seeking damages for losses, have judgment against the defendants listed in Exhibit B, and

shall be entitled to a hearing before this Court to establish the aggregate value of the Plaintiffs'

damages.

Dated: New York, New York
        ~~May 3,~~ 2006
        May 12

_____
                                                    U.S.D.J.

        This document was entered on the docket on

_____

1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   5-12-06

In re Terrorist Attacks on September 11, 2001

03 MDL 1570 (RCC)
ECF Case

*This document relates only to:  Ashton v. Al Qaeda Islamic Army,* 02-CV-6977 (RCC)

*This document is filed on behalf of those plaintiffs in the above case seeking unliquidated damages for losses as they relate to personal injuries and deaths suffered by victims of the September 11th Terrorist Attacks.  Those plaintiffs are listed in Exhibit A hereto.*

## DEFAULT JUDGMENT

This action having been commenced on September 4, 2002, in the United States District Court for the Southern District of New York by the filing of the *Ashton* Summons and Complaint; the First Amended Complaint was filed on September 10, 2002, the Consolidated Master Complaint was filed on March 6, 2003, the First Amended Consolidated Master Complaint was filed on August 5, 2003, the Second Amended Consolidated Master Complaint was filed on August 13, 2003, the Third Amended Consolidated Master Compliant was filed on September 5, 2003, the Fourth Amended Consolidated Master Complaint was filed on March 10, 2004, the Fifth Amended Consolidated Master Complaint was filed on September 20, 2004, and the Sixth Amended Consolidated Master Complaint was filed on September 30, 2005; each of the defendants listed in Exhibit B were served by publication pursuant to an Order of this Court dated September 16, 2004, permitting service by publication, and proofs of such service were filed on dates set forth in Exhibit B, those defendants not having answered or otherwise defended against the *Ashton* complaint, and the time for answering or otherwise defending against the *Ashton* complaint having expired, it is

ORDERED, ADJUDGED AND DECREED:  That the Plaintiffs listed in Exhibit A as

seeking unliquidated damages for losses, have Judgment against the defendants listed in Exhibit

B, *subject to deletions submitted by Plaintiffs* and shall be entitled to a hearing before this Court to establish the aggregate value of the

Plaintiffs' unliquidated damages.

Dated: New York, New York
~~April~~ ___, 2006

MAY 12

_Richard Conway_

United States District Judge

This document was entered on the docket on:

_____

-2-

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-CV-6978

## MOTION OF PLAINTIFFS AXA, CHUBB, MUNICH RE AMERICA, ONEBEACON INSURANCE GROUP, AND TIG INSURANCE COMPANY[1] TO ASSESS DAMAGES AGAINST DEFAULTED DEFENDANTS FOR BUSINESS AND PROPERTY CLAIMS UNDER THE ANTI-TERRORISM ACT

PLEASE TAKE NOTICE that, pursuant to the Federal Rules of Civil Procedure and based upon the accompanying Memorandum of Law and Affirmation, Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG Insurance Company, by and through the undersigned counsel, hereby move this Court for an Order assessing damages against the defendants listed in Exhibit B to the Affirmation of Sean P. Carter in Support of the Motion in the amount of $9,481,764,208.61, the total of the claim indemnity payments, claim adjustment expenses, and claim legal expenses, trebled, in damages against defaulted defendants, jointly and

---

[1]     As per the Affidavits filed Herewith as Exhibits C-F (filed under seal) to the Affirmation of Sean P. Carter Transmitting Evidence in Support of the Memorandum of Law of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG (the "Carter Affirmation"), the AXA Companies Are AXA Art Insurance Company, AXA Global Risks (UK) Ltd., AXA CSA UK Branch; AXA Insurance Company, AXA Reinsurance Company, AXA Re, AXA Re Canadian Branch, AXA Re UK  Plc, AXA Versicherung, And SPS Re; The Chubb Companies are Chubb Custom Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Chubb Indemnity Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Pacific Indemnity Company and Vigilant Insurance Company; and the Munich Re America Companies are American Alternative Insurance Corporation, The Princeton Excess and Surplus Lines Insurance Company and The Great Lakes (UK) Insurance Company.

severally, to which Movants are entitled as of this date under the Anti-Terrorism Act, 18 U.S.C.
§ 2333(a).

Respectfully submitted,

COZEN O'CONNOR

BY: _____/s/_____

Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
Adam C. Bonin, Esquire
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000

Attorneys for Federal Insurance Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, pursuant to this Court's Case Management Order No. 2, On February 13, 2007, a true and correct copy of the foregoing Motion of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG Insurance Company to Assess Damages Against Defaulted Defendants for Business and Property Claims under the Anti-Terrorism Act was served on all counsel, electronically, via the Court's Electronic Case Filing (ECF) System.

COZEN O'CONNOR

BY: _____/s/_____
Adam C. Bonin, Esquire
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000

Attorneys for Federal Insurance Plaintiffs

Dated: February 13, 2007

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

# MEMORANDUM OF LAW OF PLAINTIFFS AXA, CHUBB, MUNICH RE AMERICA, ONEBEACON INSURANCE GROUP, AND TIG[1] IN SUPPORT OF THEIR MOTION TO ASSESS DAMAGES AGAINST DEFAULTED DEFENDANTS <u>FOR BUSINESS AND PROPERTY CLAIMS UNDER THE ANTI-TERRORISM ACT</u>

---

[1] As per the Affidavits filed Herewith as Exhibits C-G to the Affirmation of Sean P. Carter in Support of the Motion of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG (the "Carter Affirmation"), the AXA Companies Are AXA Art Insurance Company, AXA Global Risks (UK) Ltd., AXA CSA UK Branch; AXA Insurance Company, AXA Reinsurance Company, AXA Re, AXA Re Canadian Branch, AXA Re UK  Plc, AXA Versicherung, And SPS Re; The Chubb Companies are Chubb Custom Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Chubb Indemnity Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Pacific Indemnity Company and Vigilant Insurance Company; and the Munich Re Companies are American Alternative Insurance Corporation and The Princeton Excess and Surplus Lines Insurance Company and The Great Lakes (UK) Insurance Company.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................ ii

I.      INTRODUCTION ............................................................................ 1

II.     LEGAL ARGUMENT........................................................................ 3

   A.   The Measure of Damages is a Question of Law for the Court ....................... 3

   B.   Monetary Losses and Expenditures Constitute Injuries to "Business and
        Property" Under the ATA ........................................................... 5

      1.   The Anti-Terrorism Act ........................................................ 5

      2.   The Clayton Act ............................................................... 7

      3.   RICO ........................................................................ 8

III.    METHOD OF PROVING DAMAGES........................................................ 11

   A.   Damages Can Be Assessed Based Upon Affidavits and Documentary Evidence........ 11

   B.   This Court Can Rely Upon the Affidavits for This Assessment................... 12

      1.   The Affidavit Evidence Regarding Movants' Aggregate Monetary
           Expenditures Provides a Competent Basis for Assessing Damages
           Against the Defaulted Defendants Under the ATA ............................... 12

      2.   Movants Employed Accepted and Sound Processes and Procedures
           in Adjusting the September 11 Claims ...................................... 13

      3.   The Categories of Monetary Losses ......................................... 15

         a)   Claim Indemnity Payments.............................................. 15

         b)   Claim Adjustment And Claim Legal Expenses ............................. 16

IV.     CONCLUSION................................................................. 17

# TABLE OF AUTHORITIES

Page

CASES

Action S.A. v. Marc Rich & Co., Inc.,
   951 F.2d 504 (2d Cir. 1991) ...................................................................................11

Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines),
   125 F.3d 120 (3d Cir. 1997) ....................................................................................3

Albizu v. Strohl,
   2005 U.S. Dist. LEXIS 27578 (E.D. Cal. 2005)...........................................................9

Andy Warhol Found. for the Visual Arts, Inc. v. Barth & Dreyfuss,
   2006 U.S. Dist. LEXIS 294 (S.D. N.Y. 2006).............................................................11

Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose,
   282 F. Supp. 2d 126 (S.D. N.Y. 2003).........................................................................9

Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc.,
   183 A.D. 2d 1055 (N.Y. App. Div. 1992) .....................................................................4

Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   651 F.2d 615 (9th Cir. 1981) .....................................................................................3

Ashland Management v. Janien,
   82 N.Y. 2d 395 (N.Y. 1993) .......................................................................................4

Au Bon Pain Corp. v. Artect, Inc.,
   653 F.2d 61 (2d Cir. 1981)........................................................................................12

Bankers Trust Co. v. Rhoades,
   741 F.2d 511 (2d Cir. 1984)........................................................................................9

Birdsall v. Coolidge,
   93 U.S. 64 1876) ......................................................................................................4

BMW of N. Am. v. Gore,
   517 U.S. 559 (1996)..................................................................................................10

Boim v. Quranic Literacy Institute,
   291 F.3d 1000 (7th Cir. 2002) ...................................................................................5

Cablevision Sys. N.Y. City Corp. v. Lall,
   2004 U.S. Dist. LEXIS 15346 (S.D. N.Y. 2004)........................................................11

Chattanooga Foundry & Pipe Works v. Atlanta,
    203 U.S. 390 (1960)................................................................................7

D. Klein & Son, Inc. v. Good Decision, Inc.,
    2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005) ................................3

EEOC v. Reno,
    758 F.2d 581 (11th Cir. 1985) ................................................................6

Evans v. City of Chicago,
    434 F.3d 916 (7th Cir. 2006) ................................................................3

Fustok v. ContiCommodity Services, Inc.,
    873 F.2d 38 (2d Cir. 1989)................................................................11

Garvin v. Greenbank,
    856 F.2d 1392 (9th Cir. 1988) ................................................................4

Hamman v. United States,
    267 F. Supp. 420 (D. Mont. 1967) ................................................................8

Hill v. Chemical Bank,
    799 F. Supp. 948 (D. Minn. 1992) ................................................................7

Home Placement Service, Inc. v. Providence Journal Co.,
    819 F.2d 1199 (1st Cir. 1987)................................................................4

Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.,
    196 F.3d 818 (7th Cir. 1999) ................................................................8

Jones v. UNUM Life Ins. Co. of Am.,
    223 F.3d 130 (2d Cir. 2000) ................................................................3

Maio v. Aetna Inc.,
    221 F.3d 472 (3d Cir. 2000)................................................................9

McCready v. Blue Shield of Virginia,
    649 F.2d 228 (4th Cir. 1981) ................................................................8

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,
    456 U.S. 353 (1982)................................................................6

Mid-America Tablewares v. Mogi Trading Co.,
    100 F.3d 1353 (7th Cir. 1996) ................................................................4

National Treasury Employees Union v. Federal Labor Relations Authority,
    856 F. 2d 293 (D.C. Cir. 1988) ................................................................3

New Mexico v. GE,
    467 F.3d 1223 (10th Cir. 2006) ..................................................................3

Northcross v. Bd. of Educ. of Memphis City Sch.,
    412 U.S. 427 (1973)..............................................................................6, 10

Oscar Gruss & Son, Inc. v. Hollander,
    337 F.3d 186 (2d Cir. 2003).......................................................................3

Osofsky v. Zipf,
    645 F.2d 107 (2d Cir. 1981).......................................................................4

Panos v. Island Gem Enters.,
    880 F. Supp. 169 (S.D.N.Y. 1995) ............................................................3

Reiter v. Sonotone Corp.,
    442 U.S. 330 (1979)................................................................................7-8

Schwab v. Philip Morris USA, Inc.,
    2006 U.S. Dist. LEXIS 73196 (E.D.N.Y. 2006) ......................................9

Story Parchment Co. v. Paterson Parchment Paper Co.,
    282 U.S. 555 (1931)...............................................................................4-5

Sutton v. Earles,
    26 F.3d 903 (9th Cir. 1994) .......................................................................4

Taffet v. Southern Co.,
    930 F.2d 847, 857 (11th Cir. 1991) ...........................................................8

Tamarin v. Adam Caterers, Inc.,
    13 F.3d 51, 54 (2d Cir. 1993).....................................................................11

The National Asbestos Workers Medical Fund v. Philip Morris, Inc.,
    74 F. Supp. 2d 221, 233-34 (E.D. N.Y. 1999) ......................................9-10

Time Warner Cable v. Browne,
    2000 U.S. Dist. LEXIS 6273 (S.D. N.Y. 2000)........................................12

Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,
    109 F.3d 105, 111 (2d Cir. 1997)..........................................................11-12

Ungar v. The Palestine Auth.,
    325 F. Supp. 2d 15 (D. R.I. 2004) .............................................................5

United States v. Espinoza-Cano,
    456 F.3d 1126 (9th Cir. 2006) ...................................................................6

United States v. Jordan,
    915 F.2d 622 (11th Cir. 1990) ...........................................................................6

United States v. Sioux,
    362 F.3d 1241 (9th Cir. 2004) ...........................................................................6

Wehrly v. United States,
    808 F.2d 1311 (9th Cir. 1986) ...........................................................................6

White v. Mercury Marine,
    129 F.3d 1428 (11th Cir. 1997) ..........................................................................6

Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,
    946 F.2d 1003 (2d Cir. 1991)...........................................................................3

## STATUTES

Anti-Terrorism Act, 18 U.S.C. § 2331 et. seq. ......................................................... *passim*

Clayton Act, 15 U.S.C. §§ 12 *et seq.* ......................................................................... 6-8

Fed. R. Civ. P. 55(b)(2)...........................................................................................11

RICO ........................................................................................................................ 6-9

## OTHER AUTHORITIES

Lloyd Dixon and Rachel Kaganoff Stern, Compensation for Losses from the 9/11 Attacks
    (RAND Institute for Civil Justice 2004)...............................................................14

## I.      INTRODUCTION

On September 11, 2001, members of the al Qaida terrorist network hijacked four

commercial airliners, and used those planes as weapons in a coordinated terrorist attack on the

United States (the "September 11[th] Attack").  The September 11th Attack resulted in the tragic

loss of several thousand lives, personal injuries to countless other persons, and property damage

on a catastrophic scale, including the complete destruction of the World Trade Center complex

in New York City.  Plaintiffs in the Federal Insurance action (Plaintiffs) are members of the

insurance industry who, in accordance with their obligations under applicable policies of

insurance, have paid well in excess of $5 billion to insureds who were killed, injured, or suffered

property or other forms of economic damages as a result of the September 11th Attack.

Plaintiffs initiated this action by Complaint on September 10, 2003, seeking recovery for

their direct and subrogated September 11th claims, as well as for the wrongful death and personal

injury claims of several hundred victims of the September 11th Attack who elected to assign their

claims to Plaintiffs.  Plaintiffs filed a First Amended Complaint (FAC) and Amended Summons

on March 10, 2004.  The FAC asserts claims under several statutory and common-law theories,

including claims under the Anti-Terrorism Act, 18 U.S.C. § 2331 et. seq.  (ATA).

On September 29, 2005, Plaintiffs moved for entry of default judgments against 309 non-

state defendants, based on their failure to appear to defend the claims against them after valid

service of the FAC and Amended Summons.[2]  On April 7, 2006, this Court entered an Order

granting default judgments in favor of the plaintiffs and against those defendants as to liability.

In that Order, the Court held that the amount of damages Plaintiffs were entitled to recover

---

[2]      Exhibit A to the Carter Affirmation hereto describes the manner through which service upon each
of those defendants was accomplished, as well as the date upon which service upon each of those
defendants was perfected.  Plaintiffs previously filed Exhibit A in connection with their September 29,
2005 Motion for Entry of Default Judgments.

against the defaulted defendants under the various theories of liability advanced in the FAC were
to be determined later.

      Movants AXA, Chubb, Munich Re America, OneBeacon and TIG (Movants) are
plaintiffs in the <u>Federal Insurance</u> action who have asserted claims against the defaulted
defendants under the ATA for "business and property" damages.  More specifically, Movants
have made payments to insureds for business, property and related damages those insureds
suffered as a result of the September 11th Attack.  Movants have asserted claims against the
defaulted defendants under the ATA for all direct and subrogated business and property injuries
associated with those payments, and the handling of the underlying insurance claims.[3]

      In an effort to limit the scope of the necessary damages proceedings relative to the default
judgments entered in their favor, Movants seek through the present Motion to establish the
amount of damages they are entitled to recover for their ATA claims for injury to business and
property from the defaulted defendants identified in Exhibit B to the Carter Affirmation hereto.[4]
For the reasons set forth in further detail below, those damages may be measured under the ATA
simply by calculating the amount of money Movants were compelled to expend under applicable
policies of insurance as a result of the September 11th Attack, and trebling that aggregate figure.

---

[3]     Certain of the Movants have also made payments under worker's compensation insurance
policies for personal injuries or deaths resulting from the Attack.  Although those payments constitute
injuries to Movants' "business and property" as well, the underlying wrongful death and personal injury
claims have been assigned to those Movants. The losses arising from those payments are therefore
captured within the asserted wrongful death and personal injury claims.  Plaintiffs will seek an assessment
of damages for those wrongful death and personal injury claims, under the ATA and all other theories of
liability, at a later date.

[4]     On July 12, 2006, the Court vacated the default judgments previously entered against Al Aqsa
Islamic Bank, Al Baraka Bancorp, Dallah Avco Trans Arabia, Sanabil, Inc., Sanabel al-Kheer and
Tadamon Islamic Bank at the mutual request of plaintiffs and those defendants.  Because the default
judgments entered against those defendants have been vacated, those defendants have been excluded from
the list submitted as Exhibit B to the Carter Affirmation.  In addition, Movants have excluded defendant
Samir Salah from the scope of the present Motion. Mr. Salah wrote to plaintiffs several months ago to
request that Plaintiffs voluntarily vacate the default judgment entered against him.  Plaintiffs have
requested, but not yet received, additional information necessary to evaluate that request.

In the context of the default judgment proceedings against the defendants identified in Exhibit B

to the Carter Affirmation, the detailed affidavits of Movants' officers and representatives,

submitted in support of this Motion and attached as Exhibits C-G of the Carter Affirmation,

provide a competent and appropriate evidentiary basis for setting the value of Movants' business

and property damages under that standard.

## II.   LEGAL ARGUMENT

### A.   The Measure of Damages is a Question of Law for the Court

As the Second Circuit has recognized, the measure of damages applicable to a plaintiff's

cause of action is a question of law to be determined by the Court. D. Klein & Son, Inc. v. Good

Decision, Inc., 2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005); Oscar Gruss & Son, Inc. v.

Hollander, 337 F.3d 186, 196 (2d Cir. 2003); Wolff & Munier, Inc. v. Whiting-Turner

Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991). "Ultimately, therefore, 'it is for the district

judge, after becoming aware of the nature of the case, to determine the appropriate measure of

damages in the first instance.'" Panos v. Island Gem Enters., 880 F. Supp. 169, 175 (S.D. N.Y.

1995), citing Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 620-21

(9th Cir. 1981).

Where a plaintiff is entitled to recover damages under a federal statute with remedial and

deterrent objectives, the Court should liberally construe the remedies available thereunder to

advance those goals. Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000)

(ERISA); New Mexico v. GE, 467 F.3d 1223, 1238 (10th Cir. 2006) (CERCLA); Nat'l Treasury

Employees Union v. Fed. Labor Relations Auth., 856 F. 2d 293, 296 (D.C. Cir. 1988) (LMRA);

Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines), 125 F.3d 120, 135-136

(3d Cir. 1997) (Title VII), cert. denied, 522 U.S. 114 (1998); Evans v. City of Chicago, 434 F.3d

916, 925 (7th Cir. 2006) (RICO). As a result, more than one standard may be available for

measuring a plaintiff's damages under a federal statute.  *See* Osofsky v. Zipf, 645 F.2d 107, 111

(2d Cir. 1981), *quoting* Birdsall v. Coolidge, 93 U.S. 64, 70 (1876) ("Still, it is obvious that

'there cannot be any one rule of damages which will apply in all cases, even where it is conceded

that the finding must be limited to actual damages.'")  The same is true under New York law.

Ashland Management v. Janien, 82 N.Y. 2d 395, 403 (N.Y. 1993); Aqua Dredge, Inc. v. Stony

Point Marina & Yacht Club, Inc., 183 A.D. 2d 1055, 1057-1058 (N.Y. App. Div. 1992).

Still, in matters such as this a plaintiff need not prove its damages under any applicable

standard with mathematical certainty.  Garvin v. Greenbank, 856 F.2d 1392, 1401 (9th Cir. 1988)

(federal securities law); Sutton v. Earles, 26 F.3d 903, 918 (9th Cir. 1994) (FTCA); Home

Placement Service, Inc. v. Providence Journal Co., 819 F.2d 1199, 1205 (1st Cir. 1987)

(Sherman Act) (internal cites omitted). To the contrary, a plaintiff need only provide a rational

evidentiary basis for calculating damages, which is not merely speculative or conjectural.  As

noted in Garvin, "Damages need not be proven to a mathematical certainty. Sufficient evidence

must be introduced so that the court can arrive at an intelligent estimate without speculation and

conjecture. It is for the judge, after becoming aware of the nature of the case, to determine the

appropriate measure of damages."  856 F.2d at 1401.

Moreover, when a lack of precision in calculating damages has resulted from the nature

of defendant's wrong, "The risk of uncertainty must fall on the defendant whose wrongful

conduct caused the damages." Mid-America Tablewares v. Mogi Trading Co., 100 F.3d 1353,

1366 (7th Cir. 1996). *See, similarly,* Story Parchment Co. v. Paterson Parchment Paper Co., 282

U.S. 555, 562 (1931) ("It is true that there was uncertainty as to the extent of the damage, but

there was none as to the fact of damage; and there is a clear distinction between the measure of

proof necessary to establish the fact that petitioner had sustained some damage, and the measure

of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of

4

uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.")

B.   Monetary Losses and Expenditures Constitute Injuries to "Business and Property" Under the ATA

Movants seek to establish damages under the Anti-Terrorism Act, one of the causes of action for which judgment has been entered against the defaulting defendants.  For the reasons which follow, the Anti-Terrorism Act allows recover for movants' monetary losses and expenditures resulting from defendants' actions.

1.   The Anti-Terrorism Act

Although plaintiffs have obtained default judgments against these defendants under several theories of liability, this Motion concerns only the assessment of damages for their business and property damage claims under the ATA.[5]  In enacting the ATA, Congress sought to deter acts of international terrorism, "by imperil[ing] the flow of terrorism's lifeblood, money." Ungar v. The Palestine Auth, 325 F. Supp. 2d 15, 16 (D. R.I. 2004).  In furtherance of that objective, the ATA extends civil liability and penalties "to any point along the causal chain of terrorism" and "to the furthest reaches of the common law."  Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1011, 1021 (7th Cir. 2002).  Pursuant to that statute:

> Any national of the United States injured in his or her person, property or business by reason of an act of international terrorism… may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorneys' fees.

18 U.S.C. § 2333(a).

To this point, no Court has had occasion to consider the measure of damages to be applied to a claim for injury to "property or business" under the ATA.  However, the "property

---

[5]   Movants will seek an assessment of damages under other theories of liability, and/or for other categories of injury, at an appropriate date in the future.

or business" language of the ATA directly tracks the language Congress used in describing the

remedies and damages available under the Clayton Act[6] and Civil RICO statute,[7] two statutes

with similar deterrent and remedial objectives.   The decisions interpreting the damages available

for property and business injuries under those statutes thus guide this Court's analysis of the

measure of damages for Movants' property and business damage claims under the ATA, as "it is

a long-established principle of statutory construction that similar statutory language should be

construed similarly." United States v. Espinoza-Cano, 456 F.3d 1126, 1135 (9th Cir. 2006),

citing Northcross v. Bd. of Educ. of Memphis City Sch., 412 U.S. 427, 428 (1973); United States

v. Sioux, 362 F.3d 1241, 1246 (9th Cir. 2004). See, similarly, EEOC v. Reno, 758 F.2d 581, 583-

84 (11th Cir.1985) (finding that because provisions of the Age Discrimination in Employment

Act "were taken in haec verba from Title VII, decisions under the analogous section of Title VII

are highly relevant to the issue before [the Court]"); White v. Mercury Marine, 129 F.3d 1428,

1434 (11th Cir. 1997) ("It is a familiar canon of statutory construction that courts should

generally construe similar statutory language similarly.").

Indeed, because "prior construction by courts of similar statutory language used in a new

statute is one means of divining congressional intent," see Wehrly v. United States, 808 F.2d

1311, 1314 (9th Cir. 1986), it would be inappropriate for this Court to not consider the

interpretation of similar statutory text. See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Curran, 456 U.S. 353, 378-82 (1982);  United States v. Jordan, 915 F.2d 622, 628 (11th Cir.

1990), cert. denied, 499 U.S. 979 (1991) ("Under accepted rules of statutory construction, it is

generally presumed that Congress, in drafting legislation, is aware of well established judicial

---

[6]      15 U.S.C. §15 grants a cause of action to "any person who shall be insured in his business or property" by reason of an antitrust violation.

[7]      18 U.S.C. § grants a cause of action to "any person who shall be injured in his business or property" by reason of an antitrust violation.

constructions of other pertinent existing statutes.") Hill v. Chem. Bank, 799 F. Supp. 948, 952

(D. Minn. 1992) ("Congress is presumed to be aware of judicial interpretations of statutory

language when it intentionally incorporates the language of one statute into another statute.").

          2.    The Clayton Act

     In interpreting the measure of damages available for injuries to business or property

under the Clayton Act and RICO, the federal courts have universally held that a plaintiff's loss or

expenditure of money constitutes an injury to both business and property, compensable under

those statutes. In allowing for civil recovery for victims of antitrust violations, the Clayton Act,

15 U.S.C. §§ 12 *et seq.*, provides as follows:

> Any person who shall be injured in his business or property by
> reason of anything forbidden in the antitrust laws may sue therefor
> in any district court of the United States . . . without respect to the
> amount in controversy, and shall recover threefold the damages by
> him sustained, and the cost of suit, including a reasonable
> attorney's fee.

15 U.S.C. § 15. In Reiter v. Sonotone Corp., 442 U.S. 330 (1979), the Supreme Court

affirmed that a loss of money is a form of damage to one's "property" for purposes of the

Clayton Act, even separate from damages to business. Id. at 338. In Reiter, retail purchasers of

hearing aids sued under the Clayton Act alleging a variety of antitrust violations, including

vertical and horizontal price fixing, resulting in higher costs to them. Defendants moved to

dismiss, arguing that merely paying higher prices did not result in an injury to one's "business or

property" within the meaning of the Act.

     The Supreme Court squarely rejected the defendants' argument, and held that plaintiffs'

monetary losses were indeed compensable under the Clayton Act. Relying on Chattanooga

Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1960), the Court found no difficulty in

including a loss of money within the meaning of injury to business or property. In an opinion

which attracted no dissents, the Court held:

> When a commercial enterprise suffers a loss of money it suffers an injury in both its "business" and its "property." But neither term is rendered redundant by recognizing that a consumer not engaged in a "business" enterprise, but rather acquiring goods or services for personal use, is injured in "property" when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of. The phrase "business or property" also retains restrictive significance. It would, for example, exclude personal injuries suffered. E.g., Hamman v. United States, 267 F. Supp. 420, 432 (D. Mont. 1967). Congress must have intended to exclude some class of injuries by the phrase "business or property." But it taxes the ordinary meaning of common terms to argue, as respondents do, that a consumer's monetary injury arising directly out of a retail purchase is not comprehended by the natural and usual meaning of the phrase "business or property." We simply give the word "property" the independent significance to which it is entitled in this context. A consumer whose money has been diminished by reason of an antitrust violation has been injured "in his . . . property" within the meaning of 4.

Reiter, 442 U.S. at 339. This decision has been universally followed in allowing antitrust damages to be awarded for loss of money. See, e.g., Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc., 196 F.3d 818, 823 (7th Cir. 1999); Taffet v. Southern Co., 930 F.2d 847, 857 (11th Cir. 1991), cert. denied, 506 U.S. 1021 (1992); McCready v. Blue Shield of Virginia, 649 F.2d 228, 231 (4th Cir. 1981).

### 3.   RICO

The Reiter holding has been repeatedly extended to the application of similar language in the RICO context to damages suffered through loss of money. In RICO, civil recovery is afforded to plaintiffs damages as a result of racketeering activity as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .

18 U.S.C. § 1964(c). As with the Clayton Act, the language "injured in his business or property" in the RICO statute has been consistently interpreted to apply to monetary losses,

*including a subrogee's right to recover for amounts paid to an insured.* See The National

Asbestos Workers Medical Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221, 233-34 (E.D. N.Y.

1999) (collecting cases), in which the plaintiff-insurer's right to seek recovery for economic

injuries suffered by the insured was confirmed – in this case, the direct costs of treatment paid by

the insurer for smoking-related illnesses:

> The recovery of pecuniary losses associated with physical injuries
> directly caused by racketeering conduct is consistent with the
> language of the RICO statute. Such claims, furthermore, would
> materially advance the statute's legislative purposes of deterring
> racketeering, in all its forms, and of remedying, as fully as
> practicable, the economic consequences of racketeering. Finally,
> the recovery of these pecuniary losses is consistent with the
> expansive scope of RICO's civil remedy provisions as consistently
> interpreted by the Supreme Court.

74 F. Supp. 2d at 229. Similarly, in Anglo-Iberia Underwriting Mgmt. Co. v.

Lodderhose, 282 F. Supp. 2d 126 (S.D. N.Y. 2003), following a default judgment in a RICO case

based upon fraud on an reinsurance agreement, damages were assessed by calculating the

amount of the premiums fraudulently paid to defendants. Id. at 128-29. *See also* Albizu v.

Strohl, 2005 U.S. Dist. LEXIS 27578 (E.D. Cal. 2005), a RICO claim predicated upon fraud, in

which damages were assessed using the value of the check tendered to defendants as a result of

the fraud. Id. at *34

More generally, money is property under RICO. See Bankers Trust Co. v. Rhoades, 741

F.2d 511 (2d Cir. 1984), *vacated and remanded on other grounds*, 473 U.S. 922 (1985)

("Bankers has alleged that it has been deprived of various sums of money by the defendants'

activities. There is no question that this constituted 'injur[y] in [its] business or property. . .'");

Schwab v. Philip Morris USA, Inc., 2006 U.S. Dist. LEXIS 73196, *69-70 (E.D.N.Y. 2006) ("*A

fortiori*, if money is property under the antitrust laws, it is property under RICO"); Maio v. Aetna

Inc., 221 F.3d 472, 484 (3d Cir. 2000).

Because the relevant language of the ATA directly tracks that of the Clayton Act and RICO, it is clear that money a plaintiff expends as a result of a violation of the ATA constitutes an injury to business and/or property, compensable under that statute. Northcross, 412 U.S. at 428. In keeping with that well established principle, the assessment of damages against the defaulted defendants for Movants' business and property claims under the ATA may be performed by calculating the money Movants expended as a result of the September 11th Attack and trebling that amount.[8]

For purposes of the present Motion, those monetary expenditures include: (1) the amounts Movants paid to their insureds for business, property, and related losses resulting from the September 11th Attack; and (2) amounts Movants expended in good faith to adjust the underlying insurance claims.[9] The National Asbestos Workers Medical Fund, 74 F. Supp. 2d at 233-34. In the context of the present default judgment proceedings, the detailed affidavits of Movants' officers and representatives, which attest to the aggregate value of those monetary expenditures, and describe the processes through which their companies analyzed and set the value of each claim submitted under an applicable "property insurance" policy, provide a competent evidentiary basis for setting the value of Movants' claims for business and property injury under the ATA.

---

[8]      Movants are entitled to seek punitive damages under the ATA as well. However, the assessment of punitive damages against these defendants should not be undertaken until the compensatory value for all Movants' claims against these defendants has been set, including the assigned wrongful death and personal injury claims. Under Supreme Court jurisprudence, punitive damages must bear a reasonable relationship to the harm caused. BMW of N. Am. v. Gore, 517 U.S. 559, 580-82 (1996). Accordingly, Movants reserve their right to seek or award of punitive damages against the defaulted defendants at an appropriate point in the future.

[9]      Given the potential availability of other measures of damage for these claims under the ATA, Movants reserve their right to seek recovery under another appropriate measure, or to submit evidence of additional damages under the standard advanced herein, in relation to proceedings against the remaining defendants.

### III.   METHOD OF PROVING DAMAGES

This section first summarizes the evidentiary standards for assessing damages in the context of default judgment proceedings, and then discusses the specific elements of the damage claims and evidence offered in relation to Movants' claims for relief under the ATA.

### A.   Damages Can Be Assessed Based Upon Affidavits and Documentary Evidence

Having already entered default judgments against these defendants as to liability under Fed. R. Civ. P. 55(b)(2), this Court may assess damages without holding an evidentiary hearing, instead relying on the affidavits and other documentary evidence presented by Movants. As one Second Circuit case explained:

> Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, "the court may conduct . . . a hearing." We have held that, under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment." Fustok v. ContiCommodity Services, Inc., 873 F.2d 38, 40 (2d Cir. 1989); see Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993) ("not necessary for the district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record gained during four years involvement with the litigation.'"); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991) (where district judge was "inundated with affidavits, evidence, and oral presentations" a full evidentiary hearing was not necessary).

Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); see also Cablevision Sys. N.Y. City Corp. v. Lall, 2004 U.S. Dist. LEXIS 15346, *3 (S.D. N.Y. 2004). Andy Warhol Found. for the Visual Arts, Inc. v. Barth & Dreyfuss, 2006 U.S. Dist. LEXIS 294, *6 (S.D. N.Y. 2006).

In connection with the Court's analysis of whether the affidavits and documentary evidence provide a "basis for the damages specified in the default judgment," Transatlantic

Marine, 109 F.3d at 111, plaintiffs are entitled to "all reasonable inferences" from the evidence they offer, given the default setting. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Time Warner Cable v. Browne, 2000 U.S. Dist. LEXIS 6273, *2 (S.D.N.Y. 2000).

      B.    This Court Can Rely Upon the Affidavits for This Assessment

Movants have carefully prepared these affidavits to explain to this Court the bases upon which they now seek relief. For the reasons which follow, this Court can recognize them as credible evidence, and assess damages accordingly.

      1.    The Affidavit Evidence Regarding Movants' Aggregate Monetary Expenditures Provides a Competent Basis for Assessing Damages Against the Defaulted Defendants Under the ATA

In keeping with the foregoing standards, Movants may establish the value of their business and property damages under the ATA in the context of the present default judgment proceedings merely by submitting affidavits which describe, in general detail, the current aggregate value of the monetary expenditures and losses as a result of the September 11th Attack. Without question, such affidavits provide a rational basis for assessing damages under the governing measure, which is neither speculative nor conjectural. Furthermore, an assessment of damages against the defaulted defendants based on affidavit evidence of the aggregate value of Movants' monetary expenditures and losses as the result of the September 11th Attack will advance the remedial and deterrent purposes of the ATA, as well as the public policy favoring prompt payment of claims made by an insured to an insurer, and is therefore particularly appropriate. Accordingly, Plaintiffs respectfully submit that this Court may validly assess damages against the defaulted defendants for Movants' business and property claims under the ATA based solely on the affidavit evidence regarding the amount of money Movants expended as a result of the September 11th Attack, and trebling that amount.

2.       Movants Employed Accepted and Sound Processes and
         Procedures in Adjusting the September 11 Claims

Although such additional detail is unnecessary in the present context, the affidavits

submitted by Movants also provide extensive descriptions of the thorough claims adjustment

processes through which their companies verified their obligations to compensate their insureds

for losses sustained as a result of the September 11th Attack, and determined the fair value of

each claim submitted.  While each insurer's process varies slightly, the affidavits confirm that

Movants followed longstanding, well-established principles and procedures applicable to the

adjustment of claims in responding to the losses of their insureds following the September 11th

Attack.  In general terms, those processes involved, where feasible:  confirmation of proper

notice of all potential claims; verification of coverage under, and measurement of the claims

against, the provisions of the policies of insurance; the protection of property from further loss,

including reasonable repairs;[10] the separation of damaged from undamaged property;  review of

accounting records, bills, invoices and other documents; analysis of available receipts

documenting increased costs and lost income; and visual examination of the damaged property.

In relation to the processes described above, and as further explained in the affidavits

submitted herewith, the claims of Movants' insureds were subject to scrutiny by trained or

experienced claims adjustment professionals, and this included in many instances analysis and

review by outside professionals, such as certified public accountants, engineers, architects, and

construction cost specialists.  Moreover, the handling of the September 11th claims by those

professionals was subject to internal review and audit by management.  In accordance with

established practices, Movants' management personnel received and regularly reviewed reports

prepared by other company officials responsible for the adjustment of the individual September

---

[10]       Because of the national and international impact of the September 11th Attack, not all insured
losses occurred at the World Trade Center site in Lower Manhattan, such that steps such as this were
indeed feasible and necessary for certain losses.

11th claims, including the particulars of the adjustment and payments for claims submitted by policyholders and insureds.[11]

As attested in the Movants' affidavits, the management and supervisory personnel who reviewed and audited the adjustments of the September 11th claims generally have expertise in a wide range of areas, including expertise in the calculation and determination of loss of business income, property values, and construction costs and expenses. As a general rule, management and supervisory personnel are all highly trained in their particular areas of specialty, and each individual brings to the claims evaluation process many years of experience. Finally, the adjustment process is also subject to industry standards of compliance and the fair claims handling statutes and laws of the applicable jurisdiction.

While the September 11th Attack caused death, injury and physical destruction on a scale never before experienced in this country, the processes employed by Movants' in adjusting the insurance claims arising from that event were well suited to meet the unique challenges and circumstances of that tragedy. The processes and procedures followed in the adjustment of the September 11th claims were developed over many decades, through Movants' experiences in responding to numerous catastrophic losses such as floods, hurricanes, wildfires, and earthquakes. Those processes and procedures have been further honed and refined through several decades of the adjustment of claims in the more routine context.

As a result, Movants' were well prepared to respond to the devastation caused by the September 11th Attack. As the RAND Corporation observed in a 2004 monograph entitled Compensation for Losses from the 9/11 Attacks, "Insurers were able to mobilize hundreds of adjusters to evaluate and process claims after 9/11. Many of those we interviewed praised the

---

[11]   Management regularly rely upon financial data and records related to the adjustment of claims and payment for these claims, including executive summaries of claims in process, identification of issues which arise in the adjustment of claims which require resolution, and other data which allows the adjuster to determine the accuracy of the claims adjustment process.

insurance industry's quick response to the claims … Without the huge insurance payments, the economic disruption caused by the Attack on the WTC would have been much greater. Greater demands for assistance would have been placed on government and charities, and a greater portion of the losses likely would have been borne by businesses and their workers." [12]

As the above summary of the evidence presented in the affidavits of Movants' officers and representatives demonstrates, Movants followed established industry standards and processes in the adjustment of the September 11th claims, and analyzed claims under established and recognized standards of proof.  For these reasons, the processes implemented and followed by Movants resulted in total claim payments upon which this Court can rely in fairly and properly assessing damages against the defaulted defendants under the ATA.

3.     The Categories of Monetary Losses

The monetary expenses and losses for which Movants here seek an assessment of damages against the defaulted defendants under the ATA fall into three broad categories: claim indemnity payments, claim adjustment expenses, and claim legal expenses.  A review of each category is in order.

a)     Claim Indemnity Payments

The total of the claim indemnity payments by the Movants reflect the scope and tragedy of the September 11th Attack, since "behind these numbers" of almost incomprehensible dimension are the persons, businesses and companies that suffered the significant and devastating losses.  The claims which make up the total of the claim indemnity payments were subject to the adjustment processes and procedures described within the affidavits.  The schedules of the total claim payments included as exhibits to the affidavits lists each separate

---

[12]     Lloyd Dixon and Rachel Kaganoff Stern, Compensation for Losses from the 9/11 Attacks at 22 (RAND Institute for Civil Justice 2004), available online at http://www.rand.org/pubs/monographs/2004/RAND_MG264.pdf .

insured, claim number, loss location, individual claim paid, and (where applicable) the claim

adjustment and legal expenses incurred by the Movants. A review of some of the individual

claims listed on these schedules reveals the entire gamut of the scope of the losses sustained by

the Movants' insureds in this matter.[13]

The individual claims predominately arose in and around lower Manhattan at the former

site of the World Trade Center towers. The claims include payments for the loss of personal

property items, the loss of business personal property, the loss of income, and other business

interruption losses as a result of the September 11th Attack. The claims paid by Movants range

from losses in the hundreds of dollars suffered by insured individuals to losses in the multi-

millions of dollars suffered by some of the largest and best known companies in the United

States.

The affidavits establish that the claims of insured individuals or companies were

considered pursuant to the adjustment processes as further described within these affidavits. The

result is the total of the claim payments as of this date and noted within the claim schedules

included as exhibits to the filed affidavits.

b)   Claim Adjustment And Claim Legal Expenses

The response of the insurance industry to the catastrophic event of the September 11th

Attack involved an unprecedented marshaling of resources in order to quickly, fully, and fairly

respond to the claims submitted by Plaintiffs' policyholders for their damages and losses. The

expenses incurred because of the commitment of these resources included the fees charged by

outside consultants who were retained in order to accurately access the scope of the damages,

---

[13]   Pursuant to this Court's Order dated May 9, 2005, the schedules themselves are being filed under
seal to protect the identity of the insureds from public disclosure. A copy of the Order is attached to the
Carter Affirmation as Exhibit H.

and assist with the prompt conclusion of the adjustment of the claims.[14]  As noted within the

affidavits filed herewith, these expenses represent the fees charged by accountants and engineers

who were utilized to ensure the accuracy of the claims submitted and losses sustained.

Additionally, Movants retained construction consultants and other professionals with expertise in

the areas necessary to evaluate the claimed casualty losses.  Movants also paid the expenses

incurred by adjustment professionals in responding to the extraordinary demands of the claims

submitted following the September 11th Attack.

      The Plaintiffs are entitled to recover these actual monetary expenditures as losses

pursuant to the ATA, since these expenditures also represent injuries to Movants' business and

property compensable under the provisions of that statute.  For this same reason, the losses

represented by the expenses incurred to retain legal counsel to advise and assist in the proper and

fair adjustment of the claims submitted under Movants' policies of insurance are likewise

compensable under the ATA statutory scheme.

## IV.    CONCLUSION

      Based on the affidavits, Movants are entitled to the assessment of damages against these

defendants, jointly and severally, as follows:

---

[14]     In an effort to simplify the issues presently before the Court and promote judicial efficiency in the
resolution of the claims against the defaulted defendants, Movants are limiting the damages sought for
their business and property damage claims against the defaulted defendants to the money paid to their
insureds for business and property losses, and expenses directly associated with the adjustment of those
business and property damage claims.  However, those expenditures do not represent all of Movants'
monetary losses as a result of the September 11th Attack.  For instance, Movants incurred significant
internal expenses in evaluating their obligations under the applicable polices of insurance.  Movants
reserve their right to seek recovery of such additional monetary losses in relation to the claims asserted
against the defendants who are not subject to this Motion.

|  | **Total Expended To-Date** | **Amount Trebled** |
|---|---|---|
| AXA | $   539,784,217.34 | $1,619,352,652.02 |
| Chubb | $2,248,047,793.41 | $6,744,143,380.23 |
| Munich Re | $   108,341,198.07 | $   325,023,594.21 |
| OneBeacon | $   185,805,247.79 | $   557,415,743.33 |
| TIG | $     78,609,612.94 | $   235,828,838.82 |
| **Totals:** | **$3,160,588,069.55** | **$9,481,764,208.61** |

For these reasons, the Movants request that the Court declare that the ATA is the standard for assessing damages against the defaulted defendants, that said damages can be established pursuant to the affidavits and evidence filed herewith, and that the Plaintiffs be awarded the total sum of $9,481,764,208.61 (the total of the claim indemnity payments, claim adjustment expenses, and claim legal expenses, trebled) in damages against defaulted defendants.[15]

Respectfully submitted,

COZEN O'CONNOR

Dated: February 13, 2007

BY: _____/s/_____
Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
Adam C. Bonin, Esquire
1900 Market Street
Philadelphia, PA 19103
Tele: (215) 665-2000
Fax: (215) 665-2013

Attorneys for *Federal Insurance* Plaintiffs

PHILADELPHIA\2975268\2  117430.000

---

[15]     Upon an order setting the amount of damages assessed based upon these claims, Plaintiffs will move to amend the order based to reflect the interest accrued based on that amount to-date.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) <br> ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

### ORDER

And now, on this ___ day of _____, 2007, upon Pursuant to the Motion

of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG

Insurance Company to Assess Damages Against Defaulted Defendants for Business and Property

Claims under the Anti-Terrorism Act, accompanying memorandum of law and exhibits, it is

hereby ORDERED that damages are assessed in the amount of $9,481,764,208.61 against the

attached list of defaulted defendants, jointly and severally, based upon Movants' claims to-date

under the Anti-Terrorism Act, 18 U.S.C. § 2333(a).


_____
                                    J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

**AFFIRMATION OF SEAN P. CARTER IN SUPPORT OF THE MOTION OF**
**PLAINTIFFS AXA, CHUBB & SON, MUNICH RE AMERICA, ONEBEACON**
**INSURANCE GROUP AND TIG INSURANCE COMPANY TO ASSESS DAMAGES**
**AGAINST DEFAULTED DEFENDANTS FOR BUSINESS AND PROPERTY CLAIMS**
**UNDER THE ANTI-TERRORISM ACT**

Sean P. Carter, Esq., affirms as follows:

1.      I am an attorney admitted to practice *pro hac vice* in the above-captioned matter, and a member of the law firm Cozen O'Connor. I submit this Affirmation to transmit to the Court the following documents in support of the Memorandum of Law of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group and TIG in Support of Their Motion to Assess Damages Against Defaulted Defendants For Business And Property Claims Under the Anti-Terrorism Act.

2.      Exhibit A to this Affirmation is a true and correct copy of a chart outlining the means by which each of the defaulted defendants was properly served in this action.

3.      Exhibit B to this Affirmation is a true and correct copy of a list of the defendants in default against whom Movants seek to assess damages via this motion.

4.      Exhibit C to this Affirmation is a true and accurate copy of the Affidavit of Steven Judovin in support of AXA's Proof of Damages.

5.      Exhibit D to this Affirmation is a true and accurate copy of the Affidavit of Donald L. Siegrist, Jr. in Support of Proof of Damages for Chubb & Son, a Division of Federal Insurance Company, on Behalf of Itself and as Manager of Its Insurance Subsidiaries

6.      Exhibit E to this Affirmation is a true and correct copy of the Affidavit of Thomas J. Toth in Support of the Proof of Damages of American Alternative Insurance Company, The Princeton Excess and Surplus Lines Insurance Company and Great Lakes Reinsurance (UK) Limited. (Munich Reinsurance Group)

7.      Exhibit F to this Affirmation is a true and accurate copy of the Affidavit of John F. Murphy in support of OneBeacon Insurance Group's Proof of Damages.

8.      Exhibit G to this Affirmation is a true and accurate copy of the Affidavit of Robert Knowles in support of TIG Insurance Company's Proof of Damages.

9.      Exhibit H to this Affirmation is a true and correct copy of this Court's order dated May 9, 2005, granting the Federal Insurance letter application seeking this Court's permission to file under seal schedules identifying the insureds in connection with default filings.  Pursuant to this order, the schedules attached to Exhibits C through G are being filed under seal in order to protect the identity of the insureds from public disclosure.

Affirmed in Philadelphia, Pennsylvania on February 12, 2007.


                                        /s/
                                  Sean P. Carter


2

**Exhibit A**

# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Aaran Money Wire Service Inc. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abbas Abdi Ali | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abd Al-Mushin Al-Libi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abd Al-Rahim Al-Nashiri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdel Hussein | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdelghani Mzoudi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdelhalim Remadna | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdelkarim Hussein Mohamed Al-Nasser | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdi Adulaziz Ali | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdirasik Aden | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdul Fattah Zammar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdul Rahman Yasin | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdullah Ahmed Abdullah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdullah 'Qassim | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdullahi Hussein Kahie | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abdulrahman Hassan Sharbatly | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu al-Hadi al-Iraqi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Al-Maid | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Hafs the Mauritanian | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Hajer Al Iraqi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Hamza Al-Masri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Ibrahim Al-Masri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Musab Al-Zarqawi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Qatada Al-Filistini | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Rida Al Suri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Sayef Group | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Abu Zubaydah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Adel Ben Soltane | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Adel Muhammad Sadiq Bin Kazem | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

Exhibit A

# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Advice and Reformation Committee | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Afghan Support Committee | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Agus Budiman | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmad Ajaj | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmad Ibrahim Al- Mughassil | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmad Sa'ld Al-Kadr | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmed Hasni Rarrbo | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmed Idris Nasreddin | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Ahmed Khalfan Ghailani | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ahmed Mohammed Hamed Ali | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Akida Bank Private Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Akida Investment Co | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Baraka Exchange LLC | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Barakaat Bank | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Farooq Mosque | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Gama'a al-Islamiyya | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| al Qaida | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Shamal For Investment and Development | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Taqwa Trade, Property and Industry Company Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Taqwa/Nada Group | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al Tawhid | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakaat | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Bank of Somalia (BSS) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Finance Group | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Financial Holding Co. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Global Telecommunications | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Group of Companies Somalia Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

# Exhibit A
## Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Al-Barakat International | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Investments | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Barakat Wiring Service | Sec. State Minnesota | 05/26/2004 | 06/16/2004 | 04/05/2005 |
| Al-Bir Saudi Organization | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Birr | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Hamati Sweets Bakeries | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Hijrah Construction and Development Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Itihaad al-Islamiya (AIAI) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Nur Honey Press Shops | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Rashid Trust | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Shaykh Al-Iraqi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Al-Shifa' Honey Press for Industry and Commerce | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Albert Fredrich Armand Huber | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Algerian Armed Islamic Group | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ali Atwa | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ali Ghaleb Himmat | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ali Saed Bin Ali El-Hoorie | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| American Muslim Foundation | US Marshal Service c/o Abdulrahman Alamoudi | 06/02/2004 | 07/30/2004 | 09/23/2005 |
| Amin Al-Haq | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Anas Al-Liby | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ansar al-Islam (AI) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Arafat El-Ashi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Asbat al-Ansar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ayadi Chafiq Bin Muhammad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ayman al-Zawahiri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Azzam Service Center | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| BA Taqwa for Commerce and Real Estate Company Ltd. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Bank of al Taqwa Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

## Exhibit A

## Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Baraka Trading Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Boston | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Construction Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Enterprise | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Group of Companies | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat International | Registered Mail | 5/27/2004 | 07/26/2004 | 09/23/2005 |
| Barakaat International Foundation | Registered Mail | 5/27/2004 | 07/26/2004 | 09/23/2005 |
| Barakaat International, Inc. | Sec. State Minnesota | 05/26/2004 | 06/16/2004 | 04/05/2005 |
| Barakaat North America, Inc. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Red Sea Telecommunications | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakaat Telecommunications Co. Somalia | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Bank and Remittances | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Computer Consulting (BCC) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Consulting Group (BCG) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Global Telephone Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat International Companies (BICO) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Post Express (BPE) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Refreshment Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Telecommunications Company Limited (BTELCO) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barakat Wire Transfer Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Barako Trading Company, LLC | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Bassam Dalati Satut | Publication | 01/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Benevolence International Fund | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Benevolence International Foundation | Adams County Sheriff's Office c/o Enaam Arnaout | 04/01/2004 | 04/21/2004 | 0510/2004 |
| Bensayah Belkacem | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

## Exhibit A
# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Bilal Bin Marwan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Blessed Relief Foundation | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Bosanska Idealna Futura | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Bosnia-Herzegovina branch of Al-Haramain Islamic Foundation | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Brahim Ben Hedili Hamami | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Chiheb Ben Mohamed Ayari | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Dahir Ubeidullahi Aweys | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Dr. Mahmoud Dakhil | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Dr. Mohaman Ali Elgari | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Egyptian Islamic Jihad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Enaam M Arnanout | Adams County Sheriff's Office | 04/01/2004 | 04/21/2004 | 0/10/2004 |
| Essam Al Ridi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fahad Al-Thumairy | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fahid Mohammed Ally Msalam | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fazeh Ahed | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fazul Abdullah Mohammed | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fethi Ben Rebai Masri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Fouzi Jendoubi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ghasoub Al Abrash | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ghasoub Al Abrash Ghalyoun | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Global Diamond Resource | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Global Relief Foundation | Sec. State Illinois | 05/28/2004 | 06/17/2004 | 04/05/2005 |
| Global Services International | Sec. State Minnesota | 05/26/2004 | 06/16/2004 | 04/05/2005 |
| Gulbuddin Hekmatyar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Gulf Center S.R.L. | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Gum Arabic Company Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Habib Waddani | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Haji Abdul Manan Agha | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Haji Mohamad Akram | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hamas | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

**Exhibit A**

# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Hasan Izz-Al-Din | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hashim Abdulrahman | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hassan A.A Bahfzallah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hassan Dahir Aweys | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hassan Turabi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hazem Ragab | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Help African People | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Heyatul Ulya | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hezb-e-Islami | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hisham Arnanout | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Human Concern International Society | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Hussein Mahmud Abdullkadir | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ibn al-Shaykh al-Libi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ibrahim Hassabella | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ibrahim Muhammed Afandi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ibrahim S Abdullah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ibrahim Salih Mohammed Al-Yacoub | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ihab Ali | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Imad Eddin Barakat Yarkas | Publication | 1/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Imad Mughniyeh | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Islamic African Relief Agency | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Islamic Army of Aden | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Islamic Cultural Institute of Milan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Islamic International Brigade | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Islamic Movement of Uzbekistan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Jaish-I-Mohammed | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Jamal Ahmed Mohammed | Publication | 1/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Jamal Al-Badawi | Publication | 1/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Jamal Nyrabeh | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

**Exhibit A**

# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Jamil Qasim Saeed | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Jam'Yah Ta'Awun Al-Islamia | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Jemaah Islamiya Organization | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Khaled Nouri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Khalid Shaikh Mohammed | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Khalil Jarraya | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Lashkar I Janghvi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Lashkar-e Tayyiba | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Lazhar Ben Mohammed Tlili | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Lebanese Hezbollah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Liban Hussein | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Lionel Dumont | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mahdi Chamran Savehi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mahmoud Jaballah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Makhtab Al-Khidamat | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mamoun Darkazanli | Registered Mail | 5/27/2004 | 07/26/2004 | 09/23/2005 |
| Mamoun Darkazanli Import-Export Company | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Mansour Thaer | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mansouri Al-Kadi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Masjed Al Madinah Al Munawarah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mazin M.H. Bareth | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mendi Kammoun | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mercy International Relief Agency | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Miga - Malaysian Swiss, Gulf and African Chamber | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Mohamed Bayazid | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammad S. Mohammad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Al Massari | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Al-Issai | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

# Exhibit A
## Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Mohammed Amine Akli | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Bahareth | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Chehade | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Iqbal Abdurrahman | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Khair Al Saqqa | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Khatib | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Mansour | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Omar Al-Harazi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Omeish | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohammed Sarkawi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mohrez Amdouni | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mondher Baazaoui | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Moro Islamic Liberation Front | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mounir Ben Habib Jerraya | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mounir El Motassadeq | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Moussa Ben Amor Essaadi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mufti Rashid Ahmad Ladehyanoy | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammad Abu-Islam | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammad Al-Hamati | Publication | 1/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammad Atif | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammad Omar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammad Salah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammed Galeb Kalaje Zuoyadi | Publication | 01/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Muhammed J. Fakihi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muhsin Musa Matwalli Atwah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mullah Kakshar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mustaf Ahmed Al-Hisawi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mustafa Al-Kadir | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Mustafa Mohamed Fadhil | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

# Exhibit A
## Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Mustasim Abdel-Rahim | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Muzaffar Kahn | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nabil Benattia | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nada International Anstalt | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nada Management Organization | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nada Management Organization, SA | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Najib Ouaz | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nasco Business Residence Center SAS Di Nasreddin Ahmed Idris EC | Registered Mail | 5/27/2004 | 07/26/2004 | 09/23/2005 |
| Nasco Nasreddin Holding A.S. | Registered Mail | 5/27/2004 | 07/26/2004 | 09/23/2005 |
| Nascoservice S.R.L. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nascotex S.A. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nasreddin Company Nasco SAS Di Ahmed Idris Nassneddin EC | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nasreddin Foundation | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nasreddin Group International Holding Ltd. | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nasreddin International Group Limited Holding | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| National Development Bank | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| National Islamic Front | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nedal Saleh | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| New Diamond Holdings | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Nurjaman Riduan Ismuddin | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Omar Abu Omar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Omar Al Bayoumi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Osama Bassnan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Palestine Islamic Jihad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Parka Trading Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Piedmont Poultry | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

# Exhibit A
## Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Queen City Cigarettes and Candy | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Rabih Haddah | Publication | 01/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Rachid Fehar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ramzi Binalshibh | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Red Sea Barakat Company Limited | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Riyadus-Salikhin Recognizance and Sabotage Battalion of Chechen Martyrs | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| S.M. Tufail | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| SAAR Foundation | Process Server | 03/31/2005 | 04/20/2005 | 09/23/2005 |
| Sabir Lamar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Said Bahaji | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Saif Al Islam El Masry | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Salafist Group for Call and Combat | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Samir Kishk | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Saqar Al-Sadawi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Saudi Sudanese Bank | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Sayf al-Adl | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Sa'D Al-Sharif | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Sheikh Abu Bdul Aziz Nagi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Sheikh Ahmed Salim Swedan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Sheikh Omar Bakri Muhammad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Somalia Branch of the Al-Haramain Islamic Foundation | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Somalia International Relief Organization | Sec. State Minnesota | 05/26/2004 | 06/16/2004 | 04/5/2005 |
| Somalia Internet Company | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Somalia Network AB | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Special Purpose Islamic Regiment | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Syed Suleman Ahmer | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

Exhibit A

# Service of Process on Defendants Currently in Default

| DEFENDANT | TYPE | DATE OF SERVICE | ANSWER DUE | PROOF FILED |
|---|---|---|---|---|
| Taba Investments | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Taibah International Aid Association | Sec. State Virginia | 06/02/2004 | 06/22/2004 | 08/19/2004 |
| Tareq M Al-Swaidan: Abdul Al-Moslah | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Tariq Anwar al-Sayyid Ahmad | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| The Aid organization of the Ulema | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| The Taliban | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Thirwat Salah Shihata | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Turkistan Islamic Movement | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Ulema Union of Afghanistan | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Umar Faruq | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Umma Tameer-E-Nau (UTN) | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Usama bin Laden | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Wadi Al Aqiq | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Wafa Humanitarian Organization | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Walid Al-Sourouri | Publication | 01/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Yassine Chekkouri | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Yassir Al-Sirri a/k/a Ammar | Publication | 01/13/2005 | 03/14/2005 | 03/04/2005; 03/16/2005 |
| Youssef Abdaoui | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Youssef M Nada & Co. Gesellschaft MBH | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Youssef Nada | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Yusaf Ahmed Ali | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Zahir H. Kazmi | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Zakariya Essabar | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |
| Zeinab Mansour-Fattah | Registered Mail | 05/27/2004 | 07/26/2004 | 09/23/2005 |
| Ziyad Khaleel | Publication | 1/13/2005 | 3/14/2005 | 03/04/2005; 03/16/2005 |

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Aaran Money Wire Service Inc.

Abbas Abdi Ali

Abd Al-Mushin Al-Libi

Abd Al-Rahim Al-Nashiri

Abdel Hussein

Abdelghani Mzoudi

Abdelhalim Remadna

Abdelkarim Hussein Mohamed Al-Nasser

Abdi Adulaziz Ali

Abdirasik Aden

Abdul Fattah Zammar

Abdul Rahman Yasin

Abdullah Ahmed Abdullah

Abdullah 'Qassim

Abdullahi Hussein Kahie

Abdulrahman Hassan Sharbatly

Abu al-Hadi al-Iraqi

Abu Al-Maid

Abu Hafs the Mauritanian

Abu Hajer Al Iraqi

Abu Hamza Al-Masri

Abu Ibrahim Al-Masri

Abu Musab Al-Zarqawi

Abu Qatada Al-Filistini

Abu Rida Al Suri

Abu Sayef Group

Abu Zubaydah

Adel Ben Soltane

Adel Muhammad Sadiq Bin Kazem

Advice and Reformation Committee

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Afghan Support Committee

Agus Budiman

Ahmad Ajaj

Ahmad Ibrahim Al- Mughassil

Ahmad Sa'ld Al-Kadr

Ahmed Hasni Rarrbo

Ahmed Idris Nasreddin

Ahmed Khalfan Ghailani

Ahmed Mohammed Hamed Ali

Akida Bank Private Limited

Akida Investment Co

Al Baraka Exchange LLC

Al Barakaat Bank

Al Farooq Mosque

Al Gama'a al-Islamiyya

al Qaida

Al Shamal For Investment and Development

Al Taqwa Trade, Property and Industry Company Limited

Al Taqwa/Nada Group

Al Tawhid

Al-Barakaat

Al-Barakat Bank of Somalia (BSS)

Al-Barakat Finance Group

Al-Barakat Financial Holding Co.

Al-Barakat Global Telecommunications

Al-Barakat Group of Companies Somalia Limited

Al-Barakat International

Al-Barakat Investments

Al-Barakat Wiring Service

Al-Bir Saudi Organization

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Al-Birr

Al-Hamati Sweets Bakeries

Al-Hijrah Construction and Development Limited

Al-Itihaad al-Islamiya (AIAI)

Al-Nur Honey Press Shops

Al-Rashid Trust

Al-Shaykh Al-Iraqi

Al-Shifa' Honey Press for Industry and Commerce

Albert Fredrich Armand Huber

Algerian Armed Islamic Group

Ali Atwa

Ali Ghaleb Himmat

Ali Saed Bin Ali El-Hoorie

American Muslim Foundation

Amin Al-Haq

Anas Al-Liby

Ansar al-Islam (AI)

Arafat El-Ashi

Asbat al-Ansar

Ayadi Chafiq Bin Muhammad

Ayman al-Zawahiri

Azzam Service Center

BA Taqwa for Commerce and Real Estate Company Ltd.

Bank of al Taqwa Limited

Baraka Trading Company

Barakaat Boston

Barakaat Construction Company

Barakaat Enterprise

Barakaat Group of Companies

Barakaat International

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Barakaat International Foundation

Barakaat International, Inc.

Barakaat North America, Inc.

Barakaat Red Sea Telecommunications

Barakaat Telecommunications Co. Somalia

Barakat Bank and Remittances

Barakat Computer Consulting (BCC)

Barakat Consulting Group (BCG)

Barakat Global Telephone Company

Barakat International Companies (BICO)

Barakat Post Express (BPE)

Barakat Refreshment Company

Barakat Telecommunications Company Limited (BTELCO)

Barakat Wire Transfer Company

Barako Trading Company, LLC

Bassam Dalati Satut

Benevolence International  Fund

Benevolence International Foundation

Bensayah Belkacem

Bilal Bin Marwan

Blessed Relief Foundation

Bosanska Idealna Futura

Bosnia-Herzegovina branch of Al-Haramain Islamic Foundation

Brahim Ben Hedili Hamami

Chiheb Ben Mohamed Ayari

Dahir Ubeidullahi Aweys

Dr. Mahmoud Dakhil

Dr. Mohaman Ali Elgari

Egyptian Islamic Jihad

Enaam M Arnanout

February 9, 2007

# Exhibit B

# Defendants Currently in Default

Essam Al Ridi

Fahad Al-Thumairy

Fahid Mohammed Ally Msalam

Fazeh Ahed

Fazul Abdullah Mohammed

Fethi Ben Rebai Masri

Fouzi Jendoubi

Ghasoub Al Abrash

Ghasoub Al Abrash Ghalyoun

Global Diamond Resource

Global Relief Foundation

Global Services International

Gulbuddin Hekmatyar

Gulf Center S.R.L.

Gum Arabic Company Limited

Habib Waddani

Haji Abdul Manan Agha

Haji Mohamad Akram

Hamas

Hasan Izz-Al-Din

Hashim Abdulrahman

Hassan A.A Bahfzallah

Hassan Dahir Aweys

Hassan Turabi

Hazem Ragab

Help African People

Heyatul Ulya

Hezb-e-Islami

Hisham Arnanout

Human Concern International Society

# Exhibit B
## Defendants Currently in Default

Hussein Mahmud Abdullkadir

Ibn al-Shaykh al-Libi

Ibrahim Hassabella

Ibrahim Muhammed Afandi

Ibrahim S Abdullah

Ibrahim Salih Mohammed Al-Yacoub

Ihab Ali

Imad Eddin Barakat Yarkas

Imad Mughniyeh

Islamic African Relief Agency

Islamic Army of Aden

Islamic Cultural Institute of Milan

Islamic International Brigade

Islamic Movement of Uzbekistan

Jaish-I-Mohammed

Jamal Ahmed Mohammed

Jamal Al-Badawi

Jamal Nyrabeh

Jamil Qasim Saeed

Jam'Yah Ta'Awun Al-Islamia

Jemaah Islamiya Organization

Khaled Nouri

Khalid Shaikh Mohammed

Khalil Jarraya

Lashkar I Janghvi

Lashkar-e Tayyiba

Lazhar Ben Mohammed Tlili

Lebanese Hezbollah

Liban Hussein

Lionel Dumont

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Mahdi Chamran Savehi

Mahmoud Jaballah

Makhtab Al-Khidamat

Mamoun Darkazanli

Mamoun Darkazanli Import-Export Company

Mansour Thaer

Mansouri Al-Kadi

Masjed Al Madinah Al Munawarah

Mazin M.H. Bareth

Mendi Kammoun

Mercy International Relief Agency

Miga - Malaysian Swiss, Gulf and African Chamber

Mohamed Bayazid

Mohammad S. Mohammad

Mohammed Al Massari

Mohammed Al-Issai

Mohammed Amine Akli

Mohammed Bahareth

Mohammed Chehade

Mohammed Iqbal Abdurrahman

Mohammed Khair Al Saqqa

Mohammed Khatib

Mohammed Mansour

Mohammed Omar Al-Harazi

Mohammed Omeish

Mohammed Sarkawi

Mohrez Amdouni

Mondher Baazaoui

Moro Islamic Liberation Front

Mounir Ben Habib Jerraya

February 9, 2007

# Exhibit B

# Defendants Currently in Default

Mounir El Motassadeq

Moussa Ben Amor Essaadi

Mufti Rashid Ahmad Ladehyanoy

Muhammad Abu-Islam

Muhammad Al-Hamati

Muhammad Atif

Muhammad Omar

Muhammad Salah

Muhammed Galeb Kalaje Zuoyadi

Muhammed J. Fakihi

Muhsin Musa Matwalli Atwah

Mullah Kakshar

Mustaf Ahmed Al-Hisawi

Mustafa Al-Kadir

Mustafa Mohamed Fadhil

Mustasim Abdel-Rahim

Muzaffar Kahn

Nabil Benattia

Nada International Anstalt

Nada Management Organization

Nada Management Organization, SA

Najib Ouaz

Nasco Business Residence Center SAS Di Nasreddin Ahmed Idris EC

Nasco Nasreddin Holding A.S.

Nascoservice S.R.L.

Nascotex S.A.

Nasreddin Company Nasco SAS Di Ahmed Idris Nassneddin EC

Nasreddin Foundation

Nasreddin Group International Holding Ltd.

Nasreddin International Group Limited Holding

February 9, 2007

-8-

# Exhibit B
# Defendants Currently in Default

National Development Bank

National Islamic Front

Nedal Saleh

New Diamond Holdings

Nurjaman Riduan Ismuddin

Omar Abu Omar

Omar Al Bayoumi

Osama Bassnan

Palestine Islamic Jihad

Parka Trading Company

Piedmont Poultry

Queen City Cigarettes and Candy

Rabih Haddah

Rachid Fehar

Ramzi Binalshibh

Red Sea Barakat Company Limited

Riyadus-Salikhin Recognizance and Sabotage Battalion of Chechen Martyrs

S.M. Tufail

SAAR Foundation

Sabir Lamar

Said Bahaji

Saif Al Islam El Masry

Salafist Group for Call and Combat

Samir Kishk

Saqar Al-Sadawi

Saudi Sudanese Bank

Sayf al-Adl

Sa'D Al-Sharif

Sheikh Abu Bdul Aziz Nagi

Sheikh Ahmed Salim Swedan

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Sheikh Omar Bakri Muhammad

Somalia Branch of the Al-Haramain Islamic Foundation

Somalia International Relief Organization

Somalia Internet Company

Somalia Network AB

Special Purpose Islamic Regiment

Syed Suleman Ahmer

Taba Investments

Taibah International Aid Association

Tareq M Al-Swaidan: Abdul Al-Moslah

Tariq Anwar al-Sayyid Ahmad

The Aid organization of the Ulema

The Taliban

Thirwat Salah Shihata

Turkistan Islamic Movement

Ulema Union of Afghanistan

Umar Faruq

Umma Tameer-E-Nau (UTN)

Usama bin Laden

Wadi Al Aqiq

Wafa Humanitarian Organization

Walid Al-Sourouri

Yassine Chekkouri

Yassir Al-Sirri a/k/a Ammar

Youssef Abdaoui

Youssef M Nada & Co. Gesellschaft MBH

Youssef Nada

Yusaf Ahmed Ali

Zahir H. Kazmi

Zakariya Essabar

February 9, 2007

# Exhibit B
# Defendants Currently in Default

Zeinab Mansour-Fattah

Ziyad Khaleel

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Federal Insurance Co. v. al Qaida*, Case No. 03-CV-6978 (RCC) (S.D.N.Y.)

## AFFIDAVIT OF  STEVEN JUDOVIN  IN SUPPORT OF AXA'S PROOF OF DAMAGES

I, Steven Judovin, being duly sworn according to law, depose and say,

1.      I am  a Senior Vice President of AXA Liabilities Managers, a plaintiff in the above-action.

2.      As an Officer of AXA Liabilities Managers, I have been authorized to execute this Affidavit on behalf of its subsidiaries AXA Insurance Company, AXA Reinsurance Company and AXA Global Risks UK Ltd., as well as the following other companies which are part of the AXA Group and which assert claims for damages in the above-action, including, AXA RE, AXA RE Canadian Branch, AXA RE UK Plc, AXA Corporate Solutions Assurance UK Branch, SPS RE, AXA Art Insurance Corp., and AXA Versicherung (hereinafter referred to as "the AXA Companies"). The  AXA Companies provide insurance and reinsurance services.

3.     AXA is both an insurer and a reinsurer.  Reinsurance is the practice

whereby in consideration of the premium paid, AXA, as the reinsurer,

agrees to indemnify another insurance company, called the reinsured or

cedant, for all or part of the liability assumed by the reinsured or cedant

under the policies of insurance which it has issued.

4.     As an Officer of AXA Liabilities Managers, I have personal knowledge of

the day-to-day affairs of the business of the AXA Insurance Company and

AXA Reinsurance Company, including personal knowledge of the process

related to the submission of claims, and the adjustment of claims under the

policies of insurance and reinsurance issued by AXA Companies.

5.     The adjustment process includes compliance with standards and

procedures which must be followed in completing the adjustment of the

claim and the subsequent payment of claims under the policies of

insurance.  The adjustment process is tailored to the provisions of the

applicable policy of insurance or reinsurance, and may include follow-the-

settlement and/or claims cooperation clauses.  The most basic standards of

compliance include the following:

- Prompt notice of the loss or damage and a description of the property involved.

- A description of how, when and where the loss or damage occurred.

- Submission of complete inventories of the damaged and undamaged property,

2

including quantities, costs,
values and amount of loss
claimed.

- Inspection of the property
proving the loss or damage.

- Cooperation in the
investigation or settlement of
the claim.

- Examination of an insured or
reinsured's books and
records.

6.      The adjustment of claims submitted by policy holders and insureds or

reinsureds are subject to specific and exacting requirements of proof,

including, but not limited to, (a) compliance with, and measurement

against, the terms and provisions of the policies of insurance or

reinsurance (b) examination by qualified adjustment professionals, (c)

rigorous scrutiny by highly qualified and experienced adjustment

professionals, (d) analysis and review by outside professionals, such as

certified public accounts, engineers, architects, and construction cost

specialists, and (e) production of records and other documentation in

support of submitted claims.  The adjustment process as described herein

is completed at both the primary insurance company level, and the

reinsurance level in that the claims submitted by reinsureds and cedants

have been subjected to the adjustment process, and payment is made in

accordance with the insurance policy or reinsurance contract.

7.      As an Officer of AXA Insurance Company, I also receive and regularly

review reports prepared by other company officials responsible for the

adjustment process, including individual reports of particular claims and summary reports of claims submitted to us. These reports are prepared by both AXA claims analysts and independent adjusters. The reports contain information and details on the particulars of the adjustment and payments for claims submitted by insureds, reinsureds and cedants. Additionally, in further discharge of my job duties and responsibilities, I regularly rely upon financial data and records related to the adjustment of claims and payment for these claims. The information and data I receive includes executive summaries of claims in process, identification of issues which arise in the adjustment of claims which require resolution, and other data which allows me to determine the accuracy of the claims adjustment process. For these reasons, I am familiar with the adjustment process and disposition of claims submitted by our insureds, reinsureds and cedants.

8.    The adjustment process is also subject to internal review and audit by other management and supervisory personnel, which further ensures accuracy in the final adjustment and payment of claims submitted by insureds, reinsureds and cedants. Our management and supervisory personnel have expertise in a wide range of areas, including expertise in the calculation and determination of loss of business income, and property values. Further, each of our management and supervisory personnel are trained or experienced in their particular areas of specialty, and each individual brings to the claims evaluation process many years of

experience.  I have personal knowledge of their work and regularly rely upon it in my own evaluation and disposition of claims.

9.      The adjustment of claims is further subject to numerous industry regulatory standards and requirements, including fair claims handling statutes and codes within various jurisdictions.  We are bound by law to follow these standards and requirements in the adjustment and disposition of all claims.

10.     In connection with preparation of this Affidavit, each AXA company has undertaken review of its' business records necessary to determine that insurance claims were submitted to the AXA Companies by its insureds, reinsureds and cedants for damages and injuries resulting from the September 11, 2001 Attack on the United States (the "September 11[th] Attack"), and that payments were made by the AXA Companies in compensation for losses suffered by our insureds, reinsureds and cedants for the claims submitted by them under the AXA Companies' policies of insurance and reinsurance.

11.     At the time of the September 11th Attack, the AXA Companies provided property, business interruption and related insurance coverage to numerous corporations, companies, partnerships, affiliations, persons, trusts and other parties ("policy holders and insureds") who suffered injuries, losses and damages as a result of the September 11th Attack.

12.     Based on my review of the AXA Companies' documents, as well as information I have also received in my capacity as an Officer of AXA

Liabilities Managers, I have personal knowledge of the insurance claims submitted to the AXA Companies by its insureds, reinsureds and cedants for the damages, losses, and injuries resulting from the September 11th Attack, and the adjustment and subsequent payments made by the AXA Companies in compensation for these submitted claims.

13.     The records and information reviewed revealed that the AXA Companies were able to make a determination regarding the validity of claims filed with the AXA Companies, and this determination was made by the AXA Companies based upon all information, data, reports and evaluations provided to them.  AXA Companies further determined that the losses claimed were covered under the AXA Companies insurance or reinsurance policies.

14.     In accordance with the terms of the applicable policies of insurance or reinsurance contracts, the adjustment process as described herein, the needs of the insureds, reinsureds or cedants, the exigencies of the aftermath of the September 11th Attack, and sound considerations related to business operations, the AXA Companies have made as of the date of this affidavit total aggregate payments in the amount of $539,784,217.34 in compensation for property, business interruption and related damages, and it would not have made these payments and suffered these losses, nor would its insureds and policy holders have suffered these losses, but for the September 11th Attack.  Specifically, the AXA Companies which have

made payments  included within the aggregate claim for damages herein

are, as follows:

| | |
|---|---|
| AXA Art Insurance Corp. | $   14,287,543.00 |
| AXA Global Risks (UK) Ltd. | $   10,986,623.57 |
| AXA CSA UK Branch | $   64,779,883.00 |
| AXA Insurance Company | $ 131,696,044.96 |
| AXA Reinsurance Company | $   82,714,778.00 |
| AXA RE | $ 105,790,023.00 |
| AXA RE Canadian Branch | $   26,138,407.11 |
| AXA RE UK Plc | $   18,162,701.70 |
| AXA Versicherung | $        923,053.00 |
| SPS RE | $   84,305,160.00 |

The payments noted for each of the AXA Companies listed above include

claim adjustment and claim legal expenses to the extent that those costs

and expenses were incurred by reinsureds or cedants.

15.    The loss of money represented by the amounts paid, and costs and

expenses incurred, by the AXA Companies were a direct result of the

September 11th Attack.

16.    A schedule, with Columns A through D,  identifying each insured,

reinsured and cedant who submitted a covered claim which was adjusted,

and for which payments in the total aggregate amount of $539,784,217.34

was made by the AXA Companies as of

7

December 31, 2005 as a result of the September 11th Attack, is attached

hereto as Exhibit "A".

Further affiant says naught.

_____

Steven Judovin
Senior Vice President
AXA Liabilities Managers

State of New York      )

                       )SS

County of New York  )

Sworn and Subscribed to before me

this 20th day of November, 2006

Diana Morrison – Notary Public

My commission expires 11/30/2006

DIANA MORRISON
Notary Public - State of New York
NO. 01MO4676326
Qualified in New York County
My Commission Expires Nov 30, 2006

8

Pursuant To This Court's Order Dated May 9, 2005, The Schedule Attached As Exhibit A Has Been Filed Under Seal In Order To Protect The Identity Of The Insureds From Public Disclosure.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |
|---|---|

*This document relates to:*

*Federal Insurance Co. v. al Qaida*, Case No. 03-CV-6978 (RCC) (S.D.N.Y.)

## AFFIDAVIT OF DONALD L. SIEGRIST, JR. IN SUPPORT OF PROOF OF DAMAGES FOR CHUBB & SON, A DIVISION OF FEDERAL INSURANCE COMPANY ON BEHALF OF ITSELF AND AS MANAGER OF ITS INSURANCE SUBSIDIARIES

I, Donald L. Siegrist, Jr., being duly sworn according to law, depose and say,

1.  I am a Vice President and an Officer of Chubb & Son, a division of Federal Insurance Company, and this Affidavit is submitted on behalf of Federal Insurance Company, individually, and as manager of its insurance subsidiaries which are known informally as the Chubb Group of Insurance Companies (hereinafter "Chubb"), and plaintiffs in the above action.

2.  I make this Affidavit in support of Chubb's Proof of Damages.

3.      As an Officer of Chubb, I have been authorized to execute this Affidavit on
its behalf.

4.      As an Officer of Chubb, I have knowledge of the day-to-day affairs of the
business of the company, including knowledge of the process related to
submission of claims and adjustment of claims under policies of insurance
issued by Chubb.  The Chubb companies identified hereinafter participate in
the adjustment of claims as both primary and excess insurance companies
for numerous policy holders and insureds.  I have knowledge of both the
direct adjustment of claims for those Chubb companies which are primary
insurers, and knowledge of the adjustment process in those situations
wherein Chubb is an excess insurer for a particular policy holder and
insured.  The adjustment process hereinafter described is consistent for those
claims wherein a particular Chubb company is either a primary or excess
insurance company for a policy holder or insured.

5.      The adjustment process includes compliance with standards and procedures
which must be followed in completing the adjustment of the claim and the
subsequent payment of claims under the policies of insurance.  The most
basic standards of compliance include the following:

**Insured's Duties in The Event of Loss Or Damage**

You must see to it that the following are done in the event of loss
or damage:

- Notify us, or one of our authorized representatives, as soon as possible, as to what occurred. Include a description of the property involved, that time and place of the loss or damage, and names and addresses of available witnesses. If there has been loss or damage that may result in a loss under any Business Income or Extra Expense Insurance, notify us by telephone, telegraph or facsimile at our expense.

- Notify the police if a law may have been broken.

- Take every reasonable step to protect the covered property from further damage, and keep a record of your expenses necessary to protect such covered property for consideration in the settlement of the claim. This will not increase any Limit Of Insurance. However, we will not pay for any subsequent loss or damage resulting from a peril that is not a covered peril. Also, if feasible, set such damaged property aside and in the best possible order for examination.

- If you intend to continue your business, you must resume all or part of your operations as quickly as possible.

- File with us, or with our authorized representative, sworn proof of loss within 90 days after the date of loss or damage.

- Cooperate with us in the investigation, settlement or handling of any claim.

- Authorize us to obtain records or reports necessary for our investigation.

- At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss or damage claimed.

- As often as may be reasonably required, permit us to inspect the property and examine your books and records.

- Permit us to take samples of the damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

- Permit us to examine any insured under oath, outside the presence of any other insured at such times as may e reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

This language (or substantially similar language) is found within most property policies of insurance issued by Chubb.

6. The adjustment of claims submitted by policy holders and insureds are subject to specific and exacting requirements of proof, including, but not limited to, (a) compliance with, and measurement against, the terms and provisions of the policies of insurance, (b) examination by qualified adjustment professionals, (c) analysis and review by outside professionals including, but not limited to, certified public accounts, engineers, architects, and construction cost specialists, and (d) production of records and other documentation in support of submitted claims.

7. I also receive and regularly review a variety of reports prepared by other company employees and representatives responsible for the adjustment process, including individuals reports of particular claims and summary reports of claims submitted to Chubb. These reports are prepared by both Chubb employees who adjust claims in the field and independent adjusters retained by the company to complete the same tasks. In those situations wherein a Chubb company is an excess insurer, these reports are prepared by the primary insurance company claims adjustment representative or employee, or are included within reports sent to Chubb by the primary insurance company. The reports generated for both Chubb primary and excess insurance companies contain information and details on the

4

particulars of the adjustment and payments for claims submitted by policy holders and insureds.  Additionally, in further discharge of my job duties and responsibilities, I rely upon financial data and records related to the adjustment of claims and payment for these claims.  The information and data I receive includes executive summaries of claims in process, identification of issues which arise in the adjustment of claims which require resolution, and other data which allows me to determine the accuracy of the claims adjustment process.  For these reasons, I am familiar with the adjustment process and disposition of claims submitted by our policy holders and insureds.

8.    The adjustment process is also subject to internal review and audit by other management and supervisory personnel, which further ensures accuracy in the final adjustment and payment of claims submitted by policy holders and insureds.  Our management and supervisory personnel have experience in a wide range of areas, including experience in the calculation and determination of loss of business income, property values, and construction costs and expenses.  Further, each of our management and supervisory personnel are trained or experienced in their particular areas of specialty, and each individual brings to the claims evaluation process many years of experience.  I have knowledge of their work and regularly rely upon it in my own evaluation and disposition of claims.

9.   The adjustment of claims is further subject to numerous industry regulatory standards and requirements, including fair claims handling statutes and codes within various jurisdictions. We are bound by law to follow these standards and requirements in the adjustment and disposition of all claims.

10.   In connection with the preparation of this Affidavit, I have undertaken review of Chubb's records necessary to determine that insurance claims were submitted to Chubb by its policy holders and insureds for damages and injuries resulting from the September 11, 2001 Attack on the United States (the "September 11[th] Attack"), and that payments were made by Chubb in compensation for losses suffered by our policy holders and insureds for the claims submitted by them under Chubb's policies of insurance.

11.   At the time of the September 11th Attack, Chubb provided property, business interruption and related insurance coverage to numerous corporations, companies, partnerships, affiliations, persons, trusts and other parties ("policy holders and insureds") who suffered injuries, losses and damages as a result of the September 11th Attack.

12.   Based on my review of Chubb's records, and information I have also received in my capacity as an Officer of Chubb, I have knowledge concerning the insurance claims submitted to Chubb by its policy holders and insureds for the damages, losses, and injuries resulting from the September 11th Attack, and the adjustment and subsequent payments made by Chubb in compensation for these submitted claims.

6

13.     The records and information reviewed revealed that Chubb was able to

make a determination about the validity of the claims filed with Chubb, and

this determination was made by Chubb based upon all information, data,

reports and evaluations provided to it.  Chubb paid for those claimed losses

submitted by its policy holders and insureds which met the requirements of

our policies of insurance.

14.     In accordance with the terms of the applicable policies of insurance, the

adjustment process as described herein, the needs of the insureds, the

exigencies of the aftermath of the September 11th Attack, and sound

considerations related to business operations, Chubb continues to make

payments to its policy holders and insureds and it has made total aggregate

payments as of the date of this affidavit in the amount of $2,217,468,721.70

and in compensation for property, business interruption and related

damages,  and it would not have made these payments and suffered these

losses, nor would its insureds and policy holders have suffered these losses,

but for the September 11th Attack.  Specifically, the Chubb companies

which have made payments to policy holders and insureds as a result of the

September 11th Attack are, as follows:

| | | |
|---|---|---|
| Vigilant Ins. Co. | $ | 42,305,933.24 |
| Chubb Custom Ins. Co. | $ | 612,585.00 |
| Chubb Indemnity Ins. Co. | $ | 4,083,878.20 |
| Federal Ins. Co. | $ | 1,513,667,597.39 |
| Chubb Ins. Co. of NJ | $ | 412,681.71 |
| Chubb Ins. Co. of Canada | $ | 50,452,395.71 |
| Pacific Indemnity Co. | $ | 9,936,536.66 |
| Great Northern Ins. Co. | $ | 595,997,113.79 |

These companies and the payments listed above represent the aggregate amount of $2,217,468,721.70, paid by all Chubb companies to-date in this matter.

15.    Chubb also suffered losses because of the need to incur costs in the claims adjustment process. These costs included the fees charged by outside consultants such as accountants and engineers, who were utilized to ensure the accuracy of the claims submitted and losses sustained. These costs also included the fees charged by legal counsel retained to advise and assist Chubb in fairly and fully responding to our obligations under the policies of insurance and to resolve questions of policy coverage consistent with the law and our policy obligations. These costs further included the expenses incurred by our claims adjustment professionals in responding to the extraordinary demands of the claims submitted following the September 11th Attack. Chubb continues to incur claims adjustment costs, and the claims adjustment costs incurred by it as of the date of this Affidavit total $30,579,071.71, and Chubb would not have suffered these losses but for the September 11th Attack.

16.   The loss of money represented by the amounts paid, and costs and

expenses incurred, by Chubb was a direct result of the September 11th

Attack.

17.   A schedule identifying each insured and policy holder who has submitted

a covered claim as of the date of this Affidavit, and for which adjustment

was completed and payment made in the total aggregate amount of

$2,217,468,721.70, is attached hereto as Exhibit "A". Also, a schedule

identifying the category and the total of claims adjustment costs of

$30,579,071.71 incurred by Chubb as of the date of this Affidavit is

attached hereto as Exhibit "B".

Further affiant says naught.

Donald L. Siegrist, Jr.
Vice President
Chubb & Son, a division of
Federal Insurance Company

Sworn to and subscribed
before me this
___ day of _Feb_, 20 _07_

CAMILLE R. DOUGLAS
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 11/13/2007

9

Pursuant To This Court's Order Dated May 9, 2005, The Schedules Attached As Exhibits A & B Have Been Filed Under Seal In Order To Protect The Identity Of The Insureds From Public Disclosure.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978  (RCC) (S.D.N.Y.)

## AFFIDAVIT OF THOMAS J. TOTH IN SUPPORT OF THE PROOF OF DAMAGES OF AMERICAN ALTERNATIVE INSURANCE COMPANY, THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY AND GREAT LAKES REINSURANCE (UK) LIMITED

I, Thomas J. Toth, being duly sworn according to law, depose and say,

1.      I am Vice President of Property Claims and an officer of Munich

Reinsurance America, Inc. ( hereinafter "MRAm") (formerly known as

American Reinsurance Company).  I am also an officer of American

Alternative Insurance Corporation and The Princeton Excess and Surplus

Lines Insurance Company.  MRAm, American Alternative Insurance

Company and The Princeton Excess and Surplus Lines Insurance

Company are insurance companies domiciled in Delaware and are wholly-

owned subsidiaries of Munich Re America Corporation ( hereinafter

"MRAC"), a Delaware corporation.  MRAC is ultimately owned by

Munich Reinsurance Company (hereinafter "MRC"), a German

corporation.  MRC also owns Great Lakes Reinsurance (UK) Limited, a

United Kingdom corporation.  Pursuant to an underwriting management

agreement between MRAm and Great Lakes Reinsurance (UK) Limited,

MRAm has issued certain surplus lines insurance policies on behalf of

Great Lakes Reinsurance (UK) Limited in the United States, and handles

claims on such policies.

2.      I make this Affidavit in support of the Proof of Damages of American

Alternative Insurance Company, the Princeton Excess and Surplus Lines

Insurance Company, and Great Lakes UK Insurance Company (hereinafter

"AAIC, PESLIC and/or GLUK"), plaintiffs in the above-action.

3.      As an Officer of AAIC and PESLIC, and as an Officer of MRAm, writing

on behalf of GLUK,  I have been authorized to execute this Affidavit on

behalf of AAIC, PESLIC and GLUK.

4.      As an Officer of MRAm, I have personal knowledge of the day-to-day

affairs of the business of these companies, including personal knowledge

of the process related to the submission of claims and the adjustment of

claims under policies of insurance issued by these companies.

5.      AAIC, PESLIC and GLUK act as following participatory insurance

carriers of lead insurance carriers in layered coverage on various risk for

numerous insureds and policy holders.  As such, these companies follow

the lead insurance carriers on a particular risk in the adjustment of claims

2

submitted by policy holders and insureds. As part of the adjustment

process, I will typically receive reports from the lead insurance carriers or

adjusters in the field assigned to the adjustment of particular claims. The

adjustment process provides me with an opportunity to review the reports,

raise issues associated with the adjustment of claims, or pose particular

questions or make specific inquiries about the adjustment of claims during

the adjustment process. The adjustment will be approved, if appropriate,

and payments made according to the participation of AAIC, PESLIC and

GLUK in the risk, and based upon recommendations by the lead insurance

carriers or adjusters in the field.

6.      The nature of the participation of AAIC, PESLIC and GLUK in the

adjustment process is such that I understand and I am familiar with the

field adjustment process and procedures. The adjustment process includes

compliance with standards and procedures which must be followed in

completing the adjustment of the claim and subsequent payment of claims

under the applicable policies of insurance. The most basic standards of

compliance include prompt notification of the loss or damage, a

description of the property involved in the loss, a description of how,

when and where the loss or damage occurred, the requirement that the

insured take reasonable steps to protect the property from further damage

and provide documentation in support of the loss, an itemization and

inventory of lost or damaged items, an allowance of an inspection of the

damaged property, an examination of books and records related to the lost

or damaged property, cooperation in the investigation of the loss, and submission to an examination under oath, if necessary.

7.   The adjustment of claims submitted by policy holders and insureds are subject to specific and exacting requirements of proof, including, but not limited to, (a) compliance with, and measurement against, the terms and provisions of the policies of insurance, (b) examination by qualified claims adjustment professionals, (c) analysis and review by outside professionals, such as certified public accounts, engineers, architects, and construction cost specialists, and (d) production of records and other documentation in support of submitted claims.

8.   I also receive and regularly review reports prepared by other company officials responsible for the adjustment process, including the particulars of the adjustment and payments for claims submitted by policy holders and insureds.  Additionally, in the discharge of my job duties and responsibilities, I regularly rely upon financial data and records related to the adjustment of claims and payment for these claims. The information and data I receive includes executive summaries of claims in process, identification of issues which arise in the adjustment of claims which require resolution, and other data which allows me to determine the accuracy of the claims adjustment process.  For these reasons, I am familiar with the adjustment process and disposition of claims submitted by our policy holders and insureds.

9.    The adjustment process is subject to my review and audit which further ensures accuracy in the final adjustment and payment of claims submitted by policy holders and insureds.

10.   The adjustment of claims is further subject to numerous industry regulatory standards and requirements, including fair claims handling statutes and codes within various jurisdictions. We are bound by law to follow these standards and requirements in the adjustment and disposition of all claims.

11.   In connection with preparation of this Affidavit, I have undertaken a thorough review of business records relating to insurance claims submitted to AAIC, PESLIC and GLUK by their policyholders and insureds for losses resulting from the September 11, 2001 Attack on the United States (the "September 11th Attack"), and the payments made by these companies in compensation for losses suffered by their policy holders and insureds for the claims submitted by them.

12.   At the time of the September 11th Attack, AAIC, PESLIC and GLUK provided property, business interruption and related insurance coverage to numerous corporations, companies, partnerships, affiliations, persons, trusts and other parties ("policy holders and insureds") who suffered injuries, losses and damages as a result of the September 11th Attack.

13.   Based on my review of the business records of AAIC, PESLIC and GLUK, as well as information I have also received in my capacity as an

Officer of MRAm, I have personal knowledge concerning the insurance claims submitted to these companies by their policy holders and insureds for the damages, losses, and injuries resulting from the September 11th Attack, and the adjustment and subsequent payments made by these companies in compensation for these submitted claims.

14.    I was the individual ultimately responsible for determining the validity of the claims filed with AAIC, PESLIC and GLUK, and I made a determination based upon all information, data, reports, and evaluations provided to me whether these companies were responsible for the losses claimed pursuant to the submissions of our policy holders and insureds and the requirements of our policies of insurance.

15.    In accordance with the terms of the applicable policies of insurance, the adjustment process as described herein, the needs of the insureds, the exigencies of the aftermath of the September 11th Attack, and sound considerations related to business operations, AAIC, PESLIC and GLUK have made total aggregate payments to-date in the amount of $107,230,501.59 in compensation for property, business interruption and related damages, as follows:

| | |
|---|---|
| American Alternative Insurance Company | $ 3,922,782.07 |
| Princeton Excess and Surplus Lines Insurance Company | $ 3,796,292.50 |
| Great Lakes UK Reinsurance Company | $ 99,511,427.02 |

16.    AAIC, PESLIC and GLUK would not have made these payments and suffered these losses, nor would their insureds and policy holders have suffered these losses, but for the September 11th Attack.

17.    We also suffered losses because of the need to incur costs in the claims adjustment process. These costs included the fees charged by outside consultants such as accountants and engineers, who were utilized to ensure the accuracy of the claims submitted and losses sustained. These costs also included the expenses incurred by our claims adjustment professionals in responding to the extraordinary demands of the claims submitted following the September 11th Attack. The claims adjustment costs incurred by AAIC, PESLIC and GLUK total $810,805.43 to-date, and they would not have suffered these losses but for the September 11th Attack.

18.    We also suffered losses because of the need to incur legal expenses in the claims adjustment process. These expenses involved the fees charged by counsel retained to advise and assist us in fairly and fully responding to our obligations under the policies of insurance and to resolve questions of policy coverage consistent with the law and our policy obligations. The legal expenses incurred by AAIC, PESLIC and GLUK total $299,891.05

7

to-date, and they would not have suffered these losses but for the September 11th Attack.

19. The loss of money represented by the amounts paid, and costs and expenses incurred by AAIC, PESLIC and GLUK was a direct result of the September 11th Attack.

20. A schedule identifying each insured and policy holder who submitted a covered claim which was adjusted as of the date of this Affidavit, and for which payment in the total aggregate amount of $107,230,501.59 was made by AAIC, PESLIC and GLUK is attached hereto as Exhibit "A", Columns A through D. Claims adjustment costs of $810,805.43 incurred by AAIC, PESLIC and GLUK is attached hereto as Exhibit "A", Column E. Legal expenses of $299,891.05 incurred by AAIC, PESLIC and GLUK is attached hereto as Exhibit "A", Column F.

8

Further affiant says naught.

January, 16, 2007

_Thomas J. Toth_
Thomas J. Toth, Officer
Munich Reinsurance America, Inc.

_Lauren M. Lupica_
01-16-07

LAUREN MARY LUPICA
Notary Public, State of New Jersey
No. 2291019
Qualified in Middlesex County
Commission Expires August 21, 2007

Pursuant To This Court's Order Dated May 9, 2005, The Schedule Attached As Exhibit A Has Been Filed Under Seal In Order To Protect The Identity Of The Insureds From Public Disclosure.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Federal Insurance Co. v. al Qaida*, Case No. 03-CV-6978 (RCC) (S.D.N.Y.)

### AFFIDAVIT OF JOHN F. MURPHY IN SUPPORT OF
### ONEBEACON INSURANCE GROUP'S PROOF OF DAMAGES

I, John F. Murphy, being duly sworn according to law, depose and say,

1.  I am the Property Claim Officer of OneBeacon Insurance Group, a plaintiff in the above-action.

2.  I make this Affidavit in support of OneBeacon Insurance Group's Proof of Damages.

3.  As an Officer of OneBeacon Insurance Group, I have been authorized to execute this Affidavit on its behalf.

4.  As an Officer of OneBeacon Insurance Group, I have personal knowledge of the day-to-day affairs of the business of the company, including personal knowledge of the process related to submission of claims, and the adjustment of claims under policies of insurance issued by OneBeacon Insurance Group.

5.  The adjustment process includes compliance with standards and procedures which must be followed in completing the adjustment of the claim and the subsequent payment of claims under the policies of insurance.  The most basic standards of compliance include the following:

*Duties In The Event Of Loss Or Damage*

*You must see that the following are done in the event of loss or damage to Covered Property:*

*Notify the police if a law may have been broken.*

*Give us prompt notice of the loss or damage. Include a description of the property involved.*

*As soon as possible, give us a description of how, when and where the loss or damage occurred.*

*Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.*

*At our request, give us the complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.*

*As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.*

*Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.*
*Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.*

*Cooperate with us in the investigation or settlement of the claim.*

*We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.*

This language (or substantially similar language) is found within all

property policies of insurance issued by OneBeacon Insurance Group.

6.    The adjustment of claims submitted by policy holders and insureds

are subject to specific and exacting requirements of proof, including,

but not limited to, (a) compliance with, and measurement against,

the terms and provisions of the policies of insurance, (b)

examination by qualified adjustment professionals, (c) analysis and

review by outside professionals, such as certified public accounts,

engineers, architects, and construction cost specialists, and (d)

production of records and other documentation in support of

submitted claims.

7.    I also receive and regularly review reports prepared by other

company officials responsible for the adjustment process, including

the particulars of the adjustment and payments for claims submitted

by policy holders and insureds.  Additionally, in the discharge of my

job duties and responsibilities, I regularly rely upon financial data

and records related to the adjustment of claims and payment

for these claims.  The information and data I receive includes

executive summaries of claims in process, identification of issues

which arise in the adjustment of claims which require resolution,

and other data which allows me to determine the accuracy of the

claims adjustment process.  For these reasons, I am familiar with the

adjustment process and disposition of claims submitted by our

policy holders and insureds

8.   The adjustment process is also subject to internal review and audit by

other management and supervisory personnel, which further ensures

accuracy in the final adjustment and payment of claims submitted by

policy holders and insureds.  Our management and supervisory personnel

have expertise in a wide range of areas, including expertise in the

calculation and determination of loss of business income, property values,

and construction costs and expenses.  Further, each of our management

and supervisory personnel are trained or experienced in their

particular areas of specialty, and each individual brings to the claims

evaluation process many years of experience.  I have personal knowledge

of their work and regularly rely upon it in my own evaluation and

disposition of claims.

9.   The adjustment of claims is further subject to numerous

industry regulatory standards and requirements, including fair claims

handling statutes and codes within various jurisdictions.  We are bound by

law to follow these standards and requirements in the adjustment and

disposition of all claims.

10.   In connection with preparation of this Affidavit, I have undertaken a

review of OneBeacon Insurance Group's business records relating to

insurance claims submitted to OneBeacon Insurance Group by its policy

holders and insureds for damages and injuries resulting from the

September 11, 2001 Attack on the United States (the "September 11[th]

Attack"), and the payments made by OneBeacon Insurance Group in

compensation for losses suffered by our policy holders and insureds for

the claims submitted by them under OneBeacon Insurance Group's

policies of insurance.

11.    At the time of the September 11th Attack, OneBeacon Insurance Group

provided property, business interruption and related insurance

coverage to numerous corporations, companies, partnerships, affiliations,

persons, trusts and other parties ("policy holders and insureds") who

suffered injuries, losses and damages as a result of the September 11th

Attack.

12.    Based on my review of OneBeacon Insurance Group's business records,

as well as information I have also received in my capacity as an Officer of

OneBeacon Insurance Group, I have personal knowledge concerning the

insurance claims submitted to OneBeacon Insurance Group by its policy

holders and insureds for the damages, losses, and injuries resulting from

the September 11th Attack, and the adjustment and subsequent payments

made by OneBeacon Insurance Group in compensation for these

submitted claims.

13.    I have reviewed the OneBeacon Insurance Group records related to the

time period associated with the insurance claims submitted to OneBeacon

Insurance Group by its policy holders and insured for the damages, losses,

and injuries resulting from the September 11th attack, and the adjustment

and subsequent payments made by OneBeacon Insurance Group in compensation for these submitted claims. I am satisfied from a review of the records that the adjustment of the claims was thorough and complete, and that the payments made were properly and satisfactorily documented and valid pursuant to the obligations of OneBeacon Insurance Company under its various policies of insurance.

14.     In accordance with the terms of the applicable policies of insurance, the adjustment process as described herein, the needs of the insureds, the exigencies of the aftermath of the September 11th Attack, and sound consideration relating to business operations, OneBeacon Insurance Group has made total aggregate payments as of the date of this affidavit in the amount of $185,805,247.79 in compensation for property, business interruption and related damages, and it would not have made these payments and suffered these losses, nor would its insureds and policy holders have suffered these losses, but for the September 11th Attack.

15.     We also suffered losses because of the need to incur costs in the claims adjustment process. These costs included the fees charged by outside consultants such as accountants and engineers, who were utilized to ensure the accuracy of the claims submitted and losses sustained. These costs also included the expenses incurred by our claims adjustment professionals in responding to the extraordinary demands of the claims submitted following the September 11th Attack. The claims adjustment

costs incurred by OneBeacon Insurance Group are included in the total amount listed in paragraph 14 above.

16.   We also suffered losses because of the need to incur legal expenses in the claims adjustment process.  These expenses involved the fees charged by counsel retained to advise and assist us in fairly and fully responding to our obligations under the policies of insurance and to resolve questions of policy coverage consistent with the law and our policy obligations.  The legal expenses incurred by OneBeacon Insurance Group are included in paragraph 14 above.

17.   The loss of money represented by the amounts paid, and costs and expenses incurred, by OneBeacon Insurance Group was a direct result of the September 11th Attack.

18.   A schedule identifying each insured and policy holder who submitted a covered claim which was adjusted as of the date of this Affidavit, and for which payment in the total aggregate amount of $185,805,247.79 was made by OneBeacon Insurance Group is attached hereto as Exhibit "A", Columns A through D.

Further affiant says naught.

Property Claim Officer
OneBeacon Insurance Group

**BARRY JOHNSON ROCK**
Notary Public
Commonwealth of Massachusetts
My Commission Expires
September 28, 2012

1/16/07

Pursuant To This Court's Order Dated May 9, 2005, The Schedule Attached As Exhibit A Has Been Filed Under Seal In Order To Protect The Identity Of The Insureds From Public Disclosure.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) ECF Case |
|---|---|

*This document relates to:*

*Federal Insurance Co. v. al Qaida*, Case No. 03-CV-6978 (RCC) (S.D.N.Y.)

## AFFIDAVIT OF ROBERT KNOWLES IN SUPPORT OF
## TIG INSURANCE COMPANY'S PROOF OF DAMAGES

I, Robert Knowles, being duly sworn according to law, depose and say,

1.  I am the Vice President and an Officer of TIG Insurance Company, a plaintiff in the above action.

2.  I make this Affidavit in support of TIG Insurance Company's Proof of Damages.

3.  As an Officer of TIG Insurance Company, I have been authorized to execute this Affidavit on its behalf.

4.  As an Officer of TIG Insurance Company, I have personal knowledge of the day-to-day affairs of the business of the company, including personal knowledge of the process related to the submission of claims, and the adjustment of claims under policies of insurance issued by TIG Insurance Company.

5.  The adjustment process includes compliance with standards and procedures which must be followed in completing the adjustment of the claim and the subsequent payment of claims under the policies of insurance. The most basic standards of compliance include the following:

*Duties In The Event Of Loss Or Damage*

*You must see that the following are done in the event of loss or damage to Covered Property:*

*Notify the police if a law may have been broken.*

*Give us prompt notice of the loss or damage. Include a description of the property involved.*

*As soon as possible, give us a description of how, when and where the loss or damage occurred.*

*Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.*

*At our request, give us the complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.*

*As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.*

*Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.*

*Cooperate with us in the investigation or settlement of the claim.*

*We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.*

2

This language (or substantially similar language) is found within all

property policies of insurance issued by TIG Insurance Company.

6.      The adjustment of claims submitted by policy holders and insureds

are subject to specific and exacting requirements of proof,

including, but not limited to, (a) compliance with, and measurement

against, the terms and provisions of the policies of insurance, (b)

examination by qualified adjustment professionals, (c) analysis and

review by outside professionals, such as certified public accounts,

engineers, architects, and construction cost specialists, and (d)

production of records and other documentation in support of

submitted claims.

7.      I also receive and regularly review reports prepared by other

company officials responsible for the adjustment process, including

the particulars of the adjustment and payments for claims submitted

by policy holders and insureds.  Additionally, in the discharge of my

job duties and responsibilities, I regularly rely upon financial data

and records related to the adjustment of claims and payment

for these claims.  The information and data I receive includes

executive summaries of claims in process, identification of issues

which arise in the adjustment of claims which require resolution,

and other data which allows me to determine the accuracy of the

claims adjustment process.  For these reasons, I am familiar with the

adjustment process and disposition of claims submitted by our
policy holders and insureds.

8. The adjustment process is also subject to internal review and audit by
other management and supervisory personnel, which further ensures
accuracy in the final adjustment and payment of claims submitted by
policy holders and insureds. Our management and supervisory personnel
have expertise in a wide range of areas, including expertise in the
calculation and determination of loss of business income, property values,
and construction costs and expenses. Further, each of our management
and supervisory personnel are trained or experienced in their particular
areas of specialty, and each individual brings to the claims evaluation
process many years of experience. I have personal knowledge of their
work and regularly rely upon it in my own evaluation and disposition of
claims.

9. The adjustment of claims is further subject to numerous industry
regulatory standards and requirements, including fair claims handling
statutes and codes within various jurisdictions. We are bound by law to
follow these standards and requirements in the adjustment and disposition
of all claims.

10. In connection with preparation of this Affidavit, I have undertaken a
review of TIG Insurance Company's business records relating to insurance
claims submitted to TIG Insurance Company by its policy holders and
insureds for damages and injuries resulting from the September 11, 2001

4

Attack on the United States (the "September 11[th] Attack"), and the

payments made by TIG Insurance Company in compensation for losses

suffered by our policy holders and insureds for the claims submitted by

them under TIG Insurance Company's policies of insurance.

11.   At the time of the September 11th Attack, TIG Insurance Company

provided property, business interruption and related insurance coverage to

numerous corporations, companies, partnerships, affiliations, persons,

trusts and other parties ("policy holders and insureds") who suffered

injuries, losses and damages as a result of the September 11th Attack.

12.   Based on my review of TIG Insurance Company's business

records, as well as information I have also received in my capacity as an

Officer of TIG Insurance Company, I have personal knowledge

concerning the insurance claims submitted to TIG Insurance

Company by its policy holders and insureds for the damages, losses, and

injuries resulting from the September 11th Attack, and the adjustment and

subsequent payments made by TIG Insurance Company in compensation

for these submitted claims.

13.   I was the individual ultimately responsible for determining the validity of

the claims filed with TIG Insurance Company.  I made a determination

based upon all information, data, reports, and evaluations provided to me

whether TIG Insurance Company was responsible for the losses claimed

pursuant to the submissions of our policy holders and insureds and the

requirements of our policies of insurance.

5

14.   In accordance with the terms of the applicable policies of insurance, the

adjustment process as described herein, the needs of the insureds, the

exigencies of the aftermath of the September 11th Attack, and sound

considerations related to business operations, TIG Insurance Company has

made total aggregate payments as of the date of this affidavit in the

amount of $76,084,229.30 in compensation for property, business

interruption and related damages, and it would not have made these

payments and suffered these losses, nor would its insureds and policy

holders have suffered these losses, but for the September 11th Attack.

15.   We also suffered losses because of the need to incur costs in the claims

adjustment process.  These costs included the fees charged by outside

consultants such as accountants and engineers, who were utilized to ensure

the accuracy of the claims submitted and losses sustained.  These costs

also included the expenses incurred by our claims adjustment

professionals in responding to the extraordinary demands of the claims

submitted following the September 11th Attack.  The claims adjustment

costs incurred by TIG Insurance Company total  $755,373.44 to date, and

we would not have suffered these losses but for the September 11th Attack.

16.   We also suffered losses because of the need to incur legal expenses in the

claims  adjustment process.  These expenses involved the fees charged by

counsel retained to advise and assist us in fairly and fully responding to

our obligations under the policies of insurance and to resolve questions of

policy coverage consistent with the law and our policy obligations.  The

legal expenses incurred by TIG Insurance Company total $1,770,010.20 to date, and we would not have suffered these losses but for the September 11th Attack.

17.    The loss of money represented by the amounts paid, and costs and expenses incurred, by TIG Insurance Company was a direct result of the September 11th Attack.

18.    A schedule identifying each insured and policy holder who submitted a covered claim which was adjusted as of the date of this Affidavit and for which payment in the total aggregate amount of $76,084,229.30 was made by TIG Insurance Company is attached hereto as Exhibit "A", Columns A through D. Also, a schedule identifying the category and the total of claims adjustment costs incurred by TIG Insurance Company is attached hereto as Exhibit "A", Column E.  Finally, a schedule identifying the total of legal expenses incurred by TIG Insurance Company is attached hereto as Exhibit "A", Column F.

Further affiant says naught.

Robert Knowles
Vice President
TIG Insurance Company

TRACY L. POWHATAN
My Commission Expires
August 26, 2010

Tracy Powhatan 1-11-07

8

Pursuant To This Court's Order Dated May 9, 2005, The Schedule Attached As Exhibit A Has Been Filed Under Seal In Order To Protect The Identity Of The Insureds From Public Disclosure.



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES

# COZEN
## O'CONNOR
ATTORNEYS

A PROFESSIONAL CORPORATION

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

1900 MARKET STREET     PHILADELPHIA, PA 19103-3508     215.665.2000     800.523.2900     215.665.2013 FAX     www.cozen.com

*EcF*

**J. Scott Tarbutton**
Direct Phone  215.665.7255
Direct Fax      215.701.2467
starbutton@cozen.com

May 4, 2005

**VIA FEDERAL EXPRESS**



The Honorable Richard C. Casey
United States District Court for the
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1950
New York, NY 10007-1312

Re:  *In Re: Terrorist Attack on September 11, 2001*, MDL No. 1570;
     *Federal Insurance Company et al. v. al Qaida, et al.*, 03 CV 6978

Dear Judge Casey:

As Your Honor is aware, this firm represents the Plaintiffs in *Federal Insurance Co., et al. v. al Qaida, et al.*, 03 CV 6978, one of the consolidated cases comprising *In Re: Terrorist Attack of September 11, 2001*, 03 MDL 1570.  In an effort to make this case more manageable for the Court and all parties involved, the *Federal* Plaintiffs will shortly be seeking entries of default against several hundred defendants who were served some time ago, but have not appeared to defend the claims asserted against them.

In connection with the default process the *Federal* Plaintiffs intend to file schedules detailing their insureds, and the amounts paid to those insureds in compensation for property, business interruption, and related losses resulting from the September 11, 2001 Attack, as Exhibits to the default papers.

This Court has previously authorized the *Federal* Plaintiffs to file schedules identifying their insureds under seal, in order to protect the identity of those insureds from public disclosure. Copies of the Court's prior Orders relating to the filing of such schedules under seal are attached hereto for the Court's convenience.  Consistent with these prior Orders, the *Federal* Plaintiffs

Judge Richard C. Casey
May 4, 2005
Page 2

write to respectfully request the Court's permission to file the schedules to be attached as
Exhibits to the default filings under seal.

I thank Your Honor in advance for the Court's attention to this matter.

Respectfully submitted,

COZEN O'CONNOR

By:    J. Scott Tarbutton

JST

cc:    Steven A Cozen, Esq.
       Elliott R. Feldman, Esq.
       Sean P. Carter, Esq.
       All MDL Counsel

*Application granted*
*5/5/05*

*Richard Casey*

PHILA1\2266318\2 117430.000

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*   *Federal Insurance Co. v. al Qaida*
03 CV 06978 (RCC)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**ASSESSMENT OF DAMAGES AGAINST THE DEFAULTED DEFENDANTS**

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

## I.   INTRODUCTION

On February 13, 2007, several of the plaintiffs in *Federal Insurance Co., et al. v. al Qaida, et al.* 03 CV 6978 (RCC) (Plaintiffs) filed a Motion for Assessment of Damages Against the Defaulted Defendants[1] Under the Anti-Terrorism Act (Motion for Assessment).  The Motion for Assessment requests that the Court assess damages against the defaulted defendants for Plaintiffs' property and business damage claims under the Anti-Terrorism Act, based on the detailed affidavit testimony of Plaintiffs' designated representatives and officers.  Consistent with well-established authority, the Motion for Assessment advocates that the measure of damages applicable to Plaintiffs' business and property damage claims under the ATA is simply the aggregate of Plaintiffs' September 11th payments and expenses, trebled.

On March 2, 2007, the Defendants' Executive Committee submitted a letter to the Honorable Judge Richard Conway Casey, which was not filed of record through the ECF system or otherwise docketed in the case, in which the Defendants' Executive Committee requests that the Court deny Plaintiffs' Motion for Assessment.  In that letter, the Defendants' Executive Committee does not dispute the propriety of the measure of damages advanced by plaintiffs in the Motion for Assessment, or that the affidavit testimony of Plaintiffs' designated representatives and officers provides a competent evidentiary basis for this Court to assess damages against the defaulted defendants.  Instead, the Defendants' Executive Committee contends that this Court should hold the assessment of damages against the defaulted defendants in abeyance until the completion of pre-trial proceedings against all of the non-defaulted

---

[1]   The Court entered default judgments as to liability against approximately 300 defendants on April 7, 2006, and held that Plaintiffs were entitled to have the value of damages recoverable from those defendants set at a hearing.  Thus, the Court most certainly did not find that Plaintiffs were not entitled to an assessment of damages against the defaulted defendants "at this time," as the Defendants' Executive Committee suggests in its letter.  Given the straightforward measure of damages applicable to Plaintiffs' business and property claims under the ATA, the Motion for Assessment submits that the value of those claims can be assessed based on affidavit testimony, in lieu of a formal evidentiary hearing.

defendants, and leave the valuation of Plaintiffs' business and property injuries to the jury at the

time of trial.  Thus, the Defendants' Executive Committee essentially advocates that Plaintiffs'

claims against the defaulted defendants should be suspended, likely for a period of several years.

In addition, although the members of the Defendants' Executive Committee have never publicly

indicated that they represent any of the defaulted defendants against whom Plaintiffs seek an

assessment of damages, the Defendants' Executive Committee nonetheless expresses in its letter

a concern that the valuation of Plaintiffs' business and property damage claims against the

defaulted defendants (a group which includes Osama bin Laden, al Qaida and more than two

hundred other designated sponsors of terrorism and terrorist organizations) could lead to

execution proceedings against "innocent" parties.

For the reasons set forth below, Plaintiffs respectfully submit that the Defendants'

Executive Committee fundamentally lacks the authority or standing to oppose Plaintiffs' Motion

for Assessment, and that its letter submission directly to the Court is a substantive and procedural

nullity.  Furthermore, Plaintiffs are entitled to an assessment of damages by this Court for their

business and property damage claims at this time, and the failure to promptly set a value of those

claims would in fact severely prejudice Plaintiffs.

## II.    ARGUMENT

### A.    The Defendants' Executive Committee Has No Authority to Oppose Plaintiffs' Motion for Assessment

During a hearing on September 27, 2005, this Court directed the defendants to form an

Executive Committee to facilitate progress in the consolidated proceedings, a measure the

defendants had long resisted.  In response to that directive, counsel for the defendants expressed

concerns regarding the proper scope of authority that Executive Committee should be granted,

given the potentially divergent interests of the defendants.  In view of those concerns, counsel for

the defendants requested that the defendants be afforded the opportunity to draft the Order

governing the structure and scope of authority of the Defendants' Executive Committee.

That Order, which was endorsed by the Court in the form submitted by the defendants,

provides as follows:

1.   The defendants shall designate a single Executive Committee which will have **the following authority,** *and no other authority*:

a.   To confer and agree with Plaintiffs' Executive Committee on scheduling matters relating to court hearings, depositions, and deadlines affecting defendants generally, and on proposed agenda items for Court hearings.

b.   To coordinate communications with counsel for any plaintiff seeking the consent of defendants generally to a non-dispositive motion.

c.   To coordinate the examination of witnesses by defense counsel at a deposition or hearing.

d.   To coordinate communications with Plaintiffs' Executive Committee and with the Court concerning any requested changes in this case management and pre-trial scheduling order.

Case Management Order No. 5 (emphasis supplied).

As the plain language of Case Management Order No. 5 makes clear, the Defendants'

Executive Committee fundamentally lacks the authority to file any opposition to Plaintiffs'

Motion for Assessment.  Because the defendant themselves chose the relevant limitations on the

authority of their Executive Committee, those limitations should be strictly enforced.

Accordingly, this Court should strike the Defendants' Executive Committee's March 2, 2007

letter, and disregard the arguments advanced therein entirely.

### B.   The Defendants' Executive Committee's Letter to the Court Is Procedurally Improper

This Court also should strike the Defendants' Executive Committee's March 2, 2007

letter on the grounds that it was not properly filed of record, as required by the rules and

governing case management orders.  Pursuant to the governing case management orders and practices of the Southern District of New York, the parties in this case generally are required to make written submissions through the ECF system.  Although the Court has permitted letter briefing in certain settings, the use of that practice has generally been restricted to procedural and discovery issues, or disputes relative to which the parties consent to letter briefing.  In the limited circumstances where letter briefing is permitted, this Court's June 17, 2004 Order requires that the parties refrain from submitting letter briefs to the Court until the completion of all such briefing, and then submit the positions of all parties in a single package.

By virtue of their participation in these proceedings over the last four years, the members of the Defendants' Executive Committee are intimately familiar with these procedures, and unquestionably aware that letter oppositions are not permitted in relation to motions filed through the ECF system, such as Plaintiffs' Motion for Assessment.  Indeed, in the nearly four year history of this case, Plaintiffs are unaware of a single instance in which a defendant has submitted a letter in opposition or reply to a brief filed through the ECF system.  Nonetheless, in this isolated instance, the Defendants' Executive Committee chose to deliberately ignore the governing briefing procedures, and submit a letter opposition directly to the Court, prior to the completion briefing.

Presumably, the Defendants' Executive Committee chose to ignore the governing procedures in an effort to influence the Court without having to submit a formal filing in the name of a particular defendant or defendants, or to gain some other perceived strategic advantage.  Regardless of its motive, this Court should not countenance such a deliberate attempt to manipulate the judicial process in contravention of the governing rules.[2]

---

[2]    The requirement that the parties file briefs of record, in their own names, serves to protect the integrity of the judicial system in several significant ways, which would be undermined by the acceptance of the letter oppositions submitted directly to chambers by the Defendants' Executive Committee.  As an example, proper identification of the party filing the brief is necessary to evaluate the standing of that

**C.     Joint and Several Liability Principles Do Not Warrant Deferral of an Assessment of Damages Against the Defaulted Defendants**

In addition to the standing and procedural deficiencies identified above, the Defendants'

Executive Committee's letter fails to present a valid substantive argument in opposition to the

Motion for Assessment.  In support of its request that the Court deny the Motion for Assessment,

the Defendants' Executive Committee summarily argues that Plaintiffs' claims in this action rest

on conspiracy and aiding and abetting theories, which implicate principles of joint and several

liability.  Given these joint and several theories of recovery, the Defendants' Executive

Committee raises concerns regarding the potential for "inconsistent judgments," as to both

liability and damages issues.  These arguments misapprehend plaintiffs' theories of liability

under the ATA, and are directly inconsistent with relevant authority.

**1.     Plaintiffs' ATA Claims Against the Defaulted Defendants Do Not Rest Solely on Conspiracy and Aiding and Abetting Theories**

Contrary to the unsupported assertion in the Defendants' Executive Committee's letter,

Plaintiffs ATA theories are not predicated solely on concerted action theories of liability.  As the

7th Circuit observed in Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1015 (7th Cir. 2002),

plaintiff asserting claims under the ATA may establish liability in either of two ways: (1) based

on common-law theories of conspiracy and aiding and abetting liability; or (2) by demonstrating

that the defendant violated the ATA's criminal provisions, and that those violations were a

substantial factor in bringing about plaintiff's injuries.  In the present case, plaintiffs have

advanced ATA claims against the defaulted defendants under all theories of liability available

under that statute, including claims based on the defaulted defendants' violations of the ATA's

criminal provisions.

---

party in relation to the issues in dispute, as well as potential conflicts with positions previously asserted in
the litigation.  In addition, formal submissions of briefs and pleadings of record is necessary to ensure that
the parties comply with the obligations of Rule 11.

In view of the foregoing, the default judgments previously entered against the defaulted defendants as to liability under the ATA do not rest solely on conspiracy and aiding and abetting theories.  Accordingly, the Defendants' Executive Committees' arguments – all of which rest on the flawed assumption that common law conspiracy and aiding and abetting theories represent the sole basis of liability advanced against the defaulted defendants under the ATA - necessarily fail.

**2.      The Entry of Default Judgments and Assessment of Damages Do Not Present any Potential for Inconsistent Judgments as to Liability Issues**

Moreover, even if Plaintiffs' ATA claims were predicated solely upon concerted action theories of liability, the entry of default judgments and assessment of damages against the defaulted defendants would not present any risk of inconsistent liability judgments, as the Defendants' Executive Committee implies in its letter.  In cases involving theories of joint and several liability, differing results as to liability issues are not logically inconsistent or contradictory.  In re: Uranium Antitrust Litig., 617 F.2d 1248, 1257 (7th Cir. 1980).  As a result, every court in this Circuit to have considered the issue has held that the entry of default judgments against fewer than all defendants as to liability does not present any potential for inconsistent judgments in cases involving joint and several theories, and is in fact entirely appropriate.[3]  See International Gemmological Institute, Inc. v. Rafaeil., 2005 U.S. Dist. LEXIS

---

[3]      Although the Defendants' Executive Committee does not cite a single case in support of its misplaced arguments regarding the alleged potential for inconsistent liability judgments, Plaintiffs assume those arguments are loosely based on the Supreme Court's decision in Frow v. De la Vega, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872).  In Frow, the plaintiff filed an action against multiple defendants, alleging theories of *joint* liability.  The trial court entered a default judgment against one of the defendants, but subsequently dismissed the plaintiff's complaint on the merits as against the other defendants.  The Supreme Court later reversed the default judgment, reasoning that the trial court in a case involving theories of *joint* liability should not enter default judgment against the defendant until and unless the Court finds for plaintiff as against the appearing defendants. Id. at 554.  Although Frow remains good law, it has been narrowly construed by every court in this Circuit to apply only to cases involving "true joint" liability, and to have absolutely no application to cases involving theories of joint and several liability.  International Gemmological Institute, 2005 U.S. Dist. LEXIS 19288 at *6.  Consistent with this reasoning, the Frow doctrine applies only (1) where the theory of recovery is one of true joint liability, such that, as a matter of law, *no one defendant may be liable unless all defendants are liable* or (2)

6

19288 *6 (S.D. N.Y. 2005).  Accordingly, the arguments the Defendants' Executive Committee

raises regarding potential inconsistent judgments on liability questions should be rejected out of

hand.[4]

More fundamentally, neither the Defendants' Executive Committee nor the individual

non-defaulting defendants possess standing to challenge the default judgments on liability

grounds.  In presenting its regarding the alleged potential for inconsistent judgments as to

liability issues, the Defendants' Executive Committee conveniently ignores the fact that this

Court already has entered default judgments as to liability against the defaulted defendants,

notably without opposition from any of the non-defaulting defendants.  Those default judgments

are subject to challenge only by the defaulted defendants themselves, under Fed. R.Civ. P. 60.[5]

Neither the Defendants' Executive Committee nor the individual non-defaulting defendants have

standing to challenge those default judgments as to liability.  Schmid, Inc. v. Zucker's Gifts, Inc.,

766 F. Supp. 118, 123 (S.D. N.Y. 1991).  Indeed, this Court previously rejected an attempt by the

non-defaulting defendants to challenge the liability default judgments entered in the World Trade

Center Properties and EuroBrokers cases, and held that any challenge to those default judgments

must be presented by the defendant against whom that judgment was entered.  See May 22, 2006

Orders, Docket Nos. 1812, 1814

---

where the nature of the relief demanded is such that, in order to be effective, it must be granted against
each and every defendant. In re: Uranium Antitrust Litig., 617 F.2d at 1256-58.  Obviously, neither of
those situations applies here.

[4]      The arguments the Defendants' Executive Committee raises on this point also are without
practical merit.  For example, the Defendants' Executive Committee raises as a potential point of
inconsistency the possibility that the Court could later find that no conspiracy existed.  However, the fact
that the September 11, 2001 tragedy was the result of a successful conspiracy to attack the United States
through terrorist means is most certainly beyond any rational dispute.

[5]      Although irrelevant given its lack of standing, it is worth noting that the Defendants' Executive
Committee makes no effort to address or satisfy the standards for vacating default judgments under Rule
60, a fact which further requires that its arguments be rejected.

3.      **Delaying the Assessment of Damages Against the Defaulted Defendants Would Severely Prejudice Plaintiffs and Undermine the Objectives of the ATA**

Furthermore, where proceedings against the non-defaulting defendants could potentially extend for a significant period of time, the mild administrative inconvenience which could potentially result from inconsistent damage valuations is greatly outweighed by the severe prejudice the plaintiff would suffer from delaying the assessment of damages against defaulting parties, and it is therefore necessary and appropriate to proceed with that assessment.  In this regard, the decision of the Court in <u>International Gemmological Institute</u> is particularly instructive.

In <u>International Gemmological Institute</u>, a gem appraisal corporation sued numerous defendants, including one of its former employees and a number of jewelry companies, alleging theories of joint and several recovery.  <u>International Gemmological Institute</u>, 2005 U.S. Dist. LEXIS 19288 at *2.  After a number of defendants failed to appear in a timely manner, the Court entered default judgments against those defendants, and referred the matter to a magistrate judge for an inquest on damages.  <u>Id.</u>  One of the non-defaulting defendants objected to the proposed assessment of damages against the defaulted defendants, arguing that the inquest was premature and should be delayed until the liability of all defendants had been determined.  <u>Id.</u> at *4.

The Court rejected the defendant's arguments, reasoning that plaintiff's assertion of theories of joint and several liability did not preclude the Court from assessing damages and entering default judgments against defendants who failed to appear, and that the failure to promptly assess damages against the defaulting defendants would severely prejudice the plaintiff.  <u>Id.</u> at *7-9.  In reaching its decision, the Court acknowledged that other courts had on occasion declined to assess damages against defaulted defendants in joint and several liability cases prior to the conclusion of all pre-trial proceedings.  However, the Court correctly noted that those decisions were predicated solely on principles of judicial economy, which must yield to

8

more important considerations in complex cases, especially where proceedings against the non-

defaulting defendants are unlikely to conclude in a short time.  Id. at *6-7.  In this respect, the

Court held as follows:

> Many courts, however, have refused to assess damages against
> defaulting defendants in these cases since doing so presents the
> possibility of judgments inconsistent with jury awards against the
> non-defaulting parties. …The main justification for requiring such
> a delay has been judicial economy.  Here, however, the strain on
> judicial resources is so slight that this consideration must give way
> to the interests of the parties in proceeding with the inquest.
>
> It is undisputed that the amount of damages that a plaintiff may
> recover from defaulting and non-defaulting defendants in a case
> based on joint and several liability should not differ.  However, it
> is unclear why the mere possibility that such a circumstance may
> come to pass should prevent this Court from assessing damages.  If
> a jury returns a verdict for a different amount than is assessed
> during this inquest, my ruling will be set aside, and the jury's
> finding will prevail.  This mild administrative inconvenience is
> clearly outweighed by the interests of the parties in proceeding
> with the damage assessment at this time.

Id. at *7-8.

The International Gemological Institute Court further recognized that the failure to

promptly assess damages against the defaulting defendants could substantially prejudice the

plaintiff, *as well as the non-defaulting defendants*.  Id. at *7-8.  In this regard, the Court noted

that postponing the inquest could potentially jeopardize plaintiff's ability to recover for its

injuries, as potentially protracted litigation against the non-defaulting defendants would provide

the defaulting defendants with "ample opportunity to spend, secrete, or otherwise protect" their

assets.[6]  Id. at *7.  Finding that the proposed inquest on damages could give rise to substantial

---

[6]     For this same reason, the Court recognized that delaying the inquest would likely cause harm to
the non-defaulting defendants as well, by requiring them to pay damages that would otherwise have been
satisfied from the assets of the defaulted defendants.  This potential prejudice to the non-defaulting
defendants is all the more reason to strictly enforce the limitations on the Defendants' Executive
Committee's authority in the present context, and strike its letter submission to the Court.

9

prejudice to plaintiff's interests, and presented absolutely no potential prejudice to the non-

defaulting defendants, the Court held that a prompt inquest in the damages was necessary and

appropriate. Id. at *9.

The International Gemological Institute decision offers compelling reasoning in favor of

granting Plaintiffs' Motion for Assessment. As was the case in International Gemological

Institute, the proceedings against the non-defaulting defendants in these consolidated cases are

likely to be protracted. In fact, given the number of parties involved, the complexity of the

issues presented, and almost certain appeals by both plaintiffs and defendants, final resolution of

all claims against all of the non-defaulting defendants will almost certainly take several years.

Delaying the assessment of damages until completion of those proceedings would allow the

defaulted defendants to hide and transfer their assets, thereby depriving plaintiffs of any potential

for recovery from those defendants. This risk is especially acute in the present case, given that

more than 200 of the defaulted defendants are designated terrorist organizations and sponsors,

located in foreign countries and dedicated to covertly funding terrorist attacks against the United

States.[7] Plaintiffs respectfully submit that mild administrative inconveniences should not serve to

effectively immunize such parties from any financial liability to the victims of the September

11th Attack. Indeed, delaying the assessment of damages against those defendants and thereby

affording them an opportunity to shield their assets would run afoul of the ATA's stated

objective – to imperil the flow of terrorism's lifeblood, money. Boim, 291 F.3d at 1021.

---

[7]     Given the predominance of designated terrorist organizations and sponsors in the defaulted
defendant class, Plaintiffs submit that the concerns the Defendants' Executive Committee raises regarding
potential harm to "innocent" parties is deeply misplaced. The far more likely scenario is that delaying the
assessment of damages will benefit reprehensible parties like Osama bin Laden, Ayman al Zawahiri,
Khalid Sheikh Mohamed and al Qaida itself. Regardless, unless the members of the Defendants'
Executive Committee represent those defendants, they have no standing to present arguments on their
behalves.

## III.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court strike the

Defendants' Executive Committee's March 2, 2007 letter submission, and grant Plaintiffs'

Motion for Assessment in its entirety.

Respectfully submitted,

COZEN O'CONNOR

BY:   _____
ELLIOTT R. FELDMAN, ESQUIRE
SEAN P. CARTER, ESQUIRE
ADAM C. BONIN, ESQUIRE
1900 Market Street
Philadelphia, PA 19103

(215) 665-2000

11