# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |
|---|---|
| | |

This document relates to:

*Marinella Hemenway, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD) (SN)
*BNY Mellon, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11767 (GBD) (SN)
*Deborah Bodner, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11776 (GBD) (SN)
*August Bernaerts, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11865 (GBD) (SN)
*Ber Barry Aron, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09376 (GBD) (SN)
*Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09387 (GBD) (SN)
*Michael Bianco, et al. v. Islamic Republic of Iran*, No. 1:20-cv-10902 (GBD) (SN)

## THE MOVING PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT AS TO DAMAGES

ANDERSON KILL P.C.

Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email:  jgoldman@andersonkill.com
            bstrong@andersonkill.com
            agreene@andersonkill.com
*Attorneys for Plaintiffs*

Dated:    New York, New York
              January 13, 2022

## **TABLE OF CONTENTS**

**Page**

Introduction ..................................................................................................................... 1

I.  Procedural Background ............................................................................................ 5

    A.  Applicable Orders .......................................................................................... 5

    B.  Related Cases ................................................................................................. 5

    C.  *O'Neill* Plaintiffs Herein - Liability ........................................................... 8

    D.  Iran Was Properly Served. ........................................................................... 10

        1.  Service by Mail Was Not Successful ................................................. 10

        2.  Iran Was Served Via Diplomatic Means ........................................... 11

    E.  The Clerk Properly Entered Default Against Iran ........................................ 13

    F.  Motions to Correct Errors/Notices of Amendment ...................................... 14

        1.  Motions to Correct Errors ................................................................. 14

        2.  Individuals Not Named in the Original Complaint Are Entitled to Solatium Damages (Notices of Amendment) ........................................... 15

II.  Damages – Governing Law ..................................................................................... 16

    A.  Background .................................................................................................... 16

    B.  Solatium Damages ......................................................................................... 17

        1.  Functional Equivalents of Immediate Family Members ..................... 20

    C.  Punitive Damages .......................................................................................... 61

    D.  Prejudgment Interest ..................................................................................... 62

III.  Conclusion ............................................................................................................. 64

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ............................................................ 62

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ............................................................ 17

*Dammarell v. Islamic Republic of Iran*,
  281 F. Supp. 2d 105 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp.
  2d 261 (D.D.C. 2005) ............................................................ 17

*Est. of Bland v. Islamic Republic of Iran*,
  831 F. Supp. 2d 150 (D.D.C. 2011) ............................................................ 18

*Est. of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ............................................................ 6, 18

*Reed v. Islamic Republic of Iran*,
  845 F. Supp. 2d 204 (D.D.C. 2012) ............................................................ 13

*In re Sept. 11 Litig.*,
  802 F.3d 314 (2d Cir. 2015) ............................................................ 63

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) ............................................................ 17

*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................ 10, 18

**Statutes**

28 U.S.C. § 1602 ............................................................ 12

28 U.S.C. § 1605A(a)(1) ............................................................ 16

28 U.S.C. § 1605A(c)(4) ............................................................ 6, 16, 61

28 U.S.C. § 1608(a) ............................................................ 1, 64

28 U.S.C. § 1608(a)(1) ............................................................ 10

28 U.S.C. § 1608(a)(3) ............................................................ 10, 11

28 U.S.C. § 1608(a)(4) ............................................................ 11, 12, 13

iii

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

28 U.S.C. § 1608(b) ............................................................................................... 1, 64

28 U.S.C. § 1608(c)(1) ................................................................................................ 13

28 U.S.C. § 1608(d) .................................................................................................... 14

49 U.S.C. § 40101 ....................................................................................................... 63

Pub. L. No. 107-42, 115 Stat. 230 (2001) ................................................................... 63

## Other Authorities

F.R.C.P. 55(a) ............................................................................................................. 13

*Derek O. Sword, A New Yorker At Heart,* NEW YORK TIMES (Oct. 11, 2001),
*reprinted at* LEGACY.COM,
http://www.legacy.com/sept11/story.aspx?personid=139440 (last visited Jan. 12,
2022) .......................................................................................................................... 38

*Peter Christopher Frank, On the Verge of Marriage*, NEW YORK TIMES (Mar. 31,
2002), *reprinted at* http://www.legacy.com/sept11/story.aspx?personid=96912
(last visited Jan. 12, 2022) ................................................................................... 40, 41

Michael Lou, *September 11 made Karen Carlucci a widow before she was a
bride*, ARIZONA DAILY SUN (Jan. 5, 2002), https://azdailysun.com/sept-11-made-
karen-carlucci-a-widow-before-she-was-a-bride/article_c6848d65-be90-5ddf-
8948-2041b65273a0.html (last visited Jan. 12, 2022) ............................................... 41

*Timothy Aaron Haviland Obituary*,
https://www.legacy.com/obituaries/name/timothy-haviland-obituary?pid=96029
(last visited Jan. 12, 2022) ......................................................................................... 33

*Tim Haviland, 9/11 Casualty, 'Absolutely Loved New York'*, OCEANSIDE/ISLAND
PARK HERALD (Nov. 2001), *reprinted at* http://www.kellardmedia.com/tim-
haviland-911-victim-absolutely-loved-new-york (last visited Jan. 12, 2022) ............. 33

docs-100429819.3

## INTRODUCTION

For the reasons set forth below, the statements contained in the Declaration of Jerry S. Goldman, Esq., with Exhibits appended thereto ("Goldman Declaration"), which is being filed contemporaneously with this Memorandum of Law, as well as those set forth in prior motions for damages made on behalf of other *O'Neill* wrongful death plaintiffs, certain plaintiffs in the above-captioned matters who are identified in annexed Exhibits A-1 to A-7 (collectively, "Exhibits A") to the Goldman Declaration (the Plaintiffs identified in annexed Exhibits A are collectively referred to herein as the "Moving Plaintiffs") by and through their counsel, Anderson Kill, P.C., respectfully move this Court for an Order:

(1)     determining that service of process in the above-captioned matter was properly effected upon Defendant Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[1] AND,

(2)     awarding the Plaintiffs identified in annexed Exhibits A judgments as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill, Burnett, Havlish*, *Ashton*, *Bauer*, and other cases; AND,

(3)     Determining that:

a.   Joan Ruth Puwalski is the functional equivalent of a spouse of Steven J. Bates, who died in the Terrorist Attacks on September 11, 2001; AND,

---

[1] This only applies for the plaintiff in this motion in the above-referenced 2018 matter.

b.  Laura Nogaj is the functional equivalent of a spouse of Stephen Philip Morris, who died in the Terrorist Attacks on September 11, 2001; AND,

c.  Jude Monteserrato a/k/a Judith Monteserrato is the functional equivalent of a spouse of John Michael Sbarbaro, who died in the terrorist attacks on September 11, 2001; AND,

d.  Janice Dukes is the functional equivalent of a spouse of Donnie Taylor, who died in the terrorist attacks on September 11, 2001; AND,

e.  Jesse Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

f.  Nicholas Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

g.  Maureen Sullivan is the functional equivalent of a spouse of Derek O. Sword, who died in the terrorist attacks on September 11, 2001; AND,

h.  Karen Carlucci is the functional equivalent of a spouse of Peter Frank, who died in the terrorist attacks on September 11, 2001; AND,

i.  Lucy Aita is the functional equivalent of a spouse of Paul Innella, who died in the terrorist attacks on September 11, 2001; AND,

    j.   Cristal Barragan is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

    k.   Katherin Pleitez is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

    l.   Denyse Betcher is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

    m.   Danny J. Marino is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

    n.   Natalie Pollack is the functional equivalent of a child of Louis F. Aversano, Jr., who died in the terrorist attacks on September 11, 2001; AND,

    o.   Jamielah Persol is the functional equivalent of a spouse of DaJuan Hodges, who died in the terrorist attacks on September 11, 2001; AND,

(4)    awarding solatium damages to the Moving Plaintiffs in the amounts of $12,500,000 per spouse and $8,500,000 per child, as set forth in annexed Exhibits A; AND,

(5)      awarding the Moving Plaintiffs prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(6)      granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(7)      granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibits A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed;[2, 3] AND,

(8)      granting to the Moving Plaintiffs such other and further relief as this Honorable Court deems just and proper.

This motion is made only on behalf of the Moving Plaintiffs, all of whom, it is respectively submitted, are the functional equivalents of a child or a spouse of a person killed in the terrorist attacks on September 11, 2001.

As the awards set forth in the attached Proposed Order represent the only direct recovery against Iran on behalf of the Moving Plaintiffs for the claims herein, any award issued to those individuals will constitute final awards and judgments against Iran for the Moving Plaintiffs.

---

[2] The plaintiffs listed in annexed Exhibits A are the relatives of a 9/11 decedent, which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

[3] Annexed Exhibits A only include plaintiffs who will be submitting U.S. Victims of State Sponsored Terrorism Fund applications for the next tranche. The remaining plaintiffs have either already filed a motion for damages or intend to file a similar motion seeking damages at a later date.

## I.     PROCEDURAL BACKGROUND

### A.     Applicable Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

   a.     The Court's January 24, 2017 Order, ECF No. 3435,[4] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

   b.     The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

   c.     The Court's October 14, 2016 Order, ECF No. 3362, related to *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

   d.     The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

   e.     The Court's December 6, 2019 Order, ECF No. 5338, setting forth the scheduling order.

   f.     The Court's August 23, 2021 Order, ECF No. 7067, setting forth procedures as for filing confidential information relating to damages under seal.

### B.     Related Cases

Relying on evidence and arguments[5] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the

---

[4] All ECF numbers are to the MDL docket unless stated otherwise.

[5] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December

docs-100429819.3

September 11th attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *O'Neill*, *Havlish*, *Ashton*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran (*See* e.g., ECF Nos. 2516, 3014, 3016, 3020, 3020-23).  Subsequently, other liability findings were made for additional *O'Neill* plaintiffs.  After granting *Havlish* plaintiffs' Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents.  Upon the *Havlish* plaintiffs' submissions, on October 3, 2012 this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium…in an action under Section 1605A.  28 U.S.C. § 1605A(c)(4).  In such an action, …family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other

---

15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation.  *See*, e.g., ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the Foreign Sovereign Immunities Act ("FSIA") in an amount of 3.44 multiplied by their compensatory damages award.  ECF No. 2623 at 5.  The Court has applied that 3.44 multiplier also to judgments in *Ashton*.  *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16, 3363 at 28.  Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety.  ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages.  ECF No. 2623 at 5.  The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5).  In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest.  ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.  However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all

solatium claims.  ECF Nos. 3358 at 17-20; 3363 at 28-29.  Judge Daniels adopted Judge

Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96

percent per annum, compounded annually.  ECF Nos. 3383 at 2, 3384 at 6.  The Court applied

that interest rate, 4.96 percent per annum, to other plaintiffs' awards in *Burnett*.

### C.    *O'Neill* Plaintiffs Herein - Liability

Plaintiffs herein filed suit and duly served Iran.  The Clerk's Office, upon Plaintiffs'

applications, issued Clerk's Certificates of Default.

As set forth below, the Moving Plaintiffs filed motions for default judgments against Iran

for liability.  Such motions were granted, with leave to seek a determination of damages at a later

date, as specifically described in the table below.

| NAME OF CASE: | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: | 08/14/2019 |
| | ECF NO. OF MOTION FOR LIABILITY: | ECF No. 4856 |
| | DATE ORDER DETERMINING LIABILITY: | 09/03/2019 |
| | ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 5054 |
| | | |
| NAME OF CASE: | *BNY Mellon, et al. v. Islamic Republic of Iran* | |
| | CASE NO: | No. 1:19-cv-11767 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: | 11/12/2021 |
| | ECF NO. OF MOTION FOR LIABILITY: | ECF No. 7329 |
| | DATE ORDER DETERMINING LIABILITY: | 01/04/2022 |
| | ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 7522 |
| | | |
| NAME OF CASE: | *Deborah Bodner, et al. v. Islamic Republic of Iran*, | |
| | CASE NO: | No. 1:19-cv-11776 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: | 11/12/2021 |
| | ECF NO. OF MOTION FOR LIABILITY: | ECF No. 7329 |
| | DATE ORDER DETERMINING LIABILITY: | 01/04/2022 |
| | ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 7522 |

**NAME OF CASE:**     *August Bernaerts, et al. v. Islamic Republic of Iran*
                     CASE NO:                                        No. 1:19-cv-11865
                                                                     (GBD) (SN)
                     DATE MOTION FOR LIABILITY FILED:                11/12/2021
                     ECF NO. OF MOTION FOR LIABILITY:                ECF No. 7329
                     DATE ORDER DETERMINING LIABILITY:               01/04/2022

                     ECF NO. OF ORDER DETERMINING LIABILITY:         ECF No. 7522


**NAME OF CASE:**     *Ber Barry Aron, et al. v. Islamic Republic of Iran*
                     CASE NO:                                        No. 1:20-cv-09376
                                                                     (GBD) (SN)
                     DATE MOTION FOR LIABILITY FILED:                11/12/2021
                     ECF NO. OF MOTION FOR LIABILITY:                ECF No. 7329
                     DATE ORDER DETERMINING LIABILITY:               01/04/2022


                     ECF NO. OF ORDER DETERMINING LIABILITY:         ECF No. 7522


**NAME OF CASE:**     *Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*
                     CASE NO:                                        No. 1:20-cv-09387
                                                                     (GBD) (SN)
                     DATE MOTION FOR LIABILITY FILED:                11/12/2021
                     ECF NO. OF MOTION FOR LIABILITY:                ECF No. 7329
                     DATE ORDER DETERMINING LIABILITY:               01/04/2022


                     ECF NO. OF ORDER DETERMINING LIABILITY:         ECF No. 7522


**NAME OF CASE:**     *Michael Bianco, et al. v. Islamic Republic of Iran*
                     CASE NO:                                        No. 1:20-cv-10902
                                                                     (GBD) (SN)
                     DATE MOTION FOR LIABILITY FILED:                11/12/2021
                     ECF NO. OF MOTION FOR LIABILITY:                ECF No. 7329
                     DATE ORDER DETERMINING LIABILITY:               01/04/2022


                     ECF NO. OF ORDER DETERMINING LIABILITY:         ECF No. 7522


Service was effectuated as set forth below.[6]

---

[6] We only discuss service for the 2018 case that is part of this motion.

**D.      Iran Was Properly Served.**

**1.      Service by Mail Was Not Successful**

Service on Iran could not be effected under 28 U.S.C. § 1608(a)(1) because the United

States and Iran do not have any special arrangement for service of process, nor is service

permitted by any applicable international convention under the provisions of subsection (2).  *See*

*Valore*, 700 F. Supp. 2d at 70.

Accordingly, the Moving Plaintiffs first attempted to serve Iran in accordance with

Section 1608(a)(3) of the FSIA.  Section 1608(a)(3) provides that:

> if service cannot be made under paragraphs (1) or (2), by sending a
> copy of the summons and complaint and a notice of suit, together
> with a translation of each into the official language of the foreign
> state, by any form of mail requiring a signed receipt, to be
> addressed and dispatched by the clerk of the court to the head of
> the ministry of foreign affairs of the foreign state concerned.

The Southern District of New York's Clerk's Office Foreign Mailing Instructions provide

plaintiffs with instructions for service by U.S. Postal Service ("USPS"), FedEx, or DHL.  *See*

United States District Court for the Southern District of New York Clerk's Office Foreign

Mailing Instructions at 2.

On the dates set forth in the table below, the instant Plaintiffs attempted to utilize DHL or

USPS for service under § 1608(a)(3).[7] Pursuant to the Southern District of New York's Clerk's

Office Foreign Mailing Instructions, plaintiffs prepared an envelope along with the requisite

service documents for the Clerk of the District Court as prescribed, and delivered a Service

Packet[8] to the Clerk.  The Clerk of Court, in accordance with the Southern District of New

---

[7] FedEx was not delivering packages to Iran at the time service was effectuated.

[8] The Service Packet, in addition to pre-paid postage, contained an envelope, two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state (Farsi), and a certification of same.

York's Clerk's Office Foreign Mailing Instructions and 28 U.S.C. § 1608(a)(3), attempted to serve the Service Packet on Iran via DHL or USPS.[9]  As set forth in Jerry S. Goldman's Affidavits in Support of Requests for Clerk's Default (the "Goldman Default Affidavits"), Iran refused to accept the Service Packet**.**  Because service by mail could not be effected within 30 days, Plaintiffs proceeded to effect service by diplomatic channels pursuant to §1608(a)(4).  *See* Jerry S. Goldman's Affidavits of Service (the "Goldman Affidavits of Service"); *see also* Goldman Default Affidavits; *see also* Clerk's Certificates of Mailing, all as identified in the following table:

| **CASE NAME:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL: | 02/20/2019 |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 10 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4694 |
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4801 |

## 2.    Iran Was Served Via Diplomatic Means

Under 28 U.S.C. § 1608(a)(4), if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

---

[9] We used DHL early in the litigation to expedite the process. As a result of the reimposition of sanctions, we were compelled to use USPS as DHL was unavailable.

Therefore, pursuant to 28 U.S.C. § 1608(a)(4), after service by mail was rejected, the instant Plaintiffs delivered to the Clerk of the Court for the U.S. District Court for the Southern District of New York the following items: cover letter, a cashier's check in the amount of $2,275.00 payable to the U.S. Embassy Bern, copies of the Complaint in English, copies of the Complaint in Farsi, Notice of Suit in English, Notice of Suit in Farsi, Summons in English, Summons in Farsi, Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, Civil Cover Sheet, Affidavits from translators, and a U.S. Airbill (from FedEx) (collectively, "Service Documents").[10]  The Clerk was requested to transmit these documents to the United States State Department in Washington, D.C.  *Id.*  In accordance with the statute and the protocol of the Department of State, it would, in turn, transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.  Plaintiffs met all of those requirements in this case.  *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As set forth in the below table, the Clerk of the Court transmitted the Service Documents to the Secretary of State, Director of Consular Services, Office of Policy Review and Inter-Agency Liaison, United States Department of State for service on Iran under 28 U.S.C. § 1608(a)(4).  *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As evidenced by letter from Jared Hess, Attorney Advisor, Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Ruby J. Krajick, Clerk of Court, service was effectuated on Iran as set forth in the below table, when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran,

---

[10] Also included were United States Airbills from the State Department to the Embassy in Bern and back, and to the Southern District of New York Clerk.

12

delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes, whose number is in the below table. Pursuant to 28 U.S.C. § 1608(c)(1), in instances of service under § 1608(a)(4), service shall be deemed to have been made "as of the date of transmittal indicated in the certified copy of the diplomatic note." *See* Goldman Default Affidavits, Goldman Affidavits of Service, Clerk's Certificates, and Diplomatic Notes.

| | | |
|---|---|---|
| **CASE NAME:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| | DIPLOMATIC NOTE NO: | 1045-IE |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4694 |
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4801 |

Based on the foregoing, Plaintiffs filed an Affidavit of Service confirming service was effected on Iran on the dates of the diplomatic notes as set forth above.

Because service upon Iran was proper, and Section 1605A of the FSIA provides subject matter jurisdiction for the Plaintiffs' claims against Iran, this Court has personal jurisdiction over Iran. *Shapiro*, 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012). *See* Goldman Declaration at ¶ 17.

E.    **The Clerk Properly Entered Default Against Iran.**

Iran did not file any responsive pleading or otherwise defend the suit. Rule 55(a) of the Federal Rules of Civil Procedure, provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id*.

The within Plaintiffs requested, on the dates set forth in the following table, that the Clerk enter default against Iran because:

13

- Iran was obligated to "serve an answer or other responsive pleading to the complaint within sixty days after service [was effectuated]." 28 U.S.C. § 1608(d);

- Iran was served on the dates set forth in the table; and

- More than sixty (60) days elapsed since service, and Iran failed to file an answer or other responsive pleading, or take any other steps to defend this action.

Upon the Moving Plaintiffs' application, the Clerk issued a Certificate of Default as set forth below.

As Iran failed to timely answer or move in response to the duly served summons and complaint, the Clerk of the Court properly issued a Certificate of Default.

| CASE NAME: | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF SERVICE: | 06/11/2019 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4800 |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4814 |

## F.   Motions to Correct Errors/Notices of Amendment

### 1.   Motions to Correct Errors

Certain of the within Plaintiffs requested that the Complaint be amended to correct certain minor errors as set forth below.

| CASE NAME: | *Jeanmarie Hargrave, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:20-cv-09387 (GBD) (SN) |
| | DATE OF MOTION TO AMEND TO CORRECT ERRORS: | 10/27/2021 |
| | ECF NO. OF MOTION TO AMEND TO CORRECT ERRORS: | ECF No. 7290 |
| | DATE OF ORDER GRANTING MOTION TO CORRECT ERRORS: | 10/2/2021 |

|  | ECF NO. OF ORDER GRANTING MOTION TO CORRECT ERRORS: | ECF No. 7300 |
|---|---|---|
| **PLAINTIFF:** | Danny J. Marino, individually, as surviving child of Paul Ruback | |

## 2. Individuals Not Named in the Original Complaint Are Entitled to Solatium Damages (Notices of Amendment)

Certain of the Plaintiffs herein have been added pursuant to a Notice of Amendment as set forth in Exhibits A and Exhibits C-1 to C-2 (collectively, "Exhibits C") to the Goldman Declaration, which includes the MDL docket numbers and dates of the Notices of Amendment pursuant to which those plaintiffs were added.

Pursuant to paragraph 5 of Section II(D) of the Plaintiffs' Executive Committee January 23, 2017 letter, ECF No. 3433, which was adopted by the Court through its January 25, 2017 Order, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate. The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative." ECF No. 3433 at 7; *see also* ECF No. 5234 (October 28, 2019).

Such individuals are identified and the compliance with such procedure is described in Goldman Declaration at ¶¶ 15-16 and annexed Exhibit C to the Goldman Declaration.

Accordingly, judgment should be entered in such Plaintiff's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in prior proceedings in this *MDL*.

## II.   DAMAGES – GOVERNING LAW

### A.   Background

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members [or the functional equivalents of such family members] can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83).

Plaintiffs identified in annexed Exhibits A are the functional equivalents of immediate family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, as discussed in Section II(B)(1) of this Memorandum of

Law and Goldman Declaration at ¶¶ 20-45 (including accompanying exhibits), which attest to a familial relationship eligible for recovery.[11]  *See* Goldman Declaration at ¶¶ 4-14, 18-19, 20-45.

As liability has been established in these matters, each Moving Plaintiff is now entitled to damages in the amounts set forth in annexed Exhibits A and Exhibits B, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks") or based upon expert economic reports submitted herewith.  In accordance with the terms of the FSIA, the Moving Plaintiffs are entitled to compensation under Section 1605A for their solatium, pain and suffering, and are also entitled to prejudgment interest.

### B.    Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See*, e.g., *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C.

---

[11] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

17

2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See*, e.g., *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, …are faced with frequent reminders of the events of that day." ECF No. 2618 at 10-12. Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ." *Id.* at 11. In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in *Bauer*, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in *Hoglan*, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* plaintiffs, ECF No. 3977 at 6–7.  The same amounts were adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "*Burnett/Iran II*," No. 15-cv-09903, ECF No. 101.[12]

The solatium losses suffered by the Exhibits A Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in *O'Neill*, *Havlish*, *Ashton*, *Bauer*, *Hoglan*, and *Burnett*.  As such, Plaintiffs identified in annexed Exhibits A respectfully request that the Court grant awards of solatium to the functional equivalents of

---

[12] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's July 31, 2017 Order, ECF No. 3666, are in later filings of the *Burnett*, *Ashton*, and *O'Neill* plaintiffs.

immediate family members identified in annexed Exhibits A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan*, *O'Neill*, and *Burnett* cases.

### 1.     Functional Equivalents of Immediate Family Members

The *Hoglan II* October 14, 2016 Report and Recommendation, ECF No. 3363, *adopted by* Mem. Decision and Order dated October 31, 2017, ECF No. 3384, recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member.  *See, Hoglan IV* Report and Recommendation, dated August 8, 2017, ECF No. 3676, Adapted by Mem. Decision and Order dated November 17, 2017, ECF No. 3795. These categories of non-immediate family members included fiancées and domestic partners, step-relatives (including step-children), aunts, uncles, nieces, nephews and cousins.  *See* ECF No. 3363.

In the October, 2016 Report and Recommendation, ECF No. 3363, three (3) factors were identified by the Court as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member).  *Id*. at 10-12.  In weighing these different factors, the Court stated it

20

would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together.  *Id.*  With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors."  *Id.* at 14-15.  In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents.  *Id.* at 17-28.

This motion relates to fifteen (15) requests for damage judgments submitted on behalf of eight (8) women who became widows before they had the opportunity to become brides, and seven (7) children who were raised by men who volunteered to become their fathers.  Their claims are all unique, yet are common in the love that they express.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected in annexed Exhibit D to Exhibit S (with accompanying sub-exhibits) [13] to the Goldman Declaration, had the "functional equivalent" of a spousal relationship or biological parent/child and they are therefore entitled to an award for solatium damages.  *See* Goldman Declaration at ¶¶ 20-45.

---

[13] References to an exhibit denominated by a letter followed by a number refer to exhibits attached to the respective declarations.

        **(a)**       *Joan Ruth Puwalski, Spouse Equivalent of Steven J. Bates*
                  **Presumptive Award: $12.5 Million**
                  **Requested Award: $12.5 Million**

Joan Ruth Puwalski ("Joan") was the life partner of Steven J. Bates ("Steven"), and for the reasons set forth below, and in Joan's accompanying declaration annexed as Exhibit D (including appended Exhibits E-1 to E-3) to the Goldman Declaration, Plaintiffs submit Joan should be deemed a functional equivalent of Steve's spouse.

Joan and Steve, a New York City firefighter,[14] started dating in Spring 1992. Exhibit D, ¶ 2. In November 1994 they got their first dog, Samantha, and moved in together in Steve's home in Glendale, New York, where they lived as a family unit until Steve's tragic death on 9/11, almost seven (7) years later. Exhibit D ¶ 2. While Joan and Steve were not formally engaged and did not have a marriage ceremony, they fully intended to be together forever as they were the love of each other's lives, and they had a relationship akin to a married couple for almost seven (7) years until he was taken from her on 9/11. Exhibit D ¶ 3. Among other things, Joan cooked, cleaned, and did Steve's laundry, and they spent quality time together. Simply put, they were always there for each other. Exhibit D ¶ 3. They went to Fire Department functions and weddings as a couple. Later they rescued a second dog, Norton, who they found roaming the streets, and raised both of their dogs (their "babies;" Steve called Joan the "momma") in their loving home. Exhibit D, ¶ 3. Together, over the years, they ran in races, went on vacation to Hilton Head and Key West, and spent summers in East Hampton, New York. Exhibit D ¶ 3. In addition to experiencing new things together, Joan and Steve also had their rituals of things they

---

[14] Steve was a lieutenant with the Fire Department of the City of New York when he was killed in the South Tower. Exhibit D-3.

enjoyed as a couple, including going to Belmont Stakes for celebratory meals where they enjoyed nights of fun and good food.  Exhibit D ¶ 3.  *See* photographs, Exhibit D-1.

As life partners, Joan and Steve both contributed financially to their life together, shared the everyday expenses for their dogs, and took turns paying for vacations.  Exhibit D ¶¶ 4, 5. Steve paid the bills associated with the carrying costs of their home, including the mortgage and property taxes, and Joan paid for their everyday household expenses including food, toiletries, cleaning products, furniture, and household appliances.  Exhibit D ¶ 4.  Joan also purchased a family gym membership for both her and Steve.  Exhibit D ¶ 4.

Because Steve was an only child and had lost his mother, aunt, and grandfather before Joan and Steve met, and Steve was estranged from his father who passed away after Joan and Steve met, Steve longed for a family.  Joan's family considered him Joan's spouse and welcomed Steve into the family with open arms.  Exhibit D ¶ 5.  Joan and Steve celebrated Christmas and Thanksgiving with Joan's family and Steve loved having family dinners.  Exhibit D ¶ 5.  Joan's family recently had a remembrance party for Steve for the twentieth 9/11 anniversary.  Exhibit D ¶ 5.  On that occasion, they made all the food and drinks that Steve enjoyed, and sat around sharing stories about him.  Exhibit D ¶ 5.

After Steve was killed on 9/11, Joan received, as a spouse, Steve's pension and lifetime medical benefits from the New York City Fire Department as well as funds from the American Red Cross, Safe Horizon, Twin Towers Fund, Knights of Columbus, September 11th Fund, Robin Hood Fund, World Trade Center Relief Fund, USA Widows & Children Fund, International Association of Firefighters Fund, New York Police and Fire Widows' & Children's Fund, and the Crime Victims Board.  Exhibit D ¶ 6.  Steve executed his Will back in 1993, which is why Joan was not included for benefits under the September 11th Victim Compensation

Fund.  Exhibit D ¶ 6.  After 9/11 Joan's father told her that Steve had told him he would update his will once he and Joan moved in together, but Steve never updated his will after they moved in together and before his tragic death on 9/11, at 42 years of age.  Exhibit D ¶ 6; Exhibit D-2.

Unfortunately, the tragic day of 9/11 cut Joan's and Steve's life together short.  After losing Steve, Joan was barely able to function and went to individual and group therapy to deal with her devastating loss.  Exhibit D ¶ 8.  Joan was not herself for several years and still feels as if a part of her died on 9/11.  Exhibit D ¶ 8.  Joan feels Steve's loss every day and shares fond memories of him.  Exhibit D ¶ 8; Exhibit D-3.

Based on Joan's extremely traumatic experience in losing her life partner, Steven J. Bates, as described above, Joan should be awarded the full spousal solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

> **(b)** ***Laura Nogaj, Spouse Equivalent of Stephen Philip Morris***
> **Presumptive Award: $12.5 Million**
> **Requested Award: $12.5 Million**

Laura Nogaj ("Laura") was the fiancé and life partner of Stephen Philip Morris ("Steve"), and for the reasons set forth below, and in Laura's accompanying declaration annexed as Exhibit E (including appended Exhibits E-1 through E-11) to the Goldman Declaration, Plaintiffs submit Laura should be deemed a functional equivalent of Steve's spouse.

Laura and Steve both worked as management consultants for Oracle, based in Orlando, Florida.  Exhibit E ¶ 2.  Steve and Laura began dating in October 1998 when they started working together at a client site in Columbus, Ohio.  Exhibit E ¶ 2.  Just three months later, in January 1999, Laura and Steve began living together in both Laura's house in Ormond Beach, Florida and Steve's apartment in Atlanta, Georgia.  Exhibit E ¶ 2.  From January 1999 through September 11, 2001, Laura lived with Steve when they were not traveling for work.  Exhibit E ¶ 2.  Laura and Steve split their time between their homes in Atlanta and Florida, but they also

24

worked as consultants at client sites in various cities.  Exhibit E ¶ 2.  They flew out for work on Mondays from Atlanta or Florida and then they both returned to their home on Friday to share the weekends together – all of their non-working time.  Exhibit E ¶ 2.  Two years later, in January 2001, Laura and Steve gave up the Atlanta apartment and they lived together solely in Ormond Beach, Florida.  Exhibit E ¶ 2; Exhibit E-5 ("our home").

Laura and Steve purchased "promise rings" for each other and became officially engaged in July 2001.  Exhibit E ¶ 3; Exhibit E-2 (receipt).  In preparation of their wedding, around July 2001 Laura and Steve discussed with Pastor John J. Ryan of St. Brendan Roman Catholic Church their intent to be married and to celebrate their Nuptial Mass at the Church.  Exhibit E ¶ 3.  Laura and Steve asked Pastor Ryan to serve as the Church's Witness.  Exhibit E ¶ 3; Exhibit E-3 (letter from Rev. Ryan).

As life partners, Laura and Steve both contributed financially to their life together.  Exhibit E ¶ 4.  They comingled purchases for both the Atlanta and Ormond Beach properties, vacations, clothing, gifts for family members, utility bills, home improvements, and federal income tax bill payments.  Exhibit E ¶ 4; Exhibit E-4.

At the time of Steve's death, Laura and Steve lived together and shared their lives exclusively for a number of years.  Exhibit E ¶ 6.  Laura and Steve enjoyed, among other things, dining and traveling, and they went on wonderful trips to London, Manchester, Amsterdam, Paris, Wales, Sweden, Lexington, Kentucky, and Vail, Colorado, and were looking forward to spending a lifetime of adventures together.  Exhibit E ¶ 6.  In addition to experiencing new things, Laura and Steve also had their rituals of things they enjoyed together, including going to the Punchline Comedy Club in Atlanta where they enjoyed many nights of fun and laughter.  Exhibit E ¶ 7; Exhibit E-6 (photographs).

Laura and Steve were family.  Together they attended family gatherings and were very close with each other's families.  Exhibit E ¶ 8; Exhibit E-6 (photographs).  Laura and Steve visited Steve's family abroad and Steve's family also visited Laura and Steve.  Exhibit E ¶ 8.  In 1999, Laura and Steve spent Christmas with Steve's family in the UK; in 2000 Steve's sister flew over from the UK to spend Thanksgiving with them; and in 2000 Laura and Steve spent Christmas with Laura's mother in Atlanta.  Exhibit E ¶ 8.  After Christmas, Laura flew on to work and Steve drove with Laura's mother from Atlanta back to Florida.  Exhibit E ¶ 8.  Laura and Steve also went to family celebrations together, including Steve's cousin's wedding in Sweden in August 2000, and Laura's step-sister's wedding in Princeton, New Jersey in August, 2001.  Exhibit E ¶ 8.  Laura's entire extended family attended Steve's funeral after his tragic death on 9/11.  Exhibit E ¶ 8.

Steve was only 31 years old when he was murdered.

Following 9/11, Laura received support from Safe Horizon, a victim services nonprofit organization, the World Trade Center Disaster Fund, the American Red Cross, workers' compensation benefits as a domestic partner, and she received part of the award from the September 11th Victim Compensation Fund.  Exhibit E ¶ 9.  Steve's parents also paid off his car and gifted it to Laura.  Exhibit E ¶ 9.  Steve did not have a Last Will and Testament at the time of his death, like many other 31 year olds (and many other 9/11 Decedents).  Exhibit E ¶ 5.  Steve had no reason to think he would die any time soon, and was instead thinking about his and Laura's brand-new home they built together, his career, his family in the United Kingdom, and getting married and starting a family with Laura.  Exhibit E ¶ 5; Exhibits E-7-11.

Laura and Steve were looking forward to getting married and spending the rest of their lives together as husband and wife, but unfortunately the tragic day of 9/11 cut Laura's and Steve's life together short.  Exhibit E ¶ 11; Exhibit E-6 (photographs).

Laura feels Steve's loss every day and shares fond memories of him.  Exhibit E ¶ 11.

Based on Laura's extremely traumatic experience in losing her fiancé and life partner, Stephen Philip Morris, as described above, Laura should be awarded the full spousal solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

> **(c)**     ***Jude Monteserrato a/k/a Judith Monteserrato, Spouse Equivalent of John Michael Sbarbaro***
> **Presumptive Award: $12.5 Million**
> **Requested Award: $12.5 Million**

Jude Monteserrato a/k/a Judith Monteserrato ("Jude") was the life partner of John Michael Sbarbaro ("John"), and for the reasons set forth below, and in Jude's accompanying declaration annexed as Exhibit F (including appended Exhibits F-1 through F-8) to the Goldman Declaration, Plaintiffs submit Jude should be deemed a functional equivalent of John's spouse.

John and Jude began dating in 1986.  Exhibit F ¶ 2.  They met at the Chase Manhattan Bank where they both worked.  Exhibit F ¶ 2.  Starting in 1992, they moved in together in Brooklyn, New York, where they resided until John's tragic death nine (9) years later on 9/11.  Exhibit F ¶ 2.  They owned their home in Brooklyn together, with rights of survivorship.  Exhibit F-1 (Deed, June 8, 2001).[15]

As life partners, John and Jude both contributed financially to their life together.  Exhibit F ¶ 3; Exhibit F-2.  They paid equally the mortgage, condo fees, utilities, and food bills, they together purchased a timeshare in Sanibel Island, Florida.  Exhibit F ¶ 3.  They were the

---

[15] *See* Exhibit F-3 regarding the Condominium, of November 8, 1998.

beneficiary of each other's financial accounts, including life insurance policies, investment accounts, and IRAs; they shared expenses for trips and vacations; and they saved for the future together. Exhibit F ¶ 3, Exhibit F-2. While John was the titleholder of their condo, John notarized a letter stating the condo should go to Jude, "The love of my life," if he passed away. The property was re-titled in June, 2001. Exhibit F ¶ 3, Exhibit F-2. John's mother previously told Jude she viewed her as John's wife even though Jude and John were not legally married. Exhibit F ¶ 3.

At the time of John's death, John and Jude had lived together for nine (9) years and shared their lives. Exhibit F ¶ 4. John and Jude did everything together, including commuting to work together on a daily basis (their offices were located near each other's). Exhibit F ¶ 4. They traveled together to Colorado, Utah, and Vermont to ski, South Carolina, Hawaii, the Hamptons, and Lake George. Exhibit F ¶ 4. Jude will never forget when John surprised her with an all-expense-paid first-class trip to Maui when she turned 40 years old. Exhibit F ¶ 4. John even contacted her boss to get the time off from work. Exhibit F ¶ 4. Jude hoped to take John to Scotland for his 50th birthday because he dreamed of playing golf there. Exhibit F ¶ 4. John and Jude looked forward to going on many more adventures together. Exhibit F ¶ 4. In addition to experiencing new things, John and Jude also had their rituals of things they enjoyed together, including celebrating birthdays and special occasions at Nobu and Windows on the World (the restaurant at the top of the World Trade Center). Exhibit F ¶ 5.

In addition to the happy times John and Jude spent together, John and Jude were there for each other through difficult times. Exhibit F ¶ 6. John supported Jude both when she had cancer and when her brother passed away, and Jude supported John when his sister passed away. Exhibit F ¶ 6. John always accompanied Jude to the hospital for her treatments and to her

doctor's visits.  Exhibit F ¶ 6.  It brought Jude's parents great comfort that John was always there

with her.  Exhibit F ¶ 6.  Jude, too, was also always there for John when he was sick and took

him to the hospital.  Exhibit F ¶ 6.

John and Jude truly were family.  While John and Jude were never formally engaged and

did not have a formal marriage ceremony, they were committed to each other as "husband and

wife" and planned to be together forever.  Exhibit F ¶ 7.  John wrote that Judy was "The love of

my life", for example, back on November 2, 1998.  Exhibit F-3 (under oath).  John and Jude had

a relationship akin to a married couple and loved each other immensely.  Exhibit F ¶ 7.  In fact,

people said they were "more married" than most married couples.  Exhibit F ¶ 7.  Together they

attended family gatherings and celebrated holidays with each other's families for an extended

period of time.  Exhibit F ¶ 7.  They were very close with each other's families, and Jude was

particularly close with John's sister, who was like a sister to her.  Exhibit F ¶ 7.  Both of their

families got along well, and they all celebrated John's 40th birthday together.  Exhibit F ¶ 7.  *See*

Photographs, Exhibit F-5.

Based on being John's domestic partner, Jude received a September 11th Victim

Compensation Fund award from her own application as a domestic partner, proceeds from John's

family's September 11th Victim Compensation Fund award, funds from the American Express

9/11 Fund and the Robin Hood Fund.  Exhibit F ¶ 8; *see* Exhibit F-4.  Families of Freedom paid

for some of Jude's courses to become a professional yoga instructor, and Cantor Fitzgerald,

John's employer at the time of his death, honored and treated Jude as John's "wife" and paid for

her health insurance for 10 years.  Exhibit F ¶ 8.

John and Jude were looking forward to getting married and spending the rest of their

lives together as husband and wife, but unfortunately the tragic day of 9/11 cut their life together

short.  Exhibit F ¶ 10.  After the attacks, Jude contacted hospitals and put up missing persons

pictures of John.  Exhibit F ¶ 9.  She did not want to believe the love of her life left this world so

suddenly and unexpectedly, but she eventually had to accept the terrible truth that John was

really gone.  Exhibit F ¶ 9.  Jude feels his loss every day and shares fond memories of him, and

he is forever in her heart.  Exhibit F ¶ 10.  Jude purchased a cobblestone at the 9/11 Memorial

and got a tattoo in John's memory.  Exhibit F ¶ 10; Exhibits F-6 (Memorial Cobblestone); F-7

(Tattoo).  She also bought John a plot in a cemetery on Long Island and bought the neighboring

plot for herself, so their tombstones will be next to each other forever.  Exhibit F ¶ 10; Exhibit F-

8 (Cemetery Plot).

Based on Jude's extremely traumatic experience in losing her life partner, John Michael

Sbarbaro, as described above, Jude should be awarded the full spousal solatium damages award

of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

> **(d)** ***Janice Dukes, Spouse Equivalent of Donnie Taylor***
> **Presumptive Award: $12.5 Million**
> **Requested Award: $12.5 Million**

Janice Dukes ("Janice") was the fiancé and life partner of Donnie Taylor ("Donnie"), and

for the reasons set forth below, and in Janice's accompanying declaration annexed as Exhibit G

(including appended Exhibits G-1 to G-7) to the Goldman Declaration, Plaintiffs submit Janice

should be deemed a functional equivalent of Donnie's spouse.

Donnie and Janice met in 1988 and were friends for several years before they began

dating in February 1994.  Exhibit G ¶ 2.  A few months later, in July 1994, Donnie and Janice

began living together and did so for seven (7) continuous years until Donnie's tragic death on

9/11.  Exhibit G ¶ 2; *See* Exhibit G-1 (utility bills).

Donnie and Janice became engaged in February 2001 and Donnie bought Janice a ring in

August 2001.  Exhibit G ¶ 3.  Janice told her family about their engagement, and her family was

thrilled for them.  Exhibit G ¶ 3.  Janice's sons thought Donnie treated her beautifully and they looked forward to officially welcoming him into the family.  Exhibit G ¶ 3.  Donnie and Janice could not have been more excited to spend the rest of their lives together as husband and wife, continuing their relationship.  They planned to get officially married in 2002.  Exhibit G ¶ 3.

As life partners, Donnie and Janice both contributed financially to their life together. Exhibit G ¶ 4.  They had two joint credit cards and shared common household expenses. Exhibit G ¶ 4.  Donnie paid the rent, Janice paid the phone, light, gas, and cable bills, and they both paid for food.  Exhibit G ¶ 4; *See, e.g.,* Exhibits G-1–G-2.

At the time of Donnie's death, Donnie and Janice had lived as a couple together and shared their lives for over seven (7) years.  Exhibit G ¶ 5.  They were engaged to be married and planned to be together forever.  Exhibit G ¶ 5.  They shared dreams and were the love of each other's lives.  Exhibit G ¶ 5.  While Donnie and Janice were not yet legally married, they were committed to each other as husband and wife and had a relationship akin to a married couple. Exhibit G ¶ 5.  In fact, Janice's co-workers told her she and Donnie acted like newlyweds. Exhibit G ¶ 5.  Janice believes the years she and Donnie spent together were the best years of her life, and she is sure Donnie felt the same.  Exhibit G ¶ 5.  Whether it was going on an adventure or cooking and doing laundry, they had the best time together.  Exhibit G ¶ 5.  Donnie and Janice enjoyed, among other things, going out for dinner and a movie.  Exhibit G ¶ 6.  While they liked to try new restaurants, Donnie and Janice had their favorite places they frequented.  Exhibit G ¶ 6.  They loved Mexican food and enjoyed going to a place called Rosa's, where they enjoyed the chimichangas.  Exhibit G ¶ 6.

Donnie and Janice were family.  They celebrated holidays together every year and attended family gatherings and were close with each other's families.  Exhibit G ¶ 7.  They spent

31

every other weekend with Donnie's children from a prior marriage, and Janice had a very nice loving relationship with them. Exhibit G ¶ 7. Donnie and Janice had a joint birthday celebration for Janice's niece and Donnie's son and took them to the Central Park Zoo. Exhibit G ¶ 7. Donnie's children loved going to Janice's sister's house, who cooked for them and had children around their age with whom they played. Exhibit G ¶ 7; Exhibit G-3 (photographs).

After Donnie was killed on 9-11 at 40 years of age, Janice received spousal workers' compensation, funds from the Aggregate Trust Fund of the New York State Insurance Fund, and a portion of the proceeds from the September 11th Victim Compensation Fund award. Exhibit G ¶ 8; Exhibits E-5-6. Janice was also judicially appointed, by the Surrogate of New York County, the Administratrix of Donnie's estate. Exhibit G ¶ 8; Exhibit E-7.

Donnie and Janice were engaged to be married and looked forward to spending the rest of their lives together, but unfortunately the tragic day of 9/11 cut their life together short. Exhibit G ¶ 10. Janice did not want to believe the love of her life left this world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that Donnie was really gone. Exhibit G ¶ 9. Janice feels his loss every day and shares fond memories of him. Exhibit G ¶ 10; *See* N.Y. Times Article, October 1, 2001 (Exhibit E-4).

Based on Janice's extremely traumatic experience in losing her fiancé and life partner, Donnie Taylor, as described above, Janice should be awarded the full solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

     **(e)**    ***Jesse Kemp and Nicholas Kemp, Child Equivalents of Timothy Haviland***
                **Presumptive Award: $8.5 Million**
                **Requested Award: $8.5 Million**

Jesse Kemp ("Jesse") and Nicholas Kemp ("Nicholas") were the stepchildren of Timothy Haviland ("Timothy"), and for the reasons set forth below, and in Jesse's and Nicholas' accompanying declarations annexed as Exhibit H and Exhibit I (with appended Exhibits H-1 –

H-2 and Exhibits I-1 – I-2, respectively) to the Goldman Declaration, Plaintiffs submit Jesse and Nicholas should be deemed the functional equivalents of Timothy's children.

Timothy came into Jesse's and Nicholas' lives in 1997 when he started dating their mother, Amy.  Exhibit H ¶ 2; Exhibit I ¶ 2.[16]  At that time, Jesse and Nicholas were only 8 years old and 10 years old, respectively.  Exhibit H ¶ 2; Exhibit I ¶ 2.  A few months later, in January 1997, Timothy moved to and started a job in New York.[17]  He moved into Amy, Jesse and Nicholas's home on Long Island, and they became a family unit.  Exhibit H ¶ 2; Exhibit I ¶ 2.  Shortly after, Timothy and their mother, Amy, purchased a home together.  The following year, in November 1998, Timothy and their mother, Amy, got engaged.  Exhibit H ¶ 2; Exhibit I ¶ 2.  A year later, in August 1999, Timothy and Amy got married.  Jesse and Nicholas remember going to the courthouse to see the ceremony.  Exhibit H ¶ 2; Exhibit I ¶ 2.  There were four rings at the wedding ceremony- one for the bride, one for the groom, for Jesse and one for Nicholas.  *Timothy Aaron Haviland Obituary*, https://www.legacy.com/obituaries/name/timothy-haviland-obituary?pid=96029 (last visited Jan. 12, 2022).  Their mother, Amy, has been quoted as referring to Timothy as having taken "over managing my children's lives and became their financial supporter and their homework man.  He was very devoted to me and my children." *Tim Haviland, 9/11 Casualty, 'Absolutely Loved New York'*, OCEANSIDE/ISLAND PARK HERALD (Nov. 2001), *reprinted at* http://www.kellardmedia.com/tim-haviland-911-victim-absolutely-loved-new-york (last visited Jan. 12, 2022).

---

[16] They met online and at that time lived a thousand miles apart.  Tim met Amy in person later that year when he came to New York.

[17] When Timothy was killed, he was a vice president and project manager at Marsh McLennan. He was 41 years old.

Timothy financially supported Jesse and Nicholas as a family and took care of them. Exhibit H ¶ 3; Exhibit I ¶ 3.  In addition to financial support, he treated Jesse and Nicholas like his daughter and son, both emotionally and socially, and made their family whole. Exhibit H ¶ 3; Exhibit I ¶ 3.  Timothy was a true family man.  Exhibit H ¶ 3; Exhibit I ¶ 3.  He cooked family dinners, drove Jesse and Nicholas to school, accompanied them on field trips, took them to the movies, took them bowling and to play miniature golf, organized family board game nights, and took them on trips to Eisenhower Park and to the beach.  Exhibit H ¶ 3; Exhibit I ¶ 3.

Timothy strongly believed in education and helped Jesse and Nicholas with their homework and made sure they did well in school.  Exhibit H ¶ 4; Exhibit I ¶ 4.  Timothy was a voracious reader and loved taking them to the bookstore to read and pick out new books. Exhibit H ¶ 4; Exhibit I ¶ 4.

Jesse and Nicholas have fond memories of Timothy and looked forward to spending more time and creating more memories with him.  Exhibit H ¶ 5; Exhibit I ¶ 5.  Timothy taught Jesse how to roller skate, and he and Jesse frequently went on walks and rode their bikes together.  Exhibit H ¶ 5.  Timothy was very handy and taught Jesse crafting and pottery.  Exhibit H ¶ 5.  Jesse remembers when she and Timothy made plates and bowls that they eventually ate out of.  Nicholas and Timothy bonded over computers and Timothy taught Nicholas how to build a computer from scratch.  Exhibit I ¶ 5.  Nicholas and Timothy also shared a love for the Knicks and watched games together.  Exhibit I ¶ 5.  Additionally, Nicholas and Timothy played basketball in front of their home.  Exhibit I ¶ 5.

Jesse and Nicholas were an integral part of Timothy's family.  They visited Timothy's parents, brothers, and sisters, each year (including after 9/11).  Exhibit H ¶ 6; Exhibit I ¶ 6.

Timothy's parents sent the children Christmas gifts. Exhibit H ¶ 6; Exhibit I ¶ 6. Timothy's family knew how much Jesse and Nicholas meant to him. Jesse and Nicholas spent every holiday with Timothy and their extended family (e.g., aunts, uncles, cousins), and they decorated the Christmas tree as a family every year. Exhibit H ¶ 6; Exhibit I ¶ 6.

Jesse and Nicholas each had a special bond with Timothy and considered themselves very close with him. Exhibit H ¶ 7; Exhibit I ¶ 7. Timothy made it known to others that Jesse and Nicholas were his daughter and son, and they each referred to Timothy as their father. Exhibit H ¶ 7; Exhibit I ¶ 7. Even several years after 9/11, when Nicholas was dating his now-wife, Nicholas referred to Timothy as his dad. Exhibit I ¶ 7. Timothy gave Jesse and Nicholas advice (and, of course, discipline) like any loving father. Exhibit H ¶ 7; Exhibit I ¶ 7. Jesse and Nicholas were not close with their biological father and he did not play an important role in their lives. Exhibit H ¶ 7; Exhibit I ¶ 7. After their parents divorced, prior to Timothy entering their lives, Jesse and Nicholas saw their biological father only sporadically. Exhibit H ¶ 7; Exhibit I ¶ 7. Timothy filled that void and was the father figure in their lives. Exhibit H ¶ 7; Exhibit I ¶ 7. It meant so much to Jesse and Nicholas that Timothy was always present and made sure they felt important and taken care of. Exhibit H ¶ 7; Exhibit I ¶ 7.

After Timothy's tragic death on 9/11, Jesse and Nicholas received workers' compensation, social security benefits, and funds from the September 11th Victim Compensation Fund as his children. Exhibit H ¶ 8, Exhibit H-1; Exhibit I ¶ 8, Exhibit I-1. Additionally, they were claimed as dependents on Timothy's tax returns. Exhibit H ¶ 8, Exhibit H-2; Exhibit I ¶ 8, Exhibit I-2.

Unfortunately, 9/11 ripped their family apart. After Timothy's tragic death, both Jesse and Nicholas had trouble dealing with his passing. Exhibit H ¶ 10; Exhibit I ¶ 10.

Based on Jesse's and Nicholas' extremely traumatic experience in losing their stepfather, Timothy Haviland, as described above, Jesse and Nicholas should each be awarded the full solatium damages award of $8.5 million otherwise awarded to children of September 11, 2001 decedents.

> **(f)      *Maureen Sullivan, Spouse Equivalent of Derek O. Sword***
> **Presumptive Award: $12.5 Million**
> **Requested Award: $12.5 Million**

Maureen Sullivan ("Maureen") was the fiancé and life partner of Derek O. Sword ("Derek), and for the reasons set forth below, and in Maureen's accompanying declaration annexed as Exhibit J to the Goldman Declaration (with appended Exhibits J-1 - J-4), Plaintiffs submit Maureen should be deemed a functional equivalent of Derek's spouse.

Derek and Maureen began dating in the Spring of 1999. Exhibit J ¶ 2. They met at a party at the New York Athletic Club and had an instant connection. Exhibit J ¶ 2. In Fall 2000, they moved in together on the Upper East Side, where they resided until Derek's tragic death on 9/11. Exhibit J ¶ 2.

Derek and Maureen got engaged in February 2001. Exhibit J ¶ 3. They told their family and friends, and everyone was so excited for them. Exhibit J ¶ 3. Derek and Maureen began planning their wedding. Exhibit J ¶ 4. They set the date of the wedding for December 7, 2002 at the Racket and Tennis Club in Manhattan and selected a priest to officiate the ceremony. Exhibit J ¶ 4. They were excited to celebrate their special day with their family and friends. Exhibit J ¶ 4. *See* Exhibit J-3 (Letter from Derek's mother and father).

As life partners, Derek and Maureen both contributed financially to their life together. Exhibit J ¶ 5. Since Derek earned more money, he paid the rent and bigger expenses, and Maureen paid the utilities and the telephone bill. Exhibit J ¶ 5. Derek and Maureen specifically

added each other as their respective life insurance beneficiaries demonstrating the nature of their relationship.  Exhibit J ¶ 5.

At the time of Derek's death, Derek and Maureen lived together and shared their lives. Exhibit J ¶ 6.  They were engaged to be married and planned to be together forever. Exhibit J ¶ 6.  They shared dreams and were the love of each other's lives.  Exhibit J ¶ 6.  Derek and Maureen enjoyed, among other things, exercising, dining, and traveling.  Exhibit J ¶ 6. Derek was an avid squash player and taught Maureen how to play at the New York Athletic Club.  Exhibit J ¶ 6.  They went on special trips to, among other places, Lake George, Boston, St. Barts, Ireland, Scotland, England, South Africa, Canada, and Italy, and were looking forward to going on more adventures together.  Exhibit J ¶ 6.  In fact, they had a planned trip for December 2001 to visit Derek's twin brother and his wife and son in Dubai.  Exhibit J ¶ 6.  In addition to experiencing new things, Derek and Maureen had their rituals of things they enjoyed together, including going to the same bars and restaurants in their neighborhood, such as Heidelberg, Marty O'Brien's, East End Grill, and Fiona's.  Exhibit J ¶ 7.  *See, e.g.,* Exhibit J-1, Love letter from Derek to Maureen ("I am the luckiest guy in the world to have the most beautiful lady in the world!  I love you!!).

Derek and Maureen were family.  Exhibit J ¶ 8.  Together they attended family gatherings and celebrated holidays with each other's families.  Exhibit J ¶ 8.  They spent Christmas and other holidays with Maureen's parents, siblings, nieces, and nephews. Exhibit J ¶ 8.  *See e.g.,* Exhibit J-2 (photographs).  Derek was very close with Maureen's family and had an especially great bond with her father.  Exhibit J ¶ 8.  During the summers, they visited Maureen's parents' beach house in Long Beach, went to the beach and had barbecues. Exhibit J ¶ 8.  *See, e.g.*, Exhibit J-2 (photographs).  They visited Derek's family multiple times in

Scotland, and Derek's family visited Derek and Maureen every year.  Exhibit J ¶ 8.  Derek's uncle stayed with Derek and Maureen when he came to visit in 2000.  Exhibit J ¶ 8.  Their families got along well and jointly celebrated Derek's mother's 60th birthday.  Exhibit J ¶ 8.  In fact, Maureen to this day remains close with Derek's family.  Exhibit J ¶ 8.  Derek's memorial was held at the New York Athletic Club in November 2001 and his family traveled from Scotland and the Middle East to attend.  Exhibit J ¶ 8.  Thereafter, the New York Athletic Club renamed their annual squash tournament in Derek's memory.  Exhibit J ¶ 8.  Derek's parents visit Maureen every year (except for during Covid-19).  Exhibit J ¶ 8.  Maureen's family traveled to Scotland when the tournament was held there and Maureen and her father have visited Derek's family in Scotland twice since Derek's death.  Exhibit J ¶ 8.

Derek's family still views Maureen as Derek's wife.  Letter, Exhibit J-3.

Maureen was awarded workers' compensation benefits based on being Derek's domestic partner and she received Derek's life insurance proceeds.  Exhibit J ¶ 9.  *See* Exhibit J-4.

On Tuesday morning September 11, 2001, while trapped on the 89th Floor of 2 World Trade Center, in the offices of the securities firm where he worked, the 29-year-old Derek called his parents in Scotland, and made three calls to Maureen. *Derek O. Sword, A New Yorker At Heart,* NEW YORK TIMES (Oct. 11, 2001), *reprinted at* LEGACY.COM, http://www.legacy.com/sept11/story.aspx?personid=139440 (last visited Jan. 12, 2022).

Derek and Maureen looked forward to spending the rest of their lives together, but unfortunately the tragic day of 9/11 cut their life together short.  Exhibit J ¶ 11.  Maureen did not want to believe the love of her life left this world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that Derek was really gone.  Exhibit J ¶ 10.  Maureen feels his loss every day and shares fond memories of him.  Exhibit J ¶ 11.

Based on Maureen's extremely traumatic experience in losing her fiancé and life partner, Derek O. Sword, as described above, Maureen should be awarded the full solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

      **(g)**    ***Karen Carlucci, Spouse Equivalent of Peter Frank***
                **Presumptive Award: $12.5 Million**
                **Requested Award: $12.5 Million**

Karen Carlucci ("Karen") was the fiancé and life partner of Peter Frank ("Peter"), and for the reasons set forth below, and in Karen Carlucci's and Constance Frank's accompanying declarations annexed as Exhibit K (including Exhibits K-1 – K-8 appended thereto) and Exhibit L (including Exhibits L-1 - L-3 appended thereto) to the Goldman Declaration, Plaintiffs submit Karen should be deemed a functional equivalent of Peter's spouse.

Karen and Peter began dating in October 1995.  Exhibit K ¶ 2.  They met in New York City through a mutual friend who worked with Peter at Bear Sterns.  Exhibit K ¶ 2.  Karen and Peter were both only 23 years old at the time they met.  Exhibit K ¶ 2.  A few years later, in March 1999, they moved in together into Peter's apartment in the West Village, where they resided until Peter's tragic death on 9/11.[18] Peter was 29 years old when he died.  Exhibit K ¶ 2. They spent the bulk of their adult lives together.

After living together since 1999, Karen and Peter became engaged on January 6, 2001. Exhibit K ¶ 3; Exhibit K-2 (engagement ring insurance).  Before Peter proposed, he asked Karen's parents for permission.  Karen and Peter shared the news with their families and friends, and everyone was so excited for them.  Exhibit K ¶ 3.  They finalized their wedding plans and set the date for October 19, 2001 in Livingston, New Jersey.  Exhibit K ¶ 4; Exhibit K-3 (venue

---

[18] Karen became a co-signer on the sub-lease for the apartment they shared in March 2000. Exhibit K-1.

contract; wedding invitation).[19] They looked forward to celebrating their special day with their family and friends.  Exhibit K ¶ 4.  Karen and Peter also had a planned honeymoon to Anguilla and St. Barts.  Exhibit K ¶ 4.

As life partners, Karen and Peter both contributed financially to their life together. Exhibit K ¶ 5.  Since Peter earned more money, he paid the rent and usually paid for dinner when they went out.  Exhibit K ¶ 5.  Karen paid the telephone and cable TV bills, and frequently paid for groceries.  Exhibit K ¶ 5.  During the summer of 2001, Peter told Karen that he made her his life insurance beneficiary, but his company later said the records were destroyed on 9/11. Exhibit K ¶ 5.  Notwithstanding, Peter's parents gave Karen his life insurance money because they considered her to be his spouse.  Exhibit K ¶ 5.

---

[19] Karen did have a small group of friends and relatives gathered together on the date of the scheduled wedding to memorialize a wedding that never was.

> There were no exchanges of "I do." No cake was cut, with a slice saved to store in the freezer for the first anniversary. And there was no dance to the couple's favorite song. The guests simply looked at photographs and talked about possibilities at a banquet hall in Caldwell, N.J., on Oct. 19.
>
> Karen Carlucci had called a small group of friends and relatives together to memorialize a wedding that never was.
>
> Her fiancé, Peter Christopher Frank, was a vice president and financial analyst for Fred Alger & Co. on the 93rd floor of 1 World Trade Center.
>
> "It was going to be our wedding day and I just couldn't pretend that it wasn't anything," Ms. Carlucci said of that October day. "I had to do something. I think it was helpful, not just for me, but for everybody."

*Peter Christopher Frank, On the Verge of Marriage*, NEW YORK TIMES (Mar. 31, 2002), *reprinted at* http://www.legacy.com/sept11/story.aspx?personid=96912 (last visited Jan. 12, 2022).

40

At the time of Peter's death at the age of 29, Karen and Peter lived together and shared their lives.  Exhibit K ¶ 6.  They were engaged to be married (the wedding was scheduled to be held a month after 9/11) and planned to be together forever.  Exhibit K ¶ 6.  They were planning on purchasing an apartment in the Village.  *Peter Christopher Frank, On the Verge of Marriage*, NEW YORK TIMES (Mar. 31, 2002), *reprinted at*

http://www.legacy.com/sept11/story.aspx?personid=96912 (last visited Jan. 12, 2022).  "A Kiss to Build A Dream On" was to be their first song.  After Peter's death, Karen picked up the wedding ring from the jeweler.  *See* Exhibit K-7.  Michael Lou, *September 11 made Karen Carlucci a widow before she was a bride*, ARIZONA DAILY SUN (Jan. 5, 2002),

https://azdailysun.com/sept-11-made-karen-carlucci-a-widow-before-she-was-a-bride/article_c6848d65-be90-5ddf-8948-2041b65273a0.html (last visited Jan. 12, 2022).

They shared dreams, spoke about raising a family, and were the love of each other's lives.  Exhibit K ¶ 6.  They enjoyed, among other things, going out for dinner, walking our dog, and simply sitting together in the park.  Exhibit K ¶ 6.  Karen and Peter went on incredible trips to the Bahamas, Florida, Palm Springs, and Paris, and were excited to go on more adventures together.  Exhibit K ¶ 6.  In addition to experiencing new things, Karen and Peter also had their rituals of things they enjoyed together, including going to L'Oro di Napoli, a neighborhood Italian restaurant in the West Village, where they enjoyed many nights of good food and laughter.  Exhibit K ¶ 7; Exhibit K-4 (photographs) – K-6 K-8.

Karen and Peter were family.  Although they were not yet legally married, they lived as husband and wife and took care of each other like a married couple.  Exhibit K ¶ 8.  Karen cooked, cleaned, and helped care for their dog, Chavez (a boxer).  Exhibit K ¶ 8.  Together they attended family gatherings and celebrated holidays with each other's families.  Exhibit K ¶ 8.

41

Their families got along very well and were excited to officially become family.  Exhibit K ¶ 8.
In fact, Peter's family considers Karen's to be family and Peter's mother calls Karen "my
daughter."  Exhibit K ¶ 8.  For several years after 9/11, Karen spent Christmas, Thanksgiving,
and 9/11 anniversaries with Peter's family.  Exhibit K ¶ 8.  They are still very close and recently
spent the twentieth 9/11 anniversary together.  Exhibit K ¶ 8.

According to Peter's mother, Constance Frank, Karen was Peter's fiancé and the love of
his life, and although they were not yet legally married, she viewed Karen as Peter's wife, and
Peter as Karen's husband.  Further, Constance says she developed a wonderful relationship with
Karen, who became, and still is, her daughter.  Exhibit L ¶¶ 2, 3, 5.

Because Peter's family considered Karen to be his spouse, they provided Karen with
Peter's life insurance proceeds and the largest percentage of the September 11th Victim
Compensation Fund award.  Exhibit K ¶ 9.  Karen also received spousal workers' compensation
benefits and financial support from the American Red Cross, Safe Horizon, Robin Hood
Foundation, September 11th Fund, Crime Victims Board, Salvation Army, World Trade Center
Relief Fund, and Fred Alger & Co. (Peter's former employer).  Exhibit K ¶ 9; Exhibit K-9;
Exhibit L.

Karen and Peter looked forward to getting married and spending the rest of their lives
together, but unfortunately the tragic day of 9/11 cut their life together short on the eve of their
wedding ceremony.  Exhibit L ¶ 11.  Karen did not want to believe the love of her life left this
world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that Peter
was really gone.  Exhibit L ¶ 10.  Karen feels his loss every day and shares fond memories of
him.  Exhibit L ¶ 11.

docs-100429819.3

Based on Karen's extremely traumatic experience in losing her fiancé and life partner, Peter Frank, as described above, Karen should be awarded the full solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

      **(h)**    ***Lucy Aita, Spouse Equivalent of Paul Innella***
                **Presumptive Award: $12.5 Million**
                **Requested Award: $12.5 Million**

Lucy Aita ("Lucy") was the fiancé and life partner of Paul Innella ("Paul"), and for the reasons set forth below, and in Lucy's accompanying declarations annexed as Exhibit M to the Goldman Declaration (including Exhibits M-1 – M-13 appended thereto), Plaintiffs submit Lucy should be deemed a functional equivalent of Paul's spouse.

Lucy and Paul began dating in August 2000. Exhibit M ¶ 2. They met on an online dating website and immediately felt that they had a connection. Exhibit M ¶ 2. They became very serious with each other shortly thereafter. Exhibit M ¶ 2. Since Lucy and Paul were both in their thirties and previously married, they knew what they wanted and did not want to waste time. Exhibit M ¶ 2. In October 2000, Paul moved into Lucy's parents' home in East Brunswick, New Jersey, where they lived with Lucy's son (he was 8 years old at the time) and her parents. Exhibit M ¶ 2; M-10 (Affidavit of Lucy's mother).

A month later, in November 2000, Paul proposed to Lucy in Atlantic City, New Jersey and they got engaged. Exhibit M ¶ 3; *See* Exhibit M-1. Lucy was so surprised and could not wait to marry Paul. Exhibit M ¶ 3. Thereafter, they told their families, who were so excited for them to live the rest of their lives as husband and wife. Exhibit M ¶ 3; *See* Exhibit M-10.

Lucy and Paul initially planned to have their wedding ceremony in Summer 2001, but they pushed back the date until April 2002 so it would coincide with Paul's family's already planned trip to Las Vegas where they planned to celebrate their marriage. Exhibit M ¶ 4; *See*

Exhibit M-10.  They began inviting their friends, family, and coworkers, and were excited to celebrate their special day.  Exhibit M ¶ 4.

In terms of finances, Lucy and Paul lived as husband and wife.  Exhibit M ¶ 5.  Since Lucy's work ability was limited due to childcare, Paul financially supported their family. Exhibit M ¶ 5.  Paul paid for, among other things, Lucy son's school trips, summer camp, and school books and clothes, Lucy's car loan, food for the home, the maintenance, upkeep, and utilities of the home, and Paul gave Lucy's mother money for household bills and property taxes. Exhibit M ¶ 5.  Paul was so generous and always paid for everyone whenever they went out. Exhibit M ¶ 5.  While Lucy paid for some household items, cosmetics, and food, Paul wanted Lucy's money to go towards their savings and his to go towards their living expenses.  Exhibit M ¶ 5; *See generally* Exhibit M-3.  Lucy and Paul intended to purchase Lucy's parents' home, and they started repairing and remodeling the home.  Exhibit M ¶ 5; *See* Exhibit M-4, M-10.  Lucy's parents agreed to sell them their home at fair market value, and they planned to continue living with Lucy and Paul indefinitely (Lucy and Paul planned to take care of them).  Exhibit M ¶ 5; M-11 (Letter of Michael Aita).  The house was going to be jointly titled in Lucy's and Paul's names and they were both going to be on the mortgage.  Exhibit M ¶ 5.  Lucy and Paul asked their accountant to advise them on the best way to file taxes once they were legally married.  Exhibit M ¶ 5; Exhibit M-5.  In July 2001, Lucy and Paul made each other the primary beneficiary of each other's life insurance.  Exhibit M ¶ 5; Exhibit M-6.  That summer, Paul asked his attorney to draft a will to make sure Lucy would be taken care of forever.  Exhibit M ¶ 5.  Paul had an abnormal electrocardiogram (EKG), which prompted him to prepare a will in case something happened to him.  Exhibit M ¶ 5.  Paul was supposed to sign the will the Saturday after 9/11. Exhibit M ¶ 5; Exhibit M-7.

At the time of Paul's death, Lucy and Paul lived together and shared their lives. Exhibit M ¶ 6.  Lucy and Paul were engaged to be married, committed to each other, and planned to be together forever.  Exhibit M ¶ 6.  They shared dreams and were the love of each other's lives.  Exhibit M ¶ 6.  They talked about growing their family and planned to have a baby after their wedding.  Exhibit M ¶ 6.  Lucy and Paul had the same doctor and went with each other to appointments.  Exhibit M ¶ 6.  They enjoyed, among other things, going on walks, playing miniature golf with Lucy's son, going bowling, dining, and traveling.  Exhibit M ¶ 6.  Lucy and Paul traveled to Atlantic City and Canada together.  Exhibit M ¶ 6.  Shortly before 9/11, Paul planned a family trip to Disney and they also planned to visit Italy shortly thereafter. Exhibit M ¶ 6.  Paul felt strongly about showing Lucy's son as much of the world as possible before they had a baby, which would make it difficult to travel.  Exhibit M ¶ 6.  In addition to experiencing new things, Lucy and Paul also had their rituals of things they enjoyed together, including going to Shogun for hibachi, where they enjoyed nights of fun and great food. Exhibit M ¶ 7.  Lucy's son enjoyed going with them and watching the chef put on a show.  Lucy and Paul loved to eat and went out to a lot of restaurants together.  Exhibit M ¶ 7.  Since Lucy ended work earlier than Paul, she cooked a daily three-course meal, which Paul greatly enjoyed. Exhibit M ¶ 7.  *See* Exhibit M-8 (photographs); M-9 (travel)

Lucy and Paul were family.  Together they attended family gatherings and holiday celebrations, and were very close with each other's families.  Exhibit M ¶ 8.  Lucy and Paul spent holidays with each other's families, including Thanksgiving at Paul's sister's house and Christmas Eve at Lucy's parents' house.  Exhibit M ¶ 8.  Lucy's spoke with Paul's family on the phone and visited them with Paul.  Exhibit M ¶ 8.  Lucy's parents considered Paul to be like a son to them.  Exhibit M ¶ 8; Exhibit M-10 (Affidavit of Lucy M. Aita).  Paul also had a great

relationship with Lucy's brother and Paul asked him to be the best man at their wedding.  Exhibit M ¶ 8; Exhibit M-11.  Lucy's aunt and uncle loved Paul, and they lived across from them and frequently had dinner together.  Exhibit M ¶ 8.

Paul and Lucy's son had a special bond and Paul loved her child like a son.  Exhibit M ¶ 9.  Lucy's son's biological father did not play an important role in his life and Paul filled that void and treated him like his own and was a father figure to him.  Exhibit M ¶ 9.  Lucy's son hugged and kissed Paul every night before he went to sleep.  Exhibit M ¶ 9.  Paul strongly believed in education and encouraged Lucy's son to read and put him in a book club.  Exhibit M ¶ 9.  They both liked sports and played hockey together in the garage.  Exhibit M ¶ 9.  Paul bought Lucy's son a trampoline for the yard and they jumped on it together all the time.  Exhibit M ¶ 9.  Paul took him out for ice cream, they rode their bikes down the block, and they watched Disney movies a couple of times each week.  Exhibit M ¶ 9.  One of Lucy's fondest memories is when they decorated the Christmas tree as a family and Paul picked up her son so he could put the porcelain angel on top.  Exhibit M ¶ 9.  Lucy would give anything to go back to that moment. Exhibit M ¶ 9.

After Paul's tragic death on 9/11, Lucy received funds as a spouse from the New York State Crime Victims Board, New Jersey Victims of Crime Compensation Board, American Red Cross, Robinhood Fund, the Archdiocese of Metuchen, Cantor Fitzgerald, and lifetime workers' compensation benefits as Paul's domestic partner.  Exhibit M ¶ 10; Exhibit M-12.

Lucy and Paul looked forward to getting married, having a baby, and spending the rest of their lives together, but unfortunately the tragic day of 9/11 cut their life together short. Exhibit M ¶ 12.  Lucy did not want to believe the love of her life left this world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that Paul was really gone.

Exhibit M ¶ 11.  Lucy feels his loss every day and shares fond memories of him.  Exhibit M ¶ 12.

After 9/11, Lucy began suffering from post-shock syndrome, anxiety, and depression, and she ended up on disability and unable to work.  Exhibit M ¶ 11.  In fact, Lucy is still on disability to this day.  Exhibit M ¶ 11.  She lost her joy for living and her spirit left with Paul's.  Exhibit M ¶ 11.  Lucy's son was also affected by Paul's passing and began having trouble in school and suffering from depression.  Exhibit M ¶ 11.  He needed support groups and therapy to deal with his loss.  Exhibit M ¶ 11.  With respect to Lucy's parents, their health declined after 9/11.  Everyone in Lucy's family understood how special Paul was and had difficulty dealing with Paul's death.  Exhibit M ¶ 11.

Based on Lucy's extremely traumatic experience in losing her fiancé and life partner, Paul Innella, as described above, Lucy should be awarded the full solatium damages award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

      **(i)**    ***Cristal Barragan and Katherin Pleitez, Child Equivalents of Moises Rivas***
              **Presumptive Award: $8.5 Million**
              **Requested Award: $8.5 Million**

Cristal Barragan ("Cristal") and Katherin Pleitez ("Katherin") were the stepchildren of Moises Rivas ("Moises") and for the reasons set forth below, and in Cristal's and Katherin's accompanying declarations annexed as Exhibit N (including annexed Exhibits N-1 – N-2) and Exhibit O (including appended Exhibits O-1 – O-2) to the Goldman Declaration, Plaintiffs submit Cristal and Katherin should be deemed the functional equivalent of Moises' children.

In 1996, Moises came into Cristal's and Katherin's lives when he started dating their mother.  Exhibit N ¶ 2; Exhibit O ¶ 2.  At the time their mother began to date Moises, Cristal and Katherin were only 5 years old and 9 years old, respectively.  Exhibit N ¶ 2; Exhibit O ¶ 2.  Their

father had passed away several years earlier.  Shortly afterwards, Moises moved in with them and they began living together as a family unit.  Exhibit N ¶ 2; Exhibit O ¶ 2.  On May 15, 1996, Moises and their mother got married.  Exhibit N ¶ 2; Exhibit O ¶ 2.  They lived in the Bronx with Moises and their mother, and eventually their two baby siblings (Moises and their mother had a baby boy and girl), and then moved to Washington Heights.  Exhibit N ¶ 2; Exhibit O ¶ 2.  They all lived together for five (5) critical developmental years,[20] which only ended when Moises was taken from them, their siblings, and their mother on 9/11.  Exhibit N ¶ 2; Exhibit O ¶ 2.

Moises supported their family and took care of them.  Exhibit N ¶ 3; Exhibit O ¶ 3.  He was the sole financial support of their family as their mother was a stay-at-home mother.  Exhibit N ¶ 3; Exhibit O ¶ 3.  Moises paid the rent, took them clothes shopping, bought them school clothes and supplies, and bought them other things they enjoyed.  Exhibit N ¶ 3; Exhibit O ¶ 3.  Most importantly, Moises treated Cristal and Katherin like his daughters, both emotionally and socially, and made their family whole.  Exhibit N ¶ 3; Exhibit O ¶ 3.  Moises was a true family man.  Exhibit N ¶ 3; Exhibit O ¶ 3.  He cooked family dinners, took them to a family Christmas party at Windows on the World, and to Jones Beach.  Exhibit N ¶ 3; Exhibit O ¶ 3.

Moises strongly believed in education and encouraged Cristal and Katherin to do well in school.  Exhibit N ¶ 4; Exhibit O ¶ 4.  He taught them Spanish, and they helped him learn English.  Exhibit N ¶ 4; Exhibit O ¶ 4.

Cristal and Katherin each have good memories of Moises.  Exhibit N ¶ 5; Exhibit O ¶ 5.  One of Cristal's fondest childhood memories is when Moises taught her how to play the guitar.

---

[20]   Moises was there for them from ages 5-10 for Cristal and 9-14 for Katherin, until he was killed.

Exhibit N ¶ 5.  Moises was musically talented—he played the guitar and piano and sang Spanish music in a band—and wanted to introduce Cristal and Katherin, his children, to the world of music.  Exhibit N ¶ 5; Exhibit O ¶ 5.  In fact, Cristal still has Moises' guitar to this day and cherishes it and will give it to Moises Jr. (Moises and their mother's son) once he is older and tell him how talented his father was.  Exhibit N ¶ 5.  Moises was also very athletic and taught Cristal how to play soccer and volleyball.  Exhibit N ¶ 5.  He played on a soccer team in Washington Heights and loved the sport.  Exhibit N ¶ 5; Exhibit O ¶ 5.  Cristal remembers when she visited Moises at his job at Windows on the World and he proudly introduced her to his supervisor and coworkers as his daughter.  Exhibit N ¶ 5.  They ate lunch together surrounded by a beautiful view of the city.  Exhibit N ¶ 5.  It was a special moment for her because she did not have a father figure before Moises entered her life as her biological father died when she was only three (3) years old.  Exhibit N ¶ 5.  Cristal also remembers when Moises took her to the Disney store in Times Square and they saw the Disney characters and sat on the red stairs.  Exhibit N ¶ 5.  Cristal still has the Winnie the Pooh Moises bought her and she keeps it in good condition.  Exhibit N ¶ 5.  It has great sentimental value because it reminds Cristal of the special times she and Moises had together.  Exhibit N ¶ 5.

One of Katherin's fondest childhood memories is when she and Moises got up early and he bought her a concert ticket to watch NSYNC perform at Madison Square Garden.  Exhibit O ¶ 5.  NSYNC was Katherin's favorite band and it meant so much to her that he got her a ticket.  Exhibit O ¶ 5.  She also remembers when he bought her a Mickey Mouse pajama shirt from the Disney store.  Exhibit O ¶ 5.  It was her favorite shirt and was so comfortable.  Exhibit O ¶ 5.  Katherin vividly remembers the night before 9/11.  Exhibit O ¶ 5.  Moises played his guitar in the living room and asked Katherin to sing with him.  Exhibit O ¶ 5.

Cristal and Katherin were Moises' family.  They went to Moises' family gatherings and celebrations together, and also went on overnight trips to his family's house in Queens. Exhibit N ¶ 6; Exhibit O ¶ 6.  Cristal and Katherin were close with Moises' family and celebrated holidays with them.  Exhibit N ¶ 6; Exhibit O ¶ 6.  Their extended family loved Moises dearly.  Exhibit N ¶ 6; Exhibit O ¶ 6.  He had a great sense of humor and was lovable. Exhibit N ¶ 6; Exhibit O ¶ 6.  *See* photographs, Exhibit N-1; Exhibit O-1.

Moises was Cristal's father.  Exhibit N ¶ 7.  They had a special bond and were very close. Moises made it known to others that Cristal was his daughter, and she referred to him as her dad. Exhibit N ¶ 7.  Moises gave her advice like any loving father.  Exhibit N ¶ 7.  After Cristal's biological father passed away when she was only three (3) years old, she had no father in her life. Exhibit N ¶ 7.  Moises stepped in just two (2) years later and filled that void.  He was the father figure in her life.  Exhibit N ¶ 7.  It meant so much to Cristal that Moises was always present and made her feel important and taken care of.  Exhibit N ¶ 7.

Katherin and Moises had a special bond and were very close, with Moises making it known to others that she was his daughter.  Exhibit O ¶ 7.  Moises gave her advice like any loving father, and encouraged her to succeed and chase her dreams.  Exhibit O ¶ 7.  After Katherin's biological father passed away when she was about six (6) years old, she had no father in her life until Moises entered at age nine (9).  Exhibit O ¶ 7.  Moises stepped in and stepped up to fill that void and was the father figure in her life from age nine (9) until he was taken away from her at only fourteen (14) years old.  Exhibit O ¶ 7.  It meant so much to Katherin that Moises was always present and made her feel important and taken care of.  Exhibit O ¶ 7.

Moises claimed Cristal and Katherin as dependents on his tax returns, and they both received social security benefits as his children and an award, as his children, from the

September 11th Victim Compensation Fund.  Exhibit N ¶ 8; Exhibit O ¶ 8; Exhibit N-2; Exhibit O-2.

9/11 ripped their family apart.  Cristal and Katherin did not want to believe that Moises left this world so suddenly and unexpectedly, but they eventually had to accept the terrible truth that he was really gone.  Exhibit N ¶ 9; Exhibit O ¶ 9.  Cristal had a difficult time dealing with Moises' passing and was depressed and did not go to school for approximately two months (her teacher came to her house and dropped off her homework).  Exhibit N ¶ 9.  Katherin began suffering from anxiety and depression and began having trouble in school.  Exhibit O ¶ 9. Things were never the same again.  Exhibit N ¶ 9; Exhibit O ¶ 9.  Cristal and Katherin feel Moises' loss every day and share fond memories of him.  Exhibit N ¶ 10; Exhibit O ¶ 10.

Cristal and Katherin suffered the tragedies of losing their father twice while they were young children.

Based on Cristal's and Katherin's extremely traumatic experience in losing their stepfather, Moises Rivas, as described above, Cristal and Katherin should each be awarded the full solatium damages award of $8.5 million otherwise awarded to children of September 11, 2001 decedents.

>            **(j)**     ***Denyse Betcher and Danny Marino, Child Equivalents of Paul Ruback***
>                      **Presumptive Award: $8.5 Million**
>                      **Requested Award: $8.5 Million**

Denyse Betcher ("Denyse") and Danny Marino ("Danny") were the stepchildren of Paul Ruback ("Paul"), and for the reasons set forth below, and in Denyse's and Danny's accompanying declarations annexed as Exhibit P (including appended Exhibits P-1 – P-4) and Exhibit Q (including appended Exhibits Q-1 – Q-2) to the Goldman Declaration, Plaintiffs submit Denyse and Danny should be deemed the functional equivalent of Paul's children.

Paul came into Denyse's and Danny's lives in 1977 or 1978 when he started dating their mother.  Exhibit P ¶ 2; Exhibit Q ¶ 2.  Denyse and Danny were 10 years old and around 12 or 13 years old at the time, respectively.  Soon after, Paul, a New York City firefighter, moved into their home, and they became a family.  Exhibit P ¶ 2; Exhibit Q ¶ 2.  Shortly thereafter, Paul and their mother got married.  Paul and their mother purchased a house in Newburgh, where they all lived together as a family until Paul's murder on 9/11.  Exhibit P ¶ 2; Exhibit Q ¶ 2.

Paul supported, in all ways, Denyse and Danny's family.  Exhibit P ¶ 3; Exhibit Q ¶ 3. He was the main breadwinner as Denyse's and Danny's mother was mostly a stay-at-home mother.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  Paul bought Denyse and Danny birthday and Christmas presents, and they never wanted for anything.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  In addition to financial support, Paul treated Denyse and Danny like his daughter and son, both emotionally and socially, and made their family whole.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  Paul was a true family man.  He loved to cook dishes that he learned to make at his firehouse (Ladder 25). Exhibit P ¶ 3; Exhibit Q ¶ 3.  They had family game nights where they played cards, Pictionary, Monopoly, and Trivial Pursuit.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  Paul was incredibly smart and was one of those people who watched Jeopardy! and knew the answers.  Exhibit P ¶ 3; Exhibit Q ¶ 3. When it rained, their family sat on their screened-in porch and told jokes and laughed. Exhibit P ¶ 3; Exhibit Q ¶ 3.  Paul loved the outdoors and frequently took them camping and on bicycle rides.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  Denyse and Danny remember the laughs they had and the songs they sang sitting around the campfire.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  Paul took them on family vacations to Lake George, New Mexico, and Wyoming.  Exhibit P ¶ 3; Exhibit Q ¶ 3.  They had a blast going white water rafting together as a family in Wyoming. Exhibit P ¶ 3; Exhibit Q ¶ 3.

Paul strongly believed in education and stressed the importance of reading. Exhibit P ¶ 4; Exhibit Q ¶ 4.  He helped Denyse and Danny with their homework and encouraged them to do well in school.

Denyse and Danny each have good memories of Paul.  Exhibit P ¶ 5; Exhibit Q ¶ 5.  One of Denyse's fondest memories with Paul is when they stayed at a friend's house in Rochester, New York, and she and Paul walked around the city and sang together for an hour. Exhibit P ¶ 5.  They bonded and had a great time.  Exhibit P ¶ 5.  Paul was musically talented and taught himself how to play guitar, and he wanted to share music with Denyse so he bought her a guitar for Christmas.  Exhibit P ¶ 5.  Denyse and Paul went on bike rides together. Exhibit P ¶ 5.  Paul was, in effect, a big kid at heart.  Exhibit P ¶ 5.  He loved sports and frequently played basketball and soccer.  Exhibit P ¶ 5.  When Denyse moved out of the family home when she turned 21, like any parent, Paul helped her move.  Exhibit P ¶ 5.  Paul was the parent who taught her how to drive an automobile.  Exhibit P ¶ 5.  When Denyse's car broke down or her bicycle needed to be fixed, Paul was the father who helped her.  Exhibit P ¶ 5. Denyse and Paul had so many wonderful times together and looked forward to spending more time and creating more memories together.  Exhibit P ¶ 5.  *See generally*, Exhibit P-1 (photographs); Exhibit Q-1 (photographs).

One of Danny's fondest memories is when they had their first overnight stay at Paul's apartment before Paul moved in with them.  Exhibit Q ¶ 5.  Danny woke up early and looked through Paul's record albums.  Exhibit Q ¶ 5.  Paul came into the room, put them on the record player, and introduced Danny to great music.  Exhibit Q ¶ 5.  In fact, Paul bought Danny his first album: Pink Floyd, The Wall.  Exhibit Q ¶ 5.  Danny and Paul were best friends and Paul taught Danny everything.  Exhibit Q ¶ 5.  Danny remembers when Paul took him camping in the

Catskills for his 13th birthday.  Exhibit Q ¶ 5.  They walked ten miles up a mountain and stood together above the clouds.  Exhibit Q ¶ 5.  Whenever Danny sees blueberries, he thinks of Paul because they picked blueberries while hiking and had them for breakfast.  Exhibit Q ¶ 5.  Once Danny became an adult, he and Paul used to sit on the porch with a beer and talked for hours about a variety of topics.  Exhibit Q ¶ 5.  They lived near each other and remained very close until Paul was killed.  Exhibit Q ¶ 5.  Danny and Paul had so many wonderful times together and looked forward to spending more time and creating more memories together.  Exhibit Q ¶ 5.

Paul took Danny and Denyse to Christmas parties at Fire Department Ladder 25. Exhibit P ¶ 6; Exhibit Q ¶ 6.  They spent holidays with Paul's family, and Paul's family loved them as if they were Paul's biological children.  Exhibit P ¶ 6; Exhibit Q ¶ 6.  They decorated the Christmas tree, put up the lights, and sang Christmas carols.  Exhibit P ¶ 6; Exhibit Q ¶ 6.  In fact, Denyse and Danny are still close with Paul's family and they still, 20 years later, get together on holidays.  Exhibit P ¶ 6; Exhibit Q ¶ 6.

Paul was a father figure in Denyse's life.  Exhibits P ¶ 7, Exhibit P-4.  While Denyse's biological father was a great father and she stayed with him every other weekend and called him dad, Paul was a father figure in her life along with her biological father.  Exhibit P ¶ 7.  Paul raised Denyse with her mother and made it known to others that she was his daughter. Exhibit P ¶ 7.  Paul gave her advice (and, of course, discipline) like any loving father. Exhibit P ¶ 7.  While Denyse's biological father was in her life, she spent much more time with Paul.  Exhibit P ¶ 7.  It meant so much to Denyse that Paul was always present and made sure she felt important.  Exhibit P ¶ 7.  Paul was so easy to talk to and he and Denyse had hours-long conversations.  Exhibit P ¶ 7.  Before Denyse's husband proposed to her, he asked both Denyse's

biological father and Paul for her hand in marriage.  Exhibit P ¶ 7.  Denyse and Paul also had a special dance at her wedding.  Exhibit P ¶ 7.

By Danny's account, there is no doubt Paul was his father.  Exhibit Q ¶ 7.  Paul gave Danny advice (and, of course, discipline) like any loving father.  Exhibit Q ¶ 7.  While Danny's biological father was in his life, Danny spent much more time and was closer with Paul. Exhibit Q ¶ 7.  Danny can never be as close with another man as he was with Paul. Exhibit Q ¶ 7.  Paul was Danny's father and a great man.  Exhibit Q ¶ 7.  It meant so much to Danny that Paul was always present and made sure Danny felt important.  Exhibit Q ¶ 7.  Danny recently adopted his granddaughter and he thinks about all of the things Paul did for him and he wants to be the same person for her.  Exhibit Q ¶ 7.

Paul's will specifically named Denyse and Danny as beneficiaries in the event their mother predeceased Paul.  Exhibit P ¶ 8; Exhibit Q ¶ 8, Exhibit P-3; Exhibit Q-2.  Additionally, Paul claimed Denyse and Danny as dependents on his tax returns when they were minors. Exhibit P ¶ 8; Exhibit Q ¶ 8.  Denyse and Danny received support from the Twin Towers Fund following 9/11.  Exhibit P ¶ 8; Exhibit Q ¶ 8.  Danny received an out-of-court settlement with the airlines.  Exhibit Q ¶ 8.

9/11 ripped their family apart.  Denyse and Danny did not want to believe that Paul left this world so suddenly and unexpectedly, but they eventually had to accept the terrible truth that Paul was really gone.  Exhibit P ¶ 9; Exhibit Q ¶ 9.  Denyse and Danny were devastated by Paul's tragic death.  Exhibit P ¶ 9; Exhibit Q ¶ 9.  Denyse was robbed of a father, friend, and grandfather for her young growing family.  Exhibit P ¶ 9.  Danny similarly was robbed of a father and friend.  Exhibit Q ¶ 9.  Denyse and Danny feel Paul's loss every day and share fond memories of him.  Exhibit P ¶ 9; Exhibit Q ¶ 9.

Based on Denyse's and Danny's extremely traumatic experience in losing their stepfather, Paul Ruback, as described above, Denyse and Danny should each be awarded the full solatium damages award of $8.5 million otherwise awarded to children of September 11, 2001 decedents.

> **(k)** ***Natalie Pollack, Child Equivalent of Louis F. Aversano, Jr.***
> **Presumptive Award: $8.5 Million**
> **Requested Award: $8.5 Million**

Natalie Pollack ("Natalie") was the stepchild of Louis F. Aversano, Jr. ("Lou"), and for the reasons set forth below, and in Natalie's accompanying declaration annexed as Exhibit R (including appended Exhibits R-1 – R-3) to the Goldman Declaration, Plaintiffs submit Natalie should be deemed the functional equivalent of Lou's child.

Lou entered Natalie's life when he started dating Natalie's mother.  Exhibit P ¶ 2. Natalie was about five years old at the time.  Exhibit R ¶ 2.  Lou married Natalie's mother on October 18, 1969, and they officially became a family for the next 32 years and virtually her entire childhood.  Exhibit R ¶ 2.  Natalie lived in the same home as Lou until she moved away to attend college when she was 18 years old in 1982.  Exhibit R ¶ 2.

Lou supported Natalie's family and took care of them.  Exhibit R ¶ 3.  Lou was the main financial support as Natalie's mother was a stay-at-home mother.  Exhibit R ¶ 3.  Lou bought Natalie toys and bikes, and Natalie never wanted for anything.  Exhibit R ¶ 3.  In addition to financial support, Lou treated Natalie like his daughter, both emotionally and socially, and made their family whole.  Exhibit R ¶ 3.  Lou was a true family man.  Exhibit R ¶ 3.  Among other things, he walked Natalie to school and made the family breakfast and barbecued on the weekends.  Exhibit R ¶ 3.

Lou strongly believed in education.  Exhibit R ¶ 4.  He helped Natalie with her homework and made sure that she did well in school.  Exhibit R ¶ 4.  He was great at math and made it easier for Natalie to understand the subject.  Exhibit R ¶ 4.

One of Natalie's fondest memories is when Lou taught her how to ride a bicycle. Exhibit R ¶ 5.  Natalie was so scared, and Lou made her feel comfortable.  Exhibit R ¶ 5.  It was a huge milestone for Natalie that Lou helped and encouraged her to accomplish.  Exhibit R ¶ 5. Lou was very athletic and liked to play sports.  Exhibit R ¶ 5.  He taught Natalie how to swim, to play handball, and they played both handball and tennis together.  Exhibit R ¶ 5.

Natalie was Lou's family.  On the weekend, Natalie and her family spent time with her grandparents, aunts, uncles, and cousins.  Exhibit R ¶ 6.  Natalie and Lou were always together for family gatherings and celebrations.  Exhibit R ¶ 6.  Natalie celebrated Christian holidays with Lou's side of the family and Jewish holidays with her mother's side.  Exhibit R ¶ 6.  On Christmas, Natalie's house was decorated beautifully, and they decorated the tree and opened presents as a family.  Exhibit R ¶ 6.  They went to Lou's parents' home for dinner every Sunday. Exhibit R ¶ 6.  Lou's mother was an excellent cook and made gravy from scratch.  Exhibit R ¶ 6. She was also an excellent baker and made her famous toll house cookies.  Exhibit R ¶ 6.  One of Lou's brothers had two sons who were Natalie's cousins.  Exhibit R ¶ 6.  When they got older, they learned how to play poker at Lou's parents' home.  Exhibit R ¶ 6.  Natalie was, and still is, very close with Lou's extended family, and they treat her like a loved family member. Exhibit R ¶ 6.  *See generally* Exhibits R-1 – R-2 (photographs).

Lou was Natalie's father.  Exhibit R ¶ 7.  They had a special bond and were very close. Exhibit R ¶ 7.  Lou made it known to others that Natalie was his daughter, and she referred to him as her dad.  Exhibit R ¶ 7.  Lou gave Natalie advice (and, of course, discipline) like any

loving father.  Exhibit R ¶ 7.  Natalie's biological father was absent for most of her life and they were not close.  Exhibit R ¶ 7.  There were times when years would go by without Natalie ever seeing her biological father.  Exhibit R ¶ 7.  Lou filled that void and was the father figure in virtually her entire life since she was a very young child.  Exhibit R ¶ 7.  It meant so much to Natalie that Lou was always present and made sure she felt important and taken care of.  Exhibit R ¶ 7.  Lou knew how much Natalie loved him.  Exhibit R ¶ 7.  They were extremely close throughout Natalie's childhood and adult life.  Exhibit R ¶ 7.  There was mutual respect, love, and friendship as she grew up.  Exhibit R ¶ 7.  When Natalie got engaged and married, Lou and her mother welcomed Natalie's husband into the family.  Exhibit R ¶ 7.  Lou and Natalie's mother viewed wedding venues with them, participated in food tastings, met with the wedding band, and Lou was one of the witnesses at the wedding.  Exhibit R ¶ 7.  They spent all birthdays and holidays together, and Natalie and her husband frequently went to dinner and a movie with her mother and Lou.  Exhibit R ¶ 7.  They were an extremely close-knit family.  Exhibit R ¶ 7.  Since Natalie's birthday and Lou's were only three days apart, they had joint birthday celebrations.  Exhibit R ¶ 7.  For her mother and Lou's twenty-fifth anniversary, they had a celebratory party and Natalie and her husband paid for them to go on vacation to Florida.  Exhibit R ¶ 7.  Lou was at the hospital when Natalie's first child was born, and he became a proud grandpa.  Exhibit R ¶ 7, Exhibit R-2 (photograph of Lou and the baby).  The last time Natalie saw Lou was at her daughter's second birthday party just a few days before 9/11.  Exhibit R ¶ 7.

Lou claimed Natalie as a dependent on his tax returns for several years, and his will specifically named Natalie a substitute or successor Executrix, and an estate beneficiary in the event Natalie's mother predeceased him.  Exhibit R ¶ 8, Exhibit R-3 (Will).

9/11 ripped Natalie's family apart.  Natalie did not want to believe that Lou left this world so suddenly and unexpectedly, but she eventually had to accept the terrible truth that he was really gone.  Exhibit R ¶ 9.  Natalie feels Lou's loss every day and shares fond memories of him.  Exhibit R ¶ 9.

Based on Natalie's extremely traumatic experience in losing her stepfather, Louis F. Aversano, Jr., as described above, Natalie should be awarded the full solatium damages award of $8.5 million otherwise awarded to children of September 11, 2001 decedents.

        **(l)**    ***Jamielah Persol, Spouse Equivalent of DaJuan Hodges***
                **Presumptive Award: $12.5 Million**
                **Requested Award: $12.5 Million**

Jamielah Persol ("Jamielah") was the fiancé and life partner of DaJuan Hodges ("DaJuan"), and for the reasons set forth below, and in Jamielah's accompanying declaration annexed as Exhibit S to the Goldman Declaration (including appended Exhibits S-1 – S-3), Plaintiffs submit Jamielah should be deemed a functional equivalent of DaJuan's spouse.

Jamielah and DaJuan started dating in late 1992 and were together continuously until his tragic death on 9/11.  Exhibit S ¶ 2.  They met at work and built a loving relationship from there.  Exhibit S ¶ 2.  Jamielah got pregnant approximately three months into their relationship and they had a baby girl together.  Exhibit S ¶ 2.  In late 1993, Jamielah moved in with DaJuan, their child, and his mother in the Morningside Heights area of New York City.  Exhibit S ¶ 2.  Jamielah and DaJuan moved into their own apartment in the Bronx with their daughter around 1996 or 1997.  Exhibit S ¶ 2.  They lived together for almost 8 years.

Jamielah and DaJuan got engaged in the summer of 2001.  Exhibit S ¶ 3.  Jamielah was home sick and asked DaJuan to bring her something from the pharmacy, and when she looked inside the pharmacy bag there was a ring.  Exhibit S ¶ 3.  Jamielah was so surprised because she did not expect a proposal at that time.  Exhibit S ¶ 3.  They told their friends and family about

their engagement and everyone was so excited for them.  They spoke about having a courthouse wedding and a small party with family and friends on Halloween 2001, but sadly they never had the opportunity to finalize it, as DaJuan was killed on September 11, 2001.  Exhibit S ¶ 3.

As life partners, Jamielah and DaJuan both contributed financially to their life together. They shared expenses, including rent, groceries, utilities, and their daughter's expenses.  Since DaJuan earned more money, he paid a larger share of our expenses.  DaJuan made her a partial beneficiary of death benefits.  Exhibit S ¶ 4.

At the time of DaJuan's death, Jamielah and DaJuan lived together and shared their lives as husband and wife, as well as the mother and father of a young child.  Exhibit S ¶ 5.  They shared dreams, raised their daughter and cared for their dog together, and were the love of each other's lives.  Exhibit S ¶ 5.  DaJuan was a great father and partner, and Jamielah is confident he would have been a great husband had he not been stolen away from her on 9/11.  Exhibit S ¶ 5. DaJuan loved to cook and made Jamielah his famous lasagna.  Exhibit S ¶ 5.  He had a great sense of humor and always made Jamielah laugh, and their daughter is just like DaJuan in that respect.  Exhibit S ¶ 5.  Jamielah and DaJuan enjoyed, among other things, going to the movies and taking their daughter to the park and to amusement parks.  Exhibit S ¶ 5.  They planned to go to Disney World and Universal Studios at some point.  Exhibit S ¶ 5.  *See* Exhibit S-1 (photographs).

Jamielah and DaJuan, with their child, were family.  Exhibit S ¶ 6.  Together they attended family gatherings and celebrated holidays with each other's families.  Exhibit S ¶ 6. Jamielah remembers going to DaJuan's mother's house for Christmas and New Year's Eve where they celebrated and spent quality time together as a family.  Exhibit S ¶ 6.  Jamielah's family loved DaJuan and could not get enough of him.  Exhibit S ¶ 6.  Their families got along

60

very well and were excited to become one after Jamielah and DaJuan's wedding.  Exhibit S ¶ 6.
Unfortunately, that day never came because of the tragedy of 9/11.

Jamielah was appointed by the Surrogate's Court, Bronx County, New York, as the
administrator of DaJuan's estate after he passed away.  Exhibit S ¶ 7, Exhibit S-3 (decree).

9/11 ripped Natalie's family apart.  Jamielah did not want to believe the love of her life
and her daughter's father left this world so suddenly and unexpectedly, but she eventually had to
accept the terrible truth that DaJuan was really gone.  Exhibit S ¶ 8.  Jamielah feels DaJuan's loss
every day and shares fond memories of him.  Exhibit S ¶ 9.

Based on Jamielah's extremely traumatic experience in losing her fiancé and life partner,
DaJuan Hodges, as described above, Jamielah should be awarded the full solatium damages
award of $12.5 million otherwise awarded to spouses of September 11, 2001 decedents.

### C.   Punitive Damages

Plaintiffs are also entitled to punitive damages under the FSIA.  28 U.S.C. § 1605A(c)(4).
In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a
"3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist
attacks."  ECF No. 2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d
150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive
damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1
(compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in
other related cases.  *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and
Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels
adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier);
ECF No. 3300 at 1 and Exhibits A (Judge Daniels applying 3.44 punitive multiplier to claims in
*Ashton*).

61

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363 at 28.  Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date.  *See*, e.g., ECF No. 3666 (Judge Daniels' Order in *Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

**D.      Prejudgment Interest**

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment.  ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used

in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims.  ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

III.    **CONCLUSION**

For all of the reasons herein, the Goldman Declaration, in the papers previously submitted to this Court in support of damages against Iran in this *MDL*, and as previously decided by this Court, the Plaintiffs respectfully request that this Honorable Court enter an Order:

(1)    determining that service of process by the Moving Plaintiffs was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[21] AND,

(2)    awarding the Moving Plaintiffs judgments as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill*, *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases;  AND,

(3)    Determining that:

    a.    Joan Ruth Puwalski is the functional equivalent of a spouse of Steven J. Bates, who died in the Terrorist Attacks on September 11, 2001; AND,

    b.    Laura Nogaj is the functional equivalent of a spouse of Stephen Philip Morris, who died in the Terrorist Attacks on September 11, 2001; AND,

    c.    Jude Monteserrato a/k/a Judith Monteserrato is the functional equivalent of a spouse of John Michael Sbarbaro, who died in the terrorist attacks on September 11, 2001; AND,

---

[21] The service references and case information concerning service in this memorandum of law applies only for the plaintiff in this motion in the above-referenced 2018 matter.

d.  Janice Dukes is the functional equivalent of a spouse of Donnie Taylor, who died in the terrorist attacks on September 11, 2001; AND,

e.  Jesse Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

f.  Nicholas Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

g.  Maureen Sullivan is the functional equivalent of a spouse of Derek O. Sword, who died in the terrorist attacks on September 11, 2001; AND,

h.  Karen Carlucci is the functional equivalent of a spouse of Peter Frank, who died in the terrorist attacks on September 11, 2001; AND,

i.  Lucy Aita is the functional equivalent of a spouse of Paul Innella, who died in the terrorist attacks on September 11, 2001; AND,

j.  Cristal Barragan is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

k.  Katherin Pleitez is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

l. Denyse Betcher is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

m. Danny J. Marino is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

n. Natalie Pollack is the functional equivalent of a child of Louis F. Aversano, Jr., who died in the terrorist attacks on September 11, 2001; AND,

o. Jamielah Persol is the functional equivalent of a spouse of DaJuan Hodges, who died in the terrorist attacks on September 11, 2001; AND,

(4)     awarding solatium damages to the Moving Plaintiffs in the amounts of $12,500,000 per spouse and $8,500,000 per child, as set forth in annexed Exhibits A; AND,

(5)     awarding the Moving Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(6)     granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(7)     granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibits A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

66

(8)     granting to the Moving Plaintiffs such other and further relief as this

Honorable Court deems just and proper.


Dated:     New York, New York                    Respectfully submitted,
           January 13, 2022


                                                 /s/ Jerry S. Goldman
                                                 ANDERSON KILL P.C.
                                                 Jerry S. Goldman, Esq.
                                                 Bruce E. Strong, Esq.
                                                 Alexander Greene, Esq.
                                                 1251 Avenue of the Americas
                                                 New York, NY 10020
                                                 Tel:  (212) 279-1000
                                                 Fax: (212) 278-1733
                                                 Email:  jgoldman@andersonkill.com
                                                         bstrong@andersonkill.com
                                                         agreene@andersonkill.com
                                                 *Attorneys for Plaintiffs*