**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:

*Marinella Hemenway, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD) (SN)
*BNY Mellon, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11767 (GBD) (SN)
*Deborah Bodner, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11776 (GBD) (SN)
*August Bernaerts, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11865 (GBD) (SN)
*Ber Barry Aron, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09376 (GBD) (SN)
*Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09387 (GBD) (SN)
*Michael Bianco, et al. v. Islamic Republic of Iran*, No. 1:20-cv-10902 (GBD) (SN)

**DECLARATION OF JERRY S. GOLDMAN, ESQ., IN SUPPORT OF MOTION FOR**
**PARTIAL FINAL JUDGMENTS FOR PLAINTIFFS IN EXHIBITS A**

JERRY S. GOLDMAN, Esq., hereby declares under penalty of perjury, as provided for

by 28 U.S.C. § 1746, as follows:

1.     I am an attorney representing the Plaintiffs in the above-captioned

litigations, and I submit this declaration in support of the motion for final judgment as to

damages on behalf of the plaintiffs listed in annexed Exhibits A-1 to A-7 (collectively,

"Exhibits A")[1] (the Plaintiffs identified in annexed Exhibits A are collectively referred to

herein as the "Moving Plaintiffs") in the above-referenced actions.  Such motion seeks

the following requested relief:

(1)     an order determining that service of process by the Moving Plaintiffs was

properly effected upon Defendant Islamic Republic of Iran ("Iran") in accordance

---

[1] Exhibit B is intentionally omitted from this motion.

with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[2] AND,

(2)      an order awarding the Moving Plaintiffs judgments as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill, Burnett, Havlish, Ashton, Bauer*, and other cases;  AND,

(3)      an order determining that:

(a)      Joan Ruth Puwalski is the functional equivalent of a spouse of Steven J. Bates, who died in the terrorist attacks on September 11, 2001; AND,

(b)      Laura Nogaj is the functional equivalent of a spouse of Stephen Philip Morris, who died in the terrorist attacks on September 11, 2001; AND,

(c)      Jude Monteserrato a/k/a Judith Monteserrato is the functional equivalent of a spouse of John Michael Sbarbaro, who died in the terrorist attacks on September 11, 2001; AND,

(d)      Janice Dukes is the functional equivalent of a spouse of Donnie Taylor, who died in the terrorist attacks on September 11, 2001; AND,

(e)      Jesse Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

(f)      Nicholas Kemp is the functional equivalent of a child of Timothy Haviland, who died in the terrorist attacks on September 11, 2001; AND,

(g)      Maureen Sullivan is the functional equivalent of a spouse of Derek O. Sword, who died in the terrorist attacks on September 11, 2001; AND,

---

[2] This only applies for the plaintiff in this motion in the above-referenced 2018 matter.

(h)     Karen Carlucci is the functional equivalent of a spouse of Peter Frank, who died in the terrorist attacks on September 11, 2001; AND,

(i)     Lucy Aita is the functional equivalent of a spouse of Paul Innella, who died in the terrorist attacks on September 11, 2001; AND,

(j)     Cristal Barragan is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

(k)     Katherin Pleitez is the functional equivalent of a child of Moises Rivas, who died in the terrorist attacks on September 11, 2001; AND,

(l)     Denyse Betcher is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

(m)     Danny J. Marino is the functional equivalent of a child of Paul Ruback, who died in the terrorist attacks on September 11, 2001; AND,

(n)     Natalie Pollack is the functional equivalent of a child of Louis F. Aversano, Jr., who died in the terrorist attacks on September 11, 2001; AND,

(o)     Jamielah Persol is the functional equivalent of a spouse of DaJuan Hodges, who died in the terrorist attacks on September 11, 2001; AND,

(4)     an order awarding solatium damages to the Moving Plaintiffs in the amounts of $12,500,000 per spouse and $8,500,000 per child, as set forth in annexed Exhibits A; AND,

(5)     an order awarding the Moving Plaintiffs prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

docs-100429822.2

(6)      an order granting the Moving Plaintiffs permission to seek punitive

damages, economic damages, and other appropriate damages at a later date; AND,

(7)      an order granting permission for all other Plaintiffs in these actions not

appearing in annexed Exhibits A to submit applications for damages awards in

later stages, to the extent such awards have not previously been addressed; AND

(8)      granting the Moving Plaintiffs such other and further relief as this

Honorable Court deems just and proper.

2.      The form of this motion and the relief requested herein are intended to

comply with the following orders of this Court:

    a.      The Court's January 24, 2017 Order, ECF No. 3435,[3] requiring that "[a]ll
    further motions for final judgment against any defaulting defendant shall be
    accompanied by a sworn declaration attesting that the attorney has (1) complied
    with the due diligence safeguards [referenced in Section II.D. of the January 23,
    2017 letter from the Plaintiffs' Executive Committee, ECF No. 3433] and (2)
    personally verified that no relief has previously been awarded to any plaintiff
    included in the judgment (or, if relief has been awarded, the nature of that relief)."

    b.      The Court's October 14, 2016 Order, ECF No. 3363, concerning the
    amounts of solatium damage awards.

    c.      The Court's October 14, 2016 Order, ECF No. 3362, related to *Bauer v. Al
    Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic
    Army*, 02-CV-6977 (GBD)(SN).

    d.      The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated
    procedural rules.

    e.      The Court's December 6, 2019 Order, ECF No. 5338, setting forth the
    scheduling order.

    f.      The Court's August 23, 2021 Order, ECF No. 7067, setting forth
    procedures for filing confidential information relating to damages under seal.

---

[3] All ECF numbers are to the MDL docket unless stated otherwise.

docs-100429822.2

3.     The form of this motion and the relief requested herein are also consistent with the form and relief requested as to other plaintiffs in the *O'Neill* group of actions filed by Anderson Kill, P.C.

<u>Due Diligence</u>:

4.     The source of my information and the basis for my belief in my statements contained herein is my personal involvement in this matter for the past almost eighteen (18) years, my firm's representation of the Moving Plaintiffs in connection with the September 11th litigations, communications directly from family members of the individuals killed in the attacks on September 11th and the Moving Plaintiffs, communications with other counsel for other plaintiffs in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, and documents and records contained in my firm's files and other court records relating to the multidistrict litigation to which the Moving Plaintiffs are parties.  Any matters about which I lack personal knowledge are asserted herein upon information and belief.

5.     The Plaintiffs identified in annexed Exhibits A are each functional equivalents of immediate family members of decedents from the terrorist attacks on September 11, 2001, as specifically set forth in annexed Exhibits A, which includes individuals who were not named in the complaints, but are otherwise members of the 9/11 decedent's family, and are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent because there is a pending claim by the personal representative of that decedent's estate.  These plaintiffs have provided documentary evidence of their familial relationship to a 9/11 decedent, as discussed in paragraphs 20 to 45 hereof (functional equivalents), which attest to a familial relationship eligible for recovery.

docs-100429822.2

6.      Intentionally omitted.

7.      Intentionally omitted.

8.      All of the decedents listed in annexed Exhibits A died in the September

11th terrorist attacks and are survived by the family members whose relationships to the

decedents are described in annexed Exhibits A.  These relationships have been personally

verified by staff members in my office who have obtained written documentation and/or

conducted interviews confirming the relationships as described in paragraphs 20 to 45

hereof.

9.      To minimize the chance of any human error, my firm has instituted a

further level of quality control, during which an additional attorney has reviewed all case

files and corroborated that the relationship is as stated in annexed Exhibits A and that the

claimants all survived the deaths of their loved ones on September 11, 2001.

10.     After reviewing the records available to me regarding other judgments

entered by this Court against Iran, I have not identified any relief that has previously been

awarded to any particular plaintiff identified in annexed Exhibits A.

11.     Before filing this motion, I have (1) complied with the due diligence

safeguards referenced in Section II.D of the January 23, 2017 letter from the Plaintiffs'

Executive Committees, ECF No. 3433, and (2) personally verified that, based on my

review of the records available to me regarding other judgments entered by this Court

against Iran, no economic relief has previously been awarded to any plaintiff included in

the proposed judgment.

12.     Intentionally omitted.

docs-100429822.2

13.    We have verified via written documentation and/or interviews that the

Moving Plaintiffs have not recovered for such losses by way of an award of this Court as

to Iran.

14.    We have further confirmed that none of the Moving Plaintiffs have any

prior judgment or pending motion before this Court for compensation arising out of the

September 11th attacks.

Notices of Amendment:

15.    Among other things, Section II.D provides, "In instances where a default

judgment is sought by a personal representative in favor of a solatium claimant who is

not a named plaintiff in the action in which the award is sought, counsel requesting the

judgment will be asked to confirm that: (1) the personal representative has requested that

a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has

been contacted and affirmed that he or she authorized the personal representative to seek

the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant

in favor of whom the judgment is being sought has not retained other counsel or been

named in any other action or, if he or she has, that counsel has communicated with the

claimant's counsel and received authorization to seek the judgment via the estate's

representative." ECF No. 3435.

16.    I hereby confirm that the Plaintiffs listed in annexed Exhibit C, which is

attached hereto, are incorporated herein, are such claimants, and that: (1) the personal

representatives of the estates set forth in annexed Exhibit C have requested that a

judgment be sought in such claimant-plaintiffs favor; (2) the plaintiffs set forth in

annexed Exhibit C have affirmed that he or she authorized the personal representative to

seek this judgment; and (3) the plaintiffs set forth in annexed Exhibit C have not retained

7

other counsel or been named in any other action and/or that I, or a representative of

Anderson Kill, P.C., communicated with claimant's counsel and received authorization to

seek the judgment via the estate's representative.[4]

Service of Process

17.     Service of process on Iran was executed pursuant to 28 U.S.C. § 1608(a)

as described in depth in the Memorandum of Law, and by way of Affidavits of Service

and Affidavits in Support of Requests for Clerk's Default by Jerry S. Goldman, Esq.,

previously filed as of record, under the ECF Nos. set forth in the Memorandum of Law.

Solatium:

18.     We have been retained individually by the plaintiffs listed in annexed

Exhibits A to pursue recovery for their solatium losses arising out of the deaths of their

loved ones on September 11, 2001.  Each claimant listed in annexed Exhibits A is the

functional equivalent of an immediate relative of a 9/11 decedent or is acting on behalf of

the estate of the functional equivalent of an immediate relative of a 9/11 decedent, all of

whom have previously been awarded a final default judgment only on liability against

Iran in relation to the September 11th terrorist attacks. We have verified that none of the

plaintiffs listed in annexed Exhibits A have recovered for their solatium damages

previously, nor do they have any other pending motion before this Court for

compensation arising out of the September 11th terrorist attacks.

19.     The solatium amounts set forth in annexed Exhibits A are the figures this

Court has previously determined appropriate for solatium damages based on familial

relationship to the decedent.  *See*, e.g., ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at

16, 3399, 3666, and 4023.

---

[4] Notices of Amendment have been filed as set forth in Exhibit C.

docs-100429822.2

Functional Equivalents:

20.     A true and correct copy of the Declaration of Joan Ruth Puwalski is attached hereto as Exhibit D.

21.     Upon information and belief, Joan Ruth Puwalski was the life partner of Steven J. Bates, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Joan Ruth Puwalski, I believe Joan Ruth Puwalski qualifies as the spouse equivalent of Steven J. Bates.  *See* Exhibit D. In particular, upon information and belief, Joan and Steve started dating in Spring 1992 and lived together continuously from November 1994 until Steve's tragic death on 9/11, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit D.

22.     A true and correct copy of the Declaration of Laura Nogaj is attached hereto as Exhibit E.

23.     Upon information and belief, Laura Nogaj was the fiancé and life partner of Stephen Philip Morris, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Laura Nogaj, I believe Laura Nogaj qualifies as the spouse equivalent of Stephen Philip Morris.  *See* Exhibit E.  In particular, upon information and belief, Laura and Steve started dating in October 1998 and lived together from January 1999 until Steve's tragic death on 9/11, they were engaged to be married, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit E.

24.     A true and correct copy of the Declaration of Jude Monteserrato a/k/a Judith Monteserrato is attached hereto as Exhibit F.

9

25.     Upon information and belief, Jude Montesserrato a/k/a Judith Montesserrato was the life partner of John Michael Sbarbaro, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Jude Montesserrato a/k/a Judith Montesserrato, I believe Jude Montesserrato a/k/a Judith Montesserrato qualifies as the spouse equivalent of John Michael Sbarbaro.  *See* Exhibit F. In particular, upon information and belief, Jude and John started dating in 1996 and lived together from 1992 until John's tragic death on 9/11, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit F.

26.     A true and correct copy of the Declaration of Janice Dukes is attached hereto as Exhibit G.

27.     Upon information and belief, Janice Dukes was the fiancé and life partner of Donnie Taylor, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Janice Dukes, I believe Janice Dukes qualifies as the spouse equivalent of Donnie Taylor.  *See* Exhibit G.  In particular, upon information and belief, Janice and Donnie started dating in February 1994 and lived together from July 1994 until Donnie's tragic death on 9/11, they were engaged to be married, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit G.

28.     A true and correct copy of the Declarations of Jesse Kemp and Nicholas Kemp are attached hereto as Exhibits H and I.

29.     Upon information and belief, Jesse Kemp and Nicholas Kemp were the stepchildren of Timothy Haviland, who died on September 11, 2001 when the World

10

Trade Center collapsed. For the reasons set forth in the Declarations of Jesse Kemp and Nicholas Kemp, I believe Jesse Kemp and Nicholas Kemp each qualify as the child equivalent of Timothy Haviland. *See* Exhibits H and I. In particular, upon information and belief, Timothy came into Jesse's and Nicholas' lives in 1997, when Jesse and Nicholas were 8 years old and 10 years old, respectively, and a few months later Timothy moved in with them and they became a family. Timothy was married to Jesse and Nicholas' mother. In addition to financially supporting Jesse and Nicholas, Timothy treated them like his children, both emotionally and socially, and had a strong bond with each of them. Timothy referred to Jesse and Nicholas as his daughter and son, and they both referred to Timothy as their dad. Jesse and Nicholas were not close with their biological father who did not play an important role in their lives, and Timothy filled that void and was the father figure in their lives. *See* Exhibits H and I.

30.     A true and correct copy of the Declaration of Maureen Sullivan is attached hereto as Exhibit J.

31.     Upon information and belief, Maureen Sullivan was the fiancé and life partner of Derek O. Sword, who died on September 11, 2001 when the World Trade Center collapsed. For the reasons set forth in the Declaration of Maureen Sullivan, I believe Maureen Sullivan qualifies as the spouse equivalent of Derek O. Sword. *See* Exhibit J. In particular, upon information and belief, Maureen and Derek started dating in Spring 1999 and lived together from Fall 2000 until Derek's tragic death on 9/11, they were engaged to be married, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit J.

11

32.     A true and correct copy of the Declaration of Karen Carlucci is attached hereto as Exhibit K.

33.     Upon information and belief, Karen Carlucci was the fiancé and life partner of Peter Frank, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Karen Carlucci, I believe Karen Carlucci qualifies as the spouse equivalent of Peter Frank.  *See* Exhibit K.  In particular, upon information and belief, Karen and Peter started dating in October 1995 and lived together from March 1999 until Peter's tragic death on 9/11, they were engaged to be married, they were the love of each other's lives, they both contributed financially to their life together, and they intended to be together forever. *See* Exhibit K.

34.     A true and correct copy of the Declaration of Constance Frank is attached hereto as Exhibit L.

35.     Constance Frank is the mother of Peter Frank, who died on September 11, 2001 when the World Trade Center collapsed, and submits a declaration to demonstrate Karen Carlucci was the functional equivalent of Peter's spouse. In her declaration, Constance asserts that Karen and Peter lived like husband and wife, were engaged to be married, and that Karen became, and still is, her daughter. *See* Exhibit L.

36.     A true and correct copy of the Declaration of Lucy Aita is attached hereto as Exhibit M.

37.     Upon information and belief, Lucy Aita was the fiancé and life partner of Paul Innella, who died on September 11, 2001 when the World Trade Center collapsed. For the reasons set forth in the Declaration of Lucy Aita, I believe Lucy qualifies as the spouse equivalent of Paul Innella.  *See* Exhibit M.  In particular, upon information and

12

belief, Lucy and Paul started dating in August 2000 and lived together with Lucy's

parents and son from October 2000 until Paul's tragic death on 9/11, they were engaged

to be married, they were the love of each other's lives, Paul supported Lucy and her

family financially, and they intended to be together forever. *See* Exhibit M.

    38.    A true and correct copy of the Declarations of Cristal Barragan and

Katherin Pleitez are attached hereto as Exhibits N and O.

    39.    Upon information and belief, Cristal Barragan and Katherin Pleitez were

the stepchildren of Moises Rivas, who died on September 11, 2001 when the World

Trade Center collapsed.  For the reasons set forth in the Declarations of Cristal Barragan

and Katherin Pleitez, I believe Cristal Barragan and Katherin Pleitez each qualify as the

child equivalent of Moises Rivas.  *See* Exhibits N and O.  In particular, upon information

and belief,  Moises came into Cristal's and Katherin's lives in 1996, when Cristal and

Katherin were 5 years old and 9 years old, respectively, and shortly thereafter Moises

moved in with them and they began living together as a family. Moises was married to

Cristal and Katherin's mother. In addition to financially supporting Cristal and Katherin,

Moises treated them like his children, both emotionally and socially, and had a strong

bond with each of them. Cristal and Katherin's biological father had passed away, and

Moises filled that void and was a father figure in their lives and referred to them as his

daughters. *See* Exhibits N and O.

    40.    A true and correct copy of the Declarations of Denyse Betcher and Danny

J. Marino are attached hereto as Exhibits P and Q.

    41.    Upon information and belief, Denyse Betcher and Danny J. Marino were

the stepchildren of Paul Ruback, who died on September 11, 2001 when the World Trade

docs-100429822.2

Center collapsed.  For the reasons set forth in the Declarations of Denyse Betcher and

Danny J. Marino, I believe Denyse Betcher and Danny J. Marino each qualify as the child

equivalent of Paul Ruback.  *See* Exhibits P and Q.  In particular, upon information and

belief,  Paul came into Denyse's and Danny's lives in 1977 or 1978, when Denyse and

Danny were 10 years old and 12 or 13 years old, respectively, and shortly thereafter Paul

moved in with them and they began living together as a family. In addition to financially

supporting Denyse and Danny, Paul treated them like his children, both emotionally and

socially, and had a strong bond with each of them and was a father figure in their lives.

*See* Exhibits P and Q.

42.     A true and correct copy of the Declaration of Natalie Pollack are attached

hereto as Exhibit R.

43.     Upon information and belief, Natalie Pollack was the stepchild of Louis F.

Aversano, Jr., who died on September 11, 2001 when the World Trade Center collapsed.

For the reasons set forth in the Declaration of Natalie Pollack, I believe Natalie Pollack

qualifies as the child equivalent of Louis F. Aversano, Jr. *See* Exhibit R.  In particular,

upon information and belief, Lou came into Natalie's life when she was 5 years old or

younger, her mother and Lou got married when she was 5 years old, and she lived in the

same home as Lou until she moved away for college at 18 years old in 1982. In addition

to financially supporting Natalie, Lou treated her like his daughter, both emotionally and

socially, and was the father figure in her life. Natalie was not close with her biological

father and he did not play an important role in her life. She only saw her biological father

sporadically and Lou filled that void. *See* Exhibit R.

44.     A true and correct copy of the Declaration of Jamielah Persol is attached hereto as Exhibit S.

45.     Upon information and belief, Jamielah Persol was the fiancé and life partner of DaJuan Hodges, who died on September 11, 2001 when the World Trade Center collapsed.  For the reasons set forth in the Declaration of Jamielah Persol, I believe Jamielah qualifies as the spouse equivalent of DaJuan Hodges. *See* Exhibit S. In particular, upon information and belief, Jamielah and DaJuan started dating in late 1992 and were together continuously until DaJuan's tragic death on 9/11. Jamielah and DaJuan had a daughter together, were living and raising a family together, were engaged to be married, were the love of each other's lives, they both contributed financially to their lives together, and they intended to be together forever. *See* Exhibit S.

Conclusion:

46.     Based on the foregoing, I respectfully request that this Court grant the proposed partial final judgments as set forth in the Notice of Motion, including annexed Exhibits A.


Dated:   New York, New York
          January 13, 2022

                                        _____
                                        Jerry S. Goldman, Esq.

docs-100429822.2