# EXHIBIT K

DocuSign Envelope ID: 94FDDFE3-2E6C-426C-86B9-4B7597675E9EA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) |
|---|---|

This document relates to:

*Ber Barry Aron, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09376 (GBD) (SN)

## **DECLARATION OF FAMILIAL RELATIONSHIP**

I, Karen Carlucci, declare under penalty of perjury, as provided for by 28 U.S.C. § 1746, that the following statements are true and correct:

1.       My name is Karen Carlucci, and I was the fiancé and life partner of Peter Frank ("Peter") who died on September 11, 2001 ("9/11") when the World Trade Center collapsed. I submit this Declaration to demonstrate I was the functional equivalent of Peter's spouse.

2.       Peter and I began dating in October 1995. We met in New York City through a mutual friend who worked with Peter at Bear Sterns. We were both 23 years old at the time. In March 1999, we moved in together in the West Village (*see* letter from our former landlord attached as Exhibit 1), where we resided until Peter's tragic death on 9/11.

3.       Peter and I got engaged on January 6, 2001. *See* engagement ring insurance policy attached as Exhibit 2. Before Peter proposed, he asked my parents for permission. We shared the news with our families and friends, and everyone was so excited for us.

4.       We finalized our wedding plans and set the date for October 19, 2001 in Livingston, New Jersey. *See* wedding invitation and wedding reception contract attached as Exhibit 3. We looked forward to celebrating our special day with our family and friends. Peter and I also had a planned honeymoon to Anguilla and St. Barts.

DocuSign Envelope ID: 94FDDFE3-2F6C-426C-86B9-46759767E9EA

5.     As life partners, Peter and I both contributed financially to our life together. Since Peter earned more money, he paid the rent and usually paid for dinner when we went out. I paid the phone and TV bills, and frequently paid for groceries. During Summer 2001, Peter told me he made me his life insurance beneficiary, but his company later said the records were destroyed on 9/11. Notwithstanding, Peter's parents gave me his life insurance money because they considered me to be his spouse.

6.     At the time of Peter's death, we lived together and shared our lives. We were engaged to be married and planned to be together forever. We shared dreams, spoke about raising a family, and were the love of each other's lives. *See* photos attached as Exhibit 4. We enjoyed, among other things, going out for dinner, walking our dog, and sitting in the park. Peter and I went on incredible trips to the Bahamas, Florida, Palm Springs, and Paris (*see* photo attached as Exhibit 5) and were excited to go on more adventures together.

7.     In addition to experiencing new things, Peter and I also had our rituals of things we enjoyed together. For example, Peter and I often went to L'Oro di Napoli, a neighborhood Italian restaurant in the West Village, where we enjoyed many nights of good food and laughter.

8.     There is no doubt that Peter and I were family. Although we were not yet legally married, we lived as husband and wife and took care of each other like a married couple. I cooked, cleaned, and helped care for our dog, Chavez (a boxer). Together we attended family gatherings and celebrated holidays with each other's families. Our families got along very well and were excited to officially become family. *See* photo from my surprise bridal shower with both of our mothers attached as Exhibit 6. In fact, Peter's family considers me to be family and his mother calls me "my daughter." *See* article attached as Exhibit 7. For several years after 9/11,

2

DocuSign Envelope ID: 94FDDFF3-2F6C-426C-86B9-4B7597675E9EA

I spent Christmas, Thanksgiving, and 9/11 anniversaries with Peter's family. We are still very close and spent the twentieth 9/11 anniversary together. *See* photos attached as Exhibit 8.

9.      Because Peter's family considered me to be his spouse, they provided me with Peter's life insurance money and the largest percentage of the September 11th Victim Compensation Fund award. *See* Distribution Agreement attached as Exhibit 9. I also received workers' compensation benefits and financial support from the American Red Cross, Safe Horizon, Robin Hood Foundation, September 11th Fund, Crime Victims Board, Salvation Army, World Trade Center Relief Fund, and Fred Alger & Co. (Peter's former employer).

10.     Upon hearing news of the terrorist attack at the World Trade Center, I prayed Peter would be found alive. I did not want to believe that the love of my life left this world so suddenly and unexpectedly, but I eventually had to accept the terrible truth that Peter was really gone.

11.     When I woke up on 9/11, I never imagined I would never see Peter again. After all, we looked forward to getting married and spending the rest of our lives together. Peter was stolen away from me, and I feel his loss every day and share fond memories of him. He is forever in my heart.

12.     Peter and I shared our lives as committed life partners with the deepest love for one another. We considered each other to be family. Accordingly, I should be deemed the functional equivalent of Peter's spouse.

Executed on: 10/12/2021

Name (Signature): *Karen Carlucci*
C966E583C500429...

Name (Print):   Karen Carlucci

3

# EXHIBIT 1

October 28, 2001

Re:  ████████████████████████
      New York, New York ███████

To Whom It May Concern:

From March 1999 through September 2001, Peter Frank paid the entire monthly rent, each month, to me on from his checking account. I became aware, sometime after March 1999, that Ms. Karen Carlucci had taken up residence with Peter Frank, and she subsequently became a co-signer on the sublease in March 2000.

Ms. Carlucci and Mr. Frank had confirmed with me that they planned to continue to rent ████████████ through March 14, 2002.

Sincerely,

W. Van R. Spaulding, Over-tenant (Landlord)
████████████
Santa Barbara, CA ███████
(805) 965-7105  Fax 965-5285

# EXHIBIT 2

*Masterpiece*®



**CHUBB**

---

**Name and address of Insured**

PETER FRANK AND KAREN CARLUCCI

NEW YORK, NY

*(engagement ring insurance)*

**Effective Date** 2/5/02
**Policy no.** ▮▮▮▮▮01
**Policy period** 2/5/02 to 2/5/03

**If you have any questions, please contact**
INSURANCE COUNSELORS, INC.
1 GEICO BLVD
FREDERICKSBURG, VA 22412
800-841-4926

Dear Chubb Customer,

Fine gems and precious metals increase in value, so it's important to keep your jewelry insurance up to date. That is why we've created our Jewelry Inflation Program, which allows you to periodically increase your jewelry coverage limits quickly and easily.

If an item appraised for $10,000 several years ago were lost, stolen, or damaged, it's unlikely the item could be replaced for the same amount of money today. Insuring your jewelry for its full value is the only way to avoid disappointment at the time of loss.

Today, your itemized jewelry is insured with Chubb for $ 15,000.

If you think this amount no longer reflects the full value of your jewelry, you may choose to automatically increase your coverage by:

• 10%, 25%, or 50%; or

• Annually, with a 2%, 4%, or 6% increase at renewal. We will continue to increase your scheduled jewelry items yearly by this amount until you advise us to stop.

Simply complete the following information, and we will provide the additional coverage when your Masterpiece policy renews. If you'd like additional coverage immediately, contact your agent or broker. Thank you for insuring through Chubb.

Chubb & Son
Personal Insurance Division

At renewal, please increase the value of each itemized article of my jewelry coverage by:

_____ 10%, 25%, or 50% (Circle one); **or**

_____ An annual increase of 2%, 4%, or 6% (Circle one)

The value of each item will be rounded up to the nearest $100.

Signature: _____     Date: _____

EAST

Chubb & Son Is a division of Federal Insurance Company

© Copyright 1984 by Chubb & Son Inc. INSURED

1319

10/09/01 0:20:40

# *Masterpiece*®   *Itemized Articles*



**CHUBB**

**Name and address of insured**

PETER FRANK AND KAREN CARLUCCI

NEW YORK, NY

**Page** 1
**Effective date** 2/5/02
**Policy no.** ▮▮▮▮▮01
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 2/5/02 to 2/5/03

**If you have any questions, please contact**
INSURANCE COUNSELORS, INC.
1 GEICO BLVD
FREDERICKSBURG, VA  22412
800-841-4926

| Class | No. | Description | | Value |
|---|---|---|---|---|
| Jewelry | 1 | LADIES DIAMOND ENGAGEMENT RING WITH 1 EMARALD CUT DIAMOND WEIGHING 2.16CT COLOR I CLARITY VS1 SET IN PLATINUM WITH TWO TAPERED BAGUETTES .30CT TOTAL WEIGHT | $ | 15,000 |

© Copyright 1984 by Chubb & Son Inc.   Form no. Q1200000 05/85 INSURED

12/07/01 2:50:53

# EXHIBIT 3

*Wedding Reception Contract* — A Janoff Family Endeavor

## Crystal Plaza

(973) 992-8100
FAX (973) 992-8845

**305 WEST NORTHFIELD ROAD, LIVINGSTON, NEW JERSEY 07039**

This Agreement, dated _11/9/01_, by and between CRYSTAL PLAZA, a corporation of New Jersey, the "Lessor," and _Mothers Kitchen Caplicci_, the "Lessee", residing at: _[redacted]_ _Fresh Pi N.J._ _[redacted]_ Phone - _022-3024_

The Lessor has let, and the lessee has hired, the use of the following facilities of the Lessor: __CRYSTAL PLAZA__

for _Friday_, the _19_ day of _October_, _2001_ ~~AFTERNOON~~ **EVENING**

for the sole purpose of conducting therein a _Wedding Recp_ for _Karen + Peter_

for a MINIMUM of, _up to 175_ guests at the rate of _40,000_ per person, ~~plus tax~~, plus _Free_ gratulties.

~~MUST HAVE~~

~~PLUS LIQUOR~~                                                                                    ~~$5.00 per person~~

TOTAL CONTRACT AMOUNT                         $ _40,000 Tax_

DEPOSIT herewith, receipt whereof is acknowledged    $ _8,000_

$ _20,000_ Balance of Deposit Due by _4/1/00_

If failure of Lessee to pay same the Lessor shall have the right on three days written notice to the Lessee to cancel the reservation and obtain damages as provided in paragraph #4.

EXTRAS (Maitre D'Gratulty)

Beverage & Dessert Service for Musicians & Photographers will be charged at $35.00 per _____

---

### MENU TO BE SERVED

Assorted Varieties of Hot and Cold Hors D'Oeuvres _2 ??_
_10  Chef ???_

| | |
|---|---|
| Appetizer | Salad |
| Entree _Chie 5_ | |
| Veg | Pot |
| Dessert to be served is _Plated_ | |
| _W Pales_ | Cake    Coffee |

Complete affair for a MINIMUM of _up to 175_ persons.
Including Waitresses, Waiters, Bartenders, Checkroom,
Colored Linen, Candelabra Centerpieces, French Service.
All Premium Brand Liquors, Cordials, Wine, Champagne.

_Cancel to 10/27/01_
_for $60,000 Tax by 1/10/01_
_oct 5 th_

This affair is scheduled for the hours of _7_ to _12_.
Overtime is charged at the rate of _5,000_ per hour.
Any Flowers Used In Our Chapel
Must Be Ordered Thru Crystal Plaza Vendors.

---

This Agreement is subject to the following regulations, all of which constitute part of the agreement between the parties.

**(1)** The Lessee agrees to abide by all rules and regulations that may be adopted by the Lessor for the purposes of regulating the use of the said facilities.

**(2)** The facilities are to be used only for the specific purposes for which they have been rented.

**(3)** If the event is held in any location other than that of the Lessor, then all rules and regulations of the institution where such event is to be held are to be complied with.

**(4)** If the Lessee shall cancel the contemplated affair the Lessee agrees to pay to Lessor and Lessor agrees to accept an amount equal to 75% of the total contract price, less credit for any deposit paid, as liquidated damages. The parties agree because of the peculiar nature of the rental and services to be rendered, that it will be difficult, if not impossible, to prove the amount of damages and therefore the parties have estimated and agreed upon such a sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages which will result. Not withstanding the liquidated damages provisions, Lessee agrees that Lessor shall have the right, to re-rent its facilities for the above designated date.

Wedding Invitation

Mr. and Mrs. William Anthony Carlucci
request the honour of your presence
at the marriage of their daughter
Karen Marie
to
Peter Christopher
son of
Mr. and Mrs. Peter Carl Frank
Friday, the nineteenth of October
Two thousand and one
at five o'clock in the afternoon
Church of Saint Philomena
Livingston, New Jersey

# EXHIBIT 4

























# EXHIBIT 5



# EXHIBIT 6



# EXHIBIT 7

https://azdailysun.com/sept-11-made-karen-carlucci-a-widow-before-she-was-a-bride/article_c6848d65-be90-5ddf-8948-2041b65273a0.html

# Sept. 11 made Karen Carlucci a widow before she was a bride

By MICHAEL LUO
AP National Writer
Jan 5, 2002



Peter Frank and his fiancee, Karen Carlucci, dance together at a wedding in this August 1999 photo. The couple to wed in October 2001, but Frank died in the World Trade Center attack Sept. 11. (AP Photo/Courtesy Karen Car HO

By MICHAEL LUO
AP National Writer

NEW YORK — A few weeks after Sept. 11, Karen Carlucci took the train into the city to pick up her wedding ring.

She had canceled everything else: the hall, the band, the flowers, the honeymoon. She had put her engagement ring back in its box.

But she wanted this, she decided. The jeweler didn't know what to say, so he just handed it to her.

She slipped the thick platinum band onto her right ring finger — and vowed to go on.

"The engagement ring represented us being engaged. This," she said, fingering the band, "now represents a new time in my life but still connected to him."

For Karen, 29, the timing of Sept. 11 was especially cruel. She and Peter Christopher Frank, 29, were to be married in a little more than a month. She was supposed to wear Vera Wang. Louis Armstrong's, "A Kiss to Build a Dream On," was to be their first song.

He already had his bachelor's party. Her bachelorette was supposed to be in a week and a half. The honeymoon was planned for St. Bart's and Anguilla. They were going to build a future together.

Instead, the dates that were once eagerly anticipated have marched steadily by, transformed into milestones of loss.

"We were about to get married," she said. "How do I move on from that?"

Yet, in small, tentative steps, she has begun to do just that.

She's gone back to work — part-time. She can now stay by herself in the Manhattan apartment they once shared, although she still spends most of her time at her parents' home in New Jersey. She's mustered the enthusiasm to go out with friends again.

She's learning to work around the hole in her heart, said her mother, Elaine Carlucci.

Some Sept. 11 charities have helped Karen, but she's been stymied by others because she is only a fiancee, not a spouse.

People don't seem to understand that families today are more than just married couples with children, she said.

'THE PERFECT MAN'

She still remembers when she first met him, six years ago. He turned around in the bar and looked her straight in the eye. "Nice to meet you," he said.

She was taken aback by his confidence. "Who does he think he is?" she thought.

Later on the dance floor, they flirted. Outside, he asked if he would ever see her again.

"Probably not," she said, before speeding away in a cab.

But something about this former college football player with the movie-star looks got to her. Like teen-agers at a slumber party, she and her giggling friends called a slew of Peter Franks in the phone book at 4 a.m., looking for him.

She got his number a few days later from a mutual friend. Their first date was in an Italian restaurant.

He was more handsome than the guys she usually went for. He could be a J. Crew model, she thought. Later, when investigators asked Karen if he had any birthmarks or scars, she almost blurted out, "Look for the perfect man. That's what he is."

He seemed very focused to her, as he explained his job as an asset manager. He wanted to be successful; to make a lot of money.

Before long, Karen was helping take care of Chavez, his rambunctious 1-year-old boxer.

He proved to be a romancer, buying her flowers and introducing her to opera. They went to museums and on long walks.

After dating for three years, they decided to move in together. They weren't ready for marriage quite yet.

Their apartment in Greenwich Village faced south, toward the World Trade Center. Karen took a picture from the window and hung it in their bedroom.

PETER'S PROPOSAL

A year ago, Pete was hired at Fred Alger Management, on the 93rd floor of the north tower. Alger, with its sterling Wall Street reputation, was the next step in his career, he told Karen.

Last Christmas Eve, the couple stayed at Karen's parents' house in Florham Park, N.J. In the morning, Pete told Karen's father, Bill, that he was going to ask Karen to marry him. Bill Carlucci cried.

Pete originally planned to ask her on New Year's Eve, at a bed and breakfast on Long Island, but a blizzard socked the area.

They went the following week. Walking along the beach, Pete said he needed to ask her something.

Karen remembered squinting because the sun was in her eyes.

He reached into his pocket and pulled out the ring, a gorgeous emerald cut diamond with baguettes.

In the next few months, they picked a location, set a date and chose a band. Karen looked at dozens of dresses before picking a strapless gown that was simple yet elegant.

The weekend before Sept. 11 was his bachelor's party. Glenn Conte, a childhood friend, drove him down to Atlantic City to meet up with the guys. His friends remember him seeming at peace, as he sat on the beach.

NEVER SAID GOOD-BYE

On the morning of Sept. 11, Pete put on a suit and headed for the door. She remembered looking up suddenly, thinking they hadn't properly bid farewell. She opened her mouth to call to him, but the door had already closed.

"I specifically remember thinking I didn't say good-bye to him," she said.

At 8:41 a.m., Pete sent an e-mail from his office to the groomsmen in his wedding, reminding them to get measured for their tuxedos.

At work, Karen was preparing for a meeting when she heard the news. She dialed his number but couldn't get through.

The phone began ringing with other people. Everyone tried to remain upbeat. His sister, Michelle, insisted that he must be walking home.

Conte came to wait with Karen at the apartment that afternoon. They tried not to pay attention to the news as the evening stretched on.

The next day, she went home to New Jersey. With her mother at her side, Karen sat down on her bed and broke down.

The Friday after Sept. 11, she told her mother, "We have to cancel everything."

ALTERED PLANS

Many of the vendors cried on the phone with them. Some sent heartfelt notes of condolence.

A week later, she walked around the armory. She found the flier that his friends had put up for him. Next to Pete's face, she wrote, "I love you. I miss you."

On Sept. 22, the day that was to be her bachelorette party, she went to his memorial service in Queens. The best man, John Kavanagh, delivered a eulogy.

"On Oct. 19, Karen's father would have given her away," he said. "Today, we're giving Pete away."

For her wedding day, Karen gathered everyone together. She put on a red dress. They had food catered.

Karen's younger brother played the violin, just as he would have at the wedding. A book was passed around in which everyone wrote their memories.

A TOAST TO PETER

The day after was the lowest point. Karen woke up alone, her wedding dress still in its plastic wrapping.

Another Sept. 11 fiancee whom Karen talked to put it well: They are widows before they had the chance to become brides.

An Alger official told Karen that their victims' foundation was only for "families" but that the company was exploring how it might help her.

Upset, Karen said that Pete would want her taken care of.

Pete's mother, Connie, who lives on Long Island, says now that they've lost Pete, they don't want to lose Karen, too. She calls Karen, "my daughter."

Pete was supposed to be the godfather of his sister Michelle's baby. At the christening a few weeks ago, she asked Karen to take his place.

Karen has put together a scrapbook of photos and memories. She bought a big stuffed dog to keep her company. She took down the photo of the trade center in the bedroom. In its place, she hung a cross.

She's started to venture out more. For Pete's birthday, on Dec. 1, she went out with a group of his friends. In contrast to earlier occasions, the mood was light. They told stories about him and laughed. When a good song came on, Karen danced freely. This, she said, is what he would have wanted.

They raised their glasses. She did, too.

To Peter Frank.

— Arizona Daily Sun

# EXHIBIT 8







# EXHIBIT 9

```
-------------------------------------------X
IN THE MATTER OF PETER
CHRISTOPHER FRANK
-------------------------------------------X
```
**DISTRIBUTION
AGREEMENT**

IT IS HEREBY STIPULATED, CONSENTED TO AND AGREED upon by all

parties having interest in the Estate of Peter Frank as follows:

1. Peter Christopher Frank, Jr. died on September 11, 2001 in the World Trade Center;

2. Peter Christopher Frank. Jr. is not survived by any children:

3. Whereas, Peter Christopher Frank, Jr. is survived by his mother, Constance Frank, father, Peter Carl Frank, sister, Michelle Frank and domestic partner (fiancé) Karen Carlucci;

4. Constance Frank, Peter Carl Frank, Sr., Michelle Frank and Karen Carlucci have agreed to apportion monies received from the Victims Compensation Fund and any other awards granted as follows:

   a. Constance Anne Frank receiving    15%;

   b. Peter Carl Frank, Sr. receiving    15%;

   c. Michelle Anne Frank receiving    30%; and

   d. Karen Marie Carlucci receiving    40%.

5. Whereas all parties enter into this Agreement and Stipulation under there own free will without any duress, force and/or coercion.

Dated: New York, New York
       October 23, 2003

_____
Constance Anne Frank

_____
Peter Carl Frank, Sr.

_____
Michelle Anne Frank

_____
Karen Marie Carlucci